In the Matter Of:

# Nortel Trial

---

## DAY 22

## September 22, 2014

---



**WILCOX & FETZER LTD.**

FOR EXCELLENCE IN COURT REPORTING

```
 1                UNITED STATES BANKRUPTCY COURT
 2                 FOR THE DISTRICT OF DELAWARE
 3      ----------------------------)
 4      In Re                       )
 5          NORTEL NETWORKS INC.,   ) Chapter 11
 6          et al,                  ) Case No.
 7              Debtors.            ) 09-10138(KG)
 8      ----------------------------)
 9                       - and -
10                  Court File No. 09-CL-7950
11                        ONTARIO
12             SUPERIOR COURT OF JUSTICE
13                  (COMMERCIAL LIST)
14         IN THE MATTER OF THE COMPANIES' CREDITORS
15     ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED
16      AND IN THE MATTER OF A PLAN OF COMPROMISE OR
17        ARRANGEMENT OF NORTEL NETWORKS CORPORATION,
18     NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL
19       CORPORATION, NORTEL NETWORKS INTERNATIONAL
20       CORPORATION AND NORTEL NETWORKS TECHNOLOGY
21                      CORPORATION
22       APPLICATION UNDER PART IV OF THE COMPANIES'
23     CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36,
24                     AS AMENDED
25                      --------
```

```
 1
 2                          --------
 3
 4   --- This is the Day 22/Volume 22 of the transcript
 5   of proceedings in the above matter held
 6   simultaneously in:
 7   Superior Court of        United States Bankruptcy
 8   Ontario (Commercial      Court for the District of
 9   List)                    Delaware
10   Courtroom 8-1            Courtroom 3
11   330 University Avenue    824 Market Street
12   Toronto, Ontario         Wilmington, Delaware
13
14   on the 22nd day of September, 2014, commencing at
15   9:11 a.m.
16
17                          --------
18   B E F O R E:
19   The Honourable Judge Kevin Gross (United States)
20   The Honourable Mr. Justice Frank Newbould (Canada)
21
22                        ----------
23
24
25
```

```
1    REPORTED BY:   Toronto - Deana Santedicola
2                   RPR, CRR, CSR
3           Delaware - Lorraine Marino
4                   RDR, CRR, CSR
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1    A P P E A R A N C E S:

 2

 3                    CANADIAN DEBTORS

 4

 5    FOR THE MONITOR, ERNST & YOUNG INC.

 6    GOODMANS LLP

 7    Bay Adelaide Centre

 8    333 Bay Street, Suite 3400

 9    Toronto, ON  M5H 2S7

10    PER:      Jay Carfagnini, Esq.

11              Joseph Pasquariello, Esq.

12              Ben Zarnett, Esq.

13              Alan Mark, Esq.

14              Peter Ruby, Esq.

15              Jessica Kimmel, Esq.

16              Julie Rosenthal, Esq.

17              Chris Armstrong, Esq.

18

19    ERNST & YOUNG INC.

20    Ernst & Young Tower

21    222 Bay Street, P.O. Box 251

22    Toronto, ON  M5K 1J7

23    PER:      Murray McDonald, Esq.

24              Brent Beekenkamp, Esq.

25
```

```
 1   FOR THE APPLICANTS

 2   GOWLING LAFLEUR HENDERSON LLP

 3   Suite 1600, First Canadian Place

 4   100 King Street West

 5   Toronto, ON  M5X 1G5

 6   PER:       Derrick Tay, Esq.

 7              Jennifer Stam, Esq.

 8

 9   FOR THE CANADIAN DEBTORS

10   ALLEN & OVERY LLP

11   1221 Avenue of the Americas

12   New York, NY  10020

13   PER:       Jacob Pultman, Esq.

14              Ken Coleman, Esq.

15              Paul Keller, Esq.

16              Daniel Guyder, Esq.

17              Laura Hall, Esq.

18              Joseph Badtke-Berkow, Esq.

19              Jonathan Cho, Esq.

20              Nicolette Ward, Esq.

21

22   FOR THE CANADIAN DEBTORS

23   BUCHANAN INGERSOLL & ROONEY

24   1105 North Market Street

25   Suite 1900
```

```
 1   Wilmington, DE  19801-1054
 2   PER:        Kathleen A. Murphy, Esq.
 3               Mary F. Caloway, Esq.
 4
 5                    U.S. DEBTORS
 6
 7   FOR NORTEL NETWORKS INC.
 8   TORYS LLP
 9   79 Wellington Street West, Suite 3000
10   Box 270, TD Centre
11   Toronto, ON  M5K 1N2
12   PER:        Sheila Block, Esq.
13               Andrew Gray, Esq.
14
15   FOR THE U.S. DEBTORS
16   MORRIS, NICHOLS, ARSHT & TUNNELL LLP
17   1201 North Market Street, 16th Floor
18   P.O. Box 1347
19   Wilmington, DE  19899-1347
20   PER:        Derek Abbott, Esq.
21               Annie Cordo, Esq.
22
23   FOR NORTEL NETWORKS INC.
24   CLEARY GOTTLIEB STEEN & HAMILTON LLP
25   One Liberty Plaza
```

```
 1   New York, NY  10006

 2   PER:      James Bromley, Esq.

 3             Lisa Schweitzer, Esq.

 4             Howard Zelbo, Esq.

 5             Jeffrey Rosenthal, Esq.

 6             Avi Luft, Esq.

 7

 8                   EMEA DEBTORS

 9

10   FOR THE JOINT ADMINISTRATORS OF NORTEL NETWORKS UK

11   LIMITED

12   DAVIES WARD PHILLIPS & VINEBERG LLP

13   40th Floor

14   155 Wellington Street

15   Toronto, ON  M5V 3G7

16   PER:      Matthew Milne-Smith, Esq.

17             Robin B. Schwill, Esq.

18             Sean Campbell, Esq.

19             James Doris, Esq.

20             Louis Sarabia, Esq.

21

22   FOR THE JOINT ADMINISTRATORS OF NORTEL NETWORKS UK

23   LIMITED

24   LAX O'SULLIVAN SCOTT LISUS LLP

25   Suite 2750, 145 King Street West
```

```
 1   Toronto, ON   M5H 1J8
 2   PER:        Matthew P. Gottlieb, Esq.
 3               Tracy Wynne, Esq.
 4               Paul Michell, Esq.
 5   FOR THE JOINT ADMINISTRATORS OF NORTEL NETWORKS UK
 6   LIMITED
 7   HUGHES HUBBARD & REED
 8   One Battery Park Plaza
 9   New York, NY   10004-1482
10   PER:        Derek Adler, Esq.
11               Neil Oxford, Esq.
12               Fara Tabatabai, Esq.
13               Charles Huberty, Esq.
14
15   FOR THE JOINT ADMINISTRATORS OF NORTEL NETWORKS UK
16   LIMITED
17   YOUNG CONAWAY STARGATT & TAYLOR LLP
18   Rodney Square
19   1000 North King Street
20   Wilmington, DE   19801
21   PER:        Ed Harron, Esq.
22               John Dorsey, Esq.
23
24   FOR THE EMEA DEBTORS
25   HERBERT SMITH FREEHILLS LLP
```

```
 1   Exchange House

 2   Primrose Street

 3   London, England  EC2A 2EG

 4   PER:       James Norris-Jones, Esq.

 5              CANADIAN CREDITORS COMMITTEE

 6

 7   FOR THE FORMER EMPLOYEES OF NORTEL AND LTD

 8   BENEFICIARIES

 9   KOSKIE MINSKY

10   20 Queen Street West

11   Suite 900

12   Toronto, ON  M5H 3R3

13   PER:       Mark Zigler, Esq.

14              Susan Philpott, Esq.

15              Ari Kaplan, Esq.

16              Barbara Walancik, Esq.

17

18   FOR ALL ACTIVE AND RETIRED NORTEL EMPLOYEES

19   REPRESENTED BY THE CAW-CANADA

20   CAW-CANADA

21   Legal Department

22   205 Placer Court

23   Toronto, ON  M2H 3H9

24   PER:       Barry E. Wadsworth, Esq.

25              Lewis Gottheil, Esq.
```

```
 1
 2   FOR THE RECENTLY SEVERED CANADIAN NORTEL EMPLOYEES
 3   COMMITTEE
 4   SHIBLEY RIGHTON LLP
 5   250 University Avenue, Suite 700
 6   Toronto, ON  M5H 3E5
 7   PER:       Arthur O. Jacques, Esq.
 8              Thomas McRae, Esq.
 9
10   FOR THE SUPERINTENDENT OF FINANCIAL SERVICES AS
11   ADMINISTRATOR OF THE PENSION BENEFITS GUARANTEE
12   FUND
13   PALIARE ROLAND ROSENBERG ROTHSTEIN LLP
14   35th Floor
15   155 Wellington Street West
16   Toronto, ON  M5V 3H1
17   PER:       Kenneth T. Rosenberg, Esq.
18              Massimo (Max) Starnino, Esq.
19              Lily Harmer, Esq.
20              Karen Jones, Esq.
21              Tina Lie, Esq.
22              Michelle Jackson, Esq.
23
24   FOR THE STEERING COMMITTEE OF NORTEL CANADIAN
25   CONTINUING EMPLOYEES - POST CCAA AS AT JANUARY 14,
```

```
 1    2009

 2    NELLIGAN O'BRIEN PAYNE LLP

 3    50 O'Connor Street, Suite 1500

 4    Ottawa, ON  K1P 6L2

 5    PER:      Janice B. Payne, Esq.

 6              Steven Levitt, Esq.

 7              Christopher Rootham, Esq.

 8              Ainslie Benedict, Esq.

 9

10    FOR MORNEAU SHEPELL LIMITED

11    MCCARTHY TETRAULT LLP

12    Suite 5300, Toronto Dominion Bank Tower

13    Toronto, ON  M5K 1E6

14    PER:      Barbara J. Boake, Esq.

15              James D. Gage, Esq.

16              Elder C. Marques, Esq.

17              Paul Steep, Esq.

18              Byron Shaw, Esq.

19              Sharon Kour, Esq.

20              Kelly Peters, Esq.

21

22    FOR THE CANADIAN CREDITORS COMMITTEE

23    DLA PIPER

24    919 North Market Street, Suite 1500

25    Wilmington, DE  19801
```

1  PER:        Selinda A. Melnik, Esq.

2              Richard Hans, Esq.

3              Timothy Hoeffner, Esq.

4              Farah Lisa Whitley-Sebti, Esq.

5          INFORMAL NORTEL NOTEHOLDER GROUP

6

7  FOR THE INFORMAL NORTEL NOTEHOLDER GROUP

8  BENNETT JONES LLP

9  1 First Canadian Place

10 Suite 3400

11 Toronto, ON  M5X 1A4

12 PER:        Kevin Zych, Esq.

13             S. Richard Orzy, Esq.

14             Gavin Finlayson, Esq.

15             Richard Swan, Esq.

16             Sean Zweig, Esq.

17             Jonathan Bell, Esq.

18             Amanda McLachlan, Esq.

19

20 FOR THE INFORMAL NORTEL NOTEHOLDER GROUP

21 MILBANK, TWEED, HADLEY, MCCLOY LLP

22 1 Chase Manhattan Plaza

23 New York, NY  10005

24 PER:        Thomas R. Kreller, Esq.

25             Jennifer P. Harris, Esq.

1              Albert A. Pisa, Esq.

2              Samir Vora, Esq.

3              Andrew LeBlanc, Esq.

4              Michael Hirschfeld, Esq.

5              Atara Miller, Esq.

6              Tom Matz, Esq.

7              Nick Bassett, Esq.

8              Gabrielle Ruha, Esq.

9              Rachel Pojunas, Esq.

10

11     THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

12

13   FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

14   CASSELS BROCK & BLACKWELL LLP

15   Suite 2100, Scotia Plaza

16   40 King Street West

17   Toronto, ON  M5H 3C2

18   PER:      Shayne Kukulowicz, Esq.

19              Michael Wunder, Esq.

20              Ryan Jacobs, Esq.

21

22   FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

23   ASHURST LLP

24   Boardwalk House

25   5 Appold Street

1    London, England   EC2A 2HA

2    PER:         Angela Pearson, Esq.

3                 Antonia Croke, Esq.

4

5    FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

6    RICHARDS LAYTON & FINGER, P.A.

7    920 North King Street

8    Wilmington, DE  19801

9    PER:         Christopher Samis, Esq.

10

11   FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

12   AKIN GUMP STRAUSS HAUER & FELD LLP

13   One Bryant Park

14   New York, NY  10036

15   PER:         Fred S. Hodara, Esq.

16                David H. Botter, Esq.

17                Abid Qureshi, Esq.

18                Robert A. Johnson, Esq.

19                Brad M. Kahn, Esq.

20                Christine Doniak, Esq.

21                Joseph Sorkin, Esq.

22                Jacqueline Yecies, Esq.

23

24     UK PENSION PROTECTION FUND AND NORTEL NETWORKS

25             UK PENSION TRUST LIMITED

1

2   FOR THE UK PENSION PROTECTION FUND AND NORTEL

3   NETWORKS UK PENSION TRUST LIMITED

4   THORNTON GROUT FINNIGAN LLP

5   Suite 3200, 100 Wellington Street West

6   P.O. Box 329

7   Toronto, ON  M5K 1K7

8   PER:        Michael Barrack, Esq.

9               D.J. Miller, Esq.

10               Rebecca Lewis, Esq.

11               Andrea McEwan, Esq.

12               John Finnigan, Esq.

13               Michael Shakra, Esq.

14

15   FOR THE UK PENSION PROTECTION FUND AND NORTEL

16   NETWORKS UK PENSION TRUST LIMITED

17   WILLKIE FARR & GALLAGHER LLP

18   787 Seventh Avenue

19   New York, NY  10019-6099

20   PER:        Brian O'Connor, Esq.

21               Sameer Advani, Esq.

22               Andrew Hanrahan, Esq.

23

24   FOR THE UK PENSION PROTECTION FUND AND NORTEL

25   NETWORKS UK PENSION TRUST LIMITED

```
 1   BAYARD, P.A.

 2   222 Delaware Avenue, Suite 900

 3   Wilmington, DE  19899

 4

 5   PER:       Charlene D. Davis, Esq.

 6              Justin Alberto, Esq.

 7

 8              THE BANK OF NEW YORK MELLON

 9

10   FOR THE BANK OF NEW YORK MELLON

11   MCMILLAN LLP

12   Brookfield Place

13   181 Bay Street, Suite 4400

14   Toronto, ON  M5J 2T3

15   PER:       Sheryl E. Seigel, Esq.

16

17   FOR THE BANK OF NEW YORK MELLON

18   LATHAM & WATKINS LLP

19   885 Third Avenue

20   New York, NY  10022-4834

21   PER:       Michael J. Riela, Esq.

22

23         WILMINGTON TRUST, NATIONAL ASSOCIATION

24

25   FOR WILMINGTON TRUST, NATIONAL ASSOCIATION
```

```
 1  HEENAN BLAIKIE LLP

 2  Bay Adelaide Centre

 3  333 Bay Street, Suite 2900

 4  P.O. Box 2900

 5  Toronto, ON  M5H 2T4

 6  PER:      John Salmas, Esq.

 7            Kenneth Kraft, Esq.

 8            Sara-Ann Van Allen, Esq.

 9

10  FOR WILMINGTON TRUST, NATIONAL ASSOCIATION

11  KATTEN MUCHIN ROSENMAN LLP

12  575 Madison Avenue

13  New York, NY  10022-2585

14  PER:      Craig A. Barbarosh, Esq.

15            David A. Crichlow, Esq.

16            Karen B. Dine, Esq.

17

18       LAW DEBENTURE TRUST COMPANY OF NEW YORK

19

20  FOR LAW DEBENTURE TRUST COMPANY OF NEW YORK

21  BORDEN LADNER GERVAIS LLP

22  40 King Street West

23  Toronto, ON  M5H 3Y4

24  PER:      Edmond F.B. Lamek, Esq.

25            James Szumski, Esq.
```

1

2   FOR LAW DEBENTURE TRUST COMPANY OF NEW YORK

3   PATTERSON BELKNAP WEBB & TYLER LLP

4   1133 Avenue of the Americas

5   New York, NY  10036

6   PER:       Daniel A. Lowenthal, Esq.

7

8        BOARDS OF DIRECTORS OF NORTEL NETWORKS

9        CORPORATION AND NORTEL NETWORKS LIMITED

10

11  FOR THE BOARDS OF DIRECTORS OF NORTEL NETWORKS

12  CORPORATION AND NORTEL NETWORKS LIMITED

13  OSLER HOSKIN AND HARCOURT LLP

14  100 King Street West

15  1 First Canadian Place, Suite 6100

16  P.O. Box 50

17  Toronto, ON  M5X 1B8

18  PER:       Lyndon Barnes, Esq.

19             Edward Sellers, Esq.

20             Betsy Putnam, Esq.

21             Adam Hirsh, Esq.

22             Alexander Cobb, Esq.

23

24

25

1                        I N D E X

2

3   CLOSING SUBMISSIONS:                          PAGE

4

5   BY MR. ZARNETT.......................... 5149

6   BY MR. COLEMAN.......................... 5211

7   BY MR. ZIGLER........................... 5224

8   BY MR. HOEFFNER......................... 5239

9   BY MR. CRICHLOW......................... 5267

10  BY MR. MAGUIRE.......................... 5278

11  BY MR. GOTTLIEB......................... 5296

12  BY MR. MAGUIRE.......................... 5358

13  BY MR. BARRACK.......................... 5380

14

15

16

17

18

19

20

21

22

23

24

25

```
 1   -- Upon commencing at 9:11 a.m.
 2
 3              THE US COURT:  Justice Newbould, we're
 4   back.
 5              THE CANADIAN COURT:  I am back.  Good
 6   morning, Judge Gross.
 7              THE US COURT:  Good morning, it is good
 8   to see you again.  Mr. Abbott.
 9              MR. ABBOTT:  Good morning, Your Honour.
10   It is almost like we never left.
11              THE US COURT:  Almost.  I'll tell you,
12   I lost 14 pounds during the trial, and gained five
13   of them back by reading all these briefs.
14              THE CANADIAN COURT:  They didn't take
15   away your appetite?
16              THE US COURT:  No, it didn't.
17              MR. ABBOTT:  Your Honour, I think we
18   are prepared to proceed, but I believe we are going
19   to proceed first in Canada.  So we'll pay attention
20   to what the folks do up there.
21              THE CANADIAN COURT:  Mr. Zarnett.
22              MR. ZARNETT:  Good morning, Judge
23   Gross, Justice Newbould.  Benjamin Zarnett for the
24   Monitor and Canadian Debtors.
25              I'm going to be leading off the
```

1  submissions this morning.  When I am done, my

2  colleague, Mr. Coleman, will have some submissions

3  in Delaware, on the issues arising from the

4  assertions about the Monitor's conduct.

5            But the focus of my submissions, given

6  the extensive written briefings that the Courts

7  both have, is going to be on the key legal

8  determinations that, in my submission, have to be

9  made to decide between the competing positions of

10  the Canadian, US and EMEA estates and the

11  implications of those determinations on the major

12  issues.

13            What you should have, to follow my

14  submission, are the initial and rebuttal briefs

15  that the Monitor has filed, your favourite version

16  of the MRDA, the most well-thumbed version.

17            THE US COURT:  I decided, by the way,

18  that stands for major reason for the dispute on

19  allocation.

20            MR. ZARNETT:  Yes.  Well, confirming

21  the centrality of that document, I also have

22  prepared and both Courts should have a compendium

23  of the authorities I'm going to refer to.  These

24  are not new authorities, but since there is a lot

25  less than in the large case books, I thought it

1    would be easier to proceed that way.

2              And that should be it.  We may call up

3    a couple of --

4              THE CANADIAN COURT:  Aren't you

5    concerned I have already read all these three

6    volumes?

7              MR. ZARNETT:  Yes.

8              To put the legal submission in context,

9    the three competing characterizations of the

10   relevant interests and the most important asset

11   that affects allocation, the IP, I think can be

12   summarized as follows.

13             The Canadian position is NNL owned the

14   IP and the MRDA so provided.  The Canadian position

15   goes on.  NNI and the relevant EMEA Debtors, NNUK,

16   NN Ireland, NN France, which I'll just call the

17   EMEA Debtors for the rest of my submission, they

18   had licence rights granted to them by NNL pursuant

19   to the MRDA.

20             The Canadian position goes on.  The

21   licence rights were not unlimited.  They were

22   subject to a field of use or scope restriction,

23   were not transferable, and there were costs

24   associated with exercising the rights and deriving

25   the benefits under them.

1              And all those matters have to be taken

2    into account to arrive at the value of those

3    licence rights when they were surrendered.

4              Now, the US position is different.  It

5    says that each, as they call them, IE, integrated

6    entity, but the same NNL, NNI and the EMEA Debtors,

7    they all held all of the rights to the IP in their

8    respective exclusive territories; in other words,

9    NNI had all the rights and all the value of Nortel

10   IP in its exclusive territory, the US.

11             And that, they say, is beneficial

12   ownership of the IP in each territory.

13             They go on, they say the right or the

14   beneficial ownership was subject to no scope or

15   field of use restriction.  All means all, no

16   exception.  And they say the value of the rights is

17   to be measured for these purposes without

18   consideration of the costs such as RPSM sharing

19   provided in the MRDA, primarily, therefore, by

20   revenue.

21             And all that leads them to say that

22   except in Canada, NNL's legal title was bare or

23   nominal, valueless on its own.

24             That is my encapsulation of their

25   position.

1          Now, EMEA has a third position, which

2    is also quite different.  They say that the IP was

3    jointly owned by all of the entities we have been

4    talking about in all of the territories.  In other

5    words, in the US the owners were NNI, NNL, the EMEA

6    Debtors, they jointly owned it.  They say the joint

7    ownership is not created by the MRDA or affected by

8    it.

9          And they say except for the joint

10   ownership, NNL's title to the IP was bare, nominal,

11   valueless, and they say the proportions of

12   ownership, and therefore what has to be decided to

13   determine who gets what from the sale, is relative

14   contribution to R&D, but not according to the

15   methodology that the MRDA sets out.

16          So those are the competing positions,

17   and I say that gives rise to four essential issues

18   that the Courts will have to determine.

19          First, what is the nature of NNL's

20   interest in the IP?  Are we the owner?  Subject to

21   licenses, are we the owner, or is it that bare,

22   valueless legal title?

23          Second, what is the nature, critically,

24   what is the nature and what is the extent of the

25   NNI and EMEA interest in the IP?  Is it a licence

1    with restrictions?  Is it unrestricted?  Is it

2    ownership?

3            Third, can there be a theory of joint

4    ownership measured by relative contribution outside

5    and independent of the MRDA.  Is that a legally

6    permissible theory?

7            And then fourth, how do the other MRDA

8    terms, RPSM sharing, affect the value of the NNI

9    and EMEA Debtors' rights?

10           And those are all determinations which,

11   in my submission, are affected specifically by some

12   legal doctrine which I'm going to spend the

13   majority of my time on.

14           So the first proposition that I ask the

15   Courts to accept is that the MRDA, properly

16   interpreted, means NNL is the owner of the

17   intellectual property, with the corresponding

18   implication that the US and EMEA are wrong when

19   they say that NNL held bare, valueless legal title,

20   and they are wrong about beneficial and joint

21   beneficial ownership.

22           Now, it will be emblazoned in Your

23   Honours' minds the first recital of the MRDA at

24   Article 4(a) that speak of legal title, legal title

25   to NN Technology being held in the name of NNL, and

```
 1   the words of Article 4(a) begin by saying:

 2                    "Except as otherwise expressly

 3               agreed, legal title to any and all

 4               NN Technology shall be vested in

 5               NNL".

 6               Now, the debate in part revolves around

 7   the words "legal title".

 8               And I say as a general matter and in

 9   the absence of the creation of a separate

10   beneficial title, legal title means ownership.

11   That is my proposition which I'm going to

12   demonstrate for you.

13               I say that's true because we start with

14   title.  Title and ownership are not only equivalent

15   but they connote a legal arrangement, so the term

16   "legal", although it is sometimes used in

17   contra-distinction to beneficial, it often, most

18   often, is used to mean rightful, that which a Court

19   will recognize, et cetera.

20               So if you take the first tab of the

21   compendium of authorities and take a look at

22   Black's Law Dictionary, some definitions, which is

23   a good place to start, but obviously not a place to

24   end.

25               THE CANADIAN COURT:  I'm not sure that
```

1  I have got that compendium.

2            THE US COURT:  Incidentally, Mr.

3  Zarnett, I am correct, am I not, that Ottawa law

4  governs the MRDA?

5            MR. ZARNETT:  Ontario law, yes.

6            THE US COURT:  Ontario law, yes,

7  forgive me.

8            MR. ZARNETT:  Yes, it applies sometimes

9  in Ottawa.

10           THE CANADIAN COURT:  You don't want to

11 get into Ottawa law, Judge Gross.

12           THE US COURT:  All right, thank you,

13 thank you for the warning.

14           MR. ZARNETT:  Justice Newbould, it

15 should be labelled "Case Book for Closing

16 Argument".

17           THE CANADIAN COURT:  I have it.

18           MR. ZARNETT:  If you go to the first

19 tab, the first definition I wanted to take you to

20 is the definition of "title" which is over on the

21 second or third page and it defines title as being:

22              "The union of all elements (as

23           ownership, possession, and custody)

24           constituting the legal right to

25           control and dispose of property, the

1                    legal link between the person who

2                    owns the property and the property

3                    itself".

4               So you see the word "legal" immediately

5     as part of the idea of ownership and title.

6               And then if you go back to the first

7     page, to the word "own", you'll see that "own" is

8     defined as:

9                    "To rightfully have or possess

10                    as property".

11               And then:

12                    "To have legal title".

13               So legal title and own, according to

14     Black's, are in that sense equivalent.

15               And if you go over to the definition of

16     "vest", which is the last highlighted definition in

17     this excerpt, you will see that the word "vest",

18     which is what the MRDA uses when it talks about

19     giving legal title, it says:

20                    "Vest is to confer ownership on

21                    a person".

22               That is one of the definitions and that

23     is the word they used, a word commonly associated

24     with the transfer or conferring of ownership.

25               Now, what that means is that we can

1    talk sensibly of legal title as ownership without

2    really confusing anyone, and that is evidenced if

3    you go to the second tab from the excerpt from a

4    book called Falconbridge on Mortgages with

5    Falconbridge being one of the great legal scholars

6    in Ontario history.

7              And this excerpt and the reason that I

8    use it is this excerpt talks about the common law

9    effect of granting a mortgage and what it describes

10   is that, before some statutory changes in Ontario,

11   the granting of a mortgage conveyed legal title to

12   the mortgagee on the condition that the mortgage

13   was not paid.  If it was paid, that was it for the

14   legal title.  If it was not paid, and you'll see

15   this at the bottom of the first page of this

16   excerpt, if it wasn't paid, the mortgagee could

17   retain ownership of the property.  You'll see that

18   in the second-last line of the excerpt.

19              So the mortgagee gets legal title.  If

20   it keeps legal title, it has ownership.

21              And the excerpt goes on to explain the

22   right of redemption and how equity supported the

23   right of redemption by giving time to repay, but

24   the excerpt goes on to describe that the reason

25   that the mortgagee could have possession of the

1  property was because it had legal title and

2  possession was one of the indices of ownership.

3  You'll see that in the excerpt on page 22-2, about

4  in the middle of the page.

5           So you'll see the equivalence, in this

6  scholarly work, of the words "legal title" and

7  "ownership".  If you have legal title, you can have

8  possession to property because you have ownership.

9           So that is why the transfer of legal

10  title can mean the transfer of ownership, and there

11  is no difficulty in generally equating the two.

12           So what that illustrates, I say, is

13  that absent the separate creation of legal and

14  equitable title, and equitable title has to be

15  separately created, the word "legal title" refers

16  to all rights in the property.

17           And that is authoritatively described

18  in a House of Lords decision you'll see at tab 3 of

19  this case book, Westdeutsche Landesbank et cetera,

20  which I will refer to as the German bank.  I know

21  I'm going out on a bit of a limb there.

22           But this was a case where the bank had

23  advanced money to a local authority, the great

24  English arrangement, a local authority which turned

25  out didn't have the power to enter into the

1  transaction, and the bank, when the bank got the

2  money back, they wanted it with compound interest

3  which required them to establish certain rights to

4  compound interest, including that the money had

5  been deprived to them by a fiduciary.

6           Now, in the course of the decision, if

7  you go over to page 706, one of the ways that the

8  bank was arguing that this money had gotten into

9  the hands of someone who had a fiduciary duty to

10  them, was to say, well, our intention was to

11  transfer ownership only to someone who actually had

12  the power to create and enter into this transaction

13  with us.

14           And because they didn't, all we

15  actually gave them, when we gave them the money,

16  was our legal title, but we kept our beneficial

17  title.  It was always our money, even though it got

18  into their hands.

19           And on page 706, you will see Lord

20  Brown Wilkinson deals with that around line E by

21  saying:

22                "I think this argument is

23                fallacious.  A person solely

24                entitled to the full beneficial

25                ownership of money or property, both

1              at law and in equity, does not enjoy

2              an equitable interest in that

3              property.  The legal title carries

4              with it all rights."

5                   "The legal title carries with it

6              all rights.  Unless and until there

7              is a separation of the legal and

8              equitable estates, there is no

9              separate equitable title.

10             Therefore, to talk about the bank

11             retaining its equitable interest is

12             meaningless.  The only question is

13             whether the circumstances under

14             which the money was paid were such

15             as, in equity, to impose a trust on

16             the local authority.  If so, an

17             equitable interest arose for the

18             first time under that trust."

19             So words "legal interest" or legal

20   title, or I give you legal title or I transfer

21   legal title means I transfer everything to you, I

22   vest everything in you, unless here the US Debtors

23   and EMEA Debtors could show the creation of a

24   separate beneficial or equitable interest.

25             It is not enough for them to say, well,

1   it just legal title; there must be beneficial title

2   somewhere else.  The House of Lords decision I was

3   going to say scotches that idea, but maybe I should

4   say it rejects that idea.

5               THE US COURT:  Mr. Zarnett, if I may

6   just interrupt for a moment.

7               MR. ZARNETT:  Sure.

8               THE US COURT:  But the MRDA itself

9   provides that each Licensed Participant held and

10  enjoyed equitable and beneficial ownership.

11              MR. ZARNETT:  I'm going to come to

12  that.  I'm going to come to the terms of the MRDA

13  and address why there is no creation -- that

14  particular recital talks about, I say, ownership of

15  licence rights when you read the whole recital and

16  it is reference to an earlier agreement that

17  created licence rights.

18              THE US COURT:  All right, thank you.

19  I'm going to withhold my questions really I think

20  until the end.  I have a number of questions of

21  course, and others will arise, and Justice Newbould

22  will ask and probably prompt others.

23              But I don't want to interrupt your

24  argument any further.

25              MR. ZARNETT:  That is fine, Judge

1   Gross.  I only say that that is exactly the right

2   question, and that is, does the MRDA say they have

3   or does it create that separate title.

4              So that is the sense that Black's Law

5   Dictionary, if we visit it one more time back at

6   tab 1, that is the sense that Black's Law

7   Dictionary must mean when speaking of legal title,

8   which you will see on the second-last page of the

9   excerpt.  It says:

10                  "A title that evidences

11                  apparent ownership but does not

12                  necessarily signify full and

13                  complete title or a beneficial

14                  interest."

15             Does not necessarily signify it.  It

16   can signify, and it will signify it unless there is

17   a separate beneficial or equitable interest.

18             So that is, therefore, the nature of

19   the inquiry.

20             Now, none of this, none of what I have

21   said is affected by two cases that are cited, which

22   I want to deal with quite briefly.

23             One is the decision which is found at

24   tab 4 of the authorities book, the Francey case,

25   Francey v. Wawanesa Insurance, and the other is a

1    decision actually of Justice Newbould in the

2    Computershare case at tab 5.

3              So let me deal first with the Francey

4    case.  This is a case, was a claim on an insurance

5    policy.  There had been a theft of a motor home.

6    The plaintiff had given it to someone to sell for

7    her and he turned out to be a fraudster and

8    absconded with it.  The insurer tried to rely on an

9    exclusion in the insurance policy about

10   transferring title or ownership.  They said if you

11   transfer ownership or title voluntarily, then you

12   don't have coverage.

13             And the Court there, after looking at

14   the Black's Law Dictionary definitions, at least

15   some of them that we have discussed this morning,

16   said, well, that exclusion would be triggered by a

17   transfer of legal title or equitable title but

18   neither happened here, so the exclusion doesn't

19   apply.

20             The case didn't decide how you get a

21   separation of legal and equitable title, and it

22   didn't decide what the words "legal title" mean if

23   no equitable title exists.

24             And I have something similar to say

25   about a very different fact pattern in the

1   Computershare case, which is at tab 5.

2            That was a case about a triggering

3   event in a bond, something that would be triggered

4   by a change of ownership, clause prohibited, it is

5   at page 32 of the decision, clause prohibited a

6   change of -- or ascribe consequences to a change of

7   control that meant a transaction as a result of

8   which the corporation ceased to beneficially own a

9   majority interest in a certain project.

10           And the Court, in dealing with that,

11  said, well, of course, that clause would only be

12  triggered by a change in beneficial title; it

13  wouldn't be triggered if legal title was changed

14  but beneficial title was not, but the Court then

15  went on to hold that no change had occurred.

16           So the Court didn't have to determine

17  whether any separate beneficial title was created

18  and what the effect of legal title is when there is

19  no separate beneficial title.

20           So I say, against that legal backdrop,

21  we move to the question that is raised by Judge

22  Gross's question, which is what happens under the

23  MRDA.

24           Now, in Article 4(a) of the MRDA, I say

25  the first thing that happens is something that is

1   inconsistent with the idea that there is a separate

2   beneficial interest, because Article 4(a)

3   immediately after vesting legal title contemplates

4   NNL in consideration for that agreeing to grant a

5   licence.

6               And in Article 5, it then goes on to

7   grant a licence.

8               So in the place where you would first

9   expect the reservation of beneficial title, I give

10  you legal title for you to hold on my behalf as

11  beneficial owner, we see quite a different

12  transaction contemplated, which is legal title is

13  vested and a licence transaction is going to be

14  undertaken and is undertaken.  Now --

15              THE CANADIAN COURT:  Is your point that

16  you would expect, on your argument, you would

17  expect to see vesting of legal title in NNL except

18  for the beneficial title which is held by the IEs,

19  is that what your argument is?

20              MR. ZARNETT:  Yes.

21              THE CANADIAN COURT:  Is what you would

22  expect to see if they are right?

23              MR. ZARNETT:  If they are right, that

24  is what you would expect to see.

25              Now, instead what you see is, as I

1  said, the grant of a licence, but the grant of a

2  licence itself has an important implication for

3  this particular argument because the grant of a

4  licence implies ownership in the grantor, and that

5  is because of the way our law characterizes what a

6  licence is.

7            And if I could take you to tab 6 of the

8  authorities brief to the Eli Lilly case, the

9  Supreme Court of Canada, if you go over to

10 paragraph 49 of this decision, the Court begins by

11 adopting a quote from a text which includes the

12 statement which is in part of the underlined

13 portion of:

14            "A licence prevents that from

15            being unlawful which, but for the

16            licence, would be unlawful; it is a

17            consent by an owner of a right

18            [...]"

19            And then if you go on to what the

20 Supreme Court's own words are, they say:

21            "In other words, by the grant

22            of a licence, the patentee grants to

23            the licensee the right to act in a

24            certain way vis-à-vis the patented

25            article, a right which, but for the

1                    licence, the licensee would not

2                    enjoy.  The licensee's rights,

3                    however, are not necessarily

4                    equivalent to those of the patentee;

5                    rather, they are limited to, and

6                    qualified by, the express terms of

7                    the licence."

8               Now, all that is inconsistent with a

9     kind of transaction where the legal title of a

10    nominal valueless type is being put into NNL

11    because, if we follow the Supreme Court's words, a

12    right is being granted to act in a certain way but

13    the beneficial owners would have had that right in

14    the first place.

15              And then the rights granted by a

16    licence are not necessarily equivalent to the

17    patentee, so greater rights are in the owner than

18    in the licence holder if the rights are limited or

19    qualified by the terms of the licence, which is a

20    very unusual transaction and one that really

21    doesn't make any sense if the real owner, the

22    beneficial owner, is just putting nominal title in

23    someone else's name.

24              Now --

25              THE CANADIAN COURT:  Well, I mean, I

1    don't know which argument you are dealing with, but

2    this argument I assume is partly in answer to the

3    EMEA position?

4              MR. ZARNETT:  Yes.

5              THE CANADIAN COURT:  But isn't the US

6    position somewhat different?  It is just saying

7    that the US position is not so much about the

8    meaning of legal title in itself but rather the

9    effect of the licence and what that does?

10             MR. ZARNETT:  That is the position that

11   -- that is an important plank in the US position,

12   and Your Honour is quite right, that much of this

13   goes to the EMEA position.

14             But I don't think it only affects the

15   EMEA position because the US argument actually

16   interweaves the extent of the licence simply as

17   worded, which I think is certainly a legitimate --

18   is the legitimate plane on which we should be

19   arguing, how broad is that licence as a contractual

20   right, with the idea that legal title was nominal

21   and bare, and this is really beneficial ownership,

22   as a way of evidencing that the licence rights are

23   as broad as they claim them to be.  They are

24   effectively beneficial ownership.

25             So I say that it is important to denude

1   the argument that is put against us of any

2   beneficial ownership content so that we can get

3   plainly to how broad is that licence, because I say

4   that really is the only issue.

5              Just to complete one point on this, in

6   a series of cases, both before the Eli Lilly

7   decision and after, the Supreme Court has remarked

8   that a licence is not a property interest.  And the

9   two cases are the Armstrong Cork case at tab 7 and

10  the Euro-Excellence case at tab 8.  I won't bother

11  reading the passages.

12             But it is in connection with a notional

13  transaction that the owner has vested only bare

14  title in NNL and takes back a licence which is not

15  a property interest, in my submission, makes the

16  proposition that is put against us that there is a

17  creation or a maintenance of a separate equitable

18  title, it makes that proposition even more

19  untenable.

20             Now, I think there are a couple of

21  reasons why the argument of the existence of an

22  equitable interest doesn't work.

23             The parties here would want an

24  effective licence.  The licence must come from

25  someone, as the German bank case said, someone with

1   all the rights or, as Falconbridge says, all the

2   incidents of ownership, so it has to come from

3   someone who can grant those rights and therefore

4   NNL must have had them.

5           And that was especially important

6   because rights that NNI, for example, were getting

7   to the US were rights that were, in whole or in

8   part, the result of R&D activity that took place in

9   the UK, for example, but NNUK is not granting any

10  licence and never granted a licence.

11          So how did NNI get any rights if

12  nothing was put into the name of NNL that was

13  effective ownership of those rights so that they

14  could be licensed.

15          And of course, that works vice versa,

16  how did NNUK get rights for things developed in the

17  United States.

18          It is not an answer to this to argue,

19  as EMEA does, that Trustees can give mortgages over

20  trust property, one of the positions they put

21  forward.

22          They say NNL isn't a Trustee and it

23  can't be because the agreement disclaims any

24  fiduciary duty, but Article 5(a), when the licence

25  is granted, Article 5(a) of the MRDA says that the

1  licence comes from NNL, to the extent of its legal

2  right.  To the extent of its legal right.

3              And Article 13 says that no one, no

4  participant has the right to contract on behalf of

5  or bind another.

6              So these licenses must come from the

7  sole power of NNL, from its rights, not on behalf

8  of anyone else, and that implies it must have had

9  the rights to grant.

10              Now, let me say one last thing on the

11  operative provisions of the MRDA and why they are

12  inconsistent with the idea that NNL was anything

13  other than the owner.

14              Everyone says and the MRDA in fact

15  acknowledges in a recital that NNL maintained

16  exclusive rights in Canada.  Where did those rights

17  come from?

18              On the interpretation that I am

19  advancing, NNL owned it, gave up certain rights by

20  way of licence.  That is a standard licence

21  arrangement.  The owner gives up certain rights.

22  Anything it doesn't give up, it keeps.  So if it

23  didn't give a licence to anyone else from Canada,

24  it had exclusive rights in Canada.

25              The MRDA doesn't grant any licence to

1    NNL.

2              But on the idea that all NNL had was,

3    under Article 4, bare legal title and beneficial

4    ownership in everything was shared, where did the

5    exclusive right in Canada come from for NNL?

6              There is no source for it.

7              Another reason why that interpretation

8    can't --

9              THE CANADIAN COURT:  Well, people can

10   get together and we can say, well, Mr. Zarnett, you

11   own everything or you own these patents, but let's

12   make a deal, we'll write down that I get beneficial

13   ownership and you have legal title.  That can be

14   done, can't it?  The fact that that's done -- the

15   fact that that's done would not impinge on the fact

16   that you had it earlier but have given some away.

17             Isn't the issue was there separation of

18   the legal and beneficial ownership in the agreement

19   and, if there was, how was that done?  Isn't that

20   the real issue we are dealing with?

21             MR. ZARNETT:  It is the issue and the

22   point of my argument is that it is not only not

23   done expressly, but it is excluded by what actually

24   is done because the parties were very careful to

25   say for NNUK to have rights in the UK, they get a

1   licence.  The same for the US.  Nothing for Canada.

2           Yet everyone accepts Canada had

3   exclusive rights in Canada.  That can only be by

4   the retention --

5           THE CANADIAN COURT:  Right, I

6   understand.

7           MR. ZARNETT:  -- of a right they didn't

8   give up.

9           THE CANADIAN COURT:  I understand.

10          MR. ZARNETT:  So let me then turn, and

11  I think in the written argument there are more

12  provisions of the MRDA that are cited and the

13  consistency of NNL being the owner, such as the

14  confidentiality provisions, et cetera, which are

15  consistent with NNL being the owner and the others

16  being licensees.

17          But let me turn to the provisions, the

18  only provisions that are raised in the MRDA that

19  are advanced on the beneficial title point to show

20  you why none of them create separate equitable

21  title in the licensees.

22          So the first one that is on the agenda

23  is the one that Judge Gross --

24          THE CANADIAN COURT:  Did you use that

25  verb "create" advisedly?  Does it matter whether

1    you change that to "reflect"?

2              MR. ZARNETT:  My argument would be no

3    different.

4              THE CANADIAN COURT:  All right.

5              MR. ZARNETT:  I agree that if there was

6    an equitable title that preexisted and that was

7    preserved, it would have to be, as the House of

8    Lords said in the German bank case, separate legal

9    title has to be created, so it had to be created

10   before and not taken away by the MRDA, the entire

11   agreement, or it had to be created in this

12   agreement.

13             Now, the recital, the second recital to

14   the agreement, speaks of each Licensed Participant

15   holding and enjoying equitable and beneficial

16   ownership of, and the "of" is important because the

17   "of", after the "of" it says certain exclusive

18   rights under NN Technology for a specified

19   territory pursuant to a 1992 agreement.

20             Now, if you contrast to Article 4(a)

21   for a moment, Article 4(a) speaks of legal title to

22   NN Technology, but the recital speaks of equitable

23   and beneficial ownership not of the technology but

24   of certain exclusive rights under a Cost Sharing

25   Agreement.  And that Cost Sharing Agreement has

1   been examined during that trial.  It says nothing

2   about equitable and beneficial ownership of the IP.

3   It grants exclusive licence rights, very similar to

4   the MRDA rights.

5              So it is possible to own licence

6   rights.  Dr. Reichert in his evidence and some of

7   the references to some of the transfer pricing OEC

8   documents talked about the ability to own a

9   licence.

10             THE CANADIAN COURT:  What does it mean,

11  I don't know why they used the word "under", but

12  whereas they held equitable and beneficial

13  ownership of certain exclusive rights under?  Would

14  the word "in" have been just as -- what does that

15  mean "under"?

16             MR. ZARNETT:  Actually, there is some

17  case law, and it is cited by the CCC, where the

18  Courts have said properly speaking, a licensee's

19  right is not of or in the technology; it is under

20  the technology.

21             THE CANADIAN COURT:  Okay.

22             MR. ZARNETT:  So that language

23  fortifies that this is a reference to the licence

24  rights.

25             So that is not the equitable interest

1   in what was given to --

2              THE CANADIAN COURT:  You are saying

3   that certain exclusive rights under that were not

4   ownership rights?

5              MR. ZARNETT:  No.

6              THE CANADIAN COURT:  That is your

7   point?

8              MR. ZARNETT:  That's right.  They owned

9   licence rights.  They had equitable and beneficial

10  ownership of licence rights, but that is not an

11  equitable title to the technology itself, when that

12  is what we are talking about here.  We are talking

13  about ownership of the IP.  They had ownership of a

14  licence that gave them contractual, not property

15  rights in the IP.  That is the distinction and that

16  wording is consistent with that.

17             As well, it is a recital, and the law,

18  our law, gives very limited effect to a recital,

19  and you will see this discussed in the Re Elliott

20  case at tab 12 of my authorities which essentially

21  say, well, they are helpful but they can't create a

22  grant of something, and this is now in paragraph

23  11.  They can't create a grant.  They can't

24  contradict a grant.  They can't change the

25  operative words of the agreement.

1              So if I'm right on the operative words,

2    that there is no grant of an equitable interest and

3    what is granted is inconsistent with that, the

4    recital can't change that, but I say the recital,

5    properly interpreted, is referring to a different

6    set of historical rights, because this agreement

7    then goes on, the MRDA, after reciting that those

8    rights were in effect, it goes on to create the

9    licence arrangement, recreate the licence

10   arrangement that we see in the MRDA and not to

11   grant an equitable or beneficial interest in the

12   IP.

13              And that is important.

14              Now, the second reference that is made

15   is found in Schedule A, and it gets repeated each

16   time Schedule A was updated, usually for

17   calculation purposes, but if you look at any

18   version of Schedule A, it has in it a third

19   paragraph that says:

20              "The current transfer pricing

21              methodology is the residual profit

22              split method, RPSM, which was

23              adopted by the participants at the

24              request of the tax authorities as

25              the most appropriate method for

1              determining the arm's length

2              compensation".

3                   And it goes on to acknowledge R&D,

4    development of intellectual property as the key

5    profit driver and then it goes on to say:

6                   "Accordingly, the compensation

7              provided to participants under the

8              RPSM reflects the fact that the

9              participants bear the full

10             entrepreneurial risk of the Nortel

11             business such as the risks attendant

12             with the substantial and continuous

13             development and ownership of the NN

14             Technology.  Mathematically, the

15             RPSM accords the participants all

16             the upside risk in the Nortel

17             business as well as the downside

18             risk in such business".

19                  Now, that provision decidedly does not

20   say all the participants are joint owners or

21   equitable owners of the NN Technology.  In fact, it

22   doesn't tell you, looking at it on its own, which

23   participant owns it.

24                  What it does say is we have an RPSM

25   method in place which is according the participants

1   upside risk and downside risk; in other words, the

2   sharing of payments as defined herein is according

3   upside and downside in the Nortel business.  It is

4   not creating ownership.  It is describing that the

5   RPSM is reflecting upside and downside risk.

6               But if the purpose of this provision

7   was to create specific ownership, contrary to the

8   Article 4 and 5, one would expect very different

9   language, not this language.

10              Now, the next reference --

11              THE CANADIAN COURT:  Well, I understand

12   what you are saying about the compensation, that

13   here is how you are going to measure it.  And I

14   suppose it reflects that the participants bear the

15   full entrepreneurial risk of the Nortel business,

16   such as the risks attendant with the substantial

17   and continuous development and ownership of the

18   technology.

19              Would you say that could be read to

20   reflect the licences or -- I'm not quite sure what

21   your argument is on this paragraph.

22              MR. ZARNETT:  In my submission, what it

23   means is the business is going to develop IP.  It

24   is going to be owned as Article 4 says, and

25   licensed as Article 5 says.

1           But we have a contractual arrangement

2   between ourselves to measure overall profit and to

3   make payments to each other as a result.  And what

4   that does is visit the risks and upside of that

5   activity, it shares it or distributes, as we have

6   discussed, but it doesn't affect who owns it.

7           I could enter into an agreement with

8   Mr. Ruby that says I own a business, but he is

9   going to be compensated if we make money, and he is

10  going to have to give up compensation or pay money

11  if we lose money, without ever giving up any

12  ownership, but he is going to bear the upside and

13  downside risk of what we do.  We develop and I own.

14          And in my submission, there is no

15  inconsistency with that.  In fact, that is exactly

16  what the RPSM model does, to the extent it does it,

17  without changing or affecting the ownership.

18          And as I say, it would be a strange

19  place to create an equitable ownership if in fact

20  -- given what Article 4 and 5 say.

21          THE CANADIAN COURT:  There is little

22  doubt that this language is driven by the transfer

23  pricing tax people.

24          MR. ZARNETT:  There is no doubt that,

25  yes, the RPSM was drafted obviously, as this says,

1    following a submission to the taxing authorities.

2              However, that doesn't determine who had

3    actual ownership.  It simply describes what the

4    RPSM is compensating for, upside and downside.

5              Now, the next provision that I wanted

6    to look at was the agreement with respect to NN

7    Technology.  This is TR46984, but it should be in

8    the -- if you have the original book of documents

9    with the MRDA which had several tabs, I think it

10   came up in the openings, it is at tab 2.

11             THE CANADIAN COURT:  I have to get

12   that.

13             MR. ZARNETT:  It refers -- it has a

14   recital that speaks --

15             THE CANADIAN COURT:  Hang on a second.

16             MR. ZARNETT:  All right, we have an

17   extra copy, Your Honour.

18             THE CANADIAN COURT:  I have got it

19   somewhere, but not in this room.

20             MR. ZARNETT:  This version might help.

21             THE CANADIAN COURT:  Well, I have got

22   that one.

23             MR. ZARNETT:  It should be then at tab

24   2.

25             THE CANADIAN COURT:  I beg your pardon,

1   yes, I have got it.

2              MR. ZARNETT:  So the second recital of

3   this, again, a recital, and this was around the

4   time of the famous Alcatel transaction, refers to

5   the disposition of a business beneficially owned by

6   the participants.  That is in the recital.  What

7   exactly was referred to in the business is not

8   further defined, but the agreement goes on then to

9   vest legal title to certain IP, and you will see

10  this in paragraph 4, in NNL and to grant licences

11  in paragraph 5 and 6, an exclusive and a

12  non-exclusive licence.

13             So we see exactly the same structure as

14  we saw in the MRDA of the vesting of legal title

15  and the granting of licences, so I say that recital

16  doesn't change the MRDA and the operative

17  provisions obviously mirror the MRDA, an

18  arrangement I say is inconsistent with equitable

19  separation of title.

20             Now --

21             THE CANADIAN COURT:  Well, at paragraph

22  4 basically it is just mirroring the language of

23  the MRDA, isn't it?

24             MR. ZARNETT:  Correct, and that is the

25  operative provision.

1                   THE CANADIAN COURT:   I beg your pardon?

2                   MR. ZARNETT:   That is the operative

3    provision rather than a recital.  So if that is --

4    if we are right in our submission that legal title

5    means ownership in this context and the granting of

6    licences is inconsistent with the idea of a

7    retention of equitable title, then the result is

8    that the recital has no effect on this argument.

9                   THE US COURT:   Why do you need it then

10   and why is it limited to the disposed intellectual

11   property?

12                  MR. ZARNETT:   Yeah, this -- I'm not

13   sure I have a full answer for you, Judge Gross,

14   just a full historical answer for you on this.

15                  It was meant to preserve certain rights

16   in intellectual property in a disposed business and

17   to keep them in effect exactly as they had been.

18                  So the actual title and licensing

19   mirrored the MRDA for that set of intellectual

20   property.  The recital, in my submission, just

21   doesn't change that.  It just gives a little bit of

22   background without changing any of the ownership or

23   licensing regime.

24                  Now, the next document that I wanted to

25   look at was at tab 3, which is an Addendum to the

1    Master R&D Agreement, and the second recital of it

2    says:

3                      "Whereas each Participant holds

4                 and enjoys equitable and beneficial

5                 ownership of NN Technology as

6                 defined in the Prior Agreement".

7              Now, is that sufficient to create or

8    recognize equitable and beneficial ownership by the

9    entire group, as EMEA contends or in the manner

10   that NNI contends?

11             And I say it is not.

12             First, it is not an operative grant, it

13   is not an operative provision, and therefore, it

14   must be treated as a recital in the limited way in

15   which our law recognizes recitals can be treated,

16   and that is that they are not grants; they are not

17   operative; and they don't override operative

18   provisions.

19             Now, the recital ends, that particular

20   recital ends with "as defined in the Prior

21   Agreement", and then goes on to do certain specific

22   things to the prior agreement, to the MRDA in

23   certain specific ways, none of which are a grant of

24   equitable and beneficial ownership and some of

25   which reflect the licensing provisions of the

1  earlier agreement, because they are not -- they

2  don't amend them or change them.

3              So in my submission, that language --

4              THE CANADIAN COURT:  This provision,

5  the second recital, says they hold equitable title

6  "as defined in the Prior Agreement".  Your argument

7  is in the prior agreement they didn't define any

8  ownership of equitable title.  If there is an

9  ambiguity in the prior agreement, in this recital

10 we looked at, to consider how the ambiguity should

11 be dealt with?

12             MR. ZARNETT:  If there is ambiguity in

13 the prior agreement, I believe you could look at

14 some elements of subsequent conduct and this might

15 be one of them, but there would --

16             THE CANADIAN COURT:  Well, this is not

17 conduct.  This is an agreement to be read together,

18 presumably.

19             MR. ZARNETT:  Right, right.  If there

20 were ambiguity.

21             THE CANADIAN COURT:  Yes.

22             MR. ZARNETT:  But you can't create the

23 ambiguity with this recital.

24             THE CANADIAN COURT:  I understand that.

25             MR. ZARNETT:  And it can't, if you are

1  going to use it, conflict as a recital with the

2  operative terms of the earlier agreement, and I say

3  once you hold it up against that standard, it

4  doesn't get anyone anywhere.

5                    THE CANADIAN COURT:   Okay.

6                    MR. ZARNETT:   That's fortified, because

7  if you go on to the next addendum, the Third

8  Addendum, which is at tab 4, which then makes

9  amendments to the MRDA itself, it then repeats and

10  restates, in part, definitions, Article 4, which is

11  the vesting of legal title, and Article 5, the

12  granting of the exclusive licences, and doesn't

13  grant any equitable and beneficial ownership,

14  doesn't incorporate that earlier recital, and keeps

15  up the structure that I say not only doesn't grant

16  equitable and beneficial ownership; it is

17  inconsistent with it.

18                    And it leaves in place, for example,

19  the no fiduciary duty provision of Article 13,

20  which is inconsistent with the idea that there is a

21  legal title holder holding in trust for others.

22                    So if that view is correct, there are

23  two other provisions --

24                    THE CANADIAN COURT:   Well, this was

25  made so that to take into account non-exclusive

1   licences.

2              MR. ZARNETT:  Correct.

3              THE US COURT:  Well, if you don't mind,

4   Mr. Zarnett, take a look at Article 4 on page 3,

5   because this provision deletes in its entirety the

6   text of Article 4(a) and gives to the Licensed

7   Participants the rights that you would normally

8   encounter in ownership of a patent, for example.

9   Am I misreading that?

10             MR. ZARNETT:  Article 4 of this

11  addendum?

12             THE US COURT:  Yes, of addendum 3, the

13  Third Addendum.

14             MR. ZARNETT:  So Article 4(a) gives

15  legal title, vests -- repeats the same language as

16  we had in the original 4(a), legal title to any and

17  all NN Technology, whether now in existence or

18  hereafter acquired, shall be vested in NNL, and

19  then says:

20                  "In consideration for that, NNL

21             agrees to enter into an exclusive

22             and a non-exclusive licence".

23             It is the same formula as previously

24  existed, but now recognizes a non-exclusive licence

25  as well as an exclusive licence.

1         THE US COURT:  All right, I misread

2    4(e), I'm sorry.

3         MR. ZARNETT:  Yes.

4         So there are two other provisions of

5    the MRDA which the Court is well familiar with, but

6    I just wanted to highlight them to move into the

7    next branch of my argument and --

8         THE CANADIAN COURT:  I suppose your

9    argument as well, you are at odds with the US

10   Debtors, but you say there is a limited field of

11   use or it really comes down to that they can -- the

12   licensee can sublicense to make products for use by

13   the licensee, by the participants, that is, to make

14   Nortel products.

15        I suppose your argument would be as

16   well that if it were the case that they were the

17   owners of the -- the equitable owners of the IP,

18   there wouldn't be any room to negotiate the kind of

19   scope of use that we are talking about?

20        MR. ZARNETT:  That's right.  Why would

21   the parties spend any time on a scope of use when

22   they all had exactly equal or ownership

23   entitlements?

24        The entire licence makes no sense if

25   you are talking about a licence in favour of

1   someone who already owns and has broader rights

2   than the licence in fact confers.

3             THE CANADIAN COURT:  All right.

4             MR. ZARNETT:  Now, I wanted to say

5   briefly something about Articles 2 and 3 of the

6   MRDA which have something to do with this as well,

7   and that has to do with the requirement that

8   participants perform R&D activity, which is a

9   defined term, and the RPSM, constitutes the RPSM,

10  the methodology for measuring the compensation for

11  that activity.  That is what you get for performing

12  R&D.  And then the agreement, paragraph 2(c) says

13  everybody has to pay for the R&D themselves.  So

14  you bear your own responsibility to pay for R&D,

15  you have to do it, and when you do do it, your

16  compensation is your share calculated under the

17  RPSM.

18             Now, if that view that I have expressed

19  to the Court is correct, it has a legal impact

20  first on EMEA's joint ownership case, and let me

21  tell you what I say it is.

22             The MRDA deals with each subject matter

23  that is an element of their claim.  Remember, they

24  say the MRDA says, it deals with the interests of

25  NNL in the IP and the interests of NNI and the EMEA

1    Debtors.  It deals with the activity that gives

2    rise to the creation of IP, R&D, and it deals with

3    the funding of it and it deals with what you get in

4    return, a share of RPSM.

5              So when EMEA says on its joint

6    ownership theory the RPEs had a common

7    understanding that they would invest money in a

8    program to create R&D and the common understanding

9    was that they would each be the joint beneficial

10   ownerships of it forever until sold, that is

11   clearly setting up an arrangement that is

12   inconsistent with the MRDA, because the MRDA at

13   paragraph 14 makes it the entire agreement and

14   understanding between the participants.

15             And therefore, in law it precludes

16   inconsistent understandings and agreements.  And I

17   have included, and I won't take the Courts' time,

18   at tab 13 the Supreme Court of Canada's decision in

19   Bauer v. Bank of Montreal which will be familiar to

20   Justice Newbould, but it stands for the proposition

21   that an inconsistent lateral agreement cannot stand

22   where it contradicts the terms of a written

23   agreement, especially one that is expressed to be

24   the entire agreement.

25             THE CANADIAN COURT:  I have a question

```
 1   while you are on the EMEA position on this.

 2                MR. ZARNETT:  Sure.

 3                THE CANADIAN COURT:  They say that the

 4   IP belongs to the -- under a question of law, as a

 5   matter of law, it belongs to the particular RPE.

 6   One of the answers that you set up in your rebuttal

 7   is the entire agreements clause, which I understand

 8   that argument, but you also say, if I can ask you

 9   to look at paragraph 206 of your rebuttal brief,

10   you say:

11                     "The inventions and any

12                associated patents and patent

13                applications were assigned from the

14                inventor and/or his or her employer

15                to NNL."

16                And there is no reference to the

17   evidence, but was there any assignment from the RPE

18   to NNL or was it simply by the inventor?

19                MR. ZARNETT:  There are assignments by

20   the inventors and there is the MRDA.  So the MRDA

21   is the transaction, the CSA before it --

22                THE CANADIAN COURT:  All right, but on

23   one reading of this there is some assignment,

24   separate assignment by the RPE to NNL.

25                MR. ZARNETT:  There are, there are, for
```

1    each patent, because you have to list the inventor.

2          THE CANADIAN COURT:  For each patent

3    there is a what?

4          MR. ZARNETT:  There is an assignment by

5    the inventor to NNL.

6          THE CANADIAN COURT:  Right, but on the

7    EMEA argument, that doesn't matter because the RPE

8    has the rights, and I read this to say it may be

9    the RPE also assigning the rights to NNL.

10         MR. ZARNETT:  Well, I'll have to check

11   if there were any additional assignments.

12         THE CANADIAN COURT:  Right, that is my

13   question.

14         MR. ZARNETT:  But we say the MRDA and

15   the CSAs before that contain that vesting.

16         So if we are right about what the MRDA

17   says, then even if the RPEs obviously did have

18   rights in what their employees did in some

19   jurisdictions, because that varies by jurisdiction,

20   not always the case as I understand in the United

21   States that an employer owns the work product of

22   the employee, but regardless of that, there are

23   assignments from the inventors and there are

24   assignments from the RPEs themselves.

25         Now --

```
1              THE CANADIAN COURT:  Well, are there
2   assignments from the RPEs apart from what you say
3   the effect of the MRDA is?  That is my question.
4              MR. ZARNETT:  No, I don't think so.  I
5   think that it is the MRDA that gives that.
6              Now, as I say, the real question that
7   the Courts have to look at is what is the scope of
8   the licence, unaffected by these notions of
9   beneficial ownership which I say are a distraction.
10             And the lens to look at that through is
11  a statement that I have already taken you to from
12  the Eli Lilly case, which was back at tab 6, which
13  said licensee rights are not necessarily equivalent
14  to those of the patentee, they are limited and
15  qualified by the express terms of the licence.
16             So they can be equivalent, but they are
17  not necessarily equivalent.  What matters is the
18  express terms of the licence.  And those terms have
19  a direct bearing on what the value of those rights
20  are because, as the Eli Lilly formulation sets out,
21  what the patentee does not grant in the licence it
22  retains and this is a question of contractual
23  interpretation.
24             Now, Article 4(a), as we have seen, has
25  fairly clearly set out all NN Technology, "any and
```

1    all NN Technology now in existence or acquired or

2    developed pursuant to the terms of the agreement

3    shall be vested in NNL."

4              But the licence is not in those terms,

5    and one would expect, if someone was licensing back

6    exactly what NNL was getting, we would see words

7    that are just as broad, all rights to NN Technology

8    are hereby exclusively licensed to the licensees.

9              Those words don't appear.  Article 5 is

10   much longer, has more words, and those words

11   qualify the licence.

12             And the Courts have very detailed

13   arguments about why that is in our brief and in the

14   CCC briefs, but let me just tick off the three ways

15   that I say the rights are qualified.

16             They are qualified in Article 5 as a

17   right to make - I'm leaving out some of the words -

18   make, use or sell products using or embodying NN

19   Technology.

20             They are qualified by defining

21   "products" with the words "by or for the

22   participants".  And they are qualified by referring

23   to rights to patents in the second arm of Article 5

24   as rights necessary or appropriate in connection

25   with the first arm, which has to do with making,

1   using or selling capital "P" Products.

2            All those are a field of use or a scope

3   restriction, and they are discussed in our brief at

4   paragraphs 318 to 350, in our rebuttal paragraphs

5   15 to 22.

6            But the bottom line of it is the rights

7   do not extend to products designed, developed,

8   manufactured or marketed or proposed to be by

9   anyone else outside of the Nortel participants.

10  That is not a right the licensees had and it is not

11  a right they had the ability to create in a third

12  person.  Only the owner had that right, because it

13  wasn't granted, it was retained.

14           And that right, that retained right is

15  of obvious importance when one considers what a

16  purchaser of a business would pay for, wants to

17  make its own products as well as going on with what

18  Nortel was doing, or what a licensing business,

19  IPCo or Rockstar, would want when they want to go

20  out and license other people who want to make their

21  products and need or are told that they need a

22  licence to NN Technology to do that.

23           And those were rights, to encapsulate

24  it, beyond what were granted to the licensees and

25  that is the residual right that has to be taken

1   into account.

2            THE US COURT:  Mr. Zarnett, look at the

3   beginning of Article 5(a), the first few words say:

4                 "To the extent of its legal

5                 right to do so".

6            MR. ZARNETT:  Yes.

7            THE US COURT:  Why are those words

8   necessary if there was a question of its ownership,

9   NNL's ownership?

10            MR. ZARNETT:  I think the reason that

11   they are there doesn't have anything to do with the

12   extent of NNL's ownership vis-à-vis the licensees.

13   It has to do with to what extent NNL was promising

14   or warranting to the people it was licensing that

15   as against third parties it had the right to do it.

16            So instead of saying, look, no one else

17   in the world can interfere with what you are doing,

18   NNL is saying to the extent of all of our legal

19   rights, which as against you, licensees, is

20   everything, we license on these terms.  But I don't

21   think it is or can be read as reflecting some

22   retained additional right or ownership in the

23   licensees themselves.

24            THE CANADIAN COURT:  The language says

25   "To the extent of its legal right to do so" and

1  then it goes on to say "and subject to the rights

2  of relevant third parties."

3                 MR. ZARNETT:  Yes.

4                 THE CANADIAN COURT:  Who are those

5  relevant third parties?  To the extent they may

6  have given away some rights to somebody else, is

7  that the --

8                 MR. ZARNETT:  Yes, they may have

9  licensed someone else already.

10                THE CANADIAN COURT:  Which would

11 perhaps be read together with "to the extent of its

12 legal right to do so"?

13                MR. ZARNETT:  That's right, I think

14 they are of a piece, Your Honour.

15                THE CANADIAN COURT:  Is there any

16 evidence of who those relevant third parties might

17 have been at the time?

18                MR. ZARNETT:  There is evidence of

19 cross-licensing that had gone on between Nortel and

20 competitors where, in exchange for the Nortel Group

21 getting a licence to use a competitor's technology,

22 Nortel gave licences, so those people would have

23 rights.  I'm told there is a confidentiality issue

24 so I can't tell you the name of that person.

25                But those would be the kind of

1    arrangements.

2              THE CANADIAN COURT:  Right.

3              MR. ZARNETT:  Now, there's a couple of

4    other terms of the MRDA.  We have talked about the

5    non-transferability provision, and we have talked

6    about the RPSM sharing obligations.

7              But one provision that I did want to

8    draw to your attention is that to exercise the

9    rights and continue to, Article 11 required certain

10   things to continue, and they are performing R&D

11   activity, and not being in breach of the agreement

12   and not curing it, as well as remaining an

13   affiliate of NNL, all of which is to say that

14   although the licence was perpetual, it could be

15   lost if payments weren't made as pursuant to the

16   obligations under the MRDA and, therefore, the

17   licence came with a cost and the cost was

18   associated, even though the licence is said to be

19   royalty-free, with the very continuation of the

20   exercise of rights --

21             THE CANADIAN COURT:  Before you get to

22   that, I'm just looking and every time I read this,

23   I read something else.  In Article 5(c) it says:

24                  "The rights granted under this

25                  Article shall not relieve any

1                  Participant from its obligations in

2                  respect of royalty payments to third

3                  parties".

4             So that perhaps ties back into the

5    question I was asking you where it says "To the

6    extent of its legal right to do so" and "subject to

7    the rights of relevant third parties."

8                  MR. ZARNETT:  Right, I think that is

9    right, Your Honour.

10                 THE CANADIAN COURT:  Sorry I

11   interrupted you.

12                 MR. ZARNETT:  Now, I wanted to deal

13   briefly with one point of history, which then ties

14   into the next legal proposition that I wanted to

15   put to the Court, and that is there was some

16   history of sublicensing, licensing and sublicensing

17   and lawsuits, and these are described in our -- the

18   lawsuits are described in our initial brief,

19   paragraphs 356 to 359.  I'm sorry, it goes up to

20   362, actually.

21             And the point that is discussed there,

22   and I won't take you to it in any detail, but to

23   the extent there was litigation against others in

24   the United States, NNL was a party to that

25   litigation in all but one minor case, and so was

1   NNI.

2            And the allegations in the claim were

3   always NNL is the owner, NNI has a licence, they

4   have both suffered damages.

5            And if you think about that for a

6   moment, it is not consistent with a US position

7   that all the rights in the United States under a

8   patent and all of the value is NNL's.

9            There is also some sublicensing that

10  took place, and this is described in the CCC's

11  reply, paragraph 28, and again, the history of the

12  licensing is that NNL was always a party, sometimes

13  on its own, sometimes with NNI, and they were both

14  described as having rights, again not consistent

15  with the US position that it had all the rights and

16  NNL had none.

17           So that is a segue --

18           THE CANADIAN COURT:  Just a second.

19  You say that is in the CCC reply brief?

20           MR. ZARNETT:  The CCC reply brief, yes,

21  paragraph 28 deals with --

22           THE CANADIAN COURT:  Paragraph 28?

23           MR. ZARNETT:  Yes, deals with the

24  licensing.  There is a list of licences attached to

25  the US rebuttal brief in Appendix A, and none of

1  them recite that it was an NNI-only licence.  So --

2          THE CANADIAN COURT:  Just a minute.

3  Okay, there is a list of what, of the sublicenses?

4          MR. ZARNETT:  Yes.

5          THE CANADIAN COURT:  Pardon?

6          MR. ZARNETT:  Of licences, sublicences,

7  US licences to others.

8          THE CANADIAN COURT:  I won't take the

9  time to look it up.  You say none of them list --

10  what is your point, that NNL is a party to all of

11  them?

12          MR. ZARNETT:  Yes, NNI is not the sole

13  party, I'm told, in any of them.

14          THE CANADIAN COURT:  All right.

15          MR. ZARNETT:  Now, what that highlights

16  is what the Courts are to do with all of the

17  extrinsic evidence, the tidal wave, the tsunami of

18  extrinsic evidence that has been launched at us in

19  this case.

20          THE CANADIAN COURT:  I have seen the

21  allocation of time, and we are going to be fair to

22  everybody, so if we are going to have to sit

23  longer, we'll sit longer, but I think probably we

24  should take a morning break.

25          Is this a convenient time for you,

1    Judge Gross?

2              THE US COURT:  Any time, yes.

3              THE CANADIAN COURT:  Is it convenient

4    to you, Mr. Zarnett?

5              MR. ZARNETT:  Yes, thank you.

6              THE CANADIAN COURT:  So why don't we

7    take 20 minutes.

8              THE US COURT:  All right, counsel,

9    we'll be back slightly before 11:00, thank you.

10              -- RECESSED AT 10:36 A.M.

11              -- RESUMED AT 11:04 A.M.

12              THE CANADIAN COURT:  Mr. Zarnett.

13              MR. ZARNETT:  Thank you.

14              I want to turn now to the extrinsic,

15    the topic of extrinsic evidence, and my proposition

16    is that in this case extrinsic evidence is not

17    available to alter the conclusions that I have

18    asked this Court to reach on the wording of the

19    MRDA.

20              And that is so because of three

21    principles that flow out of Ontario's rules of

22    contractual interpretation.

23              The first one is what is known as the

24    cardinal presumption of the primacy of contractual

25    language that the parties' intent is determined by

1    the words they use, the objective intention based

2    on their words, not anything else.

3              And that point has been made in every

4    leading contractual interpretation case in Ontario

5    and recently reaffirmed by the Supreme Court of

6    Canada.

7              So if I could take you --

8              THE CANADIAN COURT:  Well, do you want

9    to take that time?

10             MR. ZARNETT:  I don't want to take that

11   time, as I was saying.

12             The second principle, equally well

13   known, is that evidence of subjective intention is

14   inadmissible.

15             And subjective intention is evidence

16   about what a person thinks the document means,

17   understood it to mean or intended it to mean.

18             And this case has had no shortage of

19   that, and I'll give Your Honours just one example

20   which will probably bring to mind the wealth of

21   others.

22             Mr. Orlando in his declaration at

23   paragraph 23 said:

24                  "It was and is my

25                  understanding, as well as the

1              understanding of other tax personnel

2              and business people at Nortel, that

3              the MRDA was intended to provide

4              each of the IEs with economic and

5              beneficial ownership of Nortel's IP

6              in their exclusive territories".

7         Just the classic subjective intention

8   evidence.  It is all inadmissible.  It doesn't help

9   the Courts at all, and should be ignored.

10        Now, the third principle is the

11  important limit on factual matrix evidence, factual

12  matrix being the kind of evidence that is used by

13  the Courts to provide some context to understand

14  what the contracting parties meant by their

15  language, and there are clear limits but the one

16  limit that I want to stress is the one that the

17  Supreme Court of Canada recently reaffirmed and

18  this was in the Sattva decision which is at tab 14

19  and I will go to that language.

20        Paragraph 57 the Court says:

21              "While the surrounding

22              circumstances will be considered in

23              interpreting the terms of a

24              contract, they must never be allowed

25              to overwhelm the words of that

1           agreement.  The goal of examining

2           such evidence is to deepen a

3           decision-maker's understanding of

4           the mutual and objective intentions

5           of the parties as expressed in the

6           words of the contract.  The

7           interpretation of a written

8           contractual provision must always be

9           grounded in the text and read in

10          light of the entire contract.  While

11          the surrounding circumstances are

12          relied upon in the interpretive

13          process, courts cannot use them to

14          deviate from the text such that the

15          court effectively creates a new

16          agreement."

17           And in my submission, when you step

18     back from all the debates about what is factual

19     matrix and what isn't and whether it has been

20     accurately portrayed, whether this bit of history

21     is consistent with this party's position or that

22     party's position, when you step back from it all,

23     what it can't do is what the US Debtors and EMEA

24     Debtors need it to do.

25           It cannot turn a licence into an

 1  ownership interest.  It can't turn legal title into

 2  an administrative convenience.  It can't create a

 3  collateral ownership arrangement outside the MRDA,

 4  which is the entire agreement.  It can't,

 5  importantly, it can't remove a scope or field of

 6  use restriction and it can't remove the costs of

 7  enforcing or exploiting the licence.

 8              THE CANADIAN COURT:  Well, I guess you

 9  rely upon paragraph 59 as well.

10              MR. ZARNETT:  Yes, the parol evidence

11  rule, absolutely.

12              So with the factual matrix, in summary

13  our position is it doesn't allow them to get there

14  where they want to get to from here.

15              So with that, with the correct

16  paradigm, with the question, the major question

17  being how do you value the licence that was given

18  up with the scope restriction that it had and the

19  costs that it carried with it, I say it must lead

20  these Courts to reject the valuation or allocation

21  of Mr. Kinrich and that put forward by Mr. Huffard

22  and Mr. Malackowski.  And there are many valuation

23  issues, pure valuation issues and they are

24  described in the briefs, but what I wanted to focus

25  on is there is just simply an underlying legal

1  basis why they are talking about the wrong points.

2          So let me start with Mr. Kinrich, and

3  this is a brief summary of what is in our initial

4  brief, paragraphs 508 to 540.

5          But Mr. Kinrich proceeded on the

6  assumption that NNL had nominal legal title other

7  than in Canada; in other words, no retained or

8  prospect of retained value because he proceeded on

9  the assumption that there was no scope or field of

10  use restriction.

11          He accepted that those matters could

12  affect value, if he had treated them differently,

13  but he didn't treat them differently and therefore

14  he didn't calculate value based on that.

15          So what was he measuring?  He wasn't

16  measuring the value of the licence as it stood and

17  as it was surrendered.  His revenue model, his

18  comparative revenue model in the business sales,

19  isn't valuing what people actually owned, even if

20  revenue could ever be a proper gauge of value,

21  which I say in this case it couldn't be.

22          But the assets were different than what

23  he was looking at.  The licence rights were less,

24  and NNL's ownership was more.

25          And he gave no recognition to the costs

1  that would have to be incurred to maintain the

2  licence rights to earn anything in the future.

3           So in my submission, his analysis

4  doesn't stand on the business sales, and for

5  similar reasons, in addition to the valuation

6  problems and discount rates and that sort of thing,

7  on the Rockstar transaction because again he was

8  assuming a licence right that was broader than it

9  was, no scope restriction.

10          No wrestling with the issue of what was

11 the value of this licence right in the context of a

12 proposed business that was going to do exactly what

13 isn't in the scope of the licence; in other words,

14 give other people the right to make their own

15 products.

16          And he didn't give any effect to the

17 RPSM sharing, even though if NNI was going to

18 exercise --

19          THE CANADIAN COURT:  We are faced here

20 with valuation issues of valuers who essentially

21 adopted the legal position taken by their client

22 and said, look, based upon that, here is how we are

23 going to value.

24          MR. ZARNETT:  Right.

25          THE CANADIAN COURT:  Which in the end

1   doesn't leave a whole lot for the Court, once

2   whatever the legal position is that we land on or I

3   land on or Judge Gross lands on.

4            MR. ZARNETT:  I think that is exactly

5   right.  Mr. Malackowski and Mr. Huffard are

6   following the -- the contribution theory flows from

7   the joint ownership theory.  Just as Mr. Kinrich is

8   a prisoner of his assumptions, their theory flows

9   from joint ownership.

10            And if you reject that, they don't have

11   much to tell you.

12            THE CANADIAN COURT:  It is your

13   valuation is a prisoner of --

14            MR. ZARNETT:  Well, that's right.

15            THE COURT:  At least, I was hoping that

16   I would say that.

17            MR. ZARNETT:  But my point, which I

18   would put slightly differently than Your Honour

19   has, but maybe to a similar effect is this:

20   Mr. Britven for the CCC and Mr. Green are the only

21   ones who approached, supported by the theory of

22   Mr. Berenblut and Mr. Cox, but they are the only

23   ones who approached the question on the basis of

24   the rights as I ask the Court to find them.

25            THE CANADIAN COURT:  I understand.

1            MR. ZARNETT:  And if you agree, as I

2   urge you to, then those are the tools that the

3   Court should use to come up with the allocations

4   because Mr. Green does look at the value of the

5   licence.  He does take into account the scope

6   restriction.  He does, therefore conclude that

7   there is a value to the owner based on the rights

8   that were retained in excess of the value the

9   licensees gave up, and that is, in my submission,

10  completely right on the right interpretation of who

11  owned what.

12            So I want to reserve time for

13  Mr. Coleman.  I want to reserve some time to

14  respond.

15            So subject to any questions that the

16  Courts had for me at this time, I was going to turn

17  it over to Mr. Coleman.

18            Thank you, Your Honour.

19            THE US COURT:  Mr. Coleman, good

20  morning, sir.  Good to see you.

21            MR. COLEMAN:  Good morning.  Good to see

22  you, Judge Gross.  Good morning, Justice Newbould.

23  Ken Coleman of Allen & Overy for the Monitor and the

24  Canadian Debtors.

25            Your Honors, our case focuses on the

1    words actually used in the MRDA.  The other estates

2    have argued theories that attempt to rewrite the

3    MRDA; and the evidence that they have put forward

4    in the trial has been intended to distract the

5    Courts from what the MRDA actually says.

6              And to take you further from that

7    critical agreement, there is also the argument that

8    the Courts should disregard the Monitor's position

9    in this case.  To put it another way, they argue

10   that even if the Courts agree with our position,

11   the Courts must nonetheless deprive the Canadian

12   Estates and their creditors of the benefit of their

13   property rights because the Monitor did not assert

14   its position in this trial prior to May 2013.

15             Now, based on the central theme in this

16   case, which was to sell assets collectively, to

17   maximize the value of the pot, and to sort out

18   allocation later, we submit that the argument that

19   we can lose even if we are right is absurd.  But

20   because that argument against us would have such

21   catastrophic impact on the creditors of the

22   Canadian Estate, and because, frankly, reputations

23   have been implicated, we think we have to address

24   it.

25             We think the record is clear in two

1  very fundamental respects.  First, May 2013 was

2  established as the date by which all parties were

3  to set forth their allocation positions and the

4  date by which all parties did that.  Second, it is

5  clear from the record that at all times prior to

6  May 2013 the parties had agreed and the Courts so

7  ordered that each party reserved all its rights to

8  make any arguments for allocation; and it was

9  agreed and it was so ordered that there were no

10 limitations on those reservation of rights.

11            So the US Debtors in particular would

12 ask these Courts to override the reservation of

13 rights contained in paragraph 12(f) of the IFSA.

14 The US Debtors would ask the Courts to override the

15 clear reservation of rights contained in Section 12

16 of the IP transaction side agreement.  They would

17 ask the Courts to disregard orders implementing the

18 allocation protocol, which expressly provide,

19 without condition, there shall be no restriction on

20 the ability of any core party to advance or oppose

21 any theory of allocation.

22            They would ask the Courts to ignore

23 that pursuant to the litigation time line and

24 discovery plan that was approved by the Courts,

25 that the parties to this litigation were not

1   required to submit their positions until May 2013.

2   They ask the Courts to ignore that all parties took

3   the same exact risk that they may ultimately

4   receive an allocation that is different from what

5   they thought they might get.

6           That was the deal that the parties made

7   at the inception of this case.  That was what was

8   necessary to get these sales done at the highest

9   possible price and promptly in order to preserve

10  value.  And it was understood quite clearly that

11  fighting over allocation would be

12  value-destructive.

13          Your Honor, it is simply not possible

14  to reconcile the US position on this issue with the

15  extensive record on the agreements and court orders

16  concerning reservation of rights.  In short, it

17  just doesn't make sense based on the reality of

18  this case.

19          So what they do is they try to dress it

20  up.  They add gratuitously offensive labels, like

21  "bad faith," "misrepresentation," "breach of the

22  duty of candor."  These are labels that are

23  intended to shock the Courts, and they repeat it

24  over and over and over again in the hope that you

25  will start to believe it.  But when you look behind

1   the labels, there is no substance.

2              And then they throw on an entire

3   catalog of estoppel theories; by the way, none of

4   which were pled in the initial responsive pleadings

5   in this litigation, and therefore, all of which

6   were waived.  And in any event, none of them stands

7   up to scrutiny.

8              I would like to take a few minutes to

9   walk through what is behind some of these labels.

10  They first point to the Monitor's reports.  They

11  allege that the Monitor publicly filed reports

12  stating that NNL's ownership of intellectual

13  property is subject to licenses to its

14  subsidiaries.

15             That is a true statement.  As

16  Mr. Zarnett has just gone through, that is evident

17  from the face of the MRDA.  The Monitor and the

18  Canadian Debtors have never disputed that NNL's

19  ownership interests were subject to licenses.

20             The critical question that was deferred

21  to this trial is not whether the licenses existed

22  but what those license rights were and what they

23  were worth.  On that point, the Monitor's reports

24  never made any representations as to value.  In

25  fact, in every report there was the same recitation

1    that the allocation issue was deferred to later

2    agreement or resolution by the Courts.

3              They then cite to testimony to a

4    Canadian legislative committee, a Parliamentary

5    subcommittee of some sort, to the effect that the

6    existence of the licenses to NNL IP obligated the

7    Canadian Debtors to include the subsidiaries in the

8    sale process; again, an entirely correct statement.

9              The licenses to the subsidiaries

10   remained assets of their estates, and therefore,

11   the Monitor and the Canadian Debtors could not

12   unilaterally deal with those assets.  And they were

13   required to work within the various insolvency

14   processes that had been commenced in various

15   jurisdictions to obtain license termination

16   agreements, and that was what the sale process

17   entailed.  There is nothing false or misleading in

18   those statements.  It is not possible to read into

19   those statements any concession as to value.  And

20   again, the very issue of value and allocation is

21   the whole point of this trial, which was launched

22   in May 2013.

23             If you read what was said in those

24   comments before that legislative body and you read

25   what was said in the Monitor's report, you will see

 1   that there is no substance to the claim.

 2                  There is then reference to the

 3   post-petition transfer pricing --

 4                  THE CANADIAN COURT:  Mr. Coleman, was

 5   that legislative committee what Mr. Tay said?  Is

 6   that what you are referring to?

 7                  MR. COLEMAN:  That is correct.  There

 8   is also reference to the post-petition transfer

 9   pricing report and the involvement of Sean Kruger

10   referring to, quote, economic ownership.  And the

11   allegation is that this is inconsistent with the

12   Monitor's position, and it is not.  And we think

13   that the evidence at the trial demonstrated that.

14   In a going-concern context for transfer pricing

15   purposes, the sharing of certain revenue from the

16   exploitation of IP constitutes economic ownership.

17   This does not conflict with the Monitor's position.

18                  And that brings us to the Rockstar

19   hearing.  There is much said in the briefs about

20   the Rockstar hearing.  The US Debtors suggest that

21   in light of the position taken at this trial, the

22   Monitor should have told Your Honor that it

23   believed that the Canadian Estate owned the

24   proceeds of the Rockstar transaction.

25                  Now, of course, the US Debtors said

1   nothing to either Court about their position that

2   NNL's ownership interest was worthless in that

3   transaction.  That, for some reason, is a different

4   matter and fully within bounds, whereas our

5   position for some reason is out of bounds.  But the

6   fact of the matter is that given the agreements in

7   place, given the court orders in place, there was

8   nothing for anyone to say at the Rockstar hearing

9   about the allocation of value.  There was no

10  further need to reserve rights to argue for an

11  allocation.  That had been done numerous times

12  before and again specifically in connection with

13  the sale of the residual IP.

14          The IP transaction side agreement in

15  Section 12 made it crystal clear that the

16  termination of the licenses as part of the sale of

17  the residual IP was without prejudice to any

18  party's right to present any arguments,

19  methodologies, legal or factual theories in support

20  of a proposed allocation of the IP sale proceeds or

21  the proceeds of any other transaction.  So if it

22  wasn't enough to have this history of reservation

23  of rights up to that point, it was done again

24  specifically in connection with that transaction.

25  There was nothing further that needed to be said

1   about value and the allocation of value.  It

2   couldn't have been clearer.  That hearing was not

3   about what any single estate would realize or

4   expect to realize from that transaction.  It was

5   about whether the estates had collectively

6   maximized value to create a pot against which they

7   could ultimately assert an entitlement to proceeds

8   and resolve it either consensually through a

9   negotiation process or in a litigation.

10          And there is no doubt that the Rockstar

11   transaction achieved the best value possible and

12   that consummation of that transaction was in the

13   collective best interests of the estates.  That was

14   the deal.  That was the reality.  That was the

15   theme of this entire case up until May 2013, when

16   we moved into the dispute resolution phase

17   regarding allocation.  And there is nothing in the

18   record to support the position that some minimum

19   allocation value was guaranteed to any party at any

20   time.

21          That's what that hearing was about.

22   And frankly, given the reservation of rights that

23   was so abundantly clear, no purchaser would have

24   any involvement in this sort of transaction unless

25   both Courts were involved, unless both Courts

1   approved it.  So that's why we had the hearings

2   that we had.

3              This Court's very order approving the

4   Rockstar transaction follows the central theme in

5   the case.  Paragraph 45 of Your Honor's order says

6   that the proceeds of the sale were to be only

7   distributed in accordance with the process for

8   determining allocation provided for in the IFSA;

9   again, the very document where the parties agreed

10  to reserve all of their rights to future consensual

11  resolution or a litigated outcome before the

12  Courts.

13             Now that the IFSA process has achieved

14  its purpose and, frankly, there is enough money in

15  these estates to be talking about breathtaking sums

16  of post-petition interest, we want to change the

17  rules, somebody wants to change the rules on us.

18  Now the US Debtors say that the Monitor and the

19  Canadian Debtors and only the Monitor and the

20  Canadian Debtors had an obligation to put all their

21  cards on the table at some earlier date.  And

22  notably, the US and EMEA Debtors didn't feel

23  similarly obligated and didn't do so.  And in any

24  event, the testimony of Sharon Hamilton, Murray

25  McDonald, John Doolittle shows that the ownership

1    position of NNL was discussed and the implications

2    of that position were discussed in terms of

3    entitlement to proceeds.

4                 THE CANADIAN COURT:  Was there also not

5    evidence that they didn't land on their position

6    until after the mediation before Justice Winkler

7    terminated?

8                 MR. COLEMAN:  There is that statement,

9    yes, Your Honor, that's correct, until they were

10   required to do so under the agreements among the

11   parties that both Courts approved.

12                Now, just a word on prejudice, because

13   none of this matters, of course, at all.  But none

14   of it matters unless there is some prejudice here.

15   The US Debtors have identified none.  The issues

16   that are before these Courts in this trial would be

17   here whether IPCo was for some reason or another

18   deemed feasible and pursued, or whether it was

19   decided to fight first, sell later.  We would have

20   had to resolve these very issues.

21                Now, we have shown that IPCo was not

22   feasible.  But even if it were and even if it had

23   been pursued, we would be back to dealing with what

24   the MRDA provided for, who owns what and who is

25   entitled to what share of the IPCo profit.  So we

 1    would have all these issues anyway, so where is the

 2    prejudice?

 3                    THE US COURT:  I take it you will argue

 4    that, in contrast, there would be substantial

 5    prejudice to the Monitor?

 6                    MR. COLEMAN:  Indeed, Your Honor.  And

 7    more importantly, it is not the Monitor.  It is the

 8    creditors of the Canadian Estate.

 9                    Now, a quick word on estoppel.  It is

10    way too late in the game to raise it in pretrial

11    memorandum of law.  It needed to be raised, if at

12    all, in the initial responsive pleadings because

13    then we could have tested it in discovery.  We

14    didn't have that opportunity, and therefore, those

15    theories are waived.  In any event, there is no

16    substance to them.

17                    Judicial estoppel.  There is no

18    evidence of any irreconcilably inconsistent

19    statements from the Monitor, no evidence -- there

20    is labels, there is accusations, but no evidence of

21    bad faith.

22                    On equitable estoppel, there is no

23    evidence that there have been any representations

24    upon which the US Debtors had any right to rely,

25    given the agreements and court orders in place, and

1   no injury.  And so all of these, all of this swirl

2   of allegation at the end of the day is just

3   defamatory.

4            Estoppel by convention, which is a

5   Canadian law doctrine and which was raised, I

6   think, for the first time in a post-trial brief,

7   suffers from all those infirmities plus two more.

8   First, the full reservation of rights is actually

9   fatal to that theory, and separately, the entire

10  agreement clause in the MRDA is likewise fatal to

11  that theory.

12           So when you think through the position

13  on this issue and you realize that even if some of

14  these suggested alternatives had been pursued,

15  IPCo, or let's get some kind of declaratory

16  judgment or have our litigation ahead of the sales,

17  and you realize that we would have gone through

18  this trial anyway, what did they give up?  You

19  realize that what they actually gave up was holdup

20  value.  What they gave up was that if they had

21  known before the sales the position that has

22  unfolded during the course of this trial, they

23  could have leveraged a better result.  But

24  everybody gave that up.  That was the genius behind

25  the IFSA.  Everybody knowingly gave that up because

1  to do otherwise would have been value-destructive.

2            So there is no prejudice here.  That

3  was the deal.  That was the bargain.  There is now

4  a substantial cash escrow that needs to be

5  allocated, and it should be allocated on its

6  merits.

7            Thank you.

8            THE US COURT:  Thank you, Mr. Coleman.

9            MR. COLEMAN:  Unless there are any

10  questions, I think CCC is up next.

11            THE US COURT:  And I am reserving

12  questions, because I would like to hear from all of

13  the parties before I raise any substantial issues.

14  Thank you, Mr. Coleman.

15            THE CANADIAN COURT:  Is there any more

16  coming from the Monitor in-chief?

17            MR. COLEMAN:  I think not, Your Honor.

18            THE CANADIAN COURT:  Thank you.

19            Mr. Zigler.

20            THE US COURT:  Thank you, Mr. Coleman.

21            MR. ZIGLER:  Your Honour, Judge Gross,

22  if we could give our folks in Delaware a minute to

23  get set up and then we'll start.

24            THE US COURT:  Of course.

25            MR. ZIGLER:  There is also a

1   demonstrative set of slides we'll be using that

2   we'll be passing around to the Court and the others

3   while we wait.

4              THE CANADIAN COURT:  Go ahead.

5              MR. ZIGLER:  I hope we are set up in

6   Delaware and we have the demonstratives up for you

7   in both courtrooms.

8              THE US COURT:  Thank you.

9              MR. ZIGLER:  Your Honour, Judge Gross,

10  Mark Zigler for the Canadian Creditors Committee,

11  and with me, my co-counsel Mr. Steep, Ms. Walancik,

12  and Ms. Harmer in Toronto, and Mr. Hoeffner and Ms.

13  Melnick, Mr. Marques who has come from Canada down

14  to Delaware, and Ms. Whitley-Sebti.

15             We won't be referring much to our brief

16  and findings of fact and those of the Monitor, but

17  I do want to start out by saying we adopt the

18  findings of fact set out by the Monitor,

19  particularly in their reply, and that much of what

20  I will be saying pertains to those facts.

21             As a preamble, it has been of course a

22  privilege to appear before both Courts in this

23  unprecedented litigation.  It has been a long and

24  arduous road for well over a year.  It has been

25  five and a half years since the filing.

1          Regrettably, it has been a very

2    expensive process, and particularly for the 20,000

3    or so stakeholders which we represent and the tens

4    of thousands of others elsewhere, because no matter

5    what happens, they will suffer some loss.

6          But what I was asked to say by my

7    clients, and I think it is quite important, is that

8    they do not seek any special treatment here.  Like

9    every other creditor, like every other party, they

10   would like a fair and prompt, reasonable decision.

11         But also importantly, they would like

12   something that accords with the type of Nortel and

13   the operation which they understood they worked

14   for, given the evidence that has come out at trial.

15         So to give you the outline for our

16   argument, I will give you a brief overview of the

17   CCC's position and deal with facts which we believe

18   are uncontroverted, that part of the matrix that

19   Mr. Zarnett said is admissible in accordance with

20   the Supreme Court of Canada's decision in Sattva.

21         My colleague, Mr. Hoeffner, will then

22   deal with some of the specifics and the outcomes

23   that arise from the ownership allocation theories

24   and the CCC's equitable pro rata allocation, and

25   we'll then conclude.

1           To go to the overview, the issue from

2    our perspective is that the Courts can only resolve

3    this in one of two ways.  Either we are dealing

4    with ownership lines pursuant to the MRDA and to

5    the extent there are any supporting documents and

6    the factual matrix to support it, or we are left

7    with no avenue other than the equitable pro rata

8    allocation to the estates, I would underscore,

9    based on global claims.

10          Because essentially once you get past

11   the ownership issues identified by Mr. Zarnett this

12   morning, you are in extra-contractual territory,

13   for want of a better term, and we will demonstrate

14   that in terms of not just the pro rata theory,

15   which is an equitable theory, but those that are

16   being posited by EMEA and the US interests.

17          The MRDA and the surrounding facts

18   support legal ownership, as do the outcomes based

19   on the legal ownership approaches.  The only issue

20   in dealing with the ownership theory is the value

21   that you accord to the licences.  In this respect,

22   we support the interpretation put forward by the

23   Monitor's counsel, and we will say no more.  You

24   won't hear me parsing the wording of the MRDA this

25   morning.  You won't hear me citing authorities on

1    how that wording should be parsed.

2              What you will hear are the facts that

3    are consistent, the objective facts occurring at

4    the time that accord with such an interpretation,

5    but also accord with the pro rata interpretation.

6              I should point out that even within the

7    ownership valuation of licences issue, there are

8    some business valuation issues, but ultimately it

9    comes down to the value that is ascribed to the

10   licences as part of the Rockstar sale, and the

11   Monitor has put forward to you an alternative

12   contained in Mr. Green's Appendix P which we

13   support as well.

14             So what are the allocation positions?

15             I think Mr. Zarnett left one out.

16             THE CANADIAN COURT:  Well, you don't

17   have to go through all of this.  This demonstrative

18   is -- I don't know if you have to go through it

19   all.  We understand what the various theories are.

20             MR. ZIGLER:  Oh, I didn't intend to

21   review them.  There are four in all.  The one that

22   Mr. Zarnett did not touch on was the pro rata

23   allocation alternative, which we say is legally

24   sustainable, just as the ownership one is, given

25   the nature of Nortel's operations and consistent

1  with both Courts' jurisdictions as Courts of law

2  and equity.

3            We also agree with the Monitor's

4  criticisms of the revenue and contribution theories

5  that were put forward and Mr. Hoeffner will add

6  some other points, but we'll also tell you that

7  they produce inequitable and extreme results and

8  require leaps that are outside the contract.  They

9  do not produce commercially sensible results based

10 on how Nortel operated.

11           The last part of our overview deals

12 with avoiding extreme results.  Everybody in this

13 litigation has said, we want to avoid extreme

14 results.  A rational position to take.

15           But you can't deal with that concept in

16 a vacuum.  This allocation dispute can't be viewed

17 in a vacuum.  It is at the heart of resolving

18 issues in a six-year-long major insolvency where

19 the objective at this stage is to resolve unsecured

20 creditor claims.  Nortel is dead.  There is no

21 business to continue.

22           THE CANADIAN COURT:  Well, you are

23 supporting the Monitor and the other side is saying

24 that that is an extreme result.

25           MR. ZIGLER:  Well, I think not, Your

1    Honour, and when you look at the waterfall, for

2    want of a better term, of where the money goes, you

3    will see that the result is not extreme at all, and

4    that is what the factual matrix takes you to.

5              If you look at the nature of the claims

6    in Canada, if you look at the broad picture, then

7    the allocation dispute which is at the heart of

8    this whole insolvency produces outcomes that are

9    actually quite reasonable and defensible.

10             We would be deluding ourselves if we

11   thought that the allocation just stopped at the

12   numbers and the black box, because in the context

13   of the 2 billion dollar intercompany claim,

14   noteholders who claim 4 billion dollars in two

15   jurisdictions, a UKP guarantee claim that is still

16   to be determined before Your Honour, in the context

17   of all of that, there is a much broader picture

18   than just how you allocate at the base level.

19             The pensioners and disabled employees

20   are involuntary creditors.  They should be treated

21   fairly, and to do that you have to avoid lopsided

22   distributions to the different estates in terms of

23   their claims.  Otherwise, the recoveries to the

24   Canadian creditors, if you look at the US position,

25   you are down as little as 10 or 11 percent.  The

1   EMEA position may be in the range of the low 20s,

2   maybe up to 25, and you contrast that with others,

3   and this was quite evident in the post-petition

4   interest debate which is still out before the

5   Courts, we have got parties seeking more than 100

6   percent plus interest, and in the context of the

7   facts of this case that would be an extreme

8   outcome.

9                So let's look at the facts.

10                THE CANADIAN COURT:  The waterfall you

11   are referring to, is that at paragraph 23 of your

12   brief?

13                MR. ZIGLER:  That is correct, it is the

14   chart that Mr. Britven produced and we will get

15   into it in greater detail later in our submissions,

16   but looking at paragraph 23 of our brief -- it is

17   actually paragraph 31 of our brief.

18                Paragraph 23 is the first step of the

19   waterfall.

20                THE CANADIAN COURT:  All right.

21                MR. ZIGLER:  Paragraph 31 takes it a

22   step further.

23                And I will deal with that in the

24   context of the facts that I am pointing Your Honour

25   to, because that is the factual matrix.  It is

1    objective.  It is not opinion evidence.  The

2    opinion evidence of the experts puts you all over

3    the map here, as Mr. Zarnett pointed out.  The

4    subjective views are not particularly helpful.  But

5    totally what we want to get to are the findings of

6    fact that help you interpret the MRDA or determine

7    whether it is applicable at all.

8              And there is one uncontroverted fact

9    that cannot be questioned I think by any party, and

10   that is there was one Nortel.  Nortel operated as

11   an integrated matrix organization in the technology

12   business.  It had three elements to the matrix.

13   There were the lines of business along which it did

14   its business planning and strategic planning, its

15   marketing, its business development, even much of

16   its research and development activity.  That was

17   the key driver of the business.  That was the

18   evidence you got.

19              THE US COURT:  Is that true for its

20   creditors as well, Mr. Zigler?

21              MR. ZIGLER:  That is true for

22   everybody, Your Honour.

23              The evidence of the creditors and the

24   people who gave evidence, whether they were senior

25   officers or lowly employees, all of their evidence

1  was quite consistent:  This business ran on a line

2  of business model.

3              THE CANADIAN COURT:  Well, I think

4  Judge Gross's question really related to the

5  Bondholders.

6              MR. ZIGLER:  I don't know if they

7  disagree with how Nortel ran, but the facts are the

8  facts.

9              And the evidence before you from the

10 former office -- four of the more senior officers

11 of this company was pretty clear.  We ran along

12 lines of business.  We had head office global

13 services, which included treasury, finance, legal,

14 taxation, and the CEO's office, and we had regional

15 and geographic functions, primarily in the areas of

16 sale and accounting, and you can further break down

17 the regions by subsidiaries.

18             And although the Courts in this case

19 are called upon to determine allocation by

20 subsidiaries, that is hardly the first tier by

21 which Nortel ran its operations.  It was in fact a

22 rather insignificant one in terms of how the

23 business was run.

24             The evidence of Mr. Currie was pretty

25 clear that Nortel ran on this matrix.  Nobody

1    questioned it.  The evidence of Mr. Binning, who

2    was also the Chief Financial Officer, was pretty

3    clear.  The evidence of Mr. McFadden who ran one of

4    the lines of business as its president and was a

5    Chief Technology Officer, was very clear on these

6    points, and the evidence of Mr. Allen who was its

7    Chief Legal Officer and secretary.  They are the

8    most senior people who testified.  They are the

9    only ones who had a view of the entire operation,

10   maybe with a few exceptions, and they were not

11   restricted to the fields of transfer pricing or

12   people who actually did the inventing, but they had

13   the big picture.

14            And what was clear from Mr. Currie's

15   evidence in terms of subsidiaries, and this plays

16   right into the approach which NNI is taking, it had

17   no strategic purpose in the Nortel operation, and

18   that was his evidence.

19            Maybe he was a bit facetious by

20   likening it to NN Poland in that respect, but he

21   wasn't being disrespectful of the United States as

22   a market and he wasn't being disrespectful of

23   Nortel's activities in the United States or

24   anywhere else.  What he was saying, and you will

25   see in his deposition testimony, is that a

1   subsidiary is not a market.  In other words, NNI

2   could not do what it did if it were not for massive

3   support from Canada and from the UK in terms of

4   research and development.  Although the sales got

5   booked through NNI and that was the largest market,

6   and Canada was a small market, you wouldn't have

7   the resources of research and development and head

8   office and the expenditures in Canada just for that

9   small market.  It serviced a global market, and

10  clearly Mr. Allen gave you some -- and when he was

11  cross-examined, he gave you some clear evidence as

12  to the genesis of that.

13           And that situation worked right through

14  to the insolvency filing from the evidence of

15  Mr. Binning.

16           You can't argue with those facts.  That

17  is how it operated.  And you have to contrast that

18  with the rather limited view of extrinsic evidence

19  which we say is not admissible, and we agree with

20  Mr. Zarnett on this, of transfer pricing people,

21  and with all due respect to what they do and it is

22  valuable work in terms of transfer pricing, what is

23  clear from the transfer pricing evidence and

24  particularly that of all the experts, and I am

25  thinking of Mr. Reichert and Professor Eden, you

1  cannot translate what happens in the transfer

2  pricing world which pertains exclusively to a small

3  element of taxation to the way a business is run or

4  to any legal rights.

5            The second fact that I want to take you

6  to is that ownership of the IP vested in NNL.  That

7  is a rather obvious one.  Yes, the issue is what is

8  the value of the licences, but everybody

9  acknowledged that in their opening filings and in

10  IFSA, and really what you have to look at is how

11  far you want to go with valuing those licences.

12            The third fact is that NNL owned the IP

13  for valid business reasons.  It was not formality.

14  It was not administrative convenience.  It is not a

15  question of opinion either.  Ms. De Wilton and Ms.

16  Anderson from the EMEA who gave evidence on behalf

17  of EMEA were clear that there were business

18  reasons.  There had to be central control to deal

19  with licensing, cross-licensing, defending claims,

20  and dealing with the IP in all markets, not just

21  the individual ones of the subsidiaries.

22            The patents were developed worldwide on

23  a collaborative platform, everybody agrees to that,

24  but they were registered in NNL's name.

25            And you have the evidence of the

1  assignments.

2           What other facts could we give you?

3  And I will conclude with these two particular

4  areas, because they are quite important.

5           Nortel's leadership was based in and

6  employed in Canada, and why would a parent company

7  have licensed any more than it had to for transfer

8  pricing purposes if it was, as Mr. Allen testified,

9  a company based here in Canada that put huge

10 resources into dealing with a global business.  You

11 have to read the MRDA in that context.

12          The last point which indicates

13 precisely why we are where we are in the insolvency

14 and does deal with this waterfall issue, is that

15 Canada was in fact a high-cost low-revenue

16 jurisdiction as a market for Nortel because Nortel

17 NNL and the other Canadian Debtors took on burdens

18 that were global in nature.

19          It did so because the Canadian market

20 was small, and so the US, EMEA and other markets

21 had to be serviced.  And that is why Nortel, NNL

22 and NNC, were the borrowers on 4.2 billion dollars

23 worth of debt.  They are the primary borrowers.

24 The burden they took on before the filing was

25 servicing that debt, and that was not part of the

1    MRDA calculation, as evidenced by Mr. Currie.

2              The burden they took on involved

3    producing intellectual property at levels way more

4    than what would ever have been necessary to service

5    a Canadian market.  I think the inventorship

6    analysis of Mr. Malackowski showed you 50 percent,

7    and Mr. Bazelon, more than 50 percent of the

8    inventors were -- the patents were registered to

9    Canadian inventors.

10             It did so and undertook the burdens of

11   guaranteeing UK pension obligations in order to

12   make the entire operation run.

13             And as a result of transfer pricing,

14   very much tied to this case, it took on a 2 billion

15   dollar claim from the US Debtors because of events

16   between 2001 and 2005, to say nothing of the burden

17   it had to its own employees here in Canada, its

18   head office employees who helped run the operation.

19             At the end of the day, what you see

20   after five and a half years of this insolvency is

21   in fact that Canada has become, and I use this

22   euphemism, I have used it before, but I think it is

23   the only way you can describe it, it is the dumping

24   ground for claims worldwide and from Canada.  Yet

25   when you look at the key asset of this global

1   business, its intellectual property, those outside

2   of Canada are saying, well, you can't have that

3   asset, it is not yours, when the documents clearly

4   say it is.

5                And I think you have to read the MRDA

6   in that context, and that is where the waterfall

7   comes in.  That is where you realize that a dollar

8   paid into Canada in this allocation dispute doesn't

9   stay here.  In fact, most of it does not, given the

10  2 billion dollar claim, the Bondholder claim, the

11  UKP claims and the EMEA 125 million dollar

12  settlement that you have.

13               So based on that factual matrix, I

14  think you have the groundwork for the two positions

15  that we advocate, and at this point I'm going to

16  turn it over to Mr. Hoeffner in Delaware, unless

17  there are any further questions.

18               THE CANADIAN COURT:  Thank you.

19               THE US COURT:  Mr. Hoeffner.

20               MR. HOEFFNER:  11:59.

21               THE US COURT:  All right.  You are in

22  the morning.

23               MR. HOEFFNER:  So I can still say good

24  morning to Judge Gross and Justice Newbould.  Thank

25  you for having us.

1          THE US COURT:  Of course.

2          THE CANADIAN COURT:  Good morning.

3          MR. HOEFFNER:  I have had the pleasure

4  of sitting quietly in the back of this courtroom

5  for much of these proceedings.  And during the

6  course of the trial it has become increasingly

7  clear that critical to the outcome of this dispute

8  are two considerations which I would like to

9  discuss.

10          First, we believe it is important for

11  the Court to avoid extreme results, and I am going

12  to talk about that issue.  The possible solutions

13  for the Courts that we have structured will avoid

14  extreme results.

15          Second, we have been focused on how the

16  Third Circuit and the Ontario Court of Appeal would

17  review the arguments and the decisions in this

18  case.  And in that context in particular, I am

19  going to speak a bit about the pro rata theory and

20  try to clear up some of the misconceptions that may

21  be out there about that theory.

22          THE US COURT:  And how it differs from

23  substantive consolidation.

24          MR. HOEFFNER:  I sure am going to get

25  to that, yes.

1            Just briefly again, Mr. Zigler

2   mentioned this, but Mr. Zarnett and Mr. Coleman

3   were far more eloquent on the ownership theory than

4   I ever could be or ever want to be, frankly, and

5   did a great job covering those theories, so we are

6   not going to repeat those arguments.  We believe

7   they are fully supported by the MRDA and the law,

8   and we believe that the contractual ownership

9   theory is the one theory that focuses on the value

10  of the residual IP assets sold that clearly is

11  sustainable at the appellate level.

12           The CCC also supports the business

13  valuation in the line of business sales that was

14  presented by Mr. Britven in his expert testimony.

15  The PPAs, the purchase price allocations, that he

16  referred to provide the only objective measure of

17  the intellectual property and other assets that

18  were sold in the line of business sales.

19           Again, now I want to get to the

20  equitable results.  There is nothing inequitable or

21  extreme about the allocations that will occur under

22  the contractual ownership theory.  To put the issue

23  into focus, the Court should consider that Nortel's

24  operations led to significant claims into Canada by

25  NNI, $2 billion, and by EMEA, $125 million, as well

1   as the asserted UKP pension guarantee claim.

2              If NNL must bear the burdens of

3   supporting Nortel's global operations and claims of

4   creditors of other estates, it should also be

5   allocated the values of what it owns contractually.

6   Otherwise, NNL is left holding the bag on claims

7   with no assets to pay for those claims.

8              THE US COURT:  But didn't Canada

9   receive very substantial revenues?  I have heard a

10  lot of talk about burden to Canada, but I haven't

11  heard about the benefits to Canada.

12             MR. HOEFFNER:  There were benefits.

13  Those were all taken into account in connection

14  with the MRDA and the RPSM provisions that are

15  built in there.  That is all factored in.  But

16  again, now we are focusing on the claims and the

17  method to pay the claims and recognizing all these

18  burdens that were taken on by Canada.  So that's

19  going to be the focus of what we are going to talk

20  about here.

21             As the evidence shows, most of the

22  money under any scenario that will be allocated to

23  NNL in this case flows out of Canada.  So it goes

24  to Canada.  It doesn't stay in Canada.  Most of it

25  is going to go back to the creditors of the other

1   estates.  Under the contractual ownership theory,

2   the Bondholder and other US unsecured creditors

3   would essentially be made whole.  And again, the

4   chart from Mr. Britven is really the core

5   illustration of how this would all work and why we

6   are not going to have inequitable results under the

7   methods that we are proposing.

8            This chart shows clearly that equitable

9   outcomes would occur under the theories put forward

10  by the Monitor, by the Canadian Debtors, and by the

11  CCC.  In contrast, the chart demonstrates there

12  would be extreme results if the Courts were to

13  accept the US revenue theory or the EMEA license or

14  contribution theories.

15           We are going to focus on some specifics

16  here.  With respect to the contractual ownership

17  theory, the Bondholders would receive 100 cents on

18  the dollar, and the US unsecured creditors would

19  receive 95 cents on the dollar.  EMEA creditors

20  would obtain significant recoveries.

21           Canadian creditors -- namely, the

22  pensioners and former and disabled employees of

23  Nortel in Canada -- under this scenario would at

24  least receive a fair treatment.  They are not going

25  to receive everything by any stretch of the

1    imagination, but at least they would receive a fair

2    treatment.  Here we have got 59 percent going

3    through Canada.

4              So in short, the contractual ownership

5    theory provides both a legitimate basis for

6    allocation that is sustainable on appeal, and it

7    also will not lead to extreme results for any

8    party.

9              The CCC's alternative pro rata theory

10   also is both legitimately grounded for reasons we

11   will talk about a little bit later and also leads

12   to an equitable result.  Each estate is allocated

13   sufficient funds to enable it to distribute to its

14   general unsecured creditors the same recovery on

15   their claims as that received by the general

16   unsecured creditors of the other estates.  And this

17   is an important point.  If the Courts were to

18   determine in proceedings in their own estates to

19   permit the crossover Bondholders to proceed with

20   the full amount of their claims in both Canada and

21   the United States, the crossover Bondholders would

22   receive recoveries from both estates of up to

23   100 percent of their pre-petition claims.

24             In this scenario -- and this is another

25   important point --

1          THE CANADIAN COURT:  May I just ask you

2     a question, please, Mr. Hoeffner.

3          MR. HOEFFNER:  Yes, sure.

4          THE CANADIAN COURT:  In this chart, you

5     have got in Column 1 CCC ownership; No. 2, Canadian

6     Debtors and Monitor.  What is the difference

7     between CCC ownership in Column 1 and Canadian

8     Debtors and Monitor in Column 2?

9          MR. HOEFFNER:  There are two different

10    expert reports that were submitted independently

11    through the theories, and Mr. Green in his report

12    and Mr. Britven in his report came essentially --

13    most importantly, essentially to the same

14    conclusions, but there were some modest differences

15    between the two.

16         THE CANADIAN COURT:  All right.  I

17    understand that.  So the ownership, the CCC

18    ownership and the Canadian Debtors and Monitor are

19    both a contractual interpretation ownership; am I

20    correct?

21         MR. HOEFFNER:  Yes, sir.

22         THE CANADIAN COURT:  And the difference

23    between 1 and 2 is simply the experts?

24         MR. HOEFFNER:  Yes, sir.

25         THE CANADIAN COURT:  As to how they

1   value that?

2            MR. HOEFFNER:  Yes, sir, exactly.

3            THE CANADIAN COURT:  All right.  Thank

4   you.

5            MR. HOEFFNER:  So under the scenario I

6   was just describing, the results under the CCC's

7   pro rata theory are pretty much the same as the

8   results under the contractual ownership theory.  So

9   that is basically what I would call the double-dip

10  scenario.

11           And again, we are going to come back to

12  the Courts and the different estates being left

13  with the autonomy to deal with the different claims

14  in their estates.  But again, viewed this way, in

15  the end, the pro rata approach serves as a market

16  check on the ownership theory.  And I think it is

17  important in terms of, we have two theories that

18  could basically get you to the same conclusion,

19  both credible.  Both avoid extreme results.

20           In contrast, allocation by revenue is,

21  for all the reasons that have been talked about

22  earlier today by Mr. Zarnett, inequitable, and we

23  believe it would also importantly provide for

24  extreme results.

25           The 11 percent allocation to the

1    Canadian Estates that we have highlighted is

2    actually the most extreme result of all under any

3    of the scenarios that are proposed by any of the

4    parties.

5                The revenue theory simply maximizes

6    assets in the US, and it makes no effort to match

7    them against the costs and claims incurred to

8    create those assets.  It is not commercially

9    sensible to allow any single entity to shield

10   itself from the claims associated with the costs

11   incurred to develop the assets that reside in their

12   jurisdiction.

13               The result proposed by the United

14   States is even more extreme when you consider the

15   pre-allocation cash in NNI, which is on the bottom

16   of this chart and identified as approximately

17   $1.3 billion, that NNI would retain.  And I would

18   just note that we believe that this number has been

19   reduced fairly significantly due to the burn rate

20   in this proceeding over time.  But again, it is

21   $1.3 billion that they would retain, and that's the

22   number that essentially would be used to pay the

23   Bondholders the post-petition interest under the

24   settlement that they have proposed.

25               THE CANADIAN COURT:  What is the date

1    of that 1.3 billion?  That is as of when?

2                    MR. HOEFFNER:  This is as of the date

3    that Mr. Britven had submitted his initial report,

4    so we are going back to that point in time.  It is

5    really preceding the whole trial proceeding and

6    significant activities in this case.

7                    THE CANADIAN COURT:  Thank you.  All

8    right.  That's fine.

9                    MR. HOEFFNER:  So -- yes.  I mean, we

10   have estimates for that, and it would -- but it is

11   not in evidence.

12                   The EMEA approach would also lead to

13   extreme results.  Under the two approaches that are

14   suggested by EMEA, the Canadian Debtors would

15   receive only 11 percent under the license approach

16   and 25 percent under the contribution approach.

17   And again, the contribution approach would retain

18   $536 million of pre-allocation undistributed cash

19   in NNI.

20                   Let's talk about the CCC's pro rata

21   theory.  We believe that pro rata is a principled,

22   sustainable allocation methodology, and, most

23   significantly, it embodies how Nortel operated and

24   generated the assets that are being sold, that were

25   sold.  It is only a means of calculating the amount

1  of money to be allocated to each estate.  It is not

2  a means of calculating the ultimate payments on

3  claims the estates' creditors will receive.  That

4  role is retained by the authorities having the

5  jurisdiction to resolve those claims.

6           This is too many words on a slide.  I

7  understand that, and I apologize.  But it is a long

8  quote that we had taken out of our brief, so we

9  have included it.  But the points are really that

10  the CCC pro rata theory would generate an equitable

11  outcome for each estate because it appropriately

12  balances the assets available to each estate

13  against the risk of claims each bore in making

14  Nortel a global IP company.  So you are focusing on

15  the amount of claims, what those burdens were that

16  were taken on by each estate.

17           It provides the Courts with an

18  allocation solution if the Courts conclude that it

19  is not possible to answer with certainty the

20  question posed at the outset of the trial:  What

21  portion of the purchase price paid in the

22  bankruptcy sales was due to the transfer or

23  surrender of assets by each selling debtor.

24           To be clear, we are presenting the

25  pro rata theory as an alternative to the Courts.

1    You have the other three theories.  If you make a

2    decision that each of those theories are

3    unsustainable, if the revenue theory is ridiculous

4    because that's not the way any company operates;

5    companies have revenues and expenses.  If the

6    decision is made that the contribution theory is

7    ridiculous because, based on the question from

8    Judge Gross some time ago, if a company spends a

9    million dollars to develop an iPhone and spends a

10   billion dollars to develop an unsuccessful product,

11   the value shouldn't be attributed solely to the

12   funds that are contributed to develop product.  You

13   have got to look deeper.

14            And if the Courts for some reason,

15   which, of course, we don't understand, decides that

16   the ownership theory does not apply, we are again

17   trying to give you a solution.  So we know that you

18   can't just throw your hands up in the air at the

19   end of this proceeding.  We are trying to give you

20   as much flexibility as possible.

21            So absent acceptance of clear ownership

22   of assets pursuant to the MRDA, it is not possible

23   to trace most of the assets sold to any one selling

24   debtor.  The assets are intangible and were

25   developed, managed, marketed and sold

 1    collaboratively by one integrated, multinational

 2    enterprise without regard for borders or corporate

 3    entity.

 4              As Mr. Zigler explained, the evidence

 5    concerning the nature of Nortel's business and its

 6    operations is really undisputed.  The nature of the

 7    assets and the collaborative contribution of the

 8    estates and their creditors to the proceeds

 9    realized for them lead to only one fair method of

10    allocation apart from ownership.  That's the

11    allocation of the lockbox funds to the separate

12    estates under the supervision of these two Courts

13    based on the valid claims of their creditors.

14    Payments within the estates -- again, this is

15    critical -- will be determined by each estate

16    within its jurisdiction according to its laws and

17    processes.

18              It bears repeating that pro rata

19    appropriately balances the assets available to each

20    estate against the risk of claims each bore in

21    making Nortel a global IP company.

22              It is also important that the Courts

23    appreciate what the CCC's pro rata theory does and

24    what it is and not be misled by the

25    mischaracterizations that have been set forth in

1    some of the briefs about the pro rata theory.  CCC

2    pro rata allocation is not and does not affect

3    global substantive consolidation.  It bears none of

4    the badges of substantive consolidation.  It

5    respects the corporate separateness and the

6    self-determination of each Nortel entity, the

7    sovereignty and jurisdiction of each entity's laws

8    and courts, and the enforceable rights and

9    interests of their creditors.

10            It does not move assets among the

11   creditors -- I am sorry.  It does not move assets

12   among the estates.  It does not dictate creditor

13   recoveries or how they are to be determined.  It

14   does not restructure or revalue the rights of any

15   creditors.  And it does not determine the

16   enforceability of inter-entity guarantees,

17   intercompany claims, or Bondholder claims to

18   post-petition interest or to enhancements.

19            These issues all remain within the

20   purview of the individual estate's jurisdictions,

21   laws and courts.  Guarantee and intercompany claims

22   found enforceable and allowed by the Courts for

23   each of the estates will be recognized in the

24   calculation of funds allocated to those estates.

25            THE CANADIAN COURT:  How does that

1    work?  I mean, I know your brief -- I read your

2    brief, and it talks about lack of evidence of what

3    their expectations were and they bought at so many

4    cents on the dollar and the like.  I understand all

5    that.

6              But what you are saying is that if the

7    Court finds that they are entitled to 100 cents on

8    the dollar, disregarding interest for the moment,

9    then what do we do with the pro rata?  Just you

10   allocate 100 cents on the dollar to the Bondholders

11   and then that reduces the pot?

12             MR. HOEFFNER:  Yes, yes, exactly.  Yes.

13   And I think what Mr. Britven --

14             THE CANADIAN COURT:  What do we do with

15   the US Estate?  What is the size of the pot for the

16   US Estate?

17             MR. HOEFFNER:  Again, the funds would

18   be allocated to the Bondholders through the two

19   claims and, again, with the two different estates

20   making the determination on the Bondholder claims

21   in the two different jurisdictions.

22             THE CANADIAN COURT:  Yes.

23             MR. HOEFFNER:  Assuming that is taken

24   up to 100 cents on the dollar, again, that would

25   reduce the pot that is going to be paid to all the

1   other creditors, all the remaining other creditors

2   in the various estates, in the two estates.  So

3   there would be a modest -- well, there would be an

4   adjustment to basically modify the amounts.  So

5   instead of the 71 cents for each of the creditors,

6   there would be an accommodation to the Bondholders

7   where they would get to 100 percent.  That would

8   reduce the amount that is paid out to each of the

9   other creditors to a level somewhere -- I think it

10  is 63 percent or something like that.

11              Now, both of Your Honors have

12  jurisdiction and authority to order this pro rata

13  allocation and its implementation.  That is set

14  forth in our briefs in paragraphs 163 through 208.

15  And we believe the appellate courts in both

16  jurisdictions are more likely to sustain such

17  orders than they would be to sustain orders

18  adopting the US and EMEA proposals.

19              I want to talk a little bit about Owens

20  Corning, to go to your question, Judge Gross.

21              THE US COURT:  Yes, sir.

22              MR. HOEFFNER:  I am sure that some

23  people on the right side of the room here are going

24  to talk about the Owens Corning case, and they are

25  going to argue that it precludes adoption of the

1   pro rata theory.

2                We believe that the contention of the

3   US interests and the Bondholder group that the

4   Third Circuit's decision in Owens Corning applies

5   to Your Honors' consideration of CCC pro rata

6   allocation and precludes adoption of that theory

7   as, at best, seriously misguided.  And, again, we

8   believe that it ignores what the pro rata

9   allocation theory is and what it does.

10               As Your Honor is well aware, in Owens

11  Corning the Third Circuit addressed when a US

12  Bankruptcy Court may and when it may not approve a

13  Chapter 11 plan that provides for the substantive

14  consolidation of the affiliated US debtor estates.

15  Specifically, the Court of Appeals describes

16  substantive consolidation as a construct of US

17  federal common law emanating from equity which --

18  and I am going to read a long quote --

19                    "Treats separate legal entities

20               as if they were merged into a single

21               survivor, left with all of the

22               cumulative assets and liabilities,

23               save for inter-entity liabilities,

24               which are erased.  The result is

25               that the claims of creditors against

1              separate debtors morph to claims

2              against the consolidated survivor."

3              Now, for the reasons we have been

4    talking about, CCC pro rata allocation does none of

5    this.  It does the opposite.  In the Owens Corning

6    case the Third Circuit found that certain facts of

7    the Owens Corning debtors prohibited their

8    substantive consolidation.

9              None of the facts in Owens Corning bear

10   any relationship to the facts in Nortel.  The Owens

11   debtors were subject to a loan agreement which

12   expressly bound them to maintain corporate

13   separateness.  No such provisions exist in the

14   Nortel indentures.  And the CCC pro rata allocation

15   does not in any way, shape or form impact the

16   corporate separateness or self-determination of any

17   Nortel entity.

18              The Owens plan eliminated inter-entity

19   claims and guarantees.  The CCC allocation does not

20   eliminate any claims of any creditors.  Allowance

21   and enforcement of all claims asserted against each

22   Nortel estate, including intercompany and guarantee

23   claims, remain solely within the jurisdiction and

24   power of each estate's court.

25              Different entities within the Owens

1   corporate group had different purposes, performed

2   different functions and dealt with different

3   products and services.  Several were entirely

4   autonomous and independent, operated outside of

5   business units and had their own logos and trade

6   names.  But here, as the evidence has clearly

7   established, Nortel was a highly integrated matrix

8   organization that operated along business lines,

9   that spanned geographic borders and corporate

10  entities.  All Nortel entities were known as

11  Nortel.

12          Owens' unintegrated operation made it

13  easy for the Third Circuit to conclude that there

14  is no question which entity owns which assets.

15  Respectfully, if that were the case here, we

16  wouldn't have been in this courtroom for the last

17  three months.

18          Now, the Bondholder group, our friends,

19  submitted a lengthy brief discussing creditor

20  expectations in what appears to be a misplaced

21  effort to satisfy the Third Circuit's -- the first

22  prong of the test in Owens Corning for harm to

23  creditors occasioned by substantive consolidation.

24  But as I have explained, this case does not involve

25  substantive consolidation.  But despite this, since

1    the Bondholder group has put this at issue, it is

2    necessary to address the harm they allege that CCC

3    pro rata allocation will cause the crossover

4    Bondholders.  And in brief, there is no harm to

5    them.

6              The members of the Bondholder group

7    represent more than 50 percent of the outstanding

8    bonds.  They purchased their bonds after the

9    bankruptcy filing.  There is no evidence that their

10   purchases in the secondary market provided any

11   benefit to Nortel.  These and other current holders

12   of Nortel bonds are the creditors of the debtors.

13   The investors in the initial bond offerings are no

14   longer the creditors.

15             And the circumstances in Nortel at the

16   time the initial investors purchased the bonds are

17   vastly different from those with the current

18   Bondholders, that the current Bondholders confront

19   today.  Things have changed dramatically.  As the

20   UCC's expert acknowledged, expectations change as

21   circumstances change.  That is particularly true in

22   a bankruptcy case.  With changed circumstances, the

23   original expectations for recoveries arising from a

24   contract, here the indentures, of necessity must

25   change.  The expectation that all contractual

 1   provisions will be capable of being satisfied are

 2   no longer reasonable and sustainable.  These are

 3   critical points that the sophisticated distressed

 4   debt purchasers, who are members of the Bondholder

 5   group, are more than well aware of.

 6            Most notable in this case -- and this

 7   is another huge distinction from Owens Corning --

 8   there is zero evidence, zero evidence in the record

 9   of the expectations of the members of the

10   Bondholder group.  Let me say that again.  There is

11   no evidence in the record before the Courts

12   regarding the expectations of the members of the

13   Bondholder group, nothing.  No member of the

14   Bondholder group appeared at trial.  No

15   documentation of the bond-trading

16   consideration-making process was offered into

17   evidence.  And the Bondholder group's expert,

18   Mr. Kilimnik, was pulled from testifying at the

19   last minute.

20            This is very different from Owens

21   Corning, where the banks, CSFB, the attorneys came

22   in for the banks, and they appeared in court and

23   they testified concerning their expectations that

24   they claimed would be impaired by the Owens Corning

25   debtors' plan.

1          CCC pro rata allocation does not deny

2   the Bondholders any rights that they are entitled

3   to under their indentures.  Only the Courts having

4   jurisdiction over the Bondholder claims have the

5   power and authority to determine their validity and

6   enforceability and their recovery.  The CCC

7   pro rata allocation method does not make or dictate

8   these determinations any more than do any of the

9   other allocation methodologies proposed by the

10  other parties.

11          Now, the Bondholders cling dearly to

12  their contractual rights and in particular to the

13  guarantees.

14          THE US COURT:  Doesn't that

15  substantiate their expectations?

16          MR. HOEFFNER:  Again, there is no

17  evidence of what their expectations are.  You have

18  a contract term.  You have no evidence of what any

19  one member of that Bondholder group, what any one

20  Bondholder really expects.  It is not there;

21  nothing.  They didn't show up.

22          While they are focused so much on the

23  existence of the guarantees, at the same time they

24  ask these Courts to reject the ownership theory.

25  That ownership theory is grounded in contractual

1  rights under the MRDA.  And the Bondholders'

2  rejection of the ownership theory is all the more

3  ironic inasmuch as it is one that would pay the

4  Bondholders 100 cents on the dollar.

5            Finally, contrary to the protestations

6  of the bondholders and the US interests, it is

7  really irrelevant that no court has ever before

8  ordered allocation of global asset sales proceeds

9  based on the justifications underpinning the CCC's

10  proposed pro rata allocation methodology.

11            I think everyone in the room would

12  agree this case is extraordinary, and no Court has

13  ever had to address the types of issues that are

14  before these Courts today.  No court has upheld the

15  allocation of proceeds of a company in bankruptcy

16  based solely on a revenue theory.  No court in a

17  bankruptcy context has allocated proceeds based

18  solely on a cherry-picked contribution theory such

19  as has been put forth here.

20            So in conclusion, I just want to wrap

21  up.  Again, for all the reasons we have talked

22  about, the US revenue and EMEA contribution

23  theories we believe are unsustainable.  They do not

24  accord with the MRDA or any theory of equity.  They

25  are substantively flawed, and they yield extreme

1    and inequitable results.

2              We believe the CCC ownership approach

3    accords with the MRDA and produces an equitable

4    outcome.  The CCC pro rata approach is viable and

5    sustainable and produces a fair outcome similar to

6    that realized through the ownership approach.

7              CCC is in no means asking the Courts to

8    prefer one group of creditors over the other.  We

9    are taking -- we are asking the Courts to do the

10   polar opposite.  We are simply asking the Courts to

11   look to the competing interests to avoid an

12   inequitable result.

13             This case has garnered much public

14   attention worldwide, and particularly in Canada.

15   It affects tens of thousands of people.  While it

16   has resulted in extraordinary cooperation amongst

17   the multiple firms involved in multiple continents,

18   trailblazing levels of cooperation between the two

19   Courts in this case -- and we have got some pretty

20   fancy and snazzy technology to make it all

21   happen -- it has come at an incredibly high cost,

22   particularly to the involuntary creditors, the

23   pensioners and the former employees.

24             These people situated all around have

25   dedicated their lives to Nortel, and through their

1  efforts they built the business and the

2  intellectual property that is at issue in this

3  case.  In turn, they expected -- they expected --

4  to receive the retirement, health and disability

5  benefit compensation that they were promised.  They

6  face reductions in pensions and elimination of

7  health and disability benefits and should be fairly

8  compensated from the Nortel assets they produced.

9  They are not asking for everything.  They are

10 asking to be treated fairly.

11            Any allocation outcome must be legally

12 sustainable and accord with the reality of the

13 Nortel that they once knew.  A result that provides

14 only 11 to 25 percent recoveries to the Canadian

15 Estates and a full recovery plus interest to

16 distressed fund investors who purchased after this

17 proceeding was commenced based on a risky bet on

18 the outcome of a bankruptcy proceeding is clearly

19 inequitable.  It is an extreme result that is not

20 sustainable.

21            We do not need to encourage more

22 expensive cases in future insolvencies of

23 multinational companies where the courts are left

24 to try and allocate assets so that investors in

25 claims or debt can achieve a higher return.  We

1   believe that courts serve a higher purpose, and we

2   respectfully submit that any allocation

3   consideration must treat all of the unsecured

4   creditors fairly and equitably.

5             We thank the Courts for their

6   dedication in this case.  We all, on behalf of our

7   enormous team, and everyone in the room, I am sure,

8   thank everyone for the dedication of this Court.

9   That concludes my submissions.

10            THE US COURT:  Thank you, Mr. Hoeffner.

11            THE CANADIAN COURT:  Mr. Hoeffner,

12   could I ask you a question, please?

13            MR. HOEFFNER:  Of course.

14            THE CANADIAN COURT:  Could you turn up

15   the chart which was page 14 of your demonstrative.

16   Under Column 3 US creditors are shown as

17   100 percent.  The Bondholders are shown as

18   100 percent.  And I am right, am I not, that that

19   100 percent reflects 100 percent of the principal,

20   but that doesn't reflect interest?

21            MR. HOEFFNER:  That's correct.

22            THE CANADIAN COURT:  All right.

23            MR. HOEFFNER:  This chart does not

24   address the post-petition interest issue.

25            THE CANADIAN COURT:  I understand.  I

1    understand.

2            Now, if you drop to the bottom of that

3    Column 3, you have got a billion three there, less

4    what has been burned.  If I am reading right what

5    has been burned, there is not much more than a

6    billion dollars there at the moment.

7            MR. HOEFFNER:  I mean, we could -- yes.

8            THE CANADIAN COURT:  So if the

9    Bondholders end up with a billion dollars on their

10   bonds before the interest, that would leave

11   virtually no money available for the equity holder

12   in Canada.  Do I read that right?

13           MR. HOEFFNER:  You are correct.  Again,

14   if they receive the 100 percent that is identified

15   towards the top of the chart and they receive -- I

16   mean, again, there is some quote/unquote settlement

17   amount of $1 million.  You reduce that 1.3 by the

18   burn rate, which, I mean, I could give you an

19   estimate which is well in excess of 100 million,

20   and then you also have a US tax claim.

21           It is all going to the Bondholders.  I

22   mean, that's the bottom line.

23           THE CANADIAN COURT:  Right.  Thank you.

24           THE US COURT:  Is there any evidence,

25   Mr. Hoeffner, in the record relating to at what

1    price the Bondholders purchased their bonds and the

2    like?

3                MR. HOEFFNER:  The Bondholders declined

4    to submit information showing the actual prices at

5    which they purchased their bond.  We had provided a

6    chart, Judge Gross, in connection with the

7    examination of Mr. McConnell, their expert, which

8    basically tracked the prices during the periods in

9    which they did buy.  We have the changes from their

10   filings with the Court which show when their

11   positions changed at various points in time in the

12   bankruptcy proceeding, and we have what the public

13   market price was for those bonds.  We have that.

14   But again, they declined to provide the specific

15   information on their specific trading activity.

16               THE US COURT:  All right.  All right.

17   Thank you, Mr. Hoeffner.  I may have questions

18   later, but I am trying to let parties -- just ask a

19   few basic questions as we go along and ask parties

20   later.

21               MR. HOEFFNER:  We appreciate that, and

22   we will reserve whatever additional time we have

23   for rebuttal.

24               THE US COURT:  You bet.  Thank you.

25               MR. HOEFFNER:  Thank you.

1          THE US COURT:  Thank you, sir.

2          THE CANADIAN COURT:  Your brief,

3    Mr. Hoeffner, refers to some of this, doesn't it,

4    at page 69 and 70?  It deals with when they

5    acquired their bonds and some evidence about the

6    market range at the time.

7          MR. HOEFFNER:  Yes.  The information

8    that we were able to obtain from their filings with

9    the Court and from the public market information is

10   included in the brief.

11         THE CANADIAN COURT:  All right.  Thank

12   you.

13         THE US COURT:  Good afternoon.

14         MR. CRICHLOW:  Good afternoon, Judge

15   Gross.  Good afternoon, Justice Newbould.  I am

16   David Crichlow, on behalf of Wilmington Trust, on

17   behalf of the NNL Canada-issued bonds that are

18   nonguaranteed.

19         The good news I have for Your Honors is

20   the last time I was up here for openings, I was the

21   sole person standing between the conclusion of

22   opening, and I think now I am the sole person

23   standing between us and lunch.  So I have not been

24   allocated a lot of time, but I do have the

25   incentive to make sure that I am very efficient.

1          And the good news is much has been said

2    this morning from the Canadian interests that I

3    agree with, and I would like to start out by saying

4    that Mr. Zarnett did a wonderful job of marshaling

5    the issues on the law of interpretation of the MRDA

6    and marshaling some of the relevant evidence.  And

7    on behalf of Wilmington Trust, Your Honors, we

8    would adopt that argument in full.  And I think we

9    have already stated in our papers that we adopt

10   their proposed findings of fact and conclusions of

11   law.

12          I would like to start by simply stating

13   that at the beginning of this case I stood up and I

14   said and predicted that the Court would hear much

15   evidence, but at the end of the day, from my

16   respectful opinion, I thought this case turned on

17   the MRDA and its interpretation and that it would

18   mostly be about the MRDA.  And, Judge Gross, I like

19   your Major Reason for Dispute on Allocation acronym

20   because that is accurate.  That is why we are here.

21   And I am just going to take a few minutes to say

22   why it should not be so.

23          I am not going to go through all of the

24   provisions.  I think it is clear what the

25   provisions state and that in some respects I would

1    argue that its interpretation is a matter of law

2    for Justice Newbould under Ontario legal

3    principles.  But what is not disputed with respect

4    to the MRDA -- and I don't think anyone really

5    mentioned this today -- is that no one has

6    testified and everyone says that the MRDA is the

7    only agreement that governs the rights and

8    obligations of the various parties with respect to

9    the licenses, and with respect to whatever

10   ownership theory any party has, they are pointing

11   to that agreement for those rights, and that's

12   where we disagree.

13            What we cannot disagree about is what

14   it says.  And Mr. Zarnett took you through that in

15   painstakingly and very careful detail today.  All I

16   want to add is what is not disputed is that it

17   says, and it has always said, that legal title to

18   any and all NN technology, whether now in existence

19   or acquired or developed later pursuant to the

20   terms of this agreement, shall be vested in NNL.

21            There were amendments to that

22   agreement.  There has been language that has

23   changed.  There has been some language that has

24   caused some confusion I will talk about very

25   briefly.  But the one thing that did not change

1    through iterations, through amendments or the like

2    is that title, the ownership of that IP, the

3    property interests, were vested in and remain in

4    NNL until sold.

5              So that takes us to equitable,

6    beneficial ownership, which, Judge Gross, you

7    mentioned earlier today.  And we had testimony

8    about that.  And the testimony came from

9    Dr. Reichert, among others.  And I would argue and

10   respectfully submit to the Court that it should pay

11   very, very close attention to Dr. Reichert's

12   testimony in this case.  He testified that

13   ownership for tax purposes does not denote actual

14   ownership.  Transfer pricing regulations and

15   guidelines do not purport to dictate legal or

16   property interests either in insolvency or in a

17   going-concern context.  That was Dr. Reichert's

18   testimony.  And what we heard is that there were

19   some concerns about tax, transfer tax issues and

20   reasons to have language such as beneficial

21   ownership.

22             I think Mr. Zarnett hit the threshold

23   issue, which is when you look at the actual

24   language, it is an economic beneficial ownership in

25   the rights under licenses.  They have an equitable

1    beneficial ownership in rights.  But I cannot

2    ignore that the word "ownership" appears later.

3    And there is some discussion about, you know,

4    taking on the entrepreneurial risk and the like.

5    And what we heard from Dr. Reichert is those are

6    terms that resonate with tax authorities.  And the

7    testimony from all parties involved was that

8    despite the fact that the agreement may have been a

9    Canadian agreement, they were concerned about tax

10   consequences, transfer tax pricing in all of the

11   jurisdictions in which they operate.

12              Now, as triers of fact, just like a

13   jury, you are entitled to take into consideration

14   other places we see these types of issues that may

15   dictate to you which testimony is more credible,

16   because Dr. Reichert's testimony is one of the

17   testimonies that is not uncontroverted.  There are

18   people that take issue with it.  They suggest that

19   it would not be rational, which I'll get to in a

20   second, for the US interests to have agreed to that

21   strictly for tax purposes.  But where else do we

22   see these types of agreements?

23              And it is not just in a complicated

24   multinational transaction.  If you are living in

25   the United States at least in a jurisdiction where

1   they have luxury taxes for expensive automobiles,

2   boats and the like, and you are like me and you are

3   unfortunate enough to learn it this way, if you

4   lease a car and you do not own title in it, you are

5   still the equitable beneficial owner of it for tax

6   purposes only, and the leasing company holds title.

7   You cannot sell it.  You cannot -- or if you do

8   sell it, the leasing company is going to be

9   entitled to the proceeds.  We all know that.  But

10  the fact is, as a lessee, in some instances you can

11  be a beneficial owner for tax purposes because you

12  have the right to use something, and it is the

13  fairest way to apply it.

14              The same is true here.  And I am sure

15  that the US interests would say, well, that is an

16  inapt analogy because, you know, we gave so much in

17  research and development.  We gave so much to the

18  enterprise.  Why would we do that?  That would be

19  irrational.  And that's one other subject that I

20  don't think was covered here that was covered

21  during the course of the trial, because

22  irrationality was also addressed by Dr. Reichert

23  and Clive Allen.  And we addressed it a little bit

24  in our brief.

25              The licensed participants initially

1   received the IP that they needed to start and grow

2   their one successful business.  We are here talking

3   about it now that it is not successful, but the US

4   interests in their opening statement talked about a

5   period of time when it was largely successful.  And

6   they were permitted by NNL to maintain operations

7   without paying any upfront costs or royalties for

8   extremely lucrative licenses that they received to

9   go out and market their products, book their sales

10  and profits, split pursuant to the RPSM agreement,

11  of course, but to do so with licenses that they

12  didn't have to pay for.  And Clive Allen testified

13  extensively about that, in addition to

14  Dr. Reichert.

15              They obtained a right to make and use

16  Nortel technology and sell products related to that

17  technology, all the while obtaining substantial

18  revenue as a result, at no cost for the relative

19  licenses and without respect to whether a

20  particular participant's R&D was responsible for

21  the technology supporting the products sold by that

22  participant.  Those are extremely valuable rights,

23  and that is the consideration they received for

24  that R&D contribution.

25              So it would not be irrational for them

1  to have beneficial ownership for purposes of tax

2  reasons if the parent and all of the entities

3  agreed that it would be so.  It also would not be

4  commercially unreasonable for them to enter into a

5  transaction where they would commit so much to

6  research and development because they were

7  benefiting from others' research and development.

8             There was an upside and a downside, as

9  it turns out.  And what you have here is the

10  classic example that in a commercial agreement that

11  was not designed to anticipate the liquidation of

12  this company and the way proceeds would be

13  allocated, that you now have parties coming to the

14  Court, and I think in good faith and with good

15  hearts, saying, Well, this isn't what we intended,

16  Your Honors.  We would have never agreed to that.

17  And that happens quite frequently in commercial

18  transactions.  But the problem is, if the Courts

19  were to simply rewrite agreements and make it so

20  that in hindsight we get the fairest result, you

21  two would be even more burdened every day with

22  cases coming to court.

23             So I know in the United States, and I

24  understand from my colleagues in Canada, that's the

25  reason we go to the contract.  We look at what the

1  parties intended at the time, what their agreement

2  was, and if it is unambiguous, we don't look at

3  anything else.  And what is unambiguous is the

4  property rights and title vested in NNL, which gave

5  them the rights to sell it and receive the

6  proceeds.

7             Now, finally, in stating that we have

8  heard much from the US interests that it is simply

9  unfair for all of the allocation to go to the US

10  entity -- I am sorry -- to the Canadian entity.

11  And I think Mr. Zigler spoke on this extensively,

12  so I am not going to extend the thought.  But it is

13  absolutely clear, and the evidence was not

14  controverted, that if the Canadian allocation

15  process under the ownership allocation theory were

16  adopted by these courts, it would provide recovery

17  for the US creditors at or near par.

18             And I think you saw a chart that just

19  said the Bondholders would receive 100 cents on the

20  dollar.  It would provide other US creditors with

21  95 cents on the dollar.  And that was testified by

22  Mr. Britven, and it was not contradicted by

23  Mr. Ray.

24             He was asked this specific question on

25  cross-examination:

1              "So we can agree that no matter

2          what the outcome of this allocation

3          proceeding, whether the proceeds go

4          to Canada or the United States,

5          there will be a significant recovery

6          by the US and by the Bondholders."

7              His answer was:

8              "There will be a recovery in

9          both estates."

10         He didn't buy the word "significant,"

11    but I want the Court to pay attention that he

12    didn't dispute it either, because he can't.  It is

13    accurate.  There is going to be a significant

14    recovery.

15         So any argument that this really

16    provided the US interests with nothing is

17    disingenuous.  What it does do is it would provide

18    a full and overwhelming majority of the allocation

19    proceeds in the first instance to go to the

20    Canadian Estate.  That does not mean it is not

21    fair.

22         Finally, I will end on this.  I join

23    Mr. Hoeffner's well-stated and eloquent argument on

24    pro rata.  It is an alternative theory for

25    Wilmington Trust also and not one that we simply

1   joined with the CCC.  We had independently come up

2   with the theory.  And I said at the beginning that

3   this was an unprecedented case in scope, magnitude

4   and process.  And I said it may require some

5   pragmatic sensibilities.  Mr. Hoeffner has laid out

6   all the reasons why, if this Court can't make a

7   determination on ownership, those pragmatic

8   sensibilities should lend itself to a pro rata

9   distribution.  It is in line with how the company

10  ran and how the business operated, and it would be

11  the fairest result.

12          With that, Your Honors, I will thank

13  you all for your time.  And if you have any

14  questions, I am happy to address.  Otherwise, I am

15  happy to sit down.

16          THE US COURT:  Mr. Crichlow, I will

17  reserve questions.

18          Justice Newbould?

19          THE CANADIAN COURT:  You may sit down,

20  Mr. Crichlow.  I have no questions at this time.

21          MR. CRICHLOW:  Thank you, Your Honor.

22          THE US COURT:  Thank you.

23          THE CANADIAN COURT:  This probably is

24  an appropriate time to take the lunch recess.  Come

25  back -- how is 2:00 with everybody?  Is that okay

1    with you, Judge Gross?

2                    THE US COURT:  That's fine.  You live a

3    more elegant lifestyle up in Canada.  We will be

4    back at 2:00.

5                    THE CANADIAN COURT:  Elegant, that's

6    what you call it?

7                    THE US COURT:  That's it.  Thank you,

8    all.  We will stand in recess until 2:00.

9                    -- LUNCHEON RECESS TAKEN AT 12:45 P.M.

10                   -- RESUMED AT 2:16 P.M.

11                   THE US COURT:  Please be seated,

12   everyone.  Thank you.

13                   THE CANADIAN COURT:  Good afternoon,

14   Judge Gross.

15                   THE US COURT:  Good afternoon,

16   Mr. Justice Newbould.  Mr. Maguire, it is good to

17   see you again, sir.

18                   MR. MAGUIRE:  Good afternoon, Judge

19   Gross.

20                   THE US COURT:  Good afternoon.

21                   MR. MAGUIRE:  Thank you, sir.  Good

22   afternoon, Justice Newbould.

23                   THE CANADIAN COURT:  Mr. Maguire.

24                   MR. MAGUIRE:  Again, it is Bill Maguire

25   for the EMEA Debtors.

1              THE US COURT:  Yes.

2              MR. MAGUIRE:  And if it please the

3    Courts, our plan is that I will kick off our

4    closing by addressing the question that you asked

5    earlier today, Judge Gross, and which my friend

6    Mr. Zarnett described as exactly the right

7    question, which is where --

8              THE US COURT:  No one has ever said

9    that to me before.

10             MR. MAGUIRE:  It is a response with

11   which we heartily agree, and it is specifically to

12   those provisions in which the parties contractually

13   recognized the ownership, the joint ownership, of

14   the participants to the MRDA.

15             Then I will hand the baton to my

16   colleague Matthew Gottlieb in Toronto, who will

17   address certain Ontario law on three things:

18   First, how the MRDA vested NNL with legal title and

19   only legal title and not beneficial ownership,

20   which all of the parties shared; second, how the

21   parties owned NN technology by creating it; and

22   third, how evidence of joint ownership that we

23   presented at trial is admissible in various ways,

24   including as direct evidence of ownership.

25             Now, we have handed up a binder that I

1    hope you have, Judge Gross.

2                 THE US COURT:  Yes.

3                 MR. MAGUIRE:  And hopefully, Justice

4    Newbould, you have that as well.

5                 THE CANADIAN COURT:  I do.

6                 MR. MAGUIRE:  That contains our

7    demonstratives.  And on the inside flap we have a

8    demonstrative that some of my friends have unkindly

9    called a menu.

10                THE US COURT:  I thought maybe it was a

11   brochure for your firm.

12                MR. MAGUIRE:  That's a special treat we

13   are holding for later.

14                THE US COURT:  All right.

15                MR. MAGUIRE:  This demonstrative is in

16   the form of a time line, and it covers the key

17   evidence of ownership and contribution over the

18   last decade of the life of Nortel.

19                Now, throughout the trial our Canadian

20   friends argued that extrinsic evidence of ownership

21   should be disregarded as so much Hamburger Helper

22   and rabbit holes.  So to address that point, we

23   have put all the -- and I will call it the

24   noncontractual evidence above the time line on the

25   chart.  So if we take the years and go up, or

1   north, we see what our friends would call the

2   Hamburger Helper or the rabbit holes.  Below the

3   time line we set forth what I will call the

4   contractual evidence, and that is what the parties

5   stated in their written agreements.

6           The irony here is that the Canadian

7   interests rely on the contract to deny shared

8   ownership, but the contract itself recognizes

9   shared ownership.  And I believe my friend

10  Mr. Zarnett had it exactly right when he brought

11  the Courts to the provision of the MRDA that

12  specifically addresses shared ownership.  And we

13  have it on our chart under the MRDA, under the year

14  2004, where we have the MRDA, and specifically

15  there we have Schedule A.  We also have it up on

16  our screen here.  This is the provision that, if I

17  remember right, Justice Newbould raised in opening

18  statements with the Canadian interests on the

19  subject of ownership.

20          The first and second lines of that

21  provision refer to the participants -- that is us,

22  all of the parties to the MRDA -- and to their

23  ownership of NN technology.  Now, we heard from

24  Mr. Zarnett this morning.  And in their main brief

25  the Canadian interests say, the Monitor says, that

1   provision, this provision of Schedule A says

2   nothing about who owns the NN technology.  Well,

3   that provision could hardly be more clear.  It

4   specifically refers to the ownership of the NN

5   technology, and it talks about participants.  It

6   doesn't talk about anyone else.  It talks about the

7   participants.  It talks about their compensation.

8   It talks about their risk.  It talks about their

9   development and their ownership of NN technology.

10           So the argument that Schedule A of the

11  contract says nothing about who owns NN technology

12  requires the Courts to ignore the words

13  "participants" and the words "ownership of NN

14  technology."  If we don't ignore "participants" and

15  "ownership," then this provision of Schedule A

16  clearly recognizes the participants' ownership of

17  NN technology.

18           Now, not to pile on, but if we take our

19  time line to the year 2007 and look below the line,

20  sticking with contractual statements, we have the

21  second addendum, where the parties referred to each

22  participant holding and enjoying equitable and

23  beneficial ownership of NN technology.  Nothing

24  unclear about the words "each participant."  No

25  wriggle room in the words "beneficial ownership of

1    NN technology."

2              And, Justice Newbould, I believe you

3    raised the additional words at the end which say

4    "as defined in the prior agreement."  And I suppose

5    that could be read as a reference to beneficial

6    ownership.

7              I would submit another reading, perhaps

8    even a better reading, would be a reference to the

9    defined term "NN Technology," which, indeed, is a

10   defined term and, indeed, is defined in the MRDA in

11   Article 1.  And that definition, of course, is very

12   broad, and it includes all of the Rockstar patents

13   and all of the IP that was sold in the lines of the

14   business sales.  And so we have the parties here

15   specifically saying that each participant has

16   beneficial ownership in all of those patents and

17   all of that IP.

18             And if we go to the following year in

19   our time line, under 2008, we have the MOU, where

20   the parties refer to their respective ownership

21   interests in the NN technology.  Now, the MOU is

22   not binding, but it certainly is evidence, and it

23   confirms that provision of Schedule A.

24             Same, too, if we jump to 2009.  Here we

25   have the third addendum, where the parties

1    reenacted, so to speak, the very words of

2    Schedule A that we have been talking about,

3    recognizing the participants' ownership of NN

4    technology.

5             In fact, our chart shows below the line

6    the parties amended their MRDA five times over four

7    years, and every single time they kept those

8    critical words about the participants' ownership of

9    NN technology.

10            Another argument we hear is that

11   Schedule A does not purport to change Article 4's

12   vesting of legal title in NNL.  Well, of course

13   not.  As my colleague Mr. Gottlieb will explain,

14   legal title is just legal title, not beneficial

15   ownership.  It is only by misinterpreting the

16   vesting of legal title as if it were something

17   else, a grant of sole ownership, that our Canadian

18   colleagues say the contract somehow excludes

19   beneficial ownership.  And that misinterpretation

20   would create an irreconcilable conflict with

21   Schedule A, which clearly and repeatedly, time and

22   again, confirmed the parties' shared ownership of

23   NN technology.

24            There is no conflict if we give the

25   words of the contract their natural and obvious and

1    ordinary meaning.  Article 4 vests legal title and

2    only legal title in NNL.  And Schedule A confirms

3    the parties' joint beneficial ownership of NN

4    technology.  No conflict, no ambiguity; just the

5    obvious distinction between legal title on the one

6    hand and beneficial ownership on the other.

7              With respect to the second addendum and

8    the MOU, we have heard our Canadian friends say

9    that the Courts can ignore their admissions in

10   those contracts because they are in recitals which

11   do not purport to change the existing rights of the

12   parties.  That, with respect, misses the point,

13   which the Canadian Debtors never answer.  The point

14   is why.  Why would the participants repeatedly

15   recognize anywhere in a recital or, even worse, in

16   Schedule A joint ownership if they didn't intend

17   there to be any such thing?  Why would they

18   repeatedly recognize beneficial ownership if their

19   intention was to vest sole and exclusive ownership

20   with NNL?

21             People confirm rights that already

22   exist, and that's --

23             THE CANADIAN COURT:  Mr. Maguire, we

24   have certain rules of construction up here as to

25   the use of recitals.  What do you say, taking those

```
 1   principles into account, allows you to use the
 2   recitals?
 3                 MR. MAGUIRE:  I would respectfully
 4   submit, Your Honor, that those principles are
 5   completely in accordance with EMEA's argument.
 6                 THE CANADIAN COURT:  Which particular
 7   one?  I mean, which particular one?
 8                 MR. MAGUIRE:  Specifically, we are not
 9   suggesting that these recitals should overwhelm or
10   override any express grant or any operative
11   provision in any contract.  We are showing here
12   that it makes perfect sense that the parties
13   recited their respective ownership interests which
14   they already had when they entered into the MRDA.
15   They were simply clarifying and making it available
16   for the reader of the contract to understand that,
17   when there was a grant of legal title and it was
18   described as legal title, there was, of course, a
19   separate beneficial ownership that was not affected
20   by that.  And so --
21                 THE CANADIAN COURT:  Let me ask you one
22   more question.
23                 MR. MAGUIRE:  Yes.
24                 THE CANADIAN COURT:  Do you say that
25   there is some ambiguity in the language of the
```

1  agreement as opposed to -- and I am not talking

2  about the recitals now.  I am talking about the

3  rest of the agreement.  Do you say there is or is

4  not any ambiguity?

5                  MR. MAGUIRE:  There is no ambiguity,

6  Your Honor, unless you adopt the Canadian I call it

7  misinterpretation of legal title.  In that case you

8  create an irreconcilable conflict between Article

9  4's grant of legal title to NNL and Schedule A's

10  specific reference to the parties' joint -- the

11  participants' joint ownership.

12                  If you create that conflict by

13  misinterpreting the words "legal title," then you

14  have a conflict between two contractual provisions,

15  and we are in ambiguity.  And Schedule A, of

16  course, is not a recital.  It is an operative

17  provision of the contract.

18                  THE CANADIAN COURT:  Thank you.

19                  MR. MAGUIRE:  So the recitals here play

20  a role simply in confirming the history, what the

21  parties brought to their contract; part, if you

22  like, of the factual matrix.

23                  The third recital says that the

24  participants bear the full entrepreneurial risks

25  and benefits of the business.  That's what owners

1    do.   And they had been doing it for years before

2    2004, when they executed the MRDA.

3                    As my colleague Mr. Gottlieb will

4    explain, the parties did not get their ownership

5    from the contract.   They did not get their

6    ownership from the MRDA.   They had already had it.

7    They had been jointly creating Nortel IP for years.

8    So the recitals in the contract recognize something

9    that already exists.   It doesn't need to create

10   anything.

11                   My friend Mr. Zarnett also relied on

12   Articles 2 and 3 of the MRDA, which give the

13   participants nothing more than a profit split, as

14   if that had some significance here.   But here we

15   are not talking about some annual operating profit

16   share.   We are talking about allocating the

17   proceeds of sale among owners, and owners are

18   entitled to the proceeds of what they have sold.

19   And there is nothing in Article 2 or Article 3 that

20   speaks to the allocation of sales proceeds among

21   owners, nor does the entire agreement clause help

22   the Canadian argument.

23                   My friend Mr. Zarnett brought that to

24   the attention of the Courts this morning, but when

25   he did so, he omitted seven words from that

1    provision.  And they are somewhat important words,

2    so I would like to bring them to your attention.

3    The entire agreement clause of the contract says

4    that it is the entire agreement --

5                    THE CANADIAN COURT:  Just a minute.

6    Which provision is that?

7                    MR. MAGUIRE:  I believe, if I remember

8    right, it is Article 14.  We will put it up on the

9    screen.  It is on page 13, and it is at the top,

10   paragraph (d).

11                   THE CANADIAN COURT:  Yes.  Okay.  Thank

12   you.

13                   MR. MAGUIRE:  And, of course,

14   Mr. Zarnett is entirely correct, that it does

15   provide that this agreement sets forth the entire

16   agreement and understanding between the

17   participants.  But the seven words that I would

18   invite the Courts' attention to are the first seven

19   words of the provision, which say, "In respect to

20   the subject matter hereof."

21                   And if we want to see what the subject

22   matter of the MRDA was, we only have to go to the

23   first page.  The first two lines of the contract

24   say exactly what the subject matter is.  And maybe

25   we can pull that up.

1               The first two lines show that this

2    agreement is all about confirming and formalizing

3    the operating arrangements of the participants.

4    And, in fact, when you step back and think about

5    it, all of the terms of the MRDA deal with the

6    operating arrangements among the parties.  Even the

7    terms --

8               THE CANADIAN COURT:  Well, if you are

9    right about that, I mean, isn't that something that

10   could be turned against your argument?  If all it

11   is dealing with is the operational context, then is

12   Article A -- or Schedule A, I am sorry -- to be

13   read as dealing only with the operational, an

14   operational context?

15               MR. MAGUIRE:  Oh, I think absolutely.

16   But remember, that's what owners do.  They operate.

17   So it doesn't undercut or diminish in any way my

18   argument.  No question that owners have assets and

19   they use those assets.

20               And this contract reflects the

21   operating arrangements among the parties and in

22   doing so confirms that it is dealing with owners.

23   The people who are participating in this, the

24   people who are doing the operating arrangements are

25   owners.

1            THE US COURT:  The MRDA does not say,

2    for example, then, this agreement is to delineate

3    the ownership interests of the participants or the

4    various parties, does it?

5            MR. MAGUIRE:  Exactly right.  None of

6    the terms of the MRDA do that.  In fact, even the

7    terms that deal with a participant retiring or

8    dropping out assumes that the show will go on.  It

9    assumes that the operations will continue among the

10   remaining participants.  The contract absolutely

11   does not address the liquidation of Nortel.  It

12   absolutely does not address the allocation of a

13   sale of all of Nortel's IP.  That is why --

14           THE CANADIAN COURT:  Mr. Maguire, you

15   referred to a recital, and I didn't catch it.

16   Which recital did you say says what the subject

17   matter is?

18           MR. MAGUIRE:  The subject matter.  It

19   is actually -- well, maybe you could call it a

20   recital.  It is the very first two lines of the

21   contract on page 1.  And I think we still have it

22   up on the screen for you, Justice Newbould.

23           THE CANADIAN COURT:  Oh, I see.  I see.

24   Okay.

25           MR. MAGUIRE:  And specifically, it, I

1  would submit, makes clear that the purpose, the end

2  and aim of this agreement, the subject matter of it

3  is to confirm and to formalize the operating

4  arrangements of the participants, which actually

5  they had been carrying on for a number of years at

6  this point.

7              THE CANADIAN COURT:  Thank you.

8              MR. MAGUIRE:  The only other ownership

9  argument I think we have heard today is

10 Mr. Crichlow's suggestion, which we heard somewhat

11 through trial from the Canadian interests as well,

12 that somehow the word "ownership" or references to

13 ownership could be dismissed as some nonlegal or

14 economic or transfer pricing type of context.

15             Well, of course, that would not work

16 for Schedule A.  Schedule A is part of the

17 contract.  And the MRDA, as our Canadian friends

18 have told us repeatedly, is a legal contract.  It

19 lays out the rights and obligations of the parties.

20             Nortel lawyers drafted the MRDA, and

21 there is no claim here for legal malpractice or for

22 reformation.  There is no basis here to suppose

23 that the word "ownership" in the contract means

24 anything other than ownership.

25             Bottom line:  In this proceeding, which

1   is all about the participants' ownership of NN

2   technology, if, as Mr. Coleman reminded us, it is

3   important to focus on the words that are actually

4   used in a contract, NNL simply has no basis to ask

5   the Courts to ignore the most critical words in the

6   contracts, which are participants and their

7   ownership of NN technology.

8                The parties' other contracts, as the

9   parties had other contracts concerning NN

10  technology -- the MRDA was not the only one -- but

11  they all say the same thing.  On our time line, for

12  example, under 2004, if you go to the bottom of the

13  time line, you will see the Foundry license

14  agreement, which says that Nortel and its

15  subsidiaries own the US patents.  And those, of

16  course, are patents that were sold to Rockstar.  No

17  sole ownership there.

18                And if we move to 2007 and again drop

19  to the bottom of the chart, we see the Alcatel sale

20  agreement, where Nortel represented to Alcatel that

21  the IP being sold was owned by the designated

22  sellers, who were NNL and its affiliates.  Again,

23  no sole ownership there.

24                All these contractual statements of

25  joint ownership are no accident.  They reflect what

1    was going on in the real world above the line.

2    They reflect how important it was for NNL that EMEA

3    and the US shared ownership of NN technology.  And

4    I think there is no question, as Justice Newbould

5    suggested this morning, that the transfer pricing

6    and tax considerations played an enormous role and

7    motivation for NNL to frankly and candidly

8    acknowledge the participants' ownership rights.

9              The US Debtors in their main brief at

10   page 49 refer us to the OECD guidelines.  Under the

11   guidelines, if the EMEA and the US were not owners,

12   if they were mere licensees, then the $20 billion

13   that they contributed to creating NN technology

14   would have been taxable royalty income to NNL.  So

15   NNL had 20 billion reasons to keep recognizing that

16   the EMEA and the US parties were not mere licensees

17   but owners who owned the NN technology that they

18   jointly created.

19             My colleague Mr. Gottlieb will walk

20   through how jointly creating IP gave rise to

21   ownership under Ontario law and under the parties'

22   agreements with their employees.  Mr. Gottlieb will

23   show how all the evidence of ownership that we

24   presented at trial is admissible here not only as

25   part of the factual matrix but also as direct

1    evidence of ownership.

2              THE CANADIAN COURT:  Mr. Maguire, I was

3    going to ask one of you.  Whether it is you or

4    Mr. Gottlieb, I don't really care.  But you say

5    that the issue of ownership is a question for

6    Ontario law.  And under Ontario law, you just said

7    that that is the principle of the employer has some

8    equitable ownership of the patent if the inventor

9    was employed to do that kind of work.

10             Is somebody going to explain why

11   Ontario law applies?  I read in another brief, I

12   think the reply of the Monitor, that under US law

13   that is not the case.  So I would like to

14   understand why it is Ontario law.

15             MR. GOTTLIEB:  I can do it now or I can

16   do it after.

17             THE CANADIAN COURT:  That is fine, as

18   long as somebody at some point deals with that.

19             MR. GOTTLIEB:  Sure.  I am happy to do

20   it now or Mr. Maguire can keep going.

21             THE CANADIAN COURT:  No.  I don't want

22   to interrupt, as long as --

23             MR. GOTTLIEB:  Okay.  Thank you very

24   much.

25             MR. MAGUIRE:  So that is fine.  I will

1  defer to my colleague Mr. Gottlieb, and then when

2  he has concluded, I will return to look at the

3  evidence, the extrinsic evidence, what my friend

4  Mr. Zarnett referred to as that tidal wave, that

5  tsunami of evidence that is before the Courts.

6              THE CANADIAN COURT:  Thank you.

7              THE US COURT:  Thank you.

8              THE CANADIAN COURT:  Mr. Gottlieb.

9              MR. GOTTLIEB:  Thank you, Your Honour

10 and Judge Gross, let me just get organized for one

11 second, please.

12             THE US COURT:  You bet.

13             MR. GOTTLIEB:  Thank you.  Judge Gross,

14 as always, good to see you on the TV.  Justice

15 Newbould, good to see you here.

16             I am going to go through what

17 Mr. Maguire said I was going to touch.  As a result

18 of some of the submissions this morning, I'm going

19 to raise a couple of additional points, but I think

20 as a matter of time I'll just start off directly

21 dealing with the interpretation of the MRDA and why

22 we say Canada got nothing more than legal title

23 under the MRDA and which left and did not touch the

24 beneficial interest of the EMEA Debtors and I will

25 say NNI as well.

1            I want to deal with a point that

2    Justice Newbould raised in questions to Mr. Maguire

3    about the interpretation.  As we all said, we don't

4    want to go through the law of interpretation in

5    Ontario.  It is well briefed.  I don't think there

6    is much dispute about it.

7            I just want to deal with the two points

8    raised and that is recitals and schedules, if I

9    might.

10           The law is not in debate between the

11   parties that recitals can be looked at and in fact

12   should be looked at to assist the Courts in

13   arriving at the intentions of the parties.

14           And that is not surprising since

15   recitals usually are there to tell what the

16   intentions of the parties are in entering into the

17   agreement.  So they are a very important guide, and

18   what we see in Ontario at least in case law over

19   and over and over again is Courts, when

20   interpreting contractual provisions, referring to

21   recitals and saying how they help and what they

22   tell the Court.

23           And I am just going to give two

24   references so the Courts have it for their notes.

25   One is of course the Eli Lilly decision from the

1    Supreme Court of Canada, and that is a well-known

2    decision.  Mr. Zarnett took the Court to it.  It is

3    in his brief, and just for your notes that is at

4    our authorities Volume 1, tab 13.

5              And the Court there, the Supreme Court

6    of Canada says explicitly look to recitals that

7    assist in the interpretation and the Court --

8              THE CANADIAN COURT:  Can you point out

9    where you would like me to look in that case?

10             MR. GOTTLIEB:  I will.  I believe it is

11   at paragraph -- sorry, Your Honour, I just had

12   that.

13             In our version of it, it is paragraphs

14   starting 57 through 63 that deals with that, where

15   the Court says:

16                  "All of this is evident on a

17                  plain reading of the recitals to the

18                  supply agreement".

19             That is about three-quarters of the way

20   down in 57.  So the Supreme Court looks at that.

21             But there is actually a more direct

22   case on the point which I would like to refer to,

23   which is a recent decision of Justice Newbould

24   sitting in this Court from 2012 and it is called

25   Sistem, spelled S-I-S-T-E-M, and then the Republic,

1    as I like to refer to it as, because it is the

2    Kyrgyz Republic --

3                    THE CANADIAN COURT:  Kyrgyzstan.

4                    MR. GOTTLIEB:  Kyrgyzstan Republic.

5    You do that obviously better than I do.

6                    That is at tab 23 of Volume 2 of our

7    brief, and I am going to come back to that case, so

8    we need not take it out now, but the only thing I

9    want to point to is Justice Newbould had the

10   opportunity to consider ownership of shares and

11   looked at the recitals and said that the recitals,

12   the preambles gave clear statement about who owned

13   what and showed a clear intention.

14                    So there is no debate about how to use

15   a recital in Ontario.  They are very important and

16   cannot be avoided.

17                    Now, the schedule actually forms part

18   of the contract and the case law again is replete

19   with examples of Courts going through entire

20   contracts starting at the recitals and going

21   through the schedule and there is a tremendous

22   amount of case law that says schedules are part of

23   the contract and there is no real issue with that.

24                    THE CANADIAN COURT:  The MRDA provides

25   in section 3, Article 3 for the schedule.

1           MR. GOTTLIEB:  Yes.

2           THE CANADIAN COURT:  And it refers to

3   that as to the Schedule A is to determine each

4   participant's share and the allocation will be

5   computed pursuant to Schedule A.  So that is the

6   purpose of Schedule A, according to this Article 3.

7           MR. GOTTLIEB:  Yes, and that is the

8   purpose of it, but let me put it to you slightly

9   differently, which is this.

10          The evidence is clear that the MRDA was

11  entered into for the purpose of dealing with this

12  transfer pricing issue to make sure that it was

13  being dealt with on an arm's length basis.

14          And Schedule A was the reason for

15  entering into the entire MRDA so that the taxation

16  authorities could be satisfied.

17          So when we talk about Schedule A, and I

18  don't know how to put this, it is not just some

19  minor schedule at the back of the agreement for a

20  minor purpose.  It is the whole reason that the

21  MRDA was entered into.

22          So it is safe to assume and in my

23  respectful submission the Court ought to take it as

24  a given that Schedule A was very important to the

25  parties, and when Mr. Maguire took you to the words

1    of it, I think those words, with respect, have to

2    be interpreted in accordance with the plain and

3    ordinary meaning there.

4              So my point was simply that schedules

5    obviously form a part of the agreement, and

6    although probably no authority for that is needed,

7    I have got one, which is the SimEx Inc. case, and

8    that is against IMAX Corp., and that is in our

9    Volume 3, tab 48, and that is a 2005 decision of

10   our Ontario Court of Appeal.  And again, that case

11   the Court starts at the front of the document, goes

12   to the back of the document, refers to all the

13   schedules, all the recitals, to come up with the

14   intention of the parties.

15             So those are just points of contractual

16   interpretation that, in my respectful view, are

17   clear, which takes me to 4(a) of the MRDA and the

18   point we have to make about.

19             And Your Honour and Judge Gross, if you

20   have the MRDA up, what we know is that 4(a) says

21   that:

22                  "Except as otherwise

23                  specifically agreed, legal title to

24                  any and all NN Technology [...]"

25                  And then it goes on, so it is legal

1   title is vested, shall be vested in NNL.  And the

2   reason I point that out is if you go back to

3   recital 1, which is on page 2 of the document,

4   recital 1, again, intention of the parties, says:

5                    "Whereas legal title to all NN

6                    Technology is held in the name of

7                    NNL [...]"

8                    Now, we say, in our respectful

9   submission, and I'll take you to the law, that

10  legal title is a very well-known defined term that

11  means not beneficial interest.  But I point to the

12  recital that shows the intention of the parties

13  because title held in the name of, legal title held

14  in the name of is what I am going to say is the

15  hallmark of showing an intention that there is no

16  beneficial interest.

17                   When we talk about holding something in

18  the name of a company, what that means is it is for

19  someone else.  That is what "in the name of" means

20  and that is the intention of the parties that comes

21  out right from the first recital.

22                   And I'll state the obvious as well with

23  respect to 4(a), when it uses the term "legal

24  title" that Mr. Zarnett says is ownership, is

25  everything, is all the rights, we --

1          THE CANADIAN COURT:  Well, just a

2    second, you are saying that holding something in

3    the name of means it is being held for someone

4    else.

5          MR. GOTTLIEB:  Correct.

6          THE CANADIAN COURT:  Is it your

7    contention that the legal title is being held by

8    NNL for other people?  Isn't that the logic of what

9    you are saying?

10          MR. GOTTLIEB:  No, I apologize, I am

11    not being clear on that.

12          When you talk about the title being

13    held, it is in the name of NNL for sure, but it is

14    the technology is being held in the name of NNL.

15          When you talk about it being held in

16    the name of someone, you talk about it being held

17    for the benefit of others.  That was my only point

18    there.

19          THE CANADIAN COURT:  Well, are you

20    saying that NNL holds the legal title for the

21    benefit of others?  I thought your point is it is

22    equitable title.

23          MR. GOTTLIEB:  It is.  My point is that

24    it is holding -- that legal title is held by NNL,

25    that is correct.

1              And when we go to 4(a), which is the

2    operative provision, when we go to 4(a), which is

3    the operative provision and it refers to legal

4    title, we have to recall that the experts for the

5    Canadian Debtors were told to assume that legal

6    title equals ownership.  So that is the basis of

7    the Canadian case, legal title equals ownership.

8              And as a matter of law, that is just

9    not right, and I point out one.  If it was intended

10   that NNL would hold ownership, it could have said

11   that incredibly clearly and very clearly.  The

12   evidence is unequivocal that Nortel knew how to say

13   all the right, title, interest in technology, it

14   said that in the contracts.  We know that recital

15   number 2 that was referred to earlier today

16   actually refers to the language of beneficial and

17   equitable.

18             THE US COURT:  Somewhere in the back of

19   my mind, Mr. Gottlieb, there was a draft or

20   something where the word "ownership" appeared.

21             MR. GOTTLIEB:  That is correct, Judge

22   Gross.  That is correct.  There was a discussion

23   early on -- pardon me, not early.  At the time that

24   the MRDA was being drafted and there was a draft of

25   it that provided that NNL would hold ownership of

1    the technology.

2            And the lawyer --

3            THE CANADIAN COURT:  So how is that

4    admissible?

5            THE US COURT:  Well, because I asked

6    the question.  Other than that, I'm not sure,

7    Justice Newbould.

8            THE CANADIAN COURT:  Well, we have

9    rules about whether you can look at prior drafts.

10            MR. GOTTLIEB:  I'm actually -- if you

11    don't mind, I'm going to address that question,

12    because I like Judge Gross's answer as to why I can

13    answer it better than mine.  But the answer to

14    the question is yes, there was a prior draft that

15    had --

16            THE CANADIAN COURT:  I remember it.

17            MR. GOTTLIEB:  -- ownership in it and

18    the lawyer for NNL said, no, you've got to take

19    that out.

20            Now, this is going way ahead in the

21    submissions, Your Honour, but when it comes to

22    discussion of what is admissible and not admissible

23    and subjective intention and not subjective

24    intention, the question that we have got before the

25    Court is who owned what.  That is the question

1  before the Court:  Who owned what.

2            And from your own decision in the

3  Sistem case that I'll obviously take us to, you

4  look at a broad range of evidence to decide who

5  owns what, notwithstanding there is a contract.

6            So when there is evidence of people

7  around at the time before the MRDA is entered into,

8  at the time before it is entered into, who talk

9  about ownership and talk about who owned what, that

10  evidence is directly admissible for the purpose of

11  showing the Court who owned what.

12            Now, subjective --

13            THE CANADIAN COURT:  How does that

14  square with the law as to when you cannot use a

15  prior draft?

16            And secondly, so you have got a lawyer

17  saying take it out.  Is that the company?  I mean,

18  did the executives say, okay, we are going to take

19  it out?  I mean, it is a bunch of lawyers playing

20  around.

21            MR. GOTTLIEB:  Right, I'm actually not

22  arguing about that particular piece of evidence

23  right now.  I was just giving a heads-up because

24  you made the comment that there is direct evidence

25  about ownership that is highly relevant.  I'm not

1    talking about prior drafts and I am not -- clearly

2    not talking about subjective intention.

3              THE CANADIAN COURT:  Well, it is in a

4    prior draft.

5              MR. GOTTLIEB:  Yes, but it is the

6    discussion of the people at the time, but I'm going

7    to move on with that point so I can deal with 4(a)

8    and the law in 4(a), and then I'll come back to the

9    evidence point, if that is okay.

10             As you saw in the brief from the

11   Canadian Debtors, they rely on Black's Dictionary

12   to ask the Court to come to an interpretation of

13   what legal title means, but what is interesting, is

14   the way I'll put it, is they actually don't take

15   the Court to the definition of legal title in

16   Black's in their brief, they take it to title.

17             And the reason why they don't is

18   because it is actually completely contrary to what

19   their position is on it.

20             And I want to take you to the Francey

21   decision that Mr. Zarnett referred to because this

22   is the definition of legal title and how it is

23   dealt with as a matter of Canadian law.

24             And we are going to bring it up on the

25   screen, but it is referred to at tab 15, Volume 1,

 1   of the EMEA authorities.

 2               THE CANADIAN COURT:  Just a second.

 3   I'm looking --

 4               MR. GOTTLIEB:  You can look at it in

 5   there, obviously.

 6               THE CANADIAN COURT:  It is tab 4 of his

 7   brief.

 8               MR. GOTTLIEB:  Do you have that there?

 9   Okay, so Francey is a decision of the Alberta

10   Queen's Bench which was upheld by the Court of

11   Appeal.  It is a 1990 decision.  And I refer to it

12   because it actually takes us to the Black's Law

13   Dictionary that was actually in place at the time

14   of the MRD being drafted.

15               In this case, a fraudster, as

16   Mr. Zarnett said, had represented himself as the

17   general manager of a car dealer.  On that pretense

18   he convinced the plaintiff to deliver her motor

19   home.  He then absconded and the question was, what

20   was -- whether or not the exclusion clause would

21   apply.

22               And it is important to go to the

23   language of the case because the Court had to

24   decide what these various definitions mean, and if

25   you go to page 15 of the decision, please, so if

1    you have that, what the Court starts with at

2    paragraph 73 is:

3                   "What is meant by 'title' and

4                   'ownership'?  Ownership is defined

5                   in Black's Law Dictionary as:

6                   Collection of rights to use and

7                   enjoy property, including right to

8                   transmit it to others...  The

9                   complete dominion, title or

10                  proprietary right in a thing or

11                  claim.  The entirety of the powers

12                  of use and disposal allowed by law."

13                  So that is what ownership is.  And then

14   if you go down, it says:

15                  "Given the limited rights

16                  granted [...] under the consignment

17                  agreement, it cannot reasonably be

18                  argued that such rights included

19                  all, or even substantially all, of

20                  the rights which Francey enjoyed as

21                  'owner' of the motor home so as to

22                  warrant the inference that Francey

23                  parted with ownership in favour of

24                  Checknita".

25                  And then it refers to at 74 the

1    definition of "legal title" and it says:

2                      "Legal title is defined in

3               Black's at p. 807".

4               And this is the definition that is not

5    in the Canadians' brief, notwithstanding that legal

6    title is the precise phrase in the MRDA 4(a):

7                      "Legal title.  One cognizable

8               or enforceable in a court of law, or

9               one which is complete and perfect so

10              as regards the apparent right of

11              ownership and possession, but which

12              carries no beneficial interest in

13              the property, another person being

14              equitably entitled thereto..."

15              So the definition that is in Black's

16   Law Dictionary, and again, it is my friends that

17   rely on Black's Law Dictionary, goes directly

18   against their proposition of what legal title

19   means.  They see it means ownership including

20   beneficial ownership.

21              And I have handed up the full portion

22   of the Black's Law Dictionary.  And if you go to

23   807, page 807 in the top left corner, we have the

24   definition that is relied on by the Court as to

25   legal title, bottom right-hand corner where it

1    says:

2                    "One cognizable or enforceable

3                in a Court of law or one which is

4                complete and perfect so far as

5                regards the apparent right of

6                ownership and possession but which

7                carries no beneficial interest in

8                the property, another person being

9                equitably entitled thereto.  In

10               either case, the antithesis of

11               equitable title."

12               Which is the beneficial interest in the

13   property.

14               So my friends say legal title means

15   ownership including beneficial interest.  They rely

16   on Black's Law Dictionary.  I have just shown you

17   the provision from Black's Law Dictionary which

18   says that legal title does not include ownership

19   and is in fact the antithesis of ownership, which

20   is where I started this discussion, which is legal

21   title clearly isn't ownership.

22               And I will just refer to another case

23   which makes the same point, which is at Volume 2,

24   tab 26 of our authorities, and it is called MacKeen

25   Estate v. Nova Scotia and it is the Appellate

1    Division of the Nova Scotia Supreme Court in 1978.

2              And this was what I will call a

3    complicated estate planning undertaken to try to

4    avoid succession tax, and the question for the

5    Court was, who was the real owner?  Who was the

6    real owner and not through the mechanism that had

7    been put in place.

8              And if we go to page 6, paragraph 22,

9    please, again the Court deals with what legal title

10   really is and what it is really not.  And what the

11   Court says in 22 is:

12                   "In the modern sense of the

13                   phrase, a person is 'beneficially

14                   entitled' to property if he is the

15                   real or beneficial owner of it, even

16                   though it is in someone else's name

17                   as nominal owner.  The nominal owner

18                   of the property, whether real

19                   property, choses in action or other

20                   personal property, has legal title

21                   to it."

22             Legal title does not carry with it

23   those things.  Legal title is the nominal owner,

24   according to the Court.

25                   "The real owner, the person

1              'beneficially entitled' to it, can

2              require the nominal owner to let him

3              use or have possession of the

4              property, or to give him the income

5              from it, or otherwise to let him

6              have the benefit and enjoyment of

7              it."

8              And it goes on.

9              But the point there is obviously that

10   when the Court talks about legal title, it talks

11   about it in the sense of being the opposite of

12   beneficial ownership.  And what it says is, which

13   again makes perfect sense --

14              THE CANADIAN COURT:  I mean, I

15   understand your Black's Law Dictionary.  This one

16   doesn't seem to say the same thing.  He is talking

17   about what is a nominal, quote, owner, and under

18   this quote he says you can call him a nominal owner

19   to convey or transfer its legal title.

20              But you are not saying that your

21   clients have the right to have transferred to it

22   the legal title, you are not saying that, and that

23   is what this says.

24              MR. GOTTLIEB:  Well, let me put this

25   differently, Your Honour.  What this says, in my

1   respectful submission, is the nominal owner of the

2   property, that definition where it says the nominal

3   owner of the property, whether real or choses in

4   action, has legal title to it.

5              So it is just putting the point that

6   the Francey case made in the opposite way, saying

7   if you have legal title, you are the nominal owner.

8   But I understand your point about the Black's Law

9   Dictionary one is more direct because that is

10  exactly what the Canadian Debtors --

11             THE CANADIAN COURT:  He is saying here

12  if you are the nominal owner, whatever the nominal

13  owner was in that estate, he is saying that the

14  equitable owner could call for a transfer of the

15  legal title.  Well, no one is saying that here,

16  that you could call upon for transfer of the legal

17  title.  So it is not quite apt, that is my --

18             THE US COURT:  But I think it is

19  standing for the legal proposition, the sentence:

20             "The nominal owner of the

21             property [...]" and I will skip some

22             words "has legal title to it.  The

23             real owner, the person 'beneficially

24             entitled' to it, can require the

25             nominal owner to let him use or have

1          possession [...]," et cetera.

2          MR. GOTTLIEB:  That is exactly correct,

3    Judge Gross, and that is relevant here because NNL

4    holds only legal title, but don't forget NNL also

5    has a beneficial interest with the other RPEs, and

6    the use that this quote is talking about makes

7    perfect sense, because when you have legal title

8    separated from beneficial title, the beneficial

9    owners have to get the permission from the legal

10   title holder to use the property.  That is not a

11   novel proposition.  So that makes perfect sense

12   here.

13          So when we talk about the separation

14   between the legal title and the beneficial title,

15   what we are talking about here is contrary to the

16   position of the Canadian Debtors, the Canadian

17   Debtors would have us read the MRDA to see they

18   mean the same things based on Black's Law

19   Dictionary, when in fact it shows that they mean

20   the opposite thing and do not include those

21   provisions.

22          That is why, Your Honour and Judge

23   Gross, you notice the EMEA Debtors never run away

24   from the legal title.  They never try to say that

25   NNL doesn't have legal title.  What we say is legal

1   title means something drastically different than

2   what the Canadian Debtors say it means.

3   Mr. Maguire took you through the agreements

4   themselves that acknowledge that point, and

5   therefore, the proposition put forward by the

6   Canadian Debtors that we should read "legal title"

7   to mean full ownership in our respectful submission

8   just doesn't stand up on the wording of the MRDA

9   and doesn't stand up on the law that interprets

10  those provisions.

11          So in our respectful submission, when

12  you look at 4(a), it is of no help at all to the

13  Canadian Debtors' position and in fact shows the

14  opposite.

15          Now, I want to just raise one point

16  very briefly.  The question came up as to whether

17  or not, and this was in questioning earlier today,

18  Justice Newbould, the question came up whether

19  there would have to be an ambiguity to look at and

20  rely on the provisions of the addendum.  That was

21  just a question asked.

22          You asked --

23          THE CANADIAN COURT:  I don't know if I

24  asked that.

25          MR. GOTTLIEB:  One of the counsel --

neesons                WₐF
WILCOX & FETZER LTD.                www.neesonsreporting.com
                                    www.wilfet.com

1  okay, I may have misheard that, whether or not

2  there would have to be an ambiguity.

3            THE CANADIAN COURT:  Whether there had

4  to be an ambiguity to look at the recital, I think.

5            MR. GOTTLIEB:  And my submission on the

6  use of recitals doesn't change.  The addendum are

7  obviously agreements entered into between the

8  parties and therefore they are agreements that must

9  be looked at by the Court, if I can go that far.

10  But I think you know that.

11            Before I move on to very quickly deal

12  with the arm's length standard that I am going to

13  deal with quickly, I want to get to the tax law

14  point that was raised directly by Mr. Crichlow and

15  in a bit of a sideways way by Mr. Zarnett where

16  they discussed ownership for tax purposes.  That

17  was actually the phrase that was used, ownership

18  for tax purposes by Mr. Crichlow.

19            And there is no such thing as ownership

20  for tax purposes.  You own it or you don't.  It

21  would be nice if you could do things like that for

22  tax purposes, but that is not the way it works.

23            When people are owners, they are owners

24  for everything.  And I would have thought that's

25  trite, but because it was raised, I'll refer the

1    Court to the Gelber case, which is a 1991 case from

2    our tax court and it is at tab 19, Volume 1.

3              And in this case, and you don't have to

4    turn to it, but in this case, and paragraph 31 is

5    the reference, in this case the taxpayer set up a

6    corporation to own condo projects.  The taxpayers

7    were shielded therefore from personal liability

8    during construction.  On completion, ownership was

9    transferred to the taxpayers and the taxpayers

10   tried to deduct all the expenses in connection with

11   the construction.

12             Not surprisingly, the Courts said I'm

13   sorry, you can't do that, you can't have it both

14   ways.  And paragraph 31 is up on the screen and in

15   the second sentence the Court -- pardon me, the

16   third sentence the Court says:

17             "But one cannot be an owner of

18             property for one purpose - for

19             protection of personal liability

20             during construction - and be an

21             owner for another purpose - for tax

22             purposes.  In the same way a person

23             cannot simultaneously inhale and

24             exhale, a person cannot

25             simultaneously own and not own a

1              property.  An owner of a property

2              owns the property throughout the

3              time he is owner, for good and bad.

4              A person must decide what is more

5              important, protection from potential

6              liability and have a corporation own

7              the property during construction, or

8              potential tax deductions and have

9              oneself own the property during

10             construction.  The decision is to be

11             made prior to construction."

12             You've got to make the decision.

13             So the suggestions that somehow the

14    provisions that are referred to throughout the

15    evidence, in the agreements and elsewhere, mean

16    something different when they say "ownership" and

17    all of the things that Mr. Maguire took the Court

18    to, just in the written agreements, just in the

19    written agreements those mean ownership but they

20    mean a different ownership, in my respectful

21    submission there is just no possible merit to that

22    argument at all and the case law makes that clear.

23             I want to now move just to one point

24    before I leave the MRDA and go to ownership, which

25    is the arm's length standard, because in our

1   respectful submission, the construction that the

2   Canadian Debtors put to the contract and ask the

3   Court to adopt would violate the arm's length

4   principle.

5           And I will say as an aside it would

6   also violate the commercial absurdity requirement,

7   meaning a contract should be interpreted in a

8   manner that should avoid commercial absurdity.

9           But the arm's length principle is very

10  important here, and it has to be remembered that

11  this is not some idea in the sky of arm's length

12  principle existing.  It is actually not that at

13  all.  The MRDA was drafted because Nortel as a

14  group wanted to convince the taxation authorities

15  that their arrangements complied with the arm's

16  length principle and requirements.  They had tax

17  lawyers who specialized in it.  The MRDA itself

18  refers to the arm's length principle.

19          So there can be no doubt that the arm's

20  length principle was something that surrounded the

21  MRDA and the preparation of the MRDA, and therefore

22  should be part of the interpretation of the MRDA

23  because that is what the parties intended and there

24  can be no doubt about that on the evidence and

25  there can be no doubt about it --

1            THE CANADIAN COURT:  Well, this

2    argument really comes down to nobody would ever

3    sign such an agreement, that is what your argument

4    comes down to, that nobody at arm's length would

5    have signed such an agreement.

6            MR. GOTTLIEB:  That the Canadian

7    Debtors say this agreement is, correct.

8            THE CANADIAN COURT:  All right, but

9    where is the evidence that nobody would sign such

10   an agreement?

11           MR. GOTTLIEB:  The evidence is in a

12   couple of places.  One, it is in Dr. Cooper's

13   testimony where he said based on his experience and

14   his view of transfer pricing and arrangements, no

15   party would enter into an agreement where all of

16   the benefit in effect went one way.  And I'll pause

17   there to make the point.

18           NNL benefitted just like the other

19   RPEs, the other IEs, because they all benefitted

20   from the pool of technology they were all creating.

21   So they all put their IP together into a large pool

22   and they all agreed to share it.  There is no doubt

23   about that on the evidence.  That is agreed by

24   everyone.

25           So NNL got a huge benefit from getting

1  IP from the other entities and the revenues from

2  the other entities, which as one of the witnesses

3  said, Clive Allen, that NNL couldn't have continued

4  in business if it didn't have that, those revenues.

5            So you have the entities get together

6  to figure out how to develop R&D and to pool R&D,

7  but NNL is the only party that gets to keep the

8  R&D, to get the benefit of the proceeds of a sale

9  of the very asset they are creating, and that is

10  from inception of the MRDA, according to the

11  Canadian Debtors.  That is the interpretation they

12  put on it, and that interpretation, I'll say just

13  bluntly, makes no sense because commercial parties

14  would not enter into such a deal.  They would not

15  agree, NNI and the EMEA Debtors, they would not

16  agree to spend billions and billions and billions

17  of dollars on the creation of IP, and if you take

18  the Canadians' argument for what it is, here is the

19  example.

20            EMEA and NNI spend 5 billion dollars on

21  creating a technology and NNL contributes zero in

22  the development of that technology.  This is the

23  Canadian interpretation.  The next day, because NNL

24  owns it, NNL can sell it without even asking EMEA

25  and NNI, can sell it to Ericsson for 10 billion

1  dollars.  It hasn't gone into a product, so they

2  say the other parties have no right to it

3  whatsoever, not even a licence.

4            Recall the Canadians' argument, that

5  is, if it doesn't go into a product, the EMEA

6  Debtors and NNI have no right to it, no licence in

7  it.

8            THE CANADIAN COURT:  Well, how could

9  they sell it?

10            MR. GOTTLIEB:  I'm sorry?

11            THE CANADIAN COURT:  How could they

12  sell it?

13            MR. GOTTLIEB:  It is a package of

14  technology.  They say they own it --

15            THE CANADIAN COURT:  How can you sell

16  it without getting the permission, while the

17  contract is going on, without getting the

18  permission?

19            MR. GOTTLIEB:  That is the Canadian

20  Debtors' argument, a hundred percent, that is a

21  hundred percent their argument.  Because what they

22  say is any technology that is developed is vested

23  in NNL.  The vesting of the legal title of NNL

24  equals the ownership.  If it does not go into a

25  product, if that technology has not gone into a

1  product, that technology is owned outright by NNL,

2  not even subject to a licence.

3            That is the argument they make, because

4  it is not in a product.  So they can sell the

5  package of technology made by NNI and EMEA to

6  Ericsson the next day as a bundle of software, as a

7  bundle of technology, and they get to keep it all,

8  every penny of it, without giving any of it to NNI

9  and the EMEA Debtors.

10           THE CANADIAN COURT:  Well, are they

11  saying that while the companies were in business

12  they could do that?

13           MR. GOTTLIEB:  Yes, that is the natural

14  flow from their argument.

15           THE CANADIAN COURT:  Are they saying

16  that, that while the companies were in business

17  making product, Nortel products, that they could do

18  that?  I haven't heard them say that.

19           MR. GOTTLIEB:  Let me answer it two

20  different ways, Your Honour, and that is the whole

21  point I'd say.

22           The answer is when this happened, when

23  there was an ability to get the fruits of

24  exploitation of NN Technology, so for example, the

25  Foundry litigation where there were patents in the

1    Foundry litigation that were not even part of a

2    product, got transferred to Rockstar, they did not

3    say they could get it all.  They did not keep it

4    all.  And they distributed it to all of the RPEs

5    based on their R&D contribution.

6              That is not what they say today.  That

7    is against what they say today, because they say

8    that if it is not in a product, there is no licence

9    and, therefore, they own it outright subject to

10   nothing.

11             So to put it this way, it is a great

12   question, but that is why we say that the Canadian

13   Debtors' approach to allocation flies in the face

14   and is contrary to the way the companies operated

15   throughout the life up until insolvency, and in

16   fact, frankly, after insolvency.

17             Alcatel, that you have heard so much

18   about as well, it was allocated in accordance with

19   R&D contribution, not based on the legal title

20   theory that they now put forward.

21             Mr. Britven, you'll recall, expert for

22   the CCC, in answer to your question, Mr. Britven in

23   his cross-examination acknowledged that Foundry and

24   Alcatel were inconsistent with the position put

25   forward by NNL in this litigation that it gets to

1  sell that IP.

2         THE CANADIAN COURT:  Let me ask you, I

3  was going to ask you at some point and I might as

4  well ask you now, Article 3, 3(a).

5         MR. GOTTLIEB:  Yes.

6         THE CANADIAN COURT:  When we turn to

7  performing the R&D activity, each participant gets

8  their RPSM.

9         MR. GOTTLIEB:  Yes.

10         THE CANADIAN COURT:  It is put to you

11  by the Monitor that that's the deal.

12         MR. GOTTLIEB:  Right.

13         THE CANADIAN COURT:  That they paid all

14  this money for R&D activity, but the deal was that

15  each person got their RPSM.

16         MR. GOTTLIEB:  Right, okay, so I'll

17  deal with that directly now.  And there are a few

18  different answers to that.

19         One is this agreement was, as

20  Mr. Maguire said, about operating.  This was an

21  operating agreement.

22         What 3 talks about is the payment that

23  they are going to receive as a result of their

24  contributions to that operating.

25         So it would be fully expected that that

1    would be what the parties would get as a result of

2    this.   Section 3 sets out the parties' entitlement.

3    And, Your Honour, I'll point out, very important,

4    if you read 3 closely, it is the participants and

5    that includes NNL.  So all of the participants,

6    including NNL, what they are entitled to receive

7    for their R&D activity is the allocation, the

8    adjustments calculated in Schedule A, but that

9    includes NNL.

10                  So if NNL is right, if that is the

11   only, if that is the only part of the compensation,

12   then NNL doesn't get any more either.

13                  And the Canadian argument, Your Honour,

14   hinges on the word "the" when it says "the

15   compensation".  Let me just pull up the language.

16   It says:

17                      "Each participant", and I point

18                      out again that includes NNL "shall

19                      be entitled to receive a payment in

20                      an amount equal to the allocation

21                      determined under the RPSM as the

22                      measure of the benefit [...]"

23                  So the Canadian Debtors put a lot of

24   weight on the word "the" as being the only benefit

25   you get from doing R&D, because the Canadians say

1    that they get a way bigger benefit than that as a

2    result of doing R&D.  They say they get to sell it

3    and keep all the proceeds and no one else gets it.

4              That is the benefit that they say they

5    get.  So again, when we talk about the proper

6    interpretation of the agreement and questions of

7    commercial absurdity and whether or not any arm's

8    length parties would enter into such an agreement,

9    it all deals with the same point.  The Canadians'

10   interpretation, with respect, doesn't make sense.

11             THE CANADIAN COURT:  Which of the

12   "the's" in that provision do you say they rely on?

13             MR. GOTTLIEB:  They say right after the

14   definition of R&D allocation, they say you are

15   "entitled to receive a payment as the measure of

16   the benefit."

17             It is "the measure", as opposed to a

18   measure, as opposed to the measure of the benefit

19   with respect to operating profits.  But this whole

20   section deals with operating profits.  Everybody

21   agrees that this provision says nothing about how

22   to allocate the proceeds of sale, everybody agrees

23   that the MRDA doesn't do that.

24             So on the one hand the Canadian Debtors

25   say this shows that you are not entitled to any

1  allocation of the proceeds of sale of IP, that is

2  what they say out one side, and then out of the

3  other side of their mouth they say but everybody

4  acknowledges that the MRDA doesn't deal with the

5  allocation of proceeds of sale of IP.

6            So this provision 3 makes perfect sense

7  in this context, which is in an operating agreement

8  to set out the profits and losses on an ongoing

9  basis, that is what it deals with and that is why

10  it makes sense on there.

11           So, Your Honour, I was back at the

12  arm's length principle, and I am going to leave

13  that very quickly to move on.

14           The only thing I wanted to put up on

15  the screen, if I could, was everyone relies on

16  jointly the OECD guidelines.  All the experts

17  referred to these OECD guidelines, and I want to go

18  to page 25 because, again, the entire discussions

19  were based on the MRDA being in compliance with

20  transfer pricing principles.

21           And at 25, if we just blow up the

22  summary section at 89, and really 90 is the key,

23  because it talks about the benefits that parties

24  who are obliged to comply with legal transfer

25  pricing principles must comply with.  And it says:

1                    "The legal owner", and that is

2                NNL "of an intangible is entitled to

3                all returns attributable to the

4                intangibles only if, in substance

5                [...]"

6                And what all those bullet points say is

7    if it does everything.  This is in an MNE context

8    where you have multinational entities, you have

9    various entities in various countries.  And 90

10   says:

11                    "To the extent that one or more

12               members of the MNE group other than

13               the legal owner performs functions,

14               uses or contributes assets, or

15               assumes risks or costs related to

16               the development, enhancement,

17               maintenance and protection [...]" et

18               cetera, et cetera "returns

19               attributable to the intangible must

20               accrue to such other members through

21               arm's length compensation reflecting

22               their anticipated contribution to

23               intangible value.  This may,

24               depending on the facts and

25               circumstances, constitute all or

1           substantially all or part of the

2           return attributable to the

3           intangible".

4           So it is saying that the legal title

5    isn't entitled to anything as a result of it being

6    the legal title holder.  It is entitled to what it

7    does, but if any of the other entities around the

8    world carry on these functions, they are going to

9    get the benefits and in fact they may get all the

10   benefits and the legal title holder may get none.

11           THE CANADIAN COURT:  One of the things

12   about this case that can be a puzzle or a conundrum

13   or whatever one wants to call it that we have to

14   think about is that this agreement was clearly

15   driven by transfer pricing issues.

16           Dr. Eden I think said it is all about

17   transfer pricing, that is all it is, the way she

18   put it.

19           And transfer pricing deals with the

20   allocation of profit of an operating business year

21   to year, and so far as selling an asset is

22   concerned, eventually they put in this schedule

23   that you don't take into account the sale of an

24   asset.

25           THE US COURT:  You see, that leads me

1    to something that concerns me, and Mr. Gottlieb

2    being a nice man will not embarrass me with the

3    question.

4              Because it may be a dumb question, but

5    you know, as you have pointed out and as I was

6    thinking over the weekend, the MRDA does not speak

7    about the sale of assets, what happens in the event

8    of an insolvency or anything of that nature.

9              So if I found that the MRDA simply does

10   not apply to the issues before me, would we not go

11   back to the course of dealing and all of that

12   extrinsic evidence?

13             MR. GOTTLIEB:  Yes, and yes.  The first

14   yes is my answer to the question is you would go

15   back and you would look at what I am about to turn

16   to, which is how do you own IP.  How does a party

17   become the owner of the IP?  And the answer is

18   through the inventive process and no one can

19   disagree with that.  That is consistent law around

20   the world.  You invent it, you own it.

21             So you would look at the rights of the

22   party, Judge Gross, and what you would see is the

23   parties who develop it own it.  So I agree with

24   that fully.

25             That would be the way you would have to

1    approach the ownership issue as well.

2              Now, as you know, Judge Gross, we say,

3    and it is the same right here because there is

4    nothing that takes away the ownership rights in the

5    MRDA, but yes, you would look at the rights of the

6    parties as they existed, how they treated it, how

7    they agreed upon it, how they discussed it.  You

8    would use all of that to determine the rights of

9    the parties, which you are going to hear shortly, I

10   hope I get to it, is that we say you get to look at

11   and must look at all of that now as well.

12             So yes, course of dealing of the

13   parties, what they said about it, and how they

14   owned it is the critical part.

15             Now we say the MRDA doesn't change

16   that, Judge Gross, but it gets to the same point.

17             THE CANADIAN COURT:  And Judge Gross

18   asked the same -- is really asking the same

19   question as what I was positing, and my experience

20   in life is no question is a dumb question.

21             THE US COURT:  I have had a few.

22             THE CANADIAN COURT:  But when you start

23   thinking about this agreement and what was behind

24   it and the purpose of it as an operating agreement

25   and a year-to-year, how the tax authorities are

1  going to deal with your income statements every

2  year, whether you are off-side or not, all of these

3  provisions in some respects can be said, on one

4  interpretation, none of this matters after the

5  companies go under and we are now dealing with an

6  insolvency.

7              MR. GOTTLIEB:  Right.

8              THE CANADIAN COURT:  And that is one

9  way of looking at it.

10             That is really what Dr. Eden, the US

11 expert, said, it is all about transfer pricing,

12 that is from the beginning to the end.

13             MR. GOTTLIEB:  Right.

14             THE CANADIAN COURT:  The other -- your

15 protagonists on each side of you are saying no, you

16 have got to look at the agreement.  It does more

17 than just transfer pricing.  It deals more with how

18 you split up the baby every year.  It deals with

19 sort of legal rights, whatever those legal rights

20 are, and there is huge variance on what they say

21 those legal rights are.

22             So I'm really throwing out the same

23 thing Judge Gross was throwing out:  What are we

24 looking at this agreement for, and I'm certainly

25 interested in all the argument, because that is not

1  something I have landed on yet.

2           MR. GOTTLIEB:  Well, I mean, our

3  argument runs, if I can put it this way, right up

4  the middle.

5           THE CANADIAN COURT:  I understand.

6           MR. GOTTLIEB:  As you know from our

7  brief, we say that ownership of IP comes from

8  inventorship and we have taken you through and my

9  friend Mr. Maguire took you through the parts why

10 we say that wasn't impacted.

11          So from our point of view the operating

12 agreement that was the MRDA to deal with the

13 day-to-day operations and the profits and losses on

14 an ongoing basis doesn't change that at all.  It

15 has no impact on the rights of the parties with

16 respect to their ownership interest.

17          So to answer the question this way,

18 Judge Gross, if there was no MRDA at all, if the

19 MRDA got wiped out, if the parties agreed that the

20 MRDA was not in existence as at the date of filing,

21 that that was a disclaimed or non-existent

22 agreement, wouldn't have an impact, we would have

23 to go back exactly where we say we go back in any

24 event, which is the rights of the parties in the IP

25 because all of the parties agree that we have to

1  get to who owned what.

2           And we say who owned what comes from

3  ownership and that the MRDA -- ownership from

4  invention and the MRDA doesn't impact that.

5           And, Justice Newbould, just to deal

6  with one point you raised.  The one thing I wanted

7  to let you know, and I don't have the time to bring

8  you to it, but in the transfer pricing guidelines,

9  although they do deal with the operations, there is

10  no doubt, and I would ask you to make note of this,

11  if you don't mind, at page 52 and 53 of the very

12  same guidelines, this is why it is so important,

13  they actually deal with the sale of assets and it

14  is the exact same principle, which is you can't

15  just take the assets from the other multinational

16  parties in the other jurisdictions, sell them and

17  keep the money.

18           So I don't have time to go through it,

19  but that is what it deals with.

20           THE CANADIAN COURT:  Again, that is

21  dealing with annual tax issues, it is presumably

22  not dealing with what we are dealing with here.

23           MR. GOTTLIEB:  Okay, again, I'm going

24  to put it slightly differently, which is this.  The

25  MRDA was negotiated in this exact, I'm going to use

1   this terminology which isn't precise but you'll get

2   it, regulated environment.

3                    THE CANADIAN COURT:  Just while I make

4   a note here, what is the exhibit number of the

5   guidelines on transfer pricing?

6                    MR. GOTTLIEB:  50471.

7                    Now I'm going to jump, if I might, to

8   ownership of invention, and I have a few tasks

9   ahead of me that I am going to have to go through

10  rather quickly just because of the time.

11                   And you asked this question of

12  Mr. Maguire.  There is no question that as a matter

13  of law, ownership of IP, of any IP comes through

14  invention.

15                   That is the law and nobody debates

16  that.  And then the question becomes, does the

17  inventor as a matter of law or contract transfer to

18  his or her employer so that the employer becomes

19  the beneficial owner?  And the answer is yes.

20                   And the reason I would have thought is

21  rather obvious, but when NNL, NNUK and the other

22  groups pay for their employees to invent, it makes

23  sense that the inventions go upstream to the parent

24  because they are paying for it.  They are paying

25  for the labour, they are paying for the equipment,

1   they are paying for the cost of the material.  So

2   as a matter of law in Ontario, there is no debate

3   about that at all.

4              I'm going to come now, Justice

5   Newbould, to your question, but I'm going to avoid

6   it for one second by saying there are also

7   contracts, and they are all in the record and I'll

8   give you the document numbers where the employees

9   of the RPEs sign as part of their employment

10  agreement, they agree that anything they create,

11  anything they invent is their employer's.  And that

12  is the case with NNI and that is important here

13  because of the points the Canadians are raising,

14  that is the case with NNL, that is the case with

15  NNUK, that is what the documents show.

16             So as a matter of contract, once

17  someone is sitting at their desk and has a eureka,

18  has an invention, that becomes the property of

19  their employer automatically.  And the reason

20  obviously why that is so important is because the

21  Canadian Debtors take the position that when the

22  employees sign the patent assignments so as to

23  allow NNL to register a patent, because as part of

24  the patent process NNL has to have the

25  inventor/employee sign it, so when it is assigned

1   to NNL, the Canadian Debtors say, well, that is

2   where NNL got all of its right, title and interest

3   in the invention, in the patent.

4              But the problem with that is the

5   employee didn't have it because the employee as a

6   matter of his or her employment had already granted

7   it to his or her employer, and the contracts make

8   that clear.

9              THE CANADIAN COURT:  Okay, you have

10  said that.  Where do I find them?

11             MR. GOTTLIEB:  I'll give you the

12  document numbers and I can bring a couple of them

13  up.

14             So one is at, and this is TR48819, and

15  this is an employment agreement for an NNI

16  employee, that had to be blacked out because of the

17  confidentiality issues.

18             And the company, you can't see it, but

19  the company here is not shown but the employee is

20  an NNI employee, it is a document produced by NNI,

21  and I can tell you, without telling too many

22  secrets --

23             THE CANADIAN COURT:  That's all right,

24  we'll take your word for it, and if you are wrong,

25  somebody is going to tell us.

1              MR. GOTTLIEB:  And there is a SIN

2    number on it, so that is a SIN number, so we know

3    that.

4              So as you can see, I further

5    acknowledge the company has notified me -- oh, I

6    apologize, right at the top there:

7                     "I acknowledge that by signing

8                the Employment Agreement to which

9                this Acknowledgment of Notification

10               is attached and specifically that

11               under the terms of paragraph 3 of

12               that agreement, I have agreed that

13               inventions, discoveries and

14               improvements developed by me during

15               my employment shall be the sole

16               property of Company and are thereby

17               assigned to Company".

18             So that is a term of the employment

19    agreement.

20             For your notes, there is one for NNUK

21    at TR21500.  And do we have an NNL number?  And

22    Your Honour, I'm happy to take you to the

23    paragraphs here if you want on the screen in front

24    of you, this is the NNUK one.

25             THE CANADIAN COURT:  I'll take your

1    word for it.  It says the same thing.

2              MR. GOTTLIEB:  Well, it says something

3    different, but paragraph 18 we can go to on the

4    document.  We can blow that up.  You know it is

5    from the UK when it starts with "whilst" and I am

6    sure I didn't pronounce that well.

7              THE CANADIAN COURT:  Well, it says

8    essentially the same thing.

9              MR. GOTTLIEB:  Yeah, it is the same

10   point.  And the NNL one is the same.  I'll just

11   give you the number, it is TR45736.  Yes, TR45736.

12             THE CANADIAN COURT:  Now, is the

13   evidence that all the employees signed this form?

14   You haven't got all the employees obviously, but is

15   there any disagreement about that, that all the

16   employees signed this?

17             MR. GOTTLIEB:  If there is any

18   disagreement, I don't know about it.  I think we

19   can take it as a given that when employees were

20   employed, they signed.  The database is filled with

21   employee agreements.  Mercifully, we didn't deal

22   with them all.

23             So the fact of the law of Ontario is

24   very interesting, but it is unnecessary because the

25   contracts did exactly this.

```
 1              But I want to take you -- I apologize,

 2   our brief sets out why we say Ontario law applies

 3   regardless.  We didn't prove any other law, so in

 4   the Ontario Court, Ontario law is assumed to be the

 5   same as the other jurisdictions.  Again, that is

 6   not a controversial point.

 7              And in our brief we set out why we say

 8   Ontario law applies as a matter of conflict of laws

 9   in connection with the US and we set out those

10   cases and explain why that Ontario law is the

11   proper law of the question to be answered with

12   respect to ownership.

13              And again, that is set out in the

14   brief.

15              So I want to take you quickly, if I

16   could, to a case --

17              THE CANADIAN COURT:  Actually, looking

18   at the US, at least the Monitor's reply or rebuttal

19   brief, it is at page 93, footnote 294, it says:

20                   "Under US law, absent an

21              enforceable agreement to the

22              contrary, it is the inventor (not

23              the employer) who is the owner

24              [...]"

25              And you would say well, there is an
```

1  enforceable agreement.

2              MR. GOTTLIEB:  There is an enforceable

3  agreement, and you will see in our brief that we

4  say Ontario law applies anyhow, so it is belt and

5  suspenders on that point.

6              And I want to take you to a case, a

7  recent decision of our Court, 2000, of the

8  commercial list called C.I. Covington Fund v.

9  White, and it is Volume 1, tab 6 of our brief of

10  authorities.

11              Now, we'll bring it up on the screen,

12  but this is a 2000 decision of the commercial list

13  Court, affirmed by the Divisional Court, and what

14  this dealt with was a gentleman named White was the

15  president and CEO of the company Delta.  He was

16  also the inventor and invented valuable patents

17  used by Delta in the business.  And Covington, C.I.

18  Covington, a financial institution, had loaned

19  money to Delta and taken a security agreement and

20  Delta ultimately went insolvent, and the issue was

21  whether White or Delta owned the patent.  If Delta

22  owned it, Covington could seize it; if White owned

23  it, they couldn't.

24              White was the registered patent holder

25  and White had entered into a licence agreement with

1   Delta allowing Delta all rights to use the patent.

2            So we have a situation where there is a

3   licence and the question -- and it is very similar

4   here, obviously.  The patents here are registered

5   to NNL and the patents were licensed by NNL to EMEA

6   and US, same as here.

7            Nonetheless, the Court here held that

8   on the evidence Delta was the beneficial owner of

9   the patents and, therefore, they could be seized by

10  Covington when enforcing.

11           And I want to go, please, to paragraph

12  38 of this decision on page 11.  Now, that's the

13  provision, just if we go to the very last sentence

14  in particular:

15                   "[...] Courts will find that

16                   the employer is the owner of an

17                   invention where an employee is hired

18                   precisely to design or develop a

19                   product".

20           But the reason I'm going to this case

21  is actually a different reason because that is,

22  again, in my respectful submission, trite, and

23  we'll see this when I come and finish up on the

24  evidence point.

25           The Court examined in coming to this

1  conclusion all facts in order to answer the

2  question of who owns the patent.  Just like here,

3  the question was, who owns the patent?

4             And the Court didn't just look at the

5  licence agreement that set out White was the owner

6  and that White was the licensor.  On the contrary,

7  it went much further than that and looked at all of

8  the evidence, including the patent applications

9  that were put in, the investment agreements, and

10 representations made by the company in its dealings

11 with Covington.  It looked at those representations

12 that were made after the licence agreement was

13 entered into.

14             They also looked at statements in the

15 audited financial statements about who owned the

16 IP, again, both before and after the licence

17 agreement.

18             And based on that and the testimony of

19 executives as to their understanding of the issue

20 of ownership, not of the issue of interpretation of

21 the agreement, the issue of ownership, the Court

22 concluded that when all of the relevant evidence

23 was considered, including the licence agreement, of

24 course, but when all of the relevant evidence was

25 considered, it was Delta that was the beneficial

1  owner and that White was just the legal title

2  holder and therefore it could be seized.

3          Now, that is obviously critical here

4  because, in our respectful submission, when it

5  comes to what evidence is admissible and not

6  admissible, that is exactly the type of evidence

7  that the Court should look at, all the evidence

8  that will assist in the determination of the

9  question before it, who owned.  And that is what

10 the Court did there, and the Court in fact found

11 the opposite of what the agreement said in that

12 case, the opposite of what the agreement said.

13         So if we just flip to paragraph 39,

14 right below, of that paragraph, so it just refers

15 to this is a case where at common law the employer

16 here, Delta, could assert that it was the

17 beneficial owner.  No one said any of this evidence

18 was parol evidence or inadmissible, it was direct

19 evidence regarding the issue of ownership.

20         In our brief we refer to several other

21 cases with respect to the ownership/inventorship

22 point, so I won't go to that.

23         The point obviously is, is that the

24 RPEs each owned the IP as a matter of law and as a

25 matter of contract and that was not taken away from

1    them by the MRDA.

2              And when we come to the question of who

3    owned what, in our respectful submission it really

4    doesn't matter how the Courts look at what the RPEs

5    owned in this sense, and that was a confusing

6    statement, but in this sense.  As you know from our

7    submissions, from our briefs, we say that the

8    evidence is unequivocal that the IP created was an

9    indivisible pool and that all the RPEs owned a

10   beneficial interest in that indivisible pool.

11             And that how do you value that

12   interest?  Well, you value it exactly the way

13   Nortel valued it, which is to look at R&D

14   contributions, so you have to look at R&D

15   contribution.

16             That is the proxy, because it is

17   impossible to know exactly who did what, so you

18   need a proxy, and the proxy that Nortel used was

19   R&D contribution.  So we say they all owned a piece

20   of the entire pool, but the Canadians have, put it

21   this way, taken a shot at that and said well, you

22   couldn't have owned a piece of the entire pool, and

23   we say, well, based on the evidence, that is

24   accurate.  Based on the indivisible nature.  But if

25   you want to take the position that we just own what

1   our own employees are referred to on the patents

2   of, that is fine, so we have a beneficial interest

3   in some part of that pool but you still have to

4   value it exactly the same way.

5             How do you value it?  Well, you value

6   it exactly the way Nortel historically valued it

7   based on R&D contribution.  You look at the R&D

8   contribution over the appropriate period of time

9   for the assets sold and that is how you come to the

10  question that you have before you.

11            THE CANADIAN COURT:  I suppose you

12  would say, in answer to the question Judge Gross

13  asked one day, what if you spend a billion dollars

14  and you drill a hole and there is nothing there and

15  you still get your contribution.  I suppose you

16  would say to that, well, what you lose in the

17  corners you gain in the straights and vice versa.

18            MR. GOTTLIEB:  Yes.  So, for example,

19  what we know is that the CTO office, the Chief

20  Technology Office assigned the various tasks to

21  this group, and it was done for some purpose, some

22  people to work on very innovative material that may

23  give you nothing for a long time.  Some may work on

24  a correction or, as we say, a ring tone, something

25  that fixed something that really wasn't that

1   tremendously valuable.

2              You don't penalize parties or benefit

3   parties by what they were assigned to do, and that

4   wasn't the way at Nortel, which is why when you

5   looked at the proxy, the proxy was based on the

6   total R&D spend, and that, in our respectful

7   submission, as Mr. Maguire will deal with it, is

8   the way to look at it, so that you don't penalize,

9   one dollar is no better than another dollar,

10  notwithstanding what some might say in this

11  courtroom.  That wasn't the way Nortel operated.

12             And before I get a little bit of a dart

13  in the back of my head, I'm going to quickly go to

14  the issue and close out on the evidence.

15             There has been a huge fuss made about

16  the evidence, and in our respectful submission,

17  there is no merit to it.  The evidence that we have

18  put in, that Mr. Maguire will take you to after the

19  break -- pardon me, after I sit down, is all

20  admissible and it is admissible under three

21  different categories.

22             One is it is admissible as direct

23  evidence --

24             THE CANADIAN COURT:  Sorry, what

25  evidence are you talking about?

1            MR. GOTTLIEB:  The evidence that starts

2    with, for example, the APA kickoff meeting in 2002

3    where it was discussed at the meeting and it was

4    discussed before the meeting what answer would be

5    given to the taxation authorities when they asked

6    how are you going to divvy up the proceeds of a

7    future sale of IP.  They give an answer there.

8            There is a whole bunch of

9    representations made to the taxation authorities

10   about ownership.  It is all of the statements about

11   ownership and all of the evidence about the way the

12   parties dealt with it.  So that is the evidence I'm

13   talking about, both before and after.  So before

14   and after the MRDA.

15            And in our respectful submission, it is

16   all admissible as direct evidence and I am going to

17   take you to one case for that, a tremendous amount

18   is admissible as factual matrix evidence because

19   who owned what they brought into the MRDA is the

20   most important factual matrix.  Like all

21   agreements, the most important thing, the most

22   important part of the factual matrix is what are

23   the parties' rights before they come into the

24   agreement, what are they bringing to the agreement.

25            So the factual matrix includes all of

1    the evidence where there is a discussion about what

2    the rights of the parties are.

3                    THE CANADIAN COURT:  You say you have

4    to go -- you don't have to go back to 1992, because

5    the MRDA sort of continues with rights under the

6    1992 agreement, doesn't it?

7                    MR. GOTTLIEB:  Right, so --

8                    THE CANADIAN COURT:  So what time do

9    you look at to say it is part of the factual

10    matrix?

11                    MR. GOTTLIEB:  Well, obviously you can

12    go back as far as there is significant evidence as

13    to the ownership rights of the parties as they

14    existed at the relevant time period.

15                    So what we know is and what we have put

16    a tremendous amount of evidence in, which is all

17    consistent that all of the RPEs, all of the R&D

18    parties owned IP, is around the relevant period of

19    time starting after the RPSM methodology was put in

20    place.  That is where the evidence really begins

21    and goes to, in fact, post-filing, because that

22    deals with ownership and how the parties dealt with

23    what the rights of the parties were.

24                    So we say that is all admissible there.

25    We say it is all admissible under factual matrix

1   and that the Canadians, in our respectful

2   submission, are reading down Sattva and factual

3   matrix in a manner that it just doesn't lend itself

4   to.

5                THE CANADIAN COURT:  Can I ask you a

6   question.  Do you say that post-agreement conduct

7   is admissible?

8                MR. GOTTLIEB:  Yes.

9                THE CANADIAN COURT:  If there is no

10  ambiguity?

11               MR. GOTTLIEB:  Yes.

12               THE CANADIAN COURT:  Is that what the

13  law says?

14               MR. GOTTLIEB:  Yes.

15               THE CANADIAN COURT:  I thought the law

16  said if there is an ambiguity, you can look at

17  joint post-agreement conduct.

18               MR. GOTTLIEB:  So I'm going to take you

19  to a case right now which I say deals with that

20  square on, because I referred, you'll recall, to

21  direct evidence of ownership.

22               So I'm going to take you back to, Your

23  Honour, I just referred to the Covington case, so

24  please recall that.  The Covington case was a case

25  where the Court looked at a significant amount of

1   evidence post-agreement, notwithstanding the terms

2   of the agreement, to answer the question before the

3   Court, which is who owns.

4            The question before the Court isn't

5   what is the interpretation of the MRDA.  The

6   question before this Court is who owns the IP.

7   That is the question before the Court.

8            And I just want to go back to your

9   decision, Your Honour, in the Sistem case, and the

10  Sistem case is at tab - and then I will sit down -

11  the Sistem case is at tab 23 of our brief -- in our

12  reply brief of authorities, I apologize, and it is

13  a 2012 decision of yours, Justice Newbould, and you

14  know the history.

15           Judge Gross I'm going to take a guess

16  you haven't read this decision, but there was an

17  enforcement of a foreign award and there was an

18  attempt to enforce the award against shares held by

19  a company, not the Republic, and the question was,

20  was the company holding the shares on behalf of the

21  Republic.

22           That was really the issue before the

23  Court, and there was in fact an agreement in place

24  that dealt with some of the shares and referred to

25  the company being the beneficial owner of those

1  shares.

2          So the question before me now, the

3  question before the Court, and the question before

4  the Court on the Sistem case was, what can you look

5  at?

6          And I would like to turn, if we could,

7  please, to page 5 of that decision.  And we go down

8  to paragraph 23.  And again, the question before

9  the Court here, Judge Gross, was who owns the

10  shares.  I know they are in the name of the company

11  that I can't pronounce, I know it says the company

12  beneficially owns those shares, but are they really

13  held for the Republic.

14          And so paragraph 23 says that:

15              "Kyrgyzaltyn relies on an

16          agreement [...]"

17          And if you see that if you go about

18  five or six lines down, it says:

19              "The agreement provided

20          expressly in section 2.2 that the

21          treasury shares would be issued to

22          [them] so that [they] will

23          beneficially own such shares and be

24          entitled to all the benefits arising

25          from such shares.  [The company]

1              asserts that that is the end of the

2              matter and that it is [them] and not

3              the Republic that beneficially owns

4              the shares [...]"

5              If you flip over the page, here is

6    where the Court goes on to analyze the evidence,

7    and it is not just the agreement, because it

8    shouldn't just be the agreement, to answer the

9    question of who owns what.  So we start with the

10   preamble and paragraph 26 says:

11              "This is a clear statement that

12              Kyrgyzaltyn holds its shares of

13              Centerra on behalf of the Republic."

14              So that is the recital that is looked

15   at for the clear intention, and it goes on further.

16              But if we go down now to paragraph 27,

17   it says:

18              "There are other indications

19              that the shares of Centerra held by

20              Kyrgyzaltyn are held for the

21              Republic."

22              And then it refers to a press release

23   that is made, and this is obviously made after the

24   agreement, and then it refers to a newswire

25   referring to ownership, and then paragraph 28 says

1  that there are statements from Centerra, not a

2  party to the agreement, that it is holding the

3  shares for the Republic.

4           And then there is an MD&A, a management

5  discussion and analysis that refers to ownership,

6  and then there is a reference in another agreement.

7           So I'll stop there --

8           THE CANADIAN COURT:  I think it is fair

9  to say, is it not, there was never any argument as

10 to whether any of this stuff could be looked at in

11 that case?

12          MR. GOTTLIEB:  I obviously can't

13 answer --

14          THE CANADIAN COURT:  There was no

15 discussion in the reasons.

16          MR. GOTTLIEB:  Yes, there was no

17 discussion in the reasons, but in our view, in the

18 Covington case, the question before the Court is

19 who owns what, and therefore you have to look at

20 all the evidence as to who owns what.

21          And I'll just again say I haven't said

22 Alcatel yet, so I'm going to say Alcatel before I

23 sit down.  But when you look at what the evidence

24 is, it would make, in my respectful submission, no

25 sense whatsoever if there was some argument that

1  the Court couldn't look at Alcatel to determine

2  what the rights of the parties were because that

3  was a central way, a central way to look at what

4  the parties believed they owned and what they did

5  in fact own.

6            THE CANADIAN COURT:  That is why I

7  asked you, unless you can point me to some new

8  case, it is my understanding that the law in

9  Ontario is you don't look at post-agreement conduct

10 unless there is some ambiguity and that the joint

11 conduct of the parties can help resolve that.

12           MR. GOTTLIEB:  You don't look at

13 post-agreement conduct if you are trying to

14 interpret or vary the contract unless there is an

15 ambiguity.  But the question here isn't what does

16 that contract say.  The question here is what is

17 owned by the parties.

18           THE CANADIAN COURT:  But you are saying

19 that because of your position that it is owned not

20 by the contract but because of the law that the --

21           MR. GOTTLIEB:  Well, that is correct

22 and I will add on to that, the parties say that the

23 MRDA doesn't govern the sale of the proceeds.

24           So I apologize for taking so long,

25 subject to questions.

1           THE CANADIAN COURT:  That is all right,

2   we are going to need to take a few minutes break.

3   Is this a convenient time, is this a convenient

4   time, Judge Gross?

5           THE US COURT:  Yes, it is.

6           THE CANADIAN COURT:  We'll take 15

7   minutes.

8           -- RECESSED AT 3:55 P.M.

9           -- RESUMED AT 4:17 P.M.

10          THE US COURT:  Please be seated,

11  everyone.  Thank you.

12          THE CANADIAN COURT:  Mr. Gottlieb.

13          THE US COURT:  Mr. Maguire, we are

14  ready for you.

15          MR. MAGUIRE:  Good afternoon.  Good

16  afternoon, Judges.

17          THE CANADIAN COURT:  Good afternoon,

18  Mr. Maguire.

19          MR. MAGUIRE:  Yes, Justice Newbould.  I

20  would like to follow up on the discussion we were

21  just having about the various ways in which

22  extrinsic evidence comes before the Courts.

23          THE US COURT:  Yes.

24          MR. MAGUIRE:  Ownership, ambiguity,

25  matrix.  Just one small point on that.

1            Justice Newbould, I believe you

2    referred once or twice to the general rule that

3    post-contractual conduct is not admissible.  And

4    there is a rub here, and that is that in this case

5    the parties kept amending their contract over the

6    course of our time line.  So every time they

7    engaged in post-contractual conduct, that was post

8    the original contractual conduct, but it was pre

9    the amendment.

10            So you say post-contractual.  I say

11   pre-contractual.  And so we can dance through the

12   entire time line showing that our extrinsic

13   evidence is, in fact, pre-contractual, where the

14   parties amended and reenacted, and specifically my

15   favorite language, which is that in Schedule A,

16   recognizing the participants' ownership of NN

17   technology.

18            So that brings me to the extrinsic

19   evidence itself, the evidence that my friend

20   Mr. Zarnett referred to as the tsunami or the tidal

21   wave.  And it is a testament to his wisdom that he

22   tried to exclude this from the trial.  King Kanute

23   tried to hold back the tide, but even he didn't

24   take on a tsunami.

25            We have, in the interests of saving

1    time, put this forward in a graphic form above the

2    time line, so I will try to roll through that

3    reasonably quickly.

4              My colleague Mr. Gottlieb already

5    described the APA kickoff Q&A, if we start at the

6    time line back in 2002.  And that's what Nortel

7    Networks Limited had prepared to tell the tax

8    authorities if the question were asked what are you

9    going to do in a sale of proceeds.  And, of course,

10   the answer was to allocate it according to the

11   ownership of the participants.

12             Then if we move forward in the time

13   line, we have various representations to tax

14   authorities.  In 2003 we have Nortel's APA

15   responses which say that the residual entities, it

16   treats them as owners of intangible property; very

17   explicit.

18             If we stick with tax authorities and

19   just book-end the time line by going to 2009, we

20   see the report that NNL prepared for the tax

21   authorities, was required to in case of inspection.

22   And it reports that NNL -- this is 2010 -- NNL and

23   other integrated entities are the primary owners of

24   intangibles.  Again, it doesn't leave anything to

25   the imagination.

1            If we go back, leave aside the

2    representations to the tax authorities, take on

3    some other themes throughout the time line, we see

4    in 2003 the parties had occasion to examine an IP

5    migration analysis.  What was at issue there was

6    Nortel was considering a transfer of IP from the UK

7    company and the French company to NNL.  And in

8    doing that analysis it measured the respective

9    ownership of the French and the UK company based on

10   their contribution to R&D.

11           If we go to the following year, we have

12   the Foundry settlement, where Nortel settled its

13   patent litigation and shared the proceeds, the

14   royalty income, among the licensed participants

15   according to their contributions.

16           If we move forward to 2006, we have the

17   impairment analysis for the French company.  The

18   company was struggling.  The issue was should there

19   be a write-off, a write-down of assets on its

20   balance sheet?  Was it insolvent?  And in doing

21   that, the conclusion that it did not need to write

22   down, that NNL did not need to write down the value

23   of the French company on its financial statements

24   was because NNSA, the French company, owns a

25   significant IP asset and, with the other Nortel R&D

1   participants across the world, owns a share in the

2   IP that has been generated over years of R&D.

3           The evidence continues, only gets more

4   compelling as we move to 2007.  We go to the

5   Alcatel sale.  And here again we have the sale, the

6   only major sale of IP by Nortel pre-insolvency.

7   NNL was not treated as the sole owner.  The

8   proceeds were allocated based on contribution, all

9   provided to the auditors.  NNL, if its theory here

10  is correct, was making a gift of millions of

11  dollars of the proceeds of IP of which it was the

12  sole owner.  Well, that's not how the parties saw

13  it at the time.  That's not how they represented it

14  to the auditors.  That's simply not what happened.

15  The reality above the line reflects the reality

16  below the line, which is that there was a shared

17  ownership of Nortel technology.

18          THE CANADIAN COURT:  Mr. Maguire, do we

19  put in above the line the statements made in the

20  briefs filed with the Court on the approval of IFSA

21  and I think another one that NNL owned the IP?

22          MR. MAGUIRE:  I think it is entirely

23  appropriate to say that at all relevant times the

24  parties completely agreed that NNL was the owner of

25  the IP.  I think that is absolutely a true

1  statement.  I think it is completely consistent

2  with all aspects of dealing with outside third

3  parties, NNL was the legal owner.  It had legal

4  title.  It was the one that registered the patents.

5           So I see no distinction there, quite

6  frankly, between that and what we are saying here,

7  which is among the family there was a shared

8  ownership, a beneficial interest which was

9  acknowledged, it was contractually recognized, and

10  it was repeatedly confirmed both contractually and

11  extra-contractually.

12           We have on the same year as the Alcatel

13  sale, 2007, we have Project Swift, and there we

14  have a transfer of NNL's subsidiaries to the UK.

15  And in connection with that, Nortel recognized that

16  whilst legal ownership -- that's the ownership that

17  we talk about, legal ownership or legal title, if

18  you want -- of the NN technology is with NNL,

19  beneficial ownership is shared across various group

20  companies.  Again, the same fundamental distinction

21  that we have had from the beginning of this case.

22           There is a pattern here, and the

23  pattern is one of shared ownership.  And we

24  highlight that in yellow, and it runs right across

25  the time line.

1           All of this evidence is also consistent

2    with contribution.  The parties owned the

3    technology that they created, that they invented,

4    commensurate with their contributions.  And that is

5    also a consistent throughout the time line, and we

6    mark it in green.

7           And it is interesting to note that

8    nowhere in all this record did NNL ever get or even

9    claim sole ownership rights that it seeks here.

10   Never happened.  And that's why you won't get this

11   chart from the Canadian interests.  If they were to

12   give you this chart, it would be a blank sheet.

13   How could it be otherwise when we are discussing a

14   position that wasn't landed on until after the

15   failure of the third mediation?

16           As our chart shows, and as all that

17   evidence that came in at trial proved, on every

18   occasion that the Nortel parties allocated or even

19   talked about allocating IP, they respected their

20   shared ownership, and they did so in accordance

21   with their respective contributions to R&D.

22           I would like now to turn to some issues

23   concerning the experts and IP and customers and

24   goodwill.  And for reference, I would invite the

25   Courts to turn in our binder to the back of the

1    binder.  We have two little charts.  The first of

2    those is valuation and allocation of IP.  And I

3    would like to start with that, if I may.

4              The Court heard in the course of trial

5    from the expert we presented, Ocean Tomo's Jim

6    Malackowski.  He was a -- he is a supremely

7    qualified expert, I might say, and his

8    presentation, I think, was in part so compelling

9    because of his mastery of the objective data and

10   the fact that he rooted his opinions on the

11   contemporaneous analysis and information that was

12   available to Nortel.  We have all that, and he used

13   it.

14             We have the Lazard analysis, and we

15   have the Global IP data.  And we have the actual

16   R&D contributions that the participants made by

17   year and by participant.  And Mr. Malackowski

18   mastered and used all of that objective data, all

19   of those facts.

20             And we have here -- we reproduce a

21   chart -- I think it is almost iconic -- from the

22   trial, which shows where the real value of the IP

23   was.  And it takes the residual patent portfolio

24   and takes the priority dates and shows when those

25   patents were created.  And, of course, the pattern

1   is a fascinating one, because it gives you a sense

2   of the chronology here.  It shows in a bump the

3   golden years of creating value and technology at

4   Nortel.  And it is the late 1990s and it is the

5   early 2000s.  And then we have it tailing off as

6   the company goes into terminal decline.

7                And also represented on this chart is

8   what we refer to as the Canadian look-back period,

9   the five-year look-back period from 2009 back.  And

10  all of this is helpful to show how discordant that

11  is compared with the actual facts on the ground.

12  We have a look-back period here that begins after

13  99 percent of all of the high-interest patents were

14  created.  We have no reason to use a sample of five

15  years, and we have every reason not to use the

16  wrong sample that we know will give us the wrong

17  answer.

18                We have 100 percent of the data.  We

19  know all of the patents.  We know when they were

20  created.  We know the R&D spending that each

21  participant put into each of those years.  Why

22  would we exclude 99 percent of the evidence?  Why

23  would we exclude any of the evidence?  Why don't we

24  use all of the evidence?  Mustn't we use all of the

25  evidence?  And that's what Mr. Malackowski did.

1            The particular problems of using a

2    five-year period that goes from 2005 to 2009 is

3    represented here, because as the company went into

4    terminal decline, the relative expenditures became

5    skewed, and that leads the Courts to the wrong

6    answer if they use the wrong data.

7            2009 the company is insolvent.  It is

8    post-insolvency.  Nortel was winding down its

9    business.  There was no high-interest patent that

10   was created in 2009 or 2008.  The last

11   high-interest patents were registered in 2007, and

12   that's from spending in 2006.

13           If we look under the five-year

14   look-back column at the bottom of our page here,

15   you will see the number of high-interest patents

16   sold within that period, that five years of 2005 to

17   2009, is only 20 out of a population of 2600; less

18   than 1 percent.  And if we go to the table next to

19   it, we see what happens when we use a five-year

20   period that includes 2009 and excludes 2004.  2009,

21   zero high-interest patents; 2004, 22.

22           And as we go back on the time line, you

23   see 2003 we have 77 high-interest patents; 2002,

24   133.  The further we go back, the more

25   representative we become with respect to the golden

1   age of when all the high-interest patents were

2   created.

3            And so that's the problem with using a

4   sample and a particular problem of using the wrong

5   sample, which will only give us the wrong

6   conclusion.

7            THE CANADIAN COURT:  Mr. Maguire,

8   before you leave that document, under the five-year

9   look-back, your last bullet says the tax

10  authorities could not accept five years.  We don't

11  have that evidence, do we, what the tax authorities

12  did or didn't accept?

13           MR. MAGUIRE:  No.  I think we know that

14  the tax authorities didn't accept anything.  We

15  know for sure that the Internal Revenue Service

16  recharacterized some $2 billion of R&D activity --

17           THE CANADIAN COURT:  Right.

18           MR. MAGUIRE:  -- as dividends.  So I

19  think we know for sure they didn't accept anything.

20  And frankly, with respect to the proceeding we are

21  talking about here, it is hard to imagine any

22  circumstances in which tax authorities could

23  possibly accept a conclusion based on the wrong

24  data.  How would one ever justify to anyone a

25  conclusion that is based on an unrepresentative

1  sample?

2          THE CANADIAN COURT:  No.  I understand

3  all that.  My understanding was that nobody was

4  giving -- we don't know the reason why the tax

5  authorities came up with 2 billion.

6          MR. MAGUIRE:  That's exactly right,

7  Your Honor.

8          THE CANADIAN COURT:  Right.

9          MR. MAGUIRE:  Unless there are any

10  further questions on the IP point, I will move to

11  our customers, and that is on our next

12  demonstrative, customer-related assets and

13  goodwill.  This is a $2 billion asset.  It

14  represents about 29 percent of the total sales

15  proceeds that are before the Courts.  We have in

16  all $7.3 billion.  Of that, about 2 billion is

17  customer-related assets and goodwill.

18          Now, among all the experts, everyone

19  recognizes that customer-related assets have value.

20  And the facts showed that the purchasers, Nortel

21  itself, everybody at the time has always recognized

22  even within a high-tech company like Nortel that

23  customer-related assets have value.  The CCC's

24  expert, Mr. Britven, recognized that.  The only

25  expert who failed to separately allocate value for

1   customer-related assets was the Monitor's expert,

2   Mr. Green, and he was criticized for that by his

3   colleague for the CCC, Mr. Britven.

4           The main criticism we have heard with

5   respect to these assets is, well, you have heard

6   how IP drove the value for Nortel.  So if IP was so

7   important, and we have heard that it was, how can

8   you have most of the value of the business sales

9   being for assets other than IP?  And the answer to

10  that is Mr. John Veschi, because as you may recall,

11  Mr. Veschi undertook a major project in which he

12  stripped as much value, IP value, out of the

13  business sales to put in the residual patent

14  portfolio.  And he was so successful at that that

15  the Rockstar sale was $4-1/2 billion.  He left as

16  little IP in the business sales as he could get

17  away with.

18          Now, if we undo his good work -- not

19  that we give the 4-1/2 billion back to anybody.

20  But if we undo his work and put all of the IP from

21  the business sales together with Rockstar, then we

22  get the pie charts at the bottom of our graph.  And

23  we have --

24          THE CANADIAN COURT:  It is hard to put

25  a quantification on what Veschi did.  I mean, there

1   was a definition -- I forgot -- what's reasonably

2   necessary or something for the line of business

3   that was sold?  Whatever the definition was.  And

4   obviously, he would have fought to make it as tight

5   as possible, and the other people would want to

6   make it broad as possible.  But they ended up with

7   some definition of what they would keep in the

8   lines of business sold.

9            But it is hard -- the fact that he did

10  that, it is hard for us to quantify what that comes

11  to, whether it is 29 percent or 10 percent or

12  45 percent.  It is hard to quantify that evidence,

13  isn't it?

14            MR. MAGUIRE:  I think that's very fair,

15  and I would completely agree with that.  And my

16  only point really here is that when people come in

17  and say, oh, most of the value in the business

18  sales had to be IP, that's simply not right.  And

19  Mr. Britven himself, the CCC's own expert, finds

20  that that's not the case.  Mr. Britven in his

21  report finds that most of the value in the business

22  sales was for customers and goodwill.  That's

23  54 percent.  He says there is only 40 percent of

24  the business sales was IP.

25            So yes, you have to -- this obviously

1   is an expert issue.  Mr. Malackowski followed his

2   approach.  Mr. Britven followed his approach.  All

3   I am saying is, when we hear the criticism -- and

4   there has been a drumbeat of criticism that, oh,

5   there must be something wrong with

6   Mr. Malackowski's approach.  We can't tell you what

7   it is, but there must be something wrong because

8   you can't land on more than 50 percent of the value

9   of the business sales being non-IP, because IP was

10  so important to Nortel.  That's simply not the

11  case, and Mr. Britven's own conclusion is

12  consistent at least with that 50-yard goal line.

13          Goodwill, everyone recognizes, it is an

14  asset class.  And Mr. Britven again recognizes

15  goodwill was transferred in the asset sales.

16          Mr. Green is the outlier again.  He

17  claimed that there was no goodwill that was

18  transferred to the business sales, but he made a

19  little exception for workforce.  He acknowledged

20  that workforce is part of goodwill.  So if there

21  was no goodwill, there should be no value for

22  workforce, but workforce he said was valuable to

23  Canada, and he kept a little exception for that.

24          Again, I think the compelling weight of

25  the evidence is that goodwill is clearly an asset

1   class.  Its value is the value that it generates

2   from historical sales, and therefore, it is

3   entirely appropriate for Mr. Huffard and Blackstone

4   to value it on a revenue basis.

5            And if we go all the way to the right

6   of our sheet, you see we have the LREs, the

7   limited-risk entities, and the AREs, the at-risk

8   entities.  There are 16 limited-risk entities, all

9   European, and they didn't sell IP.  They weren't

10  party to the MRDA.  All they sold was their

11  distribution networks, their customer rights and

12  their goodwill.

13           We have here Italy, Poland, Spain and

14  13 other European countries.  Blackstone reports

15  that the value of that is $135 million.  Mr. Green

16  gives precisely zero, zero for all of that.

17           If we go down to France and Germany,

18  the two at-risk entities, we have a French

19  subsidiary, Nortel France SAS, and we have Nortel

20  Germany.  Blackstone values the German market, the

21  goodwill, the customer-related assets of the Nortel

22  France SAS at $35 million.  And Mr. Malackowski has

23  $21 million for IP.  Mr. Green gives these entities

24  zero for everything.

25           It is of particular interest with

1    respect to the IP, because you will recall

2    Mr. Green went -- the whole basis of his theory was

3    legal ownership.  His view was that legal title was

4    everything.  Well, these are two companies who were

5    not party to the MRDA.  Their patents they owned

6    the legal title to and the beneficial ownership.

7    There was no one else who had any interest at all

8    in their patents.  Their patents were included in

9    the sale, and they are entitled to 100 percent of

10   the proceeds for their patents, and Mr. Green gives

11   them exactly nothing.

12            If the Courts have no questions for me

13   at this point, I will reserve our remaining time

14   for rebuttal.

15            THE US COURT:  Thank you.  Thank you

16   very much, Mr. Maguire.

17            Where does that leave us as far as

18   arguments are concerned and how we are doing on

19   time at this point?  I know we certainly have the

20   US interests to hear from.

21            THE CANADIAN COURT:  Mr. Barrack is

22   slowly walking up to the podium.

23            THE US COURT:  Oh, I am sorry.  I

24   wasn't looking.

25            MR. BARRACK:  No, don't look, Your

1   Honour.  I would prefer to start in the morning.  I

2   think we are doing fine for time.

3                    THE CANADIAN COURT:  Are we?

4                    MR. BROMLEY:  Your Honours.

5                    THE US COURT:  Yes, Mr. Bromley, good

6   to see you.

7                    MR. BROMLEY:  You too.  Quite

8   unexpectedly I rise to disagree with Mr. Barrack.

9                    MR. BARRACK:  I said to Mr. Qureshi on

10  the break, I said why don't you get Bromley to do

11  it, and so he did.

12                   MR. BROMLEY:  If I can just go over the

13  timelines that we have, Your Honour, and where I

14  think we stand, there was an exchange of emails

15  last week amongst the parties and I believe Ms.

16  Cordo forwarded that timeline to the Courts.

17                   THE US COURT:  She did.

18                   MR. BROMLEY:  The time that the US

19  Interests have is 3 hours and 45 minutes.  That

20  would include any time for rebuttal.

21                   The UK pension parties have an hour and

22  15 minutes.

23                   So if we deferred until the morning,

24  that would be five hours of total time before we

25  get to rebuttals, which would, according to the way

1   that we paced ourselves today, I think put us in

2   the 4 o'clock range or so, perhaps later, by the

3   time we got to rebuttals.

4                We have, as far as we can tell, about

5   35 minutes reserved for the Canadian Debtors and

6   Monitor, 20 minutes or so reserved for the CCC,

7   EMEA seems to have 30 minutes reserved for

8   rebuttal, with Law Debenture having 15 minutes and

9   Bank of New York Mellon having 15 minutes.

10               So in other words, if we don't go any

11  further today, I think we have at least seven hours

12  tomorrow and that would probably mean we would be

13  finishing, if we start at 9:00 and kept to the pace

14  that we have been at, somewhere around 8 o'clock at

15  night.

16               So I think, at least from my

17  perspective, and I have consulted with at least the

18  US interests, that it would seem to make sense to

19  try to get some more in today so that tomorrow is

20  not overleveraged, so to speak.

21               THE US COURT:  And that would then

22  sensibly mean we would hear from the UK at this

23  point; is that right?

24               MR. BROMLEY:  The UK pension parties I

25  believe are next.

```
 1              THE US COURT:  The UK pension parties,
 2   and that would take us until roughly 6 o'clock or
 3   so.
 4              MR. BARRACK:  Well, Your Honours, in
 5   this jurisdiction the Court of Appeal sits a
 6   shorter day, because they listen to submissions,
 7   and in my view, even if we don't get done tomorrow
 8   and we do need another day, it has been a very long
 9   day and I'm loathe to start now.
10              But I will if you ask me to.
11              THE CANADIAN COURT:  That is what I
12   have been worrying about.  I don't know what your
13   schedule is like, Judge Gross, but if we went into
14   Wednesday, I think I probably could move stuff
15   away.  I have got sympathy for what both
16   Mr. Bromley is saying and what Mr. Barrack is
17   saying.
18              THE US COURT:  My only concern is we
19   are butting up against the Jewish holiday that
20   evening.
21              THE CANADIAN COURT:  Which evening?
22              THE US COURT:  Wednesday evening.  So
23   parties are travelling, and I don't know who would
24   be, you know, affected by that if we went Wednesday
25   or -- I'm available -- I'll make myself available
```

1    Wednesday morning.

2                THE CANADIAN COURT:  Mr. Barrack, what

3    if we went to 5 o'clock today and stopped?

4                MR. BARRACK:  You know, that is going

5    to get me halfway through.  Three of us are going

6    to make presentations.  You know, you can

7    appreciate my concern coming at the very end of the

8    day with a fresh area.

9                THE CANADIAN COURT:  Right.

10               THE US COURT:  Well, you have two

11   lively judges.

12               MR. BROMLEY:  Your Honours, I would

13   note that the UK pension parties have a maximum of

14   an hour and 15 minutes, so even if they used the

15   entire hour and 15 minutes, we would be at 6

16   o'clock.  If they reserve any time, I'm thinking it

17   is more like 5:30 or 6:00.  You know, our office

18   doesn't even close until 5:30, so, you know, I

19   would think that it would make sense to try to

20   squeeze something in, but obviously it is up to the

21   Courts to decide.

22               THE US COURT:  I am certainly in

23   favour, personally in favour of proceeding.  But I

24   don't know if there are rules and procedures in

25   Canada.

1            THE CANADIAN COURT:  No, there aren't.

2    I'm going to suggest Mr. Barrack go to 5 o'clock.

3    I had people in my office at 8:30 this morning, so

4    I would suggest you go to 5 o'clock, and then we

5    come back tomorrow, Mr. Barrack.  That is my

6    suggestion.  And then if we go into Wednesday

7    morning, we go into Wednesday morning.

8            MR. BROMLEY:  I would note Mr. Abbott

9    had told me the teamsters will be arriving to

10   disassemble your courtroom on Wednesday morning,

11   Your Honour, so...

12           THE US COURT:  We'll lock the door,

13   we'll lock the door.

14           MR. BROMLEY:  That usually doesn't work

15   with them.

16           THE CANADIAN COURT:  Let's do that, go

17   to 5 o'clock and then we'll come back in the

18   morning.

19           THE US COURT:  May I suggest, Justice

20   Newbould, how would you feel about starting

21   tomorrow at 8:30, would that help a little bit?

22           THE CANADIAN COURT:  Sure.  I have

23   got --

24           THE US COURT:  We can talk about this

25   off the record.

1          THE CANADIAN COURT:  That is fine.

2          THE US COURT:  Is that all right with

3     the parties, to start at 8:30?

4          THE CANADIAN COURT:  I have people

5     coming at 8:30, but they'll be quick, I'll make

6     sure they are quick.  Okay, why don't you go ahead,

7     Mr. Barrack.

8          MR. BARRACK:  Okay, Your Honours, you

9     know that we appear on behalf of the UK Pension

10    Claimants, 36,000 involuntary creditors of Nortel.

11    You heard from some of them during the evidence, if

12    you think of Simon Brueckheimer.  Sorry, I should

13    have handed up, we have demonstratives.

14          I'll be addressing some of the

15    threshold issues, the fundamental task of the Court

16    in this allocation proceeding.  Ms. Miller will

17    address some of the broader questions relating to

18    pro rata and why it should be applied in this

19    proceeding.  And Mr. O'Connor will address how pro

20    rata intersects with Owens Corning.

21          And, Your Honours, you have been fairly

22    silent throughout this, but if you have specific

23    issues you would like us to address, we would be

24    pleased to address them.

25          And it may be that we'll turn the

1    specific question to one of the team members.

2                    We would prefer, very much prefer to

3    deal with the issues which are engaging you rather

4    than take up time on issues you have no interest

5    in.

6                    It goes without saying that the UKPC

7    considers it important for these Courts in this

8    case to have the opportunity to rule on the

9    appropriateness of the pro rata allocation.  It

10   would be most unfortunate if these Courts did not

11   have the opportunity to consider it.

12                   As we know, this case will be

13   exhaustively analyzed.  We had an eminent academic

14   in the courtroom this morning observing the

15   proceedings.  You know this is going to be closely

16   scrutinized.

17                   It would be irresponsible for the

18   parties to leave the Court without the ability to

19   assess the merits of the only method which can

20   provide a precedent which will avoid the wasteful

21   excesses of this proceeding.  These Courts on this

22   record not only have the jurisdiction and authority

23   to order the pro rata allocation, it is, I

24   sincerely believe, the most appropriate method of

25   allocation in the unique circumstances of Nortel's

1  global insolvency.

2          The other methods, especially the

3  Canadian and American methods, are deeply flawed.

4          So what is the jurisdiction of these

5  Courts?  When we started these submissions, we

6  thought to sit back and say, so what is the

7  jurisdiction?  Your jurisdiction has been found,

8  and it has been found by the Courts, to flow from

9  the consensual submission to these Courts through

10  the IFSA and the cross-border protocol.

11          That has been decided by other Courts.

12  Despite the fact that there are three estates, you

13  are well aware there are only two Courts.  There is

14  no UK Court or representative adjudicator in this

15  proceeding.  And that places a heavy burden on each

16  of you.

17          While the IFSA has been held to provide

18  the necessary jurisdiction to these Courts to

19  allocate the funds in the lockbox, it is important

20  that the IFSA provides little guidance to you on

21  the method of allocation to be employed.  The fact

22  that the playing field is wide open was a key

23  feature of the IFSA, and we have up on the screen

24  section 12(f) which reads:

25                  "Nothing in Section 12 shall

1              prejudice the rights of any Party,

2              or otherwise constitute an

3              amendment, modification or waiver of

4              the rights of any Party, to seek

5              entitlement to Sale Proceeds from

6              any Sale Transaction".

7              And I would note that the word is "any

8    party", not any selling debtor.

9              So what then, against that

10   jurisdiction, is the actual role of the Courts?

11             We submit the role of the Courts is

12   first to determine if there was an agreement, but

13   it is important as to what the agreement is.  An

14   agreement between the relevant parties prior to the

15   Nortel insolvency as to how in a global liquidating

16   insolvency the proceeds of a joint sale of the

17   Nortel assets generally, and the patents

18   specifically, were to be allocated.

19             If the Court finds, as all parties

20   agree, there was no prior agreement on this point,

21   then in our submission what the Courts should do is

22   exercise its broad discretionary jurisdiction it is

23   given under the bankruptcy laws of each

24   jurisdiction.

25             But those broad discretionary

1    principles are not unfettered or unlimited.  It

2    should determine, in exercising that jurisdiction,

3    what are the relevant legal principles and

4    determine the most appropriate allocation method.

5              The Bankruptcy Code, as each of you

6    know, in section 105A and the CCAA in section 11

7    provides broad discretionary powers to these

8    Courts.  But these discretionary powers are not

9    limitless.  When exercised, the Court must ask

10   itself two fundamental questions.

11             First, is there a legal basis either

12   directly on point or by analogy which supports the

13   exercise of the discretion?

14             And second, and importantly, are there

15   any limiting legal constraints which would prevent

16   the exercise of the discretion in a particular way?

17             In our submission, the answer to the

18   first question is that there are several legal

19   bases for the adoption of pro rata.  We have dealt

20   with these in our written submissions.  The most

21   fundamental legal principle the Courts should

22   adhere to in an insolvency case is, is the

23   principle of pro rata pari passu treatment of

24   unsecured creditors.

25             And we don't stop there.  The fact is

1  the bedrock, and we know your task is not as simple

2  as simply to take a broad discretion and to take

3  that broad principle and to stop there.  We are not

4  that naive and that is not what we are suggesting

5  to you.

6            The manner in which the Nortel

7  Enterprise operated prior to insolvency as a single

8  Nortel rather than separate entities provides the

9  Court with several specific legal bases to support

10 a pro rata allocation.  You don't exercise that

11 discretion in a vacuum.  You exercise that

12 discretion against the record before you.

13            While Ms. Miller and Mr. O'Connor will

14 refer to the facts in more detail, a single line

15 from paragraph 306 of the Monitor and Canadian

16 Debtors' submission in the Canadian claims case is

17 instructive, and it reads as follows:

18                "The fact that an entity in the

19                Nortel Group had cash on its balance

20                sheet did not necessarily mean that

21                cash was available to be used at

22                that point in time.  It had to be

23                deployed in reference to an overall

24                cash management plan designed to

25                ensure the ongoing liquidity and

1                      viability of the entire Nortel

2                      Group."

3                      Just stopping there, think about that.

4        Think about what the Monitor is saying.  And that

5        is in the context of a claims case.  Why couldn't

6        we pay down the UK pension debt?  And if you go to

7        that and you look, and it is part of the evidence

8        in this case as well, the point was made time and

9        time again --

10                     THE CANADIAN COURT:  You said this was

11       in paragraph 306 of their brief.  Was this their

12       brief --

13                     MR. BARRACK:  In the claims.

14                     THE CANADIAN COURT:  In your claim, not

15       in the --

16                     MR. BARRACK:  No, in the Monitor's

17       claim.  In our claims case.

18                     THE CANADIAN COURT:  In your claims

19       case, right.

20                     MR. BARRACK:  In the claims case, the

21       Monitor's submission in the claims case, and they

22       refer to evidence that is joint evidence.

23                     THE CANADIAN COURT:  I understand.  I

24       just want to make a note.

25                     MR. BARRACK:  Yes, and the point that

1    is being made, and it is a point that was made time

2    and time again, what was good for one entity was

3    good for all of Nortel, and we have spent a lot of

4    time on the patents and we are going to come to

5    that and how they were hopelessly entangled and you

6    couldn't separate the ownership.  You just heard a

7    very passionate, eloquent dissertation on that

8    point.

9              But it wasn't only the patents, it was

10   the cash.  When you go to your pensioners and you

11   say, no, you can't have the cash in your company

12   because we need it throughout the organization

13   before insolvency and then when the music stops,

14   you go, hey, something very different.  It is that

15   fact pattern.  It is that fact pattern that gives

16   rise to the legal bases that support a pro rata

17   distribution.  It is those unique facts in this

18   case.

19              So what are those legal bases?

20              They are joint venture law.  They are

21   the law relating to the imposition of a

22   constructive trust based on unjust enrichment.

23   They are equitable receivership principles applied

24   in the context of the relevant insolvency statutes.

25   And we say the law relating to substantive or

1   substantive consolidation.

2            And it is this last area, this law

3   relating to substantive or substantive

4   consolidation that has generated a great deal of

5   debate.  The UKPC is not seeking substantive or

6   substantive consolidation, but it does submit that

7   the law relating to that area of the law which on

8   the specific facts of this case would support the

9   pro rata allocation method.

10           And using my formulation before, what

11  the Courts are about, the Courts are about a broad

12  jurisdiction, applying broad legal principles,

13  determining are there applicable legal principles

14  or are there constraints.  And coming back, Judge

15  Gross, to the question you asked earlier in the day

16  and what is the effect of this proceeding, is is

17  that law relating to substantive consolidation a

18  restraint on you from ordering pro rata?

19           And we will take you to the cases and

20  show you strongly that it is not only not a

21  restraint, in fact it is an accelerating factor

22  towards the pro rata methodology.  But it is clear

23  we have joined issue with the Bondholders on this

24  point and it is a point you will have to decide.

25           Mr. O'Connor will be dealing with that

1   debate directly.

2                Ms. Miller will be addressing in more

3   detail the support for pro rata within the

4   insolvency law context.

5                So the Courts should begin with the

6   threshold question that I have identified:  Was

7   there a prior agreement on the method to allocate

8   the lockbox proceeds?

9                Well, I couldn't be standing up at a

10  better time in one sense after you having listened

11  to the debate today, because 1.3 billion dollars in

12  costs spent by only two of the estates over the

13  past five years on multiple depositions, expert

14  reports, opening submissions, trial testimony and

15  thousands of pages of closing submissions are all

16  testament to the simple fact that there was no

17  agreement prior to the insolvency about how these

18  proceeds were to be allocated as between the Nortel

19  entities.

20               Those costs, that 1.3 by two estates,

21  don't include parties such as my client, UKPC, who

22  have been bearing their own costs.

23               There is absolutely no dispute on the

24  record before you that allocating the proceeds of a

25  worldwide asset sale was simply a future event that

1   the various entities within the one Nortel never

2   dealt with before insolvency.  The evidence of

3   every single witness was clear on that point.  As

4   we pointed out in paragraph 36 of our written

5   submission, and you may recall some of these

6   witnesses, the plain speaking Clive Allen, the

7   general counsel Walter Henderson, the outside

8   lawyer Michael Orlando, the Director of transfer

9   pricing, and Mark Weisz the former Director of

10  international tax, all testified that consideration

11  was never given to the rights of the various

12  entities in the event of a global insolvency.

13          Those involved in drafting the MRDA

14  were unanimous in their evidence that the MRDA was

15  not intended to address an Enterprise-wide

16  insolvency.  The terms of the MRDA confirm this.

17          Had any party believed there was a

18  prior agreement on this point, it would have been

19  raised in the IFSA or at the time of the IFSA.

20  Indeed, instead, the IFSA was clear that all

21  allocation methods were on the table.  In the

22  submissions this morning from Wilmington Trust, you

23  heard that the ownership concepts in the MRDA were

24  for tax purposes only.

25          So in the absence of an agreement, then

1   how do the American and Canadian estates proceed?

2              In the absence of the parties reaching

3   an agreement on an allocation method to be used in

4   a worldwide liquidating insolvency, the Canadian

5   and American estates attempt to infer or imply a

6   prior agreement arising out of the MRDA.  They turn

7   in that direction rather than turning to

8   fundamental insolvency legal principles.

9              In essence, the reasoning of the

10  American and the Canadian estates is premised on

11  the assumption that the MRDA, which was a transfer

12  pricing document, which did not contemplate the

13  events now before the Courts, can stand in the

14  place of such an agreement.

15             There are several basic flaws in this

16  line of reasoning.

17             The first is that the basic purpose of

18  the transfer pricing document was different than

19  the task before the Court.  As you pointed out

20  earlier today, Justice Newbould, on one level the

21  purpose was to allocate periodic income.  On

22  another, more practical, fundamental level, it was

23  to move as much profit as possible to Canada,

24  something that was an entirely noble goal when

25  there is one Nortel, a purpose, which as you have

1    just noted, was not achieved in the eyes of the

2    Canadian and the American competent tax

3    authorities, given the deemed dividend of 2 billion

4    dollars resulting in a claim for that amount being

5    accepted.

6                    Therefore, the American and Canadian

7    approach is attempt to take a document, the MRDA,

8    which was drafted for a single purpose, and attempt

9    to use it for a completely foreign purpose.

10                   And just stopping on that point, if you

11   think about -- I have said one of the basic legal

12   principles that you could use is constructive trust

13   for unjust enrichment, and you think -- I'm sorry,

14   Judge Gross, you may not know this case and I don't

15   have it, but Justice Newbould will.  It is our

16   foundational constructive trust case, arose in a

17   common law family situation where the working

18   spouse of a farmer, it was a beekeeper actually, a

19   beekeeping operation, alleged a constructive trust

20   for all of the work she had done over the years.

21                   Well, in that case there was no

22   question about who the legal title owner was of the

23   farm and who the legal title owner was of the

24   beehives, so it is a misdirection.  Well, who owned

25   it, who owned it, who owned it?  Who owned it on

1   the facts of this case, when you come to all of

2   those relevant legal principles that we come to,

3   doesn't really matter.  They didn't allocate this

4   specific risk in these circumstances.

5              The second basic flaw in both the

6   Canadian and American allocation approaches ignore

7   a different fundamental economic premise of the

8   MRDA, and as a consequence each is economically

9   irrational when viewed from the other estates'

10  perspective.

11             The Canadian approach ignores the

12  fundamental agreement contained in the MRDA that

13  the value created by the Nortel entities was to be

14  shared among.  The MRDA applied this fundamental

15  agreement to periodic income, but the Canadian

16  approach ignores this fundamental approach in

17  allocating the proceeds of asset sales.

18             The Canadian approach, unlike what

19  Mr. Zigler tried to urge upon you today, is not a

20  proxy for a pro rata result.  It seeks to take all

21  of the proceeds of the sale and limit the claims

22  that can benefit from those proceeds.  It would

23  only be the equivalent if both the assets and the

24  worldwide liabilities were both migrated to Canada.

25             And I see I have gone on past 5 o'clock

1   and I will --

2              THE CANADIAN COURT:  You can go ahead.

3              MR. BARRACK:  I'll just stop here.

4              Pro rata is not the economic equivalent

5   of the Canadian ownership theory.  And, Justice

6   Newbould, you may recall that in Mr. Britven's

7   numbers there is full allowance of the guarantee

8   claims at 880 million dollars.  You know that that

9   is an issue that the Monitor to this day is

10  fighting tooth and nail.

11             So I'm prepared to stop there, or go

12  on.  I'm in your hands.

13             THE CANADIAN COURT:  All right, let's

14  come back tomorrow morning.

15             MR. BARRACK:  Okay.

16             Thank you, Judge Gross.

17             THE US COURT:  Thank you.

18             THE CANADIAN COURT:  We'll come back at

19  8:30 tomorrow morning.

20             THE US COURT:  Yes.

21

22  -- Adjourned at 5:05 p.m.

23

24

25

1               REPORTERS' CERTIFICATE

2

3          I, DEANA SANTEDICOLA, RPR, CRR, CSR,

4   and I, LORRAINE MARINO, RMR, CRR, CSR, certify;

5          That the foregoing proceedings were

6   taken before us at the time and place therein set

7   forth;

8          That the entire proceedings of the

9   hearing date were recorded stenographically

10  individually by each of us and were thereafter

11  transcribed;

12         That the foregoing is a true and

13  correct transcript of our shorthand notes so taken.

14

15         Dated this 22nd day of September, 2014.

16

17  PER:                PER:

18  *Lorraine Marino*   *Deana Santedicola*

19  LORRAINE MARINO     DEANA SANTEDICOLA

20  WILCOX & FETZER     NEESONS

21  WILMINGTON, DE  USA  TORONTO, ON  CANADA

22

23

24

25

**$**

**$1**
5265:17

**$1.3**
5247:17,21

**$125**
5241:25

**$135**
5373:15

**$2**
5241:25 5368:16
5369:13

**$20**
5294:12

**$21**
5373:23

**$35**
5373:22

**$4-1/2**
5370:15

**$536**
5248:18

**$7.3**
5369:16

**(**

**(d)**
5289:10

**1**

**1**
5163:6 5245:5,7,23
5283:11 5291:21
5298:4 5302:3,4
5307:25 5318:2 5343:9
5367:18

**1.3**
5248:1 5265:17
5389:11,20

**10**
5322:25 5371:11

**100**
5231:5 5243:17

5244:23 5253:7,10,24
5254:7 5261:4 5264:17,
18,19 5265:14, 5275:19
5366:18 5374:9

**105A**
5384:6

**10:36**
5203:10

**11**
5177:23 5199:9
5246:25 5248:15
5255:13 5263:14
5344:12 5384:6

**11:00**
5203:9

**11:04**
5203:11

**11:59**
5239:20

**12**
5177:20 5218:15
5382:25

**12(f)**
5213:13 5382:24

**125**
5239:11

**12:45**
5278:9

**13**
5172:3 5187:19
5191:18 5289:9 5298:4
5373:14

**133**
5367:24

**14**
5149:12 5191:13
5205:18 5264:15
5289:8

**15**
5196:5 5308:25 5358:6
5375:22 5376:8,9
5378:14,15

**16**
5373:8

**163**
5254:14

**18**
5341:3

**19**
5318:2

**1978**
5312:1

**1990**
5308:11

**1990s**
5366:4

**1991**
5318:1

**1992**
5175:19 5351:4,6

**2**

**2**
5182:10,24 5190:5
5230:13 5238:14
5239:10 5245:5,8,23
5288:12,19 5299:6
5302:3 5304:15
5311:23 5369:5,16
5392:3

**2(c)**
5190:12

**2.2**
5354:20

**20**
5203:7 5294:15
5367:17 5376:6

**20,000**
5226:2

**2000**
5343:7,12

**2000s**
5366:5

**2001**
5238:16

**2002**
5350:2 5360:6 5367:23

**2003**
5360:14 5361:4
5367:23

**2004**
5281:14 5288:2

**2005**
5238:16 5301:9 5367:2,
16

**2006**
5361:16 5367:12

**2007**
5282:19 5293:18
5362:4 5363:13
5367:11

**2008**
5283:19 5367:10

**2009**
5283:24 5360:19
5366:9 5367:2,7,10,17,
20

**2010**
5360:22

**2012**
5298:24 5353:13

**2013**
5212:14 5213:1,6
5214:1 5216:22
5219:15

**2014**
5395:15

**206**
5192:9

**208**
5254:14

**20s**
5231:1

**22**
5196:5 5312:8,11
5367:21

**22-2**
5159:3

**22nd**
5395:15

**23**
5204:23 5231:11,16,18
5299:6 5353:11 5354:8,
14

**25**
5231:2 5248:16
5263:14 5329:18,21

**5293:12 5367:20,21**

**26**
5311:24 5355:10

**2600**
5367:17

**27**
5355:16

**28**
5201:11,21,22 5355:25

**29**
5369:14 5371:11

**294**
5342:19

**2:00**
5277:25 5278:4,8

**2:16**
5278:10

---

**3**

---

**3**
5159:18 5184:25
5188:4,12 5190:5
5264:16 5265:3
5288:12,19 5299:25
5300:6 5301:9 5326:4,
22 5327:2,4 5329:6
5340:11 5375:19

**3(a)**
5326:4

**30**
5376:7

**306**
5385:15 5386:11

**31**
5231:17,21 5318:4,14

**318**
5196:4

**32**
5165:5

**35**
5376:5

**350**
5196:4

**356**
5200:19

**359**
5200:19

**36**
5390:4

**36,000**
5380:10

**362**
5200:20

**38**
5344:12

**39**
5346:13

**3:55**
5358:8

---

**4**

---

**4**
5163:24 5173:3 5180:8,
24 5181:20 5183:10,22
5187:8,10 5188:4,10
5230:14 5285:1 5308:6
5376:2

**4's**
5284:11 5287:9

**4(a)**
5154:24 5155:1
5165:24 5166:2
5175:20,21 5188:6,14,
16 5194:24 5301:17,20
5302:23 5304:1,2
5307:7,8 5310:6
5316:12

**4(e)**
5189:2

**4-1/2**
5370:19

**4.2**
5237:22

**40**
5371:23

**45**
5220:5 5371:12
5375:19

**48**
5301:9

**49**

**5294:10**

**4:17**
5358:9

---

**5**

---

**5**
5164:2 5165:1 5166:6
5180:8,25 5181:20
5187:11 5195:9,16,23
5322:20 5354:7 5378:3
5379:2,4,17 5393:25

**5(a)**
5171:24,25 5197:3

**5(c)**
5199:23

**50**
5238:6, 5258:7 5372:8

**50-yard**
5372:12

**50471**
5337:6

**508**
5208:4

**52**
5336:11

**53**
5336:11

**54**
5371:23

**540**
5208:4

**57**
5205:20 5298:14,20

**59**
5207:9 5244:2

**5:05**
5394:22

**5:30**
5378:17,18

---

**6**

---

**6**
5167:7 5183:11
5194:12 5312:8 5343:9

**5377:2 5378:15**

**63**
5254:10 5298:14

**69**
5267:4

**6:00**
5378:17

---

**7**

---

**7**
5170:9

**70**
5267:4

**706**
5160:7,19

**71**
5254:5

**73**
5309:2

**74**
5309:25

**77**
5367:23

---

**8**

---

**8**
5170:10 5376:14

**807**
5310:3,23

**880**
5394:8

**89**
5329:22

**8:30**
5379:3,21 5380:3,5
5394:19

---

**9**

---

**90**
5329:22 5330:9

**93**
5342:19



**95**
5243:19 5275:21

**99**
5366:13,22

**9:00**
5376:13

**9:11**
5149:1

---

**A**

**A's**
5287:9

**a.m.**
5149:1 5203:10,11

**Abbott**
5149:8,9,17 5379:8

**ability**
5176:8 5196:11
5213:20 5324:23
5381:18

**absconded**
5164:8 5308:19

**absence**
5155:9 5390:25 5391:2

**absent**
5159:13 5250:21
5342:20

**absolutely**
5207:11 5275:13
5290:15 5291:10,12
5362:25 5389:23

**absurd**
5212:19

**absurdity**
5320:6,8 5328:7

**abundantly**
5219:23

**academic**
5381:13

**accelerating**
5388:21

**accept**
5154:15 5243:13
5368:10,12,14,19,23

**acceptance**
5250:21

**accepted**
5208:11 5392:5

**accepts**
5174:2

**accident**
5293:25

**accommodation**
5254:6

**accord**
5227:21 5228:4,5
5261:24 5263:12

**accordance**
5220:7 5226:19 5286:5
5301:2 5325:18
5364:20

**accords**
5179:15 5226:12
5262:3

**account**
5152:2 5187:25 5197:1
5211:5 5242:13 5286:1
5331:23

**accounting**
5233:16

**accrue**
5330:20

**accurate**
5268:20 5276:13
5347:24

**accurately**
5206:20

**accusations**
5222:20

**achieve**
5263:25

**achieved**
5219:11 5220:13
5392:1

**acknowledge**
5179:3 5294:8 5316:4
5340:5,7

**acknowledged**
5236:9 5258:20
5325:23 5363:9
5372:19

**acknowledges**
5172:15 5329:4

**Acknowledgment**
5340:9

**acquired**
5188:18 5195:1 5267:5
5269:19

**acronym**
5268:19

**act**
5167:23 5168:12

**action**
5312:19 5314:4

**activities**
5234:23 5248:6

**activity**
5171:8 5181:5 5190:8,
11 5191:1 5199:11
5232:16 5266:15
5326:7,14 5327:7
5368:16

**actual**
5182:3 5184:18 5266:4
5270:13,23 5365:15
5366:11 5383:10

**add**
5214:20 5229:5
5269:16 5357:22

**addendum**
5184:25 5187:7,8
5188:11,12,13 5282:21
5283:25 5285:7
5316:20 5317:6

**addition**
5209:5 5273:13

**additional**
5193:11 5266:22
5283:3 5296:19

**address**
5162:13 5212:23
5258:2 5261:13
5264:24 5277:14
5279:17 5280:22
5291:11,12 5305:11
5380:17,19,23,24
5390:15

**addressed**
5255:11 5272:22,23

**acknowledges**
5172:15 5329:4

**addresses**
5281:12

**addressing**
5279:4 5380:14 5389:2

**adhere**
5384:22

**Adjourned**
5394:22

**adjudicator**
5382:14

**adjustment**
5254:4

**adjustments**
5327:8

**administrative**
5207:2 5236:14

**admissible**
5235:19 5279:23
5294:24 5305:4,22
5306:10 5346:5,6
5349:20,22 5350:16,18
5351:24,25 5352:7
5359:3

**admissions**
5285:9

**adopt**
5225:17 5268:8,9
5287:6 5320:3

**adopted**
5178:23 5209:21
5275:16

**adopting**
5167:11 5254:18

**adoption**
5254:25 5255:6
5384:19

**advance**
5213:20

**advanced**
5159:23 5174:19

**advancing**
5172:19

**advisedly**
5174:25

**advocate**
5239:15



**affect**
5154:8 5181:6 5208:12
5252:2

**affected**
5153:7 5154:11
5163:21 5286:19
5377:24

**affecting**
5181:17

**affects**
5151:11 5169:14
5262:15

**affiliate**
5199:13

**affiliated**
5255:14

**affiliates**
5293:22

**affirmed**
5343:13

**afternoon**
5267:13,14,15 5278:13,
15,18,20,22 5358:15,
16,17

**age**
5368:1

**agenda**
5174:22

**agree**
5175:5 5211:1 5212:10
5229:3 5235:19
5261:12 5268:3 5276:1
5279:11 5322:15,16
5332:23 5335:25
5338:10 5371:15
5383:20

**agreed**
5155:3 5213:6, 5220:9
5271:20 5274:3,16
5301:23 5321:22,23
5333:7 5335:19
5340:12 5362:24

**agreeing**
5166:4

**agreement**
5162:16 5171:23
5173:18 5175:11,12,14,
19, 5177:25 5178:6
5181:7 5182:6 5183:8

5185:1,6,21,22 5186:1,
6,7,9,13,17 5187:2
5190:12 5191:13,21,23,
24 5195:2 5199:11
5206:1,16 5207:4
5212:7 5213:16 5216:2
5218:14 5223:10
5256:11 5269:7,11,20,
22 5271:8,9 5274:10
5275:1 5283:4 5287:1,3
5288:21 5289:3,4,15,16
5292:2 5293:14,20
5297:17 5298:18
5300:19 5301:5
5309:17 5321:3,5,7,10,
15 5326:19,21 5328:6,8
5329:7 5331:14
5333:23,24 5334:16,24
5335:12,22 5338:10
5339:15 5340:8,12,19
5342:21 5343:1,3,19,25
5345:5,12,17,21,23
5346:11,12 5350:24
5351:6 5353:2,23
5354:16,19 5355:7,8,24
5356:2,6 5383:12,13,
14,20 5389:7,17
5390:18,25 5391:3,6,14
5393:12,15

**agreements**
5191:16 5192:7
5214:15 5216:16
5218:6 5221:10
5222:25 5271:22
5274:19 5281:5
5294:22 5316:3 5317:7,
8 5319:15,18,19
5341:21 5345:9
5350:21

**agrees**
5188:21 5236:23
5328:21,22

**ahead**
5223:16 5225:4
5305:20 5337:9 5380:6
5394:2

**aim**
5292:2

**air**
5250:18

**Alberta**
5308:9

**Alcatel**
5183:4 5293:19,20
5325:17,24 5356:22
5357:1 5362:5 5363:12

**allegation**
5217:11 5223:2

**allegations**
5201:2

**allege**
5215:11 5258:2

**alleged**
5392:19

**Allen**
5211:23 5234:6
5235:10 5237:8
5272:23 5273:12
5322:3 5390:6

**allocate**
5230:18 5253:10
5263:24 5328:22
5360:10 5369:25
5382:19 5389:7
5391:21 5393:3

**allocated**
5242:5,22 5244:12
5249:1 5252:24
5253:18 5261:17
5267:24 5274:13
5325:18 5362:8
5389:18

**allocating**
5288:16 5364:19
5389:24 5393:17

**allocation**
5150:19 5151:11
5202:21 5207:20
5212:18 5213:3,8,18,21
5214:4,11 5216:1,20
5218:9,11,20 5219:1,
17,19 5220:8 5226:23,
24 5227:8 5228:14,23
5229:16 5230:7,11
5233:19 5239:8 5244:6
5246:20,25 5248:22
5249:18 5251:10,11
5252:2 5254:13 5255:6,
9 5256:4,14,19 5258:3
5260:1,7,9 5261:8,10,
15 5263:11 5264:2
5268:19 5275:9,14,15
5276:2,18 5288:20

5291:12 5300:4
5325:13 5327:7,20
5328:14 5329:1,5
5331:20 5365:2
5380:16 5381:9,23,25
5382:21 5384:4
5385:10 5388:9
5390:21 5391:3 5393:6

**allocations**
5211:3 5241:15,21

**allowance**
5256:20 5394:7

**allowed**
5205:24 5252:22
5309:12

**allowing**
5344:1

**alter**
5203:17

**alternative**
5228:11,23 5244:9
5249:25 5276:24

**alternatives**
5223:14

**ambiguity**
5186:9,10,12,20,23
5285:4 5286:25 5287:4,
5,15 5316:19 5317:2,4
5352:10,16 5357:10,15
5358:24

**amend**
5186:2

**amended**
5284:6 5359:14

**amending**
5359:5

**amendment**
5359:9 5383:3

**amendments**
5187:9 5269:21 5270:1

**American**
5382:3 5391:1,5,10
5392:2, 5393:6

**amount**
5244:20 5248:25
5249:15 5254:8
5265:17 5299:22
5327:20 5350:17



5351:16 5352:25
5392:4

**amounts**
5254:4

**analogy**
5272:16 5384:12

**analysis**
5209:3 5238:6 5361:5,
8,17 5365:11,14

**analyze**
5355:6

**analyzed**
5381:13

**and/or**
5192:14

**Anderson**
5236:16

**annual**
5288:15 5336:21

**answers**
5192:6 5326:18

**anticipate**
5274:11

**anticipated**
5330:22

**antithesis**
5311:10,19

**APA**
5350:2 5360:5,14

**apologize**
5249:7 5303:10 5340:6
5342:1 5353:12
5357:24

**apparent**
5163:11 5310:10
5311:5

**appeal**
5240:16 5244:6
5301:10 5308:11
5377:5

**Appeals**
5255:15

**appeared**
5259:14,22 5304:20

**appears**
5257:20 5271:2

**appellate**
5241:11 5254:15
5311:25

**Appendix**
5201:25 5228:12

**appetite**
5149:15

**applicable**
5232:7 5388:13

**applications**
5192:13 5345:8

**applied**
5380:18 5387:23
5393:14

**applies**
5156:8 5255:4 5295:11
5342:2,8 5343:4

**apply**
5164:19 5250:16
5272:13 5308:21
5332:10

**applying**
5388:12

**approach**
5234:16 5246:15
5248:12,15,16,17
5262:2,4,6 5325:13
5333:1 5372:2,6 5392:7
5393:11,16,18

**approached**
5210:21,23

**approaches**
5227:19 5248:13
5393:6

**appropriately**
5249:11 5251:19

**appropriateness**
5381:9

**approval**
5362:20

**approve**
5255:12

**approved**
5213:24 5220:1
5221:11

**approving**
5220:3

**approximately**
5247:16

**apt**
5314:17

**arduous**
5225:24

**area**
5378:8 5388:2,7

**areas**
5233:15 5237:4

**ARES**
5373:7

**argue**
5171:18 5212:9
5218:10 5222:3
5235:16 5254:25
5269:1 5270:9

**argued**
5212:2 5280:20
5309:18

**arguing**
5160:8 5169:19
5306:22

**argument**
5156:16 5160:22
5162:24 5166:16,19
5167:3 5169:1,2,15
5170:1,21 5173:22
5174:11 5175:2
5180:21 5184:8 5186:6
5189:7,9,15 5192:8
5212:7,18,20 5226:16
5268:8 5276:15,23
5284:10 5286:5
5288:22 5290:10,18
5292:9 5319:22 5321:2,
3 5322:18 5323:4,20,21
5324:3,14 5327:13
5334:25 5335:3 5356:9,
25

**arguments**
5195:13 5213:8
5218:18 5240:17
5241:6 5374:18

**arise**
5162:21 5226:23

**arising**
5150:3 5258:23
5354:24 5391:6

**arm**
5195:23,25

**arm's**
5179:1 5300:13
5317:12 5319:25
5320:3,9,11,15,18,19
5321:4 5328:7 5329:12
5330:21

**Armstrong**
5170:9

**arose**
5161:17 5392:16

**arrangement**
5155:15 5159:24
5172:21 5178:9,10
5181:1 5183:18
5191:11 5207:3

**arrangements**
5199:1 5290:3,6,21,24
5292:4 5320:15
5321:14

**arrive**
5152:2

**arriving**
5297:13 5379:9

**article**
5154:24 5155:1
5165:24 5166:2,6
5167:25 5171:24,25
5173:3 5175:20,21
5180:8,24,25 5181:20
5187:10,11,19 5188:4,
6,10,14 5194:24
5195:9,16,23 5197:3
5199:9,23,25 5284:11
5285:1 5287:8 5288:19
5289:8 5290:12
5299:25 5300:6 5326:4

**Articles**
5190:5 5288:12

**ascribe**
5165:6

**ascribed**
5228:9

**aspects**
5363:2

**assert**
5212:13 5219:7
5346:16

**asserted**
5242:1 5256:21

**assertions**
5150:4

**asserts**
5355:1

**assess**
5381:19

**asset**
5151:10 5238:25
5239:3 5261:8 5322:9
5331:21,24 5361:25
5369:13 5372:14,15,
5389:25 5393:17

**assets**
5208:22 5212:16
5216:10,12 5241:10,17
5242:7 5247:6,8,11
5248:24 5249:12,23
5250:22,23,24 5251:7,
19 5252:10,11 5255:22
5257:14 5263:8,24
5290:18,19 5330:14
5332:7 5336:13,15
5348:9 5361:19
5369:12,17,19,23
5370:1,5,9 5373:21
5383:17 5393:23

**assigned**
5192:13 5338:25
5340:17 5348:20
5349:3

**assigning**
5193:9

**assignment**
5192:17,23,24 5193:4

**assignments**
5192:19 5193:11,23,24
5194:2 5237:1 5338:22

**assist**
5297:12 5298:7 5346:8

**assume**
5169:2 5300:22 5304:5

**assumed**
5342:4

**assumes**
5291:8,9 5330:15

**assuming**
5209:8 5253:23

**assumption**
5208:6,9 5391:11

**assumptions**
5210:8

**at-risk**
5373:7,18

**attached**
5201:24 5340:10

**attempt**
5212:2 5353:18 5391:5
5392:7,8

**attendant**
5179:11 5180:16

**attention**
5149:19 5199:8
5262:14 5276:11
5288:24 5289:2,18

**attorneys**
5259:21

**attributable**
5330:3,19 5331:2

**attributed**
5250:11

**audited**
5345:15

**auditors**
5362:9,14

**authoritatively**
5159:17

**authorities**
5150:23,24 5155:21
5163:24 5167:8
5177:20 5178:24
5182:1 5227:25 5249:4
5271:6 5298:4 5300:16
5308:1 5311:24
5320:14 5333:25
5343:10 5350:5,9
5353:12 5360:8,14,18,
21 5361:2 5368:10,11,
14,22 5369:5 5392:3

**authority**
5159:23,24 5161:16
5254:12 5260:5 5301:6
5381:22

**automatically**
5338:19

**automobiles**
5272:1

**autonomous**
5257:4

**autonomy**
5246:13

**avenue**
5227:7

**avoid**
5229:13 5230:21
5240:11,13 5246:19
5262:11 5312:4 5320:8
5338:5 5381:20

**avoided**
5299:16

**avoiding**
5229:12

**award**
5353:17,18

**aware**
5255:10 5259:5
5382:13

———————————

**B**

**baby**
5334:18

**back**
5149:4,5,13 5157:6
5160:2 5163:5 5170:14
5194:12 5195:5 5200:4
5203:9 5206:18,22
5221:23 5240:4
5242:25 5246:11
5248:4 5277:25 5290:4
5299:7 5300:19
5301:12 5302:2
5304:18 5307:8
5332:11,15 5335:23
5349:13 5351:4,12
5352:22 5353:8
5359:23 5360:6 5361:1
5364:25 5366:9
5367:22,24 5370:19
5379:5,17 5382:6
5394:14,18

**backdrop**
5165:20

**background**

**5184:22**

**bad**
5222:21 5319:3

**badges**
5252:4

**bag**
5242:6

**balance**
5361:20 5385:19

**balances**
5249:12 5251:19

**bank**
5159:20,22 5160:1,8
5161:10 5170:25
5175:8 5191:19 5376:9

**bankruptcy**
5249:22 5255:12
5258:9,22 5261:15,17
5263:18 5266:12
5383:23 5384:5

**banks**
5259:21,22

**bare**
5152:22 5153:10,21
5154:19 5169:21
5170:13 5173:3

**bargain**
5224:3

**Barrack**
5374:21,25 5375:8,9
5377:4,16 5378:2,4
5379:2,5 5380:7,8
5386:13,16,20,25
5394:3,15

**base**
5230:18

**based**
5204:1 5208:14
5209:22 5211:7
5212:15 5214:17
5227:9,18 5229:9
5237:5,9 5239:13
5250:7 5251:13 5261:9,
16, 5263:17 5315:18
5321:13 5325:5,
5329:19 5345:18
5347:23,24 5348:7
5349:5 5361:9 5362:8
5368:23,25 5387:22

**bases**
5384:19 5385:9
5387:16,19

**basic**
5266:19 5391:15,17
5392:11 5393:5

**basically**
5183:22 5246:9,18
5254:4 5266:8

**basis**
5208:1 5210:23 5244:5
5292:22 5293:4
5300:13 5304:6 5329:9
5335:14 5373:4 5374:2
5384:11

**baton**
5279:15

**Bauer**
5191:19

**Bazelon**
5238:7

**bear**
5179:9 5180:14
5181:12 5190:14
5242:2 5256:9 5287:24

**bearing**
5194:19 5389:22

**bears**
5251:18 5252:3

**bedrock**
5385:1

**beehives**
5392:24

**beekeeper**
5392:18

**beekeeping**
5392:19

**beg**
5182:25 5184:1

**begin**
5155:1 5389:5

**beginning**
5197:3 5268:13 5277:2
5334:12 5363:21

**begins**
5167:10 5351:20
5366:12

**behalf**
5166:10 5172:4,7
5236:16 5264:6
5267:16,17 5268:7
5353:20 5355:13
5380:9

**believed**
5217:23 5357:4
5390:17

**belongs**
5192:4,5

**belt**
5343:4

**Bench**
5308:10

**beneficial**
5152:11,14 5154:20,21
5155:10,17 5160:16,
5161:24 5162:1,10
5163:13,17 5165:12,14,
17,19 5166:2,9,11,18
5168:13,22 5169:21,24
5170:2 5173:3,12,18
5174:19 5175:15,23
5176:2,12 5177:9
5178:11 5185:4,8,24
5187:13,16 5194:9
5205:5 5270:6,20,24
5271:1 5272:5,11
5274:1 5279:19
5282:23,25 5283:5,16
5284:14,19 5285:3,6,18
5286:19 5296:24
5302:11, 5304:16
5310:12,20 5311:7,12,
5312:15 5313:12
5315:5,8,14 5337:19
5344:8 5345:25
5346:17 5347:10
5348:2 5353:25 5363:8,
19 5374:6

**beneficially**
5165:8 5183:5 5312:13
5313:1 5314:23
5354:12,23 5355:3

**benefit**
5212:12 5258:11
5263:5 5303:17,21
5313:6 5321:16,25
5322:8 5327:22,24
5328:1,4,16,18 5349:2
5393:22

**benefiting**
5274:7

**benefits**
5151:25 5242:11,12
5263:7 5287:25
5329:23 5331:9,10
5354:24

**benefitted**
5321:18,19

**Benjamin**
5149:23

**Berenblut**
5210:22

**bet**
5263:17 5266:24
5296:12

**big**
5234:13

**bigger**
5328:1

**Bill**
5278:24

**billion**
5230:13,14 5237:22
5238:14 5239:10
5241:25 5247:17,21
5248:1 5250:10 5265:3,
6,9 5294:12,15
5322:20,25 5348:13
5368:16 5369:5,13,16
5370:15,19 5389:11
5392:3

**billions**
5322:16

**bind**
5172:5

**binder**
5364:25 5365:1

**binding**
5283:22

**Binning**
5234:1 5235:15

**bit**
5184:21 5206:20
5240:19 5244:11
5254:19 5272:23
5317:15 5349:12
5379:21

**black**
5230:12

**Black's**
5155:22 5157:14
5163:4,6 5164:14
5307:11,16 5308:12
5309:5 5310:3,15,17,22
5311:16,17 5313:15
5314:8 5315:18

**blacked**
5339:16

**Blackstone**
5373:3,14,20

**blank**
5364:12

**blow**
5329:21 5341:4

**bluntly**
5322:13

**boats**
5272:2

**body**
5216:24

**bond**
5165:3 5258:13 5266:5

**bond-trading**
5259:15

**Bondholder**
5239:10 5243:2
5252:17 5253:20
5255:3 5257:18 5258:1,
6 5259:4,10,13,14,17
5260:4,19,20

**bondholders**
5233:5 5243:17
5244:19,21 5247:23
5253:10,18 5254:6
5258:4,18 5260:2,11
5261:4,6 5264:17
5265:9,21 5266:1,3
5275:19 5276:6
5388:23

**Bondholders'**
5261:1

**bonds**
5258:8,12,16 5265:10
5266:1,13 5267:5,17

**book**
5156:15 5158:4
5159:19 5163:24
5182:8 5273:9

**book-end**
5360:19

**booked**
5235:5

**books**
5150:25

**borders**
5251:2 5257:9

**bore**
5249:13 5251:20

**borrowers**
5237:22,23

**bother**
5170:10

**bottom**
5158:15 5196:6
5247:15 5265:2,22
5292:25 5293:12,19
5310:25 5367:14
5370:22

**bought**
5253:3

**bound**
5256:12

**bounds**
5218:4,5

**box**
5230:12

**branch**
5189:7

**breach**
5199:11 5214:21

**break**
5202:24 5233:16
5349:19 5358:2
5375:10

**breathtaking**
5220:15

**briefed**
5297:5

**briefings**
5150:6

**briefly**
5163:22 5190:5
5200:13 5241:1
5269:25 5316:16

**briefs**
5149:13 5195:14
5207:24 5217:19
5252:1 5254:14 5347:7
5362:20

**bring**
5204:20 5289:2
5307:24 5336:7
5339:12 5343:11

**bringing**
5350:24

**brings**
5359:18

**Britven**
5210:20 5241:14
5243:4 5245:12 5248:3
5253:13 5275:22
5325:21,22 5369:24
5370:3 5371:19,20
5372:2,14

**Britven's**
5372:11 5394:6

**broad**
5169:19,23 5170:3
5195:7 5230:6 5283:12
5306:4 5371:6 5383:22,
25 5384:7 5385:2,3
5388:11,12

**broader**
5190:1 5209:8 5380:17

**brochure**
5280:11

**Bromley**
5375:4,5,7,10,12,18
5376:24 5377:16
5378:12 5379:8,14

**brought**
5281:10 5287:21
5288:23 5350:19

**Brown**
5160:20

**Brueckheimer**
5380:12

**built**
5242:15 5263:1

**bullet**
5330:6 5368:9

**bump**
5366:2

**bunch**
5306:19 5350:8

**bundle**
5324:6,7

**burden**
5237:24 5238:2,16
5242:10 5382:15

**burdened**
5274:21

**burdens**
5237:17 5238:10
5242:2,18 5249:15

**burn**
5247:19 5265:18

**burned**
5265:4,5

**business**
5179:11,17,18 5180:3,
15,23 5181:8 5183:5,7
5196:16,18 5205:2
5208:18 5209:4,12
5228:8 5229:21
5232:12,13,14,15,17
5233:1,2,12,23 5234:4
5236:3,13,17 5237:10
5239:1 5241:12,13,18
5257:5,8 5263:1 5273:2
5277:10 5283:14
5287:25 5322:4
5324:11,16 5331:20
5343:17 5367:9 5370:8,
13,16,21 5371:2,8,17,
21,24 5372:9,18

**butting**
5377:19

**buy**
5266:9 5276:10

---

**C**

---

**C.I.**
5343:8,17

**calculate**
5208:14

**calculated**
5190:16 5327:8

**calculating**
5248:25 5249:2

**calculation**
5178:17 5238:1
5252:24

**call**
5151:2,16 5152:5
5246:9 5278:6 5280:23
5281:1,3 5287:6
5291:19 5312:2
5313:18 5314:14,16
5331:13

**called**
5158:4 5233:19 5280:9
5311:24 5343:8

**Canada**
5149:19 5152:22
5167:9 5172:16,23,24
5173:5 5174:1,2,3
5204:6 5205:17 5208:7
5225:13 5230:6 5235:3,
6,8 5237:6,9,15
5238:17,21,24 5239:2,8
5241:24 5242:8,10,11,
18,23,24 5243:23
5244:3,20 5262:14
5265:12 5274:24
5276:4 5278:3 5296:22
5298:1,6 5372:23
5378:25 5391:23
5393:24 5395:21

**Canada's**
5191:18 5226:20

**Canada-issued**
5267:17

**Canadian**
5149:5,14,21,24
5150:10 5151:4,13,14,
20 5155:25 5156:10,17
5166:15,21 5168:25
5169:5 5173:9 5174:5,
9,24 5175:4 5176:10,21
5177:2,6 5180:11
5181:21 5182:11,15,18,
21,25 5183:21 5184:1
5186:4,16,21,24
5187:5,24 5189:8
5190:3 5191:25 5192:3,
22 5193:2,6,12 5194:1
5197:24 5198:4,10,15

5199:2,21 5200:10
5201:18,22 5202:2,5,8,
14,20 5203:3,6,12
5207:8 5209:19,25
5210:12,25 5211:24
5212:11,22 5215:18
5216:4,7,11 5217:4,23
5220:19,20 5221:4
5222:8 5223:5 5224:15,
18 5225:4,10 5228:16
5229:22 5230:24
5231:10,20 5233:3
5237:17,19 5238:5,9
5239:18 5240:2
5243:10,21 5245:1,4,5,
7,16,18,22,25 5246:3
5247:1,25 5248:7,14
5252:25 5253:14,22
5263:14 5264:11,14,22,
25 5265:8,23 5267:2,11
5268:2 5271:9 5275:10,
14 5276:20 5277:19,23
5278:5,13,23 5280:5,19
5281:6,18,25 5284:17
5285:8,13,23 5286:6,
21,24 5287:6,18
5288:22 5289:5,11
5290:8 5291:14,23
5292:7,11,17 5295:2,
17,21 5296:6, 5298:8
5299:3,24 5300:2
5303:1,6,19 5304:5,7
5305:3,8,16 5306:13
5307:3,11,23 5308:2,6
5313:14 5314:10,11
5315:16 5316:2,6,13,23
5317:3 5320:2 5321:1,
6,8 5322:11,23 5323:8,
11,15,19 5324:10,15
5325:12 5326:2,6,10,
5327:13,23 5328:11,24
5331:11 5333:17,22
5334:8,14 5335:5
5336:20 5337:3
5338:21 5339:1,9,23
5340:25 5341:7,12
5342:17 5348:11
5349:24 5351:3,8
5352:5,9,12,15 5356:8,
14 5357:6,18 5358:1,6,
12,17 5362:18 5364:11
5366:8 5368:7,17
5369:2,8 5370:24
5374:21 5375:3 5376:5
5377:11,21 5378:2,9
5379:1,16,22 5380:1,4

5382:3 5385:15,16
5386:10,14,18,23
5391:1,4,10 5392:2,
5393:6,11,15,18
5394:2,5,13,18

**Canadians**
5327:25 5338:13
5347:20 5352:1

**Canadians'**
5310:5 5322:18 5323:4
5328:9

**candidly**
5294:7

**candor**
5214:22

**capable**
5259:1

**capital**
5196:1

**car**
5272:4 5308:17

**cardinal**
5203:24

**cards**
5220:21

**care**
5295:4

**careful**
5173:24 5269:15

**carried**
5207:19

**carries**
5161:3,5 5310:12
5311:7

**carry**
5312:22 5331:8

**carrying**
5292:5

**case**
5150:25 5156:15
5159:19,22 5163:24
5164:2,4,20 5165:1,2
5167:8 5170:9,10,25
5175:8 5176:17
5177:20 5189:16
5193:20 5194:12
5200:25 5202:19
5203:16 5204:4,18

5208:21 5211:25
5212:9,16 5214:7,18
5219:15 5220:5 5231:7
5233:18 5238:14
5240:18 5242:23
5248:6 5254:24 5256:6
5257:15,24 5258:22
5259:6 5261:12
5262:13,19 5263:3
5264:6 5268:13,16
5270:12 5277:3 5287:7
5295:13 5297:18
5298:9,22 5299:7,18,22
5301:7,10 5304:7
5306:3 5308:15,23
5311:10,22 5314:6
5318:1,3,4,5 5319:22
5338:12,14 5342:16
5343:6 5344:20
5346:12,15 5350:17
5352:19,23,24 5353:9,
10,11 5354:4 5356:11,
18 5357:8 5359:4
5363:21 5371:20
5372:11 5381:8,12
5384:22 5385:16
5386:5,8,17,19,20,21
5387:18 5388:8
5392:14,16,21 5393:1

**cases**
5163:21 5170:6,9
5274:22 5342:10
5346:21 5388:19

**cash**
5224:4 5247:15
5248:18 5385:19,21,24
5387:10,11

**catalog**
5215:3

**catastrophic**
5212:21

**catch**
5291:15

**categories**
5349:21

**caused**
5269:24

**CCAA**
5384:6

**CCC**
5176:17 5195:14

5201:19, 5210:20
5224:10 5241:12
5243:11 5245:5,7,17
5249:10 5252:1 5255:5
5256:4,14,19 5258:2
5260:1,6 5262:2,4,7
5277:1 5325:22 5370:3
5376:6

**CCC'S**
5201:10 5226:17,24
5244:9 5246:6 5248:20
5251:23 5261:9
5369:23 5371:19

**ceased**
5165:8

**Centerra**
5355:13,19 5356:1

**central**
5212:15 5220:4
5236:18 5357:3

**centrality**
5150:21

**cents**
5243:17,19 5253:4,7,
10,24 5254:5 5261:4
5275:19,21

**CEO**
5343:15

**CEO'S**
5233:14

**certainty**
5249:19

**CERTIFICATE**
5395:1

**certify**
5395:4

**cetera**
5159:19 5174:14
5315:1 5330:18

**change**
5165:4,6,12,15 5175:1
5177:24 5178:4
5183:16 5184:21
5186:2 5220:16,17
5258:20,21, 5269:25
5285:11 5317:6
5333:15 5335:14

**changed**
5165:13 5258:19,22



5266:11 5269:23

**changing**
5181:17 5184:22

**Chapter**
5255:13

**characterizations**
5151:9

**characterizes**
5167:5

**chart**
5231:14 5243:4,8,11
5245:4 5247:16
5264:15,23 5265:15
5266:6 5275:18
5280:25 5281:13
5284:5 5293:19
5364:11,12,16 5365:21
5366:7

**charts**
5365:1 5370:22

**check**
5193:10 5246:16

**Checknita**
5309:24

**cherry-picked**
5261:18

**Chief**
5234:2,5,7 5348:19

**choses**
5312:19 5314:3

**chronology**
5366:2

**Circuit**
5240:16 5255:11
5256:6 5257:13

**Circuit's**
5255:4 5257:21

**circumstances**
5161:13 5205:22
5206:11 5258:15,21,22
5330:25 5368:22
5381:25 5393:4

**cite**
5216:3

**cited**
5163:21 5174:12
5176:17

**citing**
5227:25

**claim**
5164:4 5190:23 5201:2
5217:1 5230:13,14,
5238:15 5239:10
5242:1 5265:20
5292:21 5309:11
5364:9 5386:14,17
5392:4

**Claimants**
5380:10

**claimed**
5259:24 5372:17

**claims**
5227:9 5229:20 5230:5,
23 5236:19 5238:24
5239:11 5241:24
5242:3,6,7,16,17
5244:15,20,23 5246:13
5247:7,10 5249:3,5,13,
15 5251:13,20 5252:17,
21 5253:19,20 5255:25
5256:1,19,20,21,23
5260:4 5263:25
5385:16 5386:5,13,17,
18,20, 5393:21 5394:8

**clarifying**
5286:15

**class**
5372:14 5373:1

**classic**
5205:7 5274:10

**clause**
5165:4,5,11 5192:7
5223:10 5288:21
5289:3 5308:20

**clear**
5205:15 5212:25
5213:5, 5218:15
5219:23 5233:11,25
5234:3,5,14 5235:11,23
5236:17 5240:7,20
5249:24 5250:21
5268:24 5275:13
5282:3 5292:1 5299:12,
13 5300:10 5301:17
5303:11 5319:22
5339:8 5355:11,15
5388:22 5390:3,20

**citing**
5227:25

**clearer**
5219:2

**client**
5389:21

**clients**
5226:7 5313:21

**cling**
5260:11

**Clive**
5272:23 5273:12
5322:3 5390:6

**close**
5270:11 5349:14
5378:18

**closely**
5327:4 5381:15

**closing**
5156:15 5279:4
5389:15

**co-counsel**
5225:11

**Code**
5384:5

**cognizable**
5310:7 5311:2

**Coleman**
5150:2 5211:13,17,19,
21,23 5217:4,7 5221:8
5222:6 5224:8,9,14,17,
20 5293:2

**collaborative**
5236:23 5251:7

**collaboratively**
5251:1

**collateral**
5207:3

**colleague**
5150:2 5226:21
5279:16 5284:13
5288:3 5294:19 5296:1
5360:4 5370:3

**colleagues**
5274:24 5284:18

**Collection**
5309:6

**collective**
5219:13

**collectively**
5212:16 5219:5

**column**
5245:5,7,8 5264:16
5265:3 5367:14

**commenced**
5216:14 5263:17

**commencing**
5149:1

**commensurate**
5364:4

**comment**
5306:24

**comments**
5216:24

**commercial**
5274:10,17 5320:6,8
5322:13 5328:7 5343:8,
12

**commercially**
5229:9 5247:8 5274:4

**commit**
5274:5

**committee**
5216:4 5217:5 5225:10

**common**
5158:8 5191:6,8
5255:17 5346:15
5392:17

**commonly**
5157:23

**companies**
5250:5 5263:23
5324:11,16 5325:14
5334:5 5363:20 5374:4

**company**
5233:11 5237:6,9
5249:14 5250:4,8
5251:21 5261:15
5272:6,8 5274:12
5277:9 5302:18
5306:17 5339:18,19
5340:5,16,17 5343:15
5345:10 5353:19,20,25
5354:10,11,25 5361:7,
9,17,18,23,24 5366:6
5367:3,7 5369:22
5387:11




**comparative**
5208:18

**compared**
5366:11

**compelling**
5362:4 5365:8 5372:24

**compendium**
5150:22 5155:21
5156:1

**compensated**
5181:9 5263:8

**compensating**
5182:4

**compensation**
5179:2,6 5180:12
5190:10,16 5263:5
5282:7 5327:11,15
5330:21

**competent**
5392:2

**competing**
5151:9 5153:16
5262:11

**competitor's**
5198:21

**competitors**
5198:20

**complete**
5163:13 5170:5 5310:9
5311:4

**completely**
5211:10 5286:5
5307:18 5362:24
5363:1 5371:15 5392:9

**completion**
5318:8

**compliance**
5329:19

**complicated**
5271:23 5312:3

**complied**
5320:15

**comply**
5329:24,25

**compound**
5160:2,4

**computed**
5300:5

**Computershare**
5164:2 5165:1

**concept**
5229:15

**concepts**
5390:23

**concern**
5377:18 5378:7

**concerned**
5151:5 5271:9 5331:22
5374:18

**concerns**
5270:19 5332:1

**concession**
5216:19

**conclude**
5211:6 5226:25 5237:3
5249:18 5257:13

**concluded**
5296:2 5345:22

**concludes**
5264:9

**conclusion**
5246:18 5261:20
5267:21 5345:1
5361:21 5368:6,23,25
5372:11

**conclusions**
5203:17 5245:14
5268:10

**condition**
5158:12 5213:19

**condo**
5318:6

**conduct**
5150:4 5186:14,17
5352:6,17 5357:9,11,13
5359:3,7,8

**confer**
5157:20

**conferring**
5157:24

**confers**
5190:2

**confidentiality**
5174:14 5198:23
5339:17

**confirm**
5285:21 5292:3
5390:16

**confirmed**
5284:22 5363:10

**confirming**
5287:20 5290:2

**confirms**
5283:23 5285:2
5290:22

**conflict**
5187:1 5217:17
5284:20,24 5285:4
5287:8,12,14 5342:8

**confront**
5258:18

**confusing**
5158:2 5347:5

**confusion**
5269:24

**connection**
5170:12 5195:24
5218:12,24 5242:13
5266:6 5318:10 5342:9
5363:15

**connote**
5155:15

**consensual**
5220:10 5382:9

**consensually**
5219:8

**consent**
5167:17

**consequence**
5393:8

**consequences**
5165:6 5271:10

**consideration**
5152:18 5166:4
5188:20 5255:5 5264:3
5271:13 5273:23
5390:10

**consideration-making**
5259:16

**considerations**
5240:8 5294:6

**considered**
5205:22 5345:23,25

**considers**
5196:15 5381:7

**consignment**
5309:16

**consistency**
5174:13

**consistent**
5174:15 5177:16
5201:6,14 5206:21
5228:3,25 5233:1
5332:19 5351:17
5364:1,5 5372:12

**consolidated**
5256:2

**consolidation**
5240:23 5252:3,4
5255:14,16 5256:8
5257:23,25 5388:1,4,6,17

**constitute**
5330:25 5383:2

**constitutes**
5190:9 5217:16

**constituting**
5156:24

**constraints**
5384:15 5388:14

**construct**
5255:16

**construction**
5285:24 5318:8,11,20
5319:7,10,11 5320:1

**constructive**
5387:22 5392:12,16,19

**consulted**
5376:17

**consummation**
5219:12

**contained**
5764:8

5213:13,15 5393:12

**contemplate**
5391:12

**contemplated**
5166:12

**contemplates**
5166:3

**contemporaneous**
5365:11

**contends**
5185:9,10

**content**
5170:2

**contention**
5255:2 5303:7

**context**
5151:8 5184:5 5205:13
5209:11 5217:14
5230:12,16 5231:6,24
5237:11 5239:6
5240:18 5270:17
5290:11, 5292:14
5330:7 5386:5 5387:24
5389:4

**continents**
5262:17

**continuation**
5199:19

**continue**
5199:9,10 5229:21
5291:9

**continued**
5322:3

**continues**
5351:5 5362:3

**continuous**
5179:12 5180:17

**contra-distinction**
5155:17

**contract**
5172:4 5205:24 5206:6,
10 5229:8 5258:24
5260:18 5274:25
5281:7,8 5282:11
5284:18,25 5286:11,16
5287:17,21 5288:5,8
5289:3,23 5290:20
5291:10,21 5292:17,18,

23 5293:4 5299:18,23
5306:5 5320:2,7
5337:17 5338:16
5346:25 5357:14,16,20
5359:5

**contracting**
5205:14

**contracts**
5285:10 5293:6,8,9
5299:20 5304:14
5339:7 5341:25

**contractual**
5169:19 5177:14
5181:1 5203:22,24
5204:4 5241:8,22
5243:1,16 5244:4
5245:19 5246:8
5258:25 5260:12,25
5281:4 5282:20
5287:14 5293:24
5297:20 5301:15
5359:8

**contractually**
5242:5 5279:12 5363:9,
10

**contradict**
5177:24

**contradicted**
5275:22

**contradicts**
5191:22

**contrary**
5180:7 5261:5 5307:18
5315:15 5325:14
5342:22 5345:6

**contrast**
5175:20 5222:4 5231:2
5235:17 5243:11
5246:20

**contributed**
5250:12 5294:13

**contributes**
5322:21 5330:14

**contribution**
5153:14 5154:4 5210:6
5229:4 5243:14
5248:16,17 5250:6
5251:7 5261:18,22
5273:24 5280:17
5325:5,19 5330:22

**contributions**
5326:24 5347:14
5361:15 5364:4,21
5365:16

**control**
5156:25 5165:7
5236:18

**controversial**
5342:6

**controverted**
5275:14

**conundrum**
5331:12

**convenience**
5207:2 5236:14

**convenient**
5202:25 5358:3

**convention**
5223:4

**convey**
5313:19

**conveyed**
5158:11

**convince**
5320:14

**convinced**
5308:18

**Cooper's**
5321:12

**cooperation**
5262:16,18

**copy**
5182:17

**Cordo**
5375:16

**core**
5213:20 5243:4

**Cork**
5170:9

**corner**
5310:23,25

**corners**
5348:17

**Corning**
5254:20,24 5255:4,11
5256:5,7,9 5257:22
5259:7,21,24 5380:20

**Corp**
5301:8

**corporate**
5251:2 5252:5 5256:12,
16 5257:1,9

**corporation**
5165:8 5319:6

**correct**
5156:3 5183:24
5187:22 5188:2
5190:19 5207:15
5216:8 5217:7 5221:9
5231:13 5245:20
5264:21 5265:13
5289:14 5303:5,25
5304:21,22 5315:2
5321:7 5357:21
5362:10 5395:13

**correction**
5348:24

**cost**
5175:24,25 5199:17
5262:21 5273:18
5338:1

**costs**
5151:23 5152:18
5207:6,19 5208:25
5247:7,10 5273:7
5330:15 5389:12,20,22

**counsel**
5203:8 5227:23
5316:25 5390:7

**countries**
5330:9 5373:14

**couple**
5151:3 5170:20 5199:3
5296:19 5339:12

**court**
5149:3,5,7,11,14,16,21
5150:17 5151:4
5155:18,25 5156:2,6,
10,12,17 5162:5,8,18
5164:13 5165:10,14,16
5166:15,21 5167:9,10
5168:25 5169:5 5170:7
5173:9 5174:5,9,24

5175:4 5176:10,21
5177:2,6 5180:11
5181:21 5182:11,15,18,
21,25 5183:21 5184:1,9
5186:4,16,21,24
5187:5,24 5188:3,12
5189:1,5,8 5190:3,19
5191:18,25 5192:3,22
5193:2,6,12 5194:1
5197:2,7,24 5198:4,10,
15 5199:2,21 5200:10,
15 5201:18,22 5202:2,
5,8,14,20 5203:2,3,6,8,
12,18 5204:5,8
5205:17,20 5206:15
5207:8 5209:19,25
5210:1,12,15,24,25
5211:3,19 5214:15
5217:4 5218:1,7 5221:4
5222:3,25 5224:8,11,
15,18,20,24 5225:2,4,8
5226:20 5228:16
5229:22 5231:10,20
5232:19 5233:3
5239:18,19,21 5240:1,
2,11,16,22 5241:23
5242:8 5245:1,4,16,22,
25 5246:3 5247:25
5248:7 5252:25 5253:7,
14,22 5254:21 5255:12,
15 5256:24 5259:22
5260:14 5261:7,12,14,
16 5264:8,10,11,14,22,
25 5265:8,23,24
5266:10,16,24 5267:1,
2,9,11,13 5268:14
5270:10 5274:14,22
5276:11 5277:6,16,19,
22,23 5278:2,5,7,11,13,
15,20,23 5279:1,8
5280:2,5,10,14 5285:23
5286:6,21,24 5287:18
5289:5,11 5290:8
5291:1,14,23 5292:7
5295:2,17,21 5296:6,7,
8,12 5297:22 5298:1,2,
5,7,8,15,20,24 5299:3,
24 5300:2,23 5301:10,
11 5303:1,6,19 5304:18
5305:3,5,8,16,25
5306:1,11,13 5307:3,
12,15 5308:2,6,10,23
5309:1 5310:8,24
5311:3 5312:1,5,9,11,
24 5313:10,14 5314:11,
18 5316:23 5317:3,9

5318:1,2,15,16 5319:17
5320:3 5321:1, 5323:8,
11,15 5324:10,15
5326:2,6,10,13
5331:11,25 5333:17,21,
22 5334:8,14 5335:5
5336:20 5337:3 5339:9,
23 5340:25 5341:7,12
5342:4,17 5343:7,13
5344:7,25 5345:4,21
5346:7,10 5348:11
5349:24 5351:3,8
5352:5,9,12,15,25
5353:3,4,6,7,23 5354:3,
4,9 5355:6 5356:8,14,
18 5357:1,6,18 5358:1,
5,6,10,12,13,17,23
5362:18,20 5365:4
5368:7,17 5369:2,8
5370:24 5374:11,23
5375:3,5,17 5376:21
5377:1,5,11,18,21,22
5378:2,9,10,22 5379:1,
12,16,19,22,24 5380:1,
2,4,15 5381:18 5382:14
5383:19 5385:9
5386:10,14,18,23
5391:19 5394:2,13,17,
18,20

**Court's**
5167:20 5168:11
5220:3

**courtroom**
5240:4 5257:16
5349:11 5379:10
5381:14

**courtrooms**
5225:7

**courts**
5150:6,22 5153:18
5154:15 5176:18
5194:7 5195:12
5202:16 5205:9,
5206:13 5207:20
5211:16 5212:5,8,10,11
5213:6,12,14,17,22,24
5214:2,23 5216:2
5219:25 5220:12
5221:11,16 5225:22
5227:2 5229:1 5231:5
5233:18 5240:13
5243:12 5244:17
5246:12 5249:17,18,25
5250:14 5251:12,22

5252:8,21,22 5254:15
5259:11 5260:3,24
5261:14 5262:7,9,10,19
5263:23 5264:1,5
5274:18 5275:16
5279:3 5281:11
5282:12 5285:9
5288:24 5296:5
5297:12,19,24 5299:19
5318:12 5344:15
5347:4 5358:22
5364:25 5367:5
5369:15 5374:12
5375:16 5378:21
5381:7,10,21 5382:5,8,
9,11,13,18 5383:10,11,
21 5384:8,21 5388:11
5389:5 5391:13

**Courts'**
5191:17 5229:1
5289:18

**coverage**
5164:12

**covered**
5272:20

**covering**
5241:5

**covers**
5280:16

**Covington**
5343:8,17,18,22
5344:10 5345:11
5352:23,24 5356:18

**Cox**
5210:22

**create**
5160:12 5163:3
5174:20,25 5177:21,23
5178:8 5180:7 5181:19
5185:7 5186:22 5191:8
5196:11 5207:2 5219:6
5247:8 5284:20 5287:8,
12 5288:9 5338:10

**created**
5153:7 5159:15
5165:17 5175:9,11
5294:18 5347:8 5364:3
5365:25 5366:14,20
5367:10 5368:2
5393:13

**creates**
5206:15

**creating**
5180:4 5279:21 5288:7
5294:13, 5321:20
5322:9,21 5366:3

**creation**
5155:9 5159:13
5161:23 5162:13
5170:17 5191:2
5322:17

**credible**
5246:19 5271:15

**creditor**
5226:9 5229:20
5252:12 5257:19

**creditors**
5212:12,21 5222:8
5225:10 5230:20,24
5232:20,23 5242:4,25
5243:2,18,19,21
5244:14,16 5249:3
5251:8,13 5252:9,11,15
5254:1,5,9 5255:25
5256:20 5257:23
5258:12,14 5262:8,22
5264:4,16 5275:17,20
5380:10 5384:24

**Crichlow**
5267:14, 5277:16,20,21
5317:14,18

**Crichlow's**
5292:10

**critical**
5212:7 5215:20 5240:7
5251:15 5259:3 5284:8
5293:5 5333:14 5346:3

**critically**
5153:23

**criticism**
5370:4 5372:3,4

**criticisms**
5229:4

**criticized**
5370:2

**cross-border**
5382:10

**cross-examination**
5275:25 5325:23



**cross-examined**
5235:11

**cross-licensing**
5236:19

**crossover**
5244:19,21 5258:3

**CRR**
5395:3,4

**crystal**
5218:15

**CSA**
5192:21

**CSAS**
5193:15

**CSFB**
5259:21

**CSR**
5395:3,4

**CTO**
5348:19

**cumulative**
5255:22

**curing**
5199:12

**current**
5178:20 5258:11,17,18

**Currie**
5233:24 5238:1

**Currie's**
5234:14

**custody**
5156:23

**customer**
5373:11

**customer-related**
5369:12,17,19,23
5370:1 5373:21

**customers**
5364:23 5369:11
5371:22

---

**D**

---

**damages**
5201:4

**dance**
5359:11

**dart**
5349:12

**data**
5365:9,15, 5366:18
5367:6 5368:24

**database**
5341:20

**date**
5213:2,4 5220:21
5247:25 5248:2
5335:20 5395:9

**Dated**
5395:15

**dates**
5365:24

**David**
5267:16

**day**
5223:2 5238:19
5268:15 5274:21
5322:23 5324:6
5348:13 5377:6,8,9
5378:8 5388:15 5394:9
5395:15

**day-to-day**
5335:13

**De**
5236:15 5395:21

**dead**
5229:20

**deal**
5163:22 5164:3
5200:12 5214:6
5216:12 5219:14
5224:3 5226:17,22
5229:15 5231:23
5236:18 5237:14
5246:13 5290:5 5291:7
5297:1, 5307:7
5317:11,13 5322:14
5326:11,14,17 5329:4
5334:1 5335:12 5336:5,
9,13 5341:21 5349:7
5381:3 5388:4

**dealer**
5308:17

**dealing**
5165:10 5169:1
5173:20 5221:23
5227:3, 5236:20
5237:10 5290:11,13,22
5296:21 5332:11
5333:12 5334:5
5336:21,22 5363:2
5388:25

**dealings**
5345:10

**deals**
5160:20 5190:22,24
5191:1,2,3 5201:21,23
5229:11 5267:4
5295:18 5298:14
5328:9,20 5329:9
5331:19 5334:17,18
5336:19 5351:22
5352:19

**dealt**
5186:11 5257:2
5300:13 5307:23
5343:14 5350:12
5351:22 5353:24
5384:19 5390:2

**DEANA**
5395:3,19

**dearly**
5260:11

**debate**
5155:6 5231:4 5297:10
5299:14 5338:2 5388:5
5389:1,11

**debates**
5206:18 5337:15

**Debenture**
5376:8

**debt**
5237:23,25 5259:4
5263:25 5386:6

**debtor**
5249:23 5250:24
5255:14 5383:8

**debtors**
5149:24 5151:15,17
5153:6 5161:22,23
5189:10 5191:1
5206:23 5211:24
5213:11,14 5215:18

5216:7,11 5217:20,25
5220:18,19,20,22
5221:15 5222:24
5237:17 5238:15
5243:10 5245:6,8,18
5248:14 5256:1,7,11
5258:12 5278:25
5285:13 5294:9
5296:24 5304:5
5307:11 5314:10
5315:16,17,23 5316:2,6
5320:2 5321:7 5322:11,
15 5323:6 5324:9
5327:23 5328:24
5338:21 5339:1 5376:5

**debtors'**
5154:9 5259:25
5316:13 5323:20
5325:13 5385:16

**decade**
5280:18

**decide**
5150:9 5164:20,22
5306:4 5308:24 5319:4
5378:21 5388:24

**decided**
5150:17 5153:12
5221:19 5382:11

**decidedly**
5179:19

**decides**
5250:15

**decision**
5159:18 5160:6 5162:2
5163:23 5164:1 5165:5
5167:10 5170:7
5205:18 5226:10,20
5250:2,6 5255:4
5297:25 5298:2,23
5301:9 5306:2 5307:21
5308:9,11,25 5319:10,
12 5343:7, 5344:12
5353:9,13,16 5354:7

**decision-maker's**
5206:3

**decisions**
5240:17

**declaration**
5204:22

**declaratory**

5223:15

**decline**
5366:6 5367:4

**declined**
5266:3,14

**dedicated**
5262:25

**dedication**
5264:6,8

**deduct**
5318:10

**deductions**
5319:8

**deemed**
5221:18 5392:3

**deepen**
5206:2

**deeper**
5250:13

**deeply**
5382:3

**defamatory**
5223:3

**defending**
5236:19

**defensible**
5230:9

**defer**
5296:1

**deferred**
5215:20 5216:1
5375:23

**define**
5186:7

**defined**
5157:8 5180:2 5183:8
5185:6,20 5186:6
5190:9 5283:4,9,
5302:10 5309:4 5310:2

**defines**
5156:21

**defining**
5195:20

**definition**
5156:19,20 5157:15,16
5283:11 5307:15,22

**definitions**
5157:22 5164:14
5187:10 5308:24

**Delaware**
5150:3 5224:22 5225:6,
14 5239:16

**deletes**
5188:5

**delineate**
5291:2

**deliver**
5308:18

**Delta**
5343:15,17,19,20,21
5344:1,8 5345:25
5346:16

**deluding**
5230:10

**demonstrate**
5155:12 5227:13

**demonstrated**
5217:13

**demonstrates**
5243:11

**demonstrative**
5225:1 5228:17
5264:15 5280:8,15
5369:12

**demonstratives**
5225:6 5280:7 5380:13

**denote**
5270:13

**denude**
5169:25

**deny**
5260:1 5281:7

**depending**
5330:24

**deployed**
5385:23

**deposition**
5234:25

**depositions**
5389:13

**deprive**
5212:11

**deprived**
5160:5

**deriving**
5151:24

**describe**
5158:24 5238:23

**describes**
5158:9 5182:3 5255:15

**describing**
5180:4 5246:6

**design**
5344:18

**designated**
5293:21

**designed**
5196:7 5274:11
5385:24

**desk**
5338:17

**detail**
5200:22 5269:15
5385:14 5389:3

**detailed**
5195:12

**determination**
5253:20 5277:7 5346:8

**determinations**
5150:8,11 5154:10
5260:8

**determine**
5153:13,18 5165:16
5182:2 5232:6 5233:19
5244:18 5252:15
5260:5 5300:3 5333:8
5357:1 5383:12 5384:2,
4

**determined**
5203:25 5230:16
5251:15 5252:13
5327:21

**determining**
5179:1 5220:8 5388:13

**develop**
5180:23 5181:13
5247:11 5250:9,10,12

**developed**
5171:16 5195:2 5196:7
5236:22 5250:25
5269:19 5323:22
5340:14

**development**
5179:4,13 5180:17
5232:15,16 5235:4,7
5272:17 5274:6,7
5282:9 5322:22
5330:16

**deviate**
5206:14

**dictate**
5252:12 5260:7
5271:15

**Dictionary**
5155:22 5163:5,7
5164:14 5307:11
5308:13 5309:5
5310:16,17,22 5311:16,
17 5313:15 5314:9
5315:19

**difference**
5245:6,22

**differences**
5245:14

**differently**
5208:12,13 5210:18
5300:9 5313:25
5336:24

**differs**
5240:22

**difficulty**
5159:11

**diminish**
5290:17

**direct**
5194:19 5279:24
5294:25 5298:21
5306:24 5314:9
5346:18 5349:22
5350:16 5352:21

**direction**
5391:7

**directly**
5296:20 5306:10

5310:17 5317:14
5326:17 5384:12
5389:1

**Director**
5390:8,9

**disability**
5263:4,7

**disabled**
5230:19 5243:22

**disagree**
5233:7 5269:12,13
5332:19 5375:8

**disagreement**
5341:15,18

**disassemble**
5379:10

**disclaimed**
5335:21

**disclaims**
5171:23

**discordant**
5366:10

**discount**
5209:6

**discoveries**
5340:13

**discovery**
5213:24 5222:13

**discretion**
5384:13,16 5385:2,11,
12

**discretionary**
5383:22,25 5384:7,8

**discuss**
5240:9

**discussed**
5164:15 5177:19
5181:6 5196:3 5200:21
5221:1,2 5317:16
5333:7 5350:3,4

**discussing**
5257:19 5364:13

**discussion**
5271:3 5305:22 5307:6
5311:20 5351:1 5356:5,
15,17 5358:20

**discussions**
5329:18

**disingenuous**
5276:17

**dismissed**
5292:13

**disposal**
5309:12

**dispose**
5156:25

**disposed**
5184:10,16

**disposition**
5183:5

**dispute**
5150:18 5229:16
5230:7 5239:8 5240:7
5268:19 5276:12
5297:6 5389:23

**disputed**
5215:18 5269:3,16

**disregard**
5212:8 5213:17

**disregarded**
5280:21

**disregarding**
5253:8

**disrespectful**
5234:21,22

**dissertation**
5387:7

**distinction**
5177:15 5259:7 5363:5,
20

**distract**
5212:4

**distraction**
5194:9

**distressed**
5259:3 5263:16

**distribute**
5244:13

**distributed**
5220:7 5325:4

**distributes**
5181:5

**distribution**
5277:9 5373:11
5387:17

**distributions**
5230:22

**dividend**
5392:3

**dividends**
5368:18

**Division**
5312:1

**Divisional**
5343:13

**divvy**
5350:6

**doctrine**
5154:12 5223:5

**document**
5150:21 5184:24
5204:16 5220:9
5301:11,12 5302:3
5338:8 5339:12,20
5341:4 5368:8 5391:12,
18 5392:7

**documentation**
5259:15

**documents**
5182:8 5227:5 5239:3
5338:15

**dollar**
5230:13 5238:15
5239:7,10,11 5243:18,
19 5253:4,8,10,24
5261:4 5275:20,21
5349:9

**dollars**
5230:14 5237:22
5250:9,10 5265:6,9
5322:17,20 5323:1
5348:13 5389:11
5392:4 5394:8

**dominion**
5309:9

**Doolittle**
5220:25

**door**
5379:12,13

**double-dip**
5246:9

**doubt**
5181:22,24 5219:10
5320:19,24,25 5321:22
5336:10

**downside**
5179:17 5180:1,3,5
5181:13 5182:4 5274:8

**draft**
5304:19,24 5305:14
5306:15 5307:4

**drafted**
5181:25 5292:20
5304:24 5308:14
5320:13 5392:8

**drafting**
5390:13

**drafts**
5305:9 5307:1

**dramatically**
5258:19

**drastically**
5316:1

**draw**
5199:8

**dress**
5214:19

**drill**
5348:14

**driven**
5181:22 5331:15

**driver**
5179:5 5232:17

**drop**
5265:2 5293:18

**dropping**
5291:8

**drove**
5370:6

**drumbeat**
5372:4

**due**
5235:21 5247:19
5249:22

**dumb**
5332:4 5333:20

**dumping**
5238:23

**duty**
5160:9 5171:24
5187:19 5214:22

---

**E**

**earlier**
5173:16 5186:1 5187:2,
14 5220:21 5246:22
5270:7 5279:5 5304:15
5316:17 5388:15
5391:20

**early**
5304:23 5366:5

**earn**
5209:2

**easier**
5151:1

**easy**
5257:13

**economic**
5205:4 5217:10,16
5270:24 5292:14
5393:7 5394:4

**economically**
5393:8

**Eden**
5235:25 5331:16
5334:10

**effect**
5158:9 5165:18 5169:9
5177:18 5184:8,17
5194:3 5209:16
5210:19 5216:5
5388:16

**effective**
5170:24 5171:13

**effectively**
5169:24 5206:15

**efficient**
5267:25

**effort**
5247:6 5257:21

**efforts**
5263:1

**elegant**
5278:3,5

**element**
5190:23 5236:3

**elements**
5156:22 5186:14
5232:12

**Eli**
5167:8 5170:6 5194:12,
20 5297:25

**eliminate**
5256:20

**eliminated**
5256:18

**elimination**
5263:6

**Elliott**
5177:19

**eloquent**
5241:3 5276:23 5387:7

**else's**
5168:23 5312:16

**emails**
5375:14

**emanating**
5255:17

**embarrass**
5332:2

**emblazoned**
5154:22

**embodies**
5248:23

**embodying**
5195:18

**EMEA**
5150:10 5151:15,17
5152:6 5153:1,5,25
5154:9,18 5161:23
5169:3,13,15 5171:19
5185:9 5190:25 5191:5
5192:1 5193:7 5206:23
5220:22 5227:16
5231:1 5236:16,17
5237:20 5239:11
5241:25 5243:13,19

5248:12,14 5254:18
5261:22 5278:25
5294:2,11,16 5296:24
5308:1 5315:23
5322:15,20,24 5324:5,9
5344:5 5376:7

**EMEA'S**
5190:20 5286:5

**eminent**
5381:13

**employed**
5237:6 5295:9 5341:20
5382:21

**employee**
5193:22 5339:5,16,19,
20 5341:21 5344:17

**employees**
5193:18 5230:19
5232:25 5238:17,18
5243:22 5262:23
5337:22 5338:8,22
5341:13,14,16,19
5348:1

**employer**
5192:14 5193:21
5295:7 5337:18
5338:19 5339:7
5342:23 5344:16
5346:15

**employer's**
5338:11

**employment**
5338:9 5339:6,15
5340:8,15,18

**enable**
5244:13

**encapsulate**
5196:23

**encapsulation**
5152:24

**encounter**
5188:8

**encourage**
5263:21

**end**
5155:24 5162:20
5209:25 5223:2
5238:19 5246:15
5250:19 5265:9

5268:15 5276:22
5283:3 5292:1 5334:12
5355:1 5378:7

**ended**
5371:6

**ends**
5185:19,20

**enforce**
5353:18

**enforceability**
5252:16 5260:6

**enforceable**
5252:8,22 5310:8
5311:2 5342:21 5343:1,
2

**enforcement**
5256:21 5353:17

**enforcing**
5207:7 5344:10

**engaged**
5359:7

**engaging**
5381:3

**English**
5159:24

**enhancement**
5330:16

**enhancements**
5252:18

**enjoy**
5161:1 5168:2 5309:7

**enjoyed**
5162:10 5309:20

**enjoying**
5175:15 5282:22

**enjoyment**
5313:6

**enjoys**
5185:4

**enormous**
5264:7 5294:6

**enrichment**
5387:22 5392:13

**ensure**
5385:25

**entailed**
5216:17

**entangled**
5387:5

**enter**
5159:25 5160:12
5181:7 5188:21 5274:4
5321:15 5322:14
5328:8

**entered**
5286:14 5300:11,21
5306:7,8 5317:7
5343:25 5345:13

**entering**
5297:16 5300:15

**enterprise**
5251:2 5272:18 5385:7

**Enterprise-wide**
5390:15

**entire**
5175:10 5185:9
5189:24 5191:13,24
5192:7 5206:10 5207:4
5215:2 5219:15 5234:9
5238:12 5288:21
5289:3,4,15 5299:19
5300:15 5329:18
5347:20,22 5359:12
5378:15 5386:1 5395:8

**entirety**
5188:5 5309:11

**entities**
5153:3 5255:19
5256:25 5257:10
5274:2 5322:1,2,5
5330:8,9 5331:7
5360:15,23 5373:7,8,
18,23 5385:8 5389:19
5390:1,12 5393:13

**entitled**
5160:24 5221:25
5253:7 5260:2 5271:13
5272:9 5288:18
5310:14 5311:9 5313:1
5327:6,19 5328:15,25
5330:2 5331:5,6
5354:24 5374:9

**entitled'**
5312:14 5314:24

**entitlement**
5219:7 5221:3 5327:2
5383:5

**entitlements**
5189:23

**entity**
5152:6 5247:9 5251:3
5252:6 5256:17
5257:14 5275:10
5385:18 5387:2

**entity's**
5252:7

**entrepreneurial**
5179:10 5180:15
5271:4 5287:24

**environment**
5337:2

**equal**
5189:22 5327:20

**equally**
5204:12

**equals**
5304:6,7 5323:24

**equating**
5159:11

**equipment**
5337:25

**equitable**
5159:14 5161:2,8,9,11,
17,24 5162:10 5164:17,
21,23 5170:17,22
5174:20 5175:6,15,22
5176:2,12,25 5177:9,11
5178:2,11 5179:21
5181:19 5183:18
5184:7 5185:4,8,24
5186:5,8 5187:13,16
5189:17 5222:22
5226:24 5227:7,15
5241:20 5243:8
5244:12 5249:10
5262:3 5270:5,25
5272:5 5282:22 5295:8
5303:22 5304:17
5311:11 5314:14
5387:23

**equitably**
5264:4 5310:14 5311:9

**equity**

**entailment**
5158:22 5161:1,15
5229:2 5255:17
5261:24 5265:11

**equivalence**
5159:5

**equivalent**
5157:14 5168:4,16
5194:13,16,17 5393:23
5394:4

**erased**
5255:24

**Ericsson**
5322:25 5324:6

**escrow**
5224:4

**essence**
5391:9

**essential**
5153:17

**essentially**
5209:20 5227:10
5243:3 5245:12,13
5247:22 5341:8

**establish**
5160:3

**established**
5213:2 5257:7

**estate**
5212:22 5217:23
5219:3 5222:8 5244:12
5249:1,11,12,16
5251:15,20 5253:15,16
5256:22 5276:20
5311:25 5312:3
5314:13

**estate's**
5252:20 5256:24

**estates**
5150:10 5161:8 5212:1,
12 5216:10 5219:5,13
5220:15 5227:8
5230:22 5242:4 5243:1
5244:16,18,22 5246:12,
14 5247:1 5251:8,12,14
5252:12,23,24 5253:19
5254:2 5255:14
5263:15 5276:9
5389:12,20 5391:1,5,10

**estates'**
5249:3 5393:9

**estimate**
5265:19

**estimates**
5248:10

**estoppel**
5215:3 5222:9,17,22
5223:4

**euphemism**
5238:22

**eureka**
5338:17

**Euro-excellence**
5170:10

**European**
5373:9,14

**evening**
5377:20,21,22

**event**
5165:3 5215:6 5220:24
5222:15 5332:7
5335:24 5389:25
5390:12

**events**
5238:15 5391:13

**eventually**
5331:22

**evidence**
5176:6 5192:17
5198:16,18 5202:17,18
5203:15,16 5204:13,15
5205:8,11,12 5206:2
5207:10 5212:3
5217:13 5221:5
5222:18,19,20,23
5226:14 5232:1,2,18,
23,24,25 5233:9,24
5234:1,3,6,15,18
5235:11,14,18,23
5236:16,25 5242:21
5248:11 5251:4 5253:2
5257:6 5258:9 5259:8,
11, 5260:17,18 5265:24
5267:5 5268:6,15
5275:13 5279:22,24
5280:17,20,24 5281:4
5283:22 5294:23
5295:1 5296:3,5
5300:10 5304:12

5306:4,6,10,22,24
5307:9 5319:15
5320:24 5321:9,11,23
5332:12 5341:13
5344:8,24 5345:8,22,24
5346:5,6,7,17,18,19
5347:8,23 5349:14,16,
17,23,25 5350:1,11,12,
16,18 5351:1,12,16,20
5352:21 5353:1 5355:6
5356:20,23 5358:22
5359:13,19 5362:3
5364:1,17 5366:22,23,
24,25 5368:11 5371:12
5372:25 5380:11
5386:7,22 5390:2,14

**evidenced**
5158:2 5238:1

**evidences**
5163:10

**evidencing**
5169:22

**evident**
5215:16 5231:3
5298:16

**exact**
5214:3 5336:14,25

**examination**
5266:7

**examine**
5361:4

**examined**
5176:1 5344:25

**examining**
5206:1

**examples**
5299:19

**exception**
5152:16 5372:19,23

**exceptions**
5234:10

**excerpt**
5157:17 5158:3,7,8,16,
18,21,24 5159:3 5163:9

**excess**
5211:8 5265:19

**excesses**
5381:21

**exchange**
5198:20 5375:14

**exclude**
5366:22,23

**excluded**
5173:23

**excludes**
5284:18 5367:20

**exclusion**
5164:9,16,18 5308:20

**exclusive**
5152:8,10 5172:16,24
5173:5 5174:3 5175:17,
24 5176:3,13 5177:3
5183:11 5187:12
5188:21,25 5205:6
5285:19

**exclusively**
5195:8 5236:2

**executed**
5288:2

**executives**
5306:18 5345:19

**exercise**
5199:8,20 5209:18
5383:22 5384:13,16
5385:10,11

**exercised**
5384:9

**exercising**
5151:24 5384:2

**exhale**
5318:24

**exhaustively**
5381:13

**exhibit**
5337:4

**exist**
5256:13 5285:22

**existed**
5188:24 5215:21
5333:6 5351:14

**existence**
5170:21 5188:17
5195:1 5216:6 5260:23
5269:18 5335:20

**existing**
5285:11 5320:12

**exists**
5164:23 5288:9

**expect**
5166:9,16,17,22,24
5180:8 5195:5 5219:4

**expectation**
5258:25

**expectations**
5253:3 5258:20,23
5259:9,12,23 5260:15,
17

**expected**
5263:3 5326:25

**expects**
5260:20

**expenditures**
5235:8 5367:4

**expenses**
5250:5 5318:10

**expensive**
5226:2 5263:22 5272:1

**experience**
5321:13 5333:19

**expert**
5241:14 5245:10
5258:20 5259:17
5266:7 5325:21
5334:11 5365:5,7
5369:24,25 5370:1
5371:19 5372:1
5389:13

**experts**
5232:2 5235:24
5245:23 5304:4
5329:16 5364:23
5369:18

**explain**
5158:21 5284:13
5288:4 5342:10

**explained**
5251:4 5257:24

**explicit**
5360:17

**explicitly**
5298:6

**exploitation**
5217:16 5324:24

**exploiting**
5207:7

**express**
5168:6 5194:15,18
5286:10

**expressed**
5190:18 5191:23
5206:5

**expressly**
5155:2 5173:23
5213:18 5256:12
5354:20

**extend**
5196:7 5275:12

**extensive**
5150:6 5214:15

**extensively**
5273:13 5275:11

**extent**
5153:24 5169:16
5172:1,2 5181:16
5197:4,12,13,18,25
5198:5,11 5200:6,23
5227:5 5330:11

**extra**
5182:17

**extra-contractual**
5227:12

**extra-contractually**
5363:11

**extraordinary**
5261:12 5262:16

**extreme**
5229:7,12,13,24 5230:3
5231:7 5240:11,14
5241:21 5243:12
5244:7 5246:19,24
5247:2,14 5248:13
5261:25 5263:19

**extremely**
5273:8,22

**extrinsic**
5202:17,18 5203:14,15,
16 5235:18 5280:20
5296:3 5332:12
5358:22 5359:12,18



**eyes**
5392:1

---

**F**

---

**face**
5215:17 5263:6
5325:13

**faced**
5209:19

**facetious**
5234:19

**fact**
5164:25 5173:14,15
5179:8,21 5181:15,19
5190:2 5215:25 5218:6
5225:16,18 5232:6,8
5233:21 5236:5,12
5237:15 5238:21
5239:9 5268:10 5271:8,
12 5272:10 5284:5
5290:4 5291:6 5297:11
5315:19 5316:13
5325:16 5331:9
5341:23 5346:10
5351:21 5353:23
5357:5 5359:13
5365:10 5371:9
5382:12,21 5384:25
5385:18 5387:15
5388:21 5389:16

**factor**
5388:21

**factored**
5242:15

**facts**
5225:20 5227:17
5228:2,3 5231:7,9,24
5233:7,8 5235:16
5237:2 5256:6,9,10
5330:24 5345:1
5365:19 5366:11
5369:20 5385:14
5387:17 5388:8 5393:1

**factual**
5205:11 5206:18
5207:12 5218:19
5227:6 5230:4 5231:25
5239:13 5287:22
5294:25 5350:18,20,22,
25 5351:9,25 5352:2

**failed**
5369:25

**failure**
5364:15

**fair**
5202:21 5226:10
5243:24 5244:1 5251:9
5262:5 5276:21 5356:8
5371:14

**fairest**
5272:13 5274:20
5277:11

**fairly**
5194:25 5230:21
5247:19 5263:7,10
5264:4 5380:21

**faith**
5222:21 5274:14

**Falconbridge**
5158:4,5 5171:1

**fallacious**
5160:23

**false**
5216:17

**familiar**
5189:5 5191:19

**family**
5363:7 5392:17

**famous**
5183:4

**fancy**
5262:20

**farm**
5392:23

**farmer**
5392:18

**fascinating**
5366:1

**fatal**
5223:9,10

**favorite**
5359:15

**favour**
5189:25 5378:23

**favourite**
5150:15

**feasible**
5221:18,22

**feature**
5382:23

**federal**
5255:17

**feel**
5220:22 5379:20

**FETZER**
5395:20

**fiduciary**
5160:5,9 5171:24
5187:19

**field**
5151:22 5152:15
5189:10 5196:2 5207:5
5208:9 5382:22

**fields**
5234:11

**fight**
5221:19

**fighting**
5214:11 5394:10

**figure**
5322:6

**filed**
5150:15 5215:11
5362:20

**filing**
5225:25 5235:14
5237:24 5258:9
5335:20

**filings**
5236:9 5266:10 5267:8

**filled**
5341:20

**finally**
5261:5 5275:7 5276:22

**finance**
5233:13

**financial**
5234:2 5343:18
5345:15 5361:23

**find**
5210:24 5339:10
5344:15

**findings**
5225:16,18 5232:5
5268:10

**finds**
5253:7 5371:19,21
5383:19

**fine**
5162:25 5248:8 5278:2
5295:17,25 5375:2
5380:1

**finish**
5344:23

**finishing**
5376:13

**firm**
5280:11

**firms**
5262:17

**five-year**
5366:9 5367:2,13,19
5368:8

**fixed**
5348:25

**flap**
5280:7

**flaw**
5393:5

**flawed**
5261:25 5382:3

**flaws**
5391:15

**flexibility**
5250:20

**flies**
5325:13

**flip**
5346:13 5355:5

**flow**
5203:21 5324:14
5382:8

**flows**
5210:6,8 5242:23

**focus**
5150:5 5207:24
5241:23 5242:19
5243:15 5293:3

 

**focused**
5240:15 5260:22

**focuses**
5211:25 5241:9

**focusing**
5242:16 5249:14

**folks**
5149:20 5224:22

**follow**
5150:13 5168:11
5358:20

**footnote**
5342:19

**foregoing**
5395:5,12

**foreign**
5353:17 5392:9

**forever**
5191:10

**forget**
5315:4

**forgive**
5156:7

**forgot**
5371:1

**form**
5256:15 5280:16
5301:5 5341:13 5360:1

**formality**
5236:13

**formalize**
5292:3

**formalizing**
5290:2

**forms**
5299:17

**formula**
5188:23

**formulation**
5194:20 5388:10

**fortified**
5187:6

**fortifies**
5176:23

**forward**
5207:21 5212:3
5227:22 5228:11
5229:5 5243:9 5316:5
5325:20,25 5360:1,12
5361:16

**forwarded**
5375:16

**fought**
5371:4

**found**
5163:23 5178:15
5252:22 5256:6 5332:9
5346:10 5382:7,8

**foundational**
5392:16

**Foundry**
5293:13 5324:25
5325:1,23 5361:12

**fourth**
5154:7

**France**
5151:16 5373:17,19,22

**Francey**
5163:24,25 5164:3
5307:20 5308:9
5309:20,22 5314:6

**frankly**
5219:22 5220:14
5241:4 5294:7 5325:16
5363:6 5368:20

**fraudster**
5164:7 5308:15

**French**
5361:7,9,17,23,24
5373:18

**frequently**
5274:17

**fresh**
5378:8

**friend**
5279:5 5281:9 5288:11,
23 5296:3 5335:9
5359:19

**friends**
5257:18 5280:8,20
5281:1 5285:8 5292:17
5310:16 5311:14

**front**
5301:11 5340:23

**fruits**
5324:23

**full**
5160:24 5163:12
5179:9 5180:15
5184:13,14 5223:8
5244:20 5263:15
5268:8 5276:18
5287:24 5310:21
5394:7

**fully**
5218:4 5241:7 5326:25
5332:24

**functions**
5233:15 5257:2
5330:13 5331:8

**fund**
5263:16 5343:8

**fundamental**
5213:1 5363:20
5380:15 5384:10,21
5391:8,22 5393:7,12,
14,16

**funding**
5191:3

**funds**
5244:13 5250:12
5251:11 5252:24
5253:17 5382:19

**fuss**
5349:15

**future**
5209:2 5220:10
5263:22 5350:7
5389:25

**G**

**gain**
5348:17

**gained**
5149:12

**game**
5222:10

**garnered**
5262:13

**gauge**
5208:20

**gave**
5160:15 5172:19
5177:14 5198:22
5208:25 5211:9
5223:19,20,24,25
5232:24 5235:10,11
5272:16,17 5275:4
5294:20 5299:12

**Gelber**
5318:1

**general**
5155:8 5244:14,15
5308:17 5359:2 5390:7

**generally**
5159:11 5383:17

**generate**
5249:10

**generated**
5248:24 5362:2 5388:4

**generates**
5373:1

**genesis**
5235:12

**genius**
5223:24

**gentleman**
5343:14

**geographic**
5233:15 5257:9

**German**
5159:20 5170:25
5175:8 5373:20

**Germany**
5373:17,20

**get all**
5331:9

**gift**
5362:10

**give**
5161:20 5166:9
5171:19 5172:22,23
5174:8 5181:10
5204:19 5209:14,16
5223:18 5224:22
5226:15,16 5237:2
5250:17,19 5265:18

5284:24 5288:12
5297:23 5313:4 5338:8
5341:11 5348:23
5350:7 5364:12
5366:16 5368:5
5370:19

**giving**
5157:19 5158:23
5181:11 5306:23
5324:8 5369:4

**global**
5227:9 5233:12 5235:9
5237:10,18 5238:25
5242:3 5249:14
5251:21 5252:3 5261:8
5365:15 5382:1
5383:15 5390:12

**goal**
5206:1 5372:12
5391:24

**going-concern**
5217:14 5270:17

**golden**
5366:3 5367:25

**good**
5149:5,7,9,22 5155:23
5211:19,20,21,22
5239:23 5240:2
5267:13,14,15,19
5268:1 5274:14
5278:13,15,16,18,20,21
5296:14,15 5319:3
5358:15,17 5370:18
5375:5 5387:2,3

**goodwill**
5364:24 5369:13,17
5371:22 5372:13,15,17,
20,21,25 5373:12,21

**Gottlieb**
5279:16 5284:13
5288:3 5294:19,22
5295:4,15,19,23
5296:1,8,9,13 5298:10
5299:4 5300:1,7
5303:5,10,23 5304:19,
21 5305:10,17 5306:21
5307:5 5308:4,8
5313:24 5315:2
5316:25 5317:5 5321:6,
11 5323:10,13,19
5324:13,19 5326:5,9,
12,16 5328:13 5332:1,

13 5334:7,13 5335:2,6
5336:23 5337:6
5339:11 5340:1 5341:2,
9,17 5343:2 5348:18
5350:1 5351:7,11
5352:8,11,14,18
5356:12,16 5357:12,21
5358:12 5360:4

**govern**
5357:23

**governs**
5156:4 5269:7

**grant**
5166:4,7 5167:1,3,21
5171:3 5172:9,25
5177:22,23,24 5178:2,
11 5183:10 5185:12,23
5187:13,15 5194:21
5284:17 5286:10,17
5287:9

**granted**
5151:18 5168:12,15
5171:10,25 5178:3
5196:13, 5199:24
5309:16 5339:6

**granting**
5158:9,11 5171:9
5183:15 5184:5
5187:12

**grantor**
5167:4

**grants**
5167:22 5176:3
5185:16

**graph**
5370:22

**graphic**
5360:1

**gratuitously**
5214:20

**great**
5158:5 5159:23 5241:5
5325:11 5388:4

**greater**
5168:17 5231:15

**green**
5210:20 5211:4
5245:11 5364:6 5370:2
5372:16 5373:15,23

5374:2,10

**Green's**
5228:12

**Gross**
5149:6,23 5156:11
5163:1 5174:23
5184:13 5203:1 5210:3
5211:22 5224:21
5225:9 5239:24 5250:8
5254:20 5266:6
5267:15 5268:18
5270:6 5278:1,14,19
5279:5 5280:1 5296:10,
13 5301:19 5304:22
5315:3,23 5332:22
5333:2,16,17 5334:23
5335:18 5348:12
5353:15 5354:9 5358:4
5377:13 5388:15
5392:14 5394:16

**Gross's**
5165:22 5233:4
5305:12

**ground**
5238:24 5366:11

**grounded**
5206:9 5244:10
5260:25

**groundwork**
5239:14

**group**
5185:9 5198:20 5255:3
5257:1,18 5258:1,6
5259:5,10,13,14
5260:19 5262:8
5320:14 5330:12
5348:21 5385:19
5386:2

**group's**
5259:17

**groups**
5337:22

**grow**
5273:1

**guarantee**
5230:15 5242:1
5252:21 5256:22
5394:7

**guaranteed**
5219:19

**guaranteeing**
5238:11

**guarantees**
5252:16 5256:19
5260:13,23

**guess**
5207:8 5353:15

**guidance**
5382:20

**guide**
5297:17

**guidelines**
5270:15 5294:10,11
5329:16,17 5336:8,12
5337:5

**H**

**half**
5225:25 5238:20

**halfway**
5378:5

**hallmark**
5302:15

**Hamburger**
5280:21 5281:2

**Hamilton**
5220:24

**hand**
5279:15 5285:6
5328:24

**handed**
5279:25 5310:21
5380:13

**hands**
5160:9, 5250:18
5394:12

**Hang**
5182:15

**happen**
5262:21

**happened**
5164:18 5324:22
5362:14 5364:10

**happy**
5277:14,15 5295:19
5340:22

 

**hard**
5368:21 5370:24
5371:9,10,12

**harm**
5257:22 5258:2,4

**Harmer**
5225:12

**head**
5233:12 5235:7
5238:18 5349:13

**heads-up**
5306:23

**health**
5263:4,7

**hear**
5224:12 5227:24,25
5228:2 5268:14
5284:10 5333:9 5372:3
5374:20 5376:22

**heard**
5242:9,11 5270:18
5271:5 5275:8 5281:23
5285:8 5292:9,10
5324:18 5325:17
5370:4,5,7 5380:11
5387:6 5390:23

**hearing**
5217:19,20 5218:8
5219:2,21 5395:9

**hearings**
5220:1

**heart**
5229:17 5230:7

**heartily**
5279:11

**hearts**
5274:15

**heavy**
5382:15

**held**
5152:7 5154:19,25
5162:9 5166:18
5176:12 5302:6,13
5303:3,7,13,14,15,16,
24 5344:7 5353:18
5354:13 5355:19,20
5382:17

**helped**
5238:18

**Helper**
5280:21 5281:2

**helpful**
5177:21 5232:4
5366:10

**Henderson**
5390:7

**hereof**
5289:20

**hey**
5387:14

**high**
5262:21

**high-cost**
5237:15

**high-interest**
5366:13 5367:9,11,15,
21,23 5368:1

**high-tech**
5369:22

**higher**
5263:25 5264:1

**highest**
5214:8

**highlight**
5189:6 5363:24

**highlighted**
5157:16 5247:1

**highlights**
5202:15

**highly**
5257:7 5306:25

**hindsight**
5274:20

**hinges**
5327:14

**hired**
5344:17

**historical**
5178:6 5184:14 5373:2

**historically**
5348:6

**history**
5158:6 5200:13,16
5201:11 5206:20
5218:22 5287:20
5353:14

**hit**
5270:22

**Hoeffner**
5225:12 5226:21
5229:5 5239:16,19,20,
23 5240:3,24 5242:12
5245:2,3,9,21,24
5246:2,5 5248:2,9
5253:12,17,23 5254:22
5260:16 5264:10,11,13,
21,23 5265:7,13,25
5266:3,17,21,25
5267:3,7 5277:5

**Hoeffner's**
5276:23

**hold**
5165:15 5166:10
5186:5 5187:3 5304:10,
25 5359:23

**holder**
5168:18 5187:21
5265:11 5315:10
5331:6,10 5343:24
5346:2

**holders**
5258:11

**holding**
5175:15 5187:21
5242:6 5280:13
5282:22 5302:17
5303:2,24 5353:20
5356:2

**holds**
5185:3 5272:6 5303:20
5315:4 5355:12

**holdup**
5223:19

**hole**
5348:14

**holes**
5280:22 5281:2

**holiday**
5377:19

**home**

5164:5 5308:19
5309:21

**Honor**
5214:13 5217:22
5221:9 5222:6 5224:17
5255:10 5277:21
5286:4 5287:6 5369:7

**Honor's**
5220:5

**Honors**
5211:25 5254:11
5267:19 5268:7
5274:16 5277:12

**Honors'**
5255:5

**Honour**
5149:9,17 5169:12
5182:17 5198:14
5200:9 5211:18
5224:21 5225:9 5230:1,
16 5231:24 5232:22
5296:9 5298:11
5301:19 5305:21
5313:25 5315:22
5324:20 5327:3,13
5329:11 5340:22
5352:23 5353:9 5375:1,
13 5379:11

**Honours**
5204:19 5377:4
5378:12 5380:8,21

**Honours'**
5154:23

**hope**
5214:24 5225:5 5280:1
5333:10

**hopelessly**
5387:5

**hoping**
5210:15

**hour**
5375:21 5378:14,15

**hours**
5375:19,24 5376:11

**House**
5159:18 5162:2 5175:7

**Huffard**
5207:21 5210:5 5373:3



**huge**
5237:9 5259:7 5321:25
5334:20 5349:15

**hundred**
5323:20,21

---

**I**

**iconic**
5365:21

**idea**
5157:5 5162:3,4 5166:1
5169:20 5172:12
5173:2 5184:6 5187:20
5320:11

**identified**
5221:15 5227:11
5247:16 5265:14
5389:6

**IES**
5166:18 5205:4
5321:19

**IFSA**
5213:13 5220:8,13
5223:25 5236:10
5362:20 5382:10,17,20,
23 5390:19,20

**ignore**
5213:22 5271:2
5282:12,14 5285:9
5293:5 5393:6

**ignores**
5255:8 5393:11,16

**illustrates**
5159:12

**illustration**
5243:5

**imagination**
5244:1 5360:25

**imagine**
5368:21

**IMAX**
5301:8

**immediately**
5157:4 5166:3

**impact**
5190:19 5212:21
5335:15,22 5336:4

**impacted**
5335:10

**impaired**
5259:24

**impairment**
5361:17

**impinge**
5173:15

**implementation**
5254:13

**implementing**
5213:17

**implicated**
5212:23

**implication**
5154:18 5167:2

**implications**
5150:11 5221:1

**implies**
5167:4 5172:8

**imply**
5391:5

**importance**
5196:15

**important**
5151:10 5167:2
5169:11,25 5171:5
5175:16 5178:13
5205:11 5226:7 5237:4
5240:10 5244:17,25
5246:17 5251:22
5289:1 5293:3 5294:2
5297:17 5299:15
5300:24 5308:22
5319:5 5320:10 5327:3
5338:12, 5350:20,21,22
5370:7 5372:10 5381:7
5382:19 5383:13

**importantly**
5207:5 5222:7 5226:11
5245:13 5246:23
5384:14

**impose**
5161:15

**imposition**
5387:21

**impossible**
5347:17

**improvements**
5340:14

**in-chief**
5224:16

**inadmissible**
5204:14 5205:8
5346:18

**inapt**
5272:16

**incentive**
5267:25

**inception**
5214:7 5322:10

**Incidentally**
5156:2

**incidents**
5171:2

**include**
5216:7 5311:18
5375:20 5389:21

**included**
5191:17 5233:13
5249:9 5267:10
5309:18 5374:8

**includes**
5167:11 5283:12
5327:5,9,18 5350:25
5367:20

**including**
5160:4 5256:22
5279:24 5309:7
5310:19 5311:15
5327:6 5345:8,23

**income**
5294:14 5313:4 5334:1
5361:14 5391:21
5393:15

**inconsistency**
5181:15

**inconsistent**
5166:1 5168:8 5172:12
5178:3 5183:18 5184:6
5187:17,20 5191:12,16,
21 5217:11 5222:18
5325:24

**incorporate**
5187:14

**increasingly**
5240:6

**incredibly**
5262:21 5304:11

**incurred**
5209:1 5247:7,11

**indentures**
5256:14 5258:24
5260:3

**independent**
5154:5 5257:4

**independently**
5245:10 5277:1

**indications**
5355:18

**indices**
5159:2

**individual**
5236:21 5252:20

**individually**
5395:10

**indivisible**
5347:9,10,24

**inequitable**
5229:7 5241:20 5243:6
5246:22 5262:1,12
5263:19

**infer**
5391:5

**inference**
5309:22

**infirmities**
5223:7

**information**
5266:4,15 5267:7,9
5365:11

**inhale**
5318:23

**initial**
5150:14 5200:18
5208:3 5215:4 5222:12
5248:3 5258:13,16

**initially**
5272:25

**injury**
5223:1

 

**innovative**
5348:22

**inquiry**
5163:19

**inside**
5280:7

**insignificant**
5233:22

**insolvencies**
5263:22

**insolvency**
5216:13 5229:18
5230:8 5235:14
5237:13 5238:20
5270:16 5325:15,16
5332:8 5334:6 5382:1
5383:15,16 5384:22
5385:7 5387:13,24
5389:4,17 5390:2,12,16
5391:4,8

**insolvent**
5361:20 5367:7

**inspection**
5360:21

**instance**
5276:19

**instances**
5272:10

**institution**
5343:18

**instructive**
5385:17

**insurance**
5163:25 5164:4,9

**insurer**
5164:8

**intangible**
5250:24 5330:2,19,23
5331:3 5360:16

**intangibles**
5330:4 5360:24

**integrated**
5152:5 5232:11 5251:1
5257:7 5360:23

**intellectual**
5154:17 5179:4
5184:10,16,19 5215:12

5238:3 5239:1 5241:17
5263:2

**intend**
5228:20 5285:16

**intended**
5204:17 5205:3 5212:4
5214:23 5274:15
5275:1 5304:9 5320:23
5390:15

**intent**
5203:25

**intention**
5160:10 5204:1,13,15
5205:7 5285:19
5299:13 5301:14
5302:4,12,15,20
5305:23,24 5307:2
5355:15

**intentions**
5206:4 5297:13,16

**inter-entity**
5252:16 5255:23
5256:18

**intercompany**
5230:13 5252:17,21
5256:22

**interest**
5153:20,25 5160:2,4
5161:2,11,17,19,24
5163:14,17 5165:9
5166:2 5170:8,15,22
5176:25 5178:2,11
5207:1 5218:2 5220:16
5231:4,6 5247:23
5252:18 5253:8
5263:15 5264:20,24
5265:10 5296:24
5302:11,16 5304:13
5310:12 5311:7,12,15
5315:5 5335:16 5339:2
5347:10,12 5348:2
5363:8 5373:25 5374:7
5381:4

**interested**
5334:25

**interesting**
5307:13 5341:24
5364:7

**interests**
5151:10 5190:24,25

5215:19 5219:13
5227:16 5252:9 5255:3
5261:6 5262:11 5268:2
5270:3,16 5271:20
5272:15 5273:4 5275:8
5276:16 5281:7,18,25
5283:21 5286:13
5291:3 5292:11
5359:25 5364:11
5374:20 5375:19
5376:18

**interfere**
5197:17

**Internal**
5368:15

**international**
5390:10

**interpret**
5232:6 5357:14

**interpretation**
5172:18 5173:7
5194:23 5203:22
5204:4 5206:7 5211:10
5227:22 5228:4,5
5245:19 5268:5,17
5269:1 5296:21 5297:3,
4 5298:7 5301:16
5307:12 5320:22
5322:11,12,23 5328:6,
10 5334:4 5345:20
5353:5

**interpreted**
5154:16 5178:5 5301:2
5320:7

**interpreting**
5205:23 5297:20

**interpretive**
5206:12

**interprets**
5316:9

**interrupt**
5162:6,23 5295:22

**interrupted**
5200:11

**intersects**
5380:20

**interweaves**
5169:16

**invent**
5332:20 5337:22
5338:11

**invented**
5343:16 5364:3

**inventing**
5234:12

**invention**
5336:4 5337:8,14
5338:18 5339:3
5344:17

**inventions**
5192:11 5337:23
5340:13

**inventive**
5332:18

**inventor**
5192:14,18 5193:1,5
5295:8 5337:17
5342:22 5343:16

**inventor/employee**
5338:25

**inventors**
5192:20 5193:23
5238:8,9

**inventorship**
5238:5 5335:8

**invest**
5191:7

**investment**
5345:9

**investors**
5258:13, 5263:16,24

**invite**
5289:18 5364:24

**involuntary**
5230:20 5262:22
5380:10

**involve**
5257:24

**involved**
5219:25 5238:2
5262:17 5271:7
5390:13

**involvement**
5217:9 5219:24

**IP**
5151:11,14 5152:7,10,
12 5153:2,10,20,25
5176:2 5177:13,15
5178:12 5180:23
5183:9 5189:17
5190:25 5191:2 5192:4
5205:5 5213:16 5216:6
5217:16 5218:13,14,17,
20 5236:6,12,20
5241:10 5249:14
5251:21 5270:2 5273:1
5283:13,17 5288:7
5291:13 5293:21
5294:20 5321:21
5322:1,17 5329:1,5
5332:16,17 5335:7,24
5337:13 5345:16
5346:24 5347:8 5350:7
5351:18 5353:6 5361:4,
6,25 5362:2,6,11,21,25
5364:19,23 5365:2,15,
22 5369:10 5370:6,9,
12,16,20 5371:18,24
5373:9,23 5374:1

**IPCO**
5196:19 5221:17,21,25
5223:15

**iphone**
5250:9

**Ireland**
5151:16

**ironic**
5261:3

**irony**
5281:6

**irrational**
5272:19 5273:25
5393:9

**irrationality**
5272:22

**irreconcilable**
5284:20 5287:8

**irreconcilably**
5222:18

**irrelevant**
5261:7

**irresponsible**
5381:17

**issue**
5170:4 5173:17,20,21
5198:23 5209:10
5214:14 5216:1,20
5223:13 5227:1,19
5236:7 5237:14
5240:12 5241:22
5258:1 5263:2 5264:24
5270:23 5271:18
5295:5 5299:23
5300:12 5333:1
5343:20 5345:19,20,21
5346:19 5349:14
5353:22 5361:5,18
5372:1 5388:23 5394:9

**issued**
5354:21

**issues**
5150:3,12 5153:17
5207:23 5209:20
5221:15,20 5222:1
5224:13 5227:11
5228:8 5229:18
5252:19 5261:13
5268:5 5270:19
5271:14 5331:15
5332:10 5336:21
5339:17 5364:22
5380:15,23 5381:3,4

**Italy**
5373:13

**iterations**
5270:1

---

**J**

---

**Jewish**
5377:19

**Jim**
5365:5

**job**
5241:5 5268:4

**John**
5220:25 5370:10

**join**
5276:22

**joined**
5277:1 5388:23

**joint**
5153:6,9 5154:3,

5190:20 5191:5,9
5210:7,9 5279:13,22
5285:3,16 5287:10,11
5293:25 5352:17
5357:10 5383:16
5386:22 5387:20

**jointly**
5153:3,6 5288:7
5294:18,20 5329:16

**Judge**
5149:6,22 5156:11
5162:25 5165:21
5174:23 5184:13
5203:1 5210:3 5211:22
5224:21 5225:9 5233:4
5239:24 5250:8
5254:20 5266:6
5267:14 5268:18
5270:6 5278:1,14,18
5279:5 5280:1 5296:10,
13 5301:19 5304:21
5305:12 5315:3,
5332:22 5333:2,16,17
5334:23 5335:18
5348:12 5353:15
5354:9 5358:4 5377:13
5392:14 5394:16

**judges**
5358:16 5378:11

**judgment**
5223:16

**Judicial**
5222:17

**jump**
5283:24 5337:7

**jurisdiction**
5193:19 5237:16
5247:12 5249:5
5251:16 5252:7
5254:12 5256:23
5260:4 5271:25 5377:5
5381:22 5382:4,7,18
5383:10,22,24 5384:2
5388:12

**jurisdictions**
5193:19 5216:15
5229:1 5230:15
5252:20 5253:21
5254:16 5271:11
5336:16 5342:5

**jury**

5271:13

**Justice**
5149:3,23 5156:14
5162:21 5164:1
5191:20 5211:22
5221:6 5239:24
5267:15 5269:2
5277:18 5278:16,22
5280:3 5281:17 5283:2
5291:22 5294:4
5296:14 5297:2
5298:23 5299:9 5305:7
5316:18 5336:5 5338:4
5353:13 5358:19
5359:1 5379:19
5391:20 5392:15
5394:5

**justifications**
5261:9

**justify**
5368:24

---

**K**

---

**Kanute**
5359:22

**Ken**
5211:23

**key**
5150:7 5179:4 5232:17
5238:25 5280:16
5382:22

**kick**
5279:3

**kickoff**
5350:2 5360:5

**Kilimnik**
5259:18

**kind**
5168:9 5189:18
5198:25 5205:12
5223:15 5295:9

**King**
5359:22

**Kinrich**
5207:21 5208:2,5
5210:7

**knew**
5263:13 5304:12



**knowingly**
5223:25

**Kruger**
5217:9

**Kyrgyz**
5299:2

**Kyrgyzaltyn**
5354:15 5355:12,20

**Kyrgyzstan**
5299:3,4

---

**L**

**labelled**
5156:15

**labels**
5214:20,22 5215:1,9
5222:20

**labour**
5337:25

**lack**
5253:2

**laid**
5277:5

**land**
5210:2,3 5221:5 5372:8

**landed**
5335:1 5364:14

**Landesbank**
5159:19

**lands**
5210:3

**language**
5176:22 5180:9
5183:22 5186:3
5188:15 5197:24
5203:25 5205:15,19
5269:22,23 5270:20,24
5286:25 5304:16
5308:23 5359:15

**large**
5150:25 5321:21

**largely**
5273:5

**largest**
5235:5

**late**
5222:10 5366:4

**lateral**
5191:21

**launched**
5202:18 5216:21

**law**
5155:22 5156:3,5,6,11
5158:8 5161:1 5163:4,6
5164:14 5167:5
5177:17,18 5191:15
5192:4,5 5222:11
5223:5 5229:1 5241:7
5255:17 5268:5,11
5269:1 5279:17
5294:21 5295:6,11,12,
14 5297:4,10, 5299:18,
22 5302:9 5304:8
5306:14 5307:8,23
5308:12 5309:5,12
5310:8,16,17,22
5311:3,16,17 5313:15
5314:8 5315:18 5316:9
5317:13 5319:22
5332:19 5337:13,15,21
5338:2 5341:23 5342:2,
3,4,8,10,11,20 5343:4
5346:15,24 5352:13,15
5357:8,20 5376:8
5387:20,21,25 5388:2,
7,17 5389:4 5392:17

**laws**
5251:16 5252:7,21
5342:8 5383:23

**lawsuits**
5200:17,18

**lawyer**
5305:2,18 5306:16
5390:8

**lawyers**
5292:20 5306:19
5320:17

**lays**
5292:19

**Lazard**
5365:14

**lead**
5207:19 5244:7
5248:12 5251:9

**leadership**

5237:5

**leading**
5149:25 5204:4

**leads**
5152:21 5244:11
5331:25 5367:5

**leaps**
5229:8

**learn**
5272:3

**lease**
5272:4

**leasing**
5272:6,8

**leave**
5210:1 5265:10
5319:24 5329:12
5360:24 5361:1 5368:8
5374:17 5381:18

**leaves**
5187:18

**leaving**
5195:17

**led**
5241:24

**left**
5149:10 5227:6
5228:15 5242:6
5246:12 5255:21
5310:23 5370:15

**legal**
5150:7 5151:8 5153:22
5154:12,19,24 5155:3,
7,10,15,16 5156:24
5157:1,4,12,13,19
5158:1,5,11,14,19,20
5159:1,6,7,9,13,15
5160:16 5161:3,5,7,19,
20,21 5162:1 5163:7
5164:17,21,22 5165:13,
18,20 5166:3,10,12,17
5168:9 5169:8,20
5172:1,2 5173:3,13,18
5175:8,21 5183:9,14
5184:4 5187:11,21
5188:15,16 5190:19
5197:4,18,25 5198:12
5200:6,14 5207:1,25
5208:6 5209:21 5210:2
5218:19 5227:18,19

5233:13 5234:7 5236:4
5255:19 5269:2,17
5270:15 5279:18,19
5284:12,14,16 5285:1,
2,5 5286:17,18 5287:7,
9,13 5292:18,21
5296:22 5301:23,25
5302:5,10,13,23
5303:7,20,24 5304:3,5,
7 5307:13,15,22
5310:1,2,5,7,18,25
5311:14,18,20 5312:9,
20,22,23 5313:10,19,22
5314:4,7,15,16,19,22
5315:4,7,9,14,24,25
5316:6 5323:23
5325:19 5329:24
5330:1,13 5331:4,6,10
5334:19,21 5346:1
5363:3,16,17 5374:3,6
5384:3,11,15,18,21
5385:9 5387:16,19
5388:12,13 5391:8
5392:11,22,23 5393:2

**legally**
5154:5 5228:23
5263:11

**legislative**
5216:4,24 5217:5

**legitimate**
5169:17,18 5244:5

**legitimately**
5244:10

**lend**
5277:8 5352:3

**length**
5179:1 5300:13
5317:12 5319:25
5320:3,9,11,16,18,20
5321:4 5328:8 5329:12
5330:21

**lengthy**
5257:19

**lens**
5194:10

**lessee**
5272:10

**level**
5230:18 5241:11
5254:9 5391:20,22

**levels**
5238:3 5262:18

**leveraged**
5223:23

**liabilities**
5255:22,23 5393:24

**liability**
5318:7,19 5319:6

**licence**
5151:18,21 5152:3
5153:25 5162:15,17
5166:5,7,13 5167:1,2,4,
6,14,16,22 5168:1,7,16,
18,19 5169:9,16,19,22
5170:3,8,14,24
5171:10,24 5172:1,20,
23,25 5174:1 5176:3,5,
9,23 5177:9,10,14
5178:9 5183:12
5188:22,24,25 5189:24,
25 5190:2 5194:8,15,
18,21 5195:4,11
5196:22 5198:21
5199:14,17,18 5201:3
5202:1 5206:25 5207:7,
17 5208:16,23 5209:2,
8,11,13 5211:5 5323:3,
6 5324:2 5325:8
5343:25 5344:3 5345:5,
12,16,23

**licences**
5180:20 5183:10,15
5184:6 5187:12 5188:1
5198:22 5201:24
5202:6,7 5227:21
5228:7,10 5236:8,11

**license**
5197:20 5215:22
5216:15 5243:13
5248:15 5293:13

**licensed**
5162:9 5175:14
5180:25 5188:6 5195:8
5198:9 5237:7 5272:25
5344:5 5361:14

**licensee**
5167:23 5168:1
5189:12, 5194:13

**licensee's**
5168:2 5176:18

**licensees**
5174:16,21 5195:8
5196:10,24 5197:12,19,
23 5211:9 5294:12,16

**licenses**
5153:21 5172:6
5215:13,19,21 5216:6,9
5218:16 5269:9
5270:25 5273:8,11,19

**licensing**
5184:18,23 5185:25
5195:5 5196:18
5197:14 5200:16
5201:12,24 5236:19

**licensor**
5345:6

**life**
5280:18 5325:15
5333:20

**lifestyle**
5278:3

**light**
5206:10 5217:21

**likening**
5234:20

**likewise**
5223:10

**Lilly**
5167:8 5170:6 5194:12,
20 5297:25

**limb**
5159:21

**limit**
5205:11,16 5393:21

**limitations**
5213:10

**limited**
5168:5, 5177:18
5184:10 5185:14
5189:10 5194:14
5235:18 5309:15
5360:7

**limited-risk**
5373:7,8

**limiting**
5384:15

**limitless**
5384:9

**limits**
5205:15

**lines**
5227:4 5232:13
5233:12 5234:4 5257:8
5281:20 5283:13
5289:23 5290:1
5291:20 5354:18
5371:8

**link**
5157:1

**liquidating**
5383:15 5391:4

**liquidation**
5291:11

**liquidity**
5385:25

**list**
5193:1 5201:24 5202:3,
9 5343:8,12

**listen**
5377:6

**listened**
5389:10

**litigated**
5220:11

**litigation**
5200:23,25 5213:23,25
5215:5 5219:9 5223:16
5225:23 5229:13
5324:25 5325:1,25
5361:13

**live**
5278:2

**lively**
5378:11

**lives**
5262:25

**living**
5271:24

**loan**
5256:11

**loaned**
5343:18

**loathe**
5377:9

**local**
5159:23,24 5161:16

**lock**
5379:12,13

**lockbox**
5251:11 5382:19
5389:8

**logic**
5303:8

**logos**
5257:5

**long**
5225:23 5249:7
5295:18,22 5348:23
5357:24 5377:8

**longer**
5195:10 5202:23
5258:14 5259:2

**look-back**
5366:8,9,12 5367:14
5368:9

**looked**
5186:10 5297:11,12
5299:11 5317:9 5345:7,
11,14 5349:5 5352:25
5355:14 5356:10

**lopsided**
5230:21

**Lord**
5160:19

**Lords**
5159:18 5162:2 5175:8

**LORRAINE**
5395:4,19

**lose**
5181:11 5212:19
5348:16

**loss**
5226:5

**losses**
5329:8 5335:13

**lost**
5149:12 5199:15

**lot**
5150:24 5210:1
5242:10 5267:24
5327:23 5387:3



**low**
5231:1

**low-revenue**
5237:15

**lowly**
5232:25

**LRES**
5373:6

**lucrative**
5273:8

**lunch**
5267:23 5277:24

**LUNCHEON**
5278:9

**luxury**
5272:1

---

**M**

**Mackeen**
5311:24

**made**
5150:9 5178:14
5187:25 5199:15
5204:3 5214:6 5215:24
5218:15 5243:3 5250:6
5257:12 5306:24
5314:6 5319:11 5324:5
5345:10,12 5349:15
5350:9 5355:23
5362:19 5365:16
5372:18 5386:8 5387:1

**magnitude**
5277:3

**Maguire**
5278:16,18,21,23,24
5279:2,10 5280:3,6,12,
15 5285:23 5286:3,8,23
5287:5,19 5289:7,13
5290:15 5291:5,14,18,
25 5292:8 5295:2,20,25
5296:17 5297:2
5300:25 5316:3
5319:17 5326:20
5335:9 5337:12 5349:7,
18 5358:13,15,18,19,24
5362:18,22 5368:7,13,
18 5369:6,9 5371:14
5374:16

**main**
5281:24 5294:9 5370:4

**maintain**
5209:1 5256:12 5273:6

**maintained**
5172:15

**maintenance**
5330:17

**major**
5150:11,18 5207:16
5229:18 5268:19
5362:6 5370:11

**majority**
5154:13 5165:9
5276:18

**make**
5168:21 5173:12
5181:3,9 5189:12,13
5195:17,18 5196:17,20
5209:14 5213:8
5214:17 5238:12
5250:1 5260:7 5262:20
5267:25 5273:15
5274:19 5277:6
5300:12 5301:18
5319:12 5321:17
5324:3 5336:10 5337:3
5339:7 5356:24 5371:4,
6 5376:18 5377:25
5378:6,19 5380:5
5386:24

**makes**
5170:15,18 5187:8
5189:24 5191:13
5247:6 5286:12 5292:1
5311:23 5313:13
5315:6,11 5319:22
5322:13 5329:6,10
5337:22

**making**
5195:25 5249:13
5251:21 5253:20
5286:15 5324:17
5362:10

**Malackowski**
5207:22 5210:5 5365:6,
17 5366:25 5372:1
5373:22

**Malackowski's**
5372:6

**malpractice**
5292:21

**man**
5332:2

**managed**
5250:25

**management**
5356:4 5385:24

**manager**
5308:17

**manner**
5185:9 5320:8 5352:3
5385:6

**manufactured**
5196:8

**map**
5232:3

**MARINO**
5395:4,19

**mark**
5225:10 5364:6 5390:9

**market**
5234:22 5235:1,5,6,9
5237:16,19 5238:5
5246:15 5258:10
5266:13 5267:6, 5273:9
5373:20

**marketed**
5196:8 5250:25

**marketing**
5232:15

**markets**
5237:20

**Marques**
5225:13

**marshaling**
5268:4,6

**massive**
5235:2

**Master**
5185:1

**mastered**
5365:18

**mastery**
5365:9

**match**
5247:6

**material**
5338:1 5348:22

**Mathematically**
5179:14

**matrix**
5205:11,12 5206:19
5207:12 5226:18
5227:6 5230:4 5231:25
5232:11,12 5233:25
5239:13 5257:7
5287:22 5294:25
5350:18,20,22,25
5351:10,25 5352:3
5358:25

**matter**
5155:8 5174:25
5190:22 5192:5 5193:7
5218:4,6 5226:4 5276:1
5289:20,22,24 5291:17,
18 5292:2 5296:20
5304:8 5307:23
5337:12,17 5338:2,16
5339:6 5342:8 5346:24,
25 5347:4 5355:2
5393:3

**matters**
5152:1 5194:17
5208:11 5221:13,14
5334:4

**Matthew**
5279:16

**maximize**
5212:17

**maximized**
5219:6

**maximizes**
5247:5

**maximum**
5378:13

**Mcconnell**
5266:7

**Mcdonald**
5220:25

**Mcfadden**
5234:3

**MD&A**
5356:4

**meaning**
5169:8 5285:1 5301:3
5320:7

**meaningless**
5161:12

**means**
5152:15 5154:16
5155:10 5157:25
5161:21 5180:23
5184:5 5204:16
5248:25 5249:2 5262:7
5292:23 5302:11,18,19
5303:3 5307:13
5310:19 5311:14
5316:1,2

**meant**
5165:7 5184:15
5205:14 5309:3

**measure**
5180:13 5181:2
5241:16 5327:22
5328:15,17,18

**measured**
5152:17 5154:4 5361:8

**measuring**
5190:10 5208:15,16

**mechanism**
5312:6

**mediation**
5221:6 5364:15

**meeting**
5350:2,3,4

**Mellon**
5376:9

**Melnick**
5225:13

**member**
5259:13 5260:19

**members**
5258:6 5259:4,9,
5330:12,20 5381:1

**memorandum**
5222:11

**mentioned**
5241:2 5269:5 5270:7

**menu**
5280:9

**Mercifully**
5341:21

**mere**
5294:12,16

**merged**
5255:20

**merit**
5319:21 5349:17

**merits**
5224:6 5381:19

**method**
5178:22, 5179:25
5242:17 5251:9 5260:7
5381:19,24 5382:21
5384:4 5388:9 5389:7
5391:3

**methodologies**
5218:19 5260:9

**methodology**
5153:15 5178:21
5190:10 5248:22
5261:10 5351:19
5388:22

**methods**
5243:7 5382:2,3
5390:21

**Michael**
5390:8

**middle**
5335:4

**migrated**
5393:24

**migration**
5361:5

**Miller**
5380:16 5385:13
5389:2

**million**
5239:11 5241:25
5248:18 5250:9
5265:17,19 5373:15,22,
23 5394:8

**millions**
5362:10

**mind**
5188:3 5204:20
5304:19 5336:11

**minds**
5154:23

**mine**
5305:13

**minimum**
5219:18

**minor**
5200:25 5300:19,20

**minute**
5202:2 5224:22
5259:19 5289:5

**minutes**
5203:7 5215:8 5268:21
5358:2,7 5375:19,22
5376:5,6,7,8,9 5378:14,
15

**mirror**
5183:17

**mirrored**
5184:19

**mirroring**
5183:22

**mischaracterizations**
5251:25

**misconceptions**
5240:20

**misdirection**
5392:24

**misguided**
5255:7

**misheard**
5317:1

**misinterpretation**
5284:19 5287:7

**misinterpreting**
5284:15 5287:13

**misleading**
5216:17

**misled**
5251:24

**misplaced**
5257:20

**misread**
5189:1

**misreading**
5188:9

**misrepresentation**
5214:21

**misses**
5285:12

**MNE**
5330:7,12

**model**
5181:16 5208:17,18
5233:2

**modern**
5312:12

**modest**
5245:14 5254:3

**modification**
5383:3

**modify**
5254:4

**moment**
5162:6 5175:21 5201:6
5253:8 5265:6

**money**
5159:23 5160:2,4,8,15,
17,25 5161:14 5181:9,
10,11 5191:7 5220:14
5230:2 5242:22 5249:1
5265:11 5326:14
5336:17 5343:19

**Monitor**
5149:24 5150:15
5211:23 5212:13
5215:11,17 5216:11
5217:22 5220:18,19
5222:5,7,19 5225:16,18
5228:11 5229:23
5243:10 5245:6,8,18
5281:25 5295:12
5326:11 5376:6
5385:15 5386:4 5394:9

**Monitor's**
5150:4 5212:8 5215:10,
23 5216:25 5217:12,17
5227:23 5229:3
5342:18 5370:1
5386:16,21

**months**
5257:17



**Montreal**
5191:19

**morning**
5149:6,7,9,22 5150:1
5164:15 5202:24
5211:20,21,22 5227:12,
25 5239:22,24 5268:2
5288:24 5294:5
5296:18 5375:1,23
5378:1 5379:3,7,10,18
5381:14 5390:22
5394:14,19

**morph**
5256:1

**mortgage**
5158:9,11,12

**mortgagee**
5158:12,16,19,25

**mortgages**
5158:4 5171:19

**motivation**
5294:7

**motor**
5164:5 5308:18
5309:21

**MOU**
5283:19,21 5285:8

**mouth**
5329:3

**move**
5165:21 5189:6
5252:10,11 5293:18
5307:7 5317:11
5319:23 5329:13
5360:12 5361:16
5362:4 5369:10
5377:14 5391:23

**moved**
5219:16

**MRD**
5308:14

**MRDA**
5150:16 5151:14,
5152:19 5153:7,15
5154:5,7,15,23 5156:4
5157:18 5162:8,12
5163:2 5165:23,24
5171:25 5172:11,14,25
5174:12,18 5175:10

5176:4 5178:7,10
5182:9 5183:14,16,17,
23 5184:19 5185:22
5187:9 5189:5 5190:6,
22,24 5191:12 5192:20
5193:14,16 5194:3,5
5199:4,16 5203:19
5207:3 5212:1,3,5
5215:17 5221:24
5223:10 5227:4,17,24
5232:6 5237:11 5238:1
5239:5 5241:7 5242:14
5250:22 5261:1,24
5262:3 5268:5,17,18
5269:4,6 5279:14,18
5281:11,13,14,22
5283:10 5284:6
5286:14 5288:2,6,12
5289:22 5290:5 5291:1,
6 5292:17,20 5293:10
5296:21,23 5299:24
5300:10,15,21 5301:17,
20 5304:24 5306:7
5310:6 5315:17 5316:8
5319:24 5320:13,17,21,
22 5322:10 5328:23
5329:4,19 5332:6,9
5333:5,15 5335:12,18,
19,20 5336:3,4,25
5347:1 5350:14,19
5353:5 5357:23
5373:10 5374:5
5390:13,14,16,23
5391:6,11 5392:7
5393:8,12,14

**multinational**
5251:1 5263:23
5271:24 5330:8
5336:15

**multiple**
5262:17 5389:13

**Murray**
5220:24

**music**
5387:13

**Mustn't**
5366:24

**mutual**
5206:4

**N**

**nail**
5394:10

**naive**
5385:4

**named**
5343:14

**names**
5257:6

**natural**
5284:25 5324:13

**nature**
5153:19,23,24 5163:18
5228:25 5230:5
5237:18 5251:5,6
5332:8 5347:24

**necessarily**
5163:12,15 5168:3,16
5194:13,17 5385:20

**necessity**
5258:24

**needed**
5218:25 5222:11
5273:1 5301:6

**NEESONS**
5395:20

**negotiate**
5189:18

**negotiated**
5336:25

**negotiation**
5219:9

**networks**
5360:7 5373:11

**Newbould**
5149:3,23 5156:14
5162:21 5164:1
5191:20 5211:22
5239:24 5267:15
5269:2 5277:18
5278:16,22 5280:4
5281:17 5283:2
5291:22 5294:4
5296:15 5297:2
5298:23 5299:9 5305:7
5316:18 5338:5

5353:13 5358:19
5359:1 5391:20
5392:15 5394:6

**news**
5267:19 5268:1

**newswire**
5355:24

**nice**
5317:21 5332:2

**night**
5376:15

**NN**
5151:16 5154:25
5155:4 5175:18,22
5179:13,21 5182:6
5185:5 5188:17
5194:25 5195:1,7,18
5196:22 5234:20
5269:18 5279:21
5281:23 5282:2,4,9,11,
13,17,23 5283:1,9,21
5284:3,9,23 5285:3
5293:1,7,9 5294:3,13,
17 5301:24 5302:5
5324:24 5359:16
5363:18

**NNC**
5237:22

**NNI**
5151:15 5152:6,9
5153:5,25 5154:8
5171:6,11 5185:10
5190:25 5201:1,3,13
5202:12 5209:17
5234:16 5235:1,5
5241:25 5247:15,17
5248:19 5296:25
5322:15,20,25 5323:6
5324:5,8 5338:12
5339:15,20

**NNI-ONLY**
5202:1

**NNL**
5151:13,18 5152:6
5153:5 5154:16,19,25
5155:5 5166:4,17
5168:10 5170:14
5171:4,12,22 5172:1,7,
12,15,19 5173:1,2,5
5174:13,15 5183:10
5188:18,20 5190:25



5192:15,18,24 5193:5,9
5195:3,6 5197:13,18
5199:13 5200:24
5201:3,12,16 5202:10
5216:6 5221:1 5236:6,
12 5237:17,21 5242:2,
6,23 5267:17 5269:20
5270:4 5273:6 5275:4
5279:18 5284:12
5285:2,20 5287:9
5293:4,22 5294:2,7,14,
15 5302:1,7 5303:8,13,
14,20,24 5304:10,25
5305:18 5315:3,4,25
5321:18,25 5322:3,7,
21,23,24 5323:23
5324:1 5325:25 5327:5,
6,9,10,12,18 5330:2
5337:21 5338:14,23,24
5339:1,2 5340:21
5341:10 5344:5
5360:20,22 5361:7,22
5362:7,9,21,24 5363:3,
18 5364:8

**NNL'S**
5152:22 5153:10,19
5197:9,12 5201:8
5208:24 5215:12,18
5218:2 5236:24
5363:14

**NNSA**
5361:24

**NNUK**
5151:15 5171:9,16
5173:25 5337:21
5338:15 5340:20,24

**noble**
5391:24

**nominal**
5152:23 5168:10,22
5169:20 5208:6
5312:17,23 5313:2,17,
18 5314:1,2,7,12,20,25

**non-exclusive**
5183:12 5187:25
5188:22,24

**non-existent**
5335:21

**non-ip**
5372:9

**non-transferability**

5199:5

**noncontractual**
5280:24

**nonetheless**
5212:11 5344:7

**nonguaranteed**
5267:18

**nonlegal**
5292:13

**Nortel**
5152:9 5179:10,16
5180:3,15 5189:14
5196:9,18 5198:19,20,
22 5205:2 5226:12
5229:10,20 5232:10
5233:7,21,25 5234:17
5237:16,21 5248:23
5249:14 5251:21
5252:6 5256:10,14,17,
22 5257:7,10, 5258:11,
12,15 5262:25 5263:8,
13 5273:16 5280:18
5288:7 5291:11
5292:20 5293:14,20
5304:12 5320:13
5324:17 5347:13,18
5348:6 5349:4,11
5361:6,12,25 5362:6,17
5363:15 5364:18
5365:12 5366:4 5367:8
5369:20,22 5370:6
5372:10 5373:19,21
5380:10 5383:15,17
5385:6,8,19 5386:1
5387:3 5389:18 5390:1
5391:25 5393:13

**Nortel's**
5205:5 5228:25
5234:23 5237:5
5241:23 5242:3 5251:5
5291:13 5360:14
5381:25

**north**
5281:1

**notable**
5259:6

**notably**
5220:22

**note**
5247:18 5336:10
5337:4 5364:7 5378:13

5379:8 5383:7 5386:24

**noted**
5392:1

**noteholders**
5230:14

**notes**
5297:24 5298:3
5340:20 5395:13

**notice**
5315:23

**Notification**
5340:9

**notified**
5340:5

**notional**
5170:12

**notions**
5194:8

**notwithstanding**
5310:5 5349:10 5353:1

**Nova**
5311:25 5312:1

**number**
5162:20 5247:18,22
5292:5 5304:15 5337:4
5340:2,21 5341:11
5367:15

**numbers**
5230:12 5338:8
5339:12 5394:7

**numerous**
5218:11

_____

**O**
_____

**O'connor**
5380:19 5385:13
5388:25

**objective**
5204:1 5206:4 5228:3
5229:19 5232:1
5241:16 5365:9,18

**obligated**
5216:6 5220:23

**obligation**
5220:20

**obligations**
5199:6,16 5200:1
5238:11 5269:8
5292:19

**obliged**
5329:24

**observing**
5381:14

**obtain**
5216:15 5243:20
5267:8

**obtained**
5273:15

**obtaining**
5273:17

**obvious**
5196:15 5236:7
5284:25 5285:5
5302:22 5337:21

**occasion**
5361:4 5364:18

**occasioned**
5257:23

**occur**
5241:21 5243:9

**occurred**
5165:15

**occurring**
5228:3

**Ocean**
5365:5

**odds**
5189:9

**OEC**
5176:7

**OECD**
5294:10 5329:16,17

**off-side**
5334:2

**offensive**
5214:20

**offered**
5259:16

**offerings**
5258:13



**office**
5233:10,12,14 5235:8
5238:18 5348:19,20
5378:17 5379:3

**Officer**
5234:2,5,7

**officers**
5232:25 5233:10

**omitted**
5288:25

**oneself**
5319:9

**ongoing**
5329:8 5335:14
5385:25

**Ontario**
5156:5, 5158:6,10
5204:4 5240:16 5269:2
5279:17 5294:21
5295:6,11,14 5297:5,18
5299:15 5301:10
5338:2 5341:23 5342:2,
4,8,10 5343:4 5357:9

**Ontario's**
5203:21

**open**
5382:22

**opening**
5236:9 5267:22 5273:4
5281:17 5389:14

**openings**
5182:10 5267:20

**operate**
5271:11 5290:16

**operated**
5232:10 5235:17
5248:23 5257:4,8
5277:10 5325:14
5349:11 5385:7

**operates**
5250:4

**operating**
5288:15 5290:3,6,21,24
5292:3 5326:20,21,24
5328:19,20 5329:7
5331:20 5333:24
5335:11

**operation**
5226:13 5234:9,17
5238:12,18 5257:12
5392:19

**operational**
5290:11,13,14

**operations**
5228:25 5233:21
5241:24 5242:3 5273:6
5291:9 5335:13 5336:9

**operative**
5172:11 5177:25
5178:1 5183:16,25
5184:2 5185:12,13,17
5187:2 5286:10
5287:16 5304:2,3

**opinion**
5232:1,2 5236:15
5268:16

**opinions**
5365:10

**opportunity**
5222:14 5299:10
5381:8,11

**oppose**
5213:20

**opposed**
5287:1 5328:17,18

**opposite**
5256:5 5262:10
5313:11 5314:6
5315:20 5316:14
5346:11,12

**order**
5214:9 5220:3,5
5238:11 5254:12
5345:1 5381:23

**ordered**
5213:7,9 5261:8

**ordering**
5388:18

**orders**
5213:17 5214:15
5218:7 5222:25
5254:17

**ordinary**
5285:1 5301:3

**organization**
5232:11 5257:8
5387:12

**organized**
5296:10

**original**
5182:8 5188:16
5258:23 5359:8

**Orlando**
5204:22 5390:8

**others'**
5274:7

**Ottawa**
5156:3,9,11

**outcome**
5220:11 5231:8 5240:7
5249:11 5262:4,5
5263:11,18 5276:2

**outcomes**
5226:22 5227:18
5230:8 5243:9

**outlier**
5372:16

**outline**
5226:15

**outright**
5324:1 5325:9

**outset**
5249:20

**outstanding**
5258:7

**overleveraged**
5376:20

**override**
5185:17 5213:12,14
5286:10

**overview**
5226:16 5227:1
5229:11

**overwhelm**
5205:25 5286:9

**overwhelming**
5276:18

**Overy**
5211:23

**Owens**
5254:19,24 5255:4,10
5256:5,7,9,10,18,25
5257:22 5259:7,20,24
5380:20

**Owens'**
5257:12

**owned**
5151:13 5153:3,6
5172:19 5177:8
5180:24 5183:5
5208:19 5211:11
5217:23 5236:12
5293:21 5294:17
5299:12 5305:25
5306:1,9,11 5324:1
5333:14 5336:1,2
5343:21,22 5345:15
5346:9,24 5347:3,5,9,
19,22 5350:19 5351:18
5357:4,17,19 5362:21
5364:2 5374:5 5392:24,
25

**owner**
5153:20,21 5154:16
5166:11 5168:17,21,22
5172:13,21 5174:13,15
5196:12 5201:3 5211:7
5272:5,11 5309:21
5312:5,6,15,17,23,25
5313:2,17,18 5314:1,3,
7,12,13,14,20,23,25
5318:17,21 5319:1,3
5330:1,13 5332:17
5337:19 5342:23
5344:8,16 5345:5
5346:1,17 5353:25
5362:7,12,24 5363:3
5392:22,23

**owners**
5153:5 5168:13
5179:20,21 5189:17
5287:25 5288:17,21
5290:16,18,22,25
5294:11,17 5315:9
5317:23 5360:16,23

**ownership**
5152:12,14 5153:7,10,
12 5154:2,4,21
5155:10,14 5156:23
5157:5,20,24 5158:1,
17,20 5159:2,7,8,10
5160:11,25 5162:10,14

 

5163:11 5164:10,11
5167:4 5169:21,24
5171:2,13 5173:4,13,18
5175:16,23 5176:2,13
5177:4,10, 5179:13
5180:4,7,17 5181:12,
17,19 5182:3 5184:5,22
5185:5,8,24 5186:8
5187:13,16 5188:8
5189:22 5190:20
5191:6 5194:9 5197:8,
9,12,22 5205:5 5207:1,
3 5208:24 5210:7,9
5215:12,19 5217:10,16
5218:2 5220:25
5226:23 5227:4,11,18,
19,20 5228:7,24 5236:6
5241:3,8,22 5243:1,16
5244:4 5245:5,7,17,18,
19 5246:8, 5250:16,21
5251:10 5260:24,25
5262:2,6 5269:10
5270:2,6,13,14,21,24
5271:1,2 5274:1
5275:15 5277:7
5279:13,19,22,24
5280:17,20 5281:8,9,
12,19,23 5282:4,9,13,
15,16,23,25 5283:6,16,
20 5284:3,8,15,17,19,
22 5285:3,6,16,18,19
5286:13,19 5287:11
5288:4,6 5291:3
5292:8,12,13,23,24
5293:1,7,17,23,25
5294:3,8,21,23 5295:1,
5,8 5299:10 5302:24
5304:6,7,10,20,25
5305:17 5306:9,25
5309:4,13,23 5310:11,
19,20 5311:6,15,18,19,
21 5313:12 5316:7
5317:16,17,19 5318:8
5319:16,19,20, 5323:24
5333:1,4 5335:7,16
5336:3 5337:8,13
5342:12 5345:20,21
5346:19 5350:10,11
5351:13,22 5352:21
5355:25 5356:5
5358:24 5359:16
5360:11 5361:9
5362:17 5363:8,16,17,
19,23 5364:9,20
5374:3, 5387:6 5390:23
5394:5

**ownership'**
5309:4

**ownership/
inventorship**
5346:21

**ownerships**
5191:10

**owns**
5157:2 5179:23 5181:6
5190:1 5193:21
5221:24 5242:5
5257:14 5282:2,11
5306:5 5319:2 5322:24
5345:2, 5353:3,6
5354:9,12 5355:3,9
5356:19,20 5361:24
5362:1

---

**P**

---

**p.m.**
5278:9,10 5358:8,9
5394:22

**pace**
5376:13

**paced**
5376:1

**package**
5323:13 5324:5

**pages**
5389:15

**paid**
5158:13,14,16 5161:14
5239:8 5249:21
5253:25 5254:8
5326:13

**painstakingly**
5269:15

**papers**
5268:9

**par**
5275:17

**paradigm**
5207:16

**paragraph**
5167:10 5177:22
5178:19 5180:21
5183:10,11,21 5190:12

5191:13 5192:9
5201:11,21,22 5204:23
5205:20 5207:9
5213:13 5220:5
5231:11,16,17,18,21
5289:10 5298:11
5309:2 5312:8 5318:4,
14 5340:11 5341:3
5344:11 5346:13,14
5354:8,14 5355:10,16,
25 5385:15 5386:11
5390:4

**paragraphs**
5196:4 5200:19 5208:4
5254:14 5298:13
5340:23

**pardon**
5182:25 5184:1 5202:5
5304:23 5318:15
5349:19

**parent**
5237:6 5274:2 5337:23

**pari**
5384:23

**Parliamentary**
5216:4

**parol**
5207:10 5346:18

**parsed**
5228:1

**parsing**
5227:24

**part**
5155:6 5157:5 5167:12
5171:8 5187:10
5218:16 5226:18
5228:10 5229:11
5237:25 5287:21
5292:16 5294:25
5299:17,22 5301:5
5320:22 5325:1
5327:11 5331:1
5333:14 5338:9,23
5348:3 5350:22 5351:9
5365:8 5372:20 5386:7

**parted**
5309:23

**participant**
5162:9 5172:4 5175:14
5179:23 5185:3 5200:1

5282:22,24 5283:15
5326:7 5365:17
5366:21

**participant's**
5273:20 5300:4

**participants**
5178:23 5179:7,9,15,
20,25 5180:14 5183:6
5188:7 5189:13 5190:8
5191:14 5195:22
5196:9 5272:25
5279:14 5281:21
5282:5,7,13, 5285:14
5287:24 5288:13
5289:17 5291:3,10
5292:4 5293:6 5327:4,5
5360:11 5361:14
5362:1 5365:16

**participants'**
5282:16 5284:3,8
5287:11 5293:1 5294:8
5359:16

**participating**
5290:23

**parties**
5170:23 5173:24
5189:21 5197:15
5198:2,5,16 5200:3,7
5205:14 5206:5 5213:2,
4,6,25 5214:2,6 5220:9
5221:11 5224:13
5231:5 5247:4 5260:10
5266:18,19 5269:8
5271:7 5274:13 5275:1
5279:12,20,21 5281:4,
22 5282:21 5283:14,20,
25 5284:6 5286:12
5287:21 5288:4 5290:6,
21 5291:4 5292:19
5293:9 5294:16
5297:11,13,16 5300:25
5301:14 5302:4,12,20
5317:8 5320:23
5322:13 5323:2 5327:1
5328:8 5332:23 5333:6,
9,13 5335:15,19,24,25
5336:16 5349:2,3
5350:12 5351:2,13,18,
22,23 5357:2,4,11,17,
22 5359:5,14 5361:4
5362:12,24 5363:3
5364:2,18 5375:15,21
5376:24 5377:1,23



5378:13 5380:3
5381:18 5383:14,19
5389:21 5391:2

**parties'**
5203:25 5284:22
5285:3 5287:10 5293:8
5294:21 5327:2
5350:23

**partly**
5169:2

**parts**
5335:9

**party**
5200:24 5201:12
5202:10,13 5213:7,20
5219:19 5232:9 5244:8
5269:10 5321:15
5322:7 5332:16,22
5356:2 5373:10 5374:5
5383:1,4,8 5390:17

**party's**
5206:21,22 5218:18

**passages**
5170:11

**passing**
5225:2

**passionate**
5387:7

**passu**
5384:23

**past**
5227:10 5389:13
5393:25

**patent**
5188:8 5192:12 5193:1,
2 5295:8 5338:22,23,24
5339:3 5343:21,24
5344:1 5345:2,3,8
5361:13 5365:23
5367:9 5370:13

**patented**
5167:24

**patentee**
5167:22 5168:4,17
5194:14,21

**patents**
5173:11 5192:12
5195:23 5236:22
5238:8 5283:12,16

5293:15,16 5324:25
5343:16 5344:4,5,9
5348:1 5363:4 5365:25
5366:13,19 5367:11,15,
21,23 5368:1 5374:5,8,
10 5383:17 5387:4,9

**pattern**
5164:25 5363:22,23
5365:25 5387:15

**pause**
5321:16

**pay**
5149:19 5181:10
5190:13,14 5196:16
5242:7,17 5247:22
5261:3 5270:10
5273:12 5276:11
5337:22 5386:6

**paying**
5273:7 5337:24,25
5338:1

**payment**
5326:22 5327:19
5328:15

**payments**
5180:2 5181:3 5199:15
5249:2 5251:14

**penalize**
5349:2,8

**penny**
5324:8

**pension**
5238:11 5242:1
5375:21 5376:24
5377:1 5378:13 5380:9
5386:6

**pensioners**
5230:19 5243:22
5262:23 5387:10

**pensions**
5263:6

**people**
5173:9 5181:23
5196:20 5197:14
5198:22 5205:2
5208:19 5209:14
5232:24 5234:8,12
5235:20 5254:23
5262:15,24 5271:18
5285:21 5290:23,24

5303:8 5307:6 5317:23
5348:22 5371:5,16
5379:3 5380:4

**percent**
5230:25 5238:6,7
5244:2,23 5246:25
5248:15,16 5254:7,10
5258:7 5263:14
5264:17,18,19 5265:14
5323:20,21 5366:13,18,
22 5367:18 5369:14
5371:11,12,23 5372:8
5374:9

**perfect**
5286:12 5310:9 5311:4
5313:13 5315:7,11
5329:6

**perform**
5190:8

**performed**
5257:1

**performing**
5190:11 5199:10
5326:7

**performs**
5330:13

**period**
5273:5 5348:8 5351:14,
18 5366:8,9,12 5367:2,
16,20

**periodic**
5391:21 5393:15

**periods**
5266:8

**permissible**
5154:6

**permission**
5315:9 5323:16,18

**permit**
5244:19

**permitted**
5273:6

**perpetual**
5199:14

**person**
5157:1,21 5160:23
5196:12 5198:24
5204:16 5267:21,22

5310:13 5311:8
5312:13,25 5314:23
5318:22,24 5319:4
5326:15

**personal**
5312:20 5318:7,19

**personally**
5378:23

**personnel**
5205:1

**perspective**
5227:2 5376:17
5393:10

**pertains**
5225:20 5236:2

**phase**
5219:16

**phrase**
5310:6 5312:13
5317:17

**picture**
5230:6,17 5234:13

**pie**
5370:22

**piece**
5198:14 5306:22
5347:19,22

**pile**
5282:18

**place**
5155:23 5166:8
5168:14 5171:8
5179:25 5181:19
5187:18 5201:10
5218:7 5222:25
5308:13 5312:7
5351:20 5353:23
5391:14 5395:6

**places**
5271:14 5321:12
5382:15

**plain**
5298:17 5301:2 5390:6

**plainly**
5170:3

**plaintiff**
5164:6 5308:18

 

**plan**
5213:24 5255:13
5256:18 5259:25
5279:3 5385:24

**plane**
5169:18

**plank**
5169:11

**planning**
5232:14 5312:3

**platform**
5236:23

**play**
5287:19

**played**
5294:6

**playing**
5306:19 5382:22

**plays**
5234:15

**pleadings**
5215:4 5222:12

**pleased**
5380:24

**pleasure**
5240:3

**pled**
5215:4

**podium**
5374:22

**point**
5166:15 5170:5
5173:22 5174:19
5177:7 5200:13,21
5202:10 5204:3
5210:17 5215:10,23
5216:21 5218:23
5228:6 5237:12
5239:15 5244:17,25
5248:4 5280:22
5285:12,13 5292:6
5295:18 5297:1 5298:8,
22 5299:9 5301:4,18
5302:2,11 5303:17,21,
23 5304:9 5307:7,9
5311:23 5313:9 5314:5,
8 5316:4,15 5317:14
5319:23 5321:17
5324:21 5327:3,17

5328:9 5333:16
5335:11 5336:6
5341:10 5342:6 5343:5
5344:24 5346:22,23
5357:7 5358:25
5369:10 5371:16
5374:13,19 5376:23
5383:20 5384:12
5385:22 5386:8,25
5387:1,8 5388:24
5390:3,18 5392:10

**pointed**
5232:3 5332:5 5390:4
5391:19

**pointing**
5231:24 5269:10

**points**
5208:1 5234:6 5249:9
5259:3 5266:11
5296:19 5297:7
5301:15 5330:6
5338:13

**Poland**
5234:20 5373:13

**polar**
5262:10

**policy**
5164:5,9

**pool**
5321:20,21 5322:6
5347:9,10,20,22 5348:3

**population**
5367:17

**portfolio**
5365:23 5370:14

**portion**
5167:13 5310:21

**portrayed**
5206:20

**posed**
5249:20

**posited**
5227:16

**positing**
5333:19

**position**
5151:13,14,20 5152:4,
25 5153:1 5169:3,6,7,

10,11,13,15 5192:1
5201:6,15 5206:21,22
5207:13 5209:21
5210:2 5212:8,10,
5214:14 5217:12,17,21
5218:1,5 5219:18
5221:1,2,5 5223:12,21
5226:17 5229:14
5230:24 5231:1
5307:19 5315:16
5316:13 5325:24
5338:21 5347:25
5357:19 5364:14

**positions**
5150:9 5153:16
5171:20 5213:3 5214:1
5239:14 5266:11

**possess**
5157:9

**possession**
5156:23 5158:25
5159:2,8 5310:11
5311:6 5313:3 5315:1

**possibly**
5368:23

**post**
5359:7

**post-agreement**
5352:6,17 5353:1
5357:9,13

**post-contractual**
5359:3,7,10

**post-filing**
5351:21

**post-insolvency**
5367:8

**post-petition**
5217:3,8 5220:16
5231:3 5247:23
5252:18 5264:24

**post-trial**
5223:6

**pot**
5212:17 5219:6
5253:11,15,25

**potential**
5319:5,8

**pounds**
5149:12

**power**
5159:25 5160:12
5172:7 5256:24 5260:5

**powers**
5309:11 5384:7,8

**PPAS**
5241:15

**practical**
5391:22

**pragmatic**
5277:5,7

**pre**
5359:8

**pre-allocation**
5247:15 5248:18

**pre-contractual**
5359:11,13

**pre-insolvency**
5362:6

**pre-petition**
5244:23

**preamble**
5225:21 5355:10

**preambles**
5299:12

**precedent**
5381:20

**preceding**
5248:5

**precise**
5310:6 5337:1

**precisely**
5237:13 5344:18
5373:16

**precludes**
5191:15 5254:25
5255:6

**predicted**
5268:14

**preexisted**
5175:6

**prefer**
5262:8 5375:1 5381:2

**prejudice**
5218:17 5221:12,14
5222:2,5 5224:2 5383:1

**premise**
5393:7

**premised**
5391:10

**preparation**
5320:21

**prepared**
5149:18 5150:22
5360:7,20 5394:11

**present**
5218:18

**presentation**
5365:8

**presentations**
5378:6

**presented**
5241:14 5279:23
5294:24 5365:5

**presenting**
5249:24

**preserve**
5184:15 5214:9

**preserved**
5175:7

**president**
5234:4 5343:15

**press**
5355:22

**presumption**
5203:24

**pretense**
5308:17

**pretrial**
5222:10

**pretty**
5233:11,24 5234:2
5246:7 5262:19

**prevent**
5384:15

**prevents**
5167:14

**previously**
5188:23

**price**
5214:9 5241:15
5249:21 5266:1,13

**prices**
5266:4,8

**pricing**
5176:7 5178:20
5181:23 5217:3,9,14
5234:11 5235:20,22,23
5236:2 5237:8 5238:13
5270:14 5271:10
5292:14 5294:5
5300:12 5321:14
5329:20,25 5331:15,17,
19 5334:11,17 5336:8
5337:5 5390:9 5391:12,
18

**primacy**
5203:24

**primarily**
5152:19 5233:15

**primary**
5360:23

**principal**
5264:19

**principle**
5204:12 5205:10
5295:7 5320:4,9,12,16,
18,20 5329:12 5336:14
5384:21,23 5385:3

**principled**
5248:21

**principles**
5203:21 5269:3 5286:1,
4 5329:20,25 5384:1,3
5387:23 5388:12,13
5391:8 5392:12 5393:2

**prior**
5185:6,20,22 5186:6,7,
9,13 5212:14 5213:5
5283:4 5305:9,14
5306:15 5307:1,4
5319:11 5383:14,20
5389:7,17 5390:18
5391:6

**priority**
5365:24

**prisoner**
5210:8,13

**privilege**
5225:22

**pro**

**prices**
5226:24 5227:7,14
5228:5,22 5240:19
5244:9 5246:7,15
5248:20,21 5249:10,25
5251:18,23 5252:1,2
5253:9 5254:12 5255:1,
5,8 5256:4,14 5258:3
5260:1,7 5261:10
5262:4 5276:24 5277:8
5380:18,19 5381:9,23
5384:19,23 5385:10
5387:16 5388:9,18,22
5389:3 5393:20 5394:4

**problem**
5274:18 5339:4 5368:3,
4

**problems**
5209:6 5367:1

**procedures**
5378:24

**proceed**
5149:18,19 5151:1
5244:19 5391:1

**proceeded**
5208:5,8

**proceeding**
5247:20 5248:5
5250:19 5263:17,18
5266:12 5276:3
5292:25 5368:20
5378:23 5380:16,19
5381:21 5382:15
5388:16

**proceedings**
5240:5 5244:18
5381:15 5395:5,8

**proceeds**
5217:24 5218:20,21
5219:7 5220:6 5221:3
5261:8,15,17 5272:9
5274:12 5275:6 5276:3,
19 5288:17,18,20
5322:8 5328:3,22
5329:1,5 5350:6
5357:23 5360:9
5361:13 5362:8,11
5369:15 5374:10
5383:5,16 5389:8,18,24
5393:17,21,22

**process**
5206:13 5216:8,16

**processes**
5216:14 5251:17

**produce**
5229:7,9

**produced**
5231:14 5263:8
5339:20

**produces**
5230:8 5262:3,5

**producing**
5238:3

**product**
5193:21 5250:10,12
5323:1,5,25 5324:1,4,
17 5325:2,8 5344:19

**products**
5189:12,14 5195:18,21
5196:1,7,17,21 5209:15
5257:3 5273:9,16,21
5324:17

**Professor**
5235:25

**profit**
5178:21 5179:5 5181:2
5221:25 5288:13,15
5331:20 5391:23

**profits**
5273:10 5328:19,20
5329:8 5335:13

**program**
5191:8

**prohibited**
5165:4,5 5256:7

**project**
5165:9 5363:13
5370:11

**projects**
5318:6

**promised**
5263:5

**promising**
5197:13

**prices**
5219:9 5220:7,13
5226:2 5259:16
5275:15 5277:4
5332:18 5338:24

**prompt**
5162:22 5226:10

**promptly**
5214:9

**prong**
5257:22

**pronounce**
5341:6 5354:11

**proper**
5208:20 5328:5
5342:11

**properly**
5154:15 5176:18
5178:5

**property**
5154:17 5156:25
5157:2,10 5158:17
5159:1,8,16 5160:25
5161:3 5170:8,15
5171:20 5177:14
5179:4 5184:11,16,20
5215:13 5238:3 5239:1
5241:17 5263:2 5270:3,
16 5275:4 5309:7
5310:13 5311:8,13
5312:14,18,19,20
5313:4 5314:2,3,21
5315:10 5318:18
5319:1,2,7,9 5338:18
5360:16

**proportions**
5153:11

**proposals**
5254:18

**proposed**
5196:8 5209:12
5218:20 5247:3,13,24
5260:9 5268:10

**proposing**
5243:7

**proposition**
5154:14 5155:11
5170:16,18 5191:20
5200:14 5203:15
5310:18 5314:19
5315:11 5316:5

**proprietary**
5309:10

**prospect**

5208:8

**protagonists**
5334:15

**protection**
5318:19 5319:5
5330:17

**protestations**
5261:5

**protocol**
5213:18 5382:10

**prove**
5342:3

**proved**
5364:17

**provide**
5205:3,13 5213:18
5241:16 5246:23
5266:14 5275:16,20
5276:17 5289:15
5381:20 5382:17

**provided**
5151:14 5152:19
5179:7 5220:8 5221:24
5258:10 5266:5
5276:16 5304:25
5354:19 5362:9

**provision**
5179:19 5180:6 5182:5
5183:25 5184:3
5185:13 5186:4
5187:19 5199:5,7
5206:8 5281:11,16,21
5282:1,3,15 5283:23
5286:11 5287:17
5289:1,6,19 5304:2,3
5311:17 5328:12,21
5329:6 5344:13

**provisions**
5172:11 5174:12,14,17,
18 5183:17 5185:18,25
5187:23 5189:4
5242:14 5256:13
5259:1 5268:24,25
5279:12 5287:14
5297:20 5315:21
5316:10,20 5319:14
5334:3

**proxy**
5347:16,18 5349:5
5393:20

**public**
5262:13 5266:12
5267:9

**publicly**
5215:11

**pull**
5289:25 5327:15

**pulled**
5259:18

**purchase**
5241:15 5249:21

**purchased**
5258:8, 5263:16
5266:1,5

**purchaser**
5196:16 5219:23

**purchasers**
5259:4 5369:20

**purchases**
5258:10

**pure**
5207:23

**purport**
5270:15 5285:11

**purpose**
5180:6 5220:14
5234:17 5292:1 5300:6,
8,11,20 5306:10
5318:18,21 5333:24
5348:21 5391:17,21,25
5392:8,9

**purposes**
5178:17 5217:15
5237:8 5257:1 5270:13
5271:21 5272:6,11
5274:1 5317:16,18,20,
5318:22 5390:24

**pursuant**
5151:18 5175:19
5195:2 5199:15
5213:23 5227:4
5250:22 5269:19
5273:10 5300:5

**pursued**
5221:18,23 5223:14

**purview**
5252:20

**put**
5151:8 5168:10 5170:1,
16 5171:12,20 5200:15
5207:21 5210:18
5212:3,9 5220:20
5227:22 5228:11
5229:5 5237:9 5241:22
5243:9 5258:1 5261:19
5280:23 5300:8,18
5307:14 5312:7
5313:24 5316:5 5320:2
5321:21 5322:12
5325:11,20,24 5326:10
5327:23 5329:14
5331:18,22 5335:3
5336:24 5345:9
5347:20 5349:18
5351:15,19 5360:1
5362:19 5366:21
5370:13,20,24 5376:1

**puts**
5232:2

**putting**
5168:22 5314:5

**puzzle**
5331:12

**Q**

**Q&a**
5360:5

**qualified**
5168:6,19 5195:15,16,
20,22 5365:7

**qualify**
5195:11

**quantification**
5370:25

**quantify**
5371:10,12

**Queen's**
5308:10

**question**
5161:12 5163:2
5165:21,22 5191:25
5192:4 5193:13 5194:3,
6,22 5197:8 5200:5
5207:16 5210:23
5215:20 5233:4
5236:15 5245:2



5249:20 5250:7
5254:20 5257:14
5264:12 5275:24
5279:4,7 5286:22
5290:18 5294:4 5295:5
5305:6,11,14,24,25
5308:19 5312:4
5316:16,18,21 5325:12,
22 5332:3,4,14
5333:19,20 5335:17
5337:11,12,16 5338:5
5342:11 5344:3 5345:2,
3 5346:9 5347:2
5348:10,12 5352:6
5353:2,4,6,7,19 5354:2,
3,8 5355:9 5356:18
5357:15,16 5360:8
5381:1 5384:18
5388:15 5389:6
5392:22

**questioned**
5232:9 5234:1

**questioning**
5316:17

**questions**
5162:19,20 5211:15
5224:10,12 5266:17,19
5277:14,17,20 5297:2
5328:6 5357:25
5369:10 5374:12
5380:17 5384:10

**quick**
5222:9 5380:5,6

**quickly**
5317:11, 5329:13
5337:10 5342:15
5349:13 5360:3

**quietly**
5240:4

**quote**
5167:11 5217:10
5249:8 5255:18
5313:17,18 5315:6

**quote/unquote**
5265:16

**Qureshi**
5375:9

# R

**R&d**
5153:14 5171:8 5179:3
5185:1 5190:8,12,13,14
5191:2,8 5199:10
5273:20,24 5322:6,8
5325:5,19 5326:7,14
5327:7,25 5328:2,14
5347:13,14,19 5348:7
5349:6 5351:17
5361:10,25 5362:2
5364:21 5365:16
5366:20 5368:16

**rabbit**
5280:22 5281:2

**raise**
5222:10 5224:13
5296:19 5316:15

**raised**
5165:21 5174:18
5222:11 5223:5
5281:17 5283:3 5297:2,
8 5317:14,25 5336:6
5390:19

**raising**
5338:13

**ran**
5233:1,7,11,21,25
5234:3 5277:10

**range**
5231:1 5267:6 5306:4
5376:2

**rata**
5226:24 5227:7,14
5228:5,22 5240:19
5244:9 5246:7,15
5248:20,21 5249:10,25
5251:18,23 5252:1,2
5253:9 5254:12 5255:1,
5,8 5256:4,14 5258:3
5260:1,7 5261:10
5262:4 5276:24 5277:8
5380:18,20 5381:9,23
5384:19,23 5385:10
5387:16 5388:9,18,22
5389:3 5393:20 5394:4

**rate**
5247:19 5265:18

**rates**
5209:6

**rational**
5229:14 5271:19

**Ray**
5275:23

**reach**
5203:18

**reaching**
5391:2

**read**
5151:5 5162:15
5180:19 5186:17
5193:8 5197:21
5198:11 5199:22,23
5206:9 5216:18,23,24
5237:11 5239:5 5253:1
5255:18 5265:12
5283:5 5290:13
5295:11 5315:17
5316:6 5327:4 5353:16

**reader**
5286:16

**reading**
5149:13 5170:11
5192:23 5265:4 5283:7,
8 5298:17 5352:2

**reads**
5382:24 5385:17

**ready**
5358:14

**reaffirmed**
5204:5 5205:17

**real**
5168:21 5173:20
5194:6 5294:1 5299:23
5312:5,6,15,18,25
5314:3,23 5365:22

**reality**
5214:17 5219:14
5263:12 5362:15

**realize**
5219:3,4 5223:13,17,19
5239:7

**realized**
5251:9 5262:6

**reason**
5150:18 5158:7,24

5173:7 5197:10 5218:3,
5 5221:17 5250:14
5268:19 5274:25
5300:14,20 5302:2
5307:17 5337:20
5338:19 5344:20,21
5366:14,15 5369:4

**reasonable**
5226:10 5230:9 5259:2

**reasoning**
5391:9,16

**reasons**
5170:21 5209:5
5236:13,18 5244:10
5246:21 5256:3
5261:21 5270:20
5274:2 5277:6 5356:15,
17

**rebuttal**
5150:14 5192:6,9
5196:4 5201:25
5266:23 5342:18
5374:14 5375:20
5376:8

**rebuttals**
5375:25 5376:3

**recall**
5323:4 5325:21
5352:20,24 5370:10
5374:1 5390:5 5394:6

**receive**
5214:4 5242:9 5243:17,
19,24,25 5244:1,22
5248:15 5249:3 5263:4
5265:14,15 5275:5,19
5326:23 5327:6,19
5328:15

**received**
5244:15 5273:1,8,23

**receivership**
5387:23

**recent**
5298:23 5343:7

**recently**
5204:5 5205:17

**recess**
5277:24 5278:8,9

**RECESSED**
5203:10 5358:8



**recharacterized**
5368:16

**recital**
5154:23 5162:14,
5172:15 5175:13,22
5177:17,18 5178:4
5182:14 5183:2,3,6,15
5184:3,8,20 5185:1,14,
19,20 5186:5,9,23
5187:1,14 5285:15
5287:16,23 5291:15,16,
20 5299:15 5302:3,4,
12,21 5304:14 5317:4
5355:14

**recitals**
5185:15 5285:10,25
5286:2,9 5287:2,19
5297:8,11,15,21
5298:6,17 5299:11,20
5301:13 5317:6

**recitation**
5215:25

**recite**
5202:1

**recited**
5286:13

**reciting**
5178:7

**recognition**
5208:25

**recognize**
5155:19 5185:8
5285:15,18 5288:8

**recognized**
5252:23 5279:13
5363:9,15 5369:21,24

**recognizes**
5185:15 5188:24
5369:19 5372:13,14

**recognizing**
5242:17 5284:3
5294:15 5359:16

**reconcile**
5214:14

**record**
5212:25 5213:5
5214:15 5219:18
5259:8,11 5265:25

**recorded**
5395:9

**recoveries**
5230:23 5243:20
5244:22 5252:13
5258:23 5263:14

**recovery**
5244:14 5260:6
5263:15 5275:16
5276:5,8,14

**recreate**
5178:9

**redemption**
5158:22,23

**reduce**
5253:25 5254:8
5265:17

**reduced**
5247:19

**reduces**
5253:11

**reductions**
5263:6

**reenacted**
5284:1 5359:14

**refer**
5150:23 5159:20
5281:21 5283:20
5294:10 5298:22
5299:1 5308:11
5311:22 5317:25
5346:20 5366:8
5385:14 5386:22

**reference**
5162:16 5176:23
5178:14 5180:10
5192:16 5217:2,8
5283:5,8 5287:10
5318:5 5356:6 5364:24
5385:23

**references**
5176:7 5292:12
5297:24

**referred**
5183:7 5241:16
5282:21 5291:15

5338:7 5364:8 5379:25
5381:22 5385:12
5389:24

5296:4 5304:15
5307:21,25 5319:14
5329:17 5348:1
5352:20,23 5353:24
5359:2,20

**referring**
5178:5 5195:22 5217:6,
10 5225:15 5231:11
5297:20 5355:25

**refers**
5159:15 5182:13
5183:4 5267:3 5282:4
5300:2 5301:12 5304:3,
16 5309:25 5320:18
5346:14 5355:22,24
5356:5

**reflect**
5175:1 5180:20
5185:25 5264:20
5293:25 5294:2

**reflecting**
5180:5 5330:21

**reflects**
5179:8 5180:14
5264:19 5290:20
5362:15

**reformation**
5292:22

**regard**
5251:2

**regime**
5184:23

**regional**
5233:14

**regions**
5233:17

**register**
5338:23

**registered**
5236:24 5238:8
5343:24 5363:4
5367:11

**Regrettably**
5226:1

**regulated**
5337:2

**regulations**
5270:14

**Reichert**
5176:6 5235:25 5270:9
5271:5 5272:22
5273:14

**Reichert's**
5270:11,17 5271:16

**reject**
5207:20 5210:10
5260:24

**rejection**
5261:2

**rejects**
5162:4

**related**
5233:4 5273:16
5330:15

**relating**
5265:25 5380:17
5387:21,25 5388:3,7,17

**relationship**
5256:10

**relative**
5153:13 5154:4
5273:18 5367:4

**release**
5355:22

**relevant**
5151:10,15 5198:2,5,16
5200:7 5268:6 5306:25
5315:3 5345:22,24
5351:14,18 5362:23
5383:14 5384:3
5387:24 5393:2

**relied**
5206:12 5288:11
5310:24

**relies**
5354:15

**relieve**
5199:25

**rely**
5164:8 5207:9 5222:24
5281:7 5307:11
5310:17 5311:15
5316:20 5328:12

**remain**
5252:19 5256:23
5270:3



**remained**
5216:10

**remaining**
5199:12 5254:1
5291:10 5374:13

**remarked**
5170:7

**remember**
5190:23 5281:17
5289:7 5305:16

**remembered**
5320:10

**reminded**
5293:2

**remove**
5207:5,6

**repay**
5158:23

**repeat**
5214:23 5241:6

**repeated**
5178:15

**repeatedly**
5284:21 5285:14,
5292:18 5363:10

**repeating**
5251:18

**repeats**
5187:9 5188:15

**replete**
5299:18

**reply**
5201:11,19,20 5225:19
5295:12 5342:18
5353:12

**report**
5216:25 5217:9
5245:11,12 5248:3
5360:20 5371:21

**REPORTERS'**
5395:1

**reports**
5215:10,11,23 5245:10
5360:22 5389:14

**represent**
5226:3 5258:7

**representations**
5215:24 5222:23
5345:10,11 5350:9
5360:13 5361:2

**representative**
5367:25 5382:14

**represented**
5293:20 5308:16
5362:13 5366:7 5367:3

**represents**
5369:14

**reproduce**
5365:20

**Republic**
5298:25 5299:2,4
5353:19,21 5354:13
5355:3,13,21 5356:3

**reputations**
5212:22

**request**
5178:24

**require**
5229:8 5277:4 5313:2
5314:24

**required**
5160:3 5199:9 5214:1
5216:13 5221:10
5360:21

**requirement**
5190:7 5320:6

**requirements**
5320:16

**requires**
5282:12

**research**
5232:16 5235:4,7
5272:17 5274:6,7

**reservation**
5166:9 5213:10,12,15
5214:16 5219:22
5223:8

**reserve**
5211:12,13 5220:10
5266:22 5277:17
5374:13 5378:16

**reserved**
5213:7 5376:5,6,7

**reserving**
5224:11

**reside**
5247:11

**residual**
5178:21 5196:25
5218:13,17 5241:10
5360:15 5365:23
5370:13

**resolution**
5216:2 5219:16
5220:11

**resolve**
5219:8 5221:20 5227:2
5229:19 5249:5
5357:11

**resolving**
5229:17

**resonate**
5271:6

**resources**
5235:7 5237:10

**respect**
5182:6 5200:2 5227:21
5234:20 5235:21
5243:16 5269:3,8,9
5273:19 5285:7,12
5289:19 5301:1
5302:23 5328:10,19
5335:16 5342:12
5346:21 5367:25
5368:20 5370:5 5374:1

**respected**
5364:19

**respectful**
5268:16 5300:23
5301:16 5302:8 5314:1
5316:7,11 5319:20
5320:1 5344:22 5346:4
5347:3 5349:6,16
5350:15 5352:1
5356:24

**respectfully**
5257:15 5264:2
5270:10 5286:3

**respective**
5152:8 5283:20
5286:13 5361:8
5364:21

**respects**
5213:1 5252:5 5268:25
5334:3

**respond**
5211:14

**response**
5279:10

**responses**
5360:15

**responsibility**
5190:14

**responsible**
5273:20

**responsive**
5215:4 5222:12

**rest**
5151:17 5287:3

**restates**
5187:10

**restraint**
5388:18,21

**restricted**
5234:11

**restriction**
5151:22 5152:15
5196:3 5207:6,18
5208:10 5209:9 5211:6
5213:19

**restrictions**
5154:1

**restructure**
5252:14

**result**
5165:7 5171:8 5181:3
5184:7 5223:23
5229:24 5230:3
5238:13 5244:12
5247:2,13 5255:24
5262:12 5263:13,19
5273:18 5274:20
5277:11 5296:17
5326:23 5327:1 5328:2
5331:5 5393:20

**resulted**
5262:16

**resulting**
5392:4

 

**results**
5229:7,9,12,14
5240:11,14 5241:20
5243:6,12 5244:7
5246:6,8,19,24 5248:13
5262:1

**RESUMED**
5203:11 5278:10
5358:9

**retain**
5247:17,21 5248:17

**retained**
5196:13,14 5197:22
5208:7, 5211:8 5249:4

**retaining**
5161:11

**retains**
5194:22

**retention**
5174:4 5184:7

**retirement**
5263:4

**retiring**
5291:7

**return**
5191:4 5263:25 5331:2

**returns**
5330:3,18

**revalue**
5252:14

**revenue**
5152:20 5208:17,18,20
5217:15 5229:4
5243:13 5246:20
5247:5 5250:3 5261:16,
22 5273:18 5368:15
5373:4

**revenues**
5242:9 5250:5 5322:1,4

**review**
5228:21 5240:17

**revolves**
5155:6

**rewrite**
5212:2 5274:19

**ridiculous**
5250:3,7

**right-hand**
5310:25

**rightful**
5155:18

**rightfully**
5157:9

**rights**
5151:18,21,24 5152:3,
7,9,16 5154:9 5159:16
5160:3 5161:4,6
5162:15,17 5168:2,15,
17,18 5169:22 5171:1,
3,6,7,11,13,16 5172:7,
9,16,19,21,24 5173:25
5174:3 5175:18,24
5176:3,4,6,13,24
5177:3,4,9,10,15
5178:6,8 5184:15
5188:7 5190:1 5193:8,
9,18 5194:13,19
5195:7,15,23,24
5196:6,23 5197:19
5198:1,6,23 5199:9,20,
24 5201:7,14,15
5208:23 5209:2
5210:24 5211:7
5212:13 5213:7,10,13,
15 5214:16 5215:22
5218:10,23 5219:22
5220:10 5223:8 5236:4
5252:8,14 5260:2,12
5261:1 5269:7,11
5270:25 5271:1
5273:22 5275:4,5
5285:11,21 5292:19
5294:8 5302:25 5309:6,
15,18,20 5332:21
5333:4,5,8 5334:19,21
5335:15,24 5344:1
5350:23 5351:2,5,13,23
5357:2 5364:9 5373:11
5383:1,4 5390:11

**ring**
5348:24

**rise**
5153:17 5191:2
5294:20 5375:8
5387:16

**risk**
5179:10,16,18 5180:1,
5,15 5181:13 5214:3
5249:13 5251:20
5271:4 5282:8 5393:4

**risks**
5179:11 5180:16
5181:4 5287:24
5330:15

**risky**
5263:17

**RMR**
5395:4

**road**
5225:24

**Rockstar**
5196:19 5209:7
5217:18,20,24 5218:8
5219:10 5220:4
5228:10 5283:12
5293:16 5325:2
5370:15,21

**role**
5249:4 5287:20 5294:6
5383:10,11

**roll**
5360:2

**room**
5182:19 5189:18
5254:23 5261:11
5264:7 5282:25

**rooted**
5365:10

**roughly**
5377:2

**royalties**
5273:7

**royalty**
5200:2 5361:14

**royalty-free**
5199:19

**RPE**
5192:5,17,24 5193:7,9

**RPES**
5191:6 5193:17,24
5194:2 5315:5 5321:19
5325:4 5338:9 5346:24
5347:4,9 5351:17

**RPR**
5395:3

**RPSM**
5152:18 5154:8
5178:22 5179:8,15,24

**risks** (continued)
5180:5 5181:16,25
5182:4 5190:9,17
5191:4 5199:6 5209:17
5242:14 5273:10
5326:8,15 5327:21
5351:19

**rub**
5359:4

**Ruby**
5181:8

**rule**
5207:11 5359:2 5381:8

**rules**
5203:21 5220:17
5285:24 5305:9
5378:24

**run**
5233:23 5236:3
5238:12,18 5315:23

**runs**
5335:3 5363:24

---

**S**

**S-i-s-t-e-m**
5298:25

**safe**
5300:22

**sale**
5153:13 5216:8,16
5218:13,16,20 5220:6
5228:10 5233:16
5288:17 5291:13
5293:19 5322:8
5328:22 5329:1,5
5331:23 5332:7
5336:13 5350:7
5357:23 5360:9 5362:5,
6 5363:13 5370:15
5374:9 5383:5,6,16
5389:25 5393:21

**sales**
5208:18 5209:4 5214:8
5223:16,21 5235:4
5241:13,18 5249:22
5261:8 5273:9 5283:14
5288:20 5369:14
5370:8,13,16,21
5371:18,22,24 5372:9,
15,18 5373:2 5393:17

**sample**
5366:14,16 5368:4,5
5369:1

**SANTEDICOLA**
5395:3,19

**SAS**
5373:19,22

**satisfied**
5259:1 5300:16

**satisfy**
5257:21

**Sattva**
5205:18 5226:20
5352:2

**save**
5255:23

**saving**
5359:25

**scenario**
5242:22 5243:23
5244:24 5246:5,10

**scenarios**
5247:3

**schedule**
5178:15,16,18 5281:15
5282:1,10,15 5283:23
5284:2,11,21 5285:2,16
5287:9,15 5290:12
5292:16 5299:17,21,25
5300:3,5,6,14,17,19,24
5327:8 5331:22
5359:15 5377:13

**schedules**
5297:8 5299:22 5301:4,
13

**scholarly**
5159:6

**scholars**
5158:5

**scope**
5151:22 5152:14
5189:19,21 5194:7
5196:2 5207:5,18
5209:9,13 5211:5
5277:3

**scotches**
5162:3

**Scotia**
5311:25 5312:1

**screen**
5281:16 5289:9
5291:22 5307:25
5318:14 5329:15
5340:23 5343:11
5382:23

**scrutinized**
5381:16

**scrutiny**
5215:7

**Sean**
5217:9

**seated**
5278:11 5358:10

**second-last**
5158:18 5163:8

**secondary**
5258:10

**secretary**
5234:7

**secrets**
5339:22

**section**
5218:15 5299:25
5327:2 5328:20
5329:22 5354:20
5382:24,25 5384:6

**security**
5343:19

**seek**
5226:8 5383:4

**seeking**
5388:5

**seeks**
5364:9 5393:20

**segue**
5201:17

**seize**
5343:22

**seized**
5344:9 5346:2

**self-determination**
5252:6 5256:16

**sell**
5164:6 5195:18
5212:16 5221:19
5272:7,8 5273:16
5275:5 5322:24,25
5323:9,12,15 5324:4
5326:1 5328:2 5336:16
5373:9

**sellers**
5293:22

**selling**
5196:1 5250:23
5331:21 5383:8

**senior**
5232:24 5233:10
5234:8

**sense**
5157:14 5163:4,6
5168:21 5189:24
5214:17 5312:12
5313:11,13 5315:7,11
5322:13 5328:10
5329:6,10 5337:23
5347:5,6 5356:25
5366:1 5376:18
5378:19 5389:10

**sensibilities**
5277:5,8

**sensibly**
5158:1 5376:22

**sentence**
5314:19 5318:15,16
5344:13

**separate**
5155:9 5159:13 5161:9,
24 5163:3, 5165:17,19
5166:1 5170:17
5174:20 5175:8
5192:24 5251:11
5255:19 5256:1
5286:19 5385:8 5387:6

**separated**
5315:8

**separately**
5159:15 5223:9
5369:25

**separateness**
5252:5 5256:13,16

**separation**
5161:7 5164:21

**Scotia**
5173:17 5183:19
5315:13

**September**
5395:15

**series**
5170:6

**serve**
5264:1

**serves**
5246:15

**service**
5238:4 5368:15

**serviced**
5235:9 5237:21

**services**
5233:13 5257:3

**servicing**
5237:25

**set**
5178:6 5184:19 5192:6
5194:25 5213:3
5224:23 5225:1,5,18
5251:25 5254:13
5281:3 5318:5 5329:8
5342:7,9,13 5345:5
5395:6

**sets**
5153:15 5194:20
5289:15 5342:2

**setting**
5191:11

**settled**
5361:12

**settlement**
5239:12 5247:24
5265:16 5361:12

**shape**
5256:15

**share**
5190:16 5191:4
5221:25 5288:16
5300:4 5321:22 5362:1

**shared**
5173:4 5279:20 5281:7,
9,12 5284:22 5294:3
5361:13 5362:16
5363:7,19,23 5364:20
5393:14




**shares**
5181:5 5299:10
5353:18,20,24 5354:1,
10,12,21,23,25 5355:4,
12,19 5356:3

**sharing**
5152:18 5154:8
5175:24,25 5180:2
5199:6 5209:17
5217:15

**Sharon**
5220:24

**sheet**
5361:20 5364:12
5373:6 5385:20

**shield**
5247:9

**shielded**
5318:7

**shock**
5214:23

**short**
5214:16 5244:4

**shortage**
5204:18

**shorter**
5377:6

**shorthand**
5395:13

**shortly**
5333:9

**shot**
5347:21

**show**
5161:23 5174:19
5260:21 5266:10
5290:1 5291:8 5294:23
5338:15 5366:10
5388:20

**showed**
5238:6 5299:13
5369:20

**showing**
5266:4 5286:11
5302:15 5306:11
5359:12

**shown**
5221:21 5264:16,17

**shows**
5220:25 5242:21
5243:8 5284:5 5302:12
5315:19 5316:13
5328:25 5364:16
5365:22,24 5366:2

**side**
5213:16 5218:14
5254:23 5329:2,3
5334:15

**sideways**
5317:15

**sign**
5321:3, 5338:9,22,25

**signed**
5321:5 5341:13,16,20

**significance**
5288:14

**significant**
5241:24 5243:20
5248:6 5276:5,10,13
5351:12 5361:25

**significantly**
5247:19 5248:23

**signify**
5163:12,15,16

**signing**
5340:7

**silent**
5380:22

**Simex**
5301:7

**similar**
5164:24 5176:3 5209:5
5210:19 5262:5 5344:3

**similarly**
5220:23

**Simon**
5380:12

**simple**
5385:1 5389:16

**simply**
5169:16 5182:3
5192:18 5207:25
5214:13 5245:23
5247:5 5262:10

**5311:16 5339:19**

**simultaneously**
5318:23,25

**SIN**
5340:1,2

**sincerely**
5381:24

**single**
5219:3 5247:9 5255:20
5385:7,14 5390:3
5392:8

**sir**
5211:20 5245:21,24
5246:2 5254:21 5267:1
5278:17,21

**Sistem**
5298:25 5306:3 5353:9,
10,11 5354:4

**sit**
5202:22,23 5277:15,
5349:19 5353:10
5356:23 5382:6

**sits**
5377:5

**sitting**
5240:4 5298:24
5338:17

**situated**
5262:24

**situation**
5235:13 5344:2
5392:17

**six-year-long**
5229:18

**size**
5253:15

**skewed**
5367:5

**skip**
5314:21

**sky**
5320:11

**5268:12 5274:19**
5275:8 5276:25
5286:15 5287:20
5301:4 5332:9 5362:14
5371:18 5372:10
5385:2 5389:25

**slide**
5249:6

**slides**
5225:1

**slightly**
5203:9 5210:18 5300:8
5336:24

**slowly**
5374:22

**small**
5235:6,9 5236:2
5237:20 5358:25

**snazzy**
5262:20

**software**
5324:6

**sold**
5241:10,18 5248:24,25
5250:23,25 5270:4
5273:21 5283:13
5288:18 5293:16,21
5348:9 5367:16 5371:3,
8 5373:10

**sole**
5172:7 5202:12
5267:21,22 5284:17
5285:19 5293:17,23
5340:15 5362:7,12
5364:9

**solely**
5160:23 5250:11
5256:23 5261:16,18

**solution**
5249:18 5250:17

**solutions**
5240:12

**sophisticated**
5259:3

**sort**
5209:6 5212:17 5216:5
5219:24 5334:19
5351:5

**source**
5173:6

**sovereignty**
5252:7

**Spain**
5373:13

neesons                www.neesonsreporting.com
                                           www.wilfet.com

**spanned**
5257:9

**speak**
5154:24 5240:19
5284:1 5332:6 5376:20

**speaking**
5163:7 5176:18 5390:6

**speaks**
5175:14,21,22 5182:14
5288:20

**special**
5226:8 5280:12

**specialized**
5320:17

**specific**
5180:7 5185:21,23
5266:14,15 5275:24
5287:10 5380:22
5381:1 5385:9 5388:8
5393:4

**specifically**
5154:11 5218:12,24
5255:15 5279:11
5281:12,14 5282:4
5283:15 5286:8
5291:25 5301:23
5340:10 5359:14
5383:18

**specifics**
5226:22 5243:15

**spelled**
5298:25

**spend**
5154:12 5189:21
5322:16,20 5348:13
5349:6

**spending**
5366:20 5367:12

**spends**
5250:8,9

**spent**
5387:3 5389:12

**split**
5178:22 5273:10
5288:13 5334:18

**spoke**
5275:11

**spouse**
5392:18

**square**
5306:14 5352:20

**squeeze**
5378:20

**stage**
5229:19

**stakeholders**
5226:3

**stand**
5191:21 5209:4 5316:8,
9 5375:14 5391:13

**standard**
5172:20 5187:3
5317:12 5319:25

**standing**
5267:21,23 5314:19
5389:9

**stands**
5150:18 5191:20
5215:6

**start**
5155:13,23 5208:2
5214:25 5224:23
5225:17 5268:3,12
5273:1 5296:20
5333:22 5355:9 5360:5
5365:3 5375:1 5376:13
5377:9 5380:3

**started**
5311:20 5382:5

**starting**
5298:14 5299:20
5351:19 5379:20

**starts**
5301:11 5309:1 5341:5
5350:1

**state**
5268:25 5302:22

**stated**
5268:9 5281:5

**statement**
5167:12 5194:11
5215:15 5221:8 5273:4
5299:12 5347:6
5355:11 5363:1

**statements**
5216:18, 5222:19
5281:18 5282:20
5293:24 5334:1
5345:14,15 5350:10
5356:1 5361:23
5362:19

**States**
5171:17 5193:21
5200:24 5201:7
5234:21,23 5244:21
5247:14 5271:25
5274:23 5276:4

**stating**
5268:12 5275:7

**statutes**
5387:24

**statutory**
5158:10

**stay**
5239:9 5242:24

**Steep**
5225:11

**stenographically**
5395:9

**step**
5206:17,22 5231:18,22
5290:4

**stick**
5360:18

**sticking**
5282:20

**stood**
5208:16 5268:13

**stop**
5356:7 5384:25 5394:3,
11

**stopped**
5230:11 5378:3

**stopping**
5386:3 5392:10

**stops**
5387:13

**straights**
5348:17

**strange**
5181:18

**strategic**
5232:14 5234:17

**stress**
5205:16

**stretch**
5243:25

**strictly**
5271:21

**stripped**
5370:12

**strongly**
5388:20

**structure**
5183:13 5187:15

**structured**
5240:13

**struggling**
5361:18

**stuff**
5356:10 5377:14

**subcommittee**
5216:5

**subject**
5151:22 5152:14
5153:20 5190:22
5198:1 5200:6 5211:15
5215:13,19 5256:11
5281:19 5289:20,21,24
5291:16,18 5324:2
5325:9 5357:25

**subjective**
5204:13,15 5205:7
5232:4 5305:23
5306:12 5307:2

**sublicences**
5202:6

**sublicense**
5189:12

**sublicenses**
5202:3

**sublicensing**
5200:16 5201:9

**submission**
5150:8,14 5151:8,17
5154:11 5170:15
5180:22 5181:14
5182:1 5184:4,20



5186:3 5206:17 5209:3
5211:9 5300:23 5302:9
5314:1 5316:7,11
5317:5 5319:21 5320:1
5344:22 5346:4 5347:3
5349:7,16 5350:15
5352:2 5356:24 5382:9
5383:21 5384:17
5385:16 5386:21
5390:5

**submissions**
5150:1,2,5 5231:15
5264:9 5296:18
5305:21 5347:7 5377:6
5382:5 5384:20
5389:14,15 5390:22

**submit**
5212:18 5214:1 5264:2
5266:4 5270:10 5283:7
5286:4 5292:1 5383:11
5388:6

**submitted**
5245:10 5248:3
5257:19

**subsequent**
5186:14

**subsidiaries**
5215:14 5216:7,9
5233:17,20 5234:15
5236:21 5293:15
5363:14

**subsidiary**
5235:1 5373:19

**substance**
5217:1 5222:16 5330:4

**substantial**
5179:12 5180:16
5224:4,13 5242:9
5273:17

**substantially**
5309:19 5331:1

**substantiate**
5260:15

**substantive**
5240:23 5252:3,4
5255:13,16 5256:8
5257:23, 5387:25
5388:1,3,5,6,17

**substantively**
5261:25

**successful**
5273:2,3,5 5370:14

**succession**
5312:4

**suffer**
5226:5

**suffered**
5201:4

**suffers**
5223:7

**sufficient**
5185:7 5244:13

**suggest**
5217:20 5271:18
5379:2,4,19

**suggested**
5248:14 5294:5

**suggesting**
5286:9 5385:4

**suggestion**
5292:10 5379:6

**suggestions**
5319:13

**summarized**
5151:12

**summary**
5207:12 5208:3
5329:22

**sums**
5220:15

**supervision**
5251:12

**supply**
5298:18

**support**
5218:19 5219:18
5227:6,18,22 5228:13
5235:3 5385:9 5387:16
5388:8 5389:3

**supported**
5158:22 5210:21
5241:7

**supporting**
5227:5 5229:23 5242:3
5273:21

**supports**
5384:12

**suppose**
5180:14 5189:8,15
5283:4 5292:22
5348:11,15

**Supreme**
5167:9,20 5168:11
5170:7 5191:18 5204:5
5205:17 5226:20
5298:1,5,20 5312:1

**supremely**
5365:6

**surprising**
5297:14

**surprisingly**
5318:12

**surrender**
5249:23

**surrendered**
5152:3 5208:17

**surrounded**
5320:20

**surrounding**
5205:21 5206:11
5227:17

**survivor**
5255:21 5256:2

**suspenders**
5343:5

**sustain**
5254:16,17

**sustainable**
5228:24 5241:11
5244:6 5248:22 5259:2
5262:5 5263:12,20

**Swift**
5363:13

**swirl**
5223:1

**sympathy**
5377:15

_____

**T**

_____

**tab**
5155:20 5156:19

**supports**

**table**
5220:21 5367:18
5390:21

**tabs**
5182:9

**tailing**
5366:5

**takes**
5170:14 5230:4
5231:21 5270:5
5301:17 5308:12
5333:4 5365:23,24

**taking**
5234:16 5262:9 5271:4
5285:25 5357:24

**talk**
5158:1 5161:10
5240:12 5242:10,19
5244:11 5248:20
5254:19, 5269:24
5282:6 5302:17
5303:12,15,16 5306:8,9
5315:13 5328:5
5363:17 5379:24

**talked**
5176:8 5199:4,5
5261:21 5273:4
5364:19

**talking**
5153:4 5177:12
5189:19,25 5208:1
5220:15 5256:4 5284:2
5287:1,2 5288:15,16
5307:1,2 5313:16
5315:6,15 5349:25
5350:13 5368:21

**talks**
5157:18 5158:8
5162:14 5253:2 5282:5,
6,7,8 5313:10 5326:22
5329:23

**Supreme**
5158:3 5159:18 5163:6,
24 5164:2 5165:1
5167:7 5170:9,10
5177:20 5182:10,23
5184:25 5187:8
5191:18 5194:12
5205:18 5298:4 5299:6
5301:9 5307:25 5308:6
5311:24 5318:2 5343:9
5353:10,11




**task**
5380:15 5385:1
5391:19

**tasks**
5337:8 5348:20

**tax**
5178:24 5181:23
5205:1 5265:20
5270:13,19 5271:6,9,
10,21 5272:5,11 5274:1
5294:6 5312:4 5317:13,
16,18,20,22 5318:2,21
5319:8 5320:16
5333:25 5336:21
5360:7,13,18,20 5361:2
5368:9,11,14,22 5369:4
5390:10,24 5392:2

**taxable**
5294:14

**taxation**
5233:14 5236:3
5300:15 5320:14
5350:5,9

**taxes**
5272:1

**taxing**
5182:1

**taxpayer**
5318:5

**taxpayers**
5318:6,9

**Tay**
5217:5

**team**
5264:7 5381:1

**teamsters**
5379:9

**technology**
5154:25 5155:4
5175:18,22,23 5176:19,
20 5177:11 5179:14,21
5180:18 5182:7 5185:5
5188:17 5194:25
5195:1,7,19 5196:22
5198:21 5232:11
5234:5 5262:20
5269:18 5273:16,17,
5279:21 5281:23
5282:2,5,9,11,14,17,23
5283:1,9,21 5284:4,9,

23 5285:4 5293:2,7,10
5294:3,13,17 5301:24
5302:6 5303:14
5304:13 5305:1
5321:20 5322:21,22
5323:14,22,25 5324:1,
5,7,24 5348:20 5362:17
5363:18 5366:3

**telling**
5339:21

**tens**
5226:3 5262:15

**term**
5155:15 5190:9
5227:13 5230:2
5260:18 5283:9,
5302:10,23 5340:18

**terminal**
5366:6 5367:4

**terminated**
5221:7

**termination**
5216:15 5218:16

**terminology**
5337:1

**terms**
5154:8 5162:12 5168:6,
19 5187:2 5191:22
5194:15,18 5195:2,4
5197:20 5199:4
5205:23 5221:2
5227:14 5233:22
5234:15 5235:3,22
5246:17 5269:20
5271:6 5290:5,7
5291:6,7 5340:11
5353:1 5390:16

**territories**
5152:8 5153:4 5205:6

**territory**
5152:10,12 5175:19
5227:12

**test**
5257:22

**testament**
5359:21 5389:16

**tested**
5222:13

**testified**
5237:8 5259:23 5269:6
5273:12 5275:21
5390:10

**testifying**
5259:18

**testimonies**
5271:17

**testimony**
5216:3 5220:24
5234:25 5241:14
5270:7,8,12,18 5271:7,
15,16 5321:13 5345:18
5389:14

**text**
5167:11 5188:6 5206:9,
14

**the's**
5328:12

**theft**
5164:5

**theme**
5219:15 5220:4

**themes**
5361:3

**theories**
5212:2 5215:3 5218:19
5222:15 5226:23
5228:19 5229:4 5241:5
5243:9,14 5245:11
5246:17 5250:1,2
5261:23

**theory**
5154:3, 5210:6,7,8,
5213:21 5223:9,11
5227:14,15,20 5240:19,
21 5241:3,9,22 5243:1,
13,17 5244:5,9 5246:7,
8,16 5247:5 5248:21
5249:10,25 5250:3,6,16
5251:23 5255:1,6,9
5260:24,25 5261:2,16,
18,24 5269:10 5275:15
5276:24 5277:2
5325:20 5362:9 5374:2
5394:5

**thereto**
5310:14 5311:9

**thing**
5165:25 5172:10

5209:6 5269:25
5285:17 5293:11
5299:8 5309:10
5313:16 5315:20
5317:19 5329:14
5334:23 5336:6 5341:1,
8 5350:21

**things**
5171:16 5185:22
5199:10 5258:19
5279:17 5312:23
5315:18 5317:21
5319:17 5331:11

**thinking**
5235:25 5332:6
5333:23 5378:16

**thinks**
5204:16

**thought**
5150:25 5214:5
5230:11 5268:16
5275:12 5280:10
5303:21 5317:24
5337:20 5352:15
5382:6

**thousands**
5226:4 5389:15

**three-quarters**
5298:19

**threshold**
5270:22 5380:15
5389:6

**throw**
5215:2 5250:18

**throwing**
5334:22,23

**tick**
5195:14

**tidal**
5202:17 5296:4
5359:20

**tide**
5359:23

**tied**
5238:14

**tier**
5233:20

 

**ties**
  5200:4,13

**tight**
  5371:4

**time**
  5154:13 5158:23
  5161:18 5163:5
  5178:16 5183:4
  5189:21 5198:17
  5199:22 5202:9,21,25
  5203:2 5204:9,11
  5211:12,13,16 5213:23
  5219:20 5223:6 5228:4
  5247:20 5248:4 5250:8
  5258:16 5260:23
  5266:11,22 5267:6,20,
  24 5273:5 5275:1
  5277:13,20,24 5280:16,
  24 5281:3 5283:19
  5284:7,21 5293:11,13
  5296:20 5304:23
  5306:7,8 5307:6
  5308:13 5319:3 5336:7,
  18 5337:10 5348:8,23
  5351:8,14,19 5358:3,4
  5359:6,12 5360:1,2,6,
  12,19 5361:3 5362:13
  5363:25 5364:5
  5367:22 5369:21
  5374:13,19 5375:2,18,
  20,24 5376:3 5378:16
  5381:4 5385:22 5386:8,
  9 5387:1,2,4 5389:10
  5390:19 5395:6

**timeline**
  5375:16

**timelines**
  5375:13

**times**
  5213:5 5218:11 5284:6
  5362:23

**title**
  5152:22 5153:10,22
  5154:19,24 5155:3,7,
  10,14 5156:20,21
  5157:5,12,13,19
  5158:1,11,14,19,20
  5159:1,6,7,10,14,15
  5160:16,17 5161:3,5,9,
  20,21 5162:1 5163:3,7,
  10,13 5164:10,11,17,
  21,22,23 5165:12,13,
  14,17,18,19 5166:3,9,

  10,12,17,18 5168:9,22
  5169:8,20 5170:14,18
  5173:3,13 5174:19,21
  5175:6,9,21 5177:11
  5183:9,14,19 5184:4,7,
  18 5186:5,8 5187:11,21
  5188:15,16 5207:1
  5208:6 5269:17 5270:2
  5272:4,6 5275:4
  5279:18,19 5284:12,14,
  16 5285:1,2,5 5286:17,
  18 5287:7,9,13 5296:22
  5301:23 5302:1,5,10,
  13,24 5303:7,12,20,22,
  24 5304:4,6,7, 5307:13,
  15,16,22 5309:3,9
  5310:1,2,6,7,18,25
  5311:11,14,18,21
  5312:9,20,22,23
  5313:10,19,22 5314:4,
  7,15,17,22 5315:4,7,8,
  10,14,24,25 5316:1,6
  5323:23 5325:19
  5331:4,6,10 5339:2
  5346:1 5363:4,17
  5374:3,6 5392:22,23

**today**
  5246:22 5258:19
  5261:14 5269:5,15
  5270:7 5279:5 5292:9
  5304:15 5316:17
  5325:6,7 5376:1,11,19
  5378:3 5389:11
  5391:20 5393:19

**told**
  5196:21 5198:23
  5202:13 5217:22
  5292:18 5304:5 5379:9

**Tomo's**
  5365:5

**tomorrow**
  5376:12,19 5377:7
  5379:5,21 5394:14,19

**tone**
  5348:24

**tools**
  5211:2

**tooth**
  5394:10

**top**
  5265:15 5289:9
  5310:23 5340:6

**topic**
  5203:15

**Toronto**
  5225:12 5279:16
  5395:21

**total**
  5349:6 5369:14
  5375:24

**totally**
  5232:5

**touch**
  5228:22 5296:17,23

**TR21500**
  5340:21

**TR45736**
  5341:11

**TR46984**
  5182:7

**TR48819**
  5339:14

**trace**
  5250:23

**tracked**
  5266:8

**trade**
  5257:5

**trading**
  5266:15

**trailblazing**
  5262:18

**transaction**
  5160:1,12 5165:7
  5166:12,13 5168:9,20
  5170:13 5183:4
  5192:21 5209:7
  5213:16 5217:24
  5218:3,14,21,24
  5219:4,11,12,24 5220:4
  5271:24 5274:5 5383:6

**transactions**
  5274:18

**transcribed**
  5395:11

**transcript**
  5395:13

**transfer**
  5157:24 5159:9,10

  5160:11 5161:20,21
  5164:11,17 5176:7
  5178:20 5181:22
  5217:3,8,14 5234:11
  5235:20,22,23 5236:1
  5237:7 5238:13
  5249:22 5270:14,19
  5294:5 5300:12
  5313:19 5314:14,16
  5321:14 5329:20,24
  5331:15,17,19 5334:11,
  17 5336:8 5337:5,17
  5361:6 5363:14 5390:8
  5391:11,18

**transferable**
  5151:23

**transferred**
  5313:21 5318:9 5325:2
  5372:15,18

**transferring**
  5164:10

**translate**
  5236:1

**transmit**
  5309:8

**travelling**
  5377:23

**treasury**
  5233:13 5354:21

**treat**
  5208:13 5264:3
  5280:12

**treated**
  5185:14,15 5208:12
  5230:20 5263:10
  5333:6 5362:7

**treatment**
  5226:8 5243:24 5244:2
  5384:23

**treats**
  5255:19 5360:16

**tremendous**
  5299:21 5350:17
  5351:16

**tremendously**
  5349:1

**trial**
  5149:12 5176:1 5212:4,



14 5216:21 5217:13,21
5221:16 5223:18,22
5226:14 5240:6 5248:5
5249:20 5259:14
5272:21 5279:23
5280:19 5292:11
5294:24 5359:22
5364:17 5365:4,22
5389:14

**triers**
5271:12

**triggered**
5164:16 5165:3,12,13

**triggering**
5165:2

**trite**
5317:25 5344:22

**true**
5155:13 5215:15
5232:19, 5258:21
5272:14 5362:25
5395:12

**trust**
5161:15,18 5171:20
5187:21 5267:16
5268:7 5276:25
5390:22 5392:12,16,19

**Trustee**
5171:22

**Trustees**
5171:19

**tsunami**
5202:17 5296:5
5359:20,24

**turn**
5174:10,17 5203:14
5206:25 5207:1
5239:16 5263:3
5264:14 5318:4 5326:6
5332:15 5354:6
5364:22, 5380:25
5391:6

**turned**
5159:24 5164:7
5268:16 5290:10

**turning**
5391:7

**turns**
5274:9

**TV**
5296:14

**type**
5168:10 5226:12
5292:14 5346:6

**types**
5261:13 5271:14,22

---

**U**

**UCC'S**
5258:20

**UK**
5171:9 5173:25 5235:3
5238:11 5341:5 5361:6,
9 5363:14 5375:21
5376:22,24 5377:1
5378:13 5380:9
5382:14 5386:6

**UKP**
5230:15 5239:11
5242:1

**UKPC**
5381:6 5388:5 5389:21

**ultimate**
5249:2

**ultimately**
5214:3 5219:7 5228:8
5343:20

**unaffected**
5194:8

**unambiguous**
5275:2,3

**unanimous**
5390:14

**unclear**
5282:24

**uncontroverted**
5226:18 5232:8
5271:17

**undercut**
5290:17

**underlined**
5167:12

**underlying**
5207:25

**underpinning**
5261:9

**underscore**
5227:8

**understand**
5174:6,9 5180:11
5186:24 5192:7
5193:20 5205:13
5210:25 5228:19
5245:17 5249:7
5250:15 5253:4
5264:25 5265:1
5274:24 5286:16
5295:14 5313:15
5314:8 5335:5 5369:2
5386:23

**understanding**
5191:7,8,14 5204:25
5205:1 5206:3 5289:16
5345:19 5357:8 5369:3

**understandings**
5191:16

**understood**
5204:17 5214:10
5226:13

**undertaken**
5166:14 5312:3

**undertook**
5238:10 5370:11

**undisputed**
5251:6

**undistributed**
5248:18

**undo**
5370:18,20

**unequivocal**
5304:12 5347:8

**unexpectedly**
5375:8

**unfair**
5275:9

**unfettered**
5384:1

**unfolded**
5223:22

**unfortunate**
5272:3 5381:10

**unilaterally**
5216:12

**unintegrated**
5257:12

**union**
5156:22

**unique**
5381:25 5387:17

**United**
5171:17 5193:20
5200:24 5201:7
5234:21,23 5244:21
5247:13 5271:25
5274:23 5276:4

**units**
5257:5

**unjust**
5387:22 5392:13

**unkindly**
5280:8

**unlawful**
5167:15,16

**unlike**
5393:18

**unlimited**
5151:21 5384:1

**unnecessary**
5341:24

**unprecedented**
5225:23 5277:3

**unreasonable**
5274:4

**unrepresentative**
5368:25

**unrestricted**
5154:1

**unsecured**
5229:19 5243:2,18
5244:14,16 5264:3
5384:24

**unsuccessful**
5250:10

**unsustainable**
5250:3 5261:23

**untenable**
5170:19

**unusual**
5168:20

**updated**
5178:16

**upfront**
5273:7

**upheld**
5261:14 5308:10

**upside**
5179:16 5180:1,3,5
5181:4,12 5182:4
5274:8

**upstream**
5337:23

**urge**
5211:2 5393:19

**USA**
5395:21

**V**

**vacuum**
5229:16,17 5385:11

**valid**
5251:13

**validity**
5260:5

**valuable**
5273:22 5343:16
5349:1 5372:22

**valuation**
5207:20,22,23 5209:5,
20 5210:13 5228:7,8
5241:13 5365:2

**value-destructive**
5214:12 5224:1

**valued**
5347:13 5348:6

**valueless**
5152:23 5153:11,22
5154:19 5168:10

**valuers**
5209:20

**values**
5242:5 5373:20

**valuing**
5208:19 5236:11

**variance**
5334:20

**varies**
5193:19

**vary**
5357:14

**vastly**
5258:17

**venture**
5387:20

**verb**
5174:25

**versa**
5171:15 5348:17

**version**
5150:15,16 5178:18
5182:20 5298:13

**Veschi**
5370:10,11,25

**vest**
5157:16,17,20 5161:22
5183:9 5285:19

**vested**
5155:4 5170:13
5188:18 5195:3 5236:6
5269:20 5270:3 5275:4
5279:18 5302:1
5323:22

**vesting**
5166:3,17 5183:14
5187:11 5193:15
5284:12,16 5323:23

**vests**
5188:15 5285:1

**viability**
5386:1

**viable**
5262:4

**vice**
5171:15 5348:17

**view**
5187:22 5190:18
5234:9 5235:18
5301:16 5321:14
5335:11 5356:17

5374:3 5377:7

**viewed**
5229:16 5246:14
5393:9

**views**
5232:4

**violate**
5320:3,6

**virtually**
5265:11

**vis-à-vis**
5167:24 5197:12

**visit**
5163:5 5181:4

**Volume**
5298:4 5299:6 5301:9
5307:25 5311:23
5318:2 5343:9

**volumes**
5151:6

**voluntarily**
5164:11

**W**

**wait**
5225:3

**waived**
5215:6 5222:15

**waiver**
5383:3

**Walancik**
5225:11

**walk**
5215:9 5294:19

**walking**
5374:22

**Walter**
5390:7

**wanted**
5156:19 5160:2 5182:5
5184:24 5189:6 5190:4
5200:12,14 5207:24
5329:14 5336:6

**warning**
5156:13

**warrant**
5309:22

**warranting**
5197:14

**wasteful**
5381:20

**waterfall**
5230:1 5231:10,19
5237:14 5239:6

**wave**
5202:17 5296:4
5359:21

**Wawanesa**
5163:25

**ways**
5160:7 5185:23
5195:14 5227:3
5279:23 5318:14
5324:20 5358:21

**wealth**
5204:20

**Wednesday**
5377:14,22,24 5378:1
5379:6,7,10

**week**
5375:15

**weekend**
5332:6

**weight**
5372:24

**Weisz**
5390:9

**well-known**
5298:1 5302:10

**well-stated**
5276:23

**well-thumbed**
5150:16

**Westdeutsche**
5159:19

**whatsoever**
5323:3 5356:25

**whilst**
5341:5 5363:16

**White**
5343:9,14,21,22,24,25

5345:5,6 5346:1

**Whitley-sebti**
5225:14

**wide**
5382:22

**WILCOX**
5395:20

**Wilkinson**
5160:20

**Wilmington**
5267:16 5268:7
5276:25 5390:22
5395:21

**Wilton**
5236:15

**winding**
5367:8

**Winkler**
5221:6

**wiped**
5335:19

**wisdom**
5359:21

**withhold**
5162:19

**witnesses**
5322:2 5390:6

**wonderful**
5268:4

**word**
5157:4,7,17,23 5159:15
5176:11,14 5221:12
5222:9 5271:2 5276:10
5292:12,23 5304:20
5327:14, 5339:24
5341:1 5383:7

**worded**
5169:17

**wording**
5177:16 5203:18
5227:24 5228:1 5316:8

**words**
5152:8 5153:5 5155:1,7
5159:6 5161:19
5164:22 5167:20,21
5168:11 5177:25
5180:1 5195:6,9,10,17,

21 5197:3,7 5204:1,2
5205:25 5206:6 5208:7
5209:13 5235:1 5249:6
5282:12,13,24,25
5283:3 5284:1,8,25
5287:13 5288:25
5289:1,17,19 5293:3,5
5300:25 5301:1
5314:22 5376:10

**work**
5159:6 5170:22
5193:21 5216:13
5235:22 5243:5 5253:1
5292:15 5295:9
5348:22,23 5370:18,20
5379:14 5392:20

**worked**
5235:13

**workforce**
5372:19,20,22

**working**
5392:17

**works**
5171:15 5317:22

**world**
5197:17 5236:2 5294:1
5331:8 5332:20 5362:1

**worldwide**
5236:22 5238:24
5262:14 5389:25
5391:4 5393:24

**worrying**
5377:12

**worse**
5285:15

**worth**
5237:23

**worthless**
5218:2

**wrap**
5261:20

**wrestling**
5209:10

**wriggle**
5282:25

**write**
5173:12 5361:21,22

**write-down**
5361:19

**write-off**
5361:19

**written**
5150:6 5174:11
5191:22 5206:7 5281:5
5319:18,19 5384:20
5390:4

**wrong**
5154:18,20 5208:1
5339:24 5366:16
5367:5,6 5368:4,5,23
5372:5,7

---

### Y

**year**
5225:24 5281:13
5282:19 5283:18
5331:20,21 5334:2,18
5361:11 5363:12
5365:17

**year-to-year**
5333:25

**years**
5225:25 5238:20
5280:25 5284:7 5288:1,
7 5292:5 5362:2
5366:3,15,21 5367:16
5368:10 5389:13
5392:20

**yellow**
5363:24

**yield**
5261:25

**York**
5376:9

---

### Z

**Zarnett**
5149:21,22,23 5150:20
5151:7 5156:3,5,8,14,
18 5162:5,7,11,25
5166:20,23 5169:4,
5173:10,21 5174:7,10
5175:2,5 5176:16,22
5177:5,8 5180:22
5181:24 5182:13,16,20,

23 5183:2,24 5184:2,
5186:12,19,22,25
5187:6 5188:2,4,10,14
5189:3,20 5190:4
5192:2,19,25 5193:4,
10,14 5194:4 5197:2,6,
10 5198:3,8,13,18
5199:3 5200:8,12
5201:20,23 5202:4,6,
12,15 5203:4,5,12,13
5207:10 5209:24
5210:4,14,17 5211:1
5215:16 5226:19
5227:11 5228:15,22
5232:3 5235:20 5241:2
5246:22 5268:4
5269:14 5270:22
5279:6 5281:10,24
5288:11,23 5289:14
5296:4 5298:2 5302:24
5307:21 5308:16
5317:15 5359:20

**Zigler**
5224:19,21,25 5225:5,
9,10 5228:20 5229:25
5231:13,21 5232:20,21
5233:6 5241:1 5251:4
5275:11 5393:19



www.neesonsreporting.com
www.wilfet.com