In the Matter Of:

# Nortel Trial

## DAY 24

## September 24, 2014



WILCOX & FETZER LTD.

FOR EXCELLENCE IN COURT REPORTING

```
 1              UNITED STATES BANKRUPTCY COURT

 2               FOR THE DISTRICT OF DELAWARE

 3      ----------------------------)

 4    In Re                         )

 5      NORTEL NETWORKS INC.,       )  Case No.

 6      et al.,                     )  09-10138 (KG)

 7        Debtors.                  )

 8      ----------------------------)

 9                     - and -

10           Court File No. 09-CL-7950

11                    ONTARIO

12          SUPERIOR COURT OF JUSTICE

13                (COMMERCIAL LIST)

14       IN THE MATTER OF THE COMPANIES' CREDITORS

15    ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED

16      AND IN THE MATTER OF A PLAN OF COMPROMISE OR

17    ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL

18       NETWORKS LIMITED, NORTEL NETWORKS GLOBAL

19      CORPORATION, NORTEL NETWORKS INTERNATIONAL

20      CORPORATION AND NORTEL NETWORKS TECHNOLOGY

21                   CORPORATION

22      APPLICATION UNDERT PART IV OF THE COMPANIES'

23    CREWDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36,

24                   AS AMENDED

25
```

1

2

3

4    ---- This is the Day 24/Volume 24 of the transcript

5    of the proceedings in the above matter held

6    simultaneously in:

7    Superior Court of          United States Bankruptcy

8    Ontario (Commercial        Court for the District of

9    List)                      Delaware

10   Courtroom 8-1              Courtroom 3

11   330 University Avenue      824 Market Street

12   Toronto, Ontario          Wilmington, Delaware

13

14

15   on the 24th day of September, 2014, commencing at

16   8:41 a.m.

17

18                    ---------

19   B E F O R E:

20   The Honorable Judge Kevin Gross (United States)

21   The Honorable Mr. Justice Frank Newbould (Canada)

22

23                    ---------

24

25

```
 1    A P P E A R A N C E S:

 2

 3    CANADIAN DEBTORS

 4

 5    FOR THE MONITOR, ERNST & YOUNG INC.

 6    GOODMANS LLP

 7    Bay Adelaide Centre

 8    333 Bay Street, Suite 3400

 9    Toronto, ON  M5H 2S7

10    PER: Jay Carfagnini, Esq.

11         Joseph Pasquariello, Esq.

12         Ben Zarnett, Esq.

13         Alan Mark, Esq.

14         Peter Ruby, Esq.

15         Jessica Kimmel, Esq.

16         Chris Armstrong, Esq.

17         Julie Rosenthal, Esq.

18    ERNST & YOUNG INC.

19    Ernst & Young Tower

20    222 Bay Street, P.O. Box 251

21    Toronto, ON  M5K 1J7

22

23    PER: Murray McDonald, Esq.

24         Brent Beekenkamp, Esq.

25
```

```
 1    FOR THE APPLICANTS

 2    GOWLING LAFLEUR HENDERSON LLP

 3    Suite 1600, First Canadian Place

 4    100 King Street West

 5    Toronto, ON  M5X 1G5

 6    PER: Derrick Tay, Esq.

 7         Jennifer Stam, Esq.

 8

 9    FOR THE CANADIAN DEBTORS

10    ALLEN & OVERY LLP

11    1221 Avenue of the Americas

12    New York, NY  10020

13    PER: Ken Coleman, Esq.

14         Paul Keller, Esq.

15         Daniel Guyder, Esq.

16         Laura Hall, Esq.

17         Joseph Badtke-Berkow, Esq.

18         Jonathan Cho, Esq.

19         Nicolette Ward, Esq.

20

21    FOR THE CANADIAN DEBTORS

22    BUCHANAN INGERSOLL & ROONEY

23    1105 North Market Street

24    Suite 1900

25    Wilmington, DE  19801-1054
```

```
 1    PER: Kathleen A. Murphy, Esq.

 2         Mary F. Caloway, Esq.

 3

 4    U.S. DEBTORS

 5

 6    FOR NORTEL NETWORKS INC.

 7    TORYS LLP

 8    79 Wellington Street West, Suite 3000

 9    Box 270, TD Centre

10    Toronto, ON  M5K 1N2

11    PER: Sheila Block, Esq.

12         Andrew Gray, Esq.

13

14    FOR THE U.S. DEBTORS

15    MORRIS, NICHOLS, ARSHT & TUNNELL LLP

16    1201 North Market Street, 16th Floor

17    P.O. Box 1347

18    Wilmington, DE  19899-1347

19    PER: Derek Abbott, Esq.

20         Annie Cordo, Esq.

21

22    FOR NORTEL NETWORKS INC.

23    CLEARY GOTTLIEB STEEN & HAMILTON LLP

24    One Liberty Plaza

25    New York, NY  10006
```

```
 1   PER: James Bromley, Esq.

 2        Lisa Schweitzer, Esq.

 3        Howard Zelbo, Esq.

 4        Jeffrey Rosenthal, Esq.

 5        Avi Luft, Esq.

 6

 7   EMEA DEBTORS

 8

 9   FOR THE JOINT ADMINISTRATORS OF NORTEL NETWORKS UK

10   LIMITED

11   DAVIES WARD PHILLIPS & VINEBERG LLP

12   40th Floor

13   135 Wellington Street

14   Toronto, ON  M5V 3G7

15   PER: Matthew Milne-Smith, Esq.

16        Robin B. Schwill, Esq.

17        Sean Campbell, Esq.

18        James Doris, Esq.

19        Louis Sarabia, Esq.

20

21   FOR THE JOINT ADMINISTRATORS OF NORTEL NETWORKS UK

22   LIMITED

23   LAX O'SULLIVAN SCOTT LISUS LLP

24   Suite 2750, 145 King Street West

25   Toronto, ON  M5H 1J8
```

```
 1   PER: Matthew P. Gottlieb, Esq.

 2        Tracy Wynne, Esq.

 3        Paul Michell, Esq.

 4

 5   FOR THE JOINT ADMINISTRATORS OF NORTEL NETWORKS UK

 6   LIMITED

 7   HUGHES HUBBARD & REED

 8   One Battery Park Plaza

 9   New York, NY  10004-1482

10   PER: Derek Adler, Esq.

11        William Maguire, Esq.

12        Neil Oxford, Esq.

13        Fara Tabatabai, Esq.

14        Charles Huberty, Esq.

15

16   FOR THE JOINT ADMINISTRATORS OF NORTEL NETWORKS UK

17   LIMITED

18   YOUNG CONAWAY STARGATT & TAYLOR LLP

19   Rodney Square

20   1000 North King Street

21   Wilmington, DE  19801

22   PER: Ed Harron, Esq.

23        John Dorsey, Esq.

24

25   FOR THE EMEA DEBTORS
```

```
 1   HERBERT SMITH FREEHILLS LLP

 2   Exchange House

 3   Primrose Street

 4   London, England  EC2A 2EG

 5   PER: James Norris-Jones, Esq.

 6

 7   CANADIAN CREDITORS COMMITTEE

 8

 9   FOR THE FORMER EMPLOYEES OF NORTEL AND LTD

10   BENEFICIARIES

11   KOSKIE MINSKY

12   20 Queen Street West

13   Suite 900

14   Toronto, ON  M5H 3R3

15   PER: Mark Zigler, Esq.

16        Susan Philpott, Esq.

17        Ari Kaplan, Esq.

18        Barbara Walancik, Esq.

19

20   FOR ALL ACTIVE AND RETIRED NORTEL EMPLOYEES

21   REPRESENTED BY THE CAW-CANADA

22   CAW-CANADA

23   Legal Department

24   205 Placer Court

25   Toronto, ON  M2H 3H9
```

```
 1   PER: Barry E. Wadsworth, Esq.

 2        Lewis Gottheil, Esq.

 3

 4   FOR THE RECENTLY SEVERED CANADIAN NORTEL EMPLOYEES

 5   COMMITTEE

 6   SHIBLEY RIGHTON LLP

 7   University Avenue, Suite 700

 8   Toronto, ON  M5H 3E5

 9   PER: Arthur O. Jacques, Esq.

10        Thomas McRae, Esq.

11

12   FOR THE SUPERINTENDENT OF FINANCIAL SERVICES AS

13   ADMINISTRATOR OF THE PENSION BENEFITS GUARANTEE

14   FUND

15   PALIARE ROLAND ROSENBERG ROTHSTEIN LLP

16   35th Floor

17   155 Wellington Street West

18   Toronto, ON  M5V 3H1

19   PER: Kenneth T. Rosenberg, Esq.

20        Massimo (Max) Starnino, Esq.

21        Lily Harmer, Esq.

22        Karen Jones, Esq.

23        Tina Lie, Esq.

24        Michelle Jackson, Esq.

25
```

```
 1   FOR THE STEERING COMMITTEE OF NORTEL CANADIAN

 2   CONTINUING EMPLOYEES - POST CCAA AS AT JANUARY 14,

 3   2009

 4   NELLIGAN O'BRIEN PAYNE LLP

 5   50 O'Connor Street, Suite 1500

 6   Ottawa, ON  K1P 6L2

 7   PER: Janice B. Payne, Esq.

 8        Steven Levitt, Esq.

 9        Christopher Rootham, Esq.

10        Ainslie Benedict, Esq.

11

12   FOR MORNEAU SHEPELL LIMITED

13   MCCARTHY TETRAULT LLP

14   Suite 5300, Toronto Dominion Bank Tower

15   Toronto, ON  M5K 1E6

16   PER: Barbara J. Boake, Esq.

17        James D. Gage, Esq.

18        Elder C. Marques, Esq.

19        Paul Steep, Esq.

20        Byron Shaw, Esq.

21        Sharon Kour, Esq.

22        Kelly Peters, Esq.

23

24   FOR THE CANADIAN CREDITORS COMMITTEE

25   DLA PIPER
```

1   919 North Market Street, Suite 1500

2   Wilmington, DE   19801

3   PER: Selinda A. Melnik, Esq.

4       Richard Hans, Esq.

5       Timothy Hoeffner, Esq.

6       Jason Gerstein, Esq.

7       Farah Lisa Whitley-Sebti, Esq.

8

9   INFORMAL NORTEL NOTEHOLDER GROUP

10

11  FOR THE INFORMAL NORTEL NOTEHOLDER GROUP

12  BENNETT JONES LLP

13  1 First Canadian Place

14  Suite 3400

15  Toronto, ON   M5X 1A4

16  PER: Kevin Zych, Esq.

17       S. Richard Orzy, Esq.

18       Gavin Finlayson, Esq.

19       Richard Swan, Esq.

20       Sean Zweig, Esq.

21       Jonathan Bell, Esq.

22       Amanda McLachlan, Esq.

23

24  FOR THE INFORMAL NORTEL NOTEHOLDER GROUP

25  MILBANK, TWEED, HADLEY, MCCLOY LLP

```
 1    1 Chase Manhattan Plaza

 2   New York, NY  10005

 3   PER: Thomas R. Kreller, Esq.

 4        Jennifer P. Harris, Esq.

 5        Albert A. Pisa, Esq.

 6        Samir Vora, Esq.

 7        Andrew LeBlanc, Esq.

 8        Michael Hirschfeld, Esq.

 9        Atara Miller, Esq.

10        Tom Matz, Esq.

11        Nick Bassett, Esq.

12        Gabrielle Ruha, Esq.

13        Rachel Pojunas, Esq.

14

15   THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

16

17   FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

18   CASSELS BROCK & BLACKWELL LLP

19   Suite 2100, Scotia Plaza

20   40 King Street West

21   Toronto, ON  M5H 3C2

22   PER: Shayne Kukulowicz, Esq.

23        Michael Wunder, Esq.

24        Ryan Jacobs, Esq.

25
```

```
 1    FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

 2    ASHURST LLP

 3    Boardwalk House

 4    5 Appold Street

 5    London, England  EC2A 2HA

 6    PER: Angela Pearson, Esq.

 7         Antonia Croke, Esq.

 8

 9    FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

10    RICHARDS LAYTON & FINGER, P.A.

11    920 North King Street

12    Wilmington, DE  19801

13    PER: Christopher Samis, Esq.

14

15    FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

16    AKIN GUMP STRAUSS HAUER & FELD LLP

17    One Bryant Park

18    New York, NY  10036

19    PER: Fred S. Hodara, Esq.

20         David H. Botter, Esq.

21         Abid Qureshi, Esq.

22         Robert A. Johnson, Esq.

23         Brad M. Kahn, Esq.

24         Christine Doniak, Esq.

25         Joseph Sorkin, Esq.
```

```
 1        Jacqueline Yecies, Esq.

 2   UK PENSION PROTECTION FUND AND NORTEL NETWORKS

 3   UK PENSION TRUST LIMITED

 4

 5   FOR THE UK PENSION PROTECTION FUND AND NORTEL

 6   NETWORKS UK PENSION TRUST LIMITED

 7   THORNTON GROUT FINNIGAN LLP

 8   Suite 3200, 100 Wellington Street West

 9   P.O. Box 329

10   Toronto, ON  M5K 1K7

11   PER: Michael Barrack, Esq.

12        D.J. Miller, Esq.

13        Rebecca Lewis, Esq.

14        Andrea McEwan, Esq.

15        John Finnigan, Esq.

16        Michael Shakra, Esq.

17        D.J. Miller, Esq.

18

19   FOR THE UK PENSION PROTECTION FUND AND NORTEL

20   NETWORKS UK PENSION TRUST LIMITED

21   WILLKIE FARR & GALLAGHER LLP

22   787 Seventh Avenue

23   New York, NY  10019-6099

24   PER: Brian O'Connor, Esq.

25        Sameer Advani, Esq.
```

1          Andrew Hanrahan, Esq.

2

3    FOR THE UK PENSION PROTECTION FUND AND NORTEL

4    NETWORKS UK PENSION TRUST LIMITED

5    BAYARD, P.A.

6    222 Delaware Avenue, Suite 900

7    Wilmington, DE  19899

8    PER: Charlene D. Davis, Esq.

9          Justin Alberto, Esq.

10

11   THE BANK OF NEW YORK MELLON

12

13   FOR THE BANK OF NEW YORK MELLON

14   MCMILLAN LLP

15   Brookfield Place

16   181 Bay Street, Suite 4400

17   Toronto, ON  M5J 2T3

18   PER: Sheryl E. Seigel, Esq.

19

20   FOR THE BANK OF NEW YORK MELLON

21   LATHAM & WATKINS LLP

22   885 Third Avenue

23   New York, NY  10022-4834

24   PER: Michael J. Riela, Esq.

25

```
 1   FOR THE BANK OF NEW YORK MELLON

 2   VEDDER PRICE

 3   1633 Broadway, 47th Floor

 4   New York, New York 10019

 5   PER:  Michael J. Riela, Esq.

 6

 7   WILMINGTON TRUST, NATIONAL ASSOCIATION

 8

 9   FOR WILMINGTON TRUST, NATIONAL ASSOCIATION

10   HEENAN BLAIKIE LLP

11   Bay Adelaide Centre

12   333 Bay Street, Suite 2900

13   P.O. Box 2900

14   Toronto, ON  M5H 2T4

15   PER: John Salmas, Esq.

16        Kenneth Kraft, Esq.

17        Sara-Ann Van Allen, Esq.

18

19   FOR WILMINGTON TRUST, NATIONAL ASSOCIATION

20   KATTEN MUCHIN ROSENMAN LLP

21   575 Madison Avenue

22   New York, NY  10022-2585

23   PER: Craig A. Barbarosh, Esq.

24        David A. Crichlow, Esq.

25        Karen B. Dine, Esq.
```

  1

  2    LAW DEBENTURE TRUST COMPANY OF NEW YORK

  3

  4    FOR LAW DEBENTURE TRUST COMPANY OF NEW YORK

  5    BORDEN LADNER GERVAIS LLP

  6    40 King Street West

  7    Toronto, ON  M5H 3Y4

  8    PER: Edmond F.B. Lamek, Esq.

  9         James Szumski, Esq.

 10

 11    FOR LAW DEBENTURE TRUST COMPANY OF NEW YORK

 12    PATTERSON BELKNAP WEBB & TYLER LLP

 13    1133 Avenue of the Americas

 14    New York, NY  10036

 15    PER: Daniel A. Lowenthal, Esq.

 16

 17    BOARDS OF DIRECTORS OF NORTEL NETWORKS

 18    CORPORATION AND NORTEL NETWORKS LIMITED

 19

 20    FOR THE BOARDS OF DIRECTORS OF NORTEL NETWORKS

 21    CORPORATION AND NORTEL NETWORKS LIMITED

 22    OSLER HOSKIN AND HARCOURT LLP

 23    100 King Street West

 24    1 First Canadian Place, Suite 6100

 25    P.O. Box 50

```
 1   Toronto, ON  M5X 1B8

 2   PER: Lyndon Barnes, Esq.

 3        Edward Sellers, Esq.

 4        Betsy Putnam, Esq.

 5        Adam Hirsh, Esq.

 6        Alexander Cobb, Esq.

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                        I N D E X

 2   CLOSING STATEMENTS:                           PAGE

 3        BY MR. RIELA                             5761

 4        BY MR. LOWENTHAL                         5767

 5        BY MR. ZARNETT                           5772

 6        BY MR. ZIGLER                            5813

 7        BY MR. MAGUIRE                           5828

 8        BY MR. GOTTLIEB                          5845

 9        BY MR. BARRACK                           5851

10        BY MS. MILLER                            5859

11        BY MR. CHANG                             5862

12        BY MR. BROMLEY                           5868

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    ---- Upon commencing at commencing at 8:41 a.m.

2              THE US COURT:  Good morning, everyone.

3    Please be seated.  Thank you very much.

4              Good morning, Justice Newbould.

5              THE CANADIAN COURT:  Good morning,

6    Judge Gross.  So who is up to bat and who is on

7    deck?

8              MR. ZARNETT:  I know I am on deck.

9              THE US COURT:  Mr. Bromley, good

10   morning.

11             MR. BROMLEY:  Good morning, Your

12   Honors.  James Bromley of Cleary Gottlieb on behalf

13   of the US Debtors.  Before we get going this

14   morning, I just wanted to pick up where we left off

15   in the evening, which was on procedural issues with

16   respect to how we would proceed today.  And I

17   believe that Mr. Maguire has a procedural question

18   as well, so we will be quick to try to get those

19   out of the way.

20             THE US COURT:  Very well, Mr. Bromley.

21             MR. BROMLEY:  In terms of the order of

22   play --

23             THE US COURT:  Yes.

24             MR. BROMLEY:  -- batting order today,

25   the parties did convene a phone call last night in

1    terms of trying to divide times, and unfortunately,

2    there was not a unanimity of opinion as to how to

3    proceed.  I am sure that surprises the Courts.

4              THE US COURT:  You have all done a

5    remarkable job, though, of coordinating.

6              MR. BROMLEY:  We tried very hard.  And

7    on the most part, the procedural issues have

8    generally, I think, been worked out consensually.

9              THE US COURT:  Yes.

10             MR. BROMLEY:  One of the things that we

11   are dealing with is the fact that we are now moving

12   after the indenture trustees speak into the

13   rebuttal.  And I think it is fair to say that from

14   a timing perspective, we just want to make sure

15   that everyone has the ability to actually have a

16   rebuttal, and so we are going to depend on everyone

17   to move as quickly as possible.

18             Based on what we have heard, I think

19   that the expectation is that the Monitor will have

20   more time or more information to provide.  We can't

21   fully calculate what we need to do in rebuttal

22   until we hear what the Monitor has to say.

23             At least from our perspective, we just

24   encourage everyone to be as timely as possible,

25   keeping in mind that the holiday for our Jewish

1    colleagues starts this evening --

2              THE US COURT:  Yes.

3              MR. BROMLEY:  -- and travel plans need

4    to stay firm on that.

5              THE US COURT:  I don't expect to hear a

6    lot of new material on rebuttal.

7              MR. BROMLEY:  Well, that is certainly

8    our hope, Your Honor.  I mean, from our

9    perspective, everything that we talked about in our

10   closing was in our papers.  So if anyone wanted to

11   raise it in the beginning of their closing

12   argument, then they had the opportunity to do so.

13             Also, at least, you know, from the US

14   perspective, rebuttal tends to be, I think, in the

15   appellate courts five minutes or ten minutes rather

16   than an hour or a half an hour.  And on this basis,

17   we will just have to proceed and see how it goes.

18   We encourage everyone to be as quick as possible.

19             Now, I think Mr. Maguire has a question

20   for the Court, so I will cede the podium to him.

21             THE US COURT:  Thank you, Mr. Bromley.

22             Mr. Maguire, good morning, sir.

23             MR. MAGUIRE:  Good morning, Judge

24   Gross.  Justice Newbould, good morning.

25             Judge Gross, there is simply a

1    housekeeping matter I wanted to raise with you, and

2    that is that there had been a meeting set up, I

3    think, for November 3 with the Court here in

4    Delaware.

5              THE US COURT:  Yes.

6              MR. MAGUIRE:  And I think originally

7    that may have grown out of proceedings related to

8    the Bondholder interests.

9              THE US COURT:  It did.

10             MR. MAGUIRE:  But we received the

11   Court's invitation to attend, and we are assuming

12   that in the event of settlement negotiations or

13   anything happening out of that, you would want to

14   have the decision-makers present.  So I just wanted

15   to clarify that we are meeting your expectations if

16   we have someone come from London to be present on

17   November 3 for that meeting.

18             THE US COURT:  That would be helpful,

19   certainly, Mr. Maguire.  Thank you.

20             MR. MAGUIRE:  Thank you.

21             THE US COURT:  Thank you for raising

22   it.

23             Mr. Bromley.

24             MR. BROMLEY:  Yes.  And on that, Your

25   Honor, I just wanted to make one point:  That we

1    had noticed in your note to the group that there

2    was the opportunity, if there was a difficulty, to

3    participate by phone.  At least from our

4    perspective, we believe this is of sufficient

5    import that if decision-makers can be available,

6    they should be available in person.

7              THE US COURT:  I agree.  And I should

8    have made that clear.  And when I was talking about

9    telephone, I was thinking more in terms of if, for

10   example, there is an attorney who would like to

11   participate who wants to be involved, that they did

12   not have to necessarily be present, especially

13   since space is somewhat limited.

14             MR. BROMLEY:  Thank you very much, Your

15   Honor.  Our view is that the primary participants

16   should be in person.  Certainly our decision-maker,

17   Mr. Ray, will be there in person, and we encourage

18   everyone to have their decision-maker there as

19   well.

20             THE US COURT:  Very well.  Thank you.

21             MR. BROMLEY:  Thank you, Your Honor.

22             THE US COURT:  We can start earlier in

23   the day.  The reason I said 5:00 was I assumed

24   parties would be coming in during the day, and I

25   didn't want them to have to necessarily spend an

 1    additional day here.  If it would be better for all

 2    of you, I can start earlier.

 3              MR. BROMLEY:  Well, I think, having

 4    become somewhat familiar with travel plans, I think

 5    it is just as easy to start in the morning.  People

 6    fly in the night before.  You know, the Brits, when

 7    they fly in in the afternoon, they tend to be a

 8    little groggy.  So I would encourage them to get in

 9    the night before.

10              THE US COURT:  Well, then let me do

11    this.  I will go back and check my calendar, and I

12    will let you know how early we might be able to

13    start this.

14              MR. BROMLEY:  Thank you.

15              THE US COURT:  Sure, Mr. Bromley.

16    Thank you.

17              Good morning, Ms. Melnik.

18              MS. MELNIK:  Good morning, Judge Gross.

19    I just wanted to ask a question with regard to

20    November 3.

21              THE US COURT:  Yes.

22              MS. MELNIK:  The CCC is comprised of

23    five very separate entities and representatives,

24    and the decision-making is collective.

25              THE US COURT:  Okay.

1             MS. MELNIK:  So it is kind of difficult

2    to have just one decision-maker for the group

3    present.  And also, in terms of efficiency, like

4    possibly many others, they have to consult with

5    constituents.

6             THE US COURT:  Yes.

7             MS. MELNIK:  And we were wondering

8    whether it was possible to have more than one

9    decision-maker there, but even more probably

10   efficient and effective would be to allow folks to

11   attend who are not going to participate, because I

12   know you want to limit the active participants, but

13   for them to be able to attend, listen only, and if

14   they have something to convey to their

15   representative, for them to be able to email them.

16            THE US COURT:  That would be fine.  Let

17   me do this, though.  Rather than take time today to

18   give this some thought, let me do that.

19            MS. MELNIK:  Okay.

20            THE US COURT:  And then I will

21   communicate with all of you about perhaps, for

22   example, there is someplace else we could do this

23   other than, you know, my courthouse, the courtroom.

24            MS. MELNIK:  Right.

25            THE US COURT:  Or the library, where

1    there would be more space and more people could,

2    therefore, attend.

3                    MS. MELNIK:  That would be lovely.

4                    THE US COURT:  All right.

5                    MS. MELNIK:  Thank you.

6                    THE US COURT:  Thank you very much.

7                    MS. MELNIK:  Thank you.

8                    THE US COURT:  Finally.

9                    MR. RIELA:  Yes.

10                   THE US COURT:  Good to see you.  Good

11   morning.

12                   MR. RIELA:  Thank you, Judge Gross.

13   Good morning, Justice Newbould.  My name is Michael

14   Riela from Vedder Price on behalf of Bank of New

15   York Mellon, the indenture Trustee with respect to

16   what has been called the crossover bonds, the bonds

17   that were issued by NNC or NNL, guaranteed by NNI.

18                   I rise primarily to join and support

19   the submissions that were made yesterday on behalf

20   of the US Debtors by Ms. Block and Mr. Bromley, as

21   well as the submissions that Mr. Qureshi made on

22   behalf of the Unsecured Creditors' Committee and

23   Mr. Leblanc on behalf of the ad hoc Bondholder

24   group.

25                   In light of those submissions, I don't

 1   plan on repeating anything, and I think my 15

 2   minutes will be cut down to about four or five

 3   minutes.

 4              THE US COURT:  Thank you.

 5              MR. RIELA:  And really, it is just to

 6   focus on a couple of observations mainly in

 7   connection with the pro rata theory that the CCC

 8   and the UKP have advanced.

 9              And with respect to the CCC's

10   formulation of the pro rata theory, it seems to me

11   that they have emphasized the differences in the

12   potential recovery percentages that the crossover

13   Bondholders may be receiving on the one hand versus

14   what the Canadian-only creditors may be receiving

15   on the other hand.  And this was Mr. Britven's now

16   famous or infamous chart that has been discussed

17   quite extensively yesterday and perhaps the day

18   before.

19              I acknowledge Mr. Bromley's observation

20   from yesterday that that chart seems to understate

21   what the Canadian pensioners and perhaps the UK

22   pensioners would actually be receiving under the

23   insolvency regimes because of the governmental

24   guarantees, which is obviously a good thing.

25              But the reason for any other difference

1    in the expected recoveries of the crossover

2    Bondholders versus creditors of only one estate is

3    clear.  The reason is clear.  The crossover

4    Bondholders have claims against entities in two

5    jurisdictions.  The NNI guarantee was a

6    contractually bargained-for guarantee that has not

7    been disputed by any party.  And the CCC now seems

8    to be arguing that the Courts should now disregard

9    the Bondholders' undisputed contractual rights to

10   the claims in both jurisdictions and impose

11   basically the same percentage recovery for all

12   creditors, regardless of where they hold their

13   claims.  They say that that's fair.

14           It is my submission that it would not

15   be fair to summarily disregard the bargained-for

16   legal rights of creditors simply because by taking

17   money from one creditor, you are giving the money

18   to another creditor who may or may not be more

19   politically popular.  You really -- in focusing on

20   allocation, we need to focus on the facts and the

21   law.

22           Second, in supporting the pro rata

23   theory, the CCC and the UKP are arguing that this

24   case is so unique that the case may impose a

25   nonconsensual form of global and substantive

1    consolidation.  I will say a form of substantive

2    consolidation because I do know that both parties

3    say that this really isn't subcon.  And in support

4    of their statement that this really isn't

5    substantive consolidation, the UKP and the CCC seem

6    to focus more on kind of structural legal niceties,

7    like we are not going to merge the two entities, we

8    are not going to have one plan of reorganization;

9    we will have two plans of reorganization.  But

10   economically, we are talking about the exact same

11   thing.

12             And I think the CCC and the UKP are

13   trying to avoid the global substantive

14   consolidation label because they cannot meet the

15   requirements for substantive consolidation in the

16   Third Circuit or under Ontario law.  And

17   Mr. Qureshi and Mr. Leblanc yesterday, I think,

18   took the Courts through why that is, and I won't

19   repeat that here.

20             But one thing that I would want to

21   mention on -- one of the items of substantive

22   consolidation that you have to look at is what the

23   creditor expectations were.  And in receiving the

24   NNI guarantee under the 2006-2007 indentures, the

25   creditors sought for and received that NNI

1    guarantee.  And I recall testimony on the record

2    that NNL would have been unable to obtain the funds

3    under the 2006-2007 indentures under the terms they

4    did unless they got the NNI guarantee.  And I would

5    also note that UKP itself is also relying on the

6    corporate separateness of the parties in asserting

7    claims against both NNL and NNI.

8              The last point that I would want to

9    make with respect to the pro rata theory relates to

10   the UKP's submission yesterday about how you would

11   divvy up the money among the various estates.  And

12   there was colloquy between Ms. Miller and Justice

13   Newbould yesterday about, well, how do you

14   apportion money to NNL and NNI in light of the

15   $2 billion NNI guaranteed claim.  And there was

16   discussion about, well, if you assume a 70 percent

17   recovery, perhaps you apportion less money to NNI

18   under the allocation decision because you know that

19   $2 billion of the money going to NNL, some

20   percentage of that will be going to NNI.

21   Basically, what the UKP is asking for is for these

22   Courts to disregard the NNI guarantee -- the NNI

23   $2 billion allowed claim just kind of in a

24   backhanded way.

25              Interestingly enough, the UKP does not

1    seem to support the idea of NNUK receiving less of

2    an allocation because of the potential claim that

3    the UKP has against NNL.  It is basically the exact

4    same thing, but they are looking at just one

5    potential reduction in recovery, and that's a

6    reduction in recovery to NNI because of the NNI

7    guarantee claim.

8              That is the end of my submission.  I

9    think I had 15 minutes allotted to me.  I believe I

10   took only five, I hope.

11             THE US COURT:  Thank you, Mr. Riela.  I

12   have one quick question for you, and I think it is

13   an obvious answer.  But we all agree that Ontario

14   law governs the interpretation of the MRDA.

15             MR. RIELA:  Right.

16             THE US COURT:  But on issues such as

17   whether this is substantive consolidation that the

18   CCC is asking for, whether that applies, that is US

19   law that I will be applying.

20             MR. RIELA:  It is US law.  And I am not

21   sure if I misunderstood your statement.  The

22   indentures under which BNY is the indenture Trustee

23   are actually governed by New York law.

24             THE US COURT:  Yes.

25             MR. RIELA:  But, yes, I believe issues

1    about substantive consolidation for NNI and the US

2    Debtors would be governed by US law.

3                    THE US COURT:  Yes.  All right.  Thank

4    you, Mr. Riela.

5                    MR. RIELA:  Thank you, Your Honor.

6                    THE CANADIAN COURT:  Can I just ask you

7    the same question.  So far as NNL is concerned, the

8    substantive consolidation law that would govern

9    would be Ontario law, would it not?

10                   MR. RIELA:  I would presume so.

11                   THE CANADIAN COURT:  Yes.  Whether it

12   is any different or not is another matter.  But all

13   right.  Thank you.

14                   MR. RIELA:  Thank you.

15                   THE US COURT:  Thank you, Mr. Riela.

16                   Mr. Lowenthal, good morning.

17                   MR. LOWENTHAL:  Good morning.  Good

18   morning, Judge Gross.  Good morning, Justice

19   Newbould.  Dan Lowenthal of Patterson, Belknap.  As

20   you know, we represent Law Debenture Trust Company

21   of New York.  We are the Indenture Trustee on the

22   2026 notes, also a core party, and also a member of

23   the Unsecured Creditors' Committee, the official

24   committee here in the US.

25                   And I am mindful, Your Honors, that you

1    have heard hours of closing arguments, that you

2    have received many briefs.  And no doubt any

3    arguments that should have been made by now have

4    been made, and if they haven't been made, they

5    probably were not important enough to have been

6    made.

7              So I have been allotted 15 minutes.  I

8    anticipate that my remarks will take about five.

9              And as you know from our opening

10   arguments, our written submissions, we support the

11   positions of the US interests.  And I just want to

12   amplify a couple of points that have been made over

13   the last several days.

14             I think it was Mr. Bromley yesterday --

15   I think I am right about this -- who made the point

16   during his closing that the Delaware Bankruptcy

17   Court is one of the two or three most respected in

18   this country.  And I have appeared here for many

19   years in cases.  I haven't appeared in Toronto,

20   except for this case.  And I believe that

21   practitioners respect this Court for many reasons,

22   but one of them is that, and what I have always

23   found is, the jurisprudence here is predictable.

24             And what I mean by that is, those of us

25   who appear here know that the judges give careful

1    consideration to statutory language.  They respect

2    case law precedent and valuation methodologies.

3    They deal with valuation methodologies in every

4    case all the time.  And I assume the Court in

5    Toronto does as well.  And I submit that when Your

6    Honors sift through all of the evidence that has

7    come before you and look at all of the cases that

8    have been put in the big binders and all of the

9    many expert reports from the capable experts, that

10   really it is only fair market valuation that stands

11   up and that has to be accepted after we look

12   through everything that has been said and put

13   before the Courts over the last four and a half

14   months and more.  And the reasons I say that are

15   the reasons that Ms. Block explained yesterday,

16   that Mr. Bromley explained yesterday, the Kinrich

17   reports and the other reports that have been

18   submitted on behalf of the US interests.

19             Next, I want to say briefly -- I was

20   going to say a little bit more on this, but I don't

21   think it is necessary.  What Mr. Leblanc said

22   yesterday and what Mr. Riela just mentioned briefly

23   with respect to creditor expectations, as an

24   Indenture Trustee's counsel -- I must say this and

25   I will move on -- is really spot on.  It is

1    actually very simple.  What they say really does

2    reflect -- what Mr. Leblanc went through yesterday

3    really does reflect the realities of the

4    marketplace.

5              And what creditors expect is simple,

6    and Mr. Riela just alluded to this.  They expect to

7    be repaid by all of the entities that have

8    contractually agreed to do so, whether it is a

9    primary obligor, whether there is a support

10   agreement, whether there is a guarantee.  That's

11   what it comes down to in terms of creditor

12   expectations.

13             And finally, I have one more point.  I

14   have sat here.  Many others have testified and

15   questioned witnesses and heard a lot.  And the one

16   point that I do want to raise, and it relates to

17   the pro rata point, the substantive consolidation

18   point -- I have been waiting to speak on this for a

19   while.  And I heard something yesterday -- I was

20   going to cut this a little bit, but I will just

21   take a couple of minutes.  I heard something

22   yesterday, and I said I had to speak on this,

23   because the argument was made by one of the

24   attorneys that supports this point and pushes for

25   it that these cases are just so complex that there

 1    is somehow a perfect storm here that would justify

 2    the Courts implementing the pro rata/substantive

 3    consolidation proposal.

 4              Now, I will agree and I will submit

 5    that these cases are very complex, but I don't

 6    think they are that complex.  What they really are

 7    is logistically complicated.

 8              We have had more than 100 fact

 9    depositions.  Many experts have submitted reports

10    on complicated, complex topics.  But we heard

11    mostly on Monday and some on yesterday really what

12    this case comes down to.  It comes down to several

13    things.  It comes down to patent invention, it

14    comes down to contract interpretation, and it comes

15    down to valuation methodologies.  This is the bread

16    and butter of what bankruptcy courts deal with day

17    in and day out every day, and that's what they

18    should do in this case.

19              As Mr. Bromley said yesterday very

20    clearly, courts must follow the law.  Equity takes

21    last, and structural subordination must be

22    respected.  And I was so glad that he said that.

23    And as Mr. Qureshi and Mr. Leblanc detailed very

24    clearly, the pro rata/substantive consolidation

25    methodology that has been put forth has no legal

1    basis.  And if the law is to be followed, it must

2    be rejected; that is, the pro rata/substantive

3    consolidation methodology.

4              Those are my remarks.  I have probably

5    ten minutes left on my time.  And what I would like

6    to do, because I know he has a few more remarks,

7    is, absent questions from Your Honor, just cede the

8    podium to Mr. Bromley.

9              THE US COURT:  All right.  Thank you,

10   Mr. Lowenthal.

11              MR. LOWENTHAL:  Thank you, Your Honor.

12              THE US COURT:  Thank you for your

13   comments.  And I was thinking when I heard the

14   analogy of a perfect storm, that in a perfect

15   storm, a compass becomes all the more significant

16   and important.  And I think to a large extent a

17   compass is the law here.  So I appreciate

18   Mr. Lowenthal's comments.

19              All right.  I think -- is there anyone

20   in Canada?

21              THE CANADIAN COURT:  Mr. Zarnett is

22   standing up.

23              THE US COURT:  Mr. Zarnett, good

24   morning.

25              MR. ZARNETT:  Good morning.  Good

1    morning, Justice Newbould, Judge Gross.

2              Let me begin my rebuttal, which will be

3    focused on the specific submissions that were made

4    by the EMEA Debtors and by the US by saying that we

5    have prepared a compendium that is designed to

6    assist this going in as quickly as possible and to

7    save both Courts from fumbling around looking for

8    material, so hopefully this will be helpful.

9              And let me begin then with my response

10   to the EMEA Debtors and then I'll move to some of

11   the submissions from the US interests.

12             Mr. Gottlieb in his submissions put to

13   you that legal title unequivocally means no

14   beneficial title, and he relied on the Fifth

15   Edition of Black's Law Dictionary, which I have

16   reproduced at the first tab.

17             He is not right in that unequivocal and

18   dogmatic position because the definition that is

19   found in Black's on page 3 of the compendium

20   towards the bottom and carries over to page 4,

21   including a number of alternative definitions, and

22   one of them is one that comes from a case called

23   Barnes v. Boyd which you will see in the

24   definition, and it says:

25                  "Full and absolute title or

1          apparent right of ownership

2          with equitable . . . title in

3          another . . . "

4               So there's a range of definitions, and

5     actually when I have called up the Barnes v. Boyd

6     case, which begins at page 5 of the compendium, and

7     when you go over to page 15 you will see what

8     Black's at the time was drawing on, and that is the

9     statement on page 11 of the case, page 15 of the

10    compendium, that says:

11              "The term 'legal title' has no

12         absolute or strict legal meaning.  At

13         times it is used to mean full and

14         absolute title; at other times (a

15         frequent use) it is used to indicate that

16         condition where there is an apparent

17         right of ownership in property but where

18         the beneficial interest (the equitable

19         title) is in another."

20              So the term "legal title" can't be read

21    as Mr. Gottlieb said as though there was some

22    statutory dictate --

23              THE CANADIAN COURT:   I noticed that

24    when I saw Mr. Gottlieb's, I looked at yours, and I

25    noticed you were using the Tenth Edition or some

1    later edition.  If you used the edition that you

2    were using, does it have the same stuff that we

3    just looked at?

4              MR. ZARNETT:  You have anticipated my

5    point, because the Fifth Edition was in 1979, which

6    isn't that long ago for me, but for others ancient

7    history, but if you go over to page 20, you will

8    see the 1999 edition, which was the Seventh

9    Edition, which was about the time of the MRDA, and

10   you will see there that the legal title definition

11   on page 22 became the one that I was using and has

12   continued as such:

13             "A title that evidences apparent

14        ownership but does not necessarily

15        signify full and complete title or a

16        beneficial interest."

17             So according to Black's, it is going to

18   be a question of interpretation and context what

19   "legal title" means.

20             And that, in my submission, means that

21   the Courts are going to have to consider what I was

22   dealing with in my submissions, which I won't

23   repeat, and that is how do you understand those

24   words in light of the MRDA and in light of its

25   structure as a license arrangement, et cetera.

1            Secondly --

2            THE US COURT:  Are you suggesting

3    ambiguity here, Mr. Zarnett?

4            MR. ZARNETT:  No, it is not an

5    ambiguity because it is an interpretation that can

6    be resolved on the language of the agreement.  What

7    I am saying is there isn't a dogmatic fixed meaning

8    to "legal title" that negates or that automatically

9    means beneficial title, which simply means you have

10   to look at the words and look at the structure of

11   this agreement.  Where a grant of a license is

12   given, Canada retains ownership of what it

13   retained, et cetera, and understand the words in

14   that context.

15           In my submission, it is not an

16   ambiguity.  These are just dictionary definitions.

17   They simply help as a starter as to what we are

18   trying to understand.

19           So let me turn, if I may, to the next

20   point, which is Mr. Gottlieb referred to the legal

21   doctrine of an employer owning the invention of

22   employees, and the point that I wanted to make for

23   the benefit of the Courts in response to this is

24   that Article 4(b) of the MRDA required further

25   steps by the Licensed Participants essentially to

1    perfect what they had agreed NNL was to have,

2    execute further documents, cause further documents

3    to be executed, et cetera.

4              It is the employees of the Licensed

5    Participants who then enter into assignments to

6    NNL, and this is all described in Ms. De Wilton's

7    evidence which I have included at tab 14, an

8    excerpt from it, where she describes the assignment

9    process and includes a sample assignment of all

10   right, title and interest.

11             So the employers are contractually

12   bound to see this delivered and it does get

13   delivered and, in my submission, it is consistent

14   with or reinforces the type of ownership that NNL

15   had.

16             THE CANADIAN COURT:  Sorry, I was just

17   looking at it.  Where am I to look now?

18             MR. ZARNETT:  Okay, sorry, I'm taking

19   very seriously Mr. Bromley's admonition to go

20   quickly, but I don't want to go more quickly than

21   is required to make the point.

22             So if you are at tab 14, Honor --

23             THE CANADIAN COURT:  Tab 14?

24             MR. ZARNETT:  Yes, of the compendium.

25             THE CANADIAN COURT:  Rebuttal?

1    Uhm-hmm.

2               MR. ZARNETT:  So that is Ms. De

3    Wilton's affidavit and page 78 of the compendium

4    where she describes the process of patent

5    registration, in paragraph 8 that is reproduced

6    there, she says that the assignments came either

7    first to a subsidiary and then to NNL or directly

8    to NNL, and she concludes that paragraph by saying:

9               "Whatever practice was in place at

10          any given time, with only a handful of

11          exceptions, the assignment documentation

12          would invariably provide that the entire

13          right, title and interest in and to the

14          invention and the application was

15          ultimately assigned to NNL."

16               And in the next paragraph she says she

17    has included a sample standard assignment, which I

18    have then reproduced at pages 79 and 80.

19               THE CANADIAN COURT:  And what is the

20    point you are making?

21               MR. ZARNETT:  The point is that the

22    EMEA construction is the employers had ownership of

23    what their employees created, and what I am saying

24    is under Article 4(a) they assigned that, vested

25    that in NNL, but under Article 4(b) they also

1    caused those employees to assign to NNL all right,

2    title and interest without ever saying "and we

3    reserve our own ownership."  These are their

4    employees who they are causing to make the

5    assignment.

6              So the package, in my submission, is

7    consistent with the Canadian theory of ownership in

8    NNL and not with some reservation of beneficial

9    title.  You don't see it in 4(a), as I discussed on

10   Monday, and you don't see it under these 4(b)

11   assignments --

12             THE CANADIAN COURT:  Well, 4(b) says

13   that each Licensed Participant shall execute, and

14   that wouldn't be the employee?

15             MR. ZARNETT:  Or cause to be executed.

16             THE CANADIAN COURT:  I was going to say

17   you are relying upon the language "cause to be

18   executed"?

19             MR. ZARNETT:  Right, what power would

20   anyone have to have an employee of NNUK sign

21   something in favor of NNL other than their employer

22   tells them to do it?  The employer tells them to do

23   it in unequivocal terms.  In my submission it would

24   stretch credulity to say but the employer was

25   standing back and saying I'm maintaining an

 1    interest in that.

 2                Now, the next point I wanted to make is

 3    that Mr. Maguire and Ms. Block referred to Schedule

 4    A of the MRDA and to the risks, full

 5    entrepreneurial risks language that we have

 6    discussed.

 7                And I wanted to make one point about

 8    that that really flows out of the submission that

 9    the US interests made about corporate separateness.

10                If you look at the language of Schedule

11    A in the MRDA, which begins with an introductory

12    paragraph that says that it is supposed to be a

13    summary of Nortel's transfer pricing policy and how

14    participants are to be compensated, which is not

15    the language of a grant of ownership, it describes

16    in the third paragraph the Nortel business without

17    defining it, but clearly a reference to the

18    businesses that are carried on by separate

19    corporations, businesses carried on by separate

20    corporations, but in the matrix kind of

21    organization that we have heard about.

22                THE CANADIAN COURT:  Sorry, the third?

23                MR. ZARNETT:  The third paragraph of

24    the recital says -- I'm sorry, the third paragraph

25    of -- I may have been looking at the wrong one.

1            I am in the Schedule A as it was

2    originally drafted and the third paragraph, the

3    last sentence says:

4            "The RPSM acknowledges the fact

5        that the key profit driver in the Nortel

6        business . . . "

7            THE CANADIAN COURT:   Yes.

8            MR. ZARNETT:  Well, that reference to

9    Nortel business, in accordance with the corporate

10   separateness doctrine, is to separately-owned

11   businesses, although the document is describing

12   them in a generic combined way.

13           But it is not creating any ownership

14   interest that didn't previously exist.

15           And I say when you look at the next

16   paragraph, which deals with "the participants bear

17   the full entrepreneurial risk of the Nortel

18   business such as the risks attendant with the

19   substantial and continuous development and

20   ownership of NN Technology," it is similarly not

21   creating or dividing or merging any ownership

22   interests otherwise established.  It is not doing

23   that in relation to the business as a whole and it

24   is not doing that in relation to the examples it

25   gives.

1           The words "development and ownership of

2   NN Technology" are a "such as," those are things

3   that the businesses are doing, but it is not

4   defining or taking away or changing the ownership

5   structure otherwise set up.

6           Now, let me turn to a different point.

7           Mr. Gottlieb and Mr. Maguire suggested

8   two reasons why the Courts could look outside the

9   MRDA to determine who really owned the IP, my

10  words, not theirs, but I think I have captured

11  their submission.

12          Mr. Maguire said the entire -- he said,

13  correctly, that the entire agreement clause is

14  limited to the subject matter of the MRDA, and I

15  think I said the same thing.  We have no

16  disagreement about that.

17          Where we disagree is that the subject

18  matter is completely defined by the opening words

19  under the title "confirming and formalizing the

20  operating arrangements."

21          The second-last recital of the MRDA

22  talks about the parties' intent to enter into

23  licensing arrangements and the agreement goes on to

24  deal with doing R&D and what you get for it, title,

25  licenses, filing patents, duration of rights,

 1    confidentiality, termination of rights.

 2                So it can't be confined as suggested.

 3                The second point that was made, which

 4    was one that was made by --

 5                THE CANADIAN COURT:  Just a second.

 6    I'm not quite sure of the point you are making.

 7                MR. ZARNETT:  I took Mr. Maguire's

 8    point to be the MRDA is only the entire agreement

 9    about operating arrangements because the beginning

10    words say "operating arrangements," that that is

11    the subject matter.

12                I say the subject matter is the

13    substance of what the agreement dealt with, and

14    once you determine that it deals with titles,

15    licenses, how long those rights last, what their

16    terms are, et cetera, then there is an entire

17    agreement that is inconsistent with the

18    arrangement.

19                THE CANADIAN COURT:  And you are saying

20    the entire substance includes what is referred to

21    in the second-last recital?

22                MR. ZARNETT:  Second-last recital and

23    then the substantive provisions of the agreement as

24    they deal with matters of permanence.  For example,

25    the duration of the rights extends beyond its

1    operations.

2              THE CANADIAN COURT:  Okay.

3              MR. ZARNETT:  The second proposition

4    that was put to the Courts as to why you could look

5    elsewhere than the MRDA to determine ownership was

6    made by Mr. Gottlieb with reference to a couple of

7    cases, but the major one he referred to was the

8    Covington case, which was at tab 6 of the EMEA

9    authorities, and I am not going to ask the Courts

10   in the interests of time to turn it up right now,

11   but what I wanted to say about that case was that

12   case was a claim by a creditor of a company.  The

13   company had represented it owned IP and money was

14   lent on that basis.

15             When the creditor came to collect, the

16   company said, I don't own the IP, my principal owns

17   the IP and here is a piece of paper that says that.

18             So it was in the context of the

19   creditor attacking those arrangements that the

20   Court looked at how the IP came about, what the

21   obligation of the principal to the company was as

22   to who should have owned it, and who was involved

23   in the representations to the creditor as to who

24   owned it.

25             And of particular reference is

 1    paragraph 42 of that decision where the Court

 2    essentially finds, under the statutory Ontario

 3    oppression remedy, it would be oppressive to allow

 4    the principal to maintain that he had ownership

 5    because it was essentially diverting an asset that

 6    should have been in the company and had been

 7    represented in the company, as in the company.

 8              That whole analysis has no bearing on

 9    how a contract between parties is interpreted as

10    between them.  No one is trying to set this

11    agreement aside or say it was oppressive, and

12    therefore all the rules of interpretation apply,

13    including those that deal with extrinsic and parol

14    evidence.

15              And I say on this point the Sistem

16    case, which was another one that Mr. Gottlieb

17    referred to, is the same kind of thing.  It is a

18    creditor looking into the arrangements of people

19    trying to avoid payment of a debt.

20              The next point that I wanted to make

21    was about a submission of Mr. Maguire when he was

22    asked by Justice Newbould whether his timeline in

23    the menu, demonstrative that he handed up, whether

24    the timeline should have added to it statements

25    that were made to the Courts in 2009 about topics

 1    like IP, ownership, et cetera.

 2               And Mr. Maguire said, yes, of course,

 3    but he didn't consider there was anything

 4    inconsistent, and I therefore have reproduced in

 5    the compendium at tab 2, first of all, a list, and

 6    this is just for the Court's reference, of where we

 7    deal in our proposed findings of fact with some of

 8    the items on the timeline where there is some more

 9    context around them that is necessary.

10               But at tab 3 I have included EMEA's

11    statement to the Court when it made its original

12    filing, and you will see that at page 31 at

13    paragraph 3.3 they said:

14               ". . . all intellectual property

15          rights belong to NNL, the Canadian

16          company, irrespective of which group

17          company originally carried out the

18          research and development activity that

19          generated the IP."

20               Now, that isn't consistent with what

21    EMEA is now saying.  That is, in my submission, a

22    repudiation of it, and it just shows the difficulty

23    of trying to pick, as EMEA does, various

24    characterizations along the way and impose those on

25    the contractual language.

1          Now, Mr. Gottlieb said in his

2    submissions that there is no such thing as an

3    agreement for tax purposes; an agreement is an

4    agreement.

5          And I agree with Mr. Gottlieb, and I

6    sense him steeling himself right now, figuring out

7    where he went wrong.

8          THE CANADIAN COURT:  He doesn't look

9    too scared at the moment.

10         MR. ZARNETT:  No, well . . .

11         The conclusion that flows from that, of

12   course, is that the ownership and license rights in

13   the parties' agreement, whether they were entered

14   into with tax objectives in mind or not, are an

15   agreement, a durable agreement that must be

16   interpreted by the Court and given effect to.  They

17   were carefully, as Mr. Bromley pointed out,

18   carefully maintained in place, that agreement,

19   right up to including and through the sales that

20   generated the proceeds we are talking about.

21         What we do not agree with is that

22   occasional terminology used by tax people, not in

23   the agreement but when talking about it, governs or

24   changes any of the legal terms or concepts.

25         Now, Mr. Gottlieb made an argument

1    about commercial rationality, and I am going to

2    leave aside the legal effect of those kinds of

3    points which are reviewed in the written briefs.

4              But the problem with the argument is

5    that matters must be viewed at the time the

6    agreement is being made, not with hindsight.  And

7    every example that is given is always a hindsight

8    example.  It is always, well, NNL could have, what

9    if NNL went out and sold all this IP and kept all

10   the money for itself, et cetera.

11             No one has provided any evidence that

12   they would not have agreed to a deal to invest in

13   R&D and gain access to other parties' R&D through a

14   license and an opportunity to share operating

15   profits in an enterprise expected to be, A,

16   profitable, and B, long term.

17             And Dr. Reichert testified that that

18   was rational, and in my submission, that is the

19   lens, not a hindsight lens of, well, here is how

20   things have worked out, if we had known then, could

21   we go back and renegotiate.  That is what the

22   Supreme Court means when it says we don't rewrite

23   contracts for the parties.

24             Now, Mr. Maguire -- this is a separate

25   point now.  Mr. Maguire criticized Mr. Green's

1   business value -- business sale approach because it

2   didn't separate out customer relations.

3            Now, he didn't mention that Mr. Kinrich

4   didn't either, but beyond that, Mr. Green didn't

5   ignore customer relations.  What he said was the

6   same cash flows that you would look at to value

7   them are cash flows you would look at to value the

8   licensed rights in IP, so the valuation method that

9   he adopted would capture both.

10           And that was of course consistent with

11  what Mr. Berenblut and Dr. Cox had said.

12           But Mr. Maguire noted in his submission

13  that the CCC expert did account separately for

14  customer relations, so it bears noting the

15  comparison of the results to see exactly what's

16  involved, if you take one view or another.  And for

17  that purpose at tab 9 there is a chart and that

18  chart compares three results, Mr. Green's

19  allocation --

20           THE CANADIAN COURT:  Just a minute.

21  Tab what, 9?

22           MR. ZARNETT:  It is tab 9, page 59, and

23  it compares three results.  It compares Mr. Green's

24  original allocation, the alternative allocation,

25  and then Mr. Britven's.

1                So you'll see how the numbers relate

2        given the different methodologies.  In my

3        submission, they cluster around similar results,

4        very, very different results from the ones urged by

5        either Mr. Kinrich or Malackowski and Huffard.

6                Now, the allocation of the business

7        sales contradicts a point that Mr. Gottlieb and

8        Mr. Maguire said quite a few times, and that is

9        that somehow it is the Canadian position that they

10       can just sell IP and keep everything.  That is not

11       the position.  It has never been the position.

12               The position has always been that the

13       licensees get the value, the fair market value of

14       their license rights, which varies from business to

15       business, context to context.  It depends what they

16       gave up and what they could have earned if they

17       didn't give it up.

18               So it is a question of value.

19               In the business sales there was value

20       and it has been allocated.

21               Now, Mr. Maguire commended to you Mr.

22       Malackowski's approach, and there are numerous

23       issues with it which are detailed in our briefs and

24       I have already addressed you on the underlying

25       assumption of the contribution theory.

1                But there is one fundamental matter,

2     even if Mr. Malackowski was operating on the right

3     theory, that is something the Courts will have to

4     address.  And I am reformulating slightly something

5     that came from a question from Judge Gross.

6                If one were to simply set aside the

7     MRDA as not being applicable to these kinds of

8     circumstances and looked to practice in the company

9     as the guide, in my submission what that would

10    require was that one look actually at all of the

11    practice and not cherry-pick parts of it, because

12    even a practice as it grows up has certain gives

13    and takes in it.

14               If there was a true sharing of IP

15    ownership, parties could have decided to measure it

16    by who actually invented and how much time was

17    spent and keep records of particular expenditures

18    on patents, et cetera, and Mr. Malackowski said

19    that would have been the best way, but the company

20    didn't operate that way; it didn't keep that.

21               Instead, they followed a different

22    practice, and if that practice was R&D spending,

23    using it as they did, and contemplating using it in

24    other circumstances, it involved consideration of

25    and their own settling on a look-back period.

1            And so if we take the company's

2    practice, I say you would have to take all of it.

3    And if that is so, then you would have to adjust

4    Mr. Malackowski's results in a number of ways.  And

5    at tab 10 --

6            THE CANADIAN COURT:  What is your

7    point?  What are you saying then, that you would

8    have to take a look at the company's look-back

9    period of five years?

10            MR. ZARNETT:  Right, because once you

11    start to pull at one of the strings, you have to

12    start unraveling all of the strings and you are no

13    longer implementing the company's practice.  You

14    are taking part of the practice and you are saying,

15    but now we have a better way than the company ever

16    did to measure things, and, in my submission, that

17    is not deriving a result out of practice or conduct

18    or implied understandings.

19            That is a hodgepodge, not a hotchpot,

20    but a hodgepodge.

21            So if that was done, if you look at tab

22    10, which is an excerpt from our initial argument,

23    and you go over to page 66, which is headed

24    "revised," because two of the numbers on the

25    original page were reversed, using the company's

1    considered look-back period, which everyone had

2    agreed to within the company for purposes of the

3    RPSM, but if the company's practice is said to

4    extend, you would have these percentages for IP on

5    the bottom line rather than the ones Mr.

6    Malackowski used, 49 and a half percent for Canada

7    rather than 39.9 percent, et cetera.

8              So that is one consequence of actually

9    following practice.

10             The other is, if you look over at tab

11   11 and go to page 70, we have extracted there from

12   a document that EMEA relies on, which is after some

13   of the business sales were done, the company

14   actually did some internal allocations.

15             And these allocations were done by the

16   very people that both the US and EMEA looked to as

17   the source of the company's collected wisdom on who

18   did what.

19             And you will see, for example, the CDMA

20   sale, which was I think the largest single sale,

21   the internal allocation to Canada using RPSM

22   percentages, et cetera, is 45.3 percent.  That

23   compares to what the Malackowski/Huffard allocation

24   would be of 15 percent.  Mr. Kinrich's allocation

25   to Canada, that is the EMEA Debtors' allocation to

1   NNL, and Mr. Kinrich's allocation in this sale to

2   Canada is about 5 and a half percent.

3              So you see the difference between the

4   company's practice, collected wisdom, et cetera, if

5   there was such a thing, and the approaches taken by

6   others.

7              So in my submission, Mr. Malackowski is

8   involved in an impermissible mix and match.

9              So that is what I had to say about

10  EMEA.

11             Let me turn to the US Interests and let

12  me begin by saying that I agree wholeheartedly with

13  two things that Ms. Block said.

14             The first is that the MRDA defined the

15  relevant rights, and even though it doesn't tell

16  you how to allocate, it tells you what rights are

17  to be valued and what their terms are.  And I agree

18  with that.

19             I also agree with something that she

20  said, that the label attached to the rights of NNI

21  and the EMEA Debtors is not what matters, but

22  rather what the rights are.  And I think she

23  properly identified those rights as the ones

24  granted in Article 5 of the MRDA.

25             That is the only grant of rights in IP,

1    a license arrangement in Article 5.

2                Now, that position, of course, is

3    completely inconsistent with EMEA's, but it is, in

4    my submission, correct in the sense that it focuses

5    on the key issue, and that is what is the extent of

6    those rights.

7                Now, the equity-takes-last point that

8    has been made is entirely beside the point to the

9    Monitor and Canadian Debtors' theory.

10                NNL doesn't seek the value of NNI's

11   rights or NNUK's rights.  It seeks the value of its

12   own rights and it is not disqualified from that

13   because it is also an equity-holder.

14                Now, let me turn to a different point.

15   When the correct focus is on the extent of the

16   rights and the extent of the rights in Article 5, I

17   think it is even plainer that the dealings with the

18   tax department that the US points to, Ms. Block

19   pointed to, don't assist at all even if it is

20   factual matrix.  And that is because no one

21   disputes that for transfer pricing purposes a

22   license arrangement could suffice.

23                The Horst Frisch report, the famous

24   Horst Frisch report that talked about owning

25   something from an economic standpoint was speaking

 1    of license rights in the 1992 CSA.  Those rights on

 2    the critical terms we are talking about, what is

 3    the definition of products, what is the scope of

 4    the license, et cetera, are the same as were

 5    continued in the MRDA.

 6             Dr. Reichert's evidence was that

 7    make-use rights under a license could be economic

 8    ownership for transfer pricing purposes.  None of

 9    the dialogue with the tax authorities addressed the

10    field of use or the products definition or the

11    existence of obligations to exploit the license,

12    the very things that these Courts have to now

13    determine the meaning of and the extent of.

14             The parts of the license you have to

15    interpret were in place from 1992 and not

16    questioned in the tax process.

17             And then the MRDA was given to the tax

18    authorities, and, as Dr. Reichert said, the bedrock

19    principle is the tax authorities respect the legal

20    arrangements.

21             So the question is not assisted by

22    characterizations or tags or labels in discussions

23    with the tax authorities.  It is about the terms of

24    that license, so even if that was factual matrix,

25    it doesn't license assist, let alone rising to the

 1    level of changing the text or deviating from the

 2    text.

 3              Now --

 4              THE CANADIAN COURT:  I don't quite

 5    understand your point.  You are saying that the

 6    report spoke in economic terms?

 7              MR. ZARNETT:  What I am saying is the

 8    issues for the Courts to decide have to do with the

 9    scope of the license, the meaning of the definition

10    of products, what you do with obligations, costs,

11    RPSM share, and so on.

12              When Horst Frisch started to talk about

13    economic ownership, they were talking about a

14    license right, a license right that had exactly

15    those terms.  They expressed that as economic

16    ownership without commenting on what about the

17    products definition or the field of use restriction

18    or whether there was one or not.

19              And then those issues never come up in

20    the dialogue with the tax department in any way

21    that would inform the Court's interpretation of

22    what those mean.  There was a license in place and

23    the MRDA granted exactly or almost exactly the same

24    license rights with the same field of use, the same

25    products definition, et cetera.

1              So for the factual matrix to assist,

2    the Court would have to be able to look at

3    something in it and say, ah, now I understand what

4    they mean by products or now I see what the field

5    of use was to be.

6              But there is nothing in the dialogue

7    about that.  And none of the descriptive tags as to

8    whether it amounts to economic ownership or not

9    help.  And none of it helps on the precise

10   interpretations of the words.  The tax department

11   was given those words.  Those words pre-existed.

12             So, in my submission, it is just a

13   redder herring than it was when it started.

14             Now, although he didn't quite identify

15   the interpretive principle that allows you to look

16   at this, Mr. Bromley took you to some -- made some

17   submissions about the ability to sue, who could

18   sue, who could sue in the United States, et cetera,

19   and for what.

20             The history of litigation does not

21   assist the US interpretation, even if this can be

22   looked at.

23             So let me start at tab 5 of the

24   compendium and just quickly tick off this point for

25   you.

1                      This was litigation in 2002 that NNL

2      and NNI launched against Kyocera so they are both

3      parties so presumably it is a statement by both

4      parties.  You'll see, if you go over to paragraph

5      -- and what it is about is a US patent or a number

6      of them, and you will see paragraph 10 describes

7      NNL as the owner of all right, title and interest

8      to the patents, and NNI as the exclusive licensee.

9                      And then paragraph 15 says, after

10     reciting some alleged infringement, paragraph 15

11     says:

12                      "NNL has been and will be damaged

13          by the infringement of these US patents."

14                      Paragraph 16 says:

15                      "NNI has been and will be

16          damaged . . . "

17                      Now, on the US theory, the joinder of

18     NNL in this action was unnecessary, but on the US

19     theory, the allegation that NNL is damaged, the US

20     theory and that allegation are simply

21     irreconcilable.  On the US theory, all the rights

22     and all the value in the United States belonged to

23     NNI.  NNL could not have been damaged by

24     infringement of patents and couldn't make a claim

25     for damages, as it goes on to do in the same

neesons          W&F
                WILCOX & FETZER LTD.                         www.neesonsreporting.com
                                                             www.wilfet.com

 1    lawsuit as NNI does.

 2              It is consistent with the idea of two

 3    separate groups of rights in these patents, which

 4    is consistent with the field of use of NNI not

 5    extending to everything that an infringer does, but

 6    I don't take it so far.  It is a Statement of

 7    Claim.  I don't take it so far as to be

 8    determinative.  All I say is it is completely

 9    inconsistent with the US position and can't be

10    supportive of the theory they advance.

11              The same is true if you look at the

12    litigation at tab 6 against someone called Extreme

13    Networks, tab 7 against Ciena Corporation, and that

14    is I believe a 2006 claim.

15              THE US COURT:  Who were the attorneys

16    representing in those cases, however?

17              MR. ZARNETT:  Were they representing

18    one or both?

19              THE US COURT:  They were representing

20    both?

21              MR. ZARNETT:  They were representing

22    both, yes.

23              THE US COURT:  All right.

24              MR. ZARNETT:  So if it is a

25    statement --

1            THE US COURT:  So it is not an

2    admission, so to speak; correct?

3            MR. ZARNETT:  What it is, I think, is

4    we have to put the right interpretive lens on it.

5    To the extent it is conduct before the MRDA is

6    entered into, it can be taken into account only if

7    it is factual matrix.  Well, if someone was looking

8    at this as factual matrix, and I don't think it is

9    factual matrix, but if someone is, they would see

10   conduct consistent with two sets of rights in the

11   United States, not NNI owning everything.

12            And then the 2006 lawsuit against Ciena

13   would be after the fact and would only be

14   admissible on interpretation if you accept the

15   argument that because there were amendments,

16   everything keeps getting swept into the factual

17   matrix, or if there was ambiguity.

18            So once you look at it, though, it

19   doesn't resolve any interpretive issue in favor of

20   the United States position, which would be only NNI

21   could possibly be harmed, only it had rights, NNL

22   had nothing.  If anything, it resolves it or points

23   the other way.

24            Now, Mr. Bromley discussed with the

25   Courts sublicenses, and what we did was at tab 15

 1   tried to find in the record each sublicense, and we

 2   have included the exhibit number there.  And

 3   essentially they fall into a number of different

 4   categories:  NNI as sole licensor, even when the

 5   territory includes the United States, inconsistent

 6   with the US position.

 7            NNL on behalf of itself and its

 8   subsidiaries where the territory is the United

 9   States and elsewhere, which is profoundly

10   equivocal, is NNL on behalf of itself granting US

11   rights or on behalf of NNI granting, or are they

12   both, or is it the combination of both?

13            And then a group of NNL and NNI, to the

14   extent of their legal rights to do so, but the

15   grants never separate NNI is doing this because of

16   the United States and NNL for elsewhere.  It is the

17   combined rights that is being granted.

18            So one category you don't see, we can't

19   find, is any licenses where NNI does it itself to

20   someone who wants to make their own product.

21            So once again, if this is to be taken

22   into account in interpretation, and I don't think

23   it can be, it doesn't support the US position.  It

24   is either equivocal or inconsistent.

25            So what that brings us to, I think --

```
 1              THE CANADIAN COURT:  Just before you do
 2    that, I thought I was shown yesterday another list
 3    that showed --
 4              MR. ZARNETT:  Yes, it was in -- it was
 5    a list of licensing income, but it didn't attach
 6    the actual license agreements, so it didn't tell us
 7    who had actually granted the license.
 8              You'll recall that the appendix in my
 9    friends' argument also listed a number of license
10    agreements, again no NNI on their own, so I think
11    that is about as good as the trial record gets.
12    There isn't a license agreement that we have been
13    able to find in the record, and I assume my friends
14    haven't because they would have pointed it out,
15    that is consistent with their position that NNI on
16    its own could grant this kind of sublicense.
17              And even if there was, there is
18    countervailing evidence where NNI brings its parent
19    along or its parent brings it along and says, okay,
20    we'll both do it either because there is
21    uncertainty about what the rights are or we can't
22    satisfy a sublicensee that NNI has the rights on
23    its own.
24              But as a tool for interpreting the
25    actual text of the agreement, it needs to be
```

 1    unequivocal in favor of NNI.  It isn't.

 2              So that leaves us with the text of the

 3    agreement as I say what the Courts simply have to

 4    wrestle with and determine.

 5              And in Ms. Block's argument, she

 6    alluded only briefly to why the text should be

 7    interpreted her way and I am just going to

 8    categorize the arguments and in the interests of

 9    time tell you where they are dealt with in our

10    written brief.

11              One is the two-arm arguments, that the

12    license says you may make, use or sell products,

13    short-forming it, and all rights to patents, a lot

14    of other words, in connection therewith.

15              And we say the interpretation that that

16    second arm is a free-standing grant of rights to

17    patents unconnected to the first arm fails because

18    the second arm ends with the words "in connection

19    therewith"; it must be a reference back to the

20    first arm.

21              And that is dealt with in our brief,

22    our initial brief, paragraphs 320 to 350, and at

23    this point especially at 340 to 348.

24              The other argument that is made that

25    Ms. Block briefly alluded to is that the word

 1    "services" covers an IPCo-type arrangement.  That

 2    is dealt with in our rebuttal brief, paragraphs 15

 3    to 22, and just to short-form the argument, the

 4    word "services" is part of the definition of

 5    products.  Products means -- capital "P" Products

 6    means small "p" products, software and services.

 7    And then that word gets dumped into the first arm

 8    of the license as something embodying or using NN

 9    Technology.

10              So it is products that embody or use NN

11    Technology, and if you break down the words, small

12    "p" product using or embodying, software using or

13    embodying, a service that uses or embodies.

14              Now, none of that is what the US

15    Interests want to call service here which is, hey,

16    we have got a service for you.  Here is some

17    technology; use it for your own products.  That

18    simply defeats the language of the license, and it

19    is not what could be contemplated by the word

20    "service" in that context.

21              Now, let me turn finally to a few

22    points about the valuation issues that the Courts

23    will have to deal with.

24              Mr. Bromley sought to defend

25    Mr. Kinrich's revenue approach to the business

1    sales, but, in my submission, it simply cannot be

2    justified.

3                 Courts familiar with valuation cannot

4    accept a theory that does not recognize costs and

5    values nothing.  On Mr. Kinrich's approach, if the

6    EMEA Debtors had done all of the R&D in a line of

7    business and then the US earned all the revenue,

8    taking advantage of that R&D, the US would get a

9    hundred percent and the EMEA would get zero in that

10   example, even though clearly the value of that

11   business is reflective of both the revenue and the

12   reasons why revenue can be generated, that is, the

13   costs.

14                 Mr. Kinrich's approach doesn't take

15   that into account and it has to be rejected.

16                 Now, moving to Mr. Bromley's criticism

17   of Mr. Green, he criticized Mr. Green for valuing

18   the license rights by considering what could have

19   been earned if the companies had operated.  He said

20   that is a value-in-use approach, which is what

21   Mr. Green called it, but that is exactly the right

22   approach if the interpretation of the license that

23   we urge on you is correct.

24                 Those licenses were not transferred.

25   They were surrendered.  The purchasers didn't

1    become licensees under the MRDA.  To talk about a

2    transfer of them is to confuse the issue.

3                 The licenses were surrendered to

4    facilitate the sale, and the question is what did

5    they give up by doing that?  What would they have

6    had if they didn't?  They would have had the

7    ability to exploit the license according to its

8    terms, and that is what Mr. Green searched for by

9    forecasting what would have happened under that

10   scenario.

11               And on the topic of what the scope of

12   the rights and the transferability have to do with

13   each other, at tab 12 I have repeated from our

14   brief, paragraph 464, Mr. Britven's evidence that

15   wasn't challenged on this, who says, if you have

16   got this kind of a right which has limitations on

17   what you can do, consider it as though it was

18   transferred into the hands of a third party, even

19   if it wasn't, just conceptually hypothesize that.

20   What would a third party pay for those kinds of

21   rights, especially if they are not transferable?

22               And the response that he gave was that

23   he considered that and determined the best, highest

24   use, and therefore the fair market value of those

25   rights, is in the hands of Nortel, the person who

 1    could exploit them.

 2            So in my submission, that is further

 3    confirmation of Mr. Green's approach.

 4            Mr. Bromley made the criticism of

 5    Mr. Green that RPSM sharing obligations were used.

 6    I say that that follows precisely from the fact

 7    that when you hypothesize continued operations

 8    under the license, you must take into account the

 9    costs that they bear.

10            Forecasting what the revenues would

11    have been without forecasting what would have been

12    paid to earn them, in my submission, is not a

13    valuation.

14            THE CANADIAN COURT:  Well, the point

15    you made about the lines of business, I guess you

16    are making it also with respect to the residual

17    patent sale?  I mean, your point, your theory, is

18    that if you value what they gave up, what they gave

19    up was what they would have had to pay.  They say,

20    well, not anymore because we are not operating that

21    way.

22            MR. ZARNETT:  But the valuation

23    question requires, in my submission, the assumption

24    that you would operate to come up with a value, and

25    then, in a way, it is no different than if a

1    business burns down and someone is making a claim

2    for business interruption.  They didn't operate,

3    but what would have happened if they did.  That was

4    the right that they lost by the interference in the

5    fire case with their continued business or in this

6    case by the giving up of the license that would

7    have allowed them to continue.

8                    And since the license had the terms

9    that it had, one has to forecast what would have

10   happened, and that governs the approach in the

11   business sales, and in my submission, also applies

12   in Rockstar even if you accept the proposition that

13   the license extended to an IPCo and if you accept

14   that some -- that IPCo was viable.

15                    If the licensees could have

16   participated in IPCo but didn't, then you have to

17   value what would have happened.  What did they give

18   up by not participating in IPCo?  And that is what

19   Mr. Green's Appendix P, as it came to be called,

20   illustrated where he took the Lazard forecast, the

21   Lazard discount rates, et cetera, and presented a

22   number of alternatives which you will see at tab --

23   if you go to tab 9, to page 60, that is Mr. Green's

24   calculations of what would have happened -- how the

25   sharing in an IPCo would have run on various

 1    scenarios from the Lazard forecasts.

 2                Now, I want to turn to two final

 3    points, if I may.

 4                One is that Mr. Bromley suggested that

 5    there was some kind of a "gotcha" about the order

 6    in which the sales took place, and that is

 7    completely wrong.  The order of the sales, Rockstar

 8    coming last rather than first, has no impact

 9    whatsoever in how the valuation of the rights of

10    the licensees should work.

11                If the Rockstar transaction happened

12    first and then while the businesses continued

13    operating with people looking for purchasers, we

14    would have to do exactly the same analysis:  What

15    is the scope of the license rights; what were the

16    alternatives; was there an IPCo alternative; how

17    viable was it; what would have happened.

18                And we would have done it with the

19    businesses continuing, but we would reach the same

20    result, one way or the other we would reach the

21    same result.  It is not affected by the order of

22    the sales and the suggestion that we are taking

23    advantage of the order of the sales is wrong.  The

24    facts presented themselves in this order, but the

25    result should be no different and we don't argue

1    that it is different.

2              Some matters are clearer and some

3    matters are probably murkier because of the order

4    of the sales.  If Rockstar had taken place first,

5    you would have seen all the businesses carrying on

6    with the patents they were using, which would have

7    fortified presumably an argument that they didn't

8    need or use any of the patents in the Rockstar

9    portfolio.

10             But, in my submission, it is just the

11   wrong lens to look at.  It has nothing to do with

12   it.

13             And the final point is a bit of a

14   "gotcha," but I think on this one it is the US

15   interests who are maybe unintentionally asserting

16   something as a "gotcha," and that is the reliance

17   on an answer given by Dr. Cox.

18             So if you go to tab 13, I have

19   reproduced from our argument the back and forth

20   with Dr. Cox when he was being deposed.

21             And if you look at page 76, when the US

22   Interests refer to this, they always leave out the

23   first question, which is the assumption from which

24   the questions flowed, and the question was:

25             "Assume with me that the IFSA did

1          not require them to transfer their

2          licenses for zero consideration, that

3          they would not have been required by the

4          Courts to do that."

5               And then the question is, Okay, under

6     those assumptions, how would that affect what

7     someone would pay NNL?

8               Well, of course, those assumptions

9     presuppose the very questions that the Courts are

10    now being asked to decide.  If the Courts had

11    already decided there is no obligation to transfer

12    these licenses for no value, in other words, they

13    have value, then of course that is going to affect

14    what Rockstar would pay, and to the extent the

15    value wasn't determined, it would affect by

16    uncertainty what the payment would be.

17               But that wasn't the IFSA model.  The

18    IFSA model was, first we'll sell, then we'll

19    actually determine actual values, not negotiating

20    leverage, not what NNL could have done to a sale by

21    saying we won't transfer title, not what NNI could

22    have done by saying we won't transfer licenses.  So

23    in my submission, the answer that Dr. Cox gave on

24    that assumption is not helpful to the scenario the

25    Courts are actually being asked to deal with.

1               So let me conclude by thanking the

2     Courts on behalf of the Monitor for taking on this

3     responsibility, you may not have known what you

4     were getting yourselves into, but you are in it,

5     and allowing this case to be presented and heard

6     with such, I was going to say, Canadian and

7     Delaware style civility.

8               So on behalf of the Monitor's team, I

9     thank you.

10              THE CANADIAN COURT:  Thank you,

11    Mr. Zarnett.

12              THE US COURT:  Thank you, Mr. Zarnett.

13              THE CANADIAN COURT:  Mr. Zigler.

14              MR. ZIGLER:  Yes, good morning, Honor,

15    good morning, Judge Gross.

16              THE US COURT:  Good morning.

17              MR. ZIGLER:  I'll try to be as brief

18    as possible and will refer only to a couple of

19    documents.

20              One is what Mr. Bromley described as

21    the prize-winning EMEA Debtors' binder as one of

22    the slides I want to look at, and we have passed up

23    to you or are passing up to you Mr. Britven's

24    demonstrative that was put to him on his evidence,

25    rather than just finding it, it will be more

1    convenient and I'll be referring to a couple of

2    pages.  I think it is demonstrative number 0016,

3    which I will allude to briefly in dealing with some

4    of the things that were said yesterday.

5                 With respect to the EMEA Debtors'

6    closing argument, the only piece I want to talk

7    about, and Mr. Zarnett alluded to it briefly, was

8    this comparison between Mr. Britven's work and Mr.

9    Huffard and Malackowski's work.  It is that sort of

10   glossy pull-out thing called the "EMEA Debtors

11   closing argument customer-related assets and

12   goodwill."

13                And the main point here is, as

14   Mr. Zarnett said, Mr. Britven used Mr. Green as the

15   reality check on his work, although he used a

16   different approach.  He used the objective PPAs,

17   purchase price allocations, on the sales of the

18   business.  For whatever reason, the estates agreed

19   not to use them amongst themselves.  Mr. Britven

20   said that is credible evidence, it is real, it is

21   objective, it's not made up by any party advocating

22   a position, and I am going to use it.

23                And the suggestion was that Mr. Britven

24   really accords with what Mr. Malackowski and Mr.

25   Huffard did, and the fact is that that is not so.

 1    And they are sort of saying, well, you know, there

 2    is only an 8 percent difference in how they valued

 3    intellectual property, aren't they in the same

 4    ballpark.

 5              And my only point here is 8 percent of

 6    7.3 billion dollars is about 580 million dollars.

 7    It is a lot of money by any stretch.

 8              And when you are moving it from the

 9    bucket of intellectual property, where no matter

10    how you cut it NNL had a lot to do with the

11    development of that intellectual property, and

12    moving it to the customer-related assets and

13    goodwill bucket where Nortel, NNL served directly

14    only a small market while indirectly the whole

15    global market, that creates a very adverse

16    difference between the two, and Mr. Britven does

17    not form a reality check to Mr. Malackowski's work.

18    In fact, his work is much closer to Mr. Green's.

19              While we are talking about

20    Mr. Britven's conclusions, that moves me to the

21    next point that I wish to raise this morning, and

22    that is Mr. Bromley I think gave you a 30-minute

23    political speech in response to a question from

24    Judge Gross regarding Mr. Britven's work and, in

25    fact, regarding my clients and their claims, and

  1    there are a number of misconceptions that came up

  2    in that submission that I want to clear up because

  3    they are very critical to understanding this case.

  4                    And the first point, Judge Gross and

  5    Justice Newbould, is that my clients ask for

  6    nothing else than that this case be determined on

  7    the facts and the law.  That is why, and perhaps

  8    Mr. Bromley was -- and he is a fine fellow and a

  9    fine lawyer, and God knows, we have come to know

 10    each other over five and a half years, but he must

 11    have been too busy reading Canadian newspapers when

 12    I was making my first submission Monday morning,

 13    because what I said is my clients don't want

 14    special treatment; they want this case decided on

 15    the facts of the Nortel that they worked for as

 16    they saw it, and we went through those facts and

 17    then we went through the law on ownership and the

 18    alternative pro rata submission.  It is in fact

 19    rather disrespectful to say my clients want this

 20    case decided on the basis of who they are.  That is

 21    not what we are saying.

 22                    And in fact, we have to understand

 23    their claims, and I want to clear up the

 24    misconceptions about their claims before I get to

 25    Mr. Britven's work.

1                   And that is this.  There is somehow a

2     suggestion, well, because they are being paid out

3     of a pension fund and their cuts -- Mr. Sproule's

4     evidence was my pension has been cut 30 percent, I

5     live in Ontario, the others outside of Ontario have

6     been cut 40 percent, but somehow whatever they

7     recover will get them something close to a full

8     recovery.

9                   The answer here is no matter how you

10    cut it, their pensions will be reduced.  They will

11    not get a full recovery.

12                  And the other fact of the matter is

13    there is no insurance company backing them up, and

14    Justice Newbould knows this better than Judge Gross

15    in terms of the Canadian system.  But the evidence

16    is that something like 40 percent of the pensioners

17    are in Ontario where there is a small guarantee

18    fund, and those outside of Ontario, there is no

19    guarantee whatsoever for their pensions.

20                  And any suggestion that this is a fight

21    between insurance companies and distress fund

22    investors, that is nonsense.  These people will

23    suffer on their pensions.  That is a 2 billion

24    dollar claim identified by Mr. Sproule.  That is

25    the shortfall in the pension fund.  And in that

1    respect they are not any different than any trade

2    creditor or anyone else who says, well, I have been

3    partly paid for what I am owed for my goods and

4    services and I am still owed 30, 40 percent of what

5    you owed me, that is my claim.  That is what that 2

6    billion dollars is about, and I'm sure Ms. Miller

7    will tell you what the UK pension shortfall is

8    about.  That is real money.  That is a real claim.

9              And for most of them, they bear the

10   brunt.  They all bear part of the brunt.  Even the

11   so-called insurer, if they only get eleven cents on

12   the dollar, that is an eleven cent recovery to the

13   insured.

14             The other point is there is another

15   billion dollars worth of claim in Canada, and

16   Mr. Sproule, if you look at his affidavit, I'm not

17   asking you to turn it up, but attached as an

18   exhibit to it, it is Exhibit TR49818, is a 75th

19   report of the Monitor, the motion record on the

20   compensation claims, so these are the claims above

21   the pension.  They are claims in Canada and they

22   have been identified by the Monitor to total a

23   little over a billion dollars, 1.06 billion.  There

24   are some adjustments that pertain to non-registered

25   pensions, to lost health and disability benefits,

1    to severance pay and patent awards that haven't

2    been paid.

3              Those are real claims.  Those people

4    have been paid zero on that.  They are not going to

5    get anything.  There was a small trust fund for

6    some of the disability, but not much.  They are not

7    going to get anything.  If there is an eleven cent

8    recovery, there is an eleven cent recovery.

9              It doesn't matter.  They are no

10   different than a trade creditor.  They are no

11   different than a bondholder who bought at 30 cents

12   and hopes to get more.  That is irrelevant for

13   purposes of deciding this case and I don't know why

14   Mr. Bromley brought you to it, but my point is they

15   are real claims, they are not insured claims.

16             Let's go to Mr. Britven's chart, and

17   that is very important.  The first thing to note

18   about Mr. Britven's opinion --

19             THE CANADIAN COURT:  What are we

20   looking at?

21             MR. ZIGLER:  Well, the chart itself.

22             THE CANADIAN COURT:  Where?

23             MR. ZIGLER:  It is in the

24   demonstrative, it is in the material.  Actually, it

25   is in the demonstrative at page 35.

1             But Mr. Britven, if you go back to his

2    testimony, before we look at his chart, I mean, he

3    gave an opinion that you had to deal with the

4    allocation dispute by going beyond the first tier

5    of allocation on whatever theory he compared,

6    whether it was Malackowski's or Kinrich's or his or

7    Green's or the pro rata, you had to look at the

8    intercompany claims and you had to look at the

9    guarantee claims to see how the waterfall of

10   allocation worked.

11            His opinion was, for example, on the 2

12   billion intercompany claim, if it was a sort of

13   deemed dividend to Canada, and if Canada was the

14   owner, you had to see what Canada got out of that

15   and you had to see what the US got out of it as an

16   intercompany claim to NNI, and therefore, he did

17   his analysis in two steps.

18            He did the first tier allocation in

19   terms of the 7.3 billion dollars on the different

20   theories, and then looked at it in terms of the

21   ultimate outcome to the creditors in the estates

22   because of the inter-companies and the guarantees.

23            And he did that as a matter of

24   professional opinion.  The Court has to determine

25   whether that is appropriate, but it is what it is.

 1   It certainly deals with the outcomes of allocation.

 2              The other thing and the other reason we

 3   have put this to you and the reason I submit that

 4   Mr. Hoeffner talked about it Monday morning was

 5   this is a reality check on the different allocation

 6   theories, just as the experts look at reality

 7   checks on each other.

 8              And that is if somebody is taking an

 9   extreme position, find out why, and if there is a

10   suggestion that, for example, the Canadian Debtors

11   and the CCC were taking an extreme position on the

12   ownership piece, it is in fact not so when you look

13   at how the allocation works its way through.

14              And that is the reason this was put to

15   you.

16              What Mr. Bromley was suggesting was

17   that there was no evidence to support Mr. Britven's

18   numbers on claims, and in that respect he is wrong.

19   Mr. Britven, both in his report and in his

20   examination before these Courts, alluded to the

21   sources of information.  And in this respect I have

22   to stop for a minute to say, look, we are five and

23   a half years into this and there actually was

24   something Dickensian from the statements yesterday

25   from all the estates that we don't have a real

1    picture on our claims.  You kind of wonder five and

2    a half years in why that is, but, let's face it,

3    Mr. Britven did the best with what was known, and

4    five and a half years in we know pretty well what

5    the claims are.  The three biggest claimants are

6    before you as core parties in this case, the

7    noteholders and the CCC and the UK Pension

8    Trustees.

9              And what Mr. Britven did, if you look

10   at, go to his demonstrative at page 29, is he

11   looked at the sources that support all of the big

12   known claims and came up with numbers to back it

13   up.  He didn't make up the size of the Bondholder

14   claim.  Both Courts have known about it since the

15   day these applications were filed.  He didn't make

16   up the US creditor numbers.  In fact, Mr. Ray, they

17   were known again on the initial filing, that is,

18   creditors outside the guaranteed bonds, and Mr. Ray

19   confirmed all of this in his testimony before this

20   Court.

21             He knew what the Canadian creditors

22   were claiming because of the evidence in

23   Mr. Sproule's affidavit -- well, the documents that

24   support the evidence in Mr. Sproule's affidavit

25   that I took you to earlier, the 2 billion dollar

1    pension shortfall and about a billion dollars in

2    benefits plus other Canadian unsecured creditors,

3    the Canadian-only bonds of 200 million and some

4    China and Singapore claims that the Monitor had

5    referred to in his reports.

6              I'll skip the EMEA creditors for a

7    minute, but he knew what the UK pension trust

8    claims were and the reason he did that is because

9    there was in evidence a letter from Ernst & Young

10   UK as to exactly what that was.  That is up on the

11   chart, it has an exhibit number, and Mr. Britven

12   worked from that.

13             He also knew what the residual cash was

14   in each of the estates.

15             So essentially, Mr. Britven put

16   together all these numbers.  The 500 million dollar

17   EMEA creditor number, he did admit he backed into

18   it in the sense that the UK pension trust expressed

19   that they were I believe a certain percentage, I

20   think it was 78 percent of all the EMEA claims.

21   The EMEA Debtors I think acknowledge that.  So he

22   just used that because we have no further

23   visibility.

24             But no matter how you cut it, again,

25   Mr. Britven gave evidence.  He was cross-examined

 1    about these numbers, and he did say they were

 2    illustrative, but what he did say is that's the

 3    best evidence I have got.  And nobody put to him

 4    any other evidence of anything he had missed.

 5    Nobody put to him any evidence of anywhere where he

 6    had made any error.

 7                Mr. Britven is an expert valuator with

 8    the world's biggest valuation firm.  He wouldn't

 9    put his name to this unless he had some support for

10    those numbers.

11                And all that Mr. Bromley did yesterday

12    was say, well, there may be some tax claims, which

13    Mr. Britven acknowledged, in the US, essentially he

14    is giving evidence.  We have got some PBGC claims

15    that are larger than what Mr. Ray talked about.

16    There is some burn.

17                And everybody acknowledged that.

18                Mr. Britven acknowledged that the

19    numbers are illustrative and they can move up and

20    down, but he has got all the big numbers in the

21    mix.

22                So if you go back to the chart and this

23    is where you go to the question that Mr. Bromley

24    was asked yesterday, if you go back to the chart,

25    what Mr. Britven said is yes, the numbers may move

1    up and down, the percentages may move up and down a

2    little bit, and Mr. Bromley acknowledged it, but

3    the ballpark is what is here, and that is the

4    reality check, as Courts of equity that you have to

5    have on any outcome in this case.

6              And it is obvious using Mr.

7    Malackowski's contribution approach that there is a

8    sizable amount left in the United States, to go

9    back to Judge Gross's question, that may in fact

10   not only deal with Mr. Bromley's concerns but leave

11   room for this post-petition interest issue which

12   you have to deal with next month, and there is

13   certainly under Mr. Kinrich's approach a lot of

14   money, and this came up in the questioning of

15   Mr. Hoeffner in his submissions, this 1.3 billion.

16   Yes, it can go up, it can go down, but the ballpark

17   is certainly there, and it is certainly there to

18   deal with one issue and one issue only now that you

19   have that settlement --

20             -- OFF THE RECORD DUE TO TECHNICAL

21   DIFFICULTIES --

22             MR. ZIGLER:  So my point on this is I

23   commend Ms. Schweitzer for her candor to say, look,

24   the US Debtors are advocating for a solution, that

25   is what she said in response to your questions,

1    that will produce a solvent US Estate with the

2    ability to pay post-petition interest.  And that is

3    what that is about, and we have seen that in the

4    settlement agreement that Judge Gross has to deal

5    with.

6               And as far as the other -- the numbers

7    on the other position, the toggles go up and down,

8    they can go up a few percentages, they can go down

9    a few percentages, but the ballpark is what it is.

10              THE CANADIAN COURT:  You said that a

11   minute ago.  I think we can move it along.

12              MR. ZIGLER:  So I want to move on from

13   that simply to say that that's what that is about.

14   That is how you are to use that information, and

15   hopefully I have cleared up those issues.

16              With respect to what Mr. Qureshi and

17   Mr. Leblanc said, and this is my final point, and

18   what was said by the two indentured Trustees this

19   morning, and I'll reference my submissions because

20   I'm not going to spend time taking you to this,

21   there is no question that the jurisdiction, both

22   Courts have a jurisdiction to do a pro rata

23   allocation and it is not substantive consolidation.

24   In fact, our submission has it as a bit of a

25   weighted pro rata calculation.

1                    Paragraphs 169 and 170 deal with the

2    authority -- of our brief deal with the authority

3    of the Court, Justice Newbould, section 11 of the

4    CCAA and the Century Services case you know very,

5    very well, I don't need to repeat it.  There is no

6    question about that jurisdiction.  Mr. Hoeffner

7    spoke about the US Court's jurisdiction on Monday,

8    so I'm not going to repeat that, although that is

9    also in the subsequent paragraphs of our brief.

10                    The basis for allocation, and this is

11   the point that both Mr. Leblanc and Mr. Qureshi

12   missed, that we put forward recognizes and leaves

13   room for recognizing the intercompany claims and

14   the guarantees.  And in fact, if you believe that

15   those guarantees are strong enough, then yes, that

16   means that the Bondholders get a claim in both

17   jurisdictions.  They may get topped up to a hundred

18   percent but not with any post-filing interest, and

19   everybody else takes a bit of a smaller percentage.

20   I think we have identified it in our brief as 57

21   percent.

22                    So you can recognize all of these

23   things in a pro rata allocation --

24                    THE CANADIAN COURT:  This was said

25   in-chief.  I don't think we need to hear it again.

 1                MR. ZIGLER:  But in fact, that is just

 2    not recognized by them.

 3                And my final point in terms of how it

 4    can be implemented, that is set out in our brief as

 5    well.  There is no impossibility of implementing

 6    this and it won't take any more or less time than

 7    implementing any of the other possible outcomes of

 8    the allocation dispute.

 9                So subject to any further questions

10    from both Courts, it has been a pleasure appearing

11    before you, and thank you.

12                THE US COURT:  Thank you, sir.

13                THE CANADIAN COURT:  Thank you.  How

14    much longer are we going to be?  The reporter is

15    saying she has more technical problems.  We were

16    really hoping just to go right through.  Can we

17    take five or ten minutes at the max.

18                THE US COURT:  Are we looking all right

19    on time to take a ten-minute recess?

20                All right, we'll take ten minutes,

21    Justice Newbould.

22    -- RECESSED AT 10:28 A.M.

23    -- UPON RESUMING AT 10:42 a.m.

24                THE US COURT:  Thank you, everyone.

25    Please be seated.  Oh, you beat me today.

1            Mr. Maguire.

2            MR. MAGUIRE:  Good morning, Judge

3    Gross.

4            THE US COURT:  Good to see you again.

5    Good morning.

6            MR. MAGUIRE:  Good morning, Justice

7    Newbould.

8            THE CANADIAN COURT:  Good morning.

9            MR. MAGUIRE:  Again, it is Bill Maguire

10   for the EMEA Debtors.  I would like to start on

11   behalf of the EMEA Debtors in joining in the thanks

12   for the many courtesies and extraordinary patience

13   that the Courts have shown us.  I and my colleague

14   Mr. Gottlieb will try not to impose on your

15   patience too much longer.

16           I would like to start with the point

17   that my friend Mr. Zarnett made about how the

18   employees of the EMEA and the US did not make any

19   reservation when they assigned their rights and

20   title to NNL.  And, of course, that's correct.

21   They are not the ones who had the beneficial

22   interest, as my colleague Mr. Gottlieb explained.

23   It is the employer is the one who has the

24   beneficial interest.  And that's the significance

25   of Justice Newbould's question just the other day

1    about whether there was a written agreement in

2    which the US or the EMEA had conveyed their

3    beneficial interest to NNL.  And, of course,

4    Mr. Zarnett made clear that there is no such

5    written agreement.

6              What we do have are the terms of the

7    MRDA, and specifically Schedule A, which expressly

8    recognizes the participants' beneficial ownership

9    and the fact that that is retained.  And so that

10   brought Mr. Zarnett to that exact question, the

11   beneficial ownership that is referred to in

12   Schedule A.  And I was listening very carefully to

13   see how he might address, by what authority or how

14   the Courts might set aside those words that we

15   spent so much time on the other day, the words

16   "participants" and "ownership of NN Technology."

17             And I am not sure -- I generally try to

18   listen very carefully to Mr. Zarnett, and I am

19   always rewarded in doing so.  In fact, it is one of

20   the great privileges of this trial is to be able to

21   watch a master craftsman at work.  But I am not

22   sure today I caught him using either of those

23   words, "participants" or "ownership."

24             THE CANADIAN COURT:  Is this the Mafia

25   kiss?

1                MR. MAGUIRE:  We call it an Irish hug.

2                Somehow, those words seemed not to slip

3     by.  There was -- I did catch a couple of

4     references to business and businesses there.  And

5     Mr. Zarnett very properly referred to the separate

6     legal entities and how each one has its business.

7     But in the critical provisions that we spent so

8     much time on, the key word was not "business."  The

9     key word was "ownership."  And that was followed

10    immediately by the defined term of "NN Technology."

11    And, of course, "NN Technology" is everything in

12    every business on every entity of every party.

13                Mr. Zarnett referred to our expert,

14    Mr. Malackowski, and how he felt that if we got to

15    a situation where we were to set aside the MRDA,

16    then we would revert to practice, to Nortel's

17    practice.  And I think there is a step there that,

18    respectfully, my friend is missing, and that is

19    where we don't have a contractual provision, an

20    agreement that sets out exactly who owns what, then

21    we turn to the compass.  We turn to the law, and we

22    turn specifically to the law of patents and the law

23    of IP.

24                So practice can be helpful.  It is very

25    helpful to look at what Nortel did to understand

1   the context in which they did it.  But the

2   immediate step is what does the law say about

3   ownership.  And the law is very clear on this

4   point.  It is the inventor, it is the creative or

5   inventive process that gives rise, that gives rise

6   to ownership.

7              So when the question before us is

8   ownership, we must look to the law.  And if the

9   contract does not tell us, to the extent it does

10  not tell us -- and here, I would submit, the

11  contract does tell us -- there is beneficial

12  ownership.  The question only is the content of

13  that ownership.  And the law, we submit, speaks

14  very clearly in the context of patents and IP that

15  it is the inventor who is the first owner of the

16  patent and specifically that beneficial ownership

17  resides in the employer, the employer of Simon

18  Brueckheimer, the employer of the inventors who

19  created the great value that was realized in the

20  sales that bring us here.

21             Mr. Zarnett talked a little bit about

22  practice.  And that, I think, was a shorthand, as

23  Justice Newbould may have suggested, for the

24  five-year look-back.  I did not hear any authority

25  that would allow us to use a five-year look-back

1    that we know for sure gives us the wrong answer

2    here, that we know is skewed, especially when it

3    would in no way -- there is nothing about any

4    practice that allows us to override the law of

5    inventions, the law of IP.

6              So Mr. Malackowski, respectfully,

7    played it right down the middle, and he gave Canada

8    credit for every dollar of research that Canada

9    actually performed and not one dollar less, and he

10   did the same for the US.  The problem, of course,

11   was when you play it right down the middle, you

12   tend to get fire from both sides.

13             And back to my notes from yesterday, my

14   friend Mr. Bromley made an observation in which he

15   spoke about Mr. Malackowski's analysis.  And you

16   may have the demonstrative that he put up, which is

17   from -- indicating the conclusions based on

18   Blackstone and Mr. Malackowski as to EMEA's

19   proposed allocation in this case.  And what

20   Mr. Bromley said was "We like Malackowski's

21   analysis a lot," but he said there is one thing

22   that he missed.  And so I would like to dwell on

23   that for a moment, if I may.  And what Mr. Bromley

24   was suggesting he missed was that there were

25   transfer pricing payments that were made under the

neesons    W&F
WILSON & FEIZER LTD.                    www.neesonsreporting.com
www.wilfet.com

 1    cost-sharing agreements and that maybe the US

 2    should get credit for those payments and that

 3    Mr. Malackowski had somehow missed that.

 4              And the point I would like to make is,

 5    number one, Mr. Malackowski did not miss that.  He

 6    dealt with it head on in his direct examination.

 7    He dealt with it on cross-examination, even showed

 8    you a demonstrative about how inappropriate it

 9    would be to play around with the transfer pricing

10    payments like that.

11              And secondly, that that is entirely

12    consistent with the law.  The law of ownership

13    looks to who and what was actually created and

14    invented, not to some reimbursement or who funded

15    it.  And, of course, that's consistent with

16    Nortel's practice.  Nortel fundamentally

17    distinguished between direct R&D spend, which was

18    the actual act of creation, the actual Simon

19    Brueckheimer and his colleagues going into their

20    labs and coming up with inventions.  That is the

21    creative process, not someone reallocating some

22    cost later on some budget line item or transferring

23    money back and forth between entities after the

24    fact.

25              Now, we got into this in the course of

1    trial where the UCC, I believe it was, had

2    presented a report of an expert by the name of

3    Laureen Ryan, and she testified in Toronto.  And

4    what she had said was -- she had given a report

5    which indicated that if you were to take all of the

6    moneys, the transfer pricing payments that the US

7    Debtor over the years had sent to Canada and you

8    reallocated all of the research from various

9    entities to the US, then you would have a huge

10   reallocation in favor of the US Debtor.  And she

11   said you could do that across all these periods:

12   The early years, which I would call the

13   cost-sharing years, and the later years under the

14   MRDA.

15            Now, the problem with that approach was

16   that it was -- a fundamental flaw was that it

17   ignored the critical distinction, the critical

18   distinction which the law recognizes and Nortel's

19   practice recognized between performing research and

20   creating something and inventing something on the

21   one hand and simply paying for it, cutting a check

22   or having a journal entry on the other hand.

23            And Ms. Ryan had to acknowledge -- on

24   the witness stand she acknowledged that there were

25   some serious problems with her approach.  For

 1    example, of the billions of dollars that NNI sent

 2    to Canada, we took one piece, $2 billion that the

 3    Internal Revenue Service says was a dividend.

 4    Ms. Ryan acknowledged that's a dividend.  She

 5    counted it as research activity by the US Debtor.

 6    She acknowledged, as she had to, that a company

 7    paying a dividend to its parent is not performing

 8    research.  You don't invent anything when you pay a

 9    dividend.  It may be a good thing to pay a

10    dividend, it may be a very bad thing, but it has

11    got nothing with research.  It is not creating

12    anything.

13              THE US COURT:  But in order to put the

14    parties, if you will, on an equal start, doesn't

15    there have to be sort of a true-up?  In other

16    words, under your formulation, this R&D money that

17    is going to be paid is the US money.

18              MR. MAGUIRE:  Absolutely.  The money

19    comes from the US -- well, some of it came from the

20    Bondholders.

21              THE US COURT:  Sure.

22              MR. MAGUIRE:  Some of it came from the

23    shareholders.

24              THE US COURT:  Right.

25              MR. MAGUIRE:  Money is fungible.

1              THE US COURT:  Sure.

2              MR. MAGUIRE:  Nortel spent a billion.

3    It got it from all the customers.  I mean, we

4    probably have got a hundred billion that customers

5    put into the organization.  So the money came from

6    lots of different places.

7                   But the exercise here -- and, of

8    course, you are right, Judge Gross.  If the

9    exercise here was an accounting exercise of debits

10   and credits, if what we were trying to do was

11   simply tally up who paid the most amount of money

12   into that, you would have tremendous allocation

13   questions and valuation questions and tracing

14   questions, frankly.

15             THE US COURT:  Right.

16             MR. MAGUIRE:  But in concept, of

17   course, you are right.  The law, however, says

18   something different.  And the law of ownership is

19   not really who pays for something.  The payor,

20   bank, the creditor card company, all these people

21   are very important.  They allow inventors to eat

22   every day and to go home and to be nourished and to

23   manage and to live, but they don't create anything.

24   The banker who extends the line of credit, the

25   Bondholder who finances things, they don't create

1    anything.  They don't invent anything.  At the end

2    of the day it is the inventor who does the

3    inventing, the creator who does the creation.

4              And what the law says is it is not the

5    banker or the credit card company who gets

6    ownership.  What the law says is the first owner of

7    the patent is the inventor.  So it has to be the

8    EMEA, where Simon Brueckheimer invents it.  It has

9    to be the US, where the research is in Texas.  It

10   has to be Canada, where you have Canadian inventors

11   creating.

12             Now, you can do all kinds of

13   reallocations of cost.  NNL could say it may be

14   unfair, but we want the US to pick up the whole tab

15   for all the research we have done since year zip.

16   That would cause tax problems.  There could be all

17   kinds of solvency issues, many legal problems that

18   could be caused.  But it wouldn't change the fact

19   that the US inventors created what the US created.

20   It wouldn't change the fact that the ownership

21   arose from the act of creation.  And so that's what

22   the law recognizes, and that's a fundamental

23   distinction.

24             And we did cover this with Ms. Ryan.

25   We talked about tuition.  It is great to pay

 1   tuition, but that's not the same as walking into a

 2   classroom and performing the act of teaching.

 3              We talked about surgery.  A hospital

 4   performs surgery through its surgeons.  We can

 5   measure the amount of surgery by what it pays, the

 6   direct spend for the salaries of the surgeon and

 7   the assistants and the lab room and the operating

 8   room.  The government may end up paying for all of

 9   that.  The insurance company or the patient may pay

10   for all of that.  But at the end of the day there

11   is a fundamental difference between the act of

12   paying for the surgery and performing the surgery.

13   And that's exactly true in the case of IP, exactly

14   the case in terms of patents.

15              And Mr. Malackowski addressed that

16   directly, and there was a demonstrative he had

17   which showed how he wanted to be as close to the

18   inventive process as possible.  And if we can pull

19   that up, you will see how he described that the

20   approach that he had followed and that Nortel

21   consistently followed was, in the circumstances,

22   the best measure of research and development

23   contribution.

24              And what he said specifically -- you

25   may recall this, Judge Gross -- was he would

1    actually prefer not even to be using direct R&D

2    spend.  He would actually rather go back to the

3    labs.  He would rather go back to Ottawa and go to

4    Harlow and go to Richardson and go through the lab

5    notebooks and see exactly who invented what.  And

6    if he did that, then you would have your best

7    answer.

8              That information was not available, so

9    he went to the next best, the proxy for that, which

10   would get him to the same place.  And he confirmed

11   all of that by looking at the actual patent

12   applications and saw that that was very consistent

13   with the results of his analysis.

14             But the key thing that he kept

15   emphasizing was he wanted to get to the inventors.

16   He wanted to get into the lab.  What happened

17   afterwards in terms of who picked up the tab, who

18   reimbursed whom, that was a corporate internal

19   thing that, according to people's budgets and what

20   the parent dictated, it did not change the fact

21   that what Canada invented, Canada invented.  It did

22   not change the fact that what was invented in

23   Richardson was invented in Richardson.  And it

24   didn't change the fact that Simon Brueckheimer

25   invented what he invented.

1                    Once you start playing with the

2     numbers, then you get all kinds of crazy results.

3     And we have Ms. Ryan, for example.  You may recall

4     she had some periods where she had taken away from

5     the UK all of its research activity for entire

6     periods, zero.  Simon Brueckheimer went to work

7     every day and apparently for that entire period --

8     it was actually worse than nothing.  She had a

9     negative number for the UK, as though he had

10    uninvented stuff.

11                   And my friends say, oh, look -- and you

12    have heard this in the post-trial briefs.  People

13    have said, look.  All right, there may be issues

14    with Ms. Ryan's report with respect to the later

15    years under the MRDA.  But even if that's not

16    reliable, you can still rely on the report with

17    respect to the early years, because nobody is

18    criticized with respect to the early years under

19    cost-sharing, and that was just, you know,

20    reimbursing costs.  Well, that's not really the

21    case.

22                   Her flaw, frankly, is fundamental.  At

23    no point in the early years or the later years did

24    she recognize the fundamental distinction between

25    stepping into the lab and inventing something and

 1    paying for it or reallocating costs afterwards.

 2              Mr. Malackowski did recognize that.  He

 3    absolutely applied it.  It was fundamental to his

 4    analysis.  And so Mr. Malackowski didn't miss

 5    anything here.  He was absolutely right on.  It is

 6    frankly -- I forgive Ms. Ryan for missing it.  It

 7    is something that I think people who are not versed

 8    in IP would easily confuse the debits and the

 9    credits and the true-up, so to speak, with the

10    actual inventive process.  It is something our own

11    expert, I think, Dr. Cooper, eluded him.  But it is

12    certainly not something that Mr. Malackowski would

13    miss.

14              You may recall Mr. Malackowski from his

15    entry-level job way back at Arthur Andersen, where

16    they valued the first patent that came in the door,

17    to building up two powerhouse IP companies and to

18    being an inventor himself.  I think it was like 20

19    patents.  So he absolutely gets the distinction

20    between funding, because he deals with the capital

21    markets now, between funding R&D, research, and

22    actually inventing it.

23              Now, of course, an inventor can assign,

24    he can mortgage, he can pledge things to the banks

25    or the Bondholders or to anybody.  But absent an

1   agreement, the law is clear:  It is the inventor

2   who is the owner, not the banker, not the funder.

3   That is the fundamental proposition of the law that

4   is given effect by Mr. Malackowski's analysis.  And

5   that is also very true with respect to the practice

6   at Nortel, because the practice at Nortel

7   recognized direct spend, which was the salary of

8   Mr. Brueckheimer, the lab facilities that were

9   spent, and not later reallocations that were done

10  back at corporate headquarters.

11            And with that, I will turn the mic over

12  to --

13            THE CANADIAN COURT:  Mr. Maguire, I

14  have got a question for you.

15            MR. MAGUIRE:  Yes, Justice.

16            THE CANADIAN COURT:  If you could look

17  at Article 4(a) and (b) of the MRDA.

18            MR. MAGUIRE:  4(a) and (b), yes, yes,

19  Justice Newbould.

20            THE CANADIAN COURT:  (b) says:

21            "Each Licensed Participant shall

22       execute or cause to be executed such

23       documents," et cetera.

24            Now, your case is that the licensed

25  participant held the equitable title to the patent

 1    because the inventor worked for that licensed

 2    participant; correct?

 3               MR. MAGUIRE:  By operation of law;

 4    that's exactly right.

 5               THE CANADIAN COURT:  Yes.

 6               MR. MAGUIRE:  And also by virtue of

 7    their agreements.

 8               THE CANADIAN COURT:  No.  I understand.

 9               MR. MAGUIRE:  Yes.

10               THE CANADIAN COURT:  Your case has been

11    it is by operation of law.

12               What is the purpose of having the

13    licensed participant, on your theory, execute a

14    document requested by NNL if it is not to transfer

15    whatever the participant has to NNL?

16               MR. MAGUIRE:  I see it as a matter of

17    good administration, Justice.  What has to happen

18    here is there has got to be a registration of the

19    patents somewhere in order for the group as a whole

20    to be able to enforce its patents and to register

21    the patents and to protect the property.  So there

22    has to be a set of policies and agreements whereby

23    the rights -- where you can go to the registry

24    office and say here is an application for a patent,

25    and here -- don't reject it, because we have got

1    all the right signatures.

2              And, of course, a critical line on the

3    application for many of these is who is the

4    inventor.  So you have to fill out the inventor.

5    If you put down an inventor who is some person in

6    some foreign country, then you are going to want to

7    show that somehow you got title from that person in

8    that foreign country.  And so you want the licensed

9    participants to be in a position to make sure that

10   their employees do that so that the property is

11   ultimately protected.

12             I hope that answers your question.

13             THE CANADIAN COURT:  Thank you.

14             THE US COURT:  Thank you, Mr. Maguire.

15             MR. GOTTLIEB:  Thank you, Your Honor.

16             THE US COURT:  Mr. Gottlieb, good

17   morning.

18             MR. GOTTLIEB:  Thank you, Your Honor.

19             THE US COURT:  Thank you, Mr. Maguire.

20   Mr. Gottlieb, good morning.

21             MR. GOTTLIEB:  Good morning, thank

22   you.

23             I'm going to pick up and I just have a

24   few points to raise regarding my friend

25   Mr. Zarnett's comments.

1               I am going to start, Justice Newbould,

2   if I can, with your last question because it leads

3   into my first point.  You referred to 4(b) and you

4   read it and you said "etc.," the words "et cetera.

5   Those et ceteras are an important part as well

6   because it says that:

7               "Each Licensed Participant shall

8         execute or cause to be executed such

9         documents reasonably requested by NNL,"

10        and here is the important part "as may be

11        necessary or desirable to give effect to

12        or perfect the foregoing."

13              And the foregoing is obviously 4(a).

14  And 4(a) specifically is referring to - sorry to

15  leave the mic - 4(a) is specifically referring to

16  legal title which comes to the point that I want to

17  deal with first of Mr. Zarnett's response, which is

18  Mr. Zarnett dealt with our argument that legal

19  title does not mean ownership, that it doesn't mean

20  beneficial ownership, it just means legal title,

21  which as a matter of law is a restricted right, not

22  a broad right as he put it.  That was the first

23  point that Mr. Zarnett dealt with.

24              And he dealt with that by going to the

25  Seventh Edition of Black's Law Dictionary and I

1    just have a few points to make there, and I will

2    just say this as an aside and this is repetitive of

3    something I said earlier, so, Justice Newbould, I

4    will say it very quickly.  Cox and Berenblut in

5    their report said that they are advised that legal

6    title is synonymous with legal ownership and the

7    point is that is not correct.

8              So when my friend goes to Black's

9    Seventh Edition I want to start by saying the law

10   that I took the Court to, the law is in the Francey

11   decision which is the Alberta Court of Appeal

12   decision, and it adopts the Fifth Edition as the

13   law, so I took the Court to the case law, and that

14   law is explicit.  It is explicit in the words of

15   that case that legal title does not include

16   beneficial ownership.

17             So when you read that case and read the

18   law of the Courts in Canada, that is an explicit

19   finding there that legal title is not the same and

20   does not include beneficial ownership.

21             So if you look at the law, the

22   predominant meaning of "legal title" is the absence

23   of beneficial ownership.

24             But even if you go to the Black's Law

25   Dictionary and look at the Seventh Edition, what it

1    refers to is a title, for legal title, a title that

2    evidences apparent ownership but does not

3    necessarily signify full and complete title or

4    beneficial interest.

5              And what Mr. Zarnett, when he took us

6    to that, and this is a change, he says but you have

7    to therefore look at the context.  So we of course

8    don't run from the context.  We say the context is

9    very important with respect to the words in the

10   MRDA and the context that the Court must view

11   outside of the MRDA.

12             So with respect to having to look at

13   the context, legal title, when viewed with the

14   other words in the MRDA such as ownership, those

15   can't be read to mean the same thing.

16             So when you look at 4(a) and look at

17   the terminology used, "legal title," and go back to

18   the first recital where it refers to legal title in

19   the name of NNL, that must be viewed in context of

20   the MRDA and points to something different than

21   ownership, because the different terms are used.

22             THE CANADIAN COURT:  We have heard all

23   this argument before.

24             MR. GOTTLIEB:   Okay.  So my point was

25   Mr. Zarnett said you have to look at the context,

1    and we obviously agree and we say that the context

2    in the MRDA points to the direction of a difference

3    between legal title and a distinction between

4    beneficial ownership as does the context outside of

5    the MRDA which is the slides that we prepared

6    obviously and the menu demonstrative.

7              So in our respectful submission,

8    nothing changes there.

9              The second point is dealing with the

10   point of evidence and the Covington case and the

11   Sistem case, and I'll just make a very brief point.

12             My friend Mr. Zarnett tried to narrow

13   the use of that case or the interpretation of that

14   case, and, with respect, he is wrong in his

15   interpretation.

16             And this is the key point, Justice

17   Newbould and Judge Gross.  What the Court was asked

18   to look at in both of those cases, in both the

19   Covington case and the Sistem case, was who owns

20   the IP.  That was the question for the Court in

21   both of those cases, for different reasons

22   obviously.

23             And in both cases there was a written,

24   signed agreement that one of the parties to the

25   litigation said it is all in the agreement.

1                    In the Covington case, White said it is

2    all in the agreement, it said it is owned; in the

3    Sistem case it was the subsidiary of the Republic

4    that said it beneficially owned.  And in both those

5    cases the Courts didn't just look at the words of

6    the agreement and they looked at many pieces of

7    evidence which were --

8                    THE CANADIAN COURT:  You are repeating

9    yourself again.  Look, I'll read the cases, this

10   isn't --

11                   MR. GOTTLIEB:  I appreciate this and

12   move on.  My point was simply that the narrow

13   reading of the case that Mr. Zarnett is pointing to

14   is not an appropriate narrowing because it deals

15   with exactly what the Court --

16                   THE CANADIAN COURT:  You just said that

17   a minute ago.

18                   MR. GOTTLIEB:  And the final point is

19   Mr. Zarnett, he agreed with me so I'm going to

20   agree with Mr. Zarnett on this point.

21                   You have to look for the purpose of

22   commercial absurdity and for arm's length dealings,

23   you have to look at the date the contract is

24   entered into, especially with respect to commercial

25   absurdity, but the point that he is missing is as

1    at the date the MRDA is entered into, he said it is

2    hindsight to talk about the sale of IP and how that

3    would go.

4              Well, that is, with respect, dead

5    wrong.  What we know is in 2002 under the APA

6    kick-off meeting memorandum they actually

7    considered a sale of IP, so when the Court looks at

8    the MRDA and says is it commercially absurd, does

9    it violate the arm's length principle, what the

10   Court needs to consider as of that date, all of the

11   RPEs agreed to contribute IP; all of the RPEs

12   agreed to share the IP; all of the RPEs agreed to

13   take the profits and losses.

14             But only one of the parties, according

15   to the Canadian Debtors' interpretation of the

16   agreement, as at the day the MRDA is entered into,

17   only one of the parties got to benefit from the

18   sale of IP that they took because they own it, they

19   say.

20             And that is, with respect, not in

21   accordance with arm's length and the OECD makes

22   that principle clear.

23             And that is a commercially absurd

24   agreement entered into as at the date because all

25   of the parties agreed to share, but yet one party

neesons                                        www.neesonsreporting.com
W&F                                             www.wilfet.com
WILSON & FETZER LTD.

1    took a significantly bigger benefit as at the date.

2              And that is not an arm's length

3    transaction.

4              And subject to any questions, I thank

5    both of you very much.

6              THE CANADIAN COURT:  Thank you.

7              THE US COURT:  Thank you, Mr. Gottlieb.

8              MR. BARRACK:  Judge Gross, Justice

9    Newbould, some bullet points in response.

10             I am just going to hand up some slides,

11   I'm not going to hit them all.

12             In response to Mr. Bromley yesterday, a

13   quick point.  The PPF, the Pension Protection Fund,

14   is a body corporate established by statute.  It is

15   not funded by government but by levies imposed on

16   private pension plans in the UK.  It is not the UK

17   government and it is not a government guarantee.

18             With respect to Mr. Qureshi and

19   Mr. Leblanc, in our submission, they engaged in

20   misdirection yesterday by mischaracterizing both

21   the UKPC position on pro rata and the law on pro

22   rata, and I'll come to it, but what they did is

23   conflate the first and second branch of the Owens

24   Corning test, and I will come to that in a moment.

25             Rather than answer the true positions,

1    they failed to respond to the true facts and law.

2    The UKPC did not submit, as they suggested, that

3    there is no direct or express authority.  To the

4    contrary, there are statutory provisions which are

5    not limited by law.  It was not submitted that

6    there are no direct legal bases.

7            UKPC submits that there is a body of

8    international case law which both permits and

9    encourages a single pool allocation approach.

10   Maxwell, Livent, BCCI.  You can find these in the

11   initial brief at paragraphs 108 to 124 and in the

12   reply brief at paragraph 127.

13           Now, with respect to reference to

14   academics and the question you raised, Judge Gross,

15   about evidence, modified universalism and authors

16   who have written on it have been accepted by the

17   Third Circuit without testimony, specifically

18   Mr. Clark, Professor -- Judge Clark and Professor

19   Westbrook.  Our submissions refer to academic

20   writing in the same way to respond to the US

21   argument that Nortel is the same as every other

22   multinational enterprise.

23           There are no legal impediments to pro

24   rata, and, Judge Gross, if you find yourself in a

25   perfect storm, don't sail by the compass.  You'll

1    sink.  What you have to do is read and react to the

2    seas as you find them, and that is what a broad

3    judicial discretion allows you to do.  Don't run it

4    up on the rocks but don't sail by that compass.

5              But we are not asking you to ignore the

6    law and the facts.  The UCC confuse the absence of

7    a specific statutory authorizing provision with the

8    exercise of broad powers.  The history of

9    insolvency law reflects the exercise of those broad

10   powers.  But there are direct legal bases which do

11   not require analogy, both in our submission

12   substantive consolidation on both sides of the

13   border and constructive trust are direct legal

14   bases that you can rely on.

15             We admit that in this context equitable

16   receivership and because of that provision in the

17   MRDA, joint venture law is employed by analogy.

18             But you'll recall Kerry Stephens'

19   evidence that if this is not a joint venture, I

20   don't know what it is.

21             I'm not going to go back to it because

22   I went back to it yesterday but remind you that

23   there are no contractual impediments to pro rata.

24   The event which has occurred, a global liquidating

25   insolvency, all parties agree was not the subject

1    of discussion, let alone agreement.

2              So let me come to the key misdirection

3    by Mr. Qureshi and Mr. Leblanc and that is to

4    conflate the two tests in Owens Corning.  Creditor

5    expectations are relevant to the first branch only.

6    In the second branch the asset entanglement branch

7    does not consider creditor expectations of

8    corporate separateness.  The UCC and the

9    Bondholders need to do that because on the facts

10   and the law there is no real answer to the second

11   branch of the test, that is asset entanglement.

12             Their only feeble answer is that the

13   entangled assets have been sold.  These profoundly

14   entangled assets are the very reason that billions

15   of creditor dollars have been taken from them to

16   support this very overblown allocation process.

17             The mere existence of a guarantee was

18   suggested to you to defeat pro rata.  As you know

19   from the cases, the mere existence of a guarantee

20   does not defeat pro rata or a request for

21   substantive consolidation, if that is what is being

22   requested.

23             Better pricing obtained by a company on

24   its financing or creditors requiring guarantees,

25   those facts in and of themselves do not defeat pro

 1    rata.  The key is the expectation pre-insolvency of

 2    the rights provided by the guarantee.  These weak

 3    Bondholder guarantees that are found in this case

 4    provided only access to pools of assets.  These

 5    guarantees did not limit the right of Nortel to

 6    place additional liabilities, specifically the

 7    other Nortel entity liabilities against these

 8    assets either before or after insolvency.

 9                This is a key fact in showing there was

10    no legitimate creditor expectation which acts as a

11    bar to pro rata.

12                And similarly, the onus or burden of

13    proof was misstated if you go back to the Owens

14    Corning case.  Under the first branch of the test,

15    if a prima facie case of significant disregard of

16    corporate separateness is made out, then the burden

17    shifts to the creditors opposing consolidation to

18    actually prove their own reliance on the corporate

19    separateness of the entities.

20                And I would refer you to page 212 of

21    the Owens Corning Third Circuit decision.  The

22    creditors can't rely on generic statements or

23    assumptions about the market generally or other

24    creditors, but they have to come forward with

25    evidence of their own reliance.

 1                Here the facts, the treatment of cash,

 2      the matrix organization, the extreme integration

 3      give rise to a prima facie case.  It is then up to

 4      the Bondholders to prove their own reliance on the

 5      corporate separateness in order to defeat the

 6      requested consolidation.  We submit on this

 7      evidence they did not even attempt to meet that

 8      burden.

 9                By contrast, UKPC provided positive and

10      objective evidence of bond terms, pre-filing credit

11      ratings, pre-filing spread data that clearly

12      defeats any assumptions or generalizations that the

13      Bondholders may argue on the issue of creditor

14      expectations.

15                And at the end of the day, whatever

16      conclusion you come to on guarantees, we have

17      submitted to both of you Justices that you have a

18      broad discretion in pro rata to deal with those

19      guarantees in a way that you consider appropriate

20      to bring this case from its extreme positions that

21      have been put to you to something that you consider

22      to be workable.

23                The UKPC guarantees were attacked.

24      Those guarantees reflected that Nortel, the global

25      enterprise, recognized its obligation to the

1    pension obligations of its subsidiaries, those

2    obligations formed part of the one Nortel.

3              The funding guarantee was in respect of

4    the entire deficit under the UK Pension Plan at the

5    time it was given, and that deficit today is the

6    second-largest creditor group of this entire Nortel

7    insolvency.

8              The UKPC guarantees were given as part

9    only of a pattern of reassurance that the Trustees

10   could look at the strength of the global covenant

11   and in response to the fact that cash in the NNUK

12   was not available to the plan.  There was no

13   impediment in the UKPC guarantee terms that runs

14   counter to pro rata.  They became -- they will

15   become subsumed in pro rata, and contrary to what

16   was said yesterday, the amounts received from the

17   US settlement of its claims can be taken into

18   account in pro rata.

19             Pro rata is not a deemed consolidation

20   as that term was used in Owens Corning.  This is a

21   liquidating restructuring, no business will emerge.

22   This is not a pretend, to use the words of Owens

23   Corning, consolidation aimed at harming one

24   creditor in an insolvency process and then revert

25   to business as usual as separate companies.

1              The fact of consolidation occurred long

2      ago and was confirmed by the parties through the

3      collective sale of the assets and the consolidation

4      of the proceeds in a single process and will never

5      be reversed.

6              I won't dwell on it because I dealt

7      with it yesterday, but there is no disregard for

8      corporate separateness.  Each entity will continue

9      to exist within its estate and the Courts

10     administering the estates will be unfettered unless

11     you, the judges, administering those estates choose

12     to act.

13             And finally, that is all of our

14     submissions with respect to pro rata, subject to

15     any of your questions.

16             THE CANADIAN COURT:  I have one

17     question.  Mr. Qureshi yesterday said the hotchpot

18     rule doesn't apply because it only applies to a

19     single debtor.  And we have two debtors here.

20             MR. BARRACK:  I'm going to turn this

21     over to Ms. Hotchpot.

22             THE CANADIAN COURT:  All right.

23             MS. MILLER:  Ms. Hotchpot is happy to

24     stick her hand in that blender.

25             The language of the hotchpot, as

 1    reflected, both in the UNCITRAL provisions,

 2    reflected in the Bankruptcy Code and reflected in

 3    the CCAA do in fact refer to a single debtor

 4    because the foundational principle, I would submit,

 5    in bankruptcy generally is that the assets of a

 6    debtor are in fact identifiable.  You file a claim

 7    against assets, you receive a distribution in

 8    respect of assets.

 9              So start with the premise in bankruptcy

10    that you have assets, you have liabilities, you can

11    match those assets and liabilities and assert those

12    claims against a particular debtor.

13              The underlying principle of the

14    hotchpot rule is that there ought not to be, first

15    of all, a multiplicity of proceedings, but more

16    importantly, there ought not to be an opportunity

17    or opportunism on the part of creditors to go

18    around and basically grab assets and recover more

19    than the general body of creditors who would

20    otherwise be entitled to look to all the assets of

21    that debtor could recover on a pro rata basis,

22    because we start with the premise pro rata, pari

23    passu, treatment of unsecured creditors.

24              So in this particular case, and again

25    not to keep belaboring the point, but in the

 1    incredibly unique facts of this case, where we do

 2    not have 23 debtors with 23 pools of assets and 23

 3    sets of claims, we have a global enterprise and the

 4    exact same assets that stand for the claims of NNL,

 5    stand for the claims of NNC, stand for the claims

 6    of NNI and stand for the claims of NNUK.

 7                And the indisputable fact is that

 8    similar to, you know, a claim against the same

 9    debtor, in my respectful submission, and

10    unfortunately we don't have a body of law that has

11    been developed where the Courts have had an

12    opportunity to consider this, but given all of the

13    insolvency principles that underlie the hotchpot

14    rule, my respectful submission is the concept is

15    that you don't have parties who would otherwise be

16    looking to the same assets with the ability --

17                THE CANADIAN COURT:  In essence you are

18    talking about it being the same, just the proceeds

19    of the sales?

20                MS. MILLER:  The commingled, exactly,

21    the lockbox funds represent the assets of NNL, they

22    represent the assets of NNI and they represent the

23    assets of NNUK, so we only have one pool of assets.

24    And I would submit to Your Honors that particularly

25    in a multijurisdictional case where we have one

1    pool of funds and that pool of funds is being

2    administered with respect to the estates in

3    multiple jurisdictions, the very reference to

4    hotchpot in the UNCITRAL provisions almost mandate

5    a reflection and application of hotchpot principles

6    from the outset.

7              We have one fund of global assets that

8    created a global pool of proceeds against which all

9    worldwide creditors in various estates and

10   capacities are asserting a claim.

11             With respect, Your Honors, I think it

12   absolutely mandates an application of hotchpot in

13   the particular and unique facts of this case.

14             THE CANADIAN COURT:  Thank you.

15             MS. MILLER:  Thank you, Your Honor.

16             THE US COURT:  Thank you.

17             MR. BARRACK:  Are there any other

18   questions, Your Honor?

19             Mr. Chang just wants to have a few

20   minutes to speak about one adjustment to the US

21   position.

22             MR. CHANG:  May it please the Courts.

23             THE US COURT:  Mr. Chang.

24             MR. CHANG:  Eugene Chang, Willkie Farr

25   & Gallagher, for the UKPC.  I am not here to talk

1    about pro rata.  I am here to discuss a flaw in the

2    US income approach.

3              As Mr. O'Connor said yesterday, the

4    legal title and income allocation methods are not

5    just subject to reversal on the selection of the

6    allocation method but also on implementation flaws.

7    And I want to highlight and focus on two key

8    implementation flaws in the limited time I have.

9    The first is recognition of licensing revenue in

10   China, and the second is use of 2008-'9, the

11   bankruptcy year, as the basis for the business sale

12   valuations.  Now, I am just going to frame the

13   issue out at a high level and put myself at your

14   disposal for any questions or any detail that you

15   want to drill down more on.

16             For China, at heart, the income

17   approach is a discounted cash flow analysis.  It

18   relies on cash flows that are in the IPCo model.

19   As Mr. Bromley told you yesterday, the IPCo model

20   was dependable.  It was based on the best

21   information.  It was pressure-tested by Lazard and

22   Global IP.  It was developed by all the

23   participants; in other words, the best of the best,

24   done by the best.

25             Mr. Kinrich adopts all of the

neesons      W&F
WILSON & FETZER LTD.                            www.neesonsreporting.com
                                                www.wilfet.com

 1    projections, assumptions, evaluations in the IPCo

 2    model except one:  The revenues from China.  This

 3    is a significant issue because it moves hundreds of

 4    millions of dollars into the US Estate from the

 5    other estates.  With due respect, we submit that

 6    when you understand this issue, it is like biting

 7    into a cookie and chipping your tooth on a rock,

 8    because this is a significant flaw.

 9              The IPCo model has detailed projections

10    year by year by vendor territory, by worldwide, and

11    it has that exact same information for China.  I

12    would like to show you the detail in the IPCo

13    model.  But, in fact, my understanding is Rockstar

14    has told us this is so confidential to them, even

15    today, including all the China information, that we

16    can't show you --

17              THE US COURT:  I recall Mr. Kinrich

18    addressing his reasons for not including the China

19    information.

20              MR. CHANG:  Right.  So Mr. Kinrich

21    starts from the premise that the IPCo model, in

22    addition to these very detailed projections and

23    information in it, also includes a toggle for

24    taking China in or out of the model.  And he uses

25    that to then say, well, then I should evaluate

1    whether or not what the enforcement risks are for

2    these Chinese patents.  And he goes and does

3    research himself.  He relies on Mr. Zenkich, and

4    Mr. Zenkich also goes out and does research.  And

5    they conclude that Chinese patents in general are

6    close to valueless, either valueless or close to

7    valueless.

8              Now, I do want to point out to you that

9    since we couldn't show you the IPCo model itself,

10   on slide 14 we have the pages listed.  So you can

11   go, and I encourage you to go look at the detail

12   yourself that the IPCo model has for China.

13             Two important threshold points for what

14   Kinrich does and the basis for it, because he

15   discounts these Chinese revenues by 75 percent.  He

16   takes three-fourths of them down.  And he concludes

17   that that is appropriate because of his and

18   Mr. Zenkich's evaluation of the enforcement

19   problems.

20             Two threshold points.  First, neither

21   Mr. Kinrich nor Mr. Zenkich actually evaluated and

22   looked at the Chinese patents that are in the

23   Nortel patent portfolio.  They had them at their

24   disposal.  In fact, Mr. Zenkich evaluated them for

25   the appropriateness of the model itself, but they

 1   never actually went to look to see if these patents

 2   had enforcement problems.

 3              Second -- and actually, before I move

 4   on, consider how amazing this is.  They are

 5   valuators.  They know how to value these things.

 6   And the standard valuation technique is to actually

 7   look at the patents, and they didn't do that.

 8              Second, there is no evidence that

 9   Rockstar itself placed no value on these Chinese

10   patents.  In fact, what we know is Rockstar paid

11   $4-1/2 billion for the entire portfolio, including

12   the Chinese patents.  So let's move on to their

13   basis.

14              Mr. Kinrich and Mr. Zenkich were very

15   clear at trial -- and I can point you to the trial

16   record; it is in our briefs -- that they are not

17   experts on Chinese patent law.  They are not

18   experts on enforcement of Chinese patents.  So what

19   we are left with is instead Mr. Kinrich is

20   substituting his valuation expertise for that of

21   the IPCo model when he defers to the IPCo model in

22   every other respect.  And he himself never looked

23   at those patents and didn't have a look at all of

24   the information that the experts that put together

25   the IPCo model had at their fingertips, so he has

 1   no basis for second-guessing the IPCo model in this

 2   one area and adopting it in every other respect.

 3                Putting aside the lack of expertise,

 4   Mr. Kinrich also ignores three separate factual

 5   facts that were established in the trial evidence,

 6   each alone showing that the Chinese patents are

 7   worth a lot.

 8                Nortel itself, we saw -- we heard from

 9   Ms. Anderson, we heard from Ms. DeWilton, unrefuted

10   in the trial record that Nortel itself valued these

11   patents.  Only the top 3 percent of patents, the

12   highest-value patents at Nortel, were filed in

13   China.  And these patents survived a regular

14   culling process by which only the most valuable

15   patents survived.  And these Chinese patents were

16   part of that because they are part of the final

17   portfolio.

18                Second point.  Nortel built

19   conservative assumptions already into the IPCo

20   model.  In page 9 of the IPCo model, Exhibit

21   TR50463, it has the assumptions that were built in,

22   including the fact that they didn't start looking

23   at revenue until 2015, years later than other areas

24   of the world.  They only included three markets in

25   the model.  All of the Chinese patents they used to

1    develop this had US counterparts, and the revenue

2    projections were limited to two-thirds of the

3    Chinese market already.  So there were already

4    conservative assumptions.

5              And then third, if we turn to slide 17

6    of our model, it is simply untrue that foreigners

7    through this entire time period believed that

8    Chinese patents were valueless.  These are the

9    statistics from the State Intellectual Property

10   Office from China showing the filings of new

11   applications by foreigners -- not domestic Chinese

12   companies; foreigners -- and the grants to

13   foreigners going up.  People believed Chinese

14   patents were valuable because China was developing

15   a robust patent system.

16             So now the second point that I had was

17   on 2009 revenue.  I will just hit that very

18   briefly.  Mr. Kinrich relies on 2009 revenues for

19   his business valuations.  2009 obviously was a very

20   different year.  The filing of the bankruptcy

21   changed everything.  There were companies being

22   sold.  There were agreements being negotiated.

23   Mr. Bazelon's evidence showed that there was a

24   steady increase in the percentage of revenue from

25   EMEA up 2001 through 2008; then 2009 it takes a

1    dip.  That just shows that things changed and 2009

2    was not the right year to start from.

3              That's all I have, subject to any

4    questions that Your Honors may have.

5              THE US COURT:  Thank you, Mr. Chang.

6              MR. CHANG:  Thank you.

7              THE US COURT:  Mr. Bromley.

8              MR. BROMLEY:  Thank you, Your Honors.

9    Once again, James Bromley of Cleary Gottlieb on

10   behalf of the US Debtors.  I will echo all my

11   colleagues' thanks and compliments to the Courts

12   for accommodating us and bearing with us during

13   this long trial.  And it has been my privilege to

14   be before both of you.

15             THE US COURT:  Thank you.

16             MR. BROMLEY:  On rebuttal I am going to

17   go through in a fairly disjointed fashion the

18   things that we feel we need to address and hope I

19   can keep your attention as I do that.

20             The first thing, Your Honors, is I

21   would like to go back to the first question this

22   morning when rebuttal started, and I think it was

23   raised actually before rebuttal to the Indenture

24   Trustees' counsels, which was doesn't US law govern

25   substantive consolidation in the US and doesn't

1    Ontario law govern substantive consolidation in

2    Canada.  And I think the answer to both of those

3    questions was given as yes.

4              But I think we are losing the thread a

5    little bit, which is that it is not within the

6    jurisdiction of the US Court to force a Canadian

7    corporation to be consolidated with a US

8    corporation, and it is not within the jurisdiction

9    of an Ontario court to force a US corporation to be

10   consolidated with an Ontario corporation.  So that,

11   I think, is the link between the two, which is

12   that, with all due respect, if one of you decides

13   one way and the other decides the other way, it

14   ain't going to happen.

15             And it is important to keep that in

16   mind as it relates to Chapter 15 in the United

17   States, which is the adoption of the UNCITRAL model

18   law on cross-border insolvency, which is that in

19   the United States there are two main considerations

20   that come up over and over again in the circuit

21   courts with respect to the enforcement of foreign

22   judgments.

23             So, for instance, if there was a

24   decision that the Ontario court decides that the US

25   corporation should be consolidated with the Ontario

1    corporation, that would have to be enforced here in

2    the United States under Chapter 15; and it would

3    run contrary to Section 1522, sufficient protection

4    of creditors test, as US creditors are the only

5    creditors in such a situation who would end up

6    paying, so to speak, and 1506, which is that it

7    would be manifestly contrary to the public policy

8    of the United States of America.

9              And we are, I would note, sitting in

10   Delaware, where respect for the corporate form is a

11   state public policy.

12             Mr. Zarnett talked a bit about the

13   phrasing at the beginning of the MRDA about

14   operating arrangements being the phraseology.  And

15   I wasn't entirely clear as to Mr. Zarnett's

16   tracking that we do have to pay attention to

17   certain words in some contexts, and in other

18   contexts we have to go to things like Black's Law

19   Dictionary.

20             But let me be clear.  There is ample

21   testimony in the record that what was intended by

22   the MRDA was that the business reality on the

23   ground of the Nortel Group had to be reflected in

24   that agreement, because as the tax experts --

25   Mr. Weisz, Ms. Sparagna, Karina O, Mr. Doolittle --

 1    said, it was necessary that the tax reality match

 2    the business reality.  Otherwise, as all of our

 3    transfer pricing experts have said, the contract

 4    would not qualify under transfer pricing

 5    principles.

 6              Mr. Zarnett also said that no one has

 7    said it would not be rational to agree to the

 8    Canadians' reading of the MRDA.  Now, that

 9    actually, I think, is incorrect for two reasons.

10    First, every pertinent fact witness in this case

11    made clear that transfer pricing and permanent

12    established reasons mandated that the licensed

13    participants have all the economic rights in their

14    exclusive territories.  That's inconsistent with

15    the Monitor's interpretation.

16              And number two, just looking at the US

17    witnesses, Ms. Eden said very clearly if the

18    Monitor's interpretation were to govern, it would

19    not meet the arm's-length principle.  And

20    Ms. Tucker said very clearly no arm's-length third

21    party would ever agree to the economics proposed by

22    the Monitor.

23              Mr. Zarnett --

24              THE CANADIAN COURT:  And we have

25    competing experts on that issue, do we not?

1             MR. BROMLEY:  And I like ours better,

2    Your Honor.  And actually -- but when we are

3    talking about that, I am not sure actually there is

4    any disagreement.  Mr. Reichert also says that

5    economic substance has to match the tax reality.

6    There is no question about that.  There is not much

7    I agree with in terms of Mr. Reichert, but I agree

8    with that statement.

9             Mr. Zarnett takes us to the comments of

10   Ms. Block, that the MRDA defines rights; the label

11   is not what matters.  So what we have to do is look

12   at Article 5, and that is the only grant of rights

13   in IP in the MRDA.

14             A couple of things.  Over two and now a

15   half days of closing, Mr. Zarnett actually never

16   put up Article 5(a) to read it to Your Honors.

17   Only we did.

18             Number two, there is a parsing of words

19   that is necessary here.  Mr. Zarnett does not take

20   into account Article 4(e).  Article 4(e) is the

21   enforcement right, which is the "except as

22   otherwise agreed" carve-out from the vesting of

23   legal title.

24             It is impossible to read Article 5

25   consistently with Article 4(e).  It is absolutely

1    in the way that Mr. Zarnett suggests that Article 5

2    should be read.  Either Article 5 is read

3    consistent with Article 4(e) as we read it or, as I

4    think Mr. Zarnett is actually suggesting, there is

5    an ambiguity.

6              Mr. Zarnett mentioned that

7    Mr. Reichert -- this is moving on into the MRDA a

8    little deeper -- said that a make-use license could

9    suffice, a make-use license could suffice for

10   transfer pricing purposes.  There is no question

11   that a make-use license could suffice for transfer

12   pricing purposes, because there is one in the MRDA

13   that is described in Appendix A, and that make-use

14   license is the one that is given to the

15   distributors.

16             If you look at the routine returns that

17   are in Appendix A, the first routine return that

18   has to be taken into account in calculating the

19   RPSM is the routine returns of distributors who

20   have a make-use license.  But we don't have a

21   make-use license; we have an exclusive license in

22   our jurisdiction.  That's what we have.

23             And why is that important?  Well,

24   another thing Mr. Zarnett didn't mention is that

25   when you are looking at transfer pricing and the

neesons    W&F
WILSON & FETZER LTD.                           www.neesonsreporting.com
                                               www.wilfet.com

1      MRDA, on this point you have to take into account

2      the value exchange.  The only way you are going to

3      satisfy the arm's-length standard is if the stuff

4      that is being given by party A is somehow

5      consistent with the rights that it is getting from

6      party B.  That's the definition of an arm's-length

7      standard.  That's what Ms. Tucker said -- or

8      Professor Tucker and Professor Eden.  You need to

9      look at what was given, $7-1/2 billion of funding

10     in the 2000's.

11               And remember, we did have a fully

12     paid-up license for all of the CSA-period IP, which

13     was the vast majority of the value in any respect.

14     But you have to look at the exchange of value.

15               THE US COURT:  Otherwise, you have a

16     fraudulent conveyance.

17               MR. BROMLEY:  Otherwise, you have a

18     fraudulent conveyance.  And that's why the term

19     "fair market value" is in Section 11.  It is as

20     simple as that.  That's why there is an

21     arm's-length standard.  Remember, these are not

22     parties of equal bargaining power.  These are

23     parties all living in the same house, in effect,

24     negotiating with the taxing authorities.

25               Mr. Zarnett mentioned our two-arm

 1   argument with respect to Article 5.  He didn't take

 2   you to the language, but to remind the Courts, it

 3   is the fact that there are two recitations within

 4   Article 5(a) that cannot be read as -- they can

 5   only be read as the way we read it, unless you take

 6   the Monitor's argument, which is the second

 7   recitation of patent rights is redundant.  That's

 8   really the two-arm argument.

 9             THE CANADIAN COURT:  Haven't we heard

10   all this argument several times, Mr. Bromley?

11             MR. BROMLEY:  Sorry, Your Honor?

12             THE CANADIAN COURT:  Haven't we heard

13   this argument several times?

14             MR. BROMLEY:  That's all I was going to

15   say on it, Your Honor.

16             THE CANADIAN COURT:  Thank you.

17             MR. BROMLEY:  Now I have a few other

18   things to go through quickly.  On China.

19   Mr. Chang, thank you for bringing up something that

20   was not brought up in the initial closings.

21             First of all, Mr. Kinrich dealt with

22   this extensively in his deposition, in his

23   testimony.  I will just direct the Courts to

24   Kinrich trial slide 22, Kinrich report Table 13 on

25   page 71 of his initial report.

neesons      W&F
WILSON & FETZER LTD.                    www.neesonsreporting.com
                                        www.wilfet.com

1              The reason there was a toggle in the

2     IPCo model with respect to the Chinese patent

3     rights is that when the IPCo model was being

4     created, the creators felt there was a substantial

5     question as to the ability to enforce patent rights

6     in the People's Republic of China.  I submit there

7     still is such a problem.

8              Moving on to Mr. Zigler.  The main

9     point that we wanted to raise with respect to the

10    Britven chart was the fact that it is misleading in

11    the sense that it does not take into account that

12    what we are talking about are recoveries on

13    deficiency claims.  If we are talking about someone

14    who is going to recover 70 percent already, you

15    have to take into account that X percent on top of

16    70 percent is the recovery of 70 percent-plus from

17    dollar zero.

18             Both Mr. Barrack and Mr. Zigler

19    quibbled with the fact that I referred to an

20    insurance scheme, and I think it is just semantics.

21    The fact is the US system is set up exactly as the

22    UK system.  There is a guarantee given in Canada.

23    You have someone else paying some or all of the

24    remaining benefits.  In terms of the estimates that

25    were used by Mr. Britven, there was a term that was

1    used consistently by Mr. Zigler, which was they are

2    in the ballpark.  If we are going to look at

3    something like that, they have to be on the balance

4    sheet.

5                    Moving to Mr. Malackowski and the

6    comments of Mr. Maguire, we still like

7    Mr. Malackowski and hope that he hasn't taken too

8    much umbrage at our subtle criticism of him.  I

9    would note, however, that if you look at the

10   Malackowski report on page 39 and 40,

11   Mr. Malackowski makes clear in his own report that

12   using inventorship as the metric for measuring

13   contribution would be misleading and that you have

14   to take a look at cost.  And the only point we were

15   making with respect to Mr. Malackowski is that in

16   the CSA period, we were paying that cost.  He

17   criticizes Ms. Ryan for a lot of things, but

18   everything he criticized Ms. Ryan about was about

19   her analysis of the RPSM period.  We are not

20   addressing that.  We are simply making note that he

21   did not take into account the fact of contribution

22   in the CSA period.

23                    There has been a complaint lodged by

24   Mr. Zarnett about Mr. Kinrich's approach, his

25   income approach, and the fact it doesn't take

1    account of costs.  We have already mentioned that.

2    It is in our brief, I will tell you, our reply

3    brief at page 62 and all the citations thereto.  We

4    won't go any further.

5                Now I would like to talk about the two

6    remaining issues, and that has to do first with the

7    issues raised by Mr. Zarnett on licensing and then

8    the criticisms of the value in use criticisms that

9    we had.

10               First, on the licensing point.  The

11   words that were used by Mr. Zarnett this morning

12   was that joining NNL in the United States as a

13   plaintiff was simply irreconcilable with our

14   position, and that's absolutely not true.  It is

15   important to note that when you are taking a look

16   at the licensing/sublicensing issue, that the law

17   in the United States is clear and the record in

18   this case in terms of the documents from Nortel are

19   clear that the issue that is being addressed when

20   NNL joins as a party in a US litigation, it is

21   doing so to avoid a very specific challenge.

22               Now, we took the Courts to the Vonage

23   complaint and the Vonage reply.  It is worth giving

24   the context again of that.  So if we could bring

25   that up on the screen.  Yesterday we talked about

1    the Vonage reply.  And what we were talking about

2    at that time was a very specific statement that was

3    made by NNI in a pleading that was a reply to a

4    challenge to NNI's ability to assert the claim in

5    its own name.  And the challenge was based on the

6    fact that NNL had not been also joined.

7              Well, I will direct the Courts to a

8    case Morrow v. Microsoft Corporation, United States

9    Court of Appeals, Federal Circuit, 48 Bankruptcy

10   Court Decisions 243.  And there is a statement in

11   that case -- and I have copies that I will hand up.

12             Do we have copies in Toronto as well?

13   I am sorry.  We don't have this for the screen at

14   the moment.

15             And I will direct the Courts'

16   attention, Your Honor -- Justice Newbould, do you

17   have the case yet?

18             THE CANADIAN COURT:  I do, yes.

19             MR. BROMLEY:  Okay.  If we could turn

20   to page 7, and this starts in the middle of -- near

21   the top of the left-hand corner, headnote 6 and 7.

22   It says:

23                  "There are three general

24                  categories of plaintiffs encountered

25                  when analyzing the constitutional

1               standing issue in patent infringement

2               suits:  Those that can sue in their own

3               name alone, those that can sue as long

4               as the patent owner is joined in the

5               suit, and those that cannot even

6               participate as a party to the

7               infringement suit."

8          We fall into Category 1 because, as we

9    have demonstrated to the Court and as

10   representations have been made, we hold all

11   substantial rights that allow us to sue in our own

12   name.  You will note near the bottom of the page it

13   says:

14               "The patentee who transferred

15               these exclusionary interests is usually

16               joined to satisfy prudential standing

17               concerns in the second category."

18          That's exactly what was being addressed

19   in Vonage.  They said, look, you can't sue unless

20   you have NNL joined.

21          There is evidence in the record that

22   Nortel itself recognized this, because it is not a

23   disputed issue of US patent law.  I have in front

24   of me Exhibit TR22151, which is an email from

25   Monday, December 24, 2001.  This is among members

 1     of the Nortel patent law department.  If you take

 2     the third paragraph down beginning with:

 3                    "I think the critical point of

 4                    concern is that a plaintiff must have

 5                    substantially all rights under the

 6                    patents to sue for infringement.  (This

 7                    is likely a paraphrase of the correct

 8                    law)."  We have already seen that.  "In

 9                    our case NTL owns the patents and NTI

10                    is the exclusive licensee, but there

11                    are certain provisions whereby there

12                    could be a reversion.  As such, we name

13                    both the parent and the exclusive

14                    licensee as plaintiffs in the patent

15                    infringement action.  It is consistent

16                    with the named plaintiffs in the

17                    Foundry and Extreme actions."

18                    The reason that Nortel Networks Limited

19     was consistently listed as a plaintiff was pretty

20     simple.  We want to make sure we don't have to go

21     through useless litigation about who has standing,

22     so let's just include them.  Then we don't have to

23     worry about it.

24                    It is also worth bringing up Exhibit

25     TR22154, which is another email amongst members of

 1    the IP law department.  If you go to the line that

 2    says:

 3                      "It is for this reason the Nortel

 4                 group of companies has traditionally

 5                 entered into worldwide licensing

 6                 agreements naming as a party the local

 7                 Nortel subsidiary on its own behalf and

 8                 on behalf of NNL and its subsidiaries.

 9                 As I understand it, the tax people view

10                 this language as being broad enough so

11                 that NNL will be viewed as licensing

12                 the Canadian rights, NNI the US rights,

13                 Nortel Japan the Japanese rights,

14                 et cetera."

15                 And then it gives a tax explanation as

16    to why we need to make sure that the revenue for

17    each of these goes into the right jurisdictions.

18                 So now let's go back, if I could, to a

19    couple of other issues that were raised by

20    Mr. Zarnett about licensing.  In Exhibit TR21080 --

21    we saw this yesterday.  If we could go to the

22    chart.  Mr. Zarnett mentioned quite a bit about the

23    idea that the US Debtors have not had any license

24    agreements where they are the only licensee, and he

25    provided to the Court certain examples of that.

 1    This is a chart -- the next page -- I am sorry --

 2    if we can have it.  Page 108, which we displayed

 3    yesterday.

 4              This is in response to questions from

 5    the Internal Revenue Service, questions:  Do you

 6    license?  Who licenses?  How much do you make?

 7    This chart shows that NNL made a representation to

 8    the Internal Revenue Service, the Canadian Revenue

 9    Agency and Inland Revenue that the US, NNI,

10    licensed over 30 times in 2002.  The category says,

11    "Nortel entity licensor."  It doesn't say US and

12    Canada.  There are separate entries for Canada.

13    There are separate entries for the UK.  But the

14    majority of them are for the US.

15              So to square Mr. Zarnett's comments, we

16    have to ignore these explicit representations that

17    were made to the US, Canadian and English tax

18    authorities and look at what he has in his

19    compendium as four licenses where NNL is the sole

20    licensor; more than I can count where NNL is doing

21    it on behalf of itself and its subsidiaries, and we

22    explained why it did that; and another substantial

23    amount which say NNL and NNI.  To use a phrase that

24    I have heard a few times in this case, if NNI had

25    no rights, why bother to have anything that lists

1    NNI as licensor?

2              And this goes back to the point we made

3    yesterday, which is that at bottom, the theory of

4    the Monitor here says that the US, NNI, NNUK,

5    France and Ireland are nothing more than exclusive

6    distributors.  All we have the ability to do is the

7    exclusive right to distribute Nortel products in

8    our jurisdiction.  There is not a single example

9    given by the Monitor throughout this entire case

10   where NNL on its own licensed in the United States

11   anything that NNI was supposed to do.

12             So what are we talking about here?  It

13   is critical to understand the difference between an

14   exclusive distributor and an exclusive licensee.

15   As an exclusive licensee, under the MRDA we had an

16   enormous obligation, an enormous obligation, to pay

17   billions of dollars of our revenue into this common

18   pool under the RPSM and billions of dollars before

19   that in the context of cost-sharing agreements.

20   The other exclusive distributors everywhere else in

21   the world got a fixed return, 1 percent.

22             So this is a theory that gives us

23   absolutely nothing for everything that we put into

24   the R&D system.  Not only did we pay for the R&D

25   but we conducted our own R&D and created our own

1   intellectual property.  And under the Monitor's

2   point of view, we will have simply gifted it and in

3   return received nothing other than an exclusive

4   distributorship.

5              That does not satisfy the arm's-length

6   standard.  And it is entirely consistent, in our

7   view, with the admissions that have been made to

8   the taxing authorities.  And I took the Courts

9   yesterday to the APAs from 1996.  There were

10  similar comments in the APA submissions that were

11  made in an attempt to get an APA on the RPSM.

12  That's a sentence that would be hard to understand

13  if you weren't in this case.

14             Finally, Your Honors, I would like to

15  talk about the last issue, which is value in use.

16  And it relates to the comment about Mr. Cox that

17  was made by Mr. Zarnett earlier today.  And I am

18  referring back to the trial transcript of today.

19  And this is at 10:05:00 through 10:07:18, and it is

20  the final comments that Mr. Zarnett made.  And it

21  really now encapsulates the argument that is being

22  made to support the expert opinion, which I will

23  note is not the explanation that was given by the

24  expert.  The expert said, "I am looking at this as

25  nontransferability, and the only way I see

1    nontransferability is under 14(a) of the MRDA."

2    That's all Mr. Green said under repeated

3    questioning at deposition and at trial.

4              THE US COURT:  Mr. Cox.

5              MR. BROMLEY:  Well, Mr. Green.

6              THE US COURT:  Mr. Green.  I am sorry.

7              MR. BROMLEY:  Who did the calculations.

8    Mr. Cox and Berenblut wrote a separate report that

9    kind of gave some color or commentary on what

10   Mr. Green was doing.

11             So you will recall the quote we put

12   yesterday on the screen from Mr. Cox was if we had

13   rights in the US and EMEA with respect to our

14   exclusive licenses, the value that NNL had in those

15   jurisdictions with respect to those businesses was

16   little, maybe nothing.  That's the comment he made.

17   Mr. Zarnett has said we should ignore that.  And

18   then he jumps to the IFSA, the Interim Funding and

19   Settlement Agreement.

20             The Interim Funding and Settlement

21   Agreement is absolutely crystal clear on this

22   point.  Mr. Zarnett criticizes our criticism of

23   value in use saying it is just like business

24   interruption insurance.  What you should be doing

25   is looking at what it could have operated in your

1    own hands, and, therefore, the RPSM with all its

2    defects is still okay.  But that is really trying

3    to game the system.  And there is a "gotcha."  It

4    is the "gotcha" that I talked about yesterday

5    really relates to now Mr. Zarnett, I think, has

6    finally explained to be the key, which is, under

7    the IFSA, you are not entitled to anything, and you

8    gave that up in the IFSA.  You gave that up in June

9    of 2009, before we had signed a single agreement

10   and before we had closed a single agreement.

11             And when I was talking about a "gotcha"

12   and the order, it really was about this.  And I am

13   sorry if I was unclear yesterday.  But this is an

14   argument about -- I was almost tempted to say it is

15   form over substance.  But here the form is the

16   substance.  You have to take a look at the IFSA,

17   because the argument that Mr. Zarnett is making

18   that we gave up this right to get something with

19   respect to the patent portfolio under the IFSA

20   because, remember, he said we surrendered our

21   exclusive license rights in the Rockstar

22   transaction, and that surrender was not a sale.

23   And since we surrendered those rights and didn't

24   sell those rights, we are not entitled to an

25   allocation.



1                    Now, I would like to pull up very

2    quickly the IFSA.

3                    THE US COURT:   The IFSA?

4                    MR. BROMLEY:   The IFSA, yes.   And we go

5    to Section 11(d).  "Where any Debtor enters into an

6    appropriate license termination in accordance with

7    the provisions of this Section 11" -- and no one

8    has argued that our terminations were not in

9    accordance with the provisions of this Section

10   11 -- "such Debtor will be deemed to be a selling

11   debtor, and the proceeds shall be deemed to be sale

12   proceeds for purposes of Section 12 and shall apply

13   accordingly."

14                   Sections 12 (b) and (d) are the ones

15   that deal with allocation, so we are, in effect,

16   right now living in Sections (b) and (d)."

17                   This was clearly put into the IFSA to

18   make sure that there were not going to be arguments

19   about form over substance with respect to license

20   terminations.  If you terminate a license, you are

21   deemed to be a selling debtor.  What is a selling

22   debtor?  A seller.  "And the proceeds of the asset

23   sale shall be deemed to be sale proceeds."  Selling

24   debtors are allowed to argue they are entitled to

25   sale proceeds.

1                  What the IFSA was supposed to be about

2     in this provision was to make sure that we didn't

3     have to find some kind of difficult transactional

4     structure to squeeze every sale into to make sure

5     we all preserved our rights to an allocation.  It

6     can't be clearer.  This means that if you terminate

7     your license, you are deemed to be a seller.

8                  Now, let me bring the Courts quickly to

9     something that was in Ms. Block's compendium

10    yesterday, and it is Exhibit TR22085.  This is the

11    Rockstar sale agreement.  This is the $4.5 billion

12    sale agreement.  If we can go to page 144, which is

13    the first page of the document -- it is page 2.

14    And let's highlight the first paragraph.

15                  This defines the parties to this

16    agreement.  NNC, NNI, and NNL are together defined

17    to be the North American, or NA, sellers.  NNUK and

18    the various other entities are --

19                  THE CANADIAN COURT:  Didn't we look at

20    this yesterday?

21                  MR. BROMLEY:  Yes, Your Honor, but I

22    want to raise -- I want to get to one point; okay?

23    And I understand, but I think it is important to

24    emphasize.

25                  When we are talking about the IFSA and

 1    being a seller, this is the sale of the patent

 2    portfolio.  We are sellers under the patent

 3    portfolio.  We are sellers under the Interim

 4    Funding and Settlement Agreement to make sure that

 5    the form of that transaction isn't going to be a

 6    "gotcha."

 7              If you go to page 24 of that document,

 8    and that is page 145 of Ms. Block's compendium,

 9    there is the definition of the purchase and sale of

10    assets, and Ms. Block did take you to this

11    yesterday.  I will be quick.

12              The definition of assets includes the

13    patents.  So the sellers are selling the patents.

14    "Each seller shall sell, convey and assign and

15    deliver the following assets."

16              Then if you go to (b) -- I am sorry --

17    (a) at the top, the transferred patents are being

18    sold together with (D) at the bottom, "The right to

19    sue and recover damages and other compensation for

20    past, present and future" -- no.  I am sorry.  It

21    is (D) in (a), at the bottom of (a).  Capital (D).

22              This is the right which the US Debtors,

23    the NNI, NNUK, NN France and NN Ireland have and

24    have alone in our exclusive jurisdictions pursuant

25    to 4(e) of the MRDA.  This is an asset that is

1    being conveyed in the transaction.  This is an

2    asset we owned.  There is not a single word

3    mentioned by the Monitor on how we should be

4    compensated for that.

5              So coming back to Mr. Cox's comment, it

6    is in that context, the context of what the IFSA

7    provides, to make sure that form would not defeat

8    substance in these transactions, that we have found

9    ourselves at the end of the day.  And it was really

10   only at the conclusion of the Monitor's submissions

11   today that I think it became crystal clear that

12   that's what they are arguing:  That the IFSA in

13   June of 2009, approved by both of these Courts,

14   notwithstanding the very clear statements that you

15   are indeed a seller if you are terminating a

16   license, was the "gotcha" moment.  And the fact of

17   the matter is the reason that provision was in

18   there was that so we didn't have to change the

19   format of any of these transactions to fit into

20   what the parties had.  We were simply going to deal

21   with it later.

22             Now, it is unfortunate that we found

23   ourselves at this point, but there is not a single

24   piece of evidence that indicates either on the MRDA

25   or the IFSA that that interpretation should stand.

1              So, Your Honors, with that, I conclude

2    my submissions and thank you once again for your

3    kind attention.

4              THE US COURT:  Thank you, Mr. Bromley.

5              THE CANADIAN COURT:  Thank you,

6    Mr. Bromley.

7              THE US COURT:  Before we depart, I have

8    a basic question for you, and that is -- and I

9    think it also obviously will apply to Justice

10   Newbould -- to what extent do you expect that

11   Justice Newbould and I can/should discuss our

12   allocation opinions.

13             You know, we each are obviously

14   exercising our independent judgment.  There is

15   language, I know, in the protocol talking about our

16   discussing matters for the sake of consistency.

17   But I don't know and I am asking what the parties'

18   expectation is with respect to discussions.  It is

19   obviously not going to be a joint decision.

20             Mr. Bromley.

21             THE CANADIAN COURT:  It is like being

22   in school.  You know, everybody has got their head

23   down, afraid the teacher is going to ask a

24   question.

25             THE US COURT:  Well, I don't blame

1    them, and I am not trying to put anyone on the

2    spot.  People are trying to go.  If you want to

3    give this thought, I am certainly willing to take

4    an answer --

5              THE CANADIAN COURT:  I would just --

6    oh, Mr. Bromley, you wanted to say something?

7              MR. BROMLEY:  Only after I hear what

8    you have to say, Your Honor.

9              THE CANADIAN COURT:  No.  But what I

10   was going to say was, the last time I read the

11   protocol -- that was a little bit of time ago -- I

12   recall it said -- there was language to the effect

13   that we exercise independent jurisdiction but we

14   are entitled to communicate to see if we could --

15   if there could be a, quote, consistent result, is I

16   think what the language is.

17              And if someone thinks that that's

18   wrong, I would like to hear it.  And I think Judge

19   Gross would like to hear it, too.

20              MR. BARRACK:  May I just ask -- sorry.

21   This is a substantial issue, one that hasn't been

22   raised before.  It is dealt with in the

23   cross-border protocol.  I would like to be able to

24   get some instructions and think about it, and

25   perhaps you could call for some submissions in

1    writing if people have submissions in writing on

2    that point.

3              I know it is a problem.  But I do think

4    that, Judge Gross, you are right to raise it and

5    get parties' positions on the record.

6              THE CANADIAN COURT:  Thank you.

7              THE US COURT:  I am not trying to put

8    anyone on the spot.  It arose --

9              MR. BROMLEY:  Your Honor, Mr. Rosenthal

10   actually has been able to hand me the section of

11   the cross-border protocol which I think answers the

12   question for everyone.  Paragraph 12(d)(iv)

13   authorizes the Courts to communicate with each

14   other during and after any joint hearing for

15   purposes of determining whether consistent rulings

16   can be made by both Courts, coordinating the terms

17   of the Courts' respective rulings, and addressing

18   other administrative and procedural matters.

19              I would add two thoughts to that, which

20   is -- I don't have the other quote.  There is

21   clearly, you know, statements within the protocol

22   that both Courts are sitting and exercising their

23   exclusive jurisdiction over each case.

24              THE US COURT:  Yes.

25              MR. BROMLEY:  We understand that there

1    may be a risk of inconsistent rulings, but -- we

2    certainly don't want them, but we understand there

3    is a risk.

4              I think one thing that is worth

5    mentioning from a procedural perspective.  I think

6    it is very important that whenever the Courts

7    decide to rule, that you rule at the same time.

8              THE US COURT:  That I agree.  And I

9    think that -- I haven't spoken with Justice

10   Newbould about that, but I think that makes sense.

11             THE CANADIAN COURT:  I agree.

12             MR. BROMLEY:  Because I think if we

13   don't do that, we will have another set of problems

14   that --

15             THE US COURT:  On appeals or

16   whatever --

17             THE CANADIAN COURT:  Is there anybody

18   who wants to volunteer to write the opinions?

19             MR. BROMLEY:  Your Honor, we have

20   already written it for you.

21             MR. ZARNETT:  I am here for you, Your

22   Honor.

23             THE US COURT:  They have all written it

24   for us, six different opinions.

25             MR. ZARNETT:  I am sorry.  I just

 1    wanted to make one comment.  I know what our

 2    position is, and it is consistent with the

 3    protocol.

 4               And in light of what Mr. Barrack said,

 5    if there are going to be submissions from parties

 6    about this, then I would ask that they be called

 7    for as quickly as possible, because I am sure you

 8    want to get working on the judgment quickly and,

 9    therefore, will have to decide that you can

10    communicate, as I think you can freely, as the

11    protocol describes, but --

12               THE CANADIAN COURT:  Thank you.

13               THE US COURT:  Yes, Mr. Hodara.

14               MR. HODARA:  Your Honors, Fred Hodara

15    for the Official Committee of Unsecured Creditors.

16    We don't think we need time to answer the question.

17    We would hope that all would agree 100 percent with

18    what Mr. Bromley expressed.  That is certainly the

19    view of the Creditors' Committee.

20               THE US COURT:  Thank you.  All right.

21    Well, you know, I guess this ends the official --

22    officially closes out the allocation trial.  And my

23    wife said to me this morning, "Oh, Honey, you are

24    almost finished."  And I said, "It is just

25    beginning."  Because I can just imagine, it is

 1    going to be a daunting task to write an opinion.

 2              You have done such a wonderful job,

 3    which makes it both easier and more difficult, of

 4    course.  And I have been really overwhelmed and

 5    honored and humbled by what tremendous skills and

 6    knowledge all of you have and your patience with me

 7    and with one another.  And your professionalism has

 8    really been astounding, and I compliment you on

 9    that.

10              I just want to mention, at the risk of

11    offending anyone, but there is someone who is not

12    in the courtroom who is so helpful to us, Ms. Cordo

13    from Mr. Abbott's firm.  My staff just holds her in

14    such high esteem because she really did help us to

15    make this run, I think, very seamlessly and

16    surprisingly so.

17              And I want to also thank my colleague

18    in Canada, Justice Newbould, for coming into this

19    case late and picking it up so quickly and doing a

20    wonderful job.  And now I can understand why all of

21    the Canadian lawyers love to appear before you.  So

22    thank you for that.

23              THE CANADIAN COURT:  I am not so sure

24    about that.

25              THE US COURT:  And I didn't hear any of

1    them either, to tell you the truth, but -- and, of

2    course --

3                 THE CANADIAN COURT:  Oh, I am sorry.

4    What I would say --

5                 THE US COURT:  I just want to conclude,

6    and then I will turn it over to Justice Newbould.

7    And to those of you who are celebrating the

8    important Jewish holiday of Rosh Hashanah, I want

9    to wish you a l'shanah tovah and everyone else,

10   indeed, a l'shanah tovah and a shalom and a good

11   holiday to everyone.

12                 Justice Newbould.

13                 THE CANADIAN COURT:  I would just like

14   to say I came into this case quickly, but one thing

15   that Judge Gross and I both appreciate and any

16   judge appreciates is picking up something and

17   reading and saying that sounds pretty good and then

18   picking up the next piece and that sounds pretty

19   good.

20                 THE US COURT:  Yes.

21                 THE CANADIAN COURT:  And you go down

22   the line and they all sound pretty good.  And then

23   when counsel get on their feet, we are blessed in

24   this case with very good counsel, which any judge

25   will tell you is a treat.  And every time good

1    counsel gets up, I am not sure I would put it quite

2    the way it was ascribed about you, Mr. Zarnett,

3    with Mr. Maguire's Irish hug, but every time

4    someone stands up, they make a very good argument,

5    and then the contrary argument is put and that

6    sounds very good, so it makes our task all the more

7    daunting, but it is a nice daunting task to have.

8               And I want to thank all counsel for all

9    the work they have done in this case --

10              THE US COURT:  Thank you.

11              THE CANADIAN COURT:  -- and putting it

12   forward in the way it has been put.

13              So with that, I guess we would say

14   adieu, bid you adieu.

15              THE US COURT:  Yes.

16              THE CANADIAN COURT:  And how long the

17   au revoir is, time will tell.

18              MS. BLOCK:  I am not going to have a

19   long au revoir, but I think that the court staff in

20   both courts and the reporters have been phenomenal

21   and made all of our jobs a lot easier.

22              THE CANADIAN COURT:  They should be

23   thanked.  Thank you.

24              THE US COURT:  Thank you.  Yes, I

25   neglected to thank our court reporters and my

1    staff, and very much appreciated.  I will miss you

2    all for a while.

3                    All right, everyone.  Be well.

4    Travel safely.  Happy holidays, and we will stand

5    in recess.

6                    MR. ROSENTHAL:  Your Honor, thank you

7    for the accommodation today.

8                    THE US COURT:  Yes, absolutely.

9    -- ADJOURNED at 12:18 p.m.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    REPORTERS' CERTIFICATE

 2              I, DEANA SANTEDICOLA, RPR, CRR, CSR,

 3    and I, LORRAINE B. MARINO, RDR, CRR, CSR, certify;

 4              That the foregoing proceedings were

 5    taken before us at the time and place therein set

 6    forth;

 7              That the entire proceedings of the

 8    hearing date were recorded stenographically

 9    individually by each of us and were thereafter

10    transcribed;

11              That the foregoing is a true and

12    correct transcript of our shorthand notes so taken.

13

14              Dated this 24th day of September, 2014.

15    PER:                    PER:

16

17

18    Lorraine B. Marino      Deana Santedicola

19    LORRAINE B. MARINO      DEANA SANTEDICOLA
      WILCOX & FETZER         NEESONS
20    WILMINGTON, DE USA      TORONTO, ON

21

22

23

24

25
```

**$**

**$2** 5765:15,19,23
5836:2

**$4-1/2** 5866:11

**$4.5** 5890:11

**$7-1/2** 5875:9

**(**

**(a)** 5891:17,21

**(b)** 5843:17,18,20
5889:14, 5891:16

**(d)** 5889:14,16
5891:18,21

**0**

**0016** 5814:2

**1**

**1** 5881:8 5885:21

**1.06** 5818:23

**1.3** 5825:15

**10** 5792:5,22
5799:6

**100** 5771:8
5897:17

**108** 5853:11
5884:2

**10:05:00**
5886:19

**10:07:18**
5886:19

**10:28** 5828:22

**10:42** 5828:23

**11** 5774:9
5793:11 5827:3
5875:19 5889:7,
10

**11(d)** 5889:5

**12** 5807:13
5889:12,14

**12(d)(iv)**
5895:12

**124** 5853:11

**127** 5853:12

**12:18** 5901:9

**13** 5811:18
5876:24

**14** 5777:7,22,23
5865:10

**14(a)** 5887:1

**144** 5890:12

**145** 5891:8

**15** 5762:1 5766:9
5774:7,9 5793:24
5799:9,10
5801:25 5805:2
5870:16 5871:2

**1506** 5871:6

**1522** 5871:3

**16** 5799:14

**169** 5827:1

**17** 5868:5

**170** 5827:1

**1979** 5775:5

**1992** 5796:1,15

**1996** 5886:9

**1999** 5775:8

**2**

**2** 5786:5 5817:23
5818:5 5820:11
5822:25 5890:13

**20** 5775:7
5842:18

**200** 5823:3

**2000's** 5875:10

**2001** 5881:25

**2002** 5799:1
5851:5 5884:10

**2006** 5800:14
5801:12

**2006-2007**
5764:24 5765:3

**2008** 5868:25

**2008-'9** 5863:10

**2009** 5785:25
5868:17,18,19,25
5869:1 5888:9
5892:13

**2015** 5867:23

**2026** 5767:22

**212** 5856:20

**22** 5775:11
5805:3 5876:24

**23** 5861:2

**24** 5881:25
5891:7

**243** 5880:10

**29** 5822:10

**3**

**3** 5757:3,17
5759:20 5773:19
5786:10 5867:11

**3.3** 5786:13

**30** 5818:4
5819:11 5884:10

**30-minute**
5815:22

**31** 5786:12

**320** 5804:22

**340** 5804:23

**348** 5804:23

**35** 5819:25

**350** 5804:22

**39** 5878:10

**39.9** 5793:7

**4**

**4** 5773:20

**4(a)** 5778:24
5779:9 5843:17,
18 5846:13,14,15
5848:16

**4(b)** 5776:24
5778:25 5779:10,
12 5846:3

**4(e)** 5873:20,25
5874:3 5891:25

**40** 5817:6,16
5818:4 5878:10

**42** 5785:1

**45.3** 5793:22

**464** 5807:14

**48** 5880:9

**49** 5793:6

**5**

**5** 5774:6 5794:2,
24 5795:1,16
5798:23 5873:12,
24 5874:1,2
5876:1

**5(a)** 5873:16
5876:4

**500** 5823:16

**57** 5827:20

**580** 5815:6

**59** 5789:22

**5:00** 5758:23

**6**

**6** 5784:8 5800:12
5880:21

**60** 5809:23

**62** 5879:3

**66** 5792:23

**7**

**7** 5800:13
5880:20,21

**7.3** 5815:6
5820:19

**70** 5765:16
5793:11 5877:14,
16

**71** 5876:25

**75** 5865:15

**75th** 5818:18

**76** 5811:21

**78** 5778:3
5823:20

**79** 5778:18

**8**

**8** 5778:5 5815:2,5

**80** 5778:18

**8:41** 5754:1

**9**

**9** 5789:17,21,22
5809:23 5867:20

**A**

**a.m.** 5754:1
5828:22,23

**Abbott's**
5898:13

**ability** 5755:15
5798:17 5807:7
5826:2 5861:16
5877:5 5880:4
5885:6

**absence**
5847:22 5854:6

**absent** 5772:7
5842:25

**absolute**
5773:25 5774:12, 14

**absolutely**
5836:18 5842:3,5, 19 5862:12 5873:25 5879:14 5885:23 5887:21 5901:8

**absurd** 5851:8, 23

**absurdity**
5850:22,25

**academic**
5853:19

**academics**
5853:14

**accept** 5801:14 5806:4 5809:12, 13

**accepted**
5769:11 5853:16

**access** 5788:13 5856:4

**accommodating** 5869:12

**accommodation** 5901:7

**accordance**
5781:9 5851:21 5889:6,9

**accords**
5814:24

**account**
5789:13 5801:6 5802:22 5806:15 5808:8 5858:18 5873:20 5874:18 5875:1 5877:11, 15 5878:21 5879:1

**accounting**
5837:9

**acknowledge**
5762:19 5823:21 5835:23

**acknowledged**

5824:13,17,18 5825:2 5835:24 5836:4,6

**acknowledges**
5781:4

**act** 5834:18 5838:21 5839:2, 11 5859:12

**action** 5799:18 5882:15

**actions** 5882:17

**active** 5760:12

**activity** 5786:18 5841:5

**acts** 5856:10

**actual** 5803:6,25 5812:19 5834:18 5840:11 5842:10

**ad** 5761:23

**add** 5895:19

**added** 5785:24

**addition**
5864:22

**additional**
5759:1 5856:6

**address** 5791:4 5830:13 5869:18

**addressed**
5790:24 5796:9 5839:15 5879:19 5881:18

**addressing**
5864:18 5878:20 5895:17

**adieu** 5900:14

**ADJOURNED**
5901:9

**adjust** 5792:3

**adjustment**
5862:20

**adjustments**
5818:24

**administered**
5862:2

**administering**
5859:10,11

**administration**
5844:17

**administrative**
5895:18

**admissible**
5801:14

**admission**
5801:2

**admissions**
5886:7

**admit** 5823:17 5854:15

**admonition**
5777:19

**adopted** 5789:9

**adopting**
5867:2

**adoption**
5870:17

**adopts** 5847:12 5863:25

**advance**
5800:10

**advanced**
5762:8

**advantage**
5806:8 5810:23

**adverse**
5815:15

**advised** 5847:5

**advocating**
5814:21 5825:24

**affect** 5812:6,13, 15

**affected**
5810:21

**affidavit** 5778:3 5818:16 5822:23, 24

**afraid** 5893:23

**afternoon**
5759:7

**Agency** 5884:9

**agree** 5758:7 5766:13 5771:4 5787:5,21 5794:12,17,19 5849:1 5850:20 5854:25 5872:7, 21 5873:7 5896:8, 11 5897:17

**agreed** 5770:8 5777:1 5788:12 5793:2 5814:18 5850:19 5851:11, 12,25 5873:22

**agreement**
5770:10 5776:6, 11 5782:13,23 5783:8,13,17,23 5785:11 5787:3,4, 13,15,18,23 5788:6 5803:12, 25 5804:3 5826:4 5830:1,5 5831:20 5843:1 5849:24, 25 5850:2,6 5851:16,24 5855:1 5871:24 5887:19,21 5888:9,10 5890:11,12,16 5891:4

**agreements**
5803:6,10 5834:1 5844:7, 5868:22 5883:6,24 5885:19

**aimed** 5858:23

**Alberta** 5847:11

**allegation**
5799:19,20

**alleged** 5799:10

**allocate** 5794:16

**allocated**
5790:20

**allocation**
5763:20 5765:18 5766:2 5789:19, 24 5790:6 5793:21,23,24,25 5794:1 5820:4,5,

10,18 5821:1,5,13 5826:23 5827:10, 23 5828:8 5833:19 5837:12 5853:9 5855:16 5863:4,6 5888:25 5889:15 5890:5 5893:12 5897:22

**allocations**
5793:14,15 5814:17

**allotted** 5766:9 5768:7

**allowed** 5765:23 5809:7 5889:24

**allowing** 5813:5

**allude** 5814:3

**alluded** 5804:6, 25 5814:7 5821:20

**alternative**
5773:21 5789:24 5810:16 5816:18

**alternatives**
5809:22 5810:16

**amazing** 5866:4

**ambiguity**
5776:3,5,16 5801:17 5874:5

**amendments**
5801:15

**America** 5871:8

**American**
5890:17

**amount** 5825:8 5837:11 5839:5 5884:23

**amounts** 5798:8 5858:16

**ample** 5871:20

**amplify** 5768:12

**analogy**
5772:14 5854:11, 17

**analysis** 5785:8 5810:14 5820:17

5833:15,21
5840:13 5843:4
5863:17 5878:19

**analyzing**
5880:25

**ancient** 5775:6

**Andersen**
5842:15

**Anderson**
5867:9

**answers**
5845:12 5895:11

**anticipate**
5768:8

**anticipated**
5775:4

**anymore**
5808:20

**APA** 5851:5
5886:10,11

**APAS** 5886:9

**apparent**
5774:1,16
5775:13 5848:2

**apparently**
5841:7

**Appeal** 5847:11

**appeals** 5880:9
5896:15

**appeared**
5768:18,19

**appearing**
5828:10

**appellate**
5756:15

**appendix**
5803:8 5809:19
5874:13,17

**applicable**
5791:7

**application**
5778:14 5844:24
5845:3 5862:5,12

**applications**
5822:15 5840:12

5868:11

**applied** 5842:3

**applies** 5766:18
5809:11 5859:18

**apply** 5785:12
5859:18 5889:12
5893:9

**applying**
5766:19

**apportion**
5765:14,17

**appreciated**
5901:1

**appreciates**
5899:16

**approach**
5789:1 5790:22
5805:25 5806:5,
14,20,22 5808:3
5809:10 5814:16
5825:7,13
5835:15,25
5839:20 5853:9
5863:2,17
5878:24,25

**approaches**
5794:5

**appropriatene
ss** 5865:25

**approved**
5892:13

**area** 5867:2

**areas** 5867:23

**argue** 5810:25
5857:13 5889:24

**argued** 5889:8

**arguing** 5763:8,
23 5892:12

**argument**
5756:12 5770:23
5787:25 5788:4
5792:22 5801:15
5803:9 5804:5,24
5805:3 5811:7,19
5814:6,11
5846:18 5848:23
5853:21 5876:1,6,

8,10,13 5886:21
5888:14,17
5900:4,5

**arguments**
5768:1,3,10
5804:8,11
5889:18

**arm** 5804:16,17,
18,20 5805:7

**arm's** 5850:22
5851:9,21 5852:2

**arm's-length**
5872:19,20
5875:3,6,21
5886:5

**arose** 5838:21
5895:8

**arrangement**
5775:25 5783:18
5795:1,22 5805:1

**arrangements**
5782:20,23
5783:9,10
5784:19 5785:18
5796:20 5871:14

**Arthur** 5842:15

**Article** 5778:24,
25 5794:24
5795:1,16
5843:17 5873:12,
16,20,24,25
5874:1,2,3
5876:1,4

**ascribed** 5900:2

**assert** 5860:11
5880:4

**asserting**
5765:6 5811:15
5862:10

**asset** 5785:5
5855:6,11
5889:22 5891:25
5892:2

**assets** 5814:11
5815:12 5855:13,
14 5856:4,8
5859:3 5860:5,7,
8,10,11,18,20
5861:2,4,16,21,

22,23 5862:7
5891:10,12,15

**assign** 5779:1
5842:23 5891:14

**assigned**
5778:15,24
5829:19

**assignment**
5777:8,9 5778:11,
17 5779:5

**assignments**
5777:5 5778:6
5779:11

**assist** 5773:6
5795:19 5796:25
5798:1,21

**assistants**
5839:7

**assisted**
5796:21

**assume** 5765:16
5769:4 5803:13
5811:25

**assumed**
5758:23

**assuming**
5757:11

**assumption**
5790:25 5811:23
5812:24

**assumptions**
5812:6,8 5856:23
5857:12 5864:1
5867:19,21
5868:4

**astounding**
5898:8

**attach** 5803:5

**attached**
5794:20 5818:17

**attacked**
5857:23

**attacking**
5784:19

**attempt** 5857:7
5886:11

**attend** 5760:11,
13 5761:2

**attendant**
5781:18

**attention**
5869:19 5880:16
5893:3

**attorney**
5758:10

**attorneys**
5770:24 5800:15

**au** 5900:17,19

**authorities**
5796:9,18,19,23
5875:24 5884:18
5886:8

**authority**
5827:2 5830:13
5832:24 5853:3

**authorizes**
5895:13

**authorizing**
5854:7

**authors** 5853:15

**automatically**
5776:8

**avoid** 5764:13
5785:19 5879:21

**awards** 5819:1

---

**B**

---

**back** 5759:12
5779:25 5788:21
5811:19 5820:1
5822:12 5824:22,
24 5825:9
5833:13 5834:23
5840:2,3 5842:15
5843:10 5848:17
5854:21,22
5856:13 5869:21
5883:18 5885:2
5886:18 5892:5

**backed** 5823:17

**backhanded**
5765:24



**backing**
5817:13

**bad** 5836:10

**balance** 5878:3

**ballpark** 5815:4
5825:3,16 5826:9
5878:2

**bank** 5761:14
5837:20

**banker** 5837:24
5838:5 5843:2

**bankruptcy**
5771:16 5860:2,5,
9 5863:11
5868:20 5880:9

**banks** 5842:24

**bar** 5856:11

**bargained-for**
5763:6,15

**bargaining**
5875:22

**Barnes** 5773:23
5774:5

**Barrack** 5852:8
5859:20 5862:17
5877:18 5894:20
5897:4

**based** 5755:18
5833:17 5863:20
5880:5

**bases** 5853:6
5854:10,14

**basic** 5893:8

**basically**
5763:11 5765:21
5766:3 5860:18

**basis** 5756:16
5772:1 5784:14
5816:20 5827:10
5860:21 5863:11
5865:14 5866:13
5867:1

**bat** 5754:6

**batting** 5754:24

**Bazelon's**
5868:23

**BCCI** 5853:10

**bear** 5781:16
5818:9,10

**bearing** 5785:8
5869:12

**bears** 5789:14

**beat** 5828:25

**bedrock**
5796:18

**begin** 5773:2,9
5794:12

**beginning**
5756:11 5783:9
5871:13 5882:2
5897:25

**begins** 5774:6
5780:11

**behalf** 5754:12
5761:14,19,22,23
5769:18 5802:7,
10,11 5813:2,8
5829:11 5869:10
5883:7,8 5884:21

**belaboring**
5860:25

**believed**
5868:7,13

**Belknap**
5767:19

**belong** 5786:15

**belonged**
5799:22

**beneficial**
5773:14 5774:18
5775:16 5776:9
5779:8 5829:21,
24 5830:3,8,
5832:11,16
5846:20 5847:16,
20,23 5849:4

**beneficially**
5850:4

**benefit** 5776:23
5851:17 5852:1

**benefits**
5818:25 5823:2
5877:24

**Berenblut**
5789:11 5847:4
5887:8

**bid** 5900:14

**big** 5769:8
5822:11 5824:20

**bigger** 5852:1

**biggest** 5822:5
5824:8

**Bill** 5829:9

**billion** 5765:15,
19,23 5815:6
5817:23 5818:6,
15,23 5820:12,19
5822:25 5823:1
5825:15 5837:2,4
5866:11 5875:9
5890:11

**billions** 5836:1
5855:14 5885:17,
18

**binder** 5813:21

**binders** 5769:8

**bit** 5770:20
5811:13 5825:2
5826:24 5827:19
5832:21 5870:5
5871:12 5883:22
5894:11

**biting** 5864:6

**Black's** 5773:15,
19 5774:8
5775:17 5846:25
5847:8,24
5871:18

**Blackstone**
5833:18

**blame** 5893:25

**blender** 5859:24

**blessed** 5899:23

**Block** 5761:20
5769:15 5780:3
5794:13 5795:18
5804:25 5891:10
5900:18

**Block's** 5804:5
5890:9 5891:8

**BNY** 5766:22

**body** 5852:14
5853:7 5860:19
5861:10

**bond** 5857:10

**bondholder**
5757:8 5761:23
5819:11 5822:13
5837:25 5856:3

**Bondholders**
5762:13 5763:2,4
5827:16 5836:20
5842:25 5855:9
5857:4,13

**Bondholders'**
5763:9

**bonds** 5761:16
5822:18 5823:3

**border** 5854:13

**bother** 5884:25

**bottom** 5773:20
5793:5 5881:12
5885:3 5891:18,
21

**bought** 5819:11

**bound** 5777:12

**Boyd** 5773:23
5774:5

**branch** 5852:23
5855:5,6,11
5856:14

**bread** 5771:15

**break** 5805:11

**briefly** 5769:19,
22 5804:6,25
5814:3,7 5868:18

**briefs** 5768:2
5788:3 5790:23
5841:12 5866:16

**bring** 5857:20
5879:24 5890:8

**bringing**
5876:19 5882:24

**brings** 5802:25
5803:18,19

**Brits** 5759:6

**Britven** 5814:14,
19,23 5815:16
5820:1 5821:19
5822:3,9 5823:11,
15,25 5824:7,13,
18,25 5877:10,25

**Britven's**
5762:15 5789:25
5807:14 5813:23
5814:8 5815:20,
24 5816:25
5819:16,18
5821:17

**broad** 5846:22
5854:2,8,9
5857:18 5883:10

**Bromley**
5754:9,11,12,20,
21,24 5755:6,10
5756:3,7,21
5757:23,24
5758:14,21
5759:3,14,15
5761:20 5768:14
5769:16 5771:19
5772:8 5787:17
5798:16 5805:24
5810:4 5813:20
5815:22 5816:8
5819:14 5821:16
5824:11,23
5825:2 5833:14,
20,23 5852:12
5863:19 5869:7,8,
9,16 5873:1
5875:17 5876:10,
11,14,17 5880:19
5887:5,7 5889:4
5890:21 5893:4,6,
20 5894:6,7
5895:9,25
5896:12,19
5897:18

**Bromley's**
5777:19 5806:16
5825:10

**brought**
5819:14 5830:10
5876:20

**Brueckheimer**
5832:18 5834:19



5838:8 5840:24
5841:6 5843:8

**brunt** 5818:10

**bucket** 5815:9,
13

**budget** 5834:22

**budgets**
5840:19

**building**
5842:17

**built** 5867:18,21

**bullet** 5852:9

**burden** 5856:12,
16 5857:8

**burn** 5824:16

**burns** 5809:1

**business**
5780:16 5781:6,9,
18,23 5789:1
5790:6,14,15,19
5793:13 5805:25
5806:7,11
5808:15 5809:1,2,
5,11 5814:18
5831:4,6,8,12
5858:21,25
5863:11 5868:19
5871:22 5872:2
5887:23

**businesses**
5780:18,19
5781:11 5782:3
5810:12,19
5811:5 5831:4
5887:15

**busy** 5816:11

**butter** 5771:16

---

**C**

**calculate**
5755:21

**calculating**
5874:18

**calculation**
5826:25

**calculations**
5809:24 5887:7

**calendar**
5759:11

**call** 5754:25
5805:15 5831:1
5835:12 5894:25

**called** 5761:16
5773:22 5774:5
5800:12 5806:21
5809:19 5814:10
5897:6

**can/should**
5893:11

**Canada** 5772:20
5776:12 5793:6,
21,25 5794:2
5818:15,21
5820:13,14
5833:7,8 5835:7
5836:2 5838:10
5840:21 5847:18
5870:2 5877:22
5884:12 5898:18

**Canadian**
5754:5 5762:21
5767:6,11
5772:21 5774:23
5777:16,23,25
5778:19 5779:7,
12,16 5780:22
5781:7 5783:5,19
5784:2 5786:15
5787:8 5789:20
5790:9 5792:6
5795:9 5797:4
5803:1 5808:14
5813:6,10,13
5816:11 5817:15
5819:19,22
5821:10 5822:21
5823:2 5826:10
5827:24 5828:13
5829:8 5830:24
5838:10 5843:13,
16,20 5844:5,8,10
5845:13 5848:22
5850:8,16
5851:15 5852:6
5859:16,22
5861:17 5862:14
5870:6 5872:24
5876:9,12,16

5880:18 5883:12
5884:8,17
5890:19 5893:5,
21 5894:5,9
5895:6 5896:11,
17 5897:12
5898:21,23
5899:3,13,21
5900:11,16,22

**Canadian-only**
5762:14 5823:3

**Canadians'**
5872:8

**candor** 5825:23

**capable** 5769:9

**capacities**
5862:10

**capital** 5805:5
5842:20 5891:21

**capture** 5789:9

**captured**
5782:10

**card** 5837:20
5838:5

**careful** 5768:25

**carefully**
5787:17,18
5830:12,18

**carried** 5780:18,
19 5786:17

**carries** 5773:20

**carrying** 5811:5

**carve-out**
5873:22

**case** 5763:24
5768:20 5769:2,4
5771:12,18
5773:22 5774:6,9
5784:8,11,12
5785:16 5809:5,6
5813:5 5816:3,6,
14,20 5819:13
5822:6 5825:5
5827:4 5833:19
5839:13,14
5841:21 5843:24
5844:10 5847:13,
15,17 5849:10,11,

13,14,19 5850:1,
3,13 5853:8
5856:3,14,15
5857:3,20
5860:24 5861:1,
25 5862:13
5872:10 5879:18
5880:8,11,17
5882:9 5884:24
5885:9 5886:13
5895:23 5898:19
5899:14,24
5900:9

**cases** 5768:19
5769:7 5770:25
5771:5 5784:7
5800:16 5849:18,
21,23 5850:5,9
5855:19

**cash** 5789:6,7
5823:13 5857:1
5858:11 5863:17,
18

**catch** 5831:3

**categories**
5802:4 5880:24

**categorize**
5804:8

**category**
5802:18 5881:8,
17 5884:10

**caught** 5830:22

**caused** 5779:1
5838:18

**causing** 5779:4

**CCAA** 5827:4
5860:3

**CCC** 5759:22
5763:7,23 5764:5,
12 5766:18
5789:13 5821:11
5822:7

**CCC'S** 5762:9

**CDMA** 5793:19

**cede** 5756:20
5772:7

**celebrating**
5899:7

**cent** 5818:12
5819:7,8

**cents** 5819:11

**Century** 5827:4

**cetera** 5775:25
5776:13 5777:3
5783:16 5786:1
5788:10 5791:18
5793:7,22 5796:4
5797:25 5798:18
5809:21 5843:23
5846:4 5883:14

**ceteras** 5846:5

**challenge**
5879:21 5880:4,5

**challenged**
5807:15

**Chang** 5862:19,
22,23,24 5864:20
5869:5,6 5876:19

**change** 5838:18,
5840:20,22,24
5848:6 5892:18

**changed**
5868:21 5869:1

**changing**
5782:4 5797:1

**Chapter**
5870:16 5871:2

**characterizatio
ns** 5786:24
5796:22

**chart** 5762:16,20
5789:17,18
5819:16,21
5820:2 5823:11
5824:22,24
5877:10 5883:22
5884:1,7

**check** 5759:11
5814:15 5815:17
5821:5 5825:4
5835:21

**checks** 5821:7

**cherry-pick**
5791:11



**China** 5823:4
5863:10,16
5864:2,11,15,18,
24 5865:12
5867:13 5868:10,
14 5876:18
5877:6

**Chinese** 5865:2,
5,15,22 5866:9,
12,17,18 5867:6,
15,25 5868:3,8,
11,13 5877:2

**chipping** 5864:7

**choose** 5859:11

**Ciena** 5800:13
5801:12

**circuit** 5764:16
5853:17 5856:21
5870:20 5880:9

**circumstances**
5791:8,24
5839:21

**citations** 5879:3

**civility** 5813:7

**claim** 5765:15,23
5766:2,7 5784:12
5799:24 5800:7,
14 5809:1
5817:24 5818:5,8,
15 5820:12,16
5822:14 5827:16
5860:6 5861:8
5862:10 5880:4

**claimants**
5822:5

**claiming**
5822:22

**claims** 5763:4,
10,13 5765:7
5815:25 5816:23,
24 5818:20,21
5819:3,15 5820:8,
9 5821:18 5822:1,
5,12 5823:4,8,20
5824:12,14
5827:13 5858:17
5860:12 5861:3,4,
5,6 5877:13

**clarify** 5757:15

**Clark** 5853:18

**classroom**
5839:2

**clause** 5782:13

**clear** 5758:8
5763:3 5816:2,23
5830:4 5832:3
5843:1 5851:22
5871:15,20
5878:11 5879:17,
19 5887:21
5892:11,14

**cleared** 5826:15

**clearer** 5811:2
5890:6

**Cleary** 5754:12
5869:9

**clients** 5815:25
5816:5,13,19

**close** 5817:7
5839:17 5865:6

**closed** 5888:10

**closer** 5815:18

**closes** 5897:22

**closing** 5756:10,
11 5768:1,16
5814:6,11
5873:15

**closings**
5876:20

**cluster** 5790:3

**Code** 5860:2

**colleague**
5829:13,22
5898:17

**colleagues**
5756:1 5834:19

**colleagues'**
5869:11

**collect** 5784:15

**collected**
5793:17 5794:4

**collective**
5759:24 5859:3

**colloquy**
5765:12

**color** 5887:9

**combination**
5802:12

**combined**
5781:12 5802:17

**commencing**
5754:1

**commend**
5825:23

**commended**
5790:21

**comment**
5887:16 5892:5
5897:1

**commentary**
5887:9

**commenting**
5797:16

**comments**
5772:13,18
5845:25 5873:9
5878:6 5884:15
5886:10,20

**commercial**
5788:1 5850:22,
24

**commercially**
5851:8,23

**commingled**
5861:20

**committee**
5761:22 5767:23,
24 5897:15,19

**common**
5885:17

**communicate**
5760:21 5894:14
5895:13 5897:10

**companies**
5806:19 5817:21
5842:17 5858:25
5868:12,21
5883:4

**company**
5767:20 5784:12,

13,16,21 5785:6,7
5786:16,17
5791:8,19
5792:15 5793:2,
5817:13 5836:6
5837:20 5838:5
5839:9 5855:23

**company's**
5792:1,8,13,25
5793:3,17 5794:4

**compared**
5820:5

**compares**
5789:18, 5793:23

**comparison**
5789:15 5814:8

**compass**
5772:15,17
5831:21 5853:25
5854:4

**compendium**
5773:5,19 5774:6,
10 5777:24
5778:3 5786:5
5798:24 5884:19
5890:9 5891:8

**compensated**
5780:14 5892:4

**compensation**
5818:20 5891:19

**competing**
5872:25

**complaint**
5879:23

**complete**
5775:15 5848:3

**completely**
5782:18 5795:3
5800:8 5810:7

**complex**
5770:25 5771:5,6,
10

**complicated**
5771:7,10

**compliment**
5898:8

**compliments**
5869:11

**comprised**
5759:22

**concept**
5837:16 5861:14

**concepts**
5787:24

**conceptually**
5807:19

**concern** 5882:4

**concerned**
5767:7

**concerns**
5825:10 5881:17

**conclude**
5813:1 5865:5
5893:1 5899:5

**concludes**
5778:8 5865:16

**conclusion**
5787:11 5857:16
5892:10

**conclusions**
5815:20 5833:17

**condition**
5774:16

**conduct**
5792:17 5801:5,
10

**conducted**
5885:25

**confidential**
5864:14

**confidentiality**
5783:1

**confined** 5783:2

**confirmation**
5808:3

**confirmed**
5822:19 5840:10
5859:2

**confirming**
5782:19

**conflate**
5852:23 5855:4

**confuse** 5807:2 5842:8 5854:6

**connection** 5762:7 5804:14, 18

**consensually** 5755:8

**consequence** 5793:8

**conservative** 5867:19 5868:4

**consideration** 5769:1 5791:24 5812:2

**considerations** 5870:19

**considered** 5793:1 5807:23 5851:7

**consistency** 5893:16

**consistent** 5777:13 5779:7 5786:20 5789:10 5800:2,4 5801:10 5803:15 5834:12, 15 5840:12 5874:3 5875:5 5882:15 5886:6 5895:15 5897:2

**consistently** 5839:21 5873:25 5878:1 5882:19

**consolidated** 5870:7,10,25

**consolidation** 5764:1,2,5,14,15, 22 5766:17 5767:1,8 5770:17 5771:3,24 5772:3 5826:23 5854:12 5855:21 5856:17 5857:6 5858:19, 23 5859:1,3 5869:25 5870:1

**constituents** 5760:5

**constitutional** 5880:25

**construction** 5778:22

**constructive** 5854:13

**consult** 5760:4

**contemplated** 5805:19

**contemplating** 5791:23

**content** 5832:12

**context** 5775:18 5776:14 5784:18 5786:9 5790:15 5805:20 5832:1, 14 5848:7,8,10, 13,19,25 5849:1,4 5854:15 5879:24 5885:19 5892:6

**contexts** 5871:17,18

**continue** 5809:7 5859:8

**continued** 5775:12 5796:5 5808:7 5809:5 5810:12

**continuing** 5810:19

**continuous** 5781:19

**contract** 5771:14 5832:9, 11 5850:23 5872:3

**contracts** 5788:23

**contractual** 5763:9 5786:25 5831:19 5854:23

**contractually** 5763:6 5770:8 5777:11

**contradicts** 5790:7

**contrary** 5853:4 5858:15 5871:3,7 5900:5

**contrast** 5857:9

**contribute** 5851:11

**contribution** 5790:25 5825:7 5839:23 5878:13, 21

**convene** 5754:25

**convenient** 5814:1

**convey** 5891:14

**conveyance** 5875:16,18

**conveyed** 5830:2 5892:1

**cookie** 5864:7

**Cooper** 5842:11

**coordinating** 5755:5 5895:16

**copies** 5880:11, 12

**Cordo** 5898:12

**core** 5767:22 5822:6

**corner** 5880:21

**Corning** 5852:24 5855:4 5856:14,21 5858:20,23

**corporate** 5765:6 5781:9 5840:18 5843:10 5852:14 5855:8 5856:16,18 5857:5 5859:8 5871:10

**corporation** 5800:13 5870:7,8, 9,10,25 5871:1 5880:8

**corporations** 5780:19,20

**correct** 5795:4, 15 5801:2 5806:23 5829:20

**5844:2** 5882:7

**correctly** 5782:13

**cost** 5834:22 5838:13 5878:14, 16

**cost-sharing** 5834:1 5835:13 5885:19

**costs** 5797:10 5806:4,13 5808:9 5841:20 5879:1

**counsel** 5769:24 5899:23, 24 5900:1,8

**counsels** 5869:24

**count** 5884:20

**counted** 5836:5

**counter** 5858:14

**counterparts** 5868:1

**countervailing** 5803:18

**country** 5768:18 5845:6,8

**couple** 5762:6 5768:12 5770:21 5784:6 5813:18 5814:1 5831:3 5873:14 5883:19

**court** 5754:2,5,9, 20,23 5755:4,9 5756:2,5,20,21 5757:3,5,9,18,21 5758:7,20,22 5759:10,15,21,25 5760:6,16,20,25 5761:4,6,8,10 5762:4 5766:11, 16,24 5767:3,6, 11,15 5768:17,21 5769:4 5772:9,12, 21, 5774:23 5776:2 5777:16, 23,25 5778:19 5779:12,16 5780:22 5781:7 5783:5,19 5784:2,

20 5785:1 5786:11 5787:8, 16 5788:22 5789:20 5792:6 5797:4 5798:2 5800:15,19,23 5803:1 5808:14 5813:10,12,13,16 5819:19,22 5820:24 5822:20 5826:10 5827:3, 24 5828:12,13,18, 24 5829:4,8 5830:24 5836:13, 21,24 5837:1,15 5843:13,16,20 5844:5,8,10 5845:13,14,16,19 5847:10,11,13 5848:10,22 5849:17,20 5850:8,15,16 5851:7,10 5852:6, 7 5859:16,22 5861:17 5862:14, 16,23 5864:17 5869:5,7,15 5870:6,9, 5872:24 5875:15 5876:9, 12,16 5880:9,10, 18 5881:9 5883:25 5887:4,6 5889:3 5890:19 5893:4,5,7,21,25 5894:5,9 5895:6, 7,24 5896:8,11, 15,17,23 5897:12, 13,20 5898:23,25 5899:3,5,13,20,21 5900:10,11,15,16, 19,22,24,25 5901:8

**Court's** 5757:11 5786:6 5797:21 5827:7

**courtesies** 5829:12

**courthouse** 5760:23

**courtroom** 5760:23 5898:12

**courts** 5755:3 5756:15 5763:8

5764:18 5765:22
5769:13 5771:2,
16,20 5773:7
5775:21 5776:23
5782:8 5784:4,9
5785:25 5791:3
5796:12 5797:8
5801:25 5804:3
5805:22 5806:3
5812:4,9,10,25
5813:2 5821:20
5822:14 5825:4
5826:22 5828:10
5829:13 5830:14
5847:18 5850:5
5859:9 5861:11
5862:22 5869:11
5870:21 5876:2,
23 5879:22
5880:7 5890:8
5895:13,16,22
5896:6 5900:20

**Courts'** 5880:15
5895:17

**covenant**
5858:10

**cover** 5838:24

**covers** 5805:1

**Covington**
5784:8 5849:10,
19 5850:1

**Cox** 5789:11
5811:17,20
5812:23 5847:4
5886:16 5887:4,8,
12

**Cox's** 5892:5

**craftsman**
5830:21

**crazy** 5841:2

**create** 5837:23,
25

**created** 5778:23
5832:19 5834:13
5838:19 5862:8
5877:4 5885:25

**creates** 5815:15

**creating**
5781:13,21

5835:20 5838:11

**creation**
5834:18 5838:3,
21

**creative** 5832:4
5834:21

**creator** 5838:3

**creators** 5877:4

**credible**
5814:20

**credit** 5833:8
5834:2 5837:24
5838:5 5857:10

**creditor**
5763:17,18
5769:23 5770:11
5784:12,15,19,23
5785:18 5818:2
5819:10 5822:16
5823:17 5837:20
5855:4,7,15
5856:10 5857:13
5858:6,24

**creditors**
5762:14 5763:2,
12,16 5764:25
5770:5 5820:21
5822:18,21
5823:2,6 5855:24
5856:17,22,24
5860:17,19,23
5862:9 5871:4,5
5897:15

**Creditors'**
5761:22 5767:23
5897:19

**credits** 5837:10
5842:9

**credulity**
5779:24

**critical** 5796:2
5816:3 5831:7
5835:17 5845:2
5882:3 5885:13

**criticism**
5806:16 5808:4
5878:8 5887:22

**criticisms**
5879:8

**criticized**
5788:25 5806:17
5878:18

**criticizes**
5878:17 5887:22

**cross-border**
5870:18 5894:23
5895:11

**cross-
examination**
5834:7

**cross-
examined**
5823:25

**crossover**
5761:16 5762:12
5763:1,3

**crystal** 5887:21
5892:11

**CSA** 5796:1
5878:16,22

**CSA-PERIOD**
5875:12

**culling** 5867:14

**customer**
5789:2,5,14

**customer-
related** 5814:11
5815:12

**customers**
5837:3,4

**cut** 5762:2
5770:20 5815:10
5817:4,6,10
5823:24

**cuts** 5817:3

**cutting** 5835:21

---

**D**

---

**damaged**
5799:12,16,19,23

**damages**
5799:25 5891:19

**Dan** 5767:19

**data** 5857:11

**date** 5850:23
5851:1,10,24
5852:1

**daunting**
5898:1 5900:7

**day** 5758:23,24
5759:1 5762:17
5771:16,17
5822:15 5829:25
5830:15 5837:22
5838:2 5839:10
5841:7 5851:16
5857:15 5892:9

**days** 5768:13
5873:15

**De** 5777:6 5778:2

**dead** 5851:4

**deal** 5769:3
5771:16 5783:24
5785:13 5786:7
5788:12 5805:23
5812:25 5820:3
5825:10,12,18
5826:4 5827:1,2
5846:17 5857:18
5889:15 5892:20

**dealing** 5755:11
5775:22 5814:3
5849:9

**dealings**
5795:17 5850:22

**deals** 5781:16
5783:14 5821:1
5842:20 5850:14

**dealt** 5783:13
5804:9,21 5805:2
5834:6,7 5846:18,
23,24 5859:6
5876:21 5894:22

**Debenture**
5767:20

**debits** 5837:9
5842:8

**debt** 5785:19

**debtor** 5835:7,
10 5836:5
5859:19 5860:3,6,

12,21 5861:9
5889:5,10,11,21,
22

**debtors** 5754:13
5761:20 5767:2
5773:4,10
5794:21 5806:6
5821:10 5823:21
5825:24 5829:10,
11 5859:19
5861:2 5869:10
5883:23 5889:24
5891:22

**Debtors'**
5793:25 5795:9
5813:21 5814:5
5851:15

**December**
5881:25

**decide** 5797:8
5812:10 5896:7
5897:9

**decided**
5791:15 5812:11
5816:14,20

**decides**
5870:12,13,24

**deciding**
5819:13

**decision**
5765:18 5785:1
5847:11,12
5856:21 5870:24
5893:19

**decision-
maker** 5758:16,
18 5760:2,9

**decision-
makers** 5757:14
5758:5

**decision-
making** 5759:24

**Decisions**
5880:10

**deck** 5754:7,8

**deemed**
5820:13 5858:19
5889:10,11,21,23



5890:7

**deeper** 5874:8

**defeat** 5855:18, 20,25 5857:5 5892:7

**defeats** 5805:18 5857:12

**defects** 5888:2

**defend** 5805:24

**defers** 5866:21

**deficiency** 5877:13

**deficit** 5858:4,5

**defined** 5782:18 5794:14 5831:10 5890:16

**defines** 5873:10 5890:15

**defining** 5780:17 5782:4

**definition** 5773:18,24 5775:10 5796:3, 10 5797:9,17,25 5805:4 5875:6 5891:9,12

**definitions** 5773:21 5774:4 5776:16

**Delaware** 5757:4 5768:16 5813:7 5871:10

**deliver** 5891:15

**delivered** 5777:12,13

**demonstrated** 5881:9

**demonstrative** 5785:23 5813:24 5814:2 5819:24, 25 5822:10 5833:16 5834:8 5839:16 5849:6

**depart** 5893:7

**department** 5795:18 5797:20

5798:10 5883:1

**depend** 5755:16

**dependable** 5863:20

**depends** 5790:15

**deposed** 5811:20

**deposition** 5876:22 5887:3

**depositions** 5771:9

**deriving** 5792:17

**describes** 5777:8 5778:4 5780:15 5799:6 5897:11

**describing** 5781:11

**descriptive** 5798:7

**designed** 5773:5

**desirable** 5846:11

**detail** 5863:14 5864:12 5865:11

**detailed** 5790:23 5864:9, 22

**determinative** 5800:8

**determine** 5782:9 5783:14 5784:5 5796:13 5804:4 5812:19 5820:24

**determined** 5807:23 5812:15 5816:6

**determining** 5895:15

**develop** 5868:1

**developed** 5861:11 5863:22

**developing** 5868:14

**development** 5781:19 5782:1 5786:18 5815:11 5839:22

**deviating** 5797:1

**Dewilton** 5867:9

**dialogue** 5796:9 5797:20 5798:6

**Dickensian** 5821:24

**dictate** 5774:22

**dictated** 5840:20

**dictionary** 5773:15 5776:16 5847:25 5871:19

**difference** 5762:25 5794:3 5815:2,16 5839:11 5849:2 5885:13

**differences** 5762:11

**difficult** 5760:1 5898:3

**DIFFICULTIES** 5825:21

**difficulty** 5758:2 5786:22

**dip** 5869:1

**direct** 5834:6,17 5839:6 5840:1 5843:7 5853:3,6 5854:10,13 5876:23 5880:7, 15

**direction** 5849:2

**directly** 5778:7 5815:13 5839:16

**disability** 5818:25 5819:6

**disagree** 5782:17

**disagreement** 5782:16 5873:4

**discount** 5809:21

**discounted** 5863:17

**discounts** 5865:15

**discretion** 5854:3 5857:18

**discuss** 5863:1 5893:11

**discussed** 5762:16 5779:9 5780:6 5801:24

**discussing** 5893:16

**discussion** 5765:16 5855:1

**discussions** 5796:22 5893:18

**disjointed** 5869:17

**displayed** 5884:2

**disposal** 5863:14 5865:24

**dispute** 5820:4 5828:8

**disputed** 5763:7 5881:23

**disputes** 5795:21

**disqualified** 5795:12

**disregard** 5763:8,15 5765:22 5856:15 5859:7

**disrespectful** 5816:19

**distinction** 5835:17,18 5838:23 5841:24

5842:19 5849:3

**distinguished** 5834:17

**distress** 5817:21

**distribute** 5885:7

**distribution** 5860:7

**distributor** 5885:14

**distributors** 5874:15,19 5885:6,20

**distributorship** 5886:4

**diverting** 5785:5

**divide** 5755:1

**dividend** 5820:13 5836:3,4, 7,9,10

**dividing** 5781:21

**divvy** 5765:11

**doctrine** 5776:21 5781:10

**document** 5781:11 5793:12 5844:14 5890:13 5891:7

**documentation** 5778:11

**documents** 5777:2 5813:19 5843:23 5846:9 5879:18

**dogmatic** 5773:18 5776:7

**dollar** 5817:24 5818:12 5822:25 5823:16 5833:8,9 5877:17

**dollars** 5818:6, 15,23 5820:19 5836:1 5855:15



5864:4 5885:17, 18

**domestic** 5868:11

**Doolittle** 5871:25

**door** 5842:16

**doubt** 5768:2

**drafted** 5781:2

**drawing** 5774:8

**drill** 5863:15

**driver** 5781:5

**due** 5825:20 5864:5 5870:12

**dumped** 5805:7

**durable** 5787:15

**duration** 5783:25

**dwell** 5833:22 5859:6

___

**E**

**earlier** 5758:22 5759:2 5822:25 5847:3 5886:17

**early** 5835:12 5841:17,18,23

**earn** 5808:12

**earned** 5790:16 5806:7,19

**easier** 5898:3 5900:21

**easily** 5842:8

**easy** 5759:5

**eat** 5837:21

**echo** 5869:10

**economic** 5795:25 5796:7 5797:6,13,15 5798:8 5872:13 5873:5

**economically** 5764:10

**economics** 5872:21

**Eden** 5872:17 5875:8

**edition** 5773:15 5774:25 5775:1,5, 8,9 5846:25 5847:9,12,25

**effect** 5787:16 5788:2 5843:4 5846:11 5875:23 5889:15 5894:12

**effective** 5760:10

**efficiency** 5760:3

**efficient** 5760:10

**eleven** 5818:11, 12 5819:7,8

**eluded** 5842:11

**email** 5760:15 5881:24 5882:25

**embodies** 5805:13

**embody** 5805:10

**embodying** 5805:8,12,13

**EMEA** 5773:4,10 5778:22 5784:8 5786:21,23 5793:12,16,25 5794:10,21 5806:6,9 5813:21 5814:5,10 5823:6, 17,20,21 5829:10, 11,18 5830:2 5838:8 5868:25 5887:13

**EMEA'S** 5786:10 5795:3 5833:18

**emerge** 5858:21

**emphasize** 5890:24

**emphasized** 5762:11

**emphasizing** 5840:15

**employed** 5854:17

**employee** 5779:14,20

**employees** 5776:22 5777:4 5778:23 5779:1,4 5829:18 5845:10

**employer** 5779:21,22,24 5829:23 5832:17, 18

**employers** 5777:11 5778:22

**encapsulates** 5886:21

**encountered** 5880:24

**encourage** 5755:24 5756:18 5758:17 5759:8 5865:11

**encourages** 5853:9

**end** 5766:8 5838:1 5839:8,10 5857:15 5871:5 5892:9

**ends** 5804:18 5897:21

**enforce** 5844:20 5877:5

**enforced** 5871:1

**enforcement** 5865:1,18 5866:2, 18 5873:21

**engaged** 5852:19

**English** 5884:17

**enormous** 5885:16

**entangled** 5855:13,14

**entanglement** 5855:6,11

**enter** 5777:5 5782:22

**entered** 5787:13 5801:6 5850:24 5851:1,16,24 5883:5

**enterprise** 5788:15 5853:22 5857:25 5861:3

**enters** 5889:5

**entire** 5782:12, 13 5783:8,16,20 5841:5,7 5858:4,6 5866:11 5868:7 5885:9

**entities** 5759:23 5763:4 5770:7 5831:6 5834:23 5835:9 5856:19 5890:18

**entitled** 5860:20 5888:7, 5889:24 5894:14

**entity** 5831:12 5856:7 5859:8 5884:11

**entrepreneurial** 5780:5 5781:17

**entries** 5884:12, 13

**entry** 5835:22

**entry-level** 5842:15

**equal** 5836:14 5875:22

**equitable** 5774:2,18 5843:25 5854:15

**equity** 5771:20 5825:4

**equity-holder** 5795:13

**equity-takes-last** 5795:7

**equivocal** 5802:10,24

**Ernst** 5823:9

**error** 5824:6

**essence** 5861:17

**essentially** 5776:25 5785:2,5 5802:3 5823:15 5824:13

**established** 5781:22 5852:14 5867:5 5872:12

**estate** 5763:2 5826:1 5859:9 5864:4

**estates** 5765:11 5814:18 5820:21 5821:25 5823:14 5859:10,11 5862:2,9 5864:5

**esteem** 5898:14

**estimates** 5877:24

**Eugene** 5862:24

**evaluate** 5864:25

**evaluated** 5865:21,24

**evaluation** 5865:18

**evaluations** 5864:1

**evening** 5754:15 5756:1

**event** 5757:12 5854:24

**evidence** 5769:6 5777:7 5785:14 5788:11 5796:6 5803:18 5807:14 5813:24

5814:20 5817:4, 15 5821:17 5822:22,24 5823:9,25 5824:3, 4,5,14 5849:10 5850:7 5853:15 5854:19 5856:25 5857:7,10 5866:8 5867:5 5868:23 5881:21 5892:24

**evidences** 5775:13 5848:2

**exact** 5764:10 5766:3 5830:10 5861:4 5864:11

**examination** 5821:20 5834:6

**examples** 5781:24 5883:25

**exceptions** 5778:11

**excerpt** 5777:8 5792:22

**exchange** 5875:2,14

**exclusionary** 5881:15

**exclusive** 5799:8 5872:14 5874:21 5882:10, 13 5885:5,7,14, 15,20 5886:3 5887:14 5888:21 5891:24 5895:23

**execute** 5777:2 5779:13 5843:22 5844:13 5846:8

**executed** 5777:3 5779:15, 18 5843:22 5846:8

**exercise** 5837:7,9 5854:8,9 5894:13

**exercising** 5893:14 5895:22

**exhibit** 5802:2 5818:18 5823:11 5867:20 5882:24

5883:20 5890:10

**exist** 5781:14 5859:9

**existence** 5796:11 5855:17, 19

**expect** 5770:5,6 5893:10

**expectation** 5755:19 5856:1, 10 5893:18

**expectations** 5757:15 5769:23 5770:12 5855:5,7 5857:14

**expected** 5763:1 5788:15

**expenditures** 5791:17

**expert** 5769:9 5789:13 5824:7 5831:13 5835:2 5842:11 5886:22, 24

**expertise** 5866:20 5867:3

**experts** 5771:9 5821:6 5866:17, 18, 5871:24 5872:3,25

**explained** 5769:15,16 5884:22 5888:6

**explanation** 5883:15 5886:23

**explicit** 5847:14, 18 5884:16

**exploit** 5796:11 5807:7 5808:1

**express** 5853:3

**expressed** 5797:15 5897:18

**expressly** 5830:7

**extend** 5793:4

**extended** 5809:13

**extending** 5800:5

**extends** 5783:25 5837:24

**extensively** 5762:17 5876:22

**extent** 5772:16 5795:5,15,16 5796:13 5801:5 5812:14 5832:9 5893:10

**extracted** 5793:11

**extraordinary** 5829:12

**extreme** 5800:12 5821:9, 11 5857:2,20 5882:17

**extrinsic** 5785:13

---

**F**

**face** 5822:2

**facie** 5856:15 5857:3

**facilitate** 5807:4

**facilities** 5843:8

**fact** 5755:11 5771:8 5781:4 5786:7 5801:13 5808:6 5814:25 5815:18,25 5816:18,22 5821:12 5822:16 5825:9 5826:24 5827:14 5828:1 5830:9,19 5834:24 5838:18, 5840:20,22,24 5856:9 5858:11 5859:1 5860:3,6 5861:7 5864:13 5865:24 5866:10 5867:22 5872:10 5876:3 5877:10,

19, 5878:21,25 5880:6 5892:16

**facts** 5763:20 5810:24 5816:7, 15,16 5853:1 5854:6 5855:9,25 5861:1 5862:13 5867:5

**factual** 5795:20 5796:24 5798:1 5801:7,8,9,16 5867:4

**failed** 5853:1

**fails** 5804:17

**fair** 5763:13,15 5769:10 5790:13 5807:24 5875:19

**fairly** 5869:17

**fall** 5802:3 5881:8

**familiar** 5759:4 5806:3

**famous** 5762:16 5795:23

**Farr** 5862:24

**fashion** 5869:17

**favor** 5779:21 5801:19 5804:1 5835:10

**Federal** 5880:9

**feeble** 5855:12

**feel** 5869:18

**feet** 5899:23

**fellow** 5816:8

**felt** 5831:14 5877:4

**field** 5796:10 5797:17,24 5800:4

**fight** 5817:20

**figuring** 5787:6

**file** 5860:6

**filed** 5822:15 5867:12

**filing** 5782:25 5786:12 5822:17 5868:20

**filings** 5868:10

**fill** 5845:4

**final** 5810:2 5811:13 5826:17 5828:3 5850:18 5867:16 5886:20

**finally** 5761:8 5770:13 5805:21 5859:13 5886:14 5888:6

**finances** 5837:25

**financing** 5855:24

**find** 5802:1,19 5803:13 5821:9 5853:10,24 5854:2 5890:3

**finding** 5813:25 5847:19

**findings** 5786:7

**finds** 5785:2

**fine** 5760:16 5816:8,9

**fingertips** 5866:25

**finished** 5897:24

**fire** 5809:5 5833:12

**firm** 5756:4 5824:8 5898:13

**fit** 5892:19

**five-year** 5832:24,25

**fixed** 5776:7 5885:21

**flaw** 5835:16 5841:22 5863:1 5864:8

**flaws** 5863:6,8

**flow** 5863:17

**flowed** 5811:24

**flows** 5780:8 5787:11 5789:6,7 5863:18

**fly** 5759:6,7

**focus** 5762:6 5763:20 5764:6 5795:15 5863:7

**focused** 5773:3

**focuses** 5795:4

**focusing** 5763:19

**folks** 5760:10

**follow** 5771:20

**force** 5870:6,9

**forecast** 5809:9, 20

**forecasting** 5807:9 5808:10, 11

**forecasts** 5810:1

**foregoing** 5846:12,13

**foreign** 5845:6,8 5870:21

**foreigners** 5868:6,11,12,13

**forgive** 5842:6

**form** 5763:25 5764:1 5815:17 5871:10 5888:15 5889:19 5891:5 5892:7

**formalizing** 5782:19

**format** 5892:19

**formed** 5858:2

**formulation** 5762:10 5836:16

**fortified** 5811:7

**forward** 5827:12

**found** 5768:23 5773:19 5856:3 5892:8,22

**foundational** 5860:4

**Foundry** 5882:17

**frame** 5863:12

**France** 5885:5 5891:23

**Francey** 5847:10

**frankly** 5837:14 5841:22 5842:6

**fraudulent** 5875:16,18

**Fred** 5897:14

**free-standing** 5804:16

**freely** 5897:10

**frequent** 5774:15

**friend** 5829:17 5831:18 5833:14 5845:24 5847:8 5849:12

**friends** 5803:13 5841:11

**friends'** 5803:9

**Frisch** 5795:23, 24 5797:12

**front** 5881:23

**full** 5773:25 5774:13 5775:15 5780:4 5781:17 5817:7,11 5848:3

**fully** 5755:21 5875:11

**fumbling** 5773:7

**fund** 5817:3,18, 21,25 5819:5 5852:13 5862:7

**fundamental** 5791:1 5835:16 5838:22 5839:11 5841:22,24 5843:3

**fundamentally** 5834:16

**funded** 5834:14 5852:15

**funder** 5843:2

**funding** 5842:20,21 5858:3 5875:9 5887:18,20 5891:4

**funds** 5765:2 5861:21 5862:1

**fungible** 5836:25

**future** 5891:20

---

**G**

**gain** 5788:13

**Gallagher** 5862:25

**game** 5888:3

**gave** 5790:16 5807:22 5808:18 5812:23 5815:22 5820:3 5823:25 5833:7 5887:9 5888:8,18

**general** 5860:19 5865:5 5880:23

**generalizations** 5857:12

**generally** 5755:8 5830:17 5856:23 5860:5

**generated** 5786:19 5787:20 5806:12

**generic** 5781:12 5856:22

**get all** 5841:2

**gifted** 5886:2

**give** 5760:18 5768:25 5790:17 5807:5 5809:17 5846:11 5894:3

**giving** 5763:17 5809:6 5824:14 5879:23

**glad** 5771:22

**global** 5763:25 5764:13 5815:15 5857:24 5858:10 5861:3 5862:7,8 5863:22

**glossy** 5814:10

**God** 5816:9

**good** 5754:2,4,5, 9,11 5756:22,23, 24 5759:17,18 5761:10,13 5762:24 5767:16, 17,18 5772:23,25 5803:11 5813:14, 15,16 5829:2,4,5, 6,8 5836:9 5844:17 5845:16, 20,21 5899:10,17, 19,22,24,25 5900:4,6

**goods** 5818:3

**goodwill** 5814:12 5815:13

**gotcha** 5810:5 5811:14,16 5888:3,4,11 5891:6 5892:16

**Gottlieb** 5773:12 5774:21 5776:20 5782:7 5784:6 5785:16 5787:1,5,25 5790:7 5829:14, 22 5845:15,16,18, 20,21 5848:24 5850:11,18 5852:7 5869:9

**Gottlieb's** 5774:24

**govern** 5767:8

**gifted** ... (column continues)

**gifted** 5886:2

**governed** 5766:23 5767:2

**government** 5839:8 5852:15, 17

**governmental** 5762:23

**governs** 5766:14 5787:23 5809:10

**grab** 5860:18

**grant** 5776:11 5780:15 5794:25 5804:16 5873:12

**granted** 5794:24 5797:23 5802:17 5803:7

**granting** 5802:10,11

**grants** 5802:15 5868:12

**great** 5830:20 5832:19 5838:25

**Green** 5789:4 5806:17,21 5807:8 5808:5 5814:14 5887:2,5, 6,10

**Green's** 5788:25 5789:18,23 5808:3 5809:19, 23 5815:18 5820:7

**groggy** 5759:8

**Gross** 5754:6 5756:24,25 5759:18 5761:12 5767:18 5773:1 5791:5 5813:15 5815:24 5816:4 5817:14 5826:4 5829:3 5837:8 5839:25 5849:17 5852:8 5853:14, 24 5894:19 5895:4 5899:15

**5869:24 5870:1 5872:18**



**Gross's** 5825:9

**ground** 5871:23

**group** 5758:1
5760:2 5761:24
5786:16 5802:13
5844:19 5858:6
5871:23 5883:4

**groups** 5800:3

**grown** 5757:7

**grows** 5791:12

**guarantee**
5763:5,6 5764:24
5765:1,4,22
5766:7 5770:10
5817:17,19
5820:9 5855:17,
19 5856:2 5858:3,
13 5877:22

**guaranteed**
5761:17 5765:15
5822:18

**guarantees**
5762:24 5820:22
5827:14,15
5855:24 5856:3,5
5857:16,19,23,24
5858:8

**guess** 5808:15
5897:21 5900:13

**guide** 5791:9

---

**H**

---

**half** 5756:16
5769:13 5793:6
5794:2 5816:10
5821:23 5822:2,4
5873:15

**hand** 5762:13,15
5835:21,22
5852:10 5859:24
5880:11 5895:10

**handed** 5785:23

**handful** 5778:10

**hands** 5807:18,
25 5888:1

**happen** 5844:17

5870:14

**happened**
5807:9 5809:3,10,
17,24 5810:11,17
5840:16

**happening**
5757:13

**happy** 5859:23
5901:4

**hard** 5755:6
5886:12

**Harlow** 5840:4

**harmed** 5801:21

**harming**
5858:23

**Hashanah**
5899:8

**head** 5834:6
5893:22

**headed** 5792:23

**headnote**
5880:21

**headquarters**
5843:10

**health** 5818:25

**hear** 5755:22
5756:5 5827:25
5832:24 5894:7,
18,19 5898:25

**heard** 5755:18
5768:1 5770:15,
19,21 5771:10
5772:13 5780:21
5813:5 5841:12
5848:22 5867:8,
5876:9,12
5884:24

**hearing** 5895:14

**heart** 5863:16

**held** 5843:25

**helpful** 5757:18
5773:8 5831:24,
25 5898:12

**helps** 5798:9

**herring** 5798:13

**hey** 5805:15

**high** 5863:13
5898:14

**highest** 5807:23

**highest-value**
5867:12

**highlight**
5863:7 5890:14

**hindsight**
5788:6,7,19
5851:2

**history** 5775:7
5798:20 5854:8

**hit** 5852:11
5868:17

**hoc** 5761:23

**Hodara** 5897:13,
14

**hodgepodge**
5792:19,20

**Hoeffner** 5821:4
5825:15 5827:6

**hold** 5763:12
5881:10

**holds** 5898:13

**holiday** 5755:25
5899:8,11

**holidays** 5901:4

**home** 5837:22

**Honey** 5897:23

**Honor** 5756:8
5757:25 5758:15,
21 5767:5 5772:7,
11 5777:22
5813:14 5845:15,
18 5862:15,18
5873:2 5876:11,
15 5880:16
5890:21 5894:8
5895:9 5896:19,
22 5901:6

**honored** 5898:5

**Honors** 5754:12
5767:25 5769:6

5861:24 5862:11
5869:4,8,20
5873:16 5886:14
5893:1 5897:14

**hope** 5756:8
5766:10 5845:12
5869:18 5878:7
5897:17

**hopes** 5819:12

**hoping** 5828:16

**Horst** 5795:23,
24 5797:12

**hospital** 5839:3

**hotchpot**
5792:19 5859:17,
21,23,25 5860:14
5861:13 5862:4,5,
12

**hour** 5756:16

**hours** 5768:1

**house** 5875:23

**housekeeping**
5757:1

**Huffard** 5790:5
5814:9,25

**hug** 5831:1
5900:3

**huge** 5835:9

**humbled** 5898:5

**hundred** 5806:9
5827:17 5837:4

**hundreds**
5864:3

**hypothesize**
5807:19 5808:7

---

**I**

---

**idea** 5766:1
5800:2 5883:23

**identifiable**
5860:6

**identified**
5794:23 5817:24
5818:22 5827:20

**identify** 5798:14

**IFSA** 5811:25
5812:17, 5887:18
5888:7,8,16,19
5889:2,3,4,17
5890:1,25 5892:6,
12,25

**ignore** 5854:5
5884:16 5887:17

**ignores** 5867:4

**illustrated**
5809:20

**illustrative**
5824:2,19

**imagine**
5897:25

**immediately**
5831:10

**impact** 5810:8

**impediment**
5858:13

**impediments**
5854:23

**impermissible**
5794:8

**implementatio
n** 5863:6,8

**implemented**
5828:4

**implementing**
5771:2 5792:13
5828:5,7

**implied** 5792:18

**import** 5758:5

**important**
5768:5 5772:16
5819:17 5837:21
5846:5,10 5848:9
5865:13 5870:15
5874:23 5879:15
5890:23 5896:6
5899:8

**importantly**
5860:16

**impose** 5763:10,
5786:24 5829:14

**imposed**
5852:15

**impossibility**
5828:5

**impossible**
5873:24

**in-chief** 5827:25

**inappropriate**
5834:8

**include** 5847:15,
20 5882:22

**included** 5777:7
5778:17 5786:10
5802:2 5867:24

**includes** 5777:9
5783:20 5802:5
5864:23 5891:12

**including**
5773:21 5785:13
5787:19 5864:15,
18 5866:11
5867:22

**income** 5803:5
5863:2,4,16
5878:25

**inconsistent**
5783:17 5786:4
5795:3 5800:9
5802:5,24
5872:14 5896:1

**incorrect**
5872:9

**increase**
5868:24

**incredibly**
5861:1

**indenture**
5755:12 5761:15
5766:22 5767:21
5769:24 5869:23

**indentured**
5826:18

**indentures**
5764:24 5765:3
5766:22

**independent**
5893:14 5894:13

**indicating**
5833:17

**indirectly**
5815:14

**indisputable**
5861:7

**infamous**
5762:16

**inform** 5797:21

**information**
5755:20 5821:21
5826:14 5840:8
5863:21 5864:11,
15,19,23 5866:24

**infringement**
5799:10,13,24
5881:1,7 5882:6,
15

**infringer** 5800:5

**initial** 5804:22
5822:17 5853:11
5876:20,25

**Inland** 5884:9

**insolvency**
5762:23 5854:9,
25 5856:8 5858:7,
24 5861:13
5870:18

**instance**
5870:23

**instructions**
5894:24

**insurance**
5817:13,21
5839:9 5877:20
5887:24

**insured** 5818:13
5819:15

**insurer** 5818:11

**integration**
5857:2

**intellectual**
5786:14 5815:3,9,
11 5868:9 5886:1

**intended**
5871:21

**intent** 5782:22

**inter-
companies**
5820:22

**intercompany**
5820:8,12,16
5827:13

**interest** 5774:18
5775:16 5777:10
5778:13 5779:2
5780:1 5781:14
5799:7 5825:11
5826:2 5827:18
5829:22,24
5830:3 5848:4

**Interestingly**
5765:25

**interests** 5757:8
5768:11 5769:18
5773:11 5780:9
5781:22 5784:10
5794:11 5804:8
5811:15,22
5881:15

**interference**
5809:4

**Interim** 5887:18,
20 5891:3

**internal**
5793:14,21
5836:3 5840:18
5884:5,8

**international**
5853:8

**interpret**
5796:15

**interpretation**
5771:14 5775:18
5776:5 5785:12
5798:21 5801:14
5802:22 5804:15
5806:22 5849:13,
5872:15,18
5892:25

**interpretations**
5798:10

**interpreted**
5785:9 5787:16
5804:7

**interpreting**
5803:24

**interpretive**
5798:15 5801:4,
19

**interruption**
5809:2 5887:24

**introductory**
5780:11

**invariably**
5778:12

**invent** 5836:8
5838:1

**invented**
5791:16 5834:14
5840:5,21,22,23,
25

**inventing**
5835:20 5838:3
5841:25 5842:22

**invention**
5771:13 5776:21
5778:14

**inventions**
5833:5 5834:20

**inventive**
5832:5 5839:18
5842:10

**inventor** 5832:4,
15 5838:2,7
5842:18,23
5844:1 5845:4,5

**inventors**
5832:18 5837:21
5838:10,19
5840:15

**inventorship**
5878:12

**invents** 5838:8

**invest** 5788:12

**investors**
5817:22

**invitation**
5757:11

**involved**
5758:11 5784:22
5789:16 5791:24

5794:8

**IP** 5782:9
5784:13,16,17,20
5786:1,19 5788:9
5789:8 5790:10
5791:14 5793:4
5794:25 5831:23
5832:14 5833:5
5839:13 5842:8,
17 5849:20
5851:2,7,11,12,18
5863:22 5873:13
5875:12 5883:1

**IPCO** 5809:13,
14,16,18,25
5810:16 5863:18,
19 5864:1,9,12,21
5865:9,12
5866:21,25
5867:1,19,20
5877:2,3

**IPCO-TYPE**
5805:1

**Ireland** 5885:5
5891:23

**Irish** 5831:1
5900:3

**irreconcilable**
5799:21 5879:13

**irrelevant**
5819:12

**irrespective**
5786:16

**issue** 5795:5
5801:19 5807:2
5825:11,18
5863:13 5864:3,6
5872:25 5879:16,
19 5881:1,23
5886:15 5894:21

**issued** 5761:17

**issues** 5754:15
5755:7 5766:16,
25 5790:23
5797:8,19
5805:22 5826:15
5838:17 5841:13
5879:6,7 5883:19

**item** 5834:22

neesons                    W&F
                           WILCOX & FETZER LTD.          www.neesonsreporting.com
                                                         www.wilfet.com

**items** 5764:21
5786:8

---

**J**

**James** 5754:12
5869:9

**Japan** 5883:13

**Japanese**
5883:13

**Jewish** 5755:25
5899:8

**job** 5755:5
5842:15 5898:2,
20

**jobs** 5900:21

**join** 5761:18

**joinder** 5799:17

**joined** 5880:6
5881:4,16,20

**joining** 5829:11
5879:12

**joins** 5879:20

**joint** 5854:17,
5893:19 5895:14

**journal** 5835:22

**judge** 5754:6
5756:23,25
5759:18 5761:12
5767:18 5773:1
5791:5 5813:15
5815:24 5816:4
5817:14 5825:9
5826:4 5829:2
5837:8 5839:25
5849:17 5852:8
5853:14,18,24
5894:18 5895:4
5899:15,16,24

**judges** 5768:25
5859:11

**judgment**
5893:14 5897:8

**judgments**
5870:22

**judicial** 5854:3

**jumps** 5887:18

**June** 5888:8
5892:13

**jurisdiction**
5826:21,22
5827:6,7 5870:6,8
5874:22 5885:8
5894:13 5895:23

**jurisdictions**
5763:5,10
5827:17 5862:3
5883:17 5887:15
5891:24

**jurisprudence**
5768:23

**Justice** 5754:4
5756:24 5761:13
5765:12 5767:18
5773:1 5785:22
5816:5 5817:14
5827:3 5828:21
5829:6,25
5832:23 5843:15,
19 5844:17
5846:1 5847:3
5849:16 5852:8
5880:16 5893:9,
11 5896:9
5898:18 5899:6,
12

**Justices**
5857:17

**justified** 5806:2

**justify** 5771:1

---

**K**

**Karina** 5871:25

**keeping**
5755:25

**Kerry** 5854:18

**key** 5795:5
5831:8,9 5840:14
5849:16 5855:2
5856:1,9 5863:7
5888:6

**kick-off** 5851:6

**kind** 5760:1
5764:6 5765:23
5780:20 5785:17
5807:16 5810:5
5822:1 5887:9
5893:3

**kinds** 5788:2
5791:7 5807:20
5838:12,17
5841:2

**Kinrich** 5769:16
5789:3 5790:5
5863:25 5864:17,
20 5865:14,21
5866:14,19
5867:4 5868:18
5876:21,24

**Kinrich's**
5793:24 5794:1
5805:25 5806:5,
14 5820:6
5825:13 5878:24

**kiss** 5830:25

**knew** 5822:21
5823:7,13

**knowledge**
5898:6

**Kyocera** 5799:2

---

**L**

**l'shanah**
5899:9,10

**lab** 5839:7
5840:4,16
5841:25 5843:8

**label** 5764:14
5794:20 5873:10

**labels** 5796:22

**labs** 5834:20
5840:3

**lack** 5867:3

**language**
5769:1 5776:6
5779:17 5780:5,
10,15 5786:25
5805:18 5859:25
5876:2 5883:10

5893:15 5894:12,
16

**large** 5772:16

**larger** 5824:15

**largest** 5793:20

**late** 5898:19

**launched**
5799:2

**Laureen** 5835:3

**law** 5763:21
5764:16 5766:14,
19,20,23 5767:2,
8,9,20 5769:2
5771:20 5772:1,
17 5773:15
5816:7,17
5831:21,22
5832:2,3,8,13
5833:4,5 5834:12
5835:18 5837:17,
18 5838:4,6,22
5843:1, 5844:3,11
5846:21,25
5847:9,10,13,14,
18,21,24 5852:21
5853:1,5,8
5854:6,9,17
5861:10 5866:17
5869:24 5870:1,
5871:18 5879:16
5881:23 5882:1,8
5883:1

**lawsuit** 5800:1
5801:12

**lawyer** 5816:9

**lawyers** 5898:21

**Lazard** 5809:20,
21 5810:1
5863:21

**leads** 5846:2

**leave** 5788:2
5811:22 5825:10
5846:15

**leaves** 5804:2
5827:12

**Leblanc**
5761:23 5764:17
5769:21 5770:2

5771:23 5826:17
5827:11 5852:19
5855:3

**left** 5754:14
5772:5 5825:8
5866:19

**left-hand**
5880:21

**legal** 5763:16
5764:6 5771:25
5773:13 5774:11,
12,20 5775:10,19
5776:8,20
5787:24 5788:2
5796:19 5802:14
5831:6 5838:17
5846:16,18,20
5847:5,6,15,19,22
5848:1,13,17,18
5849:3 5853:6,23
5854:10,13
5863:4 5873:23

**legitimate**
5856:10

**length** 5850:22
5851:9,21 5852:2

**lens** 5788:19
5811:11

**lent** 5784:14

**let alone**
5796:25 5855:1

**letter** 5823:9

**level** 5797:1
5863:13

**leverage**
5812:20

**levies** 5852:15

**liabilities**
5856:6,7 5860:10,
11

**library** 5760:25

**license** 5775:25
5776:11 5787:12
5790:14 5795:1,
22 5796:1,4,7,11,
14,24,25 5797:9,
14,22,24 5803:6,
7,9, 5804:12

5805:8, 5806:18, 22 5807:7 5808:8 5809:6,8,13 5810:15 5874:8,9, 11,14,20,21 5875:12 5883:23 5884:6 5888:21 5889:6,19,20 5890:7 5892:16

**licensed** 5776:25 5777:4 5779:13 5789:8 5843:21,24 5844:1,13 5845:8 5846:7 5872:12 5885:10

**licensee** 5799:8 5882:10,14 5883:24 5885:14, 15

**licensees** 5790:13 5807:1 5809:15 5810:10

**licenses** 5782:25 5783:15 5802:19 5806:24 5807:3 5812:2,12, 22 5884:6,19 5887:14

**licensing** 5782:23 5803:5 5863:9 5879:7,10 5883:5,11,20

**licensing/ sublicensing** 5879:16

**licensor** 5802:4 5884:11,20 5885:1

**light** 5761:25 5765:14 5775:24 5897:4

**limit** 5760:12 5856:5

**limitations** 5807:16

**limited** 5758:13 5782:14 5853:5 5863:8 5868:2 5882:18

**lines** 5808:15

**link** 5870:11

**liquidating** 5854:24 5858:21

**list** 5786:5 5803:2,5

**listed** 5803:9 5865:10 5882:19

**listen** 5760:13 5830:18

**listening** 5830:12

**lists** 5884:25

**litigation** 5798:20 5799:1 5800:12 5849:25 5879:20 5882:21

**live** 5817:5 5837:23

**Livent** 5853:10

**living** 5875:23 5889:16

**local** 5883:6

**lockbox** 5861:21

**lodged** 5878:23

**logistically** 5771:7

**London** 5757:16

**long** 5775:6 5783:15 5788:16 5859:1 5869:13 5881:3 5900:16, 19

**longer** 5792:13 5828:14 5829:15

**look-back** 5791:25 5792:8 5793:1 5832:24, 25

**looked** 5774:24 5775:3 5784:20 5791:8 5793:16 5798:22 5820:20 5822:11 5850:6 5866:22

**losing** 5870:4

**losses** 5851:13

**lost** 5809:4 5818:25

**lot** 5756:6 5770:15 5804:13 5815:7,10 5825:13 5833:21 5867:7 5878:17 5900:21

**lots** 5837:6

**love** 5898:21

**lovely** 5761:3

**Lowenthal** 5767:16,17,19 5772:10,11

**Lowenthal's** 5772:18

---

**M**

**made** 5758:8 5761:19,21 5768:3,4,6,12,15 5770:23 5773:3 5780:9 5783:3,4 5784:6 5785:25 5786:11 5787:25 5788:6 5795:8 5798:16 5804:24 5808:4,15 5814:21 5824:6 5829:17 5830:4 5833:14,25 5856:16 5872:11 5880:3 5881:10 5884:7,17 5885:2 5886:7,11,17,20, 22 5895:16 5900:21

**Mafia** 5830:24

**Maguire** 5754:17 5756:19, 22,23 5757:6,10, 19,20 5780:3 5782:7,12 5785:21 5786:2 5788:24,25 5789:12 5790:8, 21 5829:1,2,6,9

**Maguire's** 5783:7 5900:3

**main** 5814:13 5870:19 5877:8

**maintain** 5785:4

**maintained** 5787:18

**maintaining** 5779:25

**major** 5784:7

**majority** 5875:13 5884:14

**make** 5755:14 5757:25 5765:9 5776:22 5777:21 5779:4 5780:2,7 5785:20 5799:24 5802:20 5804:12 5822:13,15 5829:18 5834:4 5845:9 5847:1 5849:11 5882:20 5883:16 5884:6 5889:18 5890:2, 5891:4 5892:7 5897:1 5898:15 5900:4

**make-use** 5796:7 5874:8,9, 11,13,20,21

**makes** 5851:21 5878:11 5896:10 5898:3 5900:6

**making** 5778:20 5783:6 5808:16 5809:1 5816:12 5878:15,20 5888:17

**Malackowski** 5790:5 5791:2,18 5793:6 5794:7 5814:24 5831:14 5833:6,18 5834:3, 5 5839:15 5842:2,

4,12,14 5878:5,7, 10,11,15

**Malackowski's** 5790:22 5792:4 5814:9 5815:17 5820:6 5825:7 5833:15,20 5843:4

**Malackowski/ huffard** 5793:23

**manage** 5837:23

**mandate** 5862:4

**mandated** 5872:12

**mandates** 5862:12

**manifestly** 5871:7

**market** 5769:10 5790:13 5807:24 5815:14,15 5856:23 5875:19

**market already** 5868:3

**marketplace** 5770:4

**markets** 5842:21 5867:24

**master** 5830:21

**match** 5794:8 5860:11 5872:1 5873:5

**material** 5756:6 5773:8 5819:24

**matrix** 5795:20 5796:24 5798:1 5801:7,8,9,17 5857:2

**matter** 5757:1 5767:12 5782:14, 18 5783:11,12 5791:1 5817:9,12 5819:9 5820:23 5823:24 5844:16 5846:21 5892:17

**matters** 5783:24
5788:5 5794:21
5811:2,3 5873:11
5893:16 5895:18

**max** 5828:17

**Maxwell**
5853:10

**meaning**
5774:12 5776:7
5796:13 5797:9
5847:22

**means** 5773:13
5775:19,20
5776:9 5788:22
5805:5,6 5827:16
5846:20 5890:6

**measure**
5791:15 5792:16
5839:5,22

**measuring**
5878:12

**meet** 5764:14
5857:7 5872:19

**meeting** 5757:2,
15,17 5851:6

**Mellon** 5761:15

**Melnik** 5759:17,
18,22 5760:1,7,
19,24 5761:3,5,7

**member**
5767:22

**members**
5882:25

**memorandum**
5851:6

**mention**
5764:21 5789:3
5874:24 5898:10

**mentioned**
5769:22 5874:6
5875:25 5879:1
5883:22 5892:3

**mentioning**
5896:5

**menu** 5785:23
5849:6

**mere** 5855:17,19

**merge** 5764:7

**merging**
5781:21

**method** 5789:8
5863:6

**methodologies**
5769:2,3 5771:15
5790:2

**methodology**
5771:25 5772:3

**methods** 5863:4

**metric** 5878:12

**mic** 5843:11
5846:15

**Michael** 5761:13

**Microsoft**
5880:8

**middle** 5833:7,
11 5880:20

**Miller** 5765:12
5818:6 5859:23
5861:20 5862:15

**million** 5815:6
5823:3,16

**millions** 5864:4

**mind** 5755:25
5787:14 5870:16

**mindful** 5767:25

**minute** 5789:20
5821:22 5823:7
5826:11 5850:17

**minutes**
5756:15 5762:2,3
5766:9 5768:7
5770:21 5772:5
5828:17, 5862:20

**mischaracteriz
ing** 5852:20

**misconception
s** 5816:1,24

**misdirection**
5852:20 5855:2

**misleading**
5877:10 5878:13

**missed** 5824:4
5827:12 5833:22,
24 5834:3

**missing**
5831:18 5842:6
5850:25

**misstated**
5856:13

**misunderstoo
d** 5766:21

**mix** 5794:8
5824:21

**model** 5812:17,
5863:18,19
5864:2,9,13,21,24
5865:9,12,25
5866:21,25
5867:1,20,25
5868:6 5870:17
5877:2,3

**modified**
5853:15

**moment** 5787:9
5833:23 5852:24
5880:14 5892:16

**Monday**
5771:11 5779:10
5816:12 5821:4
5827:7 5881:25

**money** 5763:17
5765:11,14,17,19
5784:13 5788:10
5815:7 5818:8
5825:14 5834:23
5836:16,17,18,25
5837:5,11

**moneys** 5835:6

**Monitor**
5755:19,22
5795:9 5813:2
5818:19,22
5823:4 5872:22
5885:4,9 5892:3

**Monitor's**
5813:8 5872:15,
18 5876:6 5886:1
5892:10

**month** 5825:12

**months** 5769:14

**morning**
5754:2,4,5,10,11,
14 5756:22,23,24
5759:5,17,18
5761:11,13
5767:16,17,18
5772:24,25
5773:1 5813:14,
15,16 5815:21
5816:12 5821:4
5826:19 5829:2,5,
6,8 5845:17,20,21
5869:22 5879:11
5897:23

**Morrow** 5880:8

**mortgage**
5842:24

**motion** 5818:19

**move** 5755:17
5769:25 5773:10
5824:19,25
5825:1 5826:11,
5850:12 5866:3,
12

**moves** 5815:20
5864:3

**moving** 5755:11
5806:16 5815:8,
12 5874:7 5877:8
5878:5

**MRDA** 5766:14
5775:9, 5776:24
5780:4,11 5782:9,
14,21 5783:8
5784:5 5791:7
5794:14,24
5796:5,17
5797:23 5801:5
5807:1 5830:7
5831:15 5835:14
5841:15 5843:17
5848:10,11,14,20
5849:2,5 5851:1,
8,16 5854:17
5871:13,22
5872:8 5873:10,
13 5874:7,12
5875:1 5885:15
5887:1 5891:25

5892:24

**multijurisdictio
nal** 5861:25

**multinational**
5853:22

**multiple** 5862:3

**multiplicity**
5860:15

**murkier** 5811:3

___

**N**

**NA** 5890:17

**named** 5882:16

**naming** 5883:6

**narrow** 5850:12

**narrowing**
5850:14

**necessarily**
5758:12,25
5775:14 5848:3

**negates** 5776:8

**negative** 5841:9

**neglected**
5900:25

**negotiated**
5868:22

**negotiating**
5812:19 5875:24

**negotiations**
5757:12

**Networks**
5800:13 5882:18

**Newbould**
5754:4 5756:24
5765:13 5767:19
5773:1 5785:22
5816:5 5817:14
5827:3 5828:21
5829:7 5832:23
5843:19 5846:1
5847:3 5849:17
5852:9 5880:16
5893:10,11
5896:10 5898:18

5899:6,12

**Newbould's**
5829:25

**newspapers**
5816:11

**nice** 5900:7

**niceties** 5764:6

**night** 5754:25
5759:6,9

**NN** 5781:20
5782:2 5805:8,10
5830:16 5831:10,
11 5891:23

**NNC** 5761:17
5861:5 5890:16

**NNI** 5761:17
5763:5 5764:24,
25 5765:4,7,14,
15,17,20,22
5766:6 5767:1
5794:20 5799:2,8,
15,23 5800:1,4
5801:11,20
5802:4,11,13,15,
19 5803:10,15,18,
22 5804:1
5812:21 5820:16
5836:1 5861:6,22
5880:3 5883:12
5884:9,23,24
5885:1,4,11
5890:16 5891:23

**NNI'S** 5795:10
5880:4

**NNL** 5761:17
5765:2,7,14,19
5766:3 5767:7
5777:1,6,14
5778:7,8,15,25
5779:1,8,21
5786:15 5788:8,9
5794:1 5795:10
5799:1,7,12,18,
19,23 5801:21
5802:7,10,13,16
5812:7,20
5815:10,13
5829:20 5830:3
5838:13 5844:14,
15 5846:9
5848:19 5861:4,

21 5879:12,20
5880:6 5881:20
5883:8,11 5884:7,
19,20,23 5885:10
5887:14 5890:16

**NNUK** 5766:1
5779:20 5858:11
5861:6,23 5885:4
5890:17 5891:23

**NNUK'S**
5795:11

**non-registered**
5818:24

**nonconsensual**
5763:25

**nonsense**
5817:22

**nontransferability**
5886:25
5887:1

**Nortel** 5780:16
5781:5,9,17
5807:25 5815:13
5816:15 5831:25
5834:16 5837:2
5839:20 5843:6
5853:21 5856:7,
5857:24 5858:2,6
5865:23 5867:8,
10,12,18 5871:23
5879:18 5881:22
5882:1,18 5883:3,
7,13 5884:11
5885:7

**Nortel's** 5780:13
5834:16 5835:18

**North** 5890:17

**note** 5758:1
5765:5 5819:17
5878:9,20
5879:15 5881:12
5886:23

**notebooks**
5840:5

**noted** 5789:12

**noteholders**
5822:7

**notes** 5767:22

5833:13

**noticed** 5758:1
5774:23,25

**noting** 5789:14

**notwithstanding** 5892:14

**nourished**
5837:22

**November**
5757:3,17
5759:20

**NTI** 5882:9

**NTL** 5882:9

**number** 5773:21
5792:4 5799:5
5802:2,3 5803:9
5809:22 5814:2
5816:1 5823:11,
17 5834:5 5841:9
5872:16 5873:18

**numbers**
5790:1 5792:24
5821:18 5822:12,
5823:16 5824:1,
10,19,20,25
5826:6 5841:2

**numerous**
5790:22

---

**O**

**O'connor**
5863:3

**objective**
5814:16,21
5857:10

**objectives**
5787:14

**obligation**
5784:21 5812:11
5857:25 5885:16

**obligations**
5796:11 5797:10
5808:5 5858:1,2

**obligor** 5770:9

**observation**

5762:19 5833:14

**observations**
5762:6

**obtain** 5765:2

**obtained**
5855:23

**obvious**
5766:13 5825:6

**occasional**
5787:22

**occurred**
5854:24 5859:1

**OECD** 5851:21

**offending**
5898:11

**office** 5844:24
5868:10

**official** 5767:23
5897:15,21

**officially**
5897:22

**Ontario** 5764:16
5766:13 5767:9
5785:2 5817:5,17,
18 5870:1,9,10,
24,25

**onus** 5856:12

**opening** 5768:9
5782:18

**operate** 5791:20
5808:24 5809:2

**operated**
5806:19 5887:25

**operating**
5782:20 5783:9,
10 5788:14
5791:2 5808:20
5810:13 5839:7
5871:14

**operation**
5844:3,11

**operations**
5784:1 5808:7

**opinion** 5755:2
5819:18 5820:3,
11,24 5886:22

5898:1

**opinions**
5893:12 5896:18,
24

**opportunism**
5860:17

**opportunity**
5756:12 5758:2
5788:14 5860:16
5861:12

**opposing**
5856:17

**oppression**
5785:3

**oppressive**
5785:3,11

**order** 5754:21,24
5810:5,7,21,23,24
5811:3 5836:13
5844:19 5857:5
5888:12

**organization**
5780:21 5837:5
5857:2

**original** 5786:11
5789:24 5792:25

**originally**
5757:6 5781:2
5786:17

**Ottawa** 5840:3

**outcome**
5820:21 5825:5

**outcomes**
5821:1 5828:7

**outset** 5862:6

**overblown**
5855:16

**override** 5833:4

**overwhelmed**
5898:4

**owed** 5818:3,4,5

**Owens** 5852:23
5855:4 5856:13,
21 5858:20,22

**owned** 5782:9
5784:13,22,24

5850:2,4 5892:2

**owner** 5799:7
5820:14 5832:15
5838:6 5843:2
5881:4

**ownership**
5774:1,17
5775:14 5776:12
5777:14 5778:22
5779:3,7 5780:15
5781:13,20,21
5782:1,4 5784:5
5785:4 5786:1
5787:12 5791:15
5796:8 5797:13,
16 5798:8
5816:17 5821:12
5830:8,11,16,23
5831:9 5832:3,6,
8,12,13,16
5834:12 5837:18
5838:6,20
5846:19,20
5847:6,16,20,23
5848:2,14,21
5849:4

**owning** 5776:21
5795:24 5801:11

**owns** 5784:16
5831:20 5849:19
5882:9

---

**P**

---

**p.m.** 5901:9

**package** 5779:6

**pages** 5778:18
5814:2 5865:10

**paid** 5808:12
5817:2 5818:3
5819:2,4 5836:17
5837:11 5866:10

**paid-up** 5875:12

**paper** 5784:17

**papers** 5756:10

**paragraph**
5778:5,8,16
5780:12,16,23,24
5781:2,16 5785:1

5786:13 5799:4,6,
9,10, 5807:14
5853:12 5882:2
5890:14 5895:12

**paragraphs**
5804:22 5805:2
5827:1,9 5853:11

**paraphrase**
5882:7

**parent** 5803:18,
19 5836:7
5840:20 5882:13

**pari** 5860:22

**parol** 5785:13

**parsing** 5873:18

**part** 5755:7
5792:14 5805:4
5818:10 5846:5,
10 5858:2,8
5860:17 5867:16

**participant**
5779:13 5843:21,
25 5844:2,13,15
5846:7

**participants**
5758:15 5760:12
5776:25 5777:5
5780:14 5830:16,
23 5845:9
5863:23 5872:13

**participants'**
5830:8

**participate**
5758:3, 5760:11
5881:6

**participated**
5809:16

**participating**
5809:18

**parties** 5754:25
5758:24 5764:2
5765:6 5785:9
5788:23 5791:15
5799:3,4 5822:6
5836:14 5849:24
5851:14,17,
5854:25 5859:2
5861:15 5875:22,
23 5890:15

5892:20 5897:5

**parties'** 5782:22
5788:13 5893:17
5895:5

**partly** 5818:3

**parts** 5791:11
5796:14

**party** 5763:7
5767:22 5807:18,
20 5814:21
5831:12 5851:25
5872:21 5875:4,6
5879:20 5883:6

**passed** 5813:22

**passing**
5813:23

**passu** 5860:23

**past** 5891:20

**patent** 5771:13
5778:4 5799:5
5808:17 5819:1
5832:16 5838:7
5840:11 5842:16
5843:25 5844:24
5865:23 5866:17
5868:15 5876:7
5877:2,5 5881:1,
4,23 5882:1,14
5888:19 5891:1,2

**patentee**
5881:14

**patents** 5782:25
5791:18 5799:8,
13,24 5800:3
5804:13,17
5811:6,8 5831:22
5839:14 5844:19,
20,21 5865:2,5,22
5866:1,7,10,12,
18,23 5867:6,11,
12,13,15,25
5868:8,14 5882:6,
9 5891:13,17

**patience**
5829:12,15
5898:6

**patient** 5839:9

**pattern** 5858:9

**Patterson**
5767:19

**pay** 5807:20
5808:19 5812:7,
14 5819:1 5826:2
5836:8,9 5838:25
5839:9 5885:16,
24

**paying** 5835:21
5836:7 5839:8,12
5842:1 5871:6
5877:23 5878:16

**payment**
5785:19 5812:16

**payments**
5833:25 5834:2,
10 5835:6

**payor** 5837:19

**pays** 5837:19
5839:5

**PBGC** 5824:14

**pension** 5817:3,
4,25 5818:7,21
5822:7 5823:1,7,
18 5852:13,16
5858:1,4

**pensioners**
5762:21,22
5817:16

**pensions**
5817:10,19,23
5818:25

**people** 5759:5
5761:1 5785:18
5787:22 5793:16
5810:13 5817:22
5819:3 5837:20
5841:12 5842:7
5868:13 5883:9
5894:2 5895:1

**people's**
5840:19 5877:6

**percent** 5765:16
5793:6,7,22,24
5794:2 5806:9
5815:2,5 5817:4,
6,16 5818:4
5823:20 5827:18,
21 5865:15

5867:11 5877:14,
15,16 5885:21
5897:17

**percent-plus**
5877:16

**percentage**
5763:11 5765:20
5827:19 5868:24

**percentages**
5762:12 5793:4,
22 5825:1 5826:8,
9

**perfect** 5771:1
5772:14 5777:1
5846:12 5853:25

**performed**
5833:9

**performing**
5835:19 5836:7
5839:2,12

**performs**
5839:4

**period** 5791:25
5792:9 5793:1
5868:7 5878:16,
19,22

**periods** 5835:11
5841:4,6

**permanence**
5783:24

**permanent**
5872:11

**permits** 5853:8

**person** 5758:6,
16,17 5807:25
5845:5,7

**perspective**
5755:14,23
5756:9,14 5758:4
5896:5

**pertain** 5818:24

**pertinent**
5872:10

**phenomenal**
5900:20

**phone** 5754:25
5758:3

 

**phrase** 5884:23

**phraseology** 5871:14

**phrasing** 5871:13

**pick** 5754:14 5786:23 5838:14 5845:23

**picked** 5840:17

**picking** 5898:19 5899:16,18

**picture** 5822:1

**piece** 5784:17 5814:6 5821:12 5836:2 5892:24 5899:18

**pieces** 5850:6

**place** 5778:9 5787:18 5796:15 5797:22 5810:6 5811:4 5840:10 5856:6

**places** 5837:6

**plainer** 5795:17

**plaintiff** 5879:13 5882:4,19

**plaintiffs** 5880:24 5882:14, 16

**plan** 5762:1 5764:8 5858:4,12

**plans** 5756:3 5759:4 5764:9 5852:16

**play** 5754:14 5833:11 5834:9

**played** 5833:7

**playing** 5841:1

**pleading** 5880:3

**pleasure** 5828:10

**pledge** 5842:24

**podium** 5756:20 5772:8

**point** 5757:25 5765:8 5768:15 5770:13,16,17,18, 24 5775:5 5776:20,22 5777:21 5778:20, 21 5780:2,7 5782:6 5783:3,6,8 5785:15,20 5788:25 5795:7,8, 14 5797:5 5798:24 5804:23 5808:14,17 5814:13 5815:5, 21 5816:4 5819:14 5825:22 5826:17 5827:11 5828:3 5829:16 5834:4 5841:23 5846:3,16,23 5847:7 5848:24 5849:9,10,11,16 5850:12,18,20,25 5852:13 5860:25 5865:8 5866:15 5867:18 5868:16 5875:1 5877:9 5878:14 5879:10 5882:3 5886:2 5890:22 5892:23 5895:2

**pointed** 5787:17 5795:19 5803:14

**pointing** 5850:13

**points** 5768:12 5788:3 5795:18 5805:22 5810:3 5845:24 5847:1 5848:20 5849:2 5852:9 5865:13, 20

**policies** 5844:22

**policy** 5780:13 5871:7,11

**political** 5815:23

**politically** 5763:19

**pool** 5853:9 5861:23 5862:1,8 5885:18

**pools** 5856:4 5861:2

**popular** 5763:19

**portfolio** 5811:9 5865:23 5866:11 5867:17 5888:19 5891:2,3

**position** 5773:18 5790:9, 11,12 5795:2 5800:9 5801:20 5802:6,23 5803:15 5814:22 5821:9,11 5826:7 5845:9 5862:21 5879:14 5897:2

**positions** 5768:11 5852:25 5857:20 5895:5

**positive** 5857:9

**possibly** 5760:4 5801:21

**post-filing** 5827:18

**post-petition** 5825:11 5826:2

**post-trial** 5841:12

**potential** 5762:12 5766:2,5

**power** 5779:19 5875:22

**powerhouse** 5842:17

**powers** 5854:8, 10

**PPAS** 5814:16

**PPF** 5852:13

**practice** 5778:9 5791:8,11,12,22 5792:2,13,14,17 5793:3,9 5794:4 5831:16,17,24 5832:22 5833:4 5834:16 5835:19 5843:5,6

**practitioners** 5768:21

**pre-existed** 5798:11

**pre-filing** 5857:10,11

**pre-insolvency** 5856:1

**precedent** 5769:2

**precise** 5798:9

**precisely** 5808:6

**predictable** 5768:23

**predominant** 5847:22

**prefer** 5840:1

**premise** 5860:9, 22 5864:21

**prepared** 5849:5

**present** 5757:14,16 5758:12 5760:3 5891:20

**presented** 5809:21 5810:24 5813:5 5835:2

**preserved** 5890:5

**pressure-tested** 5863:21

**presume** 5767:10

**presuppose** 5812:9

**pretend** 5858:22

**pretty** 5822:4 5882:19 5899:17, 18,22

**previously** 5781:14

**price** 5761:14 5814:17

**pricing** 5780:13 5795:21 5796:8 5833:25 5834:9 5835:6 5855:23 5872:3,4,11 5874:10,12,25

**prima** 5856:15 5857:3

**primarily** 5761:18

**primary** 5758:15 5770:9

**principal** 5784:16,21 5785:4

**principle** 5796:19 5798:15 5851:9,22 5860:4, 13 5872:19

**principles** 5861:13 5872:5

**private** 5852:16

**privilege** 5869:13

**privileges** 5830:20

**prize-winning** 5813:21

**pro** 5762:7,10 5763:22 5765:9 5770:17 5771:2, 24 5772:2 5816:18 5820:7 5826:22,25 5827:23 5852:2 5854:23 5855:18, 20,25 5856:11 5857:18 5858:14, 15,18,19 5859:14 5860:21,22 5863:1

**problem** 5788:4 5833:10 5835:15 5877:7 5895:3

**problems** 5828:15 5835:25 5838:16,17 5865:19 5866:2 5896:13

 

**procedural**
5754:15,17
5755:7 5895:18
5896:5

**proceed**
5754:16 5755:3
5756:17

**proceedings**
5757:7 5860:15

**proceeds**
5787:20 5869:4
5861:18 5862:8
5889:11,12,22,23,
25

**process** 5777:9
5778:4 5796:16
5832:5 5834:21
5839:18 5842:10
5855:16 5858:24
5859:4 5867:14

**produce** 5826:1

**product** 5802:20
5805:12

**products**
5796:3, 5797:10,
17,25 5798:4
5804:12 5805:5,6,
10,17 5885:7

**professional**
5820:24

**professionalis
m** 5898:7

**Professor**
5853:18 5875:8

**profit** 5781:5

**profitable**
5788:16

**profits** 5788:15
5851:13

**profoundly**
5802:9 5855:13

**projections**
5864:1,9,22
5868:2

**proof** 5856:13

**properly**
5794:23 5831:5

**property**
5774:17 5786:14
5815:3,9,11
5844:21 5845:10
5868:9 5886:1

**proposal**
5771:3

**proposed**
5786:7 5833:19
5872:21

**proposition**
5784:3 5809:12
5843:3

**protect** 5844:21

**protected**
5845:11

**protection**
5852:13 5871:3

**protocol**
5893:15 5894:11,
23 5895:11,21
5897:3,11

**prove** 5856:18
5857:4

**provide** 5755:20
5778:12

**provided**
5788:11 5856:2,4
5857:9 5883:25

**provision**
5831:19 5854:7,
16 5890:2
5892:17

**provisions**
5783:23 5831:7
5853:4 5860:1
5862:4 5882:11
5889:7,9

**proxy** 5840:9

**prudential**
5881:16

**public** 5871:7,11

**pull** 5792:11
5839:18 5889:1

**pull-out** 5814:10

**purchase**
5814:17 5891:9

**purchasers**
5806:25 5810:13

**purpose**
5789:17 5844:12
5850:21

**purposes**
5787:3 5793:2
5795:21 5796:8
5819:13 5874:10,
5889:12 5895:15

**pursuant**
5891:24

**pushes** 5770:24

**put** 5769:8,12
5771:25 5773:12
5801:4 5813:24
5821:3,14
5823:15 5824:3,5,
9 5827:12
5833:16 5836:13
5845:5 5846:22
5857:21 5863:13
5866:24 5873:16
5885:23 5887:11
5889:17 5894:1
5895:7 5900:1,5,
12

**putting** 5867:3
5900:11

**Q**

**qualify** 5872:4

**question**
5754:17 5759:19
5766:12 5767:7
5790:18 5791:5
5796:21 5807:4
5811:23,24
5812:5 5824:23
5825:9 5826:21
5827:6 5829:25
5830:10 5832:7,
12 5843:14
5845:12 5846:2
5849:20 5853:14
5859:17 5869:21
5873:6 5874:10
5877:5 5893:8,24
5895:12 5897:16

**questioned**
5770:15 5796:16

**questioning**
5825:14 5887:3

**questions**
5772:7 5811:20
5812:9 5825:25
5828:9 5837:13,
14 5852:4
5859:15 5862:18
5863:14 5869:4
5870:3 5884:4,5

**quibbled**
5877:19

**quick** 5756:18
5766:12 5852:13
5891:11

**quickly** 5755:17
5773:6 5777:20
5798:24 5847:4
5876:18 5889:2
5890:8 5897:7,8
5898:19 5899:14

**quote** 5887:11
5894:15 5895:20

**Qureshi**
5761:21 5764:17
5771:23 5826:16
5827:11 5852:18
5855:3 5859:17

**R**

**R&d** 5782:24
5788:13 5791:22
5806:6,8 5834:17
5836:16 5840:1
5842:21 5885:24,
25

**raise** 5756:11
5757:1 5770:16
5815:21 5845:24
5877:9 5890:22
5895:4

**raised** 5853:14
5869:23 5879:7
5883:19 5894:22

**raising** 5757:21

**range** 5774:4

**rata** 5762:7,10
5763:22 5765:9
5770:17 5816:18
5820:7 5826:22,
25 5827:23
5852:21,22
5853:24 5854:23
5855:18,20
5856:1,11
5857:18 5858:14,
15,18,19 5859:14
5860:21,22
5863:1

**rata/
substantive**
5771:2,24 5772:2

**rates** 5809:21

**ratings** 5857:11

**rational** 5788:18
5872:7

**rationality**
5788:1

**Ray** 5758:17
5822:16,18
5824:15

**reach** 5810:19,
20

**react** 5854:1

**read** 5774:20
5846:4 5847:17
5848:15 5850:9
5854:1 5873:16,
24 5874:2,3
5876:4,5 5894:10

**reading** 5816:11
5850:13 5872:8
5899:17

**real** 5814:20
5818:8 5819:3,15
5821:25 5855:10

**realities** 5770:3

**reality** 5814:15
5815:17 5821:5,6
5825:4 5871:22
5872:1,2 5873:5

**realized** 5832:19

**reallocated**
5835:8

**reallocating**
5834:21 5842:1

**reallocation**
5835:10

**reallocations**
5838:13 5843:9

**reason** 5758:23
5762:25 5763:3
5814:18 5821:2,3,
14 5823:8
5855:14 5877:1
5882:18 5883:3
5892:17

**reasons**
5768:21 5769:14,
15 5782:8
5806:12 5849:21
5864:18 5872:9,
12

**reassurance**
5858:9

**rebuttal**
5755:13,16,21
5756:6,14 5773:2
5777:25 5805:2
5869:16,22,23

**recall** 5765:1
5803:8 5839:25
5841:3 5842:14
5854:18 5864:17
5887:11 5894:12

**receive** 5860:7

**received**
5757:10 5764:25
5768:2 5858:16
5886:3

**receivership**
5854:16

**receiving**
5762:13,14,22
5764:23 5766:1

**recess** 5828:19
5901:5

**RECESSED**
5828:22

**recital** 5780:24
5783:21,22
5848:18

**recitation**
5876:7

**recitations**
5876:3

**reciting** 5799:10

**recognition**
5863:9

**recognize**
5806:4 5827:22
5841:24 5842:2

**recognized**
5828:2 5835:19
5843:7 5857:25
5881:22

**recognizes**
5827:12 5830:8
5835:18 5838:22

**recognizing**
5827:13

**record** 5802:1
5803:11,13
5818:19 5825:20
5866:16 5867:10
5871:21 5879:17
5881:21 5895:5

**records** 5791:17

**recover** 5817:7
5860:18,21
5877:14 5891:19

**recoveries**
5763:1 5877:12

**recovery**
5762:12 5763:11
5765:17 5766:5,6
5817:8,11
5818:12 5819:8
5877:16

**redder** 5798:13

**reduced**
5817:10

**reduction**
5766:5,6

**redundant**
5876:7

**refer** 5811:22
5813:18 5853:19
5856:20 5860:3

**reference**
5780:17 5781:8
5784:6,25 5786:6
5826:19 5853:13
5862:3

**references**
5831:4

**referred**
5776:20 5780:3
5783:20 5784:7
5785:17 5823:5
5830:11 5831:5,
13 5846:3
5877:19

**referring** 5814:1
5846:14,15
5886:18

**refers** 5848:1,18

**reflect** 5770:2,3

**reflected**
5857:24 5860:1,2
5871:23

**reflection**
5862:5

**reflective**
5806:11

**reflects** 5854:9

**reformulating**
5791:4

**regard** 5759:19

**regimes**
5762:23

**register** 5844:20

**registration**
5778:5 5844:18

**registry** 5844:23

**regular** 5867:13

**Reichert**
5788:17 5796:18
5873:4, 5874:7

**Reichert's**
5796:6

**reimbursed**
5840:18

**reimbursemen
t** 5834:14

**reimbursing**
5841:20

**reinforces**
5777:14

**reject** 5844:25

**rejected** 5772:2
5806:15

**relate** 5790:1

**related** 5757:7

**relates** 5765:9
5886:16 5888:5

**relation**
5781:23,24

**relations**
5789:2,5,14

**relevant**
5794:15 5855:5

**reliable** 5841:16

**reliance**
5811:16 5856:18,
25 5857:4

**relied** 5773:14

**relies** 5793:12
5863:18 5865:3
5868:18

**rely** 5841:16
5854:14 5856:22

**relying** 5765:5
5779:17

**remaining**
5877:24 5879:6

**remarkable**
5755:5

**remarks** 5768:8
5772:4,6

**remedy** 5785:3

**remember**
5875:11,21
5888:20

**remind** 5854:22
5876:2

**reimbursemen
t** 5834:14

**renegotiate**
5788:21

**reorganization**
5764:8,9

**repaid** 5770:7

**repeat** 5764:19
5775:23 5827:5,8

**repeated**
5807:13 5887:2

**repeating**
5762:1 5850:8

**repetitive**
5847:2

**reply** 5853:12
5879:2,23 5880:1,
3

**report** 5795:23,
24 5797:6
5821:19 5835:2,4
5841:14,16
5847:5 5876:24,
25 5878:10,11
5887:8

**reporter**
5828:14

**reporters**
5900:20,25

**reports** 5769:9,
17 5771:9 5823:5

**represent**
5767:20 5861:21,
22

**representation**
5884:7

**representation
s** 5784:23
5881:10 5884:16

**representative**
5760:15

**representative
s** 5759:23

**represented**
5784:13 5785:7

**representing**
5800:16,17,19,21

**reproduced** 5773:16 5778:5, 18 5786:4 5811:19

**Republic** 5850:3 5877:6

**repudiation** 5786:22

**request** 5855:20

**requested** 5844:14 5846:9 5855:22 5857:6

**require** 5791:10 5812:1 5854:11

**required** 5776:24 5777:21 5812:3

**requirements** 5764:15

**requires** 5808:23

**requiring** 5855:24

**research** 5786:18 5835:8, 19 5836:5,8,11 5838:9,15 5839:22 5841:5 5842:21 5865:3,4

**reservation** 5779:8 5829:19

**reserve** 5779:3

**resides** 5832:17

**residual** 5808:16 5823:13

**resolve** 5801:19

**resolved** 5776:6

**resolves** 5801:22

**respect** 5754:16 5761:15 5765:9 5768:21 5769:1, 23 5796:19 5808:16 5814:5 5818:1 5821:18, 21 5826:16 5841:14,17,18

5843:5 5848:9,12 5849:14 5850:24 5851:4,20 5852:18 5853:13 5858:3 5859:14 5860:8 5862:2,11 5864:5 5866:22 5867:2 5870:12, 21 5871:10 5875:13 5876:1 5877:2,9 5878:15 5887:13,15 5889:19 5893:18

**respected** 5768:17 5771:22

**respectful** 5849:7 5861:9,14

**respectfully** 5831:18 5833:6

**respective** 5895:17

**respond** 5853:1, 20

**response** 5773:9 5776:23 5807:22 5815:23 5825:25 5846:17 5852:9,12 5858:11 5884:4

**responsibility** 5813:3

**restricted** 5846:21

**restriction** 5797:17

**restructuring** 5858:21

**result** 5792:17 5810:20,21,25 5894:15

**results** 5789:15, 18,23 5790:3, 5792:4 5840:13 5841:2

**RESUMING** 5828:23

**retained** 5776:13 5830:9

**retains** 5776:12

**return** 5874:17 5885:21 5886:3

**returns** 5874:16, 19

**revenue** 5805:25 5806:7, 11,12 5836:3 5863:9 5867:23 5868:1,17,24 5883:16 5884:5,8, 9 5885:17

**revenues** 5808:10 5864:2 5865:15 5868:18

**reversal** 5863:5

**reversed** 5792:25 5859:5

**reversion** 5882:12

**revert** 5831:16 5858:24

**reviewed** 5788:3

**revised** 5792:24

**revoir** 5900:17, 19

**rewarded** 5830:19

**rewrite** 5788:22

**Richardson** 5840:4,23

**Riela** 5761:9,12, 14 5762:5 5766:11,15,20,25 5767:4,5,10,14,15 5769:22 5770:6

**rights** 5763:9,16 5782:25 5783:1, 15,25 5786:15 5787:12 5789:8 5790:14 5794:15, 16,20,22,23,25 5795:6,11,12,16 5796:1,7 5797:24 5799:21 5800:3 5801:10,21 5802:11,14,17

5803:21,22 5804:13,16 5806:18 5807:12, 21,25 5810:9,15 5829:19 5844:23 5856:2 5872:13 5873:10,12 5875:5 5876:7 5877:3,5 5881:11 5882:5 5883:12, 13 5884:25 5887:13 5888:21, 23,24 5890:5

**rise** 5761:18 5832:5 5857:3

**rising** 5796:25

**risk** 5781:17 5896:1,3 5898:10

**risks** 5780:4,5 5781:18 5865:1

**robust** 5868:15

**rock** 5864:7

**rocks** 5854:4

**Rockstar** 5809:12 5810:7, 11 5811:4,8 5812:14 5864:13 5866:9,10 5888:21 5890:11

**room** 5825:11 5827:13 5839:7,8

**Rosenthal** 5895:9 5901:6

**Rosh** 5899:8

**routine** 5874:16, 17,19

**RPES** 5851:11, 12

**RPSM** 5781:4 5793:3,21 5797:11 5808:5 5878:19 5885:18 5886:11 5888:1

**rule** 5859:18 5861:14 5896:7

**rules** 5785:12

**rulings** 5895:15, 17 5896:1

**run** 5809:25 5848:8 5871:3 5898:15

**runs** 5858:13

**Ryan** 5835:3,23 5836:4 5838:24 5841:22 5842:6 5878:17,18

**Ryan's** 5841:14

_____

**S**

**safely** 5901:4

**sail** 5853:25 5854:4

**sake** 5893:16

**salaries** 5839:6

**salary** 5843:7

**sale** 5789:1 5793:20 5794:1 5807:4 5808:17 5812:20 5851:2,7, 18 5859:3 5863:11 5888:22 5889:11,23,25 5890:4,11,12 5891:1,9

**sales** 5787:19 5790:7,19 5793:13 5806:1 5809:11 5810:6,7, 22,23 5811:4 5814:17 5832:20 5861:19

**sample** 5777:9 5778:17

**sat** 5770:14

**satisfy** 5803:22 5875:3 5881:16 5886:5

**save** 5773:7

**scared** 5787:9

**scenario** 5807:10 5812:24

**scenarios** 5810:1

**Schedule** 5780:3,10 5781:1 5830:7,12

**scheme** 5877:20

**school** 5893:22

**Schweitzer** 5825:23

**scope** 5796:3 5797:9 5807:11 5810:15

**screen** 5879:25 5880:13 5887:12

**seamlessly** 5898:15

**searched** 5807:8

**seas** 5854:2

**seated** 5754:3 5828:25

**second-guessing** 5867:1

**second-largest** 5858:6

**second-last** 5783:21,22

**section** 5871:3 5875:19 5889:5,7, 9,12 5895:10

**Sections** 5889:14,16

**seek** 5795:10

**seeks** 5795:11

**selection** 5863:5

**sell** 5790:10 5804:12 5812:18 5888:24 5891:14

**seller** 5889:22 5890:7 5891:1,14 5892:15

**sellers** 5890:17 5891:2,3,13

**selling** 5889:10, 21,23 5891:13

**semantics** 5877:20

**sense** 5787:6 5795:4 5823:18 5877:11 5896:10

**sentence** 5781:3 5886:12

**separate** 5759:23 5780:18, 19 5788:24 5789:2 5800:3 5802:15 5831:5 5858:25 5867:4 5884:12,13 5887:8

**separately** 5789:13

**separately-owned** 5781:10

**separateness** 5765:6 5780:9 5781:10 5855:8 5856:16,19 5857:5 5859:8

**served** 5815:13

**service** 5805:13, 15,16,20 5836:3 5884:5,8

**services** 5805:1,4,6 5827:4

**set** 5757:2 5782:5 5785:10 5791:6 5828:4 5830:14 5831:15 5844:22 5877:21 5896:13

**sets** 5801:10 5831:20 5861:3

**settlement** 5757:12 5825:19 5826:4 5858:17 5887:19,20 5891:4

**settling** 5791:25

**Seventh** 5775:8 5846:25 5847:9, 25

**severance** 5819:1

**shalom** 5899:10

**share** 5788:14 5797:11 5851:12, 25

**shareholders** 5836:23

**sharing** 5791:14 5808:5 5809:25

**sheet** 5878:4

**shifts** 5856:17

**short-form** 5805:3

**short-forming** 5804:13

**shortfall** 5817:25 5818:7 5823:1

**shorthand** 5832:22

**show** 5845:7 5864:12,16 5865:9

**showed** 5803:3 5834:7 5839:17 5868:23

**showing** 5856:9 5867:6 5868:10

**shown** 5803:2 5829:13

**shows** 5786:22 5869:1 5884:7

**sides** 5854:12

**sift** 5769:6

**sign** 5779:20

**signatures** 5845:1

**signed** 5849:24 5888:9

**significance** 5829:24

**significant** 5856:15 5864:3,8

**significantly** 5852:1

**signify** 5775:15 5848:3

**similar** 5790:3 5861:8 5886:10

**similarly** 5781:20 5856:12

**Simon** 5832:17 5834:18 5838:8 5840:24 5841:6

**simple** 5770:1,5 5882:20

**simply** 5756:25 5763:16 5776:9, 17 5791:6 5799:20 5804:3 5805:18 5806:1 5826:13 5835:21 5837:11 5850:12 5868:6 5878:20 5879:13 5886:2 5892:20

**Singapore** 5823:4

**single** 5793:20 5853:9 5859:4,19 5860:3 5885:8 5888:9,10 5892:2, 23

**sink** 5854:1

**sir** 5756:22 5828:12

**Sistem** 5785:15 5849:11,19 5850:3

**sitting** 5871:9 5895:22

**situation** 5831:15 5871:5

**sizable** 5825:8

**size** 5822:13

**skewed** 5833:2

**skills** 5898:5

**skip** 5823:6

**slide** 5865:10 5868:5 5876:24

**slides** 5813:22 5849:5 5852:10

**slightly** 5791:4

**slip** 5831:2

**small** 5805:6,11 5815:14 5817:17 5819:5

**smaller** 5827:19

**so-called** 5818:11

**software** 5805:6,12

**sold** 5788:9 5855:13 5868:22 5891:18

**sole** 5802:4 5884:19

**solution** 5825:24

**solvency** 5838:17

**solvent** 5826:1

**someplace** 5760:22

**sort** 5814:9 5815:1 5820:12 5836:15

**sought** 5764:25 5805:24

**sound** 5899:22

**sounds** 5899:17,18 5900:6

**source** 5793:17

**sources** 5821:21 5822:11

**space** 5758:13 5761:1

**Sparagna** 5871:25

**speak** 5755:12 5770:18,22

 

5801:2 5842:9
5862:20 5871:6

**speaking**
5795:25

**speaks** 5832:13

**special** 5816:14

**specific** 5773:3
5854:7 5879:21
5880:2

**specifically**
5830:7 5831:2
5832:16 5839:24
5846:14,15
5853:17 5856:6

**speech** 5815:23

**spend** 5758:25
5826:20 5834:17
5839:6 5840:2
5843:7

**spending**
5791:22

**spent** 5791:17
5830:15 5831:7
5837:2 5843:9

**spoke** 5797:6
5827:7 5833:15

**spoken** 5896:9

**spot** 5769:25
5894:2 5895:8

**spread** 5857:11

**Sproule** 5817:24
5818:16

**Sproule's**
5817:3 5822:23,
24

**square** 5884:15

**squeeze** 5890:4

**staff** 5898:13
5900:19 5901:1

**stand** 5835:24
5861:4,5,6
5892:25 5901:4

**standard**
5778:17 5866:6
5875:3,7,21
5886:6

**standing**
5772:22 5779:25
5881:1,16
5882:21

**standpoint**
5795:25

**stands** 5769:10
5900:4

**start** 5758:22
5759:2,5,13
5792:11,12
5798:23 5829:10,
16 5836:14
5846:1 5860:9,
5867:22 5869:2

**started** 5797:12
5798:13 5869:22

**starter** 5776:17

**starts** 5756:1
5864:21 5880:20

**state** 5868:9
5871:11

**statement**
5764:4 5766:21
5774:9 5786:11
5799:3 5800:6,25
5873:8 5880:2,10

**statements**
5821:24 5856:22
5892:14 5895:21

**States** 5798:18
5799:22 5801:11,
20 5802:5,9,16
5825:8 5870:17,
19 5871:2,8
5879:12,17
5880:8 5885:10

**statistics**
5868:9

**statute** 5852:14

**statutory**
5769:1 5774:22
5785:2 5853:4
5854:7

**stay** 5756:4

**steady** 5868:24

**steeling** 5787:6

**step** 5831:17
5832:2

**Stephens'**
5854:18

**stepping**
5841:25

**steps** 5776:25
5820:17

**stick** 5859:24

**stop** 5821:22

**storm** 5771:1
5772:14,15
5853:25

**strength**
5858:10

**stretch** 5779:24
5815:7

**strict** 5774:12

**strings** 5792:11,
12

**strong** 5827:15

**structural**
5764:6 5771:21

**structure**
5775:25 5776:10
5782:5 5890:4

**stuff** 5775:2
5841:10 5875:3

**style** 5813:7

**subcon** 5764:3

**subject** 5782:14,
17 5783:11,12
5828:9 5852:4
5854:25 5859:14
5863:5 5869:3

**sublicense**
5802:1 5803:16

**sublicensee**
5803:22

**sublicenses**
5801:25

**submission**
5763:14 5765:10
5766:8 5775:20
5776:15 5777:13

5779:6,23 5780:8
5782:11 5786:21
5788:18 5789:12
5790:3 5791:9
5792:16 5794:7
5795:4 5798:12
5806:1 5808:2,12,
23 5809:11
5811:10 5812:23
5816:2,12,18
5826:24 5849:7
5852:19 5854:11
5861:9,14

**submissions**
5761:19,21,25
5768:10 5773:3,
11,12 5775:22
5787:2 5798:17
5825:15 5853:19
5859:14 5892:10
5893:2 5894:25
5895:1 5897:5

**submit** 5769:5
5771:4 5821:3
5832:10,13
5853:2 5857:6
5860:4 5861:24
5864:5 5877:6

**submits** 5853:7

**submitted**
5769:18 5771:9
5853:5 5857:17

**subordination**
5771:21

**subsequent**
5827:9

**subsidiaries**
5802:8 5858:1
5883:8 5884:21

**subsidiary**
5778:7 5850:3
5883:7

**substance**
5783:13,20
5873:5 5888:15,
16 5889:19
5892:8

**substantial**
5781:19 5877:4
5881:11 5884:22
5894:21

**substantially**
5882:5

**substantive**
5763:25 5764:1,5,
13,15,21 5766:17
5767:1,8 5770:17
5826:23 5854:12
5855:21 5869:25
5870:1

**substituting**
5866:20

**subsumed**
5858:15

**subtle** 5878:8

**sue** 5798:17,18
5881:2,3,11,19
5882:6 5891:19

**suffer** 5817:23

**suffice** 5795:22
5874:9,11

**sufficient**
5758:4 5871:3

**suggested**
5782:7 5783:2
5810:4 5832:23
5853:2 5855:18

**suggesting**
5776:2 5821:16
5833:24 5874:4

**suggestion**
5810:22 5814:23
5817:2,20
5821:10

**suggests**
5874:1

**suit** 5881:5,7

**suits** 5881:2

**summarily**
5763:15

**summary**
5780:13

**support** 5761:18
5764:3 5766:1
5768:10 5770:9
5802:23 5821:17
5822:11,24
5824:9 5855:16

neesons
WILSON & FIZZER LTD.
www.neesonsreporting.com
www.wilfet.com

5886:22

**supporting**
5763:22

**supportive**
5800:10

**supports**
5770:24

**supposed**
5780:12 5885:11
5890:1

**Supreme**
5788:22

**surgeon** 5839:6

**surgeons**
5839:4

**surgery** 5839:3,
4,5,12

**surprises**
5755:3

**surprisingly**
5898:16

**surrender**
5888:22

**surrendered**
5806:25 5807:3
5888:20,23

**survived**
5867:13,15

**swept** 5801:16

**synonymous**
5847:6

**system** 5868:15
5877:21,22
5885:24 5888:3

——————

**T**

——————

**tab** 5773:16
5777:7,22,23
5784:8 5786:5,10
5789:17,21,22
5792:5,21
5793:10 5798:23
5800:12,13
5801:25 5807:13
5809:22,23
5811:18 5838:14

5840:17

**Table** 5876:24

**tags** 5796:22
5798:7

**takes** 5771:20
5791:13 5827:19
5865:16 5868:25
5873:9

**taking** 5763:16
5777:18 5782:4
5792:14 5806:8
5810:22 5813:2
5821:8,11
5826:20 5864:24
5879:15

**talk** 5797:12
5807:1 5814:6
5851:2 5862:25
5879:5 5886:15

**talked** 5756:9
5795:24 5821:4
5824:15 5832:21
5838:25 5839:3
5871:12 5879:25
5888:4

**talking** 5758:8
5764:10 5787:20,
23 5796:2
5797:13 5815:19
5861:18 5873:3
5877:12,13
5880:1 5885:12
5888:11 5890:25
5893:15

**talks** 5782:22

**tally** 5837:11

**task** 5898:1
5900:6,7

**tax** 5787:3,14,22
5795:18 5796:9,
16,17,19,23
5797:20 5798:10
5824:12 5838:16
5871:24 5872:1
5873:5 5883:9,15
5884:17

**taxing** 5875:24
5886:8

**teacher** 5893:23

**teaching** 5839:2

**team** 5813:8

**technical**
5825:20 5828:15

**technique**
5866:6

**technology**
5781:20 5782:2
5805:9,11,17
5830:16 5831:10,
11

**telephone**
5758:9

**tells** 5779:22
5794:16

**tempted**
5888:14

**ten** 5756:15
5772:5 5828:17,
20

**ten-minute**
5828:19

**tend** 5759:7
5833:12

**Tenth** 5774:25

**term** 5774:11,20
5788:16 5831:10
5858:20 5875:18
5877:25

**terminate**
5889:20 5890:6

**terminating**
5892:15

**termination**
5783:1 5889:6

**terminations**
5889:8,20

**terminology**
5787:22 5848:17

**terms** 5754:21
5755:1 5758:9
5765:3 5770:11
5779:23 5783:16
5787:24 5794:17
5796:2,23 5797:6,
15 5809:8
5817:15 5820:19,

20 5828:3 5830:6
5839:14 5840:17
5848:21 5857:10
5858:13 5873:7
5877:24 5879:18
5895:16

**territories**
5872:14

**territory** 5802:5,
8 5864:10

**test** 5852:24
5855:11 5856:14
5871:4

**testified**
5770:14 5788:17
5835:3

**testimony**
5765:1 5820:2
5822:19 5853:17
5871:21 5876:23

**tests** 5855:4

**Texas** 5838:9

**text** 5797:1,2
5803:25 5804:2,6

**thanked**
5900:23

**thanking** 5813:1

**theories**
5820:20 5821:6

**theory** 5762:7,
10 5763:23
5765:9 5779:7
5790:25 5791:3
5795:9 5799:17,
19,20,21 5800:10
5806:4 5808:17
5820:5 5844:13
5885:3,22

**thereto** 5879:3

**therewith**
5804:14,19

**thing** 5762:24
5764:11,20
5766:4 5782:15
5785:17 5787:2
5794:5 5814:10
5819:17 5821:2
5833:21 5836:9,

10 5840:14,19
5848:15 5869:20
5874:24 5896:4
5899:14

**things** 5755:10
5771:13 5782:2
5788:20 5792:16
5794:13 5796:12
5814:4 5827:23
5837:25 5842:24
5866:5 5869:1,
5871:18 5873:1
5876:18 5878:17

**thinking** 5758:9
5772:13

**thinks** 5894:17

**thought** 5760:18
5803:2 5894:3

**thoughts**
5895:19

**thread** 5870:4

**three-fourths**
5865:16

**threshold**
5865:13,20

**tick** 5798:24

**tier** 5820:4,18

**time** 5755:20
5760:17 5769:4
5772:5 5774:8
5775:9 5784:10
5788:5 5791:16
5804:9 5826:20
5828:6,19
5830:15 5831:8
5858:5 5863:8
5868:7 5880:2
5894:10,11
5896:7 5897:16
5899:25 5900:3,
17

**timeline**
5785:22,24
5786:8

**timely** 5755:24

**times** 5755:1
5774:13,14
5790:8 5876:10,
13 5884:10,24

**timing** 5755:14

**title** 5773:13,14, 25 5774:2,11,14, 19,20 5775:10,13, 15,19 5776:8,9 5777:10 5778:13 5779:2,9 5782:19, 24 5799:7 5812:21 5829:20 5843:25 5845:7 5846:16,19,20 5847:6,15,19,22 5848:1,3,13,17,18 5849:3 5863:4 5873:23

**titles** 5783:14

**today** 5754:16, 24 5760:17 5828:25 5830:22 5858:5 5864:15 5886:17,18 5892:11 5901:7

**toggle** 5864:23 5877:1

**toggles** 5826:7

**told** 5863:19 5864:14

**tool** 5803:24

**tooth** 5864:7

**top** 5867:11 5877:15 5880:21 5891:17

**topic** 5807:11

**topics** 5771:10 5785:25

**topped** 5827:17

**Toronto** 5768:19 5769:5 5835:3 5880:12

**total** 5818:22

**tovah** 5899:9,10

**TR21080** 5883:20

**TR22085** 5890:10

**TR22151** 5881:24

**TR22154** 5882:25

**TR49818** 5818:18

**TR50463** 5867:21

**tracing** 5837:13

**tracking** 5871:16

**trade** 5818:1 5819:10

**traditionally** 5883:4

**transaction** 5810:11 5852:3 5888:22 5891:5 5892:1

**transactional** 5890:3

**transactions** 5892:8,19

**transcript** 5886:18

**transfer** 5780:13 5795:21 5796:8 5807:2 5812:1,11, 21,22 5833:25 5834:9 5835:6 5844:14 5872:3,4, 11 5874:10,11,25

**transferability** 5807:12

**transferable** 5807:21

**transferred** 5806:24 5807:18 5881:14 5891:17

**transferring** 5834:22

**travel** 5756:3 5901:4

**treat** 5899:25

**treatment** 5816:14 5857:1 5860:23

**tremendous** 5837:12 5898:5

**trial** 5803:11 5830:20 5835:1 5866:15 5867:5, 10 5869:13 5876:24 5886:18 5887:3 5897:22

**true** 5791:14 5800:11 5839:13 5843:5 5852:25 5853:1 5879:14

**true-up** 5836:15 5842:9

**trust** 5767:20 5819:5 5823:7,18 5854:13

**Trustee** 5761:15 5766:22 5767:21

**Trustee's** 5769:24

**trustees** 5755:12 5822:8 5826:18 5858:9

**Trustees'** 5869:24

**truth** 5899:1

**Tucker** 5872:20 5875:7,8

**tuition** 5838:25 5839:1

**turn** 5776:19 5782:6 5784:10 5794:11 5795:14 5805:21 5810:2 5818:17 5831:21, 22 5843:11 5859:20 5868:5 5880:19 5899:6

**two-arm** 5804:11 5875:25 5876:8

**two-thirds** 5868:2

**type** 5777:14

**U**

**UCC** 5835:1 5854:6 5855:8

**Uhm-hmm** 5778:1

**UK** 5762:21 5823:7,10,18 5841:5,9 5852:16 5858:4 5877:22 5884:13

**UKP** 5762:8 5763:23 5764:5, 12 5765:5,21,25 5766:3

**UKP'S** 5765:10

**UKPC** 5852:21 5853:2,7 5857:9, 23 5858:8,13 5862:25

**ultimate** 5820:21

**ultimately** 5778:15 5845:11

**umbrage** 5878:8

**unable** 5765:2

**unanimity** 5755:2

**uncertainty** 5803:21 5812:16

**UNCITRAL** 5860:1 5862:4 5870:17

**unclear** 5888:13

**unconnected** 5804:17

**underlie** 5861:13

**underlying** 5790:24 5860:13

**understand** 5775:23 5776:13, 18 5797:5 5798:3 5816:22 5831:25 5844:8 5864:6

5883:9 5885:13 5886:12 5890:23 5895:25 5896:2 5898:20

**understanding** 5816:3 5864:13

**understandings** 5792:18

**understate** 5762:20

**undisputed** 5763:9

**unequivocal** 5773:17 5779:23 5804:1

**unequivocally** 5773:13

**unfair** 5838:14

**unfettered** 5859:10

**unfortunate** 5892:22

**unintentionally** 5811:15

**uninvented** 5841:10

**unique** 5763:24 5861:1 5862:13

**United** 5798:18 5799:22 5801:11, 20 5802:5,8,16 5825:8 5870:16, 19 5871:2,8 5879:12,17 5880:8 5885:10

**universalism** 5853:15

**unnecessary** 5799:18

**unraveling** 5792:12

**unrefuted** 5867:9

**unsecured** 5761:22 5767:23 5823:2 5860:23



5897:15

untrue 5868:6

urge 5806:23

urged 5790:4

useless 5882:21

usual 5858:25

---

**V**

valuable 5868:14

valuation 5769:2,3,10 5771:15 5789:8 5805:22 5806:3 5808:13,22 5810:9 5824:8 5837:13 5866:6, 20

valuations 5863:12 5868:19

valuator 5824:7

valuators 5866:5

value-in-use 5806:20

valued 5794:17 5815:2 5842:16 5867:10

valueless 5865:6,7 5868:8

values 5806:5 5812:19

valuing 5806:17

varies 5790:14

vast 5875:13

Vedder 5761:14

vendor 5864:10

venture 5854:17,19

versed 5842:7

versus 5762:13 5763:2

vested 5778:24

vesting 5873:22

viable 5809:14 5810:17

view 5758:15 5789:16 5848:10 5883:9 5886:2,7 5897:19

viewed 5788:5 5848:13,19 5883:11

violate 5851:9

virtue 5844:6

visibility 5823:23

volunteer 5896:18

Vonage 5879:22,23 5880:1 5881:19

---

**W**

waiting 5770:18

walking 5839:1

wanted 5754:14 5756:10 5757:1, 14,25 5759:19 5776:22 5780:2,7 5784:11 5785:20 5839:17 5840:15, 16 5877:9 5894:6 5897:1

watch 5830:21

waterfall 5820:9

ways 5792:4

weak 5856:2

weighted 5826:25

Weisz 5871:25

Westbrook 5853:19

whatsoever 5810:9 5817:19

White 5850:1

wholeheartedly 5794:12

wife 5897:23

Willkie 5862:24

Wilton's 5777:6 5778:3

wisdom 5793:17 5794:4

witnesses 5770:15 5872:17

wonderful 5898:2,20

wondering 5760:7

word 5804:25 5805:4,7,19 5831:8,9 5892:2

words 5775:24 5776:10,13 5782:1,10,18 5798:10,11 5804:14,18 5805:11 5812:12 5830:14,15,23 5831:2 5836:16 5846:4 5847:14 5848:9,14 5850:5 5858:22 5863:23 5871:17 5873:18 5879:11

work 5810:10 5814:8,9,15 5815:17,18,24 5816:25 5830:21 5841:6 5900:9

workable 5857:22

worked 5755:8 5788:20 5816:15 5820:10 5823:12 5844:1

working 5897:8

works 5821:13

world 5867:24 5885:21

world's 5824:8

worldwide 5862:9 5864:10 5883:5

worry 5882:23

worse 5841:8

worth 5818:15 5867:7 5879:23 5882:24 5896:4

wrestle 5804:4

write 5896:18 5898:1

writing 5853:20 5895:1

written 5768:10 5788:3 5804:10 5830:1,5 5849:23 5853:16 5896:20, 23

wrong 5780:25 5810:7,23 5811:11 5821:18 5833:1 5849:14 5851:5 5894:18

wrote 5887:8

---

**Y**

year 5838:15 5863:11 5864:10 5868:20 5869:2

years 5768:19 5792:9 5816:10 5821:23 5822:2,4 5835:7,12,13 5841:15,17,18, 5867:23

yesterday 5761:19 5762:17, 20 5764:17 5765:10,13 5768:14 5769:15, 16,22 5770:2,19, 22 5771:11,19 5803:2 5814:4 5821:24 5824:11, 24 5833:13 5852:12,20 5854:22 5858:16

5859:7,17 5863:3, 19 5879:25 5883:21 5885:3 5886:9 5887:12 5888:4,13 5890:10,20 5891:11

York 5761:15 5766:23 5767:21

Young 5823:9

---

**Z**

Zarnett 5754:8 5772:21,23,25 5775:4 5776:3,4 5777:18,24 5778:2,21 5779:15,19 5780:23 5781:8 5783:7,22 5784:3 5787:10 5789:22 5792:10 5797:7 5800:17,21,24 5801:3 5803:4 5808:22 5813:11, 12 5814:7,14 5829:17 5830:4, 10,18 5831:5,13 5832:21 5846:18, 23 5848:5,25 5849:12 5850:13, 19,20 5871:12 5872:6,23 5873:9, 15,19 5874:1,4,6, 24 5875:25 5878:24 5879:7, 11 5883:20,22 5886:17,20 5887:17,22 5888:5,17 5896:21,25 5900:2

Zarnett's 5845:25 5846:17 5884:15

Zenkich 5865:3, 4,21,24 5866:14

Zenkich's 5865:18

Zigler 5813:13, 14,17 5819:21,23

5825:22 5826:12
5828:1 5877:8,18
5878:1

**zip**  5838:15