## EXHIBIT E

*U.S. Debtors Canadian Notice of Motion for Leave to Appeal*

Court of Appeal File No. _____
Superior Court File No. CV-12-9667-00CL

## COURT OF APPEAL FOR ONTARIO

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT
OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS
TECHNOLOGY CORPORATION**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED**

## NOTICE OF MOTION FOR LEAVE TO APPEAL

**THE MOVING PARTIES**, Nortel Networks Inc. ("NNI") and certain of its affiliates[1]

(collectively, the "U.S. Debtors"), will make a motion to be heard by the Court in writing within

36 days after service of the moving parties' motion record, factum and transcripts, if any, or on

the filing of the moving parties' reply factum, if any, whichever is earlier, at Osgoode Hall, 130

Queen Street West, Toronto, Ontario.

**THE MOVING PARTIES** propose that the motion be heard in writing as an opposed

motion under Rule 61.03.1(1) unless this Court orders otherwise under Rule 61.03.1(14)(b).

**THE TIME FOR SERVING AND FILING** this notice of motion was extended by

Justice Newbould in an order made May 29, 2015 to 10 days after the release of his decision on

the motion for reconsideration and/or clarification, which decision was released on July 6, 2015.

---

[1] The U.S. Debtors are Nortel Networks Inc., Nortel Networks Capital Corporation, Nortel Altsystems Inc., Nortel
Altsystems International Inc., Xros, Inc., Sonoma Systems, Qtera Corporation, CoreTek, Inc., Nortel Networks
Applications Management Solutions Inc., Nortel Networks Optical Components Inc., Nortel Networks HPOCS Inc.,
Architel Systems (U.S.) Corporation, Nortel Networks International Inc., Northern Telecom International Inc.,
Nortel Networks Cable Solutions Inc. and Nortel Networks (CALA) Inc.

**THE MOTION IS FOR**:

1.      An order granting leave to appeal to the Court of Appeal for Ontario from the reasons for

judgment of Justice Newbould of the Ontario Superior Court of Justice (the "Ontario Court"),

dated May 12, 2015 as clarified and amended by the Ontario Court's ruling on the

reconsideration and/or clarification motion, dated July 6, 2015 (the "Ontario Judgment").

2.      Such further and other relief as counsel may request and this Court deems just.

**THE GROUNDS FOR THE MOTION ARE:**

1.      The Ontario Judgment presents important issues of first impression in the cross-border

insolvency context, including whether well-settled principles of corporate separateness and

contract rights of Canadian and non-Canadian parties in such a cross-border context can be

ignored.

**A.      Overview**

2.      In 2009, restructuring proceedings in respect of Nortel[2] were commenced in Canada, the

United States and the United Kingdom, among other places.  Subsequent sales of Nortel's

operating business lines and remaining intellectual property portfolio ("IP") generated proceeds

of approximately US$7.3 billion (the "Sale Proceeds").  By agreement of the U.S. Debtors, the

Canadian Debtors[3] and the EMEA Debtors[4] (collectively, the "Estates" or the "Selling Debtors"),

the Sale Proceeds were placed in escrow pending determinations by the Ontario Court and the

United States Bankruptcy Court for the District of Delaware (the "U.S. Bankruptcy Court", and

collectively with the Ontario Court, the "Courts") regarding the proper allocation of the Sale

---

[2] References to "Nortel" include all affiliated entities in the Nortel group of companies.
[3] The Canadian Debtors are Nortel Networks Corporation,  Nortel Networks Limited ("NNL"), Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation.
[4] The EMEA Debtors are various direct and indirect subsidiaries of Nortel Networks Limited located in Europe, the Middle East and Africa, including, Nortel Networks UK Limited ("NNUK").

Proceeds among the Estates.  The allocation of Sale Proceeds is the overarching issue that must

be finally determined before the Estates' respective creditors may receive distributions on their

claims.[5]

3.      Through the agreement of the Selling Debtors, the Courts were tasked with determining

each Selling Debtor's respective entitlement to the Sale Proceeds.  The Selling Debtors described

that task in nearly identical terms: (i) "What portion of the proceeds realized in each transaction

was to the transfer of, or surrender by, the Canadian Debtors, EMEA Debtors or U.S. Debtors, as

the case may be, of property interests in the assets which were the subject matter of that

transaction," by the Canadian Debtors; (ii) "To allocate the sale proceeds in these insolvency

proceedings, the Courts must first determine what each legally distinct Selling debtor held prior

to the sales, and second, determine the value of what that Selling Debtor sold or relinquished,"

by the U.S. Debtors; and (iii) "[A]llocation of the Sale Proceeds should be determined by

analyzing the entitlement of each Selling Debtor to the proceeds of the specific assets that were

conveyed to purchaser in each Asset Sale," by the EMEA Debtors.

4.      Despite the Selling Debtors' agreement on the question presented to the Courts –

essentially, what did each Selling Debtor relinquish – the Courts failed to answer this question,

as they acknowledged, instead imposing a unprecedented and unprincipled judge-made

allocation that consolidates assets owned by multiple separate debtor corporations and

redistributes the value of those assets based on a sub-set of claims filed against each of them (the

"Judges' Allocation").  This novel theory – which the Courts acknowledged was not related to

the value relinquished by each Selling Debtor in the asset sales – imposes, without legal basis, a

variant of cross-border substantive consolidation on the Estates, although with "modifications"

---

[5] Claims will need to be decided by the courts overseeing the various insolvency proceedings and neither the
Canadian Debtors nor the EMEA Debtors have progressed materially with their claims processes.

that are further unsupported by the law of any jurisdiction and contrary even to the principles of substantive consolidation, where such principles exist. The Judges' Allocation was imposed even though both Courts recognized the corporate separateness of the Estates and analyzed an agreement among the multinational Estates – the "MRDA," described below – which governed the ownership of Nortel's IP, a significant driver of value in the asset sales.

5.      In rendering the Ontario Judgment, the trial judge made a number of fundamental errors. First, substantive consolidation was not appropriate in this case, yet the Judges' Allocation is akin to substantive consolidation, although using a variant in its "modifications" that is far more inequitable than even pure substantive consolidation. Second, the trial judge ignored basic tenets of contract law, including the principles of contract interpretation established by the Supreme Court of Canada in *Sattva Capital Corp. v. Creston Moly Corp.*,[6] and misapplied the doctrine of unjust enrichment, in finding that the MRDA did not govern ownership of the IP for the purposes of the allocation of the Sales Proceeds and did not provide NNI with valuable ownership rights to the IP.

6.      The U.S. Debtors make this motion for leave on the basis that it is appropriate, and necessary, in the circumstances for this Court to hear this proposed appeal in respect of the overarching issue in these proceedings. The U.S. Debtors are exercising their right of appeal in the United States, which right is not subject to a leave requirement, and the Unsecured Creditors Committee have already served a notice of appeal in the U.S.

**B.      Background**

7.      *Nortel's Corporate Structure.* Prior to its bankruptcy, Nortel was a multinational enterprise. Nortel Networks Corporation ("NNC") and its various subsidiaries operated as

---

[6] 2014 SCC 53 ("*Sattva*").

separate legal entities, each with its own books and records, financial statements, bank accounts, and cash reserves. Each distinct corporation maintained a separate board of directors and was organized in accordance with and operated under local laws. Creditors treated these corporations as separate legal entities, including by lending money to specific Nortel entities and, in certain circumstances, seeking guarantees from others. Even after Nortel's insolvency, the Ontario Court and the U.S. Bankruptcy Court entered numerous cash management and interim-funding orders predicated on NNC and its subsidiaries being separate legal entities.

8.      *The MRDA*.  During Nortel's operation, its "Integrated Entities,"[7] those entities which conducted Nortel's research and development ("R&D") and generated the vast majority of Nortel's global revenue, entered into the Master R&D Agreement (the "MRDA," as referenced above), made effective January 1, 2001 although executed in 2004 and amended several times, the last of which was in January 2009, made effective December 31, 2008. In addition to detailing Nortel's transfer pricing arrangements, the MRDA governed ownership of IP in various jurisdictions throughout the world.

9.      *U.S. Debtors*.  NNI was Nortel's largest entity worldwide by a number of measures and exclusively operated Nortel's businesses – and had the exclusive, perpetual right to exploit Nortel's valuable IP – in the United States, Nortel's most lucrative market. From 2001 to 2009, NNI generated approximately $46 billion in revenue, which amounted to 69.5% of the revenue generated by Nortel's Integrated Entities. By comparison, NNL accounted for 12.5% of the Integrated Entities' revenue during that period, while the EMEA Debtors collectively accounted for 18.4%. Because of its strong financial position, NNI guaranteed various loans necessary to keep Nortel operating following the downturn in the technology industry in the early 2000s.

---

[7] Nortel's Integrated Entities consisted of NNL, NNI, NNUK, Nortel Networks S.A. (NNSA), and Nortel Networks (Ireland) Limited.

Further, NNI provided NNL with direct financing in the form of a revolving credit agreement of up to $2 billion.

10.    *Nortel's Insolvency Proceedings*.  On January 14, 2009, the Ontario Court made an Initial Order commencing proceedings in respect of the Canadian Debtors under the *Companies' Creditors Arrangement Act* (the "CCAA" and the "CCAA Proceedings") and appointing Ernst & Young Inc. as monitor.  On that same day, the U.S. Debtors filed voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code with the U.S. Bankruptcy Court, and the Ontario Court made an order under the CCAA recognizing the chapter 11 cases as "foreign proceedings" in Canada.  Also on the same day, the High Court of England and Wales placed the EMEA Debtors into administration under the control of individuals from Ernst & Young LLP.

11.    *Asset Sales*.  During the CCAA Proceedings, the Estates concluded that the best way to maximize value for their respective creditors was to sell certain of their respective rights, property and other assets together.  The Estates entered into the Interim Funding and Settlement Agreement, dated June 9, 2009 (the "IFSA"), through which the Estates agreed not to condition their participation in the asset sales upon a prior agreement on how to allocate the Sale Proceeds. Pending a resolution of the allocation question, the Estates agreed to place all Sale Proceeds into escrow accounts (referred to below as the "lockbox").  From shortly after the IFSA was approved through April 4, 2011, the Estates successfully sold all of Nortel's major business lines and related assets, including its IP.

12.    *Allocation Protocol*.  On April 3, 2013 and May 17, 2013, the Ontario Court and the U.S. Bankruptcy Court, respectively, approved an Allocation Protocol proposed by the U.S. Debtors and Canadian Debtors that set forth binding procedures for determining the allocation of Sale Proceeds among the Estates. This Court affirmed the decision of the Ontario Court to approve

the Allocation Protocol.  The Allocation Protocol provided for joint hearings on the merits of the

respective Debtors' allocation theories before the Courts.

13.     *Joint Trial*.  Pursuant to the Allocation Protocol, a cross-border, twenty-one day joint trial

was presided over concurrently by the Courts in May and June 2014 (the "Joint Trial").  During

the Joint Trial, the Courts heard testimony from fact and expert witnesses.  Only two non-Debtor

Estate parties advanced theories advocating any form of consolidation.[8]  Neither theory advanced

by the two non-Debtor Estate parties was adopted by the Courts.

14.     *Allocation Decisions*.  On May 12, 2015, the Ontario Court and the U.S. Bankruptcy

Court released their separate allocation decisions, after having communicated to determine that

consistent rulings could be made by the Courts.  Although the Courts reached different

conclusions with respect to the Estates' respective rights under the MRDA, the Courts agreed on

the distribution of the Sale Proceeds according to the Judges' Allocation.  No party – not even

the proponents of substantive consolidation (described by them as "pro rata" allocation) – had

advocated for the Judges' Allocation during the Joint Trial; it appeared for the first time in the

Ontario Judgment and the judgment of the U.S. Bankruptcy Court.[9]

15.     *Motion for Clarification and/or Reconsideration*.  On May 26, 2015, the U.S. Debtors

filed a motion for clarification and/or reconsideration of the U.S. Court's allocation decision and

requested a joint hearing with the Ontario Court to decide that motion.  A joint hearing on that

motion was held on June 25, 2015 and decisions were issued by the Courts on July 6, 2015.

---

[8] The two non-Debtor Estate parties were the Canadian Creditors Committee, who advocated it solely in the alternative, and the U.K. Pension Claimants.
[9] While the Courts have described their allocation methodology as "modified pro rata," that term does not accurately describe the Judges' Allocation.  Contrary to the implication that the Courts made relatively immaterial modifications to the allocation methodology proposed by the expert witnesses called by the U.K. Pension Claimants and Canadian Creditors Committee, the Judges' Allocation bears little resemblance to any position advanced at trial.

**C.      The Test for Leave to Appeal is Met**

16.      The test for leave to appeal a CCAA order is met in this case:

> (a)      the proposed appeal will not unduly hinder the progress of the action;
>
> (b)      the proposed appeal is *prima facie* meritorious;
>
> (c)      the points on the proposed appeal are of significance to the practice; and
>
> (d)      the points on the proposed appeal are of significance to the action.

### *The proposed appeal will not unduly hinder the progress of the action*

17.      This appeal will not hinder the progress of the CCAA proceeding.  Indeed, it is an integral step on the way to a final determination in Canada of the proper allocation of the Sale Proceeds among the Estates.

18.      This appeal is unlikely to delay final allocations from the lockbox and distributions to creditors.  Many steps and issues outside of this appeal remain before creditor distributions can be made.  Pursuant to the Ontario Judgment, allocation from the lockbox according to the Judges' Allocation is dependent on determination of claims at every Estate.  No Estate has completed this process and the EMEA Debtors have only just begun their claims determination process in the past month.  In addition, the determination of significant claims against the Canadian Debtors cannot proceed until a claims-related appeal is decided by this Court.

19.      Moreover, given the parallel appeal proceedings in the United States that have already been commenced, this Court cannot expedite the progress of this action by denying leave to appeal as the allocation decisions of the Ontario Court and the U.S. Bankruptcy Court must both be final orders in both jurisdictions before any funds can be allocated to any Nortel entity from the lockbox and before any creditors can receive corresponding distributions on their claims.

- 8 -

20.     Finally, in Nortel's CCAA case, unlike the typical CCAA case, there are no operating businesses that are in the process of restructuring.  Instead, Nortel's businesses and assets have been liquidated.

### The appeal is prima facie meritorious

21.     The trial judge made numerous fundamental errors in finding that the Judges' Allocation is an appropriate allocation methodology, including those set out below.

22.     *Substantive Consolidation is Inappropriate and the Judges' Allocation is Inequitable.* Substantive consolidation, including the Judges' Allocation, which is a variant of substantive consolidation, is not an appropriate allocation methodology where the separateness of corporate entities was respected and relied upon by creditors, including creditors who are employees and retirees.  As witnesses consistently testified, and as the Ontario Court itself recognized, the separateness of Nortel's corporate entities was respected by Nortel itself and by Nortel's creditors which contracted with separate Nortel entities and had the expectation that the value of the assets of the contracting entity would be available to satisfy its debts.  The trial judge's consolidation of the assets of the Estates set an impermissibly low threshold for consolidating debtors and disregarding corporate separateness, particularly across national borders.  Notably, the Courts' rulings go beyond consolidation of the Selling Debtors' assets, allowing Nortel affiliates who were not even Selling Debtors to receive allocations from the Sale Proceeds.

23.     The application of the Judges' Allocation as an allocation methodology in circumstances such as these will have major precedential effect on future cross-border insolvency proceedings under the CCAA, whether or not centered in Canada, including the willingness of corporate affiliates to undertake joint sales of assets and enter into cross-border insolvency protocols.  It will also affect multinational enterprises and creditor expectations with respect to the

separateness of corporate entities.  Given this potential impact of the Ontario Judgment, it should

be examined by this Court.

24.      The Judges' Allocation is inequitable; it lacks a principled framework, it is subject to

manipulation by the Estates and it disproportionately prejudices the U.S. Debtors' recovery, even

though the Courts justified this theory on the basis that it was equitable to the creditors of each of

the Estates and rejected alternatives on the basis that they were unfair.  For example, the

principal "modification" to substantive consolidation imposed by the Courts is to exclude $4

billion in bondholder guarantee claims from the U.S. Debtors' lockbox allocation, even though

such claims have already been allowed by the U.S. Court.  As a result, whereas all the other

Debtor estates will receive allocations relatively proportional to the claims they must pay, the

U.S. Debtors – who will unquestionably have to pay a significant portion of the $4 billion

bondholders claim – will receive no allocation of funds from the lockbox to do so. This will

significantly dilute recoveries for the other U.S. Debtors' general unsecured creditors, whose

claims are dwarfed by the bondholder claims.

25.      Procedurally, the Judges' Allocation was not proposed by any of the Estates or other

parties.  Therefore, the U.S. Debtors did not have the opportunity to address it during the joint

trial, including the potential for manipulation and the disproportionately prejudicial effect on the

U.S. Debtors' recovery.  Indeed, during discovery, the expert witness called by the Canadian

Creditors Committee to support substantive consolidation testified that an outcome akin to the

Judges' Allocation would be "grossly inequitable" and insisted that it was not what he was

proposing.

26.      *MRDA Governs Ownership of the IP and Provides NNI with Valuable Rights.*  In

imposing the Judges' Allocation, the trial judge failed to value the assets relinquished by each of

the Selling Debtors (and allocate to each Selling Debtor its proportionate share), which all three

Estates agreed was the question before the Court.  The fair market value of those assets had to be

assessed to allocate the Sale Proceeds and the trial judge erred in failing to complete this task.

The MRDA is central to this task.  The trial judge stated that the reason for disregarding the

MRDA was that it did not have specific provisions governing allocation upon the insolvency of

all of the parties to the MRDA; in so doing, however, he both misinterpreted the MRDA and

ignored the fact that in respect of the specific context, the agreement set out the parties'

respective ownership rights to the IP, the principal assets relinquished in the sales.

27.      The trial judge further erred by misapplying the Supreme Court of Canada's recent

decision in *Sattva*, which requires courts to consider factual matrix evidence in interpreting an

agreement.  The trial judge failed to do so, adopting an overly restrictive approach to the

consideration of such evidence contrary to the Supreme Court of Canada's "practical, common-

sense approach not dominated by technical rules of construction."  The trial judge's legal error

led him to err in finding that NNL had all ownership interests in Nortel's IP, subject only to

certain limited licenses and other rights granted to certain other Nortel entities, including NNI.

The MRDA, among other things, provided NNI with valuable, exclusive, perpetual rights in

Nortel's IP.  The trial judge in the U.S. Bankruptcy Court, hearing the same evidence, came to

this correct conclusion.

28.      The trial judge erred by finding that arrangements provided for in agreements and other

related documents, including the MRDA, that were prepared to achieve a desired tax result are

therefore only relevant for tax purposes and can be disregarded for other purposes.  In other

words, according to the trial judge, agreements governing ownership rights entered into to

achieve a tax-related result do not actually determine ownership rights because they are merely

tax agreements.  Ownership rights in IP created by contract are relevant not merely for tax purposes, but for all purposes.  Therefore, the trial judge erred by dismissing important evidence concerning the ownership of Nortel's IP on the basis that it is only relevant in an isolated tax context.

29.     Regardless of whether the MRDA contemplated an allocation proceeding, it did govern ownership rights to Nortel's IP and was plainly applicable to the allocation of the Sale Proceeds. Given that the MRDA governed ownership rights to Nortel's IP, the trial judge erred in his application of the doctrine of unjust enrichment; the MRDA is the juristic reason for any enrichment arising from its enforcement.  The parties to the MRDA had an agreement governing their ownership rights to Nortel's IP and that agreement cannot be ignored.

### *The points on appeal are of significance to the practice*

30.     The Ontario Judgment creates significant uncertainty as to corporate separateness of subsidiaries within a corporate group, a fundamental tenet of corporate law with significant implications for insolvency practice.  In particular, the decision fosters uncertainty among legal and financial professionals as to the consequences of an insolvency proceeding on the rights of creditors and other stakeholders in a corporate group, especially in the cases of multinational enterprises with corporate structures similar to Nortel.  The proposed appeal will allow this Court to clarify the role of corporate separateness in Canadian insolvency proceedings and whether it can be ignored in the manner done by the Courts in this case.  In addition, the proposed appeal will allow this Court to apply the decision in *Sattva* and to clarify the proper interpretation and effect of commercial agreements.

- 12 -

### *The points on appeal are of significance to the action*

31.     The allocation of Sale Proceeds among the Estates is the overriding issue in the CCAA

Proceedings.  This is the very subject matter of this proposed appeal.  Approximately US$7.3

billion in Sale Proceeds that were generated from Nortel's asset sales are currently being held in

escrow pending final determinations by the courts in each of Canada and the United States

regarding the proper allocation of the Sale Proceeds among the Estates.  Only after final

determinations will each of the Estates' respective creditors be entitled to receive distributions on

their claims.

### D.    General

32.     The U.S. Debtors also rely on:

  (a) Sections 2, 13 and 14 of the CCAA.

  (b) Sections 106 and 134 of the *Courts of Justice Act.*

  (c) Rules 2, 3, 37, 61 and 63 of the *Rules of Civil Procedure.*

  (d) Such further and other grounds as counsel may advise and this Court may permit.

**THE FOLLOWING DOCUMENTARY EVIDENCE** will be used at the hearing of the

motion:

1.     Extracts from the trial record that was before each of the Ontario Court and the U.S.

Bankruptcy Court.

2.     Such further and other evidence as counsel may advise and this Court may permit.

Date:  July 16, 2015

**TORYS LLP**
79 Wellington St. W., Suite 3000
Box 270, TD Centre
Toronto, ON  M5K 1N2

Fax:  416.865.7380

**Sheila Block** (LSUC#: 14089N)
Tel: 416.865.7319
Email: sblock@torys.com

**Scott A. Bomhof** (LSUC#: 37006F)
Tel: 416.865.7370
Email: sbomhof@torys.com

**Andrew Gray** (LSUC#: 46626V)
Tel: 416.865.7630
Email: agray@torys.com

**Adam M. Slavens** (LSUC#: 54433J)
Tel: 416.865.7333
Email: aslavens@torys.com

**Jeremy Opolsky** (LSUC#: 60813N)
Tel; 416.865.8117
Email: jopolsky@torys.com

Lawyers for Nortel Networks Inc.
and the other U.S. Debtors

**TO:**    Service List.

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

Court of Appeal File No.

Superior Court File No. CV-12-9667-00CL

---

**COURT OF APPEAL FOR ONTARIO**
PROCEEDING COMMENCED AT TORONTO

---

**NOTICE OF MOTION FOR
LEAVE TO APPEAL OF
NORTEL NETWORKS INC.
AND THE OTHER U.S. DEBTORS**

---

**TORYS LLP**
79 Wellington St. W., Suite 3000
Box 270, TD Centre
Toronto, ON  M5K 1N2

Fax:  416.865.7380

**Sheila Block** (LSUC#: 14089N)
Tel: 416.865.7319
Email: sblock@torys.com

**Scott A. Bomhof** (LSUC#: 37006F)
Tel: 416.865.7370
Email: sbomhof@torys.com

**Andrew Gray** (LSUC#: 46626V)
Tel: 416.865.7630
Email: agray@torys.com

**Adam M. Slavens** (LSUC#: 54433J)
Tel: 416.865.7333
Email: aslavens@torys.com

**Jeremy Opolsky** (LSUC#: 60813N)
Tel: 416.865.8117
Email: jopolsky@torys.com

Lawyers for Nortel Networks Inc.
and the other U.S. Debtors