## EXHIBIT F

*Stephen Taylor, Conflicts Administrator of Nortel Networks S.A.,*
*Canadian Notice of Motion for Leave to Appeal*

Court of Appeal File No.

Superior Court File No. 09-CL-7950

## COURT OF APPEAL FOR ONTARIO

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

## NOTICE OF MOTION
### (Motion for Leave to Appeal)

Stephen Taylor (the "**Conflicts Administrator**"), the Conflicts Administrator of Nortel Networks S.A. ("**NNSA**"), will make a motion to the Court of Appeal for Ontario pursuant to Rule 61.03.1(1) of the *Rules of Civil Procedure*, R.R.O. 1990, Reg. 194 (the "**Rules**").

THIS MOTION WILL BE HEARD in writing 36 days after service of the motion record and factum, or on the filing of the Conflicts Administrator's reply factum, if any, whichever is earlier, unless otherwise fixed by the Court of Appeal, at Osgoode Hall, 130 Queen Street West, Toronto, Ontario, M5H 2N5.

**THE MOTION IS FOR:**

(a)    An order pursuant to sections 13 and 14 of the *Companies Creditors'*
*Arrangement Act*, R.S.C. 1985, c. C-36 (the "**CCAA**") granting the Conflicts
Administrator leave to appeal to the Court of Appeal from the allocation
trial judgment (the "**Canadian Allocation Judgment**") of the Honourable
Mr. Justice Newbould of the Ontario Superior Court of Justice (the
"**Canadian Court**") released on May 12, 2015;

(b)    The costs of this motion; and

(c)    Such further and other relief as this Honourable Court may deem just.

**THE GROUNDS FOR THE MOTION ARE:**

**A.    Overview**

(a)    The proposed appeal is brought by the Conflicts Administrator, who was
appointed by the High Court of London at the request of the Joint
Administrators (described below) on June 3, 2015, following the release of
the Canadian Allocation Judgment and the companion judgment (the
"**U.S. Allocation Judgment**") of the Honorable Mr. Justice Gross of the
U.S. Bankruptcy Court for the District of Delaware (the "**U.S. Court**");

(b)    The Joint Administrators sought the appointment of the Conflicts
Administrator because they recognized the disproportionately prejudicial

- 3 -

impact that the Canadian and U.S. Allocation Judgments had on the interests of NNSA, and by extension, NNSA's creditors;

(c)     At the trial below (the "**Allocation Trial**"), the Canadian and U.S. Courts were asked to determine the appropriate allocation among the various Nortel debtors of the approximately $7.3 billion (the "**Sale Proceeds**") raised through the various sales of assets in these proceedings (the "**Asset Sales**");

(d)     All three Nortel debtor groups, as described herein, asked the Canadian and U.S. Courts to value the rights transferred or surrendered in the context of the Asset Sales;

(e)     The Canadian and U.S. Courts did not value or attempt to value the rights in the sold assets that were transferred or surrendered, but instead determined that each debtor would receive an allocation premised on its overall share of the total claims against the Nortel debtors, termed by the Courts a "modified *pro rata*" allocation;

(f)     The Allocation Judgments disregard the corporate separateness of the Nortel debtors and result in an impermissible global substantive consolidation that is extremely prejudicial to NNSA because of its relatively small creditor base;

- 4 -

**B.     Background**

(g)     Prior to the commencement of these proceedings Nortel Networks Corporation ("**NNC**") was a Canadian public company and the direct or indirect parent of more than 130 subsidiaries located in more than 100 countries (together, referred to herein as "**Nortel**");

(h)     NNSA was Nortel's operating company in France and is a direct and indirect subsidiary of the main Canadian operating company, Nortel Networks Limited ("**NNL**");

(i)     While NNSA was represented by the Joint Administrators in the Allocation Trial, the EMEA Debtors (defined below) did not have a common European or EMEA parent, and operated as subsidiaries of NNL;

(j)     As acknowledged in the Canadian Allocation Judgment (though not reflected in the modified *pro rata* allocation methodology), research and development ("**R&D**") was the primary driver of Nortel's value and profit;

(k)     The principal Nortel entities that performed R&D were NNL in Canada, Nortel Networks Inc. ("**NNI**") in the U.S., Nortel Networks UK Limited ("**NNUK**") in the United Kingdom, Nortel Networks (Ireland) Limited ("**NN Ireland**") in Ireland, and NNSA in France, which, together, were known as the Residual Profit Entities ("**RPEs**");

- 5 -

(l)     On January 14, 2009 (the **"Filing Date"**), in addition to the filings in Canada under the CCAA and in the U.S. under chapter 11 of the U.S. Bankruptcy Code, the High Court of England and Wales placed nineteen of Nortel's European, Middle Eastern and African (**"EMEA"**) affiliates, including NNSA, into administration under the control of the Joint Administrators;

(m)    Subsequent to the Filing Date, NNSA commenced secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC) No 1346/2000 of 29 May 2000 on insolvency proceedings, in the Republic of France, pursuant to which a liquidator (the **"NNSA Liquidator"**) was appointed by the Versailles Commercial Court;

## C.     The IFSA

(n)     In the spring of 2009, representatives of the Nortel debtor entities commenced negotiations to settle various intercompany debts and to attempt to collectively sell off their lines of business and related assets;

(o)     Because of, among other things, the intellectual property (**"IP"**) licences held by the RPEs in respect of Nortel's IP, the cooperation of Nortel debtors around the world was required in order to consummate the Asset Sales;

(p)     To avoid requiring agreement on the allocation of the Sale Proceeds among the various Nortel debtors before the completion of any Asset Sale, which would have delayed Asset Sales and reduced overall Sale Proceeds, the Nortel debtors agreed that the Sale Proceeds would be deposited into escrow pending resolution of allocation;

(q)     This agreement of the Nortel debtors to maximize the funds available for distribution to creditors and to prevent the possibility that disputes over allocation would hinder the Asset Sales was documented in the Interim Funding and Settlement Agreement (the "**IFSA**"), effective June 9, 2009;

(r)     Pursuant to the IFSA, various Nortel debtors agreed, *inter alia,* to relinquish their IP licences "for the purpose of facilitating, and <u>in consideration of a right to an allocation</u> . . . to such Debtors of portions of the sale proceeds from, the sale of any material assets of any of the Canadian Debtors and/or the US Debtors to a third party . . ." (emphasis added);

(s)     NNSA was not an original signee of the IFSA, however, section 7 of the IFSA contemplated that the Joint Administrators would use commercially reasonable efforts to obtain a letter from the NNSA Liquidator binding NNSA to the provisions of the IFSA;

(t)     NNSA ultimately acceded to the terms of the IFSA and participated in the trial below under the representation of the Joint Administrators;

- 7 -

(u)     The Asset Sales resulted in Sale Proceeds of approximately $3.285 billion on the sale of Nortel's business lines, of which $2.85 billion is available for allocation, and $4.5 billion on the sale of Nortel's residual IP, leaving an amount of approximately $7.3 billion held in escrow for allocation;

(v)     The Nortel debtors could not reach agreement on how the Sale Proceeds are to be allocated among themselves;

## D. The Allocation Trial

(w)     For purposes of the Allocation Trial, the Nortel debtors were generally represented as three geographic regional debtor groups (referred to as the "**Canadian Debtors**", the "**U.S. Debtors**" and the "**EMEA Debtors**");

(x)     On March 8, 2013, over the objection of the Joint Administrators (who argued that allocation should be resolved by way of a 3-member international arbitration panel), the Canadian and U.S. Debtors obtained an order approving an allocation protocol that would have the Canadian and U.S. Courts jointly hear the Allocation Trial;

(y)     In addition to the Canadian, U.S. and EMEA Debtors, a number of significant creditors were also designated as "Core Parties" entitled to participate in the Allocation Trial, including the U.S. Unsecured Creditors' Committee (the "**UCC**"), the Canadian Creditors' Committee (the "**CCC**"),

the U.K. Pension Claimants (the "**UKPC**") and an *ad hoc* group of holders of bonds issued by NNL and guaranteed by NNI (the "**Bondholders**");

(z)     The Allocation Trial proceeded by way of a joint, electronically-linked hearing held simultaneously before the Canadian and U.S. Courts over 21 days of evidence in May and June 2014, followed by three days of oral argument in September 2014;

(aa)    At the Allocation Trial, in general terms, the Canadian, U.S. and EMEA Debtors each took the position that the allocation should be based on the rights transferred or surrendered in the Asset Sales, with reference to the rights held under Nortel's Master Research & Development Agreement (the "**MRDA**");

(bb)    However, the Canadian, U.S. and EMEA Debtors each argued a different interpretation of the MRDA that would have resulted in substantially different allocations;

(cc)    The UKPC, and to a lesser extent the CCC, took the position that the MRDA did not apply to the allocation of the Sale Proceeds and that the Courts should apply a *"pro rata"* methodology by which all creditors of Nortel would receive a *pari passu* distribution;

**E. The Allocation Judgments**

(dd)     On May 12, 2015, the Canadian and U.S. Courts both issued judgments in

respect of the Allocation Trial;

(ee)     In respect of the MRDA,

(i)      The Canadian Court generally agreed with the Canadian Debtors,

finding that, under the MRDA, NNL held legal ownership of all

Nortel IP and the U.S. and EMEA Debtors did not retain any

beneficial or equitable ownership of the Nortel IP; whereas

(ii)     The U.S. Court generally agreed with the U.S. Debtors, finding that,

under the MRDA, NNL held only bare legal title and the RPEs

retained beneficial and equitable ownership of the Nortel IP;

(ff)     Newbould J. nevertheless concluded that NNL would be unjustly enriched

under his interpretation of the MRDA if it received, as the Canadian

Debtors sought, all of the Sale Proceeds of the Nortel IP;

(gg)     In any event, both the Canadian and U.S. Courts concluded that the MRDA

did not apply to the allocation of the Sale Proceeds, and decided "by

default" to apply the modified *pro rata* allocation methodology by which

each debtor will be entitled to receive (subject to modification, set out

below) from the Sale Proceeds the percentage that all accepted claims against that debtor bear to the total claims against all Nortel debtors;

(hh)   The modified *pro rata* methodology was not advocated by any party at the Allocation Trial and differs from the *pro rata* methodology proposed by the UKPC in several ways, including the following:

    (i)    Each debtor retains its cash on hand;

    (ii)    All intercompany claims are retained and count towards allocation; and

    (iii)    Claims can be asserted against more than one debtor, but they are calculated and recognized only once, meaning (for example) that the Bondholders can increase their recovery by asserting claims against both NNL and the guarantor, NNI;

(ii)   The modified *pro rata* allocation methodology completely disregards the rights and interests each of the debtors had in the assets sold and instead allocates to each debtor an amount based entirely on its liabilities;

(jj)   As a result, the allocation granted to NNSA under the modified *pro rata* methodology is not related to NNSA's rights and interests in the assets sold and rights relinquished by NNSA, and in fact results in an amount substantially less than those interests and rights, to the considerable

prejudice of NNSA's creditors and the unjust benefit of the creditors of other debtors, such as NNUK, that have comparably higher liabilities;

(kk)     The modified *pro rata* methodology provides certain debtor entities with a disproportionately high share of the allocation based on very large creditor claims that are calculated in accordance with domestic law that attributes higher claim values in comparison to the law of other debtors' countries;

(ll)     Furthermore, contrary to the standards of global insolvency practice, the modified *pro rata* methodology penalizes creditors of entities that had been diligent in paying their liabilities;

**F. Leave to Appeal Should be Granted**

(mm)   The Canadian Allocation Judgment is unprecedented and raises significant questions that are important to the practice of insolvency and IP law both in Ontario and internationally;

(nn)    On appeal, the Conflicts Administrator proposes to argue that Newbould J. erred (i) in his interpretation of the MRDA, whereby he determined that NNSA had no equitable or beneficial interest in the Nortel IP (the "**MRDA Interpretation**"); (ii) in his determination that the MRDA does not apply to the allocation of the Sale Proceeds and settling, by default, on the modified *pro rata* methodology (the "**Modified Pro Rata Determination**"); (iii) in adopting a modified pro rata methodology that does not comport with law

and is inequitable as applied; and (iv) in making the other additional improper legal rulings and factual determinations described in subparagraphs (qq) to (ss) below, which are incorporated herein by reference;

### The Appeal is Prima Facie Meritorious

(oo)    The Conflicts Administrator's proposed appeal is *prima facie* meritorious;

(pp)    In respect of the MRDA Interpretation, the merit of the Conflicts Administrator's proposed appeal is demonstrated by the U.S. Allocation Judgment, in which the U.S. Court, applying Ontario law, arrived at an interpretation in direct conflict with the Canadian Allocation Judgment;

(qq)    In making the MRDA Interpretation, Newbould J. erred as follows:

  (i)    He incorrectly found that NNSA and the other RPEs did not retain equitable and beneficial ownership of the Nortel IP under the MRDA or otherwise;

  (ii)   He erred in determining that he did not need to consider whether his interpretation of the MRDA was commercially reasonable for the RPEs, and failed to acknowledge that his interpretation of the MRDA was commercially unreasonable in light of his conclusion that NNL's ownership rights under the MRDA (as interpreted by

him) resulted in an unjust enrichment of NNL to the detriment of the other RPEs;

(iii)    He failed to consider statements made by Nortel to tax authorities that clearly demonstrated that the RPEs, other than NNL, retained beneficial and equitable ownership in the Nortel IP;

(iv)    He found that the distribution of residual profits to RPEs under the MRDA was the sole consideration for the performance of R&D activity and transfer of all legal, beneficial and equitable ownership in the Nortel IP;

(v)    He disregarded Canadian and U.K. law which provides that, where an employee creates intellectual property as a part of his or her employment, the employer beneficially owns the intellectual property, and the EMEA Debtors (including specifically NNSA) never assigned their beneficial ownership of the Nortel IP to NNL; and

(vi)    He improperly held that NNSA's assignment of legal title to the Nortel IP also effected an assignment of beneficial and equitable ownership of the Nortel IP;

(rr)    In respect of the Modified *Pro Rata* Determination, both the Canadian and U.S. Courts erred in applying, "by default", an allocation methodology

that bears no relation to the rights that were transferred or surrendered as part of the Asset Sales;

(ss)     In making the Modified *Pro Rata* Determination, Newbould J. erred as follows:

(i)     He erred in finding that the MRDA does not apply to the allocation of the Sale Proceeds on the grounds that the MRDA was not *intended* to deal with allocation on insolvency;

(ii)     He improperly treated ownership rights and interests in the event of insolvency as distinct and independent from ownership rights pre-insolvency;

(iii)     He improperly concluded that, absent an agreement governing allocation in an insolvency, there is no guiding law for allocation;

(iv)     He found that the modified *pro rata* allocation methodology was the most fair and equitable approach, despite no evidence being presented at trial as to how the creditors of individual Nortel debtors would be affected by a modified *pro rata* allocation;

(v)     He disregarded the corporate separateness of the various Nortel Debtors, including uncontroverted evidence that the various Nortel

entities respected corporate separateness both before and after filing for creditor protection on January 14, 2009;

(vi)    He improperly effected a global substantive consolidation of the assets of the Nortel debtors as represented by the Sale Proceeds;

(vii)   He allocated to NNSA less than the value of its interests and rights in the assets that it contributed towards the Asset Sales based on inchoate and unenforceable notions of fairness, thereby improperly allocating assets owned by NNSA to other Nortel debtors and, in effect, authorizing the expropriation of NNSA's assets to benefit other Nortel debtors;

(viii)  He failed to recognize that payments to preferred and priority creditors of different Nortel Debtors would result in unequal treatment of unsecured creditors in different jurisdictions; and

(ix)    He adopted an approach that will undermine capital markets and hinder the fair and just administration of debtor estates under the CCAA;

*The Appeal is Significant to the Parties*

(tt)    This appeal is about no less than the allocation of approximately $7.3 billion in Sale Proceeds, and is the culmination of the international efforts over several years to maximize recovery for Nortel's global creditors;

(uu)    There are automatic rights to appeal the U.S. Allocation Judgment, first to the District Court for the District of Delaware, and second to the Third Circuit Court of Appeals;

(vv)    Given that a notice of appeal has already been filed in respect of the U.S. Allocation Judgment, and given the importance (recognized by both Newbould J. and Gross J.) of consistency between the Canadian and U.S. Allocation Judgments, it is important to the parties that appeals proceed through the Courts of both jurisdictions, with such coordination among appeal courts as appropriate;

*The Appeal is Significant to the Practice*

(ww)    The Allocation Judgments relate to several issues that are significant to insolvency and other legal practitioners in Canada, the U.S., the U.K. and elsewhere:

(i)    The appropriate method to allocate the proceeds of sale of a multinational enterprise;

(ii)     The allocation of property rights in an international insolvency where the assets were created in multiple jurisdictions with different legal rules governing ownership;

(iii)    The rights that arise from creation of IP by one party when legal title to the IP is then vested in another party;

(iv)    Whether the Ontario Superior Court of Justice has the power, under s. 11(1) of the CCAA or otherwise, to allocate sale proceeds without regard to legal and beneficial ownership of the assets that generated the sale proceeds in question;

(v)     Whether and when Canadian law permits a substantive consolidation of the assets of a multinational enterprise in the course of CCAA proceedings; and

(vi)    Whether a *pro rata* allocation of sale proceeds among different debtors within an insolvent corporate group amounts to a substantive consolidation of the assets of a multinational enterprise;

***The Appeal will not Hinder the Progress of the CCAA Proceedings:***

(xx)    NNSA is committed to having the appeal heard as quickly as is reasonably possible;

- 18 -

(yy)   As no payment can be made from the Sale Proceeds until appeals are resolved in both the Canadian and U.S. Courts, and the U.S. Allocation Judgment is already under appeal, there will be no delay caused by an appeal to the Court of Appeal;

(zz)   The modified *pro rata* allocation methodology is dependent upon the administration of all claims for all Nortel debtors before a final distribution can be made;

(aaa)  As the administration of claims is ongoing, and in the case of the EMEA Debtors claims proceedings have just been commenced, the determination of each debtor's allocation based on a modified *pro rata* allocation is likely years away;

(bbb)  Rules 37, 61.03.1 and 61.16 of the *Rules of Civil Procedure*;

(ccc)  sections 13 and 14 of the CCAA; and

(ddd)  Such further and other grounds as counsel may advise and this Honourable Court may deem just.

**THE FOLLOWING DOCUMENTARY EVIDENCE** will be used at the hearing of the

Motion:

(a)    the trial record that was before the trial judge;

(b)    such further and other evidence as the Conflicts Administrator may advise

and this Honourable Court may permit.

July 15, 2015

David R. Byers
Daniel S. Murdoch
Suzanne Amiel
Stikeman Elliott LLP

TO:        **THE SERVICE LIST**

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED
AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, et al.

Court of Appeal File No.
Superior Court File No. 09-CL-7950

*ONTARIO*
**COURT OF APPEAL**

Proceeding commenced at Toronto

**NOTICE OF MOTION FOR LEAVE TO APPEAL**

**STIKEMAN ELLIOTT LLP**
Barristers & Solicitors
5300 Commerce Court West
199 Bay Street
Toronto, Canada  M5L 1B9

**David R. Byers** LSUC #: 29225P
Tel: (416) 869-5697
E-mail: dbyers@stikeman.com
**Daniel S. Murdoch** LSUC#: 53123L
Tel: (416) 869-5529
E-mail: dmurdoch@stikeman.com
**Suzanne Amiel** LSUC#: 63933B
Tel: (416) 869-6866
E-mail: samiel@stikeman.com
Fax: (416) 947-0866
*Lawyers for the Conflicts Administrator of Nortel Networks S.A.*