In the Matter Of:

# Nortel Trial

## DAY 23
## September 23, 2014



**WILCOX & FETZER LTD.**
FOR EXCELLENCE IN COURT REPORTING

```
 1              UNITED STATES BANKRUPTCY COURT

 2               FOR THE DISTRICT OF DELAWARE

 3        ----------------------------)

 4     In Re                          )

 5        NORTEL NETWORKS INC.,     ) Chapter 11

 6        et al,                      ) Case No.

 7              Debtors.            ) 09-10138(KG)

 8        ----------------------------)

 9                    - and -

10            Court File No. 09-CL-7950

11                  ONTARIO

12          SUPERIOR COURT OF JUSTICE

13              (COMMERCIAL LIST)

14      IN THE MATTER OF THE COMPANIES' CREDITORS

15    ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED

16     AND IN THE MATTER OF A PLAN OF COMPROMISE OR

17      ARRANGEMENT OF NORTEL NETWORKS CORPORATION,

18    NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL

19     CORPORATION, NORTEL NETWORKS INTERNATIONAL

20     CORPORATION AND NORTEL NETWORKS TECHNOLOGY

21                  CORPORATION

22     APPLICATION UNDER PART IV OF THE COMPANIES'

23   CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36,

24              AS AMENDED

25                  --------
```

```
 1

 2                              --------

 3

 4    --- This is the Day 23/Volume 23 of the transcript

 5    of proceedings in the above matter held

 6    simultaneously in:

 7    Superior Court of          United States Bankruptcy

 8    Ontario (Commercial        Court for the District of

 9    List)                      Delaware

10    Courtroom 8-1              Courtroom 3

11    330 University Avenue      824 Market Street

12    Toronto, Ontario           Wilmington, Delaware

13

14    on the 23rd day of September, 2014, commencing at

15    8:30 a.m.

16

17                              --------

18    B E F O R E:

19    The Honourable Judge Kevin Gross (United States)

20    The Honourable Mr. Justice Frank Newbould (Canada)

21

22                             ----------

23

24

25
```

```
 1    REPORTED BY:  Toronto - Deana Santedicola

 2                     RPR, CRR, CSR

 3            Delaware - Lorraine Marino

 4                     RDR, CRR, CSR

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1    A P P E A R A N C E S:

 2

 3                      CANADIAN DEBTORS

 4

 5    FOR THE MONITOR, ERNST & YOUNG INC.

 6    GOODMANS LLP

 7    Bay Adelaide Centre

 8    333 Bay Street, Suite 3400

 9    Toronto, ON  M5H 2S7

10    PER:       Jay Carfagnini, Esq.

11               Joseph Pasquariello, Esq.

12               Ben Zarnett, Esq.

13               Alan Mark, Esq.

14               Peter Ruby, Esq.

15               Jessica Kimmel, Esq.

16               Julie Rosenthal, Esq.

17               Chris Armstrong, Esq.

18

19    ERNST & YOUNG INC.

20    Ernst & Young Tower

21    222 Bay Street, P.O. Box 251

22    Toronto, ON  M5K 1J7

23    PER:       Murray McDonald, Esq.

24               Brent Beekenkamp, Esq.

25
```

```
 1    FOR THE APPLICANTS

 2    GOWLING LAFLEUR HENDERSON LLP

 3    Suite 1600, First Canadian Place

 4    100 King Street West

 5    Toronto, ON  M5X 1G5

 6    PER:        Derrick Tay, Esq.

 7                Jennifer Stam, Esq.

 8

 9    FOR THE CANADIAN DEBTORS

10    ALLEN & OVERY LLP

11    1221 Avenue of the Americas

12    New York, NY  10020

13    PER:        Jacob Pultman, Esq.

14                Ken Coleman, Esq.

15                Paul Keller, Esq.

16                Daniel Guyder, Esq.

17                Laura Hall, Esq.

18                Joseph Badtke-Berkow, Esq.

19                Jonathan Cho, Esq.

20                Nicolette Ward, Esq.

21

22    FOR THE CANADIAN DEBTORS

23    BUCHANAN INGERSOLL & ROONEY

24    1105 North Market Street

25    Suite 1900
```

```
 1   Wilmington, DE  19801-1054
 2   PER:        Kathleen A. Murphy, Esq.
 3               Mary F. Caloway, Esq.
 4
 5                    U.S. DEBTORS
 6
 7   FOR NORTEL NETWORKS INC.
 8   TORYS LLP
 9   79 Wellington Street West, Suite 3000
10   Box 270, TD Centre
11   Toronto, ON  M5K 1N2
12   PER:        Sheila Block, Esq.
13               Andrew Gray, Esq.
14
15   FOR THE U.S. DEBTORS
16   MORRIS, NICHOLS, ARSHT & TUNNELL LLP
17   1201 North Market Street, 16th Floor
18   P.O. Box 1347
19   Wilmington, DE  19899-1347
20   PER:        Derek Abbott, Esq.
21               Annie Cordo, Esq.
22
23   FOR NORTEL NETWORKS INC.
24   CLEARY GOTTLIEB STEEN & HAMILTON LLP
25   One Liberty Plaza
```

```
 1   New York, NY  10006

 2   PER:        James Bromley, Esq.

 3               Lisa Schweitzer, Esq.

 4               Howard Zelbo, Esq.

 5               Jeffrey Rosenthal, Esq.

 6               Avi Luft, Esq.

 7

 8                    EMEA DEBTORS

 9

10   FOR THE JOINT ADMINISTRATORS OF NORTEL NETWORKS UK

11   LIMITED

12   DAVIES WARD PHILLIPS & VINEBERG LLP

13   40th Floor

14   155 Wellington Street

15   Toronto, ON  M5V 3G7

16   PER:        Matthew Milne-Smith, Esq.

17               Robin B. Schwill, Esq.

18               Sean Campbell, Esq.

19               James Doris, Esq.

20               Louis Sarabia, Esq.

21

22   FOR THE JOINT ADMINISTRATORS OF NORTEL NETWORKS UK

23   LIMITED

24   LAX O'SULLIVAN SCOTT LISUS LLP

25   Suite 2750, 145 King Street West
```

```
 1    Toronto, ON   M5H 1J8

 2    PER:        Matthew P. Gottlieb, Esq.

 3                Tracy Wynne, Esq.

 4                Paul Michell, Esq.

 5    FOR THE JOINT ADMINISTRATORS OF NORTEL NETWORKS UK

 6    LIMITED

 7    HUGHES HUBBARD & REED

 8    One Battery Park Plaza

 9    New York, NY  10004-1482

10    PER:        Derek Adler, Esq.

11                Neil Oxford, Esq.

12                Fara Tabatabai, Esq.

13                Charles Huberty, Esq.

14

15    FOR THE JOINT ADMINISTRATORS OF NORTEL NETWORKS UK

16    LIMITED

17    YOUNG CONAWAY STARGATT & TAYLOR LLP

18    Rodney Square

19    1000 North King Street

20    Wilmington, DE  19801

21    PER:        Ed Harron, Esq.

22                John Dorsey, Esq.

23

24    FOR THE EMEA DEBTORS

25    HERBERT SMITH FREEHILLS LLP
```

```
 1   Exchange House

 2   Primrose Street

 3   London, England   EC2A 2EG

 4   PER:        James Norris-Jones, Esq.

 5               CANADIAN CREDITORS COMMITTEE

 6

 7   FOR THE FORMER EMPLOYEES OF NORTEL AND LTD

 8   BENEFICIARIES

 9   KOSKIE MINSKY

10   20 Queen Street West

11   Suite 900

12   Toronto, ON  M5H 3R3

13   PER:        Mark Zigler, Esq.

14               Susan Philpott, Esq.

15               Ari Kaplan, Esq.

16               Barbara Walancik, Esq.

17

18   FOR ALL ACTIVE AND RETIRED NORTEL EMPLOYEES

19   REPRESENTED BY THE CAW-CANADA

20   CAW-CANADA

21   Legal Department

22   205 Placer Court

23   Toronto, ON  M2H 3H9

24   PER:        Barry E. Wadsworth, Esq.

25               Lewis Gottheil, Esq.
```

```
 1

 2    FOR THE RECENTLY SEVERED CANADIAN NORTEL EMPLOYEES

 3    COMMITTEE

 4    SHIBLEY RIGHTON LLP

 5    250 University Avenue, Suite 700

 6    Toronto, ON  M5H 3E5

 7    PER:        Arthur O. Jacques, Esq.

 8                Thomas McRae, Esq.

 9

10    FOR THE SUPERINTENDENT OF FINANCIAL SERVICES AS

11    ADMINISTRATOR OF THE PENSION BENEFITS GUARANTEE

12    FUND

13    PALIARE ROLAND ROSENBERG ROTHSTEIN LLP

14    35th Floor

15    155 Wellington Street West

16    Toronto, ON  M5V 3H1

17    PER:        Kenneth T. Rosenberg, Esq.

18                Massimo (Max) Starnino, Esq.

19                Lily Harmer, Esq.

20                Karen Jones, Esq.

21                Tina Lie, Esq.

22                Michelle Jackson, Esq.

23

24    FOR THE STEERING COMMITTEE OF NORTEL CANADIAN

25    CONTINUING EMPLOYEES - POST CCAA AS AT JANUARY 14,
```

```
 1    2009

 2    NELLIGAN O'BRIEN PAYNE LLP

 3    50 O'Connor Street, Suite 1500

 4    Ottawa, ON   K1P 6L2

 5    PER:        Janice B. Payne, Esq.

 6                Steven Levitt, Esq.

 7                Christopher Rootham, Esq.

 8                Ainslie Benedict, Esq.

 9

10    FOR MORNEAU SHEPELL LIMITED

11    MCCARTHY TETRAULT LLP

12    Suite 5300, Toronto Dominion Bank Tower

13    Toronto, ON   M5K 1E6

14    PER:        Barbara J. Boake, Esq.

15                James D. Gage, Esq.

16                Elder C. Marques, Esq.

17                Paul Steep, Esq.

18                Byron Shaw, Esq.

19                Sharon Kour, Esq.

20                Kelly Peters, Esq.

21

22    FOR THE CANADIAN CREDITORS COMMITTEE

23    DLA PIPER

24    919 North Market Street, Suite 1500

25    Wilmington, DE   19801
```

```
 1    PER:        Selinda A. Melnik, Esq.

 2                Richard Hans, Esq.

 3                Timothy Hoeffner, Esq.

 4                Farah Lisa Whitley-Sebti, Esq.

 5            INFORMAL NORTEL NOTEHOLDER GROUP

 6

 7    FOR THE INFORMAL NORTEL NOTEHOLDER GROUP

 8    BENNETT JONES LLP

 9    1 First Canadian Place

10    Suite 3400

11    Toronto, ON  M5X 1A4

12    PER:        Kevin Zych, Esq.

13                S. Richard Orzy, Esq.

14                Gavin Finlayson, Esq.

15                Richard Swan, Esq.

16                Sean Zweig, Esq.

17                Jonathan Bell, Esq.

18                Amanda McLachlan, Esq.

19

20    FOR THE INFORMAL NORTEL NOTEHOLDER GROUP

21    MILBANK, TWEED, HADLEY, MCCLOY LLP

22    1 Chase Manhattan Plaza

23    New York, NY  10005

24    PER:        Thomas R. Kreller, Esq.

25                Jennifer P. Harris, Esq.
```

```
 1              Albert A. Pisa, Esq.

 2              Samir Vora, Esq.

 3              Andrew LeBlanc, Esq.

 4              Michael Hirschfeld, Esq.

 5              Atara Miller, Esq.

 6              Tom Matz, Esq.

 7              Nick Bassett, Esq.

 8              Gabrielle Ruha, Esq.

 9              Rachel Pojunas, Esq.

10

11      THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

12

13   FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

14   CASSELS BROCK & BLACKWELL LLP

15   Suite 2100, Scotia Plaza

16   40 King Street West

17   Toronto, ON  M5H 3C2

18   PER:      Shayne Kukulowicz, Esq.

19             Michael Wunder, Esq.

20             Ryan Jacobs, Esq.

21

22   FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

23   ASHURST LLP

24   Boardwalk House

25   5 Appold Street
```

```
 1   London, England  EC2A 2HA

 2   PER:        Angela Pearson, Esq.

 3               Antonia Croke, Esq.

 4

 5   FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

 6   RICHARDS LAYTON & FINGER, P.A.

 7   920 North King Street

 8   Wilmington, DE  19801

 9   PER:        Christopher Samis, Esq.

10

11   FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

12   AKIN GUMP STRAUSS HAUER & FELD LLP

13   One Bryant Park

14   New York, NY  10036

15   PER:        Fred S. Hodara, Esq.

16               David H. Botter, Esq.

17               Abid Qureshi, Esq.

18               Robert A. Johnson, Esq.

19               Brad M. Kahn, Esq.

20               Christine Doniak, Esq.

21               Joseph Sorkin, Esq.

22               Jacqueline Yecies, Esq.

23

24      UK PENSION PROTECTION FUND AND NORTEL NETWORKS

25             UK PENSION TRUST LIMITED
```

```
 1

 2    FOR THE UK PENSION PROTECTION FUND AND NORTEL

 3    NETWORKS UK PENSION TRUST LIMITED

 4    THORNTON GROUT FINNIGAN LLP

 5    Suite 3200, 100 Wellington Street West

 6    P.O. Box 329

 7    Toronto, ON  M5K 1K7

 8    PER:      Michael Barrack, Esq.

 9              D.J. Miller, Esq.

10              Rebecca Lewis, Esq.

11              Andrea McEwan, Esq.

12              John Finnigan, Esq.

13              Michael Shakra, Esq.

14

15    FOR THE UK PENSION PROTECTION FUND AND NORTEL

16    NETWORKS UK PENSION TRUST LIMITED

17    WILLKIE FARR & GALLAGHER LLP

18    787 Seventh Avenue

19    New York, NY  10019-6099

20    PER:      Brian O'Connor, Esq.

21              Sameer Advani, Esq.

22              Andrew Hanrahan, Esq.

23

24    FOR THE UK PENSION PROTECTION FUND AND NORTEL

25    NETWORKS UK PENSION TRUST LIMITED
```

```
 1    BAYARD, P.A.

 2    222 Delaware Avenue, Suite 900

 3    Wilmington, DE  19899

 4

 5    PER:        Charlene D. Davis, Esq.

 6                Justin Alberto, Esq.

 7

 8                THE BANK OF NEW YORK MELLON

 9

10    FOR THE BANK OF NEW YORK MELLON

11    MCMILLAN LLP

12    Brookfield Place

13    181 Bay Street, Suite 4400

14    Toronto, ON  M5J 2T3

15    PER:        Sheryl E. Seigel, Esq.

16

17    FOR THE BANK OF NEW YORK MELLON

18    LATHAM & WATKINS LLP

19    885 Third Avenue

20    New York, NY  10022-4834

21    PER:        Michael J. Riela, Esq.

22

23          WILMINGTON TRUST, NATIONAL ASSOCIATION

24

25    FOR WILMINGTON TRUST, NATIONAL ASSOCIATION
```

```
 1    HEENAN BLAIKIE LLP

 2    Bay Adelaide Centre

 3    333 Bay Street, Suite 2900

 4    P.O. Box 2900

 5    Toronto, ON  M5H 2T4

 6    PER:      John Salmas, Esq.

 7              Kenneth Kraft, Esq.

 8              Sara-Ann Van Allen, Esq.

 9

10    FOR WILMINGTON TRUST, NATIONAL ASSOCIATION

11    KATTEN MUCHIN ROSENMAN LLP

12    575 Madison Avenue

13    New York, NY  10022-2585

14    PER:      Craig A. Barbarosh, Esq.

15              David A. Crichlow, Esq.

16              Karen B. Dine, Esq.

17

18         LAW DEBENTURE TRUST COMPANY OF NEW YORK

19

20    FOR LAW DEBENTURE TRUST COMPANY OF NEW YORK

21    BORDEN LADNER GERVAIS LLP

22    40 King Street West

23    Toronto, ON  M5H 3Y4

24    PER:      Edmond F.B. Lamek, Esq.

25              James Szumski, Esq.
```

```
 1

 2    FOR LAW DEBENTURE TRUST COMPANY OF NEW YORK

 3    PATTERSON BELKNAP WEBB & TYLER LLP

 4    1133 Avenue of the Americas

 5    New York, NY  10036

 6    PER:        Daniel A. Lowenthal, Esq.

 7

 8         BOARDS OF DIRECTORS OF NORTEL NETWORKS

 9         CORPORATION AND NORTEL NETWORKS LIMITED

10

11    FOR THE BOARDS OF DIRECTORS OF NORTEL NETWORKS

12    CORPORATION AND NORTEL NETWORKS LIMITED

13    OSLER HOSKIN AND HARCOURT LLP

14    100 King Street West

15    1 First Canadian Place, Suite 6100

16    P.O. Box 50

17    Toronto, ON  M5X 1B8

18    PER:        Lyndon Barnes, Esq.

19                Edward Sellers, Esq.

20                Betsy Putnam, Esq.

21                Adam Hirsh, Esq.

22                Alexander Cobb, Esq.

23

24

25
```

1                               I N D E X

2

3       CLOSING SUBMISSIONS:                                PAGE

4

5       BY MR. BARRACK.......................... 5415

6       BY MS. MILLER........................... 5431

7       BY MR. O'CONNOR......................... 5471

8       BY MR. BROMLEY.......................... 5490

9       BY MS. BLOCK............................ 5506

10      BY MR. BROMLEY.......................... 5583

11      BY MR. QURESHI.......................... 5695

12      BY MR. LEBLANC.......................... 5710

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1    -- Upon commencing at 8:30 a.m.

 2

 3                THE CANADIAN COURT:  Good morning,

 4    Judge Gross.

 5                THE US COURT:  Good morning, Justice

 6    Newbould.

 7                THE CANADIAN COURT:  Mr. Barrack.

 8                MR. BARRACK:  Good morning, Your

 9    Honour, good morning, Judge Gross.

10                THE US COURT:  Good morning.

11                MR. BARRACK:  Where I finished

12    yesterday was that pro rata is not the economic

13    equivalent of the Canadian ownership theory, and

14    what I pointed out was that the guarantees aren't

15    allowed -- sorry, in the Britven demonstrative that

16    you got from the CCC, you'll recall that it had

17    numbers for the UKPC, and where I finished

18    yesterday was saying that those numbers did not

19    include the guarantee but they also presume that

20    within EMEA funds are taken away --

21                THE CANADIAN COURT:  Just a minute,

22    just to make sure we understand what you are

23    talking about.  Are you talking about --

24                MR. BARRACK:  Sorry, they do include

25    the guarantee.
```

```
1                 THE CANADIAN COURT:  I just want to
2    make sure I understand what you are talking about.
3                 MR. BARRACK:  Yes.
4                 THE CANADIAN COURT:  Was this in the
5    CCC brief?
6                 MR. BARRACK:  This was in the CCC
7    demonstrative.  And maybe you can help me out which
8    page it was, Mr. Zigler.
9                 THE CANADIAN COURT:  I have got it.
10                MR. BARRACK:  Page 14.  And you can see
11   that there are numbers for UK pension trust along
12   the second from bottom row.
13                THE CANADIAN COURT:  Yes.
14                MR. BARRACK:  And you see the 44 and 37
15   percent?
16                THE CANADIAN COURT:  Yes.
17                MR. BARRACK:  Those include an allowed
18   guarantee claim of 880 million dollars.
19                THE CANADIAN COURT:  I'm looking at
20   their brief.
21                MR. BARRACK:  Right.
22                THE CANADIAN COURT:  At page 5 of their
23   brief.
24                MR. BARRACK:  Right.
25                THE CANADIAN COURT:  And so I want to
```

1    understand when you say something includes that, I

2    want to understand where that is coming from.

3              MR. BARRACK:  What it is coming from is

4    the Britven report and from the deposition of

5    Britven and the cross-examination of Britven, to

6    understand how he developed his numbers.

7              THE CANADIAN COURT:  What do you say

8    that includes or doesn't include?

9              MR. BARRACK:  It includes 880 million

10   allowed guarantee claim, and I can't give you the

11   numbers on the second point, but what it presumes

12   is that EMEA funds are taken away from some

13   entities, funds that are in the entities now, and

14   given to others, which is different than under pro

15   rata.

16              Under pro rata you simply leave the

17   funds where they are, it is only an allocation

18   concept, and that similarly overstates the UK

19   pension trust share, but I can't give you a

20   quantification of that.

21              THE CANADIAN COURT:  Okay, well --

22              MR. BARRACK:  The 880 is the big one

23   and it's --

24              THE CANADIAN COURT:  Where does that

25   come from?  This is not meaning a whole lot to me

```
 1    right now.  You are rhyming this stuff off, but it
 2    doesn't mean a whole lot to me.
 3                 MR. BARRACK:  That 44 percent number is
 4    too high.
 5                 THE CANADIAN COURT:  I understand you
 6    are saying that.  What's the 880 million guarantee
 7    claims?
 8                 MR. BARRACK:  Sorry?
 9                 THE CANADIAN COURT:  The 880 million
10    guarantee claims, guarantee claims of whom?
11                 MR. BARRACK:  Sorry, the guarantee
12    claims of the UKPC.  So in order to work out these
13    numbers, what Britven did was determine how much
14    money each of these entities would have at the end
15    of the day, and embedded in this 44 or 37 percent
16    is an 880 million dollar guarantee claim for UKPC
17    and, as you know, Your Honour, that matter is hotly
18    contested.
19                 THE CANADIAN COURT:  Well, are you
20    calling the guarantee -- are you talking about the
21    claim against the Canadian Estate?
22                 MR. BARRACK:  The claim against the
23    Canadian Estate.  So it is presumed that those are
24    allowed.
25                 So the point that Mr. Zigler is making
```

1    to you, which we dispute, is that the Canadian

2    ownership theory and pro rata are the same, and we

3    are saying that they are not necessarily the same.

4    They are not the same, and there are real reasons

5    why they are not.

6              And I am told that the 880 million

7    guarantee claim is at the Britven initial report,

8    page 18.

9              THE CANADIAN COURT:  Okay.

10             MR. BARRACK:  So then turning to the

11   flaws in the American approach, the American

12   approach ignores the fundamental agreement

13   contained in the MRDA that net or residual income

14   was allocated, not revenue.

15             As you are well aware, expenses were

16   satisfied before residual income was shared, and

17   revenue had to be reduced by worldwide expenses,

18   including pension expenses, before residual profit

19   could be allocated.

20             The US approach seeks to attribute the

21   future revenue from the Nortel patents to the US,

22   but it does so without first paying the expenses

23   that were incurred to create these patents.

24             Now, each of the Canadian and American

25   approaches is based on using the MRDA to infer or

1    imply an allocation approach.  Each of them is

2    based on a different alleged ownership interest in

3    the Nortel patents.

4              The difficulty is that if the Court is

5    going to infer or imply an outcome, then it must

6    meet the test of being obvious to an outsider.

7    That is the essence of any test in law for implying

8    a term into a contract.  But as you know and as

9    yesterday demonstrated and today will demonstrate,

10   the very --

11             THE CANADIAN COURT:  I haven't heard

12   them argue that they are implying a term.  I have

13   heard the Canadians argue that they have legal

14   title and that is ownership, and I have heard the

15   US side saying that they had beneficial interest

16   and it is all taken from the language of the

17   agreement.  I don't hear them saying it is implied.

18             MR. BARRACK:  What they are implying,

19   and this is a subtle distinction, they are making

20   the step that from that fact of ownership, they are

21   implying an agreement that the sales -- that the

22   proceeds of sales in a global liquidating

23   insolvency would be distributed on the basis of

24   that ownership.

25             That is the question before the Court,

```
 1    and everyone agrees that that question, that

 2    allocation of risk is not contained in the MRDA.

 3    And what they are saying is you should imply from

 4    the fact of ownership, you should imply from the

 5    licence or from the fact of ownership that the

 6    parties intended that there would be an allocation

 7    on that basis.

 8              And that is a very important

 9    distinction and it goes back to the Pettkus v.

10    Becker discussion yesterday.  When you answer that

11    question of who owns what, you are not at the end

12    of the road.  You are only at the beginning of the

13    road.  And that is the essential flaw in these

14    ownership arguments.

15              The fact Mr. Becker owned the farm had

16    nothing to do with whether there was a constructive

17    trust claim.  The fact that there may be a licence

18    or an ownership interest does not impair a pro rata

19    result.

20              So that is the essential implication.

21              THE CANADIAN COURT:  All right.

22              MR. BARRACK:  And so the very intensity

23    of that debate around the ambiguities --

24              THE CANADIAN COURT:  So you say it is

25    not so obvious to fall within our implied term
```

1    rules?

2              MR. BARRACK:  Right, and the very

3    intensity of the debate around the ambiguities of

4    the MRDA is compelling evidence of the fact of the

5    lack of obviousness.  I mean, we all know, you

6    know, the officious bystander, commercial efficacy,

7    all the rest of it.  They are all shorthand for

8    there has to be a sufficient degree of obviousness.

9              And the very intensity of the debate

10   around the ambiguities of the MRDA is compelling

11   evidence of the fact that the ownership concepts

12   embedded in it are not appropriate surrogates for a

13   prior agreement on the question that is before the

14   Court.

15             When an attempt is made to use the MRDA

16   for a purpose for which it was not intended, it is

17   not surprising that it contains extreme ambiguities

18   and even inconsistencies.  There was a transfer

19   pricing document dealing with allocation of

20   periodic income.

21             What each of the Canadians and

22   Americans are doing are attempting to use the MRDA

23   to find a meaning or result which was never

24   intended to be contained within the document and

25   does not exist within the document.

1           And if we stand back, the absurdity of

2     the ownership allocation is demonstrated by

3     comparing the positions of two of NNL's

4     wholly-owned subsidiaries, NNUK and NNTC.  If the

5     Canadian legal title theory is accepted, then the

6     majority of the lockbox funds will be allocated to

7     a single entity, NNL, the holder of the legal

8     title.

9           So let's compare --

10          THE CANADIAN COURT:  Is that right?  We

11    are hearing it is going to go elsewhere.

12          MR. BARRACK:  It is going to go

13    elsewhere -- if you take their theory, and their

14    theory is that you give it to the selling debtor,

15    the allocation, in the allocation phase, would be

16    to NNL because that is the only entity that owned

17    the legal title.

18          THE CANADIAN COURT:  Okay.

19          MR. BARRACK:  Okay, but NNTC employed

20    the Canadian R&D employees who contributed to the

21    jointly created R&D.  NNUK employed the UK R&D

22    employees who contributed the jointly created R&D.

23          Sharon Hamilton, you'll recall,

24    testified at trial that the Monitor is considering

25    substantive consolidation or substantive

```
 1    consolidation of the entities within the Canadian

 2    Estate.   There is no other evidence on how the

 3    proceeds of the lockbox received by NNL would be

 4    distributed to NNTC if not through substantive

 5    consolidation.   If this occurs, it leads to an

 6    absurd result.   Neither of these subsidiaries who

 7    employed R&D employees can claim legal title to the

 8    patents.   NNUK, however, is recognized in the MRDA

 9    as an RPE, which had both a licence and a

10    beneficial interest in the NN Technology.

11                 NNTC had neither.   And under the

12    Canadian legal title theory, pensioners and other

13    creditors of NNTC would share in the windfall to

14    NNL purely by virtue of having the good fortune to

15    be located in Canada.

16                 NNUK pensioners would not share because

17    they are located in the UK.

18                 A pro rata method of allocation would

19    eliminate such absurd results.   As pointed out in

20    our written submissions, each of the American and

21    Canadian ownership approaches takes the allocation

22    result out to the margin in favour of its proponent

23    in a manner which would be economically irrational

24    from the perspective of the other parties.

25                 And I would like to give you, Judge
```

1    Gross, I liked your acronym yesterday, but I would

2    like to give you another one.  Misdirection really

3    has diverted allocation.  And the misdirection has

4    been to ownership theories.

5              So finally, how does the EMEA approach

6    to allocation question -- approach the allocation

7    question in the absence of a prior agreement?

8              Well, the EMEA contribution approach is

9    economically rational from the perspective of all

10   parties.  It does not look to the MRDA to create

11   ownership interests to support that.  The EMEA

12   contribution approach recognizes the collaborative

13   way --

14             THE CANADIAN COURT:  You are just

15   reading something off, rhyming it off at huge

16   speed.  If you want to make your points, you are

17   not making them well with me when you are just

18   rhyming them off and reading because I can't keep

19   up with you.

20             MR. BARRACK:  Okay.  So what I am

21   saying, Your Honour, is the EMEA contribution

22   approach is economically rational, that is point

23   number one, and it is economically rational from

24   the perspective of all parties.

25             The second point is that it doesn't

1    look to the MRDA to create ownership interests, a

2    document that I think persuasively that was pointed

3    out yesterday.

4              It does recognize the collaborative way

5    in which Nortel RPEs developed and shared the

6    technology and it does attempt to evaluate the

7    contribution of each Nortel entity to the assets

8    that were sold in the insolvency proceeding.  And

9    you heard that from Dr. Bazelon.

10              However, the challenge with the

11    contribution approach is the metric, and that was

12    implicit in the slides you were shown yesterday.

13    The collaborative nature of the R&D at Nortel and

14    its entangled nature meant that R&D spending is not

15    a fully accurate proxy for measuring R&D value

16    creation and contribution.

17              NNUK didn't have any control over its

18    level of R&D spending.  That was centrally

19    controlled.  And as the evidence showed, NNUK

20    contributed a much greater percentage of patentable

21    inventions than its percentage of R&D spending.

22              THE CANADIAN COURT:  Well, didn't NNUK

23    agree to that as part of the MRDA?  Didn't it agree

24    that's how the business will operate?

25              MR. BARRACK:  It did agree as to how

1    the business would operate, but the question before

2    the Court today is not how R&D got allocated.  It

3    is a question of was the result of that R&D jointly

4    owned by all of the parties and, given that it was

5    jointly owned by all of the parties, who today

6    those entities have no reality.  The only reality

7    of those entities are their creditors.

8              THE CANADIAN COURT:  I understand that.

9    But you said the R&D spending is not a fully

10   accurate proxy for measuring R&D value.

11             MR. BARRACK:  Yes.

12             THE CANADIAN COURT:  Well, I'm just

13   asking you, is it not the case that during the

14   operation of that agreement, NNUK didn't take that

15   position.  It took the position that it was an

16   accurate proxy because that is what the terms were.

17             MR. BARRACK:  Right, it took that

18   position, but if we stand back from it with an air

19   of reality, the reason it takes that position is

20   because what was good for the entire Nortel was to

21   reduce their tax burden, and what they were trying

22   to do in this, unsuccessfully against Canada and

23   the US, was get as much profit into Canada as they

24   could.

25             Tax planning of that kind is entirely

```
 1    permissible in an ongoing operation, but again, it

 2    is a very separate question from when the music

 3    stops, what is the right way to divide up the

 4    proceeds of sale.

 5                  THE CANADIAN COURT:  Okay.

 6                  MR. BARRACK:  So my final point is to

 7    thank the Courts, because I may not speak again,

 8    for your attention and efficient running of what

 9    has been a most demanding trial.  The Courts have

10    done an excellent job.

11                  Ms. Miller will now address you.

12                  THE CANADIAN COURT:  Just a minute,

13    Mr. Barrack.

14                  THE US COURT:  Thank you, Mr. Barrack.

15                  THE CANADIAN COURT:  Mr. Barrack, I

16    have a question for you.

17                  MR. BARRACK:  Sure.

18                  THE CANADIAN COURT:  At page 33 of your

19    brief --

20                  MR. BARRACK:  Initial or reply?

21                  THE CANADIAN COURT:  Initial.

22                  MR. BARRACK:  Okay.

23                  THE CANADIAN COURT:  Paragraph 74, the

24    last sentence says:

25                        "As Courts have explained, one
```

1            claimant's fortuitous ability to

2            trace his assets should not elevate

3            him above others with whom he is

4            expected to be on equal ground".

5        Can it be said that the parties all

6    expected to be on equal ground when they agreed to

7    different percentages, the percentage of spend on

8    R&D would allocate profits?

9        MR. BARRACK:  The parties had no

10   conscious expectation of how the proceeds of the

11   sale in a liquidating insolvency would be allocated

12   between them, and let's break that down into two

13   things.

14        Number one, who are the parties?  The

15   parties we are now talking about functionally are

16   the entities.  And did these entities do anything

17   in terms of a negotiation as between themselves in

18   a self-interested way to protect their own

19   creditors?  No.

20        Question number one.  As a matter of

21   fact, there were no functioning entities that are

22   relevant to the task before the Court.

23        And number two, they never turned their

24   mind to that question.  And we would adopt what

25   EMEA said yesterday.  What they knew was that they

```
 1    were creating -- they were engaging in R&D.  They

 2    were creating patents.  And they jointly owned

 3    them.

 4                And if the implication of that is that

 5    they were to own them equally, we would agree.

 6    What we do say on the pro rata is standing as

 7    surrogates for their creditors, that the way this

 8    entire entity operated, the natural implication

 9    would be not that -- if you have -- if you come to

10    somebody and say you can't have the cash today, we

11    can't put it into your pension plan because it is

12    for the good of everybody, then that creates an

13    expectation that when the music stops, everything

14    is going to be for the good of all of the

15    creditors.  And that is the essence of the

16    argument.

17                THE CANADIAN COURT:  All right.

18                Now, the other question I wanted to ask

19    you about was paragraph 130, and I don't know, is

20    Ms. Miller going to deal with this part of the

21    argument?

22                MR. BARRACK:  She may.  What is

23    paragraph 30?

24                THE CANADIAN COURT:  It is the hotchpot

25    rule.
```

```
1                    MR. BARRACK:  She'll deal with that.

2                    THE CANADIAN COURT:  Ms. Miller.

3                    MS. MILLER:  Your Honour, Judge Gross.

4                    THE US COURT:  Ms. Miller.

5                    MS. MILLER:  I'm wedged in between

6    Mr. Barrack and Mr. O'Connor, and I am conscious of

7    the time, and I am also conscious of Your Honour's

8    request that we not speak --

9                    THE CANADIAN COURT:  Perhaps it is a

10   rose between two thorns.

11                   MS. MILLER:  Well, it is a bankruptcy

12   lawyer between two real litigators, so they wedged

13   me in the middle.

14                   I am conscious of the comment about not

15   speaking too quickly, and I know we do feel

16   tremendous time pressure with a very, very small

17   amount of time that we have been allocated to

18   present the pro rata --

19                   THE CANADIAN COURT:  Everybody is going

20   to have a fair chance to make their argument.

21                   MS. MILLER:  Thank you, Your Honour.

22                   THE CANADIAN COURT:  Lawyers can

23   allocate as they want, but we have to make sure

24   everybody has a fair chance.

25                   MS. MILLER:  Thank you, Your Honour.
```

```
 1              So the two issues that I intend to
 2     address are, firstly, why pro rata is appropriate
 3     in the circumstances of this particular case, and
 4     secondly, I will address head-on the objections
 5     that have been raised by the various parties to its
 6     use as a metric for allocation.
 7              Firstly, Your Honours, it is our
 8     respectful view that Nortel represents the absolute
 9     paradigm case for an application of pro rata
10     principles for an allocation of the lockbox funds.
11              There has never been a bankruptcy case,
12     in our view, where the facts so clearly cry out for
13     this result, and based on what has occurred over
14     the last five and a half years, with 1.3 billion
15     dollars in professional fees and that amount
16     reflecting the fees in two estates alone, there
17     won't likely be another Nortel any time soon.
18              The facts in this case that make it so
19     unusual and that so cry out for this result are the
20     following.
21              The assets that were sold and that
22     comprise the lockbox funds consisted primarily of
23     intellectual property, property that couldn't be
24     seen, felt, touched and didn't reside in any one
25     jurisdiction.
```

1              But most importantly for this
2    particular case and the issues before the Court,
3    the assets in this case were never ring-fenced.
4    They were never identified by a legal entity.  They
5    were never segregated by geography, and nor could
6    they be.
7              Multiple entities had indivisible
8    interests in the whole, and the whole was the whole
9    of Nortel, the fully integrated multinational
10   enterprise of Nortel.
11             The assets in question were created
12   through the efforts of individuals located in
13   various parts of the world who collaborated and
14   worked as part of a common endeavour.  They created
15   value for the enterprise as a whole, not for the
16   geography in which they worked, not for the entity
17   that might have been their technical employer, but
18   for the enterprise as a whole.
19             The global organization of Nortel
20   operated along business lines and those business
21   lines cut right across legal entities; they cut
22   across geographies; all of the entities were
23   involved in all of the products that created all of
24   the IP that created a common pool of assets in
25   which they all shared.

1          And so, Your Honours, with that
2    context, this is not a simple valuation case.  We
3    know right now what the assets were worth.  We know
4    what the amount is that is in the lockbox.  It is
5    not a case of determining the value of those
6    assets.  It is also not a case of valuing
7    individual interests in the lockbox because the
8    simple reality is that each of the entities that
9    claims an interest claims an interest in the whole.
10   It is an indivisible whole.
11          It is also the case that in this
12   particular, and again, the facts and circumstances
13   of this case, no creditor or outside party who was
14   dealing with Nortel would have been able to
15   determine or discern what assets each individual
16   legal entity owned, and there are two reasons for
17   that.
18          Until February of 2008, and at that
19   point in time you'll recall that all of the bonds
20   with the exception of one 650 million dollar
21   add-on, all of the bonds had already been issued.
22   All of the financial reporting up to that point in
23   time was on a fully-consolidated basis for the
24   group as a whole.
25          Secondly, the most valuable assets of

1   Nortel, a technology company, its intellectual

2   property, didn't appear on any publicly available

3   balance sheet or financial statement.  So the very

4   assets in question that are the subject matter of

5   this allocation dispute nobody could look to and

6   say, those assets are the assets of NNI, these

7   assets are the assets of NNL, and these assets are

8   the assets of NNUK.

9           The parties who were --

10          THE CANADIAN COURT:  Just a minute.  I

11  just want to make sure I understand.  You are

12  saying that the IP was an asset of a particular

13  technology company?

14          MS. MILLER:  We are saying that, first

15  of all, no one would have known --

16          THE CANADIAN COURT:  I understand that

17  point, I just want to understand where you are

18  saying it resided in fact.

19          MS. MILLER:  In fact, the IP, our

20  position is, is an asset that is owned by or that

21  multiple entities have an interest in, but they

22  don't have an interest in a piece of it; they have

23  an interest in the entire --

24          THE CANADIAN COURT:  I understand all

25  of that.  You just referred to the intellectual

1    property as being a tech company or something.

2    Which company -- did it reside in any particular

3    company in fact?  Was it a sub of Nortel NNL?

4                MS. MILLER:  No, in fact, unlike most

5    multinational enterprises where they might have one

6    sub that is responsible for the IP, that is not the

7    case here.

8                And I think the answer to your question

9    is if we look at the affidavit of John Doolittle

10   filed on the initial application, he is clear in

11   making a distinction between Nortel as a defined

12   term, which refers to the group, and NNL and

13   various entities.  When he is referring to the

14   intellectual property, he is referring to Nortel as

15   a group.

16                THE CANADIAN COURT:  Okay.

17                MS. MILLER:  So again, if we are

18   looking at, first of all, consolidated financial

19   statements, that wouldn't give anybody an

20   indication of where that intellectual property

21   assets reside, but more importantly, the actual

22   intellectual property assets themselves, as an

23   asset, did not appear on a balance sheet that was

24   publicly available or publicly disclosed.

25                So the parties who are opposed to a pro

1    rata allocation of the lockbox funds argue that if

2    that occurs in this case, the floodgates will open.

3    It will send a message to the market that that is

4    the standard to be applied in all future

5    bankruptcies involving multinational enterprise

6    groups, that Nortel is no different in the way in

7    which it operated from a number of other

8    multinational enterprise groups.  It will destroy

9    long-standing principles of corporate separateness.

10   It will create an entire upheaval in the market.

11            And I know that the Courts are well

12   familiar with the sky-is-falling arguments.  They

13   are raised often.  The arguments in this case to

14   that effect are simply not supportable, for three

15   reasons.

16            Firstly, Nortel really does represent a

17   unique set of facts that distinguish it from most

18   other multinational enterprise groups.  It is in

19   effect the perfect storm, a perfect storm that

20   arises once in a very long while.

21            Secondly, the allocation of the lockbox

22   funds that the UKPC and others who support pro rata

23   are requesting does not ignore corporate form.  It

24   maintains and respects corporate form to the same

25   extent as existed pre-filing.

```
 1              Thirdly --
 2              THE CANADIAN COURT:  How does it do
 3    that?
 4              MS. MILLER:  It does that because all
 5    of the entities remain in place.  The liabilities
 6    that are filed and asserted against those entities
 7    are considered on an entity basis.  There is no
 8    merging of the entities.  And at the end of the
 9    day, the underlying issue, which is the assets that
10    were not segregated, ring-fenced and didn't belong
11    to any particular entity are the assets and the
12    characteristics that remain in a common pool.  The
13    liabilities are not merged.
14              The third reason that the arguments
15    that I have referenced are not supportable is that
16    any effect that an application of pro rata
17    principles and the lockbox funds, any effect on the
18    guarantees that the Bondholders hold as a result of
19    the application of those principles will simply
20    reflect what the market and the parties already
21    understood about those particular guarantees and
22    the entangled nature of the assets and the unique
23    facts of this case.
24              So perhaps the best way to illustrate
25    that this case truly is the perfect storm and is
```

```
 1    not the norm or the ordinary course, if we recall

 2    the published remarks of at that time the Chief

 3    Justice of Ontario who was mandated with leading

 4    the parties in the third mediation who implored the

 5    parties by saying in this particular case there

 6    does not appear to be any realistic litigation

 7    option.  He repeated that twice.

 8              THE CANADIAN COURT:  This is in your

 9    demonstrative, isn't it?

10              MS. MILLER:  Yes, it is, Your Honour.

11    It is slide 14.

12              An extraordinary comment and an

13    extraordinary recognition of the uniqueness of this

14    particular case.

15              The Nortel proceeding has been and

16    continues to be extraordinary and unprecedented.

17    There is no obvious and easy answer.  And

18    otherwise, the Courts would not have permitted and

19    the parties would not have spent the last four and

20    a half years fighting about how to divvy up the

21    proceeds of sale.

22              So to provide some context for how

23    Nortel is distinct from other multinational

24    enterprise groups and to counter the suggestion

25    that Nortel is no different from any other large
```

1    organization, and to show why this case does in

2    fact stand in a very unique place, we can look to

3    two sources.

4              The first source is the empirical and

5    the comparative studies that have been conducted by

6    Dr. Irit Mevorach of the World Bank, and secondly,

7    the evidence that is given in this trial.  There is

8    a wide spectrum of multinational enterprise groups

9    ranging from those that would be considered

10   non-integrated --

11             THE CANADIAN COURT:  Where do we find

12   this?  Oh, I see, it is page 15 of your study?

13             MS. MILLER:  Yes, I'm sorry, I'm just

14   going to flip to that slide and take you there, and

15   there is more detail on this in our closing brief,

16   and in fact, we included for the benefit of the

17   Court, and I would encourage you, there are three

18   chapters of that book, and I know with the

19   thousands of pages that have been filed, it is a

20   lot to ask, but it is, I think, a very helpful

21   analysis.

22             THE CANADIAN COURT:  You can lead a

23   horse to water; you can't necessarily make it

24   drink.

25             MS. MILLER:  I appreciate that, Your

1    Honour, so I'm trying to take the Coles notes

2    versions.

3            The two sources are actual empirical

4    studies that have been done by a very, very

5    authoritative international insolvency scholar and

6    co-head of the insolvency group at the World Bank,

7    and secondly, the evidence in this trial.

8            So there is in fact a range of

9    multinational enterprise groups and it is helpful

10   to look at that objectively to see where Nortel

11   fits within that range.

12           Of the many factors that Dr. Mevorach

13   identified and has looked at and studied in

14   multinational enterprise groups, she has identified

15   that you can narrow that down effectively by three

16   categories of comparison.

17           One is the degree of integration that

18   is demonstrated within the MNE, which is -- I'll

19   refer to MNE just as a short form for the

20   multinational enterprise groups.

21           The second is the degree of autonomy or

22   centralized control.

23           And the third is the evidence of what

24   happens upon insolvency based on the first two

25   factors.

1              Within those categories, in comparing

2      numerous multinational enterprise groups,

3      Dr. Mevorach has identified the factors that would

4      cause one to fall in either the far left category

5      of having weak or no integration to those that may

6      be significantly integrated on a business basis --

7              THE CANADIAN COURT:  Is this book an

8      exhibit in this case?

9              MS. MILLER:  The book is filed with our

10     brief of authorities, the three chapters that we

11     refer to are filed with our brief of authorities.

12             THE CANADIAN COURT:  Okay.

13             MS. MILLER:  So the parties have those

14     chapters.

15             And then on the far right side is of

16     course the asset integration, which is the category

17     that we say Nortel clearly falls within.

18             THE US COURT:  Isn't this really akin

19     to expert testimony that we have not previously

20     considered or that has not been identified as

21     perhaps something that would be submitted to the

22     Courts?

23             MS. MILLER:  Your Honour, I don't think

24     it is, with respect.  I mean, we have all -- all

25     the parties in this proceeding have filed articles

```
 1   written by academics and other scholars, and
 2   Dr. Mevorach who has also written articles and one
 3   of her articles became a lengthier article and
 4   found its way into an actual textbook on the
 5   subject.  So I think it is no different to refer to
 6   it.  I have put it for visualization purposes in
 7   the form of a chart --
 8              THE CANADIAN COURT:  Let's assume you
 9   are asking us to come to the conclusion that Nortel
10   fits in the right-hand column.  Just on that
11   assumption, then what do you say?
12              MS. MILLER:  So there are a number of
13   things that flow from that, and that is my
14   argument, that whether it is accepted as evidence
15   or not, and clearly --
16              THE CANADIAN COURT:  Just tell me on
17   the question, assuming it were an asset
18   integration, what flows from that?
19              MS. MILLER:  So as indicated in our
20   written submissions, what flows from that are that
21   the solutions upon insolvency are different, and
22   the tools and options available to the Courts in
23   cases of asset integration --
24              THE CANADIAN COURT:  Okay, I must have
25   -- where is that in your argument?
```

```
 1              MS. MILLER:  So if I can direct you to
 2   our reply closing brief --
 3              THE CANADIAN COURT:  I don't think I
 4   ever got that, frankly.
 5              No, I have got it, here it is, yes.
 6   Where is that?
 7              MS. MILLER:  So let me just refer you
 8   to the right page.  Yes, pages 57 to 59 of our
 9   reply closing brief.
10              THE CANADIAN COURT:  All right, I'll
11   look at it.
12              MS. MILLER:  And also page 72 and 92.
13   If I can direct you perhaps in particular that, for
14   example, in paragraph 146 of our reply brief, at
15   the end of paragraph 146, citing from
16   Dr. Mevorach's text which is attached, she is
17   suggesting that in those cases where asset
18   integration exists, those are the cases in which
19   substantive consolidation should typically be the
20   solution.
21              THE CANADIAN COURT:  But you are not
22   asking for substantive consolidation.
23              MS. MILLER:  We are not, but as we will
24   -- as Mr. O'Connor will address in the next
25   submissions, there are a number of legal
```

1    principles, substantive consolidation of which is

2    one, where the Courts can look to by analogy and by

3    reference to what tools are available, what

4    considerations are appropriate.

5              THE CANADIAN COURT:  Yes, okay.

6              MS. MILLER:  So with respect to Judge

7    Gross's question, it is argument.  We are not

8    submitting this as expert evidence.  And certainly

9    Dr. Mevorach has not studied Nortel, she has not

10   given any opinion and doesn't purport to give any

11   opinion on where Nortel fits within this

12   categorization.  That is our argument on behalf of

13   UK Pension Claimants that given the characteristics

14   that she has identified, Nortel fits within the

15   highest degree of integration.

16              And so the thing to keep in mind is

17   that there is nothing wrong with the structure that

18   involves asset integration.  We are not suggesting

19   that it was, you know, with a view to defraud or

20   deceive creditors.  There is nothing wrong with the

21   structure.  But certain consequences flow from that

22   structure upon insolvency.

23              And as I mentioned at the outset, the

24   key issue in this case is that the very assets that

25   represent the greatest value for the enterprise as

```
 1    a whole, that is the IP, are highly integrated

 2    assets.  There are multiple entities that claim an

 3    interest in the whole of those assets.

 4              The degree of integration that existed

 5    at Nortel made a group collapse on insolvency

 6    almost inevitable.  None of these entities could

 7    have realistically engaged in stand-alone

 8    insolvency proceedings.  They all depended on one

 9    another prior to filing, and it resulted in, as

10    Dr. Mevorach has identified in the third column, a

11    group collapse because of the degree of integration

12    and interdependence.  The integration that existed

13    at Nortel --

14              THE CANADIAN COURT:  I think in support

15    of that argument, as I recall, there was some

16    evidence I think from Mr. Ray that no one ever

17    considered NNI going out on its own after the

18    collapse.

19              MS. MILLER:  That's right, Your Honour,

20    and the evidence of Sharon Hamilton on behalf of

21    the Monitor is equally consistent that there was

22    absolutely no way that any of these entities could

23    have survived on its own, including the parent NNL.

24              So we have in effect a highly scrambled

25    egg, not just in terms of the manner in which these
```

```
 1    companies operated, not just in terms of

 2    integration of functions or integration of business

 3    lines or the control.  We have a highly integrated

 4    organization that included the integration of its

 5    assets.

 6              And just to give some very, very brief

 7    context to the degree of integration, I'm just

 8    going to flip very quickly through some of the

 9    slides that show the most senior officers of these

10    organizations, what their testimony was in this

11    trial.

12              Pavi Binning, the CFO and Chief

13    Restructuring Officer:

14                    "When you run a business on a

15                    global basis... legal entities are

16                    quite secondary [...]"

17              Ernie Briard, an accountant with the

18    Chief Technology Office:

19                    "We did not run the business

20                    with any real knowledge of the

21                    statutory entities at all.  We ran

22                    it as a global Nortel Corporation".

23                    Our whole company was being run

24                    on a one-Nortel basis, bonus

25                    schemes, profit, motivation, a big
```

```
 1                    chunk of it, everything had to do

 2                    with your total Nortel.

 3                    Doug Beatty in the Treasury Department

 4      and Chief Financial Officer:

 5                         "Decisions to allocate

 6                    resources were not based on legal

 7                    entity lines but by lines of

 8                    business".

 9                    Peter Currie, Chief Financial Officer:

10                         "Nortel reported its finances

11                    on a consolidated basis without

12                    regard for its different legal

13                    entities".

14                    Peter Currie also testified that:

15                         "[...] legal entities were not

16                    free-standing [...] they could not

17                    feasibly have been hived off and

18                    operated independently."

19                    David Drinkwater, Chief Legal Officer,

20      considered his employer to be Nortel, the global

21      organization.

22                    George Riedel, Chief Strategy Officer,

23      he obviously knew that the legal entity that

24      employed him changed over time but it did not

25      affect his responsibilities.
```

1                    "I didn't think of it as

2             entities, it was Nortel".

3                    Kush Dadyburjor, the VP of Mergers &

4    Acquisitions, testified that the legal entity that

5    employed him was irrelevant from the standpoint of

6    his job responsibilities.

7                    THE CANADIAN COURT:  If it helps, I

8    have read through all of this, Ms. Miller.

9                    MS. MILLER:  So these are not the line

10   people making widgets who are unfamiliar with how

11   an organization works.  These are the people, in

12   most cases the most senior people running this

13   organization.

14                   Common law courts are familiar with

15   situations where there is common ownership of

16   assets or competing legal and beneficial claims to

17   the same assets, and we most often see those

18   competitions and legal disputes in situations

19   involving joint ventures, constructive trusts,

20   equitable receiverships and substantive

21   consolidation.

22                   We have addressed each of those in our

23   written closing briefs, and, in our submission, the

24   only allocation method that reflects the way in

25   which this particular multinational enterprise

1    operated and that is economically rational is a pro

2    rata pari passu treatment of all unsecured

3    creditors.

4              I am not going to take time to go

5    through the materials that we have in our written

6    brief on joint venture and the other analogous

7    situations because with the time I have I would

8    like to deal directly, if I can, with some of the

9    objections that have been raised by the parties to

10   an implementation of pro rata.

11             The first main objection is summarized

12   as the difficulty in implementing a pro rata

13   result, and in that regard I would like to just

14   recall for the parties in the Court a quote from

15   Judge Sloviter of the Third Circuit in Delaware in

16   this Nortel case --

17             THE CANADIAN COURT:  What was before

18   him at the time he made this statement?

19             MS. MILLER:  It is her, Your Honour.

20             THE CANADIAN COURT:  Her, what was

21   before her?

22             MS. MILLER:  So it was an appeal on the

23   issue.  It was an EMEA appeal on the issue of

24   whether the Delaware Court had jurisdiction to

25   determine allocation.

1                    THE CANADIAN COURT:  Okay.  All right.

2                    MS. MILLER:  Or whether it had to go to

3      arbitration.

4                    THE CANADIAN COURT:  All right.

5                    MS. MILLER:  So the Court, after

6      disposing of the appeal before it, went out of its

7      way to make comments to the parties.  And keep in

8      mind this is 2011, three years ago.  The comments

9      and the quote are up on the screen.

10                   The reality is the Court was imploring

11     the parties and the attorneys representing the

12     parties to not focus on technical differences

13     governing bankruptcy in the various jurisdictions

14     without considering that there is real live

15     individuals who are affected by the decisions.

16                   In my respectful view, the Court was

17     very clearly telegraphing to the parties be

18     practical, be sensible, and that that's the manner

19     in which the Third Circuit, if this matter comes

20     before it, will view the decisions and the

21     jurisdiction exercised by the Delaware Bankruptcy

22     Court.

23                   So with that context -- I'm sorry, Your

24     Honour, did I --

25                   THE CANADIAN COURT:  No, I said go

```
 1    ahead.  I have read it, don't worry.  It is not
 2    hard to read.  He is saying a lot -- Chief Justice
 3    Winkler said it too, it all fell on deaf ears.
 4              MS. MILLER:  Yes, yes.  So within that
 5    context, the UK Pension Claimants, in seeking a pro
 6    rata allocation of the lockbox funds, would not put
 7    forward an allocation position that we did not
 8    believe was supportable and sustainable both at the
 9    Ontario Court of Appeal and in the Third Circuit in
10    Delaware.
11              Our client has very special reasons for
12    ensuring that the position that it puts forward are
13    actually supportable and upheld on appeal.  Our
14    clients need finality and they need a distribution.
15              An allocation position that is going to
16    be tied up and perhaps remanded back down in one or
17    two jurisdictions on particular issues or tweaks or
18    variables or discount rates and a number of other
19    factors in the other allocation positions does not
20    serve our clients' interests.
21              Over 5,000 of our clients died before
22    this trial started.
23              So if we can turn then to what some of
24    these specific roadblocks or impediments are that
25    have been raised by the parties.
```

1              So the first argument on implementation

2      is the US Interests argue that because all the

3      claims have not been finalized and because pro rata

4      allocation is premised upon a common dividend to be

5      paid on claims, that this is going to result in a

6      delay.

7              They also argue that the very fact that

8      claims will be addressed in the jurisdictions in

9      which those claims are asserted, that there is a

10     possibility for mischief in that somehow claims are

11     going to either be admitted that might not

12     otherwise be admitted or admitted in higher

13     amounts.

14             The reality is, Your Honours, that five

15     and a half years after this proceeding started,

16     there are absolutely no unknowns that are going to

17     move the dial in any way, shape or form on an

18     allocation in this case.  There are no surprise

19     claims lurking in the woodwork that are going to

20     change the dial.  A trade creditor in Portugal that

21     has not filed a claim because a claims process has

22     not been finalized is not going to change the dial.

23             With respect to the opportunity for any

24     mischief, the Courts need not be reminded that

25     there are three Court Officers administering the

1    insolvency proceedings in three jurisdictions.

2              The Court has a number of ways of

3    ensuring that directions and orders that it issues

4    are in fact implemented and can have confidence

5    that with three Court Officers administering claims

6    proceedings, if a direction is issued by these

7    Courts to implement a pro rata allocation of the

8    lockbox, that will occur.

9              With respect to any mischief, firstly,

10   there is no incentive on any geography or party or

11   estate administrator to admit claims that are

12   either invalid or that are for amounts that are

13   higher than what they legitimately should be.  It

14   does not change the overall recovery to the

15   creditors in that jurisdiction because everything

16   is based on a common dividend.  It will simply have

17   the effect of reducing the overall dividend

18   received by all creditors.

19              THE US COURT:  How does a common

20   dividend respect the distinct corporate entities?

21              MS. MILLER:  The common dividend

22   respects the distinct entities to the same extent

23   as those distinct entities were respected prior to

24   filing, because claims can be determined based on

25   the liabilities and claims that have been filed

1    against each of those entities.

2              But the issue that makes Nortel unique

3    is that unlike most bankruptcy cases where claims

4    are filed against assets available for distribution

5    and it is the assets of the debtor that are

6    available for distribution, in this case the assets

7    against which those claims are asserted are all the

8    same assets.  It is one pool of intermingled assets

9    of all of the debtors.

10             So that the corporate entities are

11   respected.  Claims that are filed against NN

12   Portugal will be the aggregate claims pool of

13   claims filed against NN Portugal.

14             The other comment of, you know,

15   submission of the US parties that how can we

16   possibly trust what mischief might occur over in

17   EMEA, we have no visibility into those proceedings,

18   we only have visibility in the North American

19   proceedings.

20             The short answer to that, Your Honours,

21   is that the Canadian and US Estates made a very

22   conscious and strategic decision to not seek

23   recognition of the Chapter 11 or the CCAA

24   proceedings in the UK.  They made that decision,

25   and so it does not now lie in their mouth to say we

1    have no visibility on those proceedings.

2            And, quite frankly, it is never too

3    late.  If those parties want to go to the UK and

4    seek recognition of the Chapter 11 or CCAA

5    proceedings, there is nothing preventing them from

6    doing that.

7            In short, Your Honour, with respect to

8    implementation issues, the Courts are well familiar

9    with both the concept of interim distributions,

10   with the concept of holdbacks for any unresolved

11   claims to the extent that there are any large ones

12   that need to be addressed or finalized.  It is no

13   different than dealing with this on an

14   estate-by-estate basis, and implementation issues,

15   the mechanics of implementation ought not to be an

16   impediment if that is the correct result.

17           The second objection that is raised by

18   the parties is with respect to the effect it might

19   have on the 2 billion dollar intercompany claim,

20   that is, the claim that was accepted in the

21   Canadian Estate against NNL in favour of NNI

22   arising out of a third party -- two third parties,

23   two tax authorities determining, negotiating and

24   settling between themselves an amount of 2 billion

25   dollars, representing this deemed dividend from one

1    to the other.

2              The parties who oppose pro rata have

3    suggested that it would result in either the

4    unwinding of Court orders or that it would have the

5    effect of ignoring the 2 billion dollar claim that

6    has been accepted by the Courts.

7              Our submission is that that is not

8    correct.  Under the pure pro rata approach which

9    the UK Pension Claimants unequivocally advocate as

10   being the correct and most principled approach in

11   this case, the 2 billion dollar claim continues to

12   be treated as a liability of NNL.  It is a claim

13   against NNL ranking pari passu with all other

14   unsecured claims.  That makes it completely

15   consistent with any Court orders that have been

16   issued.

17             The pro rata allocation proposed by UK

18   Pension Claimants provides that the dividend that

19   is received by NNI as a result of that claim is

20   recognized as cash in the hands of NNI for the

21   purposes of determining NNI's entitlement to any

22   allocation of the lockbox which, again, as you'll

23   recall from the testimony during trial, represents

24   a view of the cash that is sitting in a particular

25   estate which does not move and is not transferred

```
 1    to any other asset, but it is taking into account

 2    the cash that is sitting in an estate and the

 3    aggregate claims within that estate.

 4              Now, as we have said in our

 5    submissions, it is always open to the Court in the

 6    Court's equitable jurisdiction, if you determine

 7    that for any reason that produces a result that you

 8    feel offends either prior Court orders, is not

 9    consistent with or is not supportable, it is always

10    open to the Courts to have the dividend that NNI

11    receives not be treated as forming part of the cash

12    that is taken into account in determining any

13    allocation of the lockbox funds.

14              In doing so, it is not the case that we

15    are simply, quote, "throwing these complicated

16    issues back at the Court".

17              We are simply acknowledging that the

18    Courts do have the jurisdiction and the discretion

19    to make orders that they think produce the right

20    result.

21              THE CANADIAN COURT:  Let me ask you, I

22    understand what you are saying, but considering how

23    much money -- let's just use for the sake of

24    argument the 71 percent, whether that is right or

25    not, who knows, but for the sake of argument use 71
```

1    percent.  What you are saying is that -- or 71

2    cents on the dollar.

3            You are saying that in doing this

4    calculation, you transfer 2 billion from the

5    Canadian Estate to the US Estate and that 2 billion

6    in the US Estate, what, will reduce the amount of

7    money needed to bring the US claimants up to 71

8    cents on the dollar?  Is that what you are saying?

9            MS. MILLER:  Not exactly, Your Honour.

10   Let me explain.

11           THE CANADIAN COURT:  I want to make

12   sure I understand what you are saying.

13           MS. MILLER:  Sure, so let's use that

14   example.

15           In the calculation of the aggregate

16   liabilities claims against the Canadian Estate, the

17   2 billion dollar claim forms one of those.

18           THE CANADIAN COURT:  All right.

19           MS. MILLER:  So if in a hypothetical

20   example we say there are 10 billion dollars worth

21   of claims against the Canadian Estate, that is the

22   aggregate claims pool.

23           And let's use your example that the

24   distribution under this common dividend would

25   result in a 71 percent distribution, that 71

1    percent would be paid as a distribution on that 2

2    billion dollar claim.

3              So whatever the math works out to be,

4    let's call it 1.3 billion, that 1.3 billion dollar

5    distribution is what would flow to NNI as the

6    holder of that claim against Canada, so it would

7    receive its distribution on that claim.  The cash

8    it receives on account of that distribution would

9    then be cash in the hands of NNI, which is then

10   calculated as forming part of the aggregate cash

11   with whatever cash otherwise exists in the NNI

12   Estate as the cash portion of the pool.

13             THE CANADIAN COURT:  So you'd credit,

14   if your math is right, 1.3 billion, I think it is

15   1.4, but anyway...

16             MS. MILLER:  You are probably right.

17             THE CANADIAN COURT:  You'd credit the

18   1.4 to NNI or the US Estate, we'll call it?  Is

19   that right?

20             MS. MILLER:  That's right.

21             THE CANADIAN COURT:  And then so that

22   when you are figuring out the 71 percent that goes

23   to the US claimants, the 1.4 is included in the pot

24   they have got so that would reduce the amount from

25   the lockbox needed by 1.4.

1              MS. MILLER:  Yes, by whatever amount to

2    get that estate up to 71 percent.

3              THE CANADIAN COURT:  Right, but there

4    would be 1.4 more now in the US Estate than before.

5              MS. MILLER:  Yes, correct.

6              THE CANADIAN COURT:  So it would be

7    taken out of the lockbox funds that otherwise would

8    go to the US Estate?

9              MS. MILLER:  Correct.

10             THE CANADIAN COURT:  Okay, I

11   understand.

12             MS. MILLER:  And so the second -- or

13   the third argument, I guess, in opposition to a pro

14   rata result, which is the one that has probably

15   generated the most pages of paper in the filings,

16   is the effect that it would have on the Bondholder

17   guarantees, the fact that the Bondholders hold

18   direct claims against the Canadian Estate and

19   guarantee claims against the US Estate.

20             And I think it is important to say at

21   the outset that UK Pension Claimants are not

22   advocating for a pro rata allocation of the lockbox

23   for the purpose of prejudicing any creditor.  They

24   are advocating that allocation position because we

25   believe it is right, because we believe it is

1    factually supportable and legally supportable.

2             The fact that it may have a certain

3    effect on the guarantees that exist in this case,

4    if the principal basis upon which it is applied is

5    correct, then the effect that it has on the

6    guarantees is simply a by-product of that.

7             We believe that any prejudice that the

8    Bondholders argue that they may suffer by not

9    having two distinct and separate claims to assert

10   does not arise as a result of the application of

11   pro rata but instead arises as a result of the way

12   in which Nortel operated, the absence of any

13   segregation of assets to which a distinct liability

14   under a guarantee could be matched, and the

15   extremely weak terms of the Bondholder guarantees

16   in this particular case.

17            It also is based on the fact that there

18   is a complete absence of any credible basis upon

19   which the Bondholders could have assumed, much less

20   reasonably relied, that there would be separate

21   pools of assets against which to assert two

22   separate and distinct claims.

23            And in that respect, I would submit,

24   Your Honours, that the mere existence of a

25   guarantee in and of itself does not support

1    reliance upon the separateness of legal entities,

2    either in Canada and, as Mr. O'Connor will address

3    next with respect to Owens Corning, that is not the

4    law in the US either.

5              And the analysis of Owens Corning has

6    attempted to extrapolate that principle, but a

7    close examination even of that case shows that the

8    Court required actual evidence of the reliance.  It

9    was not taken as a given that the existence of

10   guarantees demonstrated that.  In fact, it is quite

11   clearly the law in Canada and clearly recognized as

12   the law in the US prior to Owens Corning that the

13   presence of intercompany guarantees actually

14   supports the concept of a substantive

15   consolidation.

16             So it is also important to note that

17   the pro rata allocation in this case is not being

18   put forward as a standard to be applied for all

19   cases involving all cross-guarantees within a

20   multinational enterprise group.

21             It simply illustrates that the

22   obtaining of guarantees in a situation where the

23   group's assets were never separately identified,

24   were never segregated into distinct entities,

25   result in a guarantee claim being of limited value

1    in the event of a group collapse.

2                    And in opening submissions a couple of

3    months ago, I'm going to pull up a slide, counsel

4    for the Bondholders confirmed that the only time

5    period that is relevant for considering creditor

6    expectations is the period prior to insolvency.

7    And there is a quote from Mr. Leblanc there.

8                    But in the face of that admission, the

9    Bondholders filed no evidence whatsoever on what

10   their actual expectations might have been in order

11   to allow any parties to test that evidence.

12                   The US Interests and the Bondholders

13   filed expert evidence with respect to absolute bond

14   trading prices but that information through an

15   expert was limited to the time period after the

16   insolvency filings.

17                   So notwithstanding a recognition that

18   the only time period that is relevant to even

19   consider or discuss creditor expectations is

20   pre-filing, no evidence was filed from the actual

21   Bondholders and the only evidence filed through

22   their expert related to the post-filing period.

23                   It is also of note that the only expert

24   report at all that was filed by the Bondholders was

25   withdrawn the night before the expert was to

1    testify at trial.

2            But that particular expert,

3    Mr. Kilimnik, had confirmed on his deposition, and

4    the references are in our closing brief, when asked

5    about the difference between looking at bond

6    trading prices versus how the market actually

7    valued or determined the risk relating to

8    particular bonds, he confirmed, in answer to our

9    questions, that that was in fact based on spread

10   data.

11           And we have up on the chart here and we

12   have attached, and this forms part of an agreed

13   stipulation which is filed with the Courts, so an

14   agreement with the parties because this

15   presentation which was prepared purely for

16   presentation purposes reflects the information

17   which was otherwise reflected in market data.

18           And so the evidence of that, you know,

19   reflection of the spread data as opposed to pure

20   bond pricing data suggests that if the theory is

21   that bonds that had a guarantee from NNI would have

22   been considered less risky in the market because

23   they had another source of recovery, then you would

24   expect those less risky bonds to be reflected as

25   having a lower spread.

```
 1                   In fact, if you look at this data, and
 2      you can see that the three bonds which benefit from
 3      the guarantee from NNI, which are the green, the
 4      purple and the orange colour, are all over -- well,
 5      all over the map, but essentially for all of these
 6      bond issuances, the spread is incredibly close on
 7      all of them.  There is no meaningful or tangible
 8      differentiation, and in some cases, if you look at
 9      the blue, for example, which is one of the bond
10      issuances for which there is no NNI guarantee, it
11      has the lowest spread.
12                   This is just simply by way --
13                   THE CANADIAN COURT:  You say this is an
14      agreed exhibit?
15                   MS. MILLER:  Yes, it is.  The
16      presentation of this information is agreed as being
17      accurate.
18                   So this information, of course, is
19      dealing with the pre-filing period, the period
20      which the Bondholders' counsel has confirmed is the
21      only relevant period.
22                   And this information is simply to
23      illustrate the fallacy in the concept that the
24      market viewed the bonds that had the benefit of an
25      NNI guarantee as being less risky than the bonds
```

1    that did not.

2              As I know the Courts are aware, in any

3    bankruptcy or insolvency situation, claims are

4    asserted against assets that are available for

5    distribution, but that again is what makes Nortel

6    unique and stand out amongst many other bankruptcy

7    cases, because in a situation like Nortel, which

8    operated as one fully integrated global enterprise,

9    that had intermingled assets that were never

10   ring-fenced into separate companies, it is

11   impossible to say at any given point in time that

12   liabilities that were occurring with respect to the

13   various entities were liabilities in respect of

14   particular assets.

15             There is nothing for the Bondholders to

16   have ever based an assumption or expectation on,

17   much less an actual reliance, either in the

18   consolidated financial reporting, in the terms of

19   the bond indentures themselves or in the

20   information that was available to the market

21   through the credit rating agencies.

22             And as you'll recall the evidence in

23   the trial, the credit rating agency reports made no

24   differentiation in terms of the ratings for the

25   bonds that had the guarantees and the bonds that

1    did not.

2                 And most fundamentally, there has been

3    no evidence, no evidence whatsoever filed by the

4    Bondholders that they in fact relied in any respect

5    on the separateness of these entities or, more

6    importantly, on distinct and separate assets that

7    might be available to satisfy their claims in the

8    two jurisdictions.

9                 So the net effect of that, I would

10   submit, Your Honour, is that the Bondholders have

11   two doors that lead into the same room.  They have

12   two sources of recovery that are in respect of the

13   exact same assets.  The guarantees that were

14   provided to the Bondholders in this particular case

15   only granted the Bondholders the right to assert a

16   claim against the assets of more than one entity.

17   There was no basis upon which it could be inferred

18   or assumed from those documents that it was not in

19   fact the same assets that supported the direct

20   claim and the guarantee claim.

21                So the UK Pension Claimants request

22   that in the face of that, where we have the very

23   unique situation of we may have creditors with 12

24   claims, but to the extent that those claims can

25   only be asserted against the same indivisible pool

```
 1    of assets, there is no legal basis upon which to

 2    support 12 separate claims.

 3              So in the face of that, and just to

 4    conclude, Your Honour, the UKPC would submit that

 5    creditor claims against the various entities

 6    represent a reasonable and legally supportable

 7    metric by which to effect an allocation of the

 8    lockbox funds because they best reflect commingled

 9    assets against which multiple parties claim an

10    interest and multiple parties are asserting claims.

11              Now, at this point I would turn over to

12    my colleague Mr. O'Connor, but Your Honour had

13    requested about the hotchpot and I would like to --

14              THE CANADIAN COURT:  Can I ask you just

15    to turn to page 55 of your initial brief and I

16    understand the argument, I understand what you have

17    said about it.  I just have a question.

18              You are making an assertion in

19    paragraph 129 as to when it will not be available

20    and when it is appropriate.

21              MS. MILLER:  Yes.

22              THE CANADIAN COURT:  Do you have case

23    law to support -- all I'm asking is do you have

24    case law to support the statements in paragraph

25    129?  Because at the moment I see nothing there.
```

1            MS. MILLER:  Your Honour, Nortel might

2    be the case that is cited in the next brief under

3    that paragraph.  I do not have case law to point

4    to, because again on the very unique situation, I

5    don't.

6            THE CANADIAN COURT:  That is okay.

7            MS. MILLER:  But if I can just address

8    for one minute the hotchpot rule, the concept that,

9    you know, if someone is looking to recover from the

10   assets of a debtor in another jurisdiction that

11   they have to account for that, the very underlying

12   principle of the hotchpot rule is that if a debtor

13   has assets disbursed in various jurisdictions, they

14   ought to have to account for it.

15           But that very rule, which on its

16   language and on a plain reading and in the

17   application of the rule, presupposes that the

18   assets of the debtor are identifiable and are

19   separate and distinct.

20           THE CANADIAN COURT:  I understand all

21   of that.  I just -- I understand all of that.  I

22   just asked you if you had authority to support that

23   paragraph.

24           MS. MILLER:  Sadly, Your Honour, I

25   don't have a case directly on point.

```
 1                With that, I'll turn it over to my

 2     colleague, Mr. O'Connor.

 3                THE US COURT:  Good morning,

 4     Mr. O'Connor.

 5                MR. O'CONNOR:  Good morning, Judge Gross.

 6     Good morning, Justice Newbould.

 7                Let me just for the record make one

 8     correction.  That quote from Judge Sloviter was

 9     actually from the appeal from the order enforcing

10     the automatic stay rather than on the EMEA appeal.

11                THE US COURT:  Thank you.

12                MR. O'CONNOR:  As Mr. Barrack and

13     Ms. Miller indicated, I will focus my argument on

14     whether there are legal principles that would

15     constrain the Courts from adopting the pro rata

16     allocation metric.  And the two primary constraints

17     that have been argued are that it amounts to global

18     subcon, and second, that it is an impermissible sub

19     rosa plan, at least for purposes of the US law.

20                And our first point is that this is not

21     global subcon.  And the reason we say that is

22     because global subcon, as the screen -- rather, the

23     pro rata, as the screen indicates, the slide, it

24     doesn't contemplate the merging of any of the

25     debtor estates into one estate.  It doesn't
```

1    contemplate the administration of one consolidated

2    estate by a single administrator in a single

3    jurisdiction.  It doesn't contemplate a single plan

4    of arrangement or reorganization, and it doesn't

5    contemplate distributions pursuant to the

6    insolvency regime of a single jurisdiction.

7              THE US COURT:  But just to follow up on

8    a question I asked Ms. Miller, a $100 claim against

9    the UK entity and a $100 claim against the French

10   entity would both be -- would both receive the same

11   distribution; is that correct?

12             MR. O'CONNOR:  Correct.  You would get

13   a common dividend based upon the combination of

14   what assets are outside the lockbox and then what

15   would be needed to supplement those assets to

16   arrive at a common dividend.

17             THE US COURT:  So a distribution is not

18   dependent in any way upon the separation of the

19   entities.

20             MR. O'CONNOR:  It is not dependent upon

21   the separation of the entities, no.  But the

22   separate entities are taken into consideration,

23   given the fact that assets that are located outside

24   the lockbox are taken into consideration in

25   arriving at what is necessary to achieve that