1    common dividend.

2                THE US COURT:  All right.  All right.

3    Thank you, Mr. O'Connor.

4                MR. O'CONNOR:  Now, instead, the

5    pro rata allocation is really a metric like any

6    other of the allocation metrics being proposed by

7    the estates.  It will allow for the distribution of

8    the allocated funds to the creditors pursuant to

9    the insolvency laws of their respective

10   jurisdictions and under the supervision of the

11   courts in those respective insolvency proceedings.

12               But we would submit, Your Honors, that

13   even if pro rata allocation were a request for

14   subcon, which again we submit that it is not, that

15   Owens Corning is really not the bogeyman portrayed

16   by the bonds and that it does not pose an

17   impediment or a constraint on the Courts adopting

18   pro rata allocation.  And we would go further, Your

19   Honor, and submit that on the unique facts of this

20   case, that the principles in Owens Corning would

21   actually support subcon here.

22               And as the Courts know, in Owens

23   Corning the Third Circuit established two

24   disjunctive or alternative tests for subcon, the

25   first being where pre-petition the debtors had so

1   disregarded separateness that their creditors

2   treated them as one entity; and secondly, where,

3   post-petition, the debtors' assets and their

4   liabilities were so scrambled that separating them

5   would be prohibitive and would hurt all creditors.

6            Now, if the Courts were to conclude

7   that the teaching of Owens Corning is relevant

8   here, the UK pension claimants submit that under

9   either of those tests the Owens Corning test would

10  be satisfied.  However, I want to make it clear our

11  primary argument is predicated on the profound

12  post-petition entanglement of the group's assets

13  and the prohibitive cost of attempting to

14  disentangle them.

15           So let's look at the facts for a moment

16  of Owens Corning.  Although the proponents of

17  subcon in Owens Corning argued that either of the

18  two prongs of the test were satisfied, they focused

19  almost exclusively on the first test.  There was

20  really no evidence of post-petition entanglement of

21  assets and liabilities.  At most, there was, in the

22  words of the Third Circuit, some "sloppy

23  bookkeeping" concerning certain intercompany

24  interest and royalty payments that had not been,

25  again, using the Third Circuit's words, perfectly

1     accounted for in the debtors' financial statements.

2            The testimony there from the debtors'

3     own officers, however, was that the financial

4     statements of all of the subsidiaries were accurate

5     in all material respects, and the debtors'

6     auditors, Ernst & Young, testified that they had

7     eliminated most financial discrepancies.  Based on

8     that evidence, the Third Circuit found that there

9     was "no question which entity owns which principal

10    assets and has which principal liabilities."  And

11    in the face of that, it held that commingling of

12    assets justifies consolidation only when separately

13    accounting for assets and liabilities of the

14    corporate entities will reduce the recovery of

15    every creditor; that is, where every creditor will

16    benefit from the consolidation.  And the court

17    noted that the benefit to creditors should come

18    from cost savings that makes assets available for

19    distribution to creditors rather than shifting of

20    assets to benefit some creditors at the expense of

21    others or for the administrative convenience of the

22    court.

23            Now, let's contrast the facts in Owens

24    Corning with the facts in Nortel.  Now, let's turn

25    the clock back five years.  Now, if the parties had

1    come before Your Honors five years ago and they

2    told you that we have profound differences of

3    opinion as to who owns what and as to who should

4    get what from the sales of the assets and that it

5    was going to take years to untangle that, and the

6    US and Canadian Estates alone, it was going to cost

7    a billion dollars to do that, it is difficult to

8    imagine that the Courts would have been receptive

9    to the concept of subcon, because when you look at

10   that -- and this is unlike Owens Corning -- there

11   is a dispute about ownership based upon entangled

12   assets.  It is not a concern about whether the

13   debtors' financial statements perfectly account for

14   certain intercompany payments between the entities.

15   And here all --

16             THE CANADIAN COURT:  Mr. O'Connor, did

17   you say that it is difficult for the Court to

18   accept -- would it accept subcon, or did you mean

19   to say it was difficult that the Court would not

20   accept subcon?

21             MR. O'CONNOR:  I hope I said it right,

22   but difficult to imagine the Court would not accept

23   subcon.

24             THE US COURT:  Yes.  I heard it

25   differently, too.

```
 1              MR. O'CONNOR:  Okay.  I apologize.

 2              THE US COURT:  But I knew what you

 3    meant.

 4              MR. O'CONNOR:  Five years ago, if we

 5    had told Your Honor, all the parties had told Your

 6    Honor we would be here five years later, we would

 7    have spent a billion dollars in the US and Canadian

 8    Estate and would still be arguing about this, it

 9    would be hard to argue that that wasn't fairly

10    entangled post-petition assets that had to be dealt

11    with.

12              And here all creditors, all creditors,

13    have been hurt by the erosion of over a billion

14    dollars of available assets for distribution during

15    the pendency of this dispute.  Here every creditor

16    would have benefited if this massive and

17    unprecedented erosion of available assets had been

18    avoided.  And I would submit that for any party to

19    seriously argue otherwise would be disingenuous in

20    the extreme.

21              And, in fact, the parties here

22    recognized as much right at the outset.  They

23    recognized that given the profound entanglement, it

24    was not possible to sell the group's assets on a

25    legal entity-by-entity basis, and they recognized
```

1    that to maximize the value of the group's assets,

2    they had to be sold collectively.  And to achieve

3    that laudable goal, they agreed in the IFSA to put

4    allocation issues aside, to sell their assets

5    collectively, and to deposit the sale proceeds in a

6    common fund to be allocated at a later date by

7    agreement or, absent that, by litigation.

8                In essence, they took the first step

9    towards substantive consolidation themselves by

10   pooling their assets in a common fund after -- the

11   funds in a common fund after selling their assets

12   collectively.  All creditors benefited from that

13   pooling, as there can be little doubt that by doing

14   that they substantially increased the sale proceeds

15   that were received for the group's assets.  They

16   would not have $7.3 billion in the lockbox to

17   distribute to creditors had they attempted to sell

18   their assets on an entity-by-entity basis.  I think

19   everyone would agree it would be unlikely that they

20   would have achieved the success that they

21   remarkably achieved.

22                And it is no answer to argue, as the

23   bonds do, that substantive consolidation would be

24   inappropriate because the bond recoveries would be

25   less than they would receive if they had the

1    benefit of their guarantee claims.  Substantive

2    consolidation is a zero-sum game.  Anytime it is

3    granted, some creditors are likely to do better and

4    some worse than they would have in the absence of

5    subcon.  If every creditor had to receive at least

6    what it would receive in the absence of subcon, it

7    could never be granted.

8              Moreover, again, in Owens Corning, what

9    the debtors proposed was a deemed or what the Third

10   Circuit called a pretend consolidation in which

11   consolidation would be effected only for voting and

12   for distribution purposes.  There would be no

13   consolidation of the reorganization debtors' assets

14   and liabilities.  The only purpose for the

15   consolidation was to eliminate the lenders'

16   guarantee claims.  It was clearly aimed at

17   disadvantaging one creditor group.

18              That's not the case here.  In a pure

19   pro rata allocation model that the UKPC advocate,

20   all creditors are treated the same.  All

21   intercompany claims and guarantee claims, including

22   the UKPC's guarantee claims, are treated the same

23   way.

24              And now, as I indicated earlier, the

25   UKPC relies primarily --

```
 1            THE US COURT:  By the way, I didn't
 2   have that previous page in my book, so perhaps
 3   later I can get a copy of it.
 4            MR. O'CONNOR:  Oh, okay.  We will get
 5   that for Your Honor.
 6            Now, as I said earlier, the UK pension
 7   claimants rely primarily on the post-petition
 8   entanglement test in Owens Corning to the extent
 9   that Owens Corning is applicable here.  But having
10   said that, we would also submit that even if the
11   first-prong test needed to be satisfied on creditor
12   expectations, it would be satisfied.  So let's
13   again look at the Owens Corning facts for a moment.
14            Now, although Owens Corning was a
15   multinational corporate group, it was structured in
16   a very, very different way than Nortel's matrix
17   structure was.  Owens Corning specifically created
18   subsidiaries to act autonomously, the Third Circuit
19   found, to shield those assets from certain
20   liabilities.  For example, it created a subsidiary
21   to act as a holding company to hold all Owens
22   Corning's domestic subsidiaries' IP.  It was
23   specifically structured to shield those assets from
24   Owens Corning liability for asbestos.  That
25   subsidiary operated autonomously, and it received,
```

 1    according to the Third Circuit's findings, no

 2    administrative support from the parent.

 3              It also created a subsidiary to act as

 4    a holding company to hold Owens Corning's

 5    investments in its foreign subsidiaries.  Again, it

 6    was specifically structured to shield those assets

 7    from asbestos liability.  It also operated

 8    autonomously, and it too received no administrative

 9    support from its parent.

10              Another subsidiary was specifically

11    created to manage the asbestos liability.  It had

12    its own trade name, its own trade logo and its own

13    business unit.  Clearly, these were autonomous

14    entities that could operate as standalone

15    companies.  Now let's contrast that with the facts

16    in Nortel.

17              As we all know and heard for weeks now,

18    Nortel operated on a matrix basis, on a

19    line-of-business basis across the legal entities,

20    across geographic regions.  All of the entities

21    collaborated to create the group's IP jointly.  The

22    group's profits were shared under the RPSM, where

23    cash -- wherever cash was, it was considered to be

24    fungible, and it was moved around the globe to be

25    used where it was needed.

```
 1                    Let's look for a moment also at the
 2    lender agreement in Owens Corning and compare that
 3    to the bond indenture and guarantees that we have
 4    in Nortel.  In Owens Corning, the lenders'
 5    agreement contained provisions that were
 6    specifically designed to protect the separateness
 7    of the Owens Corning assets and the subsidiary
 8    assets.  For example, Owens Corning was prohibited
 9    from entering into a transaction with a subsidiary
10    that would result in a loss for the sub.  The
11    subsidiaries were prohibited from merging into
12    Owens Corning.  The subsidiaries were prohibited
13    from merging into one another unless there would be
14    no effect on the value of the guarantees.
15                    Now, that's not the case in Nortel.
16    There were no such prohibitions in the bond
17    indentures or the guarantees.  And as Ms. Miller, I
18    think, took the Courts through, the Bondholders
19    could have no reasonable expectation that the
20    assets and liabilities of the issuer and the
21    guarantor would be kept separate, as separate pots
22    available, as was the case in Owens Corning.
23                    And again, as I think Ms. Miller -- and
24    I won't duplicate this -- demonstrated, this was
25    supported by the empirical evidence.  The market
```

1    simply didn't distinguish between Nortel's

2    guaranteed bonds and the nonguaranteed bonds.  The

3    rating agencies did not rate Nortel's guaranteed

4    bonds higher than those without guarantees.  The

5    guaranteed bonds traded at higher or equal spreads

6    to Nortel's bonds without a guarantee, and clearly

7    the market was assessing the Nortel's

8    creditworthiness on a group basis, not on a legal

9    entity-by-entity basis.

10              And we would submit that the bonds'

11   concern expressed to the Court with roiling the

12   capital markets is not a legitimate one under the

13   facts.  The markets are sophisticated.  They know

14   the difference between creditor agreements and

15   guarantees like those in Owens Corning that have

16   teeth and toothless bond indentures and guarantees

17   like those in Nortel that provided no assurance

18   that separate pools of assets would be available to

19   satisfy debt obligations.  And, of course, as

20   Ms. Miller pointed out, the bonds, although

21   promising to introduce evidence to the Courts about

22   Bondholder expectations, submitted none.

23              Now, we have set out in slides 31 and

24   32 sort of a summary of the differences between

25   Owens Corning and Nortel.  Given the interest in

1    time, I am not going to take you through those but

2    leave those to the Courts to review at their

3    leisure, if they have any leisure.

4              And I will just go on to say that, you

5    know, although the UKPC is not requesting subcon,

6    if the Courts are concerned that pro rata

7    allocation would somehow be inconsistent with Owens

8    Corning, we submit you should have no concerns.

9    Even if Owens Corning were applicable, we think

10   either one of the tests would have been satisfied

11   here.

12             And let me turn for a moment then to

13   the sub rosa plan issue.  Again, we think that's a

14   red herring.  Pro rata is an allocation metric,

15   just like any of the other allocation metrics.

16   Each of these metrics is advanced to assist the

17   Courts in determining the parties' entitlement to a

18   portion of the lockbox funds.  Pro rata does not

19   dictate, again, how the allocated funds will be

20   distributed to creditors of the three estates no

21   more than any of the other allocation metrics do.

22   Creditor distributions will be made in each of the

23   jurisdictions pursuant to the respective insolvency

24   laws as supervised by the Courts in those

25   jurisdictions.

1              So in short, none of the arguments, we

2    would submit, against pro rata based upon either

3    subcon or sub rosa withstand scrutiny.

4              Now, importantly, I want to leave the

5    Court with this.  The Courts should have no fear

6    that ordering a pro rata allocation of the lockbox

7    funds is going to set a default precedent for

8    subcon for --

9              THE CANADIAN COURT:  Can I just

10   understand your last submission, Mr. O'Connor.  You

11   say it doesn't direct how the allocated funds will

12   be distributed by each of the -- to creditors by

13   each of the estates.  Are you saying that using a

14   71 percent example, if 71 percent ends up in any

15   one estate, that the estate could be allocating to

16   its creditors on a different basis, so some might

17   get more than 71 and some less?

18             MR. O'CONNOR:  Well, I think, Your

19   Honor, that would be left to each of the Courts to

20   determine.  Obviously, each of the claims would be

21   adjudicated and allowed or disallowed based upon

22   the laws of that jurisdiction, and I think we are

23   saying that the Courts would retain the

24   jurisdiction to do what they thought was

25   appropriate.  So the money would be allocated to

1    the funds, but that would not be dictating to the

2    individual Courts what they would do.

3               THE CANADIAN COURT:  Thank you.

4               MR. O'CONNOR:  As I was saying, I think

5    we want to make sure that the Courts don't have the

6    impression that we are arguing that pro rata

7    allocation is the appropriate default -- or

8    substantive consolidation would be the appropriate

9    default for all garden-variety multinational

10   enterprises.  That is simply not the case.  We

11   don't contend that every MNE that operates through

12   a matrix structure and has a cash management system

13   is a candidate for pro rata or for subcon; nor is

14   it an answer to contend that even if it would have

15   been appropriate to substantively consolidate

16   Nortel five years ago, it is inappropriate to do

17   that now because the effort to unscramble the egg

18   is now over and the billions of dollars in

19   professional fees and expenses is now water under

20   the bridge.

21              This may be the closing arguments for

22   the allocation trial, but we are far from having

23   unscrambled the egg.  The parties remain hopelessly

24   apart in their arguments as to who owned what and

25   who is entitled to what amount of the lockbox

1    funds.  Delay and costs will continue to mount.  If

2    the Courts adopt any of the theories advocated by

3    the three estates, appeals will surely follow in

4    Canada and the US, resulting in a potential for

5    years further of delay and erosion of asset value,

6    putting aside the very real prospect of

7    inconsistent appellate decisions.

8                  Now, it is certainly equally likely

9    that if the Court adopts the pro rata allocation

10   model, appeals will follow as well.  But we submit

11   there is a difference.  We would submit that if the

12   Courts conclude as a matter of the very unique

13   facts of this case on the record before you that

14   pro rata is appropriate, that there are very few

15   implementation toggles that have the potential for

16   creating subordinate appellate issues.  As

17   Ms. Miller said, we know what the assets are.  We

18   know what the claims are.  And to the extent that

19   there are certain unresolved claims, they can be

20   dealt with through reserves and through interim

21   distributions.

22                  In contrast, each of the other

23   allocation metrics incorporate a variety of

24   subordinate assumptions challengeable on appeal.

25   They depend upon constructions of the MRDA.  They

1    depend on valuation, on whether the projections

2    used are correct, whether the discount rate used

3    was correct, whether certain types of proposed

4    revenues should be excluded or included.  There

5    are, we would submit, a variety of other issues

6    which would create a number of separate subordinate

7    issues for appeal.

8              Now, finally, in Owens Corning, the

9    Third Circuit said that substantive consolidation

10   is appropriate where without it:

11             "All creditors will be worse

12             off, as Humpty-Dumpty cannot be

13             reassembled, or even if so, the

14             effort will threaten to reprise

15             Jarndyce and Jarndyce, the fictional

16             suit in Dickens' 'Bleak House,'

17             where only the professionals

18             profited."

19             Unfortunately, this has been and

20   continues to be a reprise of Jarndyce and Jarndyce.

21   There the fictional suit was a decades-long case in

22   Chancery Court which was pending for such a long

23   period of time that no one was entirely sure

24   anymore what the issues were, and it was so

25   complicated that it was said that two Chancery

```
 1   lawyers could, quote, talk about it for five

 2   minutes -- could not talk about it for five minutes

 3   without coming to a total disagreement about all

 4   its premises.

 5              I submit that I am not sure this group

 6   could even do it for five minutes.

 7              THE CANADIAN COURT:  Are you saying

 8   that the fog has rolled down the Thames to our

 9   courtrooms here?

10              MR. O'CONNOR:  I think it has engulfed

11   the courtroom, at least all of Wilmington and at

12   least half of Toronto.

13              And as Dickens said, innumerable people

14   were born into the case.  Innumerable people

15   married into it, and innumerable people died out of

16   it.  As Ms. Miller indicated, unfortunately that is

17   sadly the case for the UK pension claimants, with

18   5,000 people having died since the insolvency

19   filing.

20              And we would submit that the Courts

21   have the last -- in the US law on tort, last clear

22   chance to do what the parties have been unable to

23   do:  To work collectively for the good of all

24   creditors to fairly distribute the proceeds that

25   they worked collectively so well to realize for the
```

```
 1    benefit of the group's creditors as a whole.  That

 2    laudable collective effort broke down,

 3    unfortunately, into parochial squabbling among the

 4    estates to garner a windfall for their respective

 5    creditors.

 6               But the Courts can put an end to this

 7    interminable and costly jurisdictional tug of war.

 8    And this is a unique case that requires a unique

 9    solution, one that allocates the lockbox funds in a

10    fair and equitable manner, consistent with the way

11    One Nortel operated pre-petition.  And we submit

12    that of all the allocation metrics proposed,

13    pro rata best accomplishes that objective.

14               Let me echo Mr. Barrack and

15    Ms. Miller's comments and thank the Courts for

16    their dedication and diligence throughout this

17    matter.

18               THE US COURT:  Thank you, Mr. O'Connor.

19               MR. O'CONNOR:  Thank you.

20               THE US COURT:  Are we up next with the

21    US interests, Mr. Bromley?

22               MR. BROMLEY:  Yes, we are, Your Honor.

23    Would you like to take the morning break at this

24    point in time?

25               THE US COURT:  It probably would make
```

```
 1    sense to do that.  What do you think, Justice

 2    Newbould?

 3                 THE CANADIAN COURT:  Well, how long are

 4    we going to go?  I mean, if we are going to go till

 5    close to 1:00, I wonder if we should go to about

 6    10:00 and then take the break.  If we are going to

 7    take one break, maybe try and split it.  Is that

 8    all right with you?

 9                 THE US COURT:  Do you mean go to 11:00?

10                 THE CANADIAN COURT:  Oh, no.  I am

11    getting a grimace from -- no.  The reporters are

12    telling me they would like to break now.

13                 THE US COURT:  It would be helpful, I

14    am sure.

15                 MR. BROMLEY:  We are at your disposal,

16    Your Honor.

17                 THE US COURT:  Thank you, Mr. Bromley.

18                 THE CANADIAN COURT:  Sure, that is

19    fine.

20                 THE US COURT:  All right.  Let's take a

21    break till --

22                 THE CANADIAN COURT:  20 minutes?

23                 THE US COURT:  15.

24                 THE CANADIAN COURT:  15.  All right.

25                 THE US COURT:  15 minutes.  All right.
```

```
 1   We will return.
 2               -- RECESS AT 10:15 a.m. --
 3               -- UPON RESUMING AT 10:42 a.m. --
 4               THE US COURT:  Mr. Bromley, welcome to
 5   you.  It is good to have you back.
 6               MR. BROMLEY:  Thank you, Your Honor.
 7   It is good to be back.
 8               Justice Newbould, on behalf of the US
 9   Debtors, James Bromley of Cleary Gottlieb, as I
10   have been here for going on five and a half years,
11   and it is an honor to be here again, Your Honors,
12   before both Courts.
13               Before we get going, I will kick off
14   the presentation for the US Debtors with a few
15   brief introductory remarks.
16               THE US COURT:  Yes.
17               MR. BROMLEY:  And then I will toss it,
18   as they say, up to Toronto, and my colleague
19   Ms. Block will take over for the first substantive
20   portion of the US Debtors' closing.  Then we will
21   return here to the podium in Delaware to finish up
22   before we hand things over primarily on the
23   pro rata substantive consolidation issues to the
24   unsecured creditors' committee and the ad hoc
25   Bondholders committee.
```

```
 1                    THE US COURT:  All right.
 2                    MR. BROMLEY:  And in broad terms,
 3     Ms. Block is going to address the MRDA and critical
 4     evidence regarding same.  I will address valuation
 5     and related expert testimony and a couple of key
 6     issues of US law.
 7                    Now, following hot on the heels of the
 8     UK pension parties, I can't help but say a couple
 9     of things about that as we get started.  First, I
10     think it is important, as the US Debtors start
11     their closing, to get back to the law and to the
12     facts.  A couple of points that Mr. O'Connor and
13     Ms. Miller raised in the course of their
14     presentations I think deserve a bit of
15     clarification right from the beginning.
16                    First, no one relied more on
17     separateness of the Nortel entities than the UK
18     pension parties.  Indeed, the UK pension parties
19     separately negotiated for a separate guarantee from
20     the Nortel parent, and that's why there is a
21     closing next week in Toronto, and that's why there
22     was an additional claims trial.
23                    So when you have the phrase "have your
24     cake and eat it too," it kind of reminds me of one
25     of the phrases that has been used by Monitor's
```

1    counsel, which is "down a rabbit hole."  And to a

2    certain extent, we are down a rabbit hole with the

3    pro rata theories and we are sitting down with the

4    Mad Hatter and having cake.

5             With respect to the references to

6    "Bleak House," first I would note Dickens was paid

7    by the word.  Second, I would note that perhaps we

8    need to take into account that an awful lot of the

9    money that was spent -- and yes, there was a lot

10   spent -- was spent on generating the $7-1/2 billion

11   that we are here to split.  So the constant

12   recitation of spending billions and billions of

13   dollars is just wrong --

14             THE CANADIAN COURT:  How much has been

15   spent since the sale?

16             MR. BROMLEY:  I don't have that

17   breakdown, Your Honor, but we can certainly get it.

18   We in the United States have to file monthly fee

19   applications, so it is well known at least in terms

20   of the US Debtors.

21             Now, in the opening, Your Honors, we

22   heard a little bit about the history of Nortel, and

23   we heard a lot more during trial.  We wanted to

24   give that information to the Courts to place this

25   stubborn dispute in context and to dispel a few

```
 1    fallacies.

 2              The first, that Nortel was a Canadian

 3    company.  I think we can all agree now that Nortel

 4    was actually a multinational enterprise, global in

 5    nature, with separate corporate entities, separate

 6    groups of creditors spread around the world.

 7              Second was that Nortel's intellectual

 8    property was created solely in Canada.  I think we

 9    can all agree, based on the evidence presented,

10    that while Canada certainly had a large role in

11    research and development, research and development

12    took place all around the world, and the US role

13    was incredibly important, particularly during the

14    glory days, as was described yesterday by

15    Mr. Maguire, from the mid-'90's to the 2000's, at

16    which time US R&D was just short of the same amount

17    of R&D that was being conducted in Canada.

18              The third fallacy is that Nortel's

19    business was run from Canada.  The CCC put up a

20    slide yesterday that said still that Nortel's

21    business was run from Canada.  But let's be clear.

22    While the Board of Directors and certain high-level

23    executives were in Canada, the largest and most

24    profitable business units were operated out of the

25    United States -- that is undisputed -- and that it
```

1    was those lines of business that directed the R&D

2    for those lines of business, whether they were

3    taking place in the US or in Canada, and that

4    included the R&D for the vaunted advanced R&D.

5                    Every single business line had R&D

6    heads.  And when the biggest units are in the

7    United States, that meant that the decisions

8    relating to what R&D to pursue for the business of

9    Nortel was being decided in the United States.

10                   And the United States had the largest

11   customers.  Verizon, Sprint, AT&T, MCI WorldCom,

12   far outstripped the customers anywhere in the

13   world.  And the United States had more Nortel

14   employees and, therefore, more Nortel retirees,

15   more Nortel disabled, than anywhere else.  Not

16   saying that others don't, but it is important to

17   recognize that when we talk about NNI and the

18   United States, that there was an incredibly large

19   and vibrant organization here in the United States

20   made up of humans, individuals, just as much as

21   anywhere else.

22                   Now, we have also heard a number of

23   observations about the post-petition period, and

24   they can be categorized in three main ways.  The

25   first is cooperation.  If it wasn't for the

```
 1    cooperation of all the estates, we wouldn't have

 2    the money that we are arguing about today.  This

 3    necessitated quick decisions, decisions that led to

 4    very successful results.  And I use that word

 5    hesitantly in this context because we are in a

 6    bitter litigation.  There is no question about

 7    that.  But it is important to recognize what those

 8    sales accomplished in addition to cash.

 9              Every one of the businesses, including

10    the patent portfolio, was transferred as an

11    operating business.  Every one of those businesses

12    took with that in the sale enormous liabilities:

13    Contracts with counterparties, liabilities to the

14    employees of the transferred businesses, and

15    frankly, from my perspective, most importantly, the

16    employees themselves.

17              We don't have the exact numbers, but

18    somewhere well north of 60 to 70 percent of the

19    employees who were employed in those lines of

20    businesses went to the purchasers.  That meant that

21    those individuals continued to have jobs, benefits,

22    pensions and the like.  They were placed into safe

23    hands.  At the same time, it meant that all of the

24    estates avoided having to pay the liabilities

25    related to those individuals.  And having
```

1    participated in those transactions or most of them,

2    I can tell you that the negotiations relating to

3    the taking of employee and employee obligations and

4    the liabilities generally was a key element in all

5    of that.  And in many respects, Nortel lives on in

6    the safe hands of Avaya, Ericsson, Ciena and

7    Rockstar.

8            The second theme that we have seen in

9    the post-petition period is the continuation of a

10   theme that we saw in the pre-petition period, which

11   is the financing of NNL by NNI.  There is

12   uncontroverted evidence in the record, including

13   from every senior finance executive, whether

14   testifying at trial or in deposition, that NNL was

15   dependent on NNI's cash for its operations

16   pre-filing.  The same evidence is clear in the

17   post-filing period, that if it was not for the

18   financing provided by NNI after these proceedings

19   commenced, that NNL would have simply shut its

20   doors and run out of cash.

21           In the first year, the first 12 months

22   of these proceedings, the US Debtors transferred

23   $453 million in cash to NNL to keep it alive.  It

24   did not have to do that.  It did that to help

25   facilitate the sale transactions.  And as we stand

1    here today, we find it difficult to accept that,

2    notwithstanding providing nearly a half a billion

3    dollars in post-petition financing to NNL, that the

4    Monitor's position is that we should get next to

5    nothing out of the IP sale.

6              The third theme in the post-filing

7    period is that up until May of 2013, when the first

8    pleadings were filed in these litigations, that

9    there is one constant and consistent view of IP

10   rights held by all the parties:  That the

11   integrated entities held exclusive rights to

12   Nortel's intellectual property in their exclusive

13   territories and that they were all substantial

14   rights in that intellectual property.  That was the

15   consistent theme from the filing date through the

16   first filing of the briefs in this litigation in

17   May of 2013.

18             Now, when we are talking about a

19   multinational insolvency such as this, the first

20   issue and the first concept that comes to mind is

21   encapsulated in three words:  Equity takes last.

22   And we can't lose sight of the fact that NNI was

23   owned 100 percent by NNL.

24             So to take the words of the Monitor's

25   counsel for a moment, when we talk about NNL owning

 1    the rights to intellectual property in the United
 2    States, in one very real sense that is entirely
 3    true.  The problem for the Monitor's position is
 4    that NNL owned the intellectual property rights in
 5    the United States through and only through its
 6    ownership of the equity of NNI.  That was an
 7    entirely conscious and appropriate decision, and we
 8    have heard a mountain or a tsunami of evidence, as
 9    we have heard, that supports that.
10              So what does that mean?  Well, it
11    focuses us on two other words, which is structural
12    subordination.  For those of us who practice in the
13    insolvency world and, frankly, anyone involved in
14    the world of finance, those two words have a very
15    clear and unambiguous meaning, which is that the
16    creditors of a parent company are not entitled to
17    the assets of a subsidiary of that parent company
18    until all of the creditors of that subsidiary
19    company are paid in full.  That is the cornerstone
20    of the insolvency regimes in each of the three main
21    jurisdictions.  We don't have to go to any extreme.
22    We don't have to try to find experts who might say
23    this is the way the law should be to recognize that
24    that's the truth in each of our major
25    jurisdictions.  And frankly, the position of the

```
 1    Monitor and the position of the CCC and the
 2    position of the UKP simply tries to circumvent that
 3    corporate structure and that structural
 4    subordination and scoop assets out of the US
 5    Estate.
 6              And it is worth mentioning, as we have
 7    previously, that 75 to 80 percent of the claims in
 8    the United States are guarantee claims of debts of
 9    the Canadian Debtors.  We are sitting here today
10    dealing with bond claims in the United States
11    solely because our Canadian parent told us to
12    guarantee those debts.  And when that decision was
13    made, and it was made over a series of years, 2006
14    and 2007 primarily, the capital markets told the
15    finance executives at Nortel that you could not get
16    financing on the terms in the amounts with the
17    covenants that you want and need without getting
18    that guarantee -- without giving that guarantee.
19    Excuse me.  It is uncontroverted evidence.
20    Mr. Binning, Mr. Currie, Ms. Stevenson,
21    Mr. Williams, no one has said anything other than
22    that.  If it wasn't for those guarantees, we
23    wouldn't have got those terms.
24              I would love not to have the
25    Bondholders as my creditors, with all due respect
```

```
 1    to Mr. Leblanc.

 2              THE US COURT:  Yes.

 3              MR. BROMLEY:  But my corporate parent

 4    told me they will be your creditors.  And so I have

 5    them, and so we have a fiduciary duty to them.

 6              And let's not lose sight of the fact

 7    that $4 billion was actually paid to the Canadian

 8    Debtors, including moneys that were used to settle

 9    securities class action claims.  $575 million of

10    the $4 billion that was borrowed was effectively

11    used to settle securities class action claims to

12    put aside the scandal that had arisen as a direct

13    result of the restatements and misstatement of

14    earnings that took place in the early 2000's.

15              Now, before handing it over to

16    Ms. Block, there are a few quick points I would

17    like to make about what you are going to hear in

18    the rest of our presentation.

19              First, the MRDA.  We have heard a lot

20    about it.  We are not going to disappoint you.  We

21    are going to give you some more.

22              We all agree that the MRDA does not

23    dictate an allocation result, but it is still

24    critically important to understand it.  And

25    notwithstanding what the Monitor's counsel says, we
```

1   do not run away from any language in the MRDA.  We

2   embrace it.  We embrace the entire agreement.  We

3   have not taken the telescope out, turned it around

4   and focused on three lines or three words.  We read

5   the entire agreement.  And you will hear from

6   Ms. Block about that.

7              The US allocation theory has been

8   characterized as a revenue theory.  That's not the

9   entire story.  Mr. Kinrich testified, testified, in

10  our view, very effectively.  But remember, from the

11  very beginning we have always said that our theory

12  is a fair market value theory.  It includes -- it

13  is a theory that values the ownership rights that

14  we have to the US business in the United States,

15  which we believe firmly is the most valuable asset

16  of all of the Nortel Group.

17             And Mr. Kinrich values that business

18  using basic valuation principles that have been

19  adopted in many courts, and Mr. Kinrich is the only

20  expert who has tested and cross-checked every one

21  of his analyses.  And as you will see, Mr. Green,

22  the only allocation expert presented by the

23  Monitor, has four separate theories.  Every one of

24  them fails.

25             In the same context, we were going to

1    be talking about Mr. Kinrich and his valuation of

2    the transactions that actually happened.  We are

3    standing here in 2014, and we had a series of

4    sales.  We are dividing sales proceeds.  We are

5    allocating sales proceeds.  We should not be

6    talking about what would happen if we didn't sell

7    the businesses.  It is as simple as that.

8              You will also hear that NNI owned all

9    of the rights in the United States to the US

10   business, and at the same time NNL owned none of

11   those rights except through its equity interest in

12   NNI.  The US owned the right to exclude, the right

13   to practice and the right to sublicense and did all

14   of those things over and over again.

15             If we are to believe the Monitor's

16   position, we are going to have to ignore the fact

17   that the US Debtors and the Canadian Debtors, NNI

18   and NNL, went into US courts repeatedly and

19   represented to those courts that NNI owned all

20   substantial rights to the intellectual property in

21   the United States.

22             By the same token, we will have to

23   ignore that NNI and NNL made representations to the

24   taxing authorities over and over and signed

25   agreements with those taxing authorities that said

1    we make money in two ways:  We sell products and we

2    license technology.

3              And Mr. Allen looked at those

4    agreements and said they can't be true.  They can't

5    be enforceable because they don't have two

6    signatures on them.  I think we can ignore that

7    evidence.  Both of those agreements, signed in

8    1996, say very clearly agreements with the IRS and

9    with the CRA, two sources of income, two sources of

10   taxable revenue for those jurisdictions:  Licensing

11   revenue, building and selling products.

12             And finally, while we are going to give

13   you a little bit more on the MRDA, it is not just

14   about the MRDA.  We have heard precious little,

15   oddly enough, in these closing arguments about

16   valuation and experts other than from the EMEA

17   Debtors with respect to Mr. Malackowski.  We are

18   going to go into detail and talk about

19   Mr. Kinrich's report and his testimony and

20   Mr. Green's report and his testimony.

21             It is not entirely the sort of thing

22   that we as lawyers come to naturally, and it takes

23   a little time to read through it, but there is no

24   doubt, from the US Debtors' perspective, that the

25   Green valuation testimony must be rejected in its

```
 1   entirety.  And Mr. Green admitted on cross that the

 2   basis for three of the four theories that he

 3   espouses have no basis.

 4             Mr. Kinrich, on the other hand,

 5   conducted numerous cross-checks on the work that he

 6   did and has ample support in the literature and on

 7   the basis of his experience to support his

 8   valuation theories.

 9             But it is worth ending on this point:

10   Mr. Kinrich is not, with all due respect, Justice

11   Newbould, a prisoner of our legal theories.

12   Mr. Kinrich did a separate analysis, taking all of

13   the Canadian theories, and presented that in his

14   evidence.  Mr. Kinrich looked at Mr. Malackowski's

15   work and cross-checked it.  He ran two checks.  He

16   is the only expert who did that.  And when we talk

17   about Mr. Green's report, we will make that

18   abundantly clear.

19             And so with that, Your Honors, I would

20   like to pass it over to Ms. Block up in Toronto.

21             THE US COURT:  All right.  Thank you.

22             THE CANADIAN COURT:  Ms. Block.

23             MS. BLOCK:  Thank you.  Good morning,

24   Your Honours.

25             My aim is to collect what we say are
```

1    the important controlling facts, they are largely

2    uncontroverted, and put them in one spot for you,

3    because I know both of these Courts have to decide

4    this case on the record.   Talk about tsunamis, you

5    have had tsunamis just in final briefings, so I

6    have tried to package what we say you should be

7    looking at in the compendium that I have handed

8    out.

9              And I'm trying to fish out of the

10   record what we submit you should be considering on

11   the factual matrix and our interpretation of the --

12             THE CANADIAN COURT:   It is a small

13   wave, not a tidal wave, right?

14             MS. BLOCK:   Well, I'm not going to go

15   through every page.   It is largely from our

16   findings of fact document which is an American

17   invention.   We are told we are not supposed to

18   write judgments for the judges because the Supreme

19   Court of Canada gets surety about that, but the

20   concept behind this, I understand, is to try and

21   give you the objective evidence and then all the

22   sources of it, so if you want to go and check

23   whether our summary at the beginning of the

24   paragraph is correct or not, you have got the

25   hyper-linked access to everything we are citing, so

1    it is supposed to be a neutral, objective

2    assessment.

3              And to a large extent, I hope we have

4    done that.  Of course, lawyers being lawyers, you

5    know, but it is not a spin document.

6              And let me start with two concerns,

7    though.

8              First, what the Canadian Estate and the

9    Monitor seek to do is use the value of the assets

10   and rights that belong to other estates to pay

11   NNL's creditors.

12             As Mr. Coleman said yesterday, you

13   can't deprive an estate of its property, an estate

14   and its creditors of their property rights.  So the

15   first point that I ask both these Courts to keep in

16   mind is that Canada chose to organize the Nortel

17   businesses setting up separate legal entities and

18   those separate legal entities acquiring their own

19   creditors and, as Mr. Bromley points out, NNL only

20   took equity and did this deliberately.

21             And, of course, it made sense.  It was

22   for a very good reason.  No permanent establishment

23   by NNL in the US or the EMEA territories, no taxes

24   on the businesses from those lucrative territories

25   to NNL.  So, for example, no withholding tax from

1    the NNI US being taken.  And compliance with

2    transfer pricing rules.

3              And as you know, as NNI went from a

4    start-up to a powerhouse, as Mr. Bromley has

5    pointed out, it became a source of financing and of

6    guarantees to obtain lenders and better rates for

7    financing.

8              So NNI didn't dictate this structure.

9    The Canadian Debtors chose it to obtain significant

10   benefits, yet what we say is happening is that the

11   Canadian Estate, led by the Monitor, wants to take

12   the value of the assets and rights that belong to

13   the other estates and use it to pay the Canadian

14   creditors.

15             And, Justice Newbould, we are all

16   distressed about the costs and the extenuated

17   proceedings we have here, but a position that takes

18   -- that says we get all of it, of more than 50

19   percent --

20             THE CANADIAN COURT:  Well, they are

21   responsible for all the costs?

22             MS. BLOCK:  No, but it is a huge issue.

23   We have had to fight.  We had billions of dollars

24   worth of claims from the UKP which we settled for a

25   relatively minor amount.  That was a long, hard

1    fight.

2              So there have been complexities.

3              And as Mr. Bromley said, NNL took

4    equity and it did burden NNI with 4 billion in

5    claims.  So you cannot directly or indirectly take

6    value from creditors of the US Estate in order to

7    give it to equity holders or in this case the

8    equity holders' creditors such as those claiming in

9    the Canadian Estate.

10             And it is telling that in December

11   2008, with insolvency looming, Peter Look, the VP

12   tax, saw the writing on the wall and he wrote to a

13   number of Canadian executives that if NNL wanted

14   the valuable licences back, it would have to pay

15   for them and that would cost billions and NNL

16   didn't have the money.

17             And of course, it couldn't grab them

18   back for nothing.  That would have been a

19   fraudulent conveyance.

20             THE CANADIAN COURT:  Well, isn't the

21   argument by the Monitor, the Monitor, all these

22   things you are saying, it all comes down to the

23   Monitor's position as to what the contract means?

24             MS. BLOCK:  Well, that is what I am

25   going to spend the next hour talking to you about.

```
 1                THE CANADIAN COURT:  All right.
 2                MS. BLOCK:  So they clearly couldn't
 3   get them back for nothing.  As I say, that would be
 4   a fraudulent conveyance, and over the separate
 5   auditors of the separate entities.  All of the
 6   entities had borrowed money, taken on obligations
 7   to their employees, their pensioners, and each
 8   separate entity was legally obliged to honour
 9   those.
10                So the decision made in 2008 which
11   reinforced the structure that the MRDA would not be
12   terminated, something that is reinforced in the
13   FCFSA, in clause 28 of FCFSA, that there wouldn't
14   be a termination, it confirmed that these rights
15   continued.
16                THE CANADIAN COURT:  It says what?
17                MS. BLOCK:  The FCFSA, the FCFSA says
18   that the MRDA shall not be terminated without
19   everybody agreeing, and indeed even before that in
20   the Fourth Addendum we have the same term.
21                So they intended that the rights that
22   had been placed in the hands of all of the
23   participants would remain.
24                The second concern is that I ask Your
25   Honours to examine the rights that were held by the
```

1    integrated entities and to realize that it is those

2    rights, whether they are labelled ownership or

3    licence rights, that must be valued by you, these

4    rights that were going to be maintained throughout

5    the bankruptcy, and you are here to determine what

6    is the fair market value of the assets and rights

7    relinquished by each estate in the sales that

8    resulted in the 7.3 billion dollars.

9                   That is the issue.  It is not a

10   misdirection to either of these Courts.  That is

11   what we are here doing.

12                  And as you have seen, the MRDA says

13   that NNL holds legal title and, in consideration

14   for that legal title that vested under the MRDA,

15   NNI and the EMEA entities have a licence.

16                  And as we'll go through in more detail,

17   Article 5 says it is exclusive, it is perpetual, it

18   includes the right to sublicense, the right to

19   make, use and sell capital "P" Products, and all

20   rights to patents, industrial designs, copyrights,

21   applications therefor, and technical know-how in

22   connection therewith.

23                  And Article 4(e), those integrated

24   entities have the right to sue and enforce NN

25   Technology in their respective territory, and with

1    all of these rights being exclusive in the

2    territory for each integrated entity, they get to

3    exclude anyone else, including their sister

4    companies, including NNL, as each does in its own

5    territory.

6              So those are the rights that were

7    ultimately sold, and they were most valuable by far

8    in the US where NNL had no rights to exploit the

9    technology or exclude others.  That was NNI's

10   exclusive right.

11             So the MRDA reflected these rights

12   through the mechanism of the exclusive licence and

13   the legal title of NNL.  And the caution which we

14   submit must be kept in mind is that it is not a

15   label, "ownership", "licence", it makes no

16   difference if you call them exclusive, perpetual,

17   royalty-free licences with the attributes I have

18   discussed, or if you call them ownership rights.

19   They are the rights that were sold to Rockstar.

20             They were valuable in the US and in the

21   US territory they were NNI's to sell, and similarly

22   for each of the other estates of the EMEA entities

23   and their territory.

24             So the dividing up of these rights

25   among the participants is done through the

```
 1   mechanism that you see in the MRDA, and as you will
 2   have seen from the evidence, and I will -- I'm
 3   about to show you where that evidence is, the
 4   intent was that NNI and the EMEA entities were to
 5   enjoy beneficial and economic ownership rights to
 6   the IP in their respective territory, but it is not
 7   the label that matters because those are the very
 8   valuable rights that were sold.
 9              So first, I want to address the
10   principles to apply in construing the MRDA, then
11   the factual matrix and then look in more detail at
12   the words as understood with that factual matrix,
13   all to show whose rights and assets are being sold
14   in the business and residual patent sale.
15              And the principles can be quickly
16   described.  I understand, Justice Newbould, you
17   have read Sattva.  In fact, I would observe that
18   you have been applying it long before the Supreme
19   Court of Canada articulated it in August of 2014,
20   because these are not --
21              THE CANADIAN COURT:  BCE.
22              MS. BLOCK:  Yes, not new principles.
23              THE CANADIAN COURT:  A whole lot of old
24   stuff in BCE and now it is BCE we look at.
25              MS. BLOCK:  But the point is, we are
```

1    engaged in a question of -- one thing they did make

2    clear is it's mixed fact and law.

3                    THE CANADIAN COURT:  I see what they

4    have said about that.

5                    MS. BLOCK:  Mixed fact and law, and we

6    are engaged in that mixed fact and law question in

7    two Courts.  And Judge Gross, you are obliged to

8    apply the principles that apply to the facts as you

9    find them, and the principles I will review

10   Mr. Bromley, I expect, will be telling you, Judge

11   Gross, are nothing new in Delaware either.

12                   So each of Your Honours will interpret

13   the contract.

14                   THE US COURT:  I feel like I'm

15   practising law in Canada without a licence, though.

16                   MS. BLOCK:  This one is going to be

17   easy, because it is second nature to any judge who

18   is interpreting it.

19                   THE CANADIAN COURT:  It depends on what

20   you are charging.

21                   MS. BLOCK:  But you will see I have

22   given you some references, and the first point they

23   make is:

24                       "[...] the interpretation of

25                       contracts has evolved towards a

1                      practical, common-sense approach not

2                      dominated by technical rules [...]"

3                      And your concern is obviously to

4      determine the intent of the parties and the scope

5      of the understanding, so you read it as a whole.

6      Of course you have to look at the words and give

7      them their ordinary and grammatical meaning, but it

8      is "consistent with the surrounding circumstances

9      known to the parties at the time of formation of

10     the contract."

11                     And as they say in the quote from Lord

12     Wilberforce, "No contracts are made in a vacuum;

13     there is always a setting", and in a commercial

14     contract you are looking for the commercial

15     purpose, the genesis of the transaction, the

16     background, the context, the market in which the

17     parties are operating.

18                     And as Mr. Zarnett said, the goal of

19     examining that evidence is to deepen the

20     decision-maker's understanding of the natural and

21     objective intentions of the parties, as they set

22     them out in the contract.

23                     So you are always grounded in the text

24     and reading it in the entire context.

25                     And of course they make the point in

1    paragraph 58 that the circumstances will vary from

2    situation to situation, but objective evidence of

3    the background facts at the time of execution,

4    subject to that and the parol evidence requirement,

5    that you are really looking --

6              THE CANADIAN COURT:  What goes below

7    about the parol evidence and subjective intention

8    of evidence and what do you do with that?

9              MS. BLOCK:  Well, we are not -- I'm

10   going to take you through the evidence that I want

11   you to look at.

12             THE CANADIAN COURT:  I'm saying you

13   have left out some of the discussion in Sattva

14   about the parol evidence rule and about the

15   inability to use subjective intent evidence.

16             MS. BLOCK:  I'm not going to be

17   suggesting that you look at subjective intent and

18   the parol evidence rule is one of the points in

19   paragraph 58, they say subject to the parol

20   evidence rule, which you can't look at, "absolutely

21   anything which would have affected [...] the

22   language [...] would have been understood".

23             What I am going to focus on is the

24   commercial purpose, the genesis, the background to

25   the transaction, the context, the markets in which

```
 1    people were operating.

 2                I am not putting forward to you what a

 3    witness comes and says, well, when we wrote these

 4    words, this is what I thought it meant.  It doesn't

 5    matter.

 6                THE CANADIAN COURT:  The evidence that

 7    was led, one of them said, this is what I thought

 8    and everybody else in my department thought it

 9    meant that too, you are not going to rely upon

10    that?

11                MS. BLOCK:  What I am going to show you

12    is what they were trying to achieve and they were

13    collectively trying to achieve.  They are not

14    negotiating against each other, NNL, NNI, the EMEA.

15    They are dealing with the revenue authorities on

16    the other side and the Nortel entities collectively

17    are trying to achieve a goal.

18                And they talk about what goal they are

19    trying to achieve and why they are trying to

20    achieve it.  That is not parol evidence, and it is

21    totally admissible and it is required as evidence

22    of the objective circumstances in which these

23    people were operating.

24                And this decision --

25                THE US COURT:  Is this what you call in
```

1    Canada the factual matrix?

2              MS. BLOCK:  Yes, it is.  You would call

3    it context, and I don't know if you can see Justice

4    Newbould, but he is shaking his head.

5              THE CANADIAN COURT:  Well, factual

6    matrix cannot include evidence of subjective

7    intent.  The law is quite clear on that.

8              MS. BLOCK:  I accept that, and I am not

9    suggesting that when the parties are dealing with

10   here is our objective from a transfer pricing point

11   of view, here is what we have to set up in order to

12   achieve the goals, and when I take you through the

13   sequence of how that was done, that is all in

14   advance of writing up the MRDA, which was to

15   reflect the very goals, objectives and purposes and

16   the back and forth with the CRA and IRS is factual

17   matrix evidence which you are obliged to consider.

18   And I will walk you through that, and I hope to be

19   able to persuade you.

20              But this decision affirms that

21   contractual interpretation is not a mechanical

22   task, and it is more than simply reading the words

23   of the parties, but you have to consider these

24   surrounding circumstances.

25              So you can see what the objective facts

1    and circumstances that were known to the parties at

2    the time of the contract.  And it is not to

3    overwhelm the words.  It is because the

4    circumstances have an important role to play in the

5    interpretive exercise.

6              So before going to the words of the

7    MRDA, in accordance with the principles I have just

8    reviewed, it is essential to put the MRDA in

9    context, since it actually just writes up the

10   reality of what the integrated entities were doing

11   for the four years between the end of the CSA and

12   the MRDA.  So there is a lot of important factual

13   matrix evidence which sets the stage for these two

14   Courts to read and understand the agreement.

15             And the first, I have six factual

16   matrix points and the first one, corporate

17   separateness, has been referenced by Mr. Bromley

18   and the reason, of course, was sensible and well

19   understood.  NNL did not want to have a permanent

20   establishment in the US or UK, et cetera, and be

21   liable to pay taxes.

22             So at tab 2 of the compendium, I have

23   given you, from the findings of fact documents, the

24   references which will give you all the cites to the

25   separate structures deliberately put in place that

```
 1    created the separate entities such as NNI and NNUK

 2    with their separate functions, separate lending.

 3              And if I can just take you to page 15

 4    of the compendium -- sorry, page 5, pardon me, just

 5    point out the references at 41 and 42, you will see

 6    that NNC and NNL were careful to make disclosure to

 7    lenders, that unless they had a separate guarantee

 8    against a specific separate legal subsidiary, the

 9    lenders would have no claims against the sub or

10    access to its assets.

11              This is a typical structural

12    subordination warning.  And it went on to say, in

13    bankruptcy, it is the subsidiary's creditors who

14    are first in line for the subsidiary's assets, so

15    lending to NNL and NNC, you only access those

16    assets if there is a distribution to the

17    shareholder.

18              And it was not, as Ms. Miller and

19    others have said, that everyone was just lending to

20    a non-legal, non-entity known as Nortel and saying,

21    well, roll the dice and see who grabs which assets.

22    These were all documented, done in the usual way.

23    It is very clear that lenders to NNL and NNC were

24    told you cannot grab the assets of the sub, and the

25    same goes for any of their creditors.
```

1              And that applies in this case.

2              The Monitor's own pleading in the

3    allocation reply made the same point about the

4    separate and distinct existence:

5                   "Employees were employed by the

6                   specific company they worked for.

7                   Trade creditors [...] Bondholders

8                   [...]" et cetera.

9              And this pleading actually went on to

10   say, when the Monitor came in and had to reconcile

11   among the various entities' intercompany

12   transactions and payments, it was able to do so

13   completely, because everybody kept their separate

14   records.

15             So the next factual matrix fact which

16   is objective is the transfer pricing objective of

17   the MRDA, and that is a key background objective

18   fact, that the MRDA was designed to achieve very

19   important transfer pricing and tax objectives.

20             And to do that, it had to meet the

21   revenue authority's requirements, and in the

22   Supreme Court of Canada's words, that is an

23   important background, relevant fact because it is

24   objective evidence of the genesis of the agreement,

25   of its commercial purpose and the market in which

 1    they were operating.

 2              And at the compendium tab 3 I have

 3    given you the evidence on the important transfer

 4    pricing points and you will see in those paragraphs

 5    that transfer pricing allows an MNE to manage,

 6    ideally minimize, as you heard, tax and with Nortel

 7    that meant directing as much it could to Canada.

 8              And you will remember why.  We had the

 9    chart that showed an 11 percent tax rate in Canada.

10    As Canadians, as Justice Newbould will attest, we

11    always think we are in such a high tax

12    jurisdiction, but when it comes to this, it went

13    from the high 30s in other jurisdictions, like the

14    US, to 11 percent.  And that was part of the

15    commercial context for the MRDA.

16              And at paragraph 215 at page 14 of the

17    compendium we have given you the evidence of the

18    numerous Nortel documents that show the personnel

19    and advisors at the time were very tuned into these

20    differences.  And this was the point.  They were

21    talking among themselves about - you'll see in the

22    first bullet under 215 - minimizing the long-term

23    effective tax rate, and the second bullet, a

24    December 2001 presentation which was sent to NNL

25    management that talked about being able to increase

1    NNL's operating income by 4.2 billion and

2    decreasing NNI 3.36 for the very purpose of

3    reducing the tax burden.

4              The next point was Mr. Henderson's, you

5    may remember his mission accomplished email where

6    he talked about on the day they put in the APA

7    application that this resulted in -- was going to

8    result in a 1.6 billion decrease to NNI alone.

9              And if you turn the page to page 15,

10   you will see in the third bullet, this is Doolittle

11   in an email to his senior colleagues describing:

12              "This is exactly the way we

13              designed our transfer pricing i.e.

14              take as much out of the US as we

15              could."

16             First of all, this is an admission by

17   an NNL executive, but, in any event, it is a

18   statement about what the purpose of going through

19   all this was, and it is consistent with all of the

20   other documentation.  You will see the last -- the

21   second-last bullet, a 2007 tax town hall where

22   Canada is referred to as a tax haven that we saw

23   was the whole point of this.

24             And this is an NNC/NNL document, and

25   the transfer pricing method they were putting in

1    the RPSM isn't valuing the assets owned by each

2    entity.  It is directing operational revenue to the

3    lowest tax jurisdiction to minimize the tax.

4              And as you see on the next page in the

5    first bullet, Peter Look, the VP tax at NNL

6    indicated that the goal of the system was "to

7    attribute more income to Canada."

8              Those are objective facts.

9              And if you look at 218 you will see the

10   first reference is to Doolittle in his deposition,

11   and he is explaining the objective underlying

12   reasons for the MRDA.  This is not parol evidence.

13   This is what is it we were trying to achieve.  It

14   is evidence of the purpose by an NNL executive

15   saying that:

16              "The thesis behind the

17              [RPSM]... was that to the extent

18              laws permitted it, we would move as

19              much profit and hence cash into

20              Canada and as a consequence we

21              would... minimize the tax on the

22              entire corporation."

23              So there are two points.  One, the RPSM

24   is not a proper formula for allocation.  That was

25   never what it was intended to be.  And the Monitor

1    agrees with this point.  And indeed, it is made

2    explicit in the contract itself, it is not to be

3    used for sale proceeds.

4              And the second point is to be able to

5    take advantage of the tax minimization afforded by

6    the transfer pricing, the businesses had to be set

7    up to meet the tax authority's requirements, and as

8    we will see, that required ownership of the IP by

9    each of the MRDA participants, beneficial, economic

10   ownership, and that is a key part of the commercial

11   context and key factual matrix.

12             Now, yesterday, sir, you said, Justice

13   Newbould, that there is little doubt that the

14   language was driven by transfer pricing and tax

15   considerations, and Mr. Zarnett agreed with you,

16   but then said that doesn't determine who had actual

17   ownership.  But, in fact, it did because this

18   contract would not work as a transfer pricing

19   contract if integrated entities did not get a

20   beneficial ownership.  If you didn't divide the

21   ownership, you wouldn't get these massive tax

22   benefits that was the whole commercial purpose of

23   doing this transaction.

24             As Mr. Maguire said, to work it had to

25   be ownership, and he said there were 20 billion

1    reasons why NNL wanted it to work to achieve the

2    goal of this transfer pricing arrangement.

3              So a further key point that's set out

4    in tab 3 is the fact that you don't just walk in

5    and say to the tax department, give us this.  You

6    do a functional analysis.  And you will remember

7    the evidence, that meant going around and talking

8    to people on the ground to determine what it is

9    they do, and you will see we have referenced that

10   at pages 29 and 31.

11             And the advanced pricing arrangement is

12   based on the reality of what they are actually

13   doing.  And NNL and NNI applied in 2002 for an APA.

14   They wrote up the MRDA in 2004.  They signed it at

15   the end of 2004 and 2005, and that reflected the

16   reality on the ground that they were representing

17   to the tax department and that they testified here

18   was the reality on the ground.

19             The MRDA was the contractualization of

20   that.

21             And the Monitor badly mixes this up in

22   its reply in paragraph 87.  It says statements to

23   the tax authorities can't change the meaning of the

24   MRDA.  I don't argue with that.  And NNI isn't

25   suggesting that is what happened.  There is no need

```
 1    to change the words of the MRDA.
 2              And more seriously and erroneously, the
 3    Monitor says at paragraph 87, quote:
 4                   "The MRDA itself was given to
 5                   the tax authorities as the
 6                   fundamental representation to them
 7                   of the nature and extent of the
 8                   parties' rights."
 9              Well, actually, the sequence is very
10    clear.  First, you do the functional analysis, what
11    parties actually did and you write it up.
12              Then in the 2002 application, you set
13    that out.  That is before the MRDA is prepared and
14    executed.  And the tax authorities in that are told
15    about the divided ownership that reflected what
16    happened on the ground.
17              And that is more objective evidence.
18    And that was the application supported by the Horst
19    Frisch report that Your Honours will remember where
20    they say that IEs own the intangibles in the
21    territory and that that's going to continue under
22    the new regime.
23              And then in 2004, to reflect those
24    facts on the ground, the representations and
25    negotiations you have had with the tax authorities,
```

1    the MRDA gets written up, reflecting the

2    circumstances, the commercial purpose and the

3    reality of the operations.

4              And the Monitor wants to give it to you

5    backwards, wants to say ignore this very important

6    context that the Supreme Court of Canada says is

7    essential to understanding and construing the

8    words.  But this is classic factual matrix

9    evidence, the objective reality that everyone

10   accepted as they wrote up the MRDA to reflect that

11   reality.

12             So let me turn to what the Nortel side

13   said to the other side of these discussions, the

14   revenue authorities, because this reveals, and

15   again, it is key factual matrix evidence, what the

16   objectives of the contract were, what the

17   commercial reality and purpose was, and what the

18   genesis of the contract was.

19             And this very evidence is what the

20   Ontario Court of Appeal has said is key factual

21   matrix evidence that would be error to ignore.

22             And if you just stay in tab 3 at page

23   24, I have given you the title of proceedings of

24   what we have been calling the Canada Trust v.

25   Browne case, or the Poloniato Grandchildren's Trust

 1    case, and given you some excerpts of that.  But

 2    this was a case where the correspondence with the

 3    CRA setting out the purpose of and the potential

 4    consequences --

 5                 THE CANADIAN COURT:  Where is that?

 6                 MS. BLOCK:  Sorry, it's at tab 3, it's

 7    at page 24 and 25 of the compendium.  Have you got

 8    that?

 9                 THE CANADIAN COURT:  I was looking at

10    tab 4 where you deal with representations to tax

11    authorities.

12                 MS. BLOCK:  Yes, it is in the wrong

13    spot.  They shouldn't really let me do these things

14    myself, but that one got away from them.

15                 The correspondence with the CRA about

16    the consequences, about -- and you will remember,

17    Justice Newbould, that Marty Rochwerg, the lawyer

18    for the trust, sent correspondence with legal

19    memoranda and the children's lawyers and the other

20    parties, the beneficiaries' lawyers,

21    correspondence.

22                 That was all part of what they call the

23    back and forth with the CRA leading up to the

24    variation.  It tells them what are we trying to

25    achieve, what do we see as the issues.  And the

 1    Court held that -- they even had E&Y provide

 2    economic analysis, that was all part of the mix

 3    that the Court said had to be looked at.

 4              And the criticism that was made of your

 5    brother Pattillo was that he had failed to look at

 6    it, and the Court of Appeal said no, he looked at

 7    it, and if he had failed, it would be an error not

 8    to review that.

 9              And you will see at paragraph 89 at

10    page 28 some highlighting, I noticed this morning I

11    missed, in 89 in that first sentence:

12                   "[...] the correspondence by

13                   the trustee's lawyer and by the

14                   income beneficiaries' lawyer with

15                   the Children's lawyer that explained

16                   the purpose of the variation and its

17                   intended effect and benefits also

18                   forms part of the factual matrix."

19              THE CANADIAN COURT:  This is an appeal

20    from Justice Pattillo; is that what you say?

21              MS. BLOCK:  It was, yes.  He was

22    upheld.  And rightly so, because they said he

23    didn't ignore it, and to the extent that he did, he

24    didn't come to the wrong decision.

25              But the Monitor in opening urged the

1    Courts to look at the words of the MRDA and really

2    dismiss everything else and labelling it as parol

3    evidence.  This isn't parol evidence, and in its

4    written submissions, it mischaracterizes most

5    blatantly the US position by saying we want to have

6    the MRDA interpreted by looking at what people say

7    the words mean.  That is not what this evidence

8    goes to.

9              And you have seen in both the Supreme

10   Court and in the Court of Appeal that it would be

11   an error to not consider this evidence, the genesis

12   of the agreement, the commercial purpose, the

13   market in which the parties were operating, the

14   back and forth with the tax department saying what

15   they were trying to achieve, what the surrounding

16   circumstances were.

17             So this evidence, which is largely from

18   NNL witnesses to begin with, isn't here's what I

19   now say the words meant.  First of all, a lot of it

20   is documents leading up to the MRDA saying what the

21   purpose was, and in the testimonial evidence it is

22   NNL reps saying here's what we, the Nortel

23   entities, were trying to achieve, what we knew was

24   required to get over our collective goal line.

25             And that is not parol evidence.  It is

1    evidence of the objectives, the purposes, the

2    surrounding circumstances leading to the MRDA.

3              THE CANADIAN COURT:  I'm going to hear

4    about this in reply, so I want to ask you.  Looking

5    at page 32, paragraph 171, there is a quote here

6    from the Horst Frisch report.

7              MS. BLOCK:  Right.

8              THE CANADIAN COURT:

9                   "From an economic standpoint,

10                  each R&D cost sharing participant

11                  could be considered to 'own' the NT

12                  Technology [...]"

13             What is that telling them so far as

14   from a legal point of view is concerned?

15             MS. BLOCK:  Well, I'll get to divisible

16   title which you acknowledge, Justice Newbould, is

17   divisible.  Legal title was clearly intended to be

18   in NNL and was put in NNL's hands at the time of

19   the MRDA.

20             THE CANADIAN COURT:  No, I would just

21   ask you to answer the question.  What is this

22   sentence?  Is this sentence telling them that the

23   subsidiaries own the technology?

24             MS. BLOCK:  They beneficially,

25   economically own the intangible property in itself.

```
 1    They have an interest to exploit separately as an

 2    effective owner.  They are not as a licensee

 3    without that interest.

 4                THE CANADIAN COURT:  Well, was there

 5    not evidence that -- I mean, this says "from an

 6    economic standpoint", it doesn't say from a legal

 7    standpoint.  But was there not evidence, and it may

 8    have come from Dr. Eden, I'm not sure, but was

 9    there not evidence to the effect that what we are

10    telling the tax people isn't legal?  I'm

11    simplifying it, but is there not evidence to that

12    effect?

13                MS. BLOCK:  No, her evidence, and if

14    you --

15                THE CANADIAN COURT:  Maybe not

16    Dr. Eden, but somebody, is there not evidence

17    somewhere that someone said when you are dealing

18    with the tax people, you are talking about -- we

19    are not talking about legal, we are talking about

20    economics and tax?

21                MS. BLOCK:  Right, there were some -- I

22    can't remember which witness it was who said, well,

23    this is how we talk in the tax and transfer pricing

24    area.

25                But I will be coming to the Supreme
```

```
 1   Court of Canada and the Federal Court of Appeal
 2   that says there is no secret language, it is plain
 3   and ordinary meaning of beneficial ownership.  And
 4   what Dr. Eden told you was that in order to make
 5   these work as the CRA guideline says, you don't
 6   have to be a legal owner but you have to have the
 7   same attributes as an owner.
 8              And that is what the OECD guidelines
 9   say, and this agreement would not have worked for
10   any of the Nortel entities if that hadn't been put
11   in place.
12              And so when Horst Frisch, a
13   well-reputed, as you well know, transfer pricing
14   and tax specialist, say they can be considered to
15   own, they are saying to the tax department we will
16   meet your requirements, we know they cannot be a
17   mere licensee, they cannot just have use of the IP,
18   they have to be effectively like an owner.
19              And I'll get to divisible ownership and
20   so on.  But are there stray comments here and
21   there?  Yes.  But this is the persuasive evidence
22   and it is overwhelming, as I'll show you.
23              So all of the evidence of the dealings
24   with the tax authorities that in opening the
25   Monitor ignored and wants you to ignore because it
```

1     shows its interpretation is wrong, is in fact the

2     evidence that is key, that is mandatory to

3     consider, and it shows that the Monitor's

4     interpretation that NNL owned all interest in the

5     collective Nortel IP is wrong, and in fact, an

6     arrangement that worked that way would have been

7     rejected outright by the revenue authorities and

8     would have defeated the clear and undisputed

9     collective goal for this transfer pricing

10    agreement.

11               And indeed, NNL described the

12    arrangement very differently when it wanted to get

13    revenue authority approval, and each one of its

14    witnesses told these Courts that they told the

15    truth to the revenue authorities.

16               So let's look at that truth as

17    represented to the revenue authorities, and that

18    takes me to tab 4 and we have looked at Horst

19    Frisch who said this was the essential structure

20    and it was going to continue.

21               And 173, 174, you have got the 1996 APA

22    which was agreed with the tax authorities, and the

23    IRS --

24               THE CANADIAN COURT:  This may not be

25    much of a point, but the word "benefit", I see that

1    elsewhere, is a capital "B", isn't it?  Presumably

2    benefit was defined somewhere in that?

3              MS. BLOCK:  Sorry, which?

4              THE CANADIAN COURT:  Looking at 173,

5    for example, at the third line down, the word

6    "Benefit" appears and then it goes on to say they

7    are "entitled to all Benefits".  I'm assuming

8    somewhere "Benefits" was defined in the MRDA.

9              MS. BLOCK:  Yes, I'll try and track

10   that down.  I don't have it at hand.

11             If we look at 173 and 174, you will see

12   that NNI, they are told NNI "[...] is entitled to

13   all Benefits in its geographic market [...] except

14   [where NNL] has granted to other Cost-Sharing

15   Participants, in return for contribution to R&D

16   Expenses."

17             And the equivalent was said about NNL

18   in Canada in its part of the application.

19             And then the OECD guidelines, which

20   we'll come to in more detail, are described in 176

21   and 177, showing you that the undisputed objectives

22   that the Nortel entities were seeking to achieve,

23   the IEs needed to have effective ownership and

24   beneficial ownership or else the structure would

25   not work of creating -- of not creating taxable

1    events in the hands of NNL.

2             Because if NNI and the other Licensed

3    Participants did not receive ownership in the IP

4    itself, their contributions of all the R&D they

5    were contributing would constitute a royalty for

6    the use of the intangible property and that would

7    be taxable.

8             And as the OECD guidelines say, each

9    entity has to be able to separately as an effective

10   owner exploit the technology in their territory.

11            Now, we know the terms of that

12   ownership.  They are the rights that I have

13   described, and of course, when we get to the story,

14   it is those rights to exclude in important

15   territories, to enforce in those territories, like

16   the US, indeed we say especially in the US, is

17   exactly what Rockstar was buying and only NNI had

18   that to convey, and NNUK in the UK, et cetera.

19            And Inland Revenue was told the same

20   thing, at paragraph 265.  And at 266, if we can

21   just stop there for a moment, the continued

22   representations that were made by Nortel, you will

23   see the first bullet under 266:

24            "In September 2003 [...] Nortel

25            stated that the [Integrated

1             Entities] were 'owners of the

2             intangible property'."

3             And that description by NNL to the

4    revenue authorities that all participants were

5    owners of the IP never changed.  It is only since

6    March 2013 that NNL ever said anything different.

7             But if you look in 2008 in an APA

8    request by NNL -- sorry, let me just get that up.

9    This is the 2008 APA joint request and this is NNL,

10   NNI, et cetera, telling the revenue authorities:

11             "All Intellectual Property is

12             registered by NNL.  Each Integrated

13             Entity maintains an economic

14             ownership in the IP".

15             And then the famous chart, which you

16   may remember, which shows "X's" when it is local

17   and extra-territorial activity and it shows "Y's"

18   when it is local activity.  And you will see

19   everyone does R&D.  The registration of

20   intellectual property is done only by NNL, but the

21   intellectual property economic ownership is local.

22   NNL has it in Canada, NNI in the US, NNUK in the UK

23   and so on.

24             And not only did the description never

25   change from NNL, when the Monitor worked on the

```
 1    Transfer Pricing Report in 2009, which was done in

 2    2010, and Mr. Sean Kruger of E&Y who came to

 3    depositions in this case was helping prepare, you

 4    see the Monitor set out for the tax authorities the

 5    same point:

 6                    "[...] operates under RPSM

 7                    where affiliates, including NNL and

 8                    other IEs, are the primary owners of

 9                    intangibles developed by the Nortel

10                    Group".

11                    And then they put in the transfer

12    pricing chart with the same point that we have

13    seen, that NNL's ownership is local.  As is

14    everyone else's in its territory.  That was the

15    entire structure of the arrangement that had been

16    made.

17                    And you have to ask yourself, Your

18    Honours, if it is so clear from the words that this

19    wasn't the case, that NNL owned everything, then

20    why did it take five years, first of all, in this

21    case to come up with this argument, but actually

22    nine years when E&Y first started working with NNL

23    in 2004, and this was the consistent representation

24    throughout the entire period.

25                    The Monitor's interpretation is not
```

1    clear from the words.  It is not the intent of the

2    parties and it is a product of, I would suggest,

3    lawyering after the fact.

4              And when the parties and the Monitor

5    describe the licence rights as beneficial ownership

6    -- sorry, when the parties and the Monitor

7    describe, saying licence rights are beneficial

8    ownership and that is some kind of tax code thing,

9    they are wrong.  It is plain English.  It is not

10   some secret language of the tax transfer pricing

11   fraternity.

12             And at page 48 of tab 4, I have given

13   you the references from the Supreme Court of Canada

14   that approve the meaning given to the words

15   "beneficial ownership", that it is:

16                  "[...] the plain and ordinary

17                  meaning of the expression [...] [it]

18                  is the real or true owner of the

19                  property.  The property may be

20                  registered in another name or held

21                  in trust [...]"

22             And I'll come to this point.  It is not

23   always in trust if it is held in another name; it

24   can be or it is held in trust for the real owner,

25   but the beneficial owner is the one who can

```
 1   ultimately exercise the rights of ownership.

 2                And the Federal Court of Appeal in a

 3   tax case, in Jodrey, was also a tax case, said the

 4   same thing.  So from the Monitor's own authority,

 5   Mr. Ziff, you'll remember this from the opening,

 6   this was a part that the Monitor didn't cite, that

 7   you can have divisible ownership, it is infinitely

 8   divisible, and their own expert, Mr. Green, agreed,

 9   you can divide it.

10                And indeed, that was a discussion that,

11   Justice Newbould, you had with Mr. Zarnett and said

12   people can agree to divide it as they want, and he

13   agreed that that was the case.

14                But then he says, well, it has to be a

15   trust.  And under 13 it can't be a trust.

16                But that is just wrong.  It is a, I

17   will quote the Court, a fallacious argument.

18                My friend took you to the German case

19   Westdeutsche, and it is at tab 3 of his

20   authorities, Westdeutsche bank, and at 706 he read

21   the first two highlighted portions, but actually if

22   you keep reading page 706 --

23                THE CANADIAN COURT:  Hang on a second.

24                MS. BLOCK:  Tab 3, I think it is tab 3.

25   You see at the bottom of the page, Your Honours,
```

```
 1    tab 3 at 706, "The separation of title point":
 2                    "The bank's submission, at its
 3              widest [...]"
 4              THE CANADIAN COURT:  I haven't found it
 5    yet.
 6              MS. BLOCK:  "[...] is that if the
 7              legal title is in A but the
 8              equitable interest in B, A holds as
 9              Trustee for B."
10              And this is the part that isn't
11    underlined, as if we wouldn't see it.  Again, I
12    think --
13              THE CANADIAN COURT:  You are way ahead
14    of me.
15              MS. BLOCK:  Page 706.  I don't want to
16    be ahead of you on this one.  Tab 3.
17              THE CANADIAN COURT:  Tab 3 is not that
18    case.  So I'm looking at the wrong thing.  You
19    filed a compendium or something, didn't you,
20    Mr. Zarnett?
21              MS. BLOCK:  It was a -- yes, it was an
22    argument -- it was an argument compendium that had
23    segments of the case law, case book for argument.
24    Who has it?
25              THE CANADIAN COURT:  Yes, sorry, where
```

1    were you?

2                    MS. BLOCK:  I'm at tab 3, 706.  Judge

3    Gross, do you have the right document?

4                    THE US COURT:  Yes, I do.

5                    THE CANADIAN COURT:  He is better

6    organized than I am.

7                    MS. BLOCK:  This is English law, so

8    both of you can ignore it.  No, I don't want you to

9    ignore it.  It is "The separation of title point"

10   on the bottom of the page at letter H:

11                    "The bank's submission, at its

12                    widest, is that if the legal title

13                    is in A but the equitable interest

14                    in B, A holds as Trustee for B.

15                    Again I think this argument is

16                    fallacious.  There are many cases

17                    where B enjoys rights which, in

18                    equity, are enforceable against the

19                    legal owner, A, without A being a

20                    trustee [...]"

21                    And it goes on to give these various

22   examples of that being the case.  And my friend is

23   also wrong on the --

24                    THE CANADIAN COURT:  Sorry, I can't

25   find where you are.

```
 1              MS. BLOCK:  Oh, are you in the Deutsche
 2  bank case?
 3              THE CANADIAN COURT:  Yes, Westdeutsche
 4  bank.
 5              MS. BLOCK:  So tab 3 -- oh, no.
 6              THE CANADIAN COURT:  Which page?
 7              MS. BLOCK:  Yes, page 706.
 8              THE CANADIAN COURT:  Oh, sorry.
 9              MS. BLOCK:  It is right at the bottom
10  and the only important point is that the thing that
11  Mr. Zarnett didn't highlight is exactly the point.
12              THE CANADIAN COURT:  Which part didn't
13  he --
14              MS. BLOCK:  He didn't, at least in
15  mine:
16              "Again I think this argument is
17              fallacious."
18              It stands out quite a lot when it is
19  not highlighted, but that is the point, they are
20  saying it is not always a trust relationship.  You
21  can divide legal title without making the legal
22  titleholder a trustee, and it gives the example of
23  the equitable right to redeem a mortgage, equitable
24  easements, restrictive covenants, the right to
25  rectification, right to subrogation.
```

```
 1                    "Even in cases where the whole

 2               beneficial interest is vested in B

 3               and the bare legal interest is in A,

 4               A is not necessarily a trustee, e.g.

 5               where title to land is acquired by

 6               estoppel as against the legal owner;

 7               a mortgagee who has fully discharged

 8               his indebtedness enforces his right

 9               to recover the mortgaged property in

10               a redemption action, not an action

11               for breach of trust."

12                    So it is just a wrong proposition to

13     say therefore, because they divided ownership, it

14     must mean we were, on the US and EMEA argument, it

15     must be that there was trust relationship and that

16     can't be right.  They are not right.

17                    And he had given you Falconbridge on

18     Mortgages as well, you'll remember that, the

19     history on common law mortgages and he gives you

20     the cite in Falconbridge, but he is also wrong on

21     that point.  And there is a Supreme Court of Canada

22     case.  I'm not sure if my colleagues in the US have

23     this case to hand to Judge Gross, but we'll get

24     one.

25                    It is the Petranik v. Dale case, and it
```

1     is the leading Supreme Court of Canada decision on

2     equity of redemption where Laskin at paragraph 18

3     says it is a:

4                      "[...] well-established

5                  proposition that the equitable right

6                  to redeem is more than a mere equity

7                  but [...]"

8                  THE CANADIAN COURT:  Sorry, where?

9                  MS. BLOCK:  Paragraph 18, it is an

10    interest in land.

11                 THE CANADIAN COURT:  Paragraph 18.  My

12    copy doesn't number the paragraphs.  What page is

13    it?

14                 MS. BLOCK:  Sorry, I was working from a

15    different copy.  Page 186?  Anyway, I'll get the

16    references for you, but the point of the case is

17    Laskin said you have a property right in the

18    mortgaged land, and Dickson said an equity of

19    redemption is a right of property.  It is not --

20    this is not a trust right.  It is a right of

21    property.

22                 So it is just a wrong proposition that

23    you can't divide ownership without creating a

24    trust.

25                 It is 986, and 995 for Dickson, the

1    second-last paragraph.

2                   THE CANADIAN COURT:   986?

3                   MS. BLOCK:   986 for Laskin CJ.

4                   THE CANADIAN COURT:   986 is Justice

5    Dickson.

6                   MS. BLOCK:   Dickson, okay, sorry, so it

7    is 995 for Dickson's reference, the last -- the

8    second-last paragraph:

9                        "An equity of redemption is an

10                       interest in land."

11                  So it is not a trust interest.

12                       "And that equity has always

13                       [...] guarded the mortgagor's right

14                       to redeem."

15                  So let me turn quickly to tab 5, which

16   was the reality on the ground where I have given

17   you the facts and figures which are not contested

18   or contestable about NNI's activity, the R&D it did

19   and funded, the customer relationships.  These

20   sections show you that more was spent outside of

21   Canada on R&D than inside of Canada.

22                  And at paragraph 103, if I can take you

23   there, at page 59, it refers to the capital "P"

24   Products that we'll see when we get to the --

25                  THE CANADIAN COURT:   Why is this

1    relevant, the fact that more money was spent

2    somewhere else?

3              MS. BLOCK:  This is just part of the

4    context, some of what you have heard and read in

5    the brief is this history about how important

6    Canada was and how unimportant other people were.

7              THE CANADIAN COURT:  Right, there is

8    evidence that the more important stuff was done in

9    Canada.  There is evidence more money was spent in

10   the States.  But what does all that do for us?

11             MS. BLOCK:  Well, it is just -- I'm

12   just setting the record straight from the rhetoric,

13   but the facts are in here so you can have that.

14             THE CANADIAN COURT:  The rhetoric is

15   all on one side, is it?

16             MS. BLOCK:  Eye of the beholder.

17             Paragraph 103, the capital "P"

18   Products, this goes to the issue of IPCo, and you

19   will see when we look at the definition, capital

20   "P" Products is defined as all products, all

21   services, all software, including proposed to be

22   developed and designed at any time, and IPCo was a

23   service that was proposed to be designed and

24   developed and was underway, as you know, from 2008

25   when John Veschi was hired and it was ultimately

```
 1    sold to Rockstar.

 2                And it is a service and I wanted to

 3    just show you one document that was on the

 4    cross-examination of Mr. Burshtein.  Where is it?

 5                It is slide 12.  Can you help me with

 6    slide 12?  Slide 13, I guess.  It is --

 7                THE CANADIAN COURT:  This all goes down

 8    to the argument as to the meaning of the MRDA, I

 9    understand that.

10                MS. BLOCK:  Right.

11                THE CANADIAN COURT:  I think your

12    argument is that it is the product for the

13    participants, which means Nortel product.  That is

14    essentially what they are saying?

15                MS. BLOCK:  Well, the IPCo was the

16    exploitation and licensing of intellectual property

17    and intellectual property rights, and that is

18    considered a service.  I have given you this one,

19    because it was --

20                THE CANADIAN COURT:  I see that.

21                MS. BLOCK:  -- their expert witness,

22    their legal expert before Judge Gross,

23    Mr. Burshtein.  This is his firm and this is what

24    they call a service at Blake Cassels, and indeed

25    there is no issue that it is a service to do that
```