```
 1    and they were developing that.

 2                    THE CANADIAN COURT:  Is he a lawyer,

 3    Burshtein?

 4                    MS. BLOCK:  Sheldon Burshtein.

 5                    THE CANADIAN COURT:  He was one of the

 6    lawyers?

 7                    MS. BLOCK:  He was one of the lawyers.

 8                    THE CANADIAN COURT:  So it is really

 9    not evidence for me, is it?

10                    MS. BLOCK:  No, but this is a document

11    that just gives you an example of the very service

12    that Veschi was developing and Rockstar is running.

13                    Tab 5 also gives you the evidence about

14    the patent registration process and how fundamental

15    the US was, and you will see those references.

16                    And if I could just take you to 126,

17    page 126 -- sorry, paragraph 126 at page 68, this

18    is the evidence about the employment agreements

19    that we have collected that shows that each

20    inventor employed by the participant or Licensed

21    Participant assigns to that Licensed Participant,

22    and so the Licensed Participant has beneficial and

23    legal title to the IP assigned.

24                    And under the MRDA, in return for the

25    licence to all the substantive rights, the Licensed
```

```
 1   Participants were assigned the legal title to the
 2   technology which immediately turned around -- NNL
 3   immediately turned around and issued the exclusive
 4   licence to the Licensed Participants.  That is how
 5   and when NNL gets its legal title, and that was
 6   confirmed again by Mr. Burshtein and I have given
 7   you that reference in the materials.
 8              And I have also given you, at
 9   paragraphs 128 and 129, and I'll just leave that
10   with you, the evidence that shows why it made sense
11   to centralize the legal title holding.
12              THE CANADIAN COURT:  Let me just ask
13   you a question on 127.
14              MS. BLOCK:  Yes.
15              THE CANADIAN COURT:  "Where
16              inventions were initially assigned
17              to an employer other than NNL, legal
18              title was ultimately assigned to NNL
19              by the applicable Nortel entity
20              [...]"
21              What did the document say?  I don't --
22   I mean, did NNI, for example, say we have
23   contractually legal title?  Or what was the
24   language of this ultimate assignment to NNL?
25              MS. BLOCK:  There isn't a separate from
```

1    NNI to NNL or NNUK to NNL.  That is done under

2    Article 4(a).  Now, there may be --

3              THE CANADIAN COURT:  I'm just taking

4    you up on what paragraph 127 says.  It looked to me

5    like you are telling me that legal title was --

6    "ultimately" is the word, the notion is further

7    assigned, and what you are saying is it's just by

8    virtue of the MRDA?

9              MS. BLOCK:  Yes, in accordance with the

10   exchange contemplated in the MRDA.  And you will

11   remember in --

12             THE CANADIAN COURT:  You are saying

13   there is no separate assignment, it is just the

14   MRDA?

15             MS. BLOCK:  Right.

16             THE CANADIAN COURT:  All right.

17             MS. BLOCK:  And under 4(b), there is an

18   obligation --

19             THE CANADIAN COURT:  I understand.

20             MS. BLOCK:  But under 4(b) there is an

21   obligation if there were a situation where NNL

22   needed another piece of paper to show to the patent

23   regulator or whatever, NNI or the other IEs would

24   be obliged to provide it, but the exchange is as

25   said, you will get legal title, it shall be vested

1     in you and we get the exchange.

2                 THE CANADIAN COURT:  Okay, thank you.

3                 MS. BLOCK:  And then 128, and 129, as I

4     say, shows you why it made sense to have legal

5     title holding centralized.

6                 And then in tab 6, I'll just leave this

7     with you, this is the business reality that shows

8     you not only the activity about customers, revenue

9     generation, financing.

10                Let me stop at 87 -- at 78, if I may,

11    Mr. Binning's evidence, as you know, the CFO from

12    NNL, who agreed that:

13                      "Creditors were looking for

14                      those guarantees because they wanted

15                      to look at the assets of NNI as a

16                      support for lending to NNL."

17                And the rest of this deals with both

18    enforcement and sublicensing that were done by NNI

19    in their territory, and the balance is the custom

20    and practice --

21                THE CANADIAN COURT:  I assume these

22    sublicenses were to make Nortel product?

23                MS. BLOCK:  No, not --

24                THE CANADIAN COURT:  They were to allow

25    someone to compete with Nortel?

1           MS. BLOCK:  No, to allow an infringer,

2    when you settled a lawsuit there was sublicensing

3    like that.  When someone was using a claim in a

4    patent that isn't a Nortel product to make their

5    own product, like Foundry or like Kyocera, which

6    was making mobile handsets, and Nortel was not in

7    mobile handsets, and they settled that lawsuit by

8    NNI granting a licence to Kyocera to be able to

9    continue infringing the patent.  It is no longer an

10   infringement when you settle it.

11          And there are sublicenses, as we will

12   see, contemplated to third parties right in the

13   MRDA and I'll take to you that in a few minutes.

14          So it is not licences -- it is not the

15   have-made right.  There is a have-made right in

16   5(a).

17          THE CANADIAN COURT:  Can you just tell

18   me where is the evidence of that?  I'm not

19   questioning you.  I would just like to know where

20   is it.  Where is the evidence that they sublicensed

21   to people who are not making Nortel product?

22          MS. BLOCK:  If you look at 282.

23          THE CANADIAN COURT:  Yes.

24          MS. BLOCK:  Exercise the full range of

25   sublicensing rights.

```
 1                    THE CANADIAN COURT:  That doesn't --
 2               MS. BLOCK:  283 --
 3                    THE CANADIAN COURT:  But 282 doesn't
 4      tell me what that was.
 5               MS. BLOCK:  283, Tim Collins' evidence
 6      that each IE had an exclusive right to grant a
 7      licence where the third party is already making
 8      their own product and is seeking a licence from the
 9      IE so they will not be infringing.
10                    This isn't making a product for Nortel
11      or a Nortel product.  This is they are making their
12      own product, like Kyocera was, like Foundry was.
13               THE CANADIAN COURT:  All right, but
14      that is a statement on discovery.  But again, is
15      there any evidence that that in fact happened?  Any
16      evidence before me?
17               MS. BLOCK:  All the licences are in the
18      record.  If you want us to --
19                    THE CANADIAN COURT:  Well, I'm sure
20      they are.
21               MS. BLOCK:  Yes, we can get you the
22      particular licences to show you, but this is the
23      evidence that they were entitled to and they did
24      license to third parties.
25                    THE CANADIAN COURT:  Well, that is a
```

1    statement.  I'm not questioning the veracity of

2    what you are saying.  I would just like to see the

3    evidence.

4              MS. BLOCK:  All right.  In Schedule A

5    to our -- I think it is -- is it our reply brief or

6    our original brief?  Our reply brief.

7              MR. ZELBO:  It is Schedule A to our

8    reply brief.

9              THE CANADIAN COURT:  Sorry?

10             MR. ZELBO:  Sorry if I rose

11   inappropriately, but Schedule A to our reply brief,

12   Your Honour, lists sublicenses to which we are a

13   party.  None of them are have-made.  The only

14   have-made sublicense was, as far as I know, to

15   Flextronics who was making products for Nortel.

16   The rest were either products either competing with

17   Nortel products or not competing with Nortel

18   products.  It was both and it was generally in part

19   to settle enforcement suits but it was also just

20   general sublicensing.  And they also wrote to the

21   IRS specifically saying that NNI is a sublicensor

22   receiving royalties which you wouldn't receive in a

23   have-made licence.  And that document is in

24   evidence as well.  I don't have the exhibit cite,

25   we can get it to you, but that was a document

1    Nortel submitted.

2              And in the 1996 APA, Your Honour, which

3    you asked about earlier, the benefits included

4    sublicensing to which they received royalties,

5    again, that is not a have-made --

6              THE CANADIAN COURT:  I have opened up

7    tab "A", I see there are a lot of sublicenses, but

8    it doesn't say what they are for.  It just lists a

9    whole bunch of licensees.

10             MR. ZELBO:  Well, we have all the

11   agreements.  They are all in the record.  Not one

12   of them, Your Honour, is a have-made.  The only

13   have-made I'm aware of --

14             THE CANADIAN COURT:  Sorry, what do you

15   mean by have-made?

16             MR. ZELBO:  Sorry, Your Honour, I

17   apologize for intruding.

18             THE CANADIAN COURT:  No, no, don't

19   apologize at all.  I am just asking what you mean

20   by have-made.

21             MR. ZELBO:  If I can just cut through

22   this a little bit, a have-made licence is I believe

23   what Your Honour was asking about, which is if I

24   give a sublicense to, I'm going to use the name

25   Flextronics, and I'll explain why in a minute, if I

1    give a sublicense to Flextronics so it can make a

2    Nortel branded product that then Nortel will sell,

3    that is a have-made licence.

4                    THE CANADIAN COURT:  All right.

5                    MR. ZELBO:  And they had a have-made

6    licence with Flextronics because Flextronics was a

7    manufacturer of Nortel products.

8                    You wouldn't receive royalty payments

9    from Flextronics; in fact, you would pay

10   Flextronics to make your products.

11                   My point being we know the other

12   sublicenses are not have-mades because, first of

13   all, the only have-made I know of I believe in the

14   record is Flextronics, but, more importantly, those

15   sublicenses had royalty payments which therefore it

16   couldn't be to make a Nortel product for Nortel.

17   They are making their own products.

18                   And some of those products competed

19   with Nortel products, some of those products did

20   not compete with Nortel products.

21                   And the only additional point I was

22   going to make, Your Honour, about that is there is

23   a document that is part of the functional analysis

24   in 2004 submitted while they were putting together

25   the MRDA, submitted to the IRS, CRA and Her

1    Majesty's Revenue, where the IRS asked whose

2    sublicenses, and they weren't asking about

3    have-mades because they asked about royalty, again

4    you wouldn't get a royalty on a have-made.

5              And Nortel wrote back, the entities

6    that sublicense are NNL, NNI and NNUK, and they

7    included an exhibit showing the NNI sublicenses.

8              Thank you, Your Honour, and I apologize

9    again for --

10             THE CANADIAN COURT:  You don't have to

11   apologize at all.

12             MS. BLOCK:  And you will see, Your

13   Honours, that in 5(a) there is the right to capital

14   "P" Products includes the right to have-made.  It

15   is not the sublicense right, which is separate.  It

16   is make, sell, have-made products, and we'll come

17   to that.  So that is already built in.

18             THE CANADIAN COURT:  Okay, thank you.

19             MS. BLOCK:  And in this Collins email

20   that I have just put up, and all of the slides are

21   in the compendium, you will see he is explaining

22   about how they enter into worldwide licensing

23   agreements, so you will see NNL on these agreements

24   because they are worldwide.

25             THE CANADIAN COURT:  Which page is that

1    in your --

2                   MS. BLOCK:  It is at 286 -- I think it

3    is at page 85 -- no, that is not the licence.  It

4    is at 87, sorry, page 87.

5                   THE CANADIAN COURT:  Thank you.

6                   MS. BLOCK:  And in this document he is

7    explaining the sublicensing and you get NNL on the

8    sublicense, and you will see they name the local

9    Nortel subsidiary and it is on its own behalf and

10   on behalf of NNL and its subsidiaries.  There's

11   others that are NNL on behalf of NNI and its

12   subsidiaries or on behalf of all its subsidiaries.

13                  And Collins says:

14                     "[...] the Tax people view this

15                     language as being broad enough so

16                     that NNL will be viewed as licensing

17                     the Canadian rights, NNI the US

18                     rights, Nortel Japan the Japanese

19                     rights, etc.  This is important for

20                     two reasons:  First, as a result of

21                     the R&D Cost Sharing Agreements each

22                     of the regional subsidiaries has the

23                     exclusive rights to license NNL's

24                     IPR," intellectual property rights,

25                     "within their respective regions".

1              And this was also the case under the

2    MRDA.

3                   "Second, the language allows

4                   the Tax people to claim NNL licensed

5                   the Canadian rights to the

6                   licensee's Canadian entity, NNI

7                   licensed to the licensee's US

8                   entity, etc. thereby avoiding any

9                   cross-border IPR transfers which may

10                  trigger tax liability."

11             And if I can take you to one more

12   document which is also in the compendium --

13             THE CANADIAN COURT:  This is from

14   Timothy Collins, and who are the people he is

15   sending it to?

16             MS. BLOCK:  Let's see.  There are

17   people in NNL.  We have a cheat sheet at the back

18   of one of our briefs that tells us who everybody

19   is.  Have you got it?

20             THE CANADIAN COURT:  What about the

21   next paragraph?  It says:

22                  "I haven't seen the standard

23                  form technology licensing agreement,

24                  but I would assume that if the

25                  technology in question belongs to

1              NNL or one of NNL's subsidiaries

2              [...]"

3              It looks like NNI on its own behalf and

4    on behalf of NNL and the subsidiaries, is that what

5    the agreements say?

6              MS. BLOCK:  Some of them say that.

7    Some of them say NNL and its subsidiaries.  And the

8    point is that that would cover, they are saying the

9    language would cover --

10             THE CANADIAN COURT:  But if NNI is

11   doing it on behalf of NNL --

12             MS. BLOCK:  Well, it is a worldwide

13   licence, so it is NNI in relation to the US, it is

14   NNL in relation to all those other places in the

15   world that it had the rights to.  You'll remember

16   it had rights until the amendment of the territory

17   in the Third Addendum to all the other places in

18   the world, so they are worldwide licences and the

19   point was to be able to say to the tax authorities

20   this -- and then they attribute the income to NNI

21   if it is in the US.

22             THE CANADIAN COURT:  I have this tab

23   "A" of your reply brief and the licensor for the

24   most part is NNL and NNI.

25             MS. BLOCK:  When it relates to the --

1            THE CANADIAN COURT:  Well, this appears
2    to be just done by NNI.
3            MS. BLOCK:  No, but it is a worldwide
4    licence, so NNL has to be on there.
5            THE CANADIAN COURT:  I understand but
6    you were making the point that NNI has done all
7    this sublicensing when it appears to be NNL and NNI
8    or NNL alone.
9            MS. BLOCK:  But if you look at the
10   Collins email, he is explaining that it is to be
11   done this way so that the people with the exclusive
12   rights in their respective regions so that the tax
13   people can claim that NNL licensed the Canadian
14   rights to the Canadian entity, NNI licensed to the
15   licensee's US entity, avoiding any cross-border IPR
16   transfers which may trigger tax liability.
17            So this was the way they set it up, and
18   you'll see --
19            THE CANADIAN COURT:  But my only point
20   is it seems to be quite contrary to the point you
21   were making.  You are making the point that NNI had
22   the right to sublicense to all these people who
23   were --
24            MS. BLOCK:  Yes.
25            THE CANADIAN COURT:  And they weren't

1   have-made, but when I take a look at it, which I

2   could because of this email, it appears it wasn't

3   done by NNI alone; it was done by NNL and NNI.

4                    MS. BLOCK:  But it was done that way so

5   that they could say to the tax authorities, as you

6   see from Mr. Collins' email, that this is language

7   that allows them to say when it comes to that part

8   of this licence, this worldwide licence that

9   relates to NNI and the --

10                    THE CANADIAN COURT:  That is the reason

11  they did it that way?

12                    MS. BLOCK:  Well, he is explaining it,

13  and if I can go back to this other email that I

14  have got up on the screen, this is Matthew Vella

15  writing an email to a large number of NNL and NNI

16  people saying that:

17                         "The tax people were mortified

18                         at the prospect of creating a

19                         taxable entity in the US called NNL

20                         (i.e. the Canadian parent)."

21                    And then he says two lines after:

22                         "Doing this led to a bunch of

23                         other practices, such as ensuring

24                         that NNI's name was on litigation

25                         that we got involved in within the

1                    USA, and on licenses we did in the

2                    USA.  But the real point behind all

3                    of this was to ensure that no

4                    taxable entity besides NNI existed

5                    here in the USA."

6                    It is to avoid the permanent

7    establishment, one of the main reasons for the

8    transfer pricing deal and for getting the tax

9    authorities on-side.

10                   So NNL did not have operations,

11   business in the US.  That was within the exclusive

12   territory of NNI.

13                   The next tab is the CSA, which is the

14   predecessor document, and there is really only two

15   points I want to -- I want to leave you with all

16   this, but the two points I want to make is, first,

17   as we saw, the Licensed Participants had to own the

18   IP to make this system work, and I have given you

19   at slides -- at pages 105 to 103 and 105 -- sorry,

20   101 to 105, the OECD guidelines which show you that

21   you had to own it in order to make this work.

22                   They also didn't want to have buy-out

23   payments from the CSA, and remember, everybody came

24   into the MRDA owning the perpetual rights that they

25   had under the CSA.  They were given a perpetual

1    paid-up, fully paid-up licence with all their CSA

2    rights.  They come into the MRDA with that.

3              And the question was, do they have to

4    make a buy-out payment.  And you'll see at 104

5    Ernst & Young advising NNL, is writing to the

6    authorities, the tax authorities, that because the

7    participants acquired this fully paid-up licence to

8    continue to exercise the rights they had under the

9    CSA:

10                    "[...] no buy-out payment is

11                    necessary because each former CSA

12                    participant continues to own the

13                    rights it acquired during the CSA

14                    upon CSA termination."

15              Now, let me turn, if I can, to the MRDA

16    and I will start at tab 8 with page 108 where the

17    Monitor in its reply brief says that the US ignores

18    the unequivocal testimony of Binning, Currie and

19    Allen, the three most senior Nortel executives to

20    testify, that NNL owned the IP.

21              And I have given you in tab 8 at pages

22    123 to 129 the evidence and the references, but let

23    me just summarize.

24              Binning admitted that what he knew was

25    via hearsay, it was not from studying the matter,

```
 1   and that when he said NNL quote "owned", he meant

 2   legal title.

 3              Currie told us he had never --

 4              THE CANADIAN COURT:  Okay, where do I

 5   find --

 6              MS. BLOCK:  Binning's evidence?

 7              THE CANADIAN COURT:  No, you said at

 8   page 123.

 9              MS. BLOCK:  120 is Binning's evidence,

10   120 and 121 and 122.

11              123 are our submissions regarding the

12   Allen evidence, and 129 is the Currie material.  So

13   that section will give you the background, and I

14   don't have the time to walk you through it.

15              THE CANADIAN COURT:  No, I understand.

16   I just want to make a note, that is all, so that I

17   can look at it carefully later.

18              MS. BLOCK:  So Binning said he meant

19   legal title --

20              THE CANADIAN COURT:  And he is page

21   what?

22              MS. BLOCK:  He is page 120 to 122.

23              THE CANADIAN COURT:  Currie?

24              MS. BLOCK:  Currie is 129, and what

25   Currie says is he never heard of RPS, he never
```

1    heard of residual profit share methodology, and

2    although he had heard the letters MRDA, he had

3    never read the MRDA.  And maybe what he thought it

4    meant was major reason for dispute allocation.  I

5    don't know.  He didn't know about the MRDA.

6              So those are the three.  And Allen left

7    in '99 before the MRDA was done, and he didn't even

8    know about the earlier -- about the previous CSA.

9    He only knew about the very historical ones, which

10   are irrelevant in this case.  And he left the

11   organization shortly after he said that Canada

12   couldn't survive, it was too small, so it had to be

13   focussed elsewhere, like the US.

14             So let me turn to the words and the

15   MRDA doesn't tell you how to allocate.  It tells

16   you who owns what.  That is why it is relevant,

17   because the parties documented their shared

18   ownership in the MRDA.  And the recital, as you

19   know, speaks of legal title, but the consideration

20   for that is explicitly the exclusive licences.  The

21   actual "O" word, "ownership", does not appear in

22   relation to NNL.

23             Let me just get you -- sorry, we have

24   set out on this slide all the references to

25   "ownership", and they are all in relation, as you

1    have seen yesterday, to the Licensed Participants

2    or to all the participants.

3              And the Monitor tells you in its

4    rebuttal at paragraph 242 of its findings of fact

5    that although the second recital to the MRDA, which

6    is the first one up there, refers to equitable and

7    beneficial ownership of certain exclusive rights

8    under NN Technology, and Mr. Zarnett spent some

9    time on that, nowhere, according to the Monitor,

10   does it reference economic ownership or beneficial

11   ownership of NN Technology.

12             And that is not in fact the case.  You

13   will see in the rest of the page three times in the

14   Schedule A, the amended Schedule A, the second

15   amended Schedule A, and also in the recital to the

16   Second Addendum, in all four places the

17   participants are said to either bear the risks of

18   ownership of NN Technology or to hold and enjoy

19   equitable and beneficial ownership of NN

20   Technology.

21             The other references that I give you

22   that you have seen are the Memorandum of

23   Understanding and the Monitor here in its findings

24   of fact at paragraph 161 accurately says that this

25   was entered, the participants entered into this on

```
 1    December 30, '08, and it, quote:
 2                   "Provides a record of certain
 3                   operating arrangements and
 4                   understandings".
 5               So this is written evidence by NNL and
 6    all the others of their understanding of their
 7    arrangements, and it is factual matrix concurrent
 8    with the Third Addendum, it is done the same day as
 9    the Third Addendum, and it precedes the Fourth
10    Addendum which is signed in 2009.
11               So it is just not the case that nowhere
12    does it say the participants had ownership of NN
13    Technology.  It made clear that that's what they
14    had and the Memorandum of Understanding is like a
15    message in a bottle to Your Honours.  They know
16    they are going into bankruptcy and they send out
17    this description.  Ignoring it would be like
18    Justice Pattillo ignoring all of that material that
19    the Courts said he had to look at in relation to
20    what the parties were saying they were doing.
21               So point number one, ownership is
22    explicitly addressed and it does not say NNL owns
23    everything.  Indeed, quite the contrary.  Legal
24    title is held in the name of, and then we have
25    territory, which is the whole structure, each one
```

1    was operating exclusively in its territory.  You'll

2    remember that gets amended in the Third Addendum so

3    that they put in the non-exclusive territory, and

4    you'll see it is interesting under the

5    non-exclusive definition it means the world except

6    Canada where NNL retains its exclusive rights.

7    This is consistent with the "Y" on those charts,

8    that is where it has its ownership, and those areas

9    in Schedule B where everybody else has their

10   exclusive territory.

11              And then we go to Article 2 where:

12                  "Each Participant hereby agrees

13                  to use its best efforts to perform

14                  R&D activity at a level consistent

15                  with past practices and the [...]

16                  needs of the [...] business for its

17                  respective territory".

18              And secondly, each agrees to share it

19   all.  It will account, it will disclose, it will

20   make available to each of the others its results,

21   its studies, et cetera from its R&D.  There is no

22   circling of the wagons.  This is the concept.

23              And then 4 and 5 are the mechanic of

24   how these parties achieve this multilateral

25   sharing.

```
 1               And 4 you have seen, I don't have to
 2     read it to you again, but just point out that legal
 3     title shall be vested as a result of this MRDA and
 4     every participant has to execute documents as may
 5     be necessary to give effect.
 6               And you will see Mr. Burshtein, who was
 7     the witness in Delaware, who agreed, and I'll leave
 8     these references to you, they are in the compendium
 9     at tab 8, he agreed that NNL gets legal title in
10     the course of making this exchange, that it shall
11     be vested, it is going to happen once the MRDA is
12     in place.  This is the quid pro quo, the
13     consideration is getting the licences in the
14     territory.  So --
15               THE CANADIAN COURT:  You have said that
16     they agreed to share and I take it you are
17     referring to clause 2(b), to Article 2(b)?
18               MS. BLOCK:  Yes, they have to account
19     for their activity by disclosing it, by making it
20     available to each of the other participants, and
21     this is the -- you don't have six agreements here.
22     You have got one agreement where everything goes --
23     everything that they bring in, they are bringing in
24     all their CSA IP because they have the rights to
25     it, as you saw E&Y telling the tax department,
```

```
 1    these people own this now perpetually.

 2                  THE CANADIAN COURT:  Mr. Barrack is

 3    going to say that he likes that idea.

 4                  MS. BLOCK:  Yes, but they want to

 5    forget how it worked.  Everybody puts it on the

 6    table.  It goes up.  Legal title stays with NNL and

 7    then it goes out to all of the individual IEs in

 8    their territory and they get the beneficial

 9    ownership rights in each territory.  No one else

10    can go in.

11                  Now, the Monitor reads Article 4 as

12    though it says NNL has and always had ownership,

13    but it says legal title, not ownership, and the

14    Monitor knows that at some point someone suggested

15    let's put in ownership.

16                  And I am not putting in a draft, sir,

17    although this is commentary on a draft, by --

18                  THE CANADIAN COURT:  Pardon?

19                  MS. BLOCK:  This is from Scott Wilkie

20    who was NNL's lawyer.

21                  THE CANADIAN COURT:  How is this

22    admissible?

23                  MS. BLOCK:  It is admissible because it

24    is not the draft that is the point.  The reason you

25    can't look at drafts, sir, is because if I have a
```

1    draft and send it to Mr. Gray and he rejects it, we

2    don't know why he rejected it.  It doesn't tell us

3    anything.  It is inadmissible.

4            But this is NNL's lawyer and only NNL's

5    lawyer saying why putting ownership in is a

6    problem.  He is saying --

7            THE CANADIAN COURT:  Well, he didn't

8    sign the agreement.  A lawyer can say anything.

9    Why does that make it the company?

10           MS. BLOCK:  This is NNL's lawyer.

11           THE CANADIAN COURT:  Well, a lawyer for

12   NNL.

13           MS. BLOCK:  A lawyer for NNL saying if

14   you put in ownership, you are undermining the whole

15   structure, the mechanic that documents the benefits

16   and rights that participants have owned in their

17   own right, and he writes an email saying that you

18   are suggesting that NNL is the real owner when in

19   fact it is a consequence of each of them having

20   earned in their own right participants in the R&D

21   program.

22           The Court of Appeal, in my submission,

23   and the Supreme Court of Canada would say this is

24   extrinsic evidence, this is factual matrix evidence

25   that you should look at.

1              And it is an admission from someone on

2     behalf of NNL, and ownership, as you know, didn't

3     go in there.

4              So we have three parts to 5(a),

5     sublicense, right to make, and you will see make,

6     have made, use, lease.  This is the have-made

7     point.  It is already in there.  It is not the

8     sublicense.  And then the third is rights to make

9     -- all rights to patents, industrial designs, et

10    cetera.

11             And then you will see it is structured

12    with these three elements, royalty-free licence,

13    including the sublicense right, the right to make,

14    to practice, and all rights to patents -- comma,

15    and all rights to patents.

16             And if you plug in the products,

17    capital "P" Products, you will see that it includes

18    not just existing products like something embodied

19    in a patent or an industrial design.  It is more

20    than that.  It is the Nortel definition of

21    products, which says we have to give each other our

22    ideas, what we are proposing to design and develop.

23    So you want a specific clause that is inclusive of

24    those additional elements over and above patents or

25    industrial designs, and then you also have all

1     rights to patents, industrial designs.

2              And the Monitor says that -- let me

3     just plug in the next defined term "NN Technology",

4     and you will see "any and all intangible assets,

5     not limited to", and it has patents, industrial

6     designs, copyrights, et cetera, in the products

7     clause.  And then it still has comma "and all

8     rights to patents, industrial designs".

9              So my friend says, well, why, if you

10    have all rights to patents, you know, this is

11    just -- this is in there because you have to give,

12    in relation to products, the rights to patents,

13    industrial designs, copyrights, applications and

14    technical know-how.

15             That is not the case.  What the Monitor

16    wants you to do is to read this clause and after

17    you read the products clause add the words, and now

18    let me repeat myself and again say, you have all

19    rights to patents, copyrights, industrial designs,

20    applications and technical know-how in connection

21    therewith.  You have that already in the second

22    part of the clause.  You don't need the third

23    clause to give you those rights in relation to

24    products.

25             So how do you read this?  Products

1    gives specific rights to the capital "P" Products,

2    which is more than small "p" products.  It is a

3    defined term that permits each participant to use

4    incipient ideas that haven't been developed into a

5    patent or a trademark, so you are dealing with

6    something specific with capital "P" Products.  And

7    the all rights clause takes us back to the

8    traditional legal meanings of IP, patents,

9    industrial designs, copyrights, not the custom-made

10   bespoke item which is a specialized capital "P"

11   Products, but it includes everything else and, as

12   the Monitor says, IP is more than what is in the

13   products clause because there is more rights

14   involved in having patents than rights to products.

15            And all those rights are conferred on

16   the Licensed Participants and they include the

17   right to exclude, the right to enforce and claim

18   damages, the right to sublicense, all of which are

19   given to the Licensed Participants.

20            And then most importantly 4(e), the

21   right to assert actions and recover damages in

22   their respective territories by the Licensed

23   Participants.  And the evidence you have from

24   Mr. Bereskin, which is uncontradicted, is that the

25   custom and practice in the trade is that this

1    clause, the enforcement right, is coextensive with

2    the scope of the licence and 4(e) is unlimited, it

3    is not restricted to products or this narrow

4    definition that my friends want to give you, and

5    they were explicitly held by the Licensed

6    Participants.  And they were important assets that

7    the Licensed Participants sold in the Rockstar

8    sale.

9              And I have given you the asset sale

10    agreement between the participants, and you will

11    see them all there, who are the sellers, with

12    Rockstar the purchaser, and you will see what is

13    being sold are the assets which the purchaser shall

14    purchase, and the seller, and that includes NNI and

15    NNUK, shall convey, colon.

16              And what are those assets?  The

17    transfer patents together with, and you will see at

18    the bottom, the right to sue and recover damages or

19    other compensation for past, present, or future

20    infringements, the right to sue and obtain

21    equitable relief, including injunctive relief in

22    respect of such infringements and to fully and

23    entirely stand in the place of the sellers.

24              And those rights in the US territory

25    were held by NNI.  Rockstar would not buy these

```
 1    assets without those rights.  That is the whole

 2    essence of their business.

 3              Now, there are other clauses which are

 4    also inconsistent with the Monitor's reading of

 5    these licences.

 6              Article 6, you will see they have to

 7    keep confidential information from suppliers, from

 8    customers, and also third persons' licensing rights

 9    to use NN Technology.  That is an obligation

10    everyone had in its own territory.  So they have

11    the right to license to third parties.

12              Article 7(b), the indemnification is to

13    hold harmless NNL from any and all claims arising

14    in the territory with respect to NN Technology, not

15    limited by products, and this is a complete

16    indemnity.  If NNL had rights in the US, why would

17    NNI have to indemnify them?  It is because they

18    don't have any operations there.  It is NNI's

19    complete exclusive territory and they are

20    responsible in respect of all NN Technology.

21              Article 9, the parties did put their

22    mind to the termination of the agreement, and when

23    it is terminated, you are deemed to have gotten a

24    fully paid-up licence.  If you are elected or you

25    are forced to retire, you get a retirement
```

1    allocation and that means fair market value.

2              So with that, I will yield the floor to

3    my confrere, as we say, Mr. Bromley, and sorry for

4    the race to the end, but --

5              THE CANADIAN COURT:  I just want to ask

6    you a question.

7              MS. BLOCK:  Yeah, sure.

8              THE CANADIAN COURT:  One of the

9    arguments we have heard is that this was a, quote,

10   operational agreement, and that it says at the

11   beginning "confirming and formalizing the operating

12   arrangements" and that it doesn't provide what

13   happens, how this allocation should be made.

14   Therefore, we can look at some other method apart

15   from the, quote, "ownership".

16              What do you say to that argument?

17              MS. BLOCK:  Well, that confounds, that

18   argument, and I am not suggesting you are

19   confounding it, sir, but that argument confounds

20   what the Courts have to do, which is, okay, the

21   music has stopped, we have to assess what assets

22   each entity had, and those assets are there for

23   their creditors.

24              So how do we figure out who owned what?

25   The MRDA, even though the RPSM is an operational

```
 1   calculation, yes, and it was to deal with the

 2   ongoing revenues or losses of the various

 3   businesses, to get the MRDA benefit, to achieve the

 4   objective and the purpose and the commercial

 5   purpose, it had to divide ownership and it divides

 6   it.  It reflects that divided ownership.

 7              So the MRDA isn't irrelevant.  It

 8   doesn't tell you how to allocate.  But it tells you

 9   who owns what, and the IP being the centrepiece of

10   the dispute here, all of this, this is a document

11   you have to construe and understand.

12              But for people to say, well, it doesn't

13   tell you how to allocate, of course it doesn't tell

14   you how to allocate.  It wasn't developed for the

15   purposes of the bankruptcy allocation.  It was

16   developed to divide ownership so that it could

17   achieve the transfer pricing objectives which were

18   very important.

19              And you can't construe the agreement

20   without looking at all that stuff.

21              THE CANADIAN COURT:  Thank you.  Does

22   it make sense to take the lunch hour break now

23   before we hear from Mr. Bromley?

24              THE US COURT:  I suspect Mr. Bromley

25   would say yes.
```



1              MR. BROMLEY:  Whatever Your Honours

2     would prefer.

3              THE US COURT:  Just so you'll know, the

4     plan is to go until 6:00 or a few minutes later,

5     and then if we need more time, we have tomorrow

6     morning set aside now.

7              MR. BROMLEY:  Very good, Your Honours.

8     We would suggest, in an attempt to maybe be more

9     optimistic than many in the room usually are, maybe

10    45 minutes for lunch, and be back at 1:30, if that

11    would work.

12             THE US COURT:  Does that work for you,

13    Justice Newbould?

14             THE CANADIAN COURT:  Okay.

15             THE US COURT:  All right.  Thank you.

16    We'll be back here then at around 1:30.

17             MR. BROMLEY:  Thank you very much, Your

18    Honour.

19             -- RECESSED AT 12:45 P.M.

20             -- RESUMED AT 1:30 P.M.

21             THE US COURT:  You may be seated.

22    Thank you.  Justice Newbould, good afternoon.

23             THE CANADIAN COURT:  Good afternoon,

24    Judge Gross.

25             THE US COURT:  Mr. Bromley, before you

1    begin, I have got a quick question for you.  And it

2    won't interfere that way with my thinking about

3    what you are saying after I have asked the

4    question.  And then you can digress into your

5    argument.

6                    MR. BROMLEY:  Okay.

7                    THE US COURT:  The question is this.

8                    Yesterday Mr. Hoeffner, using the

9    Britven chart, I will call it, indicated that if we

10   went the way of the Monitor, all creditors would be

11   paid in full.  And I think that I heard him

12   correctly, and I think that was what I understood.

13                    Is that the case?

14                    MR. BROMLEY:  You know, I sat listening

15   to Mr. Hoeffner as well --

16                    THE US COURT:  Yes.

17                    MR. BROMLEY:  -- and looking at the

18   chart that Mr. Britven had prepared, and I continue

19   to be flabbergasted at the chart.  And I planned on

20   dealing with this, so maybe if you want me to, I

21   can just deal with it now.

22                    THE US COURT:  You can do that or you

23   can deal with it in the course of your comments.

24                    MR. BROMLEY:  The answer is -- and I

25   will get to it.  But the answer to your question,

```
 1    Your Honor, is there are a number of different
 2    things that go into answering the question; right?
 3    And it is difficult for us to begin with, because
 4    in our view, we shouldn't be dealing with
 5    result-oriented exercises.
 6                    THE US COURT:  Understood.  I agree
 7    with that.
 8                    MR. BROMLEY:  Okay?  That is not what
 9    the law provides, in our view, and that is not what
10    this exercise has been about.
11                    But there is no question that the CCC
12    throughout this exercise has been sitting here
13    pointing to this not as a method of argument on the
14    law or the facts but, in our view, as a means of
15    trying to distort the exercise.  I jokingly said to
16    my colleagues when we were preparing for the trial
17    that at some point we would simply have the CCC
18    hold up a sign that said "X percent," whatever the
19    low percent was.  And now I know it is 11 percent.
20                    But the fact of the matter is that
21    there is a lot of misinformation on this chart.
22    The amount of claims in the US Estate and the
23    Canadian Estate and the EMEA Estate are not known
24    with any certainty.  There hasn't even been a bar
25    date set in EMEA.
```

1              I completely trust that Ernst & Young

2    UK is doing their job as Joint Administrators and

3    working hard to understand those claims.  But the

4    fact is that there has not yet been a bar date, so

5    there is no certainty as to what those claims might

6    be.

7              We know that the UKP has claims of

8    about $3 billion that they are asserting in every

9    one of the EMEA estates and that they have taken

10   appeals on that issue up to the Supreme Court in

11   England.  We know that they have a similar claim in

12   Canada.  We know that there has been a claims trial

13   at which the argument has been made by the CCC and

14   the Monitor that the claim in Canada is zero.

15             Mr. Britven carries on the line that

16   says "UK pension trust" a claim of $880 million.

17   So just for example, if we went down under US

18   interests -- or Canadian Debtors and Monitor, and

19   it says UK pension trust, 37 percent; Canadian

20   creditors, 61 percent.  That 37 percent assumes an

21   allowed claim for the UKP in Canada of

22   $880 million.  The CCC and the Monitor say it

23   should be zero.  If that number is zero, then the

24   UK pension trust recovery percentage goes down

25   substantially.  The Canadian creditors' percentage

1    recovery goes up substantially.

2              THE US COURT:  Right.

3              MR. BROMLEY:  Now, the US Debtors have

4    a $2 billion claim, so that would lead to certain

5    additional cash coming into the US and certain

6    additional cash coming into the Bondholders.  But

7    the fact is is that every one of these boxes has a

8    toggle, and every one of these boxes has built

9    within it a series of assumptions.  And one of the

10   assumptions, which is difficult to express -- and I

11   want to preface it with the following.

12              I have been very reluctant throughout

13   this case to take head-on certain of the points

14   that have been made by counsel to the CCC relating

15   to the pension claims in Canada.  They are clearly

16   very emotional claims.  The CCC continually issues

17   press releases and talks to the press in Canada.

18   And unlike the United States, people in Canada

19   continue to read newspapers.  As I found out, they

20   are a much more educated people than us, and --

21              THE US COURT:  More civilized.

22   Certainly more civilized.

23              MR. BROMLEY:  Certainly more civilized.

24   I mean, the fact is in New York nobody is reading

25   papers anymore.  Most people are using The New York

1    Times to pick up certain things on the ground, if

2    you know what I mean.

3              But in Canada there is a lot being

4    written all the time, and the CCC has played to

5    that; there is no question.  And one of the things

6    where they play to it is this line where it talks

7    about the return for Canadian creditors under the

8    US interests' analysis of 11 percent versus the CCC

9    alternative pro rata of 71 percent.  And you have

10   to take that into account in the following way.

11             There is evidence in the record -- and

12   I know the record is enormous, but I will point you

13   to it now -- which is evidence that comes from the

14   website that is maintained by the CCC's financial

15   advisors, or particularly the financial advisors

16   that deal with retiree claims.  That information is

17   saying -- and this is --

18             That information is saying that the

19   pension claims in Canada are already funded to a

20   very large extent.  They are funded to a large

21   extent because moneys were deposited in trust

22   accounts on behalf of those pensioners while they

23   were employed and that there are certain provincial

24   guarantees that are provided to provide for certain

25   benefits to those individuals.

1                    THE US COURT:  Like our PBGC.

2                    THE CANADIAN COURT:  Mr. Bromley, I

3      don't know anything about their website, but I know

4      what the evidence in the case was, and that wasn't

5      the evidence in the case.

6                    MR. BROMLEY:  Your Honor, with all due

7      respect, that evidence, at least as we understand

8      it, is among the evidence that has been admitted

9      and not objected to by any of the parties.  And if

10     I can just explain it, I will get to the punch

11     line.  The 71 percent number is a 71 percent number

12     of the deficiency claim, of the claim that is

13     unfunded.

14                   So it is not that you are going to get

15     71 percent of a hundred cents.  You are going to

16     get 71 percent of whatever the deficiency is.  So

17     if the deficiency is 30 percent, you are going to

18     get 71 percent of 30 percent, add it to 70 cents,

19     and get 92 cents.  And by the same token --

20                   THE CANADIAN COURT:  Where do we get

21     the evidence of that, Mr. Bromley?

22                   MR. BROMLEY:  Your Honor, hold on one

23     second, if you will.  So --

24                   THE US COURT:  This is my time.

25                   MR. BROMLEY:  I understand, Your Honor.

1    Thank you very much.

2              If you look at Exhibit TR50892, which

3    is the website of Morneau Shepell, administrator of

4    the Canadian pensions, at page 2, it says towards

5    the top in the first paragraph "Our actuaries -- it

6    is the second sentence -- "have determined on a

7    preliminary basis that the funded ratio calculated

8    in this manner for benefits earned in Ontario,

9    which are now nonindexed, is 70 percent for the

10   Managerial Plan and 75 percent for the Negotiated

11   Plan.  This funded ratio applies prior to the

12   application of any eligibility for a top-up under

13   the PBGF."

14             So for these retirees, who I know have

15   worked hard and have dedicated their lives to

16   Nortel -- and I am not taking anything away from

17   them -- the fact of the matter is that their own

18   website says that for the managerial plan, they are

19   70 percent funded in Ontario for Ontario employees

20   and 75 percent funded under the negotiated plan for

21   Ontario employees, and that that funded ratio

22   applies before any top-up from the Pension

23   Guarantee Fund in Ontario.

24             So when we are looking at Mr. Britven's

25   chart, we have to take into account that the

1    11 percent, which is, we believe, the wrong number,

2    is 11 percent of the deficiency, so it is the

3    30 percent or the 25 percent, and the 71 percent is

4    the 71 percent of the deficiency.

5              I don't know what other people think,

6    but I have gone through this case hearing the CCC

7    say the US are only giving Canadian pensioners 11

8    cents on the dollar and our plan will give

9    pensioners 71 cents on the dollar.  And assuming

10   11 percent is right, which we don't, for a 70-cent

11   funded claim under the managerial plan, even at

12   11 percent, you are talking about 74 cents on the

13   dollar, and at 71 percent, you are talking about 92

14   or 93 cents on the dollar.

15             THE US COURT:  Yes.

16             MR. BROMLEY:  So that's not also taking

17   into account the fact that the pensioners have been

18   getting their pensions paid.  And they should.

19   They absolutely should.  But the reason that we are

20   having this fight in many respects is about the

21   insurance companies that stand behind those pension

22   obligations.  The PBGC in the United States, as you

23   know full well, Your Honor, have a deficiency claim

24   in this case.

25             THE US COURT:  Yes.

1           MR. BROMLEY:  They have amended their

2    claim; same type of analysis.  You have earned your

3    pension benefits.  The funding was X; the

4    deficiency is Y.  And the deficiency in the United

5    States is over $700 million, according to the PBGC.

6           Now, granted, the PBGC provides a

7    stronger level of protection than the pension

8    guarantee system in Canada, so that the likelihood

9    is that the pensioners in the United States that

10   are qualified under the PBGC are going to be closer

11   to getting paid in full.  There would be some that

12   won't because the PBGC benefits don't cover

13   everything, but they are closer to being paid in

14   full.

15           The same thing is true in the UK.  The

16   UK pension system and Mr. O'Connor's clients

17   include the PPF, the Pension Protection Fund, which

18   is the British government, which tops up

19   deficiencies in the trust fund.  It is just a

20   different way of doing it, but it is the same

21   thing.  We have the PGBF, the PBGC and the PPF.

22   They all belong to the same club and they all

23   operate under exactly the same types of rules.

24           The main difference is the level of

25   protection.  And the level of protection that is

1    accorded to bring people up from the deficiency

2    claim in Canada is simply different than it is in

3    the United States and different than it is in the

4    UK.  But it doesn't mean that there is not

5    substantial funding of these claims, and it doesn't

6    mean that those people haven't been getting paid

7    their claims.

8             So there is, I think, a

9    misapprehension.  And if there isn't, fine.  Then

10   this information is redundant.  But if there was a

11   misapprehension that somehow the claim difference

12   here is between 11 cents on the dollar and 71 cents

13   on the dollar, which is what was reported in The

14   Globe and Mail this morning in Toronto, then it

15   needs to be corrected.

16            And Mr. Britven's -- just let me tell

17   you a little bit about Mr. Britven.  He described

18   in his deposition the Canadian claims as a black

19   box.  That $1.3 billion number at the bottom he

20   admitted does not take into account cash burn

21   through the end of litigation.

22            THE CANADIAN COURT:  Are you talking

23   about the 1.3 at the bottom of Column 3?

24            MR. BROMLEY:  Yes, I am, Your Honor.

25            THE CANADIAN COURT:  Right.

1              MR. BROMLEY:  And there are many ways

2      that that number could be substantially higher,

3      depending on how all the toggles are flipped.

4              Mr. Britven assumes that there is no

5      $2 billion claim for the US.  He assumes there is

6      no administrative bar date, which is true.  There

7      hasn't been.

8              For US income tax claims, zero.  He

9      gives that claim zero.  That claim could be

10     substantial, Your Honor, substantial, and you are

11     going to hear more about that.

12             He takes into account a lower PBGC

13     claim that had been filed.  And he very clearly

14     says this entire exercise is simply illustrative

15     and that he didn't have the actual information that

16     would allow him to calculate this with any

17     certainty.

18             Now, in addition to the website -- and

19     I have only taken you to one particular portion of

20     the website -- Mr. Sproule in his affidavit at

21     paragraph 30 said the reductions in pension

22     payments range from 30 percent in Ontario to

23     41 percent in Alberta and Quebec for the managerial

24     plan, and from 25 percent in Ontario to 43 percent

25     in Alberta and Quebec for the negotiated plan.

1    Now, it varies on a provincial basis because the

2    Canadian federal system does not have a pension

3    protection program that covers the entire country.

4    So there is a different protection program in

5    Alberta than there is in Ontario than there is in

6    Quebec.

7                    With all due respect, it is not

8    accurate to be standing here and looking at this

9    chart and saying that all of this is gospel truth.

10   None of it is.  None of it has been tested and

11   footed.  And the only person who has put it on is

12   Mr. Britven and, in our view, entirely to skew the

13   conversation away from the real question, which is

14   who should get what based on what they sold to who

15   should get what based on who they are.

16                    THE US COURT:  Well, maybe it is a good

17   thing we don't read the newspaper anymore.  But --

18   all right.  And I understand.  And look, I share

19   your concern for people who have worked hard and

20   are entitled to pensions and the like.  But I take

21   it that that really is not my concern sitting here

22   in the United States.  Is that correct?  From a

23   legal standpoint, from a purely legal standpoint.

24                    MR. BROMLEY:  From a legal standpoint.

25   Look, Your Honor, I have a lot of sympathy for this

 1    exercise.  My father was a union employee.  He

 2    didn't have a high school education.  And the idea

 3    that people dedicated their entire lives to a

 4    company and have found it to not be what they

 5    expected is difficult.  And I actually have

 6    personally represented one of the largest unions in

 7    the United States in one of the largest

 8    bankruptcies that ever occurred in the world, and

 9    it was one of the greatest points in my life to be

10    able to do that.

11              But the fact is you have to obey the

12    law.  And the exercise here is about obeying the

13    law.  And obeying the law is not all that hard.

14    What we have done in this exercise is to pay less

15    attention to what actually happened and what

16    actually is written down and more attention to the

17    tangential impact.

18              When I stand here and hear the UKP say

19    that the companies were operated in a manner that

20    blurred corporate separateness even though they

21    went out and specifically executed two separate

22    guarantees from NNL, they did that with PwC

23    representing them and a very well-known UK law firm

24    representing them.  If those guarantees don't hold

25    up in Justice Newbould's court, that should not be

1    the responsibility for the rest of us.  They might

2    have a claim against their former professionals,

3    but they certainly don't have a claim on the assets

4    of the United States or of Canada, frankly.

5                    So it is important --

6                    THE CANADIAN COURT:  Mr. Bromley, I

7    don't want to stop your argument or your flow.

8    When you said you were going to deal with this

9    chart at some point in time, are you going to be

10   dealing with that $1.3 billion and how it can go up

11   and how it can go down?  Do you plan to do that?

12                   MR. BROMLEY:  I am happy to do that.  I

13   am most of the way through the chart anyway so --

14                   THE CANADIAN COURT:  At some point I

15   would like to hear from you on that, but whether it

16   is now or later I am indifferent.

17                   MR. BROMLEY:  I am happy to do it.  One

18   of the notes on my chart was "deal with Britven,"

19   so I am happy to continue to deal with

20   Mr. Britven's chart.

21                   THE CANADIAN COURT:  All right.

22                   MR. BROMLEY:  Yes.  So, Your Honor, do

23   you have a specific question about the $1.3 billion

24   number?

25                   THE CANADIAN COURT:  Yes.  I mean, I

1    have heard that there is some burn and that would

2    reduce it.  I have heard there is a tax claim that

3    could reduce it.  Is there any way that could go

4    up, that figure?  Is there any outcome that would

5    make that go up?

6            MR. BROMLEY:  Yes, Your Honor.  One of

7    the things that I mentioned was that if the UK

8    pension claims in Canada are found to be zero or

9    less than 880 million, then the percentage that

10   would be paid to the UK pension trust would go down

11   and the percentage that would be available for

12   distribution to Canadian creditors would go up.

13   That impacts that number in two ways, that 1.3

14   number.  And I will get to the fact that the 1.3 is

15   a fiction as well, but whatever number should be in

16   there.  Right?

17            First, the percentage recovery to

18   Canadian creditors under whatever scenario goes up

19   if the UK pension claim is rejected in Canada.

20   That would then flow into that number for US

21   interests in two ways.  One, the $2 billion claim

22   NNI has against NNL would recover at a higher rate,

23   so that would lead to more cash directly.

24            Two, the Bondholder claims would

25   recover in Canada at a higher rate, and therefore,

1   there would be less money needed to satisfy

2   Bondholder claims in the United States.  So that

3   number could certainly go up.  And there are other

4   ways.

5            So, for instance, we have claims that

6   are in the United States that haven't been

7   reconciled and dealt with to a final point.  Any

8   reduction of those claims goes up.  We don't have

9   any defenses to the bond claims, so that is not

10  going to get out of the way.  And then obviously it

11  depends on what the allocation is into the US.  It

12  depends on the cash at hand at the particular point

13  in time.  It depends on other cash that is in the

14  system.  We are owed cash from Asia, for instance,

15  that we haven't received yet.  There are other

16  numbers that could flow into it that could bring it

17  up.  If we were to truly do this exercise, you

18  would have a hundred pages of backup that would

19  leave you with thousands of line items.

20           And, you know, Mr. McDonald has

21  testified separately that they are able to

22  reconcile all of the claims in Canada.  And they

23  are not only dealing with the Canadian claims; they

24  are also dealing with all of the claims in Asia.

25           So in order to pinpoint that number,

1    you would have to have a number of material

2    assumptions, and how those assumptions go could

3    bring that number up and perhaps substantially.

4              THE CANADIAN COURT:   I appreciate that.

5    I don't think -- correct me if I am wrong, but I

6    don't think we have the size of the claims against

7    the Canadian Estate before us, do we?

8              MR. BROMLEY:   Your Honor, no.   And

9    frankly, I don't think you have the size of the

10   claims in any of the estates before the Courts.

11             THE CANADIAN COURT:   Yes.   Right.   I

12   understand.   So that when you say that if the UK

13   pension claim is less than 880 million, that means

14   there is more cash available to the creditors in

15   Canada, we don't know what -- we don't know enough

16   to know what percentage that would be.

17             MR. BROMLEY:   That's true.   And for

18   instance -- and everything I said about US claims

19   would apply with equal force to Canadian claims.

20   For instance, I think there is some question as to

21   the deficiency claim relating to the pension

22   guarantee fund, how big that should be.   And it is

23   a very large claim as filed.   It hasn't been

24   finally reconciled.   If that is reconciled at a

25   lower number, that would increase the recoveries in

1    Canada as well.  So, you know, it is that kind of

2    exercise.

3                  THE CANADIAN COURT:  I have forgotten,

4    but did Mr. Britven have assumptions in there about

5    the size of the estates?  He must have.  The size

6    of the claims.

7                  MR. BROMLEY:  He did have assumptions

8    on the size of the claims.  But he did also testify

9    that, you know, for Canadian claims, for instance,

10   he did refer to them as a black box, not having all

11   of the information.  On the US side there were

12   fairly -- there were several that he had made

13   estimates on, which are, frankly, guesses.

14                 THE CANADIAN COURT:  Okay.  Thank you.

15                 THE US COURT:  And all of that just

16   confirms my determination to decide this case on

17   the facts and the law.

18                 Thank you.  That was very helpful,

19   Mr. Bromley.

20                 MR. BROMLEY:  My pleasure, Your Honor.

21   Before we get started, Your Honor, I just wanted to

22   take care of one piece of housekeeping.

23                 THE US COURT:  Yes.

24                 MR. BROMLEY:  Ms. Block had brought up

25   to Justice Newbould the Petranik case.

1                    THE US COURT:  Yes.

2                    MR. BROMLEY:  And we didn't have it in

3       court, but we have it now.

4                    THE US COURT:  Thank you.

5                    MR. BROMLEY:  I have given one to

6       Mr. Coleman and dared him to read it.

7                    THE US COURT:  All right.  Thank you,

8       Mr. Bromley.  I appreciate that.

9                    MR. BROMLEY:  So, Your Honors, if I

10      could, I want to -- I am not sure if we have handed

11      up the compendium for the afternoon.  We have a

12      compendium for the afternoon.

13                   THE US COURT:  Oh, Volume 2.

14                   MR. BROMLEY:  Volume 2.

15                   THE US COURT:  Yes.

16                   MR. BROMLEY:  And as a US lawyer, I am

17      not used to a compendium.  So the first thing I

18      will tell you is that I am going to renumber the

19      tabs, and we will go in a bit of a different order.

20      But the good news is the first tab is still the

21      first tab.

22                   THE US COURT:  All right.

23                   MR. BROMLEY:  And you will notice that

24      the first item is US patent law.  I am going to get

25      to that in a moment.  I do want to pick up exactly

1   where Ms. Block ended, which was a conversation

2   about the MRDA.  And there was one or two things I

3   wanted to pick up on as we segued into the rest of

4   it.

5               Now, there was some conversation

6   earlier about the MRDA being an operating agreement

7   or a transfer pricing agreement and it doesn't tell

8   us how to allocate.  Well, I think it is important,

9   though, to go to Section 11 of the MRDA, which my

10  friend Mr. Zarnett took you to yesterday, and look

11  at the entire Article 11.  This is Retirement of

12  Participants.

13              You know, there has been some

14  conversation that might give the impression that

15  the drafting of the MRDA and the text does not take

16  into account at all any kind of bankruptcy

17  situation.  And the answer to that is, no, it is

18  actually wrong.  It does take into account a

19  bankruptcy situation.  And you will recall that the

20  earlier CSAs did as well.

21              At one point very early in Nortel

22  Networks Inc.'s life there was a clause that said

23  in the event of a bankruptcy, any licenses are

24  canceled and revert up to NNL, but that was changed

25  in 1992, and it was carried over into Article 11 of

 1    the MRDA in an amended form.  And what it says in

 2    substance is that if a participant has a

 3    bankruptcy, then they are entitled to what is known

 4    as a retirement allocation.  I think they changed

 5    the name of it later on in one of the many

 6    amendments to a special allocation or a special

 7    retirement allocation, but the substance is the

 8    same, which is, in the event of a bankruptcy of one

 9    of the participants, that participant is entitled

10    to receive the fair market value of its exclusive

11    license.

12                   So it is true that the MRDA does not

13    say in the event that every single participant goes

14    into bankruptcy simultaneously, they are entitled

15    to something, but it does say in the event a

16    participant goes into bankruptcy.  And if you just

17    bring it down a little bit further, and that is in

18    11(c)(iv), "In the event that any one of the

19    participants becomes insolvent or is the object of

20    bankruptcy or insolvency proceedings" -- okay? --

21    they are entitled to the special retirement

22    allocation.  That's where we start our valuation

23    exercise.

24                   And there is nothing odd about reading

25    that provision and saying that that provision

1    should govern in the event that everyone goes into

2    insolvency proceedings.  And that's what we

3    proposed from the very beginning, that the fair

4    market value of the exclusive licenses in the

5    exclusive territories is what we are entitled to.

6              And just think of it this way.  Let's

7    back up for a second and assume for illustrative

8    purposes that NNI filed for bankruptcy alone, just

9    NNI, and NNL was fine, for whatever reason.  They

10   had made asbestos at some point.  It is not unlike

11   material subsidiaries can go into insolvency

12   proceedings.

13             In that event, the only way that NNL

14   would be entitled to get anything in terms of the

15   exclusive licenses is to pay the fair market value

16   of those exclusive licenses.  Why is that there?

17   Well, there is a statute that talks about fair

18   market value, and that's the fraudulent conveyance

19   statute.  So imagine if NNI is in bankruptcy; NNL

20   is not.  If NNL tried to cancel those licenses,

21   they wouldn't be allowed to under 365(n).  The

22   Qimonda case makes absolutely clear, Fourth Circuit

23   decision, that cannot happen.

24             And you know what?  The drafters were

25   smart enough to know that, because they don't say,

1    "We are taking it back."  They are saying, "We have

2    to buy it and we have to buy" --

3                THE US COURT:  No forfeit.

4                MR. BROMLEY:  No forfeit.  We have to

5    buy it and we have to pay fair market value.

6                Well, there is a protection there,

7    because if you did it for anything less than fair

8    market value, it would be a fraudulent conveyance.

9    It is a very simple connection.

10                To the extent that there is any

11   bankruptcy thought that has been applied to this

12   contract at all, it is in Section 11, and that is a

13   very basic concept.  You see these types of savings

14   clauses in all sorts of corporate debt instruments.

15   I give a guarantee up to the amount that would

16   allow me to not be insolvent.  Therefore, I have

17   covered myself from a fraudulent conveyance

18   perspective.  That is exactly what is going on

19   here.

20                THE CANADIAN COURT:  Mr. Bromley, I

21   appreciate what you are saying, but that section

22   isn't applicable, because it says that the bankrupt

23   participant is entitled to be paid by NNL.  So

24   that's not what we are dealing with here.

25                MR. BROMLEY:  That's true, Your Honor.

1    It says, "Shall be entitled to a retirement

2    allocation from NNL."

3                    THE CANADIAN COURT:  Right.

4                    THE US COURT:  Your example, what you

5    were discussing was if NNI alone went into

6    bankruptcy.

7                    MR. BROMLEY:  Yes.  I was using the

8    example if NNI alone went into insolvency.  That's

9    why the provision is there.

10                   THE CANADIAN COURT:  Right.

11                   MR. BROMLEY:  But when you are talking

12   about -- so it can't be that we are entitled to the

13   fair market value of our exclusive license in the

14   exclusive territories in one circumstance and we

15   are not in the other, particularly when everyone is

16   terminating.  And it is important to note, Section

17   11 is not limited in its application to the

18   licensed participants.  It says a participant is

19   entitled to.  That would include NNL.  Now,

20   granted, it doesn't make a lot of sense that NNL

21   would be entitled to a retirement allocation from

22   NNL, but frankly, it wouldn't need one.

23                   So it is from that clear statement in

24   the MRDA that we proceed.  And you have to be

25   careful when you are reading the MRDA.  Ms. Block

1    mentioned this, and it came up in the context of

2    looking at Mr. Wilkie's emails.  But remember, the

3    MRDA is not an arm's-length agreement.  Mr. Zarnett

4    during his closing yesterday stated several times

5    the parties were very careful to; careful to do

6    this, careful to do that.

7              Well, let's back up.  As Ms. Block

8    said, the counterparty here wasn't NNI versus NNL.

9    There was no hard bargaining across a table.  The

10   only Nortel entity that had its own lawyer was

11   Mr. Wilkie, who, when I took his deposition,

12   refused to answer questions because he said, "I

13   only represented NNL."

14              "Are you sure?"

15              "Absolutely."

16              "Will you answer this question?"

17              "Nope."

18              I flew home.

19              So we have to keep that in mind.  So

20   when Ms. Block said that all the Nortel parties

21   were on the same side of the table, that's exactly

22   what was going on.  And that's why the arm's-length

23   standard is there.  You don't need an arm's-length

24   standard where there is a contract between two

25   fighting parties.

```
 1              You know what is an arm's-length
 2    agreement?  The IFSA is an arm's-length agreement.
 3    The Final Canadian Funding and Settlement Agreement
 4    are arm's-length agreements.  You don't need to
 5    impose a standard on it.  The only reason that
 6    transfer pricing imposes a standard, the OECD, the
 7    Canadian Revenue Authority, the Internal Revenue
 8    Service, the only reason they impose that standard
 9    of arm's length is because the parties are all
10    together.
11              What kind of hard bargaining are you
12    going to get when you sit down with your parent?  I
13    know I never really did well with my parents, and
14    it is even more so in a corporate environment.  So
15    when you are sitting here talking about the
16    evidence that relates to the MRDA, you need to take
17    that into account.
18              Now, I know Ms. Block talked a lot
19    about the law in Canada, and I am going to talk a
20    little bit about the law in Delaware.  We are not
21    talking, about for things like Mr. Wilkie's email,
22    unilateral, undisclosed, subjective intent.  It is
23    not like somebody is sitting over there and going,
24    "This is what I thought when I sat down fighting
25    with that guy over this contract."  What he is
```

1    saying is, "Hey, we are all sitting here together

2    trying to figure out what to say to the taxing

3    authorities."  This was open, discussed

4    conversations between everyone sitting on the same

5    side of the table.  And so it is not something that

6    we can take lightly.

7              Now, Your Honor in In Re: Plassein or

8    "Plassein," you actually have a quote, Judge Gross,

9    that I think applies very clearly here:  That we

10   consider not only the language in the contract but

11   also the circumstances surrounding the making of

12   the contract, the motives of the parties, and the

13   purposes they sought to accomplish.

14             The Third Circuit in Baldwin Piano --

15   the Seventh Circuit in Baldwin Piano in 2004, which

16   was adopted by the Third Circuit, says when there

17   is a choice among plausible interpretations, it is

18   best to choose a reading that makes commercial

19   sense rather than a reading that makes the deal

20   one-sided.

21             These are the sorts of phrases that

22   could just as easily appear in Canadian cases

23   relating to factual matrix:  Common-sense approach,

24   pay attention to what the parties were thinking and

25   doing at the time, don't reach an absurd commercial

1    result.  It is that type of thing that we are

2    talking about when you are talking about commercial

3    contract interpretation.  That's, I think, as true

4    in Delaware as it is in Ontario.

5                THE CANADIAN COURT:  You would agree,

6    Mr. Bromley, won't you, that Ontario law governs

7    the interpretation of this agreement?

8                MR. BROMLEY:  I would agree that it

9    governs the interpretation of certain provisions of

10   it, and I will get to that in a moment, Your Honor.

11               THE CANADIAN COURT:  Okay.

12               MR. BROMLEY:  But I also think it is

13   critical to note that.

14               Now, the Monitor, the CCC, have not

15   raised any particular point of Canadian law that

16   says it is different in Ontario than it is in

17   Delaware and therefore you have to pay attention to

18   Delaware law and not Ontario law.

19               THE US COURT:  Right.

20               MR. BROMLEY:  That hasn't been raised

21   at all.  And the other thing I think is clear in

22   both jurisdictions is that if the Courts find

23   ambiguity, you have to look at everything.

24               THE US COURT:  Right.

25               MR. BROMLEY:  And our view, very

```
 1    clearly, is that our reading of the contract is
 2    that it is entirely unambiguous, but we think it is
 3    the Monitor's reading that demands that it be
 4    ambiguity.
 5              If you look at the final comments that
 6    Ms. Block made before lunch, you can't read the
 7    MRDA license provisions in Article 5 consistent
 8    with Article 4's right to exclude, Article 6's
 9    statement on confidentiality that allows you to
10    disclose information to licensors, and the
11    indemnity for everything that happens in the United
12    States.  You can't read them with the Monitor's
13    understanding of Article 5.  You can read it with
14    our understanding of Article 5.  So we think it is
15    unambiguous.  You can read the entire contract
16    together in an unambiguous fashion.
17              The Monitor reads --
18              THE US COURT:  That's why I think it
19    was Mr. Gottlieb who said yesterday that it was
20    really the Monitor's interpretation that creates
21    the ambiguity.
22              MR. BROMLEY:  The Monitor is like a
23    horse at Belmont wearing blinders:  The bell rings
24    and he goes.  He doesn't see anything off to the
25    right and he doesn't see anything off to the left,
```

1    and he is trying to get to the finish line.

2                THE US COURT:  It is Mr. Maguire who

3    said that.  I hope to give credit to the right

4    person.

5                MR. BROMLEY:  I would like to just

6    pause for a moment and say that we concede to the

7    EMEA Debtors the award for best demonstrative

8    exhibits, and fine job there.

9                So now I would like to turn to US

10   patent law.  And it goes to your question, Justice

11   Newbould:  Does Ontario law govern this contract?

12               And the answer is, it does not govern

13   with respect to who has standing to assert US

14   patent claims in the United States.  And that is a

15   critical element of this agreement, because it is a

16   critical element of the Rockstar transaction.

17               97 percent of the high-interest patents

18   that were sold to Rockstar were US patents.  The

19   vast majority of the assets that Rockstar acquired

20   were US assets.  And the question of who has the

21   right to assert with respect to US patents the

22   rights in the United States is critical, and that's

23   a question of US patent law.

24               And we have to take that seriously.  We

25   are standing here in the District of Delaware,

1    which is one of the two or three busiest patent

2    districts in the country.  If there is an appeal on

3    this decision, it goes up to one of four judges,

4    all of whom know it a hell of a lot better than I

5    do.

6                    THE US COURT:  Yes.

7                    MR. BROMLEY:  And it starts off by

8    looking at what the fundamental nature of a patent

9    is.  We have heard -- Professor Tucker said it in,

10   I thought, the best way as a right to exclude.  But

11   you just have to look it up.

12                   If you go to 35 USC 154, the US Patent

13   Act, a patent consists of the right to exclude

14   others from making, offering, using, offering for

15   sale or selling an invention throughout the United

16   States.

17                   Now, let's look at both the US and

18   Canadian offices, the Canadian Intellectual

19   Property Office and the US Patent and Trademark

20   Office.  These are screen shots of the website.  If

21   you went to Google and Googled these things, you

22   would come to these.  And they are in the trial

23   record at Exhibit TR50849 and Exhibit TR50857.

24                   Looking first at the US Patent and

25   Trademark Office, there it is exactly as I read it:

1    An inventor has the right -- it is an intellectual

2    property right granted by the USA to an inventor to

3    exclude others from, so on and so forth.

4              And if you go to the Canadian

5    Intellectual Property Office, it says the same

6    thing.  Through a patent, the government gives you

7    the right to stop others from making, using or

8    selling your invention.

9              You go down further -- and there is an

10   extra sentence:  The rights given by a Canadian

11   patent extend throughout Canada but not to other

12   countries.  And that's a critical element as well.

13   Patents are territorial.  They only apply in the

14   country in which they are issued.  So when we heard

15   Angela Anderson and Angela deWilton talking about

16   decisions about where to file, these were conscious

17   business decisions.  A US patent only applies in

18   the United States and a Canadian patent only

19   applies in Canada.

20             So let's use an example.  Let's assume

21   that Nortel decided to file a patent, and I think

22   65 percent of the patents that are at issue were

23   filed only in the United States.  And you take one

24   of those patents, and someone decides to do

25   something with that patent outside of the United

1    States, even in Canada or Mexico.  If there is not

2    a patent in that particular jurisdiction, there is

3    no infringement.

4              You could use Nortel intellectual

5    property in jurisdictions outside of the patent

6    protection area without any issues.  It is a

7    conscious business decision by the company to not

8    seek protection.  We heard in the depositions of

9    Ms. McColgan and Mr. Veschi that those decisions

10   were made for years.  We heard from Ms. Anderson

11   and Ms. DeWilton that the biggest bang for the buck

12   was hitting them in the United States.

13             So the question really boils down to,

14   when you are looking at an asset which is a

15   territorial asset, is who has the right to assert

16   and get value from that asset.

17             So how does this relate to this

18   litigation?  We can always go back to the MRDA.

19   Article 4, "Legal Title to NN Technology."  Article

20   4(e):

21             "Licensed Participants have the

22             right to assert actions and recover

23             damages or other remedies in their

24             respective territories for

25             infringement," so on.

1              "Licensed Participants," defined term,

2    includes NNI, NNUK, NN France, NN Ireland; not NNL.

3              Other remedies in their respective

4    territories, defined to be exclusive territories.

5    For the US, the 50 states and Puerto Rico.

6              Now, where does this appear in the

7    agreement?  It appears in Article 4, "Legal Title

8    to NN Technology."

9              The Monitor's counsel focuses a lot on

10   Article 4(a).  Let's look at Article 4(a).

11   "Except as otherwise specifically agreed, legal

12   title...shall be vested in NNL."  Everyone reads

13   this sentence quickly and jumps to "legal title

14   shall be vested in NNL."  But the first phrase says

15   "except as otherwise specifically agreed."

16   This is 4(a).

17             When you go to 4(e), there is "except

18   as otherwise specifically agreed."  There is no

19   other specific agreement in the agreement.

20             Article 4(a)'s key sentence, relied on

21   by Monitor's counsel, is modified clearly by 4(e).

22   Any vesting of legal title in NNL is without the

23   right to assert infringement claims in the United

24   States of America.

25             And Article 4(a) continues:

1    "In consideration therefor, NNL agrees to enter

2    into the exclusive license."

3              To go along with the Monitor's reading,

4    you have to ignore "except as otherwise

5    specifically agreed," and you have to ignore

6    Article 4(e).

7              The Monitor would say wait a second,

8    4(e)'s enforcement right is somehow limited by the

9    scope of the license under 5, and that is simply

10   not true.  There is not a single limitation in

11   4(e), and there is no reason in the world to read

12   any into it.

13             Now, Article 4(a) and 4(e) is

14   referenced later.  If we could bring up on the MRDA

15   Article 9(c).  Article 9 is captioned "Duration and

16   Continuing Rights and Obligations."  Haven't paid a

17   lot of attention to Article 9, but let's read 9(c).

18                   "The provisions of Article 4

19                   (Legal Title to NN Technology) with

20                   respect to NN Technology acquired or

21                   developed pursuant to this

22                   Agreement...shall survive

23                   notwithstanding the expiry of the

24                   Agreement or any termination of this

25                   Agreement for any cause whatsoever."

1           It doesn't say the provisions of

2    Article 4(a).  It doesn't say shall not survive the

3    termination for bankruptcy purposes.

4           It is very common for contracts to have

5    sections that say there are certain things that are

6    so important, even after this contract blows up,

7    they are still in effect.  That is what Article 9

8    is.

9           So when we are talking about Article

10   4(a) and Article 4(e) as well as (b), (c), and (d),

11   they survive notwithstanding anything that happens

12   to it, if it expires on its own terms or it is

13   terminated.

14          Now, why is this important from a

15   perspective of US patent law?  Well, I would like

16   to talk a little bit about a couple of cases at

17   this point.  US patent law says that where an

18   agreement conveys:

19               "All substantial rights in a

20               licensed patent to the exclusive

21               licensee, the licensee alone has the

22               right to bring infringement suits

23               without joining the patentee."

24          THE CANADIAN COURT:  Where are you

25   looking at now?

1            MR. BROMLEY:  I am just reading my

2    notes, but I will point you to the exact language

3    in a moment, Your Honor.

4            And so the case that I am referring to

5    is Vaupel Textilmaschinen vs. Meccanica Euro

6    Italia.  It is kind of a World Cup game, the

7    Germans versus the Italians, and it is about a

8    patent relating to a machine that makes fabric.  It

9    is a 1991 decision in the federal circuit, which,

10   as we know, is the circuit that is charged with the

11   sole responsibility for deciding patent appeals.

12           So let's move to this quote:

13                "In determining whether a grant

14            of all substantial rights was

15            intended" --

16           THE CANADIAN COURT:  Just a minute.

17           MR. BROMLEY:  I am sorry.

18           THE CANADIAN COURT:  I am trying to

19   find it in the case.  What page is it?

20           MR. BROMLEY:  It is on page 16, Your

21   Honor, in the compendium.  I am sorry.  I am not

22   used to referencing a compendium.  I apologize.  It

23   is on page 6 at the bottom.  The paragraph begins,

24   "A patent provides its owner with the right to

25   exclude others."

1          THE CANADIAN COURT:  Thank you.

2          MR. BROMLEY:  Okay.  And then the Court

3    says:

4                    "In determining whether a grant

5                of all substantial rights was

6                intended, it is helpful to look at

7                what rights have been retained by

8                the grantor, not only what was

9                granted."

10         And it notes here that four specific

11    rights were retained:  A veto right on

12    sublicensing, a right to obtain patents on the

13    invention in other countries, a reversionary right

14    to protect the patent in the event of -- or a right

15    to the patent in the event of a bankruptcy, and a

16    right to receive infringement damages.  All four of

17    those were there.  Okay.

18         At most, in our case the MRDA retains

19    the right to obtain patents on the invention in

20    other countries to NNL.

21         But then the Court goes on and says:

22                    "As the district court properly

23                held, none of these reserved rights

24                was so substantial as to reduce the

25                transfer to a mere license or

1                      indicate an intent not to transfer

2                      all substantial rights."

3            The court goes on and holds on this

4    particular point, standing:

5                      "We hold the district court was

6                      correct.  The contractual documents

7                      constituted a transfer of all

8                      substantial rights under the patent,

9                      thereby permitting Vaupel to sue.

10                     The agreements expressly granted

11                     Vaupel the sole right to sue for all

12                     infringements, past, present and

13                     future as well."

14           That's exactly what happens in Article

15    4(e) of the MRDA.

16                     Now, the case is interesting.  There is

17    also a case I can refer Your Honors to, which is --

18    it is not in the compendium, but I can provide a

19    copy later.  It is a case here in the District of

20    Delaware, Judge Robinson decision, Syngenta Seeds

21    vs. Monsanto.  And among other quotes, citing a

22    case called Calgon Corp., Judge Robinson says that

23    Calgon does not establish that retention of title

24    is a substantial right denying standing to a

25    licensee.

1              So when one is interpreting 4(e),

2    particularly when one is trying to enforce a US

3    patent, which can only be done in the US courts,

4    you have to look at US patent law as to who has the

5    right to do that.

6              Now, Nortel ran into this problem.  It

7    was not blessed with immunity from litigation

8    before these hapless lawyers came upon it.  There

9    is a litigation we have talked about a bit called

10   Vonage.  There were two litigations that were

11   happening simultaneously.  It is important to note

12   at the start both litigations were being handled by

13   the same law firm.  One of the litigations only

14   involved NNI.  Another of the litigations involved

15   NNI and NNL.  Same law firm, Winston & Strawn,

16   handling both lawsuits; same defendant, Vonage, in

17   both.

18             So there was a pleading filed in August

19   of 2007.  It says, "Reply to Vonage's Opposition

20   for Motion to Leave."  And what was going on there?

21   Well, Vonage was saying, "Wait a second, NNI.  You

22   have not joined NNL in this lawsuit, and therefore,

23   the lawsuit can't go forward.  They are essential.

24   They are an essential party."

25             In this pleading drafted by counsel

1    that also represents NNL in the companion case as

2    well as NNI, this is what is written:

3                    "Exclusive licensees such as

4              Nortel Networks Inc. Unquestionably

5              possessed the standing to assert

6              patent infringement claims.  The

7              fact of the matter is that Nortel

8              Networks Inc. Is the exclusive

9              licensee of all US patents legally

10             owned by Nortel Networks Limited and

11             possesses" -- the magic words --

12             "substantially all rights with

13             respect to those patents."

14             MR. ZELBO:  What are you looking at?

15             MR. BROMLEY:  I am sorry, Your Honor.

16    I am looking at the slide on the screen.

17             THE CANADIAN COURT:  I understand that.

18    But I am not taking the slide with me.  I am trying

19    to find where I find all this.

20             MS. BLOCK:  Page 19 of the compendium.

21             MR. BROMLEY:  Again, I am sorry.

22             THE CANADIAN COURT:  Page what?

23             MR. BROMLEY:  19 of the compendium,

24    Your Honor.

25             THE CANADIAN COURT:  Thank you.

1                MS. BLOCK:   The compendium was my idea.

2                THE CANADIAN COURT:   Pardon?

3                MS. BLOCK:   The compendium was my idea.

4     It is not your fault.

5                MR. BROMLEY:   I will try to get used to

6     it, Your Honor.

7                And just as I mentioned, there is a

8     companion case that was actually in the District of

9     Delaware where both NNI and NNL were parties.

10               So not only does the law, the US patent

11    law say that if you possess all substantial rights

12    in a patent, it doesn't matter what the label is;

13    you own that patent in that jurisdiction.   You have

14    the right to sue to enforce, which is exactly what

15    the law says.   Nortel acted in exactly that same

16    fashion when it was operating prior to bankruptcy.

17               The Monitor would suggest that this is

18    superfluous or irrelevant, but it is not, because

19    the assets that were sold to Rockstar were the US

20    patents.   Those US patents are territorial, as the

21    law says.   They are only good within the United

22    States, and the only entity that had the right to

23    enforce those assets in the United States was NNI.

24    And it made perfect sense.   I mean, we are in a

25    contested litigation right now, but again, it made

1    perfect sense.  NNI was owned by NNL for very good

2    and valid reasons, particularly relating to tax, as

3    Ms. Block said.  You can't go into the way-back

4    machine and change it.  That's the way the company

5    was structured, and that's the way the legal rights

6    are required to be applied.

7              It also makes sense, as Mr. Zelbo said,

8    because in 1996 there were APAs, advance pricing

9    agreements, signed between each of Nortel Networks

10   Inc. And the IRS on the one hand and Nortel

11   Networks Inc. And the CRA -- Nortel Networks

12   Limited and the CRA on the other hand on the issue

13   of licensing.  So I would like to mention that for

14   a moment.

15              Now, when Mr. Zelbo --

16              THE CANADIAN COURT:  Mr. Bromley, I

17   just want to make a note.  I want to make sure I

18   understand you.  Is your point that under US law

19   NNI had the right to enforce the patents because it

20   had all substantive rights as licensee, and under

21   Section 4(e) of the MRDA it had the exclusive right

22   as opposed to NNL?  Is that the nub of your point?

23              MR. BROMLEY:  Yes, Your Honor.

24              THE CANADIAN COURT:  Thank you.

25              THE US COURT:  And that right survived

1    the termination of the agreement.

2                MR. BROMLEY:  Yes.  That right survived

3    the termination.  And I would say you have to look

4    at this -- I would add one other thing, which is

5    that 4(e) is a carve-out from the vesting of title.

6    That's what Article 4 says.

7                So if I could go back quickly to what

8    we were talking about just before the lunch break,

9    Mr. Zelbo rose to answer a couple of questions and

10   referenced a document, so let me just take you to

11   that document.

12               The question having been raised:  Is it

13   possible for NNI to license to third parties to

14   make their own products?  Can NNI enter into a

15   license with Cisco that Cisco could use Nortel

16   technology to make a Cisco product?

17               THE US COURT:  Could NNI you said?

18               MR. BROMLEY:  Could NNI do that.

19               THE US COURT:  Yes.

20               MR. BROMLEY:  And the answer is

21   absolutely, and it did.  It is stated in those two

22   APAs from 1996.  And remember, they are agreements.

23   They are not representations.  They are actual

24   contracts with the taxing authorities that say we

25   earn our income from two sources.  We make, sell,

```
 1    develop products, and we license our technology.
 2    Those are the two sources of income.  That's in an
 3    agreement with the two taxing authorities.
 4              It makes sense to be in an agreement
 5    with the two taxing authorities, because what are
 6    the taxing authorities looking to do but tax
 7    revenue.  So it is common, you would think, for
 8    them to say, "Where do you get your revenue,
 9    because I want to tax it."  Certainly that's what
10    the IRS says to me all the time.
11              And I would like to just go back one
12    step for a moment.  When we are talking about 4(a)
13    and Article 9, it is important to note -- and I
14    will get to this later -- the MRDA has not been
15    terminated.  When the US Debtors sent $190 million
16    under the Final Canadian Funding and Settlement
17    Agreement to the Canadian Debtors, there was an
18    agreement that no one would touch the MRDA and
19    those licenses unless everyone consented, and not
20    only the US Debtors but the Creditors' Committee
21    and the Bondholders Committee.
22              THE CANADIAN COURT:  Mr. Bromley --
23              MR. BROMLEY:  Yes.
24              THE CANADIAN COURT:  -- you just said a
25    minute ago that NNI did involve licensing to third
```