```
 1    parties.
 2              MR. BROMLEY:  Yes.
 3              THE CANADIAN COURT:  What I saw before
 4    lunch was that it was not NNI by itself.  It was
 5    NNL and NNI or NNL for itself and its subsidiaries.
 6    Is that right?
 7              MR. BROMLEY:  Yes, and I am going to
 8    dispel that impression immediately, Your Honor.
 9              THE CANADIAN COURT:  Okay.
10              MR. BROMLEY:  If I can direct your
11    attention to -- and I don't -- is this in the
12    compendium?
13              Your Honor, Justice Newbould, this is
14    not in the compendium.  I apologize.  It is on the
15    screen, however.  This is a document that is
16    responses to questions posed by the three taxing
17    authorities.  Both Ms. Block and Mr. Zelbo
18    referenced this document.  It is dated September
19    2003.
20              Now, if you go to the next slide, there
21    is a question, and this is a question that was
22    posed by the IRS.  And you can see that at the end
23    of the first answer, question 14-IRS.
24                   "Does Nortel license technology
25                   to or from uncontrolled parties?  If
```

1                          so, please provide a schedule

2                          listing."

3                          So licensing technology to or from

4     uncontrolled parties.   To uncontrolled parties are

5     third parties; right?

6                              "Provide a schedule listing the

7                          Nortel entity that licenses the

8                          technology, a description of the

9                          technology, and the annual royalty

10                         payments or receipts for the

11                         technology."

12                             Then it answers the question:

13                             "The Nortel Group licenses its

14                         propriety technology to third

15                         parties.   The three Nortel entities

16                         that license that technology are

17                         NNL, NNI and NNUK."

18                         And it goes on to list the amounts.

19                         There is also an appendix.   This is

20    from 2002.   "Licensing income."   "Program

21    technology" is in Column 1.   "Business" is in

22    Column 2.   "Nortel Entity (Licensor)" is in Column

23    3, and the dollar amount total is in Column 4.

24                         MS. BLOCK:   And that is in the

25    compendium, Your Honor, at page 23, if you want the

```
 1    hard copy.

 2            MR. BROMLEY:  I believe there are 55

 3    line items.  And I believe that 33 of them say that

 4    the licensor is the United States.  So well over

 5    half of the licensing income were in transactions

 6    where the licensor was NNI.  That was a

 7    representation made to all three of the taxing

 8    authorities in response to a question posed by the

 9    IRS in 2003.  And it is a question that the IRS

10    legitimately should make.  Particularly, it is only

11    six or seven years after the APA had been signed

12    where the IRS and NNI agreed that there were two

13    sources of income for NNI:  Making, selling,

14    developing products; and licensing technology.

15            Now, Your Honor, particularly Justice

16    Newbould, I haven't completely answered your

17    question, which is, well, what about those

18    situations where NNI and NNL were both on the

19    license.  And the answer that was given, which I

20    will now show you an example of, was that there

21    were situations where the licensing was happening

22    within the United States, but it was also a

23    worldwide license.  And so you had licensing within

24    the United States, the license being granted by

25    NNI, and the licensing anywhere else being granted
```

1    by NNL on behalf of itself and its subsidiaries.

2              There is evidence in the record that is

3    cited in our findings of fact that that phraseology

4    was chosen very consciously.  Look, it is kind of

5    complicated when you are putting a license together

6    to say there are five different parties that need

7    to license.  I don't know if it is going to license

8    in the UK.  Maybe it is; maybe it isn't.  We will

9    just say NNL on behalf of itself and its

10   subsidiaries, and it captures the five integrated

11   entities.

12             But I have here an example of a license

13   agreement which has been redacted where -- and do

14   we have it up in Toronto as well?  And I apologize,

15   Your Honors.  We did this at lunch in anticipation

16   of dealing with this question.  And we will hand it

17   up here and in Toronto.  We have it on the screen.

18   And, Your Honors, the unredacted version is on the

19   database.

20             This is a patent license agreement

21   bearing the identity marker Exhibit TR48861.  And

22   if you bring this to the second page and you

23   highlight the Nortel Networks Limited block, you

24   will see it is by and between Nortel Networks

25   Limited on behalf of itself and its subsidiaries

1    other than Nortel Networks Incorporated.  And then

2    the next party is Nortel Networks Incorporated.

3              Certain of this is redacted in a manner

4    that makes it difficult to read, but the unredacted

5    versions are available.

6              In the definitions it makes clear that

7    this is being used in products that the

8    counterparty manufactures and sells.  So this is

9    not a supplier agreement.  This is an agreement

10   with a third party to allow it to use Nortel

11   technology in its products.  And I invite everyone

12   to go and look at the unredacted version, the

13   Courts included.  Obviously, the confidentiality

14   provisions that are imposed by both the Rockstar

15   deal and this transaction make it difficult for us

16   to go any further.

17              THE CANADIAN COURT:  Do we know why

18   Nortel was signing this agreement?

19              MR. BROMLEY:  Yes, Your Honor.  And I

20   am sorry, Your Honor.  I am just pulling the

21   unredacted version, because I think I have to

22   reference one of the redactions.

23              THE US COURT:  And you said patent and

24   its foreign equivalents.  Is that --

25              MR. BROMLEY:  Yes.  Oh, here we are.

```
 1    If you go, bring up page 3, it is under the big
 2    redaction at the top:
 3                   "Territories shall mean the
 4                   countries and jurisdictions,
 5                   including the United States of
 6                   America, in which Nortel now or in
 7                   the future holds Nortel patents."
 8                   So the license is from a territorial
 9    perspective for the US and the rest of the world.
10    We make no argument in this case, Your Honors, that
11    NNI had the right to license Nortel technology
12    outside of the United States.  The only party that
13    did was NNL and the other integrated entities.
14                   So the formulation of Nortel Networks
15    Limited on behalf of itself and its subsidiaries
16    other than NNI matches completely with the
17    territories, which is the United States of America
18    and the rest of the world, wherever Nortel holds
19    patents.
20                   And if you go to page 4, in 3.1 and 3.2
21    you will see that royalties have to be paid.  Now,
22    admittedly, the royalties say they are going to be
23    paid to NNL, but it also says Nortel may at any
24    time direct the company to remit some or all of the
25    royalties due and payable to Nortel to NNI.  And
```

```
 1    there is a document in the record -- I mean, in the

 2    trial exhibits, Exhibit TR44259, which makes it

 3    clear that royalty income would be sent to NNL and

 4    then allocated -- not allocated -- distributed out

 5    for accounting purposes to the various entities.

 6    So NNL functioned as a clearinghouse.  The actual

 7    dollars and cents hit the books and records of the

 8    actual companies.

 9               And as Ms. Block said, there is

10    substantial --

11               THE CANADIAN COURT:  This is I think

12    from the date I can -- it shows up in Schedule A?

13               MR. BROMLEY:  Sorry.  Schedule A of the

14    license agreement, Your Honor?

15               THE CANADIAN COURT:  No; of your reply

16    brief.  We were looking at that this morning.

17               MR. BROMLEY:  We are checking that,

18    Your Honor.  We can certainly give you that

19    citation.

20               THE CANADIAN COURT:  I am assuming it

21    is about this -- well, I am not going to say out

22    loud, but --

23               MR. BROMLEY:  I know what you mean,

24    Your Honor.  Schedule A, yes.

25               THE CANADIAN COURT:  It is one of those
```

1    on Schedule A?

2         MR. BROMLEY:  Now, before I move on,

3    Your Honor, to the valuation information, it is

4    important to recognize where this leaves us.  Okay?

5    Article 4(e) says that we have the right to enforce

6    in the United States.  We clearly have the right to

7    license.  We have been licensing.  We have made

8    representations to the taxing authorities that we

9    are licensing in the United States.  We report our

10   income that we are licensing in the United States.

11   We entered into agreements with the taxing

12   authorities saying we were licensing in the United

13   States.  And we have to now examine against that

14   prism the Monitor's argument.

15         The Monitor would say we don't have a

16   right to sublicense in the United States to third

17   parties to create third-party products.  Now,

18   sitting at the core of this, the beginning of it, I

19   should say, is this kind of very basic approach to

20   what a product is, according to the Monitor.  The

21   Monitor's perception, I think intentionally so, is

22   that Nortel products all were in boxes on shelves,

23   as you might have in Costco, that say "Nortel," and

24   that's entirely incorrect.  Nortel products are

25   defined to be small P products, software and

1    services.  A line of software code embedded in my

2    cellphone or my VCR or the cell tower that is

3    transmitting my telephone call is a Nortel product.

4              But embedded within this argument that

5    the Monitor makes is that NNL had a right to

6    sublicense in the United States, that it was NNL

7    that could decide either to sell the technology

8    notwithstanding our exclusive licenses or

9    sublicense in the United States.  So let's just

10    stop there for a second.

11              If I have the right to sublicense to

12    party X which is embedded in this license agreement

13    and I do it, that is consistent with our reading of

14    the license.  If NNL signed that agreement without

15    NNI, what are the implications?

16              First, my exclusive license is not an

17    exclusive license because I have a right to enforce

18    against NNL.  Two, NNL is doing business in the

19    United States and has to pay tax as a US taxpayer,

20    which then gives rise to what is known as a

21    permanent establishment, which is what Ms. Block

22    had mentioned several times this morning.

23              It cannot be that this contract, which

24    says we have the right, the exclusive right to

25    enforce all rights relating to NN technology in the

1    United States, and we have an exclusive license

2    within the United States to sell, build, buy,

3    develop, think up anything, including the right to

4    sublicense, is the equivalent to an exclusive

5    distributorship, because if you took the Monitor's

6    argument and said, "I have the right as NNL to go

7    into your jurisdiction and sublicense and license

8    NN technology, I have the right to compete as NNL

9    with NNI in the United States," the exclusive

10   license becomes a nonexclusive license, and what we

11   end up being is solely a distributor of NN

12   products.  That doesn't make any sense from a

13   transfer pricing perspective.  It doesn't make any

14   sense on a basic reading of the contract.  And

15   again, it doesn't make any sense because NNL owned

16   NNI.

17              NNL owned the right to NN technology in

18   the United States but only through its equity

19   ownership of NNI.  It structured it entirely

20   intentionally for that, and it cannot escape that

21   structure.  And one of the difficult elements of

22   this case is that that structure provides that we

23   are going to use any moneys that we receive here in

24   the United States to pay off their creditors.  We

25   heard from the CCC this morning saying that NNL is

1    the gathering point of all claims in this

2    proceeding.   There is $4 billion worth of claims in

3    the US which we do not try to disavow but are only

4    here because NNL put them here.

5              So, Your Honors, I would like to now

6    move on to what we believe should be the real

7    question that we should be addressing, which is

8    valuation and allocation and looking at the

9    experts.

10             As I mentioned in my introduction, we

11   believe that regardless of whether Canada's legal

12   theory that it is all ours, that legal title equals

13   complete ownership and that our exclusive license

14   is really an exclusive distributorship,

15   notwithstanding that, Mr. Kinrich has done an

16   analysis that says we get a substantial recovery.

17             THE CANADIAN COURT:   Just before you do

18   that, I was handed up a piece of paper a few

19   minutes ago, "Corporate procedure, financial

20   control of license income."   What am I supposed to

21   do with that?

22             MR. BROMLEY:   I am sorry, Your Honor.

23   I referred to it very briefly.   I am past that.   I

24   apologize.

25             THE CANADIAN COURT:   All right.   I will

1    just put it here in the pile.  What did you say you

2    did with The New York Times down there?

3            MR. BROMLEY:  Read it faithfully every

4    day, Your Honor.

5            So what I would like to do now in terms

6    of the valuation experts is to refresh our

7    recollection as to who they are.  It has been a

8    while, so we will do this very quickly.  We have

9    two slides.  The first, we have -- and this is up

10   on the screen -- Mr. Kinrich for the US; Mr. Green

11   for NNL and the Monitor.

12           Okay.  Now we have it up on the screen.

13   I apologize.

14           Mr. Huffard and Mr. Malackowski for the

15   EMEA Debtors.  Mr. Berenblut and Cox, who wrote a

16   report together.  Only Mr. Berenblut testified, but

17   we will reference something that Mr. Cox said in

18   his deposition; and Mr. Britven, who is the creator

19   of the chart that we talked about earlier.

20           So let's talk first about Mr. Kinrich

21   and Mr. Green because, like so many other things in

22   this trial, it boils down to what does the US

23   Debtor say and what does the Monitor say.  Now,

24   Mr. Kinrich and Mr. Green actually look at this at

25   least at first glance in a similar way.  They are

1    taking -- they are trying -- they are doing two

2    things.  They are going to value the lines of

3    businesses that were sold -- Enterprise, Carrier,

4    MEN and so forth -- and then separately value the

5    patent portfolio.  They have different reasons for

6    doing so, but they both actually do it in that way.

7              When you look at Mr. Kinrich, his

8    approach on lines of business is an income-based

9    approach.  He uses revenue multiples.  And there

10   are criticisms that are made, and I will deal with

11   those.  On the patent portfolio, he uses the tried

12   and true discounted cash flow analysis.

13             Mr. Green has two options for each.  He

14   has got a primary and an alternative.  And the

15   primary, on the line of business sale, Mr. Green

16   focuses on value in use.  And we talked about this

17   briefly in the opening.  Mr. Green assumes for

18   value in use that we continue, NNI and EMEA, to

19   operate the businesses that were sold.  And I will

20   talk in a minute about why that is a problem.

21             On the patents, his primary theory is

22   "I read the MRDA.  I consulted with Monitor's

23   counsel.  It all goes to Canada."  He gives us a

24   little bit for workforce in-place, which is

25   essentially compensating us for the fact that

1    Mr. Veschi and Ms. McColgan, who ran the IP within

2    Nortel, were actually US employees.

3                 Then he has got an alternative for

4    both.  On the line of business, he has something

5    that he refers to as his alternative max theory.

6    And on the patents in his reply report on page 20

7    in Footnote 30 he has a sentence that says, "I am

8    going to value the patent portfolio as if NNI and

9    EMEA continue to operate -- operated the IPCo

10   model."  And we have criticisms for Mr. Green on

11   all of his approaches.

12                 Starting off with Mr. Kinrich's theory,

13   his overall theory with respect to using

14   income-based valuation, he views this as the best

15   means to capture all the elements of value

16   operating together, because the lines of business

17   and the patent portfolio were sold as complete

18   businesses.  There were important synergies that

19   existed between all of the individual assets that

20   comprised those businesses.

21                 Mr. Kinrich looks to accepted

22   literature in the valuation field to support this,

23   the income approach and the revenue-based approach.

24   These are just slides from his presentation.  They

25   appear in his report.  But it is important to note,

1    because Mr. Kinrich is really the only expert that

2    relies on widely accepted valuation methodologies.

3             When he looks at the lines of business,

4    his job is to allocate roughly $2.8 billion of the

5    sale proceeds.  He goes into that looking at the

6    fact that the sales were all consensual, that each

7    business was sold as a whole, and they were sold on

8    a going-concern basis.  We don't think that there

9    is any debate that those things are all true.  And,

10   indeed, the record of the bankruptcy proceedings

11   writ large are evidence of that.  Anyone who lived

12   through them knows that those are true.

13            Now, looking at the lines of business,

14   the revenue multiples are, as Mr. Kinrich said,

15   used especially where companies have losses and

16   erratic earnings.  This information is available

17   for most troubled firms.  It is available even

18   where profit margin is negative.

19            Mr. Kinrich is criticized a bit by

20   saying, "Well, you didn't use a discounted cash

21   flow analysis on the lines of business."  But

22   Mr. Kinrich testified quite clearly that there

23   wasn't dependable information sufficient on the

24   lines of business sales to conduct a discounted

25   cash flow analysis.

1            Now, conversely, Mr. Kinrich uses a

2     discounted cash flow analysis on the patent

3     portfolio, and he is criticized for using it there.

4     So they kind of -- you know, you are in trouble if

5     you do, in trouble if you don't type of situation.

6            Now, the revenues that he uses with

7     respect to the lines of business are dependable.

8     They are already broken down by country, but the

9     profit forecasts were not.

10            He also takes account of costs.  There

11    is a criticism lodged against Mr. Kinrich

12    consistently that somehow he doesn't take account

13    of costs, but he does.  He charges within his

14    revenue-multiple exercise everyone for R&D,

15    overhead, corporate management, sales and

16    marketing.  He testified to that.  He was pressed

17    on cross-examination and, in our view, gave clear

18    and convincing evidence that he took these costs

19    into account.

20            When he was looking at the lines of

21    business, he used two separate approaches.  He

22    treated revenues of the integrated entities and the

23    nonintegrated entities, the true distributors, as

24    equivalent.  Then he looked at it and said, "Well,

25    I am going to apply a discount to the revenues of

1    the distributors, the true distributors, because

2    they are not integrated.  They don't have all of

3    the same problems and risks that the integrated

4    entities have."

5         For the first exercise he used the

6    carve-out financials.  Your Honors will recall that

7    when we were doing the sale transactions, there

8    needed to be separate audited financial statements

9    for each of the businesses.  A lot of money was

10   spent to create them, so he used them.

11        Going through the line of business

12   sales, he checked a lot of things.  He looked at

13   the Nortel forecasts for growth rate sensitivities.

14   He also looked at GDP forecasts where the markets

15   were.  He looked at forecasts for the

16   telecommunications industry generally.  He examined

17   market-based multiples for the distributors, and he

18   conducted line of business valuation sensitivities.

19   And on this basis, he then computed the appropriate

20   revenue multiple.

21        For the second exercise he used a

22   combination of income and market-based methods to

23   account for the different risk levels for the

24   distributors.  He looked at them all.  He averaged

25   them.  He checked whether the revenue figures were

neesons    W&F
WILSON & EPSTEIN LTD.                    www.neesonsreporting.com
www.wilfet.com

1    reasonable proxy for future forecasts.  He did all

2    of this and was very comfortable with his results.

3              Of all the experts that testified, I

4    don't think there is any on the valuation exercise

5    that cross-checked things like Mr. Kinrich did.

6    His conclusions were that his exercise was

7    reliable, made sense, was consistent with

8    profitability and expected growth.

9              Now, when you turn to Mr. Green, he

10   looks at the lines of business from a value in use

11   perspective.  And again, value in use is we are

12   going to assume EMEA and the US continued to

13   operate the businesses that were sold.

14             First off, we know that didn't happen.

15   Mr. Kinrich criticized Mr. Green for that.  Why

16   take the information that you have, which is I know

17   these businesses were sold, why pretend that they

18   weren't sold?

19             Well, it all depends and boils down to

20   one thing:  Mr. Green assumed that NNI and the EMEA

21   Debtors had no ability to transfer these businesses

22   or their assets, and he assumed that that lack of

23   transferability was based on a lack of consent to

24   the transactions.  I will get to that in some of

25   the quotes from Mr. Green's testimony, but that is

1    entirely incorrect.

2               Even assuming that the value in use

3    exercise is the right exercise, Mr. Green applied

4    to the analysis a couple of very erroneous

5    assumptions:  One, that the RPSM methodology from

6    2007 in Appendix A to the third addendum would

7    continue to apply.  He has no basis for that

8    whatsoever.  What we have heard from our transfer

9    pricing experts over and over again is that

10   transfer pricing methodologies are personal.  They

11   are like bespoke suits:  They fit the company that

12   they are intended to, that they are designed for.

13               The idea that the Nortel that Mr. Green

14   fantasizes might have existed from 2009 onward

15   would have used the same RPSM methodology and

16   conducted the same amounts of R&D just has no basis

17   in fact.  He basically said, "Well, look, if you

18   are still in business, you still need a transfer

19   pricing system, so I will assume the same one

20   applies."

21               First theory, I will assume you are in

22   business, is wrong because we sold it.  The second

23   one is we will use the same one.  Well, all of the

24   transfer pricing testimony says you have to

25   carefully tailor it to that company.

```
1              He needed to use some projections to
2     develop his analysis, so he went into the Nortel
3     databases of the materials that were produced and
4     he searched for projections.  There were lots of
5     projections:  High projections, low projections,
6     but there was no set of official projections for
7     the lines of business.  There were two general
8     categories, though.  Some of that assumed that the
9     businesses would be operated by people who had the
10    economic wherewithal to operate them -- safe hands
11    projections, so to speak -- and the other, that the
12    financially compromised Nortel would continue to
13    stumble along and operate those lines of business.
14             It is not easy to predict which
15    projections Mr. Green took:  The financially
16    compromised stumbling-along Nortel that was already
17    in bankruptcy.
18             Then he conducted a discounted cash
19    flow analysis.  A discounted cash flow analysis has
20    to have as part of it a terminal value.  Mr. Green
21    assumed that the businesses would remain in the
22    hands of NNI and NNL -- I mean NNI and EMEA through
23    2018 and then, like lemmings, we would all fall off
24    a cliff.  Notwithstanding the fact that
25    $900 million a year is assumed to be spent on R&D
```

1    under that RPSM system, Mr. Green says once you get

2    to 2018, no more value.  It is not a discounted

3    cash flow analysis if you don't have a terminal

4    value, and he doesn't have one.

5                So as I said, however, it all boils

6    down to this concept of transferability.  The

7    system doesn't work.  His inputs are wrong.  But we

8    don't even have to think about how wrong they are,

9    because all we have to do is ask Mr. Green why he

10   is in value in use territory.

11               So during the trial -- there's quotes

12   up on the screen --

13               THE CANADIAN COURT:  Mr. Bromley, I

14   just want to ask you, I know the reporter will be

15   looking for a break, so when you have got a

16   convenient time here.  I am not saying it is now,

17   but --

18               MR. BROMLEY:  Thank you, Your Honor.  I

19   will work to find the right spot, but I think I

20   know it.

21               So when Green is talking about

22   transferability, or we are asking Green about

23   transferability at trial -- and Your Honors may

24   recall, because there is a slide that is coming up

25   in which the evidence is actually adduced by the

1    best lawyer in the room, which is Justice Newbould.

2    We ask him a question.  We say:

3                   "The provision you relied on to

4              say on page 4 that because the

5              licenses by their terms were not

6              transferable -- and it is the

7              provision you relied on on page 4

8              that because the licenses by their

9              terms are not transferable, the

10             appropriate method is value in use?"

11             So it is because value in use -- he

12   used value in use because they are not

13   transferable?  What does he say?  Yes.

14                  "Now, you say in your report

15             the reason you use this value-in-use

16             analysis is because the licenses by

17             their terms were not transferable;

18             right?  That's what you say in your

19             report?"

20                  "That's right."

21             He gives no other answer as to why he

22   believes there is a lack of transferability.  And

23   again, the only reason you use value in use is you

24   can't transfer the licenses or the business.  And

25   we know they were transferred.

1            Now, we talk about -- we go to the next

2     stage, which is, that testimony was in the context

3     of a break between breakfast and lunch.   And right

4     before the break, Justice Newbould, you had a

5     question to Mr. Green about his report said

6     nontransferability but the slide he used in

7     testimony said limited transferability.   And you

8     scratched your head, rightly, and asked him to

9     explain where does it come from.

10           And he says, "Well, look, I understand

11    the transferability that is being described here

12    can actually occur with the consent of the parties.

13    And I understood there had never been consent of

14    the parties when I wrote my report.   So I assumed

15    there had been no transfer, that there was no

16    transferability."

17           Frankly, for the line of business

18    analysis, Mr. Green should just get off the stand

19    now and go home, because the fact is there was

20    consent of the parties and there was

21    transferability.   Everything transferred.   We sold

22    operating businesses.   We sold them to buyers.

23    That's why we have the $7.3 billion.

24           So, Justice Newbould, after the lunch

25    break they came back, because you had said, "And

1    where do you see that?"  And it boils down to

2    Article 14(a) of the MRDA.  Article 14(a) of the

3    MRDA says:

4                    "The Agreement shall not be

5                    assigned by any Participant except

6                    with the written consent of each of

7                    the other Participants."

8                    This is the only thing that Mr. Green

9    relies on to say that you can't transfer the

10   licenses or the businesses, and this is the only

11   thing that he relies upon to say that value in use

12   is what should be used.

13                   We all know that this doesn't apply.

14   Indeed, the Monitor now knows it.  In the

15   post-trial brief, the first post-trial brief, there

16   was a sentence that I read that I thought we had

17   written which describes the discussion on

18   transferability as a red herring.  Of course it is,

19   because there is transferability.

20                   Now, it is not entirely clear to us

21   what the Monitor is now arguing on Mr. Green's

22   evidence, but there appears to be an argument that

23   the "by or for any participant" language in the

24   definition of "products" in the MRDA is now the

25   explanation that is being given for why value in

1    use is appropriate.  And there are two responses to

2    that.

3                First of all, that's not what Mr. Green

4    said.  He didn't say that in his report, his

5    deposition or his trial testimony, and we can't put

6    words into Mr. Green's mouth now.

7                Number two, we have a very strong

8    argument with the Monitor about the "by and for"

9    language, particularly as it relates to the patent

10   portfolio.  But what was sold here were the

11   businesses in the United States, which were in the

12   business of selling and marketing Nortel products.

13   So there can't be any dispute on the line of

14   business.  And Mr. Green's first line of attack,

15   value in use, is simply gone.

16                THE CANADIAN COURT:  Well, they are

17   saying that there was no assignment of the MRDA.

18                MR. BROMLEY:  Well, that's true, Your

19   Honor.  There was no assignment of the MRDA.  And

20   it is on that basis that Mr. Green says because you

21   can't assign the MRDA, you can't assign the

22   licenses or the business, and therefore, you are

23   not entitled to anything.

24                But we know -- and he said without

25   consent.  We know every one of these transactions

1    was a transaction that took place with consent and

2    the authorization of both the US and the Canadian

3    Courts.  There is no question about that.

4               There is simply no argument that

5    Mr. Green can point to to say that value in use

6    should apply.  And so when you are talking about

7    the line of business analysis, at least for the

8    primary point, the primary theory, the Monitor has

9    no supportable valuation opinion.

10              Now, I am not going to go into a lot --

11   sorry, Your Honor?

12              THE CANADIAN COURT:  I wonder if we

13   should -- I think we should take the break for

14   about 15 minutes, Mr. Bromley.

15              MR. BROMLEY:  Okay.  I am at your

16   disposal, Your Honor.  We will break here --

17              THE CANADIAN COURT:  I promised the

18   reporter I would do it by 3:00, so I have broken

19   that promise.

20              MR. BROMLEY:  Sorry about that, Your

21   Honor.

22              THE US COURT:  All right.

23              THE CANADIAN COURT:  Why don't we just

24   take 15 minutes.  Is that okay with you, Judge

25   Gross?

```
 1              THE US COURT:  That is wonderful.  3:30
 2   we will be back.
 3              -- RECESS AT 3:15 p.m. --
 4              -- UPON RESUMING AT 3:45 p.m.
 5              THE US COURT:  Thank you, everyone.
 6   Please be seated.
 7              THE CANADIAN COURT:  I have had
 8   discussions with counsel and with Judge Gross, and
 9   we are going to stop at 5:00 today and come back at
10   8:30 tomorrow morning and get it finished sometime
11   tomorrow morning.
12              MR. BROMLEY:  Okay.  It is about a
13   quarter to 4:00, so I guess we will just continue
14   through.
15              If I could just make a suggestion, Your
16   Honors.  I am very sensitive to the fact that
17   tomorrow is the first night of Rosh Hashanah, my
18   colleagues who celebrate on all sides.  So, you
19   know, I think it is important that we try to do our
20   best to make sure that we are done by noon
21   tomorrow.
22              THE US COURT:  Oh, yes.
23              THE CANADIAN COURT:  The discussions we
24   had, Mr. Bromley, people thought that we could
25   probably be done by 11:00.  So I couldn't agree
```

1    with you more.

2              MR. BROMLEY:  Okay.  Well, thank you

3    very much, Your Honors.

4              THE US COURT:  I also can make one

5    other suggestion, and that is, people who feel

6    pressed could certainly participate, you know, back

7    in their offices perhaps.  I know that may make it

8    a little difficult for consultation purposes, but

9    there may be some people who don't need to be here

10   and who could take leave.

11             MR. BROMLEY:  I think it might make

12   sense for all of us at 5:00 to get together and

13   talk a little bit and make sure that we have

14   structured the time tomorrow so that we know

15   exactly what we are getting into.

16             THE US COURT:  You should do that.

17             MR. BROMLEY:  We have obviously been

18   through all of this for a very long time, and I

19   think we should be able to all agree that we get X

20   amount of time per side and stick to it.

21             THE US COURT:  And if you would like to

22   remain in the courtroom off the record, we can do

23   that as well.

24             MR. BROMLEY:  That would be helpful,

25   Your Honors.  We appreciate that.

1          THE US COURT:  Sure.

2          MR. BROMLEY:  Well, let me get back to

3    Mr. Green and his line of business valuation.

4          THE US COURT:  Yes.

5          MR. BROMLEY:  I will not spend a lot of

6    time on this, which is up on the screen.  It

7    appears at page 84 of the compendium in Tab 5.  And

8    this was actually a slide that appeared in

9    Mr. Kinrich's testimony.  And the importance of

10   this slide really is looking at the middle column

11   and the right-hand column, because I mentioned

12   earlier in terms of Mr. Green's value in use

13   exercise with respect to the line of business

14   valuation, the numbers that he allocates to the US

15   and EMEA in the blue and the green are based on,

16   once again, the worst possible projections for each

17   of the US and EMEA as well as the application of

18   the RPSM, which has no basis, all premised, as we

19   have already discussed, on the idea that the

20   businesses could not be transferred.

21          If you look at the third column, what

22   Mr. Kinrich did initially was said, "Look, I

23   understand that what Mr. Green did is not do a

24   value in use analysis for Canada."  And it

25   shouldn't be done, because he essentially gives the

1    $1.4 billion in the middle column directly to

2    Canada because, in his view, Canada owns the IP.

3    But he really should do, if he is going to be fair,

4    a value in use analysis for Canada as well.

5              Mr. Kinrich did that and testified

6    about it.  The right-hand column shows that the

7    value in use exercise, using the same assumptions

8    for Canada, would bring it to 387, leaving a

9    billion dollars that, in effect, is gifted, under

10   Mr. Green's analysis, directly to Canada.  That

11   otherwise, even assuming Mr. Green's faulty

12   assumptions, should be divided up between EMEA, the

13   US and Canada on some other basis.  It should be

14   based on goodwill, customer relations, other

15   things, but he just gives it entirely to Canada.

16             On the issue of goodwill, Mr. Green

17   says, you know, "I didn't see any indicia of

18   goodwill," and the Monitor has argued that we don't

19   need to look at goodwill because Nortel wrote the

20   goodwill off of its books.  But that's the wrong

21   goodwill that the Monitor is talking about.  The

22   fact is is that if Mr. Green needed an indicia of

23   goodwill, he should have consulted or at least read

24   Mr. Britven's report, because Mr. Britven says,

25   "You know what?  I looked and found that the

1    purchase price allocations of the purchasers of the

2    businesses found $850 million of goodwill, publicly

3    filed."

4              And so while we don't agree with

5    Mr. Britven at all in most circumstances, as we

6    have already discussed, we do point out that he is

7    the one who pointed to the 850 of goodwill.  We

8    knew about it, and we were operating under the

9    assumption that no one would reference those

10   goodwill -- those purchase price allocations.  CCC

11   didn't feel restricted, but since it is in the

12   record, we need to point out that.

13             Now, the line of business value in use,

14   as I said, all depends on the transferability and

15   the consent.  And Mr. Green has admitted under

16   cross that if you have consent, then his value in

17   use analysis doesn't work.  So let's go to his --

18   and let's look at what he said on that.

19             And this is in the June 5, in the trial

20   transcript, and it appears on page 85 of the

21   compendium.  And in the Q and A it is very clear.

22   We ask him you don't use this value in use analysis

23   if there is consent; right?

24             And he says:

25                  "Well, no.  If there was

1              consent it's a different

2              understanding.  The most that would

3              ever be allocable would be the

4              maximum allocation on page 62 of my

5              report."

6                   So to confirm that we asked it

7              again:

8                   "If there is consent, we're in

9              what you call the maximum allocation

10             of business sale proceeds on page

11             62; right?"

12                  "That's right."

13                  So let's move to Mr. Green's alt max

14        allocation.  And the alt max allocation is flawed

15        as well.  And it is flawed because what he does is

16        listed up at the top of page 62.  The alternative

17        allocation assumes that the purchase price

18        represents capitalized future cash flows to the

19        business -- again, does not assume it has been

20        sold -- and that normal routine returns are in

21        approximately the same relative proportion as RPS

22        percentages.  And Mr. Kinrich criticized that,

23        showing that those percentages are not the same,

24        anywhere near the same.

25                  Well, we would like to show you a

1    little bit very quickly as to why that problem is a

2    huge problem and why Mr. Green recognizes it as

3    well.  So we have already talked about the RPSM.

4    It is personal to Nortel pre-2009.  But we have

5    talked about the RPSM and the MRDA in certain

6    respects as almost the same thing, and they are

7    not.

8              So the RPSM is the residual profit

9    split methodology, which appears in Schedule A to

10   the MRDA.  The MRDA has more than just the RPSM.

11   And when we talk about the RPSM, there has been a

12   tendency at times during the trial to refer to the

13   RPSM percentages.  And what does that exactly mean?

14   Well, there are two percentages that are calculated

15   in the RPSM methodology, so let's look at that.

16              If you go to the MRDA addendum -- and

17   this appears on page 87 of the compendium -- dated

18   December 14, 2007, here is the formula.  Pretty

19   simple:  Determine the operating profit, the

20   accounting operating profit.  Then you deduct two

21   things:  The functional routine return of

22   distributors -- remember, we are not a distributor,

23   except in the Monitor's current legal theories --

24   and deduct the functional routine return of the

25   RPSM participants.  Then and only then you compute

```
 1   the RPSM participants' relative level of R&D stock.
 2   The shorthand of the RPSM percentages is usually
 3   referring to what is in No. 4.  But the functional
 4   routine in No. 3(a) and (b) are also percentages.
 5   And we are not distributors so we are not worried
 6   about that.  We are really looking at 3(b).
 7   So this is the next slide.  This is based on three
 8   different pieces of trial exhibits, and you will
 9   see the difference.  Now, the one on the bottom is
10   what Mr. Green uses.  It is really Q1 2010, and it
11   deals with the four prior quarters, so it captures
12   all of 2009.
13             The last line, R&D capital stock,
14   49.9 percent for Canada, 38.5 percent for the US,
15   11.6 percent for EMEA, that's what Mr. Green looks
16   at and says, "You know, I am going to assume for
17   purposes of my alt max analysis that those numbers
18   are the same as the routine returns."
19             But Mr. Green had all this information.
20   The routine returns were not the same.  They
21   weren't anywhere near the same.  The routine return
22   percentage was not 49.9 percent.  It is
23   25.2 percent and so on.  It is absolutely clear.
24             By using the wrong percentages,
25   Mr. Green in his alternative max scenario has
```

1    grossly distorted the line of business valuation

2    exercise.

3              Now, to just show the comparison, we

4    have run those numbers based on 2006 to 2008 on the

5    top.  And you will see the R&D capital stock

6    percentages are different.  Stop here for a moment.

7              When we talk about the five-year

8    look-back period and Mr. Malackowski, this is where

9    the rubber hits the road.  The accelerated

10   depreciation of intellectual property assets on a

11   five-year look-back period moves the needle, moves

12   the R&D capital stock percentage away from the US

13   and EMEA directly towards Canada.  And you can see

14   over the three-year period at the top, the average

15   for Canada was 41.7 percent.  In 2010 it is

16   almost -- it is some eight points higher.  If that

17   five-year look-back was a ten-year look-back or a

18   20-year look-back, the movement of those

19   percentages in favor of Canada would be much

20   different.  Okay?

21             So when we are looking at this from a

22   Mr. Green perspective, we asked him a question.

23   Again, looking at the bottom.  That's the actual

24   numbers.  These are the actual numbers from Q1

25   2010.  Mr. Green had access to the top line, but he

1   says the bottom line and the top line are the same.

2   We are using the bottom numbers.

3               At trial we asked Mr. Green:

4                    "And if the routine returns

5                    were not approximately in the same

6                    relative proportion to the RPS

7                    percentages, then your calculation

8                    would be incorrect."

9               So what does Mr. Green say?

10                   "Well, it's not that my

11                   calculation would be incorrect.  The

12                   fundamental underlying construct of

13                   this analysis...wouldn't really be

14                   correct."

15              THE CANADIAN COURT:  Can I ask you a

16   question, Mr. Bromley?

17              MR. BROMLEY:  Yes, Your Honor.

18              THE CANADIAN COURT:  When he is talking

19   about -- you are talking about the real

20   percentages.  He is talking about what he calls the

21   same relative proportion as RPS percentages, which

22   I am not quite sure what he is talking about.  Did

23   this cross go on and get him to acknowledge that

24   the same relative proportion was not the same, that

25   the relative proportion was not the same?  Do you

1    understand what I am asking?

2              MR. BROMLEY:   I think so, Your Honor.

3    I think I understand what you are saying, and I

4    believe that what he is saying is that "I didn't do

5    the work to see whether they were the same.  I just

6    assumed they were.  And if they are different, then

7    the fundamental underlying construct of the

8    analysis would not be correct."

9              Now, it is important to keep in mind

10   why -- I will go back a slide -- when you look at

11   these percentages, why it matters.  R&D capital

12   stock is in theory trying to take into account

13   something about the share of ownership, if you

14   will, in the intellectual property exercise on an

15   operating basis for distributing operating profits;

16   okay?  That's what the R&D capital stock percentage

17   is supposed to be calculating.

18              The routine returns are very important,

19   because one of the major criticisms the Internal

20   Revenue Service had in the 2001 to 2005 period was

21   that the routine returns going back to the United

22   States were not high enough.

23              In 2001 to 2005 Nortel used something

24   called return on net assets to calculate the

25   concept of routine returns.  Return on net assets

1    was based on bricks and mortar.  Bricks and mortar.

2    Canada had more bricks and mortar because there

3    were factories and distribution centers before the

4    divestiture of the manufacturing facilities.  And

5    the IRS was not happy with that because it wasn't

6    giving credit to the US in terms of the sales and

7    marketing that were happening in the US.  The vast

8    majority of the revenue being generated in the US

9    wasn't getting credit under the formula.

10            So in this addendum in 2007 it was

11   changed, and you can see the routine returns are

12   very high to the US.  And the concept of routine

13   returns in this RPSM analysis is that you are doing

14   something in the group setting.  There are expenses

15   that you are incurring that are higher than they

16   should be if it was just for you who you are doing

17   it for.  Okay?

18            So if you look at the breakdown of the

19   routine returns -- and this is in the trial record

20   as well -- the US had substantially more sales and

21   marketing expense than anyone else.  Canada, on the

22   other hand, had overhead, G&A, headquarters

23   expenses.  And while it was higher than it was

24   generally for the others, it wasn't nearly as high

25   as the sales and marketing expenses for the US.

```
 1              So it was in 2007 that the routine
 2    return structure was changed in addendum -- in the
 3    third addendum dated 2007.  So that the formula
 4    that would yield the percentages would say the
 5    first swipe is we are going to give more credit on
 6    routine returns, addressing the IRS issue.
 7    Therefore, we are giving more credit to NNI.  And
 8    then we are going to calculate the R&D capital
 9    stock after that.
10              For Mr. Green to ignore the fact that
11    the routine returns were substantially different,
12    what he was doing was effectively, again, shifting
13    substantial value away from Canada to the US.  And
14    now Mr. Green doesn't --
15              THE US COURT:  Yes.
16              MR. BROMLEY:  I am shifting -- I am
17    sorry -- from the US to Canada.
18              And Mr. Green admits that if the
19    routine return percentages are the same as the
20    capital stock percentages or not the same, that his
21    entire fundamental premise fails.
22              So on the line of business analysis, we
23    submit, Your Honor, that the evidence is entirely
24    clear that Mr. Green's first analysis, the value in
25    use, must fail, and his alt max must fail.  And as
```

1    a result, there is simply no evidence from the

2    Canadian Monitor about allocation, the proper

3    allocation percentages of the line of business

4    transactions.

5            Now I will move quickly to the patent

6    portfolio.  I think I have already summarized it

7    enough, but I will just do it one more time.

8            Mr. Kinrich uses a discounted cash flow

9    analysis with respect to the 4.5 billion of

10   proceeds.  And the discounted cash flow analysis is

11   a formula that, once you have the inputs that we

12   have here, when you know what the fair market value

13   of the assets are, you are able to actually fill in

14   the information pretty easily.

15           Now, one of the criticisms of

16   Mr. Kinrich was that he used information from the

17   IPCo model.  Now, why did he use information from

18   the IPCo model?  He used it because it was

19   dependable.  It had been pressure-tested by Lazard

20   and Global IP.  It had been developed by all of the

21   participants, by the Monitor, the US Debtors, the

22   Bondholders, the Creditors' Committee.  He reviewed

23   royalty rates, markets, the targeted companies, the

24   location of the patents, the markets by franchise;

25   all the way that IPCo model measured these things.

```
 1                  He also recognized that effectively
 2     what Rockstar bought was IPCo.  Mr. Veschi
 3     developed IPCo.  Ms. McColgan was his
 4     second-in-command.  If you go to the Rockstar
 5     website today, Mr. Veschi is the CEO and
 6     Ms. McColgan is the second-in-command.  And they
 7     are in the business of licensing and enforcing
 8     patents.  That's exactly what IPCo was about.
 9                  In order to pressure-test his analysis,
10     Mr. Kinrich looked to Mr. Zenkich.  You may recall
11     Mr. Zenkich from Red Chalk.  Mr. Zenkich looked
12     over the shoulder of what Global IP had done and he
13     found it to be effectively 95 percent accurate.  So
14     we believe that Mr. Kinrich's analysis with respect
15     to the patent portfolio and his use of the IPCo
16     model was entirely appropriate.
17                  Now, Mr. Green, on the other hand,
18     has --
19                  THE CANADIAN COURT:  Can I just ask you
20     a question about that?
21                  MR. BROMLEY:  Yes, Your Honor.
22                  THE CANADIAN COURT:  Mr. Kinrich backed
23     into a discount rate based upon the Rockstar sale
24     price, and he did not know -- at least the
25     buyers -- Rockstar did not know the IPCo cash
```

1    flows, and therefore, he didn't know what cash

2    flows were being used by Rockstar in coming up with

3    the purchase price.  Doesn't that raise an issue

4    with respect to the discount rate he used?

5                MR. BROMLEY:  Well, I am not sure why

6    that would matter, in all honesty, Your Honor.

7                THE CANADIAN COURT:  Because, well, the

8    discounted cash flow requires, A, cash flow, and B,

9    what someone is prepared -- what discount rate

10   someone is prepared to use to measure that cash

11   flow.  But we don't know what cash flow Rockstar

12   used to get its purchase price.

13               MR. BROMLEY:  Well, there are two

14   responses to that.  You are right.  We don't have

15   Rockstar's cash flows, but we do know that Rockstar

16   bought the IPCo business.  And the IPCo model was

17   put together by Mr. Veschi and Ms. McColgan, and I

18   think there is every reason to be able to infer

19   from all the evidence that that's exactly what

20   Rockstar is doing, is implementing the IPCo model.

21               Also, you have to recognize that the

22   purchasers of the patent portfolio had reason to

23   buy it because they were potential targets with

24   respect to IPCo.  So it wasn't happenstance that

25   brought all of the big players in the tech business

1    into our offices in 2011.  They were there for a

2    particular reason.  And yes, you can argue that

3    they were paying certain amounts for defensive

4    purposes, but we think that it is entirely

5    appropriate to take the IPCo model, which was

6    seriously vetted, and use that as the basis.

7              Now, the other thing is that we do know

8    the weighted cost of capital that each one of the

9    members of the Rockstar Consortium used or had at

10   the time, and Mr. Kinrich took into account that

11   weighted average cost of capital.  It is accepted

12   in finance that companies will look at transactions

13   and take into account how much it is going to cost

14   them to finance -- to obtain financing to do the

15   deal.  It is no different than if you or I walked

16   out and tried to buy a house or a car.  We are

17   taking into account how much we are going to have

18   to pay in order to decide whether or not to buy.

19              And in Mr. --

20              THE CANADIAN COURT:  Is there evidence

21   that there were different levels of business

22   between what this business was and what those

23   weighted average cost of capital were taken from?

24              MR. BROMLEY:  Well, if you look at

25   the -- I don't know if we can bring it up, but I do

1    have slide 20 from Mr. Kinrich's deck.  And the

2    title of it -- it's not in the compendium, I

3    apologize -- is "Discount Rate Consistent with

4    Relevant Market Data," and it has the weighted

5    average cost of capital for Rockstar Consortium

6    members in 2011.  And it ranges from a low for 8.3

7    percent for Ericsson to a high of 15.7 percent for

8    Sony.

9            And Mr. Kinrich -- here we are; we have

10   it up on the screen -- was able to determine that

11   the median average weighted cost of capital for

12   communications equipment companies during that

13   period ranged from 11.6 percent to 16.5 percent.

14           THE CANADIAN COURT:  Does it matter

15   that they are more mature, those businesses?

16           MR. BROMLEY:  Well, it depends on your

17   point of view.  If you look at the weighted average

18   cost of capital, you have to look -- and

19   Mr. Kinrich talked about this in terms of his

20   reliance on IPCo.

21           You know, I sense in Your Honor's

22   question the idea that perhaps we should be looking

23   at -- Mr. Kinrich should have been looking at a

24   higher discount rate, like the discount rate that

25   Lazard was using when it was putting together IPCo,

1    which I think was 25 to 40 or 45 percent.

2              And the maturity of the business is a

3    good question; right?  The maturity of the IPCo

4    business prior to the sale, prior to the bids

5    coming in, was a start-up.  And that's when Lazard

6    was putting those numbers together.  We didn't know

7    whether it would succeed and what people thought it

8    would be worth in the marketplace.

9              However, when you are looking at

10   Rockstar after the purchase and what the potential

11   purchasers were willing to pay, each one of them is

12   a mature business, and they would be able to put

13   behind it the wherewithal to effectively fully

14   capitalize Rockstar in a manner that would have

15   been admittedly more difficult for the creditor

16   bodies within the Nortel community.

17             THE US COURT:  It is one of the reasons

18   they decided not to proceed with the IPCo.

19             MR. BROMLEY:  Look, there's lots of

20   fancy words.  But before the bids came in, people

21   were wondering whether it was worth the risk.

22   Clearly, that was a question.

23             THE US COURT:  Yes.

24             MR. BROMLEY:  The US had a billion

25   dollars on its balance sheet.  Canada didn't.

1   Ms. Hamilton said they were worried about that.   It

2   wasn't as if anybody wasn't worried about it.

3              But once you are sitting in a room,

4   frankly, with people who have more money than

5   God -- I mean, the cash on hands of Apple and

6   Google and all of these other companies sitting in

7   our offices was larger than the gross national

8   product of half of the world, if not more; right?

9              So when you are sitting there thinking

10  about whether Apple has enough money to pay

11  4-1/2 billion when they have 190 billion on their

12  balance sheet, you know, I think all these folks

13  once they decided to get behind it were going to

14  capitalize the business in a manner that was vastly

15  different than we would have capitalized it if we

16  were going to run it.  So certainly, we would have

17  a higher discount rate if we were running IPCo.

18             And what Mr. Kinrich was saying was

19  effectively, they bought IPCo.  And then you have

20  to look at their weighted cost of capital, which is

21  appropriate because they bought it.

22             And I think it is important -- and I

23  will move on now to Mr. Green's view of the patent

24  portfolio.  But it is important to note that as we

25  talk about the patent portfolio, you know, one

1   thing that there isn't any debate about is that

2   most of the value of the patent portfolio resided

3   in the US patents.  The only question is whether or

4   not the value of those US patents is shared

5   together, as the EMEAs would say; is entirely

6   resident in Toronto, as the Canadians would say; or

7   is the value for the US, as NNI would say.

8               Now, when you look at Mr. Green's

9   patent portfolio analysis, as I said, he relies in

10  his primary report, his first report, on one thing,

11  which is that "I have read the MRDA and I have

12  talked to counsel to the Monitor, and my assumption

13  is that the Canadian Debtors own the IP, and

14  therefore, the US Debtors and the EMEA Debtors get

15  none of that value."

16              There is a very small amount that is

17  given in terms of workforce in-place, and again,

18  that primarily relates to Mr. Veschi and

19  Ms. McColgan.

20              He then in his follow-up report on page

21  20 in Footnote 30 introduces an alternative, which

22  is Appendix P.  So this is page 20, Footnote 30.

23  If you look at this, it says two things.  It says,

24  "My initial report" -- this is halfway through the

25  footnote, and the compendium cite to this is page

1    92, halfway through.   "My Initial Report determines

2    the appropriate compensation to the US and EMEA

3    Debtors for surrendering license rights related to

4    the operating businesses" was compensated as part

5    of the allocation of the business sale proceeds.

6    There is a mistake there, which I will correct in a

7    moment.

8              Then he says, "I have also considered

9    the effect of assuming that IPCo was run as a

10   business by Nortel and its profits split in

11   accordance with the terms of the MRDA."  That

12   effectively is value in use again and effectively

13   using the RPSM inappropriately.

14             So there is no question that Mr. Green

15   believes that the value of license rights not

16   directly transferred to the purchaser have to be

17   taken into account and allocated.  This appears

18   on -- sorry.  I apologize, Your Honor.

19             THE US COURT:  It is fine.

20             MR. BROMLEY:  Excuse me.  I apologize

21   for that.

22             So -- and as part of the allocation --

23   this is Exhibit TR21616, and it is his rebuttal

24   report:

25                       "The value of the license

```
 1                    rights was not directly transferred
 2                    to the purchaser, but I am of the
 3                    view that the value of the
 4                    surrendered licenses must be taken
 5                    into account and allocated.  As part
 6                    of the allocation of proceeds from
 7                    the business sales, the debtors --
 8                    US and EMEA Debtors have already
 9                    been compensated for the value of
10                    the MRDA license rights they
11                    surrendered."
12            This is simply incorrect.  There have
13   been certain patents that were transferred in their
14   entirety, the predominant use patents.  We admit
15   that with respect to the predominant use patents,
16   the value was obtained in the line of business
17   sales, and that is allocated per the line of
18   business sales.  But, however, you will recall that
19   Mr. Green points out that there is a large group of
20   patents that are, quote, shared IP.  Okay?  They
21   were used in the line of business sales, and they
22   were not sold in the business sales.
23            What happened there was very simple.
24   Mr. Green misunderstands the licenses in the line
25   of business sales.  So here is an example on the
```

1    screen.  We have a patent.  That patent is a shared

2    patent.  It applies to two lines of business.  We

3    are using as an example CDMA and MEN.  And the

4    transactions take place.

5              The view that Mr. Green adopts assumes

6    that there is no shared IP, that effectively

7    those -- the shared IP goes in those sales

8    transactions.  But what actually happened was that

9    there were nonexclusive licenses.  In the CDMA

10   transaction the nonexclusive license went to

11   Ericsson.  In the MEN transaction the nonexclusive

12   license went to Ciena.  That is the keystone of the

13   entire patent portfolio exercise and for which

14   Mr. Veschi is justly proud, saying that by focusing

15   on this we retained an enormous amount of patent

16   rights that we could then sell separately in the

17   Rockstar transaction.  What this means is that not

18   only could you sell it in the Rockstar transaction

19   but you could have entered into multiple other

20   nonexclusive licenses for that same technology.

21             So when you are looking at Mr. Green's

22   alt max analysis, you have to taken into account

23   the fact that he is incorrect that the shared IP

24   was compensated in the line of business sale

25   transactions.  It was compensated for in the

1    Rockstar transaction.

2              I am sorry.  This is Appendix P.  I got

3    it mixed up.  Not alt max.  They are all wrong, so

4    it is hard to keep them straight.

5              When we were talking earlier, we

6    mentioned about Mr. Kinrich and the fact that he

7    actually did take into account the Canadian theory,

8    and he ran an analysis based on that.  And you

9    recall this slide, which is slide 23 from the

10   Kinrich deck, and there are three columns here.

11   The first column assumes that in-use patents

12   comprise 33 percent of the patent portfolio.

13   Mr. Kinrich picked 33 percent, which he thinks is

14   too low, because in the Cox and Berenblut report,

15   they used the number of 33 percent based on a

16   snapshot taken by Gillian McColgan with respect to

17   patents that were in use but leaving out patents

18   that had been in use and were still anticipated to

19   be in use but were not in use at that particular

20   moment in time.

21             On the far right, this is Mr. Kinrich's

22   analysis which we believe is an appropriate one,

23   where the IPCo model is used, and the assumption is

24   that IPCo is a service and, therefore, a Nortel

25   product.

1                    So even when you are talking about the

2       Canadian analysis about it is limited to products,

3       this is where we are saying that IPCo is a service,

4       and a product includes a service.  We don't think

5       there is any true debate about whether or not a

6       licensing service qualifies as a service.  And

7       that's how -- on the basis which we run these

8       numbers.  Mr. Kinrich picks 60 percent as just a

9       midpoint.

10                   Now, the worst-case scenario.  If you

11      look at the far left-hand corner, far left-hand

12      side, even under the Canadian analysis, even

13      assuming their reading of the MRDA is correct, we

14      should be getting 25 percent of the value of the

15      patent portfolio, not zero.  So we aren't arguing

16      for that by any stretch of the imagination, but

17      this is up there to respond to two things:  One,

18      that Mr. Kinrich only was doing the work relating

19      to the US analysis, which is not true.  He ran

20      Canada's numbers.  And number two, that in the

21      event that the Canadian legal theory is adopted, we

22      are still talking about at least 25 percent of the

23      value of the $4.5 billion coming to the US.

24                   And when I say "at least," because it

25      is very important to note that Cox and Berenblut

1    use numbers which we believe are not sustainable in

2    terms of the percentage of the portfolio that were

3    in the type of products that fit in boxes that

4    would fit into the definition of the Monitor.  We

5    believe it is a substantially higher number.  But

6    at a bare minimum, assuming that that faulty

7    information is correct, that 33 percent, that is

8    the number that you would come up with.

9              And it is important, obviously, to

10   repeat once again:  You only get to that if we

11   don't have the exclusive rights under the MRDA.

12   Right?

13             Now let's talk about Mr. Malackowski.

14   Mr. Malackowski is the contribution theory.  And

15   there is a lot about Mr. Malackowski that we agree

16   with, and in particular, you have heard about our

17   adoption of the useful life analysis.  Professor

18   Tucker checked it, confirmed it, agreed with it and

19   adopted it; that the five-year look-back employed

20   by the Canadian Debtors is simply incorrect and

21   another element of shifting value to Canada as part

22   of the RPSM.

23             Also important to note is, as

24   Mr. Maguire did yesterday, the RPSM does not apply

25   to the sales of businesses and should not apply to

1     the sale of the patents.

2                   We go to the famous Malackowski slide

3     22.  It shows the vast majority of the high-value

4     patents were produced prior to the five-year

5     look-back period.  We agree with that, and we agree

6     that the five-year look-back period is entirely

7     inappropriate.

8                   Now, when you look at the contribution

9     percentages that are yielded by Mr. Malackowski's

10    analysis, this is what you get:  About 50 percent

11    for the US, about 32 percent for Canada.

12                  Now, while we like Mr. Malackowski's

13    analysis a lot, there is one thing that he missed.

14    He missed an important step in calculating

15    contribution.  And the testimony relating to this

16    came up in Mr. Cooper's, Mr. Richard Cooper's

17    testimony.  You will recall he was the transfer

18    pricing expert for the EMEA Debtors.

19                  Mr. Cooper's testimony related to the

20    cost-sharing agreement years.  You will recall the

21    cost-sharing agreement years were 2000 and prior

22    and that the cost-sharing agreements were

23    terminated as of December 31, 2000, and that as a

24    result of that, the US and EMEA received fully

25    paid-up licenses for all of the IP created prior to

```
 1    the date of the termination.

 2              The cost-sharing agreement period ran a

 3    different transfer pricing methodology:

 4    Cost-sharing.  So what happened was during that

 5    period of time payments were made to, in effect,

 6    reimburse R&D that was being done elsewhere.  They

 7    were reimbursement payments, sharing of costs.

 8    RPSM is about pooling.  Cost-sharing is about

 9    reimbursing.

10              So we asked Mr. Cooper a few questions.

11    So under the CSA, whatever R&D a participant pays

12    for constitutes its economic ownership?  He agrees.

13                   "And the money that an entity

14                   spends on R&D it conducts in its own

15                   territory is part of that?

16                   "Yes.

17                   "And it could include the R&D

18                   that an entity pays for to an

19                   independent contractor?

20                   "I would think so.

21                   "And it could include R&D that a

22                   counterparty to a cost-sharing

23                   agreement performs but for which the

24                   first entity received the benefit

25                   and thus makes a transfer pricing
```

```
 1              adjustment?

 2                   "Correct.

 3                   So basically, whoever pays for

 4              the R&D, regardless of whether or

 5              not they do it, has an economic

 6              ownership proportionate to the

 7              amount it paid?

 8                   "That's correct."

 9                   Well, the problem with

10   Mr. Malackowski's analysis is that he doesn't take

11   into account the fact that during the cost-sharing

12   period, 2000 and prior, the moneys were

13   reimbursements, and there is a lot of money that

14   the US had paid.  So the numbers need to be

15   adjusted.

16              So if you take into account the slide

17   22, the famous slide 22, and you take into account

18   when the cost-sharing took place, more than

19   80 percent of the R&D responsible for the

20   high-interest patents took place during the

21   cost-sharing years.  We did a calculation running

22   those numbers.  It was Ms. Ryan did this.  And

23   these are the corrected percentages.

24              So to the extent that the Courts are

25   inclined to adopt the contribution theory, which we
```

1    don't support, we believe that the error that

2    Mr. Malackowski had in his calculations needs to be

3    taken into account.

4              Now, Your Honors, that more or less

5    concludes where I was on the valuation exercise.

6    And there are three very short things I want to

7    mention to conclude.

8              The first is that yesterday Mr. Coleman

9    talked about issues relating to the post-petition

10    conduct of the Monitor.  And it is clearly an

11    emotional issue for the Monitor, and I wanted to

12    give a little bit of clarity as to why we are where

13    we are on that.

14              We had Ms. Hamilton testify at

15    deposition and at trial.  We had Mr. McDonald

16    testify in deposition.  And quite simply, their

17    testimony is inconsistent.  And Mr. McDonald says

18    quite clearly in terms of the litigation position

19    on the products argument happened after the failure

20    of the third mediation and was first disclosed in

21    connection with the pleadings in this case.

22              Ms. Hamilton, on the other hand, says a

23    variety of things.  At one point in answering a

24    question from Ms. Block she said it is ridiculous

25    to think that we didn't think of it beforehand.

1    Certain other of her testimony says we weren't

2    focusing on that.  We weren't spending the time and

3    money to figure out what our final positions are.

4              In all honesty, it is difficult for us

5    to figure out exactly what the Monitor has been

6    saying on this.  And I think it boils down,

7    therefore, to two things for us.  One is, if the

8    Monitor knew about this legal theory and didn't

9    disclose it, then that was wrong.

10             THE CANADIAN COURT:  Well, why do you

11   say that?  Wasn't there an agreement as to when it

12   was to be disclosed?

13             MR. BROMLEY:  Yes, there was, Your

14   Honor.  It was the IFSA.  And the IFSA said the

15   parties had a good-faith obligation to negotiate

16   and then to later mediate to determine allocation.

17             Now, without going into the actual

18   content of the mediations, we exchanged substantial

19   legal briefing, very similar to all the legal

20   briefing that we have done in this case, on three

21   separate occasions, on three separate occasions.

22             THE CANADIAN COURT:  We can't go into

23   what discussions were taking place during

24   mediation.

25             MR. BROMLEY:  I am certainly not going

1    into that, Your Honor.  But I am telling you that

2    there were three sets of briefings, and the one

3    thing we do know is that Mr. Ray, Mr. McDonald and

4    Mr. Bloom have all testified that this legal theory

5    was not disclosed until --

6              THE CANADIAN COURT:  But now you are

7    going into what took place.

8              MR. BROMLEY:  No, Your Honor.  We are

9    talking about what is already in the evidence.  I

10   am not talking about anything that took place.  I

11   am talking about what is in the record of this --

12             THE CANADIAN COURT:  Well, maybe it

13   shouldn't be in evidence.

14             MR. BROMLEY:  Excuse me, Your Honor?

15             THE CANADIAN COURT:  Maybe it shouldn't

16   be in the evidence.

17             MR. BROMLEY:  Well, Your Honor, the

18   testimony is in the record.

19             And the point I am trying to make,

20   though -- right? -- is that Mr. Coleman was talking

21   about estoppel arguments and the like.  Our view is

22   that there is only two ways to look at this:

23   Either they knew about it and should have told us,

24   or that they didn't.  And we are happy to take the

25   point that they didn't know about it and that it

```
 1    first came up in May of 2013.  But if it did come

 2    up at that point in time, it goes to the weight of

 3    the argument that the Monitor's counsel is now

 4    making.

 5              Remember, the argument is based on

 6    there is no doubt; it is absolutely crystal clear;

 7    it is not ambiguous; this is the only way to read

 8    the agreement.  If it took four years after the

 9    filing of this proceeding for that understanding to

10    be finally enunciated, we think that it is

11    probative as to how unambiguous that argument is.

12    And that's all I have to say on that.  We don't

13    want to get into a stone-throwing exercise.

14              Now, two other things, Your Honors,

15    that I would like to conclude with.  Right?

16    First -- and I won't go through this.  It is all --

17    in any sort of detail.  It is in our proposed

18    findings of fact and conclusions of law.  It was in

19    our opening.

20              The amount of money that was earned in

21    the United States and the amount of value that was

22    contributed to the overall Nortel Group by the

23    United States by Nortel Networks Incorporated is

24    clearly stated in the record.  We had more

25    employees.  We earned more money.  We had bigger
```

1    customers.  There is simply no debate about that.

2    Even Canada's valuation expert, Mr. Green, who I

3    don't think has a leg to stand on, has recognized

4    that the value of the US business lies within NNI.

5                Now, that leads us to the next and

6    final point that I would like to talk about, which

7    is, when we are talking about what happened in

8    these cases, we can't lose sight of the fact of

9    what happened in the IFSA and the FCFSA, as we call

10   it, the Interim Funding and Settlement Agreement

11   and the Final Canadian Funding and Settlement

12   Agreement.

13               Through the course of the first 12

14   months of this case -- can you bring up slide 19 --

15   the US Debtors provided $453 million -- I am sorry.

16   It is this one.

17               $75 million in the form of a DIP loan

18   on the first day of the case, $30 million in the

19   form of a transfer pricing payment that happened

20   before the transfer pricing system was shut down.

21   In June $157 million in the IFSA, $191 million in

22   January 2010 under the Canadian Final Funding

23   Settlement Agreement.  $453 million.

24               So the focus has been in this case that

25   when we are talking about the sales, we focus on

```
 1    the findings that were made in connection with the
 2    sales.  But we can't lose sight of the fact that in
 3    connection with these two agreements and the DIP
 4    loan and the transfer pricing payment, we needed
 5    the authorization of this Court to do it here in
 6    the United States, and that the reason, the only
 7    reason that this debtor entity would spend a half a
 8    billion dollars was to facilitate these sales so
 9    that it would have a fair allocation with respect
10    to the sales proceeds.
11             THE US COURT:  And obviously because
12    there was a finding that it was in the best
13    interests of the debtors' estate.
14             MR. BROMLEY:  Exactly, Your Honor; in
15    the best interests of these debtors' estates.
16             THE US COURT:  Yes.
17             MR. BROMLEY:  Mr. Zarnett mentioned
18    yesterday that generating a big pot of cash for
19    everyone generally was apparently the goal.  But
20    that loses sight of the fact that this Court had to
21    make very specific findings on each of these
22    matters that it was in the best interests of these
23    estates.  And that was premised on a common
24    understanding of how the MRDA worked and a common
25    understanding about what it meant.
```

```
 1            In the IFSA there is mention of the
 2   MRDA and the IP licenses.  It is clear in the IFSA
 3   that people thought about these licenses and that
 4   if those licenses were to be surrendered in the
 5   context of any sale transaction, the seller -- I
 6   mean the party delivering a license termination
 7   would be deemed to be a seller.
 8            The Monitor somehow says that that's an
 9   irrelevancy now.  Now the Monitor is arguing that
10   the order in which these transactions took place
11   somehow eliminated the right that we would have to
12   share in the patent portfolio sale proceeds.  It
13   cannot be the case that if we had decided to do the
14   Rockstar transaction first and sell all the
15   businesses second, that we would have a right to
16   the patent portfolio proceeds, but that if we did
17   it the other way around, we wouldn't.  That is
18   exactly the sort of "gotcha" that the IFSA was
19   intended to avoid.  But that is exactly the result
20   of the argument that the Monitor is making.
21            And as we mentioned before, the same
22   exact thing happened in connection with the Final
23   Canadian Funding and Settlement Agreement.  It
24   allowed the $2 billion claim against the Canadian
25   Debtors.  It provided for $190 million of cash to
```

1    Canada, without which it wouldn't have been able to

2    continue to survive.  But it also preserved the

3    MRDA.  It said the parties will not terminate it

4    without the written consent of all of the parties

5    and without the written consent of the Creditors'

6    Committee and the Bondholders.

7                  That provision, paragraph 28 of the

8    Final Canadian Funding and Settlement Agreement,

9    was put in there intentionally to make sure that

10   there would be no mischief with respect to the

11   licenses.

12                 And put that in the calendar, the time

13   line that we are talking about.  The Final Canadian

14   Funding and Settlement Agreement, the motion was

15   made in December of 2009.  The first two

16   transactions for sales had closed, and the IPCo

17   exercise was in full bloom.  We had sold Enterprise

18   and we had sold Carrier Networks, or CDMA, to

19   Ericsson and Avaya respectively, and we were in the

20   process of selling MEN and the other lines of

21   business.  We already hired Global IP.  We had

22   already hired Lazard.  We already had our first

23   meetings with respect to the creation of IPCo and

24   created the steering committee that you heard about

25   to direct the creation of IPCo.

1            It was in that context and in that
2     timeframe that the final Canadian Funding and
3     Settlement Agreement was entered into and that the
4     preservation of the MRDA and those exclusive
5     licenses was agreed to.  That's why it is in that
6     agreement.  And we can't lose sight of that.
7            So, Your Honors, I would like to wrap
8     up very quickly.  We do have one last slide, which
9     I think is worth talking to.
10           So when you are looking at what we are
11    talking about here with respect to the valuation of
12    the US business, we had asked some questions of
13    Mr. Cox, who wrote the report with Mr. Berenblut
14    but did not testify at trial.  We talked about
15    throughout the trial what the US possessed in the
16    US:  The rights to operate the business with
17    respect to the intellectual property, to exclude,
18    the right to sublicense.  All of the value was
19    value of the US Debtors.  And there is not a shred
20    of evidence that indicates that NNL had any right
21    to do any of that within the United States.
22           So we put during his deposition
23    questions to Mr. Cox.  We said:
24                "Did you undertake to assess
25                the value of what a buyer would have

```
 1              paid to NNL to take all of NNL's
 2              rights under the patent portfolio
 3              subject to whatever NNI's and the
 4              EMEA Debtors' exclusive licenses
 5              were?
 6                   "Answer:  "I did think about
 7              that, yes.
 8                   "Did you assess what that
 9              fictional buyer would have paid?"
10                   Mr. Cox said, "Well, I thought
11              about it and amongst the
12              possibilities I thought was that
13              they would pay a relatively small
14              amount, certainly a lot less than
15              what was paid in the Rockstar
16              transaction, possibly nothing."
17                   Now, what is interesting about this
18     comment of Mr. Cox is that it is entirely
19     consistent with an email that Mr. Doolittle sent in
20     the fall of 2008, who said, "Wow, I thought our
21     intellectual property was worth a lot more."  This
22     was an email to Mr. Look, when he said two-thirds
23     of the value was going to have to go to the US and
24     to EMEA.
25                   So with that, Your Honors, I will cede
```

```
 1    the podium to Mr. Qureshi, I believe, in Toronto.

 2                  THE US COURT:  Thank you, Mr. Bromley.

 3                  THE CANADIAN COURT:  Mr. Qureshi.

 4                  THE US COURT:  Mr. Qureshi, good

 5    afternoon.

 6                  MR. QURESHI:  Good afternoon.  Good

 7    afternoon, Judge Gross, Justice Newbould.

 8                  For the record, Abid Qureshi, Akin Gump

 9    Strauss Hauer & Feld on behalf of the Official

10    Committee of the US Debtors.

11                  Your Honours, my comments will be

12    confined to the pro rata theory.  Mr. Leblanc will

13    follow me with respect to the same theory.

14                  I will do my best to see to it that

15    both of us can get done as close to 5 o'clock as

16    possible.

17                  And so with that, I'll jump right in

18    and I'll start on a similar note to where

19    Mr. Bromley ended.  There are a bunch of reasons

20    why the pro rata theory has got to fail.  And I

21    will get into some of them, but the most

22    fundamental one of those is that it is a theory

23    that does not allocate to any estate the value of

24    that which the estate gave up in the sales process.

25                  Instead, it is very clearly a
```

1    results-oriented theory, and it has as an objective

2    transferring value from the US Estate to make that

3    value available to non-US creditors.

4              It should come as no surprise to Your

5    Honours that it is a theory that is not being

6    supported in this case by any of the estates, the

7    ones who actually agreed to the joint sale of their

8    assets.

9              So what do the proponents of this

10   theory argue is the source of the Courts' authority

11   for such an extreme remedy?

12             I want to turn to a slide Your Honour

13   saw yesterday in the UKP presentation.  If we could

14   have that pulled up, what they say is that the task

15   before Your Honours is to exercise your broad

16   discretionary jurisdiction.  They concede that

17   there is no direct or express statutory authority,

18   either in the CCAA or in the Bankruptcy Code that

19   would allow this result.

20             So they say Your Honours' broad

21   discretionary jurisdiction should be guided by two

22   factors.

23             First, is there either a direct or by

24   analogy legal basis that supports exercising their

25   jurisdiction in this way?

1              And second, is there a limiting legal

2      constraint that should prevent exercising it in

3      that way?

4              So I want to start with the first of

5      these points, is there a legal basis.

6                  Now, the UKPC concedes that there is no

7      direct legal basis, and so they then turn to a

8      whole bunch of different theories that they point

9      to by analogy, and I'm going to pull them all up on

10     this slide.

11             And I won't spend a lot of time on

12     these because, frankly, Your Honours, I don't think

13     they take much analysis to dispense with.

14                 Now, in the centre of this chart, there

15     is the Nortel globe logo that was part of the

16     Nortel logo throughout, and the UKPC, they refer to

17     this logo several times in their submissions and

18     they say it symbolizes the global integration of

19     Nortel, and they went to great lengths at trial to

20     introduce evidence as to the integrated manner in

21     which Nortel operated.

22             And they tell Your Honours that those

23     facts are largely undisputed, and they are right,

24     they are undisputed.  But they are also irrelevant

25     to this theory.  The fact that Nortel operated as a

1    globally integrated enterprise does not provide any

2    support or any justification for this theory.

3                    Like most multinational enterprises,

4    Your Honours, Nortel operated in a highly

5    integrated way.  But it does not come even close to

6    justifying, even if Nortel were an entirely

7    domestic enterprise, whether in Canada or the US,

8    the wholesale disregard of the corporate form that

9    the pro rata theory demands.

10                   Now, turning quickly to their various

11   theories by analogy.  Joint venture, well, Nortel

12   is not a joint venture.  The MRDA says it is not a

13   joint venture.  They concede it is not a joint

14   venture, so not a lot to be found in those

15   principles.

16                   Equitable receivership, the same thing,

17   Nortel is not in equitable receivership.

18                   One of the stranger ones they cite is

19   the hotchpot rule, going further to suggest that

20   the rule actually applies here, but the hotchpot

21   rule on its face, and again, they acknowledge this

22   in their pleadings too, applies to a single debtor.

23   It is meant to deal with a situation where one

24   debtor has proceedings in multiple places and

25   stands for the proposition that a creditor can only

```
 1    assert a claim once.

 2              That too is not Nortel.

 3              Then they return to unjust enrichment,

 4    and here they propose it not as a direct

 5    justification for unjust enrichment but -- for pro

 6    rata, I should say, but rather as a basis to

 7    disallow the US theory.  But that makes no sense

 8    because the US theory is based upon the contractual

 9    rights that the US Estate has pursuant to the MRDA.

10              So that then leaves us with

11    international insolvency principles, and this is an

12    area where the UKPC spends a lot more time.  They

13    put forth the testimony of two international law

14    experts, Judge Clark and Professor Westbrook.

15              Now Your Honours may recall that Clark

16    and Westbrook, they disagreed, as it turned out,

17    about a lot that was in their joint report, but on

18    two points they did agree.

19              And the first is that there is no rule

20    of international law in existence today that

21    permits a pro rata distribution based on a single

22    pool approach that is being advocated here.

23              And the second point on which they

24    agree is that such a rule has not even been

25    proposed by UNCITRAL or by any other global
```

1   organization.  In fact, Clark and Westbrook don't

2   agree on what international law should one day

3   provide for on this point.  It was that portion of

4   their joint report that Judge Clark disavowed.

5            And don't forget, Your Honours, that

6   Professor Westbrook was the one who refused to

7   testify at trial.  We didn't hear mention of them

8   during the UKPC's closing, and I guess that

9   shouldn't come as a surprise.  They seem to have

10  switched horses and now prefer the analysis of a

11  different academic that did not testify.

12           So whatever the source, the UKPC does

13  not contend that any existing law controls here,

14  and that is why, if we turn to the next slide, Your

15  Honours will see repeated references to these

16  Courts to point the way to the future of

17  international insolvency, to create a new

18  precedent, to set a benchmark and to not pass up a

19  tremendous opportunity.

20           Now, it is ironic, Your Honours, that

21  for a theory that is supposedly grounded in

22  principles of fairness and in principles of equity,

23  its implementation would require the Courts to

24  completely ignore and in fact to be inconsistent

25  with existing law in both the US and Canada.

1              What is fair and what is equitable is

2       that the Courts apply the law as it exists today in

3       both countries.

4              Now, let's turn to the second point

5       that the UKPC brought up yesterday, which is, is

6       there a limiting legal constraint which would

7       prevent the exercise of discretion?

8              And the answer is there most certainly

9       is.  In fact, there are several.

10             First, the Courts cannot simply

11      disregard contracts that were freely negotiated

12      between the parties.  But that is absolutely what

13      the implementation of the pro rata theory requires.

14             The second is that the Courts cannot

15      simply disregard the corporate form and ignore the

16      corporate separateness that Nortel respected.

17             And the third is that these Courts

18      cannot violate the absolute priority rule.

19             And this is where the discussion of

20      substantive consolidation comes into play.

21             And so if we could turn to slide 3,

22      Your Honours have heard much about the Owens

23      Corning case and the law in Canada, the governing

24      principles are not that different here.  And I'm

25      going to talk a little bit about this.

```
 1                 The starting point and really what
 2      should also be the end of the analysis is that
 3      there is no law today that permits the
 4      non-consensual consolidation of estates across
 5      jurisdictions, and they don't argue otherwise.
 6                 So let's look at the second prong of
 7      the Owens Corning case, which is the one that they
 8      principally rely on, and that is the post-petition
 9      scrambling of assets and liabilities.  And if we
10      could turn to the next slide.
11                 Now, what Your Honours heard from
12      Mr. O'Connor on this point is he would like to take
13      you back to the petition date, but for better or
14      worse, Your Honours, that date is no longer
15      relevant because here we are some five and a half
16      years later and the assets certainly are no longer
17      scrambled, if they ever were, because they are
18      gone, they have been sold.
19                 And the liabilities are certainly not
20      scrambled, I think it is quite clear which claims
21      are in which estates, and you can see on this slide
22      the testimony from the Monitor.
23                 The Monitor was asked whether it has
24      been able to reconcile all of Nortel's intercompany
25      transactions and the Monitor's testimony was that
```

 1    that task was largely done.

 2              And again, that comes as no surprise,

 3    given the clear recordkeeping and the clear

 4    separateness of the corporations within Nortel that

 5    always existed.

 6              So Your Honours, for better or for

 7    worse, we are at the end of a long road, and

 8    although these proceedings may certainly be

 9    unprecedented in terms of their procedural

10    posture --

11              THE CANADIAN COURT:  Well, are you

12    saying that the intercompany transactions being

13    reconciled, that deals with all the assets and

14    where they were?

15              MR. QURESHI:  I'm saying, Your Honour,

16    that --

17              THE CANADIAN COURT:  Is that just not

18    one subset of a company's assets?

19              MR. QURESHI:  That is certainly one set

20    of a company's assets.

21              THE CANADIAN COURT:  It is only one

22    subset, isn't it?

23              MR. QURESHI:  Well, what I am saying,

24    Your Honour, ultimately is this, and there is lots

25    of evidence about corporate separateness, about

```
 1   assets, about liabilities, and we will get to that,
 2   but the sub con analysis in which this comes up,
 3   that is a creditor-focussed analysis, and
 4   ultimately the whole point of looking at those
 5   factors, was there scrambling, was there respect
 6   for corporate separateness, the point of that is to
 7   answer the question, did creditors know who they
 8   were dealing with or did creditors think that they
 9   were relying on just one big giant Nortel?
10              And there the evidence is
11   uncontroverted, Your Honour, as Mr. Bromley pointed
12   out, the principal proponent of this theory, the UK
13   pension, were ones that sought guarantees.  They
14   certainly knew who they were dealing with.  They
15   certainly didn't believe there was one Nortel.  As
16   Mr. Leblanc will get to with respect to the
17   Bondholders, that is true of the Bondholders as
18   well.
19              And if we can just jump ahead briefly
20   to slide 6, there we have testimony from
21   Mr. Binning which goes to this same point.
22   Mr. Binning was asked whether he understood that
23   the boards of each entity knew that creditors had
24   lent to that entity, and as the CFO of course
25   Mr. Binning was the one who undertook negotiations
```

 1    with the banks and who dealt with many of the

 2    creditors, and it was very clear to him that

 3    creditors were counting on the entity they lent to.

 4              So there is no evidence, Your Honours,

 5    that there is the type of scrambling or of

 6    commingling that would create any confusion among

 7    the creditors that were dealing with Nortel.

 8              And if we can just go back to slide 5,

 9    and I won't again spend a lot of time on this

10    because it is something Mr. Bromley covered to some

11    degree, the evidence on corporate separateness is

12    also uncontroverted.  The issuing of guarantees,

13    first and foremost among them, the separate books

14    and records, the financial statements, the fact

15    that cash was kept separate.

16              And what Your Honours might note from

17    looking at this slide is that much of this

18    testimony, all from very senior officers of NNL,

19    much of this testimony comes from the same

20    witnesses for whom the UKPC offered quotes saying

21    everything was hopelessly integrated.

22              And again, that is because their focus

23    is on operational integration, but that is just not

24    the type of integration that is relevant for

25    purposes of looking at whether a remedy is

1    extraordinary and as severe as substantive

2    consolidation is justified.

3              So going back one more time briefly to

4    slide 6, that is why the Monitor in its pretrial

5    allocation position statement, its reply position

6    statement, and this is at paragraph 41 and we have

7    put the quote on slide 6, the Monitor wrote:

8                        "Ex-post facto characterization

9                   of creditors dealing

10                  indiscriminately with members of the

11                  Nortel group is entirely incorrect

12                  and unsubstantiated."

13             So, Your Honours, if we can turn to

14   slide 7, just back one more time to Owens Corning

15   for this, I think, very important point.

16             You have heard the CCCs say this isn't

17   substantive consolidation.  You have heard the UKPC

18   say that is not what we are asking for.  We are

19   going to keep the entities separate.  There won't

20   actually be one entity left that administers

21   everything.

22             But in result, that most certainly is

23   what they are seeking.  They are asking Your

24   Honours to order an allocation that would achieve

25   exactly the same outcome as actually consolidating