IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| *In re* | Chapter 11 |
| Nortel Networks Inc., *et al.*,[1] | Case No. 09-10138 (KG) |
| | (Jointly Administered) |
| | Re: D.I. 15924, 15940 |
| Debtors. | |

**RESPONSE OF THE *AD HOC* GROUP OF BONDHOLDERS IN OPPOSITION TO THE MOTION OF THE MONITOR AND CANADIAN DEBTORS FOR AN ORDER PURSUANT TO 28 U.S.C. § 158(d)(2) CERTIFYING THE ALLOCATION DECISION FOR DIRECT APPEAL TO THE UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT**

The *ad hoc* group of bondholders (the "Bondholder Group")[2] files this response (the "Response") in opposition to the motion (the "Motion") of the Monitor and Canadian Debtors for an order pursuant to 28 U.S.C. § 158(d)(2) certifying the *Allocation Trial Opinion* [D.I. 15544] (the "Allocation Opinion") and accompanying *Order* [D.I. 15545] (the "Allocation Order") and the *Memorandum Order on Motions for Reconsideration* [D.I. 15830] (the "Reconsideration Order" and, together with the Allocation Opinion and Allocation Order, the "Allocation Decision") entered by the United States Bankruptcy Court for the District of

---

[1] The Debtors in the chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).

[2] The Bondholder Group consists of entities that hold certain bonds issued or guaranteed by Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Inc., and Nortel Networks Capital Corporation.

Delaware (the "Court") for direct appeal to the United States Court of Appeals for the Third Circuit (the "Third Circuit").[3] In support of this Response, the Bondholder Group respectfully states as follows:

## **PRELIMINARY STATEMENT**

1. After more than six years of proceedings before this Court, the Bondholder Group seeks, above all, a just and prompt resolution of these cases that finally allows creditors to receive distributions from the Debtors' estates. Certifying appeals of the Allocation Decision directly to the Third Circuit, however, will not further this goal and, indeed, is not appropriate under 28 U.S.C. § 158(d). The Monitor argues that direct certification is warranted because (i) no controlling Third Circuit or Supreme Court precedent exists with respect to the Allocation Decision, and (ii) direct certification will materially advance the case. The Monitor is wrong on both counts. To the contrary, appeals of the Allocation Decision will benefit substantially from initial review by the district court, and there is no meaningful risk that this normal appellate process will delay distributions to creditors.

2. *First*, despite the Court's characterization of its decision as "unprecedented," this is not a case in which direct certification is appropriate on the ground that no controlling decisions exist. Appeals of the Allocation Decision can be decided by reference to existing case law, including the Third Circuit's decision in *Owens Corning*[4] and its progeny, which directly address the appropriateness of a "pro rata" approach that consolidates the assets and claims of multiple debtor estates. Although the Court held that *Owens Corning* was distinguishable based on the facts presented here, a central issue on appeal will be the application of that long-standing precedent to this case.

---

[3] Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Motion.
[4] 419 F.3d 195 (3d. Cir. 2005).

3.      Moreover, courts have cautioned against permitting direct certification where the issues on appeal are unsettled or where the decision involves mixed questions of law and fact. Both are the case here. To begin with, no party actually advanced the "modified pro rata" allocation approach at trial, which means that there are numerous unsettled issues that need to be resolved (only some of which were addressed in the reconsideration motions). Indeed, the Bondholder Group does not even know what arguments other parties might advance in support of or against the approach adopted by the Court. Moreover, according to the Monitor, one of the questions it intends to present on appeal (which the Bondholder Group does not adopt)[5] is whether the allocation approach adopted by the Court is "fair and equitable"—a question which the Monitor suggests would involve "complex and fact-intensive issues." (Motion ¶¶ 1, 8.) Such "fact-intensive" issues, to the extent the Monitor intends to raise them on appeal, are unfit for direct certification and are best left for the district court to decide in the first instance.

4.      *Second*, a direct appeal to the Third Circuit will do nothing to advance the progress of this case because the Court's "modified pro rata" approach does not even contemplate the allocation of assets to Debtors—let alone the distribution of such assets to creditors—until claims processes are completed in each and every jurisdiction where there is a Debtor estate. Those claims resolution processes, which can and should continue without disruption during the pendency of any appeals to the district court, will likely be contentious and time-consuming. They have only recently begun in Canada and the U.K. and may well take longer to complete than would separate appeals before **both** the district court and the Third Circuit. As such, bypassing district court review is not likely to advance the progress of these cases at all, let alone "materially."

---

[5]   The Bondholder Group does not adopt the issues on appeal as articulated by the Monitor in the Motion or the Canadian Creditors' Committee in its joinder. The Bondholder Group will identify its own issues on appeal when required to do so under applicable rules.

5. For these reasons, there is simply no reason to short-circuit the normal appellate process and certify a direct appeal to the Third Circuit. To the contrary, district court review will ensure a more complete and developed record on appeal, and thus a more efficient and well-informed appellate process if review by the Third Circuit is ultimately required. As such, the Motion should be denied.

## LEGAL STANDARD

6. Pursuant to 28 U.S.C. § 158(d), certification for direct appeal to the Court of Appeals is appropriate in only three limited circumstances:

   i. where the bankruptcy court "judgment, order, or decree involves a question of law as to which there is no controlling decision of the court of appeals for the circuit or of the Supreme Court of the United States, or involves a matter of public importance";

   ii. where the bankruptcy court "judgment, order, or decree involves a question of law requiring resolution of conflicting decisions"; or

   iii. where "an immediate appeal from the judgment, order, or decree may materially advance the progress of the case or proceeding in which the appeal is taken."

28 U.S.C. § 158(d)(2)(A)(i)-(iii). In addition to satisfying one of these tests, the Court of Appeals must authorize the direct appeal of the judgment, order, or decree. *Id.*; *see also Weber v. United States Trustee*, 484 F.3d 154, 161 (2d Cir. 2007) ("Congress has explicitly granted [Courts of Appeals] plenary authority to grant or deny leave to file a direct appeal, notwithstanding the presence of one, two, or all three of the threshold conditions.") (citations omitted).

7. The Monitor argues that the Allocation Decision satisfies a portion of the first test for certification (the "no controlling decision" clause) and the entirety of the third test for certification.

8. "Courts have interpreted the 'controlling precedent' prong of 28 U.S.C. § 158(d)(2)(A)(i) to require that there be 'no governing law on the issue before the court.'" *In re Nortel Networks Corp.*, No. 09-10138(KG), 2010 WL 1172642, at *1 (Bankr. D. Del. Mar. 18, 2010) (Gross, J.) (quoting *Mull Drilling Co. v. SemCrude, L.P.* (*In re SemCrude L.P.*), 407 B.R. 82, 111 (Bankr. D. Del. 2009)). In addition, courts have construed this prong of section 158(d)(2)(A) to require that the issue on appeal be purely legal in nature. *In re Am. Home Mortgage Inv. Corp.*, 408 B.R. 42, 44 (D. Del. 2009) ("mixed questions that implicate the particular circumstances of [a] case . . . are not pure legal questions warranting direct certification."); *In re Tribune Co.*, 477 B.R. 465, 472 (Bankr. D. Del. 2012) ("The issue [decided by this Court] is not a pure legal issue; it is not appropriate for direct appeal.") (citation omitted); *see also Weber*, 484 F.3d at 158 ("Congress intended [§ 158(d)(2)] to facilitate [the Courts' of Appeals] provision of guidance on pure questions of law.").

9. The third basis on which a court may certify a direct appeal is when certification will "materially advance the progress of the case or proceeding in which the appeal is taken." 28 U.S.C. § 158(d)(2)(A)(iii). For this test to be met there must be something "extraordinary or urgent about [the] situation that recommends departing from the standard appellate process." *In re Conex Holdings, LLC*, Civ. No. 14-179 (LPS), 2015 WL 1383113, at *3 (D. Del. Mar. 23, 2015) (Stark, J.). Indeed, in enacting 28 U.S.C. § 158(d)(2), Congress expressly chose not make direct appeals mandatory. As the Second Circuit recently explained:

> [A]lthough Congress emphasized the importance of our expeditious resolution of bankruptcy cases, it did not wish to privilege speed over other goals; indeed, speed is not necessarily compatible with our ultimate objective—answer questions wisely and well. In many cases involving unsettled areas of bankruptcy law, review by the district court would be most helpful. Courts of appeals benefit immensely from reviewing the efforts of the district court to resolve such questions. Permitting direct

appeal too readily might impede the development of a coherent body of bankruptcy case-law.

*Weber*, 484 F.3d at 160.  Courts have thus refused to certify appeals for direct review when the bankruptcy case is "proceeding regardless of [a direct] appeal" or if there are "still a number of issues on appeal" or issues yet to be determined.  *See Am. Home Mortgage Inv. Corp.*, 408 B.R. at 44 (denying motion for certification); *In re Tribune Co.*, 477 B.R. at 473 (same); *see also In re Johns-Manville Corp.*, 449 B.R. 31, 34 (S.D.N.Y. 2011) (finding that the certification process can, without sufficient reason for a direct appeal, "lengthen[] the appellate process rather than advance[] it.").

## RESPONSE

### I. THE ALLOCATION DECISION DOES NOT MEET THE "CONTROLLING PRECEDENT" TEST FOR CERTIFICATION

10.    The first test for certification set out in 28 U.S.C. § 158(d)(2)(A) is not satisfied for two reasons.  *First*, guiding precedent did exist in the allocation dispute, including but not limited to the Third Circuit's decision in *Owens Corning*.  *Second*, the issues on appeal are not appropriate for Third Circuit review because (i) they have not been sufficiently defined through the adversarial process, such that it is not even possible to know at this time whether additional controlling precedent exists, and (ii) the Monitor has made clear that it intends to dispute "complex and fact-intensive issues," as well as legal conclusions.  As such, the Allocation Decision epitomizes the type of decision that would benefit from intermediate appellate review.

### A. The Allocation Decision directly implicates *Owens Corning* and other controlling case law.

11.    As discussed above, the "controlling precedent" prong of 28 U.S.C. § 158(d)(2)(A) is met only where there is "***no governing law*** on the issue before the court."  *In re Nortel Networks Corp.*, 2010 WL 1172642 at *1 (internal quotations and citation omitted)

- 6 -

(emphasis added). The Monitor argues that this test is satisfied here because the Court, in determining that a "modified pro rata" allocation methodology was appropriate, suggested that there was "nothing in the law or facts" to guide its ultimate decision. (Motion ¶ 14 (citing Allocation Opinion at 60).) The Monitor's analysis of this prong is flawed.

12. It cannot be seriously disputed that the Allocation Decision directly implicates the *Owens Corning* line of cases and the factual predicates for substantive consolidation articulated by those decisions. Indeed, a central issue on appeal will be whether the "modified pro rata" allocation adopted by the Court is tantamount to a substantive consolidation that runs afoul of *Owens Corning*. Having devoted 12 pages of its Allocation Opinion to analyzing *Owens Corning* based on its factual findings, it is evident that the Court understood that distinguishing the case was a necessary prerequisite to its holding. (Allocation Opinion at 99-111.) For this reason alone, it cannot be said that ***no governing law*** exists on the issues to be presented on appeal.

13. The *Owens Corning* decision and its progeny, however, are not the only legal authorities that govern the allocation dispute and must be considered on appeal. In fact, contrary to the suggestions of the Monitor and the Court, although these cross-border cases are unique in their scope and complexity, the issues before the Court in the allocation dispute were not. Bankruptcy courts in Delaware and across the country are often called upon to determine and allocate the value of a debtor's assets and they deploy common methodologies for doing so. For example, the fair market value methodology proposed by the U.S. Interests is a common allocation methodology that courts have recognized as widely accepted in law and economics across the globe. (*See, e.g.*, Proposed Findings of Fact and Conclusions of Law of the U.S.

Interests, Conclusions of Law Section I.)  The fact that the Court attempted to distinguish these cases in the Allocation Decision does not make them any less controlling on appeal.

14. Appeals of the Allocation Decision will also likely involve the interpretation of contracts governed by either U.S. state law or Canadian law, which are matters that are likewise inappropriate for direct appeal.  *See In re Tribune Co.*, 477 B.R. at 472 (finding that contract interpretation "requires application of state law and is not appropriate for direct appeal to the Third Circuit.") (citation omitted).  Indeed, the Monitor itself asserts that one issue on appeal will be whether "the Court erred in its construction of an agreement [the Master R&D Agreement] governed by Ontario law and in rejecting legal ownership as the basis for allocation."  (Motion ¶ 9.)[6]  Other parties will undoubtedly raise similar issues on appeal concerning the appropriate construction of other agreements, such as the IFSA, which is governed by New York law.  On these questions, direct certification is not appropriate either.  *See In re Tribune Co.*, 477 B.R. at 472.

    **B.  Consideration of direct certification based on the issues presented is not appropriate at this time.**

        **i. The specific issues that require appellate review are unknown because the Court adopted an allocation approach not advocated at trial.**

15. Courts have cautioned against permitting direct appellate review where, as here, the issues on appeal are unsettled.  As the Second Circuit has recognized, there are "salutary effects of allowing some cases to percolate through the normal [appellate] channels."  *Weber*, 484 F.3d at 160.  That is especially true when "percolation through the district court would cast more light on the issue[s] and facilitate a wise and well-informed decision."  *Id.* at 161.  Here,

---

[6] Similarly, in its arguments in the allocation trial, the Monitor argued that the Master R&D Agreement can be interpreted with reference to "basic principles of contractual interpretation," as set out by decisions of the Ontario Court of Appeal. (Initial Post-Trial Brief (Allocation) of the Monitor and Canadian Debtors at 73-74; *see also id.* at 62 ("[t]he law is clear that, in granting a license, the owner may choose to permit the licensee to enjoy only some of the customary rights of ownership, as opposed to all of those privileges.")  The Monitor can hardly now argue that no controlling law governed the issues before the Court.

the full scope of issues that the parties will ultimately ask the district court or the Third Circuit to review cannot possibly be known at this time because the parties have not even identified the issues they are raising on appeal and no party advanced the "modified pro rata" approach that the Court adopted. Once the parties have expressed their views on this allocation approach, the issues that need to be resolved on appeal will undoubtedly shift and evolve, or even be eliminated altogether.

16. The briefing that occurred on the parties' motions for reconsideration provides an apt example of this problem. In its motion for reconsideration, the Bondholder Group sought clarification from the Court that bondholders are entitled to enforce the full amount of their guarantee claims against NNI because the Court had suggested that bondholders were limited to claiming for the "shortfall" against guarantors.[7] The Bondholder Group and other parties had not briefed or argued this issue at trial because they did not know that the Court would reference the "shortfall" concept (as no party had advocated it). The Bondholder Group learned for the first time in reviewing the responses to its motion for reconsideration that no other party actually disagreed with the Bondholder Group on this issue.[8] Had the Bondholder Group not learned of the other parties' positions during reconsideration, it would have had to raise the issue on appeal and, in doing so, would have wasted the time and resources of itself, the other parties, and whichever appellate court hears the appeals in the first instance.

17. There are undoubtedly many other issues like this one that remain unaddressed by the parties or the Court in an adversarial setting and will be revealed, for the first time, in

---

[7]   *Ad Hoc* Group of Bondholders' Motion for Reconsideration of Opinion and Order Allocating Proceeds from Asset Sales of Nortel Networks, Inc., its Affiliates and Subsidiaries [D.I. 15612] ¶ 1.

[8]   Reply of the *Ad Hoc* Group of Bondholders to the Objections of (i) the Canadian Creditors' Committee; (ii) the Monitor and Canadian Debtors; (iii) the Joint Administrators; and (iv) the U.K. Pension Claimants to Bondholders' Motion for Reconsideration [D.I. 15782] ¶ 4.

appellate briefing.  The parties and the courts will benefit by having the district court review these issues in the first instance, thereby creating a more refined record for the Third Circuit and avoiding the wasteful exercise of disputing issues that may not actually be in dispute.

> **ii. The issues on appeal identified by the Monitor involve questions of fact that are not appropriate for direct certification.**

18.  The Monitor has made clear that, if the Third Circuit is asked to hear the parties' appeals at this time, it intends to argue that an issue on appeal is whether the Court's decision is "fair and equitable" to the parties.  (Motion ¶ 8.)  The Monitor further makes clear that it will argue that such an issue involves complex issues of fact.  (Motion ¶ 1.)[9]  Only *pure issues of law*, however, are appropriate for direct certification pursuant to 28 U.S.C. § 158(d)(2)(A)(i).  *See, e.g.*, *In re Am. Home Mortgage Inv. Corp.*, 408 B.R. at 44 ("mixed questions that implicate the particular circumstances of [a] case . . . are not pure legal questions warranting direct certification."); *In re Tribune Co.*, 477 B.R. at 472 ("The issue [decided by this Court] is not a pure legal issue; it is not appropriate for direct appeal.") (citation omitted).

19.  Indeed, direct certification of an issue that purportedly turns on specific factual findings is contrary to the Congressional intent concerning, and courts' interpretation of, 28 U.S.C. § 158(d)(2)(A).  *See Weber*, 484 F.3d at 158 (citing H.R. Rep. No. 109-31, at 148-49, U.S. Code Cong. & Admins. News 2005 at pp. 88, 206 for the proposition that "Congress did not expect that [§ 158(d)(2)(A)] would be used to facilitated direct appeal of 'fact-intensive issues'"); *see also In re Tribune Co.*, 477 B.R. at 470 (citing *Weber*).  Such an issue should first be heard and decided by the district court, which normally functions as a trial court and thus commonly resolves such questions.

---

[9]  As noted above, the Bondholder Group does not adopt the Monitor's characterization of the issues to be presented on appeal and intends to argue on appeal that, in addition to any factual issues that may be disputed, the Bankruptcy Court committed pure legal errors in rendering its Allocation Decision.

20.     For these reasons, the issues on appeal, as articulated by the Monitor itself, do not meet the first prong of 28 U.S.C. § 158(d)(2)(A) for direct certification to the Third Circuit.

## II.   DIRECT CERTIFICATION WILL NOT "MATERIALLY ADVANCE THE PROGRESS" OF THIS CASE

21.     The Monitor next argues that the third test for certification set out in 28 U.S.C. § 158(d)(2)(A) is met because "[a] decision from the Third Circuit on the Allocation Dispute will resolve . . . the key remaining dispute in these bankruptcy cases, and facilitate the return of funds to creditors[.]" (Motion ¶ 15.) The Monitor, however, ignores the fact that under the "modified pro rata" allocation approach, funds will not be released from the lockbox until claims-reconciliation processes have been completed by *each debtor* in *every* jurisdiction. These processes, which can and will go forward whether appeals are pending or not, are almost certain to be extremely complicated and contentious and could take years to complete—particularly because the outcome of those processes will now dictate how much in sales proceeds each estate will be allocated. It is these processes—not the time that it takes for appeals to conclude—that will likely determine when creditors are ultimately paid.[10]

22.     The Monitor also argues that, "given the magnitude of the issues resolved by the Allocation Decision and the near certainty that any decision of the District Court will be further appealed, certification will materially advance these cases." (Motion ¶ 16.) This obvious and self-serving argument is easily rejected. As one court correctly observed:

> That argument can be made in every case where there is an appeal involving a final judgment of the Bankruptcy Court. If valid, the

---

[10]   As the Monitor has conceded in another simultaneous filing in this Court, "[t]he amount that each debtor will ultimately receive is not knowable currently" and there is a "***vast amount of work to be done*** before the total amounts to be distributed to each debtor's estate can be known[.]" (The Monitor and Canadian Debtors' Motion for Determination that Allocation Order is Interlocutory and for Leave to Appeal [D.I. 15922] (the "Motion for Leave to Appeal" at 2 (emphasis added).) This is hardly the "extraordinary or urgent" situation required by 28 U.S.C. § 158(d)(2)(A)(iii). *See In re Conex Holdings, LLC*, 2015 WL 1383113 at *3. Instead, the typical appellate process can go forward, "in parallel with the claims processes being carried out by each debtor," without any impact on distributions to creditors. (Motion for Leave to Appeal at 3.)

argument would eliminate appeals to the District Court, contrary to the statement by the [Second Circuit] that the normal appellate process should proceed so that the Court of Appeals is provided with the views of the District Court to aid in the fair decision of the appeal.

*In re Johns-Manville Corp.*, 449 B.R. at 34 (citing *Weber*, 484 F.3d at 160). Indeed, Congress could have, but chose not to, make direct appeals mandatory. *See Weber*, 484 F.3d at 160.

23. In summary, direct certification of the appeals to the Third Circuit will do nothing to advance the progress of these cases. Instead, it would undermine the very purpose of the appellate process, which is to "answer questions wisely and well." *Weber*, 484 F.3d at 160. The best way to meet this objective is for the district court to review the Allocation Decision in the first instance.

## CONCLUSION

For the reasons set forth herein, the Bondholder Group respectfully requests that the Court deny the Motion.

[*Remainder of page intentionally left blank*]

Dated: July 28, 2015

**PACHULSKI STANG ZIEHL & JONES LLP**

/s/ *Peter J. Keane*
Laura Davis Jones (No. 2436)
Peter J. Keane (No. 5503)
919 N. Market Street, 17th Floor
PO Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400

-and-

**MILBANK, TWEED, HADLEY & M<sup>C</sup>CLOY LLP**
Dennis F. Dunne
Albert A. Pisa
Andrew M. Leblanc
Atara Miller
28 Liberty Street
New York, New York 10005-1413
Telephone: (212) 530-5000
Facsimile: (212) 530-5219

-and-

Thomas R. Kreller
601 S. Figueroa Street, 30th Floor
Los Angeles, California 90017
Telephone: (213) 892-4463
Facsimile: (213) 629-5063

*Attorneys for Ad Hoc Group of Bondholders*