**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

---------------------------------------------------------------- X
                                                               :
*In re*                                                        :    Chapter 11
                                                               :
Nortel Networks Inc., *et al.*,                                :    Case No. 09-10138 (KG)
                                                               :
                                   Debtors.[1]                 :    Jointly Administered
                                                               :    **Re:  D.I. 15924, 15940**
                                                               :
---------------------------------------------------------------- X

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED**
**CREDITORS OF NORTEL NETWORKS INC., <u>ET</u> <u>AL.</u>**
**TO THE MOTION OF THE MONITOR AND CANADIAN DEBTORS**
**FOR AN ORDER CERTIFYING APPEAL DIRECTLY**
**<u>TO THE THIRD CIRCUIT COURT OF APPEALS</u>**

The Official Committee of Unsecured Creditors (the "<u>Official Committee</u>") of Nortel

Networks Inc. ("<u>NNI</u>") and certain of its U.S. affiliates, as debtors and debtors in possession

(collectively, the "<u>U.S. Debtors</u>"), by and through its undersigned counsel, hereby objects (the

"<u>Objection</u>") to the *Corrected Motion of the Monitor and Canadian Debtors[2] for an Order*

*Pursuant to 28 U.S.C. § 158(d)(2) Certifying the Allocation Decision for Direct Appeal to the*

*United States Court of Appeals for the Third Circuit* (D.I. 15940) (the "<u>Motion to Certify</u>").

**PRELIMINARY STATEMENT**

1.      The Monitor presents two arguments in favor of its extraordinary request

to bypass the district court and force this appeal directly upon the circuit court: (i) that no

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226) ("<u>NN CALA</u>").

[2] Collectively, the "<u>Monitor</u>".  Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the *Allocation Trial Opinion* (D.I. 15544) and *Order* (D.I. 15545).

controlling precedent exists with respect to the Allocation Decision; and (ii) that direct appeal

will materially advance the progress of this case.  Both arguments fail.

2.      First, direct appeal is appropriate only if the appeal involves a pure

"question of law."  Yet, in the very first sentence of the Monitor's own Motion to Certify, the

Monitor characterizes this appeal as involving "complex and *fact-intensive* issues."  And in the

Monitor's attempt to unilaterally define the "question presented," the Monitor describes its

principal issue on appeal as whether the "modified pro rata" allocation methodology is "*fair and*

*equitable*" — an inherently fact-based inquiry.  Thus, as the Monitor itself frames the issue, this

appeal is hardly limited to the type of pure legal issues that are appropriate for direct appeal to a

circuit court.  Once each of the parties files its statement of issues on appeal, it likely will

become clear that this appeal involves myriad factual issues, as well as mixed questions of law

and fact, in addition to various errors on issues of pure law that the Monitor has not raised.

Moreover, because the Monitor's cross-appeal is contingent, it makes little sense to certify the

appeal based on questions that the Third Circuit may never reach.

3.      Second, direct appeal will not materially advance progress in this case: far

from it.  Given the vast record and myriad potential appeal issues, the appellate process would

benefit materially from the crystallization of salient facts and issues obtained through district

court adjudication.  This Court's Allocation Decision is based on a theory that *no party*

advocated.  Moreover, the Allocation Decision does not even contemplate allocating assets to

each debtor until claims processes are finally completed in each and every debtor jurisdiction

around the world.  As much as the Committee continues to strive for a prompt and just resolution

to these proceedings, this Court has set the parties down a path in which each debtor estate has a

direct, pecuniary interest in the claims resolution process of every other estate.  Thus, there is

2

ample time for this appeal to follow its proper and ordinary path through the district court while

the claims processes continue to progress in multiple jurisdictions around the world.  The

Monitor therefore misses — by a wide margin — meeting the legal standard for direct

certification of this appeal to the circuit court.

## PROCEDURAL HISTORY

4.      On May 12, 2015, the Bankruptcy Court entered its *Allocation Trial*

*Opinion* (D.I. 15544) and *Order* (D.I. 15545).  On the same date, the Superior Court of Justice –

Ontario Commercial List issued its Reasons for Judgment.

5.      On May 26, 2015, the U.S. Debtors, the Official Committee, the

Bondholder Group, and Law Debenture moved for reconsideration and/or clarification (D.I.

15611, 15613, 15612, and 15615 respectively).  Similar motions were made in the Ontario Court,

and a joint hearing was conducted on June 25, 2015.  On July 6, 2015, the Bankruptcy Court

entered its *Memorandum Order on Motions for Reconsideration* (D.I. 15830), and the Ontario

Court issued its *Ruling on Reconsideration / Clarification Motion*.

**Appellate Developments in the United States**

6.      On July 9, 2015, the Official Committee filed a Notice of Appeal of the

Allocation Trial Opinion, Order, and Memorandum Order on Motions for Reconsideration

(collectively, the "Allocation Decision") (D.I. 15846).  On July 17, 2015, the Trade Claims

Consortium filed a Notice of Appeal (D.I. 15878).  On July 20, 2015, Notices of Appeal were

filed by the U.S. Debtors (D.I. 15890), the Bondholder Group (D.I. 15893), the Bank of New

York Mellon, as Indenture Trustee ("BNY Mellon") (D.I. 15888), and Stephen Taylor as

Conflicts Administrator for Nortel Networks S.A. ("NNSA") (D.I. 15894).  On July 23, 2015,

Pension Benefit Guaranty Corporation ("PBGC") filed a Notice of Appeal (D.I. 15916).

7.      No statement of issues on appeal has yet been filed for any of these appeals.  Following discussions among counsel regarding the setting of uniform appellate deadlines, the Official Committee submitted a Certification of Counsel (D.I. 15915) on July 23, 2015, providing that the deadline for all appellants to file their statement of issues on appeal and designation of the record on appeal would be August 3, 2015.  The Certification of Counsel further provided that the parties had agreed that, subject to subsequent orders of the Bankruptcy Court or an appellate court, the designation of record and statement of issues by any party that filed a notice of cross-appeal would be due August 28, 2015, and that counter-designation of the record by any party to the appeal with respect to any appeal or cross-appeal would be due September 18, 2015.  On July 23, 2015, the Bankruptcy Court entered an Order (D.I. 15917) extending the deadlines as set forth in the Certification of Counsel.

8.      Also on July 23, 2015, the Joint Administrators for the EMEA Debtors filed a Notice of Conditional Cross-Appeal (D.I. 15919).  Additional Notices of Contingent Cross-Appeal were filed by the Monitor and the Canadian Debtors (D.I. 15921) and the Canadian Creditors Committee (D.I. 15926).

9.      The Monitor and Canadian Debtors also filed on July 23, 2015:  (a) a motion for a determination that the Allocation Decision is interlocutory, and for leave to appeal (D.I. 15922); (b) the instant Motion to Certify (D.I. 15924); and (c) a motion to shorten notice (D.I. 15925) of the Motion to Certify.

10.      On July 24, 2015, the Bankruptcy Court granted the request of the Monitor and Canadian Debtors to shorten notice, entering an Order (D.I. 15943) setting July 28, 2015 as the objection deadline for the Motion to Certify.[3]

---

[3] No party had yet submitted a response to the Monitor and Canadian Debtors' motion to shorten notice.

**Appellate Developments in Canada**

11.     On July 16, 2015, motions for leave to appeal the Ontario Court's

allocation rulings were filed in the Ontario Court of Appeal by the Official Committee, the U.S.

Debtors, the Bondholder Group, BNY Mellon, NNSA, and the Trade Claims Consortium.

12.     On July 27, 2015, the Ontario Court of Appeal set a deadline of August

24, 2015 for the applicants' briefing of the motions for leave to appeal, with the respondents'

briefing due in September 2015 on a date to be confirmed once the applicants' briefs are filed.

## OBJECTION

13.     Under 28 U.S.C. § 158(d) ("Section 158(d)"), a bankruptcy court may

certify its decision for direct review by the circuit court only in the following circumstances:

> (i) the judgment, order, or decree involves a question of law as to which there is no controlling decision of the court of appeals for the circuit or of the Supreme Court of the United States, or involves a matter of public importance;
>
> (ii) the judgment, order, or decree involves a question of law requiring resolution of conflicting decisions; or
>
> (iii) an immediate appeal from the judgment, order, or decree may materially advance the progress of the case or proceeding in which the appeal is taken.

28 U.S.C. § 158(d)(2)(A).  The Monitor seeks certification for immediate Third Circuit review of

the Allocation Decision because, in the Monitor's view, that decision "involves a question of law

as to which there is no controlling decision," *id.* § 158(d)(2)(A)(i), and that "an immediate appeal

. . . may materially advance the progress of the case," *id.* § 158(d)(2)(A)(iii).  Neither ground for

certification applies here.

### 1.     *The Monitor's Questions Presented Are Not Pure Questions Of Law*

14.     To be "appropriate for direct appeal" under the "controlling decision"

prong of Section 158(d), certification must concern a "pure legal issue."  *In re Tribune*, 477 B.R.

465, 472 (Bank. D. Del. 2012).  That requirement is plainly stated in the statute:  "the judgment,

order, or decree" must "involve[] a question of *law*."  28 U.S.C. § 158(d)(2)(A)(i) (emphasis

added).  And it is reinforced by the legislative history, which evinces Congress's "belie[f] [that]

direct appeal would be most appropriate where [the courts of appeals] are called upon to resolve

a question of law not heavily dependent on the particular facts of a case."  *Weber v. U.S. Trustee*,

484 F.3d 154, 159 (2d Cir. 2007); *see In re Am. Home Mortg. Inv. Corp.*, 408 B.R. 42, 44 (D.

Del. 2009) (refusing to certify "mixed questions that implicate the particular circumstances of

this case" because "they are not pure legal questions warranting direct certification").  Congress

was explicit that Section 158(d)(2)(A)(i) should not be invoked to "bring to the circuit courts of

appeals matters that can appropriately be resolved initially by district court judges" — pointing

in particular to "fact-intensive issues."  H.R. REP. 109-31, pt. 1, at 148-49 (2005), *reprinted in*

2005 U.S.C.C.A.N. 88, 206-07.

       15.    In this case, neither of the Monitor's questions presents a question of law.

The Monitor's characterization of the first appellate question[4] — whether the "'modified pro

rata' allocation methodology is 'a fair and equitable mechanism'" for allocation, Cert. Mot. ¶ 8

— is an inherently fact-intensive question, as courts in this Circuit regularly acknowledge.  *See,*

*e.g.*, *In re Jevic Holding Corp.*, 787 F.3d 173, 180-81 (3d Cir. 2015) (discussing fact-specific

considerations for determining whether settlement is "fair and equitable"); *In re Exide Techs.*,

303 B.R. 48, 67 (Bankr. D. Del. 2003) (holding that whether "reorganization plan is fair and

equitable" requires court to "reach an informed, independent judgment *supported by the factual*

*background* underlying the litigation and bankruptcy) (emphasis added) (citations and internal

quotation marks omitted); *Corestates Bank, N.A. v. United Chem. Techs., Inc.*, 202 B.R. 33, 52-

---

[4] The Official Committee here addresses the questions as framed by the Monitor for purposes of the Monitor's certification request.  The Official Committee, however, has filed its own Notice of Appeal to the district court and takes a very different view of the salient issues for appeal.

53 (E.D. Pa. 1996) ("Whether a plan violates the fair and equitable requirements of § 1129(b)(2)(A)(i)(II) through negative amortization presents a question of fact . . . ."); *In re Harman*, 141 B.R. 878, 880 (Bank. E.D. Pa. 1992) ("*In the instant factual setting*, we find that the Debtors' personal expenses under their proposed budget are too lavish to constitute 'fair and equitable' treatment to unsecured creditors.") (emphasis added).  Indeed, the Monitor concedes in its own Motion to Certify that "these cases involve complex and fact-intensive issues".  Cert. Mot. ¶ 1.

16.    The Monitor's characterization of that issue for appeal makes this case legally indistinguishable from *Tribune*, where this Court denied certification to Indenture Trustees who argued that a reorganization plan "discriminate[d] *unfairly* against the Senior Noteholders by disputing the Court's method of applying the facts . . . to measure whether the [plan] resulted in a *materially* lower percentage recovery."  477 B.R. at 471-72.

17.    The Monitor's second question is presented in a fact-based manner as well.  Whether "the Court erred in its construction of an agreement governed by Ontario law and in rejecting legal ownership as a basis for allocation" likely will require delving into the terms of the Master R&D Agreement ("MRDA").  *See* Allocation Trial Opinion at 48 (explaining that "the Monitor's position" regarding the ownership of the intellectual property "follows from the clear words of the MRDA"), 86-88 (rejecting legal ownership as basis for allocation because Monitor's interpretation of MRDA was incorrect).  As this Court recognized in the Allocation Decision, under Ontario law, "[c]ontractual interpretation involves issues of *mixed* fact and law as it is an exercise in which the principles of contractual interpretation are applied to the words of the written contract, considered in light of the factual matrix."  *Id.* at 65 (emphasis added) (citation and quotation marks omitted).  These "basic principles" "require application of state

law" — or in this case, provincial law — "and [are] not appropriate for direct appeal to the Third

Circuit". *See In re Tribune*, 477 B.R. at 472.

18.     In addition, contrary to its claim in the instant Motion to Certify, the

Monitor previously argued that there *is* settled law to apply here. *See* Allocation Trial Opinion

47-48 (describing Monitor's position as "follow[ing] from the clear words of the MRDA" and

"controlling Ontario law," and that the approach is "one that the Courts would follow in a

priority dispute over property or over funds derived from property — that is, to determine the

priorities and how funds will flow according to the applicable legal rights"). The Monitor should

not be permitted to sweep aside the position it took at trial for purposes of obtaining certification.

### 2.     *The Third Circuit Would Benefit Significantly From The District Court's Review*

19.     Certification is also inappropriate because direct Third Circuit review will

not "materially advance the progress of the case." 28 U.S.C. § 158(d)(2)(A)(iii).

20.     According to the Monitor, once the allocation question is resolved, all of

the "key" disputes in the bankruptcy cases will have been resolved. That is incorrect. Rather,

the modified pro rata approach adopted by the Court — using allowed claims against each debtor

estate as the measuring stick for allocating the Lockbox Funds — necessarily engenders a

situation in which each debtor estate (and its respective creditor constituency) has a direct

interest in the outcome of the claims reconciliation processes in each other debtor estate. This

will not be a straightforward or swift exercise given the prevalence of large claims against

multiple debtors and the lack of advancement of the claims processes in certain of the debtor

jurisdictions.

21.     First, there are several known claims that will materially affect any

allocation under the modified pro rata approach crafted by the Bankruptcy Court. The claims

include, among others, billions of dollars of asserted pension liabilities in each of EMEA, Canada and the United States.  Given the importance of the resolution of such claims to the allocation outcome and ultimate creditor recoveries, their adjudication likely will be contentious and time-consuming.  Second, there is no assurance that the claims processes in jurisdictions outside of the United States will advance in an expeditious fashion.  In the EMEA jurisdictions, for example, the Joint Administrators are just now undertaking to commence a formal "proof process" to call for claims to be filed against the EMEA Debtors.  *See The Joint Administrators' Objection and Response to the Motions for Reconsideration and Clarification* (D.I. 15741), ¶ 51.  Accordingly, it is unclear when there will be any final determination of allowed claims against the various estates to enable distributions from the Lockbox Funds.  In short, the implementation of the modified pro rata approach will be lengthy, complicated, and fraught with litigation.  There is little assurance, then, that immediate Third Circuit review would cause parties to "fold up their tents."  *Weber*, 484 F.3d at 158.

22.    The Monitor also points to the need for a "prompt determination of the Allocation Dispute."  Cert. Mot. ¶ 15.  But promptness must be weighed against the "dangers of leapfrogging the district court in the appeals process."  *Weber*, 484 F.3d at 160.  As the Second Circuit has recognized, Congress "did not wish [courts] to privilege speed over other goals; indeed, speed is not necessarily compatible with our ultimate objective—answering questions wisely and well."  *Id.*

23.    This case presents a textbook example of why district court review should not be forsaken in the name of expediency.  In the Monitor's words, the "21-day joint trial" involved "21 fact witnesses and 15 expert witnesses and . . . over 2,000 exhibits and designations from depositions into evidence, following which the parties prepared extensive written briefs

exceeding 1,000 pages." Cert. Mot. ¶ 3. Several parties have filed notices of appeal and cross-appeal. The appeal is therefore certain to concern myriad issues that draw from the vast trial record.

24. In this instance, it is clear that "percolation through the district court would cast more light on the issue and facilitate a wise and well informed decision." *Weber*, 484 F.3d at 161; *see id.* at 160 (noting "the salutary effects of allowing some cases to percolate through the normal channels," and that "[c]ourts of appeals benefit immensely from reviewing the efforts of the district court"). The district court is best situated to confront the record and focus the lens of further appellate review. *Cf. United States v. Wright*, 493 F. App'x 265, 273 (3d Cir. 2012) ("On appeal, although our review of the available facts might lead us to reach the same ultimate decision to suppress the evidence, we are not in a position to reach out and undertake an analysis that is better left to the District Court in the first instance."); *United States v. Provenzano*, 605 F.2d 85, 91 (3d Cir. 1979) (explaining that application for bail pending appeal must be made "in the first instance to the district court, notwithstanding that the jurisdiction of the court of appeals has already attached by virtue of the appeal from the judgment of conviction," because of the "trial court's superior capacity . . . to gather and sift the pertinent information").

25. Moreover, "since district courts tend to resolve bankruptcy appeals faster than the courts of appeals, . . . the cost in speed of permitting district court review will likely be small." *Weber*, 484 F.3d at 160. That is especially true in this case because the courts can continue to adjudicate claims while the appeals proceed. Completing that task is necessary regardless of whether the Allocation Trial Opinion survives review. *See id.* at 161 ("We must also bear in mind that in most cases, even without certification, the parties will have an

opportunity to appeal both to the district court and to this court before the termination of the entire bankruptcy proceeding . . . .").

26.    Nor does the suggestion that this case is likely to reach the Third Circuit (Cert. Mot. ¶ 16) justify certification.  "[I]f the mere expectation of advancement to a circuit court was sufficient to establish material advancement, Section 158(d)(2)(A) would effectively eliminate the district court from the bankruptcy review process altogether."  *In re Lehman Bros. Inc.*, No. 13-cv-5381, 13-cv-5964, 2013 WL 5272937, at *5 (S.D.N.Y. Sept. 18, 2013).  Congress considered and then rejected that result.  *See Weber*, 484 F.3d at 160 ("Initially divided over whether to make direct appeals mandatory in certain circumstances, or to grant discretion to the courts of appeals to accept or decline such direct appeals, Congress wisely adopted the latter path . . . .").  Accordingly, the unremarkable fact that a district court judgment in a bankruptcy proceeding may be appealed to the courts of appeals does not help the Monitor.

## CONCLUSION

27.    For all of the foregoing reasons, the Official Committee respectfully requests that the Court deny the Motion to Certify, and grant the Official Committee such other and further relief as the Court deems just, proper and equitable.

Dated: July 28, 2015                               Respectfully submitted,
        Wilmington, Delaware

By:    */s/ Christopher M. Samis*

Christopher M. Samis (No. 4909)
Whiteford, Taylor & Preston LLC
The Renaissance Centre
405 North King Street, Suite 500
Wilmington, Delaware 19801
Tel.:  (302) 353-4144

and

Fred S. Hodara (*pro hac vice*)
David H. Botter (*pro hac vice*)
Abid Qureshi (*pro hac vice*)
Brad M. Kahn (*pro hac vice*)
Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, NY  10036
Tel.:  (212) 872-1000

*Co-counsel to the Official Committee*