# **EXHIBIT D**

**CITATION:** Re Nortel Networks Corporation et al, 2014 ONSC 6973
**COURT FILE NO.:** 09-CL-7950
**DATE:** 20141209

## ONTARIO
### SUPERIOR COURT OF JUSTICE
### COMMERCIAL LIST

**IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. c-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION and NORTEL NETWORKS TECHNOLOGY CORPORATION**

**APPLICATION UNDER THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED**

| | | |
|---|---|---|
| **COUNSEL:** | *Michael Barrack* - | Counsel for United Kingdom Pension Claimants |
| | *John Finnigan* | |
| | *D.J. Miller* | |
| | *Andrea McEwan* | |
| | *Michael Shakra* | |
| | *Brian O'Connor* | |
| | *Matthew Bullen* | |
| | *James McCreath* | |
| | *Chris Edward-Earl* | |
| | | |
| | *Alan Mark* - | Counsel for the Monitor & Canadian Debtors |
| | *Jessica Kimmel* | |
| | *Graham Smith* | |
| | *Jason Wadden* | |
| | *Gale Rubenstein* | |
| | *Christopher Armstrong* | |
| | *Derrick Tay* | |
| | *Jennifer Stam* | |
| | *Melanie Ouanounou* | |
| | *Vasudu Sinha* | |
| | *Nicholas Kluge* | |
| | *Niklas Holmberg* | |
| | *Jonathan Edge* | |
| | *Joe Pasquariello* | |
| | *Jesse Mighton* | |

**BEFORE:**    **JUSTICE NEWBOULD**

**DATE HEARD:** July 7, 8, 9, 10, 11, 14, 15, 16, 17, 18, 21, 22, September 29, 30, October 1, 2014

**REASONS FOR JUDGMENT**

**TABLE OF CONTENTS**

Page No.

Nortel history and structure ................................................................................ 3
NNUK and the UK pension plan ........................................................................ 6
Project Swift .......................................................................................................... 9
Claims made by UKPC ...................................................................................... 10
Financial Support Direction ("FSD") claim .................................................... 11
    (a)   Is the FSD claim an exercise of sovereign authority and one which will not
         be enforced by this Court? .................................................................... 15
    (b)   Are these proceedings intended to impermissibly reorder and interfere with
         the rights of the creditors of NNL and NNC? ...................................... 15
    (c)   Does the UKPC lack status to bring the FSD claim? ............................ 17
    (d)   What is the contingency to be measured and is it a provable claim? ........... 18
         (i)   Standard to be applied......................................................... 20
         (ii)   Application of the "too remote or speculative" standard ................... 22
    (e)   Reason for the Nortel failure and Issues raised by the UKPC to support its
         FSD claims ............................................................................................ 34
         (i)   Reason for Nortel failure ................................................... 34
         (ii)   Contribution holiday ......................................................... 36
         (iii) Interest-free loan ............................................................... 38
         (iv) Transfer pricing ................................................................ 40
         (v)   Conclusion ...................................................................... 47
    (f)   Was NNUK Insufficiently Resourced? ............................................... 48
The Funding Agreement and the Funding Guarantee......................................... 61
Quantum of Funding Guarantee ....................................................................... 72
Claims on the Swift Guarantee ......................................................................... 80
    (a)   English principles of construction of an agreement ............................. 80
    (b)   Analysis ............................................................................................... 84
Rule in *Ex Parte James* .................................................................................... 98
Oppression ......................................................................................................... 100
    (a)   Standing to be a complainant ............................................................ 100
    (b)   Merits of oppression claims .............................................................. 106
         (i)   Interest free loans ............................................................ 107
         (ii)   Project Swift .................................................................... 110
         (iii) Funding and Swift Guarantees ......................................... 119
         (iv) Transfer pricing ............................................................... 119
         (v)   Conclusion...................................................................... 120
Unjust Enrichment ............................................................................................ 120
         (i)   Unjust enrichment claims ................................................. 123
         (ii)   Interest free loans ........................................................... 124
         (iii) Project Swift ................................................................... 126
         (iv) Funding and Swift guarantees .......................................... 126

(v) Conclusion ................................................................... 127
End Result ........................................................................ 127

## Nortel history and structure

[1]    On January 14, 2009, Nortel Networks Corporation ("NNC") was a publicly-traded Canadian company and the direct or indirect parent of more than 130 subsidiaries located in more than 100 countries, collectively known as the "Nortel Group" or "Nortel". NNC was the successor to a long line of technology companies headquartered in Canada dating back to the founding of Bell Telephone Company of Canada in 1883. NNC's principal, direct operating subsidiary, also a Canadian company, was Nortel Networks Limited ("NNL"), which in turn was the direct or indirect parent of operating companies located around the world.[1]

[2]    From the mid-1980s, Nortel expanded substantially through the continued development of ground-breaking technology. The Nortel Group moved from developing and manufacturing traditional landline phone technology and equipment into digital, wireless and photonic technologies. At the same time, the Nortel Group expanded into Europe, Asia, Africa, the Middle East and Latin America.

[3]    Beginning around 2001, the burst of the dot-com bubble had a severe effect on the global economy and on the telecommunications industry in particular, including Nortel. Market forces led to a decline in Nortel's revenues and market share, and a decline in customer demand for Nortel's products. Subsequently, Nortel was faced with accounting issues which impacted Nortel's credit rating and its cost of financing and required Nortel to restate its financial statements for the fiscal years 2000 to 2005. The rating downgrades affected Nortel's access to capital markets and cost of financing for some years. The fortunes of Nortel improved for a few years but for various reasons, including the financial meltdown in the fall of 2008, Nortel saw its business decline in the two profitable lines of business that it was operating. That and a lack of customer support caused Nortel to file for bankruptcy protection in January 2009.

---

[1] Unless otherwise indicated, statements of fact in these reasons are findings of fact.

[4]    On January 14, 2009 NNC, NNL and a number of other Canadian corporations filed for protection under the CCAA. On the same date, Nortel Network Inc. ("NNI"), the principal US subsidiary, and a number of other US corporations filed for protection under chapter 11 of the US Bankruptcy Code. On January 15, 2009 Nortel Networks UK Plan Limited ("NNUK") and all of the EMEA[2] debtors save the French subsidiary Nortel Networks S.A. ("NNSA") entered into administration under the UK insolvency laws and NNSA had a liquidator appointed under French secondary proceedings.

[5]    The initial intent was to attempt to restructure the business and go forward, but by June 2009 the decision was made to liquidate the business. The lines of business were sold for US $2.8 billion and the residual intellectual property was sold for US$4.5 billion, for total proceeds of US $7.3 billion. A joint trial of this court and the Delaware Bankruptcy Court has been held to determine how the US $7.3 billion is to be allocated among the Canadian debtors, the US debtors and the EMEA debtors. A decision is pending.

[6]    Prior to the insolvency, Nortel had four main product groups (also known as a Line of Business), and operated along business lines as a highly integrated multinational enterprise with a matrix structure that transcended geographic boundaries and legal entities organized around the world.  Each entity, such as NNUK, was integrated into regional and product line management structures to share information and perform R&D, sales and other common functions across geographic boundaries and across legal entities.  The matrix structure was designed to enable Nortel to function more efficiently, drawing on employees from different functional disciplines worldwide, allowing them to work together to develop products and attract and provide service to customers, fulfilling their demands globally.

[7]    As a result of Nortel's matrix structure, no single Nortel entity, either NNUK or any of the other EMEA debtors in Europe, or NNI or any of the other US debtors in the United States, or NNL or any of the other Canadian debtors in Canada, was able to provide the full line of Nortel products and services, including R&D capabilities, on a stand-alone basis.

---

[2] EMEA is an acronym for all of the Nortel subsidiaries in Europe, the Middle East and Africa.

[8]    R&D was the primary driver of Nortel's value and profit. Together with NNL, the principal companies that performed R&D were NNI, (a US company), NNUK, NNSA, (a French company) and Nortel Networks Ireland (an Irish company)[3].  These were known as Residual Profit Entities ("RPEs") due to their participation from 2001 in a residual profit pool in connection with Nortel's transfer pricing arrangements. Other operating companies performed sales and distribution functions and were known as Limited Risk Distributors or Entities ("LRDs").

[9]    R&D was performed at labs around the world. The advanced technology primary research which was intended to develop novel, cutting edge intellectual property technologies was performed mostly in NNL laboratories in Ottawa, which also did R&D for various lines of business. From 2000 to 2009 NNL accounted on average for just under half of all R&D expenditures, more in the latter years than the earlier years. NNI accounted for 38 to 42% and EMEA accounted for 16 to 20% in the earlier years and 11.7 % from 2005 to 2009. Between 2001 and 2008, NNUK's share of R&D was 5.5 %. The R&D was shared throughout the Nortel Group as needed by the lines of business and customer needs in the various regions and countries.

[10]    Because R&D was the primary driver of Nortel's value and profit, the residual profits of Nortel, after payment of fixed rates of return to all Nortel companies for sales and distribution functions, were paid to the RPEs under a Master Research and Development Agreement ("MRDA") in accordance with a residual profit split method ("RPSM") based on each RPE's percentage expenditure on R&D each year of the total R&D yearly expenditure of all RPEs.

[11]    Under the MRDA, each RPE, including NNUK, was granted an exclusive right to make and sell in its territory Nortel products using or embodying Nortel intellectual property developed by Nortel companies anywhere in the world and a non-exclusive right to do so in territories that were not exclusive to an RPE.

---

[3] Nortel Networks Australia was also a RPE until December 31, 2007.

## NNUK and the UK pension plan

[12]    NNUK was a wholly owned direct and indirect subsidiary of NNL. NNL acquired its NNUK business by acquiring the UK business of STC plc initially by a minority investment in 1987 and entirely in 1991. STC, and then NNUK, had a defined benefits or "balance of cost" plan under which employees made specified contributions and the employer was required to fund the balance of the cost of providing the benefits after taking into account the contributions paid by the employees and the investment performance of the plan's assets (the "UK Plan"). As sponsor, NNUK was responsible for funding any deficit in the plan and was entitled to take contribution reductions or holidays when the plan was in surplus.  In December, 2002 an actuarial valuation of the UK Plan disclosed a deficit for the first time since 1988.

[13]    Under UK pension law, a pension plan (or scheme[4]) is managed by a trustee independent from the employer sponsor of the plan. The UK Plan was managed by its independent trustee, Nortel Networks UK Pension Trust Limited (the "Trustee").  The Trustee held the UK Plan's assets in trust to pay the benefits required by the UK Plan.  The Trustee had the responsibility for the investment of the plan's assets.  NNL did not have the responsibility or authority to dictate the asset mix (the split between bonds and equities, and the make-up of each) or the choice of investment managers.

[14]    When Nortel acquired STC in 1991, the UK Plan was in surplus and had been since 1988. There had been a contribution holiday in that STC since May 1, 1989 had not been making contributions to the UK Plan. This had been suggested by the Chairman of the Trustee, Mr. Ken Gardner, to STC. It was a common thing to do in the UK. The UK government discouraged the accumulation of surpluses because they could be used as a tax haven by employers and adverse tax consequences would be imposed if a pension plan's surplus grew too large.

---

[4] Pension plans in the UK are called schemes.

[15]    Under UK pension laws, a triennial valuation of a pension plan's assets is required. The UK Plan actuary considered the contribution holiday at each triennial valuation and on each valuation until 2002, the actuary confirmed to the Trustee that a contribution holiday could be taken.

[16]    Following the global stock market crash in the early 2000s, NNUK agreed that a valuation of the UK Plan should be completed a year earlier than required (in 2002 instead of 2003) to determine its funding position.  NNUK and the Trustee also agreed that yearly updates on the UK Plan's funding position would be done thereafter.  Underlying this agreement was the realization the UK Plan might have entered into a deficit despite the fact the 2000 actuarial valuation had disclosed a surplus.

[17]    The valuation, conducted as at April 5, 2002 and dated December 19, 2002 disclosed a deficit in the plan for the first time since 1988.  The deficit of £177 million was calculated on an on-going basis, i.e. assuming the business and the plan continued.  Interim reviews of the UK Plan as at April 5, 2003 and as at April 5, 2004 indicated a deficit of £346 million and £315 million, respectively, on an on-going basis.

[18]    In October 2002, NNUK resumed contributions.   From 2002 through 2005, NNUK contributed a total of £184 million, comprised of £33 million in 2002, £59 million in 2003, £46 million in respect of 2004 and £46 million for 2005.

[19]    From 2002 Nortel and the Trustee discussed funding the deficit in the UK Plan.  The Trustee initially wanted to conclude a long-term funding arrangement with NNUK that would provide for the retirement of the deficit over a period of years.   While NNUK affirmed its intention to remove the deficit, it could not commit to a long-term funding arrangement at that time in light of the uncertain state of the market, cease trade orders issued by the Ontario and US securities commissions that restricted Nortel's access to capital markets and other issues arising from the various restatements of NNC's consolidated financial statements, including a large class

action settlement that was in the process of being finalized. Concerns about liquidity and affordability of contributions constrained Nortel's approach in eliminating the deficit.

[20]    Under the *Pensions Act 2004*, (UK) c. 35 ("2004 Act"), if there is a deficit, the trustee and the employer sponsor are required, within a prescribed timeframe, to negotiate and agree to a recovery plan that sets out the steps to restore the plan to full funding and the time period over which it is to be achieved.    The 2004 Act contemplates a robust, arm's length negotiation between the employer and the Trustee.  This was different from the previous pension legislation in the *Pension Act 1995* (UK) c. 26, under which the employer had unilateral authority to set contribution levels.

[21]    In February 2005, the Trustee retained PricewaterhouseCoopers LLP to act as its financial advisor in the funding negotiations. The Trustee's legal advisor was Pinsent Masons LLP, a leading UK pensions firm.

[22]    As negotiations progressed, the Trustees became uncomfortable accepting a long-term proposal because they were worried by uncertainty regarding the nature and scope of their obligations and potential liability under the recently enacted 2004 Act. In the result, NNUK and the Trustee agreed to a 2005 schedule of payments which provided for an immediate contribution by NNUK to the plan of £10 million, annual contributions of £46 million to be made in quarterly installments from 2005 through 2007, and a further 2006 schedule of contributions by NNUK of £85 million from 2006 to 2008.

[23]    Eventually a Funding Agreement was made between NNUK and the Trustee dated November 21, 2006 that provided for the 2005 deficit to be paid over seven years from 2005 to 2012. As well, NNL signed a Funding Guarantee on the same date guaranteeing the obligations of NNUK under the Funding Agreement. There is a difference between the parties as to whether NNL has any liability under the Funding Guarantee and, if so, what the obligations of NNUK were that were guaranteed by NNL.

**Project Swift**

[24]    Project Swift resulted from an interest-free loan of some US $950 million owing on the books of NNUK by NNL to NNUK which had been built up over several years. Because the loan was interest-free, the UK tax authorities had imputed interest to NNUK each year. NNUK had had previous tax losses and therefore had not had to pay tax on the imputed interest. However by 2007 the tax people in EMEA became concerned that the tax losses were running out and that tax may have to be paid in the future for the imputed income to NNUK. They therefore recommended what was known as Project Swift which resulted in a transfer to NNUK in December 2007 of a number of EMEA subsidiary corporations indirectly owned by NNL in return for a reduction in the loan owing by NNL to NNUK in an amount equal to the value of the subsidiaries transferred to NNUK.

[25]    Valuations of the subsidiaries were carried out by the parties to ensure that adequate value was provided to NNUK in return for the loan to be reduced. One of the subsidiaries intended to be transferred to NNUK was NNSA, the French Nortel subsidiary. However concerns arose as to the value of NNSA due to a tax audit by the French tax authorities. NNUK wanted that problem to be dealt with and a new valuation undertaken of NNSA before it was transferred to NNUK. In the result, an 8.83% minority interest in NNSA held by NNIF (a Netherlands company) was transferred to NNUK based on an evaluation of that interest, and the balance of the 91.17% of NNSA owned by NNL was not transferred in December, 2007 at the time of the other transfers and the amount of the loan owing by NNL to NNUK that was repaid was reduced by the value that had been ascribed to that interest in NNSA.

[26]    The issues at NNSA were not resolved by the time of the CCAA filing on January 14, 2009 and the 91.7% interest of NNL was never transferred to NNUK. The UKPC contends that this failure to transfer the remaining interest of NNSA to NNUK is an important consideration in the FSD, oppression and unjust enrichment claims.

[27]    One of the Trustee's concerns regarding Project Swift was that exchanging NNUK's loan for EMEA Nortel subsidiaries would detrimentally impact the amount of recoveries that would accrue to the UK Plan in the event NNUK failed.  As a result, the Trustee sought a guarantee from NNL to cover the value gap to the UK Plan if NNUK failed after Project Swift was implemented.

[28]    A USD$150 million guarantee dated December 21, 2007 (the "Swift Guarantee") was signed by NNL. There is a difference between the parties as to whether NNL has any liability under the Swift Guarantee. The UKPC say further that issues regarding the Swift Guarantee are to be taken into account in the oppression and unjust enrichment claims.

**Claims made by UKPC**

[29]    The Trustee of the UK Plan and The Board of the Pension Protection Fund established under the 2004 Act (together the UK pension claimants or "UKPC") assert a number of claims in these CCAA proceedings against NNC and NNL.

[30]    They claim (i) under the 2004 Act for what it says NNC and NNL would have been required to pay under the FSD regime set up under the 2004 Act, (ii) under the 2006 Funding Guarantee by NNL, (iii) under the Swift Guarantee, (iv) for oppression, and (v) for unjust enrichment. NNC and NNL contend that there is no basis for any of these claims to succeed.

[31]    In this case the Monitor is acting under what is now referred to as a "super monitor" order of October 3, 2012 in which the Monitor was authorized to exercise any powers which may be exercised by a board of directors of any of the applicants, which includes NNC and NNL. This order occurred after NNC and NNL were left without any board of directors or management and it was necessary for the Monitor to be appointed to advance the interests of NNL and NNC in this CCAA proceeding. While I will refer to the Monitor, I do so in recognition that the Monitor is advancing the position of the Canadian debtors in this litigation.

**Financial Support Direction ("FSD") claim**

[32]    Prior to the 2004 Act, the *Pension Act 1995* (UK) imposed a minimum funding requirement i.e. that the assets of the scheme should not be less than the amount of its liabilities. After it came into effect in 1997, there was dissatisfaction with the statutory regime governing occupational pension schemes and in particular with the minimum funding requirement, which came to be recognized as inadequate to ensure pension schemes were sufficiently funded to meet their liabilities.

[33]    The 2004 Act came into existence as part of the UK government's efforts to ensure improved protection of pension scheme benefits, particularly those of members of defined benefit schemes. It introduced a new funding standard for occupational pension schemes. It also established The Board of the Pension Protection Fund ("PPF") and the Regulator. It also created the FSD regime.

[34]    The Board of the PPF is a statutory corporation. The 2004 Act requires it to hold, manage and apply the PPF. The PPF is funded by levies on pension schemes. If an insolvency event occurs in relation to an employer of a particular scheme, the Board of the PPF investigates the scheme during an assessment period to determine whether the scheme qualifies for entry into the PPF. If the scheme qualifies, the PPF assumes responsibility for the scheme. What is to be assessed is whether the value of the assets of the scheme is less than the benefits that would be payable by the PPF and whether a scheme rescue is not possible. If the PPF assumes responsibility for the scheme, the scheme's pension assets will be transferred to the PPF.

[35]    In the case of NNUK, an insolvency event occurred by reason of it entering into administration in 2009. The Board of the PPF has not yet determined whether it will assume responsibility for the NNUK pension scheme and thus the assessment period has not yet expired.

[36]    With the establishment of the PPF, there was a concern that employers might organize their affairs in a way that might end up requiring the PPF to fund the pension liabilities of the

employer or that the trustees of pension plan might choose to invest in a higher risk portfolio than appropriate, with the same result. The FSD regime was seen as a way to prevent this "moral hazard" by enabling the Regulator to issue FSDs and Contribution Notices to target companies associated with the employer. This was described by Lord Neuberger in *Nortel and Lehman Brothers v. Pension Regulator* (2013), [2014] A.C. 209 as follows:

> It was perceived that the creation of the PPF might encourage some employers to arrange their affairs so as to throw the burden of pension scheme deficiencies upon the PPF, which would unfairly burden other schemes by increasing the amount of the levies. An example of such an arrangement is where a group of companies uses a single company (a "service company") to employ people who then work for other group companies. In such a case, the employees' pension rights could be regarded as unfairly prejudiced if, by comparison with the resources of other group companies, the service company had very limited resources to meet a section 75 debt.

> The FSD regime was designed to mitigate such problems. In a nutshell, it enables the Regulator in specified circumstances (i) to impose, by the issue of an FSD to some or all of the other group companies (known as "targets"), an obligation to provide reasonable financial support to the under-funded scheme of the service company or insufficiently resourced employer, and (ii) to deal with non-compliance with that obligation by imposing, through a Contribution Notice, a specific monetary liability payable by a target to the trustees.

[37]   The Regulator is a UK governmental agency. Its chairman is appointed by the Secretary of State and at least five other members are chosen by the Secretary of State after consulting with the chairman. The Regulator consists of an executive arm and a Determinations Panel, which is separate from the executive arm and consists of a chairman and no fewer than six members who are not members of the Regulator or its staff. It is the Determinations Panel that may issue an FSD or a Contribution Notice. Its members are not judges.

[38]   If the Determinations Panel issues an FSD or a Contribution Notice, there is an appeal by way of rehearing as of right to the Tax and Chancery Chamber of the Upper Tribunal (the "Upper Tribunal"), a court of record created by Parliament. Decisions in the Tribunal are taken by legally qualified judges or members appointed by the Lord Chancellor. All members are

required to take the judicial oath, are independent, and are specialists in the area of law that they cover.

[39]    The hearing before the Upper Tribunal is a new hearing and it approaches the issue before it afresh rather than by way of reviewing the decision of the Regulator or the Determinations Panel. The UKPC in their brief describe the hearing as being on a de novo basis. The Upper Tribunal may consider any evidence relating to the matter whether or not it was available to the Determinations Panel at the material time. It may be slow to disregard findings of fact by the Determinations Panel but it may do so in an appropriate case. It has a fresh discretion to exercise. An appeal lies from the Upper Tribunal to the UK Court of Appeal and then ultimately to the UK Supreme Court.

[40]    In this case, the Trustee and the Board of the PPF claim on the basis that the Regulator would have issued an FSD and ultimately a Contribution Notice to NNC and NNL requiring them to provide financial support to the UK Plan.

[41]    There are four requirements for the Determinations Panel (or Upper Tribunal on an appeal) to order an FSD or a later Contribution Notice. (i) The scheme must be an occupational pension scheme. (ii) The target companies (NNC and NNL) must be associated with the employer (NNUK). These two requirements are not contested. (iii) A test known as the "insufficiently resourced test" (IR test) must be passed. (iv) The Determinations Panel (or Upper Tribunal) must determine that it would be reasonable to issue an FSD or later a Contribution Notice. These last two requirements are contested.

[42]    Before an FSD or Contribution Notice can be issued to a target company, the Regulator must in each case first send a warning notice to the target. In this case, on September 4, 2009, the Regulator wrote to NNC advising that it was considering issuing a warning notice seeking an FSD against NNC and other members in the Nortel Group. On September 16, 2009 NNC advised the Regulator in writing of the stay of proceedings provided for in the Initial Order under the

CCAA. In spite of that, on January 11, 2010, the Regulator issued a warning notice to NNC, NNL and 27 other companies in the Nortel Group.

[43]    On March 18, 2010, Justice Morawetz held that the proceedings started by the Regulator against NNC and NNL were in breach of the stay contained in the Initial Order and he declared that for the purposes of these proceedings all acts taken by the Regulator in the purported exercise of rights and in commencing any proceedings against any of the applicants without leave of the court were null and void and should be given no force or effect or otherwise recognized as creating or forming the basis of any valid or enforceable rights, remedies or claims against the applicants or any of their assets, property or undertaking in Canada. His order was upheld by the Court of Appeal on June 22, 2010, which agreed that the warning notice was a nullity.

[44]    It is only the Regulator that has the right to begin a claim in the FSD process provided for in the 2004 Act, although the Trustee and the PPF have a right to participate in the proceedings once commenced by the Regulator. The Regulator has not sought leave in the CCAA process to pursue an FSD claim in the UK under the 2004 Act, nor has it filed a proof of claim in the CCAA process. It is the Trustee and the Board of the PPF who have filed a proof of claim against NNC and NNL in this CCAA proceeding, asserting a contingent claim based on what they contend would have been achieved in the UK from the Determinations Panel or on review from the Upper Tribunal.

[45]    In spite of the order of Morawetz J., the Regulator proceeded in the UK before the Determinations Panel on an uncontested or default proceeding basis that was heard on June 2, 2010 and on June 25, 2010 the Determinations Panel issued a determination to issue FSDs to NNC and NNL. The FSDs were subsequently issued to NNC and NNL on April 1, 2011. The Regulator did not later send a warning notice to NNC or NNL that it would be seeking a Contribution Notice, a prerequisite for requesting the Determinations Panel to issue a Contribution Notice. No Contribution Notice was ever issued to NNC or NNL.

[46]    A number of defences to the FSD claim have been asserted. I now turn to them.

### (a) Is the FSD claim an exercise of sovereign authority and one which will not be enforced by this Court?

[47]    The Monitor asserts that it has long been recognized that Canadian courts should not enforce claims emanating from the sovereign authority of a foreign state.    The rule against enforcing foreign judgments grounded in penal, revenue or other public law is but one example of this general principle.

[48]    The Monitor refers to *United States v. Ivey* (1996), 30 O.R. (3d) 370 (C.A.) and other cases and emphasizes the factual difference between *Ivey* and this case. I have considerable difficulty with the argument of the Monitor in several respects, and considerable difficulty with some of the extreme assertions of the UKPC in their reply brief. In the end, I do not need to deal with this contention.

[49]    The Monitor in argument contended that an FSD claim is a long arm statute authorizing the UK to claim in other countries in global insolvencies, and if such a claim were recognized, every country involved in international insolvencies would have no choice but to do the same thing by creating a similar regime. I understand the argument but it would seem to me to be a policy issue for Parliament to deal with rather than the courts.

### (b) Are these proceedings intended to impermissibly reorder and interfere with the rights of the creditors of NNL and NNC?

[50]    The Monitor contends that the FSD claim asserted in this proceeding is intended to interfere with the *pari passu* principle that creditors be treated equally. The Monitor also contends that the FSD claim is an attempt to reorder the rights of the creditors of NNC and NNL simply because of the insolvency of NNC and NNL and that under Canadian insolvency law no one is permitted to cause a reordering the rights of creditors. I do not accept these contentions of the Monitor.

[51]    The Monitor relies on a statement of Justice Farley in *Re Teleglobe Inc.*, (2005), 10
C.B.R. (5th) 120 that a claim under an order by the Superintendent of Corporations in Columbia
that Teleglobe Canada should repay to its Columbian subsidiary money obtained by it from its
subsidiary in Columbia should not leapfrog over the claims of the creditors of Teleglobe Canada
which was in CCAA protection.

[52]    I do not see the *Teleglobe* case as being of any application. It did not concern recognizing
a claim but was an application for payment. In that case, the claim of the Columbian subsidiary
was a claim in the Canadian CCAA proceedings and an application had been made to Farley J. to
order the payment to be then made to the Columbian subsidiary which was also in insolvency
protection in Columbia. The claim filed by the Columbian subsidiary was an unsecured claim
and if it had then been paid it would indeed have leapfrogged in front of the other creditors of
Teleglobe Canada. Farley J. stated:

> 8. ... it does not seem to me that it would be appropriate to stretch the doctrine of
> comity or the principles of *Morguard Investments Ltd. v. De Savoye*, [1990] 3
> S.C.R. 1077 (S.C.C.) or *Beals v. Saldanha*, 2003 SCC 72 (S.C.C.) in such a way
> that the claim of TCol is leapfrogged over the queue of the other unsecured
> creditors of TCan. What has to be appreciated is that TCan is also in insolvency
> and given the protection of the CCAA order for the benefit of its estate. This is
> not a situation where there is only a foreign insolvency — namely TCol — which
> would be a completely different situation — but there is also a Canadian
> insolvency — namely TCan. The Canadian insolvency court must protect the
> rights of all creditors, foreign or domestic; however, it would be contrary to the
> doctrine of equal treatment of creditors to prefer — or advance — the interest of
> foreign creditors over the interests of domestic creditors.

[53]    If the claim of UKPC is a proper claim in the CCAA proceeding, I do not see how it
would be any different from any other foreign creditor with a claim. There would be nothing
impermissible about it as somehow ignoring the *pari passu* principle of equal distributions to
creditors. Moreover, the claim would not be caused by the insolvency of NNC or NNL but rather
by the establishing of grounds under the 2004 Act for the issuance of an FSD and then a
Contribution Notice.

### (c) Does the UKPC lack status to bring the FSD claim?

[54]    The Monitor asserts that only the Regulator has the power to initiate an FSD proceeding and that neither the Trustee nor the Board of the PPF have any power to direct the Regulator to commence an FSD proceeding. If the Trustee and PPF have no status to commence FSD proceedings in the UK, it is said that they can have no status to be the claimants in this proceeding. It was open to the Regulator to seek leave of this Court to recommence FSD proceedings against NNL and NNC or to simply file a proof of claim in this claims process. The Regulator has exercised its discretion not to do either.

[55]    The UKPC assert that the decision of Morawetz J. in declaring the warning notice a nullity and the decision of the Court of Appeal in upholding that order made clear that the UKPC has standing. I do not agree. Neither Morawetz J. nor the Court of Appeal purported to rule on such matters. Morawetz J. said the claim of the Trustee has to be considered a contingent claim. He did not at all discuss whether the Trustee had standing to make the claim or otherwise deal with the merits of the claim. The Court of Appeal stated that the order of Morawetz J:

> "...should not operate so as to preclude the UK Trustee and/or the Pension Protection Fund from seeking to assert, by way of amendment to the Proof of Claim, if necessary, a claim in the Companies' Creditors Arrangement Act process for pension contribution shortfalls, including for the relief they would have been able to establish in the UK Financial Support Direction process".

[56]    By saying that the UKPC can seek to assert a claim can in no way can be taken as a judgement by the Court of Appeal on the status or right of the UKPC to make such a claim. In the vernacular, the Court of Appeal was saying no more than "you can give it your best shot". I would note that the Court of Appeal seems to have been under the misapprehension that the Trustee and the PPF were the parties to establish a case before the Determinations Panel rather than the executive arm of the Regulator that has the exclusive right to commence an FSD claim, which makes it clear that they were not giving any considered thought to the status of the Trustee or PPF to make a claim in this CCAA proceeding.

[57]    However, the 2004 Act provides in section 49(3) that any amount specified in a Contribution Notice is to be treated as a debt due from the target to the trustee of the pension scheme. It also provides in section 49(5) that during the assessment period the rights of a trustee with respect to money owing to them by virtue of a Contribution Notice are exercisable by the Board of the PPF and in section 49(6) that any money received by the Board of the PPF during the assessment period is to be paid to the trustee of the scheme. It seems clear therefore that it would be the Trustee of the NNUK pension scheme that would have the economic interest in any FSD proceeding rather than the executive arm of the Regulator who would be responsible for pursuing the claim before the Determinations Panel and the Upper Tribunal.

[58]    If the executive arm of the Regulator were to file a proof of claim in this proceeding, it would be seeking to establish a claim that would, if successful, result in a claim payable to the Trustee. The Regulator could not itself claim to be a creditor, contingent or otherwise, of NNC or NNL. So far as standing is concerned, the Regulator would be in no better position than the Trustee in making the claim. In light of the Trustee being the party with the economic interest in the claim in this proceeding, I conclude that the UKPC has standing to file the claim.

[59]    This is not to say, however, that there may not have been some benefit in the executive arm of the Regulator being the claimant in this proceeding. Issues in the FSD claim include whether the Regulator would proceed to assert a contested FSD claim against NNC or NNL before the Determinations Panel, whether if an FSD were issued by the Determinations Panel the Regulator would accept a settlement and in what amount, and whether the Regulator would request the Determinations Panel to issue a Contribution Notice against NNC or NNL and in what amount. These would be discretionary matters for the Regulator to consider, and its presence in this proceeding may have shed some light on what its thinking would have been.

### (d) What is the contingency to be measured and is it a provable claim?

[60]    Under the 2004 Act, the Regulator must choose a date on which the insufficiently resourced test is applied. In this case, the Regulator chose June 30, 2008. The 2004 Act at the

time stipulated that the relevant time for the insufficiently resourced valuation date had to fall within two years prior to the Determinations Panel's decision to issue the FSD. Thus the Determinations Panel had until June 30, 2010 to decide whether to issue an FSD to NNC or NNL. It did so on June 25, 2010.

[61]    However, Morawetz J. in his order of March 18, 2010 declared that the Warning Notice issued to NNC and NNL by the Regulator on July 11, 2010 was null and void as being contrary to the stay in the Initial Order and that all acts taken by the Regulator without leave of the court should be given no force or effect or otherwise recognized as creating or forming the basis of any valid claim. The 2004 Act now stipulates that the relevant time for the IR valuation date must fall within two years prior to the issuance of a Warning Notice. No new Warning Notice has been issued by the Regulator and, if one were, the date on which the IR test would have to be performed would have to be within two years of the issuance of the Warning Notice, long after the June 30, 2008 date that had been chosen by the Regulator to perform the IR test.

[62]    The Monitor contends that even if the UKPC has status to make this FSD claim, there must still be a valid FSD proceeding underpinning the claim being advanced by the UKPC. As no valid Warning Notice has been issued by the Regulator, there is no preceding two year period yet during which the IR test must be satisfied. Therefor it is contended that without knowing the date on which the IR test is to be satisfied, there is no valid FSD claim that can be asserted by the UKPC.

[63]    UKPC contend that the Monitor's position contains a misunderstanding of the nature of the contingent claim being made. As a contingent claim, what has to be determined is what the chances were, as of the date of NNC and NNL's CCAA filing on January 14, 2009, that an FSD and Contribution Notice would have been issued by the Determinations Panel or the Upper Tribunal. This determination is not dependent on an actual Warning Notice having been issued, or a relevant Time (i.e. an IR valuation date) having been selected by the Regulator, by January 14, 2009 or any other date. This is because, as at the date NNC and NNL filed for CCAA

protection, they were also contingently exposed to a liability based on NNUK being insufficiently resourced at dates including but not limited to June 30, 2008.

[64]    I accept this position of the UKPC. It is then necessary to first consider what standard should be applied to assess the contingency and then consider what the steps are in an FSD claim leading to a Contribution Notice being issued and whether they can be measured in a way that meets the standard to be applied.

### (i) Standard to be applied

[65]    Pursuant to section 2 of the CCAA, a Claim is defined as:

> ... any indebtedness, liability or obligation of any kind that would be a claim provable within the meaning of section 2 of the *Bankruptcy and Insolvency Act*.

[66]    Section 2 of the BIA defines a "Claim" as:

> ... any claim or liability provable in proceedings under this Act by a creditor.

[67]    Section 121 of the BIA defines a claim as:

**Claims Provable**

121. (1) All debts and liabilities, present or future, to which the bankrupt is subject on the day on which the bankrupt becomes bankrupt or to which the bankrupt may become subject before the bankrupt's discharge by reason of any obligation incurred before the day on which the bankrupt becomes bankrupt shall be deemed to be claims provable in proceedings under this Act.

**Contingent and unliquidated claims**

121. (2) The determination whether a contingent or unliquidated claim is a provable claim and the valuation of such a claim shall be made in accordance with section 135.

**Determination of provable claims**

135. (1.1) The trustee shall determine whether any contingent claim or unliquidated claim is a provable claim, and, if a provable claim, the trustee shall

value it, and the claim is thereafter, subject to this section, deemed a proved claim to the amount of its valuation.

[68]    *AbitibiBowater Inc., Re*, [2012] 3 S.C.R. 443 recently dealt with the subject of contingent claims in an insolvency. In that case Justice Deschamps for the majority of the Court stated:

> **26**    These provisions highlight three requirements that are relevant to the case at bar. First, there must be a debt, a liability or an obligation to a *creditor*. Second, the debt, liability or obligation must be incurred *before the debtor becomes bankrupt*. Third, it must be possible to attach a *monetary value* to the debt, liability or obligation.

[69]    Deschamps J. also reiterated the test for a contingent claim to be that it must not be too remove or speculative. She stated:

> **34**    Unlike in proceedings governed by the common law or the civil law, a claim may be asserted in insolvency proceedings even if it is contingent on an event that has not yet occurred (for the common law, see *Canada v. McLarty*, 2008 SCC 26, [2008] 2 S.C.R. 79, at paras. 17-18; for the civil law, see arts. 1497, 1508 and 1513 of the Civil Code of Québec, S.Q. 1991, c. 64). Thus, the broad definition of "claim" in the BIA includes contingent and future claims that would be unenforceable at common law or in the civil law. As for unliquidated claims, a CCAA court has the same power to assess their amounts as would a court hearing a case in a common law or civil law context.

> **36**    The criterion used by courts to determine whether a contingent claim will be included in the insolvency process is <u>whether the event that has not yet occurred is too remote or speculative</u>: *Confederation Treasury Services Ltd. (Bankrupt), Re* (1997), 96 O.A.C. 75. In the context of an environmental order, this means that there must be sufficient indications that the regulatory body that triggered the enforcement mechanism will ultimately perform remediation work and assert a monetary claim to have its costs reimbursed. If there is sufficient certainty in this regard, the court will conclude that the order can be subjected to the insolvency process. (Underlining added).

[70]    Exactly what makes a claim too remote or speculative, or what is a sufficient certainty, is not easily discerned. *Confederation Treasury Services Ltd. (Bankrupt), Re* referred to by Deschamps J. held that a test for a valid contingent claim requiring a need for probability of liability, i.e. establishing on a balance of probabilities, arising from the court proceedings in

question imposed too high a threshold. How much below that one goes to determine whether a claim is too remote or speculative must depend on the facts of the case.

### (ii) Application of the "too remote or speculative" standard

[71]    The Monitor contends that whether a Contribution Notice would ultimately be issued in this case and in what amount is too remote and speculative. UKPC say it is not. I have come to the conclusion that the Monitor is correct. Even assuming that the IR test were met, it would be speculative in the extreme to conclude that a Contribution Notice could or would be issued. In many respects, to put a percentage chance on what the executive arm of the Regulator, the Determinations Panel or the Upper Tribunal would do in regards to decisions to be taken would be uninformed guess work. My reasons for coming to this conclusion that the FSD claim is too remote or speculative to be admitted as a claim follow.

[72]    There are several steps in an FSD claim proceeding leading to a binding Contribution Notice. They include (i) whether the Regulator would seek leave of this Court to issue a Warning Notice that it is considering asking the Determinations Panel to issue an FSD, and whether the Court would grant leave permitting the Regulator to proceed to a hearing of the Determinations Panel; (ii) what date the Regulator would choose to determine the IR test; (iii) whether the Determinations Panel would find that the IR test has been met such that it would be open to the Determinations Panel to issue an FSD; (iv) whether the Determinations Panel would determine that it was reasonable to issue an FSD; (v) whether if the Determinations Panel decided that it was reasonable to issue an FSD what the Upper Tribunal on an appeal would decide with respect to steps (iii) and (iv); (vi) if the Upper Tribunal upheld the decision of the Determinations Panel to issue an FSD, whether the target would be able to come to some settlement with the Regulator on the level of financial support to be provided to the underfunded pension plan; (vii) assuming no agreement, whether the Regulator would issue a Warning Notice that it was considering asking the Determinations Panel to issue a Contribution Notice and what amount the Regulator would seek from the Determinations Panel; (viii) whether the Determinations Panel would determine that it was reasonable to issue a Contribution Notice; (ix) what amount the

Determinations Panel would determine should be required in the Contribution Notice to be paid; (x) whether the Upper Tribunal would uphold a decision of the Determinations Panel to issue a Contribution Notice and, if so, in what amount.

[73]    With respect to the date that the Regulator would likely choose to undertake the IR test, the UKPC say that evidence of the date the Regulator actually chose (June 30, 2008) is compelling evidence of the date the Regulator would have likely chosen in a hypothetical regulatory action against NNC and NNL. The Monitor concedes that if the UKPC have standing to assert a claim and if the claim can be asserted in the absence of an actual Warning Notice, it would be reasonable to assume that the Regulator would have selected June 30, 2008 as the date for the IR test, being the only date for which valuation evidence is available.

[74]    The Monitor says that the threshold question of whether the IR test has been met is not a contingency issue as it involves applying the IR test on a retrospective basis as of June 30, 2008 and does not depend on future events unfolding and thus is a question to be determined in this Court on a balance of probabilities. The UKPC have not contended otherwise. For the purposes of considering whether an FSD or Contribution Notice is too remote or speculative, I will assume that the date for the IR test is June 30, 2008 and that the IR has been met.

[75]    The Regulator did not seek leave from this court to issue a Warning Notice after the Warning Notice that it did deliver to NNC and NNL was declared by Morawetz J. to be null and void. It just proceeded without regard to that order. It is unknown so far as any evidence in this case is concerned whether it would seek leave to issue a new Warning Notice. So far as to whether leave would be granted, I note that Mr. Legge Q.C., the expert witness for the Monitor on UK law said in his report that he has been asked to assume that such leave would be given. I will make the same assumption.

[76]    The next contingency would be whether the Regulator would issue a Warning Notice and then seek to have the Determinations Panel issue an FSD. In light of the Regulator having taken those steps, it would not be too remote or speculative to think that the Regulator would proceed

that way if it sought and obtained leave to do so in what Mr. Barrack referred to as this hypothetical exercise of considering the contingency.

[77]    Whether, assuming that the IR test has been met, the Determinations Panel would conclude that it was reasonable to issue an FSD, or whether the Upper Tribunal would do so on a rehearing, are certainly contingencies that must be assessed.

[78]    Whether the Determinations Panel (or on review the Upper Tribunal) would issue an FSD would depend on whether it was reasonable to do so. The 2004 Act provides in section 43(7) that the Determinations Panel must have regard to such matters as it considers relevant, including a number of particular matters, as follows:

> 43(7)   The Regulator[5], when deciding for the purposes of subsection (5)(b) whether it is reasonable to impose the requirement of a financial support direction on a particular person, must have regard to such matters as the Regulator considers relevant including, where relevant, the following matters –
>
> (a) the relationship which the person has or has had with the employer (including, where the employer is a company within the meaning of subsection (11) of section 435 of the Insolvency Act 1986 (c. 45), whether the person has or has had control of the employer within the meaning of subsection (10) of that section),
>
> (b) in the case of a person falling within subsection (6)(b) or (c), the value of any benefits received directly or indirectly by that person from the employer,
>
> (c) any connection or involvement which the person has or has had with the scheme,
>
> (d) the financial circumstances of the person, and
>
> (e) such other matters as may be prescribed.

[79]    It is agreed by the experts on both sides that this list is not exhaustive. The section states that the Determinations Panel must have regard to such matters as it considers relevant. Mr. Ham Q.C., the expert witness on UK law for the UKPC, said, and in this Mr. Legge concurred, that

---

[5] Under the 2004 Act, a decision of the Determinations Panel is a decision of the Regulator. The 2004 Act specifies what acts of the Regulator must be made by the Determinations Panel rather than the executive arm of the Regulator. The reference to the Regulator in section 47(3) is a reference to the Determinations Panel.

the issue of reasonableness is to be determined "in the round". That is an attractive phrase but gives little guidance to a foreign judge in considering what matters the Determinations Panel would consider relevant.

[80]   There have been only four cases before the Determinations Panel dealing with an FSD[6] and none by the Upper Tribunal. Mr. Ham testified that the Determinations Panel is not particularly expert. There has been no judicial guidance at all from the Upper Tribunal or higher appellate authority on the issue of reasonableness under section 43(7).

[81]   Mr. Ham in his report asserted that there was a "significant body of case law" on what would be considered to be reasonable. However on cross-examination he acknowledged that there is going to be very little guidance to be taken from the reasonableness determinations in the few existing FSD cases because these cases are highly fact-specific and independent. I accept the opinion of Mr. Legge that very little reliance can be placed on the decisions thus far reached by the Determinations Panel.  Mr. Legge also pointed out that apart from the uncontested Nortel decision, the other cases involved service companies that had few if any assets and the reasonableness factors would be applied differently to them. Commonly such groups have assets in another jurisdiction as a way of avoiding tax in the UK

[82]   One of the factors listed in section 43(7) is "the value of any benefits received directly or indirectly" by the target (in this case NNC or NNL) from the employer (NNUK). The UKPC contends that there have been benefits received by NNL from NNUK such as an interest free loan, a contribution holiday to the UK pension plan when it was in surplus and from alleged defects in the transfer pricing agreement made by NNUK with other companies in the Nortel Group. The Monitor contests all of these assertions of the UKPC but goes on to assert that there were other offsetting benefits that have to be taken into account such as (i) a £700 million infusion of cash into NNUK in January 2001 by NNL paid for by NNL; (ii) extremely valuable research and development done and paid for by NNL that was to the benefit of NNUK and (iii)

---

[6] Only one concerned a FSD for an insufficiently resourced company, being the undefended Nortel case.

very high rates of return paid to NNUK for its distribution functions. The Monitor contends that as a whole there were no net benefits flowing from NNUK to NNC or NNL.

[83]    This issue of offsetting benefits is no small matter considering the integrated way in which Nortel operated. Significant benefits flowed to NNUK from the intercompany arrangements of the Nortel Group, which would not have been available to NNUK as a stand-alone entity. These included access to R&D and technology on an exclusive basis in its territory on a royalty-free basis without incurring substantial up-front costs, rights to sell Nortel technology developed anywhere in the world, diversified territories and customers from which NNUK could derive revenue, opportunities to derive revenues from intercompany sales, tax efficiencies, and access to liquidity through financing, recapitalization, and treasury services by NNL. NNUK could not have operated as a stand-alone entity. NNUK's fortunes were tied to NNL's continued existence.

[84]    NNUK was a regular recipient of intercompany financing.    For example, between approximately 2000 and 2003, NNUK was a net borrower of over $1 billion from NN Ireland, Nortel Matra Cellular (predecessor to NNSA), NN Australia, NN Singapore, NN Europe Sales, H.O.C. (a Hungarian financing subsidiary) and NNI. The loans from NN Ireland and NN Singapore, a relatively small amount of this total, were interest-free. I was pointed to no evidence that NNUK made any cash outlay for any interest on these loans, and in light of the way in which Nortel operated its cash management system, I would not assume that it did.

[85]    The £700 million infusion of cash into NNUK in January 2001 by NNL at no cost to NNUK this was by way of a capital infusion. Dr. Reichert, a transfer pricing expert called by the Monitor points out that external financing was primarily obtained through debt issuances by Nortel entities in Canada and the United States, and these entities bore the interest costs of this financing. An examination of Nortel's financial data for 2001-2008 indicates that NNL bore 82% of the external financing costs, and NNI bore 10% of the costs. However, other Nortel entities including NNUK benefited from the debt financing as it was a source of capital for the entire Nortel Group. Although it had access to cash from NNL when cash was needed, NNUK never

paid a dividend back to NNL. Dr. Reichert concluded that NNL effectively relieved NNUK of the burden of interest bearing financing despite NNL having significant interest costs on its external debt capital.

[86]    The evidence disclosed that the rate of return to NNUK on its sales and distribution function was 23.6% in the 2001-2005 period, and a 15% markup on excess SG&A expenses from 2006 onwards. Dr. Reichert testified that these returns were far higher than market. He said that in his entire career as a transfer pricing economist, he had never seen a routine return to distribution anywhere close to those figures. Dr. Felgran, the transfer pricing expert called by the UKPC, did not testify on this issue at trial but in his deposition testified that in his 20 years of experience, he would expect to see routine returns to distribution somewhere in the range of 1-5%, and confirmed that he has never seen routine returns in excess of 20%. Dr. Reichert estimated that NNUK had been overcompensated in relation the market pricing by some US$231 million just for the period 2001 to 2005. This is much greater that the interest not paid on the loan from NNUK to NNL estimated to be US$135[7] million that the UKPC says should be considered a benefit to NNL.

[87]    The UKPC says that there is no room for this argument of the Monitor of offsetting transfers of benefits to NNUK as offsetting benefits are not listed as a factor in section 47(3). It contends that it is "emphatically not" a requirement that the Regulator can demonstrate that a net benefit flowed from a UK employer to a target. It points to statements of the Determinations Panel in three cases. I do not read them as dealing generally with offsetting benefits but rather dealing with UK employer service companies and services provided by them to a target and what was paid for the service by the target.

[88]    Be that as it may, if one could establish that offsetting benefits were provided to NNUK by NNL, one might ask why that could not be argued by NNL as a factor that the Determinations Panel or Upper Tribunal could take into account in considering whether it was reasonable to issue an FSD or Contribution Notice. Mr. Ham said on his cross-examination that it would be

---

[7] I accept this figure of Dr. Reichert correcting the calculation of Dr. Felgran.

incumbent on the Regulator to consider the benefits coming back to the employer, but whether he is right or wrong on this is unknown. There is no guidance on this from the few cases dealt with by the Determinations Panel and absolutely no guidance from any judicial authority in the UK on the point, either from the Upper Tribunal or higher appellate authority.

[89]    Should these factors raised by the Monitor be considered and weighed in the balance in determining whether an FSD or Contribution Notice would be reasonable? In my view, and contrary to the assertion of the UKPC, these factors should be considered and they should add considerable weight to the side of the scales that militates against an FSD or Contribution Notice being reasonable. But that is not the issue. The issue is whether I am in a position to make a determination that the Determinations Panel or Upper Tribunal would think these issues should be considered and weighed in the balance and what effect the factors would have on their decision. I am not in a position to make such a determination other than to speculate.

[90]    As stated, the UKPC contend that the transfer pricing regime established in the Nortel Group was faulty and that the faults caused benefits to be provided by NNUK to NNL. There was much competing expert evidence led on this issue before me. It is not an easy subject. Mr. Ham, the UK expert on English law, stated with reference to the procedures under the 2004 Act that the Determinations Panel strives to be quick and that the duration of hearings is nearly always measured in days rather than weeks. The contested hearing on the Lehman case took two days. The uncontested Nortel case took one day.  One may ask whether it was intended that complicated issues of transfer pricing involving competing experts were intended to be dealt with by a Determinations Panel with no expertise at all in either transfer pricing or the law of transfer pricing. Again, there is no judicial guidance at all on such an issue, either in the Upper Tribunal or higher appellate authority.[8]

---

[8] I am aware that in the uncontested Nortel case, the Determinations Panel made a finding that the Nortel transfer pricing system did not adequately compensate NNUK for the benefits it provided to the Nortel group. However, this was based on an expert report that was not challenged and involved no real analysis by the Determinations Panel other than to accept the conclusions in the report.

[91]   Assuming that an FSD were issued by a Determinations Panel or the Upper Tribunal, a key contingency would be whether the executive arm of the Regulator would ask the Determinations Panel to issue a Contribution Notice to NNC or NNL and in what amount. If it decided to seek a Contribution Notice, the Regulator would first have to provide a warning notice to NNC and NNL. It is no easy matter to conclude that that the Regulator would take these steps.

[92]   What the regulator would decide would likely involve matters of policy taken by the executive arm of Regulator, which is a UK governmental agency. That could well involve value judgments, particularly in a situation as this in which to a great extent the Regulator would be seeking payment effectively from Canadian employees of Nortel who have extremely large claims for deficiencies of $3 billion. While it is not known how much of any recovery from Canada would actually go to the PPF rather than former employees of NNUK, it could be a considerable portion.

[93]   What is known is that in spite of the order of Morawetz J. of March 18, 2010 declaring the warning notice sent by the Regulator to NNC and NNL to be contrary to the stay in the Initial Order and declaring that all steps taken by the Regulator without leave were null and void and of no force and effect, the Regulator proceeded to a hearing of the Determinations Panel on June 2, 2010 and on June 25, 2011 the Determinations Panel issued a notice that it intended to issued FSDs to NNC and NNL. These were sent by the Regulator to NNC and NNL on April 1, 2011. They directed NNC and NNL to secure financial support within the meaning of section 45 of the 2004 Act within six months.

[94]   Although neither NNC nor NNL took steps to comply with the FSDs, the Regulator took no steps to send a warning notice to NNC or NNL that it was considering asking the Determinations Panel to issue a Contribution Notice to either NNC or NNL, a prerequisite of pursing a Contribution Notice against them.

[95]    The UKPC say that the Regulator did not proceed to seek the issuance of a Contribution Notice because of the stay of proceedings in the CCAA proceedings and the fact that any Contribution Notice would not be enforceable. I cannot accept this submission. First, the Regulator could have sought leave in the CCAA process to pursue a claim in the UK for an FSD and a Contribution Notice but it did not do so[9]. Second, there is no evidence at all as to why the Regulator took no steps to seek a Contribution Notice. There is nothing more than the assertion by the UKPC. Third, the argument runs counter to what the Regulator did regarding seeking FSDs against NNC and NNL. It proceeded to do so in the face of the earlier declaration of Morawetz J. that any such steps were a nullity and incapable of being enforced, and it later issued the FSDs and sent them to NNC and NNL.

[96]    Thus it would be speculative indeed to attempt to put odds on the chances that the Regulator would want to proceed to seek a Contribution Notice from either NNC or NNL.

[97]    The issue becomes cloudier when one considers whether it would be reasonable for the Determinations Panel to issue a Contribution Notice setting an amount to be paid by the target. The factors to be considered are set out in section 47(4) and are the same as the factors in section 43(7) plus the addition of a factor "whether the person [the target] has taken reasonable steps to secure compliance with the financial support direction". This would bring into play whether NNC or NNL had any capacity to secure compliance with the financial support direction.

[98]    An FSD when issued does not state what steps are to be taken by the target to comply with it other than that the target is to provide financial support to the employer's pension scheme. Section 45 of the 2004 Act sets out the meaning of financial support. It is quite difficult to discern what a company under CCAA protection in Canada could do. Section 45 provides:

**45. Meaning of "financial support"**

---

[9] On April 19, 2010 the UKPC, not the Regulator, filed a motion in the CCAA proceeding for an order that the FSD proceedings in the UK before the Determinations Panel could go forward against NNC and NNL. The motion was later withdrawn.

(1)   For the purposes of section 43 (financial support directions), "financial support" for a scheme means one or more of the arrangements falling within subsection (2) the details of which are approved in a notice issued by the Regulator.

(2)   The arrangements falling within this subsection are—

(a) an arrangement whereby, at any time when the employer is a member of a group of companies, all the members of the group are jointly and severally liable for the whole or part of the employer's pension liabilities in relation to the scheme;

(b) an arrangement whereby, at any time when the employer is a member of a group of companies, a company (within the meaning given in section 736 of the Companies Act 1985 (c. 6)) which meets prescribed requirements and is the holding company of the group is liable for the whole or part of the employer's pension liabilities in relation to the scheme;

(c) an arrangement which meets prescribed requirements and whereby additional financial resources are provided to the scheme;

(d) such other arrangements as may be prescribed.

[99]   Subsection 2 (a) could not apply as all companies in the Nortel Group are not jointly and severally liable for NNUK's pension liabilities and it is inconceivable that they would be permitted to agree to that in their insolvent conditions in the UK, the USA. or in Canada. There are arrangements prescribed under subsections 2(b) (c) and (d) but it is difficult to conceive that they could apply to NNC or NNL. Regulations 13 and 14 provide:

**Prescribed arrangements**

12. The requirements prescribed for the purposes of section 45(2)(b) and (c) are that–

(a)       the party or parties to the arrangement consent to the jurisdiction of the courts of England and Wales, and

(b)       where there is more than one party to the arrangement, those parties enter into a legally enforceable agreement.

14. An arrangement is prescribed for the purposes of section 45(2)(d) if–

(a)      the party or parties to the arrangement consent to the jurisdiction of the courts of England and Wales, and

(b)      where there is more than one party to the arrangement, those parties enter into a legally enforceable agreement.

[100]   Would it be reasonable to expect NNC or NNL under CCAA protection to consent to the jurisdiction of an English court, or perhaps more importantly, would the Determinations Panel or the Upper Tribunal hold it reasonable for NNC or NNL to agree to that? The Monitor, who represents NNC and NNL under a super-Monitor order, also has a fiduciary duty to the creditors of NNC and NNL who are suffering a shortfall in their benefits.

[101]   There is absolutely no guidance on this issue of the reasonableness of issuing a Contribution Notice from either a Determinations Panel or the Upper Tribunal and the consideration of "whether the person [the target] has taken reasonable steps to secure compliance with the financial support direction". It too would involve uneducated guess work as to what might be ordered.

[102]   Lastly, what amount might be sought by the Regulator or ordered by a Determinations Panel or Upper Tribunal would also be uneducated guess work. Counsel for the UKPC could not state what amount would be asked for by the Regulator or ordered by a Determinations Panel or Upper Tribunal. The reason for this is said to be that it is not known how the $ 7.3 billion will be allocated amongst the Canadian, US and EMEA estates. Taken that fact, it begs the question as to what amount the Regulator would request, if it decided to request a Contribution Notice, and what amount a Determinations Panel or Upper Tribunal would order. That issue, again, would involve uneducated guess work.

[103]   Mr. Ham in his report gave evidence as to what the Regulator might do in this case. That evidence may not be admissible as it goes to the ultimate issue. In any event, whether or not it is admissible, it is in large part simply argument to support the UKPC's case and I disregard it. Mr.

Ham is qualified to express an opinion on what the English law is regarding the 2004 Act, but he should not be expressing any opinion on what the Regulator might do in applying the Act. I agree with the statement of MacFarland J. (as she then was) in *Web Offset Publications Ltd. v. Nagoya Venture Ltd.* [1999] O.J. No. 587:

> Vickery has deposed that he is an attorney licensed to practice law in the State of New York and, in my view, that is sufficient to enable him to state the law of the State of New York for the benefit and assistance of the court. Such an expert however, must confine his evidence to a statement of what the law is and how it applies generally. Such an expert is not to express his opinion on the very facts in issue before the court. It is the sole function of the court to apply the law as the expert has stated it to the facts as the court finds them. See *Hunt v. Hunt* (1958), 14 D.L.R. (2d) 243 and 246.

[104]   I do not fault Mr. Ham particularly. He was asked to express his views and he did so. But he should not have been asked to do so.

[105]   Having said that, one submission Mr. Ham made in his report was that although it would be difficult before the allocation dispute was determined to ascertain the respective financial positions of NNUK and NNC/NNL, "the Regulator might decide that it was fair to put the UK Plan into the position it would have been in had the assets and liabilities of the integrated business been distributed equally between those participating in the business".

[106]   Apart from the fact that this statement as to what the Regulator might do is shear guess work, it is asserting the position taken by the UKPC in the allocation trial that the $7.3 billion proceeds of the asset sales of the Nortel Group should be distributed on a pro rata basis so that every creditor receives the same percentage of their claim. I am in no position to try to come to some judgment as to the probability that the executive arm of the Regulator would seek such a remedy in this FSD claims process that could alter the outcome of the allocation trial so far as NNUK and NNC/NNL were concerned or as to the probability of the Determinations Panel or the Upper Tribunal going down that route.

[107]  I conclude that the claim of the UKPC under the 2004 Act is too remote and speculative to constitute a claim in this CCAA process.

### (e)  Reason for the Nortel failure and Issues raised by the UKPC to support its FSD claim

[108]  I will deal with the allegations of the UKPC as to the benefits they allege were received directly or indirectly by NNC or NNL and whether in my view they should support the issuance of an FSD or Contribution Notice and what affect the other factors raised by the Monitor should have. I will do so in light of the evidence called and arguments made by the parties but I again say it is not my view that counts, but rather the views of the Determinations Panel or Upper Tribunal.

### (i)  Reason for Nortel failure

[109]  I think it worthwhile to first consider the circumstances of the UK Plan and the reasons for the deficit in it as calculated by the plan's actuary. The first deficit appeared in the report of December 19, 2002 and was made as of April 5, 2002. It was a deficit of £177 million. Prior to that, NNUK had a contribution holiday because of surpluses in the plan. Payments were then made by NNUK, first on an ad hoc basis. Mr. Stocker, the actuarial expert called by the Monitor, has concluded that these ad hoc payments were higher than would have been paid under a typical UK recovery plan at the time. There is no basis not to accept that conclusion and I accept it. Payments were then made under a 2005 funding agreement with the Trustee. The next actuarial valuation was dated April 4, 2006 and made as of April 5, 2005 and it indicated the deficit had increased to £356 million. The 2006 Funding Agreement was then made by NNUK with the Trustee providing for the deficit to be reduced by 2012. At the next annual review as of April 2007 the deficit had been reduced to £172 million. However by July 2008 the actuary calculated the deficit to be £479 million.

[110]  Mr. Stocker has analyzed the reasons for the deficits and why they grew or reduced. His analysis has not been questioned. His conclusion is that the main sources of the deficit were the low investment returns of the UK Plan's assets and the changes to actuarial assumptions, mainly in 2008, used to value the liabilities of the UK Plan to its retirees. The reasons for the decrease of the deficit from 2006 to 2007 were the contributions made by NNUK pursuant to the 2006 Funding Agreement, investment gains and a negative change in financial assumptions. At that stage, NNUK was ahead of the timetable for the elimination of the deficit by 2012 as set out in the 2006 Funding Agreement. The dot com bubble burst and the adverse markets in the early 2000s contributed to the investment losses that occurred up to 2005 and the financial meltdown in 2007-2008 contributed to the large investment losses disclosed in the July 2008 actuarial study.

[111]  The change to actuarial assumptions regarding mortality experience, which increased the UK Plan's actuarial liabilities as people were living longer, and the investment losses of the UK Plan under the investment responsibility of the Trustee were outside of NNUK's control. They were not caused by NNL, NNC or NNUK setting out to arrange their affairs so as to throw the burden of pension scheme deficiencies upon the PPF, which was the "moral hazard" risk that led to the 2004 FSD regime in the first place.

[112]  The failure of the Nortel business affected all members of the Nortel Group. From 2001 to 2008 the number of employees of Nortel world-wide dropped from in excess of 90,000 to approximately 30,000. NNUK was not permitted to fail to the benefit of NNC, NNL or any other member of the group. All failed at the same time due to the same economic and business circumstances. Is it reasonable to have an FSD and Contribution Notice issued in these circumstances that will negatively affect the former employees of other members such as NNC or NNL in order to profit the UK former employees, or more likely, the PPF? The Monitor says it would not be. I share that view.

[113]  The 2006 Funding Agreement made by NNUK with the Trustee was a negotiation in which the Trustee was advised by outside legal and financial advisors. The Trustee felt that it

fulfilled its fiduciary duties to the plan members in arriving at the terms under which the deficit was to be retired. In the negotiations, a balance had to be struck taking into account the funding requirements and the ability of the plan sponsor NNUK to afford the deficit repair payments to be made. Mr. Davies, the chairman of the Trustee, agreed in his evidence that the Regulator had made it very clear to the pension industry that the parties should find such an appropriate balance and the Trustee was of the same view.

[114]   During the negotiations leading to the 2006 Funding Agreement, representatives of the Trustee, NNUK and NNL met with the Regulator. The parties reviewed with the Regulator their respective negotiating positions and the proposed agreement.   After hearing the parties' positions, the Regulator did not consider it necessary to intervene in the negotiations.  Although the Regulator would not provide the guidance and comfort the Trustee was seeking as the 2004 Act did not formally apply, a representative of the Regulator told Nortel informally following the meeting that it was doing exactly as the Regulator would have expected it to do.

[115]   In his report Mr. Stocker referred to an analysis by the Regulator in its Orange Book that indicated that funding levels for most UK pension plans fell during 2008. The Regulator commented that the worsening funding levels were linked to adverse market conditions since mid-2007 and that recovery plan lengths for the plans might reflect the difficulties experienced by plan sponsors during the turbulent market conditions. The Nortel UK Plan was not alone in its experience.

### (ii)  Contribution holiday

[116]   The UKPC say that the contribution holiday under which employer contributions by NNUK were not made was a benefit to NNL and NNC and should weigh in favour of an FSD and Contribution Notice. I have difficulty with this concept. First, I have difficulty with it being a benefit if the payments were not required to be made. Second, if it were a benefit, it would be a benefit of NNUK, not of NNC or NNL.

[117]   The Monitor concedes that significant contributions to the UK Plan could not have been made without the concurrence of Nortel's global management and that to the extent that any funding decisions made with respect to the UK Plan are considered to have been improper, NNL's degree of involvement in those funding decisions would be a factor militating in favour of the issuance of an FSD. I understand that concession but in my view no funding decision regarding the UK Plan was improper.

[118]   In the period 1989-2002, it was accepted practice in the UK for employer sponsors of defined benefits plans to suspend contributions to a balance of costs plan if the plan was in surplus.  This was part of the *quid pro quo* for the employer being responsible for eliminating deficits.  Requiring employers to make contributions despite a surplus in the plan would be economically irrational, as it could divert funding from their profit and income-earning activities at a time when the employer had already over contributed to the plan.  Further, the UK government discouraged the accumulation of surpluses because they could be used as a tax haven by employers and by regulations adverse tax consequences would be imposed if a pension plan's surplus grew too large.

[119]   When Nortel acquired STC in 1991, the UK Plan was in surplus and had been since 1988. Mr. Gardener, the chairman of the Trustee of the plan at that time, testified that it was normal practice in those circumstances to have a contribution holiday and it was he who recommended it to the board of STC.   As a result, STC suspended its contributions with effect from May 1, 1989. The UK Plan actuary considered the contribution holiday at each triennial valuation.  On each valuation until 2002, the actuary confirmed to the Trustee that a contribution holiday could be taken. From 1988 until the early 2000s, while the contribution holiday was still in effect, the Trustee continued to advise plan members that the UK Plan was in a well-funded position.  The Trustee also approved benefit improvements, including discretionary improvements, under the plans. This, along with other factors, had the effect of reducing the surplus.

[120]   It is difficult to see how in these circumstances the Trustee can now take the position in effect that the contribution holiday should not have been taken and was a benefit that should weigh in favour of an FSD and Contribution Notice. It does not appear to be reasonable.

[121]   So far as the benefit said to be obtained by the contribution holiday from 1989 to 2009, Mr. Bowie, the actuarial expert called by the UKPC, put the figure at £350 million. The actuarial expert Mr. Stocker called by the Monitor accepted as reasonable the plan actuary's estimate of £292 million. He disagreed with Mr. Bowie's figure because Mr. Bowie calculated the amount using the most conservative economic basis of growth in the plan's assets, which was not used in the industry in the UK Plan. Mr. Bowie agreed that he never recommended to clients this economic basis of forecasting. I accept Mr. Stocker's opinion on this, as well as his criticism of the effect the figure would have been to 2009 and to 2013 calculated by Mr. Bowie.

[122]   So far as who might have received the benefit of the contribution holiday, assuming it can be regarded as a benefit, there is no evidence that anyone other than NNUK used the funds available due to the contribution holiday. The cash may have been used by NNUK for other of its purposes. If cash was transferred in some way, there is no evidence of who the recipient may have been. Cash in Nortel was managed on a global basis and inter-company relationships or agreements might be revolved, reinstated or extinguished at any time depending on what was most advantageous from a global cash and tax management perspective. Cash went where it was needed.

### (iii) Interest free loan

[123]   The UKPC say that the interest-free loan was a benefit to NNC or NNL to be taken into account in considering an FSD or Contribution Notice.

[124]   The fact that the books of NNUK reflected a loan to NNL is no proof that NNL used the cash for its own purposes. Cash was moved throughout the Nortel Group as required. The loan reflected allocations to NNUK under the MRDA derived from the profit split method used by the

MRDA to allocate total Nortel residual profits to the participants. Pursuant to the MRDA, transfer pricing adjustments for the participants, which included NNUK, were administered by NNL. Article 3(d) provides:

> (d) NNL agrees to administer this Agreement and the determinations under the RPSM as contemplated in this Agreement with respect to its interest and the interests of the Participants, and in particular, to compute the amount of any R&D Allocation to, and payment due from, each Participant on a periodic basis. Each Participant will be supplied with a copy of the calculations required under the RPSM as set forth in Schedule A. Any payment to, and payment from, a Participant will be reflected in the intercompany accounts of the affected Participant as a payable or a receivable, whatever the case may be and may be netted pursuant to the standard NNL practice for managing inter-company accounts.

[125] The board of NNUK was a strong board which understood its fiduciary obligations to NNUK. The directors were of the view that the intercompany loans and their interest free nature were in the best interests of NNUK. They received independent legal advice from leading UK pension solicitors that:

> Given the importance to NNUK of its parent company NNL and, as we understand it, the other members of the group, we would not have thought that it should be difficult for the directors of NNUK to conclude that the making of the loans is in the best interest of NNUK.

[126] This issue is discussed more fully under the oppression claim part of these reasons. The point is that what was of benefit to Nortel was also a benefit to NNUK.

[127] The UKPC contend that any benefit to any subsidiary in the Nortel Group was a benefit to NNC and NNL. There is a certain circularity to this argument that if NNUK loaned money to any particular subsidiary in the Nortel Group that must have been an indirect benefit to NNL and NNC because benefiting a subsidiary would be a benefit to the parent NNC and to the operating parent NNL. If it benefited the parent, it also benefited NNUK, which was part of the Nortel Group and depended on a strong Nortel for its own existence. This is not a situation such as the *Lehman* case before the Determinations Panel. The UKPC rely on reasoning of the Determinations Panel in that case:

> As the ultimate parent company of the group LBHI obtained, directly and indirectly, substantial benefits from LBL's operations in supporting the Lehman group generally. Everything that the subsidiaries benefited from ultimately benefited LBHI, albeit the benefit might be indirect and diluted.

[128]   The UKPC left off the final sentence of the paragraph: "However, we consider that the value of the benefits received by LBHI from LBL were considerable". It is not clear that the Determinations Panel thought that the benefits received from LBHI were entirely indirect. However, the UK Lehman case was a service company providing services to the entire Lehman organization. Benefits provided to the rest of the Lehman group did not benefit in any way the UK service company. That is to be contrasted with NNUK which was an operating company operating in the matrix organization of Nortel and which benefited in so many ways from being part of the Nortel Group, as discussed. The stronger the Nortel Group, the stronger NNUK.

[129]   While it may have been a benefit to whatever company used the cash from the loan not to pay interest on it, and thus an indirect benefit to NNL and NNC, it was also a benefit to NNUK to make the loan. I would not view this factor as being very strong in favour of an FSD or Contribution Notice.

### (iv)  Transfer pricing

[130]   The UKPC contend that the Nortel transfer pricing arrangements failed to compensate NNUK for the true contributions that it was making to the Nortel Group. In particular they contend that the transfer pricing failed to properly compensate NNUK for its restructuring costs and its pension costs.

[131]   Transfer pricing is the act of assigning a monetary value, or price, to movements of resources or economic contributions that occur within a multinational enterprise across different taxing jurisdictions. Against the risk that companies attempt to use transfer pricing to increase operating income (and therefore taxable income) in jurisdictions with low income tax rates and correspondingly to decrease operating income in high-tax jurisdictions, tax authorities around the world have instituted regulations governing intercompany transfer pricing. These regulations

centre on the arm's length principle. The arm's length principle necessitates that intercompany transactions be priced in a manner consistent with the way in which similarly situated uncontrolled parties bargaining at arm's length would price the transactions i.e., within an arm's length range.

[132]   Nortel employed a residual profit split method (or RPSM) to allocate operating profit among the entities of the Nortel Group. The residual profit split method is designed to allocate operating profit to the activities and/or assets that cause it. The RPSM was contained in the MRDA to which NNUK and the other residual profit entities were parties. Schedule A to the MRDA contained the details as to how the residual profits of the Nortel Group were to be allocated. It recited the fact that in 2002 Nortel made a submission to the tax authorities in Canada, the United states and the United Kingdom and that the RPSM was adopted at the request of the tax authorities as the most appropriate method for determining the arms' length compensation for each of the participants for the R&D activity to be provided pursuant to the MRDA. The RPSM was prepared by Horst Frisch, a highly regarded and leading transfer pricing firm in the United States.

[133]   Transfer pricing is technical to be sure. There are guidelines that assist the authorities and regulations enacted to be followed. The Organization for Economic Cooperation and Development ("OECD") has established OECD Transfer Pricing Guidelines for multinational Enterprises and Tax Administrations ("the OECD Guidelines"). They were first published in 1995 and revised in 2010. They carry formal legal force insofar as they are incorporated into a country's legislation and regulations. Section 164 of *Taxation (International and Other Provisions) Act*, the UK's transfer pricing regulations, directly references the OECD Guidelines as does the Canadian CRA's information circular pertaining to international transfer pricing.

[134]   The OECD Guidelines provide in section 1.64 and 1.65 that an examination of a controlled transaction should be based on the transaction actually undertaken by the associated enterprises as it has been structured by them except in two exceptional cases. The first circumstance arises where the economic substance of a transaction differs from its form. The

second circumstance arises where, while the form and substance of the transaction are the same, the arrangements made in relation to the transaction, viewed in their totality, differ from those which would have been adopted by independent enterprises behaving in a commercially rational manner. In short, so long as the agreement is economically rational, and form and substance cohere, then the agreement stands and the role of the transfer pricing expert is to price the transaction as agreed.

[135]  Restructuring costs and pension costs were provided for in the MRDA and treated in accordance with it. Dr. Reichert, the transfer pricing expert called by the Monitor, reviewed both the restructuring costs and pension costs as dealt with in the RPSM contained in the MRDA. He concluded that neither of the exceptional cases referred to in the OECD Guidelines existed and thus in accordance with those guidelines the MRDA should stand and was dispositive of the issues. In his reports Dr. Felgran, the transfer pricing expert called by the UKPC, made no reference to the MRDA and said on his deposition that he did not do so as he did not find it useful. I accept the opinion of Dr. Reichert that the MRDA is dispositive of the transfer pricing issues raised by the UKPC.

[136]  Regarding restructuring costs, Nortel as a group wrote off US$5.5 billion for restructuring costs from 2001 to 2008. Approximately 80 % of this amount, or US$4.5 billion was written off in 2001 and 2002 after the dot com bubble burst. The expert evidence of Dr. Felgran is that an extra US$662 million should have been allocated to NNUK for restructuring costs and of that US$262 million should have been born by NNL with the remainder borne by the other RPE's.

[137]  The MRDA is explicit that restructuring costs are to be borne individually by each RPE, including NNUK, and are not to be shared. The UKPC contend that they should have been shared by all RPEs as NNUK paid a disproportionate share of the overall restructuring costs.

[138]   The evidence of Dr. Reichert and Dr. Felgran conflicts. I much prefer the evidence of Dr. Reichert for several reasons, including the fact that the evidence of Dr. Felgran in parts lacked substance and appeared superficial.

[139]   In his analysis of restructuring costs, Dr. Felgran ignored the MRDA. He did not follow the OECD Guidelines and start with the arrangement agreed to by the parties in the MRDA and then consider whether one of the two exceptions existed. On his deposition he said that one starts with the economic substance and then looks to see if the legal form follows the economic substance. That is the opposite of what the OECD Guidelines call for.

[140]   Dr. Felgran stated, and the UKPC emphasize in their argument, that while regional management had a certain level of autonomy in restructuring, final or ultimate decision-making for closing facilities and reducing head count were controlled by NNL. I accept Dr. Reichert's opinion that this is irrelevant and that Dr. Felgran's approach is contrary to the very purpose of a transfer pricing analysis which is to determine how the parties would interact absent the existence of control. The question should be assuming these entities are uncontrolled, and in light of their functions, risks, and assets, how should profit be allocated? Section 9.28 of the OECD Guidelines defines "control" as "the capacity to take on risk" and that "As far as risks over which neither party has significant control are concerned, control would not be a helpful factor in the determination of whether their allocation between the parties is arm's length." In this case, the vast majority of the reconstruction costs occurred in 2001 and 2002 following the dot-com collapse and I accept Dr. Reichert's opinion that these costs were really outside the control of the parties within the meaning of the OECD Guidelines.

[141]   Dr. Felgran asserted that the Nortel Group restructuring costs were designed to benefit the entire group including the RPEs which would take the greater share of profits. Therefore he said they should have been considered part of Nortel's ordinary, usual and recurring operating costs for transfer pricing purposes. He relied on the opinion of a US accounting expert who stated that auditors in considering the consolidated 2002 financial statements would likely have

considered the accounting for these charges and that in his opinion NNC appropriately treated the costs in accordance with GAAP as normal operating expenses.

[142]  These expenses were referred to as "special charges" in the 2001 to 2006 Form 10-K filings of Nortel that contained the consolidated financial statement, and "exceptional" in the 2001 to 2006 audited NNUK financial statements. In the 2001 and 2002 10-K statements Nortel explained that it underwent an unprecedented period of business realignment in those years. Apart from that, there is a fundamental error in this assertion of Dr. Felgran. What he has done is look at events after the time when the arrangements were made by the parties in the MRDA. As Dr. Reichert explained, Chapter 9 of the OECD Guidelines explicitly frames the issue of restructuring costs and benefits as a question of *ex ante* risk allocation by way of an intercompany contract, rather than an *ex post* examination of who should bear the realization of a risk (i.e., restructuring costs).

[143]  In Dr. Reichert's view,  the criterion of "ordinary, usual, and recurring" used by Dr. Felgran is not the right question and does not appear anywhere in the transfer pricing guidance or regulation. The proper question is what the parties' arrangement called for regarding the risk of restructuring, and whether that arrangement was commercially rational and consistent with its substance. The question should not be whether an expense is an operating expense under GAAP, but whether the restructuring costs give rise to the revenue associated with the intangible. The residual profit split method in the MRDA did not provide for a sharing of operating expenses. Rather, the parties agreed to incur costs individually in exchange for a share of the residual profits. In accordance with the OECD Guidelines, Dr. Reichert's view was that the agreement of the parties should govern.

[144]  Dr. Reichert also examined what third parties did in contractual arrangements and settings similar to the Nortel RPSM. Dr. Felgran did not conduct such a study. Dr. Reichert identified 162 joint development agreements. He concluded from this evidence that the third party agreements were consistent with the parties' allocation of risk in the MRDA.

[145]  Dr. Reichert also pointed out that the primary source of the restructuring costs was the optical business of NNUK. Under the cost sharing agreement amongst the parties before the MRDA, NNUK realized most or all of the economic benefits from its optical business during its boom years pre-2001. Yet Dr. Felgran asserts that NNUK should be entitled to require the other parties to the MRDA to share the restructuring costs.

[146]  In sum, I would not find that the treatment of restructuring costs in the MRDA was contrary to transfer pricing principles. I accept the opinion of Dr. Reichert to the opposite effect.

[147]  The UKPC contend that not all of the pension costs were properly shared by the participants to the MRDA. The net periodic pension costs were included as an expense within the RPSM formula and thus the transfer pricing model factored in such items and had the economic effect of sharing those costs among the RPEs. The UKPC contend however that not all pension costs are required by US GAAP to flow through the income statement on an annual basis and that some costs are deferred and recorded in the balance sheet as Other Comprehensive Income ("OCI"). They contend that this OCI was not included within the RPSM formula and was thus a cost for which NNUK was not compensated under the transfer pricing arrangements.

[148]  Dr. Felgran's argument derives from accounting treatment of pension costs, a subject in which he is not an expert. He understood that under US GAAP accounting standards, net periodic pension costs were written for going concern enterprises and assumed that assets necessary to settle pension obligations would be afforded long periods of growth. He referred to concerns about Nortel's longevity being raised at least as early as 2006 and the opinion of Mr. Bowie, the actuary called by the UKPC, that an economic basis for calculating the future pension obligations would have been appropriate given NNUK's weak financial position.

[149]  Dr. Reichert is of the view that Dr. Felgran has impermissibly looked at the situation by rationalizing on an *ex post* basis. I agree. There was no thought of Nortel insolvency at the time of the MRDA.

[150]  Dr. Felgran stated that in order for transfer pricing models to reliably reflect arms-length equivalent dealings, true economic costs must be properly measured and compensated. The reference to economic costs was a reference to Mr. Bowie's statement. But funding a plan on an economic basis (the most conservative growth of asset assumption) was not used by pension plans at the time and Mr. Bowie never recommended to his clients to do so.

[151]  Dr. Reichert's opinion is that there was no basis to include a balance sheet item in allowable pension costs for transfer pricing purposes and in his experience, balance sheet items that pertain to future periods are never included in the determination of operating profit for the residual profit split method. Dr. Felgran pointed to no case in which that had occurred. I accept Dr. Reichert's opinion on this.

[152]  Dr. Reichert also looked at the 162 comparable arrangements for pension treatment. None of them identified pension-related balance sheet items as a cost that uncontrolled parties agreed to share. He concluded that the behaviour chosen by the parties to the MRDA was consistent with third party behaviour, and thus the arm's length principle and that it should be respected. He concluded that Dr. Felgran's assertion that in order for transfer pricing models to reliably reflect arm's-length equivalent dealings, true economic costs must be properly measured and compensated, was unsupported and not proven.

[153]  In this case, the RPSM in the MRDA required operating profits to be accounted for in accordance with US GAAP, which do not include an economic measure of pension costs. Dr. Reichert's opinion, which I accept, is that the treatment of pension costs in the MRDA was commercially rational and did not impede tax authorities.

[154]  The Monitor says that the UKPC has cherry picked its issues and not considered other related issues. In this I think the Monitor is right.

[155]  The evidence disclosed that the rate of return to NNUK on its sales and distribution function was 23.6% in the 2001-2005 period, and a 15% markup on excess SG&A expenses

from 2006 onwards. These returns were paid under the MRDA. Dr. Reichert, the transfer pricing expert called by the Monitor, testified that these returns were far higher than market. He said that in his entire career as a transfer pricing economist, he had never seen a routine return to distribution anywhere close to those figures. Dr. Felgran, the transfer pricing expert called by the UKPC, did not testify on this issue at trial but in his deposition testified that in his 20 years of experience, he would expect to see routine returns to distribution somewhere in the range of 1-5%, and confirmed that he has never seen routine returns in excess of 20%. Dr. Reichert estimated that NNUK had been overcompensated in relation the market pricing by some US$231 million just for the period 2001 to 2005.

[156]  Dr. Reichert has accepted the primacy of the MRDA in accordance with the OECD Guidelines. However, if one were not to do that and rather do what the NNUK's expert Dr. Felgran did, it would be logical to consider the high rates of return paid to NNUK on its sales and distribution function. The over compensation, for example, of US$231 million is much greater that the interest not paid on the loan from NNUK to NNL estimated to be US$135[10] million that the UKPC says should be considered a benefit to NNL.

[157]  I do not find that the treatment of pension costs in the MRDA was contrary to transfer pricing principles. I accept the opinion of Dr. Reichert to the opposite effect.

### (v)  Conclusion

[158]  My view is that issuing an FSD or Contribution Notice to NNC or NNL would not be reasonable. However, whether the Determinations Panel or Upper Tribunal would agree is another matter which I have found to be too remote and speculative to determine.

---

[10] I accept this figure of Dr. Reichert correcting the calculation of Dr. Felgran.

**(f)  Was NNUK Insufficiently Resourced?**

[159]   The Insufficiently Resourced Test ("IR test") prescribed by section 44(3) of the 2004 Act has two components:

> (a)   Is the value of the employer's resources less than 50% of the estimated section 75 debt? and

> (b)   If so, is the value of the target's resources greater than the difference between the value of the employer's resources and 50% of the estimated section 75 debt?

[160]   A target can be any company that is an associate of NNUK. In this claim, the targets are NNC and NNL. The IR test is a threshold test. It must be passed in order for an FSD to be issued.

[161]   Taking June 30, 2008 as the relevant date, NNUK would be insufficiently resourced if at that date the value of its resources were less than 50% of the estimated section 75 debt. The section 75 debt is defined in the *Pension Act 1995* (UK) and is the amount required to buy an annuity that would be sufficient to pay the scheme's pension liabilities at the relevant date. For example, if the capital amount necessary to fund the scheme's pension liabilities was estimated at June 30, 2008 to be £100 million, the employer NNUK would be insufficiently resourced if its resources were valued at less than £50 million, say only £40 million. In that case, if the resources of the target NNC or NNL were sufficient to fund the shortfall, i.e. were at least £10 million, the insufficiently resourced test would be met and NNC or NNL could be issued an FSD or a later Contribution Notice if the Determinations Panel or Tribunal considered it to be reasonable to do so. If the resources of NNC or NNL were not at least £10 million, no FSD or later Contribution Notice could be issued as the IR test would not have been met.

[162]   The Monitor contends that NNUK was not insufficiently resourced at June 30, 2008 because the value of its resources at the relevant time was at least 50% of the estimated section 75 debt. If the Monitor is not successful on this point, it does not contest that the value of the

resources of NNC or NNL would be sufficient to bring the total value of their resources and of NNUK's resources up to 50% of the estimated section 75 debt, and that in that case the IR test would be met.

[163]   For purposes of the insufficiently resourced test, the executive arm of the Regulator is to estimate the section 75 debt at the relevant date, here being June 30, 2008.   It is a different exercise than the scheme actuary certification of the section 75 debt at the insolvency date.   The scheme actuary's certification cannot be challenged under the statute.   However, I accept Mr. Legge's evidence that the Regulator's estimate of the section 75 debt for the purposes of the IR test can be challenged and that whether the IR test has been met is a matter of fact for the Determinations Panel or Upper Tribunal.

[164]   In this case, the Regulator estimated the section 75 debt as at June 30, 2008 to be £1.777 billion or US$3.534 billion.   The threshold of 50% of the estimated debt on the Regulator's estimate is therefore £888.5 million or US$1.767 billion.   The Regulator relies on the scheme actuary, Mr. Neil Mobbs, for this estimate.

[165]   Mr. Mark Stocker, an actuarial expert called by the Monitor, testified that there is an uncertainty in the estimate of Mr. Mobbs for a number of reasons and that the threshold of 50% of the estimated debt could be overstated by as much as £250 million, which if the case would make the threshold of 50% of the estimated debt to be £1.527 billion or US$1.518 billion. This presumably would have to be decided as a factual matter at the Determinations Panel or Upper Tribunal.

[166]   I will proceed on the assumption that the estimate of the Regulator of the section 75 debt at June 30, 2008 is correct and that the threshold to be used to determine if NNUK was insufficiently resourced is £888.5 million or US$1.767 billion.

[167]   The valuation exercise is not to value the shares of NNUK but rather to value the resources of NNUK. The 2004 Act does not itself define what the "resources" are, but the

regulations do. Regulation 7 says that the resources constitute "all those aspect of the entity that would be taken into account when arriving at the entity value". The "entity value" is defined in regulation 2 as "the fair value of the entity" and "fair value" is defined as "the amount for which an asset cold be exchanged, or a liability settle, between knowledgeable, willing parties in an arm's length transaction".

[168]   Regulation 9 states that the value of the resources is to be calculated in accordance with the regulation. It provides for a three stage process. The first stage is to calculate the net assets based on the entity's accounts (net book value), add pension liabilities or subtract pension deficits and then add subordinated liabilities. The second stage is to add to stage one any identifiable fair value difference between the fair value of an asset or liability and the value of that asset or liability as recorded in the entity's accounts (adjusted book value). The third stage is to calculate the difference between the entity value and the aggregate of the entity's net assets as set out in the entity's accounts and add that to the amount of the second stage calculation. If after the first or second stage the entity and the Regulator agree that the IR test has not been met, the third stage calculation need not be carried out.

[169]   The entity value is to be a notional open market valuation involving an arm's length transaction between a willing seller and willing buyer who are knowledgeable. It should be assumed to be a sale that takes place in the real world. The no hindsight principle is applicable to the valuation in that events after the date of valuation are not to be taken into account in the valuation unless they were foreseeable expectations at the time and would have affected what a reasonable purchaser would pay. However improbable it is that there would ever be a sale of the asset in the real world, for example because of restrictions attached to the asset, the sale must be treated as capable of being completed, the purchaser then holding the asset subject to the same restriction (the *Crossman* principle). Both experts on English law agree on these principles.

[170]   In the case of NNUK, its profits were calculated under the MRDA to which it and NNL, NNI and other companies in the Nortel Group that did research and development work were parties. The MRDA was not assignable, but it is agreed that because of the *Crossman* principle,

it was to be treated as assignable by NNUK to a purchaser in the valuation exercise but not further assignable by that purchaser.

[171]    The opinion evidence of Mr. Soren Reynertson was the evidence relied on by the UKPC to contend that the value of NNUK's resources was less than the threshold of 50% of the estimated section 75 debt of £888.5 million or US$1.767 billion. The Monitor challenges Mr. Reynertson's qualifications to be an expert witness and says that even if he is qualified, his opinion should be given little weight.

[172]    In *R. v. Mohan*, [1994] 2 S.C.R. 9, Justice Sopinka stated that an expert witness must be someone who is shown to have acquired special or peculiar knowledge through study or experience in respect of the matters on which he or she undertakes to testify.

[173]    Mr. Reynertson describes himself as an investment banker. He admittedly has had no education or training as a valuator, is not accredited by any professional association of valuators, has not taken any course work with a view to being accredited, has never published or taught on the subject of valuation, and has never practised in the field of valuation. The focus of his career has been primarily working with distressed companies and their creditors. He said that in his practice, he does not refer to textbooks and that he relies on his experience in having bought, sold, financed and restructured business for the past 20 years.

[174]    Mr. Reynertson does have experience in restructuring transactions. I accept him as an expert in so far as his experience may provide cogent support for his opinions. I must say, however, that I have considerable difficulty with much of his evidence. In the end, I do not accept his evidence that the value of NNUK's resources was less than 50% of the estimated section 75 debt and I find that the insufficiently resourced test has not been met.

[175]    In this case, Mr. Reynertson was instructed to give his opinion on the stage three calculation on the assumption that there would be no agreement between NNUK and the Regulator as to the use of book values or adjusted book values in the first and second stage. It

was Mr. Ham's view that in a case such as this it is a certainty that there would be no agreement with the Regulator that would excuse the need for a stage three calculation. Whether he is right or wrong is a matter of conjecture. Mr. Legge's view is that the Regulator should be reasonable if it accepts the net book value or adjusted net book value as a reflection of the true reflection of the minimum value of the entity.

[176]   Mr. Reynertson valued NNUK separately from its subsidiaries.

[177]   For NNUK, the valuation methodology used by Mr. Reynertson was a revenue multiple method in which he looked at the market capitalization of NNC (the number of outstanding common shares times the trading price per share) and allocated to NNUK a portion of that market capitalization equal to NNUK's proportionate share of global revenues. He arrived at a value of US$453.1 million for NNUK. He then applied a 35% risk downward adjustment, to get a "Base Case of US$294.5 million and an "Adjusted Case" without the discount of US$453.1 million.

[178]   For the subsidiaries of NNUK, Mr. Reynertson valued them on a liquidation value basis on the theory that no purchaser would pay more than liquidation value for them. He arrived at a "Base" value for all of the subsidiaries of US$316.2 and an "Adjusted" value of 343.5, the difference being caused by the different assumed liquidation costs of either 10% or 15%.

[179]   Mr. Reynertson then added cash and cash equivalents for NNUK and net intercompany assets and arrived at a total "Base" value of US$1.393 billion for NNUK and its subsidiaries and an "Adjusted" value of US$1.579 billion. These values were either US$374 million or US$188.2 million less than the threshold figure for 50% of the section 75 debt of US$1.767 billion resulting in NNUK being insufficiently resourced by those amounts.

[180]   I will deal first with the revenue multiple method used by Mr. Reynertson to value NNUK. Mr. Berenblut was called by the Monitor to give opinion evidence. He is a highly qualified business valuator. His evidence was that it is well understood that a revenue multiple

approach as used by Mr. Reynertson is inappropriate as a principal valuation methodology and should only be used as a secondary methodology. Revenue multiples should normally be afforded little, if any, weight. In the case of Nortel, his evidence was that because of the RPSM used to allocate profits, NNUK's operating profit (and hence its cash flows) was a significantly different proportion of its revenues than was the case for NNC. His opinion was that the revenue of a particular entity in the Nortel Group was not a reasonable indicator of its profitability because operating profits were not directly proportional to sales revenues. His view was that the value to revenue model used by Mr. Reynertson was not appropriate for determining the value of NNUK.

[181]  Mr. Reynertson agreed that the profitability of a business is what ultimately determines its value and that a revenue model can be useful to the extent it is a reliable indicator of what the profits will be. On his deposition, he said that for NNUK, he could not say if there was a historical correlation between its revenue and profitability but acknowledged that revenue was not a key metric in allocating profits under the RPSM used by Nortel. He also said that going forward there would be no correlation between revenues within NNUK and its allocation of profits under RPSM. The fact that there may be some uncertainty in the future regarding research and development spending, and thus the allocation of profits under the RPSM, does not detract from the fact that Mr. Reynertson could not say there was going to be some correlation between NNUK's revenues and profits.

[182]  I accept Mr. Berenblut's opinion that the revenue model should not have been used by Mr. Reynertson as the basis for his valuation for NNUK. The use of such model to value NNUK casts serious doubt on Mr. Reynertson's opinion.

[183]  Mr. Berenblut's opinion is that when a market approach to value is being used, which is one of the standard approaches to value used by valuators, two multiples that are used if an appropriate comparable can be located, and in his view NNC is an appropriate comparable, and which are more appropriate than revenue multiples are a value-to- operating profit multiple and a value-to-book multiple.

[184]  Mr. Berenblut did these calculations. In 2007 NNUK's operating profits (excluding those of its subsidiaries) were approximately 28% of NNC's total operating profits. Using all other assumptions used by Mr. Reynertson, including Mr. Reynertson's valuation of the subsidiaries on a liquidation basis, Mr. Berenblut arrived at a value of all of NNUK's resources at US$3.3 billion, far in excess of the threshold IR test of US$1.767 billion. The result of using a comparison of book values of NNC and NNUK, using all of Mr. Reynertson's other assumptions, resulted in a value for all of NNUK's resources of US$3.1 billion, again far in excess of the threshold IR test of US$1.767 billion.

[185]  I accept this evidence of Mr. Berenblut. He is a qualified valuator, something that Mr. Reynertson is not, and there is no expert evidence to contradict his views on this. It was put to Mr. Berenblut on cross-examination that he should not have used just one year's results in this comparative exercise, but he did not agree. I accept his explanation for the reason given by him. The acceptance of these values alone means that the IR test has not been met.

[186]  These valuations by Mr. Berenblut using Mr. Reynertson's valuation method for the NNUK subsidiaries but changing only the value of NNUK by using profit and book value comparisons rather than a revenue comparison alone indicate that Mr. Reynertson's analysis for his IR test is unreliable and not to be accepted. Mr. Reynertson is not a business valuator. His evidence of the use of a revenue model was not based on any experience he said he had used or seen used in the marketplace, which experience is the only basis upon which  he was qualified to give opinion evidence.

[187]  Mr. Reynertson also deducted 35% from his values for NNUK. He said he was doing this to reflect three factors. The first was that he assumed that at least some portion of customers of NNUK would judge it advantageous after a sale of NNUK's business to be a customer of the larger Nortel Group. The second was that after such a sale, the Nortel Group's growth prospects would have been greater than NNUK's and therefore revenue comparability might not be the same. The third is an assumption by Mr. Reynertson that a buyer would discount the value of

NNUK based on a contingency that there might be a challenge to the MRDA, noting the current litigation in the allocation proceeding indicates that the rights under the MRDA are controversial.

[188]   Mr. Reynertson said the 35% figure was a subjective judgment call of his based on his experience. He said that he had worked on a number of transactions over the years where there had been illiquidity discounts, minority discounts and the like. It was not a mathematical calculation but his judgment. He said he could look at no transaction in particular that would lead to that figure.

[189]   Mr. Reynertson's assumption about litigation over the MRDA being one of the factors leading to his figure of 35% involves hindsight information not available at the time of the notional valuation date of June 30, 2008. The allocation litigation was much later and should have played no role in his notional valuation. How much of the 35% was attributed to that factor was not said except it was one of three factors. Regarding continuing revenues at NNUK, he also acknowledged that since NNUK would remain a fully integrated member of the Nortel global business after the notional sale, the Nortel Group would be incentivized to maintain sales support, marketing and customer relationships so that customers would be just as confident about Nortel as they were before the sale. While I accept that Mr. Reynertson has had experience in the marketplace with discounts, it is hard in the circumstances to know what weight, if any, should be given to unsupported subjective views.

[190]   Mr. Reynertson valued the subsidiaries of NNUK on a liquidation basis, calculating liquidation values and deducting any liabilities the subsidiaries had and liquidation costs. He did this on the assumption that a buyer would have assumed the subsidiaries could not have continued to operate as going concerns as the Nortel Group would have likely set up a separate set of distribution entities post-sale to compete with their former subsidiaries. Thus the buyer would have assumed that the subsidiaries would have to be liquidated to realize value.

[191]   There are a number of concerns regarding this analysis.

[192]  Mr. Reynertson admitted that the notional sale transaction he posited is destructive of value. Yet this is not what English valuation principles permit. The *Crossman* principle for example requires that any restriction on alienation which may significantly reduce value is to be ignored. *Marks v. HMRC* [2011] UKF.T.T. 221, was a tax valuation case in which the open market standard was applicable. One of the two business being valued, a retail business, had no right to sell the French Connection brand manufactured by the other business, both owned by the same person. It was argued that a buyer of the retail business would have no right to sell the brand and would have to find alternative goods to sell, which would have lowered the value of the retail business. It was held, however, that the owner of the business could be a buyer of the business in the notional sale and that he would value it on the basis that the business would continue as before. This was the method chosen by the tax court to ensure value was not destroyed on a notional open market valuation by assumptions used that would destroy value.

[193]  Mr. Reynertson assumed that a buyer would suppose that Nortel would establish a new distribution network throughout Europe and put the subsidiaries out of business. He himself believed that is what likely would have happened in a notional sale at that time. There are problems with this. One obvious problem is to explain where Nortel would have found the money to build a new distribution network and whether it would have been better for Nortel to continue to employ the NNUK distribution subsidiaries to distribute their products. When it was put to Mr. Reynertson that Nortel had spent hundreds of millions of dollars to set up the network, he said he could not say how much was spent by Nortel to build its distribution network in Europe and Africa but agreed it would have been be sizeable. He admitted that he had no basis for knowing what the cost of setting up a new distribution network would be or what profits it would yield for the Nortel Group. He admitted that he was simply speculating that Nortel would set up a competing distribution network.

[194]  This speculation of Mr. Reynertson that Nortel would set up a competing distribution network is directly contrary to the contention of UKPC that Nortel could not be considered to be a special purchaser in the notional sale of NNUK's business because given the onset of the credit freeze and its impending global insolvency, it could not afford to do so. I have difficulty with

accepting Mr. Reynertson's speculation as to what a purchaser would assume regarding Nortel setting up a competing distribution system. Grounding for his speculation is far from apparent.

[195]   There is another aspect to what would happen in a notional sale. The evidence is that a purchaser would want some assurance that the business it was buying would remain as it was and not have to compete with NNUK or its parent. Mr. Berenblut testified that as a matter of valuation principles, it would be assumed that a non-competition covenant would be given if the vendor or its principals had the ability to compete with the purchaser. In this he is well supported by leading valuation texts. Mr. Reynertson agreed that in the real world that would happen. However he said he was instructed by Mr. Ham that he could not assume such a non-competition clause because that would be adding to or embellishing the asset to be sold.

[196]   Mr. Ham in his reply report said that it seemed to him that Mr. Berenblut's assumption of a non-competition covenant would amount to an embellishment of the asset being valued, improperly inflating its value. However, on cross-examination this position was softened. Mr. Ham acknowledged that the notional sale would contain the normal and customary terms in a sale of that type and that it is a factual issue for the valuators to decide as to what the terms of the notional sale would be[11]. This could include a parent providing support for the transaction going forward because it would be in its interests to see its subsidiary get enhanced proceeds of the sale. Mr. Reynertson agreed that from a valuation perspective, this support would be given in a notional sale of NNUK's resources.

[197]   Mr. Legge's evidence was essentially to the same point. He said that the asset in the hypothetical sale should be the same asset in fact owned by the vendor, and that it is a question of fact and valuation for the tribunal. He said that while the same asset has to be sold in the notional sale, what is done in the market is a question of fact.

---

[11] In his report, Mr. Ham made a number of assertions that appeared to be on issues of valuation rather than on issues of the legal principles to be applied. I realize that there may be a fine line between the two, but I have read his statements regarding valuation with caution.

[198]   It seems to me that in so far as a non-competition covenant is concerned, for NNL or any other hypothetical vendor to say they will not do anything to change the business being sold from what it was prior to the sale is not embellishing the asset being sold and it is clear from the evidence as a matter of fact that such a term would be provided. It would be in NNUK's interest to ask its parent to do that and in its parent's interest as well to do that. It also seems that it is consistent with the *Crossman* principle and the assumption caused by it in this case that the MRDA can be sold or assigned, something which under the MRDA could not happen, in order to fetch a market price not destructive of value. It is also consistent with the *Marks* case in which assumptions were made to have a market value not less than the value of the business as it existed at the time of sale. I find that such a covenant would be given and that it would be a reasonable term that would not change the asset being sold, being the distribution business of NNUK.

[199]   Mr. Berenblut did not agree that the subsidiaries should be valued on a liquidation basis. He calculated the results if the distribution subsidiaries of NNUK are valued at the valuation date not on liquidation values but using Mr. Reynertson's inappropriate revenue comparison basis with NNL. That results in a value of resources of NNUK of US$2.3 billion. If the comparison to NNL is based on what Mr. Berenblut considers to be the better comparable, the operating profits method, it results in a value of resources of NNUK of US$3.010 billion. If the comparison to NNL is based on the book value of the NNUK subsidiaries rather than their liquidation value, the resulting value of resources of NNUK is US$2.1 billion. All of these amounts result in the failure of the IR test. I accept the validity of Mr. Berenblut's calculations. They establish that if the value of the NNUK subsidiaries is based not on a liquidation basis, the IR test has not been passed even if Mr. Reynertson's values for the parent NNUK are used.

[200]   Mr. Berenblut also did other calculations to determine if the IR test had been met. He concluded that it was not met. He first calculated the net book value of NNUK. Net book value, or the asset approach to value, is one of three accepted valuation approaches. He acknowledged that what he did was undertake the first stage of the three stage requirements of Regulation 9 that sets out how the value of resources of an entity is to be calculated. That net book value was

US$2.2 billion which, with pension liabilities of US$451 million added, resulted in a value of resources of NNUK of US$2.7 billion at the valuation date, far in excess of the threshold for the IR test to be met. Mr. Berenblut noted that because NNUK was required to prepare its financial statements under US GAAP and carry assets on its balance sheet at the lower of cost or realizable value, it meant that the realizable values as verified by its auditors KPMG were as least as much as its book values.

[201]   The UKPC in their written argument attack Mr. Berenblut's opinion regarding the June 30, 2008 book value analysis. Most of it is argument derived from snippets of accounting information without any expert valuation analysis. It appears to be a lawyer's analysis of accounting information without expert valuation evidence backing it. For example, an attack is made on a said lack of firm evidence that the NNUK auditors did an impairment analysis of the balance sheet as at June 30, 2008 in considering the goodwill figure on it. Mr. Berenblut's opinion, which I accept, is that the auditors of the NNUK December 31, 2007 financial statements had to be satisfied that there was no impairment of the assets in order to provide their audit opinion and that as their audit opinion was dated August 4, 2008 they had to be satisfied that nothing material had occurred since the end of 2007 that would affect the audited financial statements. The goodwill in question was acquired goodwill when NNUK acquired a business in late 2007, and it would be surprising that there would have been impairment in it in such a short time.

[202]   I accept Mr. Berenblut's opinion that valuing the resources of a company by using net book value is an accepted valuation method and that the net book value of NNUK was US$2.2 billion[12].

---

[12] The UKPC say that net book value can be less than market or fair value as witnessed by the price obtained by Nortel in liquidating its assets as against the net book value derived from its financial statements. That however is not a legitimate comparison. The issue in this case is the value of the resources of NNUK as at June 30, 2008 when the Nortel Group was a going concern, not the price achieved from 2009 to 2011 after the Nortel world-wide insolvency had occurred. Also, I accept Mr. Berenblut's opinion that price actually obtained in the market place is a different concept than value in a notional transaction as price can be affected by unequal ability or knowledge or financing. What happened from 2009 to 2011 is also impermissible hindsight information.

[203]   To test the reasonableness of this conclusion, Mr. Berenblut used a market approach based on the market capitalization of NNC and compared NNUK to NNC based on its percentage of operating profits to NNC's operating profits. The resulting value of resources for NNUK was US$3.3 billion, which provided confirmation for him that the value of resources of NNUK of US$2.7 billion based on net book value was a conservative estimate of NNUK's value of resources at the valuation date. He also did a comparison of NNUK to NNC based on its percentage of book value to NNC's book value. The resulting value of resources for NNUK was US$3.1 billion. I accept Mr. Berenblut's opinion that his use of a comparison of operating profits and book values to the market capitalization of NNC is a valid valuation technique and accept his resulting value of resources of NNUK at US$2.7 billion as being conservative.

[204]   The UKPC is critical of Mr. Berenblut because he did not undertake the second and third stage of Regulation 9 and contends that this should have been done as there was no agreement by the Regulator to the valuation of NNUK's resources by using only the first or second stage of Regulation 9. Mr. Berenblut's response to this is that because the realizable values if NNUK as verified by its auditors can be no lower than the net book value calculated under stage one, there is no point in doing stages two or three as the IR test has failed, i.e. cannot be met, on the net book value alone. Both sides acknowledge that stage two makes no difference as no fair value adjustments have been requested to the accounts that set out the net book value for stage one. Mr. Berenblut's view was that since the entity value difference contemplated in stage three can only be a positive adjustment to the amount resulting from the first two stages, there is no need to go to step three if the IR tests have already not been met in the first two stages.

[205]   There is no evidence as to whether the Regulator would agree to stopping after stage one or two, i.e. what its views would be as to whether the IR test had failed by virtue of the adjusted book value of NNUK being more than 50% of the estimated section 75 debt[13]. Thus whether it can be said that Mr. Berenblut was required to undertake the third stage set out in Regulation 9 is unknown. In the end, I do not think it matters. Even if Mr. Berenblut's evidence of the net book

---

[13] Mr. Ham stated in his report that in a contested case, it is virtually certain that one will get to the third stage. That is speculation on what the Regulator will do in any case. That is not a legal issue and I do not accept Mr. Ham's unsupported view of what the Regulator may in fact do.

value was not sufficient to satisfy Regulation 9, his evidence regarding the invalidity of Mr. Reynertson's approach in using a revenue based comparison to NNC, which I have accepted, and his evidence of the effect of a profit and net book value comparison with NNC, which I have also accepted, means that it has not been established that NNUK was insufficiently resourced at June 30, 2008.

[206]   In the result, I find that the UKPC has failed to establish that the IR test has been met. Thus there would be no basis for an FSD to be issued against NNC or NNL.

**The Funding Agreement and the Funding Guarantee**

[207]   The 2005 triennial valuation for the UK Plan was finalized by the plan's auditor on April 4, 2006.  It disclosed an ongoing deficit of £356 million (the "2005 Deficit").  Under the 2004 Act, NNUK and the Trustee were required to negotiate and agree to a recovery plan that set out the steps to restore the plan to full funding and the time period over which it was to be achieved.

[208]   Eventually a Funding Agreement was made between NNUK and the Trustee dated November 21, 2006 that provided for the 2005 Deficit to be paid over seven years from 2005 to 2012. This seven year period was a compromise between a five year period proposed by the Trustee and a ten year period proposed by NNUK. As well, NNL signed a Funding Guarantee on the same date guaranteeing some of the obligations of NNUK under the Funding Agreement.

[209]   The Funding Agreement is not an entirely easy document to read.  It provided for NNUK to pay off the 2005 Deficit by April 5, 2012. Part of the complexity of the Funding Agreement was caused by the need for the statutorily required 2008 triennial valuation and how the deficit reduction payments were to be adjusted to reflect the deficit disclosed by the new valuation. In simple terms, payments to reduce the deficit in an agreed amount were to be made by NNUK to April 5 2008, and adjusted payments to reflect the deficit revealed by the 2008 valuation were to be made by NNUK from April 6, 2008 until April 6, 2012, so long as the deficit was measured "using actuarial methods and assumptions consistent with the actuarial methods and

assumptions" used by the actuary in arriving at the 2005 Deficit. Any larger deficit caused by a "full" 2008 valuation not using those measurements was to be funded by NNUK in accordance with a recovery plan over a period of time to be negotiated.

[210]   The reason for the two different 2008 valuations was that NNL agreed in the Funding Guarantee to guarantee certain of the payments required by the Funding Agreement but was only prepared to agree to pay that part of the deficit measured in the 2008 valuation using actuarial methods and assumptions consistent with the actuarial methods and assumptions used by the actuary in arriving at the 2005 Deficit. NNL was not prepared to guarantee any larger deficit disclosed by the 2008 valuation because in its mind to do so would have exposed it to an indeterminate liability for indeterminate reasons.

[211]   The Funding Agreement also provided for current contributions to be made by NNUK, and there is no issue that these contributions were paid to the commencement of its administration in January 2009.

[212]   The payments up to April 2008 to reduce the 2005 Deficit were paid as agreed. What is at issue in these proceedings are the obligations from April 2008 under clause 3.3 of the Funding Agreement, which provides that:

> [NNUK] shall make further Past Service Deficit Contributions to the Scheme in the period between 6 April 2008 and 5 April 2012 on the following basis:
>
> (a)      Past Service Deficit Contributions in quarterly instalments equal to 1/16th (6.25%) of the value of the April 2008 Deficit shall be paid; and
>
> (b)      such Past Service Deficit Contributions will be paid to the Scheme by quarterly cash instalments in arrears, payable on 4 January, 4 April, 4 July and 4 October of each year, beginning from 4 July 2008 until the April 2008 Deficit is reduced to zero or until this Agreement otherwise terminates,…

[213]   The 2008 Deficit is the deficit as at April 5, 2008 measured by the valuation "using actuarial methods and assumptions consistent with the actuarial methods and assumptions".

Page: 63

[214]   The relevant provisions of the Funding Guarantee are:

Section 1.1

"Guaranteed Obligations" means the payment obligations and liabilities of [NNUK] to the [Trustee] under or in connection with clauses ... 3.3 ... of the Funding Agreement ...";

[215]   Section 2.1 of the  Funding Guarantee provides that the guarantee is triggered if: (a) a "Trigger Event" occurs; and (b) a "Demand" is subsequently delivered; and

Section 1.1 defines "Trigger Event" as:

[NNUK] failing to pay any amount payable by it to the Beneficiary when contractually due pursuant to the terms of clauses ... 3.3 ... of the  Funding Agreement within a period of 10 Business Days following receipt of a written notification from the Beneficiary that such payment is overdue.

[216]   Before January 14, 2009, NNUK made every payment as it fell due under the Funding Agreement. Accordingly NNL did not incur any Funding Guarantee obligations with respect to that period.

[217]   As a result of NNUK being under administration, the UK Plan was placed in an assessment period in accordance with chapter 3 of the 2004 Act.  During the assessment period, the PPF is to determine whether the UK Plan has sufficient assets to provide the level of funding the PPF guarantees. The Board of the PPF has not yet made any decision and the assessment period has not yet terminated.

[218]   The Monitor contends that as a result of the assessment period continuing, no amounts are payable by NNUK under the Funding Agreement because the 2004 Act prevents any payments of contributions during the assessment period and any payments actually made are void. Section 133 of the 2004 Act provides in part:

**133 Admission of new members, payment of contributions etc**

(3)    Except in prescribed circumstances and subject to prescribed conditions, no further contributions (other than those due to be paid before the beginning of the assessment period) may be paid towards the scheme [i.e., the UK Plan] during the assessment period.

(4)    Any obligation to pay contributions towards the scheme during the assessment period … is to be read subject to subsection (3) and section 150 (obligation to pay contributions when assessment period ends).

(10) Any action taken in contravention of this section is void.

[219]  The UKPC contends that the prohibition against making contributions during the assessment period provided for in section 133(3) of the 2004 Act should be construed as applying only to future current service contributions and not to contributions for past deficits. Mr. Ham said in his supplemental report of March 14, 2014 that he considered this position to be "well arguable" on the basis that the purpose of section 133(3) was to prevent further liabilities accruing in a scheme during the assessment period so as to protect the PPF, although he agreed on cross-examination that no one to his knowledge has asserted this position to date. This argument was contrary to his evidence on his deposition in which he testified in effect that neither current service contributions nor past service contributions could be paid as a result of section 133(3). He said that both of those would be revived at the end of the assessment period. His view is that the obligation to make contributions revives at the end of the assessment period if the scheme emerges from the assessment period without the PPF assuming responsibility for it.

[220]  The Monitor relies on a regulation made under the 2004 Act to support its interpretation of section 133(3), which exempts prescribed circumstances from the prohibition against making contributions. Regulation 14(a) made in 2005 provides an exemption for "contributions" payable to the scheme that relate to the employer's liability for a section 75 wind-up debt:

14. During an assessment period in relation to an eligible scheme, the prescribed circumstances in which further contributions may be paid to the scheme by an employer in relation to the scheme are where those contributions relate to—

(a)    all or any part of that employer's liability for any debt due from him to the scheme under section 75 of the 1995 Act which has not yet been discharged;

[221] Pursuant to section 75 of the *Pensions Act 1995* (UK), upon a scheme's employer suffering an insolvency event, a statutory debt is imposed on the employer in an amount equal to the scheme's funding deficit calculated on a "buy-out" basis at that date, i.e. the amount that it would cost to go into the insurance market and purchase annuities to secure the members' benefits.   The scheme's actuary must issue a certificate quantifying the estimated Section 75 debt. There is no dispute that NNUK's entry into administration on January 14, 2009 qualified as an insolvency event triggering the imposition of a section 75 debt on NNUK measured as at that date.   The UK Plan's actuary, Mr. Mobbs, has still not issued his formal section 75 debt certificate.

[222] Mr. Ham agreed on his cross-examination that if section 133(3) prohibited only current service contributions and not contributions for past deficits, there would have been no need to specify a section 75 debt as an exception to section 133(3) and regulation 14(a) would be redundant. The UKPC acknowledges this redundancy, but says that regulations made contemporaneously with primary legislation cannot control the meaning of the legislation.

[223] The Monitor refers to a case of *PNPF Trust Co. Ltd. v. Taylor*, [2010] EWHC 1573, a decision of Mr. Justice Warren in which reference by Mr. Ham in argument in that case was made to a regulation under the 2004 Act as supporting his position. Justice Warren stated in para. 746 that the answer to the particular issue would depend not only on the language of the 2004 Act but also on the regulations, but he was careful to say in para. 751 that the regulations would not be determinative of the meaning of the statute although its effect was critical. I take it from all of this that under English law timely regulations reasonably contemporaneous with the legislation under which they are made can be looked at as guidance but cannot be determinative of the meaning of the legislation. I think it fair to say that regulation 14(a) is consistent with the interpretation of section 133(3) advanced by the Monitor.

[224] The UKPC also contend that section 137(2) of the 2004 Act assists in their interpretation of section 133. That section gives to the Board of the PPF the powers of the Trustee during an assessment period. It states:

> During the assessment period, the rights and powers of the trustees…of the scheme in relation to any debt (including any contingent debt) due to them by the employer, whether by virtue of section 75 of the Pensions Act 1995 or otherwise, are exercisable by the Board…

[225]  The UKPC contend that the words "or otherwise" can be explained if past service deficit contributions to be paid to a scheme remain payable notwithstanding section 133, i.e. if section 133(3) does not prevent their payment during an assessment period. I do not see why the words "or otherwise" necessarily would include past deficit amounts. It could include other payments of the kind articulated by the Monitor such as missed payments for amounts owing before the assessment period. I accept Mr. Legge's view that the words "or otherwise" is a catch-all phrase[14]. The section was not aimed at defining what payments may continue to be paid during an assessment period but rather to give the trustee's powers to the PPF during the assessment period over any debt owed to the trustee.

[226]  I was not referred to the principles of statutory construction in England, and I take it therefore that they are the same as in this country. Today in Canada there is only one principle or approach to statutory interpretation, namely, the words of a statute are to be read in their entire context and in their grammatical and ordinary sense harmoniously with the scheme and object of the statute and the intention of Parliament. See *Rizzo & Rizzo Shoes Ltd. (Re)*, [1998] 1 S.C.R. 27, at para. 21.

[227]  I take the plain language of section 133(3) and (4) to mean to mean in its ordinary sense that no contribution of any kind can be paid into the scheme during the assessment period. That includes both contributions for past deficits and for current funding obligations. Therefore NNUK has not been under any requirement to pay any contributions since it went into administration.

---

[14] The fact that Mr. Legge could not readily recall on cross-examination what other liabilities might be does to mean there could not be other liabilities. It is plain that there could be.

[228]   The UKPC contend, however, that even if payments for past deficits may not be paid during the assessment period, NNUK remains liable to pay them and that NNL is in breach of its obligations under the Funding Guarantee.

[229]   Section 133(3) says that no contributions may be paid during the assessment period. Mr. Ham said in his supplemental report that while a contribution payment made contrary to section 133(3) is void, the obligation to make that payment is not made void and that if the scheme emerges from an assessment period without the PPF assuming responsibility for it, the obligation will revive pursuant to section 150 of the 2004 Act. In this I think Mr. Ham is wrong so far as contributions for past deficits are concerned.

[230]   Apart from the fact that the odds of the PPF not assuming responsibility for the UK Plan are low indeed (the Monitor says it is clear that the PPF will assume responsibility for the plan taken the size of the deficit, said by the UK Plan actuary to be at least £2.12 billion), I do not read section 150 as saying the contribution payments not made during the assessment period will revive. Section 150(5) and (6) provide for the making of regulations dealing with benefits that could not accrue to members during the assessment period because of section 133(5) that prevented that accrual, and regulations dealing with contributions that would have been payable by an employer during the assessment period but for section 133.

[231]   The only regulation made under section 150 dealing with this is regulation 20 of the Pension Protection Fund (Entry Rules) Regulations 2005 being regulation SI 2005/590. That regulation applies when an assessment period comes to an end by virtue of the PPF no longer being involved in a scheme and permits a member of the scheme with active service during the assessment period to afterwards have benefits accrue so long as the member pays the contributions for that member's period of active service during the prior assessment period. If the member pays those contributions, contributions shall also become payable to the scheme by the employer in respect of that period of the member's employment during the assessment period.

[232] Thus there is no provision in section 150 or the regulations for past deficit payment contributions reviving after the assessment period ends where the PPF does not assume responsibility for the scheme.

[233] Mr. Ham did not state what happens to the contribution payments not made if the UK Plan is taken over by the PPF other than to say that in his view the liability of NNUK to make the schedule of contributions is not extinguished by section 133.

[234] Mr. Legge in his report said that during the assessment period, the only liability of NNUK is its section 75 liability. In his evidence, he said that the effect of the section 75 debt is to replace the employer's schedule of contributions because if that were not the case, the employer would be paying twice over as the section 75 debt payments are effectively past service contributions not paid. He also testified that while the 2004 Act does not say that the schedule of contributions are over once there is a section 75 debt, or upon the scheme entering the PPF, it would be very peculiar if the two liabilities could coexist because both relate to funding the scheme and are in substance the same thing. Because the section 75 debt is calculated on a buyout basis, it is going to be more than the schedule of contributions.

[235] I understand the logic of the argument and it makes sense that two different obligations for the same amount could not be imposed on NNUK. However, the 2004 Act does not state that the contributions that cannot be paid during the assessment period cease to exist once the assessment period is over or are overtaken by the section 75 debt. Any payment by NNUK of the section 75 debt could be credited to the contributions required to be paid by NNUK, which Mr. Legge agreed was the practice, and presumably vice versa.

[236] I agree with the UKPC that section 133(3) does not say that the employer, in this case NNUK, is not under any liability to make the payments. Section 133(4) says that any obligation is subject to subsection (3), i.e. the obligation to pay cannot be called upon during the assessment period. It does not say that the obligation is extinguished. Nor does section 133(10) extinguish the liability. It merely says that any action, i.e. a payment contrary to subsection (3), is void.

[237]   The Monitor relies on section 3.6(b) of the Funding Guarantee to say that it has no liability under the guarantee. That section provides:

### 3.6  No Double Recovery or Greater Recovery

(b)  For the avoidance of doubt, nothing in this Agreement entitles the Beneficiary [the Trustee] to recover from the Guarantor [NNL] any amount which the Company [NNUK] is not liable to pay as part of, or for failing to perform, the Guaranteed Obligations and any limitations on the Company's liability under the Funding Agreement will equally apply to the Guarantor's liability under this Agreement.

[238]   I do not see this section as assisting NNL. It is aimed, as the heading says, to the quantum of recovery, and states that nothing in the agreement entitles the Trustee to recover "any amount" which NNUK is not liable to pay under the Funding Agreement. NNUK remains liable for those payments to be made under the Funding Agreement guaranteed by NNL. It is just not free to make them during the assessment period while the Board of the PPF considers whether to assume responsibility for the UK Plan.

[239]   The UKPC contends that an indemnity in clause 2.3 of the Funding Guarantee renders NNL liable for payment. That section states:

2.3 (a)     In addition to its guarantee under Clause 2.1 (and subject at all times to Clauses 2.2 and 3.6), [NNL] indemnifies the Beneficiaries  against any loss or liability properly suffered by the Beneficiaries if any of [NNL's] payment obligations under the guarantee contained in Clause 2.1 become unenforceable, invalid or illegal.

(b)    The amount of the loss or liability under this indemnity will be equal to the amount the Beneficiaries would otherwise have been entitled to recover (including, but without limitation, pursuant to clause 9 had such guarantee obligations not become unenforceable, invalid or illegal (as the case may be).

(c)    For the avoidance of doubt, nothing in this indemnity shall entitle the Beneficiaries to recover (i) any sum from [NNL] that relates to a Guaranteed Obligation that has ceased to exist or (ii) any amount which [NNUK] is not liable to pay as part of, or for failing to perform, the Guaranteed Obligations.

[240] Clause 2.3(a) provides that NNL indemnifies the Beneficiaries against <u>loss suffered by the Beneficiaries</u> if NNL's (not NNUK's) payment obligations under the guarantee become unenforceable, invalid or illegal. "Beneficiaries" is not a defined term. "Beneficiary" is defined as Nortel Networks UK Plan Pension Trust Limited, i.e. the Trustee. NNL's payment obligations under the guarantee are to pay amounts that are to be paid by NNUK under the Funding Agreement, under which NNUK agreed in clause 3.3 to make payments in cash to the Scheme, i.e. to the pension plan. Whether the cheque would be payable to the Scheme or to the Trustee would make no difference as the money is to go to the Scheme. If those payments were not made, the Trustee would suffer no loss.

[241] If NNL's payment obligations under the guarantee become unenforceable, invalid or illegal, an indemnity by NNL requiring it to pay its unenforceable obligations makes no sense. I read the reference to "Beneficiaries" in clause 2.3(a) to be to the individual members of the Trustee and clause 2.3(a) to be protection for those individual members against their personal liability should they be liable for entering into the agreements with NNL if NNL becomes not liable under its guarantee because of any unenforceability, invalidity or illegality.

[242] In any event, it has not been argued that NNL's payment obligations have become unenforceable, invalid or illegal. What is at issue is whether NNL has any payment obligation in the first place. Therefore even if the interpretation put forward by the UKPC and Mr. Ham were correct and that the indemnity was another obligation by NNL to make payments into the scheme, which is not an interpretation I share, the clause would have no application.

[243] In any event, I do not know what benefit the indemnity could have except perhaps to give the Trustee some right of set-off. If the obligation of NNL is unenforceable, it is unenforceable and would not give rise to a claim to enforce it.

[244] The Monitor contends that the question whether NNUK may be required in the future to pay contributions after the assessment period terminates is irrelevant because the assessment period, and thus the prohibition against NNUK paying further contributions to the UK Plan, did

not end before the Funding Guarantee expired on June 30, 2012. The Funding Guarantee provides that no demand may be made under it after the expiry date. Therefore the Monitor contends that NNL has no liability under the Funding Guarantee.

[245]   In order for NNL to be liable under the Funding Guarantee, a Trigger Event must have occurred. Clause 1.1 defines "Trigger Event" as:

> [NNUK] failing to pay any amount payable by it to the Beneficiary when contractually due pursuant to the terms of clauses … 3.3 … of the Funding Agreement within a period of 10 Business Days following receipt of a written notification from the Beneficiary that such payment is overdue.

[246]   There would be no issue of NNL being liable but for the assessment period and the prohibition under section 133(3) of the 2004 Act from paying contributions. In one sense, it can be said that these contributions are not "payable…when contractually due" because section 133(3) has prohibited their payment. The question is whether that was the intent of the guarantee. I think that other provisions of the guarantee, namely clause 2.6(g), indicate a different intent and that if the amounts were not payable because of the insolvency of NNUK, the guarantee was enforceable.

[247]   It is clear that the Funding Agreement and the Funding Guarantee were negotiated in 2006 against the backdrop of the 2004 Act. It is referenced throughout the Funding Agreement. A potential insolvency of NNUK and the effect of an assessment period on NNUK's obligations would have been something known to the advisors of both sides. Mr. Poos of Nortel was aware that insolvency was one of the factors that could have caused the discontinuance of funding under the Funding Agreement.

[248]   Clause 2.6(g) of the Funding Guarantee is at the end of a long list of a Waiver of Defences clause which contains the usual provisions that would prevent a change in the underlying obligation of the debtor from releasing the guarantor, such as an extension of time granted to the debtor, etc. Clause 2.6 provides in part:

### 2.6  Waiver of defences

Subject to Clauses 2.2 and 3.6, the obligations of the Guarantor under this Clause will not be affected by any act, omission or thing which, but for this provision, would reduce, release or prejudice any of its obligations under this Clause. This includes:

(g)    any unenforceability, illegality, invalidity or non-provability of any Guaranteed Obligation due in any such case to the insolvency, bankruptcy, reorganisation, or liquidation of the Company.

[249]  The entering into administration by NNUK was an insolvency event under the 2004 Act. It is section 133 of the 2004 Act that has prevented NNUK from making the contributions called for in the Funding Agreement. By virtue of clause 2.6 of the Funding Guarantee, the obligations of NNL are not to be affected by the unenforceability of a guaranteed obligation of NNUK due to the insolvency of NNUK. That would include the unenforceability of the obligation to make contributions to the Trustee under the Funding Agreement caused by section 133(3) of the 2004 Act. If the parties had wanted to exclude that section from the clause they could have done so. Without any carve out of the effect of section 133(3) of the 2004 Act, the language of clause 2.6 must be taken to include the effects of that section and prevent those effects from reducing, releasing or prejudicing the obligations of NNL under the Funding Guarantee.

[250]  I conclude therefore that NNL has a liability under the Funding Guarantee.

## Quantum of Funding Guarantee

[251]  If there is liability under the Funding Guarantee, the parties differ markedly as to what that amount is. It arises from different actuarial views of what is to be done to calculate the April 2008 deficit measured "using actuarial methods and assumptions consistent with the actuarial methods and assumptions" used by the UK Plan actuary to calculate the deficit in 2005.

[252]  The UK Plan actuary in 2005 was Mr. Daniel Harrison of Watson Wyatt Limited. He retired and was replaced by Mr. Neil Mobbs of the same firm. Neither gave evidence at the trial.

Mr. Ronald Bowie of Hymans Robertson LLP was called as an expert actuary witness by the UKPC and Mr. Mark Stocker of Buck Consultants Limited was called as an expert actuary witness by the Monitor. Both Mr. Bowie and Mr. Stocker are highly qualified and experienced actuaries.

[253]  In the UK a triennial valuation of a pension scheme is required by statute to be done by the scheme's actuary and certified. That was done as at April 5, 2005 and it disclosed a deficit of £356 million. The Funding Agreement provided that the 2005 Deficit was to be paid off by NNUK in seven years by April 5, 2012. When the Funding Agreement was agreed in 2006, it was known that the next triennial valuation would have to be done as at April 5, 2008 and that the 2005 Deficit would need to be adjusted to reflect the 2008 valuation of the plan's deficit

[254]  NNL agreed in the Funding Guarantee to guarantee that NNUK would pay off the 2005 Deficit of £356 million over seven years and recognized that while that deficit figure would change in the 2008 valuation, it was not prepared to guarantee the entire amount that would be disclosed by the statutory valuation in 2008 but only something representing some adjustment of the 2005 deficit.

[255]  The Funding Agreement therefore provided for two valuations to be carried out in 2008. The one valuation was to be a full or "deep dive" valuation provided for in clause 8.2 of the Funding Agreement and to be certified by the UK Plan actuary as provided for in the 2004 Act. Under clause 8.2 of the Funding Agreement, it was to be carried out using actuarial methods and assumptions to be agreed between NNUK and the Trustee. It was not guaranteed by NNL.

[256]  The other valuation was the April 2008 Deficit, which is the valuation in dispute, and which was guaranteed by NNL in the Funding Guarantee. It was provided for in clause 3.3 of the Funding Agreement. The April 2008 Deficit was to be calculated on a different basis from the valuation under clause 8.2. The April 2008 Deficit was defined as the Current Deficit which was defined as:

the Deficit [£356 million], as reduced by all contributions, other than Current Service Contributions made to the Scheme after 6 April 2005…measured as at the next Valuation using actuarial methods and assumptions consistent with the actuarial methods and assumptions used by the Actuary to calculate the Deficit.

[257] That is, this deficit was to be measured using actuarial methods and assumptions consistent with the actuarial methods and assumptions used by Mr. Harrison in calculating the deficit of £356 million as at April 5, 2005.

[258] The meetings between NNUK and the Trustee to agree on the actuarial methods and assumptions for the full or clause 8.2 valuation began in late November 2008 but were not concluded by the time that NNUK went into administration on January 15, 2009. Therefore there was never a completed clause 8.2 valuation.

[259] Mr. Mobbs, however, had prepared three different valuations of the Current Deficit required by clause 3.3, being deficits of £479 million, £545 million and £619 million. The UKPC claim that the correct deficit is the £545 million figure which when reduced by contributions made by NNUK after April 5, 2008 comes to £491.75 million.

[260] The Monitor claims that the correct deficit is £390 million which when reduced by contributions made by NNUK after April 5, 2008 comes to £339.75 million.

[261] The dispute is really a dispute as to the meaning of the agreement and a dispute amongst actuaries as to what using actuarial methods and assumptions consistent with the actuarial methods and assumptions used by Mr. Harrison in 2005 means. It is a technical subject to be sure and one on which any judge would want to tread carefully. Both experts had many good points to make, supported by graphs, charts and technical terms, and the cross-examinations were little different. Mr. Bowie in his report said that the deficit in question to be measured is subject to conjecture due to being "ill defined" in the Funding Agreement. I think that to be a fair comment.

[262]  Mr. Bowie's evidence was that Mr. Mobbs calculations in 2008 were consistent with the methods and assumptions used by Mr. Morrison in 2005. Mr. Stocker testified that they were not. In the end, and with no disrespect to Mr. Bowie, I prefer the view of Mr. Stocker that supports the figure contended for by the Monitor. His conclusion was consistent with the conclusion of Mercers, an actuary firm retained to advise NNUK on the issue.

[263]  The UKPC contend that it was the UK Plan actuary who was responsible for "drawing up" the revaluation in 2008. I do not think this is correct. The UK Plan actuary was responsible under the Funding Agreement for doing and certifying the clause 8.2 valuation as required by the 2004 Act. But the Funding Agreement did not say that anyone in particular was to calculate the valuation required by the definition of Current Deficit that is now in dispute. That definition simply said that the revised deficit was to be measured by the same actuarial methods and assumptions consistent with the actuarial methods and assumptions used by Mr. Harrison in 2005.

[264]  Thus I do not think it can be said that there is any onus to displace what Mr. Mobbs, the UK Plan actuary in 2008, did in arriving at his three different valuations.

[265]  The two key assumptions affecting the calculation of a deficit are (i) financial assumptions and (ii) mortality assumptions. The financial assumptions made by Mr. Mobbs in 2008 have not been challenged by the Monitor. Mr. Stocker was asked by the Monitor to consider whether the mortality assumptions used by Mr. Mobbs in 2008 were consistent with the mortality assumptions used by Mr. Morrison in 2005. Mr. Stocker's view was that mortality assumptions used by Mr. Mobbs were not consistent with the 2005 mortality assumptions.

[266]  This is explained in some detail in his report and it is not necessary to describe all of that detail. In essence, Mr. Stocker said that while the financial assumptions should and were updated by Mr. Mobbs, the mortality assumptions should not have been changed.

[267]  He stated that there are four main factors that were commonly used in 2008 when setting a mortality assumption: (i) the underlying standard mortality table; (ii) the allowance for mortality improvements up to the valuation date (including any underpin to the assumed rate of annual improvement); (iii) the age rating to apply to the standard mortality table; and (iv) the allowance for future mortality improvements after the valuation date (including any underpin to the assumed rate of annual improvement).

[268]  Mr. Stocker was critical of Mr. Mobbs in that while he used the same baseline actuarial table used in 2005, his assumptions for 2008 did not simply project forward the baseline from 2005 to 2008, but rather Mr. Mobbs derived a new baseline table from analysis of the UK Plan's experience up to 2008. The disparity of the different values arrived at by Mr. Mobbs in 2008 was caused by different assumptions used by Mr. Mobbs for future mortality improvements.

[269]  Mr. Stocker's opinion is that many UK pension plans ask their actuary to calculate the plan's updated funding position on an actuarial basis that is consistent with the previous valuation basis. He stated that in doing so, he would update the financial assumptions such as interest rates and inflation from the previous valuation but he would use exactly the same demographic assumptions such as mortality assumptions. The reason for updating the financial assumptions is that the calculation of the plan's liabilities would need to be assessed against the current market value of the plan's assets, and so there is a need to maintain comparability between these two figures. The market value of the assets will be affected by expectations of price inflation and government bond yields, and these indicators also affect the financial assumptions used for the liability calculation.

[270]  Mr. Stocker's evidence in his report and on cross-examination was that it would be appropriate for the plan actuary to take into account any new developments and the plan's recent experience when doing a full valuation as required by the 2004 Act and clause 8.2 of the Funding Agreement. His view was that it would not have been typical actuarial practice to take them into account when setting a mortality assumption consistent with the 2005 valuation as required by clause 3.3 of the Funding Agreement.

[271]  His evidence was that a mortality assumption consistent with the 2005 valuation would have used the 2005 baseline mortality table, using the same standard table but bringing the medium cohort (a technical term) improvement projections up to 2008. This was the approach recommended by Mercers, the NNUK actuary, who estimated the resulting deficit at £390 million. Mr. Stocker agreed with that figure.

[272]  Mr. Bowie in his report and evidence said that Mr. Stocker had ignored the updated plan's experience from 2005 to 2008 and that it would be unusual for an actuary to adopt an assumption that he or she knew to be materially inconsistent with empirical evidence. He said that what Mr. Stocker did in choosing a mortality assumption in 2008 which disregarded the information available in 2008 could not be considered consistent with the principle of incorporating the plan membership experience established in 2005.

[273]  There is an important document that assists in the interpretation of the meaning of the definition of Current Deficit and the phrase "consistent with the actuarial methods and assumptions used by" the plan's auditor in 2005. That document was an interim annual review of the UK Plan done by Watson Wyatt as at April 5, 2006. The review stated that it was an "Ongoing assessment following a consistent methodology as adopted at the previous formal investigation". That assessment updated the financial assumptions and kept the non-financial assumptions unchanged.

[274]  This annual review is dated June 23, 2006. It was no doubt provided to NNUK. It is a few months before the Funding Agreement of November 21, 2006 was made. I see it as a critical part of the factual matrix. It is not, as contended by the UKPC, a subjective understanding of the November 21, 2006 Funding Agreement. It is evidence of what the parties were aware of when the Funding Agreement was made. While an annual review did not normally involve an update of mortality assumptions due to the prohibitive cost, that does not detract from the fact that the parties were told by the plan actuary that a review that did not change the mortality assumptions was consistent with the 2005 valuation. I agree with the Monitor that this informs the parties

understanding of what was meant by "consistent actuarial assumptions" as found in the Funding Agreement.

[275]  Regarding this annual review, Mr. Bowie said that it was not appropriate to look at it because the legislation makes no reference to any need for these annual update calculations to be made on a consistent methodology and assumptions as the previous valuation. That may be, but the fact of the matter is that this 2006 annual review stated expressly that it was an assessment following a consistent methodology as adopted at the previous formal investigation.

[276]  Mr. Bowie was of the view that what Mr. Mobbs did in 2008 with his revisions to the mortality assumptions were well within actuarial practice at the time and in line with that typically adopted for funding valuations. He referred to a chart that he had prepared which showed the mortality assumptions for the valuations prepared by Mr. Mobbs and by Mr. Stoker as compared to the life expectancy assumptions of 30 of the largest UK pension plans. He stated that Mr. Stocker's view of a consistent mortality assumption was materially out with the range used by the other plans participating in the 2008 survey. However, the valuations by the other large UK pension plans were done for normal or full valuations, not for a valuation within the dictates of clause 3.3 of the Funding Agreement.

[277]  There is some evidence that Mr. Mobbs was not just doing a valuation of the Current Deficit as required by clause 3.3 by attempting to determine what assumptions were consistent with the 2005 valuation, but rather was taking a cue from the Trustee to help in negotiations with NNUK. A minute of the working party of the trustees dealing with actuarial issues and Mr. Mobbs dated July 24, 2008 to discuss the work of Mr. Mobbs stated that the assumptions to be used by him had been "agreed for use" at an earlier meeting held on May 20, 2008. The result of the use of those assumptions resulted in a deficit of £479 billion. The minute stated that Mr. Davies, the chairman of the Trustee, would set up a meeting with NNUK on August 11 or 14, 2008 to discuss the results of the work of Mr. Mobbs.

[278]  Mr. Davies unfortunately was somewhat less than forthcoming about this minute, querying what was meant by the phrase "agreed for use". However, a further note of Mr. Mobbs dated August 5, 2008 stated again that the approach to calculating the Current Deficit was put forward by Mr. Mobbs and agreed by the Trustee at its meeting on May 20, 2008. The minute of July 24 went on and stated that the working party discussed the assumptions and which ones could be challenged by NNUK and stated that the valuation basis should be acceptable, i.e. the basis for the valuation of the deficit at £479 billion should be acceptable to NNUK. Mr. Davies however asserted that the valuation was only an interim valuation and that one could not draw from the minutes that the assumptions were what the Trustee thought was fair and would be put to NNUK.

[279]  The note of Mr. Mobbs of August 5, 2008 stated that it had been prepared by the Actuary and agreed by the Trustee and that it was intended to be provided to NNUK "to facilitate agreement over the application of clause 3.3 of the Funding Agreement". It went on to contain three different valuations of the Current Deficit, being £479 billion, £545 billion and £619 billion. I can only conclude from this evidence that the Trustee and Mr. Mobbs thought that the £479 billion was the right calculation and that the other two figures were put forward for negotiating purposes and did not represent what even Mr. Mobbs thought was required by clause 3.3 of the Funding Agreement.

[280]  All of this leaves a question as to what Mr. Mobbs was about. Why in these circumstances the UKPC say that the correct figure is the middle figure calculated by Mr. Mobbs of £545 billion is quite unclear.

[281]  In the end, I find that the adjusted 2005 Deficit, referred to in the Funding Agreement as the 2008 Current Deficit and to be calculated in accordance with the definition of Current Deficit, is £390 million which when reduced by contributions made by NNUK after April 5, 2008 comes to £339.75 million.

**Claim on the Swift Guarantee**

**(a)  English principles of construction of an agreement**

[282]  The Swift Guarantee is governed by English law. The UKPC say that properly interpreted, NNL is liable under the guarantee.

[283]  This involves understanding English law in so far as it governs the interpretation of contracts. I will review it briefly, but can say that the law is remarkably close to Canadian common law save for a debate in English law, as yet unsettled, as to whether a mistake in an agreement can be corrected by way of interpreting the agreement rather than in an action for rectification.

[284]  In its recent decision in *Marley v. Rawlings*, [2014] UKSC 2, at para. 19 the President of the UK Supreme Court, Lord Neuberger, summarized the current state of UK law regarding contractual interpretation as follows:

> 19.  When interpreting a contract, the court is concerned to find the intention of the party or parties, and it does this by identifying the meaning of the relevant words, (a) in light of (i) the natural and ordinary meaning of those words, (ii) the overall purpose of the document, (iii) any other provisions of the document, (iv) facts known or assumed by the parties at the time that the document was executed, and (v) common sense, but (b) ignoring subjective evidence of any parties intentions.

[285]  In *Rainy Sky SA v. Kookmin Bank*, [2011] 1 W.L.R. 2900 Lord Clarke stated that the exercise of construction was a unitary exercise in which the court must consider the language used and what a knowledgeable reasonable person would have understood the parties to have meant, and if there were two possible constructions, the one consistent with business common sense could be preferred. If the language was unambiguous, the court could not rewrite it to conform to business common sense. He stated:

21. The language used by the parties will often have more than one potential meaning. I would accept the submission made on behalf of the appellants that the exercise of construction is essentially one unitary exercise in which the court must consider the language used and ascertain what a reasonable person, that is a person who has all the background knowledge which would reasonably have been available to the parties in the situation in which they were at the time of the contract, would have understood the parties to have meant. In doing so, the court must have regard to all the relevant surrounding circumstances. If there are two possible constructions, the court is entitled to prefer the construction which is consistent with business common sense and to reject the other.

23. Where the parties have used unambiguous language, the court must apply it. This can be seen from the decision of the Court of Appeal in *Co-operative Wholesale Society Ltd v. National Westminster Bank plc* [1995] 1 EGLR 97. The court was considering the true construction of rent review clauses in a number of different cases. The underlying result which the landlords sought in each case was the same. The court regarded it as a most improbable commercial result. Where the result, though improbable, flowed from the unambiguous language of the clause, the landlords succeeded, whereas where it did not, they failed. The court held that ordinary principles of construction applied to rent review clauses and applied the principles in *The Antaios (Antaios Compania Naviera SA v Salen Rederierna AB)* [1985] AC 191. After quoting the passage from the speech of Lord Diplock cited above, Hoffmann LJ said, at p 98:

"This robust declaration does not, however, mean that one can rewrite the language which the parties have used in order to make the contract conform to business common sense. But language is a very flexible instrument and, if it is capable of more than one construction, one chooses that which seems most likely to give effect to the commercial purpose of the agreement."

[286]  As to the background of the contract, or the factual matrix, English law excludes evidence of negotiations and declarations of subjective intent. In *ICS v. West Bromwich*, [1988] 1 WLR 896 Lord Hoffman stated:

(1)  Interpretation is the ascertainment of the meaning which the document would convey to a reasonable person having all the background knowledge which would reasonably have been available to the parties in the situation in which they were at the time of the contract.

(2)    The background was famously referred to by Lord Wilberforce as the "matrix of fact," but this phrase is, if anything, an understated description of what the background may include. Subject to the requirement that it should have been reasonably available to the parties and to the exception to be mentioned next, it includes absolutely anything which would have affected the way in which the language of the document would have been understood by a reasonable man.

(3)    The law excludes from the admissible background the previous negotiations of the parties and their declarations of subjective intent. They are admissible only in an action for rectification. ...

[287]  In *Charterbrook Limited v. Persimmon Homes Ltd*, [2009] 1 AC 1101, it was argued that the law should be changed to permit evidence of pre-contractual negotiations. Lord Hoffman reviewed in some detail the principles of construction and concluded that the rule excluding pre-contractual negotiations should not be departed from. He stated:

41.  The conclusion I would reach is that there is no clearly established case for departing from the exclusionary rule. The rule may well mean, as Lord Nicholls has argued, that parties are sometimes held bound by a contract in terms which, upon a full investigation of the course of negotiations, a reasonable observer would not have taken them to have intended. But a system which sometimes allows this to happen may be justified in the more general interest of economy and predictability in obtaining advice and adjudicating disputes. It is, after all, usually possible to avoid surprises by carefully reading the documents before signing them and there are the safety nets of rectification and estoppel by convention...

41.  The rule excludes evidence of what was said or done during the course of negotiating the agreement for the purpose of drawing inferences about what the contract meant. It does not exclude the use of such evidence for other purposes: for example, to establish that a fact which may be relevant as background was known to the parties, or to support a claim for rectification or estoppel. These are not exceptions to the rule. They operate outside it.

[288]  There were other statements made by Lord Hoffman in *Charterbrook* which have given rise to the debate as to whether a mistake can be corrected in English law by construing the agreement without a rectification action. The comments were *obiter* as rectification was ordered. What Lord Hoffman said was:

22. In *East v Pantiles (Plant Hire) Ltd* (1981) 263 EG 61 Brightman J stated the conditions for what he called "correction of mistakes by construction":

> "Two conditions must be satisfied: first, there must be a clear mistake on the face of the instrument; secondly, it must be clear what correction ought to be made in order to cure the mistake. If those conditions are satisfied, then the correction is made as a matter of construction."

23. Subject to two qualifications, both of which are explained by Carnwath LJ in his admirable judgment in *KPMG LLP v Network Rail Infrastructure Ltd* [2007] Bus LR 1336, I would accept this statement, which is in my opinion no more than an expression of the common sense view that we do not readily accept that people have made mistakes in formal documents. The first qualification is that "correction of mistakes by construction" is not a separate branch of the law, a summary version of an action for rectification. As Carnwath LJ said (at p. 1351, para 50):

> "Both in the judgment, and in the arguments before us, there was a tendency to deal separately with correction of mistakes and construing the paragraph 'as it stands', as though they were distinct exercises. In my view, they are simply aspects of the single task of interpreting the agreement in its context, in order to get as close as possible to the meaning which the parties intended."

24. The second qualification concerns the words "on the face of the instrument". I agree with Carnwath LJ (at pp 1350-1351) that in deciding whether there is a clear mistake, the court is not confined to reading the document without regard to its background or context. As the exercise is part of the single task of interpretation, the background and context must always be taken into consideration.

25. What is clear from these cases is that there is not, so to speak, a limit to the amount of red ink or verbal rearrangement or correction which the court is allowed. All that is required is that it should be clear that something has gone wrong with the language and that it should be clear what a reasonable person would have understood the parties to have meant. In my opinion, both of these requirements are satisfied.

[289] In *Marley v. Rawlings, supra,* another rectification case, Lord Neuberger took up the debate as to whether it was possible to correct a mistake by construction of the document. He said it was not necessary to decide "this difficult point", as follows:

36. This contention raises a point of some potential importance and difficulty. In *Investors Compensation Scheme Ltd v West Bromwich Building Society* [1998] 1 WLR 896, 912H-913E, Lord Hoffmann set out the principles which the court should apply when interpreting documents in five propositions. Most of the content of that passage is unexceptionable, although, in one or two places, the language in which the propositions are expressed may be a little extravagant; thus, the words "absolutely anything" in his second proposition required some qualification from Lord Hoffmann in *Bank of Credit and Commerce*, para 39.

37. However, the second sentence of Lord Hoffmann's fifth proposition in *Investors Compensation* is controversial. That sentence reads, so far as relevant, "…if one would nevertheless conclude from the background that something must have gone wrong with the language, the law does not require judges to attribute to the parties an intention which they plainly could not have had".

38. Lord Hoffmann took that approach a little further in *Chartbrook Ltd v Persimmon Homes Ltd* [2009] 1 AC 1101, paras 21-25. Having observed that the exercise of interpretation involves "decid[ing] what a reasonable person would have understood the parties to have meant by using the language which they did" and referring to the "correction of mistakes by construction", he said this:

> "[T]here is not, so to speak, a limit to the amount of red ink or verbal rearrangement or correction which the court is allowed. All that is required is that it should be clear that something has gone wrong with the language and that it should be clear what a reasonable person would have understood the parties to have meant."

39. In a forcefully expressed article, *"Construction" and Rectification after Chartbrook* [2010] CLJ 253, Sir Richard Buxton has suggested that Lord Hoffmann's approach to interpretation in these two cases is inconsistent with previously established principles. Lewison on *The Interpretation of Contracts* (fifth ed (2011), para 9.03, footnote 67, in an illuminating chapter dealing with mistakes) suggests that Sir Richard has made out "a powerful case for the conclusion that the difference between construction and rectification has reduced almost to vanishing point", if Lord Hoffmann's analysis is correct.

40. At first sight, it might seem to be a rather dry question whether a particular approach is one of interpretation or rectification. However, it is by no means simply an academic issue of categorisation. If it is a question of interpretation, then the document in question has, and has always had, the meaning and effect as determined by the court, and that is the end of the matter. On the other hand, if it is a question of rectification, then the document, as rectified, has a different meaning from that which it appears to have on its face, and the court would have jurisdiction to refuse rectification or to grant it on terms (eg if there had been

delay, change of position, or third party reliance). This point is made good in relation to wills by the provisions of section 20(2) and (3).

41. In my judgment, unless it is necessary to decide this difficult point, we should not do so on this appeal. Interpretation was not the basis upon which the courts below decided this case and it was not the ground upon which Mr Ham primarily relied. Furthermore, and no doubt because of those points, only limited argument was directed to the issue of whether the issue was one of interpretation or of rectification. For the reasons developed below, I consider that this appeal succeeds on the ground of rectification, so I shall proceed on the basis that it fails on interpretation.

[290]   Before leaving this analysis of English law, it should be noted that Lord Hoffman in *Charterbrook* emphasized that English courts do not easily conclude that a mistake was made in an agreement. He stated:

14. It is agreed that the question is what a reasonable person having all the background knowledge which would have been available to the parties would have understood them to be using the language in the contract to mean. The House emphasised that "we do not easily accept that people have made linguistic mistakes, particularly in formal documents" ... but said that in some cases the context and background drove a court to the conclusion that "something must have gone wrong with the language". In such a case, the law did not require a court to attribute to the parties an intention which a reasonable person would not have understood them to have had.

15. It clearly requires a strong case to persuade the court that something must have gone wrong with the language and the judge and the majority of the Court of Appeal did not think that such a case had been made out...

(b) **Analysis**

[291]   With these principles in mind, I turn to the construction to be given to the Swift Guarantee. No claim in rectification has been made by the UKPC.

[292]   The Swift Guarantee by NNL arose because the Trustee of the UK Plan was concerned that if NNL failed sometime after the Project Swift transaction, the consideration received by NNUK, being the subsidiaries transferred to it, would probably not be worth the amount that the

loan from NNUK to NNL was being reduced by the Project Swift transaction. Ultimately a guarantee in the amount of USD$150 million was signed by NNL in favour of the Trustee.

[293]   The language of the Swift Guarantee is important. The obligation of NNL is to arise upon or after the date of the occurrence of an "insolvency event", defined to be:

**Insolvency Event** means,

(a)      a court making a winding up order or an order for the dissolution or liquidation of [NNUK];

(b)      [NNUK] being dissolved by virtue of or pursuant to any statutory provision or otherwise; or

(c)      [NNUK] passing a resolution for its winding up

following and as a consequence of which the Scheme commences winding up without, for the avoidance of doubt, another body corporate whether before, in contemplation of or after the occurrence of such an event entering into an agreement with the [Trustee] and [NNUK] or its liquidator to perform the obligations of [NNUK] under the Scheme.

[294]   The Monitor contends that none of these conditions have been met. It says that NNUK has entered into administration which is not covered by (a) as a court order for winding-up or dissolution or liquidation of NNUK is different from voluntary administration. Nor has the Scheme commenced winding-up following and as a consequence of any of (a), (b) or (c).

[295]   The UKPC contend that the clear commercial purpose of the Swift Guarantee was to protect the UK Plan in the event that NNUK entered an insolvency process because the Trustee had been warned by its advisors that the UK Plan would be worse off in such a scenario after the Project Swift transaction than it had been before the transaction. The UKPC rely on a statement of Mr. Ham, their expert on English law, that as a matter of English insolvency law and practice, it is much more common for insolvent companies to go into administration first rather than to go

directly into liquidation.[15] Accepting that and taking it as part of the factual matrix that would be known to the parties or their legal advisors, it is still necessary to construe the Swift Guarantee to discern what was intended by it.

[296] The UKPC contend as an alternative to their primary argument that the words "or administration" should simply be read into paragraph (a) of the definition of "Insolvency Event" so that it reads as follows, with the consequence that an administration of NNUK would trigger an "Insolvency Event":

> "(a)   a court making a winding up order or an order for the dissolution or liquidation <u>or administration</u> of [NNUK];
> ....
> following and as a consequence of which the Scheme commences winding up..."

[297] It is said that this addition of the word administration into the definition can be by way of implication or as a correction of an obvious error given the unitary nature of the exercise of construction under English law. I see no basis to imply that the word "administration" should be added to the clause. I was provided with no English law as to the test to imply a term in an agreement and assume the test is the same as that in our common law. The evidence does not permit it to be said that "it goes without saying" that the word should be added or that the addition of the word is necessary to give business efficacy to the guarantee. Nor do I see the evidence as revealing that something clearly has gone wrong with the language used, even assuming as a matter of English law that a mistake can be rectified by construction rather than by rectification.

[298] The UKPC rely on an internal e-mail sent by Mr. Simon Freemantle, an employee of NNUK, to a number of Nortel personnel on December 17, 2007, including Mr. Michael McCorkle, the interim treasurer of NNL. Mr. Freemantle was negotiating the Swift Guarantee with Mr. Davies, the then Chair of the Trustee. In his e-mail, Mr. Freemantle stated:

---

[15] I disregard the statements (really argument) of Mr. Ham as to what an English court would likely do in construing the Swift Guarantee, for the same reasons expressed in these reasons in the FSD claim.

> Good news this morning.  The Trustee Chair called and after a brief discussion we
> have agreed on a $150m NNL guarantee which kicks in upon NNUK
> Administration – actual wording now to be agreed between the lawyers but David
> and I have agreed in principle.

[299]   Three days earlier, Mr. Freemantle had reported internally that the matter in dispute was
that the Trustee had wanted the guarantee to be for $600 million and he had told Mr. Davies in a
difficult call that he could not agree to any more than $150 million.

[300]   Mr. Davies said in his evidence that the dispute three days earlier was between the
Trustee wanting a guarantee for $600 million and Mr. Freemantle saying that the guarantee
should be limited to $100 million. He said he was authorized to agree to $150 million if Mr.
Freemantle would agree to that figure. He recalled the conversation with Mr. Freemantle three
days later on December 17, 2007 referred to in the e-mail. He testified that it wasn't a
particularly long call, that he wasn't sure who made the first move as it involved negotiations
and that they agreed at $150 million. He said that they did not discuss any particular type of
insolvency proceedings and that at all stages they just talked generally about insolvency.

[301]   It is highly questionable whether the e-mail or Mr. Davies' evidence is admissible under
English law. It is evidence of negotiations that preceded the written guarantee. Even if the
evidence is admissible, it does not seem to make things clear. Mr. Freemantle used the word
"Administration". Mr. Davies says that they just talked generally about insolvency. In light of
the fact that the call was to discuss the different positions on the size of the guarantee, it is
unlikely that they got into a discussion of what insolvency events were to be covered in the
guarantee.

[302]   Moreover, Mr. Freemantle's e-mail stated that the actual wording was to be agreed
between the lawyers. That suggests that there was no discussion with Mr. Davies about what the
wording was to be. Also, the wording of the guarantee was then negotiated between the lawyers
after the negotiations between Mr. Freemantle and Mr. Davies.

[303]  The Monitor relies on an internal Nortel e-mail between Nortel lawyers regarding the form of the Swift Guarantee after it had been settled between the lawyers acting for the Trustee and NNUK. The e-mail stated:

> Bill, you will see the final language when we send the draft of the guarantee through, but in the meantime, and hopefully to provide some reassurance for Gordon, the definition of an insolvency event in the guarantee is limited. The trigger event is the liquidation or dissolution of NNUK. The liquidation of NNUK may be compulsory by way of court order (following petition from NNUK creditors) or voluntary by way of resolution of NNUK's shareholders i.e. NNL. As drafted and agreed, the guarantee does not include more protective forms of insolvency such as voluntary arrangements, receiverships or administrations.
>
> The draft has been agreed in principle by the lawyers, Pinsents are now awaiting authorisation from the Trustees to confirm their agreement.

[304]  This e-mail contains evidence of the subjective intention of Nortel lawyers, to whom it was left to draft the guarantee, and in my view it is not admissible as evidence of what the Swift Guarantee should be taken to mean. It is, however, admissible in so far as the argument of UKPC is concerned that something clearly went wrong with the drafting of the guarantee. If this were a rectification case, the evidence would be admissible in an attempt to establish the intention of one side of the agreement. UKPC say that the English way to interpret the guarantee is an approach that permits the guarantee to be rectified by way of interpretation as discussed by Lord Hoffman in *Charterhouse*. The evidence was that the drafting of the guarantee was to be left to the lawyers, and this e-mail is considerable evidence that from the point of view of NNUK that if the interpretation of the guarantee contended for by the Monitor is correct, there was no error in the drafting.

[305]  There is other evidence that the drafting was not in error if it has the meaning that the Monitor contends it has. Mr. Michael McCorkle, the interim treasurer of NNL, was involved in the Swift Guarantee process and was responsible for ensuring that the guarantee was acceptable to Nortel's treasury department. Mr. Freemantle who was negotiating the guarantee with the Trustee reported to him. Mr. McCorkle's evidence was that the thing he had in mind regarding the negotiations was that the guarantee would not alarm rating agencies or cause problems with

Nortel's existing financiers and future access to capital markets. He said that he was only willing to recommend a guarantee upon an ultimate wind-up or bankruptcy of NNUK, and not something potentially less terminal, such as administration proceedings.

[306]  Mr. David Davies, the chairman of the Trustee at the time, reviewed the final wording of the guarantee. He testified that he must have been satisfied that it was not mistaken and that it reflected the intention of the transaction.

[307]  I would not add the words "or administration" to paragraph (a) of the definition of Insolvency Event on the basis that something went wrong with the drafting. The evidence does not support such a conclusion.

[308]  The UKPC's primary argument is that the correct approach to the construction of the definition of insolvency event is that the order made by the English court placing NNUK into administration is "an order for the liquidation" of NNUK because as a result of the administration order NNUK's business has been liquidated.

[309]  Paragraph (a) in the definition of insolvency event includes both a winding up order and an order for liquidation. UKPC says that when referring to liquidation in the legal sense, one refers to a winding up order rather than an "order for liquidation". Therefore the UKPC contends that the words "order for liquidation" must mean something different from or at the very least are broader than the words "a winding up order". While I do not think either expert on English law said that expressly, it would seem to make sense as an order for winding up a company is an order to liquidate. So the reference in the paragraph to an order for liquidation might well encompass an order other than a winding up order. An example perhaps of an order for liquidation could be in a receivership after a receiver had been appointed in which a court authorized the receiver to liquidate the assets.

[310]  The question in this case is whether it can be said that an order appointing an administrator was "an order for liquidation". When NNUK went into administration at the same

time that the CCAA and chapter 11 proceeding were commenced in Canada and the United States, the intention was not to liquidate but rather try to restructure the business. The administration order was not initially made for the purposes of liquidation. However, NNUK has now been liquidated and all of its assets have been sold. That this was to happen was clear from at least June 2009 so far as the whole Nortel Group is concerned.

[311]  An administrator under English law must perform his functions with a cascade of objectives, including liquidating the assets if in the best interests of the creditors. This was discussed by Lord Justice Rimer in *Key2Law (Surrey) LLP v. De'Antiquis* [2011] EWCA Civ 1567 in which he reviewed the regime for administration of companies in England. In particular, he reviewed Schedule B1 to the *Insolvency Act 1996* (UK) c. 45 and section 3 which deal with the duties of an administrator. It provides:

> 3. (1) The administrator of a company must perform his functions with the objective of –
>
> > (a) rescuing the company as a going concern, or
> >
> > (b) achieving a better result for the company's creditors as a whole than would be likely if the company were wound up (without first being in administration), or
> >
> > (c) realising property in order to make a distribution to one or more secured or preferential creditors.
>
> (2) Subject to sub-paragraph (4), the administrator of a company must perform his functions in the interests of the company's creditors as a whole.
>
> (3) The administrator must perform his functions with the objective specified in sub-paragraph (1)(a) unless he thinks either –
>
> > (a) that it is not reasonably practicable to achieve that objective, or
> >
> > (b) that the objective specified in sub-paragraph (1)(b) would achieve a better result for the company's creditors as a whole.

(4) The administrator may perform his functions with the objective specified in sub-paragraph (1)(c) only if –

(a) he thinks that it is not reasonably practicable to achieve either of the objectives specified in sub-paragraph 1(a) and (b), and

(b) he does not unnecessarily harm the interests of the creditors of the company as a whole.

[312]   Rimer LJ concluded that the primary objective of an administration is the rescue of the company as a going concern, although often that is not possible. In a high proportion of cases it is recognized before and after the appointment of the administrator that the rescue of a company is not practicable and the business is sold, in whole or in parts. He stated:

It can therefore perhaps be said that the primary objective of an administration appointment is the rescuing of the company as a going concern, an objective which has in mind the saving of the company's undertaking, or a substantial part of it, and in due course the return of the company to its management. This might in some cases require the use of a company voluntary arrangement or a scheme of arrangement. Accepting the existence of such objective, it must also be recognised that in practice a high proportion of appointments of administrators have been and will be made in cases in which it is apparent both before and after the appointment that a rescue of the company in this sense is not reasonably practicable and that the alternative objective that is foreseen as being achievable is the paragraph 3(1)(b) objective. The achievement of that objective will usually involve the sale of the company's business and undertaking, either in whole or in parts. Moreover, this objective must be pursued even if a rescue of the company *is* perceived as practicable but the administrator nevertheless thinks that the paragraph 3(1)(b) objective would achieve a better result for the company's creditors as a whole.

[313]   See also *Kaupthing Singer & Friedlander Limited (In Administration)* [2010] EWHC 316 at para. 17.

[314]   Thus the appointment of an administrator can lead to the liquidation of the company. Could the reference to an order for liquidation in subsection (a) of the definition of Insolvency

Event include an order appointing an administrator?  In my view it could and should, for the following reasons.

[315]  The commercial reality is that NNL did not want to be called upon under the guarantee if NNUK survived or went through some insolvency process that did not end up in liquidation. Mr. McCorkle said that he was only willing to recommend a guarantee upon an ultimate wind-up or bankruptcy of NNUK. Mr. Gordon Davies, a very senior legal officer in Nortel responsible for obtaining the approval for the guarantee from the board of NNL, thought that the guarantee should not apply if the UK Plan was sold to a third party. He understood that the trigger for the guarantee was limited to liquidation or dissolution.

[316]  The concluding language of the definition of an Insolvency Event in the guarantee was protection against NNL being called on the guarantee if the pension plan were taken over by someone else. It provides:

> without, for the avoidance of doubt, another body corporate whether before, in contemplation of or after the occurrence of such an event entering into an agreement with the [Trustee] and [NNUK] or its liquidator to perform the obligations of [NNUK] under the Scheme.

[317]  The concern not to run into problems with covenants in other loan agreements made by Nortel was met by not having the word "administration" in the definition of Insolvency Event. But the commercial reality is that what Nortel was prepared to agree to in order to be liable on the guarantee has come to pass. There has been a liquidation of the assets.

[318]  I have been referred to various English cases dealing with the interpretation of insolvency type clauses in legislation or commercial contracts. Each case of course depends on its facts, none of which are akin to this case.

[319]  In *Key2Law, supra,* a regulation with the words "bankruptcy proceedings or any analogous insolvency proceedings which have been instituted with a view to the liquidation of the assets of the transferor" was held not to include administration proceedings. Whether "with a

view to liquidation" is different from "an order for liquidation" is perhaps debatable. I side with Lord Justice Rimer who in that case referred to the interpretation of the language sufficiently challenging as to lead to despondency if not despair. I think the same can be said of the Swift Guarantee.[16]

[320]   In *Kaupthing Singer & Friedlander Limited (In Administration), supra,* the phrase "the rights and claims of the Bondholders will, in the event of the winding up of the Issuer, be subordinated" was interpreted to cover a liquidation under an administration order. The issue was whether the words "winding up" meant only a voluntary or compulsory liquidation. Justice Blair referred to a recent statement by Lord Steyn that there has been a shift from literal methods of interpretation towards a more commercial approach, that the standard of the reasonable commercial person is hostile to technical interpretations and undue emphasis on niceties of language and that the tendency should therefore generally speaking be against literalism. He concluded that the commercial intent was that the bonds were to be subordinated in the event that the company had insufficient assets to pay its creditors, which was the result from the liquidation of its assets while under administration.  He concluded that it must have been the intention of the parties that in such a process, the claims of the Bondholders would be subordinated in the same manner as would have been the case in the winding up of a company by way of voluntary or compulsory liquidation. A distinguishing fact is that in this case  that the definition of insolvency includes detailed provisions as to what is included, whereas in *Kaupthing*, that was not the case.

[321]   Taking into account the commercial purpose of the Swift Guarantee and the statement of Lord Clarke in *Rainy Sky SA* that language is a very flexible instrument and, if it is capable of more than one construction, one chooses that which seems most likely to give effect to the commercial purpose of the agreement, I conclude that the words "order for liquidation" in the definition of Insolvency Event in the Swift Guarantee cover an order for administration under which a liquidation of the assets of NNUK has occurred. If a liquidation did not occur, an administration order would not be an insolvency event.

---

[16] An example is clause 2.6(f) that refers to a bankruptcy of NNUK. Under English law, bankruptcy only applies to an individual and not to a company. See *Key2Law* at para. 83.

[322]   An Insolvency Event as defined means an order for liquidation "following and as a consequence of which the Scheme commences winding up".

[323]   The Monitor contends that even if a liquidation order could encompass an insolvency order under the Swift Guarantee, there still has been no Insolvency Event because the Scheme has not commenced winding up and did not do so before the expiry date of the Swift Guarantee of June 30, 2012.

[324]   It is clear that the UK Plan will be wound up. On February 2, 2009 the administrators of NNUK gave notice to the Regulator and to the PPF under section 122 of the 2004 Act that after a review of the activities of the business, it was considered that a scheme rescue was unlikely. On April 30, 2009 the Board of the PPF advised the administrators that the notice given by them became binding on April 27, 2009. As a result, under section 161(2) of the 2004 Act, if the Board of the PPF assumes responsibility for the UK Plan, the scheme will be treated as having been wound up immediately afterwards. If the Board of the PPF does not assume responsibility for the UK Plan, under section 154(1) of the 2004 Act the scheme must be wound up.

[325]   The UKPC contend that there can only be one insolvency event, as is stated by the words "Insolvency Event", rather than two events.  What is required for an Insolvency Event to have occurred is that: (a) one of the "events" listed in paragraphs (a) – (c) of the definition has occurred, and (b) at some point "following and as a consequence" of that, the UK Plan will enter winding up, even if it has yet to do so. Thus the UKPC say that the insolvency event, the order for liquidation, occurred before the expiry date of June 30, 2012.

[326]   The UKPC also say that it would make no commercial sense for the parties to have required the wind up of the UK Plan by a certain date as it is out of the hands of NNUK and the Trustee. It is dependent on the decision of the Board of the PPF as to when to decide whether to assume the liabilities of the UK Plan.

[327]   I accept the position of the UKPC. It is an interpretation open on the language used in the definition of Insolvency Event and makes commercial sense. The fact that the wind up of the UK Plan has not yet occurred makes no difference to the liability of NNL.

[328]   The Monitor contends that before there can be liability on the Swift Guarantee, a demand must be made and that an actuarial certificate is required before that can be done. This contention arises from clause 3 of the Swift Guarantee. Clause 3.1(a) provides that after an Insolvency Event occurs, the Trustee shall forthwith instruct the plan actuary to calculate the "Buy Out Deficit" and produce a certificate that certifies the Buy Out Deficit in writing. The Buy Out Deficit is defined as the difference between the Schemes' liabilities and assets. This amount is needed because the amount guaranteed is the lesser of US$150 million and the Schemes' Buy Out Deficit less certain amounts.

[329]   Clause 3.1(d)(i) provides that a demand may only be issued once the actuary's certificate has been provided to NNL, as follows:

> 3.1(d)  Following the occurrence of the Insolvency Event, the Beneficiary may issue a Demand once:
>
> (i)   the Actuary's Certificate has been provided to the Guarantor in accordance with Clause 3.1(b);

[330]   The UKPC says that it has been known for years that the section 75 Debt dwarfs US$150 million. Therefore the claim filed by UKPC made clear that NNL's liability under the Swift Guarantee was obviously US$150 million and that it would be absurd to defeat the claim because the actuary's certificate has not yet certified the section 75 Debt.

[331]   In this case, the UKPC filed a proof of claim on September 30, 2009. While they could have moved for a lifting of the stay of proceedings to serve a demand but did not do so, I accept their argument that filing of a proof of claim was a method of demanding under the guarantee. The question is therefore whether the demand was premature. In my view, it was premature as there had not been an actuary's certificate. That is a requirement of clause 3.1 of the Swift

guarantee before a demand can been made. Why that has not happened is a matter of debate in this case. However, there is no basis advanced that would permit that requirement to be overlooked. It is a condition precedent to a demand being made and it is of no fault of NNUK or NNL that the actuary's certificate had not been provided.

[332]    The UKPC contend that clause 3.1(d) that states that a demand may be issued once the actuary's certificate had been provided to the guarantor is permissive and is directed to a situation in which the guaranteed obligation is in doubt and needs to be established. They contend that the guarantee does not provide that no demand may be issued in other circumstances where there is no doubt as to the amount of the guaranteed obligation.

[333]    I cannot read the guarantee in that way. Clause 3.1 provides for the establishment of the guaranteed obligation and first requires in (a) that upon an Insolvency Event, the Trustee shall forthwith instruct the actuary to calculate the buyout deficit, and it acknowledges that it may take several months for the actuary to complete the relevant calculations. Clause 3.1(b) then provides for the actuarial report to be provided to the guarantor who under clause 3.1(c) may have questions. Clause 3.1(d) then provides that the Trustee may issue a demand once the actuary's certificate has been provided to the guarantor under clause (b).

[334]    Clause 3.2 then provides that any payment due from the guarantor shall be due within 10 days following the service of "a Demand under this Agreement" on the guarantor. The only provision for a demand in the agreement is the demand referred to in clause 3.1(d). It is not possible to read any other potential for a demand into the agreement. Without such a demand after the actuary's certificate, there is no method in the guarantee to establish what the guaranteed amount is or when it is due.

[335]    No further demand either in the form of a demand or the filing of a proof of claim was made before the expiry date of the Swift Guarantee of June 30, 2012.

[336]   The UKPC make an alternative argument regarding the Swift Guarantee. They contend that if an administration is not an Insolvency Event, a wind up order would be, and as a wind up on NNUK is inevitable, there is a contingent claim for US$150 million that at the date of filing under the CCAA on January 12, 2009 was clearly not too remote or speculative to be recognized as a valid claim.

[337]   The Monitor says that this cannot be the case because the Swift Guarantee expired on June 30, 2012 and thus there is no future event which can impact the claim. I note that the UKPC acknowledged in their reply brief at page 122 that an Insolvency Event must happen before the expiry date and that if it does not the guarantee will not apply. That being the case, I accept the position of the Monitor that there cannot be a contingency claim on the basis of some future wind up of NNUK.

[338]   I accept the argument of the Monitor that the demand was premature because there was no actuarial certificate at the time of the demand and that as there was no other demand before the Swift Guarantee expired, there can be no liability of NNL under it. In the circumstances I see no result but that the Monitor's disallowance of the claim on the Swift Guarantee must be upheld.

**Rule in *Ex Parte James***

[339]   The UKPC contend that if either the Funding Guarantee or the Swift Guarantee is held to be unenforceable, they should nevertheless be accepted as valid claims by virtue of the rule in *Ex Parte James*. The rule is directed to a court officer acting in an inequitable way. It derives from the case of *Re Condon; Ex p. James* (1874), 9 Ch. App. 609.

[340]   In *Re Condon*, an execution creditor had realized on his execution prior to the bankruptcy of the debtor. Under threat of legal proceedings he paid the proceeds of the execution to the trustee in bankruptcy, mistakenly believing that the trustee was legally entitled to demand them. Later, the execution creditor sued the trustee in bankruptcy for the return of the sum paid and

was met with the defence that the money, having been paid under a mistake of law, was irrecoverable. This defence was rejected by the English Court of Appeal for the reasons given by James L.J. at p. 614:

> With regard to the other point, that the money was voluntarily paid to the trustee under a mistake of law, and not of fact, I think that the principle that money paid under a mistake of law cannot be recovered must not be pressed too far, and there are several cases in which the Court of Chancery has held itself not bound strictly by it. I am of opinion that a trustee in bankruptcy is an officer of the Court. He has inquisitorial powers given him by the Court, and the Court regards him as its officer, and he is to hold money in his hands upon trust for its equitable distribution among the creditors. The Court, then, finding that he has in his hands money which in equity belongs to someone else, ought to set an example to the world by paying it to the person really entitled to it. In my opinion the Court of Bankruptcy ought to be as honest as other people.

[341]   In my view, the rule in *Ex Parte James* has no application in this case.

[342]   First, it is directed to a court officer acting as such. In this case the Monitor is acting under the "super monitor" order of October 3, 2012 in which the Monitor was authorized to exercise any powers which may be exercised by a board of directors of any of the applicants, which includes NNC and NNL. If NNL were still able to act and defend its interests, as is the usual situation in a CCAA proceeding, it would be quite open to NNL to defend the claims on the guarantees by arguing that there was no liability under them. I see no reason why the Monitor in this case cannot advance these defences in its capacity as acting in the place of the board of directors of NNL.

[343]   Second, the rule prevents a trustee in bankruptcy, as an officer of the court, from claiming or retaining money or property in circumstances where it is inequitable for it to do so. See *Re Appleby Estates Ltd.* (1984), 53 C.B.R. (N.S.) 10 (Ont. C.A.) at para 18. In *Re M.C.C. Precision Products Ltd.,* [1972] 2 O.R. 825 at paras. 31, 33 (S.C. (In Bank.)), Houlden J. (as he then was) stated that: "[...] I do not think that the rule in *Re Condon* [*Ex parte James*] has ever been applied to a situation where the trustee has not received property or is asserting a claim to property, which is claimed by some other person..."

[344]    As in those cases, this is not a situation in which the Monitor has received property or is asserting a claim to property. This is not a case in which NNL has been enriched by NNUK assets that are to be distributed to its creditors, such as in *Re Sefel Geophysical Ltd.* (1988), 70 C.B.R. (N.S.) 97. Nothing has come into the hands of the Monitor to enrich it and thus the rule has no application. See Houlden, Morawetz and Sarra *2013-2014 Annotated Bankruptcy and Insolvency Act* (Toronto: Carswell) at F§73.

[345]    Third, if the Trustee of the UK Plan has no valid claim under one of the guarantees, the rule in *Ex Parte James* could not operate to make the claim valid. That is not the purpose of the rule and there would be no inequity in the Monitor on behalf of NNL defending the claim.

[346]    I have held that the Swift Guarantee is unenforceable because of its terms. I would not make the claim under it valid by virtue of the rule in *Ex Parte James*.

**Oppression**

[347]    The UKPC claim in oppression against NNL under section 241 of the Canada Business Corporations Act. They raise a number of matters which they say constituted an unfair disregard of the interests of the Trustee, a creditor of NNL under the Funding Guarantee and the Swift Guarantee.

### (a) Standing to be a complainant

[348]    The Monitor says that the UKPC has no standing to be a complainant. A complainant is defined in section 238 of the CBCA to mean:

> (a) a registered holder or beneficial owner, and a former registered holder or beneficial owner, of a security of a corporation or any of its affiliates,

> (b) a director or an officer or a former director or officer of a corporation or any of its affiliates,

> (c) the Director, or

(d) any other person who, in the discretion of a court, is a proper person to make an application under this Part.

[349]  I see no basis for the Board of the PPF to be a complainant. The Trustee is a creditor of NNL and asserts that it should be recognized as a complainant. It is well established that a creditor may be a complainant. It is a discretionary matter under (d) as to whether in any case a creditor can be a proper person to make an application under the CBCA. See *Peoples Department Stores Inc. (Trustee of) v. Wise*, [2004] 3 S.C.R. 461 (S.C.C.), at paras 48 - 51.

[350]  The difficulty in this case in recognizing the Trustee as a complainant is that the Trustee is not complaining that the affairs of NNL, of which it is a creditor, have been disregarded. It complains that the affairs of NNUK have been disregarded. NNUK is wholly owned by NNL and is thus an affiliate of NNL. However, I have not been provided with any case that has recognized a valid complaint by a creditor or security holder of a CBCA corporation because of oppressive conduct that has affected only an associated corporation that is not the CBCA corporation of which the complainant is a stakeholder.

[351]  Section 241 of the CBCA provides:

241. (1) A complainant may apply to a court for an order under this section.

(2) If, on an application under subsection (1), the court is satisfied that in respect of a corporation or any of its affiliates

(a) any act or omission of the corporation or any of its affiliates effects a result,

(b) the business or affairs of the corporation or any of its affiliates are or have been carried on or conducted in a manner, or

(c) the powers of the directors of the corporation or any of its affiliates are or have been exercised in a manner

that is oppressive or unfairly prejudicial to or that unfairly disregards the interests of any security holder, creditor, director or officer, the court may make an order to rectify the matters complained of.

[352]   There is authority that at least in so far as a corporation governed by the Ontario Business Corporation Act is concerned, the oppressive conduct must affect the OBCA corporation in which the complainant is a stakeholder. In *PMSM Investments Ltd. v. Bureau* (1995), 25 O.R. (3d) 586, Farley J. held that the oppression in question must affect the interests of the complainant in the OBCA corporation and not in an affiliate of the OBCA corporation. He stated:

> It would seem to me that the meaning of this section is clear in that while the activities of affiliates (OBCA or non-OBCA companies) of the corporation (an OBCA company) may be taken into account to see if there has been inappropriate behaviour, it must be such behaviour as affects (is oppressive or unfairly prejudicial to or that unfairly disregards) "the interests of any security holder, creditor, director or officer of the corporation [OBCA company]". That is, what is affected inappropriately must be the interests of those persons *qua* their interests specifically in the OBCA company in question.

[353]   See also Kevin Patrick McGuinness, *Canadian Business Corporations Law,* 2nd ed. (Markham: LexisNexis Canada, 2007) at para. 13.84.

[354]   The UKPC point to a difference in the language of the OBCA and the CBCA. The OBCA, which was the statute dealt with by Farley J. in *PMSM Investments,* contains the words "that is oppressive of the interests of a....creditor...of the corporation", whereas the words "of the corporation" are not contained in the language of section 141(2) of the CBCA. Section 248(2) of the OBCA provides:

> (2) Where, upon an application under subsection (1), the court is satisfied that in respect of a corporation or any of its affiliates,
>
> (a) any act or omission of the corporation or any of its affiliates effects or threatens to effect a result;
>
> (b) the business or affairs of the corporation or any of its affiliates are, have been or are threatened to be carried on or conducted in a manner; or
>
> (c) the powers of the directors of the corporation or any of its affiliates are, have been or are threatened to be exercised in a manner,

that is oppressive or unfairly prejudicial to or that unfairly disregards the interests of any security holder, creditor, director or officer <u>of the corporation</u>, the court may make an order to rectify the matters complained of. (Underlining added)

[355]  I see the reference to "any security holder, creditor, director or officer of the corporation" in section 248(2) of the OBCA as descriptive of the persons to be protected rather than as descriptive of the interests of such persons to be protected. In that regard I differ a little from Farley J. in *PMSM Investments* who seems to have concluded solely from the words "of the corporation" that what is affected must be the interests of those persons *qua* their interests specifically in the OBCA corporation in question. I agree with his conclusion that the interests that must be affected are the interests of those persons qua the OBCA corporation in which they are a stakeholder, but I would not base it on existence of the words "of the corporation". The section refers to the interests of a security holder etc. <u>of</u> the corporation, not to the interests of a security holder <u>in</u> the corporation.

[356]  I agree with the result of the decision of Farley J. in *PMSM Investments*. The reason has to do with our basic corporate governance principles. For both CBCA and OBCA corporations, the directors and officers owe fiduciary duties to the corporation for which they are directors or officers. See *Peoples Department Stores Inc. (Trustee of) v. Wise* at paras 34 and 35. See also *BCE Inc., Re*, [2008] 3 S.C.R. 560 at para. 36. They owe their fiduciary duty to the corporation and only the corporation. See *BCE* at para. 66.

[357]  For that reason, if the directors or officers of a corporation cause the corporation to act in an oppressive manner that harms the corporation and affects the interests of the stakeholders in that corporation, there are statutory remedies, such as the bringing of a derivative action in the name of the corporation to remedy the harm caused to the corporation, or the bringing of an oppression remedy to give relief to a complainant necessary as a result of the harm caused to the complainant. So far as reasonable expectations that are at the heart of the oppression remedy are concerned, the reasonable expectation of stakeholders is simply that the directors act in the best interests of the corporation. See *BCE* at para. 66.

[358]   Does the absence of the words "of the corporation" in section 241(2) of the CBCA make a difference from the result of the jurisprudence under section 248(2) of the OBCA? In this case I think not. The purpose of both sections is the same, to prevent harm to a corporation governed by the legislation and to give a remedy to stakeholders in the corporation for the harm done to that corporation. The purpose of the oppression remedy is to protect complainants from prejudicial acts that affect the corporation in which they are a shareholder, creditor etc.

[359]   The UKPC rely on the case of *Manufacturers Life Insurance Co. v. AFG Industries Ltd.* (2008), 44 B.L.R. (4th) 277 at para. 24. I do not see that it assists the UKPC. In that case, the actions of the defendant, a US corporation which was the parent of the Canadian corporation, detrimentally affected the assets of the Canadian corporation to the detriment of the complainant who was a creditor of the Canadian corporation. The complainant was not arguing that the assets of the US corporation were detrimentally affected by the actions of the Canadian corporation.

[360]   To hold in this case that NNL was responsible under section 141(2) of the CBCA for actions that did not affect the interests of NNL but of NNUK would mean that NNL had a duty to look after the interests of NNUK. That however, is not our law. A shareholder holds no duty to a corporation to act in the best interests of the corporation. Their interests may well conflict.

[361]   If a corporation has a subsidiary, the directors of the parent corporation in the exercise of their fiduciary duties to the corporation must consider how the subsidiary can benefit the interests of the parent corporation. What is done with the subsidiary may be in the best interests of both the parent and the subsidiary, or it may not be. But the duties of the directors and officers of the parent are to the parent, not to the subsidiary. Likewise, the duties of the directors of the subsidiary are to the subsidiary and not to the parent. See *Scottish Co-operative Wholesale Society Ltd v Meyer*, [1959] A.C. 324. See also *820099 Ontario Inc. v. Harold E. Ballard* (1991), 3 B.L.R. 2d 113, per Farley J.

[362]   This is not a case such as *Scottish Co-operative Wholesale Society Ltd v Meyer* in which the nominees of the majority shareholder on the board of the subsidiary, who were also directors

of the majority shareholder, failed to consider the interests of the subsidiary and instead just did the bidding of the majority shareholder that had nominated them. I recognize an argument under our oppression provisions governing a CBCA corporation that if a majority shareholder of a subsidiary participated through its nominees in those nominees breaching their fiduciary duties to the subsidiary, there may be some responsibility on the majority shareholder as there was in *Scottish Co-operative Wholesale Society Ltd v Meyer*. However I need not determine that question.

[363]   In this case, NNUK had its own distinct board of directors advised by independent solicitors, auditors and financial advisors. The board of NNUK owed fiduciary duties to NNUK and the directors understood that as is clear from the affidavits of Peter Currie, the CFO of NNC and NNL who was a director of NNUK and of Gordon Davies, a very senior legal officer who held various positions in the Nortel organization in Europe and in Canada. The NNUK had senior people on its board and I accept that they were not "yes men" doing the bidding of NNL but rather were fulfilling their fiduciary obligations to NNUK.

[364]   There is another reason for not recognizing the Trustee as a complainant. Apart from the claim on the guarantees made by NNL in favour of the Trustee, which I shall discuss, the complaints of the UKPC relate to transactions to which NNUK was a party. Some but not all of the complaints were the subject of claims made by the administrators of NNUK against NNL. These include what the UKPC describes in its brief as the fundamental oppression claims, being (a) the failure of NNL to pay amounts due and payable to NNUK under the MRDA, (b) the failure of NNL to pay interest to NNUK on amounts outstanding under the MRDA, and (c) the managing of world-wide cash by NNL in a manner to keep it out of NNUK. All of the claims of the administrators of NNUK have been settled and releases provided. The claims by the UKPC for these things are essentially derivative claims of NNUK and I would not recognize the UKPC as a complainant against NNL for these matters released by NNUK.

[365]   For all of these reasons, I would not exercise my discretion to recognize the UKPC as a complainant.

### (b)   Merits of oppression claims

[366]   On the assumption that the UKPC does have standing to claim oppression I will deal with the merits of the claims.    There are some facts in general that are important in considering the claims.

[367]   Nortel operated as an integrated global business, which benefited all members of the Nortel Group.   The integrated structure allowed all members to gain efficiencies by coordinating and centralizing capabilities, areas of expertise and common cost centres.   Nortel was organized on a matrix basis, where each entity was integrated into regional and product line management structures to share information and perform R&D, sales and other common functions across geographic boundaries and across legal entities.

[368]   As Mr. Currie testified, the regions were responsible for selling and marketing product, the lines of businesses were responsible for developing product, having it manufactured, servicing it after the fact, and the support organizations were responsible to supporting all the organizations whether regions or lines of business, regardless of where they were located in the world.

[369]   As a result of Nortel's matrix structure, no single Nortel entity or region, including either NNUK or NNL, was able to provide the full line of Nortel products and services, including R&D capabilities, on a stand-alone basis. This was well understood by Mr. David Davies, the chairman of the Trustee who testified at the trial of his understanding that  none of these entities was a stand-alone entity and they were integrated and depended upon one another. While he did not think about it at any great length, he understood that  that the group would allocate capital to where it was needed for the benefit of the whole. He certainly understood that NNUK could not itself survive without the support of the global enterprise.

### (i) Interest-free loans

[370]  The first and second matter raised by the UKPC relates to the large inter-company loan from NNUK to NNL that was interest free. This loan arose from the payments due over time to NNUK under the MRDA which allocated profits to the companies doing research and development on a residual profit split method. Under the MRDA, amounts to be paid were to be paid with interest if not paid within 90 days of notification that they owed. This did not happen in the case of NNUK and others in the group as well.

[371]  The UKPC state in their brief that it was reasonable for the UKPC to expect that NNL and NNUK would comply with their own contractual arrangements. The implication of this contention is that it was reasonable for the Trustee to expect that the MRDA payments would be made each year and that, if not, interest would be paid. I cannot accept that in so far as it contended that the Trustee had any expectation that the loans or interest on them would be paid at any time. The amounts under the MRDA were converted by agreement of NNUK into interest free loans, to the knowledge of the Trustee of the UK Plan. It was common in the Nortel Group for that to happen as a result of the need and desire of the group to manage its cash in an efficient manner and to allocate cash as needed to members of the group. The parties agreed in article 3(d) of the MRDA that any payment under the MRDA would be reflected in inter-company accounts payable and receivable and that the payments "may be netted pursuant to the standard NNL practice for managing intercompany accounts".

[372]  No evidence was led by the UKPC that the Trustee expected the loans would be paid at any point in time or that interest would be paid on them. The implication of the complaint of the UKPC is that if the loans or interest had been paid, more money would have been available to put toward the deficiencies in the UK Plan. That is the only interest that the Trustee could have in this matter. That contention ignores the negotiations between NNUK and the Trustee that took place over several years leading to the Funding Agreement in 2006 in which NNUK agreed to make periodic payments to reduce the deficiency by 2012. Mr. Davies, the chairman of the Trustee since 2007 testified that there was no expectation that NNL would make any payments to

the UK Plan other than those provided in the Funding Guarantee and the Funding Agreement. He also testified that the Trustee had to be satisfied before signing off on the Funding Agreement that they had fulfilled their fiduciary duties to the UK Plan. Even if the Trustee's expectations regarding what NNUK would do were relevant, they do not support the claim being made.

[373]    The allegation by UKPC also ignores the way in which the Nortel Group operated so far as cash was concerned. One of the functions of Nortel Canada within the Nortel Group was to raise cash as needed by the group and to ensure that it was distributed to the various entities in order to meet their operational, statutory and regulatory requirements.  All debt service costs were borne by NNL and did not form part of the accounting or profit split among the subsidiaries. Managing cash in an efficient manner was seen to be in the best interests of Nortel as a whole, and of all the entities within it, and the board of NNUK were of this view. Intercompany loans were a commonly used vehicle for moving cash throughout the Nortel Group. To the extent that any member of the Nortel Group did not generate sufficient funds to support itself through its own operations and was therefore facing a "cash deficit", other entities within the Nortel Group would provide the necessary loans, capital infusions and/or other forms or working cash. Importantly, NNUK was itself a regular recipient of intercompany financing, including interest-free loans, from other Nortel companies.

[374]    The intercompany loans on the books of NNUK owed by NNL were approved by the board of directors of NNUK from time to time after debate with the benefit of advice from NNUK employees in the EMEA treasury department and from NNUK's tax, finance and legal personnel as well, on occasion, from outside independent legal advice. Due consideration was given to relevant issues, as is clear from the evidence of Mr. Waida, a director of NNUK who signed loan extension agreements and who testified that the board of NNUK considered the loans to be in the best interest of NNUK. The evidence of Ms. Rolston, a director of NNUK from 2006, was that it was not unusual in any group structure for the companies to seek to utilize cash in the most effective way for the use of the group as a whole which benefited the group and also the individual companies in the group, and was something the directors of NNUK thought they were doing in approving the loans.

[375]   The board of NNUK received briefing notes from senior personnel within NNUK before each loan was approved advising on the various issues, including tax, cash management and legal. In a briefing note to the board dealing with the conversion of the payable owing from NNL to NNUK in October 2003 into a non-interest loan, the following was stated, which indicated that it was understood to be in NNUK's interest to see to the efficient deployment of cash within the Nortel Group:

> Treasury (Maggi Fraser) has advised that it is in the best interests of NNUK to enter into the loan transaction.  This is because NNUK benefits from intra-group arrangements pursuant to which its activities are and have been, where necessary, from time to time funded by other group companies.  Unless each such group company engages with the wider group in a manner that is conducive to prudent cash management, the interests of each such group company (and in this case NNUK) would be irredeemably harmed.

[376]   On December 19, 2005, Lovells, the UK solicitors advising the board of NNUK, advised the board on the intercompany loans that it had and was considering increasing.  Lovells advised as to the fiduciary obligations of the directors to NNNUK and with respect to the intercompany loans stated:

> Given the importance to NNUK of its parent company NNL and, as we understand it, the other members of the group, we would not have thought that it should be difficult for the directors of NNUK to conclude that the making of the loans is in the best interest of NNUK.

> NNUK's directors will not be in breach of their duties if they authorize loans to group companies, even on interest free terms…provided that they reasonably consider at the time when the loans are made that they are overall in NNUK's own interests, even if the benefit will be indirect.

[377]   It is clear from the briefing notes to the board of NNUK that the board of NNUK considered on each occasion whether NNL was good for the money. On each occasion the board was advised that NNL could repay the loan by borrowing from NNI, the main US subsidiary. This would have occurred within the global cash management system utilized by Nortel. I do not accept the contention of the UKPC that there was scepticism as to the ability of NNL to repay the

loans. The snippets of the few e-mails referred to by the UKPC do not represent the balance of the thinking at NNUK and they preceded the advice obtained from Lovell's. After the advice from Lovell's, Ms. Chan and Mr. Widdison supported the extension and increase in the loan that year. As well, Mr. Stephens of NNUK testified that despite the fact the loan was repayable on demand between 2003 and 2008, NNUK never demanded repayment on the loan and NNUK was never short of cash during this period. He also testified that the loan served a good business purpose for NNUK by supporting NNL from a cash flow perspective.

[378]    The board of NNUK was not a puppet of NNL. After the market crash in September 2008 the NNUK board refused a request by NNL to move surplus cash to Canada by way of an intercompany loan.

[379]    There is no cogent evidence from any witness of NNUK that supports the allegation of UKPC regarding these intercompany loans. It is all argument and ignores the business judgment exercised by the board of NNUK from time to time. That business judgment was reasonable and should be given deference in this case. See *BCE* at para. 40.

[380]    I find that there was no oppressive conduct by NNL in connection with the intercompany loans from NNUK to NNL on an interest free basis.

### (ii) Project Swift

[381]    The next matter raised by the UKPC has to do with Project Swift. That project in December, 2007 involved the transfer of subsidiary corporations of NNL in Europe held by NNIF (a Netherlands company) to NNUK in return for a reduction of the intercompany loan from NNUK to NNL. One of the subsidiaries to be transferred was NNSA, a French subsidiary, held 8.83% by NNIF and 91.17% by NNL. For reasons that I will discuss, NNL's 91.17% interest in NNSA was not transferred and the amount of the intercompany loan from NNUK to NNL that was to be reduced was adjusted so that it did not reflect the transfer of NNL's interest

in NNSA. The UKPC contend that the failure to transfer NNL's interest in NNSA was oppressive to the Trustee.

[382]  The genesis of Project Swift was that the EMEA tax department wanted to reduce NNUK's exposure to tax liability. Mr. Kerry Stephens, a chartered accountant and a member of the EMEA tax department, was considered the architect of the project. Under UK tax law, interest on the loan from NNUK to NNL was imputed to NNUK. No tax had been paid by NNUK because it had sufficient tax losses against which the imputed interest could be written off. However, the tax loss asset was in danger of running out and in order to deal with that risk, the EMEA tax people proposed writing off the loan in return for the European subsidiaries to be transferred to NNUK. Mr. Davies was aware that one of the purposes of the transaction was to reduce the taxes that would be imputed to NNUK. There were other benefits to the transaction from NNUK's point of view, including rationalizing the EMEA group legal and management structure so that NNUK would became the owner of those entities for which it already exercised significant management responsibilities and replacing the loan, a non-income-producing asset, with the transferred subsidiaries that could produce dividend income. Mr. Davies, the chairman of the Trustee, understood that the project had been proposed by NNUK because they believed it would provide a net benefit to NNUK because of the tax saving and the improvement in the profits of NNUK.

[383]  NNUK retained the UK law firm Osborne Clarke to advise it on the transaction. NNUK also retained Ernst & Young UK (EY UK)[17] to provide an independent valuation of the subsidiaries to be transferred NNUK in order to be satisfied that the value of the subsidiaries to be transferred to NNUK were at least equal to the amount of the loan from NNUK to NNL that was to be reduced.

[384]  EY UK was asked to prepare an independent valuation of the Swift Entities on an open market basis. EY UK's open market valuation was done on the basis of a discounted cash flow using multiples to arrive at a terminal value for the European subsidiaries to be transferred to

---

[17] Contrary to the statements in the UKPC brief, it was not NNL that retained E&Y UK.

NNUK. EY UK ultimately assessed the value of the subsidiaries at US$749.5 million. EY UK also prepared a separate valuation report, entitled "Project Eagle", that considered the estimated realizations and potential security value of the subsidiaries for NNUK after Project Swift, under both a going-concern approach and a theoretical insolvency scenario. The insolvency analysis was conducted for comparison purposes on a worst case scenario basis. Mr. Freemantle, a NNUK director, testified that at the time of the project, he did not believe that insolvency was a likely scenario.

[385]  Nortel understood that the Trustee would have to be involved in the Swift transaction and NNUK therefore approached the Trustee about it. The Trustee had to agree to it or it could have gone to the Regulator to discuss its concerns. I think it fair to conclude that NNUK would have preferred to avoid that result, but I do not cast aspersions against NNUK, as invited to do so, because of an attempt to avoid the Regulator. I accept the evidence of Mr. McCorkle, the acting treasurer of Nortel at the time who was part of the Project Swift team and to whom Mr. Freemantle reported, that he believed that Nortel should consider going to the Regulator if the Trustees were unable to resolve their concerns about Project Swift because he thought the Regulator would have agreed with Nortel that it was an overall transaction to everyone's benefit.

[386]  The Trustee retained its own independent financial advisor, PWC, to analyze and comment on the valuation of the transaction that had been conducted by EY UK.  The Trustee also retained Pinsent Masons LLP as its independent legal advisor. The valuation prepared by EY UK was changed following input from PWC.

[387]  Both NNL's majority interest and NNIF's minority interest in NNSA were originally intended to be transferred to NNUK in December 2007. However, by mid-November 2007 it had been determined that the transfer of NNL's majority ownership in NNSA would be deferred to an unspecified time, while the transfer of NNIF's minority interest would proceed. The reason was a tax audit by the French tax authorities of NNSA. The intention of the parties was that the transfer of NNL's majority interest in NNSA would take place once the issues surrounding NNSA had been dealt with.

[388]  It was NNUK's decision to exclude NNL's interest in NNSA from the Project Swift transaction in December 2007.  Mr. Stephens, the architect of Project Swift, testified that NNUK was concerned about whether the ongoing tax audit of NNSA would have an economic impact on the value of NNSA.  In order to determine what the consideration should be for NNSA to be transferred, NNUK wanted the tax audit to be resolved and another valuation done to reflect the impact of that settlement on NNSA.  Thus, NNUK wanted to have the certainty of the valuation before proceeding with the transfer of NNSA.

[389]  A subsequent valuation by EY UK reflected only NNIF's 8.83% in NNSA and this was reported by PWC to the Trustee.  This final valuation was used and the amount of the intercompany loan that was reduced corresponded with this value of assets that NNUK received in Project Swift. On December 21, 2007, NNUK acquired the entire issued share capital of NNIF from NNL for £327.6 million (US$628.9 million), pursuant to the EY UK independent valuation, and the intercompany loan from NNUK to NNL was reduced by that amount.  While it was the intention to still pursue a future transfer of NNSA, none of the transaction documents included a contractual obligation to do so and the intercompany loan was not reduced by the amount that had previously been earmarked to be reduced for the 91.17% of NNSA that was not transferred to NNUK.

[390]  As late as April 2008, it was still the expectation of the parties that NNSA would be transferred to NNUK, possibly in the first quarter of 2009, once NNSA's tax audit issues had been resolved and it had been properly valued.   Those issues were not resolved prior to the administration proceedings of NNUK on January 14, 2009, as a result of which the valuation of NNL's interest in NNSA was never undertaken and that part of Project Swift never went forward.  Without the completed valuation, the amount of the remaining intercompany loan which would be reduced upon the transfer of NNSA could not be determined.

[391]  The UKPC contend that the Trustee would not have agreed to Project Swift without the representation that NNSA would be transferred to NNUK and that because of the failure of

NNSA to be transferred the reasonable expectation of the Trustee that it would be transferred has been thwarted.

[392]  This claim is made in oppression because there was no binding agreement that NNSA would be transferred. The issue is whether NNL has acted oppressively in disregarding the interests of the Trustee. I do not think the evidence supports the allegation. First, it was NNUK and not NNL who decided not to accept the transfer of NNSA because of the tax issues regarding NNSA. The NNUK board considered all of the issues after taking advice and made a reasonable decision to proceed with the transaction in December 2007 without NNL's interest in NNSA being included. The Trustee was well aware of that decision when it became a party to the Swift Guarantee.

[393]  The UKPC contend in its reply brief that while reducing the risk of tax liability was plainly in NNUK's interest, that could have been done in ways which were more beneficial to NNUK than Project Swift, such as NNL repaying the loan, or at the very least paying interest payments to NNUK which would have been sheltered by historic tax losses. The latter suggestion ignores the evidence that the tax loss asset was diminished and was the reason for Project Swift. The UKPC then say in their reply brief that the real issue is what options were open to NNUK to address the fact that it was about to start incurring a cash cost on imputed interest, which contradicts the previous point they make.

[394]  It is not the test for an oppression action that there were better options for NNUK than Project Swift. If the board of NNUK gave due consideration to the issues before it, and its decision was reasonable, deference should be given to its business judgment. *BCE* at para. 40. In this case the board of NNUK was advised by leading outside legal and financial advisors and there is no evidence that the directors did not consider the issues carefully.

[395]  Mr. Davies, the chairman of the Trustee, testified that at the time when the Trustee became party to the Swift Guarantee, if the Trustee had been at all concerned about whether the terms of the transaction provided adequate safeguard for the UK Plan, it could have gone to the

Regulator but did not do so. He acknowledged that when the Trustee agreed to the terms of Project Swift, it had to be satisfied that it protected the UK Plan and its members by the terms agreed to, which in this case was the provision of the Swift Guarantee of NNL. Mr. Gilchrist, also a director of the Trustee, testified that if at any time the Trustee felt the UK Plan's interests were imperilled by Project Swift, it could have gone to the Regulator but it never considered that to be necessary. He said that the decision not to go to the Regulator was made by the Trustee on its own, without any influence or direction from NNUK or NNL. It is obviously the case that the Trustee was satisfied with the terms of the Swift Guarantee.

[396] I do not see how in the circumstances the Trustee can now assert that Project Swift unfairly disregarded the interests of the UK Plan or its members. The Trustee was intimately involved in the transaction for several months and was advised by leading solicitors and financial advisors. While it expected the remaining majority interest of NNSA to eventually be transferred to NNUK, it knew that there was no contractual requirement to do that.

[397] In any event, all of the parties to Project Swift expected and intended to have NNL's 91.17% interest in NNSA transferred to NNUK once the tax audit problems at NNSA were worked out and a valuation of NNSA obtained. Through no fault of NNL or NNUK, that did not happen before NNUK filed for administration in January, 2009. The failure cannot be regarded as any failure by NNL to regard the interests of the Trustee that would give rise to relief under the oppression provisions of the CBCA. Moreover, there has never been a valuation done of NNSA which is in insolvency proceedings in France, and no evidence as to the value lost to NNUK of not having 91.17% of the shares of NNSA as an asset of NNUK. There is no evidence that the value lost by not having NNSA transferred to NNUK was more than the amount of the intercompany loan that was left owing by NNL to NNUK and not retired in December 2007.

[398] The UKPC make another claim regarding the Swift Guarantee. They contend that while it was agreed that the guarantee would be in the amount of US$150 million, the Trustee wanted a guarantee of US$600 million but agreed to the lesser amount of US$150 million on the promise that NNSA would be transferred to NNUK. It is argued that the Trustee would not have agreed to

a guarantee of less than US$600 million had it known that NNSA would not be transferred to NNUK. Because that has not occurred, an oppression remedy ought to be granted allowing the claim of the Trustee at an additional US$450 million on the Swift Guarantee. I cannot accept this contention.

[399]   The evidence of Mr. Davies, the chairman of the Trustee, is that the Trustee was advised that if NNUK failed, the damage to the UK Plan would be US$150 million. The US$600 million was recommended by PWC to the Trustee as a negotiating position. The notion was that if the guarantee was for US$600 million, it would fetch $150 million in the event of an insolvency of NNL. Mr. Davies testified:

> We were concerned that in the event of an insolvency, whatever amount would be awarded would get diluted by so many cents on the dollar. And we wanted to arrive at a figure of 150, which the analysis that had been produced showed to be the detriment to the pension scheme.

[400]   For NNL to agree to US$600 million in these circumstances could have amounted to a preference if NNL became insolvent, and Nortel advised the Trustee of that. Mr. Freemantle, a director of NNUK and someone who was negotiating with the Trustee, stated that to Mr. Davies in an e-mail:

> As a result, in order to move the process forward and subject to obtaining all internal approvals, we are willing to consider offering an additional contingent support guarantee from NNL for the identified theoretical "gap" payable in the event of an insolvency of NNUK after a demand is made by the trustees. If exercised, this would be a senior unsecured obligation of NNL, pari passu with all other senior unsecured obligations of NNL. As such, we feel it would be totally inappropriate to increase the level of the guarantee beyond the level of the gap in order to create an adjustment factor based on some theoretical assumptions around NNL's ability to honour its commitments. It is paramount that we treat all senior unsecured creditors equally. From a corporate governance perspective, it is therefore difficult for NNL to justify offering mitigation in excess of an identified detriment which could be seen as a preference to one unsecured creditor over others.

[401]  Mr. Davies testified at trial that the Trustees had concluded they were not going to persuade NNL to provide a guarantee of anywhere near USD$600 million and agreed to counter NNL's offer of USD$100 million with an offer of USD$150 million and accept that amount if NNL agreed.

[402]  The evidence does not support any notion that at the time there was a thought that the harm to the UK Plan in the event of an insolvency of NNUK would be US$600 million. The US$150 million detriment to the UK Plan was estimated by EY UK on the assumption that there would be no recoveries from the subsidiaries of NNUK on an insolvency of NNUK. The Trustee did not request a guarantee of US$600 million on the basis that it was the estimate of harm that would be caused to the UK Plan by an insolvency of NNUK. Mr. Davies was quite open in his negotiations with Mr. Freemantle that the US$600 million figure was put forward so that on an insolvency of NNL, the amount that would be realized by the Trustee under the Swift Guarantee would be US$150 million.

[403]  Nor is there any evidence that the Trustee would have required a guarantee of US$600 million if it had known that the 91.17% of NNSA would not be transferred to NNUK. The figure of US$600 million had nothing to do with NNSA. Mr. Davies' letter to Mr. Freemantle of December 20, 2007, which he said in his affidavit he wrote to record why the Trustee had taken the points that it had, said nothing about giving up a guarantee of US$600 million because of the anticipated NNSA transfer. He said the opposite. In his note he stated:

> After careful reflection, the trustee became prepared to accept a limited guarantee from NNL (in the amount of $150m) on the insolvency of NNUK in order for Project Swift to proceed. I would note that whilst it is not and has never been the trustee's intention to frustrate the progress of Project Swift, the company will appreciate that we are obliged to protect the interests of the plan's members. We appreciate that Project Swift will generate tax savings at the NNUK level, however on taking Independent financial and legal advice, it did appear to the Trustee that Project Swift will also have potential downsides which cannot be ignored, and we have shared our concerns with the company in this respect. In particular, whilst admittedly a remote scenario, it does seem clear that following Project Swift, the plan would be materially worse off in a group wide and NNUK

insolvency scenario, hence our request for additional security to address this potential weakening in employer covenant.

[404]   That is, the extra security of a guarantee of US$600 million was to cover the eventuality that NNL became insolvent in a group wide insolvency and would be able to pay only so many cents on the dollar, which is exactly what Mr. Davies' evidence was and which the contemporaneous documents disclosed.

[405]   Mr. Davies testified that if he had been told that the 91.17% of NNSA held by NNL would not be transferred to NNUK, he would not have agreed not to object to Project Swift. This is the form of the leading question put to him. Even assuming the evidence to be reliable, I do not think it assists the Trustee's case. No one at the time of the closing of Project Swift thought that the interest in NNSA would not be transferred. It was expected that the transfer would eventually take place after the issues in NNSA were sorted out. No one misled Mr. Davies on this. I do not accept that Mr. Freemantle gave him any definite date when the transfer would take place. It was unknown when the problems with NNSA would be concluded and a valuation done. If a fixed date for the transfer was of importance to the Trustee, one might have expected with the legal advice the Trustee was receiving that a covenant regarding timing would have been requested.

[406]   In any event, I have difficulty accepting the reliability of this testimony of Mr. Davies. It was not contained in his affidavit and there is no contemporaneous note that refers to the NNSA transfer as being a condition of Mr. Davies' agreeing to the Swift Guarantee. Nor is there any evidence that Mr. Davies thought that the amount of the intercompany loan that was not being retired was less than the value of NNSA. I regard the testimony as being *ex post* rationalization.

[407]   Even if there were some basis for concluding that NNL had unfairly disregarded the interests of NNUK in relation to Project Swift, which I do not think the case, I would see no basis to order that the difference of US$450 million between the negotiating position of the Trustee and the amount settled on in the Swift Guarantee that should be paid by NNL to the Trustee. It would amount to NNUK receiving the 91.17% if NNSA without paying for it.

[408]   I find that there was no oppressive conduct by NNL in connection with Project Swift.

### (iii) Funding and Swift Guarantees

[409]   The UKPC also contend that if the Funding Guarantee or Swift Guarantee that NNL signed in favour of the Trustee are held not to be enforceable, the Trustee had an expectation that they would be enforceable and therefore an oppression remedy should be granted for the amount of those guarantees. I have held that the Funding Guarantee is enforceable but that the Swift Guarantee is not.

[410]   I fail to see how this claim has any merit. Either the guarantees by their terms are enforceable or they are not. They are to be interpreted as disclosing the intention of the parties to them. In this case, the Trustee was well advised in connection with both guarantees. Surely the expectation of the parties is derived from the terms of the agreement. In *J.S.M. Corp. (Ontario) Ltd. v. Brick Furniture Warehouse Ltd.* (2008), 41 B.L.R. (4th) 51 (Ont. C.A.) Doherty J.A. stated:

> **62**    The reasonable expectations of parties to commercial agreements negotiated at arm's length must be those reasonable expectations that find expression in the agreements negotiated by the parties.

[411]   I find that there was no oppressive conduct by NNL in connection with the Funding Guarantee or Swift Guarantee.

### (iv) Transfer pricing

[412]   While in their initial closing brief the UKPC included claims of $262 million and $335 million under their heading Remedial Claims (which included their oppression claim) for alleged improper transfer pricing, they stated in their reply closing brief that no allegation regarding transfer pricing was being made in their oppression claim.

### (v) Conclusion

[413]   The Monitor's disallowance of the claim of the UKPC for oppression is upheld.

## Unjust Enrichment

[414]   The UKPC make a claim for unjust enrichment for the same matters that are the subject of the oppression claim. In their post-trial brief a claim for a constructive trust was made as well, but this was abandoned in their post-trial reply brief.

[415]   The test or unjust enrichment is well established in Canada. There must be (i) an enrichment of the defendant, (ii) a corresponding deprivation of the plaintiff and (iii) an absence of juristic reason for the enrichment. See *Garland v. Consumers' Gas Co.,* [2004] 1 S.C.R. 629 at para. 30.

[416]   The Monitor takes the position that there can be no claim by the UKPC as the Trustee asserts harm to NNUK and that there must be a direct nexus between the enrichment of the defendant and the deprivation of the plaintiff. As there has been no deprivation of the Trustee, it is said that there is no direct nexus between the enrichment of NNL, assuming there was such an enrichment, and a deprivation to the Trustee, assuming there was such a deprivation.

[417]   This principle of the need for a direct nexus between the enrichment of the defendant and the deprivation of the plaintiff is taken from a number of cases dealing with plaintiffs who acquired a product or services from a retailer and sued the supplier to the retailer in unjust enrichment. See *VGI General Partner Inc. v. Ensis Management Inc.,* [2010] ONSC 3766. In that case Justice Perell struck a claim in unjust enrichment in a class action. In the passage relied on by the Monitor, he stated:

> **20**   With respect to the first two elements, there must be a direct nexus between the enrichment of the defendant and the deprivation of the plaintiff: *Brian Singer v. Schering-Plough Canada Inc.,* [2010] O.J. No. 113 (S.C.J.) at para. 111. In other words, the defendant's enrichment must cause the plaintiff to suffer a

corresponding economic deprivation: *Barnabe v. Touhey* (1995), 26 O.R. (3d) 477 (C.A.), revg. (1994), 18 O.R. (3d) 370 (Gen. Div.); *Sharwood & Co. v. Municipal Financial Corp.* (2001), 53 O.R. (3d) 470 (C.A.).

[418]    The statement of the need for a direct nexus came from a decision of Strathy J. (as he then was) in *Brian Singer v. Schering-Plough Canada Inc.*, a class action by purchasers of sunscreen against the manufacturer of the sunscreen and not against the retailers from whom the sunscreen was purchased. Strathy J. stated, in part:

> 111    ...It is equally well-settled that there must be a direct nexus between the enrichment of the defendant and the deprivation of the plaintiff.

> 112    This issue was discussed by the Court of Appeal in the context of an attack on a pleading in a proposed class action involving a prescription drug: *Boulanger v. Johnson & Johnson Corp.* (2003), 174 O.A.C. 44, [2003] O.J. No. 2218. The plaintiff claimed, among other things, that she was entitled to reimbursement from the manufacturer for the purchase price paid for the drug on the ground of unjust enrichment. In dismissing the appeal on this issue, the Court of Appeal held that the price paid by the consumer had been paid to retailers and not to the manufacturer. The indirect and incidental benefit received by the manufacturer could not ground a claim for unjust enrichment. The Court of Appeal stated, at paras. 20 and 21:

> > [T]he appellant seeks to support these paragraphs on the basis of unjust enrichment. In my view this argument also fails. The difficulty is that the purchase price for which the appellant seeks reimbursement was paid to the retailer not to the respondents. Any benefit to the respondents from this payment was indirect and only incidentally conferred on the respondents. Unjust enrichment does not extend to permit such a recovery. In *Peel (Regional Municipality) v. Canada; Peel (Regional Municipality) v. Ontario,* 1992 CanLII 21 (S.C.C.), [1992] 3 S.C.R. 762, McLachlin J. said this at para. 58:

> > > To permit recovery for incidental collateral benefits would be to admit of the possibility that a plaintiff could recover twice - once from the person who is the immediate beneficiary of the payment or benefit (the parents of the juveniles placed in group homes in this case), and again from the person who reaped an incidental benefit. [Citations omitted.] It would also open the doors to claims against an undefined class of persons who, while not the recipients of the payment or work conferred by the plaintiff, indirectly

> benefit from it. This the courts have declined to do. The cases in which claims for unjust enrichment have been made out generally deal with benefits conferred directly and specifically on the defendant, such as the services rendered for the defendant or money paid to the defendant.

> 115    In my view, the claim based on unjust enrichment does not disclose a cause of action. The purchase of sunscreen by the plaintiff did not result in a corresponding enrichment of the defendants because the plaintiff purchased the products from a retailer and not directly from the defendants.

[419]   The UKPC relies on a recent decision of *Pro-Sys Consultants Ltd. v. Microsoft Corp.*, [2013] 3 S.C.R. 477. In that case, a class action claim in unjust enrichment against Microsoft was made by consumers who acquired Microsoft products from sellers who had purchased the product from Microsoft. The claim alleged that Microsoft had overcharged for its PC operating systems and applications software. The claim was allowed to proceed. Rothstein J. for the Court stated:

> 87    In support of its first argument, Microsoft cites *Peel (Regional Municipality) v. Canada*, [1992] 3 S.C.R. 762. In *Peel*, McLachlin J. (as she then was) held, at p. 797, that "[t]he cases in which claims for unjust enrichment have been made out generally deal with benefits conferred directly and specifically on the defendant". A claim in unjust enrichment must be based on "more than an incidental blow-by. A secondary collateral benefit will not suffice. To permit recovery for incidental collateral benefits would be to admit of the possibility that a plaintiff could recover twice - once from the person who is the immediate beneficiary of the payment or benefit ... , and again from the person who reaped an incidental benefit" (*Peel*, at p. 797). The words of *Peel* themselves would appear to foreclose the possibility of an indirect relationship between plaintiff and defendant. However, this does not resolve the issue. First, it is not apparent that the benefit to Microsoft is an "incidental blow-by" or "collateral benefit". Second, Pro-Sys relies on *Alberta Elders*, which it says stands for the proposition that an unjust enrichment may be possible where the benefit was indirect and was passed on by a third party. At this stage, I cannot conclude that it is plain and obvious that a claim in unjust enrichment will be made out only where the relationship between the plaintiff and the defendant is direct.

[420]   I do not think that the statements in these cases that the relationship between the plaintiff and defendant must be direct, or that it is not plain and obvious that it must be direct, are applicable to this case. All of those cases dealt with plaintiffs who allegedly suffered the

damages. There was no issue about that and the courts did not deal with whether someone else who had not suffered the damage could bring the action for unjust enrichment. That is the issue in this case, in which it is alleged that while NNUK suffered the damages, the Trustee may make an indirect claim of unjust enrichment.

[421]   It seems to me that one must start with the basic principle that a plaintiff must establish that he or she suffered damage. If any authority is needed for this proposition, see Harvey McGregor, *McGregor on Damages* (Sweet & Maxwell, 19th ed.) at para. 2-001 in which it is stated that the object of an award of damages is to give the claimant compensation for the damage, loss or injury he has suffered. The test in an action for unjust enrichment that the plaintiff must establish a corresponding deprivation does not say anything differently. Thus I do not see any basis in this case for a claim of unjust enrichment by the Trustee for deprivation caused to NNUK.

[422]   I will deal briefly with the claims.

### (i)  Unjust enrichment claims

[423]   The UKPC is a creditor of NNUK and holds 93% of the accepted claims. It claims:

(a)       93% of the interest free loan from NNUK to NNL as at December 20, 2007; and

(b)       93% of the interest payable on the interest free loan, estimated by its expert to be $135.6 million.

[424]   The UKPC further claim US$450 million representing the difference in the amount of the Swift Guarantee and the amount sought.

[425]   In the event that either of the Funding Guarantee or the Swift Guarantee are held to be unenforceable, the UKPC claim the amount of such guarantees.

### (ii) Interest free loans

[426]  I see no basis for this claim. First, it has not been established that there has been an enrichment of NNL.

[427]  These loans were the result of amounts allocated to NNUK under the profit split method contained in the MRDA. Pursuant to the MRDA, transfer pricing adjustments for the Participants, which included NNL, NNI (the US operating subsidiary), NNUK, NNSA (the French operating subsidiary) and Nortel Networks Ireland, were administered by NNL for all of the Participants. Article 3(d) provides:

> (d) NNL agrees to administer this Agreement and the determinations under the RPSM as contemplated in this Agreement with respect to its interest and the interests of the Participants, and in particular, to compute the amount of any R&D Allocation to, and payment due from, each Participant on a periodic basis. Each Participant will be supplied with a copy of the calculations required under the RPSM as set forth in Schedule A. Any payment to, and payment from, a Participant will be reflected in the intercompany accounts of the affected Participant as a payable or a receivable, whatever the case may be and may be netted pursuant to the standard NNL practice for managing inter-company accounts.

[428]  This provision reflected the way in which the Nortel Group operated. Because Nortel was an integrated global organization in which the various entities had a high degree of interdependence and integration, managing cash in an efficient manner was in the best interests of Nortel as a whole, and all of the entities within it. If surplus cash was left to sit in the account of one subsidiary and could not be moved, and if as a result, tax "leakage" or avoidable financing costs were incurred, every entity in the organization would ultimately suffer. All liquidity decisions were made in compliance with applicable regulatory and legal requirements, and movements of cash were implemented by way of intercompany loans, dividends and equity investments, in accordance with applicable local laws. This included obtaining board approval from the appropriate subsidiaries for the transactions in question.

[429]   The fact that the books of NNUK reflected a loan to NNL is no proof that NNL used the cash for its own purposes. Cash was moved throughout the Nortel Group as required. The loan reflected allocations to NNUK under the MRDA derived from the profit split method used by the MRDA to allocate total Nortel residual profits to the participants. The Trustee has not established an enrichment to NNL regarding these loans. The same pertains to the interest free aspect of the loans. There is no basis to say that under the agreement made by NNUK, NNL was obliged to pay interest.

[430]   So far as a corresponding deprivation of NNUK is concerned, there is no proof that had the loans not existed or had interest been paid on them, any of the money would have gone into the UK Plan. Before 2003 when a deficit first appeared in the UK Plan, there was a contribution holiday on NNUK under which payments to the plan were not required. The evidence was that this was the standard practice in the UK and was recommended by the actuaries. The UK Government introduced legislation to prevent the accumulation of surpluses that could be used to avoid taxes by employers. Once the deficit appeared in January 2003, NNUK made periodic payments that were higher than would have been paid under a typical UK Plan recovery plan at the time, and then made payments as agreed with the Trustee under the 2005 and 2006 agreements. The discussions regarding these payments were primarily with Mr. Ken Gardener, the then chairman of the Trustee. Mr. Gardener was not called as a witness.

[431]   It cannot be said that there was an absence of juristic reason for the interest free loans. The MRDA and the later agreements made between NNL and NNUK and authorized by the board of directors of NNUK was a juristic reason for the loans. The board of NNUK considered the loans to be in the best interests of NNUK, and there is no basis to ignore the business judgment exercised by the directors.

[432]   Thus none of the three elements of unjust enrichment have been established by the UKPC with respect to the interest free loans.

### (iii) Project Swift

[433]  The UKPC seek recognition of a claim for US$450 million representing the difference between the amount of the Swift Guarantee of $150 million and the amount of US$600 million requested by the Trustee in reliance on representations that all of NNSA would be transferred to NNUK.

[434]  I need not repeat all of the findings on this issue made in the oppression claim asserted by the UKPC. The US$600 million was a negotiating position to arrive at an estimated loss of US$150 million in the event of a world-wide insolvency of the Nortel Group.

[435]  The UKPC has not established any deprivation of NNUK. The value of NNL's 91.17% interest in NNSA was expressly excluded from the amount of the inter-company loan forgiven by NNUK. NNL received no benefit. It just retained its 91.17% of NNSA. There is no evidence that its interest in NNSA was worth more than the amount of the loan retained by NNUK at the time of Project Swift or at any later time. No further valuation was ever done of NNSA.

[436]  The size of the Swift Guarantee was agreed between NNL and the Trustee. There is no lack of juristic reason for the size of the guarantee. While all parties intended that NNL's interest in NNSA would eventually be transferred once the issues at NNSA were resolved, there was no binding agreement requiring the transfer and the Trustee was well aware of that at the time it agreed to the Swift Guarantee. The decision to defer the NNSA transfer was made by the board of directors of NNUK. Time ran out before the issues at NNSA were resolved. There is no lack of juristic reason for the inability of NNL's interest in NNSA being transferred before NNUK entered into administration in January, 2009.

### (iv) Funding and Swift guarantees

[437]  In the event that either of the Funding Guarantee or the Swift Guarantee are held to be unenforceable, the UKPC claim the amount of such guarantees.

I have held the Swift Guarantee not to be enforceable. However I see no basis for an unjust enrichment claim. The juristic reason for that guarantee not being enforceable is because of its terms which were negotiated between NNL and the Trustee. Moreover, if by its terms it is not enforceable there has been no enrichment of NNL in not paying on the guarantee or deprivation of the Trustee in not receiving payment.

### (v) Conclusion

[438]   The disallowance of the unjust enrichment claim by the Monitor is upheld.

## End Result

[439]   The claim of the UKPC on the Funding Guarantee is allowed in the amount of £339.75 million. The Monitor's disallowance of the other claims is upheld.

[440]   If any party wishes costs, they should advise the opposite party and attempt to work out a procedure for settling costs. A 9:30 am appointment may be taken out to discuss the process.

_____
Newbould J.

**Released:**       December 9, 2014