# EXHIBIT A

Affidavit of Dr. Jeffrey D. Case

Court File No. 09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(Commercial List)**

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT,* R.S.C. 1985, c.C.36, AS AMENDED

AND IN THE MATTER OF A PLAN OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NOTEL NETWORKS GLOBAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT,* R.S.C. 1985, c.C.36, AS AMENDED

---

**RESPONDING MOTION RECORD**
**(Disposal of Records Motion)**

---

August 21, 2015

**CHAITONS LLP**
5000 Yonge Street, 10th Floor
Toronto, Ontario
M2N 7E9

**Harvey G. Chaiton** (LSUC #21592F)
Tel:    416-218-1129
Fax:    416-218-1849
Email: harvey@chaitons.com

**George Benchetrit (LSUC #34163H)**
Tel:    (416) 218-1141
Fax:    (416) 218-1841
E-mail: george@chaitons.com

**Lawyers for SNMP Research International, Inc. and SNMP Research, Inc.**

TO:    **SERVICE LIST**

Court File No. 09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(Commercial List)**

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT,* R.S.C. 1985, c.C.36, AS AMENDED

AND IN THE MATTER OF A PLAN OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NOTEL NETWORKS GLOBAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT,* R.S.C. 1985, c.C.36, AS AMENDED

**INDEX**

| TAB | DOCUMENT |
|-----|----------|
| 1 | Affidavit of Dr. Jeffrey D. Case sworn August 21, 2015 |
| A | SNMPRI Claims Resolution Protocol Order |
| B | Statement of Claim |
| C | Letter to counsel for Canadian Debtors |
| D | Sealing Order dated May 5, 2015 |

Court File No. 09-CL-7950

**_ONTARIO_**
**SUPERIOR COURT OF JUSTICE**
**(Commercial List)**

IN THE MATTER OF THE _COMPANIES' CREDITORS ARRANGEMENT ACT_, R.S.C. 1985, c.C.36, AS AMENDED

AND IN THE MATTER OF A PLAN OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

APPLICATION UNDER THE _COMPANIES' CREDITORS ARRANGEMENT ACT_, R.S.C. 1985, c.C.36, AS AMENDED

**AFFIDAVIT OF DR. JEFFREY D. CASE**

I, **Dr. Jeffrey D. Case**, residing in Knox County, in the State of Tennessee, in the United States of America, **MAKE OATH AND SAY AS FOLLOWS:**

1.      I am a contractor consultant to SNMP Research International, Inc. ("**SNMPRI**"). SNMPRI is 95%-owned by my wife, Mary Case, who acts as CEO of SNMPRI. SNMPRI is responsible for the marketing, sales and licensing of software that implements the Simple Network Management Protocol and related standards, an internet operations and maintenance protocol that I helped develop and co-authored. I am the sole shareholder of and act as the CEO of SNMP Research, Inc. ("**SNMPR**"), which is responsible for the development of a software implementation of the Simple Network Management Protocol and related standards. I am authorized to swear this affidavit on behalf of both SNMPRI and SNMPR, which are collectively referred herein to as "**SNMP Research**". As such, I have knowledge of the matters to which I

hereinafter depose.  To the extent that I have relied on the information of others, I believe that information to be true.

2.   I now swear this affidavit in connection with the motion brought by Nortel Networks Corporation and certain subsidiaries (collectively, the "**Canadian Debtors**") jointly with Ernst & Young Inc. (the "**Monitor**") presently scheduled for August 26, 2015 in the Ontario Superior Court of Justice (Commercial List) (the "**Canadian Court**") dealing with the disposal of records (the "**Disposal of Records Motion**").

3.   I have read the 118th Report of the Monitor dated July 14, 2015 (the "**118[th] Report**"). SNMP Research believes that the relief sought on the Disposal of Records Motion would result in the improper disposal of information that is relevant to the claims of SNMP Research.

**Lift Stay Hearing**

4.   Pursuant to the Order of Justice Morawetz dated January 14, 2009, as amended ("**Amended Initial Order**"), the Canadian Court stayed the commencement or continuation of proceedings against, *inter alia*, the **Canadian Debtors**, absent  leave of the Canadian Court or consent of the Canadian Debtors.

5.   On September 21, 2011, SNMP Research filed a motion with the Canadian Court for relief from the stay imposed by the Amended Initial Order (the "**Lift-Stay Motion**").  In the Lift-Stay Motion, SNMP Research sought permission to file and prosecute an adversary proceeding in the U.S. Bankruptcy Court against the Canadian Debtors and certain U.S.-based Nortel entities (collectively, "**Nortel**").

6.      The Lift-Stay Motion was heard on February 27, 2015, in the Canadian Court and subsequently denied.

7.      At the February 27, 2015 hearing, the Canadian Debtors also sought an order (i) imposing a timetable and discovery plan for the resolution of any claims asserted by SNMP Research, and (ii) restricting SNMP Research from searching the Canadian Debtors' source code repository.

8.      By Order dated March 3, 2015 (the "**SNMPRI Claims Resolution Protocol Order**"):

> (i) a timetable was imposed which included the delivery of a Statement of Claim by SNMP Research by March 16, 2015, the delivery by the Canadian Debtors of their Statement of Defence by April 6, 2015 and the exchange of affidavits of documents by May 22, 2015, subject to a potential motion of that date could not be met[1]; and

> (ii) the Canadian Debtors and SNMP Research were ordered to mediate with the assistance of the Former Justice Colin Campbell for the purpose of defining the scope of electronic searches in respect of the claims by SNMP Research.

9.      A copy of the SNMPRI Claims Resolution Protocol Order is attached hereto as **Exhibit A**.

**The Statement of Claim**

10.     On March 16, 2015, SNMP Research delivered its Statement of Claim, a copy of which is attached hereto as **Exhibit B**. The Canadian Debtors delivered their Statement of Defence on April 6, 2015.

---

[1] On May 28, 2015, this deadline was extended by Justice Newbould.

717230v4

Doc#3420296v4

**Document Discovery**

11.     On May 22, 2015, the Canadian Debtors produced 11,483 documents to SNMP Research. SNMP Research has reviewed this production and identified multiple deficiencies in the production.  Among other things:

    i.    over half of the documents produced by the Canadian Debtors appear to not be relevant to the litigation;

    ii.    it appears that half of the documents are duplicates, including many documents that have an abnormally high  number of duplicates (over 60);

    iii.    there are almost 2,000 documents that appear to be parts of other documents and should not have been produced at all; and

    iv.    there appears to be a significant volume of documents missing from the Canadian Debtors' productions, including emails between SNMP Research and Nortel entities;

12.     The deficiencies discussed above (which are not exhaustive) give rise to concerns on SNMP Research's part as to the methodology used by the Canadian Debtors to select the documents produced.

13.     SNMP Research has made enquiries with the Canadian Debtors to understand the process the Canadian Debtors used to produce their documents and identify all relevant documents. Attached hereto as **Exhibit C** is a letter sent on behalf of  SNMP Research to counsel for the Canadian Debtors dealing with these issues.

14. SNMP Research has recently served document requests on the United States based Nortel entities ("**Nortel US**") in Delaware Bankruptcy Court in the United States. Nortel US has not responded to SNMP Research requests yet. It is my understanding that some of Nortel US's assets and documents are located in Canada and therefore may be relevant to SNMP Research claims in the United States. It is also possible that the Canadian Debtors are in possession of documents relevant to SNMP Research's claims against Nortel US currently pending in Delaware Bankruptcy Court. It is essential to SNMP Research that any such documents be preserved.

**Source Code Searching**

15. As a result of the mediation with Former Justice Colin Campbell, the parties agreed on an initial source code searching protocol consisting of two initial phases, as specified in the Sealing Order dated May 5, 2015, a copy of which is attached hereto as **Exhibit D** (the "**Searching Order**").

16. Phase One was completed on June 5, 2015, within the time frame estimated in the Searching Order. I have reviewed the Phase One report and understand that in Phase One the experts found 100 Versioned Object Bases ("**VOBs**") that likely contain SNMP Research software. The Phase One report also notes that approximately 1,300 VOBs are missing from the VOBs available at the Carling facility and therefore these missing VOBs were not included in the search. SNMP Research has requested that the Canadian Debtors produce the approximately 1,300 missing VOBs. The Canadian Debtors have not responded to SNMP Research's request.

17. In Phase Two, the protocol limited the experts to examining 12 of the 100 VOBs (i) for the actual presence of SNMP Research software and (ii) to determine the Nortel product

717230v4

associated with each VOB.  The Phase Two search was completed on July 18, 2015, within the time frame estimated by the experts.  I have spoken with one of the experts involved in Phase Two, Kevin Chisholm, and understand from Mr. Chisholm that the experts identified SNMP Research software in each of the 12 VOBs examined, and identified the Nortel product for 11 of the 12 VOBs.  I understand that Nortel claims that the Nortel product was identified for 9 of the 12 VOBs.  The Canadian Debtors attempted to block SNMP Research's efforts to search the Nortel source code, asserting that a Nortel product could not be identified for a VOB, and therefore the searching would be futile.  The Phase Two results show that these assertions were not accurate.

18.    SNMP Research licensed software to Nortel for approximately 59 different Nortel products.  SNMP Research has not been able to identify the location of over half of these Nortel products.  An evaluation of the 88 unexamined VOBs that likely have SNMP Research software is essential for SNMP Research to understand the extent of its claim against the Canadian Debtors.

19.    SNMP Research has requested that the software search continue and the Canadian Debtors have agreed that SNMP Research may continue the search but have set an unrealistic deadline of September 30, 2015 for the completion of all searching.  SNMP Research will continue to work with the Canadian Debtors so that all searching can be completed as expeditiously as reasonably feasible.

**Disposal of Records Motion**

20.    The Monitor has stated that records that are potentially relevant to a claim are intended to be preserved until the final resolution of the claim (118th Report, ¶ 29).  Appendix A of the 118th

717230v4

Report identifies (among other things) a set of boxes that the Canadian Debtors propose to retain and a set of boxes that they propose to destroy. Likewise, Appendix B of the 118th Report identifies 41 servers to be retained and 193 servers to be decommissioned.

21.    The Canadian Debtors have not identified the hard copy records that are proposed for destruction with any specificity. The records that the Canadian Debtors have identified as relevant to SNMP Research's claim as provided in their productions to date are not complete as discussed in the letter from SNMP Research's counsel attached as Exhibit C.

22.    From the information contained in the 118th Report, SNMP Research is unable to determine if any of the hard copy records slated for destruction contain information relevant to SNMP Research's claim. The draft order circulated by the Canadian Debtors for the Disposal of Records Motion authorizes them to dispose of all their remaining "Media Tapes" immediately upon issuance of the order. "Media Tapes" are defined in the 118th Report as follows: "the remaining media tapes maintained by the Canadian Debtors ... consist primarily of a point in time system wide "snapshot" of Nortel's daily financial reporting system circa 2003 and regular daily system back-ups for the period from and after the year 2000" (emphasis added). No index or other description of these documents is provided by the Canadian Debtors or the Monitor.

23.    The Canadian Debtors intend to dispose of all hard copy records stored at Iron Mountain with a receipt date prior to January 1, 2008, excluding records in boxes coded to the legal or tax departments and certain other records specified in the  118th Report. No index or other description of these documents is provided by the Canadian Debtors or the Monitor.

717230v4

Doc#3420298v4

24.    SNMP Research is seeking to work with the Canadian Debtors to identify all relevant records, but the adoption of the draft order will short circuit that process and prohibit SNMP Research from identifying relevant information.

25.    The Canadian Debtors have specifically asked to dispose of the servers that contain "Data related to SNMP searches per search protocol." (188th Report, Appendix B). The Canadian Debtors' request to dispose of the servers being used for the search protocol before SNMP Research has finished searching is premature and inappropriate. This request directly contradicts the statement that the Canadian Debtors intend to retain all relevant records related to a claim until the claim is finally resolved.

26.    I understand from Kevin Chisholm, who participated in the search for SNMP Research software at the Carling facility, that there are 10 or fewer servers that would need to be retained to preserve evidence relevant to SNMP Research. Appendix B to the 118th Report identifies 24 servers designated as "SNMP". Regardless of whether 10 or 24 servers have to be retained, it is premature and inappropriate to dispose of these servers because the servers contain information that is relevant to SNMP Research's claims.

**Objections to the procedures in the draft order**

27.    SNMP Research requests that all information relevant to SNMP Research's claims be retained. If SNMP Research were to be bound by the procedure identified in the draft order, SNMP Research has several objections.

28.    The draft order states that in order for an Objection to be considered by the Monitor it must "identify the Records subject to the Objection (the "Disputed Records") with sufficient

717230v4

Doc#3420296v4

particularity such that they can reasonably be isolated and accessed or copied by the Monitor; state the basis for the Objection, including, without limitation, the legal basis for the Canadian Debtors being required to preserve the Disputed Records and/or the legal basis for the Objector to be given access to the Disputed Records; provide a proposal to resolve the Objection to the satisfaction of the Objector; and be received by the Monitor by the Objection Bar Date".

29.     SNMP Research cannot identify the records with particularity if a detailed index of the documents is not provided.

30.     The draft order states that in connection with the resolution of any Objection, "the Objector shall, prior to receiving access to or copies of the Disputed Records (or any portion thereof) or prior to the implementation of any other resolution as may be agreed, and prior to the Canadian Debtors incurring any costs in connection with any of the foregoing, pay to the Canadian Debtors in full, as applicable: (i) all costs associated with providing the Objector with access to the Disputed Records or any portion thereof, including, without limitation, any cost associated with providing access at a particular location or through a particular electronic platform and any costs, including professional fees, incurred in connection with the Canadian Debtors or Monitor reviewing the Disputed Records or any portion thereof (including for privilege) prior to them being accessed by or provided to the Objector; (ii) all costs associated with making copies of the Disputed Records or any portion thereof; and (iii) all costs associated with preserving the Disputed Records or any portion thereof, including, without limitation, any physical or electronic storage costs. In the absence of the actual costs of the Canadian Debtors incurred or to be incurred in connection with the foregoing being known, the Monitor shall make a reasonable estimate of such costs and the Objector shall pay such estimated amount to the Canadian Debtors prior to receiving access to or copies of the Disputed Records (or any portion

10

*10*

thereof) or prior to the implementation of any other resolution as may be agreed, and prior to the Canadian Debtors incurring any costs in connection with any of the foregoing. (Emphasis added.)

31.    The Canadian Debtors have an obligation to maintain the records relevant to SNMP Research's claims. SNMP Research objects that the draft order is seeking to transfer the cost of the maintenance of these records to SNMP Research.

_Jeffrey D. Case_
Dr. Jeffrey D. Case

**STATE OF TENNESSEE**  8/4/15
**COUNTY OF ~~KNOX~~ Sevier**

**SWORN** before me, this 21 day          )
of August, 2015                           )
                                          )
                                          )

My commission expires: 7/7/18



717230v4

Doc#3420296v4

*- - - . 11*

**THIS IS EXHIBIT "A" TO**
**THE AFFIDAVIT OF DR. JEFFREY D. CASE**
**SWORN BEFORE ME THIS 21ST**
**DAY OF AUGUST, 2015**

STATE OF TENNESSEE
COUNTY OF ~~KNOX~~ Sevier 8/21/15

**SWORN** before me, this __21st__ day                )
of August, 2015                                                          )
                                                                                   )
                                                                                   )

My commission expires: _____ 7/7/18 _____

KEION RAD
STATE
OF
TENNESSEE
NOTARY
PUBLIC
SEVIER COUNTY



*- - - . 12*

Court File No.: 09-CL-7950

**ONTARIO**
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

THE HONOURABLE        )    TUESDAY, THE 3RD
                      )
JUSTICE NEWBOULD       )    DAY OF MARCH, 2015

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C.
1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL
NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL
CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

**ORDER**
**(SNMPRI CLAIMS RESOLUTION PROTOCOL)**

THIS MOTION, made by Nortel Networks Corporation, Nortel Networks Limited,
Nortel Networks Global Corporation, Nortel Networks International Corporation and
Nortel Networks Technology Corporation (collectively, the "**Canadian Debtors**"), jointly
with Ernst & Young, Inc. in its capacity as the Monitor of the Canadian Debtors (the
"**Monitor**"), pursuant to *the Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-
36, as amended (the "CCAA"), for the relief set out in the Amended Notice of Motion
dated February 3, 2015 was heard on February 27, 2015 at 330 University Avenue,
Toronto, Ontario.

ON READING the One Hundred and Twelfth Report of the Monitor dated
February 3, 2015, the Supplement to the One Hundred and Twelfth Report of the
Monitor dated February 24, 2015 ("**Supplemental Monitor's Report**"), the Affidavit of
Dr. Jeffrey D. Case sworn February 20, 2015 and the Exhibits thereto and on hearing

- 1 -

*- - - - 13*

the submissions of counsel for the Monitor, the Canadian Debtors, SNMP Research International, Inc. and SNMP Research, Inc. (collectively, "**SNMPRI**"), counsel for Nortel Networks Inc. and certain of its U.S. subsidiaries and affiliates and counsel for Avaya Inc., no one appearing for any other person on the service list although duly served as appears from the affidavits of service of Saeed Teebi sworn February 25, 2015, and Christopher G. Armstrong sworn February 4, 2015 and February 25, 2015.

## DOCUMENTARY DISCOVERY

1.      **THIS COURT ORDERS** that the Canadian Debtors and SNMPRI shall mediate with the assistance of the Former Justice Colin Campbell for the purpose of defining the scope of electronic searches in respect of the Canadian SNMPRI Claims, as such term is defined in the One Hundred and Twelfth Report of the Monitor.   Former Justice Campbell is to report back to the Court with results of the mediation by March 13, 2015, and, failing agreement between the Canadian Debtors and SNMPRI, make a recommendation on the scope of electronic searches for the Canadian SNMPRI Claims.

## LITIGATION TIMETABLE

2.      **THIS COURT ORDERS** that the parties adhere to the following litigation timetable:

(a)     By March 16, 2015, SNMPRI shall deliver its Statement of Claim;

(b)     By April 6, 2015, the Canadian Debtors shall deliver their Statement of Defence to SNMPRI's Statement of Claim;

(c)     By April 24, 2015, SNMPRI and the Canadian Debtors shall meet to discuss and agree on further particulars, if any, of the discovery process, including the scope of any additional documentary and electronic

- 2 -

14

searches to be conducted by each party, how third-party confidentiality

issues (such as confidentiality agreements between the Canadian

Debtors and the purchasers of their former assets) may be addressed,

and issues related to examinations for discovery; and

(d)   By May 22, 2015, the parties shall exchange Affidavits of Documents,

subject to a potential Motion if there are real and pressing reasons why

this date cannot be met.

**DEEMED FILING DATE**

3.   **THIS COURT ORDERS** that the Statement of Claim to be filed by SNMPRI by

March 16, 2015 shall be deemed to have been filed as of November 2, 2011.

ENTERED AT / INSCRIT À TORONTO
ON / BOOK NO:
LE / DANS LE REGISTRE NO.:

MAY - 3 2015

- 3 -

15

Court File No: 09-CL-7950

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

*ONTARIO*
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)
Proceeding commenced at TORONTO

ORDER
(SNMPRI CLAIMS RESOLUTION PROTOCOL)

**NORTON ROSE FULBRIGHT CANADA LLP**
Suite 3800, Royal Bank Plaza, South Tower
200 Bay Street, P.O. Box 84
Toronto, Ontario M5J 2Z4

**Alan Mersky** LSUC #: 41377I
**Vasuda Sinha** LSUC#: 55005B
Tel: 416.216.4000
Fax: 416.216.3930
Lawyers for the Canadian Debtors

**GOODMANS LLP**
Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto, Ontario M5H 2S7

**Jay A. Carfagnini** LSUC#: 22293T
**Joseph Pasquariello** LSUC# 38390C
**Christopher G. Armstrong** LSUC# 55148B
Tel: 416.979.2211   Fax: 416.979.1234
Lawyers for the Monitor, Ernst & Young Inc.

Doc#3030914v2

- - - - *16*

**THIS IS EXHIBIT "B" TO
THE AFFIDAVIT OF DR. JEFFREY D. CASE
SWORN BEFORE ME THIS 21ST
DAY OF AUGUST, 2015**

**STATE OF TENNESSEE** ~~JAC~~ *8/21/15*
**COUNTY OF** ~~KNOX~~ *Sevier*

**SWORN** before me, this __21st__ day          )
of August, 2015                                  )
                                                 )
                                                 )

My commission expires: _____*7/7/18*_____

*17*

Court File No. 09-CL-7950

### *ONTARIO*
### SUPERIOR COURT OF JUSTICE
#### (Commercial List)

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT,* R.S.C. 1985, c.C.36, AS AMENDED

AND IN THE MATTER OF A PLAN OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT,* R.S.C. 1985, c.C.36, AS AMENDED

B E T W E E N :

SNMP RESEARCH INTERNATIONAL, INC. AND SNMP RESEARCH, INC.

Claimants

- and -

NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION,    NORTEL NETWORKS INTERNATIONAL CORPORATION and NORTEL NETWORKS TECHNOLOGY CORPORATION

Debtors

### STATEMENT OF CLAIM

1.    The Claimants claim from each of the Debtors on a joint and several basis in relation to the period to and including January 14, 2009 (the "**CCAA Filing Date**"):

      (a)    unpaid royalties from the fourth quarter of 2008 through to the CCAA Filing Date, along with yearly software maintenance fees, and pre-filing interest thereon to the CCAA Filing Date;

(b)     licensing fees, royalties, and maintenance fees, and pre-filing interest thereon to the CCAA Filing Date, associated with the unauthorized and illegal usage by the Debtors of EMANATE[1] with EPIC/EAL used in the MG9000 product described below;

(c)     licensing fees, royalties, and maintenance fees, and pre-filing interest thereon to the CCAA Filing Date, associated with the unauthorized and illegal usage by the Debtors of EMANATE® and EMANATE®/Lite in association with products in the Bay Stack line of products of the Debtors;

(d)     licensing fees, royalties and maintenance fees, and pre-filing interest thereon to the CCAA Filing Date, associated with the unauthorized and illegal usage by the Debtors of EMANATE® in association with products in the GEM line of products of the Debtors;

(e)     unpaid royalties for the use of SNMP software in the Universal Signaling Point and SP2000, and pre-filing interest thereon to the CCAA Filing Date;

(f)     damages in amounts to be determined (i) under the *Copyright Act*, R.S.C. 1985, c. C-42 and/or the 17 U.S.C. §101 et. Seq. (the *U.S. Copyright Act of 1976*), as amended (collectively, the "**Copyright Statutes**"), applicable trade secret law, and other intellectual property law, for unauthorized use and distribution of SNMP software with the MG9000, Bay Products, GEM Products, and other products of the Debtors, and (ii) any and all additional amounts associated with licensing fees, royalties, and maintenance fees for the Bay Products and any other

---

[1] All capitalized terms not defined in Paragraphs 1 and 2 are used as defined later in this Statement of Claim.

3                              *19*

products of the Debtors that have not been reported by the Debtors to date and are owed to SNMP Research;

(g)     damages for breaching the terms of the Nortel License, in an amount to be determined at trial;

(h)     an accounting for profits realized by the Debtors arising from their conduct as detailed herein;

(i)     disgorgement of profits realized by the Debtors arising from their conduct as detailed herein; and

(j)     pre-judgment interest on the amounts described above to the CCAA Filing Date in accordance with the License Agreement, or alternatively, at the rates prescribed under the provisions of the *Courts of Justice Act*, R.S.O. 1990, c. C.43, as amended.

2.      The Claimants claim from each of the Debtors on a joint and several basis in relation to the period after the CCAA Filing Date:

(a)     damages for breaching the terms of the Nortel License, for misappropriation of trade secrets, for copyright infringement, for inducing, procuring and/or contributing to copyright infringement by third parties, in an amount to be determined at trial, but presently estimated at USD $86,000,000.00;

(b)     an accounting for the use, distribution, transfer and location of the Unaccounted For Schedules;

4

20

(c)     an accounting for profits realized by the Debtors arising from their conduct as detailed herein;

(d)     disgorgement of profits realized by the Debtors arising from their conduct as detailed herein;

(e)     pre-judgment interest and post-judgment interest on the aforesaid amounts in accordance with the License Agreement, or alternatively, at the rates prescribed under the provisions of the *Courts of Justice Act*, R.S.O. 1990, c. C.43, as amended;

(f)     an order that the Debtors be required to return to the Claimants or destroy all SNMP Software in the Debtors' possession pursuant to Section 6.4 of the Nortel License; and

(g)     their costs on a substantial indemnity scale.

## A.  The Parties

3.      SNMP Research International, Inc. ("**SNMPRI**") is a Tennessee corporation with its principal place of business located at 3001 Kimberlin Heights Road, Knoxville, Tennessee 37920-9716.

4.      SNMP Research, Inc. ("**SNMPR**", and collectively with SNMPRI, "**SNMP Research**") is a Tennessee corporation with its principal place of business located at 3001 Kimberlin Heights Road, Knoxville, Tennessee 37920-9716.

5.     Nortel Networks Corporation ("**NNC**"), Nortel Networks Limited, Nortel Networks Global Corporation and Nortel Networks International Corporation are each corporations incorporated under the laws of Canada.  Nortel Networks Technology Corporation is a Nova Scotia unlimited liability company.  These corporations are referred to herein collectively as the "**Debtors**".

6.     By Order of the Ontario Superior Court of Justice (Commercial List) (the "**Canadian Court**") dated January 14, 2009, subsequently amended, the Debtors filed for protection under the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36.

7.     The United States Bankruptcy Court for the District of Delaware (the "**U.S. Bankruptcy Court**") subsequently recognized the Debtors' insolvency proceeding in Canada as a foreign main proceeding under Chapter 15 of the U.S. Bankruptcy Code.

8.     Also on January 14, 2009, Nortel Networks Inc. and certain of its U.S. subsidiaries and affiliates (the "**U.S. Nortel Debtors**") concurrently filed voluntary petitions under Chapter 11 of the U.S. Bankruptcy Code in the U.S. Bankruptcy Court.

9.     In this Statement of Claim, the Debtors and the U.S. Nortel Debtors are referred to collectively as "**Nortel**".

**B.  SNMP Software**

10.    At all relevant times, SNMP Research has been the owner of the sixteen (16) copyrights listed in Schedule A attached hereto (the "**Copyrights**").

_22_

11.    SNMP Research owns an implementation of the Simple Network Management Protocol (the "**Protocol**") represented by the Copyrights, including all source code, associated documentation, and Derivative Works thereof (collectively, the "**SNMP Software**"). For the purpose of this Statement of Claim, "Derivative Works" means (a) any program or documentation in source code form or binary form which (i) is developed by an entity through the use of the SNMP Software, or (ii) includes any features, provisions, algorithms, or other portions of the SNMP Software, or (b) derivative works as defined in 17 U.S.C. § 101 et seq.

12.    At all relevant times, SNMPRI had a valid license agreement with SNMPR pursuant to which SNMPRI had the authority to license to third parties the SNMP Software owned by SNMPR.

13.    Almost all large SNMP Research customers are or were original equipment manufacturers ("**OEMS**", each an "**OEM**") such as the Debtors. Each of the asset buyers in the various Nortel asset sales described below are OEMS. Additionally, many of the asset buyers, Telefonaktiebolaget LM Ericsson ("**Ericsson**"), Avaya Inc. ("**Avaya**"), GENBAND Inc. ("**Genband**"), Hitachi, Ltd. ("**Hitachi**") and Ciena Corporation ("**Ciena**"), were existing customers of SNMP Research prior to the CCAA Filing Date, which had licensed portions of the SNMP Software for use in their products.

14.    SNMP Research licenses the source code for the SNMP Software to an OEM. The licensed source code is human readable and can be modified and enhanced by the OEM's development engineers. SNMP Research licenses the source code so that the OEM's developers can adapt the SNMP Software to work within the OEM's specific product that needs to implement the Protocol.

15.    The OEM typically integrates the modified SNMP Software with the source code for the OEM's product, in the OEM's development environment.

16.    In order for the OEM's product to execute the SNMP Software, the source code is compiled and linked into a binary version.  SNMP Research's OEM customer then sells its product to the OEM's end user customers with a binary version of the SNMP Software embedded.

17.    As discussed below, under the terms of its license agreements with its customers, SNMP Research owns the SNMP Software, which typically includes Derivative Works created from the SNMP Software and integrated with the OEM customers' products.  The OEM customer is obligated to keep all the source code for the SNMP Software confidential.

## C.  The Nortel License

18.    On December 23, 1999, SNMPRI and NNC executed a nonexclusive, limited license agreement which was subsequently amended via Amendment 1 with an effective date of November 29, 2001 (as amended, the "**Nortel License**").

19.    Section 9.11 of the License Agreement states as follows:

> *This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without reference to its choice of law provisions, and the federal laws of the United States applicable therein.*

20.    To license SNMP Software, each Nortel entity that wished to license a specific portion of the SNMP Software was required to execute a separate schedule to the Nortel License.  In the Nortel License, and throughout the remainder of this Statement of Claim, the Nortel entity or

24

entities that executed a schedule to the Nortel License are referred to as a "Specified Entity" or collectively as "Specified Entities," as defined in the Nortel License.

21.    Each schedule to the Nortel License identified the SNMP Software that the Specified Entity was licensed to possess, use and distribute with a Nortel Product.

22.    For each schedule, no Nortel entities, other than the Specified Entity that executed the schedule, were authorized to possess, use, or distribute the SNMP Software identified on the schedule.

23.    If a Specified Entity wished to use SNMP Software for a purpose not identified on a particular schedule, the Specified Entity was required to execute a separate schedule.

24.    The SNMP Software licensed for use and distribution with specific Nortel products is referred to herein collectively as "Licensed Products".

25.    Pursuant to the Nortel License, SNMPRI and its third party suppliers including SNMPR retained all title to, interest in, and copyright to the Licensed Products.

26.    Pursuant to the Nortel License, SNMPRI granted to the Specified Entity that executed each schedule a non-exclusive, non-transferable worldwide license for Development Software (as defined in the Nortel License) specified in the relevant Schedule A to:

> i)   use, copy, modify, prepare derivative works of, and distribute, within the Specified Entity, such Development Software for internal research and development;
>
> ii)  use, copy, modify, prepare derivative works of, and distribute, within the Specified Entity, such Development Software to create and support Run-Time Software;
>
> iii) use, copy, prepare derivative works of, and distribute, within the Specified Entity, Run-Time Software for internal research and development; and

      iv) *use, copy, prepare derivative works of, and distribute, within the Specified Entity, Run-Time Software to create and support Nortel Networks Products.*

27.     Pursuant to the Nortel License, SNMPRI granted to a Specified Entity a non-exclusive, non-transferable worldwide license to directly or indirectly:

      i) *sublicense End Users, pursuant to sublicense agreements, the right to use and copy (to the extent permitted in the relevant Schedule A) Run-Time Software and End User Documentation in association with Nortel Networks Products;*

      ii) *grant customers of End Users such licenses as may be reasonably necessary to enable such customer to use or make use of the Binary Code of Nortel Networks Products, and*

      iii) *distribute Run-Time Software to End Users.*

28.     Pursuant to the Nortel License, a Specified Entity did not have the right to "distribut[e] the Run-Time Software in Source Code form to any third party" or "distribute the EMANATE Subagent Development Kit in any form," including to, within, or among any Other Nortel Entity other than the Specified Entity. **"Other Nortel Entity"** means affiliates and subsidiaries of Nortel throughout the world, Other Nortel Sellers as defined below in paragraph 202, any entity qualified or which could be qualified as a Specified Entity on Attachment A to the Nortel License, or any other entity that received funds as a result of the Nortel bankruptcy proceedings, and the resellers and contractors of Nortel and such entities.

29.     The Nortel License included the following confidentiality and nondisclosure provision:

      *Any Confidential Information received by a Party [defined as the Specified Entity or SNMPRI] shall be retained in confidence and shall be used, disclosed, and copied solely for the purposes of, and in accordance with, this Agreement. The receiving Party shall use the same degree of care as it uses to protect its own confidential information of a similar nature, but no less than reasonable care, to prevent the unauthorized use, disclosure or publication of the Confidential Information. Use and dissemination of Confidential*

*Information with the receiving Party shall only extend to those with a reasonable need to know the Confidential Information.*

30.     Pursuant to the Nortel License, each Specified Entity could not use or sub-license any Licensed Product without SNMPRI's prior consent if such use or sub-license was not specified in the Nortel License or its schedules.

31.     Pursuant to the Nortel License, each Specified Entity could not transfer any SNMP Software to a third party without SNMPRI's prior consent if such transfer was not authorized in the Nortel License or its schedules.

32.     Pursuant to the Nortel License, each Specified Entity was obligated to pay to SNMPRI royalties, licensing fees, and maintenance fees for a Specified Entity's use and distribution of the Licensed Products.

33.     Pursuant to the Nortel License, each Specified Entity was obligated to keep any licensed or unlicensed SNMP Software confidential and was prohibited from disclosing it to any third party without SNMPRI's consent.  Any such purported transfer constitutes breach of contract, copyright infringement, and misappropriation of trade secrets.

34.     SNMPRI prepared approximately 103 schedules[2] to the Nortel License detailing the SNMP Software that each Specified Entity was authorized to use or distribute with a specific Nortel product and the specific purposes for or limits on a Specified Entity's use and distribution of SNMP Software.

---

[2] This includes license agreements with Shasta Networks, Inc. and Periphonics Corporations, companies which Nortel acquired, which were treated in part as schedules to the Nortel License.

27

35.    A Specified Entity and SNMPRI either executed these schedules or, by not executing a schedule, Nortel represented to SNMPRI that it did not need a license to the SNMP Software identified on a particular schedule because it did not intend to use the particular SNMP Software represented by a schedule.

36.    Specified Entities and SNMPRI executed 59[3] schedules to the Nortel License.

37.    Of the 59 schedules executed by Specified Entities, SNMPRI cannot determine the current status of the SNMP Software identified on 35 of the schedules ("**Unaccounted For Schedules**").

38.    Since it executed the Nortel License in 1999 and accompanying schedules in 1999 and subsequent years, Nortel has used and distributed the Licensed Products and has benefited financially from such use and distribution.

39.    A Specified Entity initially executed Schedule 10 on July 7, 2005, which allowed it to use and distribute SNMP Software in Nortel's Universal Signaling Point product.

40.    Although Schedule 10 required the Specified Entity to pay royalties to SNMPRI for the distribution of SNMP Software in the Universal Signaling Point product, in 2006, Nortel ceased paying royalties to SNMPRI even though, on information and belief, the Specified Entity continued to distribute SNMP Software in the Universal Signaling Point product.

41.    As of July 11, 2011, Nortel had completed sales or entered into licenses in respect of all or substantially all of its business lines to various purchasers.

---

[3] This includes license agreements with Shasta Networks, Inc. and Periphonics Corporations, companies which Nortel acquired, which were treated in part as schedules to the Nortel License.

*28*

## D. Trade Secret SNMP Software

42.    The SNMP Software is protected as trade secret information.  SNMP Research's trade secret information includes the Derivative Works of the SNMP Software created by Defendants.

43.    To protect its business, SNMP Research takes reasonable efforts to maintain the secrecy of the SNMP Software.  It imposes restrictions on the number of people who have access to the SNMP Software.  The people who are allowed access to the SNMP Software are generally required by contract to keep the SNMP Software confidential.  When an SNMP Research employee is terminated, whether voluntarily or involuntarily, that employee is required to return all copies of the SNMP Software he or she had access to while employed.

44.    SNMP Research licenses SNMP Software to third parties, but in entering those licenses, SNMP Research requires the SNMP Software be kept secret.  These secrecy provisions extend beyond the life of the licenses to ensure that the SNMP Software is kept secure for years to come.  Further, these licenses require third parties to return or destroy all trade secret information, including the SNMP Software, at the end of the licenses' terms.  Such provisions were included in the Nortel License.

45.    By keeping the SNMP Software secret, SNMP Research encourages companies to come to it for the SNMP Software.  This secrecy creates independent economic value as companies must come to SNMP Research to have access to the SNMP Software.

46.    Further, SNMP Research's licensees are also required to keep the SNMP Software confidential, even where that SNMP Software is embedded in products created by those third parties.

47.    SNMP Software contains an embedded notice which states:

> *This software is furnished under a license and may be used and copied only in accordance with the terms of such license and with the inclusion of the above copyright notice.  This software or any other copies thereof may not be provided or otherwise made available to any other person.  No title to and ownership of the software is hereby transferred.*

48.    In addition to the notice above, SNMP Research includes a notice in and on the SNMP Software, which states:

> *This software is an unpublished work subject to a confidentiality agreement and is protected by copyright and trade secret law.  Unauthorized copying, redistribution or other use of this work is prohibited.*

49.    The purpose of these notices is to put the world on notice that SNMP Software is protected by copyright and trade secret laws.  To accomplish this goal, these notices are embedded in a manner that prevents the SNMP Software from being opened or configured without the notice being viewed.

50.    By taking reasonable steps to keep the SNMP Software secret, SNMP Research creates independent economic value in the SNMP Software.  Other than entities which enter into license agreements with SNMP Research or SNMP Research's resellers, no entity has access to the source code of the SNMP Software.  Thus, the secrecy of the SNMP Software enhances the value to SNMP Research and is an important aspect of SNMP Research's business.

51.    Further, SNMP Research requires third parties distributing the SNMP Software to end users to run the SNMP Software in source code form through a compiler and linker to create binary code.  This binary code is not readable by humans and that protects the SNMP Software from disclosure.  Going even further, SNMP Research requires licensees to include in their

agreements with end users a restriction that prevents the end users from reverse engineering the SNMP Software from the binary code. Such provisions were included in the Nortel License.

52.     Additionally, as discussed above, SNMP Research makes sure that any individual or entity that comes into possession of the SNMP Software is aware the SNMP Software is a trade secret and confidential by attaching notices to the SNMP Software.

53.     Each of these steps keeps the SNMP Software secure. SNMP Research keeps its SNMP Software secret and that secrecy creates independent economic value for the SNMP Software. Thus, any unlicensed party who comes into possession of SNMP Software illegally, including each of the Defendants herein, is on notice that they are utilizing and distributing SNMP Research's confidential trade secret information unlawfully and without right or justification.

**E. Alteon Products**

54.     In accordance with Schedule 51A of the Nortel License, with an effective date of November 29, 2001, SNMP Research licensed and provided the SNMP Software named EMANATE ("**EMANATE**") to one particular Nortel Specified Entity, Alteon WebSystems.

55.     Schedule 51A allowed Alteon WebSystems certain rights under the terms of the Nortel License to use EMANATE SNMP Software in Alteon Products using version 6.2 of the Red Hat Linux platform (as defined in Schedule 51A).

56.     As of late 2008, the products in Nortel's Alteon portfolio included, *inter alia*, the following:

(a)    Nortel Application Switch family, which included[4] the NAS 2208 (a/k/a the Nortel EB1412010 or EB1412030), NAS 2216 (a/k/a/ the Nortel EB1412009 or EB1412029), NAS 2424 and NAS 2424SSL (a/k/a the Nortel EB1412006 or EB1412026), and NAS 3408 (a/k/a the Nortel EB1412004 or EB1412027) (collectively, "**Alteon NAS**");

(b)    Nortel Application Accelerator family, which included the NAA 510 (a/k/a the Nortel EB1639178 E) and NAA 610 (a/k/a the Nortel EB1639178) (collectively, "**Alteon NAA**");

(c)    the Nortel Switched Firewall family, which included the NSF 5111 (a/k/a the Nortel EB1639127), NSF 5114 (a/k/a the Nortel EB1639128), NSF 5016 (a/k/a the Nortel EB1639130) plus closely related products including the NSF 5111-NE1, NSF 5026, NSF 5124, NSF 5124-NE1, NSF 6400 and NSF 6600 (collectively, "**Alteon NSF**");

(d)    the Virtual Services Switch family which included the Virtual Services Switch ("**Alteon VSS 5000**" a/k/a the Nortel EF1405A00);

(e)    the Secure Multimedia Controller 2540 ("**Alteon SMC 2450**" a/k/a the Nortel ED1639001); and

(f)    the Nortel Service Delivery Module 8660 ("**Alteon PP8660**" a/k/a the Nortel DS1404087, and collectively with the products described in subparagraphs 56 (a) to (e), the "**Alteon Products**").

---

[4] Sometimes the complete product numbers for members of the family include additional modifiers and suffixes such as NAS 2424-SSL-E.

32

All of the Alteon Products have common functionality which is consistent with the Nortel Alteon brand.

57.     Nortel reported to SNMP Research that Nortel shipped more than 5,000 Alteon Products containing SNMP Software under Schedule 51A.

58.     For the year 2008, Nortel reported shipments of 465 Alteon Products containing SNMP Software with royalties totaling approximately $18,600.

59.     In the fourth quarter of 2008, which immediately preceded the sale of the Alteon Products to Radware Ltd. ("**Radware**"), Nortel reported shipments of 108 Alteon Products containing SNMP Software with royalties totaling approximately $4,320.

60.     Royalty reports reflecting shipments in 2008 and those prepared by Nortel in 2009 represent that the SNMP Software licensed to the Alteon WebSystems Specified Entity via Schedule 51A was still in use in the Alteon NSF and the Alteon PP8660.

61.     Additionally, Nortel reported royalties to SNMP Research to pay for the distribution of SNMP Software in the Alteon VSS.

62.     SNMP Software was used and distributed in the Alteon VSS.

63.     Nortel never had a license to use or distribute SNMP Software with the Alteon VSS.

64.     Nortel reported royalties to SNMP Research to pay for the distribution of SNMP Software in the Alteon SMC 2450.

65.     SNMP Software was used and distributed in the Alteon SMC 2450.

66.     Nortel never had a license to use or distribute SNMP Software with the Alteon SMC 2450.

67.     Nortel reported royalties to SNMP Research to pay for the distribution of SNMP Software in the Alteon PP8660.

68.     SNMP Software was used and distributed in the Alteon PP8660.

69.     Nortel never had a license to use or distribute SNMP Software with the Alteon PP8660.

## F.  Unlicensed Products

### i.  Nortel's Unlicensed MG9000 Product

70.     On several occasions during 1999 and subsequent years, SNMPRI provided Nortel with the SNMP Software named EMANATE for use in various particular Nortel products.

71.     Nortel never licensed EMANATE for use in Nortel's MG9000 product.

72.     Nortel represented to SNMPRI that it did not intend to use and would not use or distribute the EMANATE product in a manner beyond the scope of the Nortel License. Furthermore, the Nortel License did not allow Nortel to use or distribute EMANATE except in accordance with the terms of the Nortel License.

73.     On May 18, 2010, an email from Nortel employee Tim Gaiser to another Nortel employee stated that the SNMP Software named EMANATE was used and distributed in four different cards in the MG9000. Emails by Nortel employee Pierre Tremblay represented that the SNMP Software was licensed under Schedule 19. Although Schedule 19 was first generated in 1999, it was never executed nor paid for by Nortel. However, based on Nortel's representations

with respect to the shipments documented in those internal emails, Nortel reported shipping copies of SNMP Software in the MG9000 cards since 2002. SNMP learned of the use of SNMP Software in the MG9000 on or around May 25, 2010. SNMP did not know of this unauthorized use and distribution before this time, and could not have reasonably known of this unauthorized distribution and use before this time.

74.     Nortel possessed, used, transferred, distributed, disclosed, and otherwise profited from its use and distribution of the EMANATE product in Nortel's MG9000 product (the "**SNMP MG9000 Software**") before and after the CCAA Filing Date.

75.     Genband advised SNMP Research that the SNMP Software was in the MG9000 product it obtained through the asset sale identified in paragraph 152, and Genband continued to sell the MG9000 with the SNMP MG9000 Software after Genband acquired the MG9000 from Nortel.

76.     Nortel did not pay SNMPRI royalties, licensing fees, or maintenance fees for its pre-filing or post-filing possession, use, transfer, distribution, or disclosure of the SNMP MG9000 SNMP Software.

ii.     **Nortel's Unlicensed SP2000 Product**

77.     Nortel never licensed any SNMP Software for use or distribution in Nortel's SP2000 product.

78.     Nortel possessed, used, transferred, distributed, disclosed, and otherwise profited from SNMP Software embedded within its SP2000 product before and after Nortel's CCAA Filing Date.

79.     Genband advised SNMP Research that the SNMP Software was in the SP2000 product it obtained through the asset sale identified in paragraph 152, and Genband continued to sell the SP2000 with SNMP Software after Genband acquired the SP2000 from Nortel. SNMP did not know of this unauthorized use and distribution before this time, and could not have reasonably known of this unauthorized distribution and use before this time.

80.     Nortel did not pay SNMPRI royalties, licensing fees, or maintenance fees for its pre-filing or post-filing possession, use, transfer, distribution, or disclosure of SNMP Software within the SP2000 product.

### iii.   Nortel's Unlicensed Bay Products

81.     NNC executed Schedule 1A, which allowed it to possess, use, and distribute particular SNMP Software with particular Nortel products in its Bay division ("**SNMP Bay Software**").

82.     Pursuant to Schedule 1A, NNC's license to possess, use, and distribute the SNMP Bay Software expired on June 20, 2003.

83.     Nortel had no right to possess, use, or distribute SNMP Bay Software after June 20, 2003.

84.     Nortel possessed, used, transferred, distributed, disclosed, or otherwise profited from the SNMP Bay Software before and after Nortel's CCAA Filing Date.

85.     Avaya revealed to SNMP Research that Avaya received the SNMP Bay Software in the asset sale and Avaya continued to sell the Bay products with the SNMP Bay Software after Avaya acquired the Bay products from Nortel.

36

86.     Nortel did not pay SNMPRI royalties or licensing fees for its pre-filing or post-filing possession, use, transfer, distribution, or disclosure of the SNMP Bay SNMP Software.

### iv.     Nortel's Unlicensed GEM and GM2 Products

87.     Nortel never licensed any SNMP Software for use or distribution in Nortel's GEM or GM2 products.

88.     Nortel possessed, used, transferred, distributed, disclosed, and otherwise profited from SNMP Software embedded within its GEM and GM2 products before and after Nortel's CCAA Filing Date.

89.     Genband advised SNMP Research that the SNMP Software was in the GEM and GM2 product it obtained through the asset sale identified in paragraph 152, and Genband continued to sell the GEM and GM2 products with SNMP Software after Genband acquired the GEM and GM2 products from Nortel.

90.     Nortel did not pay SNMPRI royalties, licensing fees, or maintenance fees for its pre-filing or post-filing possession, use, transfer, distribution, or disclosure of SNMP Software within the GEM or GM2 products.

### v.     Nortel's Unlicensed Alteon Products

91.     Nortel never licensed any SNMP Software for use in the Alteon VSS, Alteon SMC 2450, or the Alteon PP8660.

92.     Nortel possessed, used, transferred, distributed, disclosed, and otherwise profited from SNMP Software embedded within the Alteon VSS, Alteon SMC 2450, and the Alteon PP8660 before and after Nortel's CCAA Filing Date.

93.     Nortel did not pay SNMPRI all of the royalties, licensing fees, or maintenance fees for its pre-filing or post-filing possession, use, transfer, distribution, or disclosure of SNMP Software within the Alteon VSS, SMC 2450, or the Alteon PP8660.

**vi.     Other SNMP Software**

94.     Before and after Nortel's CCAA Filing Date, certain Specified Entities transferred the Licensed Products to Other Nortel Entities that did not have a license for the Licensed Products. To the extent such Other Nortel Entities possessed, used, transferred, sold, reproduced, distributed, or otherwise profited from Licensed Products for which such Other Nortel Entities did not possess a license, those Licensed Products are unlicensed products.

95.     Nortel possessed, used, transferred, distributed, disclosed, or otherwise profited from other unlicensed SNMP Software, which have not been disclosed by Nortel to SNMP Research, before and after Nortel's CCAA Filing Date.

96.     For the remainder of this Statement of Claim, the SNMP Software used or distributed with specific Nortel products discussed in paragraphs 70 - 95 are referred to as the "Unlicensed Product" or the "Unlicensed Products."

*~~ _ 58*

## G. Post-Filing Sales of Nortel's Assets

### i.    Sale of the Layer 4-7 Application Delivery Business Assets to Radware

97.    On March 26, 2009, the U.S. Bankruptcy Court entered an order (the "**U.S. Radware Order**") approving a pre-arranged sale of Nortel's Layer 4-7 Application Delivery Business Assets to Radware pursuant to an asset purchase agreement (the "**Radware APA**").

98.    The Radware APA specifically excluded the right to transfer the intellectual property of any third party.

99.    The U.S. Radware Order stated:

> *The sale of the Assets, pursuant to this Order will vest the Successful Bidder with all right, title and interest of the Debtors to the Assets and will be a legal, valid and effective transfer of the Assets free and clear of all Liens and Claims, whether known or unknown, fixed, liquidated, contingent or otherwise, including any claims held by any of the Debtors' or their affiliates' creditors, vendors, suppliers, employees or lessors, and any other person, except as expressly permitted by the Purchase Agreement or Bidding Procedures.*

100.    On April 7, 2009, the Canadian Court entered an order recognizing, implementing, and effectuating the U.S. Radware Order in Canada.

101.    On or around March 31, 2009, Nortel and Radware closed the sale of the Layer 4-7 Application Delivery Business assets.

102.    According to Nortel's 2008 Annual Report, dated March 11, 2009, Nortel indicated its intention of selling the Alteon NAA (Nortel Application Accelerators), Alteon NAS (Nortel Application Switches), and Alteon VSS (Virtual Services Switch) product families to Radware.

103.    Page 8 of Nortel's 2008 Annual Report states that "under the agreement, the products planned to be acquired by Radware include certain Nortel Application Accelerators, Nortel Application Switches and the Virtual Services Switch."

104.    Radware CEO Roy Zisapel stated that Radware purchased the Alteon NAA, Alteon NAS and Alteon VSS product lines from Nortel in March 2009.

105.    Radware's counsel Randy Lipsitz stated on October 29, 2013, that SNMP Software was in the Alteon products transferred by Nortel to Radware.

106.    The Asset Purchase Agreement between Nortel and Radware dated February 19, 2009 states that SNMP Software is embedded in the Alteon Products.

107.    On or around March 31, 2009, Nortel transferred to Radware the Layer 4-7 Application Delivery Business assets, otherwise known as the Alteon product line.

108.    The assets transferred to Radware included both finished products which Radware was immediately able to sell to its customers and the source code for the SNMP Software and knowledge necessary to produce additional products.  Radware is now selling those products as part of its rebranded Radware Alteon line of products.

109.    When Nortel transferred the Alteon business in the sale of the Layer 4-7 Application Delivery Business assets to Radware, it also distributed and disclosed to Radware the SNMP Software in the Alteon VSS, and other SNMP Software which was integrated with the Alteon Products.

110.    This SNMP Software was embedded in the finished products and in the SNMP Software necessary to support and maintain finished products and to create new or revised versions of the products.

111.    Nortel knew that it was transferring, distributing, and disclosing to Radware the SNMP Software in the Alteon VSS, and SNMP Software in other Alteon Products when it transferred the Layer 4-7 Application Delivery Business assets to Radware.

112.    Nortel transferred, distributed, and disclosed the SNMP Software in the Alteon VSS, and other Alteon Products to Radware without the authorization or consent of SNMP Research.

113.    Nortel's unauthorized and unconsented use, transfer, distribution, and disclosure of the SNMP Software in the Alteon VSS and other Alteon Products violated the Nortel License, infringed upon SNMP Research's exclusive rights under the Copyright Statutes, misappropriated SNMP Research's trade secrets, and was not authorized by any court orders.

### ii.    Sale of the CDMA and LTE Business Assets to Ericsson

114.    On July 28, 2009, the U.S. Bankruptcy Court entered an order (the "**U.S. Ericsson Order**") approving a pre-arranged sale of Nortel's CDMA and LTE Business assets to Ericsson pursuant to an asset purchase agreement (the "**Ericsson APA**").

115.    The Ericsson APA specifically excluded the right to transfer the intellectual property of any third party.

116.    The U.S. Ericsson Order stated:

> *Nothing in this Order or in the Sale Agreement or Ancillary Agreements provides for the assumption and/or assignment, whether under section 365 of*

*the Bankruptcy Code or otherwise, by the Debtors, of any contract with SNMP Research International, Inc. ("SNMP"), and no intellectual property rights or intellectual property licensed via contracts with SNMP and Nortel are being conveyed or otherwise transferred by the Debtors pursuant to the Order, Sale Agreement or Ancillary Agreements. To the extent that the Purchaser elects to have the Debtors assign to the Purchaser any contract with or intellectual property right of SNMP relating to the Assets, the Debtors and Purchaser will do so in accordance with the terms of such contract or applicable license, which terms, may include, inter alia, the written consent of SNMP.*

117.    The U.S. Ericsson Order further stated:

*This Order applies only to assets owned by the Debtors. Consequently, notwithstanding any other provision of this Order or the sale Agreement to the contrary, the portions of this Order that approve the transfer of assets to the Purchaser free and clear of all liens and other encumbrances, or that modify, enjoin, release or otherwise limit the rights of creditors of entities transferring assets, apply only to assets owned by the Debtors and do not apply to any assets owned by non-debtor entities.*

118.    On July 28, 2009, the Canadian Court entered an Approval and Vesting Order approving the sale transaction under the Ericsson APA.

119.    On August 14, 2009, the Canadian Court entered an order recognizing, implementing, and effectuating the U.S. Ericsson Order in Canada.

120.    On or around November 13, 2009, Nortel and Ericsson closed the sale of the CDMA and LTE Business assets.

121.    On or around November 13, 2009, Nortel transferred to Ericsson the CDMA and LTE Business assets.

122.    Nortel represented to SNMPRI that SNMP Software was not involved in the sale of the CDMA and LTE Business assets.

123.    On July 22, 2009, Elizabeth M. Polizzi of Cleary Gottlieb Steen & Hamilton LLP, counsel to Nortel, informed SNMP Research's counsel that "there are no contracts between SNMP Research International, Inc. and Nortel that will be affected by this sale" when speaking in reference to the sale of the CDMA and LTE assets to Ericsson.

124.    After Nortel transferred the CDMA and LTE Business assets to Ericsson, Ericsson represented to SNMP Research that Ericsson had received the Licensed Products identified on Schedule 29 of the Nortel License.

125.    When Nortel transferred the CDMA and LTE Business assets to Ericsson, it also distributed and disclosed to Ericsson the Licensed Products identified on Schedule 29 of the Nortel License, which were embedded within the CDMA and LTE Business assets.  Ericsson distributed those products as part of its VRTX-based Gateway Controller product.

126.    Nortel knew that it was transferring, distributing, and disclosing to Ericsson the SNMP Software identified in paragraph 124 when it transferred the CDMA and LTE Business assets to Ericsson.

127.    Nortel transferred, distributed, and disclosed the SNMP Software identified in paragraph 124 to Ericsson without the authorization or consent of SNMP Research.

128.    Nortel's unauthorized and unconsented use, transfer, distribution, and disclosure of the SNMP Software identified in paragraph 124 violated the Nortel License, infringed upon SNMP Research's exclusive rights under the Copyright Statutes, misappropriated SNMP Research's trade secrets, and violated the express terms of the U.S. Ericsson Order.

iii.    **Sale of the Enterprise Solutions Business Assets to Avaya**

129.    On September 16, 2009, the U.S. Bankruptcy Court entered an order (the "**U.S. Avaya Order**") approving a pre-arranged sale of Nortel's Enterprise Solutions Business assets to Avaya pursuant to an asset purchase agreement (the "**Avaya APA**").

130.    The Avaya APA specifically excluded the right to transfer the intellectual property of any third party.

131.    The U.S. Avaya Order stated:

> *Nothing in this Order authorizes or otherwise provides for the assumption, assignment or rejection, in whole or in part, of any Objecting Party Agreement. Other than the rights and obligations between the parties to the Agreement, nothing herein or in the Agreement shall affect the rights of any party regarding an Objecting Party Agreement, all of which such rights of the Objecting Parties are hereby preserved, including without limitation the right to seek, oppose or support (a) any assumption, assignment or rejection of any Objecting Party Agreement on any legal or factual basis, . . . (d) the assumption by the Purchaser of all obligations and liabilities under any Objecting Party Agreement by virtue of the assumption and assignment of the Objecting Party Agreement under Section 365 and other applicable law, including contingent, unmatured, or unliquidated claims and whether such claims arise or arose pre- or post-closing . . . . For the purposes of this Order, "Objecting Party Agreement" means any written contract, agreement, license or any other document that creates binding contractual obligations between an Objecting Party and one or more Debtors; "Objecting Party" means . . . SNMP Research International Inc. . . . and, in the case of an Objecting Party that is not an individual, such Objecting Party's respective affiliates . . . . Nothing in this Order or the Agreement shall prejudice, estop, bar, impair, or otherwise limit in any respect any party's rights under Section 365 of the Bankruptcy Code with respect to the Objecting Party Agreements, including, without limitation, the rights set forth above in subparts (a) through (e).*

132.    The U.S. Avaya Order further provided:

> *This Order applies only to assets owned by the Debtors . . . Consequently, notwithstanding any other provision of this Order or the Agreement to the contrary, the portions of this Order that approve the transfer of assets to the Purchaser free and clear of all liens and other encumbrances, or that modify, enjoin, release or otherwise limit the rights of any creditor of entities transferring assets, apply only to assets owned by the debtors and do not apply to any assets owned by non-debtor entities, except to the extent otherwise agreed by such creditor in writing . . . .*

133.    On September 16, 2009, the Canadian Court entered an Approval and Vesting Order approving the sale transaction under the Avaya APA.

134.    On November 6, 2009, the Canadian Court entered an order recognizing, implementing, and effectuating the U.S. Avaya Order in Canada.

135.    On or around December 18, 2009, Nortel and Avaya closed the sale of the Enterprise Solutions Business assets.

136.    On or around December 18, 2009, Nortel transferred to Avaya the Enterprise Solutions Business assets.

137.    On March 3, 2010, SNMPRI executed an Accession Agreement with Avaya (the "**Accession Agreement**").

138.    The following Licensed Products were listed in the Accession Agreement:

    (a)    Licensed Products identified on Schedule 51A;

    (b)    Licensed Products identified on Schedule 74A; and

    (c)    Licensed Products subject to the license agreement between SNMPRI and

Periphonics Corporation, a company that Nortel acquired.

139.    In addition to the SNMP Software identified in paragraph 138, Nortel also transferred to Avaya the following Licensed Products, which Nortel was not authorized to transfer to a third party:

> (a)    Licensed Products identified on Schedule 63A;

> (b)    Licensed Products identified on Schedule 65A;

> (c)    Licensed Products identified on Schedule 68A; and

> (d)    Licensed Products identified on Schedule 70A.

140.    The Licensed Products identified in paragraph 139 were not covered by the Accession Agreement.  Avaya has admitted that it received the Licensed Products identified in paragraph 139 from Nortel and that it is possessing, using, or distributing the SNMP Software in these products.

141.    In addition to the SNMP Software identified in paragraphs 138 and 139, Nortel also transferred to Avaya the SNMP Bay Software, the Alteon SMC2450 and the Alteon PP8660 which consist of Unlicensed Products that Nortel had no right to transfer to Avaya.

142.    The Unlicensed Products identified in paragraph 141 were not covered by the Accession Agreement.

143.    After Nortel transferred the Enterprise Solutions Business Assets to Avaya, Avaya represented to SNMP Research that Avaya received the SNMP Software identified in paragraphs

138, 139 and the SNMP Bay Software, except for the Licensed Products identified on Schedule 51A.

144.    To induce SNMPRI to execute the Accession Agreement, Nortel did not disclose to SNMPRI that the Licensed Products in paragraph 139 and Unlicensed Products in paragraph 141 were transferred to Avaya as a part of the Avaya sale.

145.    Avaya did not pay the administrative fee associated with the Accession Agreement until May 18, 2010, and therefore did not have a license to possess, use, or distribute the specific SNMP Software identified in paragraph 138 and listed on the Accession Agreement until May 18, 2010.

146.    Because of Nortel's unauthorized and unconsented use, transfer, distribution, and disclosure to Avaya of the SNMP Software identified in paragraph 138, Avaya had possession of and access to the SNMP Software identified in paragraph 138 from December 18, 2009 until May 18, 2010, and from February 15, 2011 until the present without a license to do so.

147.    Because of Nortel's unauthorized and unconsented use, transfer, distribution, and disclosure to Avaya of the SNMP Software identified in paragraph 139, Avaya had possession of and access to the SNMP Software identified in paragraph 139 from December 18, 2009 until May 18, 2010, and from February 15, 2011 until the present without a license to do so.

148.    Because of Nortel's unauthorized and unconsented use, transfer, distribution, and disclosure to Avaya of SNMP Software identified in paragraph 141, Avaya had possession of and access to the SNMP Software identified in paragraph 141 from December 18, 2009 until the present without a license to do so.

149.    Nortel knew it was transferring, distributing, and disclosing to Avaya the SNMP Software identified in paragraphs 138, 139 and 141 when it transferred the Enterprise Solutions Business assets to Avaya.

150.    Nortel transferred, distributed, and disclosed the SNMP Software identified in paragraphs 138, 139 and 141 without the authorization or consent of SNMP Research.

151.    Nortel's unauthorized and unconsented use, transfer, distribution, and disclosure of the SNMP Software identified in paragraphs 138, 139 and 141 violated the Nortel License, infringed upon SNMP Research's exclusive rights under the Copyright Statutes, misappropriated SNMP Research's trade secrets, and were not authorized by any court orders.

iv.    **Sale of the Carrier Voice Over IP and Applications Solutions Business Assets to Genband**

152.    On March 3, 2010, the U.S. Bankruptcy Court entered an order (the "**U.S. Genband Order**") approving a pre-arranged sale of Nortel's Carrier Voice Over IP and Applications Solutions Business assets to Genband pursuant to an asset purchase agreement (the "**Genband APA**").

153.    The Genband APA specifically excluded the right to transfer the intellectual property of any third party.

154.    The U.S. Genband Order stated:

> *Nothing in this Order or in the Sale Agreement or Ancillary Agreements provides for the assumption and/or assignment by the Debtors, of any contract with SNMP Research International, Inc. ("SNMP") under section 365 of the Bankruptcy Code. To the extent that the Purchaser elects to have the Debtors assign or sublicense to the Purchaser any contract with or license of SNMP relating to the Assets, the Debtors and Purchaser will do so in accordance*

*with the terms of such contract or applicable license, which may include entering into a new license agreement.*

155.    The U.S. Genband Order further provided:

> *This Order applies only to Assets owned by the Debtors. Consequently, notwithstanding any other provision of this Order or the Sale Agreement to the contrary, the portions of this Order that approve the transfer of the Purchased Assets to the Purchaser free and clear of all liens and other encumbrances, or that modify, enjoin, release or otherwise limit the rights of creditors of entities transferring Purchased Assets, apply only to the Purchased Assets owned by the Debtors and do not apply to any Purchased Assets owned by non-debtor entities.*

156.    On March 3, 2010, the Canadian Court entered an Approval and Vesting Order approving the sale transaction under the Genband APA.

157.    On or around April 7, 2010, Nortel asked SNMPRI to execute an accession agreement so that Genband could use certain SNMP Software after the sale closed.

158.    On or around April 7, 2010, Nortel represented to SNMPRI that it intended to transfer to Genband only the SNMP Software specified in the accession agreement. The SNMP Software specified in the accession agreement were those portions of the SNMP Software identified on Schedule 27A of the Nortel License, and the SNMP Software that Nortel had been using pursuant to a July 26, 1998 license agreement between SNMPRI and Shasta Networks, Inc., a company that Nortel acquired.

159.    On or around May 25, 2010, Nortel represented to SNMPRI that Nortel intended to transfer the SNMP MG9000 SNMP Software to Genband.

160.    Nortel further represented to SNMPRI that Genband would seek an agreement with SNMPRI before the Genband sale closed.

49

161.   Once Genband discovered that Nortel did not have a license for the SNMP MG9000 SNMP Software, Genband refused to sign an accession agreement with SNMPRI.

162.   On or around May 28, 2010, Nortel and Genband closed the sale of the Carrier Voice Over IP and Applications Solutions Business assets.

163.   On or around May 28, 2010, Nortel transferred to Genband the Carrier Voice Over IP and Applications Solutions Business assets.

164.   When Nortel transferred the Carrier Voice Over IP and Applications Solutions Business assets to Genband, it also distributed and disclosed to Genband the following Licensed Products, which were embedded within the Carrier Voice Over IP and Applications Solutions Business assets:

(a)   SNMP Software identified on Schedule 10A of the Nortel License;

(b)   SNMP Software identified on Schedule 27A of the Nortel License; and

(c)   SNMP Software identified on the July 26, 1998 license agreement between Shasta Networks, Inc. and SNMPRI.

165.   When Nortel transferred the Carrier Voice Over IP and Applications Solutions Business assets to Genband, it also distributed, and disclosed to Genband the following Unlicensed Products:

(a)   SNMP MG9000 SNMP Software;

(b)   SNMP Software embedded in the SP2000 products;

(c)     SNMP Software embedded in the GEM and GM2 products;

(d)     SNMP Software embedded in Nortel's Pablo product; and

(e)     SNMP Software embedded in Nortel's MAS product.

166.    After Nortel transferred the Carrier Voice Over IP and Applications Solutions Business assets to Genband, Genband represented to SNMP Research that Genband received the SNMP Software identified in paragraphs 164 and 165.

167.    Nortel knew that it was transferring, distributing, and disclosing to Genband the SNMP Software identified in paragraphs 164 and 165 when it transferred the Carrier Voice Over IP and Applications Solutions Business assets to Genband.

168.    Nortel transferred, distributed, and disclosed the SNMP Software identified in paragraphs 164 and 165 to Genband without the authorization or consent of SNMP.

169.    Nortel knew that it was transferring, distributing, and disclosing to Genband the SNMP Software identified in paragraphs 164 and 165 without an accession agreement executed by SNMP.

170.    Nortel's unauthorized and unconsented use, transfer, distribution, and disclosure of the SNMP Software identified in paragraphs 164 and 165 violated the Nortel License, infringed upon SNMP Research's exclusive rights under the Copyright Statutes, misappropriated SNMP Research's trade secrets, and were not authorized by any court orders.

**v.    Other Post-Filing Asset Sales and Transfers of Other SNMP Software**

171.    Nortel sold or licensed and transferred other of its assets ("**Other Nortel Assets**") to Hitachi, Ericsson, Kapsch Carriercom AG, and Ciena (collectively, the "**Other Asset Purchasers**").

172.    When Nortel sold or licensed and transferred the Other Nortel Assets to the Other Asset Purchasers, it also used, transferred, distributed, or disclosed SNMP Software that it had used or were otherwise embedded within the assets sold or transferred to the Other Asset Purchasers.

173.    Nortel used, transferred, distributed, or disclosed SNMP Software to the Other Asset Purchasers without the authorization or consent of SNMP Research.

174.    Nortel knew that it was transferring, distributing, and disclosing the SNMP Software to the Other Asset Purchasers without the authorization or consent of SNMP Research.

175.    When Nortel sold or licensed and transferred its assets, it also used, transferred, distributed, or disclosed SNMP Software identified on the other Unaccounted For Schedules that it had used or were otherwise embedded within the assets.

176.    When Nortel sold or licensed and transferred its assets to Hitachi, Nortel also used, transferred, distributed, or disclosed SNMP Software identified on Schedule 66 to Hitachi without the authorization or consent of SNMP Research.

177.    Nortel used, transferred, distributed, or disclosed SNMP Software identified on the Unaccounted For Schedules to purchasers in post-filing asset sales without the authorization or consent of SNMP Research.

178.    Nortel knew that it was transferring, distributing, and disclosing the SNMP Software identified on the Unaccounted For Schedules to purchasers in post-filing asset sales without the authorization or consent of SNMP Research.

179.    Nortel's unauthorized and unconsented use, transfer, distribution, and disclosure of SNMP Software violated the Nortel License, infringed upon SNMP Research's exclusive rights under the Copyright Statutes, and misappropriated SNMP Research's trade secrets.

### H. Copyright Infringement Due to Nortel's Use of Unlicensed Products

180.    At all relevant times, SNMP Research has been the owner of valid copyrights to the SNMP Software.

181.    SNMP Research has registered its copyrights to the SNMP Software with the United States Copyright Office.

182.    Nortel used, copied, transferred, sold, licensed, reproduced, distributed, or otherwise profited from the Unlicensed Products because the Unlicensed Products were embedded within the Nortel products that Nortel sold, licensed, or distributed in the ordinary course of its post-filing business operations.  Additionally, licensed Specified Entities transferred SNMP Research source code to Other Nortel Entities which were not licensed, thereby exceeding the scope of rights granted to the licensed Specified Entity and in violation of the Specified Entity's obligations under the Nortel License.  The Other Nortel Entities used, copied, transferred, sold, licensed, reproduced, and distributed Unlicensed Products in violation of the Copyright Statutes.

183.    Nortel's post-filing use, copy, transfer, sale, licensing, reproduction, and distribution of each Unlicensed Product continued until Nortel transferred such Unlicensed Product to a buyer

in a post-filing asset sale or until Nortel's obligations under transition services agreements with the asset buyers ended.

184.    Nortel has obtained significant financial benefit from its post-filing unlicensed use, sale, reproduction, and distribution of the Unlicensed Products.

185.    Nortel's post-filing infringement of SNMP Research's copyrights through the unlicensed use, copy, sale, licensing, reproduction, and distribution of the Unlicensed Products was willful.

186.    The foregoing constitute infringements of SNMP Research's copyrights in the Unlicensed Products for which Nortel and Other Nortel Entities are liable to SNMP Research under the Copyright Statutes.

187.    Furthermore, Nortel is liable for damages to SNMP Research for inducing, procuring and/or contributing to the copyright infringement of Other Nortel Entities.

188.    As a direct and proximate result of Nortel's repeated post-filing infringements set forth herein, SNMP Research has suffered damage for which Nortel is liable under the Copyright Statutes because SNMP Research has not been paid royalties, license fees, or maintenance fees for the post-filing use of the Unlicensed Products to which it was entitled.

189.    SNMP Research is also entitled to recover, pursuant to the Copyright Statutes, Nortel's profits that are attributable to its repeated infringements as set forth herein.

## I.    Copyright Infringement Due to Nortel's Transfers of SNMP Software in the Post-Filing Asset Sales

190.    When Nortel sold its CDMA and LTE Business assets to Ericsson, Nortel used, copied, transferred, sold, licensed, reproduced, distributed, or otherwise profited from SNMP Research's

copyrighted work without the authorization or consent of SNMP Research and in violation of SNMP Research's exclusive rights under the Copyright Statutes.

191.    Nortel's gross revenues from the sale of its CDMA and LTE Business assets to Ericsson were $1.13 billion USD.

192.    When Nortel sold its Enterprise Solutions Business assets to Avaya, Nortel used, copied, transferred, sold, licensed, reproduced, distributed, or otherwise profited from SNMP Research's copyrighted work without the authorization or consent of SNMP Research and in violation of SNMP Research's exclusive rights under the Copyright Statutes.

193.    Nortel's gross revenues from the sale of its Enterprise Solutions Business assets to Avaya were $900 million USD.

194.    When Nortel sold its Carrier Voice-Over IP and Applications Business assets to Genband, Nortel used, copied, transferred, sold, licensed, reproduced, distributed, or otherwise profited from SNMP Research's copyrighted work without the authorization or consent of SNMP Research and in violation of SNMP Research's exclusive rights under the Copyright Statutes.

195.    Nortel's gross revenues from the sale of its Carrier Voice- Over IP and Applications Business assets to Genband were $157.7 million USD.

196.    When Nortel sold or transferred Other Nortel Assets to Other Asset Purchasers, Nortel used, copied, transferred, sold, licensed, reproduced, distributed, or otherwise profited from SNMP Research's copyrighted work without the authorization or consent of SNMP Research and in violation of SNMP Research's exclusive rights under the Copyright Statutes.

197.    Nortel's gross revenues from the sales of Other Nortel Assets to Other Asset Purchasers were $848.7 million USD.

198.    Nortel's post-filing infringement of SNMP Research's copyrights when Nortel sold, licensed, or transferred (i) its Layer 4-7 Application Delivery Business assets to Radware, (ii) its CDMA and LTE Business to Ericsson, (iii) its Enterprise Solutions Business assets to Avaya, (iv) its Carrier Voice-Over IP and Applications Business assets to Genband, and (v) Other Nortel Assets to Other Asset Purchasers was willful.

199.    The foregoing constitute infringements of SNMP's copyrights in the SNMP Software for which Nortel is liable to SNMP Research under the Copyright Statutes.

200.    As a direct and proximate result of Nortel's repeated infringements set forth herein, SNMP Research has suffered damage for which Nortel is liable under the Copyright Statutes.

201.    Pursuant to the Copyright Statutes, SNMP Research is further entitled to recover Nortel's profits that are attributable to its repeated infringements as set forth herein.

202.    The sellers under the transactions described in paragraphs 190 to 198 above included entities other than the Debtors (the "**Other Nortel Sellers**").

203.    Some or all of the Other Nortel Sellers infringed SNMP Research's copyrights when the transfers described above were made.

204.    Nortel is liable for damages to SNMP Research for inducing, procuring and/or contributing to the copyright infringement by the Other Nortel Sellers.

## J. Copyright Infringement Due to Defendant Avaya's Use and Transfer of SNMP Products in the Ordinary Course of Business

205.    Avaya improperly obtained the following SNMP Software from Nortel in the post-filing asset sale discussed above in paragraphs 129 - 151:

(a)    Licensed Products identified on Schedule 51A;

(b)    Licensed Products identified on Schedule 74A;

(c)    Licensed Products subject to the license agreement between SNMPRI and Periphonics Corporation, a company that Nortel acquired;

(d)    Licensed Products identified on Schedule 63A;

(e)    Licensed Products identified on Schedule 65A;

(f)    Licensed Products identified on Schedule 68A;

(g)    Licensed Products identified on Schedule 70A;

(h)    Unlicensed Products SNMP Bay SNMP Software;

(i)    Unlicensed Products in the Alteon SMC2450; and

(j)    Unlicensed Products in the Alteon PP8660.

206.    On March 3, 2010, SNMPRI executed an Accession Agreement with Avaya that listed only the following Licensed Products because Nortel had previously represented to SNMP Research that only the following SNMP Software had been transferred to Avaya:

57

(a)    Licensed Products on Schedule 51A;

(b)    Licensed Products on Schedule 74A; and

(c)    Licensed Products subject to the license agreement between SNMPRI and Periphonics Corporation, a company that Nortel acquired.

207.    The Accession Agreement was due to expire on June 30, 2010, unless extended in writing by mutual consent of both Avaya and SNMPRI.

208.    On or around June 21, 2010, Avaya represented to SNMP Research that Avaya was not using, possessing or distributing the SNMP Bay SNMP Software, and that the only Avaya products transferred from Nortel that used SNMP Software were listed on the Accession Agreement.

209.    Based on Avaya's representation on June 21, 2010, SNMPRI extended the Accession Agreement.

210.    Seven times since the Accession Agreement was originally signed on March 3, 2010, SNMP Research agreed in good faith to extend the term of the Accession Agreement based on Avaya's repeated representations that it intended to execute a license for the SNMP Software that it was possessing and using.

211.    On several occasions, Avaya represented to SNMP Research that the BCM products that Avaya acquired from Nortel did not contain SNMP Software.

212.    On January 8, 2011, SNMP Research provided Avaya with evidence that the BCM products were using SNMP Software prior to Avaya's acquisition of the BCM products.

213.   On January 11, 2011, Avaya represented to SNMP Research that the BCM products do contain SNMP Software.

214.   The final extension of the Accession Agreement expired on February 15, 2011, and according to the terms of the Accession Agreement, Avaya was required to certify the destruction of all intellectual property belonging to SNMP Research that was obtained from any Nortel entity.

215.   At the time it acquired SNMP Research's Products from Nortel, Avaya knew or should have known Nortel had a confidentiality obligation to keep this trade secret information secret. Throughout the negotiation process with SNMP Research, Avaya learned that the SNMP Research trade secrets it possessed were given to Nortel under circumstances which required Nortel to keep this trade secret information secret.

216.   It is obvious that Avaya knew the SNMP Software it possessed was given to Nortel under circumstances which required Nortel to keep this trade secret information for multiple reasons. First, Avaya has a long-term business relationship with SNMP Research.  Avaya has entered numerous licensing agreements with SNMPRI and each of those license agreements contain confidentiality obligations.  Thus, Avaya was familiar with SNMPRI's business practices and knew it would not provide SNMP Software unless that SNMP Software was subject to a confidentiality obligation.

217.   Further, as set forth above, the SNMP Software which was wrongfully provided to Avaya had embedded notices which put Avaya on notice the SNMP Software it received was confidential and protected by trade secret law.

218.    Avaya continued to possess, use, distribute, or sell the Licensed Products identified in paragraph 206 after the Accession Agreement had expired, and failed to certify that the Licensed Products identified in paragraph 205 had been destroyed, in violation of the Accession Agreement.

219.    Avaya has possessed, used, or distributed the SNMP Software identified in paragraph 205 without paying any royalties, license fees, or maintenance fees to SNMP Research for such possession, use, or distribution.

220.    Avaya knew or should have known that it was possessing, using, distributing, disclosing, or transferring the SNMP Software identified in paragraph 205 in the ordinary course of its business and without SNMP Research's authorization or consent because Avaya previously searched its SNMP Software to identify the SNMP Software that it had obtained from Nortel and because Avaya had not executed a license agreement with SNMP Research for the SNMP Software identified in paragraph 205.

221.    Avaya knew that its representation to SNMP Research on or around June 21, 2010, that it did not possess SNMP Software other than the SNMP Software listed on the Accession Agreement was false when made and was designed to induce SNMP Research to sign an extension to the Accession Agreement.

222.    Avaya's unauthorized possession, use, transfer, distribution, and disclosure of the SNMP Software identified in paragraph 205 infringed upon SNMP's exclusive rights under the Copyright Statutes and misappropriated SNMP's trade secrets.

223.    Since Avaya acquired the SNMP Software identified in paragraph 205 in December, 2009, Avaya has used, copied, transferred, sold, licensed, reproduced, distributed, or otherwise profited from SNMP Research's copyrighted work without the authorization or consent of SNMP Research and in violation of SNMP Research's exclusive rights under the Copyright Statutes, except to the extent SNMP Research's copyrighted work was licensed under the Accession Agreement.

224.    The foregoing constitutes infringement of SNMP Research's copyrights for which Avaya is liable to SNMP Research under the Copyright Statutes.

225.    Avaya has derived profit from its infringement of SNMP Research's copyrights.

226.    As a direct and proximate result of Avaya's infringement, SNMP Research has suffered damage for which Avaya is liable under the Copyright Statutes.

227.    Pursuant to the Copyright Statutes, SNMP Research is further entitled to recover Avaya's profits that are attributable to its infringement as set forth herein.

228.    Nortel is liable for damages to SNMP Research for inducing, procuring and/or contributing to the copyright infringement by Avaya.

## K. Misappropriation of Trade Secrets Due to Nortel's Post-Filing Use of the Unlicensed Products

229.    The SNMP Software derives independent economic value from the fact that the SNMP Software is not generally known to the public and cannot be readily ascertained, used, or disclosed through proper means by those who could obtain economic value from their use or disclosure.

230.    Since the SNMP Software was created, SNMP Research has taken reasonable steps to maintain the secrecy of the SNMP Software including, requiring all employees to execute confidentiality and nondisclosure agreements, placing confidentiality and nondisclosure provisions in all license and sublicenses for the SNMP Software, placing copyright and confidentiality notices in every source file, and refusing to allow any third parties to ascertain, access, or use the SNMP Software without a license or sublicense that included confidentiality and nondisclosure provisions.

231.    The SNMP Software is SNMP Research's "trade secret" as defined by the Delaware Uniform Trade Secrets Act, title 6, section 2001(4) of the Delaware Code and/or other applicable law.

232.    After the CCAA Filing Date, Nortel used SNMP Research's trade secrets without SNMP Research's express or implied consent because the Unlicensed Products were embedded within the Nortel products that Nortel sold, licensed, or distributed in the ordinary course of its post-filing business operations.

233.    Under provisions of the Nortel License, Nortel had a duty to not use the SNMP Software in the Unlicensed Products.

234.    Nortel's use of the SNMP Software in the Unlicensed Products violated the confidentiality and license rights of the Nortel License.

235.    Nortel's post-filing use of SNMP Research's trade secrets continued until Nortel transferred each Unlicensed Product to a buyer in a post-filing asset sale or until Nortel's obligations under transition services agreements with the asset buyers ended.

236.    At the time of Nortel's post-filing use of the Unlicensed Products, Nortel knew that it did not have SNMPRI's express or implied consent to use the Unlicensed Products.

237.    Nortel acquired access to the Unlicensed Products by representing to SNMP Research that it was not using the Unlicensed Products.

238.    At the time of Nortel's post-filing use of the Unlicensed Products, Nortel knew or had reason to know that its knowledge of the Unlicensed Products was acquired through improper means because it did not have a license to possess, use, distribute, or disclose the Unlicensed Products and because of the representations that Nortel was not using the Unlicensed Products.

239.    Nortel has received significant financial benefit from its post-filing unlicensed use of SNMP Research's trade secrets.

240.    The foregoing constitute misappropriations of SNMP Research's trade secrets for which Nortel is liable under the Delaware Uniform Trade Secrets Act, title 6, section 2001, *et seq.* of the Delaware Code and/or other applicable law.

241.    As a direct and proximate result of Nortel's misappropriations of SNMP Research's trade secrets, SNMP Research has suffered damage for which Nortel is liable.

242.    As a direct and proximate result of Nortel's misappropriations of SNMP Research's trade secrets, Nortel has been unjustly enriched.

243.    Nortel's misappropriations were willful and malicious for which Nortel is liable to SNMP Research for exemplary damages up to twice the amount of SNMP Research's actual damages

and SNMP Research's reasonable attorneys' fees pursuant to title 6, sections 2003 to 2004 of the Delaware Code.

### L. Misappropriation of Trade Secrets Due to Nortel's Post-Filing Uses and Disclosures of SNMP Software in the Post-Filing Asset Sales

244.    SNMP Research granted Nortel a nonexclusive, limited license to use the Licensed Products subject to the use, confidentiality, and nondisclosure provisions of the Nortel License.

245.    Under the provisions of the Nortel License, Nortel had a duty to keep the Licensed Products confidential and protect them from disclosure to any third parties.

246.    Under the provisions of the Nortel License, Nortel was prohibited from disclosing, distributing, or using the Licensed Products outside the scope of the Nortel License without SNMPRI's prior consent.

247.    When Nortel sold its CDMA and LTE Business assets to Ericsson, Nortel used or disclosed to Ericsson SNMP Research's trade secrets without the authorization or consent of SNMP Research.

248.    When Nortel used or disclosed SNMP Research's trade secrets in the course of the CDMA and LTE Business asset sale to Ericsson, Nortel knew or had reason to know that it had acquired the trade secrets that it used or disclosed under circumstances giving rise to a duty to maintain their secrecy or limit their use because the Nortel License contained confidentiality and nondisclosure provisions.

249.    When Nortel sold its Enterprise Solutions Business assets to Avaya, Nortel used or disclosed SNMP Research's trade secrets to Avaya without the authorization or consent of SNMP Research.

250.    When Nortel used or disclosed SNMP Research's trade secrets in the course of the Enterprise Solutions Business asset sale to Avaya, Nortel knew or had reason to know that it had acquired the trade secrets that it used or disclosed under circumstances giving rise to a duty to maintain their secrecy or limit their use because the Nortel License contained confidentiality and nondisclosure provisions.

251.    When Nortel used or disclosed SNMP Research's trade secrets in the course of the Enterprise Solutions Business asset sale to Avaya, Nortel also knew or had reason to know that its knowledge of the Unlicensed Products was acquired through improper means.

252.    When Nortel sold its Carrier Voice-Over IP and Applications Business assets to Genband, Nortel used or disclosed SNMP Research's trade secrets to Genband without the authorization or consent of SNMP Research.

253.    When Nortel used or disclosed SNMP Research's trade secrets in the course of the Carrier Voice-Over IP and Applications Business asset sale to Genband, Nortel knew or had reason to know that it had acquired the trade secrets that it used or disclosed under circumstances giving rise to a duty to maintain their secrecy or limit their use because the Nortel License contained confidentiality and nondisclosure provisions.

254.    When Nortel used or disclosed SNMP Research's trade secrets in the course of the Carrier Voice-Over IP and Applications Business asset sale to Genband, Nortel also knew or had

reason to know that its knowledge of the Unlicensed Products was acquired through improper means.

255.    When Nortel sold or transferred Other Nortel Assets to Other Asset Purchasers, Nortel used or disclosed SNMP Research's trade secrets to the Other Asset Purchasers without the authorization or consent of SNMP Research.

256.    When Nortel sold or transferred SNMP Research's trade secrets in the course of the post-filing sales of the Other Nortel Assets to the Other Asset Purchasers, Nortel knew or had reason to know that it had acquired SNMP Research's trade secrets that Nortel used or disclosed under circumstances giving rise to a duty to maintain their secrecy or limit their use because the Nortel License contained confidentiality and nondisclosure provisions.

257.    When Nortel used or disclosed SNMP Research's trade secrets in the course of the Other Nortel Assets sales to the Other Asset Purchasers, Nortel also knew or had reason to know that its knowledge of the Unlicensed Products was acquired through improper means.

258.    When Nortel used or disclosed SNMP Research's trade secrets in the course of Nortel's performance under transition services agreements entered into as a result of the asset sales, Nortel also knew or had reason to know that Nortel used or disclosed under circumstances giving rise to a duty to maintain their secrecy or limit their use because the Nortel License contained confidentiality and nondisclosure provisions.

259.    Nortel has received significant financial benefit from its post-filing use or disclosure of SNMP Research's trade secrets.

260.   The foregoing constitute misappropriations of SNMP Research's trade secrets for which Nortel is liable under the Delaware Uniform Trade Secrets Act, title 6, section 2001, *et seq.* of the Delaware Code and/or other applicable law.

261.   As a direct and proximate result of Nortel's misappropriations of SNMP Research's trade secrets, SNMP Research has suffered damage for which Nortel is liable.

262.   As a direct and proximate result of Nortel's misappropriations of SNMP Research's trade secrets, Nortel has been unjustly enriched.

## M. Breach of Contract by the Debtors

263.   On December 23, 1999, SNMPRI and Nortel Networks Corporation executed the Nortel License.

264.   The Nortel License is an enforceable contract.

265.   Specified Entities have failed to pay to SNMPRI some of the royalties due and owing for the Licensed Products that the Specified Entity used, transferred, disclosed, sold, or licensed in the ordinary course of its post-filing business.

266.   The Specified Entities have failed to perform their duty under the Nortel License to maintain the confidentiality and secrecy of the Licensed Products and to not disclose the Licensed Products to third parties without SNMPRI's prior consent because Nortel disclosed the Licensed Products to Ericsson, Radware, Avaya, Genband, and the Other Asset Purchasers in the course of the post-filing sales and as a result of Nortel's obligations under transition services agreements.   Additionally, the Specified Entities have failed to perform under the Nortel

Licenses by transferring SNMP Research's source code to Other Nortel Entities outside the scope of their rights under the terms of the Nortel License.

267.     The Specified Entities have failed to perform their duty under the Nortel License to maintain the confidentiality and secrecy of the Licensed Products and to not disclose the Licensed Products to Other Nortel Entities that were not the Specified Entity because Nortel disclosed the Licensed Products to Other Nortel Entities in the course of Nortel's post-filing business.  Further, the Specified Entities breached their obligations by entering into transition services agreements which disclosed SNMP Research's intellectual property and trade secrets.

268.     The Specified Entities have failed to perform their obligation to refrain from transferring the Licensed Products to third parties without SNMPRI's prior consent by transferring the Licensed Products to Ericsson, Radware, Avaya, Genband, and the Other Asset Purchasers in the course of the post-filing sales.

269.     The Specified Entities have failed to perform their duty to use the Licensed Products only within the scope of the Nortel License and its accompanying Schedules.

270.     Nortel's failure to protect the confidentiality of the SNMP Software and not disclose the SNMP Software to third parties or Other Nortel Entities without SNMPRI's prior consent; its transfer of Licensed Products to Ericsson, Radware, Avaya, Genband, and the Other Asset Purchasers without SNMPRI's prior consent; and its use of Licensed Products beyond the scope of the Nortel License constitute a material breach of the Nortel License.

68

271.    As a direct and proximate result of Nortel's acts and omissions, SNMPRI has been

damaged, and Nortel is liable to SNMPRI for compensatory and incidental damages.

**CHAITONS LLP**
5000 Yonge Street, 10th Floor
Toronto, Ontario  M2N 7E9

**Harvey G. Chaiton (LSUC #21592F)**
Tel: 416-218-1129
Fax: 416-218-1849
Email:      harvey@chaitons.com

**George Benchetrit (LSUC #34163H)**
Tel: (416) 218-1141
Fax: (416) 218-1841
E-mail:  george@chaitons.com

**Lawyers for SNMP Research International,
Inc. and SNMP Research, Inc.**

69

## SCHEDULE "A"

| Company | Product | Registration Date | Registration Number |
|---|---|---|---|
| SNMP Research, Inc. | NETMON, Associated Applications, and Libraries Version 15 | January 25, 2011 | TXu 1-706-718 |
| SNMP Research, Inc. | NETMON, Associated Applications, and Libraries Version 15.2 | July 20, 2011 | TXu 1-772-248 |
| SNMP Research, Inc. | NETMON, Associated Applications, and Libraries Version 15.3 | July 20, 2011 | TXu 1-772-250 |
| SNMP Research, Inc. | NETMON, Associated Applications, and Libraries Version 15.4 | February 3, 2011 | TXu 1-738-956 |
| SNMP Research, Inc. | NETMON, Associated Applications, and Libraries Version 16 | February 3, 2011 | TXu 1-707-158 |
| SNMP Research, Inc. | NETMON, Associated Applications, and Libraries Version 16.2 | February 3, 2011 | TXu 1-738-954 |
| SNMP Research, Inc. | NETMON, Associated Applications, and Libraries Version 17 | February 3, 2011 | TXu 1-707-157 |
| SNMP Research, Inc. | NETMON, Associated Applications, and Libraries Version 17.2 | February 3, 2011 | TXu 1-738-958 |
| SNMP Research International, Inc. | SNMP Research Collection: Source Code and Documentation Version 15 | February 17, 2011 | TXu 1-710-420 |
| SNMP Research International, Inc. | SNMP Research Collection: Source Code and Documentation Version 15.2 | February 17, 2011 | TXu 1-710-462 |
| SNMP Research International, Inc. | SNMP Research Collection: Source Code and Documentation Version 15.3 | February 17, 2011 | TXu 1-710-430 |
| SNMP Research International, Inc. | SNMP Research Collection: Source Code and Documentation Version 15.4 | February 17, 2011 | TXu 1-710-425 |

2

*70*

| Company | Product | Registration Date | Registration Number |
|---|---|---|---|
| SNMP Research International, Inc. | SNMP Research Collection: Source Code and Documentation Version 16 | February 17, 2011 | TXu 1-710-413 |
| SNMP Research International, Inc. | SNMP Research Collection: Source Code and Documentation Version 16.2 | February 8, 2011 | TXu 1-710-422 |
| SNMP Research International, Inc. | SNMP Research Collection: Source Code and Documentation Version 17 | February 8, 2011 | TXu 1-710-417 |
| SNMP Research International, Inc. | SNMP Research Collection: Source Code and Documentation Version 17.2 | February 17, 2011 | TXu 1-710-435 |

71

IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c.C.36, AS AMENDED
AND IN THE MATTER OF A PLAN OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION
APPLICATION UNDER THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c.C.36, AS AMENDED

Court File No. 09-CL-7950

**ONTARIO**
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**
Proceedings commenced at TORONTO

**STATEMENT OF CLAIM**

**CHAITONS LLP**
5000 Yonge Street, 10th Floor
Toronto, ON  M2N 7E9

**Harvey G. Chaiton** (LSUC #21592F)
Tel:    416-218-1129
Fax:    416-218-1849

**George Benchetrit** (LSUC #34163)
Tel:    (416) 218-1141
Fax:    (416) 218-1841

**Lawyers for SNMP Research
International, Inc. and SNMP Research,
Inc.**

72

**THIS IS EXHIBIT "C" TO**
**THE AFFIDAVIT OF DR. JEFFREY D. CASE**
**SWORN BEFORE ME THIS 21ST**
**DAY OF AUGUST, 2015**

STATE OF TENNESSEE
COUNTY OF ~~KNOX~~ Sevier  8/21/15

**SWORN** before me, this _21ˢᵗ_ day         )
of August, 2015                              )
                                             )
                                             )

My commission expires: _____7/7/18_____



_ _ _ /3

# EGERTON MCAFEE

Egerton McAfee Armistead & Davis, P.C.

ATTORNEYS AT LAW

CLIENT DRIVEN SINCE 1932

William W. Davis
Joe Mont McAfee
Lewis C. Foster, Jr.
Stephen A. McSween
Wm. E. McClamroch, III
Rockforde D. King
Jonathan D. Reed
Ronald T. Hill
Reuben N. Pelot, IV
Norman G. Templeton
Cheryl G. Rice

James M. Cornelius, Jr.
R. Christopher Trump
Nicholas J. Chase
P. Newman Bankston
John L. Wood
Melissa B. Carrasco
Bradley C. Sagraves
William H. Kittrell
Allison S. Jackson
Heather G. Ferguson
Jeremy D. Miller

August 18, 2015

Mr. Alan Merskey
Norton Rose Fulbright Canada LLP
Royal Bank Plaza, South Tower, Suite 3800
200 Bay Street,
Toronto, ON M5J 2Z4 Canada

Re: Nortel's Discovery

Dear Mr. Merskey,

We have been reviewing the 11,483 documents that Nortel delivered on May 22, 2015. Based on our analysis of the documents we are concerned that the process Nortel followed to produce the documents was deficient. It also appears there are key documents missing in the production.

First, over half of the documents produced appear to not be relevant to the litigation. For example, there is a lot of correspondence related to royalty payments for vendors other than SNMP Research. There are also a large number of graphics that were pulled from other documents which should not have been produced (this is discussed in more detail below).

Second, a comparison of the MD5 checksums in the production shows that approximately half of the documents are duplicates. Also, many of the documents have an abnormally high number of duplicates. For example, the following documents all have over 60 duplicates:

- NNC0239143 (79 duplicates)
- NNC0196086 (79 duplicates)
- NNC0002991 (64 duplicates)
- NNC0002934 (64 duplicates)
- NNC0006617 (64 duplicates)

Third, there are almost 2,000 documents that appear to be parts of other documents and should not have been produced at all. For example, NNC0060222 is a bar, which is a part of a PowerPoint presentation, NNC0060215. It appears, in addition to producing PowerPoint documents in native format, as we agreed, each graphic and imbedded object in the PowerPoint documents was also produced as a separate document. This has created a lot of unnecessary review and inflated the number of documents actually produced.

714111v3

*74*

Finally, there also appear to be a number of documents missing from this production. Nortel maintained a spreadsheet that documented the VOBs that were transferred to various asset purchasers. That spreadsheet has not been produced. Nortel produced some of the documents related to the asset purchases, but did not produce all of these documents. Exhibit A contains a list of the documents that are missing from the production related to the asset purchases. Also, there do not appear to be any documents produced related to the search for SNMP Research software performed as a part of the Passport sale.

In the areas for which documents have been produced it appears that not all relevant documents were produced. As you know, SNMP Research has produced a large number of emails to Nortel which contain correspondence between the parties. Nortel's production is missing most of these emails which should also be in Nortel's possession. The fact that known emails are missing suggests that other documents may also be missing.

The deficiencies discussed above (which are not exhaustive) give rise to concerns on our part as to the methodology Nortel used to select the documents produced. Please let us know exactly what Nortel did in order to conduct the necessary searches and select documents to be included in its productions in the Affidavit of Documents delivered on May 22, 2015. To the extent a supplement can be provided that corrects these problems we ask that Nortel's production be supplemented immediately.

Because SNMP Research has not been able to determine the Nortel products associated with the 88 VOBS identified as containing SNMP Research software, it is likely there are documents related to additional Nortel products that are relevant to SNMP Research's claims. As soon as the search is completed SNMP Research will request such documents.


Sincerely,

**EGERTON, McAFEE, ARMISTEAD
& DAVIS, P.C.**

By: John L. Wood
John L. Wood

EXHIBIT A

<u>Radware</u>
Exhibit E – Trademark License Agreement
Exhibit G – Contract Manufacturer Inventory Agreement
Exhibit H – Patent Assignment Agreement
Exhibit I – Trademark Assignment Agreement
Exhibit M – Sellers Closing Certificate
Exhibit N – Buyers Closing Certificate
Exhibit O – Additional Employee Related Provisions

<u>Avaya</u>
Exhibit E – Contract Manufacturing Inventory Agreements Term Sheet
Exhibit F – Escrow Agreement
Exhibit H – Knowledge of the Purchaser
Exhibit I – Letter of Credit
Exhibit J – Loaned Employee Agreement
Exhibit K – Mandatory Antitrust Approvals – Relevant Antitrust Jurisdictions / Authorities
Exhibit L – Interdependencies
Exhibit M – Reserved
Exhibit N – Real Estate Agreements
Exhibit O – Trademark License Agreement
Exhibit 5.1(a) – Forms of U.S. Bidding Procedures Order and U.S. Sale Order
Exhibit 5.2.1 – Form of Canadian Sales Process Order
Exhibit 5.4(d) – Form of Notice
Exhibit 5.7 – Certain Communications
Exhibit 5.28(g) – Terms and Conditions of Lease A Sublease and Replacement Campus Consolidation
Exhibit 5.32(c) – Consolidation of C Campus

<u>Ciena</u>
Exhibit A – Other Sellers
Exhibit B – EMEA Sellers
Exhibit C – Canadian Debtors; U.S. Debtors; Israeli Company; Non-Debtor Sellers; EMEA Debtors
Exhibit D – Original EMEA Asset Sale Agreement
Exhibit D-1 – Deed of Amendment
Exhibit E – EMEA Amendment Agreement
Exhibit G – Knowledge of the Purchaser
Exhibit I – Loaned Employee Agreement
Exhibit L-1 – Lab 10 Lease Agreement
Exhibit L-2 – Carling Property Non-Disturbance Agreements
Exhibit P – Trademark License Agreement
Exhibit V – Form of Assignment of Patent Rights
Exhibit W – Form of Assignment of Trademark Rights
Exhibit X – Restricted Seller Revenue
Exhibit Y – Real Estate Terms and Conditions
Exhibit Z – Flextronics Back-to-Back Supply Agreement Term Sheet
Exhibit AA – Deposit Escrow Agreement
Exhibit 1.1 – Contract Manufacturing Inventory Agreements (Term Sheet)
Exhibit 2.1.1 – Sellers and Purchaser

714111v3

Doc#3418224v2

Exhibit 2.2.1(b)(ii) – Related Share Adjustment Table
Exhibit 2.2.1(b)(iii) – Conversion Rate Table
Exhibit 5.2.1 – Form of Canadian Sales Process Order
Exhibit 5.9 – Purchaser's Representatives for Interim Covenants Consents
Exhibit 5.12 – Purchaser's Representatives for Sellers Disclosure Schedule and Certain Information
Updates

Genband
Exhibit D – EMEA Asset Sale Agreement
Exhibit E – Adjusted Net Working Capital Statement
Exhibit F – Contract Manufacturing Inventory Agreements Term Sheet
Exhibit I – Knowledge of the Purchaser
Exhibit J – Form of Loaned Employee Agreement
Exhibit K – Mandatory Antitrust Approvals – Relevant Antitrust Authorities
Exhibit L – Other Seller Revenue
Exhibit M – Real Estate Terms and Conditions
Exhibit N – Form of Trademark License Agreement
Exhibit 3.3.(a) – Commitment Letter
Exhibit 5.2.2 – Form of Canadian Approval and Vesting Order
Exhibit 5.4(a) – Form of Letter
Exhibit 5.4(c) – Form of Notice to Microsoft Corporation
Exhibit 5.4(d) – Cross-Licenses for Spin Out
Exhibit 5.7 – Permitted Disclosures and Announcements
Exhibit 5.15(c) – Cross-Licenses for Assignment
Exhibit 5.23 – Interdependencies in the CVAS Business

Hitachi
Exhibit A – EMEA Debtors

Ericsson – CMA & LTE Assets
Exhibit A – Other Sellers
Exhibit B – Canadian Debtors; U.S. Debtors; EMEA Debtors; Non-Debtor Sellers
Exhibit C – Adjusted Net Working Capital Statement
Exhibit D – Calculation Principles
Exhibit F – Flextronics Back-to-Back Agreement Term Sheet
Exhibit G – Escrow Agreement
Exhibit H – GDNT Agreements Term Sheet
Exhibit J – China Asset Sale Agreement
Exhibit K – Transferring Employee Agreement
Exhibit L – Manufacturing and Supply Regarding Dual Use Platforms Agreement
Exhibit M – Nortel Accounting Principles
Exhibit N – Specified Seller Encumbrances
Exhibit O – Real Estate Agreements Term Sheet
Exhibit P – Trademark License Agreement
Exhibit R – Software License and Development Agreement for Common Material Platform Software
Exhibit S – Knowledge of the Sellers
Exhibit 5.1 – Form of U.S. Sale Order
Exhibit 5.2.1 – Form of Canadian Approval and Vesting Order

*/7*

**Ericcson (& Kapsch) – GSM/GSM-R Assets**
Exhibit E – Contract Manufacturing Inventory Agreement Term Sheet
Exhibit G – Real Estate Agreements Term Sheet
Exhibit H – Loaned Employee Agreement
Exhibit I – Antitrust Approvals – Relevant Antitrust Jurisdictions/Authorities
Exhibit J – Subcontract Agreement
Exhibit K – Trademark License Agreement
Exhibit M – Dual Use Platform Agreement
Exhibit N – Development and Supply Agreement
Exhibit O – Adjusted Net Working Capital Statement
Exhibit P – Contract Manufacturing Agreements Term Sheet
Exhibit Q – GDNT Back-to-Back Agreement Term Sheet
Exhibit R – Purchaser Supply Agreement
Exhibit 5.9 – Purchaser's Representatives for Interim Covenants Consent

**Ericcsson – Multi Service Switch Business Assets**
Exhibit A – Other Sellers
Exhibit B – EMEA Sellers
Exhibit C – Canadian Debtors; U.S. Debtors; Non-Debtor Sellers
Exhibit D – EMEA Asset Sale Agreement
Exhibit E – Contract Manufacturing Inventory Agreements Term Sheet
Exhibit F – Escrow Agreement
Exhibit J – Mandatory Regulatory Approvals – Relevant Antitrust Jurisdictions/Authorities
Exhibit K – Form of Sublease
Exhibit L – Transitional Trademark License Agreement
Exhibit 2.1.7(d) – Cure Costs and Related Agreements
Exhibit 5.1.1(b) – Form of U.S. Sale Order
Exhibit 5.2.1 – Form of Canadian Approval and Vesting Order
Exhibit 5.4(a) – Form of Letter to Suppliers
Exhibit 5.7 – Certain Communications
Exhibit 5.16 – Form of Real Estate License
Exhibit 5.25 – Transition Services

*78*

**THIS IS EXHIBIT "D" TO**
**THE AFFIDAVIT OF DR. JEFFREY D. CASE**
**SWORN BEFORE ME THIS 21ST**
**DAY OF AUGUST, 2015**

STATE OF TENNESSEE *Joe 8/21/15*
COUNTY OF ~~KNOX~~ *Sevier*

**SWORN** before me, this _21st_ day                   )
of August, 2015                                        )     _____
                                                       )
                                                       )

My commission expires: ____*7/7/18*____



KEION RAD
STATE
OF
TENNESSEE
NOTARY
PUBLIC
SEVIER COUNTY



*/9*

File No. 09-CL-7950

**ONTARIO**
**SUPERIOR COURT OF JUSTICE**
**COMMERCIAL LIST**

| | | |
|---|---|---|
| THE HONOURABLE MR. JUSTICE | ) | *TUESDAY* , THE *5TH* DAY OF |
| | ) | ~~MAY~~ |
| NEWBOULD | ) | ~~APRIL~~, 2015 |
| | ) | |

*25*

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,**
**R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,**
**NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS**
**INTERNATIONAL CORPORATION AND NORTEL NETWORKS**
**TECHNOLOGY CORPORATION**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,**
**R.S.C. 1985, c. C-36, AS AMENDED**

**SEALING ORDER**
**(SNMPRI – Electronic Search Protocol)**

**THIS MOTION**, made by Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation (collectively, the "**Canadian Debtors**") jointly with Ernst & Young Inc. in its capacity as monitor (the "**Monitor**") of the Canadian Debtors for the relief set out in the Amended Notice of Motion dated February 3, 2015, was heard on February 27, 2015 at 330 University Avenue, Toronto, Ontario.

**ON READING** the One Hundred and Twelfth Report of the Monitor dated February 3, 2015, the Supplement to the One Hundred and Twelfth Report of the Monitor dated February 24, 2015 ("**Supplemental Monitor's Report**"), the Affidavit of Dr. Jeffrey D. Case sworn February

- 2 -

20, 2015 and the Exhibits thereto and on hearing the submissions of counsel for the Monitor, the Canadian Debtors, SNMP Research International, Inc. and SNMP Research, Inc. (collectively, "**SNMPRI**"), counsel for Nortel Networks Inc. and certain of its U.S. subsidiaries and affiliates and counsel for Avaya Inc., no one appearing for any other person on the service list although duly served as appears from the affidavits of service of Saeed Teebi sworn February 25, 2015, and Christopher G. Armstrong sworn February 4, 2015 and February 25, 2015.

    **AND ON READING** the mediation report of former Justice Colin Campbell with respect to these matters.

    **AND ON BEING** advised that the Canadian Debtors, the Monitor and SNMPRI consent to this Order.

1.    **THIS COURT ORDERS** that the Electronic Search Protocol attached as Schedule 1 hereto (the "**Electronic Search Protocol**") be and is hereby approved.

2.    **THIS COURT ORDERS** that for the purposes of this Order computer code, metadata and any information related thereto stored in the computer systems of the Canadian Debtors shall be considered "**Confidential Information**".

3.    **THIS COURT ORDERS** that documents containing Confidential Information ("**Confidential Records**") which a party proposes to file shall be filed under seal.

4.    **THIS COURT ORDERS** that Confidential Records and Confidential Information shall be provided to: (i) Barbara Frederiksen-Cross, Alan Purdy, Kevin Chisholm and Steven Waldbusser, all of whom have been retained by Egerton McAfee Armistead & Davis, P.C. on behalf of SNMP Research International, Inc. and SNMP Research, Inc. (collectively, "**SNMPRI**") in this proceeding (the "**SNMPRI Searchers**") solely as provided for in, and subject to the terms of, the Electronic Search Protocol; and (ii) SNMPRI solely as provided for in, and subject to the terms of, the Electronic Search Protocol.

*81*

- 3 -

5.    **THIS COURT ORDERS** that the Confidential Records and Confidential Information shall be used by SNMPRI and the SNMPRI Searchers solely as contemplated by the Electronic Search Protocol.

6.    **THIS COURT ORDERS** that SNMPRI and the SNMPRI Searchers shall hold the Confidential Information and Confidential Records strictly confidential and shall not disclose the Confidential Information or Confidential Records to any other Person (as defined below).

7.    **THIS COURT ORDERS** that the Confidential Records and Confidential Information shall not be provided to, accessed by or used by any Person (excluding, for the avoidance of doubt, the Canadian Debtors and the Monitor) except as contemplated by the Electronic Search Protocol.

8.    **THIS COURT ORDERS** that notwithstanding any contractual or other obligation, neither the Canadian Debtors nor the Monitor shall be required to give notice to any Person, nor obtain the consent of any Person, with respect to SNMPRI and the SNMPRI Searchers receiving or being given access to the Confidential Information and Confidential Records.

9.    **THIS COURT ORDERS** that the Canadian Debtors, the Monitor, SNMPRI and the SNMPRI Searchers and their respective current and former affiliates, shareholders, directors, officers, employees, agents, contractors, trustees, beneficiaries, lawyers, personal representatives and authorized representatives shall not incur any liability to any individual, sole proprietorship, limited or unlimited liability corporation, partnership, unincorporated association, unincorporated syndicate, unincorporated organization, body corporate, joint venture, trust, pension fund, union, governmental authority (whether federal, provincial, municipal or otherwise) or natural person including in such person's capacity as trustee, heir, beneficiary, executor, administrator or other legal representative (each, a **"Person"**) arising from or otherwise relating to SNMPRI and the SNMPRI Searchers receiving or being given access to Confidential Information and Confidential Records or the conduct of the search contemplated by the Electronic Search Protocol. For the

82

- 4 -

avoidance of doubt, nothing in this paragraph 9 shall be construed so as to relieve SNMPRI or the SNMPRI Searchers from any liability associated with any failure to comply with the terms of this Order or the Electronic Search Protocol.

10.     **THIS COURT ORDERS** if any information subject to a claim of solicitor client privilege, work product, or any other applicable privilege or protection from disclosure (each a **"Privilege"**) is disclosed or produced to any party, such disclosure or production shall not constitute or be deemed a waiver of any claim of a Privilege that any party would otherwise be entitled to assert in this proceeding or any other proceeding, either with respect to the disclosed or produced information or any other documents, communications, or information concerning the same subject matter. The production of information subject to a claim of Privilege is without prejudice to the right of a party to seek the return or destruction of any document as to which a claim of Privilege is later asserted.

**MISCELLANEOUS**

11.     **THIS COURT ORDERS** that this Court shall retain jurisdiction and venue for the purposes of any dispute arising out of or relating to this Order.

ENTERED AT / INSCRIT À TORONTO
ON / BOOK NO:
LE / DANS LE REGISTRE NO.:

MAY - 5 2015

83

**SCHEDULE 1**

**ELECTRONIC SEARCH PROTOCOL**

**Attached**

84

Court File No. 09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE - COMMERCIAL LIST**

IN THE MATTER OF THE ***COMPANIES' CREDITORS ARRANGEMENT ACT***, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

APPLICATION UNDER THE ***COMPANIES' CREDITORS ARRANGEMENT ACT***, R.S.C. 1985, c. C-36, AS AMENDED

ELECTRONIC SEARCH PROTOCOL
(SNMPRI – Mediated before the Honourable C. Campbell March 10, 12, 13, April 2, 2015)[1]

On March 13, 2015, the parties attended before the Honourable Colin Campbell, pursuant to the order of Mr Justice Newbould made February 27, 2015, to mediate the relief sought in paragraph 81(b) of the Monitor's factum, being the extent and scope of any electronic searching of Nortel Canada's ClearCase database with respect to the allegations in the SNMPRI claim. "SNMPRI" means, collectively, SNMP Research International, Inc. and SNMP Research, Inc.

The Canadian Debtors, the Monitor, and SNMPRI have agreed to the following search process that is limited in scope and time:

1       The Parties shall seek a sealing order from the CCAA court **(Sealing Order)**, permitting SNMPRI's selected experts, Barbara Frederiksen-Cross, Alan Purdy, Kevin Chisholm, and Steven Waldbusser **(SNMPRI Searcher(s))**, to access and receive information related to computer code and metadata stored in the computer systems of the Canadian Debtors **(Confidential Information)** for the purpose of the search process contemplated hereby. The Sealing Order shall: (i) approve the search process contemplated hereby; (ii) obligate the SNMPRI Searchers to hold the Confidential Information strictly confidential, including from SNMPRI (aside from source code confirmed by all Searchers to be SNMPRI source code and its associated metadata, or the further exception for identifying SNMPRI code set out herein), absent further order of the Court; (iii) provide that, notwithstanding any contractual or other obligation, neither the Canadian Debtors nor the Monitor shall be required to give notice to any person (except those parties on the service list in the CCAA proceedings), nor obtain the consent of any person, with respect to the SNMPRI Searchers being given access to the Confidential Information; and (iv) provide that SNMPRI, the Searchers, the Canadian Debtors, the Monitor and their respective related parties shall not incur any liability to any person arising from or otherwise relating to the SNMPRI Searchers receiving or being given access to the Confidential Information, or otherwise as a result of the conduct of the search process contemplated hereby.

---

[1] Save as hereinafter expressly defined, defined terms are as set out in the Mediation Brief of the Monitor and Canadian Debtors dated March 9, 2015)

685698v8

2       Only upon the Sealing Order being issued and entered, shall the SNMPRI Searchers, the Canadian Debtors and the Monitor commence the search process hereunder.

3       It is intended that the search process undertaken by the SNMPRI Searchers and Seanna Watson, the consultant retained by the Canadian Debtors (collectively, **Searchers**) shall be collaborative and iterative. The steps within the search process may be refined and varied, within the parameters of this document, where practical and appropriate. No variation that has a materially negative effect upon time and cost, or confidentiality, shall be undertaken without first obtaining the consent of the Canadian Debtors and Monitor.

**Phase One**

4       The SNMPRI Searchers will provide to Ms Watson a proposed list of initial search terms.

5       Ms Watson shall comment on the initial list of search terms, or confirm agreement with the list.

6       Upon agreement on the initial list of search terms, Ms Watson shall run a file name search of the initial list of search terms through all of the VOBs in the ClearCase database.

7       The SNMPRI Searchers may participate in the running of the file name search, as convenient and practical to them and Ms. Watson, including by use of Team Viewer, VNC or attendance at the Carling Facility in Ottawa, or other mutually acceptable location.[2]

8       The Searchers will review the search results or "hits" and discuss and identify refinements for the purpose of narrowing and making more accurate the search technique and running a second file name search. The Searchers will have equal access to the results of the searches in order to make the analysis more efficient.

9       In refining the search technique the SNMPRI Searchers may consult with SNMPRI for the purpose of better identifying SNMPRI related software code, and in doing so may reveal Confidential Information relating to files, artifacts, meta data, dates, labels or streams, but only for the purpose of, and to the extent required, better identifying SNMPRI related software code. For greater certainty, no source code that has not been confirmed by the Searchers to be SNMPRI source code may be revealed in such consultation.

10     Using the refined search list, Ms Watson shall run a second file name search through all of the VOBs in the ClearCase database, with the SNMPRI Searchers participation on the same basis as in the first file name search.

11     Where they deem useful, the Searchers may run additional cycles of the second file name search, in order to further refine the result, keeping in mind considerations of any additional time and cost required for the effort.

12     Throughout Phase One, the Searchers will track and document the search and analytical steps that they engage in, including the time taken (computer time and human time) to perform each step.

---

[2] It is acknowledged that: (i) in negotiating this Protocol, SNMPRI sought direct access for SNMPRI Searchers to ClearCase to run independent searches, which proposal was refused by the Canadian Debtors and the Monitor; and (ii) in commencing the search process under this Protocol SNMPRI has not abandoned this request, and may seek to renew such request in the future, although the Canadian Debtors and the Monitor may continue to oppose such request. It is also acknowledged that Ms. Watson has estimated that the human-computer interaction time with ClearCase is expected to be no more than 15 minutes for each search iteration and require only a few commands per search. Ms Frederiksen-Cross agrees that Ms. Watson's estimate of 15 minutes seems reasonable, but we note that Ms. Frederiksen-Cross has no firsthand knowledge of the Nortel ClearCase system.

685698v8

13      At the completion of the second file name search the Searchers shall together produce a report (**Phase One Report**).

14      The Phase One Report will include:

(a)      Metrics with respect to search time (both human and computer);

(b)      Metrics with respect to volume of searching and the Searchers' views on the accuracy of those searches; and

(c)      A list of the hits generated by the final file name searches conducted.

15      The Phase One Report may also include such additional metrics and descriptive information as the Searchers deem appropriate. The Phase One report shall not include any Confidential Information, except for each hit, the file names and their associated metadata such as path names, version numbers, and dates the file was entered into the VOB .

16      Subject to the restrictions on Confidential Information, the SNMPRI Searchers may separately report to SNMPRI.

17      Ms Watson may separately report to the Canadian Debtors and the Monitor.

18      In the event the Searchers are unable to agree on a particular aspect or aspects of the Phase One Report, they shall set out the areas of disagreement, if any, and their respective positions on those matters.

19      A draft of the Phase One Report will be delivered to the Canadian Debtors and the Monitor to review the contents for any Confidential Information, with Ms Watson's assistance.

20      Absent any objection to Confidential Information, being contained in the Phase One Report, the Phase One Report shall be delivered to SNMPRI and Nortel Networks Inc (**NNI**). Any of SNMPRI, NNI, the Canadian Debtors and the Monitor shall be entitled to refer to, and submit, the Phase One Report, in (i) the CCAA Proceedings; (ii) any proceedings between SNMPRI and NNI in the United States, but solely as permitted by applicable U.S. law or as ordered by the applicable U.S. Court or as agreed by the parties in any such proceedings.

21      It is estimated that Phase One will take approximately three calendar weeks to conduct from commencement to completion. Phase One is expected to commence three days after the date of the Sealing Order, although SNMPRI will provide an initial list of the search terms to Ms Watson by April 14, 2015.

**Phase Two**

22      The Searchers shall, in consultation with each other, identify a sample set of 10-12 VOBs with hits that contain indicia of SNMPRI software from the Phase One search output.

23      The Searchers shall examine those VOBs to attempt to determine whether SNMPRI related "hits" can be correlated to individual Nortel products sold to customers.

24      In so doing the Searchers may examine other files, artifacts, meta data, labels or streams, in each of the VOBs selected, or in readily associated VOBs.

25      During the process of conducting their examination, the Searchers shall record the criteria by which the correlation of a hit to a Nortel product, is determined to have been achieved, if at all.

685698v8

*87*

26      Subject to the restrictions on Confidential Information, the SNMPRI Searchers may separately report on Phase Two to SNMPRI.

27      Ms Watson may separately report to the Canadian Debtors and the Monitor.

28      Upon the conclusion of the Phase Two searching, the Searchers shall together produce a report (**Phase Two Report**).

29      The Phase Two Report shall describe:

     (a)      The process implemented by the Searchers;

     (b)      Any instance in which the Searchers have correlated an SNMPRI hit to a Nortel product;

     (c)      The relevant facts supporting the conclusion that a file name hit is associated with a Nortel product;

     (d)      Any difficulties encountered in attempting to correlate the SNMPRI hits to Nortel products; and

     (e)      The time (both computer and human) and effort expended to conduct the Phase Two search.

30      In the event the Searchers are unable to agree on a particular aspect or aspects of the Phase Two Report, they shall set out the areas of disagreement, if any, and their respective positions on those matters.

31      A draft Phase Two Report shall be delivered to the Canadian Debtors and the Monitor to review the contents for any Confidential Information, with Ms Watson's assistance.

32      Absent any objection to Confidential Information, being contained in the Phase Two Report, the Phase Two Report shall be delivered to SNMPRI and NNI. Any of SNMPRI, NNI, the Canadian Debtors and the Monitor shall be entitled to refer to, and submit, the Phase Two Report, in (i) the CCAA Proceedings; (ii) any proceedings between SNMPRI and NNI in the United States, but solely as permitted by applicable U.S. law or as ordered by the applicable U.S. Court or as agreed by the parties in any such proceedings.

33      It is estimated that Phase Two will take approximately 2-4 calendar weeks from commencement to completion.

34      Upon the delivery of the Phase Two Report, SNMPRI shall have the right to apply for a further sealing order to obtain access to Confidential Information. The Canadian Debtors and the Monitor have the right to oppose such application.

35      At the conclusion of Phase Two, the parties may discuss next steps, if any, with respect to ClearCase searching.

36      Without limiting the generality of paragraphs 37 and 38, this electronic search protocol is without prejudice to:

     (a)      The Canadian Debtors and the Monitors' right to refuse to conduct any further searching of ClearCase after Phase Two; and

     (b)      SNMPRI's right to request further searching of ClearCase after Phase Two,

88

based upon the information in the Phase One and Phase Two Reports.

37    The Canadian Debtors and the Monitor shall not be taken to admit any statement in the Phase One Report or the Phase Two Report and reserve the right to challenge any aspect of the Phase One Report or the Phase Two Report, including, without limitation, through cross examination or the introduction of other evidence.

38    It is understood by the Canadian Debtors and the Monitor, that SNMPRI's agreement to the initial limited search to be conducted in accordance with this protocol is without prejudice to SNMPRI's right to seek from Nortel, with the assistance of the mediator or pursuant to court order, additional searching of Nortel's servers for SNMPRI software.

685698v8

89

Court File No. 09-CL-7950

IN THE MATTER OF THE *COMPANIES'*
*CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-
36, AS AMENDED AND IN THE MATTER OF A
PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION *et al.*

*ONTARIO*
SUPERIOR COURT OF JUSTICE
(Commercial List)

Proceeding commenced at Toronto

**SEALING ORDER**
**(SNMPRI – ELECTRONIC SEARCH PROTOCOL)**

| | |
|---|---|
| **GOODMANS LLP**<br>Barristers & Solicitors<br>333 Bay Street, Suite 3400<br>Toronto, Canada M5H 2S7<br><br>Jay A. Carfagnini (LSUC #: 22293T)<br>jcarfagnini@goodmans.ca<br>Peter Ruby (LSUC #: 38439P)<br>pruby@goodmans.ca<br>Christopher G. Armstrong (LSUC#<br>55148B)<br>carmstrong@goodmans.ca<br><br>Tel:    416.979.2211<br>Fax:    416.979.1234<br><br>**Lawyers for the Monitor, Ernst &**<br>**Young Inc.** | **Norton Rose Fulbright Canada LLP**<br>Barristers & Solicitors<br>South Tower, Suite 3800<br>Royal Bank Plaza<br>200 Bay Street, P.O. Box 84<br>Toronto, ON M5J 2Z4<br><br>Alan Merskey (LSUC #: 41377I)<br>alan.merskey@nortonrosefulbright.com<br>Vasuda Sinha (LSUC #: 55005B)<br>vasuda.sinha@nortonrosefulbright.com<br><br>Tel:    416.216.4800<br>Fax:    416.216.3930<br><br>**Lawyers for the Canadian**<br>**Debtors** |

6444186

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c.C.36, AS AMENDED
AND IN THE MATTER OF A PROPOSED COMPROMISE AND ARRANGEMENT IN RESPECT OF NORTEL NETWORKS CORPORATION et al.

Court File No. 09-CL-7950

*ONTARIO*
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

Proceedings commenced at Toronto

RESPONDING MOTION RECORD
(Disposal of Records Motion)

CHAITONS LLP
5000 Yonge Street, 10th Floor
Toronto, Ontario
M2N 7E9

Harvey G. Chaiton (LSUC #21592F)
Tel:     416-218-1129
Fax:     416-218-1849
Email:   harvey@chaitons.bom

George Benchetrit (LSUC #34163H)
Tel:     (416) 218-1141
Fax:     (416) 218-1841
E-mail:  george@chaitons.com

Lawyers for SNMP Research International,
Inc. and SNMP Research, Inc.

Doc#3421166v1