## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------------------- X

|  |  |
|---|---|
| In re: | : Chapter 11 |
| NORTEL NETWORKS INC., *et al.*,[1] | : Case No. 09-10138 (KG) |
| Debtors. | : Jointly Administered |
|  | : **RE: Docket Nos. 15544 and 15795** |

---------------------------------------------------------------------- X

### NOTICE OF FILING OF SECOND LETTER REGARDING EMEA
### INSOLVENCY PROCEEDINGS AND CLAIMS PROCEDURES

**PLEASE TAKE NOTICE THAT**, on June 24, 2015**,** in accordance with the Allocation Trial Opinion [D.I. 15544], a letter was filed with the Court from the English legal advisors for the Joint Administrators of the Nortel debtors in the EMEA region, which provided an update to the Court on the insolvency proceedings that are taking place in the various EMEA jurisdictions, including the steps being taken to implement claims procedures [D.I. 15795].

**PLEASE TAKE FURTHER NOTICE THAT**, attached hereto as <u>Exhibit A</u>, is second letter from the English legal advisors for the Joint Administrators of the Nortel debtors in the EMEA region, which provides a further update on such insolvency proceedings and claims procedures.

---

[1]    The Debtors in these Chapter 11 cases are: Nortel Networks Inc., Nortel Networks Capital Corporation, Alteon WebSystems, Inc., Alteon WebSystems International, Inc., Xros, Inc., Sonoma Systems, Qtera Corporation, CoreTek, Inc., Nortel Networks Applications Management Solutions Inc., Nortel Networks Optical Components Inc., Nortel Networks HPOCS Inc., Architel Systems (U.S.) Corporation, Nortel Networks International Inc., Northern Telecom International Inc. and Nortel Networks Cable Solutions Inc.

Dated: Wilmington, Delaware
      August 27, 2015

YOUNG CONAWAY STARGATT & TAYLOR, LLP

By: /s/ Jaime Luton Chapman
      James L. Patton (No. 2202)
      Edwin J. Harron (No. 3396)
      John T. Dorsey (No. 2988)
      Jaime Luton Chapman (No. 4936)

      Rodney Square
      1000 North King Street
      Wilmington, Delaware 19801
      Telephone:  302-571-6600
      Fax:  302-571-1253

– and –

HUGHES HUBBARD & REED LLP

William R. Maguire (*admitted pro hac vice*)
Derek J.T. Adler (*admitted pro hac vice*)
Neil J. Oxford (*admitted pro hac vice*)

One Battery Park Plaza
New York, New York 10004
Telephone:  212-837-6000
Fax:  212-422-4726

*Counsel for the Joint Administrators*

**EXHIBIT A**



HERBERT
SMITH
FREEHILLS

Mr. Justice Newbould
Ontario Superior Court of Justice
393 University Avenue – 10th Floor
Toronto, ON M5G 1EG

Hon. Judge Kevin Gross
United States Bankruptcy Court
District of Delaware
834 Market Street North – 3rd Floor
Wilmington, Delaware 19801

Herbert Smith Freehills LLP
Exchange House
Primrose Street
London EC2A 2EG
T +44 (0)20 7374 8000
F +44 (0)20 7374 0888
DX28

www.herbertsmithfreehills.com

Our ref
7938/11235/30907295
Your ref

Date
27 August 2015

Dear Mr Justice Newbould and Judge Gross

**In re Nortel Networks Inc. et al. (Case No. 09-10138) and In the Matter of Nortel Networks Limited et al. (Court File No. 09-CL-7950)**

1. We are the English legal advisors to the court-appointed administrators and authorised foreign representatives (collectively, the "**Joint Administrators**")[1] for Nortel Networks UK Limited ("**NNUK**") and its eighteen affiliates (collectively, and including NNUK, the "**EMEA Debtors**") located in the region known as EMEA (Europe, Middle East, and Africa) in proceedings under the Insolvency Act 1986, pending before the High Court of Justice of England and Wales (the "**English Court**").

2. We respectfully submit this letter pursuant to the instructions of both Courts in their respective determinations in relation to the allocation of sale proceeds of the various businesses and assets of the global Nortel Group. Specifically, we submit this letter pursuant to the statements by Mr Justice Newbould in his Reasons for Judgment issued on 12 May 2015 that "*[p]roposed schedules for expediting any remaining claims procedures are to be provided without delay*" (Reasons for Judgment ¶ 258(6)) and the instruction of Judge Gross in his Order that "*[t]he Debtor Estates (i.e., the Canadian Debtors, the U.S. Debtors and the EMEA Debtors) shall submit proposed schedules for expediting claims procedures for their own Estate*" (Order ¶ 2(d)).

3. In our letter dated 24 June 2015, we reported that the Chancellor of the English Court appointed Mr Justice Snowden, a judge of the Chancery Division of the English Court, as supervisory judge to the Nortel administration proceedings available to hear all applications for

---

[1] The Joint Administrators in the English proceedings for all of the EMEA Debtors, with the exception of Nortel Networks (Ireland) Limited ("**NNIR**"), are: Alan Robert Bloom, Christopher John Wilkinson Hill, Alan Michael Hudson, and Stephen John Harris. The Joint Administrators in the English proceedings for NNIR are: Alan Robert Bloom and David Martin Hughes. Stephen Taylor has been appointed as an additional administrator for Nortel Networks S.A. to act in relation to certain conflict matters. The subject matter of this letter falls outside those conflict matters.

Herbert Smith Freehills LLP and its subsidiaries and Herbert Smith Freehills, an Australian Partnership, are separate member firms of the international legal practice known as Herbert Smith Freehills.

Herbert Smith Freehills LLP is a limited liability partnership registered in England and Wales with registered number OC310989. It is authorised and regulated by the Solicitors' Regulation Authority of England and Wales. A list of the members and their professional qualifications is open to inspection at the registered office, Exchange House, Primrose Street, London EC2A 2EG. We use the word partner of Herbert Smith Freehills LLP to refer to a member of Herbert Smith Freehills LLP, or an employee or consultant with equivalent standing and qualifications.



HERBERT
SMITH
FREEHILLS

Date
27 August 2015
Letter to
Mr Justice Newbould and Judge Gross

directions and disputes arising in the administrations and, to the extent appropriate, to cooperate with the Canadian and U.S. Courts.

4. Since our last submission to the Courts on the EMEA Debtors' claims processes, the Joint Administrators applied to Mr Justice Snowden seeking orders that would enable each of the EMEA Debtors to commence formal claims determination procedures.

5. On 23 July 2015, in response to the applications of the Joint Administrators, Mr Justice Snowden issued an Order authorizing: (i) the Joint Administrators of NNUK to commence a formal proof of claim process for NNUK; and (ii) the Joint Administrators of each of the other EMEA Debtors to prepare company voluntary arrangements ("**CVA**") for the other eighteen EMEA Debtors, which are procedurally similar to a chapter 11 plan under title 11 of the United States Code. A copy of Mr Justice Snowden's Order of 23 July 2015 is annexed hereto as Exhibit A.

6. On 27 August 2015, Mr Justice Snowden handed down a written judgment giving his reasons for making the Order dated 23 July 2015. A copy of Mr Justice Snowden's judgment is annexed hereto as Exhibit B. In that judgment, His Lordship describes the process the Joint Administrators intend to take to establish a claims process.

7. On 7 August 2015, NNUK commenced its formal proof of claim process and notified over 1700 potential creditors that the initial deadline for the submission of proofs of claim against NNUK is 31 October 2015.[2] A copy of the Joint Administrators' Notice to Creditors in respect of the deadline for filing claims against NNUK is annexed hereto as Exhibit C. Notices also appeared in the New York Times and the Globe and Mail amongst other major newspaper publications. More information with regard to the NNUK proof of claim process (in particular, as to the anticipated timetable and next steps) can be found at paragraphs 16 to 28 of Mr Justice Snowden's judgment.

8. The Joint Administrators for NNUK have already received in excess of 300 claims and expect that the total number of claims that will ultimately be submitted will number in excess of 1000. The Joint Administrators intend to update the Courts as to the number and quantum of claims that are filed and the timetable for resolving any disputed claims after the deadline for submission of claims has passed. In the interim, the Joint Administrators will be working hard to assess the claims that are filed and attempt to adjudicate these as soon as practicable.

9. In relation to the other EMEA entities, the Joint Administrators are currently preparing the CVA documentation for each of the entities. As this is a plan that requires creditor approval the Joint Administrators are also liaising with various creditor constituencies. It is expected that the CVAs will be proposed to creditors towards the end of 2015, and it is anticipated those CVAs will set a bar date for claims to be submitted during early to mid-2016. The bar date established pursuant to the CVAs will be analogous to a general claims bar date under title 11 of the United States Code and will be a final bar date unless exceptional circumstances apply. The Joint Administrators intend to provide a further update to the Courts on the process of the CVAs in due course. More information with regard to the CVAs (and, in particular, why the other EMEA entities have not gone through a proof of claim process identical to that commenced for NNUK) can be found at paragraphs 29 to 42 of Mr Justice Snowden's judgment.

---

[2] The established deadline is analogous to a general claims bar date in a proceeding under title 11 of the United States Code, except that under the Insolvency Act, late claims may be submitted and will be eligible for distribution, at the discretion of the Joint Administrators, until a final distribution from the estate in administration is made.



HERBERT
SMITH
FREEHILLS

Date
27 August 2015
Letter to
Mr Justice Newbould and Judge Gross

10. The Joint Administrators will continue to apprise the Courts of additional developments as the EMEA Debtors' claims processes progress.  If the Courts wish us to provide further detail, we would be happy to provide such information as required.

Yours faithfully

**Herbert Smith Freehills LLP**

Encs


HERBERT
SMITH
FREEHILLS

# EXHIBIT A

**IN THE HIGH COURT OF JUSTICE**

**CHANCERY DIVISION**

**COMPANIES COURT**


**Before Mr Justice Snowden**

**23 July 2015**

**IN THE MATTER OF**

| | |
|---|---|
| **NORTEL NETWORKS UK LIMITED** | <u>No 536 of 2009</u> |
| **NORTEL NETWORKS SA** | <u>No 539 of 2009</u> |
| **NORTEL GMBH** | <u>No 542 of 2009</u> |
| **NORTEL NETWORKS NV** | <u>No 550 of 2009</u> |
| **NORTEL NETWORKS S.P.A** | <u>No 552 of 2009</u> |
| **NORTEL NETWORKS BV** | <u>No 553 of 2009</u> |
| **NORTEL NETWORKS POLSKA SP. Z.O.O** | <u>No 554 of 2009</u> |
| **NORTEL NETWORKS HISPANIA SA** | <u>No 535 of 2009</u> |
| **NORTEL NETWORKS INTERNATIONAL FINANCE &** | <u>No 549 of 2009</u> |
| **HOLDING BV** | |
| **NORTEL NETWORKS (AUSTRIA) GMBH** | <u>No 537 of 2009</u> |
| **NORTEL NETWORKS SRO** | <u>No 538 of 2009</u> |
| **NORTEL NETWORKS ENGINEERING SERVICE KFT** | <u>No 540 of 2009</u> |
| **NORTEL NETWORKS PORTUGAL SA** | <u>No 547 of 2009</u> |
| **NORTEL NETWORKS SLOVENSKO SRO** | <u>No 551 of 2009</u> |
| **NORTEL NETWORKS FRANCE SAS** | <u>No 544 of 2009</u> |
| **NORTEL NETWORKS OY** | <u>No 545 of 2009</u> |
| **NORTEL NETWORKS ROMANIA SRL** | <u>No 546 of 2009</u> |
| **NORTEL NETWORKS AB** | <u>No 548 of 2009</u> |
| **NORTEL NETWORKS (IRELAND) LIMITED** | <u>No 541 of 2009</u> |
| **(THE "COMPANIES")** | |

**AND IN THE MATTER OF THE INSOLVENCY ACT 1986**

---

# ORDER

---

**UPON THE APPLICATION** of Alan Robert Bloom, Alan Michael Hudson, Stephen John Harris, Christopher John Wilkinson Hill each of Ernst & Young LLP, 1 More London Place, London SE1 2AF in our capacity as the joint administrators of Nortel GmbH (Germany); Nortel Networks NV (Belgium); Nortel Networks S.P.A. (Italy); Nortel

Networks BV (Netherlands); Nortel Networks Polska SP. Z.O.O. (Poland); Nortel Networks Hispania SA (Spain); Nortel Networks International Finance & Holding BV (Netherlands); Nortel Networks (Austria) GmbH (Austria); Nortel Networks, S.R.O. (Czech Republic); Nortel Networks Engineering Service KFT. (Hungary); Nortel Networks Portugal SA (Portugal); Nortel Networks Slovensko S.R.O. (Slovakia); Nortel Networks France SAS (France); Nortel Networks Oy (Finland); Nortel Networks Romania SRL (Romania); Nortel Networks AB (Sweden); Nortel Networks S.A. (France) (**"NNSA"**); and Nortel Networks UK Limited (together with Nortel Networks (Ireland) Limited, the **"Companies"**)

**UPON THE APPLICATION** of Robert Alan Bloom and David Martin Hughes each of Ernst & Young LLP, 1 More London Place, London SE1 2AF in our capacity as the joint administrators of Nortel Networks (Ireland) Limited, dated 25 June 2015 (the **"Application"**)

**AND UPON HEARING** William Trower QC for Alan Robert Bloom, Alan Michael Hudson, Stephen John Harris, Christopher John Wilkinson Hill and David Martin Hughes (the **"Joint Administrators"**) and Adam Al-Attar for the Workers' Council of NNSA

**AND UPON READING** the evidence

**IT IS HEREBY ORDERED AND DIRECTED** that:

1   Pursuant to paragraph 65(3) of Schedule B1 of the Insolvency Act 1986 (the **"Act"**), the Joint Administrators be at liberty to make such distributions to the unsecured, non-preferential creditors of Nortel Networks UK Limited (in administration) (**"NNUK"**) as the Joint Administrators consider appropriate. Such distributions shall be made in accordance with Chapter 10 of Part 2 of the Insolvency Rules 1986 (the **"Rules"**);

2   Pursuant to Rule 2.97(2) of the Rules, the Joint Administrators be at liberty to declare dividends in respect of such distributions, notwithstanding that there may (at the relevant times) be pending applications to the Court to reverse or vary a decision of the Joint Administrators on a proof (or to expunge or reduce

the amount claimed), on the basis that full provision will be made for any such disputed proofs;

3   The Joint Administrators be at liberty to promulgate company voluntary arrangements in substantially the outline terms summarised in the Eleventh Witness Statement of Alan Robert Bloom under Part 1 of the Insolvency Act 1986 in respect of all of the Companies except for NNUK and NNSA;

4   The Joint Administrators be at liberty to promulgate a company voluntary arrangement in respect of NNSA providing for a claims determination mechanism to be put in place and such further terms, compromises and arrangements that the Joint Administrators consider necessary or appropriate (including following any further discussion with the creditors' committee of NNSA or direction from the Court);

5   The costs of the Application be paid as an expense of the Companies' administrations in such proportions as the Joint Administrators consider appropriate.

**Schedule**

**NORTEL NETWORKS UK LIMITED**

**(IN ADMINISTRATION)**

## NOTICE OF INTENDED DIVIDEND PURSUANT TO RULE 2.95 OF THE INSOLVENCY RULES 1986

Notice is hereby given pursuant to Rule 2.95 of the Insolvency Rules 1986 that the Joint Administrators of the above named company intend to make a distribution (by way of paying an interim dividend) to the preferential creditors (if any) and to the unsecured, non-preferential creditors of Nortel Networks UK Limited (in administration) (the "**Company**").

Proofs of debt may be lodged at any point up to (and including) 31 October 2015, the last date for proving claims, however, creditors are requested to lodge their proofs of debt at the earliest possible opportunity.

Persons so proving are required, if so requested, to provide such further details or produce such documentation or other evidence as may appear to the Joint Administrators to be necessary.

The Joint Administrators will not be obliged to deal with proofs lodged after the last date for proving but they may do so if they think fit.

The Joint Administrators intend to make such distribution within the period of two months from the last date for proving claims.

Proofs of debt should be sent to the Joint Administrators.  Further details of the methods by which proofs of debt can be submitted will be posted on the website maintained by the Joint Administrators and dedicated to the administration of the Company at www.emeanortel.com .

Rule 2.95(2)(c) of the Insolvency Rules 1986 requires the Joint Administrators to state in this notice the value of the prescribed part of the Company's net property which is required to be made available for the satisfaction of the Company's unsecured debts pursuant to section 176A of the Insolvency Act 1986.  There is no prescribed part.

Dated [   ] 2015

Alan Robert Bloom

Joint Administrator

<u>No. 536 & others of 2009</u>

**<u>IN THE HIGH COURT OF JUSTICE</u>**

**<u>CHANCERY DIVISION</u>**

**<u>COMPANIES COURY</u>**


**Before Mr Justice Snowden**

**23 July 2015**


**IN THE MATTER OF**

**NORTEL NETWORKS UK LIMITED AND OTHERS**

**AND IN THE MATTER OF THE INSOLVENCY ACT 1986**


---

# ORDER

---

**Herbert Smith Freehills LLP**
Exchange House
Primrose Street
London EC2A 2EG
Tel: 020 7374 8000
Fax 020 7374 0888
Ref: 13344/30916054



HERBERT
SMITH
FREEHILLS

# EXHIBIT B



Neutral Citation Number: 2015 EWHC 2506 (Ch)

**IN THE HIGH COURT OF JUSTICE**
**CHANCERY DIVISION**
**COMPANIES COURT**

Royal Courts of Justice
Rolls Building, Fetter Lane
London, EC4A 1NL
Date: 27 August 2015

Before :

**MR. JUSTICE SNOWDEN**

**IN THE MATTERS OF:-**

| | |
|---|---|
| **NORTEL NETWORKS UK LIMITED** | **No. 536 of 2009** |
| **NORTEL NETWORKS HISPANIA SA** | **No. 535 of 2009** |
| **NORTEL NETWORKS (AUSTRIA) GmbH** | **No. 537 of 2009** |
| **NORTEL NETWORKS SRO** | **No. 538 of 2009** |
| **NORTEL NETWORKS S.A.** | **No. 539 of 2009** |
| **NORTEL NETWORKS ENGINEERING SERVICE KFT** | **No. 540 of 2009** |
| **NORTEL NETWORKS (IRELAND) LIMITED** | **No. 541 of 2009** |
| **NORTEL GmbH** | **No. 542 of 2009** |
| **NORTEL NETWORKS FRANCE SAS** | **No. 544 of 2009** |
| **NORTEL NETWORKS OY** | **No. 545 of 2009** |
| **NORTEL NETWORKS ROMANIA SRL** | **No. 546 of 2009** |
| **NORTEL NETWORKS PORTUGAL SA** | **No. 547 of 2009** |
| **NORTEL NETWORKS AB** | **No. 548 of 2009** |
| **NORTEL NETWORKS INTERNATIONAL FINANCE** **& HOLDING BV** | **No. 549 of 2009** |
| **NORTEL NETWORKS NV** | **No. 550 of 2009** |
| **NORTEL NETWORKS SLOVENSKO** | **No. 551 of 2009** |
| **NORTEL NETWORKS S.P.A.** | **No. 552 of 2009** |
| **NORTEL NETWORKS BV** | **No. 553 of 2009** |
| **NORTEL NETWORKS POLSKA SP.Z.O.O** | **No. 554 of 2009** |

**AND IN THE MATTER OF THE INSOLVENCY ACT 1986**

- - - - - - - - - - - - - - - - - - - -

**William Trower QC** and **Daniel Bayfield** (instructed by **Herbert Smith Freehills LLP**) for the
Administrators of the Nortel companies
**Adam Al-Attar** (instructed by **Clifford Chance LLP**) for the *Comité d'enterprise* (Works Council) of
Nortel Networks S.A.

Hearing date: 15 July 2015
- - - - - - - - - - - - - - - - - - - -
**Approved Judgment**
I direct that pursuant to CPR PD 39A para 6.1 no official shorthand note shall be taken of this
Judgment and that copies of this version as handed down may be treated as authentic.

.............................
MR. JUSTICE SNOWDEN

## MR. JUSTICE SNOWDEN:

Introduction

1.      Nortel Networks UK Limited ("NNUK") and the other Nortel companies listed above (together "the EMEA Companies") are incorporated in a variety of countries in Europe, the Middle East and Africa.  The EMEA Companies  formed part of the worldwide  Nortel  Group  which  operated  a  networking  solutions  and telecommunications business across multiple jurisdictions based on the development, licensing and maintenance of intellectual property.

2.      On 14 January 2009, the (Canadian) parent company of the Nortel Group and certain of the Canadian Nortel companies (together "the Canadian Debtors") sought insolvency protection under the Canadian Companies' Creditors Arrangement Act. On the same day, the Nortel Group companies which were registered in the United States ("the US Debtors") filed for bankruptcy protection under Chapter 11 of the US Bankruptcy Code. The EMEA Companies were also all placed into administration in England by order of Mr. Justice Blackburne on the same day, the Judge being satisfied that the centre of main interests (as defined in the EC Regulation on Insolvency Proceedings (1346/2000) ("the EC Regulation")) of each of the EMEA Companies was in the United Kingdom. The joint administrators are partners in Ernst & Young LLP ("the Administrators").

3.      On 23 July 2015 I made a number of orders in relation to the EMEA Companies as follows ("the Orders"):

i)      an order pursuant to paragraph 65(3) of Schedule B1 of the Insolvency Act 1986 ("the Act") that the Administrators of NNUK be at liberty to make such distributions in accordance with Chapter 10 of Part 2 of the Insolvency Rules 1986 ("the Rules") to its unsecured non-preferential creditors as the Administrators consider appropriate;

ii)     an order pursuant to Rule 2.97(2) that the Administrators of NNUK be at liberty to declare dividends notwithstanding that there might be pending applications to the court to reverse or vary a decision of the Administrators on a proof, on the basis that full provision be made for such disputed proofs;

iii)    an order that the Administrators of the EMEA Companies apart from NNUK and Nortel Networks S.A. ("NNSA") be at liberty to promulgate company voluntary arrangements under the Act in substantially the terms set out in evidence filed by the Administrators; and

iv)     an order that the Administrators of NNSA be at liberty to promulgate a company voluntary arrangement under the Act in respect of NNSA providing for a claims determination mechanism and such other terms as they might think appropriate.

4.      I now give the reasons for my decision to make those Orders.

Background

5.    After filing for insolvency protection in January 2009, the companies in the Nortel Group continued to work together in an effort to co-ordinate a global reorganization. When that proved impossible, it was decided to attempt a global sale of the businesses and assets of the Group.  To facilitate that sale, an Interim Funding and Settlement Agreement ("the IFSA") was entered into on 9 June 2009 with the approval of the courts in Canada, the US and the UK.  The IFSA provided that the net proceeds from the global sale would be held in escrow pending agreement or court determination as to how the proceeds should be allocated amongst the parties to the agreement who included the Canadian Debtors, the US Debtors and the EMEA Companies.

6.    Pursuant to the IFSA, various business lines and associated assets were sold for approximately US$3.285 billion during the course of 2009 and 2010 and the residual intellectual property rights (being patents, patent applications and related rights) were subsequently sold for US$4.5 billion.  The net sale proceeds, totaling approximately US$7.3 billion, were paid into escrow bank accounts in New York ("the Lockbox") in accordance with the terms of the IFSA.

7.    Following extensive negotiations and three formal mediation processes, all of which failed, the task of determining how the monies in the Lockbox should be allocated was, by agreement of the parties to the IFSA, given to the courts in the US and Canada.  An allocation protocol was approved by both courts requiring a joint trial in the Ontario Superior Court of Justice (Commercial List) and the U.S. Bankruptcy Court for the District of Delaware.

8.    Following a 21-day trial, judgments were handed down on 12 May 2015 in Delaware by Judge Gross and in Ontario by Mr. Justice Newbould.  The decisions were subject to motions seeking reconsideration and further judgments were given on 6 July 2015. The conclusion reached by the Judges was summarized by Mr. Justice Newbould in paragraph 258 of his judgment of 12 May 2015, Re Nortel Networks Corporation [2015] ONSC 2987.  That paragraph was slightly modified by the judgment of 6 July 2015, and the reference to a "Debtor Estate" was clarified to be a reference to an individual debtor (i.e. company or other legal entity) rather than the Canadian Debtors, the US Debtors or the EMEA Companies as groups.  As modified, paragraph 258 of the first judgment was in the following terms:

> "A judgment is to go that the lockbox funds are to be allocated on a pro rata allocation basis with the following principles to govern:
>
> (1)    Each Debtor Estate is to be allocated that percentage of the lockbox funds that the total allowed claims against that Estate bear to the total allowed claims against all Debtor Estates.
>
> (2)    In determining what the claims are against the Debtor Estates, a claim that can be made against more than one Debtor Estate can only be calculated and recognized once in accordance with these reasons for judgment. Claims on bonds are to be made on the Debtor Estate of the issuer. A claim can

3

be recognized by the Debtor Estate that guaranteed the bond, but that claim will not be taken into account in determining the claims against the Debtor Estates. If the [UK Pension Claimants] make a claim against more than one Debtor Estate, such additional claims will not be taken into account in determining the claims against the Debtor Estates for allocation purposes.

(3)    Intercompany claims against a Debtor Estate are to be included in the determination of the claims against that Estate.

(4)    Cash on hand in any Debtor Estate will not be taken into account in the pro rata allocation. Each Debtor Estate with cash on hand will continue to hold that cash and deal with it in accordance with its administration.

(5)    An interim distribution may be allowed upon further submissions....

(6)    Proposed schedules for expediting any remaining claims procedures are to be provided without delay...."

9.    In paragraph 253 of his judgment of 12 May 2015, Mr. Justice Newbould also set out his understanding of the claims position in the various insolvencies:

"I understand that for the Canadian Debtors and the U.S. Debtors, the claims for the most part are generally known although there are some claims still unresolved....The U.K. Administrator has not yet instituted a claims procedure, apparently awaiting a determination of this allocation proceeding. In my view, the process should be undertaken now and I expect this will happen."

10.    The Administrators subsequently wrote to the US and Canadian Courts, clarifying the position in relation to the EMEA Companies, and notifying them that I had been nominated by the Chancellor of the High Court to act as supervisory judge in relation to the administrations of the EMEA Companies. In his subsequent judgment of 6 July 2015, Mr. Justice Newbould said,

"[53]    As now advised, the reason for no claims procedure having being undertaken in the U.K. was that under the U.K. Insolvency Act 1986, the Joint Administrators appointed by the English Court had no authority to commence a formal claims process until there were funds available for distribution. Nevertheless an informal claims process was undertaken in 2010 and sanctioned by the High Court of England and Wales.

[54]    Following the release of the allocation decisions, an application in the U.K. was made to the Chancellor of the High Court of England and Wales for the appointment of a supervisory judge in this matter. The Chancellor has now

appointed Mr. Justice Snowden, a judge of the Chancery Division of the High Court of England and Wales, as the supervisory judge in relation to the various EMEA Debtors. Justice Snowden will deal with any hearings in relation to the EMEA Debtors including contested claims and will be the appropriate judge to engage in any judicial co-operation with the Canadian and U.S. Courts that is deemed necessary and appropriate. The Joint Administrators intend to apply shortly to Justice Snowden to have the claims process move along.

[55]     The Joint Administrators are officers of the English Court who are duty-bound to act in good faith and in accordance with applicable law in those proceedings. The [UK Pension Claimants'] claim against NNUK, as with every claim in each of the nineteen EMEA jurisdictions, will be subject to a formal claims process which is subject to appeal rights available to creditors and shareholders. Creditors and shareholders of the EMEA entities will have the opportunity to review and contest the allowance or rejection of any proof of claim as noted above. Disputes will be heard by Justice Snowden in a full evidentiary hearing."

11.    The reference to an informal claims process was to a process sanctioned by Mr. Registrar Nicholls on 18 May 2010 under which the Administrators of the EMEA Companies (other than NNSA) were authorised to request details of trade creditor claims and seek to agree them on an informal basis notwithstanding that they did not then propose to make a distribution to any creditors.

12.    As might be expected, the Orders made by the US and Canadian Courts have been the subject of appeals filed by a number of the interested parties. I do not have any information as to the mechanism or likely timescale for resolution of those appeals.

The Administrators' Application

13.    The Application made by the Administrators has been prompted by their assessment that they must commence a proof, or other claims determination, process as soon as possible in relation to each of the EMEA Companies in order to protect the main asset in their estates - the potential recoveries from the Lockbox. Additionally, the Administrators wish to ensure that, once received, the monies from the Lockbox can be distributed amongst the creditors of the EMEA Companies as quickly and efficiently as possible.

14.    That appears to me to be an entirely sensible view for the Administrators to take. It is plain that the Judges in the US and Canada wish to see that claims against the EMEA Companies are formally lodged, adjudicated upon by the Administrators and, so far as possible, any disputes determined so that the EMEA Companies catch up with the position in relation to the US Debtors and the Canadian Debtors. That will enable an allocation and distribution from the Lockbox to take place to all of the Debtor Estates. If the appeals against Judge Gross' and Mr. Justice Newbould's orders are dismissed, the Judges will plainly expect the distribution process to proceed expeditiously in accordance with their orders. Even if the appeals as to the basis of allocation are

allowed, and the orders made by Judge Gross and Mr. Justice Newbould are varied, it still seems highly likely that substantial monies will be due to the EMEA Companies and a claims determination and distribution process will be required to facilitate a distribution to their creditors. There thus seems no good reason to defer the commencement of such a process to await the outcome of the appeals.

15.   There will, however, have to be some differences between the proposed procedures for inviting and determining claims and for making distributions to creditors in relation to (i) NNUK, (ii) the other EMEA Companies apart from NNSA, and (iii) NNSA. These differences are essentially due to two factors. The first is that in relation to the EMEA Companies other than NNUK, various statements were made by the Administrators early in the administrations as to the intended treatment of local creditors so as to alleviate any pressure for local insolvency proceedings to be commenced. The Administrators have referred to these statements as "assurances" and have indicated that they wish to honour them in relation to all of the EMEA Companies except NNUK and NNSA. This will require a departure from the procedure for *pari passu* distribution under the UK insolvency legislation. The second factor is that it was necessary to open local insolvency proceedings in relation to NNSA in France. Accordingly, whilst it is not appropriate to implement the assurances to creditors who are able to participate in local proceedings in relation to NNSA, there are other issues arising from the co-ordination of the two sets of insolvency proceedings.

## NNUK

16.   A proof of debt process and a distribution is not an automatic feature of every administration in England. Indeed, such a process was not possible in relation to administrations before the changes introduced by the Enterprise Act 2002. In the case of the EMEA Companies, the relevant statutory provisions are those in existence at the time at which they went into administration on 14 January 2009, and the references hereafter are to those provisions.

17.   The process for proof of debts is contained in Chapter 10 of the Rules and, by Rule 2.68, is only applicable where the administrator makes or proposes to make a distribution to a class of creditors, and gives notice of his intention to creditors in accordance with Rule 2.95.

18.   An administrator does not, however, have a free-standing discretion to decide to make a distribution to unsecured creditors. That power is given by paragraph 65 of Schedule B1 to the Act that provides as follows:

> "(1)   The administrator of a company may make a distribution to a creditor of a company.
>
> (2)   Section 175 shall apply in relation to a distribution under this paragraph as it applies in relation to a winding up.
>
> (3)   A payment may not be made by way of distribution under this paragraph to a creditor of the company, who is neither secured nor preferential unless the court gives permission."

19.     There have been relatively few cases which have considered the exercise by the court of its discretion to grant permission under paragraph 65(3) of Schedule B1.  In Re GHE Realisations Ltd [2006] 1 WLR 278 at [5] to [11] Mr. Justice Rimer considered that the creditors' interests as a whole should govern the exercise of the discretion, and that the court should consider whether the payment of a dividend is consistent with the functions and duties of the administrator and any proposals made by him.

20.     In Re MG Rover Belux SA/NV [2007] BCC 446 at [7] HHJ Norris QC referred to Re GHE Realisations and suggested the following considerations might be taken into account:

> "(a)     The matter is to be judged at the time when permission is sought.
>
> (b)     The court must at that time be satisfied that the proposed distribution is conducive to the achievement of the then current objectives of the administration.
>
> (c)     The court must be satisfied that the distribution is in the interests of the company's creditors as a whole (because para. 3(2) of Sch.B1 says that the administrator must perform his functions in that manner).
>
> (d)     The court must be satisfied that proper provision has been made for secured and preferential creditors (for the requirement to obtain the permission of the court seems to be directed at their protection).
>
> (e)     The court must consider what are the realistic alternatives to the proposed distribution sought by the administrators, consider the merits and demerits of adopting a course other than that proposed by the administrators and assess whether the proposed distribution adversely affects the entitlement of others (when compared with their entitlement if one of the other realistic alternatives were to be adopted).
>
> (f)     The court must take into account the basis on which the administration has been conducted so far as the creditors are concerned (under the original proposals, any modification to those original proposals, or any indications given in any reports to creditors), and in particular whether the creditors have approved (or not objected to) any proposal concerning the relevant distribution.
>
> (g)     The court must consider the nature and terms of the distribution.
>
> (h)     The court must consider the impact of the distribution upon any proposed exit route from the administration."

21.  These two cases were also considered by Mr. Justice David Richards in <u>Re MF Global Overseas Ltd</u> (unreported, 5 June 2013).

22.  Applying these principles, it seems to me that it is plainly appropriate for permission to be granted in the case of NNUK:

   i)  it is obviously in the interests of creditors as a whole that NNUK should receive and distribute its share of the Lockbox monies;

   ii)  it is necessary for the reasons outlined above to put in place a claims determination mechanism for NNUK so that it can be allocated and receive its fair share of the monies in the Lockbox;

   iii)  NNUK has no secured creditors and its preferential creditors have already been paid in full;

   iv)  the Administrators' proposals for NNUK in February 2009 did not, in terms, refer to the possibility of a distribution to unsecured creditors by the Administrators themselves, but referred instead to the possibility of payments being made through a company voluntary arrangement, a scheme of arrangement or a creditors' voluntary liquidation. However, it seems to me that nothing said by the Administrators excluded, or should be taken to preclude, the more obvious course of a distribution by the Administrators themselves if that were to be most convenient and cost-effective in the interest of creditors as a whole;

   v)  there is already a (very modest) amount which is available to the Administrators to pay a first dividend but, in any event, the expectation is that once NNUK receives what it is entitled to from the Lockbox, the Administrators will have a substantial amount available for distribution to NNUK's creditors;

   vi)  it will be relatively quick and inexpensive for the Administrators to give notice under Rule 2.95 of their proposal to make a distribution to creditors, thereby triggering the application of Chapter 10 of Part 2 of the Rules and the proof process contained within it; and

   vii)  it is unnecessary, and would be disproportionate in terms of the additional costs which would be incurred, for NNUK to have to go into liquidation to achieve substantially the same result.

23.  It is a requirement of Rule 2.95(4) that the notice that must be sent to trigger the proof of debt process in an administration must specify a last date for proving and state that it is the administrator's intention to make a distribution within two months from that date. It is implicit that this intention must be genuinely held, and that is buttressed by the provisions of Rule 2.97(1) that the administrator must proceed to declare the dividend within the specified period.

24.  In the case of NNUK it is, of course, unlikely in the extreme that any substantial proceeds from the Lockbox will be available for distribution in the next few months. However it is equally undesirable for a date for proving to be given which is a very

long way off, since that would not provide an incentive for creditors to put in their claims and hence would not correspond with the plain desire of the Administrators and the US and Canadian courts that the UK claims process should "move along".

25.    None of the counsel appearing, nor I, could see any means by which to modify the requirements of Rule 2.95(4) in order more closely to reflect the rather unique requirements of NNUK's situation.  In the end the solution proposed, which I agreed should be followed, was for the notice to specify a date for proving of 31 October 2015 on the basis that the Administrators will (subject to reserving for disputed proofs) make a very modest interim distribution from the funds currently to hand within two months from that date.

26.    The date of 31 October 2015 by which creditors are required to prove their claims was selected on the basis that the notice would be given by first class post to known creditors and widely advertised in the UK and abroad by 7 August 2015.  I received further evidence from the Administrators' solicitors of the state of their databases and of communications with creditors during the course of the administration.  This satisfied me that the Administrators have accurate details for the overwhelming majority of NNUK's creditors and that the proposals for advertising will be likely to bring the notice under Rule 2.95 to the attention of other persons who might claim to be creditors.  I was also satisfied that, especially having regard to the informal process undertaken in 2010, that creditors so notified would have a reasonable period (12 weeks) to prepare and submit their claims.  In any event, a creditor who did not submit their claim by that date might be excluded from the first interim distribution, but would be entitled to receive a catch-up dividend and participate in subsequent distributions if and when their proof had been subsequently lodged and accepted.

27.    The requirement under Rule 2.97(1) for the intended distribution to be made within two months is subject to Rule 2.97(2) which provides that:

> "Except with the permission of the court, the administrator shall not declare a dividend so long as there is pending any application to the court to reverse or vary a decision of his on a proof, or to expunge a proof or to reduce the amount claimed."

28.    It is implicit in Rule 2.97(2) (and was subsequently made explicit by an amendment to the Rules in 2010) that the permission of the court should only be given on terms that provision is made for any disputed proofs so that a *pari passu* distribution can ultimately be made and creditors are not prejudiced.  The Administrators have requested, and I accept, that they should have permission, on an ongoing basis, to declare interim dividends notwithstanding that there are pending applications to the court to reverse or vary a decision or decisions of theirs on a proof, provided that the Administrators make full provision in respect of all such disputed claims.  If the Administrators are unable to agree the maximum value of a creditor's claim, or if there is any other valid reason for them to do so, the Administrators will have to seek further directions from the court before declaring a dividend.

## The EMEA Companies other than NNUK and NNSA

29.    As indicated above, all of the EMEA Companies other than NNUK were incorporated elsewhere in the EU and had establishments in the Member States in which they were incorporated.

30.    Under Articles 3(2) and 27 of the EC Regulation, secondary insolvency proceedings may be opened in a Member State other than the state of opening of main proceedings provided that the debtor in question has an establishment there. However, the effects of such secondary proceedings shall be restricted to the assets of the debtor situated in the territory of that other Member State. The result is that assets of the debtor situated in the Member State in which secondary proceedings are opened will be distributed according to local laws, including local priority and distribution rules, which vary from Member State to Member State.

31.    In the case of the EMEA Companies other than NNUK, at the time of the opening of main insolvency proceedings by the appointment of the Administrators in England, it was thought possible that creditors in other EU Member States might seek to open secondary proceedings so as to take advantage of such local priority and distribution rules as regards local assets. The Administrators considered that it would be in the interests of the EMEA Companies' creditors as a whole to avoid such secondary proceedings being opened because such proceedings would have been likely to disrupt the EMEA Companies' participation in the coordinated global re-organisation or sale, thereby reducing the price that might be obtained. It was also feared that the opening of secondary proceedings might result in increased costs, multiplied formalities and delay.

32.    In order to reduce the risk of the opening of secondary proceedings, on their appointment the Administrators obtained directions from Mr. Justice Blackburne in relation to each of the EMEA Companies other than NNUK. Those directions were as follows,

> "Pursuant to paragraph 66 of Schedule B1 [to the Act], provided that they consider the making of such payments is likely to assist achievement of the purpose of the administrations, the Joint Administrators may:
>
> (1)    make such payments to the employees of the company as they would receive from the assets of the company if secondary proceedings were to be commenced …under Article 27 of the EC Regulation;
>
> (2)    make such payments from the assets of the company to those creditors whose claims against the company would be preferential under [local law] if secondary proceedings were to be commenced .. under Article 27 of the EC Regulation, as they would receive in such secondary proceedings; and
>
> (3)    make payment in respect of pre-administration liabilities"

10

33.    Paragraph 66 of Schedule B1 to the Act provides that:

> "The administrator of a company may make a payment otherwise than in accordance with paragraph 65 or paragraph 13 of Schedule 1 if he thinks it likely to assist achievement of the purpose of administration."

Paragraph 13 of Schedule 1 to the Act provides that the administrator has,

> "Power to make any payment which is necessary or incidental to the performance of his functions."

34.    In giving his directions, Mr. Justice Blackburne was following the approach which had already been taken in similar pan-European insolvencies including, for example, Re MG Rover España SA [2006] BCC 599 and Re Collins & Aikman Europe SA [2006] BCC 861. In those cases, the view had been expressed that provided that administrators thought it likely to assist in achieving the broader purpose of an administration, paragraph 66 of Schedule B1 could be invoked to empower them to make payments to employees under the national laws of EU Member States over and above the entitlement of those employees under English law, so reducing the pressure from employees to open secondary proceedings. In Re Collins & Aikman Europe SA Mr. Justice Lindsay had also indicated that provided that administrators considered the giving of assurances likely to assist in achieving the purposes of the administrations at the time such assurances were given, that would normally suffice to enable the administrators to make subsequent payments to give effect to the assurances: see paragraphs 30-35.

35.    Having obtained those directions, the Introduction to the Administrators' Statements of Proposals circulated in February 2009 in respect of the EMEA Companies contained a statement to the following effect,

> "The Administrators propose to make such payments from the assets of the company to those creditors of the company whose claims against the company would be preferential under local law as they would receive in a liquidation of the company under local law. Unless otherwise paid by the Administrators as a preferential claim, unpaid claims, debts and/or liabilities owed by the company to its creditors as at 14 January 2009 will be dealt with in accordance with the rules governing the lodging, verification, admission and priority of claims as would be applicable in a liquidation of the company under local English insolvency law…"

This statement was then elaborated in the section headed "Future Conduct of the Administration",

> "(1)    Provided that they consider the making of such payments is likely to assist achievement of the purpose of the administration, the Administrators may make such payments

from the assets of the company from time to time to those creditors of the                    company whose claims would be preferential in a liquidation of the company.

(2)    Unless otherwise paid by the Administrators under the previous paragraph, any assets of the company available for distribution to creditors in respect of unpaid claims, debts and/or liabilities owed by the company to its creditors as at 14 January 2009 may be dealt with in accordance with the rules governing the lodging, verification, admission and priority of claims as would be applicable in a liquidation of the company.

(3)    In order to make payments to creditors whose claims as at 14 January 2009 remain unpaid, the Administrators may (after provision for or payment of the expenses of the administration) place the company into liquidation or may make proposals for approval by creditors [of] a company voluntary arrangement under Part 1 of the Insolvency Act 1986 or a scheme of arrangement under section 899 of the Companies Act 2006."

36.    Notwithstanding those observations, secondary proceedings were in fact opened at the behest of the Administrators in France in relation to NNSA.  The Administrators considered that it was in the best interests of that company's creditors to do so, because NNSA was unable to effect the necessary redundancies in France, or carry out a major part of its required restructuring programme, without entering into a French insolvency process.  NNSA's secondary proceedings were opened in France on 28 May 2009 by the French Commercial Court and the business, property and affairs of NNSA situated in France have, since that date, been under the control of the French Liquidator.  Otherwise, no secondary proceedings have been opened in relation to any of the EMEA Companies.

37.    As regards the EMEA Companies other than NNUK and NNSA, the Administrators now consider that it is appropriate for them to follow the course outlined in their Statement of Proposals as regards the payment of local creditors.  This will ensure, so far as possible, that local creditors are not prejudiced as a result of not having sought the opening of secondary proceedings.

38.    There is, however, a difficulty.  The powers given to the Administrators under paragraph 66 do not extend to conducting a process under which all potential claimants can be called upon to make their claims and for the adjudication of such claims.  Moreover, if the Administrators were simply to give notice under Rule 2.95 so as to trigger the statutory scheme for the proof of debts in Chapter 10 of Part 2 of the Rules, this would also activate a number of mandatory provisions of the legislation which would or might be inconsistent with the making of payments to creditors under local laws.  Such provisions would include,

i)    the payment of preferential creditors (as defined by English law) in advance of the non-preferential creditors (Rule 2.69 and paragraph 65(2) of Schedule B1);

  ii)  the payment of non-preferential creditors (as defined by English law) *pari passu* (Rule 2.69);

  iii)  the application of English insolvency set-off (Rule 2.85);

  iv)  the requirement to convert foreign currency claims into sterling at the official rate prevailing on 14 January 2009 (Rule 2.86);

  v)  the payment of interest (Rule 2.88); and

  vi)  the application of Rules relating to the declaration and payment of dividends (Rules 2.97 to 2.105).

The court does not have an inherent power to disapply or vary this statutory scheme and can only do so if specific provision can be found elsewhere in the legislation to permit it: see e.g. Re Nortel GmbH (Bloom v Pensions Regulator) [2014] AC 209 (SC) at paragraphs 115-127.

39. It was very much for these reasons that the Administrators' Statement of Proposals envisaged the promulgation of a company voluntary arrangement under the Act (a "CVA") or a scheme of arrangement under the Companies Act 2006. Both those procedures require approval by creditors in accordance with the relevant statute, and if so approved (and in the case of a scheme of arrangement, sanctioned by the court) will have the effect of modifying the statutory scheme that would otherwise be applicable and creditors' rights under it.

40. The evidence of Mr. Bloom on behalf of the Administrators indicated that the Administrators intend to pursue the CVA route. Whilst the process of formulating the CVAs may take some time and effort, the present intention is for the CVAs in relation to the EMEA Companies other than NNUK and NNSA to include the following features,

  i)  a mechanism under which all creditors must submit their claims for assessment and determination by the Administrators. It is likely that the process will be based on the process set out in Chapter 10 of Part 2 of the Rules (with appropriate adjustments) and may also include a fixed date by which all proofs must be submitted (i.e. a "bar date");

  ii)  a process pursuant to which creditors can appeal the decision of the Administrators in respect of their claims;

  iii)  a timetable for distribution of an interim dividend to creditors or specifying the circumstances in which a distribution will become payable;

  iv)  a process to determine which of the assets owned by the relevant EMEA Company at the time when secondary insolvency proceedings might otherwise have been opened under the EC Regulation in the Member State in which the company had its establishment were situated in that territory ("Secondary Proceedings assets"), and which were situated outside that territory ("Main Proceedings assets"); and

    v)    a distribution mechanism under which Main Proceedings assets will be distributed in accordance with English law and Secondary Proceedings assets will be distributed in accordance with the local laws of the Member State in which the company had its establishment.

41.    The promulgation of a CVA for the EMEA Companies other than NNUK will give the creditors of the relevant EMEA Company the opportunity to vote upon the proposals, and if the CVA is approved by the necessary majority of creditors, it will become binding on all creditors who would have been entitled to vote at the requisite meetings: see section 4A of the Act. Any creditors who consider that their interests are unfairly prejudiced by the CVA can apply for it to be revoked, suspended or revised and resubmitted to creditors: see section 6 of the Act. In this way, creditors who might consider themselves to be disadvantaged by the proposals to modify the application of the Act and Rules to accommodate the assurances given by the Administrators will have an opportunity, if they so wish, to vote against and challenge such proposals. Conversely, if the proposals are rejected, the Administrators will have the fall-back of implementing the statutory scheme in administration or liquidation and applying for further directions under paragraph 63 of Schedule B1. In such event, any individual creditors who wish to contend that the assurances should be given effect by some other route will have the option of applying to the court for an order to such effect, possibly under paragraph 74 of Schedule B1. Either way, it seems to me that the promulgation of CVAs along the lines proposed by the Administrators is an entirely appropriate course for them to take to initiate a process for the submission and determination of claims against the EMEA Companies in question.

42.    As a final point in relation to the appeal process referred to in paragraph 40(ii) above, the Administrators indicated to me that they were contemplating that the CVAs should provide that any challenge to the admission of claims above a specified amount (possibly £100,000 or its equivalent) will be required to follow a process modelled on Rule 2.78, requiring an application to the court for determination of the dispute, but that disputes on smaller claims should be dealt with by way of a binding arbitration or expert determination process rather than by the court. That possibility was not referred to by Mr. Justice Newbould in paragraph 55 of his judgment of 6 July 2015 (above), but it should be noted that his remarks were made in the context of an argument that there might be "claims inflation" in the insolvencies of the EMEA Companies. Specifically, concerns were expressed by other parties in the US and Canadian insolvencies in relation to the determination of the claim of the UK Pension Claimants against NNUK, which is anticipated to be very sizeable. As presently advised, it seems to me unlikely that Mr. Justice Newbould's comments in rejecting those arguments were intended to preclude the adoption of a different appeals procedure for much smaller claims against the other EMEA Companies, but the detailed design of the adjudication and appeals process for the CVAs is clearly a matter to which the Administrators will wish to give close consideration.

## NNSA

43.    The Administrators' Statement of Proposals for NNSA contained the same statements to creditors regarding the distribution of assets in accordance with local law as were contained in all of the other Statements of Proposals. However, as set out above, secondary insolvency proceedings were opened in respect of NNSA in France in May

2009, and its assets situated in France are subject to those secondary proceedings. As the statements made by the Administrators were designed to avoid such secondary insolvency proceedings, the Administrators do not consider that it would be appropriate for them to seek to give effect to those statements in the English administration. Instead, consistent with Articles 3(2) and 27 of the EC Regulation, they propose that the assets of NNSA which are situated in France should be distributed in the French liquidation in accordance with French law; and the remaining assets of NNSA situated outside France should be distributed in accordance with English law under Article 4(2)(i) of the EC Regulation.

44.     It might be thought that this result would be achievable simply by the Administrators giving notice of their intention to make a distribution in the administration of NNSA under Rule 2.95 in the same way as with NNUK. There is, however, a problem with adopting that approach because there is uncertainty as to which of the assets of NNSA are Main Proceeding assets and which are Secondary Proceeding assets. That issue - and how to resolve it - has arisen in proceedings brought in 2011 by the *Comité d'enterprise* (Works Council) of NNSA against the French liquidator in the Commercial Court in Versailles, France. Those proceedings sought the payment by the French liquidator of monies from various bank accounts of NNSA without reference to any costs resulting from the continuation of the business of NNSA or its participation in the IFSA, payment of which costs the Administrators had sought from the same funds. The French liquidator sought to join the Administrators as third parties to those proceedings, and the Administrators asked the French court to decline jurisdiction in favour of this court.

45.     The case was referred to the European Court of Justice by the Commercial Court in Versailles in 2013 (case C-649/13), and the ECJ gave its ruling on 11 June 2015: Comité d'enterprise de Nortel Networks SA v. Cosme Rogeau and others. The ECJ held that (i) Articles 3(2) and 27 of the EC Regulation must be interpreted as meaning that the French courts and the English courts have concurrent jurisdiction to rule on the determination of NNSA's assets falling within the scope of the effects of the liquidation in France; and (ii) the assets that fall within the scope of the effects of secondary insolvency proceedings must be determined in accordance with Article 2(g) of the EC Regulation.

46.     The ECJ's ruling has yet to be put into effect in the liquidation in France or in the administration in England. The Administrators are therefore not presently in a position to seek permission to make distributions to NNSA's unsecured creditors pursuant to paragraph 65(3) of Schedule B1 of the Act until the issue of which assets are situated where is resolved. That in turn may require consideration of NNSA's allocation of the monies from the Lockbox, which itself will depend upon the level of allowed claims against NNSA for the purposes of the allocation ruling of the US and Canadian courts.

47.     In that respect, the French liquidator has already conducted a claims process, and indeed a bar on any further claims being submitted has been imposed in the liquidation under French insolvency law. The view of the Administrators, however, is that the fact that such a process has taken place in the secondary proceedings in France does not render it unnecessary or inappropriate for the Administrators to conduct a claims determination in the main insolvency proceedings in England,

because there may be creditors who would be entitled to claim against NNSA who failed to file their claim by the bar date imposed in the French liquidation. I agree, and consider that it is desirable that the Administrators commence a claims determination process in the UK for NNSA's creditors so that they can ensure that the interests of NNSA and its creditors in the Lockbox is fully protected.

48.    The Administrators consider that the most effective way to introduce such a claims determination process and, if there is an amount available for distribution in due course, to effect a distribution to NNSA's creditors, is to promulgate a CVA on similar terms to those which will be proposed in relation to the other EMEA Companies (above). The main difference will be that because the Administrators will only have Main Proceeding assets to distribute, the distribution process will apply English law priorities. Again, I agree that this is an appropriate course for the Administrators to follow.

Conclusion

49.    For the reasons that I have outlined, the Orders that I have made are intended to permit the Administrators to institute fair and efficient procedures for requiring creditors of the EMEA Companies to file their claims against the companies, and for their adjudication, so as to permit those companies to share in the allocation of the monies in the Lockbox.

50.    The Administrators are generally to be at liberty to seek further directions from this court so as to ensure that they meet any requirements under the IFSA and/or as may be imposed by the US and Canadian courts for participation of the EMEA Companies in the allocation of the Lockbox monies.



HERBERT
SMITH
FREEHILLS

# EXHIBIT C

**EY**
Building a better
working world

Contact address for creditors of Nortel Networks UK Limited:

Joint Administrators
Nortel Networks
PO Box 4725
Maidenhead
SL60 1HN
United Kingdom

www.emeanortel.com
claims@emeanortel.com
Telephone: +44 (0)118 328 2523; Skype: claims.emeanortel.uka

To potential creditors of Nortel Networks UK Limited

7 August 2015

Ref: LO3538/CP

Website: www.emeanortel.com
Email: claims@emeanortel.com

Dear Sirs

## Nortel Networks UK Limited (In Administration) ("the Company")
## Company number: 3937799
## Registered address: Fleming House, 71 King Street, Maidenhead, SL6 1DU, UK

**Notice of intended dividend pursuant to rule 2.95 of the Insolvency Rules 1986**

Invitation to lodge a claim. Time limits to be observed

| | |
|---|---|
| Bulgarian | Покана за предявяване на вземане. Срокове, които трябва да се спазват |
| Croatian | Poziv na prijavu tražbine. Rokovi kojih se treba pridržavati |
| Czech | Výzva k přihlášení pohledávky. Závazné lhůty |
| Danish | Opfordring til anmeldelse af fordringer. Vær opmærksom på fristerne |
| Dutch | Oproep tot indiening van schuldvorderingen. In acht te nemen termijnen |
| Estonian | Nõude esitamise kutse. Järgitavad tähtajad |
| Finnish | Kehotus saatavan ilmoittamiseen. Noudatettavat määräajat |
| French | Invitation à produire une créance. Délais à respecter. |
| German | Aufforderung zur Anmeldung einer Forderung. Etwaige Fristen beachten! |
| Greek | Πρόσκληση για αναγγελία απαιτήσεως. Προσοχή στις προθεσμίες |
| Hungarian | Felhívás követelés bejelentésére. Betartandó határidők |
| Irish | Cuireadh éileamh a thaisceadh. Teorainn ama le comhlíonadh. |
| Italian | Invito all'insinuazione di un credito. Termine da osservare |
| Latvian | Uzaicinājums iesniegt prasījumu. Termiņi, kas jāievēro |
| Lithuanian | Kvietimas pateikti reikalavimą. Privalomieji terminai |
| Maltese | Stedina għal preżentazzjoni ta' talba |
| Polish | Wezwanie do zgłoszenia wierzytelności. Przestrzegać terminów |
| Portuguese | Aviso de reclamação de créditos. Prazos legais a observar |
| Romanian | Invitaţie de înregistrare a cererii de admitere a creanţei. Termenul limită |
| Slovak | Výzva na prihlásenie pohľadávky. Je potrebné dodržať stanovené termíny |
| Slovenian | Poziv k prijavi terjatve. Roki, ki jih je treba upoštevati! |
| Spanish | Convocatoria para la presentación de créditos. Plazos aplicables |
| Swedish | Anmodan att anmäla fordran. Tidsfrister att iaktta |

On 14 January 2009, the Company was placed into administration and A R Bloom, S J Harris, C J W Hill and A M Hudson were appointed Joint Administrators (the "Joint Administrators") by an order of the High Court of Justice in England and Wales (the "Court"), following an application by the directors of the Company. The administration is a main proceeding under the EC Regulation on Insolvency Proceedings

Ernst & Young LLP, 1 More London Place, London, SE1 2AF
Tel: + 44 20 7951 2000; Fax: + 44 20 7951 1345; ey.com

Ernst & Young LLP is a limited liability partnership registered in England and Wales with registered number OC300001 and is a member firm of Ernst & Young Global Limited. A list of members' names is available for inspection at 1 More London Place, London, SE1 2AF, the firm's principal place of business and registered office. Ernst & Young LLP is a multi-disciplinary practice and is authorised and regulated by the Institute of Chartered Accountants in England and Wales, the Solicitors Regulation Authority and other regulators. Further details can be found at http://www.ey.com/UK/en/Home/Legal.



**EY**
Building a better
working world

number 1346/2000 (the "EC Regulation"), and is governed by the EC Regulation and the United Kingdom Insolvency Act 1986 (the "Act").

Further to an order of the Court dated 23 July 2015, the Joint Administrators intend to make a distribution (by way of paying an interim dividend) to the preferential creditors (if any) and to the unsecured, non-preferential creditors of the Company.  Formal notice is attached.

---

**Creditors are requested to lodge their claims before 31 October 2015** in order to participate in the distribution.  The Joint Administrators will not be obliged to deal with proofs lodged after the last date for proving but they may do so if they think fit.

Creditors may lodge their proof of debt in the following ways:

   **(a)  By visiting www.emeanortel.com**

The website allows creditors to submit their claims electronically.  After entering details of their claim, and submitting it online, creditors will receive a copy of their claim by email for their records.  This also confirms to the creditor that the claim has been received by the Joint Administrators.  The process is step-by-step and is intended to be the easiest way to ensure that all necessary elements of the proof of debt form are completed correctly.  It is likely that claims submitted online will be processed more quickly than claims submitted by other means.

or

   **(b)** By completing and signing the form and sending it by email to **claims@emeanortel.com**

or

   **(c)** By completing and signing the form and sending it by post to:

   *Joint Administrators*
   *Nortel Networks*
   *PO Box 4725*
   *Maidenhead*
   *SL60 1HN*
   *United Kingdom*

Creditors wishing to submit claims using a courier service (other than Royal Mail) should email the Joint Administrators at claims@emeanortel.com for an address at which claims can be received by hand.

---



**EY**

Building a better
working world

For queries in respect of the claim process, please email claims@emeanortel.com or call +44 (0)118 328 2523 (or *Skype*: claims.emeanortel.uka) to leave a message. Please note that the Joint Administrators will not be able to provide any further information on the level or timing of any distribution until the claims process has been completed. The Joint Administrators will confirm the status of creditors' claims received, by not later than 7 November 2015, and creditors will be notified in due course as to payment of the interim dividend. It is intended that the dividend will be paid within two months of the last date for proving (i.e. by 31 December 2015) although it is possible, where the Court grants approval, that any dividend payment might be delayed.

As creditors are likely to be aware, there are significant matters still to be resolved in the administration and those matters will have an impact on the ultimate outcome for creditors. The Joint Administrators should furthermore like to make creditors aware that the interim dividend is likely to pay only a small percentage of each creditor's claim; however, the Joint Administrators expect to be able to make further distributions in future. **Nevertheless, the Joint Administrators urge all creditors to lodge their claims before 31 October 2015 to be able to participate in the distribution.**

Creditors who submitted claims during the informal proof of debt process undertaken in 2010 are requested now to resubmit their claim in the required form (via the website or in writing using the attached proof of debt form) as part of this formal process. A creditor whose claim has been reconciled (as part of the informal process) will have received with this letter separate notification as to the value of the claim that has been reconciled. Such reconciliation is not a formal admission of the claim by the Joint Administrators, and neither the Joint Administrators nor creditors are bound by claims submitted as part of the informal process.

The Joint Administrators direct creditors to the website www.emeanortel.com to view copies of the Joint Administrators' reports to creditors. The Joint Administrators cannot provide further information to individual creditors other than that already provided in the reports. Further copies of the proof of debt form can be downloaded from the website or are available on request.

Please note that this process relates only to Nortel Networks UK Limited and not to other entities in the Nortel group. Only claims against Nortel Networks UK Limited should be lodged at this stage, and the creditors of other Nortel entities in Europe in administration will be contacted separately in due course.

The sending of this letter does not constitute any admission as to the validity of a claim or the recipient's status as a creditor. Persons receiving this letter who do not believe that they are creditors of Nortel Networks UK Limited may notify the Joint Administrators by email that they do not intend to make a claim. If you do not consider yourself to be a creditor and wish to receive no further correspondence in respect of Nortel Networks UK Limited please advise the Joint Administrators by email to claims@emeanortel.com.

Yours faithfully
For Nortel Networks UK Limited

A R Bloom
Joint Administrator

The Institute of Chartered Accountants in England and Wales (in the UK) authorises A R Bloom, S J Harris and C J W Hill to act as Insolvency Practitioners under section 390(2)(a) of the Insolvency Act 1986, and the Association of Chartered Certified Accountants (in the UK) authorises A M Hudson to act as an Insolvency Practitioner under section 390(2)(a) of the Insolvency Act 1986. The affairs, business and property of the Company are being managed by the Joint Administrators, who act only as agents of the Company and without personal liability.

# NORTEL NETWORKS UK LIMITED
## (IN ADMINISTRATION)

## NOTICE OF INTENDED DIVIDEND PURSUANT TO RULE 2.95 OF THE INSOLVENCY RULES 1986

Notice is hereby given pursuant to Rule 2.95 of the Insolvency Rules 1986 that the Joint Administrators of the above named company intend to make a distribution (by way of paying an interim dividend) to the preferential creditors (if any) and to the unsecured, non-preferential creditors of Nortel Networks UK Limited (in administration) (the "**Company**").

Proofs of debt may be lodged at any point up to (and including) 31 October 2015, the last date for proving claims, however, creditors are requested to lodge their proofs of debt at the earliest possible opportunity.

Persons so proving are required, if so requested, to provide such further details or produce such documentation or other evidence as may appear to the Joint Administrators to be necessary.

The Joint Administrators will not be obliged to deal with proofs lodged after the last date for proving but they may do so if they think fit.

The Joint Administrators intend to make such distribution within the period of two months from the last date for proving claims.

Proofs of debt should be sent to the Joint Administrators.  Further details of the methods by which proofs of debt can be submitted will be posted on the website maintained by the Joint Administrators and dedicated to the administration of the Company at www.emeanortel.com.

Rule 2.95(2)(c) of the Insolvency Rules 1986 requires the Joint Administrators to state in this notice the value of the prescribed part of the Company's net property which is required to be made available for the satisfaction of the Company's unsecured debts pursuant to section 176A of the Insolvency Act 1986.  There is no prescribed part.

Dated 30 July 2015


Alan Robert Bloom
Joint Administrator

## Lodgement of claim

(bg) "Предявяване на вземане"
(cs) "Přihlášení pohledávky"
(da) »Anmeldelse af fordring«
(de) „Anmeldung einer Forderung"
(el) «Αναγγελία απαιτήσεως»
(es) «Presentación de crédito»
(et) "Nõude esitamine"
(fi) "Saatavaa koskeva ilmoitus"

(fr) «Production de créance»
(ga) "Taisceadh éilimh"
(hr) „Prijava tražbine"
(hu) "Követelésbejelentés"
(it) «Insinuazione di credito»
(lt) "Reikalavimo pateikimas"
(lv) "Prasījuma iesniegums"
(mt) "Preżentazzjoni ta' talba"

(nl) „Indiening van een schuldvordering"
(pl) "Zgłoszenie wierzytelności"
(pt) «Reclamação de crédito»
(ro) "Cerere de admitere a creanței"
(sk) "Prihláška pohľadávky"
(sl) "Prijava terjatve"
(sv) "Anmälan av fordran"

## Proof of Debt – General Form

# Nortel Networks UK Limited

Company number: 3937799
Registered office address: Fleming House, 71 King Street, Maidenhead, SL6 1DU, UK

### Date of administration order: 14 January 2009

| How to lodge claims | Instructions for completing the form |
|---|---|
| Claims may be lodged by visiting the following website: <br><br> **www.emeanortel.com** <br><br> or by completing this form and returning it by email to **claims@emeanortel.com** <br><br> or by completing this form and sending it to <br><br> *Joint Administrators* <br> *Nortel Networks* <br> *PO Box 4725* <br> *Maidenhead* <br> *SL60 1HN* <br> *United Kingdom* | The form has **2 sides**. Both sides should be completed and all relevant information provided. <br><br> **For a claim to be valid, it must be signed by the creditor or by a person authorised to act on his behalf.** <br><br> Please specify details of any documents by reference to which your claim can be substantiated. It is not essential that you provide such documents with this form but the Joint Administrators may require you in future to provide any information necessary to substantiate your claim. <br><br> For questions relating to completion of this form, you may leave a message at +44 (0)118 328 2523 or send an email to claims@emeanortel.com. If you wish to deliver the claim by hand please contact the Joint Administrators by phone or email for separate address details. |

## Details of claim

| | | |
|---|---|---|
| 1 | Name of Creditor at 14 January 2009 | |
| 2 | If the Creditor is a company, give the Creditor's registration number and country of registration | |
| 3 | If the Creditor has assigned his claim since 14 January 2009, please provide the assignee's name | |
| 4 | Address of creditor (or assignee) for correspondence in respect of the claim | |
| 5 | For convenience, name, telephone number (including country code) and email address (if available) for contact in respect of the claim | |

| 6 | Total amount of claim, including any Value Added Tax or other sales tax and outstanding uncapitalised interest as at the date the company went into administration (14 January 2009). You should state the claim in the currency in which it was incurred, and may specify several claims in different currencies if necessary | |
| 7 | If amount(s) in 6 above include any Value Added Tax or other sales tax please state amount | |
| 8 | If amount(s) in 6 above include outstanding uncapitalised interest please state amount | |
| 9 | Particulars of how and when debt incurred (if you need more space append a continuation sheet to this form) | |
| 10 | Particulars of any security held, including details of the assets covered by the security, the value of the security, and the date it was given. | |
| 11 | Particulars of any reservation of title claimed in respect of goods supplied to which the claim relates. | |
| 12 | Are you claiming preferential status under English insolvency law? | |
| 13 | To receive dividends by direct payment, please provide bank details. **All dividends will be paid in GBP.** Please include the following information as applicable: <br>• Bank name *(required)* <br>• Bank account name *(required)* <br>• Bank account number *(required)* <br>• IBAN number *(if applicable)* <br>• Sort code *(required for UK accounts)* <br>• BIC/SWIFT code *(required for all non-UK accounts)* <br>• Routing bank *(required for US accounts only)* | Please tick to indicate where your bank account is located <br>☐ UK <br>☐ Europe <br>☐ US <br>☐ Other |
| 14 | **Signature of Creditor or person authorised to act on his behalf** | |
| | **Date** | |
| | **Name in BLOCK LETTERS** | |
| | **Position with or relation to Creditor** | |
| | **Address of person signing (if different from 4 above)** | |

For official use only

| Admitted to vote for | | Admitted for dividend for | |
|---|---|---|---|
| £ | | £ | |
| Date | | Date | |
| Administrator | | Administrator | |