FILED

2015 DEC -9  PM 12: 26

CLERK
US BANKRUPTCY COURT
DISTRICT OF DELAWARE

# UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF

## DELAWARE

---

In re : NORTEL NETWORKS INC. et al          CASE NO. 09-10138(KG)

## Chapter 11

## REQUEST FOR APPOINTMENT OF EQUITY SECURITY HOLDERS

## COMMITTEE

**************************************************************

(I). Merchants Equity hereby Request the Appointment of A "Equity Security Holders" Committee Under Section 1102 (a) (2) of the Bankruptcy Code.

(II). On the Grounds as Found in Exhibits A & B attach Hereto.

(III). Also Debtors have failed to uphold a Liquidation Platform for Holder of its Common Stock, Filed Financial Statements of Share Price Value have not yet been Performed.

(IV). No Common Stock Quotation Systems in Place in respect of Opinion, See Court Opinion attach hereto.

-RELIEF REQUESTED-

That a "Equity Security Holder" Committee be Appointed.

-BASIS FOR RELIEF-

Section 105 (a) of the Bankruptcy Code.

Section 1102 (a) (2) of the Bankruptcy Code.

Exhibits A & B

Date: 12-07-2015

MERCHANTS EQUITY

_Vincent E. Php_ (PTR).

1522 W. Manchester AVE.

Los Angeles, CALIF. 90047

(323) 971-6063

**EXHIBIT A**

UNITED STATES OF AMERICA
before the
SECURITIES AND EXCHANGE COMMISSION

SECURITIES EXCHANGE ACT OF 1934
Release No. 76137 / October 14, 2015

Admin. Proc. File No. 3-16679

In the Matter of

INTERNATIONAL HI-TECH INDUSTRIES INC.,
MARK ONE GLOBAL INDUSTRIES, INC., and
NORTEL NETWORKS CORPORATION



NOTICE THAT INITIAL DECISION HAS BECOME FINAL

The time for filing a petition for review of the initial decision in this proceeding has expired. No such petition has been filed by International Hi-Tech Industries Inc., Mark One Global Industries, Inc., or Nortel Networks Corporation and the Commission has not chosen to review the decision on its own initiative.

Accordingly, notice is hereby given, pursuant to Rule 360(d) of the Commission's Rules of Practice,[1] that the initial decision of the administrative law judge has become the final decision of the Commission with respect to International Hi-Tech Industries Inc., Mark One Global Industries, Inc., and Nortel Networks Corporation.[2] The order contained in that decision is hereby declared effective. The initial decision ordered that, pursuant to Section 12(j) of the

---

[1]   17 C.F.R. § 201.360(d).

[2]   *Int'l Hi-Tech Indus. Inc., Mark One Global Indus., Inc., Nortel Networks Corp., and Silverado Gold Mines Ltd.*, Initial Decision Release No. 858 (Aug. 17, 2015), 112 SEC Docket 04, 2015 WL 4881989. The Central Index Key numbers are: 921887 for International Hi-Tech Industries, Inc.; 1000791 for Mark One Global Industries, Inc.; and 72911 for Nortel Networks Corp.

Securities Exchange Act of 1934, the registrations of each class of registered securities of International Hi-Tech Industries Inc., Mark One Global Industries, Inc., and Nortel Networks Corporation are hereby revoked.

  For the Commission, by the Office of the General Counsel, pursuant to delegated authority.

Brent J. Fields
Secretary

INITIAL DECISION RELEASE NO. 858
ADMINISTRATIVE PROCEEDING
File No. 3-16679

UNITED STATES OF AMERICA
Before the
SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

| | |
|---|---|
| In the Matter of<br><br>INTERNATIONAL HI-TECH INDUSTRIES INC.,<br>MARK ONE GLOBAL INDUSTRIES, INC.,<br>NORTEL NETWORKS CORPORATION, AND<br>SILVERADO GOLD MINES LTD. | INITIAL DECISION OF<br>DEFAULT AS TO THREE<br>RESPONDENTS<br><br>August 17, 2015 |

APPEARANCE:    David S. Frye for the Division of Enforcement, Securities and Exchange
                Commission

BEFORE:        Jason S. Patil, Administrative Law Judge

## SUMMARY

This Initial Decision revokes the registrations of the registered securities of Respondents International Hi-Tech Industries Inc., Mark One Global Industries, Inc., and Nortel Networks Corporation (collectively, the Three Respondents).[1] The revocations are based on the Three Respondents' failures to timely file required periodic reports with the Securities and Exchange Commission.

## INTRODUCTION

On July 8, 2015, the Commission issued an Order Instituting Administrative Proceedings (OIP) pursuant to Section 12(j) of the Securities Exchange Act of 1934. The OIP alleges that the Three Respondents each have a class of securities registered with the Commission pursuant to Exchange Act Section 12(g) and have repeatedly failed to file timely periodic reports with the Commission, in violation of Exchange Act Section 13(a) and Rule 13a-1. The Three Respondents were served with the OIP by July 14, 2015, and their Answers were due by July 27, 2015. *See Int'l Hi-Tech Indus. Inc.*, Admin. Proc. Rulings Release No. 2965, 2015 SEC LEXIS 3018 (July 23, 2015). To date, none of the Three Respondents has filed an Answer. The Three Respondents also failed to respond to my July 30, 2015, Order to Show Cause. *See Int'l Hi-Tech Indus. Inc.*, Admin. Proc. Rulings Release No. 2995, 2015 SEC LEXIS 3111.

---

[1] The proceeding has already ended as to Silverado Gold Mines Ltd. *See Int'l Hi-Tech Indus. Inc.*, Exchange Act Release No. 75687, 2015 WL 4760908 (Aug. 13, 2015).

## FINDINGS OF FACT

The Three Respondents are in default for failing to file Answers or otherwise defend the proceeding. *See* OIP at 3; 17 C.F.R. §§ 201.155(a)(2), .220(f). Accordingly, as authorized by Rule 155(a), 17 C.F.R. § 201.155(a), I find the following allegations in the OIP to be true.

International Hi-Tech, Central Index Key (CIK) No. 921887, is a Canadian corporation located in Vancouver, British Columbia, Canada, with a class of securities registered with the Commission pursuant to Exchange Act Section 12(g). The company is delinquent in its periodic filings with the Commission, having not filed any periodic reports since it filed a Form 20-F for the period ended December 31, 2005, which reported a net loss of $8,068,400 Canadian for the prior year. As of July 7, 2015, International Hi-Tech's common shares were quoted on OTC Link operated by OTC Markets Group Inc. (formerly "Pink Sheets") (OTC Link), had five market makers, and were eligible for the "piggyback" exception of Exchange Act Rule 15c2-11(f)(3).

Mark One, CIK No. 1000791, is a British Columbia corporation located in Olathe, Kansas, with a class of securities registered with the Commission pursuant to Exchange Act Section 12(g). The company is delinquent in its periodic filings with the Commission, having not filed any periodic reports since it filed a Form 20-F for the period ended December 31, 2009, which reported a net loss of $33,125 for the prior year. As of July 7, 2015, Mark One's common shares were quoted on OTC Link, had two market makers, and were eligible for the "piggyback" exception of Exchange Act Rule 15c2-11(f)(3).

Nortel, CIK No. 72911, is a Canadian corporation located in Mississauga, Ontario, Canada, with a class of securities registered with the Commission pursuant to Exchange Act Section 12(g). The company is delinquent in its periodic filings with the Commission, having not filed any periodic reports since it filed a Form 10-Q for the period ended June 30, 2012, which reported a net loss, including non-controlling interests, of $187,000,000 for the prior six months. On January 14, 2009, a Chapter 11 petition was filed in the U.S. Bankruptcy Court for the District of Delaware, which was still pending as of June 30, 2015. As of July 7, 2015, Nortel's common shares were quoted on OTC Link, had fifteen market makers, and were eligible for the "piggyback" exception of Exchange Act Rule 15c2-11(f)(3).

In addition to their repeated failures to file timely periodic reports, the Three Respondents failed to heed delinquency letters sent to them by the Commission's Division of Corporation Finance requesting compliance with their periodic filing obligations or, through their failure to maintain a valid address on file with the Commission as required by Commission rules, did not receive such letters.

## CONCLUSIONS OF LAW

Exchange Act Section 13(a) and Rule 13a-1 require public corporations to file annual reports with the Commission. "Compliance with those requirements is mandatory and may not be subject to conditions from the registrant." *America's Sports Voice, Inc.*, Exchange Act Release No. 55511, 2007 SEC LEXIS 1241, at *12 (Mar. 22, 2007), *recons. denied*, Exchange

Act Release No. 55867, 2007 SEC LEXIS 1239 (June 6, 2007). Scienter is not required to establish violations of Exchange Act Section 13(a) and Rule 13a-1. *See SEC v. McNulty*, 137 F.3d 732, 740-41 (2d Cir. 1998); *SEC v. Wills*, 472 F. Supp. 1250, 1268 (D.D.C. 1978). There is no genuine issue of material fact that the Three Respondents failed to timely file required periodic reports. As a result, the Three Respondents failed to comply with Exchange Act Section 13(a) and Rule 13a-1.

## SANCTIONS

Under Exchange Act Section 12(j), the Commission is authorized, "as it deems necessary or appropriate for the protection of investors," to revoke the registration of a security or suspend for a period not exceeding twelve months if it finds, after notice and an opportunity for hearing, that the issuer of the security has failed to comply with any provision of the Exchange Act or rules thereunder. In determining the public interest or what is necessary or appropriate for the protection of investors, the Commission "consider[s], among other things, the seriousness of the issuer's violations, the isolated or recurrent nature of the violations, the degree of culpability involved, the extent of the issuer's efforts to remedy its past violations and ensure future compliance, and the credibility of its assurances, if any, against further violations." *Gateway Int'l Holdings, Inc.*, Exchange Act Release No. 53907, 2006 SEC LEXIS 1288, at *19-20 (May 31, 2006).

The Three Respondents' failures to file required periodic reports are serious because they violate a central provision of the Exchange Act. The purpose of periodic reporting is "to supply investors with current and accurate financial information about an issuer so that they may make sound [investment] decisions." *Id.* at *26. The reporting requirements are the primary tool that Congress fashioned for the protection of investors from negligent, careless, and deliberate misrepresentations in the sale of securities. *SEC v. Beisinger Indus. Corp.*, 552 F.2d 15, 18 (1st Cir. 1977). The Three Respondents' violations are also recurrent in that each repeatedly failed to file periodic reports. *See Nature's Sunshine Prods., Inc.*, Exchange Act Release No. 59268, 2009 SEC LEXIS 81, at *20 (Jan. 21, 2009); *Impax Labs., Inc.*, Exchange Act Release No. 57864, 2008 SEC LEXIS 1197, at *25-26 (May 23, 2008). The Three Respondents are also culpable because they failed to heed delinquency letters sent to them by the Division of Corporation Finance or, through their failure to maintain a valid address on file with the Commission, did not receive such letters, and they were therefore on notice, even before the OIP issued, of their obligations to file periodic reports. *See China-Biotics, Inc.*, Exchange Act Release No. 70800, 2013 SEC LEXIS 3451, at *37 & n.60 (Nov. 4, 2013) (holding that revocation may be warranted even without proof that a respondent was aware of its reporting obligations). Finally, the Three Respondents have not answered the OIP or otherwise defended the proceeding to address whether they have made any efforts to remedy their past violations, and have made no assurances against further violations.

Considering these delinquencies, it is necessary and appropriate for the protection of investors to revoke the registrations of each class of registered securities of the Three Respondents.

## ORDER

It is ORDERED that, pursuant to Section 12(j) of the Securities Exchange Act of 1934, the registrations of each class of registered securities of International Hi-Tech Industries Inc., Mark One Global Industries, Inc., and Nortel Networks Corporation are hereby REVOKED.

It is FURTHER ORDERED that the telephonic prehearing conference scheduled for August 21, 2015, at 11:00 a.m. EDT is CANCELLED.

This Initial Decision shall become effective in accordance with and subject to the provisions of 17 C.F.R. § 201.360. Pursuant to 17 C.F.R. § 201.360, a party may file a petition for review of this Initial Decision within twenty-one days after service of the Initial Decision. A party may also file a motion to correct a manifest error of fact within ten days of the Initial Decision, pursuant to 17 C.F.R. § 201.111(h). If a motion to correct a manifest error of fact is filed by a party, then a party shall have twenty-one days to file a petition for review from the date of the undersigned's order resolving such motion to correct a manifest error of fact.

This Initial Decision will not become final until the Commission enters an order of finality. The Commission will enter an order of finality unless a party files a petition for review or a motion to correct a manifest error of fact or the Commission determines on its own initiative to review the Initial Decision as to a party. If any of these events occur, the Initial Decision shall not become final as to that party.

The Three Respondents are each notified that they may move to set aside the default in this case. Pursuant to Rule 155(b), 17 C.F.R. § 201.155(b), the Commission is authorized, at any time, to set aside a default for good cause, in order to prevent injustice and on such conditions as may be appropriate. A motion to set aside a default shall be made within a reasonable time, state the reasons for the failure to appear or defend, and specify the nature of the proposed defense in the proceeding. *Id.*

Jason S. Patil
Administrative Law Judge

4

**EXHIBIT B**

## BASIS FOR RELIEF REQUESTED

17. Pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code, a debtor-in-possession is authorized to operate its business while maintaining a "fiduciary duty to act in the best interest of the estate as a whole, including its creditors, equity interest holders and other parties in interest." *LaSalle Nat'l Bank v. Perelman*, 82 F.Supp.2d 279, 292 (D. Del. 2000). Implicit in the fiduciary duties of any debtor-in-possession is the obligation to "protect and preserve the estate, including an operating business's going-concern value." *In re CoServ, L.L.C.*, 273 B.R. 161, 176 (Bankr. N.D. Tex. 2002). Here, the Debtors seek to secure the modifications as a critical aspect of the proposed sale of assets in order to maximize the value to the estate through the auction process. Accordingly, the Debtors are operating consistent with their duties under Sections 1107(a) and 1108 of the Bankruptcy Code.

18. The Debtors also seek authority, to the extent necessary, pursuant to Section 363(b)(1) of the Bankruptcy Code, which authorizes this Court, after notice and a

7

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| NORTEL NETWORKS, INC., et al. | ) | Case No. 09-10138 (KG) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| ———————————————— | ) | Re Dkt No. 5307 and 5531 |

## OPINION

The Court is opining on a matter of great significance in this daunting Chapter 11 case, namely, whether the Court will determine the allocation of proceeds from sales of assets in judicial proceedings, or if the allocation will be decided through an arbitration.[1] See Joint Motion for Entry of an Order Establishing an Allocation Protocol Pursuant to the Interim Funding and Settlement Agreement and for Related Relief (the "Joint Motion") (D.I. 5307); and Joint Administrators' Objection to the Motion and Cross-Motion to Compel Arbitration, dated May 31, 2011 (the "Objection") (D.I. 5531). For the reasons provided in this opinion, the Court finds that parties agreed that the Courts will make the allocation determination rather than an arbitrator or arbitrators. Despite the voluminous submissions of the parties and the lengthy arguments, the Court's decision ultimately turns on a plain and unambiguous agreement between the parties.

---

[1] Canadian entities also commenced a proceeding with the Ontario Superior Court of Justice (the "Canadian Court") under the Companies Creditors Arrangement Act (Canada) seeking relief from their creditors (the "Canadian Proceedings"). The issue before the Court is similarly before the Canadian Court. The Court will refer to the "Courts" when discussing both this Court and the Canadian Court.

## PARTIES

It is helpful in understanding the discussion of the issues to describe and define the numerous parties involved in the cases. The Court will refer to the universe of Nortel Entities described below as the "Nortel Parties."

Nortel Networks, Inc. ("NNI") and certain of its affiliates (collectively, the "U.S. Debtors") are debtors in the cases before the Court. They are joined in opposing arbitration by the Official Committee of Unsecured Creditors (the "Committee") and the Ad Hoc Committee of Bondholders (the "Bondholders"). The Bondholders hold claims in excess of $4 billion.

The Canadian Court appointed Ernst & Young to serve as the Monitor (the "Monitor") for the Canadian debtors, Nortel Networks Corporation ("NNC"), NNI's ultimate corporate parent, Nortel Networks Limited ("NNL"), NNI's direct corporate parent, and certain Canadian affiliates (collectively, the "Canadian Debtors").[2]   The Canadian Debtors also oppose arbitration.

The third group of major parties, this group favoring and seeking arbitration, consists of entities which the High Court of England and Wales placed into administration (the "EMEA Debtors"). These affiliates, all in administration, are: Nortel Networks UK Limited Nortel Networks (Ireland) Limited; Nortel Networks NV; Nortel Networks SpA; Nortel Networks BV; Nortel Networks Polska Sp z.o.o.; Nortel Networks Hispania, SA; Nortel

---

[2] Nortel Networks Global Corporation, Nortel Networks International Corporation and Nortel Networks Technology Corporation.

Networks (Austria) GmbH; Nortel Networks GmbH; Nortel Networks s.r.o.; Nortel Networks Engineering Services Kft; Nortel Networks Portugal SA; Nortel Networks Slovensko, s.r.o.; Nortel Networks Romania SRL; Nortel GmbH; Nortel Networks OY; Nortel Networks AB; Nortel Networks International Finance & Holding BV and Nortel Networks France S.A.S.

The Administrators in the insolvency proceedings pending in the United Kingdom for all EMEA Debtors except Nortel Networks (Ireland) Limited are: Alan Robert Bloom, Christopher John Wilkinson Hill, Alan Michael Hudson and Stephen John Harris. The Administrators for Nortel Networks (Ireland) Limited are Alan Robert Bloom and David Martin Hughes (collectively, the "Joint Administrators" or "EMEA Debtors").

## **RELEVANT FACTS**

The U.S. Debtors filed for bankruptcy protection on January 14, 2009, and the Canadian Debtors filed for similar relief in Canada. Shortly thereafter, the U.S. Debtors and the Canadian Debtors began a sale of all of its businesses and its intellectual property which eventually generated approximately $9 billion (the "Sales Proceeds").[3]

The prospective sales created a "stickey wicket." In the absence of agreement, what was to happen with the Sales Proceeds? The numerous, multi-national debtors who were competing for the Sales Proceeds addressed the problem by agreement. Thus, on June 9,

---

[3]   The beneficial efforts of and stress upon the parties and their professionals cannot be overemphasized. By the Court's count, the U.S. Debtors and the Canadian Debtors conducted nine massive sales, requiring numerous motions, procedures, marketing, negotiations, auctions, hearings and closings. The results were beyond expectations for the most part and certainly were as a group.

2009, the U.S. Debtors, the Canadian Debtors and the EMEA Debtors entered into the

Interim Funding and Settlement Agreement ("IFSA"), which the U.S. Court (the "U.S. IFSA

Order") and the Canadian Court approved by separate orders, dated June 29, 2009.  The

English High Court already ruled that the Joint Administrators were free to enter into the

IFSA on behalf of the EMEA Debtors.

The IFSA provided the necessary mechanism to allow the planned sales of the Nortel

Parties' businesses and assets to proceed without dispute among the Nortel Parties.  The

IFSA, *inter alia*,  provided that the parties to the IFSA would not condition the execution of

any sale agreement with a third party upon allocation or even a binding procedure for

allocation of the sale proceeds (IFSA, ¶ 12(a), but the sale proceeds would instead be placed

into an escrow account.  IFSA, ¶ 12(b).  The sales were each accompanied by an escrow

agreement pertaining to that sale (collectively, the "Escrow Agreements").  The Nortel

parties also agreed to negotiate for a protocol to resolve allocation disputes.  IFSA, ¶ 12(c).

The IFSA provides that disputes over the IFSA or anything relating to the IFSA must be

decided in a joint hearing of the U.S. Court and the Canadian Court.  IFSA, ¶16(b).

The Nortel Parties could not agree upon a protocol which would govern the allocation

process.  Their failure was not for want of trying.  The Nortel Parties engaged in lengthy

discussions, including comprehensive settlement discussions, and two rounds of mediation.

The most recent mediation with The Honorable Warren K. Winkler, Chief Justice of Ontario,

Canada serving as the mediator ended without resolution despite the Chief Justice's expertise

and hard work. The termination of the mediation led to the matter coming back before the Courts.[4]

## DISCUSSION

### A. The Joint Administrators' Case for Arbitration

The Joint Administrators argue forcefully in the Objection that the Nortel Parties agreed to arbitration, that the IFSA reflects that agreement and that arbitration is the only practical and efficient procedure. The Joint Administrators maintain that the Nortel Parties understood from the time they negotiated the IFSA that the allocation of proceeds would be decided in a private, transnational arbitration proceeding. The Joint Administrators further argue that: (1) the Joint Motion is improper from a procedural standpoint, because the Court can grant the relief only in an adversary proceeding; (2) the intent to submit the matter to arbitration can be gleaned from its content, or the IFSA is sufficiently ambiguous, particularly the term "dispute resolvers," to require the Court to consider extrinsic evidence; (3) the IFSA created an enforceable promise to negotiate in good faith for an Interim Sales Protocol which the U.S. Debtors and the Canadian Debtors failed to honor; (4) the Nortel Parties reached an understanding calling for arbitration; (5) the Court lacks jurisdiction over the EMEA Debtors; and (6) judicial proceedings are highly impractical, creating the possibility of deadlock between the Court and the Canadian Court and parallel appeal

---

[4] The Nortel Parties and others first argued the Joint Motion and the Objection to the Courts in a joint hearing on June 7, 2011. Without ruling, the Courts referred the dispute to mediation. See Order Directing Mediation, dated June 17, 2011 (D.I. 5752). When the mediation failed, the Courts ordered parties to submit supplemental papers. The Courts heard the second argument on March 7, 2013.

processes.

The Joint Administrators argue that although the IFSA does not contain the words "arbitrator" or "arbitrators," it is sufficient that there is language which clearly manifests the parties' intention to submit to arbitration. *Douglas Fin. Corp. v. Pa. Power & Light Co.*, 858 F.2d 825, 830 (2d Cir. 1988). The Joint Administrators contend that the following language in the IFSA establishes the intention for arbitration:

> [Execution by a selling debtor of sale documents] shall not be conditioned upon such Selling Debtor reaching agreement with the other Selling Debtors regarding (A) allocation of the Sale Proceeds (the "Sale Proceeds") from the relevant Sale Transaction or (B) the binding procedure for the allocation of Sale Proceeds from the relevant Sale Transaction.

IFSA, ¶ 12(a).

Also, in providing for the escrow of Sale Proceeds, the IFSA provides:

> In no case shall there be any distribution from the Escrow Account in advance of either (i) agreement of all the Selling Debtors or (ii) in a case where the Selling Debtors fail to reach agreement, determination by the relevant dispute resolver(s) under the terms of the Protocol applicable to the Sale Proceeds.

IFSA, ¶ 12(b).

Finally, the IFSA provides:

> [T]he Debtors shall, as soon as reasonably practicable, following the execution of this Agreement, negotiate in good faith and attempt to reach agreement on a timely basis on a protocol for resolving disputes concerning the allocation of Sale Proceeds from Sale Transactions (the "Interim Sales Protocol"), which Protocol shall provide binding procedures for the allocation of Sale Proceeds where the Selling Debtors in such transactions have been unable to reach agreement on such allocations.

IFSA, ¶ 12(c).

From these provisions, and particularly the words "dispute resolvers," the Joint Administrators propose the only reasonable interpretation is that no one intended the Court and the Canadian Court to hold a joint trial on allocation.

The IFSA, they argue, is at the very least ambiguous requiring the Courts to consider extrinsic evidence. The Joint Administrators in their supporting papers presented the evidence they claim proves that the Nortel Parties agreed to arbitration. For reasons discussed below, the Court finds that the IFSA is not ambiguous and therefore the Court will not consider extrinsic evidence.[5]  At bottom, the IFSA is not reasonably susceptible of more than one interpretation and therefore is not ambiguous. *Foot Locker, Inc. v. Omni Funding Corp. of America*, 911 N.Y.S. 2d 344, 346 (1st Dep't 2010).

---

[5]  The question of whether an ambiguity exists is one of law, not fact.  *W.W.W. Associates, Inc. v. Giancontieri*, 566 N.E. 2d 639, 642 (N.Y. 1990).

The Joint Administrators also argue that the EMEA Debtors did not submit to the jurisdiction of the Courts, except to enable the Courts to enforce arbitration. They further argue that the Courts do not have jurisdiction to issue a joint opinion on allocation. The Joint Administrators need not have any concern. The Court has independent jurisdiction over the EMEA Debtors and will issue its own opinion on allocation. The Court's jurisdiction rests on the IFSA itself, and Debtors' submission to the Court's jurisdiction by submitting claims against the U.S. Debtors.

The Joint Administrators are correct that the Court will confront practical and logistical difficulties. There is, indeed, the possibility that the Court and the Canadian Court will arrive at different allocations, and the trial at two distant locations may present challenges. However, difficulty is no reason for a court with jurisdiction, detailed knowledge of a case and the means to preside over that case to abandon its authority. *Meredith v. City of Winter Haven*, 320 U.S. 228, 236-37 (1943). It would be easier, but improper, for the Court to abdicate its responsibility by sending the allocation issues to arbitration without any justification. The Court is confident that the Nortel Parties and other interested parties, very ably represented, will assist the Court in minimizing any practical problems. It is entirely in the best interest of all of the Nortel Parties to facilitate the resolution of the allocation of large sums of money sitting in escrow, and equally to assist the Court in reaching the correct decision. Further, based upon the Court's years of presiding over the lawyers in this Chapter 11 case, the Court is certain that they will respect their professional obligations. More

importantly, the Court's enormous respect for the presiding jurist in the Canadian Court, Justice Geoffrey B. Morawetz, further fuels confidence in the Court's ability to render independently a fair and just result in an efficient and decorous manner. The judges overseeing these two cases have thus far worked through numerous difficulties and can no doubt continue to work together seamlessly. The U.S. Debtors and the Canadian Debtors put in place, with the Courts' approval, a Cross-Border Protocol which has facilitated these cases.[6] The EMEA Debtors were not parties to the Cross-Border Protocol, but agreed to its implementation in the Escrow Agreements.

### B. The Case Against Arbitration

The U.S. Debtors, the Canadian Debtors and their respective constituents are asking the Courts to determine the allocation of the assets, which are largely comprised of the Sales Proceeds. The Court is persuaded by their position.

### 1. Jurisdiction

The Nortel Parties agreed in the IFSA that they were submitting to the non-exclusive jurisdiction of the Court and the Canadian Court in a joint hearing conducted pursuant to the Cross-Border Protocol for "all legal proceedings to the extent relating to the matters agreed in this Agreement . . ." IFSA, ¶ 16(b)(i).

---

[6] The Court approved the Cross-Border Protocol on January 15, 2009, after the Canadian Court's approval on January 14, 2009.

In furtherance of the Courts' jurisdiction to determine allocation, the Nortel Parties agreed that "any claim, action or proceeding by such Party seeking any relief whatsoever to the extent relating to the matters agreed in this Agreement must be commenced in . . . a joint hearing of both the Canadian and U.S. Courts conducted under the Cross-Border Protocol . . . IFSA, ¶ 16(b)(ii). The words "any claim, action or proceedings," "any relief whatsoever," "relating to" and "must" in the foregoing provision establish beyond cavil that the Nortel Parties, including the EMEA Debtors, agreed that they were submitting to the Court's jurisdiction. If the quoted provisions are not sufficient to make the point, the Nortel Parties excluded two specific issues, neither allocation, from the Court's jurisdiction. Additionally, as the U.S. Debtors discuss in their papers in support of the Joint Motion, the Escrow Agreements also make it clear that disputes relating to the escrowed funds will be heard by the Court.

The language in the IFSA, "any claim, action or proceeding . . . relating to matters agreed in this [IFSA]," and similar language in the Escrow Agreements[7] are broad forum selection provisions. *Schering Corp. v. First Databank, Inc.*, 479 F. Supp. 2d 468, 471 (D.N.J. 2007); *Pacor v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984). The law is clear: forum selection clauses are interpreted broadly and are enforced. *Foster v. Chesapeake Ins. Co.*, 933 F.2d 1207, 1216-19 (3d Cir. 1991). Clearly, the Nortel Parties agreed in the IFSA and in the Escrow Agreements that the Court with the Canadian Court are the "look to"

---

[7] The Escrow Agreements, to which the EMEA Debtors are a party, also provide that the EMEA Debtors submit to the exclusive jurisdiction of the Courts for all disputes.

jurisdictions for resolution of matters covered in such agreements and that includes allocation.

## 2. The Agreement

It is very clear that the Nortel Parties did not agree to arbitrate. The Joint Administrators concede the absence of agreement by arguing that the U.S. Debtors and Canadian Debtors had an obligation to negotiate the terms of arbitration.

It is equally clear that without agreement, there is no obligation to arbitrate. *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 130 S. Ct. 2847, 2857-58 (2010). It is true that federal courts follow a policy favoring arbitration, but only if a valid agreement to arbitrate exists. *Id.* at 2859-60. Furthermore, while courts favor enforcing arbitration provisions that exist, courts are not predisposed to find parties agreed to arbitration. *Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F. 3d 156, 160 (3d Cir. 2009). Instead, when deciding whether or not there is an agreement to arbitrate, courts will apply standard principles of contract formation. Where the language in the contract is unambiguous, courts will determine intent from the contract language itself without considering extrinsic evidence. *IDT Corp. v. Tyco Group*, 13 N.Y. 3d 209, 214 (2009); *Krumme v. WestPoint Stevens, Inc.*, 238 F.3d 133, 139 (2d Cir. 2000).[8]

---

[8] New York Law governs the IFSA. IFSA, ¶ 16(a).

11

The EMEA Debtors rely on Paragraph 12 of the IFSA as proof of the Nortel Parties' intent to arbitrate. Paragraph 12 just does not provide such proof. The Nortel Parties are all sophisticated and are represented by highly capable lawyers.[9] They were surely proficient at drafting an arbitration clause, and did not. Instead, Paragraph 12(c) of the IFSA provides that the Nortel Parties will negotiate and attempt to reach agreement on a protocol for resolving allocation. Paragraph 12(a), in turn, provides that the parties will enter into future sales agreements even in the absence of a binding procedure for resolving allocation issues. The Nortel Parties also did not agree to the terms of arbitration, including: who, how many, how selected, where they would sit, right to appeal. The absence of these important terms further evidences that the parties did not even approach any agreement on arbitration. *See also Bor Corp. v. ADT Automotive, Inc.*, Case No. 96 Civ. 1019 (JFK), 1996 WL 689364 *10 (S.D.N.Y., Nov. 27, 1996) (holding that the absence of the word "arbitrate" is highly significant to finding the absence of the intent to arbitrate). In *Bor*, the parties had agreed that they would negotiate to hire Ernst & Young or another "dispute resolver." The parties also agreed that the arbitration results would be binding. Even with the apparent arbitration understanding between the parties, the court denied the motion to arbitrate, finding that the parties involved were sophisticated entities who, had they wanted arbitration, would have used the term or a derivative. *Bor* at *10.

---

[9] *See Truck Drivers, Oil Drivers, Filling Station & Platform Workers' Union Local 705, Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am. (AFL-CIO) v. Schneider Tank Lines, Inc.*, 958 F.2d 171, 175 (7th Cir. 1992), finding that an agreement unambiguously omitted arbitration provisions where it "strained credulity" that parties forgot to include them.

The Court must also consider the U.S. IFSA Order which requires that "no ... protocol for allocation of proceeds from a Sale Transaction may become effective without the prior approval of this Court . . ." Both the IFSA and the U.S. IFSA Order are entirely consistent with the Bankruptcy Rules. The parties must stipulate and the Court must approve arbitration when there is a controversy affecting the estate. Fed. R. Bankr. P. 9019(c), *accord.* Del. Bankr. L.R. 9013-3(b)(i) (requiring consent to arbitration to be "freely and knowingly obtained").

The only language in the IFSA upon which the EMEA Debtors attempt to gain a foothold for their arbitration argument is the term "dispute resolvers." IFSA, ¶ 12(c). The Court is not at all persuaded by this argument. The Courts - and there are two here - are, of course, "dispute resolvers." As the U.S. Debtors show, numerous decisions identify courts as "dispute resolvers." *See, e.g., Positive Software Solutions, Inc. v. New Century Mortg. Corp.*, 476 F.3d 278, 292 (5th Cir. 2007); *Lewis v. Sullivan*, 279 F.3d 526, 528 (7th Cir. 2002); *Armster v. U.S. Dist. Court for Cent. Dist. of California*, 806 F.2d 1347, 1350, n.2 (9th Cir. 1986); *Farber v. Job*, 467 F. Supp. 163, 170 (D.N. J. 1978). The EMEA Debtors' argument for the significance of "dispute resolvers" is further weakened by their reliance upon *Palumbo v. Select Mgmt. Holdings, Inc.*, No. 82900, 2003 WL 22674397 (Ohio Ct. App. Nov. 13, 2003) and its contrast to the facts here. The EMEA Debtors cite the case to show that "dispute resolver" refers to arbitration. *Palumbo* is inapposite because the parties had defined the term as referring to an accounting firm as arbitrator. *Id. @ *1. The parties

in *Palumbo* had also agreed to detailed procedures for the arbitration (*Id.* @ *2), which the

Nortel Parties never did.

The IFSA is unambiguous in providing that it is for the Courts, and not an arbitrator

or arbitrators, to determine the allocation issues.[10]  Under such circumstances, the Court is

obliged to give effect to its plain meaning.  *Vintage LLC v. Laws Constr. Corp.*, 13 N.Y.3d

847, 849-50 (2009).  In particular, *Pavarini McGovern, LLC v. Tag Court Square, LLC*, 878

N.Y.S. 2d 419-20 (2d Dep't 2009), describes the circumstances present before the Court:

> When interpreting a commercial contract negotiated by and
> entered into at arm's length between sophisticated business
> people, represented by an attorney, a court must enforce the
> agreement according to its terms, and extrinsic and parole
> evidence is not admissible to create an ambiguity in a written
> agreement that is complete, clear, and unambiguous on its
> face.

The Court does not hesitate to find that the IFSA, entered into at arm's length,

between sophisticated business people, represented by highly capable lawyers,

unambiguously states the agreement that the Courts retain jurisdiction to resolve allocation

disputes.

### 3. Proceeding by Motion

The Joint Administrators urge the Court to rule that the U.S. Debtors were required

to proceed by filing an adversary complaint.  The Court disagrees.  The Joint Motion is an

effort to enforce an agreement, the IFSA, which the Court approved by the U.S. IFSA Order.

---

[10]  The EMEA Debtors do not argue there is any ambiguity in the term "dispute resolvers." Instead,
they argue that the term clearly calls for arbitration.

14

*See, e.g., In re Worldcorp. Inc.*, 252 B.R. 890-95 (Bankr. D. Del. 1999) (holding that where a party seeks to enforce a prior order, it is not required to commence an adversary proceeding). The Court also recognizes the irony that the Joint Administrators' proceeded by objection and cross-motion, not by complaint.

## CONCLUSION

The Nortel Parties did not agree to arbitrate and the Court will not - indeed cannot - compel arbitration. The Court has jurisdiction and the IFSA is the call for the submission of an allocation protocol, which will define the procedures for a joint evidentiary hearing to determine allocation. The Court will issue an Order consistent with its decision.



Dated: April 3, 2013

KEVIN GROSS, U.S.B.J.

15

'10-Q 1 d245875d10q.htm FORM 10-Q

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## FORM 10-Q

☒ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the Quarterly Period Ended September 30, 2011**

**OR**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the Transition Period From     to**

**Commission File Number: 001-07260**

# Nortel Networks Corporation
### (Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Canada** | **98-0535482** |
| (State or Other Jurisdiction of Incorporation or Organization) | (I.R.S. Employer Identification No.) |
| **5945 Airport Road, Suite 360** | |
| **Mississauga, Ontario, Canada** | **L4V 1R9** |
| (Address of Principal Executive Offices) | (Zip Code) |

**Registrant's Telephone Number Including Area Code (905) 863-7000**

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☒   No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).   Yes ☒   No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer", "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

| | |
|---|---|
| Large accelerated filer ☐ | Accelerated filer ☐ |
| Non-accelerated filer ☐ (Do not check if a smaller reporting company) | Smaller reporting company ☒ |

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).   Yes ☐   No ☒

- Indicate the number of shares outstanding of each of the issuer's classes of common stock as of September 30, 2011.

**498,206,366 shares of common stock without nominal or par value**

**TABLE OF CONTENTS**

**PART I**
**FINANCIAL INFORMATION**
                                                                                    **PAGE**

ITEM 1.    Condensed Consolidated Financial Statements (unaudited)                    1

ITEM 2.    Management's Discussion and Analysis of Financial Condition and Results of Operations    34

ITEM 4.    Controls and Procedures                                                    53

**PART II**
**OTHER INFORMATION**

ITEM 1.    Legal Proceedings                                                          54

ITEM 1A.   Risk Factors                                                              55

ITEM 2.    Unregistered Sales of Equity Securities and Use of Proceeds               56

ITEM 6.    Exhibits                                                                   56

SIGNATURES                                                                           57

All dollar amounts in this document are in United States Dollars unless otherwise stated.

NORTEL, NORTEL (Logo), NORTEL NETWORKS, the Globemark, and NT are trademarks of Nortel Networks.

All other trademarks are the property of their respective owners.

**PART 1**
**FINANCIAL INFORMATION**

**ITEM 1.   Condensed Consolidated Financial Statements (unaudited)**

## NORTEL NETWORKS CORPORATION

**(Under Creditor Protection Proceedings as of January 14, 2009 — note 2)**
**Condensed Consolidated Statements of Operations (unaudited)**
**(Millions of U.S. Dollars, except per share amounts)**

|  | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|  | 2011 | 2010 | 2011 | 2010 |
|---|---|---|---|---|
| Revenues: |  |  |  |  |
| Products | $      3 | $      72 | $      20 | $      478 |
| Services | — | 13 | 4 | 114 |
| Total revenues | 3 | 85 | 24 | 592 |
| Cost of revenues: |  |  |  |  |
| Products | (9) | 81 | 15 | 452 |
| Services | 6 | 7 | 9 | 40 |
| Total cost of revenues | (3) | 88 | 24 | 492 |
| Gross profit (loss) | 6 | (3) | — | 100 |
| Selling, general and administrative expense | 28 | 108 | 119 | 409 |
| Research and development expense | — | 3 | — | 106 |
| Loss on sales and impairments of assets - net | 1 | — | 2 | 3 |
| Other operating income - net (note 6) | (6) | (94) | (49) | (250) |
| Operating loss | (17) | (20) | (72) | (168) |
| Other income (expense) - net (note 6) | (54) | (18) | (61) | 14 |
| Interest expense (contractual interest expense for the nine months ended September 30, 2011 and 2010 was $242 and $237, respectively) | (82) | (77) | (241) | (227) |
| Loss from continuing operations before reorganization items, income taxes and equity in net loss of associated companies and EMEA Subsidiaries | (153) | (115) | (374) | (381) |
| Reorganization items - net (note 5) | 4,224 | (529) | 4,240 | (1,488) |
| Earnings (loss) from continuing operations before income taxes, and equity in net loss of associated companies and EMEA Subsidiaries | 4,071 | (644) | 3,866 | (1,869) |
| Income tax benefit (expense) | (6) | 4 | (7) | 37 |
| Earnings (loss) from continuing operations before equity in net loss of associated companies and EMEA Subsidiaries | 4,065 | (640) | 3,859 | (1,832) |
| Equity in net loss of associated companies - net of tax | — | — | — | (1) |
| Equity in net loss of EMEA Subsidiaries (note 17) | — | — | — | (50) |
| Net earnings (loss) from continuing operations | 4,065 | (640) | 3,859 | (1,883) |
| Net earnings (loss) from discontinued operations - net of tax | — | (5) | (1) | 28 |
| Net earnings (loss) | 4,065 | (645) | 3,858 | (1,855) |
| Income attributable to noncontrolling interests | (5) | (4) | (18) | (11) |
| Net earnings (loss) attributable to Nortel Networks Corporation | $      4,060 | $      (649) | $      3,840 | $      (1,866) |
| Basic earnings (loss) per common share - continuing operations | $      8.14 | $      (1.29) | $      7.70 | $      (3.80) |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Diluted earnings (loss) per common share - continuing operations | $ | 7.61 | $ | (1.29) | $ | 7.22 | $ | (3.80) |
| Total basic earnings (loss) per common share | $ | 8.14 | $ | (1.30) | $ | 7.70 | $ | (3.74) |
| Total diluted earnings (loss) per common share | $ | 7.61 | $ | (1.30) | $ | 7.22 | $ | (3.74) |

*The accompanying notes are an integral part of these condensed consolidated financial statements*

1

10-Q 1 d10q.htm FORM 10-Q

**Table of Contents**

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

---

# FORM 10-Q

---

☒ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the Quarterly Period Ended March 31, 2011

**OR**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the Transition Period From     to

Commission File Number: 001-07260

---

# Nortel Networks Corporation
### (Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Canada** | **98-0535482** |
| (State or Other Jurisdiction of Incorporation or Organization) | (I.R.S. Employer Identification No.) |
| **5945 Airport Road, Suite 360** | |
| **Mississauga, Ontario, Canada** | **L4V 1R9** |
| (Address of Principal Executive Offices) | (Zip Code) |

**Registrant's Telephone Number Including Area Code (905) 863-7000**

---

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ☐ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a

smaller reporting company. See the definitions of "large accelerated filer", "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☐                                    Accelerated filer              ☐

Non-accelerated filer   ☐ (Do not check if a smaller reporting company)   Smaller reporting company ☒

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).   Yes ☐   No ☒

Indicate the number of shares outstanding of each of the issuer's classes of common stock as of May 6, 2011.

**498,206,366 shares of common stock without nominal or par value**

## TABLE OF CONTENTS

|  |  | PAGE |
|---|---|---|
| **PART I** | | |
| **FINANCIAL INFORMATION** | | |
| ITEM 1. | Condensed Consolidated Financial Statements (unaudited) | 1 |
| ITEM 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 40 |
| ITEM 4. | Controls and Procedures | 63 |
| **PART II** | | |
| **OTHER INFORMATION** | | |
| ITEM 1. | Legal Proceedings | 64 |
| ITEM 1A. | Risk Factors | 65 |
| ITEM 2. | Unregistered Sales of Equity Securities and Use of Proceeds | 66 |
| ITEM 6. | Exhibits | 66 |
| SIGNATURES | | 67 |

All dollar amounts in this document are in United States Dollars unless otherwise stated.

NORTEL, NORTEL (Logo), NORTEL NETWORKS, the Globemark, and NT are trademarks of Nortel Networks.

MOODY'S is a trademark of Moody's Investors Service, Inc.

All other trademarks are the property of their respective owners.

Table of Contents

# PART 1
## FINANCIAL INFORMATION
**ITEM 1.   Condensed Consolidated Financial Statements (unaudited)**

## NORTEL NETWORKS CORPORATION

**(Under Creditor Protection Proceedings as of January 14, 2009 — note 2)**
**Condensed Consolidated Statements of Operations (unaudited)**
**(Millions of U.S. Dollars, except per share amounts)**



|  | Three Months Ended March 31, | |
|---|---|---|
|  | 2011 | 2010 |
| Revenues: | | |
| Products | $    17 | $    290 |
| Services | 3 | 72 |
| Total revenues | 20 | 362 |
| Cost of revenues: | | |
| Products | 20 | 241 |
| Services | 2 | 24 |
| Total cost of revenues | 22 | 265 |
| Gross profit (loss) | (2) | 97 |
| Selling, general and administrative expense | 38 | 166 |
| Research and development expense | — | 82 |
| Loss on sales and impairments of assets — net | 1 | 2 |
| Other operating income — net (note 6) | (25) | (60) |
| Operating loss | (16) | (93) |
| Other income (expense) — net (note 6) | (12) | 60 |
| Interest expense (contractual interest expense for the three months ended March 31, 2011 and 2010 was $79 and $78, respectively) | (79) | (75) |
| Loss from continuing operations before reorganization items, income taxes and equity in net loss of associated companies and EMEA Subsidiaries | (107) | (108) |
| Reorganization items — net (note 5) | 5 | 496 |
| Earnings (loss) from continuing operations before income taxes, and equity in net loss of associated companies and EMEA Subsidiaries | (102) | 388 |
| Income tax benefit (expense) | 1 | (8) |
| Earnings (loss) from continuing operations before equity in net loss of associated companies and EMEA Subsidiaries | (101) | 380 |
| Equity in net loss of associated companies — net of tax | — | (1) |
| Equity in net loss of EMEA Subsidiaries (note 18) | — | (20) |
| Net earnings (loss) from continuing operations | (101) | 359 |
| Net loss from discontinued operations — net of tax | (1) | (2) |
| Net earnings (loss) | (102) | 357 |
| Income attributable to noncontrolling interests | (3) | (2) |
| Net earnings (loss) attributable to Nortel Networks Corporation | $    (105) | $    355 |
| Basic earnings (loss) per common share — continuing operations | $    (0.21) | $    0.71 |
| Diluted earnings (loss) per common share — continuing operations | $    (0.21) | $    0.67 |
| Total basic earnings (loss) per common share | $    (0.21) | $    0.71 |
| Total diluted earnings (loss) per common share | $    (0.21) | $    0.67 |

The accompanying notes are an integral part of these condensed consolidated financial statements



FILED

2015 DEC -9  PM 12: 25

CLERK
US BANKRUPTCY COURT
DISTRICT OF DELAWARE

## UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF DELAWARE

In re: NORTEL NETWORKS INC.et al.,  Case No. 09-10138 (KG)

Chapter 11

---

### [CERTIFICATE OF SERVICE]

I, Mark H. Rhynes, herby certify under penalty of perjury that: I am over

The age of Eighteen years of age and reside in Los Angeles, County California.

On 12-07-2015, I caused to be served a true and correct copy of Merchants

Equity Request for Equity Security Holders Committee to be sent by first class

Upon the Parties Listed in Exhibit A attach Hereto.


Date: 12-07-2015

Mark H. Rhynes

1522 W. Manchester AVE.

Los Angeles, CALIF. 90047

(323) 971-6063

# EXHIBIT A

**OFFICE OF THE UNITED STATES TRUSTEE**
844 King Street, Suite 2207
Lockbox # 35
Wilmington, DE 19801

**RICHARDS, LAYTON & FINGER, P.A.**
920 N. King Street
One Rodney Square
Wilmington, DE 19801

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**
1201 North Market Street,
P.O. Box 1347
Wilmington, DE 19899-1347