## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
-----------------------------------------------------------------x
                                          :
In re                                     :         Chapter 11
                                          :
NORTEL NETWORKS INC., et al.,[1]          :         Case No. 09-10138 (KG)
                                          :
                          Debtors.        :         Jointly Administered
                                          :
-----------------------------------------------------------------x
```

### MOTION OF LIQUIDITY SOLUTIONS, INC.  FOR ENTRY OF ORDER (A) AUTHORIZING AND DIRECTING DEBTOR, NORTEL NETWORKS INC., TO MAKE INTERIM DISTRIBUTIONS ON ALLOWED ADMINISTRATIVE, PRIORITY AND UNSECURED CLAIMS OR (B) CONVERTING CASES TO CHAPTER 7 PURSUANT TO SECTION 1112(b) OF THE BANKRUPTCY CODE

Liquidity Solutions, Inc. ("LSI" or the "Claimant"),[2] for its Motion for Entry of Order (a) Authorizing and Directing Debtor, Nortel Networks Inc., to Make Interim Distributions on Allowed Administrative, Priority and Unsecured Claims or (b) Converting Cases to Chapter 7 Pursuant to Section 1112(b) of the Bankruptcy Code (the "Motion"), respectfully represents:

### INTRODUCTION

1.      Nortel Networks, Inc. ("NNI") and its U.S. affiliates (the "Debtors") have been existing under this Court's protective jurisdiction for more than seven (7) years. Shortly after commencing these cases, the Debtors ceased business operations, transitioned into "sale" or

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226). Contact information for the Debtors and their petitions are available at http://dm.epiq11.com/nortel.

[2] As described herein, LSI is a holder of allowed administrative, priority, and unsecured claims against NNI.

"wind down" mode and began marketing and selling their intellectual property and other assets. Such efforts have generated nearly $7.3 billion in aggregate sales proceeds.

2.    As a consequence of disputes among various international constituencies with respect to how such proceeds should be allocated, such proceeds have been held in "stasis" for almost five (5) years. During such time, administrative costs (particularly those of estate professionals) have steadily accumulated and now aggregate hundreds of millions of dollars. NNI's priority and non-professional administrative creditors have not received any payments on account of their claims during this five (5) year period. NNI's pre-petition unsecured creditors, including holders of trade debt, employee claims, and Bonds (as defined below), have likewise not received any payments on account of their claims. LSI is unaware of any chapter 11 case in which a debtor has held such an enormous amount of money for such an extraordinarily long time without making a distribution to creditors.

3.    These cases should not continue to be held hostage by warring creditor and debtor factions while NNI's creditors remain unpaid. The Court has the authority to compel NNI to make an interim distribution to holders of allowed claims. Under the Court's Allocation Trial Opinion and Order [Docket No. 15544] (the "Allocation Opinion"), the Court recognized such authority, holding that "[t]he Court may allow interim distributions based upon submissions detailing the mechanism and proposed amount." LSI respectfully submits that it is time for the Court to authorize and direct NNI to make an interim distribution in accordance with the mechanism contained, and in the amounts set forth, herein.

4.    In the Allocation Opinion, the Court held that each debtor with cash on hand shall retain such cash for distribution to its creditors. NNI recently reported that it has approximately $594.1 million in cash-on-hand. Even if NNI establishes a reasonable and conservative reserve

of $100 million for future or unknown administrative or priority claims, NNI's cash on hand is more than sufficient for NNI to (i) pay all of NNI's allowed administrative and priority claims (which NNI has reported aggregate up to $173 million) and (ii) make a substantial "interim" distribution of not less than $321 million[3] on account of NNI's allowed unsecured claims.

5.     Moreover, based on reasonable and conservative estimates regarding reconciliation of Nortel's aggregate claims pool, LSI submits that NNI's unsecured creditors[4] are entitled to receive not less than approximately $1.9 billion of the escrowed $7.3 billion in proceeds generated from the Debtors' asset sales (regardless of the outcome of appeals pending with respect to the Allocation Opinion). Such appeals can only serve to increase the amount allocated to NNI's estate. In addition, if the Canadian and EMEA estates' ultimate claims pools are reduced from what Nortel has estimated to date - - which LSI believes is all but certain - - NNI's unsecured creditors would be allocated significantly more than $1.9 billion on account of their claims. As such, NNI should also distribute promptly $1.9 billion of such sales proceeds (in addition to not less than $321 million of NNI's cash on hand) to or on behalf of holders of allowed unsecured claims against NNI. Such a distribution would not prejudice Nortel or any other creditors as the proposed amount of such distribution is a "floor" with respect to NNI unsecured creditor recoveries.

6.     The mechanism for making such distribution to holders of allowed unsecured claims against NNI is straight-forward and simple. In the Allocation Opinion, the Court held that

---

[3] Such amount represents the remaining amount of cash on hand held by NNI following payment of up to $173 million of administrative and priority claims and establishment of a $100 million administrative reserve.

[4] Because NNI's cash on hand is more than enough to pay all of NNI's administrative and priority creditors, the sales proceeds allocated to NNI's estate are for the benefit of NNI's unsecured creditors (until such claims are paid in full).

claims against multiple debtors shall be recognized only once for purposes of allocation. For example, for purposes of allocating the sales proceeds, Bond claims shall only be counted against the issuer rather than the guarantor, provided that "[a] claim for the shortfall can be recognized by the Estate that guaranteed the bond…" The Bonds were issued by two (2) of Nortel's Canadian debtors and guaranteed by NNI (and are not secured by any of NNI's assets or contractually or structurally senior with respect to any claims against NNI). As a result, among other things, any Bond guarantee claims against NNI's estate are, at best, limited to deficiency claims to the extent the Bonds are not paid in full from the Canadian debtors' estates.

7.      In fact, LSI believes that, under the Allocation Opinion, NNI may not be liable for any Bond guarantee claims. Because Bond claims are only counted against the Canadian debtors' estates (rather than NNI's estate) for purposes of allocating the $7.3 billion of sales proceeds, NNI's estate is not allocated *any* proceeds for distribution to NNI's creditors on account of the approximately $4 billion of claims stemming from NNI's guarantee of the Bonds. LSI respectfully submits that, if no value is allocated to NNI's estate with respect to or payable on account of such Bond claims (*i.e.*, the "numerator" for creditor recovery purposes), such Bond claims should also not be taken into account or given effect when determining the NNI claims pool (*i.e.*, the "denominator" for creditor recovery purposes). The validity and amount of the Bond guarantee claims can be determined at a later stage by this Court.

8.      NNI's other unsecured claims, primarily consisting of trade debt and employee claims, do not suffer from the foregoing issues. At worst, NNI's trade debt and employee pension and severance claims rank *pari passu* with respect to, and may not be treated any worse under any plan than, the Bonds. Sales proceeds are allocated to NNI's estate on account of such

unsecured claims and such unsecured claims are not limited to "deficiency" claims after primary satisfaction of such claims by the Canadian debtors' estates.

9.      LSI submits that the Court should compel NNI to distribute a total of approximately $2.225 billion (consisting of $1.9 billion of sales proceeds and $321 million of cash on hand) on account of NNI's allowed unsecured claims. The mechanism for such distribution would be as follows. First, NNI should distribute to holders of allowed unsecured claims against NNI (other than Bond guarantee claims) cash in an amount equal to $997.44 million. Second, NNI would fund an escrow account (or establish a reserve) for Bond guarantee deficiency claims in the amount of $1.2275 billion, pending (i) final reconciliation of the Canadian estates' claims pool, and (ii) the determination by this Court of the validity and amount of the Bond guarantee claims against NNI. LSI submits that establishing such an escrow or reserve preserves the rights of and does not prejudice Bondholders, while permitting holders of allowed unsecured claims (other than Bonds) to receive a distribution on account of their claims. NNI's unsecured creditors should not be forced to await a ruling on the validity and amount of Bond claims to receive a distribution on account of their allowed claims.

10.      LSI respectfully submits that the Court has both the authority and the justification to authorize and direct NNI to make the distributions and establish the escrows or reserves in the amounts and the manner proposed herein. An interim distribution to NNI's creditors would help mitigate the prejudice that NNI's creditors have experienced while various constituencies have fought for more than five (5) years over the $7.3 billion of sales proceeds. The circumstances permit such interim distributions; the equities demand them. Alternatively, if an appropriate interim distribution cannot be made promptly to NNI's creditors in accordance with the mechanism set forth herein, these chapter 11 cases should be converted to chapter 7 pursuant to

Section 1112(b) of the Bankruptcy Code. The Debtors are not "reorganizing" and have no hope for rehabilitation. Converting these cases to chapter 7 will spare the Debtors' creditors from continuing to bear the brunt of accumulating administrative costs and the massive professional fees and expenses being incurred by the Debtors' estates on behalf of the myriad dueling constituencies.

## RELEVANT FACTUAL BACKGROUND

11.    On January 14, 2009 (the "Petition Date"), NNI and certain of its U.S. affiliates (collectively, the "Debtors") commenced cases pursuant to chapter 11 of title 11 of the Bankruptcy Code with this Court. As of the Petition Date, Nortel Networks Corporation ("NNC"), a publicly-traded Canadian company, was the indirect parent of more than 130 subsidiaries located in more than 100 countries (collectively "Nortel" or the "Nortel Entities").

12.    NNC's principal, direct operating subsidiary, also a Canadian company, was Nortel Networks Limited ("NNL"), which in turn was the direct or indirect parent of operating companies located around the world. Together with NNL, the principal companies that performed research and development were NNI, Nortel Networks (UK) Ltd., Nortel Networks S.A., and Nortel Networks Ireland. Other operating companies performed sales and distribution functions and were incorporated in most of the countries where Nortel products were sold, including in the Europe, Middle East and Africa ("EMEA") regions.

13.    On the Petition Date, NNC, NNL, and certain of their Canadian affiliates (the "Canadian Debtors") commenced an insolvency proceeding with the Canadian Court under the Companies' Creditors Arrangement Act (Canada). Also on the Petition Date, the High Court of England and Wales placed nineteen (19) of Nortel's European affiliates in the EMEA regions

(collectively, the "EMEA Debtors") into administration. Other Nortel affiliates commenced insolvency and dissolution proceedings around the world.

14.    Prior to the Petition Date, Nortel's operations were funded, in part, through various issuances of unsecured bonds (collectively, the "Bonds"). Pursuant to an Indenture, dated as of July 5, 2006, NNL issued multiple series of senior notes, including (i) two (2) series of fixed rate 10.75% senior notes due 2016 in the aggregate principal amounts of $450 million and $675 million, and (ii) a series of floating rate senior notes due 2011 in the aggregate principal amount of $1 billion (collectively, the "2006 Bonds"). The 2006 Bonds are guaranteed by NNI and NNC. Pursuant to that certain Indenture, dated as of March 28, 2007, NNC issued (a) 2.125% convertible senior notes due 2014 in an aggregate principal amount of $575 million and (b) 11.75% convertible senior notes due 2012 in an aggregate principal amount of $575 million (collectively, the "2007 Bonds"). The 2007 Bonds are guaranteed by NNI and NNL.

15.    The Bonds are not secured by any of NNI's assets or contractually or structurally senior with respect to any unsecured claims against NNI. At worst, NNI's trade debt and employee pension and severance claims rank *pari passu* with respect to the Bonds as against NNI. Indeed, LSI submits that, because the Allocation Opinion does not allocate any value to NNI's estate by virtue of NNI's guarantee of the Bonds, the Bonds may not have any valid and enforceable claims against NNI's estate.

16.    On July 12, 2010, NNI filed the *Joint Chapter 11 Plan of Nortel Networks Inc. and its Affiliated Debtors* [Docket No. 3580] (the "Plan"). Under the Plan, all holders of general unsecured claims against NNI (including, among others, trade debt, employee pension and severance claims, and NNI Bond guarantee claims) were classified together and entitled to

receive the same *pro rata* distributions. Holders of allowed administrative and priority claims against NNI were entitled to be paid in full, in cash.

17.     Commencing in July 2009, the Debtors began marketing their assets for sale. In 2011, the Debtors sold their business units and associated assets (the "Business Assets") to various purchasers and, thereafter, sold their remaining patent portfolio and related assets (collectively, the "IP Assets") to Rockstar Bidco L.P. Collectively, the sales ("Sales") of the Business Assets and IP Assets resulted in aggregate proceeds of nearly $7.3 billion for the Debtors' estates.

18.     Following consummation of the Sales, and notwithstanding multiple rounds of negotiations and mediations, the various parties were unable to reach agreement on how the proceeds should be allocated. Consequently, in 2014, this Court and the Ontario Court presiding over the Canadian Debtors' insolvency proceedings held a twenty-one (21) day joint trial to determine how to allocate the Sales proceeds among the numerous Debtor estates.

19.     Canadian, U.S. and EMEA constituencies submitted widely varying approaches for deciding the allocation issues, leaving virtually no middle ground and each resulting in radically different proposed "splits" of the Sales proceeds. In short, (i) the Canadian constituencies argued that the proceeds should be split based on which estates "legally owned" the debtors' assets (resulting in approximately 14% of the proceeds going to the U.S. estates), (ii) the U.S. constituencies argued that the proceeds should be split based on which estates "beneficially owned" the  assets and/or generated the debtors' operating revenue (resulting in approximately 70% of the proceeds going to the U.S. estates), and (iii) the EMEA constituencies argued that the proceeds should be split based on which debtor entities "contributed" to the underlying assets (resulting in approximately 50% of the proceeds going to the U.S. estates).

20.     On May 12, 2015, this Court issued the Allocation Opinion. Under the Allocation Opinion, the debtors' estates are entitled to receive a share of the Sales proceeds pursuant to a "modified pro rata allocation" formula. In short, the Court's formula provides that each of the debtors' estates is entitled to receive a percentage of the Sales proceeds equal to (i) the amount of allowed claims against such debtor's estate divided by (ii) the total amount of allowed claims against all of the debtors' estates.

21.     In addition, in the Allocation Opinion, the Court held that (i) Court-approved intercompany claims and settlements will be taken into account in calculating the allocation (*i.e.*, intercompany claims are "honored"), (ii) cash on hand will *not* be taken into account in calculating the allocation (*i.e.*, each debtor with cash on hand shall retain such cash for distribution to its creditors), and (iii) claims against multiple debtors shall be recognized only once for purposes of allocation. For example, the Court held that, for purposes of allocating the Sales proceeds, Bond claims shall only be counted against the issuer (*i.e.*, NNC or NNL, as applicable) rather than the guarantor (*i.e.*, NNI), provided that "[a] claim for the shortfall can be recognized by the Estate that guaranteed the bond…" As a result, among other things, (a) the U.S. Debtors' estates are not allocated any Sales proceeds for distribution to NNI's creditors on account of the approximately $4 billion of claims stemming from NNI's guarantee of the Bonds, and (b) any Bond guarantee claims against NNI's estate are, at best, limited to a deficiency claim to the extent they are not paid in full from the Canadian debtors' estates.

22.     Promptly after the Court's ruling, the Debtors' U.S. and EMEA constituencies filed appeals (the "Appeals") which remain pending.[5] If the Appeals are denied and the Court's

[5] The Debtors' Canadian constituencies filed cross appeals, but solely to the extent that the Appeals are granted in whole or in part.

allocation formula is upheld, LSI estimates that NNI's creditors would still receive at least $2.498 billion of the Sales proceeds. If the Appeals are successful, the portion of the Sales proceeds allocated to NNI's estates and its creditors should only increase (as the Court's allocation formula resulted in significantly lower recoveries to NNI's creditors than the U.S. and EMEA appellants have argued). Oral argument in the Appeals is currently set for April 5, 2016, however, it is uncertain at this time when the Appeals will be finally resolved.

23.    On March 15, 2016, NNI filed its Monthly Operating Report for the period from January 1, 2016 to January 31, 2016 [Docket No. 16621] (the "January 2016 Operating Report"). In the January 2016 Operating Report, NNI reported that it had (i) approximately $594.1 million in cash-on-hand, (ii) approximately $173 million of administrative and priority claims,[6] and (iii) approximately $5.3 billion of unsecured claims.[7]

24.    Based on the information provided in the January 2016 Operating Report and otherwise available to LSI (including various reports filed by the monitor in the Canadian debtors' insolvency proceeding and pleadings and claims filed by various parties in the debtors' cases), LSI conservatively estimates that, for purposes of allocation, there are (i) up to

---

[6] See January 2016 Operating Report, p. 3 (reflecting $17.8 million of "total current liabilities not subject to compromise" of NNI) and p. 6 (reflecting (i) $152.9 million of "long term debt" and (ii) $2.6 million of "income taxes payable" of NNI).

[7] In the January 2016 Operating Report, NNI reported that it had approximately $5.1 billion of unsecured claims. See January 2016 Operating Report, p. 6 (reflecting (i) $184.9 million of "trade and other accounts payable," (ii) $275.6 million of "accounts payable intercompany," (iii) $200.8 million of "restructuring liabilities," (iv) $3.9361 billion of "contingent liability for NNI's debt guarantee," (v) $400,000 of "financial obligations," (vi) $437.7 million of "pension obligations," (vii) $26.2 million of "postretirement obligations other than pensions," and (viii) $48 million of "other" liabilities of NNI).

In the January 2016 Operating Report, however, NNI also reported that the Pension Benefit Guaranty Corporation (the "PBGC") has filed amended proofs of claim asserting claims of (i) $624.6 million in respect of the unfunded benefit liability of the Nortel Networks Retirement Income Plan (the "Plan"), and (ii) $83.4 million in respect of termination insurance premiums triggered by the involuntary termination of the Plan. In an abundance of caution, in calculating the aggregate amount of asserted unsecured claims, LSI has included in its calculations the $708 million of pension liabilities asserted by the PBGC rather than the $437.7 million of pension liabilities listed by NNI in the January 2016 Operating Report.

approximately $9.989 billion[8] of claims against the Canadian debtors,[9] (ii) up to approximately $3.6 billion of claims against the EMEA debtors[10] and (ii) up to approximately $1.768 billion of claims against NNI.[11]

25.      As a result, using the conservative claim estimates set forth herein, under the Allocation Opinion, (i) NNI's estate is entitled to not less than approximately 11.5% of the Sales proceeds "directly," (ii) the Canadian debtors' estates are entitled to 65% of the Sales proceeds, and (iii) the EMEA debtors' estates are entitled to 23.5% of the Sales proceeds. In addition, NNI (a) retains its rights to approximately $594.1 million in cash that it presently has on hand, (b) holds a $63 million priority claim (the "Intercompany Priority Claim") against NNL, and (c) holds a $2 billion unsecured claim against NNL (the "Intercompany Unsecured Claim" and, together with the Intercompany Priority Claim, the "Intercompany Claims"). LSI estimates that the Bonds will recover at least approximately 50.1%[12] on account of their claims from the Canadian Debtors' estate (resulting in a "deficiency" claim of approximately $1.96277 billion).[13]

---

[8] All claim and recovery amounts set forth herein are denominated in US$. References to Canadian claim amounts utilize an exchange rate of 1.22025.

[9] For purposes of determining the claims pool amounts herein, LSI has estimated that the Canadian debtors' claim pool consists of (i) $4.141 billion of bond claims, (ii) $495 million of UK pension claims, (iii) $2 billion of Canadian pension claim, (iv) the $2.063 NNI Intercompany Claims, and (v) $1.29 billion of "trade" or "other" claims (including approximately $155 million of "disputed interest" on the bond claims). LSI respectfully submits that such amount is conservative and that the ultimate amount of allowed claims against the Canadian debtors may be significantly smaller than the $9.989 billion set forth herein.

[10] For purposes of determining the claims pool amounts herein, LSI has estimated that the EMEA debtors' claims pool consists of up to (i) $100 million of priority claims, (ii) $500 million of "other" claims, and (iii) $3 billion of UK pension claims. LSI respectfully submits that such amount is conservative and that the ultimate amount of allowed claims against the EMEA debtors may be significantly smaller than the $3.6 billion set forth herein.

[11] In accordance with the Allocation Opinion, such aggregate claim amounts do not give effect to or include Bond guarantee claims against NNI.

[12] Such amount takes into account (i) $377 million of cash held by the Canadian debtors, (ii) $63 million of senior claims and (iii) establishment of a $75 million administrative reserve for future and unknown administrative and priority claims against the Canadian debtors.

[13] Such amount represents 49.9% of the $3.936 billion Bond guarantee claim against NNI.

26.     LSI estimates that, under the Court's modified pro rata allocation formula, an aggregate of not less than approximately $2.498 billion is available for distribution to NNI's creditors. After payment of outstanding allowed priority claims against NNI and establishment of a conservative $100 million reserve for future or unknown priority claims against NNI, LSI submits that NNI's unsecured creditors are entitled to receive, at minimum, approximately $2.225 billion. Such amount would be payable on account of (i) up to approximately $1.5949 billion of non-Bonds unsecured claims and (ii) from $0 - $1.96277 billion of Bond guarantee deficiency claims (depending on the Court's determination of the validity and amount of such claims).

27.     On January 22, 2016, the Debtors and LSI entered into a stipulation (the "LSI Stipulation") regarding certain of LSI's claims. This Court entered an order (the "LSI Claims Order") approving the LSI Stipulation on February 9, 2016. Following entry of the LSI Claims Order, LSI holds (i) allowed administrative claims against NNI in the amount of $112,405.85, (ii) allowed priority unsecured claims against NNI in the amount of $222,752.41, and (iii) allowed general unsecured claims against NNI in the aggregate amount of $11,645,862.67.

## REQUEST FOR INTERIM DISTRIBUTION

### A.     Allowed Administrative and Priority Claims Against NNI

28.     LSI holds $112,405.85 in allowed administrative claims and $222,752.41 in allowed priority unsecured claims against NNI.[14] LSI is entitled to be paid in full, in cash, on account of such claims. NNI holds approximately $594.1 million of cash, which is more than sufficient to pay all of NNI's senior liabilities (including all allowed administrative and priority

---

[14] As discussed below, LSI also holds $11,645,862.67 in allowed general unsecured claims against NNI.

unsecured claims) in cash in full. LSI respectfully submits that it would be inequitable for NNI to continue to sit on this cash while LSI and other 100 cent claimants remain unpaid.

29.    It is well within the Court's authority to compel NNI to make an interim distribution to holders of administrative and priority claims. *See, e.g., In re Garden Ridge Corp.*, 323 B.R. 136, 143 (Bankr. D. Del. 2005); *see also* 4 COLLIER ON BANKRUPTCY ¶ 503.03 (16th Ed.) (noting that Bankruptcy Code section 503(b) is silent as to the timing of payment of administrative expenses and stating that "[g]enerally courts have held that the timing for payment of administrative claims is a matter to be determined within the discretion of the bankruptcy court.") (citing *In re Midway Airlines Corp.*, 406 F.3d 229, 54 (4th Cir. 2005); *Varsity Carpet Servs., Inc. v. Colortex Indus., Inc. (In re Colortex Indus., Inc.)*, 19 F.3d 1371, 1384 (11th Cir. 1994); *In re Verco Indus.*, 20 B.R. 664 (B.A.P. 9th Cir. 1982)).

30.    In determining whether to award immediate payment on such claims, courts have considered the following three factors: (1) prejudice to the debtor; (2) hardship to the claimant; and (3) potential detriment to other creditors. *Garden Ridge*, 323 B.R. at 143. Here, the factors overwhelmingly support NNI paying all of its allowed administrative and priority claims promptly.

31.    Neither NNI nor NNI's other creditors will be prejudiced or harmed if NNI makes such distribution. As set forth in the January 2016 Operating Report, NNI has more than enough cash on hand to pay all of its administrative and priority claims in full, and allowing for a reasonable and conservative $100 million reserve for future or unknown administrative and priority costs. Even if the various parties continue their course of what appears to be scorched-earth litigation in the Appeals, there is significant cash cushion remaining to pay NNI's allowed administrative and priority claims. Moreover, NNI is no longer operating as a going concern - -

there is no reason for NNI to sit on its nearly $600 million in cash, for example, to fund future operations.

32.     In contrast, with respect to the second *Garden Ridge* factor (*i.e.*, harm to LSI and other holders of allowed administrative and priority unsecured claims), the Debtors have been in in bankruptcy for more than seven (7) years with no end in sight. It is unclear if or when a plan may be confirmed and NNI has not indicated any intention to pay allowed administrative or priority claims prior to the confirmation of a plan. LSI and other 100 cent creditors should not be forced to fund the Debtors' cases and the parties' Appeals litigation before they can receive distributions on their allowed administrative and priority claims. The equities do not permit LSI and other allowed administrative/priority creditors to remain unpaid while estate professional costs continue to mount (and, upon information and belief, while such professionals are paid on a timely basis).

###     B.     Allowed Unsecured Claims Against NNI

33.     LSI also holds $11,645,862.67 in allowed general unsecured claims against NNI. LSI estimates that NNI's unsecured creditors should receive, at minimum, approximately $2.225 billion on account of their allowed claims. Such $2.225 billion amount is based on conservative claim assumptions and consists of (i) the remainder of the $594.1 million of cash on hand at NNI (after (a) payment of up to approximately $173 million in allowed administrative and priority claims and (b) establishment of a reasonable and conservative reserve of $100 million for yet-to-be-incurred or unknown administrative or priority claims against NNI), (ii) $838 million of "direct" Sales proceeds allocated to NNI's estates under the Allocation Opinion, (iii) $63 million of residual proceeds stemming from the 100% distribution on the Intercompany Priority Claim against NNL, and (iv) $1.045 billion of residual proceeds from the estimated 55% distribution on

account of the Intercompany Unsecured Claim against NNL. Such $2.225 billion distribution is conservative and represents a "worst case" scenario with respect to NNI distribution. If the Appeals are successful and/or the aggregate claims pool is reduced, NNI's unsecured creditors could easily receive payment of significantly more on account of their claims.

34.     The Bankruptcy Code expressly permits courts to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Code]." 11 U.S.C. § 105(a). The Third Circuit has construed this provision to give bankruptcy courts "broad authority" to provide appropriate equitable relief to assure the orderly conduct of reorganization proceedings, *see, e.g., In re Combustion Eng'g, Inc.*, 391 F.3d 190, 236 (3d Cir. 2004), and to "craft flexible remedies that, while not expressly authorized by the Code, effect the result the Code was designed to obtain." *Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548, 568 (3d Cir. 2003) (*en banc*). Bankruptcy Code section 105(a) specifically contemplates that a court may use the authority granted under that section to "tak[e] any action or mak[e] any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process." 11 U.S.C. § 105(a).

35.     Here, LSI respectfully submits that the Court has ample authority and justification to authorize and direct NNI to make an interim distribution on account of NNI's unsecured claims. As a threshold matter, NNI has sufficient cash on hand to make a distribution of at least approximately $321 million to NNI's unsecured creditors, after paying all of NNI's administrative and priority claims in full and reserving $100 million for future or unknown NNI administrative claims. In addition, LSI believes that it would be appropriate, and would not prejudice the rights of the Debtors or other creditors, for the Court to authorize and direct NNI to pay not less than $1.9 billion of the escrowed Sales proceeds to NNI's unsecured creditors.

Although LSI recognizes that the outcome of the Appeals is uncertain, both in terms of ultimate result and timing, LSI respectfully submits that the Appeals should only increase the amount recoverable by NNI's unsecured creditors. As a consequence, such $1.9 billion represents the *least* that NNI's unsecured creditors stand to recover from the Sales proceeds.

36.     The Court can and should compel NNI to distribute a total of approximately $2.225 billion (consisting of $1.9 billion of sales proceeds and $321 million of cash on hand) on account of NNI's allowed unsecured claims. LSI respectfully submits that the mechanism for making such distribution is simple. Under the Allocation Opinion, any Bond guarantee claims against NNI's estate are, at best, limited to deficiency claims to the extent the Bonds are not paid in full from the Canadian debtors' estates. Indeed, the Bonds may not have claims against NNI's estate at all, as no value is allocated to NNI's estate with respect to or payable on account of such Bond claims. The validity and amount of the Bond guarantee claims can be determined at a later stage by this Court. At this time, without prejudice to the Bondholders and their rights, the Court can and should establish a reserve or an escrow into which amounts potentially payable by NNI on account of the Bond guarantee claims can be held pending a final resolution on the validity and amount of such claims. Such reserve should be in the amount of $1.2275 billion.[15]

37.     NNI's other allowed unsecured claims, primarily consisting of trade debt and employee claims, should not have to wait for resolution of such issues to receive a distribution. Such claims do not suffer from the foregoing issues with respect to amount or validity. At worst, NNI's trade debt and employee pension and severance claims rank *pari passu* with respect to, and may not be treated any worse under any plan than, the Bonds. NNI should distribute to

---

[15] Such amount represents the amount of the $2.225 billion proceeds attributable to the Bonds' deficiency claim of up to $1.96277 billion, assuming an aggregate NNI unsecured claims pool (including the Bond guarantee deficiency claims) of $3.55767 billion.

holders of allowed unsecured claims against NNI (other than Bond guarantee claims) cash in an amount up to $997.44 million.[16]

38.     LSI submits that it would be both equitable and within the Court's authority to authorize and direct NNI to make the distributions in the manner and amounts set forth herein. If NNI were to make distribution of such amounts, it would help assuage and remedy the long years during which NNI's unsecured creditors have been forced to sit idly by while the powers that be have bickered over Nortel's $7.3 billion of Sales proceeds. The Court should authorize and direct NNI to make such distributions.

## REQUEST FOR CONVERSION TO CHAPTER 7 UNDER 11 U.S.C. § 1112(b)

39.     Alternatively, if an appropriate interim distribution to holders of NNI's allowed claims cannot be promptly effected, this Court should convert the U.S. Debtors' chapter 11 cases to cases under chapter 7 pursuant to Section 1112(b) of the Bankruptcy Code. Under Sections 1112(b)(1) and (2) of the Bankruptcy Code, on request of a party in interest, a Court *shall* convert a debtor's chapter 11 case to chapter 7 unless there are unusual circumstances identified by the Court that establish that conversion is not in the best interests of creditors and the estate, and the debtor can establish the grounds set forth in 1112(b)(2). *See In re Orbit Petroleum, Inc.*, 395 B.R. 145, 149 (Bankr. D. N.M. 2008); 7 COLLIER ON BANKRUPTCY ¶ 1112.05[2], p. 1112. Section 1112(b)(4) of the Bankruptcy Code provides that a debtor's chapter 11 case shall be converted to chapter 7 for cause if, among other things, there is "continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation." *See generally* 7

---

[16] Such amount represents the amount of the $2.225 billion proceeds attributable to non-Bond unsecured claims in the amount of $1.5949 billion, assuming an NNI unsecured claims pool of $3.55767 billion.

COLLIER ON BANKRUPTCY ¶ 1112.04[6]. LSI respectfully submits that such factors are present here.

40.     A "substantial or continuing loss to or diminution of the estate" can be demonstrated if the debtor has sustained a substantial loss following the commencement of the case, or the debtor is operating with a sustained negative cash flow. *In re AdBrite Corp.*, 290 B.R. 209, 215 (Bankr. S.D.N.Y. 2003) (cause existed to convert the Chapter 11 cases in part because of the debtor's negative post-petition cash flow and inability to pay current expenses); *In re 3868-70 White Plains Road, Inc*., 28 B.R. 515, 519 (Bankr. S.D.N.Y. 1983) (cause existed to dismiss where the debtor had negative cash flow and an inability to pay current expenses).

41.     By any measure, there has been both a substantial and continuing loss to, and diminution of, NNI's estate. Notwithstanding that NNI and the other Debtors entered "wind down" mode more than six (6) years ago, NNI and the other Debtors continue to accumulate significant administrative costs by estate professionals with no apparent end in sight. NNI and the other Debtors are no longer operating as a going concern or generating value. Every day that goes by while these cases are in chapter 11 depletes NNI's and the other Debtors' estates to the detriment of creditors.

42.     NNI and the other Debtors also have no reasonable likelihood of rehabilitation. "Courts have consistently understood 'rehabilitation' to refer to the debtor's ability to restore the viability of its business." *Loop Corp. v. U.S. Trustee*, 379 F.3d 511, 516 (8th Cir. 2004) (citations omitted); s*ee generally 7 COLLIER ON BANKRUPTCY* ¶ 1112.06[6][a][ii], p. 1112-28 to 29 (footnotes omitted) ("'Rehabilitation' is not another word for reorganization. Rehabilitation means to establish a business. Whereas confirmation of a plan could include a liquidation plan, rehabilitation does not include liquidation.") (citations omitted).

43.     NNI and the other Debtors are not reorganizing and have no hope of rehabilitation. The Debtors sold substantially all of their assets years ago. At this stage in these cases, the only remaining material issue is how the proceeds from such Sales will be distributed among the debtors' creditors. Because there is no longer any business to "rehabilitate," if NNI cannot make the interim distributions requested herein, these cases should be converted to Chapter 7. *Stage I Land Co. v. United States*, 71 B.R. 225, 231 (D. Minn. 1986) ("The stated purpose of Chapter 11 of the Bankruptcy Code is the rehabilitation of a viable business. Absent a reasonable possibility of an effective reorganization, a case should be dismissed at its outset for cause."); s*ee also United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs. (In re Timbers of Inwood Forest Assocs., Ltd)*, 808 F.2d 363, 374 (5th Cir. 1987) (Clark, C.J., concurring) ("Reorganization [under Chapter 11] is not a Holy Grail to be pursued at any length."); *see also In re Great American Pyramid Joint Venture*, 144 B.R. 780, 789 (Bankr. W.D. Tenn 1992) ("Not surprisingly, all troubled businesses cannot be rehabilitated or successfully reorganized under chapter 11, which chapter is clearly not a panacea for all problems.").

44.     For the reasons set forth herein, if NNI cannot make a prompt interim distribution as requested herein, LSI respectfully submits that these cases should be converted to chapter 7.

## **RESERVATION OF RIGHTS**

45.     LSI reserves its rights to amend and/or supplement this Motion.

WHEREFORE, LSI hereby requests that the Court enter an Order (i) authorizing and directing NNI to make an interim cash distribution (a) paying in full all allowed administrative and priority claims against NNI, (b) paying not less than $997.44 million to holders of allowed unsecured claims against NNI (other than the Bond guarantee claims) and (c) establishing a reserve in the amount of $1.2275 billion with respect to the Bond guarantee claims against NNI, or, alternatively, (ii) converting these cases to chapter 7.

Dated:  March 21, 2016

Respectfully submitted,

**ANDREWS KURTH LLP**

/s/ *Paul N. Silverstein*
Paul N. Silverstein (*pro hac vice* pending)
Jeremy B. Reckmeyer (*pro hac vice* pending)
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 850-2800
Facsimile: (212) 850-2929

*Counsel to Liquidity Solutions, Inc.*