## <u>EXHIBIT A</u>

**Cilia Declaration**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

---------------------------------------------------------X
                                                    :
*In re*                                             :        Chapter 11
                                                    :
Nortel Networks Inc., *et al.*,[1]                  :        Case No. 09-10138 (KG)
                                                    :
                              Debtors.              :        Jointly Administered
                                                    :
                                                    :        **Hearing date: April 19, 2016 at 10:00 a.m. (ET)**
                                                    :        **RE: D.I.s 16556, 16618**
---------------------------------------------------------X

**DECLARATION OF MARY CILIA IN SUPPORT OF
DEBTORS' REPLY TO RESPONSE TO DEBTORS'
FORTY-FIRST OMNIBUS OBJECTION (SUBSTANTIVE) TO CERTAIN CLAIMS**

I, Mary Cilia, do hereby declare as follows pursuant to 28 U.S.C. § 1746:

1.      I am a Senior Director at RLKS Executive Solutions LLC ("RLKS"), the claims

consultant retained by the Debtors to assist the Debtors in resolving all claims against the

Debtors' estates.

2.      I respectfully submit this declaration in support of the *Debtors' Reply to Response*

*to Debtors' Forty-First Omnibus Objections (Substantive) to Certain Claims* (the "Reply").[2]

Except as otherwise indicated, all facts set forth in this declaration are based upon my personal

knowledge, information supplied to me by former employees retained by the Debtors or their

affiliates and professionals retained by the Debtors, or learned from my review of relevant

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).  Contact information for the Debtors and their petitions are available at http://dm.epiq11.com/nortel.

[2]      Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Reply.

documents.  If I were called upon to testify, I could and would testify competently to the facts set forth herein.

        3.      In order to place before the court certain documents relevant to the Reply, annexed to this declaration are true and correct copies of the following documents:

         **Exhibit 1:**     Nortel Networks Enhanced Severance Allowance Plan, as Amended and Restated Effective January 1, 2008, as further Amended and Restated as of February 13, 2009.

         **Exhibit 2:**     Email correspondence from John Doolittle of Nortel to Claimant on June 22, 2010.

         **Exhibit 3:**     Email correspondence from Lewis Lockhart of Nortel to Claimant on June 10, 2010.

         **Exhibit 4:** Email correspondence from Claimant to Lewis Lockhart of Nortel on June 28, 2010.

         **Exhibit 5:** Termination paperwork as sent to Claimant on June 28, 2010.

        4.      The Debtors' books and records indicate that the Claimant corresponded on numerous occasions with the Debtors regarding his potential transition to Ericsson during June 2010.

        5.      The Debtors do not have any record of Claimant requesting clarification as to treatment of severance after his receipt of the June 22 Correspondence, with the exception of a request for general background relating to severance laws and a request for a copy of the Severance Plan.

        6.      The Debtors do not have any record of Claimant requesting a written separation agreement from the Debtors or any record of the preparation of such an agreement.

        7.      The Debtors' books and records indicate that Claimant transferred to Ericsson on June 29, 2010 in connection with the closing of the sale of Nortel Networks Limited's stake in LGE to Ericsson.

8. The Debtors' ordinary course practice was to include multiple and clear references to departing employees' severance entitlements in their termination notification packages to the extent such employees were in fact entitled to severance.

9. It was the Debtors' regular practice to not permit severance to those employees with any termination code beginning with "Mutual Agreement", regardless of whether the termination was coded as company or employee initiated. Based on the Debtors' regular business practices, their use of a footer in a termination package with the word "involuntary" did not automatically entitle the terminated employee to severance benefits. For example, termination of an employee for cause would be classified as "involuntary" but would not ordinarily entitle a terminated employee to severance.

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]*

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: Houston, Texas
       April 14, 2016

_____
Mary Cilia

## EXHIBIT 1

Nortel Networks

Severance Allowance Plan


As Amended and Restated
Effective January 1, 2008, except as otherwise indicated herein

03/120

B ALB 766113 v2
2789126-000007 12/5/2007

Table of Contents

| | | |
|---|---|---|
| Article 1 | Introduction and Definitions | 1 |
| Article 2 | Severance Allowance | 5 |
| 2.1 | Eligibility for Severance | 5 |
| 2.2 | Reduction in Force Exceptions | 5 |
| 2.3 | Business Transaction Exceptions | 6 |
| 2.4 | Re-Classification Exceptions | 6 |
| 2.5 | Additional Conditions to Payment | 7 |
| 2.6 | Other Employment Terminations | 7 |
| 2.7 | Amount of Severance Allowance | 7 |
| 2.8 | Form of Payment | 7 |
| 2.9 | Death Before Payment | 8 |
| 2.10 | Additional Benefits Available | 8 |
| 2.11 | Description of Additional Benefits | 8 |
| 2.12 | Reemployment During Severance Payment | 9 |
| 2.13 | Job Offers During Severance Payment | 9 |
| 2.14 | Termination of Additional Benefits | 10 |
| 2.15 | Employment With Unrelated Employers | 10 |
| 2.16 | Subsequent Terminations with Severance Due | 10 |
| Article 3 | Administration and Funding | 11 |
| 3.1 | Named Fiduciaries | 11 |
| 3.2 | Plan Administrator Duties | 11 |
| 3.3 | Plan Interpretation | 11 |
| 3.4 | Committee Duties | 11 |
| 3.5 | Submission of Claims | 11 |
| 3.6 | Appeal of Denied Claims | 12 |
| 3.7 | Funding | 13 |
| 3.8 | Unclaimed Benefit | 13 |
| Article 4 | Miscellaneous | 14 |
| 4.1 | Plan Amendment and Termination | 14 |
| 4.2 | Employment Rights | 14 |
| 4.3 | Applicable Law | 14 |
| 4.4 | Reduction in Severance Allowance | 14 |
| 4.5 | Tax Withholding | 15 |
| 4.6 | Payment for Additional Benefits | 15 |
| Article 5 | Window Programs | 16 |
| Article 6 | Designated Groups | 17 |
| | Exhibit A to Article 6 | 18 |

B ALB 766113 v2
2789126-000007 12/5/2007

# NORTEL NETWORKS SEVERANCE ALLOWANCE PLAN

## ARTICLE 1

### INTRODUCTION AND DEFINITIONS

1.1    The Nortel Networks Severance Allowance Plan (the "Plan") was established, effective as of September 1, 1986, to provide a severance allowance to assist certain terminated employees, as defined in Section 2.1 hereof. The Plan superseded in its entirety Northern Telecom Inc. Corporate Procedure 80019.01. The Plan may provide for the deferral of compensation within the meaning of Section 409A of the Internal Revenue Code of 1986, as amended ("Code"), and the regulations promulgated thereunder, necessitating changes to comply with such Code and regulatory provisions. This amendment and restatement of the Plan is generally effective as of January 1, 2008, except as otherwise indicated herein.

1.2    This Plan is applicable to all Employees, as defined below, who have six (6) months or more of Service and whose employment is terminated as specified in Section 2.1.

1.3    Whenever used in this Plan, the following terms shall have the following meanings:

a.      "Affiliate" shall mean Nortel Networks Corporation and any company wholly or partially owned, directly or indirectly, by Nortel Networks Corporation, excluding any Employer.

b.      "Base Weekly Salary" shall mean, as determined solely by the Plan Administrator, an Employee's basic gross weekly salary in effect on the day immediately prior to the effective date of the termination of an Employee's employment with an Employer, and excluding any other compensation, including, without limitation, bonus or incentive compensation payments, overtime pay, interest differential payments or other relocation allowances, or the value of any other benefits to which an Employee may be entitled; provided, however, that if: (i) an employee is a Part-Time Employee, "Base Weekly Salary" as defined in this Section 1.3(b) shall be computed on the basis of the number of hours in such Part-Time Employee's regular, normal work schedule (provided that the Part-Time Employee's average weekly hours worked during the last twelve (12) weeks of employment shall apply if the Part-Time Employee has an irregular work schedule); and (ii) an Employee receives all or a portion of his compensation in the form of sales commissions and/or sales bonuses, "Base Weekly Salary" shall be calculated on the basis of such Employee's Total Targeted Compensation divided by fifty two (52). However, in no event shall "Base Weekly Salary" include any amounts paid as Global Sales Compensation MAVP/RVP 50-50 Incentive Plan earnings.

c.      "Board" shall mean the Board of Directors of Nortel Networks Inc.

d.      "Business Transaction" shall mean an agreement entered into by or on behalf of Employer and a Company(ies) (e.g., divestiture or a spin-off of a business, creation of a joint

venture, an outsourcing transaction or any other transaction similar to the foregoing) and as a result thereof the Employer determines that the services of an Employee(s) are no longer required by the Employer.

e.     "Committee" shall mean the Employee Benefits Committee of Nortel Networks Inc. which shall consist of one (1) or more individuals appointed by the Board who shall serve until resignation, death or removal by the Board or, with respect to an employee of an Employer or Affiliate, termination of such employment. A majority of the members of the Committee shall constitute a quorum and actions taken by the Committee shall be by a majority vote of a quorum.

f.     "Company" shall mean the entity with which an Employer has entered into a Business Transaction or any direct or indirect subcontractor of, or any other entity affiliated with, such entity or subcontractor, including any entity or subcontractor that may be owned in whole or in part by, or be affiliated with, such Employer.

g.     "Employee" shall mean any Full-Time Employee or Part-Time Employee, as defined herein, of an Employer, excluding employees covered by a collective bargaining agreement unless such agreement specifically provides for their participation in this Plan, excluding employees who are classified as co-op students, interns, INROADS and VOEs, and excluding employees who are eligible for benefits under the Nortel Networks Enhanced Severance Allowance Plan. "Employee" for purposes of this Plan shall not include an individual whose severance benefits are set forth in a separate writing between Employee and his or her Employer that is executed by an officer of the Employer or between Employee and Nortel Networks Inc. or one of its Affiliates that is executed by an officer of or power of attorney for such entity. "Employee" shall also exclude an individual whose severance benefits are set forth in another employee benefit plan adopted by the Employer to provide benefits upon Termination of Employment to such an individual and others who are similarly situated or to exclude coverage under this Plan to such an individual.     Independent contractors and any other individuals who provide services to an Employer but do not receive W-2 earnings from an Employer are not eligible to participate in the Plan.

h.     "Employer" shall mean Nortel Networks Inc., or any of its United States subsidiaries and affiliates, or a subsidiary or affiliate of Nortel Networks Corporation, that has been authorized by the Board of Nortel Networks Inc. to adopt this Plan and has adopted this Plan by action of its board of directors. A subsidiary or affiliate for purposes of this definition shall include any entity of which Nortel Networks Inc. or Nortel Networks Corporation, directly or indirectly, owns or controls greater than fifty percent (50%) of the voting shares, for a corporation, or value, for any other type of entity.

i.     "Full-Time Employee" shall mean an Employee who is regularly scheduled to work at least thirty-five (35) hours per week, as determined solely by the Employer.

j.     "Part-Time Employee" shall mean an Employee who is regularly scheduled to work at least twenty (20) hours but less than thirty-five (35) hours per week, as determined solely by the Employer.

2

k.     "Plan" shall mean this Nortel Networks Severance Allowance Plan.

l.     "Plan Administrator" shall mean Nortel Networks Inc.

m.     "Reasonably Contiguous Location" shall mean a location that is no more than twenty-five (25) miles from the location of the "former position" referred to in Section 2.2.b., 2.3.b., 2.4.b., or 2.13 hereof, as applicable.

n.     "Reclassification" or "Reclassified" shall mean the reclassification of the Employee's current position to a lower Job Complexity Indicator/Job Family Compensation Structure ("Job Complexity Indicator/Market Reference Range" prior to April 8, 2002) ("JCI/JFCS") as a result of changes to the duties, responsibilities or scope of that position. The benefits under this Plan that apply to "Reclassification" situations shall not apply to reclassifications that occur for reasons other than those stated above, such as but not limited to re-classifications made to correct prior misclassification of a position.

o.     "Reduction in Force" shall mean the Termination of Employment of an Employee resulting from a reduction in an Employer's work force and/or from the elimination or consolidation of job functions of an Employer due to economic or other business reasons.

p.     "Service" shall mean the total cumulative period of an Employee's employment with any Employer or Affiliate, beginning on the Employee's date of employment and ending on the date of Termination of Employment. Such period shall include employment with an employer before the effective date when it became an Employer or Affiliate due to a merger or other acquisition transaction if such Employee was employed by that Employer on the effective date of the transaction. Service shall be expressed in full years and partial years. However, a partial year of employment of at least six (6) consecutive months shall be deemed to be one (1) year of Service. Provided, further, if there is a break in an Employee's employment other than due to medical or other authorized leave of absence, the period of time prior to such break in employment shall be included in the calculation of Service only if either (i) such break in employment was for thirty (30) days or less, or (ii) in the case where the break in employment was for more than thirty (30) days, the Employee has been in the employment of an Employer or an Affiliate, as applicable, subsequent to the break in employment for a period of time equal to the break in employment or one (1) year, whichever is less.

q.     "Severance Period" shall mean the period of time beginning on the Employee's effective date of Termination of Employment from an Employer and ending upon the expiration of the number of weeks used to calculate the Employee's Severance Allowance as provided in Section 2.7 of this Plan and as determined in the sole discretion of the Plan Administrator.

3

r.    "Specified Employee" shall mean a key employee (as defined in Section 416(i) of the Code without regard to paragraph 5 thereof) of the Employer if any stock of the Employer is publicly traded on an established securities market or otherwise.

s.    "Termination of Employment" shall be based on the facts and circumstances surrounding the termination of the Employee's employment and whether the Employer and the Employee intended for the Employee to provide significant services for the Employer following such termination.  A change in the Employee's employment status will not be considered a Termination of Employment if:

i.    the Employee continues to provide services as an employee of the Employer at an annual rate that is twenty percent (20%) or more of the services rendered, on average, during the immediately preceding three full calendar years of employment (or, if employed less than three years, such lesser period) and the annual remuneration for such services is twenty percent (20%) or more of the average annual remuneration earned during the final three full calendar years of employment (or, if less, such lesser period), or

ii.    the Employee continues to provide services to the Employer in a capacity other than as an employee of the Employer at an annual rate that is fifty percent (50%) or more of the services rendered, on average, during the immediately preceding three full calendar years of employment (or if employed less than three years, such lesser period) and the annual remuneration for such services is fifty percent (50%) or more of the average annual remuneration.

t.    "Total Targeted Compensation" shall mean with respect to an Employee who receives all or a portion of his compensation in the form of sales commissions and/or sales bonuses, such Employee's basic gross annual salary in effect on the day immediately prior to the effective date of his termination with an Employer plus incentive compensation payments for which the Employee would have been eligible if one hundred percent (100%) of the Employee's business objectives had been achieved in the year of termination, but excluding, without limitation, sales bonuses, sales commissions or incentive compensation payments earned or paid, overtime pay, interest differential payments or other relocation allowances, or the value of any other compensation or benefit to which such Employee may be entitled.

1.4    The masculine pronoun, whenever used in this Plan, shall include the feminine gender, and the singular pronoun whenever used herein shall include the plural, and the plural shall include the singular unless the context clearly indicates a different meaning.

4

## ARTICLE 2

### SEVERANCE ALLOWANCE

2.1    <u>Eligibility for Severance</u>.  Employees with at least six (6) months of Service whose employment with an Employer is terminated on or after November 1, 2001, for any of the following reasons shall qualify for a severance allowance in accordance with this Article 2, subject to Sections 2.2, 2.3, 2.4, 2.5 and 2.6:

     a.    Termination of employment with an Employer as part of a Reduction in Force, except to the extent such payment is prohibited under Section 2.2 hereof and except when the Plan Administrator determines in its discretion that the termination arises out of conduct and/or inaction by the Employee which is not in the best interests of the Employer; or

     b.    Any other Termination of Employment with an Employer initiated by an Employer except to the extent that such payment is prohibited under Section 2.2 hereof, or except when the Plan Administrator determines in its discretion that the termination arises out of conduct and/or inaction by the Employee which is not in the best interests of the Employer, or except when the Employee refuses to permit a background check required by a customer of the Employer or fails a background check on a basis that the Employer determines is conduct and/or action which is not in the best interests of the Employer; or

     c.    Any other Termination of Employment with an Employer that is initiated by an Employee on or after November 1, 2001 in direct and timely response to the Employer's written notification (provided prior to April 1, 2002) of the Reclassification of the Employee's current position, except to the extent such payment is prohibited under Section 2.4 hereof; or

     d.    Any other Termination of Employment with an Employer that is initiated by an Employee following the Employer's notification (provided after March 31, 2002) of the Reclassification of the Employee's current position, except to the extent such payment is prohibited under Section 2.4 hereof.

2.2    <u>Reduction in Force Exceptions</u>.  Notwithstanding Section 2.1.a., no severance allowance shall be paid to an Employee who is terminated as a result of a Reduction In Force if, either:

     a.    Prior to such termination, the Employee is offered and accepts a position as a Part-Time or Full-Time Employee with an Employer or an Affiliate, irrespective of any differences between the new position and the former position, including, without limitation, any resulting change in the location of the new position from that of the former position, any difference in the manner or amount of the compensation between the new position and the former position, any difference in work schedule or number of hours in the work week, or otherwise; or

5

b.     With respect to any Employee whose employment is terminated prior to November 1, 2001, or who is given notice of termination and is terminated after March 31, 2002, prior to such termination, a Full-Time or a Part-Time Employee is offered and refuses a transfer to another position as a Full-Time or Part-Time Employee, respectively, with an Employer or an Affiliate, for which the Employee is qualified in the same or Reasonably Contiguous Location as his former position, which new position has a Base Weekly Salary which is not less than eighty percent (80%) of the Base Weekly Salary of the Employee's former position. For purposes of this Section 2.2.b., the term "notice of termination" shall include both a notice that the Employee's position has been identified for elimination and that provides for continued work in the Employee's current position and a non-working notice of termination. A refusal of a transfer to a position that meets the requirements described above will result in no severance allowance being paid whether it follows a non-working notice period or a working notice period.

2.3     <u>Business Transaction Exceptions</u>. Notwithstanding Section 2.1.b., no severance allowance shall be paid to an Employee where his employment with an Employer is terminated in connection with a Business Transaction if, either:

a.     The terminated Employee is offered and accepts a position as a Part-Time or Full-Time Employee with the Company, irrespective of any differences between the new position and the former position, including, without limitation, any resulting change in the location of the new position from that of the former position, any difference in the manner or amount of the compensation between the new position and the former position, any difference in work schedule or number of hours in the work week, or otherwise; or

b.     The terminated Full-Time or Part-Time Employee is offered and refuses another position as a Full-Time or Part-Time Employee, respectively, for which he is qualified by the Company at the same or Reasonably Contiguous Location as his former position with the Employer and with a Base Weekly Salary which is not less than eighty percent (80%) of the Base Weekly Salary of the Employee's former position.

2.4     <u>Reclassification Exceptions.</u>

a.     Notwithstanding Section 2.1.c. and Section 2.1.d., no Severance allowance shall be paid to an Employee whose position is Reclassified and who terminates employment following such Reclassification if, prior to such termination, the Employee is offered and accepts a position (including the same reclassified position or another position at the same or a different JCI/JFCS) as a Part-Time or Full-Time Employee with an Employer or an Affiliate. This provision shall apply irrespective of any differences between the new position and the former position, including, without limitation, any resulting change in the location of the new position from that of the former position, any difference in the manner or amount of the compensation between the new position and the former position, any difference in work schedule or number of hours in the work week, or otherwise.

6

b.     Notwithstanding Section 2.1.d., no severance allowance shall be paid to an Employee who incurs a Termination of Employment with an Employer after March 31, 2002, following the Employer's notification (provided on or after April 1, 2002) to the Employee of a Reclassification if, prior to such termination, such Full-Time or Part-Time Employee is offered and refuses a position (including the same Reclassified position or another position at the same or a different JCI/JFCS) as a Full-Time or Part-Time Employee, respectively, with an Employer or an Affiliate, for which the Employee is qualified. Such position must be in the same or Reasonably Contiguous Location as his former position and must have a Base Weekly Salary that is not less than eighty percent (80%) of the Base Weekly Salary of the Employee's position before the Reclassification for this exception to apply.

2.5    <u>Additional Conditions to Payment</u>. As a condition precedent to an Employee's entitlement to receive a severance allowance, each Employee who qualifies for a severance allowance in accordance with Section 2.1 shall, at the time of his termination, timely execute and tender to the Employer a document including a release, restrictive covenant provisions and other terms as required solely in the discretion of the Plan Administrator. As a further condition precedent to an Employee's entitlement to receive a severance allowance, each Employee who qualifies for a severance allowance in accordance with Section 2.1 must be an Employee of the Employer on the day immediately preceding the effective date of his termination. Any Employee who otherwise qualifies for a severance allowance in accordance with Section 2.1, but who fails or refuses to timely execute and tender such a release, who revokes such a release, or who is not an Employee on the day immediately preceding the effective date of his Termination of Employment shall not receive a severance allowance.

No severance allowance or any other benefits under this Plan shall be paid to any Employee who, in exchange for other compensation or benefits to which the Employee is not otherwise entitled, releases, waives or otherwise gives up his rights under this Plan.

2.6    <u>Other Employment Terminations</u>. No severance allowance shall be paid to an Employee whose employment with an Employer is terminated for any reason other than as specified in Section 2.1.

2.7    <u>Amount of Severance Allowance</u>. Provided an Employee qualifies for a severance allowance in accordance with Section 2.1 and provided further that the Employee fulfills the requirements of Section 2.5, the severance allowance payable to each such Employee shall be four (4) weeks plus, for each full year of Service, one (1) additional week paid at the rate of the Employee's Base Weekly Salary, plus such additional severance allowance, if any, as the Plan Administrator may determine at his sole discretion; provided, however, that in no event shall the total severance allowance paid to any Employee under this Plan exceed an amount equal to twice the Employee's total annual compensation for the year immediately prior to the date of his or her termination. The amount of severance allowance shall be determined prior to the Employee's Termination of Employment.

B ALB 766113 v2
2789126-000007 12/5/2007

2.8    Form and Timing of Severance Allowance Payment.

     a.    Generally.  Payment of severance allowances shall be made in installments on the same regular pay days as applied to each Employee immediately prior to his termination; provided, however, that payment of severance allowances shall be completed within twenty-four (24) months after the effective date of termination.  All severance allowance payments shall be subject to applicable F.I.C.A. and federal, state and/or local income tax withholding as determined solely by the Employer.

     b.    Restrictions on Timing of Payments to Specified Employees.  Notwithstanding any provision of this Plan to the contrary, if the Employee is considered a Specified Employee at Termination of Employment under such procedures as established by the Employer in accordance with Section 409A of the Code, benefit distributions that are made upon Termination of Employment may not commence earlier than six (6) months after the date of such Termination of Employment.  Therefore, in the event this Section 2.8(b) is applicable to the Employee, any distribution which would otherwise be paid to the Employee within the first six months following the Termination of Employment shall be accumulated and paid to the Employee in a lump sum on the first day of the seventh month following the Termination of Employment.  All subsequent distributions shall be paid in the manner specified.

2.9    Death Before Payment.  If an Employee receiving a severance allowance dies before receiving full payment of his severance allowance, the balance of such Employee's severance allowance remaining unpaid at the time the Plan Administrator is notified of the Employee's death shall be paid in a single lump sum to the beneficiary(ies) most recently designated by the Employee in connection with the Employee's participation in the group term life insurance coverage under the Nortel Networks FLEX Benefits Program (whether or not the Employee is then covered for such group term life insurance) or, if no such beneficiary(ies) have been so designated, to the Employee's estate.

2.10    Additional Benefits Available.  With respect to a terminated Employee who qualifies for a severance allowance pursuant to this Article 2, in addition to such severance allowance, the Employee may elect to:

     a.    Continue all of the benefits set forth in Section 2.11 which were in effect with respect to that terminated Employee as of the day immediately preceding the effective date of termination, until the later of (i) ninety (90) days from the effective date of termination, (ii) the end of the Severance Period, or (iii) the day preceding the retirement date of an Employee who retires on an "Early Retirement Date", a "Normal Retirement Date", or a "Late Retirement Date" as defined under the Nortel Networks Retirement Income Plan on the first day of the calendar month coincident with or immediately following the termination of the Employee's Severance Period; or

     b.    Revoke all such benefits described in Section 2.10.a. effective as of the earlier of the end of the calendar month in which the Employee's termination occurs and the date on

8

which each applicable benefit plan indicates that such benefit ends following employment termination.

2.11    Description of Additional Benefits. Provided an Employee qualifies for and elects to continue benefits as described in Section 2.10.a., the benefits and the conditions under which they will be available are:

a.    Group term life insurance and/or Accidental Death & Dismemberment (AD&D) insurance coverage as provided to active Employees under the Nortel Networks FLEX Benefits Program (including, if enrolled at the time of termination, optional group term life insurance coverage for the Employee, his spouse, and/or his dependent children). The Employee contributions for such continued coverage shall be at the active employee contribution rate, as determined solely by the Employer, and shall be deducted from severance allowance payment(s) as provided in Section 4.6; and

b.    Medical, dental, vision, and hearing coverage, the Employee Assistance Program and the Health Care Reimbursement Account as provided to active Employees under the Nortel Networks FLEX Benefits Program (including, if enrolled at the time of termination, dependent and domestic partner coverage under the foregoing plans).   With respect to Employees who are expatriates covered by the Nortel Networks International Health Services Plan ("IHSP") at the time of Termination of Employment, the FLEX Benefits Program benefits identified above shall be the available plans, not the IHSP. The Employee contributions for such continued coverage shall be at the active employee contribution rate, as determined solely by the Employer, and shall be deducted from severance allowance payment(s) as provided in Section 4.6. Such period of coverage shall be considered to be part of and run concurrent with the period of continued coverage required to be offered under the Consolidated Omnibus Budget Reconciliation Act ("COBRA").

c.    Notwithstanding any provision in the Plan to the contrary, Nortel Networks Inc. may in its sole discretion amend from time to time or terminate at any time the benefits described in Section 2.11.a and b and such action shall apply to those Employees receiving such benefits under the Plan.

2.12    Reemployment During Severance Payment. If a terminated Employee receiving a severance allowance under this Plan is subsequently reemployed prior to the expiration of the Severance Period as a Full-Time or Part-Time Employee by an Employer or an Affiliate, the obligation to pay any remaining unpaid installments of such Employee's severance allowance shall cease as of the effective date of the Employee's reemployment. Any rights that such Employee had to such unpaid amounts shall be forfeited.   Such installment payments shall cease and such rights shall be forfeited irrespective of any differences between the new position and the former, including, without limitation, any resulting change in the location of the new position from that of the former position, any difference in the manner or amount of the compensation between the new position and the former position, any difference in work scheduled or number of hours in the work week, or otherwise.

9

This provision shall also apply to a terminated Employee who is reemployed by a company that subsequently becomes an Employer or Affiliate. The severance allowance payments affected by this provision shall be those which are payable or are attributable to the period beginning with the date when the company becomes an Employer or Affiliate.

2.13   <u>Job Offers During Severance Payment</u>.   If a terminated Full-Time or Part-Time Employee receiving a severance allowance under this Plan in installment payments pursuant to Section 2.8 (subsequent to his termination by an Employer and prior to the expiration of the Severance Period) is offered and refuses reemployment by an Employer or an Affiliate, as a Full-Time Employee or Part-Time Employee, respectively, in a position for which the Employee is qualified, in the same or Reasonably Contiguous Location as the Employee's former position, which new position has a Base Weekly Salary which is not less than eighty percent (80%) of the Base Weekly Salary of the Employee's former position, then the obligation to pay any remaining unpaid installments of such Employee's severance allowance shall cease as of the date such Employee refused reemployment and such unpaid amounts shall be forfeited.

This provision shall also apply to a terminated Employee who is reemployed by a company that subsequently becomes an Employer or Affiliate. The severance allowance payments which are affected by this provision shall be that which are payable or are attributable to the period beginning with the date when the company becomes an Employer or Affiliate.

2.14   <u>Continuation of Additional Benefits</u>.   If payment of an Employee's severance allowance ceases pursuant to Sections 2.12 or 2.13, extended benefit coverages provided for in Sections 2.10 and 2.11 shall not be affected by such changes.

2.15   <u>Employment With Unrelated Employers</u>.   If a terminated Employee receiving a severance allowance under this Plan subsequently obtains a gainful employment prior to the expiration of the Severance Period other than with an Employer or Affiliate, remaining unpaid amounts of such Employee's severance allowance shall not be affected (except as described in Sections 2.12 and 2.13 hereof with regard to reemployment with an unrelated company which subsequently becomes an Employer or an Affiliate). The additional benefits provided pursuant to Sections 2.10 and 2.11 shall continue except to the extent that automatic termination of a medical benefit is permitted pursuant to COBRA or to the extent that the terminated Employee elects cessation of the benefit if permitted by the provisions of the applicable benefit plan.

2.16   <u>Subsequent Terminations with Severance Due</u>.   Notwithstanding the definition of Service in Section 1.3(p), if an Employee's employment with an Employer is terminated under circumstances where the Employee is paid a severance allowance under this Plan, any predecessor plan, or any other plan, procedure or agreement for, among other things, the payment of severance or termination pay by the Employer, any Affiliate, or former Affiliate, and the Employee is subsequently reemployed by an Employer and at a later date is again terminated from employment under circumstances where the Employee qualifies for a severance allowance under this Plan, the Service used to calculate the severance allowance

B ALB 766113 v2
2789126-000007 12/5/2007

paid in connection with the earlier termination of employment shall not be included in determining the Service to be applied in calculating the severance allowance payable in connection with the subsequent termination of employment.   If the plan, procedure or agreement that paid the prior severance allowance did not describe the calculation of the amount of the allowance on the basis of "service", the Service used to calculate the severance allowance paid in connection with the subsequent termination of employment under this Plan will begin on the date of reemployment of the Employee following the prior payment of severance.

11

# ARTICLE 3

## ADMINISTRATION AND FUNDING

3.1    <u>Named Fiduciaries</u>.  The Plan Administrator and the Committee shall each be named fiduciaries for the Plan with respect to their duties as set forth in the Plan.

3.2    <u>Plan Administrator Duties</u>.    Subject to the powers, duties and responsibilities conferred on the Committee pursuant to Section 3.3, the Plan Administrator shall have in its sole discretion the general powers, duties and responsibilities of administration which it may retain, delegate, or redelegate at any time in its sole discretion to designated employees of the Employer or an Affiliate and/or to other agents.

3.3    <u>Plan Interpretation</u>.  The Plan Administrator shall rule upon all questions concerning the application or interpretation of the provisions of this Plan, except as provided in Section 3.4.  Entitlement to benefits under this Plan shall be determined in accordance with the provisions of this Plan in effect at the time of the termination of an Employee's employment with an Employer.

3.4    <u>Committee Duties</u>.    The Committee shall supervise the administration and enforcement of the Plan to the extent set forth in this Section 3.3 according to the terms and provisions of the Plan and shall have all of the powers necessary to accomplish the following:

      a.    In its sole discretion, to construe all terms, provisions, conditions, and limitations of the Plan.  In all cases, the construction necessary for the Plan to comply with the applicable provisions of the Internal Revenue Code and the Employee Retirement Income Security Act of 1974, as amended ("ERISA") shall control;

      b.    In its sole discretion, to correct any defect or to supply any omission or to reconcile any inconsistency that may appear in the Plan, in such manner and to such extent as it shall deem in its discretion expedient to effectuate the purposes of the Plan;

      c.    In its sole discretion, to determine all questions relating to eligibility;

      d.    In its sole discretion, to make a determination as to the right of any person to a benefit under the Plan; and

      e.    In its sole discretion, to review and make determinations on appeals pursuant to Section 3.6.

3.5    <u>Submission of Claims</u>.  All claims for benefits under the Plan shall be directed in writing to the attention of the Plan Administrator.  If the Plan Administrator in its sole discretion determines that any individual who has claimed a right to receive benefits under the Plan is not entitled to receive all or any part of the benefits claimed, it shall inform the

B ALB 766113 v2
2789126-000007 12/5/2007

claimant by certified mail or by electronic notification of its determination and the reasons therefore in a manner calculated to be understood by the claimant. Such notification shall be given within a reasonable period of time, but not later than ninety (90) days after receipt of the claim by the Plan Administrator, unless the Plan Administrator determines that special circumstances require an extension of time for processing the claim. If the Plan Administrator determines that an extension of time for processing is required, written notice of the extension shall be furnished to the claimant prior to the termination of the initial ninety (90) day period. In no event shall such extension exceed a period of ninety (90) days from the end of such initial period. The extension notice shall indicate the special circumstances requiring an extension of time and the date by which the Plan expects to render the benefit determination. Such notification shall set forth, in a manner calculated to be understood by the claimant: (i) the specific reason or reasons for the adverse determination; (ii) reference to the specific plan provisions on which the determination is based; (iii) a description of any additional material or information necessary for the claim to perfect the claim and an explanation of why such material or information is necessary; (iv) a description of the Plan's review procedures and the time limits applicable to such procedures, including a statement of the claimant's right to bring a civil action under section 502(a) of ERISA following an adverse benefit determination on review.

3.6  <u>Appeal of Denied Claims</u>. Following an initial adverse decision by the Plan Administrator concerning a claim for benefits, a claimant may appeal such determination within sixty (60) days of receipt of the notification of the adverse benefit determination. A claimant who appeals a denied claim may submit to the Committee written comments, documents, records, and other information relating to the claim for benefits. The claimant shall be provided, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the claimant's claim for benefits. A document, record, or other information is "relevant" to a claim for benefits if it: (i)was relied upon in making the benefit determination; (ii) was submitted, considered, or generated in the course of making the benefit determination, without regard to whether such document, record, or other information was relied upon in making the benefit determination; or (iii) demonstrates compliance with the administrative processes and safeguards required by ERISA and the applicable regulations in making the benefit determination. The review of such an appeal by the Committee shall take into account all comments, documents, records, and other information submitted by the claimant relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination.

The Committee shall make a decision on the claimant's appeal no later than the date of the meeting of the Committee that immediately follows the Plan's receipt of a request for review, unless the request for review is filed within thirty (30) days preceding the date of such meeting. In such case, a benefit determination may be made by no later than the date of the second meeting following the Plan's receipt of the request for review. If special circumstances require a further extension of time for processing, a benefit determination shall be rendered not later than the third meeting of the Committee following the Plan's receipt of the request for review. If such an extension of time for review is required because of special circumstances, the Plan Administrator shall provide the claimant with written notice of the extension, describing the special circumstances and the date as of which the benefit

13

determination will be made, prior to the commencement of the extension. The Plan Administrator shall notify the claimant of the benefit determination as soon as possible, but not later than five (5) days after the benefit determination is made.

If the Committee in its sole discretion determines that any individual who has filed an appeal of an initial adverse benefit determination is not entitled to receive all or any part of the benefits claimed, it shall inform the claimant by certified mail or by electronic notification of its determination and the reasons therefore in a manner calculated to be understood by the claimant. Such notification shall set forth, in a manner calculated to be understood by the claimant: (i) the specific reason or reasons for the adverse determination; (ii) reference to the specific plan provisions on which the determination is based; (iii) a statement that the claimant is entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the claimant's claim for benefits. A document, record, or other information is "relevant" to a claim for benefits if it: (i)was relied upon in making the benefit determination; (ii) was submitted, considered, or generated in the course of making the benefit determination, without regard to whether such document, record, or other information was relied upon in making the benefit determination; or (iii) demonstrates compliance with the administrative processes and safeguards required by ERISA and the applicable regulations in making the benefit determination.

3.7   Funding. This Plan is an unfunded plan and all severance allowances and other benefits payable under this Plan and all administrative expenses shall be paid from the general assets of the applicable Employer.

3.8   Unclaimed Benefits. If a benefit becomes payable from the Plan, but the payment is not made because the Participant cannot be located after a reasonable and diligent effort, such benefit shall be forfeited to the Plan on the first anniversary of the date when the benefit became payable.

B ALB 766113 v2
2789126-000007 12/5/2007

ARTICLE 4

MISCELLANEOUS

4.1   Plan Amendment and Termination. Nortel Networks Inc. intends to continue this Plan, but necessarily reserves the right to amend this Plan from time to time or terminate this Plan at any time. Any amendment to this Plan may reduce or eliminate benefits payable under the Plan to persons who are Employees as of the effective date of the amendment. Amendments shall be made by adoption of a written instrument of amendment by the Board, or by an officer of Nortel Networks Inc. to whom such authority has been delegated by the Board. The Plan may be terminated by appropriate actions of the Board, as evidenced by resolutions duly adopted by the Board.

4.2   Employment Rights. Nothing contained in this Plan shall be deemed to give any Employee the right to be retained in the service of an Employer or to interfere with the right of an Employer to discharge any Employee at any time for any reason, nor shall it be deemed to give an Employer the right to require any Employee to remain in its service, nor shall it interfere with any Employee's right to terminate his service at any time.

4.3   Applicable Law. This Plan is intended to qualify as a welfare plan within the scope of ERISA. This Plan shall be construed in accordance with the provisions of ERISA and, to the extent not preempted by ERISA, the laws of the State of Tennessee (without regard to provisions with respect to conflict of laws).

4.4   Compliance with Section 409A. This Plan shall at all times be administered and the provisions of this Plan shall be interpreted consistent with the requirements of Section 409A of the Code and any and all regulations thereunder, including such regulations as may be promulgated after the effective date of this Plan.

4.5   Reduction in Severance Allowance. An Employer may deem any severance allowance owing to any Employee under this Plan to be reduced by any amount determined by the Plan Administrator to be owing to any Employer by such Employee as of his or her Termination of Employment date. Such amounts owing to an Employer shall include, but not be limited to, any advances, loans, overpayments, excess commissions, any other monies or Employer property not returned immediately upon Termination of Employment (including, but not limited to, tools, computers, and identification badges). The Employer may recoup such amounts from the severance allowance by not commencing payment of the severance allowance, terminating the payment of severance allowances that have commenced, or reducing the amount of any severance allowance. Such action shall not limit the Employer from utilizing other legal means of recourse for the collection of such amounts if the severance allowance is not sufficient to repay the amounts owing to the Employer. Any such action taken with respect to the severance allowance shall have a corresponding effect on the other Sections of this Plan that relate to the continuation of additional benefits as described under Sections 2.10 and 2.11 hereof and the determination of the Severance Period as described in Section 1.3.p. hereof. Such additional benefits and the Severance

B ALB 766113 v2
2789126-000007 12/5/2007

Period shall be curtailed to the extent that they are determined by the length of the period of payment of severance allowances for purposes of this Plan and all other plans of the Employer that rely upon provisions of this Plan in the determination of benefits shall recognize such curtailment also.

4.5    Tax Withholding.  An Employer, in its sole discretion, shall be free to withhold from any severance allowance whatever amounts it shall determine to be appropriate concerning any and all applicable federal, state and local tax withholding.

4.6    Payment for Additional Benefits.    An Employer shall make deductions from severance allowance payment(s) for benefit continuation elected by the Employee at the active employee contribution rate as provided in Section 2.10 of this Plan.

B ALB 766113 v2
2789126-000007 12/5/2007

## ARTICLE 5

## WINDOW PROGRAMS

Notwithstanding anything in the Plan to the contrary, an Employee described in this Article 5 is eligible for Plan benefits in accordance with the terms of the Plan if such Employee voluntarily terminates his employment with an Employer in calendar years 1998 or 1999 pursuant to the Plan Administrator's determination (made in its sole discretion), to offer Plan benefits to Employees in a designated group due to organizational restructuring of such group in whole or in part.  An Employee shall qualify to voluntarily terminate and receive a benefit under the Plan only if the Employee belongs to such a designated group and otherwise meets the eligibility requirements under the Plan (except for those requirements denying a benefit to an Employee who voluntarily terminates).

17

# ARTICLE 6

## DESIGNATED GROUPS

Notwithstanding anything in the Plan to the contrary, an Employee within a "Group" (listed in Exhibit A) who has been notified on a "Date of Notification" (as set forth in Exhibit A) that his employment will no longer be required (as a result of a Business Transaction involving the designated Group) is eligible for Plan benefits in accordance with the terms of the Plan if such Employee further terminates his employment on a date determined by Employer, as a result of the Business Transaction involving such designated Group. Such an Employee shall qualify and receive benefits under the Plan only if the Employee is assigned to such a designated Group and otherwise meets the eligibility requirements under the Plan. The provisions of Section 2.3 of the Plan shall not apply to such an Employee.

18

EXHIBIT A TO ARTICLE 6

DESIGNATED GROUPS

Date of Notification                    Group

October 6, 1999                         Payroll, HR Info Center, Non-Production
                                        Purchasing, Accounts Payable, Employee
                                        Receivables, Corporate Services, Corporate
                                        Training, and Resourcing

19

IN WITNESS WHEREOF, this amended and restated Plan has been executed this _1 7_ day of _December_ 2007, to be effective as of January 1, 2008, except as otherwise indicated herein.

**Nortel Networks Inc.**

By: _Paula Holder_

Title: _Core Benefits Leader_

20

# NORTEL NETWORKS INC.

## ACTION BY UNANIMOUS WRITTEN CONSENT
## OF THE BOARD OF DIRECTORS

The undersigned, being all of the Directors of Nortel Networks Inc., a Delaware corporation ("Corporation"), acting in accordance with Section 141(f) of the General Corporation Law of Delaware, do hereby adopt the following resolutions:

**WHEREAS,** the Corporation has established and maintains the Nortel Networks Severance Allowance Plan, as Amended and Restated, Effective January 1, 2008, except as otherwise indicated therein ("Severance Plan") and the Nortel Networks Enhanced Severance Allowance Plan, As Amended and Restated, Effective January 1, 2008 ("Enhanced Plan", and together with the Severance Plan, "Plans");

**WHEREAS,** Section 4.1 of each of the Plans provides for the amendment of the Plan by the Board of Directors of the Corporation ("Board"), including any amendment that may reduce benefits payable under the Plan to persons who are Employees (as defined in each Plan) as of the effective date of the amendment;

**WHEREAS,** the Board has determined that it is in the best interests of the Corporation to amend the Plans to provide an offset to the benefits payable under the Plans of any amounts required to be paid under Federal and state law.

**NOW, THEREFORE, BE IT RESOLVED,** that the Board hereby amends Section 2.5 of each of the Plans by the addition of the following sentence at the conclusion thereof.

> *"Notwithstanding the foregoing, the Plan Administrator may, in its sole discretion, elect to waive the requirement of execution of such release and restrictive covenant provisions by an Employee, which waiver shall not adversely affect the right of such Employee to receive a severance allowance under this Plan.*

**FURTHER RESOLVED,** that the Board hereby amends Section 2.7 of each of the Plans by adding the following language to the end of the first sentence of such Section.

> *"and that any severance allowance payable to an Employee under this Plan shall be offset by any other severance, redundancy, pay in lieu of notice or termination payment made by an Employer to an Employee other than pursuant to this Plan, including, but not limited*

*to, any amounts paid pursuant to federal, state, local or foreign government worker notification (e.g., U.S. Worker Adjustment and Retraining Notification Act) or office closing requirements, any amounts owed the Employee pursuant to a contract with the Employer (unless the contract specifically provides otherwise) and amounts paid to an Employee placed in a temporary layoff status (often referred to as a furlough) which immediately precedes the commencement of payment of such severance allowance."*

**FURTHER RESOLVED**, That each of the officers of the Corporation, acting singly, is authorized hereby to take all actions and to execute, or cause to be executed, by one or more employees of the Corporation to whom the President of the Corporation has delegated appropriate signing authority, or one or more employees of the Corporation or Nortel Networks Corporation ("NNC") and/or any corporation, partnership or other entity with respect to which NNC has a direct or indirect ownership interest ("NNC Affiliate") to whom an officer of the Corporation has granted an appropriate power of attorney, all such agreements, instruments and/or documents, and to take all other actions as such officer may consider necessary or desirable in order to effect the foregoing resolutions, that the taking of any such action or the execution of any agreement, instrument or document by any of the persons described in this resolution shall conclusively evidence the making of any determinations and the granting of any approvals required under these resolutions; and that all actions taken or caused to be taken by any officer of the Corporation, NNC or a NNC Affiliate prior to the date hereof in order to effect the matters described in these resolutions are hereby ratified and approved.

EXECUTED as of the 13th day of February 2009.

_____
Dennis J. Carey

_____
Paul W. Karr

to, any amounts paid pursuant to federal, state, local or foreign government worker notification (e.g., U.S. Worker Adjustment and Retraining Notification Act) or office closing requirements, any amounts owed the Employee pursuant to a contract with the Employer (unless the contract specifically provides otherwise) and amounts paid to an Employee placed in a temporary layoff status (often referred to as a furlough) which immediately precedes the commencement of payment of such severance allowance."

**FURTHER RESOLVED**, That each of the officers of the Corporation, acting singly, is authorized hereby to take all actions and to execute, or cause to be executed, by one or more employees of the Corporation to whom the President of the Corporation has delegated appropriate signing authority, or one or more employees of the Corporation or Nortel Networks Corporation ("NNC") and/or any corporation, partnership or other entity with respect to which NNC has a direct or indirect ownership interest ("NNC Affiliate") to whom an officer of the Corporation has granted an appropriate power of attorney, all such agreements, instruments and/or documents, and to take all other actions as such officer may consider necessary or desirable in order to effect the foregoing resolutions, that the taking of any such action or the execution of any agreement, instrument or document by any of the persons described in this resolution shall conclusively evidence the making of any determinations and the granting of any approvals required under these resolutions; and that all actions taken or caused to be taken by any officer of the Corporation, NNC or a NNC Affiliate prior to the date hereof in order to effect the matters described in these resolutions are hereby ratified and approved.

**EXECUTED** as of the 13th day of February 2009.

Dennis J. Carey

Paul W. Karr

**Exhibit 2 – Summary Plan Description**

As Amended Effective: January 1, 2006
Modified: September 5, 2007

# U.S. - BENEFITS

# Nortel Networks Severance Allowance Plan
# Summary Plan Description
# 2007

---

## Contents

- Introduction
- Eligibility
    1. Does the Plan cover me?
    2. How do I determine if I am a Full-time or a Part-time Employee who is covered under the Plan?
    3. Under what circumstances will I qualify for a severance allowance?
    4. If my employment is terminated due to a "reduction in force," in what cases will I not qualify for a severance allowance?
    5. If I wish to terminate my employment as a result of receiving notification of the "reclassification" of my current position, will I qualify for a severance allowance?
    6. If my employment is terminated due to a "business transaction", in what cases will I not qualify for a severance allowance?
    7. What is "base weekly salary"?

- Severance Allowance Benefits

    8. How much will my severance allowance be?
    9. How is my length of Service determined?
    10. How will I receive my severance allowance?
    11. What happens if I die before receiving full payment of my severance allowance?
    12. If I qualify for a severance allowance, am I eligible for any other benefits?
    13. Can I continue the benefits identified in Question 12 beyond the periods described in that Question?
    14. What happens if I am reemployed by an Employer or an Affiliate?

15. What happens if I am receiving severance allowance payments and become employed by an entity other than the companies described in Question 14?

16. What happens if I am receiving severance allowance payments and am offered and refuse reemployment by an Employer or an Affiliate?

17. What happens if, after having received a severance allowance, I am subsequently reemployed by an Employer or an Affiliate and, after reemployment, I am again terminated from employment under circumstances where I qualify for a severance allowance?

18. Other than applicable federal, state and local tax withholding, will any other deductions be made from my severance allowance?

19. What happens if I move after I terminate employment and you are unable to locate me to make severance allowance benefit payments?

- Administrative Information
- Glossary

---

## Introduction

The Nortel Networks Severance Allowance Plan (Plan), administered by Nortel Networks Inc., was established to provide a severance allowance to assist certain terminated employees.

## Employer Identification Number:

The employer identification number assigned to Nortel Networks Inc. by the IRS is #04-2486332.

## Agent for Service of Legal Process:

The agent for service of legal process is:

Attn: Lynn Egan
Nortel Networks Inc.
220 Athens Way, Suite 300,
Nashville, TN 37228-1397 615-432-4787

## Plan Identification:

Formal Plan name: Nortel Networks Severance Allowance Plan
Plan Type: Welfare Plan
Plan Number: 507

Funding Method: Self funded
*Claims Administrator: HR Shared Services*
*Contribution Source: Nortel Networks Inc.*

This is a brief description of the severance allowance benefits and the conditions under which such benefits will be paid, as the plan is amended effective January 1, 2006, except as otherwise indicated in this summary. This description serves as a summary plan description (SPD) under the terms of the Employee Retirement Income Security Act of 1974 (ERISA).

This SPD summarizes the official plan document of the Severance Allowance Plan. We have tried to write this summary in clear, understandable and informal language. However, you should refer to the official plan document for more detailed information about the Plan. In the event of any conflict between the information we have summarized here and the official plan document, the plan document will control. The Plan may be amended or terminated at any time.

Please note that certain key words are capitalized throughout this document. These words are identified and defined in the Glossary section at the end of this document.

## Eligibility

### 1. Does the Plan cover me?

The Plan covers you if you are a Full-time or Part-time Employee of Nortel Networks Inc. (NNI) or one of the U.S. subsidiaries or Affiliate of NNI or Nortel Networks Corporation (NNC) that has adopted the plan. You must also have a total of at least six months of Service to qualify for a benefit. Some classes of Employees and other individuals who provide services to the Employers are not covered by the Plan. See Question 2 below for a description of which classes are excluded and for a description of Full-time and Part-time Employee.

### 2. How do I determine if I am a Full-time or a Part-time Employee who is covered under the Plan?

Generally, a Full-time Employee is one who is regularly scheduled to work at least 35 hours per week. A Part-time Employee is regularly scheduled to work at least 20 hours per week but less than 35 hours per week. Employees who are covered under separate severance arrangements with their Employer are excluded. The Plan also excludes certain categories of employees. Refer to the definition of "Employee" in the Glossary in this document for a detailed definition of "Employee" and list of exclusions.

### 3. Under what circumstances will I qualify for a severance allowance?

If the Plan covers you (see Question 1), you will normally qualify for a severance allowance when your employment is terminated:

a. as part of a "reduction in force[1]", or
b. a "business transaction[2]", or
c. when it is otherwise initiated by your Employer, or
d. when it is initiated by you following notification of the "reclassification[3]" of your current position,

unless one of the circumstances described below applies.

[1] *A "reduction in force" is a reduction in your Employer's work force or the elimination or consolidation of jobs by your Employer.*

[2] *A "business transaction" is a divestiture or a spin-off of a business, creation of a joint venture, an outsourcing transaction or any other similar transaction.*

[3] *A "reclassification" is the reclassification of your current position to a lower Job Complexity Indicator/Job Family Compensation Structure ("Job Complexity Indicator/Market Reference Range" prior to April 8, 2002) ("JCI/JFCS") as a result of changes to the duties, responsibilities or scope of that position. The benefits under this plan that apply to "reclassification" situations shall not apply to reclassifications that occur for reasons other than those stated here.*

However, you will not qualify for a severance allowance if:

- the Plan Administrator determines your employment termination arises out of conduct and/or inaction by you which was not in the best interests of your Employer;  for example your refusal to submit to a background check as required by employer  or your failing to meet the standards of an employer background check.
- you have released or waived your rights under this Plan in exchange for benefits or compensation to which you were not otherwise entitled; or
- you fall under one of the exceptions described in Questions 4, 5 or 6 below.

If you otherwise qualify for a severance allowance, it will not be paid unless: you sign a document within the specified time that contains a release and restrictive covenant provision; you refrain from revoking that release; and you remain an Employee through your termination date. Severance allowance owed to you under this Plan may be reduced by any amount determined by the Plan Administrator to be owed to your Employer as of your employment termination date. Such amounts shall include, but not be limited to, any advances, loans, overpayments, excess commissions, any other monies or Employer property not returned immediately upon employment termination (including, but not limited to, tools, computers, and identification badges). Your Employer may recoup such amounts from the severance allowance by not commencing payment of the severance allowance, terminating the payment of severance allowances that have commenced, or reducing the amount of any severance allowance.

**4. If my employment is terminated due to a "reduction in force," in what cases will I not qualify for a severance allowance?**

You will not qualify for a severance allowance if:

  a. you are offered and accept any other position as a Full-time or Part-time Employee with an Employer or an Affiliate; or
  b. you are given notice of termination and you are terminated, and prior to that termination, you are :

  i) offered and you refuse another Full-time or Part-time Employee position, as applicable, with an Employer or an Affiliate, for which you are qualified, as long as the position offered is in the same location or in a location that is no more than 25 miles further than the location of your former position, and

  ii) the position offered has a "base weekly salary" not less than 80% of your former "base weekly salary." (See Question 7 for definition of "base weekly salary.")

  The "notice of termination" referred in "b" above may include a notice that your position has been identified for elimination and provides for continued employment in a position determined by your Employer.

**5. If I wish to terminate my employment as a result of receiving notification of the "reclassification" of my current position, will I qualify for a severance allowance? (See Question 3 for definition of "reclassification").**

You will qualify for a severance allowance except in the following circumstances:

  a. prior to your termination, you are offered and accept any other position as a Full-time or Part-time Employee with an Employer or an Affiliate; or
  b. after March 31, 2002, you are notified of the "reclassification" and refuse the offer of the "reclassified" position or another Full-time or Part-time Employee position, as applicable, at the same or a different JCI/JFCS, with an Employer or an Affiliate, for which you are qualified (as long as the position or "reclassified" position offered is in the same location or in a location that is no more than 25 miles further than the location of your former position, and with a "base weekly salary" not less than 80% of your former "base weekly salary".

**6. If my employment is terminated due to a "business transaction", in what cases will I not qualify for a severance allowance?**

You will not qualify for a severance allowance if:

  a. you are offered and accept any position as a Full-time or Part-time Employee with the company involved in the transaction with your Employer (or any subcontractor or affiliate of that company); or

b. you are offered and refuse a Full-time or Part-time Employee position, as applicable, with the company or related companies described in a) above for which you are qualified, in the same location or in a location that is no more than 25 miles further than the location of your former position, and with a "base weekly salary" not less than 80% of your former "base weekly salary".

## 7. What is "base weekly salary"?

It is your basic gross weekly salary on the day prior to your employment termination date, as determined solely by the Plan Administrator, excluding any other compensation (such as, but not limited to, overtime, bonus or incentive compensation, relocation payments, Global Sales Compensation MAVP/RVP 50-50 Incentive Plan earnings or the value of any other compensation or benefits). If the compensation for your position includes sales commissions and/or sales bonuses, your "base weekly salary" is determined by dividing your Total Targeted Compensation (basic gross annual salary plus target incentives paid at 100% annual objectives, but excluding sales bonuses, sales commissions, or incentive compensation payments earned or paid, overtime pay, interest differential payments or other relocation allowances, Global Sales Compensation MAVP/RVP 50-50 Incentive Plan earnings, or the value of any other compensation or benefit) by 52. If you are a Part-time Employee, your "base weekly salary" is calculated on the basis of the number of hours in your regular, normal work schedule.

The Plan Administrator compares your "base weekly salary" in effect on the day before your termination to the "base weekly salary" of the position which you are offered to determine if the 80% test stated in Questions 4, 5, or 6 respectively, are met.

## Severance Allowance Benefits

### 8. How much will my severance allowance be?

Your severance allowance is normally equal to four weeks of your "base weekly salary", plus one additional week of that "base weekly salary" for each year of your Service. The Plan Administrator can authorize additional severance allowance in its discretion in certain circumstances. Under no circumstances will a person's total severance allowance exceed twice the person's total annual compensation for the year prior to termination.

### 9. How is my length of Service determined?

Your Service is the total of your periods of employment with an Employer or Affiliate. Such period will include employment with a previous employer who became an Employer or Affiliate due to a merger or other acquisition transaction if you were employed by that previous employer on the effective date of the merger or other acquisition. In calculating years of Service, a partial year of service exceeding six (6) months constitutes a full year of Service. Service is counted based on your service anniversary date (not calendar year). If you have a "break" in your period of employment of more than 30 days, your period of employment before the "break" will not be counted

as Service for purposes of calculating your severance benefit unless you have been back at work the required period of time. The period you must be back at work to have the "pre-break" employment counted is the lesser of the period of your break or one year. Medical and other authorized leaves of absence are not considered to be "breaks" in employment. If you are a rehire whose employment is being terminated and again qualify for a severance allowance, the Service used to calculate any severance allowance paid in connection with your earlier termination of employment from this Plan, any predecessor plan, or any other severance plan, procedure or agreement will be <u>excluded</u> in determining the Service to be applied in calculating the severance allowance payable in connection with any subsequent termination of employment.   In calculating  Service to determine any current severance benefit the date of your reemployment following your earlier date of termination shall commence the period to be used in any severance benefit calculation, if you received severance allowance or monetary payment pursuant to this Plan, any predecessor plan, or any other plan, procedure or agreement.

**10. How will I receive my severance allowance?**

You will receive your severance allowance payments in installments on the same paydays used during your employment. The total payment may not be made for more than 24 months after termination. Your severance allowance is subject to applicable federal, state and local income tax withholding.

**11. What happens if I die before receiving full payment of my severance allowance?**

The balance of your severance allowance will be paid in a single lump sum to the beneficiary or beneficiaries most recently designated by you under the group term life insurance coverage provided under the Nortel Networks FLEX Benefits Program. If no beneficiary was designated, it will be paid to your estate.

**12. If I qualify for a severance allowance, am I eligible for any other benefits?**

Yes. When you terminate, you may elect to continue either all or none of the following benefits (you may not elect to continue one without the others): the group term life insurance; accidental death and dismemberment insurance (AD&D); medical benefits; dental/vision/hearing care benefits; Employee Assistance Program (EAP) benefits; and Health Care Reimbursement Account (HCRA) as provided in the Nortel Networks FLEX Benefits Program in which you and your dependents (including, for health care coverage purposes only, domestic partners) were enrolled at the time of termination. For terminating expatriate Employees, the International Health Services Plan ceases and the U.S. FLEX medical benefits and dental/vision/hearing care benefits will apply at the time of termination.

You may continue these benefits until the latest of:

    a.   90 days following termination;

b. the end of the period calculated for payment of a severance allowance as described in Question 8 above; or

c. the day before your retirement under the applicable Nortel Networks retirement plan in which you are a member on the first day of the month after the end of the period calculated for payment of your severance allowance.

 Note: You and any eligible dependents must be covered under the Nortel Networks medical benefits plan for active employees immediately prior to your retirement start date to be eligible for the Nortel Networks Retiree Medical Plan.

Your premiums, which will continue at active employee contribution rates (as determined by the Employer), will be deducted from your severance allowance payments. If you elect to continue this coverage, you will not be permitted to change it or to revoke it unless there is an annual enrollment period or you experience a qualified Status Change as defined in the Employer's benefit plan documents. Your other option is to revoke your health care benefits and group term life insurance benefit coverage at the time of your termination of employment. If you revoke your health care benefits and group term life insurance benefit coverage at the time of your termination of employment, or during your severance allowance period, these benefits cannot be reinstated. See Question 12 for COBRA information.

## 13. Can I continue the benefits identified in Question 12 beyond the periods described in that Question?

If you elect to terminate the above listed coverage in which you and your dependents are enrolled at the time your employment terminates, or during your severance allowance period, you will be permitted to continue your health care coverage at 102% of the full premium for the period required by the Consolidated Omnibus Budget Reconciliation Act (COBRA).

If you choose the alternative to continue all coverage at the active employee contribution rate for the period described in Question 12, you will still have the opportunity under COBRA to continue health care coverage in which you and your dependents are enrolled after the continuation period described in Question 12 ends. However, the COBRA continuation period will be reduced by the period during which you continued coverage at the active employee contribution rate.

Group term life insurance and AD&D insurance cannot be continued beyond the period described in Question 12. You may have the opportunity to convert your group term life insurance to an individual policy. AD&D insurance cannot be converted to an individual policy.

Travel Well (Health Benefits Abroad) coverage for business/personal travel will end at your termination date. However, you may continue the Health Benefits Abroad emergency medical, dental/vision/hearing care coverage for personal travel throughout the COBRA period at COBRA rates.

COBRA coverage will be explained in more detail in a COBRA enrollment package that will be sent to you at the appropriate time following your termination.

**14. What happens if I am reemployed by an Employer or an Affiliate?**

If you are receiving a severance allowance in installments and are reemployed, your remaining unpaid installments will stop as of your reemployment date. Those remaining unpaid installments will be forfeited. If you received your severance allowance in a lump sum, you must repay the Employer an amount based on the number of unexpired weeks between your reemployment date and the end of the severance period. The other benefits described in Question 12 will also end. Any benefits under plans maintained by the Nortel Employer that rehires you will be determined by the provisions of those plans.

**15. What happens if I am receiving severance allowance payments and become employed by an entity other than the companies described in Question 14?**

Your severance allowance will be unaffected. In other words, you will not forfeit your severance allowance. If you elected to continue benefits as described in Question 12, that coverage may be continued throughout your severance period. COBRA continuation coverage, described in Question 13, however, will end when you become covered by another group health plan, provided that the other group health plan does not have a pre-existing condition limitation affecting the covered person.

**16. What happens if I am receiving severance allowance payments and am offered and refuse reemployment by an Employer or an Affiliate?**

The obligation to pay any unpaid amounts under this Plan stops as of the date you refuse the reemployment offer for a position as a Full-time or Part-time Employee, as applicable, as long as the position offered is one for which you are qualified, is located in the same location or in a location that is no more than 25 miles further than the location of your former position, and which has a "base weekly salary" not less than 80% of your former "base weekly salary". The remaining unpaid installments will be forfeited. If you received your severance allowance in a lump sum you must repay your Employer an amount based on the number of unexpired weeks remaining between your reemployment date and the end of the period. If you elected to continue group term life insurance and health care coverage as described in Question 12, those benefits will be unaffected by your rejection of the job offer.

**17. What happens if, after having received a severance allowance, I am subsequently reemployed by an Employer or an Affiliate and, after reemployment, I am again terminated from employment under circumstances where I qualify for a severance allowance?**

The length of Service used to determine your severance allowance paid for your earlier termination is excluded in determining the length of Service for your later termination. See Question 9 response for more detail on how Service is calculated and exclusions.

**18. Other than applicable federal, state and local tax withholding, will any other deductions be made from my severance allowance?**

Yes. Premiums for continued benefit coverage as described in Question 12 will be deducted from your severance payment(s). Also, if the Plan Administrator determines that you owe any money or property to your Employer including, but not limited to, advances, loans, overpayments, excess commissions, unpaid credit card balances, unreturned badges, computers, etc., your severance allowance may be withheld in part or in whole. The withholding of your severance allowance may also result in discontinued benefit coverage or other entitlements such as continued service accrual or stock option exercise capability.

**19. What happens if I move after I terminate employment and you are unable to locate me to make severance allowance benefit payments?**

It is important for you to report any address change to the appropriate Nortel Networks Employer. If a benefit payment is not made because a participant cannot be located after a reasonable and diligent effort, the benefit and any income that may accrue thereon shall be forfeited to the Plan on the first anniversary date when the benefit became payable.

## Administrative Information

This section provides administrative details about this plan, such as how to file a claim, how to appeal a denied claim, your ERISA rights, and how Nortel Networks Inc. may amend the plan.

**How to File a Claim:**

The claims filing process and the appeal of denied claims process is different for this plan. For the Severance Allowance Plan, the Human Resources Associates for your business unit routinely submit claims for severance benefits for terminating employees who qualify. If you believe that you qualify for a benefit, but a claim is not filed on your behalf, you can file a claim directly by writing to the Plan Administrator at the address below:

Plan Administrator
c/o HR Shared Services
P.O. Box 13010,
Dept. 7094, Mail Stop 570/02/0C2
Research Triangle Park, NC 27709-3010
919-905-9351
1-800-676-4636
ESN 355-9351

Overnight delivery packages should be sent to:

Plan Administrator
c/o HR Shared Services
Dept. 7094, 4001 E. Chapel Hill-Nelson Highway
Research Triangle Park, NC 27709.

The Plan Administrator will determine if you qualify for a benefit under the Plan. If a determination is made that you are not entitled to a benefit, you will be notified by certified mail or by electronic notification of the reason(s) for denial, including reference to the part of the Plan on which the decision is based. This notification will be given within a reasonable period of time but no later than 90 days after the receipt of your claim by the Plan Administrator, unless special circumstances require an extension of time for processing. If that is the case, written notice of the extension shall be sent to you within the initial 90 day period. The extension notice will explain why an extension is required and will indicate when the Plan Administrator expects to make a determination. This notification will provide the specific reason for the determination and will reference the specific plan provisions on which the determination is based. The notification will also indicate if any additional material or information is required from you and will include a description of the Plan's review procedures and a statement of your rights under ERISA following an adverse benefit determination on review.

**How to Appeal a Denied Claim:**

If you do not agree with the initial adverse decision, you have 60 days after receiving that notice in which to submit (by certified mail) an appeal with additional materials that support your claim. That information should be submitted to the Employee Benefits Committee at the address provided below. At your request, and free of charge, you will be provided with reasonable access to, and copies of, all documents, records and other information relevant to your claim for benefits. The Employee Benefits Committee will then make a final decision on your appeal at a meeting of the Committee immediately following receipt of your request for a review, unless the request is filed within 30 days preceding the date of the meeting. In that case, the decision will be made at the second meeting following the receipt of your request for a review. If special circumstances require an extension of time for processing, a decision will be made at the third meeting of the Committee following your request for review. If this extension is required, you will be notified in writing of the extension, describing the special circumstances and the date that the decision will be made. You will be advised in writing by certified mail or electronic notification of the results as soon as possible but no later than five days after the benefit determination is made. This notification will include the specific reason for the denial, reference to the specific plan provisions on which the determination is based, a statement that you are entitled to receive, upon request, and free of charge, reasonable access to, and copies of, all documents, records and other information that is relevant to your claim for benefits. No further administrative appeals are available after the Employee Benefits Committee reaches its decision. However, you do have the right to bring a civil action under ERISA Section 502(a) following such an adverse benefit determination on final review of a denied claim once you have exhausted all of your administrative appeals.

Employee Benefits Committee
Attn: Benefits Department #8426
Nortel Networks Inc.
220 Athens Way, Suite 300
Nashville, TN 37228
(615) 432-4000

**Your ERISA Rights**

Employees covered by the Severance Allowance Plan are entitled to certain rights and protections under the Employee Retirement Income Security Act of 1974 (ERISA). ERISA provides that all plan participants shall be entitled to:

*Receive Information About Your Plan and Benefits*

Examine, without charge, at the plan administrator's office and at other specified locations, such as worksites and union halls, all documents governing the plan, including insurance contracts and collective bargaining agreements, and a copy of the latest annual report (Form 5500 Series) filed by the plan with the U.S. Department of Labor and available at the Public Disclosure Room of the Pension and Welfare Benefit Administration.

Obtain, upon written request to the plan administrator, copies of documents governing the operation of the plan, including insurance contracts and collective bargaining agreements, and copies of the latest annual report (Form 5500 Series) and updated summary plan description. The administrator may make a reasonable charge for the copies.

Receive a summary of the plan's annual financial report. The plan administrator is required by law to furnish each participant with a copy of this summary annual report.

*Prudent Actions by Plan Fiduciaries*

In addition to creating rights for plan participants ERISA imposes duties upon the people who are responsible for the operation of the employee benefit plan. The people who operate your plan, called "fiduciaries" of the plan, have a duty to do so prudently and in the interest of you and other plan participants and beneficiaries. No one, including your employer, your union, or any other person, may fire you or otherwise discriminate against you in any way to prevent you from obtaining a welfare benefit or exercising your rights under ERISA.

*Enforce Your Rights*

If your claim for a welfare benefit is denied or ignored, in whole or in part, you have a right to know why this was done, to obtain copies of documents relating to the decision without charge, and to appeal any denial, all within certain time schedules.

Under ERISA, there are steps you can take to enforce the above rights. For instance, if you request a copy of plan documents or the latest annual report from the plan and do not receive them within 30 days, you may file suit in a Federal court. In such a case, the court may require the plan administrator to provide the materials and pay you up to $110 a day until you receive the materials, unless the materials were not sent because of reasons beyond the control of the administrator. If you have a claim for benefits which is denied or ignored, in whole or in part, you may file suit in a state or Federal court. In addition, if you disagree with the plan's decision or lack thereof concerning the qualified status of a domestic relations order or a medical child support order, you may file suit in Federal court. If it should happen that plan fiduciaries misuse the plan's money, or if you are discriminated against for asserting your rights, you may seek assistance from the U.S. Department of Labor, or you may file suit in a Federal court. The court will decide who should pay court costs and legal fees. If you are successful the court may order the person you have sued to pay these costs and fees. If you lose, the court may order you to pay these costs and fees, for example, if it finds your claim is frivolous.

*Assistance with Your Questions*

If you have any questions about your plan, you should contact the plan administrator. If you have any questions about this statement or about your rights under ERISA, or if you need assistance in obtaining documents from the plan administrator, you should contact the nearest office of the Pension and Welfare Benefits Administration, U.S. Department of Labor, listed in your telephone directory or the Division of Technical Assistance and Inquiries, Pension and Welfare Benefits Administration, U.S. Department of Labor, 200 Constitution Avenue N.W., Washington, D.C. 20210. You may also obtain certain publications about your rights and responsibilities under ERISA by calling the publications hotline of the Pension and Welfare Benefits Administration.

## Glossary

Affiliate:   shall mean Nortel Networks Corporation and any company wholly or partially owned, directly or indirectly, by Nortel Networks Corporation, excluding any Employer.

Employee:   shall mean any Full-time Employee or Part-time Employee, of an Employer, excluding employees covered by a collective bargaining agreement unless such agreement specifically provides for their participation in this Plan, excluding employees who are classified as co-op students, interns, INROADS and VOEs, and excluding employees who are eligible for benefits under the Nortel Networks Enhanced Severance Allowance Plan. "Employee" for purposes of this Plan shall not include an individual whose severance benefits are set forth in a separate writing between Employee and his or her Employer that is executed by an officer of the Employer or between Employee and Nortel Networks Inc. or one of its Affiliates that is executed by an officer of or power of attorney for such entity. "Employee" shall also

exclude an individual whose severance benefits are set forth in another employee benefit plan adopted by the Employer to provide benefits upon termination of employment to such an individual and others who are similarly situated or to exclude coverage under this Plan to such an individual. Independent contractors and any other individuals who provide services to an Employer but do not receive W-2 earnings from an Employer are not eligible to participate in the Plan.

Employer:    shall mean Nortel Networks Inc., or any of its United States subsidiaries and affiliates, or a subsidiary or affiliate of Nortel Networks Corporation, that has been authorized by the Board of Nortel Networks Inc. to adopt this Plan and has adopted this Plan by action of its board of directors. A subsidiary or affiliate for purposes of this definition shall include any entity of which Nortel Networks Inc. or Nortel Networks Corporation, directly or indirectly, owns or controls greater than fifty percent (50%) of the voting shares, for a corporation, or value, for any other type of entity. A complete list of the employers sponsoring the plan may be obtained by participants and beneficiaries upon written request to the plan administrator, and is available for examination by participants and beneficiaries.

Full-time    shall mean an Employee who is regularly scheduled to work at least
Employee:    thirty-five (35) hours per week, as determined solely by the Employer.

Part-time    an Employee who is regularly scheduled to work at least twenty (20)
Employee:    hours but less than thirty-five (35) hours per week, as determined solely by the Employer.

Plan:    shall mean this Nortel Networks Severance Allowance Plan.

Plan         shall mean Nortel Networks Inc.
Administrator:

Service:    shall mean the total cumulative period of an Employee's employment with any Employer or Affiliate, beginning on the Employee's date of employment and ending on the date of termination of employment. Such period shall include employment with an employer before the effective date when it became an Employer or Affiliate due to a merger or other acquisition transaction if such Employee was employed by that Employer on the effective date of the transaction. Service shall be expressed in full years and partial years. However, a partial year of employment of at least six (6) consecutive months shall be deemed to be one (1) year of Service. Provided, further, if there is a break in an Employee's employment other than due to medical or other authorized

leaves of absence, the period of time prior to such break in employment shall be included in the calculation of Service only if either (i) such break in employment was for thirty (30) days or less, or (ii) in the case where the break in employment was for more than thirty (30) days, the Employee has been in the employment of an Employer or an Affiliate, as applicable, subsequent to the break in employment for a period of time equal to the break in employment or one (1) year, whichever is less.

# SUMMARY OF MATERIAL MODIFICATIONS
## Nortel Networks Severance Plan

## 2009

The **Nortel Networks Severance Allowance Plan** ("Plan") was amended on February 13, 2009 as described below in bold text.  The Q and A before the bold text is taken from the 2007 Nortel Networks Severance Allowance Plan Summary Plan Description posted on S@W in the Benefits Summary Plan Description folder.

NOTE: This Summary of Material Modifications is meant to supplement the existing Summary Plan Description. You should keep a copy of this Summary of Material Modifications with your 2007 Nortel Networks Severance Allowance Plan Summary Plan Description posted on S@W in the Benefits Summary Plan Description folder.  If you have any questions concerning the changes contained herein, please contact HRSS by calling 919-905-9351 or toll free at 800-676-4636.

| Section | Amendment |
|---------|-----------|
| Question 3, Under what circumstance will I qualify for a severance allowance? | "If you otherwise qualify for a severance allowance, it will not be paid unless: you sign a document within the specified time that contains a release and restrictive covenant provision; you refrain from revoking that release; and you remain an Employee through your termination date. Severance allowance owed to you under this Plan may be reduced by any amount determined by the Plan Administrator to be owed to your Employer as of your employment termination date. Such amounts shall include, but not be limited to, any advances, loans, overpayments, excess commissions, any other monies or Employer property not returned immediately upon employment termination (including, but not limited to, tools, computers, and identification badges). Your Employer may recoup such amounts from the severance allowance by not commencing payment of the severance allowance, terminating the payment of severance allowances that have commenced, or reducing the amount of any severance allowance." <br><br> **The amendment enables Nortel Networks, at its sole discretion, to waive the requirement for an employee to sign a document that contains a release and restrictive covenant in order to receive a severance allowance.  If Nortel waives its right to require a release, that will not affect an employee's right to receive a severance allowance under this Plan.** |

| Question 18, Other than applicable federal, state and local tax withholding, will any other deductions be made from my severance allowance? | "Yes. Premiums for continued benefit coverage as described in <u>Question 12</u> will be deducted from your severance payment(s) if you elect benefits continuation. Also, if the Plan Administrator determines that you owe any money or property to your Employer including, but not limited to, advances, loans, overpayments, excess commissions, unpaid credit card balances, unreturned badges, computers, etc., your severance allowance may be withheld in part or in whole. The withholding of your severance allowance may also result in discontinued benefit coverage or other entitlements such as continued service accrual or stock option exercise capability." **In addition, your severance allowance will be offset by any other severance, redundancy, pay in lieu of notice or termination payment including, but not limited to, any amounts paid as a result of federal, state, local or foreign government worker notification (e.g. U.S. Worker Adjustment and Retraining Notification Act) or office closing requirements, any amounts owed you due to a preexisting contract (unless the contract specifically provides otherwise) and amounts paid to you during a temporary layoff status (often referred to as a furlough) which immediately precedes the commencement of severance allowance payment(s).** |

**EXHIBIT 2**

**From:**    Doolittle, John (APORT:0035)
**Sent:**    Tuesday, June 22, 2010 10:07 PM
**To:**    Tessy, Leith (KANG:1000)
**Cc:**    Gillespie, Linda (APORT:0279)
**Subject:**    RE: Confirmation of a number of items relating to cutover of LGN to Ericsson

Leith

I have received a response from Lewis as follows:

- if you take the deal that has been offered , you will not be entitled to a severance claim. Unfortunately, I cannot influence a change in the US severance policy.

- your assumptions in 2 below are accurate- Lewis believes he has already confirmed this

Call me.

John

---

**From:**    Tessy, Leith (KANG:1000)
**Sent:**    Monday, June 21, 2010 8:50 PM
**To:**    Doolittle, John (APORT:0035)
**Subject:**    Confirmation of a number of items relating to cutover of LGN to Ericsson

John,

As mentioned, can you please urgently help me get through a number of issues in the run-up to June 30th.

Status of my personal offer with Ericsson

- They have offered me a "freelance" contract for 12 months, and can give me 6 months notice within that.
- Unlike the other Nortel employee transfers to Ericsson, they have not provided any service bridging, severance, etc.
- They are pulling me off US payroll which affects us from an immigration standpoint (we may need to go through some unnatural hoops like buy house, make more trips to the US, etc. to try and protect the residency status/Green Cards).

Additionally:
- My salary in the conversion to Euro and KWON (based on my USD base today), and with their unrealistic tax rate assumptions (their concept is to pay me on a "net" basis) has been reduced by approx. 20%.  We have complained on this and they have not yet got back to us on whether they will change the offer.
- We see a significant watering down of expat provisions.
- Significant watering down of health benefits (e.g., no drug plan, vision, reduced dental).
- Ditto with retirement funding.

In essence we are being treated as contractors with no hooks into Ericsson for the long term.

The "ask"

Here are my questions, John:

1. If I accept the contract "as is" (or perhaps with some resolution of the comp issues), I believe that I should be "involuntarily terminated" from Nortel, given the nature of the contract, and also given the fact that I have not been offered "like for like" employment with them (i.e., overall pay level, terms, etc.).   Ericsson would then need to repatriate us down the road (not on Nortel's nickel).

2. If I cannot close with Ericsson on what I feel is a reasonable offer, and with Nortel under what I feel are the right separation terms, I would like to get confirmation on 3 scenarios:

   a/ I take the contract, but send my family back July 1.  I assume that Nortel will repatriate us under my existing terms,

   b/ I only take the 3 month transition contract (a-la the other 3 guys who have taken this) - I assume Nortel will repatriate us under those terms & treat as involuntary termination,

   c/ I cannot close altogether with Ericsson - so, I am done Jun 30th - again my assumption here is I will just be involuntarily terminated by Nortel & will be kept whole on the repatriation.

Can you please confirm these at the earliest John - we are closing this deal likely in a week, and I'd like some answers to these in order that I can make an informed decision.

Thanks for your support,
Leith

**EXHIBIT 3**

-----Original Message-----
From: Lockhart, Lewis (GWRTP:9428)
Sent: Thursday, June 10, 2010 11:37 AM
To: Tessy, Leith (KANG:1000)
Subject: FW: Seeking information

Leith

This response to ▇▇▇▇ on which you were copied is no different from what we discussed the other day in your as well as ▇▇▇▇▇ situation.  The only difference being what the applicable terms of termination would be in the home country...US and Canada due to Bankruptcy filing would be unsecured claim to applicable severance.
On your continued request for different information on the Tax situation I note that John has suggested you call him directly.

Regards
Lewis

-----Original Message-----
From: Lockhart, Lewis (GWRTP:9428)
Sent: Thursday, June 10, 2010 11:29 AM
To: ▇▇▇▇▇▇▇▇▇▇
Cc: Murphy, Julia (AUPER:4722); Tessy, Leith (KANG:1000)
Subject: RE: Seeking information

▇▇▇▇

I do not have any information on your personal situation but have assumed E// is being consistent in their approach with you and not dissimilar to ▇▇▇▇ and Leith.  Therefore I had asked Julia to request same from you to ensure my assumption was correct.
Re your request for details associated with your transition.  I see two possible scenarios which will vary depending on the outcome of the final offer from E// which I understand is still being worked:

Scenario 1
Were you to reach a mutually agreeable continuation of your role with E// which is what we are all working towards and has been our goal as well as E//'s stated intent then your termination from Nortel would be same as any other employee transferring to buyer in any acquisition.....termination resulting from divestiture where employee transfers to Buyer on agreed upon terms and severance would not be applicable.

Scenario 2
Were you unable to reach a mutually agreeable continuation of your role with E// you would be deemed surplus in your current role resulting in immediate repatriation to your home country based on Nortel program and termination of employment from Nortel on the terms applicable in your home country where appropriate termination payments would apply.

I trust this addresses your question.

Regards
Lewis

-----Original Message-----
From: ███████████████
Sent: Thursday, June 10, 2010 9:18 AM
To: Lockhart, Lewis (GWRTP:9428); Tessy, Leith (KANG:1000)
Cc: Murphy, Julia (AUPER:4722)
Subject: Re: Seeking information

Dear Lewis,

Please confirm you have all the information you need to adjudicate and make a final decision on how our transition will be handled.

I would also appreciate if you can provide an estimated timeframe on when this decision will be communicated.

Thanks in advance for your immediate attention.

Regards
███
--------------------------
Sent using BlackBerry

**EXHIBIT 4**

---

**From:** Tessy, Leith (KANG:1000)
**Sent:** Monday, June 28, 2010 9:40 AM
**To:** Lockhart, Lewis (GWRTP:9428)
**Cc:** Gell, Nancy (GWRTP:8426); Lannom, Angie (NASHF:6573); Graffam, Julie (BL60:9668)
**Subject:** RE: LGN Expat Tessy - Kim confirmed IHSP offer can be sent but needs Mr. T's correct address


Lewis -

FYI, via email I have now just closed on all terms with Ericsson.  Only waiting on their official document for signing…  It will be a few weeks before we are set up on Ericsson's medical plan.

I called Cigna who also said that Cobra would not apply to us given we are overseas…

Thanks for the sites below.  However, I was wondering, for simplicity, is it possible to just extend our Cigna coverage for one month, and either have E/// reimburse NT (they should be amenable), or failing that, I just pay for it directly (i..e., pay Nortel in advance for extending coverage a month, as Cigna will not allow a non-group plan).

Thanks,
Leith



---

**From:**       Lockhart, Lewis (GWRTP:9428)
**Sent:**       Monday, June 28, 2010 10:30 PM
**To:**         Tessy, Leith (KANG:1000)
**Cc:**         Gell, Nancy (GWRTP:8426); Lannom, Angie (NASHF:6573); Graffam, Julie (BL60:9668)
**Subject:**       FW: LGN Expat Tessy - Kim confirmed IHSP offer can be sent but needs Mr. T's correct address
**Importance:**       High

Leith
Under listed confirms my Cobra response to you on Friday however requires action on your behalf re address information required re a valid mailing address other than expat mailroom.

Caution…Cobra applies to US employees only and E//'s action is still to confirm coverage ASAP effective July 1 for all of you.  Cobra is simply your plan B.
For the other folks under listed are possible plan B service providers that they can contact if E// is as slow with their response on Medical coverage as at July 1 as they have been on everything else.  Please pass along as required.

http://www.goodhealthworldwide.com/

http://www.expat-medical-insurance.com/

http://www.globalsurance.com/?OVRAW=international%20health%20insurance&OVKEY=international%20health%20insurance&OVMTC=standard

http://www.ihi.com/english.asp

http://www.bupa.com/

Regards

Lewis

---

**From:** Gell, Nancy (GWRTP:8426)
**Sent:** Monday, June 28, 2010 9:23 AM
**To:** Lockhart, Lewis (GWRTP:9428)
**Cc:** Lorimer, Debbie (NASHF:6801); Pulliam, Kimberly (GWRTP:7094); Graffam, Julie (BL60:9668); Lannom, Angie (NASHF:6573)
**Subject:** RE: LGN Expat Tessy - Kim confirmed IHSP offer can be sent but needs Mr. T's correct address
**Importance:** High

Kim has confirmed that the IHSP will be offered but has highlighted that we need the correct address for Mr. Tessy to avoid correspondence being sent to expat mailroom.  Lewis, can you please advise on correct address.  Kim confirmed with Ceridian (our COBRA administrator) that they can mail to non US addresses.  Kim needs to have his address so they can verify the format on the record when is it received by Ceridian.

Thanks and Regards,

*Nancy F. Gell*
NORTEL
Total Rewards Healthcare Benefits
Phone:  919-905-0124 or ESN 355-0124
Mail Stop: MS 453-00-H00
e-mail address: gell@nortel.com
Fax:  919-905-0108

This e-mail and any attachments may be confidential or legally privileged.  If you received this message in error or are not the intended recipient, you should destroy the e-mail message and any attachments or copies ASAP.  You are prohibited from retaining, distributing, disclosing or using any information contained herein.  Please inform me of the erroneous delivery by return e-mail. Thank you for your cooperation.

**EXHIBIT 5**

## HR SHARED SERVICES U.S. - TERMINATION NOTIFICATION
## PROBUSINESS / SAP INFORMATION

EMPLOYEE NAME: **Leith  Tessy**                    GLOBAL ID: **513887**

TERMINATION EFFECTIVE DATE: **June 29, 2010**

BENEFITS END DATE: **June 30, 2010**                EMPLOYEE STATUS:  **Full Time**

CONTINUOUS SERVICE DATE : **October 16, 1996**      LAST DAY WORKED : **June 29, 2010**

ENTITY: **001**        DEPT: **LG01**               LOCATION : **KANG**
                                                    LOCATION  DESCRIPTION:  **KANG**

EMPLOYEE ADDRESS:

**Nortel Expat Mailroom**
**PO Box 13955**
**RTP, NC 27709**
**USA**

---

SAP ACTION CODE : **84**                    SAP SEPARATION REASON CODE:
                                            **15**
                                            SAP SEPARTION REASON DESCRIPTION:
                                            **Mutual Agreement – Company Initiated**

---

**WITHHOLDINGS & AMOUNTS OWED**
Nortel will withhold any and all applicable federal, state, or local tax from any monies or monetary equivalents paid. In addition, Nortel may, to the extent permitted by law, deduct from any payment provided to Employee any amounts (including, but not limited to, any advance, loans, overpayment, excess commissions or other monies including the monetary equivalent of equipment not returned to Nortel) that Nortel has determined that Employee owes Nortel without prejudice to subsequent revision or other collection methods.

| NORTEL NETWORKS INC. EMPLOYEE BENEFIT PLANS BENEFITS INFORMATION SUMMARY | |
|---|---|
| Employee Name: **Leith  Tessy** | Last Day Worked:  **June 29, 2010** |
| Global ID: **513887** | Termination Effective Date: **June 29, 2010** |

## MEDICAL AND DENTAL/VISION/HEARING CARE COVERAGE AND EMPLOYEE ASSISTANCE PROGRAM COVERAGE (EAP)

If enrolled, coverage ends on the last day of the month that includes Employee's Termination Date.

All eligible expenses incurred prior to the first day of the month following the Termination Date will be covered under the Employee's Medical Plan and Dental/Vision/Hearing Care Plan coverage.

However, certain Medical and Dental/Vision/Hearing Care Plan coverage and EAP  may be continued beyond the last day of the month that includes Employee's Termination date under COBRA (the Consolidated Omnibus Budget Reconciliation Act). If eligible, Employee may elect to purchase continuation under COBRA of the group Medical and Dental/Vision/Hearing care coverage for Employee and Employee's covered dependents (as defined by COBRA).  Generally, Employee's coverage may be continued for 18 months after the coverage ends due to the Employee's termination.  Employee's cost will be at the full COBRA rate (102% of the full group rate per person) in all other situations.  Information on Employee's COBRA option will be forwarded to Employee's address of record from COBRAServ within 30 days of Employee's Termination Date.  If Employee has not received the COBRA enrollment package within 30 days, please call COBRAServ at 1-800-877-7994.

## HEALTH CARE REIMBURSEMENT ACCOUNT (HRCA)
If enrolled, contribution ends on Employee's Termination Date, unless Employee elects to continue for the period provided under COBRA.   Please contact COBRAserv at 1-800-877-7994 for additional information.

If Employee elects not to continue HCRA under COBRA, Employee may continue to receive reimbursements (up to the maximum Employee has elected) from that account for eligible expenses incurred through Employee's Termination Date. Claims with dates of service on or before the Termination Date may be filed up to the deadline for all participants.  The filing deadline is May 31 of the next plan year.  For additional information, please contact WageWorks at 1-877-924-3967.

## DEPENDENT DAY CARE REIMBURSEMENT ACCOUNT (DDCRA)
If enrolled, the contribution to the DDCRA plan ends on Employee's Termination Date.

You may use any money in your account at the time your employment ends to pay eligible expenses incurred before your employment ends.  Expenses incurred after your employment ends cannot be reimbursed. Claims with dates of service on or before the Termination Date may be filed up to the deadline for all participants to file claims for the calendar year in which the Termination Date occurs.  The filing deadline is March 31 of the year following the year in which expense occurred.  For additional information, please contact WageWorks at 1-877-924-3967.

## EMPLOYEE LIFE INSURANCE
If enrolled, core and optional coverage end on Employee's Termination Date.

Employee may convert the group life insurance to an individual policy (without a medical examination) within 31 days of Employee's Termination Date.  Conversion forms must be requested by calling HR Shared Services at 1-800-676-4636.

## DEPENDENT LIFE INSURANCE – SPOUSE & CHILDREN
If enrolled, coverage ends on Employee's Termination Date.

Employee may convert the group dependent life insurance to an individual policy (without a medical examination) within 31 days of Employee's Termination Date.  Conversion forms must be requested by calling HR Shared Services at 1-800-676-4636.

## ACCIDENTIAL DEATH & DISMEMBERMENT (AD&D) INSURANCE
If enrolled, coverage ends on Employee's Termination Date.  There is no conversion privilege.

## SHORT-TERM (STD) DISABILITY
If enrolled, coverage ends on Employee's Termination Date.

## LONG-TERM (LTD) DISABILITY
If enrolled, coverage ends on Employee's Termination Date.  **The Long-Term Disability Plan will terminate August 31, 2010.**

## BUSINESS TRAVEL ACCIDENT INSURANCE
Coverage ends on Employee's Termination Date.

| NORTEL NETWORKS INC. EMPLOYEE BENEFIT PLANS<br>BENEFITS INFORMATION SUMMARY | |
|---|---|
| Employee Name: **Leith  Tessy** | Last Day Worked:  **June 29, 2010** |
| Global ID: **513887** | Termination Effective Date: **June 29, 2010** |

**LONG TERM INVESTMENT PLAN (Investment Plan)**
If enrolled, Employee's contribution and company contribution end on Employee's Termination Date.

If Employee's account balance is more than $1,000, Employee may leave the account in the Investment Plan or may request a distribution from the Investment Plan.  Statements regarding account activity and elections regarding investment options will continue to be available to the Employee if the Employee's account is not distributed.  Employee will not be eligible to contribute or rollover new money into the account or take a loan from the account after Employee's Termination Date.  If Employee's account balance is $1,000 or less, the account must be distributed to the Employee.

Loans from the Investment Plan become immediately due and payable on the Employee's Termination Date.  Employee may initiate pay-off of Employee's loan balance by calling the Nortel Networks Long-Term Savings Service Center (Hewitt Associates LLC) at 1-800-726-0026 and requesting a payoff coupon.  However, Employee will have the option to continue the 401 (k) loan repayments through the Automated Clearing House (ACH) by making payments directly to Hewitt Associates LLC.  Loans that are not repaid are treated as taxable distributions and may be subject to additional federal and state tax penalties.

**RETIREE MEDICAL PLAN ("RETIREE MEDICAL PLAN") and RETIREE LIFE AND LONG TERM CARE PLAN ("RETIREE LIFE INSURANCE PLAN")**

**Effective September 1, 2010, Nortel Networks Inc. will no long provide employer-subsidized retiree medical benefits.  At the same time, the retiree life insurance plan and the optional long-term care plan will also be discontinued.**

If eligible,
• Employee will have access to the Retiree Medical Plan and the Retiree Life and Long Term Care Insurance Plan on the date benefits commence under the Retirement Income Plan as administered by the Pension Benefits Guarantee Corporation (PBGC), if Employee (i) participated in the previously provided (now cancelled) Traditional or Balanced Program under the old Capital Accumulation Retirement Program ("CARP"), (ii) elects to commence benefits through the PBGC on the earliest date following the Termination Date or the Severance End Date,  (iii) is at least age 55 and meets the Retiree Medical Plan and the Retiree Life and Long Term Care Insurance Plan service requirements when benefits commence through the PBGC and (iv) is a participant in the Nortel Networks Medical Plan on the date immediately prior to the date of commencement of pension benefits through the PBGC or;
• Employee will have access to the Retiree Medical Plan on the later to occur of the Termination Date or the Severance End Date, if Employee (i) participated in the previously provided (now cancelled) Investor Program under the old Capital Accumulation Retirement Program (CARP), (ii) is at least age 55 on the later to occur of the Termination Date or the Severance End Date, (iii) has ten years of service after age 40 and (iv) is a participant in the Nortel Networks Medical Plan on the date immediately prior to the later of the Termination Date or Severance End Date.

As noted in the "Introduction" above, waiving his or her entitlement to Severance Plan benefits may enable Employee to begin receiving benefits through the PBGC earlier than if Employee did not waive those benefits.  Because Retiree Medical Plan benefits cannot commence until pension benefits begin through the PBGC, that decision also affects the timing of commencement of Retiree Medical Plan coverage.

However, if Employee needs the service that Employee would earn during his or her standard severance period to qualify for Retiree Medical Plan benefits or to earn the maximum subsidy for that benefit, waiving the Severance Plan benefit would mean that Employee would not qualify for that coverage or would pay a greater share of the cost of the coverage (with less of a company subsidy).  Service requirements are different depending on when Employee was grandfathered for coverage so Employee would need to check Employee's individual requirements to determine whether Employee needs the service that would be earned during the severance period.  All employees must reach age 55 before the Retiree Medical Plan coverage date, plus they must earn either 5 or 10 years of service to qualify for the coverage.  For subsidized coverage, Employee would have to qualify under the grandfathering provisions that applied to the freezing of the Retiree Medical Plan as of December 31, 2007, and to get the maximum subsidy that is available for grandfathered benefits, Employee would need 20 or 25 years of service—depending on whether Employee qualified under a prior grandfathering of benefits that was granted in 2000 or not.  So, Employee needs to consider these service issues before deciding whether it is advantageous for Employee to waive the Severance Plan benefit to begin pension benefits under the Retirement Income Plan through the PBGC and Retiree Medical Plan benefits earlier or not.

**IMPORTANT NOTE:**  To initiate pension benefit payments accrued under the Retirement Income Plan, Employee **must** call the PBGC (US Government agency now responsible for Nortel Networks pension plan) at **1-800-400-7242**.  All pension benefits related questions should be directed to the PBGC. Questions related to the Nortel Networks Retiree Medical and the Retiree Life and Long Term Care Insurance Plans should be directed to the Nortel HR Shared Services Center at 1-800-676-4636.

| NORTEL NETWORKS INC. EMPLOYEE BENEFIT PLANS<br>BENEFITS INFORMATION SUMMARY | |
|---|---|
| Employee Name: **Leith  Tessy** | Last Day Worked:  **June 29, 2010** |
| Global ID: **513887** | Termination Effective Date: **June 29, 2010** |

## DEFERRED COMPENSATION

If enrolled, normally any amounts in Employee's account in the Nortel Networks U.S. Deferred Compensation Plan ("NNDP") would be distributed to Employee pursuant to the terms of the NNDP.  However, due to the filing of the Chapter 11 petition under the Bankruptcy Code, Nortel ("NNI") and Nortel Networks CALA Inc. ("NNCI") is unable to distribute any amounts from the NNDP at this time.

## EQUITY AWARDS (including stock options, stock appreciation rights, restricted stock units and performance stock units, if applicable)

On February 27, 2009, Nortel obtained an order from the Canadian Court in the CCAA proceedings providing for the termination of the Nortel equity plans (the Nortel 2005 Stock Incentive Plan, As Amended and Restated, the Nortel Networks Corporation 1986 Stock Option Plan, As Amended and Restated and the Nortel Networks Corporation 2000 Stock Option Plan) and the equity plans assumed in prior acquisitions, including all outstanding equity under these plans (stock options, SARs, RSUs and PSUs), whether vested or unvested.

## VACATION

Annual vacation accrual ends on Employee's Termination Date. Employees will be credited with their monthly vacation accrual the final month of employment regardless of employment termination date.  All accrued but unused vacation will be paid out in compliance with Company policy.

## OTHER BENEFITS

Some voluntary/ancillary benefits may be continued post-employment by contacting the provider directly (see below list of providers). Any continuation of such benefits will be based upon the terms and conditions as set forth by that provider.

    MetLife: MetLaw/Hyatt Legal Plan, 800-821-6400
    MetLife: Veterinary Pet Insurance (VPI), 1-888-899-4VPI
    MetPay Home and Auto Insurance, 1 800 GET-MET 8 / 1-800-438-6388
    Wells Fargo: Employee Mortgage Program, 1-800-525-3898
    H&R Block: Employer Solution Tax Preparation Program, 1-800-786-3429

Any other benefits not expressly extended to Employee following the Termination Date will end on 12:01am on the day immediately following the Termination Date.

# DATA PRESERVATION INSTRUCTIONS

As a result of ongoing investigations and litigation, Nortel is required to collect and preserve certain information.  Failure to comply with this requirement may subject both Nortel and individuals to severe sanctions, including fines and/or imprisonment.

Nortel Networks Corporate Procedure 206.01 states that "all documents, messages or data composed, sent, or received through the network of Nortel Networks in any form are and remain at all times the property of Nortel Networks."  In addition, all work product that you have produced during your employment with Nortel is the property of Nortel.  Therefore, all information (however recorded or stored) ("Information") in your possession and/or that you have created in the course of your employment with Nortel (whether or not currently in your possession or control) is the property of Nortel.  As a result, you have the responsibility to secure relevant information prior to any Employment Termination Date pertaining to you.

LISTED PERSONNEL.  "Listed Personnel" are employees and NPWs working in either Finance ("Finance" includes Control, Global Planning, Investor Relations and Tax) or in Legal at any JCI Level, and  employees in a JCI 6 or higher position in any department or function.  Listed Personnel must take the following action to preserve relevant Information.

- All Information in your possession, custody, or control (including information controlled by any assistants, if applicable) must be preserved.  Therefore, Nortel will preserve all electronic Information on your computer, as well as any related servers on which you have Information stored.  You must collect all document-level passwords that are necessary to review any of the electronic documents and email the passwords to documentpreservation-soft@nortel.com.

- In addition, you must take affirmative steps to secure all hard copy Information from 1999 through January 2006 in your possession, custody, or control, including paper copies and all Information that is stored electronically on Jaz Drive tapes, CDs or any other media, and retrieve any of this Information from onsite storage.  You must gather all such hard copy Information (including any Jaz Drive tapes, external drives, CDs, and paper copies), inventory this Information, and arrange for it to be stored offsite.  You must mail an inventory of the materials that you are storing offsite to documentpreservation-hard@nortel.com.

NON-LISTED PERSONNEL.  "Non-Listed Personnel" are employees and NPWs who are not in Finance ("Finance" includes Control, Global Planning, Investor Relations and Tax) or Legal, and are in a JCI 5 or lower position.  Non-Listed Personnel must take the following action to preserve relevant Information.

- You are required to review the enclosed Schedule A to determine what, if any, of the information set forth in Schedule A ("Responsive Information") is in your possession, custody, or control (including information controlled by any assistants, if applicable).  If you are in possession, custody, or control of any Responsive Information, you are required to determine how such materials are stored (electronically or in hard copy format).  If such materials are stored electronically, you must determine where the materials reside (on the hard drive or on a server), and then you must contact documentpreservation-soft@nortel.com for instructions on how to preserve such materials.  You must email all document-level passwords that are necessary to review any of the electronic documents to documentpreservation-soft@nortel.com.

- If you are in possession, custody, or control of hard copy Responsive Information, you must gather all such hard copy information (including any Jaz Drive tapes, external drives, CDs or other media and paper copies), retrieve any of this information from onsite storage, inventory this information, and arrange for it to be stored offsite.  You must mail an inventory of the materials that you are storing offsite to documentpreservation-hard@nortel.com.

Compliance with these requirements is mandatory.  Given the penalties which the law provides, it is in your best interest to comply with this request quickly and completely.  Under no circumstance should any Information be destroyed, even if it is a printout of something that is on your hard drive, until the investigations and all of the ongoing litigation is concluded.

The preserved Information will be used by Nortel for general business purposes and may also be provided to governmental authorities in response to their requests or disclosed in any relevant litigation.  Also, the preserved Information may be used by and provided to other entities within the Nortel group and/or its external advisors.  In some instances, the recipients of this Information may be located outside your geographic area.

If you have any questions relating to these instructions please email documentpreservation-soft@nortel.com or documentpreservation-hard@nortel.com.

## SCHEDULE "A"
**February 28, 2001 and March 28, 2001 Preservation Memoranda**

1.  Documents (including underlying working documents) supporting or used in the preparation of the 2001 forecasts (guidance) for estimated growth in revenues and in earnings per share from operations as reported in the news releases of:
    a.  July 25, 2000;
    b.  October 24, 2000;
    c.  November 1, 2000;
    d.  November 20, 2000;
    e.  December 14, 2000;
    f.  January 18, 2001 (including, specifically, documents relating to the decision to state a specific forecast, rather than a range, for growth, revenues and earnings); and
    g.  February 15, 2001.
2.  Documents relating to the procedures used in the preparation of the forecasts referred to in paragraph 1
3.  Documents relating to any meetings and conversations between January 18 and February 15, 2001 concerning the 2001 forecasts.
4.  Documents relating to any discussions with analysts during the period January 18 and February 15, 2001.
5.  Documents relating to the disclosure policies and practices of Nortel Networks.
6.  Documents relating to the policies of Nortel networks on trading in the corporation's securities.
7.  All internal reports providing management with current sales and sales projections prepared in the period January 1, 2001 to February 15, 2001.
8.  Documents relating to the facts, circumstances and any discussions and decisions about the news releases of Nortel Networks of:
    a.  January 11, 2001; and
    b.  February 15, 2001
    pertaining to the size of, or reductions in, Nortel Networks' workforce and any reductions thereof during 2001.
9.  Minutes of all meetings, including board of directors meetings, wherein the 2001 forecasts were discussed or were on the agenda for the meeting.


**August 30, 2002 Preservation Memorandum**
Any documents relating to the following issues:

1.  The preparation (including underlying working documents) of any public statements by Nortel in 2000 and up to February 15, 2001 relating to financial results and/or financial guidance.
2.  Sales and revenues for 2000 (each quarter and overall) and 2001 (Q1 and overall),including sales/revenues estimates for 2000 (and each quarter and overall) and 2001(Q1 and overall).
3.  General market information from January 1, 2000 to February 15, 2001 about Nortel's industry sector, including analyst reports, capex information and market growth information (both internal and external).
4.  Orders, sales, production and shipment levels through 2000 and for the first quarter of 2001, including inventory levels over 2000 and up to the end of February 2001.
5.  Vendor financing from January 1, 1998 to March 1, 2001.
6.  Nortel's accounting practices (and the application of those practices) throughout 1999, 2000 and Q1 of 2001 for recording revenue on sales to customers in a quarter.
7.  "Pull-ins" of sales from future quarters into present quarters in 1999 and 2000.
8.  The level of reserves relating to receivables for 1999, 2000, or Q1 of 2001.
9.  The impairment of assets.
10. Financial audits and all other correspondence and exchanges of documents with Nortel's auditors between January 1, 1998 and February 15, 2001.
11. Returned or repossessed products from customers between January 1, 2000 and February 15, 2001, including the valuation of those products.
12. The February 8, 2001 $1.5 (U.S.) billion bond offering by Nortel.
13. The February 13, 2001 acquisition of JDS Uniphase's Zurich, Switzerland-based subsidiary and related assets.
14. The June 15, 2001 write-down of intangible assets by Nortel, primarily related to the goodwill associated with the acquisition of Alteon WebSystems, the JDSU subsidiary, Xros and Qtera.


**October 24, 2003 Preservation Memorandum**
All documents concerning both Nortel Networks' restatement of its financial results and the comprehensive asset and liability review and related reviews that resulted in the restatement


**November 12, 2003 Preservation Memorandum**
All materials concerning Nortel Networks' restatement of its financial results and the comprehensive asset and liability review and related reviews that resulted in the restatement, as well as all documents constituting or relating to documentation supporting any journal entry made in 2000-2002, and for the first six months of 2003 included in the restatement. The documents include without limitation those concerning board of director meetings, audit committee meetings, disclosure committee meetings, all documents used to prepare the Company's financial statements, and all documents relating to any accounting work or audit services performed by, or on behalf of, Nortel Networks.


**February 13, 2004 Preservation Memorandum**
All materials supporting or concerning each release of accrued liabilities that results in a credit to the income statement by Nortel Networks in Q1 and Q2 2003, as well as all materials constituting or relating to documentation supporting any journal entry made in Q1

and Q2 2003 relating to the release of any accrued liability that results in a credit to the income statement, in each case as reflected in your original A129 submissions. The documents include without limitation those concerning board of director meetings, audit committee meetings, disclosure committee meetings, all documents used to prepare the Company's financial statements, and all documents relating to accounting work or audit services performed by, or on behalf of, Nortel Networks.

### March 24, 2004 Preservation Memorandum

All documents created in connection with the restatements as well as all documents dating back to January 1, 2000 relating to:

1. Press releases, public announcements or public filings on the following dates: 10/23/03; 11/13/03; 11/19/03; 12/23/03; 1/29/04; 2/18/04; 3/10/04; 3/15/04.
2. Communications with industry analysts and investors regarding financial results covered by the restatement.
3. Budgets, operating results and forecasts relating to the period covered by the restatement (2000-2003).
4. Management communications and/or meetings regarding financial results covered by the restatement.
5. Board meetings regarding financial results covered by the restatement.
6. Establishment, timing of, support for, and release to income of accruals and provisions.
7. Accounting policies and procedures regarding revenue recognition and reporting of income and losses.
8. Establishment and implementation of Nortel Networks' control policies and procedures.
9. Communications with Moody's regarding Nortel Networks' debt credit rating.
10. Potential refinancing of Nortel Networks debt.
11. Nortel Networks' obligations under debt indentures and other credit facilities(including terms of repayment).
12. Strategies to increase Nortel Networks margins.
13. Relation of executive bonuses to financial results.
14. Decision to delay filing of Form 10-K for 2003.
15. Audit Committee reports.
16. Audit Committee's retention of and communications with law firm conducting independent review.
17. Decision to place individuals on paid leave of absence.
18. Appointments of William Kerr as interim CFO and MaryAnne Pahapill as Controller.
19. Insider trading data.

### April 6, 2004 and/or September 29, 2004 Preservation Memoranda

1. All documents concerning, involving or related to post-closing or post-consolidation journal entries or adjustments, trial balance adjustments, or top-side journal entries for the fiscal years ended December 31, 2002 and December 31, 2003, and the interim periods therein, including, but not limited to, all documents supporting such journal entries or adjustments;
2. All documents concerning, involving or related to all certifications made since November 12, 2002 by Nortel's principal executive officer and principal financial officer pursuant to Rule 13a-14 of the Securities Exchange Act of 1934;
3. All documents concerning, involving or related to all communications with securities analysts, including, but not limited to, recorded communications, or analyses or comparisons of analysts' estimates of Nortel's earnings for the fiscal years ended December 31, 2002 and December 31, 2003, and the interim periods therein;
4. All documents concerning, involving or related to any and all audit and review adjustments or restatements proposed by Deloitte for the fiscal years ended December 31, 2002 and December 31, 2003, and the interim periods therein, including, but not limited to, memoranda, electronic mail, notes of meetings between Nortel employees and Deloitte, correspondence, and reports;
5. All documents concerning, involving or related to budget data for the fiscal years ended December 31, 2002 and December 31, 2003, and all applicable interim periods therein, including, but not limited to, draft and preliminary financial reports, flash reports, segment and unit reports, outlooks, and analyses of Nortel's financial performance and operating results versus budgeted amounts used or reviewed in the preparation of monthly reporting packages;
6. For the fiscal years ended December 31, 2002 and December 31, 2003, and the interim periods therein, documents sufficient to identify all allowance or reserve accounts for assets, liabilities, expenses and revenues;
7. All documents concerning, involving or related to the establishment and release of reserves in the fiscal years ended December 31, 2002, and December 31, 2003, and the interim periods therein;
8. All documents concerning, involving or related to efforts undertaken by Nortel's controller's office in the second half of 2002, and by Nortel's management in the first quarter of 2003, to identify excess accrued liabilities, including, but not limited to, electronic mail messages, memoranda, summaries, and any other responsive documents created at Nortel's operating divisions or field offices;
9. All documents concerning, involving or related to Nortel's "Return to Profitability bonus program" and Nortel's "SUCCESS Incentive Plan" described in Exhibits 10.4 and 10.5 to Nortel's Form 10-Q for the quarterly period ended September 30, 2002;
10. All documents concerning, involving or related to communications concerning the establishment, disposition or treatment of reserves since January 1, 2001;
11. All drafts of public filings, including, but not limited to, Forms 10-K and 10-Q, created since January 1, 2001;
12. All documents concerning, involving or related to the restatement of Nortel's financial statements, originally announced on October 23, 2003;
13. all communications between Nortel and its outside auditors since January 1, 2000 including, but not limited to, communications concerning, involving or related to: (i) audits or interim reviews of Nortel's financial statements; (ii) Nortel's internal controls; (iii) Nortel's accounting policies and practices; and (iv) accruals, allowances, provisions or reserves made by Nortel; and
14. All documents relating to customer orders, manufacturing and inventory levels and shipments of products by Nortel throughout 2000 and the first half of 2001 to customers, including any returns or repossession of products from customers throughout this period.

**November 30, 2004 Preservation Memorandum**

All documents concerning any transaction, contract or arrangement with any customer from January 1, 1999 until the present time and all documents concerning any analyses related thereto, including, but not limited to, all documents concerning the following:
1.   the recognition of revenue from sales of products;
2.   the application of criteria for recognizing revenue, including, but not limited to: (A)whether legal title or risk of loss had passed to customers, (B) any instances where the criteria for recognizing revenue prior to actual delivery had not been met, (C) any instances of the delivery of some elements of customer orders after revenue was recognized including future software upgrades, (D) any instances of the provision of interim product solutions pending availability of a new release of a product, and (E) the use of percentage of completion accounting principles;
3.   collectibility issues pertaining to any customers; and
4.   each transaction for which revenue recognition has been reviewed or is under review in connection with a restatement.

## ERISA SPECIFIC DOCUMENT PRESERVATION CATEGORIES

1.   NNI, NNC and NNL Board of Director agendas, minutes, back up materials, notes, resolutions, chairmans'/ secretaries' binders, mailing packages and mandates;
2.   Joint Leadership Resource Committee, Retirement Planning Committee, Pension Investment Committee, Pension Fund Policy Committee and Employee Benefits Committee agendas, minutes, back up materials, notes, resolutions, chairmans'/ secretaries' binders, mailing packages and mandates;
3.   LTIP investment policies;
4.   LTIP investment benchmarks and objectives;
5.   Documents relating to evaluating, selecting, monitoring, maintaining and terminating LTIP investment options including reports, analyses, advice or recommendations regarding the propriety of investment in Nortel stock;
6.   Market analyst reports and evaluations of Nortel stock;
7.   Documents relating to LTIP asset allocation, investment, and diversification strategies/practices;
8.   Documents relating to the genesis, reporting, responsibilities and delegation of responsibilities of or to persons, entities, boards and committees responsible for the LTIP including organizational charts and employment records which identify persons and entities that were fiduciaries of the LTIP;
9.   Documents relating to the training, qualifications and experience to perform fiduciary functions of all fiduciaries of the LTIP;
10.  LTIP fiduciary liability insurance policies, any other applicable insurance policies and sharing, indemnity or other agreements between any defendant and any person or entity that may be liable for settlement or judgment in this lawsuit;
11.  LTIP form 5500s, S-8, 11ks, prospectuses and summary annual reports with attachments;
12.  LTIP plan instruments including any and all amendments and summary plan descriptions;
13.  LTIP trustee, investment management, and third-party administrator proposals and agreements including engagement letters;
14.  Trustee, investment manager or other third-party reports regarding investments in the LTIP;
15.  Files of all key personnel involved regarding the LTIP;
16.  Documents relating to Mercer's investigation, governance, oversight, recommendations or other work related to the LTIP;
17.  Documents relating to corporate governance surveys of the boards of directors for NNC, NNL and NNI.
18.  Communications to terminated employee stockholders;
19.  Self assessments prepared by the Pension Investment Committee;
20.  Documents concerning any freeze on LTIP investment in Nortel stock or the decision to move participants' elections from Nortel stock to another investment option;
21.  Semi-Annual Stewardship meeting report packages prepared by Hewitt;
22.  Documents relating to the Wilmer Cutler investigation;
23.  Legal audits of the LTIP;
24.  Conflict of interest policies regarding the company's investment in company stock, LTIP investment in company stock, and service as a fiduciary for company pension/retirement plans;
25.  LTIP plan correspondence including correspondence to and from plan participants, trustees, third-party administrators, investment managers, consultants, accountants, auditors, etc. including communications regarding plan investment options or funds, documents governing the plan and amendment or alteration to the plan instrument;
26.  Documents concerning investigations of and litigation by Nortel against Frank Dunn, Douglas Beatty, Michael Gollogly and Mary Anne Pahapill;
27.  Documents concerning investments by Nortel pension/retirement plans in Nortel stock;
28.  Personnel files for Michael Zafarano, Carol Felts and James Kauffman;
29.  Training materials, instructions, manuals, and scripts for persons charged with responding to questions concerning the LTIP (would include HR and call center materials);
30.  Documents concerning communications with insurers and brokers regarding the claims in this lawsuit including the communications themselves.
31.  Documents concerning Nortel's document retention and destruction policies including document preservation memoranda in light of this lawsuit;
32.  Auditors reports, management letters, requests for information and responses thereto regarding Nortel and the LTIP;
33.  Schedules of sales, purchases, holdings of shares or unit interests in Nortel Stock in the LTIP (not including individual account statements);
34.  Regularly maintained summary financial information for the LTIP including reports on employee contributions, participant lists, stock match reports, withdrawals, rollovers, gains, losses, cost information, market valuations, investment/fund performance, and other regularly compiled data relating to investment options in the LTIP;
35.  Documents regarding excessive trading and market timing within the LTIP;
36.  Documents relating to the purchase or sale of Nortel stock by defendants and insiders;

37. Documents discussing the change in Nortel stock price or attributing the change to particular events;

38. LTIP accounting records including bank statements and canceled checks [bank transaction reports may be used if a bank trustee controls the assets];

39. LTIP loan documents (to include amortization schedules, repayment history, and balances owed at termination), security agreements, mortgages, leases and deeds, employer real property with DOL's Exempt Application and related records, insurance contracts and premium statements relating to plan investments;

40. Individual account allocation reports and/or schedules;

41. Documents identifying business addresses, home addresses, telephone numbers, social security numbers, and date of birth of each plan trustee, official and committee member;

42. Invoices, bills and fee schedules of service providers and trustees;

43. Documents of stock and certificates of deposit owned by the plans including valuation reports and bank statements;

44. Any other documents related to the LTIP;

45. Documents relating to separation and release agreements of LTIP participants including the agreements, records or payments to the releasees and return of payments from releasees.