IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

-----------------------------------------------------------------x
                                                                 :
*In re*                                                          :    Chapter 11
                                                                 :
NORTEL NETWORKS INC., *et al.*,[1]                               :    Case No. 09-10138 (KG)
                                                                 :
                                    Debtors.                     :    Jointly Administered
                                                                 :
-----------------------------------------------------------------x

**SUPPLEMENT TO MOTION OF LIQUIDITY SOLUTIONS, INC. FOR ENTRY OF ORDER (A) AUTHORIZING AND DIRECTING DEBTOR, NORTEL NETWORKS INC., TO MAKE INTERIM DISTRIBUTIONS ON ALLOWED ADMINISTRATIVE, PRIORITY AND UNSECURED CLAIMS OR (B) CONVERTING CASES TO CHAPTER 7 PURSUANT TO SECTION 1112(b) OF THE BANKRUPTCY CODE**

Liquidity Solutions, Inc. ("LSI"), for its Supplement (this "Supplement") to Motion for Entry of Order (a) Authorizing and Directing Debtor, Nortel Networks Inc., to Make Interim Distributions on Allowed Administrative, Priority and Unsecured Claims or (b) Converting Cases to Chapter 7 Pursuant to Section 1112(b) of the Bankruptcy Code [Docket No. 16638] (the "Motion"),[2] respectfully represents:

---

[1] The U.S. debtors (the "Debtors") in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226). Contact information for the Debtors and their petitions are available at http://dm.epiq11.com/nortel.

[2] Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

1

**SUPPLEMENT**

1.      LSI is a holder of allowed administrative, priority and general unsecured claims against Nortel Networks Inc. ("NNI"), the principal U.S. debtor in these chapter 11 cases.[3] On March 21, 2016, LSI filed the Motion, in which LSI seeks an Order from this Court granting three (3) principal forms of relief: (i) directing NNI to make an interim distribution to NNI's creditors of a portion of NNI's nearly $600 million of cash-on-hand (in an amount sufficient to pay in full all NNI allowed administrative and priority claims and make a significant distribution on NNI general unsecured claims); (ii) directing the escrow agent holding the approximately $7.3 billion in aggregate sales proceeds generated from the liquidation of Nortel's assets to distribute approximately $1.9 billion of such proceeds to NNI's allowed unsecured creditors; and (iii) alternatively, if the foregoing interim distributions cannot be made to NNI's creditors, converting the Debtors' cases to chapter 7. LSI incorporates by reference into this Supplement the Motion in its entirety.

2.      Following the filing of the Motion, various "principal parties" in these cases, including the U.S. Debtors, the U.S. Creditors' Committee and the Canadian Debtors, requested that LSI adjourn the hearing on, and response deadlines with respect to, the Motion, among other things, to permit the parties to enter into discussions with respect to a potential consensual resolution of the relief sought in the Motion. In addition, the Canadian Debtors and the EMEA Debtors filed "reservations of rights" pleadings requesting that the hearing on the Motion be a "Joint Hearing" between this Court and the Ontario Court, solely on the basis that a release of

---

[3] On January 22, 2016, the Debtors and LSI entered into a stipulation (the "LSI Stipulation") regarding certain of LSI's claims. This Court entered an order (the "LSI Claims Order") approving the LSI Stipulation on February 9, 2016. Following entry of the LSI Claims Order, LSI holds (i) allowed administrative claims against NNI in the amount of $112,405.85, (ii) allowed priority unsecured claims against NNI in the amount of $222,752.41, and (iii) allowed general unsecured claims against NNI in the aggregate amount of $11,645,862.67.

NYC:357927.3

<mark><mark><mark></mark></mark></mark>

any of the $7.3 billion in escrowed sales proceeds purportedly would require approval of both this Court and the Ontario Court. LSI agreed to adjourn the hearing on the Motion to May 24, 2016 and extended the objection deadlines with respect thereto to April 25, 2016.

3. At LSI's request, and with the consent of the "principal" parties in these cases, on April 19, 2016, the Court held a telephonic status conference with respect to the Motion. At the April 19 status conference, with the Court's approval and guidance, LSI agreed to "bifurcate" the relief sought in the Motion, such that the May 24 hearing would address LSI's request for an interim distribution of a portion of NNI's cash-on-hand. The other relief sought in the Motion (including the release of a portion of the $7.3 billion of escrowed sales proceeds to NNI's unsecured creditors and conversion of the Debtors' cases to chapter 7) would be adjourned to a future date while LSI and the principal parties in interest attempted to negotiate a consensual resolution of such matters. (Optimally, LSI and the principal parties to the U.S. cases should also attempt to negotiate a consensual distribution of NNI's cash on hand prior to May 24, 2016.)

4. In this Supplement, LSI respectfully requests that, at the May 24 hearing, the Court authorize and direct NNI to make an interim distribution of a portion of its approximately $591 million of cash-on-hand in an amount sufficient to (i) pay all of NNI's allowed administrative and priority claims (which NNI has reported aggregate up to $173 million) and (ii) make an "interim" distribution of not less than $318 million[4] on account of NNI's allowed unsecured claims (including reserves for claims that are not allowed or liquidated). In addition, in order to ensure that there are sufficient funds available for NNI to close out these cases (including to "fund" the litigation process with respect to the Allocation Opinion), LSI submits

---

[4] Such amount represents the remaining amount of cash on hand held by NNI following payment of up to $173 million of administrative and priority claims and establishment of a $100 million administrative reserve.

that NNI should establish a $100 million reserve for yet to be incurred or unknown administrative costs.

5.  With respect to the proposed distribution of cash-on-hand to NNI's unsecured creditors, as set forth in the Motion, LSI believes that, pursuant to the Allocation Opinion, NNI may not be liable for any Bond guarantee claims.[5] Because Bond claims are only counted against the Canadian Debtors' estates (rather than NNI's estate) for purposes of allocating the $7.3 billion of sales proceeds, NNI's estate is not allocated *any* proceeds for distribution to NNI's creditors on account of the approximately $4 billion of claims stemming from NNI's guarantee of the Bonds. LSI respectfully submits that, if no value is allocated to NNI's estate with respect to or payable on account of such Bond claims (*i.e.*, the "numerator" for creditor recovery purposes), such Bond claims should also not be taken into account or given effect when determining the NNI claims pool (*i.e.*, the "denominator" for creditor recovery purposes). NNI's other unsecured claims, primarily consisting of trade debt and employee claims, do not have similar impediments to payment now. At worst, NNI's trade debt and employee pension and severance claims rank *pari passu* with respect to, and may not be treated any worse under any plan than, the Bonds.

6.  In any event, the validity and amount of the Bond guarantee claims as against NNI can be determined at a later stage by this Court. At this stage, the Court can and should authorize NNI to establish a reserve or escrow account with respect to the amounts that would

---

[5] In the Allocation Opinion, the Court held that claims against multiple debtors shall be recognized only once for purposes of allocation. For example, for purposes of allocating the sales proceeds, Bond claims shall only be counted against the issuer rather than the guarantor, provided that "[a] claim for the shortfall can be recognized by the Estate that guaranteed the bond…" The Bonds were issued by two (2) of Nortel's Canadian debtors and guaranteed by NNI (and are not secured by any of NNI's assets or contractually or structurally senior with respect to any claims against NNI). As a result, among other things, any Bond guarantee claims against NNI's estate are, at best, limited to claims to the extent the Bonds are not paid in full from the Canadian debtors' estates.

arguably be payable by NNI on account of Bond guarantee claims. LSI submits that establishing such an escrow or reserve preserves the rights of, and does not prejudice, Bondholders, while permitting holders of allowed unsecured claims (other than Bonds) to receive a distribution on account of their claims. NNI's general unsecured creditors should not be forced to await a ruling on the validity and amount of Bond claims in order for general unsecured creditors to receive a distribution on account of their allowed claims.

7.      LSI anticipates that certain of the "principal parties" may argue that distributions of NNI's cash-on-hand cannot or should not be made at this time because an administrative bar date has not been established in these cases and/or certain anticipated "large" administrative claims have yet-to-be-filed, and therefore, as a consequence, NNI may not have sufficient funds to pay all administrative claims against NNI in full. Such arguments are alarming to LSI (and should be equally alarming to this Court). NNI has been paying large sums (apparently, between $1 billion and $2 billion, in the aggregate) to estate professionals on a monthly basis in large (if not entire) part to fund the litigation relating to this Court's Allocation Opinion (and in connection with Debtors that are no longer operating and have sold all of their assets). If there is any possibility that NNI may be administratively insolvent, and NNI objects to an interim distribution on such grounds, LSI respectfully submits that interim payments to NNI's estate professionals must cease immediately. Such professionals may assert administrative claims against NNI and be paid in due course pursuant to a separate Order of this Court like all other administrative claimants.

8.      LSI respectfully submits that the Court has both the authority and the justification to authorize and direct NNI to make the distributions and establish the escrows or reserves in the

5

amounts and the manner proposed herein.[6] An interim distribution to NNI's creditors would help mitigate the prejudice and delay that NNI's creditors have experienced during the past five (5) years. It is unclear if or when a plan may be confirmed and NNI has not indicated any intention to pay claims prior to the confirmation of a plan. LSI and other holders of allowed claims should not be forced to continue to fund the Debtors' cases and the parties' appeals litigation without any distributions on their allowed claims. The equities do not permit LSI and other creditors to remain unpaid while estate costs continue to mount to unprecedented levels.

9. LSI preserves its demand for all relief requested in the Motion and files this Supplement in connection with the "bifurcation" of the issues set forth in the Motion (and, particular, the issue agreed to be heard by this Court at the May 24, 2016 hearing). LSI reserves its rights to amend and/or supplement the Motion and this Supplement.

---

[6] It is well within the Court's authority to compel NNI to make an interim distribution to holders of administrative and priority claims. *See, e.g., In re Garden Ridge Corp.*, 323 B.R. 136, 143 (Bankr. D. Del. 2005); *see also* 4 COLLIER ON BANKRUPTCY ¶ 503.03 (16th Ed.) (noting that Bankruptcy Code section 503(b) is silent as to the timing of payment of administrative expenses and stating that "[g]enerally courts have held that the timing for payment of administrative claims is a matter to be determined within the discretion of the bankruptcy court.") (citing In re Midway Airlines Corp., 406 F.3d 229, 54 (4th Cir. 2005); *Varsity Carpet Servs., Inc. v. Colortex Indus., Inc. (In re Colortex Indus., Inc.)*, 19 F.3d 1371, 1384 (11th Cir. 1994); *In re Verco Indus.*, 20 B.R. 664 (B.A.P. 9th Cir. 1982)). In determining whether to award immediate payment on such claims, courts have considered the following three factors: (1) prejudice to the debtor; (2) hardship to the claimant; and (3) potential detriment to other creditors. Garden Ridge, 323 B.R. at 143. Here, the factors overwhelmingly support NNI paying all of its allowed administrative and priority claims promptly.

The Bankruptcy Code also expressly permits courts to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Code]." 11 U.S.C. § 105(a). The Third Circuit has construed this provision to give bankruptcy courts "broad authority" to provide appropriate equitable relief to assure the orderly conduct of reorganization proceedings, *see, e.g., In re Combustion Eng'g, Inc.*, 391 F.3d 190, 236 (3d Cir. 2004), and to "craft flexible remedies that, while not expressly authorized by the Code, effect the result the Code was designed to obtain." *Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548, 568 (3d Cir. 2003) (en banc). Bankruptcy Code section 105(a) specifically contemplates that a court may use the authority granted under that section to "tak[e] any action or mak[e] any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process." 11 U.S.C. § 105(a).

NYC:357927.3

WHEREFORE, LSI hereby requests that the Court enter an Order authorizing and directing NNI to (i) make an interim cash distribution from its cash-on-hand in amount necessary to (a) pay in full all allowed administrative and priority claims against NNI, and (b) pay not less than $318 million to holders of allowed unsecured claims against NNI (other than the Bond guarantee claims) and (ii) establish a reserve in an amount deemed appropriate by the Court with respect to the Bond guarantee claims against NNI.

Dated:  April 25, 2016

Respectfully submitted,

**ANDREWS KURTH LLP**

/s/ *Paul N. Silverstein*
Paul N. Silverstein (admitted *pro hac vice*)
Jeremy B. Reckmeyer (admitted *pro hac vice*)
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 850-2800
Facsimile: (212) 850-2929

*Counsel to Liquidity Solutions, Inc.*