# Buchanan Ingersoll ∧ Rooney PC
Attorneys & Government Relations Professionals

**Kathleen A. Murphy**
302 552 4214
kathleen.murphy@bipc.com

919 North Market Street
Suite1500
Wilmington, DE  19801-1228
T 302 552 4200
F 302 552 4295
www.buchananingersoll.com

May 3, 2016

**VIA ECF AND HAND DELIVERY**
The Honorable Kevin Gross
United States Bankruptcy Court
District of Delaware
824 North Market Street, 6th Floor
Wilmington, Delaware 19801

Re:  **In re Nortel Networks, Inc., et al., Case No. 09-10138 (KG)**

Dear Judge Gross:

We are counsel to Ernst & Young Inc., the court-appointed monitor of the Nortel

Networks Corporation, Nortel Networks Limited, and certain of their direct and indirect

Canadian subsidiaries in the above referenced proceeding.  Please find enclosed a copy of the

decision of the Court of Appeal for Ontario, dated May 3, 2016, regarding the motions for leave

to appeal.  Counsel is available at the convenience of the Court should Your Honor have any

questions.

Very truly yours,

Kathleen A. Murphy (No. 5215)

KAM/
0075846-000001
cc: Core Parties via email

California :: Delaware :: Florida :: New Jersey :: New York :: Pennsylvania :: Virginia :: Washington, DC

# COURT OF APPEAL FOR ONTARIO

CITATION: Nortel Networks Corporation (Re), 2016 ONCA 332
DATE: 20160503
DOCKET: M45307, M45309, M45310
M45311, M45312, M45313

Hoy A.C.J.O, and Blair and Pepall JJ.A.

In the Matter of the *Companies' Creditors Arrangement Act*, R.S.C. 1985 c. C-36, as amended

And in the Matter of a Plan of Compromise or Arrangement of Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Global Corporation, Nortel Networks International Corporation and Nortel Networks Technology Corporation

Application under the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended

Sheila Block, Scott A. Bomhof, Andrew Gray, Adam M. Slavens and Jeremy Opolsky, for the moving parties, the U.S. Debtors[1]

Richard B. Swan, S. Richard Orzy and Gavin H. Finlayson, for the moving party, the Ad Hoc Group of Bondholders

David R. Byers and Daniel S. Murdoch, for the moving party, the Conflicts Administrator of Nortel Networks S.A.

Shayne Kukulowicz, Michael Wunder, Ryan Jacobs, Geoffrey Shaw and Jane Dietrich, for the moving party, the Official Committee of Unsecured Creditors of Nortel Networks Inc. *et al.*

Andrew Kent, Brett Harrison and Laura Brazil, for the moving party, The Bank of New York Mellon as Indenture Trustee

---

[1] The U.S. Debtors are Nortel Networks Inc. (formerly Northern Telecom International), Nortel Networks Capital Corporation, Nortel Altsystems Inc., Nortel Altsystems International Inc., Xros, Inc., Sonoma Systems, Qtera Corporation, CoreTek, Inc., Nortel Networks Applications Management Solutions Inc., Nortel Networks Optical Components Inc., Nortel Networks HPOCS Inc., Architel Systems (U.S.) Corporation, Nortel Networks International Inc., Northern Telecom International Inc., Nortel Networks Cable Solutions Inc. and Nortel Networks (CALA) Inc.

Page: 2

Steven L. Graff, Ian Aversa and Miranda Spence, for the moving party, the Nortel Trade Claims Consortium

Michael E. Barrack, D.J. Miller, John L. Finnigan, Michael S. Shakra and Andrea McEwan, for the responding parties, the Board of the Pension Protection Fund and Nortel Networks U.K. Pension Trust Ltd.

Benjamin Zarnett, Jessica Kimmel, Peter Ruby and Peter Kolla, for the responding party, the Monitor, Ernst & Young Inc.

Kenneth Kraft and John Salmas, for the responding party, Wilmington Trust, National Association

Derrick Tay and Jennifer Stam, for the responding parties, the Canadian Debtors[2]

Kenneth Rosenberg, Lily Harmer and Massimo Starnino, for the responding party, the Superintendent of Financial Services as Administrator of the Pension Benefits Guarantee Fund

Mark Zigler and Ari Kaplan, for the responding parties, the Former Employees of Nortel and LTD Beneficiaries

Arthur O. Jacques, Paul Steep and Byron Shaw, for the responding party, the Canadian Creditors' Committee

Barry E. Wadsworth, for the responding party, CAW-Canada

Matthew P. Gottlieb and Matthew Milne-Smith, for the responding parties, the Joint Administrators of the EMEA Debtors[3] other than Nortel Networks S.A.

Heard: In Writing

---

[2] The Canadian Debtors are Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Technology Corporation, Nortel Networks Global Corporation, and Nortel Networks International Corporation.

[3] The EMEA Debtors are Nortel Networks UK Limited, Nortel Networks S.A., Nortel Networks (Ireland) Limited, Nortel GmbH, Nortel Networks (Austria) GmbH, Nortel Networks AB, Nortel Networks BV, Nortel Networks Engineering Service Kft, Nortel Networks France S.A.S., Nortel Networks Hispania, S.A., Nortel Networks International Finance & Holding BV, Nortel Networks NV, Nortel Networks OY, Nortel Networks Polska Sp. z.o.o., Nortel Networks Portugal SA, Nortel Networks Romania SRL, Nortel Networks SpA, Nortel Networks Slovensko, s.r.o., and Nortel Networks, s.r.o.

Motions for leave to appeal from the judgment of Justice Frank J.C. Newbould of the Superior Court of Justice, dated May 12, 2015 and July 6, 2015, with reasons reported at 2015 ONSC 2987, 27 C.B.R. (6th) 175, and 2015 ONSC 4170, 27 C.B.R. (6th) 51.

**BY THE COURT:**

## A.    INTRODUCTION

[1]    January 14, 2009 was not a good day.  At that time, Nortel Networks Corp. ("NNC") and the other Nortel Canadian Debtors filed for insolvency protection under the *Companies Creditors' Arrangement Act*, R.S.C. 1985, c. C-36 ("*CCAA*").  That same day, Nortel Networks Inc. ("NNI") and other U.S. Debtors filed voluntary petitions for relief under Chapter 11 of the U.S. *Bankruptcy Code*, 11 U.S.C. §§1101 – 1174, and other Nortel entities incorporated in Europe, the Middle East and Africa ("EMEA") were placed under administration in England by the High Court of England and Wales under the U.K. *Insolvency Act 1986*, c. 45. Shortly afterwards, courts in Canada and the United States approved a cross-border, court-to-court protocol that established procedures for the co-ordination of cross-border proceedings in Canada and the U.S.

[2]    More than seven years later, many Januarys have come and gone and these insolvency proceedings continue.  During that time:

- more than 6,800 Nortel former employees or pensioners have died;

- well in excess of $1 billion has been incurred in costs; and

- Nortel's assets have been sold and some \$7.3 billion[4] in sale proceeds have been placed in escrow (the "Lockbox Funds").

[3]    The leave motions now before this court arise from the joint trial dealing with the allocation of the Lockbox Funds. Newbould J. (the "trial judge) of Ontario's Superior Court of Justice (Commercial List) and Judge Gross of the U.S. Bankruptcy Court for the District of Delaware presided over the joint trial.[5] It was held over the course of six weeks.  Each judge rendered separate decisions on May 12, 2015.  Each concluded that the Lockbox Funds should be allocated on a *pro rata* basis among the various Nortel debtor estates.  Although their analysis differed somewhat, the outcome was the same.

[4]    Appeal proceedings were initiated in Canada and the U.S. The moving parties were authorized to file their leave materials in the absence of an issued judgment on the basis that counsel would subsequently file the formal judgment. The formal judgment was issued on April 26, 2016 and filed with this court on April 27, 2016.

[5]    Before this court, the six moving parties, led by the U.S. Debtors, seek leave to appeal the trial judge's judgment pursuant to s. 13 of the *CCAA*. They submit that the trial judge made fundamental errors and that the proposed appeal

---

[4] All references to dollars are to U.S. dollars, unless otherwise specified.
[5] Judge Gross's reasons are reported at 532 B.R. 494 (2015).

is of significance to the practice of insolvency and to the parties, and will not delay the completion of the *CCAA* proceedings.

[6]    The responding parties, led by the Board of the Pension Protection Fund and Nortel Networks UK Pension Trust Limited ("UKPC"), submit that the record supports the trial judge's factual findings, which were integral to his analysis, including his findings that Nortel's assets were jointly created, that the Nortel group of companies operated on a fully-integrated global basis and that Nortel did not operate separate businesses in separate countries. In their submission, the proposed appeal is not *prima facie* meritorious. In addition, the remaining elements of the test for leave to appeal under the *CCAA* have not all been met.

[7]    After consideration of each of the factums[6] and other materials filed on the leave motions, we agree with the responding parties that the test for leave has not been met. For the reasons that follow, we dismiss the moving parties' motions for leave to appeal.

## B.    GENESIS OF DISPUTE

[8]    NNC was a publicly-traded Canadian corporation at the helm of a global networking solutions and telecommunications business, and the direct or indirect

---

[6] In accordance with the directions of the Court of Appeal case management judge, there was one main factum filed on behalf of the moving parties by the U.S. Debtors and one main factum filed on behalf of the responding parties by the UKPC. Six supplementary factums and one reply factum were also filed.

parent of more than 130 subsidiaries located in more than 100 countries.  These companies were collectively referred to as the "Nortel Group" or "Nortel".

[9]    NNC was the successor to a long line of companies, headquartered in Canada, that date back to the founding of the Bell Telephone Company of Canada in 1883.    NNC's principal, direct operating subsidiary was Nortel Networks Limited ("NNL"), also a Canadian company.   NNL was the direct or indirect parent of operating companies located around the world. It owned 100 percent of the equity of  each of the following entities: NNI, Nortel's operating company in  the  United  States;  Nortel  Networks  UK  Ltd.  ("NNUK"),  Nortel's operating company in the United Kingdom; and, Nortel Networks (Ireland) Ltd. ("NN Ireland"), Nortel's operating company in Ireland. It also owned 91.17 per cent of the equity of  Nortel Networks S.A. ("NNSA"), Nortel's operating company in France.

[10]   Following the insolvency filings, Nortel's initial plan was to downsize and carry on portions of the telecommunications business.  However, by June 2009, the decision was made to liquidate Nortel's assets.

[11]   On June 29, 2009, an Interim Funding and Settlement Agreement ("IFSA") was approved by both the Canadian and American courts.  Among other things, it addressed interim funding for NNL and the anticipated sales of Nortel's business lines and residual intellectual property ("IP").  The parties, consisting of

the Canadian Debtors, the U.S. Debtors[7], and the EMEA Debtors[8], agreed to cooperate with the sales process and also agreed that the proceeds of sale would be held in escrow. The issue of allocation was deferred.

[12]   Under the IFSA, there would be no distribution out of escrow without "either (i) agreement of all of the Selling Debtors[9] or (ii) … determination by the relevant dispute resolver(s) under the terms of the Protocol … applicable to the Sale Proceeds".   The parties were then to negotiate and attempt to reach agreement "on a protocol for resolving disputes concerning the allocation of Sale Proceeds from Sale Transactions (the "Interim Sales Protocol")". Despite numerous attempts at resolution, agreement on both an Interim Sales Protocol and allocation proved to be elusive.

[13]   Meanwhile, over $7 billion was generated from various asset sales and other realizations.  From mid-2009 until March 2011, proceeds of $3.285 billion were generated from the sale of Nortel's various business lines, including some patents. Of that amount, $2.85 billion is available for allocation. In June 2011, proceeds of approximately $4.5 billion were generated from the sale of Nortel's residual intellectual property, consisting of approximately 7,000 patents and

---

[7]  With the exception of Nortel Networks (CALA) Inc.
[8]  The Joint Administrators were also party to the IFSA but only for the purposes of Section 17 (No Personal Liability of the Joint Administrators).
[9]  A description of "Selling Debtor" is found in s.12 (a) of the IFSA: "Each Debtor hereby agrees that its execution of definitive documentation with a purchaser (or, in the case of any auction, the successful bidder in any such auction) of, or closing of any sale of, material assets of any of the Debtors to which such Debtor (a "Selling Debtor") is proposed to be a party…"

patent applications, to the Rockstar consortium.   In total, approximately $7.3 billion is currently held in escrow.

[14]   By orders dated January 21, 2010, the Canadian and U.S. courts approved a "Final Canadian Funding and Settlement Agreement". The Agreement addressed a number of issues and allowed NNI a $2 billion claim against NNL in NNL's *CCAA* proceeding, which claim is not subject to offset or counterclaims.

[15]   The parties still could not agree on an Interim Sales Protocol or on allocation.  In the spring of 2013, the Canadian court and the U.S. bankruptcy court granted orders approving an "Allocation Protocol".  The purpose of this Protocol was to set out "binding procedures for determining the allocation of the Sale Proceeds among the Selling Debtors"[10]. It provided for a joint hearing to determine allocation before the Canadian court and the U.S. bankruptcy court.[11] Any party in interest was at liberty to advance any theory on allocation. Leave to appeal that order was denied by this court on June 20, 2013.

[16]   The issue of allocation of the Lockbox Funds then proceeded to trial.

---

[10] Selling Debtors was defined in the Allocation Protocol as the "Canadian Debtors, U.S. Debtors, EMEA Debtors and Nortel Networks Optical Components Ltd., Nortel Networks AS, Nortel Networks AG, Nortel Networks South Africa (Pty) Limited, and Nortel Networks (Northern Ireland) Limited."
[11] The EMEA Debtors were held to have attorned to the jurisdiction of the Canadian court and the U.S. bankruptcy court.

## C.    TRIAL JUDGE'S DECISION

## (1)    Trial Decision

[17]    The trial judge's reasons may be summarized. He commenced by reviewing the history of the Nortel Group.  He described the operations and the four main product groups or lines of business.  Before turning to his analysis of the legal issues, he made a number of important findings about the Nortel Group's structure. He found, and repeatedly reiterated, that the Nortel Group operated as a highly-integrated multinational enterprise.  For instance, he stated:

> [16] The Nortel Group operated along business lines as a highly integrated multinational enterprise with a matrix structure that transcended geographic boundaries and legal entities organized around the world.  Each entity, such as NNL, NNI, NNUK, NN Ireland and NNSA, was integrated into regional and product line management structures to share information and perform research and development ("R&D"), sales and other common functions across geographic boundaries and across legal entities.  The matrix structure was designed to enable Nortel to function more efficiently, drawing on employees from different functional disciplines worldwide, allowing them to work together to develop products and attract and provide service to customers, fulfilling their demands globally.

> [17]  As a result of Nortel's matrix structure, no single Nortel entity, either NNL or any of the other Canadian debtors in Canada, NNI or any of the other US debtors in the United States or NNUK or any of the other EMEA debtors, was able to provide the full line of Nortel products and services, including R&D capabilities, on a stand-alone basis. While Nortel ensured that all corporate entities complied with local laws regarding

corporate governance, no corporate entity carried on business on its own.

[18]   The trial judge also found that R&D, which was performed at labs around the world, was the primary driver of Nortel's value and profit.

[19]   After reviewing the necessary background, the trial judge turned to the legal issues before him, starting with the interpretation of the Master Research and Development Agreement ("MRDA"). The MRDA dealt with transfer-pricing arrangements, effective from 2001 onwards, among NNL, NNI, NNUK, NNSA and NN Ireland, who were parties to the agreement.[12]

[20]   The parties took differing and competing positions on the meaning and application of the MRDA:

> ▪ The Monitor (on behalf of the Canadian Debtors), supported by the Canadian Creditors' Committee ("CCC"), took the position that under the MRDA, NNL owned the IP whereas other participants to the MRDA were simply licensees.  They argued that the proceeds derived from the sale of the residual IP belonged exclusively to NNL.

> ▪ The U.S. Debtors and other U.S. interests, including the Bondholders, argued that NNI and the other licensees held all of the rights and value in the IP in their respective exclusive territories as defined in the MRDA.

> ▪ The EMEA Debtors asserted that parties to the MRDA jointly owned all of the IP in proportion to their financial contributions to R&D and that all

---

[12] Nortel Networks Australia was also a party to the agreement. It ceased being a Residual Profit Entity on December 31, 2007.

should share in the sale proceeds attributable to IP in those same proportions. The joint ownership arose independent of, but was recognized in, the MRDA.

■ The UKPC took the position that the MRDA should not govern allocation and that a *pro rata* allocation based on a *pari passu* distribution should be used. The CCC also adopted this as its alternative position.

[21]   The trial judge found that, by its terms, the MRDA was to be construed in accordance with, and governed by, Ontario law. He reviewed the applicable principles of contractual interpretation, including the law on factual matrix (surrounding circumstances), commercial reasonableness, and recitals. In reviewing the law, he considered the recent authority from the Supreme Court of Canada on contractual interpretation, *Sattva Capital Corp. v. Creston Moly Corp.*, 2014 SCC 53, [2014] 2 S.C.R. 633, which was released during the course of the trial. He considered in detail the parties' positions, the language of the MRDA and evidence on factual matrix.

[22]   He concluded that the MRDA was an operating agreement and was not intended to, nor did it, deal with the disposal of all of Nortel's assets in a situation in which no revenue was being earned and no profits or losses were occurring. Rather, he found that the MRDA was developed for, and driven by, transfer-pricing concepts for tax purposes and did not govern allocation after Nortel ceased operations:

[177]   I accept that the MRDA was a transfer pricing document created for tax purposes. The licenses were a part of it. The licenses granted under it were never dealt with separately from the MRDA. Their only purpose was to support the intended tax treatment resulting from the MRDA.

…

[185]   I conclude that the circumstances surrounding the creation of the MRDA lead to no other result but that the construct of legal title to the NN Technology being in NNL in return for NNL granting exclusive licenses to the Licensed Participants was only for the purpose of supporting the proposed method to split profits or losses on a tax efficient basis while Nortel operated as a going concern business. The agreement in its application was intended to apply only to Nortel while it operated and not to deal with rights after Nortel and its subsidiaries stopped operating its businesses.

[23]   Thus, he rejected the primary positions of the Monitor, the CCC, the U.S. Debtors and other U.S. interests, as well as the EMEA Debtors' joint ownership theory.

[24]   Having found that the MRDA did not govern allocation on Nortel's insolvency and having rejected the joint ownership theory, the trial judge turned to the metric to be used to allocate the Lockbox Funds. He found that the intangible assets that were sold were not separately located or owned in any one jurisdiction.   Rather, they were created by all of the so-called "Residual Profit Entities" or "RPEs" (namely, NNL, NNI, NNUK, NNSA and NN Ireland), which were located in different jurisdictions. In addition, the matrix structure allowed

Page:  13

Nortel to draw on employees from different functional disciplines worldwide, regardless of region or country, according to need.

[25]   He held that NNL was not entitled to the proceeds of sale simply because the patents were in its name:

> [197]   This was not one corporation and one set of employees inventing IP that led to patents. Nortel was a highly integrated multi-national enterprise with all RPEs doing R&D that led to patents being granted. It was R&D that drove Nortel's business. R&D and the intellectual property created from it was the primary driver of Nortel's value and profits. All parties agree on that. It would unjustly enrich NNL to deprive all of the other RPEs of the work that they did in creating the IP just because the patents were registered in NNL's name.

[26]   He determined that he had wide powers under the *CCAA* to do what was just in the circumstances. Section 11 of the *CCAA*, which reflected prior jurisprudence, expressly provides that a court may make any order it considers appropriate in the circumstances, subject to the provisions of the Act. He wrote:

> [208] In this case, insolvency practitioners, academics, international bodies, and others have watched as Nortel's early success in maximizing the value of its global assets through cooperation has disintegrated into value-erosive adversarial and territorial litigation described by many as scorched earth litigation. The costs have well exceeded $1 billion. A global solution in this unprecedented situation is required and perforce, as this situation has not been faced before, it will by its nature involve innovation. Our courts have such jurisdiction. [Footnote omitted.]

Page:  14

[27]    He observed that it is a fundamental tenet of insolvency law that all debts be paid *pari passu* and that all unsecured creditors receive equal treatment. In his view, a *pro rata* allocation could be achieved by directing an allocation of the Lockbox Funds to each Debtor Estate based on the percentage that the claims against that Estate bore to the total claims against all of the Debtor Estates.

[28]    In reaching this conclusion, the trial judge dealt with the argument that a *pro rata* allocation would amount to substantive consolidation. He concluded that a *pro rata* allocation would not constitute substantive consolidation in the unique circumstances of this case. In any event, even if it were substantive consolidation, there was precedent that justified substantive consolidation in this case: *Re Lehndorff General Partner Ltd.* (1993), 17 C.B.R. (3d) 24 (Ont. Gen. Div.); *Re PSINet Ltd.* (2002), 33 C.B.R. 4th 284 (Ont. S.C.J.); *Re Northland Properties Ltd.* (1988), 29 B.C.L.R. (2d) 257 (S.C.).

[29]    Ultimately, he concluded that the Lockbox Funds were to be allocated on a *pro rata* basis in accordance with certain governing principles, which are outlined below.

[30]    After his reasons were released, the U.S. Debtors supported by the Official Committee, the Ad Hoc Group of Bondholders and the Law Debenture Trust Company of New York filed motions for clarification, reconsideration or amendment in Canada and the U.S. and a number of points were clarified.

Page: 15

[31]    In the end result, the judgment that was signed, issued and entered on April 26, 2016 provided that the allocation proceed on a *pro rata* basis in accordance with the following principles:

(a) Each Debtor Estate[13] is to be allocated that percentage of the Lockbox Funds that the total allowed pre-filing claims against that Debtor Estate bear to the total allowed pre-filing claims against all Debtor Estates.

(b) In determining what the claims are against the Debtor Estates, pre-filing claims of the kind provable under the *Companies' Creditors Arrangement Act* that have received court approval and which have been paid may be taken into account to the extent that they have been paid under the settlement.

(c) In determining what the pre-filing claims are against each Debtor Estate, a claim that can be made against more than one Debtor Estate can only be calculated and recognized once.

i.    Claims on bonds are to be made on the Debtor Estate of the issuer and shall be included in that Debtor Estate's total allowed claims for the purpose of determining its allocation. A claim can be recognized by the Debtor Estate that guaranteed the bond, but those claims will not be taken into account in determining the claims against the Debtor Estates for allocation purposes.

ii.   If the UK Pension Claimants make a claim for the approximately £2.2 billion deficit in the NNUK pension plan against NNUK and also against other EMEA Debtors or the EMEA Non-Filed

_____

[13] The order defines "Debtor Estate" as "each of the individual legal entities" set out in Schedule B. Schedule B lists the 45 entities, including the Canadian Debtors, the U.S. Debtors, the EMEA Debtors and five "EMEA Non-Filed Entities" who have not commenced insolvency proceedings. See also the similar definition given to Selling Debtors under the Allocation Protocol.

Entities, the claim against NNUK will be taken into account in determining claims against the Debtor Estates for allocation purposes but the additional claims against the EMEA Debtors or the EMEA Non-Filed Entities will not be taken into account in determining the claims against the Debtor Estates for allocation purposes.

(d) Subject to the general proviso in (c), above, in respect of claims that can be made against more than one Debtor Estate, pre-filing intercompany claims against a Debtor Estate shall be included in the determination of the claims against that Debtor Estate for purposes of its allocation.

(e) The following specific pre-filing claims shall be included in the determination of the allowed claims against NNL for purposes of determining its allocation:

i. the US$2.0627 billion claim of NNI against NNL that was approved by this Court and the U.S. Court;

ii. the claims of NNUK and Nortel Networks SpA against NNL pursuant to the Agreement Settling EMEA Canadian Claims and Related Claims dated July 9, 2014; and

iii. the claim of the UK Pension Claimants against NNL recognized in this Court's judgment of December 9, 2014, as such claim is finally determined.

(f) Cash on hand in any Debtor Estate will not be taken into account in determining its allocation. Each Debtor Estate with cash on hand will continue to hold that cash and deal with it in accordance with its administration.

## D.    ANALYSIS

[32] Six moving parties now seek leave to appeal from the trial judge's allocation decision: the U.S. Debtors, the Ad Hoc Group of Bondholders, the

Conflicts Administrator of Nortel Networks S.A., the Official Committee of Unsecured Creditors of NNI and others, the Bank of New York Mellon as Indenture Trustee, and the Nortel Trade Claims Consortium.

[33]    We will commence our analysis by discussing the test for leave to appeal under the *CCAA* and then address the moving parties' positions in relation to that test.

## (1)    Test for Leave to Appeal

[34]    Section 13 of the *CCAA* provides that any person dissatisfied with an order or a decision made under the Act may appeal from the order or decision with leave.    Leave to appeal is granted sparingly in *CCAA* proceedings and only where there are serious and arguable grounds that are of real and significant interest to the parties. In addressing whether leave should be granted, the court will consider whether:

> (a)  the proposed appeal is *prima facie* meritorious or frivolous;
>
> (b)  the points on the proposed appeal are of significance to the practice;
>
> (c)  the points on the proposed appeal are of significance to the action; and
>
> (d)  whether the proposed appeal will unduly hinder the progress of the action.

See, for e.g.: *Re Stelco Inc.* (2005*)*, 75 O.R. (3d) 5 (C.A.), at para. 24; *Re Timminco Ltd.*, 2012 ONCA 552, 2 C.B.R. (6th) 332, at para. 2; and *Re Nortel Networks Corp.*, 2013 ONCA 427, 5 C.B.R. (6th) 254, at para. 3.

## (a)   Whether Appeal is *Prima Facie* Meritorious

[35]   The moving parties take the position that leave should be granted because the appeal is *prima facie* meritorious. In making that argument, they raise three main issues – substantive consolidation, the interpretation of the MRDA, and questions of fairness. We will deal with each issue in turn.

## (i)    Substantive consolidation

### *Position of the Moving Parties*

[36]   First, the moving parties submit that the trial judge erred in not recognizing that the allocation ordered departed from "corporate separateness" and was a form of substantive consolidation.

[37]   Secondly, it is alleged that the trial judge erred by applying an inappropriately low threshold for the application of substantive consolidation.

[38]   In its supplementary factum, the Bank of New York Mellon, as Indenture Trustee, makes a related argument. It submits that since the Nortel proceeding no longer involves a restructuring, the *CCAA*'s purpose is spent and the proceeds should thereafter be distributed under the *Bankruptcy and Insolvency Act*, R.S.C. 1985, c. B-3 ("*BIA*"), or at least in a manner consistent with the *BIA*

scheme. It says the *BIA* does not contemplate consolidation but rather distribution on an entity-by-entity basis.

[39]   Finally, the Ad Hoc Group of Bondholders makes a related argument. It submits that the allocation decision takes property interests that belong to certain debtor estates and gives them to others. They argue that, even though the authority provided under s. 11 is broad, the *CCAA* does not permit a court to redistribute property in this way.

*Analysis*

[40]   The moving parties' arguments on substantive consolidation are not *prima facie* meritorious.

[41]   Professor Janis Sarra, a leading expert on insolvency law in Canada, describes substantive consolidation in her article "Corporate Group Insolvencies: Seeing the Forest and the Trees" (2008) 24 B.F.L.R. 63, at pp. 80 - 81:

> Substantive consolidation essentially treats member entities of a corporate group as one entity.  In the context of liquidation, it creates a common pool of assets to meet creditors' claims.  In the context of restructuring, it may create the opportunity for creditors to share in the future upside potential of a restructured entity or entities by centralizing and negotiating an arrangement in respect of their claims.  Canadian courts have recognized substantive consolidation under both the *BIA* and the *CCAA* where there is evidence of intertwined assets and liabilities; integrated administrative functioning and operations; a perception by creditors that they are dealing with an integrated entity; common control and governance structures;

> where it would be impracticable to separate the affairs
> of related entities; where it is more cost effective and
> beneficial to creditors to have the proceedings
> administered as a single estate; and where it would
> result in an expeditious and administratively efficient
> administration of the proceeding.

[42]   As we have noted, the trial judge concluded that *pro rata* allocation was

appropriate, that it did not amount to substantive consolidation, and that even if it

could be said that a *pro rata* allocation involved substantive consolidation, it was

not precluded by law in the unique circumstances of the case.

[43]   In reaching those conclusions, he made numerous factual findings, in

addition to those already mentioned, including the following:

- "Nortel (a) had fully integrated and interdependent operations; (b) had intercompany guarantees for its primary indebtedness; (c) operated a consolidated treasury system in which generated cash was used throughout the Nortel Group as required; (d) disseminated consolidated financial information throughout its entire history, save for the year before its bankruptcy; and (e) created IP through integrated R&D activities that were global in scope": para. 223.

- "[N]o one entity or region was able to provide the full line of Nortel products and services": para. 202.

- "Nortel's matrix structure also allowed Nortel to draw on employees from different functional disciplines worldwide … regardless of region or country according to need": para. 203.

- "R&D was organized around a particular project, not particular geographical locations or legal entities, and was managed on a global basis": para. 202.

- "The fact that Nortel ensured that legal entities were properly created and advised in the various countries in

which it operated in order to meet local legal requirements [did] not mean that Nortel operated a separate business in each country.  It did not": para. 202.

- "The intangible assets that were sold, being by far the largest type of asset sold, were not separately located in any one jurisdiction or owned separately in different jurisdictions": para. 202.

- The assets are "so intertwined that it is difficult to separate them for purposes of dealing with different entities": para. 222.

- There is "no recognized measurable right in any one of the selling Debtor Estates to all or a fixed portion of the proceeds of sale": para 224.

- "Nortel has had significant difficulty in determining the ownership of its princip[al] assets, namely the $7.3 billion representing the proceeds of the sales of the lines of business and the residual patent portfolio", which "constitutes more than 80 per cent of the total assets of all Nortel entities": para. 222.

[44]   In addition to his factual findings supporting the *pro rata* order, the trial judge explained why the allocation in this case did not constitute substantive consolidation, either actual or deemed:

- The Lockbox Funds were largely due to the sale of IP and no one Debtor Estate had any right to the funds. They did not belong in whole or in part to any one Estate or combination of Estates.

- The various entities and the various Estates were not being treated as one entity and the creditors of each entity would not become creditors of a single entity. Each entity remained separate and with its own creditors.

- Each entity would maintain its own cash on hand and would be administered separately.

▪  The inter-company claims would not be eliminated.

[45]  Similarly, Judge Gross explained at p. 554 of his reasons that the *pro rata* allocation, which was not a distribution, "both recognizes the integrity of the corporate separateness and the integrated synergistic operations of Nortel." Furthermore, he noted that a "pro rata allocation does not merge the Nortel Debtors into a single survivor and does not erase intercompany claims": p. 554.

[46]  In our view, there is no *prima facie* merit to the argument that we should interfere with the trial judge's conclusion that the allocation decision did not amount to substantive consolidation. His conclusion was based on the nature and effect of his allocation decision and his factual findings. He made the findings having heard from 36 witnesses and having received and reviewed thousands of exhibits and dozens of deposition transcripts over the course of a six-week trial. Those factual findings were central to the result. Absent palpable and overriding error, those factual findings are afforded deference by this court: *Housen v. Nikolaisen*, 2002 SCC 33, [2002] 2 S.C.R. 235, at para. 10.

[47]  The moving parties also allege that the trial judge erred by applying an inappropriately low threshold for the application of substantive consolidation in finding that, even if the allocation did constitute substantive consolidation, it was permissible. They point to *Northland* as the leading authority on substantive consolidation but say that it is time to revisit that decision in Canada.

[48]   The trial judge correctly observed that while the *CCAA* does not expressly

address the issue of substantive consolidation, jurisprudence in Canada has

recognized substantive consolidation as being appropriate in certain exceptional

circumstances: see, for e.g., *Re Lehndorff General Partner Ltd.*, *Re PSINet Ltd.*,

and *Re Northland Properties Ltd.*

[49]   He also correctly observed that the court has jurisdiction to make any order

that it considers appropriate in the circumstances under s. 11 of the *CCAA*.

Although that section came into effect after the Nortel filing under the *CCAA*, it

reflects past jurisprudence: *Century Services Inc. v. Canada (Attorney General)*,

2010 SCC 60**,** [2010] 3 S.C.R. 379, at para. 68. Specifically, s. 11 states:

> Despite anything in the *Bankruptcy and Insolvency Act* or the *Winding-up and Restructuring Act*, if an application is made under this Act in respect of a debtor company, the court, on the application of any person interested in the matter, may, subject to the restrictions set out in this Act, on notice to any other person or without notice as it may see fit, make any order that it considers appropriate in the circumstances.

[50]   That said, since there is no *prima facie* merit to the argument that the *pro*

*rata* allocation constitutes substantive consolidation, there is no need to re-visit

the jurisprudence governing substantive consolidation in Canada or to consider

whether the threshold for substantive consolidation should be changed.

[51]   Furthermore, we see no merit in the argument raised by the Bank of New

York Mellon that the trial judge erred by failing to allocate the Lockbox Funds in a

manner consistent with the *BIA* scheme, which contemplates distribution on an entity-by-entity basis. Under the *CCAA* allocation decision, distribution to creditors will be done on an entity-by-entity basis.

[52]   Finally, the argument raised by the Ad Hoc Group of Bondholders and the Official Committee also lacks merit. It presumes that the various Nortel companies had distinct and separable property rights in Nortel's IP. The trial judge repeatedly rejected that proposition. As we explain in the following sections, we see no merit in the argument that the trial judge erred in failing to recognize such distinct property rights. As such, we see no merit in the argument that he exercised his authority in a way that ignored such rights.

[53]   This ground of appeal is not *prima facie* meritorious.

**(ii)    The Interpretation of the MRDA**

*Position of Moving Parties*

[54]   The moving parties take the position that the trial judge erred in concluding that the MRDA has no application to the allocation of the Lockbox Funds. On their reading, the MRDA provides NNI and other "Integrated Entities" with valuable rights to Nortel's IP in their respective exclusive jurisdictions. They note that the trial judge and Judge Gross diverged on the issue of IP rights under the MRDA.

[55]   The thrust of their contractual argument is two-fold: (1) the trial judge misinterpreted the MRDA by disregarding the words of the agreement; and (2) he failed to apply the Supreme Court of Canada's decision in *Sattva* by taking an impermissibly narrow view of the scope of factual matrix evidence. In particular, they submit that the trial judge failed to take into account evidence relating to, and explaining, the tax-driven nature of the MRDA and the purposes the parties were trying to achieve through the agreement.

*Analysis*

[56]   We reject the moving parties' submissions on the interpretation of the MRDA.

[57]   On August 1, 2014, the Supreme Court of Canada released *Sattva*.  The essence of that decision is best captured by excerpts from the reasons of the court written by Rothstein J.:

- "Historically, determining the legal rights and obligations of the parties under a written contract was considered a question of law": para. 43.

- "[T]he historical approach should be abandoned. Contractual interpretation involves issues of mixed fact and law as it is an exercise in which the principles of contractual interpretation are applied to the words of the written contract, considered in light of the factual matrix": para. 50.

- "[T]his Court in *Housen* [*v. Nikolaisen*, 2002 SCC 33, [2002] 2 S.C.R. 235] found that deference to fact-finders promoted the goals of limiting the number,

length, and cost of appeals, and of promoting the autonomy and integrity of trial proceedings …. These principles also weigh in favour of deference to first instance decision-makers on points of contractual interpretation. The legal obligations arising from a contract are, in most cases, limited to the interest of the particular parties. Given that our legal system leaves broad scope to tribunals of first instance to resolve issues of limited application, this supports treating contractual interpretation as a question of mixed fact and law": para. 52.

- "[I]t may be possible to identify an extricable question of law from within what was initially characterized as a question of mixed fact and law …. Legal errors made in the course of contractual interpretation include 'the application of an incorrect principle, the failure to consider a required element of a legal test, or the failure to consider a relevant factor'": para. 53.

- "However, courts should be cautious in identifying extricable questions of law in disputes over contractual interpretation": para. 54.

- "The close relationship between the selection and application of principles of contractual interpretation and the construction ultimately given to the instrument means that the circumstances in which a question of law can be extricated from the interpretation process will be rare": para. 55.

[58]    Justice Rothstein also discussed the need to consider the surrounding circumstances, or factual matrix of a contract, when interpreting a written agreement. The goal of contractual interpretation is to ascertain the objective intentions of the parties.  In doing so, "a decision-maker must read the contract as a whole, giving the words used their ordinary and grammatical meaning, consistent with the surrounding circumstances known to the parties at the time of

formation of the contract": para. 47. Recognizing that words do not have an immutable meaning, the court should consider the contract's commercial purpose, taking into account its genesis, background, context, and the market in which the parties are operating.

[59]   In this case, the moving parties suggest that the trial judge erred in his interpretation of the MRDA and failed to pay heed to *Sattva*.  In our view, the moving parties' arguments are not *prima facie* meritorious.

[60]   We are not persuaded that there is any reason to interfere with the trial judge's interpretation of the agreement on the basis of palpable and overriding error. Nor, in our view, have the moving parties pointed to any extricable legal error warranting intervention by this court.

[61]   As mentioned, although *Sattva* was released during the course of the allocation trial, the trial judge nonetheless considered and applied *Sattva* in interpreting the MRDA.  In over 40 paragraphs, he addressed the relevant law on, and evidence of, factual matrix: see paras. 55 – 57, 117 – 157.  He properly rejected evidence of subjective intention as being inadmissible.

[62]   We would also observe that, as noted by the Monitor and the Canadian Debtors, to be fully successful on their appeal, the U.S. Debtors would have to persuade the court that the trial judge should have: (i) concluded that the MRDA controlled allocation of Nortel's assets in the event of insolvency; (ii) adopted the

interpretation of the MRDA advanced by the U.S. Debtors; and (iii) accepted the expert valuation evidence tendered by the U.S. Debtors.

[63]    The trial judge did none of these things. All of his conclusions to the contrary engage questions of fact or mixed fact and law that are well within his province.

[64]    For instance, the trial judge rejected the U.S. Debtors' valuation evidence as unreliable and the moving parties' factums are silent on how this finding could be overcome. The acceptance or rejection of the evidence of a witness is squarely within the fact-finding arena of the trial judge.  The moving parties have suggested no reason why the trial judge's findings on valuation would be reversed.

[65]    In conclusion, this ground of appeal does not warrant granting leave to appeal.

**(iii)    Fairness to the Parties and Related Arguments**

*Position of Moving Parties*

[66]    Next, the moving parties submit that they were denied procedural fairness in various respects and that the allocation decision is, among other things, arbitrary, and inequitable. In this regard, we do not propose to address every argument in the multitude of factums filed. The principal submissions on fairness and related arguments that merit comment are as follows.

[67]   The moving parties say they were given no notice or opportunity to make submissions on the remedy granted.  Moreover, there was no record before the court on the full spectrum of claims asserted against the Selling Debtors and no one proposed the specific remedy granted.

[68]   The U.S. Debtors also submit that the remedy did not respond to the question before the court, which they say was the allocation of the Sale Proceeds (i.e. the proceeds from a particular Sale Transaction) among the Selling Debtors (i.e. the Nortel parties to a particular Sale Transaction). In their view, the trial judge did not answer that question but instead allocated the Sale Proceeds to Nortel entities that did not transfer assets in a particular Sale Transaction and were, thus, not entitled to any Sale Proceeds.

[69]   The Ad Hoc Group of Bondholders similarly submits that the trial judge answered the wrong question. For instance, it says that the only question properly before the court was to determine the relative value of the assets, rights and interests that each Selling Debtor sold or relinquished, which generated the Sale Proceeds.  Moreover, they say that the decision disregards their legitimate expectations.

[70]   The U.S. Debtors further submit that the allocation is arbitrary since there is no logical connection between what will be or will not be counted for allocation purposes. In particular, they point to the fact the allocation excludes $4 billion in

bondholder guarantee claims from the U.S. Debtors' allocation. They say that, as a result, the U.S. Debtors will receive no allocation of funds on account of approximately two-thirds of their claims.

[71]   Similarly, the Ad Hoc Group of Bondholders submits the allocation is arbitrary as it produces a redistribution of assets among debtors that violates the rule that equity holders get paid after creditors.

[72]   The Conflicts Administrator of NNSA also takes issue with the fairness of the allocation decision. It says that NNSA is prejudiced by the decision because of the relatively small quantum of its creditors' claims in comparison with those of other debtor estates.

[73]   Finally, the Official Committee, which represents all general unsecured creditors of the U.S. Debtors, complains that the trial judge exercised his discretion in an unprincipled way and strayed into improper "commercial judicial moralism".

*Analysis*

[74]   We are not satisfied that there is *prima facie* merit to the moving parties' submissions.

[75]   As explained, the trial judge was required to "determine the allocation of the Sale Proceeds among the Selling Debtors" under the Allocation Protocol.

[76]   Given the trial judge's conclusion that the MRDA did not govern allocation and his rejection of the EMEA Debtors' joint ownership theory, the trial judge had to determine what other metric should be used to allocate the Lockbox Funds among the U.S., Canadian and EMEA Debtor Estates.

[77]   The Allocation Protocol permitted submissions on "any theory of allocation". At trial, the UKPC and the CCC, in the alternative, sought a *pro rata* distribution of the funds held in escrow and each submitted expert reports that supported a *pro rata* result. Moreover, the U.S. Debtors, the Official Committee and the Ad Hoc Group of Bondholders all made submissions before the trial judge opposing a *pro rata* allocation and had an opportunity to test the evidence. They submitted a motion to strike the *pro rata* allocation evidence, attacked the reliability of the expert reports and cross-examined the experts.

[78]   Thus, all parties knew that a *pro rata* allocation was in play. The fact that the specifics of the allocation ordered by the trial judge were not identical to those advanced by any of the parties does not, in our view, create unfairness to the parties. This is not a situation where the trial judge addressed an issue that was not before him, failed to grapple with the arguments or evidence, or came up with a new theory of the case.

[79]   The two judges were not required to determine value but allocation. The IFSA provided for a right to receive an allocation of the Sale Proceeds without

restricting the basis upon which that allocation might be determined by the two courts. In particular, we note that the trial judges were given authority to decide the issue of allocation. In addition to the terms of the Allocation Protocol, we note s.10(a) of the IFSA:

> [T]his Agreement is not, and shall not be deemed to be, an acknowledgement by any Party of the assumption, ratification, adoption or rejection of the Transfer Pricing Agreements or any other Transfer Pricing methodology employed by the Nortel Group or its individual members for any purpose nor shall it be determinative of, or have any impact whatsoever on, the allocation of proceeds to any Debtor from any sale of assets of the Nortel Group; [Emphasis added.]

[80]   We also observe that the trial judge turned his mind to expectations and found that there was no evidence to support the Bondholders' argument that their legitimate expectations would be disregarded by a *pro rata* allocation.

[81]   Furthermore, we see no basis for the assertion that the allocation framework is arbitrary and unfair since it excludes $4 billion in Bondholder guarantee claims from the U.S. Debtors' allocation. Under the allocation decision, a claim that can be made against more than one Debtor Estate can only be calculated and recognized once for allocation purposes. This principle is applicable to all claims. The allocation decision also specifies that claims on bonds are to be made on the Debtor Estate of the issuer. Claims on those bonds may also be made on the Debtor Estate of the guarantor but those claims will not

Page:  33

be taken into account in determining the claims against the Debtor Estates for allocation purposes.

[82]   On the reconsideration motion, it was argued that the trial judge's decision should be changed to provide that the claims by the bondholders on the guaranteed bonds against the issuer and guarantor Debtor Estates should be included in the claims for allocation purposes. It was contended that, without such a change, there would be a manifest injustice, especially to the creditors of the U.S. Debtors other than the bondholders.

[83]   The trial judge rejected that argument, noting that the $2 billion admitted claim against NNL endures. Further, cash on hand in the U.S. Debtors' Estates would be available to their creditors. He also noted that the issue of the treatment of the guaranteed bonds, and whether they should be counted once or twice in a *pro rata* allocation, was a live issue in evidence at trial, which was open to the U.S. Debtors to explore. He found, at para. 16, that "any lack of briefing by the U.S. Debtors and the [Official Committee] was a deliberate tactic taken by them in attacking the pro rata allocation method proposed at trial". He concluded that, even if he were to reconsider the double-counting issue, he would not change his mind:

> I see no injustice in the result…. There must also be considered other claims that could be made against more than one Debtor Estate, including the pension claim by the UKPC against NNUK that could be made

Page: 34

against other EMEA Debtors and claims that could be made on bonds issued by NNL and guaranteed by NNC. The allocation decision precludes the double counting of any such claims for allocation purposes. The U.S. Debtors and [Official Committee] do not suggest that any of these other claims should be permitted to be claimed twice for allocation purposes. I see no basis to treat the guaranteed bonds any differently for allocation purposes. The principles that govern allocation should be applied consistently to each debtor.

[84]    We are not persuaded that there is *prima facie* merit to the argument that the allocation is arbitrary. The trial judge was clearly alive to the fairness concerns and gave reasons for adopting the approach he did after careful consideration of the evidence and argument at trial.

[85]    We would also observe that there was no other clear answer to the question of who was entitled to receive the sale proceeds. As Judge Gross noted at p. 500 of his reasons, the parties "submitted widely varying approaches for deciding the issue leaving virtually no middle ground." The U.S. Debtors and Bondholders argued that in excess of $5 billion belonged to the U.S. Estate and that the Canadian Estate should receive only $0.77 billion. The Canadian Debtors and the Monitor, in sharp contrast, argued that in excess of $6 billion belonged to the Canadian Estate and that the U.S. Estate should receive just over $1 billion. The highly integrated nature of the Nortel business operations and the nature of the assets sold defied either outcome.

[86]   Judge Gross's comments in his reasons on the allocation trial, at pp. 532-533, accurately sum up the context in which the two courts came to adopt the *pro rata* allocation approach:

> The Court is convinced that where, as here, operating entities in an integrated, multi-national enterprise developed assets in common and there is nothing in the law or facts giving any of those entities certain and calculable claims to the proceeds from the liquidation of those assets in an enterprise-wide insolvency, adopting a pro rata allocation approach, which recognizes inter-company and settlement related claims and cash in hand, yields the most acceptable result.
>
> There is nothing in the law or facts of this case which weighs in favour of adopting one of the wide ranging approaches of the Debtors.  There is no uniform code or international treaty or binding agreement which governs how Nortel is to allocate the Sales Proceeds between the various insolvency estates or subsidiaries spread across the globe.

[87]   Nor are we satisfied that there is *prima facie* merit to the Official Committee's argument that the trial judge exercised his discretion in an unprincipled way by straying into improper "commercial judicial moralism". To the extent the Official Committee is suggesting that it amounts to judicial moralism when a judge takes into account fairness concerns, we reject that argument. The trial judge considered the evidence before him in considerable detail and worked with the facts presented to him.  Based on those facts, he concluded that a *pro rata* order constituted the answer to the allocation issue. The fact that the answer is also fair should not detract from the force of his conclusion.

[88]    Finally, we are not persuaded that there is any merit to the argument that the allocation violates the rule that equity holders get paid after creditors. The Ad Hoc Group of Bondholders submits that the trial judge's decision results in NNL (NNI's parent company) receiving allocation proceeds from the sale of NNI's assets and rights that ought to have been allocated to the NNI estate for the benefit of NNI's creditors. This argument is premised on NNI having a right to the particular proceeds as a result of the MRDA interpretation advanced by the U.S. Debtors and Bondholders. As we have discussed above, the trial judge rejected that argument.

[89]    For these reasons, we conclude that none of the fairness and related arguments put forward by the moving parties are *prima facie* meritorious.

**(b)    Significance of Issues to the Practice**

*Position of Moving Parties*

[90]    The moving parties submit that the trial judge's decision presents important issues of first impression in the cross-border insolvency context. They submit that, without appellate intervention, there is a risk substantive consolidation will become far more widely available. In addition, they say that it creates significant uncertainty on the separation of subsidiaries within a corporate group and on the consequences of an insolvency proceeding on the rights of stakeholders, including creditors. In their submission, an appeal would permit this court to

clarify these issues.  Furthermore, the appeal would allow this court to clarify the proper interpretation and effect of *Sattva* on commercial agreements.

## *Analysis*

[91]   As discussed above, the moving parties have raised three main issues they say warrant leave – namely, substantive consolidation, the interpretation of the MRDA, and fairness. Of the three issues, the moving parties submit that the first two raise issues of significant interest to the practice.

[92]   We disagree.

[93]   The facts of this case are unique and exceptional. As we have already discussed, substantive consolidation is not engaged and so this case would not provide an opportunity for this court to provide guidance on that question. Nor does this case engage any issues that require any clarification on the application of *Sattva*. In short, granting leave would not provide an opportunity for this court to provide guidance on legal issues of significance to the practice.

## (c)    Significance of Issues to the Action

## *Position of Moving Parties*

[94]   The moving parties state that the allocation of the Lockbox Funds is the overriding issue in the *CCAA* proceedings.

*Analysis*

[95]   We accept that the allocation of the Lockbox Funds is a significant issue in this *CCAA* proceeding. That said, we are of the view that, standing alone, this factor is insufficient to warrant granting leave to appeal.   To perhaps state the obvious, typically parties tend to seek leave to appeal a decision that is of significance to an action.

**(d)    Progress of Proceedings**

*Position of Moving Parties*

[96]   The moving parties submit that the proposed appeal will not unduly hinder the progress of Nortel's *CCAA* proceeding.   They state that many steps and issues remain before creditor distributions can be made, including the determination of claims.   In addition, the allocation decisions of the Canadian court and the U.S. court must both be final orders in their respective jurisdictions before funds can be released from escrow.   It is argued that this court should grant leave to ensure that it maintains the ability to address any issues should Judge Gross's decision be varied or overturned on appeal.

[97]   The moving parties also make the point that there are no operating businesses that are in the process of restructuring because the Nortel businesses and assets have been liquidated and the joint trial was a "stand-alone component" of the *CCAA* proceeding.   Thus, it is argued that the traditional

concerns leading courts to "sparingly" grant leave to appeal in *CCAA* proceedings are not applicable here. In fact, the Official Committee submits that where an appeal would have existed as of right under the *BIA*, it is nonsensical to deny leave here simply because Nortel's liquidation proceeded under the *CCAA*.

### Analysis

[98]   This brings us to the final consideration: progress.  Repeatedly, the parties have been encouraged to resolve their differences, but without success. For instance, in a 2011 decision, *In re Nortel Networks, Inc.*, 669 F.3d 128, the Third Circuit Court of Appeals admonished the parties at p. 143:

> We are concerned that the attorneys representing the respective sparring parties may be focusing on some of the technical differences governing bankruptcy in the various jurisdictions without considering that there are real live individuals who will ultimately be affected by the decisions being made in the courtrooms. It appears that the largest claimants are pension funds in the U.K. and the United States, representing pensioners who are undoubtedly dependent, or who will become dependent, on their pensions. They are the Pawns in the moves being made by the Knights and the Rooks.

> Mediation, or continuation of whatever mediation is ongoing, by the parties in good faith is needed to resolve the differences. [Footnote omitted.]

[99]   Former Chief Justice Winkler also encouraged the parties to find a way to resolve this matter. In April 2012, he warned about the "prospect of additional delays and the potential for conflicting decisions" if the parties failed to reach a negotiated settlement.

[100]  Numerous mediations have been ordered but have failed.

[101]   In the Annual Review of Insolvency, Kevin P. McElcheran described *Nortel* as a case that has become "an emblem of waste and dysfunction in a system intended to foster consensus based solutions to commercial insolvency", noting that it has "eclipsed all previous Canadian cases in both duration and expense": 2014 Ann. Rev. Insolv. L. 24 at p. 24. And that was in 2014.

[102] Consistent allocation decisions have been issued by the Canadian and U.S. courts.  A further appeal proceeding in Canada would achieve nothing but more delay, greater expense, and an erosion of creditor recoveries.  There are asymmetric appeal routes in Canada and the U.S. However, we do not accept that the separate appeal proceedings in the U.S. somehow diminish the need to bring these proceedings in Canada to a conclusion. In our view, any additional step is a barrier to progress.

[103] Furthermore, the fact that this case is a liquidation and not a restructuring does not render delay immaterial, where so many individuals and businesses continue to await a resolution of this proceeding. The potential of an interim distribution, remote or otherwise, does not alter this reality. In addition, the parties acceded to a liquidation under the *CCAA*.  They cannot now reject the parameters of that statute, which requires leave to appeal, and where the jurisprudence on the applicable test is settled and long-standing.

## E.    STANDING ISSUE

[104] There is the additional issue of the standing of the Nortel Trade Claims Consortium that needs to be addressed.  It represents a group of creditors that collectively holds over $130 million in unsecured claims against NNI and certain of its U.S. affiliates. It includes institutional investors and former Nortel employees. Unlike other U.S. creditors, the Consortium's sole recourse is against the U.S. Debtors' estates.

[105]  At trial, the Consortium was represented by the Official Committee. It says that, given the trial decision, its interests may diverge from those of the rest of the Official Committee. It submits that the Consortium should have standing to seek leave to appeal. It relies on the court's jurisdiction to grant leave to appeal, pursuant to s. 13 of the *CCAA*, to "any person dissatisfied with an order or a decision made under [the] Act". It argues that the trial judge exceeded his jurisdiction by deciding matters that are properly for the U.S. court to decide.

[106]  It is unnecessary to decide the standing issue. Even if the Consortium had standing, we would dismiss its leave motion for the same reasons we have dismissed the other leave motions. In any event, we see no merit in its argument that the trial judge exceeded his jurisdiction.

## F.    DISPOSITION

[107] In conclusion, we are not persuaded that the test for leave to appeal has been met.  For these reasons, we dismiss all of the motions for leave to appeal.


Released:

MAY  – 3 2016