## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
-------------------------------------------------------- x
                                                         :
In re                                                    :      Chapter 11
                                                         :
Nortel Networks Inc., et al.,¹                           :      Case No. 09-10138 (KG)
                                                         :
                                                         :      (Jointly Administered)
                                                         :
                                                         :      Re: D.I. 16638, 16759
                                Debtors.                 :
                                                         :
-------------------------------------------------------- x
```

**RESPONSE OF THE *AD HOC* GROUP OF BONDHOLDERS IN OPPOSITION TO THE MOTION AND SUPPLEMENT OF LIQUIDITY SOLUTIONS, INC. FOR ENTRY OF ORDER (A) AUTHORIZING AND DIRECTING DEBTOR, NORTEL NETWORKS, INC., TO MAKE INTERIM DISTRIBUTIONS ON ALLOWED ADMINISTRATIVE, PRIORITY AND UNSECURED CLAIMS OR (B) CONVERTING CASES TO CHAPTER 7 PURSUANT TO SECTION 1112(b) OF THE BANKRUPTCY CODE**

The *ad hoc* group of bondholders (the "Bondholder Group")[2] files this response

(the "Response") in opposition to the motion (the "Motion") of Liquidity Solutions, Inc. ("LSI")

for an order (a) authorizing and directing debtor, Nortel Networks Inc. to make interim

distributions on allowed administrative, priority and unsecured claims or (b) converting these

cases to chapter 7 pursuant to section 1112(b) of the Bankruptcy Code (the "Code") [D.I. 16638]

---

[1]  The Debtors in the chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).

[2]  The Bondholder Group consists of entities ("Bondholders") that hold certain bonds ("Bonds") issued or guaranteed by Nortel Networks Corporation ("NNC" and, together with its affiliates worldwide, "Nortel"), Nortel Networks Limited ("NNL" and together with NNC and certain of their subsidiaries, the "Canadian Debtors"), Nortel Networks Inc. ("NNI"), and Nortel Networks Capital Corporation ("NNCC" and, together with NNI and certain of its subsidiaries, the "U.S. Debtors").

and the related Supplement to the Motion subsequently filed by LSI (the "Supplement") [D.I. 16759].[3]  In support of this Response, the Bondholder Group respectfully states as follows:

## PRELIMINARY STATEMENT

1.      The Bondholders, like LSI and all other creditors of NNI, have been anxiously awaiting payment on their claims for years and would therefore welcome interim distributions under appropriate circumstances.   LSI's proposal, however, is ill-conceived because it is premised on the flawed notion that Bondholders are entitled to, at most, a deficiency claim against NNI's estate equal to the amount of any shortfall in Bondholders' recoveries from NNL and NNC.  When corrected for this specious contention, the simple reality is that the interim distribution from cash on hand sought in LSI's Supplement would be too small to justify the expense and distraction after reserves are taken for unresolved administrative and unsecured claims and distributions are made to the full creditor body.  While the Bondholders, as the largest creditors of the U.S. Debtors' estates, want distributions to happen as quickly as possible, making an interim distribution at this time makes no sense.

2.      The intended purpose of LSI's proposal appears to be a ruling from the Court that the Bondholders are not entitled to a distribution from NNI for the full amount of their guarantee claims, thus permitting distribution to other creditors without reserves.  At this stage of these proceedings, that argument is frivolous.   The Court already ruled at least twice that the Bondholders are entitled to recover on their guarantee claims against NNI in their *full amount*. The most recent of these orders was the Reconsideration Decision (defined *infra*), which granted the Bondholders' request for clarification—thus confirming that it was always the Court's intent—that the Allocation Trial Opinion [D.I. 15544] (the "Allocation Opinion") *does not* limit

---

[3]   Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Motion or the Supplement.

them to a deficiency claim against NNI on the guarantee. As the Court recognized in that decision, such a result would be at odds with (i) the Court's previous order allowing Bondholders to assert the full amount of their claims against NNI [D.I. 14949] (the "9019 Order") and (ii) the long-standing Supreme Court precedent established in *Ivanhoe*.[4]   Curiously, LSI nowhere references the Reconsideration Decision, the 9019 Order, or *Ivanhoe* in its Motion or Supplement, even though each individually is dispositive of the argument upon which LSI's interim distribution demand is premised.

## RELEVANT BACKGROUND

3.      On January 14, 2009, the U.S. Debtors in these cases filed petitions under chapter 11 of the Bankruptcy Code.  Other Nortel entities around the world—in Canada, as well as in Europe, the Middle East, and Africa (collectively, "EMEA")—made similar filings in their respective jurisdictions.  Subsequently, these various debtors jointly sold their assets on an enterprise-wide basis (the "Asset Sales"), ultimately generating approximately $7.3 billion in proceeds (the "Sales Proceeds"), which were placed in an escrow account (the "Lockbox"). After repeated attempts to negotiate a consensual allocation of the Sales Proceeds among the debtor estates failed, on May 12, 2014, this Court and the Ontario Superior Court of Justice (Commercial List) (the "Canadian Court") commenced a six-week joint trial (the "Allocation Trial") to decide this question.

4.      After the Allocation Trial concluded, both the Court and the Canadian Court scheduled a joint hearing to consider a dispute relating to the Bondholders' entitlement to post-petition interest from the U.S. and Canadian estates.  On July 23, 2014, certain Bondholders (the "Supporting Bondholders") and the U.S. Debtors entered into a settlement agreement [D.I. 14076-2] (the "Settlement Agreement") that:  (i) fixed the amount of Bondholders' guarantee

---

[4]  *Ivanhoe Building & Loan Association v. Orr*, 295 U.S. 243 (1935).

claims against NNI at the total outstanding principal and prepetition interest amounts due on the Bonds; and (ii) set a cap on the accrual of post-petition interest on such claims.  Settlement Agreement §§ 2.1, 2.2, 3.1.  On November 4 and 5, 2014, after briefing and discovery, the Court held a hearing to determine whether or not to approve the Settlement Agreement.

5.      On December 18, 2014, the Court issued the 9019 Order and related opinion approving the Settlement Agreement.  In relevant part, the 9019 Order held both that the "Settlement Agreement, including, without limitation, the PPI Settlement Amount ***and the allowance of the Bondholder claims***, and this Order shall be binding upon the Debtors, the Bondholders, the Indenture Trustee, and all parties-in-interest in these Chapter 11 Cases . . ." and that "[t]he Settlement Agreement shall constitute a ***full and final settlement*** of . . . (ii) the allowed claims for outstanding principal obligations and accrued prepetition interest obligations[.]"  9019 Order ¶¶ 4, 5 (emphasis added).  Specifically, the Bondholders' claims against NNI were allowed in the amount of $3,934,521,442.  Settlement Agreement, Schedule A.[5]

6.      The Monitor subsequently appealed the 9019 Order, and that appeal is currently pending before the United States District Court for the District of Delaware.  In that appeal, the Monitor has challenged ***only*** the Court's decision to approve the portion of the settlement that determined the rate at which post-petition interest would accrue in respect of the Bondholders' allowed claims.  *Ernst & Young Inc. v. Nortel Networks Inc.*, 14-cv-00104-LPS, D.I. 15 (D. Del. Mar. 30, 2015).  The Monitor has not challenged the Court's allowance of the Bondholders' claims against NNI, and no other party filed an appeal of any aspect of the 9019 Order, making the allowance component of the 9019 Order final and not subject to appeal.

---

[5]  Bonds issued by NNCC were not subject to the Settlement Agreement and were not determined in connection with the litigation that culminated in the 9019 Order.

7.      On May 12, 2015, the Bankruptcy Court issued its Allocation Order [D.I. 15545] and related Allocation Opinion, both of which included language that refers to the amount of the Bondholders' claims against NNI.  Specifically, paragraph 2(e) of the Allocation Order states:

> In determining the amount of the claims against the Debtor Estates [for purposes of implementing the pro rata allocation], a claim that can be made against more than one Debtor Estate can only be calculated and recognized once.  For example, the claims on Bonds are to be made on the Estate of the Issuer.  ***A claim for the shortfall can be recognized by the Estate that guaranteed the bond***, but that shortfall will not be taken into account in determining the claims against the Debtor Estates.

Allocation Order ¶ 2(e) (emphasis added).  The Bankruptcy Court used different language in the Allocation Opinion, stating that "for allocation purposes the Bondholder claims will be included only against the primary obligor, but the guarantees will be entitled to seek distribution from the appropriate Debtor of any deficiency resulting from the allocation."  Op. at 112.

8.      On May 26, 2015, several parties, including the Bondholder Group, moved the Court for reconsideration and/or clarification of the Allocation Opinion and Allocation Order.[6] The Bondholder Group's Reconsideration Motion addressed only a single, discrete issue: whether the Bankruptcy Court's use of the word "shortfall" was intended to limit the amount of the Bondholders' guarantee claims against NNI for distribution purposes, after the allocation of the Sales Proceeds to the Nortel Debtors' estates has occurred.  Reconsideration Motion ¶ 1.  The Reconsideration Motion argued that the Bankruptcy Court could not have intended to so limit the Bondholders' claims for three reasons, each of which was independently sufficient to support the relief sought:  (i) such a limitation would conflict with the 9019 Order, which previously granted the Supporting Bondholders allowed claims against NNI in an amount equal to the full outstanding principal amount of their bonds, plus accrued prepetition interest; (ii) such a

---

[6]  *See, e.g.*, *Ad Hoc* Group of Bondholders' Motion for Reconsideration of Opinion and Order Allocating Proceeds from Asset Sales of Nortel Networks, Inc., its Affiliates and Subsidiaries [D.I. 15612] (the "Reconsideration Motion").

limitation would be inconsistent with *Ivanhoe* and its progeny, which establish that a creditor is entitled to assert the full amount of its claim against a debtor-guarantor, regardless of any recovery received from the primary obligor; and (iii) the Bankruptcy Court itself had stated that the Allocation Opinion and Allocation Order did not purport to (and did not) address distribution issues, including the size of allowed claims against each estate.

9.      On July 6, 2015, the Bankruptcy Court issued its Memorandum Order on Motions for Reconsideration (the "<u>Reconsideration Decision</u>" and, together with the Allocation Opinion and Allocation Order, the "<u>Allocation Decision</u>") denying much of the relief sought by other parties, but granting the Bondholder Group's request for clarification, stating that it did not intend to increase or decrease the size of the Bondholders' claims.  According to the Bankruptcy Court, such a result "would be inconsistent with the Court's Opinion and Order approving the settlement agreement between the U.S. Debtors and the Bondholders (D.I. Nos. 14949 and 14950) and *Ivanhoe Building & Loan Association v. Orr*, 295 U.S. 243 (1935)." Reconsideration Decision at 4.

10.     LSI did not appear or submit any briefing in connection with the motion to approve the Settlement Agreement or the Allocation Trial (including the motions for reconsideration).

11.     On July 17, 2015, the Bondholder Group and other parties to the Allocation Trial timely filed notices of appeal of the Allocation Decision.  Oral argument on the parties' appeal was held on April 5, 2016 before Chief Judge Leonard P. Stark of the United States District Court for the District of Delaware.

<u>**RESPONSE**</u>

## I.    THE COURT SHOULD NOT ORDER INTERIM DISTRIBUTIONS AS PROPOSED IN LSI'S MOTION

### A.    Limiting The Bondholder Guarantee Claims As Proposed In LSI's Motion Would Violate This Court's Prior Orders And Supreme Court Precedent

12.     LSI's proposal for interim distributions depends in large part on its erroneous argument that "under the Allocation Opinion, any Bond guarantee claims against NNI's estate are, at best, limited to deficiency claims to the extent the Bonds are not paid in full from the Canadian debtors' estates."  Mot. ¶ 36; Supp. ¶ 5 n.5.  Astonishingly, LSI goes on to assert that, "pursuant to the Allocation Opinion, NNI may not be liable for ***any*** Bond guarantee claims" because "no value is allocated to NNI's estate with respect to or payable on account of such claims."  Supp. ¶ 5 (emphasis added); *see also* Mot. ¶ 5 ("the Bonds may not have claims against NNI's estate at all, as no value is allocated to NNI's estate with respect to or payable on account of such Bond claims.").  These arguments are frivolous in that they ignore entirely this Court's 9019 Order and clarification of the Allocation Decision in the Reconsideration Decision.

13.     In issuing the Allocation Opinion and Allocation Order, the Bankruptcy Court explicitly reaffirmed the Bondholders' rights to assert both a primary claim against each issuer and guarantee claim against each guarantor, stating that "the claims on Bonds are to be made on the Estate of the Issuer.  A claim for the shortfall can be recognized by the Estate that guaranteed the bond[.]"  Allocation Order ¶ 2(e).  As discussed *supra*, to avoid ambiguity and be certain the Bankruptcy Court did not intend to limit its claims in any way, the Bondholders sought clarification of the Allocation Decision.  The Bankruptcy Court granted the Bondholders' motion, stating clearly that nothing in its Allocation Decision was intended to revisit the 9019 Order, which already allowed the Bondholders' guarantee claims in full, or to conflict with Supreme Court precedent.  Reconsideration Decision at 4.  It is thus law of the case—and now

- 7 -

final and not subject to appeal—that the Bondholders may assert the full amount of their claims against both the Nortel Bond issuers and guarantors.[7]

14.      Indeed, this result is compelled by the decision that the Supreme Court issued eighty years ago in *Ivanhoe*.   In that case, the Supreme Court held that a creditor holding a guarantee may assert the full amount of its claim against both the primary obligor and any guarantors, even if the creditor has already received a partial recovery from the primary obligor. *See generally Nuveen Mun. Trust v. Withumsmith Brown, P.C.*, 692 F.3d 283, 295 (3d Cir. 2012) (recognizing that *Ivanhoe* "provides that a creditor may file a proof of claim for the total amount it is owed by a debtor even if it has received or may recover all or a portion of that amount from a non-debtor.").   In the context of Nortel's insolvency proceedings, this means that Bondholders have the unequivocal right to assert the full amount of their primary claims against the estates of all Nortel Bond obligors, including NNL and NNC, and the full amount of their guarantee claims against the estates of all Nortel Bond guarantors, including NNI.

15.      Notwithstanding this binding precedent, LSI claims that "[t]he validity and amount of the Bond guarantee claims can be determined at a later stage by this Court."   (Mot. ¶ 36; Supp. ¶ 6).   Again, however, this simply ignores the 9019 Order, which conclusively ordered five months before the Allocation Decision, consistent with *Ivanhoe*, that Bondholders have "allowed claims for outstanding principal obligations and accrued prepetition interest obligations" against NNI in the amount of $3,934,521,442.  9019 Order ¶ 5, Schedule A.[8]

---

[7]   *See Am. Civil Liberties Union v. Mukasey*, 534 F.3d 181, 187 (3d Cir. 2008) ("[u]nder the law-of-the-case doctrine, 'when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'") (quoting *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816 (1988)).

[8]   Indeed, the allowance of the Bondholders' claims in their full amount is fully consistent with the provisions of the indentures governing the Bonds.  *See, e.g.*, TR40050 at BNY-00586 (Bank of New York Mellon Proof of Claim and attached Indenture, dated July 5, 2006) (stating that NNI "agrees that its obligations hereunder shall be as if it were the principal debtor and not merely surety, and shall be absolute and unconditional[.]").

### B.     It Is Not Yet Appropriate To Make Interim Distributions To Unsecured Creditors

16.     When the specious arguments about proposed improper treatment of the Bondholders' guarantee claims are disposed of, it becomes obvious that the Motion must fail because it is premature.  In its Supplement, LSI seeks an interim distribution of "not less than $318 million on account of NNI's allowed unsecured claims," claiming the Court has "both the authority and justification" to make such a distribution.[9]  Supp. ¶¶ 4, 8.  Even assuming the Court could compel such interim distributions, however, it is simply not appropriate to do so at this time.

17.     In order for the U.S. Debtors to make distributions to unsecured creditors, they would have to take adequate reserves for the various administrative and priority claims that have been asserted against them as well as to ensure that they have adequate cash available to satisfy administrative claims that could arise during the course of these cases.  Once those administrative reserves are accounted for, it is likely that the cash remaining to distribute to unsecured creditors will be far less than $318 million and will have to be distributed to a class of unsecured claims, with reserves, that greatly exceeds the $4 billion guarantee claims of the Bondholders.  As such, the distributions likely would be only pennies on the dollar for each claimant, and may not be worth the expense and distraction of granting this motion.  Under such circumstances, interim distributions are not yet appropriate.

### CONCLUSION

For the reasons set forth herein, the Bondholder Group respectfully requests that the Court deny the Motion and Supplement.

---

[9]  By its Supplement, LSI agreed to bifurcate the relief sought in its Motion, effectively adjourning its requests for interim distributions of the Lockbox funds and conversion of these cases to chapter 7.  Supp. ¶ 3.  The Bondholder Group reserves its right to object to those adjourned requests for relief at the appropriate time.

- 9 -

Dated:  May 13, 2016
   Wilmington, Delaware

        PACHULSKI STANG ZIEHL & JONES LLP

        /s/ *Peter J. Keane*
        Laura Davis Jones (No. 2436)
        Peter J. Keane (No. 5503)
        919 N. Market Street, 17th Floor
        PO Box 8705
        Wilmington, Delaware 19899-8705 (Courier 19801)
        Telephone:  (302) 652-4100
        Facsimile:  (302) 652-4400

        -and-

        MILBANK, TWEED, HADLEY & MᶜCLOY LLP
        Dennis F. Dunne
        Andrew M. Leblanc
        Atara Miller
        28 Liberty Street
        New York, New York 10005-1413
        Telephone:  (212) 530-5000
        Facsimile:  (212) 530-5219

        *Attorneys for Ad Hoc Group of Bondholders*

DOCS_DE:207173.1 61026/001