UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ----------------------------------------------------------x | Chapter 11 |
| *In re* : | Case No. 09-10138 (KG) |
| : | (Jointly Administered) |
| **NORTEL NETWORKS, INC., <u>et al.</u>,** : | |
| : | Hearing Date: May 24, 2016 |
| Debtors.¹ : | Related ECF Nos.: 16638, 16759 |
| ----------------------------------------------------------x | |

**LIMITED OBJECTION OF SOLUS ALTERNATIVE ASSET MANAGEMENT LP AND POINTSTATE CAPITAL LP TO MOTION OF LIQUIDITY SOLUTIONS INC. FOR ENTRY OF ORDER (A) AUTHORIZING AND DIRECTING DEBTOR, NORTEL NETWORKS INC., TO MAKE INTERIM DISTRIBUTIONS ON ALLOWED ADMINISTRATIVE, PRIORITY AND UNSECURED CLAIMS OR (B) CONVERTING CASES TO CHAPTER 7 PURSUANT TO SECTION 1112(B) OF BANKRUPTCY CODE**

Solus Alternative Asset Management LP and PointState Capital LP (collectively, the "NNCC Noteholders"), holders of the fixed rate senior notes due June 15, 2026 (the "7.875% Notes") issued pursuant to an Indenture dated February 15, 1996 by Nortel Networks Capital Corporation ("NNCC"), submit this limited objection to the Motion Of Liquidity Solutions Inc. ("LSI") For Entry Of Order (A) Authorizing And Directing Debtor, Nortel Networks, Inc., To Make Interim Distributions On Allowed Administrative, Priority And Unsecured Claims Or (B) Converting Cases To Chapter 7 Pursuant To Section 1112(b) Of Bankruptcy Code [ECF No. 16638] (as supplemented by ECF No. 16759, the "LSI Motion") and, in support thereof, respectfully state as follows.

---

[1] The Debtors, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769),Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortea Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).

1

**LIMITED OBJECTION**

1. While the prospect of receiving an interim distribution has undeniable appeal, the inevitable consequences militate against it. Litigation over appropriate reserve levels and allowed claim amounts will ensue—particularly with respect to general unsecured claims. For example, LSI "believes that, pursuant to the Allocation Opinion, NNI may not be liable for the Bond guaranty claims."[2] Understandably, that assertion will be contested, as will disagreements over the appropriate reserve amounts for those guaranty claims.

2. The NNCC Noteholders, whose claims are entitled to substantially better treatment than those of the holders of Cross-Over Bonds, anticipate the same level of debate with respect to the Support Agreement Claim (as defined below). Notably, the 7.875% Notes can look to *four* different sources to fund distributions. ***First,*** pursuant to the Allocation Decision,[3] NNCC will receive its allocated portion of the lock-box proceeds based on the claims asserted against the NNCC estate by, inter alia, the NNCC Noteholders. ***Second***, NNCC is a special purpose financing vehicle that issued the 7.875% Notes and immediately lent the proceeds of those notes to Nortel Networks Inc. ("NNI") under a Revolving Loan Agreement dated as of June 15, 2008 (the "Revolving Loan Agreement") with NNI as Borrower and NNCC as Lender. NNCC has an allowed and undisputed intercompany claim against NNI under the Revolving

---

[2] See Supp. ¶ 5 & n. 5 ("LSI believes that, pursuant to the Allocation Opinion, NNI may not be liable for any Bond guarantee claims. Because Bond claims are only counted against the Canadian Debtors' estates (rather than NNI's estate) for purposes of allocating the $7.3 billion of sales proceeds, NNI's estate is not allocated *any* proceeds for distribution to NNI's creditors on account of the approximately $4 billion of claims stemming from NNI's guarantee of the Bonds. LSI respectfully submits that if no value is allocated to NNI's estate with respect to or payable on account of such Bond claims (i.e., the 'numerator' for creditor recovery purposes), such Bond claims should also not be taken into account or given effect when determining the NNI claims pool (i.e., the 'denominator' for creditor recovery purposes). NNI's other unsecured claims, primarily consisting of trade debt and employee claims, do not have similar impediments to recovery now …. As a result, among other things, any Bond guaranty claims against NNI's estate are, at best, limited to claims to the extent the Bonds are not paid in full from the Canadian debtors' estates."); at ¶ 6 ("In any event, the validity and amount of the Bond guarantee claims as against NNI can be determined at a later stage by this Court.").

[3] In re Nortel Networks, Inc., 532 B.R. 494 (Bankr. D. Del. 2015) (the "Allocation Decision").

Loan Agreement in the amount of $147,634,914.66 (the "Intercompany Loan Claim").[4]  **Third,** NNI and NNCC entered into the Support Agreement in favor of NNCC dated as of February 15, 1996 (the "Support Agreement," and NNCC's claim thereunder, the "Support Agreement Claim") in connection with NNCC's issuance of the 7.875% Notes.[5]  The Support Agreement requires NNI to ensure NNCC's solvency at all times.  NNI's obligations under the Support Agreement are not fixed in time and instead continue post-petition until all liabilities, including the 7.875% Notes, are repaid in full.  **Fourth,** the 7.875% Notes have a separate guaranty of payment from Nortel Networks Limited ("NNL").  Together with NNCC's lock-box allocation, NNCC's recovery on the Intercompany Loan and Support Agreement Claims against NNI will render NNCC solvent—unlike every other U.S. and Canadian debtor.

3.  In 2014, the NNCC Noteholders filed the Estimation Motion,[6] requesting the Court to estimate the Support Agreement Claim and to direct NNI to allow the Intercompany Loan Claim.  After NNI agreed to amend its schedules to allow the Intercompany Loan Claim, the NNCC Noteholders agreed to adjourn the balance of the Estimation Motion, including the portion seeking an Order estimating the Support Agreement Claim, to a date to be determined.  If the LSI Motion is granted, the NNCC Noteholders will resubmit the Estimation Motion for decision—possibly adding to the anticipated litigation over reserves and allowed claim amounts.

---

[4]   See Amended Schedules of Nortel Networks, Inc., dated December 10, 2014 [Dkt. No. 14918].

[5]   The Support Agreement states specifically that "[a]t all times prior to the termination of this Agreement, [NNI] shall cause [NNCC] to have and to maintain a net worth of at least $1.00. For purposes hereof, 'net worth' shall mean a sum equal to [NNCC's] tangible net worth, as determined in accordance with generally accepted accounting principles." (Support Agreement § 2).

[6]   See Motion Of Solus Alternative Asset Management LP And Macquarie Capital (USA) Inc. For Entry Of An Order, Pursuant To 11 U.S.C. §§ 105(a), 502(c), 521, Fed. R. Bankr. P. 1009(a) And L.R. Bankr. P. 1009-2, Estimating Nortel Networks Capital Corporation's Support Agreement Claim And Directing NNI To Amend Its Schedules With Respect To Intercompany Loan Claim [ECF. No. 14639] (the "Estimation Motion"); Second Amended Notice Of Motion Of Solus Alternative Asset Management LP And Macqaurie Capital (USA) Inc. For Entry Of An Order, Pursuant To 11 U.S.C. §§ 105(a), 502(c), 521(a), Fed. R. Bankr. P. 1009(a) And L.R. Bankr. P. 1009-2, Estimating Nortel Networks Capital Corporation's Support Agreement Claim And Directing NNI To Amend Its Schedules With Respect To Intercompany Loan Claim [ECF No. 14886] (adjourning Estimation Motion to date to be determined).

4. Moreover, while some form of interim distribution might otherwise be appropriate with respect to allowed administrative expense and priority claims, given the size of the unliquidated administrative and general unsecured claims pools, no meaningful distribution can be made at this time. LSI requests that the Court direct NNI to make a distribution of $591 million of cash-on-hand, (a) $173 million of which will be distributed to the holders of allowed administrative expense and priority claims and (b) $100 million of which will be held in reserve for operations. See Mot. ¶ 4. LSI assumes that leaves $318 million for distribution. But LSI fails to appreciate that the appropriate reserves must be established for some yet-to-be determined amount of the Support Agreement Claim as well as the billions of dollars in general unsecured claims. When those reserves are factored into the calculation, there literally will be no funds remaining for distribution. So, even a de minimis distribution will require the resolution of complex claim disputes.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

5. Accordingly, the LSI Motion should be denied.

Dated: May 13, 2016

Respectfully submitted,

*/s/ Joanne P. Pinckney*
Joanne P. Pinckney (DE No. 3344)

**PINCKNEY, URBAN, WEIDINGER & JOYCE LLC**
(302) 504 1497 (Telephone)
3711 Kennett Pike, Suite 210, Greenville, DE 19807

-and-

James C. Tecce
**QUINN, EMANUEL, URQUHART & SULLIVAN LLP**
52 Madison Avenue, 22nd Floor
(212) 849-7000 (Telephone)
New York, New York  10010

*Counsel to Solus Alternative Asset Management LP and PointState Capital LP*