# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| *In re* <br><br> Nortel Networks Inc., *et al.*,[1] <br><br><br><br><br><br> Debtors. | Chapter 11 <br><br> Case No. 09-10138 (KG) <br><br> (Jointly Administered) <br><br> **Re: D.I. 16638, 16759, 16808** |

**RESPONSE AND RESERVATION OF RIGHTS OF THE TRADE CLAIMS CONSORTIUM OF NORTEL NETWORKS INC., *ET AL.* WITH RESPECT TO RESPONSE OF THE *AD HOC* GROUP OF BONDHOLDERS IN OPPOSITION TO THE MOTION AND SUPPLEMENT OF LIQUIDITY SOLUTIONS, INC. FOR ENTRY OF ORDER (A) AUTHORIZING AND DIRECTING DEBTOR, NORTEL NETWORKS, INC., TO MAKE INTERIM DISTRIBUTIONS ON ALLOWED ADMINISTRATIVE, PRIORITY AND UNSECURED CLAIMS OR (B) CONVERTING CASES TO CHAPTER 7 PURSUANT TO SECTION 1112(B) OF THE BANKRUPTCY CODE**

The Nortel Trade Claims Consortium (the "Consortium")[2], as holders of certain U.S. Trade Claims against Nortel Networks Inc. ("NNI") and certain of its U.S. affiliates, as debtors and debtors-in-possession (collectively, the "U.S. Debtors"), by and through its undersigned counsel, hereby submits this response and reservation of rights (this "Consortium Response") in response to the *Response of the Ad Hoc Group of Bondholders in Opposition to the Motion and Supplement of Liquidity Solutions, Inc. for Entry of Order (A) Authorizing and Directing Debtor,*

---

[1] The Debtors in the chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).

[2] The Consortium represents a group of creditors holding over $125 million in unsecured (non-funded debt) claims, including but not limited to trade (supplier) claims and employee severance and pension claims(all such types of claims in these Cases, the "U.S. Trade Claims") against the U.S. Debtors.

*Nortel Networks, Inc., to Make Interim Distributions on Allowed Administrative, Priority and Unsecured Claims or (B) Converting Cases to Chapter 7 Pursuant to Section 1112(b) of the Bankruptcy Code* [D.I. 16808] (the "Bondholder Group Response" or "Response"), which was filed by the *ad hoc* group of bondholders (the "Bondholder Group")[3] in opposition to (i) the *Motion of Liquidity Solutions, Inc. for Entry of Order (A) Authorizing and Directing Debtor, Nortel Networks Inc., To Make Interim Distributions On Allowed Administrative, Priority and Unsecured Claims or (B) Converting Cases to Chapter 7 Pursuant to Section 1112(b) of the Bankruptcy Code* [D.I. 16638] (the "LSI Motion") and (ii) the *Supplement to Motion of Liquidity Solutions, Inc. for Entry of Order (A) Authorizing and Directing Debtor, Nortel Networks Inc., To Make Interim Distributions On Allowed Administrative, Priority and Unsecured Claims or (B) Converting Cases to Chapter 7 Pursuant to Section 1112(b) of the Bankruptcy Code* [D.I. 16759] (the "LSI Supplement") filed by Liquidity Solutions, Inc. ("LSI"). In support hereof, the Consortium respectfully states as follows:

**PRELIMINARY STATEMENT**

1. The Bondholders' mantra appears to be: continue to repeat an assertion and that assertion becomes fact. Throughout their Response, the Bondholders declare over and over that they are entitled to a distribution from the U.S. Debtors under an eventual U.S. plan in the full amount of their nearly $4.0 billion in guarantee claims on account of Bonds issued by NNC and/or NNL but guaranteed by NNI (the "Bond Guarantee Claims"). What is more, the Bondholders claim the mantle of this Court in making these declarations. These assertions, which are the byproduct of selective citation and mischaracterizations of the procedural record in these Cases, are meritless. Accordingly, although the Consortium has maintained since the

---

[3] The Bondholder Group consists of entities ("Bondholders") that hold certain bonds ("Bonds") issued or guaranteed by NNC, NNL, NNI, and NNCC.

outset of the ongoing Appeals (as defined below) that the assertion of the Bond Guarantee Claims against the U.S. Debtors is an inchoate issue for later determination, the Consortium is compelled to respond to the Bondholders' most recent filing.

2. The Bondholders cite to this Court's July 2015 Reconsideration Decision and December 2014 9019 Order (each as defined below) as support for their claim that "the Bondholders are entitled to recover on their guarantee claims against NNI in their full amount." Response, ¶ 2. The Bondholders are wrong on both counts. First, the 9019 Order was issued in the context of a tertiary dispute over post-petition interest, six months before the Bankruptcy Court's *de facto* substantive consolidation of these Cases, and with the working assumption at that time that the U.S. Debtors were expected to be solvent. The 9019 Order and associated Settlement Agreement provided that if the U.S. Debtors were solvent, the parties thereto would stipulate to the allowance of the Bond Guarantee Claims against the U.S. Debtors (for purposes of computing post-petition interest only), and that such post-petition interest would be capped at a ceiling of $1.01 billion. Fast-forward seventeen months to present day and, based on the Allocation Decision (which is on appeal), the U.S. Debtors are no longer expected to be solvent. This is because the Allocation Decision allocates the Sale Proceeds in proportion to the claims filed against each of the Nortel Debtors, but only the primary obligor and not the guarantor receives an allocation of value on account of such claims. Unless the Allocation Decision is overturned, no Sale Proceeds will be allocated to the U.S. Debtors on account of the $4.0 billion in Bond Guarantee Claims, but the U.S. Debtors nevertheless will remain liable to pay these claims. It is therefore highly unlikely that the U.S. Debtors will be able to pay any post-petition interest to the Bondholders. As a result, the significance (if any) of the 9019 Order is marginal at best, as it conditionally allowed post-petition interest claims that are now understood not to exist

3

(at least based upon anticipated recoveries under the Allocation Decision). In any event, the 9019 Order is entirely irrelevant to the claims resolution process of the U.S. Debtors under an eventual U.S. plan.

3. <u>Second</u>, the Bondholders' attempt to make more out of one noncontroversial clarification made by this Court in its Reconsideration Order fails. Responding to a request to clarify a provision in its Allocation Order, the Court stated, simply enough, that it "did not intend such a result which would be inconsistent with . . . *Ivanhoe Building & Loan Association v. Orr*, 295 U.S. 243 (1935)." Reconsideration Order at 4. In their Response, the Bondholders attempt to alchemize this neutral observation into a Court-ordered entitlement to assert their full $4.0 billion in Bond Guarantee Claims against the U.S. Debtors under a U.S. plan. As previously briefed by the Consortium, this is a bridge too far. Logically, from the neutral statement that "X" (the Allocation Decision) does not override "Y" (the <u>Ivanhoe</u> rule), it does not follow that "Y" necessarily applies. Furthermore, the Bondholders' creative interpretation of the Reconsideration Order vitiates this Court's Allocation Protocol, which expressly provides that the Court, as part of its Allocation Decision, did not intend to impact the claims reconciliation process at each Nortel estate.

4. At bottom, whether the Bondholders may assert the full $4.0 billion of Bond Guarantee Claims against the U.S. Debtors under a U.S. plan is an issue for another day that need not be addressed until plan time. The Bondholders appear to be the only party unwilling to acknowledge this reality. But merely repeating a purported "entitlement" to distributions on account of the Bond Guarantee Claims does not make it so. For the foregoing reasons, as more fully set forth herein, the Consortium expressly reserves all of its rights to object to the assertion of the Bond Guarantee Claims against the U.S. Debtors (including, without limitation, by

seeking reconsideration under Bankruptcy Code section 502(j)).

## RELEVANT BACKGROUND

5. On July 24, 2014, the Debtors filed the *Debtors' Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 Approving Settlement Agreement By and Among Nortel Networks Inc., The Supporting Bondholders, and the Bank of New York Mellon With Respect To The NNI Post-Petition Interest Dispute and Related Issues* [D.I. 14076] (the "9019 Motion"), in which the Debtors, the Supporting Bondholders, and certain other Parties sought Bankruptcy Court approval of a settlement agreement dated July 23, 2014 [D.I. 14076-2] (the "Settlement Agreement"). The stated purpose of the Settlement Agreement was to resolve "the rights of holders of the vast majority of Crossover Bond Claims filed against the Debtors to receive post-petition interest in consideration of their allowed claims against NNI." 9019 Motion, ¶ 1.[4]

6. On December 18, 2014, the Bankruptcy Court approved the 9019 Motion. See *Order Granting Debtors' Motion Pursuant to Bankruptcy Rule 9019 Approving Settlement Agreement By and Among Nortel Networks Inc., The Supporting Bondholders, and the Bank of New York Mellon With Respect to the NNI Post-Petition Interest Dispute and Related Issues* [D.I. 14950] (the "9019 Order"); *Opinion Regarding Debtors' Motion Pursuant to Bankruptcy Rule 9019 Approving Settlement Agreement By and Among Nortel Networks Inc., The Supporting Bondholders, and the Bank of New York Mellon With Respect to the NNI Post-Petition Interest Dispute and Related Issues* [D.I. 14949] (the "9019 Opinion"). The 9019 Order provides in relevant part that "[t]he Settlement Agreement shall constitute a full and final settlement of…the allowed claims for outstanding principal obligations and accrued prepetition interest obligations (each as set forth on Schedule A to the Settlement Agreement." 9019 Order, ¶ 5. The 9019

---

[4] Capitalized terms used but not defined herein shall have the meaning ascribed them in the 9019 Motion or the Response, as applicable.

Order further provides that "[n]othing in the Settlement Agreement or this Order shall constitute a settlement of the manner in which any funds available for distribution shall be allocated among the creditors of the Debtors in the event that less than the full amount of PPI can be paid to all creditors owed such amounts."  9019 Order, ¶ 7.

7. On May 12, 2015, the Bankruptcy Court issued its *Allocation Trial Opinion* [D.I. 15544] and related *Order* [D.I. 15545] (the "Opinion" and "Order," respectively).  In its Opinion, the Court adopted a "modified pro rata" allocation model (hereafter, "MPR").  Op. at 91.

8. On July 6, 2015, the Bankruptcy Court issued its *Memorandum Order on Motions for Reconsideration* [D.I. 15830] (the "Reconsideration Order," and together with the Opinion and Order, the "Allocation Decision").

9. On July 17, 2015, the U.S. Debtors, the UCC, the Bondholders, the PBGC, The Bank of New York Mellon (as Indenture Trustee), NNSA and the Consortium timely filed notices of appeal (the "Appeals") of the Allocation Decision.  Contingent or conditional cross appeals have been noticed by the Monitor and Canadian Debtors, the CCC, and the EMEA Debtors.  Oral argument on the Appeals was held on April 5, 2016 before Chief Judge Leonard P. Stark of the United States District Court for the District of Delaware (the "District Court").

10. On May 17, 2016, the District Court issued a Memorandum Opinion certifying the Appeals for direct appeal to the United States Court of Appeals for the Third Circuit.  As of this writing, the Third Circuit has not yet authorized the direct appeal.  A separate appeal process is underway in Canada.

11. LSI filed the LSI Motion and LSI Supplement on March 31, 2016 and April 25, 2016, respectively.  In brief, LSI seeks an Order from this Court (i) directing NNI to make an

6

interim distribution to NNI's creditors from NNI's cash-on-hand; (ii) directing the escrow agent holding the $7.3 billion in Sales Proceeds to distribute approximately $1.9 billion of such proceeds to NNI's allowed unsecured creditors; and (iii) alternatively, converting the Debtors' cases to chapter 7.  LSI Supplement, ¶ 1.  Additionally, LSI disputes that the Bondholders are entitled to assert the full $4.0 billion in Bond Guarantee Claims against the U.S. Debtors under a U.S. chapter 11 plan.  See LSI Motion, ¶ 36 ("Under the Allocation Opinion, any Bond guarantee claims against NNI's estate are, at best, limited to deficiency claims to the extent the Bonds are not paid in full from the Canadian debtors' estates.  Indeed, the Bonds may not have claims against NNI's estate at all, as no value is allocated to NNI's estate with respect to or payable on account of such Bond claims."); LSI Supplement, ¶5 n. 5 ("any Bond guarantee claims against NNI's estate are, at best, limited to claims to the extent the Bonds are not paid in full from the Canadian debtors' estates.").

12. In their Response, the Bondholders contend that it is "law of the case—and now final and not subject to appeal—that the Bondholders may assert the full amount of their claims against both the Nortel Bond issuers and guarantors."  Response, ¶13.  Further, citing to the Supreme Court's decision in Ivanhoe Building & Loan Assn. v. Orr, 295 U.S. 243 (1935), the Bondholders argue that the "Bondholders have the unequivocal right to assert the full amount of their primary claims against the estates of all Nortel Bond obligors, including NNL and NNC, and the full amount of their guarantee claims against the estates of all Nortel Bond guarantors, including NNI."  Response, ¶ 14.

7

**RESPONSE**

13. The Consortium responds herein to serial mischaracterizations contained in the Bondholders' Response, all of which seek to elevate a fiction—namely, that this Court has already blessed the assertion of $4.0 billion in Bond Guarantee Claims against the U.S. Debtors under a U.S. plan—to the status of historical fact. This Court, of course, has done no such thing. The Bondholders must not be allowed to achieve through subterfuge a result that (a) this Court most assuredly has not compelled (or even addressed), and (b) in any event is not procedurally proper for determination at this time.

14. In their Response, the Bondholders allege that this Court has "already ruled at least twice that the Bondholders are entitled to recover on their guarantee claims against NNI in their *full amount*." Response, ¶ 2 (emphasis in original). As support, the Bondholders point to this Court's Reconsideration Decision and 9019 Order. Response, ¶ 2. Without any analysis or elaboration, the Bondholders declare, in true *ipse dixit* fashion, that their combined reading of the Reconsideration Decision and 9019 Order means that "the Bondholders may assert the full amount of their claims against both the Nortel Bond issuers and guarantors." Response, ¶ 13. These self-serving proclamations are simply wrong, as discussed infra.

15. The Bondholders' interpretation of the historical record in these Cases finds no support in facts or law. In the first instance, whether the Bondholders may assert the Bond Guarantee Claims against the U.S. Debtors is an inchoate issue to be resolved at a later date when the U.S. Debtors submit a chapter 11 plan for Bankruptcy Court approval. In their haste, the Bondholders contend that "[i]n issuing the Allocation Opinion and Allocation Order, the Bankruptcy Court explicitly reaffirmed the Bondholders' rights to assert both a primary claim against each issuer and [a] guarantee claim against each guarantor." Response, ¶ 13. But the Bankruptcy Court did no such thing. Indeed, in the Allocation Opinion the Court made

8

abundantly clear that its Allocation Decision had no direct effect on specific creditor distributions or recoveries.  See Op. at 63 ("[T]he Court is not ordering a . . . distribution[.]").  Therefore, the Bondholders' contention that the Court has somehow "reaffirmed" a right to distribution is unmoored from reality—the Court has expressly disavowed any influence over the claims reconciliation process.

16.     As discussed at length in the Consortium's Reply Brief[5] filed with the District Court, the Bondholders read too much into the Bankruptcy Court's Reconsideration Decision, which contains the neutral statement that the Bankruptcy Court "***did not intend such a result which would be inconsistent with***" the Ivanhoe rule.  Reconsideration Order at 4 (emphasis added).  This noncontroversial statement speaks for itself: the Bankruptcy Court lacks authority to overturn Supreme Court precedent.  The Bondholders attempt to alchemize this one unremarkable statement as somehow standing for the joint propositions that (i) the Ivanhoe rule definitively applies to the Bonds, and (ii) because of Ivanhoe, the Bondholders are entitled to assert the full $4.0 billion in Bond Guarantee Claims against the U.S. Debtors.  This interpretation makes no sense, however, for two principal reasons.  First, the Bankruptcy Court never said that Ivanhoe applies to the Bond Guarantee Claims—merely that the Allocation Decision should not be interpreted in a manner "inconsistent with" Ivanhoe.  The Bondholders therefore confuse a noncommittal observation with a substantive right.  Second, as briefed expansively by the Consortium in its Opening Brief[6] filed with the District Court, the Ivanhoe rule does not apply where, as here, a court has effectively substantively consolidated multiple

---

[5] See *Reply Brief of Appellant The Trade Claims Consortium of Nortel Networks Inc., Et Al. In Further Support of Appeal From The Allocation Opinion* [District Court D.I. 75], filed on March 11, 2016 (the "Consortium Reply Brief").

[6] See *Opening Brief of Appellant The Nortel Trade Claims Consortium In Support Of Appeal From The Allocation Opinion* [District Court D.I. 74], filed on March 11, 2016 (the "Consortium Opening Brief").

debtor estates.  Indeed, doing so would result in absurd and untenable results.  Here, applying Ivanhoe in a manner that permits the Bondholders to assert two claims—a primary claim against the Canadian Debtors and the Bond Guarantee Claims against the U.S. Debtors—massively and inequitably dilutes holders of U.S. Trade Claims.  This is because under the Allocation Decision's MPR methodology, the U.S. Debtors receive no benefit in the Lockbox allocation for the Bond Guarantee Claims (thereby diminishing their allocated value), but at the same time are forced to share their (diminished) allocation with the Bondholders.

17. Furthermore, this Court's 9019 Order and 9019 Opinion in no way support the conclusion that the Bondholders may assert their full $4.0 billion in Bond Guarantee Claims against the U.S. Debtors under a U.S. plan.  As explained in the 9019 Opinion, the Settlement Agreement addressed one discrete issue—namely, "the amount of post-petition interest [the Bondholders] are entitled to claim and receive." 9019 Opinion at 2.  Very simply, the parties to the Settlement Agreement agreed that the Bondholders would be entitled to post-petition interest, and that such amount would be capped at $1.01 billion, subject in all events to the condition that NNI was solvent.  9019 Opinion at 21-22.  As the Court clearly explained, the purpose of the Settlement Agreement was to provide a ***ceiling*** on the amount of post-petition interest NNI "could potentially owe" the Bondholders ***in the event that NNI was solvent***.  This last point cannot be overemphasized: central to the 9019 Order was the working assumption at that time that the U.S. Debtors were solvent.  See 9019 Opinion at 7 "NNI could be ***solvent by more than $1 billion***"); id. at 43 (discussing "the possibility that NNI's estate could be ***solvent***") (emphasis added).  Indeed, this Court took pains to underscore that notwithstanding the post-petition interest cap set forth in the Settlement Agreement, "[t]he Court is fully aware of the possibility that the amount ultimately available to pay post-petition [interest] from the NNI estate could very

10

well be . . . less than $1.01 billion." 9019 Opinion at 40. In other words, a condition precedent to the Settlement Agreement having any legal effect is NNI's ability to fund payments of post-petition interest to the Bondholders. But now that the Allocation Decision has most likely rendered NNI insolvent, NNI will not have the surplus cash with which to pay post-petition interest. Accordingly, as a result of the Allocation Decision, the Settlement Agreement is a dead letter. See Settlement Agreement § 4.2 ("this PPI Settlement Agreement does not settle the manner in which any funds available for distribution shall be allocated among the creditors of the applicable US Debtors in the event that less than the full amount of PPI can be paid to all creditors owed such amounts").

18.     The Bondholders' interpretation of the 9019 Order is similarly distorted. See Response, ¶ 15. To be sure, paragraph 5 of the 9019 Order provides that "[t]he Settlement Agreement shall constitute a full and final settlement of . . . the allowed claims for outstanding principal obligations and accrued prepetition interest obligations." 9019 Order, ¶ 5. However, "allowance" of claims for purposes of computing a conditional right to post-petition interest and "allowance" of claims for purposes of the claims reconciliation process under the U.S. Debtors' eventual chapter 11 plan are two very different concepts. The first provides a basis for computing post-petition interest (as having an allowed claim is a prerequisite for a secured creditor's entitlement to post-petition interest), whereas the second requires the filing and confirmation of a chapter 11 plan. In this respect, the Bondholders conveniently fail to mention that the 9019 Order expressly states that nothing therein is intended to impact the claims reconciliation process at each Nortel Debtor. See 9019 Order, ¶ 7 ("***Nothing in the Settlement Agreement or this Order shall constitute a settlement*** of the manner in which any ***funds available for distribution shall be allocated*** among the creditors of the Debtors in the event that

11

*less than the full amount of PPI can be paid* to all creditors owed such amounts. *Such application shall be determined by later agreement of the parties or order of this Court, whether in connection with the chapter 11 plan(s) of the Debtors in the Chapter 11 Cases* or by subsequent agreement.") (emphasis added). Accordingly, not only is the Settlement Agreement a dead letter, but the parties thereto expressly acknowledged that it would not influence the claims reconciliation process at each Nortel Debtor.

19. As a practical matter, the Bondholders' assertion of an unassailable right to a $4.0 billion guarantee claim against the U.S. Debtors is also nonsensical insofar as it would require this Court to ignore its own Allocation Protocol, which expressly provided that "creditor claims . . . are not governed by this Allocation Protocol" and left the "claims reconciliation process" to be determined at a later date by each Nortel Debtor. See D.I. 10565-1 (Allocation Protocol) at ¶1. The Allocation Protocol established the ground rules for the Allocation Trial. See Op. at 5 (explaining how the "Allocation Protocol…governed the trial on allocation."). It follows, then, that the Allocation Decision did not—indeed, could not—impact the claims reconciliation process.

20. It also bears repeating that the Consortium has preserved its right to seek reconsideration under Bankruptcy Code section 502(j). Although the Consortium maintains that the 9019 Order has no bearing on the ability of the Bondholders to assert the Bond Guarantee Claims against the U.S. Debtors under a U.S. plan, to the extent that the 9019 Order or the Allocation Decision are interpreted to the contrary, the Consortium reserves all rights to move for reconsideration "for cause . . . according to the equities of the case." 11 U.S.C. §502(j).

21. Finally, the relief sought by the Bondholders—that is, this Court's post facto imprimatur that the Bond Guarantee Claims may be asserted in full against the U.S. Debtors

12

under a U.S. plan—makes no procedural sense at this juncture in the Cases.  As the Bondholders are well aware, the Appeals remain pending.  Perhaps the most significant issue being addressed through the ongoing Appeals is whether the Allocation Decision, through its adoption of the MPR method, constitutes an impermissible substantive consolidation under In re Owens Corning, 419 F.3d 195 (3d Cir. 2005).[7]  The Consortium has briefed at length how the MPR method employed by the Bankruptcy Court is legally indistinguishable from substantive consolidation.  See Consortium Opening Brief at 7-9.  The U.S. Debtors, the UCC, and indeed the Bondholders themselves have all made similar arguments.  See U.S. Debtors Opening Brief at 40; UCC Opening Brief[8] at 22; Bondholders' Opening Brief[9] at 14-15.  Further, the Consortium has also described why the Allocation Decision cannot coexist with this Court's 9019 Order, it being settled law that substantive consolidation (in all its forms) by necessity eliminates all guarantee claims.  See Consortium Opening Brief at 9-10.  Given the District Court's recent certification of the Appeals to the Third Circuit, this issue remains a "live" one.  Until a decision is reached on the Appeals, "blessing" the allowance of the Bond Guarantee Claims against the U.S. Debtors puts the proverbial cart before the horse.  For this reason, too, the Bondholders' overweening assertion that they are entitled to assert the Bond Guarantee Claims against the U.S. Debtors under a U.S. plan is meritless.

---

[7] See *Opening Brief of Debtors-Appellants Nortel Networks Inc. in Support of Appeal From the Allocation Opinion* [District Court D.I. 64], filed March 11, 2016 (the "U.S. Debtors Opening Brief"), §II.

[8] See *Opening Brief of Appellant The Official Committee of Unsecured Creditors of Nortel Networks Inc., Et Al. in Support of Appeal From The Allocation Opinion* [District Court D.I. 57], filed March 11, 2016 (the "UCC Opening Brief").

[9] See *Opening Brief of Appellant The Ad Hoc Group of Bondholders* [District Court D.I. 66], filed March 11, 2016 (the "Bondholders Opening Brief").

**RESERVATION OF RIGHTS**

22. In addition to the points raised herein, the Consortium expressly reserves all of its rights to object, on any basis whatsoever (whether or not referenced herein) to the assertion of the Bond Guarantee Claims against the U.S. Debtors under an eventual U.S. chapter 11 plan (including, without limitation, by moving for reconsideration under Bankruptcy Code section 502(j)).

Dated: May 20, 2016

FOX ROTHSCHILD LLP

By: */s/ L. John Bird*
Jeffrey M. Schlerf (DE No. 3047)
L. John Bird (DE No. 5310)
Citizens Bank Center
919 North Market Street, Suite 300
Wilmington, DE 19801
Telephone: (302) 654-7444
Facsimile: (302) 656-8920

-and-

Steven D. Pohl, Esq. (pro hac vice)
BROWN RUDNICK LLP
One Financial Center
Boston, MA 02111
Telephone: (617) 856-8200
Facsimile: (617) 856-8201

*Counsel to the Nortel Trade Claims Consortium*