**Response to Notice of Objection – Case 09-10138-KG.  Doc 16997**
**Douglas McGregor      Nortel GID: 0119055**

TO:

The Office of the Clerk
The United States Bankruptcy Court for the District of Delaware
824 Market Street
Wilmington, Delaware 19801
USA

cc:

Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, New York 10006
USA
Attn: Lisa M. Schweitzer


Morris, Nichols, Arsht & Tunnell LLP
1201 North Market Street, P.O. Box 1347
Wilmington, Delaware 19899-1347
USA
Attn: Derek C. Abbott


From;      Douglas McGregor
           2083 County Road 13
           Picton ON
           K0K 2T0
           Canada

           Nortel GID: 0119055

**Response to Notice of Objection – Case 09-10138-KG.  Doc 16997**
**Douglas McGregor        Nortel GID: 0119055**

1. Subject
   1. This notice of objection is in response to Doc 16997 dated July 15, 2016 dealing with Case 09-10138-KG.
   2. More specifiably this response deals with claim 8772 for an amount of $511,945.38

2. Basis of Response
   1. The Objection incorrectly assumes claim 8772 is a pension claim that would fall under the administration of the Pension Benefit Guaranty Corporation (PBGC).

3. Claim
   1. Mr. McGregor continues to assert he is not receiving pension benefits for a portion of his US service due to an acknowledged Nortel administrative error.  This error caused a significant portion of his US service to fall outside the administration of the US pension plan. (See attachments 1 and 2).

4. Summary of History
   1. During the 2004/2005 Mr. McGregor was advised by Nortel, that due to an administrative error by Nortel that he could not be paid pension benefits for a portion of his US service under the pension plan. This included the time that he was currently working for Nortel in the US on the US payroll and included his peak earning years.
   2. The issue was never resolved at the time of Mr. McGregor's severance due to his illness.
   3. It was Mr. McGregor's understanding that the matter had been resolved when he started receiving benefits from the Pension Benefit Guaranty Corporation (PBGC) in 2010.
   4. PBGC have since reviewed his file (Fall of 2014) and denied Mr. McGregor these same benefits again, re-exposing Mr. McGregor to the Nortel error. PBGC asserts they can take no responsibility for this issue.

5. Supporting Documents
   1. Documents supporting this claim from both Nortel and PBGC have been previously submitted.
   2. Nortel has access to a large amount of documentation concerning this issue.

6. Additional Information;
   1. Mr. McGregor is a resident of Canada where there are sometimes long delays in delivering US mail. Furthermore, a disruption of the Canadian mail service is expected due to labor issues.
   2. As such, it is respectfully requested that time sensitive matters arsing from this claim be brought to Mr. McGregor's awareness through any of the contact details provided below.

**Response to Notice of Objection – Case 09-10138-KG.  Doc 16997**
**Douglas McGregor        Nortel GID: 0119055**

Home address (<u>by courier</u>):
        2083 County Road 13
        Picton, Ontario
        K0K 2T0
        CANADA

        613-476-0462 Tel/Fax

        djmcgregor@gmail.com

NOR001179

Attachment # 1



# N☯RTEL

July 14, 2005

Mr. Douglas McGregor
5791 Queenscourt Crescent
Manotick, ON   K4M  1K3
Canada

Re: Nortel Networks Long Term Investment Plan and Nortel Networks Retirement Income Plan

Dear Mr. McGregor:

As we mentioned in our letter last year, in reviewing the records for the Nortel Networks Long-Term Investment Plan ("the LTIP") and the Nortel Networks Retirement Income Plan ("the pension plan"), we discovered you have been permitted to participate in these plans for a period that you were not eligible. The terms of both plans specifically exclude from participation non-resident aliens of the United States who have no US-source income. As a result, you should not have been permitted to participate in either of these plans during that time.

United States law requires that the LTIP refund to you the amount you contributed, as adjusted for earnings or losses, since the date your ineligible international assignment began on January 1, 1999. The LTIP trustee is sending you a check in the gross amount of $48,831.11 that represents your employee contributions and associated earnings/losses during your ineligible assignment period.  As Hewitt has communicated to you, they need to get a W-8 form from you so that you can minimize the tax withholding on this payment if you choose to.

In addition, any LTIP company matching contributions made by Nortel Networks and allocated to your account during your ineligible assignment period has been forfeited and returned to the LTIP.  However, Nortel Networks will compensate you for the amount of this company matching contribution, and associated earnings or losses, with a payment from the company.  A check in the gross amount of $23,796.97, which equals the amount of your forfeiture, is being prepared by Nortel's Accounts Payable department and will be mailed to your address in the near future.  Please understand that this is a one-time payment that the

documents provided in confidence

NOR001180



company has agreed to make and will not be paid again in the future.  If you choose to return to your assignment, you will not be eligible for this payment in the future.

Your employee contributions and company matching contributions and associated earnings/losses made prior to your assignment have been left in your Plan account since you met the requirements for participation during this period.   This amount totaled $59,395.87 as of June 10, 2005.

As mentioned above, you were not eligible to participate in the pension plan after the period you went on your international assignment.  ~~However, Nortel Networks will compensate you for the value of the pension payments that you would have received for this period.  The amount of your payment is $297,199.93 and a check will be prepared by Nortel's Accounts~~ Payable department and mailed to your address soon.

This was never done. Nortel arbitrarily took this offer off the table when I was unwilling to sign off on the offer without answers to some questions.

You will receive a United States Internal Revenue Service Form 1099s from the 401(k) trustee and W-2s from Nortel for the two Accounts Payable payments.   Since the Global Tax Equalization Policy does not apply to these payments, any tax due on these payments, whether US, host country or third country, will be entirely your responsibility.  Our outside counsel has stated that because you were not subject to United States tax at the time you made contributions to the LTIP, these payments may not be subject to U.S. tax, however, they may be taxable in another country in which you paid taxes during these years.  We strongly recommend that you consult with a tax advisor to discuss these issues.

Please let me know if you have questions.

Sincerely,

Daniel Ray
Global Benefits
Nortel Networks Inc.

Cc:  Paula Holden
      Angie Lannom

*documents provided in confidence*

**Attachment # 2**

NOR001255

| | |
|---|---|
| **From:** | Petree, Dick [RICH1:9666:EXCH] |
| **Sent:** | September 20, 2005 5:37 PM |
| **To:** | Aleksic, Christine [BRAM:0108:EXCH]; Barnes, Debbie [GWRTP:8408:EXCH]; Lockhart, Lewis [NCRTP:8427:EXCH]; Bolon, Susan [SCH:8427:EXCH]; Sicotte, Luc [RICH1:8271:EXCH] |
| **Cc:** | Ray, Daniel [NASHF:8426:EXCH]; Goodbar, Terri [GWRTP:7094:EXCH] |
| **Subject:** | RE: Doug McGregor - UPDATE |

Summary info: Doug McGregor,CSD: 11/27/1976  28 yrs., ELT, 50 yrs old.

He does not have US green card so is NRA (Non Resident Alien) on U.S. Payroll.  Not eligible to participate in US qualified plans while out of US on assignment. ~~Risk to Nortel is that plans could be declared non qualified by IRS.~~  He has been notified of NRA consequences and is to be reimbursed those funds for periods outside US for 401(k) & pension plan.  Donovan aware of the NRA issues and McGregor specifically.  ~~YES, he should NOT have been allowed to go out on expat while in NRA status but that has been an on-going problem and now being addressed.~~  Also Canadian citizen on expat assignment in home country??.

Hired in Canada, moved to US Jan.3, 1995, expat assignment from US payroll to France 1998 to 2001, to UK 2001 to 2003, to Canada July 2003 to present.  Was due to repatriate to US from Canada on present assignment June 30, 2005.  Began STD 4/2/2005.  Still awaiting full STD approval from July 31, 2005, currently using vacation days.  LTD determination not yet available until STD finalized.  Last MD appt we think was 9.16.2005 with neurologist and awaiting MD documentation to Pru.

While on Expat assignment, he became disabled-STD.  Not sure have had expat on STD at host location but continued him on expat benefits while on STD.  He is correctly for now on US payroll without qualified plan participation.

Doug has questioned what is his going forward pension situation to be.  While he is an US expat he will continue to be ineligible for US qualifed plans.  Appropriate question as to going forward?

Localization has not been offered so far as it appeared he was repatriating in June 2005.  Let me know if questions or ask one of the speciality areas for specifics ie: pension, benefits, etc.  Thanks.

Regards,

Dick Petree
ESN 450-7732

-----Original Message-----
From: Aleksic, Christine [BRAM:0108:EXCH]
Sent: Tuesday, September 20, 2005 12:32 PM
To: Petree, Dick [RICH1:9666:EXCH]
Subject: FW: Doug McGregor - UPDATE

per my voice message to you - Debbie is asking ER/HR questions about which payroll should he be on ---  are

1

*documents provided in confidence*

<div style="border:1px solid">

# Attachment #3

</div>



## PBGC
**Protecting America's Pensions**

### Pension Benefit Guaranty Corporation
1200 K Street, N.W., Washington, D.C. 20005-4026

July 25, 2016

Douglas J. McGregor
2083 County Road, #13 Rural Route #3
Pickton K0K2T0
Ontario, Canada

Re:    Appeal 2015-0073; Nortel Networks Retirement Income Plan (the "Nortel Plan"
       or the "Plan"); Case No. 213919

Dear Mr. McGregor:

The Appeals Board is responding to your appeal of PBGC's revised benefit determination of November 14, 2014.  PBGC determined that you are entitled to a monthly PBGC-payable benefit of $222.68 in the form of a Joint and 75% Survivor Annuity ("J&75%SA") under the Nortel Plan.  For the reasons stated below, we found that you did not provide a sufficient reason for changing PBGC's revised determination.  Therefore, we are denying your appeal.

**Background**

PBGC provides pension insurance in accordance with the Employee Retirement Income Security Act of 1974, *as amended* ("ERISA").  If a plan sponsor of a tax-qualified defined benefit pension plan is unable to support its plan, PBGC becomes the statutory trustee of the plan and pays benefits pursuant to the terms of the plan, subject to limitations and requirements set by Congress under ERISA.

Nortel Networks, Inc. ("Nortel") was the sponsor of the Nortel Plan and the successor to Northern Telecom Inc. ("Northern Telecom").  The Nortel Plan is an amendment and restatement, effective May 3, 1999, of the Northern Telecom Inc. Pension Service Plan.  The Northern Telecom Inc. Pension Service Plan was effective January 1, 1999, and was an amendment and restatement of the Northern Telecom Inc. Retirement Plan for Employees (the "Prior Plan").  The Prior Plan was initially effective on May 1, 1974.[1]

---

[1]  The Nortel Plan is a successor plan to the Northern Telecom Inc. Pension Service Plan and the Prior Plan.  In this decision, we will generally refer to your pension plan as the Nortel Plan or the Plan.  We will also refer to it as the Prior Plan when we need to distinguish between the provisions of the Prior Plan applicable to your benefit and the provisions of later restatements.

<div style="border:1px solid">

*documents provided in confidence*

</div>

The Nortel Plan terminated, effective July 17, 2009, without sufficient assets to provide all benefits under the Plan, and PBGC became statutory trustee on September 8, 2009. The terms of the Plan in effect when you terminated employment, the provisions of ERISA, and PBGC's regulations determine the benefits PBGC may pay.

When PBGC becomes the statutory trustee of a terminated plan, PBGC collects participant data and copies of the plan's governing documents from the plan's administrator. PBGC then audits that information. PBGC relies on the information it receives from a plan administrator unless PBGC's audit of that information shows that it is incorrect, or a participant supplies PBGC with documents showing that the information is incorrect.

PBGC records contain the following information relevant to your pension benefit:

- You were born on December 11, 1954;
- You commenced employment with Northern Telecom (Canada) on November 27, 1976, and worked there until January 2, 1995;
- You then worked for Northern Telecom (Richardson, Texas, United States) from January 3, 1995, until August 2, 1998;
- You transferred employment to a Northern Telecom affiliate in France effective August 3, 1998, and worked there until July 14, 2001;
- You then transferred employment to a Northern Telecom affiliate in Maidenhead, United Kingdom, effective July 15, 2001, and worked there until June 30, 2003;
- You transferred employment back to Northern Telecom (Ottawa, Ontario, Canada) on July 1, 2003, and worked there until June 30, 2005;
- You went on a leave of absence in July 2005, and your employment was formally terminated effective October 1, 2005;
- On April 11, 2010, you completed PBGC's *Participant Application for Pension Benefits* requesting commencement of monthly PBGC benefits effective January 1, 2010; and
- PBGC advised you on May 11, 2010, that you would be paid an *estimated* monthly benefit of $1,738.35 in the form of a J&75%SA, commencing on June 1, 2010, with retroactive back payments to January 1, 2010, your requested retirement date.

**Issue Presented by Your Appeal of PBGC's Benefit Determination**

On September 24, 2014, PBGC issued a benefit determination letter to you stating that the *estimated* monthly pension of $1,738.35 that you have been receiving was more than the monthly benefit of $217.99 to which you are entitled. PBGC noted that your benefit is payable in the form of a J&75%SA, which provides you with an actuarially reduced monthly benefit for the rest of your life; your surviving beneficiary will receive 75% of your benefit for the rest of her life. PBGC also noted that because the amount to which you are entitled is less than the amount you have been receiving, you have been overpaid $89,792.31 up to November 30, 2014. PBGC advised you that it will collect the overpayment by reducing your future monthly benefits

to $196.19 until the overpayment has been repaid.

On October 2, 2014, you requested an extension of time in which to file an appeal. The Appeals Board granted you an extension of time on October 6, 2014, up to and including December 5, 2014.

On October 30, 2014, the Appeals Board informed you that PBGC's Office of Benefits Administration ("OBA") had found an error in your September 24, 2015 benefit determination. OBA advised you that it would be sending a corrected benefit determination with a new 45-day appeal right in the near future.

OBA issued you a corrected benefit determination letter on November 14, 2014. The corrected letter advised you that the *estimated* monthly benefit of $1,738.35 in the form of a J&75%SA that you currently receive was more than the increased monthly PBGC-payable benefit of $222.68 to which you are entitled.[2] The letter also advised that because the amount you are entitled to is less than the amount you have been receiving, you have been overpaid $92,546.78 as of February 1, 2015. PBGC informed you that it will collect the overpayment by reducing your future monthly benefits to $200.41 until the overpayment has been repaid.

On November 26, 2014, you requested an extension of time to file an appeal of PBGC's corrected benefit determination. On December 1, 2014, you were granted an extension of time up to and including January 16, 2015. After receiving the filing extension, you contacted PBGC's OBA and Disclosure Division for assistance in obtaining information on the computation of your reduced PBGC-payable benefit.

You filed a timely appeal on January 10, 2015, of your PBGC benefit determinations of September 24, 2014, and November 14, 2014. In the *Preamble* to your appeal, you contend that you were on Nortel's Canadian payroll from November 1976 until December 1994, and then again from August 1998 until April 2001. You also contend that you were on Nortel's United States payroll for three periods of your employment: (1) December 1994 until July 1998; (2) May 2001 until June 2003; and (3) July 2003 until your employment terminated (October 1, 2005). Consequently, you believe that you are entitled to benefit service credit under the Nortel Plan for all the years you were on Nortel's U.S. payroll.

Broadly stated, the issue presented by your appeal is whether PBGC correctly calculated your benefit. Your appeal raises a number of subordinate issues, but your appeal turns primarily on whether PBGC was correct in determining that you earned only four years of Benefit Service under the Plan. The other issues you raise—did PBGC correctly calculate the *present value* of your accrued benefit, did PBGC use the correct amount of your "Earnings" in calculating your

---

[2] PBGC's benefit determination of September 24, 2014, finding that you were entitled to a PBGC-payable monthly benefit of $217.99 was based on Nortel Compensation earned between January 3, 1995, and August 2, 1998. When PBGC discovered that the Company treated you as an "Employee" through December 31, 1998, rather than August 2, 1998, it increased your Final Average Earnings amount to $107,049.05 to reflect almost five additional months of employment. As a result of this change, PBGC issued you a corrected benefit determination letter on November 14, 2014, informing you that your monthly PBGC-payable benefit had been increased to $222.68.

benefit, and whether PBGC may make adjustments for taxes you paid on incorrect benefit payments—are subordinate to the primary issue, but we will address them in turn.

## Discussion

### A. Relevant Plan provisions regarding your status as an "Employee"

PBGC files show that your employment in the United States terminated on August 2, 1998, but that you were considered an employee until December 31, 1998. Consequently, the terms of the Plan, effective July 1, 1998, determine your entitlement to a PBGC-payable benefit.[3]

Section 1.1 of the Plan defines the "Accrued Retirement Benefit" as follows:

> Accrued Retirement Benefit shall mean that benefit which a Member, whether or not vested, has earned up to any date and which may become payable at his Normal Retirement Date in the form of a straight life annuity, and which shall be computed as provided in Section 5.4 based on the Member's Benefit Service, Covered Compensation, and Final Average Earnings, all as of that date on which the Accrued Retirement Benefit is computed.

Thus, to earn an accrued benefit under the Plan, you must be a "Member." Section 1.22 of the Plan defines "Member" as "any Employee who is or becomes eligible for membership in the Plan pursuant to Article II."

Section 1.16 of the Plan defines the term "Employee" as follows:

> Employee shall mean any individual who is considered an employee of his Employer (including a person receiving Severance and/or accrued and/or earned (but unused) vacation immediately following termination of employment) for purposes of the taxes imposed under the Federal Insurance Contributions Act and the Federal Unemployment Tax Act. Employee excludes:
>
> * * *
>
> 1.16.3. any individual who is a non-resident alien and who receives no earned income (within the meaning of Code Section 911(d)(2)) from the Employer which constitutes income from sources within the United States (within the meaning of Code Section 861(a)(3)).

---

[3] Excerpts from the Northern Telecom Inc. Retirement Plan for Employees as Amended and Restated Effective July 1, 1998, (i.e., the Prior Plan) are provided in Enclosure 1. The next restatement of the Plan was effective January 1, 1999. The Introduction states: "The benefits and rights of any former Members whose Termination Date occurred prior to January 1, 1999, shall be governed by the terms of the Plan under which they were last covered." See "Introduction" to Northern Telecom Inc. Pension Service Plan, Effective January 1, 1999, Enclosure 2.

* * *

Your Accrued Retirement Benefit is based, in part, on years of "Benefit Service," as defined by the Plan. Section 3.1 defines "Benefit Service" of a Member as "that Member's aggregate number of Years of Service with the Employer commencing with the earliest date on which that Member was hired by, or transferred to, the Employer and ending on that Member's Termination Date. . . ." Section 1.34 of the Plan defines "Termination Date" as "the date on which the Member ceases to be an Employee."

### B. Analysis of your Appeal

#### 1. Your eligibility to participate in the Plan depends on your status as an "Employee."

PBGC records show you were employed by Nortel from November 1976 until June 2005, but are receiving only four years of Benefit Service towards your pension benefit under the Plan. The four years for which you are credited with Benefit Service correspond to the period in which you were employed by Nortel in Richardson, Texas (i.e., 1995 through 1998). The rest of your employment with Nortel was outside the United States.

We understand your appeal to claim first that you should be credited with Benefit Service under the Plan for all years of employment after 1998 in which you were "paid in US dollars with US issued checks."[4] You state you "paid both US income TAX and Social Security and received US pension plan benefit statements. . . . As I recall I also paid US income tax on the taxable benefit of the employer contributions to the pension plan." You believe that this issue "boil[s] down to what is the appropriate treatment for non-resident aliens within the plan and what is US based income."

The appropriate treatment of non-resident aliens is governed by the definition of "Employee" in Section 1.16 of the Plan. The Plan excludes from the definition of "Employee" an individual (1) who is a non-resident alien, and (2) who receives no earned income from the Employer that constitutes income from sources within the United States.

It is unclear from your appeal whether you believe your status is accurately characterized as a "non-resident alien." We believe it is. Under Internal Revenue Code ("IRC") § 7701(b)(1)(B), an individual is a non-resident alien if such individual is neither a citizen of the United States nor a permanent resident of the United States. PBGC records show that you have always been a citizen of Canada and resided in the United States temporarily from about 1995 until 1999. Therefore, the Board finds that you were a non-resident alien for purposes of the Plan.

We next determine whether, after 1998, you received "earned income" from Nortel that constitutes "income from sources within the United States." Under IRC § 911(d)(2), the term "earned income" refers to salary and compensation for professional services. The term "income from sources within the United States," refers to the location of the services performed. The

---

[4] You were paid in Canadian dollars before 1995, and between August 1998 and April 2005, and we do not read your appeal to contend that you earned service under the Plan for those periods.

IRC uses a "place of performance" rule to determine taxability of income from personal services, based on whether such services are performed within or *without* (i.e., outside) the United States.

Specifically, IRC § 861(a) provides in relevant part: "The following items of gross income shall be treated as income from sources *within* the United States:  (3) Compensation for labor or personal services *performed in the United States* . . ." (Emphasis added).  Conversely, IRC § 862(a) provides in relevant part: "The following items of gross income shall be treated as income from sources *without* the United States:  (3) Compensation for labor or personal services performed *without* the United States . . ."  (Emphasis added.)

Under the IRC's place of performance rule, except for the period from 1995 through 1998, your earned income was not earned income from sources within the United States.  Except for the period mentioned, you received compensation from Nortel for personal services outside (or without) the United States.  Consequently, you were not an "Employee" during these periods, and you were ineligible to be a Member of the Plan.  Because you could not have been a Member during these periods, you did not earn Benefit Service.  The Appeals Board finds that PBGC correctly determined that your Benefit Service was limited to four years.

In support of your appeal on this issue, you included several articles on the subject.[5]  But these articles suggest only that non-resident aliens may participate in a U.S. tax-qualified plan provided the plan's terms permit participation by foreign employees.  For example, Attachment 1 states "[e]mployers maintaining U.S. tax[-]qualified retirement plans *may* wish to include employees located outside the United States in the U.S. program."  Attachment 3 says "[t]he plan definitions of employee, compensation, and adopting employers should be carefully review [sic] to ensure that the plan terms permit participation of foreign employees."  In your case, the Plan specifically excludes participation of non-resident aliens with no earned income from sources within the United States.

You further state that you paid both "US income TAX and Social Security" on your income from Nortel.  You do not include the years in which you paid U.S. income tax and Social Security tax, and have not submitted any of your tax returns.  We presume that you paid U.S. taxes on your wages for the years in which you were employed with Nortel at Richardson, Texas, in the United States, but not on your income earned outside the United States, as it is generally not subject to U.S. taxation.[6]

As to your recollection that you paid U.S. income tax on "employer contributions" to the pension plan, we presume that any such payments of tax were attributable to Nortel's non-qualified pension plans.  PBGC insures only tax-qualified defined benefit pension plans.  In

---

[5]  You enclosed Attachments (1) – (3): (1) a December 16, 2008 Will & Leary Law Firm pronouncement about the legal requirements of including employees located outside the United States in a U.S. tax-qualified retirement plan; (2) a 2005 Ice Miller Legal and Business Advisors publication entitled *Retirement Plan Payments To Nonresident Aliens: What Are Your Tax Withholding and Reporting Obligations?*; (3) a 2015 Benefitscollective.com Article on *Nonresident Aliens and Qualified Plans*.

[6]  *See, e.g.*, 26 Code of Federal Regulations (CFR) § 1.861-4(b)(2) (Compensation for labor or personal service performed by an individual).

general, however, participants do not pay income tax on employer contributions to tax-qualified pension plans. Taxation is deferred until distribution.

To summarize, only "Members" are credited with "Benefit Service." To be a Member, an individual must be an "Employee" of Northern Telecom. The Plan's definition of "Employee" excludes "any individual who is a "non-resident alien and who receives no earned income . . . from sources within the United States." You were a non-resident alien who received no earned income from sources within the United States after 1998. You therefore experienced a "Termination Date" when you were no longer an Employee and could no longer accrue Benefit Service under the Plan.

### 2. PBGC correctly calculated your benefit under the Prior Plan

The Appeals Board believes that the crux of your second argument is that PBGC incorrectly calculated your benefit. We have explained in the previous section why your Benefit Service is limited to four years. Your Benefit Service is one element of the benefit formula under the Prior Plan. In this section, we will discuss the calculation of your benefit.

Section 5.1 of the Prior Plan defines a Member's Normal Retirement Benefit as follows:

[Section] 5.1.  Normal Retirement Benefits

The annual "Normal Retirement Benefit" of a Member shall be . . . obtained . . . from the sum of the amounts in Sections 5.1.1 and 5.1.2, where:

[Section] 5.1.1.   equals one and one-tenth percent (1.1%) of **Final Average Earnings** up to and including the amount of the Member's **Covered Compensation** multiplied by that Member's **years of Benefit Service**, up to a maximum of thirty (30) years of Benefit Service;

[Section] 5.1.2.   equals one and one-half percent (1.5%) of the amount by which the Member's Final Average Earnings exceed his Covered Compensation multiplied by the Member's years of Benefit Service, up to a maximum of thirty (30) years of Benefit Service;[7]

\* \* \*

Thus, under the Prior Plan's benefit formula, your benefit depends on the meaning of "Final Average Earnings" ("FAE," in calculations below), "Benefit Service" ("BS," in the calculations below), and "Covered Compensation" ("CC," in the calculations below), and, of course, the values associated with them. We have already determined that your Benefit Service is limited to four years.

"Covered Compensation" is the average of the contribution and benefit bases in effect under

---

[7]  We have omitted the third element of the overall formula under section 5.1.3 from the quotation above, as it does not apply to you and would in any event result in decreasing the sum of the amounts determined under sections 5.1.1 and 5.1.2.  *See* Section 5.1 of the Prior Plan, Enclosure 1.

the Social Security Act for each calendar year in the 35-year period ending with the year in which the Member reaches Social Security Retirement Age.[8] If a Member's Termination Date precedes Social Security Retirement Age, increases in the bases are disregarded. The Covered Compensation amount is derived from tables published by the Internal Revenue Service ("IRS") each year that report Covered Compensation according to a person's year of birth and Social Security Retirement Age.[9]

We next explain your "Final Average Earnings." The Prior Plan's term "Final Average Earnings" includes the term "Earnings." Both are defined in the Prior Plan, as follows:

> [Section] 1.14. <u>Earnings</u> shall mean the total of all amounts paid by the Employer to or for the benefit of an Employee for services actually rendered or labor performed for the Employer while an Employee which are required to be reported on the Employee's Federal Income Tax Withholding Statement or statements (Form W-2 or its subsequent equivalent) subject to the following adjustments and limitations:
>
> 1.14.1.1. *The following shall be excluded*:
>
> 1.14.1.1.1. *overtime pay, bonuses or other supplemental pay* . . . .
>
> <p style="text-align:center">* * *</p>
>
> [Section] 1.19. <u>Final Average Earnings</u> shall mean the Member's annual average Earnings during the one thousand ninety-five (1,095) consecutive calendar day period of the Member's highest Earnings in the three thousand six hundred fifty (3,650) consecutive calendar days...

(Emphasis added.)

Thus, under the Prior Plan, your "Final Average Earnings" are your highest annual average "Earnings" during a three-consecutive-year period within the ten-consecutive-year period before your termination of employment. Your "Earnings" include your regular base earnings and incentive payments, like commissions, but your Earnings do not include overtime earnings, bonuses, or other supplemental pay.

PBGC records from the Plan's administrator contain your Earnings for the years 1995 through 1998. The following Table lists your "Earnings" under the Prior Plan and the resulting Final Average Earnings.

---

[8] *See* Section 1.12 of the Prior Plan, Enclosure 1.

[9] *See* Covered Compensation and Transitional Covered Compensation Tables After 1983, Enclosure 3.

**Table 1**

| Year | Prior Plan Earnings |
|------|---------------------|
| 1995 | $87,494.38 |
| 1996 | $98,715.70 |
| 1997 | $107,228.75 |
| 1998 | $115,202.70 |
| FAE  | $107,049.05 |

Your FAE under the Prior Plan is $107,049.45.

You state in your appeal that PBGC's exclusion of your highest years of career earnings greatly lowers the amount of your pension. But, under Section 1.14.1 of the Prior Plan, "Earnings" represent compensation *"for services actually rendered or labor performed for the Employer while an Employee. . . ."* (Emphasis added.)   PBGC can use your "Earnings" while you were an Employee, but not while you were ineligible to be a Member of the Plan (i.e., when you were not an Employee). PBGC cannot use "Earnings" from any period during which you were a non-resident alien without income from U.S sources.

You further claim that PBGC's Final Average Earnings amount ($107,049.05) for your years of service in Richardson, Texas, is too low, as it does not take into account any annual bonuses you received, just annual salaries. As shown above, however, "bonuses" are excluded from the definition of "Earnings" under Section 1.14.1.1 of the Prior Plan.

Accordingly, we calculate your benefit under Section 5.1 of the Prior Plan as follows:

- $0.011 \times \$63,420$ (CC) $\times 4$ (BS) = $2,790.48

- $0.015 \times (\$107,049.05$ (FAE) $- \$63,420$ (CC)) $\times 4$ (BS) = $2,617.74

- ($2,790.48 + $2,617.76) ÷ 12 months = $450.69 per month (Straight Life Annuity ("SLA") at Normal Retirement Date)

- $450.69 × 0.5600 (Early Retirement Factor) = $252.39 per month (SLA at Actual Retirement Date)

- $252.39 (SLA at ARD) × 0.90445 (Benefit Form Conversion Factor) = $228.27 per month (Joint and 50% Survivor Annuity)

- $228.27 × 0.97551 (Benefit Form Conversion Factor) = **$222.68** per month (Joint and 75% Survivor Annuity)

Based on the terms of the Prior Plan and the facts in this case, the Appeals Board upholds PBGC's benefit determination of November 2014.

You also claim that PBGC has incorrectly valued your pension benefit under the Plan, stating the following:

> We believe that PBGC have used an incorrect document for estimating the value of my pensionable service while resident in the US. Attachment 5 incorrectly values the lump sum value of my pension at $29,984.64 (as of Dec. 2004) and excludes my unqualified portion. Attachment 6 is extracted from a Deloitte letter of April 2006 which valued the lump sum at $99,403.12 and indicated the value would accrue at 6% annually. Attachment 7 is a later Nortel document (believed to be 2007) that identifies both qualified and unqualified portion for a total value of $124,378.55.

The Appeals Board finds that many of the benefit computations prepared by Nortel are unreliable because they do not consistently reflect your ineligibility to participate in the Plan while a non-resident alien without U.S.-source income. In addition, you terminated employment effective December 31, 1998, under the Prior Plan—one day before the Pension Service Plan became effective. As a result of Nortel's initial uncertainty over your eligibility after 1998, some of these documents reflect more than four years of Benefit Service and some show your benefit calculated under the provisions of the Pension Service Plan.

As you may know, the Prior Plan's benefit formula and definitions defining your pension benefit differ from the Pension Service Plan's benefit formula and definitions. Because your Employment terminated on December 31, 1998, your benefit is calculated under the Prior Plan, not the Pension Service Plan. The Board calculated your benefit under the Prior Plan using four years of Benefit Service, Covered Compensation for your age cohort, and your "Earnings" according to PBGC records.

You have included documents marked "Attachment" 5, 6, and 7 in support of your appeal, and we address them in turn. Even though the heading to Attachment 5 refers to the Pension Service Plan, Attachment 5 shows your benefit under the Prior Plan. The only difference between the benefit shown on Attachment 5 and PBGC's determination is the use of your "Earnings" through December 31, 1998. On Attachment 5, your accrued benefit at age 65 is shown as $440.59 per month, payable as a SLA, rather than $450.69 per month (SLA), as shown above.

The lump-sum amount of $29,984.64 in Attachment 5 represents the present value of your monthly benefit, as of January 1, 2005. The Appeals Board independently calculated the present value of your annuity benefit as of January 1, 2005, to be approximately $29,984.64.[10] The present value of your benefit as of January 1, 2005, is not material, however, to your benefit determinations. It was material to Nortel's efforts to reimburse you for the period during which you were ineligible to participate under the Plan, which we discuss next.

---

[10] The Board's actuary found, however, that the actuarial assumptions used were based on your age between 50 and 51 years, rather than 51 years.

Attachment 6 to your appeal is a document prepared by Deloitte to show how Nortel would reimburse you for your ineligibility to participate in U.S. pension plans. It has no bearing on your PBGC-payable benefit under the Plan. Attachment 6 includes references to the Nortel Plan and also other Nortel deferred compensation plans, such as a Nortel Non-qualified pension plan and a 401(k) plan. PBGC does not insure non-qualified and individual account plans. The Board understands that when Nortel learned that employees like you were ineligible to accrue any benefits under the U.S.-based plans during non-resident-alien assignments outside the United States, Nortel offered to reimburse such persons the amount they would have accrued under these plans, as if they were eligible "Employees" of Nortel when they were otherwise ineligible.

According to Attachment 6, the total present value of your qualified and non-qualified plan benefits would be equal to $327,175.57 (shown on Attachment 6 under "Lump Sum with All Service").[11] From this total of $327,175.57, Nortel subtracted the present value of the sum of your benefits under both qualified and non-qualified plans, i.e., $99,403.12, accrued during the period when you *were* eligible to participate in these plans.[12] We understand that Nortel intended to reimburse you for the difference, though you have not stated in your appeal whether or not Nortel actually reimbursed you for the period of ineligibility.

Your reference to 6% interest on Attachment 6 refers to the rate of interest to be credited by Nortel on the net difference between the total benefits you would have earned and the benefits you earned while eligible to participate in Nortel's U.S. plans. It has no bearing on your benefit under the Plan. In any event, the Board finds that Nortel's arrangement to reimburse you for your period of ineligibility after 1998 is not directly relevant to your appeal.

Attachment 7 is another "Pension Service Plan Calculation Statement" with a calculation end date of December 31, 2007, nine years after your "Termination Date" under Section 1.34 of the Plan. Attachment 7 contains a benefit amount of $850.56 per month for the "Qualified Retirement Benefit," beginning January 1, 2020 (at age 65), and a present value of $73,926.25. Although Attachment 7 shows the correct number of years of Benefit Service (i.e., four), it shows FAE of $190,000.00. The Board finds that Attachment 7 was prepared based on the assumption that "Earnings" during the period of your ineligibility could be used in the determination of FAE and was, therefore, erroneous.

In summary, the Appeals Board upholds PBGC's determination of your benefit under the Prior Plan. We also find that Attachments 5, 6, and 7 are not inconsistent with PBGC's determinations.

---

[11] The amount of $327,175.57 is the sum of the present values of your qualified and non-qualified pension plan benefits as of January 1, 2005, based on employment through December 31, 2004, i.e., *eight* years of Benefit Service, instead of four. Note that this amount did not include your 401(k) plan benefits, which are shown separately on Attachment 6. *See* Nortel Networks Inc. Pension Service Plan Benefit Calculation Statement (Prepared on December 10, 2004), Enclosure 4.

[12] Based on the present value of your qualified plan benefit, i.e., $29,984.64, the present value of your non-qualified benefit was $69,418.48 (i.e., $99,403.12 − $29,984.64), though we have no way to verify the value of your non-qualified benefit as of January 1, 2005. As noted, PBGC does not guarantee or pay pension benefits from non-qualified plans.

### C. Recoupment of Overpayments

PBGC regulations require PBGC to recoup net overpayments if PBGC determines that benefits paid to a participant exceed the total amount to which the participant is entitled under Title IV of ERISA.[13]  PBGC files show that you have been overpaid $1,515.67 ($1,738.35 – $222.68 = $1,515.67) each month since January 1, 2010.  By law, PBGC cannot pay benefits that are not provided under the provisions of the Plan.  Thus, after January 1, 2010, PBGC was paying you a benefit from the Nortel Plan that you were not entitled to, and you were overpaid. PBGC must recoup the overpayment from your future monthly benefits by making a reduction of generally not more than 10% in your future PBGC-payable benefit.  To mitigate financial hardship, PBGC does not charge interest on the overpayments.

You ask what provisions have been made by PBGC for previously paid taxes on the overpayment of $92,546.78 (as of February 1, 2015), as you claim to have paid a portion of the overpayment in Canadian income tax.  You ask that PBGC recoup from future benefit payments only the net amount you actually received after subtraction for taxes paid.  Unfortunately, PBGC's regulation does not permit the agency to make adjustments to overpayments based on taxes paid.[14]

PBGC records show that since April of 2016, you have requested PBGC assistance in requesting a refund of approximately $250.00 of tax withheld by PBGC.  PBGC records further show that OBA advised you that they will no longer refund tax withheld based on previously made elections or by default (e.g., the failure to submit withholding forms).  All refunds for tax withholding will be processed through yearly tax filings with the IRS, which, unlike PBGC, has a full record of taxes withheld, filed and owed by individual taxpayers.  We have enclosed an information sheet containing a telephone number, facsimile number and a mailing address for contacting IRS from a location outside the United States.  There is also information on contacting the International Taxpayer Advocate.  We hope you find this information helpful.

### Decision

Having applied ERISA, PBGC's regulations and policies, and the Plan provisions to the facts of your case, the Appeals Board is denying your appeal.  This decision is PBGC's final agency action regarding its November 14, 2014 revised determination.  If you wish, you may seek review of this decision in an appropriate United States District Court.

---

[13] *See* 29 Code of Federal Regulations, Subpart E, § 4022.81.

[14] We understand that Canadian taxpayers may generally amend returns for tax years ending in any of the 10 previous calendar years and encourage you to contact the Canadian Revenue Agency with any questions.  PBGC files show that your first monthly benefit in the amount of $1,738.35 was paid to you retroactive to January 1, 2010.

If you need additional information about your PBGC benefit, you may call PBGC's Customer Contact Center at 1-800-400-7242, and ask to speak to the authorized representative assigned to the Plan (Case No. 213919).

Sincerely,

James L. Eggeman
Member, Appeals Board

5 Enclosures:

    (1) Pertinent Plan Provisions for the Northern Telecom Inc. Retirement Plan for Employees as Amended and Restated Effective July 1, 1998 (11 pages)

    (2) Northern Telecom Inc. Pension Service Plan, Effective January 1, 1999 (5 pages)

    (3) Covered Compensation and Transitional Covered Compensation Tables After 1983 (3 pages)

    (4) Nortel Networks Inc. Pension Service Plan Benefit Calculation Statement (Prepared on December 10, 2004) (1 page)

    (5) IRS Information on *Contact My Local Office Internationally* (1 page)

EXHIBIT D

# NORTHERN TELECOM INC.

## RETIREMENT PLAN FOR EMPLOYEES

### AS AMENDED AND RESTATED

### EFFECTIVE JULY 1, 1998

**Enclosure 1**

# ARTICLE I

## DEFINITIONS AND TERMS

For the purpose of this Plan, the following terms when capitalized shall have the following meanings:

1.1.    Accrued Retirement Benefit  shall mean that benefit which a Member, whether or not vested, has earned up to any date and which may become payable at his Normal Retirement Date in the form of a straight life annuity, and which shall be computed as provided in Section 5.4. based on the Member's Benefit Service, Covered Compensation, and Final Average Earnings, all as of that date on which the Accrued Retirement Benefit is computed.

1.2.    Active Member shall mean a Member who is an Employee on the date in question and who has satisfied the eligibility requirements for participation in the Plan as set forth in Article II.

1.3.    Actuarially Equivalent shall mean, with respect to any benefits payable pursuant to the Plan, benefits which are equivalent in value to the straight life annuity benefits which would otherwise have been provided to a Member. Such equivalence shall be based on the formulas and factors contained in Appendix A.

1.4.    Affiliated Company shall mean any company which is included within a "controlled group of corporations" (as defined in Code Section 414(b)) which includes an Employer or any trade or business (whether or not incorporated) which is under common control (as defined in Code Section 414(c)) with an Employer.

1.5.    Alternate Payee shall mean a spouse, former spouse, child or other dependent of a Member to whom all or a portion of such Member's nonforfeitable Plan benefit has been assigned by a Qualified Domestic Relations Order.

1.6.    Beneficiary shall mean a Member's Spouse, if any, or if the Member has no Spouse or has filed with the Plan Administrator appropriate waivers of the Spouse's rights, any person designated as such by a Member on a form supplied by the Plan Administrator to receive benefits payable pursuant to the provisions of Section 6.3.3.2. or 6.3.3.3. of the Plan as a result of or following the death of the Member. If there is no Spouse or if no such designation is in effect at the time of the death of that Member, or if the person designated has predeceased that Member, then the term "Beneficiary" shall mean that Member's estate, if applicable pursuant to the relevant benefit payment option.

1.7.    Benefit Service is defined in Section 3.1.

1.8.    Board shall mean the Board of Directors of the Company.

1.9.    Code shall mean the Internal Revenue Code of 1986 as amended or replaced from time to time.

1.10.  Committee shall mean the Employee Benefits Committee of the Company as described in Section 8.3.

1.11.  Company shall mean Northern Telecom Inc. ("NTI"), a Delaware Corporation, or any successor thereto.

1.12.  Covered Compensation shall mean that portion of a Member's Final Average Earnings which do not exceed the average of the contribution and benefit bases in effect under Section 230 of the Social Security Act for each calendar year in the 35-year period ending with the year in which the Member reaches Social Security Retirement Age, except that for the Member whose Termination Date occurs before Social Security Retirement Age, Covered Compensation will be determined by assuming no increases in the contribution and benefit bases after the year in which his Termination Date occurs.

1.13.  Early Retirement Date shall mean with respect to a Member, the first day of the calendar month coincident with or immediately following the date on which that Member attained age fifty-five (55).

1.14.  Earnings

1.14.1.  shall mean the total of all amounts paid by the Employer to or for the benefit of an Employee for services actually rendered or labor performed for the Employer while an Employee which are required to be reported on the Employee's Federal Income Tax Withholding Statement or statements (Form W-2 or its subsequent equivalent) subject to the following adjustments and limitations:

1.14.1.1.  The following shall be excluded:

1.14.1.1.1.  overtime pay, bonuses or other supplemental pay; provided that sales incentive earnings, "merit cash," and "skill block awards" or comparable forms of sales commissions otherwise designated shall not be excluded;

1.14.1.1.2.  reimbursements and other expense allowances;

1.14.1.1.3.  cash and noncash fringe benefits;

1.14.1.1.4.  moving expenses;

1.14.1.1.5.  Employer contributions to or payments from this or any other deferred compensation program, whether such program is qualified under code Section 401(a) or nonqualified;

1.14.1.1.6.  welfare benefits except for the benefits under the Company's short-term disability, vacation, and Severance plans (excluding, however, and commencing after December 31, 1994, Severance in excess of a period

equal to four (4) weeks plus one (1) week for each year of a Member's Vesting Service as of his termination of employment);

1.14.1.1.7.    amounts realized from the receipt or exercise of a stock option that is not an incentive stock option within the meaning of Code Section 422;

1.14.1.1.8.    amount realized at the time property described in Code Section 83 is freely transferable or no longer subject to a substantial risk of forfeiture;

1.14.1.1.9.    amounts realized as a result of an election described in Code Section 83(b);

1.14.1.1.10.    any amounts realized as a result of a disqualifying disposition within the meaning of Code Section 421(a); and

1.14.1.1.11.    any other amounts that receive special tax benefits under the Code but are not hereinafter included.

1.14.1.2.    The following shall be included:

1.14.1.2.1.    elective contributions made on a Participant's behalf by the Employer that are not includable in income under Code Section 125, Section 402(e)(3), Section 402(h), or Section 403(h);

1.14.1.2.2.    compensation deferred under an eligible deferred compensation plan within the meaning of Code Section 457;

1.14.1.2.3.    employee contributions described in Code Section 414(h) that are picked up by the employing unit and are treated as employer contributions; and

1.14.1.2.4.    prior employer compensation which otherwise would qualify as Earnings which is required to be considered for purposes of the Plan pursuant to the Reciprocal Agreement as defined in Section 14.9.1. unless the inclusion of such prior employer compensation would violate the rules of Treasury Regulation Section 1.414(s)-1(f).

1.14.2.    Earnings of any Member taken into account for purposes of the Plan shall be limited to $200,000 ($150,000 for years beginning after December 31, 1993) for any Plan Year, with such limitation to be:

1.14.2.1.    adjusted automatically to reflect any cost-of-living increases authorized by Code Section 401(a)(17) (with the adjustment for a calendar year being applicable to any period, not exceeding twelve (12) months, over which Final Average Earnings is determined which begins in such calendar year);

1.14.2.2.    prorated to the extent required by applicable law; and

1.14.2.3.    except for purposes of determining a Member's Covered Compensation, in the case of a Member who is either a five-percent (5%) owner of the Employer (within the meaning of Code Section 416(i)(1)(A)(iii)) or is one of the ten (10) highly compensated employees of the Employer (within the meaning of Code Section 414(q)) paid the greatest compensation during the applicable year and who has a spouse and/or lineal descendants who are under the age of nineteen (19) as of the end of an applicable year who receive Earnings during such applicable year, prorated and allocated among such Member, his spouse, and/or lineal descendants under the age of nineteen (19) based on the Earnings for such applicable year of each such individual.

If, in determining a Member's benefits accruing in a Plan Year commencing on or after January 1, 1994, Earnings for any period preceding such Plan Year is taken into account, the Earnings for such prior period shall be subject to the Earnings limitation in the preceding sentence as in effect for that prior period. For this purpose, for periods prior to January 1, 1994, the annual limit on Earnings shall be $150,000.

1.14.3.    Earnings shall have a grandfather limitation as described below effective January 1, 1994;

1.14.3.1.    For purposes of this Section 1.14.3.1., the term "Section 401(a)(17) Member" shall mean a Member whose current Accrued Retirement Benefit under the Plan as of a date on or after January 1, 1994, is based on Earnings for a year beginning prior to January 1, 1994, that exceeded $150,000.

1.14.3.2.    Notwithstanding any other provisions of the Plan, each Section 401(a)(17) Member's Accrued Retirement Benefit under the Plan will be the greater of the Accrued Retirement Benefit determined for such member under Section 1.14.3.2.1. or Section 1.14.3.2.2. below:

1.14.3.2.1.    Such Member's Accrued Retirement Benefit under the Plan determined under the benefit formula applicable for Plan Years beginning on or after January 1, 1994, and applied to such Member's total years of Benefit Service, or

1.14.3.2.2.    the sum of:

(A)    Such Member's Accrued Retirement Benefit as of December 31, 1993, frozen in accordance with Treasury Regulation Section 1.401(a)(4)-13, and

(B)    Such Member's Accrued Retirement Benefit determined under the benefit formula applicable for Plan Years beginning on or after January 1, 1994, and applied to the years of Benefit Service credited to such Member for Plan Years beginning on or after January 1, 1994.

1.14.3.3.    In determining a Member's Accrued Retirement Benefit under the Plan as of December 31, 1993, for purposes of Section 1.14.3.2. above, increases in the annual Earnings limit pursuant to Code Section 401(a)(17) for 1990,

1991, 1992, and 1993 shall be applied in determining the limits on Earnings for any prior year.

1.15.   Effective Date shall mean July 1, 1998 as to this restatement of the Plan, except as otherwise specified herein.

1.16.   Employee shall mean any individual who is considered an employee of his Employer (including a person receiving Severance and/or accrued and/or earned (but unused) vacation immediately following termination of employment) for purposes of the taxes imposed under the Federal Insurance Contributions Act and the Federal Unemployment Tax Act.  Employee excludes:

   1.16.1.   any individual whose terms and conditions of employment are governed by a collective bargaining agreement which does not provide for participation in the Plan,

   1.16.2.   any individual who is accruing credit for Benefit Service purposes pursuant to any other qualified pension plan (other than a thrift savings or other 401(k)-type plan) to which the Employer contributes concurrent with his accrual of Benefit Service under the Plan,

   1.16.3.   any individual who is a non-resident alien and who receives no earned income (within the meaning of Code Section 911(d)(2)) from the Employer which constitutes income from sources within the United States (within the meaning of Code Section 861(a)(3)), and/or

   1.16.4.   any individual who is a Leased Employee.

1.17.   ERISA shall mean the Employee Retirement Income Security Act of 1974.

1.18.   Employer shall mean the Company and/or any Participating Companies.

1.19.   Final Average Earnings shall mean the Member's annual average Earnings during the one thousand ninety-five (1,095) consecutive calendar day period of the Member's highest Earnings in the three thousand six hundred fifty (3,650) consecutive calendar days or, if less, the total number of consecutive calendar days of the Member's employment with the Employer immediately preceding the member's Termination Date; provided, however, that:

   1.19.1.   in calculating the Final Average Earnings as provided in Section 1.19., any Earnings, including, but not limited to, sales commission payments, which are not paid on a substantially equal basis throughout the calendar year, shall be allocated to such Member as Earnings in the calendar year in which paid on a prorata daily basis;

   1.19.2.   with respect to a Member who is eligible to receive a Disability Retirement pursuant to Section 4.3., the Final Average Earnings shall mean the Member's annual average Earnings during the one thousand ninety-five (1,095) consecutive calendar day period of the Member's highest Earnings in the three thousand six hundred fifty (3,650) consecutive calendar days or, if less, the total

number of consecutive calendar days of employment with an Employer immediately preceding the Member's commencement of benefits under the employer's long-term disability plan:

1.19.3.   with respect to a Member who has less than one thousand ninety-five (1,095) consecutive calendar days of employment with an Employer, Final Average Earnings shall mean the Member's annual average Earnings during the longest period of consecutive calendar days of employment; and

1.19.4.   for purposes of determining those calendar days of highest Earnings and calculating a Member's Final Average Earnings under this Section 1.19., any reduction in Earnings resulting from a Member's receipt of benefits pursuant to the Employer's short-term or long-term disability plan shall be disregarded.

1.20.   Hours of Service

1.20.1.   Hours of Service shall mean:

1.20.1.1.   each hour for which an employee is directly or indirectly paid, or entitled to payment by the Employer for the performance of duties for the Plan Year, and

1.20.1.2.   each hour for which an employee is paid, or entitled to payment by the Employer for a period of time during which no duties were performed (regardless of whether or not the employee has terminated his employment relationship with the Employer) due to vacation, holiday, illness, incapacity (including disability), layoff, jury duty, military duty, Severance or leave of absence;

1.20.1.3.   each hour for which back pay (irrespective of mitigation of damages) has either been awarded or agreed to by the Employer and shall be credited for the Plan Year to which the agreement or award pertains, and

1.20.1.4.   each hour for which the Employer is required under applicable law to provide the employee with an Hour of Service including, but not limited to, a period of military leave during which the employee's reemployment rights are protected under federal law; provided, however, that with respect to such military leave the employee returns to employment with the Employer within the longer of the ninety (90) day period after his honorable discharge or release or the period prescribed by applicable law.

1.20.2.   Notwithstanding any provisions contained herein, no employee shall be credited with an Hour of Service under more than one of Sections 1.20.1.1., 1.20.1.2., 1.20.1.3., and 1.20.1.4. No Hours of Service shall be credited pursuant to Section 1.20.1.1. or 1.20.1.2. if payment to the employee is made or due under a plan maintained solely for the purpose of complying with applicable worker's compensation, unemployment compensation or disability insurance laws. One hundred ninety (190) Hours of Service shall be credited for, and in respect of, each calendar month in which an employee is directly or indirectly paid by the Employer or entitled to payment for one (1) or more Hours of Service. For the purposes of this Section 1.20., the term "Employer" shall include, in addition to those entities

- 6 -

described in Section 1.18., an Affiliated Company. The Department of Labor Regulations Section 2530.200b-2(b) and (c) are incorporated herein by reference into this Section 1.20.

1.20.3.    Notwithstanding the provisions of Section 1.20.2., an "Hour of Service" for the purpose of Sections 6.1.2.1. and 6.1.2.2. shall mean an actual hour for which the Member is paid or is entitled to payment, whether or not the Member is to be credited with more than one Hour of Service for that same hour for the purpose of calculating future benefits under this Plan, and whether or not such compensation is with respect to the performance of duties, vacation, holiday, illness, incapacity (including disability), layoff, jury duty, military duty, Severance or leave of absence; provided, however, that "Hour of Service" for the purpose of Sections 6.1.2.1. and 6.1.2.2. shall exclude accrued and/or earned (but unused) vacation which is paid as a lump sum upon termination of employment.

1.21.    Leased Employee shall mean any person who pursuant to an agreement between an Employer and any other person ("Leasing Organization") performs services for the Employer (or for the Employer and related persons determined in accordance with Code Section 414(n)(6)) on a substantially full-time basis for a period of at least one (1) year and such services are of a type historically performed by employees in the business field of the Employer; provided, however, that such person shall cease to be treated as a Leased Employee if he has failed to perform such services on a substantially full-time basis for a period of at least one (1) year following his initial designation as a Leased Employee.

1.22.    Member shall mean any Employee who is or becomes eligible for membership in the Plan pursuant to Article II.

1.23.    Normal Retirement Date shall mean the first day of the calendar month coincident with or immediately following the date on which that Member attains age sixty-five (65).

1.24.    Participating Company shall mean any present or future subsidiary of the Company or other Affiliated Company which adopts the Plan by action of its board of directors and which is permitted to participate in the Plan by action of the Board. The effective date of such designations set forth above and the periods from which the Benefit Service and Vesting Service of Employees of a Participating Company shall be credited to such Employees pursuant to the Plan shall be indicated on Appendices B and C, as applicable, to the Plan. A Participating Company may revoke its acceptance of such designation at any time, subject to the approval of the Board, provided that until such acceptance has been finally revoked as provided above, all of the provisions of the Plan as amended shall apply to the Employees of the Participating Company. In the event of such final revocation, the Plan shall be deemed terminated only as to such Participating Company in accordance with Article IX.

1.25.    Pilot Employee shall mean any Employee with the job responsibility to pilot aircraft owned or operated by the Employer.

1.26.   Plan shall mean the Northern Telecom Inc. Retirement Plan for Employees as set forth in its entirety in this document and the Trust Agreement as this document and that Trust Agreement may be amended from time to time.

1.27.   Plan Administrator shall mean the Company.

1.28.   Plan Year shall mean each twelve (12) month period which begins on January 1 of each calendar year.

1.29.   Qualified Domestic Relations Order shall mean a judgment, decree or order made pursuant to state domestic relations law which assigns all or part of a Member's non-forfeitable Plan benefit to such Member's Alternate Payee and meets the requirements of Code Section 414(p) and Section 206(d)(3) of ERISA.

1.30.   Retirement Date of a Member shall mean the date, as applicable, on which a Member's Plan benefit commences pursuant to Section 4.1., 4.2., 4.3. or 4.4.

1.31.   Rule of 85 shall mean, as set forth in Section 4.2.2., any combination of an Active Member's age and Vesting Service that shall equal eighty-five (85), with the minimum age requirement of sixty (60).

1.32.   Severance shall mean an Employee's severance or income continuation period and/or payments, as applicable, pursuant to the Employer's Severance Allowance Plan or a separation agreement with the Employer.

1.33.   Spouse shall mean the spouse of a Member whose marriage continues to be recognized under the laws of the state in which the marriage was contracted as of the date in question.

1.34.   Termination Date shall mean the date on which the Member ceases to be an Employee. After December 31, 1994, a Member's Termination Date shall be determined excluding Severance in excess of a period equal to four (4) weeks plus one (1) week for each year of such Member's Vesting Service as of his termination of employment with the Employer.

1.35.   Trust Agreement shall mean the Master Trust Agreement entered into between the Company and the Trustees to carry out the purposes of the Plan.

1.36.   Trustees shall mean the Trustees selected by the Company as set forth in the Trust Agreement.

1.37.   Trust Fund or Fund shall mean the cash and other properties held and administered by the Trustees in accordance with the provisions of the Trust Agreement and the Plan.

1.38.   Vesting Service is defined in Section 3.2.

1.39.   Year of Service shall mean, with respect to a Member, a Plan Year in which that Member has at least one thousand (1,000) Hours of Service, and is a Member. No more than one (1) Year of Service shall be credited to a Member per Plan Year.

## ARTICLE II

## ELIGIBILITY FOR MEMBERSHIP

2.1.   Eligibility for Membership

2.1.1.    Prior Members.  Each Employee who was a Member on the day prior to the Effective Date shall remain a Member as of the Effective Date.

2.1.2.    New Employees

An Employee shall become a Member on the later of the first anniversary of the date that he commenced his employment with an Employer and age twenty-one (21).

2.1.3.    Rehires.  Any individual who was a Member prior to his Termination Date shall become an Active Member immediately upon rehire as an Employee.

2.2.   Excluded Individuals

Notwithstanding any provisions in the Plan to the Contrary, no individual who is designated, compensated or otherwise treated as an independent contractor by the Employer shall be eligible to become a Member.

ARTICLE III

BENEFIT AND VESTING SERVICE

## 3.1. Benefit Service

As used herein the term "Benefit Service" shall mean, with respect to a Member, that Member's aggregate number of Years of Service with the Employer commencing with the earliest date on which that Member was hired by, or transferred to, the Employer and ending on that Member's Termination Date; provided, however, that the determination of any Member's Benefit Service shall be subject to the following rules and exceptions:

      3.1.1.   If a Member has a Year of Service he shall be credited with one (1) year of Benefit Service.

      3.1.2.   No credit for service shall be provided:

            3.1.2.1.    for service during a Plan Year in which a Member does not have a Year of Service;

            3.1.2.2.    for service which was credited as Benefit Service and for which a Member received a payment pursuant to Section 6.6.;

            3.1.2.3.    for service prior to May 1, 1974; or

            3.1.2.4.    with respect to any Member who has not completed an Hour of Service after January 1, 1989, for service which was disregarded pursuant to the Plan's break-in-service provisions as in effect at any time prior to January 1, 1989.

      3.1.3.   An Active Member shall receive credit for one hundred ninety (190) hours of Benefit Service for each calendar month during which he is totally and permanently disabled (as described in Section 4.3.2.), provided he has completed at least one (1) year of Vesting Service prior to the date that he became totally and permanently disabled. Benefit Service credit pursuant to Section 3.1.3. shall be subject to the following limitations:

            3.1.3.1.    Such Benefit Service credit will cease upon the Active Member's Normal Retirement Date unless he is still eligible for benefits under any disability plan or policy maintained by the Employer. In such a case, Benefit Service credit shall continue until such Active Member is no longer eligible for such disability benefits; provided, however, that such Benefit Service credit shall not continue if such benefits are paid or due under a plan maintained solely for the purpose of complying with applicable worker's compensation, unemployment compensation or disability insurance laws.

            3.1.3.2.    If an Active Member ceases to be totally and permanently disabled before he attains Normal Retirement Age, the accrual of Benefit Service pursuant to Section 3.1.3. shall cease as of the date he ceased to be totally and permanently disabled.

## ARTICLE V

## COMPUTATION OF BENEFITS

### 5.1.    Normal Retirement Benefits

The annual "Normal Retirement Benefit" of a Member who becomes eligible therefor pursuant to Section 4.1. shall be the difference obtained by subtracting the amount in Section 5.1.3. from the sum of the amounts in Sections 5.1.1. and 5.1.2., where:

5.1.1.    equals one and one-tenth percent (1.1%) of the Member's Final Average Earnings up to and including the amount of the Member's Covered Compensation multiplied by the Member's years of Benefit Service, up to a maximum of thirty (30) years of Benefit Service;

5.1.2.    equals one and one-half percent (1.5%) of the amount by which the Member's Final Average Earnings exceed his Covered Compensation multiplied by the Member's years of Benefit Service. up to a maximum of thirty (30) years of Benefit Service;

5.1.3.    equals that portion of the pension benefit, if any. payable pursuant to any pension plan or former pension plan (other than a defined contribution plan) of any Employer. which pension benefit is based on a period of employment with respect to which the Member received credit for Benefit Service pursuant to this Plan.

Notwithstanding anything in Section 5.1. to the contrary, a Member's Normal Retirement Benefit shall not be less than the product of twelve (12) times the Member's years of Benefit Service (up to a maximum of thirty (30) years of Benefit Service) times Fifteen Dollars ($15.00) minus any benefit payable as described in Section 5.1.3.

### 5.2.    Early Retirement Benefit

The annual "Early Retirement Benefit" of a Member who becomes eligible therefor pursuant to Section 4.2. shall be the benefit calculated as provided in Section 5.1. based on the Member's Benefit Service, Covered Compensation, and Final Average Earnings on his Termination Date and reduced by (i) one-fourth of one percent (1/4 of 1.0%) for each complete calendar month by which that Member commences to receive Plan benefits prior to his Normal Retirement Date for the period between that Member's attainment of age sixty-two (62) and his Normal Retirement Date and (ii) five-twelfths of one percent (5/12th of 1.0%) for each complete calendar month by which that Member commences to receive benefits prior to that Member's attainment of age sixty-two (62).

### 5.3.    Disability Retirement Benefit

The annual "Disability Retirement Benefit" of a Member who becomes eligible therefor pursuant to Section 4.3. shall be the amount of the benefit computed pursuant to Section 5.1.

- 16 -

### 5.4.  Vested Retirement Benefit

5.4.1.    The annual "Vested Retirement Benefit" of a Member who becomes eligible therefor pursuant to Section 4.4. shall be the benefit computed as provided in Section 5.1. based on the Member's Benefit Service, Covered Compensation, and Final Average Earnings, all as of his Termination Date, and payable as of the Member's Normal Retirement Date.

5.4.2.    A Member may elect to commence payment of his Vested Retirement Benefit prior to his Normal Retirement Date, but not before his Early Retirement Date. In the event a Member makes such election, his Vested Retirement Benefit shall be reduced in accordance with the provisions of Section 5.2.(i) and (ii).

### 5.5.  Spouse Death Benefit

The annual Death Benefit of a Spouse eligible therefor as provided in Section 4.5. is that benefit which would have been payable to the Member's Spouse if:

5.5.1.    in the case of a Member who dies after his Early Retirement Date, such Member had retired with a Qualified Joint and Survivor Annuity as provided in Section 6.3.3.2.(ii) on the day prior to the Member's date of death or

5.5.2.    in the case of a Member who dies on or before his Early Retirement Date. such Member had:

5.5.2.1.    separated from service on such Member's Termination Date.

5.5.2.2.    survived to his Early Retirement Date,

5.5.2.3.    retired with a Vested Retirement Benefit on his Early Retirement Date with a Qualified Joint and Survivor Annuity as provided in Section 6.3.3.2.(ii), and

5.5.2.4.    died on the date after the day on which said Member would have attained his Early Retirement Date.

5.5.3.    If the Spouse elects to defer commencement of the Death Benefit provided herein until after her date of first eligibility for such benefit as provided in Sections 5.5.1 and 5.5.2., appropriate adjustments in the amount of such benefit in accordance with Section 5.2(i) and (ii) shall be made.

### 5.6.  Ad Hoc Increases

From time to time. the Board may increase the retirement benefits payable from the Fund to some or all retired Members, their Beneficiaries or Alternate Payees (as provided in the applicable Qualified Domestic Relations Order) who are receiving a Normal Retirement Benefit, an Early Retirement Benefit, a Vested Retirement Benefit, a Spouse Death Benefit, a Survivor Annuity benefit, or a Disability

Retirement Benefit by such amount and in such manner as it shall deem appropriate as set forth in Appendix E.

# ARTICLE VI

## PAYMENT OF BENEFITS

### 6.1.    Payment Period and Continued Employment/Reemployment

6.1.1.    Except as otherwise provided in Section 6.6., all benefits which become payable hereunder shall be payable monthly in an amount which is equal to one-twelfth (1/12) of the appropriate annual benefit, calculated as provided herein, commencing on the Retirement Date, which shall be the first day of a calendar month, or the first day of the calendar month coincident with or immediately following the date of death or the date on which a recipient elects to commence receipt of such benefits, whichever is applicable. All such monthly payments shall continue until the last monthly payment prior to the death of the payee.

6.1.2.    If a Member continues employment or is reemployed as an Employee on or after his Retirement Date and is paid or is entitled to payment from the Employer for a total of:

6.1.2.1.    less than forty (40) Hours of Service as described in Section 1.20.4. in any given calendar month, such Member shall be entitled to receive or continue to receive for such month his Plan benefit; provided, however, that, if such Member is credited with a Year of Service during such employment, payments of his Plan benefit shall be suspended until his subsequent retirement under the Plan;

6.1.2.2.    forty (40) or more Hours of Service as described in Section 1.20.4. in any calendar month, such Member's Plan benefit shall be suspended for such calendar month.

6.1.2.3.    In the case of any such Member whose reemployment occurs on or after he has commenced his Normal Retirement Benefit pursuant to Section 4.1. and, as a result, whose benefit is to be suspended pursuant to Sections 6.1.2.1. or 6.1.2.2. above, the Plan Administrator shall furnish such Member with the notification described in Department of Labor Regulation Section 2530.203-3. Upon such Member's termination of reemployment, his benefit shall be increased to the extent required, if at all, under such regulations to avoid the effecting of a prohibited forfeiture of benefits by reason of such suspension during such Member's post-Normal Retirement Date reemployment.

6.1.2.4.    Upon the subsequent termination of employment of a Member described in Sections 6.1.2.1 or 6.1.2.2., whether or not his Plan benefit was suspended during such employment pursuant to Sections 6.1.2.1. or 6.1.2.2., such Member's Plan benefit shall be recalculated pursuant to the applicable provisions of the Plan if such Member accrued an additional Plan benefit as a result of service completed during his period of continued employment or reemployment subsequent to his Retirement Date. Such recalculated Plan benefit amount shall be reduced by an amount which is the actuarial equivalent of the accumulated value of the Plan benefit payments, if any, such Member received prior to termination of this continued employment or reemployment period; provided, however, that (i) such reduction shall not occur if the prior benefit was paid pursuant to Section 6.6. and the Member's prior

- 19 -

# NORTEL NETWORKS INC.

# PENSION SERVICE PLAN

### EFFECTIVE May 3, 1999

**Enclosure 2**

99009

# INTRODUCTION

This Plan shall be known as the Nortel Networks Pension Service Plan (the "Plan"). The Plan is an amendment and restatement, effective May 3, 1999 (except as otherwise indicated herein), of the Northern Telecom Inc. Pension Service Plan. The Northern Telecom Inc. Pension Service Plan was effective January 1, 1999 and was an amendment and restatement of the Northern Telecom Inc. Retirement Plan for Employees (the "Prior Plan"). The Prior Plan was initially effective on May 1, 1974. The Prior Plan is attached to and made a part of the Plan (as Appendix G) to the extent that the Plan references Prior Plan provisions.

The purpose of this Plan, together with other employer sponsored retirement plans, is to provide eligible Members with retirement benefits which are in addition to Social Security benefits.

The benefits and rights of any former Members whose Termination Date occurred prior to January 1, 1999, shall be governed by the terms of the Plan under which they were last covered.

This restated Plan shall only be applicable to Employees who are active Members in the Plan on and after January 1, 1999. Active Members are Employees who are Members and complete at least one (1) Hour of Service on or after January 1, 1999. In no event will the Accrued Benefit under this restatement be less than the Accrued Benefit as of December 31, 1998 under the Prior Plan provisions in effect at that time.

It is the intention of the Company that the Plan and the Trust, which is a part of this Plan, shall meet the requirements of the Employee Retirement Income Security Act of 1974 (ERISA) and shall be qualified under Sections 401(a) and 501(a) of the Internal Revenue Code of 1986, as amended from time to time.

## VII.C.2. Covered Compensation and Transitional Covered Compensation Tables After 1983

02/26/2016

After 1983, if the plan does not specify Table I (which we also refer to as the "Rounded" table) or Table II (which we also refer to as the "Unrounded" table), TPD actuaries should use the simpler Table I (or Rounded table). The tables are published annually by the IRS. The Covered Compensations (CCs) reported in each table represent 35-year averages of Social Security (SS) wage bases ending with the calendar years of SS normal retirement age (SSNRA). In each table, whenever the calendar year of SSNRA is greater than the year of the table, projected (instead of actual) wage bases are used to determine the CC amount. For example, consider the 2011 CC tables. For every calendar year of SSNRA greater than 2011 (i.e., for every calendar year of birth after 1945), the IRS used projected wage bases to calculate the corresponding 35-year average, because, in 2011, only the actual wage bases up to 2011 were known.

Note: What we call the Unrounded table does not contain exact averages of 35 years of SS wage bases. In fact, the Unrounded table's 35-year averages are rounded down to the nearest multiple of 12. The effect makes the monthly CC a whole dollar amount.

[ Expand All | Collapse All ]

▶ 2016 Covered Compensation Table
▶ 2015 Covered Compensation Table
▶ 2014 Covered Compensation Table
▶ 2013 Covered Compensation Table
▶ 2012 Covered Compensation Table
▶ 2011 Covered Compensation Table
▶ 2010 Covered Compensation Table
▶ 2009 Covered Compensation Table
▶ 2008 Covered Compensation Table
▶ 2007 Covered Compensation Table
▶ 2006 Covered Compensation Table
▶ 2005 Covered Compensation Table
▶ 2004 Covered Compensation Table
▶ 2003 Covered Compensation Table
▶ 2002 Covered Compensation Table
▶ 2001 Covered Compensation Table
▶ 2000 Covered Compensation Table
▶ 1999 Covered Compensation Table
▼ 1998 Covered Compensation Table

01/30/1998

| Calendar Year of Birth | Calendar Year of Social Security Retirement Age | 1998 Covered Compensation | |
| --- | --- | --- | --- |
| | | Unrounded | Rounded |
| 1931 | 1996 | 27,576 | 27,000 |
| 1932 | 1997 | 29,304 | 30,000 |
| 1933 | 1998 | 31,128 | 30,000 |
| 1934 | 1999 | 32,940 | 33,000 |

**Enclosure 3**

| 1935 | 2000 | 34,752 | 36,000 |
| 1936 | 2001 | 36,528 | 36,000 |
| 1937 | 2002 | 38,292 | 39,000 |
| 1938 | 2004 | 41,748 | 42,000 |
| 1939 | 2005 | 43,488 | 42,000 |
| 1940 | 2006 | 45,216 | 45,000 |
| 1941 | 2007 | 46,908 | 48,000 |
| 1942 | 2008 | 48,552 | 48,000 |
| 1943 | 2009 | 50,136 | 51,000 |
| 1944 | 2010 | 51,684 | 51,000 |
| 1945 | 2011 | 53,208 | 54,000 |
| 1946 | 2012 | 54,684 | 54,000 |
| 1947 | 2013 | 56,136 | 57,000 |
| 1948 | 2014 | 57,432 | 57,000 |
| 1949 | 2015 | 58,644 | 60,000 |
| 1950 | 2016 | 59,760 | 60,000 |
| 1951 | 2017 | 60,780 | 60,000 |
| 1952 | 2018 | 61,716 | 63,000 |
| 1953 | 2019 | 62,592 | 63,000 |
| 1954 | 2020 | 63,420 | 63,000 |
| 1955 | 2022 | 64,872 | 66,000 |
| 1956 | 2023 | 65,544 | 66,000 |
| 1957 | 2024 | 66,120 | 66,000 |
| 1958 | 2025 | 66,612 | 66,000 |
| 1959 | 2026 | 67,044 | 66,000 |
| 1960 | 2027 | 67,404 | 68,400 |
| 1961 | 2028 | 67,716 | 68,400 |
| 1962 | 2029 | 67,944 | 68,400 |
| 1963 | 2030 | 68,148 | 68,400 |
| 1964 | 2031 | 68,304 | 68,400 |
| 1965 or later | 2032 or later | 68,400 | 68,400 |

Note: Taken from Revenue Ruling 97-45 (11/24/97).

▶ 1997 Covered Compensation Table

▶ 1996 Covered Compensation Table

▶ 1995 Covered Compensation Table

- ▶ 1994 Covered Compensation Table
- ▶ 1993 Covered Compensation Table
- ▶ 1993 Transitional Covered Compensation Table
- ▶ 1992 Covered Compensation Table
- ▶ 1992 Transitional Covered Compensation Table
- ▶ 1991 Covered Compensation Table
- ▶ 1991 Transitional Covered Compensation Table
- ▶ 1990 Covered Compensation Table
- ▶ 1990 Transitional Covered Compensation Table
- ▶ 1989 Covered Compensation Table
- ▶ 1989 Transitional Covered Compensation Table
- ▶ 1988 Covered Compensation Table
- ▶ 1987 Covered Compensation Table
- ▶ 1986 Covered Compensation Table
- ▶ 1985 Covered Compensation Table
- ▶ 1984 Covered Compensation Table

**See Also**

VII.C. Social Security Excess Plans, and Covered Compensation
and Transitional Covered Compensation Tables
VII.C.1. Social Security Excess Plans: Covered Compensation for
DOPTs to 1983

Top of Page

# NORTEL NETWORKS INC. PENSION SERVICE PLAN
# BENEFIT CALCULATION STATEMENT



| | |
|---|---|
| **Employee Name** | McGregor, Douglas |
| **Social Security Number:** | XXX-XX-2677 |
| **Vested Status:** | Yes |
| **Vesting Service:** | 28 |
| **Benefit Service:** | 8 |
| **NNL Service Credits:** | 21.07 |
| **Qualified Final Average Earnings:** | $190,000.00 |
| **Unlimited Final Average Earnings:** | $306,095.43 |
| **Accumulated Percentage Credits:** | 85.45% |
| **Grandfathered Benefit Calculated:** | No |

| | |
|---|---|
| **Calculation Type:** | Projection |
| **Date of Hire:** | November 27, 1976 |
| **Plan Eligible Date:** | January 03, 1995 |
| **Employee Date of Birth:** | December 11, 1954 |
| **Spouse Date of Birth:** | January 20, 1954 |
| **Termination Date:** | December 31, 2004 |
| **Standard Severance End Date:** | December 31, 2004 |
| **Vacation Days:** | 0 |
| **Calculation End Date:** | December 31, 2004 |
| **Retirement Date:** | January 01, 2005 |

## IMMEDIATE QUALIFIED RETIREMENT BENEFIT - Age 51 – Benefit Start Date: January 01, 2005

| Payment Options | Employee | | Beneficiary |
|---|---|---|---|
| Life Only Amount: | $1,033.51 | | |
| 10 Year Certain: | $1,002.50 | | |
| 50% J & S: | $934.76 | | $467.38 |
| 75% J & S: | $893.42 | | $670.07 |
| 100% J & S: | $864.71 | | $864.71 |
| *Lump Sum: | $203,084.91 | - Payable on Benefit Start Date plus processing time | |

*Qualified Lump Sums of $5,000 or less will be automatically paid in 1 payment. Employees may roll their Lump Sum over to a tax deferred plan or IRA. Surviving spouses may roll their Lump Sum over to an IRA. Rollover is Not available to other Beneficiaries.

## IMMEDIATE NON-QUALIFIED RETIREMENT BENEFIT - Age 51 – Benefit Start Date: January 01, 2005

| Payment Options | Employee | | Beneficiary |
|---|---|---|---|
| Life Only Amount: | $631.50 | | |
| 10 Year Certain: | $612.56 | | |
| 50% J & S: | $571.16 | | $285.58 |
| 75% J & S: | $545.90 | | $409.43 |
| 100% J & S: | $528.36 | | $528.36 |
| *Lump Sum: | $124,090.46 | - Payable on Benefit Start Date plus processing time | |

*A Non-qualified Lump Sum benefit of less than 50% of your unlimited FAE is paid as a one-time Lump Sum; if it is 50% or more of your unlimited FAE, it is paid as a 15 Year Term Certain monthly payment. Rollover to a tax deferred Plan or IRA is NOT available to any recipient of a Non-Qualified Retirement Benefit.

*green*

| INTERVENTION | Y | N |
|---|---|---|

| | INITIALS | DATE |
|---|---|---|
| ORIGINATOR | | |
| Green Review | Bcalc | |
| Yellow Review | | |
| Red Review | | |

## QUALIFIED NORMAL RETIREMENT BENEFIT
## Age 65 – Start Date: January 01, 2020

| Payment Options | Employee | | Beneficiary |
|---|---|---|---|
| Life Only Amount: | $2,984.10 | | |
| 10 Year Certain: | $2,745.37 | | |
| 50% J & S: | $2,698.97 | | $1,349.49 |
| 75% J & S: | $2,579.61 | | $1,934.71 |
| 100% J & S: | $2,496.72 | | $2,496.72 |

Lump Sum to be determined at actual retirement date.

## NON-QUALIFIED NORMAL RETIREMENT BENEFIT
## Age 65 – Start Date: January 01, 2020

| Payment Options | Employee | | Beneficiary |
|---|---|---|---|
| Life Only Amount: | $1,823.37 | | |
| 10 Year Certain: | $1,677.50 | | |
| 50% J & S: | $1,649.15 | | $824.58 |
| 75% J & S: | $1,576.21 | | $1,182.16 |
| 100% J & S: | $1,525.57 | | $1,525.57 |

Lump Sum to be determined at actual retirement date.

**Note:** This Benefit Calculation Statement presents your pension benefits based on your personal data & applicable tables in effect on the date the calculation was prepared. Since this data & the tables change over time, a final calculation will be completed immediately prior to your actual Retirement/Benefit Start Date based on the data & tables in effect on the date the final calculation is prepared. This final calculation will be used to determine your payable benefit. If y... vesting service as of December 31, 1998, you are eligible for Grandfather benefits... applies, your benefits were calculated using the current plan provisions AND the p... statement, including lump sum payments, are based upon the greater of the two fo... Networks Retirement Income Plan (as it applies to Pension Service Plan Men... that will be paid to you. You may not rely on any error in this benefit calculati... the calculation process, erroneous data in the system, or any other cause) to... described for you under the terms of the Plan.

**Enclosure 4**

Calculation ID: 150886 Prepared on December 10, 2004



## Contact My Local Office Internationally

Español | 中文 | 한국어 | TiếngViệt | Русский

**International Tax Topic Index**
Specifically designed for taxpayers with international filing requirements



**International Services**

If you are a taxpayer with specific individual or business account questions you should contact the International Taxpayer Service Call Center by phone or fax. The International Call Center is operational Monday through Friday, from 6:00 a.m. to 11:00 p.m. (Eastern Time):
Tel: 267-941-1000 (not toll-free)
Fax: 267-941-1055

If you are a tax professional or software provider calling about an e-file issue and it is not account related, please contact the e-help office in Austin at 512-416-7750 (not toll-free). Assistors are available Monday through Friday, from 7:00 a.m. to 6:00 p.m. (Central time).

Taxpayer service, formerly offered at the foreign posts of duty, is no longer available. Please send your tax forms and correspondence to the applicable address indicated below.

Individual taxpayers located outside the U.S. may also contact the IRS by mail at:

Internal Revenue Service
International Accounts
Philadelphia, PA 19255-0725

Business taxpayers located outside the U.S. may also contact the IRS by mail at:

Internal Revenue Service
International Accounts
Ogden, UT 84201-0038

Residents of Puerto Rico and the U.S. Virgin Islands may contact the IRS toll free at 1-800-829-1040. (Hours of Operation are 7:00 a.m. to 10:00 p.m. Monday - Friday). For face-to-face assistance information in Puerto Rico refer to Contact My Local Office in Puerto Rico.

**Other items of potential interest:**

**International Taxpayer Advocate:**
To request Taxpayer Advocate assistance, call the Taxpayer Advocate Service toll-free number at 1-877-777-4778, or refer to Contact a Local Taxpayer Advocate (LTA) in Caribbean US Territories (Puerto Rico & US Virgin Islands) and International or Contact a Local Taxpayer Advocate (LTA) in Hawaii & Pacific US Territories (Guam, American Samoa and the Northern Mariana Islands).

*Page Last Reviewed or Updated: 05-Nov-2015*

**Enclosure 5**