## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------------x
                         :

*In re*                            :    Chapter 11
                         :

Nortel Networks Inc., *et al.*,[1]    :    Case No. 09-10138 (KG)
                         :    Jointly Administered

             Debtors.    :
                         :    <u>Hearing Date:</u>
                         :    **October 21, 2016 at 11:00 a.m. (ET) [Requested]**
                         :    <u>Objections Due:</u>
                         :    **October 18, 2016 at 4:00 p.m. (ET)  [Requested]**
-------------------------------------------------------------x

## DEBTORS' MOTION
## FOR AN ORDER AUTHORIZING ENTRY INTO CANADIAN
## <u>CURRENCY ESCROW AGREEMENT TO FACILITATE GLOBAL SETTLEMENT</u>

Nortel Networks Inc. ("<u>NNI</u>") and certain of its affiliates, as debtors and debtors in possession (collectively, the "<u>Debtors</u>"), hereby move this Court (the "<u>Motion</u>") for entry of an order, substantially in the form attached hereto as <u>Exhibit A</u>, pursuant to sections 105(a) and 363(b) of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") and Rules 2002 and 6004 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), (a) approving the Canadian Escrow Agreement attached hereto as Exhibit B (the "<u>Canadian Escrow Agreement</u>") and authorizing the Debtors to enter into the Canadian Escrow Agreement, each to facilitate the global Settlement of the Allocation Dispute  and (b) granting such other and further relief as the Court deems just and proper.  In support of this Motion, the Debtors respectfully represent as follows:

---

[1]    Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567), Nortel Networks (CALA) Inc. (4226) and Nortel Networks India International Inc. (8667).  Contact information for the U.S. Debtors and their petitions are available at http://dm.epiq11.com/nortel.

## JURISDICTION

1.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the February 29, 2012 Amended Standing Order of Reference from the U.S. District Court for the District of Delaware.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2) and the Court may enter a final order consistent with Article III of the United States Constitution. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.     The statutory bases for the relief requested herein are Bankruptcy Code sections 105(a) and 363(b) and Bankruptcy Rules 2002 and 6004.

## BACKGROUND

### A.     Procedural Background

3.     On January 14, 2009 (the "Petition Date"), the Debtors, other than Nortel Networks (CALA) Inc. ("NN CALA")[2] and Nortel Networks India International Inc. ("NNIII")[3] filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code, which cases are consolidated for procedural purposes only.  The Debtors continue to operate as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

4.     The Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") has appointed an Official Committee of Unsecured Creditors (the "UCC") in respect of the Debtors [D.I.s 141, 142], and an ad hoc group of bondholders has been organized since 2009 (collectively the "Bondholder Group").  An ad hoc consortium of creditors holding trade claims against the Debtors (the "Trade Claims Consortium") was organized in 2015.

---

[2]     NN CALA filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on July 14, 2009, which was consolidated and is being jointly administered with the other Debtors' Chapter 11 cases for procedural purposes [D.I. 1098].

[3]     NNIII filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on July 22, 2016, which was consolidated and is being jointly administered with the other Debtors' Chapter 11 cases for procedural purposes [D.I. 8667].

5.      On the Petition Date, the Debtors' ultimate corporate parent Nortel Networks Corporation ("NNC"), NNI's direct corporate parent NNL (together with NNC and their affiliates, including Debtors, "Nortel"), and certain of their Canadian affiliates (collectively, the "Canadian Debtors")[4] commenced a proceeding with the Ontario Superior Court of Justice (the "Canadian Court") under the Companies' Creditors Arrangement Act (Canada) (the "CCAA"), seeking relief from their creditors (collectively, the "Canadian Proceedings") and a Monitor, Ernst & Young Inc. (the "Monitor"), was appointed by the Canadian Court.  The Canadian Creditors Committee (the "CCC") is an ad hoc committee of major creditors having claims only against the Canadian Debtors.

6.      Also on the Petition Date, the High Court of Justice in England and Wales placed nineteen of Nortel's European affiliates, including NNUK and certain of its affiliates located in Europe, the Middle East, and Africa (collectively, the "EMEA Debtors"),[5] into administration (the "UK Proceedings") under the control of individuals from Ernst & Young LLP (collectively, the "Joint Administrators").  Additionally, certain of the EMEA Debtors' affiliates have not commenced administration proceedings, but are under the control of their respective directors (the "EMEA Non-Filed Entities").

7.      On May 28, 2009, Nortel Networks S.A. ("NNSA") commenced secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC) No. 1346/2000 on Insolvency Proceedings in the Republic of France (the

---

[4]      The Canadian Debtors include the following entities:  NNC, NNL, Nortel Networks Technology Corporation, Nortel Networks Global Corporation, and Nortel Networks International Corporation.

[5]      The EMEA Debtors include the following entities:  NNUK, Nortel Networks S.A., Nortel Networks (Ireland) Limited, Nortel GmbH, Nortel Networks France S.A.S., Nortel Networks Oy, Nortel Networks Romania SRL, Nortel Networks AB, Nortel Networks N.V., Nortel Networks S.p.A., Nortel Networks B.V., Nortel Networks Polska Sp. z.o.o., Nortel Networks Hispania, S.A., Nortel Networks (Austria) GmbH, Nortel Networks, s.r.o., Nortel Networks Engineering Service Kft, Nortel Networks Portugal S.A., Nortel Networks Slovensko, s.r.o. and Nortel Networks International Finance & Holding B.V.

"French Secondary Proceedings") pursuant to which a liquidator, Maître Cosme Rogeau (the "French Liquidator"), and an administrator were appointed by the Commercial Court of Versailles, France (the "French Court") (Docket No. 2009P00492) for NNSA.  On June 3, 2015, Stephen Taylor was appointed as the Conflicts Administrator for Nortel Networks S.A. (the "NNSA Conflicts Administrator").[6]

8.    Other Nortel affiliates have commenced and in the future may commence additional creditor protection, insolvency, and dissolution proceedings around the world.

9.    For further information regarding these Chapter 11 cases, reference may be made to the Monthly Operating Reports filed by the Debtors at http://dm.epiq11.com/nortel.

**B.    Facts Relevant to this Motion**

10.    Starting in mid-2009, the Debtors and their various affiliates entered into a series of transactions pursuant to which they sold various business units and other assets to various purchasers.

11.    As relevant to this Motion, these sales include:  (i) the sale of certain portions of its Layer 4-7 data portfolio to Radware Ltd. ("Radware")[D.I. 539]; (ii) the sale of substantially all of its CDMA business and LTE Access assets to Telefonaktiebolaget LM Ericsson (publ) ("Ericsson") [D.I. 1205]; (iii) the sale of the assets of its Wireless Networks business associated with the development of Next Generation Packet Core network components to Hitachi Ltd. [D.I. 1760]; (iv) the sale of substantially all of the assets of the Enterprise Solutions ("Enterprise") business globally, including the shares of Nortel Government Solutions Incorporated and DiamondWare Ltd. to Avaya Inc. [D.I. 1514]; (v) the sale of substantially all the assets of its

---

[6]    The various insolvency proceedings commenced by the Debtors and the other Nortel entities, including Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks S.A. and Nortel Networks UK Limited are collectively referred to herein as the "Nortel Insolvency Proceedings.")

Optical Networking and Carrier Ethernet businesses associated with its Metro Ethernet Networks ("MEN") business unit to Ciena Corporation [D.I. 2070]; (vi) the sale of substantially all of its GSM/GSM-R business to Ericsson and Kapsch CarrierCom AG [D.I. 2065]; (vii) the sale of certain assets of its Carrier Voice Over IP and Application Solutions ("CVAS") business to GENBAND US LLC [D.I. 2632]; (viii) the sale of certain assets of the Debtors' Multi-Service Switch ("MSS", formerly known as "Passport") business to Ericsson [D.I. 4054]; and (ix) the sale of over 7,000 patents and patent applications (the "Patent Sale") [D.I. 5935]; (collectively, the "Sale Transactions").

12.     In connection with the consummation of Nortel's various business unit and asset sales and the Interim Funding and Settlement Agreement, dated June 9, 2009 and approved by this Court on June 29, 2009 [D.I. 993] (the "IFSA"), the Selling Debtors,[7] the UCC and the Monitor agreed that the proceeds of the Sale Transactions plus accrued interest (collectively, the "Sale Proceeds") be deposited into escrow accounts (collectively the "Existing Escrow Accounts") and subject to escrow agreements, pending a binding determination or agreement as to how the Sale Proceeds should be distributed, as more fully set forth in the IFSA.[8]

13.     In accordance with the IFSA, the Selling Debtors, the Joint Administrators, the UCC and the Monitor entered into various court-approved escrow agreements with JP Morgan Chase Bank, N.A., as escrow agent ("Existing Escrow Agent") (collectively, the "Existing

---

[7]     The term "Selling Debtors" refers to any Nortel debtor that signed or acceded to the IFSA or that signed one or more of the Escrow Agreements.

[8]     The Layer 4-7 transaction was consummated prior to the signing of the IFSA; however, the escrow agreement entered into in connection with that sale (the "Layer 4-7 Escrow Agreement") similarly provides that the proceeds be held in escrow pending the Escrow Agent's receipt of consistent orders from both this Court and the Canadian Court (or a letter of direction or final decision of a court of competent jurisdiction if the bankruptcy cases have been closed). Layer 4-7 Escrow Agreement, Mar. 19, 2009 ¶ 5.

Escrow Agreements") to hold Sale Proceeds.[9]  As of the date of this Motion, the Existing Escrow

Accounts hold approximately $7.3 billion in Sale Proceeds.[10]

14.     Each Existing Escrow Agreement other than the Layer 4-7 Escrow Agreement

provides three alternative "Permitted Investments" for the funds on deposit.  They include (1)

U.S. Treasury obligations with maturities not in excess of one year, (2) money market funds

invested solely in such U.S. Treasury obligations, and (3) the JPMorgan Chase Bank

Collateralized Money Market Deposit Account.

15.     Pursuant to this Court's order on March 14, 2014, [D.I. 13159] the Sale Proceeds

are currently invested in U.S. Treasury obligations with maturities not in excess of one year.

16.     Pursuant to the terms of the Existing Escrow Agreements and the IFSA, the Sale

Proceeds are held in the Existing Escrow Accounts pending either the agreement of the relevant

---

[9]      This Court approved the Debtors' entry into certain of the Escrow Agreements by specific order and the Debtors' entry into the other Escrow Agreements in connection with its approval of the relevant sales. See *Order Authorizing and Approving (A) Sale of Certain Non-Core Assets Free and Clear of All Liens, Claims and Encumbrances and (B) Assumption and Assignment of Certain Contracts* [D.I. 539] at ¶ 18 (generally approving all provisions of the Layer 4-7 Asset Purchase Agreement, which contemplated payment of the sale proceeds into escrow); *Order Pursuant to 11 U.S.C. § 105(a) and § 363(b) Approving Debtors' Entry into the CDMA Escrow Agreement and Granting Related Relief* [D.I. 1889] ("CDMA Escrow Approval Order"); *Order Pursuant to 11 U.S.C. § 105(a) and § 363(b) (A) Approving Debtors' Entry into the Next Generation Packet Core Network Components Escrow Agreement and (B) Granting Related Relief* [D.I. 2062]; *Order Authorizing and Approving Sale of Debtors' GSM/GSM-R Free and Clear of All Liens, Claims and Encumbrances* [D.I. 2065] at ¶ 44; *Order Authorizing and Approving (A) Sale of Certain Assets of the Debtors' Metro Ethernet Networks Business Free and Clear of All Liens, Claims and Encumbrances and (B) Assumption and Assignment of Certain Executory Contracts* [D.I. 2070] at ¶ 45; *Order Pursuant to 11 U.S.C. § 105(a) and § 363(b) (A) Approving Debtors' Entry Into the Enterprise Solutions Business Escrow Agreement and (B) Granting Related Relief* [D.I. 2167]; *Order Authorizing and Approving (A) the Sale of Certain Assets of the Debtors' Carrier Voice Over IP and Communications Solutions Business Free and Clear of All Liens, Claims and Encumbrances, and (B) the Assumption and Assignment of Certain Executory Contracts* [D.I. 2632] at ¶ 38; *Order (I) Authorizing the Sale of Certain Assets of Debtors' GSM/GSM-R Business Free and Clear of All Liens, Claims and Encumbrances; (II) Authorizing and Approving the Asset Sale Agreement; (III) Authorizing and Approving the Assumption and Assignment of Certain Executory Contracts; and (IV) Authorizing the Filing of Certain Documents Under Seal* [D.I. 3048] at ¶ 37; *Order Authorizing and Approving (A) the Sale of Certain Assets of Debtors' Multi-Service Switch (Formerly Known as 'Passport') Business Free and Clear of All Liens, Claims and Encumbrances and (B) the Assumption and Assignment of Certain Executory Contracts* [D.I. 4054] at ¶ 40; *Order Authorizing and Approving (A) the Sale of Certain Patent and Related Assets Free and Clear of All Claims and Interests, (B) the Assumption and Assignment of Certain Executory Contracts, (C) the Rejection of Certain Patent Licenses and (D) the License Non-Assignment and Non-Renewal Protections* [D.I. 5935] at ¶ 45.

[10]     For additional information on the current value of the assets held in the Escrow Accounts, reference may be made to the Debtors' Monthly Operating Reports, available at  http://dm.epiq11.com/nortel.

parties <u>or</u> final orders from the Ontario Superior Court of Justice and the United States

Bankruptcy Court for the District of Delaware regarding the allocation of said proceeds.

17.     The Debtors attempted to mediate their disputes regarding the allocation of the

Sales Proceeds.  When such mediation efforts failed, the parties engaged in litigation before this

Court and the Canadian Court relating to the allocation of the Sales Proceeds (the "<u>Allocation</u>

<u>Dispute</u>").

18.     The Ontario Superior Court of Justice and United States Bankruptcy Court for the

District of Delaware each issued separate decisions on or about May 12, 2015 and July 6, 2015,

respectively, regarding the Allocation Dispute and such decisions remain subject to appeal in

both jurisdictions.

19.     Following these decisions, the parties engaged in further settlement discussions,

overseen by former Judge Joseph Farnan, Jr., as mediator appointed by the U.S. District Court

for the District of Delaware.  These discussions ultimately led to a proposed settlement of the

Allocation Dispute and key potential claims matters, as memorialized in the Settlement and Plans

Support Agreement dated October 12, 2016 signed by:  (i) the Canadian Debtors; (ii) the

Monitor; (iii) the  Debtors; (iv) the EMEA Debtors; (v) the EMEA Non-Filed Entities; (vi) the

Joint Administrators; (vii) NNSA; (viii) the NNSA Conflicts Administrator; (ix) the French

Liquidator; (x) the Bondholder Group; (xi) the members of the CCC; (xii) the UCC; (xiii) the

U.K. Pension Trustee; (xiv) the PPF; (xv) the Joint Liquidators; and (xvi) the NNCC Bondholder

Signatories (collectively, the "<u>Parties</u>") (such agreement is referred to as the "<u>Settlement and</u>

<u>Support Agreement</u>" and attached to the Notice of Execution of Settlement and Plans Support

Agreement, dated October 12, 2016, as Exhibit A, as set forth therein.

20.     The Settlement and Support Agreement provides terms and conditions for the full and final settlement of the Allocation Dispute and certain potential claims matters among the Nortel entities.  The Debtors have concluded that settlement of such matters is in the best interests of the Debtors in light of the substantial cost to pursuing further litigation, the uncertainty of ultimate outcomes in the pending appeals, and the need to resolve such disputes and other issues and claims between the Debtors and their affiliates in order to advance the Nortel Insolvency Proceedings and to facilitate distribution of the Sale Proceeds to the relevant Debtors and then to their respective creditors.

21.     The effectiveness of the Settlement and Support Agreement is subject to the satisfaction of a number of material conditions including, among other things, the confirmation by the Debtors of a plan of reorganization.  One condition, which is the subject of this Motion, is the conversion of up to U.S.$1.2 billion of Sale Proceeds, currently held in the Existing Escrow Accounts from U.S. Dollars into Canadian Dollars.  See Section 9(a)(iii), Settlement and Support Agreement.  During the course of the lengthy negotiations regarding the Settlement and Support Agreement, the Canadian Debtors made it clear that the conversion of such funds from U.S. Dollars to Canadian Dollars was an absolute requirement for the resolution of the Allocation Dispute.  As a result, the Debtors agreed to the condition.[11]

22.     During the course of negotiations, inquiries were made to determine whether it was possible to convert this portion of the escrowed Sale Proceeds into Canadian Dollars, while still being held in the U.S. by the Existing Escrow Agent.  However, due to certain banking

---

[11]     The EMEA Debtors, including NNSA, also have the right to request a conversion of up to the amount listed for that EMEA Debtor in Annex E of the Settlement and Support Agreement into either Euros or British Pounds. See Section 7(c), Settlement and Support Agreement.  The EMEA Debtors have informed the Debtors that they have no present intention to seek such a conversion.  See id. at 7(c)(i).

regulations, it became clear that a currency conversion requires the establishment of a new escrow account in Canada, with a new Canadian escrow agent.  The Canadian Debtors have chosen Royal Trust Corporation of Canada ("Royal Trust" or the "New Escrow Agent"), a unit of the Royal Bank Group, one of Canada's largest banking institutions, to serve as the new escrow agent for the converted funds.  The Debtors, in consultation with the UCC and the Bondholder Group, have been involved in the negotiation of the Canadian Escrow Agreement, the form of which is attached as Annex K to the Settlement and Support Agreement and have no objection to Royal Trust serving as the New Escrow Agent.

23.    The Settlement and Support Agreement makes clear that currency conversion presents no risk to the Debtors.  Among other things, the terms of the Canadian Escrow Agreement are substantially similar to those of the Existing Escrow Agreements.  Section 5 of the Canadian Escrow Agreement provides that this Court exercises the same level of control as it has under the Existing Escrow Agreements.  Furthermore, the terms and conditions that govern the release of funds under the Canadian Escrow Agreement are substantially similar to the release provisions in the Existing Escrow Agreements.  Canadian Escrow Agreement Section 5; see e.g. Patent Portfolio Distribution Escrow Agreement Section 5; MEN Distribution Escrow Agreement Section 5.

24.    Currency converted into Canadian Dollars shall be placed into accounts with Royal Trust Corporation of Canada, established pursuant to the Canadian Escrow Agreement. The maximum amount to be converted into Canadian Dollars for the Canadian Debtors and governed by the Canadian Escrow Agreement shall not exceed U.S.$1.2 billion of the Sale Proceeds.  The Monitor will have the authority to issue directions from time to time to effectuate the currency conversions contemplated by this Motion up to the U.S.$1.2 billion cap.

25.     The fees and costs of any currency conversion including any fees and costs of the escrow agents, their counsel or other expenditures, shall be borne by the Canadian Debtors and shall be paid out of the amount of their respective Sale Proceeds allocation or directly by the Canadian Debtors out of their estate assets under Section 7(e) of the Settlement and Support Agreement.

26.     If the Settlement and Support Agreement terminates and a Final Allocation Determination (as defined in the Settlement and Support Agreement) is made that allocates less of the Sale Proceeds to the Canadian Debtors than is transferred pursuant to this Motion, the Canadian Debtors are required to pay back into the Existing Escrow Accounts (in U.S. Dollars) any amount by which the amount converted into Canadian Dollars exceeded the Final Allocation Determination.   The fees and costs of any such conversion back to U.S. Dollars, if necessary, would be borne by the Canadian Debtors.  In addition, the Canadian Debtors would bear the risk of any foreign exchange loss.

## RELIEF REQUESTED

27.     By this Motion, the Debtors seek an order, pursuant to sections 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rules 2002 and 6004 (a) approving the Debtors' entry into the Canadian Escrow Agreement, substantially in the form attached hereto as Exhibit B and (b) granting such other and further relief as the Court deems just and proper.

## BASIS FOR RELIEF

28.     The Debtors seek entry of this Order under sections 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rules 2002 and 6004.  Section 105(a) of the Bankruptcy Code provides that "[t]he court may issue any order . . . that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

29.     Section 363(b) of the Bankruptcy Code permits a debtor to use, sell or lease the property of the estate outside of the ordinary course of business after notice and a hearing. 11 U.S.C. § 363.  Section 363 applies when an agreement involves the disposition of the estate's assets in such a way that it ventures beyond an ordinary course transaction.  Myers v. Martin (In re Martin), 91 F.3d 389, 394-95 (3d Cir. 1996).

30.     The use or transfer of estate property under this provision must be supported by a sound business purpose.  Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1070-71 (2d Cir. 1983); In re Decora Indus., Inc., No. 00-4459, 2002 WL 32332749, at *2 (D. Del. May 20, 2002); Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.), 242 B.R. 147, 153 (D. Del. 1999); In re Delaware & Hudson Ry. Co., 124 B.R. 169, 175-76 (D. Del. 1991); Travelers Cas. & Sur. Co. v. Future Claimants Representative, No. 07-2785, 2008 WL 821088, at *4 (D.N.J. Mar. 25, 2008). A court determining whether a sound business purpose justifies the transaction "should consider all salient factors pertaining to the proceeding and, accordingly, act to further the diverse interests of the debtor, creditors and equity holders, alike."  In re Montgomery Ward Holding Corp., 242 B.R. at 153-54 & n.1 (quoting In re Lionel Corp., 722 F.2d at 1071).  In addition, a debtor must show that the transaction has been proposed in good faith, that adequate and reasonable notice has been provided and that it is receiving fair and reasonable value in exchange.  See In re Decora Industries, Inc., 2002 WL 32332749, at *2; In re Delaware & Hudson Ry. Co., 124 B.R. at 176.

31.     The Debtors respectively submit that approving their entry into the Canadian Escrow Agreement meets each of the requirements under Section 363 of the Bankruptcy Code. As required by Section 363, the Canadian Escrow Agreement was negotiated by the Parties in

good faith as an important part of the overall global Settlement and Support Agreement.  The entry into the Canadian Escrow Agreement is a material condition to, and is thus an integral part of, the global Settlement.  To that end, the compromise of which the currency conversion effected by the Canadian Escrow Agreement is an important part rises well above the necessary threshold of reasonableness and serves the sound business purpose of beginning to resolve the Allocation Dispute.  Importantly, all of the other parties to the Existing Escrow Agreements, including the UCC and the Bondholder Group, have agreed to enter into the Canadian Escrow Agreement, demonstrating that these material creditors groups with an economic stake in the Sale Proceeds support the relief sought.

32.     In the event that the Settlement and Support Agreement were to terminate, the Settlement and Support Agreement provides that the  Canadian Debtors would bear the risk of foreign exchange loss.  In addition, the Canadian Debtors would be responsible for any costs of currency conversion in the event that the Nortel Settlement and Support Agreement terminated.

33.     In light of the foregoing, the Debtors respectfully seek an order, substantially in the form attached hereto as Exhibit A, approving their entry into the Canadian Escrow Agreement, substantially in the form attached hereto as Exhibit B.

## WAIVER OF AUTOMATIC

## FOURTEEN-DAY STAY UNDER BANKRUPTCY RULE 6004(H)

34.     Pursuant to Bankruptcy Rule 6004(h), unless the Court orders otherwise, all orders authorizing the lease of property pursuant to Section 363 of the Bankruptcy Code are automatically stayed for fourteen days after entry of the order.  The purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to request a stay pending appeal before the order can be implemented.  See Fed. R. Bankr. P. 6004(h) advisory committee's notes.

35.     Although Bankruptcy Rule 6004(h) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the fourteen-day stay period, commentators agree that the 14-day stay period should be eliminated to allow a sale or other transaction to close immediately where there has been no objection to the procedure.  See generally 10 Collier on Bankruptcy ¶ 6004.09 (15th ed. 1999).  Furthermore, if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time necessary to file such appeal.  Id.

36.     Subject to the Court's approval of the Debtors' entry into the Canadian Escrow Agreement, the Nortel Settlement and Support Agreement depends on prompt action by the Parties to implement its terms.  The Parties to the Nortel Settlement and Support Agreement have established a prompt timetable to complete various steps in resolving their disputes and one of the key steps is entry of an order by this Court approving the Canadian Escrow Agreement and the actual conversion of the currency.  Accordingly, waiver of any applicable stay is appropriate in the circumstance.

## NOTICE

37.     Notice of this Motion has been given via electronic transmission, first-class mail, hand delivery, or overnight mail to:  (i) the Core Parties; (ii) the U.S. Trustee; (iii) counsel to the UCC; (iv) counsel to the Bondholder Group; (v) counsel to the Nortel Trade Claims Consortium (vi) the New Escrow Agent; and (vii) the general service list established in these Chapter 11 cases.  Accordingly, the Debtors submit that under the circumstances no other or further notice is necessary.

## NO PRIOR REQUEST

38.     No prior request for the relief sought herein has been made to this or any other

court.


Dated: October 12, 2016          CLEARY GOTTLIEB STEEN & HAMILTON LLP
       Wilmington, Delaware

                                 James L. Bromley (admitted *pro hac vice*)
                                 Lisa M. Schweitzer (admitted *pro hac vice*)
                                 Neil P. Forrest (admitted *pro hac vice*)
                                 One Liberty Plaza
                                 New York, New York 10006
                                 Telephone:  (212) 225-2000
                                 Facsimile:  (212) 225-3999

                                     - and -

                                 MORRIS NICHOLS, ARSHT & TUNNELL LLP


                                   */s/ Tamara K. Minott*
                                 Derek C. Abbott (No. 3376)
                                 Andrew R. Remming (No. 5120)
                                 Tamara K. Minott (No. 5643)
                                 1201 North Market Street
                                 P.O. Box 1347
                                 Wilmington, Delaware 19801
                                 Telephone:  (302) 658-9200
                                 Facsimile: (302) 658-3989

                                 *Counsel for the Debtors*
                                 *and Debtors in Possession*