**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| | |
| | Case No. 09-10138 (KG) |
| Nortel Networks, Inc., *et al.* | Jointly Administered |
| | |
| Debtors. | **Hearing Date: October 21, 2016 @ 11:00 am** |
| | **Response Due: October 18, 2016 @ 4:00 pm** |

**PENSION BENEFIT GUARANTY CORPORATION'S RESPONSE TO
DEBTORS' MOTION FOR AN ORDER AUTHORIZING ENTRY
INTO CANADIAN CURRENCY ESCROW AGREEMENT
TO FACILITATE GLOBAL SETTLEMENT (DKT. NO. 17250)**

Preliminary Statement

In their Motion,[1] the Debtors seek an order approving their entry into the Canadian

Escrow Agreement.  The Pension Benefit Guaranty Corporation ("PBGC") does not oppose this

specific relief involving currency conversion.  The Motion is but the first step, however, in a

process to advance the Settlement and Support Agreement (the "Agreement").  PBGC is one of

this bankruptcy's largest creditors, and a non-signatory to the Agreement.  PBGC opposes the

Agreement and brings to the Court's attention several issues that will soon be squarely before it.

First, it is questionable whether this Court has jurisdiction to approve such a settlement while the

Allocation Decision is on appeal.  Second, the Agreement calls for a Chapter 11 plan predicated

on the improper substantive consolidation of two of the Debtors.  Third, the Agreement unfairly

treats PBGC's claims.  Thus, this Agreement—far from being a "global" resolution that fully and

finally settles the Allocation Dispute—will instead give rise to many unnecessary obstacles

between the Debtors and a confirmable plan, let alone an eventual distribution to creditors.

---

[1] Capitalized terms not otherwise defined herein are defined as in the Motion.

Background

1.  PBGC is a wholly owned United States government corporation that administers the

nation's termination insurance program for defined benefit pension plans under Title IV of the

Employee Retirement Income Security Act of 1974, as amended ("ERISA").[2]  If a pension plan

covered by the insurance program terminates and lacks sufficient assets to pay all promised

benefits, PBGC becomes its statutory trustee and pays benefits subject to the statutory limitations

in 29 U.S.C. § 1322(b).[3]  PBGC is essentially self-financing, and receives no funds from general

tax revenues.[4]

2.  On January 14, 2009, the Debtors filed bankruptcy petitions under Chapter 11, and

other Nortel affiliates brought insolvency proceedings in Canada or the United Kingdom.  PBGC

was appointed to the official committee of unsecured creditors, and continues to serve in this

capacity.  Early in the proceedings, various Nortel debtor entities agreed to joint sales of their

assets.  These sales occurred in a number of transactions, resulting in the Sales Proceeds of

approximately $7.3 billion.

3.  The Nortel Networks Retirement Income Plan (the "Pension Plan"), sponsored by

NNI, terminated effective July 17, 2009, and PBGC became its statutory trustee.  At termination,

the underfunded Pension Plan had approximately 22,000 participants, to whom PBGC will pay

lifetime benefits.  PBGC does not expect benefit payments to the participants to change as a

result of the Agreement or any court proceedings.  As a result of the termination, PBGC asserted

---

[2] 29 U.S.C. §§ 1301-1461 (2012 & Supp. II 2014).

[3] *See* 29 U.S.C. §§ 1322, 1341(c), 1342, 1361; *PBGC v. LTV Corp.*, 496 U.S. 633, 637-638 (1990); *Nachman Corp. v. PBGC*, 446 U.S. 359, 375 (1980).

[4] *See* PBGC Ann. Rep. (2015) at 10, http://www.pbgc.gove/documents/2015-annual-report.pdf.

joint-and-several claims under ERISA totaling approximately $708 million against NNI and each

member of NNI's controlled group.[5]  This liability extends to each of the Debtors as well as two

non-debtor subsidiaries that on the termination date of the Pension Plan were wholly owned by

NNI.

4.    Also in July 2009, the Debtors proposed that the joint sales include NNI's stock in the

two aforementioned non-debtor subsidiaries among the assets to be sold.  These non-debtor

subsidiaries had a value in the range of approximately $100 million to $300 million.[6]  After

PBGC objected to the sale, NNI and PBGC negotiated a settlement.[7]  PBGC agreed to release

against the non-debtor subsidiaries any claim or lien under ERISA (as the buyer had demanded),

and NNI agreed to grant PBGC a lien on the proceeds of the transaction that were allocated to

the sale of its shares of the non-debtor subsidiaries (the "PBGC Lien").  On October 13, 2009,

the Court approved the settlement.[8]

5.    After completion of the joint sales, disagreement over how to allocate the Sales

Proceeds among the U.S., Canadian, and EMEA estates led to the Allocation Dispute, and

eventually a trial.  On May 12, 2015, the Court issued the Allocation Decision, adopting a

"modified pro rata" allocation.[9]  Rather than allocating the Sales Proceeds based on ownership of

---

[5] POC 8763 (unfunded benefit liabilities, $625 million); POC 8762 (termination premiums, $83 million).

[6] TR00042 (Green Report at Ex. D); D.I. 15611, ¶ 34.

[7] D.I. 1639.

[8] D.I. 1658.

[9] D.I. 15544 & 15545.

assets, the Court instead allocated them based on the amount of claims asserted against each

Nortel debtor entity, worldwide.

6. The Debtors moved for clarification or reconsideration. Among other points, the

Debtors challenged the Court's decision not to allocate to the U.S. estates any of the proceeds

from the sale of NNI's non-debtor subsidiaries, even though the Court had (i) granted PBGC a

lien on those proceeds, and (ii) declared that settlement-related claims would be recognized.[10]

The Court upon reconsideration largely affirmed its initial ruling.[11]  Multiple parties, including

the Debtors and PBGC, filed appeals or cross-appeals, which remain pending before the Third

Circuit.[12]

7. The Debtors, on October 12, 2016, filed their Notice of Execution of Settlement and

Plans Support Agreement, and attached as an exhibit thereto the Agreement itself.[13]  According

to the Motion, the Agreement "provides terms and conditions for the full and final settlement of

the Allocation Dispute," and the Debtors refer repeatedly to the Agreement's "global" nature.[14]

The Agreement was negotiated and executed by 16 parties, some situated abroad. The Motion,

however, makes no reference to PBGC, to its being a non-signatory, or to PBGC's separate

appeal still pending.

---

[10] D.I. 15544 at 60, 62, 63, 93, 102 (twice), 107, 112.

[11] D.I. 15830.

[12] *In re Nortel Networks Inc.*, Case No. 16-3444.

[13] D.I. 17249, 17249-1.

[14] Motion at 8; *Id.* at 1, 12

Argument

8. The Motion's characterization of the Agreement as a "global" settlement is

misleading.  PBGC is one of the largest creditors in this bankruptcy.  PBGC is part of the globe.

PBGC joined in key arguments advanced by the Debtors and others in appealing the Allocation

Decision to the district court.  For the Debtors and others now to part ways with PBGC, enter

into a settlement, and fail to disclose to the Court that a fellow appellant, PBGC, is not included

as a signatory is an inexcusable omission.

9. The Motion ignores the question whether this Court will have subject-matter

jurisdiction to decide the further steps required to implement the Agreement.

> It is well established that the filing of a notice of appeal is an event of
> jurisdictional significance in which a lower court loses jurisdiction over the
> subject matter involved in the appeal.  The purpose of the general rule is to avoid
> the confusion of placing the same matter before two courts at the same time and
> preserve the integrity of the appeal process.[15]

Although the Court need not decide this question today, PBGC brings to the Court's attention the

serious jurisdictional problems ahead, and reserves its rights on that issue.  PBGC is not a party

to the Agreement, and intends to preserve and pursue its appeal rights, including its right to

enforce its settlement with NNI establishing the PBGC Lien.

10. Another issue created by the Agreement is the proposed substantive consolidation of

Nortel Networks Capital Corporation ("NNCC") "with and into" NNI.[16]  Such treatment of

PBGC's joint-and-several claims will benefit other creditors at PBGC's expense.  This Court has

explicitly rejected substantive consolidation: "The record of Nortel's operations does not satisfy

---

[15] *In re Washington Mutual, Inc.*, 461 B.R. 200, 218 (Bankr. D. Del. 2011) (quoting *In re Whispering Pines Estates*, 369 B.R. 752, 757 (1st Cir. BAP 2007)) (internal quotation marks omitted).

[16] D.I. 17249-1, § 4(b)(ii), at 20.

the legal and factual requirements for substantive consolidation. . . . [S]ubstantive consolidation

cannot be applied in this case."[17]  The Debtors' support for substantive consolidation is a major

turnabout, after their previous insistence in the district court that the stringent factual predicates

were absent:  "Unless the strict requirement for substantive consolidation under *Owens Corning*

were met—and the Bankruptcy Court found they were not—separate ownership interests remain

separate in bankruptcy."[18]

11.  In *Owens Corning*, the Third Circuit observed that the extreme remedy of substantive

consolidation disregards corporate separateness, "treat[ing] separate legal entities as if they were

merged into a single survivor left with all the cumulative assets and liabilities. . . .  The result is

that claims of creditors against separate debtors morph into claims against the consolidated

survivor."[19]  *Owens Corning* also warned that substantive consolidation "may not be used

offensively (for example, having a primary purpose to disadvantage tactically a group of

creditors in the plan process or to alter creditor rights)."[20]

12.  In PBGC's case, with joint-and-several claims against each and every Debtor, the

effects of a consolidation would be pronounced, substantially reducing its recovery.  As the

Court is well aware:

> what must be proven (absent consent) concerning the entities for whom
> substantive consolidation is sought is that (i) prepetition they disregarded
> separateness so significantly that their creditors relied on the breakdown of
> entity borders and treated them as one legal entity, or (ii) postpetition their

---

[17] D.I. 15544, at 104.

[18] Debtors' District-Court Reply Brief, at 22.

[19] 419 F.3d 195, 205 (3d Cir. 2005).

[20] *Id.* at 211.

assets and liabilities are so scrambled that separating them is prohibitive
and hurts all creditors.[21]

With a large portion of PBGC's recovery in the balance, PBGC will oppose the substantive

consolidation of *any* of the Debtors.  When the question is properly before it, the Court should

demand from the Debtors sufficient evidence that either prong of the fact-intensive *Owens*

*Corning* test is satisfied.  PBGC intends to rigorously test through discovery and trial any

supposed evidence offered by the Debtors.

13.  Finally, if PBGC's claims are not resolved fairly, the thousands of plan sponsors that

pay PBGC premiums will have to shoulder a greater financial burden in the coming years.  The

Agreement seeks merely to establish a "maximum" of $708,000,000 for PBGC's claims against

the Debtors for allocation purposes, without allowing them.[22]  The Agreement specifically

reserves "all rights of the . . . Debtors and other U.S. based parties-in-interest . . . to contest"

PBGC's claims.[23]  Such language is a virtual open season on attempts to reduce the amount of

PBGC's claims, so that other creditors may further benefit at PBGC's expense.  By contrast,

claims much smaller than PBGC's in this purportedly "global" settlement are more favorably

treated.  For example, the NNCC Bonds Claims are allowed against NNI (into which NNCC is to

be substantive consolidated) as a general unsecured claim in the amount of $150,951,562.[24]

---

[21] *Id.*

[22] D.I. 17249-1, § 4(g)(ii), at p. 23.

[23] *Id.*

[24] Id., § 4(g)(v), at 24.

PBGC will be forced to defend its claims aggressively, though it is well-prepared to do so, given

the favorable precedent on treatment of its claims.[25]

<p align="center">Conclusion</p>

14.  The Agreement will needlessly instigate a lengthy and bitter dispute over this Court's

jurisdiction, substantive consolidation, and the legal bases for allowance and calculation of

PBGC's joint-and-several claims.  It by no means achieves a path toward the swift and amicable

confirmation of a Chapter 11 plan—a goal well beyond due for all creditors, including PBGC.

15.  PBGC remains willing to work constructively toward a more comprehensive

settlement.  However, PBGC will defend the interests of the 40 million workers and retirees in

the United States who depend on the nation's insurance program, and the thousands of

employers who support PBGC with their premiums.

---

[25] *See, e.g., Law Debenture Trust Co. v. Kaiser Aluminum Corp. (In re Kaiser Aluminum Corp.)*, 339 B.R. 91 (D. Del. 2006); *PBGC v. Asahi Tec*, 979 F. Supp. 2d 46 (D.D.C. 2013).

Dated:  October 18, 2016

<div style="margin-left:45%">

/s/ Vicente Matias Murrell
ISRAEL GOLDOWITZ
Chief Counsel
CHARLES L. FINKE
Deputy Chief Counsel
PAULA J. CONNELLY
GARTH D. WILSON
Assistant Chief Counsels
VICENTE MATIAS MURRELL
Attorney
(MD Bar No. 9806240098)
MARC S. PFEUFFER
Attorney
PENSION BENEFIT GUARANTY
CORPORATION
Office of the Chief Counsel
1200 K Street, N.W., Suite 340
Washington, D.C.  20005-4026
Telephone:  (202) 326-4020, ext. 3580
Facsimile:  (202) 326-4112

SARAH L. REID
ERIC R. WILSON
BENJAMIN D. FEDER
KELLEY DRYE & WARREN LLP
101 Park Avenue
New York, NY  10178
Telephone:  (212) 808-7800
Facsimile:  (212) 808-7897

</div>