IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------- X
:
*In re*                                                    :   Chapter 11
:
Nortel Networks Inc., *et al.*,[1]                         :   Case No. 09-10138 (KG)
:
                                    Debtors.               :   Jointly Administered
:
:   RE D.I. 17250, 17270
:
:   Hearing date: October 21, 2016 at 11:00 a.m. (ET)
---------------------------------------------------------- X

**REPLY TO PBGC "RESPONSE" TO
DEBTORS' MOTION FOR AN ORDER
AUTHORIZING ENTRY INTO CANADIAN CURRENCY
ESCROW AGREEMENT TO FACILITATE GLOBAL SETTLEMENT**

Having sat on the sidelines of these proceedings for the better part of eight years, the Pension Benefit Guaranty Corporation ("PBGC") now comes to this Court not to oppose the Motion at issue, but rather to decry a long-awaited, hard-bargained global settlement that will finally allow the billions of dollars in the escrow accounts to be released and paid to the Nortel Group's creditors. It has no grounds whatsoever to do so.

As the Court no doubt recalls from the six week allocation trial—in which the PBGC took no part—the Interim Funding and Settlement Agreement ("IFSA") controls the distribution of the escrowed sale proceeds, and Section 12(b) of that agreement permits distribution pursuant to an "agreement of all of the Selling Debtors." IFSA § 12(b) [D.I. 874-3]. And indeed, each

---

[1] The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567), Nortel Networks (CALA) Inc. (4226) and Nortel Networks India International (8667). Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://dm.epiq11.com/nortel.

and every one of these Selling Debtors as defined in the IFSA is a signatory to the Settlement and Plan Support Agreement ("SPSA"). *See* IFSA § 12(a). This eleventh-hour attempt to derail an agreement reached by the parties to the IFSA and a substantial number of the global Nortel Group's creditors (purportedly in the interest of the U.S. pensioners, despite acknowledging that the settlement will have no effect on the pensioners' benefit payments) is nothing more than obstructionism and should be rejected out of hand; the Debtors will vigorously support a plan of reorganization that will put the SPSA into effect. The PBGC's submission is nothing more than an effort to leverage the Debtors and every other party to the SPSA in an attempt to have the Debtors allow its bloated and inflated claims. In the meanwhile, no party has opposed the Motion, which should be granted.

**ARGUMENT**

Because the PBGC explicitly "does not oppose this specific relief involving currency conversion," PBGC's Response to Debtors' Motion at 1, Oct. 18, 2016 [D.I. 17270] ("PBGC Response"), little more need be said in support of the Motion. As neither the PBGC nor any other party has objected to the relief sought, the Debtors repeat their request for an order approving their entry into the Canadian Escrow Agreement for the reasons set forth in the Motion. Despite having no objection to the Motion, the PBGC nonetheless submits a response to raise three possible issues that are neither ripe for adjudication nor related in any way to the question now before the Court. *Not one of the baseless arguments identified by the PBGC is properly before the Court*, and the Debtors will of course respond to each of them at length when (if ever) they are. However, because this response is part of the PBGC's public campaign to scuttle the settlement and leverage the Debtors and every other party to the SPSA in an effort to

gain allowance of its bloated claims,[2] the Debtors submit this reply to address the most spurious assertions previewed by the PBGC. The Debtors reserve all rights to make any and all arguments in opposition to these arguments when appropriate.

*First*, this Court absolutely has jurisdiction to approve the SPSA. Bankruptcy cases frequently involve the appeals of various decisions while the bankruptcy court retains jurisdiction over the general proceedings. Such is the case here: notwithstanding the pending appeals of several of this Court's orders, there must of course be a venue to propose and confirm a plan of reorganization in the first instance, and that venue cannot reasonably be the Third Circuit instead of the Court that has overseen this proceeding for nearly eight years. Once the settlement is approved, the only question before the Third Circuit will have been answered and any decision would be merely advisory. This Court has repeatedly recognized that it has the authority to approve plans and settlements while appeals were pending. *See* Hr'g Tr. at 4:23 - 5:23, *In re L.A. Dodgers LLC*, Case No. 11-12010 (KG) (Bankr. D. Del. Jan. 11, 2012) (ECF No. 1176) (pending D. Del. appeal) (determining that the Bankruptcy Court had jurisdiction to consider the settlement where the Court's approval would "essentially vacate the order" before the District Court and not substantively change it); Hr'g Tr. at 28:13-29:3, 36:16-20, 169:13-14, *Trump Entm't Resorts, Inc.*, Case No. 14-12103 (KG) (Bankr. D. Del. Mar. 12, 2015) (ECF No. 1129-3) (pending D. Del. appeal) (approving settlement linked to plan confirmation despite pending appeal of earlier ruling).

There can be no question that the settlement embodied in the SPSA moots the appeal of the Allocation Opinion. *See* Allocation Opinion, May 12, 2015 [D.I. 15544] ("Allocation Op.").

---

[2]   Rick Baert, *Nortel Settles with Pension Plan Participants, Creditors following 2009 Bankruptcy*, Pensions & Investments, Oct. 13, 2016 (quoting statement from PBGC spokesman Marc Hopkins), http://www.pionline.com/article/20161013/ONLINE/161019932/nortel-settles-with-pension-plan-participants-creditors-following-2009-bankruptcy.

3

The Allocation Protocol [D.I. 10565-1], under which this Court conducted the trial and issued the Allocation Opinion, was premised on the IFSA's provision that courts (the "dispute resolvers") could determine the distribution of the sale proceeds *only* "in the case where the Selling Debtors fail to reach agreement." IFSA § 12(b), Opinion and Order Approving Allocation Protocol, April 3, 2013 [D.I.s 9946, 9947]. The IFSA, in turn, unequivocally provides that upon "agreement of all of the Selling Debtors"—all of whom are parties to the SPSA—the escrowed sale proceeds may be distributed. IFSA § 12(b). Having reached just such an agreement through the SPSA, there is no longer a dispute for the "dispute resolvers" to resolve. Once the SPSA becomes effective, the escrowed proceeds may be distributed and "there exists no subject matter upon which the judgment of the court can operate to make a substantive determination on the merits." *See Salovaara v. Jackson Nat'l. Life Ins. Co.* 246 F.3d 289, 295-96 (3d Cir. 2001) (per curiam) (citation and quotation omitted). Having resolved the question of allocation that was before the Court, the appeal is moot: the SPSA, rather than the Allocation Opinion, will govern the release and distribution of the escrowed sale proceeds. *See id.* at 297 ("[I]ntervening events, such as the parties reaching settlement in the case, can render an appeal moot"). This is precisely what the District Court recognized in *Bush v. Washington Mutual Inc. (In re Washington Mutual Inc.)*, No. 08-12229-MFW, 2015 WL 470551, at *3-4 (D. Del. Feb. 2, 2015), holding that a creditor's appeal was moot where the creditor's claims were dismissed with prejudice under a subsequent settlement agreement, which the creditor did not appeal, and thus any opinion regarding the appeal "would be merely advisory."

Moreover, the PBGC separately lacks standing to "pursue its appeal." PBGC Response at 5. Despite being a member of the Official Committee of Unsecured Creditors (the "UCC") since January 26, 2009, the PBGC was entirely absent from the allocation litigation and stood

4

silent through most of the bankruptcy proceedings. *See* Notice of Appointment of Committee of Unsecured Creditors, Jan. 26, 2009 [D.I. 141]. The PBGC did not file or join a single brief during the allocation trial, nor did its counsel appear on the record on any of the 24 days that the Court (and the Canadian Court) heard evidence or argument. While the other members of the UCC (the Bank of New York Mellon and Law Debenture Trust Company of New York, each as indenture trustees) and the PBGC's U.K. counterpart (the UK Pension Claimants), sought to be classified as Core Parties in the proceedings, the PBGC is not and never sought to be a Core Party.[3] *See* Allocation Protocol ¶2, May 17, 2013 [D.I. 10565-1]. That the other parties that have appealed the Allocation Opinion have not challenged the PBGC's standing to do so does not mean that it has been conceded, and the Debtors reserve all rights to challenge the PBGC's standing.

*Second*, the PBGC prematurely objects to the potential substantive consolidation of NNI and its non-operating, wholly owned, single-purpose financing subsidiary, Nortel Networks Capital Corporation ("NNCC"), pursuant to Section 4(b)(ii) of the SPSA. While the PBGC purports to rely on a decision of a trial in which it did not participate, PBGC Response at 5-7, those arguments are entirely irrelevant to NNCC. At trial, certain parties advocated allocation methodologies that the U.S. Debtors argued would effect a substantive consolidation of Nortel's operating entities across international borders: the five integrated entities and the limited risk entities that distributed Nortel's products in Europe. Allocation Op. at 56-57 (discussing UKPC theory that the assets "were co-developed, jointly used and collectively sold") and 54 (discussing CCC theory that a pro rata allocation "is the only fair and equitable alternative to an allocation

---

[3] The Allocation Protocol listed "the Selling Debtors, the Committee [the UCC], the Bondholder Group, the Monitor, the Joint Administrators, the CCC, the Indenture Trustees, the UK Pension Claimants, and the Directors and Officers and such other parties as the U.S. Court and the Canadian Court may direct" as Core Parties. The Core Parties concept was developed to identify those parties that would have the right to argue, brief, and examine witnesses in the allocation trial.

5

based on the legal rights of the Nortel Debtors in the underlying assets sold"). As the U.S. Debtors repeatedly argued—both at trial and on appeal—these were separate entities that operated substantial businesses in their respective jurisdictions, including through research, sales, marketing, customer support, and administrative activities. Indeed, this Court found that "the record of Nortel's *operations* does not satisfy the legal and factual requirements for substantive consolidation." Allocation Op. at 104 (emphasis added).

Whereas these entities conducted Nortel's operations across the globe while maintaining their corporate separateness, NNCC is a different story altogether. NNCC was created for the sole purpose of raising financing. Indeed, as disclosed to investors, NNCC had "no independent operations other than acting as a finance company for subsidiaries and affiliates of NNL." NNCC, Form S-3 Registration Statement at 4, Dec. 15, 2000. NNCC did not research, develop, or distribute any Nortel products, nor did it have even one employee. Moreover, NNCC never had any physical, commercial, or intellectual property. Apart from a single transaction in which it borrowed $150 million that it in turn lent to NNI, its sole shareholder, NNCC did nothing whatsoever. Given these facts, the Debtors are highly dubious that the PBGC will be able to demonstrate it had a specific expectation of a separate recovery from NNCC, and the Debtors are highly confident that the facts and law support the substantive consolidation of NNCC into NNI.

*Third*, and finally, the PBGC raises a concern that its claims may not be "resolved fairly," even though the SPSA says nothing more than that those claims will not exceed the amount that the PBGC itself calculated and claimed against the Debtors. The settlement merely states the obvious proposition that the PBGC must resolve its claims like any other creditor. It is almost beyond belief that the PBGC now complains of unfair treatment: as a member of the UCC since January 2009, the PBGC received material non-public information in that capacity throughout

the course of these proceedings and attended multiple mediations over the last several years, including those that most recently led to the SPSA. In fact, the Debtors have repeatedly tried to resolve the PBGC claims, and the only reason that in the SPSA the Debtors capped the PBGC's claim at $708 million—the current filed amount of the claim—is because the PBGC has already once, nearly *five years* after the general bar date, amended the amount of its liquidated claims upward by $114,894,472. *See* Claims 8760, 8761, 8762, and 8763 (filed July 7, 2014); Order Establishing Deadlines for Filing ¶2, Aug. 4, 2009 [D.I. 1280] (setting the bar date for September 30, 2009). Moreover, as the Debtors will demonstrate, the PBGC's current claim of $708 million is grossly overstated due to a number of factors, including: the use of an artificially low discount rate to calculate unfunded benefits that has no relationship to its actual damages, the fact that the PBGC improperly increased its claim nearly five years after the bar date by over $100 million, that the assets transferred to the PBGC increased significantly in value between the date the PBGC terminated Nortel's U.S. pension plan and the date it was able to assume responsibility for the plan, and that the PBGC attempts to tag Nortel with a termination claim that Congress has made clear applies only to entities that will emerge from bankruptcy as reorganized operating entities. The PBGC's inflated claim also significantly harms former employees of Nortel by diluting their general unsecured claims.

Moreover, while the PBGC now states that it "will be forced to defend its claims aggressively," PBGC Response at 8, this statement is in direct contradiction to the PBGC's actions since January 2009. Unlike the representatives of the U.K. and Canadian pension plans that tirelessly advocated for their respective pensioners in the courts and in the media, the PBGC has sat idle, conspicuously failing to pursue *any* claims against *any* foreign control group companies—including those that sold substantial assets in the various joint business line sales—

7

even though ERISA provides the PBGC with joint and several claims against those foreign affiliates, including the Canadian Debtors and EMEA Debtors.  *See* 29 U.S.C. § 1301(a)(14). The PBGC's inexplicable refusal to pursue such claims does far more violence to the "thousands of plan sponsors that pay PBGC premiums [having] to shoulder a greater financial burden in the coming years," PBGC Response at 7, than anything advocated by the Debtors.

## CONCLUSION

For the foregoing reasons and those set forth in the Motion, the Debtors respectfully request that the Court grant the Debtors Motion For An Order Authorizing Entry Into Canadian Currency Escrow Agreement to Facilitate Global Settlement and such other relief as may be just or proper.

Dated:  October 19, 2016

CLEARY GOTTLIEB STEEN & HAMILTON LLP
James L. Bromley (admitted *pro hac vice*)
Lisa M. Schweitzer (admitted *pro hac vice*)
One Liberty Plaza
New York, NY 100006
Telephone:  (212) 225-2000
Facsimile:  (212) 225-3999

– and –

MORRIS, NICHOLS, ARSHT & TUNNEL LLP


By:  */s/ Derek C. Abbott*
Derek C. Abbott (No. 3376)
Andrew R. Remming (No. 5120)
Tamara K. Minott (No. 5643)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19801
Telephone:  (302) 658-9200
Facsimile:  (302) 658-3989

*Counsel for Debtors and Debtors in Possession*