## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

--------------------------------------------------------X
:
*In re*                                                 :        Chapter 11
:
Nortel Networks Inc., *et al.*,[1]                      :        Case No. 09-10138 (KG)
:
                                      Debtors.          :        Jointly Administered
:
                                                        :        Status Conference Date:  November 22, 2016 10:00 a.m. (ET)
                                                        :        Responses Due:  November 16, 2016 4:00 p.m. (ET)
                                                        :        Hearing Date: To be determined
--------------------------------------------------------X

## DEBTORS' OBJECTION TO PROOFS OF CLAIM
## FILED BY PENSION BENEFIT GUARANTY CORPORATION
## AND MOTION FOR AN ORDER
## (I) DISALLOWING PBGC'S LATE-FILED AMENDED CLAIMS,
## (II) DISALLOWING CERTAIN OF THE PBGC CLAIMS, AND
## (III) DEEMING CERTAIN OF THE PBGC CLAIMS
## SATISFIED IN PART BY POST-PETITION TRANSFERS

Nortel Networks Inc. ("NNI") and certain of its affiliates, debtors and debtors in

possession (collectively, the "Debtors"), hereby (i) object to the proofs of claim filed against

each of the Debtors by the Pension Benefit Guaranty Corporation (the "PBGC") on September

30, 2009, (the "PBGC Claims") and the proofs of claim filed on July 7, 2014 (the "Amended

PBGC Claims");[2] (ii) move this Court to (a) disallow and expunge the late-filed Amended PBGC

Claims, (b) deem certain of the PBGC Claims fully satisfied and/or duplicative of other PBGC

---

[1]        The debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567), Nortel Networks (CALA) Inc. (4226) and Nortel Networks India International, Inc. (8667). Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://dm.epiq11.com/nortel.

[2]        The PBGC Claims are designated on the Debtors' claims register as claims 4735, 4736, 4737 and 4738. The Amended PBGC Claims are designated on the Debtors' claim register as claim numbers 8760, 8761, 8762 and 8763.

Claims, (c) deem certain of the PBGC Claims satisfied in part by the substantial increase in the value of Debtors' Pension Plan[3] assets between the date of the termination of the Pension Plan and the assets that were transferred to the PBGC, (d) reduce the PBGC Claims because of the PBGC's intentional refusal to seek recovery from the Debtor's non-US affiliates, as is authorized by ERISA[4] and requested by the Debtors, and (e) disallow and expunge certain of the PBGC Claims; and (iii) reduce and allow the PBGC Claims as set forth herein (the "Objection"). In support of the Objection, the Debtors submit the Declaration of Brent M. Tunis, dated November 2, 2016, being filed contemporaneously herewith ("Tunis Decl."), and respectfully represent as follows:

## PRELIMINARY STATEMENT

The Nortel U.S. Debtors filed for chapter 11 on January 14, 2009, nearly 8 years ago. Only 12 days later, on January 26, 2009, the United States Trustee appointed the PBGC to the Official Committee of Unsecured Creditors ("Committee").[5] This was no surprise as the PBGC is a nearly automatic selection to the official committee in any case in which a debtor is a sponsor of a ERISA-qualified defined benefit plan.[6] The PBGC comes as close as possible to a professional official committee member and is as familiar with the bankruptcy process and the rules of the bankruptcy road as any participant in these or any chapter 11 cases.

As a member of the Committee, the PBGC has had a front row seat for, and material non-public information regarding, every key matter in these cases including:

- the circumstances giving rise to these cases;

---

[3]      Capitalized terms not otherwise defined shall have the meanings ascribed to them below.

[4]      The Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001 to 1461.

[5]      See Notice of Appointment of Official Creditor Committee Filed by United States Trustee [D.I. 141];Am. Notice of Appointment of Official Creditor Committee Filed by United States Trustee [D.I. 142].

[6]      The Debtors will not list all of the cases in which the PBGC has served, or is serving on, official committees, but can provide a comprehensive list if the Court requests.

- the Debtors' businesses;

- the Debtors' assets;

- the Debtors' employees;

- the Debtors' retirees;

- the Debtors' Pension Plan;

- the Debtors' Pension Plan assets;

- the coordination of these cases with the creditor protection proceedings for the Canadian Debtors and the EMEA Debtors;

- the challenges to the Debtors' efforts to reorganize;

- the creation of the process to sell each of the Debtors' businesses;

- the negotiation of the Interim Funding and Settlement Agreement, dated as of June 9, 2009 ("IFSA") and the postponing of the allocation of sale proceeds until after consummation of the sales;

- the negotiation of each sale;

- the auctions for each sale;

- the Debtors' complicated and contentious relationships with the Canadian Debtors and the EMEA Debtors following the sales;

- the Debtors' bitter conflict with the private and governmental entities (the "UK Pension Interests") pressing the rights of the Nortel U.K. pension plan against the Debtors;

- the multiple informal attempts to resolve the allocation dispute;

- the lengthy and expensive formal mediations before Judge Layn Philips and Chief Justice Warren Winkler before the allocation trial;

- the formulation of the Debtors' legal and financial allocation theories;

- the formulation of the strategies relating to such theories;

- the facts and circumstances underlying those theories;

- the analysis of the strengths and weaknesses of the allocation theories advanced by each of the Canadian Debtors, the EMEA Debtors, and the UK Pension Interests;

- the settlement offers that were made and received over the many years of the allocation dispute;

- the creation of the protocol for conducting the unprecedented cross-border allocation trial;

- the allocation discovery process;

- the allocation trial itself;

- the pre- and post-trial briefing regarding the allocation trial;

- the decisions issued by this Court and Justice Newbould;

- the appeals that followed in the United States and Canada;

- the post-trial mediation supervised by Chief Judge Joseph J. Farnan, Jr.; and

- the difficult negotiation of the global settlement embodied in the Settlement and Plans Support Agreement, dated as of October 12, 2016, and filed with this Court on the same date (the "Global Settlement").

It is therefore with a sense of bewilderment that the Debtors now stand before the Court facing the PBGC as a vocal opponent of the Global Settlement. Having tried and failed to settle the seriously flawed PBGC Claims, the Debtors are left with no option but to file this Objection.

* * *

The defects infecting the PBGC Claims and the Amended PBGC Claims are both numerous and glaring.

First, the PBGC's attempt to amend their claims is fatally defective and must fail. Nearly five years after the Bar Date[7] and just days after the close of evidence in the allocation trial, the PBGC filed the Amended PBGC Claims, increasing their claims against the Debtors by a staggering $114 million. These amendments must be rejected because the PBGC never made a motion under Bankruptcy Rule 7015 to amend their claims. Having slept on their rights for

---

[7]       Pursuant to an order entered by this Court on August 4, 2009, Order Establishing Deadlines for Filing Proofs of Claim [D.I. 1280], September 30, 2009 was established as the final date (the "Bar Date") for the filing of all prepetition claims against the Debtors.

years, it is far too late to do so now, especially in light of the Global Settlement.  In addition, the purported amendment of the PBGC Claims was both in bad faith and is highly prejudicial to the Debtors and all of their other creditors.  The PBGC's amendment ambush was made after years of mediations and negotiations in which the PBGC participated and in which its claims, among the largest against the Debtors and the beneficiary of ERISA's statutory joint and several status, figured large.  The purported amendment was also made just thirteen days after the close of evidence in the allocation trial.  The PBGC inflated its claims by a material amount immediately after witnessing (but not participating in) the evidence phase of the allocation trial, where such a material increase would not only serve as a hedge against decisions that rejected the Debtors' allocation theory, but also materially alter the settlement dynamic that had remained static *vis a vis* the PBGC since the Bar Date.  Such machinations, particularly from a virtual insider and professional committee member cannot be allowed to stand.

Second, the PBGC's underfunding claims are based on purely fictional discount rates. As a result, the PBGC Claims do not come close to approximating the damage suffered – the gap between the value of the assets transferred and the amounts necessary to pay the Pension Plan's projected benefit liabilities given the expected returns implied by PBGC's asset allocation practices.  It is an unassailable principle of bankruptcy law that no creditor is entitled to a claim in an amount more than the damage it suffered as a result of the Debtors' breach.  That principle applies with equal force to the PBGC, which has no special rights or privileges to entitle it to a windfall on the calculation of its claims.

Third, the PBGC must take into account the fact that the Pension Plan assets transferred to the PBGC on the Trusteeship Date (as defined below) had increased by over $88 million dollars from the Plan Termination Date (as defined below).  The determination of both dates, and

5

the delay between the two, was in the complete control of the PBGC and the substantial increase in value of the Pension Plan assets while still being invested at the direction of the Plan fiduciaries must reduce the amount of the PBGC's claim on a dollar for dollar basis.

Fourth, as set forth in detail below, the PBGC's attempts to claim administrative or other priority for certain of the PBGC Claims, whether as taxes or otherwise, are utterly without merit and must fail.

Fifth, the PBGC's claims for unpaid minimum funding contributions ignore the fact that the Debtors made all of their minimum funding payments before the Plan Termination Date.  As such, these claims are without merit and must fail.

Finally, the late-filed Amended Insurance Claim (as defined below) for $83 million in so-called Termination Premiums also must fail because the PBGC ignores the statutory language and legislative history that makes clear these claims apply only to debtors that emerge from chapter 11 as reorganized operating entities.  Such claims cannot apply to the Debtors, which have had no business operations since 2011 and are engaged in a prolonged and undeniable wind-down process.  This exceedingly late attempt to pile even more claims on the Debtors should be recognized and dismissed as another transparent attempt by the PBGC to supersize their claims against the Debtors at the expense of other creditors.

## JURISDICTION AND VENUE

1.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue over the Debtors' Chapter 11 cases and this Objection is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.     The statutory bases for the relief requested herein are sections 105 and 502 of title 11 of the United States Code (the "Bankruptcy Code"), rules 3007(a) and 9014 of the Federal

Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rule 3007 of the Local Rules of

Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of

Delaware (the "Local Rules").

**BACKGROUND**

*A. Procedural History*

3.        On January 14, 2009 (the "Petition Date"), the Debtors, other than Nortel

Networks (CALA) Inc. ("NN CALA") and Nortel Networks India International, Inc. ("NNIII"),[8]

filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code, Chapter 11

Voluntary Pet. [D.I. 1], and the cases were consolidated for procedural purposes only.  The

Debtors continue to operate their remaining businesses and manage their properties as debtors in

possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  The Office of the

United States Trustee for the District of Delaware (the "U.S. Trustee") appointed the Committee

in respect of the Debtors.  Notice of Appointment of Committee, Jan. 26, 2009 [D.I. 141]; Am.

Notice of Appointment of Committee, Jan. 26, 2009 [D.I. 142].  The PBGC was one of the

original five members of the Committee and remains, as of the date hereof, a member of the

Committee.  An ad hoc group of bondholders holding claims against certain of the Debtors and

certain of the Canadian Nortel affiliates has also been organized (the "Bondholder Group").  No

trustee or examiner has been appointed in the Debtors' cases.

---

[8]        NN CALA filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on July 14, 2009,
Chapter 11 Voluntary Pet., In re Nortel Networks (CALA) Inc., (Bankr. D. Del. filed July 14, 2009) [D.I. 1],which
was consolidated and is being jointly administered with the other Debtors' chapter 11 cases for procedural purposes.
Order Directing Joint Administration, July 17, 2009 [D.I. 1098].  NNIII filed a voluntary petition for relief under
chapter 11 of the Bankruptcy Code on July 26, 2016, Chapter 11 Voluntary Pet., In re Nortel Networks India
International, Inc., (Bankr. D. Del. filed July 26, 2016) [D.I. 1],which was consolidated and is being jointly
administered with the other Debtors' chapter 11 cases for procedural purposes.  Order Directing Joint
Administration, August 16, 2016 [D.I. 17090].

7

4.     On the Petition Date, the Debtors' ultimate corporate parent Nortel Networks Corporation ("NNC"), NNI's direct corporate parent Nortel Networks Limited ("NNL," and together with NNC and their affiliates, including the Debtors, "Nortel"), and certain of their Canadian affiliates (collectively, the "Canadian Debtors")[9] commenced a proceeding with the Ontario Superior Court of Justice (the "Canadian Court") under the Companies' Creditors Arrangement Act (Canada) (the "CCAA"), seeking relief from their creditors (collectively, the "Canadian Proceedings") and a Monitor, Ernst & Young Inc. (the "Monitor"), was appointed by the Canadian Court.  Also on the Petition Date, the High Court of England and Wales (the "English Court") placed nineteen of Nortel's European affiliates (collectively, the "EMEA Debtors")[10] into administration (the "English Proceedings") under the control of individuals from Ernst & Young LLP (collectively, the "Joint Administrators").

5.     Since the Petition Date, Nortel has sold its business units and other assets to various purchasers, generating proceeds ("Sale Proceeds") of over $7.3 billion that have been placed in escrow accounts pending allocation among the various selling entities (the "Nortel Sellers").  Having failed to negotiate a consensual allocation, a cross-border trial (the "Allocation Trial") to determine such allocation was held in 2014 before this Court and the Canadian Court. Decisions on the allocation were issued in May and June 2015, and are under appeal in both the U.S. and Canada (the appeals and all controversies regarding allocation, the "Allocation

---

[9]     The Canadian Debtors include the following entities:  NNC, NNL, Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation.

[10]     The EMEA Debtors include the following entities:  Nortel Networks UK Limited, Nortel Networks S.A., Nortel Networks (Ireland) Limited, Nortel GmbH, Nortel Networks France S.A.S., Nortel Networks Oy, Nortel Networks Romania SRL, Nortel Networks AB, Nortel Networks N.V., Nortel Networks S.p.A., Nortel Networks B.V., Nortel Networks Polska Sp. z.o.o., Nortel Networks Hispania, S.A., Nortel Networks (Austria) GmbH, Nortel Networks, s.r.o., Nortel Networks Engineering Service Kft, Nortel Networks Portugal S.A., Nortel Networks Slovensko, s.r.o. and Nortel Networks International Finance & Holding B.V.

Dispute"). The only task remaining for these Debtors is the distribution of their assets to their creditors.

6.      On October 12, 2006, the Debtors entered into the Global Settlement, which provides for the resolution of the Allocation Dispute, subject to the satisfaction of certain conditions. The PBGC has stated that it opposes the Global Settlement.

B. *The Debtors' Pension Plan and the PBGC*

7.      Effective May 1, 1974, the Debtors established the Nortel Networks Retirement Income Plan (the "Plan" or "Pension Plan"). See Tunis Decl. Ex. 1 at 1 [Nortel Networks Retirement Income Plan Annual Return/Report of Employee Benefit Plan (I.R.S. Form 5500) (Sept. 8, 2009)] (the "Nortel Networks Retirement Income Plan Form 5500"). The Pension Plan provided retirement benefits for certain of the Debtors' employees, and was a single-employer defined benefit pension plan covered by Title IV of ERISA. See 29 U.S.C. § 1321(a); Tunis Decl. Ex. 2 ¶¶ C-D [PBGC and Nortel Networks Retirement Income Plan Retirement Plan Committee Trusteeship Agreement (Sept. 8, 2009)] (the "Trusteeship Agreement").

8.      The PBGC is a United States government corporation that administers the defined benefit plan termination insurance program under Title IV of ERISA. See, e.g., Tunis Decl. Ex. 14 ¶ 1 Claim No. 8763, July 7, 2014. The PBGC guarantees payment of certain pension benefits upon termination of qualified plans such as the Debtors' Pension Plan. Id. When a qualified plan terminates, the PBGC generally becomes trustee, takes custody of the terminated plan's assets, and subject to statutory limitations, pays plan beneficiaries their accrued benefits. Id. This occurred here.

9.      The PBGC is a self-funded organization that depends on insurance premiums paid by sponsors of qualified defined benefit pension plans, and is not dependent on tax revenues

from the United States.  See PBGC Annual Report at 10-11 (2014),

http://www.pbgc.gov/Documents/2014-annual-report.pdf.  The PBGC invests its assets – both

insurance premiums and the assets of terminated plans – using private sector investment

management firms that implement the PBGC's strategic investment goals.  Id. at 11.

10.    On July 16, 2009 the PBGC commenced an action in the United States District

Court for the Middle District of Tennessee captioned PBGC v. Retirement Plan Committee of

the Nortel Networks Retirement Income Plan, No. 3:09-00657 (M.D. Tenn. Filed July 17, 2009)

(the "Termination Action").  The Termination Action sought an order terminating the Debtors'

Pension Plan as of July 17, 2009, and appointing the PBGC as trustee.  See Tunis Decl. Ex. 3 at

6-7 [Compl. for Pension Plan Termination, No. 3:09-00657 (M.D. Tenn. July 17, 2009) [D.I. 1]].

On July 17, 2009, the PBGC then issued a notice of determination that the Debtors' Pension Plan

should be terminated pursuant to Section 4042(c) of ERISA.  See Tunis Decl. Ex. 1 at Notes to

Financial Statements at 13 [Nortel Networks Retirement Income Plan Form 5500].

11.    The PBGC and the Debtors subsequently negotiated the Trusteeship Agreement,

which provided for termination of the Pension Plan with a July 17, 2009 termination date (the

"Termination Date").  See Tunis Decl. Ex. 2 [Trusteeship Agreement].  The Trusteeship

Agreement was approved by the Court by order dated August 31, 2009,[11] and provided that the

PBGC's trusteeship of the Plan would take effect on the date that the last signatory executed the

agreement.  Tunis Decl. Ex. 2 at 3 [Trusteeship Agreement].  The representative of the Debtors'

Plan executed the Trusteeship Agreement on August 31, 2009, after which the PBGC counter-

signed on September 8, 2009 (the "Trusteeship Date"), on which date the Debtors' Pension Plan

assets were conveyed to the PBGC.  That same day, the PBGC filed a notice of dismissal with

---

[11]    See Order Authorizing Debtors to Take Actions in Furtherance of an Agreement with the PBGC [D.I. 1406].

prejudice of its Termination Action.  See Tunis Decl. Ex. 4 [Notice of Dismissal, No. 3:09-00657 (M.D. Tenn. Sept. 8, 2009) [D.I. 5]].

   C. *The Bar Dates and the PBGC Claims and Amended PBGC Claims*

   12.    On August 4, 2009, this Court entered an order fixing September 30, 2009 at 4:00 p.m. (Eastern Time) as the Bar Date for filing proofs of claim or interests against the Debtors (other than NN CALA) [D.I. 1280] (the "Bar Date Order").  On December 3, 2009 this Court entered an order fixing January 25, 2010 at 4:00 p.m. (Eastern Time) as the bar date for filing proofs of claim or interests against NN CALA [D.I. 2059].

   13.    On September 24, 2009, the Debtors entered into a stipulation with the PBGC that streamlined the claims process for the benefit of both parties.  See Tunis Decl. Ex. 5 [Stipulation Regarding Filing of Claims by Pension Benefit Guaranty Corporation executed on Sept. 24, 2009, [D.I. 1546-1]] (the "Claims Stipulation").  Given that each of the Debtors is jointly and severally liable in respect of the PBGC Claims, the Claims Stipulation averted the need for the PBGC to file separate proofs of claim in all sixteen of the Debtors' cases.  See Order Approving Stipulation Regarding Filing of Claims by PBGC, Sept. 24, 2009 [D.I. 1546].  Instead, the Debtors agreed that upon the PBGC's filing of the PBGC Claims in Chapter 11 Case No. 09-10138, each of the PBGC Claims would be deemed filed in the remaining fifteen cases.  See Tunis Declaration Ex. 5 ¶ 1 [Claims Stipulation].

   14.    In accordance with the Claims Stipulation, on September 29, 2009, the PBGC filed the following four proofs of claim, asserted against each of the Debtors on a joint and several basis:

   • Claim 4735, which asserted an estimated claim of $593,100,000 in respect of the Pension Plan's unfunded benefit liabilities pursuant to 29 U.S.C. § 1362 (the "Unfunded Benefits Liability Claim");

11

- Claim 4736, which asserted an unliquidated claim for any minimum funding contributions that the Debtors may have failed to make pursuant to 29 U.S.C. § 1342 (the "Minimum Funding Contribution Claim");

- Claim 4737, which asserted an unliquidated claim for certain insurance premiums, interest and penalties (including termination penalties) (the "Insurance Claim"); and

- Claim 4738, which asserted an unliquidated claim for any shortfall amortization and waiver amortization charges pursuant to 29 U.S.C. § 1342(b) and (c) (the "Amortization Claim").[12]

15.    Subsequently, on July 7, 2014, nearly five years after the Bar Date, with no advance notice and no explanation of changed circumstances or other justification, the PBGC filed the following four proofs of claims, asserted against each of the Debtors on a joint and several basis, purporting to amend their previously filed proofs of claim:

- Claim 8763, which purports to amend the Unfunded Benefits Liability Claim upward from $593,100,000 to $624,601,972 (the "Amended Unfunded Benefits Liability Claim");[13]

- Claim 8762, which purports to amend the Insurance Claim to assert $83,392,500 as an estimated amount of certain insurance premiums, interest and penalties (including termination penalties) (the "Amended Insurance Claim");

- Claim 8761, which apparently amends the Minimum Funding Contribution Claim for contributions to satisfy minimum funding standards (unliquidated) (the "Amended Minimum Funding Contribution Claim");

- Claim 8760, which apparently amends the Amortization Claim, asserting an unliquidated claim for any shortfall amortization and waiver amortization charges (the "Amended Amortization Claim").[14]

16.    The PBGC did not seek permission from this Court under Bankruptcy Rule 7015 to amend the PBGC Claims.

---

[12]    Copies of the PBGC Claims are attached as Exhibits 8, 9, 10, and 11 respectively to the Tunis Declaration.

[13]    The PBGC asserted that its Unfunded Benefits Liability Claim is entitled to administrative or other priority under Sections 503(b)(1)(B), 507(a)(2) and/or 507(a)(8) of the Bankruptcy Code. See Tunis Decl. Ex. 8 ¶¶ 11-12 [Unfunded Benefits Liability Claim].

[14]    Copies of the Amended PBGC Claims are attached as Exhibits 12, 13, 14, and 15 respectively to the Tunis Declaration.

*D.  The PBGC Has Taken No Actions to Enforce Its Claims against the Debtors' Affiliates*

17.     Although ERISA provides the PBGC with joint and several claims against the Canadian Debtors and the EMEA Debtors – which are part of the Pension Plan's "controlled group" for purposes of ERISA – the PBGC has taken <u>no action</u> to pursue such claims.

18.     The Canadian Court entered a Claims Procedure Order dated July 30, 2009 (the "<u>Canadian Bar Date Order</u>"), which required that all claims against the Canadian Debtors based in whole or in part on facts existing prior to the Petition Date, or relating to time periods prior to the Petition Date, be filed with the Monitor no later than September 30, 2009.  <u>See</u> Tunis Decl. Ex. 6 [Claims Procedure Order, <u>In re Nortel Networks Corp.</u>, File No. 09-CL-7950 (Can. Sup. Ct. J. July 30, 2009)].  The PBGC did not timely file any claims against NNL, the Debtors' corporate parent, or any of the other Canadian Debtors.  Under the terms of the Canadian Bar Date Order, the PBGC is thus "forever barred from making or enforcing any claim against the [Canadian Debtors]."  <u>Id.</u> at ¶ 8.  By failing to pursue their statutory rights against the Canadian Debtors, including NNI's direct parent, NNL, the PBGC intentionally chose to not pursue a substantial source of recovery for the PBGC Claims, to the material detriment of the Debtors and their other creditors.

19.     Similarly, the English Court entered an order on May 18, 2010 (the "<u>EMEA Claims Order</u>") authorizing the Joint Administrators to request that creditors submit details of their claims in writing to the Joint Administrators, and to seek to agree such claims.  <u>See</u> Tunis Decl. Ex. 7 ¶ B(i)-(ii) [Minute Order, <u>In re Nortel Networks UK Ltd.</u>, No. 536 of 2009 (High Ct. of J. Ch. Div. May 18, 2010) (Eng.)].  Despite repeated requests from the Debtors, the PBGC took no action to submit claims to the Joint Administrators, or otherwise enforce the PBGC Claims against the EMEA Debtors.  This is particularly prejudicial to the Debtors and their

13

creditors when the PBGC's unwillingness to pursue the Canadian Debtors and EMEA Debtors is contrasted with the aggressive litigation strategies employed by the UK Pension Interests, which filed claims against Nortel entities around the world, including against the Debtors. In fact, this Court approved a substantial payment by NNI to the UK Pension Interests to obtain releases from their claims against NNI and terminate expensive and time-consuming litigation. The UK Pension Interests are collectively the U.K. equivalent of the PBGC, and they have consistently and aggressively sought to enforce their U.K. statutory rights against the Debtors, the Canadian Debtors and most of the EMEA Debtors.[15] Throughout the process, the UK Pension Interests have loudly described their role as protecting the retirement benefits of UK retirees, most of whom worked very little, if any, for NNUK, but rather for STC plc., a failing company acquired by the Debtors' parent in 1991. The PBGC, by contrast, have sat on their hands, making no statements about the thousands of U.S. Nortel retirees whose interests they protect until just two weeks ago and filing no claims against the Canadian Debtors and EMEA Debtors, all to the material detriment of the Debtors and their other creditors.

E. *Resolution of PBGC Objections to Sale Transactions*

20.    The PBGC objected to certain of the Debtors' sale transactions, which the PBGC asserted either (i) provided for the transfer of assets of minor foreign non-debtors, against which the PBGC asserted claims or liens, and/or (ii) included the transfer of equity interests in certain non-debtors,[16] against which the PBGC also asserted claims or liens. The Debtors and the PBGC consensually resolved these objections, thus allowing the sale transactions to proceed, through a

---

[15]    See generally Mem. Op. re: Debtors' Motion for Entry of an Order Enforcing the Automatic Stay Against Certain Claimants with Respect to the U.K. Pension Proceedings, Mar. 9, 2009 [D.I. 2664].

[16]    The "non-debtors" referenced in paragraphs 20-23 and the stipulations described therein do not include any of the Canadian Debtors or the EMEA Debtors. Therefore, the stipulations do not relate to the assertion of rights by the PBGC against any of the Canadian Debtors or EMEA Debtors. The PBGC has taken no action against those affiliates.

series of stipulations that provided cash payments, or liens on sale proceeds, in favor of the

PBGC.

21.     Specifically, in connection with the sale of the CDMA and LTE business lines,

the Debtors entered into a stipulation with the PBGC to settle the PBGC's objection that the

proposed transaction provided for the sale of assets belonging to minor foreign non-debtor

subsidiaries against whom the PBGC had a rightful claim under Section 4062 of ERISA.  See

Stipulation By and Among Debtors, Certain Affiliates, and PBGC executed on July 27, 2009, at

preamble, July 28, 2009 [D.I. 1205-2].  In exchange for its agreement not to assert a lien or claim

against the assets belonging to such minor non-debtors, the purchasers of those assets, or the

related sale proceeds, the PBGC received a cash payment of $250,000 from the sale proceeds.

See id. ¶ 1-2.

22.     In connection with the sale of the Enterprise business line, the Debtors and their

affiliates entered into two parallel stipulations with the PBGC to settle the PBGC's similar

objections to that sale.  Specifically, the Debtors agreed to grant the PBGC a lien on the portion

of the sale proceeds ultimately allocated to the sale of the shares of two U.S. non-debtor

subsidiaries, in an amount equal to the lien that could have been imposed under Section 4068 of

ERISA.  See Stipulation between Debtors and PBGC executed on Oct. 7, 2009 ¶ 3, Oct. 8, 2009

[D.I. 1639-2]; Order Approving Stipulation with the Pension Benefit Guaranty Corporation, Oct.

15, 2009 [D.I. 1658].[17]  The Debtors and certain of their minor foreign non-debtor affiliates

entered into an additional stipulation providing for a cash payment of $500,000, in exchange for

the PBGC's release of all potential claims and liens against the assets belonging to the minor

foreign non-debtor subsidiaries whose assets were being transferred in the transaction, and the

---

[17]     This Court determined that no value should be allocated to the sale of such subsidiaries.  See Mem. Order
on Mots. for Reconsideration ¶ 4, July 6, 2015 [D.I. 15830].

purchasers of those assets.  See Stipulation Among the Debtors, Certain Affiliates and PBGC ¶ 1,

Dec. 16, 2009 [D.I. 2157-1]; Order Approving Stipulation Among the Debtors, Certain Affiliates

and the PBGC, Dec. 16, 2009 [D.I. 2157].

23.     In connection with each of the sales of the metro ethernet networks business line

("MEN"), the GSM/GSM-R business line ("GSM"), the carrier voice over IP and applications

solutions business line ("CVAS") and the multi-service switch business ("Passport"), the PBGC

and the Debtors entered into substantially similar stipulations, in which the PBGC released all

potential claims and liens against the assets belonging to the minor foreign non-debtor assets

being transferred in the transactions, as well as the purchasers of those assets.  These stipulations

provided for receipt by the PBGC of cash payments of (i) $250,000 in respect of the MEN sale

(see Order Approving Stipulation Among the Debtors, Certain Affiliates and the PBGC, Mar. 10,

2010 [D.I. 2676]; Stipulation Among the Debtors, Certain Affiliates and the PBGC ¶ 1, Mar. 10,

2010 [D.I. 2676-1]), (ii) $100,000 in respect of the GSM sale (see Order Approving Stipulation

Among the Debtors, Certain Affiliates, and PBGC, Mar. 29, 2010 [D.I. 2784]; Stipulation

Among the Debtors, Certain Affiliates, and PBGC ¶ 1, Mar. 29, 2010 [D.I. 2784-1]) (iii)

$100,000 in respect of the CVAS sale (see Order Approving Stipulation Among the Debtors,

Certain Affiliates and the PBGC, May 26, 2010 [D.I. 3071]; Stipulation Among the Debtors,

Certain Affiliates and the PBGC ¶ 1, May 26, 2010 [D.I. 3071-1]), and (iv) $50,000 in respect of

the Passport sale (see Order Approving Stipulation among the Debtors, Certain Affiliates and the

PBGC, Mar. 3, 2011 [D.I. 5063]; Stipulation among the Debtors, Certain Affiliates and the

PBGC ¶ 1, Mar. 3, 2011 [D.I. 5063-1]).

24.     As a result of payments made pursuant to these stipulations, the PBGC has received a total of $1,250,000 in cash, above and beyond the Plan assets delivered to the PBGC on the Trusteeship Date.

## RELIEF REQUESTED

25.     By this Objection, the Debtors contest the PBGC Claims, and seek entry of an order:  (a) disallowing and expunging the Amended PBGC Claims as time-barred; (b) reducing and allowing the Unfunded Benefits Liability Claim as a general unsecured claim to reflect the appropriate present value of that claim, to reflect the Debtors' partial satisfaction of that claim through post-petition transfers, and to reflect the damage suffered by the Debtors because of the PBGC's intentional failure to pursue claims against non-U.S. affiliates who have controlled group liability under ERISA; (c) disallowing and expunging the Minimum Funding Contribution Claim, for which the Debtors have no liability, and which is in any event duplicative of the Unfunded Benefits Liability Claim; (d) disallowing and expunging the Insurance Claim, for which the Debtors have no liability; and (e) disallowing and expunging the Amortization Claim, which seeks waiver amortization charges for which the Debtors have no liability, and shortfall amortization charges which are duplicative of the Unfunded Benefits Liability Claim.

## BASIS FOR RELIEF REQUESTED

## I.      THE AMENDED PBGC CLAIMS MUST BE DISALLOWED AND EXPUNGED

26.     On July 7, 2014, nearly five years after the Bar Date, the PBGC filed the Amended PBGC Claims, increasing its claims by a staggering $114 million.  First, the amendments must be rejected because the PBGC never obtained leave of the Court to file untimely claim amendments, in direct violation of Rule 7015 of the Federal Rules of Bankruptcy Procedure.  Hatzel & Buehler, Inc. v. Station Plaza Assocs., L.P., 150 B.R. 560, 562 (Bankr. D. Del. 1993) ("Whether the Court will permit that amended is not governed by Rule 7013,

however, but by Rule 7015 which provides that 'a party may amend the party's pleading *only* by leave of court or by written consent of the adverse party . . . .'") (emphasis added) (quoting Fed. R. Bankr. P. 7015); In re Brown, 159 B.R. 710, 714 (Bankr. D.N.J. 1993) ("When a party wishes to amend its proof of claim after the bar date it must obtain the permission of the court to do so." (citing In re Wilson, 136 B.R. 719, 721 n.1 (Bankr. S.D. Ohio 1991)).  In In re Trans World Airlines, the Third Circuit stated that, "Bankruptcy Rule 7015 provides that amendments to claims shall be governed by Rule 15 of the Federal Rules of Civil Procedure, Fed. R. Bankr. P. 7015, which commits the decision to grant or deny leave to amend to the trial court's sound discretion."  145 F.3d 124, 141 (3d Cir. 1998).  Following that ruling, at least one Delaware bankruptcy court has stated that "[a] party that wishes to amend its claim after the bar date has passed must obtain permission of the bankruptcy court."  In re Quinn, 423 B.R. 454, 463 (Bankr. D. Del. 2009).

27.     The PBGC cannot simply ignore the Bar Date set by this Court and nearly five years later amend its claims as it pleases without approval by the Court or even any notice provided to the Debtors.  See In re W.T. Grant Co., 53 B.R. 417, 420 (Bankr. S.D.N.Y. 1985) ("In setting a bar date, the court prescribes a statute of limitations which has been characterized as a prohibition and been viewed as peremptory. . . .  [S]uch amendments are not automatic . . . .").  As the Seventh Circuit has explained, "[i]f the [creditor] had an unqualified right after the bar date to amend proofs of claim dramatically for any reason or for no reason at all, the bar date in bankruptcy proceedings would be meaningless."  In re Stavriotis, 977 F.2d 1202, 1206 (7th Cir. 1992).

28.     Second, the amendments to the PBGC Claims must be denied because the PBGC's undue delay in filing them was clearly motivated by bad faith.  In the Third Circuit,

although post-bar date claims amendments may be allowed in limited circumstances, it is an accepted rule that "[a] court will deny leave to amend . . . if there is undue delay, motivated by bad faith, or [it would be] prejudicial to [the] opposing party." E.g., Hatzel & Buehler, 150 B.R. at 562 (quoting Adams v. Gould Inc., 739 F.2d 858, 868 (3d Cir. 1984)). Here, the PBGC did not amend its claims during the years of formal mediations and informal negotiations in which it participated with the Debtors, nor did the PBGC ever state an intent or basis for increasing its claim amounts during those meetings. Rather, the PBGC stood by its original claim amounts during the four formal mediations that occurred from November 11, 2012 until January 24, 2013, all of which it attended as a member of the Committee, and the numerous informal mediations that it also attended. Even during the break from the Allocation Trial during the week of June 9, 2014, when settlement negotiations were again held at the direction of this Court and the Canadian Court, the PBGC did not amend or provide any indication to the Debtors that it intended to amend its claims upwards. The PBGC only decided to materially amend its claims upwards thirteen days after the close of evidence in the Allocation Trial, on July 7, 2014, in a clear effort to hedge itself against the risk that the Courts might reject the Debtors' allocation theory. The PBGC also made such amendments in an attempt to improve its position in the settlement discussions that followed the Allocation Trial. Bad faith should be inferred from such strategic delay, and the Amended PBGC Claims should not be permitted. See Joy Global, Inc. v. Wis. Dep't of Workforce Dev. (In re Joy Global, Inc.), Civ. No. 01-039-LPS, 2009 WL 1442694, at *9 (D. Del. May 22, 2009) (finding amended proof of claim was filed impermissibly late by creditor and must be denied because creditor "had at least two significant opportunities to amend (or seek leave to amend) its claim prior to 2008" and "had ample opportunity to try to amend

earlier," but delayed for strategic reasons until Plaintiff moved for summary judgment on original proof of claim).

29.    In addition, the PBGC did not learn of any new facts after the close of evidence of the Allocation Trial.  Indeed, before the Bar Date, the PBGC possessed all of the information necessary to determine the Debtors' potential liability.  The Pension Plan terminated on July 17, 2009 and on September 8, 2009, the Pension Plan assets were transferred to the PBGC, at which point the PBGC was able to determine the Debtors' potential liability.  The Bankruptcy Court for the Eastern District of Pennsylvania denied a post-bar date amendment that sought to increase the rate of interest applied to a claim because,

> [t]his is not the case where a claimant has forgotten to add interest to its claim altogether . . . .  Instead, [creditor] asked for all components of its claim in the Original Claim, thus leading the Debtor to believe that the claim was complete.  The use of the Original Claim figure in the many prior plans filed by the parties, as well as in several cash collateral stipulations, understandably cemented this expectation.  [Creditor]'s request for an increased rate of interest at this late date is almost certainly *tactical*.  In any event, [creditor] has *all along slept on its right* . . . , and we will not permit it to rectify the situation now, when it 'wakes up' after the bar date.

In re Union Meeting Partners, 178 B.R. 664, 673 (E.D. Pa. 1995) (emphasis added).  Notably, the creditor in Union Meeting Partners filed its amended claim only one month after the bar date.  Here, the PBGC similarly slept on its rights to assert a higher claims liability, except it did so for an astounding five years.  There is no justification for such delay, and bad faith, tactical post-Bar Date amendments must be denied.  See Stavriotis, 977 F.2d at 1206-07 ("The purpose of permitting amendments to pleadings is to 'enable a party to assert matters that were overlooked or were unknown to him at the time he interposed his original complaint or answer . . . .  If a creditor knows that after analyzing information which is wholly within its own control it may later seek to amend its claim drastically, it must not keep that knowledge secret.  If it does so, and later surprises the debtor or other creditors, it should not claim surprise if the bankruptcy

court elects to deny the amendment."). Here, the prejudice is enormous. The complex allocation

dispute and the even more complex settlement dynamics required that the PBGC, an insider to

the process with material claims, not lay in wait to inject materially larger claims into the

delicate situation to improve their recoveries at the expense of other creditors – creditors without

access to the same information possessed by the PBGC.

30.    Third, the Amended PBGC Claims must be denied because they are prejudicial to

the Debtors and their other creditors. See Hatzel & Buehler, 150 B.R. at 562 (quoting Adams v.

Gould Inc., 739 F.2d at 868); Midland Cogeneration Venture Ltd. P'ship (In re Enron Corp.),

419 F.3d 115, 133 (2d Cir. 2005) ("[I]f an amendment does, in fact, 'relate back' to the timely

filed claim, courts will examine each fact within the case and determine whether it would be

equitable to allow the amendment. Multiple factors play a role in this analysis. . . . Of these,

however, the critical consideration is whether the opposing party will be unduly prejudiced by

the amendment.") (citations omitted). Here, the PBGC chose to amend its claims only after it

stood by and watched the Debtors spend tens of millions of dollars litigating the Allocation Trial,

engage in a series of mediations, and settle various other material claims and disputes in their

cases, all based on an understanding that the PBGC's claims were $114 million less than is now

claimed. The PBGC Claims are among the largest made against the Debtors and were material

to the strategies and theories developed for the Allocation Trial, as well as the numerous

mediations and informal negotiations held from 2010 to 2013, and various other settlements over

the course of these cases. At no point during any of the mediations, negotiations, or the

Allocation Trial did the PBGC state an intent to increase its claims upwards. Rather, at each

phase of the bankruptcy case and settlement discussions, the PBGC Claims were relied on by the

Debtors and their other creditors to their detriment. See In re Spiegel, Inc., 337 B.R. 816, 820

(Bankr. S.D.N.Y. 2006) ("Courts also consider whether permitting the amendment involves . . . some other detrimental reliance on the status quo.") (citation omitted).

31.    The PBGC also amended the amount of its claims not by some insubstantial sum, but rather by a stunning $114 million.  As numerous courts have held, "the second [amended] claim should not only be of the same nature as the first but also reasonably within the amount to which the first claim provided noticed."  E.g., In re AM Int'l, Inc., 67 B.R. 79, 82 (N.D. Ill. 1986) (citing In re Int'l Horizons, Inc., 751 F.2d 1213, 1217-18 (11th Cir.1985)).  The Debtors and their creditors were never put on notice that the PBGC's claims would increase by over $100 million and therefore were substantially prejudiced during the negotiations, trial and settlement process.  See Enron, 419 F.3d at 131 (affirming denial of post-bar date claim amendment in part because "while a claim of $12.5 million might seem insignificant in the face of a $900 billion bankruptcy, courts have previously upheld findings of prejudice in cases in which the late-filed claim was a small fraction of the total claims," and, "in absolute terms, $12.5 million is no small amount"); Stavriotis, 977 F.2d at 1205-06 (affirming denial of a post-bar date claim amendment by IRS which increased claim from $11,000 to $2 million because "[the] amendment would prejudice other creditors who had been given no notice of the IRS's ongoing audit and relied on the general amount of the claim listed in the original proof of claim.  And . . . the government offered no excuse or justification for its delay in notifying the court and other creditors of its potential amendment."); Praedium II Broadstone, LLC v. Wall St. Strategies, Inc., No. 04 Civ. 3880(WHP), 2004 WL 2624678, at *5 (S.D.N.Y. Nov. 18, 2004) (denying post-bar date claim amendment that increased claim from $91,000 to over $1 million); see also In re KMart Corp., 381 F.3d 709, 713-14 (7th Cir. 2004) (affirming denial of post-bar date claim that was for $750,000, even though it was a small fraction of the $6 billion total of unsecured claims, because

it was not a small claim amount, such as for $75,000, which the court noted might have been allowed).

32.     Furthermore, this case is not the typical bankruptcy case where all creditors simply receive pro rata recoveries from the debtor's estate.  Rather, here the amount of the PBGC Claims has a direct impact on the recoveries of other creditors across multiple Debtors. The Debtors and their creditors are now prejudiced by this change in position by the PBGC, which threatens to affect the allocation of assets to the estates, creditor recoveries, and even the Global Settlement.  Cf. Spiegel, 337 B.R. at 820 ("[T]he Amended Claims asserted new liabilities against the Debtor at a time when a plan had already been negotiated based, in part, upon the timely filed claims.  To allow claims filed by parties at the late date of confirmation would wreak havoc with the entire Plan negotiation process.").

33.     The Amended PBGC Claims stand in stark contrast to the post-bar date amendment allowed in In re Stone & Webster, Inc., 547 B.R. 588 (Bankr. D. Del. 2016), where the court allowed the amendment because it "simply increased the amount to reflect more accurately the liability due" and the trustee presented *no evidence* that the distribution to other creditors would be altered by a post-bar date amendment.  Stone & Webster, 547 B.R. at 606. Instead, the prejudicial impact of the Amended PBGC Claims is analogous to the impact of the claim amendment the court denied in In re Walls & All, Inc., 127 B.R. 115 (W.D. Pa. 1991). There, the court affirmed denial of a post-bar date amendment that changed a claim from unsecured to sixth priority status because, in part, "this Court must also determine the equitable impact on the debtor, the trustee, and other creditors. . . .  [A] new priority claim would have a more substantial, less favorable effect on the distribution of funds to other creditors than the general unsecured claim."  Walls & All, 127 B.R. at 119.  Here, the PBGC has claims against

every Debtor, giving it a statutory basis for multiple bites at the apple.  Allowing the Amended

PBGC Claims would greatly reduce the distributions available to other creditors, and such

prejudice cannot be permitted at this late stage in the proceedings.

## II. THE PBGC'S ARTIFICIALLY LOW DISCOUNT RATE CREATES A GROSSLY OVERSTATED UNFUNDED BENEFITS LIABILITY CLAIM

34.    The PBGC's Unfunded Benefit Liabilities Claim includes amounts that will not

become due and owing until some date in the future and thus have to be estimated.  The

unfunded benefit liabilities should be determined by calculating the difference between the value

of the assets held by the Debtors' Pension Plan (taking into account how those assets will be

invested and how those investments will perform over time) and the assets that would be

necessary to pay the Pension Plan's projected benefit liabilities given the expected returns

implied by PBGC's asset allocation practices.  See 29 U.S.C. §§ 1362(b), 1301(a)(18).  Because

the PBGC pays Pension Plan participants over time, the Court must apply a discount rate to

determine the amount of assets that would be necessary to pay benefit liabilities that will only

become payable by the PBGC in the future.

35.    When determining the likely rate of return that will be earned on invested assets,

it is appropriate to identify the rate that would be obtained by a prudent market investor (the

"Prudent Investor Rate").  The PBGC, however, wants to play by another set of rules even

though that it invests its portfolio through professional money managers and earns market returns.

The PBGC applies an artificial discount rate selected by reference to lower prevailing rates for

insurance annuities – annuities the PBGC does not purchase (the "PBGC Artificial Rate").  In

other words, the PBGC receives returns on the assets it received from the Pension Plan based on

its market-based asset allocation practices, but calculates its claims assuming an artificial

discount rate that wildly exaggerates the amount of its claims.  The Unfunded Benefits Liability

Claims bear little relation to the actual damage suffered by the PBGC – the difference between the value of the assets transferred from the Pension Plan on the Trusteeship Date (assuming real world investment returns) and the assets that would be necessary to pay the Plan's projected benefit liabilities – the clear and unambiguous standard applied to any other claim against the Debtors.

36.    Each of the Unfunded Benefits Liability Claim of $593 million and the Amended Unfunded Benefits Liability Claim of $624.6 million asserted by the PBGC is dramatically inflated by the PBGC's use of the PBGC Artificial Rate.

- The PBGC Artificial Rate is 5.31% for the first twenty years and 5.04% thereafter. Using actuarial assumptions regarding the date of birth, gender and retirement age for Plan participants and the PBGC Artificial Rate, the PBGC generated the Unfunded Benefits Liability Claim of $593 million and the Amended Unfunded Benefits Liability Claim of $624.6 million.

- By contrast, the Prudent Investor Rate is between 6.0% and 8.0%.[18]  Based on the information provided by the PBGC, the Debtors' actuarial expert has calculated that using the Prudent Investor Rate instead of the PBGC Artificial Rate would result in an Amended Unfunded Benefits Liability Claim between approximately $180 million and $460 million,[19] which means that the PBGC's Amended Unfunded Benefits Liability Claim is overstated by between $165 million and $445 million.[20]

To permit the PBGC to arbitrarily choose its own discount rate not only provides the PBGC with singular treatment, different from that afforded similarly situated creditors, but has the effect of granting the PBGC a substantial *windfall* over and above its actual losses.  As will be set out in the Expert Actuary Report, using prudent investment strategies, an amount between

---

[18]    The Debtors will submit expert reports from an actuarial expert (the "Expert Actuary Report") and a finance expert to demonstrate (a) that the Prudent Investor Rate falls within this range, and (b) the true amount of the Unfunded Benefits Liability Claim held by the PBGC.

[19]    Based on information provided by the PBGC, the Debtors' actuarial expert has attempted to calculate the impact of the Prudent Investor Rate on PBGC's valuation.  All amounts are approximate.

[20]    The Debtors' actuarial expert reserves the right to perform their own valuation using reasonable actuarial assumptions and methodologies and more information from PBGC that may result in an even lower Unfunded Benefits Liability Claim.

approximately $180 million to $460 million, taken together with the value of Plan assets as of

the Termination Date and expected returns implied by PBGC's asset allocation practices,

provides the best estimate of the amount necessary for the PBGC to *fully satisfy* all projected

benefit liabilities to Plan participants.  Thus, given the percentage distributions the Debtors

project making in respect of allowed claims, to permit the PBGC to inflate its claims using its

own bespoke discount rate would violate the fundamental bankruptcy principle that precludes a

creditor from recovering more than the amount of its actual damage.  See, e.g., Planters' Bank v.

Union Bank, 83 U.S. 483, 502-03 (1873) (finding that the plaintiffs should not "recover more

than the damages they have sustained"); Dopp v. HTC Corp., 947 F.2d 506, 517 (1st Cir. 1991)

(holding that "a plaintiff who is injured by reason of a defendant's behavior is . . . entitled to be

made whole – not to be enriched").

37.    Permitting the PBGC a windfall recovery from the Debtors is particularly

inequitable where the PBGC has made no effort to seek recoveries from the EMEA Debtors, the

Canadian Debtors, affiliates which are part of the Pension Plan's "controlled group."  Indeed, the

PBGC's lack of effort stands in marked contrast to the vigorous efforts of the UK Pension

Interests to enforce their claims against the Debtors, the Canadian Debtors and the EMEA

Debtors.

38.    To avoid such an inequitable result, this Court should adhere to decisions of every

Court of Appeals to have reached the issue, and apply the rate of return a prudent, long-term

pension fund portfolio investor is expected to achieve, which is a rate of between 6.0% and

8.0%.  See PBGC v. Belfance (In re CSC Indus., Inc.), 232 F.3d 505 (6th Cir. 2000), cert.

denied, 534 U.S. 819 (2001);[21] PBGC v. CF&I Fabricators of Utah, Inc. (In re CF&I Fabricators of Utah, Inc.), 150 F. 3d 1293 (10th Cir. 1998), cert. denied 526 U.S. 1145 (1999).  The Debtors respectfully request that this Court apply the Prudent Investor Rate and accordingly reduce the Unfunded Benefit Liabilities Claim by approximately $165 million to $445 million, to $148 million to $428 million.

A. *The PBGC's Valuation Regulation Bears No Relationship to the PBGC's Alleged Asset Shortfall*

39.    The PBGC derives the PBGC Artificial Rate from a regulation set by the PBGC itself in 29 C.F.R. §§ 4044.41-75 (the "Valuation Regulation").  The Valuation Regulation purportedly aims to generate a value that approximates the cost of single premium group annuity contracts that would pay the benefits promised under a terminated defined benefit pension plan. See In re U.S. Airways Grp., Inc., 303 B.R. 784, 788 (Bankr. E.D. Va. 2003).  This approach might be a sensible way to estimate the proper discount rate for unfunded benefit liabilities in a plan termination scenario *if* the PBGC *actually purchased* annuity contracts to satisfy its benefit obligations to plan participants.  *It does not.*  Instead, the PBGC invests its funds with institutional investment management firms, achieving a 9.4% average rate of return for the 19-year period ending September 30, 2009 and a 8.7% average rate of return for the 25-year period ending September, 2015.[22]  See PBGC Annual Reports for Fiscal Years 1995-2015, http://www.pbgc.gov/about/annual-reports.html.  The PBGC predominantly invests assets recovered from terminated pension plans in a mix of equity and fixed-income securities, as well as private equity, private debt and real estate assets.  See PBGC Annual Report at 30-31 (2014),

---

[21]    The Third Circuit has cited CSC Indus. approvingly as recently as 2011.  See In re Nortel Networks, Inc., 669 F.3d 128, 142 n.16 (3d Cir. 2011) (citing CSC Indus. 232 F.3d 505 as support for the proposition that PBGC is subject to the automatic stay in certain circumstances).

[22]    The 19-year and 25-year calculation periods use all available historical return data from PBGC's annual reports leading up to September 30, 2009 and September 30, 2015, respectively.

http://www.pbgc.gov/Documents/2014-annual-report.pdf.[23]  To repeat – PBGC does not buy

annuities to cover the unfunded benefit liabilities for which it is responsible, but uses an annuity-

derived discount rate to calculate its Unfunded Benefits Liability Claim.  The PBGC is asking

this Court to affirm a discount rate that is divorced entirely from the reality of how the PBGC

manages its own assets.[24]  This request must be rejected.

40.     The PBGC's attempt to ignore the reality of its own investment practices is

particularly stark in these cases, where the PBGC chose to terminate the Debtors' Pension Plan at

a time when equity markets were near a historic low.  On July 17, 2009, the S&P 500 was

hovering below 1,000.  See "Data Points: U.S. Markets," WALL ST. J., July 17, 2009.  Financial

markets have rebounded tremendously since then, allowing the PBGC to benefit from the

massive upswing in the value of the Pension Plan assets since that time.  Indeed, according to the

most recent PBGC Annual Report, its investments yielded an average rate of return of 8% for the

five years ending September 30, 2014.  See PBGC Annual Report at 41 (2014),

http://www.pbgc.gov/Documents/2014-annual-report.pdf.

41.     The PBGC Artificial Rate also differs from the rate the PBGC itself uses to

determine variable-rate premiums paid by plan sponsors outside of bankruptcy.  For plan years

beginning in July 2009, the PBGC uses three segment rates that are approximately equivalent to

---

[23]     In May 2011 the PBGC's Board of Directors implemented an investment policy which called for the PBGC to allocate 30% of its total portfolio to equity securities and 70% of its total portfolio to fixed income.  As of the end of 2014, the portfolio maintained approximately 31% in equity securities.  PBGC Annual Report at 34 (2014), http://www.pbgc.gov/Documents/2014-annual-report.pdf.  Since the PBGC currently invests nearly all of the assets it collects as insurance premiums from single-employer and multiemployer plans in U.S. Treasury Securities, and these assets make up approximately 23% of the PBGC's total investment portfolio, approximately 40% of the assets received from trusteed funds (such as those received from the Debtors' Plan), are invested in equity securities.  See id.

[24]     After the filing of this Objection, the Debtors will seek discovery from the PBGC related to a variety of issues relevant to the Proofs of Claim, including *inter alia*, additional information regarding the PBGC's investment policies and decision-making processes, how the PBGC invested the trusteed assets of the Debtors' Pension Plan after those assets were transferred to the PBGC on the Trusteeship Date, and additional information underlying the process by which the PBGC Artificial Rate is set.

a single 6.5% discount rate to calculate the standard premium funding target.[25]  PBGC, Variable-Rate Premiums, http://www.pbgc.gov/prac/interest/vrp.html (last visited October 29, 2016).  In effect, this means at the moment the Pension Plan terminated, the PBGC's valuation of the additional amount of funding needed to meet the Plan's future liabilities jumped from approximately $380 million to $624.6 million even though termination had no effect on the projected rates of return on Plan assets or the composition of the Plan participant base.  This is another example of the shell games being played by the PBGC.

42.     The PBGC will likely argue that this Court should defer to the PBGC Artificial Rate under Chevron U.S.A. Inc. v. Natural Res. Def. Council, 467 U.S. 837, 844 (1984) and its progeny.  The PBGC's argument is unpersuasive.  The Supreme Court has held that an agency's expertise with respect to a policy area – and the deference to be granted to such an agency – does not imbue it with expertise or deference over all subjects within its decision-making ambit.  Gonzales v. Oregon, 546 U.S. 243, 267 (2006) (holding Attorney General does not have authority to make quintessentially medical judgments that are beyond his expertise).  The PBGC has no inherent expertise in determining the present value of projected future payments, or anticipated rates of return in the market, and therefore its determination should not be granted deference by this Court.  LTV Corp. v. PBGC (In re Chateaugay Corp.), 115 B.R. 760, 769 (Bankr. S.D.N.Y. 1990), aff'd, 130 B.R. 690 (S.D.N.Y. 1991), vacated, withdrawn, 17 E.B.C. 1102 (S.D.N.Y. 1993).[26]

---

[25]     These rates are similar to those set by the Secretary of the Treasury used to calculate liability and determine required future minimum funding contributions for *operating* pension plans.  See 29 U.S.C. § 1083(h).  For plan years beginning in July 2009, the Secretary of the Treasury prescribes using 24-month average segment rates (in contrast to PBGC's spot segment rates) blended with a corporate bond weighted average rate of 6.47%.  IRS, Internal Revenue Bulletin: 2009-29, Notice 2009-57, Update for Weighted Average Interest Rates, Yield Curves, and Segment Rates (July 20, 2009), http://www.irs.gov/irb/2009-29_IRB/ar08.html.

[26]     Despite the fact that the Chateaugay decision was withdrawn by consent order after the parties settled, other courts – including bankruptcy courts in this district – have nonetheless continued to cite to Chateaugay as persuasive authority.  See, e.g., In re Loewen Grp. Int'l Inc., 274 B.R. 427, 436 (Bankr. D. Del. 2002) (holding that although

43.     Moreover, because the application of the PBGC's Valuation Regulation to the Debtors is arbitrary and capricious, it cannot trigger <u>Chevron</u> deference.  Underlying the discount rates published in the Valuation Regulation is the PBGC's attempt to estimate the rate charged by insurers for annuities, including their profit margin.  Valuation of Benefits, 70 Fed. Reg. 72205 (Dec. 2, 2005); PBGC, <u>PBGC Procedure for Setting Interest Factors Used to Value Liabilities for PBGC Financial Statements</u>, Section II: ACLI Annuity Price Survey, http://www.pbgc.gov/news/other/res/pbgc-procedure-interest-factors.html (last visited May, 7 2015).  The Court must first ask what is the purpose behind the Valuation Regulation.  Assuming the purpose behind this market proxy is not for the PBGC to claim a larger amount than the assets required to cover the unfunded benefit liabilities (which would be an impermissible purpose), the only logical remaining purpose would be to remove any incentive for employers to pursue a lower cost voluntary termination by having the PBGC assume unfunded benefit liabilities and to remove this incentive by forcing employers to purchase expensive annuities to provide all benefit liabilities under the plan.  ERISA § 4041(a)(3)(A).  However, where, as here, the PBGC files a notice of determination to involuntarily terminate a plan there can be no deterrence or disincentive; the PBGC and not the employer has decided on termination.  As the Valuation Regulation is in that situation a policy that is "unmoored from the purposes," it should receive no deference.  <u>Judulang v. Holder</u>, 132 S. Ct. 476, 484 (2011).  <u>See also</u> <u>Nat'l Indus. Sand Ass'n v. Marshall</u>, 601 F.2d 689, 697 (3d Cir. 1979) (holding that agency action that is not reasonably related to the law's purpose shall be struck down).[27]

---

the decision in <u>Chateaugay</u> was vacated by consent order, "a logical and well-reasoned decision, despite vacatur, is always persuasive authority, regardless of its district or circuit of origin or its ability to bind.").

[27]     The PBGC's only reference to the appropriateness of its Valuation Regulation in the bankruptcy context comes in the 1993 final rule where it states, without any explanation that, "the PBGC has considered" whether the regulation's assumption structure should apply to plans whose contributing sponsors were in bankruptcy "carefully

44.    In contrast to the PBGC, bankruptcy courts (guided by the evidence put before them) are routinely called upon to determine the present value of future payments.  Chateaugay, 115 B.R. at 769; see also In re Accredited Home Lender Holding Co., 441 B.R. 443, 451 (Bankr. D. Del. Jan. 28, 2011) (determining the present value of future lost earnings of asbestos claimants).

45.    These bankruptcy court decisions are consistent with decisions of other courts in the Third Circuit.  Specifically, the Third Circuit has reversed jury verdicts that included damages for future lost wages where the jury was not given instructions about the rate that should be applied to reduce future earnings to present value.  The Third Circuit noted that to determine present value, the fact-finder would require "evidence as to what interest could be fairly expected from safe investment which a person of ordinary prudence, but without particular financial experience and skill, could make."  Russell v. City of Wildwood, 428 F.2d 1176, 1183 (3d Cir. 1970).  This standard has been applied by other courts to determine the present value of future damages.  See, e.g., Ballantine v. Cent. R.R. of N.J., 460 F.2d 540, 543 (3d Cir. 1972), Benderson-Wainberg, L.P. v. Atl. Toys Inc., 228 F. Supp. 2d 584, 593 (E.D. Pa. 2002).  The Court's task in setting the PBGC claim is no different.

B.  *The PBGC's Mechanism to Set Its Discount Rate is Arbitrary and Capricious*

46.    Furthermore, the PBGC relies on an opaque and unsound survey process to obtain pricing information to set its discount rate.  Even were this Court to conclude that the PBGC is entitled to Chevron deference, the arbitrary and capricious manner in which the PBGC determines the published discount rate negates the application of Chevron and prevents the PBGC from relying on its discount rate.

---

and has determined that, as in the past, the regulation will apply in such cases."  Valuation of Plan Benefits, 58 Fed. Reg. 50812, 50813 (Sept. 28, 1993).

47.     A court must hold unlawful and set aside any agency action, finding or conclusion that is "arbitrary [and] capricious."  5 U.S.C. § 706 (2)(A); Prometheus Radio Project v. F.C.C., 652 F.3d 431, 444 (3d Cir. 2011).  Though an agency may have a legitimate reason for a given policy choice, it must effectuate this policy in "some rational way."  Judulang, 132 S. Ct. at 485. If there is no relationship between the agency's approach and its purpose, its approach must be struck down as arbitrary and capricious.  Id.

48.     The PBGC's method of determining its unfunded liability claim has no rational relationship to accurate information seeking.  In order to determine its published discount rate, the PBGC commissions the American Council of Life Insurers (the "ACLI") to conduct a survey of private insurers seeking information regarding the insurers' price for annuities (the "Survey"). The PBGC has no oversight over the Survey's implementation and has no access to crucial information:  (i) which insurers receive the survey and whether they offer the annuity products for which the PBGC is seeking information or the insurers' market share for such products; (ii) the seniority, training or access to product information of the recipient's employee(s) completing the Survey; (iii) whether the recipient has a specified industry rating, as issued by Moody's Ratings or Weiss Ratings, Inc., which may affect the pricing of their annuities; and (iv) what mortality and interest rate assumptions underlie the prices reported on each of the Surveys.  This lack of oversight is more striking when contrasted with the fact that individual respondents to the Survey have a clear motivation to provide an above-market annuity price to the PBGC, thereby making their annuity products more attractive in the event of a plan termination as compared to the cost of the PBGC's claim for the unfunded benefit liabilities.  Yet, despite the lack of information and controls, and the potential for biased responses, the PBGC admits that it has no effective method for removing outliers.  See PBGC, PBGC Procedure for Setting Interest Factors

<u>Used to Value Liabilities for PBGC Financial Statements</u>, Section III: Selecting the Interest

Factor Set-General Procedure: Eliminating the Effect of Outliers,

http://www.pbgc.gov/news/other/res/pbgc-procedure-interest-factors.html (last visited October

31, 2016) (To exclude a data point as an outlier, the PBGC requires that three conjunctive tests

be met; such elimination occurs *only once every three to four years*).

49.     Such a black box rate-setting process is not a reasonable decision of an

administrative agency, and certainly not one shielded from review by deference.  As noted

above, the basis of any deference is an agency's expertise.  <u>Aluminum Co. of Am. v. Cent.</u>

<u>Lincoln Peoples' Util. Dist.</u>, 467 U.S. 380, 390 (1984).  However, even if the PBGC is found to

have expertise relevant to this matter, its decision to effectively shield the mechanisms of the

survey from its own review effectively prevents the application of any such expertise.  Without

critical information, the PBGC cannot perform even the simplest statistical analysis to determine

the accuracy of its results.  The Survey process reveals no information on the number of Surveys

the ACLI sends out, the potential population of private insurers who sell relevant annuities, or

what proportion of either figure responds to the Survey.  Without such information it is

impossible for the PBGC to determine whether the derived rate is an accurate measure of annuity

rates.  Moreover, despite concerns among the public in 1993 that the Survey led to inaccurately

low discount rate assumptions, the Survey remains equally opaque today.  Valuation of Plan

Benefits, 58 Fed. Reg. at 50813.

50.     Even assuming, *arguendo*, that the PBGC's purpose to use the market annuity

rates as a proxy for its own discount rates is legitimate where the PBGC does not purchase

annuities to file the underfunding gap, to receive deference it must nonetheless measure the

market rate "in a rational way."  <u>Judulang</u>, 132 S. Ct at 485.  Instead, its inability to test or

account for the Survey leaves the accuracy of the resulting discount rate as arbitrary as the flip of

a coin.  Courts have long held that agencies need to make available technical studies and data

that they use in reaching their decisions.  Am. Radio Relay League, Inc. v. F.C.C., 524 F.3d 227,

236 (D.C. Cir. 2008).  Without the ability of the PBGC to show the Court any data or statistical

support for its rate assertions, the published rate should be ignored and the Court should

determine the proper rate as it does all other matters:  by receiving evidence and making its own

findings.

51.    There are additional flaws with PBGC's methodology for replicating group

annuity costs.  For example, the annuity prices collected through the ACLI survey may overstate

the true cost of liabilities because annuity prices include profit margins of insurance companies.

Also, typically the final price actually charged for close-out annuities is set by negotiation and,

therefore, may be different from survey responses.[28]  In addition, survey responses may not

include sufficient responses from larger insurance companies that could sell annuities to a group

as large as Nortel's plan population.

C. *The PBGC Artificial Rate Skews the Recovery System at the Expense of Other Creditors
and Offends Bedrock Principles of Bankruptcy Law*

52.    The Bankruptcy Code mandates that each claim or interest in a particular class be

treated alike, unless the holder of a particular claim or interest agrees to less favorable treatment

for such claim or interest.  11 U.S.C. § 1123(a)(4).  If this Court elects to apply the PBGC

Artificial Rate to determine the amount of the Unfunded Benefit Liabilities Claim, it will offend

this fundamental bankruptcy law principle because the PBGC Artificial Rate would only apply to

the PBGC Claims and not the claims of other unsecured creditors, the present value of which

---

[28]    United States General Accounting Office, Private Pensions: Process Needed to Monitor the Mandated
Interest Rate for Pension Calculations 12 (Feb. 2003), http://www.gao.gov/assets/240/237419.pdf.

claims the Court will also determine.  See CF&I, 150 F.3d at 1301; CSC Indus., 232 F.3d at 509;

Chateaugay, 115 B.R. at 770.  This principle of equal treatment for claims of similarly situated

creditors has also been embraced in this district outside of the present value context.  See Finova

Grp., Inc. v. BNP Paribas (In re Finova Grp., Inc.), 304 B.R. 630, 637 (D. Del. 2004) (upholding

the Bankruptcy Court's decision that where the economic realities of creditors' rights under

different agreements are alike, the claims of such creditors must be treated equally under 11

U.S.C. § 1123(a)(4)).

53.    Additionally, if either the PBGC Claims of $593 million or the Amended PBGC

Claims of $708 million were allowed, the PBGC could ultimately recover more than is necessary

to pay the Plan's projected benefit liabilities given the range of expected returns implied by

PBGC's asset allocation practices even were NNI unsecured claims to recover as low as 25%.

Even though the PBGC is obligated to contribute certain recoveries from the Debtors' estates to

fund benefits for participants whose benefits under the Pension Plan exceed the guaranteed-

benefit maximums, application of the PBGC Artificial Rate would dramatically increase the

likelihood that the PBGC will ultimately recover an amount greater than necessary even to

satisfy all obligations to plan participants.  See 29 U.S.C. § 1322(c).  Every dollar the PBGC

recovers above that amount is a windfall that will be unavailable to other unsecured creditors,

whose claims will not receive the same artificial premium.  While this concern will always be

relevant when bankruptcy courts make present value determinations, it is significantly

exacerbated in this case where the PBGC is asking the Court to set such an extreme special rate

for its claims – and its claims alone.

54.    The PBGC's position also conflicts with the central bankruptcy principle set forth

in section 502(b) of the Bankruptcy Code that bankruptcy courts must determine the amount of

claims, which includes, in certain cases, the need to reduce claims for future payments to their

present value.  11 U.S.C. § 502(b).  As the Sixth Circuit has stated,

> [w]hile the <u>validity</u> of a claim might be a matter for nonbankruptcy law,
> bankruptcy courts have the statutory authority to determine the <u>allowability</u> and
> <u>amount</u> of the claim.  The PBGC's authority to promulgate regulations governing
> the valuation of unfunded benefit liabilities does not extend so far as to
> subordinate the authority of the bankruptcy courts to value claims in bankruptcy
> proceedings."

<u>CSC Indus.</u>, 232 F.3d at 509 (emphasis in original).  A bankruptcy court in this district

reiterated this principle, stating,

> [r]egardless of what court determines the underlying merits or amount of a claim,
> the allowance of that claim and the amount to be distributed from the estate on
> that claim is the exclusive province of the bankruptcy court if a proof of claim has
> been filed in the bankruptcy court.  (citations omitted).

<u>Logan v. Credit Gen. Ins. Co. (In re PRS Ins. Grp., Inc.)</u>, 335 B.R. 77, 81 (Bankr. D. Del.

2005).

### D.  The Prudent Investor Approach is Consistent with Non-Bankruptcy Law

55.    The PBGC likely will argue that the authorities applying a Prudent Investor Rate

were wrongly decided and that this Court should follow instead the logic of three bankruptcy

court decisions and one district court decision that defer to the PBGC's Valuation Regulation.[29]

However, those cases are easily distinguishable.  First, the amount of assets available to the

debtors in those bankruptcy court cases was such that there was no realistic prospect for the

---

[29]    In addition to the bankruptcy court in <u>U.S. Airways</u>, bankruptcy courts in the Northern District of Georgia
(<u>Dugan v. PBGC (In re Rhodes Inc.)</u>, 382 B.R. 550 (Bankr. N.D. Ga. 2008)), the Northern District of Illinois
(<u>United Air Lines, Inc. v. U.S. Bank Tr. Nat'l Ass'n (In re UAL Corp.)</u>, 346 B.R. 456 (Bankr. N.D. Ill. 2006)) and
the District of Massachusetts (Order, <u>In re High Voltage Eng'g Corp.</u>, No. 05-10787 (Bankr. D. Mass. July 27, 2006)
[D.I. 2048]) found the PBGC's Valuation Regulation to be binding on the bankruptcy court.  No Circuit Court of
Appeals has adopted this interpretation and no Third Circuit case law supports it.  While lower courts in the Third
Circuit have approved settlements over the objections of creditors who have argued that a prudent investor rate
should apply, those decisions did not reach the question of what discount rate would apply in the absence of a
settlement.  <u>See</u> <u>Law Debenture Tr. Co. v. Kaiser Aluminum Corp. (In re Kaiser Aluminum Corp.)</u>, 339 B.R. 91 (D.
Del. 2006); <u>In re Sea Containers, Ltd.</u>, No. 06-11156 (KJC), 2008 Bankr. LEXIS 2363, at *23 n.9 (Bankr. D. Del.
Sept. 19, 2008).

PBGC to even recover the amount of its actual losses, let alone receiving a windfall recovery, which is what will occur if the PBGC Claims are allowed in their filed amounts.  In each of U.S. Airways, UAL, and Rhodes, the debtors paid only pennies on the dollar, such that regardless of how the PBGC claims were calculated, or how many entities against which the PBGC could recover, the PBGC was not made whole on its actual damages – much less paid more than those damages.[30]  The U.S. Airways court focused on this distinction, rejecting arguments of a windfall because "claims are being paid with stock having an estimated value equal to less than two cents for each dollar in allowed claims, [such that] *full allowance of the PBGC's claim could never result in the PBGC receiving more than the amount of its actual loss*."  U.S. Airways, 303 B.R. at 791 n.6  (emphasis added)  Here, by contrast, the Debtors anticipate making substantial distributions to creditors.  Second, the district court in Cox Enters., Inc. v. News-Journal Corp. conducted no analysis regarding the amount the PBGC would recover by applying its Artificial Rate and only stated that "[the] PBGC's interpretation of ERISA and its own regulation is entitled to deference."  No. 6:04-cv-698-Orl-28DAB, 2014 WL 3511228, at *12 (M.D. Fla. Apr. 24, 2014).  Indeed, the court in Cox recognized that there is "contrary authority in the context of bankruptcy," but went no further to discuss or distinguish such authority.  Id. at *13.  No other court has cited Cox in support of applying the PBGC's Artificial Rate.  Moreover, in light of the combination of the joint and several nature of the PBGC Claims and the use of the PBGC Artificial Rate, the PBGC could recover in excess of its "actual loss."  Over-valuation of the

---

[30]      See Disclosure Statement for Second Am. and Restated Joint Plan of Liquidation Filed by Rhodes, Inc., Rhodes Holdings, Inc., and Rhodes Holdings II, Inc. at 4, In re Rhodes, Inc., No. 04-78434 (Bankr. N.D. Ga. Nov. 22, 2005) [D.I. 1529]  (projecting recoveries for general unsecured claims of approximately 15.8%); First Am. Disclosure Statement for Reorganizing Debtors' First Am. Joint Plan of Reorganization pursuant to Chapter 11 of the United States Bankruptcy Code at 10, In re UAL Corp., No. 02-48191 (Bankr. N.D. Ill. Oct. 20, 2005) [D.I. 13279] (projecting recoveries for general unsecured claims of approximately 4-8%, and recoveries for the unsecured PBGC claims of 4-8% plus issuance of certain securities of the reorganized debtors); US Airways, 303 B.R. at 786 (noting that the general unsecured creditors, including the PBGC, were to share pro rata in a pool of stock in the reorganized debtor, which had a projected value at confirmation of less than 2 cents on the dollar).

PBGC Claims by application of its Valuation Regulation could permit a windfall for the PBGC

at the direct expense of other unsecured creditors, whose available recoveries will be diminished

by the overstatement of the PBGC's actual loss.[31]

56.    Moreover, the lower court decisions that could arguably support the PBGC's

calculations misapply the Supreme Court's decision in Raleigh v. Ill. Dep't of Revenue, 530 U.S.

15 (2000) (holding that state law governed burden of proof on state tax claim in a bankruptcy

proceeding).  Specifically, the U.S. Airways court held that non-bankruptcy law determines not

only the "abstract validity of the claim," but also the amount of the claim, where the amount is

also dictated by non-bankruptcy law.  U.S. Airways, 303 B.R. at 793.  But this interpretation of

Raleigh overlooks the fact that the Supreme Court, citing itself in Butner v. United States, 440

U.S. 48, 55 (1979), specifically states that a federal interest (such as bankruptcy) could require a

result different from that reached under state law.  Raleigh, 530 U.S. at 20.  In this case, the

fundamental bankruptcy principles of equality of treatment of similarly situated creditors and the

inherent authority of bankruptcy courts to determine the allowability and amount of claims

require that this Court make an independent determination as to the proper discount rate.  To that

end, the Debtors will demonstrate that the proper rate for this Court to choose is the Prudent

Investor Rate between 6.0% and 8.0%.

## III.    THE UNFUNDED BENEFITS CLAIM WAS SATISFIED IN PART BY THE DEBTORS' DELIVERY OF PLAN ASSETS THAT INCREASED IN VALUE AFTER THE TERMINATION DATE

57.    The PBGC's Unfunded Benefits Liability Claim must be reduced to reflect the

partial satisfaction of the PBGC Claims through delivery of Pension Plan assets that had

---

[31]    Similarly, while the bankruptcy court in High Voltage applied the PBGC Valuation Regulation, the High Voltage debtors were solvent, and thus paid both the PBGC and other general unsecured creditors the full amount of their claims.  See Order, In re High Voltage Eng'g Corp., No. 05-10787 (Bankr. D. Mass. July 26, 2006) [D.I. 2048] (noting that the Debtors' were proceeding in "solvent Chapter 11 cases").

significantly increased in value between the Plan Termination Date of July 17, 2009 and the

Trusteeship Date of September 8, 2009.  It is true that ERISA provides that claims for unfunded

benefit liability are calculated with reference to the value of the assets of the Plan as of the

termination date.  29 U.S.C. §§ 1301(a)(18), 1362(b).  The Debtors' Pension Plan was terminated

effective July 17, 2009, at which date the Pension Plan assets stood at $760,426,607.  However,

the Trusteeship Agreement provided that the PBGC did not assume control of the Pension Plan

and take custody of the Pension Plan assets until September 8, 2009 (the date on which the

PBGC executed the Trusteeship Agreement).  By that date, the Pension Plan assets had increased

in value to $848,665,794 – *an  increase of $88,398,771* over and above the asset amount used to

calculate the PBGC Claims as of July 17, 2009.  See Tunis Decl. Ex. 1 at Financial Statements at

4 [Nortel Networks Retirement Income Plan Form 5500].

58.    In light of the massive increase in the value of the Pension Plan assets between

the Termination Date and the Trusteeship Date, the PBGC's Unfunded Benefits Liability Claim

must be reduced to reflect this partial and material satisfaction of the PBGC Claims.  Just as

secured creditors who receive cash collateral payments have their claims reduced by the amount

of such payments, see, e.g., In re Gramercy Twins Assocs., 187 B.R. 112, 122 (Bankr. S.D.N.Y.

1995), the PBGC Claims must be reduced to reflect the value of the Plan assets actually

delivered to it.  To hold otherwise would permit the PBGC both a full allowed claim based on

the value of Plan assets as of the Termination Date, plus the benefit of the additional $88 million

dollars in additional assets that it actually received in partial satisfaction of that claim.  To permit

such a windfall would violate the basic principle that "the creditor is not allowed in any

circumstances to receive more than the total amount of its claim."  Id.; see also Jason v. Carpet

Cleaning, Inc. (In re Jason), Bankr. No. 01-10082-SSM, 2007 WL 4553608, at *5 (Bankr. E.D.

Va. Dec. 19, 2007) (postpetition partial payment by debtor's bankruptcy trustee of debtor's obligation reduced the remaining amount of that obligation).  Similarly, failure to provide credit for the value of the assets actually delivered to the PBGC would run afoul of the "one satisfaction" rule, by permitting the PBGC to obtain satisfaction in excess of the amount of its claims.  See, e.g., United States v. Occidental Chem. Corp., 200 F.3d 143, 149-50 (3d. Cir. 1999) (interpreting provisions of CERCLA so as to be consistent with the "prohibition against double recovery found in the common law," under which "double recovery is foreclosed by the rule that only one satisfaction may be obtained for a loss"); see also, Hitner v. Diamond State Steel Co., 176 F. 384, 404-05 (C.C. Del. 1910) (reaffirming general principle against "allowance of double dividends to an unsecured creditor out of one and the same fund upon one and the same claim"). The Unfunded Benefits Liability Claim should thus be deemed satisfied and reduced by $88,398,771, to reflect the Debtors' partial satisfaction of that claim through post-termination delivery of Plan assets.[32]

## IV.     THE PBGC'S UNFUNDED BENEFITS CLAIM IS NOT ENTITLED TO PRIORITY TREATMENT

59.     The Unfunded Benefits Liability Claim is not entitled to priority treatment under either the administrative priority provisions of Section 503(b)(1)(B) or the priority tax provisions of Section 507(a)(8).  Courts uniformly reject the PBGC's attempts to shoehorn claims for unfunded benefits liability into Section 503, as the PBGC's arguments depend on the post-petition assertion of a lien, that by virtue of the automatic stay has never been perfected, and that in any event is inapplicable to the status of the underlying liability.  Nor do the amounts asserted

---

[32]     Likewise, the PBGC's regulation, 29 C.F.R. § 4062.7(b), recognizes that when the "contributing sponsor's controlled group pays the PBGC an amount that exceeds the full amount of the liability," the contributing sponsor is entitled a refund.  This regulation makes no reference to valuing the assets of the Plan only as of the termination date, but instead recognizes that the value of assets transferred to the PBGC, even after the termination date, should be credited in full against the liabilities owed.

in the Unfunded Benefits Liability Claim fall within the definition of a "tax," where the

Bankruptcy Code makes no reference to priority treatment for unfunded benefit liabilities, and

the PBGC is a self-funded entity whose claims will not defray general expenses of the

government.

A.    *The Unfunded Benefits Liability Claim is Not Entitled to Administrative "Tax" Priority*
      *under Sections 503(b)(1)(B) and 507(a)(2) of the Bankruptcy Code*

60.    The PBGC asserts that its Unfunded Benefits Liability Claim is entitled to

administrative priority as a tax incurred by the Debtors' estates, in an amount up to thirty percent

of the Nortel controlled group's collective net worth.  See Tunis Decl. Ex. 8 ¶ 11 [Unfunded

Benefits Liability Claim].  In particular, the PBGC attempts to rely on the provisions of 29

U.S.C. § 1368(a)(2), which provides that if a party is liable for unfunded benefit liabilities, and

"fails to pay the liability *after demand*, a lien arises in favor of the PBGC as of the termination

date of the plan" in an amount of up to thirty percent of the net worth of the liable parties.  Id. ¶

10 (emphasis added).  Section 1368(c)(2) provides that where such a lien arises, it is treated in

Chapter 11 "in the same manner as a tax due and owing to the United States."  29 U.S.C. §

1368(c)(2).

61.    By the plain terms of these provisions, only after the PBGC makes a demand for

payment and a liable party refuses to pay, do any liens arise that are given tax priority.  Here, no

such lien on the Debtor's assets ever arose in favor of the PBGC.  Under Section 1368(b), a lien

only arises as of the termination of the plan.  29 U.S.C. § 1368(b) ("The lien imposed by

subsection (a) . . . arises on the date of termination of a plan").  The Debtors' Pension Plan was

terminated as of July 17, 2009 – more than six months after the Debtors' Petition Date.  The

protections of the automatic stay thus prevented the post-petition creation or perfection of any

security interest in the Debtors' assets in favor of the PBGC.  See CSC Indus., 232 F.3d at 505,

510; PBGC v. Reorganized CF&I Fabricators of Utah, Inc. (In re CF&I Fabricators of Utah,

Inc.), 179 B.R. 704, 709 (D. Utah 1994); In re Kent Plastics Corp., 183 B.R. 841, 846 (Bankr.

S.D. Ind. 1995); Chateaugay, 115 B.R. at 779 (holding that "[e]ven tax liens are subject to the

automatic stay and may not arise postpetition by operation of law"); In re Divco Phila. Sales

Corp., 64 B.R. 232 (Bankr. E.D. Penn. 1986).[33]   Indeed, while ERISA exempts termination of a

pension plan from the automatic stay, there is no parallel provision that permits imposition of a

lien in the face of Section 362(a) of the Bankruptcy Code.  Kent Plastics, 183 B.R. at 845.

Moreover, the Third Circuit has recognized that the PBGC is subject to the automatic stay in

circumstances similar to those in this matter.  See In re Nortel Networks, Inc., 669 F.3d 128, 142

n.16 (3d Cir. 2011) (citing as authoritative CSC Indus., 232 F.3d 505, in which the Sixth Circuit

rejected the PBGC's tax priority argument because the automatic stay prevented the PBGC from

imposing a lien).  Second, in light of the automatic stay, it is unsurprising that the PBGC's

Proofs of Claim fail to even suggest that the PBGC ever made a demand of the Debtors sufficient

to trigger any lien.  Nor are the Debtors themselves aware of any such demand having been

made.  See Kent Plastics, 183 B.R. at 846 (finding the priority granted under section 1368

inapplicable because "[i]nsofar as no demand was made for payment prior to filing, . . . the

ERISA lien never came into existence").

      62.      Moreover, the statute is clear that tax priority is accorded only to a valid lien – not

to the underlying Unfunded Benefits Liability.  CSC Indus., 232 F.3d at 510; Divco, 64 B.R. at

235 ("While it is clear that an ERISA lien for employer liability is to be treated as a tax lien for

purposes of priority, Section 1368 does not state that the underlying ERISA liability is a tax

---

[33]     While Divco was later amended on the PBGC's motion to render the relevant portion of the Court's
analysis dicta (see In re Divco Phila. Sales Corp., 72 B.R. 199 (Bankr. E.D. Pa. 1986)), other courts have continued
to rely on the Divco opinion and the analysis contained therein as persuasive authority.  See, e.g., Chateaugay, 115
B.R. at 779.

liability."). Where – as here – no valid lien attached, the PBGC has no basis for asserting tax

priority under Section 1368(c)(2).

63.     Even if the PBGC's Unfunded Benefits Liability Claim were to be treated as a

"tax" (which as set forth below, it cannot), it would nonetheless fail to qualify for administrative

status under sections 503(b)(1)(B) and 507(a)(2).  Specifically, to qualify for administrative

priority, an obligation must both (i) arise from a transaction with the debtor in possession, and

(ii) directly benefit the estate.  See Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien

Envtl. Energy, Inc.), 181 F.3d 527, 532-33 (3d Cir. 1999).  The PBGC's Unfunded Benefits

Liability Claim utterly fails to satisfy either element.  Benefits under the Debtors' Pension Plan

ceased to accrue as of January 1, 2008, and thus any liability relating to accrued benefits cannot

have arisen from a transaction with the Debtors in these Chapter 11 cases, nor could the estates

have received any benefit from such pre-petition liabilities.  See PBGC v. Skeen (In re Bayly

Corp.), 163 F.3d 1205, 1210-11 (10th Cir. 1998); PBGC v. Sunarhauserman, Inc. (In re

Sunarhauserman, Inc.), 126 F.3d 811, 817 (6th Cir. 1997); CF&I Fabricators of Utah, 179 B.R. at

708; Kent Plastics, 183 B.R. at 847; Chateaugay, 115 B.R. at 772-78 (finding, under the two-part

test for administrative priority, that unfunded benefit liability claims were not entitled to

priority).[34]

*B.  The Unfunded Benefits Liability Claim Is Not a "Tax" for Purposes of Determining
Priority*

64.     In the alternative, the PBGC asserts that its Unfunded Benefits Liability Claim is

entitled to "tax" priority under Section 507(a)(8), or that it independently meets the definition of

---

[34]     On its face, the PBGC's Unfunded Benefit Liability Claim does not assert administrative priority under
Section 503(b)(1)(A), which is limited to the "actual, necessary costs and expenses of preserving the estate."  Nor
could the PBGC assert such priority, where the Debtors' Pension Plan froze benefit accruals as of January 1, 2008.
See Bayly, 163 F.3d at 1211; Trucking Emps. of N. Jersey Welfare Fund Inc. v. Marcal Paper Mills, Inc., No. 09-
1863 (SRC), 2009 U.S. Dist. LEXIS 101695, at *21 (D. N.J. Nov. 2, 2009) (unfunded benefit liability can be
accorded priority under Section 503(b)(1)(A) only where employees' vested benefits accrued post-petition).

a "tax," as an involuntary burden placed on property for public purposes.  Tunis Decl. Ex. 8 ¶¶

11, 12 [Unfunded Benefits Liability Claim].  These assertions are neither supported by the plain

reading of the Bankruptcy Code, nor applicable case law.

      65.     Section 507(a)(8) of the Bankruptcy Code provides non-administrative priority to

certain enumerated prepetition tax liabilities.  Unfunded benefit liabilities under ERISA are

found nowhere in that section.  See 11 U.S.C. § 507(a)(8).  It is well established that the priority

sections of the Bankruptcy Code must be narrowly construed, and "if one claimant is to be

preferred over others, the purpose should be clear from the statute."  Nathanson v. NLRB, 344

U.S. 25, 29 (1952).  Nothing in the Bankruptcy Code or the PBGC's Unfunded Benefits Liability

Claim suggests any entitlement to such treatment.

      66.     Nor do unfunded benefit liabilities constitute "taxes" that qualify for priority

treatment.  While the Bankruptcy Code does not define "tax," the PBGC's Unfunded Benefits

Liability Claim fails to satisfy either prong of the test established in United States v. Reorganized

CF&I Fabricators of Utah, Inc., 518 U.S. 213 (1996).  First, there is no "explicit connector"

between the Bankruptcy Code and the relevant provisions of ERISA.  Although Congress did

elsewhere make express reference to priority treatment of certain ERISA liens, nowhere do the

priority provisions of the Bankruptcy Code reference or incorporate unfunded benefit liabilities.

CF&I, 150 F.3d at 1297; Kent Plastics, 183 B.R. at 847.  Second, even under a functional

analysis, the Unfunded Benefits Liability Claim was not imposed for "public purposes," where

the PBGC is a self-funded organization responsible for satisfying insurance obligations to private

individuals, without reliance on tax revenues.  CF&I, 150 F.3d at 1298.

67.     Accordingly, the PBGC's assertion for priority treatment of its Unfunded Benefits

Liability Claim must be denied, and such claim should be treated as a general unsecured

prepetition claim.

## V.     THE DEBTORS HAVE NO LIABILITY FOR MINIMUM FUNDING CONTRIBUTION CLAIMS

68.     Because the Debtors made all required minimum funding contributions during the

operation of the Pension Plan, the PBGC's Minimum Funding Contribution Claim must be

disallowed and expunged in its entirety.  In that claim, the PBGC asserts an unliquidated claim

for "contributions necessary to satisfy the minimum funding standards under sections 412 and

430 of the Internal Revenue Code and sections 302 and 303 of ERISA."  See Tunis Decl. Ex. 9 ¶

7 [Minimum Funding Contribution Claim].  These minimum funding standards require

employers to maintain a "funding standard account" and contribute sufficient funds to ensure

that "the plan does not have an accumulated funding deficiency."  In re Finley, Kumble, Wagner,

Heine, Underberg, Manley, Myerson & Casey, 160 B.R. 882, 889 (Bankr. S.D.N.Y. 1993).

69.     The Debtors satisfied all required minimum funding contributions up through the

Termination Date of the Pension Plan in July 2009.  Specifically, the initial required minimum

contribution to meet ERISA minimum funding standards in 2009, before application of any

credit balance, was $14,144,415.  See Tunis Decl. Ex. 1 at Notes to Financial Statements at 8-9

[Nortel Networks Retirement Income Plan Form 5500].  This amount was reduced by application

of a $12,000,000 carryover credit balance, after which the required contributions to meet ERISA

minimum funding standards were $2,141,451.  Id. at 9.  The Debtors more than satisfied this

remaining amount through three separate contributions made to the Pension Plan in 2009 which

totaled $7,400,000.  Id. at 6 (2009 employer contributions to the Pension Plan totaling

$7,400,000 for 2009).  As the minimum funding contribution requirements under Sections 302

and 303 of ERISA were thus satisfied in whole, and the Minimum Funding Contribution Claim asserts no other basis for a claim against the Debtors, the Minimum Funding Contribution Claim, must be disallowed and expunged in its entirety.

70.    Indeed, while the Debtors' satisfaction of the minimum funding contributions is itself determinative, the Minimum Funding Contribution Claim should also be disallowed because it duplicates the PBGC's Unfunded Benefit Liabilities Claim.  Any amounts recovered in respect of the Minimum Funding Contribution Claim will serve to increase the Pension Plan's available assets, thus reducing the unfunded benefit liability that is the subject of the Unfunded Benefits Liability Claim.  As such, the Minimum Funding Contribution Claim must be reduced dollar-for-dollar by the amount of unfunded benefit liabilities in the Unfunded Benefits Liability Claim.  To hold otherwise would permit the PBGC two allowed dollars of claim – cast as both a minimum funding contribution claim, and an unfunded benefit liability claim – for every one dollar of loss.  See, e.g., In re Simetco, Inc., No. 93-61772, 1996 Bankr. LEXIS 1399, at *10-11 (Bankr. N.D. Ohio Feb. 15, 1996) (reducing unfunded benefits liability claim dollar-for-dollar by the amount of any minimum contributions claim, since "because of the interrelationship between the two claims, . . . the court finds that the PBGC is effectively seeking a second distribution on its [minimum funding contributions] claim"), aff'd sub nom., PBGC v. Cohen & Co. (In re Simetco, Inc.), No. 5:96CV608, 1996 U.S. Dist. LEXIS 22979 (N.D. Ohio July 23,1996); Finley, 160 B.R. at 894; Chateaugay, 115 B.R. at 783-84 ("To the extent that the unpaid contribution claims of each plan are allowed in any of the LTV Chapter 11 cases, any amounts which would otherwise be allowed in these cases as [unfunded benefits liability] Claims must be disallowed as duplicative."); Cox, 2014 WL 3511228, at *8 ("PBGC has stipulated:  'If PBGC fully recovers on its claim . . . for the Pension Plan's unfunded benefit liabilities, then PBGC is not seeking any

separate payment on its claim for the missed minimum funding contributions owed . . . to the

Pension Plan.'").  Accordingly, even if the Debtors were liable for any minimum funding

contributions (which, as set forth above, they are not), the Minimum Funding Contribution Claim

should be disallowed in any event as entirely duplicative of the PBGC's Unfunded Benefits

Liability Claim.

## VI. THE PBGC'S AMORTIZATION CLAIMS ARE WITHOUT BASIS AND DUPLICATIVE OF ITS UNFUNDED BENEFITS CLAIM

71.    In its Amortization Claim, the PBGC asserts a claim for any waiver amortization

charges and shortfall amortization charges, pursuant to 29 U.S.C. § 1362(c).  See Tunis Decl. Ex.

11 ¶ 7(1)-(2) [Amortization Claim].  The Debtors have no outstanding independent liabilities in

respect of this claim, which must be disallowed in its entirety.  First, the Debtors have incurred

no waiver amortization charges, as they never obtained a waiver of any minimum funding

contributions, which is necessary to trigger such charges.  Second, to the extent the PBGC has

any claims for shortfall amortization charges, those claims are duplicative of its Unfunded

Benefit Liabilities Claim, and must be either set-off against such claim, or disallowed in their

entirety.

### A.  The Debtors Have Incurred No Waiver Amortization Charges

72.    Under the plain terms of ERISA, waiver amortization charges are incurred only

where an employer obtained a waiver from the Secretary of the Treasury for some portion of the

employer's minimum funding contributions.  While the PBGC asserts its claim pursuant to 29

U.S.C. § 1362(c)(2), that section calculates waiver amortization charges, if any, by reference to

29 U.S.C.§ 1083(e)(1).  In turn, Section 1083(e)(1) applies only where there is a "waived

funding deficiency" under ERISA Section 302(c).  See 29 U.S.C. § 1082(c).  A waived funding

deficiency occurs only where an employer obtains a waiver from the Secretary of the Treasury for any portion of the minimum funding standard.  29 U.S.C. § 1082(c)(1)(A).

73.    As set forth above, the Debtors have made all required minimum funding contributions.  See supra at ¶ 69.  Without such a waiver, there is no "waived funding deficiency," nor any waiver amortization charges within the meaning of ERISA.  See 29 U.S.C. §§ 1362(c)(2), 1083(e)(1), 1082(c)(1)(A).  The PBGC's Amortization Claim should thus be disallowed to the extent it seeks a claim for waiver amortization charges.

### B.    Any Shortfall Amortization Charge Is Wholly Duplicative of the Unfunded Benefits Liability Claim

74.    To the extent the Amortization Claim seeks recoveries in respect of shortfall amortization charges under 29 U.S.C. § 1362(c)(1), such charges are entirely duplicative of the PBGC's parallel Unfunded Benefits Liability Claim.  In short, both claims seek recovery in respect of the same damage – namely, the Pension Plan's funding shortfall.  Moreover, any recoveries in respect of shortfall amortization charges would increase the Pension Plan's assets and thus reduce the Unfunded Benefits Liability Claim dollar-for-dollar.

75.    It is well established that a party can only recover its damages once, and cannot obtain multiple recoveries by alleging separate theories of recovery.  See e.g., Fineman v. Armstrong World Indus. Inc., 980 F.2d 171, 218 (3d Cir. 1992), cert. denied, 507 U.S. 921 (1993) ("We are unpersuaded that a plaintiff whose case concerns a single course of conduct . . . and a single injury . . . should recover those profits twice or thrice over for each legal theory advanced in favor of liability."); Conway v. Icahn & Co., 16 F.3d 504, 511 (2d Cir. 1994) ("Where a plaintiff seeks recovery for the same damages under different legal theories, only a single recovery is allowed."); Dopp, 947 F.2d at 517 ("the law abhors duplicative recoveries").  Both the unfunded benefits liability and any shortfall amortization charge relate to the same

48

injury – the amount of benefits that participants in Nortel's Pension Plan are entitled to that are not covered by the Plan assets.  This duplication is made clear by a simple examination of how the two claims are calculated.  Under ERISA, any unfunded benefits liability is calculated by determining "the excess . . . of (A) the value of the benefit liabilities under the plan . . . over (B) the current value . . . of the assets of the plan."  29 U.S.C. § 1301(a)(18).  Similarly, any shortfall amortization charge is likewise calculated by reference to the present value of any funding shortfall.  See 29 U.S.C. § 1083(c)(4) ("For purposes of this section [on calculating shortfall amortization charges], the funding shortfall of a plan for any plan year is the excess (if any) of-- (A) the funding target of the plan for the plan year, over (B) the value of plan assets of the plan . . . for the plan year which are held by the plan on the valuation date.").[35]  Indeed, given this relationship, any recoveries by the PBGC on its claim for shortfall amortization charges would decrease its Unfunded Benefits Liability Claim proportionally.[36]  Under the same rationale articulated in cases disallowing duplicative minimum funding contribution claims, Simetco, 1996 Bankr. LEXIS 1399, at *10-11; Finley, 160 B.R. at 894; Chateaugay, 115 B.R. at 783-84, any shortfall amortization charge claims should likewise be disallowed as duplicative.  To hold otherwise would allow the PBGC to enrich itself at the expense of other creditors by recovering the same damages as both an unfunded benefits liability claim and a shortfall amortization claim. See e.g., Fineman 980 F.2d at 218; Conway, 16 F.3d at 511; Dopp, 947 F.2d at 517.  For these reasons, the Debtors respectfully request that the shortfall amortization charge portion of  the

---

[35]    Specifically, the funding shortfall amount is reduced by the present value of the shortfall amortization installments owed to arrive at a shortfall amortization base.  29 U.S.C. § 1083(c)(3).  That amount is then amortized in level annual payments over seven years.  29 U.S.C. § 1083(c)(2)(A).  Each of those annual payments is the shortfall amortization charge for those respective years.  29 U.S.C. § 1083(c)(1).

[36]    More specifically, the Unfunded Benefit Liability Claim, which, as detailed above, is calculated by dividing the plan liabilities by the value of the plan assets, would be reduced because the shortfall amortization claim would be considered a plan asset.  See Simetco, 1996 Bankr. LEXIS 1399, at *9 (finding a minimum funding contribution claim to be an asset of the plan).

Amortization Claim be disallowed as duplicative of, or set off in its entirety against, the

Unfunded Benefits Liability Claim.[37]

## VII.    THE PBGC'S AMENDED INSURANCE CLAIM MUST BE DISALLOWED AND EXPUNGED

76.    In its late-filed Amended Insurance Claim, the PBGC asserts an estimated claim

for $83,392,500 in "termination insurance premiums" (the "Termination Premiums") purportedly

arising under 29 U.S.C.A. § 1306 (West 2015).  Tunis Decl. Ex. 13 ¶ 7 [Amended Insurance

Claim].  Under section 1306(a)(7)(A), if a single-employer plan is terminated under section 1342

(or other provisions not here relevant), "there shall be payable to the [PBGC], . . .a premium at a

rate equal to $1,250 multiplied by the number of individuals who were participants in the plan

immediately before the termination date." 29 U.S.C.A. § 1306(a)(7)(A) (West 2015).  However,

under section 1306(a)(7)(B),

> In the case of a single-employer plan terminated under section 1341(c)(2)(B)(ii) of this
> title or under section 1342 of this title during pendency of any bankruptcy reorganization
> proceeding under chapter 11 of Title 11, or under any similar law of a State or a political
> subdivision of a State (or a case described in section 1341(c)(2)(B)(i) of this title filed by
> or against such person has been converted, as of such date, to such a case in which
> reorganization is sought), subparagraph (A) shall not apply to such plan until the date of
> the discharge or dismissal of such person in such case.

29 U.S.C.A. § 1306(a)(7)(B) (West 2015) (emphasis added).  As the PBGC asserts in the

statement accompanying the Amended Insurance Claim, "the Pension Plan terminated effective

July 17, 2009, under 29 U.S.C. § 1342."  Tunis Decl. Ex. 13 ¶ 8 [Amended Insurance Claim].

The PBGC does not dispute, nor could it dispute, that prior to such termination, the Debtors filed

a petition for relief under Chapter 11 of the Bankruptcy Code.  Accordingly, under the plain

terms of section 1306(a)(7)(B), the Insurance Claim does not apply until the discharge or

---

[37]    Because both the Amortization Claim and the Unfunded Benefit Liability Claim are general unsecured
claims, there is no economic distinction between disallowing any shortfall amortization charges as duplicative or
setting them off against the Unfunded Benefit Liabilities Claim.

dismissal of the Debtors' bankruptcy case. Moreover, recent case law makes clear that the

Insurance Claim applies only in the situation where a debtor files for chapter 11, shifts its

defined benefit pension obligations to the PBGC via a plan termination, and then emerges from

chapter 11 protection as a reorganized operating entity. PBGC v. Oneida Ltd., 562 F.3d 154,

157-58 (2d Cir. 2009). As the Second Circuit held in Oneida, the language of section

1306(a)(7)(B) unambiguously provides that "an employer's obligation to pay a Termination

Premium on a pension plan that is terminated during the course of the bankruptcy does not even

arise until the bankruptcy itself is terminated. Id. at 157-58. No matter how broadly the term

'claim' is construed, it cannot extend to a right to payment that does not yet exist under federal

law." Id. at 157; see also Hr'g Tr. Excerpt 58:2-21, 59:17-18, In re USA Commercial Mortg.

Co., No. BK-S-06-1-725 (Bankr. D. Nev. Apr. 17, 2008) [D.I. 6364-3] (disallowing PBGC's

claim for termination premiums, finding that special rule is not limited to "only a

reorganization," but rather "everything in a Chapter 11," and holding that in a liquidation under

chapter 11, the termination premium claim "never comes into being" and, therefore, does not

exist); 1-12 Arthur T. Carter et al., Collier Guide to Chapter 11 ¶ 12.08(6)(f) (2015)

("Termination of a pension plan by the plan sponsor liquidating in bankruptcy (or under any

similar federal law or state law) does not trigger the termination premium.").

77.     The PBGC will likely point to the ruling by the District Court of the District of

Columbia in PBGC v. Asahi Tec Corp., 979 F. Supp. 2d 46 (D.D.C. 2013), in support of its

argument that the Insurance Claim applies to a debtor that does not reorganize, but instead

liquidates. See Asahi Tec, 979 F. Supp. 2d at 73-76. But the court in Asahi Tec ignored both the

unambiguous statutory language of section 1306(a)(7)(B), which states that the Insurance Claim

will only exist when a debtor is discharged or dismissed from bankruptcy, and its legislative

history, which makes clear that the policy rationale for the Insurance Claim is that the

reorganized entity has benefited from the shifting of the pension obligations, allowing it to

*emerge* as a solvent and restructured operating business.  In that circumstance, the policy

argument goes, the reorganized entity should pay an insurance claim to the PBGC.  <u>See</u> H.R.

Rep. No.109-276, at 62 (2005) ("Next, the Committee proposes to establish a $1,250 per

participant premium on companies that have gone through bankruptcy and terminated their

pension plans.  These termination premiums would be paid for three consecutive years once a

company *emerges from bankruptcy*.") (emphasis added); <u>Id.</u> at 348 ("The bankruptcy courts

should not be used as a mechanism for eliminating the burden of an underfunded pension plan . .

. . [T]he Committee does believe that plan sponsors that have not filed a petition for bankruptcy

reorganization must take into account the cost of the termination premium that *will be imposed*

*subsequent to an emergence from bankruptcy*.") (emphasis added).

78.     Where, as here, the Debtors have ceased doing business in 2011 and have been

winding down for years, these policy rationales are conspicuously absent.  There is no

reorganization, no positive bump from the pension termination that allows for a solvent entity to

generate returns for its interest holders.  <u>See</u> <u>Oneida</u>, 562 F.3d at 157 ("The obvious purpose of

[Section 1306(a)(7)(B)] is to prevent employers from evading the Termination Premium while

seeking reorganization in bankruptcy.").  Where claims are determined and assets are distributed

and there is no resulting operating business, there simply is no justification for the Insurance

Claim.  Therefore, to the extent the Amended Insurance Claim is not rejected as time-barred, it

should be disallowed and expunged for the reasons set forth in this Section VII.

## NOTICE

79.     Notice of the Motion has been given via facsimile, electronic transmission, hand

delivery or overnight mail to (i) the U.S. Trustee; (ii) counsel to the Bondholder Group; (iii)

counsel for the PBGC; (iv) counsel to the Committee; and (v) the general service list established in the Debtors' chapter 11 cases.  The Debtors submit that under the circumstances no other or further notice is necessary.

## STATUS CONFERENCE

80.     Simultaneous with the filing of this Objection, the Debtors request a status conference, to be held on November 22, 2016 at 10:00 a.m. (ET).

## RESERVATION OF RIGHTS

81.     The Debtors expressly reserve the right to supplement this Objection, in whole or in part, and to file additional objections and adversary proceedings, on any factual or legal basis, both with respect to the Proofs of Claim, and/or other claims that the PBGC has or may assert against the Debtors.

## NO PRIOR REQUEST

82.     No prior request for the relief sought herein has been made to this or any other court.

WHEREFORE, the Debtors respectfully request that this Court: (i) sustain this Objection; (ii) disallow and expunge the Amended PBGC Claims in their entirety; (iii) reduce and allow the Unfunded Benefits Liability Claim, by application of the prudent investor rate, and deeming it to be satisfied in part by the post-petition transfer of the Pension Plan assets; (iv) reduce and allow the Unfunded Benefits Liability Claim in an amount to be determined by the Court that represents the damage suffered by the Debtors as a result of the PBGC's refusal to pursue its controlled group claims against Canadian and EMEA affiliates of the Debtors; (v) disallow and expunge each of the Minimum Funding Contribution Claim, the Amortization Claim and the Insurance Claim in their entirety; (vi) enter the proposed order attached hereto as Exhibit A; and (vii) grant such other and further relief as it deems just and proper.

Dated:  November 2, 2016
       Wilmington, Delaware

CLEARY GOTTLIEB STEEN & HAMILTON LLP

James L. Bromley (admitted *pro hac vice*)
Lisa M. Schweitzer (admitted *pro hac vice*)
One Liberty Plaza
New York, New York 10006
Telephone:  (212) 225-2000
Facsimile:  (212) 225-3999

- and -

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Derek C. Abbott*
Derek C. Abbott (No. 3376)
Andrew R. Remming (No. 5120)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19801
Telephone:  (302) 658-9200
Facsimile: (302) 658-3989

*Counsel for the Debtors*
*and Debtors in Possession*