# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
-----------------------------------------------------------X
                                                           :
In re                                                      :   Chapter 11
                                                           :
Nortel Networks Inc., et al.,[1]                           :   Case No. 09-10138 (KG)
                                                           :
                                   Debtors.                :   Jointly Administered
                                                           :
                                                           :
                                                           :
-----------------------------------------------------------X
```

## FIRST AMENDED JOINT CHAPTER 11 PLAN OF
## NORTEL NETWORKS INC. AND CERTAIN OF ITS AFFILIATED DEBTORS

**James L. Bromley, Esq. (admitted *pro hac vice*)**
**Lisa M. Schweitzer, Esq. (admitted *pro hac vice*)**
**CLEARY GOTTLIEB STEEN & HAMILTON LLP**
**One Liberty Plaza**
**New York, NY 10006**

-and-

**Derek C. Abbott, Esq. (No. 3376)**
**Andrew R. Remming, Esq. (No. 5120)**
**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**
**1201 North Market Street, 18th Floor**
**P.O. Box 1347**
**Wilmington, DE 19899**

*Attorneys for the Debtors and*
*Debtors-in-Possession*

Dated: November 4, 2016

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567), Nortel Networks (CALA) Inc. (4226) and Nortel Networks India International, Inc. (8667).  The First Amended Joint Chapter 11 Plan of Nortel Networks Inc. and Certain of its Affiliated Debtors does not include a Chapter 11 Plan for Nortel Networks India International Inc.  Contact information for the Debtors and their petitions are available at http://dm.epiq11.com/nortel.

# TABLE OF CONTENTS

**Page**

### ARTICLE 1.
DEFINITIONS, INTERPRETATION AND RULES OF CONSTRUCTION

**1.1**  **Scope of Definitions**.................................................................................. 3

**1.2**  **Definitions**.................................................................................................. 3

**1.3**  **Rules of Interpretation** ........................................................................... 27

**1.4**  **Exhibits to this Plan** ............................................................................... 28

**1.5**  **Computation of Time** .............................................................................. 29

### ARTICLE 2.
TREATMENT OF UNCLASSIFIED CLAIMS

**2.1**  **Administrative Expense Claims**............................................................. 29

**2.2**  **Statutory Fees** ......................................................................................... 30

**2.3**  **Professional Claims** ................................................................................ 30

**2.4**  **Priority Tax Claims** ............................................................................... 30

### ARTICLE 3.
CLASSIFICATION OF CLAIMS AND INTERESTS

**3.1**  **Summary of Classifications**................................................................... 31

**3.2**  **Substantive Consolidation of NNI and NNCC** .................................... 31

**3.3**  **The Debtors** ............................................................................................. 31

**3.4**  **Classification of Claims and Interests**.................................................. 33

**3.5**  **Treatment of Classes of Claims Against and Interests in the Consolidated Debtors (NNI/NNCC)** ....................................................... 33

**3.6**  **Treatment of Classes of Claims Against and Interests in NNCALA** ....................... 33

**3.7**  **Treatment of Classes of Claims Against and Interests in Nortel Altsystems** .......... 34

**3.8**  **Treatment of Classes of Claims Against and Interests in All Other Debtors**........... 35

### ARTICLE 4.
TREATMENT OF CLAIMS AGAINST AND INTERESTS IN DEBTORS

**4.1**  **Class 1 – Priority Non-Tax Claims**....................................................... 35

**4.2**  **Class 2 – Secured Claims**........................................................................ 36

**4.3**  **Class 3A – General Unsecured Claims**................................................... 36

**4.4**  **Class A-3B – Crossover Bonds Claims and EDC Claims**........................... 37

**4.5**  **Class A-3C – Convenience Claims against the Consolidated Debtors (NNI/NNCC)** ................................................................................. 37

i

# TABLE OF CONTENTS
(continued)

**Page**

**4.6**  **Class B-3C – Convenience Claims against NNCALA** ............................... 37

**4.7**  **Class C-3C – Convenience Claims against Nortel Altsystems** .................... 38

**4.8**  **Class 4 – Subordinated Claims** ............................................................ 38

**4.9**  **Class 5A – Interests** ............................................................................. 38

**4.10**  **Class 5B – Interests Securities Fraud Claims** ..................................... 40

ARTICLE 5.
ACCEPTANCE OR REJECTION OF THE PLAN

**5.1**  **Impaired Classes of Claims and Interests Entitled to Vote** ..................... 40

**5.2**  **Acceptance by an Impaired Class** ......................................................... 40

**5.3**  **Presumed Acceptances by Unimpaired Classes** ..................................... 40

**5.4**  **Elimination of Vacant Classes; Deemed Acceptance by Non-Voting Classes** .......... 40

**5.5**  **Conversion or Dismissal of Certain of the Chapter 11 Cases** ................... 41

**5.6**  **Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code** ........ 41

ARTICLE 6.
IMPLEMENTATION OF THE PLAN

**6.1**  **General Settlement of Claims and Interests** .......................................... 41

**6.2**  **Substantive Consolidation of NNI and NNCC** ...................................... 41

**6.3**  **Plan Administrator** ............................................................................. 42

**6.4**  **Intercompany Account Settlement** ....................................................... 44

**6.5**  **Settlement of Intercompany Claims and Other Matters** .......................... 44

**6.6**  **Funding of Individual Debtors for Plan Confirmation** ............................ 44

**6.7**  **Administrative Expense Contribution and Quarterly Administrative Wind-Down Reimbursement Payments** ........................................................ 44

**6.8**  **Closing of Chapter 11 Case** ................................................................ 45

ARTICLE 7.
THE SETTLEMENT AND PLANS SUPPORT AGREEMENT

**7.1**  **SPSA** ................................................................................................ 45

**7.2**  **Cooperation** ...................................................................................... 45

**7.3**  **Conditions Precedent** ......................................................................... 45

**7.4**  **Settlement of Allocation Dispute** ......................................................... 45

**7.5**  **Allocation and Distribution of Sale Proceeds** ....................................... 45

# TABLE OF CONTENTS
(continued)

**Page**

| | | |
|---|---|---|
| **7.6** | **Allocation of Sale Proceeds Among the Debtors** | 46 |
| **7.7** | **Changes in Escrow Accounts' Balances** | 46 |
| **7.8** | **Estate Administration** | 46 |
| **7.9** | **Treatment of Crossover Claims** | 47 |
| **7.10** | **Right to Subrogation** | 47 |
| **7.11** | **No Double-Recovery** | 48 |
| **7.12** | **Post-Petition Date Interest** | 48 |
| **7.13** | **Additional NNCC Bondholder Payments** | 48 |
| **7.14** | **Resolution of Certain Claims** | 48 |
| **7.15** | **Book Intercompany Claims** | 49 |
| **7.16** | **Remaining Assets and Other Proceeds** | 50 |
| **7.17** | **Resolution of Side Letters and Cascade Trust** | 50 |
| **7.18** | **Debtor Disputes** | 50 |
| **7.19** | **Currency Conversion** | 50 |
| **7.20** | **SPSA Releases** | 50 |
| **7.21** | **Escrow Release Order** | 50 |
| **7.22** | **Release of Sale Proceeds From the Escrow Accounts** | 51 |
| **7.23** | **Litigation Resolution** | 51 |

## ARTICLE 8.
## CORPORATE FORM AND ACTION

| | | |
|---|---|---|
| **8.1** | **NNI Corporate Form and Vesting** | 51 |
| **8.2** | **Corporate Form and Vesting of Other Wind-Down Debtors** | 51 |
| **8.3** | **Dissolution of the Wind-Down Debtors** | 52 |
| **8.4** | **Post-Effective Date Management** | 52 |
| **8.5** | **Corporate Existence** | 53 |
| **8.6** | **Certificate of Incorporation or Certificate of Formation** | 53 |
| **8.7** | **Wind-Down** | 53 |
| **8.8** | **Quarterly Administrative Wind-Down Reimbursement Payments** | 53 |
| **8.9** | **Other Corporate Action** | 54 |

iii

# TABLE OF CONTENTS
(continued)

**Page**

## ARTICLE 9.
### TREATMENT OF EXECUTORY CONTRACTS

**9.1** **Previous Assumption, Assignment and Rejection** ....................................... 54

**9.2** **Assumption and Assignment of Remaining Contracts** ............................. 54

**9.3** **Cure Payments; Assurance of Performance** ............................................. 55

**9.4** **Objections to Assumption of Remaining Contracts** .................................. 55

**9.5** **Rejection** ...................................................................................................... 56

**9.6** **Approval of Rejection; Rejection Damages Claims Bar Date** ................. 56

**9.7** **Postpetition Modification of Executory Contracts** .................................. 56

**9.8** **Pre-existing Obligations to the Debtors under Executory Contracts** ...... 56

## ARTICLE 10.
### PROVISIONS REGARDING VOTING AND DISTRIBUTIONS UNDER THE PLAN

**10.1** **Voting of Claims** ......................................................................................... 57

**10.2** **Nonconsensual Confirmation** .................................................................... 57

**10.3** **Distributions of Creditor Proceeds** .......................................................... 57

**10.4** **Creditor Proceeds Distribution Conditions** ............................................. 57

**10.5** **Minimum Distribution and Manner of Payment** ..................................... 58

**10.6** **Distributions to Indenture Trustees** .......................................................... 58

**10.7** **Limitation on Recovery** ............................................................................... 59

**10.8** **Distributions Free and Clear** ..................................................................... 59

**10.9** **Delivery of Distributions and Undeliverable Distributions** ..................... 59

**10.10** **Withholding and Reporting Requirements** .............................................. 59

**10.11** **Time Bar to Cash Payment Rights** ............................................................ 60

**10.12** **Setoffs and Recoupment** ............................................................................. 60

**10.13** **Distribution Record Date** .......................................................................... 61

**10.14** **Allocation of Distributions** ........................................................................ 61

**10.15** **Cancellation of Notes, Instruments and Debentures** ............................... 61

## ARTICLE 11.
### PROCEDURES FOR TREATING DISPUTED CLAIMS

**11.1** **Objections** .................................................................................................... 62

**11.2** **No Distributions Pending Allowance** ......................................................... 62

## TABLE OF CONTENTS
(continued)

**Page**

**11.3**  **Estimation of Claims** ................................................................................. 62

**11.4**  **Resolution of Disputed Claims** .................................................................. 63

**11.5**  **No Interest** ................................................................................................... 63

**11.6**  **Disputed Claims Reserve** ............................................................................ 63

**11.7**  **No Amendments to Claims** .......................................................................... 63

**11.8**  **No Late-Filed Claims** .................................................................................. 64

ARTICLE 12.
CONDITIONS PRECEDENT

**12.1**  **Conditions to Confirmation** ....................................................................... 64

**12.2**  **Canadian and U.S. Plans Effectiveness** ..................................................... 64

**12.3**  **Conditions to the Effective Date** ................................................................ 65

**12.4**  **Waiver of Conditions** .................................................................................. 66

**12.5**  **Notice of Effective Date** .............................................................................. 67

**12.6**  **Limited Severability of the Plan** ................................................................ 67

**12.7**  **Consequences of Non-Occurrence of Effective Date** ................................ 67

ARTICLE 13.
EFFECT OF CONFIRMATION

**13.1**  **Binding Effect; Plan Binds All Holders of Claims and Equity Interests** ................. 68

**13.2**  **Release and Discharge of Debtors and Wind-Down Debtors.** ................... 68

**13.3**  **Release and Discharge of the Plan Released Parties** ................................. 69

**13.4**  **SPSA Releases** ............................................................................................. 70

**13.5**  **Exculpation and Limitation of Liability** .................................................... 71

**13.6**  **Injunction on Claims** .................................................................................. 71

**13.7**  **Terms of Injunctions or Stays** .................................................................... 72

**13.8**  **Retention of Litigation Claims and Reservation of Rights** ....................... 72

**13.9**  **Retention of Rights** ..................................................................................... 73

**13.10**  **Vesting** ......................................................................................................... 73

ARTICLE 14.
RETENTION OF JURISDICTION

ARTICLE 15.
MISCELLANEOUS PROVISIONS

v

# TABLE OF CONTENTS
(continued)

**Page**

| | | |
|---|---|---|
| **15.1** | **Effectuating Documents and Further Transactions** | 75 |
| **15.2** | **Authority to Act** | 75 |
| **15.3** | **Plan Supplement** | 76 |
| **15.4** | **Amendment or Modification of the Plan** | 76 |
| **15.5** | **Administrative Expense Claims Reserve** | 76 |
| **15.6** | **Fees and Expenses** | 77 |
| **15.7** | **Revocation or Withdrawal of the Plan** | 77 |
| **15.8** | **Insurance Preservation** | 77 |
| **15.9** | **Exemption from Certain Transfer Taxes** | 77 |
| **15.10** | **Subordinated Claims** | 77 |
| **15.11** | **Cross-Border Protocol and Cross-Border Claims Protocol** | 77 |
| **15.12** | **Governing Law** | 77 |
| **15.13** | **No Admissions** | 78 |
| **15.14** | **Effect of Termination of SPSA** | 78 |
| **15.15** | **Severability of Plan Provisions** | 78 |
| **15.16** | **Successors and Assigns** | 78 |
| **15.17** | **Defenses with Respect to Unimpaired Claims** | 78 |
| **15.18** | **Section 1125(e) Good Faith Compliance** | 79 |
| **15.19** | **No Injunctive Relief** | 79 |
| **15.20** | **Payment of Statutory Fees** | 79 |
| **15.21** | **Saturday, Sunday or Legal Holiday** | 79 |
| **15.22** | **Dissolution of Creditors' Committee** | 79 |
| **15.23** | **Reservation of Rights** | 79 |
| **15.24** | **Post-Effective Date Rule 2002 Notice List** | 80 |
| **15.25** | **Right to Abandon and Dispose of Debtor Property, Books & Records** | 80 |
| **15.26** | **Notices** | 80 |

<u>PLAN EXHIBITS</u>

| Exhibit A | Settlement and Plans Support Agreement |
|---|---|
| Exhibit B | Plan Administration Agreement |
| Exhibit C | Executory Contracts and Unexpired Leases Assumed by the Debtors |
| Exhibit D | Debtor Administrative Expense Claims Resolved by Plan |
| Exhibit E | Quarterly Administrative Wind-Down Reimbursement Payments |
| Exhibit F | List of Directors and Officers of the Debtors |
| Exhibit G | Amended By-Laws of the Wind-Down Debtors |

## INTRODUCTION

Nortel Networks Inc. ("NNI"), a Delaware corporation, and certain of its affiliated Debtors and Debtors-in-Possession (excluding Nortel Networks India International Inc. ("NNIII")) (collectively with NNI and excluding NNIII, the "Debtors")[2] propose this First Amended Joint Chapter 11 Plan of Nortel Networks Inc. and certain of its affiliated Debtors (the "Plan") for the resolution and satisfaction of all Claims against and Interests in the Debtors.  The Debtors are the proponents of this Plan within the meaning of section 1129 of the Bankruptcy Code.  All capitalized terms not defined in this introduction have the meanings ascribed to them in Article 1 of this Plan.

Although the Chapter 11 Cases are jointly administered pursuant to an order of the Bankruptcy Court, the Debtors are not currently proposing the substantive consolidation of their respective Estates other than with respect to the substantive consolidation of NNI and NNCC on the Plan Effective Date.  Thus, although the Plan generally applies to all of the Debtors, except where otherwise indicated, (i) the Plan constitutes 15 distinct chapter 11 plans, one for each Debtor other than NNI and NNCC (which shall be treated under a single, joint chapter 11 plan) and excluding NNIII; (ii) for voting  purposes, each  holder of a Claim in a Class shall vote its Claim in such Class by individual Debtor; and (iii) the classification scheme set forth in Article 3 of this Plan applies to each Debtor; but to the extent there are no Claims in a certain Class against a particular Debtor, that Class shall be deemed not to exist for any purpose whatsoever in respect of that Debtor.

Under section 1125(b) of the Bankruptcy Code, a vote to accept or reject the Plan may not be solicited from holders of Claims and/or Interests until such time as the Disclosure Statement relating to the Plan is approved by the Bankruptcy Court.  THE DEBTORS URGE ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.  To the extent, if any, that the Disclosure Statement is inconsistent with the Plan, the Plan will govern.  No solicitation materials, other than the Disclosure Statement and any schedules, exhibits and other documents attached thereto or referenced therein or otherwise enclosed with the Disclosure Statement served by the Debtors on interested parties, have been authorized by the Debtors or the Bankruptcy Court for use in soliciting acceptances of the Plan.  Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code, Bankruptcy Rule 3019 and Article 15 of this Plan, each of the Debtors expressly reserves the right to alter, amend, modify, revoke or withdraw from this Plan with respect to such Debtor, one or more times, prior to its substantial consummation.

---

[2]       The Debtors proposing the Plan, along with the last four digits of each Debtor's tax identification number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567), Nortel Networks (CALA) Inc. (4226).

# ARTICLE 1.
## DEFINITIONS, INTERPRETATION AND RULES OF CONSTRUCTION

   **1.1**  **Scope of Definitions.**  For the purposes of this Plan, except as expressly provided or unless the context otherwise requires, all capitalized terms not otherwise defined shall have the meanings ascribed to them in this Article 1 of the Plan.  Any term used in this Plan that is not defined herein, but is defined in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules, respectively.

   **1.2**  **Definitions.**  The following terms (which appear in the Plan as capitalized terms) shall have the meanings ascribed to them in this Article 1 of the Plan.

   **Administrative Expense Claim** means any right to payment for any cost or expense of administration of any of the Chapter 11 Cases asserted or arising under sections 503(b), 507(a)(2) or 507(b) of the Bankruptcy Code up to and including the Effective Date, including, to the extent allowable under such sections, any (i) actual and necessary cost or expense of preserving the Debtors' Estates or operating the business of the Debtors arising on or after the Petition Date, (ii) payment to be made under this Plan to cure a default under an executory contract or unexpired lease that is assumed pursuant to section 365 of the Bankruptcy Code, (iii) compensation or reimbursement of expenses of Professionals arising on or after the Petition Date, to the extent allowed by the Bankruptcy Court under section 330(a) or section 331 of the Bankruptcy Code and (iv) fees or charges assessed against the Debtors' Estates under section 1930, chapter 123 of title 28 of the United States Code.

   **Administrative Expense Claims Bar Date** means the deadline for filing an Administrative Expense Claim, other than a Professional Claim, which Claims must be Filed so as to be actually received by the Bankruptcy Court on or before 5:00 p.m., prevailing Eastern Standard Time, on the date that is the first Business Day that is thirty (30) days following the Effective Date, unless otherwise ordered by the Bankruptcy Court.

   **Administrative Expense Claims Reserve** has the meaning set forth in Section 15.5 of this Plan.

   **Affiliate** shall have the meaning as set forth in section 101(2) of the Bankruptcy Code.

   **Allocation Decisions** means the separate decisions issued by the CCAA Court and the Bankruptcy Court on or about May 12, 2015 and July 6, 2015 regarding the Allocation Dispute, which remain subject to appeal in both jurisdictions.

   **Allocation Dispute** means certain litigation before the Canadian Court and the Bankruptcy Court in which the allocation of the Sale Proceeds is at issue.

   **Allocation Proceeds** means the Sale Proceeds allocated to each of (a) the Debtors, collectively, and (b) the Foreign Affiliate Debtors, as provided for under Section 2(c) of the SPSA.

3

**Allowed** means, with reference to any Claim against the Debtors, (a) any Claim that has been listed by the Debtors in their Schedules, as such Schedules may be amended by the Debtors from time to time in accordance with Bankruptcy Rule 1009, as liquidated in amount and not disputed or contingent and for which no contrary proof of claim has been Filed within the periods of limitation fixed by the Plan, the Bankruptcy Code or by any order of the Bankruptcy Court, (b) any Claim allowed hereunder, (c) any Claim that is not a Disputed Claim, (d) any Claim that is compromised, settled or otherwise resolved pursuant to the authority granted to the Debtors pursuant to a Final Order of the Bankruptcy Court or under Article 11 of the Plan or (e) any Claim that, if it is a Disputed Claim, has been allowed by a Final Order; *provided*, *however*, that Claims allowed solely for the purpose of voting to accept or reject the Plan pursuant to an order of the Bankruptcy Court shall not be considered "Allowed Claims" hereunder.  Unless otherwise specified herein or by order of the Bankruptcy Court, "Allowed Administrative Expense Claim" or "Allowed Claim" shall not, for any purpose under the Plan, include interest on such Administrative Expense Claim or Claim from and after the Petition Date.

**Allowed Book Intercompany Claims** means the pre-filing claims between and among the companies comprising the Nortel Group in the amounts recorded in their books and records, as set out in Annex L to the SPSA.

**Allowed Claim** means any Claim that is Allowed in accordance with the Plan.

**Allowed Crossover Bonds Claims** has the meaning set forth in Section 7.14.

**Allowed NNCC Bonds Claims** means the NNCC Bonds Claims against NNI that are Allowed against NNI as a general unsecured claim in the amount of $150,951,562.

**Architel** means Architel Systems (U.S.) Corporation, a Delaware corporation.

**Assets** means, with respect to a Debtor, (a) all "property" of such Debtor's Estate, as defined in section 541 of the Bankruptcy Code and (b) all Causes of Action that have been or may be commenced by such Debtor or its authorized representative for the benefit of such Debtor's Estate, unless modified pursuant to the Plan or a Final Order.

**Available Cash** means (a) all Cash of a Wind-Down Debtor, including, without limitation, the Cash realized from its business operations, the sale or other disposition of its Assets, the Allocation Proceeds, the Residual Assets Proceeds, the interest earned on invested funds, Cash on hand, recoveries from Litigation Claims and from any other source or otherwise, *less* (b) the amount of Cash estimated and reserved by such Wind-Down Debtor and the Plan Administrator in accordance with the Plan Administration Agreement to (i) adequately fund the reasonable and necessary projected costs to carry out the provisions of the Plan with respect to such Wind-Down Debtor on and after the Effective Date, including, without limitation, any fees and expenses incurred by Professionals, (ii) pay holders of all Disputed Claims against such Wind-Down Debtor the amount such holders would be entitled to receive under the Plan if all such Disputed Claims were to become Allowed Claims, (iii) pay all fees payable under section 1930, chapter 123 of title 28 of the United States Code and (iv) pay all other amounts required to be paid to manage and/or liquidate such Wind-Down Debtor's Assets on and after the Effective

Date and (v) pay holders of Allowed Administrative Expense Claims, Priority Tax Claims, Priority Non-Tax Claims and, (if applicable) Convenience Claims, in accordance with the Plan.

**Bankruptcy Code** means title 11 of the United States Code, as in effect on the Petition Date and as thereafter amended, as applicable in the Chapter 11 Cases.

**Bankruptcy Court** means the United States Bankruptcy Court for the District of Delaware or any other court of the United States having jurisdiction over the Chapter 11 Cases.

**Bankruptcy Rules** means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, 28 U.S.C. § 2075, as applicable to the Chapter 11 Cases, and the local and chambers rules of the Bankruptcy Court, as in effect on the Petition Date and as thereafter amended.

**Beddoes Court** means the High Court of Justice of England and Wales that has the power to provide directions to the U.K. Pension Trustee authorizing the U.K. Pension Trustee to execute and implement the SPSA.

**Bondholder Group** means the ad hoc group of bondholders that hold notes issued and/or guaranteed by NNC, NNL, NNI and NNCC, which on June 15, 2016 filed with the Bankruptcy Court a disclosure form under Bankruptcy Rule 2019, as such group may have been and may be constituted from time to time.

**Business Day** means any day (other than a Saturday, Sunday or legal holiday, as such term is defined in Bankruptcy Rule 9006(a)) on which banks are open for general business in New York City, New York, U.S.A. and Toronto, Ontario, Canada, and also, when used in connection with the Plan provisions related to the SPSA, in London, England and Paris, France.

**Business Line Sales** means the sales of various Nortel Group business lines, as identified on Annex A to the SPSA. For the avoidance of doubt, the Business Line Sales do not include the Iceberg Sale.

**Canadian Court** means any and all of the CCAA Court, the Ontario Court of Appeal, the Supreme Court of Canada or any other court of competent jurisdiction overseeing the Canadian Proceedings (including any appeals) from time to time.

**Canadian Debtors** means NNC, NNL, Nortel Networks Technology Corporation, Nortel Networks Global Corporation, Nortel Networks International Corporation, Nortel Communications Inc., Architel Systems Corporation and Northern Telecom Canada Limited.

**Canadian Escrow Account** means the account with the Canadian Escrow Agent established pursuant to the Canadian Escrow Agreement to hold that portion of the Sale Proceeds to be converted into Canadian Dollars.

**Canadian Escrow Agent** means Royal Trust Corporation of Canada.

**Canadian Escrow Agreement** means that certain distribution escrow agreement, dated October 24, 2016, entered into among NNC, NNL, NNI, NNUK, the other existing depositors under the relevant Existing Escrow Agreements, NNSA, the Monitor and the Creditors' Committee regarding the Canadian Escrow Account, in accordance with the terms of the SPSA.

**Canadian Escrow Release Order** means an order issued by the CCAA Court authorizing and directing the release of the Sale Proceeds from the Escrow Accounts in the manner contemplated hereby.

**Canadian Estate** means the Canadian Debtors as substantively consolidated in accordance with the SPSA.

**Canadian Information Circular** means the information circular to be provided to the Canadian Voting Creditors relating to the Canadian Plan as approved by the CCAA Court.

**Canadian Meeting Order** means an order of the CCAA Court granted pursuant to section 4 and/or 5 of the CCAA that, among other things, authorizes the holding of a meeting or meetings of the Canadian Debtors' creditors for purposes of considering and voting upon the Canadian Plan and approves the Canadian Information Circular.

**Canadian Plan** means the CCAA plan of compromise or arrangement (including any exhibits, annexes and schedules thereto) for the Canadian Debtors filed in the CCAA Court on November [●], 2016 that, among other things, effectuates the settlement consistent with the terms of the SPSA, as it may be modified or supplemented in accordance with its terms.

**Canadian Proceedings** means the proceedings that were commenced before the CCAA Court pursuant to the CCAA on or after January 14, 2009 in respect of the Canadian Debtors.

**Canadian Voting Creditors** means creditors holding Proven Claims against the Canadian Debtors and such other creditors that are permitted to vote on the Canadian Plan.

**Cash** means legal tender accepted in the United States of America for the payment of public and private debts, currently denominated in United States Dollars.

**Cascade Trust** means the trust established pursuant to that certain Trust Indenture, dated April 5, 2010 between NNL and NNI, as settlors, and John T. Evans, as trustee.

**Cash Management Order** means the Order of the Bankruptcy Court, pursuant to sections 345, 363(c)(l), 364(a) and 503(b)(1) of the Bankruptcy Code, approving the Debtors' continued use of the Cash Management System (as defined therein), entered by the Bankruptcy Court January 15, 2009 [D.I. 58], as amended or supplemented.

**Causes of Action** means, without limitation, any and all actions, causes of action, controversies, liabilities, obligations, rights, suits, damages, judgments, claims and demands whatsoever, whether known or unknown, reduced to judgment, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, secured or unsecured, assertable

directly or derivatively, existing or hereafter arising, in law, equity or otherwise, based in whole or in part upon any act or omission or other event occurring prior to or during the course of the Chapter 11 Cases through the Effective Date.

**CCAA** means the Companies' Creditors Arrangement Act, R.S.C. 1985, c C-36.

**CCAA Court** means the Ontario Superior Court of Justice (Commercial List).

**CCAA Sanction Order(s)** means the order of the CCAA Court sanctioning the Canadian Plan and shall include, for the avoidance of doubt, any order of a Canadian Court affirming such order.

**CCC** means the ad hoc committee of creditors having claims only against the Canadian Debtors comprised of the former and disabled Canadian employees of the Canadian Debtors through their court-appointed representatives, Unifor, Morneau Shepell Ltd. as Administrator of Nortel's Canadian registered pension plans, the Superintendent of Financial Services of Ontario as Administrator of the Pension Benefits Guarantee Fund and the court-appointed representatives of the current and transferred employees of the Canadian Debtors.

**CFSA** means the Final Canadian Funding and Settlement Agreement among, inter alia, certain of the Canadian Debtors, the Monitor and certain of the Debtors, dated December 23, 2009, approved by order of the Bankruptcy Court on January 21, 2010 [D.I. 2347].

**Chapter 11 Cases** means the chapter 11 cases of the Debtors pending before the Bankruptcy Court and as jointly administered with one another under Case No. 09-10138 (KG), and as to any Debtor individually, its chapter 11 case, and for the avoidance of doubt, for purposes of this Plan, excludes the chapter 11 case of NNIII.

**Claim** means a right of an Entity against any Debtor, whether or not asserted or Allowed, as defined in section 101(5) of the Bankruptcy Code and as construed pursuant to section 102(2) of the Bankruptcy Code.

**Claims Agent** means Epiq Bankruptcy Solutions, LLC, the claims and noticing agent retained in the Chapter 11 Cases, or any successor thereto.

**Claims Objection Deadline** has the meaning set forth in Section 11.1 of this Plan.

**Claims Register** means the official register of Claims against, and Interests in, the Debtors, maintained by the Claims Agent.

**Class** means, with respect to each Debtor, a group of Claims or Interests as classified in a particular class under the Plan pursuant to section 1122 of the Bankruptcy Code.

**Collateral** means any property or interest in property of a Debtor's Estate subject to a Lien to secure the payment of a Claim, which Lien is not subject to avoidance or otherwise invalid and unenforceable under the Bankruptcy Code or applicable non-bankruptcy law.

**Confirmation** means entry of the Confirmation Order by the Bankruptcy Court.

**Confirmation Date** means the date on which the Bankruptcy Court enters the Confirmation Order on its docket, within the meaning of Bankruptcy Rules 5003 and 9021.

**Confirmation Hearing** means the duly noticed hearing held by the Bankruptcy Court to consider Confirmation of the Plan pursuant to section 1128 of the Bankruptcy Code, including any continuances thereof.

**Confirmation Order** means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code as applicable to each Debtor, which order shall be in form and substance reasonably acceptable to the Creditors' Committee and the Bondholder Group.

**Consolidated Debtors** means NNI and NNCC as substantively consolidated under the Plan.

**Consolidation** means the consolidation of NNI and NNCC.

**Consummation** means the occurrence of the Effective Date.

**Controlled Non-Debtor Affiliate** means any non-Debtor Entity that is managed and controlled by the Wind-Down Debtors.

**Convenience Claim** means, solely with respect to any Class 3A General Unsecured Claim, any Claim (i) in an Allowed amount equal to or less than $25,000 whose holder elects on its ballot for such Claim to be Allowed as a Class 3C Convenience Claim and receive treatment as a Class 3C Convenience Claim in accordance with the Plan, or, (ii) in an Allowed amount larger than $25,000, whose holder elects on its ballot for such Allowed Claim to be reduced and Allowed at $25,000 in order to receive treatment as a Class 3C Convenience Claim in accordance with the Plan.

**Conversion Election** has the meaning set forth in Section 7(c)(i)(A) of the SPSA.

**CoreTek** means CoreTek, Inc., a Delaware corporation.

**Creditor** means any Entity that holds a Claim against any of the Debtors.

**Creditor Joinder** means a joinder to the SPSA, substantially in the form annexed as Annex D of the SPSA

**Creditor Proceeds** means, with respect to each Debtor, (a) Available Cash plus (b) any non-Cash proceeds (including, without limitation, any securities or other interests) of any sale of Residual Assets.

**Creditor Proceeds Distribution Conditions** shall have the meaning set forth in Section 10.4 herein.

**Creditors' Committee** means the statutory committee of unsecured creditors appointed in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code.

**Creditor's Maximum** has the meaning set forth in Section 7.9 hereof.

**Cross-Border Claims Protocol** means the Cross-Border Claims Protocol originally approved by the Bankruptcy Court and CCAA Court on or about September 16, 2010, as the same has been amended, with the approval of both the Bankruptcy Court and the CCAA Court, from time to time.

**Cross-Border Protocol** means the Cross-Border Protocol originally approved by the Bankruptcy Court and the CCAA Court on or about January 14, 2009, as the same has been amended, with the approval of both the Bankruptcy Court and the CCAA Court, from time to time.

**Crossover Bondholder** means a beneficial owner of Crossover Bonds as of the earlier of (a) the date such holder executes a Creditor Joinder or a Transferee Joinder; and (b) the record date that will be established under the Plan and the Canadian Meeting Order.

**Crossover Bonds** means those bonds issued pursuant to the indentures listed on Annex G of the SPSA, but excluding the NNCC Bonds.

**Crossover Bonds Claims** means the Crossover Claims arising from the Crossover Bonds that include Claims (a) against NNL and NNC as unsecured Proven Claims against the Canadian Estate in the aggregate amount of $3,940,750,260 and (b) against NNI as a General Unsecured Claim in the amount of $3,934,521,442.

**Crossover Bondholder Fee Letter** means that certain fee letter dated June 23, 2011 between various advisors to the Bondholder Group and NNC and NNL.

**Crossover Claim** means any Claim arising out of a debt or other obligation of one or more of the Debtors that is guaranteed or indemnified by one or more of the Canadian Debtors, or a debt or other obligation of one or more of the Canadian Debtors that is guaranteed or indemnified by one or more of the Debtors (including, without limitation, the Crossover Bonds Claims, NNCC Bonds Claims and EDC claims, but excluding, in relation to the Canadian Debtors, any obligation of a Canadian Debtor guaranteed by another Canadian Debtor).

**Cure Amount** means the amount required to cure any defaults under an executory contract or unexpired lease as a condition for such contract or lease to be assumed by the Debtors pursuant to sections 365 or 1123 of the Bankruptcy Code (or such other amount as may be agreed upon by the parties to such executory contract or unexpired lease).

**Currency Conversion Order** means the order entered by the Bankruptcy Court on October 21, 2016 [D.I. 17296] and by the CCAA Court on October 19, 2016 authorizing and providing procedures for the conversion into Other Currency of certain portions of the Sale Proceeds.

**Debt Securities Fraud Claims** means the Claims, including unknown claims, demands, rights, liabilities and Causes of Action of any kind whatsoever, known or unknown, which have been or could be asserted in a direct, derivative or other capacity against any Debtor arising out of, relating to or in connection with (a) the purchase, sale or other decision or action

made or taken, or declared, failed or refused to be made or taken, or otherwise foregone, concerning or relating to the Senior Notes; (b) the purchase, ownership or sale of the Senior Notes; and (c) any other claims arising out of, relating to or in connection with the Senior Notes that would be subject to subordination under section 510(b) of the Bankruptcy Code.  Debt Securities Fraud Claims do not include claims for payment for principal, interest, fees or expenses due under the Senior Notes.

**Debtor(s)** or **Debtor(s)-in-Possession** shall have the meaning set forth in the Introduction herein, including in the Debtors' capacity as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

**Debtor Releasing Parties** means the Debtors and each of their representatives, agents, successors and assigns.

**Deficiency Claim** means, with respect to any Claim secured by a Lien on any interest of any Debtor in property having a value of less than the Allowed amount of such Claim (after taking into account other Liens of higher priority in such property), the portion of such Claim equal to the difference between (a) the Allowed amount of the Claim and (b) the Allowed amount of the secured portion of such Claim (which Allowed secured amount may be set pursuant to this Plan).

**Depositors** has the meaning given to such term in the Escrow Agreements.

**Disbursing Agent** means the Plan Administrator or any party designated by the Debtors to serve as their disbursing agent under the Plan; *provided* that the NNC/NNL Notes Indenture Trustee shall be the Disbursing Agent with respect to the Crossover Bonds, and that the NNCC Bonds Indenture Trustee shall be the Disbursing Agent with respect to the NNCC Bonds.

**Disclosure Statement** means the written disclosure statement that relates to this Plan Filed in the Chapter 11 Cases by the Debtors, including the schedules and exhibits attached thereto, as it may be amended, modified or supplemented from time to time, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code.

**Disputed Claim** means a Claim that the Debtors have Scheduled as "disputed," "contingent" or "unliquidated," or as to which a proof of claim has been Filed or deemed Filed as contingent or as to which an objection has been or may be timely Filed by the Debtors or any other party in interest entitled to do so, which objection, if timely Filed, has not been withdrawn or has not been overruled or denied by a Final Order.

**Disputed Claims Reserve** means, in the event there exist Disputed Claims against a Debtor on or after the Effective Date, an aggregate amount of Cash reserved that is sufficient to pay to each holder of such Disputed Claim the Pro Rata Share of any distributions that such holder would have been entitled to receive under the Plan if such Claim had been an Allowed Claim as of the Effective Date.

**Disputed Cure Amount** means a Cure Amount that the Debtors have Scheduled as "disputed," "contingent" or "unliquidated," or as to which a proof of claim has been Filed or

deemed Filed as contingent or as to which an objection has been or may be timely Filed by the Debtors or any other party in interest entitled to do so, which objection, if timely Filed, has not been withdrawn or has not been overruled or denied by a Final Order.

**Distribution** means any payment or transfer made under the Plan.

**Distribution Date** means any date on which a Distribution is made in accordance with the Plan, including the Initial Distribution Date, an Interim Distribution Date, and the Final Distribution Date

**Distribution Record Date** means, except with respect to Allowed Crossover Bonds Claims and Allowed NNCC Bonds Claims, the record date for the purposes of making Distributions under the Plan on account of Allowed Claims, which date shall be the Confirmation Date.

**DTC** means The Depository Trust & Clearing Corporation.

**EDC** means Export Development Canada.

**EDC Claims** means the claims set forth in proof of claim number 3948 filed by EDC against NNI on September 28, 2009 related to certain guaranty obligations of NNI to EDC pursuant to a Guaranty Agreement dated as of July 4, 2006 among NNI, NNL and EDC.

**Effective Date** means the date selected by the Debtors in consultation with the Canadian Debtors that is the first Business Day on which all conditions to the Effective Date set forth in Article 12 of the Plan have been satisfied with respect to a Debtor or, if waivable, waived pursuant to Section 12.4 hereof, provided that no stay of the Confirmation Order is in effect.

**EMEA Allocation** has the meaning set forth in Section 2(c)(v) of the SPSA.

**EMEA Canada Settlement Agreement** means the Agreement Settling EMEA Canadian Claims and Related Claims among, inter alia, the Canadian Debtors, the Monitor, the EMEA Debtors and NNSA, dated July 9, 2014.

**EMEA Debtors** means, collectively, NNUK, Nortel Networks (Ireland) Limited, Nortel Networks NV (in administration), Nortel Networks SpA (in administration), Nortel Networks BV (in administration), Nortel Networks Polska Sp z.o.o. (in administration), Nortel Networks Hispania SA (in administration), Nortel Networks (Austria) GmbH (in administration), Nortel Networks s.r.o. (in administration), Nortel Networks Engineering Service Kft (in administration), Nortel Networks Portugal SA (in administration), Nortel Networks Slovensko, s.r.o. (in administration), Nortel Networks Romania SRL (in administration), Nortel GmbH (in administration), Nortel Networks OY (in administration), Nortel Networks AB (in administration), Nortel Networks International Finance & Holding BV (in administration) and Nortel Networks France S.A.S. (in administration), but, for the avoidance of doubt, for purposes of the Plan, does not include NNSA.

**EMEA Escrow Accounts** means, collectively, the EMEA Sterling Escrow Account and the EMEA Euro Escrow Account.

11

**EMEA Escrow Agreements** means, collectively, the EMEA Sterling Escrow Agreement and the EMEA Euro Escrow Agreement.

**EMEA Euro Escrow Account** means the account with the EMEA Euro Escrow Agent that will be established pursuant to the EMEA Euro Escrow Agreement to hold that portion of the Sale Proceeds to be converted into Euros, in the event that the Euro Conversion Election is requested.

**EMEA Euro Escrow Agent** means the escrow agent named in the EMEA Euro Escrow Agreement, which escrow agent shall be reasonably acceptable to NNL, NNI, NNUK, NNSA, the other existing Depositors under the relevant Existing Escrow Agreements, the Monitor and the Creditors' Committee.

**EMEA Euro Escrow Agreement** means the distribution escrow agreement, to be entered into among NNC, NNL, NNI, NNUK, NNSA the other existing Depositors under the relevant Existing Escrow Agreements, the Monitor and the Creditors' Committee, to hold that portion of the Sale Proceeds to be converted into Euros in the event that the Euro Conversion Election is requested, which agreement shall be in a form reasonably acceptable to NNL, NNI, NNUK, NNSA, the other existing Depositors under the relevant Existing Escrow Agreements, the Monitor and the Creditors' Committee.

**EMEA Non-Filed Entities** means, collectively, Nortel Networks AS, Nortel Networks AG, Nortel Networks South Africa (Pty) Limited, NNNI, and NNOCL.

**EMEA Sterling Escrow Account** means the account with the EMEA Sterling Escrow Agent that will be established pursuant to the EMEA Sterling Escrow Agreement to hold that portion of the Sale Proceeds to be converted into U.K. Pounds Sterling, in the event that the Sterling Conversion Election is requested.

**EMEA Sterling Escrow Agent** means the escrow agent named in the EMEA Sterling Escrow Account, which agent shall be reasonably acceptable to NNL, NNI, NNUK, NNSA, the other existing Depositors under the relevant Existing Escrow Agreements, the Monitor and the Creditors' Committee.

**EMEA Sterling Escrow Agreement** means the distribution escrow agreement to be entered into among NNC, NNL, NNI, NNUK, the other existing Depositors under the relevant Existing Escrow Agreements, the Monitor and the Creditors' Committee, to hold that portion of the Sale Proceeds to be converted into U.K. Pounds Sterling in the event the Sterling Conversion Election is requested, which agreement shall be in a form reasonably acceptable to NNL, NNI, NNUK, NNSA, the other existing Depositors under the relevant Existing Escrow Agreements, the Monitor and the Creditors' Committee.

**Entity** means an entity as defined in section 101(15) of the Bankruptcy Code.

**Escrow Agents** means JPMorgan Chase Bank, N.A. and Citibank, N.A., as applicable, as escrow agents in respect of the Existing Escrow Accounts, and the Canadian Escrow Agent, the EMEA Euro Escrow Agent and the EMEA Sterling Escrow Agent, as applicable.

**Escrow Accounts** means, collectively, the Existing Escrow Accounts and the New Escrow Accounts.

**Escrow Agreements** means, collectively, the Existing Escrow Agreements and the New Escrow Agreements governing the Escrow Accounts.

**Escrow Release Orders** means, collectively, the Canadian Escrow Release Order and the U.S. Escrow Release Order, which orders shall, in all respects, conform to the requirements of Section 3(d) of the SPSA.

**Estate** means, with regard to each Debtor, the estate that was created by the commencement by such Debtor of its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code, and shall be deemed to include, without limitation, any and all rights, powers and privileges of such Debtor and any and all Assets and interests in property, whether real, personal or mixed, rights, Causes of Action, avoidance powers or extensions of time that such Debtor or such estate shall have had as of the Petition Date, or which such Estate acquired after the commencement of the Chapter 11 Case, whether by virtue of sections 541, 544, 545, 546, 547, 548, 549 or 550 of the Bankruptcy Code or otherwise.

**Estate Claim** has the meaning set forth in Section 10.12(b) to this Plan.

**Estate Fiduciaries** has the meaning given to such term in the Existing Escrow Agreements.

**Euro Conversion Election** has the meaning set forth in Section 7(c)(i)(A) of the SPSA.

**Exculpated Party** means each of (i) the Debtors, (ii) the Wind-Down Debtors, (iii) the U.S. Principal Officer; (iv) the Creditors' Committee, (v) the Bondholder Group, (vi) the NNC/NNL Notes Indenture Trustee, (vii) the NNCC Bonds Indenture Trustee, and with respect to each of the foregoing, (viii) any of their respective directors, officers, employees, members, attorneys, consultants, accountants, advisors, agents and other professionals (each acting solely in such capacity), and, collectively, all of them.

**Existing Escrow Accounts** means the escrow accounts established to hold the Sale Proceeds, as set forth on Annex B of the SPSA under the heading "Distribution Escrow Accounts".

**Existing Escrow Agreements** means the agreements among the various Depositors, Estate Fiduciaries and the Escrow Agents governing the respective Existing Escrow Accounts, as set forth in Annex B to the SPSA under the heading "Distribution Escrow Accounts."

**File** or **Filed** means file or filed on the docket of the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

**Final Distribution Date** means the date upon which the Plan Administrator or Disbursing Agent makes a final Distribution on account of all Allowed Claims against a Debtor,

13

including Allowed Administrative, Priority Non-Tax, Priority Tax, Other Secured Claims and General Unsecured Claims, Crossover Bonds Claims, EDC Claims and Convenience Claims.  As determined by the Plan Administrator, the Final Distribution Date shall be a date (a) which is after the liquidation into Cash of all Residual Assets of the relevant Wind-Down Debtor (other than those Residual Assets abandoned by such Wind-Down Debtor) and the collection of other sums due or otherwise remitted or returned to the relevant Estate and (b) on which there remain no Disputed Claims against such Debtor.

**Final Order** means (a) with respect to an order of a Canadian Court, an order: (i) as to which no appeal, leave to appeal, notice of appeal, motion to amend or make additional findings of fact, motion to alter or amend judgment, motion for rehearing or motion for new trial has been timely filed (in cases in which there is a date by which such filing is required to occur, it being understood that with respect to an order issued by the CCAA Court, the time period for seeking leave to appeal shall be deemed to have elapsed on the date that is twenty-two days after the rendering of such order unless a motion has been made to extend such time period) or, if any of the foregoing has been timely filed, it has been disposed of in a manner that upholds and affirms the subject order in all material respects without the possibility for further appeal thereon; (ii) in respect of which the time period for instituting or filing an appeal, leave to appeal, motion for rehearing or motion for new trial shall have expired (in cases in which such time period is capable of expiring, it being understood that with respect to an order issued by the CCAA Court, the time period for seeking leave to appeal shall be deemed to have elapsed on the date that is twenty-two days after the rendering of such order unless a motion has been made to extend such time period); and (iii) as to which no stay is in effect; or (b) with respect to an order of a U.S. court, an order (i) as to which the fourteen-day appeal period under Bankruptcy Rule 8002(a) has passed or has been waived by the Bankruptcy Court and (ii) that has not been reversed, stayed, superseded, vacated or, to the extent it has been stayed such stay has expired.

**Foreign Affiliate Debtors** means each of (a) the Canadian Debtors, (b) the EMEA Debtors and (c) NNSA.

**Foreign Proceeding** means, collectively, the Canadian Proceedings, the French Main Proceeding, the French Secondary Proceeding, the Israeli Administration Proceedings, the U.K. Proceedings and any other insolvency or similar proceeding filed after the Petition Date in a jurisdiction other than the United States involving an Affiliate of the Debtors.

**French Court** means the judge appointed in the French Secondary Proceeding, the Versailles Commercial Court, any court hearing appeals therefrom and any other court of competent jurisdiction overseeing the French Secondary Proceeding from time to time.

**French Liquidator** means Maître Cosme Rogeau in his capacity as liquidator for NNSA under the French Secondary Proceeding.

**French Main Proceeding** means the U.K. administration of NNSA commencing on January 14, 2009.

**French Secondary Proceeding** means the secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC) No.

1346/2000 on Insolvency Proceedings in the Republic of France that was commenced before the French Court on May 28, 2009 in respect of NNSA.

**General Unsecured Claims** means all Unsecured Claims against the Debtors other than the Crossover Bonds Claims, EDC Claims, Convenience Claims, Subordinated Claims and the Interests Securities Fraud Claims.

**Global Debtors** means the Debtors and the Foreign Affiliate Debtors.

**Governmental Unit** shall have the meaning assigned to such term in section 101(27) of the Bankruptcy Code.

**Iceberg Assets** means the residual intellectual property remaining after the Business Line Sales, which intellectual property was sold to a consortium in July 2011.

**Iceberg Amendment Fee** means the $5 million from the Iceberg Sale Proceeds previously agreed by the Debtors and each of the Foreign Affiliate Debtors to be funded directly as follows: $2.8 million to NNI and $2.2 million to NNUK, prior to any other agreed upon allocation of the Sale Proceeds.

**Iceberg Escrow Account** means the escrow account established to hold the Iceberg Sale Proceeds and the Iceberg Amendment Fee.

**Iceberg Sale** means the sale of the Iceberg Assets.

**Iceberg Sale Proceeds** means that portion of the Sale Proceeds generated from the Iceberg Sale.

**IFSA** means the Interim Funding and Settlement Agreement, dated as of June 9, 2009, entered into among various of the SPSA Parties, as approved by the CCAA Court on June 29, 2009 and by the Bankruptcy Court on June 29, 2009 [D.I. 993].

**Impaired** shall have the meaning assigned to such term in section 1124 of the Bankruptcy Code when used with reference to a Claim or an Interest.

**Initial Distribution Date** means the date as determined by the Debtors upon which the initial distributions of property under this Plan will be made to holders of Allowed Claims and Allowed Interests, which date shall be within sixty (60) days of the Effective Date or as soon thereafter as practicable.

**Intellectual Property** means any and all intellectual property rights in any jurisdiction including, without limitation, rights in or to any of the following: (a) Trademarks; (b) Patents and inventions (whether or not patentable); (c) copyrights and works of authorship of any type in any medium; (d) mask works; (e) trade secrets, know-how and confidential information; (f) databases, including, without limitation, computerized databases and compilations; (g) software and computer programs; and (h) domain names and Internet protocol addresses, including, in each case, any applications or registrations for any of the foregoing.

**Intercompany Claim** means any Claim against a Debtor asserted by its Affiliate other than an Administrative Expense Claim, a Priority Non-Tax Claim, a Secured Claim, a Subordinated Claim or an Interests Securities Fraud Claim.

**Intercompany Administrative Expense Claim** means any Administrative Expense Claim against a Debtor asserted by any other Debtor.

**Interest(s)** means shares of common stock, preferred stock, other forms of ownership interest or any interest or right to convert into such an equity or ownership interest or acquire any equity or ownership interest, including, without limitation, vested and/or unvested restricted stock units, contingent stock awards, contingent equity awards, performance stock units and stock options or restricted stock awards granted under management ownership plans, stock incentive plans or employee incentive plans, in any Debtor that was in existence immediately prior to or on the Petition Date for such Debtor.

**Interests Securities Fraud Claims** means Claims, including unknown claims, demands, rights, liabilities and Causes of Action of any kind whatsoever, known or unknown, that have been or could be asserted in a direct, derivative or other capacity against any Debtor arising out of, relating to or in connection with (a) the purchase, sale or other decision or action made or taken, or declined, failed or refused to be made or taken, or otherwise foregone, concerning or relating to the Interests in such Debtor; (b) the purchase, ownership or sale of such Interests; and (c) any other Claims arising out of, relating to or in connection with such Interests that would be subject to subordination under section 510(b) of the Bankruptcy Code.

**Interim Compensation Order** means the Order under 11 U.S.C. §§ 105(a) and 331, Fed. R. Bankr. P. 2016 and Del. Bankr. L.R. 2016-2 Establishing Procedures for Interim Compensation and Reimbursement of Fees and Expenses for Professionals and Official Committee Members entered by the Bankruptcy Court on February 4, 2009 [D.I. 222].

**Interim Distribution** means the quarterly Distributions of Creditor Proceeds made by the Disbursing Agent to holders of Allowed Claims against a Debtor.

**Interim Distribution Date** means any date on which an Interim Distribution is made, which dates shall be March 31st, June 30th, September 30th, and December 31st of each year.

**IP Addresses** means internet protocol addresses registered in the name of a Canadian Debtor or a corporate predecessor thereto.

**Israeli Administration Proceedings** means the administration proceedings of Nortel Networks Israel (Sales and Marketing) Limited and its subsidiaries commenced on January 19, 2009 pursuant to the Israeli Companies Law, 1999, and the regulations relating thereto for a stay of proceedings

**Joint Administrators** means Alan Robert Bloom, Christopher John Wilkinson Hill, Alan Michael Hudson and Stephen John Harris as the administrators of all EMEA Debtors and NNSA except Nortel Networks (Ireland) Limited (in administration), and Alan Robert

16

Bloom and David Martin Hughes as the administrators of Nortel Networks (Ireland) Limited (in administration).

**Joint Liquidators** means Richard Barker and Joseph Luke Charleton as joint liquidators of NNNI and Richard Barker and Samantha Keen as joint liquidators of NNOCL.

**LG-N** means LG-Nortel Co. Ltd., a Korean joint venture between NNL and LG Electronics.

**Lien** means a charge against, interest in or other encumbrance upon property to secure payment of a debt or performance of an obligation.

**Litigation Claims** means all claims, rights and Causes of Action of any Debtor or its Estate of every kind or nature whatsoever, whether arising prior to, during or after the Chapter 11 Cases (including, without limitation, Intellectual Property enforcement rights and all rights, claims and Causes of Action arising under sections 544 through 551 of the Bankruptcy Code, except for any Released Claims).

**M&A Costs** means the fees and expenses incurred in connection with the Sales.

**M&A Cost Reimbursement** means the reimbursement of certain of the M&A Costs, which amounts shall be reimbursed from the Iceberg Escrow Account as follows: $20 million to the Debtors and $35 million to the Canadian Debtors.

**Monitor** means Ernst & Young Inc. in its capacity as the court-appointed monitor in the Canadian Proceedings.

**New Escrow Accounts** means, collectively, the Canadian Escrow Account and the EMEA Escrow Accounts.

**New Escrow Agreements** means, collectively, the Canadian Escrow Agreement and the EMEA Escrow Agreements.

**NN Applications** means Nortel Networks Applications Management Solutions Inc., a Delaware corporation.

**NN Cable** means Nortel Networks Cable Solutions Inc., a Delaware corporation.

**NN HPOCS** means Nortel Networks HPOCS Inc., a Delaware corporation.

**NN Optical** means Nortel Networks Optical Components Inc., a Delaware corporation.

**NNC** means Nortel Networks Corporation, a Canadian Debtor.

**NNC 2012 Convertible Notes** means those certain convertible senior notes issued by NNC on March 28, 2007 and guaranteed jointly and severally by NNL and NNI in an

aggregate principal amount of $575 million due on April 15, 2012, and bearing an interest rate of 1.75%.

**NNC 2014 Convertible Notes** means those certain convertible senior notes issued by NNC on May 28, 2007 and guaranteed jointly and severally by NNL and NNI in an aggregate principal amount of $575 million due on April 15, 2014, and bearing an interest rate of 2.125%.

**NNC Notes Indenture** means that certain indenture, dated as of March 28, 2007, governing the issuance of the NNC 2012 Convertible Notes and the NNC 2014 Convertible Notes, as amended, supplemented or modified from time to time.

**NNC/NNL Notes Indenture Trustee** means The Bank of New York Mellon (f/k/a The Bank of New York), in its capacity as indenture trustee under the NNC Notes Indenture and NNL Notes Indenture, or any successor thereto.

**NNCALA** means Nortel Networks (CALA), Inc., a Florida corporation.

**NNCALA Administrative Expense Contribution** shall have the meaning set forth in Section 6.7.

**NNCC** means Nortel Networks Capital Corporation, a Delaware corporation.

**NNCC Bonds** means those certain senior notes issued by NNCC on February 15, 1996 and guaranteed by NNL in an aggregate principal amount of $150 million due on June 15, 2026, and bearing an interest rate of 7.875%.

**NNCC Bonds Claims** means those Crossover Claims relating to the NNCC Bonds.

**NNCC Bondholder** means a beneficial owner of one or more NNCC Bonds.

**NNCC Bondholder Signatories** means the holders of NNCC Bonds that executed the SPSA.

**NNCC Bonds Reserve** means a reserve to be funded by NNI with the NNCC Bonds Reserve Amount.

**NNCC Bonds Reserve Amount** means a reserve of $7.5 million established by NNI from Cash otherwise available for distributions to NNI unsecured creditors.

**NNCC Bonds Indenture** means that certain indenture, dated as of February 15, 1996, governing the issuance of the NNCC Bonds, as amended, supplemented or modified from time to time.

**NNCC Bonds Indenture Trustee** means Law Debenture Trust Company of New York, in its capacity as indenture trustee under the NNCC Bonds Indenture, or any successor thereto.

18

**NNCC Bonds Guarantee Obligations** means the guarantee, indemnity and other obligations of NNL under the NNCC Bonds Indenture.

**NNI** means Nortel Networks Inc., a Delaware corporation.

**NNII** means Nortel Networks International Inc., a Delaware corporation.

**NNIII** means Nortel Networks India International Inc., a Delaware corporation.

**NNL** means Nortel Networks Limited, a Canadian Debtor.

**NNL 2011 Notes** means those certain senior notes issued by NNL on July 5, 2006 and guaranteed jointly and severally by NNC and NNI in an aggregate principal amount of $1 billion due on July 15, 2011, and bearing a floating interest rate.

**NNL 2013 Notes** means those certain senior notes issued by NNL on July 5, 2006 and guaranteed jointly and severally by NNC and NNI in an aggregate principal amount of $550 million due on July 15, 2013, and bearing an interest rate of 10.125%.

**NNL 2016 Notes** means those two tranches of senior notes issued by NNL on July 5, 2006 and May 28, 2008 and guaranteed jointly and severally by NNC and NNI in aggregate principal amounts of $450 million and $675 million, respectively, due on July 15, 2016, and each bearing an interest rate of 10.75%.

**NNL Notes Indenture** means that certain indenture, dated as of July 5, 2006, governing the issuance of the NNL 2011 Notes, the NNL 2013 Notes and the NNL 2016 Notes, as amended, supplemented or modified from time to time.

**NNNI** means Nortel Networks (Northern Ireland) Limited (in liquidation), an EMEA Non-Filed Entity.

**NNOCL** means Nortel Networks Optical Components Limited (in liquidation), an EMEA Non-Filed Entity.

**NNSA** means Nortel Networks S.A. (in administration and in liquidation judiciaire).

**NNSA Allocation** means U.S. $220,000,000.

**NNSA Conflicts Administrator** means Stephen Jonathan Taylor of Isonomy Limited as Conflicts Administrator solely in relation to NNSA.

**NNUK** means Nortel Networks UK Limited (in administration), an EMEA Debtor.

**Non-Released Matters** means the U.S. Canadian Claim, the U.S. Canadian Priority Claim, any other Allowed Claims against the Debtors for payment of the Crossover Bonds or the NNCC Bonds, any claim between or among any of the Debtors and their U.S.

19

subsidiaries (except as otherwise resolved under the Plan), any claim between the PBGC and the Debtors or any of their U.S. subsidiaries, any Professional Claim, or any claim to enforce the terms of the SPSA, the Plan, the Canadian Plan, or any order of the Bankruptcy Court or the CCAA Court related thereto, as well as any other matters listed under Section 8(i) of the SPSA.

**Nortel Altsystems** means Nortel Altsystems Inc., a Delaware corporation.

**Nortel Altsystems Int'l** means Nortel Altsystems International Inc., a Delaware corporation.

**Nortel Group** means, collectively, NNC and all of its direct and indirect subsidiaries, whether current or former.

**Nortel Trade Claims Consortium** means a group of Creditors holding over $125 million in unsecured (non-funded debt) Claims, including but not limited to trade (supplier) claims, employee severance and pension Claims against one or more of the Debtors.

**NTI** means Northern Telecom International Inc., a Delaware corporation.

**Ordinary Course Professional Order** means the Order Authorizing the Debtors to Retain and Employ Professionals Used in the Ordinary Course of Business *Nunc Pro Tunc* to the Petition Date entered by the Bankruptcy Court on February 5, 2009 [D.I. 236], as may be amended, supplemented or modified from time to time.

**Other Currency** means Canadian Dollars, Pound Sterling or Euros.

**Other Nortel Claim** shall have the meaning set forth in Section 7.11 herein.

**Participating Creditor** means any creditor of any of the Global Debtors that is a party to the SPSA or has delivered a Creditor Joinder or a Transferee Joinder.

**Patents** mean all national and multinational patents and utility models (petty patents), including, without limitation, all reissues, divisions, continuations, continuations-in-part, extensions and reexaminations thereof, and all rights therein provided by multinational treaties or conventions.

**PBGC** means the Pension Benefit Guaranty Corporation, a United States government corporation.

**Person** means an individual, a corporation, a limited liability company, a partnership, an association, a joint stock company, a joint venture, an unincorporated organization or a Governmental Unit as defined in section 101(41) of the Bankruptcy Code.

**Petition Date** means January 14, 2009; *provided*, *however*, that with respect to those Debtors, including NNCALA, that commenced their Chapter 11 Cases subsequent to January 14, 2009, "Petition Date" shall refer to the respective dates on which such Chapter 11 Cases were commenced.

**Plan** means the chapter 11 plans of the Debtors (other than NNIII), collectively, and (where specified herein) as to each Debtor, the chapter 11 plan of such Debtor, including without limitation, the Plan Supplement and all exhibits, appendices and schedules hereto and thereto, either in its present form or as the same may be altered, amended, modified or supplemented from time to time in accordance with the provisions of the Plan or the Bankruptcy Code and Bankruptcy Rules.

**Plan Administration Agreement** means the agreement describing the powers, duties and rights of the Plan Administrator in administering the Plan, which agreement shall be in form and substance reasonably satisfactory to the Creditors' Committee and the Bondholder Group and in substantially the form included in the Plan Supplement.

**Plan Administrator** means Greylock Partners, LLC, retained, as of the Effective Date, by each of the Debtors as the Person responsible for, among other things, the matters described in Section 6.3 hereof.

**Plan Certificates** shall have the meaning set forth in Section 12.2 herein.

**Plans Effective Date** means the first date that both (i) the Plan for each of the Debtors and (ii) the Canadian Plan are effective in accordance with their respective terms.

**Plan Released Parties** means each of (i) the U.S. Principal Officer, (ii) the Creditors' Committee, (iii) the Bondholder Group, (iv) the NNC/NNL Notes Indenture Trustee, (v) the NNCC Bonds Indenture Trustee, and with respect to each of the foregoing, (vi) any of their respective directors, officers, employees, members, attorneys, consultants, accountants, advisors, agents and other professionals (each acting solely in such capacity), and, collectively, all of them.

**Plan Supplement** means the supplement containing the forms of documents specified in Section 15.3 of the Plan, which shall be Filed at least ten (10) days prior to the last day upon which holders of Claims may vote to accept or reject the Plan.

**PPF** means the Board of the Pension Protection Fund, a statutory corporation established under the provisions of the Pensions Act 2004, whose principal place of business is Renaissance, 12 Dingwall Road, Croydon, United Kingdom, CRO 2NA.

**PPI Settlement** means that certain Settlement Agreement entered into between NNI and certain of the Crossover Bondholders, dated July 24, 2014, as approved by the Bankruptcy Court on December 18, 2014.

**Priority Non-Tax Claim** means any Claim, other than an Administrative Expense Claim or a Priority Tax Claim, entitled to priority in payment under section 507(a) of the Bankruptcy Code.

**Priority Tax Claim** means any Claim entitled to priority pursuant to sections 502(i) and 507(a)(8) of the Bankruptcy Code.

**Pro Rata Share** means, as at any Distribution Date, with respect to the holder of an Allowed Claim in any Class against a Debtor, the product of (A/B) x C where:

A = the amount of the particular Allowed Claim;

B = the aggregate amount of all Allowed Claims in the Class; and

C = the total amount of available Creditor Proceeds to be distributed to holders of Allowed Claims in such Class on the particular Distribution Date.

For purposes of calculating the Pro-Rata Share for holders of Allowed Claims in Classes 3A and 3B using the above formula, "B" shall equal the aggregate amount of all Allowed Claims in Classes 3A and 3B together, and "C" shall equal the aggregate amount of available Creditor Proceeds to be distributed to holders of Allowed Claims in Classes 3A and 3B together, on the particular Distribution Date.

The Pro-Rata Share shall be subject in all respects to the Creditor's Maximum set forth in Section 7.9 herein, and in no case shall the holder of an Allowed Claim in Class 3A or 3B receive more than 100% of the amount of its Allowed Claim, when taking into account distributions received from any Debtor, on the one hand, and the Canadian Estates, on the other.

**Professional** means a Person (a) employed in the Chapter 11 Cases pursuant to a Final Order in accordance with sections 327, 328 and 1103 of the Bankruptcy Code and to be compensated for services rendered prior to the Effective Date, pursuant to sections 327, 328, 329, 330 and 331 of the Bankruptcy Code, or (b) for which compensation and reimbursement has been allowed by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

**Professional Claim** means a Claim of a Professional for compensation for services rendered or reimbursement of costs, expenses or other charges incurred after the Petition Date and prior to and including the Effective Date.

**Proven Claim** has the meaning set forth in the SPSA.

**Qtera** means Qtera Corporation, a Delaware corporation.

**Quarterly Administrative Wind-Down Reimbursement Payments** means certain quarterly payments authorized to be made from an individual Debtor to NNI to reimburse NNI for the cost of administering and winding down such individual Debtor's estate (including costs for professionals retained to assist with such administration or wind-down) from and after the Effective Date, in an amount not to exceed the maximum quarterly amount for such individual Debtor, as reflected in Exhibit E.

**Rejected Contract** means any executory contract that a Debtor has rejected in accordance with Section 9.5 of this Plan

**Relay** means NNL's and NNTC's assets related to the wireless backhaul and multi-hop digital repeater/relay research development program, sold in June 2010.

**Released Claim** means any claim, right or Cause of Action of any of the Debtors or their Estates released pursuant to the Sale Agreements, the Sale Orders, the Plan, the Confirmation Order or the SPSA but does not include any claim, right or Causes of Action of any SPSA Party to enforce the SPSA.

**Releases** means the releases as set forth herein in Section 13.3.

**Remaining Contract** has the meaning set forth in Section 9.1.

**Residual Assets** means all Assets of a Wind-Down Debtor from and after the Effective Date.

**Residual Assets Proceeds** means the net Cash proceeds of the Residual Assets and any income or proceeds therefrom, as determined in accordance with the Plan Administration Agreement.

**Sale(s)** means the Business Line Sales and the Iceberg Sale between 2009 and 2011.

**Sale Agreement(s)** means, individually, each of the agreements relating to the Sales and, collectively, all of them.

**Sale Order(s)** means, individually, each of the orders entered by the Bankruptcy Court relating to the Sales.

**Sale Proceeds** means the remaining proceeds generated by the Sales, such amounts as set forth in Annex A of the SPSA, plus interest accrued thereon, less (i) US$55 million of M&A Cost Reimbursement; and (ii) the Iceberg Amendment Fee.

**Sanction Order** means the order of the CCAA Court sanctioning the Canadian Plan and shall include, for the avoidance of doubt, any order of a Canadian Court affirming such order.

**Scheduled** means as listed on the Schedules.

**Schedules** means the Schedules of Assets and Liabilities Filed by the Debtors in accordance with section 521 of the Bankruptcy Code and Bankruptcy Rule 1007, as the same may be amended from time to time prior to the Effective Date in accordance with Bankruptcy Rule 1009.

**Secured Claim** means any Claim (a) to the extent reflected in the Schedules or upon a proof of claim to which the Debtors have not objected as a "secured claim," which is secured by a Lien on Collateral to the extent of the value of such Collateral, as determined in accordance with section 506(a) of the Bankruptcy Code or (b) that is subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

**Security** means any instrument issued by, or interest in, any Debtor of the type described in section 101(49) of the Bankruptcy Code.

23

**Senior Notes** means, collectively, the NNC 2012 Convertible Notes, NNC 2014 Convertible Notes, NNCC Bonds, NNL 2011 Notes, NNL 2013 Notes and NNL 2016 Notes.

**Senior Notes Claims** means any Unsecured Claim that arises out of, or is attributable to, ownership of the Senior Notes, other than Debt Securities Fraud Claims.

**Senior Notes NNI Guarantee Claims** means any Unsecured Claim that arises out of, or is attributable to, the Senior Notes NNI Guarantee Obligations other than Debt Securities Fraud Claims.

**Senior Notes NNI Guarantee Obligations** means the guarantee, indemnity and other obligations of NNI under the Senior Notes Indentures and the Senior Notes.

**Senior Notes Indenture(s)** means, individually, as applicable, the NNC Notes Indenture, NNCC Bonds Indenture and NNL Notes Indenture, and, collectively, all of them.

**Side Letters** means side letters to which any of the Debtors and Canadian Debtors are party (as further specified on Annex C to the SPSA and which, for purposes of Section 7.17 herein and Annex C to the SPSA, include the IFSA and CFSA).

**Solicitation Procedures** means the Bankruptcy Court-approved procedures related to soliciting votes on the Plan from holders of Claims entitled to vote on the Plan.

**SPSA** means that certain Settlement and Plans Support Agreement executed on October 12, 2016, a copy of which is attached hereto as <u>Exhibit A</u>, by (i) the Canadian Debtors; (ii) the Monitor; (iii) the Debtors; (iv) the EMEA Debtors; (v) the EMEA Non-Filed Entities; (vi) the Joint Administrators; (vii) NNSA; (viii) the NNSA Conflicts Administrator; (ix) the French Liquidator; (x) the Bondholder Group; (xi) the members of the CCC; (xii) the Creditors' Committee; (xiii) the U.K. Pension Trustee; (xiv) the PPF; (xv) the Joint Liquidators and (xvi) the NNCC Bondholder Signatories.

**SPSA Party** means, individually, each of the signatories to the SPSA.

**SPSA Released Parties** means each SPSA Releasor and each of their respective employees, officers, directors, agents, advisors, lawyers, successors and assigns and their directors and officers, both former and current, in their respective capacities as such.

**SPSA Released Claims** has the meaning set forth in Section 13.4 hereof.

**SPSA Releasors** means the (i) SPSA Parties and (ii) Participating Creditors.

**SNMP** means, collectively, SNMP Research International Inc. and SNMP Research Inc.

**Sonoma** means Sonoma Systems, a California corporation.

**Sterling Conversion Election** means an EMEA Debtor's election to convert Sales Proceeds into Sterling in an amount up to the amount specified for that EMEA Debtor in Annex E to the SPSA.

**Strandherd Lands** means certain vacant lands of the Canadian Debtors in Ottawa, Ontario, sold in November 2009.

**Subordinated Claims** means Debt Securities Fraud Claims and any other Claims, except for Interests Securities Fraud Claims, that would be subject to subordination under section 510 of the Bankruptcy Code.

**Tax or Taxes** means all net income, gross income, capital, value added, goods and services, gross receipts, ad valorem, transfer, profits, business, environmental, gaming, franchise, excise, stamp, stamp duty reserve, customs, sales, use, employment, withholding, property, payroll and all other taxes, fees, duties, levies, assessments, deductions, withholdings or governmental charges, together with any interest, penalties, additions to tax, fines and similar amounts relating thereto, imposed or collected by or on behalf of any federal, state, local or foreign governmental authority on or from any of the Debtors.

**Tax Dispute** means the preparation and filing of tax returns by a Debtor and any challenges, inquiries, audits or other disputes by tax authorities in relation thereto.

**Trademarks** means all trademarks, service marks, trade dress, logos, trade names, corporate names and business names, whether or not registered, together with all goodwill associated therewith, and including all common law rights and all rights therein provided by multinational treaties or conventions.

**Transferee Joinder** means the form attached to the SPSA as Annex H.

**T&T Claim** means any and all claims made by Nortel Networks (CALA) Inc. in respect of customer receipts from Telecommunications Services of Trinidad and Tobago deposited into Nortel Networks International Corporation's bank account related to invoices issued to Telecommunications Services of Trinidad and Tobago by Nortel Networks (CALA) Inc.

**UKPI** means, collectively, the U.K. Pension Trustee and the PPF.

**U.K. Court** means the High Court of Justice of England and Wales in London, any court hearing appeals therefrom and any other court of competent jurisdiction overseeing the U.K. Proceedings (including appeals) from time to time.

**U.K. Pension Trustee** means Nortel Networks U.K. Pension Trust Limited as trustee of the Nortel Networks Pension Plan.

**U.K. Proceedings** means the administration proceedings of the EMEA Debtors and NNSA commenced on January 14, 2009 in the High Court of England and Wales, pursuant to the Insolvency Act 1986.

**U.S. Allocation** means the Allocation Proceeds to be distributed to the Debtors in accordance with the percentages as set forth in Section 2(c) of the SPSA.

**U.S. Canadian Claim** means NNI's $2.0 billion unsecured Proven Claim against the Canadian Debtors.

**U.S. Canadian Priority Claim** means NNI's allowed $62.7 million secured claim against the Canadian Debtors (defined as the "Remaining Revolver Claim" in the CFSA).

**U.S. Escrow Release Order** means an order issued by the Bankruptcy Court authorizing and directing the release of the Sale Proceeds from the Escrow Accounts in the manner contemplated hereby.

**U.S. Principal Officer** means John J. Ray III, who was appointed Principal Officer of each of the Debtors pursuant to an order entered by the Bankruptcy Court on January 6, 2010.

**U.S. Trustee** means the Office of the United States Trustee for the District of Delaware.

**U.S. Trustee Fees** means the fees payable to the U.S. Trustee pursuant to section 1930 of title 28 of the United States Code.

**Unimpaired** means any Claim or Interest that is not Impaired.

**Unsecured Claim** means any Claim against a Debtor, including, without limitation, (a) Claims arising from the rejection of executory contracts and unexpired leases, (b) Deficiency Claims, (c) Intercompany Claims, (d) Senior Notes Claims and (e) Senior Notes NNI Guarantee Claims, but excluding Administrative Expense Claims, Priority Tax Claims, Priority Non-Tax Claims and Secured Claims.

**Wind-Down Architel** means a Delaware corporation into which Architel shall transfer its Assets pursuant to the Plan.

**Wind-Down CoreTek** means a Delaware corporation into which CoreTek shall transfer its Assets pursuant to the Plan.

**Wind-Down Debtor(s)** means, individually, as applicable, Wind-Down NNI or any of the Wind-Down  Subsidiaries and, collectively, Wind-Down NNI and all of the Wind-Down Subsidiaries.

**Wind-Down NN Applications** means NN Applications on and after the Effective Date.

**Wind-Down NN Cable** means NN Cable on and after the Effective Date.

**Wind-Down NN HPOCS** means NN HPOCS on and after the Effective Date.

26

**Wind-Down NN Optical** means NN Optical on and after the Effective Date.

**Wind-Down NNCALA** means NNCALA on and after the Effective Date.

**Wind-Down NNCC** means NNCC on and after the Effective Date.

**Wind-Down NNI** means NNI on and after the Effective Date.

**Wind-Down NNII** means NNII on and after the Effective Date.

**Wind-Down Nortel Altsystems** means Nortel Altsystems on and after the Effective Date.

**Wind-Down Nortel Altsystems Int'l** means Nortel Altsystems Int'l on and after the Effective Date.

**Wind-Down NTI** means NTI on and after the Effective Date.

**Wind-Down Qtera** means Qtera on and after the Effective Date.

**Wind-Down Sonoma** means Sonoma on and after the Effective Date.

**Wind-Down Subsidiary** means, individually, as applicable, any of Wind-Down NNCALA, Wind-Down NNCC, Wind-Down Nortel Altsystems, Wind-Down Nortel Altsystems Int'l, Wind-Down Xros, Wind-Down Sonoma, Wind-Down Qtera, Wind-Down CoreTek, Wind-Down NN Applications, Wind-Down NN Optical, Wind-Down NN HPOCS, Wind-Down Architel, Wind-Down NNII, Wind-Down NTI and Wind-Down NN Cable, and, collectively, all of them.

**Wind-Down Xros** means Xros on and after the Effective Date.

**Xros** means Xros, Inc., a Delaware corporation.

### 1.3    Rules of Interpretation.

1.      In the event of an inconsistency: (a) the provisions of the Plan shall control over the contents of the Disclosure Statement; and (b) the provisions of the Confirmation Order shall control over the contents of the Plan.

2.      For the purposes of the Plan:

(a)      unless the context requires otherwise, any reference in the Plan to a contract, instrument, release or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; *provided*, *however*, that any change to such form, terms or conditions that is material to a party to such document shall not be modified without such party's consent unless such document or this Plan expressly provide otherwise;

(b)     unless the context requires otherwise, any reference in the Plan to an existing document, exhibit or schedule Filed or to be Filed means such document, exhibit or schedule, as it may have been or may be amended, modified or supplemented as of the Effective Date;

(c)     unless otherwise specified, all references in the Plan to "Sections," "Articles," "Exhibits" and "Schedules" are references to sections, articles, exhibits and schedules of or to the Plan;

(d)     the words "herein," "hereof," "hereto," "hereunder" and others of similar import refer to the Plan in its entirety rather than to only a particular portion of the Plan;

(e)     captions and headings are inserted for convenience of reference only and are not intended to be part or to affect interpretations of the Plan;

(f)     the words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation";

(g)     the definitions of terms herein shall apply equally to the singular and plural forms of the terms defined;

(h)     whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms;

(i)     the word "will" shall be construed to have the same meaning and effect as the word "shall"; and

(j)     unless the context requires otherwise, any reference herein to any Person shall be construed to include such Person's successors and assigns;

(k)     unless otherwise specified, the rules of construction set forth in section 102 of the Bankruptcy Code will apply to this Plan.

3.     Whenever a Distribution of property is required to be made on a particular date, the Distribution shall be made on such date or as soon as reasonably practicable thereafter.

4.     All Exhibits and Schedules to the Plan are incorporated into the Plan and shall be deemed to be included in the Plan, regardless of when they are Filed.

5.     Unless otherwise specified, all currency amounts are in U.S. Dollars.

**1.4     Exhibits to this Plan.**  All Exhibits, including those in the Plan Supplement, are incorporated into and are a part of this Plan as if set forth in full herein.  Holders of Claims and Interests may obtain a copy of the Exhibits, including those in the Plan Supplement, upon written request to the Debtors.  The Exhibits, including those in the Plan Supplement, may be inspected in the office of the clerk of the Bankruptcy Court or its designee during normal business hours, obtained by written request to counsel to the Debtors or obtained on the website of the Claims Agent at http://dm.epiq11.com/nortel.

1.5    **Computation of Time.**  In computing any period of time prescribed or allowed by the Plan, unless otherwise expressly provided, the provisions of Bankruptcy Rule 9006(a) shall apply.

## ARTICLE 2.
## TREATMENT OF UNCLASSIFIED CLAIMS

2.1    **Administrative Expense Claims.**  Subject to the allowance procedures and deadlines provided herein, on the later to occur of (a) the Effective Date, (b) the date on which an Administrative Expense Claim shall become an Allowed Claim and (c) to the extent an Allowed Administrative Expense Claim relates to a liability arising under another agreement incurred by the Debtors in the ordinary course, the date such liability is owed in accordance with the terms and conditions of any agreement or course of dealing relating thereto and consistent with past practice, the holder of an Allowed Administrative Expense Claim shall receive on account of its Allowed Administrative Expense Claim, and in full satisfaction, settlement and release of and in exchange for such Allowed Administrative Expense Claim, (a) Cash equal to the unpaid portion of such Allowed Administrative Expense Claim, or (b) such other treatment as to which the applicable Debtor and the holder of such Allowed Administrative Expense Claim have agreed upon in writing, which, prior to the Effective Date, shall be subject to the consent of the Creditors' Committee and Bondholder Group, acting reasonably; *provided*, *however*, that Professional Claims shall be paid in accordance with Section 2.3.

A notice setting forth the Effective Date of the Plan and the Administrative Expense Claims Bar Date shall be (i) Filed on the Bankruptcy Court's docket and (ii) posted on the Debtors' case information website at http://dm.epiq11.com/nortel.  Further notice of the Administrative Expense Claims Bar Date shall be provided as may be directed by the Bankruptcy Court.  All requests for payment of an Administrative Expense Claim that accrued on or before the Effective Date other than Administrative Expense Claims that have been paid or that relate to payment of Professionals must be Filed with the Claims Agent and served on counsel for the Debtors by the Administrative Expense Claims Bar Date.  Absent further order of the Bankruptcy Court, any requests for payment of Administrative Expense Claims that are not properly Filed and served by the Administrative Expense Claims Bar Date shall not appear on the register of Claims maintained by the Claims Agent and shall be disallowed automatically without the need for any objection from the Debtors or any action by the Bankruptcy Court.

The Debtors and the Plan Administrator may settle Administrative Expense Claims in the ordinary course without further notice or Bankruptcy Court approval, in accordance with the Plan Administration Agreement, as applicable.  The Debtors shall have the right to object to any Administrative Expense Claim within 180 days after the Administrative Expense Claims Bar Date, subject to further extensions that may be granted by the Bankruptcy Court.  Unless the Debtors or the Wind-Down Debtors object to a timely Filed and properly served Administrative Expense Claim, such Administrative Expense Claim shall be deemed Allowed in the amount requested. In the event that the Debtors or the Wind-Down Debtors object to an Administrative Expense Claim, the parties may confer to try to reach a settlement and, failing that, the Bankruptcy Court shall determine whether such Administrative Expense Claim should be allowed and, if so, in what amount.

**2.2    Statutory Fees.**  On or before the Effective Date, all fees due and payable pursuant to section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid in full, in Cash.

**2.3    Professional Claims.**  Other than a Professional retained by the Debtors pursuant to the Ordinary Course Professional Order, any entity seeking an award of the Bankruptcy Court of compensation for services rendered and/or reimbursement of expenses incurred through the Effective Date under sections 105(a), 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code shall File its final application for allowance of such compensation and/or reimbursement by no later than the first Business Day that is sixty (60) days after the Effective Date or such other date as may be fixed by the Bankruptcy Court and be paid by or on behalf of the Debtor (a) in full and in Cash in the amounts Allowed upon the date the order granting such award becomes a Final Order, or as soon thereafter as practicable or (b) upon such other terms as may be mutually agreed upon by the claimant and the Debtor obligated for the payment of such Allowed Claim.

Except as otherwise specifically provided in this Plan, on and after the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code or the Interim Compensation Order in seeking retention or compensation for services rendered after such date shall terminate, and, subject to the terms of the Plan Administrator Agreement, the Plan Administrator may employ and pay any Professional for services rendered or expenses incurred after the Effective Date in the ordinary course to facilitate the wind down of the Wind-Down Debtors and effectuate the Plan without any further notice to any party or action, order or approval of the Bankruptcy Court.

**2.4    Priority Tax Claims.**  With respect to each Allowed Priority Tax Claim, at the option of each Debtor, the holder of an Allowed Priority Tax Claim shall be entitled to receive, in full satisfaction, settlement and release of and in exchange for such Allowed Priority Tax Claim, (a) Cash in an amount equal to such Allowed Priority Tax Claim on the later of the Effective Date and the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, or as soon thereafter as practicable, (b) treatment in accordance with section 1129(a)(9)(C) of the Bankruptcy Code or (c) such other treatment as to which the applicable Debtor and the holder of such Allowed Priority Tax Claim have agreed upon in writing, which other treatment, prior to the Effective Date, shall be subject to the consent of the Creditors' Committee and Bondholder Group, acting reasonably.  On the Effective Date, the Liens (if any) securing any Priority Tax Claims shall be deemed released, terminated and extinguished, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person.

**ARTICLE 3.**
**CLASSIFICATION OF CLAIMS AND INTERESTS**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, Priority Tax Claims, Priority Non-Tax Claims and Professional Fee Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in this Article.

### 3.1    Summary of Classifications.

All Claims and Interests, other than Administrative Expense Claims, Priority Tax Claims and Professional Fee Claims, are classified in the Classes set forth in this Article for all purposes, including voting, Confirmation, and Distributions under this Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.  A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest fits within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest fits within the description of such other Classes.  A Claim is also classified in a particular Class for the purpose of receiving Distributions under this Plan only to the extent that such Claim is an Allowed Claim in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.  Subject to Section 15.7 hereof, the Debtors reserve the right to withdraw this Plan with respect to one or more Debtors while seeking Confirmation or approval of this Plan with respect to all other Debtors.

Except as set forth herein, the Plan constitutes a separate Plan for each of the Debtors, and the classification of Claims and Interests set forth herein shall apply separately to each of the Debtors.

### 3.2    Substantive Consolidation of NNI and NNCC.

Pursuant to Section 6.2 hereof, this Plan provides for the substantive consolidation of NNI and NNCC for all purposes associated with Confirmation (including voting) and Consummation. As a result of the substantive consolidation of NNI and NNCC, Claims against and Interests in NNI and NNCC shall be combined in the same Classes.

### 3.3    The Debtors.

There are a total of fifteen Plans, including one Plan for NNI and NNCC.  Each Debtor has been assigned a letter below for the purposes of classifying and treating Claims against and Interests in each Debtor.  The Claims against and Interests in each Debtor, in turn, have been assigned to separately numbered Classes with respect to each Debtor based on the type of Claim or Interest involved.  Accordingly, the classification of any particular Claim or Interest in any of the Debtors depends on the particular Debtor against which such Claim is asserted or in which such Interest is held and the type of Claim or Interest in question.  The letters applicable to the various Debtors are as follows:

| Letter | Debtor Name | Case Number |
|--------|-------------|-------------|
| A | The Consolidated Debtors (NNI/NNCC) | 09-10138/09-10139 |
| B | NNCALA | 09-12515 |
| C | Nortel Altsystems | 09-10140 |
| D | Nortel Altsystems Int'l | 09-14141 |

| E | Xros | 09-10142 |
|---|------|----------|
| F | Sonoma | 09-10143 |
| G | Qtera | 09-10144 |
| H | CoreTek | 09-10145 |
| I | NN Applications | 09-10146 |
| J | NN Optical | 09-10147 |
| K | NN HPOCS | 09-10148 |
| L | Architel | 09-10149 |
| M | NNII | 09-10150 |
| N | NTI | 09-10151 |
| O | NN Cable | 09-10152 |

### 3.4    Classification of Claims and Interests.

Claims against and Interests in the Debtors are divided into the following numbered Classes for each Debtor "A" through "O":

| Class | Designation |
|-------|-------------|
| 1 | Priority Non-Tax Claims |
| 2 | Secured Claims |
| 3A | General Unsecured Claims |
| 3B | Crossover Bonds Claims and EDC Claims |
| 3C | Convenience Claims |
| 4 | Subordinated Claims |
| 5A | Interests |
| 5B | Interests Securities Fraud Claims |

### 3.5    Treatment of Classes of Claims Against and Interests in the Consolidated Debtors (NNI/NNCC).

The following chart designates the Classes of Claims against and Interests in Debtor "A" – the Consolidated Debtors (NNI/NNCC) – and specifies which of those Classes are (a) Impaired or Unimpaired by the Plan, (b) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code and (c) deemed to accept or reject the Plan.

| Class | Designation | Status | Entitlement to Vote |
|-------|-------------|--------|---------------------|
| A1 | Priority Non-Tax Claims | Unimpaired | No (deemed to accept) |
| A2 | Secured Claims | Unimpaired | No (deemed to accept) |
| A-3A | General Unsecured Claims | Impaired | Yes |
| A-3B | Crossover Bonds Claims and EDC Claims | Impaired | Yes |
| A-3C | Convenience Claims | Impaired | Yes |
| A4 | Subordinated Claims | Impaired | No (deemed to reject) |
| A-5A | Interests | Impaired | No (deemed to reject) |
| A-5B | Interests Securities Fraud Claims | Impaired | No (deemed to reject) |

### 3.6    Treatment of Classes of Claims Against and Interests in NNCALA.

The following chart designates the Classes of Claims against and Interests in Debtor "B" – NNCALA – and specifies which of those Classes are (a) Impaired or Unimpaired

33

by the Plan, (b) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code and (c) deemed to accept or reject the Plan.

| Class | Designation | Status | Entitlement to Vote |
|---|---|---|---|
| B1 | Priority Non-Tax Claims | Unimpaired | No (deemed to accept) |
| B2 | Secured Claims | Unimpaired | No (deemed to accept) |
| B-3A | General Unsecured Claims | Impaired | Yes |
| B-3C | Convenience Claims | Impaired | Yes |
| B4 | Subordinated Claims | Impaired | No (deemed to reject) |
| B-5A | Interests | Impaired | No (deemed to reject) |
| B-5B | Interests Securities Fraud Claims | Impaired | No (deemed to reject) |

**3.7    Treatment of Classes of Claims Against and Interests in Nortel Altsystems.**

The following chart designates the Classes of Claims against and Interests in Debtor "C" – Nortel Altsystems – and specifies which of those Classes are (a) Impaired or Unimpaired by the Plan, (b) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code and (c) deemed to accept or reject the Plan.

| Class | Designation | Status | Entitlement to Vote |
|---|---|---|---|
| C1 | Priority Non-Tax Claims | Unimpaired | No (deemed to accept) |
| C2 | Secured Claims | Unimpaired | No (deemed to accept) |
| C-3A | General Unsecured Claims | Impaired | Yes |
| C-3C | Convenience Claims | Impaired | Yes |
| C4 | Subordinated Claims | Impaired | No (deemed to reject) |
| C-5A | Interests | Impaired | No (deemed to reject) |
| C-5B | Interests Securities Fraud Claims | Impaired | No (deemed to reject) |

34

**3.8**    **Treatment of Classes of Claims Against and Interests in All Other Debtors.**

The following chart designates the Classes of Claims against and Interests in Debtors "D" through "O" (which includes all Debtors other than the Consolidated Debtors) and specifies which of those Classes are (a) Impaired or Unimpaired by the Plan, (b) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code and (c) deemed to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code.

| Class | Designation | Status | Entitlement to Vote |
|-------|-------------|--------|---------------------|
| D1-O1 | Priority Non-Tax Claims | Unimpaired | No (deemed to accept) |
| D2 – O2 | Secured Claims | Unimpaired | No (deemed to accept) |
| D-3A – O-3A | General Unsecured Claims | Impaired | Yes |
| D4 – O4 | Subordinated Claims | Impaired | No (deemed to reject) |
| D-5A – O-5A | Interests | Impaired | No (deemed to reject) |
| D-5B – O-5B | Interests Securities Fraud Claims | Impaired | No (deemed to reject) |

## ARTICLE 4.
## TREATMENT OF CLAIMS AGAINST AND INTERESTS IN DEBTORS

Except to the extent that a holder of an Allowed Claim against or Interest in any of the Debtors, as applicable, agrees to a less favorable treatment, such holder shall receive under the Plan the treatment described below in full and final satisfaction, settlement, release and discharge of and in exchange for such holder's Allowed Claim or Interest.  Unless otherwise indicated, the holder of an Allowed Claim or Interest, as applicable, shall receive such treatment on the Effective Date, or as soon as reasonably practicable thereafter.

**4.1**    **Class 1 – Priority Non-Tax Claims.**

(a)    <u>Classification</u>.  Classes A1 through O1 consist of all Priority Non-Tax Claims against the applicable Debtor.

(b)    <u>Impairment and Voting</u>.  Classes A1 through O1 are Unimpaired by the Plan.  The holders of Allowed Priority Non-Tax Claims in these Classes are not entitled to vote to accept or reject the Plan and are deemed to accept the Plan.

(c)    <u>Distributions</u>.  Except to the extent that the holder of an Allowed Priority Non-Tax Claim in Classes A1 through O1 agrees to less favorable treatment or has been

35

paid by or on behalf of the applicable Debtor on account of such Allowed Priority Non-Tax Claim prior to the Effective Date, on the later of the Effective Date and the date on which such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, or as soon thereafter as is practicable, each holder of an Allowed Priority Non-Tax Claim in Classes A1 through O1 shall be paid by the applicable Debtor in Cash in the amount equal to the Allowed amount of such Priority Non-Tax Claim.

### 4.2    Class 2 – Secured Claims.

(a)    <u>Classification</u>.  Classes A2 through O2 consist of all Secured Claims against the applicable Debtor.

(b)    <u>Impairment and Voting</u>.  Classes A2 through O2 are Unimpaired by the Plan.  The holders of Allowed Secured Claims in these Classes are not entitled to vote to accept or reject the Plan and are deemed to accept the Plan.

(c)    <u>Distributions</u>.  Except to the extent that the holder of an Allowed Secured Claim agrees to less favorable treatment, each holder of an Allowed Secured Claim in Classes A2 through O2 shall be satisfied by, at the option of the applicable Debtor: (i) payment in Cash by the applicable Debtor in the amount equal to the Allowed amount of such Secured Claim on the later of the Effective Date and the date on which such Secured Claim becomes an Allowed Secured Claim; (ii) the Distribution of the sale or other disposition proceeds of the Collateral securing such Allowed Secured Claim; (iii) surrender of the Collateral securing such Allowed Secured Claim to the holder of such Allowed Secured Claim; or (iv) such treatment that leaves unaltered the legal, equitable and contractual rights to which the holder of the Allowed Secured Claim is entitled. In the event an Allowed Secured Claim is treated under clause (i) through (iii) above, the Liens securing such Claim shall be deemed released and extinguished without further order of the Bankruptcy Court.

### 4.3    Class 3A – General Unsecured Claims.

(a)    <u>Classification</u>. Classes A-3A through O-3A consist of all General Unsecured Claims against the applicable Debtor, including the NNCC Bonds Claims.

(b)    <u>Impairment and Voting</u>.  Classes A-3A through O-3A are Impaired by the Plan.  Each holder of an Allowed General Unsecured Claim in one of these Classes is entitled to vote to accept or reject the Plan.

(c)    <u>Distributions</u>.  Each holder of an Allowed General Unsecured Claim in Classes A-3A through O-3A shall, on the Initial Distribution Date or the first Interim Distribution Date after the date such Claim becomes Allowed, receive its Pro Rata Share of the Creditor Proceeds as of the applicable Distribution Date from the applicable Debtor, subject, in the case of holders of Allowed General Unsecured Claims that are Crossover Claims, to Sections 7.9, 7.10 and 7.11 of the Plan.  In accordance with Section 10.3 herein, the Disbursing Agent shall make periodic Interim Distributions of the remaining available Creditor Proceeds to holders of Allowed General Unsecured Claims in Classes A-3A through O-3A until the Final Distribution Date.  For the avoidance of doubt, Distributions on account of Allowed NNCC

36

Bonds Claims shall be made to the NNCC Bonds Indenture Trustee in accordance with Section 10.6(a) of this Plan.

### 4.4    Class A-3B – Crossover Bonds Claims and EDC Claims.

(a)    <u>Classification</u>.  Class A-3B consists of all Crossover Bonds Claims and EDC Claims against the Consolidated Debtors.

(b)    <u>Impairment and Voting</u>.  Class A-3B is Impaired by the Plan. Each holder of a Crossover Bonds Claim or EDC Claim in this Class is entitled to vote to accept or reject the Plan.

(c)    <u>Distributions</u>.  Each holder of a Crossover Bonds Claim or EDC Claim in Class A-3B shall, on the Initial Distribution Date or the first Interim Distribution Date after the date such Claim becomes Allowed, receive its Pro Rata Share of the Creditor Proceeds from the Consolidated Debtors, such distributions to be made in accordance with Sections 7.9, 7.10 and 7.11 of the Plan. In accordance with Section 10.3 herein, the Disbursing Agent shall make periodic Interim Distributions of the remaining available Creditor Proceeds to holders of Allowed Crossover Bonds Claims and EDC Claims in Class A-3B until the Final Distribution Date. For the avoidance of doubt, Distributions on account of Allowed Crossover Bonds Claims shall be made to the NNC/NNL Notes Indenture Trustee in accordance with Section 10.6(b) of the Plan.

### 4.5    Class A-3C – Convenience Claims against the Consolidated Debtors (NNI/NNCC).

(a)    <u>Classification</u>.  Class A-3C consists of all Convenience Claims against the Consolidated Debtors (NNI/NNCC).

(b)    <u>Impairment and Voting</u>.  Class A-3C is Impaired by the Plan. Each holder of a Convenience Claim in this Class is entitled to vote to accept or reject the Plan.

(c)    <u>Distributions</u>.  Each holder of a Convenience Claim in Class A-3C shall, on the date of the initial Distribution or on the first Distribution Date after the date such Convenience Claim becomes Allowed, receive Cash in an amount equal to [55%] of the amount of the Allowed Convenience Claim in full and final satisfaction of such Allowed Convenience Claim.

### 4.6    Class B-3C – Convenience Claims against NNCALA.

(a)    <u>Classification</u>. Class B-3C consists of all Convenience Claims against NNCALA.

37

(b)      <u>Impairment and Voting</u>.  Class B-3C is Impaired by the Plan.  Each holder of a Convenience Claim in this Class is entitled to vote to accept or reject the Plan.

(c)      <u>Distributions</u>.  Each holder of a Convenience Claim in Class B-3C shall, on the date of the initial Distribution or within the first Distribution Date after the date such Convenience Claim becomes Allowed, receive Cash in an amount equal to [12%] of the amount of the Allowed Convenience Claim in full and final satisfaction of such Allowed Convenience Claim.

### 4.7      **Class C-3C – Convenience Claims against Nortel Altsystems.**

(a)      <u>Classification</u>. Class C-3C consists of all Convenience Claims against Nortel Altsystems.

(b)      <u>Impairment and Voting</u>.  Class C-3C is Impaired by the Plan.  Each holder of a Convenience Claim in this Class is entitled to vote to accept or reject the Plan.

(c)      <u>Distributions</u>.  Each holder of a Convenience Claim in Class C-3C shall, on the date of the initial Distribution or on the first Distribution Date after the date such Convenience Claim becomes Allowed, receive Cash in an amount equal to [7%] of the amount of the Allowed Convenience Claim in full and final satisfaction of such Allowed Convenience Claim.

### 4.8      **Class 4 – Subordinated Claims.**

(a)      <u>Classification</u>.  Classes A4 through O4 consist of all Subordinated Claims against the applicable Debtor.

(b)      <u>Impairment and Voting</u>.  Classes A4 through O4 are Impaired by the Plan.  The holders of Allowed Subordinated Claims in these classes are not entitled to vote to accept or reject the Plan and are deemed to have rejected the Plan.

(c)      <u>Distributions</u>.  Each holder of an Allowed Subordinated Claim in Classes A4 through O4 shall not receive or retain any interest or property under the Plan on account of such Claims; *provided*, *however*, that in the event that all Allowed Claims in Classes A1 through O3 have been satisfied in full, in accordance with the Bankruptcy Code and the Plan, each holder of an Allowed Subordinated Claim in Classes A4 through O4 shall receive its Pro Rata Share of any Creditor Proceeds that remain after Classes A1 through O3 have been satisfied in full from the applicable Debtor.

### 4.9      **Class 5A – Interests.**

(a)      <u>Classification</u>.  Classes A5A through O5A consist of all Interests in a Debtor that were in existence immediately prior to or on the Petition Date for such Debtor.

(b)    Impairment and Voting.  Classes A5A through O5A are Impaired by the Plan.  The holders of Interests in these Classes are not entitled to vote to accept or reject the Plan and are deemed to have rejected the Plan.

(c)    Distributions.  The holders of Interests in NNI are not expected to receive any Distributions under the Plan.  On the Effective Date, all Interests in NNI will be cancelled and one new share of NNI's common stock will be issued to the Plan Administrator which will hold such share for the benefit of the holders of the former Interests in NNI.  The holders of Interests in NNI will neither receive nor retain any property or any interest in property on account of such Interests; *provided*, *however*, that in the event that all Allowed Claims in NNI Classes A1, A2, A3 and A4 have been satisfied in full in accordance with the Bankruptcy Code and the Plan, each holder of an Interest in NNI will receive its Pro Rata Share of any remaining Creditor Proceeds from NNI consistent with such holder's rights of priority of payment existing immediately prior to the Petition Date.  Unless otherwise determined by the Plan Administrator, all outstanding Interests in NNI will be deemed cancelled and of no force and effect as of the closing of NNI's Chapter 11 Case, in accordance with the Plan, *provided* that such cancellation does not adversely affect the Debtors' Estates.

The holders of Interests in Nortel Altsystems, Xros, Sonoma, CoreTek, NN Applications, NN Optical, and Architel are not expected to receive any Distributions under the Plan. On the Effective Date, all Interests in Nortel Altsystems, Xros, Sonoma, CoreTek, NN Applications, NN Optical, and Architel will be cancelled and one new share of the common stock of Nortel Altsystems, Xros, Sonoma, CoreTek, NN Applications, NN Optical, and Architel will be issued to the Plan Administrator which will hold such share for the benefit of the holders of the former Interests in each of Nortel Altsystems, Xros, Sonoma, CoreTek, NN Applications, NN Optical, and Architel, respectively. The holders of Interests in Nortel Altsystems, Xros, Sonoma, CoreTek, NN Applications, NN Optical, and Architel will neither receive nor retain any property or any interest in property on account of such Interests; *provided*, *however*, that in the event that all Allowed Claims in Classes 1, 2, 3 and 4 of Nortel Altsystems, Xros, Sonoma, CoreTek, NN Applications, NN Optical, and Architel, respectively, have been satisfied in full in accordance with the Bankruptcy Code and the Plan, each holder of an Interest in Nortel Altsystems, Xros, Sonoma, CoreTek, NN Applications, NN Optical, and Architel will receive its Pro Rata Share of any remaining Creditor Proceeds from Nortel Altsystems, Xros, Sonoma, CoreTek, NN Applications, NN Optical, and Architel, respectively, consistent with such holder's rights of priority of payment existing immediately prior to the Petition Date.  Unless otherwise determined by the Plan Administrator, all outstanding Interests in Nortel Altsystems, Xros, Sonoma, CoreTek, NN Applications, NN Optical, and Architel will be deemed cancelled and of no force and effect as of the closing the Chapter 11 Cases of Nortel Altsystems, Xros, Sonoma, CoreTek, NN Applications, NN Optical, and Architel, respectively, in accordance with the Plan, *provided* that such cancellation does not adversely affect the Debtors' Estates.

All Interests in each of NNCALA, NNCC, Nortel Altsystems Int'l, Qtera, NN HPOCS, NNII, NTI and NN Cable will continue to be held by its corporate parent until the closing of its Chapter 11 Case, solely for Plan administrative purposes.  No holder of Interests shall receive Distributions on account of its Interests until such time that all Allowed Claims in Classes 1 through 4 of any Debtor have been satisfied in full in accordance with the Bankruptcy

Code and the Plan. At such time, each holder of an Interest in Class 5A of the applicable Debtor will receive its Pro Rata Share of any remaining Creditor Proceeds from the applicable Debtor.

### 4.10    Class 5B – Interests Securities Fraud Claims.

(a)    Classification. Classes A5B through O5B consist of all the Interests Securities Fraud Claims against the applicable Debtor.

(b)    Impairment and Voting. Classes A5B through O5B are Impaired by the Plan. The holders of Allowed Interests Securities Fraud Claims in these Classes are not entitled to vote to accept or reject the Plan and are deemed to have rejected the Plan.

(c)    Distributions. The holders of Allowed Interests Securities Fraud Claims in Classes A5B through O5B shall receive no Distribution under the Plan in respect of their Allowed Interests Securities Fraud Claims.

### ARTICLE 5.
### ACCEPTANCE OR REJECTION OF THE PLAN

### 5.1    Impaired Classes of Claims and Interests Entitled to Vote.

Holders of Claims in Classes A-3A, A-3B, A-3C, B-3C, C-3C and B-3A through O-3A are entitled to vote to accept or reject this Plan as provided above or as otherwise set forth in such order as may be entered by the Bankruptcy Court establishing certain procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan, or any other order(s) of the Bankruptcy Court. The votes of Holders of Claims who are entitled to vote and yet abstain from voting, return a ballot with no boxes checked, or return a ballot voting both to accept and reject the Plan, will not be counted for purposes of accepting or rejecting the Plan.

### 5.2    Acceptance by an Impaired Class.

In accordance with section 1126(c) of the Bankruptcy Code and except as provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims shall have accepted this Plan if this Plan is accepted by the Holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims in such Class that have timely and properly voted to accept or reject this Plan.

### 5.3    Presumed Acceptances by Unimpaired Classes.

Classes A1, A2, B1 through O1 and B2 through O2 are Unimpaired by this Plan. Accordingly, under section 1126(f) of the Bankruptcy Code, Holders of such Claims are conclusively presumed to accept this Plan, and the votes of the Holders of such Claims will not be solicited.

### 5.4    Elimination of Vacant Classes; Deemed Acceptance by Non-Voting Classes.

(a)     Any Class of Claims or Interests that, as of the commencement of the Confirmation Hearing, does not have at least one holder of a Claim or Interest that is Allowed in an amount greater than zero (including temporarily Allowed under Bankruptcy Rule 3018) shall be considered vacant and deemed eliminated from this Plan for purposes of voting to accept or reject this Plan and for purposes of determining whether this Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to that Class.

(b)     If no votes to accept or reject this Plan are received with respect to a Class that is solicited in accordance with the Solicitation Procedures (other than a Class that is deemed eliminated pursuant to the foregoing Section 5.4(a)), such Class shall be deemed to have voted to accept this Plan, unless the Bankruptcy Court, for cause, orders otherwise.

### 5.5    Conversion or Dismissal of Certain of the Chapter 11 Cases.

If the requisite Classes do not vote to accept this Plan with respect to any particular Debtor or the Bankruptcy Court does not confirm this Plan with respect to any particular Debtor, the Debtors reserve the right, subject to Section 15.7 hereof, to have any Debtor's Chapter 11 Case dismissed or converted, or to liquidate or dissolve such Debtor under applicable non-bankruptcy procedure or chapter 7 of the Bankruptcy Code.

### 5.6    Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code.

The Debtors intend to request that the Bankruptcy Court confirm this Plan in accordance with section 1129(b) of the Bankruptcy Code with respect to any Impaired Class of Claims that rejects or is deemed to reject the Plan, where this Plan shall constitute a motion for such relief.

### ARTICLE 6.
### IMPLEMENTATION OF THE PLAN

### 6.1    General Settlement of Claims and Interests.

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under this Plan, and, as applicable, the SPSA, on the Effective Date, the provisions of this Plan shall constitute a good faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to this Plan and the SPSA.

### 6.2    Substantive Consolidation of NNI and NNCC.

The Plan shall serve as a motion by NNI and NNCC seeking entry of an order pursuant to sections 105(a), 363(b), and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 substantively consolidating the NNI and NNCC Estates into a single consolidated Estate for all purposes associated with Confirmation and Consummation.  The tabulation of votes to accept or reject this Plan with respect to NNI and NNCC shall be counted on a consolidated basis.

Entry of the Confirmation Order shall constitute the approval, pursuant to sections 105(a), 541, 1123 and 1129 of the Bankruptcy Code, effective as of the Effective Date,

of the Consolidation of the Consolidated Debtors (NNI and NNCC) for all purposes. On and after the Effective Date, (i) all assets and liabilities of the Consolidated Debtors shall be pooled and shall be vested in Wind-Down NNI; (ii) all of the Intercompany Claims between the Consolidated Debtors shall be disallowed and expunged and no Distributions shall be made on account of such Intercompany Claims; (iii) all guarantees of either of the Consolidated Debtors of the obligations of the other Consolidated Debtor shall be eliminated so that any Claim against either Consolidated Debtor and any guarantee thereof executed by the other Consolidated Debtor, and any joint or several liability of either of the Consolidated Debtors, shall be one obligation of NNI following the Consolidation of the Consolidated Debtors; (iv) for purposes of determining the availability of the right of set off under section 553 of the Bankruptcy Code, the Consolidated Debtors shall be treated as one Entity so that, subject to the other provisions of section 553 of the Bankruptcy Code, debts due to either of the Consolidated Debtors may be set off against the debts of the other Consolidated Debtor, and (v) each and every Claim Filed or to be Filed in the case of either of the Consolidated Debtors shall be deemed Filed against NNI.

The Consolidation of the Consolidated Debtors (other than as expressly set forth in this Plan) shall not affect: (i) the legal and corporate structures of either of the Consolidated Debtors; (ii) pre- and post-Effective Date guarantees, liens and security interests that are required to be maintained, if any; (iii) distributions from any insurance policies or proceeds of such policies; and (iv) vesting of the Estate Assets in the Wind-Down Debtor.

Notwithstanding the Consolidation provided for herein, U.S. Trustee Fees payable pursuant to section 1930 of title 28 of the United States Code shall continue to accrue for each and every Debtor until a particular Debtor's case is closed, dismissed or converted to a case under Chapter 7 of the Bankruptcy Code.

### 6.3    Plan Administrator.

(a)    Appointment.  Greylock Partners, LLC, shall serve as Plan Administrator for each of the Debtors and the Wind-Down Debtors pursuant to and in accordance with the provisions of the Plan, the SPSA and the Plan Administration Agreement.

(b)    Authority.  The Plan Administrator shall have the authority and right on behalf of each of the Debtors and the Wind-Down Debtors, without the need for Bankruptcy Court approval (unless otherwise indicated), to carry out and implement all provisions of the Plan, the SPSA and the Plan Administration Agreement in accordance with the provisions therein.  These rights shall include, without limitation, the authority to: (i) except to the extent Claims have been previously allowed, control and effectuate the Claims reconciliation process, including to object to, seek to subordinate, compromise or settle any and all Claims against the Debtors; (ii) make Distributions to holders of Allowed Claims in accordance with the Plan (other than to the holders of the NNCC Bonds Claims and the Crossover Bonds Claims, for whom the Notes Indenture Trustee or the NNCC Bonds Indenture Trustee, as applicable, shall be the Disbursing Agent); (iii) exercise its reasonable business judgment to direct and control the wind-down, liquidation, sale and/or abandonment of the remaining assets of the Debtors under the Plan and in accordance with applicable law as reasonably necessary to maximize Distributions to holders of Allowed Claims; (iv) prosecute all Causes of Action on behalf of the Debtors, elect not to pursue any Causes of Action, and determine whether and when to

42

compromise, settle, abandon, dismiss, or otherwise dispose of any such Causes of Action, as the Plan Administrator may determine is in the best interests of the Debtors; (v) make payments to existing professionals who will continue to perform in their current capacities; (vi) retain professionals to assist in performing its duties under the Plan; (vii) maintain the books and records and accounts of the Debtors and the Wind-Down Debtors, as applicable; (viii) invest Cash of the Debtors, including any Cash proceeds realized from the liquidation of any assets of the Debtors, including any Causes of Action, and any income earned thereon; (ix) incur and pay reasonable and necessary expenses in connection with the performance of duties under the Plan, including the reasonable fees and expenses of professionals retained by the Plan Administrator; (x) administer each Debtor's tax obligations, including filing tax returns and paying tax obligations, requesting, if necessary, an expedited determination of any unpaid tax liability of each Debtor or its estate under section 505(b) of the Bankruptcy Code for all taxable periods of such Debtor ending after the Petition Date through the liquidation of such Debtor as determined under applicable tax laws, and representing the interest and account of each Debtor or its estate before any taxing authority in all matters, including, without limitation, any action, suit, proceeding or audit; (xi) prepare and file any and all informational returns, reports, statements, returns or disclosures relating to the Debtors that are required hereunder, by any Governmental Unit or applicable law; (xii) pay statutory fees in accordance with Section 15.20 of the Plan; and (xiv) perform other duties and functions that are reasonable, necessary, or appropriate for the implementation of the Plan.

(c)    Compensation of the Plan Administrator.  In addition to reimbursement for actual out-of-pocket expenses incurred by the Plan Administrator, the Plan Administrator shall be entitled to receive reasonable compensation for services rendered on behalf of the Debtors and the Wind-Down Debtors in an amount and on such terms as may be reflected in the Plan Administration Agreement.

(d)    No Liability of Plan Administrator.  The Plan Administrator shall have no liability whatsoever for any acts or omissions to the Debtors, the Wind-Down Debtors or holders of claims against or interests in the Debtors or the Wind-Down Debtors other than for gross negligence, willful misconduct, fraud or breach of fiduciary duty by the Plan Administrator as determined by a Final Order.  Each of the Debtors and the Wind-Down Debtors shall indemnify and hold harmless the Plan Administrator for any losses, liabilities and costs incurred in such capacity to the fullest extent allowed by applicable law, other than for gross negligence, willful misconduct, fraud or breach of fiduciary duty as determined by a Final Order.

(e)    Termination, Resignation and Removal of Plan Administrator.  The duties, responsibilities and powers of the Plan Administrator shall terminate pursuant to the terms of the Plan Administration Agreement. The resignation and removal of the Plan Administrator shall occur pursuant to the terms of the Plan Administration Agreement.

(f)    Establishment of Reserves.  On the Effective Date, the Debtors shall account for the Disputed Claims in such amounts, as agreed by the Debtors and the Plan Administrator, in accordance with the terms of the Plan Administration Agreement, as may be necessary to make sufficient future payments with respect to Disputed Claims as provided by the Plan.

(g)    Periodic Reporting of the Plan Administrator.  After the Effective Date, the Plan Administrator shall periodically consult with FTI Consulting, as financial advisor to the Bondholder Group, a financial advisor or similar representative designated by the Nortel Trade Claims Consortium and, to the extent the Creditors' Committee is in existence during the first ninety (90) days after the Effective Date, its counsel, regarding the status of the resolution of any remaining Disputed Claims and Distributions expected to be made pursuant to this Plan.

6.4    **Intercompany Account Settlement.**  The Debtors and the Wind-Down Debtors will be entitled to transfer funds between and among themselves and their respective subsidiaries in all cases consistent with the terms of the Cash Management Order.  Any changes in intercompany account balances resulting from such transfers will be accounted for and settled in accordance with the ordinary course intercompany account settlement practices and will not violate the terms of this Plan.  For the avoidance of doubt, the NNCALA Administrative Expense Contribution, as defined in Section 6.7, is hereby authorized and shall not violate the terms of this Plan.

6.5    **Settlement of Intercompany Claims and Other Matters.**  Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the settlement that has been reached among the SPSA Parties with regard to (a) the Allocation Proceeds and (b) the Intercompany Claims (including, for the avoidance of doubt, the Allowed Book Intercompany Claims) in each case subject to the terms and conditions of the SPSA and the Plan and (c) the other matters settled under the SPSA. Entry of the Confirmation Order shall constitute the Bankruptcy Court's finding that such settlement is: (1) in exchange for the good and valuable consideration provided by each of the Debtors and SPSA Parties; (2) a good-faith settlement and compromise of the claims released by the Debtors; (3) in the best interests of the Debtors, their Estates, and all holders of Claims and Interests; (4) fair, equitable and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to the assertion of any claim or Cause of Actions released pursuant to the SPSA.

6.6    **Funding of Individual Debtors for Plan Confirmation.**  NNI (before the Effective Date) or the Plan Administrator (on and following the Effective Date) shall have the authority, but not the obligation, to make or authorize NNI to make certain transfers of assets to other Debtors or Wind-Down Debtors, not to exceed $50,000 in the aggregate, and not to exceed $5,000 per Debtor or Wind-Down Debtor, for the purpose of aiding such Debtor or Wind-Down Debtor's ability to effectuate the Plan and the wind down of its estate, including to make distributions to its creditors in accordance with the confirmation or implementation of such Debtor's Plan and the SPSA.

6.7    **Administrative Expense Contribution and Quarterly Administrative Wind-Down Reimbursement Payments.**  The Debtors have agreed that in full and final satisfaction of NNI's claims against the Debtors (other than NNCALA) resulting from the Intercompany Administrative Expense Claims, on the one hand, and the Debtors' (other than the Consolidated Debtors' and NNCALA's) claims for entitlements to the Sale Proceeds, the Sale Proceeds shall be allocated among the Debtors in accordance with the terms of the SPSA and the Plan as reflected in Section 2 of the SPSA, and that with respect to NNCALA, NNCALA shall be entitled to the allocation of Sale Proceeds specified on Annex F of the SPSA, subject to Section 2 of the SPSA, and that NNI shall be entitled to a one-time reimbursement payment from

NNCALA in the amount of $34 million in full and final satisfaction of the Intercompany Administrative Expense Claims attributable to NNCALA that have accrued to date (the "NNCALA Administrative Expense Contribution").

In addition, from and after the Effective Date, each Debtor listed on Exhibit E to the Plan shall make a Quarterly Administrative Wind-Down Reimbursement Payment to NNI in accordance with Section 8.8 herein.  For the avoidance of doubt, NNI shall retain the right to assert Administrative Expense Claims against any other Debtor or Wind-Down Debtor, as applicable, for any Priority Tax Claims that are asserted against and or paid by NNI that reasonably could be allocated or attributable to any other Debtor or Wind-Down Debtor, as applicable, subject to the caps specified in Exhibit E.

   **6.8 Closing of Chapter 11 Case.**  After a Chapter 11 Case has been fully administered, the Plan Administrator shall File all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close such Chapter 11 Case in accordance with the Bankruptcy Code and the Bankruptcy Rules.  The Plan Administrator's authority shall continue until such time as all of the Chapter 11 Cases have been fully administered and closed.

## ARTICLE 7.
## THE SETTLEMENT AND PLANS SUPPORT AGREEMENT

   **7.1 SPSA.**  The Plan shall serve as a motion by the Debtors seeking an order pursuant to sections 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019 approving the SPSA and authorizing the Debtors to perform their obligations under the SPSA. In the event of an inconsistency between the Plan and the SPSA, the SPSA shall govern.

   **7.2 Cooperation.**  The Debtors shall cooperate in the implementation of the SPSA in accordance with its cooperation provisions therein in furtherance of the execution and implementation of the SPSA.

   **7.3 Conditions Precedent.**  The terms of the SPSA incorporated into the Plan and the effectiveness of the SPSA and the settlements contained therein are subject to the satisfaction of the conditions contained in the SPSA, including the occurrence of the Plans Effective Date.

   **7.4 Settlement of Allocation Dispute.**  Pursuant to the resolution procedures of the IFSA, the SPSA Parties have agreed to settle the Allocation Dispute on the terms set forth in the SPSA.  As part of the integrated settlements contained in the SPSA, and subject to the terms and conditions thereof, the Debtors shall be entitled to receive the Allocation Proceeds as described in Sections 7.5 and 7.6 herein.  The Debtors shall be authorized by the Confirmation Order to take any actions necessary or appropriate to direct releases of the Allocation Proceeds to the Global Debtors in accordance with the terms of the SPSA.

   **7.5 Allocation and Distribution of Sale Proceeds**.  Without limiting the generality of Section 7.1, on the Effective Date, the Debtors shall be authorized and directed by the Plan, the Confirmation Order and the U.S. Escrow Release Order to take such steps as may be reasonably necessary to effect the distributions from the Escrow Accounts as set forth in Section 2(c) of the SPSA, in accordance with and subject to the terms of the SPSA.

**7.6    Allocation of Sale Proceeds Among the Debtors**.  Upon entry of the Confirmation Order and the Escrow Release Orders and subject to the satisfaction of the additional conditions set forth in Article 12 herein, the Sale Proceeds shall be allocated among the Debtors in the amounts as set forth in Annex F to the SPSA reflected  below (subject to the terms of Section 2 of the SPSA).

| Debtor | Allocation Amount |
|---|---|
| Nortel Networks Inc. (inclusive of consolidated Nortel Networks Capital Corporation estate) | $1,716,346,052.00 |
| Nortel Networks (CALA) Inc. | $50,070,950.00 |
| Nortel Altsystems Inc. | $0.00 |
| Nortel Altsystems International Inc. | $0.00 |
| Xros, Inc. | $0.00 |
| Sonoma Systems | $0.00 |
| Qtera Corporation | $0.00 |
| CoreTek, Inc. | $0.00 |
| Nortel Networks Applications Management Solutions Inc. | $0.00 |
| Nortel Networks Optical Components Inc. | $0.00 |
| Nortel Networks HPOCS Inc. | $0.00 |
| Architel Systems (U.S.) Corporation | $0.00 |
| Nortel Networks International Inc. | $0.00 |
| Northern Telecom International Inc. | $0.00 |
| Nortel Networks Cable Solutions Inc. | $0.00 |
|  | $1,766,417,002.00 |

**7.7    Changes in Escrow Accounts' Balances.**  Pursuant to Section 2(d) and Sections 7(b), 7(c) and 7(d) of the SPSA, any changes in the Escrow Accounts' balances between the execution date of the SPSA and the Effective Date shall be allocated among the Nortel Group in the percentages reflected in Section 2(c) of the SPSA and Section 7.6 above, respectively, subject to the following conditions: (i) any foreign exchange gain or loss made in respect of any amount in the Canadian Escrow Account (following conversion from U.S. Dollars to Canadian Dollars) shall be solely for the credit or debit of the Canadian Debtors; (ii) any foreign exchange gain or loss made in respect of any amount in the relevant EMEA Escrow Account pursuant to a Conversion Election (following conversion from U.S. Dollars to Euros or Pound Sterling) shall be solely for the credit or debit of the EMEA Debtor that requested such Conversion Election or NNSA, as the case may be; and (iii) the fees and costs of the Escrow Agents (including reasonable attorneys' fees costs), if any, associated with any currency conversion shall be borne by the Debtor(s) requesting such conversion and shall be paid out of the amount of their respective Sale Proceeds allocations  or directly by the relevant Debtor out of its estate assets.

**7.8    Estate Administration.**  From the Confirmation Date to the Effective Date, the Debtors will be administered by the U.S. Principal Officer.

     **7.9**    **Treatment of Crossover Claims.**  In the event that a creditor shall have a Proven Claim against the Canadian Estate and an Allowed Claim against the relevant Debtor, then, as contemplated by Section 4(c)(i)(B) and 4(g)(vi) of the SPSA, the issuer (or primary) Debtor estate or Canadian Debtor estate and any guarantor (or secondary) Debtor estate or Canadian Debtor estate shall pay distributions on the full amount of the Allowed Claim, if a claim against a Debtor, or the full amount of the Proven Claim, if a claim against the Canadian Estate, on a *pari passu* basis with all other creditors holding Allowed Claims (in the case of the Debtors) or Proven Claims (in the case of the Canadian Estate) with the same priority without discrimination of any kind.  In no case shall a creditor holding a Crossover Claim be entitled to receive (i) any further distributions from the Debtors where the aggregate distributions made by the Debtors and the Canadian Estate in respect of such Crossover Claim equal the total allowed amount of such Crossover Claim against the Debtors or (ii) any further distributions from the Canadian Estate where the aggregate distributions made by the Debtors and the Canadian Estate in respect of such Crossover Claim equal the total Proven Claim amount of such Crossover Claim against the Canadian Estate.  For the avoidance of doubt, in no event shall a holder of a Crossover Claim be entitled to receive aggregated distributions in respect of its allowed Crossover Claim of more than 100% of the greater of (i) its pre-filing allowed claim (U.S.), and (ii) Proven Claim (Canada) when taking into account distributions received from both the issuer (or primary) Debtor estate or Canadian Debtor estate and guarantor (or secondary) Debtor estate or Canadian Debtor estate (such greater amount, the "Creditor's Maximum").  Any amounts paid pursuant to Section 7.13 of the Plan shall not be included in calculating the Creditor's Maximum as it pertains to the NNCC Bonds.  The issuer estate and the guarantor shall reasonably cooperate to give effect to this Section and the provisions of Section 4(c) of the SPSA, including sharing information regarding the Crossover Claims and intended and actual distributions thereon.

     **7.10**    **Right to Subrogation.**  Notwithstanding Section 7.9 above, if a creditor holds a Crossover Claim and has received an aggregate amount of distributions on account of such Crossover Claim equal to the Creditor's Maximum, then the guarantor (or secondary) Debtor or Canadian Debtor estate, as applicable, shall be immediately subrogated into the Crossover Claim against the issuer (or primary) Debtor estate (for the NNCC Bonds, the issuer Debtor estate is NNCC before the Plans Effective Date, but will be deemed to be NNI on and after the Plans Effective Date) and will be entitled to receive any and all subsequent distributions from the issuer (or primary) Debtor estate or Canadian Debtor estate on account of such Crossover Claims on a *pari passu* basis with all other holders of Allowed Claims or Proven Claims (Canada) with the same priority from the issuer (or primary) Debtor estate or Canadian Debtor estate without setoff or discrimination of any kind, *provided* that (i) the guarantor (or secondary) Debtor estate or Canadian Debtor estate (as applicable) shall not receive any distributions on such claim in excess of payments the guarantor (or secondary) Debtor estate or Canadian Debtor estate (as applicable) estate has made to the underlying holder of such Crossover Claim and (ii) in the case of the Crossover Bonds Claims, NNI shall receive distributions from the Canadian Estate as a result of such subrogation for distributions NNI has made on the Allowed Crossover Bonds Claims only to the extent that NNI makes distributions in respect of the Allowed Crossover Bonds Claims in excess of U.S.$1.25 billion and such subrogation shall be only in respect of amounts distributed in excess of U.S.$1.25 billion, it being understood that NNI's right of subrogation pursuant to this Section 7.10 of the Plan and Section 4(c)(i)(C) of the SPSA, if any, against the Canadian Estate in respect of the Crossover Bonds Claims remains subject to distributions equal to the Creditor's Maximum first being

received by holders of the Crossover Bonds Claims on account of such claims.  For the avoidance of doubt, notwithstanding Section 10.12, the subrogation rights of the Canadian Debtors pursuant to this Section 7.10 shall not be subject to setoff.

      **7.11    No Double-Recovery.**  In no circumstance shall a Creditor receive aggregate distributions from a Debtor or Wind-Down Debtor and any other Nortel entity on account of an Allowed Claim in excess of 100% of the amount of such Allowed Claim. In order to be eligible for any distribution under this Plan, a Creditor who holds an Allowed Claim against a Debtor or Wind-Down Debtor (other than a Crossover Bonds Claim or NNCC Bonds Claim) and a related claim against any other Nortel entity, including a Crossover Claim (an "Other Nortel Claim"), shall, upon the written request of the Debtor or Wind-Down Debtor (which may be made from time to time), provide such information to the Debtor or Wind-Down Debtor as it may reasonably request in respect of the Other Nortel Claim, including the amount in which the Other Nortel Claim has been allowed, the amount of distributions received or expected to be received on account of such Other Nortel Claim and any and all supporting documentation relating to the foregoing. Subject to further Order of the Bankruptcy Court, the Debtor or Wind-Down Debtor is authorized to delay and/or withhold distributions to Creditors holding Other Nortel Claims pending receipt of documentation acceptable to the Debtor or Wind-Down Debtor, acting reasonably, to allow it to confirm that a Creditor has not and will not receive amounts on account of its Allowed Claim in excess of 100% of the amount of such Allowed Claim.

      **7.12    Post-Petition Date Interest.**  No post-Petition Date interest (or make whole premium, no-call payment or similar claim accruing post-Petition Date) shall be included in any Allowed Claim, nor be paid on Allowed Claims by any Debtor.

      **7.13    Additional NNCC Bondholder Payments.**  On the Effective Date, or as soon thereafter as practicable, NNI (or the Disbursing Agent on its behalf) shall pay the reasonable and documented fees of (a) the NNCC Bonds Indenture Trustee, in an amount not to exceed $4.25 million and (b) counsel to Solus Alternative Asset Management LP and PointState Capital LP in an amount not to exceed $750,000. For the avoidance of doubt, nothing contained herein shall alter or limit the right of the NNCC Bonds Indenture Trustee to assert its charging Lien against Distributions on account of Allowed NNCC Bonds Claims for payment of its reasonable fees and expenses in excess of $4.25 million, including all reasonable fees and expenses of its counsel and other professionals, as provided in the NNCC Bonds Indenture and in Section 10.6 and 10.15 of the Plan. If any amount remains in the cash reserve established pursuant to Section 4(g)(vi) of the SPSA after the making of payments required thereunder, NNI shall pay or reimburse out of such funds reasonable and documented fees (up to an additional $2.0 million) incurred by professionals in connection with the assertion of rights related to the NNCC Bonds.  Any amount payable by NNI under this Section shall include an amount equal to, and be in addition to, any fees paid by the Canadian Debtors under the Crossover Bondholder Fee Letter allocated to the NNCC Bondholders that are deducted from distributions made by the Canadian Estate to the NNCC Bondholders as described in Section 4(k) of the SPSA.

      **7.14    Resolution of Certain Claims.**  (a) The allowed PBGC claim asserted against each of the Debtors (and against any U.S. non-debtor Nortel Group entity) shall be a maximum of $708,000,000 and all rights of the Debtors and other U.S. based parties-in-interest

in the Chapter 11 Cases to contest such PBGC claims are expressly reserved and the allocation percentages provided for in Section 2(c) of the SPSA shall not change if the PBGC claims are admitted or Allowed for a different amount;  (b) the Crossover Bonds Claims shall be Allowed as one or more general unsecured claims in the aggregate amount of $3,934,521,442, as specified in Schedule A to the Agreement Settling The NNI Post-Petition Interest Dispute And Related Matters, dated July 24, 2014, (such claims the "Allowed Crossover Bonds Claims"); (c) the NNCC Bonds Claims against NNI (into which NNCC shall be substantively consolidated on the Plans Effective Date) shall be Allowed as a general unsecured claim in the amount of $150,951,562, *provided*, *however*, that in the event that distributions (including deemed distributions related to the Crossover Bondholder Fee Letter) in respect of the NNCC Bonds Claims is less than $150,951,562 (exclusive of any amount paid pursuant to Section 4(m) of the SPSA) upon the completion of distributions in respect of the NNCC Bonds Claims on the allowed claim against NNI (which claim against NNI results from the consolidation of NNCC with and into NNI) and the Proven Claim against the Canadian Estate, NNI shall reserve $7.5 million from cash otherwise available for distributions to NNI unsecured creditors, to be made available to be paid in respect of the NNCC Bonds Claims, but *further provided* that NNI shall use such reserves to make distributions in respect of the NNCC Bond Claims only in the amount of the lesser of (A) $150,951,562 less total distributions from NNI and the Canadian Estate (exclusive of any amount paid pursuant to Section 4(m) of the SPSA), and (B) $7.5 million; and (d) there shall be no holdback of Sale Proceeds with respect to any liability that may be due or become due to SNMP, as set forth in Section 4(f) of the SPSA.  No Global Debtor has or shall have any claim (whether by way of contribution, indemnity or otherwise) against any other Global Debtor in respect of any liability due or which may become due to SNMP and no Global Debtor or any other SPSA Party will assist SNMP in bringing any claim against any other Global Debtor.

      **7.15    Book Intercompany Claims.**  Allowed Book Intercompany Claims shall be included in the determination of the Allowed General Unsecured Claims against each of the Debtors.  Annex L to the SPSA shall be treated as the definitive position for all Allowed Book Intercompany Claims between the Nortel Group entities specified thereon.  Any and all other pre-filing books and records claims between (A) any of the Canadian Debtors, on the one hand, and (B) any of the Debtors and their other subsidiaries as specified on Annex L to the SPSA, on the other hand, which are not preserved specifically in the SPSA (including, without limitation the claims referenced in Sections 4(b)(i) and 4(g) of the SPSA), are forever released and barred as of the Effective Date.  Other than the Allowed Book Intercompany Claims, all pre-filing books and records claims, including any claims that a Debtor now holds as a consequence of an assignment (excluding claims against an EMEA Debtor assigned to NNUK in connection with the EMEA Canada Settlement Agreement), between (G) any of the EMEA Debtors, NNSA or the EMEA Non-Filed Entities, on the one hand, and (H) any of the Debtors, on the other hand, are forever released and barred as of the Effective Date.  The SPSA Parties agreed and acknowledged that, as of October 12, 2016, there are no post-filing books and records claims owing between (Y) any of the Canadian Debtors, on the one hand, and any of the Debtors, the EMEA Debtors, NNSA and the EMEA Non-Filed Entities, on the other hand, and (Z) any of the Debtors, on the one hand, and any of the EMEA Debtors, NNSA and the EMEA Non-Filed Entities, on the other hand.

**7.16    Remaining Assets and Other Proceeds.** Each of the Debtors has the right to retain the value of its respective remaining assets, if any, and shall not be subject to any claims thereto by any other Global Debtor except those acknowledged in the SPSA. Other than the claims acknowledged in the SPSA to receive distributions from the proceeds of such assets, the Debtors release any claims they have asserted or may assert or have as against (i) the proceeds held by the Canadian Debtors as "Restricted Cash" or "Unavailable Cash" (as noted in Monitor's Reports to the CCAA Court), including in respect of the realization of the interests in LG-N, the Strandherd Lands, Relay and IP Addresses and (ii) the remaining IP Addresses, including any proceeds arising therefrom. For the avoidance of doubt, nothing in this Section 7.16 shall (i) prohibit the assertion of claims to enforce the SPSA and claims that are reserved in the SPSA (including without limitation, the claims referenced in Section 4(b)(i) thereof) or (ii) affect the Debtors' rights to receive distributions as creditors of the various Global Debtors' estates.

**7.17    Resolution of Side Letters and Cascade Trust.** In full and final resolution of (i) all entitlements and obligations arising under side letters to which any of the Debtors and Canadian Debtors are party, and (ii) the T&T Claim, NNI shall receive payment from the Canadian Estate pursuant to Section 4(e) of the SPSA in the amount of $77.5 million. After receipt of such payment by NNI, NNI shall have a 27% interest in the remaining assets of the Cascade Trust.

**7.18    Debtor Disputes.** Notwithstanding the separate administration of the estates of the Canadian Debtors, the EMEA Debtors, NNSA, the U.S. Debtors and of the EMEA Non-Filed Entities, the Debtors shall work cooperatively and use reasonable efforts to implement the SPSA and the Plan in a tax efficient manner. The Debtors shall, upon the written request of a Global Debtor to a Debtor and to the extent permitted by applicable local law and not inconsistent with the statutory duties of the Debtor to which a request is made, reasonably cooperate with each other, including providing such documents, other information, access to current personnel and/or permission to communicate with former personnel as may reasonably be requested by the requesting Global Debtor, in connection with the preparation and filing of tax returns and responding to or contesting any challenges, inquiries, audits or other disputes by tax authorities in relation thereto; *provided*, *however*, that no Debtor shall be obligated to cooperate to the extent such requested cooperation would prejudice the interests of such Debtor and all such cooperation conforms to the requirements in Section 4(a)(v) of the SPSA.

**7.19    Currency Conversion.** The Debtors have agreed to cooperate and coordinate efforts to convert portions of the Sale Proceeds from U.S. Dollars to Other Currency, as provided in the Currency Conversion Order entered by the Bankruptcy Court on October 21, 2016 [D.I. 17296].

**7.20    SPSA Releases.** The Debtors have entered into certain releases pursuant to the terms of the SPSA, the terms of which are set forth in additional detail in Section 13.4 herein.

**7.21    Escrow Release Order.** The Debtors shall seek entry of the U.S. Escrow Release Order such that the Order is entered with, as part of or promptly following entry of, the

Confirmation Order.  The U.S. Escrow Release Order will be conditioned on the occurrence of the Effective Date and the effectiveness of the Canadian Plan.

    **7.22  Release of Sale Proceeds From the Escrow Accounts.**  Conditional on entry of the Confirmation Order, the U.S. Escrow Release Order and the occurrence of the Effective Date and satisfaction or waiver of the additional conditions to the SPSA as set forth in Section 9(a) therein, the Debtors shall submit a copy of the U.S. Escrow Release Order to the Escrow Agents simultaneously with submission of the Canadian Escrow Release Order together with any other documents contemplated by Section 3(f) of the SPSA, in order to cause the Escrow Agents to release the Sale Proceeds in accordance with the SPSA and the Plan.

    **7.23  Litigation Resolution.**  Promptly following the Effective Date, the Debtors shall comply with their obligations under Section 5(b) of the SPSA to dismiss with prejudice and with no order as to costs all appeals, leave to appeal applications and other litigations among any of the SPSA Parties (including, with respect to the Debtors, the pending appeals and cross-appeals in respect of the Allocation Dispute, the pending appeal of the PPI Settlement by the Canadian Debtors and the pending appeal of the SNMP impleader action and related denial of a chapter 15 stay to which the Debtors and the EMEA Debtors and SNMP are parties), save and except for the Non-Released Matters and *provided* that rights are reserved to enforce the SPSA and the Plan.  Such dismissals will be effected by the filing of the appropriate documents with the appropriate courts in each jurisdiction, the form of which documents must be reasonably acceptable to the SPSA Parties to such litigation, and to the extent that any motions or applications are required to obtain or effectuate such dismissals, the SPSA Parties shall make such motions or applications on a joint basis and each SPSA Party shall bear its own costs in seeking such relief.

## ARTICLE 8.
## <u>CORPORATE FORM AND ACTION</u>

    **8.1  NNI Corporate Form and Vesting.**

      (a)  On the Effective Date, Wind-Down NNI shall maintain its current corporate form, with all powers of a corporation under the laws of its state of incorporation and without prejudice to any right to alter or terminate such existence (whether by merger or otherwise) under such applicable state law, for the purpose of effectuating all aspects of the Plan pertaining to Wind-Down NNI.  From and after the Effective Date, until dissolved in accordance with this Plan or by the Plan Administrator, Wind-Down NNI shall exist in order to effectuate all aspects of the Plan and wind down.

      (b)  On the Effective Date, Wind-Down NNI shall be vested with the Assets of NNI and NNCC as provided in Section 13.10 of the Plan.

    **8.2  Corporate Form and Vesting of Other Wind-Down Debtors.**

      (a)  On the Effective Date, each Wind-Down Debtor shall maintain its current corporate form, with all powers of a corporation under the laws of its state of incorporation and without prejudice to any right to alter or terminate such existence (whether by merger or otherwise) under such applicable state law, for the purpose of effectuating all aspects

of the Plan pertaining to such Wind-Down Debtors.  From and after the Effective Date, until dissolved in accordance with this Plan or by the Plan Administrator, the Wind-Down Debtors shall exist in order to effectuate all aspects of the Plan and wind down.  For Debtors incorporated under laws of a state other than Delaware, the Debtors reserve the right to reincorporate such entities under the laws of the State of Delaware.

(b)    On the Effective Date, each Wind-Down Debtor shall be vested with the respective Debtor's Assets as provided in Section 13.10 of the Plan.

**8.3    Dissolution of the Wind-Down Debtors.**  The Debtors shall retain the right to dissolve any Wind-Down Debtor, after the occurance of such Wind-Down Debtors' Final Distribution Date, on or shortly following the Effective Date without the necessity for (i) any further approval by the board of directors or stockholders of any such Wind-Down Debtor of the dissolution or any plan of distribution, to the extent as such otherwise may be required by applicable law or (ii) any other or further actions to be taken by or on behalf of such Wind-Down Debtors or payments to be made in connection therewith, subject to the filing of a certificate of dissolution with the appropriate governmental authorities. Should the Debtors choose to dissolve any Wind-Down Debtors pursuant to this Section 8.3, the Debtors shall include a list of the Wind-Down Debtors to be dissolved in the Plan Supplement.

**8.4    Post-Effective Date Management.**

(a)    On the Effective Date, the board of directors of Wind-Down NNI shall consist of one natural person selected by the Plan Administrator, which person may be the Plan Administrator or an employee thereof, to serve as the board of directors of Wind-Down NNI through the closing of Wind-Down NNI's Chapter 11 Case in accordance with Section 6.8 of the Plan.  The current officers of NNI shall continue to serve as the officers of Wind-Down NNI in accordance with applicable non-bankruptcy law, any employment agreement with NNI entered into after the Petition Date, and NNI's by-laws, as the same may be amended from time to time, through the closing of Wind-Down NNI's Chapter 11 Case, unless an officer resigns or is removed by the board of directors of Wind-Down NNI.

(b)    On the Effective Date, the director of each Wind-Down Subsidiary shall consist of one natural person selected by the Plan Administrator, which person may be the Plan Administrator, to serve as the director of such Wind-Down Subsidiary through the closing of such Wind-Down Subsidiary's Chapter 11 Case in accordance with Section 6.8 of the Plan.  The director shall act at the direction of the Plan Administrator and in accordance with the Plan.

(c)    The current officers of each Wind-Down Subsidiary shall continue to serve in such capacity for the respective Wind-Down  Subsidiary in accordance with applicable non-bankruptcy law, any employment agreement with such applicable Debtor or Wind-Down  Subsidiary entered into after the Petition Date, and such Wind-Down Subsidiary's certificate of formation and operating agreement, as the same may be amended from time to time, through the closing of such Wind-Down Subsidiary's Chapter 11 Case, unless a current officer resigns or is removed by the director of such Wind-Down Subsidiary.

**8.5     Corporate Existence.**  After the Effective Date, the Plan Administrator may in accordance with the Plan Administration Agreement (a) maintain any Wind-Down Debtor as a corporation in good standing until such time as all aspects of the Plan pertaining to such Wind-Down Debtor have been completed, (b) subject to Section 8.3, dissolve any Wind-Down Debtor or complete the winding up of such Wind-Down Debtor without the necessity for (i) any further approval by the board of directors or stockholders of any such Wind-Down Debtor of the dissolution or any plan of distribution, to the extent as such otherwise may be required by applicable law or (ii) any further approvals or actions to be taken by or on behalf of such Wind-Down Debtor, its shareholder or for any payments to be made in connection therewith, subject to the filing of a certificate of dissolution with the appropriate governmental authorities (including, without limitation, transferring all or part of the Residual Assets of such Wind-Down Debtor to a liquidating trust) at such time as the Plan Administrator considers appropriate and consistent with the implementation of the Plan pertaining to such Wind-Down Debtor, or (c) dissolve any Controlled Non-Debtor Affiliate or complete the winding up of such Controlled Non-Debtor Affiliate in accordance with applicable law; *provided*, *however*, that the foregoing does not limit the Plan Administrator's ability to otherwise abandon an interest in a Controlled Non-Debtor Affiliate.

**8.6     Certificate of Incorporation or Certificate of Formation.**  As of the Effective Date, the certificate of incorporation, certificate of formation, by-laws and operating agreement, as applicable, of each Wind-Down Debtor shall be amended to satisfy the provisions of the Plan and the Bankruptcy Code and shall (a) include, among other things, pursuant to section 1123(a)(6) of the Bankruptcy Code, a provision prohibiting the issuance of non-voting equity securities, but only to the extent required by section 1123(a)(6) of the Bankruptcy Code, and (b) to the extent necessary or appropriate, include such provisions as may be needed to effectuate and consummate the Plan and the transactions contemplated herein, in each case, without further action under applicable law, regulation, order or rule, including, without limitation, any action by the stockholders, managers or members of the Wind-Down Debtors. The amended certificate and by-laws, as applicable, of such Wind-Down Debtor shall be included in the Plan Supplement.

**8.7     Wind-Down.**  The Plan Administrator shall effectuate the monetization, wind-down and liquidation of each Wind-Down Debtors' Residual Assets (it being understood that such may include the transfer of all or part of the Residual Assets of such Wind-Down Debtor to one or more liquidating trusts within the meaning of Treas. Reg. §301.7701-4).

**8.8     Quarterly Administrative Wind-Down Reimbursement Payments.** Effective on the Effective Date, the Consolidated Debtors shall bear the costs of administering and winding down each of the Debtor's estates and shall be reimbursed quarterly for such costs from each such Debtor in an amount not to exceed the maximum Quarterly Administrative Wind-Down Reimbursement Payment amount listed for such Debtor on <u>Exhibit E</u> hereto, and in the case of NNCALA and Nortel Altsystems, to be paid quarterly in the amount listed on such exhibit.  The payment of such Quarterly Administrative Wind-Down Reimbursement Payment shall continue until each such Debtor has been fully and finally liquidated and all costs and expenses related to such administration and wind-down have been incurred.

     **8.9**    **Other Corporate Action.**  Without limiting the foregoing, in accordance with the requirements of the Plan and the terms of the Plan Administration Agreement, from and after the Effective Date, the Wind-Down Debtors and the Plan Administrator may take any and all actions they deem appropriate in order to consummate the transactions contemplated herein, including, without limitation, to sell or otherwise dispose of any respective Residual Assets and wind up their respective affairs and, notwithstanding any provision contained in the Wind-Down Debtors' articles of incorporation, articles of formation or by-laws to the contrary, such Wind-Down Debtors shall not require the affirmative vote of holders of interests in order to take any corporate action, including to (i) compromise and settle Claims and Causes of Action of or against the Wind-Down Debtors and their Estates and (ii) dissolve, merge or consolidate with any other Entity.

## ARTICLE 9.
## TREATMENT OF EXECUTORY CONTRACTS

     **9.1**    **Previous Assumption, Assignment and Rejection.**  Throughout the Chapter 11 Cases, the Bankruptcy Court has established deadlines and procedures for the assumption and rejection of certain executory contracts and unexpired leases by the Debtors, and allocated responsibility for payment of Cure Amounts with respect to such contracts and leases. Any executory contracts and unexpired leases of the Debtors not assumed and assigned or rejected prior to the Confirmation Date or with respect to which the Debtors have not otherwise Filed a Notice of Assumption and Assignment or obtained an order assuming or rejecting the contract or lease prior to the Confirmation Date (the "Remaining Contracts"), if any, shall be rejected pursuant to Section 9.5 of this Plan unless assumed or assumed and assigned pursuant to Section 9.2 of this Plan.  Notwithstanding anything in this Article 9 to the contrary, to the extent the Debtors have Filed a Notice of Assumption and Assignment or motion for the assumption or assumption and assignment of an executory contract or unexpired lease prior to the Confirmation Date, but the Bankruptcy Court has not yet entered an order approving such assumption or assumption and assignment and fixing the Cure Amount therefor or the assumption or assumption and assignment has otherwise not yet become effective, the assumption or assumption and assignment of the contract or lease and any Cure Amount that may be owing in connection therewith shall be governed by the terms of the applicable order or procedure.

     **9.2**    **Assumption and Assignment of Remaining Contracts.**  As of the Effective Date, the Debtors shall assume or assume and assign, as applicable, pursuant to sections 365 and 1123(b)(2) of the Bankruptcy Code, each of the Remaining Contracts of the Debtors that are identified in Exhibit C hereto that have not expired under their own terms prior to the Effective Date.  Each Remaining Contract identified in Exhibit C hereto shall include modifications, amendments, supplements, restatements or other agreements, including guarantees thereof, made directly or indirectly by any Debtor in any agreement, instrument or other document that in any manner affects such Remaining Contract, without regard to whether such agreement, instrument or other document is identified in Exhibit C.  The Debtors reserve the right to amend such Exhibit not later than ten (10) days prior to the Confirmation Hearing either to: (a) delete any executory contract or unexpired lease listed therein and provide for its rejection pursuant to Section 9.5 hereof; or (b) add any executory contract or unexpired lease to such Exhibit, thus providing for its assumption or assumption and assignment, as applicable, pursuant to this Section 9.2.  The Debtors shall provide notice of any such amendment of such

Exhibit to the parties to the executory contract or lease affected thereby and counsel for the Creditors' Committee not later than ten (10) days prior to the Confirmation Hearing. The Confirmation Order shall constitute an order of the Bankruptcy Court pursuant to section 365 of the Bankruptcy Code approving all such assumptions or assumptions and assignments, as applicable, described in this Section 9.2, as of the Effective Date. If any provision of an executory contract to be assumed by any of the Debtors under the Plan limits such Debtor's ability to assign such executory contract, the effectiveness of such provision shall be limited or nullified to the fullest extent provided under section 365(f) of the Bankruptcy Code.

**9.3    Cure Payments; Assurance of Performance.**    Any monetary defaults under each Remaining Contract to be assumed under the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, in either of the following ways: (a) by payment of the monetary default amount in Cash, in full, on the Effective Date or as soon as practicable thereafter; or (b) by payment of the monetary default amount on such other terms as may be agreed to by the Debtors and the non-Debtor parties to such Remaining Contract. In the event of a dispute regarding (i) the amount or timing of any cure payments, (ii) the ability of the Debtor or Debtors assuming such Remaining Contract, or an assignee thereof, to provide adequate assurance of future performance under the Remaining Contract to be assumed or assumed and assigned, as applicable or (iii) any other matter pertaining to assumption or assumption and assignment of the Remaining Contract to be assumed, the Debtor or Debtors assuming such Remaining Contract shall pay all required Cure Amounts promptly following the entry of a Final Order resolving the dispute; *provided* that the Debtors reserve the right to withdraw their request for assumption of any Remaining Contract at any time prior to the entry of such an order. The Debtors may reject or nullify the assumption of any executory contract no later than five (5) Business Days after the entry of a Final Order of the Bankruptcy Court determining the Cure Amount or any request for adequate assurance of future performance required to assume such executory contract.

**9.4    Objections to Assumption of Remaining Contracts.**

(a)    To the extent that any party to a Remaining Contract identified for assumption asserts a claim for arrearages or damages pursuant to section 365(b)(1) of the Bankruptcy Code, or has any other objection with respect to any proposed assumption, cure or assignment on the terms and conditions provided herein (including, without limitation, in Exhibit C hereto), all such Claims for arrearages and damages and objections must be Filed and served: (a) as to any Remaining Contract identified in Exhibit C hereto that is mailed to any party to any such Remaining Contract, along with all other solicitation materials accompanying the Plan, within the same deadline and in the same manner established for the filing and service of objections to Confirmation of the Plan; and (b) as to any Remaining Contract identified in any subsequent amendments to Exhibit C hereto that is mailed to any party to any such Remaining Contract not later than ten (10) days prior to the Confirmation Hearing, in such a manner as to be Filed and received by the Bankruptcy Court and the Debtors and counsel thereto, no later than the earlier of (i) twenty (20) days after such subsequent amendment is served and (ii) three (3) days prior to the Confirmation Hearing.

(b)    Failure to assert such claims for arrearages and damages and any objections in the manner described above shall constitute consent to the proposed assumption,

revestment, cure or assignment on the terms and conditions provided herein, including an acknowledgement that the proposed assumption and/or assignment provides adequate assurance of future performance and that the amount identified for "cure" in Exhibit C hereto is the amount necessary to cover any and all outstanding defaults under the Remaining Contract to be assumed, as well as an acknowledgement and agreement that no other defaults exist under such Remaining Contract.

(c)      If any assumption or assumption and assignment of a Remaining Contract proposed herein for any reason is not approved by the Bankruptcy Court, then the Debtors shall be entitled, in their sole discretion, upon written notice to the applicable non-Debtor party to such Remaining Contract, to deem such Remaining Contract to have been rejected pursuant to the provisions of Section 9.5 below.

**9.5      Rejection.**  Except for those executory contracts and unexpired leases that (a) are assumed pursuant to this Plan, (b) have been assumed, assumed and assigned or rejected pursuant to previous orders of the Bankruptcy Court or (c) are the subject of a pending motion or notice before the Bankruptcy Court with respect to the assumption or assumption and assignment of such executory contracts and unexpired leases, as of the Effective Date, all executory contracts and unexpired leases of the Debtors shall be rejected pursuant to section 365 and 1123(b)(2) of the Bankruptcy Code; *provided*, *however*, that neither the inclusion by the Debtors of a contract or lease in Exhibit C nor anything contained in this Article 9 shall constitute an admission by any Debtor that such contract or lease is an executory contract or unexpired lease or that any Debtor or its successors and assigns has any liability thereunder.

**9.6      Approval of Rejection; Rejection Damages Claims Bar Date.**  The Confirmation Order shall constitute an order of the Bankruptcy Court approving the rejection of executory contracts and unexpired leases under Section 9.5 above pursuant to section 365 and 1123(b)(2) of the Bankruptcy Code as of the Effective Date.  Any Claim for damages arising from any such rejection must be Filed within thirty (30) days after the Effective Date, or such Claim shall receive no Distribution under the Plan or otherwise on account of such Claim.

**9.7      Postpetition Modification of Executory Contracts.**  Unless otherwise agreed by the parties and approved by the Bankruptcy Court, modifications, amendments, supplements and restatements to prepetition executory contracts that have been executed by the Debtors during the Chapter 11 Cases will not be deemed to alter the pre-petition nature of the executory contract, or the validity, priority or amount of any Claims that may arise in connection therewith.

**9.8      Pre-existing Obligations to the Debtors under Executory Contracts.**  Rejection or repudiation of any executory contract pursuant to the Plan or otherwise will not constitute a termination of pre-existing obligations owed to the Debtors under such contracts.  In particular, notwithstanding any nonbankruptcy law to the contrary, the Wind-Down Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased by the contracting Debtors or Wind-Down Debtors, as applicable, from counterparties to any Rejected Contract.

## ARTICLE 10.
## PROVISIONS REGARDING VOTING AND DISTRIBUTIONS UNDER THE PLAN

**10.1    Voting of Claims.**  Each holder of an Allowed Claim in an Impaired Class of Claims that is entitled to vote on the Plan pursuant to Article 3 and Article 4 of the Plan shall be entitled to vote separately to accept or reject the Plan, as provided in the order entered by the Bankruptcy Court establishing procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan, or any other order or orders of the Bankruptcy Court.

**10.2    Nonconsensual Confirmation.**  If any Impaired Class of Claims entitled to vote on the Plan does not accept the Plan by the requisite majority provided in section 1126(c) of the Bankruptcy Code, the Debtors reserve the right to amend the Plan in accordance with Section 15.4 of the Plan or to undertake to have the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code or both.  With respect to Impaired Classes of Claims or Interests that are deemed to reject the Plan, the Debtors shall request that the Bankruptcy Court confirm the Plan pursuant to section 1129(b) of the Bankruptcy Code.

**10.3    Distributions of Creditor Proceeds.**  After the satisfaction in full of Allowed Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims and Allowed Secured Claims (to the extent the Plan Administrator determines in accordance with the Plan Administration Agreement that the relevant Debtor will pay such Allowed Secured Claim in Cash) against a Debtor, the Disbursing Agent shall make a Distribution of its Creditor Proceeds in accordance with the provisions of the Plan (i) to each holder of an Allowed Claim as of the Distribution Record Date against such Debtor, within sixty (60) days of the Effective Date, or as soon thereafter as practicable, and (ii) to each holder of an Allowed Claim that is allowed after the Effective Date against such Debtor, in accordance with the Class priorities set forth in Article 4 herein and the provisions of Article 10 herein.  After the initial Distribution with respect to any Allowed Claim, the Disbursing Agent shall make Distributions of Creditor Proceeds in accordance with the Plan to holders of Allowed Claims against such Debtor quarterly on March 31st, June 30th, September 30th and December 31st of each year (each such Distribution, an "Interim Distribution") and on the Final Distribution Date. Notwithstanding the foregoing, the Plan Administrator may determine in accordance with the terms of the Plan Administration Agreement to direct the Disbursing Agent (a) to make Distributions more frequently than quarterly on dates other than the Interim Distribution dates or (b) not to make an Interim Distribution if it determines that the costs of making such Interim Distribution would be disproportionate to the Distribution amount.  No Distributions shall be made on account of a claim that is not yet an Allowed Claim until the Plan Administrator (i) determines not to object to such Claim (or the time to object to Claims expires), (ii) agrees with the holder of such Claim to allow such Claim in an agreed upon amount or (iii) objects to such Claim and such Claim is Allowed by a Final Order, during which time such Claim shall be treated as a Disputed Claim.

**10.4    Creditor Proceeds Distribution Conditions.**  The distribution of Creditor Proceeds is subject to the satisfaction or express written waiver by the Debtors of the following conditions (the "Creditor Proceeds Distribution Conditions"):

(a)      the Plans Effective Date shall have occurred and the SPSA shall have become effective and fully enforceable in accordance with its terms;

(b)      the dismissal with prejudice of all litigation referenced in Section 5(b) of the SPSA, including the pending leave to appeals, appeals and cross-appeals in respect of the Allocation Dispute pending before the Canadian Court and Bankruptcy Court, shall have occurred; and

(c)      the Debtors shall have received the U.S. Allocation, as set forth in Section 7.6 hereof.

**10.5     Minimum Distribution and Manner of Payment.**  No payment of Creditor Proceeds of less than $100 shall be made by any Debtor to any holder of an Allowed Claim against such Debtor.  Such amounts shall be deemed redistributed to other holders of Allowed Claims against such Debtor and, accordingly, shall be distributed in accordance with the provisions of the Plan and the Bankruptcy Code.  Any payment of Cash made pursuant to the Plan may be made at the option of the Disbursing Agent either by check or by wire transfer.

**10.6     Distributions to Indenture Trustees.**

(a)      Subject to Section 7.9 and Section 7.10, the Debtors or the Disbursing Agent, as applicable, shall deliver the initial Distribution and any subsequent Distributions on account of the Allowed NNCC Bonds Claims to the NNCC Bonds Indenture Trustee on the Initial Distribution Date and each subsequent Distribution Date thereafter.  The NNCC Bonds Indenture Trustee shall administer such Distributions as soon as is reasonably practicable in accordance with the NNCC Bonds Indenture and this Plan (and such Distributions shall remain subject to the NNCC Bonds Indenture Trustee's charging Lien for payment of its reasonable fees and expenses, including all reasonable fees and expenses of its counsel and other professionals and including the fees and expenses incurred by the NNCC Bonds Indenture Trustee in making all Distributions to holders of Allowed NNCC Bonds Claims). Any Distribution made to the NNCC Bonds Indenture Trustee in accordance with this Section 10.6(a) shall be deemed a distribution to the holders of the NNCC Bonds Claims.

(b)      Subject to Section 7.9 and Section 7.10, the Debtors or the Disbursing Agent, as applicable, shall deliver the initial Distributions and any subsequent Distributions on account of Crossover Bonds Claims to the NNC/NNL Notes Indenture Trustee on the Initial Distribution Date and each subsequent Distribution Date thereafter.  The NNC/NNL Notes Indenture Trustee shall administer such Distributions as soon as is reasonably practicable in accordance with this Plan, including Section 10.14 hereof  (and such Distributions shall remain subject to the NNC/NNL Notes Indenture Trustee's charging Lien against Distributions to holders of Crossover Bonds Claims for payment of its reasonable fees and expenses, including all reasonable fees and expenses of its counsel and other professionals and including the fees and expenses incurred by the NNC/NNL Notes Indenture Trustee in making all Distributions to holders of Crossover Bonds Claims). Any Distribution made to the NNC/NNL Notes Indenture Trustee in accordance with this Section 10.6(b) shall be deemed a distribution to the holders of the Crossover Bonds Claims.

**10.7    Limitation on Recovery.**  Notwithstanding anything contained herein to the contrary, subject to Section 7.10 and 7.11 hereof, in the event that the sum of the Distributions of Creditor Proceeds and other Distributions with respect to an Allowed Claim hereunder or in connection with a Foreign Proceeding are in excess of one hundred percent (100%) of such holder's Allowed Claim, then the Creditor Proceeds remaining to be distributed to such holder in excess of such one hundred percent (100%) shall be deemed available for distribution to other holders of Allowed Claims against such Debtor and, accordingly, shall be distributed in accordance with the provisions of the Plan and the Bankruptcy Code.

**10.8    Distributions Free and Clear.**  Except as otherwise provided herein, any Distributions under the Plan shall be free and clear of any Liens (other than the charging Lien of an indenture trustee), Claims and encumbrances, and no other Entity, including the Debtors, the Wind-Down Debtors and the Plan Administrator shall have any interest, legal, beneficial or otherwise, in the Creditor Proceeds, Assets or Residual Assets once transferred to holders of Allowed Claims pursuant to the Plan.

**10.9    Delivery of Distributions and Undeliverable Distributions.**

Distributions to holders of Allowed Claims of each Debtor shall be made at the address of each such holder as set forth on the Schedules Filed, unless superseded by a new address as set forth (a) on a proof of claim Filed by a holder of an Allowed Claim or (b) in another writing notifying the Claims Agent (at the address listed in Section I of the Disclosure Statement) of a change of address.  If any holder's Distribution is returned as undeliverable, no further Distributions shall be made or notices delivered to such holder on account of such Claim until the Claims Agent is notified in writing by such holder of such holder's current address, at which time all such distributions shall be made to such holder.  Any holder of an Allowed Claim (or any successor or assignee or other Person or Entity claiming by, through, or on behalf of, such holder) that does not assert a claim pursuant to this Plan for such undeliverable or unclaimed distribution within six (6) months after the later of the Effective Date or the date such distribution was made shall be deemed to have forfeited its Allowed Claim and shall be forever barred and enjoined from asserting any such Claim for an undeliverable or unclaimed distribution against the Debtors or their Estates, the Wind-Down Debtors or their property.  In such cases, any Cash held for Distribution on account of such Claim shall become the property of the relevant Estate and distributed to other holders of Allowed Claims against such Debtor in accordance with the terms of the Plan and the Bankruptcy Code.

**10.10    Withholding and Reporting Requirements.**  In connection with the Plan and all instruments issued in connection therewith and distributed thereon, the Debtors, the Plan Administrator and the Disbursing Agent shall comply with all applicable withholding and reporting requirements imposed by any federal, state or local taxing authority, and all Distributions under the Plan shall be subject to any such withholding or reporting requirements. Notwithstanding the above, each holder of an Allowed Claim that is to receive a Distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any Tax obligations imposed by any Governmental Unit, including income, withholding and other Tax obligations, on account of such Distribution.  The Disbursing Agent has the right, but not the obligation, to withhold a Distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such Tax obligations.  The

Disbursing Agent may require, as a condition to receipt of a Distribution, that the holder of an Allowed Claim complete and return a Form W-8 or W-9, as applicable to each such holder, to the Disbursing Agent, as applicable to each such holder.  If the Disbursing Agent makes such a request and the holder fails to comply before the date that is 180 days after the request is made, no further Distributions shall be made to such holder on account of such Claim.  In such cases, the amount of such Distribution shall irrevocably revert to the applicable Debtor and such Claim shall be discharged and the holder of such Claim shall be forever barred from asserting such Claim against such Debtor, its Estate or its respective property.  Also, in such cases, any Cash held for Distributions on account of such Claim shall become the property of the relevant Estate and distributed to other holders of Allowed Claims against such Debtor in accordance with the terms of the Plan and the Bankruptcy Code.

**10.11   Time Bar to Cash Payment Rights.**  Checks issued in respect of Allowed Claims shall be null and void if not negotiated within ninety (90) days after the date of issuance thereof.  Requests for reissuance of any check shall be made to the Plan Administrator by the holder of the Allowed Claim to whom such check originally was issued.  Any claim in respect of a voided check shall be made on or before thirty (30) days after the expiration of the ninety (90) day period following the date of issuance of such check.  Thereafter, the amount represented by such voided check shall irrevocably revert to the relevant Debtor's Estate, to be distributed to other holders of Allowed Claims against such Debtor in accordance with the terms of the Plan and the Bankruptcy Code, and any Claim in respect of such voided check shall be discharged and forever barred from assertion against such Debtor, its Estate and its respective property, *provided* that at the discretion of the Plan Administrator, any such amounts may be escheated pursuant to applicable law.  In the case of any check issued in respect of an Allowed Claim that is returned as an undeliverable distribution, such check shall be null and void if not negotiated within ninety (90) days after the date of issuance, and the Allowed Claim for which such distribution was issued shall be discharged and forever barred pursuant to this Section 10.11 only after the time period to claim such undeliverable distribution provided in Section 10.9 has passed.

**10.12   Setoffs and Recoupment.**

(a)     The Debtors may, but shall not be required to, setoff against the payment of any Claim or other Distributions to be made pursuant to the Plan in respect of such Claim of any nature whatsoever that the Debtors may have against the holder of such Claim; *provided*, *however*, that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors of any such claim the Debtors may have against such holder.

(b)     Unless otherwise stipulated in writing by the Debtors, any party against whom a claim or counterclaim is asserted by the Estates (an "Estate Claim") must assert any setoff rights, right of subrogation or recoupment of any kind against such Estate Claim prior to the Confirmation Date, or such right of setoff, subrogation or recoupment will be deemed waived and forever barred; *provided*, *however*, that nothing herein shall limit the assertion of such right of setoff, subrogation or recoupment through an amended or supplemental pleading to the extent permitted by Rule 15 of the Federal Rules of Civil Procedure or Bankruptcy Rule 7015.

**10.13    Distribution Record Date.**  Except with respect to the Crossover Bonds and the NNCC Bonds, as of the close of business on the Distribution Record Date, the register for each Debtor shall be closed and there shall be no further changes to the record holder of any of the Claims or Interests.  The Debtors and the Plan Administrator shall have no obligation to recognize any transfer of any Claims or Interests occurring after the close of business on the Distribution Record Date and shall be entitled instead to recognize and deal for all purposes hereunder only with those record holders stated on the transfer ledgers as of the close of business on the Distribution Record Date, to the extent applicable.

**10.14    Allocation of Distributions.**  Distributions to any holder of an Allowed Claim shall be allocated first to the principal portion of any such Allowed Claim (as determined for federal income tax purposes) and, only after the principal portion of any such Allowed Claim is satisfied in full, to any portion of such Allowed Claim comprising interest (but solely to the extent that interest is an allowable portion of such Allowed Claim).

**10.15    Cancellation of Notes, Instruments and Debentures.**  On the Effective Date, except as otherwise provided in this Plan or the Confirmation Order, (a) the NNCC Bonds, the NNCC Bonds Indenture, the Senior Notes NNI Guarantee Obligations and any other notes, bonds (with the exception of any surety bonds outstanding), indentures, guarantees or other instruments or documents evidencing or creating any indebtedness or obligations of the Debtors that are Impaired under this Plan shall be deemed cancelled and extinguished as to the Debtors and (b) the obligations of the Debtors under any agreements, documents, indentures, guarantees or certificates of designation governing the Senior Notes, the Senior Notes NNI Guarantee Obligations, the Senior Notes Indentures and any other notes, bonds, indentures, guarantees or other instruments or documents evidencing or creating any indebtedness or obligations of the Debtors that are Impaired under this Plan shall be, and are hereby, discharged as to the Debtors, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or any requirement of further action, vote or other approval or authorization by the Security holders, officers or directors of the Debtors or by any other Person.

Notwithstanding the foregoing, the NNCC Bonds Indenture shall continue in effect solely for the purposes of allowing and preserving: (i) the rights of the NNCC Bonds Indenture Trustee to assert its charging Lien against such Distributions for payment of its reasonable fees and expenses (including reasonable fees and expenses of counsel and other professionals and including the fees and expenses incurred by the NNCC Bonds Indenture Trustee in making all Distributions to holders of Allowed NNCC Bonds Claims), (ii) the rights of holders of Allowed Claims in respect of the NNCC Bonds to receive Distributions under the Plan, (iii) the rights of the NNCC Bonds Indenture Trustee to make Distributions in satisfaction of Allowed Claims in respect of the NNCC Bonds (after application of its charging Lien) and (iv) the rights of the NNCC Bonds Trustee and any NNCC Bondholder to pursue the NNCC Bonds Guarantee Obligations in the Canadian Proceedings, but in all cases subject to the terms and conditions of the NNCC Bonds Indenture.

Notwithstanding the foregoing, the NNC Notes Indenture and the NNL Notes Indenture will continue in effect solely for the purposes of allowing, preserving and enforcing: (i) the rights and Liens of the NNC/NNL Notes Indenture Trustee (including the NNC/NNL Notes

Indenture Trustee's right to assert its charging Lien against Distributions to holders of Crossover Bonds Claims for payment of its reasonable fees and expenses, including all reasonable fees and expenses of counsel and other professionals and including the fees and expenses incurred by the NNC/NNL Notes Indenture Trustee in making all Distributions to holders of Crossover Bonds Claims); (ii) the rights of holders of Crossover Bonds Claims to receive Distributions under the Plan; (iii) the rights of the NNC/NNL Notes Indenture Trustee to make Distributions in satisfaction of Crossover Bonds Claims (after application of its charging Lien) and (iv) the rights of holders of claims in respect of the Crossover Bonds against any Canadian Debtors to pursue such claims in the Canadian Proceedings, but in all cases subject to the terms and conditions of the NNC Notes Indenture and the NNL Notes Indenture, as applicable.

## ARTICLE 11.
## PROCEDURES FOR TREATING DISPUTED CLAIMS

**11.1    Objections.**  Unless otherwise ordered by the Bankruptcy Court after notice and a hearing, as of the Effective Date, objections to, and requests for estimation of, all Claims against the Debtors may be interposed and prosecuted only by the Plan Administrator, who shall consult with the applicable Wind-Down Debtor regarding the same.  Objections to and requests for estimation of Claims shall be Filed and served on the claimant on or before the first Business Day that is one hundred and eighty (180) days after the Effective Date (the "Claims Objection Deadline") or such later date as is established by the filing of a notice by the Wind-Down Debtors or Plan Administrator prior to the expiration of the then-current Claims Objection Deadline.

**11.2    No Distributions Pending Allowance.**  Notwithstanding any other provision hereof, if any portion of a Claim is a Disputed Claim, no Distribution shall be made on account of the disputed portion of such Claim unless and until such Disputed portion of such Claim becomes Allowed.

**11.3    Estimation of Claims.**  The Plan Administrator may at any time request that the Bankruptcy Court estimate for any purpose including Distribution any contingent, unliquidated or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code or otherwise, regardless of whether such Debtor previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection.  The Bankruptcy Court will retain exclusive jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any proceedings relating to any such Disputed Claim or any appeal relating to any such objection to a Disputed Claim.  In the event that the Bankruptcy Court estimates any contingent, unliquidated or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court estimating such Claim.  If the estimated amount constitutes a maximum limitation on the amount of such Claim, such Debtor may pursue supplementary proceedings to object to the allowance of such Claim.  All of the aforementioned objection, estimation and resolution procedures are intended to be cumulative and not exclusive of one another.  Claims may be estimated and subsequently disallowed, reduced, compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be

entitled to seek reconsideration of such estimation unless such holder has filed a motion requesting the right to seek such reconsideration on or before twenty-one (21) days after the date on which such Claim is estimated.

      **11.4    Resolution of Disputed Claims.**    On and after the Effective Date, the Plan Administrator shall have the authority to compromise, settle or otherwise resolve or withdraw any objections to Claims and to compromise, enter into protocols for the resolution of, settle or otherwise resolve any Disputed Claims regardless of whether such Claims are in a Class or otherwise (at the applicable Wind-Down Debtor's or Plan Administrator's sole discretion with or without Bankruptcy Court approval), from and after the Effective Date, the Plan Administrator shall have the sole authority to administer and adjust the Claims Register to reflect any such settlements or compromises without further notice to or action, order or hearing of the Bankruptcy Court.  On the date of the first Distribution that is at least sixty (60) days after the date on which the order allowing a Disputed Claim becomes a Final Order, such Debtor shall remit, to the holder of such Allowed Claim, Creditor Proceeds equal to the amount such holder would have received as of that date under the Plan if the Allowed portion of the Disputed Claim had been an Allowed Claim as of the Effective Date.  To the extent that a Disputed Claim against a Debtor is not Allowed or becomes an Allowed Claim in an amount less than the amount of the Disputed Claim set forth in the proof of claim, or as previously estimated by the Bankruptcy Court, the excess of the amount of Creditor Proceeds that would have been distributed to the holder of the Disputed Claim if the Claim had been Allowed in full, over the amount of Creditor Proceeds actually distributed on account of such Disputed Claim, shall become Creditor Proceeds for Distribution to other holders of Allowed Claims in the Class corresponding to the Disputed Claim at issue in accordance with the terms of the Plan and the Bankruptcy Code.

      **11.5    No Interest.**    Holders of Disputed Claims shall not be entitled to interest if such Disputed Claim becomes an Allowed Claim.

      **11.6    Disputed Claims Reserve.**    On or after the Effective Date, the Plan Administrator shall reserve an aggregate amount of Cash sufficient to pay to each holder of a Disputed Claim the amount of any Distributions that such holder would have been entitled to receive under the Plan if such Claim had been an Allowed Claim; *provided*, *however*, that the amount of such Disputed Claims is to be determined, solely for the purposes of establishing reserves and for maximum distribution purposes, to be the lesser of (a) the asserted amount of the Disputed Claim filed with the Bankruptcy Court as set forth in the non-duplicative Proof of Claim or (b) the amount, if any, estimated by the Bankruptcy Court pursuant to section 502(c) of the Bankruptcy Code or ordered by other order of the Bankruptcy Court or (c) the amount otherwise agreed to by the Debtors or the Plan Administrator, as applicable, in consultation with the Holder of such Disputed Claim for distribution purposes. With respect to all Disputed Claims that are unliquidated or contingent and/or for which no dollar amount is asserted on a Proof of Claim, the Wind-Down Debtors or Plan Administrator, as applicable, will reserve Cash equal to the amount reasonably determined by the Debtors, Wind-Down Debtors or Plan Administrator.

      **11.7    No Amendments to Claims.**    A Claim may be amended before the Confirmation Date only as agreed upon by the Debtors and the holder of such Claim or as otherwise permitted by the Bankruptcy Court, the Bankruptcy Rules or applicable law.  On or after the Confirmation Date, the holder of a Claim (other than an Administrative Expense Claim

or a Professional Claim) must obtain prior authorization from the Bankruptcy Court or Wind-Down Debtors to file or amend a Claim. Any new or amended Claim filed after the Confirmation Date without such prior authorization will not appear on the Claims Register and will be deemed disallowed in full and expunged without any action required of the Debtors or the Wind-Down Debtors and without the need for any court order.

**11.8    No Late-Filed Claims**.  In accordance with section 502(b)(9) of the Bankruptcy Code, any entity that failed to file a proof of Claim by the applicable bar date set by the Bankruptcy Court in these Chapter 11 Cases and was not otherwise permitted to file a proof of Claim after the applicable bar date by a Final Order of the Bankruptcy Court is and shall be barred, estopped and enjoined from asserting any Claim against the Debtors (a) in an amount that exceeds the amount, if any, that is identified in the Schedules on behalf of such entity as undisputed, noncontingent and liquidated; or (b) of a different nature or a different classification than any Claim identified in the Schedules on behalf of such Entity.  The Debtors and the Wind-Down Debtors shall be entitled, for the purposes of distributions, reserves and other similar purposes under this Plan, to treat all Claims filed after the later of (a) the Effective Date and (b) the Claim's applicable bar date, as disallowed and expunged unless the Holder of such Claim Files a motion to have the late post-Effective Date Claim deemed timely Filed by the Bankruptcy Court.  The Debtors and the Wind-Down Debtors have no obligation to review or respond to any Claims Filed after the later of (a) the Effective Date and (b) the Claim's applicable bar date, unless: (y) the filer has obtained an order from the Bankruptcy Court authorizing it to file such Claim after the applicable bar date; or (z) the Wind-Down Debtors have consented to the filing of such Claim in writing, provided that if any such Claim is then Allowed, any amounts due will be payable only from any Disputed Claims Reserves and not by the Wind-Down Debtors.

## ARTICLE 12.
## <u>CONDITIONS PRECEDENT</u>

**12.1    Conditions to Confirmation.**  The following are conditions precedent to the Confirmation of the Plan with respect to each Debtor:

(a)    <u>Confirmation Order</u>. The Bankruptcy Court shall have entered the Confirmation Order; and

(b)    <u>CCAA Sanction Order</u>.  The Sanction Order shall have been issued by the CCAA Court by no later than February 17, 2017 and entered and thereafter shall have become a Final Order.

**12.2    Canadian and U.S. Plans Effectiveness.**  This Plan and the Canadian Plan shall become effective at the same time on the Plans Effective Date. On the Plans Effective Date: (i) the Monitor shall deliver a certificate to the Debtors declaring the effectiveness of the Canadian Plan; and (ii) the Debtors shall deliver a certificate to the Canadian Debtors and the Monitor declaring the effectiveness of the Plan ((i) and (ii), together, the "<u>Plan Certificates</u>"). Such Plan Certificates shall be held in escrow and released simultaneously, thereby triggering the effectiveness of the Plan and the Canadian Plan and the occurrence of the Plans Effective Date (as such term is defined in the SPSA).

**12.3    Conditions to the Effective Date.**  The following are conditions precedent to the Effective Date of the Plan with respect to each Debtor:

(a)    All actions and agreements, instruments, certificates or other documents necessary to implement the terms and provisions of the Plan are effected or executed and delivered, as applicable, in form and substance satisfactory to the Debtors.

(b)    All authorizations, consents and regulatory approvals, if any, required in connection with the consummation of the Plan are obtained and not revoked.

(c)    The amended organizational documents of Wind-Down NNI and the Wind-Down Subsidiaries shall have been filed with the applicable authority of each Wind-Down Debtor's respective jurisdiction of incorporation or formation in accordance with such jurisdiction's applicable laws.

(d)    All statutory fees then due to the U.S. Trustee shall have been paid in full by the Debtors pursuant to the Plan.

(e)    The conditions precedent in this Section 12.3 to the effectiveness of each other Debtor's separate Plans have been satisfied.

(f)    The Confirmation Order shall have been entered by the Bankruptcy Court by no later than February 17, 2017 and thereafter shall have become a Final Order.

(g)    The U.S. Escrow Release Order shall have been entered by the Bankruptcy Court and the Canadian Escrow Release Order shall have been entered by the Canadian Court.

(h)    Appropriate notices and other documents dismissing with prejudice the various pending litigations specified in Section 7.23 shall have been executed by the SPSA Parties to such litigation and delivered to one another in escrow.

(i)    The Sanction Order shall have been issued by the CCAA Court by no later than February 17, 2017 and entered and thereafter shall have become a Final Order.

(j)    All conditions precedent to the effectiveness of the Canadian Plan (excluding, for the avoidance of doubt, the occurrence of the Effective Date) shall have been satisfied or waived and the Debtors and Canadian Debtors shall have exchanged and released the Plan Certificates in accordance with Section 12.2 such that the Canadian Plan shall become effective in accordance with its terms simultaneously with the occurrence of the Effective Date.

(k)    Entry of an order or orders by no later than November 4, 2016 by the U.K. Court that the Joint Administrators be at liberty to perform and procure the relevant EMEA Debtor in respect of which they are appointed to perform their respective obligations under the SPSA, including, without limitation, delivering the SPSA Releases, and any other actions necessary to implement the SPSA.

(l)     Entry of an order or orders by no later than November 4, 2016 by the U.K. Court that the NNSA Conflicts Administrator and NNSA (in the French Main Proceeding) be at liberty to perform their obligations under the SPSA, including, without limitation, delivering the SPSA Releases, and any other actions necessary to implement the SPSA.

(m)     Entry of an order or orders by no later than November 4, 2016 by the French Court approving and authorizing the entry into the SPSA by NNSA (in the French Secondary Proceeding), and authorizing NNSA to perform its obligations under the SPSA, including, without limitation, delivering the SPSA Releases, and any other actions necessary to implement the SPSA.

(n)     Entry of an order or orders by no later than November 4, 2016 by the Beddoes Court authorizing the U.K. Pension Trustee to implement the SPSA and perform its obligations under the SPSA, including, without limitation, delivering the SPSA Releases, and any other actions necessary to implement the SPSA.

(o)     All conditions of Section 9(a) of the SPSA, except for the occurrence of the Plans Effective Date, shall have been satisfied or have been waived by the required waiver parties set forth in Section 9(a) of the SPSA, including with respect to the Debtors, such waiver being subject to the prior consent of the Creditors' Committee and  the Bondholder Group, acting reasonably and in good faith.

(p)     The SPSA shall not have been terminated, including based on the non-occurrence of the Plans Effective Date on or prior to August 31, 2017, or such later date as is agreed upon in writing by the Debtors and the SPSA Parties in accordance with any applicable provision of the SPSA.

(q)     An order recognizing the Confirmation Order shall have been granted by the CCAA Court in the proceedings commenced in respect of the U.S. Debtors under section 18.6 of the CCAA.

(r)     A Final Order shall have been entered in NNIII's chapter 11 case approving the SPSA pursuant to Bankruptcy Rule 9019, including allowing NNL's claim against NNIII listed on Annex L to the SPSA as a general unsecured claim entitled to receive distributions under a plan on a *pari passu* basis with other general unsecured claims against NNIII.

**12.4     Waiver of Conditions.**  Notwithstanding the foregoing, each Debtor reserves its right, with respect to such Debtor's Chapter 11 Case only, to waive the occurrence of the conditions precedent to the Effective Date set forth in Section 12.3 of the Plan, other than Section 12.3(o) and Section 12.3(p) of the Plan.  Any such waiver may be given effect at any time, without notice, leave, hearing or order of the Bankruptcy Court, and without any formal action other than proceeding to consummate the Plan, provided that notice of any such waiver shall promptly be provided to the SPSA Parties.  Any actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action.  If any

of the Debtors decide that one of the conditions precedents to the Effective Date of its Plan cannot be satisfied and the occurrence or such condition is not waived or cannot be waived, then such Debtor shall file a notice of the inability to satisfy such condition with the Bankruptcy Court.  The failure of a Debtor to exercise any of the foregoing rights shall not be deemed a waiver of any other rights and each right shall be deemed an ongoing right that may be asserted at any time.

       **12.5**    **Notice of Effective Date.**  Upon the occurrence of the Plans Effective Date or as soon thereafter as is reasonably practicable, the Debtors shall File with the Bankruptcy Court the "Notice of Effective Date" in a form reasonably acceptable to the Debtors in their sole discretion, which notice shall constitute appropriate and adequate notice that the Plan has become effective; *provided*, *however*, that the Debtors shall have no obligation to notify any Person other than counsel to the Creditors' Committee and the Bondholder Group of such fact. The Plan shall be deemed to be effective as of 12:01 a.m., prevailing Eastern Standard Time, on the date of such filing.  A courtesy copy of the Notice of Effective Date may be sent by United States mail, postage prepaid (or at the Debtors' option, by courier, facsimile or electronic mail) to those Persons who have Filed with the Bankruptcy Court requests for notices pursuant to Bankruptcy Rule 2002.

       **12.6**    **Limited Severability of the Plan.**  Subject to the Debtors' obligations under the SPSA, the Plan shall be deemed a separate chapter 11 plan for each individual Debtor (except in the case of the Consolidated Debtors, NNI and NNCC) and the Confirmation and effectiveness of any Debtor's Plan is not conditioned on the Confirmation and effectiveness of any other Debtor's Plan.  In the event that the Plan is not confirmed for any individual Debtor, the Plan shall be treated at the Confirmation Hearing as a motion seeking approval of the SPSA pursuant to Bankruptcy Rule 9019 as to any such individual Debtor that does not confirm a Plan. Following the approval of the SPSA, any individual Debtor may dismiss or convert its chapter 11 case, as necessary to effectuate the SPSA and the settlement contemplated therein or to wind down and cease operations. The Debtors shall coordinate with the SPSA Parties to make any required amendments or seek any required waivers to or under the SPSA in order to implement any such actions, subject to the SPSA Parties' rights under the SPSA.

       **12.7**    **Consequences of Non-Occurrence of Effective Date.**  If, following the entry of the Confirmation Order, the Effective Date does not occur on or before August 31, 2017, or such later date as is agreed upon in writing by the Debtors and the SPSA Parties in accordance with any applicable provision of the SPSA, and the SPSA is terminated in accordance with Section 10 thereof, then the Confirmation Order will be deemed vacated by the Bankruptcy Court without further notice or order. If the Confirmation Order is vacated pursuant to this Section, (a) the Debtors shall File a notice to this effect with the Bankruptcy Court, (b) this Plan shall be null and void in all respects, (c) any settlement of Claims provided for hereby shall be null and void without further order of the Bankruptcy Court, and (d) the time within which the Debtors may assume, assume and assign or reject all executory contracts and unexpired leases shall be extended for a period of sixty (60) days after the date the Confirmation Order is vacated; provided, however, that the Debtors retain their rights to seek further extensions of such deadline in accordance with, and subject to, section 365 of the Bankruptcy Code, and nothing contained in the Plan or Disclosure Statement shall (x) constitute a waiver or release of any Claims, Interests, or Causes of Action, (y) prejudice in any manner the rights of any Debtor or any other Entity or

(z) constitute an admission, acknowledgement, offer or undertaking of any sort by any Debtor or any other entity.

## ARTICLE 13.
## EFFECT OF CONFIRMATION

      **13.1    Binding Effect; Plan Binds All Holders of Claims and Equity Interests.**

      (a)    Except as otherwise provided in section 1141(d) of the Bankruptcy Code, on and after the Effective Date, the provisions of the Plan shall, and shall be deemed to, be binding on any holder of a Claim against or Interest in the Debtors and its respective successors and assigns, regardless of whether the Claim or Interest of such holder is Impaired under the Plan and whether or not such holder has voted or failed to vote to accept or reject the Plan.

      (b)    Further, pursuant to section 1142 of the Bankruptcy Code and in accordance with the Confirmation Order, the Debtors and any other necessary party shall execute, deliver and join in the execution or delivery (as applicable) of any instrument, document or agreement required to consummate the Plan, and to perform any other act, and the execution of documents contemplated in the Plan, including in the Plan Supplement, that are necessary for the consummation of the Plan and the transactions contemplated herein.

      **13.2    Release and Discharge of Debtors and Wind-Down Debtors.**

      **EFFECTIVE AS OF THE EFFECTIVE DATE, FOR GOOD AND VALUABLE CONSIDERATION, TO THE FULLEST EXTENT PERMISSIBLE UNDER APPLICABLE LAW, THE HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS AND EACH OF SUCH HOLDERS' PREDECESSORS, SUCCESSORS, ASSIGNS AND EACH OF THEIR PRESENT AND FORMER OFFICERS, DIRECTORS, EMPLOYEES, CONSULTANTS AND AGENTS (ACTING IN SUCH CAPACITY) WILL BE DEEMED TO HAVE WAIVED, RELEASED, VOIDED AND DISCHARGED EACH OF THE DEBTORS AND THE WIND-DOWN DEBTORS FROM ANY AND ALL CLAIMS, OBLIGATIONS, DAMAGES, DEMANDS, DEBTS, RIGHTS, SUITS, JUDGMENTS OR LIABILITIES (OTHER THAN THE RIGHT TO ENFORCE THE DEBTORS' OR THE WIND-DOWN DEBTORS' OBLIGATIONS UNDER THIS PLAN, THE SPSA AND THE CONTRACTS, INSTRUMENTS, RELEASES, AGREEMENTS AND DOCUMENTS DELIVERED UNDER THIS PLAN), WHETHER LIQUIDATED OR UNLIQUIDATED, FIXED OR CONTINGENT, MATURED OR UNMATURED, KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, THEN EXISTING OR THEREAFTER ARISING, IN LAW, EQUITY OR OTHERWISE, THAT ARE BASED IN WHOLE OR IN PART ON ANY ACT OR OMISSION, TRANSACTION, EVENT OR OTHER OCCURRENCE TAKING PLACE ON OR PRIOR TO THE EFFECTIVE DATE IN ANY WAY RELATING TO THE DEBTORS, THE CHAPTER 11 CASES, THE DISCLOSURE STATEMENT OR THE PLAN (INCLUDING, WITHOUT LIMITATION, THE SOLICITATION OF VOTES ON THE PLAN) THAT COULD HAVE BEEN ASSERTED BY THE HOLDERS OF CLAIMS AGAINST OR INTERESTS IN THE DEBTORS, IN THEIR INDIVIDUAL CAPACITIES OR ON BEHALF**

(WHETHER DIRECTLY OR DERIVATIVELY) OF THE DEBTORS, THEIR ESTATES, THE WIND-DOWN DEBTORS, EACH OF THEIR PREDECESSORS, SUCCESSORS, ASSIGNS AND EACH OF THEIR PRESENT AND FORMER OFFICERS, DIRECTORS, EMPLOYEES, CONSULTANTS AND AGENTS (ACTING IN SUCH CAPACITY), IN EACH CASE WITHOUT FURTHER NOTICE TO OR ORDER OF THE BANKRUPTCY COURT, ACT OR ACTION UNDER APPLICABLE LAW, REGULATION, ORDER OR RULE OR THE VOTE, CONSENT OR AUTHORIZATION OR APPROVAL OF ANY PERSON.

**13.3    Release and Discharge of the Plan Released Parties.**

EFFECTIVE AS OF THE EFFECTIVE DATE, FOR GOOD AND VALUABLE CONSIDERATION, TO THE FULLEST EXTENT PERMISSIBLE UNDER APPLICABLE LAW, THE HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS AND EACH OF SUCH HOLDERS' PREDECESSORS, SUCCESSORS, ASSIGNS AND EACH OF THEIR PRESENT AND FORMER OFFICERS, DIRECTORS, EMPLOYEES, CONSULTANTS AND AGENTS (ACTING IN SUCH CAPACITY) WHO: (I) EITHER VOTE TO ACCEPT THIS PLAN OR ARE PRESUMED TO HAVE VOTED FOR THIS PLAN UNDER SECTION 1126(F) OF THE BANKRUPTCY CODE OR (II) ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THIS PLAN AND ABSTAIN FROM VOTING AND DO NOT MARK THEIR BALLOTS TO INDICATE THEIR REFUSAL TO GRANT THE RELEASES PROVIDED HEREIN WILL BE DEEMED TO HAVE WAIVED, RELEASED, VOIDED AND DISCHARGED EACH OF THE PLAN RELEASED PARTIES FROM ANY AND ALL CLAIMS, OBLIGATIONS, DAMAGES, DEMANDS, DEBTS, RIGHTS, SUITS, JUDGMENTS OR LIABILITIES (OTHER THAN THE RIGHT TO ENFORCE THE PLAN RELEASED PARTIES' OBLIGATIONS UNDER THIS PLAN, THE SPSA AND THE CONTRACTS, INSTRUMENTS, RELEASES, AGREEMENTS AND DOCUMENTS DELIVERED UNDER THIS PLAN), WHETHER LIQUIDATED OR UNLIQUIDATED, FIXED OR CONTINGENT, MATURED OR UNMATURED, KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, THEN EXISTING OR THEREAFTER ARISING, IN LAW, EQUITY OR OTHERWISE, THAT ARE BASED IN WHOLE OR IN PART ON ANY ACT OR OMISSION, TRANSACTION, EVENT OR OTHER OCCURRENCE TAKING PLACE ON OR PRIOR TO THE EFFECTIVE DATE IN ANY WAY RELATING TO THE DEBTORS, THE CHAPTER 11 CASES, THE DISCLOSURE STATEMENT, THE SPSA OR THE PLAN (INCLUDING, WITHOUT LIMITATION, THE SOLICITATION OF VOTES ON THE PLAN) THAT COULD HAVE BEEN ASSERTED BY THE HOLDERS OF CLAIMS AGAINST OR INTERESTS IN THE DEBTORS, IN THEIR INDIVIDUAL CAPACITIES OR ON BEHALF (WHETHER DIRECTLY OR DERIVATIVELY) OF THE DEBTORS, THEIR ESTATES, THE WIND-DOWN DEBTORS, EACH OF THEIR PREDECESSORS, SUCCESSORS, ASSIGNS AND EACH OF THEIR PRESENT AND FORMER OFFICERS, DIRECTORS, EMPLOYEES, CONSULTANTS AND AGENTS (ACTING IN SUCH CAPACITY), IN EACH CASE WITHOUT FURTHER NOTICE TO OR ORDER OF THE BANKRUPTCY COURT, ACT OR ACTION UNDER APPLICABLE LAW, REGULATION, ORDER OR RULE OR THE VOTE, CONSENT OR AUTHORIZATION OR APPROVAL OF ANY PERSON.

NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS SECTION 13.3 OR SECTION 13.2 HEREOF, THE RELEASES SET FORTH ABOVE DO NOT RELEASE ANY POST-EFFECTIVE DATE OBLIGATIONS OF ANY PARTY OR ENTITY UNDER THE PLAN, OR ANY DOCUMENT, INSTRUMENT OR AGREEMENT (INCLUDING THOSE SET FORTH IN THE PLAN SUPPLEMENT) EXECUTED TO IMPLEMENT THE PLAN, INCLUDING THE SPSA, AND EXCEPT AS OTHERWISE PROVIDED BY PRIOR OR SUBSEQUENT FINAL ORDER OF THE BANKRUPTCY COURT, NOTHING IN THIS SECTION 13.3 OR SECTION 13.2 SHALL OPERATE AS A WAIVER OR RELEASE OF (A) ANY PERSON (I) NAMED PRIOR TO THE EFFECTIVE DATE AS A DEFENDANT IN ANY ACTION COMMENCED BY OR ON BEHALF OF THE DEBTORS-IN-POSSESSION, INCLUDING ANY ACTIONS PROSECUTED BY THE CREDITORS' COMMITTEE AND THE BONDHOLDER GROUP OR (II) ADJUDICATED PRIOR TO THE EFFECTIVE DATE BY A COURT OF COMPETENT JURISDICTION TO HAVE ENGAGED IN ACTS OF DISHONESTY OR WILLFUL MISCONDUCT DETRIMENTAL TO THE INTEREST OF THE DEBTORS OR (B) ANY CLAIM (I) WITH RESPECT TO ANY LOAN, ADVANCE OR SIMILAR PAYMENT BY THE DEBTORS TO ANY SUCH PERSON, (II) WITH RESPECT TO ANY CONTRACTUAL OBLIGATION OWED BY SUCH PERSON TO THE DEBTORS OR (III) RELATING TO SUCH PERSON'S KNOWING FRAUD, GROSS NEGLIGENCE OR WILLFUL MISCONDUCT; AND *PROVIDED*, *FURTHER*, THAT THE FOREGOING IS NOT INTENDED, NOR SHALL IT BE CONSTRUED, TO RELEASE ANY OF THE DEBTORS' CLAIMS THAT MAY EXIST AGAINST THE DEBTORS' DIRECTORS AND OFFICERS LIABILITY INSURANCE; AND *PROVIDED*, *FURTHER*, THAT, NOTWITHSTANDING THE FOREGOING, ALL SUCH CLAIMS SHALL BE PRESERVED BY THE DEBTORS FOR SETOFF PURPOSES.

### 13.4 SPSA Releases.

UPON THE EFFECTIVE DATE, AS PROVIDED IN SECTION 8 OF THE SPSA AND IN CONSIDERATION FOR THE SETTLEMENTS PROVIDED FOR UNDER THE SPSA INCLUDING THE RELEASES GRANTED IN FAVOR OF THE DEBTOR RELEASING PARTIES UNDER THE SPSA, EACH OF THE DEBTOR RELEASING PARTIES (I) SHALL BE DEEMED TO HAVE RELEASED AND FOREVER DISCHARGED EACH OF THE OTHER SPSA RELEASED PARTIES FROM ANY AND ALL LIABILITY FOR CLAIMS, DEFENSES, DEMANDS, LIABILITIES, DAMAGES, ACTIONS, CONTRIBUTIONS, SUBROGATION, CAUSES OF ACTION, SETOFFS, RECOUPMENTS, COSTS AND EXPENSES (INCLUDING LAWYERS' OR OTHER FEES OR EXPENSES), THE FOREGOING TERMS TO BE CONSTRUED AS BROADLY AS POSSIBLE, WHETHER KNOWN OR UNKNOWN, PAST OR PRESENT, FIXED OR CONTINGENT, LIQUIDATED OR UNLIQUIDATED, WHICH ANY OF THE DEBTOR RELEASING PARTIES HAVE, HAD, MAY HAVE HAD OR HEREAFTER MAY HAVE HOWEVER SO ARISING OUT OF OR IN CONNECTION WITH THE ALLOCATION DISPUTE, ANY OTHER MATTERS RESOLVED UNDER THE SPSA OR ANY OTHER MATTER RELATING TO THE CHAPTER 11 CASES OR THE FOREIGN PROCEEDINGS OR THE NORTEL GROUP (COLLECTIVELY, AND EXCLUDING THE NON-RELEASED MATTERS, THE "SPSA

**RELEASED CLAIMS**") AND UNDERTAKE, COVENANT AND AGREE NOT TO MAKE ANY CLAIM, PARTICIPATE IN ANY PROCEEDING OR TAKE ANY ACTION AGAINST ANY OTHER PERSON OR ENTITY WHO WOULD AS A RESULT OF SUCH CLAIM, PROCEEDING OR ACTION HAVE A CLAIM FOR CONTRIBUTION OR INDEMNITY AGAINST ANY OF THE OTHER SPSA RELEASED PARTIES IN RELATION TO THE SPSA RELEASED CLAIMS, *PROVIDED HOWEVER*, THAT THE DEBTORS' RIGHT TO OBJECT TO, OR ASSERT COUNTERCLAIMS FOR PURPOSES OF SETOFF AGAINST, CLAIMS MADE AGAINST THEM BY DIRECTORS AND OFFICERS OF ANY NORTEL ENTITY AGAINST SUCH DEBTORS IS NOT RELEASED OR IN ANY WAY COMPROMISED. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS PARAGRAPH, THE RELEASES SET FORTH ABOVE IN THIS SECTION 13.4 DO NOT CONSTITUTE A RELEASE, WAIVER OR DISCHARGE OF ANY PROVEN CLAIMS AGAINST THE CANADIAN ESTATE FOR PAYMENT OF THE CROSSOVER BONDS OR THE NNCC BONDS, THE U.S. CANADIAN CLAIM, THE U.S. CANADIAN PRIORITY CLAIM, THE INTERCOMPANY CLAIMS SPECIFIED ON ANNEX L TO THE SPSA, NNI'S RIGHT TO RECEIVE PAYMENT FROM THE CANADIAN ESTATE IN THE AMOUNT OF $77.5 MILLION, AS PROVIDED FOR IN SECTION 4(E) OF THE SPSA, ANY CLAIM BETWEEN OR AMONG ANY OF THE DEBTORS AND THEIR SUBSIDIARIES, OR ANY CLAIM TO ENFORCE THE TERMS OF THE SPSA, THE PLAN, THE CANADIAN PLAN, AND ANY ORDER OF THE BANKRUPTCY COURT OR THE CCAA COURT RELATED THERETO (COLLECTIVELY, THE "**NON-RELEASED MATTERS**").

       13.5    **Exculpation and Limitation of Liability.**

       None of the Exculpated Parties shall have or incur any liability to any Entity for any act taken or omitted to be taken in connection with and subsequent to the commencement of the Chapter 11 Cases, the formulation, preparation, dissemination, implementation, solicitation of votes, confirmation or approval of the Plan or any compromises or settlements contained therein, the administration of the Plan or Distributions under the Plan, the Disclosure Statement and any ancillary documents related thereto or any contract, instrument, release or other agreement or document provided for or contemplated in connection with the consummation of the transactions set forth in the Plan; *provided*, *however*, the foregoing provisions of this Section 13.5 shall not affect the liability of any Exculpated Party that otherwise would result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted gross negligence or willful misconduct, including, without limitation, fraud and criminal misconduct, and in all respects the Exculpated Parties shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under this Plan.

       13.6    **Injunction on Claims.**

       Except as otherwise expressly provided in the Plan, the Confirmation Order or such other order of the Bankruptcy Court that may be applicable, all holders of Claims or other debt or liability that is treated under the Plan or Interest or other right of interest

**that is terminated or cancelled pursuant to the Plan are permanently enjoined, from and after the Effective Date, from (a) commencing or continuing in any manner any action or other proceeding of any kind on any such Claim or other debt or liability or Interest or other right of equity interest that is terminated or cancelled pursuant to the Plan against the Debtors, the Estates or the Wind-Down Debtors or any properties or interest in properties of the Debtors or the Wind-Down Debtors, (b) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against the Debtors, the Estates or the Wind-Down Debtors or any properties or interest in properties of the Debtors or the Wind-Down Debtors, (c) creating, perfecting or enforcing any encumbrance of any kind against the Debtors, the Estates or the Wind-Down Debtors or any properties or interest in properties of the Debtors or the Wind-Down Debtors, (d) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from the Debtors, the Estates or the Wind-Down Debtors or any properties or interest in properties of the Debtors or the Wind-Down Debtors, (e) acting or proceeding in any manner that does not conform to or comply with the provisions of the Plan and (f) taking any actions to interfere with the implementation or consummation of the Plan, with respect to any such Claim or other debt or liability that is discharged or Interest or other right of equity interest that is terminated or cancelled pursuant to the Plan.**

        **13.7    Terms of Injunctions or Stays.**  Unless otherwise provided in the Plan, the Confirmation Order or a separate order of the Bankruptcy Court, all injunctions or stays arising under or entered during the Chapter 11 Cases under sections 105 and 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until each Debtor's Effective Date.  Upon each Debtor's respective Effective Date, all injunctions or stays provided for in each Chapter 11 Case under sections 105 or 362 of the Bankruptcy Code, or otherwise, shall be lifted and of no further force or effect — being replaced, to the extent applicable, by the injunctions, discharges, releases and exculpations of this Article 13.

        **13.8    Retention of Litigation Claims and Reservation of Rights.**

        (a)    Except as expressly provided in the Plan, nothing contained in the Plan or in the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights with respect to Litigation Claims that the Debtors, the Wind-Down Debtors or the Plan Administrator may have or choose to assert on behalf of the respective Estates or Wind-Down Debtors under any provision of the Bankruptcy Code or any applicable nonbankruptcy law, including, without limitation, any and all claims against any Person or Entity, to the extent such Person or Entity asserts a cross-claim, counterclaim or claim for setoff that seeks affirmative relief against the Debtors, their officers, directors or representatives.

        (b)    Except as expressly provided in the Plan, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any Litigation Claim, right of setoff or other legal or equitable defense that the Debtors had immediately prior to the Petition Date, against or with respect to any Claim.  The Debtors, the Wind-Down Debtors and the Plan Administrator shall have, retain, reserve and be entitled to assert all such Litigation Claims, rights of setoff, and other legal or equitable defenses that the relevant Debtor had immediately prior to the Petition Date fully as if the Chapter 11 Cases had

not been commenced, and all of the Debtors' legal and equitable rights respecting any Claim may be asserted after the Confirmation Date to the same extent as if the Chapter 11 Cases had not been commenced.

(c)     Except as expressly provided in the Plan, the Plan Administrator, shall, after the Effective Date, retain the rights of each Debtor to prosecute any Litigation Claims that could have been brought by such Debtor at any time.

**13.9    Retention of Rights.**  The Plan Administrator and the Wind-Down Debtors shall retain the rights of each Debtor to enforce all orders entered and relief granted in the Chapter 11 Cases.

**13.10    Vesting.**  Except as otherwise expressly provided in the Plan or the SPSA, or any documents or instruments executed in accordance therewith, on the Effective Date, pursuant to section 1141(b) and section 1141(c) of the Bankruptcy Code, the Wind-Down Debtors shall be vested with all of the Assets of such Debtors' Estates free and clear of all Claims, Interests, Liens, encumbrances, charges and other interests of Creditors and holders of Interests, and may operate free of any restrictions imposed by the Bankruptcy Code or by the Bankruptcy Court, including, without limitation, performing any contract or lease entered into or assumed by any of the Debtors after the Petition Date.  The Debtors shall continue as Debtors-in-Possession under the Bankruptcy Code until the Effective Date, and thereafter, subject to the terms of the Plan, the Wind-Down Debtors may operate free of any restrictions imposed by the Bankruptcy Code or the Bankruptcy Court.

## ARTICLE 14.
## RETENTION OF JURISDICTION

Pursuant to sections 105 and 1142 of the Bankruptcy Code, and notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising in, arising under or related to the Chapter 11 Cases and this Plan to the fullest extent permitted by law, including, among other things, jurisdiction to:

(a)     Allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Interest, including the resolution of any request for payment of any Administrative Expense Claim and the resolution of any and all objections to the allowance or priority of all Claims and Interests;

(b)     Hear and determine any and all Causes of Action against any Person and rights of the Debtors and the Wind-Down Debtors that arose before or after the Petition Date, including, but not limited to, the rights and powers of a trustee and Debtor-in-Possession against any Person whatsoever, including, but not limited to, all avoidance powers granted to the Debtors under the Bankruptcy Code and all Causes of Action and remedies granted pursuant to sections 502, 506, 510, 541, 542, 543, 544, 545, 547 through 551 and 553 of the Bankruptcy Code;

(c)     Grant or deny any applications for allowance of compensation for Professionals authorized pursuant to the Bankruptcy Code or the Plan, for periods ending on or

prior to the Effective Date; *provided*, *however*, that the payment of all fees and expenses of the Wind-Down Debtors and the Plan Administrator incurred from and after the Effective Date, including counsel fees, shall be made in the ordinary course and without further notice or Bankruptcy Court approval;

(d)     Resolve any matters relating to the assumption, assumption and assignment or rejection of any executory contract or unexpired lease to which any Debtor is or was a party or with respect to which any of the Debtors may be liable, including, without limitation, the determination of whether such contract is executory for the purposes of section 365 of the Bankruptcy Code, and hear, determine and, if necessary, liquidate any Claims arising therefrom;

(e)     Enter orders approving the Wind-Down Debtors' post-Confirmation sale or other disposition of Residual Assets upon motion by the Plan Administrator;

(f)     Ensure that Distributions to holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

(g)     Decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications involving any Debtor that may be pending in the Chapter 11 Cases on the Effective Date;

(h)     Hear and determine matters concerning state, local or federal taxes in accordance with sections 346, 505, 1129 or 1146 of the Bankruptcy Code;

(i)     Enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and the Confirmation Order and all contracts, instruments, releases and other agreements or documents created in connection with this Plan, the Disclosure Statement or the Confirmation Order;

(j)     Hear and determine any matters concerning the enforcement of the provisions of Article 13 of this Plan and any other exculpations, limitations of liability or injunctions contemplated by this Plan;

(k)     Resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of the Plan or the Confirmation Order;

(l)     Permit the Debtors, to the extent authorized pursuant to section 1127 of the Bankruptcy Code, to modify the Plan, Confirmation Order or any agreement, contract, instrument release or document created in connection with the Plan, the Disclosure Statement or the Confirmation Order, or remedy any defect or omission or reconcile any inconsistency in the Plan or any agreement, contract, instrument, release or document created in connection with the Plan;

(m)     Issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any entity with respect to consummation, implementation or enforcement of the Plan or the Confirmation Order;

(n)     Enforce all orders, judgments, injunctions, releases, exculpations, indemnifications and rulings, including with respect to the Plan and the Confirmation Order, entered in connection with the Chapter 11 Cases;

(o)     Hear and determine Causes of Action by or on behalf of the Debtors or the Wind-Down Debtors or the Plan Administrator;

(p)     Enter and enforce such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated, or Distributions pursuant to the Plan are enjoined or stayed;

(q)     Hear and determine all claims, rights or disputes arising under or in connection with the orders previously entered in the Chapter 11 Cases;

(r)     Hear and determine any other matters that may arise in connection with or relating to the Plan, the SPSA, the Plan Administration Agreement, or any agreement or the Confirmation Order;

(s)     Enter any orders in aid of and resolve any matters relating to or arising under prior orders of the Bankruptcy Court; and

(t)     Enter final decrees closing the Chapter 11 Cases.

## ARTICLE 15.
## MISCELLANEOUS PROVISIONS

**15.1    Effectuating Documents and Further Transactions.**  Each of the Debtors and the Wind-Down Debtors and, on and after the Effective Date, the Plan Administrator shall be authorized to execute, deliver, file or record such contracts, instruments, releases, consents, certificates, resolutions, programs and other agreements or documents and take such acts and actions as may be reasonable, necessary or appropriate to effectuate, implement, consummate or further evidence the terms and conditions of this Plan, the Confirmation Order and any transactions described in or contemplated by this Plan, without the need for any approvals, authorization or consents except for those expressly required pursuant to the Plan.

**15.2    Authority to Act.**  All matters expressly provided for under this Plan that would otherwise require approval of the stockholders, security holders, officers, directors, partners, managers, members or other owners of one or more of the Debtors or Wind-Down Debtors shall be deemed to have occurred and shall be in effect prior to, on or after the Effective Date (as appropriate) pursuant to the applicable law of the states in which the Debtors or Wind-Down Debtors are formed, without any requirement of further vote, consent, approval, authorization or other action by such stockholders, security holders, officers, directors, partners,

75

managers, members or other owners of such entities or notice to, order of or hearing before the
Bankruptcy Court.

>       **15.3    Plan Supplement.**  The Plan Administration Agreement, the amended
certificate and by-laws of Wind-Down NNI, the certificate of formation and the operating
agreement of each of the Wind-Down  Subsidiaries and a list of any contracts or leases to be
assumed or assumed and assigned by the Debtors in accordance with Section 9.2 shall be
contained in the Plan Supplement that is Filed at least ten (10) days prior to the last day upon
which holders of Claims may vote to accept or reject the Plan.  Upon its filing with the
Bankruptcy Court, the Plan Supplement may be obtained on the Debtors' independent website at
http://dm.epiq11.com/nortel or by request to the Debtors in accordance with Section 15.26 of the
Plan.

>       **15.4    Amendment or Modification of the Plan.**  Subject to Section 6(c) of the
SPSA and subject to section 1127 of the Bankruptcy Code and, to the extent applicable,
sections 1122, 1123 and 1125 of the Bankruptcy Code, the Debtors reserve the right to alter,
amend or modify the Plan at any time prior to the Confirmation Date but prior to the substantial
consummation of the Plan.  Notwithstanding the foregoing, the Debtors shall not alter, amend,
withdraw, replace or modify the Plan in a manner that is inconsistent with their obligations under
the SPSA.  A holder of a Claim that has accepted the Plan shall be deemed to have accepted the
Plan, as altered, amended or modified, if the proposed alteration, amendment or modification
does not materially and adversely change the treatment of the Claims of such holder and is
consistent with this Section 15.4.  For the avoidance of doubt, nothing in this Section 15.4 limits
any SPSA Party's rights pursuant to Section 6(h) of the SPSA with respect to any proposed
amendment, restatement, modification and/or supplement to the Plan.

>       **15.5    Administrative Expense Claims Reserve.**  On or before the Effective
Date, the Debtors shall reserve for (i) Disputed Administrative Expense Claims, Disputed Cure
Amounts, Disputed Priority Tax Claims and Disputed Priority Non-Tax Claims, if any, in an
amount equal to what would be distributed to holders of Disputed Administrative Expense
Claims, Disputed Priority Tax Claims, Disputed Other Priority Claims and Disputed Cure
Amounts if their Disputed Claims had been deemed Allowed Claims on the Effective Date or on
the Administrative Expense Claims Bar Date to the extent such amounts are known, in an
amount reasonably determined by the Debtors to the extent such claims have not yet been filed
or are unliquidated, or in such other amount as may be approved by the Bankruptcy Court and (ii)
an estimated amount for unpaid Professional Claims and any other Administrative Expense
Claims that have not been Filed as of the Effective Date (together, the "Administrative Expense
Claims Reserve"). With respect to such Disputed Claims, if, when and to the extent any such
Disputed Claim becomes an Allowed Claim by Final Order, the relevant portion of the Cash held
in reserve therefore shall be distributed by the Debtors to the claimant in a manner consistent
with distributions to similarly situated Allowed Claims.  The balance of such Cash, if any,
remaining after all Professional Claims, Disputed Administrative Expense Claims, Disputed
Cure Amounts, Disputed Priority Tax Claims and Disputed Other Priority Claims have been
resolved, and distributions made in accordance with the Plan, shall be available for Distribution
to holders of Allowed Claims, in accordance with the provisions of the Plan and the
Confirmation Order.  No payments or distributions shall be made with respect to a Claim that is a
Disputed Claim pending the resolution of the dispute by Final Order or agreement of the parties.

**15.6    Fees and Expenses.**  From and after the Effective Date, the Wind-Down Debtors shall, in the ordinary course and without the necessity for any approval by the Bankruptcy Court, pay the reasonable and necessary fees and expenses incurred by the Disbursing Agent (other than the NNCC Bonds Indenture Trustee and the NNC/NNL Notes Indenture Trustee) and Plan Administrator in accordance with and from the funds provided for such use in this Plan.

**15.7    Revocation or Withdrawal of the Plan.**  Subject to the terms of the SPSA, the Debtors reserve the right to revoke or withdraw the Plan prior to the Effective Date. If any Debtor revokes or withdraws the Plan with respect to such Debtor, or if Confirmation does not occur or if the Plan does not become effective, then the Plan shall be null and void with respect to such Debtor, and nothing contained in the Plan or Disclosure Statement shall: (a) constitute a waiver or release of any Claims by or against, or any Interests in, such Debtor or any other Person; (b) constitute an admission of any fact or legal conclusion by such Debtor or any other Entity; or (c) prejudice in any manner the rights of such Debtor in any further proceedings involving such Debtor.

**15.8    Insurance Preservation.**  Nothing in the Plan, including any releases, shall diminish or impair the enforceability of any insurance policies or other policies of insurance that may cover insurance claims or other claims against the Debtors or any other Person.

**15.9    Exemption from Certain Transfer Taxes.**  Pursuant to section 1146 of the Bankruptcy Code, any transfers from any of the Debtors, the Wind-Down Debtors or the Plan Administrator pursuant to, in furtherance of or in connection with this Plan shall not be subject to any stamp tax, recording tax, personal property tax, real estate transfer tax, sales tax, use tax, transaction privilege tax, privilege taxes or other similar tax, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

**15.10    Subordinated Claims.**  The allowance, classification and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtors reserve the right for the Plan Administrator to re-classify any Allowed Claim or Interest in accordance with any contractual, legal or equitable subordination relating thereto.

**15.11    Cross-Border Protocol and Cross-Border Claims Protocol.**  The Cross-Border Protocol and Cross-Border Claims Protocol shall each remain in full force and effect in accordance with their respective  terms.

**15.12    Governing Law.**  Unless a rule of law or procedure is supplied by (a) United States federal law (including the Bankruptcy Code and Bankruptcy Rules) or (b) an express choice of law provision in any agreement, contract, instrument or document provided for,

or executed in connection with, the Plan, the rights and obligations arising under the Plan and any agreements, certificate, by-laws, release, contracts, documents and instruments executed in connection with the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without giving effect to the principles of conflict of laws thereof.

   **15.13 No Admissions.** Notwithstanding anything herein to the contrary, nothing in the Plan shall be deemed as an admission by the Debtors with respect to any matter set forth herein, including liability on any Claim.

   **15.14 Effect of Termination of SPSA.** In the event the SPSA is terminated or the Effective Date does not occur, the SPSA Parties reserve all of their rights and defenses with respect to the claims and other matters resolved by the SPSA and neither anything contained in this Plan nor the proposed settlement set forth in the SPSA shall constitute an admission by any Party regarding the validity of the litigations, claims or defenses resolved by the SPSA or that they have any liability in connection with such litigations, claims or defenses. Except as otherwise provided in the SPSA, the termination of the SPSA for any reason shall result in the SPSA being no longer effective and the rights of all Parties, including all rights advanced in litigation (including in respect of the Allocation Dispute), being restored to the status quo ante. In the event of the termination of the SPSA, or if the Plan is withdrawn or revoked, each of the Global Debtors (other than Nortel Communications Inc., Architel Systems Corporation, Northern Telecom Canada Limited and Nortel Networks India International Inc.) reserves its rights with regard to the Allocation Decisions and with respect to any interest it may have in the Sale Proceeds on deposit in the New Escrow Accounts.

   **15.15 Severability of Plan Provisions.** Subject to the terms of the SPSA, if, prior to Confirmation, any term or provision of the Plan that does not govern the treatment of Claims or Interests is held by the Bankruptcy Court to be invalid, void or unenforceable, at the request of the Debtors the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order shall constitute a final judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

   **15.16 Successors and Assigns.** This Plan shall be binding upon and inure to the benefit of the Debtors and their respective successors and assigns, including, without limitation, the Wind-Down Debtors. The rights, benefits and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such Entity.

   **15.17 Defenses with Respect to Unimpaired Claims.** Except as otherwise provided in this Plan, nothing shall affect the rights and legal and equitable defenses of the

Debtors, the Wind-Down Debtors or the Plan Administrator with respect to any Unimpaired Claim, including all rights in respect of legal and equitable defenses to setoffs or recoupments against Unimpaired Claims.

**15.18   Section 1125(e) Good Faith Compliance.** Confirmation of the Plan shall act as a finding by the Court that the Debtors and each of their respective representatives have acted in "good faith" under section 1125(e) of the Bankruptcy Code**.**

**15.19   No Injunctive Relief.** Except as otherwise provided in the Plan or Confirmation Order, no Claim or Interest shall under any circumstances be entitled to specific performance or other injunctive, equitable or other prospective relief.

**15.20   Payment of Statutory Fees.** All fees payable pursuant to section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court, shall be paid for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed or closed, whichever occurs first.

**15.21   Saturday, Sunday or Legal Holiday.** If any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

**15.22   Dissolution of Creditors' Committee.** Effective on the Effective Date, the Creditors' Committee shall dissolve automatically and its members shall be released from any further duties and responsibilities in the Chapter 11 Cases and under the Bankruptcy Code without need for a further order of the Bankruptcy Court; *provided*, *however*, that (a) following the Effective Date the Creditors Committee shall continue in existence and have standing and a right to be heard solely for the following limited purposes: (1) Claims and/or applications for compensation by Professionals and requests for allowance of Administrative Expense Claims for substantial contribution pursuant to section 503(b)(3)(D) of the Bankruptcy Code; (2) any appeals relating to the Plan to which the Creditors' Committee is a party; and (3) to respond to creditor inquiries and with respect to reporting under Section 6.3(g) of the Plan for ninety (90) days following the Effective Date. Except for the purposes described above, the Debtors, the Wind-Down Debtors and the Plan Administrator shall not have any obligation to pay or reimburse any fees of any official or unofficial committee of creditors incurred after the Effective Date. For the avoidance of doubt, any obligations arising under confidentiality agreements, joint interest agreements and protective orders, if any, entered during the Chapter 11 Cases shall remain in full force and effect in accordance with their terms.

**15.23   Reservation of Rights**. Except as expressly set forth herein, the Plan shall have no force or effect unless and until the Effective Date occurs. Neither the filing of the Plan, any statement or provision contained herein, nor the taking of any action by a Debtor or any Entity with respect to the Plan shall be or shall be deemed to be an admission or waiver of any rights of: (1) any Debtor with respect to the holders of Claims or Interests or other parties-in-interest; or (2) any holder of a Claim or Equity Interest or other party-in-interest prior to the Effective Date.

**15.24    Post-Effective Date Rule 2002 Notice List**.  After the Effective Date, any Entity that, prior to the Effective Date, had requested from the Debtors or the Claims Agent to receive notice in the Chapter 11 Cases pursuant to Bankruptcy Rule 2002 must renew such request in writing to the Claims Agent in order to be included on the Wind-Down Debtors' Post-Effective Date Notice List.  On and after the Effective Date, the Wind-Down Debtors are authorized to limit the list of entities receiving documents pursuant to Bankruptcy Rule 2002 to those entities that request to be included on the Debtors' Post Effective Date Notice List.

**15.25    Right to Abandon and Dispose of Debtor Property, Books & Records**. After the Effective Date, notwithstanding any prior order of the Bankruptcy Court, the Plan Administrator shall give notice of a proposed abandonment or disposition of property, including the Debtors' books and records, by filing a notice on the docket of the Chapter 11 Cases and delivering a copy of such notice to the Canadian Debtors, the Monitor and the EMEA Debtors. Such filing of a notice of abandonment or disposition on the docket shall constitute good and sufficient notice, and no other or further notice of proposed abandonment or disposition is necessary.  If no party serves an objection within thirty (30) days of the posting of such notice, the Plan Administrator shall be authorized immediately to abandon or dispose of such property.

**15.26    Notices.**  Any notice required or permitted to be provided under this Plan shall be in writing and served by either (a) certified mail, return receipt requested, postage prepaid, (b) hand delivery or (c) reputable overnight delivery service, freight prepaid, to be addressed as follows:

Counsel for the Debtors

> Cleary Gottlieb Steen & Hamilton LLP
> One Liberty Plaza
> New York, NY 10006
> (212) 225-3999 (facsimile)
> Attn:   James L. Bromley, Esq.
>             Lisa M. Schweitzer, Esq.
>
>             - and -
>
> Morris, Nichols, Arsht & Tunnell LLP
> 1201 North Market Street, 18th Floor
> P.O. Box 1347
> Wilmington, DE 19899
> (302) 658-3989 (facsimile)
> Attn:   Derek C. Abbott, Esq.
>             Andrew R. Remming, Esq.

The Plan Administrator

> Greylock Partners, LLC
> Attn:   John J. Ray, III
> c/o Counsel for the Plan Administrator

<u>Counsel for the Plan Administrator</u>

Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, NY 10006
(212) 225-3999 (facsimile)
Attn:   James L. Bromley, Esq.
        Lisa M. Schweitzer, Esq.

Morris, Nichols, Arsht & Tunnell LLP
1201 North Market Street, 18th Floor
P.O. Box 1347
Wilmington, DE 19899
(302) 658-3989 (facsimile)
Attn:   Derek C. Abbott, Esq.
        Andrew R. Remming, Esq.

<u>Counsel for the Bondholder Group</u>

Milbank, Tweed, Hadley & McCloy LLP
28 Liberty Street
New York, NY 10005
(212) 530-5219 (facsimile)
Attn:   Albert A. Pisa, Esq.

<u>Counsel for the Creditors' Committee</u>

Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, NY 10036
(212) 872-1002 (facsimile)
Attn:   Fred S. Hodara, Esq.
        David H. Botter, Esq.
        Brad M. Kahn, Esq.

        - and -

Whiteford, Taylor & Preston LLP
The Renaissance Centre, Suite 500
405 North King Street
Wilmington, DE 19801-3700
(302) 661-7950 (facsimile)
Attn:   Christopher M. Samis, Esq.

Dated: November    4    , 2016
       New York, New York

**Nortel Networks Inc.**

By: _____
    Name: John J. Ray, III
    Title:   Principal Officer

**Nortel Networks (CALA) Inc.**

By: _____
    Name: John J. Ray, III
    Title:   Principal Officer

**Nortel Networks Capital Corporation**

By: _____
    Name: John J. Ray, III
    Title:   Principal Officer

**Nortel Altsystems Inc.**

By: _____
    Name: John J. Ray, III
    Title:   Principal Officer

**Nortel Altsystems International Inc.**

By: _____
    Name: John J. Ray, III
    Title:   Principal Officer

**Xros, Inc.**

By: _____
    Name: John J. Ray, III
    Title:   Principal Officer

**Sonoma Systems**

By: _____
    Name: John J. Ray, III
    Title:   Principal Officer

**Qtera Corporation**

By: _____
    Name: John J. Ray, III
    Title:   Principal Officer

**Coretek, Inc.**

By: _____
    Name: John J. Ray, III
    Title:   Principal Officer

**Nortel Networks Applications
Management Solutions Inc**.

By: _____
    Name: John J. Ray, III
    Title:   Principal Officer

**Nortel Networks Optical Components Inc.**

By: _____
      Name: John J. Ray, III
      Title:  Principal Officer

**Nortel Networks HPOCS Inc.**

By: _____
      Name: John J. Ray, III
      Title:  Principal Officer

**Architel Systems (U.S.) Corporation**

By: _____
      Name: John J. Ray, III
      Title:  Principal Officer

**Nortel Networks International Inc.**

By: _____
      Name: John J. Ray, III
      Title:  Principal Officer

**Northern Telecom International Inc.**

By: _____
      Name: John J. Ray, III
      Title:  Principal Officer

**Nortel Networks Cable Solutions Inc.**

By: _____
      Name: John J. Ray, III
      Title:  Principal Officer

James L. Bromley, Esq.
Lisa M. Schweitzer, Esq.
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, NY 10006
Telephone: (212) 225-2000

    - and -

Derek C. Abbott, Esq.
Andrew R. Remming, Esq.
Morris, Nichols, Arsht & Tunnell LLP
1201 North Market Street, 18th Floor
P.O. Box 1347
Wilmington, DE 19899
Telephone: (302) 658-9200
Facsimile: (302) 658-3989

*Counsel for the Debtors and Debtors-in-Possession*