**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| Nortel Networks Inc., *et al.*,[1] | Case No. 09-10138 (KG) |
| Debtors. | (Jointly Administered) |
| | Re: Docket Nos. 17347, 17348, 17350 |

**OBJECTION OF THE NORTEL TRADE CLAIMS CONSORTIUM TO DEBTORS' (I)
PROPOSED DISCLOSURE STATEMENT FOR THE FIRST AMENDED JOINT
CHAPTER 11 PLAN OF NORTEL NETWORKS INC. AND CERTAIN OF ITS
AFFILIATED DEBTORS AND (II) RELATED SOLICITATION PROCEDURES**

The Nortel Trade Claims Consortium (the "Consortium")[2], as holders of certain U.S.

Trade Claims against Nortel Networks Inc. ("NNI") and certain of its U.S. affiliates, as debtors

and debtors-in-possession in the above-captioned proceedings (collectively, the "Debtors"), by

and through its undersigned counsel, hereby objects (this "Objection") to the Debtors' (i)

*Proposed Disclosure Statement For The First Amended Joint Chapter 11 Plan Of Nortel*

*Networks Inc. And Certain Of Its Affiliated Debtors* [D.I. 17348] (the "Disclosure Statement")

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567), Nortel Networks (CALA) Inc. (4226) and Nortel Networks India International, Inc. (8667). For the avoidance of doubt, the terms "Debtors" and "U.S. Debtors" are used interchangeably herein, and the chapter 11 cases of the Debtors are referenced collectively herein as the "Cases".

[2] The Consortium represents a group of creditors holding over $149 million in unsecured (non-funded debt) claims, including but not limited to trade (supplier) claims and employee severance and pension claims (all such types of claims in these Cases, the "U.S. Trade Claims") against the Debtors. The U.S. Trade Claims are part of a body of general unsecured creditors with claims only against the U.S. Debtors (the "U.S.-only Unsecured Creditors").

and (ii) related Solicitation Procedures.[3]  In support thereof, the Consortium respectfully states as follows:[4]

## PRELIMINARY STATEMENT

1.      The Consortium objects to the Disclosure Statement because it fails to provide "adequate information" as required by Bankruptcy Code section 1125(a).  Additionally, the Plan it describes constitutes a capitulation by the Debtors on several issues that, until very recently, the Debtors themselves had identified as non-negotiable, bedrock principles of any successful resolution of the Allocation Dispute.  The Solicitation Procedures outlined in the Debtors' Disclosure Statement Approval Motion also may not be approved in current form.

2.      In the first instance, the Disclosure Statement is deficient and on multiple fronts fails to provide "adequate information" as required by Bankruptcy Code section 1125(a).  The Disclosure Statement fails to mention that the Consortium does not support—and indeed intends to advise other general unsecured creditors not to support—the Plan.  It fails to provide any meaningful disclosure regarding the Consortium's pending appeal of the Allocation Decision before the Third Circuit, which the Consortium fully intends to pursue.  Further, it fails to mention the present controversy regarding the allowance of the unreduced Bond Guarantee Claims[5] against the U.S. estate.  As the Consortium has briefed at length in the District Court, a critical component of its appeal is that the Allocation Decision—even if left in place—does not

---

[3] See Debtors' Motion for Entry of an Order (I) Approving Adequacy of Information Contained in Disclosure Statement, (II) Establishing Voting Record Date, (III) Approving Procedures for Soliciting, Receiving and Tabulating Votes on the Plan, and (IV) Scheduling Confirmation Hearing Date and Establishing Notice and Objection Procedures [D.I. 17350] (the "Disclosure Statement Approval Motion").  The "Solicitation Procedures" are described beginning on page 14 therein.

[4] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Plan and Disclosure Statement.

[5] "Bond Guarantee Claims" refers to the approximately $4.0 billion of claims asserted by the Crossover Bondholders that were issued by NNC and/or NNL but guaranteed by NNI.

support the allowance of the nearly $4 billion in Bond Guarantee Claims against the U.S. Debtors under a U.S. plan.  Further, the Disclosure Statement does not provide any meaningful information regarding the Plan's generous treatment of the NNCC Bondholders at the expense of U.S.-only Unsecured Creditors.  On account of these critical factual omissions, the Disclosure Statement fails to provide the "adequate information" required by Bankruptcy Code section 1125(a).

3.     The Disclosure Statement also paints an incomplete picture of the genesis of the SPSA.  As the Debtors themselves acknowledge, the mediation sessions before Judge Farnan that commenced in October 2015 failed to produce the desired result prior to the scheduling of briefing and oral argument at the District Court.  Critically, the Disclosure Statement does not expressly state that the Debtors' position—like that of the Consortium and all other U.S. parties in interest—has always been that the Allocation Decision (and the meager portion of the Sale Proceeds it allocates to the U.S. estate) is "unprecedented and legally indefensible."  See Debtors' Op. Br.[6] at p. 3.  The most glaring problem with the SPSA is that it proceeds from the artificially-low baseline set by the Allocation Decision.  Even though recoveries to U.S.-only Unsecured Creditors are higher under the SPSA than they are under the Allocation Decision, such a comparison is unhelpful and inapposite.  The Allocation Decision established an improbably-low "anchor point" on U.S. recoveries; the SPSA's improvement over this nadir in no way makes the settlement fair and equitable to U.S. creditors.  Tellingly, recoveries to U.S.-only Unsecured Creditors under the SPSA are between 1.8x - 3.0x closer to the recoveries set by the Allocation Decision than they are to the position advanced by the Debtors during trial.  Furthermore, the SPSA does nothing to rectify the Bankruptcy Court's improper substantive

---

[6] "Debtors' Op. Br." refers to the *Opening Brief of Debtors-Appellants Nortel Networks Inc. In Support of Appeal from the Allocation Opinion* [D. Ct. Docket No. 64] filed on December 3, 2015.

consolidation of the Nortel Debtors or the Allocation Decision's nonsensical treatment of the Bond Guarantee Claims for allocation purposes—both of which continue to drag down U.S. recoveries.

4.      Despite all this, the Debtors now assert in the Disclosure Statement that "mediation discussions . . . ultimately resulted in a proposed settlement of the Allocation Dispute and certain other matters among the parties, as memorialized in the SPSA." <u>See</u> Disclosure Statement at 80.  But while the Consortium participated in the mediation, it is not a party to the SPSA.  Furthermore, the Consortium does not support the purported resolution of the Allocation Dispute embodied by the SPSA, principally because the SPSA codifies the same unjustifiably dilutive treatment of U.S.-only Unsecured Creditors that, until very recently, animated not only the Debtors' own appeal to the Third Circuit, but also the appeals filed by the Bondholders and the UCC.

5.      In addition, the Disclosure Statement cannot be approved because it attempts an end-run around Bankruptcy Rule 9019.  The SPSA is most assuredly a "compromise or settlement" within the meaning of Bankruptcy Rule 9019; accordingly, the Debtors must file a motion (with notice and a hearing) seeking approval of the SPSA under Bankruptcy Rule 9019.  Nonetheless, in the Disclosure Statement the Debtors assert that seeking approval of the SPSA under Bankruptcy Rule 9019 is "at their discretion." <u>See</u> Disclosure Statement at 121.  In addition to being wrong on the law, this assertion simply makes no sense from a practical standpoint.  When will the Debtors decide, if at all, to provide notice and a hearing?  Will they simply wait until voting on the Plan is complete to see if they can avoid their Rule 9019 burden through Plan voting?  As the architect of the SPSA, the Debtors must satisfy their burden to persuade this Court that the SPSA is "fair, reasonable, and in the best interest of the estate."

Simply put, there is no legal basis for jamming a 9019 settlement into a plan in order to short-circuit the settlement-approval procedure required by Bankruptcy Rule 9019.

6.     Also left unsaid by the Disclosure Statement is the arc of negotiating positions the Debtors have taken since the Allocation Trial with respect to the appropriate allocation of the Sale Proceeds to the U.S. estate.  During the Allocation Trial, the Debtors were emphatic that the Sale Proceeds should be allocated on a percentage-of-revenue basis, under which the U.S. would receive approximately 72.7%[7] of the Sale Proceeds.  This correlated to a 100.0% recovery for U.S.-only Unsecured Creditors.  Under this Court's Allocation Opinion, the U.S. would capture only 11.2% of the Sale Proceeds, constituting a recovery of only 40.0%[8] to U.S.-only Unsecured Creditors.  As a result, the Debtors commenced an appeal of the Allocation Opinion to address this inequity.  Fast-forward to the present, and the Debtors now ask the Court to bless the SPSA, under which recoveries to U.S.-only Unsecured Creditors will amount only to 55.1% - 61.2%. The Disclosure Statement provides no explanation as to why U.S.-only Unsecured Creditors should now accept such a diminished recovery that, until several weeks ago, the Debtors themselves assailed as grossly inequitable.

7.     The Solicitation Procedures set forth in the Debtors' Disclosure Statement Approval Motion also prevent the approval of the Disclosure Statement.  In an effort to silence the voice of U.S.-only Unsecured Creditors, the Debtors suggest that they can "aggregate" separate claims held by a single creditor within a particular class "as if such creditor held one Claim" in its class.  However, as discussed infra, this provision violates applicable law, and the Debtors do not cite any authority to the contrary.

---

[7] Such figure does not include the impact of the U.S. Debtors' $2 billion intercompany claim against the Canadian Debtors.

[8] Inclusive of the impact of the U.S. Debtors' $2 billion intercompany claim against the Canadian Debtors.

8.      Finally, the Plan described by the Disclosure Statement is not confirmable because, in at least six respects, the Plan is proposed in a manner "forbidden by law" under Bankruptcy Code section 1129(a)(3).   In addition to their improper attempt to circumvent Bankruptcy Rule 9019, the Debtors also seek an illegal substantive consolidation of NNCC into NNI.  Moreover, the Plan fails to escrow the Consortium's potential increase in its recovery from its pending appeal before the Third Circuit.   There are other, additional defects to the Plan as well, as discussed infra.   For all of these reasons, the Court must deny confirmation of the Disclosure Statement.

## BACKGROUND

## I.      Background Facts Relevant To This Objection

### A.      The Petition Date, Allocation Trial, Allocation Decision, and Subsequent Mediation and Appeals.

9.      On January 14, 2009 (the "Petition Date"), the Debtors, other than NN CALA and NNIII, filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

10.      Also on the Petition Date, the Debtors' ultimate corporate parent NNC, as well as NNL, Nortel Networks Technology Corporation, Nortel Networks Global Corporation, and Nortel Networks International Corporation, filed an application with the Ontario Superior Court of Justice (the "Canadian Court") under the Companies' Creditors Arrangement Act (the "CCAA"), seeking relief from their creditors (collectively, the "Canadian Proceedings").

11.      Since the Petition Date, Nortel has sold its business units and other assets to various purchasers, generating proceeds ("Sale Proceeds") of over $7.3 billion that have been placed in escrow accounts pending allocation among the various selling entities (the "Nortel Sellers").  Having failed to negotiate a consensual allocation consistent with the requirements of

the escrow agreement, a cross-border trial (the "Allocation Trial") to determine such allocation was held in 2014 before this Court and the Canadian Court.

12.     On May 14, 2015, the Bankruptcy Court and Canadian Court simultaneously issued opinions deciding the Allocation Trial (the Bankruptcy Court decision, the "Allocation Decision").  The Allocation Decision adopted an allocation methodology not advanced by any party at trial, described as "modified pro rata" ("MPR"), under which each Nortel debtor's allocation of the Sale Proceeds would be based on the relative amount of some, but not all, claims against a given debtor as compared to the amount of claims against other debtors.

13.     Numerous parties, including the Consortium, appealed the Allocation Decision to the United States District Court for the District of Delaware (the "District Court").  As part of the appeal process in the District Court, the parties agreed to brief the appeals while simultaneously proceeding with a mediation process led by the retired Chief Judge of the District Court, Joseph J. Farnan.  Confidential, non-binding mediation sessions were held starting in October 2015.

14.     The mediation sessions that began in October 2015 did not produce a settlement as of the time that briefing and oral argument were scheduled, and on May 5, 2016, following full briefing and argument before the District Court, the District Court issued an order asking for letter briefs on whether the appeals of the Allocation Decisions should be certified directly to the United States Court of Appeals for the Third Circuit (the "Third Circuit").  On May 24, 2016, the District Court entered an order certifying all appeals and contingent cross-appeals to the Third Circuit.  On June 22, 2016, the appellees petitioned the Third Circuit to accept the appeal.  The Third Circuit granted the petitions for leave to appeal on August 9, 2016.

15.     Concurrently with the appeal process in the United States, the Canadian Court's own allocation decision (the "Canadian Decision") has been contested in the Canadian courts.

On July 16, 2015, the Consortium, together with the Debtors, the U.S. Creditors' Committee (the "UCC"), the Bondholder Group, the Bank of New York Mellon (as indenture trustee), and Nortel Networks S.A. filed notices of motion for leave to appeal the Canadian Decision to the Court of Appeal for Ontario. The Court of Appeal for Ontario denied the motions for leave to appeal on May 3, 2016. Between July 29 and August 1, 2016, the moving parties applied to the Supreme Court of Canada for leave to appeal the decisions denying leave to appeal. The parties agreed to extend the deadline for responses to that motion until November 30, 2016, to enable settlement discussions to continue, and more recently have sought a further extension.

16. During this time, the parties continued to engage in mediation under the oversight of Judge Farnan as mediator. Those discussions ultimately resulted in a proposed settlement of the Allocation Dispute and certain other matters between certain of the parties, as memorialized in the SPSA. The Consortium, among others, did not agree to enter into the SPSA.

17. Previously, by Order dated December 18, 2014 [D.I. 14950], the Bankruptcy Court approved an Agreement Settling the NNI Post-Petition Interest Dispute and Related Matters dated as of July 24, 2014 (as amended, the "PPI Settlement Agreement") between NNI and the holders of all outstanding Crossover Bonds excluding the NNCC Bonds (the "Supporting Bondholders"). Pursuant to the PPI Settlement Agreement, NNI granted an allowed General Unsecured Claim to the Crossover Bonds in the aggregate amount of $3,934,521,442.00, and the parties agreed on additional terms and conditions where post-petition interest could be paid on the Crossover Bonds, subject to certain caps.

18. On October 12, 2016, the Debtors filed the *Notice of Execution of Settlement and Plans Support Agreement* [D.I. 17249], attached to which as Exhibit A is that certain Settlement and Support Agreement dated October 12, 2016 (the "SPSA"). The SPSA is alleged to

constitute a Global Settlement, which purports to resolve the Allocation Dispute, subject to the satisfaction of certain conditions.

19.     On November 4, 2016, the Debtors filed (i) the *Proposed Disclosure Statement for the First Amended Joint Chapter 11 Plan of Nortel Networks Inc. and Certain of its Affiliated Debtors* [D.I. 17348] (the "<u>Disclosure Statement</u>"); and (ii) the *First Amended Joint Chapter 11 Plan of Nortel Networks Inc. and Certain of its Affiliated Debtors* [D.I. 17347] (the "<u>Plan</u>").

### B.     The SPSA and Plan.

20.     On October 12, 2016, the Debtors, the Canadian Debtors, the Monitor, the EMEA Debtors, the EMEA Non-Filed Entities, the Joint Administrators, NNSA, the NNSA Conflicts Administrator, the French Liquidator, the members of the CCC, the UCC, the U.K. Pension Trustee, the PPF, and the Joint Liquidators, with members of the Bondholder Group and the NNCC Bondholder Signatories executing Creditor Joinders, executed the SPSA.

21.     The SPSA memorializes a settlement intended to fully and finally resolve the allocation of the Sale Proceeds among the Nortel Affiliates, which dispute is currently the subject of litigation before the U.S. Court and the Canadian Court.  The SPSA purports to be an agreement settling litigation in relation to the Allocation Dispute, and purports to provide for a full and final settlement of the Allocation Dispute and certain other matters among the SPSA Parties.  ***The Consortium is not a party to the SPSA.***

22.     The SPSA Parties have agreed to allocate the Sale Proceeds as follows:

| Party | Percentage of Proceeds | US $ | Name |
|---|---|---|---|
| U.S. Debtors | 24.3500 | 1,766,417,002 | U.S. Allocation |
| Canadian Debtors | 57.1065 | 4,142,665,131 | Canadian Allocation |
| EMEA (other than NNSA and NNUK Debtors) | 1.4859 | 107,788,879 | EMEA (Non-NNSA/Non-NNUK) Allocation |
| NNUK | 14.0249 | 1,017,408,257 | NNUK Allocation |

| Party | Percentage of Proceeds | US $ | Name |
|-------|------------------------|------|------|
| NNSA | N/A | 220,000,000 | NNSA Allocation |

23.     The SPSA also provides for the allowance of claims against both NNI and the Canadian Estate on account of the Crossover Bonds.  Under the SPSA, the Crossover Bond Claims (a) against NNL and NNC shall be allowed as unsecured Proven Claims against the Canadian Estate in the aggregate amount of $3,940,750,260 and (b) against NNI shall be allowed as a general unsecured claim in the aggregate amount of $3,934,521,442.

24.     Further, under the SPSA the NNCC Bonds Claims (a) against NNI (into which NNCC shall be substantively consolidated under the Plan) are allowed as a general unsecured claim in the amount of $150,951,562 and (b) against NNL are allowed as an unsecured Proven Claim against the Canadian Estate in the amount of $150,951,562.  The Debtors have agreed to pay up to $5 million in professional fees for the benefit of the NNCC Bonds Trustee, and have also agreed to reserve $7.5 million from cash otherwise available for distribution to top-up the NNCC Bonds in the event that their distributions are less than $150,951,562.

## **OBJECTION**

25.     The Court should not approve the Disclosure Statement at this time because the Disclosure Statement fails to provide "adequate information" from which a "hypothetical reasonable investor" could make an informed decision about the Plan, as is required by Bankruptcy Code section 1125(a).  As discussed <u>infra</u>, the Disclosure Statement is defective because, among other things, it fails entirely to (i) clearly state that the Consortium ***does not support*** the SPSA, (ii) explain to creditors the status of the Consortium's pending appeal of the Allocation Decision before the Third Circuit, and (iii) describe the present controversy regarding the allowance of the unreduced Bond Guarantee Claims against the U.S. estate.  In addition, the following non-exhaustive list of items requires additional clarification before the Disclosure Statement can be deemed to provide adequate information: (iv) approval of the SPSA in accordance with Bankruptcy Rule 9019; and (v) justification for the generous treatment afforded to NNCC Bondholders.  Moreover, the Solicitation Procedures cannot be approved in current form because they attempt to circumvent the "numerosity" requirements of Bankruptcy Code section 1126(c).  Finally, the Plan described by the Disclosure Statement is patently unconfirmable for at least six reasons.

26.     Unless the Disclosure Statement is modified to satisfy these objections, as set forth in more detail herein, the Disclosure Statement must not be approved.  In the event the Disclosure Statement is approved after its various defects are remedied, the Debtors should nonetheless be directed to include in the Solicitation Package a letter from the Consortium addressed to all U.S.-only Unsecured Creditors (the "<u>Consortium Letter</u>") setting forth the Consortium's recommendation as to voting on the Plan.

II.   **The Disclosure Statement Cannot Be Approved Because It Fails To Mention That The Consortium Does Not Support The SPSA And Omits Other Critical Information Regarding The Consortium's Pending Appeal.**

27.     The Disclosure Statement cannot be approved because it fails to provide "adequate information" as required by Bankruptcy Code section 1125(a).  <u>First</u>, the Disclosure Statement fails to mention that the Consortium ***does not support*** the SPSA.  <u>Second</u>, the Disclosure Statement ignores entirely the Consortium's pending appeal of the Allocation Decision before the Third Circuit.  <u>Third</u>, the Disclosure Statement makes no mention of the present controversy regarding the allowance of the Bond Guarantee Claims against the U.S. estate, electing instead to present that issue as a *fait accompli*.  On account of these informational deficiencies, voting creditors cannot make an informed judgment as to how to vote on the Plan.

A.   **The Disclosure Statement Fails To Mention That The Consortium Does Not Support The SPSA.**

28.     The Disclosure Statement fails to mention that the Consortium does not support the SPSA.  Through this critical omission, the Disclosure Statement cannot be said to provide "adequate information" to voting creditors for purposes of Bankruptcy Code section 1125(a).

29.     Indeed, far from informing voting creditors that the Consortium does ***not*** support the SPSA, the uninitiated reader of the Disclosure Statement could be forgiven for concluding that the Consortium actually supports the SPSA.  After describing the Allocation Decision and appeals therefrom to the District Court (including the appeal filed by the Consortium), and further identifying the Consortium as a party to the mediation <u>and</u> an appellant to the Third Circuit, the Disclosure Statement then characterizes the SPSA as a settlement reached "among the parties . . . [to] the mediation discussions."  <u>See</u> Disclosure Statement at 78-80.  This is misleading, to put it charitably.  The Consortium is not a party to the SPSA and does not agree with its terms.  Not one of these facts is apparent from reviewing the Disclosure Statement.

12

30.     Approval of a disclosure statement requires a debtor to provide "adequate information." See 11 U.S.C. § 1125(a).  "Adequate information" is defined as "information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records . . . that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan." See 11 U.S.C. § 1125(a) (emphasis added).  Thus, a debtor's disclosure statement must, as a whole, provide information that is reasonably practicable to permit an informed judgment by impaired creditors entitled to vote on the plan.  See Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. GMC, 337 F.3d 314, 321–22 (3d Cir. 2003).  Put another way, a disclosure statement "must clearly and succinctly inform the average unsecured creditor what it is going to get, when it is going to get it, and what contingencies there are to getting its distribution." In re Ferretti, 128 B.R. 16, 19 (Bankr. D.N.H. 1991).

31.     Whether a disclosure statement contains "adequate information" should be assessed from the perspective of the claim or interest holders with the ability to vote.  See In re Phoenix Petroleum Co., 278 B.R. 385, 392-93 (Bankr. E.D. Pa. 2001) (citing In re Monroe Well Serv., Inc., 80 B.R. 324, 330 (Bankr. E.D. Pa. 1987)); see also 7 Collier on Bankruptcy, ¶ 1125.02[3] (courts should "consider the needs of the claims or interest of the class as a whole and not the needs of its most sophisticated or least sophisticated members of a particular class").

32.     In determining whether a disclosure statement contains adequate information for purposes of section 1125(a) of the Bankruptcy Code, courts have identified categories of information that generally should be included in a disclosure statement.  See In re Phoenix Petroleum, 278 B.R. at 393 (listing categories of information); In re Scioto Valley Mortg. Co., 88 B.R. 168, 170-71 (S.D. Ohio 1988) (same); In re U.S. Brass Corp., 194 B.R. 420, 424-25 (Bankr.

E.D. Tex. 1996) (same).   Courts consistently recognize that information (a) regarding the existence, likelihood, and possible success of litigation and (b) that would reasonably influence creditors' determinations of whether to accept or reject the plan are among the types of information that must be included in a disclosure statement.

33.      In light of this, it is well-established that "adequate information" requires a debtor to disclose objections to a plan that are raised by creditor constituencies.   See In re Tenn-Fla Partners, 170 B.R. 946, 972 (Bankr. W.D. Tenn. 1994) (information is material and should be in disclosure statement if a hypothetical reasonable investor typical of its class would want to know such information in order to make an informed decision), aff'd in part, rev'd in part on other grounds sub nom. Tenn-Fla Partners v. First Union Nat'l Bank of Florida, 229 B.R. 720 (W.D. Tenn. 1999).  This is particularly true where, as here, the centerpiece of the plan is a settlement agreement among some—but not all—creditor bodies.  See id.

34.      The Disclosure Statement's failure to disclose that the Consortium does not support the SPSA and Plan precludes "enlightened voting" by creditors.   See BLS Operating Corp. v. 125 East Taverns, Inc. (In re BSL Operating Corp.), 57 B.R. 945, 950 (S.D.N.Y. 1986). Creditors cannot reach an "informed judgment" regarding how to vote on the Plan if they are unaware that the Consortium does not support the SPSA.  See In re Ryan Operations G.P. v. Santiam-Midwest Lumber Co., 81 F.3d 355, 362 (3d Cir. 1996).  Accordingly, the Disclosure Statement cannot be approved.

### B.    The Disclosure Statement Ignores The Consortium's Pending Appeal Before The Third Circuit, Which The Consortium Fully Intends To Pursue.

35.      The Disclosure Statement ignores entirely the Consortium's pending appeal of the Allocation Decision before the Third Circuit.  Voting creditors should be made aware that the Consortium's appeal remains a "live" issue in the Cases and that the Consortium fully intends to

vigorously pursue that appeal. The Disclosure Statement must therefore provide a complete and accurate description of the Consortium's pending appeal, including its current status and the potential effect on the U.S. estate in the event that such appeal succeeds before the Third Circuit.

36.     It is well-settled that "adequate information" for purposes of Bankruptcy Code section 1125(a) requires the disclosure of material, pending litigation issues. See In re Gunsmith's, Inc., 271 B.R. 487, 491 (S.D. Miss. 2000) (finding that "any litigation likely to arise" falls within the ambit of "adequate information.").

37.     Here, the significance of the Consortium's pending appeal of the Allocation Decision before the Third Circuit cannot be overstated. Somewhat ironically, the thrust of the Consortium's appeal is identical to the appeals submitted by the Debtors, the Bondholders, and the UCC until they very recently changed course and signed the SPSA. Below, for example, are a few ways in which the Debtors assailed the Allocation Decision in their Reconsideration Motion[9]:

- "The Court's decision…has the effect of severely depressing the amount of Lockbox proceeds available for distribution to general unsecured creditors holding claims solely against the U.S. Debtors." Reconsideration Motion at 4.

- The Allocation Decision has the "effect of disproportionately and significantly driving down creditor Lockbox recoveries in the U.S. Debtors' estates as compared to similarly situated creditors of the Canadian and EMEA Debtors." Id. at 2-3.

- The Allocation Decision "has the effect of allocating a disproportionately and inequitably low amount of proceeds to the U.S Debtors for distribution to their unsecured creditors compared to the creditors of the other Debtor estates." Id. at 16.

38.     As excerpted below, the Debtors similarly criticized the Allocation Decision in their appellate briefing before the District Court:

- The Allocation Decision "flies in the face of well-established Third Circuit law." Debtors' Op. Br. at 1.

---

[9] See U.S. Debtors' Motion for Clarification and/or Reconsideration of the May 12, 2015 Allocation Trial Opinion and Order [D.I. 15611] filed May 26, 2015 (the "Reconsideration Motion").

- The Allocation Decision is "unprecedented and legally indefensible" insofar as it "redistributed the value of the U.S. Debtors' assets to multiple non-U.S. legal entities on the inexplicable basis of the relative amounts of some, but not all, of their liabilities." Id. at 3.

- In rendering the Allocation Decision, "the Bankruptcy Court diverted billions of dollars generated by the sale of the U.S. Debtors' property…to the U.S. Debtors' foreign affiliates (including equity holder NNL, which should take last, not first) to pay their creditors instead of U.S. creditors." Id. at 4.

- "Whether the [Allocation Decision] is identical, or merely similar, to substantive consolidation, it is prohibited under *Owens Corning*[10] given the Bankruptcy Court's own factual findings that the Debtors carefully maintained corporate separateness." Id. at 22.

- "[T]he Bankruptcy Court adopted an unprecedented formula that allocates the Sale Proceeds to each Debtor—whether or not it sold assets in any given sale—based on the amount of some, but not all, of the outstanding claims against it.  As such, most of the proceeds generated by the sale of the U.S. Debtors' assets will not be used to satisfy the claims of their own creditors, but rather will be distributed to their corporate parent and affiliates." Debtors' Reply Br.[11] at 7.

- "It is undeniable that the [Allocation Decision] constitutes a form of corporate disregard given that the significant portion of the Sale Proceeds attributable to the U.S. Assets is being distributed to creditors of other Nortel companies rather than the U.S. Debtors' own creditors." Id. at 36.

- "As a result of the claims-based allocation, a Debtor with fewer creditor claims is considered to have created less value, when all it may reflect is that the Debtor did a better job than others of timely satisfying its obligations to creditors, presumably because it had more valuable assets capable of generating more revenue to pay its debts." Id. at 53.

39.    Likewise, the UCC and the Bondholders each made similar arguments in their appellate briefs before the District Court:

- "The Decision is entirely inequitable, especially to U.S. unsecured creditors.  It results in a massive shift in value from Nortel's U.S. Debtors to Nortel Debtors in Canada and

---

[10] In re Owens Corning, 419 F.3d 195 (3rd Cir. 2005).

[11] See *Reply Brief of Debtors-Appellants Nortel Networks Inc. in Support of Appeal from the Allocation Opinion and in Opposition to Contingent Cross-Appeals* [D.Ct. Docket No. 67] (the "Debtors' Reply Br.") filed March 11, 2016.

EMEA, in a manner completely untethered from any provision of the Bankruptcy Code." See UCC Op. Br.[12] at 1.

- The Bankruptcy Court "compromise[d] fundamental creditor rights…to justify a result that leaves the unsecured creditors of the U.S. Debtors—the estate that relinquished the Nortel Group's most valuable assets and rights—with the smallest share of the proceeds." UCC Op. Br. at 2.

- "The Bankruptcy Court's 'modified pro rata' allocation approach violates the Bankruptcy Code and should be reversed." Bondholders' Op. Br.[13] at 3.

- "The Decision…violates…*In re Owens Corning*, 419 F.3d 195 (3d Cir. 2005)…[because] the Bankruptcy Court's 'modified pro rata' approach pools together the assets and claims of multiple debtors—in complete disregard of such debtors' separate corporate existence and to the detriment of creditors who are entitled to expect such distinctions to be honored." Bondholders Op. Br. at 3-4.

40.     All of these positions—which the Debtors, the UCC, and the Bondholders espoused as recently as several weeks ago—are consistent with the Consortium's pending appeal. Now, the Debtors in their Disclosure Statement ask creditors to approve a Plan that codifies the Allocation Decision's "extreme detrimental and disparate impact" on U.S.-only Unsecured Creditors. See Reconsideration Motion at 12. The intractable problem with the SPSA, however, is that it proceeds from a tainted starting point—namely, the Allocation Decision. Although the projected recoveries to U.S.-only Unsecured Creditors are marginally higher under the SPSA than under the Allocation Decision, by setting an artificially-low "anchor point" on U.S. recoveries, U.S.-only Unsecured Creditors are still burdened by the Bankruptcy Court's improper substantive consolidation of the Nortel Debtors and the related (and even more troubling and completely nonsensical) result that follows from the Bond Guarantee Claims *not*

---

[12] See *Opening Brief of Appellant The Official Committee of Unsecured Creditors of Nortel Networks Inc., et al. In Support of Appeal From the Allocation Opinion* [D.Ct. Docket No. 57] (the "UCC Op. Br.") filed December 3, 2015.

[13] See *Opening Brief of Appellant The Ad Hoc Group of Bondholders* [D.Ct. Docket No. 66] (the "Bondholders' Op. Br.") filed December 3, 2015.

*being counted* as a claim for allocation purposes but potentially *being allowed* as a claim under the U.S. Plan. In fact, recoveries to U.S.-only Unsecured Creditors are far closer—by a factor of between 1.8x - 3.0x—to the recoveries under the Allocation Opinion than to what was advocated for by the U.S. Debtors during trial. At a minimum, the Disclosure Statement must be amended to explain why U.S.-only Unsecured Creditors should accept a recovery range that the Debtors previously assailed as inequitable, and also to clarify the existence and impact of the Consortium's pending appeal before the Third Circuit.

      **C.**    **The Disclosure Statement Omits The Controversy Regarding The Bond Guarantee Claims.**

      41.    The Disclosure Statement provides no information whatsoever as to the present controversy—heavily briefed by the Consortium *and the Debtors* in the District Court—regarding the allowance of the Bond Guarantee Claims under a U.S. Plan. Plainly, voting creditors cannot make an informed judgment about the Plan where the Disclosure Statement omits such elemental information. See Gen. Elec. Credit Corp. v. Nardulli & Sons, Inc., 836 F.2d 184, 188 (3rd Cir. 1988). The Disclosure Statement must therefore provide a complete and accurate description of the issues regarding the allowance of the Bond Guarantee Claims against the U.S. estate, including the potential effect on the estate in the event that the Third Circuit agrees with the Consortium's interpretation of the law.

      42.    The treatment of the Bond Guarantee Claims under a U.S. plan is perhaps ***the*** most important remaining issue in this case. The Consortium explained in its briefing before the District Court that because the Allocation Decision constitutes a *de facto* substantive consolidation of the Nortel Debtors, the Bond Guarantee Claims must not be allowed in full against the U.S. estate under a U.S. plan. The Consortium explained that under the Bankruptcy Court's own Allocation Protocol, the Bankruptcy Court lacked authority to influence the claims

reconciliation process at each Nortel Debtor.  Further, the Consortium explained that although the Bankruptcy Court cited Ivanhoe[14] in its Reconsideration Order (but did not say it applied), the Ivanhoe rule does not apply where, as here, a court has effectively substantively consolidated multiple debtor estates.

43.     Importantly, the Consortium was not alone in raising these issues on appeal. Indeed, in their briefing before the District Court, the Debtors made the very argument that "[b]y providing one allocation but dual recovery for the Crossover Bondholders, the [Allocation Decision] devastates the recoveries of the U.S. Debtors' other general unsecured creditors."[15]

44.     Despite all this, the Disclosure Statement is utterly silent on this issue.  Voting creditors are entitled to know that the Consortium is endeavoring to prevent the Bondholders from absorbing a disproportionate share of the value in the U.S. estate.  Moreover, voting creditors are entitled to know that, as the Debtors themselves previewed in their Reconsideration Motion, a favorable outcome in the Third Circuit with respect to the Ivanhoe issue will significantly improve recoveries for U.S.-only Unsecured Creditors.[16]

**D.     At A Minimum, The Disclosure Statement Should Be Amended To Include A Letter From The Consortium Voicing Its Objection To The SPSA.**

45.     At a minimum, the Disclosure Statement should be amended to include a letter from the Consortium (the "Consortium Letter") that sets forth the Consortium's objections to the SPSA and Plan and advises other similarly-situated U.S.-only Unsecured Creditors to vote against acceptance of the Plan.

---

[14] Ivanhoe Bldg. & Loan Ass'n v. Orr, 295 U.S. 243 (1935).

[15] See Debtors' Reply Br. at 55.

[16] See Reconsideration Motion at 10, n. 13.

46.     Accordingly, should the Court approve the Disclosure Statement for solicitation, the Consortium respectfully requests that it be permitted to provide the Consortium Letter as an enclosure to the Disclosure Statement reflecting the Consortium's views as described herein, including the right to make a recommendation to vote against acceptance of the Plan.  See In re Motor Coach Indus., Inc., No. 08-12136 (Bankr. D. Del. 2008), Tr. of Proceedings held Dec. 17, 2008 at 44:7-46:21 (allowing creditors' committee to include in solicitation package a letter outlining the committee's issues with the proposed plan); Central Transport, Inc. v. Roberto (In re Tucker Freight Lines, Inc.), 62 B.R. 213, 215 n.1 (Bankr. W.D. Mich. 1986) (permitting creditors' committee objecting to a disclosure statement to include in the ballot package a letter recommending that creditors vote against acceptance of the plan); In re Federated Dep't Stores, Inc., Consolidated Case No. 1-90-00130, 1992 WL 605483, at *7 (Bankr. S.D. Ohio Jan. 10, 1992) (solicitation packages included a letter from creditors' committee recommending a vote in favor of the plan).  Prior to the Disclosure Statement hearing, the Consortium will provide a copy of the Consortium Letter enclosure to the Debtors and submit it to the Court for approval of its inclusion in the Plan solicitation materials.

**III.     The Disclosure Statement Cannot Be Approved Because It Attempts To Short-Circuit The Settlement-Approval Requirements Of Bankruptcy Rule 9019.**

47.     The Disclosure Statement also cannot be approved because it attempts to short-circuit the mandatory settlement-approval requirements of Bankruptcy Rule 9019.  Notwithstanding that the SPSA is most assuredly a "compromise or settlement" within the purview of Bankruptcy Rule 9019, neither the Disclosure Statement nor the Plan contemplates compliance with this core Bankruptcy Code requirement.  Rather, in the Disclosure Statement the Debtors blithely assert that compliance with Bankruptcy Rule 9019 is "at their discretion."

<u>See</u> Disclosure Statement at 121.  As discussed below, the Debtors' insistence that compliance with the Bankruptcy Rules is somehow "discretionary" is without merit.

### A.    Approval Of The SPSA Requires Compliance With Bankruptcy Rule 9019.

48.    Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>") authorizes the Court "to approve a compromise or settlement, provided that notice is given to the debtors, creditors, the United States Trustee and any other permitted party."  Fed. R. Bankr. P. 9019(a).

49.    The law in this and other circuits is clear that in order to approve a settlement a debtor *must* satisfy the requirements of Bankruptcy Rule 9019.   <u>See</u> <u>Valucci v. Glickman, Berkovitz, Levinson & Weiner (In re Glickman, Berkovitz, Levinson & Weiner)</u>, 204 B.R. 450, 455 (E.D. Pa. 1997) ("The bankruptcy court *must review* the settlement of…claims under Bankruptcy Rule 9019(a).") (emphasis added); <u>see also</u> <u>Motorola, Inc. v. Official Comm. of Unsecured Creditors and JPMorgan Chase Bank, N.A. (In re Iridium Operating LLC)</u>, 478 F.3d 452, 455 (2d Cir. 2007) (observing that before "settlements can take effect, however, they must be approved by the bankruptcy court pursuant to Bankruptcy Rule 9019.").   The *mandatory* nature of Bankruptcy Rule 9019 is borne out of courts' concerns regarding the unfair treatment to non-settling creditors that could result from a settlement that is not subjected to judicial scrutiny.  <u>See</u> <u>Eddy v. Nat'l Union Fire Ins. Co. (In re Med. Asset Mgmt., Inc.)</u>, 249 B.R. 659, 663 (Bankr. W.D. Pa. 2000) ("The fairness to the settling parties of a proposed settlement agreement may not warrant its approval if the rights of others who are not parties to the settlement agreement are unduly prejudiced. We must further determine that no one has been set apart for unfair treatment.") (quotation marks omitted).  For this reason, courts are hesitant to allow debtors to seek approval of allocation-related settlements through the plan confirmation

process.  See In re Adelphia Commc'ns Corp., 327 B.R. 143, 172 (Bankr. S.D.N.Y. 2005) (Gerber, J.) (noting, with respect to a settlement regarding allocation issues, "I am uncomfortable with the proposal made by the Debtors…that [the settlement] be left to the plan negotiation process.  While I always welcome consensual agreement, I think the Debtors' proposal lacks the necessary mechanism for giving creditors their day in court on the allocation issues if agreement cannot be achieved.").

50.    Despite the mandatory nature of Bankruptcy Rule 9019, the Disclosure Statement provides that "[t]he Plan provides that the Debtors, at their discretion, may seek approval of the SPSA as to any Debtor pursuant to Bankruptcy Rule 9019."[17]  The Disclosure Statement further provides that "[i]f the Plan is not confirmed as to any of the Debtors, the Debtors will nonetheless seek to have entry into the SPSA authorized by the Bankruptcy Court under Bankruptcy Rule 9019."[18]  The motivations that underlie the Debtors' attempt to short-circuit Bankruptcy Rule 9019 are clear enough: by side-stepping Rule 9019's requirement that any settlement be fair and equitable and in the best interests of the estate, the Debtors evidently have calculated that they can push the SPSA through the plan-approval process (and, if necessary, cram-down any objectors).  Try as they might, however, the Debtors are not permitted to circumvent the Bankruptcy Code.

51.    Approving compromises under Bankruptcy Rule 9019 is committed to the discretion of this Court.  Key3Media Group, Inc. v. Pulver.com, Inc. (In re Key3Media Group, Inc.), 336 B.R. 87, 92 (Bankr. D. Del. 2005).  In exercising this discretion, the Court must decide whether "the compromise is fair, reasonable, and in the best interest of the estate." In re TSIC, Inc., 393 B.R. 71, 78 (Bankr. D. Del. 2008).  In order to pass muster under Bankruptcy Rule

---

[17] See Disclosure Statement at p. 121 (§IV.N.5).

[18] See Disclosure Statement at p. 145 (§VIII).

9019, a proposed settlement must be "fair and equitable." In re Capmark Fin. Grp., Inc., 438

B.R. 471, 475 (Bankr. D. Del. 2010). Under Bankruptcy Rule 9019, the bankruptcy court should

"canvass the issues to determine whether the settlement falls above the lowest point in the range

of reasonableness." Id. at 475-76. "To obtain approval of a settlement, the Debtors must

demonstrate the settlement satisfies, by a preponderance of the evidence, the requirements

imposed by Bankruptcy Rule 9019 and the Third Circuit's decision in *Myers v. Martin (In re*

*Martin)*, 91 F.3d 389, 393 (3d Cir. 1996)." See In re Capmark Fin. Grp. Inc., 438 B.R. at 509.

52.    A debtor may not circumvent Bankruptcy Rule 9019 by grafting a settlement into

a plan and then merely soliciting votes on the plan-qua-settlement. See Reynolds v. Comm'r,

861 F.2d 469, 473 (6th Cir. 1988) ("In bankruptcy proceedings, as distinguished from ordinary

civil cases, any compromise between the debtor and his creditors must be approved by the court

as fair and equitable."); In re Glickman, Berkovitz, Levinson & Weiner, 204 B.R. at 455 ("The

bankruptcy court must review the settlement of pre-petition claims under Bankruptcy Rule

9019(a)."); In re Leslie Fay Cos., 168 B.R. 294, 305 (Bankr. S.D.N.Y. 1994) ("Compromises

may not be made in bankruptcy absent notice and a hearing and a court order.").

53.    In analyzing whether a compromise is fair and equitable, the Court looks to the

fairness of the settlement to all parties in interest. Will v. Northwestern Univ. (In re Nutraquest,

Inc.), 434 F.3d 639, 645 (3d Cir. 2006). Moreover, when considering the best interest of the

estate, the Court must "assess and balance the value of the claim that is being compromised

against the value to the estate of the acceptance of the compromise proposal." Myers v. Martin

(In re Martin), 91 F.3d 389, 393 (3d Cir. 1996) (hereinafter, "Martin") (citing Protective Comm.

Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424-25 (1968)). In striking

this balance, the Court should consider: (1) the probability of success in litigation; (2) the likely

difficulties in collection; (3) the complexity of the litigation involved and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of creditors. Martin, 91 F.3d at 393; Law Debenture Trust Co. v. Kaiser Aluminum Corp. (In re Kaiser Aluminum Corp.), 339 B.R. 91, 96 (D. Del. 2006); Fry's Metals, Inc. v. Gibbons (In re RFE Indus., Inc.), 283 F.3d 159, 165 (3d. Cir. 2002).

54.    A settlement will not pass muster under the four Martin factors where "[t]he compromise . . . severely adversely impacts . . . creditors who were not at the negotiating table and who were not adequately represented in their absence." In re Nutritional Sourcing Corp., 398 B.R. 816, 835 (Bankr. D. Del. 2008). Nutritional Sourcing involved a compromise with respect to the scope of the definition of "trade creditors" under a plan. After considering the four Martin factors, the court also observed that "all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise should be considered as well." Id. at 833. Particularly relevant was that "[u]nder the fair and equitable standard, [courts] look to the fairness of the settlement to other persons, i.e., the parties who did not settle." Id. (quoting In re Nutraquest, 434 F.3d at 645). Although the court found that factors 1 and 3 of the Martin test weighed in favor of approving the settlement, the court rejected the settlement under the fourth Martin factor. Id. at 834-35. This was because "[t]he compromise . . . severely adversely impacts 'non-goods' trade creditors who were not at the negotiating table and who were not adequately represented in their absence." Id. at 835. The court observed that the recovery of "non-goods" trade creditors decreased from 100% to 13.2% based on the settlement. Id. at 836-37. However, no "non-goods" trade creditors participated in the negotiations. Id. at 835. About half of the parties to the negotiations had an incentive to narrow the definition in order to increase their own recoveries to the detriment of the "non-goods" trade creditors, and although

the debtors' interests aligned with those of the "non-goods" trade creditors, the debtors had an incentive to create a plan that would receive the requisite percentage of votes. Id. at 835-36. Therefore, there was no one to adequately represent the interests of "non-goods" trade creditors in the negotiations and the settlement was not "fair and reasonable." Id. at 836.

55.    As in Nutritional Sourcing, here Nortel's U.S.-only Unsecured Creditors were not adequately represented in the SPSA negotiations.  While the Consortium was present at the mediation, the other parties decided to settle around the Consortium.  In effect, the Consortium was permitted to be present at the mediation only superficially.  And, while the UCC is supposed to act as fiduciary for all U.S. unsecured creditors, the facts and circumstances here indicate that none of the members of the UCC is representative of the U.S.-only Unsecured Creditors (notwithstanding the fact that members of the Consortium attempted to join the UCC).    The UCC is comprised of three members—the Pension Benefit Guaranty Corporation ("PBGC"), The Bank of New York Mellon ("BNYM") (as indenture trustee to the Crossover Bonds), and Law Debenture Trust Company of New York ("Law Debenture") (as indenture trustee to the NNCC Bonds).  Not one of these entities can be said to have the same concerns or interests as a typical U.S.-only Unsecured Creditor.  As reflected in the U.S. Debtors' recent objection to the PBGC's claims, the PBGC has its own issues to be focused on.[19]  Moreover, the PBGC has certain statutory rights that enable it to assert its claims against multiple U.S. Debtors, thus enhancing its recoveries as compared to other U.S.-only Unsecured Creditors.  And, of course BNYM and Law Debenture support the SPSA—under it, the Crossover Bonds and NNCC Bonds are likely to recover at or close to par (and also enjoy generous fee reimbursement terms).  Such treatment means little to U.S.-only Unsecured Creditors, however.  In fact, earlier in the Cases the

---

[19] See Debtors' *Reply to PBGC "Response" to Debtors' Motion for an Order Authorizing Entry into Canadian Currency Escrow Agreement to Facilitate Global Settlement* [D.I. 17280].

Consortium submitted a request to the U.S. Trustee to have one or two of its members added to the UCC.  Once the UCC indicated that it did not support the request, the U.S. Trustee formally declined the request.  Therefore, the fact that the UCC is a party to the SPSA and supports the Plan is at once unsurprising and meaningless from the perspective of U.S.-only Unsecured Creditors, and therefore should be given very little weight in a Rule 9019 assessment.

56.     Moreover, U.S.-only Unsecured Creditors are severely and adversely impacted by the SPSA because it cements in place the Allocation Decision's impermissible and dilutive impact on U.S.-only Unsecured Creditors.  In addition, here, as in <u>Nutritional Sourcing</u>, creditors who are not parties to the SPSA are being asked to "take one for the team" for the benefit of those who are parties to that agreement.  <u>See</u> <u>In re Nutritional Sourcing Corp.</u>, 398 B.R. at 833.  Such treatment does not comport with the Bankruptcy Code's "fair and equitable" standard for settlement approval.  <u>See</u> <u>id.</u>

**B.     Judicial Scrutiny Of The SPSA Under Bankruptcy Rule 9019 Is Particularly Important Here, Given That U.S.-only Unsecured Creditors Are Being Asked To Accept A Recovery Range That The Debtors Have Assailed As Inequitable.**

57.     The dubious value of the SPSA to U.S.-only Unsecured Creditors is perhaps best illustrated by comparing (a) the positions taken by the Debtors during the Allocation Trial with respect to the allocation of the Sale Proceeds, with (b) the U.S. Allocation under the SPSA that the Debtors now claim is "good enough" under the circumstances.  Given the Debtors' recent change of heart respecting the positions taken in their prior briefing, judicial oversight of the SPSA is especially critical to protect the rights of U.S.-only Unsecured Creditors who are not parties to that agreement.

58.     During the Allocation Trial in the spring of 2014, the Debtors argued that the Sale Proceeds should be allocated based upon the relative percentage of revenue generated by each of

the Selling Debtors.  On this basis, the U.S. would capture approximately 72.7% of the $7.3 billion of Sale Proceeds.[20]  This corresponded to a dividend recovery of approximately 100.0% to U.S.-only Unsecured Creditors.

59.    This Court's Allocation Opinion issued on May 14, 2015 was a disappointment to the Debtors and all U.S. parties in interest.  Under the Allocation Opinion, the U.S. would capture only 11.2% of the Sale Proceeds.  As a result of the Allocation Opinion, the recovery to U.S.-only Unsecured Creditors fell from 100.0% (nearly universally agreed to during the Allocation Trial) to approximately 40.0%.[21]

60.    Against this backdrop, the Debtors now ask the Court to bless the SPSA, under which the *entire* U.S. Allocation from the Sale Proceeds will be only approximately 24.4%.  See Disclosure Statement at 80-81.  If left to stand, recoveries to U.S.-only Unsecured Creditors will amount to only between 55.1% - 61.2%.  See id. at 10.  Meanwhile, the Crossover Bonds' recovery will be at or close to par as, per the SPSA and Plan, the Bonds recover from both the U.S. and Canadian Estates.

---

[20] See *Allocation Trial Opinion* [D.I. 15544] dated May 12, 2015 (the "Allocation Op.") at 92.  Such figure does not include the impact of the U.S. Debtors' $2 billion intercompany claim against the Canadian Debtors.

[21] See *Opening Brief of Appellant the Nortel Trade Claims Consortium in Support of Appeal from the Allocation Opinion* [D. Ct. Docket No. 74] (the "Consortium Op. Br.") at 2.

61.     The table below summarizes the percentage of the Sale Proceeds allocated to the U.S. estate and the corresponding recoveries to U.S.-only Unsecured Creditors at each of the three critical junctures in the Cases:

| Recoveries to U.S. estate (percentage basis) | | | |
|---|---|---|---|
| | **Allocation Trial** | **Allocation Decision** | **SPSA** |
| U.S. share of Sale Proceeds | 72.7%[22] | 11.2%[23] | 24.4%[24] |
| Recovery to U.S.-only Unsecured Creditors | 100.0%[25] | 40.0%[26] | 55.1-61.2%[27] |

62.     As illustrated by the figures above, the recoveries to U.S.-only Unsecured Creditors under the SPSA are between 38.8% - 44.9% lower than the par recovery for which the Debtors argued during the Allocation Trial.  The Disclosure Statement contains not one scintilla of explanation as to why U.S.-only Unsecured Creditors should accept a 55.1% - 61.2% recovery as being within the range of reasonable settlement outcomes.  Moreover, that recoveries to U.S.-only Unsecured Creditors are higher under the SPSA than they are under the Allocation Decision is of no moment: as the Debtors themselves have argued strenuously before the District Court, the Allocation Decision is legally indefensible and, accordingly, it establishes an artificially low baseline for purposes of determining whether the SPSA is fair and equitable to U.S.-only Unsecured Creditors.

---

[22] See Allocation Op. at 92.  Such figure does not include the impact of the U.S. Debtors' $2 billion intercompany claim against the Canadian Debtors.

[23] See Reconsideration Motion, ¶3.

[24] See Disclosure Statement at 80.

[25] See Reconsideration Motion, ¶ 7.

[26] See Reconsideration Motion, ¶ 13.

[27] See Disclosure Statement at 10.

28

IV.     **The Disclosure Statement Fails To Provide Any Meaningful Information Regarding The Plan's Generous Treatment Of NNCC Bondholders.**

63.     Section 3.2 of the Plan provides for the substantive consolidation of NNI and NNCC.  Under the Plan, the NNCC Bonds Claims are allowed (a) against NNI as a general unsecured claim in the amount of $150,951,562 and (b) against NNL as an unsecured Proven Claim in the amount of $150,951,562.  See Disclosure Statement at 83.  In addition, the Debtors have agreed to pay up to $5 million in legal and other fees on behalf of the NNCC Bonds Trustee and two significant holders of NNCC Bonds.  Id.

64.     As if such treatment were not generous enough for holders of *unsecured* bonds, the Debtors have in effect agreed to play the role of insurer to the NNCC Bondholders by agreeing "to reserve $7.5 million from cash otherwise available for distributions to NNI unsecured creditors, to be made available to be paid in respect of the NNCC Bonds Claims in the event that distributions…in respect of the NNCC Bonds Claims will be less than $150,951,562."  See Disclosure Statement at 83, n. 25.  Perhaps unsurprisingly, the NNCC Bondholders are a party to the SPSA.

65.     Conspicuously missing from the Disclosure Statement, however, is any meaningful explanation or justification for the Plan's first-class treatment of the NNCC Bondholders.  At a minimum, U.S.-only Unsecured Creditors deserve an answer to the following question: why should U.S.-only Unsecured Creditors, whose recoveries have already plummeted on account of the Allocation Decision, have to foot a $5 million legal bill *and* reserve another $7.5 million of their recoveries for the benefit of a creditor group that *already* is able to recover from both the U.S. and Canadian estates?  Surely, a "hypothetical reasonable investor" would want an answer to this question in order to make an informed judgment about the Plan.  See In re Crowthers McCall Pattern, Inc., 120 B.R. 279, 300 (Bankr. S.D.N.Y. 1990).

**V.    The Solicitation Procedures In The Disclosure Statement Approval Motion Are Unlawful Insofar As They Attempt To Circumvent The Bankruptcy Code's Numerosity Requirement.**

66.    The Debtors' Disclosure Statement Approval Motion[28] is unlawful insofar as the Solicitation Procedures contained therein attempt to circumvent the "numerosity" requirement of Bankruptcy Code section 1126(c).    Paragraph 42(s) of the Disclosure Statement Approval Motion provides that "[f]or purposes of the numerosity requirement of section 1126(c) of the Bankruptcy Code and based on a reasonable review by the Solicitation Agent, *separate Claims held by a single creditor in a particular class shall be aggregated as if such creditor held one Claim against the Debtors in such class*, and the votes related to such Claims shall be treated as a single vote to accept or reject the Plan."    Disclosure Statement Approval Motion, ¶42(s) (emphasis added).    This transparent attempt to silence the voice of U.S.-only Unsecured Creditors is, however, completely unmoored from the overwhelming weight of caselaw which holds that creditors are entitled to one vote for *each* claim they hold.    See In re Figter Ltd., 118 F.3d 635 (9th Cir. 1997) (creditor who purchased 21 unsecured claims was entitled to vote each of those claims against confirmation of plan); In re Gilbert, 104 B.R. 206, 210 (Bankr. W.D. Mo. 1989) ("The formula contained in Section 1126(c) speaks in terms of the number of claims, not the number of creditors, that actually vote for or against the plan."); In re Kreider, 2006 WL 3068834, *3 (Bankr. E.D. Pa. Sept. 27, 2006) (holding that the claims of five related entities were each entitled to be counted for numerosity purposes).    Accordingly, this unlawful provision must be stricken from the Disclosure Statement.

---

[28] See *Debtors' Motion for Entry of an Order (I) Approving Adequacy of Information Contained in Disclosure Statement, (II) Establishing Voting Record Date, (III) Approving Procedures for Soliciting, Receiving and Tabulating Votes on the Plan, and (IV) Scheduling Confirmation Hearing Date and Establishing Notice and Objection Procedures* [D.I. 17350] (the "Disclosure Statement Approval Motion").

67.     As a threshold matter, the Consortium believes that its members, along with similarly-situated creditors, may hold sufficient claims such that a "no" vote on the Plan by such creditors may result in Class A-3A rejecting the Plan, thereby creating an impaired dissenting class.  See 11 U.S.C. §1126(c).  The Debtors will therefore be forced to avail themselves of the "cram-down" mechanics of Bankruptcy Code section 1129(b).  Although the Consortium need not delve into specifics at this juncture, suffice it to say that the Consortium seriously doubts that the Debtors will be able to demonstrate that the Plan does not unfairly discriminate and is fair and equitable to U.S.-only Unsecured Creditors.  See 11 U.S.C. §1129(b).

**VI.     The Plan Described In The Disclosure Statement Is Not Confirmable.**

68.     While the Consortium appreciates that plan-related objections are not properly raised until the plan confirmation stage, it is nonetheless that law in this Circuit that even if the Disclosure Statement provides adequate information (which it does not), a disclosure statement that describes a plan that is unconfirmable on its face should not be approved.  See In re American Capital Equip., LLC, 688 F.3d 145, 148 (3d Cir. 2012).

69.     A disclosure statement should not be approved if the plan it describes is unconfirmable on its face, because approving the disclosure statement and proceeding to a confirmation hearing would be a "futile" exercise.  See In re American Capital Equip., LLC, 688 F.3d at 154 ("a bankruptcy court may address the issue of plan confirmation where it is obvious at the disclosure statement stage that a later confirmation hearing would be futile because the plan described by the disclosure statement is patently unconfirmable."); In re Curtis Ctr. Ltd. .P'ship, 195 B.R. 631, 638 (Bankr. E.D. Pa. 1996) ("[A] disclosure statement should be disapproved where the plan it describes is patently unconfirmable.").

70.     The Plan described by the Disclosure Statement is not confirmable on its face

because, in at least six respects, the Plan contravenes Bankruptcy Code section 1129(a)(3)'s

requirement that a plan be "proposed…not by any means forbidden by law."  See 11 U.S.C.

§1129(a)(3).  Broadly speaking, the "forbidden by law" language of section 1129(a)(3) requires a

plan to "fairly achieve a result consistent with the objectives and purposes of the Bankruptcy

Code."  See In re PWS Holding Corp., 228 F.3d 224, 242 (3d Cir. 2000).  Briefly summarized

below are several reasons why the SPSA and Plan are inconsistent with this requirement:

- **Failure to satisfy Bankruptcy Rule 9019**: As discussed supra, the Plan impermissibly attempts to short-circuit the mandatory settlement approval requirements of Bankruptcy Rule 9019.  In this manner, the Plan is proposed "by…means forbidden by law."  See 11 U.S.C. §1129(a)(3).

- **Improper substantive consolidation of NNCC into NNI**: Another key component of the Plan is the Debtors' substantive consolidation of NNCC into NNI.  Disclosure Statement at 5-6.  This is surprising, given the Debtors' vehement arguments in the District Court that substantive consolidation, in all its forms, is improper in these Cases. See Debtors' Reply Br. at 29-30 ("Because the facts in this case do not meet the standards for corporate disregard set forth in Owens Corning—as the Bankruptcy Court found and as Appellees do not contest—the corporate separateness of the Debtors must be respected.").  The Debtors also argued—correctly—that "Owens Corning prohibits corporate disregard in any form unless its test is met."  See Debtors' Op. Br. at 41.

  Curiously, the Debtors now seek to substantively consolidate NNCC into NNI without any explanation as to how such a consolidation satisfies the Owens Corning test.  As the Debtors briefed ad nauseam in the District Court, "the Owens Corning court set forth an exacting test that must be satisfied before a court may order substantive consolidation: either (i) prepetition [the entities] disregarded separateness so significantly their creditors relied on the breakdown of entity borders and treated them as one legal entity, or (ii) postpetition their assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors."  Debtors Op. Br. at 41 (citing Owens Corning, 419 F.3d at 211). But the Debtors have repeatedly emphasized that the Owens Corning test is not satisfied with respect to any members of the Nortel Group.  See id. at 42 ("the members of the Nortel Group assiduously respected corporate formalities."); ("the Bankruptcy Court correctly found no evidence that the Nortel entities ever disregarded corporate separateness prepetition").  In this manner as well, the Plan is proposed "by…means forbidden by law."  See 11 U.S.C. §1129(a)(3).

- **Failure to provide for escrow of recoveries pending Consortium's appeal**: Relatedly, the Disclosure Statement and Plan must be amended to provide for an escrow of the

Consortium's additional, potential recoveries while the Consortium's appeal of the Allocation Decision remains pending. If the Consortium's appeal succeeds in the Third Circuit, holders of U.S. Trade Claims will be entitled to an additional recovery of between 38.8% - 44.9%. Until these funds are escrowed, the Plan is proposed "by…means forbidden by law." See 11 U.S.C. §1129(a)(3).

- **Improper distribution on account of the Bond Guarantee Claims**: The SPSA and Plan propose to make a full, unreduced distribution out of the U.S. estate on account of the nearly $4.0 billion in Bond Guarantee Claims. Disclosure Statement at 51. This ignores not only the gravamen of the Consortium's appeal, but also that the Bondholders already get the benefit of a full Proven Claim against the Canadian Debtors. Until the Consortium's appeal is resolved, the Debtors should not be permitted to give value away to the Bondholders that otherwise belongs to U.S.-only Unsecured Creditors. Such treatment surely does not comport with the "objectives and purposes of the Bankruptcy Code." See In re PWS Holding Corp., 228 F.3d at 242.

- **Unjustifiably high allocation to NNCALA**: Under the SPSA, NNCALA is receiving an allocation amount of $50,070,950. Disclosure Statement at 80. However, assuming the methods reflected in the Kinrich Report[29] apply to the total Lockbox allocation to the U.S. estate, NNCALA should only receive $13,533,514. Accordingly, the SPSA creates an unjustifiable value leakage from NNI of $36,537,439. This is contrary to the "objectives and purposes of the Bankruptcy Code" and should not be permitted. See In re PWS Holding Corp., 228 F.3d at 242.

- **Improper substantive consolidation of Canadian Debtors**: The SPSA provides for the substantive consolidation of the Canadian Debtors. Disclosure Statement at 82. But the impact of this is to reduce the amount of value the Bondholders otherwise could have recovered from the Canadian estate, which *increases* the value the Bondholders are able to soak up out of the U.S. estate (all to the detriment of U.S.-only Unsecured Creditors). And the Debtors have provided zero justification as to why the substantive consolidation of the Canadian Debtors is necessary or appropriate. This is also improper and should not be allowed at this juncture. See In re PWS Holding Corp., 228 F.3d at 242.

71.     For these additional reasons, the Court should refuse to approve the Disclosure Statement.

---

[29] See *Expert Report of Jeffrey H. Kinrich* [D.I. 13659] (the "Kinrich Report") filed May 28, 2014.

## **RESERVATION OF RIGHTS**

72.     In addition to the objections asserted and relief requested herein, the Consortium expressly reserves all of its rights to assert additional objections to the Disclosure Statement at the Disclosure Statement Hearing, and expressly reserves all of its rights to object separately to the Plan, on any basis whatsoever (whether or not referenced herein).

## CONCLUSION

**WHEREFORE**, the Consortium respectfully requests that the Court: (i) sustain the

Objection; (ii) deny the approval of the Disclosure Statement and Solicitation Procedures; and

(iii) grant such other and further relief as the Court may deem just, proper and equitable.


Dated:  November 18, 2016
Wilmington, Delaware

**FOX ROTHSCHILD LLP**

*/s/ Jeffrey M. Schlerf*
Jeffrey M. Schlerf (DE No. 3047)
L. John Bird (DE No. 5310)
Courtney A. Emerson (DE No. 6229)
Citizens Bank Center
919 North Market Street, Suite 300
Wilmington, DE 19801
Telephone: (302) 654-7444
Facsimile: (302) 656-8920
Email: jschlerf@foxrothschild.com

and

**BROWN RUDNICK LLP**
Steven D. Pohl, Esq.
Christopher M. Floyd, Esq.
One Financial Center
Boston, MA 02111
Telephone:  (617) 856-8200
Facsimile:  (617) 856-8201
Email: spohl@brownrudnick.com
        cfloyd@brownrudnick.com

*Counsel to the Nortel Trade Claims
Consortium*