## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

--------------------------------------------------------X
                                                :

| | |
|---|---|
| *In re* | Chapter 11 |
| Nortel Networks Inc., *et al.*,[1] | Case No. 09-10138 (KG) |
| Debtors. | (Jointly Administered) |
| | **Related Docket Nos. 17347, 17348 & 17350** |

-------------------------------------------------------- X

## OBJECTION OF SNMP RESEARCH INTERNATIONAL, INC. AND SNMP RESEARCH, INC. TO PROPOSED DISCLOSURE STATEMENT FOR THE FIRST AMENDED JOINT PLAN OF NORTEL NETWORKS INC. AND CERTAIN OF ITS AFFILIATED DEBTORS

SNMP Research International, Inc. ("SNMPRI") and SNMP Research, Inc. (individually or together with SNMPRI, "SNMP Research"), through its undersigned counsel, objects to the Debtors' Motion for Entry of an Order (I) Approving Adequacy of Information Contained in Disclosure Statement, (II) Establishing Voting Record Date, (III) Approving Procedures for Soliciting, Receiving and Tabulating Votes on the Plan, and (IV) Scheduling Confirmation Hearing Date and Establishing Notice and Objection Procedures Date [Docket No. 17350] (the "Motion for Approval"), and the accompanying Debtors' Proposed Disclosure Statement for the First Amended Joint Plan of Nortel Networks Inc. and Certain of its Affiliated Debtors [Docket No. 17348] (the "Disclosure Statement").  As discussed below, not only does the Disclosure Statement fail to provide the kind of adequate information required for approval, approval also

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567), Nortel Networks (CALA) Inc. (4226), and Nortel Networks India International Inc. (8667).  Contact information for the Debtors and their petitions are available at http://chapter11.epiqsystems.com/nortel.

should be denied because the proposed Chapter 11 plan is patently not confirmable due to the

provisions in the plan that would eliminate SNMP Research's rights to be treated with

fundamental fairness and to be assured of receiving payment of their claims to the extent

allowed.[2]

## I.     INTRODUCTION

During the first few years of these Chapter 11 cases, the Debtors completed the

liquidation of their business and assets.  After several more years under the protection of this

Court, the Debtors recently reached an agreement with the "Canadian Debtors," the "EMEA

Debtors," and certain other parties, on the allocation of the billions of dollars of proceeds from

the sales of Nortel's assets.  At this stage, the Court could have reasonably expected that a

Chapter 11 plan to distribute the cash assets of the Debtors' estates to creditors in accordance

with their respective priorities would be a relatively straightforward and simple undertaking.  All

the Debtors needed to do, and should be expected to do without this Court's intervention, is to

file a plan that respects two fundamental principles of the United States Bankruptcy Code (the

"Bankruptcy Code"):  (1) that each creditor, even one whose claim is disputed, is entitled to be

treated fairly and in a manner consistent with the provisions of the Bankruptcy Code; and (2) that

each creditor with an allowed claim must be assured of receiving payment to the same extent as

other creditors of the same class.

The Debtors instead chose a different tack.  The Debtors have proposed a Chapter 11 plan

(the "Plan")[3] that weaves together multiple opaque provisions which, if confirmed by this Court,

---

[2] SNMP Research has other objections to confirmation not raised in this Objection, including an objection to substantive consolidation of  NNI and NNCC, because they involve issues of fact which are appropriately addressed at confirmation.  SNMP Research reserves all of their rights to raise such additional objections to confirmation at the appropriate time.

[3] Capitalized terms not otherwise defined in this Objection shall have the meanings ascribed to them in the Plan.

would authorize the Debtors to discriminate against SNMP Research and to permanently deprive SNMP Research of payments on both their prepetition and postpetition claims, ***despite the fact that the Court has already held that the Debtors improperly transferred or disclosed SNMP Research's software to purchasers of the Debtors' assets in violation of copyright laws***.[4]

SNMP Research already has spent millions of dollars investigating and litigating the Debtors' unlawful conduct, and expects to complete discovery in the pending adversary proceeding by the end of January 2017 and to commence trial later the same year. This Court then will determine the amount of SNMP Research's Administrative Expense Claims and General Unsecured Claims.  Under the Plan, the Effective Date need not occur until August 31, 2017.  Plan, §9(ix), at 45.  Accordingly, the timing of the SNMP Research litigation is quite close to the timing of the Debtors' target date for having their Chapter 11 plan become effective.

The Plan, however, attempts to usurp the Court's power to determine the amounts to be paid to SNMP Research, and to reserve to the Debtors, in their "discretion", how much to pay SNMP Research on account of their allowed claims.  The Plan therefore is not confirmable as a matter of law, due to its failure to comply with multiple provisions of Sections 1123 and 1129 of the Bankruptcy Code, including the requirement that the Plan be filed in good faith.

The Debtors' attempt to discriminate against SNMP Research cannot be explained by necessity.  SNMP Research's Administrative Expense Claims, if allowed in full, will only constitute approximately 2 % of the cash available for distribution to creditors in the Consolidated Debtors' cases, and SNMP Research's General Unsecured Claims, if allowed in full, will only constitute approximately 3% of the total projected Allowed General Unsecured

---

[4] The Debtors' conduct also constituted a violation of trade secret laws and SNMPRI's license agreement with Nortel.

Claims in the Consolidated Debtors' cases.[5]  With respect to the other Debtors, SNMP

Research's Administrative Expense Claim clearly can be paid in full by the Consolidated

Debtors, and its General Unsecured Claims will simply be added to the pool of holders of

General Unsecured Claims who are entitled to share on a pro rata basis whatever distribution is

available to be made to such creditors.  Consequently, the Debtors can eliminate the fatal defects

in the Plan without any feasibility issue.  Until they do, the Court should make clear that the

confirmation process cannot move forward.  Because the Plan is patently not confirmable, the

Debtors' Motion for Approval should be denied and the accompanying Disclosure Statement

should not be approved.

## II.   RELEVANT  FACTS

### A.   SNMP Research's Claims

SNMP Research has two classes of claims against the Debtors – (1) Administrative

Expense Claims and (2) prepetition claims which fall within Class 3A for General Unsecured

Claims under the Plan.  SNMP Research's Administrative Expense Claims arise from the

Debtors' (i) post-petition unauthorized use of SNMP Research's software (the "Software") prior

to the business line sales (the "Business Line Sales") to certain buyers (the "Post-Petition Use

Claims"); and (ii) unauthorized transfer or disclosure of the Software was part of the sale of their

Business Line Sales to various entities (the "Transfer Claims").  In addressing the profits

component of the Transfer Claims, the Court held in its Memorandum Opinion entered in the

SNMP Research adversary proceeding on February 8, 2016 [Adv. D.I. 359], that the Debtors

transferred SNMP Research's software to purchasers as part of the Business Line Sales, without

Court authority.  The Court found that "[s]uch transfers constitute infringement under the

---

[5] These percentages may increase or decrease, as discovery is not yet complete in the SNMP Research adversary proceeding.  However, in no event would they be expected to rise to a level that would adversely impact the viability of the Plan.

53651/0001-13818580v4

Copyright Act, as (1) SNMP Research owned the software and (2) Nortel copied or transferred it (or allowed it to be copied or transferred)." Adv. D.I. 359 at 13.

Only recently has SNMP Research obtained the information necessary to calculate the amount of their claims against the Debtors. On November 2, 2016, SNMP Research submitted its expert report to the Debtors in the parties' adversary proceeding to determine the allowed amount of SNMP Research's pre- and post-petition claims. As set forth in that report, SNMP Research's expert has calculated that SNMP Research's prepetition damages total at least $81.08 million. These damages resulted from the Debtors' prepetition use and distribution of the Software in unlicensed products outside the scope of SNMP Research's license agreements with the Debtors, in violation of the U.S. Copyright Act and applicable trade secret laws, as well as for unpaid royalties, license and maintenance fees, prepetition interest, and profits attributable to the infringement and trade secret violations. The expert report also calculated damages relating to SNMP Research's postpetition claim (i.e., Administrative Expense Claim) in the total amount of at least $47.12 million. These damages include actual damages (including claims related to certain buyers' post-sale unauthorized use of the Software for which the U.S. Debtors are contributorily liable) and Nortel's profits received from such unauthorized use prior to and as part of the Business Line Sales.

**B.      The Cash to Be Distributed under the Plan**

While the amounts of SNMP Research's claims are substantial, they pale in comparison to the total cash to be distributed under the Plan. According to the Disclosure Statement, looking just at the numbers for the estates of Nortel Networks, Inc. and Nortel Networks Capital Corporation, the Debtors have $3.026-3.036.1 billion to distribute among creditors, with only $200,000 of secured claims to be paid. Accordingly, there is no issue as to the feasibility of the Plan. Disclosure Statement, Appendix C [Docket No. 17348-3], at 10. The Plan's disregard of

5

fundamental fairness with respect to its treatment of SNMP Research as well as other provisions

of the Plan, however, create fatal issues which make the Plan patently not confirmable.  The Plan

and the Disclosure Statement also suffer from other serious deficiencies, which are discussed

below.  The Court should not permit further confirmation proceedings until these fundamental

flaws are eliminated.

## III.   ARGUMENT

### A.   Approval of a disclosure statement should be denied where the plan is not confirmable as a matter of law.

Confirmation issues usually are reserved for the confirmation hearing, and are not

addressed at the disclosure statement stage, as often the issues involve disputes of fact requiring

a full evidentiary hearing.  However, "if it appears there is a defect that makes a plan inherently

or patently unconfirmable, the Court may consider and resolve that issue at the disclosure stage

before requiring the parties to proceed with solicitation of acceptances and rejections and a

contested confirmation hearing."  *In re Am. Capital Equip., LLC*, 688 F.3d 145, 153-54 (3d Cir.

2012)(quoting and citing cases).  *Accord, In re 266 Washington Associates*, 141 B.R. 275, 288

(Bankr. E.D.N.Y.), *aff'd sub nom*, *In re Washington Associates*, 147 B.R. 827 (E.D.N.Y. 1992)

(A disclosure statement will not be approved where, as here, it describes a plan which is fatally

flawed and thus incapable of confirmation.").  As explained by the Third Circuit, "a '[c]ourt

[should] not proceed with the time-consuming and expensive proposition of hearings on a

disclosure statement and plan when the plan may not be confirmable because it does not comply

with [confirmation requirements].'"  *American Capital,* 688 F.3d at 154.  A Chapter 11 plan is

patently not confirmable where its defects cannot be overcome by creditor voting results and

there are no disputed facts relevant to the determination of the defects.  *Id*. at 154-55.

6

In considering an objection of this kind, the debtor or plan proponent has the burden of proving that the proposed disclosure statement is adequate, "including showing that the plan is confirmable or that defects might be cured or involve material facts in dispute." *Id.* In the present cases, the Debtors cannot meet this burden of proof.

**B.     The Plan is not proposed in good faith, as a matter of law, and the provisions singling out SNMP Research for unfavorable treatment of their claims violate multiple provisions of the Bankruptcy Code and render the Plan not confirmable.**

Section 1129(a)(3) of the Bankruptcy Code requires that a Chapter 11 plan be proposed in good faith and not by any means forbidden by law. Courts have recognized that good faith requires a determination of whether the plan "'will *fairly* achieve a result consistent with the objectives and purposes of the Bankruptcy Code.'" *American Capital*, 688 F.3d at 156-57 (emphasis added). The Third Circuit has recognized in multiple cases that the Bankruptcy Code objectives include (i) discouraging debtor misconduct, and (ii) "achieving fundamental fairness and justice." *Id.* at 157 (citing *In re Kaiser Aluminum Corp.*, 456 F. 3d 328, 339-43 (3d Cir. 2006). *Accord*, *Stonington Partners, Inc. v. Official Comm. of Unsecured Creditors (In re Lernout & Hauspie Speech Products, N.V.),* 308 B.R. 672 675 (D. Del. 2004) (recognizing that a plan must be proposed with "fundamental fairness in dealing with the creditors").

It also is a fundamental principle of bankruptcy law and an express requirement of the Bankruptcy Code that a Chapter 11 plan must treat claims in the same class in an identical manner. 11 U.S.C. § 1123(a)(4) ("a plan shall …provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment"). *See In re LightSquared, Inc.*, 534 B.R. 522, 537 (S.D.N.Y. 2015) (internal quotations omitted), *aff'd sub nom. Ahuja v. LightSquared Inc.*, 644 F. App'x 24 (2d Cir. 2016), *cert. denied,* No. 16-211, 2016 WL 4367371 (U.S. Oct. 17, 2016) (*citing In re Quigley Co., Inc.,*

377 B.R. 110, 116–17 (Bankr. S.D.N.Y. 2007)); *In re Weiss-Wolf, Inc.*, 59 B.R. 653, 655 (Bankr.

S.D.N.Y. 1986).  *Accord, In re ARN LTD. Ltd. P'ship*, 140 B.R. 5, 13 (Bankr. D.D.C. 1992).

     A Chapter 11 plan cannot be confirmed unless it "complies with the applicable

provisions" of the Bankruptcy Code.  11 U.S.C. § 1129(a)(1).  With Section 1123(a)(4), this

means that to be confirmable, a plan must provide that "all *allowed* claims within a particular

class should get the same treatment, and that if claims are disputed and not yet allowed (but have

the potential to be allowed), reasonable measures must be taken to ensure that the required same

treatment is received if and when they are allowed."  *In re Motors Liquidation Co.*, 447 B.R.

198, 215 (Bankr. S.D.N.Y. 2011).  As explained in *Weiss-Wolf:*

> The disparate treatment cannot be justified on the grounds that the
> [creditor's] claims are disputed by the Debtor.  A debtor need not, course,
> pay disputed claims until the claims are fixed and the dispute resolved.
> However, a debtor must make provision for payment of disputed claims so
> that if and when allowed the claims have reasonable assurance that they
> will receive identical treatment.

59 B.R. at 655.

     In the *Weiss-Wolf* case, the bankruptcy court denied approval of the disclosure statement

because the plan was not confirmable as a result of a two-step distribution scheme under which

holders of undisputed claims would receive an immediate distribution from available assets and

holders of disputed claims would be paid at some future date if there were any monies

remaining.  *Id.* at 655.  The court was so offended by such a blatantly unfair plan proposal that it

also scheduled a hearing to consider a motion to convert the case to Chapter 7, because it was

"evident that the Debtor's scheme is to leave the [objecting creditors] with an empty bag as the

Debtor proposes to distribute all known assets prior to resolution of the disputes respecting the

[creditors'] claims."  *Id.*  As discussed below, this is **exactly** what the Debtors' Plan proposes to

do and the same result--denial of approval of the disclosure statement--should be ordered here.

1.     The Offending Plan provisions for treatment of SNMP Research's
Administrative Expense Claim

A review of the Plan provisions relevant to SNMP Research's claims reveals numerous

fatal defects in the Plan, including blatant discrimination against SNMP Research, as well as

other violations of several different provisions of the Bankruptcy Code.  With respect to SNMP

Research's Administrative Expense Claims, Section 6.3(f) of the Plan vests in the Debtors and

the Plan Administrator the power to agree to the amount of a cash reserve to be established to

make future payments to Disputed Claims "as provided by the Plan."  Plan, § 6.3(f), at 43.

Section 15.5 of the Plan provides that the Debtors shall create a cash reserve for Disputed

Administrative Expense Claims "in an amount reasonably determined by the Debtors to the

extent such claims have not yet been filed or are unliquidated, or in such other amount as may be

approved by the Bankruptcy Court."  Plan, § 15.5, at 76.  Section 11.6 of the Plan further

provides that with respect to all Disputed Claims that are unliquidated, "the Wind-Down Debtors

or Plan Administrator, as applicable, will reserve Cash equal to the amount reasonably

determined by the Debtors, Wind-Down Debtors or Plan Administrator."  Plan, § 11.6, at 63.

These provisions, which are bad enough, are further modified by Section 4(f) of the

Settlement and Plan Support Agreement, Exhibit A to the Plan (the "Settlement Agreement"),[6]

which singles out SNMP Research and provides:

> SNMP – There shall be no holdback of Sale Proceeds with respect to any
> Liability that may be due or become due to one or both of SNMP Research
> International Inc. or SNMP Research Inc. (either or together, "**SNMP**").

Settlement Agreement, § 4(f), at 23.   This provision negates Section 10.3 of the Plan, which

provides that Allowed Administrative Expense Claims, among other priority claims, must be

---

[6] The Settlement Agreement and all other Exhibits to the Plan are incorporated into and are a part of the Plan.  Plan,
§ 1.4, at 28.

paid in full before the Disbursing Agent may make distributions to more junior claim holders under the Plan.  Plan, § 10.3, at 57.  In this way, the Plan disregards the  requirements of Section 1129 of the Bankruptcy Code under which administrative expenses must be paid in full.

Under these provisions of the Plan, the Debtors would have no obligation to reserve any funds to ensure that SNMP Research will receive full payment of its Allowed Administrative Expense Claims.  The Plan therefore explicitly authorizes the Debtors to pay creditors holding claims junior to SNMP Research's Administrative Expense Claims without paying anything to SNMP Research.

That a Chapter 11 plan must provide for payment in full of all allowed administrative claims is not subject to debate.  *See, e.g., In re Lehman Bros. Holdings Inc.*, 508 B.R. 283, 289 (S.D.N.Y. 2014), *motion to certify appeal denied,* 2014 WL 3408574 (S.D.N.Y. June 30, 2014); *In re Scott Cable Commc'ns, Inc.*, 227 B.R. 596, 600 (Bankr. D. Conn. 1998) (*citing Pan Am Corp. v. Delta Air Lines, Inc.,* 175 B.R. 438, 456, 508 (S.D.N.Y. 1994).  "Administrative expenses are specially favored post-petition claims, given priority in asset distribution over most other claims against the bankruptcy estate." *In re Mid Region Petrol, Inc.,* 1 F.3d 1130, 1132 (10th Cir. 1993).  A plan that fails to provide for full payment of administrative claims cannot be confirmed, as among other reasons, it would fail to meet the requirements of Section 1129(a)(9)(A) of the Bankruptcy Code.  Such a plan would also violate the fair and equitable requirements of Section 1129(b)(2)(B) of the Bankruptcy Code.  The only way to meet this requirement is to provide a cash reserve to ensure full payment of the administrative claim in dispute in the event it is allowed post-confirmation.  *See In re Spansion, Inc.*, 426 B.R. 114, 146 (Bankr. D. Del. 2010) (citing *In re Adelphia Bus. Solutions, Inc.*, 341 B.R. 415, 419 (Bankr. S.D.N.Y. 2003)).

10

Accordingly, under Section 1129 of the Bankruptcy Code and precedent, the Plan is not confirmable unless SNMP Research is assured that when the amount of their Allowed Administrative Expense Claim is finally adjudicated, it will receive full payment to the extent its claims are allowed.  The Plan does the opposite, and would expressly authorize the Debtors and Plan Administrator to arrange for the cash required to pay SNMP Research to be gone, through accelerated distributions to junior creditors, before SNMP Research's Administrative Expense Claims are adjudicated.

This fatal defect of the Plan also violates the "best interest" requirements of Section 1129(7)(A)(ii), because in a Chapter 7, SNMP Research would be absolutely assured of full payment.  With respect to this defect, Administrative Expense Claims usually are not subject to the "best interest" requirement because Section 1129 requires that they be paid in full.  In the present cases, however, the Plan impairs SNMP Research's Administrative Expense Claims by eliminating any assurance that the claims will be paid in full to the extent allowed.  The Plan thus fails to meet the "best interest" test, since this could not happen if these cases were converted to Chapter 7.  *See* 11 U.S.C. § 1129(a)(7)(A)(ii).

As previously discussed, the unfavorably harsh treatment of SNMP Research's Administrative Expense Claims cannot be justified by the Debtors' dispute over the amount of SNMP Research's claims.  *See supra* at 6-8.  *Accord*, *ARN LTD. Ltd. P'ship*, 140 B.R. at 13.  As noted by one court:  "[o]f course it's true … that courts in this and other jurisdictions have required debtors to establish reserves with assets sufficient to pay disputed claims in full to allow creditors full pro rata recovery on their claims."  *Motors Liquidation*, 447 B.R. at 215.

2.    The Offending Plan provisions for treatment of SNMP Research's General Unsecured Claims

SNMP Research's prepetition damages, as calculated by SNMP Research's expert, total at least $81.08 million.  Section 4.3(c) of the Plan provides that each holder of an Allowed General Unsecured Claim in Class 3A shall receive its Pro Rata Share of the Creditor Proceeds as of the applicable Distribution Date.  Plan, § 4.3(c), at 36.  Like the provisions concerning Administrative Expense Claims, if this were the only provision relevant to the payment of SNMP Research's Allowed General Unsecured Claims, there would be no fatal problem in the Plan with respect to the treatment of SNMP's General Unsecured Claim.  But that is not the case.  As discussed above, Section 11.6 of the Plan, concerning the Disputed Claims Reserve, and Section 4(f) of the Settlement Agreement, combine to deprive SNMP Research of any assurance that it will receive its Pro Rata Share of the amounts to be distributed to holders of Allowed General Unsecured Claims.  *See supra* at 9-10. The Plan thus violates the basic requirement for confirmation that claims in the same class must receive the same treatment under the Plan.  *See supra* at 6-8.  A plan that singles out one member of a class for unfavorable, inferior treatment cannot be confirmed.  *Id.*

C.    **The Plan provisions for post-confirmation estimation of claims for purposes of distribution are not permissible as a matter of law.**

The Plan also contains broad provisions for post-confirmation estimation of claims in Section 11.3.  Plan, § 11.3, at 62-63.  Such provisions seek to override the requirements of Section 502(c) of the Bankruptcy Code, which permits estimation of contingent and unliquidated claims only when the fixing or liquidation of the claim would "unduly delay the administration of the case."  Consistent with the clear terms of Section 502(c), estimation of claims is only permitted when necessary to avoid undue delay in the administration of the case.  *See, e.g., In re Stone & Webster, Inc.*, 279 B.R. 748, 809 (Bankr. D. Del. 2002) ("A court must only perform an

12

estimation proceeding where the fixing of the claim 'would unduly delay' the administration of the bankruptcy case." (citations omitted).

As explained by one court: "From the plain language of § 502(c), it is clear that **estimation does not become mandatory merely because liquidation may take longer and thereby delay administration of the case**. Liquidation of a claim, in fact, will almost always be more time consuming than estimation. Nonetheless, **bankruptcy law's general rule is to liquidate, not to estimate**. For estimation to be mandatory, then, the delay associated with liquidation must be 'undue.'" *In re Dow Corning Corp.*, 211 B.R. 545, 562-63 (Bankr. E.D. Mich. 1997) (emphasis added).

"Something is 'undue' if it is 'unjustifiable.'" *Id*. at 563 (citing Random House College Dictionary, at 1433 (rev. ed. 1980)).  In *Dow Corning* the debtors were, as of the petition date, defendants in 19,000 individual silicone-gel breast implant lawsuits, at least 45 putative silicone-gel breast implant class actions and approximately 470 other product liability lawsuits. *See id.* at 553.  The debtors and a committee of tort claimants sought to implement an estimation procedure to address these claims.  Despite the enormous number of lawsuits facing the debtors, the court held that the proponents of estimation failed to establish that liquidating the claims would result in "undue delay."  *First*, the court found that estimation had three risks: (i) inaccuracy; (ii) costs associated with litigating how best to undertake estimation; and (iii) delay and expense associated with the estimation process itself. *Id.* at 563.  Against these risks, the court found that the primary risk of liquidating the claims was time delay, but that risk itself was highly speculative and not mitigated by an estimation process that itself would likely cause delay.  *Id.* The court noted that the debtors' tort cases involved "extremely contentious issues" that were "highly complex" and would "require the presentation of many witnesses, many pieces of

evidence and extensive oral argument" and that "[a]bbreviating the time parties have to present

their cases at an estimation hearing would … be ill-advised." *Id.* The court also noted that

dissatisfaction with the estimation results would result in delay through appeals. *Id.* at 564.

*Second*, the court was not sympathetic to the debtors' arguments that estimation was

necessary because its customers and employees were growing anxious over the debtors'

protracted bankruptcy proceedings. *Id.* at 564. The court noted that no party had asked to

terminate the case and that employee anxiety was a factor in every bankruptcy case. *Id.* The

court concluded that the risk of additional bankruptcy costs if the cases were extended while

claims were liquidated was a wash, given that significant bankruptcy costs would be incurred

through an estimation process. *Id.* at 564-65. *Third*, the court noted that estimation would not

avoid the need for claims to ultimately be liquidated, essentially resulting in duplication. *Id.* at

566. Ultimately the *Dow Corning* court concluded that "[e]stimation has little to recommend it.

Moreover, estimation only delays the inevitable." *Id.* at 574.

Even in cases where courts permitted the estimation process to be used for certain

purposes, assurance was provided that the disputed claims, once allowed, would be protected and

treated equally with other allowed claims of the same class. *See*, *e.g.*, *Motors Liquidation,* 447 at

215; *In re Lehman Bros. Holdings Inc.,* Case No. 08-13555 (JMP), [ECF 24726] (S.D.N.Y.

2008); *Adelphia,* 341 B.R. 415, 423-24 (Bankr. S.D.N.Y. 2003) (limiting use of estimation

proceedings solely for the purpose of determining feasibility of plan, stating that "were the

estimation process to set the outer limits of allowance for such claims, the due process rights of

such claimants would be jeopardized to a troublesome degree")(*citing In re MacDonald*, 128

B.R. 161, 164-165 (Bankr. W.D. Tex. 1991)).

14

In *Adelphia*, the Honorable Robert E. Gerber expressly rejected use of estimation proceedings to determine the amount of the disputed claimant's ultimate distribution or recovery under the plan, explaining:

> The better rule seems to be that estimation primarily serves to assist the court and parties in interest in evaluating the feasibility of a given plan under Section 1129(a)(11).  In addition, the estimation process may fulfill the allowance requirement for purposes of Section 1129(a)(9), but will not … set the "outer limits of a claimants' right to recover."  Rather, the ultimate allowance of the claim will set that right.

341 B.R. at 423-24 (*quoting In re MacDonald*, 128 B.R. at 161).  *See also In re Chemtura Corp.,* 448 B.R. 635, 647-48 (Bankr. S.D.N.Y. 2011) (bankruptcy court estimated prepetition disputed claim of creditor who did not object to estimation process for purpose of determining amount of disputed claim reserve fund under plan, but required the debtors to establish a separate reserve for each of the objecting creditors **with funds in the full amount of their claims**).

In the present cases, there is no justification for authorizing the Plan Administrator, post-confirmation, to invoke estimation procedures to fix the amount of claims for purposes of distribution.  This is not a reorganization case.  The Plan is little more than a mechanism to distribute over $3 billion to unsecured priority and non-priority creditors.  Confirmation does not require any estimation of claims to determine feasibility of the Plan or to implement it in a manner consistent with the Bankruptcy Code.

SNMP Research has incurred millions of dollars of legal fees and expenses in connection with the complaint and adversary proceeding against the Debtors, and expects discovery to be completed in January 2017 and trial to be scheduled after that.  The Debtors cannot properly be permitted to cancel the litigation and replace it with an estimation proceeding of the Debtors' design post-confirmation.

**D.    The Release, discharge, and injunction provisions of the Plan violate the Bankruptcy Code.**

Section 13.2 of the Plan provides that all holders of Claims against the Debtors will be

"DEEMED TO HAVE WAIVED, RELEASED, VOIDED AND DISCHARGED EACH OF

THE DEBTORS AND THE WIND-DOWN DEBTORS" from any and all claims arising prior to

the Effective Date. Plan, §13.2, at 68. This provision violates Section 1141(d)(3) of the

Bankruptcy Code. Under Section 1141(d)(3), confirmation of a Chapter 11 plan does not

discharge the debtor where the Debtors have been or will be liquidated and will not engage in

business after consummation of the Plan, and would not be entitled to a discharge under Section

727(a) of the Bankruptcy Code if these cases were in Chapter 7. All these elements

disqualifying the Debtors from a confirmation discharge are present here, which disqualifies the

Debtors from receiving a discharge or release. In addition, the wording of the release and

discharge provisions of the Plan are all-encompassing, and read literally would release the

Debtors from the SNMP Research claims being prosecuted against the Debtors in the pending

adversary proceeding.

The Plan also provides for an extraordinarily broad release of the Debtors and a number

of non-Debtor parties, defined as the "Plan Released Parties", from all claims, including

unknown claims, with some modest qualifications at the end of the provision. Plan, § 13.3, at

69-70. The release of claims against non-Debtors is not limited to those creditors who

affirmatively vote for the Plan or consent to such releases. Instead, it applies to all "HOLDERS

OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS AND EACH OF SUCH

HOLDERS' PREDECESSORS, SUCCESSORS, EMPLOYEES, CONSULTANTS AND

AGENTS." The parties released also include the Debtors' "PREDECESSORS, SUCCESSORS,

ASSIGNS AND EACH OF THEIR PRESENT AND FORMER OFFICERS, DIRECTORS,

EMPLOYEES, CONSULTANTS AND AGENTS", the identities of which are nowhere described. *Id*. Such a broad third-party release for non-debtors is not permissible in the circumstances of these cases, absent the consent of the creditors to which it is to apply, since the Plan Released Parties have made no monetary contribution to the Debtors' estates or otherwise meet the requirements for granting such extraordinary non-debtor third party releases. *See generally Gillman v. Cont'l Airlines (In re Cont'l Airlines)*, 203 F.3d 203, 211-17 (3d Cir. 2000)(finding that a non-consensual third-party release of another third party was not valid); *In re Dow Corning Corp.,* 280 F.3d 648 (6th Cir.), *cert. denied*, 537 U.S. 816 (2002); *In re Washington Mut., Inc.,* 442 B.R. 314, 348 (Bankr. D. Del. 2011) ("There is nothing unusual about this case that demonstrates that the Committee or its members have done anything other than fulfill their fiduciary duties.  Under the *Master Mortgage* factors, they do not qualify for a release from the Debtors.").  Just as in *Washington Mutual, Inc*., in the present case "there is no basis whatsoever for the Debtors to grant a release to directors and officers or any professionals of the Debtors, current or former," or for that matter any other person included in the Plan Released Parties.  *See* 442 B.R. at 349.

Making these provisions even more offensive, Section 13.3 of the Plan expressly provides that the release and discharge provisions in that section apply not only to creditors who vote to accept the Plan but also to any creditors who are "PRESUMED TO HAVE VOTED FOR THIS PLAN UNDER SECTION 1126(F) OF THE BANKRUPTCY CODE."  Plan, § 13.3, at 69.  Under this provision, SNMP Research could be deemed to have lost any ability to bring claims against the Plan Released Parties for its Administrative Expense Claims or other claims because SNMP Research could be deemed to have accepted the Plan under the Plan and does not

have an opportunity to vote to reject the Plan on account of its Administrative Expense Claims, even though SNMP Research's rights are significantly impaired under the Plan.

Another insidious aspect of the broad release provisions is the vague reference to "assigns." As the Debtors and this Court know, SNMP Research has substantial claims against assigns of the Debtors as a result of the Debtors' unauthorized disclosure and transfer of SNMP Research's software to purchasers of assets from the Debtors. While SNMP Research has settled with buyers such as Radware Ltd., GENBAND, Inc. and Avaya, Inc., it is entirely possible that additional unknown claims against "assigns" could arise or be discovered in the future resulting from Nortel's improper transfer or disclosure of the Software to such "assigns." The attempt by the Debtors to include such a broad release of non-Debtors would impair SNMP Research's rights to pursue claims against third parties even though no third party is named in the release and none of such parties made any contribution to the funding of the Plan.

In addition, the Plan includes an impermissibly broad provision for injunction against all holders of Claims prohibiting the continuation of any pending proceedings of any kind. Plan, § 13.6, at 71-72. This provision would prevent SNMP Research from completing the litigation against the Debtors with respect to the allowance of SNMP Research's Administrative Expense Claim and General Unsecured Claim. These defects make the Plan not confirmable.

  **E. The Plan provision requesting approval of the Settlement and Plans Support Agreement as a settlement agreement under Bankruptcy Rule 9019, if the Plan is not confirmed for any individual Debtor, cannot be used to avoid the requirements for confirmation.**

Another artifice contained in the Plan is Section 12.6, captioned "Limited Severability of the Plan." Section 12.6 provides:

> In the event that the Plan is not confirmed for any individual Debtor, the Plan shall be treated at the Confirmation Hearing as a motion seeking approval of the SPSA pursuant to Bankruptcy Rule 9019 as to any such individual Debtor that does not confirm a Plan. Following approval of the

18

> SPSA, any individual Debtor may dismiss or convert its chapter 11 case,
> as necessary to effectuate the SPSA and the settlement contemplated
> therein ….

Plan, § 12.6, at 67.

Under this seemingly innocuous caption of severability, the Debtors are attempting to arrogate to themselves, and to wrest from the Court, the power to complete the administration of individual Debtor's cases even though confirmation of the Plan is denied.  This attempt to obtain all of the benefits of confirmation without meeting the requirements for confirmation under Section 1129 of the Bankruptcy is yet another fatal defect in the Plan.

A settlement proposed as part of a Chapter 11 plan may only be approved if the settlement itself is "fair and equitable" and conforms to the absolute priority rule.  *See TMT Trailer Ferry Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968); *In re Nutritional Sourcing Corp.,* 398 B.R. 816, 836-37 (Bankr. D. Del. 2008).  Approval of the Settlement Agreement, absent meeting confirmation requirements, is particularly inappropriate here, where the Settlement Agreement intentionally singles out SNMP Research by providing that no sale proceeds shall be reserved to account for SNMP Research's claims.

**F.  The proposed Disclosure Statement fails to provide adequate information concerning SNMP Research's claims, and the impact on the feasibility and implementation of the Plan in the event that SNMP Research's Administrative Expense Claims and General Unsecured Claims are allowed in full.**

Before a proposed disclosure statement can be approved, the Court must find that it provides "adequate information."  11 U.S.C. § 1125(b).  Section 1125(a)(1) defines the term "adequate information" to include "information of a kind, and in sufficient detail," to permit creditors voting on the plan "to make an informed judgment about the plan.  11 U.S.C. § 1125(a)(1).  As the Third Circuit has made clear:

> The importance of full disclosure is underlaid by the reliance placed upon the disclosure statement by the creditors and the court.  Given this reliance, we cannot overemphasize the debtor's obligation to provide sufficient data to satisfy the Bankruptcy Code standard of adequate information.

*Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp.*, 337 F.3d 314, 322 (3d Cir. 2003) (quoting *Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 417 (3d Cir. 1988)., *cert denied*, 488 U.S. 967 (1988)).

A basic element of a disclosure statement is to provide creditors with an estimate of what they may reasonably expect to receive under the proposed plan.  *See, e.g., In re Ferretti*, 128 B.R. 16, 19 (Bankr. D.N.H. 1991) ("[T]he [Disclosure] statement should inform the reader what the undisputed claims are, what the disputed claims are, what effect, if any, there will be on the distribution if disputed claims are or are not allowed, and when will distribution be made.  This requires a total dollar amount projected for the undisputed claims, and a total dollar amount projected for the disputed claims should they be allowed over objections"); *Krystal Cadillac-Oldsmobile,* 337 F.3d at 322 ("The importance of full disclosure is underlaid by the reliance placed upon the disclosure statement by the creditors and the court. Given this reliance, we cannot overemphasize the debtor's obligation to provide sufficient data…"); *In re Copy Crafters Quickprint, Inc.*, 92 B.R. 973, 981 (Bankr. N.D.N.Y. 1988) (denying confirmation for failure to provide adequate identification of which creditors were in which class); *In re Civitella*, 15 B.R. 206, 207 (Bankr. E.D. Pa. 1981) (denying confirmation because "[a]ll the averments made in the disclosure statement must be taken on faith by the voting parties without any factual basis sufficient for the voting parties to arrive at an informed decision").

In the present cases, the proposed Disclosure Statement provides creditors with estimates of recoveries within a "low end" and "high end" range.  In doing so, however, the Debtors assume that SNMP Research is paid nothing.  Disclosure Statement, Ap'x C, at 6.  Such wishful

thinking, without information about what will happen under the Plan if SNMP Research claims

are allowed in full, falls short of providing the necessary adequate information to obtain approval

of the Disclosure Statement.  It is fine for the Debtors to assume no payment to SNMP Research

on the "high end" estimates, but the "low end" estimates should be calculated with the

assumption that SNMP Research's claims are allowed in full.

In addition, the Disclosure Statement fails to provide adequate information about other

aspects of SNMP Research's claims.   Now that the Debtors have SNMP Research's expert

reports quantifying the amount of SNMP Research's Administrative Expense Claims and

General Unsecured Claims, this information should be added to the portion of the Disclosure

Statement describing SNMP Research's claims. *See* Disclosure Statement, at 52.  Without this

more current information, the Disclosure Statement significantly understates the amounts of

SNMP Research's claims and is misleading.

The Disclosure Statement also fails to disclose accurately the Court's grant of partial

summary judgment in SNMP Research's favor in the SNMP Research litigation.  To be accurate,

the Disclosure Statement should include the words used by this Court in its Memorandum

Opinion entered in the SNMP Research adversary proceeding on February 8, 2016, that as part

of the Business Line Sales, the Debtors transferred SNMP Research's software to purchasers

without Court authority, and "[s]uch transfers constitute infringement under the Copyright Act,

as (1) SNMP Research owned the software and (2) Nortel copied or transferred it (or allowed it

to be copied or transferred)."  Adv.  D.I. 359 at 13.  The Disclosure Statement states that this

Court "did not authorize the Debtors to sell SNMP Research's property, but denied the Debtors'

motion and left the issue raised … to be resolved at a later time."  Disclosure Statement at 52.

This is misleading, as the Court specifically held that "[t]he Sale Orders specifically did not

21

authorize the sale *or transfer* of any assets owned by SNMP or other non-debtors." (emphasis

added). At the very least, the Debtors should be required to quote accurately from the Court's

prior decisions and report on SNMP Research's estimated damages calculations.

Another failing of the Disclosure Statement is the inadequate disclosure of the release,

discharge and injunction provisions of the Plan. These provisions are found on pages 113-117 of

the Disclosure Statement. Other than repeating the words in the Plan for the corresponding

provisions, no disclosure is made as to the identities of the many non-Debtor parties that would

be the beneficiaries of these broad release, discharge and injunction provisions. In addition, no

justification is offered as to why the provisions for releases, discharge and injunctions are

necessary or appropriate. This complete failure to make proper disclosures for such a significant

part of the Plan falls woefully short of the kind of adequate information required to obtain

approval of a disclosure statement. *See generally In re Lower Bucks Hospital*, 571 Fed. App'x

139, 143-44 (3d Cir. 2014) (insufficient disclosures for non-consensual third-party release held

to be fatal to approval of the release provisions, which were excised from the plan).

## IV.    CONCLUSION

After almost 8 years under the protection of this Court's jurisdiction, the Debtors are

ready to request this Court's approval of a Chapter 11 plan that will authorize the Debtors to put

into place a structure for the distribution of billions of dollars of cash to holders of Allowed

Claims. Although the Debtors are quite capable of presenting such a plan that complies with the

Bankruptcy Code and assures all participants of fundamental fairness, the Debtors instead have

chosen to file a Plan that singles out SNMP Research for unfavorable treatment in disregard of

multiple provisions of the Bankruptcy Code, which makes the Plan not confirmable as a matter

of law. Given that the Plan's fatal defects are apparent without the need to consider any disputed

facts, the Motion for Approval should be denied, and the Debtors instructed to eliminate the

gratuitous defects in the Plan before proceeding to confirmation.  The Court also should instruct

the Debtors to make the necessary revisions to the Disclosure Statement to provide adequate

information on SNMP Research's claims and the release and injunction provisions.

WHEREFORE, SNMP Research requests that the Court deny approval of the Motion for

Approval, deny approval of the Disclosure Statement, and grant SNMP Research such other and

further relief as the Court deems just and proper.

Dated: November 18, 2016

**OF COUNSEL**

Richard S. Busch, Esq.
**King & Ballow Law Offices**
315 Union Street, Suite 1100
Nashville, TN 37201
(615) 259-3456 (Phone)
(615) 726-5417 (Fax)
rbusch@kingballow.com

   -and-


John L. Wood, Esq.
**Egerton, McAfee, Armistead &
Davis, P.C.**
900 S. Gay Street
Knoxville, TN 37902
(865) 546-0500 (Phone)
(865) 525-5293 (Fax)
jwood@emlaw.com

**COLE SCHOTZ P.C.**

*/s/  Norman L. Pernick*
Norman L. Pernick (No. 2290)
Nicholas J. Brannick (No. 5721)
500 Delaware Avenue, Suite 1410
Wilmington, DE 19801
(302) 651-2002 (Phone)
(302) 652-3117 (Fax)
npernick@coleschotz.com
nbrannick@coleschotz.com

   -and-

G. David Dean, Esq.
Irving E. Walker, Esq.
300 E. Lombard Street, Suite 1450
Baltimore, MD 21202
(410) 230-0660 (Phone)
(410) 230-0667 (Fax)
ddean@coleschotz.com
iwalker@coleschotz.com

*Counsel for Plaintiffs SNMP Research, Inc.
and SNMP Research International, Inc.*