**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

--------------------------------------------------------X
:
*In re*                                                   :      Chapter 11
:
Nortel Networks Inc., *et al.*,[1]                        :      Case No. 09-10138 (KG)
:
                                    Debtors.              :      Jointly Administered
:
:
:      Hearing Date: November 22, 2016 10:00 a.m. (ET)
:
--------------------------------------------------------X

**DEBTORS' OPPOSITION TO**
**PENSION BENEFIT GUARANTY CORPORATION'S**
**MOTION FOR SUMMARY JUDGMENT BRIEFING SCHEDULE**

Nortel Networks Inc. ("NNI") and certain of its U.S. affiliates, debtors and debtors in possession (collectively, the "Debtors"), hereby oppose the motion of the Pension Benefit Guaranty Corporation (the "PBGC") filed November 10, 2016 [D.I. 17380] (the "PBGC Motion" or the "Motion")[2] seeking a summary judgment briefing schedule for the Debtors' Objection to the PBGC Claims and the Amended PBGC Claims[3] filed on November 2, 2016 [D.I. 17325] (the "Objection").

---

[1] The debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567), Nortel Networks (CALA) Inc. (4226) and Nortel Networks India International, Inc. (8667). Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://dm.epiq11.com/nortel.

[2] By Order dated November 14, 2016, the Court set the Debtors' deadline to respond to the PBGC Motion as noon on November 21, 2016 [D.I. 17391].

[3] Capitalized terms not defined herein are used as defined in the Objection.

## PRELIMINARY STATEMENT

1.      The PBGC Motion must be denied.  It is procedurally deficient and wholly

lacking in merit.  Much like the PBGC Artificial Rate on which the PBGC Claims and the

Amended PBGC Claims for unfunded benefit liabilities are based, the Motion is the product of

an alternate universe – one that ignores demonstrable facts.  The PBGC cannot be permitted

simultaneously to attack the Global Settlement and seek to prevent the Debtors from attacking

the PBGC's spurious claims.

2.      For good measure, the PBGC Motion also ignores the record in this contested

matter:

- On the Bar Date, September 30, 2009, the PBGC Claims were filed alleging damages of $593 million.  The PBGC provided no Supporting Information for these claims as required by Bankruptcy Rule 3001(c).

- Nearly five years later, on July 7, 2014, the Amended PBGC Claims were filed alleging damages of $708 million.  Again, the PBGC provided no Supporting Information as required by Bankruptcy Rule 3001(c).  The PBGC did not seek leave of the Court to amend the PBGC Claims as required by Bankruptcy Rule 7015.

- On November 2, 2016, the Debtors filed the 53-page Objection and the supporting 296-page Tunis Declaration and exhibits, creating a contested matter under Bankruptcy Rule 9014.

- On November 4, 2016, during a conference call between the PBGC and counsel to the Debtors, the PBGC requested that the Debtors agree to relief sought in the PBGC Motion.  Counsel to the Debtors refused and informed the PBGC that the Debtors would seek discovery.  (PBGC Motion ¶ 3.)

- On November 10, 2016, the PBGC Motion was filed.

- On November 11, 2016, the Debtors served discovery requests on the PBGC; amended requests were served on November 15, 2016. [4]

---

[4]      The Debtors also have the right to pursue such documents through requests made under the Freedom of Information Act, 5 U.S.C. § 552 ("FOIA").

3.      The PBGC Motion is foreclosed both by the Bankruptcy Rules, which make no allowance for the fact-free summary judgment procedure the PBGC proposes, and by the nature of the Objection itself.  Responding to the PBGC Claims and Amended PBGC Claims, both of which were devoid of Supporting Information, the Objection is filled with detailed factual allegations concerning, among other things, the PBGC Claims, the Amended PBGC Claims, the PBGC's bad faith in waiting nearly five years to amend its claims, the PBGC's arbitrary and capricious application of its regulations in creating and using the PBGC Artificial Rate, as well as the severe prejudice other creditors will suffer if these claims are accepted as filed.  The Objection is replete with mixed questions of law and fact.  As such, the Debtors are entitled to discovery as a matter of right before they are required to face a motion for summary judgment.

4.      Critically, each allegation in the Objection requires the discovery of information in the PBGC's exclusive possession.  This information includes, most notably:  (*i*) the PBGC's basis for using the arbitrary and capricious annuity-based PBGC Artificial Rate in calculating its claim for unfunded benefit liabilities – even though in reality the PBGC invests in a portfolio of securities that earns significantly higher returns, resulting in a massive overstatement of the PBGC's claim by hundreds of millions of dollars; and (*ii*) the reasons for the PBGC's bad-faith decision (five years after the Bar Date and only days after the close of evidence in the Allocation Trial) to dramatically increase its claims by a staggering $114 million without explanation or seeking leave to amend the previously filed claims.  The PBGC has not yet responded to the Debtors' discovery requests,[5] but no valid objection exists that could *preclude all discovery* on the hundreds of millions of dollars of claims filed by the PBGC, which is the exact relief the PBGC seeks with its Motion.

---

[5]      The Debtors agreed to grant the PBGC an additional seven days to respond to the discovery requests.

5.      The PBGC's argument to preclude all discovery boils down to a single myopic concept – discovery will be "too expensive" and addressing legal issues first will be more efficient.  This suggestion is both perverse and unsupported by case law.  The PBGC Claims and the Amended PBGC Claims are overstated by hundreds of millions of dollars.  The Objection makes numerous specific factual allegations and is filled with mixed questions of law and fact, questions that require discovery.  Any reduction of these claims will provide immediate and material benefits to other creditors.  The cost of legitimate discovery pales in comparison to the harm other creditors will suffer if the PBGC is successful in its attempts to supersize its claims.[6] Two vocal creditor groups have joined the Objection[7] and no other party in interest supports the PBGC Motion.  It is the PBGC's oversized claims, not discovery in this dispute, that threatens the greatest harm.[8]  As such, discovery should commence immediately.

## ARGUMENT

## I.    THE DEBTORS ARE ENTITLED TO DISCOVERY AS A MATTER OF RIGHT BEFORE RESPONDING TO A MOTION FOR SUMMARY JUDGMENT

6.      The PBGC is unabashed that the Motion is "essentially a motion for summary judgment" (PBGC Motion at 1).  However, it ignores the procedural prerequisites to making such a motion – including the hornbook requirement that summary judgment is only appropriate once the opposing party "has had a full opportunity to conduct discovery."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986).  It is "well established" in this Circuit and others that "a

---

[6]      The prejudice to the Debtors and other creditors resulting from the other prong of the PBGC's gamesmanship strategy – its baseless attempt to scuttle the hard-fought Global Settlement after sitting quietly as an insider in these proceedings for nearly eight years – is also profound.

[7]      See Joinder of the Ad Hoc Group of Bondholders [D.I. 17397]; Joinder of the Nortel Trade Claims Consortium [D.I. 17407].

[8]      The PBGC's practice of overvaluing its liabilities is not only prejudicial to other creditors in bankruptcy, but is also harmful to the *pensioners whose interests the PBGC is charged with protecting* in a wide variety of circumstances, including those in the case at hand, because the PBGC's practice results in lower benefits being paid to those pensioners.

court 'is *obliged* to give a party opposing summary judgment an adequate opportunity to obtain

discovery.'" Shelton v. Bledsoe, 775 F.3d 554, 565 (3d Cir. 2015) (emphasis added) (quoting

Doe v. Abington Friends Sch., 480 F.3d 252, 257 (3d Cir. 2007)).  It could not be otherwise:

under Fed. R. Civ. P. 56 (made applicable to this contested matter by Bankruptcy Rules 9014 and

7056), summary judgment may only be granted "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a).  Thus, "by its very nature, the summary judgment process presupposes the

existence of an adequate record."  Doe, 480 F.3d at 257.  Here, as is readily apparent from the

face of the Debtors' Objection, there are a number of key factual disputes that must be resolved

before judgment, and there is, at this time, no factual record on which to do so.

       7.     The Third Circuit's decision in Doe is on point.  There, the Third Circuit held that

the district court erred in granting summary judgment on an Americans with Disabilities Act

claim when it concluded – "on the basis of a single affidavit submitted by the [movants] and

before allowing the [non-movant] any discovery into the factual basis" for the motion – that the

ADA's exemption for religious organizations applied to the claim against a religiously affiliated

school.  480 F.3d at 254.  The Third Circuit vacated summary judgment, holding that, as here,

the question at issue was "a mixed question of law and fact, the answer to which depends, of

course, on the existence of a record sufficient to decide it."  Id. at 258.  The Objection here

likewise raises numerous mixed questions of law and fact, including whether the PBGC

Artificial Rate used to calculate the PBGC's unfunded benefit liabilities claim accurately reflects

the harm the PBGC will suffer, whether the adoption and use of that rate is arbitrary and

capricious, and whether the PBGC's out-of-time amendments were made in bad faith (a fatal

defect under Third Circuit law).  As a result, the PBGC's contemplated motion for summary

judgment is as premature as the claim in <u>Doe</u>, if not more so.  At least in <u>Doe</u> the movant had

submitted an affidavit.  Here, the PBGC has not even submitted the Supporting Information

required by Bankruptcy Rule 3001(c), let alone any sort of sworn statement.

8.     The PBGC's contemplated motion for summary judgment would also be futile in

light of Fed. R. Civ. P. 56(d).  Under that Rule, where, as here, "Facts Are Unavailable to the

Nonmovant," the court may "defer" or outright "deny" the motion for summary judgment to

allow time for needed discovery.  Indeed, in the Third Circuit such "requests for discovery under

Rule 56(d)" are generally granted "as a matter of course," particularly where – again, as here –

"there are discovery requests outstanding or where relevant facts are under control of the party

moving for summary judgment."  <u>Shelton</u>, 775 F.3d at 568.

## II.    THE DEBTORS' OBJECTION RAISES MIXED QUESTIONS OF LAW AND FACT THAT CANNOT BE RESOLVED WITHOUT DISCOVERY

9.     The above procedural failings are alone sufficient reason to reject the PBGC's

pre-discovery race to judgment.  If, however, the Court sees fit to look past these failings, the

Objection raises a number of critical defects in the PBGC Claims and the Amended PBGC

Claims that can only be properly resolved on a complete factual record.

10.    The Objection raises at least six distinct grounds of attack,[9] which collectively

raise myriad factual issues.  For the most part, the PBGC does not dispute this.  The only

---

[9]     <u>First</u>, the PBGC's attempt to amend their claims upward by *$114 million* nearly five years after the
September 30, 2009 Bar Date and just thirteen days after the close of evidence in the allocation trial must be rejected
because the PBGC never made a motion to amend under Bankruptcy Rule 7015 and because the late amendments
were made in bad faith and at the expense of the estate and other creditors.  (<u>See</u> Objection ¶¶ 26-33.)  <u>Second</u>, the
PBGC's underfunding claims are based on purely fictional discount rates that do not come close to approximating
the damage suffered – the gap between the value of the assets transferred and the amounts necessary to pay the
Pension Plan's projected benefit liabilities given the expected returns implied by the PBGC's asset allocation
practices.  (<u>See</u> Objection ¶¶ 34-56.)  <u>Third</u>, the PBGC's claims are also overstated because they fail to account for
the PBGC's decision to delay the transfer of the Pension Plan assets for nearly 3 months from the Plan Termination
Date to the Trusteeship Date, during which time the Pension Plan assets increased by over *$88 million dollars*
(notwithstanding the arguments the PBGC can be expected to make under ERISA Section 4044(c)) (<u>See</u> Objection
¶¶ 57-58.)  <u>Fourth</u>, the PBGC's attempts to claim administrative or other priority for certain of the PBGC Claims,
whether as taxes or otherwise, are utterly without merit and must fail.  (<u>See</u> Objection ¶¶ 59-67.)  <u>Fifth</u>, the PBGC's

instances of purportedly "pure" legal questions it identifies are (*i*) "the applicability of PBGC's regulatory interest assumption" (in other words, is the PBGC Artificial Rate entitled to deference); (*ii*) "the statutory termination premiums"; and (*iii*) "whether PBGC can file an amended claim without filing a motion under Bankruptcy Rule 7015." (PBGC Motion ¶ 6.) The PBGC effectively concedes that discovery is necessary on all other factual issues raised in the Objection. Even as to these three purportedly "pure" questions of law, however, the PBGC is wrong.

## A. The Debtors Are Entitled to Discovery Concerning the PBGC's Selection of a Discount Rate That Significantly Overvalues Its Claim for Unfunded Benefit Liabilities

### 1. The Size of the PBGC's Claim Is a Mixed Question of Law and Fact

11.     The PBGC wrongly asserts that "the applicability of PBGC's regulatory interest assumption" entails only "pure legal questions that require no factual development." (PBGC Motion ¶ 6.)[10] To the contrary, the Debtors' objection to the PBGC's arbitrary and capricious discount rate – the PBGC Artificial Rate – raises a fundamentally factual question:  how much money would be required as of the Plan Termination Date to enable the PBGC to meet all pension obligations as they come due in the years to come?

---

claims for unpaid minimum funding contributions have no value given that  the Debtors made all of their required minimum funding payments (a point the PBGC appears to have conceded in its filing of its amended claim for minimum funding payments).  (*See* Objection ¶¶ 68-70.)  <u>Finally</u>, the late-filed Amended Insurance Claim for $83 million in so-called Termination Premiums also must fail because these claims apply only to debtors that emerge from chapter 11 as reorganized operating entities and are therefore inapplicable to the Debtors, which have had no business operations since 2011 and are engaged in a prolonged and undeniable wind-down process.  (*See* Objection ¶¶ 76-78.)

[10]     The PBGC asserts in its Motion that the "PBGC's 'decision-making processes' and 'additional information underlying the process by which the PBGC [regulatory] rate is set' . . . are not permissible subjects of discovery" (PBGC Motion ¶ 6), but does not say why this would be the case here.  It also asserts without explanation that the "PBGC's 'investment policies' . . . are irrelevant if the Court determines that PBGC's regulatory rate applies." (<u>Id</u>.) The Debtors disagree, but in any event the issue is not ripe.  To date, the PBGC has raised no formal objection to the Debtors' discovery requests.  The Debtors served the PBGC with discovery requests on November 11, 2016 and the PBGC's responses are not due until December 12, 2016.  Upon receipt of the PBGC's responses and objections (if any), the parties will meet and confer, as prescribed by the Fed. R. Civ. P. 26(c), to attempt to resolve any disputes before raising them with the Court.

12.     Under the Employee Retirement Income Security Act of 1974 ("ERISA"), the PBGC is entitled to recover only "the total amount of the unfunded benefit liabilities" as of the termination date, plus reasonable interest.  29 U.S.C.A. § 1362(b)(1)(A).  The "amount of unfunded benefit liabilities" is a defined term meaning "the excess (if any) of--(A) the value of the benefit liabilities under the plan (determined as of such date on the basis of assumptions prescribed by the corporation for purposes of section 1344 of this title), over (B) the current value (as of such date) of the assets of the plan.)."  29 U.S.C. § 1301(a)(18).  In other words, the PBGC may recover only the amount necessary to pay out the promised benefits – no more.

13.     However, in purportedly exercising its authority to determine the "assumptions" underlying part (A) of this equation, see 29 U.S.C. § 1301(a)(18), the PBGC has crafted an artificial discount rate, the PBGC Artificial Rate, that prefers its own claim ahead of those held by other creditors – a right which Congress, despite providing the PBGC many procedural advantages (including the ability to disregard corporate separateness), did not see fit to afford it. Specifically, the PBGC calculates its claims using the PBGC Artificial Rate, which is based on interest rates it publishes under its own Valuation Regulation set out in 29 C.F.R. §§ 4044.41-75. The PBGC Artificial Rate aims (inappropriately and imprecisely) to generate a value that approximates the cost of annuity contracts that would pay the benefits promised under a terminated pension plan, based on data received through the ACLI Survey of private insurance companies.  The methodological problems with the Survey as a measure of annuity-based interest rates are many (and ripe for discovery),[11] but the PBGC Artificial Rate suffers from a

---

[11]     Among other problems, the PBGC has no oversight over the Survey's implementation and has no access to crucial information, including:  (i) which insurers receive the survey and whether they offer the annuity products for which the PBGC is seeking information or the insurers' market share for such products; (ii) the seniority, training or access to product information of the recipient's employee(s) completing the Survey; (iii) whether the recipient has a specified industry rating, as issued by Moody's Ratings or Weiss Ratings, Inc., which may affect the pricing of their annuities; and (iv) what mortality and interest rate assumptions underlie the prices reported on each of the Surveys. (See Objection ¶¶ 46-51.)

more fundamental problem that also merits discovery:  the interest rates determined using the

Survey appear to bear no rational relationship to the stated purpose of the PBGC's Valuation

Regulation, which provides that the PBGC is only entitled to a claim in the amount needed by

the PBGC if it were to pay all benefits, not a claim in an amount that would generate a windfall

relative to, and at the expense of, other creditors.[12]

      14.     The fact that the PBGC Artificial Rate is published in one of the PBGC's

regulations makes factual development all the more critical.  The Debtors intend to show after

discovery that the PBGC Artificial Rate is arbitrary and capricious, "unmoored" from the

regulation's stated purpose, and therefore cannot dictate the amount of the PBGC's claims in this

bankruptcy.  Judulang v. Holder, 132 S. Ct. 476, 484 (2011); see 5 U.S.C. § 706 (2)(A).  It is a

basic tenet of administrative law that judicial review of agency action requires, at a minimum,

the "whole" administrative record, comprising all data relied upon by the agency in reaching its

conclusion.  See 5 U.S.C. § 706.  "Post hoc rationalizations" and litigation posturing will not

substitute for review "based on the full administrative record."  Citizens to Preserve Overton

Park, Inc. v. Volpe, 401 U.S. 402, 420 (1971).  Review on anything less than the full record is an

invitation for agency misrepresentation and post hoc rationalization.  Indeed, the PBGC itself

was ordered, in the US Airways case it relies on so heavily, to compile and produce the

---

[12]      As set out in the Objection, the problem is that, while the Survey approach could be a sensible way to
estimate the proper discount rate for unfunded benefit liabilities in a plan termination scenario *if the PBGC actually
purchased annuity contracts* to satisfy its obligations to plan participants, *it does not.*  (See Objection ¶¶ 48-51.)
Instead, the PBGC invests its funds with institutional investment management firms, achieving average returns of
approximately 8-9% through investment in a mix of equity and fixed-income securities, as well as private equity,
private debt and real estate assets.  Thus, the PBGC receives returns on the assets it received from the Pension Plan
based on its market-based asset allocation practices, but calculates its claims assuming the PBGC Artificial Rate, a
low discount rate that wildly exaggerates the amount the PBGC needs to meet its obligations to the beneficiaries of
the Pension Plan, thereby providing a massive unearned windfall to the PBGC relative to other creditors and a
corresponding detriment to the estate and other creditors.

administrative record related to the Valuation Regulation as of 2003, in addition to other discovery.[13]

15.    The central questions when assessing agency rule-making necessarily require a full factual record.  Whether the agency has properly "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made," "whether the decision was based on a consideration of the relevant factors," and "whether there has been a clear error of judgment" are all factual inquiries.  Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983) (citations and quotation marks omitted).  Because "an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise," id., it is critical for the reviewing court to have all of that data before it as well.  Courts have therefore required agencies to provide the complete record, and have permitted discovery to both confirm that the record is complete, and to supplement it where necessary.  See, e.g., Higgins v. Kelley, 574 F.2d 789, 793 (3d Cir. 1978).

16.    Here, any assessment of the merits of the Debtors' argument should be made on a fully developed factual record, including the full record of the PBGC's decision-making on this issue spanning more than forty years.[14]  The original notice in the Federal Register regarding the

---

[13]    Order ¶ 2, In re US Airways Group, Inc., No. 02-83984-SSM, D.I. 4634 (Bankr. E.D. Va.  Dec. 31, 2003) ("The motion to compel is granted in part, and the PBGC must make a diligent search and compile as much of the agency administrative record as feasible for the PBGC's valuation regulation.  The record recovered by the PBGC must be produced to the debtors not later than October 24, 2003, at 5:00 p.m.") (attached as Exhibit A).

[14]    To be clear, the arbitrariness of the PBGC's policy is not excused by its age.  See Judulang, 132 S. Ct. at 488 (rejecting a "rule's vintage" as a "slender reed to support a significant government policy" and noting that

proposed Valuation Regulation, which appeared on December 12, 1975, made abundantly clear

that the rationale for the proposed regulation was that the interest rate (and other assumptions)

should reflect *the actual cost to the PBGC* of providing the guaranteed benefits:

> *General Approach.*  The value of a benefit as of the date of termination is the **current value of the cost that the PBGC normally should incur** as of the date of termination, in providing the benefit under reasonable assumption as to mortality, rates of retirement when early retirement is possible, administrative expenses that will be incurred, and investment return assumptions reflecting current and longer term investment opportunities.

40 Fed. Reg. 57982, 57982 (Dec. 12, 1975) (emphasis added) (attached as Exhibit D).  The

implication of this general approach for interest rates was clear:  "To value benefits upon

termination, **interest assumptions should reflect current market opportunities**."  Id. (emphasis

added).  The PBGC has never announced any change in this underlying cost-based and market-

tested rationale, and has *repeatedly reaffirmed* it over the course of several decades, including

specifically restating that rationale verbatim in its 1993 rulemaking.[15]

17.    As of 1975, the PBGC apparently contemplated that those "market opportunities"

in which it would invest would include the "purchase of annuities," as stated in the preamble to

the original proposed rule.  Id.  Indeed, when first announcing that it was using interest rates

derived from annuity price data in 1976, 41 Fed. Reg. 48484, 48485 (Nov. 3, 1976) (attached as

Exhibit E), the PBGC explained that the *rationale* for using annuity-based rates was to estimate

the *PBGC's actual costs*:  "the PBGC believes that the interest rate assumptions underlying

---

"[a]rbitrary agency action becomes no less so by simple dint of repetition").  If anything, the age of the PBGC's practice of using annuity-based rates hurts its position, as it is clearly out of step with the PBGC's current investment practices.

[15]    See, e.g., 42 Fed. Reg. 2678, 2678 (Jan. 13, 1977) ("The valuation rates prescribed by the PBGC are designed to reflect PBGC's cost of providing benefits in terminating plans.") (attached as Exhibit G); 45 Fed. Reg. 38415, 38416 (June 9, 1980) ("The current value of a benefit as of a specific date is equal to the amount of money needed on that date in order to be able to pay the benefit over future years, taking into account reasonable and current expectations as to the mortality, administrative expenses and interest earnings (*i.e.*, the rate of return to be earned on the investment of the money).") (attached as Exhibit I); 58 Fed. Reg. 5128, 5128 (Jan. 19, 1993) (quoting the rationale stated in the Dec. 12, 1975 proposed rulemaking) (attached as Exhibit J).

quotations for the purchase of large blocks of annuities from private insurers provide ***the most reliable basis for estimating PBGC's expected investment experience***." 41 Fed. Reg. 48498, 48498 (Nov. 3, 1976) (emphasis added) (attached as Exhibit F). The PBGC told the public that "[t]he assumptions will be changed when appropriate." 41 Fed. Reg. 48484, 48485 (Nov. 3, 1976) (attached as Exhibit E). It also made clear early on that while "[u]nder usual insurance practices, the interest rate assumption would be an estimate of the rate of return to be earned during a future interval of time on funds set aside to meet future benefit obligations," the "PBGC believes that its relatively brief period of investment experience is neither sufficient nor necessarily an appropriate basis from which to project future earnings." 45 Fed. Reg. 38415, 38416 (June 9, 1980) (attached as Exhibit I). In other words, the annuity-based PBGC Artificial Rate was chosen because the PBGC did not, at the very beginning, have sufficient experience to estimate properly its future earnings – a premise which does not apply decades later.

18.    Against this backdrop, the PBGC has specifically staked out the position that its artificial rate does not "overcharge" employers. In the course of responding to a public comment that the PBGC's rates were "too low" relative to actual market conditions, *i.e.*, relative to "the higher rates of yield for Standard & Poors ('S&P') long-term government bonds and 'AAA' Industrial bonds," the PBGC unequivocally denied that its regulatory rates in fact did, or were intended to, produce a result materially different from the PBGC's actual cost of providing the guaranteed benefits following plan termination. 43 Fed. Reg. 55240, 55240 (Nov. 27, 1978) (attached as Exhibit H). Far from disclaiming, as it does for the purposes of litigation, that the regulatory rates approximate the actual cost to the PBGC, the corporation responded that the

"PBGC does *not* believe that the rates being established" for the relevant period "result in an

'overcharge' to terminating plans."  Id. at 55241 (emphasis added).[16]

19.    One of the central factual questions presented in the Objection is whether that

position is correct or whether, as the Debtors maintain that the evidence will show, the Valuation

Regulation as applied with the interest rates published by the PBGC instead massively

"overcharges" the estate, and therefore does not apply.  The Debtors' position is that, while

annuity-based rates may have made sense at some point during the PBGC's history in which it

was contemplating that it would purchase annuities or did not have sufficient historical data (as

apparently was the case as of the late 1970s and early 1980s), use of such rates has no

application as of the 2009 Plan Termination Date because – as the evidence of the PBGC's

investment history will show – the PBGC had by then long engaged, and has since engaged, in

sophisticated investment practices yielding returns well in excess of annuity rates.[17]

       2.    The PBGC's Cases Are Not on Point

20.    The PBGC notes that bankruptcy and district court decisions over the past several

years (including several unpublished dispositions and transcript excerpts) have held in its favor

on this issue, and asserts that these courts have "done so on legal grounds without the need for

---

[16]    To the extent the PBGC has amended sub silentio its view that the regulatory interest rates should not overcharge employers (or should not reflect the PBGC's costs), its change of position is accorded no weight absent adequate justification.  See Encino Motorcars, LLC v. Navarro, 136 S. Ct. 2117, 2126 (2016) ("a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy" and an "[u]nexplained inconsistency in agency policy is a reason for holding an interpretation to be an arbitrary and capricious change from agency practice" (citations and quotation marks omitted)).

[17]    Resolving the Debtors' Objection also requires the Court to assess the interplay between ERISA (and the PBGC's regulations) and the Bankruptcy Code – which, though it obviously raises legal questions, would require a full factual record regarding the size and nature of the PBGC's liabilities.  If the Debtors are correct about the disparity between the PBGC's Amended Claims and the true amount of its damages, such inequitable treatment would run afoul of the most basic tenets of bankruptcy law, and is particularly egregious here, given that the PBGC has made no effort to seek recoveries from other entities in the corporate group, as it is empowered by statute to do and, indeed, as its UK regulatory counterpart has eagerly pursued.  (See Objection ¶¶ 52-54.)

any discovery." (PBGC Motion ¶ 5.) This argument fails to preclude discovery in this case for several reasons.

21.    <u>First</u>, none of the cases cited by the PBGC is binding (nor, the Debtors submit, persuasive) authority. In fact, though conspicuously omitted from the PBGC Motion, every Court of Appeals to have reached the issue has ruled against the PBGC and instead applied the rate of return a prudent, long-term pension fund portfolio investor is expected to achieve.[18]

22.    <u>Second</u>, none of the cases cited by the PBGC, which rely on the mistaken reasoning in <u>In re US Airways Group, Inc.</u>, 303 B.R. 784 (Bankr. E.D. Va. 2003), addresses the factual issues raised in the Debtors' Objection, nor do they support the PBGC's argument that those factual issues can or should be determined without any record evidence. In three of those decisions, the bankruptcy court did not even consider the reasonableness of the PBGC's discount-rate regulation, as the parties disclaimed any argument that it was invalid and instead relied exclusively on the argument that a different rate should apply in bankruptcy as a matter of law.[19] Indeed, in <u>US Airways</u> itself, the PBGC argued that discovery was "[i]mproper" because "[n]owhere in their objection to the PBGC Proof of Claim do the Reorganized Debtors purport to challenge the Valuation Regulation under the Administrative Procedure[] Act, 5 U.S.C. § 706, (the 'APA') as arbitrary, capricious, an abuse of discretion or otherwise not in accordance with

---

[18]    <u>See</u> PBGC v. Belfance (In re CSC Indus., Inc.), 232 F.3d 505 (6th Cir. 2000), <u>cert. denied</u>, 534 U.S. 819 (2001); PBGC v. CF&I Fabricators of Utah, Inc. (In re CF&I Fabricators of Utah, Inc.), 150 F. 3d 1293 (10th Cir. 1998), <u>cert. denied</u> 526 U.S. 1145 (1999).

[19]    <u>See</u> Order and Trans. Of Hearing, Dec. 16, 2005 at 33, <u>In re UAL Corp.</u>, No. 02-48191 (Bankr. N.D. Ill. Dec. 30, 2005) (Attachment 1 to PBGC Motion) ("neither the committee nor ALPA have argued that the regulations are inapplicable or would not be used to determine the amount of United's unfunded benefit liabilities under applicable nonbankruptcy law"); In re High Voltage Eng'g Corp., No. 05-10787, slip op. at 1 (Bankr. D. Mass. July 26, 2006) (Attachment 2 to PBGC Motion) ("the parties agreed to narrow the initial issue for determination to whether this court should utilize the underlying substantive law, namely the PBGC' regulations, to determine the amount of its claim or whether the Court should utilize a prudent investor approach advocated by the Chapter 11 Trustee"); Dugan v. PBGC (In re Rhodes, Inc.), 382 B.R. 550, 559 (Bankr. N.D. Ga. 2008) ("Indeed, the Liquidating Agent has not contended that outside of bankruptcy and without obtaining a judgment invalidating PBGC's regulations, Debtors could successfully challenge the amount of PBGC's claim solely on the ground that the claim is excessive due to PBGC' use of an inappropriate discount rate.").

law."[20]  The Debtors' Objection here, in contrast, is not so limited, attacking the reasonableness

and validity of the PBGC Artificial Rate, the PBGC's regulatory interest rates – whether in

bankruptcy or otherwise – on the basis that the rates applied are "arbitrary and capricious" under

APA § 706, which is not amenable to resolution without a factual record.  (See Objection ¶¶ 43,

46-51.)

23.    Third, and in any case, the decision in US Airways on which the PBGC relies so

heavily supports the Debtors' position that discovery should go forward.  (PBGC Motion ¶ 5.)

Putting aside the factual and legal flaws in that court's ultimate decision on the merits (which

deferred to the PBGC's discount rate, even while acknowledging that the PBGC "invests heavily

in equities," achieving returns of "approximately 10% on an annual basis," 303 B.R. at 795 –

nearly twice the rate of return the PBGC asks the Court to arbitrarily adopt here), and the fact

that the court there did not even consider the issues raised here concerning the validity of the

PBGC Artificial Rate outside of bankruptcy, the court in US Airways rejected the fact-free

summary judgment procedure requested by the PBGC.

24.    Rather, it was only after granting a motion to compel the PBGC to produce "as

much of the agency administrative record as feasible for the PBGC's valuation regulation,"[21] and

only after then holding an evidentiary hearing that the court reached its conclusion.  Indeed, the

court there overruled the PBGC's objections to producing the administrative record based on

relevance, burden, and vagueness, including the PBGC objection "on the ground that its

valuation regulation is the result of many different rulemakings over more than 25 years" and

---

[20]     The Pension Benefit Guaranty Corporation's Motion to Quash or, in the Alternative, for a Protective Order
at 11, In re US Airways Group, Inc., No. 02-83984-SSM, D.I. 4182 (Bankr. E.D. Va. Oct. 6, 2003) (attached as
Exhibit B).

[21]     Order ¶ 2, In re US Airways Group, Inc., No. 02-83984-SSM, Dk. 4634 (Bankr. E.D. Va.  Dec. 31, 2003)
(attached as Exhibit A).

"that it would be unduly burdensome for the agency to determine what it treated as the administrative record for each of those stages."[22]  After granting discovery, the US Airways court's ultimate decision relied heavily on the testimony and evidence elicited at *trial*, crediting and relying on the "testimony of the PBGC's economic experts."  303 B.R. at 795.  Whatever the merits of the ultimate decision, the Debtors here are equally entitled to test the PBGC's evidence at trial after discovery, and there can be no argument by the PBGC that it should not produce the administrative record that it has already compiled and produced on this issue.

25.     Finally, the PBGC cites two cases in which the discount-rate issue was mentioned, but only in the context of approving a settlement and therefore without reaching any determination on the underlying substantive issue,[23] and one additional case that is still pending and has yet to reach a decision.[24]

26.     As explained above, the Debtors are entitled to discovery under the Bankruptcy Rules and Federal Rules of Civil Procedure regardless of whether discovery on this issue was permitted – or even sought – in other cases, which are neither on point nor binding.

## B. The Debtors Are Entitled to Discovery Concerning the PBGC's Late-Filed Amendments and Insurance Claim

27.     The PBGC also wrongly asserts that the Debtors' objections regarding "statutory termination premiums (Objection at ¶¶ 34-56, 76-78)" and "whether PBGC can file an amended

---

[22]     Responses to Reorganized Debtors' Second Set of Document Requests to PBGC at 2, In re US Airways Group, Inc., No. 02-83984-SSM, D.I. 4205-1 (Bankr. E.D. Va.  Oct. 14, 2003) (attached as Exhibit C).  For the avoidance of doubt, the discovery produced by the PBGC in US Airways will not be alone sufficient here, both because the issues in that case were narrower, and because it was decided six years before the Plan Termination Date at issue here.

[23]     In re Wolverine, Proctor & Schwartz, LLC, 436 B.R. 253, 262-63 (D. Mass. 2010) (settlement context); In re Kaiser Aluminum Corp., 339 B.R. 91, 96 (D. Del. 2006) (noting in settlement context that "in the face of these complex and uncertain issues, it is difficult to envision who would succeed, but not difficult to envision complex, costly and time-consuming litigation").

[24]     Interim Order on Motion for Summary Judgment, In re Durango Georgia Paper Co., No. 02-21669 (Bankr. S.D. Ga. Nov. 8, 2016) (Attachment 3 to PBGC Motion).

claim without filing a motion under Bankruptcy Rule 7015 (¶¶ 26-33)" are pure questions of law. (PBGC Motion ¶ 6.)  While the PBGC is certainly correct that the Debtors' Objection alleges numerous legal defects in these late-filed claims by the PBGC, the Objection also raises mixed questions of law and fact that are appropriately addressed after discovery.  Chief among these is the PBGC's bad faith in amending its claims five years after the September 30, 2009 Bar Date.

28.     In the Third Circuit, "[a] court will deny leave to amend . . . if there is undue delay, motivated by bad faith, or [it would be] prejudicial to [the] opposing party."  E.g., Hatzel & Buehler, Inc. v. Station Plaza Assocs., L.P., 150 B.R. 560, 562 (Bankr. D. Del. 1993) (quoting Adams v. Gould Inc., 739 F.2d 858, 868 (3d Cir. 1984).  See, e.g., In re Union Meeting Partners, 178 B.R. 664, 673 (E.D. Pa. 1995) (denying post-bar date amendment, noting the creditor's "request for an increased rate of interest at this late date is almost certainly tactical").

29.     The Objection alleges such bad faith:

> [T]he purported amendment of the PBGC Claims was both in bad faith and is highly prejudicial to the Debtors and all of their other creditors.  The PBGC's amendment ambush was made after years of mediations and negotiations in which the PBGC participated and in which its claims, among the largest against the Debtors and the beneficiary of ERISA's statutory joint and several status, figured large.  The purported amendment was also made just thirteen days after the close of evidence in the allocation trial.  The PBGC inflated its claims by a material amount immediately after witnessing (but not participating in) the evidence phase of the allocation trial, where such a material increase would not only serve as a hedge against decisions that rejected the Debtors' allocation theory, but also materially alter the settlement dynamic that had remained static vis a vis the PBGC since the Bar Date.  Such machinations, particularly from a virtual insider and professional committee member cannot be allowed to stand.

(Objection at 5.)

30.     The Debtors' Objection to this strategic amendment raises myriad factual questions about the PBGC's conduct and motivations that should be the subject of discovery. For example, on what basis did the PBGC stand by its original claim amounts during the four formal mediations that occurred from November 11, 2012 until January 24, 2013, all of which it

attended as a member of the Committee, and the numerous informal mediations that it also attended? Why did the PBGC fail to amend (or even suggest it would seek leave to amend) during the break from the Allocation Trial during the week of June 9, 2014, when settlement negotiations were again held at the direction of this Court and the Canadian Court? What prompted the PBGC to materially amend its claims upwards thirteen days after the close of evidence in the Allocation Trial, on July 7, 2014? These questions and others are all proper subjects of discovery under the Third Circuit bad-faith standard, which – unless the PBGC is prepared to concede bad faith – must be explored.

## III.    ATTEMPTING TO REACH THE MERITS OF THE DEBTORS' OBJECTION TO THE PBGC'S CLAIMS BEFORE DISCOVERY WOULD BE A WASTE OF JUDICIAL AND PARTY RESOURCES

31.     Contrary to the PBGC's argument, it is the PBGC Motion – not the Debtors' requests for discovery – that is a manifest waste of judicial and party resources, particularly in light of the basic concepts of civil procedure overlooked in the PBGC Motion and discussed above, which require that the Debtors have an adequate opportunity to conduct discovery before opposing a motion for summary judgment. Absent factual development, the PBGC's contemplated motion would at best be "dress rehearsal" for a properly supported motion for summary judgment *after* discovery (should the PBGC still conclude that a motion is in order, which it cannot possibly know now, before discovery).

32.     Moreover, even if the Bankruptcy Rules provided for a discovery-free procedure here, which they do not, the Objection raises factual issues and mixed questions of law and fact that could not be resolved absent factual development. In light of the Debtors' likely ability to obtain relevant information from the PBGC through other means, including through FOIA requests – albeit a slower and less efficient process – there is no reason *not* to require the PBGC to provide that information through the more efficient and appropriate means set out in the

Federal Rules of Civil Procedure as other courts have done, and to do so now, before entertaining motion practice.

33.     In short, addressing the PBGC's contemplated motion for summary judgment now, before factual development, only invites the inefficiency and waste of serial applications (including for partial relief or reconsideration) before, during, and after factual development. Particularly in light of the PBGC's concession that there is no urgency in resolving the Objection (PBGC Motion ¶ 7), the better course – and the one required by the Rules and the nature of the Debtors' fact-based Objection – is to hear motions for summary judgment, whether from the PBGC, the Debtors or both, only after discovery is complete, and to do so only once.

Dated:  November 21, 2016
         Wilmington, Delaware

CLEARY GOTTLIEB STEEN & HAMILTON LLP

James L. Bromley (admitted *pro hac vice*)
Lisa M. Schweitzer (admitted *pro hac vice*)
One Liberty Plaza
New York, New York 10006
Telephone:  (212) 225-2000
Facsimile:  (212) 225-3999

                    - and -

KEIGHTLEY & ASHNER LLP

MORRIS, NICHOLS, ARSHT & TUNNELL LLP


         ___/s/ Tamara K. Minott_____
Harold J. Ashner                         Derek C. Abbott (No. 3376)
700 12th Street, N.W., Suite 700         Andrew R. Remming (No. 5120)
Washington, D.C. 20005                   Tamara K. Minott (No. 5643)
Telephone:  (202) 558-5147               1201 North Market Street
Facsimile:  (202) 330-5490               P.O. Box 1347
                                         Wilmington, Delaware 19801
                                         Telephone:  (302) 658-9200
                                         Facsimile: (302) 658-3989

*Special Pension Benefits Counsel*        *Counsel for the Debtors*
*for the Debtors and Debtors in*          *and Debtors in Possession*
*Possession*

20