# **EXHIBIT H**

[4810-22-M]

### Title 19—Customs Duties

## CHAPTER I—UNITED STATES CUSTOMS SERVICE, DEPARTMENT OF THE TREASURY

[T.D. 78-469]

### PART 153—ANTIDUMPING

#### Antidumping—Viscose Rayon Staple Fiber from Belgium

AGENCY: U.S. Treasury Department.

ACTION: Finding of Dumping.

SUMMARY: This notice is to inform the public that separate investigations conducted under the Antidumping Act of 1921, as amended, by the U.S. Treasury Department and the U.S. International Trade Commission, respectively, have resulted in determinations that viscose rayon staple fiber from Belgium is being sold at less than fair value and that those sales are injuring an industry in the United States. On this basis, a finding of dumping is being issued and, generally, all unappraised entries of this merchandise will be liable for the possible assessment of special dumping duties.

EFFECTIVE DATE: November 27, 1978.

FOR FURTHER INFORMATION CONTACT:

Ms. Mary S. Clapp, U.S. Customs Service, Office of Operations, Duty Assessment Division, Technical Branch, 1301 Constitution Avenue, N.W., Washington, D.C. 20229 (202-566-5492).

SUPPLEMENTARY INFORMATION: Section 201(a) of the Antidumping Act, 1921, as amended (19 U.S.C. 160(a)), gives the Secretary of the Treasury responsibility for determining whether imported merchandise is being sold at less than fair value. Pursuant to this authority the Secretary of the Treasury has determined that viscose rayon staple fiber from Belgium is being sold at less than fair value within the meaning of section 201(a) of the Antidumping Act of 1921, as amended, (19 U.S.C. 160(a)). (Published in the FEDERAL REGISTER of May 1, 1978 (43 FR 18619)). An "Amended Determination of Sales at Less Than Fair Value" was published in the FEDERAL REGISTER of July 28, 1978 (43 FR 32915).

Section 201(a) of the Antidumping Act, 1921, as amended (19 U.S.C. 160(a)), gives the United States International Trade Commission responsibility for determining whether, by reason of such sales at less than fair value, a domestic industry is being or is likely to be injured. The United States International Trade Commission has determined and on September 7, 1978, it notified the Secretary of the Treasury that a domestic industry is being injured by reason of less than fair value imports of viscose rayon staple fiber from Belgium. Notice of this determination was published in the FEDERAL REGISTER of September 15, 1978 (43 FR 41299).

On behalf of the Secretary of the Treasury, I hereby make public these determinations, which constitute a finding of dumping with respect to viscose rayon staple fiber from Belgium.

For purposes of this notice, the merchandise covered is "viscose rayon staple fiber, except solution dyed, in noncontinuous form, not carded, not combed, and not otherwise processed, wholly of filaments (except laminated filaments and plexiform filaments)."

Section 153.46 of the Customs Regulations (19 CFR 153.46) is amended by adding the following to the list of findings of dumping currently in effect:

| Merchandise | Country | T.D. |
|---|---|---|
| Viscose rayon staple fiber | Belgium | |

(Secs. 201, 407, 42 Stat. 11, as amended, 18 (19 U.S.C. 160, 173)).

ROBERT H. MUNDHEIM,
*General Counsel of the Treasury.*

NOVEMBER 20, 1978.

[FR Doc. 78-33168 Filed 11-24-78; 8:45 am]

---

[7708-01-M]

### Title 29—Labor

## CHAPTER XXVI—PENSION BENEFIT GUARANTY CORPORATION

### PART 2610—INTERIM REGULATION ON VALUATION OF PLAN BENEFITS

#### Amendment Adopting Additional PBGC Rates

AGENCY: Pension Benefit Guaranty Corporation.

ACTION: Amendment to the interim regulation.

SUMMARY: This amendment to the interim regulation on Valuation of Plan Benefits prescribes the rates and factors the Pension Benefit Guaranty Corporation (the "PBGC") will use to value benefits provided under terminating pension plans covered by Title IV of the Employee Retirement Income Security Act of 1974 ("ERISA"). This valuation is necessary because under section 4041 of ERISA, the PBGC must determine whether a terminating pension plan has sufficient assets to pay all guaranteed benefits provided under the plan. If the assets are insufficient, the PBGC will pay the unfunded guaranteed benefits under the plan termination insurance program established under Title IV.

The interest rates and factors set forth in the regulation must be adjusted periodically to reflect changes in investment markets. This amendment adopts the rates and factors applicable to plans that terminated on or after March 1, 1978, but before June 1, 1978, and will enable PBGC to value the benefits provided under those plans.

EFFECTIVE DATE: November 27, 1978.

FOR FURTHER INFORMATION CONTACT:

William E. Seals, Staff Attorney, Office of the General Counsel, Pension Benefit Guaranty Corporation, 2020 K Street NW., Washington, D.C. 20006, 202-254-4895.

SUPPLEMENTARY INFORMATION: On November 3, 1976, the Pension Benefit Guaranty Corporation (the "PBGC") issued an interim regulation establishing the methods for valuing plan benefits of terminating plans covered under Title IV of the Employee Retirement Income Security Act of 1974 (the "Act") (41 FR 48484 *et seq.*). Specifically, the regulation contains a number of formulae for valuing different types of benefits. In addition, Appendix B of the regulation sets forth the various rates and factors that are to be used in the formulae. Because these rates and factors must be reflective of investment experience, it is necessary to update the rates and factors periodically. When first published, Appendix B contained rates and factors to the used to value benefits in plans that terminated on or after September 2, 1974, but before October 1, 1975. Subsequently, the PBGC adopted additional rates and factors for valuing benefits in plans that terminated on or after October 1, 1975, but before March 1, 1978. (42 FR 2678 *et seq.*, 42 FR 32777 *et seq.*, 42 FR 41858 *et seq.*, 42 FR 59753 *et seq.*, 43 FR 10559 *et seq.*, 43 FR 25337 *et seq.*).

On July 19, 1978, the PBGC published for comment in the FEDERAL REGISTER rates and factors for valuing benefits in plans that terminated on or after March 1, 1978, but before June 1, 1978 (43 FR 31043 *et seq.*) The PBGC received one comment regarding the proposed amendment to the Interim Regulation. That comment compared low interest rates and factors set by PBGC for immediate annuities with the higher rates of yield for Standard & Poors ("S&P") long-term government bonds and "AAA" Industrial bonds. Based on this comparison, the comment suggested that the rates proposed by PBGC for the period March 1, 1978 to May 31, 1978 were too low and may result in an "overcharge" to a terminating plan.

The PBGC does not believe that the rates being established by this amendment for the March 1, 1978—May 31, 1978 period result in an "overcharge" to terminating plans. Section 4002(a)(1) of ERISA enjoins PBGC to carry out its functions under Title IV so as to encourage the continuation of private pension plans. To this end, the PBGC has sought to set rates that will not encourage plan terminations and/or PBGC trusteeships. On the other hand, the PBGC is also concerned that assessments for employer liability not be greater than what PBGC expects it will need to meet its guaranty liabilities for insufficient plans. Thus, PBGC has adopted what it believes is a balanced approach in setting its rates.

Consistent with PBGC's past practice, the interest rates and factors proposed by PBGC for the period March 1, 1978 to May 31, 1978 were derived from a survey of annuity price data obtained from the private insurance industry. Recently the PBGC became aware of certain statistical biases that may have resulted in unduly low rates proposed for this period. These biases result from variations in the size and distribution of the sample data for this reporting period. Accordingly, PBGC has reviewed its rates and factors for the period March 1, 1978 to May 31, 1978, using a refined estimation procedure to eliminate these biases. As a result, the PBGC has concluded that a minor adjustment is in order, and therefore, the interest rates and factors being issued in final form for this period are slightly higher than the proposed interest rates and factors.

The PBGC has determined that this amendment to the Valuation of Benefits regulation is not "significant" under the criteria prescribed by Executive Order 12044, "Improving Government Regulations," 43 FR 12661 *et seq.* (March 24, 1978), and the PBGC's proposed Statement of Policy implementing the Order, 43 FR 22608 *et seq.* (May 25, 1978). The reasons for this determination are that this proposal is not likely to create substantial public interest or controversy, does not affect another Federal agency, and will not have a major economic impact.

Because of the need to provide immediate guidance for the valuation of benefits in plans that terminated on or after March 1, 1978, but before June 1, 1978, and because no adjustment by ongoing plans is required by this amendment, the PBGC finds that good cause exists for making this amendment to the Interim Regulation effective immediately.

APPENDIX B [Amended]

In consideration of the foregoing, Part 2610 of Chapter XXVI, Code of Federal Regulations, is amended by adding a new Table XI to Appendix B to read as follows:

XI. *The following interest rates and quantities used to value benefits shall be effective for plans that terminate on or after March 1, 1978, but before June 1, 1978.*

I. *Interest rate for valuing immediate annuities.*

An interest rate of 7 percent shall be used to value immediate annuities, to compute the quantity "Gy" in § 2610.6 and for valuing both portions of a cash refund annuity.

II. *Interest rate for valuing death benefits.*

An interest rate of 5 percent shall be used to value death benefits other than the decreasing term insurance portion of a cash refund annuity pursuant to § 2610.8.

III. *Interest rates and quantities used for valuing deferred annuities.*

The following factors shall be used to value deferred annuities pursuant to § 2610.6:

(1) $k_1 = 1.0625$
(2) $k_2 = 1.0475$
(3) $k_3 = 1.0375$
(4) $n_1 = 7$
(5) $n_2 = 10$

(Secs. 4002(b)(3), 4041(b), 4044, 4062(b)(1)(A), Pub. L. 93-406, 88 Stat. 1004, 1020, 1025-27, 1029 (29 U.S.C. 13029(b)(3), 1341(b), 1344, 1362(b)(1)(A)).)

Issued at Washington, D.C., on this 20th day of November 1978.

RAY MARSHALL,
*Chairman, Board of Directors, Pension Benefit Guaranty Corporation.*

Issued on the date set forth above, pursuant to a resolution of the Board of Directors authorizing its Chairman to issue same.

HENRY ROSE,
*Secretary, Pension Benefit Guaranty Corporation.*

[FR Doc. 78-33197 Filed 11-24-78; 8:45 am]

---

[6560-01-M]

Title 40—Protection of Environment

CHAPTER I—ENVIRONMENTAL PROTECTION AGENCY

SUBCHAPTER R—TOXIC SUBSTANCES CONTROL ACT

[FRL 1013-4; OTS 061002]

PART 762—FULLY HALOGENATED

Chlorofluoroalkanes—Clarification of Final Rule

AGENCY: Environmental Protection Agency.

ACTION: Clarification of final rule.

SUMMARY: On March 17, 1978, the Environmental Protection Agency (EPA) promulgated a final rule prohibiting almost all of the manufacture, processing, and distribution of fully halogenated chlorofluoroalkanes (hereinafter referred to as chlorofluorocarbons) for those aerosol propellant uses which are subject to the Toxic Substances Control Act, 15 U.S.C. 2601 *et seq.* (43 FR 11318). The prohibition on manufacture for aerosol propellant uses took effect on October 15, 1978, and the prohibition on processing and distribution in commerce for aerosol propellant uses will become effective December 15, 1978. Today's notice is intended to clarify the scope of the rule and the definition of aerosol propellant.

FOR FURTHER INFORMATION CONTACT:

James D. Silverman, Office of Toxic Substances (TS-794), Environmental Protection Agency, 401 M Street, SW, Washington, DC 20460. Phone No. (202) 755-0920.

SUPPLEMENTARY INFORMATION: EPA's chlorofluorocarbon rule banned most uses of chlorofluorocarbons for aerosol propellant purposes. "Aerosol propellant" is defined in the rule to mean "a liquefied or compressed gas in a container where the purpose of the liquefied or compressed gas is to expel from the container liquid or solid material different from the aerosol propellant." (40 CFR 762.2(a)). It has come to EPA's attention that it is possible that the term "aerosol propellant" is being misinterpreted. The misinterpretation is that the definition of "aerosol propellant" does not include solvent, flame retardant, and vapor depressant uses of chlorofluorocarbons in combination with hydrocarbon or other propellants in aerosol products. This is incorrect; as explained below, manufacture, processing, and distribution of chlorofluorocarbons for such uses are prohibited by Part 762.

For the purposes of Part 762, aerosol products contain two categories of ingredients—active ingredients and propellants. The definition of "aerosol propellant" covers both the substance that directly expels the active ingredient, and any other substance that is used as part of the propellant system to modify the expelling force or to achieve the propelling effect in the desired controlled manner. Thus, even if a low vapor pressure chlorofluorocarbon like F-11 cannot by itself expel the active ingredient, it is part of the propellant system if by nature of its effect on the vapor pressure, flammability, or solvency of the substance physically expelling the active ingredient from the container, it facilitates the safe and effective delivery of the active ingredient. F-11's and F-12's various functions are interrelated and serve in effect as the product delivery system. (See, for example, a letter dated January 25, 1977 to the Office