# **EXHIBIT I**

rendering the vessel useful for service on the high seas, as opposed to the features which render the vessel useful for service on all less turbulent waters. Thus, whether a ship is "designed primarily for use on the high seas" must be determined from all the facts, including structural features and equipment. If the predominant use of a vessel is on the high seas, it shall be presumed to be "designed primarily for use on the high seas." If the predominant use of a vessel is on waters other than the high seas, it shall be presumed not to be "designed primarily for use on the high seas."

(3) *Meaning of "high seas."* For purposes of this section, "high seas" shall mean waters other than the territorial waters of the United States or any country. Thus, the high seas shall not include the internal waters of any country, the Great Lakes, harbors, or narrow coastal indentation.

(4) *Twelve foot draft*—(i) *Definition.* For purposes of section 4042(c)(1), "draft" shall mean the maximum vertical distance between the mean water line and bottom of the keel. In cases where a vessel may have a skeg or other appendage extending locally below the line of the keel, the draft shall be measured from the deepest appendage. A separate determination of draft must be made for each voyage when the vessel has its greatest load or cargo and fuel. For purposes of this determination, the term "voyage" means a round trip voyage. Therefore, if a vessel travels into the specified waterway system to pick up cargo and has a draft sufficient to qualify for the exclusion when loaded, then for purposes of section 4042(c)(1) the vessel will satisfy the 12 foot draft requirement for the entire voyage. Similarly, if a vessel loaded with cargo travels into the specified waterway system with a draft sufficient to qualify for the exclusion provided by section 4042(c)(1), then the fuel consumed on the entire voyage may be excluded, regardless of the vessel's draft after the cargo is unloaded.

(ii) *Example.* The following example illustrates the application of paragraph (a)(4)(i) of this section.

Example: A ship with a design draft of 20 feet (maximum certified draft when fully loaded) travels into a taxable waterway with only a partial load, such that the draft is 12 feet. The ship unloads and departs the waterway empty. The portion of the fuel consumed for propulsion of the vessel on the specified waterway is taxable because only vessels with a draft greater than 12 feet are eligible for the section 4042(c)(1) exclusion from tax.

(b) *Commercial passenger vessels.* Under section 4042(c)(2), the tax imposed by section 4042(a) does not apply to fuel consumed by vessels used primarily for the transportation of persons. Thus, commercial passenger vessels while being operated as passenger vessels are not subject to tax, even if such vessels in fact transport property in addition to transporting passengers. Similarly, ferry boats carrying passengers are not subject to tax, even if such vessels carry the passengers' automobiles.

(c) *Exclusion for State or local governments*—(1) *In general.* Under section 4042(c)(3), there is no tax imposed by section 4042(a) if:

(i) The vessel is being used by a State or local government; and

(ii) The vessel is being used in transporting property in the State or local government's business.

(2) *State or local government.* For purposes of paragraph (c)(1)(i) of this section a "vessel is being used by a State or local government" if it is operated by any State, the District of Columbia, or any political subdivision of a State.

If a private party is contracted to haul for a State or local government, the vessel is not "being used by a State or local government." Similarly, if a person other than a State or local government is contracted to supply vessel operators, the fuel consumed by the vessel is not used "by a State or local government," regardless of ownership of the vessel. However, where a local government leases barges and employees of the local government operate the barges, the vessel is being used by the local government.

(3) *Government business.* The test for whether a vessel is being used "in transporting in a State or local government's business," within the meaning of paragraph (c)(1)(ii) of this section, is whether the ultimate use of the cargo is for a function which is ordinarily carried out by governmental units. For example, where the cargo transported is salt to be spread on icy roads, the vessel is being used "in transporting in a State or local business" because the use to which the cargo will be put (road maintenance) is a function ordinarily performed by governmental units. Fuel consumed in a vessel transporting property for compensation or in furtherance of a business not ordinarily carried out by a governmental unit is not excluded from taxation by section 4042 (c) (3).

(d) *Ocean-going barges.* Under section 4042 (c) (4), the tax imposed by section 4042 (a) does not apply to fuel consumed by tugs moving exclusively barges released by ocean-going carriers solely to pick up or deliver international cargos. The tax exclusion provided by section 4042 (c) (4) applies to LASH barges, SEABEE barges, and all other ocean-going barges carried aboard ocean-going vessels. There is no exclusion under section 4042 (c) (4) when either—

(1) The ocean-going barge is not on an international voyage, or

(2) Part of the cargo carried is not being transported internally.

Jerome Kurtz,

*Commissioner of Internal Revenue.*

[FR Doc. 80-17523 Filed 6-6-80; 8:45 am]

**BILLING CODE 4830-01-M**

# PENSION BENEFIT GUARANTY CORPORATION

## 29 CFR Part 2610

### Valuation of Plan Benefits

**AGENCY:** Pension Benefit Guaranty Corporation.

**ACTION:** Notice of proposed change in the method for setting the interest rate and factors.

**SUMMARY:** This action gives notice of and invites comments on a proposed new method the Pension Benefit Guaranty Corporation would use to set its interest rate and factors. The interest rate and factors are used to value benefits for immediate and deferred annuities provided under terminating pension plans covered by Title IV of the Employee Retirement Income Security Act of 1974.

Currently, the method used by the Pension Benefit Guaranty Corporation to set its interest rate and factors results in those numbers being published after the period of time for which they are effective. Under this proposed method, the Pension Benefit Guaranty Corporation would be able to establish a new interest rate and the other factors on a prospective basis, before the period of time for which they are applicable. The interest rate and other factors would be issued in the same format as is currently used. Establishing these numbers on a prospective basis will enable plan administrators and plan sponsors to value plan benefits prior to termination and will enable the Pension Benefit Guaranty Corporation to process plan terminations more quickly.

**DATES:** Comments should be submitted on or before August 8, 1980.

**ADDRESSES:** Comments should be sent to: Office of the General Counsel, Pension Benefit Guaranty Corporation, Suite 7200, 2020 K Street NW., Washington, D.C. 20006. Each person submitting comments should include his

or her name and address, identify this notice and give reasons for any recommendations. PBGC requests members of the public to submit comments on this proposal on or before August 8, 1980. Copies of written comments will be available for examination at the Pension Benefit Guaranty Corporation, Public Reference Room, Suite 7000, at the above address, between the hours of 9:00 a.m. and 4:00 p.m.

**FOR FURTHER INFORMATION CONTACT:**
Ms. Nina R. Hawes, Staff Attorney, Office of the General Counsel, Pension Benefit Guaranty Corporation, 2020 K Street NW., Washington, D.C. (202) 254-4895.

**SUPPLEMENTARY INFORMATION:**

Background

The Pension Benefit Guaranty Corporation's Interim Regulation on Valuation of Plan Benefits (29 CFR, Part 2610) sets forth various formulas to be used to value the different types of pension plan benefits. The PBGC must value benefits because, under section 4041 of the Employee Retirement Income Security Act of 1974 ("ERISA"), the PBGC must determine, as of the date of plan termination, whether a pension plan has sufficient assets to pay all guaranteed benefits provided by the plan. If the assets are insufficient, the PBGC will pay the guaranteed benefits provided by the plan. In addition, the PBGC must value plan benefits to determine the amount of any employer liability for an insufficient plan owed to PBGC under sections 4062, 4063 or 4064 of ERISA, as applicable. These sections specify that the current value of the benefits should be used to calculate the employer liability.

The current value of a benefit as of a specific date is equal to the amount of money needed on that date in order to be able to pay the benefit over future years, taking into account reasonable and current expectations as to mortality, administrative expenses and interest earnings (i.e., the rate of return to be earned on the investment of the money). Because these expectations change from time to time, the factors used to determine the current value of benefits must also change. This notice addresses how the PBGC proposes to change the method it uses to determine the interest rate assumption used to value immediate annuities and the factors ($k_1$, $k_2$, $k_3$, $n_1$ and $n_2$) used with the interest rate to value deferred annuities. (The interest rate and the factors together are sometimes referred to in this Notice as simply "the rates.") The interest rate used to value death benefits other than the decreasing term insurance portion of a cash refund annuity is not affected by this proposed change; it will remain at 5%.

Under usual insurance practices, the interest rate assumption would be an estimate of the rate of return to be earned during a future interval of time on funds set aside to meet future benefit obligations. The PBGC believes that its relatively brief period of investment experience is neither sufficient nor necessarily an appropriate basis from which to project future earnings. Further, the PBGC believes it would not be appropriate for it to set rates which produce benefit values (annuity prices) that are significantly different from the prices of annuities offered by private insurers. Accordingly, PBGC will continue its practice of setting its interest rate and factors so as to produce benefit values that are intended to be comparable to prices offered by private insurers.

*PBGC's Current Method of Setting Interest Rates*

To date, the PBGC interest assumption for immediate annuities and the factors for deferred annuities have been set with the intent that when the rate and factors are coupled with PBGC's mortality assumptions, they will produce benefit values for immediate and deferred annuities that are generally in line with the private insurance industry's annuity prices. (However, the rates themselves would not be the same because, among other things, PBGC's interest assumptions include an adjustment for the anticipated expenses associated with providing these benefits. This differs from the insurance industry practice of adding on expenses as a separately identifiable charge.)

Currently, the interest rate and factors and derived primarily from price quotes given by private insurers for the purchase of large blocks of single premium, non-participating annuities (with administrative expenses excluded). These quotes are reported quarterly to the PBGC by the private insurers on a delayed basis and should reflect the prices being quoted to prospective buyers by the insurers during the most recent quarter. After receiving this data, the PBGC analyzes it in order to determine PBGC's interest rate for immediate annuities and the factors for deferred annuities, for the quarter to which the quotes applied. Thus, the PBGC has been setting its rates after the period of time to which they apply.

The drawbacks to this retroactive system of setting rates are obvious: neither plan administrators nor PBGC can make an accurate valuation of plan benefits until after the plan termination date, and thus processing of termination cases is often delayed.

*Proposed New Method of Setting Interest Rates*

The PBGC proposes to adopt a method of setting its interest rate and factors that would enable it to set a new rate and factors before the period of time for which they will be effective. The prospective rates would be derived from a statistical model developed by the PBGC from data the PBGC has assembled since its creation. The model reflects the historical relationship between financial markets (primarily fixed income) and private insurers' annuity price quotes. The model enables the PBGC to use the current level of appropriate fixed income and any other relevant financial markets to predict for the near future the interest rate implicit in the prices for immediate annuities offered by private insurers. The PBGC interest rate for immediate annuities would be the rate so predicted. The factors for deferred annuities would bear a fixed relationship to the interest rate for immediate annuities. Therefore, there would be just one set of factors for deferred annuities corresponding to each interest rate for immediate annuities.

Under the proposed new system, the PBGC would continue to receive its quarterly survey of private insurers' annuity price quotes, and would compare these annuity price quotes and the interest rates implicit therein with the PBGC rates established under this new system. In addition, PBGC would compare on a continuing basis various combinations of fixed income and other relevant financial markets with the interest rates derived from the annuity price quotes. The PBGC also anticipates comparing the survey of price quotes with other sources of annuity prices. All of this data would be used to evaluate the accuracy of the statistical model being used and, when appropriate, to refine the model for use in future periods.

Under this proposal, PBGC would change the interest rate in effect only when the model indicates a change of at least one-quarter percentage point (¼%), and the interest rate would change in only one-quarter percentage point (¼%) increments. Typically the interest rate would remain in effect for at least one month, and there would be no fixed schedule for changing the rates.

The PBGC proposes to change its interest rate in only one-quarter percentage point (¼%) increments so as

to minimize the administrative burdens associated with interest rate changes and to provide some certainty as to what the rates will be in the near future. Changes of less than one-quarter percentage point (¼%) would not be made because the construction of new valuation tables necessitated by such a change would be too burdensome administratively when compared to the slight increase in accuracy in the resulting valuation. (In order to assist plan administrators and others in working with the interest rates, the PBGC plans to issue, concurrently with the first publication of the prospective interest rate and factors, a rate book containing tables of actuarial factors based on interest rate assumptions from 6% to 11%, in increments of one-quarter percentage point (¼%).)

If a change of one-half percentage point (½%) or more is indicated in one month, PBGC would change its rate by one-quarter percentage point (¼%) and would continue to monitor the market to determine if the need for a greater change continues; if so, a subsequent one-quarter percentage point (¼%) change would be made, and so on until no further change is indicated. Based on PBGC's experience to date it is anticipated that changes larger then one-quarter percentage point (¼%) will, in fact, seldom be warranted.

Under the proposed new system, rate changes normally would be announced by the 15th of the month, to become effective on the 1st of the next month. Thus, by the 15th of any month, the PBGC rate and factors for the next month will be known and the PBGC rate and factors for the second month can be predicted within one-quarter percentage point (¼%) each way. This will enable plan administrators to know within certain limits the value of plan benefits before the proposed termination date. In most cases, a one-quarter percentage point (¼%) change in the interest rate would not significantly alter the total value of plan benefits.

*Advantages of the New Method*

The ability to perform a fairly accurate valuation of plan benefits before the termination date would be helpful to plan administrators, both in terms of deciding whether to terminate a plan and in actually carrying out the plan termination. The PBGC also expects that having the interest rate and factors available on a prospective basis will help speed its processing of plan terminations and contribute generally to the more efficient administration of the plan termination insurance program.

The availability of PBGC rates, and thus the ability to value plan benefits, prior to the plan termination date is also important to plan sponsors. Plan sponsors need to be able to calculate the value of benefits to determine the amount of any employer liability due. Under ERISA, employer liability for a plan insufficiency is owned as of the date of plan termination, and therefore, the liability must be paid as of that date in order to avoid the assessment of interest on the employer liability. (*See* PBGC's proposed regulation on Employer Liability for a Single Employer Plan Termination, 45 FR 34899.

Further, plan sponsors might want to be able to compute the value of plan benefits prior to the plan termination date in order to decide whether to make a commitment to make the plan sufficient (see PBGC's Proposed Regulation on Determination of Plan Sufficiency and Termination of Sufficient Plans, 41 FR 48504 (November 3, 1976)). PBGC contemplates that under the final sufficiency regulation, a plan sponsor would be able to make an irrevocable commitment prior to the date of termination to pay any insufficiency of a plan so that the PBGC will issue the plan a Notice of Sufficiency. Obviously, many plan sponsors will not want to make such a commitment without having a fairly good idea of the magnitude of the commitment.

*Procedures for Issuing Rates Under the New Method*

As was mentioned above, under this proposed system for setting the interest rate, whenever a rate change is warranted, the PBGC usually would publish the new rate by the 15th of the month, to be effective on the 1st of the next month. The rate would remain in effect until a new rate is called for, but generally for at least one month. The PBGC would not publish a notice when the interest rate remains the same as the previous month; only notice of rate changes would be published.

This schedule would require that PBGC publish the interest rate and factors immediately in final form, without first giving notice and an opportunity for public comment on the rate and factors. If PBGC were to allow time for notice and comment, the rates either would not be issued prospectively or would be considerably less reliable because they would have to be calculated several months in advance of their effective date. PBGC believes that the need to publish its interest rate and factors prospectively and to make them as accurate as possible warrants adopting the procedure discussed herein. Under this procedure, however, the PBGC would invite public comments at any time and would consider such comments in setting future rates.

It should be noted that publication of the rates in final form only is consistent with the present system used to issue the quarterly interest rate. On February 29, 1979 (44 FR 10398), PBGC solicited comments on a proposal that the quarterly interest rate and factors set under the current method be issued in final form without being published in a Notice of Proposed Rulemaking. All the comments received agreed with the proposal, and the PBGC has since issued the quarterly interest rate and factors in final form, without providing for prior notice and comment. The PBGC expects to continue this practice under the new system of publication. Of course, this proposal may be changed in light of the public comments received.

(Secs. 4002(b)(3), 4041(b), 4044, 4062(b)(1)(A), Pub. L. 93–406, 88 Stat. 1004, 1020, 1025–27, 1029 (29 U.S.C. 1302(b)(3), 1341(b), 1344, 1362(b)(1)(A)))

Issued on the 3d day of June 1980.

**Ray Marshall,**
*Chairman, Pension Benefit Guaranty Corporation.*

Issued on the date set forth above pursuant to a resolution of the Board of Directors authorizing its Chairman to issue this Notice.

**Henry Rose,**
*Secretary, Board of Directors, Pension Benefit Guaranty Corporation.*

[FR Doc. 80-17270 Filed 6-6-80; 8:45 am]
**BILLING CODE 7708-01-M**

---

**DEPARTMENT OF TRANSPORTATION**

**Coast Guard**

**33 CFR Part 183**

[CGD 80-047]

**Electrical Systems Standard for Recreational Boats**

**AGENCY:** Coast Guard, DOT.
**ACTION:** Notice of proposed rulemaking.

**SUMMARY:** The Coast Guard proposes to amend its regulations on electrical systems for recreational boats by adopting a more recent version of one of the industry standards incorporated by reference in the regulations. The standard lists insulated electrical cables which meet certain water absorption and flame retardancy requirements. Adoption of the more recent version of the standard would allow changes made in cable types and designations to be reflected in the Coast Guard's requirements for electrical systems on recreational boats.