## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re Nortel Networks Inc., *et al.*,[1] | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | 09-10138 (KG) |
| | ) | (Jointly Administered) |
| | ) | |
| | ) | |

## DECLARATION OF DR. JEFFREY D. CASE IN SUPPORT OF MOTION OF SNMP RESEARCH, INC. AND SNMP RESEARCH INTERNATIONAL, INC. TO AMEND PROOFS OF CLAIM AND ADD SNMP RESEARCH, INC. AS CLAIMANT

I, Dr. Jeffrey D. Case, do hereby declare as follows:

### A.    *Introductory Background*

1.    I am the founder and Chief Technology Officer of SNMP Research, Inc.
("SNMPR").  I own 100% of SNMPR and am a contractor consultant to SNMP Research
International, Inc. ("SNMPRI" and collectively with SNMPR, "SNMPR Research").  My wife,
Mrs. Mary Case, acts as CEO and owns 100% of SNMPRI.[2]  SNMPRI and SNMPR are both
Tennessee corporations that operate in offices located on our farm in Knoxville, Tennessee,
where my wife and I also reside.

2.    I am authorized to act on behalf of SNMPRI in its disputes with the U.S.
Debtors, including the matters described herein.  At all times relevant hereto, I have been and

---

[1] Debtors in these chapter 11 cases, along with the last four digits of each Debtors' tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Component Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567), Nortel Networks (CALA) Inc. (4226) ("NNCALA"), and Nortel Networks India International Inc. (8667) ("NNIII") (collectively, the "U.S. Debtors").

[2] Previous filings in this case indicated that Mrs. Case owned 95% of SNMPRI.  As of mid 2016, Mrs. Case owns 100% of SNMPRI.

continue to be responsible for SNMP Research's relationship and dealings with and concerning Nortel.[3]

3.    I am authorized to sign this Declaration on behalf of both SNMPRI and SNMPR. I am providing this Declaration in support of the Motion of SNMP Research, Inc. and SNMP Research International, Inc. to Amend Proofs of Claim and add SNMP Research, Inc. as Claimant (the "Motion"), filed contemporaneously herewith. I have personal knowledge of the matters to which I hereinafter declare and am competent to testify to the matters stated.

**B.    *The Software, SNMPR/SNMPRI License and Nortel License***

4.    SNMPR is the owner of certain valuable and unique software (the "Software") implementing the Simple Network Management Protocol and related standards (the "Protocol").[4] I helped develop and co-authored the Protocol and the Software. SNMPR and SNMPRI are parties to a license agreement (the "SNMPR/SNMPRI License"), under which SNMPR granted to SNMPRI a non-exclusive license to the Software. A true and accurate copy of the SNMPR/SNMPRI License is attached hereto as **Exhibit 1**. SNMPRI, in turn, is responsible for the sales, marketing, and licensing of the Software to customers. SNMPR owns copyrights in the underlying Software files, and SNMPRI owns copyrights in various collections and compilations of the Software that SNMPRI licenses to customers.

5.    SNMPRI and Nortel Networks Corporation (now Nortel Networks Limited), on behalf of itself and its subsidiaries, executed a License Agreement dated December 23, 1999 (the

---

[3] By Nortel, I am referring to the U.S. Debtors and their other debtor and non-debtor affiliates.

[4] The Protocol is a standardized protocol that is generally used for collecting information from, and configuring, network devices, such as servers, printers, hubs, switches, and routers on an Internet Protocol (IP) network.

2

"Nortel License").[5]

### C.    *The Original Claims and Omnibus Objection*

6.      On September 29, 2009, SNMPRI filed proofs of claim against the U.S. Debtors,

other than NNCALA and NNIII (the "Original Claims").  Copies of the Original Claims (with a

single statement of claim for brevity) are attached hereto as **Exhibit 2**.  In the Original Claims,

SNMPRI asserted a general unsecured claim against the U.S. Debtors, other than NNCALA and

NNIII, for $22,281.00 for unpaid royalties and other fees under the Nortel License, "plus any and

all additional amounts associated with royalties that have not been reported by the Debtors to

date and are owed to SNMP[RI]."  The Original Claims further state that SNMPRI "reserves the

right to modify or amend this proof of claim to assert additional claims as they arise."

7.      At the time the Original Claims were filed, I was not aware that Nortel was using

the Software outside the scope of the Nortel License or that Nortel was committing copyright

infringement and violating trade secrets prior to the U.S. Debtors' bankruptcy filings in January

2009.  I had a suspicion, however, that it was possible that Nortel was using the Software in

unauthorized ways prior to the bankruptcy filings, which was why the Original Claims preserved

the right to assert other amounts and amend.

### D.    *The First through Third Amended Proofs of Claim*

8.      On October 14, 2010, SNMPRI filed its first amendment to the NNI Claim (the

"First Amended NNI Claim"), a true and accurate copy of which is attached hereto as **Exhibit 3**.

In the First Amended NNI Claim, SNMPRI asserted a total general unsecured claim for

$1,517,038.00, consisting of the amounts asserted in the Original Claims, plus an additional

---

[5] A true and accurate copy of the Nortel License, including its corresponding schedules, was filed under seal with the initial adversary complaint pending between SNMP Research and the U.S. Debtors, other than NNIII, as well as with the first amended and second amended adversary complaints.  True and accurate copies of SNMP Research's filed copyrights are also included in these adversary complaints.

3

$1,494,946.00 due to licensing fees, royalties and maintenance fees, plus interest, associated with the unauthorized use of the Software in the MG9000. SNMPRI calculated the estimated damages based on a hypothetical royalty buyout for use of a Software product called EMANATE/Lite, plus interest at the contract rate of 18 percent per annum. At the time, SNMPRI lacked any data on Nortel's profits made on the product. The First Amended NNI Claim was filed based on the information about the MG9000 learned from the e-mails from May 25 through August 4, 2010 (defined in the Motion as the "MG9000 E-mails"), which confirmed for the first time in writing (to my knowledge) that the MG9000 product contained the Software.

9.      In hindsight, I recognize that I also should have asked to file separate proofs of claim for SNMPR when the First Amended NNI Claim was filed by SNMPRI in October 2010 asserting unlicensed uses of the Software, shortly after it was first discovered that the Software was being used outside the scope of the Nortel License. My failure to seek to file separate proofs of claim for SNMPR in October 2010 was based on my mistaken belief at the time that SNMPRI's proofs of claim were sufficient to cover violations of both SNMPRI's and SNMPR's rights in the Software, given that SNMPRI was the party to the Nortel License.

10.      On May 5, 2011, SNMPRI filed its second amendment to the NNI Claim (the "Second Amended NNI Claim"), a true and accurate copy of which is attached hereto as **Exhibit 4**. In the Second Amended NNI Claim, SNMPRI asserted a general unsecured claim for $5,370,594.00, consisting of the amounts asserted in the First Amended NNI Claim, plus an additional $3,853,309 due for license fees and royalties, plus interest at the contract rate of 18% per annum, associated with the unauthorized and use of the Software in a line of products defined as the "Bay Products," which are otherwise referred to in this dispute as the ES and ERS products. These product families were sold by Nortel to Avaya Inc. ("Avaya") as part of the

Enterprise Solutions sale. SNMPRI did not have any unit shipping or sales data at the time for these products to calculate the amounts due based on actual usage. SNMPRI also lacked, at the time, any data on Nortel's profits made on these products. In support of the Second Amended NNI Claim, SNMPRI attached Exhibit 3, which is an e-mail dated April 14, 2011 from Roy Weldon at Avaya confirming that Bay Products contained the Software (i.e., ES, ERS, WLAN and VSP7000) (the "Weldon E-mail"). Prior to the Weldon E-mail, SNMPRI did not know what specific Bay Products contained the Software.

11.     The Second Amended NNI Claim also asserts a claim for $247, plus interest, for unpaid royalties for the use of the Software in the Universal Signaling Point product. SNMPRI added a claim for the unpaid USP royalties after the Original Claims as a result of a subsequent review of SNMPRI's records, which uncovered that this amount was due and owing under the Nortel License. The Second Amended NNI Claim also identified the SP2000 and VSS products, which SNMPRI discovered contained the Software based on the U.S. Debtors' responses to interrogatories dated April 1, 2011, served in connection with the pending Claim Objection. A true and accurate copy of the U.S. Debtors' April 1, 2011 interrogatory responses are attached hereto as **Exhibit 5**.

12.     The Second Amended NNI Claim further asserts claims for unknown amounts to be determined under the U.S. Copyright Act, applicable trade secret and other laws, and any additional amounts associated with licensing fees, royalties, and maintenance fees for the Bay Products and any other products that have not been reported to date and are owed to SNMPRI. SNMPRI further reserved the right to modify or amend the Second Amended NNI Claim and to assert additional claims as SNMPRI learns of such claims through discovery or otherwise.

13. On September 9, 2011, SNMPRI filed its third amendment to the NNI Claim (the "Third Amended NNI Claim"), a true and accurate copy of which is attached hereto as **Exhibit 6**. In the Third Amended NNI Claim, SNMPRI asserted a general unsecured claim for $7,549,323.00, consisting of the same amounts asserted in the Second Amended NNI Claim, except that the amounts due for the unlicensed use of the MG9000 product was increased from $1,494,946.00 to $3,673,675.00. As noted in the Third Amended NNI Claim, that amount was increased due to representations GENBAND made to SNMPRI after the filing of the Second Amended Claim concerning the Software product contained in the MG9000. Specifically, SNMPRI learned that the MG9000 contained a product called EMANATE, instead of EMANATE/Lite. These products are priced differently, leading to the increased claim amount. SNMPRI confirmed that the MG9000 contained EMANATE on August 15, 2011, when SNMPRI received an e-mail from a representative of GENBAND on the subject (the "August 15, 2011 E-mail"). A true and accurate copy of the August 15, 2011 E-mail is attached hereto as **Exhibit 7**.

**E.    *Execution of the SNMPR/SNMPRI License and SNMP Research's Practices***

14. Prior to bringing the Adversary Proceeding (discussed and defined below), I reviewed SNMP Research's files for signed copies of internal license agreements between and among myself and SNMP Research and between SNMPR and SNMPRI. I was unable to find a signed copy of a license agreement between SNMPR and SNMPRI, although I recalled that one was prepared when SNMPRI was formed in 1994. I was able to locate an electronic copy of a license agreement between SNMPR and SNMPRI that was prepared in 1994, which appeared to be the most recent version of the document. I was not able to locate a signed version of the agreement and am therefore not able to confirm conclusively whether it was ever signed. Because I was not able to locate a signed copy of the license agreement between SNMPR and

6

SNMPR, in late September 2011, SNMP Research approved the signing of the SNMPR/SNMPRI License, and it was executed shortly thereafter, effective as of April 20, 1994.

15.     Once SNMPRI became operational in 1995, with two exceptions I can specifically recall in which SNMPR and SNMPRI jointly granted licenses, SNMPRI exclusively licensed the Software to customers. Although SNMPR had the right to license the Software directly, it was not SNMP Research's common practice to do so once SNMPRI began operations. The common practice of SNMP Research was to operate as if SNMPRI had an exclusive license to the Software. Based on the way SNMP Research functioned practically, I believed that SNMPRI, as the party to the Nortel License and based on SNMP Research's common licensing practices, was the proper party to enforce the Software rights of SNMP Research and to file the proofs of claim before the Adversary Proceeding (defined below) was filed.

16.     Prior to this dispute with Nortel, neither SNMP Research entity had ever been a plaintiff or defendant in any lawsuit, including any copyright infringement lawsuit. I had only personally been a party in one lawsuit involving an HVAC company relating to the construction of my home.

**F.     *The Adversary Proceeding***

17.     On November 2, 2011, SNMP Research filed an adversary complaint (the "Initial Adversary Complaint") in this Court against the U.S. Debtors, except NNIII (and other non-debtors) (Adv. No. 11-53454) (the "Adversary Proceeding").

18.     In the Adversary Proceeding, SNMP Research currently seeks (i) actual damages and profits against the U.S. Debtors relating to Nortel's improper post-petition, pre-business line sale use of the Software (the "Post-Petition, Pre-Sale Use Claims"), (ii) Nortel's profits from the Avaya and GENBAND business line sales and (iii) damages relating to Avaya's and Hitachi

7

Ltd.'s post-business line sale use of the Software, for which the U.S. Debtors are contributorily liable. The Post-Petition, Pre-Sale Use Claims assert claims based on conduct that began pre-petition and continued post-petition.[6] The proofs of claim assert damages for the same conduct subject to the Post-Petition, Pre-Sale Use Claims that occurred prior to the Petition Date (the "Pre-Petition Use Claims"). The same Software is also at issue in the Pre-Petition Use Claims and the Post-Petition, Pre-Sale Use Claims.

### G.   *The Fourth and Fifth Amended Proofs of Claim*

19.   On December 20, 2012, SNMPRI amended its proofs of claim against each of the U.S. Debtors, except NNCALA and NNIII (the "Fourth Amended Claims"), true and accurate copies of which are attached hereto (with a single statement of claim for brevity) collectively as **Exhibit 8**.[7] In the Fourth Amended Claims, SNMPRI asserted a general unsecured claim for $8,414,695.00, consisting of the same amounts asserted in the Third Amended NNI Claim, as well as a claim for $865,372.00 relating to Nortel's improper use of the Software in a product family referred to as "GEM," which was sold by Nortel to GENBAND[8] during these bankruptcy cases. The Fourth Amended Claims state that GENBAND discovered that the GEM product contained the Software in the summer of 2012. To be more precise, GENBAND performed a search for the presence of the Software in GENBAND products purchased from Nortel, and shared those results with SNMPRI by e-mail dated March 7, 2012 (the "March 7, 2012 E-mail"). A true and accurate copy of the March 7, 2012 E-mail is attached hereto as **Exhibit 9**. As a

---

[6] There may be a couple of minor exceptions with respect to Nortel's unauthorized use that did not begin until after the Petition Date, for which SNMP Research is seeking nominal damages in the Adversary Proceeding. Nortel also may have discontinued products prior to the Petition Date, so it is possible that not every unauthorized use that occurred pre-petition continued post-petition, but the factual issues are materially the same.

[7] The Fourth Amended Claims consisted of the fourth amended claim against NNI and the second amended claims against the remaining U.S. Debtors, except NNCALA and NNIII.

[8] By GENBAND, I am referring to GENBAND, Inc. and its affiliates, including GENBAND USA LLC.

result of this search, GENBAND and SNMPRI amended its existing license agreement, which was executed by SNMPRI on June 13, 2012.

20.    On October 7, 2015, SNMPRI again amended its proofs of claim against all of the U.S. Debtors, except NNCALA and NNIII (the "Fifth Amended Claims," and together with the First Amended NNI Claim, Second Amended NNI Claim, Third Amended NNI Claim and Fourth Amended Claims, the "Previously Amended Claims").[9]  True and accurate copies of the Fifth Amended Claims are attached hereto (with a single statement of claim for brevity) collectively as **Exhibit 10**.  In the Fifth Amended Claims, SNMPRI asserted a general unsecured claim for $8,414,695.00, the same amount asserted in the Fourth Amended Claims.  The purpose of the Fifth Amended Claims was to add claims for unknown amounts due relating to the unauthorized use of the SMC 2450 and PP8600.[10]  I discovered that these products were unlicensed by reviewing post-petition royalty reports prepared by Nortel which reported the products as if they were licensed.  No license for these products, however, existed.  I discovered that these two additional products contained the Software prior to December 2013, when SNMPRI amended the Initial Adversary Complaint for the first time and added these products to that version of the lawsuit.

**H.    *SNMP Research's Expert Report on Pre-Petition Damages***

21.    On November 2, 2016, SNMP Research served five expert reports on the U.S. Debtors, including an expert report by SNMP Research's damages expert, Mr. Ian Ratner of GlassRatner (which was subsequently amended/corrected on November 11, 2016).  Mr. Ratner concluded in his report that SNMP Research suffered pre-petition damages of **$81.08 million**,

---

[9] The Fifth Amended Claims consisted of the fifth amended claim against NNI and the third amended claims against the remaining U.S. Debtors, except NNCALA and NNIII.

[10] The Fifth Amended Claims also mentioned the VSS product, which was already identified in the Second Amended NNI Claim.

consisting of actual damages of at least $33.12 million, profits attributable to the Software net of assumed actual damages of at least $39.27 million (for a total of at least $72.39 million), plus pre-judgment interest through the Petition Date of at least $8.69 million (at the prime rate, calculated quarterly). A true and accurate copy excerpt from Mr. Ratner's amended report summarizing his damages is attached hereto as **Exhibit 11**.

22.    The pre-petition damages are largely based on the ES and ERS product families (i.e., Bay Products), and to a lesser extent, the MG9000. All of Mr. Ratner's reported pre-petition damages are premised on the same products identified in the previously filed proofs of claim, except one product family, for which Mr. Ratner concluded SNMP Research suffered nominal damages (i.e., less than $20,000.00 before interest).[11] Mr. Ratner's conclusions on pre-petition damages were based on unit sale and profit information obtained over the last several months in discovery in the Adversary Proceeding, which was not available at the time any of the prior proofs of claim were filed.[12]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: November 23, 2016

Dr. Jeffrey D. Case

---

[11] The PP8600 product identified in the proofs of claim is referred to by Mr. Ratner as the PP8660. With respect to the GEM product identified in the proofs of claim, Mr. Ratner identifies the GEM and GM2 (a/k/a GEM2), which was a later version of the GEM. The Bay Products, as defined by the proofs of claim, include ES and ERS products.

[12] The one exception to this is the unit shipments for the MG9000 product cards. This information was contained in the e-mails attached to the First Amended NNI Claim and all subsequent proofs of claim filed against the U.S. Debtors. Like the other products, the profit information for the MG9000 was not available to SNMP Research until recently, through discovery in the Adversary Proceeding.

53651/0001-13812692v2