## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| _____ | X | |
| | : | |
| *In re* | : | Chapter 11 |
| | : | |
| Nortel Networks Inc., *et al.,*[1] | : | Case No. 09-10138(KG) |
| | : | |
| Debtors. | : | Jointly Administered |
| | : | |
| | : | **Re: D.I. 17347, 17348, 17350, 17379,** |
| | : | **17413, 17415, 17416, 17417, 17431** |
| | : | |
| _____ | X | |

## REPLY OF DEBTORS TO OBJECTIONS TO THE DEBTORS' PROPOSED DISCLOSURE STATEMENT AND IN FURTHER SUPPORT OF THE DEBTORS' SOLICITATION PROCEDURES MOTION

Nortel Networks Inc. ("NNI"), a Delaware corporation, and certain of its affiliated

Debtors and Debtors-in-Possession (collectively with NNI and excluding Nortel Networks India

International Inc., the "Debtors") hereby submit this reply (the "Reply") to the objections to the

Debtors' *Disclosure Statement with Respect to the First Amended Joint Chapter 11 Plan of*

*Nortel Networks Inc., et al.* dated November 4, 2016 (as it may be amended, the "Disclosure

Statement") [D.I. 17348] and in further support of the Debtors' *Motion for Entry of an Order (I)*

*Approving Adequacy of Information Contained in Disclosure Statement, (II) Establishing Voting*

*Record Date, (III) Approving Procedures for Soliciting, Receiving and Tabulating Votes on the*

*Plan, and (IV) Scheduling Confirmation Hearing Date and Establishing Notice and Objection*

---

[1]     The debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567), Nortel Networks (CALA) Inc. (4226) and Nortel Networks India International Inc. (8667). The First Amended Joint Chapter 11 Plan of Nortel Networks Inc. and Certain of its Affiliated Debtors does not include a Chapter 11 plan for Nortel Networks India International Inc.  Contact information for the Debtors and their

*Procedures* [D.I. 17350] (the "Solicitation Procedures Motion),[2] including the objections filed by

General Beneficial LP [D.I. 17379] (the "General Beneficial Objection"), Mr. Edward E. Piltz

[D.I. 17413] (the "Piltz Objection"),  the Nortel Trade Claims Consortium [D.I. 17415] (the

"NTCC Objection" and such group, the "NTCC"), the Pension Benefit Guaranty Corporation

[D.I. 17416] (the "PBGC Objection", and such entity, the "PBGC"), SNMP Research

International, Inc. ("SNMPRI") and SNMP Research, Inc. ("SNMPR") [D.I. 17417] (the "SNMP

Research Objection", and SNMPRI and SNMPR together, "SNMP Research").[3]  An objection

also was filed by Liquidity Solutions, Inc. after the objection deadline had passed [D.I. 17431].

In support of this Reply, the Debtors respectfully represent as follows:

### Preliminary Statement

1.     The Plan proposed by the Debtors represents a pathway to the end of years of

protracted litigation and results from vigorous multi-year efforts to resolve the Allocation

Dispute and other disputes and claims between and among the Debtors, the Canadian Debtors,

the EMEA Debtors and many of their respective creditors constituencies.  The Plan memorializes

and proposes to implement a complex, integrated settlement between and among the Debtors,

their worldwide affiliates and various other key parties in interest that, if approved by the Court

and accepted by their creditors, would benefit all the Debtors' estates and their creditors by

resolving the allocation of Sale Proceeds between and among the Nortel entities around the

globe, and approving the settlement of other intercompany and creditor claims and disputes that

---

petitions are available at http://dm.epiq11.com/nortel.

[2]     Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the First Disclosure Statement.

[3]     A summary chart of the Debtors' responses to the objections received to the Disclosure Statement (collectively, the "Objections" and, the objecting parties, the "Objectors") and the Debtors' specific responses to each are summarized in more detail on Exhibit A attached hereto (the "Objection Chart").  The Debtors' responses are incorporated into this Reply as though fully set forth herein.

collectively will enable the Debtors to distribute proceeds to their creditors and set the Debtors on a straightforward course toward the final resolution of their cases.

2.      Negotiated extensively and in good faith by the Debtors and their counterparts, the Settlement and Plans Support Agreement (the "SPSA") is an integrated agreement that even Objectors to this Disclosure Statement acknowledge would provide for more Sale Proceeds to be allocated to the Debtors than what would be expected to flow from the Court's decision in the Allocation Dispute.  The SPSA also eliminates other risks and uncertainties that were not resolved by the Court's decision that could otherwise significantly impact creditor recoveries. The settlement of these disputes was necessarily intertwined with other provisions regarding the Debtors' estates and their claims, in order to reduce uncertainties as to the effects of any settlement on assets available for distribution in the various Nortel estates around the world, and such provisions are not subject to dissection or line item edits.  Just as the Debtors could (and would) walk away from the SPSA if another court refused to approve or implement its essential terms, the SPSA gives other parties equal termination rights if the Plan does not fully implement the SPSA terms.

3.      A handful of parties have filed objections to the proposed Disclosure Statement that seek further disclosures regarding details of the proposed Plan terms and possible alternatives to the Plan, and also raise preliminary objections to confirmation of the Plan.  These objectors primarily include: (i) the PBGC, which seeks to challenge the proposed substantive consolidation of NNI and NNCC under the Plan, (ii) the NTCC, which seeks additional disclosures regarding the pending appeals from the Allocation Decisions and particularly its arguments why the bondholder claims should not be permitted to receive *pari passu* distributions from the Debtors, and (iii) SNMP Research, which requests more disclosure about its claims

3

against the Debtors and their effect on creditor recoveries, and raises other confirmation related objections.  Informal comments also have been received from the Office of the United States Trustee, and the Piltz Objection and General Beneficial Objection focus on clarifications related to the treatment of their specific claims and interests.  These latter comments and Objections are addressed in this Reply and, where appropriate, by additional disclosure in the Disclosure Statement.

4.      The Objectors purport to raise concerns and seek additional disclosure regarding particular aspects of the Plan and Disclosure Statement, such as the substantive consolidation provisions or the treatment of specific creditors, on the apparent assumption the Plan could be fine-tuned or modified for the benefit of specific creditors while leaving the other benefits of the SPSA settlement in place.  The Debtors are amenable to adding some additional disclosure regarding the issues raised by these parties (as summarized on Exhibit A hereto), although all such disclosure must rest on the true and stark premise that if the Plan is not confirmed on the terms contemplated under the SPSA, the entire Plan and settlement falls apart, wasting the efforts of the SPSA parties to reach a mutually acceptable negotiated resolution to these cases.  Such an outcome would be certain to leave the Debtors and their creditors in a worse situation than under the Plan, as it would force the Debtors to return to a litigation path that would delay and could likely substantially impair creditor recoveries as a whole.  In that light, the objections raised – whether addressed now or more properly at Plan confirmation – must be seen as a request that the Court allow the Objectors to roll the dice and try for an improved outcome through additional years of litigation.  Both as originally filed and with the Debtors' proposed additional disclosures, the Disclosure Statement satisfies the Bankruptcy Code's requirement to contain "adequate information," and the Debtors request that this Court allow the Debtors to solicit their

creditors and permit the Debtors to pursue a Plan that provides a fair and balanced resolution of the numerous complex, intertwined disputes and appeals among the worldwide Nortel affiliates that are presently on hold and, if the Plan is approved, can be permanently resolved.  Finally, the objections that the Plan is "patently unconfirmable" are nonsense and should be overruled. These objections are plainly objections to confirmation, not to approval of the Disclosure Statement, and inappropriate at this time.  Moreover, while the Objectors cherry pick through the SPSA and Plan provisions to raise arguments intended to further their own creditor interests or to extract litigation settlement value, as the Debtors will demonstrate at the confirmation hearing, both the Plan and SPSA comply with applicable law and further the interests of the Debtors and their respective creditors by providing a reasonable and balanced resolution to the Allocation Dispute, resolving other disputes, and in a manner that furthers the Debtors' ability to bring these cases to closure.

5.      For these reasons and the additional reasons set forth below, the Debtors submit that (i) the Disclosure Statement, revised as discussed herein, provides adequate information pursuant to section 1125 of the Bankruptcy Code; (ii) the Objections should be otherwise overruled; and (iii) the Disclosure Statement should be approved as containing adequate information.

## Background

6.      On January 14, 2009 (the "Petition Date"), the Debtors, other than Nortel Networks (CALA) Inc. ("NN CALA")[4] and NNIII,[5] filed voluntary petitions for relief under

---

[4]      NN CALA filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on July 14, 2009, which was consolidated and is being jointly administered with the other Debtors' Chapter 11 cases for procedural purposes [D.I. 1098].

[5]      NNIII filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on July 22, 2016, which was consolidated and is being jointly administered with the other Debtors' Chapter 11 cases for procedural purposes [D.I. 17090].

Chapter 11 of the Bankruptcy Code, which cases are consolidated for procedural purposes only. Soon after the commencement of these insolvency proceedings, the Debtors and their various affiliates entered into a series of transactions in which they sold various business units and other assets to various purchasers (the sale proceeds of such transactions plus accrued interest, the "Sale Proceeds"). Despite early and repeated efforts at mediation (including before all of the asset sales were consummated), the key parties were unable to reach an agreement as to the distribution of the Sale Proceeds, and proceeded to engage in litigation before this Court and the Canadian Court (the "Allocation Dispute").[6]

7.    On May 12, 2015, this Court and the Canadian Court simultaneously issued opinions deciding the Allocation Dispute (the "Allocation Decisions"). Numerous parties appealed this Court's Allocation Decision to the United States District Court for the District of Delaware. During the pendency of the appellate process, the parties engaged in further settlement discussions the Debtors, their foreign affiliates and other key parties agreed upon a proposed settlement of the Allocation Dispute and potential claims matters, as memorialized in the SPSA, executed on October 12, 2016. See Plan Ex. A.

8.    The SPSA resolves the amounts that will be available to each Debtor estate for distribution to creditors on a debtor-by-debtor basis, providing for, among other terms, (i) the percentages by which the Sale Proceeds will be distributed to each Debtor and Global Debtor; (ii) the treatment of Crossover Claims; (iii) a cap on recoveries for creditors who receive 100% of the amount of an Allowed Claim; (iv) the elimination of post-Petition Date interest on any Allowed Claim; and (v) the cooperation and reasonable efforts of all signatories to implement the SPSA and the transactions and actions contemplated therein and take any and all reasonably

---

[6]    A detailed summary of the various business unit and asset sale transactions, as well as a description of the Allocation Dispute, is set forth in the Disclosure Statement, which is incorporated herein by reference.

necessary and appropriate actions in furtherance of consummation of the SPSA, the Disclosure
Statement and the Plan.

9.     In addition, the SPSA sets out certain material conditions to the effectiveness of
the SPSA, including (i) obtaining approval orders from the Canadian Court and this Court
authorizing the currency conversion of a portion of the Sale Proceeds from U.S. Dollars to
Canadian Dollars; (ii) entry of an order or orders from the U.K. Court, the U.K. Court for the
French Main Proceeding, the French Court and the Beddoes Court authorizing the respective
Global Debtors to implement the SPSA; (iii) confirmation of the Plan and the Canadian Plan by
the respective courts; (iv) the dismissal with prejudice of various pending litigations; and (v) the
condition that the Plans Effective Date shall have occurred by no later than August 31, 2017.
The non-satisfaction of any such conditions to the effectiveness of the SPSA can trigger
termination of the SPSA.

10.     On November 4, 2016, the Debtors filed the Disclosure Statement [D.I. 17348]
and a proposed plan of reorganization (as it may be amended, the "Plan") [D.I. 17347].  On
November 4, 2016, the Debtors also filed the Solicitation Procedures Motion [D.I. 17350].

11.     By order dated November 7, 2016 [D.I. 17355] (the "Disclosure Statement
Procedures Order"), the Court fixed December 1, 2016 at 9:00 a.m. (Prevailing Eastern Time) as
the date and time for a hearing to consider the relief requested in the Solicitation Procedures
Motion, including the adequacy of the Disclosure Statement (the "Disclosure Statement
Hearing").  Concurrently, the Court established November 18, 2016 at 4:00 p.m. (Prevailing
Eastern Time) as the date and time by which objections to the Debtors' Disclosure Statement and
the Solicitation Procedures Motion could be filed with the Court and served upon the Debtors

and other parties in interest (the "Objection Deadline").[7]  The Debtors properly provided notice

of the Disclosure Statement Hearing pursuant to the Disclosure Statement Procedures Order.[8]

12.     Only General Beneficial LP, the PBGC, the NTCC, SNMP Research and Mr.

Edward E. Piltz timely filed and served objections.[9]  In response to these Objections, the Debtors

have agreed to make certain modifications to the Disclosure Statement, as further detailed below.

The Debtors intend to file a revised Disclosure Statement, incorporating these modifications,

prior to the Disclosure Statement Hearing.[10]

<b>Debtors' Response</b>

13.     The Debtors' Disclosure Statement both as originally filed and with the additional

disclosures proposed herein satisfies the Bankruptcy Code's requirement of providing "adequate

information."  11 U.S.C. § 1125(a)(1).  Many of the Objectors' other objections are more

properly reserved for the confirmation hearing and none provides even an arguable basis for the

Court to conclude the Plan is "patently unconfirmable".

**I.     The Disclosure Statement Provides Adequate Information Under Section
1125 Of The Bankruptcy Code**

14.     The Court should approve a disclosure statement if it provides "information of a

kind, and in sufficient detail . . . that would enable such a hypothetical investor of the relevant

class to make an informed judgment about the" Plans.  11 U.S.C. § 1125(a)(1); see, e.g., Krystal

Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp., 337 F.3d 314, 321 (3d Cir. 2003)

---

[7]      In order to attempt to consensually resolve certain issues, the Debtors agreed to extend the Objection
Deadline for the United States Trustee until November 23, 2016 at 4:00 p.m. (Prevailing Eastern Time).
[8]      See Affidavit of Service Regarding Notice of Hearing to Consider Approval of Disclosure Statement of
Konstantina Haidopoulos [D.I. 17389].
[9]      Liquidity Solutions, Inc. also filed a Joinder and Reservation of Rights with Respect to the Objection of the
NTCC on November 23, 2016, after the Objection Deadline has passed, raising similar concerns as the NTCC with
respect to creditor recoveries [D.I. 17431].
[10]     To the extent that the Debtors address issues raised by the Objections in this Reply, it is without prejudice
to the Debtors' right to respond to such objections or any other objection to confirmation of the Plan prior to or at
the confirmation hearing.

(holding that a disclosure statement must contain "'adequate information' to 'enable a creditor to make an informed judgment about the Plan'"). The purpose of the disclosure statement is to "guarantee a minimum amount of information to the creditor asked for its vote." <u>Century Glove, Inc. v. First Am. Bank of N.Y.</u>, 860 F.2d 94, 100 (3d Cir. 1988); <u>see In re Indianapolis Downs, LLC</u>, 486 B.R. 286, 293 (Bankr. D. Del. 2013) (disclosure statement is "intended to provide stakeholders with 'adequate information' to permit a creditor [to make] an informed decision to vote for or against a proposed plan"). Here, the Disclosure Statement provides such "adequate information," including substantial information regarding the history of the cases, the Allocation Dispute, the history of settlement negotiations regarding the Allocation Dispute, the SPSA, expected creditor recoveries and the risks to creditors if the Plan is not confirmed. As such, it can and should be approved by this Court. Nevertheless, the Debtors have addressed several of the objections raised by the Objectors by proposing to provide additional information in the Disclosure Statement as set forth below.

### A.    The PBGC Objection

15.    The PBGC focuses its objection on the proposed substantive consolidation of NNI and NNCC under the Plan, as provided for under the SPSA, and seeks additional disclosure regarding the Plan's proposed substantive consolidation of NNI and NNCC. Specifically, the PBGC seeks disclosure regarding: (i) the impact of the substantive consolidation of NNI and NNCC for the PBGC's claims and other potentially affected creditors; (ii) additional detail on the Debtors' rationale for the substantive consolidation of NNI and NNCC; and (iii) a description of supposed "downsides of proceeding" with the Plan that contemplates the substantive consolidation of NNI and NNCC. <u>See</u> PBGC Obj. at 2.

16.    While the PBGC seeks disclosures and explanations regarding this term of the SPSA and the Plan, the consolidation of NNI and NNCC and the effect of such consolidation on

the Debtors' creditors cannot be considered in isolation from the remaining SPSA terms.

Consistent with this, the Disclosure Statement warns creditors that:

> [A] failure to effectuate the SPSA and a resumption of litigation between certain of the SPSA Parties regarding the Allocation Dispute would result in significant additional costs to the Debtors' estates and further delays in the Debtors' ability to make distributions to their creditors.  Moreover, the claims and disputes resolved by the SPSA are legally and factually complex, and there is no certainty that the Debtors could obtain an ultimate determination of such matters that would result in distributions for their creditors equal to or greater than those contemplated under the SPSA, should the SPSA fail to be effectuated.

Disclosure Statement at Section III.H.3.j.  The Disclosure Statement also provides information regarding NNCC – which existed solely as a financing arm – including that it is a "wholly owned subsidiary of NNI" and  "neither has nor has ever had operations or employees separate from NNI."  Id. at Section II.A.4.b.  Further, to the extent that the PBGC's objection can be interpreted to be a challenge to the propriety of substantively consolidating NNI and NNCC, and therefore a challenge to the Plan in its entirety, that objection must await confirmation, at which time it may be properly considered by the Court.   A disclosure statement hearing is not the proper stage for such a challenge.  See In re Stone & Webster, Inc., 286 B.R. 532, 544 (Bankr. D. Del. 2002) (Walsh, J.)  ("I do not believe that the [challenge to consolidation raised by a plan opponent pursuant to 1129(a)(7)] . . . is ripe for determination at this juncture.").  Moreover, while the actual recoveries to all of the Debtors' creditors, including the PBGC, depend on many variables including the actual allowed amount of their own claims and the total claims allowed against the Debtors, the Budget and Recovery Analysis attached as Appendix C to the Disclosure Statement includes a Summary Recovery Table that sets forth projected aggregate recoveries for the PBGC under the Plan under certain assumptions and claims amounts.[11]  Accordingly, the PBGC has

---

[11]        The Recovery Table states (solely for modeling purposes and without waiver or prejudice to any defenses

adequate information to enable it to consider the maximum improvement of its position that would be possible under any alternative plan, with the understanding that the Debtors expect plan recoveries likely would be worse under a fully litigated resolution.

17.    Nevertheless, to further address the PBGC's purported concerns, the Debtors propose to make certain additional disclosures regarding the appropriateness of substantive consolidation of NNI and NNCC as a part of the integrated SPSA settlement.  Specifically, the Debtors will include the following information in a new Section III.H.3.k of the Disclosure Statement:

> The various terms of the SPSA, including the allocation of the Sale Proceeds both between the Canadian Debtors, the EMEA Debtors, NNSA and the Debtors, and among the Debtors; the Allowance of certain intercompany claims and other Claims against the Debtors; the Substantive Consolidation of NNI and NNCC, the consolidation of the Canadian Debtors, and the non-consolidation of the other Debtors; the provisions regarding Crossover Claims and the *pari passu* treatment of creditors; and the other terms contained therein constitute an integrated settlement among the Debtors, their worldwide affiliates and the other creditors that are signatories to the SPSA.  Certain creditors and groups, including the PBGC and NTCC, have indicated their intention to object to the confirmation of the Plan including based on provisions of the Plan that incorporate the SPSA terms.  However, the Debtors believe that, while the SPSA allocates less Sale Proceeds to the Debtors than they sought in the Allocation Trial, the SPSA settlement is beneficial to the Debtors and their creditors and the Plan is in the best interests of the Debtors' creditors because, among other reasons: (1) absent a settlement the Debtors would be required to continue litigation of the Allocation Dispute and there is no assurance that a better outcome could be obtained for the Debtors in light of the Court's decision and the current status of the U.S. and Canadian appeals; (2) if the Allocation Decision is

the Debtors may have) that on an assumed claim amount of approximately $593 million (the filed amount of the original PBGC claims) the PBGC may receive distributions of approximately $539 million (or a 91% recovery) on its allowed claims, subject to the various assumptions set forth therein.  Ultimately, the PBGC's recovery on its allowed claim is highly dependent on various factors, including the amount of its allowed claim.  To the extent the claims are allowed at the higher amount of $708 million (the filed amount of the amended PBGC claims), as depicted in the "High Claim Case" in the Recovery Analysis, the PBGC may receive distributions of approximately $570 million.  Conversely, if the PBGC claim is allowed at a lower amount, the PBGC distributions are expected to be lower.

affirmed on appeal, it is expected that further litigation would be necessary to determine the Debtors' ultimate allocation of Sale Proceeds and based on the current ruling, and the expected costs to continued litigation, it is expected that the final allocation to the Debtors under such a scenario would provide the Debtors with less Sale Proceeds than is contemplated under the SPSA and Plan, (3) in the absence of the SPSA settlement, the Debtors would be forced to resume and commence further time-consuming and costly litigation regarding the resolution of numerous other intercompany claims settled by the SPSA, without any guarantee of success and with an increased likelihood that the amounts available for recovery by creditors of all Debtors would be reduced, as well as potential litigation regarding the terms of the Canadian Debtors' CCAA plan and a chapter 11 plan for each of the Debtors, (4) the Debtors would continue to incur significant administrative and professional costs during the pendency of their cases, which would reduce the amount available for recovery by Creditors, and (5) such further litigation and disputes would result in additional delays in the Debtors' ability to make distributions to their creditors.  The SPSA and the Plan reduce or eliminate significant uncertainties regarding the Debtors' respective assets, claims and the expected recoveries for their creditors, and avoid the incurrence of the substantial costs that otherwise likely would be required to resolve these issues.

18.    The Debtors also would propose to add the following disclosure to Section IV.B of the Disclosure Statement:

The Debtors believe that the substantive consolidation of NNI and NNCC, an integrated provision of the SPSA, is in the best interests of NNI and NNCC and their creditors.  Notably, prior to the Petition Date, NNCC was a wholly owned subsidiary of NNI formed solely for the purpose of raising financing for Nortel.  The officers and directors of NNCC substantially overlapped with those of NNI and NNCC never had its own employees or its own separate operations other than its role as a source of financing through its issuance of the NNCC Bonds and NNCC 2006 Notes. NNCC also did not have its own assets, other than its right to receive payments from NNI.  Moreover, prior to the Petition Date, NNI and NNCC (and other subsidiaries) also were accounted for in NNC's financial statements as "consolidated subsidiaries." Accordingly, as the Debtors will demonstrate at the Confirmation Hearing, for these and other reasons, the substantive consolidation of NNI and NNCC is appropriate under applicable law and in the best interests of their creditors.

19.    The Debtors submit that the above proposed supplemental disclosures to the Disclosure Statement more than adequately address the PBGC's objection to the adequacy of disclosures with respect to substantive consolidation and the PBGC Objection should otherwise be overruled at this stage.

### B.    The NTCC Objection

20.    The NTCC objects to the Disclosure Statement on the ground that it does not contain adequate information regarding: (i) the fact that the NTCC does not support the SPSA; (ii) the NTCC's pending appeal of the Allocation Decision, including the alleged "controversy" regarding the allowance of the Bond Guarantee Claims[12] against the Debtors in light of the Court's Allocation Decision; and (iii) the Plan's treatment of NNCC Bondholders.  The NTCC also requests that the Disclosure Statement be amended to include a letter from the NTCC voicing its objection to the SPSA.  Finally, the NTCC raises two procedural objections, based on a concern that the Debtors are attempting to "short-circuit" the settlement approval requirements of Bankruptcy Rule 9019 under the Plan and that the Debtors' solicitation procedures consolidate the votes of creditors against each Debtor.

21.    The Debtors believe that the Disclosure Statement currently provides adequate information as to each of the primary issues raised by the NTCC, but are willing to include certain additional disclosure as detailed below.  The Debtors also address the manner in which the settlement will be considered under Bankruptcy Rule 9019 and the votes of the NTCC members will be counted under the proposed solicitation procedures.

---

[12]    The Debtors' Plan uses the term "Crossover Bonds Claims" to refer to certain bond claims that the Debtors believe the NTCC refers to as the "Bond Guarantee Claims."  The Debtors will use "Crossover Bonds Claims" throughout this Reply.

### i.      Additional Disclosure Regarding the NTCC and the SPSA

22.      The Disclosure Statement contains substantial disclosure regarding the history of the Allocation Dispute and the appeals that resulted from the Allocation Decision including that the NTCC and the PBGC also filed appeal submissions, as detailed in section III.H. of the Disclosure Statement.  Various parties have engaged in substantial briefing regarding the issues raised by the Allocation Decisions and those pleadings are referenced in that section as well. That said, in order to address the NTCC's objection regarding the disclosure addressing the SPSA, the Debtors propose to revise Section III.H.2 of the Disclosure Statement to include the following language:

> In its appellate submission, the NTCC – which was not a party to the Allocation Trial – argued that the Allocation Decision constitutes a *de facto* substantive consolidation of the Nortel Debtors around the world, and that therefore allowing the Crossover Bonds Claims in full against the Debtors under a U.S. chapter 11 plan would give the Bondholders a disproportionate share of the value in the Debtors' estate and, notwithstanding the Ivanhoe Bldg. & Loan Ass'n v. Orr, 295 U.S. 243 (1935) precedent, the Crossover Bonds Claims should not be given *pari passu* distributions under a Chapter 11 Plan.  The PBGC – also not a party to the Allocation Trial – argued that the "modified pro rata" allocation adopted by the Bankruptcy Court improperly treated the PBGC's joint and several claims against the various Debtors and detrimentally affected or invalidated its lien against certain of the Sale Proceeds.  The NTCC and PBGC are not parties to the SPSA and in filings with the Bankruptcy Court have indicated they do not support the Plan or the SPSA and intend to object to the confirmation of the Plan.  The NTCC also has indicated its intention to continue to vigorously pursue its appeal of the Allocation Decision, to challenge the treatment of Bondholder claims under the Plan and to seek to have the Debtors escrow funds sufficient to pay the NTCC an enhanced recovery if the NTCC successfully litigated its pending appeal and such litigation were to result in higher recoveries to it under a plan of reorganization later approved by the Court.

The Debtors further propose to add on page 2 of the Disclosure Statement the following language (underlined solely to show the addition and where it would be placed):

14

An ad hoc group of creditors holding trade (supplier) and employee severance and pension claims (the "Nortel Trade Claims Consortium") or the "NTCC") also has appeared in the Chapter 11 Cases.  The NTCC has informed the Debtors and the Court that it does not support the SPSA or the Plan.

The above proposed additions, taken together with the language proposed to be added to Section III.H.3 of the Disclosure Statement, make clear to creditors in the Debtors' cases that the NTCC does not support the SPSA, that the NTCC has filed an appeal of the Allocation Decision that is still pending, and that the NTCC continues to object to the full allowance of the Crossover Bonds Claims against the Debtors.  As such, this language provides all the information on these issues that a creditor would need to make an informed decision about how to vote on the Plan.

### ii.    The Proposed NTCC Letter

23.    The NTCC's argument that the Disclosure Statement should be amended to include a letter of opposition from the NTCC is without merit.  See NTCC Obj. ¶ 45.  The cases the NTCC cites in support of its argument merely stand for the proposition that a supplementary letter from the official Creditors' Committee — a fiduciary to all creditors — may be permitted to be included in the Debtor's solicitation materials when such committee desires to explain its views on a chapter 11 plan.[13]  The NTCC is not an official committee.  Rather, the Creditors' Committee – charged with the duty to represent the interests of unsecured creditors in these cases – is a signatory to the SPSA and supports the confirmation of the Plan.  The Debtors are amenable to adding additional disclosure in the Disclosure Statement regarding the NTCC's position with respect to the Plan and the SPSA, but given that the NTCC has no duties to other

---

[13]    The NTCC cites to three cases, In re Motor Coach Indus., Inc., No. 08-12136 (Bankr. D. Del. 2008), Tr. Of Proceedings held Dec. 17, 2008 at 44:7-46:21, Central Transport, Inc. v. Roberto (In re Tucker Freight Lines, Inc.), 62 B.R. 213, 215 n.1 (Bankr. W.D. Mich. 1986) and In re Federated Dep't Stores, Inc., Consolidated Case No. 1-90-00130, 1992 WL 605483, at *7 (Bankr. S.D. Ohio Jan. 10, 1992),  to support its request that the Court permit NTCC to provide a letter as an "enclosure to the Disclosure Statement reflecting the [NTCC's] views."  See NTCC Obj. ¶¶ 45-46.  Such cases, which address whether a supplementary letter may be included by an official creditors' committee in a debtor's solicitation materials, are inapposite.

15

creditors beyond its own members, inclusion of a separate letter by the NTCC in the Debtors' plan materials is not warranted.

### iii.   The NTCC Remaining Objections

24.   The NTCC raises two further objections – regarding the approval of the SPSA settlements under Bankruptcy Rule 9019 and the manner in which the solicitation procedures apply to the claims of the NTCC's  members – that can be easily dispensed of.

25.   First, the NTCC raises the concern, apparently based on disclosure contained in section IV.N.5. of the Disclosure Statement, that the Debtors may not seek approval of the SPSA settlements included in the Plan under Bankruptcy Rule 9019 and therefore have a path to circumvent or "short-circuit" the requirements of Bankruptcy Rule 9019 through the confirmation of the Plan without seeking such approval.  In fact, the Plan makes clear that the settlements under the Plan are proposed to be approved under Rule 9019.  Section 6.1 of the Plan states that "[p]ursuant to . . Bankruptcy Rule 9019 . . . the provisions of this Plan shall constitute a good faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to this Plan and the SPSA."  Section 7.1 of the Plan states that "[t]he Plan shall serve as a motion by the Debtors seeking an order pursuant to . . . Bankruptcy Rule 9019 approving the SPSA and authorizing the Debtors to perform their obligations under the SPSA."  Section IV.A. of the Disclosure Statement contains identical language.  Indeed, in an abundance of caution, the Debtors intend to file a motion seeking approval of the Plan settlements under Rule 9019, to be heard at the confirmation hearing.

26.   In order to avoid any inadvertent confusion based on section IV.N.5. of the Disclosure Statement, which is only intended to apply in the event the Plan could not be

confirmed for one or more of the Debtors, the Debtors propose to modify such disclosure to

provide:

> In the event that the Plan is not confirmed for any individual Debtor, the
> Plan shall be treated at the Confirmation Hearing as a motion seeking
> approval of the SPSA pursuant to Bankruptcy Rule 9019 as to any such
> individual Debtor that does not confirm a Plan.  The Debtors reserve their
> right that, if and after such a Debtor's entry into the SPSA is approved,
> any such individual Debtor may dismiss or convert its chapter 11 case, as
> necessary to effectuate the SPSA and the settlement contemplated therein
> or to wind down.  The Debtors shall coordinate with the SPSA Parties to
> make any required amendments or seek any required waivers to or under
> the SPSA in order to implement any such actions, subject to the SPSA
> Parties' rights under the SPSA.

27.    The NTCC also objects to a common provision in the Solicitation Procedures

regarding counting votes for numerosity purposes under 11 U.S.C. § 1126.  The Solicitation

Procedures provide that "[f]or purposes of the numerosity requirement of section 1126(c) of the

Bankruptcy Code and based on a reasonable review by the Solicitation Agent, separate Claims

held by a single creditor in a particular class shall be aggregated as if such creditor held one

Claim against the Debtors in such class, and the votes related to such Claims shall be treated as a

single vote to accept or reject the Plan."  See Solicitation Procedures at 13.  The NTCC argues

that this provision undermines the numerosity requirement and will shortchange creditors

holding multiple claims.  Not so.  This provision — which is standard and frequently approved

by Delaware bankruptcy courts[14] — ensures that a single creditor that has filed many separate

proofs of claim cannot overpower the will of other creditors who each only have filed a single

---

[14]    See Order Approving Disclosure Statement at Solicitation Procedures ¶ D.3., In re Premium Transp. Serv.,
Inc., No. 16-10629 (KJC) (Bankr. D. Del. June 13, 2016) [D.I. 291]; Order Approving Disclosure Statement at 5, In
re PSL – North America LLC, No. 14-11477 (LSS) (Bankr. D. Del. Nov. 30, 2015) [D.I. 467]; Order Approving the
Adequacy of the Amended Disclosure Statement at 9, In re SS Body Armour I, Inc., No. 10-11255 (CSS) (Bankr. D.
Del. Aug. 27, 2015) [D.I. 3259]; Order Approving the EFH/EFIH Disclosure Statement at Ex. 8 at 7, In re Energy
Future Holdings Corp., No. 14-10979 (CSS) (Bankr. D. Del. Sep. 21, 2016) [D.I. 9616-6]; Order Approving
Disclosure Statement at 10, In re Kior, Inc., No. 14-12514 (CSS) (Bankr. D. Del. Apr. 9, 2016) [D.I. 494]; Order
Conditionally Approving the Disclosure Statement at 10, In re Nuo Therapeutics, Inc., No. 16-10192 (MFW)
(Bankr. D. Del. Mar. 29, 2016) [D.I. 252].

claim.  Such a provision is wholly consistent with the purposes of the numerosity requirement,

and merely serves to clarify how the numerosity requirement will apply to holders of multiple

claims.  To alleviate the NTCC's apparent concern, the Debtors confirm that this provision is

intended to apply only to the original holders of Claims; therefore, under the Solicitation

Procedures claims traders or other entities represented by the NTCC that have purchased claims

from multiple creditors will receive one vote per original creditor from which the claims were

purchased, each in the aggregate dollar amount of allowed claims of the original creditor.[15]

Accordingly, this provision does not unfairly prejudice members of the NTCC in any way.[16]

28.    With the above supplemental disclosures and clarifications, the Debtors submit

that they have addressed the NTCC's objections with respect to the adequacy of the Disclosure

Statement and that the NTCC Objection on such grounds should otherwise be overruled.

## C.    The SNMP Research Objection

29.    SNMP Research objects to the Disclosure Statement, contending that the

Disclosure Statement does not contain adequate information regarding the quantum of SNMP

Research's claims and expected recoveries for creditors if SNMPRI's prepetition claim and

SNMP Research's claims in its pending adversary proceeding against the Debtors were to be

allowed in full.  SNMP Research also raises objections regarding the Debtors' authority to set

reserves and whether SNMP Research would be bound by certain release, discharge and

injunction provisions of the Plan, all of which evidently arise from SNMP Research's

misinterpretation of the relevant Plan provisions or an apparent but baseless concern that its

claims are being singled out under the Plan.  These matters are addressed in turn below.

---

[15]    For example, if a claims trader purchased 2 claims from holder A and 2 claims from holder B, the trader would get two votes:  one vote in the aggregate dollar amount of the holder A claims, and one vote in the aggregate dollar amount of the holder B claims.

30.    As a primary matter, the Debtors believe the Disclosure Statement currently provides adequate information regarding SNMP Research's claims and estimated recoveries given various contingencies.  Notably, while the Debtors have asked for an extended period of time that SNMP Research provide a statement of the amount and basis of its damages claims, SNMP Research only recently disclosed the amount of its purported damages claims when it disclosed its expert reports in the relevant adversary proceeding on November 2, 2016. Accordingly, the claim numbers could not have been disclosed in the Disclosure Statement or recovery analysis included therein.[17]

31.    In its objection, SNMP Research contends that its "prepetition damages total at least $81.08 million," and that its expert report calculated post-petition damages "in the total amount of at least $47.12 million."  See SNMP Research Obj. at 5.  SNMP Research's Objection does not provide any further detail regarding these amounts or the purported basis for them, and therefore does not give other creditors a basis to evaluate SNMP Research's asserted damage claims.  Moreover, the Debtors dispute the validity of SNMP Research's claims and the amount of damages it now alleges for a multitude of reasons, including, among others, (i) that products it contends are unlicensed were in fact licensed, (ii) that its claims are time-barred, (iii) that it seeks to hold the Debtors liable for actions of other parties, (iv) that it overstates the amount of damages that would accrue if the Debtors did have any liability on the asserted claims, (v) that it improperly asserts claims against Debtors that did not have any potentially relevant operations or assets, and (vi) that it includes claims for amounts that are not compensable under the Bankruptcy Code at all or at the priorities at which such claims are being asserted.  To that end,

---

[16]    Nothing in the Solicitation Procedures waives the Debtors' rights to object to any claim for voting purposes or otherwise, or to see the designation of any votes by any creditors in their cases.
[17]    SNMP Research's damages expert report was filed under a confidentiality designation that precludes the Debtors from presenting any specific amounts in the Disclosure Statement.

the Debtors also do not believe it is appropriate or helpful for other creditors to merely have

SNMP Research's claims added into the low case recovery scenarios at the full claim amount

against each Debtor in light of the defenses to these claims in whole or in part.

32.    Nevertheless, in order to address SNMP Research's objection, the Debtors are

prepared to make certain additional disclosures as follows.  First, the Debtors are prepared to

expand their Budget and Recovery Analysis located at Appendix C to the Disclosure Statement

to include an additional scenario in which a claim of $47.12 million is allowed as an

administrative claim against NNI and an $81.08 million general unsecured claim is included as a

claim against each of the Debtors against whom SNMPRI has filed a proof of claim to date

(regardless of whether such claims were timely and notwithstanding the objections that have

been and may be filed to such claims).  Second, the Debtors also would be willing to add the

following disclosure to section III.D.7.c. of the Disclosure Statement:

> On November 2, 2016, SNMP Research served the Debtors with
> an expert report that purports to set forth SNMP Research's
> claimed damages, and on November 23, 2016, SNMP Research
> moved the Court to allow SNMPRI's previously-filed proofs of
> claim to be amended and also to add SNMPR as a claimant [D.I.
> 17432].  In a declaration attached to that motion, SNMP Research
> contends that its prepetition damages against the Debtors total at
> least $81.08 million, including at least $33.12 million in actual
> damages, at least $39.27 million in lost profits and at least $8.69
> million in interest.  At present, only SNMPRI has filed proofs of
> claim.  In its motion for leave to amend the proofs of claim, SNMP
> Research seeks to add SNMPR as a claimant and to significantly
> change the amount and nature of its previously-filed claims.
> SNMP Research's Objection claims that it holds post-petition
> administrative damages claims against each of the Debtors in the
> total amount of at least $47.12 million, including $__ million in
> actual damages, $__ million in lost profits and $__ million in
> interest.[18]  The Debtors assert that they have substantial defenses to
> these claims and intend to vigorously contest such claims,
> including SNMPRI's present attempt to amend its prepetition

---

[18]     While such amounts would be disclosed in the actual Disclosure Statement, the Debtors have not included
the breakdown in this Reply because the expert report is marked as confidential by SNMP Research.

claims to add a new party and to increase the amount it is claiming
to $81.08 million.

<u>Third</u>, while the Debtors disagree with SNMP Research's objection to the description of the

Court's ruling on the parties' respective motions for partial summary judgment, the Debtors

propose to modify the relevant paragraph in section III.D.7.c. of the Disclosure Statement to read

as follows:

> SNMP Research filed a motion for partial summary judgment on
> October 14, 2015, in which it sought an order determining that "the
> [Bankruptcy] Court did not authorize the U.S. Debtors to transfer
> any intellectual property owned by SNMP Research, including but
> not limited to its Software, to any third party." The Debtors cross-
> moved for partial summary judgment on November 6, 2015 for a
> ruling that SNMP Research's "profits" claims for a portion of the
> purchase price paid in the Business Line Sales could not be
> sustained because the sale agreements and sale orders provided
> only for the sale of the selling debtors' property and the purchase
> price was only attributable to the selling debtors' property. In
> response to SNMP Research's motion, the U.S. Debtors made clear
> that they were not contending that the sale orders operated to sell
> or transfer any assets belonging to SNMP Research or any other
> third party and they had not sought any such order. The
> Bankruptcy Court, on February 8, 2016, ruled with respect to
> SNMP Research's motion that "Debtors did not seek and the Court
> did not authorize the sale or transfer of SNMP's intellectual
> property rights or its intellectual property, including its software, to
> purchasers in the Business Line Sales. It is equally clear, however,
> that the Sale Orders approved the sales and did not enjoin Nortel
> from selling or transferring the SNMP software." With respect to
> the Debtors' motion, the Bankruptcy Court stated that "[t]he
> purchase price which purchasers paid to Nortel pursuant to the Sale
> Orders was for assets which the Court authorized be sold in the
> Sale Orders" and that the "Sale Orders plainly establish that Nortel
> was not authorized to sell SNMP property to purchasers, and
> therefore Nortel should have received no funds for SNMP
> property. If that is the case, then the purchase price in each sale
> cannot be attributed to SNMP property, including the SNMP
> software." The Bankruptcy Court denied the Debtors' motion,
> stating as follows: "[I]t will be SNMP's burden to prove that the
> transfer of SNMP software were sales, i.e., generated income. If
> SNMP can prove the sales occurred, then the burden will shift to
> Nortel to prove what portion of the money it received is

21

attributable to the SNMP software.  If SNMP cannot establish that
Nortel profited from the transfers, then the burden will remain with
SNMP to prove its actual damages."  Following the Debtors'
motion for clarification of the Bankruptcy Court's February 8,
2016 decision, the Bankruptcy Court indicated that resolution of
the issue raised by the Debtors' motion would need to await the
completion of discovery.  The parties are currently engaged in
discovery and expert reports are being submitted.  A trial date, if
necessary, will be set in the future. The Debtors dispute and intend
to continue vigorously defending SNMP Research's allegations.

33.     SNMP Research next raises a string of apparent confirmation objections, which it

wraps into an objection that the Plan is not confirmable because it was not filed in good faith and

does not comply with sections 1123 and 1129 of the Bankruptcy Code.  SNMP Research Obj. at

3.  SNMP Research roots its assertions in its baseless argument that the terms of the Plan

somehow "discriminate" against SNMP Research.  Id. at 7-12.  SNMP Research also objects as a

matter of law to the commonplace provisions of the Plan that: (i) preserve the Debtors' ability to

seek post-confirmation estimation of claims; (ii) grant certain third-party releases; and (iii) seek

approval of the SPSA pursuant to Bankruptcy Rule 9019 in the event the Plan is not confirmed

for any individual Debtor.  These objections are ill-founded and more properly considered at the

confirmation hearing, but it is worth debunking certain misperceptions now.

34.     SNMP Research's objection to the reserve provisions of the Plan arises from its

tortured reading of the provisions of the Plan and section 4(f) of the SPSA.  SNMP Research

reads section 4(f) of the SPSA, which provides the Debtors and their affiliates will not holdback

from the Sale Proceeds amounts related to SNMP Research's claims, as a prohibition on the

Debtors taking any distribution reserves in their own estates with respect to such claims.  This is

simply an improper reading of the documents.  The terms of the SPSA, including section 4(f),

provide that the more than $7 billion in escrowed Sale Proceeds will be distributed to the various

Nortel estates without holding back any amounts in escrow on account of SNMP Research's

claims.  This provision has no bearing on the treatment of SNMP Research's claims under the

Plan and does not eliminate the Debtors' ability to establish a reserve for SNMP Research's

claims in connection with the confirmation of the Plan.

35.     SNMP Research similarly objects to the Plan provisions granting the Debtors

authority to establish reserves as somehow providing the Debtors and the Plan Administrator

with too much discretion to determine the size of such reserves.  Id. at 9.  This objection is

particularly surprising given that SNMP Research to this day continues to purport to leave open

and undefined the actual amount of its asserted claims against the Debtors, underscoring the need

for the Plan Administrator to retain the flexibility to establish and determine the proper amount

of reserves for claims that remain disputed and have not been finally liquidated.  Even SNMP

Research's Objection, filed more than seven years after its original proofs of claim were filed

and over five years after it filed its complaint, and following SNMP Research's delivery of its

expert damages report outlining its asserted damages claims against the Debtors, still fails to

commit to any definite figure for its claimed damages.  Rather, SNMP Research contends that

prepetition damages amount to "at least" $81.08 million and post-petition damages amount to "at

least" $47.12 million.  (As noted, only SNMPRI has previously filed proofs of claim, but now

SNMP Research seeks to add SNMPR as a claimant and to significantly change the amount and

nature of its previously-filed claims.)  Id. at 5.  These amounts not only differ materially from

SNMPRI's most recent assertion of damage amounts (including the stated amount of

approximately $8.5 million in its most recently filed proofs of claim),[19] but by claiming "at least"

$81.08 million, SNMP Research requires the Plan Administrator to use its best judgment about

the proper reserve amount for such claims (without conceding the validity of such claims in

---

[19]     See, e.g., Objection to Debtors' Motion [D.I. 8803].

whole or in part). Id. at 5, 12.  SNMP Research's complaints about the discretion given to the

Debtors and the Plan Administrator is completely undercut by its own unwillingness or inability

nearly eight years into the bankruptcy case to assert its claims in a final fixed amount.  While this

is not the only example of why such discretion is required, it is an obvious example given SNMP

Research's strident complaints.

36.     SNMP Research's argument that the estimation provisions of Section 11.3 of the

Plan are inappropriate because they "seek to override the requirements of Section 502(c) of the

Bankruptcy Code," id. at 12, similarly relies on flawed interpretations of both the law and the

Plan.  Section 11.3 of the Plan merely preserves the Debtors' right to seek estimation by the

Court of claims "*pursuant* to 502(c)."  Plan § 11.3 (emphasis added).  Courts in this jurisdiction

routinely confirm chapter 11 plans that include provisions substantially similar to Section 11.3

that authorize a debtor to seek estimation of claims on a post-confirmation basis.[20]

37.     The cases cited by SNMP Research as purported support for its argument that its

claims cannot be estimated do not in fact establish that a court cannot estimate claims for

distribution purposes after the effective date of a plan.  SNMP Research relies heavily on In re

Dow Corning Corporation,[21] yet fails to note that the decision ruled on a motion to estimate a

claim, where the question before that court was whether estimation was "necessary," not whether

the court had the power to estimate.[22]  There may come a time when it is necessary to estimate or

---

[20]        See, e.g., Order Confirming Debtor's Fourth Amended Joint Plan, In re New Page Corp., No. 11-12804
(KG) (Bankr. D. Del. Dec. 14, 2012) [D.I. 2945]; Order Confirming Debtor's Second Amended Plan of Liquidation,
In re Vion Pharmaceuticals, Inc., No. 09-14429 (CSS) (Bankr. D. Del. Apr. 7, 2010) [D.I. 168]; Order Confirming
Second Amended Joint Plan of Liquidation, In re New Century Mortgage Corp., No. 07-10416 (KJC) (Bankr. D.
Del. July 15, 2008) [D.I. 8596]; Order Confirming Third Amended Joint Plan, In re Energy Future Holdings Corp.,
No. 14-10979 (CSS) (Bankr. D. Del. Aug. 29, 2016) [D.I. 9421]; First Amended Joint Plan, In re Overseas
Shipholding Group, Inc., No. 12-20000 (PJW) (Bankr. D. Del. July 16, 2014) [D.I. 3663].
[21]        In re Dow Corning Corp., 211 B.R. 545 (Bankr. E.D. Mich. 1997).
[22]        Id. at 567. Further, the facts of Dow Corning are also distinguishable.   Unlike here, the debtor in Dow
Corning sought estimation of claims that were the very impetus for the commencement of the debtor's chapter 11
proceedings, such that the delay attributable to their resolution was not sufficient to justify estimation. Id. at 553.

disallow SNMPRI's or SNMP Research's claims against some or all of the Debtors in order to avoid undue delay in the administration of their cases, but these issues are not before the Court today.

38.     SNMP Research raises similarly strident but equally unfounded concerns about the release, discharge and injunction provisions of the Plan.  SNMP Research is wholly focused on the possible risk that it could be compelled to be bound to the releases contained in section 13.3 of the Plan, a concern wholly negated by the Solicitation Procedures that would give SNMPRI the ability to opt out of such releases to the extent it holds unsecured claims against the Debtors. See Solicitation Procedures at Ex. E-1.  SNMP Research's remaining objections regarding its reading of the releases and discharge provisions can be readily addressed at the confirmation stage, but its purported concerns seem disproportionate and misplaced based on its conspiratorial reading of relatively standard plan provisions.  In the same vein, SNMP Research's complaint that the Debtors are inappropriately trying to rely on Bankruptcy Rule 9019 to approve certain plan provisions stands in stark contrast to the NTCC's objection that the Debtors must seek Rule 9019 approval of the very same provisions, other than that both are misplaced and are more appropriately addressed at confirmation.[23]

### D.     Additional Objections

39.     Two additional parties filed objections to the proposed Disclosure Statement: General Beneficial LP, a purported owner of equity interests in Nortel Networks Corporation

---

Here, the Debtors are simply reserving the right to seek estimation of claims that remain unresolved post-confirmation only to the extent that such claims become the cause of undue delay in the resolution of these Chapter 11 Cases.

[23]     For the avoidance of doubt, the Debtors acknowledge that Article 13 of the Plan (*Effect of Confirmation*) is not intended to limit SNMP Research's ability to continue to litigate its claims against the Debtors in the pending adversary proceeding before the Court, provided that SNMP Research's right to payment on account of any allowed claims resulting from such litigation shall be subject to the terms of the Plan and related documents as provided in, without limitation, section 13.1 of the Plan (*Binding Effect; Plan Binds All Holds of Claims and Equity Interests*).

("NNC"), NNI's corporate parent and a Canadian Debtor; and Mr. Edward E. Piltz, a purported former employee of the Debtors.

40.      General Beneficial LP's objection that the Debtors "failed to provided [sic] Claim #" for its purported ownership of equity in NNC must be overruled because it is based on a misunderstanding of the relationship between the Debtors and NNC, a non-debtor in these Chapter 11 Cases, as well as of the function of the Plan and Disclosure Statement, which need not provide for treatment of claims against or interests in the Canadian Debtors.  See General Beneficial Obj. at 1.  Accordingly, the Debtors request that the General Beneficial Objection be overruled because the Debtors have no obligations to General Beneficial LP on account of any purported equity holdings in non-Debtor NNC.[24]

41.      Mr. Piltz filed his Objection out of concern that the Plan or Disclosure Statement might somehow affect the pension payments that he has been receiving as a purported former employee of the Debtors.  The Debtors understand that Mr. Piltz's pension payments are currently administered and paid by the PBGC pursuant to the provisions of ERISA.  Following a discussion by telephone with the Debtors, Mr. Piltz confirmed by email dated November 21, 2016 that he was "withdraw[ing] [his] Objection."

### E.      Informal Response of the United States Trustee

42.      The United States Trustee contacted the Debtors to provide informal comments regarding the proposed Disclosure Statement and Solicitation Procedures.  Specifically, the United States Trustee sought clarifications with respect to three points: (i) that there should be additional disclosure regarding the expected identity of the director(s) of the post-confirmation entities and the procedures for the oversight and removal of the Plan Administrator, given that

---

[24]      The Debtors also submit that General Beneficial LP should be aware of these facts in light of its prior motion seeking the appointment of an equity committee in the Debtors' cases [D.I. 16414] and the Debtors'

such provisions otherwise would be disclosed in, or after the filing of, the Plan Supplement

(ii) that the Debtors adjust the Solicitation Procedures to shorten the outside date for the Debtors

to file Voting Objections to provide claimants with adequate time prior to the confirmation

hearing to respond to such objections, and (iii) that the Disclosure Statement and Solicitation

Procedures make certain clarifications regarding the Debtors' right to request at the confirmation

hearing that impaired classes for which no ballots are received be deemed to accept the Plan.

43.     In response to the United States Trustee's informal comments requesting

additional disclosure regarding the anticipated provisions of the Plan Administrator agreements,

the Debtors have agreed to include the following additional disclosures in the Disclosure

Statement:

    i.    In Section IV.E.3.a., p. 97 of Disclosure Statement:

The Debtors anticipate that John J. Ray, III will be appointed as the sole director of Wind-Down NNI.  The Plan Administrator will have the authority to appoint the officers of Wind-Down NNI.  The Debtors also expect that Kathy Schultea of RLKS Executive Solutions LLC will be named as the Vice President and Secretary and Mary Cilia of RLKS Executive Solutions LLC will be named as the Chief Financial Officer of Wind-Down NNI.

    ii.    In Section IV.E.3.b., p. 98 of Disclosure Statement:

The Debtors anticipate that John J. Ray, III will be appointed as the sole director of each of the Wind-Down Debtors.  The Plan Administrator will have the authority to appoint the officers of each of the Wind-Down Debtors.  The Debtors also expect that Kathy Schultea of RLKS Executive Solutions LLC will be named as the Vice President and Secretary and Mary Cilia of RLKS Executive Solutions LLC will be named as the Chief Financial Officer of each of the Wind-Down Debtors.

    iii.    In Section IV.E.2.c., p. 97 of the Disclosure Statement:

Subject to change and definitive documentation in the Plan Administrator Agreement, it is anticipated that the following terms will be included in the Plan Administrator Agreement.  The  Plan Administrator Agreement will provide that the Plan Administrator

---

response to such request [D.I. 16467].

will be able to resign as Plan Administrator upon delivery of sixty (60) days' written notice to the Bankruptcy Court. However, if a successor Plan Administrator has not been appointed by the end of such sixty (60) day period, the current Plan Administrator shall continue as Plan Administrator pursuant to the terms specified herein until such time as a successor is appointed by the Bankruptcy Court. The Plan Administrator shall have the authority to name a successor Plan Administrator, subject to Bankruptcy Court approval or, if the Plan Administrator is unable to make such an appointment, counsel to the Debtors also may identify a successor Plan Administrator, subject to Bankruptcy Court approval.

The Plan Administrator may be removed by the Bankruptcy Court on the grounds of: (i) the Plan Administrator's theft or embezzlement or attempted theft or embezzlement of money or tangible or intangible Assets or property; (ii) the Plan Administrator's violation of any law (whether foreign or domestic), which results in a felony indictment or similar judicial proceeding; (iii) the Plan Administrator's willful misconduct or fraud in the performance of his duties.

In the event of the death, resignation or removal of the Plan Administrator, the Bankruptcy Court shall appoint a successor Plan Administrator. Such appointment shall specify and establish the date on which such appointment shall be effective. Every successor Plan Administrator, without any further act, deed, conveyance or Bankruptcy Court order, shall become vested with all rights, powers, trusts and duties of the retiring Plan Administrator hereunder and under the Plan; *provided*, *however*, that no Plan Administrator shall be liable for the acts or omissions of any prior or subsequent Plan Administrator.

44.     In response to the United States Trustee's informal objection requesting that the

Solicitation Procedures provide adequate time for claimants to file responses to Voting

Objections after they are served with such objections, the Debtors have agreed to make certain

modifications to the Solicitation Procedures including to: 1) set the deadline by which the

Debtors must file an objection or request for estimation to disallow claims for voting purposes at

December 8, 2016, and to provide holders of Claims that receive such a voting objection from

the Debtors prior to the Voting Objection Deadline with fourteen days to prepare a serve a

response on the Debtors; 2) provide for overnight delivery or electronic service of certain pleadings related to voting rights; and 3) authorize Rule 3018(a) movants to serve their motions by e-mail on the Debtors, in addition to filing them with the Court. In effectuation of the foregoing, the Debtors have agreed to include the following language in the Solicitation Procedures:

i. Paragraph 10(c) of the Proposed Order:

If the Debtors have served an objection or request for estimation as to a Claim no later than December 8, 2016 (the "Voting Objection Deadline"), such Claim is temporarily disallowed for voting purposes only and not for the purposes of allowance or distribution, except to the extent and in the manner as may be set forth in such objection, or as ordered by the Court before the Voting Deadline; *provided that* Claims that amend previously filed Claims to which the Debtors have objected or requested estimation and for which such objection or estimation request remains pending or unresolved also shall be deemed to be subject to a pending objection or request for estimation for purposes of this provision.

ii. Paragraph 10(d) of the Proposed Order:

Additional objections or requests for estimation to Claims filed by the Debtors, if any, as described in part (c) above will be filed and served by the Debtors in a manner the Debtors deem appropriate in accordance with applicable law; *provided that* if such objection or request for estimation is served after [the entry of this Order and before the Voting Objection Deadline], such objection will be served on the holder of such Claim via overnight delivery, or via-email if consented to by the holder of such Claim, and any response filed by the holder of such Claim will be filed and served on the Debtors by (i) overnight delivery or (ii) regular mail and e-mail to the attention of Derek Abbott of Morris Nichols Arsht & Tunnell LLP (dabbott@mnat.com) and Lisa Schweitzer of Cleary Gottlieb Steen & Hamilton LLP (lschweitzer@cgsh.com);

iii. Paragraph 10(e) of the Proposed Order:

Holders of Claims subject to an objection or request for estimation as described in part (c) above that are filed by the Debtors between the entry of this Order and the Voting Objection Deadline who wish to file a response to such objection or request for estimation must file such response with the Court no later than **4:00 PM on**

the date that falls 14 days after such objection or request for estimation is filed by the Debtors (the "**Voting Objection Response Deadline**").  Such reply must be filed and served on the Debtors by United States mail, overnight mail, facsimile, hand delivery or e-mail to the attention of Derek Abbott of Morris Nichols Arsht & Tunnell LLP (dabbott@mnat.com) and Lisa Schweitzer of Cleary Gottlieb Steen & Hamilton LLP (lschweitzer@cgsh.com) so as to be received by the Voting Objection Reply Deadline.

iv.    Paragraph 10(i) of the Proposed Order:

Holders of Claims in Classes 3A, 3B, and 3C whose claims are subject to these Temporary Allowance Procedures, including those whose Claims have not been formally allowed by the Court (except those claimants whose Claims are subject to part (e) above that must respond on or before their Voting Objection Response Deadline) and that (a) wish to have their vote counted other than in accordance with the Temporary Allowance Procedures, and (b) fail to resolve such Claims by mutual consent with the Debtors, shall be required to file a motion with the Court, with evidence in support thereof, seeking temporary allowance of such Claim pursuant to Bankruptcy Rule 3018(a) (a "Rule 3018(a) Motion") **on or before December 15, 2016 at 4:00 p.m. (Prevailing Eastern Time) (the "Rule 3018(a) Motion Deadline")**.  A Rule 3018(a) Motion must be filed and served on the Debtors by United States mail, overnight mail, facsimile, hand delivery or e-mail to the attention of Derek Abbott of Morris Nichols Arsht & Tunnell LLP (dabbott@mnat.com) and Lisa Schweitzer of Cleary Gottlieb Steen & Hamilton LLP (lschweitzer@cgsh.com) so as to be received by the Rule 3018(a) Motion Deadline.

v.    Paragraph 10(j) of the Proposed Order:

With regard to any timely Rule 3018(a) Motion, the Debtors shall file a response and serve the response on the moving party via overnight delivery, or via e-mail to if consented to by the moving party, **no later than December 30, 2016 at 4:00 p.m. (Prevailing Eastern Time)**.  The Court sets [January 5], 2017 at [●] for a hearing regarding timely filed Rule 3018(a) Motions, if any;

vi.    Paragraph 8 of the Confirmation Hearing Notice:

A Rule 3018(a) Motion must be filed and served on the Debtors by United States mail, overnight mail, facsimile, hand delivery or e-mail to the attention of Derek Abbott of Morris Nichols Arsht &

Tunnell LLP (dabbott@mnat.com) and Lisa Schweitzer of Cleary
Gottlieb Steen & Hamilton LLP (lschweitzer@cgsh.com) so as to
be received by the Rule 3018(a) Motion Deadline.

45.     In response to the United States Trustee's informal objection requesting that the

Debtors specify that they will request at the confirmation hearing that impaired classes for which

no ballots are received be deemed to accept the Plan, the Debtors have agreed to modify the

current language in the Disclosure Statement and Solicitation Procedures as follows:

i.     In the Disclosure Statement, Section I.C., pg. 21:

**REQUEST FOR DEEMED ACCEPTANCE BY NON-
VOTING CLASSES.**  If no votes to accept or reject the Plan are
received with respect to a Class that is solicited in accordance with
the Solicitation Procedures (other than a Class that is deemed
eliminated pursuant to Plan Section 5.4(a) (*Elimination of Vacant
Classes; Deemed Acceptance by Non-Voting Classes*), the Debtors
will request at the Confirmation Hearing that the Court deem this
Class to have accepted the Plan.

ii.     In the Solicitation Procedures, para. 11(o) of the Proposed Order:

If no votes to accept or reject the Plan are received with respect to
a particular Class, the Debtors will request at the Confirmation
Hearing that the Court deem this Class to have accepted the Plan.

46.     The Debtors believe the foregoing modifications and additional disclosures

address the comments received from the United States Trustee.

## II.     The Remaining Objections Must be Dismissed Because They are Premature and the Plan is Not "Patently Unconfirmable"

47.     In addition to the objections discussed above, SNMP Research and the NTCC

each tack on to their objections a litany of other matters that constitute confirmation objections

shrouded as a Disclosure Statement Objection that the Plan is "patently unconfirmable." SNMP

Research Obj. at 6-22; NTCC Obj. ¶¶ 47-62, 68-70.  These arguments are more properly

considered at the confirmation stage as none of them demonstrate the Plan would be patently

unconfirmable; rather, at most, they demonstrate the complexity of the matters being

compromised and the need to bring these cases to finality in order to avoid endless and costly litigation by and  among the Debtors' many creditors and creditor groups.  These objections include:

- SNMP Research's argument that the Plan is not confirmable because it was not filed in good faith and does not comply with sections 1123 and 1129 of the Bankruptcy Code because the Plan terms somehow "discriminate" against SNMP Research.  SNMP Research Obj. at 3, 7-12.

- The NTCC's claim that the Plan "is not confirmable on its face" because the Debtors cannot satisfy section 1129(a)(3) of the Bankruptcy Code, including because of the Plan's treatment of its pending appeal of the Allocation Decision, the substantive consolidation of NNCC into NNI contemplated by the Plan, and the Debtors' proposed treatment of the Crossover Bonds Claims and NN CALA.

- The NTCC asserts that the SPSA provides an "unjustifiably high allocation" of the Debtors' portion of the Sale Proceeds to NN CALA, particularly in light of the lower allocation to NN CALA for which the Debtors advocated at the Allocation Trial.  NTCC Obj. ¶ 70.[25]

- The NTCC also objects to the provision of the SPSA that provides for the substantive consolidation of the Canadian Debtors, an objection  more properly pursued in the Canadian Debtors' CCAA proceedings.

48.    As SNMP Research and the NTCC acknowledge in their Objections, these matters relate to whether the Plan can and should be confirmed and, as such they should be considered by the Court at that stage.  See generally SNMP Research Obj. at 6 ("[c]onfirmation

---

[25]    In its objection, the NTCC does not highlight that the Plan also provides that NNI is granted a $34 million administrative expense claim against NN CALA, which resolves other inter-estate claims that otherwise would be

issues usually are reserved for the confirmation hearing, and are not addressed at the disclosure statement stage"); NTCC Obj. ¶ 68 (acknowledging a general rule that "plan-related objections are not properly raised until the plan confirmation stage").  Importantly at the disclosure statement stage, "care must be taken to ensure that the hearing on the disclosure statement does not turn into a confirmation hearing, due process considerations are protected and objections are restricted to those defects that could not be cured by voting and where the pertinent material facts are either not at issue or have been fully developed at the disclosure hearing."  In re Copy Crafters Quickprint, Inc., 92 B.R. 973, 980 (Bankr. N.D.N.Y. 1988); see In re Scioto Valley Mortgage Co., 88 B.R. 168, 172 (Bankr. S.D. Ohio 1988) ("If the creditors oppose their treatment in the plan, but the Disclosure Statement contains adequate information, issues respecting the plan's confirmability will await the hearing on confirmation.").  Accordingly, objections to the releases contained in the Plan are more appropriately resolved at the confirmation stage.[26]

49.    Finally, as the Debtors will demonstrate at confirmation, none of these Objections identifies a flaw in the Plan, let alone one that would render the Plan "patently unconfirmable." Accordingly, this Court should reject these premature Plan confirmation objections and approve the Disclosure Statement so that creditors may be empowered to vote on the Plan.

---

pending.

[26]    See In re Drexel Burnham Lambert Grp., No. 90 B 10421, 1992 WL 62758, at *1 (Bankr. S.D.N.Y. Mar. 5, 1992) (stating that objections to a plan of reorganization's releases and injunction provisions were in the nature of confirmation objections and therefore improperly raised as objections to the disclosure statement); Nielsen v. Specialty Equip. Companies, Inc., No. 92 C 20142, 1992 WL 279262 at *3 (N.D. Ill. Sept. 25, 1992), aff'd sub nom. In re Specialty Equip. Companies, Inc., 3 F.3d 1043, 1045 (7th Cir. 1993) (noting that the bankruptcy court below held that "the validity of the Releases [is] a plan confirmation issue" and overruled objections to the disclosure statement regarding the appropriateness of third-party releases).

## Conclusion

WHEREFORE, the Debtors request that the Court (i) approve the Disclosure Statement, (ii) approve the Solicitation Procedures Motion, and (iii) grant such other and further relief as is just and proper.

Dated: November 28, 2016
      Wilmington, Delaware

CLEARY GOTTLIEB STEEN & HAMILTON LLP

James L. Bromley (admitted *pro hac vice*)
Lisa M. Schweitzer (admitted *pro hac vice*)
One Liberty Plaza
New York, New York 10006
Telephone:  (212) 225-3505
Facsimile:  (212) 225-3999

- and -

MORRIS, NICHOLS, ARSHT & TUNNELL LLP


*/s/ Tamara K. Minott*
Derek C. Abbott (No. 3376)
Andrew R. Remming (No. 5120)
Tamara K. Minott (No. 5643)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware  19801
Telephone:  (302) 658-9200
Facsimile: (302) 658-3989

*Counsel for the Debtors*
*and Debtors-in-Possession*

34