**<u>EXHIBIT B</u>**

Court File No. 09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)**

**IN THE MATTER OF THE** *COMPANIES' CREDITORS
ARRANGEMENT ACT*, **R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF
COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL
NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL
CORPORATION, NORTEL NETWORKS TECHNOLOGY CORPORATION,  NORTEL
COMMUNICATIONS INC., ARCHITEL SYSTEMS CORPORATION AND
NORTHERN TELECOM CANADA LIMITED**

**ONE HUNDRED AND THIRTY FIRST REPORT OF THE MONITOR
DATED NOVEMBER 4, 2016**

## INTRODUCTION

1.      On January 14, 2009 (the "**Filing Date**"), Nortel Networks Corporation ("**NNC**" and collectively with all its subsidiaries "**Nortel**" or the "**Company**"), Nortel Networks Limited ("**NNL**"), Nortel Networks Technology Corporation, Nortel Networks International Corporation and Nortel Networks Global Corporation (collectively, with the New Applicants (as defined below), the "**Canadian Debtors**") filed for and obtained protection under the *Companies' Creditors Arrangement Act* ("**CCAA**"). Pursuant to the Order of this Court dated January 14, 2009, as amended and restated (the "**Initial Order**"), Ernst & Young Inc. was appointed as the Monitor of the Canadian Debtors (the "**Monitor**") in the CCAA proceedings (the "**CCAA Proceedings**"). The stay of proceedings was extended to March 31, 2017, by this Court in its Order dated September 29, 2016.

2.      Nortel Networks Inc. ("**NNI**") and certain of its U.S. subsidiaries and affiliates concurrently filed voluntary petitions under Chapter 11 of the U.S. Bankruptcy Code (the "**Code**") in the United States Bankruptcy Court for the District of Delaware (the "**U.S. Court**") on January 14, 2009 (the "**Chapter 11 Proceedings**").  As required by U.S. law,

an official committee of unsecured creditors (the "**Committee**") was established in January, 2009.

3.      An ad hoc group of holders of bonds issued by NNL, NNC and Nortel Networks Capital Corporation has been organized and is participating in these proceedings as well as the Chapter 11 Proceedings (the "**Bondholder Group**"). In addition, pursuant to Orders of this Court, representative counsel was appointed on behalf of the former employees of the Canadian Debtors, the continuing employees of the Canadian Debtors and the LTD Beneficiaries (collectively, "**Representative Counsel**") and each of these groups is participating in the CCAA Proceedings.

4.      Nortel Networks (CALA) Inc. ("**NN CALA**" and together with NNI and certain of its subsidiaries and affiliates that filed on January 14, 2009, the "**U.S. Debtors**") filed a voluntary petition under Chapter 11 of the Code in the U.S. Court on July 14, 2009.

5.      Nortel Networks UK Limited ("**NNUK**") and certain of its affiliates located in EMEA were granted administration orders (the "**U.K. Administration Orders**") by the High Court of England and Wales on January 14, 2009 (collectively the "**EMEA Debtors**" and with the Canadian Debtors and the U.S. Debtors, the "**Estates**" and each an "**Estate**"). The UK Administration Orders appointed Alan Bloom, Stephen Harris, Alan Hudson and Chris Hill of Ernst & Young LLP as administrators of the various EMEA Debtors, except for Nortel Networks (Ireland) Limited, to which David Hughes (Ernst & Young LLP Ireland) and Alan Bloom were appointed (collectively, the "**Joint Administrators**").

6.      Subsequent to the filing date, Nortel Networks S.A. ("**NNSA**") commenced secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings in the Republic of France pursuant to which a liquidator (the "**French Liquidator**") and an administrator were appointed by the Versailles Commercial Court.

7.      The CCAA Proceedings and the U.K. Administration proceedings of NNUK and the other EMEA Debtors have been recognized by the U.S. Court as foreign main proceedings under Chapter 15 of the Code.

8.    Subsequent to the Filing Date, certain other Nortel subsidiaries have filed for creditor protection or bankruptcy proceedings in the local jurisdiction in which they are located.

9.    On March 18, 2016, Nortel Communications Inc., Architel Systems Corporation and Northern Telecom Canada Limited (collectively, the "**New Applicants**") sought and were granted an Order (New Applicants) of this Court pursuant to the CCAA (the "**New Applicants Order**"). Pursuant to the New Applicants Order, each of the New Applicants was deemed to be an "Applicant" (as defined in the Initial Order) in the CCAA Proceedings, entitled to all of the rights, benefits and protections granted by, and otherwise subject to, among other Orders of this Court entered in the CCAA Proceedings, the Initial Order as if it were an Applicant thereunder. The New Applicants Order also procedurally consolidated the CCAA proceedings of the New Applicants with the CCAA Proceedings.

**PURPOSE**

10.    The purpose of this One Hundred and Thirty First Report of the Monitor ("**One Hundred and Thirty First Report**") is to provide this Court and stakeholders with a copy of:

a)  the proposed Plan of Compromise and Arrangement pursuant to the CCAA concerning, affecting and involving the Canadian Debtors dated November 4, 2016 (the "**Canadian Plan**") filed by the Canadian Debtors; and

b)  the proposed Information Circular relating to the Canadian Plan dated November 4, 2016 (the "**Information Circular**") filed by the Canadian Debtors,

and to provide an update in respect of certain matters pertaining to the Settlement and Support Agreement (as defined below).

**TERMS OF REFERENCE**

11.    In preparing this One Hundred and Thirty First Report, the Monitor has relied upon unaudited financial information, the Company's books and records, financial information prepared by the Company and discussions with the Company. The Monitor has not audited, reviewed or otherwise attempted to verify the accuracy or completeness of this

information. Unless otherwise stated, all monetary amounts contained herein are expressed in U.S. dollars.

12.  Capitalized terms used herein and not otherwise defined in this Report are as defined in the Settlement and Support Agreement.

13.  The Monitor has made various materials relating to the CCAA Proceedings available on its website at www.ey.com/ca/nortel. The Monitor's website also contains a dynamic link to Epiq Bankruptcy LLC's website where materials relating to the Chapter 11 Proceedings are posted.

**SETTLEMENT AND SUPPORT AGREEMENT UPDATES**

14.  As previously reported to this Court, on October 12, 2016, the Canadian Debtors, Monitor, U.S. Debtors, EMEA Debtors, Joint Administrators, French Liquidator and various Nortel creditor constituents, among others, entered into a Settlement and Plans Support Agreement (the "**Settlement and Support Agreement**"). Upon becoming fully effective in accordance with its terms, the Settlement and Support Agreement will resolve the Allocation Dispute and certain other material disputes and claims in the various Nortel insolvency proceedings.

15.  Pursuant to the Settlement and Support Agreement and related orders of this Court and the U.S. Court granted October 19 and October 21, 2016, respectively, approximately $1.06 billion of the Sale Proceeds has been transferred to Royal Trust Corporation of Canada as Canadian distribution agent (the "**Canadian Distribution Agent**") under the Canadian Distribution Escrow Agreement among NNC, NNL, NNI, NNUK, the Monitor, the Committee and certain other Nortel depositors dated October 24, 2016. The Canadian Distribution Agent has advised the Monitor that the funds received by it have been converted from U.S. dollars to Canadian dollars at a blended rate of U.S.$1 = CA$1.337650 such that the Canadian Distribution Agent now holds approximately CA$1.419 billion, which funds have been invested in Government of Canada treasury bills.

16.  Counsel to the Monitor has been advised by counsel to the Joint Administrators that a hearing before the U.K. Court to consider the Settlement and Support Agreement (as

contemplated in Section 9 of the Settlement and Support Agreement) was held on October 31, 2016. Orders of the U.K. Court granting liberty to the Joint Administrators and the NNSA Conflicts Administrator to perform and to procure the EMEA Debtors to perform the Settlement and Support Agreement were granted on November 3, 2016.

17.    Counsel to the Monitor has been advised by counsel to the French Liquidator that the First French Order (as defined in the Settlement and Support Agreement) was granted on October 12, 2016, that a further hearing to consider the Settlement and Support Agreement (as contemplated in Section 9 of the Settlement and Support Agreement) took place on October 27, 2016, and that a judgment was entered at the end of the hearing approving entry into the Settlement and Support Agreement by the French Liquidator, with a signed and sealed judgment to be issued shortly.

18.    The Monitor also understands that the Beddoes Court authorization contemplated pursuant to Section 9(a)(vii) of the Settlement and Support Agreement was obtained on October 13, 2016.

**THE CANADIAN PLAN AND THE INFORMATION CIRCULAR**

19.    The Settlement and Support Agreement is conditioned on and contemplated to be effected, in part, through plans of arrangement to be presented to creditors of the Canadian Debtors (i.e. the Canadian Plan) and U.S. Debtors, respectively.

20.    Attached as Appendix "A" hereto is a copy of the Canadian Plan, and attached as Appendix "B" hereto is a copy of the related Information Circular. The Canadian Plan remains subject to amendment or modification in accordance with its terms as does the related Information Circular.

21.    The Monitor understands the U.S. Debtors have or will file a First Amended Joint Chapter 11 Plan of Nortel Networks Inc. and Certain of its Affiliated Debtors (the "**U.S. Plans**") and related proposed disclosure statement (the "**U.S. Disclosure Statement**") with the U.S. Court on or about the date hereof.

22.    A joint hearing has been scheduled for December 1, 2016, for this Court to consider a motion by the Canadian Debtors and Monitor seeking an order to, among other things,

authorize the filing of the Canadian Plan and convene a meeting of creditors to be held on or about January 17, 2017, to consider and vote upon the Canadian Plan (the "**Meeting Order**"), and for the U.S. Court to consider a motion by the U.S. Debtors for approval of the U.S. Disclosure Statement and solicitation procedures for the U.S. Plans.

23.     The Monitor expects materials for the motion seeking the Meeting Order to be filed in due course.

All of which is respectfully submitted this 4th day of November, 2016.

**ERNST & YOUNG INC.**
**in its capacity as Monitor of Nortel Networks Corporation** *et al.*
**and not its personal capacity**

Per:

Murray A. McDonald
President

6628938

**APPENDIX "A"**

**[ATTACHED]**

Court File No. 09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**COMMERCIAL LIST**

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION, NORTEL NETWORKS
TECHNOLOGY CORPORATION, NORTEL COMMUNICATIONS INC., ARCHITEL
SYSTEMS CORPORATION AND NORTHERN TELECOM CANADA LIMITED**

---

**PLAN OF COMPROMISE AND ARRANGEMENT**
**pursuant to the *Companies' Creditors Arrangement Act***
**concerning, affecting and involving the Canadian Debtors**

---

**November 4, 2016**

# TABLE OF CONTENTS

**ARTICLE 1 INTERPRETATION** ............................................................................................. 1
1.1   Definitions ................................................................................................................. 1
1.2   Certain Rules of Interpretation ............................................................................... 19
1.3   Successors and Assigns ........................................................................................... 20
1.4   Governing Law and Jurisdiction ............................................................................. 20
1.5   Schedules ................................................................................................................. 20

**ARTICLE 2 PURPOSE AND EFFECT OF THE PLAN** ...................................................... 20
2.1   Purpose ..................................................................................................................... 20
2.2   Substantive Consolidation of the Canadian Debtors .............................................. 21
2.3   Persons Affected ...................................................................................................... 22
2.4   Persons Not Affected ............................................................................................... 22
2.5   Equity Claimants ..................................................................................................... 23

**ARTICLE 3 CLASSIFICATION AND TREATMENT OF CREDITORS AND
RELATED MATTERS** ............................................................................................................ 23
3.1   Claims Procedure ..................................................................................................... 23
3.2   Classification of Creditors ....................................................................................... 23
3.3   Creditors' Meeting ................................................................................................... 24
3.4   Treatment of Affected Unsecured Claims ............................................................... 24
3.5   Canada – U.S. Crossover Claims ............................................................................ 25
3.6   No Double-Recovery ............................................................................................... 26
3.7   No Post-Filing Date Interest .................................................................................... 26
3.8   Unaffected Claims ................................................................................................... 26
3.9   Unresolved Affected Unsecured Claims .................................................................. 27
3.10  Director/Officer Claims and the Directors' Indemnity and Directors' Charge ....... 27
3.11  Extinguishment of Claims ....................................................................................... 28
3.12  Guarantees and Similar Covenants .......................................................................... 28
3.13  Set-Off ..................................................................................................................... 28

**ARTICLE 4 ALLOCATION DISPUTE RESOLUTION, SETTLEMENT AND
SUPPORT AGREEMENT AND RELATED PROVISIONS** ................................................ 29
4.1   Authority to Effectuate and Implement the Settlement and Support Agreement ..... 29
4.2   Allocation and Distribution of the Sale Proceeds ................................................... 29
4.3   Release of Canada Only Sale Proceeds and Unavailable Cash ............................... 30
4.4   Canadian Pension Claims ........................................................................................ 30
4.5   Crossover Bondholder Claims ................................................................................. 30
4.6   NNCC Bondholder Claim ........................................................................................ 30
4.7   UKPI Claim .............................................................................................................. 30
4.8   EMEA Debtors' Claims ........................................................................................... 30
4.9   NNI Claims ............................................................................................................... 31
4.10  Intercompany Claims ............................................................................................... 31
4.11  Bondholder Group Fees ........................................................................................... 31
4.12  Other Canadian Fees ................................................................................................ 32
4.13  Settlement and Support Agreement Releases .......................................................... 32

**ARTICLE 5 CASH POOLS AND RESERVES**................................................................**32**
5.1      Administrative Reserve................................................................32
5.2      Affected Unsecured Creditor Pool................................................32
5.3      Unresolved Claims Reserve.........................................................32
5.4      Bank Accounts, Reserves and Cash Pools Generally ....................32

**ARTICLE 6 PROVISIONS REGARDING DISTRIBUTIONS, PAYMENTS AND
CURRENCY**................................................................................................................**33**
6.1      Distributions Generally................................................................33
6.2      Certain Payments and Distributions on Proven Priority Claims.......................33
6.3      Distribution Mechanics for Proven Affected Unsecured Claims ....................34
6.4      Currency Matters ........................................................................36
6.5      Distributions After Unresolved Affected Unsecured Claims and Post-Filing Claims
         Resolved.....................................................................................37
6.6      Allocation of Distributions .........................................................37
6.7      Treatment of Undeliverable Distributions ...................................37
6.8      Withholding Rights.....................................................................38
6.9      Cancellation of Certificates and Notes, etc.................................38
6.10     Calculations................................................................................39
6.11     Final Distribution .......................................................................39

**ARTICLE 7 RELEASES** ...............................................................................................**39**
7.1      Plan Releases .............................................................................39
7.2      Insured Claims ...........................................................................40
7.3      Injunctions..................................................................................41

**ARTICLE 8 COURT SANCTION**................................................................................**41**
8.1      Application for Sanction Order....................................................41
8.2      Sanction Order ...........................................................................41

**ARTICLE 9 PLAN CONDITIONS PRECEDENT AND IMPLEMENTATION** .................**44**
9.1      Canadian and U.S. Plans Effectiveness.......................................44
9.2      Conditions Precedent to Plan Effectiveness ................................44
9.3      Conditions Precedent to Plan Implementation..............................45
9.4      Monitor's Certificate – Plan Effectiveness ..................................45
9.5      Monitor's Certificate – Plan Implementation ...............................46
9.6      Waiver of Plan Effective Conditions and Plan Implementation Conditions ...................46

**ARTICLE 10 CONTINUING ADMINISTRATION AND WIND-DOWN OF THE
CANADIAN ESTATE AND RELATED MATTERS** ...............................................**46**
10.1     Continuing Administration and Wind Down of the Canadian Estate...............................46
10.2     Stakeholder Advisor Fee Arrangements ......................................47

**ARTICLE 11 GENERAL**...............................................................................................**47**
11.1     Binding Effect.............................................................................47
11.2     Deeming Provisions ...................................................................48
11.3     Non-Consummation/Termination of Settlement and Support Agreement ........................48
11.4     Modification of the Plan .............................................................49

11.5    Paramountcy ....................................................................................................49
11.6    Severability of Plan Provisions........................................................................50
11.7    Force Majeure ..................................................................................................50
11.8    Responsibilities of the Monitor and Protections of the Monitor........................50
11.9    Different Capacities ..........................................................................................51
11.10   Notices ..............................................................................................................51
11.11   Further Assurances............................................................................................52
11.12   Subsequent Bankruptcy, etc..............................................................................52
11.13   Cross-Border Protocol ......................................................................................52
11.14   Language............................................................................................................52
11.15   Acts to Occur on Next Business Day.................................................................53

## SCHEDULES AND EXHIBITS

Schedule "A"          Escrow Agreements

Schedule "B"          Crossover Bondholder Claims

Schedule "C"          Intercompany Claims - Proven Affected Unsecured Claims

Schedule "D"          Exchange Rates from Claims Procedure Order

Exhibit "A"           Settlement and Support Agreement

## PLAN OF COMPROMISE AND ARRANGEMENT

**WHEREAS** Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Global Corporation, Nortel Networks International Corporation, Nortel Networks Technology Corporation, Nortel Communications Inc., Architel Systems Corporation and Northern Telecom Canada Limited (each, a "**Canadian Debtor**" and collectively, the "**Canadian Debtors**" ) are debtor companies under the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended to and including January 14, 2009 (the "**CCAA**");

**AND WHEREAS** Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Global Corporation, Nortel Networks International Corporation and Nortel Networks Technology Corporation obtained an Initial Order (as amended and restated from time to time, the "**Initial Order**") of the Ontario Superior Court of Justice (the "**CCAA Court**") under the CCAA dated January 14, 2009;

**AND WHEREAS** Nortel Communications Inc., Architel Systems Corporation and Northern Telecom Canada Limited (collectively, the "**New Applicants**") obtained an Order of the CCAA Court dated March 18, 2016, that, among other things, deemed each of the New Applicants to be an "Applicant" (as defined in the Initial Order) and entitled to all of the rights, benefits and protections granted by, and otherwise subject to, among other Orders, the Initial Order as if it were an Applicant thereunder;

**AND WHEREAS** on October 12, 2016, the Canadian Debtors, the Monitor, the U.S. Debtors, the EMEA Debtors and the other Settlement Parties entered into the Settlement and Support Agreement, which agreement, subject to its effectiveness, fully and finally resolves the Allocation Dispute and certain claims and other disputes amongst the Settlement Parties;

**AND WHEREAS** the Settlement and Support Agreement contemplates coordinated plan processes in the CCAA Proceedings and the U.S. Proceedings as a means of implementing and effectuating the Settlement and Support Agreement;

**AND WHEREAS** the Canadian Debtors hereby propose and present this plan of compromise and arrangement to the Affected Unsecured Creditors Class (as defined below) under and pursuant to the CCAA.

### ARTICLE 1
### INTERPRETATION

### 1.1    Definitions

In the Plan, unless otherwise stated or unless the subject matter or context otherwise requires:

"**1988 Bondholders**" means a holder of one or more 1988 Bonds, including any holder of a beneficial interest in 1988 Bonds.

"**1988 Bondholder Claim**" means a Claim by a 1988 Bondholder in respect of the 1988 Bonds, including as asserted by the 1988 Bonds Trustee.

- 2 -

"**1988 Bonds**" means the 6.875% Senior Notes due 2023, governed by the 1988 Bonds Indenture, issued by Northern Telecom Limited (now NNL).

"**1988 Bonds Indenture**" means that certain Indenture dated November 30, 1988, made by Northern Telecom Limited (now NNL), as issuer, and The Toronto-Dominion Bank Trust Company, as trustee.

"**1988 Bonds Trustee**" means Wilmington Trust, National Association in its capacity as replacement trustee under the 1988 Bonds Indenture.

"**2006 Bonds**" means the Floating Rate Senior Notes due 2011, the 10.125% Senior Notes due 2013 and the 10.750% Senior Notes due 2016, governed by the Indenture dated as of July 5, 2006, as supplemented by the First Supplemental Indenture dated as of July 5, 2006, the Second Supplemental Indenture dated as of May 1, 2007, and the Third Supplemental Indenture dated as of May 28, 2008, issued by NNL and guaranteed by NNC and NNI.

"**2007 Bonds**" means the 1.75% Convertible Senior Notes due 2012 and the 2.125% Convertible Senior Notes due 2014, governed by the Indenture dated as of March 28, 2007,  issued by NNC and guaranteed by NNL and NNI.

"**Additional Bondholder Fee Amount**" has the meaning ascribed thereto in Section 4.11.

"**Administration Charge**" has the meaning ascribed thereto in the Initial Order.

"**Administrative Reserve**" means a reserve of Available Cash in an amount to be determined by the Monitor to be held by the Canadian Estate for the purpose of maintaining security for obligations secured by the Administration Charge and funding the ongoing obligations, administration and wind-down of the Canadian Estate and the implementation of this Plan, including the professional fees and expenses of the Monitor and its counsel.

"**Affected Claim**" means (i) any Claim that is not an Unaffected Claim, and (ii) any Director/Officer Claim that is a Released Claim and, for greater certainty, includes any Affected Unsecured Claim, Intercompany Claim (excluding any Canadian Intercompany Claim and the Remaining Revolver Claim) or Equity Claim.

"**Affected Creditor**" means any Creditor with an Affected Claim, but only with respect to and to the extent of such Affected Claim.

"**Affected Unsecured Claim**" means any Affected Claim that is not a Director/Officer Claim or Equity Claim.

"**Affected Unsecured Creditor**" means any holder of an Affected Unsecured Claim, but only with respect to and to the extent of such Affected Unsecured Claim.

"**Affected Unsecured Creditor Pool**" means, on a Distribution Date, the amount of Available Cash, less: (i) the Unresolved Claims Reserve; (ii) the Administrative Reserve; and (iii) the amounts necessary to satisfy any outstanding Proven Priority Claims.

- 3 -

"**Affected Unsecured Creditors Class**" means the class of Creditors comprised solely of Affected Unsecured Creditors grouped for the purposes of considering and voting on this Plan and receiving distributions hereunder.

"**Allocation Dispute**" means that certain litigation before the Canadian Court and the U.S. Court in which the allocation of the Sale Proceeds is at issue.

"**Applicable FX Rate**" means the spot or blended rate (as applicable, which blended rate shall take into account the amounts converted and the rates at which such conversion occurred) at which Sale Proceeds are or have been converted from U.S. dollars to Canadian dollars as contemplated by Section 7(b) of the Settlement and Support Agreement.

"**Applicable Law**" means any law, statute, order, decree, consent decree, judgment, rule, regulation, ordinance or other pronouncement having the effect of law whether in Canada, the United States or any other country, or any domestic or foreign state, county, province, city or other political subdivision or of any Governmental Entity.

"**Allowed Claims**" shall have the meaning given to such term in the U.S. Plans.

"**Applicant**" has the meaning ascribed thereto in the Initial Order.

"**Available Cash**" means, from time to time, all Cash of the Canadian Estate, including but not limited to the Canadian Debtors' cash on hand and amounts released to the Canadian Estate as contemplated pursuant to Section 4.2 and Section 4.3 of this Plan, and includes any Cash received by the Canadian Estate from the sale or other disposition or monetization of any residual assets or any other Cash received by the Canadian Estate from time to time.

"**Bankruptcy Proceeding**" means any bankruptcy or receivership proceeding pursuant to the BIA, whether commenced by application for a bankruptcy or receivership order or by an assignment in bankruptcy made or deemed to be made, and shall include any proceeding in which a receiver is appointed in respect of a Person or its assets, including pursuant to provincial law.

"**BIA**" means the *Bankruptcy and Insolvency Act* (R.S.C. 1985, c. B-3, as amended) or any successor legislation thereto.

"**Bondholder Advisor Fee Letter**" means that certain fee letter dated June 23, 2011, among certain of the Canadian Debtors, Bennett Jones LLP, Milbank, Tweed, Hadley & McCloy LLP and FTI Capital Advisors, LLC and shall include, for the avoidance of doubt, the "2009 Engagement Letter" as such term is defined in the fee letter.

"**Bondholder Fee Amount**" has the meaning ascribed thereto in Section 4.11.

"**Bondholder Group**" means the ad hoc group of bondholders that hold notes issued and/or guaranteed by NNC, NNL, NNI and NNCC that has been organized and is participating in the CCAA Proceedings and the U.S. Proceedings, as such group may have been and may be constituted from time to time.

- 4 -

"**Business Day**" means a day, other than Saturday, Sunday or a statutory holiday, on which banks are generally open for business in both Toronto, Ontario, Canada and New York, New York, USA.

"**CAD Claims**" has the meaning ascribed thereto in Section 6.4(c).

"**Canada Only Sale Proceeds Orders**" means the following orders of the CCAA Court: (i) Approval and Vesting Order (Strandherd Lands) dated November 19, 2009; (ii) Approval and Vesting Order (Nortel-LGE Joint Venture) dated May 3, 2010; (iii) Approval and Vesting Order (Relay) dated June 29, 2010; (iv) Approval and Vesting Order (IP Address Sale – Salesforce.com, Inc.) dated February 17, 2012; (v) Approval and Vesting Order (IP Address Sale) dated February 17, 2012; (vi) Approval and Vesting Order (IP Address Sale – Bell Aliant Regional Communications Limited Partnership) dated April 4, 2012; (vii) Approval and Vesting Order (IP Address Sale – Vodafone Americas Inc.) dated May 7, 2012; (vii) Approval and Vesting Order (IP Address Sale – Beyond Excellent Technology Ltd.) dated September 9, 2014; (viii) Approval and Vesting Order (IP Address Sale – Charter Communications Operating, LLC) dated December 17, 2014; (ix) Approval and Vesting Order (IP Address Sale – Zhejiang Tmall Technology Co., Ltd. and Alibaba Cloud Computing Limited) dated February 3, 2015; (x) Approval and Vesting Order (IP Address Sale – Alibaba.com LLC) dated April 16, 2015; (xi) Approval and Vesting Order (IP Address Sale – Frontier Communications) dated August 5, 2015; (xii) Approval and Vesting Order (IP Address Sale – Suddenlink Communications) dated August 5, 2015; (xiii) Approval and Vesting Order (IP Address Sale – Reliance Jio Infocomm Pte Ltd.) dated January 6, 2016; (xiv) Approval and Vesting Order (IP Address Sale – Zhejiang Alibaba Cloud Computing Limited and Alibaba.com LLC) dated February 1, 2016, and any other order of the CCAA Court pursuant to which proceeds of sale arising solely from the assets of the Canadian Debtors are held (but excluding, for the avoidance of doubt, the orders of the CCAA Court approving the Escrow Agreements).

"**Canadian Allocation**" means the Sale Proceeds to be received by the Canadian Estate pursuant to Section 2 of the Settlement and Support Agreement as described in Section 4.2(c)(i) of this Plan.

"**Canadian Court**" means the CCAA Court, the Ontario Court of Appeal, the Supreme Court of Canada or any other court of competent jurisdiction overseeing the CCAA Proceedings or any Bankruptcy Proceeding in respect of any of the Canadian Debtors or their assets (including any appeals) from time to time.

"**Canadian Debtors**" has the meaning ascribed thereto in the recitals to this Plan.

"**Canadian Dollar Escrow Account**" means the account with the Canadian Escrow Agent established pursuant to the Canadian Escrow Agreement to hold the Canadian dollar denominated Cash resulting from the conversion of up to $1,200,000,000 of Sale Proceeds into Canadian dollars as contemplated in the Settlement and Support Agreement.

"**Canadian Escrow Agent**" means Royal Trust Corporation of Canada in its capacity as Canadian distribution agent under the Canadian Escrow Agreement.

- 5 -

"**Canadian Escrow Agreement**" means that certain Canadian distribution escrow agreement dated October 24, 2016, among NNC, NNL, NNI, NNUK, NNSA, certain other Nortel Group entities, the Monitor, the UCC and the Canadian Escrow Agent governing that portion of the Sale Proceeds that has been or will be converted into Canadian dollars as contemplated in the Settlement and Support Agreement.

"**Canadian Escrow Release Order**" means an order issued by the CCAA Court authorizing and directing the Escrow Agents to release the Sale Proceeds from the Escrow Accounts in the manner contemplated by the Settlement and Support Agreement.

"**Canadian Estate**" means the Canadian Debtors as substantively consolidated pursuant to this Plan, the corporate body of which shall be NNL. From and after the Plan Effective Date, references to the Canadian Estate shall be deemed to be references to NNL, and *vice versa*.

"**Canadian Intercompany Claims**" has the meaning ascribed thereto in Section 2.2(f).

"**Canadian Pension Claim**" means any and all Claims arising from or related to deficits and alleged deficits in the Canadian Registered Pension Plans.

"**Canadian Registered Pension Plans**" means: (i) the Managerial Plan; and (ii) the Negotiated Plan.

"**Canadian Tax Act**" means the *Income Tax Act* (Canada) and the Income Tax Regulations, in each case as amended from time to time.

"**Cash**" means cash, certificates of deposit, bank deposits, commercial paper, treasury bills and other cash equivalents.

"**CCAA**" has the meaning ascribed thereto in the recitals to this Plan.

"**CCAA Court**" has the meaning ascribed thereto in the recitals to this Plan.

"**CCAA Proceedings**" means the proceedings commenced by certain of the Canadian Debtors in the CCAA Court under the CCAA on the Filing Date, having Court File Number 09-CL-7950, and shall include the CCAA proceedings of the New Applicants.

"**CCC**" means the ad hoc committee of creditors having claims only against the Canadian Debtors comprised of: the former and disabled Canadian employees of the Canadian Debtors through their court-appointed representatives, Unifor, Morneau Shepell Ltd. as Administrator of the Canadian Registered Pension Plans, the Superintendent of Financial Services of Ontario as Administrator of the Pension Benefits Guarantee Fund and the court-appointed representatives of the current and transferred employees of the Canadian Debtors.

"**CFSA**" means the Final Canadian Funding and Settlement Agreement among, *inter alia*, certain of the Canadian Debtors, the Monitor and certain of the U.S. Debtors dated December 23, 2009, and approved by the CCAA Court by Order dated January 21, 2010.

"**CFSA Approval Order**" means the Order of the CCAA Court dated January 21, 2010.

- 6 -

"**Chapter 15 Proceedings**" means the foreign recognition proceedings of the Canadian Debtors pursuant to Chapter 15 of the United States Bankruptcy Code pending before the U.S. Bankruptcy Court (Case No. 09-10164(KG)).

"**Charges**" means the Administration Charge, the Excess Funding Charge, the Directors' Charge, the Inter-Company Charge, the Shortfall Charge, the Payments Charge and the Nortel Special Incentive Plan Charge, each as defined in the Initial Order.

"**Claim**" means:

(a)     any right of any Person against the Canadian Debtors, or any of them, in connection with any indebtedness, liability or obligation of any kind of the Canadian Debtors, or any of them, whether liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, unsecured, perfected, unperfected, present, future, known or unknown, by guarantee, surety or otherwise and whether or not such right is executory or anticipatory in nature, including the right or ability of any Person to advance a claim for contribution or indemnity or otherwise with respect to any matter, action, cause or chose in action, whether existing at present or commenced in the future, which indebtedness, liability or obligation (A) is based in whole or in part on facts existing prior to the Filing Date, (B) relates to a time period prior to the Filing Date, or (C) would have been a claim provable in bankruptcy had the Canadian Debtors become bankrupt on the Filing Date; and

(b)     any indebtedness, liability or obligation of any kind arising out of the restructuring, termination, repudiation or disclaimer of any lease, contract, or other agreement or obligation on or after the Filing Date,

and shall include any "Claim", "EMEA Claim" or "Intercompany Claim" (as such terms are defined in the Claims Orders, in each case without any reference to the exclusion of any claims in such definitions), provided that the definition of Claim herein shall not include a Director/Officer Claim.

"**Claims Orders**" means, as the context requires, any or all of the following orders of the CCAA Court: (i) the Claims Procedure Order; (ii) the Claims Resolution Order dated September 16, 2010; (iii) the Order Approving Cross-Border Claims Protocol dated September 16, 2010; (iv) the Compensation Claims Procedure Order; (v) the EMEA Claims Procedure Order dated January 14, 2011; (vi) the Intercompany Claims Procedure Order dated July 27, 2012; (vii) paragraphs 12 to 18 of the Order (Stay Extension and Various Other Matters – September 2016) dated September 29, 2016; and (viii) the Post-Filing Claims Bar Date Order.

"**Claims Procedure Order**" means the Claims Procedure Order of the CCAA Court dated July 30, 2009, as amended and restated on October 7, 2009.

"**Compensation Claims Procedure Order**" means the Compensation Claims Procedure Order of the CCAA Court dated October 6, 2011, including the Compensation Claims Methodology Order of the CCAA Court dated October 6, 2011.

- 7 -

"**Compensation Creditors**" means Creditors who are holders of Compensation Claims (as such term is defined in the Compensation Claims Procedure Order).

"**Contingent Additional NNUK Claim**" has the meaning ascribed thereto in Section 4.8.

"**Court Appointed Representative Counsel**" shall mean Koskie Minsky LLP, Shibley Righton LLP and Nelligan O'Brien Payne LLP in their capacity as CCAA Court appointed representative counsel to certain Compensation Creditors pursuant to orders of the CCAA Court dated May 27, 2009 (former employees), July 22, 2009 (current employees) and July 30, 2009 (long term disability beneficiaries), and shall include any financial advisor retained by such counsel.

"**Creditor**" means any Person having a Claim, but only with respect to and to the extent of such Claim, including the transferee or assignee of a transferred Claim that is recognized as a Creditor in accordance with the Claims Orders or a trustee, executor, liquidator, receiver, receiver and manager, or other Person acting on behalf of or through such Person, and shall include the Former Employee Priority Creditors.

"**Creditor's Maximum**" has the meaning ascribed thereto in Section 3.5(b).

"**Crossover Bondholder**" means a holder of one or more Crossover Bonds, including any holder of a beneficial interest in Crossover Bonds.

"**Crossover Bondholder Claim**" means a Claim by a Crossover Bondholder in respect of the Crossover Bonds, including as asserted by the Crossover Bonds Trustee.

"**Crossover Bonds**" means the 2006 Bonds and the 2007 Bonds.

"**Crossover Bonds Indentures**" means: (i) the Indenture dated as of March 28, 2007, by NNC as issuer and NNL and NNI as guarantors, governing the 2007 Bonds; (ii) the Indenture dated as of July 5, 2006, as supplemented by the First Supplemental Indenture dated as of July 5, 2006, the Second Supplemental Indenture dated as of May 1, 2007, and the Third Supplemental Indenture dated as of May 28, 2008, by NNL as issuer and NNC and NNI as guarantors, governing the 2006 Bonds, in each case with the Crossover Bonds Trustee as trustee.

"**Crossover Bonds Trustee**" means The Bank of New York Mellon in its capacity as indenture trustee under the Crossover Bonds Indentures.

"**Crossover Claim**" means a claim arising out of a debt or other obligation of one or more of the U.S. Debtors that is guaranteed or indemnified by one or more of the Canadian Debtors, or a debt or other obligation of one or more of the Canadian Debtors that is guaranteed or indemnified by one or more of the U.S. Debtors, including the Crossover Bondholder Claims, the NNCC Bondholder Claims and the claims of Export Development Canada against the U.S. Debtors and the Canadian Debtors, but excluding, in relation to the Canadian Debtors, any obligation of a Canadian Debtor guaranteed by another Canadian Debtor.

"**Cross-Border Claims Protocol**" means the cross-border claims protocol attached as Schedule "A" to the Order Approving Cross-Border Claims Protocol of the CCAA Court dated September 16, 2010.

- 8 -

"**Cross-Border Protocol**" means the Cross-Border Insolvency Protocol originally approved by the CCAA Court and the U.S. Court on or about January 14, 2009, as the same has been amended from time to time as approved by the CCAA Court and the U.S. Bankruptcy Court.

"**Debtor estate**" shall mean either the Canadian Estate or the U.S. Debtors (or any of them), as the context requires.

"**Determination Date**" has the meaning ascribed thereto in Section 6.1.

"**Directors**" means all former directors (or their estates) of the Canadian Debtors, in such capacity, and "**Director**" means any one of them.

"**Directors' Charge**" has the meaning ascribed thereto in the Initial Order.

"**Director Indemnity Claim**" has the meaning ascribed thereto in Section 3.10(c).

"**Director/Officer Claim**" means any right or claim of any Person howsoever arising against one or more of the Directors or Officers that relates to a Claim for which any Director or Officer of a Canadian Debtor is alleged to be by statute or otherwise by law liable to pay in his or her capacity as a Director or Officer, whether or not such right or claim is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, unsecured, perfected, unperfected, present, future, known, or unknown, by guarantee, surety or otherwise, and whether or not such right is executory or anticipatory in nature, including the right or ability of any Person to advance a claim for contribution or indemnity or otherwise with respect to any claim, matter, action, cause or chose in action, whether existing at present or commenced in the future, and shall include any "Director/Officer Claim" (as such term is defined in the Claims Procedure Order without any reference to the exclusion of any claims in such definition).

"**Distribution Date**" means the date or dates from time to time set in accordance with the provisions of the Plan to effect distributions in respect of the Proven Affected Unsecured Claims, and includes the Initial Distribution Date.

"**Distribution Record Date**" has the meaning ascribed thereto in Section 6.3(b).

"**Duplicative Claims**" has the meaning ascribed thereto in Section 2.2(d).

"**EI Act**" means the *Employment Insurance Act* (S.C. 1996, c. 23, as amended).

"**EI Confirmation**" means, in respect of a Compensation Creditor, confirmation from Employment and Social Development Canada of the amount, if any, owing by such Compensation Creditor pursuant to Section 45 of the EI Act.

"**EMEA Claims Settlement Agreement**" means the Agreement Settling EMEA Canadian Claims and Related Claims dated July 9, 2014, and approved by Order (Approving Agreement Settling EMEA Canadian Claims and Related Claims) of the CCAA Court dated July 16 , 2014.

"**EMEA Debtors**" means, collectively, NNUK (in administration), Nortel Networks (Ireland) Limited  (in administration), Nortel Networks NV (in administration), Nortel Networks SpA (in

- 9 -

administration), Nortel Networks BV (in administration), Nortel Networks Polska Sp. z.o.o. (in administration), Nortel Networks Hispania SA (in administration), Nortel Networks (Austria) GmbH (in administration), Nortel Networks s.r.o. (in administration), Nortel Networks Engineering Service Kft (in administration), Nortel Networks Portugal SA (in administration), Nortel Networks Slovensko, s.r.o. (in administration), Nortel Networks Romania SRL (in administration), Nortel GmbH (in administration), Nortel Networks Oy (in administration), Nortel Networks AB (in administration), Nortel Networks International Finance & Holding BV (in administration), Nortel Networks France S.A.S. (in administration) and, except where expressly excluded, includes NNSA.

"**EMEA Non-Filed Entities**" means, collectively, Nortel Networks AS, Nortel Networks AG, Nortel Networks South Africa (Pty) Limited, Nortel Networks (Northern Ireland) Limited and Nortel Networks Optical Components Limited.

"**EMEA Proceedings**" means, collectively, the U.K. administration proceedings that were commenced before the U.K. Court on or about January 14, 2009 in respect of the EMEA Debtors.

"**Encumbrance**" means any charge, mortgage, lien, pledge, claim, restriction, hypothec, adverse interest, security interest or other encumbrance whether created or arising by agreement, statute or otherwise at law, attaching to property, interests or rights and shall be construed in the widest possible terms and principles known under the law applicable to such property, interests or rights and whether or not they constitute specific or floating charges as those terms are understood under the laws of the Province of Ontario.

"**Equity Claim**" means a Claim that is in respect of an Equity Interest, including a claim for, among others: (a) a dividend or similar payment, (b) a return of capital, (c) a redemption or retraction obligation, (d) a monetary loss resulting from the ownership, purchase or sale of an Equity Interest or from the rescission, or, in Quebec, the annulment, of a purchase or sale of an Equity Interest, or (e) contribution or indemnity in respect of a claim referred to in any of the foregoing (a) to (d).

"**Equity Claimant**" means any Person with an Equity Claim or holding an Equity Interest, but only in such capacity.

"**Equity Interest**" means a share of a Canadian Debtor, or a warrant or option or another right to acquire a share in a Canadian Debtor, including the common shares of NNC and the preferred shares of NNL.

"**Escrow Accounts**" means the escrow accounts established pursuant to the Escrow Agreements to hold the Sale Proceeds, including the Canadian Dollar Escrow Account and the Iceberg Escrow Account.

"**Escrow Agents**" means JPMorgan Chase Bank, N.A., the Canadian Escrow Agent and any other "Escrow Agent" as defined in the Settlement and Support Agreement.

"**Escrow Agreements**" means the various court-approved escrow agreements listed in Schedule "A" pursuant to which the Sale Proceeds are held by the Escrow Agents, and shall include the

- 10 -

Canadian Escrow Agreement and any other "Escrow Agreement" as such term is defined in the Settlement and Support Agreement.

"**Filing Date**" means January 14, 2009, provided that in the case of the New Applicants it shall be construed so as to mean March 18, 2016.

"**Final Distribution**" has the meaning ascribed thereto in Section 6.11.

"**Final Distribution Certificate**" means a certificate of the Monitor to be posted by the Monitor on the Monitor's Website indicating that the Canadian Estate intends to make a Final Distribution, a copy of which shall be served on the service list in the CCAA Proceedings and filed with the CCAA Court.

"**Final Order**" means (a) with respect to an order of a Canadian Court, an order:  (i) as to which no appeal, leave to appeal, notice of appeal, motion to amend or make additional findings of fact, motion to alter or amend judgment, motion for rehearing or motion for new trial has been timely filed (in cases in which there is a date by which such filing is required to occur, it being understood that with respect to an order issued by the CCAA Court, the time period for seeking leave to appeal shall be deemed to have elapsed on the date that is 22 days after the rendering of such order unless a motion has been made to extend such time period) or, if any of the foregoing has been timely filed, it has been disposed of in a manner that upholds and affirms the subject order in all material respects without the possibility for further appeal thereon; (ii) in respect of which the time period for instituting or filing an appeal, leave to appeal, motion for rehearing or motion for new trial shall have expired (in cases in which such time period is capable of expiring, it being understood that with respect to an order issued by the CCAA Court, the time period for seeking leave to appeal shall be deemed to have elapsed on the date that is 22 days after the rendering of such order unless a motion has been made to extend such time period); and (iii) as to which no stay is in effect; or (b) with respect to an order of a U.S. Court, an order that has not been reversed, stayed, superseded or vacated or, to the extent it has been stayed such stay shall have expired.

"**Force Majeure**" means any circumstance or act beyond the reasonable control of the Canadian Estate or the Monitor, including an intervening act of God or public enemy, war, terrorist act, blockade, civil commotion, fire, flood, tidal wave, earthquake, epidemic, quarantine restriction, a stop-work order or injunction issued by a Governmental Entity having jurisdiction, embargo, changes in laws or regulations by a Governmental Entity that have the effect of prohibiting or suspending the performance of any obligation pursuant to this Plan, any strike or labour dispute, all or any of which delays the performance of any obligation created by this Plan beyond its scheduled time.

"**Force Majeure Event**" has the meaning ascribed thereto in Section 11.7.

"**Foreign Related Claim**" has the meaning ascribed thereto in Section 3.6.

"**Former Employee Priority Creditors**" means the former employees of the Canadian Debtors who are entitled to a CA$3,000 priority claim in these CCAA Proceedings in lieu of receiving their Termination Payment pursuant to the Order (Stay Extension and Various Other Matters – March 2016) of the CCAA Court dated March 18, 2016.

- 11 -

"**French Court**" means the Versailles Commercial Court, any court hearing appeals therefrom and any other court of competent jurisdiction overseeing the French Secondary Proceeding from time to time.

"**French Liquidator**" means Maître Cosme Rogeau in his capacity as Liquidator for NNSA under the French Secondary Proceeding.

"**French Secondary Proceeding**" means the secondary insolvency proceedings that were commenced before the French Court on May 28, 2009, in respect of NNSA.

"**Governmental Entity**" means any government, regulatory authority, governmental department, agency, commission, bureau, official, minister, Crown corporation, court, board, tribunal or dispute settlement panel or other law, rule or regulation-making organization or entity: (a) having or purporting to have jurisdiction on behalf of any nation, province, territory or state or any other geographic or political subdivision of any of them; or (b) exercising, or entitled or purporting to exercise any administrative, executive, judicial, legislative, policy, regulatory or taxing authority or power.

"**Hardship Process**" means the former employee hardship application process that was established pursuant to Order of the CCAA Court dated July 30, 2009, as same has been amended and extended from time to time as approved by the CCAA Court.

"**Iceberg**" means the residual intellectual property remaining following the Nortel Group business line sales, which intellectual property was sold to a consortium in July 2011.

"**Iceberg Amendment Fee**" means the $5,000,000 cumulative fee previously agreed by the Canadian Debtors, U.S. Debtors and EMEA Debtors to be funded directly as follows: $2,800,000 to NNI, and $2,200,000 to NNUK, all from the Iceberg Sale Proceeds prior to any other agreed upon allocation of the Sale Proceeds.

"**Iceberg Escrow Account**" means the Escrow Account established to hold the Iceberg Sale Proceeds and the Iceberg Amendment Fee.

"**Iceberg Sale**" means the sale of the Iceberg assets.

"**Iceberg Sale Proceeds**" means that portion of the Sale Proceeds generated from the Iceberg Sale.

"**Indenture Trustee**" means each of the 1988 Bonds Trustee, the Crossover Bonds Trustee and the NNCC Bonds Trustee.

"**Initial Distribution**" means the first distribution to Affected Unsecured Creditors pursuant to Section 6.3.

"**Initial Distribution Date**" means the date on which the Initial Distribution is made, which date shall be a Business Day.

"**Initial Order**" has the meaning ascribed thereto in the recitals to this Plan.

- 12 -

"**Inter-company Charge**" has the meaning ascribed thereto in the Initial Order.

"**Insurance Policy**" means any insurance policy pursuant to which any Canadian Debtor or any Director or Officer is insured.

"**Insured Claim**" means all or that portion of a Claim or a Director/Officer Claim that is insured under an Insurance Policy, but solely to the extent that such Claim or Director/Officer Claim, or portion thereof, is so insured, and only as against such insurance.

"**Intercompany Claims**" means a Claim by a Nortel Group entity (including by any administrator, liquidator, receiver, trustee, office holder or similar official appointed in respect thereof) against a Canadian Debtor, including those unsecured intercompany claims against the Canadian Debtors set out on Schedule "C" hereto.

"**Joint Administrators**" means Alan Robert Bloom, Christopher John Wilkinson Hill, Alan Michael Hudson and Stephen John Harris, as the administrators of all EMEA Debtors except Nortel Networks (Ireland) Limited (in administration), and Alan Robert Bloom and David Martin Hughes as administrators for Nortel Networks (Ireland) Limited, and in the case of NNSA shall include the NNSA Conflicts Administrator.

"**Joint Liquidators**" means Richard Barker and Joseph Luke Charleton as joint liquidators of Nortel Networks (Northern Ireland) Limited (in liquidation) and Richard Barker and Samantha Keen as joint liquidators of Nortel Networks Optical Components Limited (in liquidation).

"**M&A Cost Reimbursement**" means the reimbursement of certain costs related to fees and expenses incurred in connection with the sale of assets which generated the Sale Proceeds.

"**Managerial Plan**" means the Nortel Networks Limited Managerial and Non-Negotiated Pension Plan (Registration No. 0342048).

"**Meeting**" means the meeting of the Affected Unsecured Creditors Class to be held on the Meeting Date called pursuant to the Meeting Order for the purpose of considering and voting on the Plan pursuant to the CCAA, and includes any adjournment, postponement or other rescheduling of such meeting in accordance with the Meeting Order.

"**Meeting Date**" means the date on which the Meeting is held in accordance with the Meeting Order.

"**Meeting Order**" means the Plan Filing and Meeting Order of the CCAA Court to be requested that, among other things, sets the date for the Meeting, as same may be amended, restated or varied from time to time.

"**Monitor**" means Ernst & Young Inc. in its capacity as court-appointed monitor in the CCAA Proceedings in respect of the Canadian Debtors.

"**Monitor Related Parties**" has the meaning ascribed thereto in Section 11.8.

"**Monitor's Powers Orders**" means the following orders of the CCAA Court: (i) the Initial Order; (ii) the Claims Orders; (iii) the Order dated August 14, 2009; (iv) the Order (Monitor's

- 13 -

Expansion of Power Order #2) dated October 3, 2014; (v) the Order (New Applicants) dated March 18, 2016; and (vi) the Meeting Order.

"**Monitor's Website**" means the webpage maintained by the Monitor in respect of the CCAA Proceedings, which address is currently: www.ey.com/ca/nortel.

"**Negotiated Plan**" means the Nortel Networks Negotiated Pension Plan (Registration No. 08587766).

"**New Applicants**" has the meaning ascribed thereto in the recitals to this Plan.

"**NNC**" means Nortel Networks Corporation, a Canadian Debtor.

"**NNCC**" means Nortel Networks Capital Corporation, a U.S. Debtor.

"**NNCC Bondholder**" means a holder of one or more NNCC Bonds, including any holder of a beneficial interest in NNCC Bonds.

"**NNCC Bondholder Claim**" means a Claim of an NNCC Bondholder in respect of the NNCC Bonds, including as asserted by the NNCC Bonds Trustee.

"**NNCC Bondholder Signatories**" means the holders of NNCC Bonds that executed the Settlement and Support Agreement as parties thereto.

"**NNCC Bonds**" means the 7.875% Notes due 2026 governed by the NNCC Bonds Indenture, issued by Northern Telecom Capital Corporation (now NNCC) and guaranteed by Northern Telecom Limited (now NNL).

"**NNCC Bonds Indenture**" means the Indenture dated as of February 15, 1996, by Northern Telecom Capital Corporation (now NNCC) as issuer, Northern Telecom Limited (now NNL) as guarantor and The Bank of New York, as trustee, governing the NNCC Bonds.

"**NNCC Bonds Trustee**" means Law Debenture Trust Company of New York in its capacity as replacement trustee under the NNCC Bonds Indenture.

"**NNI**" means Nortel Networks Inc., a U.S. Debtor.

"**NNI Claim**" has the meaning ascribed thereto in Section 4.9.

"**NNL**" means Nortel Networks Limited, a Canadian Debtor.

"**NNSA**" means Nortel Networks S.A., an EMEA Debtor.

"**NNSA Conflicts Administrator**" means Stephen Jonathan Taylor of Isonomy Limited as Conflicts Administrator solely in relation to NNSA.

"**NNUK**" means Nortel Networks UK Limited, an EMEA Debtor.

"**Non-Released Claims**" has the meaning ascribed thereto in Section 7.1(b).

- 14 -

"**Nortel Group**" means, collectively, NNC and all of its present and former direct and indirect subsidiaries.

"**Officers**" means all former officers (or their estates) of the Canadian Debtors, in such capacity, and "**Officer**" means any one of them.

"**Order**" means any order of the Canadian Court made in connection with the CCAA Proceedings.

"**Other Canadian Debtors**" means the Canadian Debtors other than NNL.

"**Participating Creditors**" has the meaning ascribed thereto in the Settlement and Support Agreement.

"**Person**" means any individual, firm, corporation, limited or unlimited liability company, general or limited partnership, association, trust, unincorporated organization, union, joint venture, government or any agency, officer or instrumentality thereof or any other entity.

"**Personnel Files Agreement**" means that certain Agreement re: Hard Copy Personnel Files dated December 3, 2015, among certain of the Canadian Debtors, the Monitor, certain of the U.S. Debtors and Morneau Shepell Ltd. in its capacity as administrator of the Canadian Registered Pension Plans and not in its personal capacity.

"**Plan**" means this Plan of Compromise and Arrangement filed by the Canadian Debtors under the CCAA, as it may be amended, supplemented or restated from time to time in accordance with the terms hereof.

"**Plan Certificates**" has the meaning ascribed to such term in Section 9.1.

"**Plan Documents**" has the meaning ascribed thereto in Section 11.14.

"**Plan Effectiveness Certificate**" has the meaning ascribed thereto in Section 9.4

"**Plan Effective Conditions**" has the meaning ascribed thereto in Section 9.2.

"**Plan Effective Date**" means the date which is the first Business Day on which the Plan Effective Conditions have been satisfied or waived in accordance with the terms of this Plan.

"**Plan Implementation Certificate**" has the meaning ascribed thereto in Section 9.5.

"**Plan Implementation Conditions**" means the conditions set out in Section 9.3.

"**Plan Implementation Date**" means the date which is the first Business Day on which the Plan Implementation Conditions have been satisfied or waived in accordance with the terms of this Plan.

"**Post-Filing Claim**" has the meaning ascribed thereto in the Post-Filing Claims Bar Date Order.

- 15 -

"**Post-Filing Claims Bar Date Order**" means the Order of the CCAA Court to be requested that establishes a claims bar date for Post-Filing Claims and a procedure to resolve any Post-Filing Claims.

"**Post-Filing Date Interest**" means interest or a similar amount on a Claim accruing or relating to the period from and after the Filing Date, and includes (i) a make whole premium, early redemption payment, optional redemption payment, no-call payment or similar amount, and (ii) any interest accruing or relating to the period from and after the Filing Date that purports to be included as a component of a liquidated damages or similar provision under an agreement.

"**PPF**" means the Board of the Pension Protection Fund, a statutory corporation established under the provisions of the Pensions Act 2004 (U.K.), whose principal place of business is Renaissance, 12 Dingwall Road, Croydon, United Kingdom, CRO 2NA.

"**Proof of Claim**" has the meaning ascribed thereto in the Claims Orders.

"**Pro-Rata Share**" means, as at any Distribution Date with respect to an Affected Unsecured Creditor with a Proven Affected Unsecured Claim, the product of (A/B) x C where:

A = the Proven Affected Unsecured Claim of such Affected Unsecured Creditor stated in U.S. dollars (with all non-U.S. dollar denominated Proven Affected Unsecured Claims, or portions thereof, being converted to U.S. dollars in the manner specified in Section 6.4(a));

B = the total of all Proven Affected Unsecured Claims stated in U.S. dollars (with all non-U.S. dollar denominated Proven Affected Unsecured Claims, or portions thereof, being converted to U.S. dollars in the manner specified in Section 6.4(a)); and

C = the total amount of Cash in the Affected Unsecured Creditor Pool stated in U.S. dollars (with all Canadian dollar denominated Cash being valued in U.S. dollars in the manner specified in Section 6.4(b)),

provided that distributions on CAD Claims shall be paid in Canadian dollars, with the amount of such distribution in U.S. dollars being converted to Canadian dollars at the Applicable FX Rate, all as contemplated in Section 6.4(c).

"**Proven Affected Unsecured Claim**" means any Affected Unsecured Claim or portion thereof that has been finally determined to be a "Proven Claim" (as that term is defined in the Claims Orders) for distribution purposes, and includes the Claims referenced in Sections 4.4 through 4.10 hereof (excluding, for the avoidance of doubt, the Remaining Revolver Claim and the Canadian Intercompany Claims).

"**Proven NNUK Claim**" has the meaning ascribed thereto in Section 4.8.

"**Proven Priority Claims**" means: (i) the $62,700,000 Remaining Revolver Claim of NNI; (ii) the CA$3,000 (subject to applicable withholdings) payment to each Former Employee Priority Creditor in respect of any entitlement to an outstanding Termination Payment; and (iii) any other Claim or Post-Filing Claim established pursuant to an order of the CCAA Court and allowed as a

proven priority claim against the Canadian Estate entitled to be paid in full, or otherwise entitled to be paid in priority to Proven Affected Unsecured Claims.

"**Records Assistance Side Letter**" means that certain letter agreement re: records assistance dated October 12, 2016 between the Joint Administrators and the Canadian Debtors.

"**Released Claims**" has the meaning ascribed thereto in Section 7.1(a).

"**Released Director/Officer Claim**" means any Director/Officer Claim that is not a Non-Released Claim.

"**Released Party**" and "**Released Parties**" have the meaning ascribed thereto in Section 7.1.

"**Remaining Revolver Claim**" has the meaning ascribed thereto in the CFSA.

"**Required Majority**" means, with respect to the Affected Unsecured Creditors Class, a majority in number of Affected Unsecured Creditors holding Voting Claims representing at least two thirds in value of the Voting Claims of Affected Unsecured Creditors, in each case who are entitled to vote at the Meeting in accordance with the Meeting Order and who are present and voting in person or by proxy on the resolution approving the Plan at the Meeting.

"**Sale Proceeds**" means the remaining sale proceeds generated by the sales of the various Nortel Group business lines and the Iceberg Sale between 2009 and 2011 plus interest accrued thereon, being approximately $7,254,279,269 as at July 31, 2016 (excluding, for the avoidance of doubt, the Iceberg Amendment Fee and the M&A Cost Reimbursement).

"**Sanction Order**" means the Order of the CCAA Court sanctioning and approving this Plan.

"**Settlement and Support Agreement**" means that certain Settlement and Plans Support Agreement dated as of October 12, 2016 and entered into by and among the Settlement Parties, together with all Annexes thereto, in each case as amended, supplemented or otherwise modified from time to time in accordance with the terms thereof, a copy of which is attached as Exhibit "A" hereto.

"**Settlement and Support Agreement Releases**" means the "Releases" as such term is defined in the Settlement and Support Agreement.

"**Settlement Parties**" means, collectively, the Canadian Debtors, the Monitor, the U.S. Debtors, the EMEA Debtors, the EMEA Non-Filed Entities, the Joint Administrators, the NNSA Conflicts Administrator, the French Liquidator, the Bondholder Group, the members of the CCC, the UCC, the U.K. Pension Trustee, the PPF, the Joint Liquidators and the NNCC Bondholder Signatories.

"**Tax**" or "**Taxes**" means any and all federal, provincial, municipal, local and foreign taxes, assessments, reassessments and other Governmental Entity charges, duties, impositions and liabilities including for greater certainty taxes based upon or measured by reference to income, gross receipts, profits, capital, transfer, land transfer, sales, goods and services, harmonized sales, use, value-added, excise, withholding, business, franchising, property, development, occupancy, employer health, payroll, employment, health, social services, education and social security

- 17 -

taxes, all surtaxes, all customs duties and import and export taxes, all licence, franchise and registration fees and all employment insurance, health insurance and Canada, Quebec and other government pension plan premiums or contributions, together with all interest, penalties, fines and additions with respect to such amounts.

"**Taxing Authorities**" means Her Majesty the Queen in right of Canada, Her Majesty the Queen in right of any province or territory of Canada, the Canada Revenue Agency, any similar revenue or taxing authority of Canada and each and every province or territory of Canada and any political subdivision thereof, the United States Internal Revenue Service, any similar revenue or taxing authority of the United States and each and every state of the United States, and any Canadian, United States or other Governmental Entity exercising taxing authority or power, and "**Taxing Authority**" means any one of the Taxing Authorities.

"**Termination Payments**" has the meaning ascribed thereto in the Amended and Restated Settlement Agreement among, *inter alia*, certain of the Canadian Debtors, the Monitor and the CCAA Court appointed representatives of former employees and certain long term disability beneficiaries of the Canadian Debtors dated March 30, 2010.

"**U.K. Court**" means the High Court of Justice of England and Wales in London, any court hearing appeals therefrom and any other court of competent jurisdiction overseeing the EMEA Proceedings from time to time, including any appeals.

"**U.K. Pension Trustee**" means the Nortel Networks UK Pension Trust Limited as trustee of the Nortel Networks Pension Plan (U.K.).

"**U.S. Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware.

"**U.S. Court**" means any and all of the U.S. Bankruptcy Court, the United States District Court for the District of Delaware, the United States Court of Appeals for the Third Circuit, the United States Supreme Court or any other court of competent jurisdiction overseeing the U.S. Proceedings (including appeals) from time to time.

"**U.S. Debtors**" means, collectively, NNI, NNCC, Nortel Altsystems Inc., Nortel Altsystems International Inc., Xros, Inc., Sonoma Systems, Qtera Corporation, CoreTek, Inc., Nortel Networks Applications Management Solutions Inc., Nortel Networks Optical Components Inc., Nortel Networks HPOCS Inc., Architel Systems (U.S.) Corporation, Nortel Networks International Inc., Northern Telecom International Inc., Nortel Networks Cable Solutions Inc., Nortel Networks (CALA) Inc. and Nortel Networks India International Inc.

"**U.S. Plans**" means the Chapter 11 of the United States Bankruptcy Code plans (including any exhibits, annexes and schedules thereto) for the U.S. Debtors that effectuate the settlement contemplated by the Settlement and Support Agreement, consistent with the terms of the Settlement and Support Agreement, as they may be modified or supplemented in accordance with their terms.

- 18 -

"**U.S. Proceedings**" means, collectively, those insolvency proceedings that were commenced before the U.S. Bankruptcy Court on or after January 14, 2009 in respect of the U.S. Debtors pursuant to Chapter 11 of the United States Bankruptcy Code.

"**UCC**" means the Official Committee of Unsecured Creditors of the U.S. Debtors appointed pursuant to an order entered by the U.S. Bankruptcy Court on January 26, 2009, as the same may be constituted from time to time.

"**UKPI**" means, collectively, the U.K. Pension Trustee and the PPF.

"**Unaffected Claim**" means any:

> (a)    Canadian Intercompany Claim;
>
> (b)    Insured Claim;
>
> (c)    Proven Priority Claim;
>
> (d)    Post-Filing Claim (except to the extent otherwise ordered by the CCAA Court); and
>
> (e)    any Director/Officer Claim that is not permitted to be compromised pursuant to Section 5.1(2) of the CCAA.

"**Unaffected Creditor**" means a Creditor or other Person who holds an Unaffected Claim, but only in respect of and to the extent of such Unaffected Claim.

"**Unavailable Cash**" means any Cash of the Canadian Debtors that has been identified or described by the Monitor as "Unavailable Cash" in its reports to the CCAA Court.

"**Unresolved Affected Unsecured Claim**" means an Affected Unsecured Claim which on the Initial Distribution Date or any subsequent Distribution Date, in whole or in part: (i) has not been finally determined to be a Proven Affected Unsecured Claim in accordance with the Claims Orders; (ii) is validly disputed in accordance with the Claims Orders; and/or (iii) remains subject to review and/or resolution in accordance with the Claims Orders, including both as to proof and/or quantum.

"**Undeliverable Distribution**" has the meaning ascribed thereto in Section 6.7 hereof.

"**Unresolved Claims Reserve**" means a reserve of Available Cash to be held by the Canadian Estate (in an amount to be calculated by the Monitor on the Initial Distribution Date, and recalculated as at any subsequent Distribution Date) equal to (i) the amount that would have been paid if the full amount of all Unresolved Affected Unsecured Claims had been Proven Affected Unsecured Claims as of such date, plus (ii) the full amount of any unresolved Post-Filing Claims filed in accordance with the Post-Filing Claims Bar Date Order, or, in each case, such lesser amount as may be ordered by the CCAA Court.

"**Voting Claim**" shall have the meaning ascribed to such term in the Meeting Order.

- 19 -

## 1.2    Certain Rules of Interpretation

For the purposes of the Plan:

(a)     any reference in the Plan to a contract, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions;

(b)     any reference in the Plan to an Order or an existing document or exhibit filed or to be filed means such Order, document or exhibit as it may have been or may be amended, modified, or supplemented;

(c)     unless otherwise specified, all references to currency are in U.S. dollars;

(d)     the division of the Plan into "articles" and "sections" and the insertion of a table of contents are for convenience of reference only and do not affect the construction or interpretation of the Plan, nor are the descriptive headings of "articles" and "sections" intended as complete or accurate descriptions of the content thereof;

(e)     the use of words in the singular or plural, or with a particular gender, including a definition, shall not limit the scope or exclude the application of any provision of the Plan or a schedule hereto to such Person (or Persons) or circumstances as the context otherwise permits;

(f)     the words "includes" and "including" and similar terms of inclusion shall not, unless expressly modified by the words "only" or "solely", be construed as terms of limitation, but rather shall mean "includes but is not limited to" and "including but not limited to", so that references to included matters shall be regarded as illustrative without being either characterizing or exhaustive;

(g)     unless otherwise specified, all references to time herein and in any document issued pursuant hereto mean local time in Toronto, Ontario and any reference to an event occurring on a Business Day shall mean prior to 4:00 p.m. (Toronto time) on such Business Day;

(h)     unless otherwise specified, time periods within or following which any payment is to be made or act is to be done shall be calculated by excluding the day on which the period commences and including the day on which the period ends and by extending the period to the next succeeding Business Day if the last day of the period is not a Business Day;

(i)     unless otherwise provided, any reference to a statute or other enactment of parliament or a legislature or Governmental Entity includes all regulations made thereunder, all amendments to or re-enactments of such statute or regulations in force from time to time, and, if applicable, any statute or regulation that supplements or supersedes such statute or regulation; and

- 20 -

(j)    references to a specified "article" or "section" shall, unless something in the subject matter or context is inconsistent therewith, be construed as references to that specified article or section of the Plan, whereas the terms "the Plan", "hereof", "herein", "hereto", "hereunder" and similar expressions shall be deemed to refer generally to the Plan and not to any particular article, section or other portion of the Plan and includes any documents supplemental hereto.

### 1.3    Successors and Assigns

The Plan shall be binding upon and shall enure to the benefit of the heirs, administrators, executors, legal personal representatives, successors and permitted assigns of any Person or party named or referred to in the Plan.

### 1.4    Governing Law and Jurisdiction

The Plan shall be governed by and construed in accordance with the laws of the Province of Ontario and the federal laws of Canada applicable therein. All questions as to the interpretation of or application of the Plan and all proceedings taken in connection with the Plan and its provisions shall be subject to the exclusive jurisdiction of the CCAA Court. For the avoidance of doubt, the CCAA Court shall maintain exclusive jurisdiction over the CCAA Proceedings, including the Plan, following the Plan Effective Date.

### 1.5    Schedules

The following are the Schedules to the Plan, which are incorporated by reference into the Plan and form a part of it:

| | |
|---|---|
| Schedule "A" | Escrow Agreements |
| Schedule "B" | Crossover Bondholder Claims |
| Schedule "C" | Intercompany Claims - Proven Affected Unsecured Claims |
| Schedule "D" | Exchange Rates from Claims Procedure Order |

### ARTICLE 2
### PURPOSE AND EFFECT OF THE PLAN

### 2.1    Purpose

The purpose of the Plan is to:

(a)    effectuate and implement the terms of the Settlement and Support Agreement, including the settlement of the Allocation Dispute and certain other claims, disputes and other matters contemplated therein, the release of the Sale Proceeds to the Canadian Debtors, the U.S. Debtors and the EMEA Debtors as provided for therein, and the payment contemplated pursuant to Section 4(e) of the Settlement and Support Agreement;

- 21 -

(b)     provide for the substantive consolidation of each of the Canadian Debtors into the Canadian Estate on the terms contemplated by this Plan;

(c)     provide for payment in full of the Proven Priority Claims;

(d)     provide for a pro rata distribution or distributions from the Canadian Estate to holders of all Proven Affected Unsecured Claims; and

(e)     effect a release and discharge of all Affected Claims and Released Claims.

### 2.2     Substantive Consolidation of the Canadian Debtors

The Plan fundamentally requires and shall result in the substantive consolidation of all assets of, and Claims against, the Canadian Debtors. As a result of the foregoing (and without limiting the generality of the foregoing provision):

(a)     On the Plan Effective Date: (i) NNL shall become the corporate body through which the transactions and other steps involving the Canadian Estate contemplated by this Plan and the wind-down and continuing administration of the Canadian Estate shall be conducted, it being understood that each Other Canadian Debtor shall maintain its independent corporate form; (ii) all assets and rights of the Other Canadian Debtors (but excluding the Canadian Intercompany Claims) shall vest in NNL pursuant to the Sanction Order, and NNL shall be authorized and appointed as attorney in fact of each of the Other Canadian Debtors, authorized to take all steps and actions necessary for and on behalf of the Other Canadian Debtors and to execute any and all documents and make any and all filings for and on behalf of each of the Other Canadian Debtors as may be necessary or desirable; and (iii) subject to the qualifications regarding Duplicative Claims, all Proven Affected Unsecured Claims (whether now existing or hereafter coming into existence) against the Other Canadian Debtors shall be deemed to be claims against NNL pursuant to the Sanction Order.

(b)     Each Canadian Registered Pension Plan shall only have one Proven Affected Unsecured Claim against the Canadian Estate in the respective amounts specified in Section 4.4.

(c)     Crossover Bonds that were issued by one Canadian Debtor and guaranteed by another Canadian Debtor shall only have one Proven Affected Unsecured Claim against the Canadian Estate in the respective amounts specified in Section 4.5.

(d)     Creditors shall not be permitted to have Duplicative Claims against the Canadian Estate.  To the extent that, absent substantive consolidation and this Plan, an Affected Unsecured Creditor has or would have had Proven Affected Unsecured Claims against more than one of the Canadian Debtors based on the same underlying debt or obligation ("**Duplicative Claims**"), the Affected Unsecured Creditor shall only be entitled to one Proven Affected Unsecured Claim against the Canadian Estate equal to the amount of the largest of such Duplicative Claims. By way of illustration of the foregoing, where the principal debtor on a Claim is a

- 22 -

Canadian Debtor and a guarantor of that Claim is another Canadian Debtor, or where there is joint and several liability of two or more Canadian Debtors in respect of a Claim or portion thereof, the holder of such Claims shall (to the extent such Claims are proven in accordance with the applicable Claims Order) only be entitled to one Proven Affected Unsecured Claim against the Canadian Estate, and shall only be entitled to receive distributions hereunder on one Proven Affected Unsecured Claim.

(e)     Creditors holding Proven Affected Unsecured Claims against more than one Canadian Debtor where such Proven Affected Unsecured Claims are based on separate and distinct underlying debts shall have one Proven Affected Unsecured Claim against the Canadian Estate in the aggregate amount of all such separate and distinct Proven Affected Unsecured Claims. By way of illustration of the foregoing, if a Creditor holds a Proven Affected Unsecured Claim against NNC for $1,000 on account of an invoice, and a Proven Affected Unsecured Claim against NNL for $500 on account of a separate and distinct invoice, the Creditor shall have an aggregate Proven Affected Unsecured Claim against the Canadian Estate of $1,500.

(f)     For purposes of this Plan, all Intercompany Claims between or among the Canadian Debtors (collectively, the "**Canadian Intercompany Claims**") shall be treated as Unaffected Claims and shall not be entitled to any distributions hereunder. Subject to the foregoing sentence and notwithstanding any other provision of this Plan, nothing in this Plan shall affect, impair or settle the Canadian Intercompany Claims and the Canadian Intercompany Claims shall remain in place unaffected by this Plan in all respects following the Plan Effective Date.

## 2.3     Persons Affected

The Plan provides for a full and final release and discharge of the Affected Claims and Released Claims, and a settlement of, and consideration for, all Proven Affected Unsecured Claims. Except as otherwise expressly indicated herein, the Plan will become effective on the Plan Effective Date in accordance with its terms and shall be binding on and enure to the benefit of the Canadian Debtors, the Affected Creditors, the Released Parties and all other Persons named or referred to in, or subject to, the Plan.

## 2.4     Persons Not Affected

The Plan does not affect the Unaffected Creditors, subject to the express provisions hereof providing for the payment of certain Unaffected Claims and/or the treatment of Insured Claims. Nothing in the Plan shall affect the Canadian Debtors' rights and defences, both legal and equitable, with respect to any Unaffected Claims including all rights with respect to legal and equitable defences or entitlements to set-offs or recoupments against such Unaffected Claims.

- 23 -

### 2.5     Equity Claimants

(a)     On the Plan Effective Date, the Plan will be binding on all Equity Claimants. Equity Claimants and holders of Equity Interests shall not receive a distribution or other consideration under the Plan and shall not be entitled to vote on the Plan in respect of their Equity Claims or Equity Interests.  On the Plan Effective Date all Equity Claims shall be fully, finally, irrevocably and forever compromised, released, discharged and barred without any compensation of any kind whatsoever.

(b)     Nothing in this Section 2.5 or this Plan shall impact NNL's shares held by NNC or any shares held by NNC, NNL or any other Canadian Debtor of any other entity, including any other Nortel Group entity. Notwithstanding Section 2.5(a) or any other provision of this Plan, NNC's common shares and NNL's preferred shares shall remain issued and outstanding following the Plan Effective Date, it being understood that in no circumstance shall the holders of such Equity Interests be entitled to any distribution or other consideration pursuant to this Plan.

(c)     Notwithstanding Sections 2.5(a) and 2.5(b), in the event that all obligations of the Canadian Estate owing to Creditors are satisfied in full, including the payment in full of all Proven Affected Unsecured Claims and such other amounts as may be determined to be payable to Creditors in the event of the solvency of the Canadian Estate, the holders of Equity Interests in NNC and NNL will, following payment of all amounts owing to Creditors in full and subject to further order of the Canadian Court, have an entitlement to any remaining Available Cash or other assets of the Canadian Estate in accordance with their respective legal entitlements based on the terms of such Equity Interests. For the avoidance of doubt, in no circumstance is it contemplated that the obligations of the Canadian Estate to Creditors will be satisfied in full.

### ARTICLE 3
### CLASSIFICATION AND TREATMENT OF CREDITORS AND RELATED MATTERS

### 3.1     Claims Procedure

The procedure for determining the validity and quantum of the Proven Affected Unsecured Claims for voting and distribution purposes under the Plan shall be governed by the Claims Orders, the Meeting Order, the CCAA, the Plan and any further Order of the CCAA Court. For the avoidance of doubt the Claims Orders shall remain in full force and effect from and after the Plan Effective Date.

### 3.2     Classification of Creditors

In accordance with the Meeting Order, the only class of creditors for the purposes of considering and voting on the Plan shall be the Affected Unsecured Creditors Class.  For greater certainty, Equity Claimants and holders of Equity Interests shall not be entitled to vote on the Plan or to receive any distributions hereunder.

- 24 -

### 3.3    Creditors' Meeting

The Meeting shall be held in accordance with the Meeting Order and any further Order of the CCAA Court.  The only Persons entitled to attend the Meeting are those specified in the Meeting Order and any further Order of the CCAA Court.

### 3.4    Treatment of Affected Unsecured Claims

(a)    Subject to Section 3.4(b), 3.5, 3.6 and 3.7, in full and final satisfaction of all Affected Unsecured Claims, each Affected Unsecured Creditor with a Proven Affected Unsecured Claim shall be entitled to receive its Pro-Rata Share pursuant to Section 6.3. An Affected Unsecured Claim shall receive distributions as set forth in Section 6.3 only to the extent that such Claim is a Proven Affected Unsecured Claim and has not been paid, released, or otherwise satisfied previously. All Affected Unsecured Claims shall be fully, finally, irrevocably and forever compromised, released, discharged, cancelled and barred on the Plan Effective Date, subject to the right of Affected Unsecured Creditors to receive distributions pursuant to this Plan in respect of Proven Affected Unsecured Claims.

(b)    In order to give effect to Section 4.11 hereof, solely for purposes of determining the Pro-Rata Share of Affected Unsecured Creditors and amounts to be distributed on the Initial Distribution:

   (i)    the total amount of Cash in the Affected Unsecured Creditor Pool shall be deemed to be increased by the Bondholder Fee Amount;

   (ii)    the Pro-Rata Share of each Affected Unsecured Creditor with a Proven Affected Unsecured Claim (excluding the Crossover Bondholders and the NNCC Bondholders) shall be its Pro-Rata Share calculated as if an amount equal to the Bondholder Fee Amount was included in the Affected Unsecured Creditor Pool (with such additional entitlement being funded from the deduction on distributions to Crossover Bondholders and NNCC Bondholders contemplated in Section 3.4(b)(iii));

   (iii)    the aggregate Pro-Rata Share on account of the Crossover Bondholder Claims and NNCC Bondholder Claims shall be: (x) the aggregate Pro-Rata Share on account of the Crossover Bondholder Claims and NNCC Bondholder Claims calculated as if an amount equal to the Bondholder Fee Amount was included in the Affected Unsecured Creditor Pool; minus (y) the Bondholder Fee Amount; and

   (iv)    the Additional Bondholder Fee Amount may also be deducted from distributions to Crossover Bondholders and NNCC Bondholders as contemplated pursuant to Section 4.11.

- 25 -

### 3.5 Canada – U.S. Crossover Claims

(a)    In the event that a Creditor holds a Proven Affected Unsecured Claim that is also a Crossover Claim, then, subject to Sections 3.4(b) and 3.5(b), the Canadian Estate shall pay distributions on the full amount of the Proven Affected Unsecured Claim on a *pari passu* basis with all other Proven Affected Unsecured Claims without discrimination of any kind.

(b)    In no case shall a Creditor holding a Crossover Claim be entitled to receive any further distributions from the Canadian Estate where the aggregate distributions made by the U.S. Debtors and the Canadian Estate in respect of such Crossover Claim equal the total Proven Affected Unsecured Claim amount of such Crossover Claim against the Canadian Estate. For the avoidance of doubt, in no event shall a holder of a Crossover Claim be entitled to receive aggregated distributions in respect of its allowed Crossover Claim of more than 100% of the greater of (i) its Allowed Claim against a U.S. Debtor, and (ii) its Proven Affected Unsecured Claim against the Canadian Estate when taking into account distributions received from both the issuer (or primary) Debtor estate and guarantor (or secondary) Debtor estate (such greater amount, the "**Creditor's Maximum**"). For the further avoidance of doubt, in relation to a specific Crossover Claim, if the amount in U.S. dollars of the Allowed Claim against a U.S. Debtor for such Crossover Claim is not the same as the amount of the Proven Affected Unsecured Claim against the Canadian Estate for such Crossover Claim, the Creditor's Maximum shall not be reached until the greater of the two amounts has been distributed to the Creditor. Any amounts paid by NNI pursuant to Section 4(m) of the Settlement and Support Agreement shall not be included in calculating the Creditor's Maximum as it pertains to the NNCC Bonds.

(c)    Notwithstanding Section 3.5(b), if the relevant Creditor receives an aggregate amount of distributions equal to the Creditor's Maximum on account of its Crossover Claim, then the guarantor (or secondary) Debtor estate shall subrogate into the Crossover Claim against the issuer (or primary) Debtor estate (for the NNCC Bonds, the issuer Debtor estate is NNCC as of the date hereof, but shall be deemed to be NNI on the effective date of the U.S. Plans when NNCC is consolidated into NNI) and will be entitled to receive any and all subsequent distributions from the issuer (or primary) Debtor estate on account of such Crossover Claim on a *pari passu* basis with all other creditors holding Allowed Claims against a U.S. Debtor or Proven Affected Unsecured Claims against the Canadian Estate with the same priority from the issuer (or primary) Debtor estate without setoff or discrimination of any kind, provided that (i) the guarantor (or secondary) Debtor estate shall not receive any distributions on such claim in excess of payments the guarantor (or secondary) Debtor estate has made to the underlying holder of such Crossover Claim and (ii) in the case of the Crossover Bondholder Claims, NNI shall receive distributions from the Canadian Estate as a result of such subrogation for distributions NNI has made on Allowed Claims in respect of the Crossover Bonds only to the extent that NNI makes distributions in respect of Allowed Claims in respect of the Crossover Bonds claims in excess of $1,250,000,000 and such subrogation shall be only in respect of amounts

- 26 -

distributed in excess of $1,250,000,000, it being understood that NNI's right of subrogation pursuant to this Section 3.5(c), if any, against the Canadian Estate in respect of the Crossover Bonds claims remains subject to distributions equal to the Creditor's Maximum first being received by holders of the Crossover Bonds claims on account of such claims. For the avoidance of doubt, notwithstanding Section 3.13, the subrogation rights of NNI pursuant to this Section 3.5(c) shall not be subject to set-off.

(d)     The Canadian Estate and the U.S. Debtors shall reasonably cooperate to give effect to the provisions of this Section 3.5, including sharing information regarding the Crossover Claims and intended and actual distributions thereon.

### 3.6     No Double-Recovery

In no circumstance shall a Creditor receive aggregate distributions from the Canadian Estate and any other Nortel Group entity on account of a Proven Affected Unsecured Claim and any related claim established against another Nortel Group entity (a "**Foreign Related Claim**") in excess of 100% of the amount of such Proven Affected Unsecured Claim. In order to be eligible for any distribution under this Plan, an Affected Unsecured Creditor who holds a Proven Affected Unsecured Claim (but excluding Crossover Bondholders and NNCC Bondholders) against the Canadian Estate and a Foreign Related Claim against any other Nortel Group entity, including a Crossover Claim, shall, upon the written request of the Monitor (which may be made from time to time), provide such information to the Monitor as it may reasonably request in respect of the Foreign Related Claim, including the amount in which the Foreign Related Claim has been admitted for proof, the amount of distributions received or expected to be received on account of such Foreign Related Claim and any and all supporting documentation relating to the foregoing. Subject to further Order of the CCAA Court, the Canadian Estate and Monitor are authorized to delay and/or withhold distributions to Creditors holding Foreign Related Claims pending receipt of documentation acceptable to the Monitor, acting reasonably, to allow it to confirm that a Creditor has not and will not receive amounts on account of its Proven Affected Unsecured Claim and any Foreign Related Claim in excess of 100% of the amount of such Proven Affected Unsecured Claim.

### 3.7     No Post-Filing Date Interest

No Post-Filing Date Interest will be included in any Proven Affected Unsecured Claims, Proven Priority Claims or any other Claims provable hereunder, and no distributions will be made on account of Post-Filing Date Interest. For the avoidance of doubt, all claims for Post-Filing Date Interest shall be released, discharged and barred pursuant to the terms of this Plan.

### 3.8     Unaffected Claims

(a)     Unaffected Creditors will not receive any consideration or distributions under the Plan in respect of their Unaffected Claims (except to the extent their Unaffected Claims are contemplated to be paid in full in accordance with the express terms of this Plan), and they shall not be entitled to vote on the Plan at the Meeting in respect of their Unaffected Claims.

- 27 -

(b)     Notwithstanding anything to the contrary herein, Insured Claims shall not be compromised, released, discharged, cancelled and barred by this Plan, provided that from and after the Plan Effective Date, any Person having an Insured Claim shall be irrevocably limited to recovery in respect of such Insured Claim solely from the proceeds of the applicable Insurance Policies, and Persons with any Insured Claims shall have no right to, and shall not, directly or indirectly, make any claim or seek any recoveries from any Person, other than enforcing such Person's rights to be paid by the applicable insurer(s) from the proceeds of the applicable Insurance Policies.  This section 3.8(b) may be relied upon and raised or pled by the Canadian Debtors or any Released Party in defence or estoppel of or to enjoin any claim, action or proceeding brought in contravention of this section.  Nothing in this Plan shall prejudice, compromise, release or otherwise affect any right or defence of any insured or insurer in respect of an Insured Claim.

### 3.9     Unresolved Affected Unsecured Claims

No Affected Unsecured Creditor shall be entitled to receive any distribution hereunder with respect to an Unresolved Affected Unsecured Claim or any portion thereof unless and until, and then only to the extent that, such Claim is finally resolved in the manner set out in the applicable Claims Order and becomes a Proven Affected Unsecured Claim entitled to the treatment described in Section 3.4. A distribution shall be paid from the Unresolved Claims Reserve pursuant to Section 6.5 in respect of any Unresolved Affected Unsecured Claim that is finally determined to be a Proven Affected Unsecured Claim in accordance with the applicable Claims Order. Notwithstanding the foregoing: (i) NNUK shall be entitled to receive distributions hereunder on account of the Proven NNUK Claim pending final resolution of the Contingent Additional NNUK Claim; and (ii) Compensation Creditors holding Unresolved Affected Unsecured Claims shall be entitled to receive distributions on account of such Unresolved Affected Unsecured Claims solely to the extent portions thereof have been admitted or proven pursuant to the Compensation Claims Procedure Order.

### 3.10    Director/Officer Claims and the Directors' Indemnity and Directors' Charge

Under this Plan:

(a)     All Released Director/Officer Claims shall be fully, finally, irrevocably and forever compromised, released, discharged, cancelled and barred without consideration on the Plan Effective Date pursuant to the provisions of Article 7 of the Plan.  To the extent that any part of a Director/Officer Claim is a Non-Released Claim that part of the Director/Officer Claim will not be compromised, released, discharged, cancelled or barred.

(b)     The Directors' Charge shall be discharged and expunged on the Plan Effective Date and all rights of the Directors and Officers pursuant to paragraphs 20 and 21 of the Initial Order shall be released and discharged on the Plan Effective Date.

- 28 -

(c)     Subject to Section 3.10(d) and the rule against double proofs, any Claim of a Director or Officer for indemnification from the Canadian Debtors in respect of any Director/Officer Claim (including any subrogated claim by an insurer) ("**Director Indemnity Claim**") shall be treated for all purposes under this Plan as an Affected Unsecured Claim.

(d)     To the extent a Director Indemnity Claim is in respect of an Equity Claim or Equity Interest, such Director Indemnity Claim shall be treated for all purposes under this Plan as an Equity Claim.

### 3.11    Extinguishment of Claims

On the Plan Effective Date, in accordance with the terms of this Plan and in accordance with the provisions of the Sanction Order, the treatment of Affected Claims (including Proven Affected Unsecured Claims and Unresolved Affected Unsecured Claims) and all Released Claims, in each case as set forth herein, shall be final and binding on the Canadian Debtors, all Affected Creditors (and their respective heirs, executors, administrators, legal personal representatives, successors and assigns) and any Person holding a Released Claim, and all Affected Claims and all Released Claims shall be fully, finally, irrevocably and forever released, discharged, cancelled and barred, and the Released Parties shall thereupon have no further obligation whatsoever in respect of the Affected Claims and the Released Claims, as applicable; *provided that* nothing herein releases the Canadian Estate from the obligation to make distributions in the manner and to the extent provided for in the Plan and *provided further* that such discharge and release of the Canadian Debtors shall be without prejudice to the right of a Creditor in respect of an Unresolved Affected Unsecured Claim to prove such Unresolved Affected Unsecured Claim in accordance with the applicable Claims Order so that such Unresolved Affected Unsecured Claim may become a Proven Affected Unsecured Claim entitled to receive a distribution under Section 3.4 hereof.

### 3.12    Guarantees and Similar Covenants

No Person who has a Claim under any guarantee, surety, indemnity or similar covenant in respect of any Claim which is compromised and released under this Plan or who has any right to claim over in respect of or to be subrogated to the rights of any Person in respect of a Claim which is compromised under this Plan shall be entitled to any greater rights as against the Canadian Debtors than the Person whose Claim is compromised under the Plan. For the avoidance of doubt, nothing in this Section 3.12 shall limit the U.S. Debtors' rights pursuant to Section 3.5(c) hereof.

### 3.13    Set-Off

The law of set-off applies to all Claims in accordance with Applicable Law. Without limiting the generality of the foregoing, the Canadian Debtors shall be entitled to set-off from any distributions to be made to a Creditor hereunder any amounts due and owing to the Canadian Debtors from such Creditor, including on account of any cost award owing or that may become owing to the Canadian Debtors.

- 29 -

## ARTICLE 4
## ALLOCATION DISPUTE RESOLUTION, SETTLEMENT AND SUPPORT AGREEMENT AND RELATED PROVISIONS

### 4.1    Authority to Effectuate and Implement the Settlement and Support Agreement

This Plan and the Sanction Order authorizes and approves the execution, delivery and performance of the Settlement and Support Agreement by the Canadian Debtors and Monitor and the transactions and agreements contemplated therein, including the resolution of the Allocation Dispute contemplated therein and the granting of the Settlement and Support Agreement Releases, and the Canadian Debtors and Monitor are authorized and directed to take such additional steps and execute such additional documents as may be reasonably necessary to effectuate and implement the terms of the Settlement and Support Agreement. The failure of this Plan to incorporate a provision of the Settlement and Support Agreement shall not derogate from the enforceability of such provision.

### 4.2    Allocation and Distribution of the Sale Proceeds

Without limiting the generality of Section 4.1, on the Plan Effective Date the Canadian Debtors and Monitor shall be authorized and directed by the Plan, the Sanction Order and the Canadian Escrow Release Order to take such steps as may be reasonably necessary to effect the following distributions from the Escrow Accounts, all in accordance with and subject to the terms of the Settlement and Support Agreement, including Section 2 thereof:

(a)    payments of $35,000,000 to NNL, and $20,000,000 to NNI, shall be made from the Iceberg Escrow Account in satisfaction of the M&A Cost Reimbursement;

(b)    payments of $2,800,000 to NNI, and $2,200,000 to NNUK, shall be made from the Iceberg Escrow Account in satisfaction of the Iceberg Amendment Fee; and

(c)    after making the payments described in paragraphs (a) and (b) above, the Sale Proceeds shall be allocated and paid from the Escrow Accounts on and subject to the terms of the Settlement and Support Agreement as follows:

(i)    Canadian Debtors: 57.1065% (the "**Canadian Allocation**"), being $4,142,665,131 as at July 31, 2016;

(ii)    U.S. Debtors: 24.350%, being $1,766,417,002 as at July 31, 2016;

(iii)    EMEA Debtors (excluding NNUK and NNSA): 1.4859%, being $107,788,879 as at July 31, 2016;

(iv)    NNUK: 14.0249%, being $1,017,408,257 as at July 31, 2016, subject to adjustment as contemplated in Section 2(c)(v) of the Settlement and Support Agreement; and

(v)    NNSA: $220,000,000.

- 30 -

For the avoidance of doubt, all distributions from the Escrow Accounts (including the specific amounts to be distributed to each of the Canadian Debtors, the U.S. Debtors and the EMEA Debtors) shall be strictly in accordance with the Settlement and Support Agreement. To the extent of any conflict between the provisions of the Settlement and Support Agreement and this Plan as relates to distributions from the Escrow Accounts, the provisions of the Settlement and Support Agreement shall govern in all respects.

### 4.3    Release of Canada Only Sale Proceeds and Unavailable Cash

On the Plan Effective Date, all amounts held by NNL pursuant to the Canada Only Sale Proceeds Orders or held as Unavailable Cash by the Canadian Debtors shall be released to the Canadian Estate without any restriction whatsoever, and shall be used to fund the distributions and reserves contemplated under this Plan.

### 4.4    Canadian Pension Claims

The Canadian Pension Claims are Affected Unsecured Claims. The total Proven Affected Unsecured Claim under this Plan on account of the Managerial Plan shall be CA$1,368,644,000, and the total Proven Affected Unsecured Claim on account of the Negotiated Plan shall be CA$520,835,000.

### 4.5    Crossover Bondholder Claims

A Crossover Bondholder Claim is an Affected Unsecured Claim.  The aggregate total of all Proven Affected Unsecured Claims against the Canadian Estate on account of the Crossover Bonds under this Plan shall be $3,940,750,260, with the individual Proven Affected Unsecured Claims on account of the Crossover Bonds being as set forth on Schedule "B". Distributions on account of the Proven Affected Unsecured Claims relating to the Crossover Bonds shall be made as provided for in Section 6.3(b).

### 4.6    NNCC Bondholder Claim

An NNCC Bondholder Claim is an Affected Unsecured Claim.  The total Proven Affected Unsecured Claims on account of the NNCC Bonds under this Plan shall be $150,951,562. Distributions on account of the Proven Affected Unsecured Claims relating to the NNCC Bonds shall be made as provided for in Section 6.3(b).

### 4.7    UKPI Claim

The Claims of the UKPI are Affected Unsecured Claims. UKPI shall have a single Proven Affected Unsecured Claim under this Plan in the amount of £339,750,000 (being $494,879,850 when converted to U.S. dollars in accordance with this Plan).

### 4.8    EMEA Debtors' Claims

The Claims of the EMEA Debtors are Affected Unsecured Claims. In accordance with the EMEA Claims Settlement Agreement: (i) NNUK shall have a Proven Affected Unsecured Claim under the Plan in the amount of $97,655,094 (the "**Proven NNUK Claim**"), the amount of which may increase to $122,655,094 solely in the circumstances set out in Section 2.2 of the EMEA

- 31 -

Claims Settlement Agreement (such additional contingent claim, the "**Contingent Additional NNUK Claim**"); and (ii) Nortel Networks SpA shall have a Proven Affected Unsecured Claim under the Plan in the amount of $2,344,906.

### 4.9    NNI Claims

In accordance with the CFSA: (i) NNI shall have a Proven Affected Unsecured Claim under the Plan in the amount of $2,000,000,000; and (ii) a Proven Priority Claim of $62,700,000 on account of the Remaining Revolver Claim ((i) and (ii), collectively, the "**NNI Claim**"). Notwithstanding Section 3.13, in accordance with the CFSA and the CFSA Approval Order, the NNI Claim shall not be subject to set-off, off set, deduction, counterclaim, reduction, or challenge as to amount or validity.

### 4.10    Intercompany Claims

Intercompany Claims are Affected Unsecured Claims (excluding, for the avoidance of doubt, the Canadian Intercompany Claims and the Remaining Revolver Claim). The total Proven Affected Unsecured Claims on account of Intercompany Claims under this Plan shall be as set forth on Schedule "C" (without duplication for the Proven Affected Unsecured Claims of the EMEA Debtors and U.S. Debtors that are referred to in Section 4.8 and Section 4.9, respectively).

### 4.11    Bondholder Group Fees

The aggregate amount of fees under the Bondholder Advisor Fee Letter to be deducted from distributions to Crossover Bondholders and NNCC Bondholders under this Plan in respect of their Proven Affected Unsecured Claims against the Canadian Estate shall be $47,000,000 (the "**Bondholder Fee Amount**") (which includes $3,000,000 in respect of the deferred compensation fee payable to FTI Capital Advisors, LLC).   An additional $7,000,000 (the "**Additional Bondholder Fee Amount**") shall be deducted from Canadian Estate distributions under this Plan to Crossover Bondholders and NNCC Bondholders on account of their Proven Affected Unsecured Claims in further payment of the deferred compensation fee payable to FTI Capital Advisors, LLC if the Canadian Estate is so directed in writing by all of the Crossover Bondholders and NNCC Bondholders who are Participating Creditors under the Settlement and Support Agreement. All such deductions shall be borne by the Crossover Bondholders and the NNCC Bondholders on a pro rata basis based on the amount of the Proven Affected Unsecured Claims of the Crossover Bondholders and the NNCC Bondholders. The deduction of the Bondholder Fee Amount from distributions to Crossover Bondholders and NNCC Bondholders shall be effected in the manner contemplated in Section 3.4(b) hereof. If the Canadian Estate is so directed as contemplated pursuant to this Section 4.11, the deduction of the Additional Bondholder Fee Amount from distributions to Crossover Bondholders and NNCC Bondholders shall be deducted in full from the distributions to be made for the benefit of the Crossover Bondholders and NNCC Bondholders on the Initial Distribution Date as contemplated pursuant to Section 3.4(b)(iv).

- 32 -

### 4.12   Other Canadian Fees

The Canadian Debtors will not pay voluntarily, or seek permission to pay, legal or advisor fees of any stakeholder that the Canadian Debtors are not currently paying. Payment of any such further legal or advisor fees will be done only pursuant to an order of the CCAA Court.

### 4.13   Settlement and Support Agreement Releases

The Settlement and Support Agreement Releases given and received by the Canadian Debtors and the Monitor are authorized and approved pursuant to this Plan and incorporated herein by reference. The Settlement and Support Agreement Releases shall be binding on and enure to the benefit of the Canadian Debtors (including the Canadian Estate), the Monitor, the other Settlement Parties, the Participating Creditors and their respective employees, officers, directors, agents, advisors, lawyers, successors and assigns and the directors and officers, both former and current, of any Nortel Group entity pursuant to this Plan as if set out herein in full.

## ARTICLE 5
## CASH POOLS AND RESERVES

### 5.1   Administrative Reserve

On the Plan Implementation Date, the Canadian Estate shall establish the Administrative Reserve and thereafter hold the Administrative Reserve and use the Administrative Reserve to fund the ongoing administration and wind-down of the Canadian Estate. Any balance remaining in the Administrative Reserve at the conclusion of the CCAA Proceedings shall be distributed in accordance with Section 6.11.

### 5.2   Affected Unsecured Creditor Pool

Following the Plan Implementation Date, prior to the Initial Distribution Date and prior to all subsequent Distribution Dates, the Canadian Estate shall establish an Affected Unsecured Creditor Pool. On the Initial Distribution Date and any subsequent Distribution Dates, the Canadian Estate shall distribute the Affected Unsecured Creditor Pool to Affected Unsecured Creditors on and subject to the terms of Article 6.

### 5.3   Unresolved Claims Reserve

Following the Plan Implementation Date, prior to the Initial Distribution Date, the Canadian Estate shall establish the Unresolved Claims Reserve. The Canadian Estate shall maintain and distribute the Unresolved Claims Reserve in accordance with the provisions of Section 6.5.

### 5.4   Bank Accounts, Reserves and Cash Pools Generally

The reserves and cash pools contemplated pursuant to this Article 5 are notional only, and neither the Canadian Estate nor the Monitor shall have any obligation to establish separate accounts or funds, or to otherwise segregate Available Cash, in respect of any of the Administrative Reserve, an Affected Unsecured Creditor Pool, the Unresolved Claims Reserve or any other reserve, cash pool, fund, payment or distribution contemplated hereunder, provided that the Canadian Estate and the Monitor shall maintain appropriate records in respect of the

- 33 -

calculation and determination of all such reserves and cash pools. Following the Plan Effective Date, the Canadian Estate, with the assistance of the Monitor, shall work to consolidate and hold all Available Cash in the Canadian Estate's U.S. dollar and Canadian dollar operating bank accounts, as applicable.


# ARTICLE 6
# PROVISIONS REGARDING DISTRIBUTIONS, PAYMENTS AND CURRENCY

### 6.1    Distributions Generally

All distributions to Affected Creditors and other payments to be effected pursuant to this Plan shall be made by the Canadian Estate pursuant to this Article 6 and shall occur in the manner set out in this Article 6 under the supervision of the Monitor.  Distribution Dates shall be set from time to time by and at the discretion of the Monitor, provided that: (i) the Initial Distribution Date shall be no more than sixty (60) days after the Plan Implementation Date; and (ii) the Monitor shall set a Distribution Date within ninety (90) days of the date (the "**Determination Date**") it determines the Available Cash of the Canadian Estate is sufficient to establish an Affected Unsecured Creditor Pool of not less than $150,000,000, provided that if the Monitor believes the Canadian Estate will be in a position to make a Final Distribution within six (6) months of the Determination Date, it shall be authorized to delay such Distribution Date for up to six (6) months from the Determination Date in order to attempt to complete a Final Distribution. Notwithstanding any other provision of this Plan, any distribution to a Compensation Creditor (including the distributions contemplated pursuant to Section 6.2(b) hereof) will be subject to the Canadian Estate and Monitor first obtaining EI Confirmation in respect of such Compensation Creditor as well as resolving any issues regarding applicable withholdings in respect of such distribution to the satisfaction of the Canadian Estate and the Monitor, acting reasonably. For the avoidance of doubt, all distributions to Creditors and other payments to be made hereunder shall be subject to satisfaction or waiver of the Plan Implementation Conditions specified in Section 9.3 hereof and the occurrence of the Plan Implementation Date. Notwithstanding any provision of the Claims Orders, but subject to Section 6.3(b)(i) to Section 6.3(b)(iii), all distributions pursuant to this Plan on account of Proven Affected Unsecured Claims shall be made to the holder of such Proven Affected Unsecured Claim on file with the Monitor as at the Plan Effective Date.

### 6.2    Certain Payments and Distributions on Proven Priority Claims

(a)    Within five (5) Business Days of the Plan Implementation Date the Canadian Estate shall make the following payments and distributions by wire transfer of immediately available funds in full satisfaction and discharge of the following:

(i)    $62,700,000 to NNI in full satisfaction of the Remaining Revolver Claim; and

(ii)    $77,500,000 to NNI in full satisfaction of the payment contemplated by Section 4(e) of the Settlement and Support Agreement, which payment shall not be subject to set-off pursuant to Section 3.13.

- 34 -

(b)     On the Initial Distribution Date, the Canadian Estate shall make a distribution of CA$3,000 (subject to applicable withholdings) to each Former Employee Priority Creditor in full satisfaction and discharge of his or her Proven Priority Claim in respect of any entitlement to a Termination Payment. This distribution shall be made in addition to any distributions to that Former Employee Priority Creditor in respect of his or her Proven Affected Unsecured Claim as contemplated by Section 6.3.

(c)     Any distributions on account of Proven Priority Claims other than those Proven Priority Claims specified in Sections 6.2(a)(i) and 6.2(b) shall be made at the time and in the manner as may be determined by the Monitor, or as may be ordered by the CCAA Court.

(d)     For the avoidance of doubt, all payments and distributions pursuant to this Section 6.2 shall be subject to satisfaction or waiver of the Plan Implementation Conditions specified in Section 9.3 hereof and the occurrence of the Plan Implementation Date.

**6.3     Distribution Mechanics for Proven Affected Unsecured Claims**

(a)     Prior to the Initial Distribution Date and each subsequent Distribution Date, the Monitor shall calculate the Pro-Rata Share to be paid to each Affected Unsecured Creditor with a Proven Affected Unsecured Claim.

(b)     Subject in all cases to Article 3 and Sections 4.11, 6.1, 6.3(c), 6.4 and 6.8 hereof, the Canadian Estate shall, on or about the respective Distribution Date, cause to be distributed from the Affected Unsecured Creditor Pool to each Affected Unsecured Creditor with a Proven Affected Unsecured Claim its Pro-Rata Share by way of (in the sole discretion of the Monitor): (i) cheque sent by prepaid ordinary mail to the address on file with the Monitor on the date that is twenty-one (21) days after notice of a Distribution Date is given by the Monitor by notice posted on the Monitor's Website (a "**Distribution Record Date**"); or (ii) wire transfer of immediately available funds to an account designated in writing by the Creditor to the Monitor (with any wire transfer or similar fee being satisfied from the distribution amount), provided that distributions on account of the 1988 Bondholder Claims, the Crossover Bondholder Claims and NNCC Bondholder Claims, shall be made as follows on or about the respective Distribution Date:

   (i)     1988 Bondholder Claims – Distributions for the benefit of the 1988 Bondholders on account of the 1988 Bondholder Claims shall be made to the 1988 Bonds Trustee by wire transfer of immediately available funds to an account designated in writing by the 1988 Bonds Trustee to the Monitor (with any wire transfer or similar fee being satisfied from the distribution amount). The 1988 Bonds Trustee shall administer such distributions as soon as is reasonably practicable in accordance with the 1988 Bonds Indenture and this Plan, including Section 6.6, and such distributions shall remain subject to the 1988 Bonds Trustee's charging lien against distributions to holders of 1988 Bondholder Claims for

payment of the 1988 Bonds Trustee's reasonable fees and expenses, including all reasonable fees and expenses of its counsel and other professionals and including the fees and expenses incurred by the 1988 Bonds Trustee in making all distributions to holders of 1988 Bondholder Claims. Receipt by the 1988 Bonds Trustee of distributions for the benefit of the 1988 Bondholders shall be deemed to constitute receipt of all such distributions by the 1988 Bondholders.

(ii)    <u>Crossover Bondholder Claims</u> - Distributions for the benefit of the Crossover Bondholders on account of the Crossover Bondholder Claims shall be made to the Crossover Bonds Trustee by wire transfer of immediately available funds to an account (or accounts) designated in writing by the Crossover Bonds Trustee to the Monitor (with any wire transfer or similar fee being satisfied from the distribution amount). The Crossover Bonds Trustee shall administer such distributions as soon as is reasonably practicable in accordance with this Plan, including Section 6.6, and such distributions shall remain subject to the Crossover Bonds Trustee's charging lien against distributions to holders of Crossover Bondholder Claims for payment of the Crossover Bonds Trustee's reasonable fees and expenses, including all reasonable fees and expenses of its counsel and other professionals and including the fees and expenses incurred by the Crossover Bonds Trustee in making all distributions to holders of Crossover Bonds. Receipt by the Crossover Bonds Trustee of distributions for the benefit of the Crossover Bondholders shall be deemed to constitute receipt of all such distributions by the Crossover Bondholders.

(iii)    <u>NNCC Bondholder Claims</u> - Distributions for the benefit of the NNCC Bondholders on account of the NNCC Bondholder Claims shall be made to the NNCC Bonds Trustee by wire transfer of immediately available funds to an account (or accounts) designated in writing by the NNCC Bonds Trustee to the Monitor (with any wire transfer or similar fee being satisfied from the distribution amount). The NNCC Bonds Trustee shall administer such distributions as soon as is reasonably practicable in accordance with the NNCC Bonds Indenture and this Plan, including Section 6.6, and such distributions shall remain subject to the NNCC Bonds Trustee's charging lien against distributions to holders of NNCC Bondholder Claims for payment of the NNCC Bonds Trustee's reasonable fees and expenses, including all reasonable fees and expenses of its counsel and other professionals and including the fees and expenses incurred by the NNCC Bonds Trustee in making all distributions to holders of NNCC Bonds. Receipt by the NNCC Bonds Trustee of distributions for the benefit of the NNCC Bondholders shall be deemed to constitute receipt of all such distributions by the NNCC Bondholders.

(c)    In accordance with the terms of the Hardship Process, any payments made to a Compensation Creditor pursuant to the Hardship Process shall be deducted, dollar

- 36 -

for dollar, from any distributions to such Compensation Creditor pursuant to this Plan.

### 6.4    Currency Matters

(a)    For the purposes of voting on the Plan, calculating the Required Majority and other calculations in this Plan that involve a totalling of, or other calculation involving, Affected Unsecured Claims or Proven Affected Unsecured Claims, including in factors A and B of the calculation of any Pro-Rata Share, all Claims (including Proven Affected Unsecured Claims) shall be valued in U.S. dollars and all non-U.S. dollar denominated Claims (or portions thereof) will be converted into U.S. dollars by the Monitor at the exchange rates set out at Appendix "A" to the Claims Procedure Order, a copy of which is attached at Schedule "D" hereto. For the avoidance of doubt, for purposes of effecting the foregoing conversions, any non-Canadian dollar and non-U.S. dollar denominated claims shall first be converted to Canadian dollars at the exchange rate specified on Schedule "D" hereto, and then such Canadian dollar amount shall be converted to U.S. dollars at the exchange rate specified on Schedule "D" hereto.

(b)    For the purposes of determining factor C of any Pro-Rata Share calculations, any Canadian dollar denominated Cash in the Affected Unsecured Creditor Pool shall be valued in U.S. dollars at: (i) in the case of Canadian dollar denominated Cash received by the Canadian Estate from the Canadian Dollar Escrow Account, the Applicable FX Rate; and (ii) in the case of all other Canadian dollar denominated Cash held or received by the Canadian Estate, the then applicable foreign exchange rate between Canadian and U.S. dollars at the time of making the Pro-Rata Share calculation. All Canadian dollar denominated Cash in the Affected Unsecured Creditor Pool and distributed on account of CAD Claims shall be deemed to first be taken and made from the Canadian dollar denominated Cash received by the Canadian Estate from the Canadian Dollar Escrow Account.

(c)    Distributions to Creditors holding Proven Affected Unsecured Claims predominately denominated in Canadian dollars ("**CAD Claims**") shall be paid in Canadian dollars, and distributions to all other Creditors holding Proven Affected Unsecured Claims shall be paid in U.S. dollars. For purposes of determining the amount of Canadian dollars to be paid by the Canadian Estate on distributions on a CAD Claim, the amount of such distribution in U.S. dollars (i.e. the relevant Pro-Rata Share in U.S. dollars) shall be converted to Canadian dollars at the Applicable FX Rate. A Proven Affected Unsecured Claim is considered "predominantly denominated" in Canadian dollars if more than fifty percent (50%) of such Proven Affected Unsecured Claim is denominated in Canadian dollars.

(d)    The Canadian Estate and the Monitor shall be authorized to effect such exchange(s) of currency between Canadian dollars and U.S. dollars as may be necessary to effect the distributions and other payments (including in respect of the continuing administration of the Canadian Estate) contemplated pursuant to this Plan in the currency contemplated for such distributions or payments.

- 37 -

### 6.5    Distributions After Unresolved Affected Unsecured Claims and Post-Filing Claims Resolved

(a)    The Canadian Estate shall hold the Unresolved Claims Reserve (as may be reduced from time to time as contemplated pursuant to Section 6.5(b) and Section 6.5(c)) until the final determination of all Unresolved Affected Unsecured Claims and Post-Filing Claims in accordance with the applicable Claims Order and this Plan.

(b)    To the extent that an Unresolved Affected Unsecured Claim becomes a Proven Affected Unsecured Claim in accordance with this Plan, the Canadian Estate shall distribute to the holder of such Proven Affected Unsecured Claim, on or before the next following Distribution Date, an amount from the Unresolved Claims Reserve equal to the Pro-Rata Share that such Affected Unsecured Creditor would have been entitled to receive in respect of its Proven Affected Unsecured Claim on the previous Distribution Date(s) had such Unresolved Affected Unsecured Claim been a Proven Affected Unsecured Claim on such Distribution Date(s).

(c)    After an Unresolved Affected Unsecured Claim or Post-Filing Claim has been finally resolved in accordance with the applicable Claims Order and any required distributions contemplated in Sections 6.2(c) or 6.5(b) have been made with respect to such claim, any remaining Cash held in the Unresolved Claims Reserve in respect of such Unresolved Affected Unsecured Claim or Post-Filing Claim shall no longer be held in the Unresolved Claims Reserve and shall become Available Cash.

### 6.6    Allocation of Distributions

All distributions made pursuant to the Plan shall be allocated first towards the repayment of the amount of the Proven Affected Unsecured Claim or Proven Priority Claim, as applicable, attributable to principal and, if greater than the amount of principal, second, towards the repayment of any amount of such Proven Affected Unsecured Claim or Proven Priority Claim attributable to unpaid interest.

### 6.7    Treatment of Undeliverable Distributions

If any distribution to a Creditor under this Article 6 is returned as undeliverable (an "**Undeliverable Distribution**"), no further distributions to such Creditor shall be made unless and until the Monitor is notified in writing by such Creditor of such Creditor's current address, at which time all such distributions shall be made to such Creditor.  Upon the Monitor becoming aware of an Undeliverable Distribution, the Canadian Estate shall, prior to the next following Distribution Date, reserve from the Affected Unsecured Creditor Pool the amount of Cash equal to the Undeliverable Distribution.  All claims for an Undeliverable Distribution existing prior to the Final Distribution must be made in writing to the Monitor (in the manner contemplated by Section 11.10 hereof) on or before the date that is thirty (30) days following the date the Monitor posts a copy of the Final Distribution Certificate on the Monitor's Website, after which date any entitlement with respect to any Undeliverable Distributions shall be forever discharged and forever barred, without any compensation therefor, notwithstanding any federal, state or

- 38 -

provincial laws to the contrary, and the amount of any Undeliverable Distributions shall be included in the Affected Unsecured Creditor Pool for distribution on the Final Distribution. Any Undeliverable Distributions remaining following the Final Distribution shall be dealt with in such manner as the CCAA Court may direct.  Nothing herein shall require the Canadian Estate or the Monitor to attempt to locate any Creditor or other Person with respect to an Undeliverable Distribution. No interest shall be payable in respect of an Undeliverable Distribution. Following each Distribution Date, the Canadian Estate, the Monitor and the U.S. Debtors shall exchange information and consult with one another with respect to any Undeliverable Distributions on account of Crossover Claims.

<b>6.8      Withholding Rights</b>

The Canadian Estate and any other Person facilitating distributions hereunder shall be entitled to deduct and withhold from any distribution or payment to any Person pursuant to this Plan such amounts as may be required to be deducted or withheld with respect to such distribution or payment under the Canadian Tax Act or other Applicable Laws and to remit such amounts to the appropriate Taxing Authority or other Person entitled thereto. To the extent that amounts are so withheld or deducted and remitted to the appropriate Taxing Authority or other Person, such withheld or deducted amounts shall be treated for all purposes hereof as having been paid to such Person as the remainder of the distribution or payment in respect of which such withholding or deduction was made. Without in any way limiting the generality of the foregoing, the Canadian Estate shall deduct from any distribution to a Creditor hereunder any amounts as indicated by Employment and Social Development Canada in an EI Confirmation, and remit such amounts to Employment and Social Development Canada pursuant to the EI Act. Any Creditor whose address on file with the Monitor on the Distribution Record Date for the Initial Distribution is not a Canadian address shall be treated as a non-resident of Canada for purposes of any applicable non-resident withholding Tax on all distributions hereunder, subject to receipt by the Monitor of information satisfactory to it (in its sole discretion) that such Creditor is not a non-resident. No gross-up or additional amount will be paid on any distribution or payment hereunder to the extent the Canadian Estate or any other Person deducts or withholds amounts pursuant to this Section 6.8 (it being understood, for the avoidance of doubt, that this sentence shall have no impact on any such gross-up amount proven as part of a Proven Affected Unsecured Claim in accordance with the Claims Orders).

<b>6.9      Cancellation of Certificates and Notes, etc.</b>

On the Plan Effective Date, all debentures, notes, certificates, indentures, guarantees, agreements, invoices and other instruments evidencing Affected Claims, including the 1988 Bonds, the 1988 Bonds Indenture, the Crossover Bonds, the Crossover Bonds Indenture, the NNCC Bonds and the NNCC Bonds Indenture (and all guarantees associated with each of the foregoing), will not entitle any holder thereof to any compensation or participation other than as expressly provided for in the Plan and shall be deemed cancelled  and extinguished and be null and void. Notwithstanding the foregoing: (a) the 1988 Bonds Indenture, the Crossover Bonds Indenture and the NNCC Bonds Indenture shall remain in effect solely for the purpose of and to the extent necessary to: (i) allow the relevant Indenture Trustee to make distributions as contemplated in Section 6.3(b) above; (ii) maintain all of the protections the Indenture Trustees enjoy with respect to carrying out their duties thereunder against the beneficial holders, including lien rights with respect to any distributions contemplated in Section 6.3(b) under this Plan, until

all such distributions are made; (iii) preserve the rights of the 1988 Bondholders, the Crossover Bondholders and the NNCC Bondholders to receive distributions pursuant to this Plan; and (iv) allow and preserve the rights of the Crossover Bonds Trustee, the Crossover Bondholders, the NNCC Bonds Trustee and the NNCC Bondholders to pursue their claims in the U.S. Proceedings; and (b) the Canadian Registered Pension Plans shall remain in effect solely for the purposes of and to the extent necessary to permit the continuing administration and wind-up of the Canadian Registered Pension Plans.

### 6.10    Calculations

All amounts to be paid by the Canadian Estate hereunder will be calculated by the Monitor. All calculations made by the Monitor shall be conclusive, final and binding upon the Affected Creditors, the Canadian Estate and all other Persons, absent manifest error.

### 6.11    Final Distribution

After (i) all Unresolved Affected Unsecured Claims, Post-Filing Claims and any other Claims (excluding, for the avoidance of doubt, any Equity Claims) have been finally resolved; (ii) any remaining Cash held in the Unresolved Claims Reserve has been transferred into the Affected Unsecured Creditor Pool; and (iii) the administration and wind-down matters set out in Article 10 have been substantially completed, the Monitor shall set a Distribution Date for the purposes of effecting a final distribution of Available Cash to Affected Unsecured Creditors with Proven Affected Unsecured Claims (the "**Final Distribution**"). The Final Distribution shall include, among other things, any remainder of the Administrative Reserve (except for an amount to be set aside for fees and costs to be incurred by or on behalf of the Monitor (including the fees and expenses of the Monitor's counsel) in effecting the Final Distribution, the completion of any remaining administration matters and the discharge of the Monitor). After completing the Final Distribution and upon being granted a discharge and release, the Monitor shall pay any remaining Cash of the Canadian Estate, including any Cash on account of Undeliverable Distributions remaining following the Final Distribution, as the CCAA Court may direct.

### ARTICLE 7
### RELEASES

### 7.1    Plan Releases

On the Plan Effective Date: (i) the Canadian Debtors (including the Canadian Estate) and their respective current and former employees, auditors, financial advisors, legal counsel and agents (in each case, in that capacity only); (ii) the Directors and Officers; and (iii) the Monitor, the Monitor's legal counsel, and each and every current and former shareholder, affiliate, affiliate's shareholder, director, officer, member (including members of any committee or governance council), partner, employee, auditor, financial advisor and agent of any of the foregoing Persons (in each case, in that capacity only) (each of the Persons specified in (i), (ii) or (iii) of this Section 7.1, in their capacity as such, being herein referred to individually as a "**Released Party**" and collectively referred to as the "**Released Parties**") shall be fully, finally and irrevocably released and discharged from any and all Released Claims and all Released Claims shall be fully, finally, irrevocably and forever waived, discharged, released, cancelled and barred as against the

- 40 -

Released Parties, all to the fullest extent permitted by Applicable Law. Notwithstanding the foregoing, nothing herein shall release or discharge Non-Released Claims.

For the purposes of the foregoing:

(a)     "**Released Claims**" means any and all demands, claims, actions, causes of action, counterclaims, suits, debts, sums of money, liabilities, accounts, covenants, damages, judgments, orders (including for injunctive relief or specific performance and compliance orders), expenses, executions, Encumbrances and recoveries on account of any liability, obligation, demand or cause of action of whatever nature, including claims for contribution or indemnity, which any Creditor or other Person has or may be entitled to assert (including any and all of the foregoing in respect of the payment and receipt of proceeds and statutory or common law liabilities of directors or officers, and any alleged fiduciary, statutory or other duty (in any capacity whatsoever)), whether known or unknown, matured or unmatured, direct, indirect or derivative, at common law, equity or under statute, foreseen or unforeseen, existing or hereafter arising, based in whole or in part on any act, omission, transaction, duty, responsibility, indebtedness, liability, obligation, dealing, matter or occurrence existing or taking place on or prior to the Plan Effective Date, or such later date as actions are taken to implement the Plan, that in any way relate to, or arise out of or in connection with, any Claims, any Director/Officer Claims, the business and affairs of the Canadian Debtors or the Nortel Group whenever, wherever or however conducted, the administration and/or management of the Canadian Debtors or the Nortel Group, the CCAA Proceedings or any matter or transaction involving any of the Canadian Debtors occurring in or in connection with the CCAA Proceedings, including the Plan or the development thereof, but excluding Non-Released Claims; and

(b)     "**Non-Released Claims**" means, collectively: (i) the Canadian Estate's obligations under this Plan (including the right of Affected Unsecured Creditors to receive distributions pursuant to this Plan in respect of Proven Affected Unsecured Claims), the Settlement and Support Agreement, the Records Assistance Side Letter and the Personnel Files Agreement; (ii) any claim against a Released Party if the Released Party is determined by a Final Order of a court of competent jurisdiction to have committed fraud or wilful misconduct; (iii) solely as against a Director in his or her capacity as such, any Director/Officer Claim that is not permitted to be released pursuant to Section 5.1(2) of the CCAA; (iv) the Canadian Intercompany Claims; (v) the rights of the Canadian Debtors and the U.S. Debtors preserved in Section 8(b)(iii) of the Settlement and Support Agreement; and (vi) any obligation secured by the Administration Charge.

### 7.2     Insured Claims

Notwithstanding anything to the contrary in Section 7.1, Insured Claims shall not be compromised, released, discharged, cancelled and barred by this Plan, provided that from and after the Plan Effective Date, any Person having an Insured Claim shall be irrevocably limited to recovery in respect of such Insured Claim solely from the proceeds of the applicable Insurance

- 41 -

Policies, and Persons with any Insured Claim shall have no right to, and shall not, directly or indirectly, make any claim or seek any recoveries from any Released Party or their assets, other than enforcing such Person's rights to be paid by the applicable insurer(s) from the proceeds of the applicable Insurance Policies.

### 7.3    Injunctions

From and after the Plan Effective Date, all Persons are permanently and forever barred, estopped, stayed and enjoined, with respect to any and all Released Claims, from: (i) commencing, conducting, continuing or making in any manner, directly or indirectly, any action, suit, claim, demand or other proceeding of any nature or kind whatsoever (including any proceeding in a judicial, arbitral, administrative or other forum) against the Released Parties; (ii) enforcing, levying, attaching, collecting or otherwise recovering or enforcing by any manner or means, directly or indirectly, any judgment, award, decree or order against the Released Parties or their property; (iii) commencing, conducting, continuing or making in any manner, directly or indirectly, any action, suit, claim, demand or other proceeding of any nature or kind whatsoever (including any proceeding in a judicial, arbitral, administrative or other forum) against any Person who makes a claim or might reasonably be expected to make a claim, in any manner or forum, including by way of contribution or indemnity or other relief, against one or more of the Released Parties; (iv) creating, perfecting, asserting or otherwise enforcing, directly or indirectly, any lien or Encumbrance of any kind against the Released Parties or their property; or (v) taking any actions to interfere with the implementation or consummation of this Plan.

### ARTICLE 8
### COURT SANCTION

### 8.1    Application for Sanction Order

If the Required Majority approves the Plan, the Monitor and the Canadian Debtors shall apply for the Sanction Order and the Canadian Escrow Release Order on or before the date set for the hearing of the Sanction Order or such later date as the CCAA Court may set.

### 8.2    Sanction Order

The Sanction Order shall, among other things:

(a)    effect the substantive consolidation of the Canadian Debtors into the Canadian Estate on the terms contemplated by Section 2.2 hereof, including vesting all of the assets of the Other Canadian Debtors in NNL (excluding any Canadian Intercompany Claims held by the Other Canadian Debtors), deeming all Proven Affected Unsecured Claims (whether now existing or hereafter coming into existence) against the Other Canadian Debtors to be claims against NNL and barring and extinguishing all Duplicative Claims;

(b)    declare that (i) the Plan has been approved by the Required Majority in conformity with the CCAA; (ii) the activities of the Canadian Debtors have been in reasonable compliance with the provisions of the CCAA and the Orders of the CCAA Court made in this CCAA Proceeding in all respects; (iii) the CCAA

- 42 -

Court is satisfied that the Canadian Debtors have not done or purported to do anything that is not authorized by the CCAA; and (iv) the Plan and the transactions contemplated thereby are fair and reasonable;

(c)     declare that the Settlement and Support Agreement is fair and reasonable and authorize and direct the Canadian Debtors and the Monitor to perform their obligations under the Settlement and Support Agreement and carry out the transactions contemplated thereby;

(d)     approve and authorize the giving of the Settlement and Support Agreement Releases by the Canadian Debtors and the Monitor;

(e)     declare that the Plan and all associated steps, compromises, transactions, arrangements, releases and reorganizations effected thereby are approved, binding and effective, subject to the terms set out in the Plan, upon and with respect to the Canadian Debtors, all Affected Creditors, the Directors and Officers, any Person with a Released Director/Officer Claim, the Released Parties and all other Persons named or referred to in, or subject to, the Plan;

(f)     as of the Plan Effective Date, compromise, discharge and release the Canadian Debtors from any and all Affected Claims of any nature in accordance with the Plan, and declare that the ability of any Person to proceed against any one or more of the Canadian Debtors in respect of or relating to any Affected Claims shall be forever discharged and restrained, and all proceedings with respect to, in connection with or relating to such Affected Claims be permanently stayed, subject only to the right of Affected Creditors to receive distributions pursuant to the Plan in respect of their Affected Claims (to the extent they become Proven Affected Unsecured Claims);

(g)     as of the Plan Effective Date, subject to Section 7.2, compromise, discharge and release the Directors and Officers from any and all Released Claims of any nature in accordance with the Plan, and declare that the ability of any Person to proceed against the Directors and Officers (or any of them) in respect of or relating to any Released Claim shall be forever discharged and restrained, and all proceedings with respect to, in connection with or relating to such Released Claims be permanently stayed;

(h)     as of the Plan Effective Date, discharge and release the Released Parties on the terms set forth in Article 7 hereof and implement the injunctions contemplated thereby;

(i)     as of the Plan Effective Date, bar, stop, stay and enjoin the commencing, taking, applying for or issuing or continuing of any and all steps or proceedings, including without limitation, administrative hearings and orders, declarations or assessments, commenced, taken or proceeded with or that may be commenced, taken or proceeded with against any Released Party in respect of all Released Claims and any matter which is released pursuant to Article 7 hereof;

- 43 -

(j)　　authorize the Canadian Estate and the Monitor to perform their obligations and functions under the Plan, including the establishment of the Administrative Reserve and the Unresolved Claims Reserve, and to perform all such other acts and execute such documents as may be required in connection with the foregoing;

(k)　　authorize the Monitor to continue its administration and wind-down of the Canadian Estate in accordance with the Monitor's Powers Orders and the Plan;

(l)　　declare that no shareholder approval is required in respect of the Settlement and Support Agreement, the Plan or any transaction or act contemplated thereby;

(m)　　authorize and direct that all amounts held by NNL pursuant to the Canada Only Sale Proceeds Orders or held as Unavailable Cash by the Canadian Debtors shall form part of the Available Cash without any restriction thereon;

(n)　　declare that each of the Charges (except for the Administration Charge) shall be terminated, discharged, expunged and released on the Plan Effective Date, subject to, in the case of the Inter-company Charge (but solely to the extent it benefits NNI), payment of the Remaining Revolver Claim as contemplated pursuant to Section 6.2(a) hereof;

(o)　　declare that the tolling of any Claims, Director/Officer Claims or other claims or rights pursuant to prior orders of the CCAA Court shall cease on the Plan Effective Date, without prejudice to the rights all Affected Unsecured Creditors with Proven Affected Unsecured Claims (whether now existing or hereafter coming into existence) to receive all distributions contemplated by this Plan;

(p)　　order that the CCAA stay of proceedings provided for in the Initial Order shall be extended indefinitely, subject to further order of the CCAA Court, and provided that the Monitor shall serve on the service list in the CCAA Proceedings and file with the CCAA Court a report on the progress of the continuing administration and wind-down of the Canadian Estate, including the implementation of this Plan, on no less than an annual basis;

(q)　　declare that any obligation of the Monitor to provide cash flow forecasting or reconciliations and monthly claims reporting (whether pursuant to paragraph 11 of the Claims Resolution Order dated September 16, 2010, or any other agreement or order) shall cease as at the Plan Effective Date, provided that the Monitor shall provide cash flow reporting and claims reporting in the reports contemplated in the foregoing subsection;

(r)　　provide for the termination of the Hardship Process and that all remaining amounts relating to the Hardship Process shall become Available Cash on the Plan Effective Date;

(s)　　authorize and effect the matters contemplated pursuant to Section 10.2　and Section 11.12 hereof;

- 44 -

(t)     declare that, notwithstanding: (i) the pendency of this proceeding; (ii) any applications for a bankruptcy, receivership or other order now or hereafter issued pursuant to the BIA, the CCAA or otherwise in respect of any of the Canadian Debtors and any bankruptcy, receivership or other order issued pursuant to any such applications; and (iii) any assignment in bankruptcy made or deemed to be made in respect of any of the Canadian Debtors, the transactions contemplated by this Plan and by the Settlement and Support Agreement shall be binding on any trustee in bankruptcy or receiver that may be appointed in respect of the Canadian Debtors or their assets and shall not be void or voidable by creditors of the Canadian Debtors, nor shall the Plan, the Settlement and Support Agreement or the payments and distributions contemplated pursuant thereto constitute nor be deemed to constitute a fraudulent preference, assignment, fraudulent conveyance, transfer at undervalue, or other reviewable transaction under the BIA, CCAA or any other applicable federal or provincial legislation, nor shall the Plan or the Settlement and Support Agreement constitute oppressive or unfairly prejudicial conduct pursuant to any applicable federal or provincial legislation; and

(u)     declare that the Canadian Debtors and the Monitor may apply to the CCAA Court for advice and direction in respect of any matters arising from or in relation to this Plan.

## ARTICLE 9
## PLAN CONDITIONS PRECEDENT AND IMPLEMENTATION

### 9.1     Canadian and U.S. Plans Effectiveness

This Plan and the U.S. Plans shall become effective at the same time on the Plan Effective Date. On the Plan Effective Date: (i) the Monitor shall deliver a certificate to the U.S. Debtors declaring the effectiveness of this Plan; and (ii) the U.S. Debtors shall deliver a certificate to the Canadian Debtors and the Monitor declaring the effectiveness of the U.S. Plans ((i) and (ii), collectively, the "**Plan Certificates**"), such Plan Certificates to be held in escrow and released simultaneously, thereby triggering the effectiveness of this Plan and the U.S. Plans and the occurrence of the Plans Effective Date (as such term is defined in the Settlement and Support Agreement).

### 9.2     Conditions Precedent to Plan Effectiveness

The effectiveness of this Plan is subject to the satisfaction of the following conditions  (the "**Plan Effective Conditions**"):

(a)     the Plan shall have been approved by the Required Majority;

(b)     the Sanction Order shall have been issued and entered and shall have become a Final Order;

(c)     the Canadian Escrow Release Order shall have been issued and entered and shall have become a Final Order;

- 45 -

(d)     the U.S. Plans shall have been confirmed by Final Order in the U.S. Proceedings in a form that, to the satisfaction of the Monitor and its counsel, contains the terms contemplated by and referred to in the Settlement and Support Agreement as being contained in the U.S. Plans;

(e)     the U.S. Escrow Release Order shall have been issued and entered and shall have become a Final Order in a form satisfactory to the Monitor and its counsel;

(f)     the Sanction Order shall have been recognized and given full force and effect in the United States by an order of the U.S. Bankruptcy Court in the Chapter 15 Proceedings;

(g)     all conditions precedent to the Settlement and Support Agreement (excluding the condition specified in Section 9(a)(xi)) shall have been satisfied or waived in accordance with the terms of the Settlement and Support Agreement;

(h)     all conditions precedent to the effectiveness of the U.S. Plans (but excluding the occurrence of the Plan Effective Date hereunder) shall have been satisfied or waived in accordance with their respective terms, and the U.S. Debtors and Canadian Debtors shall have exchanged the Plan Certificates in escrow; and

(i)     the Settlement and Support Agreement shall not have been terminated.

### 9.3     Conditions Precedent to Plan Implementation

The establishment of the cash pools and reserves contemplated in Article 5 and the making of the distributions and payments contemplated pursuant to Article 6 is subject to the satisfaction of the following conditions (the "**Plan Implementation Conditions**"):

(a)     the Plans Effective Date (as defined in the Settlement and Support Agreement) shall have occurred and the Settlement and Support Agreement shall have become fully effective and enforceable in accordance with its terms;

(b)     the with prejudice dismissal of all litigation referenced in Section 5(b) of the Settlement and Support Agreement, including the pending leave to appeals, appeals and cross-appeals in respect of the Allocation Dispute pending before the Canadian Courts and the U.S. Courts, shall have occurred; and

(c)     NNL shall have received the Canadian Allocation.

### 9.4     Monitor's Certificate – Plan Effectiveness

As soon as practicable following the occurrence of the Plan Effective Date, the Monitor shall serve on the service list in the CCAA Proceedings and post on the Monitor's Website a certificate confirming that the Plan Effective Date has occurred (the "**Plan Effectiveness Certificate**"). The Monitor shall file the Plan Effectiveness Certificate with the CCAA Court as soon as practicable after it has been delivered.

- 46 -

### 9.5    Monitor's Certificate – Plan Implementation

As soon as practicable following the occurrence of the Plan Implementation Date, the Monitor shall serve on the service list in the CCAA Proceedings and post on the Monitor's Website a certificate confirming that the Plan Implementation Date has occurred (the "**Plan Implementation Certificate**").  The Monitor shall file the Plan Implementation Certificate with the CCAA Court as soon as practicable after it has been delivered.

### 9.6    Waiver of Plan Effective Conditions and Plan Implementation Conditions

Notwithstanding Sections 9.2 and 9.3, each of the Plan Effective Conditions and Plan Implementation conditions (except for the Plan Effective Conditions specified in Sections 9.2(a), 9.2(g) and 9.2(i)) can be waived, in whole or in part, solely by the Monitor with prior approval of the CCAA Court.

### ARTICLE 10
### CONTINUING ADMINISTRATION AND WIND-DOWN OF THE CANADIAN ESTATE AND RELATED MATTERS

### 10.1    Continuing Administration and Wind Down of the Canadian Estate

The administration and wind-down of the Canadian Estate will continue to be conducted by the Monitor pursuant to the Monitor's Powers Orders and this Plan, including following the Plan Effective Date and the Plan Implementation Date. Without in any way limiting the powers of the Monitor pursuant to the CCAA, the Initial Order, this Plan or the Monitor's Powers Orders, such continuing administration and wind-down may include:

(a)    taking all steps and actions contemplated by this Plan and the Settlement and Support Agreement, including effecting distributions and payments contemplated hereby and thereby;

(b)    the resolution of any remaining unresolved Claims or Post-Filing Claims;

(c)    the sale or other realization of the Canadian Debtors' residual assets and the repatriation of funds from foreign controlled subsidiaries, all to be used to make the distributions and payments contemplated pursuant to this Plan;

(d)    the resolution of the Canadian Debtors' Tax matters and recovery of any Tax refunds;

(e)    the wind-down of the Canadian Debtors and their direct and indirect controlled subsidiaries (which, for the avoidance of doubt, does not include any of the U.S. Debtors, the EMEA Debtors or the EMEA Non-Filed Entities); and

(f)    the disposal of the Canadian Debtors' books and records, including their remaining information technology infrastructure.

- 47 -

### 10.2    Stakeholder Advisor Fee Arrangements

(a)    The Bondholder Advisor Fee Letter shall terminate on the Plan Implementation Date, and the Canadian Debtors (including the Canadian Estate) shall have no obligation to pay any fees and expenses of the advisors to the Bondholder Group from and after the Plan Implementation Date.

(b)    From and after the Plan Implementation Date, the fees and expenses of Court Appointed Representative Counsel shall no longer be borne by the Canadian Estate and instead shall be borne by the Compensation Creditors. Any fees and expenses incurred by Court Appointed Representative Counsel from and after the Plan Implementation Date shall be deducted, dollar for dollar, from the distributions pursuant to this Plan to Compensation Creditors whom such Court Appointed Representative Counsel represent. Any such deductions shall be borne by the applicable Compensation Creditors on a *pro rata* basis based on the amount of their respective Proven Affected Unsecured Claims. Notwithstanding the foregoing, from and after the Plan Implementation Date, to the extent the Monitor requests in writing that Court Appointed Representative Counsel provide any service relating to such Court Appointed Representative Counsel responding to inquiries of Compensation Creditors regarding distributions under this Plan, the Canadian Estate shall pay the associated reasonable fees and expenses of such Court Appointed Representative Counsel as may be agreed to in writing between the Canadian Estate, the Monitor and the applicable Court Appointed Representative Counsel.

(c)    The obligation of the Canadian Debtors to pay the fees and expenses of counsel to the Directors and Officers (whether pursuant to the Initial Order or otherwise) shall terminate on the Plan Implementation Date and the Canadian Debtors (including the Canadian Estate) shall have no obligation to pay any fees and expenses of counsel to the Directors and Officers from and after the Plan Implementation Date.

### ARTICLE 11
### GENERAL

### 11.1    Binding Effect

The Plan will become effective and binding on the Plan Effective Date, provided that the establishment of the cash pools and reserves contemplated in Article 5 and the making of the distributions contemplated pursuant to Article 6 shall be conditional upon satisfaction or waiver of the Plan Implementation Conditions and the occurrence of the Plan Implementation Date. Without limiting the generality of the foregoing, on the Plan Effective Date:

(a)    the treatment of Affected Claims and Released Claims under the Plan shall be final and binding for all purposes and shall be binding upon and enure to the benefit of the Canadian Debtors, the Released Parties, all Affected Creditors, any Person having a Released Claim and all other Persons named or referred to in, or

- 48 -

subject to, the Plan and their respective heirs, executors, administrators and other legal representatives, successors and assigns;

(b)     all Affected Claims shall be forever discharged and released, excepting only the distribution thereon in the manner and to the extent provided for in the Plan;

(c)     all Released Claims shall be forever discharged and released;

(d)     each Affected Creditor and each Person holding a Released Claim shall be deemed to have consented and agreed to all of the provisions of the Plan, in its entirety; and

(e)     each Affected Creditor and each Person holding a Released Claim shall be deemed to have executed and delivered to the Canadian Debtors and to the other Released Parties, as applicable, all consents, releases, assignments and waivers, statutory or otherwise, required to implement and carry out the Plan in its entirety.

### 11.2    Deeming Provisions

In the Plan, the deeming provisions are not rebuttable and are conclusive and irrevocable.

### 11.3    Non-Consummation/Termination of Settlement and Support Agreement

If the Plan Effective Date does not occur on or prior to August 31, 2017 (or such later date as the date for the Plans Effective Date (as defined in the Settlement and Support Agreement) to have occurred pursuant to Section 9(a)(xi) of the Settlement and Support Agreement may be extended to), then, notwithstanding any other provision hereof: (a) the Plan shall be null and void in all respects, (b) any settlement or compromise embodied in the Plan shall be deemed null and void, and (c) nothing contained in the Plan, and no acts taken in preparation for consummation of the Plan, shall (i) constitute or be deemed to constitute a waiver or release of any Claims by or against the Canadian Debtors or any other Person; (ii) prejudice in any manner the rights of the Canadian Debtors or any other Person in any further proceedings involving the Canadian Debtors; or (iii) constitute an admission of any sort by the Canadian Debtors or any other Person; provided, however, that nothing in this Section 11.3 shall impair the enforceability of the Settlement and Support Agreement in accordance with its terms. In the event the Settlement and Support Agreement is terminated or does not become effective in accordance with its terms, the Canadian Debtors and Monitor reserve all of their rights and defenses with respect to the claims and other matters resolved by the Settlement and Support Agreement, including the Allocation Dispute, and nothing contained in this Plan nor the proposed settlement set forth in the Settlement and Support Agreement shall constitute an admission by the Canadian Debtors or the Monitor regarding the validity of the litigations, claims or defenses resolved by the Settlement and Support Agreement or that the Canadian Debtors have any liability in connection with such litigations, claims or defenses. In the event of the termination of the Settlement and Support Agreement, or if this Plan does not become effective in accordance with its terms, all rights of the Canadian Debtors (excluding the New Applicants) and the Monitor with regard to the Allocation Dispute and with respect to the interest of the Canadian Debtors in the Sale Proceeds be and are hereby reserved.

- 49 -

### 11.4    Modification of the Plan

(a)    Subject to Section 6(b) of the Settlement and Support Agreement, the Monitor and Canadian Debtors reserve the right, at any time and from time to time, to amend, restate, modify and/or supplement the Plan, provided that any such amendment, restatement, modification or supplement must be contained in a written document which is filed with the CCAA Court and (i) if made prior to or at the Meeting, communicated to the Affected Creditors in the manner contemplated by the Meeting Order; and (ii) if made following the Meeting, approved by the CCAA Court following notice to the Affected Creditors. Notwithstanding the foregoing, the Canadian Debtors shall not amend, restate, modify and/or supplement the Plan in a manner that is inconsistent with their obligations under the Settlement and Support Agreement. For the avoidance of doubt, nothing in this Section 11.4(a) limits any Settlement Party's rights pursuant to Section 6(h) of the Settlement and Support Agreement with respect to any amendment, restatement, modification and/or supplement to the Plan.

(b)    Notwithstanding Section 11.4(a), any amendment, restatement, modification or supplement to the Plan may be made by the Monitor and Canadian Debtors at any time and from time to time, provided that it: (i) concerns a matter which is of an administrative nature required to better give effect to the implementation of the Plan; or (ii) is to cure any errors, omissions or ambiguities, and in either case is not materially adverse to the financial or economic interests of the Affected Creditors.

(c)    Any amended, restated, modified or supplementary Plan or Plans filed with the CCAA Court and, if required by this section, approved by the CCAA Court, shall, for all purposes, be and be deemed to be a part of and incorporated in the Plan.

### 11.5    Paramountcy

From and after the Plan Effective Date, any conflict between:

(a)    the Plan or the Sanction Order; and

(b)    the covenants, warranties, representations, terms, conditions, provisions or obligations, expressed or implied, of any contract, mortgage, security agreement, indenture, trust indenture, note, loan agreement, commitment letter, agreement for sale, lease or other agreement, written or oral and any and all amendments and supplements thereto existing between one or more of the Affected Creditors and the Canadian Debtors as at the Plan Effective Date;

will be deemed to be governed by the terms, conditions and provisions of the Plan and the Sanction Order, which shall take precedence and priority, provided that the Settlement and Support Agreement and any settlement agreement executed by the Canadian Debtors and any Person asserting a Claim or a Director/Officer Claim that was entered into from and after the Filing Date shall be read and interpreted in a manner that assumes that such settlement agreement is intended to operate congruously with, and not in conflict with, the Plan, and,

- 50 -

provided further, that to the extent of any inconsistency between the Settlement and Support Agreement and the Plan, the Settlement and Support Agreement shall govern. For the avoidance of doubt: (i) all distributions from the Escrow Accounts (including the specific amounts to be distributed to each of the Canadian Debtors, the U.S. Debtors and the EMEA Debtors) shall be strictly in accordance with the Settlement and Support Agreement; and (ii) to the extent of any conflict between the provisions of the Settlement and Support Agreement and this Plan as relates to distributions from the Escrow Accounts, the provisions of the Settlement and Support Agreement shall govern in all respects.

### 11.6    Severability of Plan Provisions

If any term or provision of the Plan is held by the Canadian Court to be invalid, void or unenforceable, the Canadian Court, at the request of the Canadian Debtors and the Monitor, shall have the power to either (a) sever such term or provision from the balance of the Plan and provide the Canadian Debtors with the option to proceed with the implementation of the balance of the Plan, or (b) alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as so altered or interpreted. Notwithstanding any such holding, alteration or interpretation, and provided that the Canadian Debtors proceed with the implementation of the Plan, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation.

### 11.7    Force Majeure

If the Canadian Estate's or Monitor's performance of any obligation pursuant to this Plan, including, without limitation, pursuant to Article 6 hereof, is prevented, hindered or delayed by reason of Force Majeure (a "**Force Majeure Event**"), then the Canadian Estate and Monitor shall be excused from performance to the extent that either of them is prevented, hindered or delayed as a result of such Force Majeure Event during the continuance of such Force Majeure Event, and the Canadian Estate's and Monitor's obligations hereunder shall be excused so long as and to the extent that such Force Majeure Event prevents or delays performance.

### 11.8    Responsibilities of the Monitor and Protections of the Monitor

The Monitor is acting and will continue to act in all respects in its capacity as Monitor in the CCAA Proceedings (and not in its personal capacity), including to implement the Plan and the Settlement and Support Agreement and to otherwise continue the ongoing administration and wind-down of the Canadian Debtors. The Monitor will not be responsible or liable for any obligations of the Canadian Debtors (including, for the avoidance of doubt, the Canadian Estate). The Monitor shall have the powers and protections granted to it by the Plan, the CCAA, the Monitor's Powers Orders and any other Order made in the CCAA Proceedings. None of the Monitor or its affiliates, shareholders, affiliate's shareholders (including Ernst & Young LLP, a Canadian limited liability partnership), employees, advisors, lawyers, representatives or agents ("**Monitor Related Parties**") shall incur any personal liability whatsoever whether on their own part or in respect of any failure on the part of any Canadian Debtor to observe, perform or comply with any of its obligations under this Plan or under or in relation to any associated arrangements or negotiations. Any release, discharge or other benefit conferred upon the Monitor

- 51 -

pursuant to this Plan shall enure to the benefit of the Monitor Related Parties and Ernst & Young Inc. in its personal capacity, and each of the Monitor Related Parties and Ernst & Young Inc. in its personal capacity shall be a third party beneficiary to this Plan entitled to enforce such releases, discharges and benefits in accordance with the terms of this Plan.

### 11.9    Different Capacities

Persons who are affected by this Plan may be affected in more than one capacity. Unless expressly provided herein to the contrary, a Person will be entitled to participate hereunder in each such capacity. Any action taken by a Person in one capacity will not affect such Person in any other capacity, unless expressly agreed by the Canadian Debtors and the Person in writing or unless its Claims overlap or are otherwise duplicative.

### 11.10   Notices

Any notice or other communication to be delivered hereunder must be in writing and reference the Plan and may, subject as hereinafter provided, be made or given by personal delivery, ordinary mail or by facsimile or email addressed to the respective parties as follows:

If to the Canadian Debtors:

c/o Ernst & Young Inc.
Court-appointed Monitor of Nortel Networks Corporation *et al*.
222 Bay Street, Suite 2400
Toronto, Ontario M5K 1J7

Attention:       Nortel Monitor

Telephone:    1-416-943-4439 or 1-866-942-7177
Fax:              1-416-943-2808
Email            nortel.monitor@ca.ey.com

If to an Affected Creditor: to the mailing address, facsimile address or email address provided on such Affected Creditor's Proof of Claim or such more recent address particulars of  an Affected Creditor as noted in the files of the Canadian Debtors or the Monitor;

If to the Monitor:

Ernst & Young Inc.
Court-appointed Monitor of Nortel Networks Corporation *et al*.
222 Bay Street, Suite 2400
Toronto, Ontario M5K 1J7

Attention:       Nortel Monitor

Telephone:    1-416-943-4439 or 1-866-942-7177
Fax:              1-416-943-2808
Email            nortel.monitor@ca.ey.com

- 52 -

or to such other address as any party may from time to time notify the others in accordance with this section, or, in the case of an address change for the Canadian Debtors or the Monitor, by posting notice of such address change on the Monitor's Website. Any such communication so given or made shall be deemed to have been given or made and to have been received on the day of delivery if delivered, or on the day of faxing or sending by other means of recorded electronic communication, provided that such day in either event is a Business Day and the communication is so delivered, faxed or sent before 4:00 p.m. (Toronto time) on such day. Otherwise, such communication shall be deemed to have been given and made and to have been received on the next following Business Day.

### 11.11   Further Assurances

Each of the Persons named or referred to in, or subject to, the Plan will execute and deliver all such documents and instruments and do all such acts and things as may be necessary or desirable to carry out the full intent and meaning of the Plan and to give effect to the transactions contemplated herein.

### 11.12   Subsequent Bankruptcy, etc.

If, following the Plan Effective Date, a Bankruptcy Proceeding occurs in respect of the Canadian Debtors (or any of them or their assets), the Proven Affected Unsecured Claims compromised and released hereby shall be deemed to be reinstated in their full amounts solely for purposes of giving effect to any distributions to be made in such a Bankruptcy Proceeding, it being the intention that holders of Proven Affected Unsecured Claims under this Plan shall share rateably with holders of any additional claims (including any Post-Filing Claims) asserted against the Canadian Debtors (or any of them) in a Bankruptcy Proceeding, provided that any distributions made on account of Proven Affected Unsecured Claims pursuant to this Plan shall also be accounted for in any distributions in a Bankruptcy Proceeding. All Proven Affected Unsecured Claims pursuant to this Plan and the Claims Orders shall be deemed to constitute proven claims in any Bankruptcy Proceeding without any need for a Creditor to file an additional proof of claim in any such Bankruptcy Proceeding. All Claims and Post-Filing Claims as finally resolved pursuant to the Claims Orders shall be final and binding for all purposes in a Bankruptcy Proceeding without any ability on the part of any Creditor or any trustee in bankruptcy or receiver to further dispute, re-assert or re-litigate such claims in a Bankruptcy Proceeding.

### 11.13   Cross-Border Protocol and Cross-Border Claims Protocol

The Cross-Border Protocol and Cross-Border Claims Protocol shall each remain in full force and effect in accordance with their respective terms.

### 11.14   Language

This Plan, as well as any notices, schedules or other documents related thereto (collectively, including the Plan, the "**Plan Documents**"), has been and shall be prepared in the English language only. To the extent a French language or other translation of a Plan Document is

- 53 -

prepared, any such translation shall be for informational purposes only, it being intended that the English language version of any Plan Document shall govern and prevail in all respects.

### 11.15   Acts to Occur on Next Business Day

If any distribution, payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such distribution, payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

**DATED** as of the 4th day of November, 2016.

6618513

- 54 -

## SCHEDULE "A"

## ESCROW AGREEMENTS

1. Escrow Agreement dated March 31, 2009 with JP Morgan Chase Bank, N.A., as escrow agent (re: Layer 4-7)

2. Escrow Agreement dated November 11, 2009 with JP Morgan Chase Bank, N.A., as escrow agent (re: CDMA)

3. Escrow Agreement dated December 1, 2009 with JP Morgan Chase Bank, N.A., as escrow agent (re: Packet Core)

4. Escrow Agreement dated December 18, 2009 with JP Morgan Chase Bank, N.A., as escrow agent (re: Enterprise)

5. MEN Distribution Escrow Agreement dated March 19, 2010 with JP Morgan Chase Bank, N.A., as escrow agent

6. GSM/GSM-R Distribution Escrow Agreement dated March 31, 2010 with JP Morgan Chase Bank, N.A., as escrow agent

7. GSM Retained Contracts Distribution Escrow Agreement dated June 3, 2010 with JP Morgan Chase Bank, N.A., as escrow agent

8. CVAS Distribution Escrow Agreement dated May 27, 2010 with JP Morgan Chase Bank, N.A., as escrow agent

9. MSS Distribution Escrow Agreement dated March 11, 2011 with JP Morgan Chase Bank, N.A., as escrow agent

10. Patent Portfolio Distribution Escrow Agreement dated July 28, 2011 with JP Morgan Chase Bank, N.A., as escrow agent

**SCHEDULE "B"**

**CROSSOVER BONDHOLDER CLAIMS**

| | |
|---|---|
| 1. 2006 Bonds - 10.750% Senior Notes due 2016 | $1,185,132,812 |
| 2. 2006 Bonds - 10.125% Senior Notes due 2013 | $577,689,063 |
| 3. 2006 Bonds - Floating Rate Senior Notes due 2011 | $1,022,419,965 |
| 4. 2007 Bonds - 2.125% Convertible Senior Notes due 2014 | $578,020,746 |
| 5. 2007 Bonds - 1.75% Convertible Senior Note Due 2012 | $577,487,674 |

## SCHEDULE "C"

## INTERCOMPANY CLAIMS - PROVEN AFFECTED UNSECURED CLAIMS

All amounts in USD

| Legal company code | Legal company name | Legal trading partner code | Legal trading partner name | Grand Total |
|---|---|---|---|---|
| 1107 | Architel Systems Corp | 2114 | Architel Systems (U.S.) Corp | (1,912,993) |
| 1002 | Nortel Networks Limited | 2001 | Nortel Networks Inc. | (2,000,000,000) |
| 1002 | Nortel Networks Limited[1] | 4360 | Nortel Networks UK Limited | (122,655,094) |
| 1002 | Nortel Networks Limited | 4220 | Nortel Networks S.p.A. | (2,344,906) |
| 1002 | Nortel Networks Limited | 7120 | Nortel (China) Ltd | (104,218,075) |
| 1002 | Nortel Networks Limited | 6210 | Nortel Networks Singapore Pte | (91,167,570) |
| 1101 | Nortel Technology Corp | 6210 | Nortel Networks Singapore Pte | (8,212) |
| 1101 | Nortel Technology Corp | 3171 | Nortel de México | (276,176) |
| 1101 | Nortel Technology Corp | 7100 | Nortel Networks (Asia) Limited | (176,933) |
| 1101 | Nortel Technology Corp | 6160 | Nortel Malaysia Sdn. Bhd. | (3,222) |
| 1102 | Nortel Int Corp | 7120 | Nortel (China) Ltd | (734,289) |
| 1102 | Nortel Int Corp | 6100 | Nortel Networks Australia Pty | (1,480) |
| 1001 | Nortel Networks Corporation | 3171 | Nortel de México | (59) |

1. Balance includes USD 25M subject to satisfaction of paragraph 2.2 of the Agreement Settling EMEA
Canadian Claims and Related Claims

**SCHEDULE "D"**

**EXCHANGE RATES FROM CLAIMS PROCEDURE ORDER**

Currency conversion factors
Source: Reuters, January 14, 2009

|  |  | CAD per unit of Currency |
|---|---|---|
| CAD | Canadian Dollar | 1 |
| USD | United States Dollar | 1.22025 |
| EUR | Euro | 1.6170753 |
| GBP | United Kingdom: Pnd Ster | 1.77741615 |
| JPY | Japan: Yen | 0.01362647 |

| | | | | | |
|---|---|---|---|---|---|
| AED | United Arab Emir.: Dirham | 0.33221709 | LTL | Lithuanian Litas | 0.46830925 |
| ARS | Argentine Peso | 0.35410621 | LVL | Latvian Lats | 2.29456567 |
| AUD | Australian Dollar | 0.82275356 | MAD | Moroccan Dirham | 0.14500201 |
| BBD | Barbados Dollar | 0.61319095 | MXN | Mexican Peso | 0.08842392 |
| BDT | Bangladeshi Taka | 0.01772331 | MYR | Malaysian Ringgit | 0.34156754 |
| BGN | Bulgaria: New Lev | 0.82683968 | NGN | Nigerian Naira | 0.00816494 |
| BOB | Bolivian Boliviano | 0.17345416 | NOK | Norwegian Krone | 0.17167276 |
| BRL | Brazilian Real | 0.52726527 | NZD | New Zealand Dollar | 0.6711375 |
| CHF | Swiss Franc | 1.09468915 | OMR | Oman: Rial Omani | 3.16980987 |
| CLP | Chilean Peso | 0.0019827 | PAB | Panama: Balb0A | 1.22025 |
| CNY | China: Yuan Renminbi | 0.17854268 | PEN | Peru: Nuevo Sol | 0.3889243 |
| COP | Colombian Peso | 0.00054867 | PGK | Papua New Guinea Kina | 0.4671117 |
| CRC | Costa Rican Colon | 0.00219273 | PHP | Philippine Peso | 0.02592415 |
| CZK | Czech Koruna | 0.06004872 | PKR | Pakistan Rupee | 0.015414 |
| DKK | Danish Krone | 0.21701242 | PLN | Poland: Zloty | 0.39077386 |
| DOP | Dominican Peso | 0.03444601 | PYG | Paraguay: Guarani | 0.0002498 |
| DZD | Algerian Dinar | 0.01682672 | QAR | Qatar: Qatari Rial | 0.33516446 |
| EEK | Estonian Kroon | 0.10334226 | RON | New Romania Leu | 0.37703348 |
| EGP | Egyptian Pound | 0.22086973 | RUB | Russian Ruble | 0.03847246 |
| FJD | Fiji Dollar | 0.67418812 | SAR | Saudi Arabia: Saudi Riyal | 0.32539566 |
| GTQ | Guatemala: Quetzal | 0.15495238 | SEK | Swedish Krona | 0.14788041 |
| HKD | Hong Kong Dollar | 0.15732068 | SGD | Singapore Dollar | 0.82052921 |
| HUF | Hungary: Forint | 0.00583154 | THB | Thailand: Baht | 0.03495417 |
| IDR | Indonesia: Rupiah | 0.00010993 | TND | Tunisian Dinar | 0.89144172 |
| ILS | Israel: Shekel | 0.31449742 | TRY | New Turkish Lira | 0.76914592 |
| INR | Indian Rupee | 0.02499872 | TTD | Trinidad & Tobago Dollar | 0.19524 |
| ISK | Iceland Krona | 0.00966994 | UAH | Ukraine: Hryvnia | 0.13945714 |
| JMD | Jamaican Dollar | 0.01515838 | UYU | Uruguay: Peso | 0.05016444 |
| JOD | Jordanian Dinar | 1.72084329 | VEF | Bolivar Fuerte | 0.56827178 |
| KPW | North Korean Won | 0.00853023 | VND | Vietnam: Dong | 0.00006981 |
| KRW | Republic Of Korea: Won | 0.00090543 | XCD | East Caribbean Dollar | 0.4587406 |
| KWD | Kuwaiti Dinar | 4.28157891 | ZAR | South Africa: Rand | 0.12249969 |
| LBP | Lebanese Pound | 0.00080945 | ZMK | Zambia: Kwacha | 0.00024601 |
| LKR | Sri Lanka Rupee | 0.01072276 | | | |

**EXHIBIT "A"**

**SETTLEMENT AND SUPPORT AGREEMENT**

**[ATTACHED]**

CONFIDENTIAL
FOR SETTLEMENT PURPOSES ONLY
SUBJECT TO FRE 408 AND ANALOGS IN ALL RELEVANT JURISDICTIONS
**(EXECUTION VERSION)**

### SETTLEMENT AND PLANS SUPPORT AGREEMENT

This **SETTLEMENT AND PLANS SUPPORT AGREEMENT** (together with all Annexes hereto, in each case as amended, supplemented or otherwise modified from time to time in accordance with the terms hereof, this "<u>**Settlement and Support Agreement**</u>")[1] is dated as of October 12, 2016 and entered into by and among: (i) the Canadian Debtors;[1] (ii) the Monitor; (iii) the U.S. Debtors; (iv) the EMEA Debtors; (v) the EMEA Non-Filed Entities; (vi) the Joint Administrators; (vii) NNSA; (viii) the NNSA Conflicts Administrator; (ix) the French Liquidator; (x) the Bondholder Group; (xi) the members of the CCC; (xii) the UCC; (xiii) the U.K. Pension Trustee; (xiv) the PPF; (xv) the Joint Liquidators and (xvi) the NNCC Bondholder Signatories (collectively, the "<u>**Parties**</u>" and each a "<u>**Party**</u>").

**WHEREAS**, NNC, NNL, NNI, NNSA and NNUK and various other members of the Nortel Group commenced insolvency proceedings as early as January 14, 2009 (collectively, the "<u>**Nortel Insolvency Proceedings**</u>");

**WHEREAS,** during the course of the Nortel Insolvency Proceedings various assets were sold and certain Sale Proceeds are held in the Existing Escrow Accounts pending either the agreement of the relevant parties or final CCAA Court and Bankruptcy Court decisions regarding the allocation of said proceeds;

**WHEREAS**, various of the Parties have or may have claims as against other Parties which are to be resolved in the context of the Nortel Insolvency Proceedings;

**WHEREAS**, certain of the Parties are parties to certain litigation before the Canadian Court and U.S. Court in which the allocation of the Sale Proceeds is at issue (the "<u>**Allocation Dispute**</u>");

**WHEREAS**, the CCAA Court and the Bankruptcy Court each issued separate decisions on or about May 12, 2015 and July 6, 2015 regarding the Allocation Dispute and such decisions remain subject to appeal in both jurisdictions (the "<u>**Allocation Decisions**</u>");

**WHEREAS**, the Parties acknowledge and agree that the ultimate outcome of continued litigation in relation to the Allocation Dispute and the potential claim matters among them is uncertain, that further appeals are likely, that the cost of such litigation is substantial and burdensome to each of the Parties and their respective constituencies and that settlement of such

---

[1] Capitalized terms not otherwise defined in the main body of this Settlement and Support Agreement shall have the meaning ascribed to them in Section 1 hereof.

matters is key to advancing the Nortel Insolvency Proceedings to facilitate distributions to creditors of the various Debtors' estates;

**WHEREAS**, the Parties desire to settle fully and finally the Allocation Dispute and key potential claims matters among them and each Party has concluded it is appropriate and in the best interest of each to enter into this Settlement and Support Agreement;

**WHEREAS,** the Parties wish to effectuate a full and final settlement of the Allocation Dispute and certain other matters in accordance with terms and conditions set forth herein (the "**Settlement**"); and

**WHEREAS**, to effect the Settlement, the Parties have agreed to enter into this Settlement and Support Agreement.

**NOW, THEREFORE**, in consideration of the foregoing and the promises, mutual covenants, and agreements set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound, agrees as follows:

**Section 1.  Definitions**

"**Allocation Decisions**" has the meaning set forth in the recitals hereto.

"**Allocation Dispute**" has the meaning set forth in the recitals hereto.

"**Applicable FX Rate**" has the meaning set forth in Section 7(g) hereof.

"**Bankruptcy Code**" means title 11 of the United States Code, as amended.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware.

"**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, 28 U.S.C. § 2075, as applicable to the Chapter 11 Cases and the general, local and chambers rules of the Bankruptcy Court.

"**Beddoes Court**" means the High Court of Justice of England and Wales that has the power to provide directions to the U.K. Pension Trustee authorizing the U.K. Pension Trustee to execute and implement this Settlement and Support Agreement.

"**Bondholder Group**" means the ad hoc group of bondholders that hold notes issued and/or guaranteed by NNC, NNL, NNI, and NNCC, which on June 15, 2016, filed with the Bankruptcy Court a disclosure form under Bankruptcy Rule 2019, as such group may be constituted from time to time.

"**Business Day**" means any day (other than a Saturday, Sunday or legal holiday, as such term is defined in Bankruptcy Rule 9006(a)) on which banks are open for general business in all of New York City, New York, U.S.A.; Toronto, Ontario, Canada; London, England; and Paris France.

"**Buyer Escrow Accounts**" means the escrow accounts established pursuant to certain escrow agreements among certain Nortel Group entities, certain purchasers of Nortel assets and escrow agents governing the holding and release of certain amounts held in escrow in connection with such transactions as set forth on Annex B under the heading "Buyer Escrow Accounts."

"**Buyer Escrow Amount**" has the meaning set forth in Section 2(g) hereof.

"**CAD Claims**" has the meaning set forth in Section 4(n)(i) hereof.

"**Canadian Allocation**" has the meaning set forth in Section 2(c)(ii) hereof.

"**Canadian Court**" means any and all of the CCAA Court, the Ontario Court of Appeal, the Supreme Court of Canada or any other court of competent jurisdiction overseeing the Canadian Proceedings (including any appeals) from time to time.

"**Canadian Debtors**" means, collectively, NNC, NNL, Nortel Networks Global Corporation, Nortel Networks International Corporation, Nortel Networks Technology Corporation, Nortel Communications Inc., Architel Systems Corporation and Northern Telecom Canada Limited.

"**Canadian Escrow Account**" means the account with the Canadian Escrow Agent established pursuant to the Canadian Escrow Agreement to hold that portion of the Sale Proceeds to be converted into Canadian Dollars.

"**Canadian Escrow Agent**" means Royal Trust Corporation of Canada.

"**Canadian Escrow Agreement**" means that certain distribution escrow agreement, substantially in the form attached hereto as Annex K to be entered into among NNC, NNL, NNI, NNUK, the other existing Depositors under the relevant Existing Escrow Agreements, NNSA, the Monitor and the UCC to hold that portion of the Sale Proceeds to be converted into Canadian Dollars.

"**Canadian Escrow Release Order**" means an order issued by the CCAA Court authorizing and directing the release of the Sale Proceeds from the Escrow Accounts in the manner contemplated hereby.

"**Canadian Estate**" means the Canadian Debtors as substantively consolidated as contemplated herein.

"**Canadian Information Circular**" means the information circular to be provided to the Canadian Voting Creditors relating to the Canadian Plan as approved by the CCAA Court.

"**Canadian Meeting Order**" means an order of the CCAA Court granted pursuant to Section 4 and/or 5 of the CCAA that, among other things, authorizes the holding of a meeting or meetings of the Canadian Debtors' creditors for purposes of considering and voting upon the Canadian Plan and approves the Canadian Information Circular.

"**Canadian Pension Claim**" has the meaning set forth in Section 4(g)(i) hereof.

3

"**Canadian Plan**" means the CCAA plan of compromise or arrangement (including any exhibits, annexes and schedules thereto) for the Canadian Debtors that effectuates the Settlement, consistent with the terms of this Settlement and Support Agreement, as it may be modified or supplemented in accordance with its terms.

"**Canadian Proceedings**" means, collectively, those Nortel Insolvency Proceedings that were commenced before the CCAA Court pursuant to the CCAA on or after January 14, 2009 in respect of the Canadian Debtors.

"**Canadian Surplus Amount**" has the meaning set forth in Section 7(j)(i)(B).

"**Canadian Voting Creditors**" means creditors holding Proven Claims against the Canadian Debtors and such other creditors that are permitted to vote on the Canadian Plan.

"**Cascade Trust**" means the trust established pursuant to that certain Trust Indenture dated April 5, 2010 among NNL and NNI, as settlors, and John T. Evans, as trustee.

"**Cascade Trust Side Letter**" means the Trust Indenture Side Agreement, dated April 5, 2010, between NNL and NNI relating to the Cascade Trust.

"**CCAA**" means the Companies' Creditors Arrangement Act, R.S.C. 1985, c C-36.

"**CCAA Court**" means the Ontario Superior Court of Justice (Commercial List).

"**CCC**" means the ad hoc committee of creditors having claims only against the Canadian Debtors comprised of the former and disabled Canadian employees of the Canadian Debtors through their court-appointed representatives, Unifor, Morneau Shepell Ltd. as Administrator of Nortel's Canadian registered pension plans, the Superintendent of Financial Services of Ontario as Administrator of the Pension Benefits Guarantee Fund and the court-appointed representatives of the current and transferred employees of the Canadian Debtors.

"**CFSA**" means the Final Canadian Funding and Settlement Agreement among, inter alia, certain of the Canadian Debtors, the Monitor and certain of the U.S. Debtors, dated December 23, 2009.

"**Chapter 11 Cases**" means the cases filed by the U.S. Debtors pursuant to Chapter 11 of the Bankruptcy Code.

"**Claims Procedure Order**" means the Claims Procedure Order entered by the CCAA Court dated July 30, 2009, as amended and restated on October 7, 2009.

"**Confirmation Order**" means an order of the Bankruptcy Court entered on the docket in the Chapter 11 Cases confirming the U.S. Plans.

"**Conversion Elections**" has the meaning set forth in Section 7(c)(i)(A) hereof.

"**Conversion Election Request**" has the meaning set forth in Section 7(c)(iii) hereof.

"**Converting Debtor**" has the meaning set forth in Section 7(i)(i) hereof.

"**Creditor Joinder**" means a joinder to this Settlement and Support Agreement, substantially in the form annexed hereto as Annex D.

"**Creditor's Maximum**" has the meaning set forth in Section 4(c)(i)(B) hereof.

"**Cross-Border Protocol**" means the Cross-Border Protocol originally approved by the Bankruptcy Court on or about January 14, 2009 and by the CCAA Court on January 14, 2009, as the same has been amended, as approved by both the Bankruptcy Court and the CCAA Court, from time to time.

"**Crossover Bondholder Fee Letter**" has the meaning set forth in Section 4(k) hereof.

"**Crossover Bondholders**" means beneficial owners of Crossover Bonds as of the earlier of (a) the date each such holder executes a Creditor Joinder or a Transferee Joinder; and (b) the record date that will be established under the U.S. Plans and the Canadian Meeting Order.

"**Crossover Bonds**" means those bonds issued pursuant to the indentures listed on Annex G hereto, but excluding the NNCC Bonds.

"**Crossover Bonds Claims**" means those Crossover Claims relating to the Crossover Bonds.

"**Crossover Claims**" has the meaning set forth in Section 4(c)(i) hereof.

"**Debtors**" means, collectively, the U.S. Debtors, the Canadian Debtors, the EMEA Debtors and NNSA.

"**Depositors**" has the meaning given to such term in the Escrow Agreements.

"**Disclosure Statements**" means, collectively, the U.S. Disclosure Statement and the Canadian Information Circular.

"**EDC**" means Export Development Canada.

"**EMEA Allocation**" has the meaning set forth in Section 2(c)(v) hereof.

"**EMEA Canada Settlement Agreement**" has the meaning set forth in Section 4(b)(i) hereof.

"**EMEA Canadian Claim**" has the meaning set forth in Section 4(b)(i) hereof.

"**EMEA Debtors**" means, collectively, NNUK, Nortel Networks (Ireland) Limited (in administration), Nortel Networks NV (in administration), Nortel Networks SpA (in administration), Nortel Networks BV (in administration), Nortel Networks Polska Sp z.o.o. (in administration), Nortel Networks Hispania SA (in administration), Nortel Networks (Austria) GmbH (in administration), Nortel Networks s.r.o. (in administration), Nortel Networks Engineering Service Kft (in administration), Nortel Networks Portugal SA (in administration), Nortel Networks Slovensko s.r.o. (in administration), Nortel Networks Romania SRL (in administration), Nortel GmbH (in administration), Nortel Networks OY (in administration), Nortel Networks AB (in administration), NNIF, and Nortel Networks France S.A.S. (in

administration), but does not include, for purposes of this Settlement and Support Agreement, NNSA.

"**EMEA Escrow Accounts**" means, collectively, the EMEA Sterling Escrow Account and the EMEA Euro Escrow Account.

"**EMEA Escrow Agreements**" means, collectively, the EMEA Sterling Escrow Agreement and the EMEA Euro Escrow Agreement.

"**EMEA Euro Escrow Account**" means the account with the EMEA Euro Escrow Agent that will be established pursuant to the EMEA Euro Escrow Agreement to hold that portion of the Sale Proceeds to be converted into Euros, in the event that the Euro Conversion Election is requested.

"**EMEA Euro Escrow Agent**" means the escrow agent named in the EMEA Euro Escrow Agreement, which escrow agent shall be reasonably acceptable to NNL, NNI, NNUK, NNSA, the other existing Depositors under the relevant Existing Escrow Agreements, the Monitor and the UCC.

"**EMEA Euro Escrow Agreement**" means the distribution escrow agreement, to be entered into among NNC, NNL, NNI, NNUK, NNSA the other existing Depositors under the relevant Existing Escrow Agreements, the Monitor and the UCC, to hold that portion of the Sale Proceeds to be converted into Euros in the event that the Euro Conversion Election is requested, which agreement shall be in a form reasonably acceptable to NNL, NNI, NNUK, NNSA, the other existing Depositors under the relevant Existing Escrow Agreements, the Monitor and the UCC.

"**EMEA Non-Filed Entities**" means, collectively, Nortel Networks AS, Nortel Networks AG, Nortel Networks South Africa (Pty) Limited, NNNI, and NNOCL.

"**EMEA (Non-NNSA/Non-NNUK) Allocation**" has the meaning set forth in Section 2(c)(iii) hereof.

"**EMEA (Non-NNSA/Non-NNUK) Debtors**" means, collectively, Nortel Networks (Ireland) Limited (in administration), Nortel Networks NV (in administration), Nortel Networks SpA (in administration), Nortel Networks BV (in administration), Nortel Networks Polska Sp z.o.o. (in administration), Nortel Networks Hispania SA (in administration), Nortel Networks (Austria) GmbH (in administration), Nortel Networks s.r.o. (in administration), Nortel Networks Engineering Service Kft (in administration), Nortel Networks Portugal SA (in administration), Nortel Networks Slovensko s.r.o. (in administration), Nortel Networks Romania SRL (in administration), Nortel GmbH (in administration), Nortel Networks OY (in administration), Nortel Networks AB (in administration), NNIF and Nortel Networks France S.A.S. (in administration), but does not include NNSA or NNUK.

"**EMEA Proceedings**" means, collectively, those Nortel Insolvency Proceedings that were commenced before the U.K. Court on or about January 14, 2009 in respect of the EMEA Debtors and NNSA, which, for the avoidance of doubt, excludes the French Secondary Proceeding.

6

"**EMEA Sterling Escrow Account**" means the account with the EMEA Sterling Escrow Agent that will be established pursuant to the EMEA Sterling Escrow Agreement to hold that portion of the Sale Proceeds to be converted into U.K. pounds Sterling, in the event that the Sterling Conversion Election is requested.

"**EMEA Sterling Escrow Agent**" means the escrow agent named in the EMEA Sterling Escrow Account, which agent shall be reasonably acceptable to NNL, NNI, NNUK, NNSA, the other existing Depositors under the relevant Existing Escrow Agreements, the Monitor and the UCC.

"**EMEA Sterling Escrow Agreement**" means the distribution escrow agreement to be entered into among NNC, NNL, NNI, NNUK, the other existing Depositors under the relevant Existing Escrow Agreements, the Monitor and the UCC, to hold that portion of the Sale Proceeds to be converted into U.K. pounds Sterling in the event the Sterling Conversion Election is requested, which agreement shall be in a form reasonably acceptable to NNL, NNI, NNUK, NNSA, the other existing Depositors under the relevant Existing Escrow Agreements, the Monitor and the UCC.

"**EMEA Surplus Amount**" has the meaning set forth at Section 7(k)(i)(B) hereof.

"**Escrow Accounts**" means, collectively, the Existing Escrow Accounts and the New Escrow Accounts.

"**Escrow Agents**" means the Existing Escrow Agents, the Canadian Escrow Agent, the EMEA Euro Escrow Agent and the EMEA Sterling Escrow Agent, as applicable.

"**Escrow Agreements**" means, collectively, the Existing Escrow Agreements and the New Escrow Agreements governing the Escrow Accounts.

"**Escrow Release Orders**" means, collectively, the Canadian Escrow Release Order and the U.S. Escrow Release Order.

"**Estate Fiduciaries**" has the meaning given to such term in the Escrow Agreements.

"**Euro Conversion Election**" has the meaning set forth in Section 7(c)(i)(A) hereof.

"**Existing Escrow Accounts**" means the escrow accounts established to hold the Sale Proceeds, as set forth on Annex B under the heading "Distribution Escrow Accounts."

"**Existing Escrow Agents**" means JPMorgan Chase Bank, N.A. and Citibank, N.A., as applicable, as escrow agents in respect of the Existing Escrow Accounts.

"**Existing Escrow Agreements**" means the agreements among the various Depositors, Estate Fiduciaries and the Escrow Agents governing the Existing Escrow Accounts, as set forth on Annex B under the heading "Distribution Escrow Accounts."

"**Final Allocation Amount**" has the meaning set forth in Section 7(h) hereof.

"**Final Allocation Determination**" has the meaning set forth in Section 7(h) hereof.

"**Final Order**" means (a) with respect to an order of a Canadian Court, an order:  (i) as to which no appeal, leave to appeal, notice of appeal, motion to amend or make additional findings of fact, motion to alter or amend judgment, motion for rehearing or motion for new trial has been timely filed (in cases in which there is a date by which such filing is required to occur, it being understood that with respect to an order issued by the CCAA Court, the time period for seeking leave to appeal shall be deemed to have elapsed on the date that is 22 days after the rendering of such order unless a motion has been made to extend such time period) or, if any of the foregoing has been timely filed, it has been disposed of in a manner that upholds and affirms the subject order in all material respects without the possibility for further appeal thereon; (ii) in respect of which the time period for instituting or filing an appeal, leave to appeal, motion for rehearing or motion for new trial shall have expired (in cases in which such time period is capable of expiring, it being understood that with respect to an order issued by the CCAA Court, the time period for seeking leave to appeal shall be deemed to have elapsed on the date that is 22 days after the rendering of such order unless a motion has been made to extend such time period); and (iii) as to which no stay is in effect; or (b) with respect to an order of a U.S. Court, an order that has not been reversed, stayed, superseded or vacated or, to the extent it has been stayed such stay shall have expired.

"**First French Order**" has the meaning set forth in Section 15(p) hereof.

"**Flextronics**" means Flextronics Telecom Systems Ltd. or any affiliate thereof.

"**French Court**" means the judge appointed in the French Secondary Proceeding, the Versailles Commercial Court, any court hearing appeals therefrom and any other court of competent jurisdiction overseeing the French Secondary Proceeding from time to time.

"**French Liquidator**" means Maître Cosme Rogeau in his capacity as Liquidator for NNSA under the French Secondary Proceeding.

"**French Main Proceeding**" means the U.K. administration of NNSA commencing on January 14, 2009.

"**French Secondary Proceeding**" means the Nortel Insolvency Proceeding that was commenced before the French Court on May 28, 2009 in respect of NNSA.

"**French Supervisory Judge**" has the meaning set forth in Section 15(p) hereof.

"**HOC**" means Nortel Networks Pénzügyi Szolgáltató Korlátolt Felelősségű Társaság.

"**Iceberg**" means the residual intellectual property remaining following the Nortel Group business line sales, which intellectual property was sold to a consortium in July 2011.

"**Iceberg Amendment Fee**" means the U.S.$5 million[2] cumulative fee previously agreed by the Canadian Debtors, U.S. Debtors, EMEA Debtors and NNSA to be funded directly as follows:  U.S.$2.8 million to NNI, and U.S.$2.2 million to NNUK, all from the Iceberg Sale Proceeds prior to any other agreed upon allocation of the Sale Proceeds.

---

[2] All amounts in this Settlement and Support Agreement are expressed in U.S. Dollars unless expressly noted otherwise.

"**Iceberg Escrow Account**" means the escrow account established to hold the Iceberg Sale Proceeds and the Iceberg Amendment Fee, as set forth on Annex B.

"**Iceberg Sale**" means the sale of the Iceberg assets.

"**Iceberg Sale Proceeds**" means that portion of the Sale Proceeds generated from the Iceberg Sale.

"**IFSA**" means the Interim Funding and Settlement Agreement, dated as of June 9, 2009, entered into among various of the Parties, as approved by the CCAA Court on June 29, 2009 and by the Bankruptcy Court on June 29, 2009.

"**IP Addresses**" means internet protocol addresses registered in the name of a Canadian Debtor or a corporate predecessor thereto.

"**Joint Administrators**" means Alan Robert Bloom, Christopher John Wilkinson Hill, Alan Michael Hudson and Stephen John Harris, as the administrators of all EMEA Debtors and NNSA except Nortel Networks (Ireland) Limited (in administration), and Alan Robert Bloom and David Martin Hughes as Administrators of Nortel Networks (Ireland) Limited (in administration).  To the extent that this Settlement and Support Agreement refers to the "Joint Administrators of NNSA" this means Alan Robert Bloom, Christopher John Wilkinson Hill, Alan Michael Hudson, Stephen John Harris and the NNSA Conflicts Administrator.

"**Joint Liquidators**" means Richard Barker and Joseph Luke Charleton as joint liquidators of NNNI and Richard Barker and Samantha Keen as joint liquidators of NNOCL.

"**LG-N**" means LG-Nortel Co. Ltd., a Korean joint venture between NNL and LG Electronics.

"**M&A Cost Reimbursement**" means the reimbursement of certain costs related to fees and expenses incurred in connection with the sale of assets which generated the Sale Proceeds.

"**MEN**" means the Nortel Group business line known as Metro Ethernet Networks.

"**Monitor**" means Ernst & Young Inc. in its capacity as the court-appointed monitor in the proceedings commenced under the CCAA in respect of the Canadian Debtors.

"**Negative Converting Debtor**" has the meaning set forth at Section 7(i)(iv) hereof.

"**New Escrow Accounts**" means, collectively, the Canadian Escrow Account and the EMEA Escrow Accounts.

"**New Escrow Agreements**" means, collectively, the Canadian Escrow Agreement and the EMEA Escrow Agreements.

"**NNC**" means Nortel Networks Corporation, a Canadian Debtor.

"**NNCC**" means Nortel Networks Capital Corporation, a U.S. Debtor.

"**NNCC Bondholder Signatories**" means the holders of NNCC Bonds that execute this Settlement and Support Agreement.

"**NNCC Bondholders**" means holders of NNCC Bonds as of the record date that will be established under the U.S. Plans.

"**NNCC Bonds**" means those bonds issued by NNCC and guaranteed by NNL.

"**NNCC Bonds Claims**" means those Crossover Claims relating to the NNCC Bonds.

"**NNCC Bonds Trustee**" means Law Debenture Trust Company of New York, as indenture trustee for the NNCC Bonds.

"**NNI**" means Nortel Networks Inc., a U.S. Debtor.

"**NNIF**" means Nortel Networks International Finance & Holding B.V. (in administration), an EMEA Debtor.

"**NNL**" means Nortel Networks Limited, a Canadian Debtor.

"**NNNI**" means Nortel Networks (Northern Ireland) Limited (in liquidation), an EMEA Non-Filed Entity.

"**NNOCL**" means Nortel Networks Optical Components Limited (in liquidation), an EMEA Non-Filed Entity.

"**NNSA**" means Nortel Networks S.A. (in administration and in *liquidation judiciaire*).

"**NNSA Allocation**" has the meaning set forth in Section 2(c)(v) hereof.

"**NNSA Conflicts Administrator**" means Stephen Jonathan Taylor of Isonomy Limited as Conflicts Administrator solely in relation to NNSA.

"**NNSA Surplus Amount**" has the meaning set forth at Section 7(k)(iii)(B) hereof.

"**NNUK**" means Nortel Networks U.K. Limited (in administration), an EMEA Debtor.

"**NNUK Allocation**" has the meaning set forth in Section 2(c)(iv) hereof.

"**Non-Converting Debtor**" has the meaning set forth in Section 7(i)(ii) hereof.

"**Non-Released Matters**" has the meaning set forth in Section 8(i) hereof.

"**Nortel Group**" means, collectively, NNC and all of its direct and indirect subsidiaries, whether current or former.

"**Nortel Insolvency Proceedings**" has the meaning set forth in the recitals hereto.

"**Nortel U.S. Trade Claims Consortium**" means a group of creditors holding over U.S.$125 million in unsecured (non-funded debt) claims, including but not limited to trade

(supplier) claims, employee severance and pension claims against one or more of the U.S. Debtors.

"**Other Currencies**" has the meaning set forth in Section 7(a) hereof.

"**Participating Creditor**" means a creditor of any of the Debtors that (i) is a Party to this Settlement and Support Agreement; or (ii) delivers a Creditor Joinder or a Transferee Joinder.

"**Party**" and "**Parties**" have the meanings set forth in the recitals hereto.

"**PBGC**" means the Pension Benefit Guaranty Corporation, a United States government corporation.

"**Petition Date**" means January 14, 2009.

"**Person**" means a "person" as defined in Section 101(41) of the Bankruptcy Code.

"**Plans**" means, collectively, the U.S. Plans and the Canadian Plan.

"**Plans Effective Date**" means the first date that (i) all of the U.S. Plans, and (ii) the Canadian Plan are effective in accordance with their respective terms.

"**Positive Converting Debtor**" has the meaning set forth in Section 7(i)(iii) hereof.

"**PPF**" means the Board of the Pension Protection Fund, a statutory corporation established under the provisions of the Pensions Act 2004, whose principal place of business is Renaissance, 12 Dingwall Road, Croydon, United Kingdom, CRO 2NA.

"**PPI Settlement**" means that certain Settlement Agreement entered into between NNI and certain of the Crossover Bondholders dated July 24, 2014 as approved by the Bankruptcy Court on December 18, 2014.

"**Proceeding**" has the meaning set forth in Section 5(e).

"**Proven Claim**" shall, with respect to a claim against one or more of the Canadian Debtors, have the meaning ascribed to such term in the Claims Procedure Order, the Claims Resolution Order of the CCAA Court, dated September 16, 2010, the Compensation Claims Procedure Order of the CCAA Court, dated October 6, 2011, and the Intercompany Claims Procedure Order of the CCAA Court, dated July 27, 2012 and shall include the U.S. Canadian Claim, the Crossover Bondholders' Proven Claim, the NNCC Bondholders' Proven Claim, the EMEA Canadian Claim, the Canadian Pension Claim and the UKPI Canadian Claim.

"**Qualified Marketmaker**" has the meaning set forth in Section 6(j)(ii) hereof.

"**Relay**" means the June 2010 sale of NNL's and NNTC's assets related to the wireless backhaul and multi-hop digital repeater/relay research development program.

"**Released Claims**" has the meaning set forth in Section 8(b)(i) hereof.

"**Releases**" has the meaning set forth in Section 8(b)(ii) hereof.

"**Releasee**" has the meaning set forth in Section 8(b)(i) hereof.

"**Releasor**" has the meaning set forth in Section 8(b) hereof.

"**Remaining HOC Claim**" has the meaning set forth in Section 4(h) hereof.

"**Sale Proceeds**" means the remaining proceeds generated by the sales of various Nortel Group business lines and the Iceberg Sale between 2009 and 2011 plus interest accrued thereon such amounts being as currently set forth in Annex A hereto,[3] less (i) US$55 million of M&A Cost Reimbursement; and (ii) the Iceberg Amendment Fee.

"**Sanction Hearing**" means the hearing before the CCAA Court to consider sanction of the Canadian Plan.

"**Sanction Order**" means the order of the CCAA Court sanctioning the Canadian Plan and shall include, for the avoidance of doubt, any order of a Canadian Court affirming such order.

"**Settlement**" has the meaning set forth in the recitals hereto.

"**Settlement and Support Agreement**" has the meaning set forth in the recitals hereto.

"**Side Letters**" has the meaning set forth in Section 4(e) hereof.

"**SNMP**" has the meaning set forth in Section 4(f) hereof.

"**Sterling Conversion Election**" has the meaning set forth in Section 7(c)(i)(A) hereof.

"**Strandherd Lands**" means certain vacant lands of the Canadian Debtors in Ottawa, Ontario, sold in November 2009.

"**Surplus Amount**" has the meaning set forth at Section 7(i)(v) hereof.

"**T&T Claim**" means any and all claims made by Nortel Networks (CALA) Inc. in respect of customer receipts from Telecommunications Services of Trinidad and Tobago deposited into Nortel Networks International Corporation's bank account related to invoices issued to Telecommunications Services of Trinidad and Tobago by Nortel Networks (CALA) Inc.

"**Tax Disputes**" has the meaning set forth in Section 4(a)(v) hereof.

"**Third Circuit**" means the United States Court of Appeals for the Third Circuit.

"**Third Party Claims**" has the meaning set forth in Section 8(c) hereof.

"**Timetable**" has the meaning set forth in Section 9(b) hereof.

---

[3] The total Sale Proceeds available for allocation and distribution may differ from the amounts detailed in Annex A, as described in Section 2(d) hereto.

"**Termination Event**" has the meaning set forth in Section 10(a) hereof.

"**Transfer**" has the meaning set forth in Section 6(j)(i) hereof.

"**Transferee Joinder**" has the meaning set forth in Section 6(j)(i) hereof.

"**Transferor**" has the meaning set forth in Section 6(j)(i) hereof.

"**UCC**" means the Official Committee of Unsecured Creditors appointed pursuant to an order entered by the Bankruptcy Court on January 26, 2009, as the same may be constituted from time to time.

"**UKPI**" means, collectively, the U.K. Pension Trustee and the PPF.

"**UKPI Canadian Claim**" has the meaning set forth in Section 4(b)(i) hereof.

"**U.K. Court**" means the High Court of Justice of England and Wales in London, any court hearing appeals therefrom and any other court of competent jurisdiction overseeing the EMEA Proceedings (including appeals) from time to time.

"**U.K. Pension Trustee**" means Nortel Networks U.K. Pension Trust Limited as trustee of the Nortel Networks Pension Plan.

"**U.S. Allocation**" has the meaning set forth in Section 2(c)(i) hereof.

"**U.S. Canadian Claim**" has the meaning set forth in Section 4(b)(i) hereof.

"**U.S. Canadian Priority Claim**" has the meaning set forth in Section 4(b)(i) hereof.

"**U.S. Court**" means any and all of the Bankruptcy Court, the United States District Court for the District of Delaware, the Third Circuit, the United States Supreme Court or any other court of competent jurisdiction overseeing the U.S. Proceedings (including appeals) from time to time.

"**U.S. Debtors**" means, collectively, NNI, NNCC, Nortel Altsystems Inc., Nortel Altsystems International Inc., Xros, Inc., Sonoma Systems, Qtera Corporation, CoreTek, Inc., Nortel Networks Applications Management Solutions Inc., Nortel Networks Optical Components Inc., Nortel Networks HPOCS Inc., Architel Systems (U.S.) Corporation, Nortel Networks International Inc., Northern Telecom International Inc., Nortel Networks Cable Solutions Inc., Nortel Networks (CALA) Inc., and Nortel Networks India International Inc.

"**U.S. Disclosure Statement**" means a disclosure statement to be provided to the U.S. Voting Creditors relating to the U.S. Plans that complies with sections 1125 and 1126(b) of the Bankruptcy Code.

"**U.S. Escrow Release Order**" means an order issued by the Bankruptcy Court authorizing and directing the release of the Sale Proceeds from the Escrow Accounts in the manner contemplated hereby.

"**U.S. Plans**" means the chapter 11 plans of reorganization (including any exhibits, annexes and schedules thereto) for the U.S. Debtors that effectuate the Settlement, consistent with the terms of this Settlement and Support Agreement, as they may be modified or supplemented in accordance with their respective terms.

"**U.S. Principal Officer**" means John J. Ray III, who was appointed Principal Officer of each of the U.S. Debtors pursuant to an order entered by the Bankruptcy Court on January 6, 2010.

"**U.S. Proceedings**" means, collectively, those Nortel Insolvency Proceedings that were commenced before the Bankruptcy Court on or after January 14, 2009 in respect of the U.S. Debtors pursuant to chapter 11 of the Bankruptcy Code.

"**U.S. Voting Creditors**" means unsecured creditors of the U.S. Debtors that are entitled to vote on one or more of the U.S. Plans and whose votes will count toward acceptance of such plans.

"**Worldwide Ds&Os**" has the meaning set forth in Section 8(b)(i) hereof.

The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation."  The word "will" shall be construed to have the same meaning and effect as the word "shall."  Unless the context requires otherwise (a) any reference herein to any Person shall be construed to include such Person's successors and assigns, (b) the words "herein," "hereof" and "hereunder," and words of similar import, shall be construed to refer to this Settlement and Support Agreement in its entirety and not to any particular provision hereof, and (c) all references herein to Sections and Annexes shall be construed to refer to Sections of, and Annexes to, this Settlement and Support Agreement.  The division of this Settlement and Support Agreement into Sections and the insertion of headings are for convenience only and are not to affect or be used in the construction or interpretation of this Settlement and Support Agreement.

**Section 2.  <u>Settlement of Allocation Dispute</u>**

(a)     For the avoidance of doubt, this Section 2 is subject to the satisfaction of the conditions contained in Section 9(a) hereof, except to the extent expressly indicated in Section 9(c) hereof.

(b)     The Parties hereby agree to settle the Allocation Dispute on the terms set forth herein and enter into coordinated processes which shall include, among other things, (i) the drafting of the Canadian Plan and its submission to Canadian Voting Creditors for voting under the CCAA and to the CCAA Court for sanction, (ii) the drafting of the U.S. Plans and their submission to U.S. Voting Creditors for voting and to the Bankruptcy Court for confirmation, each on the schedule set forth in the Timetable, (iii) the submission of the Settlement and Support Agreement to the U.K. Court and the French Court, and (iv) submission to the Beddoes Court for authorization of the U.K. Pension Trustee to implement the Settlement and Support Agreement, as contemplated by Section 6 hereof.

(c)     The Parties hereto agree to allocate the Sale Proceeds as follows:

   (i)     U.S. Debtors: 24.350%, U.S.$1,766,417,002 (the "**U.S. Allocation**")[4];

   (ii)    Canadian Debtors:  57.1065%, U.S.$4,142,665,131 (the "**Canadian Allocation**");

   (iii)   EMEA (Non-NNSA/Non-NNUK) Debtors: 1.4859%, U.S.$ 107,788,879 (the "**EMEA (Non-NNSA/Non-NNUK) Allocation**")[5];

   (iv)    NNUK:  14.0249%, U.S.$1,017,408,257 (the "**NNUK Allocation**"); and

   (v)     NNSA:  U.S.$220,000,000 (the "**NNSA Allocation**," and collectively with the EMEA (Non-NNSA/Non-NNUK) Allocation and the NNUK Allocation, the "**EMEA Allocation**").  The EMEA Allocation shall be 18.5435%, provided, however, within the EMEA Allocation, the NNSA Allocation is fixed at U.S.$220,000,000 and NNSA shall not share proportionally with any increase or decrease in the Sale Proceeds as the result of the matters contemplated in Section 2(d) hereof, and any such increase or decrease in the Sale Proceeds that would but for this Section 2(c)(v) have been allocated to NNSA shall be allocated to NNUK.

(d)     The Sale Proceeds to be allocated in accordance with Section 2(c) hereof include the Buyer Escrow Amount. To the extent that the amount of Sale Proceeds ultimately released from the Buyer Escrow Accounts to the Debtors is less than the Buyer Escrow Amount, any such shortfall shall be allocated among the Debtors in the percentages set forth in Section 2(c), subject to Section 2(c)(v) hereof, so that the amount of Sale Proceeds to be allocated in accordance with Section 2(c), subject to Section 2(c)(v) hereof, shall be reduced by the amount of such shortfall.

   (i)     Any fees and costs of the Escrow Agents for the Existing Escrow Agreements (other than costs and fees relating to any currency conversion that occurs pursuant to Section 7) shall be borne and allocated among the Debtors in the percentages set forth in Section 2(c), subject to Section 2(c)(v) hereof.

   (ii)    Any further amounts credited to the Escrow Accounts following the date of this Agreement, including any accrued interest not otherwise reflected in Annex A earned on the Sale Proceeds, shall be allocated among the Debtors in the percentages set forth in Section 2(c), subject

---

[4] Such allocation is to be distributed among the U.S. Debtors in the amounts and proportions set forth in Annex F.

[5] Such allocation is to be distributed among the EMEA Debtors (other than NNUK) in the amounts and proportions set forth in Annex E.

to the provisions of Sections 2(c)(v) and 7(b)(vi), 7(c)(x) and 7(e) hereof.

(e)    The Parties hereto further agree first to distribute the following amounts from the Iceberg Escrow Account, which amounts shall not be subject to the Section 2(c) allocation percentages or be deemed to constitute Sale Proceeds:

(i)    U.S.$2.8 million of the Iceberg Amendment Fee to NNI and U.S.$2.2 million of the Iceberg Amendment Fee to NNUK, and

(ii)    U.S.$20 million to NNI and U.S.$35 million to the Canadian Debtors on account of the M&A Cost Reimbursement.

(f)    Distributions of the Sale Proceeds will next be made as follows:

(i)    all amounts in the Canadian Escrow Account shall be released to the Canadian Estate, with the funds received by the Canadian Estate being credited against the Canadian Allocation set forth in Section 2(c)(ii) in the manner set forth in Section 7(g);

(ii)    all amounts (if any) in the EMEA Euro Escrow Account shall be released to NNSA with the funds received by NNSA being credited against the NNSA Allocation as set forth in Section 2(c)(v), in the manner set forth in Section 7(g);

(iii)    all amounts (if any) in the EMEA Sterling Escrow Account shall be released to the EMEA Debtors who are Converting Debtors in proportion to their allocation set out at Annex E, with the funds received by such Converting Debtors being credited against the allocation of such Converting Debtors in the manner set forth in Section 7(g);

(iv)    remaining amounts in the Existing Escrow Accounts shall be released (A) in accordance with  the allocations set forth in Section 2(c) hereof, and (B) taking into account the funds to be released from the New Escrow Accounts under Sections 2(f)(i), (ii) and (iii) hereof; and

(v)    for the avoidance of doubt, total distributions under Sections 2(f)(i)(ii)(iii) and (iv) hereof, will be strictly in accordance with the allocations set forth in Section 2(c) hereof.

(g)    NNC, NNL, NNI and NNUK shall use reasonable best efforts to obtain the release of the remaining amounts held in the Buyer Escrow Accounts, totaling approximately U.S.$21.8 million (the "**Buyer Escrow Amount**"), into the Escrow Account holding that portion of the Sale Proceeds attributable to the particular sale (or such other accounts as jointly agreed to and directed by NNC, NNL, NNI, and NNUK for their respective shares).  Any amount so obtained shall be allocated in accordance with the percentages set forth in Section 2(c).

16

(h)     In connection with the distribution of Sale Proceeds contemplated pursuant to Section 2(f), NNIF shall pay U.S. $3 million to the Canadian Estate within 30 days of the conditions in Section 9(a) being satisfied and such payment obligation shall rank as an administration expense of NNIF.  Subject to receipt by the Canadian Estate of such amount, such payment shall be in full satisfaction of the Remaining HOC Claim.

## Section 3.  Release of Sale Proceeds

(a)     For the avoidance of doubt, this Section 3 is subject to the satisfaction of the conditions contained in Section 9(a) hereof, except to the extent expressly indicated in Section 9(c) hereof.

(b)     As set forth in Section 6(b) hereof, the Canadian Debtors and Monitor shall seek entry of the Canadian Escrow Release Order, which order shall be entered with, or promptly following entry of, the Sanction Order and will be conditioned on the occurrence of the Plans Effective Date.

(c)     As set forth in Section 6(c) hereof, the U.S. Debtors shall seek entry of the U.S. Escrow Release Order, which order shall be entered with, or promptly following entry of, the Confirmation Order and will be conditioned on the occurrence of the Plans Effective Date.

(d)     The Escrow Release Orders shall:  (i) constitute the order required under Section 12(b) of the IFSA to permit and authorize the distribution of the Sale Proceeds in accordance with the allocation set forth in Section 2(c) hereof; (ii) constitute the orders of the "dispute resolvers" contemplated by the Escrow Agreements to permit and authorize the Escrow Agents to distribute the Sale Proceeds; and (iii) be in form and substance reasonably satisfactory to the Parties.

(e)     In addition to any Escrow Release Orders, the parties to the Escrow Agreements may also provide joint instructions to the Escrow Agents, as permitted by the Escrow Agreements, directing the release of the Sale Proceeds in accordance with this Settlement and Support Agreement, the form and substance of such joint instructions being reasonably satisfactory to the Parties.

(f)     Immediately following the occurrence of the Plans Effective Date, the Canadian Debtors, the Monitor, the EMEA Debtors, NNSA, the EMEA Non-Filed Entities, the U.S. Debtors and the UCC shall jointly provide copies of the Escrow Release Orders to the Escrow Agents and the parties to the Escrow Agreements shall take such other and further steps as are reasonably necessary, including but not limited to the provision of joint instructions or other notices to the Escrow Agents under Section 3(e) above, in order to cause the Escrow Agents to release the Sale Proceeds in accordance with the terms of this Settlement and Support Agreement.

(g)     It is understood and agreed that the Canadian Debtors, the Monitor, the U.S. Debtors, the UCC, the EMEA Debtors, NNSA, and the EMEA Non-Filed Entities, to the extent necessary, may provide more specific instructions to the Escrow Agents in connection with the Escrow Release Orders or any instruction

17

provided pursuant to Section 3(e) hereof, to direct payment to specific Debtor estates subject always to the collective maximum allocation and distribution of Sale Proceeds allocated to each of the U.S. Debtors, Canadian Debtors, EMEA Debtors and NNSA, respectively, as set forth in Section 2(c) hereof (and, in the case of the U.S. Debtors and the EMEA Debtors subject to the agreed allocations set forth in Annexes F and E, respectively) and each of the U.S. Debtors, the Canadian Debtors, the EMEA Debtors, NNSA, and the EMEA Non-Filed Entities in their capacity as Depositors under the Escrow Agreements (to the extent they are Depositors under any specific Escrow Agreement), and the Monitor and the UCC in their capacity as Estate Fiduciaries under the Escrow Agreements, shall give such instructions or consents as may be reasonably required in connection with the foregoing.  In relation to NNSA, any such instructions shall be given conjointly by the NNSA Conflicts Administrator and the French Liquidator following agreement with the Joint Administrators. The Bondholder Group and the UCC shall provide any consent as may be reasonably necessary under the IFSA in connection with any such instruction.  If, following the Plans Effective Date, all or any portion of the remaining Buyer Escrow Amount is to be released in accordance with this Settlement and Support Agreement then the parties to such escrows shall give the necessary instructions to the relevant Escrow Agent to apportion and release those proceeds to the Debtors in the respective allocation percentages set forth in Section 2(c).

## Section 4.  Additional Settlement Provisions

The following provisions are also essential terms of the Settlement, which provisions, in respect of the U.S. Debtors, shall be incorporated into the U.S. Plans and, in respect of the Canadian Debtors, shall be incorporated into the Canadian Plan, as applicable.  For the avoidance of doubt, this Section 4 is subject to the satisfaction of the conditions contained in Section 9(a) hereof, except to the extent expressly indicated in Section 9(c) hereof.

(a)    Estate Administration

(i)    The Canadian Debtor estates will be administered by the Monitor.

(ii)    The EMEA Debtor and NNSA (in the French Main Proceeding) estates will be administered by their respective representatives being the Joint Administrators in respect of each EMEA Debtor and being the Joint Administrators and the NNSA Conflicts Administrator in respect of NNSA in the French Main Proceeding.

(iii)    The French Secondary Proceeding will be administered by its representative, being the French Liquidator.

(iv)    The U.S. Debtor estates will be administered by the U.S. Principal Officer.

(v)    Notwithstanding the separate administration of the estates of the Canadian Debtors, the EMEA Debtors, NNSA, the U.S. Debtors and of the EMEA Non-Filed Entities, the Parties shall work cooperatively and

18

use reasonable efforts to implement this Settlement and Support Agreement and the Plans in a tax efficient manner. In addition, the Debtors shall, upon the written request of a Debtor to another Debtor and to the extent permitted by applicable local law and not inconsistent with the statutory duties of the Debtor, or the Debtor's representatives and fiduciaries, to which a request is made, reasonably cooperate with each other, including providing such documents, other information, access to current personnel and/or permission to communicate with former personnel as may reasonably be requested by the requesting Debtor, in connection with the preparation and filing of tax returns and responding to or contesting any challenges, inquiries, audits or other disputes by tax authorities in relation thereto (collectively, "**Tax Disputes**"); provided, however, that no Debtor shall be obligated to cooperate to the extent such requested cooperation would prejudice the interests of such Debtor. The Debtor requesting cooperation shall bear all costs and expenses, including reasonable attorney fees, of the Debtor providing such cooperation, including the reasonable costs of accessing, processing, reviewing and making available any documents, other information and/or personnel requested. For the avoidance of doubt, each Debtor shall be solely responsible for preparing and filing its own tax returns and contesting or challenging any Tax Disputes in relation thereto, and no other Debtor shall have any obligation to respond to, contest, challenge, dispute or appear in any other Debtor's Tax Disputes. It is acknowledged that the Debtors intend to progress the wind-up of their respective estates, including the continuing disposal of records and decommissioning of their electronic data infrastructure (such as servers), and that the cooperation contemplated pursuant to this Section 4(a)(v) shall in no way preclude any of the Debtors from taking any steps in connection with such wind-up. To the extent that any Debtor receiving a request under this Section 4(a)(v) takes the position that it is unable to provide the assistance requested, such Debtor shall confer with the Debtor making the request as to the basis for such position.

(vi)     No Party will interfere with or oppose any Debtor regarding such Debtor's asset monetization, subsidiary wind-downs, tax positions, distributions, or marshalling, to the extent such actions are not inconsistent with this Settlement and Support Agreement, provided however, that the foregoing shall not compromise (x) the right, if any, of a creditor to (A) object, if such creditor has a claim that remains outstanding and unpaid against the relevant Debtor or Debtors against which the claim is to be allowed, after the date of this Settlement and Support Agreement, in the U.S. Court allowing a claim against the U.S. Debtors or in the Canadian Court allowing a claim as a Proven Claim against the Canadian Estate, in each case, other than claims expressly referred to in this Settlement and Support Agreement, and/or (B) exercise any right it may have as a creditor in respect of its claim including in respect of a Debtor's asset monetization, except in a

19

manner that directly contradicts any term of this Settlement and Support Agreement, or (y) the Parties' rights and obligations, if any, under the Cross-Border Protocol, the Cross-Border Protocol on the Resolution of Claims approved by the CCAA Court by Order dated September 16, 2010 and by the Bankruptcy Court by order dated September 16, 2010, or the Claims Resolution Order of the CCAA Court, dated September 16, 2010 .

(b)    <u>Estate Consolidation</u>

(i)    <u>Canadian Debtors</u> – The Canadian Debtors shall be substantively consolidated pursuant to the Canadian Plan on the Plans Effective Date with all intercompany claims between and among the Canadian Debtors being thereby eliminated for purposes of the Canadian Plan and no distributions or payments will be made by the Canadian Debtors on account of such claims under the Canadian Plan or otherwise, and all unsecured creditors holding claims against the Canadian Estate (including the U.S. Debtors' $2.0 billion Proven Claim (the "**U.S. Canadian Claim**"), the Crossover Bondholders' Proven Claims of U.S.$3,940,750,260 in the aggregate, the NNCC Bondholders' Proven Claim of U.S.$150,951,562, the Proven Claims held by certain of the EMEA Debtors in an aggregate amount not to exceed U.S.$125,000,000 (subject to the contractually agreed upon conditions in clause 2.2 of the Agreement Settling EMEA Canadian Claims and Related Claims among, *inter alia*, the Canadian Debtors, the Monitor, the EMEA Debtors and NNSA, dated July 9, 2014) (respectively, the "**EMEA Canadian Claim**" and the "**EMEA Canada Settlement Agreement**") and the UKPI's Proven Claim of £339.75 million[6] (the "**UKPI Canadian Claim**") and the Canadian Pension Claim) will be paid *pari passu* by the Canadian Estate with all other general unsecured creditor distributions without discrimination of any kind. The U.S. Debtors' allowed U.S.$62.7 million secured claim (defined as the "Remaining Revolver Claim" in the CFSA) (the "**U.S. Canadian Priority Claim**") will retain its priority status granted by the CCAA Court in the order dated January 21, 2010.

(ii)    <u>U.S. Debtors</u> – The U.S. Debtors' estates shall not be substantively consolidated, provided, however, that NNCC shall be substantively consolidated with and into NNI on the Plans Effective Date.

(iii)    <u>EMEA Debtors</u> – The EMEA Debtors' estates and NNSA (or any of them) shall not be substantively consolidated.

(c)    <u>Coordination of Crossover Claims (Issuer Pays First)</u>

---

[6] Being U.S.$494,879,850 when converted from £339.75 million in accordance with Appendix "A" to the Claims Procedure Order.

(i)    The U.S. Plans and the Canadian Plan shall contain the following provisions with respect to claims arising out of a debt or other obligation of one or more of the U.S. Debtors that is guaranteed or indemnified by one or more of the Canadian Debtors, or a debt or other obligation of one or more of the Canadian Debtors that is guaranteed or indemnified by one or more of the U.S. Debtors (such claims, including, without limitation, the Crossover Bonds Claims, NNCC Bonds Claims and EDC claims, but excluding, in relation to the Canadian Debtors, any obligation of a Canadian Debtor guaranteed by another Canadian Debtor, being the "**Crossover Claims**"):

(A)    In the event that the creditor shall have a Proven Claim against the Canadian Estate and an allowed claim against the relevant U.S. Debtor, then, subject to Section 4(c)(i)(B) and 4(g)(vi), the issuer (or primary) Debtor estate and any guarantor (or secondary) Debtor estate shall pay distributions on the full amount of the allowed claim, if a claim against a U.S. Debtor estate, or the full amount of the Proven Claim, if a claim against the Canadian Estate, on a *pari passu* basis with all other creditors holding allowed claims (in the case of the U.S. Debtors) or Proven Claims (in the case of the Canadian Debtors) with the same priority without discrimination of any kind.

(B)    In no case shall a creditor holding a Crossover Claim be entitled to receive (i) any further distributions from the U.S. Debtors where the aggregate distributions made by the U.S. Debtors and the Canadian Estate in respect of such Crossover Claim equal the total allowed amount of such Crossover Claim against the U.S. Debtors, or (ii) any further distributions from the Canadian Estate where the aggregate distributions made by the U.S. Debtors and the Canadian Estate in respect of such Crossover Claim equal the total Proven Claim amount of such Crossover Claim against the Canadian Estate. For the avoidance of doubt, in no event shall a holder of a Crossover Claim be entitled to receive aggregated distributions in respect of its allowed Crossover Claim of more than 100% of the greater of (i) its pre-filing allowed claim (U.S.), and (ii) Proven Claim (Canada) when taking into account distributions received from both the issuer (or primary) Debtor estate and guarantor (or secondary) Debtor estate (such greater amount, the "**Creditor's Maximum**"). For the further avoidance of doubt, in relation to a specific Crossover Claim, if the amount in U.S. Dollars of the allowed claim (U.S.) for such Crossover Claim is not the same as the amount of the Proven Claim (Canada) for such Crossover Claim, the Creditor's Maximum shall not be reached until the greater of the two amounts has been distributed to the creditor. Any amounts paid pursuant to Section 4(m) shall not be included in calculating the Creditor's Maximum as it pertains to the NNCC Bonds.

21

(C)    Notwithstanding Section 4(c)(i)(B) above, if the relevant creditor receives an aggregate amount of distributions equal to the Creditor's Maximum on account of its Crossover Claim, then the guarantor (or secondary) Debtor estate shall subrogate into the Crossover Claim against the issuer (or primary) Debtor estate (for the NNCC Bonds, the issuer Debtor estate is NNCC as of the date hereof, but shall be deemed to be NNI on the Plans Effective Date when NNCC is consolidated into NNI) and will be entitled to receive any and all subsequent distributions from the issuer (or primary) Debtor estate on account of such Crossover Claim on a *pari passu* basis with all other creditors holding allowed claims (U.S.) or Proven Claims (Canada) with the same priority from the issuer (or primary) Debtor estate without discrimination of any kind, provided that (i) the guarantor (or secondary) Debtor estate shall not receive any distributions on such claim in excess of payments the guarantor (or secondary) Debtor estate has made to the underlying holder of such Crossover Claim and (ii) in the case of the Crossover Bonds Claims, NNI shall receive distributions from the Canadian Estate as a result of such subrogation for distributions NNI has made on the allowed Crossover Bonds Claims only to the extent that NNI makes distributions in respect of the allowed Crossover Bonds Claims in excess of U.S.$1.25 billion and such subrogation shall be only in respect of amounts distributed in excess of U.S.$1.25 billion, it being understood that NNI's right of subrogation pursuant to this Section 4(c)(i)(C), if any, against the Canadian Estate in respect of the Crossover Bonds Claims remains subject to distributions equal to the Creditor's Maximum first being received by holders of the Crossover Bonds Claims on account of such claims.

(ii)    For the avoidance of doubt, no right of subrogation or indemnity (however described) will arise in favour of any Canadian Debtor or any U.S. Debtor against any EMEA Debtor, NNSA, or any EMEA Non-Filed Entity in respect of any amount paid by a Canadian Debtor or any U.S. Debtor pursuant to any guarantee or indemnity in respect of a liability of any EMEA Debtor, NNSA or EMEA Non-Filed Entity, and no Canadian Debtor nor any U.S. Debtor shall pursue or file any such claims or assert any right of subrogation against any EMEA Debtor, NNSA or EMEA Non-Filed Entity.

(iii)    The issuer Debtor estate and the guarantor Debtor estate shall reasonably cooperate to give effect to the provisions of this Section 4(c), including sharing information regarding the Crossover Claims and intended and actual distributions thereon.

(d)    <u>Post-Petition Date Interest</u> — No post-Petition Date interest (or make whole premium or similar claim accruing post-Petition Date) shall be included in any creditor claims, nor be paid on creditor claims in any Debtor estate, save and

except with respect to any EMEA Debtor estate, and then only to the extent payment is required under applicable law (and, if interest is payable by an EMEA Debtor, nothing herein shall restrict the right of the EMEA Debtor to compromise in whole or in part the amount of interest due and payable), provided, however, that the Canadian Debtors agree that they shall not receive post-Petition Date interest on the Remaining HOC Claim.

(e)     Side Letters, IFSA, CFSA and T&T Claims – In full and final resolution of (i) all entitlements and obligations arising under side letters to which any of the U.S. Debtors and Canadian Debtors are party (as further specified on Annex C hereto and which, for purposes of this Section 4(e) and Annex C shall include the IFSA and CFSA, collectively, the "**Side Letters**"), and (ii) the T&T Claim, NNI shall receive payment from the Canadian Estate in the amount of U.S.$77.5 million. After receipt of such payment by NNI, NNI shall have a 27% interest in the remaining assets of the Cascade Trust and the Canadian Estate shall have a 73% interest in the remaining assets of the Cascade Trust.  The Parties agree that except in relation to the Iceberg Amendment Fee, in respect of which NNUK will be entitled to a payment of U.S.$2.2 million from the Iceberg Sale Proceeds, neither the EMEA Debtors (nor NNSA) nor the EMEA Non-Filed Entities shall have any other entitlements or obligations under the Side Letters.

(f)     SNMP – There shall be no holdback of Sale Proceeds with respect to any liability that may be due or become due to one or both of SNMP Research International Inc. or SNMP Research Inc. (either or together, "**SNMP**").  No Debtor has or shall have any claim (whether by way of contribution, indemnity or otherwise) against any other Debtor in respect of any liability due or which may become due to SNMP and no Debtor or any other Party will assist SNMP in bringing any claim against any other Debtor.

(g)     Resolution of Certain Claims – The Parties have agreed to the following treatment for the following claims:

(i)     the Canadian registered pension plans deficit claims against each of the Canadian Debtors shall be allowed as unsecured Proven Claims against the Canadian Estate in the aggregate amount of CAD$1,889,479,000 (the "**Canadian Pension Claim**");

(ii)     the PBGC claim against each of the U.S. Debtors (and against any non-debtor U.S. Nortel Group entity) shall be a maximum of U.S.$708,000,000 and all rights of the U.S. Debtors and other U.S. based parties-in-interest in the U.S. Proceedings to contest such PBGC claims are expressly reserved and the allocation percentages provided for in Section 2(c) shall not change if the PBGC claims are admitted or allowed for a different amount;

(iii)     the Parties (other than NNUK and the UKPI) agree that they will not challenge the adjudication by the Joint Administrators of NNUK of the UKPI's claim arising under section 75 of the U.K. Pension Act 1995 (presently filed in the amount of £2,147,000,000) against NNUK and

the allocation percentages provided for in Section 2(c) shall not change if the UKPI claim is admitted or allowed for a different amount;

(iv)    the Crossover Bonds Claims (a) against NNL and NNC shall be allowed as unsecured Proven Claims against the Canadian Estate in the aggregate amount of U.S.$3,940,750,260, as specified in Annex G hereto, and (b) against NNI shall be allowed as a general unsecured claim in the aggregate amount of U.S.$3,934,521,442, as specified in Schedule A to the Agreement Settling The NNI Post-Petition Interest Dispute And Related Matters dated July 24, 2014;

(v)    the NNCC Bonds Claims (a) against NNI (into which NNCC shall be substantively consolidated on the Plans Effective Date) shall be allowed as a general unsecured claim in the amount of U.S.$150,951,562, and (b) against NNL shall be allowed as an unsecured Proven Claim against the Canadian Estate in the amount of U.S.$150,951,562;

(vi)    the U.S. Plans shall provide that NNI shall reserve U.S.$7.5 million from cash otherwise available for distributions to NNI unsecured creditors, to be made available to be paid in respect of the NNCC Bonds Claims in the event that distributions (including deemed distributions related to the Crossover Bondholder Fee Letter) in respect of the NNCC Bonds Claims will be less than U.S.$150,951,562 (exclusive of any amount paid pursuant to Section 4(m)) upon the completion of distributions in respect of the NNCC Bonds Claims on the allowed claim against NNI (which claim against NNI results from the consolidation of NNCC with and into NNI) and the Proven Claim against the Canadian Estate, provided, however, that NNI shall use such reserves to make distributions in respect of the NNCC Bond Claims only in the amount of the lesser of (A) U.S.$150,951,562 less total distributions from NNI and the Canadian Estate (exclusive of any amount paid pursuant to Section 4(m)), and (B) U.S.$7.5 million;

(vii)    The Bondholder Group agrees that it will negotiate in good faith with the Nortel U.S. Trade Claims Consortium regarding additional terms that would cause such group to support the Settlement and the U.S. Plans; and

(viii)    the UKPI Canadian Claim and the EMEA Canadian Claim shall be allowed as unsecured Proven Claims against the Canadian Estate.

(h)    <u>Book Intercompany Claims</u> – Pre-filing intercompany claims in the amounts recorded in the books and records of companies comprising the Nortel Group as set out in Annex L shall be included in the determination of the allowed unsecured claims against a Debtor (except to the extent such claims are between Canadian Debtors, where no distributions or payments will be made by the Canadian Debtors on account of such claims under the Canadian Plan or otherwise). Annex L shall be treated as the definitive position for all pre-filing intercompany claims between the Nortel Group entities specified thereon. Any

and all other pre-filing books and records claims between (A) any of the Canadian Debtors, on the one hand, and (B) any of the U.S. Debtors and their other subsidiaries as specified on Annex L, on the other hand, which are not preserved specifically herein (including, without limitation the claims referenced in Sections 4(b)(i) and 4(g)), are forever released and barred.  Other than the EMEA Canadian Claim, the Remaining HOC Claim and any other pre-filing intercompany claims set forth on Annex L, all pre-filing books and records claims, including any claims that a Debtor now holds as a consequence of an assignment (excluding claims against an EMEA Debtor assigned to NNUK in connection with the EMEA Canada Settlement Agreement), between (G) any of the EMEA Debtors, NNSA or the EMEA Non-Filed Entities, on the one hand, and (H) any of the Canadian Debtors or the U.S. Debtors, on the other hand, are forever released and barred.  The EMEA Debtors and the Canadian Debtors agree that in full and final settlement of:  (Q) the Tranche 2 Payment (as such term is defined in the Q1 2010 Transfer Pricing Settlement Agreement among, *inter alia*, certain of the Canadian Debtors, the Joint Administrators and the EMEA Debtors, dated September 8, 2011); and (R) the U.S.$7,621,249 claim of certain of the Canadian Debtors against NNIF related to HOC, the Canadian Estate shall have an accepted post-Petition Date claim against NNIF in the amount of U.S.$3 million (the "**Remaining HOC Claim**"). The Remaining HOC Claim shall rank as an administration expense of NNIF payable in full in accordance with Section 2(h) and not subject to compromise or reduction.  For the avoidance of doubt, the Tranche 2 Payment (being the remaining amount of the Shortfall Payments (as defined in the IFSA)) is forever released and barred.  The Parties agree and acknowledge that, as at the date hereof, there are no post-filing books and records claims owing between (Y) any of the Canadian Debtors, on the one hand, and any of the U.S. Debtors, the EMEA Debtors, NNSA and the EMEA Non-Filed Entities, on the other, and (Z) any of the U.S. Debtors, on the one hand, and any of the EMEA Debtors, NNSA and the EMEA Non-Filed Entities, on the other.

(i)     <u>Intra-EMEA Claims</u> – Nothing in this Settlement and Support Agreement affects claims as between or among any of the EMEA Debtors and/or NNSA and/or the EMEA Non-Filed Entities, which shall be dealt with separately between the EMEA Debtors, NNSA and the EMEA Non-Filed Entities.  Nothing in this Settlement and Support Agreement affects claims between or among the UKPI, any EMEA Debtor, NNSA, or the EMEA Non-Filed Entities, the Joint Administrators, the NNSA Conflicts Administrator or the French Liquidator, which shall be dealt with separately between and among the EMEA Debtors, NNSA, the EMEA Non-Filed Entities, the Joint Administrators, the NNSA Conflicts Administrator, the French Liquidator and the UKPI.

(j)     <u>Remaining Assets and Other Proceeds</u> – Each Debtor estate has the right to retain the value of its respective remaining assets, if any, and shall not be subject to any claims thereto by any other Debtor save and except those acknowledged herein.  Other than those claims acknowledged herein to receive distributions from the proceeds of such assets, the U.S. Debtors, the EMEA Debtors, NNSA, the UKPI and the EMEA Non-Filed Entities release any claims they have asserted or may assert or have as against (i) those proceeds held by the Canadian Debtors as

"Restricted Cash" or "Unavailable Cash" (as noted in Monitor's Reports to the CCAA Court), including in respect of the realization of the interests in LG-N, the Strandherd Lands, Relay and IP Addresses, and (ii) the remaining IP Addresses, including any proceeds arising therefrom.  For the avoidance of doubt, nothing in this subsection shall (i) prohibit the assertion of claims to enforce this Settlement and Support Agreement and claims that are reserved in this Settlement and Support Agreement (including without limitation, the claims referenced in Section 4(b)(i) hereof) or (ii) affect the Parties' rights to receive distributions as creditors of the various Debtors' estates.

(k)     Bondholder Group Fees – The aggregate amount of fees under the existing fee letter dated June 23, 2011 between various advisors to the Bondholder Group and NNC and NNL (the "**Crossover Bondholder Fee Letter**") to be deducted from distributions to Crossover Bondholders and NNCC Bondholders in respect of their Proven Claims against the Canadian Estate shall be U.S.$47 million (which includes U.S.$3.0 million in respect of the deferred compensation fee payable to FTI Consulting).  An additional U.S.$7.0 million may be deducted from Canadian Estate distributions to Crossover Bondholders and NNCC Bondholders in further payment of the deferred compensation fee payable to FTI Consulting.  All such deductions shall be borne by the Crossover Bondholders and the NNCC Bondholders on a pro rata basis based on the amount of the Proven Claims of the Crossover Bondholders and the NNCC Bondholders as set forth on Annex G hereto.

(l)     Canadian Fees – The Canadian Debtors and Monitor agree that the Canadian Debtors will not pay voluntarily, or seek permission to pay, legal or advisor fees of any stakeholder that the Canadian Debtors are not paying as of the date hereof.  Payment of any such further legal or advisor fees will be done only pursuant to an order of the CCAA Court.

(m)     NNCC Fees – The U.S. Plans shall provide that NNI shall pay the reasonable and documented fees of (a) the NNCC Bonds Trustee, in an amount not to exceed U.S.$4.25 million, and (b) counsel to Solus Alternative Asset Management LP and PointState Capital LP in an amount not to exceed U.S.$750,000.  Notwithstanding any other term in this Settlement and Support Agreement, if any amount remains in the cash reserve established pursuant to Section 4(g)(vi) hereof after the making of payments required thereunder, the U.S. Plans shall provide that, out of such funds, NNI shall pay or reimburse reasonable and documented fees (up to an additional U.S.$2.0 million) incurred by professionals in connection with the assertion of rights related to the NNCC Bonds.  Any amount payable by NNI under this Section 4(m) shall include an amount equal to, and be in addition to, any fees paid by the Canadian Debtors under the Crossover Bondholder Fee Letter allocated to the NNCC Bondholders that are deducted from distributions made by the Canadian Estate to the NNCC Bondholders as described in Section 4(k).

(n)     Canadian Debtor Claim Distributions – Solely for determining *pari passu* distributions in respect of unsecured claims against the Canadian Estate, claims

26

will be valued in U.S. Dollars and all non-U.S. Dollar denominated Proven Claims against the Canadian Estate will be converted to U.S. Dollars at the prevailing exchange rate reported by Reuters on January 14, 2009 (as reflected at Appendix "A" to the Claims Procedure Order).

(i)       Proven Claims against the Canadian Estate predominantly denominated in Canadian Dollars ("**CAD Claims**") will be paid from Canadian Estate assets in Canadian Dollars.

(ii)      All other Proven Claims against the Canadian Estate will be paid in U.S. Dollars.

(iii)    For purposes of determining the amount of Canadian Dollars to be paid by the Canadian Estate on distributions on CAD Claims, the amount of such distribution in U.S. Dollars (as calculated in accordance with this Section 4(n)), shall be converted to Canadian Dollars at the Applicable FX Rate at which Sale Proceeds are converted from U.S. Dollars to Canadian Dollars as contemplated by Section 7 hereof.

(o)     <u>Plans Effective Date</u> – Each of the Plans shall contain a term to the effect that the U.S. Plans and the Canadian Plan shall become effective at the same time.

## Section 5.  <u>Litigation Resolution</u>

(a)     For the avoidance of doubt, this Section 5 is subject to the satisfaction of the conditions set forth in Section 9(a) hereof, except to the extent expressly indicated in Section 9(c) hereof.

(b)     Promptly following the Plans Effective Date, the Parties shall dismiss with prejudice and with no order as to costs all appeals, leave to appeal applications and other litigations among any of the Parties (including the pending appeals and cross-appeals in respect of the Allocation Dispute, the pending appeal of the PPI Settlement by the Canadian Debtors, the pending appeal of the SNMP impleader action and related denial of a chapter 15 stay to which the U.S. Debtors and the EMEA Debtors and SNMP are parties, and the pending appeal and cross-appeal in respect of the claims of the UKPI against the Canadian Debtors), save and except for the Non-Released Matters and provided that rights are reserved to enforce this Settlement and Support Agreement. Such dismissals will be effected by the filing of the appropriate documents with the appropriate courts in each jurisdiction, the form of which documents must be reasonably acceptable to the Parties party to such litigation.

(c)     The Parties hereby agree that immediately upon this Settlement and Support Agreement being executed by all Parties, in a coordinated fashion the Parties shall contact the CCAA Court, the Bankruptcy Court, the Ontario Court of Appeal, the Supreme Court of Canada, the U.S. District Court for the District of Delaware, the Third Circuit, the U.K. Court, the French Court, and such other courts as may be necessary, and notify them that the Settlement and Support Agreement has been executed. Counsel to the Monitor shall coordinate contacting the Canadian

Courts (except with respect to contacting the Supreme Court of Canada in connection with the leave application filed therewith, which shall be coordinated by counsel to the U.S. Debtors in consultation with counsel to the Monitor), counsel to the U.S. Debtors shall coordinate contacting the U.S. Courts, counsel to the Joint Administrators shall coordinate contacting the U.K. Court and counsel to each of the French Liquidator and NNSA Conflicts Administrator shall coordinate contacting the French Court.

(d)    Subject to Section 5(e), the Parties hereby agree that immediately upon this Settlement and Support Agreement being executed by all Parties, in a coordinated fashion the Parties shall request that the Canadian Courts and the U.S. Courts stay any and all matters pending before those courts between any of the Parties to, or that are otherwise related to, this Settlement and Support Agreement, including, without limitation, the litigation described in Section 5(b) hereof, pending satisfaction of the conditions set forth in Section 9(a) hereof.

(e)    The Parties hereby agree not to commence or take any step to advance any action, claim, appeal, objection or other similar proceeding (a "**Proceeding**") seeking relief that is the subject of the matters addressed in this Settlement and Support Agreement; provided, however, that (i) to the extent that a stay contemplated by subsection 5(d) above is not granted or ceases to exist in respect of any Proceeding, the Parties shall be entitled to take all reasonably necessary steps to preserve their rights in all relevant jurisdictions in respect of such Proceeding prior to the Plans Effective Date, provided, further, however, in accordance with Section 10 hereof, in the event of a termination of this Settlement and Support Agreement, upon the occurrence of such termination, the Parties agree to notify the relevant courts of such termination and immediately thereafter recommence, or continue, as applicable, litigation.  For the avoidance of doubt, the Parties rights to propose or oppose expedition of any Proceeding in the event of such termination are preserved as set forth in Section 10(c) herein.

## Section 6.  <u>Support of Settlement, Disclosure Statements and Plans</u>

(a)    For the avoidance of doubt, this Section 6 is subject to the satisfaction of the conditions set forth in Section 9(a) hereof, except to the extent expressly indicated in Section 9(c) hereof.

(b)    The Canadian Debtors and Monitor hereby agree to take any and all reasonably necessary and appropriate actions (including, without limitation, obtaining requisite corporate approvals, if any) to (i) file the Canadian Plan and Canadian Information Circular with the CCAA Court (each of which shall be in a form and substance that contains, implements and accurately reflects the terms and conditions of this Settlement and Support Agreement), seek approval of the Canadian Meeting Order and solicit votes from Canadian Voting Creditors to accept the Canadian Plan, and (ii) seek entry of the Sanction Order and the Canadian Escrow Release Order.  The sanction of the Canadian Plan will be conditioned on, among other things, confirmation of the U.S. Plans.

28

Consideration of the Canadian Plan and the U.S. Plans will take place in joint hearings conducted in accordance with the Cross-Border Protocol.

(c)     The U.S. Debtors hereby agree to take any and all reasonably necessary and appropriate actions (including, without limitation, obtaining requisite corporate approvals, if any) to (A) file the U.S. Plans and Disclosure Statement with the U.S. Court (each of which shall be in a form and substance that contains, implements and accurately reflects the terms and conditions of this Settlement and Support Agreement) and seek approval of the Disclosure Statement by the Bankruptcy Court, (B) solicit votes from U.S. Voting Creditors to accept the U.S. Plans, and (C) seek entry of the Confirmation Order and the U.S. Escrow Release Order.  Confirmation of the U.S. Plans will be conditioned on, among other things, sanction of the Canadian Plan.  Consideration of the Canadian Plan and the U.S. Plans will take place in joint hearings conducted in accordance with the Cross-Border Protocol.

(d)     The EMEA Debtors hereby agree to take any and all reasonably necessary and appropriate actions (including, without limitation, obtaining requisite corporate approvals, if any) to (A) file with the U.K. Court materials (which shall be, *inter alia*, in a form and substance that accurately reflects the terms and conditions of this Settlement and Support Agreement) as contemplated by Section 9(a)(iv) hereof, and (B) seek entry of the order or orders from the U.K. Court as contemplated by Section 9(a)(iv) hereof.

(e)     The French Liquidator hereby agrees to take any and all reasonably necessary and appropriate actions (including, without limitation, obtaining requisite corporate approvals, if any) to (A) file with the French Court materials (which shall be, *inter alia,* in a form and substance that accurately reflects the terms and conditions of this Settlement and Support Agreement) seeking the approval required by Section 9(a)(vi) hereof, and (B) seek entry of an order or orders from the French Court granting such approval.

(f)     The NNSA Conflicts Administrator hereby agrees to take any and all reasonably necessary and appropriate actions (including, without limitation, obtaining requisite corporate approvals, if any) to (A) file with the U.K. Court materials (which shall be, *inter alia,* in a form and substance that accurately reflects the terms and conditions of this Settlement and Support Agreement) as contemplated by Section 9(a)(v) hereof, and (B) seek entry of the order or orders from the U.K. Court as contemplated by 9(a)(v) hereof.

(g)     The U.K. Pension Trustee hereby agrees to take any and all reasonably necessary and appropriate actions (including, without limitation, obtaining requisite corporate approvals, if any) to (A) file with the Beddoes Court materials (which shall be in a form and substance that accurately reflects the terms and conditions of this Settlement and Support Agreement) seeking the approval required by Section 9(a)(vii) hereof, and (B) seek entry of an order or orders from the Beddoes Court authorizing the U.K. Pension Trustee to implement this Settlement and Support Agreement.

(h)     Subject to the Plans and the Disclosure Statements (A) accurately incorporating the terms and conditions of this Settlement and Support Agreement, and (B) being in form and substance reasonably satisfactory to the respective Parties (including in respect of any material amendments to the Plans), each of the Parties and each of the Participating Creditors hereby agrees to:

(i)     support the Settlement and all of the transactions and actions contemplated hereby (including the Plans) and take any and all reasonably necessary and appropriate actions in furtherance of consummation of the Settlement, the Plans and this Settlement and Support Agreement;

(ii)    support approval of the Disclosure Statements, the granting of the Canadian Meeting Order (and not object to approval of the Disclosure Statements or the granting of the Canadian Meeting Order, or support the efforts of any other Person to oppose or object to, approval of the Disclosure Statements or the granting of the Canadian Meeting Order) and the granting of the approvals from the U.K. Court, the French Court and the Beddoes Court;

(iii)   subject to receipt of the Disclosure Statements and solicitation in accordance with (as applicable) Sections 1125 and 1126 of the Bankruptcy Code and/or the Canadian Meeting Order,

(A)    (1) as necessary given its creditor status, deliver its duly-completed ballot(s) and/or proxy(ies) for receipt (at the address specified therein) by the required date (or to attend at the meeting of creditors to be held pursuant to the Canadian Meeting Order) in order to vote its claims to accept the Plans, (2) with respect to voting of any claim held by a Participating Creditor for trades not settled (but which claims will be bound by the terms hereof upon the closing of such trade), to direct the delivery of duly-completed ballot(s) and/or proxy(ies) for receipt (at the address specified therein) by the required date in order to vote such claims to accept the Plans, and (3) not change or withdraw (or cause to be changed or withdrawn) any such vote, unless the Plan related thereto is modified to be inconsistent with this Settlement and Support Agreement or is otherwise modified in a manner not permitted by such Plan;

(B)    (1) support the granting of the Confirmation Order, the Sanction Order and the Escrow Release Orders (and not object to approval of the granting of such orders, or support the efforts of any other Person to oppose or object to, the granting of such orders), unless the Plan related thereto is modified to be inconsistent with this Settlement and Support Agreement or is otherwise modified in a manner not permitted by such Plan, and (2) refrain from taking any action not required by law that is inconsistent with, or that would delay or impede sanction, confirmation or consummation of the

30

Plans or that is otherwise inconsistent with the express terms of this Settlement and Support Agreement; and

(C)     not, directly or indirectly, propose, support, solicit, encourage, or participate in the formulation of any alternative plan or plans of compromise, arrangement, reorganization or liquidation in the Chapter 11 Cases or the Canadian Proceedings other than the Plans.

(iv)     in the case of Participating Creditors who are Crossover Bondholders, issue directions to the trustees under the indentures governing the Crossover Bonds to support this Settlement and Support Agreement and the Plans and to act in a manner as contemplated pursuant to this Section 6(h); and

(v)     in the case of Participating Creditors who are NNCC Bondholders, issue directions to the NNCC Bonds Trustee to cause the NNCC Bonds Trustee to support this Settlement and Support Agreement and the Plans and to act in a manner as contemplated pursuant to this Section 6(h).

(i)     For the avoidance of doubt, each of the Parties and each Participating Creditor also agrees that it will not take any action (or refrain from taking an action) that, directly or indirectly, would interfere with, delay, impede, or postpone or take any other action that interferes with, the implementation of the Settlement, the confirmation and consummation of the U.S. Plans, the sanction and consummation of the Canadian Plan and/or the granting of the approvals by the U.K. Court, the French Court and the Beddoes Court.

(j)     Transfers of Claims and Interests.

(i)     No Participating Creditor shall (i) sell, transfer, assign, pledge, grant a participation interest in, or otherwise dispose of, directly or indirectly, its right, title, or interest in respect of any of such Participating Creditor's claims against any Debtor in whole or in part, or (ii) deposit any of such Participating Creditor's claims against any Debtor, as applicable, into a voting trust, or grant any proxies, or enter into a voting agreement with respect to any such claims or interests (the actions described in clauses (i) and (ii) are collectively referred to herein as a "**Transfer**" and the Participating Creditor making such Transfer is referred to herein as the "**Transferor**"), unless such Transfer is to another Party or Participating Creditor or any other Person that first agrees in writing to be bound by the terms of this Settlement and Support Agreement by executing and delivering a Transferee Joinder substantially in the form attached hereto as Annex H (the "**Transferee Joinder**") to the Debtors or, if to a Party or Participating Creditor, which Party or Participating Creditor has already executed this Settlement and Support Agreement, in which case, the Party or Participating Creditor receiving such Transferee Joinder shall deliver same to the Debtors.  With respect to claims against or interests in a

31

Debtor held by the relevant transferee upon consummation of a Transfer in accordance herewith, such transferee is deemed to make all of the representations, warranties, and covenants of a Participating Creditor, as applicable, set forth in this Agreement.  Upon compliance with the foregoing, the Transferor shall be deemed to relinquish its rights (and be released from its obligations, except for any claim for breach of this Settlement and Support Agreement or any related non-disclosure agreement that occurs prior to such Transfer) under this Agreement to the extent of such transferred rights and obligations.  Any Transfer made in violation of this Sub-Clause (i) of this Section 6(j) shall be deemed null and void *ab initio* and of no force or effect, regardless of any prior notice provided to the Debtors, and shall not create any obligation or liability of any Debtor or any other Party to the purported transferee.

(ii)    Notwithstanding Sub-Clause (i) of this Section 6(j), an entity that is acting in its capacity as a Qualified Marketmaker shall not be required to execute and deliver a Transferee Joinder on its own behalf to effect any transfer (by purchase, sale, assignment, participation, or otherwise) of any claim against any Debtor, by a Participating Creditor to a transferee; *provided that* (A) such transfer by a Participating Creditor to a transferee shall be in all other respects in accordance with and subject to Section 6(j)(i), including in that the ultimate transferee shall execute a Transferee Joinder, and (B) to the extent that a Participating Creditor, acting in its capacity as a Qualified Marketmaker, acquires any claim against, or interest in, any Debtor from a holder of such claim who is not a Participating Creditor, it may transfer (by purchase, sale, assignment, participation, or otherwise) such claim or interest without the requirement that the transferee be or become a Party in accordance with this Section 6(j).  For purposes of this Section 6(j)(ii), a "**Qualified Marketmaker**" means an entity that (Y) holds itself out to the market as standing ready in the ordinary course of its business to purchase from customers and sell to customers claims against any of the Debtors (including debt securities or other debt) or enter with customers into long and short positions in claims against the Debtors (including debt securities or other debt), in its capacity as a dealer or market maker in such claims against the Debtors, and (Z) is in fact regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).  For the avoidance of doubt, if a Qualified Marketmaker purchases a claim against a Debtor from a Participating Creditor for its own account or otherwise has a beneficial ownership interest in a claim being acquired from a Participating Creditor, it shall be required to execute and deliver a Transferee Joinder to the Debtors.

**Section 7.  <u>Currency Conversion</u>**

(a)    The Parties hereby agree to cooperate and coordinate efforts to convert portions of the Sale Proceeds from U.S. Dollars to, as the case may be, Canadian Dollars, Sterling and Euros (collectively, the "**<u>Other Currencies</u>**").

(b)     Canadian Dollar Conversion.

   (i)     The Canadian Debtors have elected to convert a portion of the Sale Proceeds, not to exceed US$1.2 billion, into Canadian Dollars.  The Parties hereto agree to such conversion subject to the terms of this Section 7.

   (ii)    Within seven (7) Business Days of the date the conditions specified in Sections 9(a)(i) and 9(a)(ii) hereof are satisfied or waived in writing by the Parties:

       (A)     NNC, NNL, NNI, NNUK, NNSA, the other existing Depositors under the relevant Existing Escrow Agreements, the Monitor and the UCC shall enter into the Canadian Escrow Agreement, which agreement shall be subject to the separate approvals of the Bankruptcy Court and the CCAA Court; and

       (B)     the U.S. Debtors agree to make a motion to the Bankruptcy Court, and the Canadian Debtors agree to make a motion to the CCAA Court, for orders approving the conversion contemplated by this Section 7(b).

   (iii)   Each Party appearing at the hearings on the motions contemplated by Section 7(b)(ii)(B) will confirm to the Bankruptcy Court and/or the CCAA Court its support for the conversion and will take all necessary steps to support the conversion motions before the Bankruptcy Court and CCAA Court.

   (iv)    Forthwith upon the granting of the approvals of the Bankruptcy Court and the CCAA Court contemplated by Section 7(b)(ii)(B), the Parties (and in particular the relevant Depositors and Estate Fiduciaries) shall issue such instructions and/or directions to the existing Escrow Agents as may be necessary to give effect to the transfer of an amount of the Sale Proceeds as specified by the Monitor in writing (not to exceed the amount specified in Section 7(b)(i)) to the Canadian Escrow Agent.

   (v)     Following receipt by the Canadian Escrow Agent of such Sale Proceeds, the Monitor shall direct the conversion of such Sale Proceeds by the Canadian Escrow Agent (or its affiliate) on the date(s) and in the manner specified from time to time by the Monitor.

   (vi)    Any foreign exchange gain or loss made in respect of any amount in the Canadian Escrow Account (following conversion from U.S. Dollars to Canadian Dollars) shall be solely for the credit or debit of the Canadian Debtors.

(c)     Sterling and Euro Conversion Elections.

(i)    The EMEA Debtors and NNSA have not yet elected to convert a portion of Sale Proceeds into Sterling or Euros.

    (A)    Any of the EMEA Debtors and NNSA may, subject to the conditions set forth in this Section 7, elect to convert, in the case of an EMEA Debtor, up to the amount specified for that EMEA Debtor in Annex E into Sterling (a "**Sterling Conversion Election**") and, in the case of NNSA, up to $220 million into Euros, and in each case, less the pro rata percentage of the Buyer Escrow Amount attributable to NNSA and each EMEA Debtor (the "**Euro Conversion Election**," and together with any Sterling Conversion Election, the "**Conversion Elections**").

(ii)    A Conversion Election may be requested at any time following the satisfaction of the conditions contained in Section 9(a)(i),(ii), (iv), (v) and (vi).

(iii)    A Conversion Election must be made in writing to the Parties (a "**Conversion Election Request**") and be accompanied by the form of the EMEA Sterling Escrow Agreement in the event the Sterling Conversion Election is requested and/or the EMEA Euro Escrow Agreement in the event the Euro Conversion Election is requested, which agreements shall be on terms and conditions that are substantially similar to the terms and conditions of the Existing Escrow Agreements governing the Existing Escrow Accounts and shall include, without limitation:

    (A)    provisions that provide for the same level of joint control by the Bankruptcy Court and the CCAA Court over the EMEA Escrow Accounts that such courts now have over the Existing Escrow Accounts; and

    (B)    provisions that provide for the release of funds from the EMEA Escrow Accounts on the same terms and conditions that govern the release of funds from the Existing Escrow Accounts; and

    (C)    a requirement that the funds shall be held in a bank in London (U.K.) acceptable to the U.S. Debtors, the Canadian Debtors, the EMEA Debtors and NNSA.

(iv)    Promptly following delivery of a Conversion Election Request, the U.S. Debtors, the Canadian Debtors, the EMEA Debtors, NNSA, the Monitor and the UCC shall work together in good faith to agree the terms of the EMEA Euro Escrow Agreement and the EMEA Sterling Escrow Agreement, as applicable.

(v)    Promptly following delivery of a Conversion Election Request, the Debtors shall agree on the U.S. Dollar amount of Sale Proceeds to be

transferred from each of the Existing Escrow Accounts to satisfy the Conversion Election Request.

(vi)    Each of the EMEA Escrow Agreements shall be subject to the approval of the Bankruptcy Court and the CCAA Court, respectively.   The Parties agree that within seven (7) Business Days of agreement on the form of the relevant EMEA Escrow Agreement:

(A)    the U.S. Debtors shall apply to the Bankruptcy Court; and

(B)    the Canadian Debtors shall apply to the CCAA Court,

in each case for permission to complete the relevant conversion and for approval to enter into the relevant EMEA Escrow Agreement.

(vii)    Each Party appearing at the motions contemplated by Section 7(c)(vi) will confirm to the Bankruptcy Court and/or the CCAA Court its support for the conversion and will take all necessary steps to support the conversion motions before the Bankruptcy Court and the CCAA Court.

(viii)    Within:

(A)    seven (7) Business Days; or

(B)    such longer period as the Party making the Conversion Election Request may require,

of obtaining the approvals of the Bankruptcy Court and the CCAA Court contemplated by Section 7(c)(vi), the Parties (and in particular the relevant Depositors and Estate Fiduciaries) shall issue such instructions and/or directions to the Existing Escrow Agents as may be necessary to give effect to the Conversion Election Request(s) and to the transfer of the requisite amount to the EMEA Euro Escrow Agent and/or the EMEA Sterling Escrow Agent, as the case may be, for conversion in accordance with Section 7(c)(ix) below.

(ix)    The Parties agree that the currency conversions contemplated under this Section 7(c) shall occur:

(A)    in the case of a Conversion Election by an EMEA Debtor, on the date(s) and in the manner specified from time to time by the Joint Administrators of that EMEA Debtor (which in the case of NNUK shall follow consultation between the Joint Administrators and the UKPI); and

(B)    in the case of a Conversion Election by NNSA, on the date(s) and in the manner specified from time to time by the NNSA Conflicts

Administrator following consultation with the French Liquidator and the agreement of the Joint Administrators of NNSA.

(x)     Any foreign exchange gain or loss made in respect of any amount in the relevant EMEA Escrow Account pursuant to a Conversion Election (following conversion from U.S. Dollars to Euros or Sterling) shall be solely for the credit or debit of the EMEA Debtor who requested such Conversion Election or NNSA, as the case may be.

(d)     The Parties undertake and agree to cooperate with the Escrow Agents to establish appropriate steps necessary to effect the necessary and timely conversion contemplated in this Section 7.

(e)     The fees and costs of the Escrow Agents (including reasonable attorneys' fees costs), if any, associated with any currency conversion shall be borne by the Debtor(s) requesting such conversion and shall be paid out of the amount of their respective Sale Proceeds allocation or directly by the relevant Debtor out of its estate assets.

(f)     Without in any way limiting the right of the EMEA Debtors and NNSA to convert any amount to Sterling or Euros in accordance with Section 7(c), it is the current intention of the EMEA Debtors and NNSA that:

(i)     they will not issue a Conversion Election Request prior to the Plans Effective Date; and

(ii)    they will receive their respective allocations pursuant to Section 2 (or following a Final Allocation Determination) in U.S. Dollars.

(g)     For purposes of determining the allocation entitlements of the Debtors either pursuant to Section 2(c) hereof or pursuant to a Final Allocation Determination, any Sale Proceeds converted into Other Currencies as contemplated by this Section 7 (for the avoidance of doubt, plus interest on such converted amount) shall, when distributed to a Debtor, be valued as a U.S. Dollar equivalent of such Other Currency at the spot rate or blended rate (as applicable, which blended rate shall take into account the amounts converted and the rates at which such conversion occurred) at which such Sale Proceeds were converted from U.S. Dollars to such Other Currency (any such spot or blended conversion rate, the "**Applicable FX Rate**").  Solely for illustrative purposes, if U.S.$10 of Sale Proceeds was converted to CAD$13 (spot rate or blended rate of U.S.$1.00 to CAD$1.30), receipt by the Canadian Debtors of CAD$13 from the Canadian Escrow Account would constitute receipt of US$10 for purposes of determining the Canadian Debtors' allocation entitlement pursuant to Section 2(c) hereof or pursuant to a Final Allocation Determination regardless of the actual relative value of U.S. Dollars to Canadian Dollars at the date of distribution of such Sale Proceeds to the Canadian Estate.

36

(h)    If this Agreement terminates after the date of any currency conversion pursuant to this Section 7, then any amount so converted shall, absent any agreement among the parties to the relevant New Escrow Agreement, remain in the relevant New Escrow Account in the form of the converted Other Currency until such time as the Allocation Dispute has been finally resolved and the amount to be distributed to each Debtor estate has been finally determined (the "**Final Allocation Determination**", and the amount calculated as payable to each Debtor pursuant to the Final Allocation Determination, its "**Final Allocation Amount**").  In assisting the U.S. Court and the Canadian Court to come to a Final Allocation Determination, the Parties hereby agree to inform the U.S. Court and the Canadian Court that the Final Allocation Determination should be made as though no currency conversion had taken place.

(i)    For the purpose of Section 7(j) to (k), inclusive, the following terms shall have the following meaning:

   (i)    "**Converting Debtor**" means any Debtor that has elected to convert a portion of the Sale Proceeds and has a New Escrow Account established into which converted currency is paid pursuant to this Section 7;

   (ii)    "**Non-Converting Debtor**" means any Debtor that is not a Converting Debtor;

   (iii)    "**Positive Converting Debtor**" means any Converting Debtor in respect of which the Sale Proceeds in the relevant New Escrow Account (as expressed in U.S. Dollars using the Applicable FX Rate) exceeds the Final Allocation Amount due to such Converting Debtor;

   (iv)    "**Negative Converting Debtor**" means any Converting Debtor who is not a Positive Converting Debtor; and

   (v)    "**Surplus Amount**" means any, all of or any combination of a Canadian Surplus Amount, an EMEA Surplus Amount or an NNSA Surplus Amount.

(j)    In respect of the Canadian Debtors, upon a Final Allocation Determination:

   (i)    If the amount of Sale Proceeds in the Canadian Escrow Account plus any fees and costs paid pursuant to Section 7(e) from such Sale Proceeds (in each case as expressed in U.S. Dollars using the Applicable FX Rate) is greater than the aggregate of the Final Allocation Amounts due to the Canadian Debtors, then the Canadian Debtors shall pay into the Existing Escrow Accounts an amount, in U.S. Dollars, equal to the amount by which:

      (A)    the amount of Sale Proceeds in the Canadian Escrow Account plus any fees and costs paid pursuant to Section 7(e) from such Sale

37

Proceeds (in each case as expressed in U.S. Dollars using the Applicable FX Rate), *exceeds*

(B)    the aggregate of the Final Allocation Amounts due to the Canadian Debtors (such excess amount, the "**Canadian Surplus Amount**").

(ii)    The Canadian Surplus Amount shall, at the election of the Canadian Debtors and the Monitor, be satisfied from: (A) the Canadian Debtors' own assets; (B) the Canadian Escrow Account; or (C) any combination of the foregoing (A) and (B). If all or part of the Canadian Surplus Amount is to be transferred from the Canadian Escrow Account then all of the Parties agree that they shall issue such instructions or other directions to the Canadian Escrow Agent as may be required in order to effect such transfer to the Existing Escrow Accounts. Any fees or costs associated with the transfer of such funds from the Canadian Escrow Account or the conversion of such funds back to U.S. Dollars for the purpose of transfer, including without limitation any fees and costs of the Escrow Agents or their counsel, shall be borne by the Canadian Debtors either directly or from the Canadian Escrow Account.

(iii)    Once the Canadian Surplus Amount has been paid into the Existing Escrow Accounts then:

(A)    the amounts in the Existing Escrow Accounts (less any costs of the Existing Escrow Agents) shall be applied in payment of the amounts due to the Non-Converting Debtors in proportion to their respective Final Allocation Amounts; and

(B)    the amounts in the Canadian Escrow Account shall be paid to the Canadian Debtors.

(iv)    If there is no Canadian Surplus Amount upon a Final Allocation Determination:

(A)    the amounts in the Canadian Escrow Account shall be paid to the Canadian Debtors; and

(B)    the amounts in the Existing Escrow Accounts (less any costs of the Existing Escrow Agents) shall be paid to all Debtors as necessary to satisfy their respective Final Allocation Amounts (taking into account the amount of Sale Proceeds to be paid to the Canadian Debtors pursuant to the foregoing (A) plus any fees and costs paid pursuant to Section 7(e) from such Sale Proceeds (in each case as expressed in U.S. Dollars using the Applicable FX Rate)).

(k)    If an EMEA Debtor and/or NNSA also becomes a Converting Debtor then Section 7(j)(iii) and (iv) shall not apply and the following provisions shall apply upon a Final Allocation Determination:

(i)     If the amount of Sale Proceeds in the EMEA Sterling Escrow Account attributable to a Conversion Election made by that EMEA Debtor plus any fees and costs paid pursuant to Section 7(e) from such Sale Proceeds attributable to that EMEA Debtor (in each case as expressed in U.S. Dollars using the Applicable FX Rate) is greater than the Final Allocation Amount due to that EMEA Debtor, then that EMEA Debtor shall pay into the Existing Escrow Accounts an amount, in U.S. Dollars, equal to the amount by which:

   (A)     the amount of Sale Proceeds in the EMEA Sterling Escrow Account attributable to a Conversion Election made by that EMEA Debtor plus any fees and costs paid pursuant to Section 7(e) from such Sale Proceeds attributable to that EMEA Debtor (in each case as expressed in U.S. Dollars using the Applicable FX Rate), *exceeds*

   (B)     the Final Allocation Amount due to that EMEA Debtor (such excess amount, the "**EMEA Surplus Amount**").

(ii)    The EMEA Surplus Amount shall, at the election of that EMEA Debtor, be satisfied from: (A) the EMEA Debtor's own assets; (B) the EMEA Sterling Escrow Account; or (C) any combination of the foregoing (A) and (B). If all or part of the EMEA Surplus Amount is to be transferred from the EMEA Sterling Escrow Account then all of the Parties agree that they shall issue such instructions or other directions to the EMEA Sterling Escrow Agent as may be required in order to effect such transfer to the Existing Escrow Accounts. Any fees or costs associated with the transfer of such funds from the EMEA Sterling Escrow Account or the conversion of such funds back to U.S. Dollars for the purpose of transfer, including without limitation any fees and costs of the Escrow Agents or their counsel, shall be borne by that EMEA Debtor either directly or from the EMEA Sterling Escrow Account.

(iii)   If the amount of Sale Proceeds in the EMEA Euro Escrow Account plus any fees and costs paid pursuant to Section 7(e) from such Sale Proceeds (in each case as expressed in U.S. Dollars using the Applicable FX Rate) is greater than the aggregate of the Final Allocation Amount due to NNSA, then NNSA shall pay into the Existing Escrow Accounts an amount, in U.S. Dollars, equal to the amount by which:

   (A)     the amount of Sale Proceeds in the EMEA Euro Escrow Account plus any fees and costs paid pursuant to Section 7(e) from such Sale Proceeds (as expressed in U.S. Dollars using the Applicable FX Rate), *exceeds*

   (B)     the Final Allocation Amount due to NNSA (such excess amount, the "**NNSA Surplus Amount**").

(iv)    The NNSA Surplus Amount shall, at the election of NNSA, be satisfied from: (A) NNSA's own assets; (B) the EMEA Euro Escrow Account; or (C) any combination of the foregoing (A) and (B). If all or part of the NNSA Surplus Amount is to be transferred from the EMEA Euro Escrow Account then all of the Parties agree that they shall issue such instructions or other directions to the EMEA Euro Escrow Agent as may be required in order to effect such transfer to the Existing Escrow Accounts. Any fees or costs associated with the transfer of such funds from the EMEA Euro Escrow Account or the conversion of such funds back to U.S. Dollars for the purpose of transfer, including without limitation any fees and costs of the Escrow Agents or their counsel, shall be borne by NNSA either directly or from the EMEA Euro Escrow Account.

(v)    If there is a Surplus Amount then once such Surplus Amount has been paid into the Existing Escrow Accounts in accordance with Sections 7(j)(i), 7(j)(ii) and 7(k)(i-iv), as applicable:

    (A)    the amounts in the Existing Escrow Accounts (less any costs of the Existing Escrow Agents) shall be applied in payment of the amounts due to (i) all Non-Converting Debtors; and (ii) all Negative Converting Debtors (taking into account the amount of Sale Proceeds to be paid to such Negative Converting Debtors pursuant to the following (B), (C) and (D), as expressed in U.S. Dollars using the Applicable FX Rate), in proportion to their respective Final Allocation Amounts;

    (B)    the amounts in the Canadian Escrow Account shall be paid to the Canadian Debtors;

    (C)    the amounts in the EMEA Sterling Escrow Account shall be paid to the EMEA Debtors who are Converting Debtors in proportion to their respective Final Allocation Amounts; and

    (D)    the amounts in the EMEA Euro Escrow Account shall be paid to NNSA.

(vi)    If there is no Surplus Amount:

    (A)    the amounts in the Canadian Escrow Account shall be paid to the Canadian Debtors;

    (B)    the amounts in the EMEA Sterling Escrow Account shall be paid to the EMEA Debtors who are Converting Debtors in proportion to their respective Final Allocation Amounts;

    (C)    the amounts in the EMEA Euro Escrow Account shall be paid to NNSA; and

(D)    the amounts in the Existing Escrow Accounts (less any costs of the Existing Escrow Agents) shall be paid to all Debtors as necessary to satisfy their respective Final Allocation Amounts (taking into account the amount of Sale Proceeds to be paid pursuant to the foregoing (A), (B) and (C) plus any fees and costs paid pursuant to Section 7(e) from such Sale Proceeds (in each case as expressed in U.S. Dollars using the Applicable FX Rate)).

(l)    Notwithstanding the terms of any New Escrow Agreement, the Parties acknowledge that, in the event of the termination of this Settlement and Plan Support Agreement, each of the Debtors (other than Nortel Communications Inc., Architel Systems Corporation, Northern Telecom Canada Limited and Nortel Networks India International Inc.) reserves its rights pursuant to the Allocation Decisions with respect to any interest it may have in the Sale Proceeds on deposit in the New Escrow Accounts.

## Section 8.  <u>Releases</u>

(a)    For the avoidance of doubt, this Section 8 is subject to the satisfaction of the conditions contained in Section 9(a) hereof.

(b)    Subject to Section 8(b)(iii) and 8(i) hereof, upon the Plans Effective Date, each of the Parties and the Participating Creditors and their respective representatives, agents, successors and assigns (each a "**<u>Releasor</u>**"):

(i)    release and forever discharge the other Releasors and each other Releasor's respective employees, officers, directors, agents, advisors, lawyers, successors and assigns and the directors and officers, both former and current, of any Nortel entity ("**<u>Worldwide Ds&Os</u>**") (each being a "**<u>Releasee</u>**") from any and all liability for claims, defences, demands, liabilities, damages, actions, contributions, subrogation, causes of action, setoffs, recoupments, costs and expenses (including lawyers' or other fees or expenses), the foregoing terms to be construed as broadly as possible, whether known or unknown, past or present, fixed or contingent, liquidated or unliquidated, which any of the Releasors now have, had, may have had or hereafter may have however so arising out of or in connection with the Allocation Dispute, any other matters resolved herein or any other matter relating to the Nortel Insolvency Proceedings or the Nortel Group (collectively and excluding the Non-Released Matters, "**<u>Released Claims</u>**"); and

(ii)    undertakes, covenants and agrees not to make any claim, participate in any proceeding or take any action against any other person or entity who would as a result of such claim, proceeding or action have a claim for contribution or indemnity against any of the Releasees in relation to the matters herein resolved and released (collectively, the "**<u>Releases</u>**").

(iii)    Notwithstanding the above Sections 8(b)(i) and 8(b)(ii), each of the Canadian Debtors and U.S. Debtors do not release or in any way

41

compromise their right to object to, or assert counterclaims for purposes of setoff against, claims made against them by Worldwide Ds&Os against such Debtors.

(c)  Notwithstanding the Releases provided in Section 8(b), the Debtors shall, upon the written request of a Debtor to another Debtor and to the extent permitted by applicable local law and not inconsistent with the statutory duties of the Debtor, or the Debtor's representatives and fiduciaries, to which a request is made, reasonably cooperate with each other, including providing such documents, other information, access to current personnel and/or permission to communicate with former personnel as may reasonably be requested by the requesting Debtor, in connection with opposing claims asserted by third parties against one or more of the Debtors ("**Third Party Claims**"), which Third Party Claims would have, but for the Releases, given rise to claims for indemnity and/or contribution among one or more of the Debtors; provided, however, that no Debtor shall be obligated to cooperate to the extent such requested cooperation would prejudice the interests of such Debtor.  Further, a Debtor shall only be obligated to provide cooperation in respect of a Third Party Claim pursuant to this Section 8(c) if, but for the Releases, such Third Party Claim would have given rise to a claim for indemnity and/or contribution against such Debtor.  The Debtor requesting cooperation shall bear all costs and expenses, including reasonable attorney fees, of the Debtor providing such cooperation, including the costs of accessing, processing, reviewing and making available any documents, other information and/or personnel requested.  For the avoidance of doubt (i) each Debtor shall be solely responsible for responding to and defending any Third Party Claims against it, and no other Debtor shall have any obligation to respond to, defend, appear in or become party to any Third Party Claims asserted against another Debtor, and (ii) this Section 8(c) shall not create any rights on the part of any person asserting a Third Party Claim, including any discovery or similar rights.  It is acknowledged that the Debtors intend to progress the wind-up of their respective estates, including the continuing disposal of records and decommissioning of their electronic data infrastructure (such as servers), and that the cooperation contemplated pursuant to this Section 8(c) shall in no way preclude any of the Debtors from taking any steps in connection with such wind-up.  To the extent that a Debtor receiving a request under this Section 8(c) takes the position that it is unable to provide the assistance requested, such Debtor shall confer with the Debtor making the request as to the basis for such position.

(d)  The U.S. Plans will include the Releases and the delivery thereof will be authorized by the Confirmation Order.  With respect to any Participating Creditor, such Releases shall be effective regardless of whether such Participating Creditor elects or opts out of any third-party release in the U.S. Plans.

(e)  The Canadian Plan will include the Releases and the effectiveness thereof will be authorized by the Sanction Order.

(f)  The Releases provided by the Joint Administrators, the NNSA Conflicts Administrator, NNSA (in the French Main Proceeding) and the EMEA Debtors

will be effective on the occurrence of the Plans Effective Date and the foregoing will be obliged to give effect to the releases as a result of the orders of the U.K. Court referred to in Section 9(a)(iv) and 9(a)(v).

(g)     The Releases provided by the French Liquidator and NNSA (in the French Secondary Proceeding) will be authorized by the French Court to be effective on the occurrence of the Plans Effective Date.

(h)     The Releases provided by the U.K. Pension Trustee will be authorized by the Beddoes Court to be effective on the occurrence of the Plans Effective Date.

(i)     Nothing in this Settlement and Support Agreement shall constitute a release, waiver or discharge of:

    (i)     any claims advanced by any party represented by a member of the CCC as against any of the Canadian Debtors or their directors, and any claims of the Canadian registered pension plans (or their administrator or other authorized representative on their behalf) against the Pension Benefits Guarantee Fund (Ontario);

    (ii)    any allowed claims (U.S.) or Proven Claims (Canadian) against the U.S. Debtors or the Canadian Estate for payment of the Crossover Bonds or the NNCC Bonds;

    (iii)   the U.S. Canadian Claim, the U.S. Canadian Priority Claim, the EMEA Canadian Claim, the UKPI Canadian Claim, the Remaining HOC Claim and the pre-filing intercompany claims specified on Annex L;

    (iv)    any claim advanced by any EMEA Debtor or EMEA Non-Filed Entity against any other EMEA Debtor or EMEA Non-Filed Entity, or NNSA;

    (v)     any claim advanced by NNSA against any EMEA Debtor or the Joint Administrators;

    (vi)    any claim advanced by the UKPI against any EMEA Debtor, the Joint Administrators, or NNSA;

    (vii)   any claim advanced by any EMEA Debtor or NNSA against the UKPI;

    (viii)  any claim between or among any of the U.S. Debtors and their subsidiaries;

    (ix)    any claim between the PBGC and the U.S. Debtors or any of their U.S. subsidiaries;

    (x)     any claim between or among the Canadian Debtors, provided no distributions or payments will be made by the Canadian Debtors on account of such claims under the Canadian Plan or otherwise; and

(xi)    any claim to enforce the terms of this Settlement and Support Agreement, the Plans and any orders of the U.S. Court or the CCAA Court related thereto (collectively, (i) through (xi), the "**Non-Released Matters**").

**Section 9.  Conditions**

(a)    The effectiveness of the Settlement and this Settlement and Support Agreement and each of the provisions hereof is subject to the satisfaction or the express written waiver by each of the Canadian Debtors (such waiver by the Canadian Debtors being subject to the prior consent of the CCC acting reasonably and in good faith), the EMEA Debtors (such waiver by NNUK being subject to the prior consent of the U.K. Pension Trustee and the PPF acting reasonably and in good faith), NNSA and the U.S. Debtors (such waiver by the U.S. Debtors being subject to the prior consent of the UCC and the Bondholder Group acting reasonably and in good faith) of the following conditions:

(i)    <u>Crossover Bondholder Joinder</u>.  Execution and delivery by the date that is fourteen (14) days from the date of this Settlement and Support Agreement of Creditor Joinders from Crossover Bondholders beneficially holding notes representing at least 67% of the principal amount (as of the Petition Date) of the Crossover Bonds Claims outstanding as at the Petition Date.

(ii)    <u>NNCC Bondholder Joinder</u>.  Execution and delivery by the date that is fourteen (14) days from the date of this Settlement and Support Agreement of Creditor Joinders from NNCC Bondholders beneficially holding notes representing at least 67% of the principal amount (as of the Petition Date) of the NNCC Bonds Claims outstanding as at the Petition Date.

(iii)    <u>Currency Conversion</u>.  Approval orders shall have been obtained from the CCAA Court and the Bankruptcy Court authorizing the Canadian Debtors and U.S. Debtors, respectively, to enter into the Canadian Escrow Agreement, open the Canadian Escrow Account, and convert a portion of the Sale Proceeds from U.S. Dollars to Canadian Dollars, all as contemplated by Section 7, by no later than October 21, 2016.

(iv)    <u>Order by U.K. Court</u>.  Entry of an order or orders by no later than November 4, 2016 by the U.K. Court that the Joint Administrators be at liberty to perform and procure the relevant EMEA Debtor in respect of which they are appointed to perform their respective obligations under this Settlement and Support Agreement, including, without limitation, delivering the Releases, and any other actions necessary to implement the Settlement.

(v)    <u>Order by U.K. Court for French Main Proceeding</u>.  Entry of an order or orders by no later than November 4, 2016 by the U.K. Court that the NNSA Conflicts Administrator and NNSA (in the French Main

44

Proceeding) be at liberty to perform their obligations under this Settlement and Support Agreement, including, without limitation, delivering the Releases, and any other actions necessary to implement the Settlement.

(vi)    Approval by French Court.  Entry of an order or orders by no later than November 4, 2016 by the French Court approving and authorizing the entry into this Settlement and Support Agreement by NNSA (in the French Secondary Proceeding), and authorizing NNSA to perform its obligations under this Settlement and Support Agreement, including, without limitation, delivering the Releases, and any other actions necessary to implement the Settlement.

(vii)    Authorization by Beddoes Court.  Entry of an order or orders by no later than November 4, 2016 by the Beddoes Court authorizing the U.K. Pension Trustee to implement this Settlement and Support Agreement and perform its obligations under this Settlement and Support Agreement, including, without limitation, delivering the Releases, and any other actions necessary to implement the Settlement.

(viii)    Confirmation of U.S. Plans.  The Confirmation Order shall have been entered by the Bankruptcy Court by no later than February 17, 2017 and thereafter shall have become a Final Order.

(ix)    Sanction of Canadian Plan.  The Sanction Order shall have been issued by the CCAA Court by no later than February 17, 2017 and entered and thereafter shall have become a Final Order.

(x)    Litigation Dismissal Notices Exchanged in Escrow.  Appropriate notices and other documents dismissing with prejudice the various pending litigations specified in Section 5(b) shall have been executed by the requisite Parties party to such litigation and delivered to one another in escrow.

(xi)    Plans Implementation.  The Plans Effective Date shall have occurred by no later than August 31, 2017.

(b)    The Parties agree to work in good faith and provide such reasonable cooperation to one another as may be necessary or desirable to achieve the satisfaction of the conditions specified in Section 9(a) and certain related steps on the timetable specified in Annex I (the "**Timetable**"), it being understood and agreed that a failure to achieve the satisfaction of a particular condition by the specified date on the Timetable shall not constitute a breach of this Agreement or result in a failure of such condition except as expressly contemplated by Section 9(a) hereof.  The following Parties shall have responsibility for seeking to satisfy the conditions specified in the Section(s) indicated next to the Party's name, it being understood and agreed that such Parties will, upon request, keep the other Parties reasonably informed as to their progress in satisfying such conditions and share drafts of any

45

proposed court filings (except that there shall be no obligations to share any court filings, or drafts thereof, in respect of which a confidential order shall be sought):

    (i)       Bondholder Group – Section 9(a)(i) and (a)(iii)

    (ii)      NNCC Bondholders – Section 9(a)(ii)

    (iii)     Joint Administrators and NNSA Conflicts Administrator – Section 9(a)(iii), (a)(iv) and (a)(v)

    (iv)     French Liquidator – Section 9(a)(iii) and (a)(vi)

    (v)       U.K. Pension Trustee – Section 9(a)(vii)

    (vi)     U.S. Debtors – Sections 9(a)(iii), (a)(viii) and (a)(xi)

    (vii)    Canadian Debtors/Monitor – Sections 9(a)(iii), (a)(ix) and (a)(xi)

    (viii)   Parties that are parties to the litigations specified in Section 5(b) – Section 9(a)(x)

(c)    Notwithstanding the foregoing Section 9(a): (i) the following provisions of this Settlement and Support Agreement shall be enforceable immediately upon execution of this Settlement and Support Agreement by the Parties: Sections 1 (as necessary to the implementation of the Sections referenced in this Section 9(c)), 5(c), 5(d), 5(e), 7, 9, 10, 11, 12, 13, 14 and 15 (other than Section 15(b)(i)); and (ii) the following provisions of this Settlement and Support Agreement shall be enforceable immediately upon satisfaction of the conditions specified in Section 9(a)(i) and 9(a)(ii): Sections 2(g) (but only the first sentence thereof), 3(b), 3(c), 4(g)(vii), 4(l), the other provisions of Section 4 (but solely to the extent of obligating the U.S. Debtors and the Canadian Debtors to include such provisions in the Canadian Plan and the U.S. Plan, as applicable) and Section 6.  All other provisions of this Settlement and Support Agreement shall be enforceable upon the satisfaction or waiver of all the conditions set forth in Section 9(a).

## Section 10.  <u>Termination</u>

    (a)    Upon the non-satisfaction of any condition set forth in Section 9(a) hereof (a "**<u>Termination Event</u>**"), unless such condition is waived by the Debtors in accordance with Sections 9(a) hereof, this Settlement and Support Agreement may be terminated by any of the Canadian Debtors, the EMEA Debtors, NNSA or the U.S. Debtors after the passage of ten (10) Business Days following the delivery of a written notice by any of the foregoing Parties to each of the other Parties in the manner set forth in Section 12 hereof.  Prior to the expiration of such ten (10) Business Day period, the Parties shall meet and confer with respect to such Termination Event to discuss alternatives to termination.  No Party may terminate this Settlement and Support Agreement in accordance with this Section 10(a) if the non-satisfaction of that condition was caused by a breach of that Party.

(b)     In the event this Settlement and Support Agreement is terminated, the Parties reserve all of their rights and defenses with respect to the claims and other matters resolved by this Settlement and Support Agreement and this proposed settlement shall not constitute an admission by any Party regarding the validity of the litigations, claims or defenses resolved by this Settlement and Support Agreement or that they have any liability in connection with such litigations, claims or defenses.  Upon termination, Parties are free to notify courts of such termination and to immediately thereafter recommence litigation.

(c)     In the event this Settlement and Support Agreement is terminated, the Parties agree that such termination shall be deemed an occurrence arising more than fourteen (14) days after the opening of the appeals from the Allocation Decisions currently pending before the Third Circuit for purposes of Third Circuit Local Rule of Appellate Procedure 4.1.  If a motion to expedite is made after such termination, the Parties agree not to oppose such motion on the grounds that it was not timely filed, but the Parties reserve all rights to support or oppose such motion on any other grounds.

(d)     The termination of this Settlement and Support Agreement for any reason shall:

(i)     not affect this Section 10(d), Sections 7(b)(vi), 7(c)(x), 7(e) and (g)-(l), Section 11, Section 12, and Sections 15(a), 15(d), 15(e), 15(h), 15(i) and 15(j), which provisions shall continue in force after such termination; and

(ii)    otherwise result in this Settlement and Support Agreement being no longer effective and the rights of all Parties, including all rights advanced in litigation (including in respect of the Allocation Dispute), shall be restored to the *status quo ante*.

## Section 11.  <u>Limitations of Liability</u>

(a)     <u>Joint Administrators' and NNSA Representatives' Limited Liability</u> – The Joint Administrators of the EMEA Debtors (including for the purpose of this subsection, NNSA) and the NNSA Conflicts Administrator have entered into and signed this Settlement and Support Agreement as agents for the EMEA Debtors and NNSA for the purpose of obtaining the releases contained in this clause and neither they, their firm, nor its affiliates, shareholders, employees, advisors, lawyers, representatives or agents shall incur any personal liability whatsoever in respect of any of the obligations undertaken by the EMEA Debtors or NNSA or in respect of any failure on the part of the EMEA Debtors or NNSA to observe, perform or comply with any obligation under this Settlement and Support Agreement or under or in relation to any associated arrangements or negotiations or under any document or assurance made pursuant to this Settlement and Support Agreement. The French Liquidator and the NNSA Conflicts Administrator have entered into and signed this Settlement and Support Agreement as agents for NNSA and neither they, their firms, nor their attorneys or other representatives shall incur any personal liability whatsoever in respect of any of the obligations undertaken by NNSA or in respect of any failure on the part of NNSA to observe, perform or comply with any obligation under this Settlement and Support

Agreement or under or in relation to any associated arrangements or negotiations or under any document or assurance made pursuant to this Settlement and Support Agreement. Any release, discharge or other benefit conferred upon the Joint Administrators, the NNSA Conflicts Administrator, and the French Liquidator pursuant to this Settlement and Support Agreement or the Plans shall enure to their benefit in their personal capacities and each of the Joint Administrators, the NNSA Conflicts Administrator, and the French Liquidator in their personal capacity shall be a third party beneficiary to this Settlement and Support Agreement and the Plans entitled to enforce such releases, discharges and benefits in accordance with the terms of this Settlement and Support Agreement and the Plans.

(b)   <u>Joint Liquidators' Liability</u> - Each of the Joint Liquidators is a Party to this Agreement: (i) as an agent of NNOCL or NNNI, respectively, in such appointed capacity; and (ii) in their own capacity solely for taking the benefit of this Section 11. Notwithstanding anything else to the contrary herein, any claim, action or proceeding against the Joint Liquidators in their personal capacity (and not as agent for NNOCL or NNNI respectively) under this Settlement and Support Agreement shall be governed exclusively by English law and subject to the exclusive jurisdiction of the U.K. Courts. None of the Joint Liquidators, their firms, partners, employees, advisors, representatives or agents shall incur any personal liability whatsoever whether on their own part or in respect of any failure on the part of any company in the Nortel Group to observe, perform or comply with any of its obligations under this Settlement and Support Agreement or under or in relation to any associated arrangements or negotiations.

(c)   <u>Monitor's Limited Liability</u> – The Monitor is a party to this Settlement and Support Agreement solely in its capacity as the CCAA Court appointed Monitor of the Canadian Debtors and not in its personal capacity and shall have all of the protections granted to it under the CCAA and the orders of the CCAA Court, including the Initial Order dated January 14, 2009 (as amended and restated), the Order dated August 14, 2009, the Claims Procedure Order, the Claims Resolution Order dated September 16, 2010, the EMEA Claims Procedure Order dated January 14, 2011, the Intercompany Claims Procedure Order dated July 27, 2012 and the Order (Monitor's Expansion of Power Order #2) dated October 3, 2014. None of the Monitor or its affiliates, shareholders, employees, advisors, lawyers, representatives or agents shall incur any personal liability whatsoever whether on their own part or in respect of any failure on the part of any Nortel Group company to observe, perform or comply with any of its obligations under this Settlement and Support Agreement or under or in relation to any associated arrangements or negotiations.  Any release, discharge or other benefit conferred upon the Monitor pursuant to this Settlement and Support Agreement or the Plans shall enure to the benefit of Ernst & Young Inc. in its personal capacity and Ernst & Young Inc. in its personal capacity shall be a third party beneficiary to this Settlement and Support Agreement and the Plans entitled to enforce such releases, discharges and benefits in accordance with the terms of this Settlement and Support Agreement and the Plans.

(d)    U.S. Principal Officer's Limited Liability – The U.S. Principal Officer has signed this Settlement and Support Agreement solely in its capacity as the Bankruptcy Court appointed Principal Officer of the U.S. Debtors and not in his personal capacity.  None of the U.S. Principal Officer or his firm or its affiliates, shareholders, employees, advisors, lawyers, representatives or agents shall incur any personal liability whatsoever whether on their own part or in respect of any failure on the part of any Nortel Group company to observe, perform or comply with any of its obligations under this Settlement and Support Agreement or under or in relation to any associated arrangements or negotiations.  Any release, discharge or other benefit conferred upon the U.S. Principal Officer pursuant to this Settlement and Support Agreement or the Plans shall enure to the benefit of the U.S. Principal Officer in his personal capacity and his firm, in its personal capacity shall be a third party beneficiary to this Settlement and Support Agreement entitled to enforce such releases, discharges and benefits in accordance with the terms of this Settlement and Support Agreement and the Plans.

## Section 12.  Notice

All demands, notices and communications provided for in this Settlement and Support Agreement shall be in writing and shall be sent by facsimile transmission with confirmation to the number specified on Annex J, electronic format via email, personally delivered or sent by reputable overnight courier service (delivery charges prepaid) to any Party at the address and other particulars specified on Annex J, or at such other address or particulars as the recipient Party has specified by prior written notice to the other Parties pursuant to the provisions of this Section 12.

## Section 13.  Further Acquisition of Claims

Except as set forth in Section 6(j), nothing in this Settlement and Support Agreement shall be construed as precluding any Party or any of its affiliates from acquiring additional Crossover Bonds, NNCC Bonds, claims, or interests in the instruments underlying the Crossover Bonds, NNCC Bonds or claims; provided, however, that any additional Crossover Bonds, NNCC Bonds, claims, or interests in the underlying instruments acquired by any Party and with respect to which such Party is the legal owner, beneficial owner, and/or investment advisor or manager of or with power and/or authority to bind any claims or interests held by it shall automatically be subject to the terms and conditions of this Settlement and Support Agreement.  Upon any such further acquisition, such Party shall promptly notify the Debtors, the Monitor and counsel to the Bondholder Group.

## Section 14.  Relationship Among Parties.

Notwithstanding anything in this Settlement and Support Agreement to the contrary, the duties and obligations of the Parties under this Settlement and Support Agreement shall be several, and not joint. No Party shall have any responsibility by virtue of this Settlement and Support Agreement for any trading by any other entity.  No prior history, pattern, or practice of sharing confidences among or between the Parties shall in any way affect or negate this Settlement and Support Agreement.  The Parties acknowledge that this Settlement and Support Agreement does not constitute an agreement, arrangement, or understanding with respect to

49

acting together for the purpose of acquiring, holding, voting, or disposing of any equity securities of the Debtors and they (or any combination of them) do not constitute a "group" within the meaning of Rule 13d-5 under the U.S. Securities Exchange Act of 1934, as amended. No action taken by any Party pursuant to this Settlement and Support Agreement shall be deemed to constitute or to create a presumption by any of the Parties that the Parties are in any way acting in concert or as such a "group."

## Section 15. **Miscellaneous Provisions**

(a) <u>Evidentiary Limitations/No Waiver or Admission</u> – This Settlement and Support Agreement is being entered into as part of a comprehensive resolution of multiple disputes, each element of which is consideration for the other elements and an integral aspect of the proposed resolution. The Parties may submit this Settlement and Support Agreement to any court of competent jurisdiction in connection with seeking approval of this Settlement and Support Agreement, provided, however, except for purposes of seeking to implement or enforce this Settlement and Support Agreement, its terms and the transactions, agreements and actions contemplated hereby, no Party shall introduce, tender, reference or otherwise seek to rely on the Settlement, this Settlement and Support Agreement or any term, compromise or agreement reflected herein in any litigation in or related to the Nortel Insolvency Proceedings, including the Allocation Dispute, and this Settlement and Support Agreement is entitled to protection as a settlement communication pursuant to Federal Rule of Evidence 408 and any other rule of similar effect in any relevant jurisdiction. As the terms of this Settlement and Support Agreement constitute a settlement, nothing herein shall constitute or shall be argued to constitute an admission of any fact or legal position, waiver of any legal or factual argument or defense, or estop any Party from advancing or defending against any legal or factual argument for any other purpose.

(b) <u>Costs and Expenses</u> – Each Party shall: (i) pay its own costs incurred in relation to the litigation which is resolved by this Settlement and Support Agreement, except as otherwise agreed, and no Party shall contest such costs in any manner; and (ii) bear its own costs and expenses (including legal fees and expenses) incurred in connection with this Settlement and Support Agreement, the Plans and the transactions contemplated hereby and thereby. Nothing in the foregoing sentence or in Section 8(b) shall alter any pre-existing arrangement, order or agreement pursuant to which a Debtor estate has agreed or is obligated to pay the professional costs of a Party hereto, save and except as outlined in Sections 4(k) and 4(m).

(c) <u>Adjudication of Claims</u> – For the avoidance of doubt, nothing in this Settlement and Support Agreement is intended to affect the rights of the respective Debtor estate representatives to resolve and adjudicate claims in their estates, except as set out in Sections 4(b)(i), 4(g), and 4(h) hereof.

(d) <u>Disputes</u> – To the fullest extent permitted by applicable law, each Party (i) agrees to submit to the non-exclusive jurisdiction of the Bankruptcy Court and the CCAA Court (in a joint hearing conducted under the Cross-Border Protocol), for

purpose of all legal proceedings to the extent relating to the matters agreed in this Settlement and Support Agreement (which shall not include legal proceedings relating to the adjudication of claims not resolved herein, which proceedings shall take place before the supervising court of the Debtor against whom such claims have been asserted, subject to the Cross-Border Protocol, where applicable), (ii) agrees that any claim, action or proceeding by such Party seeking any relief whatsoever to the extent relating to the matters agreed in this Settlement and Support Agreement may be brought in the Bankruptcy Court and the CCAA Court, (iii) waives and agrees not to assert any objection that it may now or hereafter have to the laying of venue of any such action brought in such court, or any claim that any such action brought in such a court, has been brought in an inconvenient forum, (iv) agrees that email service of process or other papers in connection with any such action or proceeding shall be valid and sufficient service thereof, and (v) agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable law. Notwithstanding anything in this Section 15(d), any claim, action or proceeding against (x) the Joint Administrators or the NNSA Conflicts Administrator in their personal capacities under this Settlement and Support Agreement shall be governed exclusively by English law and subject to the exclusive jurisdiction of the U.K. Court, and any such claim, action or proceeding against the French Liquidator in his personal capacity under this Settlement and Support Agreement shall be governed exclusively by French law and subject to the exclusive jurisdiction of the French Court; (y) the U.S. Principal Officer in his personal capacity under this Settlement and Support Agreement shall be governed exclusively by law of the State of New York and subject to the exclusive jurisdiction of the Bankruptcy Court; and (z) the Monitor in its personal capacity under this Settlement and Support Agreement shall be governed exclusively by the law of Ontario and the federal laws of Canada applicable therein and subject to the exclusive jurisdiction of the CCAA Court.  For the avoidance of doubt, nothing in this Section 15(d) shall apply to (A) any claim between or among the UKPI, any EMEA Debtor, any EMEA Non-Filed Entity, the Joint Administrators or NNSA or any claim of any EMEA Debtor against any other EMEA Debtor, EMEA Non-Filed Entity or NNSA, (B) any claim of the PBGC against any U.S. Debtor or affiliate or any claim of any U.S. Debtor against any other U.S. Debtor, or (C) any claim of any creditor against any Debtor or affiliate, in each case except to the extent relating to the matters agreed in this Settlement and Support Agreement.

(e)     **Waiver of Jury Trial.  Each Party hereby waives, to the fullest extent permitted by applicable law, any right it may have to a trial by jury in respect of any litigation directly or indirectly arising out of or in connection with this Settlement and Support Agreement or any transaction contemplated hereby or thereby. Each Party (i) certifies that no representative, agent or attorney of any other Party has represented, expressly or otherwise, that such other Party would not, in the event of litigation, seek to enforce the foregoing waiver, and (ii) acknowledges that it has entered into this Settlement and Support Agreement as a result of,**

**among other things, the mutual waivers and certifications in this Section 15(e).**

(f) <u>Injunctive Relief</u> – All remedies available at law or equity, including specific performance, to any Party for a breach of this Settlement and Support Agreement by another Party shall be available to the non-breaching Parties. The Parties further agree that irreparable damage would occur in the event that any of the provisions of this Settlement and Support Agreement were not performed in accordance with their specific terms or were otherwise breached. Accordingly, each of the Parties shall be entitled to equitable relief to prevent or remedy breaches of this Settlement and Support Agreement prior to the Plans Effective Date, without the proof of actual damages, including in the form of an injunction or injunctions or orders for specific performance in respect of such breaches. Each Party agrees, to the extent that such Party is subject to any equitable remedy, to waive any requirement for the security or posting of any bond in connection with any such equitable remedy.

(g) <u>Further Assurances</u> – The Parties undertake and agree to cooperate in good faith to effectuate the terms of this Settlement and Support Agreement, obtain confirmation of the U.S. Plans, obtain sanction of the Canadian Plan and obtain approvals from the U.K. Court, the French Court and the Beddoes Court.

(h) <u>Governing Law</u> – This Settlement and Support Agreement shall be interpreted, construed and enforced in accordance with the laws of the State of New York without giving effect to the choice of law provisions thereof that would result in the application of the law of another jurisdiction.

(i) <u>Entire Agreement</u> – This Settlement and Support Agreement constitutes the entire agreement among the Parties and supersedes all prior or contemporaneous written or oral communications, understandings and agreements with respect to the settlement of the Allocation Dispute and the other matters and disputes among the Parties that are resolved herein. For the avoidance of doubt, the EMEA Debtors, NNSA, the Joint Administrators, the NNSA Conflicts Administrator, the French Liquidator, the EMEA Non-Filed Entities, the Joint Liquidators, the U.K. Pension Trustee and the PPF are party to certain side agreements amongst some or all of them related to this Settlement and Support Agreement, which side agreements shall bind solely the parties to such side agreements for the purposes of those side agreements, it being understood and agreed that any such side agreement shall have no impact on the Parties' rights and obligations under this Settlement and Support Agreement or the interpretation of this Settlement and Support Agreement.

(j) <u>Amendments and Waivers</u> – This Settlement and Support Agreement may not be amended, supplemented or modified except by a written instrument executed by each of the Parties to this Settlement and Support Agreement. No Party shall be deemed to have waived any provision of this Settlement and Support Agreement unless such waiver is in writing, and then such waiver shall be limited to the circumstances set forth in such written waiver.

(k)     <u>Non-Severability</u> – Each of the provisions of this Settlement and Support Agreement is an integrated, essential and non-severable part of this Settlement and Support Agreement.

(l)     <u>Representative Capacity</u> – Each person executing this Settlement and Support Agreement in a representative capacity represents and warrants that he or she is empowered to do so.

(m)     <u>Successors and Assigns</u> – This Settlement and Support Agreement shall enure to the benefit of, and shall be binding upon, each Party and its respective agents, successors and assigns.

(n)     <u>Authorization</u> – Each Party represents and warrants, severally and not jointly, that as of the date of this Settlement and Support Agreement, it has the requisite power and authorization to enter into this Settlement and Support Agreement and carry out the transactions contemplated hereby, provided, however, that in the case of the U.S. Debtors, the Canadian Debtors and the Monitor, the EMEA Debtors, NNSA and the U.K. Pension Trustee, such power and authorization to carry out the transactions contemplated herein is subject to the granting of the Confirmation Order, the Sanction Order, and the orders of the U.K. Court, the French Court and the Beddoes Court, respectively.

(o)     <u>Manner of Execution</u> – This Settlement and Support Agreement may be executed in counterparts, each of which shall be an original, and such counterparts shall be construed together as one instrument.  The signature of any of the Parties hereto may be evidenced by a facsimile, scanned email or internet transmission copy of this Settlement and Support Agreement bearing such signature.

(p)     <u>French Court Approval</u> – Immediately upon receipt of an order (the "**First French Order**") from the French supervisory judge (*Juge-commissaire*) (the "**French Supervisory Judge**") appointed in respect of NNSA in form and substance satisfactory to the Parties, acting reasonably, each of the Parties shall execute and deliver a release and waiver to the French Liquidator that: (i) waives the requirement for notification of the First French Order; (ii) consents to the terms of the First French Order; and (ii) waives any appeal or other remedy in respect of the First French Order. The French Liquidator shall deliver a draft of the First French Order with a certified English translation thereof to the other Parties within five (5) Business Days of execution of this Settlement and Support Agreement. Forthwith following entry of the First French Order by the French Supervisory Judge, the French Liquidator shall deliver a certified copy of the First French Order together with a certified English translation thereof to the other Parties for their review and consideration.

IN WITNESS WHEREOF, the Parties have executed this Agreement on the date first above written.

**Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Global Corporation, Nortel Networks International Corporation, Nortel Networks Technology Corporation, Nortel Communications Inc., Architel Systems Corporation and Northern Telecom Canada Limited.**

By: _____

Name:  Tanecia Wong Ken

Title:    Authorized Representative

**Ernst & Young Inc. in its capacity as Monitor of Nortel Networks Corporation, *et al.*, and not in its personal capacity.**

By: _____

Name:  Murray A. McDonald

Title:  President

**Nortel Networks Inc., Nortel Networks Capital Corporation, Nortel Altsystems Inc., Nortel Altsystems International Inc., Xros, Inc., Sonoma Systems, Qtera Corporation, CoreTek, Inc., Nortel Networks Applications Management Solutions Inc., Nortel Networks Optical Components Inc., Nortel Networks HPOCS Inc., Architel Systems (U.S.) Corporation, Nortel Networks International Inc., Northern Telecom International Inc., Nortel Networks Cable Solutions Inc., Nortel Networks (CALA) Inc. and Nortel Networks India International Inc.**

By: _____

Name:  John J. Ray III

Title:  U.S. Principal Officer

IN WITNESS WHEREOF, the Parties have executed this Agreement on the date first above

written.

**Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Global Corporation, Nortel Networks International Corporation, Nortel Networks Technology Corporation, Nortel Communications Inc., Architel Systems Corporation and Northern Telecom Canada Limited.**

By:_____
Name:
Title:

**Ernst & Young Inc. in its capacity as Monitor of Nortel Networks Corporation, *et al.*, and not in its personal capacity.**

By:_____
Name:  Murray A. McDonald
Title:  President

**Nortel Networks Inc., Nortel Networks Capital Corporation, Nortel Altsystems Inc., Nortel Altsystems International Inc., Xros, Inc., Sonoma Systems, Qtera Corporation, CoreTek, Inc., Nortel Networks Applications Management Solutions Inc., Nortel Networks Optical Components Inc., Nortel Networks HPOCS Inc., Architel Systems (U.S.) Corporation, Nortel Networks International Inc., Northern Telecom International Inc., Nortel Networks Cable Solutions Inc., Nortel Networks (CALA) Inc. and Nortel Networks India International Inc.**

By:_____
Name:  John J. Ray III
Title:  U.S. Principal Officer

IN WITNESS WHEREOF, the Parties have executed this Agreement on the date first above

written.

**Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Global Corporation, Nortel Networks International Corporation, Nortel Networks Technology Corporation, Nortel Communications Inc., Architel Systems Corporation and Northern Telecom Canada Limited.**

By:_____
Name:
Title:

**Ernst & Young Inc. in its capacity as Monitor of Nortel Networks Corporation, *et al.*, and not in its personal capacity.**

By:_____
Name:  Murray A. McDonald
Title:  President

**Nortel Networks Inc., Nortel Networks Capital Corporation, Nortel Altsystems Inc., Nortel Altsystems International Inc., Xros, Inc., Sonoma Systems, Qtera Corporation, CoreTek, Inc., Nortel Networks Applications Management Solutions Inc., Nortel Networks Optical Components Inc., Nortel Networks HPOCS Inc., Architel Systems (U.S.) Corporation, Nortel Networks International Inc., Northern Telecom International Inc., Nortel Networks Cable Solutions Inc., Nortel Networks (CALA) Inc. and Nortel Networks India International Inc.**

By:_____
Name:  John J. Ray III
Title:  U.S. Principal Officer

**The EMEA Debtors**

**Nortel Networks UK Limited (in administration)**

_____

acting by
:_____

as joint administrator (acting as agent and without personal liability)

**Nortel Networks NV (in administration)**

_____

acting by
:_____

as joint administrator (acting as agent and without personal liability)

**Nortel Networks B.V. (in administration)**

_____

acting by
:_____

as joint administrator (acting as agent and without personal liability)

**Nortel Networks Hispania SA (in administration)**

_____

acting by
:_____

as joint administrator (acting as agent and without personal liability)

**Nortel Networks (Ireland) Limited (in administration)**

_____

acting by
:_____

as joint administrator (acting as agent and without personal liability)

**Nortel Networks SpA (in administration)**

_____

acting by
:_____

as joint administrator (acting as agent and without personal liability)

**Nortel Networks Polska Sp z.o.o. (in administration)**

_____

acting by
:_____

as joint administrator (acting as agent and without personal liability)

**Nortel Networks (Austria) GmbH (in administration)**

_____

acting by
:_____

as joint administrator (acting as agent and without personal liability)

**The EMEA Debtors**

**Nortel Networks UK Limited (in administration)**

_____

acting by
:_____

as joint administrator (acting as agent and without personal liability)

**Nortel Networks NV (in administration)**

_____

acting by
:_____

as joint administrator (acting as agent and without personal liability)

**Nortel Networks B.V. (in administration)**

_____

acting by
:_____

as joint administrator (acting as agent and without personal liability)

**Nortel Networks Hispania SA (in administration)**

_____

acting by
:_____

as joint administrator (acting as agent and without personal liability)

**Nortel Networks (Ireland) Limited (in administration)**

_____

acting by
:_____ DAVID   HUGHES

as joint administrator (acting as agent and without personal liability)

**Nortel Networks SpA (in administration)**

_____

acting by
:_____

as joint administrator (acting as agent and without personal liability)

**Nortel Networks Polska Sp z.o.o. (in administration)**

_____

acting by
:_____

as joint administrator (acting as agent and without personal liability)

**Nortel Networks (Austria) GmbH (in administration)**

_____

acting by
:_____

as joint administrator (acting as agent and without personal liability)

**Nortel Networks s.r.o. (in administration)**

acting by
:

as joint administrator (acting as agent and
without personal liability)

**Nortel Networks Engineering Service Kft
(in administration)**

acting by
:

as joint administrator (acting as agent and
without personal liability)

**Nortel Networks Portugal SA (in
administration)**

acting by
:

as joint administrator (acting as agent and
without personal liability)

**Nortel Networks Slovensko s.r.o. (in
administration)**

acting by
:

as joint administrator (acting as agent and
without personal liability)

**Networks Romania SRL (in administration)**

acting by
:

as joint administrator (acting as agent and
without personal liability)

**Nortel GmbH (in administration)**

acting by
:

as joint administrator (acting as agent and
without personal liability)

**Nortel Networks OY (in administration)**

acting by
:

as joint administrator (acting as agent and
without personal liability)

**Nortel Networks AB (in administration)**

acting by
:

as joint administrator (acting as agent and
without personal liability)

**Nortel Networks International Finance &
Holding B.V. (in administration)**

**Nortel Networks France S.A.S. (in
administration)**

acting by
:_____

acting by
:_____

as joint administrator (acting as agent and
without personal liability)

as joint administrator (acting as agent and
without personal liability)

**The EMEA Non-Filed Entities**

**Nortel Networks AS**

_____

acting by
: DAVE QUANE (DIRECTOR)

**Nortel Networks AG**

_____

acting by
: DAVE QUANE (DIRECTOR)

**Nortel Networks South Africa (Pty) Limited**

_____

acting by
: DAVE QUANE (DIRECTOR)

**Nortel Networks (Northern Ireland)
Limited (in liquidation)**

_____

acting by
:_____

as joint liquidator (acting as agent and without
personal liability)

**Nortel Networks Optical Components
Limited (in liquidation)**

_____

acting by
:_____

as joint liquidator (acting as agent and without
personal liability)

**The EMEA Non-Filed Entities**

**Nortel Networks AS**

_____

acting by
:_____

**Nortel Networks South Africa (Pty) Limited**

_____

acting by
:_____

**Nortel Networks Optical Components Limited (in liquidation)**

_____

acting by
:    _RICHARD  BARKER_____

as joint liquidator (acting as agent and without personal liability)

**Nortel Networks AG**

_____

acting by
:_____

**Nortel Networks (Northern Ireland) Limited (in liquidation)**

_____

acting by
:    _RICHARD  BARKER_____

as joint liquidator (acting as agent and without personal liability)

**Alan Robert Bloom, Christopher John Wilkinson Hill, Alan Michael Hudson and Stephen John Harris, as the administrators of all EMEA Debtors and Nortel Networks S.A. except Nortel Networks (Ireland) Limited (in administration), and Alan Robert Bloom and David Martin Hughes as Administrators for Nortel Networks (Ireland) Limited (in administration).**

By:_____

Name:_____

Title:_____

By:_____

Name:_____

Title:_____

By:_____

Name:_____

Title:_____

**Nortel Networks S.A. (in administration and in *liquidation judiciaire*)**

_____

acting by

:_____

as joint administrator (acting as agent and without personal liability)

_____

acting by :Stephen Jonathan Taylor

as NNSA Conflicts Administrator (acting as agent and without personal liability)

_____

acting by : Maître Cosme Rogeau as French Liquidator (acting as agent and without personal liability)

**Alan Robert Bloom, Christopher John Wilkinson Hill, Alan Michael Hudson and Stephen John Harris, as the administrators of all EMEA Debtors and Nortel Networks S.A. except Nortel Networks (Ireland) Limited (in administration), and Alan Robert Bloom and David Martin Hughes as Administrators for Nortel Networks (Ireland) Limited (in administration).**

By:_____

Name:

Title:


By:_____

Name:

Title:


By:_____

Name:

Title:


**Nortel Networks S.A. (in administration and in *liquidation judiciaire*)**

_____

acting by

:_____

as joint administrator (acting as agent and without personal liability)

acting by :Stephen Jonathan Taylor

as NNSA Conflicts Administrator (acting as agent and without personal liability)


_____

acting by : Maître Cosme Rogeau as French Liquidator (acting as agent and without personal liability)

**Alan Robert Bloom, Christopher John Wilkinson Hill, Alan Michael Hudson and Stephen John Harris, as the administrators of all EMEA Debtors and Nortel Networks S.A. except Nortel Networks (Ireland) Limited (in administration), and Alan Robert Bloom and David Martin Hughes as Administrators for Nortel Networks (Ireland) Limited (in administration).**

By:_____
Name:
Title:


By:_____
Name:
Title:


By:_____
Name:
Title:


**Nortel Networks S.A. (in administration and in *liquidation judiciaire*)**

_____

acting by
:_____

as joint administrator (acting as agent and without personal liability)


_____

acting by :Stephen Jonathan Taylor

as NNSA Conflicts Administrator (acting as agent and without personal liability)


acting by : Maître Cosme Rogeau as French Liquidator (acting as agent and without personal liability)

Stephen Jonathan Taylor of Isonomy Limited as Conflicts Administrator of Nortel Networks S.A.

By:_____
Name:  Stephen Taylor
Title:  Conflicts Administrator


Maître Cosme Rogeau in his capacity as Liquidator for Nortel Networks S.A. under the French Secondary Proceeding.

By:_____
Name: Maître Cosme Rogeau
Title: French Liquidator


The ad hoc group of bondholders that hold notes issued and/or guaranteed by Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Inc., and Nortel Networks Capital Corporation, which on June 15, 2016, filed with the Bankruptcy Court a disclosure form under Bankruptcy Rule 2019, as such group may be constituted from time to time.

By:_____
Name:
Title:


By:_____
Name:
Title:


By:_____
Name:
Title:

Stephen Jonathan Taylor of Isonomy Limited as Conflicts Administrator of Nortel Networks S.A.

By:_____
Name:  Stephen Taylor
Title:  Conflicts Administrator

Maître Cosme Rogeau in his capacity as Liquidator for Nortel Networks S.A. under the French Secondary Proceeding.

By:_____
Name: Maître Cosme Rogeau
Title: French Liquidator

The ad hoc group of bondholders that hold notes issued and/or guaranteed by Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Inc., and Nortel Networks Capital Corporation, which on June 15, 2016, filed with the Bankruptcy Court a disclosure form under Bankruptcy Rule 2019, as such group may be constituted from time to time.

By:_____
Name:
Title:

By:_____
Name:
Title:

By:_____
Name:
Title:

Stephen Jonathan Taylor of Isonomy Limited as Conflicts Administrator of
Nortel Networks S.A.

By:

_____

Name:  Stephen Taylor
Title:  Conflicts Administrator

Maître Cosme Rogeau in his capacity as Liquidator for Nortel Networks S.A.
under the French Secondary Proceeding.

By:

_____

Name: Maître Cosme Rogeau
Title: French Liquidator

The ad hoc group of bondholders that hold notes issued and/or guaranteed by Nortel
Networks Corporation, Nortel Networks Limited, Nortel Networks Inc., and Nortel
Networks Capital Corporation, which on June 15, 2016, filed with the Bankruptcy Court
a disclosure form under Bankruptcy Rule 2019, as such group may be constituted from
time to time.

**MILBANK, TWEED, HADLEY &
MCCLOY LLP**, as counsel to the
Bondholder Group

By: _Albert Pisa_

Name: Albert Pisa
Title:  Partner

**Bennett Jones LLP**, as counsel to the
Bondholder Group

By: _____
Name:
Title:  Partner

**FTI Capital Advisors LLC,** as financial
advisor to the Bondholder Group

By: _____
Name:
Title:

**Stephen Jonathan Taylor of Isonomy Limited as Conflicts Administrator of Nortel Networks S.A.**

By:_____
Name:  Stephen Taylor
Title:  Conflicts Administrator


**Maître Cosme Rogeau in his capacity as Liquidator for Nortel Networks S.A. under the French Secondary Proceeding.**

By: _____
Name: Maître Cosme Rogeau
Title: French Liquidator

**The ad hoc group of bondholders that hold notes issued and/or guaranteed by Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Inc., and Nortel Networks Capital Corporation, which on June 15, 2016, filed with the Bankruptcy Court a disclosure form under Bankruptcy Rule 2019, as such group may be constituted from time to time.**

**MILBANK, TWEED, HADLEY& MCCLOY LLP**, as counsel to the Bondholder Group


By: _____
Name: Albert Pisa
Title:  Partner


**Bennett Jones LLP**, as counsel to the Bondholder Group

By: _____
Name: Kevin Zych
Title:  Partner


**FTI Capital Advisors LLC**, as financial advisor to the Bondholder Group

By: _____
Name:
Title:

**Stephen Jonathan Taylor of Isonomy Limited as Conflicts Administrator of Nortel Networks S.A.**

By:_____
Name:  Stephen Taylor
Title:  Conflicts Administrator


**Maître Cosme Rogeau in his capacity as Liquidator for Nortel Networks S.A. under the French Secondary Proceeding.**

By:_____
Name: Maître Cosme Rogeau
Title: French Liquidator

**The ad hoc group of bondholders that hold notes issued and/or guaranteed by Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Inc., and Nortel Networks Capital Corporation, which on June 15, 2016, filed with the Bankruptcy Court a disclosure form under Bankruptcy Rule 2019, as such group may be constituted from time to time.**

**MILBANK, TWEED, HADLEY& MCCLOY LLP**, as counsel to the Bondholder Group


By: _____
Name: Albert Pisa
Title:  Partner


**Bennett Jones LLP**, as counsel to the Bondholder Group


By: _____
Name:
Title:  Partner


**FTI Capital Advisors LLC,** as financial advisor to the Bondholder Group

By:_____
Name: Mark Spragg
Title:  Senior Managing Director

Ad hoc committee of creditors having claims only against the Canadian Debtors comprised of: the former and disabled Canadian employees of the Canadian Debtors through their court-appointed representatives, Unifor, Morneau Shepell Ltd. as Administrator of Nortel's Canadian registered pension plans, Superintendent of Financial Services of Ontario as Administrator of the Pension Benefits Guarantee Fund and the court-appointed representatives of the current and transferred employees of the Canadian Debtors.

By: _____

Name: DONALD E/ SPROULE

Title: COURT APPOINTED REP
FORMER NORTEL EMPLOYEES

By: _____

Name:

Title:

By: _____

Name:

Title:

The Official Committee of Unsecured Creditors of Nortel Networks Inc., et al. appointed pursuant to an order entered by the Bankruptcy Court on January 26, 2009, as the same may be constituted from time to time.

By: _____

Name:

Title:

Nortel Networks U.K. Pension Trust Limited as trustee of the Nortel Networks U.K. Pension Plan

By: _____

Name:

Title:

Ad hoc committee of creditors having claims only against the Canadian Debtors comprised of: the former and disabled Canadian employees of the Canadian Debtors through their court-appointed representatives, Unifor, Morneau Shepell Ltd. as Administrator of Nortel's Canadian registered pension plans, Superintendent of Financial Services of Ontario as Administrator of the Pension Benefits Guarantee Fund and the court-appointed representatives of the current and transferred employees of the Canadian Debtors.

By:_____
Name:
Title:

By:_____
Name: DAVID D. ARCHIBALD,
Title: COURT APPOINTED REP.

By:_____
Name:
Title:

The Official Committee of Unsecured Creditors of Nortel Networks Inc., et al. appointed pursuant to an order entered by the Bankruptcy Court on January 26, 2009, as the same may be constituted from time to time.

By:_____
Name:
Title:

Nortel Networks U.K. Pension Trust Limited as trustee of the Nortel Networks U.K. Pension Plan

By:_____
Name:
Title:

Ad hoc committee of creditors having claims only against the Canadian Debtors comprised of: the former and disabled Canadian employees of the Canadian Debtors through their court-appointed representatives, Unifor, Morneau Shepell Ltd. as Administrator of Nortel's Canadian registered pension plans, Superintendent of Financial Services of Ontario as Administrator of the Pension Benefits Guarantee Fund and the court-appointed representatives of the current and transferred employees of the Canadian Debtors.

By: _M.G. Campbell P.ENG._

Name: _M.A. CAMPBELL, P.ENG._

Title: _COURT APPOINTED REP._

By: _____

Name:

Title:

By: _____

Name:

Title:

The Official Committee of Unsecured Creditors of Nortel Networks Inc., et al. appointed pursuant to an order entered by the Bankruptcy Court on January 26, 2009, as the same may be constituted from time to time.

By: _____

Name:

Title:

Nortel Networks U.K. Pension Trust Limited as trustee of the Nortel Networks U.K. Pension Plan

By: _____

Name:

Title:

Ad hoc committee of creditors having claims only against the Canadian Debtors comprised of: the former and disabled Canadian employees of the Canadian Debtors through their court-appointed representatives, Unifor, Morneau Shepell Ltd. as Administrator of Nortel's Canadian registered pension plans, Superintendent of Financial Services of Ontario as Administrator of the Pension Benefits Guarantee Fund and the court-appointed representatives of the current and transferred employees of the Canadian Debtors.

By: _Susan Kennedy_
Name: Susan Kennedy
Title: Court-Appointed Representative for Disabled Employees

By: _____
Name:
Title:

By: _____
Name:
Title:

The Official Committee of Unsecured Creditors of Nortel Networks Inc., et al. appointed pursuant to an order entered by the Bankruptcy Court on January 26, 2009, as the same may be constituted from time to time.

By: _____
Name:
Title:

Nortel Networks U.K. Pension Trust Limited as trustee of the Nortel Networks U.K. Pension Plan

By: _____
Name:
Title:

Ad hoc committee of creditors having claims only against the Canadian Debtors comprised of: the former and disabled Canadian employees of the Canadian Debtors through their court-appointed representatives, Unifor, Morneau Shepell Ltd. as Administrator of Nortel's Canadian registered pension plans, Superintendent of Financial Services of Ontario as Administrator of the Pension Benefits Guarantee Fund and the court-appointed representatives of the current and transferred employees of the Canadian Debtors.

By:_____

Name: Jerry Dias

Title: President, Unifor

By:_____

Name:

Title:

By:_____

Name:

Title:

The Official Committee of Unsecured Creditors of Nortel Networks Inc., et al. appointed pursuant to an order entered by the Bankruptcy Court on January 26, 2009, as the same may be constituted from time to time.

By:_____

Name:

Title:

Nortel Networks U.K. Pension Trust Limited as trustee of the Nortel Networks U.K. Pension Plan

By:_____

Name:

Title:

Ad hoc committee of creditors having claims only against the Canadian Debtors comprised of:  the former and disabled Canadian employees of the Canadian Debtors through their court-appointed representatives, Unifor, Morneau Shepell Ltd. as Administrator of Nortel's Canadian registered pension plans, Superintendent of Financial Services of Ontario as Administrator of the Pension Benefits Guarantee Fund and the court-appointed representatives of the current and transferred employees of the Canadian Debtors.

By: _____
Name: HAMISH DUNLOP
Title: PRINCIPAL, MORNEAU SHEPELL IN ITS CAPACITY AS ADMINISTRATOR OF NORTEL'S CANADIAN REGISTERED PENSION PLANS
By: AND NOT IN ITS PERSONAL CAPACITY
Name: _____
Title: _____

By: _____
Name: _____
Title: _____

The Official Committee of Unsecured Creditors of Nortel Networks Inc., et al. appointed pursuant to an order entered by the Bankruptcy Court on January 26, 2009, as the same may be constituted from time to time.

By: _____
Name: _____
Title: _____

Nortel Networks U.K. Pension Trust Limited as trustee of the Nortel Networks U.K. Pension Plan

By: _____
Name: _____
Title: _____

Ad hoc committee of creditors having claims only against the Canadian Debtors comprised of:  the former and disabled Canadian employees of the Canadian Debtors through their court-appointed representatives, Unifor, Morneau Shepell Ltd. as Administrator of Nortel's Canadian registered pension plans, Superintendent of Financial Services of Ontario as Administrator of the Pension Benefits Guarantee Fund and the court-appointed representatives of the current and transferred employees of the Canadian Debtors.

By:_____
Name:
Title:


By:_____
Name:
Title:


By:_____
Name: Brian Mills
Title:  Superintendent of Financial Services of Ontario


The Official Committee of Unsecured Creditors of Nortel Networks Inc., et al. appointed pursuant to an order entered by the Bankruptcy Court on January 26, 2009, as the same may be constituted from time to time.

By:_____
Name:
Title:


Nortel Networks U.K. Pension Trust Limited as trustee of the Nortel Networks U.K. Pension Plan

By:_____
Name:
Title:

Ad hoc committee of creditors having claims only against the Canadian Debtors comprised of: the former and disabled Canadian employees of the Canadian Debtors through their court-appointed representatives, Unifor, Morneau Shepell Ltd. as Administrator of Nortel's Canadian registered pension plans, Superintendent of Financial Services of Ontario as Administrator of the Pension Benefits Guarantee Fund and the court-appointed representatives of the current and transferred employees of the Canadian Debtors.

By:_____
Name:   Kent Felske
Title:   Representative NCCE
        (Nortel Canadian Continuing Employees)

By:_____
Name:
Title:

By:_____
Name:
Title:

The Official Committee of Unsecured Creditors of Nortel Networks Inc., et al. appointed pursuant to an order entered by the Bankruptcy Court on January 26, 2009, as the same may be constituted from time to time.

By:_____
Name:
Title:

Nortel Networks U.K. Pension Trust Limited as trustee of the Nortel Networks U.K. Pension Plan

By:_____
Name:
Title:

**Ad hoc committee of creditors having claims only against the Canadian Debtors comprised of: the former and disabled Canadian employees of the Canadian Debtors through their court-appointed representatives, Unifor, Morneau Shepell Ltd. as Administrator of Nortel's Canadian registered pension plans, Superintendent of Financial Services of Ontario as Administrator of the Pension Benefits Guarantee Fund and the court-appointed representatives of the current and transferred employees of the Canadian Debtors.**

By:_____
Name: Dany Sylvain
Title: Representative NCCE
( Nortel Canadian Continuing Employees)

By:_____
Name:
Title:

By:_____
Name:
Title:

**The Official Committee of Unsecured Creditors of Nortel Networks Inc., et al. appointed pursuant to an order entered by the Bankruptcy Court on January 26, 2009, as the same may be constituted from time to time.**

By:_____
Name:
Title:

**Nortel Networks U.K. Pension Trust Limited as trustee of the Nortel Networks U.K. Pension Plan**

By:_____
Name:
Title:

**The Official Committee of Unsecured Creditors of Nortel Networks Inc., et al. appointed pursuant to an order entered by the Bankruptcy Court on January 26, 2009, as the same may be constituted from time to time.**

By:  AKIN GUMP STRAUSS HAUER &
FELD LLP, as Counsel to the Committee
and authorized signatory and not in its
individual capacity

By: _____
Name:  David H. Botter
Title:   Partner

Ad hoc committee of creditors having claims only against the Canadian Debtors comprised of: the former and disabled Canadian employees of the Canadian Debtors through their court-appointed representatives, Unifor, Morneau Shepell Ltd. as Administrator of Nortel's Canadian registered pension plans, Superintendent of Financial Services of Ontario as Administrator of the Pension Benefits Guarantee Fund and the court-appointed representatives of the current and transferred employees of the Canadian Debtors.

By:_____
Name:
Title:

By:_____
Name:
Title:

By:_____
Name:
Title:

The Official Committee of Unsecured Creditors of Nortel Networks Inc., et al. appointed pursuant to an order entered by the Bankruptcy Court on January 26, 2009, as the same may be constituted from time to time.

By:_____
Name:
Title:

Nortel Networks U.K. Pension Trust Limited as trustee of the Nortel Networks U.K. Pension Plan

By:_____
Name:   DAVID DAVIES
Title:      DIRECTOR

Board of the Pension Protection Fund, a statutory corporation established under the
provisions of the Pensions Act 2004, whose principal place of business is Renaissance, 12
Dingwall Road, Croydon, England, CRO 2NA.

By:_____

Name: MALCOLM WEIR

Title: HEAD OF RESTRUCTURING & INSOLVENCY

Richard Barker and Joseph Luke Charleton, as the liquidators of Nortel Networks
(Northern Ireland) Limited (in liquidation) and Richard Barker and Samantha Keen as
liquidators of Nortel Networks Optical Components Limited (in liquidation).

By:_____
Name:
Title:

By:_____
Name:
Title:

By:_____
Name:
Title:

Board of the Pension Protection Fund, a statutory corporation established under the provisions of the Pensions Act 2004, whose principal place of business is Renaissance, 12 Dingwall Road, Croydon, England, CRO 2NA.

By:_____

Name:

Title:


Richard Barker and Joseph Luke Charleton, as the liquidators of Nortel Networks (Northern Ireland) Limited (in liquidation) and Richard Barker and Samantha Keen as liquidators of Nortel Networks Optical Components Limited (in liquidation).

By:_____

Name: RICHARD BARKER

Title: JOINT LIQUIDATOR


By:_____

Name:

Title:


By:_____

Name:

Title:

**Holders of Nortel Networks Capital Corporation Bonds**

Solus Alternative Asset Management LP

By: _C. J. Larktree_____
Name: CJ Larktree
Title: Authorized Signatory

PointState Capital LP

By:_____
Name:
Title:

**Holders of Nortel Networks Capital Corporation Bonds**

Solus Alternative Asset Management LP

By:_____
Name:
Title:

PointState Capital LP

By:_
Alfred J. Barbagallo
Managing Director & General Counsel

## ANNEX A

### Sale Proceeds[7]

| Transaction | Purchaser | Account Type | Account Description | Escrow Agent | July 31, 2016 Balance |
|---|---|---|---|---|---|
| Layer 4-7 | Radware | Escrow | Purchase Price | JP Morgan | 18,135,907 |
| CDMA | Ericsson | Escrow | Purchase Price | JP Morgan | 1,054,408,277 |
| Enterprise | Avaya | Escrow | Purchase Price | JP Morgan | 844,174,607 |
| GSM | Ericsson & Kapsch | Escrow | Purchase Price | JP Morgan | 104,664,988 |
| GSM-CALA | Ericsson | Escrow | Purchase Price | JP Morgan | 1,503,009 |
| Packet Core | Hitachi | Escrow | Purchase Price | JP Morgan | 10,390,694 |
| MEN | Ciena | Escrow | Purchase Price | JP Morgan | 611,047,234 |
| CVAS | Genband | Escrow | Purchase Price | JP Morgan | 140,337,608 |
| MSS | Ericsson | Escrow | Purchase Price | JP Morgan | 46,112,548 |
| Iceberg | Rockstar | Escrow | Purchase Price | JP Morgan | 4,461,637,286 |
| | | | | | 7,292,412,156 |
| MEN Buyer Escrow | Ciena | Escrow | Tax | Citibank | 10,047,067 |
| MEN Buyer Escrow | Ciena | Escrow | EMEA Tax | Citibank | 2,513,188 |
| MEN Buyer Escrow | Ciena | Escrow | Italian Tax | Citibank | 753,950 |
| MEN Buyer Escrow | Ciena | Escrow | Poland | Citibank | 1,005,272 |
| MEN Buyer Escrow | Ciena | Escrow | TSA | Citibank | 7,545,535 |
| MEN Buyer Escrow | Ciena | Escrow | Working Capital | Citibank | 2,101 |
| Buyer Escrows | | | | | 21,867,113 |
| **Total** | | | | | **7,314,279,269** |
| | | | Less: M&A Cost Reimbursement | | (55,000,000) |
| | | | Less: Iceberg Amendment Fee | | (5,000,000) |
| | | | **Sale Proceeds for Allocation** | | **$7,254,279,269** |

---

[7] All amounts in U.S. dollars.

## ANNEX B

### EXISTING ESCROW ACCOUNTS

#### Distribution Escrow Accounts

| Escrow Agreement | Date | Account Number | Escrow Agent |
|---|---|---|---|
| Layer 4-7 | March 31, 2009 | *[8] | JP Morgan |
| CDMA | November 11, 2009 | * | JP Morgan |
| Enterprise | December 18, 2009 | * | JP Morgan |
| GSM | March 31, 2010 | * | JP Morgan |
| GSM-CALA | June 3, 2010 | * | JP Morgan |
| Packet Core | December 1, 2009 | * | JP Morgan |
| MEN | March 19, 2010 | * | JP Morgan |
| CVAS | May 27, 2010 | * | JP Morgan |
| MSS | March 11, 2011 | * | JP Morgan |
| Iceberg | July 28, 2011 | * | JP Morgan |

#### Buyer Escrow Accounts

| MEN Buyer Escrow | March 19, 2010 | * | Citibank |
|---|---|---|---|
| MEN Buyer Escrow | March 19, 2010 | * | Citibank |
| MEN Buyer Escrow | March 19, 2010 | * | Citibank |
| MEN Buyer Escrow | March 19, 2010 | * | Citibank |
| MEN Buyer Escrow | March 19, 2010 | * | Citibank |
| MEN Buyer Escrow | March 19, 2010 | * | Citibank |

---

[8] Redacted

## ANNEX C

## CANADA-U.S. SIDE LETTERS

1.  Side Agreement in respect of Enterprise dated July 20, 2009;

2.  China Side Agreement dated November 2, 2009;

3.  Side Agreement in respect of Flextronics dated November 20, 2009;

4.  Incentive Fee Side Agreement in respect of GSM dated January 8, 2010;

5.  Jabil Side Agreement dated February 5, 2010;

6.  Metro Ethernet Networks Side Agreement dated February 26, 2010;

7.  Offer in respect of Argentina dated March 19, 2010;

8.  GSM/GSM-R Side Agreement dated March 31, 2010;

9.  CVAS Side Agreement;[9]

10. Cascade Trust Side Letter;

11. Lazard Fees Side Agreement dated November 23, 2010;

12. Amended and Restated MSS Side Agreement dated March 10, 2011 (including any prior version of this agreement);

13. IP Transaction Side Agreement dated April 4, 2011;

14. Supplemental IP Transaction Side Agreement re Certain Transaction Costs and Related Matters dated July 27, 2011;

15. Second Amended and Restated IP Transaction Side Agreement re: Certain Structural Matters dated July 27, 2011 (including any prior version of this agreement); and

16. The so-called "Canada/U.S. Interstate Term Sheet" (styled "August 2011 – Timeline for and Proposed Resolution of U.S./Canada Issues") executed on or about September 8, 2011.

---

[9] This side agreement was never executed but is included for the avoidance of doubt.

## ANNEX D

## FORM OF CREDITOR JOINDER

This joinder (this "**Creditor Joinder**") to the Settlement and Plans Support Agreement (the "**Settlement and Support Agreement**")[5] dated as of [__], 2016 and entered into by and among: (i) the Canadian Debtors;  (ii) the Monitor; (iii) the U.S. Debtors; (iv) the EMEA Debtors; (v) the EMEA Non-Filed Entities; (vi) the Joint Administrators; (vii) NNSA; (viii) the NNSA Conflicts Administrator; (ix) the French Liquidator; (x) the Bondholder Group; (xi) the members of the CCC; (xii) the UCC; (xiii) the U.K. Pension Trustee; (xiv) the PPF; (xv) the Joint Liquidators; and (xvi) the NNCC Bondholder Signatories (collectively, the "**Parties**" and each a "**Party**"), is executed and delivered by [_____] (the "**Joining Creditor**") as of [_____], 2016.

1.      Agreement to be Bound. The Joining Creditor hereby agrees to be bound by all of the terms of the Settlement and Support Agreement, a copy of which is attached to this Joinder as Exhibit 1 (as the same has been or may be hereafter amended, restated, or otherwise modified from time to time in accordance with the provisions thereof). The Joining Creditor shall hereafter be deemed to be a Participating Creditor for all purposes under the Settlement and Support Agreement.

2.      Representations and Warranties. The Joining Creditor hereby represents and warrants to each Party to the Settlement and Support Agreement that, as of the date hereof, such Joining Party (a) is the legal or beneficial owner of, and has all necessary authority (including authority to bind any other legal or beneficial owner) with respect to, the claims identified below its name on the signature page hereof, and (b) makes, as of the date hereof, the representations, warranties and covenants of a Participating Creditor set forth in the Settlement and Support Agreement to each Party.

3.      Governing Law. This Joinder shall be governed by and construed in accordance with the laws of the state of New York.

4.      Notice. All notices and other communications given or made pursuant to the Settlement and Support Agreement shall be sent to:

To the Joining Creditor at:

---

[5] Each capitalized term used herein but not otherwise defined shall have the meaning ascribed to it in the Settlement and Support Agreement.

[JOINING     PARTY]
[ADDRESS]

Attn:

Facsimile:       [FAX]
EMAIL:

IN WITNESS WHEREOF, the Joining Creditor has caused this Joinder to be executed as of the date first written above.

[JOINING CREDITOR]

**Aggregate Face Amounts Beneficially Owned or Managed on Account of**:

10.75% Notes:  $_____

10.125% Notes:  $_____

Floating Rate Notes:  $_____

2.125% Notes:  $_____

1.75% Notes:  $_____

7.875% Notes:  $_____

Other:

Name of Institution:

_____

By _____

    Name:

    Title:

For signatories requiring a second signature
   line:

By _____

    Name:

    Title:

## ANNEX E

## EMEA DEBTOR ALLOCATION PROPORTION

| EMEA Debtor | Allocation Proportion | Allocation Amount |
|---|---|---|
| Ireland | 0.5473% | 39,700,848 |
| NNF | 0.0536% | 3,888,460 |
| Germany | 0.2985% | 21,657,395 |
| Spain | 0.1171% | 8,494,707 |
| Portugal | 0.0119% | 859,908 |
| Belgium | 0.0538% | 3,901,159 |
| Netherlands | 0.1310% | 9,505,530 |
| Austria | 0.0117% | 846,210 |
| Poland | 0.0888% | 6,441,991 |
| Italy | 0.0734% | 5,321,673 |
| Czech | 0.0258% | 1,870,623 |
| Slovakia | 0.0098% | 713,284 |
| Hungary | 0.0130% | 940,938 |
| Romania | 0.0049% | 353,402 |
| Finland | 0.0004% | 31,282 |
| Sweden | 0.0071% | 518,276 |
| NNIF | 0.0378% | 2,743,194 |
| NNUK | 14.0249% | 1,017,408,257 |
| | 15.5108% | 1,125,197,136 |
| NNSA | | 220,000,000 |
| **Total** | | 1,345,197,136 |

6557501

# ANNEX F

## U.S. DEBTOR ALLOCATION PROPORTION

| U.S. Debtor | Allocation Amount[10] |
|---|---|
| Nortel Networks Inc. | $1,716,346,052 |
| Nortel Networks (CALA) Inc. | $50,070,950 |
| Nortel Networks Capital Corporation (see Note (9) below) | 0 |
| Nortel Altsystems Inc. | 0 |
| Nortel Altsystems International Inc. | 0 |
| Xros, Inc. | 0 |
| Sonoma Systems | 0 |
| Qtera Corporation | 0 |
| CoreTek, Inc. | 0 |
| Nortel Networks Applications Management Solutions Inc. | 0 |
| Nortel Networks Optical Components Inc. | 0 |
| Nortel Networks HPOCS Inc. | 0 |
| Architel Systems (U.S.) Corporation | 0 |
| Nortel Networks International Inc. | 0 |
| Northern Telecom International Inc. | 0 |
| Nortel Networks Cable Solutions Inc. | 0 |
| Nortel Networks India International Inc. | 0 |
| | $1,766,417,002 |

---

[10] Such allocation amounts are based on Sale Proceeds included in Annex A, which includes the MEN Buyer Escrow Amount.  NNCC is consolidated into NNI for the purposes of this Annex.

## ANNEX G

## CROSSOVER BONDS PROVEN CLAIMS AGAINST CANADIAN ESTATE[11]

1. Nortel Networks Limited and Nortel Networks Corporation and Nortel Networks Inc. and the Bank of New York as indenture trustee for 10.750% Senior Notes due 2016                    $1,185,132,812

2. Nortel Networks Limited and Nortel Networks Corporation and Nortel Networks Inc. and the Bank of New York as indenture trustee for 10.125% Senior Notes due 2013                    $577,689,063

3. Nortel Networks Limited and Nortel Networks Corporation and Nortel Networks Inc. and the Bank of New York as indenture trustee for Floating Rate Senior Notes due 2011                    $1,022,419,965

4. Nortel Networks Corporation and Nortel Networks Limited and Nortel Networks Inc. and the Bank of New York as indenture trustee for 2.125% Convertible Senior Notes due 2014                    $578,020,746

5. Nortel Networks Corporation and Nortel Networks Limited and Nortel Networks Inc. and the Bank of New York as indenture trustee for 1.75% Convertible Senior Note Due 2012                    $577,487,674

## NNCC BONDS PROVEN CLAIMS AGAINST CANADIAN ESTATE

1. Northern Telecom Limited and the Northern Telecom Capital Corporation and the Bank of New York as indenture trustee for 7.875% Notes due June 15, 2026                    $150,951,562

---

[11] All amounts in U.S. Dollars.

# **ANNEX H**

## **Form of Transferee Joinder**

This joinder (this "**Transferee Joinder**") to the Settlement and Plans Support Agreement (the "**Settlement and Support Agreement**")[12] dated as of [__], 2016 and entered into by and among: (i) the Canadian Debtors;  (ii) the Monitor; (iii) the U.S. Debtors; (iv) the EMEA Debtors; (v) the EMEA Non-Filed Entities; (vi) the Joint Administrators; (vii) NNSA; (viii) the NNSA Conflicts Administrator; (ix) the French Liquidator; (x) the Bondholder Group; (xi) the members of the CCC; (xii) the UCC; (xiii) the U.K. Pension Trustee; (xiv) the PPF; (xv) the Joint Liquidators; and (xvi) the NNCC Bondholder Signatories (collectively, the "**Parties**" and each a "**Party**"), is executed and delivered by [_____] (the "**Joining Creditor**") as of [_____], 2016.

1.      Agreement to be Bound.  The Joining Party hereby agrees to be bound by all of the terms of the Settlement and Support Agreement, a copy of which is attached to this Joinder as Exhibit 1 (as the same has been or may be hereafter amended, restated, or otherwise modified from time to time in accordance with the provisions thereof).  The Joining Creditor shall hereafter be deemed to be a Participating Creditor for all purposes under the Settlement Support Agreement.

2.      Representations and Warranties.  The Joining Creditor hereby represents and warrants to each Party to the Settlement and Support Agreement that, as of the date hereof, such Joining Creditor (a) is the legal or beneficial holder of, and has all necessary authority (including authority to bind any other legal or beneficial holder) with respect to, the claims identified below its name on the signature page hereof, and (b) makes, as of the date hereof, the representations, warranties and covenants of a Participating Creditor, as applicable, set forth in the Settlement and Support Agreement to each Party.

3.      Governing Law.  This Joinder shall be governed by and construed in accordance with the laws of the State of New York.

4.      Notice.  All notices and other communications given or made pursuant to the Support Agreement shall be sent to:

To the Joining Creditor at:

[JOINING          PARTY]
[ADDRESS]

---

[12] Each capitalized term used herein but not otherwise defined shall have the meaning ascribed to it in the Settlement and Support Agreement.

Attn:

Facsimile:          [FAX]
EMAIL:

IN WITNESS WHEREOF, the Joining Creditor has caused this Joinder to be executed as of the date first written above.

[JOINING PARTY]

**Aggregate Face Amounts Beneficially Owned
or Managed on Account of**:

10.75% Notes:  $_____

10.125% Notes:  $_____

Floating Rate Notes:  $_____

2.125% Notes:  $_____

1.75% Notes:  $_____

7.875% Notes:  $_____

Other:

Name of Institution:

_____

By  _____

   Name:

Title:

For signatories requiring a second signature
    line:

By _____

    Name:

    Title:

**Exhibit 1 to the Form of Transferee Joinder**

**Settlement and Plans Support Agreement**

## ANNEX I

## TIMETABLE

| Step | Target Date[8] |
|------|----------------|
| 1.   Entry of orders authorizing currency conversion | October 14, 2016 |
| 2.   Filing of U.S. Plans and Disclosure Statement with Bankruptcy Court and Canadian Plan and Canadian Information Circular with CCAA Court | October 28, 2016 |
| 3.   Canadian Meeting Order Hearing (CCAA Court) | December 1, 2016 |
| 4.   Disclosure Statement Hearing (Bankruptcy Court) | December 1, 2016 |
| 5.   Creditors' Meeting (Canada) | By January 17, 2017 |
| 6.   Plan Confirmation Hearing (Bankruptcy Court) and Sanction Hearing (CCAA Court) | January 24, 2017 |
| 7.   Plans Effective Date | February 15, 2017 |
| 8.   Long Stop Date | August 31, 2017 |

## ANNEX J

## NOTICE PARTICULARS

(a)    Notice to Canadian Debtors/Monitor:

        Goodmans LLP
        Bay Adelaide Centre
        333 Bay Street, Suite 3400
        Toronto, ON M5H 2S7
        Canada
        Attention:  Jay Carfagnini
        Facsimile:  416-979-1234
        Email:  jcarfagnini@goodmans.ca

        Attention:  Joseph Pasquariello
        Facsimile:  416-979-1234
        Email:  jpasquariello@goodmans.ca

        Allen & Overy LLP
        1221 Ave of the Americas
        New York, NY 10020
        United States
        Attention:  Ken Coleman
        Facsimile:  212-610-6399
        Email:  ken.coleman@allenovery.com

(b)    Notice to U.S. Debtors

        Cleary Gottlieb Steen & Hamilton
        One Liberty Plaza
        New York, New York 10006
        United States
        Attention:  James Bromley
        Facsimile:  212-225-3999
        Email:  jbromley@cgsh.com

        Attention:  Lisa Schweitzer
        Facsimile:  212-225-3999
        Email:  lschweitzer@cgsh.com

Torys LLP
79 Wellington St. W. 30th Floor
Box 270 TD South Tower
Toronto, Ontario M5K 1N2
Canada
Attention:  Scott Bomhof
Facsimile:  416-865-7380
Email:  sbomhof@torys.com


(c)    Notice to EMEA Debtors (other than NNSA)

Debevoise & Plimpton
65 Gresham Street
London EC2V 7NQ
United Kingdom
Attention:  Kevin Lloyd
Facsimile:  +44-20-7588-4180
Email:  klloyd@debevoise.com

Herbert Smith Freehills
Exchange House
Primrose Street
London EC2A 2EG
United Kingdom
Attention:  Kevin Pullen
Facsimile:  +44 20-7098-4976
Email:  kevin.pullen@hsf.com

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004
United States
Attention:  Derek Adler
Facsimile:  212-422-4726
Email:  derek.adler@hugheshubbard.com

(d)      Notice to NNSA

        Skadden, Arps, Slate, Meagher & Flom LLP
        4 Times Square
        New York, New York 10036
        United States
        Attention: Susan Salzstein
        Facsimile: 917-777-4132
        Email: susan.saltzstein@skadden.com

        Stikeman Elliot LLP
        5300 Commerce Court West
        199 Bay Street
        Toronto, ON M5L 1B9
        Canada
        Attention: Daniel Murdoch
        Facsimile: 416-947-0866
        Email: DMurdoch@stikeman.com

(e)      Notice to UCC

        Akin, Gump, Strauss, Hauer & Feld LLP
        Bank of America Tower,
        One Bryant Park, 42nd Floor
        New York, New York 10036
        United States
        Attention: Fred Hodara
        Facsimile: 212-872-1002
        Email: fhodara@akingump.com

        Attention: David Botter
        Facsimile: 212-872-1002
        Email: dbotter@akingump.com

        Cassels Brock & Blackwell LLP
        Suite 2010, Scotia Plaza
        40 King Street West
        Toronto, Ontario M5H 3C2
        Canada
        Attention: Michael Wunder
        Facsimile: 416-640-3206
        Email: mwunder@casselsbrock.com

(f)    Notice to CCC

        Koskie Minsky LLP
        20 Queen Street West
        Suite 900, Box 52
        Toronto, Ontario M5H 3R3
        Canada
        Attention:  Mark Zigler
        Facsimile:  416-977-8353
        Email:  mzigler@kmlaw.ca

        McCarthy Tétrault LLP
        Suite 5300, TD Bank Tower
        Box 48, 66 Wellington Street West
        Toronto ON M5K 1E6
        Canada
        Attention:  James D. Gage
        Facsimile:  416-868-0673
        Email:  jgage@mccarthy.ca

        Paliare Roland Rosenberg Rothstein LLP
        155 Wellington St. W., Suite 3500
        Toronto, ON M5V 3H1
        Attention:  Ken Rosenberg
        Facsimile:  416-646-4301
        Email:  ken.rosenberg@paliareroland.com

(g)    Notice to Ad Hoc Bondholder Group

        Milbank, Tweed, Hadley & McCloy LLP
        28 Liberty Street
        New York, New York 10005
        United States
        Attention:  Albert Pisa
        Facsimile:  212-822-5319
        Email:  apisa@milbank.com

        Bennett Jones
        3400 One First Canadian Place
        P.O. Box 130
        Toronto, Ontario M5X 1A4
        Canada
        Attention:  Kevin Zych
        Facsimile:  416-863-1716
        Email:  zychk@bennettjones.com

(h)     Notice to UKPI

Hogan Lovells International LLP
Atlantic House
Holborn Viaduct
London EC1A 2FG
United Kingdom
Attention:  Angela Dimsdale Gill
Facsimile:  +44 20-7296-2001
Email:  amdg@hoganlovells.com

Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, New York 10019
United States
Attention:  Marc Abrams
Facsimile:  212-728-9200
Email:  mabrams@willkie.com

Thornton Grout Finnigan LLP
Suite 3200, 100 Wellington Street West
P.O. Box 329, Toronto-Dominion Centre
Toronto, ON M5K 1K7, Canada
Attention:  D.J. Miller
Facsimile:  416-304-1313
Email:  djmiller@tgf.ca

Blake, Cassels & Graydon LLP
199 Bay Street, Suite 4000
Toronto, Ontario M5L 1A9
Canada
Attention:  Michael Barrack
Facsimile:  416-863-2653
Email:  michael.barrack@blakes.com

(i)     Notice to NNCC Bondholder Signatories

Quinn Emanuel Urquardt & Sullivan, LLP
51 Madison Avenue
New York, New York 10010
United States
Attention:  James Tecce
Facsimile:  212-849-7100
Email:  jamestecce@quinnemanuel.com

# ANNEX K

**Canadian Distribution Escrow Agreement**

**CANADIAN DISTRIBUTION ESCROW AGREEMENT**

**among**

**NORTEL NETWORKS CORPORATION
NORTEL NETWORKS LIMITED
NORTEL NETWORKS INC.
NORTEL NETWORKS UK LIMITED**

**and**

**THE OTHER DEPOSITORS**

**and**

**THE ESTATE FIDUCIARIES**

**and**

**Royal Trust Corporation of Canada, as Canadian Distribution Agent**

**dated as of September ●, 2016**

**This CANADIAN DISTRIBUTION ESCROW AGREEMENT** (the "**Agreement**"), dated as of September ⬤, 2016, by and among

(i)     Nortel Networks Corporation ("**NNC**"), a corporation organized under the laws of Canada;

(ii)    Nortel Networks Limited ("**NNL**"), a corporation organized under the laws of Canada;

(iii)   Nortel Networks Inc. ("**NNI**"), a corporation organized under the laws of Delaware;

(iv)    Nortel Networks UK Limited (in administration) ("**NNUK**"), a corporation organized under the laws of the United Kingdom acting by Alan Robert Bloom, Stephen John Harris, Alan Michael Hudson and Christopher John Wilkinson Hill of Ernst & Young LLP (the "**Joint Administrators**");

(v)     the affiliates of NNC, NNL, NNI and NNUK specified on Schedule "A" hereto (collectively, the "**Other Depositors**" and with NNC, NNL, NNI and NNUK, the "**Depositors**");

(vi)    the Estate Fiduciaries (as defined below) with the exclusion from liability set forth in Section 26; and

(vii)   Royal Trust Corporation of Canada, a trust company organized and existing under the laws of Canada (in its capacity as distribution escrow agent hereunder, the "**Canadian Distribution Agent**").

**WHEREAS**, on January 14, 2009 (the "**Petition Date**"), NNC, NNL and certain of their affiliates (collectively, the "**Canadian Debtors**") filed with the Ontario Superior Court of Justice (the "**Canadian Court**") an application for protection under the *Companies' Creditors Arrangement Act* (Canada) (the "**CCAA**") and were granted certain creditor protection pursuant to an order issued by the Canadian Court on the same date, which has been extended from time to time by further order of the Canadian Court (such proceedings, together with any other formal insolvency proceedings commenced in Canada in respect of NNL, the "**Canadian Cases**");

**WHEREAS**, NNI and certain of its affiliates (collectively, the "**U.S. Debtors**") are debtors-in-possession under Title 11 of the United States Code (the "**U.S. Bankruptcy Code**"), which commenced cases under Chapter 11 of the U.S. Bankruptcy Code on the Petition Date by filing voluntary petitions for relief in the U.S. Bankruptcy Court for the District of Delaware (the "**U.S. Court**") (the "**U.S. Cases**" and together with the Canadian Cases, the "**Bankruptcy Cases**");

**WHEREAS**, the Canadian Court has appointed Ernst & Young Inc. as Monitor in the Canadian Cases (the "**Monitor**"), and the Office of the United States Trustee for the District of Delaware has appointed an Official Committee of Unsecured Creditors as representative for the unsecured creditors of the U.S. Debtors (the "**Committee**" and, together with the Monitor, the "**Estate Fiduciaries**"), and in addition, an *ad hoc* group of bondholders holding claims against certain of the U.S. Debtors and certain of the Canadian Debtors has also been organized (the "**Bondholder Group**");

- 2 -

**WHEREAS**, on the Petition Date, the High Court of Justice in London, England (the "**English Court**") ordered that NNUK and certain of its affiliates (collectively, the "**EMEA Debtors**") be placed into administration under the English Insolvency Act 1986, as amended (the "**Insolvency Act**") and European Union's Council Regulation (EC) No. 1346/2000 on Insolvency Proceedings (the "**EC Regulation**") and appointed the Joint Administrators to manage the affairs, business and property of NNUK and certain of its affiliates;

**WHEREAS**, while the administration proceedings in respect of Nortel Networks S.A. ("**NNSA**"), being main proceedings pursuant to Article 3(1) of the EC Regulation and under the Insolvency Act are continuing, subsequent to the Petition Date, NNSA commenced secondary insolvency proceedings within the meaning of Article 27 of the EC Regulation pursuant to which the Commercial Court of Versailles (the "**French Court**") appointed Maître Cosme Rogeau, 26, avenue Hoche, 78000 Versailles as the "Mandataire Liquidateur" of NNSA (the "**French Liquidator**");

**WHEREAS**, Stephen Taylor of Isonomy Limited has been appointed as conflicts administrator of NNSA (the "**Conflicts Administrator**");

**WHEREAS** the Depositors and certain other parties (together, the "**IFSA Parties**") have entered into that certain agreement to address interim funding and the settlement of certain intercompany matters dated June 9, 2009 (the "**IFSA**"), pursuant to clause 12.c and clause 12.g of which, the IFSA Parties agreed to negotiate in good faith a protocol for resolving disputes concerning the allocation of sale proceeds from sale transactions;

**WHEREAS** the Depositors and certain of their affiliates sold certain of their assets pursuant to various sale transactions approved by the Canadian Court and the U.S. Court over the period 2009 through 2011, the sale proceeds of which (the "**Sale Proceeds**") were placed into escrow with JPMorgan Chase Bank, N.A., as distribution escrow agent (the "**U.S. Distribution Agent**");

**WHEREAS** by order of the Canadian Court dated April 3, 2013 and order of the U.S. Court dated May 17, 2013, the Canadian Court and U.S. Court approved an allocation protocol (the "**Allocation Protocol**") to resolve the allocation of the Sale Proceeds amongst the Depositors and certain of their affiliates;

**WHEREAS** the Depositors, certain of their affiliates, certain of their respective creditors and the Estate Fiduciaries participated in a joint trial pursuant to the Allocation Protocol before the Canadian Court and U.S. Court pursuant to which decisions concerning the allocation of the Sale Proceeds were issued and various appeals have been taken and sought from such decisions (collectively, the "**Allocation Dispute**");

**WHEREAS** the Depositors, certain of their affiliates, certain of their respective creditors and the Estate Fiduciaries have entered into a Settlement and Plans Support Agreement dated September ●, 2016 (the "**Settlement and Support Agreement**"), pursuant to which, subject to the effectiveness of the Settlement and Support Agreement, they have agreed to resolve the Allocation Dispute and certain other matters on the terms contemplated by the Settlement and Support Agreement;

- 3 -

**WHEREAS** the Settlement and Support Agreement contemplates the conversion of an amount of the Sale Proceeds not exceeding US$1.2 billion (the "**CAD Sale Proceeds**") from U.S. dollars to Canadian dollars and the Depositors and Estate Fiduciaries are desirous of entering into this Agreement so that the Canadian Distribution Agent can receive, hold, convert such funds from U.S. dollars to Canadian dollars and release such funds in furtherance of the Settlement and Support Agreement and in accordance with the terms and conditions of the Settlement and Support Agreement and this Agreement;

**WHEREAS**, the U.S. Debtors shall seek authorization from the U.S. Court to enter into this Agreement, to cause the transfer of the CAD Sale Proceeds to the Canadian Distribution Agent and to convert certain of the Sale Proceeds as contemplated hereby (the "**U.S. Court Approval**");

**WHEREAS** the Canadian Debtors and the Monitor shall seek authorization from the Canadian Court to enter into this Agreement, to cause the transfer of the CAD Sale Proceeds to the Canadian Distribution Agent and to convert certain of the Sale Proceeds as contemplated hereby (the "**Canadian Court Approval**" and with the U.S. Court Approval, the "**Court Approvals**"); and

**WHEREAS**, the Depositors and the Estate Fiduciaries wish to appoint the Canadian Distribution Agent as escrow and distribution agent and the Canadian Distribution Agent is willing to accept such appointment and to act as escrow and distribution agent, in each case upon the terms and conditions of the Agreement.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and adequacy of which is hereby irrevocably acknowledged, the Depositors, the Estate Fiduciaries and the Canadian Distribution Agent agree as follows:

1.      Appointment of Canadian Distribution Agent.

The Depositors and the Estate Fiduciaries hereby jointly nominate, constitute and appoint the Canadian Distribution Agent as escrow and distribution agent to hold the Escrow Property (as defined below) in the Distribution Account (as defined below) upon the terms and conditions set forth herein. The Canadian Distribution Agent hereby accepts such appointment and agrees that deposits to, and disbursements from, the Distribution Account, or applicable portions thereof, shall only be made in accordance with the terms and conditions of this Agreement. The Canadian Distribution Agent hereby represents to each of the Depositors that it has the corporate power and legal authority to execute this Agreement and to perform its obligations hereunder. The Depositors and the Canadian Distribution Agent agree that any action specified in this Agreement as to be taken by all of the Depositors, acting jointly, when taken by all of the Depositors, shall be binding upon each of the Depositors and the Canadian Distribution Agent shall be entitled to act and rely upon any action taken by all of the Depositors, acting jointly, and to the extent required hereunder, the Estate Fiduciaries, as provided in this Agreement.

2.      Deposit of Escrow Property and Conversion of CAD Sale Proceeds.

      (a)      Forthwith upon the granting of the Court Approvals, the Depositors, certain of their affiliates and the Estate Fiduciaries shall instruct the U.S. Distribution Agent

- 4 -

to transfer the CAD Sale Proceeds to the Canadian Distribution Agent by wire transfer of immediately available funds (such funds as received by the Canadian Distribution Agent, the "**Escrow Funds**") to an account established with the Canadian Distribution Agent (the "**Distribution Account**"). The Canadian Distribution Agent shall forthwith notify the Depositors and the Estate Fiduciaries in writing of the account number for the Distribution Account upon the Distribution Account being established. The Escrow Funds and all interest and other income therefrom received by the Canadian Distribution Agent, together with any investments of the Escrow Property, less any funds distributed or paid in accordance with this Agreement are collectively referred to herein as "**Escrow Property**". The Canadian Distribution Agent shall provide written confirmation to the Depositors, the Estate Fiduciaries, the Bondholder Group and the U.S. Distribution Agent upon its receipt of the Escrow Funds. Prior to the deposits made in accordance with this Section 2, there shall be no other funds in the Distribution Account. The Escrow Property shall at all times, until disbursement as provided herein, remain segregated and separately identified by the Canadian Distribution Agent and shall not be commingled with the other assets held by the Canadian Distribution Agent.

(b) The Monitor shall be entitled to instruct the Canadian Distribution Agent (or its affiliated financial institutions as specified on Schedule E) on not less than one (1) Business Days' notice to the Canadian Distribution Agent, and the Canadian Distribution Agent shall be entitled to solely rely on such instruction, to convert the CAD Sale Proceeds from U.S. dollars to Canadian dollars on the date(s) and in the manner specified from time to time by the Monitor, provided that such specifications allow the Canadian Distribution Agent to convert the CAD Sale Proceeds from U.S. dollars to Canadian dollars in an orderly manner. NNL shall provide notice to the other Depositors within three Business Days of any conversion of the amount of U.S. dollars converted, the date of such conversion and the rate(s) at which such conversion occurred.

3.    Investment of Escrow Property.

(a) The Canadian Distribution Agent shall hold, invest and reinvest the Escrow Property strictly in accordance with joint, written instructions executed by all of the Depositors and the Estate Fiduciaries and delivered to the Canadian Distribution Agent; provided, however, that any investment of the Escrow Property shall be limited to Government of Canada treasury bills ("**Canadian T-Bills**"). Until otherwise jointly directed by all of the Depositors and the Estate Fiduciaries, the Canadian Distribution Agent shall invest the Escrow Property (once converted into Canadian dollars) in Canadian T-Bills having maturities of up to two months, on a rolling basis. In the event that Canadian T-Bills having maturities of up to two months are not available, the Canadian Distribution Agent shall invest the Escrow Property in Canadian T-Bills with the next available maturity date(s) available in the relevant market. For greater certainty, depending on market availability, the Escrow Property may be invested in one or more Canadian T-Bills having various maturity dates. The parties hereto further understand and agree that, notwithstanding the Canadian Distribution Agent's

- 5 -

obligations hereunder to invest and reinvest the Escrow Property, depending on market availability, the Canadian Distribution Agent may not be able to invest all of the Escrow Property in Canadian T-Bills, and that any cash balances constituting that portion of the Escrow Property unable to be invested in Canadian T-Bills, that is required to be held in cash in contemplation of the conversions contemplated hereby, that is required for a distribution to be made hereunder, or that is earned as a result of the investment or holding of the Escrow Property (the "**Cash Balances**") may be deposited as provided for in Section 3(b). The Canadian Distribution Agent makes no representation as to the yield available upon the Escrow Property and shall bear no liability for any failure to achieve any yield from the Escrow Property. The Canadian Distribution Agent shall use reasonable efforts to obtain the requested maturity dates for any such investments, however, the Canadian Distribution Agent shall have no responsibility whatsoever with respect to the availability of maturity dates and will not be liable in any respect for: (i) any investment-related loss resulting from the sale of an investment prior to its maturity date or for the unavailability of all or any portion of the Escrow Funds resulting from an investment maturity date, or (ii) any investment of the Escrow Property in a particular investment made in accordance with the terms of this Agreement.

(b)     The Canadian Distribution Agent may deposit any Cash Balances in an interest bearing cash account with the Canadian Distribution Agent, Royal Bank of Canada or any financial institution affiliated or related to the Royal Bank of Canada as listed on Schedule E hereto (collectively, "**Authorized Depositaries**") notwithstanding that the Canadian Distribution Agent and/or any of the other Authorized Depositaries may benefit therefrom, and the Canadian Distribution Agent or other Authorized Depositaries shall not be required to account for, or to give up, any such benefit. In particular, it shall not be improper for the Canadian Distribution Agent to deposit moneys with, or give custody of the Escrow Property to any other Authorized Depositaries, notwithstanding any benefit realized as a result, including retaining a profit in excess of interest paid (if any) on, or fees payable to any affiliated or related companies in respect of, such deposit or custody arrangement.

(c)     The Canadian Distribution Agent shall be authorized to sell any investment of the Escrow Property from time to time, including prior to any maturity date, in order to make a payment or release Escrow Property pursuant to this Agreement or a written direction executed by all of the Depositors and the Estate Fiduciaries.

(d)     Any written notice to remit payment received by the Canadian Distribution Agent after 11:00 a.m. Toronto time shall be treated as if received on the following Business Day. For purposes of this Agreement, "**Business Day**" shall mean any day, other than a Saturday or Sunday, on which Schedule I Canadian chartered banks are open for business in Toronto, Ontario, Canada.

- 6 -

4.    Ownership of Escrow Property; Taxes.

(a)    The Escrow Property at all times is and shall be the exclusive property of the Depositors. All T-5 slips and other tax information related to the Distribution Account will be reported by the Canadian Distribution Agent (i) based upon the disbursement of the Escrow Property to Depositors pursuant to Section 5 if such Escrow Property was disbursed during such calendar year, or (ii) with respect to any Escrow Property not disbursed during such calendar year, in the name of NNL (it being understood that the designation of NNL on such T-5 slip or other tax information shall not be presented by any Depositor or Estate Fiduciary as being indicative of the final allocation of the Escrow Property). The Canadian Distribution Agent acknowledges and agrees that the foregoing Section 4(a)(ii) is not indicative of the final allocation of the Escrow Property. Each Depositor acknowledges and agrees that any taxes payable from the income earned by such Depositor on the investment of any sums held in the Escrow Property shall be paid by such Depositor.

(b)    Notwithstanding the provisions of Section 4(a), to the extent that the Canadian Distribution Agent becomes liable for the payment of any taxes in respect of income derived from the investment of the Escrow Property, the Canadian Distribution Agent shall satisfy such liability to the extent possible from the Escrow Property. The Depositors shall jointly and severally indemnify, defend and save harmless the Canadian Distribution Agent from and against any and all tax, late payment, interest, penalty or other costs and expenses (including, without limitation, the reasonable fees and expenses of outside counsel) that may be assessed against or incurred by the Canadian Distribution Agent on or with respect to the Escrow Property and the investment thereof, except to the extent such tax, late payment, interest, penalty or other expense are finally adjudicated (and not subject to appeal) by a court of competent jurisdiction to have been a direct result of the gross negligence or willful misconduct of the Canadian Distribution Agent. The indemnification provided for by this Section 4(b) shall be initially satisfied out of the Escrow Property to the extent available. The indemnification provided by this Section 4(b) is in addition to the limitations of liability and indemnification provisions set out in Sections 9 and 10 and shall survive the resignation or removal of the Canadian Distribution Agent and the termination or expiration of this Agreement. As among themselves, the Depositors agree that the costs of any such indemnification shall be borne on a pro rata basis by the Depositors in accordance with the percentage of the Escrow Property allocable to each of the Depositors pursuant to the Allocation Protocol or a letter of direction as described in Section 5(a) and, notwithstanding anything to the contrary in the Settlement and Support Agreement, any Depositor paying in excess of its pro rata share of the cost of such indemnification shall have rights of contribution vis-à-vis any Depositor that has paid less than its pro rata share of such costs either directly to the Canadian Distribution Agent or by payment to another Depositor pursuant to this sentence; provided, that if the costs of any such indemnification arise from a breach of this Agreement or other fault of a Depositor, the Depositor(s) so in breach or at fault shall bear the cost of such

- 7 -

indemnification and any Depositor paying in excess of its share of the cost of such indemnification, after taking into account the breach or fault of the other Depositors, shall, notwithstanding anything to the contrary in the Settlement and Support Agreement, have rights of contribution vis-à-vis any Depositor that has paid less than its share of such costs either directly to the Canadian Distribution Agent or by payment to another Depositor.

(c)    In connection with making a distribution hereunder, the Canadian Distribution Agent shall be entitled to withhold any taxes required to be withheld by applicable law in connection with such distribution, including but not limited to applicable withholding taxes, and shall remit such taxes to the appropriate tax authority; provided, however, that the Canadian Distribution Agent shall not withhold any taxes if it receives documentation from the Depositors demonstrating to the Canadian Distribution Agent, acting reasonably, that no such withholding is required.

5.    <u>Distribution of Escrow Property.</u>

The Depositors, the Estate Fiduciaries and the Canadian Distribution Agent hereby agree that, until the termination of the escrow established pursuant to this Agreement, the Canadian Distribution Agent shall hold the Escrow Property and not disburse any amounts from the Distribution Account except in accordance with the following terms and conditions:

(a)    The Canadian Distribution Agent shall disburse to any person amounts from the Escrow Property if and as so instructed pursuant to (i) a letter of direction substantially in the form attached as Exhibit B hereto jointly executed by the Depositors and the Estate Fiduciaries, a copy of which shall be provided by the Depositors to the Bondholder Group, or (ii) any Depositor's delivery to the Canadian Distribution Agent, with copies to the other Depositors, the Estate Fiduciaries and the Bondholder Group, of a duly authenticated copy of the binding decision made by the relevant dispute resolver(s) under the Allocation Protocol (a "**Decision**") which is not stayed or subject to appeal, accompanied by a certificate from such Depositor certifying as to the finality of the Decision.

(b)    Any joint instruction given by the Depositors and Estate Fiduciaries pursuant to Section 5(a) shall be executed by the respective Authorized Representatives (as defined below) of such Depositors and Estate Fiduciaries. In relation to NNSA, any instructions shall be executed jointly by the French Liquidator and the Conflicts Administrator with the agreement of the Joint Administrators. The Canadian Distribution Agent is authorized but not required to seek confirmation of such instructions by telephone call-back to the person or persons designated on Schedule D hereto (each an "**Authorized Representative**" of the applicable Depositor or Estate Fiduciary), and the Canadian Distribution Agent may rely upon the confirmations of anyone purporting to be the person or persons so designated. The Authorized Representative(s) and telephone numbers for call-backs may be changed only in writing from the applicable Depositor or Estate Fiduciary actually received and acknowledged by the Canadian Distribution Agent (with a copy of such writing to be delivered to the other Depositors, the

- 8 -

Estate Fiduciaries and the Bondholder Group) it being understood that each Depositor and Estate Fiduciary shall have the right to replace its Authorized Representative from time to time by providing written notice to the Canadian Distribution Agent, the other Depositors, the Estate Fiduciaries and the Bondholder Group or by providing a copy of a final and non-appealable court order of a court of competent jurisdiction (as provided in Section 21 below) to the Canadian Distribution Agent designating a successor Authorized Representative. The Depositors and Estate Fiduciaries acknowledge that such security procedure is commercially reasonable. Concurrent with the execution of this Agreement, the Depositors and the Estate Fiduciaries shall deliver to the Canadian Distribution Agent sample signatures of the Authorized Representatives as set forth on Schedule D.

(c)     The Canadian Distribution Agent shall have no responsibility or obligation for investigating or determining the validity or sufficiency of any matter asserted in a letter of instruction or of any pending claim for entitlement to release of funds from the Distribution Account. The Canadian Distribution Agent shall have the right to withhold an amount equal to the amount due and owing to the Canadian Distribution Agent under the terms of this Agreement, plus any reasonable costs and expenses incurred by Canadian Distribution Agent in accordance with the terms of this Agreement in connection with the termination of the Distribution Account.

(d)     No Depositor shall submit to the Canadian Distribution Agent a certificate that falsely certifies to the finality of a Decision.

6.    <u>Termination of Distribution Account.</u>

The Agreement shall terminate upon the distribution of all Escrow Property from the Distribution Account established hereunder in accordance with Section 5(a) hereof, subject to the survival of provisions which expressly survive the termination of this Agreement. Without limiting the foregoing, Sections 4(b), 9, 10 and 12 shall survive the termination of this Agreement.

7.    <u>Method of Payment.</u>

Any payments to be made hereunder shall be made by wire transfer in immediately available funds to the account of such Depositor designated on Schedule B annexed hereto (collectively, the "**Standing Settlement Instructions**"). Any Depositor shall have the right, from time to time, to provide written notice to the Canadian Distribution Agent and the other Depositors updating its Standing Settlement Instructions, and the Canadian Distribution Agent shall thereafter use such revised Standing Settlement Instructions for purposes of any subsequent distributions to such Depositor pursuant to Section 5(a) until such Standing Settlement Instructions have been further updated pursuant to this Section 7. The Depositors acknowledge that the Canadian Distribution Agent may rely upon all identifying information set forth in the Standing Settlement Instructions. The Depositors acknowledge that such Standing Settlement Instructions are a security procedure and are commercially reasonable.

- 9 -

8.      Monthly Reports.

The Canadian Distribution Agent shall, following the end of each calendar month, provide monthly account statements to the Depositors with respect to the Distribution Account, with copies to the Estate Fiduciaries and the Bondholder Group.

9.      Liability of Canadian Distribution Agent.

(a)      Notwithstanding any other provision of this Agreement, the Canadian Distribution Agent shall:

(i)      have only those duties as are specifically provided herein, which shall be deemed purely procedural and administerial in nature, and shall under no circumstance be deemed a fiduciary of any of the Depositors, the Estate Fiduciaries, the Bondholder Group, the U.S. Distribution Agent or of any of their respective officers, directors, employees, agents, representatives, members, attorneys, successors or assigns. The Canadian Distribution Agent shall neither be responsible for nor chargeable with knowledge of the terms and conditions of any other agreement, instrument or document between or involving the other parties hereto, including the Settlement and Support Agreement, the IFSA or the Allocation Protocol, nor shall the Canadian Distribution Agent be required to determine if any person or entity has complied with any such agreements, nor shall any additional obligations of the Canadian Distribution Agent be inferred from the terms of such agreements, even though reference thereto may be made in this Agreement. This Agreement sets forth all matters pertinent to the escrow contemplated hereunder and no additional duties or obligations of the Canadian Distribution Agent shall be inferred from the terms of this Agreement or any other agreement, instrument or document. The permissive rights of the Canadian Distribution Agent to do things enumerated in this Agreement shall not be construed as duties or obligations;

(ii)      be entitled to rely exclusively upon, and shall have no responsibility to investigate, inquire into or determine the genuineness, authenticity or sufficiency of, any document, notice, direction, request, demand, instrument or other instruction (or, in each case, any signature thereon) submitted to it or otherwise given in connection with this Agreement;

(iii)      be entitled to assume that any person who is an Authorized Representative of a Depositor or Estate Fiduciary has the full power and authority to act on behalf of and to bind, for all intents and purposes, such party, as applicable;

(iv)      be entitled to rely upon and have no liability in acting on the opinion, advice of or information obtained from its counsel (including in-house counsel) or other advisors in relation to any matter arising in connection

- 10 -

with this Agreement, provided that the Canadian Distribution Agent does not act with gross negligence or wilful misconduct;

(v)     have the right, but not the obligation, to consult with any counsel (including in-house counsel) or other advisors of its choice in relation to any matter arising in connection with this Agreement;

(vi)    have the right to perform any of its duties hereunder through agents, attorneys, custodians or nominees; and

(vii)   not be responsible for any failure to act or other omission as a result of causes beyond the reasonable control of the Canadian Distribution Agent.

(b)     None of the Canadian Distribution Agent, nor any of the officers, directors, employees, agents, representatives, attorneys, successors or assigns of the Canadian Distribution Agent, shall be liable, directly or indirectly, to any person or entity, including any of the other parties, for any costs, expenses, damages, claims, actions, demands or liabilities arising out of or relating to any of the services provided hereunder, except to the extent such costs, expenses, damages, claims, actions, demands or liabilities have been finally adjudicated to have resulted from the Canadian Distribution Agent's or its officers, directors, employees, agents, representatives or attorneys gross negligence or willful misconduct. Without limiting the generality of the foregoing, none of the Canadian Distribution Agent, nor any of the officers, directors, employees, agents, representatives, attorneys, successors or assigns of the Canadian Distribution Agent, shall:

(i)     have any duty or responsibility, and shall not incur any liability, with respect to the adequacy of the Escrow Property to meet and discharge any payments, obligations, liabilities or other commitments of any person or entity;

(ii)    have any duty to solicit any payments which may be due to it in connection with the Distribution Account, including without limitation, the Escrow Funds or any amounts due on any investments of the Escrow Property; provided, that the Canadian Distribution Agent shall advise the Depositors and the Estate Fiduciaries in writing forthwith upon it becoming aware of any amounts due to it in connection with the Distribution Account having not been paid;

(iii)   have no duty or obligation to make any calculations of any kind in connection with any distribution or allocation of the Escrow Property;

(iv)    be responsible for any loss to, or diminution of, the Escrow Property resulting from the acquisition, retention, investment or sale of any investments made in accordance with this Agreement or pursuant to any investment direction delivered pursuant to this Agreement; or

- 11 -

    (v)    be liable for any special, indirect or consequential damages or losses of any kind whatsoever (including but not limited to lost profits), even if the Canadian Distribution Agent has been advised of the likelihood of such losses or damages and regardless of the form of action.

(c)    Notwithstanding any other provision of this Agreement, in the event that the Canadian Distribution Agent is uncertain as to how to proceed in any situation not explicitly addressed by the terms of this Agreement, whether because of any conflicting notice, direction, instruction, claim, allegation or demand of a Depositor or Estate Fiduciary or for any other reason whatsoever, the Canadian Distribution Agent shall be entitled, at its option and in its sole discretion, to refuse to comply with any such notice, direction, instruction, claim, allegation or demand with respect thereto as long as such uncertainty is continuing, and in so refusing, the Canadian Distribution Agent may elect, at its option and in its sole discretion, to make no release or delivery of any Escrow Property and its sole obligation shall be to keep safely all property held in escrow until it shall be given a joint instruction in writing by the Depositors and Estate Fiduciaries pursuant to Section 5(a) which eliminates such ambiguity or uncertainty to the satisfaction of the Canadian Distribution Agent or by a final and non-appealable order or judgment of a court of competent jurisdiction (as set forth in Section 21, below).

10.    <u>Indemnification of Canadian Distribution Agent.</u>

(a)    The Depositors shall jointly and severally indemnify, defend and save harmless the Canadian Distribution Agent and its affiliates and their respective officers, directors, employees, agents, representatives, attorneys, successors and assigns (collectively, "**Indemnitees**") from and against any and all losses, costs, expenses (including without limitation, the reasonable fees and expenses of outside counsel), damages, claims, actions, demands and liabilities incurred by or asserted against any of them directly or indirectly arising out of or relating to this Agreement, including, without limitation, in connection with tax reporting or withholding and the enforcement by the Canadian Distribution Agent of any of its rights or remedies under or in connection with this Agreement, except to the extent such costs, expenses, losses, damages, claims, actions, demands or liabilities are finally adjudicated by a court of competent jurisdiction (as set forth in Section 21 below) to have been a direct result of an Indemnitee's gross negligence or wilful misconduct. For greater certainty, the commencement of formal legal proceedings shall not be a precondition for indemnification hereunder. Further, none of the provisions of this Agreement shall require the Canadian Distribution Agent to expend or risk its own funds, appear in, prosecute or defend proceedings, or otherwise incur financial liability in the performance of any of its duties or in the exercise of any of its rights or powers hereunder, unless the Canadian Distribution Agent is first indemnified to its reasonable satisfaction.

(b)    Any indemnity payments to the Canadian Distribution Agent arising from the indemnification provided by Section 4(b) or this Section 10 shall be initially satisfied from the Escrow Property to the extent available. As among themselves, the Depositors agree that the costs of any such indemnification shall be borne on a

- 12 -

pro rata basis by the Depositors in accordance with the percentage of the Escrow Property allocable to each of the Depositors pursuant to the Allocation Protocol or a letter of direction as described in Section 5(a)(i), and any Depositor paying in excess of its pro rata share of such indemnification shall, notwithstanding anything to the contrary in the Settlement and Support Agreement, have rights of contribution vis-à-vis any Depositor that has paid less than its pro rata share of such costs either directly to the Canadian Distribution Agent or by payment to another Depositor pursuant to this sentence; provided, that if the costs of any such indemnification arise from a breach of this Agreement or other fault of a Depositor, the Depositor(s) so in breach or at fault shall bear the cost of such indemnification and any Depositor paying in excess of its share of the cost of such indemnification, after taking into account the breach or fault of the other Depositors, shall, notwithstanding anything to the contrary in the Settlement and Support Agreement, have rights of contribution vis-à-vis any Depositor that has paid less than its share of such costs either directly to the Canadian Distribution Agent or by payment to another Depositor. The indemnification provided by this Section 10 is in addition to the indemnification provided in Section 4(b) and shall survive the resignation or removal of the Canadian Distribution Agent and the termination of this Agreement.

11.    Resignation or Removal of Canadian Distribution Agent.

The Canadian Distribution Agent may, at any time and for any reason or for no reason, in its sole discretion, resign as escrow holder under this Agreement by giving the Depositors and the Estate Fiduciaries at least thirty (30) Business Days' notice in writing of its intention to resign, or such shorter notice as the Depositors and the Estate Fiduciaries may accept in writing as sufficient. The Depositors and the Estate Fiduciaries may, at any time and for any reason or for no reason, in their sole discretion, remove the Canadian Distribution Agent as escrow holder under this Agreement by giving the Canadian Distribution Agent at least thirty (30) Business Days' notice in writing of their intention to remove, or such shorter notice as the Canadian Distribution Agent may accept in writing as sufficient. Each of the Depositors and the Estate Fiduciaries agree that they shall forthwith, upon receipt of such notice from the Canadian Distribution Agent or upon the giving of such notice to the Canadian Distribution Agent, as applicable, work diligently to find and appoint a new escrow holder to act in the place and stead of the Canadian Distribution Agent and if they fail to agree on such appointment, any of the Depositors, the Estate Fiduciaries or the Canadian Distribution Agent may apply to a court of competent jurisdiction (as set forth in Section 21, below) for the appointment of a new escrow holder and any such resulting appointment shall be binding upon all of the parties hereto. Upon any such appointment, the new escrow holder shall be vested with the same powers, rights, duties and obligations as if it had been originally named herein as escrow holder and such new escrow holder shall enter into an agreement with the Depositors and the Estate Fiduciaries with respect to such replacement escrow arrangement. If at any time or for any reason the Canadian Distribution Agent is authorized or directed to release and deliver the Escrow Property to a new escrow holder or to any other person, the Canadian Distribution Agent shall, prior to effecting such release and transfer, be paid all of its unpaid fees, non-reimbursed expenses and costs arising pursuant to this Agreement.

- 13 -

Notwithstanding any other provision of this Agreement, upon the release from escrow by the Canadian Distribution Agent of all of the Escrow Property pursuant to or as contemplated by this Agreement (whether such release occurs before or after any termination of this Agreement), the Canadian Distribution Agent and each of the officers, directors, employees, agents, representatives, attorneys, successors and assigns of the Canadian Distribution Agent shall be fully and unconditionally relieved, discharged and released from any and all claims, duties, obligations and liabilities arising under or in connection with this Agreement, and none of them shall be subject to or liable for any claim whatsoever made against it by or on behalf of any other person or entity (including any party to this Agreement) with respect to this Agreement.

12.    Compensation of Canadian Distribution Agent.

The Canadian Distribution Agent shall be entitled to compensation for its services as stated in the Fees of Escrow Agent, attached hereto as Exhibit A, which compensation shall be paid by NNL. The Canadian Distribution Agent will invoice NNL monthly in arrears for such compensation and NNL shall pay such invoices upon receipt. The fees agreed upon for the services rendered hereunder as outlined on Exhibit A are intended as full compensation for the Canadian Distribution Agent's services as contemplated by this Agreement; provided, however, that in the event that the conditions for the disbursement of the Escrow Property under this Agreement are not fulfilled, or the Canadian Distribution Agent renders any service not contemplated in this Agreement, or there is any assignment of interest in the subject matter of this Agreement, or any material modification hereof, or if any material controversy arises hereunder, or the Canadian Distribution Agent is made a party to any litigation pertaining to this Agreement or the subject matter hereof, the Canadian Distribution Agent shall be compensated for such extraordinary services (at a rate of $300 per hour) and reimbursed for all costs and expenses, including reasonable attorneys' fees and expenses, occasioned by any such delay, controversy, litigation or event (collectively, the "**Extraordinary Fees and Expenses**"), it being understood that any Extraordinary Fees and Expenses shall be satisfied and borne by the Depositors in the same manner as the indemnity payments contemplated by Section 10(b). If any amount due to the Canadian Distribution Agent hereunder is not paid within thirty (30) days after the date due, the Canadian Distribution Agent in its sole discretion may charge interest on such amount in an amount equal to the lesser of 10% per annum or the highest rate permitted by applicable law. The Depositors acknowledge and agree that the fees to which the Canadian Distribution Agent is entitled to under this Agreement do not include applicable taxes, whether federal or provincial, including but not limited to goods and services tax and harmonized sales tax, which taxes shall be an additional charge payable by NNL or the Depositors, as applicable.

13.    Notices and Discharge/Dissolution.

All communications hereunder shall be in writing and shall be deemed to be duly given and received: (i) upon delivery, if delivered personally, or upon confirmed transmittal, if by facsimile; (ii) on the next Business Day if sent by overnight courier; or (iii) four (4) Business Days after mailing if mailed by prepaid registered mail, return receipt requested, to the appropriate notice address set forth in Schedule C or at such other address as any party hereto may have furnished to the other parties hereto in writing in accordance with this Section 13.

If, at any time prior to the termination of this Agreement, any of the Estate Fiduciaries is discharged, removed or dissolved, whether pursuant to an approved plan of reorganization or

- 14 -

liquidation by order of the Canadian Court or U.S. Court or otherwise, any Depositor or Estate Fiduciary may present to the Canadian Distribution Agent evidence of such discharge, removal or dissolution in the form of a court order or other officially certified document which upon receipt by the Canadian Distribution Agent shall constitute an effective amendment to this Agreement, and such Estate Fiduciary by operation of this Agreement, as amended, shall cease to be such for all purposes of this Agreement and the consent of such removed or dissolved Estate Fiduciary shall no longer be required for any purposes hereunder; provided that, for the avoidance of doubt, nothing in this Section 13 shall affect the rights of the Estate Fiduciaries under Section 26 hereof. If such discharge, removal or dissolution provides for a successor to the duties and responsibilities of such removed or dissolved Estate Fiduciary, or a successor to the same or substantially similar duties and responsibilities of such removed or dissolved Estate Fiduciary (including, without limitation, a trustee in bankruptcy) is otherwise appointed, then the preceding sentence shall be of no effect with respect to such successor entity, the rights and responsibilities of such Estate Fiduciary hereunder shall, subject to Section 30, pass automatically to such successor entity and such successor entity shall be deemed to be a party to this Agreement as if it were a signatory hereto.

If, at any time prior to the termination of this Agreement, any of the Depositors is liquidated or dissolved, whether pursuant to an approved plan of reorganization or liquidation by order of the Canadian Court or U.S. Court or otherwise, any Depositor, or Estate Fiduciary (as the case may be) shall present to the Canadian Distribution Agent evidence of such dissolution or liquidation in the form of a court order or other officially certified document which upon receipt by the Canadian Distribution Agent shall constitute an effective amendment to this Agreement, and such dissolved or liquidated Depositor by operation of this Agreement, as so amended, shall cease to be such for all purposes of this Agreement, as amended, and the consent of such dissolved or liquidated Depositor shall no longer be required for any purposes hereunder. If such dissolution or liquidation provides for a successor to such dissolved or liquidated Depositor, then such rights and responsibilities shall, subject to Section 30, pass automatically to such successor entity. Any person appointed as a liquidator of an EMEA Debtor under the Insolvency Act 1986 (U.K.) shall, subject to Section 30, be treated as a successor of such EMEA Debtor.

14.    Counterparts.

This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but such counterparts shall constitute one and the same agreement. Delivery of an executed counterpart of a signature page to this Agreement by facsimile or electronic mail shall be as effective as delivery of a manually executed counterpart of a signature page to this Agreement. Each of the parties hereto agrees to deliver an original executed signature page to this Agreement to the Canadian Distribution Agent within five (5) Business Days of the date hereof. The Canadian Distribution Agent shall be entitled in its sole and absolute discretion to freeze the Distribution Account until such time as all of the original executed signature pages have been delivered to it.

15.    Section Headings.

The Section headings of this Agreement are for convenience of reference only and shall not be deemed to limit or affect any of the provisions hereof.

- 15 -

16.   Amendments; No Waivers.

(a)   Except for the resignation, removal or replacement of an Estate Fiduciary as set forth in Section 13 or the liquidation or dissolution of a Depositor as set forth in Section 13, any provision of this Agreement may be waived or amended if, and only if, such amendment or waiver is in writing and is signed by the Depositors, the Estate Fiduciaries and the Canadian Distribution Agent (with a copy thereof to the Bondholder Group) and, if prior to the entry of a final decree closing the Bankruptcy Cases, such amendment or waiver is approved by both the U.S. Court and the Canadian Court; provided, however, that (i) court approval shall not be required of any applicable court (whether the U.S. Court or the Canadian Court) if a final decree closing the Bankruptcy Cases pending before such court shall have been entered by such court and (ii) court approval shall not be required of any court if final decrees terminating the Bankruptcy Cases shall have been entered by the U.S. Court and the Canadian Court.

(b)   No failure by any party hereto to insist upon the strict performance of any covenant, duty, agreement or condition of this Agreement, or to exercise any right or remedy consequent upon a breach hereof, shall constitute a waiver of any such breach or any other covenant, duty, agreement or condition hereof.

17.   Entire Agreement; No Third Party Beneficiaries.

This Agreement (including any exhibits, schedules and amendments hereto) and (solely with respect to the parties that are party or subject thereto) the IFSA, the Allocation Protocol and the Settlement and Support Agreement (a) constitute the entire agreement and understanding of the parties hereto and supersede all prior agreements and understandings, both written and oral, among the parties hereto with respect to the subject matter hereof and (b) are not intended to confer upon any other person any rights or remedies hereunder; provided, however, that the Joint Administrators shall be entitled to enforce and take the benefit of Section 20 hereof.

18.   Governing Law.

Subject to Section 20, this Agreement shall be governed by and construed in accordance with the laws of the Province of Ontario and the federal laws of Canada applicable therein.

19.   Severability.

If any provision of this Agreement is determined by a court of competent jurisdiction (as set forth in Section 21 below) to be prohibited or unenforceable by reason of any applicable law of a jurisdiction, then such provision shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions thereof, and any such prohibition or unenforceability in such jurisdiction shall not invalidate or render unenforceable such provisions in any other jurisdiction.

- 16 -

20. Exclusion of Liability for the Joint Administrators, Conflict Administrator and the French Liquidator.

(a) Subject to Section 20(c) below, the parties hereto agree that the Joint Administrators have negotiated this Agreement both in their capacities as administrators of NNUK and the other EMEA Debtors party hereto and for and on behalf of NNUK and the other EMEA Debtors party hereto and that none of the Joint Administrators or their respective firm, partners, employees, advisers, representatives or agents shall incur any personal liability whatsoever whether on their own part or in respect of any failure on the part of NNUK or the other EMEA Debtors party hereto to observe, perform or comply with any of its obligations under this Agreement or under or in relation to any associated arrangements or negotiations whether such liability would arise under Section 99(4) of Schedule B1 to the Insolvency Act or otherwise howsoever.

(b) Subject to Section 20(c) below, the parties hereto agree that the Conflicts Administrator and French Liquidator have negotiated this Agreement for and on behalf of NNSA, and that none of the Conflicts Administrator, the French Liquidator or their respective firm, partners, employees, advisers, representatives or agents shall incur any personal liability whatsoever whether on their own part or in respect of any failure on the part of NNSA to observe, perform or comply with any of its obligations under this Agreement or under or in relation to any associated arrangements or negotiations whether such liability would arise under applicable laws or otherwise howsoever.

(c) Nothing in this Section 20 or any other provision of this Agreement shall prevent the Depositors or the Canadian Distribution Agent from bringing any action against NNUK, NNSA, the other EMEA Debtors, the Joint Administrators, the Conflict Administrator or the French Liquidator for wilful misconduct or fraud.

(d) Notwithstanding Section 18 or anything in Section 21, (i) any claim, action or proceeding against the Joint Administrators in their personal capacities (and not as agents for any EMEA Debtor) under this Agreement shall be governed exclusively by English law and subject to the exclusive jurisdiction of the English Court; (ii) any claim, action or proceeding against the Conflicts Administrator in his personal capacity (and not as agent for NNSA) under this Agreement shall be governed exclusively by English law and subject to the exclusive jurisdiction of the English Court, and (iii) any claim, action or proceeding against the French Liquidator in his personal capacity (and not as agent for NNSA) under this Agreement shall be governed by the laws of France and subject to the exclusive jurisdiction of the French Court.

(e) Notwithstanding Section 21, any claim, action or proceeding against the Canadian Distribution Agent asserting any personal liability on the part of the Canadian Distribution Agent shall be subject to the exclusive jurisdiction of the Canadian Court.

(f) This Section 20 shall survive the termination of this Agreement.

- 17 -

21.    <u>JURISDICTION.</u>

SUBJECT TO SECTION 20, FOR ANY CLAIM, ACTION OR PROCEEDING ARISING UNDER OR OUT OF, IN RESPECT OF, OR IN CONNECTION WITH THIS AGREEMENT, EACH PARTY HEREBY IRREVOCABLY SUBMITS TO AND ACCEPTS FOR ITSELF AND ITS PROPERTIES, GENERALLY AND UNCONDITIONALLY TO THE EXCLUSIVE JURISDICTION OF AND SERVICE OF PROCESS PURSUANT TO THE RULES OF BOTH (I) THE U.S. COURT AND THE CANADIAN COURT, IF SUCH CLAIM, ACTION OR PROCEEDING IS BROUGHT PRIOR TO THE ENTRY OF A FINAL DECREE CLOSING THE BANKRUPTCY CASES INVOLVING THE RELEVANT DEPOSITORS PENDING BEFORE SUCH COURTS, INCLUDING THAT CERTAIN CROSS-BORDER INSOLVENCY PROTOCOL APPROVED BY THE U.S. COURT PURSUANT TO SECTION 105(A) OF THE BANKRUPTCY CODE IN AN ORDER DATED JANUARY 15, 2009, AND BY THE CANADIAN COURT PURSUANT TO AN ORDER DATED JANUARY 14, 2009, AS AMENDED OR AS AMENDED AND RESTATED FROM TIME TO TIME, AND (II) THE CANADIAN COURT, IF BROUGHT AFTER ENTRY OF SUCH FINAL DECREE CLOSING SUCH BANKRUPTCY CASES INVOLVING THE RELEVANT DEPOSITORS PENDING BEFORE THE U.S. COURT OR THE CANADIAN COURT, WAIVES ANY DEFENSE OF *FORUM NON CONVENIENS* AND AGREES TO BE BOUND BY ANY JUDGMENT RENDERED THEREBY ARISING UNDER OR OUT OF, IN RESPECT OF, OR IN CONNECTION WITH THIS AGREEMENT. EXCEPT AS PROVIDED IN THE FOREGOING NO PARTY HERETO SHALL INITIATE ANY CLAIM, ACTION OR PROCEEDING ARISING UNDER OR OUT OF, IN RESPECT OF, OR IN CONNECTION WITH THIS AGREEMENT IN ANY OTHER STATE, PROVINCIAL OR FEDERAL COURT IN THE UNITED STATES OF AMERICA, CANADA OR ANY COURT IN ANY OTHER COUNTRY. EACH PARTY FURTHER IRREVOCABLY DESIGNATES AND APPOINTS THE INDIVIDUAL(S) IDENTIFIED AS ITS AUTHORIZED REPRESENTATIVES TO RECEIVE NOTICES ON ITS BEHALF, AS ITS AGENT TO RECEIVE ON ITS BEHALF SERVICE OF ALL PROCESS IN ANY SUCH CLAIM, ACTION OR PROCEEDING BEFORE ANY BODY, SUCH SERVICE BEING HEREBY ACKNOWLEDGED TO BE EFFECTIVE AND BINDING SERVICE IN EVERY RESPECT. A COPY OF ANY SUCH PROCESS SO SERVED SHALL BE MAILED BY REGISTERED MAIL TO EACH PARTY AT ITS ADDRESS PROVIDED PURSUANT TO SECTION 13; PROVIDED THAT, UNLESS OTHERWISE PROVIDED BY APPLICABLE LAW, ANY FAILURE TO MAIL SUCH COPY SHALL NOT AFFECT THE VALIDITY OF THE SERVICE OF SUCH PROCESS. IF ANY AGENT SO APPOINTED REFUSES TO ACCEPT SERVICE, THE DESIGNATING PARTY HEREBY AGREES THAT SERVICE OF PROCESS SUFFICIENT FOR PERSONAL JURISDICTION IN ANY CLAIM, ACTION OR PROCEEDING AGAINST IT IN THE APPLICABLE JURISDICTION MAY BE MADE BY REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO ITS ADDRESS PROVIDED PURSUANT TO SECTION 13. EACH PARTY HEREBY ACKNOWLEDGES THAT SUCH SERVICE SHALL BE EFFECTIVE AND BINDING IN EVERY RESPECT. NOTHING HEREIN SHALL AFFECT THE RIGHT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR SHALL LIMIT THE RIGHT OF ANY PARTY TO BRING ANY CLAIM, ACTION OR PROCEEDING AGAINST AN OTHER PARTY IN ANY OTHER JURISDICTION. NOTWITHSTANDING ANYTHING IN THIS SECTION 21 TO THE CONTRARY, ANY CLAIM, ACTION OR PROCEEDING SET FORTH IN SECTION 20 SHALL BE BROUGHT

- 18 -

EXCLUSIVELY IN THE COURTS CONTEMPLATED IN SECTION 20. FINALLY, REGARDLESS OF THE JURISDICTION OF THE APPLICABLE COURT, THE PARTIES FURTHER HEREBY WAIVE ANY RIGHT TO A TRIAL BY JURY WITH RESPECT TO ANY LAWSUIT OR JUDICIAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT.

22.   Interpretation.

As used in this Agreement (including all exhibits, schedules and amendments hereto), the masculine, feminine or neuter gender and the singular or plural number shall be deemed to include the others whenever the context so requires. References to Sections refer to Sections of this Agreement, unless the context otherwise requires. Words such as "herein," "hereinafter," "hereof," "hereto," "hereby" and "hereunder," and words of like import, unless the context requires otherwise, refer to this Agreement. "Including", "includes" and similar words shall mean including without limiting the generality of the foregoing. The captions contained herein are for convenience only and shall not control or affect the meaning or construction of any provision of this Agreement.

23.   Compliance with Court Orders.

In the event that any of the Escrow Property shall be attached, garnished or levied upon by any court order, or the distribution or disbursement thereof shall be stayed or enjoined by an order of a court of competent jurisdiction (as set forth in Section 21 above), or any order, judgment or decree shall be made or entered by any court order affecting the property deposited under this Agreement, the Canadian Distribution Agent is hereby expressly authorized, in its sole discretion, to obey and comply with all writs, orders or decrees so entered or issued, which it is advised by legal counsel of its own choosing is binding upon it, whether with or without jurisdiction, and in the event that the Canadian Distribution Agent obeys or complies with any such writ, order or decree it shall not be liable to any of the parties hereto or to any other person, firm or corporation, by reason of such compliance notwithstanding such writ, order or decree be subsequently reversed, modified, annulled, set aside or vacated.

24.   Force Majeure.

In the event that any party hereto is unable to perform its obligations under the terms of this Agreement because of acts of God, strikes, equipment or transmission failure or damage reasonably beyond its control, or other cause reasonably beyond its control, the Canadian Distribution Agent shall not be liable for damages to the other parties for any damages resulting from such failure to perform otherwise from such causes. Performance under this Agreement shall resume when the Canadian Distribution Agent is able to perform its obligations hereunder.

25.   Merger or Consolidation.

Any corporation or association into which the Canadian Distribution Agent may be converted or merged, or with which it may be consolidated, or to which it may sell or transfer all or substantially all of its corporate escrow business and assets as a whole or substantially as a whole, or any corporation or association resulting from any such conversion, sale, merger, consolidation or transfer to which the Canadian Distribution Agent is a party, shall be and

- 19 -

become the successor escrow agent under this Agreement and shall have and succeed to the rights, powers, duties, immunities and privileges of the Canadian Distribution Agent, without the execution or filing of any instrument or paper or the performance of any further act except for the giving of written notice by the Canadian Distribution Agent to the Depositors and the Estate Fiduciaries.

26.     Exclusion of Liability for Estate Fiduciaries.

The Depositors and the Canadian Distribution Agent agree that (a) each of the Estate Fiduciaries has negotiated and is entering into this Agreement as a representative of its applicable creditor constituency for the purpose of benefiting from the rights being granted hereunder and to allow the Canadian Distribution Agent to be able to rely on any joint instructions signed by the Estate Fiduciaries and (b) none of the Estate Fiduciaries, their firms, members or affiliates of such parties and such parties respective partners, associates, employees, advisers, representatives or agents shall incur any liability whatsoever under this Agreement. This Section 26 shall survive termination of this Agreement.

27.     No Agency.

Each of Depositors and Estate Fiduciaries acknowledge and agree that the Canadian Distribution Agent does not have any interest in the Escrow Property and is acting solely as an escrow holder at the request and for the convenience of the Depositors, having only possession of the Escrow Property. The Canadian Distribution Agent shall not be deemed to be the agent or trustee of any party in respect of the escrow herein referred to and none of the Depositors or the Estate Fiduciaries shall be deemed to be the agent or trustee of the Canadian Distribution Agent in respect of the escrow herein referred to.

28.     Regulatory Compliance.

(a)     If the Canadian Distribution Agent is subject to any legislation, including anti-money laundering legislation and privacy legislation, that requires it to collect information or obtain undertakings, agreements, documents or the like from the parties to this Agreement, their representatives, employees, officers, directors, or any agent or agents of such parties, the parties hereto agree that they shall fully cooperate with the reasonable requests of the Canadian Distribution Agent in this regard, including delivery of information, agreements, or documents or providing signatures or executing documents and to take all reasonable steps to cause the parties' representatives, employees, officers, directors, or agents as the case may be to do the same, all to the extent required to ensure that the Canadian Distribution Agent satisfies applicable legislative requirements, and the parties hereto agree that if for any reason such requirements are not satisfied, the Canadian Distribution Agent may, at its option and in its sole discretion, refuse to act as may otherwise be required under this Agreement until such requirements are satisfied.

(b)     The parties may exchange personal information ("**Confidential Information**"), but only such information as is required in order for the parties to fulfill their duties under this Agreement.

- 20 -

(c)  The parties agree to use the Confidential Information solely for performing their duties under this Agreement. The parties will hold the Confidential Information in confidence and will not use or disclose the Confidential Information to any third party; provided, however, that the parties may disclose any such Confidential Information to their directors, officers, employees, agents, service providers, advisors, internal and external auditors or regulatory authorities as well as those of their affiliates with a need to know such Confidential Information and who agree to be bound by these confidentiality obligations, or as required or permitted by law.

(d)  The parties acknowledge that the Confidential Information may include personal information about identifiable individuals.  Each of the parties hereto agree to act in accordance with the Personal Information Protection and Electronic Documents Act ("**PIPEDA**") and applicable provincial private sector privacy legislation which has by order by a court of competent jurisdiction been declared as substantially similar to PIPEDA with respect to collection, use, disclosure, retention of and access to personal information

(e)  The Canadian Distribution Agent will correct or amend any inaccuracy with any Confidential Information promptly after it is notified of the inaccuracy by the parties.  If the Canadian Distribution Agent otherwise becomes aware of any inaccuracy with any Confidential Information, the Canadian Distribution Agent will promptly advise the parties.

29.    Service Providers.

The Canadian Distribution Agent's services to the parties hereto are not exclusive and the Canadian Distribution Agent is hereby expressly authorized from time to time in its discretion, for any purpose, including for the purpose of assisting the Canadian Distribution Agent with its duties under, and the administration of, this Agreement, to appoint, employ, invest in, contract or deal with any individual, firm, partnership, association, trust or body corporate, including without limitation, itself and any individual, firm, partnership, association, trust or body corporate with which it may directly or indirectly be affiliated or related or in which it may be directly or indirectly interested, whether on its own account, for this Agreement, or for the account of another (in a fiduciary capacity or otherwise) without being liable to account therefor and without being in breach of this Agreement.

30.    Successors and Assigns.

This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors (including any receiver or trustee in bankruptcy or any such party) and permitted assigns. The Canadian Distribution Agent shall have no obligation in performing this Agreement to recognize any successor or assign of another party hereto unless the Canadian Distribution Agent, acting reasonably, receives authoritative and conclusive written evidence of the change of such party and any documentation required to ensure that the Canadian Distribution Agent satisfies applicable legislative requirements.

*[Signature pages follow]*

**IN WITNESS WHEREOF**, each of the parties hereto has caused this Agreement to be executed on the day and year first above written.

**NORTEL NETWORKS CORPORATION**

By: _____
      Name:  Tanecia Wong Ken
      Title:   Authorized Representative

**NORTEL NETWORKS LIMITED**

By: _____
      Name:  Tanecia Wong Ken
      Title:   Authorized Representative

**NORTEL NETWORKS INC.**

By: _____

      Name:  John J. Ray III
      Title:    Principal Officer

**SIGNED for and on behalf of Nortel Networks UK Limited (in administration) by Alan Bloom and Stephen Harris as Joint Administrators (acting as agent and without personal liability):**

_____
Alan Bloom

_____
Stephen Harris

_____
Witness Signature
Name:
Address:

_____
Witness Signature
Name:
Address:

Signature Page to Canadian Distribution Escrow Agreement

**SIGNED for and on behalf of Nortel Networks S.A. (in administration and *liquidation judiciare*) by Alan Bloom as Joint Administrator and Stephen Taylor as Conflict Administrator (both acting as agent and without personal liability):**

| | |
|---|---|
| _____ | _____ |
| Alan Bloom | Stephen Taylor |

| | |
|---|---|
| _____ | _____ |
| Witness Signature | Witness Signature |
| Name: | Name: |
| Address: | Address: |

**SIGNED for and on behalf of Nortel Networks S.A. (in administration and *liquidation judiciare*) by Maître Cosme Rogeau as *Mandataire Liquidateur* (acting as agent and without personal liability) in the presence of:**

| | |
|---|---|
| _____ | _____ |
| Witness signature | Maître Cosme Rogeau |
| Name: | |
| Address: | |

Signature Page to Canadian Distribution Escrow Agreement

**ERNST & YOUNG INC. IN ITS CAPACITY AS THE MONITOR OF NORTEL NETWORKS CORPORATION ET AL., AND NOT IN ITS PERSONAL CAPACITY**

By: _____
      Name:  Murray A. McDonald
      Title:    President

**THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS OF NORTEL
NETWORKS INC., ET. AL.**

**By: AKIN GUMP STRAUSS HAUER & FELD
LLP, as Counsel to the Committee and
authorized signatory and not in its individual
capacity**

By:  _____
　　　　Name:
　　　　Title:

**CANADIAN DISTRIBUTION AGENT**

**Royal Trust Corporation of Canada, as Canadian Distribution Agent**

By: _____
       Name:
       Title:

## SCHEDULE A

## OTHER DEPOSITORS

1.  NNSA

2.  **[NTD: Any other depositors under existing escrow agreements from which cash to be transferred to Canadian Escrow Agent to be specified herein as Other Depositors and added as signatories. Entities to be specified as Canadian Debtor, U.S. Debtor or EMEA Debtor.]**

**SCHEDULE B**

**REDACTED**

**SCHEDULE C**

**NOTICE ADDRESSES**

<u>Depositors:</u>

| | |
|---|---|
| **NNC and NNL [and the other Canadian Debtors]**: | 5945 Airport Road<br>Suite 152<br>Mississauga, Ontario, Canada  L4V 1R9<br>Attn: Tanecia Wong Ken<br>Phone: 905-863-1184<br>Facsimile: 416-4789-9688<br><br>With a copy to:<br><br>The Monitor and Goodmans LLP at the address particulars set forth below. |
| **NNI [and the other U.S. Debtors]**: | c/o Cleary Gottlieb Steen & Hamilton LLP<br>One Liberty Plaza<br>New York, NY  10006<br>United States<br>Attention: Lisa Schweitzer<br>Facsimile: +1-212-225-3999 |
| **NNUK [and the other EMEA Debtors]**: | c/o Herbert Smith LLP<br>Exchange House<br>Primrose Street<br>London<br>EC2A 2HS<br>United Kingdom<br>Attn: John Whiteoak and Kevin Pullen<br>Phone: +44 20 7374 8000<br>Facsimile: +44 20 7374 0888 |
| **NNSA**: | c/o Herbert Smith LLP<br>Exchange House<br>Primrose Street<br>London<br>EC2A 2HS<br>United Kingdom<br>Attn: John Whiteoak and Kevin Pullen<br>Phone: +44 20 7374 8000<br>Facsimile: +44 20 7374 0888<br><br>-and- |

|                                   |                                                     |
|-----------------------------------|-----------------------------------------------------|
|                                   | c/o Skadden, Arps, Slate, Meagher & Flom (UK) LLP<br>40 Bank Street<br>Canary Wharf<br>London<br>E14 5DS<br>United Kingdom<br>Attn: Christopher Mallon<br>Phone: +44 20 7519 7236<br>Facsimile: +44 20 7072 7236 |
| Canadian Distribution Agent:      | Royal Trust Corporation of Canada<br>155 Wellington St. West, 20th Floor<br>Toronto, Ontario  M5V 3K7<br>Attention: Sharon Yeung, Director, Institutional Trust Services<br>Facsimile: (416) 955-3268 |
| Estate Fiduciaries:               |                                                     |
| The Official Committee of Unsecured Creditors in connection with the Chapter 11 cases of Nortel Networks Inc., et al. (Case No. 09-10138): | c/o Akin Gump Strauss Hauer & Feld LLP<br>One Bryant Park<br>New York, New York  10036<br>Attn: Fred S. Hodara, Brad Kahn and David H. Botter<br>Phone: 212-872-1000<br>Facsimile: 212-872-1002 |
| Monitor:                          | Ernst & Young Inc. in its capacity as Monitor of Nortel Networks Corporation et al.<br>Ernst & Young Tower<br>222 Bay Street, P. O. Box 251<br>Toronto, Ontario, Canada<br>M5K 1J7<br>Facsimile: (416) 943-3300<br>Attn: Murray A. McDonald<br><br>With a copy to:<br><br>Goodmans LLP<br>Bay Adelaide Centre<br>333 Bay St., Suite 3400<br>Toronto, ON  M5H 2S7<br>Attn: Jay A. Carfagnini, Joe Pasquariello and Chris Armstrong<br>Phone: (416) 979-2211<br>Facsimile: (416) 979-1234 |

Bondholder Group:                    c/o Milbank, Tweed, Hadley & McCloy LLP
                                     1 Chase Manhattan Plaza
                                     New York, New York  10005
                                     Attn: Albert A. Pisa
                                     Phone: 212-530-5000
                                     Facsimile: 212-822-5735

**SCHEDULE D**

**REDACTED**

**SCHEDULE E**

**AFFILIATED FINANCIAL INSTITUTIONS OF CANADIAN DISTRIBUTION AGENT**

1.  RBC Dominion Securities Inc.

# EXHIBIT A

## FEES OF ESCROW AGENT

INITIAL SERVICES FEE

A one-time fee of $25,000.00 plus legal costs incurred by Royal Trust on a time cost basis will be charged for the review  and modification of escrow document and setting up of the escrow account.

(A)    ANNUAL FEES

For custody and safekeeping of assets, monthly administration, including correspondence, payments, record-keeping, reporting, and related Escrow Agent duties and responsibilities including investments in Government of  Canada Treasury Bills and/or Bankers Acceptances and/or Forward Exchange Contracts, fees will be charged  monthly on the market value of assets held at the previous month at the following:

| | |
|---:|---|
| **Annual Fee:** | 1 basis points or 0.01% |
| **Minimum Annual Fee:** | $20,000.00 CAD |
| **Investment Transactions (e.g., Trades)*:** | $300.00 CAD per transaction |
| **Disbursements:** | $500.00 CAD per transaction |

*excludes any 3rd party fees applicable to investments

(B)    TAX PREPARATION FEES

A fee of $325.00 per hour is applied for the preparation, filing, review of income tax returns and other required tax filings, including issuance of tax slips.

**EXHIBIT B**

**FORM OF LETTER OF INSTRUCTION**

Reference is made to the Canadian Distribution Escrow Agreement dated September ●, 2016 (the "**Agreement**") among the Depositors, the Estate Fiduciaries and the Canadian Distribution Agent. Capitalized terms used herein that are otherwise undefined shall have the meanings ascribed thereto in the Agreement.

Subject to the terms and conditions of the Agreement, each of the Depositors and the Estate Fiduciaries hereby irrevocably authorizes and directs the Canadian Distribution Agent to:

release from the Distribution Account the amount of CAD$_____ and disburse such amount by wire transfer to_____ using the following wiring transfer instructions:

Bank Name: _____
ABA Number: _____
Account Name: _____
Account Number: _____

and this shall be your good and sufficient authority for so doing.

**[Depositors and Estate Fiduciaries]**

by: _____

Name: ●
Title: ●

6603416

# ANNEX L

# BOOK INTERCOMPANY CLAIMS

US Debtors Pre-filing Intercompany Obligations as at January 14, 2009, except for NNCALA, which is as at July 14, 2009, and NIII, which is at July 26, 2016
Excludes claims filed by the Nortel Joint Ventures (GDNT and NETAS)
The schedule below excludes net intercompany receivables vis-à-vis non-filed entities; however this is not a reflection on the validity and the collectibility of such amounts
All amounts in USD

| Legal company code | Legal company name | Legal trading partner code | Legal trading partner name | Grand Total |
|---|---|---|---|---|
| **Claims as per Nortel Books and Records** | | | | |
| 2001 | Nortel Networks Inc. | 1107 | Architel Systems Corp | (72,538) |
| 2001 | Nortel Networks Inc. | 2103 | Sonoma Systems | (725,588) |
| 2001 | Nortel Networks Inc. | 2106 | Nortel AMS Inc. | (93,032) |
| 2001 | Nortel Networks Inc. | 2113 | Nortel HPOCS Inc. | (813,713) |
| 2001 | Nortel Networks Inc. | 2114 | Architel Systems (U.S.) C | (4,890,419) |
| 2001 | Nortel Networks Inc. | 2117 | Northern Telecom Int Inc. | (9,226) |
| 2001 | Nortel Networks Inc. | 2121 | Nortel Networks Cable Solutions Inc | (840) |
| 2001 | Nortel Networks Inc. | 6211 | Nortel Southeast Asia | - |
| 2001 | Nortel Networks Inc. | 6221 | Nortel Technology Thailand | - |
| 2001 | Nortel Networks Inc. | 3110 | Nortel Industria e Comerc | - |
| 2001 | Nortel Networks Inc. | 3140 | Nortel Networks Colombia | - |
| 2002 | Nortel Networks (CALA) Inc | 1002 | Nortel Networks Limited | (42,983,870) |
| 2002 | Nortel Networks (CALA) Inc | 2001 | Nortel Networks Inc. | (161,910,186) |
| 2002 | Nortel Networks (CALA) Inc | 2107 | Alteon WebSystems, Inc. | (2,700,910) |
| 2002 | Nortel Networks (CALA) Inc | 3140 | Nortel Networks Colombia | - |
| 2101 | Alteon Websystems Int Inc | 2107 | Alteon WebSystems, Inc. | (30,267,270) |
| 2102 | XROS Inc. | 2001 | Nortel Networks Inc. | (44,655,372) |
| 2104 | QTERA Corp | 2001 | Nortel Networks Inc. | (179,966,010) |
| 2105 | CoreTek Inc. | 2001 | Nortel Networks Inc. | (81,325,779) |
| 2107 | Alteon WebSystems, Inc. | 2001 | Nortel Networks Inc. | (6,075,811) |
| 2108 | Nortel Optical Comp Inc. | 2001 | Nortel Networks Inc. | (152,044) |
| 2115 | Nortel Int Inc. | 2001 | Nortel Networks Inc. | (63,972,219) |
| 2112 | Nortel Networks India Int | 1002 | Nortel Networks Limited | (17,695,763) |
| 2112 | Nortel Networks India Int | 2001 | Nortel Networks Inc. | (53,663,414) |
| | | | | |
| **Settled Claims** | | | | |
| 2001 | Nortel Networks Inc. | 2110 | Nortel Capital Corp | (144,371,388) |
| 2001 | Nortel Networks Inc. | 3171 | Nortel de México | (4,658,948) |
| 2001 | Nortel Networks Inc. | 6140 | Nortel Korea Ltd | (2,166,851) |
| 2002 | Nortel Networks (CALA) Inc | 3170 | Nortel Networks de Mexico S.A. | (563,142) |
| 2002 | Nortel Networks (CALA) Inc | 3171 | Nortel de México | (3,045,862) |
| 2002 | Nortel Networks (CALA) Inc | 6111 | Nortel (India) Pvt. Ltd. | (167,634) |
| 2002 | Nortel Networks (CALA) Inc | 7100 | Nortel Networks (Asia) Limited | (7,694) |
| 2107 | Alteon WebSystems, Inc. | 3171 | Nortel de México | (5,164) |
| 2115 | Nortel Int Inc. | 3171 | Nortel de México | (836) |
| 2115 | Nortel Int Inc. | 6111 | Nortel (India) Pvt. Ltd. | (17,184) |

**Canadian Debtors Pre-filing Intercompany Obligations as at January 14, 2009**
**Excludes claims filed by the Nortel Joint Ventures (GDNT and NETAS)**
**The schedule below excludes net intercompany receivables vis-à-vis non-filed entities; however this is not a reflection on the validity and the collectibility of such amounts**
**All amounts in USD**

| Legal company code | Legal company name | Legal trading partner code | Legal trading partner name | Grand Total |
|---|---|---|---|---|
| **Claims as per Nortel Books and Records** | | | | |
| 1107 | **Architel Systems Corp** | 2114 | Architel Systems (U.S.) C | (1,912,993) |
| | | | | |
| **Settled Claims** | | | | |
| 1002 | **Nortel Networks Limited** | 2001 | Nortel Networks Inc. | (2,062,700,000) |
| 1002 | **Nortel Networks Limited**¹ | 4360 | Nortel Networks UK Limited | (122,655,094) |
| 1002 | **Nortel Networks Limited** | 4220 | Nortel Networks S.p.A. | (2,344,906) |
| 1002 | **Nortel Networks Limited** | 7120 | Nortel (China) Ltd | (104,218,075) |
| 1002 | **Nortel Networks Limited** | 6210 | Nortel Networks Singapore Pte | (91,167,570) |
| 1101 | **Nortel Technology Corp** | 6210 | Nortel Networks Singapore Pte | (8,212) |
| 1101 | **Nortel Technology Corp** | 3171 | Nortel de México | (276,176) |
| 1101 | **Nortel Technology Corp** | 7100 | Nortel Networks (Asia) Limited | (176,933) |
| 1101 | **Nortel Technology Corp** | 6160 | Nortel Malaysia Sdn. Bhd. | (3,222) |
| 1102 | **Nortel Int Corp** | 7120 | Nortel (China) Ltd | (734,289) |
| 1102 | **Nortel Int Corp** | 6100 | Nortel Networks Australia Pty | (1,480) |
| 1001 | **Nortel Networks Corporation** | 3171 | Nortel de México | (59) |

1. Balance includes USD 25M subject to satisfaction of paragraph 2.2 of the Agreement Settling EMEA Canadian Claims and Related Claims

EMEA Debtors and NNSA Pre-filing Intercompany Obligations as at January 14, 2009.
The schedule below excludes any balances between the EMEA Debtors and/or NNSA and/or the
EMEA Non-Filed Entities; however this is not a reflection on the validity and the collectibility of such amounts
All amounts in USD

| Legal Company Code | Legal Company name | Legal trading partner code | Legal trading partner name | Grand Total |
|---|---|---|---|---|
| **Claim as per Nortel Books and Records** | | | | |
| 4100 | Nortel Networks (Austria) GmbH | 3171 | Nortel de México, S. de R.L. de C.V. | (8,821) |
| 4110 | Nortel Networks N.V. | 6111 | Nortel Networks (India) Private Limited | (5,030) |
| 4130 | Nortel Networks, s.r.o. | 3171 | Nortel de México, S. de R.L. de C.V. | (3,613) |
| 4160 | Nortel Networks S.A. | 3140 | Nortel Networks de Colombia S.A. | (17,220) |
| 4160 | Nortel Networks S.A. | 3150 | Nortel Comunicaciones de Colombia S.A. en Liquidación | (22,228) |
| 4160 | Nortel Networks S.A. | 3160 | Nortel Networks de Guatemala Ltda. | (158,007) |
| 4160 | Nortel Networks S.A. | 3170 | Nortel Networks de México, S.A. de C.V. | (1,457) |
| 4160 | Nortel Networks S.A. | 6100 | Nortel Networks Australia Pty. Limited | (2,417) |
| 4160 | Nortel Networks S.A. | 6160 | Nortel Networks Malaysia Sdn. Bhd. | (2,977) |
| 4160 | Nortel Networks S.A. | 6220 | Nortel Networks (Thailand) Limited | (30,065) |
| 4160 | Nortel Networks S.A. | 6231 | Nortel Vietnam Limited | (9,842) |
| 4160 | Nortel Networks S.A. | 7100 | Nortel Networks (Asia) Limited | (265,892) |
| 4160 | Nortel Networks S.A. | 7124 | Guandong Nortel Telecommunications Company Limited | (8,432,851) |
| 4162 | Nortel Networks France S.A.S | 3171 | Nortel de México, S. de R.L. de C.V. | (3,315) |
| 4162 | Nortel Networks France S.A.S | 6111 | Nortel Networks (India) Private Limited | (200) |
| 4162 | Nortel Networks France S.A.S | 7110 | Nortel Networks (Asia) Limited - Taiwan Branch | (22,406) |
| 4180 | Nortel GmbH (formerly 4180 Nortel Network Germany GmbH & Co KG) | 3171 | Nortel de México, S. de R.L. de C.V. | (29,481) |
| 4200 | Nortel Networks Engineering Service Kft. | 3171 | Nortel de México, S. de R.L. de C.V. | (4,928) |
| 4210 | Nortel Networks (Ireland) Limited | 3171 | Nortel de México, S. de R.L. de C.V. | (4,336) |
| 4210 | Nortel Networks (Ireland) Limited | 6100 | Nortel Networks Australia Pty. Limited | (75) |
| 4210 | Nortel Networks (Ireland) Limited | 6111 | Nortel Networks (India) Private Limited | (341) |
| 4210 | Nortel Networks (Ireland) Limited | 6120 | PT Nortel Networks Indonesia | (70) |
| 4210 | Nortel Networks (Ireland) Limited | 7110 | Nortel Networks (Asia) Limited - Taiwan Branch | (10,045) |
| 4220 | Nortel Networks S.p.A. | 7110 | Nortel Networks (Asia) Limited - Taiwan Branch | (5,145) |
| 4260 | Nortel Networks Polska Sp. z o.o. | 3171 | Nortel de México, S. de R.L. de C.V. | (1,823) |
| 4270 | Nortel Networks Portugal S.A. | 3110 | Nortel Networks Telecomunicacoes Industria e Comercio Ltda. | (121,067) |
| 4270 | Nortel Networks Portugal S.A. | 3171 | Nortel de México, S. de R.L. de C.V. | (3,103) |
| 4280 | Nortel Networks Romania SRL | 3171 | Nortel de México, S. de R.L. de C.V. | (532) |
| 4310 | Nortel Networks Hispania, S.A. | 6199 | Nortel Networks (Asia) Limited - Pakistan Branch | (1,294) |
| 4310 | Nortel Networks Hispania, S.A. | 7100 | Nortel Networks (Asia) Limited | (901) |
| 4360 | Nortel Networks UK Limited | 1107 | Architel Systems Corporation | (1,476,623) |
| 4360 | Nortel Networks UK Limited | 3171 | Nortel de México, S. de R.L. de C.V. | (58,159) |
| 4360 | Nortel Networks UK Limited | 4321 | Alteon WebSystems AB | (228,195) 1 |
| 4360 | Nortel Networks UK Limited | 6100 | Nortel Networks Australia Pty. Limited | (354,095) |
| 4360 | Nortel Networks UK Limited | 6130 | Nortel Networks Kabushiki Kaisha | (81,375) 2 |
| 4360 | Nortel Networks UK Limited | 6140 | Nortel Networks Korea Limited | (33,761) |
| 4360 | Nortel Networks UK Limited | 6160 | Nortel Networks Malaysia Sdn. Bhd. | (98,358) |
| 4360 | Nortel Networks UK Limited | 7120 | Nortel Networks (China) Limited | (100,633) |
| 4360 | Nortel Networks UK Limited | 7124 | Guandong Nortel Telecommunications Company Limited | (4,888) |
| 4360 | Nortel Networks UK Limited | 7125 | Nortel Networks Communications Engineering Limited | (1,812) |

1. Subsequent to the liquidation of Alteon WebSystems AB, the balance of $228,195 is due to Nortel Altsystems Inc.
2. Subsequent to the liquidation of Nortel Networks Kabushiki Kaisha, the balance of $81,375 is due to Nortel Networks Inc.

**APPENDIX "B"**

**[ATTACHED]**

**INFORMATION CIRCULAR**

**relating to a proposed**

**PLAN OF COMPROMISE AND ARRANGEMENT**

**under the**

***COMPANIES' CREDITORS ARRANGEMENT ACT*** **(CANADA)**

**concerning, affecting and involving**

**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION, NORTEL NETWORKS TECHNOLOGY CORPORATION, NORTEL COMMUNICATIONS INC., ARCHITEL SYSTEMS CORPORATION AND NORTHERN TELECOM CANADA LIMITED**

**November 4, 2016**

**This Information Circular is being distributed to creditors of the above-named Canadian Debtors in connection with a meeting called to consider and vote on a plan of compromise and arrangement.  The Meeting is presently planned to be held on or about January 17, 2017, subject to the terms of a Meeting Order to be granted by the CCAA Court on or about December 1, 2016.**

*These materials require your immediate attention. You should consult your legal, financial, tax or other professional advisors in connection with the contents of these documents.*

# TABLE OF CONTENTS

**Page**

IMPORTANT DISCLAIMERS ........................................................................................................2

INFORMATION FOR UNITED STATES CREDITORS ........................................................3

CAUTIONARY NOTICE REGARDING FORWARD LOOKING INFORMATION ...............4

TERMS OF REFERENCE ........................................................................................................4

SUMMARY INFORMATION...................................................................................................5

INFORMATION REGARDING NORTEL .............................................................................11

    Corporate Structure ...........................................................................................................11
    Operations..........................................................................................................................11
    Capital Structure ...............................................................................................................12

CCAA PROCEEDINGS AND OTHER MATTERS ...............................................................13

    Commencement of CCAA Proceedings............................................................................13
    U.S. Proceedings...............................................................................................................13
    EMEA Proceedings...........................................................................................................13
    Initial Restructuring Efforts .............................................................................................14
    The Line of Business Sales ..............................................................................................14
    Lockbox Funds .................................................................................................................15
    The IFSA, CFSA, NNI Claim and other Inter-Estate Matters ........................................15
    The Rest of the World.......................................................................................................16
    Claims Orders ...................................................................................................................17
    Certain Employee Matters: The Health & Welfare Trust, the Employee Settlement and Hardship Process ........18
    Certain Significant Claims ................................................................................................19

THE ALLOCATION DISPUTE AND THE ALLOCATION AND CLAIMS LITIGATION ...............21

    Allocation Protocol Negotiation Efforts and Phillips Mediation .....................................21
    Allocation Protocol Motions and Winkler Mediation......................................................21
    Fourth Estate Settlement Agreement ................................................................................22
    Allocation and Claims Litigation .....................................................................................22
    Settlement of the Allocation Dispute – Settlement and Support Agreement .....................26

DESCRIPTION OF THE PLAN .............................................................................................29

    Purpose of the Plan ..........................................................................................................29
    Substantive Consolidation ................................................................................................30
    Classification of Creditors ...............................................................................................30
    Allocation and Distribution of Sale Proceeds ..................................................................30
    Release of Canada Only Sale Proceeds and other Restricted or Unavailable Cash ...............31
    Treatment of Claims Pursuant to the Plan ........................................................................31
    Plan Releases ....................................................................................................................36
    Injunctions ........................................................................................................................37

REQUIRED APPROVALS UNDER THE CCAA AND OTHER CONDITIONS TO IMPLEMENTATION...........38

    Creditor Approval by a Required Majority........................................................................38
    Court Approval of the Plan under the CCAA ...................................................................38
    Conditions to the Effectiveness and Implementation of the Plan......................................41

IMPLEMENTATION OF THE PLAN .....................................................................................42

    Timing of Implementation ................................................................................................42
    Cash Pools and Reserves ..................................................................................................42
    Distributions under the Plan..............................................................................................43
    Continuing Administration and Wind-Down of the Canadian Estate and Related Matters ...................47

ESTIMATED DISTRIBUTIONS TO CREDITORS WITH PROVEN AFFECTED UNSECURED CLAIMS ........49

ALTERNATIVES TO THE PLAN.................................................................................................................49

STATUS OF CLAIMS PROCESS.................................................................................................................50

RECOMMENDATION OF THE MONITOR..................................................................................................50

SUPPORT OF OTHER SIGNIFICANT STAKEHOLDERS ........................................................................50

MEETING AND VOTING ............................................................................................................................50

WITHHOLDING FROM DISTRIBUTIONS AND CERTAIN OTHER TAX MATTERS...................................51

RISK FACTORS ...........................................................................................................................................52

    Risks Relating to Non-Implementation of the Plan ..........................................................................52
    Risks Relating to the Plan and its Implementation .........................................................................52
    Risks Related to Recovery under the Plan .......................................................................................53

DOCUMENTS INCORPORATED BY REFERENCE .................................................................................55

SCHEDULE "A" – FORM OF RESOLUTION
SCHEDULE "B" – GLOSSARY OF CERTAIN TERMS
SCHEDULE "C" – EXCHANGE RATES

**INFORMATION CIRCULAR**

**relating to a proposed**

**PLAN OF COMPROMISE AND ARRANGEMENT**

**pursuant to the**

*COMPANIES' CREDITORS ARRANGEMENT ACT* (CANADA)

**concerning, affecting and involving**

**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION, NORTEL NETWORKS TECHNOLOGY CORPORATION, NORTEL COMMUNICATIONS INC., ARCHITEL SYSTEMS CORPORATION AND NORTHERN TELECOM CANADA LIMITED**

**(the "Plan")**

**November 4, 2016**

**IMPORTANT DISCLAIMERS**

THIS INFORMATION CIRCULAR HAS BEEN PREPARED BASED ON THE INFORMATION AVAILABLE TO THE CANADIAN DEBTORS AND THE MONITOR AS AT THE DATE HEREOF.

SUBJECT TO THE FOREGOING, THIS INFORMATION CIRCULAR CONTAINS IMPORTANT INFORMATION THAT SHOULD BE READ BY AFFECTED CREDITORS BEFORE ANY DECISION IS MADE WITH RESPECT TO THE MATTERS REFERRED TO HEREIN.

NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION IN CONNECTION WITH THE MATTERS TO BE CONSIDERED AT THE MEETING OTHER THAN THOSE CONTAINED IN THIS INFORMATION CIRCULAR, AND IF GIVEN OR MADE, ANY SUCH INFORMATION OR REPRESENTATION SHOULD BE CONSIDERED AS NOT HAVING BEEN AUTHORIZED AND MUST NOT BE RELIED UPON. THIS INFORMATION CIRCULAR DOES NOT CONSTITUTE THE SOLICITATION OF A PROXY, IN ANY JURISDICTION, TO OR FROM ANY PERSON TO WHOM IT IS UNLAWFUL TO MAKE SUCH PROXY SOLICITATION IN SUCH JURISDICTION. NEITHER THE DELIVERY OF THIS INFORMATION CIRCULAR NOR ANY DISTRIBUTION PURSUANT TO THE PLAN REFERRED TO IN THIS INFORMATION CIRCULAR SHALL, UNDER ANY CIRCUMSTANCES, CREATE ANY IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION SET FORTH HEREIN SINCE THE DATE OF THIS INFORMATION CIRCULAR.

ANY FINANCIAL ANALYSIS OR OTHER ESTIMATIONS CONTAINED HEREIN, INCLUDING ANY ANALYSIS CONTAINING NUMERICAL SPECIFITY, IS BASED ON ASSUMPTIONS AND ESTIMATES WHICH MAY NOT BE ACHIEVED AND SUBJECT TO BUSINESS, ECONOMIC, REGULATORY AND OTHER UNCERTAINTIES WHICH MAY BE BEYOND THE CONTROL OF THE CANADIAN DEBTORS.

Affected Creditors should not construe the contents of this Information Circular as investment, legal or tax advice. An Affected Creditor should consult its own legal, financial, tax or other professional advisors with respect to the legal, tax, business, financial and related consequences of the Plan for such Affected Creditor. In making a decision regarding the Plan, Affected Creditors must rely on their own examination of the Canadian Debtors and the advice of their own advisors. Affected Creditors should seek advice from their own advisors concerning the income tax consequences of the Plan.

The solicitation presented in this Information Circular does not extend to Affected Creditors residing in jurisdictions where solicitations of proxies under this Information Circular are unlawful, or to Affected Creditors to whom it is unlawful to direct these types of activities. The solicitation of proxies for the implementation of the Plan is being made on the basis of this Information Circular and is subject to the terms and conditions described herein.

Each Affected Creditor must comply with all Applicable Laws and regulations in force in any jurisdiction in which it participates in the solicitation of proxies for the Resolution approving the Plan, or in which it possesses or distributes this Information Circular, and must obtain any consent, approval or permission required by it for participation in the solicitation of proxies for

the Resolution approving the Plan under the laws and regulations in force in any jurisdiction to which it is subject, and none of the Canadian Debtors or the Monitor nor any of their respective representatives shall have any responsibility therefor.

The information contained in this Information Circular is given as of November 4, 2016, unless otherwise specifically stated, and is subject to change or amendment without notice. Any statement contained in this Information Circular, a document incorporated by reference or referred to in this Information Circular, or any amendment hereof or supplement hereto, is to be considered modified or replaced to the extent that a statement contained herein or in any amendment or supplement or any subsequently filed document modifies or replaces such statement. Any statement so modified or replaced is not to be considered, except as so modified or replaced, to be a part of this Information Circular.

This Information Circular provides summaries and descriptions of events, Orders and other matters relating to the CCAA Proceedings. Any such summaries or descriptions are provided for convenience purposes only. The Monitor has been providing ongoing reporting regarding events impacting the Canadian Debtors throughout the CCAA Proceedings. Copies of all such Monitor reports are available on the Monitor's website at www.ey.com/ca/nortel in the Section entitled "Monitor Reports". Affected Creditors should refer to such Monitor reports in the event that such Affected Creditor wishes to receive more detailed information regarding specific events described herein.

All summaries of and references to certain documents in this Information Circular, including the summary of the Plan in this Information Circular, are qualified in their entirety by reference to the complete text of each of those documents.  Copies of documents referred to herein are either attached as Schedule(s) hereto or will be made available to Affected Creditors upon request to the Monitor.  Affected Creditors are urged to carefully read the full text of the Plan posted on the Monitor's website at www.ey.com/ca/nortel in the Section entitled "Plan and Other Creditor Meeting Documents".

Affected Creditors are urged to carefully read the "*Risk Factors*" section of this Information Circular before making any decision regarding the Plan.

All references to this Information Circular shall be deemed to include the Schedule(s) attached hereto.

## INFORMATION FOR UNITED STATES CREDITORS

The Canadian Debtors are corporations governed by the laws of Canada or a province thereof. The proxy solicitation rules under the U.S. Securities Exchange Act of 1934, as amended, are not applicable to this solicitation, and, accordingly, this solicitation is not being effected in accordance with such rules.

**NEITHER THIS INFORMATION CIRCULAR NOR THE PLAN HAS BEEN APPROVED OR DISAPPROVED BY THE U.S. SECURITIES AND EXCHANGE COMMISSION ("SEC"), ANY U.S. STATE SECURITIES REGULATORY AUTHORITY OR ANY U.S. BANKRUPTCY COURT, NOR HAS THE SEC, ANY U.S. SECURITIES REGULATORY AUTHORITY OR ANY U.S. BANKRUPTCY COURT PASSED UPON THE FAIRNESS OR MERITS OF THE PLAN OR UPON THE ADEQUACY, COMPLETENESS OR ACCURACY OF THE INFORMATION**

**CONTAINED IN THIS INFORMATION CIRCULAR.  ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENCE.**

This Information Circular does not discuss any U.S. federal or state tax consequences of the Plan.  Certain information concerning Canadian federal income tax consequences of the Plan for Affected Creditors who are not resident in Canada is set forth under the heading "*Withholding from Distributions and Certain Other Tax Matters*".  Affected Creditors resident in the United States should be aware that the transactions contemplated herein may have tax consequences both in Canada and the United States.  Such consequences are not described herein.  Affected Creditors should consult with their own tax advisors with respect to their particular circumstances and the tax considerations applicable to them.

## CAUTIONARY NOTICE REGARDING FORWARD LOOKING INFORMATION

The forward looking statements expressed or implied by this Information Circular are subject to important risks and uncertainties. When used in this Information Circular, the words "expect", "anticipate", "may", "will", "should", "intend", "believe", "plan" and similar expressions are intended to identify forward-looking statements, although not all forward-looking statements contain such words. Forward-looking statements are based on estimates and assumptions made by the Canadian Debtors in light of their experience and perception of historical trends, current conditions and expected future developments, as well as other factors that the Canadian Debtors believe are appropriate in the circumstances.  The results or events predicted in these statements may differ materially from actual results or events and are not guarantees of future performance. Factors which could cause results or events to differ from current expectations include, among other things: (a) uncertainty regarding future asset realizations; (b) the applicable foreign exchange rate at various dates of conversion or realization of remaining assets; (c) the resolution of unresolved Claims as to quantum and/or priority; (d) the cost to monetize the remaining assets, resolve Claims and complete the wind down and administration of the Canadian Debtors; (e) the other risks identified in the "Risk Factors" section of this Information Circular, and other factors not currently viewed as material that could cause actual results to differ materially from those described in the forward-looking statements.  The Canadian Debtors and the Monitor disclaim any intention or obligation to update or revise any forward-looking statements, whether as a result of new information, future events or otherwise, except as required by law.

## TERMS OF REFERENCE

The Monitor has made various materials relating to the CCAA Proceedings available on its website at [www.ey.com/ca/nortel](www.ey.com/ca/nortel) (the "**Monitor's Website**"). The Monitor's Website also contains a dynamic link to Epiq Bankruptcy LLC's website where materials relating to the Chapter 11 Proceedings are posted.

Unless otherwise stated, all monetary amounts contained herein are expressed in U.S. dollars. References to "CA" are to Canadian dollars.

Unless otherwise defined or referenced herein, all capitalized terms used herein have the meaning given to them in the Plan which have also been included in the glossary attached as Schedule "B" hereto (the "**Glossary**").  Definitions in the Glossary are included for convenience purposes only and reference should be made to the Plan or other original source document.

## SUMMARY INFORMATION

*The following is a summary of certain information contained elsewhere in this Information Circular, including the Schedule(s) hereto, and is qualified in its entirety by reference to the more detailed disclaimers and information contained or referred to elsewhere in this Information Circular or the Schedule(s) hereto.*

| | |
|---|---|
| **Monitor's Website** | All references to the "Monitor's Website" mean the Monitor's website maintained for these CCAA Proceedings at www.ey.com/ca/nortel. |
| | Among other things, the Monitor's Website contains all of the Monitor's Reports issued in the CCAA Proceedings which provide information and reporting regarding the significant events and processes in the CCAA Proceedings. |
| **Meeting and Voting on the Plan** | The Meeting is targeted to be held on or about January 17, 2017. |
| | The actual date for calling the Meeting and the process for voting on the Plan (including the forms of proxy and instructions for voting) will be subject to a Plan Filing and Meeting Order (the "**Meeting Order**") which will be subject to CCAA Court approval on or about December 1, 2016.  Once granted, the Meeting Order will be posted on the Monitor's Website and distributed in accordance with the terms of the Meeting Order. |
| **Purpose of the Plan** | The purpose of the Plan is to: (a) effectuate and implement the terms of the Settlement and Support Agreement, including the settlement of the Allocation Dispute and certain other claims, disputes and other matters contemplated therein, and the release of the Sale Proceeds to the Canadian Debtors, the U.S. Debtors and the EMEA Debtors; (b) provide for the substantive consolidation of each of the Canadian Debtors into the Canadian Estate on the terms contemplated by the Plan; (c) provide for payment in full of the Proven Priority Claims; (d) provide for a pro rata distribution or distributions from the Canadian Estate to holders of all Proven Affected Unsecured Claims; and (e) effect a release and discharge of all Affected Claims and Released Claims. |
| **Classification and Voting** | The Plan provides for one class of Affected Unsecured Creditors for the purpose of considering and voting on the Plan, namely the Affected Unsecured Creditors Class. |
| **Treatment of Affected Claims** | Generally, the Plan provides for treatment of claims as follows: |
| | <u>Affected Unsecured Claims</u>.  In full and final satisfaction of their Claims, Affected Unsecured Creditors holding Proven Affected Unsecured Claims shall be entitled to vote on and receive their Pro-Rata Share of cash available to be distributed to Affected Unsecured Creditors under the Plan. |

Directors/Officer Claims. Director/Officer Claims are Affected Claims under the Plan. A Creditor holding a Director/Officer Claim, if any, is not entitled to vote on the Plan or receive any distributions under the Plan. The Plan provides for releases in favour of the Directors and Officers. However, certain types of claims will not be released pursuant to the Plan, including: (a) claims determined to be on account of fraud or willful misconduct; and (b) claims not permitted to be released by section 5.1(2) of the CCAA.

Equity Claims. Equity Claims are Affected Claims under the Plan. Holders of Equity Claims are not entitled to vote on or receive distributions under the Plan.

Unresolved Affected Unsecured Claims. Potential distributions in respect of Unresolved Affected Unsecured Claims will be maintained in the Unresolved Claims Reserve until such claims are finally resolved. If an Unresolved Affected Unsecured Claim becomes a Proven Affected Unsecured Claim, on or before the next Distribution Date, the Canadian Estate shall distribute funds from the Unresolved Claims Reserve equal to the Affected Unsecured Creditor's Pro-Rata Share that it/he/she would have been entitled to receive on the previous Distribution Date(s). Once an Unresolved Affected Unsecured Claim is finally resolved and all distributions (if any) have been made out of the Unresolved Claims Reserve in respect of such claim, any remaining Cash in the Unresolved Claims Reserve with respect to such Unresolved Affected Unsecured Claim shall become Available Cash.

Unaffected Claims. Certain other claims are "unaffected claims", and holders of those unaffected claims will not be entitled to vote on the Plan. Unaffected claims include: (a) Canadian Intercompany Claims; (b) Insured Claims; (c) Proven Priority Claims; (d) Post-Filing Claims (except to the extent otherwise ordered by the CCAA Court); and (e) any Director/Officer Claim that is not permitted to be compromised pursuant to Section 5.1(2) of the CCAA. The treatment of Unaffected Claims is described in further detail below.

See "*Description of the Plan – Treatment of Claims Pursuant to the Plan*".

| | |
|---|---|
| **Certain Proven Affected Unsecured Claims** | Certain Claims have been agreed as Proven Unaffected Unsecured Claims under the Plan pursuant to the Settlement and Support Agreement.<br><br>See "*Description of the Plan – Treatment of Claims Pursuant to the Plan – Certain Proven Affected Unsecured Claims*" |
| **Creditor Approval of Plan** | In order for the Plan to be approved pursuant to the CCAA, the Resolution must receive the affirmative vote of the Required Majority of the Affected Unsecured Creditors Class, being a majority in number |

6

of Affected Unsecured Creditors with Voting Claims who vote (in person or by proxy) on the Plan at the relevant Meeting, and two-thirds in value of the Voting Claims held by such Affected Unsecured Creditors who vote (in person or by proxy) on the Plan at the Meeting.

Creditors who have Affected Unsecured Claims that are Crossover Claims must vote on the Plan in addition to any vote that such Creditor may cast in respect of the U.S. Plans. Voting on the U.S. Plans will not be considered a vote on the Plan and *vice versa*.

See "*Required Approvals Under the CCAA and Other Conditions to Implementation – Creditor Approval by a Required Majority*".

**Court Approval under the CCAA**

If the Plan is approved by the Required Majority the Canadian Debtors and Monitor shall apply for the Sanction Order. The hearing in respect of the Sanction Order is presently planned for on or about January 24, 2017. The specific date and place of hearing for the Sanction Order will be posted on the Monitor's Website.

See "*Required Approvals Under the CCAA and Other Conditions to Implementation – Court Approval of the Plan Under the CCAA*".

**Conditions to the Effectiveness and Implementation of the Plan**

The effectiveness of the Plan is conditional upon satisfaction of a number of conditions, including (a) approval of the Plan by the Required Majority; (b) the issuance of the Sanction Order and expiration of relevant appeal periods or the final resolution of any appeals taken; and (c) confirmation of the U.S. Plans by the U.S. Court. The implementation of the Plan, including distributions thereunder, is conditional on certain additional conditions being satisfied, including (x) the full effectiveness of the Settlement and Support Agreement; (y) dismissal of all outstanding litigation pending in respect of the Allocation Dispute; and (z) receipt of the Canadian Allocation by NNL.

(See "*Required Approvals Under the CCAA and Other Conditions to Implementation – Conditions to the Effectiveness and Implementation of the Plan*".)

**Settlement and Support Agreement**

The full effectiveness of the Settlement and Support Agreement is conditional upon satisfaction of, among others, the following conditions: (a) receipt of Creditor Joinders from Crossover Bondholders beneficially holding notes representing at least 67% of the principal amount of the Crossover Bondholder Claim; (b) receipt of Creditor Joinders from NNCC Bondholders beneficially holding notes representing at least 67% of the principal amount of the NNCC Bondholder Claim; (c) Orders from the CCAA Court and the U.S. Court regarding the conversion of currency; (d) Certain Orders of the U.K. Court, the French Court and the Beddoes Court regarding the Settlement and Support Agreement having been obtained; (e) sanction and confirmation of the Plan and the U.S. Plans by the CCAA Court

and the U.S. Court, respectively; and (f) the Plans Effective Date having occurred. The conditions specified in the foregoing (a), (b) and (c) have been satisfied as at the date of this Information Circular and the Canadian Debtors and Monitor have also been advised the conditions specified in the foregoing (d) have been satisfied.

Certain of these conditions have already been satisfied.  See "*CCAA Proceedings and Other Matters – Settlement of the Allocation Dispute – Settlement and Support Agreement*" and "*Support of Other Significant Stakeholders*"

**Timing**

The current estimated timeline to implementation of the Plan is as follows:

(a) Meeting – January 17, 2017

(b) Sanction Hearing – January 24, 2017

(c) Effective Date – February 15, 2017

(d) Implementation Date – as soon as possible following the Effective Date

(e) Initial Distribution Date – within 60 days of the Implementation Date

The actual timing of the steps contemplated above will be set in accordance with the Meeting Order, Sanction Order or as otherwise contemplated by the Plan and, where applicable, will be posted on the Monitor's Website.

See "*Implementation of the Plan – Timing of Implementation*"

**Distributions**

The Plan provides for the creation of various notional Cash pools and reserves for the purposes of implementing the Plan, including making payments to holders of Proven Priority Claims and distributions in respect of Proven Affected Unsecured Claims.

See "*Implementation of the Plan – Cash Pools and Reserves and Distributions Under the Plan*"

**Estimate of Distribution to Affected Unsecured Creditors**

Pursuant to the Plan, distributions to Creditors holding Proven Affected Unsecured Claims predominantly denominated in Canadian dollars ("**CAD Claims**") shall be paid in Canadian dollars and distributions to all other Creditors holding Proven Affected Unsecured Claims shall be paid in U.S. dollars.  A Proven Affected Unsecured Claim is considered "predominantly denominated" in Canadian dollars if more than 50% of such Claim is denominated in Canadian dollars.

For information on the method for conversion of Claims, see

8

"*Description of the Plan – Treatment of Claims Pursuant to the Plan – Currency Conversion Matters*"

Pursuant to the Currency Conversion Orders (defined below), on October 24, 2016, directions were issued to the U.S. Distribution Agent to transfer approximately $1.06 billion to the Canadian Distribution Agent. The funds have been transferred and converted from U.S. dollars to Canadian dollars at a blended foreign exchange rate of $1.00 = CA$1.337650. The blended foreign exchange rate at which such funds together with any other funds transferred are converted from U.S. dollars to Canadian dollars shall constitute the Applicable F/X Rate for the Plan.

With respect to Proven Affected Unsecured Claims, the Monitor currently estimates that the range of recovery (per U.S. dollar) of Proven Affected Unsecured Claims will be approximately 41.5 cents to 45 cents.  Given currency conversion matters as described in the Plan (See *Description of the Plan - Treatment of Claims Pursuant to the Plan – Currency Conversion Matters* ) the Monitor estimates that the range of recovery (per CA dollar) for CAD Claims will be approximately CA 45 cents to CA 49 cents <u>assuming</u> an Applicable F/X Rate of approximately $1.00 = CA $1.337650.

See "*Estimated Distributions to Creditors with Proven Affected Unsecured Claims*"

| | |
|---|---|
| **Monitor** | The Monitor and its counsel have been involved throughout the course of negotiations regarding the Plan. The Monitor supports the Plan and recommends that Affected Unsecured Creditors vote to approve the Plan. |
| **Support of Certain Stakeholders** | Certain significant Affected Unsecured Creditors of the Canadian Estate, including Crossover Bondholders holding Crossover Bonds in the principal amount of approximately $3 billion representing approximately 80% of the principal amount of the Crossover Bonds, NNCC Bondholders holding NNCC Bonds in the principal amount of approximately $135,665,000 representing approximately 90% of the principal amount of the NNCC Bonds, members of the CCC, UKPI, EMEA Debtors and NNI support the Plan, subject to the terms and conditions set out in the Settlement and Support Agreement.<br><br>(See "*Support of Other Significant Stakeholders*") |
| **Tax Considerations** | Certain tax considerations relating to the Plan are described in "*Withholding from Distributions and Certain Other Tax Matters*". Affected Creditors should consult their own tax advisors with respect to their individual circumstances.<br><br>(See "*Withholding from Distributions and Certain Other Tax* |

*Matters*")

**Risk Factors**         Affected Creditors should carefully consider certain risk factors relating, among other things, to the non-implementation of the Plan, the Plan and its implementation and recoveries under the Plan.

(See "*Risk Factors*")

**Important**            The information contained in this Information Circular is subject to a
**Disclaimers**          number of important qualifications and disclaimers.  See "*Important Disclaimers*" and "*Risk Factors*".

# INFORMATION REGARDING NORTEL

## Corporate Structure

As at January 14, 2009 (the "**Filing Date**") [1], NNC was the parent holding company and NNL was the primary Canadian operating entity of the Nortel group of companies ("**Nortel**"), a multi-national telecommunications company with approximately 126 subsidiaries that operated in virtually every country in the world.

## Operations

### *Business Segments and Lines of Business*

Nortel operated through various lines of business ("**LOB**").

As at the Filing Date, Nortel's three core business segments were Carrier Networks, Enterprise Solutions ("**Enterprise**") and Metro Ethernet Networks ("**MEN**"). A fourth business segment, Global Services (Nortel's support and services arm), was a separate reportable segment until December 31, 2008, before being integrated into the other LOBs.

The Carrier Networks segment provided wireless networking solutions that enabled service providers and cable operators to supply mobile voice, data and multimedia communications to individuals and enterprises using mobile phones and other wireless computing and communications devices. The Carrier Networks segment included the code division multiple access ("**CDMA**"), carrier voice over internet protocol applications solutions ("**CVAS**") and global system for mobile communications ("**GSM**") LOBs.

The LOBs operated across jurisdictional boundaries and in many cases on a world-wide basis. The assets, contracts and employees relevant to the operation of a particular LOB were owned or employed by various individual Nortel legal entities, including NNL, but also including NNI, NNUK and numerous other debtor and non-debtor Nortel entities around the globe.

### *Employees*

At its peak in the early 2000s, Nortel employed nearly 93,000 people worldwide. As at the Filing Date, the Canadian Debtors employed approximately 6,000 employees. The Canadian Debtors also administered two registered defined benefit pension plans, the Nortel Networks Limited Managerial and Non-Negotiated Pension Plan (Registration No. 0342048) and the Nortel Networks Negotiated Pension Plan (Registration No. 08587766), that provided pension benefits to more than 11,000 former employees and their survivors at the time of the Filing Date. In addition, the Canadian Debtors administered a Capital Accumulation and Retirement Program, which consisted of a combination of separate pension and other retirement savings plans and various other pension and benefits programs for the Canadian Debtors' former and current employees. Total participation in Nortel's Canadian Registered Pension Plans at the Filing Date was approximately 21,000 members. Finally, the Canadian Debtors also funded various current and post-employment employee benefits through Nortel's Health & Welfare Trust ("**HWT**"), a trust that provided benefits to approximately 9,000 current and former employees at the time of the Filing Date.

---

[1] In respect of the New Applicants, references to the "Filing Date" shall mean March 18, 2016.

**Capital Structure**

*Equity*

NNC is a public company whose shares traded on the Toronto Stock Exchange and the New York Stock Exchange ("**NYSE**").  As at December 31, 2008, NNC had approximately 497 million common shares issued and outstanding.

As at December 31, 2008, NNL had approximately 1.4 million common shares (all owned by NNC), as well as 16 million Series 5 preferred shares and 14 million Series 7 preferred shares issued and outstanding. NNL's preferred shares were listed on the Toronto Stock Exchange.

*Bond Debt*

As at the Filing Date, one or more of the Canadian Debtors had either issued or guaranteed outstanding Bonds in the principal amount of approximately $4.175 billion pursuant to the Crossover Bonds Indentures, the NNCC Bonds Indenture and the 1988 Bonds Indenture as follows:

    (a)    the 1988 Bonds issued by NNL, in the principal amount of approximately $200 million;

    (b)    the 2006 Bonds issued by NNL and guaranteed by NNC and NNI, in the principal amount of approximately $2.675 billion;

    (c)    the 2007 Bonds issued by NNC and guaranteed by NNL and NNI, in the principal amount of approximately $1.150 billion; and

    (d)    the NNCC Bonds issued by Northern Telecom Capital Corporation (now NNCC, a U.S. Debtor) and guaranteed by Northern Telecom Limited (now NNL), in the principal amount of approximately $150 million.

*Reporting Issuer Status & Stock Exchange Listings*

Prior to the Filing Date, NNC was a reporting issuer under U.S. and Canadian securities laws and its common shares were traded on the NYSE and the Toronto Stock Exchange.

On January 14, 2009, NNC received notice from the NYSE that it had decided to suspend the listing of NNC's common shares on the NYSE. Subsequently, on February 2, 2009, NNC common shares were delisted from the NYSE. On June 19, 2009, and several times subsequently, Nortel publicly announced it did not expect that holders of NNC common shares and NNL preferred shares would receive any value from the CCAA Proceedings and that such proceedings would ultimately result in the cancellation of those equity interests. As a result, NNC and NNL applied to delist the NNC common shares and the NNL preferred shares, respectively, from trading on the Toronto Stock Exchange, and such delisting occurred on June 26, 2009.

On August 9, 2012, NNC issued a press release announcing that as a result of the current status of the Canadian Debtors' restructuring proceedings, NNC and NNL would discontinue further preparation of quarterly and annual financial statements.  In connection with this announcement,

the Ontario Securities Commission issued a final cease trade order dated December 24, 2012 (the "**Cease Trade Order**") prohibiting further trading of Nortel securities.  The Cease Trade Order contained certain exceptions to the prohibition on trading, including allowing certain trading of the Bonds to continue by "accredited investors" and trades for nominal consideration for the purposes of crystallizing tax losses.  Cease trade orders were also issued in Alberta, Manitoba and Quebec.

## CCAA PROCEEDINGS AND OTHER MATTERS

### Commencement of CCAA Proceedings

On the Filing Date, NNC, NNL, Nortel Networks Technology Corporation, Nortel Networks International Corporation and Nortel Networks Global Corporation (collectively, with the New Applicants (as defined below), the "**Canadian Debtors**") filed for and obtained protection under the *Companies' Creditors Arrangement Act* ("**CCAA**"). Pursuant to the Initial Order of the CCAA Court dated January 14, 2009 (as amended and restated from time to time, the "**Initial Order**"), Ernst & Young Inc. was appointed as the Monitor of the Canadian Debtors (the "**Monitor**") in the CCAA Proceedings. The stay of proceedings under the Initial Order was most recently extended to March 31, 2017 by Order dated September 29, 2016.

On March 18, 2016, Nortel Communications Inc., Architel Systems Corporation and Northern Telecom Canada Limited (collectively, the "**New Applicants**") sought and were granted an Order (New Applicants) of the CCAA Court (the "**New Applicants Order**"). Pursuant to the New Applicants Order, each of the New Applicants was deemed to be an "Applicant" (as defined in the Initial Order) in these CCAA Proceedings, entitled to all of the rights, benefits and protections granted by, and otherwise subject to, among other Orders of the CCAA Court entered in the CCAA Proceedings, the Initial Order as if it were an Applicant thereunder. The New Applicants Order also procedurally consolidated the CCAA Proceedings of the New Applicants with the CCAA Proceedings.

### U.S. Proceedings

Nortel Networks Inc. ("**NNI**") and certain of its U.S. subsidiaries and affiliates (the "**Initial Chapter 11 Debtors**") filed voluntary petitions under Chapter 11 of the U.S. Bankruptcy Code (the "**Code**") in the United States Bankruptcy Court for the District of Delaware (the "**U.S. Court**") on January 14, 2009 (the "**Chapter 11 Proceedings**"). As required by U.S. law, an official committee of unsecured creditors (the "**UCC**") was established on January 26, 2009.

Subsequently, Nortel Networks (CALA) Inc. ("**NN CALA**") filed a voluntary petition under Chapter 11 of the Code in the U.S. Court on July 14, 2009.

Nortel Networks India International Inc. filed a voluntary petition under Chapter 11 of the Code in the U.S. Court on July 26, 2016 ("**NNIII**" and together with NN CALA and the Initial Chapter 11 Debtors, the "**U.S. Debtors**").

### EMEA Proceedings

On January 14, 2009, Nortel Networks UK Limited ("**NNUK**") and certain of its affiliates located in EMEA (collectively, the "**EMEA Debtors**" and with the Canadian Debtors and the U.S. Debtors, the "**Estates**" and each an "**Estate**") were granted administration orders (the "**U.K.**

**Administration Orders**") by the High Court of England and Wales (the "**EMEA Proceedings**"). The U.K. Administration Orders appointed Alan Bloom, Stephen Harris, Alan Hudson and Chris Hill of Ernst & Young LLP as administrators of the various EMEA Debtors, except for Nortel Networks (Ireland) Limited, to which David Hughes (Ernst & Young LLP Ireland) and Alan Bloom were appointed (collectively, the "**Joint Administrators**").

Subsequent to the Filing Date, Nortel Networks S.A. ("**NNSA**") commenced secondary insolvency proceedings ("**French Secondary Proceeding**") within the meaning of Article 27 of the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings in the Republic of France pursuant to which a liquidator and an administrator were appointed by the Versailles Commercial Court (the "**French Court**"). Pursuant to the French Secondary Proceeding, Maitre Cosme Rogeau was appointed as liquidator in the French Secondary Proceeding. Stephen Jonathan Taylor of Isonomy Limited was subsequently appointed as conflicts administrator of NNSA (the "**Conflicts Administrator**").

Subsequent to the Filing Date, various other Nortel Group entities have filed for bankruptcy protection or commenced liquidation in their local jurisdictions.

**Initial Restructuring Efforts**

Before and immediately after the Filing Date, the Estates considered a restructuring pursuant to which Nortel's LOBs except the CDMA (2G) wireless business and its next generation (4G) LTE wireless technology would be sold. Under this option, a smaller Nortel would emerge centered on the legacy CDMA business and the potential LTE business.

However, by June 2009, the Estates, in consultation with their advisors and key stakeholders, determined that the best means for the realization of value was the sale of all the LOBs including CDMA. On June 19, 2009, Nortel issued a press release announcing, among other things, that it had entered into a stalking horse agreement for the sale of its CDMA business and certain LTE assets and that it also intended to pursue sales of its other LOBs.

**The Line of Business Sales**

Sales of LOBs occurred from mid-2009 through late 2010, with the last LOB transaction, MSS, closing in March 2011.  With limited exceptions, the LOB sale processes generally utilized a stalking-horse auction process that ultimately generated sale proceeds in excess of $3.28 billion. The transactions were going concern sales and resulted in more than 10,600 of Nortel's global employees being transferred to the various purchasers and the preservation of most Nortel supplier and customer relationships. Nortel entered into and closed nine LOB transactions, generating gross proceeds of approximately $3.28 billion ($3.09 billion after purchase price adjustments).

**The Residual IP**

Following the completion of the LOB sales, approximately 7,000 patents and patent applications remained with Nortel that had not been sold in the LOB sales.

Prior to the completion of the LOB sales, it was anticipated that there would be a retained patent portfolio and efforts commenced in early 2010 to consider the means to maximize the value of

this portfolio. An IP leadership team (consisting of representatives of each of the Estates) was formed to consider the issue.

After significant negotiation with two prospective purchasers, on April 4, 2011, NNC, NNL, NNI and NNUK (amongst other Nortel entities) entered into a stalking-horse asset sale agreement with Ranger Inc., a wholly owned subsidiary of Google Inc., to sell the Residual IP (which included the approximately 7,000 remaining patents and patent applications) for $900 million. Following an auction held at the end of June 2011, the Residual IP was ultimately sold to a consortium of technology companies for $4.5 billion.

**Lockbox Funds**

Gross proceeds of approximately $7.8 billion resulted from the LOB sales and the Residual IP sale.  As proceeds were received from the sales, cash was placed into various escrow accounts (the "**Escrow Accounts**") pursuant to the terms of the IFSA and associated escrow agreements (discussed in further detail below - See "*The IFSA, CFSA and the NNI Claim*").

The current cash balance in the Escrow Accounts is approximately $7.3 billion (the "**Lockbox Funds**") after taking into consideration negative purchase price and working capital adjustments of approximately $186 million and various prior Court approved distributions out of the Escrow Accounts, including approximately $45 million in respect of the Fourth Estate Settlement, $73 million on account of certain fees and expenses relating to the sales, and $53 million payable to NNI in respect of cash on hand of certain wholly owned subsidiaries sold in the LOB sales.

**The "Canada Only" Sales**

In addition to the various LOB sales, from May 2009 onwards the Monitor oversaw Court-approved sales processes for various assets owned by one of more of the Canadian Debtors (the "**Canada Only Sales**"). These Canada Only Sales processes generated gross proceeds of approximately CA $615 million (plus a further amount in respect of 12 IP Addresses (as defined in the Settlement and Support Agreement) transactions, the financial terms of which are sealed pursuant to orders of the CCAA Court).

Proceeds generated by the Canada Only Sales (other than to the extent sealed by the CCAA Court in the case of the IP Address Sales) have been reported by the Monitor in the Canadian Debtors' cash-flow reports from time to time throughout the course of the CCAA Proceedings and, generally, have either been classified as Unavailable Cash as a result of the terms of the applicable approval and vesting order, or used to fund the ongoing costs of the administration of the CCAA Proceedings.

**The IFSA, CFSA, NNI Claim and other Inter-Estate Matters**

Two issues central to the CCAA Proceedings during the first six months included: (i) the aforementioned attempts to develop and implement a global restructuring plan; and (ii) a means of addressing the significant cash burn being experienced by NNL as result of it continuing to incur significant corporate overhead and research and development costs in the course of the restructuring proceedings.

On June 9, 2009, NNL, NNI, NNUK and the Joint Administrators (among other parties) entered into the Interim Funding and Settlement Agreement (the "**IFSA**") that assisted in addressing

these issues. Pursuant to the IFSA, NNI agreed to pay $157 million to the Canadian Debtors which, together with a $30 million payment made in January 2009, was in satisfaction of any claims of NNL for corporate overhead and research and development costs incurred by NNL for the benefit of certain of the U.S. Debtors for the period from the Filing Date to September 30, 2009. In addition, NNL agreed to pay NNUK $20 million on a deferred basis (secured by a Court-ordered charge) and the EMEA Debtors, on the one hand, and the Canadian Debtors and U.S. Debtors, on the other, agreed to the settlement of any transfer pricing obligations between them for the period from the Filing Date to December 31, 2009. Pursuant to the IFSA, the Estates also reached certain agreements that facilitated the LOB transactions that would be entered into in the coming months, including an agreement that the execution of sale documentation or closing of a transaction of material assets would not be conditioned upon reaching agreement on either allocation of the sale proceeds of such sale or a binding procedure for the allocation of such sale proceeds and that all sale proceeds would be deposited in the Escrow Accounts pending resolution of allocation.

The cash burn of NNL and the Canadian Debtors continued throughout 2009 necessitating further funding discussions for the period post-September 2009. On December 23, 2009, the Canadian Debtors, the Monitor and the U.S. Debtors entered into the Final Canadian Funding and Settlement Agreement (the "**CFSA**"). The CFSA was entered into to address certain funding needs of the Canadian Estate as well as to settle various outstanding claim matters between NNI and NNL. Pursuant to the CFSA, among other things, NNI agreed to pay to NNL $190 million in satisfaction of certain obligations of NNI to NNL for the period from October 1, 2009 to the end of the CCAA Proceedings, subject to certain "true-up" obligations relating to the allocation of the Lockbox Funds. Additionally, NNL agreed to grant to NNI a $2.0627 billion Claim (the "**NNI Claim**") in connection with historical transfer pricing overpayments by NNI to NNL as well as amounts owing under an existing secured revolving loan between NNI and NNL. $2.0 billion of the Claim was agreed to be unsecured, with the balance (relating to the revolving loan) being a secured priority claim. The NNI Claim was approved by the CCAA Court on January 21, 2010 as part of the approval of the CFSA.

In addition to the foregoing, over the course of the CCAA Proceedings, the Canadian Debtors have also entered into various side letters and other agreements with the U.S. Debtors, often to provide interim financial arrangements regarding costs and other matters but subject to re-allocation upon resolution of the Allocation Dispute.

**The Rest of the World**

As set out above, Nortel operated throughout the world including in jurisdictions where there were no insolvency proceedings commenced. Given the integration of Nortel's businesses, the assistance and cooperation of these entities were required in many cases in order to, among other things, facilitate the sales described above and wind down any remaining operations. However, with the insolvency proceedings in Canada, the U.S. and EMEA, many of these entities and their directors and officers expressed ongoing concerns as to the funding and solvency of these entities as well as other liabilities for which the directors and officers might become personally liable. Many of these directors and officers resigned and, pursuant to Applicable Laws in the applicable jurisdictions, had to be replaced with new directors.

In order to find new individuals willing to serve on these boards of directors, NNL and NNI created a trust, generally referred to as the "**Cascade Trust**", pursuant to which NNL and NNI

would settle a $35 million trust to be claimed against, subject to certain terms and conditions, by the directors of these non-filed entities. Pursuant to the terms of a side agreement entered into between NNL and NNI relating to the Cascade Trust, each of NNL and NNI agreed to initially contribute $17.5 million to the Cascade Trust, provided, however, that such contribution would be reallocated on the overall weighted average based on each entities ultimate entitlement to the Sale Proceeds. The Cascade Trust was approved by the CCAA Court on March 31, 2010. As discussed below, the resolution of the interests in the Cascade Trust as between NNL and NNI is included in the proposed settlement terms under the Settlement and Support Agreement.

See also "*The Allocation Dispute and the Allocation and Claims Litigation – Fourth Estate Settlement Agreement*".

**Claims Orders**

Throughout the course of the CCAA Proceedings, the CCAA Court has issued and entered the following Orders pertaining to the calling for Claims against the Canadian Debtors and their Directors and Officers:

| | <u>Order</u> | <u>Claims Filed</u> |
|---|---|---|
| 1. | Claims Procedure Order dated July 30, 2009, as amended and restated | Pursuant to the Claims Procedure Order, the Canadian Debtors called for most third party, non-employee related Claims as of the Filing Date against the Canadian Debtors and their current and former directors and officers.<br><br>For the status on the resolution of these claims, see "*Status of Claims Process*". |
| 2. | Compensation Claims Procedure Order dated October 6, 2011 and the Compensation Claims Methodology Order dated October 6, 2011 (the "**Compensation Claims Orders**") | Pursuant to the Compensation Claims Orders, former employees of the Canadian Debtors were given "Form C" letters notifying them of their proposed Compensation Claim based on the calculation methodology approved pursuant to the Compensation Claims Orders. Compensation Creditors could dispute the underlying information pursuant to the terms of the Compensation Claims Orders, and additional claims could also be filed.<br><br>For the status on the resolution of these claims, see "*Status of Claims Process*". |
| 3. | EMEA Claims Procedure Order dated January 14, 2011 | Claims filed pursuant to the EMEA Claims Procedure Order are described below in the subsection entitled |

|  |  | "*EMEA Claims Against the Canadian Debtors*".<br><br>The EMEA Claims were resolved pursuant to the EMEA Claims Settlement Agreement, see "*The Allocation Dispute and the Allocation and Claims Litigation – Allocation and Claims Litigation - EMEA Claims Settlement*". |
|---|---|---|
| 4. | Intercompany Claims Procedure Order dated July 27, 2012 | Pursuant to the Intercompany Claims process, the Monitor sent balance statements to certain of the Canadian Debtors' affiliates (whose claims had not otherwise been settled pursuant to the Fourth Estate Settlement Agreement or otherwise) ("**Non-Fourth Estate Entities**") indicating where there were balances owing or owed based on the Canadian Debtors books and records. Any Non-Fourth Estate Entity could either accept the statement, dispute the statement or file a new Proof of Claim. This process did not apply to the U.S. Debtors, EMEA Debtors or the APAC/CALA Affiliates who were party to the Fourth Estate Settlement Agreement described below. |
| 5. | An Order calling for Claims against the New Applicants dated September 29, 2016 (the "**September 29 Order**") | The Claims Bar Date was October 31, 2016. The Monitor received placeholder claims filed by Canada Revenue Agency and no other proofs of claim were filed. |

In addition to the above Orders, the Canadian Debtors intend to request an Order from the CCAA Court calling for certain "Post-Filing Claims" pursuant to an Order of the CCAA Court.

**Certain Employee Matters: The Health & Welfare Trust, the Employee Settlement and Hardship Process**

The current and former employees of the Canadian Debtors including pensioners, employees on disability and terminated employees, have been actively represented by Court Appointed Representative Counsel in the CCAA Proceedings who have the ability to act on their behalf and bind them in matters relating to the CCAA Proceedings, including in the settling of their Compensation Claims.

Throughout the course of the CCAA Proceedings, the Canadian Debtors, Monitor and Court Appointed Representative Counsel have worked to resolve many issues faced by the former and current employee group including as it related to the HWT, rights to termination and severance amounts and transitioning of benefits.  In particular:

- The Canadian Debtors, with the approval and support of the Monitor, established an employee hardship process (the "**Hardship Process**") pursuant to which former employees who were experiencing financial hardship resulting from loss of income and/or medical benefit coverage could receive certain cash distributions. The Hardship Process has allowed eligible claimants to receive a timely interim distribution in advance of a general distribution to creditors. Total approved funding for the Hardship Process to date is currently CA$2.3 million.

- In February 2010, the Canadian Debtors entered into a settlement agreement with, among others, Court Appointed Representative Counsel and Unifor (then the CAW) (the "**Employee Settlement Agreement**").  The Employee Settlement Agreement provided certainty to the Canadian Debtors and their stakeholders by establishing the date on which the Canadian Debtors would terminate ongoing pension funding and the payment of benefits to pensioners, long term disability beneficiaries and survivors, facilitating the distribution of the HWT, providing advance notice of such termination and preserving the corpus of the HWT to the extent possible pending a CCAA Court approved distribution. Additionally, the Employee Settlement Agreement provided for termination payments of CA$3,000 made to eligible former employees ("**Termination Payments**").

Pursuant to an Order of the CCAA Court on November 9, 2010, the methodology for the allocation of the corpus of the HWT was determined.  Since that time, various distributions have been made out of the HWT.  The Plan will not impact any further distributions from the HWT. Distributions made to Compensation Creditors out of the HWT result in the reduction of such Compensation Creditor's claim.

**Certain Significant Claims**

For information regarding the NNI Claim, see "*CCAA Proceedings and Other Matters – The IFSA, CFSA, NNI Claim and other Inter-Estate Matters*".

*Crossover and NNCC Bond Claims*

Pursuant to the Claims Procedure Order, the Indenture Trustee in respect of each of the Crossover Bonds and the NNCC Bonds filed proofs of claim which included liquidated claims for the principal amounts plus accrued interest owing under the Crossover Bonds and NNCC Bonds plus an unliquidated amount in respect of additional fees, expenses and post-petition interest.

See "*Crossover Bondholder Claims Litigation*" and "*Settlement of the Allocation Dispute-Settlement and Support Agreement*" for a summary of the resolution of the Crossover and NNCC Bondholder Claims.

*1988 Bonds*

Pursuant to the Claims Procedure Order, the Indenture Trustee in respect of the 1988 Bonds filed a proof of claim which included liquidated claims for the principal amounts plus accrued interest owing under the 1988 Bonds, plus an unliquidated amount in respect of additional fees, expenses and post-petition interest. The 1988 Bondholder Claim amount was not settled under the Settlement and Support Agreement. However, pursuant to the Plan, no post-filing interest will be paid in respect of the 1988 Bondholder Claim.

*UKPI Claims*

On or about September 30, 2009, the Board of Trustees of NNUK's U.K. Pension Plan (the "**Trustee**") and the Pension Protection Fund (the "**PPF**" and with the Trustee, the "**UKPI**") filed proofs of claim against each of the Canadian Debtors in accordance with the Claims Procedure Order (the "**Original UKPI Proofs of Claim**"). Although a total liquidated claim amount was not specified, the Original UKPI Proofs of Claim filed by the Trustee against NNL claimed:

(a)     £495.25 million in respect of amounts alleged owing pursuant to a guarantee made by NNL in favour of the Trustee dated November 21, 2006 (the "**Funding Guarantee**");

(b)     $150 million in respect of amounts alleged owing pursuant to a guarantee made by NNL in favour of the Trustee dated December 21, 2007 (the "**Insolvency Guarantee**"); and

(c)     an unspecified placeholder claim in respect of liability owing pursuant to the "financial support direction" ("**FSD**")  regime under the U.K. Pensions Act 2004, as amended.

On November 29, 2010, UKPI filed amended proofs of claim against NNC and NNL (collectively, the "**Amended UKPI Proofs of Claim**" and with the Original UKPI Proofs of Claim, the "**UKPI Claims**"). The Amended UKPI Proofs of Claim did not specify a total liquidated claim amount, but did assert an FSD related claim of up to £2.1 billion against each of NNC and NNL. They were filed in addition to and did not replace the Original UKPI Claim against NNL in respect of the Funding Guarantee and the Insolvency Guarantee.  As alternatives to the FSD claim, the Amended UKPI Proofs of Claim also asserted an oppression claim under Canadian corporate law and a claim for a breach of an "implied obligation of good faith" under U.K. pension law. In its closing submissions at trial, the UKPI sought to establish claims against the Canadian Debtors estimated to be in excess of CA$18 billion.

See "*Settlement of the Allocation Dispute-Settlement and Support Agreement*" below for summary of resolution of the UKPI Claims.

**EMEA Claims Against the Canadian  Debtors**

On March 18, 2011, more than 80 proofs of claim were filed against the Canadian Debtors and their current or former Directors and Officers for and on behalf of the EMEA Debtors by the Joint Administrators and the French Liquidator (the "**EMEA Claims**") pursuant to the EMEA Claims Procedure Order.  Although not capable of precise quantification, the total amount of quantified EMEA Claims filed against NNL alone exceeded CA$9.8 billion.

The EMEA Claims included claims and allegations relating to: (i) inter-company trading debts; (ii) the implementation and operation of Nortel's transfer pricing regime; (iii) intercompany loans; (iv) an internal corporate reorganization known as "Project Swift"; (v) mismanagement; (vi) breach of fiduciary duty; (vii) the funding of the NNUK pension fund; (viii) customer revenue recognition; and (ix) the allocation of pre-Filing Date asset sale proceeds. The EMEA Claims were advanced under both Canadian and foreign laws (i.e. English, French, Irish and laws of 11 other European countries) and included allegations of, among other things, contractual breach, breach of duties, bankruptcy, insolvency and corporate law based claims and various tort based claims. They also included both unsecured claims and trust and/or proprietary claims to the Canadian Debtors' assets. Certain of these claims were also asserted against the Directors and Officers.

See "*The Allocation Dispute and the Allocation and Claims Litigation – Allocation and Claims Litigation - EMEA Claims Settlement*"  and "*Settlement of the Allocation Dispute-Settlement and Support Agreement*" below for summary of resolution of the EMEA Claims.

### Compensation Claims

The total value of Compensation Claims has previously been estimated by the Monitor in October 2013 to be approximately CA $1.084 billion, which amount was exclusive of the Compensation Claims of active employees but reflected a reduction for Termination Payments made.

## THE ALLOCATION DISPUTE AND THE ALLOCATION AND CLAIMS LITIGATION

### Allocation Protocol Negotiation Efforts and Phillips Mediation

Pursuant to the IFSA, the Estates were obligated to negotiate in good faith and attempt to reach agreement on a timely basis on a protocol for resolving disputes concerning the allocation of sale proceeds from sale transactions governed by the IFSA, which protocol was to provide binding procedures for the allocation of such sale proceeds where agreement had not been reached. From approximately mid-2009 into 2010, the Monitor, U.S. Debtors, the Joint Administrators and certain stakeholders, including the Bondholder Group, UCC and CCC engaged in negotiations regarding the terms of such a protocol. During the course of these negotiations it became apparent that the parties had differing views as to the proper scope of such a protocol and the parties agreed to cease negotiations and instead focus on a process to facilitate comprehensive settlement discussions of all inter-estate matters.

The Estates and certain of their stakeholders ultimately agreed this process would be aided by the appointment of Layn R. Phillips, a former U.S. federal district court judge and commercial arbitrator and mediator, to act as mediator (the "**Phillips Mediation**"). The first mediation sessions with Mr. Phillips took place over four days in November 2010 and continued over the course of a further four days in April 2011 before concluding unsuccessfully.

### Allocation Protocol Motions and Winkler Mediation

Following the failure of negotiations and the Phillips Mediation, the U.S. Debtors and Canadian Debtors (supported by the Monitor) brought parallel motions to the CCAA Court and the U.S. Court in June 2011 seeking approval of an allocation protocol ("**Allocation Protocol**") pursuant to which the CCAA Court and the U.S. Court would determine the allocation of the Sale

Proceeds amongst the Estates and certain other Nortel parties (the "**Allocation Dispute**") as well as the significant claims advanced against the Canadian Debtors and the U.S. Debtors by the EMEA Debtors.

Following the initial Allocation Protocol hearings on June 7, 2011, the CCAA Court and the U.S. Court ordered the parties to mediate the disputes raised in the Allocation Protocol hearings before former Chief Justice of Ontario Warren Winkler (the "**Winkler Mediation**"). Mediation sessions were held throughout the second half of 2012 and in January 2013. On January 24, 2013 Chief Justice Winkler declared that further efforts at mediation were no longer worthwhile.

**Fourth Estate Settlement Agreement**

In addition to the three Estates, various non-debtor Nortel affiliates in the Asia Pacific/Asia Central ("**APAC**") region and the Central America/Latin America ("**CALA**") region (the "**Fourth Estate Entities**") participated in the LOB transactions as sellers and were made party to certain of the distribution escrow agreements that govern the holding and distribution of the LOB sale proceeds. The consent of these parties was required to effect a consensual release of sale proceeds from a particular escrow account. As time passed without a resolution of the Allocation Dispute, this became an increasingly pressing issue for two reasons. First, in some cases, not having received their entitlement was preventing certain Fourth Estate Entities from commencing liquidation or wind-up proceedings and distributing any equity to their parent (being, in many cases, NNL). Second, the Fourth Estate Entities' potential entitlements to the global sale proceeds made the ongoing Allocation Dispute settlement discussions and mediation more complicated insofar as it involved a greater number of parties, and also made the mechanics of consensually distributing sale proceeds more complicated.

To address these issues, the Estates and the Fourth Estate Entities (among others) entered into the Allocation Settlement Agreement (APAC/CALA) dated June 19, 2012 (the "**Fourth Estate Settlement Agreement**"). Pursuant to this agreement, the Fourth Estate Entities agreed to settle their allocation entitlement for payments totalling $44.9 million. In addition, under the Fourth Estate Settlement Agreement, the parties agreed to fix both the pre-filing and post-filing balances owing amongst the Fourth Estate Entities and between the Fourth Estate Entities and the other Nortel parties, including fixing significant claims against NNL by Nortel Networks (China) Limited (approximately $104 million) and Nortel Networks Singapore Pte Ltd. (approximately $91 million). Further, in some cases certain Fourth Estate Entities agreed to direct some or all of their allocation entitlement to various inter-company creditors. The Canadian Debtors were the recipients of approximately $11.6 million under the Fourth Estate Settlement Agreement as a result of such payments.

**Allocation and Claims Litigation**

On March 7, 2013, the CCAA Court and the U.S. Court heard further argument regarding the appropriate forum to resolve the Allocation Dispute. Ultimately, the CCAA Court determined that it and the U.S. Court were the appropriate forums to determine the Allocation Dispute (rejecting the positions of the EMEA Debtors and the UKPI that the Allocation Dispute should be arbitrated) and ordered a trial start date of January 6, 2014, to hear the Allocation Dispute.

Given the overlap of evidence and certain issues between the Allocation Dispute, on the one hand, and the EMEA Claims and UKPI Claims, on the other, as well as the significance of each of these issues to the CCAA Proceedings and the other Nortel insolvency proceedings, the

Allocation Protocol proposed by the Canadian Debtors and the Monitor (and ultimately approved by the Courts) contemplated a joint discovery and litigation process to resolve the Allocation Dispute, EMEA Claims and UKPI Claims (the "**Allocation and Claims Litigation**").

Since the EMEA Debtors and the UKPI had also asserted claims against the U.S. Debtors substantially similar to the EMEA Claims and the UKPI Claims asserted against the Canadian Debtors, the Allocation Protocol contemplated a joint trial before both the CCAA Court and the U.S. Bankruptcy Court for all aspects of the Allocation and Claims Litigation.  The claims of the EMEA Debtors and the UKPI as against the U.S. Debtors ultimately settled in December 2013, and therefore only the Allocation Dispute was conducted by way of a joint trial.

### Trial and Court Decisions Regarding the Allocation Dispute

The opening and evidentiary phase of the Allocation Dispute joint trial began on May 12, 2014 and ended on June 24, 2014.  Closing arguments were heard on September 22 through 24, 2014.

On May 12, 2015, the CCAA Court issued its Reasons for Judgment and the U.S. Court issued its Allocation Trial Opinion (collectively, the "**Allocation Decisions**" and each an "**Allocation Decision**") in respect of the Allocation Dispute. The Allocation Decisions provide for a modified pro rata allocation of the Lockbox Funds amongst the Canadian Debtors, the U.S. Debtors and the EMEA Debtors which pro rata allocation was to be based on the estimated claims into each Estate as determined by the Courts.

### Reconsideration Motions and Appeals

At a June 25, 2015 joint hearing, the CCAA Court and the U.S. Court heard motions for clarification, reconsideration or amendment of the Allocation Decisions brought by the U.S. Debtors, the Bondholder Group and Law Debenture Trust Company of New York. On July 6, 2015, the CCAA Court issued a Ruling on Reconsideration/Clarification Motion and the U.S. Court issued a Memorandum Order on Motions for Reconsideration that denied most of the relief requested.

On July 16, 2015, the U.S. Debtors, UCC, Bondholder Group, Nortel U.S. Trade Claims Consortium (as defined in the Settlement and Support Agreement), Bank of New York Mellon and Conflicts Administrator (the "**Moving Parties**") filed motions to the Ontario Court of Appeal for leave to appeal the CCAA Court's Allocation Decision. On May 3, 2016, the Ontario Court of Appeal denied the motions seeking leave to appeal the CCAA Court's Allocation Decision. The Moving Parties have sought leave to appeal the Ontario Court of Appeal's decision to the Supreme Court of Canada. In light of the continuing discussions regarding resolution of the Allocation Dispute, pursuant to a consent order of the Supreme Court of Canada dated August 17, 2016, the time period for serving and filing any responses to the Moving Parties' leave applications to the Supreme Court of Canada was extended to November 30, 2016, or such earlier date as may be compelled by the service by a Moving Party of a notice requiring responses within 30 days.

Appeals of the U.S. Court's Allocation Decision were also filed by the Moving Parties as well as the Pension Benefit Guaranty Corporation. The Canadian Debtors and Monitor, Joint Administrators and CCC have also filed contingent cross-appeals of the U.S. Court's Allocation Decision solely to preserve arguments on appeal in the event the U.S. Court's Allocation Decision is altered on appeal. Contemporaneously with filing their notices of appeal, the

Canadian Debtors and the Monitor, joined by the CCC, filed a motion for certification of the U.S. Court's Allocation Decision for direct appeal to the United States Court of Appeals for the Third Circuit (the "**Third Circuit**") and a motion for leave to appeal on the basis that the U.S. Court's Allocation Decision is interlocutory but the appeal should be permitted because it would advance the final resolution of the Allocation Dispute and conclusion of the CCAA Proceedings and the Chapter 11 Proceedings.  On July 30, 2015, the U.S. Court entered an order denying certification of the U.S. Court's Allocation Decision for direct appeal to the Third Circuit.

Oral argument on the appeals of the U.S. Court's Allocation Decision were heard by the United States District Court for the District of Delaware (the "**District Court**") on April 5, 2016. Following the Ontario Court of Appeal's denial of leave to appeal the CCAA Court's Allocation Decision, in May 2016, the District Court, on its own motion, certified the U.S. allocation appeals, including the contingent cross-appeals, directly to the Third Circuit. In light of the continuing discussions regarding resolution of the Allocation Dispute and related matters, at a status hearing with judges of the Third Circuit held September 7, 2016, the parties to the appeal sought an extension of time to report back to the Third Circuit on various matters relating to briefing and a timeline for the appeal. All parties' rights to seek or oppose expediting the appeal in the Third Circuit were preserved through that date.  The parties have since notified the Third Circuit as to the execution of the Settlement and Support Agreement and requested that the appeal and all timelines thereunder be stayed pending the effectiveness of the Settlement and Support Agreement and the Canadian and U.S. Plans.

### The Farnan Mediation

On July 13, 2015, pursuant to its standing order directing all bankruptcy appeals to mediation, the District Court requested that the parties submit a joint statement regarding their positions on mediation and defer briefing of the appeal until resolution of the mediation. Consistent with the U.S. Federal Rules of Bankruptcy Procedure, the parties to the appeal filed statements of issues on appeal and designated items for the record on appeal.

On July 27, 2015, the Monitor and Canadian Debtors and the other parties to the appeal submitted a joint statement expressing their respective views on mediation. On August 25, 2015, the Magistrate Judge assigned to determine the appropriateness of mediation pursuant to the District Court's standing order scheduled a status conference for September 2, 2015, for the purpose of discussing details of the mediation, including selection of a mediator, length of mediation and adoption of protocols to govern the conduct of the mediation. The parties to the appeal ultimately submitted a joint mediation proposal to the Magistrate Judge and a mediation began in late October 2015 before retired Chief Judge Joseph J. Farnan (the "**Farnan Mediation**").

### EMEA Claims Settlement

The EMEA Claims in Canada were settled just prior to the commencement of the EMEA Claims and UKPI Claims trial for a maximum admitted general unsecured claim against NNL of $125 million.  Pursuant to the Plan, certain of the EMEA Debtors have aggregate Proven Affected Unsecured Claims of $100 million and a $25 million Contingent Additional NNUK Claim which Claim may become a Proven Affected Unsecured Claim if certain conditions are met.

The CCAA Court approved the settlement of the EMEA Claims pursuant to an Order dated July 16, 2010.  The settlement also resulted in the withdrawal and/or discontinuation of proceedings

pending against the Canadian Debtors and certain former Nortel Directors and Officers in the U.K., France and Ireland.

### Trial Decision Regarding the UKPI Claims

The opening and evidentiary phase of the UKPI Claims trial took place between July 7, 2014, and July 22, 2014. Closing arguments were heard September 29 through October 1, 2014.

By decision dated December 9, 2014, the CCAA Court upheld the Monitor's disallowance of the billions of dollars of claims asserted by the UKPI against NNL and the Other Canadian Debtors. The CCAA Court allowed a single claim against NNL pursuant to the Funding Guarantee in the amount of £339.75 million, which amount was approximately £152 million less than the amount sought by the UKPI on account of such claim.

The UKPI sought and was granted leave to appeal the UKPI Claims trial decision with respect to the disallowance of the Swift Guarantee. The Monitor and the Canadian Debtors filed a cross-appeal with respect to the allowance of the Funding Guarantee claim and a cross-cross appeal was filed by the UKPI with respect to the quantum under the Funding Guarantee claim.

The various appeals and motions seeking leave to appeal were heard by the Court of Appeal on February 17 and 18, 2016.  The UKPI's motion seeking leave to cross-cross appeal on the quantum of the Funding Guarantee was denied from the bench.  Decisions on the UKPI's appeal in respect of the Swift Guarantee and the Canadian Debtors and Monitor's cross-appeal  are under reserve. In light of the Settlement and Support Agreement (which resolves the UKPI Claim), the Monitor and the UKPI have requested that the Court of Appeal reserve its decision until further notice from the parties.

### Crossover Bondholder Claims Litigation

During the course of the Allocation Dispute, the CCAA Court and the U.S. Court directed a joint hearing to determine whether the Crossover Bondholders and the NNCC Bondholders were entitled to claim amounts under the respective trust indentures beyond principal and pre-filing interest amounts.  At the time, the Monitor estimated the Post-Filing Date interest potentially claimable by the Crossover Bondholders and NNCC Bondholders to be approximately $1.6 billion (if claimed at the contractual rate). The Monitor opposed the ability of the Crossover Bondholders and the NNCC Bondholders to claim amounts in excess of $4.092 billion (being principal plus pre-filing accrued interest), including any interest accruing after the Filing Date.

On August 19, 2014, the CCAA Court issued an Endorsement holding and declaring that the Crossover Bondholders and NNCC Bondholders are not legally entitled to claim or receive any amounts under the trust indentures above and beyond the outstanding principal debt and pre-filing interest (namely, above and beyond $4.092 billion). On September 9, 2014, the Bondholder Group filed a motion seeking leave to appeal the CCAA Court's Order in respect of the claims of the Crossover Bondholders. On November 27, 2014, the Ontario Court of Appeal denied leave to appeal on two of three issues on which the Bondholder Group sought leave to appeal and granted leave to appeal on one issue, namely whether the Crossover Bondholders were legally entitled to post-filing interest and other amounts owing under the Trust Indentures for the post-filing period. The Bondholder Group's appeal was heard on April 29, 2015. On October 13, 2015, the Ontario Court of Appeal dismissed the Bondholder Group's appeal. The Bondholder Group subsequently sought leave to appeal the Ontario Court of Appeal's decision

to the Supreme Court of Canada. On May 5, 2016, the Supreme Court of Canada dismissed the Bondholder Group's application for leave to appeal.

In the U.S., the hearing was adjourned after the U.S. Debtors announced they had entered into a settlement with certain bondholders resolving post-filing interest. The Monitor and Canadian Debtors unsuccessfully objected to the settlement and subsequently pursued an appeal of the decision to approve the settlement. The parties have notified the U.S. Court as to the execution of the Settlement and Support Agreement and requested that the appeal and all timelines thereunder be stayed pending the effectiveness of the Settlement and Support Agreement and the Canadian and U.S. Plans.

**Settlement of the Allocation Dispute – Settlement and Support Agreement**

*Settlement Discussions*

Following the cessation of the formal Farnan Mediation, the Canadian Debtors, U.S. Debtors, EMEA Debtors, Monitor and certain other key stakeholders continued to meet and discuss resolution of the Allocation Dispute and related matters, including with the assistance of Judge Farnan in some cases, which has led to the execution of the Settlement and Support Agreement.

*Settlement and Support Agreement*

On October 12, 2016 the Settlement and Plans Support Agreement ("**Settlement and Support Agreement**") was signed by the Canadian Debtors, Monitor, U.S. Debtors, EMEA Debtors, EMEA Non-Filed Entities, Joint Administrators, NNSA, NNSA Conflicts Administrator, French Liquidator, Bondholder Group, the members of the CCC, UCC, UKPI, Joint Liquidators and NNCC Bondholder Signatories (collectively, the "**Settlement Parties**"). A copy of the Settlement and Support Agreement is attached as Exhibit "A" to the Plan and also available on the Monitor's Website.

The Settlement and Support Agreement, when implemented, will fully and finally settle the Allocation Dispute and certain key potential claims among the Settlement Parties. By resolving all of the outstanding issues between the Estates as well as the claims of certain key creditors, it is believed that the Estates will be able to proceed with the final stages of their respective insolvency proceedings on a timely basis instead of expending continued efforts on lengthy and costly appeals in the Allocation Dispute, UKPI Claims litigation and Crossover Bondholder and NNCC Bondholder post-filing interest litigation, among other disputes and potential disputes.

In summary, the Settlement and Support Agreement would resolve the Allocation Dispute by allocating the escrowed sale proceeds among the three Estates as follows:

(a)      payment of the Iceberg Amendment Fee in the amount of $2.8 million to NNI and $2.2 million to NNUK, and, in settlement of the M&A Cost Reimbursement, payments in the amount of $20 million to the U.S. Debtors and $35 million to the Canadian Debtors; then,

(b)      to the Canadian Debtors: 57.1065% (being $4,142,665,131 as at July 31, 2016) (the "**Canadian Allocation**");

(c)      to the U.S. Debtors: 24.350% (being $1,766,417,002 as at July 31, 2016);

(d)    to the EMEA Debtors (excluding NNUK and NNSA): 1.4859% (being $107,778,879 as at July 31, 2016);

(e)    to NNUK: 14.0249% (being $1,017,408,257 as at July 31, 2016); and

(f)    to NNSA: $220,000,000.[2]

Other key aspects of the Settlement and Support Agreement as relates to the Canadian Debtors include as follows:

- it is contemplated the Canadian Debtors shall be substantively consolidated into one Canadian Estate;

- the Canadian Estate shall make priority payments to NNI in the amounts of $62.7 million (in payment of the Remaining Revolver Claim under the CFSA) and $77.5 million (resolving obligations under the Side Letters and the T&T Claim (each as defined in the Settlement and Support Agreement), and upon receipt by NNI of the $77.5 million payment, NNI shall have a 27% interest in the Cascade Trust and the Canadian Estate shall have a 73% interest in the Cascade Trust;

- the Canadian Estate shall retain the value of its remaining assets, which means, among other things, the release to the Canadian Estate of approximately $237 million of the proceeds from the Canada Only Sales plus further amounts in respect of the sale of the IP Addresses currently held as Unavailable Cash for the benefit of the Canadian Estate;

- the following claims will be allowed as Proven Affected Unsecured Claims against the Canadian Estate:

  o   in accordance with the CFSA and as previously approved by the CCAA Court, the Canadian Debtors shall allow an unsecured claim by NNI in the amount of $2.0 billion, which claim is not subject to set-off, off set, deduction, counterclaim, reduction, or challenge as to amount or validity;

  o   in accordance with the EMEA Claims Settlement Agreement and as previously approved by the CCAA Court, the Canadian Debtors shall allow an unsecured claim by NNUK in the amount of $97,655,094, which may increase to US$122,655,094 under conditions set out in that agreement, and an unsecured claim by Nortel Networks SpA in the amount of $2,344,906;

  o   In accordance with the CCAA Court's decision, UKPI shall be allowed a single unsecured claim against the Canadian Estate in the amount of £339.75 million (being $494,879,850 when converted to U.S. dollars in accordance with the Plan) in settlement of any and all of the UKPI Claims;

  o   The Canadian Pension Claims shall be for a total of CA$1,889,479,000;[3]

---

[2] The allocation amounts set forth above are subject to certain potential adjustments as further specified in the Settlement and Support Agreement.

- o  The Crossover Bondholder Claim shall be $3,940,750,260; and

- o  the NNCC Bondholder Claim shall be $150,951,562;

- the U.S. Debtors and the Canadian Debtors shall treat all unsecured claims against them rateably;

- once a holder of a Crossover Claim has received aggregate distributions equal to 100% of its claim, the guarantor Estate shall be entitled to subrogate to any subsequent distributions by the principal Estate in respect of that creditor's claim on a *pari passu* basis with other creditors of the same priority, to the extent of the amount paid by the guarantor Estate, and subject to certain additional restrictions in certain instances;

- no post-petition interest will be included on any creditor claims or paid by any Estate (with certain limited exceptions required by Applicable Law with respect to the EMEA Debtors);

- solely for determining *pari passu* distributions in respect of unsecured claims against the Canadian Estate, all non-U.S. dollar denominated claims against the Canadian Estate will be converted to U.S. Dollars at the prevailing exchange rate reported by Reuters on January 14, 2009;

- distributions on claims against the Canadian Estate predominantly denominated in Canadian dollars will be paid from the Canadian Estate in Canadian dollars, and distributions on all other claims shall be paid in U.S. dollars;

- the Canadian Debtors have elected to convert a portion of the sale proceeds, not to exceed $1.2 billion, into Canadian dollars, in advance of the effective date of the Plan, for the purpose of paying distributions on the predominantly Canadian dollar denominated claims on and after Plan implementation;

- the Canadian Debtors and the U.S. Debtors (other than NNIII) shall both propose Plans implementing the terms of the Settlement and Support Agreement as relates to their respective Estates for approval by vote of affected unsecured creditors and approval of their respective Courts;

- the Settlement Parties shall dismiss all litigation and release all other claims among them, subject to the terms and conditions contained in the Settlement and Support Agreement; and

- the Settlement Parties will not take any action that interferes with the implementation of the Settlement and Support Agreement or the Canadian or U.S. Plans.

Since the execution of the Settlement and Support Agreement, Crossover Bondholders holding Crossover Bonds in the principal amount of approximately $3 billion representing approximately 80% of the principal amount of the Crossover Bonds and NNCC Bondholders holding NNCC Bonds in the principal amount of approximately $135,665,000 representing approximately 90%

---

[3] Pursuant to the Plan, the Canadian Pension Claims shall be Proven Affected Unsecured Claims in the following amounts: (a) on account of the Managerial Plan: CA$1,368,644,000; and (b) on account of the Negotiated Plan: CA$520,835,000.

of the principal amount of the NNCC Bonds have executed and delivered Creditor Joinders indicating their support of the Settlement and Support Agreement.

*Currency Conversion*

As set out above, pursuant to the Settlement and Support Agreement and the Plan, distributions made by the Canadian Debtors on account of Proven Affected Unsecured Claims that are predominantly denominated in Canadian dollars will be paid in Canadian dollars and distributions on all other Proven Affected Unsecured Claims will be paid in U.S. dollars. In order to facilitate this provision of the Settlement and Support Agreement and to crystallize certain aspects of the economic resolution, the parties agreed to convert up to $1.2 billion of the Sale Proceeds from U.S. dollars to Canadian dollars and deposit such proceeds with a Canadian escrow agent. The parties also agreed to potentially convert certain Sale Proceeds from U.S. dollars to Sterling and Euros in respect of potential distributions or payments to creditors of the EMEA Debtors, although no such conversions are currently contemplated.

On October 19, 2016, the Monitor sought and obtained an Order (the "**Canadian Currency Conversion Order**") from the CCAA Court that, among other things, authorized the Canadian Debtors and the Monitor to enter into and perform their obligations under a Canadian escrow agreement with a subsidiary of Royal Bank of Canada (the "**Canadian Distribution Agent**") and authorized the conversion of up to $1.2 billion of the Sale Proceeds into Canadian dollars. On October 21, 2016, the U.S. Court also issued an order (together with the Canadian Currency Conversion Order, the "**Currency Conversion Orders**") approving the entering into of the Canadian escrow agreement and the conversion of up to $1.2 billion of the Sale Proceeds into Canadian dollars.

Pursuant to the Currency Conversion Orders, on October 24, 2016, directions were issued to the U.S. Distribution Agent to transfer approximately $1.06 billion to the Canadian Distribution Agent. The funds have been transferred and converted from U.S. dollars to Canadian dollars at a blended foreign exchange rate of $1.00 = CA$1.337650. The blended foreign exchange rate at which such funds together with any other funds transferred are converted from U.S. dollars to Canadian dollars shall constitute the Applicable F/X Rate for the Plan. In accordance with the terms of the Canadian escrow agreement, funds that have been received and converted were invested in Government of Canada treasury bills.

## DESCRIPTION OF THE PLAN

*A copy of the Plan is available on the Monitor's Website under the heading "Plan and Other Creditor Meeting Documents". A Glossary of certain terms used in the Plan is included on Schedule "B" hereto. The Glossary and the following summary of certain material terms of the Plan are included for reference purposes only. Creditors are urged to read the Plan in its entirety.*

## Purpose of the Plan

The purpose of the Plan is to (a) effectuate and implement the terms of the Settlement and Support Agreement, including the settlement of the Allocation Dispute and certain other claims, disputes and other matters contemplated therein, the release of the Sale Proceeds to the Canadian Debtors, the U.S. Debtors and the EMEA Debtors as provided for therein, and the payment contemplated pursuant to Section 4(e) of the Settlement and Support Agreement; (b) provide for

the substantive consolidation of each of the Canadian Debtors into the Canadian Estate on the terms contemplated by the Plan; (c) provide for payment in full of the Proven Priority Claims; (d) provide for a pro rata distribution or distributions from the Canadian Estate to holders of all Proven Affected Unsecured Claims; and (e) effect a release and discharge of all Affected Claims and Released Claims.

**Substantive Consolidation**

The Plan requires and will result in the substantive consolidation of all assets of, and Claims (excluding Canadian Intercompany Claims) against, the Canadian Debtors.  All assets and rights of the Canadian Debtors (excluding Canadian Intercompany Claims) will become the assets of the Canadian Estate.  All Canadian Intercompany Claims, being intercompany Claims between and among the Canadian Debtors themselves, will not be entitled to vote on or receive distributions under the Plan but shall otherwise not be affected, impaired or settled by the Plan.

Creditors shall not be allowed to have Duplicative Claims against the Canadian Estate.  To the extent that, absent substantive consolidation and the Plan, an Affected Unsecured Creditor would have had Duplicative Claims against more than one of the Canadian Debtors, the Affected Unsecured Creditor will be entitled to one Proven Affected Unsecured Claim equal to the amount of the largest Duplicative Claims.  The resolution of Crossover Claims (defined below) shall be coordinated between the Canadian Debtors and the U.S. Debtors, and creditors holding Crossover Claims against the Canadian Debtors and U.S. Debtors shall not be entitled to receive more than 100% of their Creditor's Maximum after taking into account distributions from both the Canadian Estate and the U.S. Debtors.  Creditors holding Proven Affected Unsecured Claims against more than one Canadian Debtor where such Proven Affected Unsecured Claims are based on separate and distinct underlying debts shall have one Proven Affected Unsecured Claim against the Canadian Estate in the aggregate amount of all such separate and distinct Proven Affected Unsecured Claims;

**Classification of Creditors**

The only class of Creditors for the purposes of considering and voting on the Plan will be the Affected Unsecured Creditors Class.

**Allocation and Distribution of Sale Proceeds**

The Plan and contemplated orders will authorize the Canadian Debtors and the Monitor to direct the Escrow Agents to effect the allocation and distribution of the Sale Proceeds as follows:[4]

(a)     payment of the Iceberg Amendment Fee in the amount of $2.8 million to NNI and $2.2 million to NNUK, and, in settlement of the M&A Cost Reimbursement, payments in the amount of $20 million to the U.S. Debtors and $35 million to the Canadian Debtors, then;

(b)     after making the payments described in (a) above, the balance of the Sale Proceeds will be paid as follows:

---

[4] For the avoidance of doubt, all distributions from the Escrow Accounts shall be strictly in accordance with the Settlement and Support Agreement. To the extent that there is any conflict between the provisions of the Settlement and Support Agreement and the Plan as it relates to distributions from the Escrow Accounts, the provisions of the Settlement and Support Agreement shall govern in all respects.

(i)      to Canadian Debtors: 57.1065% (being $4,142,665,131 as at July 31, 2016)

(ii)     to the U.S. Debtors: 24.350% (being $1,766,417,002 as at July 31, 2016);

(iii)    to the EMEA Debtors (excluding NNUK and NNSA): 1.4859% (being $107,778,879 as at July 31, 2016);

(iv)    to NNUK: 14.0249% (being $1,017,408,257 as at July 31, 2016); and

(v)     to NNSA: $220,000,000.

## Release of Canada Only Sale Proceeds and other Restricted or Unavailable Cash

On the Plan Effective Date, all amounts held by NNL pursuant to the Canada Only Sale Proceeds Orders or otherwise held as Unavailable Cash by the Canadian Debtors shall be released to the Canadian Estate without any restriction whatsoever, and shall be used to fund the distributions and reserves contemplated under the Plan. The estimated amount to be released is approximately $237,000,000 plus an additional amount in respect of the sale of the IP Addresses. Restricted cash held in the trust established for certain Directors and Officers at the outset of the CCAA Proceedings will remain restricted and not available for distribution at this time. Additionally, funds in the HWT will continue to be distributed pursuant to the terms of the Employee Settlement Agreement and are not affected by the terms of the Plan.

## Treatment of Claims Pursuant to the Plan

### *Affected Unsecured Claims*

In full and final satisfaction of its Claim, an Affected Unsecured Creditor that has a Proven Affected Unsecured Claim will be entitled to receive its Pro-Rata Share as calculated by the Monitor prior to the Initial Distribution Date and each subsequent Distribution Date.[5]

For the purposes of the Plan, an Affected Unsecured Creditor's Pro-Rata Share is:

***Pro-Rata Share***: as at any Distribution Date with respect to an Affected Unsecured Creditor with a Proven Affected Unsecured Claim, the product of (A/B) x C where:

A = the Proven Affected Unsecured Claim of such Affected Unsecured Creditor stated in U.S. dollars (with all non-U.S. dollar denominated Proven Affected Unsecured Claims, or portions thereof, being converted to U.S. dollars in the manner specified in Section 6.4(a) of the Plan);

B = the total of all Proven Affected Unsecured Claims stated in U.S. dollars (with all non-U.S. dollar denominated Proven Affected Unsecured Claims, or portions thereof, being converted to U.S. dollars in the manner specified in Section 6.4(a) of the Plan); and

C = the total amount of Cash in the Affected Unsecured Creditor Pool stated in U.S. dollars (with all Canadian dollar denominated Cash being valued in U.S. dollars in the manner specified in Section 6.4(b)) of the Plan,

---

[5] In order to determine what currency will be used to make distributions, see the sub-heading "*Currency Conversion Matters*" below.

> provided that distributions on CAD Claims shall be paid in Canadian dollars, with the amount of such distribution in U.S. dollars being converted to Canadian dollars at the Applicable FX Rate, all as contemplated in Section 6.4(c) of the Plan.

In order to give effect to the payment of the Bondholder Fee Amount (see *Implementation of the Plan – Continuing Administration and Wind-Down of the Canadian Estate and Related Matters – Creditor Fee Arrangements*"), solely for purposes of determining the Pro-Rata Share of Affected Unsecured Creditors and amounts to be distributed on the Initial Distribution: (a) the total amount of Cash in the Affected Unsecured Creditor Pool shall be deemed to be increased by the Bondholder Fee Amount; (b) the Pro-Rata Share of each Affected Unsecured Creditor with a Proven Affected Unsecured Claim (excluding the Crossover Bondholders and the NNCC Bondholders) shall be its Pro-Rata Share calculated as if an amount equal to the Bondholder Fee Amount was included in the Affected Unsecured Creditor Pool (with such additional entitlement being funded from the deduction on distributions to Crossover Bondholders and NNCC Bondholders contemplated in Section 3.4(b)(iii) of the Plan); and (c) the aggregate Pro-Rata Share on account of the Crossover Bondholder Claims and NNCC Bondholder Claims shall be: (x) the aggregate Pro-Rata Share on account of the Crossover Bondholder Claims and NNCC Bondholder Claims calculated as if an amount equal to the Bondholder Fee Amount was included in the Affected Unsecured Creditor Pool, <u>minus</u> (y) the Bondholder Fee Amount. The Additional Bondholder Fee Amount may also be deducted from distributions to Crossover Bondholders and NNCC Bondholders as contemplated pursuant to Section 4.11 of the Plan.

### Certain Proven Affected Unsecured Claims

As contemplated by the Settlement and Support Agreement, the following Claims shall be allowed as Proven Affected Unsecured Claims under the Plan:

- The Canadian Pension Claims of CA\$1,368,644,000 in respect of the Managerial Plan and CA\$520,835,000 in respect of the Negotiated Plan;

- Crossover Bondholder Claims in the total amount of \$3,940,750,260;

- NNCC Bondholder Claims in the total amount of \$150,951,562;

- The UKPI Claim of £339,750,000 (being \$494,879,850 when converted to U.S. dollars in accordance with the Plan); and

- The Intercompany Claims listed on Schedule "C" to the Plan.

The Plan also affirms the Proven Affected Claims of NNI in respect of the NNI Claim and the Proven Affected Unsecured Claims of EMEA in respect of the EMEA Claims previously allowed pursuant to prior Orders of the CCAA Court.

### Other Affected Claims

Equity Claims are Affected Claims under the Plan; however, Equity Claimants or other holders of Equity Interests are not entitled to vote at the Meeting or receive distributions under the Plan. All Equity Claims shall be fully and finally released on the Plan Effective Date provided that

nothing in the Plan impacts NNL's shares held by NNC or any shares held by NNC, NNL or any other Canadian Debtor of any other entity. In addition, NNC's common shares and NNL's preferred shares shall not be cancelled and shall remain issued and outstanding following the Plan Effective Date, it being understood that in no circumstance shall the holders of such Equity Interests be entitled to any distribution or other consideration pursuant to the Plan.

The Canadian Debtors have publicly indicated that they do not expect that there will be any value for their shareholders. However, out of an abundance of caution, the Plan provides that in the event that all obligations of the Canadian Estate owing to Creditors are satisfied in full, including the payment in full of all Proven Affected Unsecured Claims and such other amounts as may be determined to be payable to Creditors in the event of the solvency of the Canadian Estate, the holders of Equity Interests in NNC and NNL will, following payment of all amounts owing to Creditors in full and subject to further order of the CCAA Court, have an entitlement to any remaining Available Cash or other assets of the Canadian Estate in accordance with their respective legal entitlements based on the terms of such Equity Interests.

Director/Officer Claims are Affected Claims under the Plan. Creditors with Director/Officer Claims, if any, will not be entitled to vote or receive distributions under the Plan on account of their Director/Officer Claims.  To the extent that any part of a Director/Officer Claim is a Non-Released Claim that part of the Director/Officer Claim will not be compromised, released, discharged, cancelled or barred. The Directors' Charge shall be discharged and expunged on the Plan Effective Date and all rights of the Directors and Officers pursuant to paragraphs 20 and 21 of the Initial Order shall be released and discharged on the Plan Effective Date.

### *Proven Priority Claims and Other Payments under the Plan*

Under the Plan the Canadian Estate shall satisfy certain Proven Priority Claims and other payment obligations under the Settlement and Support Agreement as follows: (i) within five (5) Business Days of the Plan Implementation Date, pay to NNI the amounts of $62.7 million (in satisfaction of the Remaining Revolver Claim under the CFSA) and $77.5 million (in satisfaction of the payment contemplated by Section 4(e) of the Settlement and Support Agreement, which payment shall not be subject to set-off pursuant to Section 3.13 of the Plan) (the "**NNI Payments**"); and (ii) on the Initial Distribution Date, distribute CA$3,000 to each of the Former Employee Priority Creditors in full satisfaction of the Canadian Estate's obligations for their Termination Payments.

*No Double-Recovery*

In no circumstance shall a Creditor receive aggregate distributions from the Canadian Estate and any other Nortel entity on account of a Proven Affected Unsecured Claim in excess of 100% of the amount of such Proven Affected Unsecured Claim, including in respect of a Crossover Claim. For the avoidance of doubt, as it relates to Crossover Claims, to determine the maximum recovery available to holders of Crossover Claims, the greater of such Creditor's (a) Allowed Claim (as defined in the U.S. Plans) against a U.S. Debtor; and (b) its Proven Unsecured Claim against the Canadian Estate shall be used.

"Crossover Claims" has the meaning given to it in the Plan and means Claims in respect of a debt owing by one or more of the Canadian Debtors or U.S. Debtors, and guaranteed by a Canadian Debtor or U.S. Debtor in the other Estate.

*Currency Conversion Matters*

The Plan contemplates currency conversion in a number of contexts. Certain aspects are summarized below:

| Purpose | Method |
|---|---|
| • Voting on the Plan<br><br>• Calculating the Required Majority<br><br>• Other calculations where indicated in the Plan that involve a totalling of or comparison to all Affected Unsecured Claims or including Proven Affected Unsecured Claims, including in factors A and B of the calculation of any Pro-Rata Share | • U.S. dollar Claims: no conversion necessary.<br><br>• All non-U.S. dollar denominated Claims will be converted to U.S. dollars at the exchange rates set out on Schedule "C" hereto (being also Schedule "D" to the Plan). For the avoidance of doubt, all dollar amounts that are not Canadian dollar amounts or U.S. dollar amounts shall first be converted into Canadian dollar amounts pursuant to Schedule "C" and then converted to U.S. dollar amounts pursuant to Schedule "C". |
| For the purposes of determining factor C of any Pro-Rata Share calculations | Any Canadian dollar denominated Cash in the Affected Unsecured Creditor Pool shall be valued in U.S. dollars at: (i) in the case of Canadian dollar denominated Cash received by the Canadian Estate from the Canadian Dollar Escrow Account, the Applicable FX Rate; and (ii) in the case of all other Canadian dollar denominated Cash held or received by the Canadian Estate, the then applicable foreign exchange rate between Canadian and U.S. dollars at the time of making the Pro-Rata Share calculation.<br><br>All Canadian dollar denominated Cash in the |

| Purpose | Method |
|---|---|
| | Affected Unsecured Creditor Pool and distributed on account of CAD Claims shall be deemed to first be taken and made from the Canadian dollar denominated Cash received by the Canadian Estate from the Canadian Dollar Escrow Account. |
| Distributions to Affected Unsecured Creditors in respect of Proven Affected Unsecured Claims | Distributions will be made in the following currencies:<br><br>• CAD Claims will be paid from the Canadian Estate in Canadian dollars. The calculation of the distribution made on account of any such CAD Claim will be as set out in the definition of "Pro-Rata Share".<br><br>• For Proven Affected Unsecured Claims that are not CAD Claims:<br><br>    o U.S. dollar Proven Affected Unsecured Claims shall be paid in U.S. dollars.<br><br>    o A Proven Affected Unsecured Claim in any other currency shall be paid in U.S. dollars. |

### *Unaffected Claims*

The Plan does not affect Unaffected Creditors. Unaffected Creditors will not receive any consideration or distributions under the Plan in respect of their Unaffected Claims (except to the extent their Unaffected Claims are paid in full in accordance with the express terms of the Plan or, with respect to Post-Filing Claims, as may be ordered by the CCAA Court), and they shall not be entitled to vote on the Plan in respect of their Unaffected Claims.

Insured Claims are Unaffected Claims under the Plan.  Insured Claims shall not be compromised, released, discharged, cancelled or barred by the Plan, provided that from and after the Plan Effective Date, any Person having an Insured Claim shall be irrevocably limited to recovery in respect of such Insured Claim solely from the proceeds of the applicable Insurance Policies, and Persons with any Insured Claims shall have no right to, and shall not, directly or indirectly, make any claim or seek any recoveries from any Person, other than enforcing such Person's rights to be paid by the applicable insurer(s) from the proceeds of the applicable Insurance Policies.

Nothing in the Plan shall prejudice, compromise, release or otherwise affect any right or defence of any insurer or insured in respect of an Insured Claim.

*Unresolved Affected Unsecured Claims*

No Affected Unsecured Creditor shall be entitled to receive any distribution under the Plan with respect to an Unresolved Affected Unsecured Claim unless and until such Claim is finally resolved in the manner set out in the applicable Claims Order and becomes a Proven Affected Unsecured Claim entitled to the treatment described in Section 3.4 of the Plan.  A distribution shall be paid from the Unresolved Claims Reserve pursuant to Section 6.5 of the Plan, in respect of any Unresolved Affected Unsecured Claim that is finally determined to be a Proven Affected Unsecured Claim in accordance with the applicable Claims Order. However: (i) NNUK shall be entitled to receive distributions under the Plan on account of the Proven NNUK Claim pending final resolution of the Contingent Additional NNUK Claim; and (ii) Compensation Creditors holding Unresolved Affected Unsecured Claims shall be entitled to receive distributions on account of such Unresolved Affected Unsecured Claims solely to the extent portions thereof have been admitted or proven pursuant to the Compensation Claims Procedure Order.

**Plan Releases**

On the Plan Effective Date: (i) the Canadian Debtors (including the Canadian Estate) and their respective current and former employees, auditors, financial advisors, legal counsel and agents (in each case, in that capacity only); (ii) the Directors and Officers; and (iii) the Monitor, the Monitor's legal counsel, and each and every current and former shareholder, affiliate, affiliate's shareholder, director, officer, member (including members of any committee or governance council), partner, employee, auditor, financial advisor and agent of any of the foregoing Persons (in each case, in that capacity only) (each of the Persons specified in (i), (ii) or (iii), in their capacity as such, being herein referred to individually as a "**Released Party**" and collectively referred to as the "**Released Parties**") shall be fully, finally and irrevocably released and discharged from any and all Released Claims and all Released Claims shall be fully, finally, irrevocably and forever waived, discharged, released, cancelled and barred as against the Released Parties, all to the fullest extent permitted by Applicable Law. Nothing in the Plan shall release Non-Released Claims.

For the purposes of the foregoing:

> "**Released Claims**" means any and all demands, claims, actions, causes of action, counterclaims, suits, debts, sums of money, liabilities, accounts, covenants, damages, judgments, orders (including for injunctive relief or specific performance and compliance orders), expenses, executions, Encumbrances and recoveries on account of any liability, obligation, demand or cause of action of whatever nature, including claims for contribution or indemnity, which any Creditor or other Person has or may be entitled to assert (including any and all of the foregoing in respect of the payment and receipt of proceeds and statutory or common law liabilities of directors or officers, and any alleged fiduciary, statutory or other duty (in any capacity whatsoever)), whether known or unknown, matured or unmatured, direct, indirect or derivative, at common law, equity or under statute, foreseen or unforeseen, existing or hereafter arising, based in whole or in part on any act, omission, transaction, duty, responsibility, indebtedness, liability, obligation, dealing, matter or occurrence existing or taking place on or prior to the Plan Effective Date, or such later date as actions are taken to implement the Plan, that in any way relate to, or arise out of or in connection with, any Claims, any Director/Officer Claims, the business and affairs of the Canadian Debtors or the Nortel Group whenever,

wherever or however conducted, the administration and/or management of the Canadian Debtors or the Nortel Group, the CCAA Proceedings or any matter or transaction involving any of the Canadian Debtors occurring in or in connection with the CCAA Proceedings, including the Plan or the development thereof, but excluding Non-Released Claims; and

"**Non-Released Claims**" means, collectively: (i) the Canadian Estate's obligations under the Plan (including the right of Affected Unsecured Creditors to receive distributions pursuant to the Plan in respect of Proven Affected Unsecured Claims),  the Settlement and Support Agreement, the Records Assistance Side Letter and the Personnel Files Agreement; (ii) any claim against a Released Party if the Released Party is determined by a Final Order of a court of competent jurisdiction to have committed fraud or wilful misconduct; (iii) solely as against a Director in his or her capacity as such, any Director/Officer Claim that is not permitted to be released pursuant to Section 5.1(2) of the CCAA; (iv) the Canadian Intercompany Claims; and (v) the rights of the Canadian Debtors and the U.S. Debtors preserved in Section 8(b)(iii) of the Settlement and Support Agreement; (vi) any obligation secured by the Administration Charge.

In addition, the Settlement and Support Releases given and received by the Canadian Debtors and the Monitor under the Settlement and Support Agreement are authorized pursuant to the Plan and incorporated therein by reference.  Pursuant to the Settlement and Support Agreement Releases, each of the Settlement Parties and Participating Creditors and their respective representatives, agents, successors and assigns (each a "**Releasor**") releases each of the other Releasors their respective employees, officers, directors, agents, advisors, lawyers, successors and assigns and the directors and officers, both former and current, of any Nortel Group entity from any claims which any of the Releasors now have, had, may have had or hereafter may have however so arising out of or in connection with the Allocation Dispute, any other matters resolved in the Settlement and Support Agreement or any other matter relating to the global Nortel insolvency proceedings or the Nortel Group, except for certain specified claims which are expressly preserved.

**Injunctions**

From and after the Plan Effective Date, all Persons are permanently and forever barred, estopped, stayed and enjoined, with respect to any and all Released Claims, from: (i) commencing, conducting, continuing or making in any manner, directly or indirectly, any action, suit, claim, demand or other proceeding of any nature or kind whatsoever (including any proceeding in a judicial, arbitral, administrative or other forum) against the Released Parties; (ii) enforcing, levying, attaching, collecting or otherwise recovering or enforcing by any manner or means, directly or indirectly, any judgment, award, decree or order against the Released Parties or their property; (iii) commencing, conducting, continuing or making in any manner, directly or indirectly, any action, suit, claim, demand or other proceeding of any nature or kind whatsoever (including any proceeding in a judicial, arbitral, administrative or other forum) against any Person who makes a claim or might reasonably be expected to make a claim, in any manner or forum, including by way of contribution or indemnity or other relief, against one or more of the Released Parties; (iv) creating, perfecting, asserting or otherwise enforcing, directly or indirectly, any lien or Encumbrance of any kind against the Released Parties or their property; or (v) taking any actions to interfere with the implementation or consummation of the Plan.

## REQUIRED APPROVALS UNDER THE CCAA
## AND OTHER CONDITIONS TO IMPLEMENTATION

### Creditor Approval by a Required Majority

In order to be approved and binding in accordance with the CCAA, the Canadian Debtors must hold a Meeting pursuant to a Meeting Order[6] (to be sought from the CCAA Court on or about December 1, 2016) and the Resolution to approve the Plan must receive the affirmative vote of the Required Majority of the Affected Unsecured Creditors Class, being a majority in number of Affected Unsecured Creditors, and two-thirds in value of the Voting Claims of Affected Unsecured Creditors, in each case who vote (in person or by proxy) on the Plan at the Meeting.

Creditors who have Affected Unsecured Claims that are Crossover Claims must vote on the Plan in addition to any vote that such Creditor may cast in respect of the U.S. Plans. Voting on the U.S. Plans will not be considered a vote on the Plan and *vice versa*.

### Court Approval of the Plan under the CCAA

Prior to the Plan becoming effective, the CCAA requires that the Plan be approved by the CCAA Court if it is approved by the Required Majority of Affected Unsecured Creditors with Voting Claims voting at the Meeting (in person or by proxy).

Pursuant to the Settlement and Support Agreement and subject to the approval of the Resolution in respect of the Plan, it is contemplated the hearing for the Sanction Order will be scheduled for no later than January 24, 2017.

Interested parties should consult their legal advisors with respect to the legal rights available to them in relation to the Plan, Meeting and the Sanction Order.

The authority and discretion of the CCAA Court is very broad under the CCAA. The CCAA Court will consider, among other things, the fairness and reasonableness of the terms and conditions of the Plan. The CCAA Court must issue the Sanction Order before the Plan can be implemented. If the CCAA Court grants the Sanction Order, and other conditions are satisfied, the Plan will become binding on the Affected Creditors and all Persons named or referred to in, or subject to, the Plan.

The Plan states that the Sanction Order will, among other things:

    (a)    effect the substantive consolidation of the Canadian Debtors into the Canadian Estate on the terms contemplated in Section 2.2 of the Plan, including vesting all of the assets of the Canadian Debtors in NNL (excluding any Canadian Intercompany Claims held by the Other Canadian Debtors), deeming all Proven Affected Unsecured Claims (whether now existing or hereafter coming into existence) against the Other Canadian Debtors to be claims against NNL and barring and extinguishing all Duplicative Claims;

    (b)    declare that (i) the Plan has been approved by the Required Majority in conformity with the CCAA; (ii) the activities of the Canadian Debtors have been

---

[6] Upon being granted by the CCAA Court, the Meeting Order will be posted on the Monitor's Website and distributed in accordance with the terms of the Meeting Order.

in reasonable compliance with the provisions of the CCAA and the Orders of the CCAA Court made in this CCAA Proceeding in all respects; (iii) the CCAA Court is satisfied that the Canadian Debtors have not done or purported to do anything that is not authorized by the CCAA; and (iv) the Plan and the transactions contemplated thereby are fair and reasonable;

(c)     declare that the Settlement and Support Agreement is fair and reasonable and authorize and direct the Canadian Debtors and the Monitor to perform their obligations under the Settlement and Support Agreement and carry out the transactions contemplated thereby;

(d)     approve and authorize the granting of the Settlement and Support Agreement Releases by the Canadian Debtors and the Monitor;

(e)     declare that the Plan and all associated steps, compromises, transactions, arrangements, releases and reorganizations effected thereby are approved, binding and effective, subject to the terms set out in the Plan, upon and with respect to the Canadian Debtors, all Affected Creditors, the Directors and Officers, any Person with a Released Director/Officer Claim, the Released Parties and all other Persons named or referred to in, or subject to, the Plan;

(f)     as of the Plan Effective Date, compromise, discharge and release the Canadian Debtors from any and all Affected Claims of any nature in accordance with the Plan, and declare that the ability of any Person to proceed against any one or more of the Canadian Debtors in respect of or relating to any Affected Claims shall be forever discharged and restrained, and all proceedings with respect to, in connection with or relating to such Affected Claims be permanently stayed, subject only to the right of Affected Creditors to receive distributions pursuant to the Plan in respect of their Affected Claims (to the extent they become Proven Affected Unsecured Claims);

(g)     as of the Plan Effective Date, subject to Section 7.2 of the Plan, compromise, discharge and release the Directors and Officers from any and all Released Claims of any nature in accordance with the Plan, and declare that the ability of any Person to proceed against the Directors and Officers (or any of them) in respect of or relating to any Released Claim shall be forever discharged and restrained, and all proceedings with respect to, in connection with or relating to such Released Claims be permanently stayed;

(h)     as of the Plan Effective Date, discharge and release the Released Parties on the terms set forth in Article 7 of the Plan and implement the injunctions contemplated under the Plan;

(i)     as of the Plan Effective Date, bar, stop, stay and enjoin the commencing, taking, applying for or issuing or continuing of any and all steps or proceedings, including without limitation, administrative hearings and orders, declarations or assessments, commenced, taken or proceeded with or that may be commenced, taken or proceeded with against any Released Party in respect of all Released Claims and any matter which is released pursuant to Article 7 of the Plan;

(j)     authorize the Canadian Estate and the Monitor to perform their obligations and functions under the Plan including the establishment of the Administrative Reserve and the Unresolved Claims Reserve, and to perform all such other acts and execute such documents as may be required in connection with the foregoing;

(k)     authorize the Monitor to continue its administration and wind-down of the Canadian Estate in accordance with the Monitor's Powers Orders and the Plan;

(l)     declare that no shareholder approval is required in respect of the Settlement and Support Agreement, the Plan or any transaction contemplated thereby;

(m)    authorize and direct that all amounts held by NNL pursuant to the Canada Only Sale Proceeds Orders or held as Unavailable Cash by the Canadian Debtors shall form part of the Available Cash without any restriction thereon;

(n)     declare that each of the Charges (except for the Administration Charge) shall be terminated, discharged, expunged and released on the Plan Effective Date, subject to, in the case of the Inter-company Charge (but solely to the extent it benefits NNI), payment of the Remaining Revolver Claim as contemplated pursuant to Section 6.2(a)(i) of the Plan;

(o)     declare that the tolling of any Claims, Director/Officer Claims or other claims or rights pursuant to prior orders of the CCAA Court shall cease on the Plan Effective Date, without prejudice to the rights of all Affected Unsecured Creditors with Proven Affected Unsecured Claims (whether now existing or hereafter coming into existence) to receive all distributions contemplated by the Plan;

(p)     order that the CCAA stay of proceedings provided for in the Initial Order shall be extended indefinitely, subject to further order of the CCAA Court, and provided that the Monitor shall serve on the service list in the CCAA Proceedings and file with the CCAA Court a report on the progress of the continuing administration and wind-down of the Canadian Estate, including the implementation of the Plan, on no less than an annual basis;

(q)     declare that any obligation of the Monitor to provide cash flow forecasting or reconciliations and monthly claims reporting (whether pursuant to paragraph 11 of the Claims Resolution Order dated September 16, 2010, or any other agreement or order) shall cease as at the Plan Effective Date, provided that the Monitor shall provide cash flow reporting and claims reporting in the reports contemplated in the foregoing subsection;

(r)     provide for the termination of the Hardship Process as of the Plan Effective Date;

(s)     effect the matters contemplated pursuant to Section 10.2 and 11.12 of the Plan;

(t)     declare that, notwithstanding: (i) the pendency of the CCAA proceeding; (ii) any applications for a bankruptcy, receivership or other order now or hereafter issued pursuant to the BIA, the CCAA or otherwise in respect of any of the Canadian Debtors and any bankruptcy, receivership or other order issued pursuant to any such applications; and (iii) any assignment in bankruptcy made or deemed to be

40

made in respect of any of the Canadian Debtors, the transactions contemplated by the Plan and by the Settlement and Support Agreement shall be binding on any trustee in bankruptcy or receiver that may be appointed in respect of the Canadian Debtors or their assets and shall not be void or voidable by creditors of the Canadian Debtors, nor shall the Plan, the Settlement and Support Agreement or the payments and distributions contemplated pursuant thereto constitute nor be deemed to constitute a fraudulent preference, assignment, fraudulent conveyance, transfer at undervalue, or other reviewable transaction under the BIA, CCAA or any other applicable federal or provincial legislation, nor shall the Plan or the Settlement and Support Agreement constitute oppressive or unfairly prejudicial conduct pursuant to any applicable federal or provincial legislation; and

(u)    declare that the Canadian Debtors and the Monitor may apply to the CCAA Court for advice and direction in respect of any matters arising from or in relation to the Plan.

## Conditions to the Effectiveness and Implementation of the Plan

The effectiveness of the Plan is conditional upon satisfaction or waiver of the following conditions:

(a)    the Plan shall have been approved by the Required Majority;

(b)    the Sanction Order shall have been issued and entered and shall have become a Final Order;

(c)    the Canadian Escrow Release Order shall have been issued and entered and shall have become a Final Order;

(d)    the U.S. Plans shall have been confirmed in the U.S. Proceedings in a form that, to the satisfaction of the Monitor and its counsel, contains the terms contemplated by and referred to in the Settlement and Support Agreement as being contained in the U.S. Plans;

(e)    the U.S. Escrow Release Order shall have been issued and entered and shall have become a Final Order in a form satisfactory to the Monitor and its counsel;

(f)    the Sanction Order shall have been recognized and given full force and effect in the United States by an order of the U.S. Bankruptcy Court in the Chapter 15 Proceedings;

(g)    all conditions precedent to the Settlement and Support Agreement (excluding the condition specified in Section 9(a)(xi)) shall have been satisfied or waived in accordance with the terms of the Settlement and Support Agreement;

(h)    all conditions precedent to the effectiveness of the U.S. Plans (but excluding the occurrence of the Plan Effective Date hereunder) shall have been satisfied or waived in accordance with their respective terms, and the U.S. Debtors and Canadian Debtors shall have exchanged Plan Certificates in escrow; and

41

(i)    The Settlement and Support Agreement shall not have been terminated.

The implementation of the Plan is conditional upon satisfaction or waiver of the following conditions:

(a)    the Plans Effective Date (as defined in the Settlement and Support Agreement) shall have occurred and the Settlement and Support Agreement shall have become fully effective and enforceable in accordance with its terms;

(b)    the with prejudice dismissal of all litigation referenced in Section 5(b) of the Settlement and Support Agreement, including all leave to appeals, appeals and cross-appeals in respect of the Allocation Dispute pending before the Canadian Courts and U.S. Courts, shall have occurred; and

(c)    NNL shall have received the Canadian Allocation.

## IMPLEMENTATION OF THE PLAN

**Timing of Implementation**

The current estimated timeline to implementation of the Plan is as follows:

(a) Meeting: January 17, 2017;

(b) Sanction Hearing: January 24, 2017;

(c) Effective Date: February 15, 2017;

(d) Implementation Date: as soon as possible following the Effective Date; and

(e) Initial Distribution Date: within sixty (60) days of the Plan Implementation Date.

The actual timing of the steps contemplated above will be set in accordance with the Meeting Order, Sanction Order or as otherwise contemplated by the Plan and, where applicable, will be posted on the Monitor's Website.

**Cash Pools and Reserves**

On the Plan Implementation Date, the Canadian Estate shall establish the Administrative Reserve in accordance with the terms of the Sanction Order and thereafter hold the Administrative Reserve and use the Administrative Reserve to fund the ongoing administration, obligations and wind-down of the Canadian Estate. Any balance remaining in the Administrative Reserve at the conclusion of the CCAA Proceedings shall be distributed in accordance with Section 6.11 of the Plan. Following the Plan Implementation Date, prior to the Initial Distribution Date, the Canadian Estate shall establish the Unresolved Claims Reserve in accordance with the terms of the Sanction Order. The Canadian Estate shall maintain and distribute the Unresolved Claims Reserve in accordance with the provisions of Section 6.5 of the Plan. See *Implementation of the Plan - Distributions Under the Plan – Distributions After Unresolved Affected Unsecured Claims and Post-Filing Claims Resolved"*

Following the Plan Implementation Date, prior to the Initial Distribution Date and prior to all subsequent Distribution Dates, the Canadian Estate shall establish an Affected Unsecured Creditor Pool. On the Initial Distribution Date and any subsequent Distribution Dates, the Canadian Estate shall distribute the Affected Unsecured Creditor Pool to Affected Unsecured Creditors on and subject to the terms of Article 6 of the Plan.

## Distributions under the Plan

### *Distributions Generally*

All distributions to Affected Creditors to be effected pursuant to the Plan shall be made by the Canadian Estate pursuant to Article 6 of the Plan. Distribution Dates shall be set from time to time by and at the discretion of the Monitor, provided that the Initial Distribution Date shall be no more than sixty (60) days after the Plan Implementation Date, and the Monitor shall set a Distribution Date within ninety (90) days of the date (the "**Determination Date**") it determines the Available Cash of the Canadian Estate is sufficient to establish an Affected Unsecured Creditor Pool of not less than $150,000,000, provided that if the Monitor believes the Canadian Estate will be in a position to make a Final Distribution within six (6) months of the Determination Date, it shall be authorized to delay such Distribution Date for up to six (6) months from the Determination Date in order to attempt to complete a Final Distribution.

### *Distribution Mechanics*

See "*Description of the Plan – Treatment of Claims Pursuant to the Plan – Proven Priority Claims and Other Payments under the Plan*" for a description of the NNI Payments and distribution of the Termination Payments.

Prior to the Initial Distribution Date and each subsequent Distribution Date, the Monitor shall calculate the Pro-Rata Share to be paid to each Affected Unsecured Creditor with a Proven Affected Unsecured Claim.

Subject to the Plan, the Canadian Estate shall, on or about the respective Distribution Date cause to be distributed from the Affected Unsecured Creditor Pool to each Affected Unsecured Creditor with a Proven Affected Unsecured Claim its Pro-Rata Share by way of (in the sole discretion of the Monitor): (i) cheque sent by prepaid ordinary mail to the address on file with the Monitor on the date that is twenty-one (21) days after notice of a Distribution Date is given by the Monitor by notice posted on the Monitor's Website; or (ii) wire transfer of immediately available funds to an account designated in writing by the Creditor to the Monitor (with any wire transfer or similar fee being satisfied from the distribution amount), subject to the following:

- 1988 Bondholder Claims – Distributions for the benefit of the 1988 Bondholders on account of the 1988 Bondholder Claims shall be made to the 1988 Bonds Trustee by wire transfer of immediately available funds to an account designated in writing by the 1988 Bonds Trustee to the Monitor (with any wire transfer or similar fee being satisfied from the distribution amount). The 1988 Bonds Trustee shall administer such distributions as soon as is reasonably practicable in accordance with the 1988 Bonds Indenture and the Plan, including Section 6.6 of the Plan, and such distributions shall remain subject to the 1988 Bonds Trustee's charging lien against distributions to holders of 1988 Bondholder Claims for payment of the 1988 Bonds Trustee's reasonable fees and expenses, including all reasonable fees and expenses of its counsel and other professionals and including the

fees and expenses incurred by the 1988 Bonds Trustee in making all distributions to holders of 1988 Bondholder Claims. Receipt by the 1988 Bonds Trustee of distributions for the benefit of the 1988 Bondholders shall be deemed to constitute receipt of all such distributions by the 1988 Bondholders.  Neither the Canadian Debtors nor the Monitor are aware of the current fees and expenses of the 1988 Bonds Trustee.

- <u>Crossover Bondholder Claims</u> - Distributions for the benefit of the Crossover Bondholders on account of the Crossover Bondholder Claims shall be made to the Crossover Bonds Trustee by wire transfer of immediately available funds to an account (or accounts) designated in writing by the Crossover Bonds Trustee to the Monitor (with any wire transfer or similar fee being satisfied from the distribution amount). The Crossover Bonds Trustee shall administer such distributions as soon as is reasonably practicable in accordance with the Plan, including Section 6.6 of the Plan, and such distributions shall remain subject to the Crossover Bonds Trustee's charging lien against distributions to holders of Crossover Bondholder Claims for payment of the Crossover Bonds Trustee's reasonable fees and expenses, including all reasonable fees and expenses of its counsel and other professionals and including the fees and expenses incurred by the Crossover Bonds Trustee in making all distributions to holders of Crossover Bonds. Receipt by the Crossover Bonds Trustee of distributions for the benefit of the Crossover Bondholders shall be deemed to constitute receipt of all such distributions by the Crossover Bondholders. Neither the Canadian Debtors nor the Monitor are aware of the current fees and expenses of the Crossover Bonds Trustee. The Canadian Debtors and Monitor have been advised that as at September 30, 2016, the fees and expenses of the Crossover Bonds Trustee (including the fees and expenses of its legal counsel) with respect to the CCAA Proceedings and the U.S. Proceedings were approximately $4 million.

- <u>NNCC Bondholder Claims</u> - Distributions for the benefit of the NNCC Bondholders on account of the NNCC Bondholder Claims shall be made to the NNCC Bonds Trustee by wire transfer of immediately available funds to an account (or accounts) designated in writing by the NNCC Bonds Trustee to the Monitor (with any wire transfer or similar fee being satisfied from the distribution amount). The NNCC Bonds Trustee shall administer such distributions as soon as is reasonably practicable in accordance with the NNCC Bonds Indenture and the Plan, including Section 6.6 of the Plan, and such distributions shall remain subject to the NNCC Bonds Trustee's charging lien against distributions to holders of NNCC Bondholder Claims for payment of the NNCC Bonds Trustee's reasonable fees and expenses, including all reasonable fees and expenses of its counsel and other professionals and including the fees and expenses incurred by the NNCC Bonds Trustee in making all distributions to holders of NNCC Bonds. Receipt by the NNCC Bonds Trustee of distributions for the benefit of the NNCC Bondholders shall be deemed to constitute receipt of all such distributions by the NNCC Bondholders. The Canadian Debtors and Monitor have been advised that as at September 30, 2016, the fees and expenses of the NNCC Bonds Trustee (including the fees and expenses of its counsel and other professionals), in addition to the amount to be paid by NNI pursuant to the U.S. Plans (being up to $4.25 million), was approximately $3.5 million.

- <u>Distributions to Compensation Creditors</u> - Distributions to Compensation Creditors will be subject to the Canadian Estate and Monitor first obtaining EI Confirmation in respect of such Compensation Creditor as well as resolving any issues regarding applicable

withholdings in respect of such distribution to the satisfaction of the Canadian Estate and the Monitor, acting reasonably.  Further, in accordance with the terms of the Hardship Process, any payments made to a Compensation Creditor pursuant to the Hardship Process shall be deducted, dollar for dollar, from any distributions to such Compensation Creditor pursuant to the Plan.

### *Distributions After Unresolved Affected Unsecured Claims and Post-Filing Claims Resolved*

An Affected Unsecured Creditor holding an Unresolved Affected Unsecured Claim will not be entitled to receive a distribution under the Plan in respect of such Unresolved Affected Unsecured Claim or any portion thereof unless and until, and then only to the extent that, such Unresolved Affected Unsecured Claim becomes a Proven Affected Unsecured Claim. To the extent that any Unresolved Affected Unsecured Claim becomes a Proven Affected Unsecured Claim, the Canadian Estate shall distribute to the holder of such Proven Affected Unsecured Claim, on or before the next following Distribution Date, an amount from the Unresolved Claims Reserve equal to the Pro-Rata Share that such Affected Unsecured Creditor would have been entitled to receive in respect of its Proven Affected Unsecured Claim on the previous Distribution Date(s) had such Unresolved Affected Unsecured Claim been a Proven Affected Unsecured Claim on the Initial Distribution Date.

Once an Unresolved Affected Unsecured Claim is finally resolved and all distributions (if any) have been made out of the Unresolved Claims Reserve in respect of such claim, any remaining Cash in the Unresolved Claims Reserve with respect to such Unresolved Affected Unsecured Claim shall become Available Cash.

### *Allocation of Distributions*

All distributions made pursuant to the Plan shall be allocated first towards the repayment of the amount of the Proven Affected Unsecured Claim or Proven Priority Claim, as applicable, attributable to principal and, if greater than the amount of principal, second, towards the repayment of any amount of such Proven Affected Unsecured Claim or Proven Priority Claim attributable to unpaid interest.

### *Treatment of Undeliverable Distributions*

If any distribution to a Creditor under the Plan is returned as undeliverable (an "**Undeliverable Distribution**"), no further distributions to such Creditor shall be made unless and until the Monitor is notified in writing by such Creditor of such Creditor's current address, at which time all such distributions shall be made to such Creditor.  Upon the Monitor becoming aware of an Undeliverable Distribution, the Canadian Estate shall, prior to the next following Distribution Date, reserve from the Affected Unsecured Creditor Pool the amount of Cash equal to the Undeliverable Distribution.  All claims for an Undeliverable Distribution existing prior to the Final Distribution must be made in writing to the Monitor (in the manner contemplated by Section 11.10 of the Plan) on or before the date that is thirty (30) days following the date the Monitor posts a copy of the Final Distribution Certificate on the Monitor's Website, after which date any entitlement with respect to any Undeliverable Distributions shall be forever discharged and forever barred, without any compensation therefor, notwithstanding any federal, state or provincial laws to the contrary, and the amount of any Undeliverable Distributions shall be included in the Affected Unsecured Creditor Pool for distribution on the Final Distribution. Any Undeliverable Distributions remaining following the Final Distribution shall be dealt with in

such manner as the CCAA Court may direct. Nothing in the Plan shall require the Canadian Estate or the Monitor to attempt to locate any Creditor or other Person with respect to an Undeliverable Distribution. No interest shall be payable in respect of an Undeliverable Distribution.

### Withholding Rights

The Canadian Estate and any other Person facilitating distributions hereunder shall be entitled to deduct and withhold from any distribution or payment to any Person pursuant to the Plan such amounts as may be required to be deducted or withheld with respect to such distribution or payment under the Canadian Tax Act or other Applicable Laws and to remit such amounts to the appropriate Taxing Authority or other Person entitled thereto. To the extent that amounts are so withheld or deducted and remitted to the appropriate Taxing Authority or other Person, such withheld or deducted amounts shall be treated for all purposes as having been paid to such Person as the remainder of the distribution or payment in respect of which such withholding or deduction was made. Without in any way limiting the generality of the foregoing, the Canadian Estate shall deduct from any distribution to a Creditor any amounts as indicated by Employment and Social Development Canada in an EI Confirmation, and remit such amounts to Employment and Social Development Canada pursuant to the EI Act. Any Creditor whose address on file with the Monitor on the Distribution Record Date for the Initial Distribution is not a Canadian address shall be treated as a non-resident of Canada for purposes of any applicable non-resident withholding Tax on all distributions hereunder, subject to receipt by the Monitor of information satisfactory to it (in its sole discretion) that such Creditor is not a non-resident. For the avoidance of doubt, no gross-up or additional amount will be paid on any distribution or payment hereunder to the extent the Canadian Estate or any other Person deducts or withholds amounts pursuant to Section 6.8 of the Plan.

### Cancellation of Certificates and Notes, etc.

Following the Plan Effective Date all debentures, notes, certificates, indentures, guarantees, agreements, invoices and other instruments evidencing Affected Claims, including the 1988 Bonds, the 1988 Bonds Indenture, the Crossover Bonds, the Crossover Bonds Indenture, the NNCC Bonds and the NNCC Bonds Indenture (and all guarantees associated with each of the foregoing), will not entitle any holder thereof to any compensation or participation other than as expressly provided for in the Plan and shall be cancelled and be null and void. Notwithstanding the foregoing, (a) the 1988 Bonds Indenture, the Crossover Bonds Indenture and the NNCC Bonds Indenture shall remain in effect solely for the purpose of and to the extent necessary to: (i) allow the relevant Indenture Trustee to make distributions as contemplated in Section 6.3(b) of the Plan; (ii) maintain all of the protections the Indenture Trustees enjoy with respect to carrying out their duties thereunder against the beneficial holders, including lien rights with respect to any distributions contemplated in Section 6.3(b) of the Plan, until all such distributions are made; (iii) preserve the rights of the 1988 Bondholders, the Crossover Bondholders and the NNCC Bondholders to receive distributions pursuant to the Plan; and (iv) allow and preserve the rights of the Crossover Bonds Trustee, the Crossover Bondholders, the NNCC Bonds Trustee and the NNCC Bondholders to pursue their claims in the U.S. Proceedings; and (b) the Canadian Registered Pension Plans shall remain in effect solely for the purposes of and to the extent necessary to permit the continuing administration and wind-up of the Canadian Registered Pension Plans.

**Continuing Administration and Wind-Down of the Canadian Estate and Related Matters**

*Wind-Down of the Canadian Estate*

The administration and wind-down of the Canadian Estate will continue to be conducted by the Monitor pursuant to the Monitor's Powers Orders and the Plan, including following the Plan Effective Date and the Plan Implementation Date. Without in any way limiting the powers of the Monitor pursuant to the CCAA, the Initial Order, the Plan or the Monitor's Powers Orders, such continuing administration and wind-down may include:

(a) taking all steps and actions contemplated by the Plan and the Settlement and Support Agreement, including effecting distributions and payments contemplated thereby;

(b) the resolution of any remaining unresolved Claims or Post-Filing Claims;

(c) the sale or other realization of the Canadian Debtors' residual assets and the repatriation of funds from foreign controlled subsidiaries all to be used to make distributions and payments contemplated pursuant to the Plan;

(d) the resolution of the Canadian Debtors' Tax matters and recovery of any Tax refunds;

(e) the wind-down of the Canadian Debtors and their direct and indirect controlled subsidiaries (but not the U.S. Debtors, the EMEA Debtors or the EMEA Non-Filed Entities); and

(f) the disposal of the Canadian Debtors' books and records, including their remaining information technology infrastructure.

*Creditor Fee Arrangements*

The Canadian Debtors have been paying the fees and expenses of certain advisors to the Bondholder Group pursuant to the CCAA Court approved Bondholder Advisor Fee Letter. Under the Plan, fees in the aggregate amount of $47 million (the "**Bondholder Fee Amount**") (which includes $3 million in respect of the deferred compensation fee payable to FTI Capital Advisors, LLC) under the Bondholder Advisor Fee Letter will be deducted from distributions to Crossover Bondholders and NNCC Bondholders under the Plan in respect of their Proven Affected Unsecured Claims against the Canadian Estate. In addition, an additional $7,000,000 (the "**Additional Bondholder Fee Amount**") shall be deducted from Canadian Estate distributions under the Plan to Crossover Bondholders and NNCC Bondholders on account of their Proven Affected Unsecured Claims in further payment of the deferred compensation fee payable to FTI Capital Advisors, LLC if the Canadian Estate is so directed in writing by all of the Crossover Bondholders and NNCC Bondholders who are Participating Creditors under the Settlement and Support Agreement. All such deductions shall be borne by the Crossover Bondholders and the NNCC Bondholders on a pro rata basis based on the amount of the Proven Affected Unsecured Claims of the Crossover Bondholders and the NNCC Bondholders. The Bondholder Advisor Fee Letter shall terminate on the Plan Implementation Date, and the Canadian Debtors (including the Canadian Estate) shall have no obligation to pay any fees and expenses of the advisors to the Bondholder Group from and after the Plan Implementation Date.

The Canadian Debtors will not pay voluntarily, or seek permission to pay, legal or advisor fees of any stakeholder that the Canadian Debtors are not currently paying. Payment of any such further legal or advisor fees will be done only pursuant to an order of the CCAA Court.

From and after the Plan Implementation Date, the fees and expenses of Court Appointed Representative Counsel shall no longer be borne by the Canadian Estate and shall instead be borne by the Compensation Creditors. Any fees and expenses incurred by Court Appointed Representative Counsel from and after the Plan Implementation Date shall be deducted, dollar for dollar, from distributions to Compensation Creditors pursuant to the Plan. Any such deductions shall be borne by Compensation Creditors on a *pro rata* basis based on the amount of their respective Proven Affected Unsecured Claims. Notwithstanding the foregoing, from and after the Plan Implementation Date, to the extent the Monitor requests in writing that Court Appointed Representative Counsel provide any service relating to such Court Appointed Representative Counsel responding to inquiries of Compensation Creditors regarding distributions under the Plan, the Canadian Estate shall pay the associated reasonable fees and expenses of such Court Appointed Representative Counsel as may be agreed to in writing between the Canadian Estate, the Monitor and the applicable Court Appointed Representative Counsel.

### Final Distribution

After (i) all Unresolved Affected Unsecured Claims, Post-Filing Claims and any other Claims (but excluding, for the avoidance of doubt, any Equity Claims) have been finally resolved; (ii) any remaining Cash held in the Unresolved Affected Unsecured Claims Reserve has been transferred into the Affected Unsecured Creditor Pool; and (iii) the administration and wind-down matters set out in Article 10 of the Plan have been substantially completed, the Monitor shall set a Distribution Date for the purposes of effecting a final distribution of Available Cash to Affected Unsecured Creditors with Proven Affected Unsecured Claims (the "**Final Distribution**"). The Final Distribution shall include, among other things, any remainder of the Administrative Reserve (except for an amount to be set aside for fees and costs to be incurred by or on behalf of the Monitor (including the fees and expenses of the Monitor's counsel) in effecting the Final Distribution, the completion of any remaining administration matters and the discharge of the Monitor). After completing the Final Distribution and upon being granted a discharge and release, the Monitor shall pay any remaining Cash of the Canadian Estate, including any Cash on account of Undeliverable Distributions remaining following the Final Distribution, as the CCAA Court may direct.

### Non-Consummation/ Termination of the Settlement and Support Agreement

If the Plan Effective Date does not occur on or prior to August 31, 2017 (or such later date as the date for the Plans Effective Date (as defined in the Settlement and Support Agreement) to have occurred pursuant to Section 9(a)(xi) of the Settlement and Support Agreement may be extended to) (the "**Outside Date**"), then, notwithstanding any other provision of the Plan: (a) the Plan shall be null and void in all respects, (b) any settlement or compromise embodied in the Plan shall be deemed null and void, and (c) nothing contained in the Plan, and no acts taken in preparation for consummation of the Plan, shall (i) constitute or be deemed to constitute a waiver or release of any Claims by or against the Canadian Debtors or any other Person; (ii) prejudice in any manner the rights of the Canadian Debtors or any other Person in any further proceedings involving the Canadian Debtors; or (iii) constitute an admission of any sort by the Canadian

Debtors or any other Person; provided, however, that nothing in Section 11.3 of the Plan shall impair the enforceability of the Settlement and Support Agreement in accordance with its terms.

In the event the Settlement and Support Agreement is terminated or does not become effective in accordance with its terms, the Canadian Debtors and Monitor reserve all of their rights and defenses with respect to the claims and other matters resolved by the Settlement and Support Agreement, including the Allocation Dispute, and nothing contained in the Plan nor the proposed settlement set forth in the Settlement and Support Agreement shall constitute an admission by the Canadian Debtors or the Monitor regarding the validity of the litigations, claims or defenses resolved by the Settlement and Support Agreement or that the Canadian Debtors have any liability in connection with such litigations, claims or defenses.

In the event of the termination of the Settlement and Support Agreement, or if the Plan does not become effective in accordance with its terms, all rights of the Canadian Debtors (excluding the New Applicants) and the Monitor with regard to the Allocation Dispute and with respect to the interest of the Canadian Debtors in the Sale Proceeds are reserved.

## ESTIMATED DISTRIBUTIONS TO CREDITORS WITH PROVEN AFFECTED UNSECURED CLAIMS

Pursuant to the Plan, distributions to Creditors holding Proven Affected Unsecured Claims predominantly in Canadian dollars shall be paid in Canadian dollars and all other Proven Affected Unsecured Claims will be paid in U.S. dollars.  A Proven Affected Unsecured Claim is considered "predominantly denominated" in Canadian dollars if more than 50% of such Claim is denominated in Canadian dollars.  For information on the method for conversion of Claims, see "*Description of the Plan - Treatment of Claims Pursuant to the Plan – Currency Conversion Matters*".

With respect to Proven Affected Unsecured Claims:

(a) for CAD Claims, the Monitor estimates that the range of recovery per CA dollar of Proven Affected Unsecured Claims will be approximately CA 45 cents to CA 49 cents assuming an Applicable F/X Rate of approximately $1.00 to CA $1.337650; and

(b) for all other Proven Affected Unsecured Claims, the Monitor estimates that the range of recovery per U.S. dollar of Proven Affected Unsecured Claims will be approximately 41.5 cents to 45 cents.

## ALTERNATIVES TO THE PLAN

The CCAA Proceedings (as well as the U.S. Proceedings and EMEA Proceedings) have been ongoing for nearly eight (8) years with the Allocation Dispute and certain significant Claims being settled pursuant to the Settlement and Support Agreement after years of mediations, negotiations and litigation.  There is no reasonable basis to support a view that an alternative process available to the Canadian Debtors at this time would provide equivalent value in a timely fashion to Affected Unsecured Creditors with Proven Affected Unsecured Claims.  If the Plan is not approved by the Required Majority and sanctioned by the CCAA Court, the most likely alternatives are for the Canadian Debtors to remain in CCAA Proceedings indefinitely or be put into bankruptcy or receivership.  In any such scenario, litigation regarding the Allocation Dispute and other significant unresolved Claims would likely continue until finally resolved, which could

take a significant period of further time, and delay distributions to Creditors pending such final resolution.

## STATUS OF CLAIMS PROCESS

Assuming the Settlement and Support Agreement and the Plan become effective, the total Proven Affected Unsecured Claims as at the date of this Information Circular is approximately $9.8 billion. The Monitor continues to work to resolve significant unresolved Claims on an ongoing basis.

## RECOMMENDATION OF THE MONITOR

The Monitor and its counsel have been involved throughout the course of negotiations regarding the Plan and the Monitor supports the Canadian Debtors' request to convene meetings to consider the Plan. After careful consideration of all relevant factors relating to the Plan, and after receiving the advice of its advisors, the Monitor supports the Plan and is of the view that the Plan is in the best interests of the Affected Creditors and recommends that Affected Unsecured Creditors vote to approve the Plan.

## SUPPORT OF OTHER SIGNIFICANT STAKEHOLDERS

The Plan reflects the terms of the Settlement and Support Agreement entered into by, among others, the Canadian Debtors, U.S. Debtors, EMEA Debtors, Monitor, the members of the CCC, UCC, UKPI, NNSA, Conflicts Administrator, Joint Administrators and Joint Liquidators each of whom support the Plan pursuant to the terms of the Settlement and Support Agreement. Additionally, Crossover Bondholders with a principal amount of $3 billion representing 80% of the principal amount of the Crossover Bonds and NNCC Bondholders holding NNCC Bonds with a total principal amount of $135,665,000 representing 90.44% of the principal amount of the NNCC Bonds support the Plan, subject to the terms of the Settlement and Support Agreement.

See also "*Required Approvals under the CCAA and Other Conditions to Implementation – Conditions to the Effectiveness and Implementation of the Plan.*"

## MEETING AND VOTING

Pursuant to the Settlement and Support Agreement, the Meeting is targeted to be held by January 17, 2017.

The actual date for calling the Meeting and the process for voting on the Plan will be subject to the Meeting Order which will be subject to CCAA Court approval on or about December 1, 2016. Once granted, the Meeting Order will be posted on the Monitor's Website and distributed in accordance with the terms of the Meeting Order. The Meeting Order will also set the forms of proxy, instructions for voting and other matters relevant to the voting on the Plan and conduct of the Meeting.

Pursuant to the CCAA and the Plan, in order for the Plan to be approved, the Resolution must receive the affirmative vote of the Required Majority of the Affected Unsecured Creditors Class, being a majority in number of Affected Unsecured Creditors with Voting Claims who vote (in person or by proxy) on the Plan at the Meeting, and two-thirds in value of the Voting Claims

held by such Affected Unsecured Creditors who vote (in person or by proxy) on the Plan at the Meeting.

For the purpose of calculating the two-thirds majority in value of Voting Claims in the Affected Unsecured Creditors Class, the aggregate amount (in U.S. dollars) of Voting Claims held by those Affected Unsecured Creditors who vote in favour of the Plan (in person or by proxy) shall be divided by the aggregate amount (in U.S. dollars) of all Voting Claims held by all Affected Unsecured Creditors who vote on the Plan (in person or by proxy). For the purpose of calculating a majority in number of Affected Unsecured Creditors voting on the Plan, each Affected Unsecured Creditor that votes on the Plan (in person or by proxy) shall only be counted once, without duplication.

Pursuant to the Plan, for the purposes of considering and voting on the Resolution there shall be one class of Affected Creditors, the Affected Unsecured Creditors Class.

## WITHHOLDING FROM DISTRIBUTIONS AND CERTAIN OTHER TAX MATTERS

**The following discussion is not and is not intended to be, nor should it be construed to be, legal or tax advice to any particular Affected Creditor as to the consequences of receiving any distributions or payments under the Plan. Affected Creditors are urged to consult their own tax advisors for advice as to the tax considerations in respect of the Plan having regard to their particular circumstances.**

The Canadian Estate and any other Person making distributions under the Plan (a "**Payer**") will deduct and withhold from any distribution or payment to any Person made pursuant to the Plan such amounts as are required to be deducted or withheld with respect to such distribution or payment under Applicable Laws and will remit such amounts to the appropriate Taxing Authority or other Person entitled thereto. Any amount deducted or withheld and remitted to the appropriate Taxing Authority or other Person shall be treated for all purposes as having been paid to the Person receiving the distribution or payment as part of the distribution or payment to the Person under the Plan. Where a Payer deducts or withholds amounts from a distribution or payment under the Plan, no gross-up or additional amount will be paid on, or in respect of, such distribution or payment.

Without limiting the generality of the foregoing paragraph, the following are certain of the distributions or payments contemplated by the Plan that will be subject to deduction and withholding: (a) payments as, on account or in lieu of payment of, or in satisfaction of, interest to a Person who is a non-resident of Canada (other than a Person who is a qualifying person for the purposes of the Canada-United States Income Tax Convention) who does not deal at arm's length with the Canadian Debtors, or a Person who is a "Specified non-resident Shareholder" (as defined in the Canadian Tax Act) of a Canadian Debtor; (b) distributions or payments made as, or on account of, salary, wages and other remuneration, a superannuation or pension benefit, a retiring allowance, or a death benefit; and (c) distributions or payments made to a Person who is a non-resident of Canada in respect of services rendered in Canada. In addition, certain distributions or payments to Creditors may be subject to deductions on account of any employment insurance overpayment received by a Creditor.

Pursuant to the Plan, any Creditor whose latest address on file with the Monitor as at the Distribution Record Date for the Initial Distribution is not a Canadian address shall be treated as

a non-resident of Canada for all Applicable Laws, including for purposes of any applicable withholding taxes. The Canadian Estate or the Monitor may request documentation from a Creditor regarding its residency status. If, upon such request, a Creditor fails to provide satisfactory evidence that it is a resident of Canada, the Creditor shall be treated as a non-resident for all Applicable Laws, including for the purposes of any applicable withholding taxes.

***Transfer Taxes***

Payments or distributions made pursuant to the Plan will be inclusive of any applicable Canadian federal goods and services tax, harmonized sales tax, and any other applicable Canadian provincial, U.S. or other foreign sales tax. These taxes may be required to be remitted by the recipient to the appropriate Taxing Authority.

## RISK FACTORS

*In evaluating the Plan and determining whether to vote for the Resolution, Affected Creditors should read and consider carefully the risk factors set forth below. These risk factors should not, however, be regarded as the only risks associated with the Plan. You should carefully consider information about these risks and uncertainties, together with all of the other information contained within this document.*

### Risks Relating to Non-Implementation of the Plan

***Failure to Implement the Plan and the Settlement and Support Agreement***

If the Plan is not implemented before the Outside Date the Canadian Debtors may remain under CCAA protection for an indefinite period of time. The most likely alternative to the Plan is continued litigation among the Canadian Debtors, EMEA Debtors and U.S. Debtors and various stakeholders, including over the resolution of claims and the outstanding appeals and cross-appeals of the Allocation Decisions, which could be protracted, expensive and uncertain in outcome.

If the Plan and the Settlement and Support Agreement are not implemented, there is no assurance that any distributions to the Affected Creditors will be on terms that provide equivalent value to Affected Creditors compared to the distributions to be received by Affected Creditors pursuant to the Plan.

### Risks Relating to the Plan and its Implementation

***Consummation of the CCAA Plan is subject to Affected Unsecured Creditors' acceptance and Court approval***

Before the Plan can be consummated, it must have been approved by the Required Majority and sanctioned, after notice and a hearing on any objection, by the CCAA Court. Although the Support and Settlement Agreement binds various significant Creditors to vote to approve the Plan, there can be no assurance that the Plan will be approved by the Required Majority, and that even if approved, the CCAA Court will sanction the Plan. The failure of any of these conditions will delay or prevent the consummation of the Plan.

***The Implementation of the Plan and the Settlement and Support Agreement is subject to a number of other significant conditions***

Implementation of the Plan is subject to numerous other conditions, which must be satisfied (or waived, if applicable) prior to effectiveness and implementation of the Plan. This includes the dismissal of all of the remaining litigation relating to the Allocation Dispute.  Not all of the parties to the litigation are party to the Settlement and Support Agreement and such parties may object to the dismissal of the remaining litigation.  In addition, the effectiveness of the Settlement and Support Agreement is subject to confirmation of the U.S. Plans and receipt of various foreign Court approvals.

As of the date hereof, there can be no assurance that any or all of the conditions in the Plan or in the Settlement and Support Agreement will be satisfied (or waived, if applicable). In addition, there can be no assurance that the Plan or the Settlement and Support Agreement will be consummated even if the Plan is approved by the Affected Unsecured Creditors and sanctioned by the CCAA Court. See "*Required Approvals under the CCAA and Other Conditions to Implementation*".

***If any of the conditions to consummation are not satisfied or an alternative plan is not approved, the Canadian Debtors may be forced to continue litigation over claims and the allocation of Sale Proceeds***

If any of the conditions precedent as described in the Plan, including Court sanction and the satisfaction of the implementation conditions, are not satisfied (or waived, if applicable) and the Plan or the Settlement and Support Agreement is not consummated, there can be no assurance when distributions to Affected Unsecured Creditors may be possible, or that such distributions would be comparable to those contemplated under the Plan. The most likely alternative to the Plan is continued litigation among the Canadian Debtors, the EMEA and U.S. Estates and various stakeholders, including over the resolution of claims and the outstanding appeals and cross-appeals of the Allocation Decisions, which could be protracted, expensive and uncertain in outcome.

**Risks Related to Recovery under the Plan**

*Financial Analysis Subject to Other factors*

Financial analysis or other estimations contained herein, including any financial analysis containing numerical specificity, is based on assumptions and estimates which may not be achieved and is subject to business, economic, regulatory and other uncertainties which may be beyond the control of the Canadian Debtors and the Monitor.  Without limiting the foregoing, the foreign exchange rate applicable to any remaining asset realizations or other conversions (including for the conversion of funds from U.S. dollars to Canadian dollars or vice versa as contemplated by the Plan) could adversely impact the ultimate return to Creditors.

*Remaining Estate Recoveries may differ from Monitor's Current estimated Calculations*

The Monitor has based its estimated recoveries on certain assumptions as to the remaining asset realizations available to the Canadian Estate, including on account of recovery of funds from foreign subsidiaries and the sale of the remaining IP Addresses.  The actual amount realized may vary depending on the final resolution of claims and legal, political and tax matters in respect of

foreign entities as they complete their formal or informal wind up proceedings. Further, there is no guarantee that the Canadian Estate will be able to sell its remaining IP Addresses or for what price.

***The actual amount of Proven Claims may differ from the estimated Affected Unsecured Claims and adversely affect the percentage recovery of each individual Affected Unsecured Creditor***

Recovery estimates for Affected Unsecured Creditors have been based on certain assumptions regarding the total quantum and priority of proven Claims against, and other liabilities of, the Canadian Estate, which assumptions may not be borne out. The resolution of unresolved Claims, including as to quantum or priority, or the assertion of any new Claims, including in respect of the post-Filing Date period, could impact the actual distributions received by Affected Unsecured Creditors pursuant to the Plan.

***The Timing of Distributions may Vary***

The Canadian Debtors and Monitor cannot estimate the amount of time that will lapse between the Effective Date of the Plan and certain Distributions under the Plan, including the Final Distribution which will depend on, among other factors, the amount of time required to recover funds from foreign subsidiaries and resolve all remaining Affected Unsecured Unresolved Claims and other obligations of the Canadian Debtors, including any Post-Filing Claims that may be filed.

***The Canadian Debtors remain subject to environmental laws and regulations and the environmental liabilities and obligations of the Canadian Debtors have yet to be finally determined and may not be determined in a timely fashion***

NNL's historical operations included the management and disposal of hazardous substances. The Canadian Debtors are subject to environmental laws and regulations, including certain director's orders issued against NNL pursuant to the *Environmental Protection Act* (R.S.O. 1990, c. E.19) relating to environmental risk management and remediation of hazardous substances alleged to be relating to certain of NNL's former operations at properties which it owned or continues to own in Ontario. In addition, the Canadian Debtors have received related notices and Claims in these CCAA Proceedings relating to environmental liabilities and obligations, some of which remain unresolved as of the date of this Information Circular.  NNL may have ongoing statutory obligations for an indefinite period of time for carrying out various risk assessment and risk management measures relating to these matters which may include the identification, investigation and analysis of environmental impacts as well as the mitigation of such impacts. The ability of NNL to cease performing these statutory obligations post-Plan implementation is uncertain, as is the timeline for the final determination of any related obligations or liabilities. The Canadian Debtors' ultimate liabilities, if any, relating to these matters, including any Claim that may become a Proven Affected Unsecured Claim under the Plan, has yet to be determined.

*Certain Tax Impacts*

There are a number of material income tax considerations, risks and uncertainties related to the Plan.  Creditors are urged to obtain their own tax advice as to these tax considerations and risks.

***Canadian Debtors' income tax position remains unresolved and the Plan may have a negative impact on the Canadian Debtors' income tax position***

The final income tax position of the Canadian Debtors has yet to be resolved or determined. Although the Canadian Debtors do not expect to have any income tax payable as a result of receipt of the Canadian Allocation or the other transactions contemplated in, or related to, the Plan or the Settlement and Support Agreement, there can be no guarantee that the Canadian Debtors will not be required to pay any such taxes, or that the Canadian Debtors' outstanding tax matters, including pending audits, will be resolved in a timely or favourable manner. Further, there can be no guarantee or other assurance that the transactions and other matters contemplated by the Plan, including the proposed substantive consolidation of the Canadian Debtors, will not have a negative impact on the Canadian Debtors' tax position or attributes.

***Distributions and payments to Creditors may be subject to withholdings and have tax impacts for individual Creditors***

Distributions or payments to Creditors pursuant to the Plan may have income tax consequences for Creditors depending on their circumstances, including that such distributions and payments may subject the recipient to liability for income tax or be subject to non-resident withholding tax or other taxes. The potential distributions may be inclusive of amounts in respect of Canadian federal goods and services, harmonized sales taxes and any other applicable Canadian federal, provincial, U.S. or other foreign sales taxes, which may be required to be remitted by the recipient to the appropriate Taxing Authority. Creditors are urged to obtain their own tax advice with respect to the matters contemplated in the Plan, including the tax impact of receipt of distributions and payments on them.

***Costs of Administration***

Even if the Plan is implemented, the Monitor and Canadian Debtors will need to take various steps to wind down the Canadian Estate, including as set out in Section 10.1 of the Plan. The costs of the wind-down efforts and ongoing administration of the CCAA Proceedings could exceed those currently forecast by the Monitor and reduce distributions pursuant to the Plan.

## DOCUMENTS INCORPORATED BY REFERENCE

The Plan, including all Schedules and Exhibits thereto, which has been filed with the CCAA Court, is specifically incorporated by reference into and form is an integral part of this Information Circular.

Any statement contained in a document incorporated or deemed to be incorporated by reference herein shall be deemed to be modified or superseded for purposes of this Information Circular to the extent that a statement contained herein or any other subsequently filed document that also is or is deemed to be incorporated by reference herein modifies or supersedes that statement. The modifying or superseding statement need not state that it has modified or superseded a prior statement or include any other information set forth in the document that it modifies or supersedes. The making of a modifying or superseding statement shall not be deemed an admission for any purposes that the modified or superseded statement, when made, constituted a misrepresentation, an untrue statement of a material fact or an omission to state a material fact that is required to be stated or that is necessary to make a statement not misleading in light of the circumstances in which it was made. Any statement so modified or superseded shall not be

deemed, except as so modified or superseded, to constitute a part of this Information Circular.

## SCHEDULE A

## FORM OF RESOLUTION

**BE IT RESOLVED THAT:**

1.    The plan of compromise and arrangement (as such Plan may be amended, varied or supplemented from time to time in accordance with its terms, the "**Plan**") under the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended to and including January 14, 2009, concerning, affecting and involving Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Global Corporation, Nortel Networks International Corporation, Nortel Networks Technology Corporation, Nortel Communications Inc., Architel Systems Corporation and Northern Telecom Canada Limited (each, a "**Canadian Debtor**" and collectively, the "**Canadian Debtors**"), substantially in the form attached as Schedule "A" to the information circular dated November 4, 2016 (the "**Information Circular**") and the transactions contemplated therein be and is hereby accepted, approved, agreed to and authorized; and

2.    Any authorized representative of the Canadian Debtors, be and is hereby authorized, for and on behalf of the Canadian Debtors, to execute and deliver, or cause to be executed and delivered, any and all documents and instruments and to take or cause to be taken such other actions as he or she may deem necessary or desirable to implement this resolution and the matters authorized hereby, including the transactions required by the Plan, such determination to be conclusively evidenced by the execution and delivery of such documents or other instruments or taking of any such action.

## SCHEDULE "B" – GLOSSARY OF CERTAIN TERMS

"**1988 Bondholders**" means a holder of one or more 1988 Bonds, including any holder of a beneficial interest in 1988 Bonds.

"**1988 Bondholder Claim**" means a Claim by a 1988 Bondholder in respect of the 1988 Bonds, including as asserted by the 1988 Bonds Trustee.

"**1988 Bonds**" means the 6.875% Senior Notes due 2023, governed by the 1988 Bonds Indenture, issued by Northern Telecom Limited (now NNL).

"**1988 Bonds Indenture**" means that certain Indenture dated November 30, 1988, made by Northern Telecom Limited (now NNL), as issuer, and The Toronto-Dominion Bank Trust Company, as trustee.

"**1988 Bonds Trustee**" means Wilmington Trust, National Association in its capacity as replacement trustee under the 1988 Bonds Indenture.

"**2006 Bonds**" means the Floating Rate Senior Notes due 2011, the 10.125% Senior Notes due 2013 and the 10.750% Senior Notes due 2016, governed by the Indenture dated as of July 5, 2006, as supplemented by the First Supplemental Indenture dated as of July 5, 2006, the Second Supplemental Indenture dated as of May 1, 2007, and the Third Supplemental Indenture dated as of May 28, 2008, issued by NNL and guaranteed by NNC and NNI.

"**2007 Bonds**" means the 1.75% Convertible Senior Notes due 2012 and the 2.125% Convertible Senior Notes due 2014, governed by the Indenture dated as of March 28, 2007,  issued by NNC and guaranteed by NNL and NNI.

"**Additional Bondholder Fee Amount**" has the meaning ascribed thereto in Section 4.11 of the Plan.

"**Administration Charge**" has the meaning ascribed thereto in the Initial Order.

"**Administrative Reserve**" means a reserve of Available Cash in an amount to be determined by the Monitor to be held by the Canadian Estate for the purpose of maintaining security for obligations secured by the Administration Charge and funding the ongoing obligations, administration and wind-down of the Canadian Estate and the implementation of the Plan, including the professional fees and expenses of the Monitor and its counsel.

"**Affected Claim**" means (i) any Claim that is not an Unaffected Claim, and (ii) any Director/Officer Claim that is a Released Claim and, for greater certainty, includes any Affected Unsecured Claim, Intercompany Claim (excluding any Canadian Intercompany Claim and the Remaining Revolver Claim) or Equity Claim.

"**Affected Creditor**" means any Creditor with an Affected Claim, but only with respect to and to the extent of such Affected Claim.

"**Affected Unsecured Claim**" means any Affected Claim that is not a Director/Officer Claim or Equity Claim.

"**Affected Unsecured Creditor**" means any holder of an Affected Unsecured Claim, but only with respect to and to the extent of such Affected Unsecured Claim.

"**Affected Unsecured Creditor Pool**" means, on a Distribution Date, the amount of Available Cash, less: (i) the Unresolved Claims Reserve; (ii) the Administrative Reserve; and (iii) the amounts necessary to satisfy any outstanding Proven Priority Claims.

"**Affected Unsecured Creditors Class**" means the class of Creditors comprised solely of Affected Unsecured Creditors grouped for the purposes of considering and voting on the Plan and receiving distributions hereunder.

"**Allocation Dispute**" means that certain litigation before the Canadian Court and the U.S. Court in which the allocation of the Sale Proceeds is at issue.

"**Applicable FX Rate**" means the spot or blended rate (as applicable, which blended rate shall take into account the amounts converted and the rates at which such conversion occurred) at which Sale Proceeds are or have been

converted from U.S. dollars to Canadian dollars as contemplated by Section 7(b) of the Settlement and Support Agreement.

"**Applicable Law**" means any law, statute, order, decree, consent decree, judgment, rule regulation, ordinance or other pronouncement having the effect of law whether in Canada, the United States or any other country, or any domestic or foreign state, county, province, city or other political subdivision or of any Governmental Entity.

"**Allowed Claims**" shall have the meaning given to such term in the U.S. Plans.

"**Available Cash**" means, from time to time, all Cash of the Canadian Estate, including but not limited to the Canadian Debtors' cash on hand and amounts released to the Canadian Estate as contemplated pursuant to Section 4.2 and Section 4.3 of the Plan, and includes any Cash received by the Canadian Estate from the sale or other disposition or monetization of any residual assets or any other Cash received by the Canadian Estate from time to time.

"**Bankruptcy Proceeding**" means any bankruptcy or receivership proceeding pursuant to the BIA, whether commenced by application for a bankruptcy or receivership order or by an assignment in bankruptcy made or deemed to be made, and shall include any proceeding in which a receiver is appointed in respect of a Person or its assets, including pursuant to provincial law.

"**BIA**" means the *Bankruptcy and Insolvency Act* (R.S.C. 1985, c. B-3, as amended) or any successor legislation thereto.

"**Bonds**" means the Crossover Bonds, NNCC Bonds and 1988 Bonds.

"**Bondholder Advisor Fee Letter**" means that certain fee letter dated June 23, 2011, among certain of the Canadian Debtors, Bennett Jones LLP, Milbank, Tweed, Hadley & McCloy LLP and FTI Capital Advisors, LLC and shall include, for the avoidance of doubt, the "2009 Engagement Letter" as such term is defined in the fee letter.

"**Bondholder Group**" means the ad hoc group of bondholders that hold notes issued and/or guaranteed by NNC, NNL, NNI and NNCC that has been organized and is participating in the CCAA Proceedings and the U.S. Proceedings, as such group may have been and may be constituted from time to time.

"**Business Day**" means a day, other than Saturday, Sunday or a statutory holiday, on which banks are generally open for business in both Toronto, Ontario, Canada and New York, New York, USA.

"**Canada Only Sale Proceeds Orders**" means the following orders of the CCAA Court: (i) Approval and Vesting Order (Strandherd Lands) dated November 19, 2009; (ii) Approval and Vesting Order (Nortel-LGE Joint Venture) dated May 3, 2010; (iii) Approval and Vesting Order (Relay) dated June 29, 2010; (iv) Approval and Vesting Order (IP Address Sale – Salesforce.com, Inc.) dated February 17, 2012; (v) Approval and Vesting Order (IP Address Sale) dated February 17, 2012; (vi) Approval and Vesting Order (IP Address Sale – Bell Aliant Regional Communications Limited Partnership) dated April 4, 2012; (vii) Approval and Vesting Order (IP Address Sale – Vodafone Americas Inc.) dated May 7, 2012; (viii) Approval and Vesting Order (IP Address Sale – Beyond Excellent Technology Ltd.) dated September 9, 2014; (viii) Approval and Vesting Order (IP Address Sale – Charter Communications Operating, LLC) dated December 17, 2014; (ix) Approval and Vesting Order (IP Address Sale – Zhejiang Tmall Technology Co., Ltd. and Alibaba Cloud Computing Limited) dated February 3, 2015; (x) Approval and Vesting Order (IP Address Sale – Alibaba.com LLC) dated April 16, 2015; (xi) Approval and Vesting Order (IP Address Sale – Frontier Communications) dated August 5, 2015; (xii) Approval and Vesting Order (IP Address Sale – Suddenlink Communications) dated August 5, 2015; (xiii) Approval and Vesting Order (IP Address Sale – Reliance Jio Infocomm Pte Ltd.) dated January 6, 2016; (xiv) Approval and Vesting Order (IP Address Sale – Zhejiang Alibaba Cloud Computing Limited and Alibaba.com LLC) dated February 1, 2016, and any other order of the CCAA Court pursuant to which proceeds of sale arising solely from the assets of the Canadian Debtors are held (but excluding, for the avoidance of doubt, the orders of the CCAA Court approving the Escrow Agreements).

"**Canadian Allocation**" means the Sale Proceeds to be received by the Canadian Estate pursuant to Section 2 of the Settlement and Support Agreement as described in Section 4.2(c)(i) of the Plan.

"**Canadian Court**" means the CCAA Court, the Ontario Court of Appeal, the Supreme Court of Canada or any other court of competent jurisdiction overseeing the CCAA Proceedings or any Bankruptcy Proceeding in respect of any of the Canadian Debtors or their assets (including any appeals) from time to time.

"**Canadian Dollar Escrow Account**" means the account with the Canadian Escrow Agent established pursuant to the Canadian Escrow Agreement to hold the Canadian dollar denominated Cash resulting from the conversion of up to $1,200,000,000 of Sale Proceeds into Canadian dollars as contemplated in the Settlement and Support Agreement.

"**Canadian Escrow Agent**" means Royal Trust Corporation of Canada in its capacity as Canadian distribution agent under the Canadian Escrow Agreement.

"**Canadian Escrow Agreement**" means that certain Canadian distribution escrow agreement dated October 24, 2016, among NNC, NNL, NNI, NNUK, NNSA certain other Nortel Group entities, the Monitor, the UCC and the Canadian Escrow Agent governing that portion of the Sale Proceeds that has been or will be converted into Canadian dollars as contemplated in the Settlement and Support Agreement.

"**Canadian Escrow Release Order**" means an order issued by the CCAA Court authorizing and directing the Escrow Agents to release the Sale Proceeds from the Escrow Accounts in the manner contemplated by the Settlement and Support Agreement.

"**Canadian Estate**" means the Canadian Debtors as substantively consolidated pursuant to the Plan, the corporate body of which shall be NNL. From and after the Plan Effective Date, references to the Canadian Estate shall be deemed to be references to NNL, and *vice versa*.

"**Canadian Intercompany Claims**" has the meaning ascribed thereto in Section 2.2(f) of the Plan.

"**Canadian Pension Claim**" means any and all Claims arising from or related to deficits and alleged deficits in the Canadian Registered Pension Plans.

"**Canadian Registered Pension Plans**" means: (i) the Managerial Plan; and (ii) the Negotiated Plan.

"**Canadian Tax Act**" means the *Income Tax Act* (Canada) and the Income Tax Regulations, in each case as amended from time to time.

"**Cash**" means cash, certificates of deposit, bank deposits, commercial paper, treasury bills and other cash equivalents.

"**CCAA**" has the meaning ascribed thereto in the recitals to the Plan.

"**CCAA Court**" has the meaning ascribed thereto in the recitals to the Plan.

"**CCAA Proceedings**" means the proceedings commenced by certain of the Canadian Debtors in the CCAA Court under the CCAA on the Filing Date, having Court File Number 09-CL-7950, and shall include the CCAA proceedings of the New Applicants.

"**CCC**" means the ad hoc committee of creditors having claims only against the Canadian Debtors comprised of: the former and disabled Canadian employees of the Canadian Debtors through their court-appointed representatives, Unifor, Morneau Shepell Ltd. as Administrator of the Canadian Registered Pension Plans, the Superintendent of Financial Services of Ontario as Administrator of the Pension Benefits Guarantee Fund and the court-appointed representatives of the current and transferred employees of the Canadian Debtors.

"**Chapter 15 Proceedings**" means the foreign recognition proceedings of the Canadian Debtors pursuant to Chapter 15 of the United States Bankruptcy Code pending before the U.S. Bankruptcy Court (Case No. 09-10164(KG)).

"**Charges**" means the Administration Charge, the Excess Funding Charge, the Directors' Charge, the Inter-Company Charge, the Shortfall Charge, the Payments Charge and the Nortel Special Incentive Plan Charge, each as defined in the Initial Order.

"**Claim**" means:

(a)     any right of any Person against the Canadian Debtors, or any of them, in connection with any indebtedness, liability or obligation of any kind of the Canadian Debtors, or any of them, whether liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, unsecured, perfected, unperfected, present, future, known or unknown, by guarantee, surety or otherwise and whether or not such right is executory or anticipatory in nature, including the right or ability of any Person to advance a claim for contribution or indemnity or otherwise with respect to any matter, action, cause or chose in action, whether existing at present or commenced in the future, which indebtedness, liability or obligation (A) is based in whole or in part on facts existing prior to the Filing Date, (B) relates to a time period prior to the Filing Date, or (C) would have been a claim provable in bankruptcy had the Canadian Debtors become bankrupt on the Filing Date; and

(b)     any indebtedness, liability or obligation of any kind arising out of the restructuring, termination, repudiation or disclaimer of any lease, contract, or other agreement or obligation on or after the Filing Date,

and shall include any "Claim", "EMEA Claim" or "Intercompany Claim" (as such terms are defined in the Claims Orders, in each case without any reference to the exclusion of any claims in such definitions), provided that the definition of Claim herein shall not include a Director/Officer Claim.

"**Claims Orders**" means, as the context requires, any or all of the following orders of the CCAA Court: (i) the Claims Procedure Order; (ii) the Claims Resolution Order dated September 16, 2010; (iii) the Order Approving Cross-Border Claims Protocol dated September 16, 2010; (iv) the Compensation Claims Procedure Order; (v) the EMEA Claims Procedure Order dated January 14, 2011; (vi) the Intercompany Claims Procedure Order dated July 27, 2012; (vii) paragraphs 12 to 18 of the Order (Stay Extension and Various Other Matters – September 2016) dated September 29, 2016; and (viii) the Post-Filing Claims Bar Date Order.

"**Claims Procedure Order**" means the Claims Procedure Order of the CCAA Court dated July 30, 2009, as amended and restated on October 7, 2009.

"**Compensation Creditors**" means Creditors who are holders of Compensation Claims (as such term is defined in the Compensation Claims Procedure Order).

"**Contingent Additional NNUK Claim**" has the meaning ascribed thereto in Section 4.8 of the Plan.

"**Court Appointed Representative Counsel**" shall mean Koskie Minsky LLP, Shibley Righton LLP and Nelligan O'Brien Payne LLP in their capacity as CCAA Court appointed representative counsel to certain Compensation Creditors pursuant to orders of the CCAA Court dated May 27, 2009 (former employees), July 22, 2009 (current employees) and July 30, 2009 (long term disability beneficiaries), and shall include any financial advisor retained by such counsel.

"**Creditor**" means any Person having a Claim, but only with respect to and to the extent of such Claim, including the transferee or assignee of a transferred Claim that is recognized as a Creditor in accordance with the Claims Orders or a trustee, executor, liquidator, receiver, receiver and manager, or other Person acting on behalf of or through such Person, and shall include the Former Employee Priority Creditors.

"**Creditor Joinder**" means a joinder to the Settlement and Support Agreement, substantially in the form annexed thereto as Annex D.

"**Creditor's Maximum**" has the meaning ascribed thereto in Section 3.5(b) of the Plan.

"**Crossover Bondholder**" means a holder of one or more Crossover Bonds, including any holder of a beneficial interest in Crossover Bonds.

"**Crossover Bondholder Claim**" means a Claim by a Crossover Bondholder in respect of the Crossover Bonds, including as asserted by the Crossover Bonds Trustee.

"**Crossover Bonds**" means the 2006 Bonds and the 2007 Bonds.

"**Crossover Bonds Indentures**" means: (i) the Indenture dated as of March 28, 2007, by NNC as issuer and NNL and NNI as guarantors, governing the 2007 Bonds; (ii) the Indenture dated as of July 5, 2006, as supplemented by the First Supplemental Indenture dated as of July 5, 2006, the Second Supplemental Indenture dated as of May 1, 2007, and the Third Supplemental Indenture dated as of May 28, 2008, by NNL as issuer and NNC and NNI as guarantors, governing the 2006 Bonds, in each case with the Crossover Bonds Trustee as trustee.

"**Crossover Bonds Trustee**" means The Bank of New York Mellon in its capacity as indenture trustee under the Crossover Bonds Indentures.

"**Crossover Claim**" means a claim arising out of a debt or other obligation of one or more of the U.S. Debtors that is guaranteed or indemnified by one or more of the Canadian Debtors, or a debt or other obligation of one or more of the Canadian Debtors that is guaranteed or indemnified by one or more of the U.S. Debtors, including the Crossover Bondholder Claims, the NNCC Bondholder Claims and the claims of Export Development Canada against the U.S. Debtors and the Canadian Debtors, but excluding, in relation to the Canadian Debtors, any obligation of a Canadian Debtor guaranteed by another Canadian Debtor.

 "**Directors**" means all former directors (or their estates) of the Canadian Debtors, in such capacity, and "**Director**" means any one of them.

"**Directors' Charge**" has the meaning ascribed thereto in the Initial Order.

"**Director/Officer Claim**" means any right or claim of any Person howsoever arising against one or more of the Directors or Officers that relates to a Claim for which any Director or Officer of a Canadian Debtor is alleged to be by statute or otherwise by law liable to pay in his or her capacity as a Director or Officer, whether or not such right or claim is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, unsecured, perfected, unperfected, present, future, known, or unknown, by guarantee, surety or otherwise, and whether or not such right is executory or anticipatory in nature, including the right or ability of any Person to advance a claim for contribution or indemnity or otherwise with respect to any claim, matter, action, cause or chose in action, whether existing at present or commenced in the future, and shall include any "Director/Officer Claim" (as such term is defined in the Claims Procedure Order without any reference to the exclusion of any claims in such definition).

"**Distribution Date**" means the date or dates from time to time set in accordance with the provisions of the Plan to effect distributions in respect of the Proven Affected Unsecured Claims, and includes the Initial Distribution Date.

"**Distribution Record Date**" has the meaning ascribed thereto in Section 6.3(b) of the Plan.

"**Duplicative Claims**" has the meaning ascribed thereto in Section 2.2(d) of the Plan.

"**EI Act**" means the *Employment Insurance Act* (S.C. 1996, c. 23, as amended).

"**EI Confirmation**" means, in respect of a Compensation Creditor, confirmation from Employment and Social Development Canada of the amount, if any, owing by such Compensation Creditor pursuant to Section 45 of the EI Act.

"**EMEA Claims Settlement Agreement**" means the Agreement Settling EMEA Canadian Claims and Related Claims dated July 9, 2014, and approved by Order (Approving Agreement Settling EMEA Canadian Claims and Related Claims) of the CCAA Court dated July 16 , 2014.

"**EMEA Non-Filed Entities**" means, collectively, Nortel Networks AS, Nortel Networks AG, Nortel Networks South Africa (Pty) Limited, Nortel Networks (Northern Ireland) Limited and Nortel Networks Optical Components Limited.

"**Encumbrance**" means any charge, mortgage, lien, pledge, claim, restriction, hypothec, adverse interest, security interest or other encumbrance whether created or arising by agreement, statute or otherwise at law, attaching to property, interests or rights and shall be construed in the widest possible terms and principles known under the law

applicable to such property, interests or rights and whether or not they constitute specific or floating charges as those terms are understood under the laws of the Province of Ontario.

"**Equity Claim**" means a Claim that is in respect of an Equity Interest, including a claim for, among others: (a) a dividend or similar payment, (b) a return of capital, (c) a redemption or retraction obligation, (d) a monetary loss resulting from the ownership, purchase or sale of an Equity Interest or from the rescission, or, in Quebec, the annulment, of a purchase or sale of an Equity Interest, or (e) contribution or indemnity in respect of a claim referred to in any of the foregoing (a) to (d).

"**Equity Claimant**" means any Person with an Equity Claim or holding an Equity Interest, but only in such capacity.

"**Equity Interest**" means a share of a Canadian Debtor, or a warrant or option or another right to acquire a share in a Canadian Debtor, including the common shares of NNC and the preferred shares of NNL.

"**Escrow Agents**" means JPMorgan Chase Bank, N.A., the Canadian Escrow Agent and any other "Escrow Agent" as defined in the Settlement and Support Agreement.

"**Escrow Agreements**" means the various court-approved escrow agreements listed in Schedule A to the Plan pursuant to which the Sale Proceeds are held by the Escrow Agents, and shall include the Canadian Escrow Agreement and any other "Escrow Agreement" as such term is defined in the Settlement and Support Agreement.

"**Estate**" means either the Canadian Estate, the U.S. Debtors, or the EMEA Debtors (or any of them), as the context requires.

"**Final Distribution Certificate**" means a certificate of the Monitor to be posted by the Monitor on the Monitor's Website indicating that the Canadian Estate intends to make a Final Distribution, a copy of which shall be served on the service list in the CCAA Proceedings and filed with the CCAA Court.

"**Final Order**" means (a) with respect to an order of a Canadian Court, an order:  (i) as to which no appeal, leave to appeal, notice of appeal, motion to amend or make additional findings of fact, motion to alter or amend judgment, motion for rehearing or motion for new trial has been timely filed (in cases in which there is a date by which such filing is required to occur, it being understood that with respect to an order issued by the CCAA Court, the time period for seeking leave to appeal shall be deemed to have elapsed on the date that is 22 days after the rendering of such order unless a motion has been made to extend such time period) or, if any of the foregoing has been timely filed, it has been disposed of in a manner that upholds and affirms the subject order in all material respects without the possibility for further appeal thereon; (ii) in respect of which the time period for instituting or filing an appeal, leave to appeal, motion for rehearing or motion for new trial shall have expired (in cases in which such time period is capable of expiring, it being understood that with respect to an order issued by the CCAA Court, the time period for seeking leave to appeal shall be deemed to have elapsed on the date that is 22 days after the rendering of such order unless a motion has been made to extend such time period); and (iii) as to which no stay is in effect; or (b) with respect to an order of a U.S. Court, an order that has not been reversed, stayed, superseded or vacated or, to the extent it has been stayed such stay shall have expired.

"**Former Employee Priority Creditors**" means the former employees of the Canadian Debtors who are entitled to a CA$3,000 priority claim in these CCAA Proceedings in lieu of receiving their Termination Payment pursuant to the Order (Stay Extension and Various Other Matters – March 2016) of the CCAA Court dated March 18, 2016.

"**French Liquidator**" means Maître Cosme Rogeau in his capacity as Liquidator for NNSA under the French Secondary Proceeding.

"**Iceberg**" means the residual intellectual property remaining following the Nortel Group business line sales, which intellectual property was sold to a consortium in July 2011.

"**Iceberg Amendment Fee**" means the $5,000,000 cumulative fee previously agreed by the Canadian Debtors, U.S. Debtors and EMEA Debtors to be funded directly as follows: $2,800,000 to NNI, and $2,200,000 to NNUK, all from the Iceberg Sale Proceeds prior to any other agreed upon allocation of the Sale Proceeds.

"**Iceberg Sale**" means the sale of the Iceberg assets.

"**Iceberg Sale Proceeds**" means that portion of the Sale Proceeds generated from the Iceberg Sale.

"**Indenture Trustee**" means each of the 1988 Bonds Trustee, the Crossover Bonds Trustee and the NNCC Bonds Trustee.

"**Initial Distribution**" means the first distribution to Affected Unsecured Creditors pursuant to Section 6.3 of the Plan.

"**Initial Distribution Date**" means the date on which the Initial Distribution is made, which date shall be a Business Day.

"**Inter-company Charge**" has the meaning ascribed thereto in the Initial Order.

"**Insurance Policy**" means any insurance policy pursuant to which any Canadian Debtor or any Director or Officer is insured.

"**Insured Claim**" means all or that portion of a Claim or a Director/Officer Claim that is insured under an Insurance Policy, but solely to the extent that such Claim or Director/Officer Claim, or portion thereof, is so insured, and only as against such insurance.

"**Intercompany Claims**" means a Claim by a Nortel Group entity (including by any administrator, liquidator, receiver, trustee, office holder or similar official appointed in respect thereof) against a Canadian Debtor, including those unsecured intercompany claims against the Canadian Debtors set out on Schedule "C" to the Plan.

"**Joint Liquidators**" means Richard Barker and Joseph Luke Charleton as joint liquidators of Nortel Networks (Northern Ireland) Limited (in liquidation) and Richard Barker and Samantha Keen as joint liquidators of Nortel Networks Optical Components Limited (in liquidation).

"**M&A Cost Reimbursement**" means the reimbursement of certain costs related to fees and expenses incurred in connection with the sale of assets which generated the Sale Proceeds.

"**Managerial Plan**" means the Nortel Networks Limited Managerial and Non-Negotiated Pension Plan (Registration No. 0342048).

"**Meeting**" means the meeting of the Affected Unsecured Creditors Class to be held on the Meeting Date called pursuant to the Meeting Order for the purpose of considering and voting on the Plan pursuant to the CCAA, and includes any adjournment, postponement or other rescheduling of such meeting in accordance with the Meeting Order.

"**Monitor's Powers Orders**" means the following orders of the CCAA Court: (i) the Initial Order; (ii) the Claims Orders; (iii) the Order dated August 14, 2009; (iv) the Order (Monitor's Expansion of Power Order #2) dated October 3, 2014; (v) the Order (New Applicants) dated March 18, 2016; and (vi) the Meeting Order.

"**MSS**" means Nortel's North American, CALA and Asian Multi-Service Switch business.

"**Negotiated Plan**" means the Nortel Networks Negotiated Pension Plan (Registration No. 08587766).

"**NNC**" means Nortel Networks Corporation, a Canadian Debtor.

"**NNCC**" means Nortel Networks Capital Corporation, a U.S. Debtor.

"**NNCC Bondholder**" means a holder of one or more NNCC Bonds, including any holder of a beneficial interest in NNCC Bonds.

"**NNCC Bondholder Claim**" means a Claim of an NNCC Bondholder in respect of the NNCC Bonds, including as asserted by the NNCC Bonds Trustee.

"**NNCC Bondholder Signatories**" means the holders of NNCC Bonds that executed the Settlement and Support Agreement as parties thereto.

"**NNCC Bonds**" means the 7.875% Notes due 2026 governed by the NNCC Bonds Indenture, issued by Northern Telecom Capital Corporation (now NNCC) and guaranteed by Northern Telecom Limited (now NNL).

"**NNCC Bonds Indenture**" means the Indenture dated as of February 15, 1996, by Northern Telecom Capital Corporation (now NNCC) as issuer, Northern Telecom Limited (now NNL) as guarantor and The Bank of New York, as trustee, governing the NNCC Bonds.

"**NNCC Bonds Trustee**" means Law Debenture Trust Company of New York in its capacity as replacement trustee under the NNCC Bonds Indenture.

"**NNI**" means Nortel Networks Inc., a U.S. Debtor.

"**NNL**" means Nortel Networks Limited, a Canadian Debtor.

"**Nortel Group**" means, collectively, NNC and all of its present and former direct and indirect subsidiaries.

"**Officers**" means all former officers (or their estates) of the Canadian Debtors, in such capacity, and "**Officer**" means any one of them.

"**Order**" means any order of the Canadian Court made in connection with the CCAA Proceedings.

"**Other Canadian Debtors**" means the Canadian Debtors other than NNL.

"**Participating Creditors**" has the meaning ascribed thereto in the Settlement and Support Agreement.

"**Person**" means any individual, firm, corporation, limited or unlimited liability company, general or limited partnership, association, trust, unincorporated organization, union, joint venture, government or any agency, officer or instrumentality thereof or any other entity.

"**Personnel Files Agreement**" means that certain Agreement re: Hard Copy Personnel Files dated December 3, 2015, among certain of the Canadian Debtors, the Monitor, certain of the U.S. Debtors and Morneau Shepell Ltd. in its capacity as administrator of the Canadian Registered Pension Plans and not in its personal capacity.

"**Plan**" means the Plan of Compromise and Arrangement filed by the Canadian Debtors under the CCAA, as it may be amended, supplemented or restated from time to time in accordance with the terms hereof.

"**Plan Certificates**" has the meaning ascribed to such term in Section 9.1 of the Plan.

"**Plan Effective Conditions**" has the meaning ascribed thereto in Section 9.2 of the Plan.

"**Plan Effective Date**" means the date which is the first Business Day on which the Plan Effective Conditions have been satisfied or waived in accordance with the terms of the Plan.

"**Plan Implementation Conditions**" means the conditions set out in Section 9.2 of the Plan.

"**Plan Implementation Date**" means the date which is the first Business Day on which the Plan Implementation Conditions have been satisfied or waived in accordance with the terms of the Plan.

"**Post-Filing Claim**" has the meaning ascribed thereto in the Post-Filing Claims Bar Date Order.

"**Post-Filing Claims Bar Date Order**" means the Order of the CCAA Court to be requested that establishes a claims bar date for Post-Filing Claims and a procedure to resolve any Post-Filing Claims.

"**Post-Filing Date Interest**" means interest or a similar amount on a Claim accruing or relating to the period from and after the Filing Date, and includes (i) a make whole premium, early redemption payment, optional redemption

payment, no-call payment or similar amount, and (ii) any interest accruing or relating to the period from and after the Filing Date that purports to be included as a component of a liquidated damages or similar provision under an agreement.

"**Proof of Claim**" has the meaning ascribed thereto in the Claims Orders.

"**Proven Affected Unsecured Claim**" means any Affected Unsecured Claim or portion thereof that has been finally determined to be a "Proven Claim" (as that term is defined in the Claims Orders) for distribution purposes, and includes the Claims referenced in Sections 4.4 through 4.10 of the Plan (excluding, for the avoidance of doubt, the Remaining Revolver Claim and the Canadian Intercompany Claims).

"**Proven NNUK Claim**" has the meaning ascribed thereto in Section 4.8 of the Plan.

"**Proven Priority Claims**" means: (i) the $62,700,000 Remaining Revolver Claim of NNI; (ii) the CA$3,000 (subject to applicable withholdings) payment to each Former Employee Priority Creditor in respect of any entitlement to an outstanding Termination Payment; and (iii) any other Claim or Post-Filing Claim established pursuant to an order of the CCAA Court and allowed as a proven priority claim against the Canadian Estate entitled to be paid in full, or otherwise entitled to be paid in priority to Proven Affected Unsecured Claims.

"**Records Assistance Side Letter**" means that certain letter agreement re: records assistance dated October 12, 2016 between the Joint Administrators and the Canadian Debtors.

"**Released Director/Officer Claim**" means any Director/Officer Claim that is not a Non-Released Claim.

"**Remaining Revolver Claim**" has the meaning ascribed thereto in the CFSA.

"**Required Majority**" means, with respect to the Affected Unsecured Creditors Class, a majority in number of Affected Unsecured Creditors holding Voting Claims representing at least two thirds in value of the Voting Claims of Affected Unsecured Creditors, in each case who are entitled to vote at the Meeting in accordance with the Meeting Order and who are present and voting in person or by proxy on the resolution approving the Plan at the Meeting.

"**Residual IP**" means certain remaining intellectual property assets of Nortel including its approximately 7,000 patent portfolio.

"**Sale Proceeds**" means the remaining sale proceeds generated by the sales of the various Nortel Group business lines and the Iceberg Sale between 2009 and 2011 plus interest accrued thereon, being approximately $7,254,279,269 as at July 31, 2016 (excluding, for the avoidance of doubt, the Iceberg Amendment Fee and the M&A Cost Reimbursement).

"**Sanction Order**" means the Order of the CCAA Court sanctioning and approving the Plan.

"**Settlement and Support Agreement Releases**" means the "Releases" as such term is defined in the Settlement and Support Agreement.

"**Tax**" or "**Taxes**" means any and all federal, provincial, municipal, local and foreign taxes, assessments, reassessments and other Governmental Entity charges, duties, impositions and liabilities including for greater certainty taxes based upon or measured by reference to income, gross receipts, profits, capital, transfer, land transfer, sales, goods and services, harmonized sales, use, value-added, excise, withholding, business, franchising, property, development, occupancy, employer health, payroll, employment, health, social services, education and social security taxes, all surtaxes, all customs duties and import and export taxes, all licence, franchise and registration fees and all employment insurance, health insurance and Canada, Quebec and other government pension plan premiums or contributions, together with all interest, penalties, fines and additions with respect to such amounts.

"**Taxing Authorities**" means Her Majesty the Queen in right of Canada, Her Majesty the Queen in right of any province or territory of Canada, the Canada Revenue Agency, any similar revenue or taxing authority of Canada and each and every province or territory of Canada and any political subdivision thereof, the United States Internal Revenue Service, any similar revenue or taxing authority of the United States and each and every state of the United

States, and any Canadian, United States or other Governmental Entity exercising taxing authority or power, and "**Taxing Authority**" means any one of the Taxing Authorities.

"**U.K. Court**" means the High Court of Justice of England and Wales in London, any court hearing appeals therefrom and any other court of competent jurisdiction overseeing the EMEA Proceedings from time to time, including any appeals.

"**U.S. Distribution Agent**" means JPMorgan Chase Bank, N.A.

"**U.K. Pension Trustee**" means the Nortel Networks UK Pension Trust Limited as trustee of the Nortel Networks Pension Plan (U.K.).

"**U.S. Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware.

"**U.S. Plans**" means the Chapter 11 of the United States Bankruptcy Code plans (including any exhibits, annexes and schedules thereto) for the U.S. Debtors that effectuate the settlement contemplated by the Settlement and Support Agreement, consistent with the terms of the Settlement and Support Agreement, as they may be modified or supplemented in accordance with their terms.

"**U.S. Proceedings**" means, collectively, those insolvency proceedings that were commenced before the U.S. Bankruptcy Court on or after January 14, 2009 in respect of the U.S. Debtors pursuant to Chapter 11 of the United States Bankruptcy Code.

"**Unaffected Creditor**" means a Creditor or other Person who holds an Unaffected Claim, but only in respect of and to the extent of such Unaffected Claim.

"**Unavailable Cash**" means any Cash of the Canadian Debtors that has been identified or described by the Monitor as "Unavailable Cash" in its reports to the CCAA Court.

"**Unresolved Affected Unsecured Claim**" means an Affected Unsecured Claim which on the Initial Distribution Date or any subsequent Distribution Date, in whole or in part: (i) has not been finally determined to be a Proven Affected Unsecured Claim in accordance with the Claims Orders; (ii) is validly disputed in accordance with the Claims Orders; and/or (iii) remains subject to review and/or resolution in accordance with the Claims Orders, including both as to proof and/or quantum.

"**Unresolved Claims Reserve**" means a reserve of Available Cash to be held by the Canadian Estate (in an amount to be calculated by the Monitor on the Initial Distribution Date, and recalculated as at any subsequent Distribution Date) equal to (i) the amount that would have been paid if the full amount of all Unresolved Affected Unsecured Claims had been Proven Affected Unsecured Claims as of such date, plus (ii) the full amount of any unresolved Post-Filing Claims filed in accordance with the Post-Filing Claims Bar Date Order, or, in each case, such lesser amount as may be ordered by the CCAA Court.

"**Voting Claim**" shall have the meaning ascribed to such term in the Meeting Order.

**SCHEDULE "C" – EXCHANGE RATES**

Currency conversion factors
Source: Reuters, January 14, 2009

|     |                          | CAD per unit of Currency |
| --- | ------------------------ | ------------------------ |
| CAD | Canadian Dollar          | 1                        |
| USD | United States Dollar     | 1.22025                  |
| EUR | Euro                     | 1.6170753                |
| GBP | United Kingdom: Pnd Ster | 1.77741615               |
| JPY | Japan: Yen               | 0.01362647               |

| Code | Currency | CAD | Code | Currency | CAD |
| --- | --- | --- | --- | --- | --- |
| AED | United Arab Emir.: Dirham | 0.33221709 | LTL | Lithuanian Litas | 0.46830925 |
| ARS | Argentine Peso | 0.35410621 | LVL | Latvian Lats | 2.29456567 |
| AUD | Australian Dollar | 0.82275356 | MAD | Moroccan Dirham | 0.14500201 |
| BBD | Barbados Dollar | 0.61319095 | MXN | Mexican Peso | 0.08842392 |
| BDT | Bangladeshi Taka | 0.01772331 | MYR | Malaysian Ringgit | 0.34156754 |
| BGN | Bulgaria: New Lev | 0.82683968 | NGN | Nigerian Naira | 0.00816494 |
| BOB | Bolivian Boliviano | 0.17345416 | NOK | Norwegian Krone | 0.17167276 |
| BRL | Brazilian Real | 0.52726527 | NZD | New Zealand Dollar | 0.6711375 |
| CHF | Swiss Franc | 1.09468915 | OMR | Oman: Rial Omani | 3.16980987 |
| CLP | Chilean Peso | 0.0019827 | PAB | Panama: Balb0A | 1.22025 |
| CNY | China: Yuan Renminbi | 0.17854268 | PEN | Peru: Nuevo Sol | 0.3889243 |
| COP | Colombian Peso | 0.00054867 | PGK | Papua New Guinea Kina | 0.4671117 |
| CRC | Costa Rican Colon | 0.00219273 | PHP | Philippine Peso | 0.02592415 |
| CZK | Czech Koruna | 0.06004872 | PKR | Pakistan Rupee | 0.015414 |
| DKK | Danish Krone | 0.21701242 | PLN | Poland: Zloty | 0.39077386 |
| DOP | Dominican Peso | 0.03444601 | PYG | Paraguay: Guarani | 0.0002498 |
| DZD | Algerian Dinar | 0.01682672 | QAR | Qatar: Qatari Rial | 0.33516446 |
| EEK | Estonian Kroon | 0.10334226 | RON | New Romania Leu | 0.37703348 |
| EGP | Egyptian Pound | 0.22086973 | RUB | Russian Ruble | 0.03847246 |
| FJD | Fiji Dollar | 0.67418812 | SAR | Saudi Arabia: Saudi Riyal | 0.32539566 |
| GTQ | Guatemala: Quetzal | 0.15495238 | SEK | Swedish Krona | 0.14788041 |
| HKD | Hong Kong Dollar | 0.15732068 | SGD | Singapore Dollar | 0.82052921 |
| HUF | Hungary: Forint | 0.00583154 | THB | Thailand: Baht | 0.03495417 |
| IDR | Indonesia: Rupiah | 0.00010993 | TND | Tunisian Dinar | 0.89144172 |
| ILS | Israel: Shekel | 0.31449742 | TRY | New Turkish Lira | 0.76914592 |
| INR | Indian Rupee | 0.02499872 | TTD | Trinidad & Tobago Dollar | 0.19524 |
| ISK | Iceland Krona | 0.00966994 | UAH | Ukraine: Hryvnia | 0.13945714 |
| JMD | Jamaican Dollar | 0.01515838 | UYU | Uruguay: Peso | 0.05016444 |
| JOD | Jordanian Dinar | 1.72084329 | VEF | Bolivar Fuerte | 0.56827178 |
| KPW | North Korean Won | 0.00853023 | VND | Vietnam: Dong | 0.00006981 |
| KRW | Republic Of Korea: Won | 0.00090543 | XCD | East Caribbean Dollar | 0.4587406 |
| KWD | Kuwaiti Dinar | 4.28157891 | ZAR | South Africa: Rand | 0.12249969 |
| LBP | Lebanese Pound | 0.00080945 | ZMK | Zambia: Kwacha | 0.00024601 |
| LKR | Sri Lanka Rupee | 0.01072276 |  |  |  |

6628799

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION *et al.*

Court File No:  09-CL-7950

---

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

Proceeding commenced at Toronto

---

**ONE HUNDRED AND THIRTY FIRST REPORT**
**OF THE MONITOR DATED**
**NOVEMBER 4, 2016**

---

**GOODMANS LLP**
Barristers & Solicitors
Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto, ON  M5H 2S7

Jay A. Carfagnini  (LSUC#: 22293T)
jcarfagnini@goodmans.ca
Joseph Pasquariello (LSUC# 38390C)
jpasquariello@goodmans.ca
Christopher G. Armstrong (LSUC# 55148B)
carmstrong@goodmans.ca

Tel: 416.979.2211
Fax: 416.979.1234

Lawyers for the Monitor, Ernst & Young Inc.