## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| Nortel Networks Inc., *et al.*,[1] | Case No. 09-10138 (KG) |
| Debtors. | (Jointly Administered) |
|  | Re: D.I. 14950 & 17452 |
|  | **Hearing Date on Reconsideration: December 20, 2016 at 10:00 a.m. ET**<br>**Objections to Reconsideration Due: December 13, 2016 at 4:00 p.m. ET** |
|  | **Hearing Date on Claim Objection: January 24, 2017 at 10:00 a.m. ET**<br>**Objections to Claim Objection Due: December 30, 2016 at 4:00 p.m. ET** |

## THE NORTEL TRADE CLAIMS CONSORTIUM'S (I) MOTION FOR RECONSIDERATION AND VACATION OF THE BANKRUPTCY COURT'S DECEMBER 18, 2014 PPI SETTLEMENT ORDER AND (II) OBJECTION TO CROSSOVER BONDS CLAIMS

The Nortel Trade Claims Consortium (the "Consortium")[2], as holders of certain U.S.

Trade Claims against Nortel Networks Inc. ("NNI") and certain of its U.S. affiliates, as debtors

and debtors-in-possession in the above-captioned proceedings (collectively, the "Debtors"), by

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567), Nortel Networks (CALA) Inc. (4226) and Nortel Networks India International, Inc. (8667).  For the avoidance of doubt, the terms "Debtors" and "U.S. Debtors" are used interchangeably herein, and the chapter 11 cases of the Debtors are referenced collectively herein as the "Cases".

[2] The Consortium represents a group of creditors holding over $149 million in unsecured (non-funded debt) claims, including but not limited to trade (supplier) claims and employee severance and pension claims (all such types of claims in these Cases, the "U.S. Trade Claims") against the Debtors.  The U.S. Trade Claims are part of a body of general unsecured creditors with claims only against the U.S. Debtors (the "U.S.-only Unsecured Creditors," and the claims held thereby, the "U.S.-only Unsecured Claims").

and through its undersigned counsel, hereby (i) moves this Court (this "<u>Motion</u>") to reconsider and vacate its December 18, 2014 PPI Settlement Order [D.I. 14950] and (ii) objects to the Crossover Bonds Claims asserted by the Crossover Bondholders against NNI on account of various bonds issued by NNC and/or NNL and guaranteed by NNI (the "<u>Crossover Bonds</u>").  In support hereof, the Consortium respectfully states as follows:[3]

<u>**PRELIMINARY STATEMENT**</u>

1.      Through this Motion, the Consortium respectfully asks this Court to rectify an intractable problem that continues to depress the recoveries of U.S.-only Unsecured Creditors: namely, this Court's December 18, 2014 PPI Settlement Order (as defined below), which authorized the Debtors to enter into a Settlement Agreement with the Crossover Bondholders regarding the now-obsolete issue of the Crossover Bondholders' entitlement to postpetition interest.  Fortunately, a remedy exists: the Court can and should reconsider—and vacate—the Order in accordance with Bankruptcy Code section 502(j).  In addition, the Consortium objects to the allowance of the Crossover Bonds Claims against the U.S. Debtors under a U.S. plan.  As discussed herein, Bankruptcy Code section 502(b)(1) requires the disallowance of these claims because the purported basis for NNI's liability on account of such claims—its status as a guarantor of the Crossover Bonds—has been mooted by the Court's Allocation Decision. Although the Allocation Decision constitutes a *de facto* substantive consolidation of the Nortel Group, the Crossover Bonds Claims are rooted in the <u>Ivanhoe</u> rule.  However, these two doctrines are mutually-exclusive: <u>Ivanhoe</u> has *never* been applied in substantively consolidated cases.  Consequently, the Crossover Bonds Claims are unenforceable against NNI under applicable law, and thus must be disallowed.

---

[3] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Plan and Disclosure Statement.

2.      The Order itself is perhaps the last remaining relic in these Cases from the period before this Court issued its Allocation Decision in May 2015. Not only do the factual circumstances that existed when the Order was entered in December 2014 *no longer exist*, the current factual circumstances are in fact diametrically *opposite* those that animated the Court's entry of the Order nearly two years ago. As background, the PPI Settlement Order provisionally "allowed" the Crossover Bondholders to assert a nearly $4.0 billion general unsecured claim against the U.S. Debtors in connection with a dispute regarding the Crossover Bondholders' entitlement to postpetition interest. However, the issue of postpetition interest has since been resolved: section 7.12 of the Plan expressly provides that *no* postpetition interest will be paid on account of *any* Allowed Claim. In other words, the edifice upon which the Settlement Agreement was reached, and thus the entire basis for this Court's Order, has crumbled. Moreover, the Order was issued at a time when most parties believed that NNI was *solvent*—a Bankruptcy Code prerequisite for the payment of postpetition interest. See 9019 Settlement Opinion[4] at 7 ("NNI could be ***solvent*** by more than $1 billion[.]"); id. at 27 n. 17 (discussing "payment of post-petition interest by a ***solvent*** debtor"); id. at 43 (discussing "the possibility that NNI's estate could be ***solvent***") (emphasis added). But that ship has also long since sailed—all parties now understand that the Allocation Decision (and the allocations under the SPSA based thereupon) have rendered NNI ***insolvent***.

3.      Notwithstanding that the Order was intended to address issues that have been rendered moot by subsequent events, its very existence continues to harm U.S.-only Unsecured Creditors. This is because the Order's treatment of the Crossover Bondholders—entitling such holders to assert two claims against one asset pool—continues to taint the SPSA and Plan.

---

[4] See *Opinion Regarding Debtors' Motion Pursuant to Bankruptcy Rule 9019 Approving Settlement Agreement By Among Nortel Networks Inc., The Supporting Bondholders, and The Bank of New York Mellon With Respect To The NNI Post-Petition Interest Dispute and Related Issues* [D.I. 14949] (the "PPI Settlement Opinion").

Indeed, the Plan itself cites to the Order as the purported justification for handing the Crossover Bondholders an allowed, unreduced general unsecured claim against NNI in the amount of nearly $4.0 billion.  See Plan § 7.14 ("the Crossover Bonds Claims shall be Allowed as one or more general unsecured claims in the aggregate amount of $3,934,521,442, as specified in [the PPI Settlement Order]").  And even though the SPSA purports to be a stand-alone agreement, it is flawed because it proceeds from a contaminated starting point—namely, the Allocation Decision's "modified pro rata" allocation framework.  By setting an artificially-low "anchor point" on U.S. recoveries, the Allocation Decision heavily influenced the negotiation of the SPSA and continues to burden U.S.-only Unsecured Creditors.  Indeed, it is no coincidence that recoveries to U.S.-only Unsecured Creditors under the SPSA are between 1.8x - 3.0x closer to the recoveries set by the Allocation Decision than they are to the allocation position advanced by the Debtors during the Allocation Trial.

4.      The harm caused to U.S.-only Unsecured Creditors by the continued existence of the Order is not only extant—it is also quantifiable.  Take away the Order, and recoveries to U.S. creditors (including the PBGC) without the Crossover Bonds Claims would be at or near 100 cents on the dollar—nearly double the 55.1 - 61.2 percent recovery projected in the Disclosure Statement.  Further, the Court should not lose sight of the irony here that *but for* the existence of the U.S.-only Unsecured Claims, the U.S. estate would have received *no* allocation from the Lockbox—the same source of value from which the Crossover Bondholders are now attempting to recover.  This is the antithesis of equity.

5.      Moreover, the Consortium objects herein to the allowance of the Crossover Bonds Claims against NNI in accordance with Bankruptcy Code section 502(b)(1).  Any allowance of such claims against NNI is necessarily based solely on NNI's status as a guarantor of the

Crossover Bonds and application of the <u>Ivanhoe</u> doctrine, which ordinarily allows creditors holding guaranteed debt to assert one claim against the primary obligor and a second claim against the guarantor.  Yet although the Court cites <u>Ivanhoe</u> in its Reconsideration Order (but did not state that it applied), the <u>Ivanhoe</u> rule absolutely does not apply where, as here, a court has effectively substantively consolidated multiple debtor estates.  For this additional reason, the Court should reconsider and vacate the Order and disallow the Crossover Bonds Claims against NNI.

## JURISDICTION

6.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

7.      The statutory bases for the relief requested herein are sections 105(a) and 502(j) of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "<u>Bankruptcy Code</u>") and Rule 60 of the Federal Rules of Civil Procedure ("<u>FRCP</u>"), which applies to these proceedings through Rule 9024 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>").

## RELEVANT BACKGROUND

8.      On January 14, 2009 (the "<u>Petition Date</u>"), the Debtors (other than NN CALA and NNIII) filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>" or "<u>Court</u>").

9.      On September 25, 2009, The Bank of New York Mellon ("<u>BNYM</u>"), as indenture trustee for the Crossover Bonds, filed two proofs of claim (Nos. 3971 & 3972) (collectively, the "<u>Crossover Bonds Claims</u>") against NNI in the aggregate amount of $3,940,750,260 on account of NNI's status as a guarantor of the Crossover Bonds.

10.     On July 24, 2014, the Debtors filed the *Debtors' Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 Approving Settlement Agreement By and Among Nortel Networks Inc., The Supporting Bondholders, and the Bank of New York Mellon With Respect To The NNI Post-Petition Interest Dispute and Related Issues* [D.I. 14076] (the "PPI Settlement Motion").  Through the PPI Settlement Motion, the Debtors sought Court approval, pursuant to Bankruptcy Rule 9019, of a settlement (the "Settlement Agreement") between the Debtors and certain Crossover Bondholders with respect to "the rights of holders of the vast majority of Crossover Bond Claims filed against the Debtors to receive post-petition interest in consideration of their allowed claims against NNI."  PPI Settlement Motion, ¶1.  The Settlement Agreement addressed one discrete issue only: "the proper amounts of postpetition interest . . . owed in respect of such Crossover Bonds."  PPI Settlement Motion, ¶2.  The Debtors specified that with the exception of resolving the amounts of postpetition interest owed to the Crossover Bondholders, the Settlement Agreement was "appropriately leaving other matters . . . to be resolved in connection with the claims resolution process and the process of proposing and confirming a chapter 11 plan for each of these Debtors."  PPI Settlement Motion, ¶1.

11.     As part of the resolution of the postpetition interest dispute, in the Settlement Agreement the Debtors and the Crossover Bondholders stipulated that the Crossover Bonds Claims would be *conditionally* allowed against NNI in an aggregate amount of $3,934,521,442.  PPI Settlement Motion, ¶21, p. 12.  The allowance of the Crossover Bonds Claims was conditional because the Settlement Agreement provided that the Crossover Bondholders would only receive postpetition interest "in the event that NNI…has more than sufficient funds to pay all of its allowed…general unsecured claims in full."  Settlement Agreement, § 2.1.

12.     On December 18, 2014, the Bankruptcy Court approved the PPI Settlement

Motion.  See *Order Granting Debtors' Motion Pursuant to Bankruptcy Rule 9019 Approving Settlement Agreement By and Among Nortel Networks Inc., The Supporting Bondholders, and the Bank of New York Mellon With Respect to the NNI Post-Petition Interest Dispute and Related Issues* [D.I. 14950] (the "PPI Settlement Order" or "Order").  Pursuant to the Order, the Bankruptcy Court authorized "the allowance of the Bondholder claims" against NNI as set forth in the Settlement Agreement.  Order ¶¶ 3-5.  The Order explicitly states that "[n]othing in the Settlement Agreement or this Order shall constitute a settlement of the manner in which any funds available for distribution shall be allocated among the creditors of the Debtors in the event that less than the full amount of PPI can be paid to all creditors owed such amounts."  Order ¶ 7. The Court retained jurisdiction "with respect to all matters arising from or related to the implementation of this Order."  Order ¶ 11.

13.    Since the Petition Date, the Nortel Group has sold its business units and other assets, generating proceeds (the "Sale Proceeds") of over $7.3 billion that have been placed in escrow accounts pending allocation among the various selling entities.  Having failed to negotiate a consensual allocation, a cross-border trial (the "Allocation Trial") to determine such allocation was held in 2014 before this Court and the Canadian Court.

14.    On May 14, 2015, the Bankruptcy Court issued an opinion deciding the Allocation Trial (the "Allocation Decision").  The Allocation Decision adopted an allocation methodology not advanced by any party at trial, described as "modified pro rata" ("MPR"), under which each Nortel Debtor's allocation of the Sale Proceeds would be based on the relative amount of some, but not all, claims against a given Debtor as compared to the amount of claims against other Debtors.

15.    Numerous parties, including the Consortium, the Debtors, the UCC, and the

Crossover Bondholders, appealed the Allocation Decision to the United States District Court for the District of Delaware (the "District Court").  As part of the appeal process in the District Court, the parties agreed to a mediation process led by the retired Chief Judge of the District Court, Joseph J. Farnan.  Confidential, non-binding mediation sessions were held starting in October 2015.

16.    The mediation sessions did not produce a settlement, and on May 24, 2016, the District Court entered an order certifying all appeals and contingent cross-appeals to the United States Court of Appeals for the Third Circuit (the "Third Circuit").  The Third Circuit granted the petitions for leave to appeal on August 9, 2016.

17.    During this time, the parties continued to engage in mediation under the oversight of Judge Farnan as mediator.  On October 12, 2016, the Debtors filed the *Notice of Execution of Settlement and Plans Support Agreement* [D.I. 17249], attached to which as Exhibit A is that certain Settlement and Support Agreement dated October 12, 2016 (the "SPSA").  The SPSA is alleged to constitute a Global Settlement, which purports to resolve the Allocation Dispute.  The Consortium, among others, did not enter into the SPSA.

18.    On November 4, 2016, the Debtors filed their (i) *Proposed Disclosure Statement for the First Amended Joint Chapter 11 Plan of Nortel Networks Inc. and Certain of its Affiliated Debtors* [D.I. 17348] (as subsequently amended on November 29, 2016 [D.I. 17456], the "Disclosure Statement"); and (ii) *First Amended Joint Chapter 11 Plan of Nortel Networks Inc. and Certain of its Affiliated Debtors* [D.I. 17347] (as subsequently amended on November 29, 2016 [D.I. 17452], the "Plan").

19.    In relevant part, the Plan proposes to treat the Crossover Bonds Claims as a single allowed General Unsecured Claim against NNI in the amount of $3,934,521,442.  Plan, p. 9.

8

The Crossover Bonds Claims are classified in Class A-3B and are entitled to vote on the Plan as an Impaired class.  Plan § 4.4.  Section 7.12 of the Plan also provides that no postpetition interest shall be paid on account of any Allowed Claims against any Debtor.  Plan § 7.12 ("No post-Petition Date interest . . . shall be included in any Allowed Claim, nor be paid on Allowed Claims by any Debtor.").

## ARGUMENT

20.     Through this Motion, the Consortium requests that the Court reconsider and vacate the PPI Settlement Order pursuant to section 502(j) of the Bankruptcy Code.  Ample "cause" exists to reconsider and vacate the Order under Bankruptcy Code section 502(j) due to the fundamental change in factual circumstances that has occurred since the Order was issued in December 2014.  Alternatively, the Court can reconsider and vacate the Order pursuant to its inherent equitable powers under Bankruptcy Code section 105(a).

21.     In addition, the Consortium objects to the allowance of the Crossover Bonds Claims against NNI under the Plan.  The only legal basis for the assertion of such claims against NNI is the Ivanhoe rule; however, as discussed below, the Ivanhoe rule cannot be applied in substantively consolidated cases.  Through the Allocation Decision—which is the predecessor to the SPSA—the Court has most assuredly substantively consolidated the Nortel Group.  As a result, the assertion of the Crossover Bonds Claims against NNI is unenforceable under applicable law pursuant to Bankruptcy Code section 502(b)(1).

## I.      The Court Should Reconsider And Vacate The PPI Settlement Order For "Cause" Under Bankruptcy Code Section 502(j).

22.     The Court should reconsider and vacate the PPI Settlement Order in order to prevent manifest injustice to U.S.-only Unsecured Creditors.  The Order was issued based upon two key premises that plainly no longer exist: (i) that NNI was a solvent entity (and therefore had

the authority to pay postpetition interest to the Crossover Bondholders); and (ii) that the global

Nortel Group *would not* be substantively consolidated.  Quite the contrary, it is now universally

accepted that due to the Allocation Decision and SPSA, NNI is *insolvent*.  Moreover, as briefed

*ad nauseam* by all U.S. parties before this Court and the District Court, including the Debtors,

the UCC, and the Crossover Bondholders, the Court's Allocation Decision constitutes a

substantive consolidation of the Nortel Group.   These subsequent events—which have

fundamentally changed the factual landscape of these Cases—warrant reconsideration and

vacation of the Order for "cause" under Bankruptcy Code section 502(j).

23.    Bankruptcy Code section 502(j) provides that "[a] claim that has been allowed or

disallowed may be reconsidered *for cause*…according to the *equities of the case*."  11 U.S.C. §

502(j) (emphasis added).  Bankruptcy Rule 3008 implements this section of the Bankruptcy

Code by providing that "[a] party in interest may move for reconsideration of an order allowing

or disallowing a claim against the estate.  The court after a hearing on notice shall enter an

appropriate order."  Fed. R. Bankr. P. 3008.  "The determination of whether a motion for

reconsideration should be granted is within the sound discretion of the court."  In re Flatbush

Square, Inc., 508 B.R. 563, 568 (Bankr. E.D.N.Y. 2014).

24.    A bankruptcy court order may also be reconsidered and vacated under Bankruptcy

Rule 9024, which incorporates FRCP 60.  FRCP 60 enumerates several grounds for relief from a

final judgment, order, or proceeding, including "any other reason that justifies relief."  Fed. R.

Civ. P. 60(b); see Claybrook v. AutoZone Tex., L.P. (In re Am. Remanufacturers, Inc.), 439 B.R.

633, 636 (Bankr. D. Del. 2010).   Relief from a prior order under FRCP 60(b)(6) is

"appropriate…when it offends justice to deny such relief."  See Woods v. Kenan (In re Woods),

173 F.3d 770, 780 (10th Cir. 1999).  FRCP 60(b)(6) has also been described as a "grand

reservoir of equitable power to do justice in a particular case."  See Woods, 173 F.3d at 780. There is no specified limitations period for a motion brought under Bankruptcy Code section 502(j) to reconsider a previously-allowed claim.  Fed. R. Bankr. P. 9024.

25.     Indeed, the Third Circuit has stated that "[i]t is well settled that a bankruptcy court has the power to vacate or modify its orders, as long as it is equitable to do so."  Marcus Hook Dev. Park, Inc. v. T.A. Title Ins. Co. (In re Marcus Hook Dev. Park, Inc.), 943 F.2d 261, 265 n.5 (3d Cir. 1991).  As Judge Walrath of this Court has declared:

> Vacating or modifying orders is "particularly appropriate **where factual circumstances have changed**. The basic policy tension in determining whether a final judgment should be set aside resolves around whether the factual or legal circumstances have change to such an extent that the Court's interests in deciding the case on the merits outweighs its interest in orderly procedures and the finality of judgments…"
>
> [T]he bankruptcy court may exercise more liberally its power to vacate orders granted under Rule 60(b)(6) if it is **necessary to "accomplish justice" or to deal with "unforeseen contingencies**."

Vision Metals v. SMS Demag, Inc. (In re Vision Metals, Inc.), 311 B.R. 692, 697-98 (Bankr. D. Del. 2004) (emphasis added).

26.     The Third Circuit has recognized that a federal court may vacate its own orders under Rule 60(b) as long as it has retained jurisdiction.  See Kelly v. Greer, 334 F.2d 434, 436-37 (3d Cir. 1964) ("[T]here can be no question of the power of a Federal district court to vacate its own orders entered in civil actions over which it had original jurisdiction 'whenever such action is appropriate to accomplish justice.'").  Courts in other jurisdictions have similarly recognized the "practical utility . . . of a rule which permits the vacation or modification of bankruptcy orders where **subsequent events** presented during administration demonstrate the necessity therefor."  Otte v. Manufacturers Hanover Commercial Corp. (In re Texlon Corp.), 596 F.2d 1092, 1098 (2d Cir. 1979) (emphasis added).

11

27.    Although the term "cause" is undefined for purposes of Bankruptcy Code section 502(j), see In re Opus E., LLC, 528 B.R. 30, 104-05 (Bankr. D. Del. 2015), in deciding whether to reconsider a previously-allowed claim, a court's discretion is "virtually plenary."  See In re Genesis Health Ventures, Inc., 362 B.R. 657, 661 (D. Del. 2007); see also Brielle Assocs. v. Graziano, 685 F.2d 109, 111 (3d Cir. 1982) (bankruptcy court has the "ancient and elementary power" to reconsider any of its orders).  Of particular relevance to the PPI Settlement Order, "cause" has been found under section 502(j) where the circumstances under which a court previously allowed or disallowed a claim have been altered in some fundamental way.  See In re H.K. Porter Co., Inc. (Prop. Damage Claimants Identified on Exhibit "A" v. H.K. Porter Co. Inc.), 156 B.R. 149, 150 (Bankr. W.D. Pa. 1993) (finding cause to reconsider prior order disallowing property damage claims, and reinstating such claims, where prior disallowance was based on creditor's belief (later determined to be false) that there would be no distribution on its claim because such claim was not insured, but subsequently discovered the existence of insurance coverage); Karen-Richard Beauty Salon, Inc. v. Fontaineblue Hotel Corp., 36 B.R. 896, 898 (S.D. Fla. 1983) ("The clearest cause for reconsideration is the discovery, subsequent to allowance, of new relevant facts or evidence that could not have been discovered at an earlier stage.").

28.    Here, "cause" exists to reconsider and vacate the PPI Settlement Order because the factual circumstances under which the Order was entered have most assuredly changed.  See In re SMS Demag., Inc., 311 B.R. at 699 (explaining "changed or unforeseeable circumstances" may require vacation of prior order); H.K. Porter Co., 156 B.R. at 150; Karen-Richard Beauty Salon, 36 B.R. at 898; C.I.T. Corp. v. Johnson & Morgan Contractors (In re Johnson & Morgan Contractors), 29 B.R. 372, 374-75 (Bankr. M.D. Pa. 1983) (relief from prior order warranted on

account of unforeseeable consequences); <u>In re Lebanon Steel Foundry</u>, 48 B.R. 520, 524-25

(Bankr. M.D. Pa. 1985) (same).  The following non-exhaustive list demonstrates just how

drastically the factual circumstances of these Cases have shifted since this Court issued the

Order:

- The Order was entered six months *before* the Court issued its Allocation Decision.  Thus, the Bankruptcy Court by necessity could not have appreciated the disastrous impact of the Order on other creditors of the U.S. Debtors.  <u>See</u> PPI Settlement Opinion at 36 ("The Allocation Dispute has yet to be decided by the Court[.]").

- The Order was entered six months before the Court, through its Allocation Decision, effectively substantively consolidated the Cases—an outcome that *no* party advanced at trial, and which *all* U.S. parties in interest have appealed for being inconsistent with <u>Owens Corning</u>.

- The Order was entered at a time when most parties—and this Court—believed (at least enough to enter the Order) that NNI was solvent.

- The Order was issued nearly *two years* before the execution of the SPSA.

29.     The harm caused to U.S.-only Unsecured Creditors by the continued existence of

the Order is both significant *and* quantifiable.   Due entirely to the Order, the Crossover

Bondholders have asserted the right to take two *full* bites at the same apple: one bite against the

Canadian Debtors, and a second against the U.S. Debtors.  However, under the Court's claims-

based Allocation Decision, the U.S. Debtors receive no allocation "credit" for the $4.0 billion of

Crossover Bonds Claims for which they are liable.   And, as discussed <u>supra</u>, the Allocation

Decision formed the baseline for the proposed allocation under the SPSA.  As a result, not only

is the U.S. share of the Lockbox pie artificially low, but the Crossover Bondholders are also able

to sop up an inordinately high percentage of the (diminished) value in the U.S. estate.  The irony

here is that but for the existence of the U.S.-only Unsecured Creditors, the Crossover Bonds

Claims would recover a fraction of their current projected recovery, because the U.S. estate

would have received no allocation from the Lockbox.  The Consortium estimates that *but for* the

Order, recoveries to all U.S. creditors (including the PBGC) without the Crossover Bonds Claims would be at or near 100 cents on the dollar—substantially more than the 55.1 - 61.2 percent recovery projected in the Disclosure Statement.  See Disclosure Statement at 10.

II.    **Alternatively, The Court Should Reconsider And Vacate The PPI Settlement Order Pursuant To Its Broad Equitable Authority Under Bankruptcy Code Section 105(a).**

30.    In addition, Bankruptcy Code section 105(a) authorizes a court *sua sponte* to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a).  The "broad power" accorded to bankruptcy courts under section 105(a) includes the inherent authority of a bankruptcy court to vacate its own prior order.  See In re Argose, Inc., 377 B.R. 148, 150 (Bankr. D. Del. 2007) ("The Court has the power under section 105(a) of the Code to modify an order if equity so requires."); In re G-1 Holdings, Inc., 472 B.R. 263, 279-80 (Bankr. D.N.J. 2012) ("At the outset, the Court acknowledges it has independent, discretionary authority to review, amend, correct, or clarify its own Opinion and other orders under its inherent equitable power."); Utica Leaseco, LLC v. GMI Land Co., LLC, No. 11CV0564, 2011 WL 2458065, at *5 (W.D. Pa. June 16, 2011) ("Bankruptcy courts generally have independent authority to reconsider their own orders pursuant to Section 105.").

31.    For instance, in In re Argose, Inc., Judge Walrath applied her inherent equitable authority under section 105(a) of the Bankruptcy Code to reconsider and modify her own prior order.  See 377 B.R. at 150.  In Argose, the bankruptcy court entered an order approving a stipulation between the chapter 7 trustee and the debtor's secured lender that authorized the trustee to use the lender's cash collateral to liquidate the debtor's assets and also provided a carve-out from the lender's collateral to pay for the trustee's legal fees.  Id. at 149.  Due to "unanticipated complexity" in the liquidation of the assets, the trustee's legal fees ended up

exceeding the carve-out. Id. The trustee then filed a motion to modify the stipulation in order to increase the carve-out, which the court denied. Id. Thereafter, the trustee filed a motion for reconsideration of the stipulation order, in which the trustee explained that, at the time the stipulation was reached, the parties anticipated that the proceeds from the sale of the debtor's assets would be sufficient to cover the trustee's legal fees; however, "that did not materialize," and the assets were sold for a fraction of their expected value. Id. at 150. After considering this change in circumstances, the court granted the trustee's reconsideration motion as being consistent with its broad equitable authority under Bankruptcy Code section 105(a). Id.

32.     There are myriad other examples in which bankruptcy courts have vacated their own prior orders based upon a fundamental change in factual circumstances. In Woods v. Kenan (In re Woods), 173 F.3d 770, 778 (10th Cir. 1999), the Tenth Circuit upheld a bankruptcy court order vacating a prior order closing the case in order to permit the sale of oil and gas wells even though the wells had already been technically abandoned. Similarly, in In re Lintz West Side Lumber, Inc., the Seventh Circuit upheld a bankruptcy court order vacating its own prior abandonment order. 655 F.2d 786, 788 (7th Cir. 1981). In Lintz, the property at issue had been abandoned to a purportedly secured creditor that was later found to have failed to perfect its security interest in inventory and accounts receivables. Id. The creditor opposed revocation of the abandonment order. Id. at 789-90. In affirming the bankruptcy court's authority to vacate its prior order, the Seventh Circuit stated:

> The case instead involves the bankruptcy judge's "ancient and elementary power to reconsider" his own orders. Long ago Judge Learned Hand concluded that there was no reason why a referee's orders "should be as immutable as the Twelve Tables, once the ink is dry." It is now well settled that a bankruptcy judge has the power to reexamine and revise an order which he entered during the pendency of bankruptcy proceedings.

655 F.2d at 789.[5]

33.    The Consortium's request for reconsideration of the PPI Settlement Order is entirely consistent with Judge Walrath's decision in Argose.  See 377 B.R. at 150.  As in Argose, here too were events that were reasonably anticipated at the time the Order was entered that ultimately "did not materialize"—namely, the solvency of NNI, and the belief that the Nortel Group would *not* be substantively consolidated.  See id.  Fast-forward to present day, and each of these expectations has been flipped upside-down: NNI is not solvent (as a result of the Allocation Decision, and as reflected in the proposed recoveries under the SPSA), and the Court has effectively substantively consolidated the Nortel Group.  Accordingly, reconsideration of the PPI Settlement Order is a proper exercise of the Court's equitable authority under Bankruptcy Code section 105(a).

## III.    In Any Case, The Crossover Bonds Claims Should Be Disallowed Because Such Claims Are Unenforceable Against the U.S. Debtors Under Applicable Law.

34.    In addition, the Consortium objects to the allowance of the Crossover Bonds Claims against NNI because such claims are unenforceable against NNI under applicable law.  Bankruptcy Code section 502(b)(1) requires a bankruptcy court to disallow claims asserted against a debtor that violate "applicable law."  11 U.S.C. § 502(b)(1).  The Consortium therefore moves this Court to disallow the Crossover Bonds Claims, as all such claims are unenforceable against NNI under applicable law.

35.    Section 502(b)(1) of the Bankruptcy Code provides that a claim may not be allowed to the extent that it "*is unenforceable against the debtor* and property of the debtor, *under* any agreement or *applicable law*."  11 U.S.C. § 502(b) (emphasis added).  Here, the

---

[5] The Sixth Circuit has also endorsed the principle that bankruptcy courts possess abundant authority to reconsider and overturn their prior orders when the equities of the case weigh in favor of so doing.  See LPP Mortg., Ltd. v. Brinley, 547 F.3d 643, 649 (6th Cir. 2008).

"applicable law" that renders the Crossover Bonds Claims unenforceable against NNI is the law of substantive consolidation.  In this Circuit, it is well-settled that creditors in substantively consolidated cases are entitled only to *one* claim against the common "hotchpot" of the debtor's consolidated assets.  <u>See</u> <u>Genesis Health Ventures, Inc. v. Stapleton (In re Genesis Health Ventures, Inc.)</u>, 402 F.3d 416, 423 (3d Cir. 2005).  By necessity, then, substantive consolidation *eliminates* all guarantee claims.  <u>See</u> <u>In re Panolam Holdings, Co.</u>, No. 09-13889, 2009 WL 7226968, at *13 (Bankr. D. Del. Dec. 10, 2009) (guarantee claims eliminated and cancelled at time of substantive consolidation).

36.     As briefed extensively by the Consortium, the Debtors, the UCC, and the Bondholders in their respective prior briefings before this Court and the District Court, the Allocation Decision is legally indistinguishable from the prototypical type of substantive consolidation discussed by the Third Circuit in <u>In re Owens Corning</u>, 419 F.3d 195 (3d Cir. 2005).[6]  The Allocation Decision disregards corporate form to use the assets of one Debtor (NNI) for the benefit of creditors of different Debtors (NNC and NNL).  It merges, co-mingles, and re-distributes the Debtors' assets—effectively "[c]ommunizing" the assets, as per <u>Owens Corning</u>—for the benefit of other creditors of the Nortel Group.  <u>See</u> <u>Owens Corning</u>, 419 F.3d at 216.  Similarly, the Allocation Decision merges the Debtors' liabilities because the greater the amount of claims against a particular Debtor, the greater the Debtor's allocation of the Sale Proceeds.  All of these are tell-tale indicia of substantive consolidation.

37.     The Allocation Decision's substantive consolidation of the Nortel Group—which forms the basis for the recoveries under the SPSA—renders the Crossover Bonds Claims unenforceable against NNI under Bankruptcy Code section 502(b)(1).  <u>See</u> 11 U.S.C. §

---

[6] <u>See</u> *Opening Brief of Appellant The Nortel Trade Claims Consortium In Support Of Appeal From The Allocation Opinion* [District Court D.I. 74], filed on March 11, 2016 (the "<u>Consortium Opening Brief</u>").

502(b)(1). This is because the *only* legal basis for the assertion of the Crossover Bonds Claims against NNI is by virtue of NNI's role as guarantor of the Crossover Bonds. The Crossover Bonds Claims, therefore, are quintessential <u>Ivanhoe</u> claims under the Supreme Court's seminal 1935 decision in <u>Ivanhoe Building & Loan Assn. v. Orr</u>, 295 U.S. 243 (1935) ("<u>Ivanhoe</u>").[7] The <u>Ivanhoe</u> rule, very simply, is what in ordinary circumstances permits holders of guaranteed debt to assert one claim against the primary obligor and a second claim against the guarantor.

38.    However, as a result of the Allocation Decision, these Cases no longer occupy the realm of the ordinary. Like oil and water, the doctrine of substantive consolidation simply cannot coexist with the allowance of <u>Ivanhoe</u>-type claims. This principle is borne out by post-<u>Ivanhoe</u> case law: since decided, <u>Ivanhoe</u> has been cited in fifty-nine (59) decisions, *none* of which have applied the <u>Ivanhoe</u> doctrine to substantively consolidated cases. This makes intuitive sense, because the two doctrines are fundamentally incompatible: whereas <u>Ivanhoe</u> respects corporate separateness (multiple asset pools, multiple claims), substantive consolidation does the exact opposite (one consolidated asset pool, one claim). The complete dearth of *any* reported caselaw in which <u>Ivanhoe</u> and substantive consolidation have coexisted mandates that, here, the Crossover Bondholders cannot avail themselves of a full <u>Ivanhoe</u> claim against NNI under the Plan.

39.    Consistent with this principle, the Court should disallow the Crossover Bonds Claims for the simple reason that their entire *raison d'etre*—the <u>Ivanhoe</u> rule—does not apply in substantively consolidated cases. The Order's prior "allowance" of the Crossover Bonds Claims

---

[7] In <u>Ivanhoe</u>, the Supreme Court held that a creditor was permitted to assert the full value of its claim against a debtor co-obligor, unreduced by the stipulated value of the collateral (owned by a non-debtor co-obligor), subject only to the single-satisfaction rule that no creditor may retain value beyond full repayment. <u>See</u> <u>Ivanhoe</u>, 295 U.S. at 245. There, the trustee sought to reduce a creditor's claim by the market value of the property (owned by a third party) that the creditor had foreclosed upon prior to the commencement of the bankruptcy case. <u>Id.</u> In reversing the holding of the lower courts, the Supreme Court held that the creditor was not requested to set off the value it realized from the foreclosure against its claim filed against the debtor. <u>Id.</u> at 245-46.

against NNI, when applied in concert with the Court's Allocation Decision, violates this well-settled law.  The Court's Allocation Decision—again, the precursor to the recoveries under the SPSA—is most assuredly a form of substantive consolidation.  Accordingly, unless and until the Allocation Decision is overturned on appeal, there is no legal basis whatsoever for the assertion of the Crossover Bonds Claims against NNI.  The Crossover Bonds Claims are therefore unenforceable against NNI under applicable law, and must be disallowed pursuant to Bankruptcy Code section 502(b)(1).  <u>See</u> 11 U.S.C. § 502(b)(1).

## NOTICE

40.    The Consortium has provided notice of this Motion via electronic transmission, first class mail, hand delivery, or overnight mail to: (i) the U.S. Debtors; (ii) the U.S. Trustee; (iii) counsel to the Official Committee of Unsecured Creditors; (iv) Crossover Bondholders; and (v) all parties requesting or entitled to notice pursuant to Rule 2002.  Accordingly, the Consortium submits that under the circumstances no other or further notice is necessary.

## NO PRIOR REQUEST

41.    No prior request for the relief sought herein has been made to this or any other court.

## CONCLUSION

For the reasons set forth herein, the Consortium respectfully requests that the Court: (i) reconsider and vacate its December 18, 2014 PPI Settlement Order in accordance with the relief sought in this Motion; (ii) disallow the Crossover Bonds Claims against the U.S. Debtors; and (iii) grant such other and further relief as the Court may deem just, proper and equitable.

Dated:  November 30, 2016
Wilmington, Delaware

**FOX ROTHSCHILD LLP**

*/s/ Courtney A. Emerson*
Jeffrey M. Schlerf (DE No. 3047)
L. John Bird (DE No. 5310)
Courtney A. Emerson (DE No. 6229)
919 North Market Street, Suite 300
Wilmington, DE 19801
Telephone: (302) 654-7444
Facsimile: (302) 656-8920
jschlerf@foxrothschild.com
jbird@foxrothschild.com
cemerson@foxrothschild.com

and

**BROWN RUDNICK LLP**
Steven D. Pohl, Esq.
Christopher M. Floyd, Esq.
One Financial Center
Boston, MA 02111
Telephone:  (617) 856-8200
Facsimile:  (617) 856-8201
Email: spohl@brownrudnick.com
           cfloyd@brownrudnick.com

*Counsel to the Nortel Trade Claims Consortium*