# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
----------------------------------------------------------X
                                                          :
In re                                                     :     Chapter 11
                                                          :
                                                          :
Nortel Networks Inc., et al.,¹                            :     Case No. 09-10138 (KG)
                                                          :
                          Debtors.                        :     Jointly Administered
                                                          :
                                                          :
                                                          :
----------------------------------------------------------X
```

## DISCLOSURE STATEMENT FOR THE
## FIRST AMENDED JOINT CHAPTER 11 PLAN OF
## NORTEL NETWORKS INC. AND CERTAIN OF ITS AFFILIATED DEBTORS

James L. Bromley, Esq. (admitted *pro hac vice*)
Lisa M. Schweitzer, Esq. (admitted *pro hac vice*)
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, NY 10006-1470

Derek C. Abbott, Esq. (No. 3376)
Andrew R. Remming, Esq. (No. 5120)
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 North Market Street, 18th Floor
P.O. Box 1347
Wilmington, DE 19899-1347

*Attorneys for the Debtors and Debtors-in-Possession*

Dated:  December 1, 2016

## THE DEADLINE TO VOTE ON THE PLAN (THE "VOTING DEADLINE") IS JANUARY 9, 2017 AT 4:00 P.M. (PREVAILING EASTERN TIME)

## FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE ACTUALLY RECEIVED BY THE NOTICE AND CLAIMS AGENT BEFORE THE APPLICABLE VOTING DEADLINE AS DESCRIBED HEREIN.

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567), Nortel Networks (CALA) Inc. (4226) and Nortel Networks India International, Inc. (8667). The First Amended Joint Chapter 11 Plan of Nortel Networks Inc. and Certain of its Affiliated Debtors does not include a Chapter 11 Plan for Nortel Networks India International Inc.  Contact information for the Debtors and their petitions are available at http://dm.epiq11.com/nortel.

**DISCLAIMER**

THE INFORMATION CONTAINED IN THIS PROPOSED DISCLOSURE STATEMENT (INCLUDING THE APPENDICES HERETO, THIS "<u>DISCLOSURE STATEMENT</u>") RELATES TO THE FIRST AMENDED JOINT CHAPTER 11 PLAN OF NORTEL NETWORKS INC. AND CERTAIN OF ITS AFFILIATED DEBTORS FILED ON DECEMBER 1, 2016 (THE "<u>PLAN</u>")[2], AND IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN.  NO PARTY IS AUTHORIZED TO PROVIDE TO ANY OTHER PARTY ANY INFORMATION CONCERNING THE PLAN OTHER THAN THE CONTENTS OF THIS DISCLOSURE STATEMENT.  THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN THOSE SET FORTH IN THIS DISCLOSURE STATEMENT.  THE DEBTORS HAVE NOT AUTHORIZED ANYONE TO GIVE THE CREDITORS (AS DEFINED BELOW), THE INTERESTHOLDERS (AS DEFINED BELOW) AND OTHER PARTIES IN INTEREST ANY INFORMATION OTHER THAN THE INFORMATION CONTAINED HEREIN, AND THE DEBTORS TAKE NO RESPONSIBILITY FOR ANY OTHER INFORMATION THAT OTHERS MAY GIVE.

ALL SOLICITED CREDITORS (AS DEFINED BELOW) ARE ADVISED AND ENCOURAGED TO READ AND CONSIDER CAREFULLY THIS DISCLOSURE STATEMENT, THE PLAN AND THE SUPPLEMENT TO THE PLAN (THE "<u>PLAN SUPPLEMENT</u>") TO BE FILED WITH THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE (THE "<u>BANKRUPTCY COURT</u>") IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.  SUMMARIES OF THE PLAN AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, THE PLAN SUPPLEMENT, EXHIBITS ANNEXED OR REFERRED TO IN THE PLAN OR THE PLAN SUPPLEMENT AND APPENDICES TO THIS DISCLOSURE STATEMENT.  THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF.  THE DELIVERY OF THIS DISCLOSURE STATEMENT WILL NOT UNDER ANY CIRCUMSTANCES CREATE AN IMPLICATION THAT THERE HAS NOT BEEN ANY CHANGE IN THE FACTS SET FORTH HEREIN SINCE THE DATE OF THIS DISCLOSURE STATEMENT.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF TITLE 11 OF THE UNITED STATES CODE (THE

---

[2]    The Debtors proposing the Plan, along with the last four digits of each Debtor's tax identification number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components, Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).

"BANKRUPTCY CODE") AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY
PROCEDURE (THE "BANKRUPTCY RULES").  THE BANKRUPTCY COURT HAS
APPROVED THIS DISCLOSURE STATEMENT AS CONTAINING "ADEQUATE
INFORMATION" AS PROVIDED IN SECTION 1125 OF THE BANKRUPTCY CODE, BUT
THE BANKRUPTCY COURT HAS NOT ENDORSED AND MAY NOT ENDORSE THE
PLAN.  THIS DISCLOSURE STATEMENT HAS NOT BEEN REVIEWED OR APPROVED
BY ANY OTHER COURT IN ANY OTHER JURISDICTION OR BY ANY REGULATORY
BODY IN ANY JURISDICTION.

THIS DISCLOSURE STATEMENT HAS NOT BEEN PREPARED TO COMPLY
WITH, AND IS NOT INTENDED TO COMPLY WITH, FEDERAL OR STATE SECURITIES
LAWS OR OTHER LAWS GOVERNING DISCLOSURE OUTSIDE THE CONTEXT OF
THE BANKRUPTCY CODE.  CREDITORS, INTERESTHOLDERS, OTHER PARTIES IN
INTEREST AND ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR
TRANSFERRING CLAIMS AGAINST, INTERESTS IN OR SECURITIES OF, THE
DEBTORS SHOULD EVALUATE THIS DISCLOSURE STATEMENT ONLY IN LIGHT OF
THE PURPOSE FOR WHICH IT WAS PREPARED.  THIS DISCLOSURE STATEMENT
HAS NOT BEEN APPROVED OR DISAPPROVED BY THE U.S. SECURITIES AND
EXCHANGE COMMISSION (THE "SEC") OR ANY STATE SECURITIES COMMISSION,
NOR HAS THE SEC APPROVED OR DISAPPROVED OF THE ACCURACY OR
ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.  ANY REPRESENTATION
TO THE CONTRARY IS A CRIMINAL OFFENSE.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER
ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT
CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY,
STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN
SETTLEMENT NEGOTIATIONS, AND IS PROTECTED TO THE FULLEST EXTENT
PERMITTED BY LAW UNDER RULE 408 OF THE FEDERAL RULES OF EVIDENCE
AND ANY OTHER SIMILAR LAW, RULE OR REGULATION OF ANY APPLICABLE
JURISDICTION.  THIS DISCLOSURE STATEMENT WILL NOT BE ADMISSIBLE IN ANY
PROCEEDING OTHER THAN THE CHAPTER 11 CASES (AS DEFINED BELOW), NOR
WILL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES,
ACCOUNTING OR OTHER LEGAL EFFECTS OF THE PLAN AS TO CREDITORS,
INTERESTHOLDERS AND OTHER PARTIES IN INTEREST.

EACH CREDITOR, INTERESTHOLDER OR OTHER PARTY IN INTEREST
SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL, ACCOUNTING
AND TAX ADVISORS AS TO ANY SUCH MATTERS CONCERNING THE
SOLICITATION OF THE PLAN, THE APPROVAL OF THE PLAN, THE PLAN ITSELF OR
THE TRANSACTIONS CONTEMPLATED THEREBY.

ADDITIONAL HISTORIC INFORMATION REGARDING NORTEL (AS DEFINED
BELOW) IS CONTAINED IN THE HISTORIC PUBLIC FILINGS OF NORTEL NETWORKS
CORPORATION ("NNC"), INCLUDING ANNUAL REPORTS ON FORM 10-K (THE "NNC
FORM 10-K"), QUARTERLY REPORTS ON FORM 10-Q (EACH, A "NNC FORM 10-Q")
AND HISTORIC FILINGS WITH THE CANADIAN SECURITIES ADMINISTRATORS

(THE "CSA") (SUCH FILINGS, THE "NNC PUBLIC FILINGS"), PREPARED AND FILED BY NNC WITH THE RELEVANT AUTHORITIES, ON A CONSOLIDATED BASIS FOR NNC AND CERTAIN OF ITS AFFILIATES, INCLUDING THE DEBTORS AND THEIR SUBSIDIARIES, WHICH WERE ACCOUNTED FOR AS CONSOLIDATED SUBSIDIARIES UNTIL SEPTEMBER 30, 2010 AND AS AN INVESTMENT UNDER THE COST METHOD OF ACCOUNTING THEREAFTER.  SUCH INFORMATION IS NOT A PART OF AND IS NOT DEEMED TO BE INCORPORATED BY REFERENCE IN THIS DISCLOSURE STATEMENT.  CERTAIN OF SUCH INFORMATION RELATES TO NORTEL AFFILIATES OTHER THAN THE DEBTORS AND, IN PROVIDING OR REFERRING TO SUCH INFORMATION, THE DEBTORS HAVE RELIED UPON INFORMATION AND DESCRIPTIONS PROVIDED BY NORTEL AFFILIATES WITHOUT INDEPENDENT VERIFICATION.  THE DESCRIPTIONS AND DISCUSSION OF NORTEL AFFILIATES OTHER THAN THE DEBTORS AND THE CREDITOR PROTECTION PROCEEDINGS OTHER THAN THE CHAPTER 11 CASES CONTAINED IN THIS DISCLOSURE STATEMENT SHOULD BE RELIED ON ONLY FOR PURPOSES OF EVALUATING THE PLAN, THE DEBTORS AND THE CHAPTER 11 CASES.

ALTHOUGH THE DEBTORS HAVE USED THEIR BEST EFFORTS TO ENSURE THE ACCURACY OF THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT, THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS NOT BEEN AUDITED.  THE HISTORIC FINANCIAL STATEMENTS AND OTHER INFORMATION INCLUDED IN THE NNC PUBLIC FILINGS WERE PREPARED BY NNC ON THE FOLLOWING BASIS: (I) THE EMEA DEBTORS AND NNSA (AS DEFINED BELOW) WERE ACCOUNTED FOR UNDER THE EQUITY METHOD FROM THE PETITION DATE UP TO MAY 31, 2010 AND AS AN INVESTMENT UNDER THE COST METHOD OF ACCOUNTING THEREAFTER; (II) THE DEBTORS AND THEIR SUBSIDIARIES WERE ACCOUNTED FOR AS CONSOLIDATED SUBSIDIARIES UNTIL SEPTEMBER 30, 2010 AND AS AN INVESTMENT UNDER THE COST METHOD OF ACCOUNTING THEREAFTER; AND (III) ALL OF NNC'S OTHER AFFILIATES, INCLUDING THE OTHER CANADIAN DEBTORS (AS DEFINED IN THE PLAN) AND CERTAIN ENTITIES NOT SUBJECT TO BANKRUPTCY, INSOLVENCY OR OTHER CREDITOR PROTECTION PROCEEDINGS, WERE ACCOUNTED FOR AS CONSOLIDATED SUBSIDIARIES.  THE CONTENTS OF SUCH NNC PUBLIC FILINGS, INCLUDING FINANCIAL STATEMENTS INCLUDED THEREIN, DO NOT NECESSARILY REPRESENT THE FINANCIAL CONDITION OF THE DEBTORS COLLECTIVELY OR THE FINANCIAL CONDITION OF ANY OF THE DEBTORS INDIVIDUALLY.  THE DEBTORS CAN MAKE NO REPRESENTATION AS TO THE ACCURACY OF ANY FINANCIAL AND OTHER INFORMATION CONTAINED IN THE NNC PUBLIC FILINGS, AND BY REFERRING TO THE NNC PUBLIC FILINGS HEREIN, THE DEBTORS ARE NOT REPRESENTING OR ADMITTING TO THE COMPLETENESS OR ACCURACY OF THE CONTENT OF ANY SUCH FILINGS.

THE BUDGET AND RECOVERY ANALYSIS PROVIDED IN THIS DISCLOSURE STATEMENT AS APPENDIX C (COLLECTIVELY, THE "BUDGET AND RECOVERY ANALYSIS") HAS BEEN PREPARED BY THE DEBTORS' MANAGEMENT IN CONSULTATION WITH THE DEBTORS' FINANCIAL AND LEGAL PROFESSIONALS. THE BUDGET AND RECOVERY ANALYSIS, WHILE PRESENTED WITH NUMERICAL

SPECIFICITY, IS NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY MANAGEMENT AT THE TIME THEY WERE MADE, MAY NOT BE ACHIEVED AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, COMPETITIVE, INDUSTRY, REGULATORY, MARKET AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES (INCLUDING, WITHOUT LIMITATION, POTENTIALLY SIGNIFICANT LITIGATION CONTINGENCIES), MANY OF WHICH ARE BEYOND THE DEBTORS' CONTROL.

THIS DISCLOSURE STATEMENT CONTAINS FORWARD LOOKING STATEMENTS THAT ARE BASED ON THE DEBTORS' CURRENT EXPECTATIONS, ESTIMATES AND FORECASTS CONCERNING FUTURE DEVELOPMENTS, MANY OF WHICH ARE BEYOND THE DEBTORS' CONTROL.  THESE STATEMENTS ARE SUBJECT TO IMPORTANT ASSUMPTIONS, RISKS AND UNCERTAINTIES THAT ARE DIFFICULT TO PREDICT, AND THE ACTUAL OUTCOME MAY BE MATERIALLY DIFFERENT THAN IMPLIED BY SUCH FORWARD LOOKING STATEMENTS.  THE DEBTORS CAUTION THAT NO REPRESENTATION CAN BE MADE AS TO THE ACCURACY OF SUCH FORWARD LOOKING STATEMENTS.  SOME ASSUMPTIONS INEVITABLY WILL NOT MATERIALIZE.  FURTHER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THIS DISCLOSURE STATEMENT WAS PREPARED MAY BE DIFFERENT FROM THOSE ASSUMED OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED, AND THUS THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER.  THIS DISCLOSURE STATEMENT, THEREFORE, MAY NOT BE RELIED UPON AS A GUARANTY OR OTHER ASSURANCE OF ANY FUTURE EVENT DISCUSSED HEREIN.

THIS DISCLOSURE STATEMENT CONTAINS SUMMARIES AND DESCRIPTIONS OF VARIOUS MOTIONS, COURT ORDERS, AGREEMENTS AND OTHER DOCUMENTS.  SUCH SUMMARIES AND DESCRIPTIONS ARE INCLUDED HEREIN FOR CONVENIENCE PURPOSES AND ARE QUALIFIED BY THE RELEVANT MOTIONS, ORDERS, AGREEMENTS AND OTHER DOCUMENTS IN THEIR ENTIRETY. IN CASE OF INCONSISTENCY BETWEEN SUMMARY OR DESCRIPTION INCLUDED HEREIN AND THE MOTION, ORDER, AGREEMENT OR OTHER DOCUMENTS, THE LATTER CONTROLS IN ALL RESPECTS.  COPIES OF MOTIONS, COURT ORDERS, AGREEMENTS AND OTHER DOCUMENTS FILED WITH THE BANKRUPTCY COURT CAN BE OBTAINED AT THE WEBSITE OF THE DEBTORS' OFFICIAL CLAIMS, NOTICING AND BALLOTING AGENT, EPIQ BANKRUPTCY SOLUTIONS LLC ("EPIQ"), WITHOUT CHARGE, AT http://dm.epiq11.com/nortel.

PLEASE ALSO SEE SECTION VI (*CERTAIN RISK FACTORS TO BE CONSIDERED*) FOR A DISCUSSION OF CERTAIN RISK FACTORS, WHICH SHOULD BE CONSIDERED IN CONNECTION WITH A DECISION BY A SOLICITED CREDITOR TO ACCEPT OR REJECT THE PLAN.

INFORMATION CONTAINED ON ANY WEBSITES REFERRED TO HEREIN OR THAT CAN BE ACCESSED THROUGH ANY SUCH WEBSITE DOES NOT CONSTITUTE

A PART OF AND IS NOT INCORPORATED BY REFERENCE IN, THIS DISCLOSURE
STATEMENT.

NEITHER THIS DISCLOSURE STATEMENT NOR THE PLAN IS OR SHOULD BE
CONSTRUED AS AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER.
NO RELIANCE SHOULD BE PLACED ON THE FACT THAT A PARTICULAR CLAIM OR
POTENTIAL OBJECTION TO A PARTICULAR CLAIM IS, OR IS NOT, IDENTIFIED IN
THIS DISCLOSURE STATEMENT. THE DEBTORS OR THE WIND-DOWN DEBTORS, AS
APPLICABLE, MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND
MAY OBJECT TO CLAIMS AFTER CONFIRMATION OR THE EFFECTIVE DATE OF
THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT
IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ........................................................................................................1

    A.      Scope of this Disclosure Statement.................................................3

    B.      Overview of the Plan and Its Treatment of Claims ..............................5

          1.      Substantive Consolidation of NNI and NNCC ........................6

          2.      Classification of Claims................................................6

          3.      Estimated Recoveries for Each Class of Claims ......................9

          4.      Bar Dates...............................................................17

    C.      Bankruptcy Plan Voting Instructions and Procedures .........................19

    D.      Confirmation of the Plan by the Bankruptcy Court............................22

          1.      Acceptance by Impaired Classes......................................22

          2.      No Unfair Discrimination and Fair and Equitable Test..................23

          3.      Best Interests Test .....................................................24

          4.      Feasibility..............................................................24

          5.      Conversion or Dismissal of Certain Chapter 11 Cases..................24

II. BACKGROUND AND CERTAIN PRE-PETITION OPERATIONS OF THE
      DEBTORS ...........................................................................25

    A.      Corporate Structure and Management of the Debtors ........................25

          1.      History of Nortel .......................................................25

          2.      Overview of Nortel's Historical Business Operations ..................25

          3.      Corporate Structure of the Debtors .....................................26

          4.      Business of Each Debtor.................................................27

          5.      Nortel Networks India International Inc................................29

    B.      The Debtors' Pre-petition Capital Structure...................................30

          1.      NNCC Bonds ...........................................................30

          2.      Certain NNI Guarantees ................................................30

          3.      Bonding Facilities Maintained or Guaranteed by the Debtors.................31

          4.      Pre-petition Liquidity ...................................................31

          5.      Transfer Pricing.........................................................31

    C.      Delisting from the New York Stock Exchange and Other Information..............32

III. THE CHAPTER 11 CASES AND CERTAIN POST-PETITION OPERATIONS OF
      THE DEBTORS ......................................................................34

# TABLE OF CONTENTS
(continued)

A.    Events Leading up to the Chapter 11 Cases .......................................................34

B.    Commencement of the Chapter 11 Cases and Other Creditor Protection
      Proceedings.......................................................................................................35

      1.    Chapter 11 Cases .....................................................................................35

      2.    Canadian Proceedings..............................................................................35

      3.    Other Creditor Protection Proceedings....................................................36

C.    Current Management of the Debtors....................................................................37

D.    Significant Events During the Chapter 11 Cases.................................................38

      1.    Certain Significant Court Orders.............................................................38

      2.    Appointment of Creditors' Committee and Organization of Bondholder
            Group and the Nortel Trade Claims Consortium .....................................38

      3.    Retained Professionals.............................................................................39

      4.    Disposition of Unexpired Leases and Executory Contracts ....................40

      5.    Claims Resolution Processes ...................................................................41

      6.    Significant Settlements and Settlement Procedures.................................42

      7.    Summary of Certain Significant Claims...................................................51

      8.    Avoidance Actions ...................................................................................56

      9.    Post-petition Liquidity, Lending and Financing ......................................56

      10.   Cascade Indemnity ..................................................................................60

E.    Post-petition Sales and Other Dispositions of Assets .........................................61

      1.    Mobile WiMAX Business and Alvarion Agreement ...............................61

      2.    Layer 4-7 Assets......................................................................................61

      3.    CDMA and LTE Access Assets...............................................................62

      4.    Enterprise Solutions Business..................................................................63

      5.    Packet Core Assets ..................................................................................63

      6.    Optical Networking and Carrier Ethernet Businesses..............................64

      7.    GSM/GSM-R Business.............................................................................65

      8.    CVAS Business ........................................................................................65

      9.    LGN Joint Venture ..................................................................................66

      10.   Relay Sale ...............................................................................................66

**TABLE OF CONTENTS**

(continued)

**Page**

| | | | |
|---|---|---|---|
| | 11. | MSS Business | 67 |
| | 12. | Sales of Certain Equity and Limited Partnership Interests | 67 |
| | 13. | Internet Protocol Numbers Sale | 68 |
| | 14. | Richardson Campus Sale | 68 |
| | 15. | Residual Patent and Related Assets Sale | 68 |
| | 16. | De Minimis Asset Sales | 68 |
| | 17. | Purchase Price Adjustments | 69 |
| | 18. | Transition Services Agreements | 69 |
| | 19. | Remaining Intellectual Property Assets | 69 |
| F. | | Certain Other Post-petition Operations of the Debtors and Other Nortel Affiliates | 70 |
| | 1. | Creation of Nortel Business Services Group and the Corporate Group | 70 |
| | 2. | Employee Information | 70 |
| | 3. | Non-Creditor Protection Legal Proceedings | 73 |
| | 4. | Insurance | 75 |
| | 5. | Environmental Matters | 75 |
| | 6. | Supply Chain Agreements | 76 |
| G. | | Description of Non-Debtor Subsidiaries of the Debtors | 76 |
| | 1. | Non-Debtor Subsidiaries Held by NNI | 76 |
| | 2. | Non-Debtor Subsidiaries Held by Nortel AltSystems Inc. | 77 |
| | 3. | Non-Debtor Subsidiaries Held by Sonoma Systems | 78 |
| | 4. | Non-Debtor Subsidiaries Held by NNCALA | 78 |
| H. | | Allocation of Sale Proceeds and Global Settlement of Allocation Dispute | 78 |
| | 1. | Pre-Trial Negotiation | 78 |
| | 2. | The Allocation Trial and Appeals | 79 |
| | 3. | The Settlement and Plans Support Agreement | 82 |
| IV. CHAPTER 11 PLAN | | | 90 |
| A. | | Summary of the Plan | 90 |
| B. | | Substantive Consolidation of NNI and NNCC | 92 |

## TABLE OF CONTENTS
(continued)

**Page**

C.  Treatment of Unclassified Claims ...................................................93

    1.  Administrative Expense Claims ..................................................93

    2.  Professional Claims ................................................................94

    3.  Priority Tax Claims ...............................................................94

D.  Treatment of Classified Claims and Interests....................................95

    1.  Class 1 — Priority Non-Tax Claims ......................................96

    2.  Class 2 — Secured Claims....................................................96

    3.  Class 3A — General Unsecured Claims and NNCC Bonds Claims ........96

    4.  Class 3B — Crossover Bonds Claims and EDC Claims ........................97

    5.  Class 3C — Convenience Claims ...........................................97

    6.  Class 4 — Subordinated Claims ............................................98

    7.  Class 5A — Interests............................................................98

    8.  Class 5B — Interests Securities Fraud Claims .......................99

E.  Implementation of the Plan .........................................................100

    1.  General Settlement of Claims and Interests..........................100

    2.  Plan Administrator ..............................................................100

    3.  Post-Effective Date Management..........................................101

    4.  Corporate Existence of Debtors ...........................................102

    5.  Effectuating Documents and Further Transactions...............102

    6.  Funding of Individual Debtors for Plan Confirmation ..........103

F.  Provisions Governing Voting and Distributions..............................103

    1.  Voting of Claims ................................................................103

    2.  Minimum Distribution ........................................................103

    3.  Distributions of Creditor Proceeds ......................................103

    4.  Distributions to Indenture Trustees ....................................104

    5.  Cancellation of Notes, Instruments and Debentures ............105

    6.  Distribution Record Date ....................................................106

    7.  Limitation on Recovery ......................................................107

    8.  Allocation of Distributions .................................................107

## TABLE OF CONTENTS
(continued)

<strong>Page</strong>

9.   Delivery of Distributions and Undeliverable Distributions ...................107

10.   Time Bar to Cash Payment Rights .......................................................108

11.   Withholding and Reporting Requirements ...........................................108

12.   Setoffs and Recoupment ......................................................................109

13.   Disputed Claims ..................................................................................109

14.   No Payment on Saturday, Sunday or Legal Holiday............................110

15.   No Distributions on Late-Filed Claims ...............................................110

16.   Post-petition Interest...........................................................................111

G.   Treatment of Executory Contracts and Unexpired Leases ............................111

1.   Previous Assumption, Assignment and Rejection ...............................111

2.   Assumption and Assignment of Remaining Contracts.........................111

3.   Cure of Defaults ..................................................................................112

4.   Objections to Assumption of Remaining Contracts.............................112

5.   Rejection and Approval of Rejection ..................................................113

6.   Post-petition Modification of Executory Contracts.............................113

7.   Pre-existing Obligations to the Debtors under Executory Contracts .....113

H.   Conditions Precedent to Plan's Confirmation and Effective Date ...................114

1.   Conditions to Confirmation of the Plan...............................................114

2.   Canadian and U.S. Plans Effectiveness ...............................................114

3.   Conditions to the Effective Date .........................................................114

4.   Creditor Proceeds Distribution Conditions ..........................................116

5.   Waiver of Conditions...........................................................................116

6.   Limited Severability of the Plan..........................................................117

7.   Notice of Effective Date ......................................................................117

I.   Effect of the Plan on Assets, Claims and Interests ..........................................118

1.   Binding Effect; Plan Binds All Holders of Claims and Equity Interests118

2.   Release and Discharge of Directors and Wind-Down Debtors..............118

3.   Release and Discharge of the Plan Released Parties.............................119

4.   SPSA Releases ....................................................................................120

xi

# TABLE OF CONTENTS
(continued)

**Page**

5. Exculpation ........................................................................121

6. Injunction on Claims ..........................................................122

7. Terms of Injunctions or Stays .............................................122

8. Retention of Litigation Claims and Reservation of Rights....122

J. Retention of Rights ..........................................................................123

K. Vesting .............................................................................................123

L. Defenses with Respect to Unimpaired Claims .................................123

M. The Debtors' Post-Emergence Wind-Down Activities......................123

N. Summary of Other Provisions of the Plan.......................................124

1. Retention of Jurisdiction....................................................124

2. Plan Supplement.................................................................126

3. Administrative Expense Claims Reserve..............................126

4. Amendment or Modification of the Plan.............................126

5. Approval of SPSA Under Bankruptcy Rule 9019................127

6. Fees and Expenses..............................................................127

7. Revocation or Withdrawal of the Plan ...............................127

8. Exemption from Certain Transfer Taxes .............................127

9. Governing Law....................................................................128

10. Severability of Plan Provisions ..........................................128

11. Notices of Retention on Abandonment of Documents and Property.....128

12. Dissolution of the Creditors' Committee.............................128

13. Dissolution of the Wind-Down Debtors ..............................129

14. Post-Effective Date Rule 2002 Notice List..........................129

15. Notice..................................................................................129

V. CONFIRMATION OF THE PLAN .........................................................131

A. Confirmation Hearing ......................................................................131

B. Confirmation Standards....................................................................131

C. Acceptance by an Impaired Class .....................................................132

D. No Unfair Discrimination and Fair and Equitable Test ...................132

# TABLE OF CONTENTS

(continued)

**Page**

    1.    No Unfair Discrimination Test...............................................133

    2.    Fair and Equitable Test........................................................133

E.    Best Interests Test ......................................................................133

F.    Feasibility ..................................................................................135

VI. CERTAIN RISK FACTORS TO BE CONSIDERED......................................136

A.    General Considerations ..............................................................136

B.    Certain Bankruptcy Considerations ...........................................136

C.    Inherent Uncertainty of Projections and Estimations .................137

D.    Liquidation Analysis .................................................................138

E.    Claims Estimations ...................................................................138

F.    Distributions under the Plan ......................................................139

G.    Conditions to Effectiveness of the Plan .....................................139

H.    Monetization of Remaining Assets.............................................140

I.    Greater Than Budgeted Wind-Down Costs................................140

J.    Intercompany Claims and Causes of Action ..............................140

K.    Other Creditor Protection Proceedings ......................................141

L.    Environmental Regulation..........................................................141

M.    Certain Tax Considerations .......................................................142

VII. CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS .................143

A.    In General .................................................................................143

B.    U.S. Federal Income Tax Consequences to the Debtors................144

    1.    Cancellation of Debt and Reduction of Tax Attributes.........144

    2.    Taxable Income Resulting From the Sales ..........................145

    3.    Limitation of NOL Carryforwards and Other Tax Attributes...............145

C.    Disputed Claims Reserve ..........................................................146

D.    U.S. Federal Income Tax Consequences to Holders of Claims........146

    1.    Generally............................................................................146

    2.    Holders of Allowed General Unsecured Claims...................147

    3.    Holders of Disputed Claims.................................................148

**TABLE OF CONTENTS**
(continued)

**Page**

        4.      Interest Income with Respect to Allowed Claims .................................148

    E.      Backup Withholding and Information Reporting .............................................148

VIII. ALTERNATIVES TO THE PLAN ................................................................................150

IX. CONCLUSION ..............................................................................................................151

**Index of Appendices to the Proposed Disclosure Statement**

| Appendix A | First Amended Joint Chapter 11 Plan of the Debtors |
|---|---|
| Appendix B | Structure Chart of Selected Nortel Affiliates |
| Appendix C | Budget and Recovery Analysis |
| Appendix D | Liquidation Analysis |
| Appendix E | Creditors' Committee Letter in Support of Plan Confirmation |

## PROPOSED DISCLOSURE STATEMENT
## FOR THE FIRST AMENDED JOINT CHAPTER 11 PLAN OF
## NORTEL NETWORKS INC. AND CERTAIN OF ITS AFFILIATED DEBTORS

THE DEBTORS RESERVE THE RIGHT TO AMEND OR SUPPLEMENT THIS
DISCLOSURE STATEMENT AT OR BEFORE THE CONFIRMATION HEARING.

## I.
## INTRODUCTION

Nortel Networks Inc., a Delaware corporation ("NNI")[3]; Nortel Networks Capital Corporation, a Delaware corporation ("NNCC"); Nortel Altsystems Inc. (formerly known as Alteon WebSystems, Inc.), a Delaware corporation; Nortel Altsystems International Inc. (formerly known as Alteon WebSystems International, Inc.), a Delaware corporation; Xros, Inc., a Delaware corporation; Sonoma Systems, a California corporation; Qtera Corporation, a Delaware corporation; CoreTek, Inc., a Delaware corporation; Nortel Networks Applications Management Solutions Inc., a Delaware corporation; Nortel Networks Optical Components Inc., a Delaware corporation; Nortel Networks HPOCS Inc., a Delaware corporation; Architel Systems (U.S.) Corporation, a Delaware corporation; Nortel Networks International Inc., a Delaware corporation; Northern Telecom International Inc., a Delaware corporation; Nortel Networks Cable Solutions Inc., a Delaware corporation; and Nortel Networks (CALA) Inc., a Florida corporation ("NNCALA" and collectively the "Debtors")[4], provide this Disclosure Statement to holders of claims against the Debtors ("Creditors") to permit such Creditors to make an informed decision in voting to accept or reject the plan filed on December 1, 2016 with the Bankruptcy Court (the "Plan").  On January 14, 2009 (the "Initial Petition Date"), the Debtors, other than NNCALA, filed their respective voluntary petitions for relief under chapter 11 of the Bankruptcy Code and, on July 14, 2009, NNCALA filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code and, on July 26, 2016, Nortel Networks India International Inc. ("NNIII"), a Delaware corporation and a wholly-owned subsidiary of NNI, filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (collectively, the "Chapter 11 Cases"). The Chapter 11 Cases are jointly administered for procedural purposes with one another under Case No. 09-10138 (KG).  Please see the copy of the Plan that is included in this Disclosure Statement as Appendix A  (*First Amended Joint Chapter 11 Plan of the Debtors*).

All Solicited Creditors (as defined below) are advised and encouraged to read and consider carefully this Disclosure Statement, the Plan and the Plan Supplement in their entirety before voting to accept or reject the Plan.

**This Disclosure Statement, the Plan and the Plan Supplement are an integral package, and they must be considered together for the reader to be adequately informed. This introduction is qualified in its entirety by the remaining portions of this Disclosure**

---

[3]     Capitalized terms not otherwise defined herein shall have the meaning ascribed to such terms in the Plan.

[4]     For the avoidance of doubt, the Plans described herein consist of separate Chapter 11 Plans for each Debtor, except for Nortel Networks India International, Inc. ("NNIII") (8667).  For purposes of the Plan and Disclosure Statement, the term "Debtors" shall not include NNIII, unless expressly indicated.

**Statement, and this Disclosure Statement in turn is qualified, in its entirety, by the Plan and the Plan Supplement.  In the event of any inconsistency between this Disclosure Statement and the Plan, the Plan controls.**

**Capitalized terms used herein but not otherwise defined have the meanings assigned to such terms in the Plan.**  Whenever the words "include," "includes" or "including" are used in this Disclosure Statement, they are deemed to be followed by the words "without limitation."  All dollar amounts in this Disclosure Statement are in United States Dollars unless otherwise stated.

This Disclosure Statement is presented to certain Creditors in accordance with the requirements of section 1125 of the Bankruptcy Code.  Section 1125 of the Bankruptcy Code requires that a disclosure statement provide information sufficient to enable a hypothetical investor typical of the holders of claims against or interests in the debtors to make an informed judgment whether to accept or reject a plan.  This Disclosure Statement may not be relied upon for any purpose other than that described above.

This Disclosure Statement solicits acceptances of the Plan from certain Creditors.  To the extent that any Class entitled to vote rejects or any Class is deemed to reject the Plan, the Debtors intend to seek confirmation of the Plan, notwithstanding such rejection or deemed rejection, pursuant to the "cramdown" provisions of section 1129(b) of the Bankruptcy Code.

The Debtors believe that the distributions under the Plan will provide Creditors and holders of Interests in the Debtors ("Interestholders"), at least the same recovery on account of Allowed Claims or Interests as would distributions by a chapter 7 trustee.  Further, the Debtors believe that distributions under the Plan to Creditors and Interestholders likely would be made more quickly than distributions by a chapter 7 trustee, the Debtors' ability to realize value from the remaining assets could be impaired in a chapter 7 liquidation, and a chapter 7 trustee would charge a substantial fee, reducing the amount available for distribution on account of Allowed Claims or Interests.

A statutory committee of unsecured creditors was appointed in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code on January 26, 2009 (as it has been and may be reconstituted from time to time, the "Creditors' Committee").  An *ad hoc* group of bondholders that hold notes issued and/or guaranteed by NNC, NNL, NNI, and NNCC, which on June 15, 2016 filed with the Bankruptcy Court a disclosure form under Bankruptcy Rule 2019, has also appeared in the Chapter 11 Cases (as such group may have been and may be constituted from time to time,  the "Bondholder Group").  An *ad hoc* group of creditors holding trade (supplier) and employee severance and pension claims (the "Nortel Trade Claims Consortium" or the "NTCC") also has appeared in the Chapter 11 Cases.  The NTCC has informed the Debtors and the Court that it does not support the SPSA or the Plan.

**THE DEBTORS AND THE CREDITORS' COMMITTEE BELIEVE THAT THE PLAN WILL ENABLE THEM TO ACCOMPLISH THE OBJECTIVES OF CHAPTER 11 THROUGH A TIMELY, EFFICIENT AND COST-EFFECTIVE LIQUIDATION AND THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS AND THEIR CREDITORS. THE DEBTORS AND**

**THE CREDITORS' COMMITTEE URGE ALL CREDITORS ENTITLED TO VOTE ON THE PLAN TO ACCEPT THE PLAN.**

The Debtors filed their initial Joint Chapter 11 Plan of Reorganization on July 12, 2010, and filed the disclosure statement relating to that plan on September 3, 2010. The Debtors subsequently filed the Plan on November 4, 2016 [D.I. 17347] and  revised versions of the Plan were filed on November 29, 2016 [D.I. 17452] and December 1, 2016, as attached at Appendix A. This Disclosure Statement, which accompanies the Plan, was filed on the same date. The Bankruptcy Court approved this Disclosure Statement and procedures for soliciting votes on the Plan by order entered on December 1, 2016 (the "Disclosure Statement Order"), approving this Disclosure Statement as containing adequate information of a kind and in sufficient detail to enable a hypothetical investor in the relevant classes to make an informed judgment whether to accept or reject the Plan.

The Bankruptcy Court has scheduled a hearing to consider confirmation of the Plan (the "Confirmation Hearing" ) beginning at 10:00 A.M. (prevailing Eastern time) on January 24, 2017, in the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, 6th Floor, Wilmington, Delaware 19801. At the Confirmation Hearing, the Bankruptcy Court will consider whether the Plan satisfies the requirements of the Bankruptcy Code, including whether the Plan is in the best interests of the Creditors, and will review a ballot report concerning votes cast for acceptance or rejection of the Plan.

To obtain, at your cost, additional copies of this Disclosure Statement or of the Plan, please contact:

> Nortel Networks Inc. Ballot Processing Center
> c/o Epiq Bankruptcy Solutions, LLC
> 10300 SW Allen Boulevard
> Beaverton, OR 97005

Electronic copies of the Plan and Disclosure Statement are available at no cost at Epiq's website at:  http://dm.epiq11.com/nortel.

Requests may be made in writing to the above address, or via email to tabulation@epiqsystems.com with a reference "Nortel" in the subject line.

**A.      Scope of this Disclosure Statement**

Before the Initial Petition Date, the Debtors, NNC and their Affiliates (collectively, "Nortel") were a global group of companies with legal entities conducting business operations across many jurisdictions around the world. Nortel includes certain entities that are not Debtors in the Chapter 11 Cases but are either subject to the Creditor Protection Proceedings (as defined below) in other jurisdictions or not subject to any bankruptcy, insolvency or other creditor protection proceedings. The Debtors are each direct or indirect subsidiaries of NNC and their operations represented only part of Nortel's global operations.

Since the Initial Petition Date, certain Nortel entities have initiated creditor protection proceedings under the respective restructuring, insolvency, liquidation or other similar regimes of certain jurisdictions in which they did business, including without limitation Canada, the United States, the United Kingdom, France and Israel (together with the Chapter 11 Cases, the "Creditor Protection Proceedings"). Resolution of each Creditor Protection Proceeding will occur or has occurred in accordance with the procedures of its respective jurisdiction.

This Disclosure Statement was prepared by the Debtors for the Chapter 11 Cases only, and not for any Creditor Protection Proceeding in any other jurisdiction. Creditors, Interestholders and other parties in interest are hereby advised that, although certain portions of this Disclosure Statement describe the businesses and history of Nortel as a global group, as well as various Creditor Protection Proceedings initiated by Nortel Affiliates in other jurisdictions, such descriptions are provided solely for background related to the Plan, and should not be relied upon for evaluating any Creditor Protection Proceeding other than the Chapter 11 Cases or any Nortel Affiliate other than the Debtors.

This Disclosure Statement is based on information provided by the Debtors' management, information publicly available in certain SEC and other similar filings and pleadings filed with the Bankruptcy Court and courts of other Creditor Protections Proceedings. While this Disclosure Statement makes reference to the Canadian Debtors and the Canadian Proceedings (as defined below) and certain other Nortel Affiliates, this Disclosure Statement is solely intended to provide adequate information for purposes of section 1125(a) of the Bankruptcy Code with respect to the Plan. It is not intended to provide any information regarding any Creditor Protection Proceeding other than the Chapter 11 Cases or any Nortel Affiliate other than the Debtors, and creditors and shareholders of such other Nortel Affiliates are advised not to rely on this Disclosure Statement for any purpose. Please see the *Disclaimer* that starts on page (i) above.

NO STATEMENTS OR INFORMATION CONCERNING THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY HAVE BEEN AUTHORIZED, OTHER THAN THE STATEMENTS AND INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AND THE INFORMATION ACCOMPANYING THIS DISCLOSURE STATEMENT. ALL OTHER STATEMENTS REGARDING THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY, WHETHER WRITTEN OR ORAL, ARE UNAUTHORIZED.

**APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN.**

The order that, among other things, approves the Disclosure Statement sets forth in detail the deadlines, procedures and instructions for voting to accept or reject the Plan and for filing objections to confirmation of the Plan, the record date for the purposes of voting to accept or reject the Plan, and the applicable standards for tabulating the Ballots used for voting ("Ballots"). Each holder of a Claim entitled to vote on the Plan should read in their entirety this Disclosure Statement (including the Exhibits attached hereto), the Plan and the instructions accompanying the Ballots before voting on the Plan. These documents contain, among other

things, important information concerning the classification of Claims and Interests for voting purposes and the tabulation of votes. No solicitation of votes to accept the Plan may be made except pursuant to section 1125 of the Bankruptcy Code.

**B.      Overview of the Plan and Its Treatment of Claims**

THE FOLLOWING IS A BRIEF SUMMARY OF THE TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN.  THE DESCRIPTION OF THE PLAN SET FORTH BELOW CONSTITUTES A SUMMARY ONLY AND IS QUALIFIED, IN ITS ENTIRETY, BY THE PLAN, THE PLAN SUPPLEMENT AND, WHERE APPROPRIATE, THE CONFIRMATION ORDER. CREDITORS, INTERESTSHOLDERS AND OTHER PARTIES IN INTEREST ARE URGED TO REVIEW THE MORE DETAILED DESCRIPTION OF THE PLAN CONTAINED IN SECTION IV (*CHAPTER 11 PLAN*) AND THE PLAN ITSELF.  THE PLAN IS INCLUDED IN THIS DISCLOSURE STATEMENT AS APPENDIX A (*FIRST AMENDED JOINT CHAPTER 11 PLAN OF THE DEBTORS*).  IN THE EVENT OF ANY INCONSISTENCY BETWEEN THIS DISCLOSURE STATEMENT AND THE PLAN, THE PLAN CONTROLS.

The Plan applies separately to each of the Debtors, subject to the substantive consolidation of NNI and NNCC.  The Plan recognizes the corporate integrity of each Debtor and, therefore, Allowed Claims against a particular Debtor will be satisfied only from the assets of that Debtor's bankruptcy estate, other than with respect to NNI and NNCC, which are proposed to be substantively consolidated.  A Creditor or Interestholder of any particular Debtor, by virtue of its Claims against or Interests in that Debtor, has no direct claim against or interest in any other Debtor and has no direct claim against or interest in any Affiliate of that Debtor.

The key components of the Plan include:

- Payment in full of all Allowed Administrative Expense Claims, Priority Tax Claims, Priority Non-Tax Claims, and Secured Claims against each Debtor.

- A global resolution among the Nortel Group regarding the allocation of the Sale Proceeds among each of the Nortel Group estates and settlement of other inter-estate claims and other claims, through a negotiated Settlement and Plans Support Agreement.

- Approval of a process whereby the Sale Proceeds currently in the Escrow Accounts shall be released simultaneously to each Nortel Group estate.

- The substantive consolidation of NNI and NNCC.

- The satisfaction, compromise, and settlement of various Intercompany Administrative Expense Claims (as defined below).

- The appointment of a Plan Administrator to wind down and distribute the assets of each Debtor estate.

Additional detail on certain important features of the Plan follows:

1.      **Substantive Consolidation of NNI and NNCC**

Section 3.2 (*Substantive Consolidation of NNI and NNCC*) of the Plan provides for the substantive consolidation of NNI and NNCC for all purposes associated with confirmation of the Plan (including voting) and effectiveness of the Plan.  As a result of the consolidation of NNI and NNCC, NNI and NNCC will constitute one NNI and NNCC estate (the "Consolidated Debtors"), from which all Claims against NNI and NNCC will be satisfied, without regard to the separate corporate identities of NNI and NNCC.  For more information on the substantive consolidation of NNI and NNCC, see Section IV.B (*Substantive Consolidation of NNI and NNCC*) herein.

2.      **Classification of Claims**

The Plan divides the Claims against and Interests in each Debtor into Classes. Certain Claims (in particular, Administrative Expense Claims; bankruptcy fees (including filing fees and quarterly fees) due and payable pursuant to section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing; Professional Claims; and Priority Tax Claims) remain unclassified in accordance with section 1123(a)(1) of the Bankruptcy Code.  Creditors whose Claims are unclassified are unimpaired and will be deemed to accept the Plan.

Each table included in "*Estimated Recoveries for Each Class of Claims*" below summarizes the classification and treatment under the Plan of the Claims and Interests and reflects the amount and form of consideration that will be distributed in exchange for and in full satisfaction, settlement, release and discharge of such Claims and Interests.

**The classification and treatment for Claims against and Interests in the Consolidated Debtors (NNI as substantively consolidated with NNCC) is as follows:**

"Class A1" consists of Priority Non-Tax Claims against the Consolidated Debtors.  Class A1 is unimpaired and will be deemed to accept the Plan.

"Class A2" consists of Secured Claims (if any) against the Consolidated Debtors. Class A2 is unimpaired and will be deemed to accept the Plan.

"Class A-3A" consists of General Unsecured Claims against the Consolidated Debtors (including NNCC Bonds Claims) other than Convenience Claims and Crossover Bonds Claims and EDC Claims.  Class A-3A is impaired and is entitled to vote to accept or reject the Plan.

"Class A-3B" consists of Crossover Bonds Claims and EDC Claims against the Consolidated Debtors.  Class A-3B is impaired and is entitled to vote to accept or reject the Plan.

"Class A-3C" consists of Convenience Claims against the Consolidated Debtors. A Convenience Claim is any Class 3A General Unsecured Claim, (i) in an Allowed amount equal to or less than $25,000 whose holder elects on its ballot for such Claim to be Allowed as a

Class 3C Convenience Claim and receive treatment as a Class 3C Convenience Claim in accordance with the Plan, or, (ii) in an Allowed amount larger than $25,000, whose holder elects on its ballot for such Allowed Claim to be reduced and Allowed at $25,000 in order to receive treatment as a Class 3C Convenience Claim in accordance with the Plan.  Class A-3C is impaired and is entitled to vote to accept or reject the Plan.

"Class A4" consists of Subordinated Claims against the Consolidated Debtors. Class A4 is impaired and will be deemed to reject the Plan.

"Class A-5A" consists of Interests in the Consolidated Debtors.  Class A5A is impaired and will be deemed to reject the Plan.

"Class A-5B" consists of Interests Securities Fraud Claims against the Consolidated Debtors.  Class A5B is impaired and will be deemed to reject the Plan.

**The classification and treatment for Claims against and Interests in NNCALA is as follows:**

"Class B1" consists of Priority Non-Tax Claims against NNCALA.  Class B1 is unimpaired and will be deemed to accept the Plan.

"Class B2" consists of Secured Claims (if any) against NNCALA.  Class B2 is unimpaired and will be deemed to accept the Plan.

"Class B-3A" consists of General Unsecured Claims against NNCALA other than Convenience Claims.  Class B-3A is impaired and is entitled to vote to accept or reject the Plan.

"Class B-3C" consists of Convenience Claims against NNCALA.  A Convenience Claim is any Class 3A General Unsecured Claim (i) in an Allowed amount equal to or less than $25,000 whose holder elects on its ballot for such Claim to be Allowed as a Class 3C Convenience Claim and receive treatment as a Class 3C Convenience Claim in accordance with the Plan, or, (ii) in an Allowed amount larger than $25,000, whose holder elects on its ballot for such Allowed Claim to be reduced and Allowed at $25,000 in order to receive treatment as a Class 3C Convenience Claim in accordance with the Plan.  Class B-3C is impaired and is entitled to vote to accept or reject the Plan.

"Class B4" consists of Subordinated Claims against NNCALA.  Class B4 is impaired and will be deemed to reject the Plan.

"Class B-5A" consists of Interests in NNCALA.  Class B5A is impaired and will be deemed to reject the Plan.

"Class B-5B" consists of Interests Securities Fraud Claims against NNCALA. Class B5B is impaired and will be deemed to reject the Plan.

**The classification and treatment for Claims against and Interests in Nortel Altsystems is as follows:**

"Class C1" consists of Priority Non-Tax Claims against Nortel Altsystems. Class C1 is unimpaired and will be deemed to accept the Plan.

"Class C2" consists of Secured Claims (if any) against Nortel Altsystems. Class C2 is unimpaired and will be deemed to accept the Plan.

"Class C-3A" consists of General Unsecured Claims against Nortel Altsystems other than Convenience Claims. Class C-3A is impaired and is entitled to vote to accept or reject the Plan.

"Class C-3C" consists of Convenience Claims against Nortel Altsystems. A Convenience Claim is any Class 3A General Unsecured Claim (i) in an Allowed amount equal to or less than $25,000 whose holder elects on its ballot for such Claim to be Allowed as a Class 3C Convenience Claim and receive treatment as a Class 3C Convenience Claim in accordance with the Plan, or, (ii) in an Allowed amount larger than $25,000, whose holder elects on its ballot for such Allowed Claim to be reduced and Allowed at $25,000 in order to receive treatment as a Class 3C Convenience Claim in accordance with the Plan. Class C-3C is impaired and is entitled to vote to accept or reject the Plan.

"Class C4" consists of Subordinated Claims against Nortel Altsystems. Class C4 is impaired and will be deemed to reject the Plan.

"Class C-5A" consists of Interests in Nortel Altsystems. Class C5A is impaired and will be deemed to reject the Plan.

"Class C-5B" consists of Interests Securities Fraud Claims against Nortel Altsystems. Class C5B is impaired and will be deemed to reject the Plan.

**The classification and treatment of all Claims against and Interests in the remaining Debtors is as follows:**

"Class 1" of each Debtor consists of Priority Non-Tax Claims (if any) against that Debtor. Class 1 is unimpaired and will be deemed to accept the Plan.

"Class 2" of each Debtor consists of Secured Claims (if any) against that Debtor. Class 2 is unimpaired and will be deemed to accept the Plan.

"Class 3" of each Debtor consists of General Unsecured Claims, if any, against that Debtor. Class 3 is impaired and is entitled to vote to accept or reject the Plan.

"Class 4" of each Debtor consists of Subordinated Claims, if any, against that Debtor. Class 4 is impaired and will be deemed to reject the Plan.

"Class 5A" of each Debtor consists of Interests in that Debtor. Class 5A is impaired and will be deemed to reject the Plan.

"Class 5B" of each Debtor consists of Interests Securities Fraud Claims, if any, against that Debtor. Class 5B is impaired and will be deemed to reject the Plan.

### 3. Estimated Recoveries for Each Class of Claims

The recovery percentages for each Class of Creditors and Interestholders for each Debtor are set forth in the tables below, on a Debtor-by-Debtor basis (other than with respect to the Consolidated Debtors, as discussed above). These recovery percentages are merely estimates and actual amounts distributed to holders of Allowed Claims under the Plan may be higher or lower than estimated.

To estimate Allowed Claims against each Debtor, the Debtors first calculated the total asserted Claims (other than Administrative Expense Claims, which are based on filed, scheduled, accrued and budgeted amounts) based on Filed and Scheduled Claims. To the extent a Creditor Filed a proof of claim that superseded a Scheduled Claim, the amount in the Filed proof of claim was used.

The Debtors and their advisors then reviewed all of the proofs of claim asserting Priority Tax Claims, Professional Claims, Secured Claims, Subordinated Claims and General Unsecured Claims. The Debtors (with the assistance of their advisors) then analyzed these claims and reduced asserted claim amounts for duplicate claims, amended claims, misclassified claims, settled claims, satisfied claims and claims that lack merit in whole or in part to determine the claims the Debtors would allow as Allowed Claims. The Debtors have resolved a significant number of Filed and Scheduled Claims and the number of Allowed Claims and amount of such Allowed Claims is reflected in the below estimated recoveries for each class of claims.

With respect to the Debtors' unexpired leases and executory contracts, to the extent they have not been assumed or rejected, the Debtors (with the assistance of their advisors) have analyzed their financial accounts and other available information and prepared estimates of cure amounts and rejection claims for the leases or executory contracts.

The ultimate aggregate amount of Allowed Claims may differ significantly from the amount used for purposes of the Debtors' estimates.

In addition, as discussed in additional detail in Section III.D.9.d (*Final Canadian Funding and Settlement Agreement*) below, NNI's assets expected to be available for distribution to its creditors, and to pay for other wind-down and Plan implementation expenses include its right to receive distributions on the $62.7 million U.S. Canadian Priority Claim and $2 billion U.S. Canadian Unsecured Claim against certain Canadian Debtors. The Debtors are reliant on the Canadian Debtors and the Monitor for estimates of the distributions expected to be made on these claims. The ultimate total amount of distributions on these claims may differ significantly from the amount used for purposes of the Debtors' estimates.

The recovery estimates in the Disclosure Statement are based on, among other things, the assumption that no tax withholding will be made on the expected recoveries from the Canadian Debtors. If the Canadian Debtors are required under applicable law to withhold any taxes in connection with their payment of the U.S. Canadian Unsecured Claim, the U.S. Canadian Priority Claim or the $77.5 million payment required by section 4(e) of the SPSA, distributions made to NNI with respect to such obligations would be reduced by the amount of the required withholding tax. The Debtors do not expect that any such withholding tax would

apply on a payment or distribution by the Canadian Debtors on account of the U.S. Canadian Unsecured Claim, U.S. Canadian Priority Claim or the $77.5 million payment required by section 4(e) of the SPSA and do not have any reason to believe that the Canadian Debtors would take a different position.  However, if any amounts are withheld by the Canadian Debtors, such withholding would reduce the payment the Debtors receive in respect of the U.S. Canadian Unsecured Claim, U.S. Canadian Priority Claim or the $77.5 million payment required by section 4(e) of the SPSA and there is no certainty that the Debtors would be able to recover all or any portion of the withheld amounts through a refund or credit.

**Nortel Networks Inc. (and Nortel Networks Capital Corporation) Claims and Interests**

| Class | Designation | Range of Estimated Allowed Amounts | Estimated Recovery | Status |
|---|---|---|---|---|
| 1 | Priority Non-Tax Claims against the Consolidated Debtors | $9.6-4.8 | 100% | Unimpaired and not entitled to vote (deemed to accept) |
| 2 | Secured Claims against the Consolidated Debtors | $0.2 | 100% | Unimpaired and not entitled to vote (deemed to accept) |
| 3A | General Unsecured Claims against the Consolidated Debtors | $1,499.4-1,271.7 | 55.1-61.2% | Impaired and entitled to vote |
| 3B | Crossover Bonds Claims and EDC Claims against the Consolidated Debtors | $3,954.7 | 55.1-56.7% | Impaired and entitled to vote |
| 3C | Convenience Claims against the Consolidated Debtors | $18.0 | 55.0% | Impaired and entitled to vote |
| 4 | Subordinated Claims against the Consolidated Debtors | $0 | 0% | Impaired and not entitled to vote (deemed to reject) |
| 5A | Consolidated U.S. Debtors Interests | $0 | 0% | Impaired and not entitled to vote (deemed to reject) |
| 5B | Consolidated U.S. Debtors Interests Securities Fraud Claims | $0 | 0% | Impaired and not entitled to vote (deemed to reject) |

**Nortel Networks (CALA) Inc. Claims and Interests**

| Class | Designation | Range of Estimated Allowed Amounts | Estimated Recovery | Status |
|---|---|---|---|---|
| 1 | Priority Non-Tax Claims against NNCALA | $0.1 | 100% | Unimpaired and not entitled to vote (deemed to accept) |
| 2 | Secured Claims against NNCALA | $0 | 100% | Unimpaired and not entitled to vote (deemed to accept) |
| 3A | General Unsecured Claims against NNCALA | $935.2-816.3 | 12.1-13.9% | Impaired and entitled to vote |

10

| Class | Designation | Range of Estimated Allowed Amounts | Estimated Recovery | Status |
|---|---|---|---|---|
| 3C | Convenience Claims against NNCALA | $0.6 | 12.0% | Impaired and entitled to vote |
| 4 | Subordinated Claims against NNCALA | $0 | 0% | Impaired and not entitled to vote (deemed to reject) |
| 5A | NNCALA Interests | $0 | 0% | Impaired and not entitled to vote (deemed to reject) |
| 5B | NNCALA Interests Securities Fraud Claims | $0 | 0% | Impaired and not entitled to vote (deemed to reject) |

## Nortel Altsystems Inc. Claims and Interests

| Class | Designation | Range of Estimated Allowed Amounts | Estimated Recovery | Status |
|---|---|---|---|---|
| 1 | Priority Non-Tax Claims against Nortel Altsystems | $0 | 100% | Unimpaired and not entitled to vote (deemed to accept) |
| 2 | Secured Claims against Nortel Altsystems | $0 | 100% | Unimpaired and not entitled to vote (deemed to accept) |
| 3 | General Unsecured Claims against Nortel Altsystems | $726.9-608.0 | 7.6-9.1% | Impaired and entitled to vote |
| 3C | Convenience Claims against Nortel Altsystems | $0.1 | 7.0% | Impaired and entitled to vote |
| 4 | Subordinated Claims against Nortel Altsystems | $0 | 0% | Impaired and not entitled to vote (deemed to reject) |
| 5A | Nortel Altsystems Interests | $0 | 0% | Impaired and not entitled to vote (deemed to reject) |
| 5B | Nortel Altsystems Interests Securities Fraud Claims | $0 | 0% | Impaired and not entitled to vote (deemed to reject) |

11

## Nortel Altsystems International Inc. Claims and Interests

| Class | Designation | Range of Estimated Allowed Amounts | Estimated Recovery | Status |
|---|---|---|---|---|
| 1 | Priority Non-Tax Claims against Nortel Altsystems Int'l | $0 | 100% | Unimpaired and not entitled to vote (deemed to accept) |
| 2 | Secured Claims against Nortel Altsystems Int'l | $0 | 100% | Unimpaired and not entitled to vote (deemed to accept) |
| 3 | General Unsecured Claims against Nortel Altsystems Int'l | $750.6-631.8 | <0.1%[5] | Impaired and entitled to vote |
| 4 | Subordinated Claims against Nortel Altsystems Int'l | $0 | 0% | Impaired and not entitled to vote (deemed to reject) |
| 5A | Nortel Altsystems Int'l Interests | $0 | 0% | Impaired and not entitled to vote (deemed to reject) |
| 5B | Nortel Altsystems Int'l Interests Securities Fraud Claims | $0 | 0% | Impaired and not entitled to vote (deemed to reject) |

## Xros, Inc. Claims and Interests

| Class | Designation | Range of Estimated Allowed Amounts | Estimated Recovery | Status |
|---|---|---|---|---|
| 1 | Priority Non-Tax Claims against Xros | $0.0 | 100% | Unimpaired and not entitled to vote (deemed to accept) |
| 2 | Secured Claims against Xros | $0.0 | 100% | Unimpaired and not entitled to vote (deemed to accept) |
| 3 | General Unsecured Claims against Xros | $764.9-646.2 | <0.1%[6] | Impaired and entitled to vote |
| 4 | Subordinated Claims against Xros | $0 | 0% | Impaired and not entitled to vote (deemed to reject) |
| 5A | Xros Interests | $0 | 0% | Impaired and not entitled to vote (deemed to reject) |
| 5B | Xros Interests Securities Fraud Claims | $0 | 0% | Impaired and not entitled to vote (deemed to reject) |

---

[5]    The recovery percentage for Nortel Altsystems International Inc. Class 3 Creditors assumes a transfer of cash of $5,000 from NNI in accordance with Section 6.6 of the Plan.

[6]    The recovery percentage for Xros, Inc. Class 3 Creditors assumes a transfer of cash of $5,000 from NNI in accordance with Section 6.6 of the Plan.

## Sonoma Systems Claims and Interests

| Class | Designation | Range of Estimated Allowed Amounts | Estimated Recovery | Status |
|---|---|---|---|---|
| 1 | Priority Non-Tax Claims against Sonoma | $0 | 100% | Unimpaired and not entitled to vote (deemed to accept) |
| 2 | Secured Claims against Sonoma | $0 | 100% | Unimpaired and not entitled to vote (deemed to accept) |
| 3 | General Unsecured Claims against Sonoma | $720.3-601.5 | 0.1% | Impaired and entitled to vote |
| 4 | Subordinated Claims against Sonoma | $0 | 0% | Impaired and not entitled to vote (deemed to reject) |
| 5A | Sonoma Interests | $0 | 0% | Impaired and not entitled to vote (deemed to reject) |
| 5B | Sonoma Interests Securities Fraud Claims | $0 | 0% | Impaired and not entitled to vote (deemed to reject) |

## Qtera Corporation Claims and Interests

| Class | Designation | Range of Estimated Allowed Amounts | Estimated Recovery | Status |
|---|---|---|---|---|
| 1 | Priority Non-Tax Claims against Qtera | $0 | 100% | Unimpaired and not entitled to vote (deemed to accept) |
| 2 | Secured Claims against Qtera | $0 | 100% | Unimpaired and not entitled to vote (deemed to accept) |
| 3 | General Unsecured Claims against Qtera | $900.3-781.5 | <0.1%[7] | Impaired and entitled to vote |
| 4 | Subordinated Claims against Qtera | $0 | 0% | Impaired and not entitled to vote (deemed to reject) |
| 5A | Qtera Interests | $0 | 0% | Impaired and not entitled to vote (deemed to reject) |
| 5B | Qtera Interests Securities Fraud Claims | $0 | 0% | Impaired and not entitled to vote (deemed to reject) |

---

[7]    The recovery percentage for Qtera Corporation Class 3 Creditors assumes a transfer of cash of $5,000 from NNI in accordance with Section 6.6 of the Plan.

## CoreTek, Inc. Claims and Interests

| Class | Designation | Range of Estimated Allowed Amounts | Estimated Recovery | Status |
|---|---|---|---|---|
| 1 | Priority Non-Tax Claims against CoreTek | $0 | 100% | Unimpaired and not entitled to vote (deemed to accept) |
| 2 | Secured Claims against CoreTek | $0 | 100% | Unimpaired and not entitled to vote (deemed to accept) |
| 3 | General Unsecured Claims against CoreTek | $801.6-682.9 | <0.1% [8] | Impaired and entitled to vote |
| 4 | Subordinated Claims against CoreTek | $0 | 0% | Impaired and not entitled to vote (deemed to reject) |
| 5A | CoreTek Interests | $0 | 0% | Impaired and not entitled to vote (deemed to reject) |
| 5B | CoreTek Interests Securities Fraud Claims | $0 | 0% | Impaired and not entitled to vote (deemed to reject) |

## Nortel Networks Applications Management Solutions Inc. Claims and Interests

| Class | Designation | Range of Estimated Allowed Amounts | Estimated Recovery | Status |
|---|---|---|---|---|
| 1 | Priority Non-Tax Claims against NN Applications | $0 | 100% | Unimpaired and not entitled to vote (deemed to accept) |
| 2 | Secured Claims against NN Applications | $0 | 100% | Unimpaired and not entitled to vote (deemed to accept) |
| 3 | General Unsecured Claims against NN Applications | $720.3-601.5 | <0.1% [9] | Impaired and entitled to vote |
| 4 | Subordinated Claims against NN Applications | $0 | 0% | Impaired and not entitled to vote (deemed to reject) |
| 5A | NN Applications Interests | $0 | 0% | Impaired and not entitled to vote (deemed to reject) |
| 5B | NN Applications Interests Securities Fraud Claims | $0 | 0% | Impaired and not entitled to vote (deemed to reject) |

---

[8]    The recovery percentage for CoreTek Inc. Class 3 Creditors assumes a transfer of cash of $5,000 from NNI in accordance with Section 6.6 of the Plan.

[9]    The recovery percentage for Nortel Networks Applications Management Solutions Inc. Class 3 Creditors assumes a transfer of cash of $5,000 from NNI in accordance with Section 6.6 of the Plan.

## Nortel Networks Optical Components Inc. Claims and Interests

| Class | Designation | Range of Estimated Allowed Amounts | Estimated Recovery | Status |
|---|---|---|---|---|
| 1 | Priority Non-Tax Claims against NN Optical | $0 | 100% | Unimpaired and not entitled to vote (deemed to accept) |
| 2 | Secured Claims against NN Optical | $0 | 100% | Unimpaired and not entitled to vote (deemed to accept) |
| 3 | General Unsecured Claims against NN Optical | $720.4-601.7 | <0.1% [10] | Impaired and entitled to vote |
| 4 | Subordinated Claims against NN Optical | $0 | 0% | Impaired and not entitled to vote (deemed to reject) |
| 5A | NN Optical Interests | $0 | 0% | Impaired and not entitled to vote (deemed to reject) |
| 5B | NN Optical Interests Securities Fraud Claims | $0 | 0% | Impaired and not entitled to vote (deemed to reject) |

## Nortel Networks HPOCS Inc. Claims and Interests

| Class | Designation | Range of Estimated Allowed Amounts | Estimated Recovery | Status |
|---|---|---|---|---|
| 1 | Priority Non-Tax Claims against NN HPOCS | $0 | 100% | Unimpaired and not entitled to vote (deemed to accept) |
| 2 | Secured Claims against NN HPOCS | $0 | 100% | Unimpaired and not entitled to vote (deemed to accept) |
| 3 | General Unsecured Claims against NN HPOCS | $720.3-601.5 | 0.1% | Impaired and entitled to vote |
| 4 | Subordinated Claims against NN HPOCS | $0 | 0% | Impaired and not entitled to vote (deemed to reject) |
| 5A | NN HPOCS Interests | $0 | 0% | Impaired and not entitled to vote (deemed to reject) |
| 5B | NN HPOCS Interests Securities Fraud Claims | $0 | 0% | Impaired and not entitled to vote (deemed to reject) |

---

[10]    The recovery percentage for Nortel Networks Optical Components Inc. Class 3 Creditors assumes a transfer of cash of $5,000 from NNI in accordance with Section 6.6 of the Plan.

## Architel Systems (U.S.) Corporation Claims and Interests

| Class | Designation | Range of Estimated Allowed Amounts | Estimated Recovery | Status |
|-------|-------------|-----------------------------------|--------------------|--------|
| 1 | Priority Non-Tax Claims against Architel | $0 | 100% | Unimpaired and not entitled to vote (deemed to accept) |
| 2 | Secured Claims against Architel | $0 | 100% | Unimpaired and not entitled to vote (deemed to accept) |
| 3 | General Unsecured Claims against Architel | $720.3-601.5 | 0.5-0.6% | Impaired and entitled to vote |
| 4 | Subordinated Claims against Architel | $0 | 0% | Impaired and not entitled to vote (deemed to reject) |
| 5A | Architel Interests | $0 | 0% | Impaired and not entitled to vote (deemed to reject) |
| 5B | Architel Interests Securities Fraud Claims | $0 | 0% | Impaired and not entitled to vote (deemed to reject) |

## Nortel Networks International Inc. Claims and Interests

| Class | Designation | Range of Estimated Allowed Amounts | Estimated Recovery | Status |
|-------|-------------|-----------------------------------|--------------------|--------|
| 1 | Priority Non-Tax Claims against NNII | $0 | 100% | Unimpaired and not entitled to vote (deemed to accept) |
| 2 | Secured Claims against NNII | $0 | 100% | Unimpaired and not entitled to vote (deemed to accept) |
| 3 | General Unsecured Claims against NNII | $784.3-665.5 | 0.7-0.9% | Impaired and entitled to vote |
| 4 | Subordinated Claims against NNII | $0 | 0% | Impaired and not entitled to vote (deemed to reject) |
| 5A | NNII Interests | $0 | 0% | Impaired and not entitled to vote (deemed to reject) |
| 5B | NNII Interests Securities Fraud Claims | $0 | 0% | Impaired and not entitled to vote (deemed to reject) |

## Northern Telecom International Inc. Claims and Interests

| Class | Designation | Range of Estimated Allowed Amounts | Estimated Recovery | Status |
|---|---|---|---|---|
| 1 | Priority Non-Tax Claims against NTI | $0 | 100% | Unimpaired and not entitled to vote (deemed to accept) |
| 2 | Secured Claims against NTI | $0 | 100% | Unimpaired and not entitled to vote (deemed to accept) |
| 3 | General Unsecured Claims against NTI | $720.3-601.5 | <0.1%[11] | Impaired and entitled to vote |
| 4 | Subordinated Claims against NTI | $0 | 0% | Impaired and not entitled to vote (deemed to reject) |
| 5A | NTI Interests | $0 | 0% | Impaired and not entitled to vote (deemed to reject) |
| 5B | NTI Interests Securities Fraud Claims | $0 | 0% | Impaired and not entitled to vote (deemed to reject) |

## Nortel Networks Cable Solutions Inc. Claims and Interests

| Class | Designation | Range of Estimated Allowed Amounts | Estimated Recovery | Status |
|---|---|---|---|---|
| 1 | Priority Non-Tax Claims against NN Cable | $0 | 100% | Unimpaired and not entitled to vote (deemed to accept) |
| 2 | Secured Claims against NN Cable | $0 | 100% | Unimpaired and not entitled to vote (deemed to accept) |
| 3 | General Unsecured Claims against NN Cable | $720.3-601.5 | <0.1%[12] | Impaired and entitled to vote |
| 4 | Subordinated Claims against NN Cable | $0 | 0% | Impaired and not entitled to vote (deemed to reject) |
| 5A | NN Cable Interests | $0 | 0% | Impaired and not entitled to vote (deemed to reject) |
| 5B | NN Cable Interests Securities Fraud Claims | $0 | 0% | Impaired and not entitled to vote (deemed to reject) |

### 4.     Bar Dates

By an order dated August 4, 2009 (the "Bar Date Order"), the Bankruptcy Court established 4:00 p.m. (prevailing Eastern time) on September 30, 2009 (the "Original Bar Date") as the deadline for filing proofs of claim against the Debtors, except NNCALA and NNIII.[13]   The

---

[11]     The recovery percentage for Norther Telecom International Inc. Class 3 Creditors assumes a transfer of cash of $5,000 from NNI in accordance with Section 6.6 of the Plan.

[12]     The recovery percentage for Nortel Networks Cable Solutions Inc.  Class 3 Creditors assumes a transfer of cash of $5,000 from NNI in accordance with Section 6.6 of the Plan.

[13]     On August 16, 2016, the Bankruptcy Court entered an order (the "NNIII Bar Date Order") fixing the general bar date as 4:00 p.m. (prevailing Eastern time) on September 19, 2016 for filing proofs of claim against NNIII (the "NNIII General Bar Date") and January 23, 2017 for filing proofs of claim by governmental entities against NNIII

Debtors provided notice of the Original Bar Date to all known Creditors and published notice of the same in THE GLOBE AND MAIL and THE WALL STREET JOURNAL. In addition to the Original Bar Date, on November 18, 2009, the Debtors established 5:00 p.m. (prevailing Eastern time) on December 15, 2009 as a supplemental deadline for the filing of proofs of claim by certain Creditors (the "Supplemental Bar Date"). The Debtors provided notice of the Supplemental Bar Date to those Creditors.

On December 3, 2009, the Bankruptcy Court entered an order (the "NNCALA Bar Date Order") fixing the general bar date as 4:00 p.m. (prevailing Eastern time) on January 25, 2010 for filing proofs of claim against NNCALA (the "NNCALA General Bar Date"). The Debtors provided notice of the NNCALA General Bar Date to all known Creditors of NNCALA and published notice of the same in THE GLOBE AND MAIL and THE WALL STREET JOURNAL.

On April 1, 2011, the Debtors filed an objection to the proofs of claim filed against the Debtors by the EMEA Debtors (as defined below), NNSA and certain related entities (such claims, collectively, the "EMEA Claims"), which resulted in the entry, on May 10, 2011, of an order (the "EMEA Claims Order") establishing June 1, 2011 as the deadline for the filing of proofs of claim by the EMEA Debtors, NNSA, and certain related entities (including any amended claims) against the Debtors. That date was subsequently extended to June 3, 2011 (the "EMEA Claims Bar Date").

On September 21, 2011, the Bankruptcy Court entered an order (the "Non-Canadian Intercompany Claims and D&O Bar Date Order") fixing the general bar date for the filing of (i) claims of certain intercompany creditors (other than the Canadian Debtors, those entities bound by the EMEA Claims Bar Date and those direct and indirect subsidiaries in which a Debtor holds a majority of the equity) and (ii) indemnification and/or contribution claims of the Debtors or any of the Debtors' non-debtor affiliates' directors and officers, who were directors and/or officers as of August 1, 2009, arising from such director's and/or officer's service as 4:00 p.m. (prevailing Eastern time) on November 15, 2011 (the "General Non-Canadian Intercompany Claims and D&O Bar Date"). The Debtors provided notice of the General Non-Canadian Intercompany Claims and D&O Bar Date to all known applicable creditors and published notice of the same in THE GLOBE AND MAIL and THE WALL STREET JOURNAL.

The Original Bar Date, Supplemental Bar Date, NNCALA General Bar Date, NNIII General Bar Date, the EMEA Claims Bar Date, and the General Non-Canadian Intercompany Claims and D&O Bar Date do not apply to Administrative Expense Claims, except to the extent provided by the Orders establishing such bar dates.

Pursuant to the Plan, all unpaid Administrative Expense Claims, other than Professional Claims, that accrued on or before the Effective Date must be filed on or before the Administrative Expense Claims Bar Date. The Administrative Expense Claims Bar Date is the

---

(the "NNIII Governmental Bar Date"). The Debtors provided notice of the NNIII General Bar Date and NNIII Governmental Bar Date to all known Creditors of NNIII and published notice of the same in THE WALL STREET JOURNAL.

first Business Day that is 30 days following the Effective Date unless otherwise ordered by the Bankruptcy Court.

## C.  Bankruptcy Plan Voting Instructions and Procedures

**THE DEBTORS AND THE CREDITORS' COMMITTEE URGE EACH SOLICITED CREDITOR TO VOTE TO <u>ACCEPT</u> THE PLAN.**

The Bankruptcy Code entitles only holders of Impaired claims or interests who are to receive some distribution under a proposed plan to vote to accept or reject that plan. Pursuant to section 1126(f) of the Bankruptcy Code, holders of claims or interests that are Unimpaired under a proposed plan are "conclusively presumed" to have accepted that plan and are not entitled to vote on it.  Pursuant to section 1126(g) of the Bankruptcy Code, holders of claims or interests that will receive no distributions under a proposed plan are deemed to have rejected that plan and, therefore, are also not entitled to vote on it.

The Creditors in Classes 1 and 2 of each Plan are Unimpaired under the Plan. Thus, pursuant to section 1126(f) of the Bankruptcy Code, the Creditors in Classes 1 and 2 of each Plan are "conclusively presumed" to have accepted the Plan and are, therefore, not entitled to vote on the Plan.

The Creditors in Class 3B and 3C of the Consolidated Debtors and Class 3C of NNCALA and the Class 3A Creditors of each Debtor are Impaired and thus may vote to accept or reject the Plan. The Debtors have enclosed ballots with this Disclosure Statement to solicit the votes of all such Creditors of each Debtor.  Each Impaired Creditor entitled to vote to accept or reject the Plan pursuant to the Plan is referred to as a "<u>Solicited Creditor</u>."

The Class 4 Creditors of each Plan will receive no distribution under the Plan unless the Allowed Claims of Creditors in Classes 1, 2, 3, 3A, 3B, and 3C of such Plan, as applicable, have been satisfied in full, which is not expected to occur, as reflected in the estimated recovery tables above.  Thus, for purposes of determining the right to vote on the Plan, the Class 4 Creditors of each Debtor are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and are not entitled to vote on the Plan.

The Class 5A Interestholders of each Debtor will receive no distribution under the Plan.  Thus, pursuant to section 1126(g) of the Bankruptcy Code, the Class 5A Interestholders of each Debtor are deemed to have rejected the Plan and are not entitled to vote on the Plan.

The Class 5B Creditors of each Debtor will receive no distribution under the Plan. Thus, pursuant to section 1126(g) of the Bankruptcy Code, the Class 5B Creditors of each Debtor are deemed to have rejected the Plan and are not entitled to vote on the Plan.

**A BALLOT FOR ACCEPTANCE OR REJECTION OF THE PLAN IS BEING PROVIDED ONLY TO SOLICITED CREDITORS.  SOLICITED CREDITORS SHOULD READ AND CONSIDER CAREFULLY THIS DISCLOSURE STATEMENT, THE PLAN AND THE PLAN SUPPLEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.**

The voting deadline is 4:00 P.M. (prevailing Eastern time) on January 9, 2017 and the Confirmation Hearing is scheduled for 10:00 A.M. (prevailing Eastern Time) on January 24, 2017.  The Debtors presently intend to consummate the Plan and to cause the Effective Date to occur with respect to each Debtor.  However, the confirmation and effectiveness of the Plan are subject to material conditions precedent, some of which may not be satisfied or waived.  Thus, there can be no assurance that those conditions will be satisfied or waived and there can also be no assurance as to whether or when the Effective Date actually will occur.  Furthermore, in accordance with the provisions of the Plan, the Debtors reserve the right to withdraw the Plan with respect to one or more Debtors while seeking Confirmation of the Plan with respect to all other Debtors.  Further, the Debtors reserve the right to withdraw the Plan with respect to one or more Debtors while seeking Confirmation of the Plan with respect to all other Debtors.  Additionally, certain matters that are expected to affect the timing of the receipt of distributions by Creditors and Interestholders in certain Classes, and that could affect the amount of distributions ultimately received by such Creditors and Interestholders, are described in Section IV (*Chapter 11 Plan*) and in the Plan.

You should use the Ballot sent to you with this Disclosure Statement to cast your vote for or against the Plan.  You may not cast Ballots or votes orally or by facsimile.  **In order for your Ballot to be considered by the Bankruptcy Court, it must be <u>actually received</u> by the Solicitation Agent by 4:00 P.M. (prevailing Eastern time) on January 9, 2017, at the following address:**

**For general ballots:**

**If by first class mail:**
Nortel Networks Inc. Ballot Processing Center
c/o Epiq Bankruptcy Solutions, LLC
P.O. Box 4422
Beaverton, OR 97076-4422

**If by Overnight Courier or Personal Delivery:**
Nortel Networks Inc. Ballot Processing Center
c/o Epiq Bankruptcy Solutions, LLC
10300 SW Allen Boulevard
Beaverton, OR 97005

**For beneficial ballots:**

Return the Ballot in accordance with the instructions received and in the envelope provided, so that Ballot or the master ballot cast on your behalf is actually received by the Solicitation Agent by the Voting Deadline.

If you are a Solicited Creditor of any Debtor, and you did not receive a Ballot with this Disclosure Statement, please contact the Nortel Networks Inc. Ballot Processing Center at the address above to receive a Ballot at no charge.

Only Solicited Creditors are entitled to vote on the Plan. Any Ballot executed by a Solicited Creditor, but which does not indicate acceptance or rejection of the Plan, will not be considered a vote regarding the Plan. Any Ballot not timely and properly executed by a Solicited Creditor will not be counted as a vote to accept or reject the Plan.

**An Impaired Class of Claims accepts the Plan if the holders of at least two-thirds in amount and more than one-half in number of the Allowed Claims in the Class that actually vote cast ballots in favor of the Plan.**

**YOU MAY BE BOUND EVEN IF YOU DO NOT VOTE.** Whether or not a Creditor or Interestholder votes on the Plan, such Person will be bound by the terms and treatment set forth in the Plan if the Plan is accepted by the requisite majorities of Claims and is confirmed by the Bankruptcy Court.

**REQUEST FOR DEEMED ACCEPTANCE BY NON-VOTING CLASSES.** If no votes to accept or reject the Plan are received with respect to a Class that is solicited in accordance with the Solicitation Procedures (other than a Class that is deemed eliminated pursuant to Plan Section 5.4(a) (*Elimination of Vacant Classes; Deemed Acceptance by Non-Voting Classes*), the Debtors will request at the Confirmation Hearing that the Court deem this Class to have accepted the Plan.

Pursuant to the provisions of section 1126(e) of the Bankruptcy Code, the Bankruptcy Court may disallow any vote accepting or rejecting the Plan if such vote is not cast in good faith.

Subject to the terms of the Disclosure Statement Order, any Claim in an Impaired Class as to which an objection or request for estimation is pending is not entitled to vote unless the holder of such Claim has obtained an order of the Bankruptcy Court temporarily allowing such Claim for the purpose of voting on the Plan; *provided, however*, that if a Debtor against which a Claim is asserted objects to the Claim, asserting that the Claim should be Allowed at a reduced amount, the claimant may, absent a Resolution Event (as defined below), vote such Claim at the amount asserted by the Debtor. Additionally, subject to the terms of the Disclosure Statement Order, any Claim in an Impaired Class that is listed on the Schedules as unliquidated, disputed or contingent is not entitled to vote unless the holder of such Claim has timely filed a proof of claim and no objection has been filed to such proof of claim or if an objection is filed with respect to such proof of claim (a) an order of the Bankruptcy Court is entered allowing such Claim pursuant to section 502(b) of the Bankruptcy Code, after notice and a hearing; (b) an order of the Bankruptcy Court is entered temporarily allowing such claim for voting purposes only pursuant to Bankruptcy Rule 3018(a), after notice and a hearing; (c) a stipulation or other agreement is executed between the holder of such Claim and the Debtor against which the claim is asserted resolving the objection and allowing such claim in an agreed upon amount; (d) a stipulation or other agreement is executed between the holder of such claim and the Debtor against which the claim is asserted temporarily allowing the holder of such claim to vote its claim in an agreed upon amount; or (e) the pending objection to such claim is voluntarily withdrawn by the Debtor against which the claim is held (each, a "Resolution Event"); provided, however, that if the Debtor against which the claim is asserted objects to a claim, asserting that the Claim should be Allowed at a reduced amount, the claimant may, absent a Resolution Event,

vote such claim at the amount asserted by the Debtor against which the claim is asserted. Allowance of a Claim for voting purposes or disallowance of a Claim for voting purposes does not necessarily mean that all or a portion of that Claim will be allowed or disallowed for distribution purposes. The Debtors' Schedules listing Claims and indicating whether such Claims are disputed can be reviewed upon reasonable request at the Delaware offices of Morris Nichols (as defined below) at 1201 North Market Street, 18th Floor, Wilmington, Delaware 19899-1347 (telephone: (302) 351-9238) or are available anytime without charge at the website of the Debtors' official claims, noticing and balloting agent, Epiq Bankruptcy Solutions LLC (http://dm.epiq11.com/nortel).

## D.    Confirmation of the Plan by the Bankruptcy Court

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan with respect to each of the Debtors only if all of the requirements of section 1129 of the Bankruptcy Code are met with respect to each such Debtor.

Among the statutory requirements for confirmation of a chapter 11 plan are that the plan is: (i) accepted by all Impaired classes of Claims, or if rejected by one or more Impaired Classes, that the plan "does not discriminate unfairly" and is "fair and equitable" as to such rejecting Classes (provided an Impaired class has otherwise accepted the Plan), (ii) in the "best interests" of creditors that are Impaired under the plan and (iii) feasible.

As more fully discussed in <u>Section V</u> (*Confirmation of the Plan*), the Debtors believe that the Plan will satisfy all of the requirements for confirmation with respect to each Debtor.

### 1.    Acceptance by Impaired Classes

**An impaired class of Claims accepts a chapter 11 plan if the holders of at least two-thirds in amount and more than one-half in number of the Allowed Claims or Claims otherwise entitled to vote in such class that actually vote cast ballots in favor of the Plan.**

As discussed above, the Class 4 Creditors of each Debtor will likely receive no distribution under the Plan. Thus, the Debtors are not soliciting votes from the Class 4 Creditors, and for purposes of determining the right to vote on the Plan, the Class 4 Creditors of each Debtor are deemed to have rejected the Plan.

Class 5A Interestholders and Class 5B Creditors of each Debtor will receive no distributions, in each case, on account of their respective Claims or Interests, and are therefore deemed to have rejected the Plan.

With respect to Classes 4, 5A and 5B, therefore, the Debtors will seek confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code. Under section 1129(b) of the Bankruptcy Code, the Bankruptcy Court may confirm the Plan if at least one of the Impaired Classes of Claims for each Debtor (not including any acceptances by "insiders" as defined in section 101(31) of the Bankruptcy Code) accepts the Plan and certain additional conditions are met.

## 2.    No Unfair Discrimination and Fair and Equitable Test

Section 1129(b) of the Bankruptcy Code is generally referred to as the "cramdown" provision.  Pursuant to this section, the Bankruptcy Court may confirm a chapter 11 plan notwithstanding the plan's rejection (or deemed rejection) by one or more impaired classes as long as the plan is accepted by at least one impaired class (by meeting the acceptance requirement described above), "does not discriminate unfairly," is "fair and equitable" as to each impaired class that has not accepted it and meets certain other statutory requirements.

### a.    No Unfair Discrimination

A plan does not "discriminate unfairly" within the meaning of the Bankruptcy Code with respect to a non-accepting class if the value of the consideration to be distributed to the non-accepting class is equal to, or otherwise fair when compared to, the value of the distributions to other classes whose legal rights are the same as those of the non-accepting class.

### b.    Fair and Equitable Test

#### i.    *Secured Creditors*

A plan is "fair and equitable" as to a non-accepting class of secured claims if the plan satisfies one of the alternative requirements of section 1129(b)(2)(A) of the Bankruptcy Code.  These requirements are fulfilled if either (i) each impaired secured creditor will retain its liens securing its secured claim and will receive on account of its secured claim deferred cash payments having a present value equal to the amount of its allowed secured claim, (ii) each impaired secured creditor will realize the "indubitable equivalent" of its allowed secured claim or (iii) the property securing the claim will be sold free and clear of liens with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds to be as provided in clause (i) or (ii) above.

#### ii.    *Unsecured Creditors*

Likewise, a plan is "fair and equitable" as to a non-accepting class of unsecured claims if the plan satisfies one of the alternative requirements of section 1129(b)(2)(B) of the Bankruptcy Code.  These requirements are fulfilled if (i) the non-accepting claimants will receive the full value of their claims or (ii) if the non-accepting claimants receive less than full value, no class of junior priority will receive anything on account of their pre-petition claims or interests.

The Debtors believe that the Plan does not discriminate unfairly and is fair and equitable as to each Impaired Class.

If the Bankruptcy Court determines that the Plan does not meet the "cramdown" requirements as set forth above with respect to any Debtor, in the Debtors' sole discretion, the Plan may be revoked with respect to some or all of the Debtors, and such Debtors' cases may be continued, converted to chapter 7 liquidation or dismissed in such Debtors' sole discretion upon the Bankruptcy Court's approval where required.

### 3.        Best Interests Test

In order for a chapter 11 plan to be confirmed, the Bankruptcy Code requires that, with respect to each impaired class of creditors or interestholders, that each of such impaired creditors or interestholders either (i) accepts the plan or (ii) receives or retains under the plan property of a value, as of the effective date of the plan, that is not less than the amount such class members would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code on the effective date (referred to herein as the "Best Interests Test").

The Debtors believe that the Plan meets the Best Interests Test. Given the history and complexity of the Chapter 11 Cases, the additional costs and expenses associated with a chapter 7 liquidation, including the substantial fee charged by a chapter 7 trustee, would significantly reduce the amount available for distribution on account of Allowed Claims. Furthermore, because the Plan embodies the SPSA, conversion to a chapter 7 would prevent the occurrence of certain conditions for the SPSA to become fully effective, absent consent of all the parties to that agreement.  This would likely lead to continued litigation over the allocation of the Sales Proceeds, the cost of which would continue to be borne by the Nortel Group estates, including the Debtors' creditors.  Finally, in light of the foregoing, distributions in a chapter 7 case would most likely be significantly delayed compared to distributions under this chapter 11 Plan.  Therefore, the Debtors believe that impaired creditors will receive more value under the Plan than they would if the Debtors were liquidated under chapter 7.

### 4.        Feasibility

To confirm a chapter 11 plan, the Bankruptcy Court must find that the confirmation of the plan is not likely to be followed by the liquidation or the need for further financial reorganization of the debtor, unless and to the extent liquidation is contemplated by the plan.  The Plan contemplates a distribution of the Debtors' remaining assets to the Debtors' creditors, followed by a liquidation of all Debtors.  Therefore, the Plan meets the requirements for feasibility necessary for Confirmation.

### 5.        Conversion or Dismissal of Certain Chapter 11 Cases.

If the requisite Classes do not vote to accept the Plan with respect to any particular Debtor or the Bankruptcy Court does not confirm the Plan with respect to any particular Debtor, the Debtors reserve the right, subject to Section 15.7 (*Revocation or Withdrawal of the Plan*) of the Plan, to have any Debtor's Chapter 11 Case dismissed or converted, or to liquidate or dissolve such Debtor under applicable non-bankruptcy procedure or chapter 7 of the Bankruptcy Code.

THESE ARE COMPLEX STATUTORY PROVISIONS, AND THE PRECEDING PARAGRAPHS ARE NOT INTENDED TO BE A COMPLETE SUMMARY OF THE LAW.  PLEASE CONSULT WITH YOUR ATTORNEY TO OBTAIN A COMPLETE UNDERSTANDING OF THE LAW AND YOUR RIGHTS UNDER THE LAW.

# II.
# BACKGROUND AND CERTAIN PRE-PETITION OPERATIONS OF THE DEBTORS

This Section provides a general description of Nortel's and the Debtors' organization and businesses prior to the Initial Petition Date. As a result of the commencement of the Chapter 11 Cases, the commencement of the other Creditor Protection Proceedings and the sale of significant business units and assets after the Initial Petition Date, the nature and scope of Nortel's current global businesses and the Debtors' individual businesses have changed substantially from the descriptions set forth in this Section. Following the divestiture of their various businesses and other assets over the course of the Chapter 11 Cases, the Debtors continued the process of winding down and monetizing their remaining assets and to pursue the resolution of the allocation of Sale Proceeds among the Nortel Affiliates.

## A.    Corporate Structure and Management of the Debtors

### 1.    History of Nortel

Nortel traces its origins to 1895 when the Bell Telephone Company of Canada founded the Northern Electric and Manufacturing Company Limited ("Northern Electric") as an equipment provider for Canada's telephone system. Over the following century, Northern Electric grew into an international communications technology and services company and changed its name to Northern Telecom in 1976. In 1995, celebrating its 100th anniversary, Northern Telecom changed its name again to Nortel to reflect its corporate evolution from a telephony manufacturing company to designer, builder and integrator of diverse multiservice networks. In 1998, the name Nortel Networks was first officially adopted in recognition of the continuing transformation of the company's business. Over time, Nortel gained a reputation for innovation and creativity through the development of ground-breaking technology, including many industry firsts, in such fundamental technologies as digital, optical, wireless, Internet Protocol ("IP"), voice-over IP ("VoIP"), broadband, multimedia and Ethernet.

From the mid-1980s to 2000, Nortel expanded substantially, helping to lead the telecommunications boom, moving from the development and manufacturing of traditional landline phone technology and equipment into the wireless and digital age. North American operations were expanded into the United States with the establishment of production and research and development facilities, resulting in an increase in the number of U.S.-based employees and the creation of a large customer base in the United States. At the same time, Nortel moved significantly into Europe, Asia, Africa and Latin America, becoming a truly global enterprise.

In 2000, BCE Inc. (formerly known as Bell Canada Enterprises), the parent company of Bell Canada, Inc., spun-off substantially all its shareholdings in Nortel through a statutory reorganization transaction, with the result that NNC became the ultimate parent entity of all Nortel Affiliates, and NNL became its principal Canadian operating subsidiary.

### 2.    Overview of Nortel's Historical Business Operations

Prior to the Initial Petition Date, Nortel supplied end-to-end networking products and solutions that helped organizations enhance and simplify communications. These

25

organizations ranged from small businesses to multi-national corporations involved in all aspects of commercial and industrial activity, to federal, state and local government agencies and the military.  They included cable operators, wireline and wireless telecommunications service providers and Internet service providers.  Nortel designed, developed, engineered, marketed, sold, supplied, licensed, installed, serviced and supported these networking solutions worldwide. Nortel's technology expertise ranged across carrier and enterprise, wireless and wireline, applications and infrastructure.

### 3.      Corporate Structure of the Debtors

Each Debtor is a direct or indirect subsidiary of NNC.

NNC is a corporation organized under the laws of Canada and its principal offices are located in Mississauga, Ontario, Canada.  Nortel Networks Limited, a corporation organized under the laws of Canada ("NNL"), is NNC's principal Canadian operating subsidiary and also the parent of NNI.  NNC and NNL are not Debtors in the Chapter 11 Cases, but are Canadian Debtors.  A copy of the current organizational structure of selected Nortel Affiliates, including NNC, NNL and the Debtors, is included in this Disclosure Statement as Appendix B (*Structure Chart of Selected Nortel Affiliates*).

Nortel's U.S. assets and operations are organized under either NNC or NNI, NNL's principal U.S. subsidiary.  NNI is the corporate parent of most of Nortel's wholly or partially owned U.S. subsidiaries.

As depicted in Appendix B (*Structure Chart of Selected Nortel Affiliates*), NNL, a direct subsidiary of NNC, owns 100% of the equity of NNI, which, in turn, owns directly or indirectly 100% of the equity of the following Debtors: NNCC, Nortel Networks Cable Solutions Inc., Nortel Networks International Inc., Northern Telecom International Inc., NNCALA, Qtera Corporation and NNIII.  NNI also owns 99.93% (and NNL owns 0.07%) of the equity of Nortel Networks Optical Components Inc., which owns 100% of the equity of Nortel Networks HPOCS Inc.

NNC owns 100% of the equity of the following Debtors: Sonoma Systems, CoreTek, Inc., Xros, Inc., Nortel Altsystems Inc. and Architel Systems Corporation, a non-Debtor entity that owns 100% of the equity of Architel Systems (U.S.) Corporation, a Debtor. Nortel Altsystems Inc. owns 100% of the equity of Nortel Altsystems International Inc., a Debtor.  NNC also owns 88.62% (and NNI owns 11.38%) of the equity of Nortel Networks Applications Management Solutions Inc., a Debtor.  NNC also directly or indirectly owns certain non-Debtor Affiliates of the Debtors.

NNC, formerly a public reporting company in the United States and Canada, previously filed annual, quarterly and current reports, and other information with the SEC and the CSA, which provide additional historical information about Nortel, its management and operations.  NNC's historic SEC filings are available to the public through the SEC's Electronic Data Gathering, Analysis and Retrieval system (EDGAR) on the website maintained by the SEC at *www.sec.gov* and from commercial document retrieval services.  NNC's CSA filings are available to the public through the CSA's System for Electronic Document Analysis and

Retrieval (SEDAR) which is operated by CDS Inc. on behalf of the CSA on the website *www.sedar.com* and from commercial document retrieval services.  Please see the *Disclaimer* starting on page (i) above regarding these historic financial reports.

### 4.      Business of Each Debtor

The remainder of this Section II.A.4 (*Business of Each Debtor*) provides information regarding each Debtor's business operations prior to the sale of its businesses through the Creditor Protection Proceedings, or as otherwise earlier ceased.

#### a.      Nortel Networks Inc.

As Nortel's primary U.S. operating subsidiary, prior to the Initial Petition Date, Nortel Networks Inc. served as a supplier of data and telephone network solutions and services and a U.S. purchasing hub for various Nortel Affiliates.  It is the direct or indirect parent of a majority of the Nortel Affiliates in the United States, including many of the Debtors.  It is also a guarantor of certain debt securities of NNC and NNL, including the Crossover Bonds.

As of the Initial Petition Date, NNI had 8,843 employees.  Its central headquarters and research and development complex were based in Richardson, Texas and it owned or leased multiple properties throughout the United States.  NNI had a customer base of over 1,000 customers and total revenue of over $4 billion in fiscal year 2008.

#### b.      Nortel Networks Capital Corporation

Nortel Networks Capital Corporation, a wholly owned subsidiary of NNI, is a Delaware Corporation that issued $300 million in aggregate principal amount of debt securities, comprised of the NNCC 2006 Notes (as defined below) and the NNCC Bonds (as defined below), each guaranteed by NNL.  These debt securities are described further below in Section II.B.1 (*NNCC Bonds*).  As of the Initial Petition Date, NNCC had repaid the 2006 Notes in full at maturity.  In connection with the issuance of the debt securities, NNI entered into a support agreement, dated as of February 15, 1996, with NNCC.  On July 23, 1996, NNCC entered into a pre-petition intercompany loan with NNI, pursuant to which NNI borrowed an initial principal amount equal to approximately $296.7 million.  As of the Initial Petition Date, the remaining principal together with accrued and unpaid interest on this loan was approximately $147.6 million.  NNCC neither has nor has ever had other operations or employees separate from NNI.

#### c.      Nortel Altsystems Inc.

Nortel Altsystems Inc. (formerly known as Alteon WebSystems, Inc.), a wholly owned subsidiary of NNC, was a provider of content aware switching technology, a provider of Internet infrastructure equipment and a manufacturer and marketer of web switches.  As of the Initial Petition Date, Nortel Altsystems Inc. had three subsidiaries: (i) Nortel Altsystems International Inc. (formerly known as Alteon WebSystems International, Inc.), another Debtor (as described below); (ii) Nortel Altsystems AB (formerly known as Alteon WebSystems AB), a Swedish entity that was responsible for product development of Nortel's IntelligentEdge products, which was liquidated as of August 16, 2011; and (iii) Nortel Altsystems International

Limited (formerly known as Alteon WebSystems International Limited), a Bermuda-based company that previously provided Internet infrastructure equipment and manufactured and marketed web switches, and that was struck off the Bermuda Registrar of Companies as of October 26, 2011.

### d.    Nortel Altsystems International Inc.

Nortel Altsystems International Inc. (formerly known as Alteon WebSystems International, Inc.), a wholly owned subsidiary of Nortel Altsystems Inc., was incorporated as a holding company for international branch and representative offices.

### e.    Xros, Inc.

Xros, Inc., a wholly owned subsidiary of NNC, developed and marketed optical networking systems.

### f.    Sonoma Systems

Sonoma Systems, a wholly owned subsidiary of NNC, developed carrier-class Broadband Integrated Access Devices that allowed service providers to deliver integrated services (Internet, voice, data and video) over a single access network.  Sonoma Systems owned 100% of a dormant U.K.-based subsidiary, Sonoma Limited, which was struck off the U.K. register of companies and dissolved pursuant to U.K. law as of August 31, 2010.  Sonoma Limited owned 100% of Sonoma Systems Europe, which was struck off the U.K. register of companies and dissolved pursuant to U.K. law as of September 28, 2010.

### g.    Qtera Corporation

Qtera Corporation, a wholly owned subsidiary of NNI, developed and marketed ultra-long-reach optical networking systems for telecommunications service providers.

### h.    CoreTek, Inc.

CoreTek, Inc., a wholly owned subsidiary of NNC, was a leader and pioneer in the use of VCSEL (vertical cavity surface-emitting laser) and MEMs (micro-electromechanical systems) technology for optical networking.

### i.    Nortel Networks Applications Management Solutions Inc.

Nortel Networks Applications Management Solutions Inc. is owned 88.62% by NNC and 11.38% by NNI.  Its primary business activities were software development and marketing.

### j.    Nortel Networks Optical Components Inc.

Nortel Networks Optical Components Inc. is a holding company 99.93% owned by NNI, with the remaining 0.07% held by NNL.  Nortel Networks Optical Components Inc. owns 100% of its sole subsidiary, Nortel Networks HPOCS Inc., which is described below.

### k.    Nortel Networks HPOCS Inc.

Nortel Networks HPOCS Inc. is a wholly owned subsidiary of Nortel Networks Optical Components Inc.  The entity's primary activities were research, development, manufacture, marketing and sale of optical and microelectronic components for use in telecommunications applications.

### l.    Architel Systems (U.S.) Corporation

Architel Systems (U.S.) Corporation, a wholly owned subsidiary of Architel Systems Corporation (a Canadian corporation), provided sales and professional services in the U.S. for its parent company.

### m.    Nortel Networks International Inc.

Nortel Networks International Inc., a wholly owned subsidiary of NNI, held various international sales offices and other branch, liaison or representative offices on behalf of its parent corporation, NNI.  Nortel Networks International Inc. also holds a minority ownership interest in Nortel Networks Technology (Thailand) Ltd.

### n.    Northern Telecom International Inc.

Northern Telecom International Inc., a wholly owned subsidiary of NNI, is a service company that utilized U.S. employees to provide services to Affiliates.  This entity is a name holding corporation, which preserves the use of the "Northern Telecom" name in the United States.

### o.    Nortel Networks Cable Solutions Inc.

Nortel Networks Cable Solutions Inc., a wholly owned subsidiary of NNI, represented Nortel interests at cable industry forums with the goal of influencing the definition of cable telephony network interface specifications and standards.

### p.    Nortel Networks (CALA) Inc.

Nortel Networks (CALA) Inc., a wholly owned subsidiary of NNI, conducted sales and marketing of Nortel products throughout the Caribbean and Latin America and served as a trading partner for all Nortel local entities throughout the Caribbean and Latin American region.

### 5.    Nortel Networks India International Inc.

Nortel Networks India International Inc., a wholly owned subsidiary of NNI, acted as a supplier of hardware and software for certain Nortel Affiliates that had contracts with certain Nortel customers in India.  Nortel Networks India International, Inc. is not a Debtor and presently intends to file its own separate Chapter 11 plan.

**B.**     **The Debtors' Pre-petition Capital Structure**

**1.**     **NNCC Bonds**

On June 12, 1996, NNCC issued and sold $150 million in aggregate principal amount of 7.40% debt securities due June 2006 (the "NNCC 2006 Notes") and $150 million in aggregate principal amount of 7.875% debt securities due June 2026 (the "NNCC Bonds") pursuant to an indenture dated as of February 15, 1996 among NNCC, as issuer, NNL, as issuer (in respect of the debt securities not issued by NNCC) and guarantor, and The Bank of New York Mellon ("BNYM", formerly known as The Bank of New York) as trustee.  On June 15, 2006, the NNCC 2006 Notes were repaid in full at maturity.  On February 12, 2009, BNYM was succeeded by Law Debenture Trust Company of New York (the "NNCC Bonds Indenture Trustee") as trustee under the indenture.  As noted above, in connection with the issuance of the NNCC Bonds, NNI entered into a support agreement with NNC and NNCC entered into an intercompany loan agreement with NNI.

**2.**     **Certain NNI Guarantees**

**a.**     **NNI guaranteed the following debt securities of NNL, issued under an indenture dated as of July 5, 2006 among NNL, as issuer, NNC and NNI, as guarantors, and BNYM as trustee:**

(i)     $2 billion in aggregate principal amount of senior notes comprised of $450 million in aggregate principal amount of 10.75% senior notes due 2016 (the "First Tranche of NNL 2016 Notes"), $550 million in aggregate principal amount of 10.125% senior notes due 2013 (the "NNL 2013 Notes") and $1 billion in aggregate principal amount of floating rate senior notes due 2011 with a stated interest rate per annum, reset quarterly, equal to LIBOR plus 4.250% (the "NNL 2011 Notes"), each of which were issued on July 5, 2006, and

(ii)     $675 million in aggregate principal amount of 10.75% senior notes due July 2016, which were issued on May 28, 2008 (together with the First Tranche of NNL 2016 Notes, the "NNL 2016 Notes").

**b.**     **NNI guaranteed the following debt securities of NNC, issued under the indenture dated as of March 28, 2007 among NNC, as issuer, NNL and NNI, as guarantors, and BNYM, as trustee:**

(i)     $575 million in aggregate principal amount of 1.75% convertible senior notes due 2012, which were issued on May 28, 2007 (the "NNC 2012 Notes"), and

(ii)     $575 million in aggregate principal amount of 2.125% convertible senior notes due 2014, which were issued on May 28, 2007 (the "NNC 2014 Notes").

The NNL 2011 Notes, the NNL 2013 Notes, the NNL 2016 Notes, the NNC 2012 Notes and the NNC 2014 Notes are hereinafter referred to collectively as the "Crossover Bonds". The proceeds from one or more issuances of the Crossover Bonds were used to redeem existing debt, to refinance a credit facility and for general corporate purposes.

3.     **Bonding Facilities Maintained or Guaranteed by the Debtors**

Nortel obtained financing support from certain institutions that issued letters of credit and performance bonds on behalf of various Nortel Affiliates (the "L/C and Bonding Facilities") in favor of Nortel's customers who did business with the relevant Nortel Affiliates.

Prior to the Initial Petition Date, Export Development Canada ("EDC"), Canada's federal export credit agency that provides financing support to Canadian exporters, provided a support facility that backstopped certain letters of credit and performance bonds on behalf of various Nortel Affiliates, including certain of the Debtors (the "EDC Facility").  The EDC Facility provided for the issuance of support in the form of guarantee bonds or guarantee-type documents issued to financial institutions that issue letters of credit or guarantee, performance or surety bonds or other instruments in support of Nortel's contract performance.  Prior to the Initial Petition Date, NNI issued a guaranty in support of the EDC Facility.

Prior to the Initial Petition Date, ACE American Insurance Company issued surety bonds on behalf of NNI, guaranteeing performance of certain NNI contracts and backstopped by the EDC Facility.  Since the Initial Petition Date, NNI's contingent obligations on the surety bonds have been secured by cash collateral.

4.     **Pre-petition Liquidity**

Historically, Nortel deployed its cash through a variety of intercompany borrowing and transfer pricing arrangements to allow it to operate on a global basis and to allocate profits, losses and certain costs among Nortel Affiliates.

From time to time, as part of the management of Nortel's cash needs on a global basis, certain Nortel Affiliates funded intercompany loans and capital contributions to other Nortel Affiliates to fund working capital and other expenses for these Affiliates.  As part of this practice, prior to the Initial Petition Date, NNI and NNL were parties to a $1 billion revolving loan agreement dated March 21, 2008, which permitted NNL to borrow funds from NNI.  As of the day before the Initial Petition Date, the aggregate outstanding principal balance of this revolving loan was approximately $296 million.  NNI's right to repayment of this loan was one of the claims comprising the CFSA Claim (as defined below) in connection with a subsequent settlement described below.

5.     **Transfer Pricing**

Nortel's transfer pricing arrangements are documented in certain distribution agreements between two or more Nortel Affiliates and a Master R&D Agreement, dated as of December 22, 2004, among NNL, NNI, Nortel Networks UK Limited ("NNUK"), Nortel Networks (Ireland) Limited, Nortel Networks S.A. ("NNSA") and other Nortel Affiliates (as amended from time to time, the "Master R&D Agreement", and together with the distribution agreements, the "Transfer Pricing Agreements").  Until the Initial Petition Date, the Canadian Debtors and the Debtors continued to allocate operating profits, losses and certain costs among the corporate group through Transfer Pricing Agreement payments ("TPA Payments"), although certain of these TPA Payments were suspended as of the Initial Petition Date, as further described below.

NNI, on behalf of itself and the other members of NNI's consolidated group for U.S. federal income tax purposes (the "NNI Consolidated Group"),[14] and NNL had previously entered into three concurrent Advanced Pricing Arrangements ("APAs") with the U.S. and Canadian tax authorities in connection with TPA Payments between the U.S. and Canadian Nortel entities. Two of these arrangements expired in 1999 and one in 2000. In 2002, NNI (on behalf of the NNI Consolidated Group), NNL and NNUK filed APA requests for the adoption of a new transfer pricing arrangement based on the residual profit split methodology with the tax authorities in the United States, Canada and the U.K. That method applied to the taxation years 2001 through 2005 (such arrangement, the "2001-2005 APA"). During 2006, NNI became aware of the fact that the U.S. Internal Revenue Service ("IRS") disagreed with certain aspects of Nortel's implementation of the residual profit split methodology. During 2009, Nortel received details from the U.S. and Canadian tax authorities concerning the settlement of the 2001-2005 APA under competent authority procedures. The settlement mandated a reallocation of taxable income from NNL to the NNI Consolidated Group in the aggregate amount of $2 billion for the tax years ending 2001 to 2005. In December 2009, NNI and NNL agreed to accept the settlement and the resulting reallocation of taxable income to the NNI Consolidated Group.

During 2007 and 2008, NNI (on behalf of the NNI Consolidated Group) and NNL requested new bilateral APAs for tax years 2007 through at least 2011 (the "2007-2011 APA"), for the United States and Canada, with a request for rollback to 2006, following methods generally similar to those requested for 2001 through 2005. NNI and NNL ultimately withdrew the relevant applications for the 2007-2011 APA following a request by the Canadian tax authority.

## C.    Delisting from the New York Stock Exchange and Other Information

On January 14, 2009, NNC received notice from the New York Stock Exchange (the "NYSE") that it decided to suspend the listing of NNC's common shares on the NYSE. The NYSE stated that its decision was based on the commencement of the Canadian Proceedings and the Chapter 11 Cases. Subsequently, on February 2, 2009, NNC common shares were delisted from the NYSE.

On June 19, 2009, and several times subsequently, Nortel announced that it did not expect that the holders of NNC common shares and NNL preferred shares would receive any value from the Chapter 11 Cases and the Canadian Proceedings and that such proceedings would ultimately result in the cancellation of those equity interests. As a result, NNC and NNL applied to delist the NNC common shares and the NNL preferred shares, respectively, from trading on the Toronto Stock Exchange, and such delisting occurred on June 26, 2009. Therefore, neither NNC nor NNL currently have traded shares on the Toronto Stock Exchange. NNL no longer files reports with the SEC, although it continues to file documents on the CSA's System for Electronic Document Analysis and Retrieval (SEDAR).

---

[14]    Only the Debtors that are direct or indirect subsidiaries of NNI are members of the NNI Consolidated Group. Therefore, Sonoma Systems, Xros, Inc., Architel Systems (U.S.) Corporation, CoreTek, Inc., Nortel Altsystems Inc. and their respective subsidiaries (if any) are not members of the NNI Consolidated Group. In addition, Nortel Networks Applications Management Solutions Inc. is not a member of the NNI Consolidated Group because only 11.38% of its equity is owned by NNI.

Although the reports historically filed with the SEC or the CSA by NNC and NNL may contain information regarding the Debtors, they are not considered to be part of this Disclosure Statement.  In addition, the financial and other information provided in such reports is prepared on a consolidated basis for NNC and certain of its Affiliates and does not provide information separately for all of the Debtors.  Please see the *Disclaimer* that starts on page (i) above regarding these historic financial reports.

**III.**
**THE CHAPTER 11 CASES AND CERTAIN POST-PETITION OPERATIONS**
**OF THE DEBTORS**

Chapter 11 is the chapter of the Bankruptcy Code primarily used for business reorganization.  The fundamental purpose of a chapter 11 case is to formulate a plan to restructure a debtor's finances so as to maximize recoveries to its creditors.  Below is a summary of certain events leading up to the commencement of the Chapter 11 Cases and certain significant events thereafter.

**A.      Events Leading up to the Chapter 11 Cases**

Nortel operated in a highly volatile telecommunications industry that was characterized by vigorous competition for market share and rapid technological development.  In the years immediately preceding the Initial Petition Date, Nortel's operating costs generally exceeded its revenues, resulting in negative cash flow.  A number of factors contributed to these results, including competitive pressures in the telecommunications industry, an inability to sufficiently reduce operating expenses, costs related to ongoing restructuring efforts described below, significant customer and competitor consolidation, customers cutting back on capital expenditures and deferring new investments and the poor state of the global economy.

In the years immediately preceding the Initial Petition Date, Nortel took a wide range of steps to attempt to address these issues, including a series of restructurings that reduced the number of worldwide employees from more than 90,000 in 2000 to approximately 30,000 (including employees in joint ventures) as of December 31, 2008.

These restructuring measures, however, did not provide adequate relief from the significant financial pressures Nortel was experiencing.  As global economic conditions dramatically worsened beginning in September 2008, Nortel experienced significant pressure on its business and faced a deterioration of cash and liquidity, globally as well as on a regional basis, as customers across all businesses suspended, delayed and reduced their capital expenditures.  The extreme volatility in the financial, foreign exchange, equity and credit markets globally and the expanding economic downturn and potentially prolonged recessionary period compounded the situation.

In addition, over the several years prior to the Initial Petition Date, Nortel made significant cash payments related to its restructuring programs, settlements of class action lawsuits in the United States and Canada, debt servicing costs and pension plans.  It became increasingly clear to Nortel that the struggle to reduce operating costs during a time of decreased customer spending and massive global economic uncertainty was putting substantial pressure on its liquidity position globally, particularly in North America.

Market conditions further restricted Nortel's ability to access the capital markets, which was compounded by actions taken by rating agencies with respect to the downgrading of the credit ratings of NNC and NNL.  With no access to the capital markets, limited prospects of the capital markets opening up in the near term, substantial interest carrying costs on over $4

billion of unsecured public debt and significant pension plan liabilities, it became imperative for Nortel to protect its cash position.

## B.    Commencement of the Chapter 11 Cases and Other Creditor Protection Proceedings

On the Initial Petition Date, after extensive consideration of all other alternatives, with the unanimous authorization of Nortel's board of directors after thorough consultation with its advisors, Nortel initiated certain Chapter 11 Cases and the Canadian Proceedings.  At the same time, as described below, certain Nortel Affiliates initiated other Creditor Protection Proceedings under the restructuring regimes of various jurisdictions.

### 1.    Chapter 11 Cases

On the Initial Petition Date (January 14, 2009), the Debtors, other than NNCALA and NNIII, filed their respective voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate and manage their remaining assets as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  On January 15, 2009, the Bankruptcy Court entered an order of joint administration pursuant to Bankruptcy Rule 1015(b) that provided for the joint administration and consolidation of these cases for procedural purposes only.

On July 14, 2009, NNCALA filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  On July 17, 2009, the Bankruptcy Court entered orders approving the joint administration and consolidation of NNCALA's Chapter 11 Case with the other Debtors' Chapter 11 Cases for procedural purposes only, and applying to NNCALA certain previously entered orders in the other Chapter 11 Cases.

On July 26, 2016, NNIII, filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.  On August 16, 2016, the Bankruptcy Court entered orders approving the joint administration and consolidation of NNIII's chapter 11 case with the other Debtors' Chapter 11 Cases for procedural purposes only, and applying to NNIII certain previously entered orders in the other Chapter 11 Cases.

While the Debtors are authorized to operate in the ordinary course of business, transactions out of the ordinary course require approval from the Bankruptcy Court.  In addition, the Bankruptcy Court has supervised the Debtors' retention of attorneys, accountants, financial advisors and other professionals as required by the Bankruptcy Code.

### 2.    Canadian Proceedings

Also on the Initial Petition Date, the Debtors' ultimate corporate parent NNC, as well as NNL, Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation, filed an application with the Ontario Superior Court of Justice (the "Canadian Court") under the Companies' Creditors Arrangement Act (the "CCAA"), seeking relief from their creditors (collectively and with the proceedings for the three additional Canadian Debtors described below, the "Canadian Proceedings").  Ernst & Young, Inc. is the court-appointed Monitor for the Canadian Debtors (the "Monitor") .  On March 18,

2016, three additional Canadian Affiliates, Nortel Communications Inc., Architel Systems Corporation and Northern Telecom Canada Limited, commenced proceedings under the CCAA. The Monitor is the court-appointed monitor for those cases as well.

On January 14, 2009, the Canadian Court entered an order recognizing the Chapter 11 Cases filed as of that date as a foreign proceeding under section 18.6 of the CCAA. On February 27, 2009, based on a petition filed by the Monitor as foreign representative for the Canadian Debtors, the Bankruptcy Court entered an order recognizing the Canadian Proceedings as foreign main proceedings under chapter 15 of the Bankruptcy Code.

### 3.    Other Creditor Protection Proceedings

In addition, on the Initial Petition Date, the High Court of England and Wales (the "U.K. Court") placed NNSA and 18 of Nortel's other European Affiliates, including NNUK, Nortel Networks (Ireland) Limited, Nortel GmbH, Nortel Networks France S.A.S., Nortel Networks Oy, Nortel Networks Romania SRL, Nortel Networks AB, Nortel Networks N.V., Nortel Networks S.p.A., Nortel Networks B.V., Nortel Networks Polska Sp. z.o.o., Nortel Networks Hispania, S.A., Nortel Networks (Austria) GmbH, Nortel Networks, s.r.o., Nortel Networks Engineering Service Kft, Nortel Networks Portugal S.A., Nortel Networks Slovensko, s.r.o. and Nortel Networks International Finance & Holding B.V., (collectively, but excluding NNSA, the "EMEA Debtors") into administration (such proceedings, the "U.K. Proceedings") pursuant to the English Insolvency Statute and the European Insolvency Regulation.  The U.K. Court appointed as administrators for the EMEA Debtors certain individuals from Ernst & Young LLP: Alan Robert Bloom, Christopher John Wilkinson Hill, Alan Michael Hudson and Stephen John Harris, as the administrators of all EMEA Debtors and NNSA except Nortel Networks (Ireland) Limited (in administration), Alan Robert Bloom and David Martin Hughes as administrators of Nortel Networks (Ireland) Limited (in administration), and Stephen Jonathan Taylor of Isonomy Limited as Conflicts Administrator solely in relation to matters in which the interests of NNSA conflict with the interests of the EMEA Debtors.

On June 26, 2009, the Bankruptcy Court entered an order recognizing the EMEA Proceedings of NNUK as foreign main proceedings under chapter 15 of the Bankruptcy Code. On October 20, 2010, the Joint Administrators as foreign representatives sought recognition of the remaining EMEA Proceedings as foreign main proceedings under chapter 15 of the Bankruptcy Code, to which the Debtors and the Creditors' Committee objected and sought discovery. On January 31, 2011, the Bankruptcy Court entered an order recognizing the EMEA Proceedings as foreign main proceedings under chapter 15 of the Bankruptcy Code with respect to NNSA and the EMEA Debtors other than NNUK.

On January 18, 2009, certain Nortel Affiliates, directly or indirectly owned by NNL, including Nortel Networks Israel (Sales and Marketing) Limited (the "Israeli Debtors"), filed an application for separate creditor protection proceedings (the "Israeli Administration Proceedings") with the Tel-Aviv-Jaffa District Court (the "Israeli Court"), pursuant to the Israeli Companies Law, 1999.  On January 19, 2009, the Israeli Court appointed Yaron Har-Zvi and Avi D. Pelossof as joint administrators of the Israeli Debtors under the Israeli Companies Law.

36

On May 28, 2009, at the request of the Joint Administrators, the Commercial Court of Versailles, France (the "French Court") (D.I. 2009P00492) ordered the commencement of secondary liquidation proceedings (the "French Proceedings") in respect of NNSA. NNSA was authorized to continue to operate as a going concern until completion of the sale of the Global Systems for Mobile Communications ("GSM") and the Global System for Mobile Railway Communications ("GSM-R") business. While NNSA's business operations are now substantially terminated, the French Proceedings are continuing as secondary proceedings and, in accordance with the European Union's Council Regulation (EC) No. 1346/2000, the EMEA Proceedings remain the main proceedings in respect of NNSA.

## C.    Current Management of the Debtors

A list of each Debtor's current directors and officers is included as Exhibit F (*List of Directors and Officers of the Debtors*) to the Plan.

The following provides a brief description of the members of the management team of the Debtors as of November 3, 2016:

| **Name** | **Position** | **Age** |
| --- | --- | --- |
| John J. Ray, III | Principal Officer of each Debtor | 57 |
| Timothy C. Ross | Chief Financial Officer & Corporate Secretary of each Debtor | 51 |

*John J. Ray, III* was retained as Principal Officer of each of the Debtors on December 7, 2009, and his appointment was approved by the Bankruptcy Court on January 6, 2010.[15] In this capacity, Mr. Ray has the principal responsibility for overseeing and directing the restructuring and wind down of the Debtors' estates. Mr. Ray is Senior Managing Director of Greylock Partners, LLC. Mr. Ray has served in various capacities with respect to Chapter 11 bankruptcy estates. From 2012 to 2014, Mr. Ray served as Chief Restructuring Officer of Overseas Shipping Group and from 2014 to 2015, Chairman of the Board of Overseas Shipping Group. From 2014 to 2016, Mr. Ray served as the Chairman of the Restructuring Committee of the Board of GT Technologies. From 2004 to 2009, Mr. Ray was Chairman of the post confirmation Board of Enron Corporation and, from 2005 to 2009, President of post confirmation Enron Corporation.

*Timothy C. Ross* has served as the Chief Financial Officer & Corporate Secretary of NNI and its affiliated Debtors since May 31, 2013. Prior to this appointment Mr. Ross served as the Sole Director and Corporate Secretary of NNI and its affiliated Debtors since January 2011. Mr. Ross held the position of Vice-President of U.S. Finance Operations since October 2011. Prior to this, he served as Vice-President NBS Financial Planning and Analysis from

---

[15]    By Order of the Bankruptcy Court dated August 16, 2016, Mr. Ray's appointment as Principal Officer of NNIII was approved. Accordingly, Mr. Ray has the principal responsibility for overseeing and directing the restructuring and wind down of NNIII's estate.

August 2009 to September 2011.  From May 2008 to July 2009 he held the position of Director Financial Planning and Analysis Nortel Global Operations.

## D.       Significant Events During the Chapter 11 Cases

### 1.       Certain Significant Court Orders

#### a.       Initial Orders Entered in the Chapter 11 Cases

The Debtors have obtained numerous orders from the Bankruptcy Court intended to enable the Debtors to operate in the normal course of business during the Chapter 11 Cases.  Among other things, these orders authorize: (i) the use and operation of the Debtors' consolidated cash management system during the Chapter 11 Cases in substantially the same manner as it was operated prior to the commencement of the Chapter 11 Cases; (ii) the continued engagement in intercompany transactions during the Chapter 11 Cases and the Debtors' exercise of setoffs in connection therewith; (iii) the payment of certain pre-petition employee salaries, wages and other compensation; medical, retirement and other benefits; and other employee obligations; (iv) the payment of certain taxes and fees; (v) the continuance of insurance coverage in the ordinary course of business during the Chapter 11 Cases; (vi) the performance of certain pre-petition obligations to customers; and (vii) the payment of certain pre-petition common carrier charges and warehouse fees.

#### b.       Cross-Border Protocol

Each of the Bankruptcy Court and the Canadian Court approved a cross-border protocol (the "Cross-Border Protocol") to establish general administrative procedures to govern and to facilitate the administration of cross-border matters among the Chapter 11 Cases and the Canadian Proceedings, which protocol was most recently amended and approved by the Bankruptcy Court and the Canadian Court on June 29, 2009.  Additionally, as discussed in Section III.D.5 (*Claims Resolution Processes*) below, a cross-border claims protocol was later approved by the Courts.

The Cross-Border Protocol shall remain in full force and effect in accordance with its terms.

### 2.       Appointment of Creditors' Committee and Organization of Bondholder Group and the Nortel Trade Claims Consortium

On January 26, 2009, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee"), appointed the Creditors' Committee to represent the interests of the Debtors' unsecured creditors.  Since its formation, the Debtors consulted with the Creditors' Committee concerning the administration of the Chapter 11 Cases.  The Debtors have kept the Creditors' Committee informed about their operations and have sought the concurrence of the Creditors' Committee for actions and transactions taken outside of the ordinary course of the Debtors' businesses.

The Creditors' Committee currently consists of the following members:

The Bank of New York Mellon, as indenture trustee
Corporate Trust - Default Administration Group
6525 W. Campus Oval, Suite 200
New Albany, OH 43054
Attn: Donna Parisi

Law Debenture Trust Company of New York, as indenture trustee
400 Madison Ave., 4th Floor
New York, New York 10017

Pension Benefit Guaranty Corporation
1200 K Street, Northwest
Washington, D.C.  20005

The Creditors' Committee is represented by Akin Gump Strauss Hauer & Feld LLP and Whiteford, Taylor and Preston LLC.  Additionally, the Creditors' Committee has retained and employs Cassels Brock & Blackwell LLP as Canadian counsel and Ashurst LLP as European counsel.  The Creditors' Committee's current financial advisor is Berkeley Research Group, LLC and its investment banker was Jefferies & Company, Inc. until its role was completed in 2012.

The Bondholder Group is represented by Milbank, Tweed, Hadley & McCloy LLP and Pachulski Stang Ziehl & Jones LLP.  Additionally, the Bondholder Group has retained and employs Bennett Jones LLP as Canadian counsel.  The Bondholder Group's financial advisor is FTI Capital Advisors, LLC.  The professionals retained and employed by the Bondholder Group have not sought approval of their retention and employment from the Bankruptcy Court and the Debtors do not pay for their fees and expenses.

The Nortel Trade Claims Consortium, an *ad hoc* group of creditors holding trade (supplier) and employee severance and pension claims, was formed and appeared in the Chapter 11 Cases starting in June 2015. The NTCC is represented by Brown Rudnick LLP and Fox Rothschild LLP.  The professionals retained and employed by the NTCC have not sought approval of their retention and employment from the Bankruptcy Court and the Debtors do not pay for their fees and expenses.

3.    **Retained Professionals**

The Bankruptcy Court authorized the Debtors to retain certain professionals to represent them and assist them in connection with the Chapter 11 Cases.  The Debtors have retained, and the Bankruptcy Court has approved the retention of, various professionals including: (a) Cleary Gottlieb Steen & Hamilton LLP, Morris, Nichols, Arsht & Tunnell LLP ("Morris Nichols"), and Jackson Lewis LLP as counsel for the Debtors in the Chapter 11 Cases; (b) Lazard Frères & Co. LLC ("Lazard"), as financial advisor and investment banker to the Debtors and their Affiliates; (c) Epiq, as official claims, noticing and balloting agent for the Debtors; (d) Huron Consulting Services LLC ("Huron"), as restructuring advisor to the Debtors;

(e) John J. Ray, III, as the Debtors' Principal Officer; (f) Chilmark Partners, LLC, as consulting expert to the Debtors; (g) RLKS Executive Solutions LLC, as document management and data preservation consultants to the Debtors; (h) Benesch Friedlander Coplan & Aronoff LLP and Shearman & Sterling LLP as special litigation counsel for the Debtors; (i) Mercer (US) Inc., as employee benefit consultants to the Debtors; (j) Torys LLP, as Canadian counsel to the Debtors; (k) Linklaters LLP, as U.K. counsel to the Debtors; (l) Keightley & Ashner LLP, and Punter Southall LLC as special pension benefits counsel for the Debtors; (m) Ernst & Young LLP, as tax service providers to the Debtors; (n) Global IP Law Group, LLC ("Global IP"), as intellectual property consultant and legal advisors to the Debtors; (q) Crowell & Moring, special counsel for the Debtors; and (r) Eugene F. Collins as Special Irish Counsel to the Debtors.

The Bankruptcy Court has also authorized the Debtors to retain, compensate and reimburse the expenses of certain additional attorneys, accountants, consultants and other professionals used in the ordinary course of the Debtors' businesses and retained pursuant to section 327(e) of the Bankruptcy Code or otherwise.

### 4.    Disposition of Unexpired Leases and Executory Contracts

Section 365 of the Bankruptcy Code provides a debtor in possession in a chapter 11 proceeding with the power, subject to the approval of the bankruptcy court, to assume or reject executory contracts and unexpired leases entered into before the commencement of the case.  In the event an executory contract or unexpired lease is rejected, the counterparty may file a claim for damages incurred due to the rejection.  In the case of rejection of leases of real property, such claims are subject to certain limitations imposed by the Bankruptcy Code.

After the Initial Petition Date, the Debtors, with the assistance of their professionals, devoted substantial time to evaluating and identifying unexpired leases and executory contracts that are no longer necessary to the operation of the Debtors' estates and economically burdensome to the estates, determining the appropriate and beneficial disposition of such leases and contracts pursuant to section 365 of the Bankruptcy Code and obtaining court approval of such disposition.

On March 20, 2009, the Bankruptcy Court entered the Order Approving Procedures for the Rejection of Executory Contracts and Unexpired Leases and the Abandonment of Certain Assets Related Thereto (the "Rejection Procedures Order"), which provides procedures for the rejection of executory contracts and unexpired leases on limited notice.  These procedures alleviated additional expense to the Debtors' estates and the attendant delay that would have resulted if the Debtors had been required to proceed by separate motion and hearing for each executory contract and unexpired lease they determined to reject.

From the Initial Petition Date to the date of this Disclosure Statement, the Debtors have rejected approximately 61 unexpired real property leases and subleases pursuant to the Rejection Procedures Order and assumed five leases, one of which was assigned to a third party in connection with such third party's acquisition of various assets of the Debtors.  In addition, since the Initial Petition Date, the Debtors have permitted three leases to expire by their terms in the ordinary course of the Debtors' business and one lease to be deemed rejected.  Following

such lease being deemed rejected, the Debtors and the landlord party thereto entered into a new lease.

Under the Rejection Procedures Order, the Debtors have rejected approximately 33 executory contracts as of the date of this Disclosure Statement. A significant number of the Debtors' executory contracts have been assumed and assigned or assigned in whole or in part to various purchasers in connection with the Sales described in Section III.E (*Post-petition Sales and Other Dispositions of Assets*). In addition, two executory contracts were assumed outside of the post-petition asset sale process.

### 5. Claims Resolution Processes

Since the Initial Petition Date, the Debtors have undertaken the process of reconciling the amount and classification of outstanding Claims and filing and prosecuting objections to Claims. As of October 11, 2016, approximately 8,727 proofs of claim had been filed against the Debtors, asserting claims in the aggregate amount of approximately $45.6 billion, as well as additional unliquidated amounts. As of October 11, 2016, approximately 8,473 proofs of claim have been resolved, reducing the aggregate amount of Claims asserted against the Debtors by approximately $19.8 billion. Certain of these Claims have been resolved on a consensual basis as further described below in Section III.D.6 (*Significant Settlements and Settlement Procedures*).

As of October 11, 2016, the Debtors had filed 45 omnibus objections to proofs of claim in which the Debtors objected to various types of Claims, such as (i) duplicative and redundant Claims; (ii) amended and superseded Claims; (iii) Claims for disputed liabilities; (iv) Claims that were previously paid or otherwise satisfied; (v) overstated Claims; (vi) Claims asserted against the wrong Nortel Affiliate; (vii) misclassified Claims; and (viii) Claims asserted against multiple Debtors with respect to the same liability. The Debtors have also filed individual claims objections, settled claims by stipulation and mutually settled Claims under various Claims settlement protocols approved by the Bankruptcy Court. Utilizing all of these mechanisms for Claims resolution, as of October 11, 2016, 4,799 Claims in the aggregate amount of $19.7 billion have been disallowed, withdrawn or otherwise satisfied and 3,674 Claims in the aggregate amount of $430.7 million have been Allowed. The Debtors expect to continue preparing, filing and resolving objections and executing settlements to resolve the remaining 254 unresolved Claims (including duplicate Claims) in the aggregate amount of $25.4 billion throughout the course of the Chapter 11 Cases. As of October 11, 2016, approximately 145 unresolved proofs of claim (counting only once those proofs of claim filed against more than one Debtor and excluding those duplicate claims filed more than once against the same Debtor in the same amount) remain against the Debtors, asserting claims in the aggregate amount of approximately $5.3 billion, as well as additional unliquidated amounts.

Since the Initial Petition Date, the Debtors also have resolved some Claims consensually through stipulations and orders, and are negotiating additional consensual resolutions. Through the course of the Chapter 11 Cases, the Debtors may continue to resolve certain Claims through stipulations, orders and other agreements relating to settlement of certain pre-petition claim amounts and classifications. These agreements also may include resolution of certain post-petition claims and other disputes in addition to resolution of the Claims.

The ultimate aggregate amount of Allowed Claims may differ significantly from the amount used for purposes of the Debtors' estimates. While the Debtors are working actively to resolve disputed Claims, a number of Claims have not yet been resolved, and additional Claims could be filed. Although the Bankruptcy Court has established bar dates as described above, certain further Claims may be permitted. The Debtors have amended their Schedules seven times to date and reserve the right to amend them further. Therefore, the projected recoveries set forth in this Disclosure Statement are based on the Debtors' best estimates as of the date hereof of the Claims that will eventually be Allowed in the various classes. There is no guarantee that either the ultimate aggregate amount of Allowed Claims or the actual amounts of Allowed Claims in any Class will correspond to these estimates. The Debtors expressly disclaim any obligation to update these estimates after the date hereof on any basis (including new or different information received and/or errors discovered). Actual recoveries will depend on a number of factors including litigation outcomes, the amount of distributions from the Canadian Debtors, and future costs to administer and wind down the Debtors and their cases. The amount of Distributions that will ultimately be received by any particular holder of an Allowed Claim may be affected by the outcome of the ongoing claims resolution process.

By Order dated September 16, 2010, the Bankruptcy Court approved certain procedures to govern the coordination and resolution of claims that involve cross-border issues between the Canadian Proceedings and the Chapter 11 Cases (the "Cross-Border Claims Protocol"). The Debtors have worked, and continue to work, with the Canadian Debtors in accordance with the Cross-Border Claims Protocol to resolve the claims that involve cross-border issues in the Chapter 11 Cases and the Canadian Proceedings.

The Cross-Border Claims Protocol shall remain in full force and effect in accordance with its terms.

### 6.    Significant Settlements and Settlement Procedures

In addition to the proposed settlements embodied in the SPSA, discussed in Section III.H.3 (*The Settlement and Plans Support Agreement*) below, the Debtors have entered into various significant settlements during the course of their Chapter 11 Cases.

#### a.    Settlements with Affiliates

##### i.    *APAC Debt Restructuring Agreement*

As a consequence of the Chapter 11 Cases and other Creditor Protection Proceedings, a portion of intercompany payables owed by the Debtors to certain Nortel Affiliates (the "APAC Agreement Subsidiaries") in the Asia Pacific region as of the Initial Petition Date were not paid when due. To enable each APAC Agreement Subsidiary to continue its respective business operations and to facilitate any potential sales of assets, the Debtors and the APAC Agreement Subsidiaries entered into an Asia Restructuring Agreement (the "APAC Agreement"). Under the APAC Agreement, the APAC Agreement Subsidiaries were required to pay a portion of certain of the APAC Agreement Subsidiaries' net intercompany debt outstanding as of the Initial Petition Date (the "Pre-petition Intercompany Debt") to the Canadian Debtors, the Debtors and the EMEA Debtors.

## ii.    ATPA Settlement and Related Agreements

On September 8, 2011, the Debtors (other than NNCALA), the Canadian Debtors, the EMEA Debtors, NNSA and Nortel Networks AG (the "EMEA Group") entered into the Agreement on Transfer Pricing Amendments and Certain Other Matters (the "ATPA"). On the same day, the parties, together with Nortel Networks Japan, NNIII and NNCALA, also executed the Q1 2010 Settlement Agreement (the "Q1 Agreement"). The ATPA halted all transfer pricing payment obligations among the parties to the Master R&D Agreement retroactively to April 1, 2010. The ATPA also settled certain other inter-estate issues and among other things, provided for the release of certain amounts owing to the Debtors from the sales proceeds escrow accounts. The Q1 Agreement settles all transfer pricing payment obligations between the Canadian Debtors and the EMEA Group for the first quarter of 2010, and acknowledged a full and final settlement of such obligations for that period between the EMEA Debtors and NNSA, on the one hand, and the Canadian Debtors and the Debtors on the other hand. As more fully set forth below, the CFSA (as defined below) settled all transfer pricing payment obligations between the Debtors (other than NNCALA and NNIII) and the Canadian Debtors through the end of the Chapter 11 Cases, and the ATPA together with the Q1 Agreement provided a similar settlement for all three estates. The ATPA and Q1 Agreement were approved by the Bankruptcy Court and the Canadian Court on August 23, 2011, and the transactions contemplated thereunder closed on September 14, 2011.

Also, on September 8, 2011, NNI, NNL, NNC and certain of their Affiliates entered into that certain Timeline for and Proposed Resolutions of Pending US-Canada Issues (the "US-Canada Term Sheet"). The US-Canada Term Sheet resolved a number of outstanding inter-estate issues between the Debtors and the Canadian Debtors.

## iii.    Nortel Israel Settlement

On April 13, 2011, NNI, NNUK and Nortel Networks Israel (Sales and Marketing) Ltd. ("Nortel Sales and Marketing") and Nortel Communications Holdings (1997) Ltd. ("Nortel Communications" and, together with Nortel Sales and Marketing, "Nortel Israel") entered into an agreement (the "Israel Agreement") pursuant to which Nortel Israel transferred to NNI and NNUK, jointly, any and all right, title and interest it may have had in the proceeds of the MEN, CVAS, Radware, Enterprise and MSS (each term as defined below) asset sale transactions. In exchange for these rights, NNI and NNUK agreed to provide to Nortel Israel cash consideration of $2 million, $813,819 of which was contributed by NNI and the remaining $1,186,181 of which was paid by NNUK, and a waiver by NNI and NNUK of any right they may have had to collect on any outstanding claims they had against Nortel Israel that arose prior to the commencement of Nortel Israel's administration proceedings. The Israel Agreement and its supporting documentation, including proposed amendments to the relevant distribution escrow agreements, were approved by the Bankruptcy Court on June 6, 2011 and by the Canadian Court on June 7, 2011.

## iv.    Nortel Russia Settlement

Nortel Networks o.o.o. ("Nortel Russia") is a wholly owned subsidiary of Nortel Networks International Finance & Holding B.V. ("NNIFH"), which in turn is a wholly owned

subsidiary of NNUK.  As a party to several sale escrow agreements, Nortel Russia's consent was required for any consensual release of funds from the relevant sale escrow accounts and any amendment to the relevant escrow agreements.  To facilitate subsequent payments from the sale escrow accounts, and to secure Nortel Russia's consent to certain other inter-estate agreements, NNIFH, Nortel Russia, and all other Nortel entities that were parties to at least one of the relevant sale escrow agreements, including the Debtors, executed side letters for each of the four relevant sale escrow agreements, each dated August 19, 2011 (the "Russia Agreements").  The Russia Agreements were approved by the Bankruptcy Court and the Canadian Court on August 23, 2011.  In accordance with those side letters, each of the escrow agreements was amended to remove Nortel Russia as a party, effective as of September 22, 2011.  NNIFH then paid approximately $6.0 million into the MEN sale escrow account and $1.4 million into the CVAS sale escrow account (the "NNIFH Payments") on September 19, 2011, and was assigned any remaining rights of Nortel Russia under the relevant sale escrow agreements.  Finally, once the NNIFH Payments were received, Nortel Russia was paid amounts equal to the NNIFH Payments from the CVAS and MEN sale escrow accounts on September 22, 2011.

v.      *EMEA and UK Pension Claims Settlement*

By Order dated January 7, 2014, the Bankruptcy Court approved an Agreement Settling US Claims Litigation dated as of December 17, 2013 (the "U.S.-EMEA Claims Settlement Agreement") by and among the Debtors, certain of the Debtors' non-filed Affiliates, and the Creditors' Committee (collectively, the "U.S. Claims Settlement Parties") on the one hand, and the EMEA Debtors, NNSA, certain non-filed affiliates of the EMEA Debtors, the Joint Administrators, Nortel Networks Optical Components Limited and its liquidator, Northern Telecom France SA, the court-appointed liquidator of NNSA, the UK Pension Parties, and for purposes of Section 8.14 of the Settlement Agreement only, the Joint Administrators, the Liquidator and the court-appointed liquidator of NNSA in their individual capacities, on the other hand (collectively the "EMEA Claims Settlement Parties", and, together with the U.S. Claims Settlement Parties, the "U.S.-EMEA Claims Settlement Parties").

Pursuant to the terms of the U.S.-EMEA Claims Settlement, the U.S.-EMEA Claims Settlement Parties agreed to fully and finally settle claims of the EMEA Claims Settlement Parties against the Debtors and certain of their non-filed Affiliates and to exchange releases of various other claims, in exchange for the allowance and payment of administrative expense priority claims by NNI in favor of the Joint Administrators (on behalf of the EMEA Claims Settlement Parties other than the U.K. Pension Parties) and the U.K. Pension Parties, each in the amount of $37.5 million. Subsequent to the effective date of the U.S.-EMEA Claims Settlement Agreement, the Debtors settled the net intercompany positions with the Joint Administrators and the U.K. Pension Parties, and made payments to the Joint Administrators of $37.5 million and to the U.K. Pension Parties of $37.5 million.

vi.     *Non-Filed Entity Settlement*

On June 19, 2012, the Debtors, the Canadian Debtors, the Monitor, the EMEA Debtors, Nortel Networks (Northern Ireland) Limited (in liquidation), Nortel Networks Optical Components Limited (in liquidation), NNSA, certain affiliates of NNC that have not commenced insolvency (the "Non-Filed Entities"), the Joint Administrators, the Creditors Committee, and

certain other parties entered into the Allocation Settlement Agreement (the "Non-Filed Entity Settlement Agreement").  Under the terms of the Non-Filed Entity Settlement Agreement, $45 million from the Sale Proceeds held in escrow were released and allocated among 23 non-debtor Nortel affiliates that participated in the various global business sales.  The settlement also resolved certain claims by and against the Non-Filed Entities. The Non-Filed Settlement Agreement was approved by the Bankruptcy Court by order dated July 11, 2012 [D.I. 7985] and the transactions contemplated thereunder were completed in August of 2012.

### b.      Settlements Related to Employee Benefits and Related Claims

#### i.      *ERISA Litigation*

Beginning in December 2001, NNI, NNC and NNL, together with certain of their then-current and former directors, officers and employees, were named as defendants in several purported class action lawsuits pursuant to the Employee Retirement Income Security Act ("ERISA"), which lawsuits were subsequently consolidated into a single proceeding.  The Bankruptcy Court and the United States District Court for the Middle District of Tennessee, Nashville Division approved a settlement of these class action lawsuits on September 20, 2011 and January 11, 2012, respectively.  The settlement includes the payment of $21.5 million by Chubb Insurance Company of Canada to an escrow account for the benefit of class members in exchange for, among other things, the withdrawal of the ERISA proofs of claim filed against the Debtors that relate to the ERISA lawsuits.  For further discussion on such lawsuits, please see Section III.F.3.a (*ERISA Litigation*).

#### ii.     *Deferred Compensation Settlement*

Prior to the Petition Date, on or about January 1, 2000, NNI established the Nortel Networks U.S. Deferred Compensation Plan (as amended from time to time, the "Deferred Compensation Plan"), which provided tax deferral benefits to certain employees.  In connection with the establishment of the Plan, NNI, as grantor, and U.S. Bank, National Association ("US Bank") as trustee, established a grantor trust (the "Deferred Compensation Plan Trust") pursuant to the Nortel Networks U.S. Deferred Compensation Plan Trust Agreement dated January 1, 2000 (as amended, the "Deferred Compensation Plan Trust Agreement").

On December 22, 2010, the Debtors filed a motion seeking, *inter alia*, a turnover of the assets held by the Deferred Compensation Plan Trust to the estates of the Debtors, as well as approval of a stipulation between NNI and US Bank as the trustee of the Plan Trust (the "Turnover Motion"), on the basis that the Deferred Compensation Plan qualified as a "top hat" plan that is exempt from ERISA and, accordingly, the assets held by the Deferred Compensation Plan Trust were property of the Debtors' bankruptcy estates.  Individual participants in the Deferred Compensation Plan filed objections to the Turnover Motion, and a group of participants retained counsel and formed the Ad Hoc Group of Beneficiaries of the Nortel Networks U.S. Deferred Compensation Plan (the "Ad Hoc DCP Group"), asserting that the Turnover Motion should be denied because, among other things, the Deferred Compensation Plan failed to comply with all of the "top hat" requirements needed for exemption from ERISA.  On December 23, 2011, the Ad Hoc DCP Group and certain individual participants in the Deferred Compensation Plan (together, the "DCP Plaintiffs") filed a putative class action complaint (the "DCP

<u>Complaint</u>") against the Debtors, US Bank, and certain individuals in their capacities as members of the Board of Directors Compensation Committee that functioned as the plan administrator of the Deferred Compensation Plan.

On December 14, 2012, the Debtors entered into a settlement agreement with the DCP Plaintiffs, pursuant to which the Debtors agreed to settle the claims of all participants in the Deferred Compensation Plan and their beneficiaries, successors, transferees and assigns arising out of the Deferred Compensation Plan, including all claims against the Deferred Compensation Plan Trust and the assets held by the Deferred Compensation Plan Trust, for a total payment of $34.25 million to the participants or their beneficiaries, successors, transferees or assigns as well as in satisfaction of certain fees and expenses of the DCP Plaintiffs and their attorneys. In exchange, the Debtors and certain other third parties received, among other things, broad releases from the participants in the Deferred Compensation Plan and their beneficiaries, successors, transferees and assigns, and an agreement that US Bank could turn over the assets held by the Deferred Compensation Plan Trust. On January 23, 2013, the Bankruptcy Court approved the settlement. On February 15, 2013, US Bank turned over to NNI the assets held by the Deferred Compensation Plan Trust, which totaled $44,127,775.52.

### iii.    Retiree & LTD Settlements

The Debtors historically have provided a number of welfare benefits to their active employees and retirees through benefit plans, including the Nortel Networks Inc. Retiree Medical Plan and the Nortel Networks Inc. Retiree Life Insurance and Long-Term Care Plan (together, the "<u>Retiree Welfare Plans</u>") and the Nortel Networks Inc. Long-Term Disability Plan (the "<u>LTD Plan</u>"). Under the Retiree Welfare Plans, the Debtors provided employer-paid (i) post-employment medical benefits for current retirees, their spouses, surviving spouses, domestic partners and dependents and (ii) term life insurance coverage and long-term care expense coverage for current retirees. Under the LTD Plan, the Debtors provided employer-paid long-term disability benefits for current participants. The Debtors terminated these plans as of June 30, 2013 pursuant to the terms of separate settlement agreements with the Official Committee of Retired Employees (the "<u>Retiree Committee</u>" and such settlement, the "<u>Retiree Settlement</u>") and the Official Committee of Long-Term Disability Participants (the "<u>LTD Committee</u>" and such settlement, the "<u>LTD Settlement</u>"), each as approved by the Bankruptcy Court. Under the Terms of the Retiree Settlement, the Debtors agreed to pay a settlement amount of $66,879,000 to be distributed by the Retiree Committee in full satisfaction of all employee claims related to any Debtor obligations under the Retiree Welfare Plans, and the parties agreed to the termination of those plans. Under the Terms of the LTD Settlement, the Debtors allowed a general, unsecured claim against NNI in the amount of $26,640,000 in satisfaction of all employee claims related to the LTD Plan, to be allocated by the LTD Committee, and the parties agreed to the termination of the LTD Plan.

### c.    IRS Settlement

In consideration of a settlement payment of $37.5 million, the IRS agreed to release all of its claims against the NNI Consolidated Group for the years 1998 through 2008. As a result of this settlement, the IRS stipulated that its Claim against NNI filed in the Chapter 11 Cases in the amount of approximately $3.0 billion was reduced to the $37.5 million

settlement payment.  This settlement was a condition to the effectiveness of the CFSA (as defined below) and was approved by the Bankruptcy Court on January 21, 2010.  NNI made the settlement payment to the IRS on February 22, 2010.

In addition, the IRS also agreed that the NNI Consolidated Group is entitled to a federal net operating loss carryforward of $814 million and general business credits of $306 million, as of January 1, 2009, inclusive of certain APA adjustments.

For more information on the APAs, please see Section II.B.5 (*Transfer Pricing*).

### d.    Other Settlements

#### i.    Flextronics

The Debtors, the Canadian Debtors, certain EMEA Debtors and Flextronics entered into a settlement and release agreement dated as of November 20, 2009, which was approved by the Bankruptcy Court and the Canadian Court on December 2, 2009, that, among other things, provided a mechanism for the transfer of Nortel's supply relationship from Flextronics Telecom Systems Ltd. ("Flextronics") to purchasers of Nortel's other businesses or assets.  In exchange for payment of certain amounts by NNI to Flextronics (which payment was made subject to re-allocation among the Debtors, the Canadian Debtors and certain EMEA Debtors pursuant to a side agreement), Flextronics and the Debtors released any and all claims that had been or could have been filed or otherwise asserted in any proceedings of Nortel (including the Chapter 11 Cases) with certain exceptions as stated in the agreement.

#### ii.    Post-petition Interest Settlement Agreement

By Order dated December 18, 2014 [D.I. 14950], the Bankruptcy Court approved an Agreement Settling the NNI Post-Petition Interest Dispute and Related Matters dated as of July 24, 2014 (as amended, the "PPI Settlement Agreement") between NNI and the holders of all outstanding Crossover Bonds excluding the NNCC Bonds, representing more than ninety-five percent of the principal amount of Crossover Claims (the "Supporting Bondholders").

Pursuant to the PPI Settlement Agreement, NNI granted an allowed General Unsecured Claim for the Crossover Bonds in the aggregate amount of $3,934,521,442.00, and the parties agreed on additional terms and conditions where post-petition interest could be paid on the Crossover Bonds, subject to certain caps.  On December 31, 2014, the Monitor filed a notice of appeal of the Bankruptcy Court order approving the PPI Settlement Agreement.  While the Monitor's appeal of the PPI Settlement is currently still pending, Section 5(b) (*Litigation Resolution*) of the SPSA provides that the  Canadian Debtors shall withdraw the appeal of the PPI Settlement promptly following the Plans Effective Date.

As discussed in additional detail in Section III.H.3 (*The Settlement and Plans Support Agreement*) below, the SPSA provides for the allowance of claims against both NNI and the Canadian Estate on account of the Crossover Bonds, disallows the payment of PPI by the Debtors and contemplates that the Monitor's appeal to the PPI Settlement would be withdrawn upon the occurrence of the Effective Date of the Plan.

e.      **Liquidity Solutions and the NNI Interim Distribution Order**

On March 21, 2016 Liquidity Solutions Inc. ("LSI"), which has acquired and holds various claims against NNI, filed a motion seeking entry of an order by the Bankruptcy Court authorizing and directing NNI to make interim distributions on certain Allowed Administrative, Priority and General Unsecured Claims or seeking conversion of the Debtors' cases to a liquidation pursuant to chapter 7 of the Bankruptcy Code (the "LSI Interim Distribution & Conversion Motion").  NNI and LSI subsequently negotiated a consensual resolution of the LSI Interim Distribution & Conversion Motion whereby the Debtors' cases would not be converted under chapter 7, certain interim distributions would be made prior to the confirmation of a plan and NNI would reimburse LSI for its attorney's fees related to the motion, subject to a cap.  On June 6, 2016, the Bankruptcy Court entered an order authorizing the interim distribution by NNI of approximately $14.2 million in satisfaction of certain allowed administrative, priority and secured claims against NNI, less withholdings for any applicable taxes (the "NNI Interim Distributions Order").  As of the filing date of this Disclosure Statement, NNI is working with claimants holding claims entitled to interim distributions to determine the appropriate withholding amounts for each claim and completing various administrative steps necessary to make distributions, and expects to make the interim distributions before January 1, 2017.

f.      **The NNCC Noteholder Claim Estimation Motion**

On October 27, 2014, Solus Alternative Asset Management LP and Macquarie Capital (USA) Inc., in their capacities as holders of certain of the NNCC Bonds filed a motion seeking entry of an order of the Bankruptcy Court: (i) estimating for the purposes of allowance and distribution the claim by NNCC against NNI for amounts owing under or related to the Support Agreement between NNI and NNCC (the "NNI-NNCC Support Agreement") in an amount not less than $72,989,050.42 and (ii) directing NNI to amend its schedules with respect to the Revolving Loan Agreement between NNI and NNCC (the "Revolving Loan Agreement") so that such claim would be allowed as a general unsecured claim against NNI in the amount of $147,602,830 (such motion, the "NNCC Noteholder Claim Estimation Motion").

On December 10, 2014, the Debtors filed the Notice of Amendments to Schedules of Assets and Liabilities of NNI and Nortel Networks Capital Corporation [D.I. 14918] (the "Seventh Amended Schedules") and a limited response to the NNCC Noteholder Claim Estimation Motion.  The Seventh Amended Schedules listed a general unsecured claim by NNCC against NNI in the amount of $147,634,914.66.  The Seventh Amended Schedules did not account for claims, if any, that may exist relating to the NNI-NNCC Support Agreement and the Debtors reserved all rights and defenses with respect to the NNI-NNCC Support Agreement. The Bankruptcy Court did not rule on or enter any order related to the NNCC Noteholder Claim Estimation Motion.

g.      **Settlement and Plans Support Agreement**

On October 12, 2016, the Debtors, the Canadian Debtors, the Monitor, the EMEA Debtors, the EMEA Non-Filed Entities, the Joint Administrators, NNSA, the NNSA Conflicts Administrator, the French Liquidator, the Bondholder Group, the members of the CCC, the Creditors' Committee, the U.K. Pension Trustee, the PPF, and the Joint Liquidators, with

members of the Bondholder Group and the NNCC Bondholder Signatories executing Creditor Joinders executed an agreement settling litigation in relation to the Allocation Dispute (such agreement, the "SPSA").  The SPSA provides for a full and final settlement of the Allocation Dispute and certain other matters among the SPSA Parties.  The SPSA is described in further detail in Section III.H.3 (*The Settlement and Plans Support Agreement*) below.

### h.    Settlement of Certain Intercompany Claims

The Plan provides for the settlement and release of certain claims among the Debtors that have arisen over the course of these Chapter 11 Cases.  Specifically, pursuant to the Cash Management Order and consistent with the Debtor's Cash Management System, certain of the administrative costs borne by the Debtors since the Petition Date have been paid by NNI on behalf of all of the Debtors, including the payment of professional fees and expenses that have accrued since the Petition Date, certain payments associated with the various settlements described in this Section III.D.6 (*Significant Settlements and Settlement Procedures*) and the M&A Costs.  Pursuant to the Cash Management Order, such payments have given, and may continue to give, rise to Administrative Expense claims of NNI against the Debtors other than NNI (the Intercompany Administrative Expense Claims").  Likewise, certain of the Debtors were sellers under the Sales and therefore have claims to certain of the Sale Proceeds.

In light of the aggregate amount of Sale Proceeds under the SPSA, any allocation to the Debtors other than NNI and NNCALA would be more than offset by the Intercompany Administrative Expense Claims and such Debtors would be net debtors to NNI.  With respect to NNCALA, the Debtors believe that NNCALA's claim for an allocation of the Sale Proceeds is sufficiently large so as not to be completely offset by application of the Intercompany Administrative Expense Claims attributable to NNCALA.  Accordingly, the Debtors have agreed that in full and final satisfaction of NNI's claims against the Debtors (other than NNCALA) resulting from the Intercompany Administrative Expense Claims, on the one hand, and the Debtors' (other than NNI and NNCALA) claims for entitlements to the Sale Proceeds, the Sale Proceeds shall be allocated among the Debtors in accordance with the terms of the SPSA and the Plan as reflected in Section 2 (*Settlement of Allocation Dispute*) of the SPSA, Section III.H.3 (*The Settlement and Plans Support Agreement*) of this Disclosure Statement, and Section 7.6 (*Allocation of Sale Proceeds Among the Debtors*) of the Plan; *provided that*, NNI shall be entitled to a one-time reimbursement payment from NNCALA in the amount of $34 million in full and final satisfaction of the Intercompany Administrative Expense Claims attributable to NNCALA that have accrued to date.  In addition, from and after the Effective Date, each Debtor listed on Exhibit E (*Quarterly Administrative Wind-Down Reimbursement Payments*) to the Plan shall make a quarterly administrative payment to NNI on account of expected administrative costs incurred by NNI in winding down and administering such entity between the Effective Date and the final liquidation of such Debtor (such payments, the "Quarterly Administrative Wind-Down Reimbursement Payments"), such payments not to exceed (on a quarterly basis) the amounts listed for each Debtor on Exhibit E (*Quarterly Administrative Wind-Down Reimbursement Payments*), and in the case of NNCALA and Nortel Altsystems Inc., to be paid quarterly in the amount listed on Exhibit E (*Quarterly Administrative Wind-Down Reimbursement Payments*) of the Plan. The Debtors are seeking authority under the Plan to enter into an intercompany settlement pursuant to Bankruptcy Rule 9019, in accordance with the terms

described in this section.  Notwithstanding the foregoing, NNI retains the right to assert administrative claims against any other Debtor or Wind-Down Debtor, as applicable, for any priority tax claims that are asserted against and/or paid by NNI that reasonably could be allocated or attributable to any other Debtor or Wind-Down Debtor, as applicable.

### i.       Settlement Procedures

The Debtors have obtained Orders of the Bankruptcy Court from time to time that approved procedures for the resolution of certain types of Claims, as described below.

### j.       Litigation Claims Settlement Procedures

By Order dated April 7, 2009, the Bankruptcy Court approved certain omnibus settlement procedures to resolve, mediate, compromise or otherwise settle certain claims and controversies (the "Litigation Claims Settlement Procedures Order").  Pursuant to the Litigation Claims Settlement Procedures Order, the Debtors are authorized to settle certain actions, including various judicial, administrative, arbitral or other actions or proceedings to which one or more of the Debtors are a party (the "Ordinary Course Actions"), in accordance with certain procedures.

### k.       Reclamation Claims Settlement Procedures

By Order dated February 19, 2009, the Bankruptcy Court approved certain procedures for settling or otherwise resolving reclamation demands (the "Reclamation Procedures Order").  The Reclamation Procedures Order (i) established uniform procedures for addressing reclamation demands; (ii) authorized the Debtors to reconcile and resolve certain reclamation demands and to conduct settlement negotiations in furtherance of such resolution; and (iii) enjoined reclamation claimants from pursuing payment of reclamation demands by alternative means.  Pursuant to the Reclamation Procedures Order, all 30 reclamation demands have been settled or otherwise resolved, totaling about $6.0 million in Allowed Claims and payments.

### l.       Avoidance Claims Settlement Procedures

By Order dated October 27, 2010, the Bankruptcy Court approved certain procedures for settling or compromising certain avoidance claims (the "Avoidance Claims Settlement Procedures Order").  If the asserted avoidance claim is equal to or less than $250,000, then the Debtors are authorized to settle the claim without filing or serving any advance notice of such settlement and without further notice or order of the Bankruptcy Court. If the asserted avoidance claim amount is greater than $250,000 but equal to or less than $1,000,000, then the Debtors are authorized to settle the claim without further notice or order of the Bankruptcy Court provided the Debtors notify certain notice parties of the settlement.  Settlements of claims greater than $1,000,000 require the Debtors to obtain Bankruptcy Court approval.  To date, 127 avoidance claims have been settled and dismissed.  For more information on settled avoidance claims, please see Section III.D.8 (Avoidance Actions) below.

### m.    Omnibus Settlement Procedures

By Order dated February 19, 2016, the Bankruptcy Court approved certain procedures for settling all disputed proofs of claim or interests and approved certain procedures to formally allow claims to which the Debtors have no objection (the "Omnibus Settlement Procedures Order").  Pursuant to the Omnibus Settlement Procedures Order the Debtors are authorized to use their reasonable business judgment to settle certain proofs of claim that the Debtors propose to allow in an amount up to $2,000,000 without prior notice to the Bankruptcy Court and on limited notice or without prior notice to other parties in interest, depending on the amount of the claim and the proposed settlement.  In addition, the Debtors are authorized to settle claims that the Debtors propose to allow in an amount equal to or greater than $2,000,000 and less than $4,000,000 on notice to the Bankruptcy Court.  The Creditors' Committee has certain consultation and objection rights pursuant to the Omnibus Settlement Procedures Order

### 7.    Summary of Certain Significant Claims

Listed below are certain significant Claims that were filed after the Initial Petition Date and which have not been finally settled as of this time.  With respect to each Claim, unless otherwise indicated, the Debtors continue to review, reconcile, and investigate available defenses to the Claim and intend to raise all objections and defenses available to them.

### a.    Public Debt Claims

The indenture trustees filed proofs of claim with respect to the Crossover Bonds and the NNCC Bonds, which together had an aggregate face value of $3.975 billion as of the Initial Petition Date.  In addition to the Claims under the Crossover Bonds indentures and the related guarantees for the principal amount of the Crossover Bonds, these Claims assert liability for accrued and unpaid interest and certain other Claims.  As noted above, pursuant to the PPI Settlement Agreement, the Debtors have allowed a general unsecured claim in the amount of $3,934,521,442.00 in full satisfaction of the pre-petition amounts owing relating to all Crossover Bonds with the exception of the NNCC Bonds, which had an aggregate face value of $150,951,562 as of the Initial Petition Date. See Section III.D.6.d.ii (*Post-petition Interest Settlement Agreement*). Claims relating to additional post-petition amounts owing under the Crossover Bonds other than the NNCC Bonds remain outstanding but subject to the limits referenced above pursuant to the PPI Settlement Agreement.  Claims relating to the NNCC Bonds were not affected by the PPI Settlement Agreement.  The SPSA contemplates the settlement of all of the Crossover Bonds Claims and the NNCC Claims as an integral part of the SPSA, as discussed in Section III.H.3 (*The Settlement and Plans Support Agreement*) below and pursuant to the terms discussed therein.  If the Plan is not confirmed and the SPSA does not become effective, the Debtors reserve all of their rights, objections and defenses with respect to these claims to the extent such Claims have not been finally resolved and allowed.

### b.    EDC Claims

EDC filed a proof of claim against NNI asserting General Unsecured Claims in the approximate amounts of $14.6 million, €2.3 million and £100,000, contingent Claims in the approximate amounts of $69.2 million, €11.7 million and £50,000, as well as certain

unliquidated Claims.  The Claims asserted by EDC are based on NNI's guarantee of certain obligations with respect to EDC's issuance of support in the form of guarantee bonds or guarantee-type documents issued to financial institutions that issue letters of credit or guarantee, performance or surety bonds or other instruments in support of Nortel's contract performance, where NNL is party to the underlying master facility agreement with EDC.  The Debtors have been informed by the Monitor that the Monitor has allowed a claim by EDC against NNL in the amount of approximately $20.1 million plus £100,000.  The EDC Claim has not been finally liquidated or allowed against NNI to date.

### c.    SNMPRI and SNMP Research Claims

SNMP Research International, Inc. ("SNMPRI")   filed proofs of claim (see, e.g., Claim No. 4625) in the Debtors' bankruptcy proceedings (other than against NN CALA and NNIII), asserting claims for $22,000 for unpaid software licensing royalties, later amended upward to claim approximately $8.4 million.  On November 23, 2016, SNMPRI and SNMP Research, Inc. (together "SNMP Research") filed a motion to allow them to file proposed prepetition claims asserting liability in an amount in excess of $81 million, which the Debtors intend to oppose.  In addition to the claim for approximately $8.4 million, SNMP Research has asserted that there are additional products that allegedly used its software without an applicable license.  In November of 2011, SNMP Research filed a complaint in an adversary proceeding against the Debtors seeking additional damages for allegedly unpaid post-petition royalties and damages purportedly linked to the allegedly improper transfer of SNMP Research software to various buyers in Nortel's Business Line Sales. SNMP Research amended its complaint twice, first removing certain buyer defendants and then, in its second amended complaint dated March 24, 2015, further narrowing the defendants to the Debtors and Avaya, one of the purchasers in the Business Line Sales (the "Second Amended Complaint"). After settling with Avaya, SNMP Research continues to assert a claim for a portion of the proceeds from the Business Line Sales and seeks to hold the Debtors liable for Sale Proceeds received by other Nortel affiliates.  The Debtors deny the allegations included in the SNMPRI Claims and the Second Amended Complaint.

SNMP Research filed a motion for partial summary judgment on October 14, 2015, in which it sought an order determining that "the [Bankruptcy] Court did not authorize the U.S. Debtors to transfer any intellectual property owned by SNMP Research, including but not limited to its Software, to any third party."  The Debtors cross-moved for partial summary judgment on November 6, 2015 for a ruling that SNMP Research's "profits" claims for a portion of the purchase price paid in the Business Line Sales could not be sustained because the sale agreements and sale orders provided only for the sale of the selling debtors' property and the purchase price was only attributable to the selling debtors' property.  In response to SNMP Research's motion, the U.S. Debtors made clear that they were not contending that the sale orders operated to sell or transfer any assets belonging to SNMP Research or any other third party and they had not sought any such order.  The Bankruptcy Court, on February 8, 2016, ruled with respect to SNMP Research's motion that "Debtors did not seek and the Court did not authorize the sale or transfer of SNMP's intellectual property rights or its intellectual property, including its software, to purchasers in the Business Line Sales.  It is equally clear, however, that the Sale Orders approved the sales and did not enjoin Nortel from selling or transferring the SNMP software."  With respect to the Debtors' motion, the Bankruptcy Court stated that "[t]he

purchase price which purchasers paid to Nortel pursuant to the Sale Orders was for assets which the Court authorized be sold in the Sale Orders" and that the "Sale Orders plainly establish that Nortel was not authorized to sell SNMP property to purchasers, and therefore Nortel should have received no funds for SNMP property. If that is the case, then the purchase price in each sale cannot be attributed to SNMP property, including the SNMP software." The Bankruptcy Court denied the Debtors' motion, stating as follows: "[I]t will be SNMP's burden to prove that the transfer of SNMP software were sales, i.e., generated income. If SNMP can prove the sales occurred, then the burden will shift to Nortel to prove what portion of the money it received is attributable to the SNMP software. If SNMP cannot establish that Nortel profited from the transfers, then the burden will remain with SNMP to prove its actual damages." Following the Debtors' motion for clarification of the Bankruptcy Court's February 8, 2016 decision, the Bankruptcy Court indicated that resolution of the issue raised by the Debtors' motion would need to await the completion of discovery. The parties are currently engaged in discovery and expert reports are being submitted. A trial date, if necessary, will be set in the future. The Debtors dispute and intend to continue vigorously defending SNMP Research's allegations.

On November 2, 2016, SNMP Research served the Debtors with an expert report that purports to set forth SNMP Research's claimed damages, and on November 23, 2016, SNMP Research moved the Court to allow SNMPRI's previously-filed proofs of claim to be amended and also to add SNMPR as a claimant [D.I. 17432]. In a declaration attached to that motion, SNMP Research contends that its prepetition damages against the Debtors total at least $81.08 million, including at least $33.12 million in actual damages, at least $39.27 million in profits (assuming actual damages are awarded in full) and at least $8.69 million in interest. At present, only SNMPRI has filed proofs of claim. In its motion for leave to amend the proofs of claim, SNMP Research seeks to add SNMPR as a claimant and to significantly change the amount and nature of its previously-filed claims. SNMP Research's Objection claims that it holds post-petition administrative damages claims against each of the Debtors in the total amount of at least $47.12 million, including $3.16 million in actual damages, $12.75 million in profits (assuming actual damages are awarded in full), $22.82 million in contributory infringement damages and $8.39 million in interest. The Debtors assert that they have substantial defenses to these claims and intend to vigorously contest such claims, including SNMPRI's present attempt to amend its prepetition claims to add a new party and to increase the amount it is claiming to $81.08 million.

### d.    The EMEA Impleader Motion

On July 7, 2015, the Debtors filed an impleader motion, seeking leave to file a third-party complaint against the EMEA Debtors and NNSA, asserting a claim for contribution to hold the EMEA Debtors and NNSA responsible for their proportionate share of damages (if any) purportedly attributable to proceeds linked to the allegedly improper transfer of SNMP Research software in the Business Line Sales (the "Impleader Motion"). While the Impleader Motion was pending, on August 10, 2015, the EMEA Debtors and NNSA filed a motion in their Chapter 15 case to enforce the automatic stay and enjoin the prosecution of the Debtors' claims (and potential claims by SNMP Research) claims against them (the "Chapter 15 Stay Motion"). The Bankruptcy Court denied the Chapter 15 Stay Motion in part on September 15, 2015, and the order is subject to a pending appeal in the U.S. District Court for the District of Delaware.

The Impleader Motion was granted by the Bankruptcy Court on September 22, 2015. The Debtors then filed their third-party complaint on October 22, 2015.  The EMEA Debtors and NNSA filed an answer and a motion for judgment on the pleadings on February 16, 2016.  The Bankruptcy Court granted this motion on May 2, 2016, dismissing the Debtors' third-party complaint.  This order is also subject to a pending appeal in the U.S. District Court for the District of Delaware.  The appeal of the order denying the Chapter 15 Stay Motion and the appeal of the order granting the motion for judgment on the pleadings of the EMEA Debtors and NNSA are each currently stayed pending confirmation of the Debtors' Plan.

### e.    Employee Claims

As of October 11, 2016 approximately 6,061 proofs of claim have been filed by current and former employees of the Debtors, for the aggregate amount of approximately $724.8 million.  The Debtors have resolved 5,908 of these employee claims, which has resulted in the allowance of $215.0 million in claims against the Debtors, and are in the process of resolving the remaining claims.  The Debtors reserve all of their rights and defenses with respect to the unresolved claims.

### f.    PBGC Claims

The Pension Benefit Guaranty Corporation (the "PBGC") has filed joint and several claims against each of the Debtors in the aggregate amount of $707,994,472 for the unfunded benefit liabilities of the Retirement Income Plan (as defined below) and for certain other amounts (the "PBGC Claims").

The PBGC is a self-funded United States government corporation that administers the defined benefit plan termination insurance program under Title IV of ERISA.  Pursuant to the statutory framework established under Title IV of ERISA, the PBGC guarantees payment of certain benefits upon termination of qualified pension plans such as the Debtors' Retirement Income Plan.  As such, the Debtors and the PBGC executed a trusteeship agreement (the "Trusteeship Agreement") which provided that the termination date for the Debtors' Retirement Income Plan  was July 17, 2009 and the Debtors' Retirement Income Plan assets were conveyed to the PBGC effective September 8, 2009.

On September 29, 2009, the PBGC filed four proofs of claim against the Debtors on a joint and several basis, asserting: (i) $593,100,000 in respect of the Retirement Income Plan's alleged unfunded benefit liabilities; (ii) unliquidated amounts for any minimum funding contributions the Debtors may have failed to make; (iii) unliquidated amounts for certain insurance premiums, interest and penalties; and (iv) unliquidated amounts for any shortfall amortization or waiver amortization charges (collectively, the "Original PBGC Claims").  On July 7, 2014, the PBGC filed amended claims, amending the previously-filed claims and asserting: (i) $624,601,972 in respect of the Retirement Income Plan's alleged unfunded benefit liabilities; (ii) $83,392.50 as an estimate amount of certain insurance premiums, interest and penalties; (iii) an unliquidated amount for contributions to satisfy certain minimum funding standards; and (iv) an unliquidated amount for any shortfall amortization or waiver amortization charges (collectively, the "Amended PBGC Claims").  On November 2, 2016, the Debtors filed an objection to the Original PBGC Claims and the Amended PBGC Claims [D.I. 17325] (the

"PBGC Claims Objection"), and as of the date, of this filing the PBGC Claims Objection remains unresolved.

During the Debtors' negotiation of the Business Line Sales, the PBGC objected to certain of the Debtors' proposed sale transactions, alleging that (i) certain transactions provided for the transfer of non-Debtor assets against which the PBGC had asserted claims or liens and/or (ii) that the sales included the transfer of equity interests in non-Debtors against which the PBGC also asserted claims or liens.  The Debtors and PBGC consensually resolved these objections through a series of stipulations.

The SPSA provides that the PBGC claim asserted against each of the Debtors (and against any U.S. non-debtor Nortel Group entity) shall be a maximum of $708,000,000 and all rights of the Debtors and other U.S. based parties-in-interest in the Chapter 11 Cases to contest such PBGC claims are expressly reserved and the allocation percentages provided for in Section 2(c) (*Settlement of Allocation Dispute*) of the SPSA shall not change if the PBGC claims are admitted or Allowed for a different amount.

For more information, please see Section III.E.4 (*Enterprise Solutions Business*) and Section III.F.2.b (*Employee Benefit Plans*).

g.    **Wanland & Associates, Inc. Claims**

Wanland & Associates, Inc. ("Wanland"), a class representative in a putative class action case filed in the United States District Court for New Jersey (the "New Jersey Court") and now pending as an adversary proceeding in the United States Bankruptcy Court for the District of New Jersey (the "New Jersey Bankruptcy Court" and such action, "the "Wanland Action"), has filed a claim on behalf of itself and the putative class in the amount of $360,000,000.00 against NNI, a named defendant in the Wanland Action.

Following briefing by the parties on a motion by NNI to dismiss the case and entry by the  New Jersey Bankruptcy Court of an order denying NNI's motion to dismiss, on October 6, 2016, Wanland, NNI and the other named defendants in the Wanland Action executed a settlement agreement (the "Wanland Settlement Agreement").  The Wanland Settlement Agreement provides for the settlement and release of all claims against NNI related to the Wanland Action, subject to approval by the Bankruptcy Court and the New Jersey Court and the terms of the Wanland Settlement Agreement.  The Bankruptcy Court preliminarily approved the Wanland Settlement Agreement and granted relief from the automatic stay to pursue the settlement by order dated October 24, 2016 [D.I. 17299]. The Debtors anticipate that final approval of the Wanland Settlement Agreement will occur in the first half of 2017, if the conditions to the settlement are met.  However, the effectiveness of the settlement remains subject to the terms and conditions of the proposed settlement, including the right of class members to opt out of the settlement.[16]

---

[16]     Although the Bankruptcy Court has preliminarily approved the Wanland Settlement, the Wanland Settlement will not be effective until finally approved by both the Bankruptcy Court and the New Jersey Bankruptcy Court. Further, the Wanland Settlement Agreement provides that NNI has the right to void the settlement if more than 30 class members affirmatively opt-out of the settlement.  Should the Wanland Settlement Agreement fail to be

### 8.    Avoidance Actions

Pursuant to the Bankruptcy Code, a debtor may seek to recover, through adversary proceedings in bankruptcy court (each such action, an "Avoidance Action"), certain transfers of the debtor's property in respect of antecedent debts to the extent the transferees received more than they would have received on account of such pre-existing debts had the debtor been liquidated under chapter 7 of the Bankruptcy Code.  Such transfers include cash payments, pledges of security interests or other transfers of interests in property.  Such transfers must have been made while the debtor was insolvent, and the debtor is rebuttably presumed to have been insolvent during the 90-day period immediately prior to the commencement of its bankruptcy case.  These provisions of the Bankruptcy Code can be broad in their application because they allow the debtor to recover payments regardless of whether there was any impropriety in such payments, with certain limited exceptions.  If the debtor recovers a transfer, the transferee receives a general unsecured claim against the debtor to the extent of the recovery unless the transferee waives and releases such claim.

The Debtors generally were required to file Avoidance Actions within two years after the applicable petition date for each Debtor.  The two-year limitations period ended on January 14, 2011 for all Debtors other than NNCALA and NNIII; the limitations period ended on July 14, 2011 for NNCALA and will end on July 26, 2018 for NNIII.  Within the applicable limitations periods (including as extended pursuant to certain tolling agreements Debtors entered into with potential defendants) the Debtors filed 133 Avoidance Actions, 6 of which were dismissed due to service issues and the remainder of which have been resolved.  To date, the Debtors have settled and dismissed 127 Avoidance Actions originally filed for $127.3 million, which were resolved through cash payments to the estates, or through waivers, releases and/or reductions in other asserted claims that the defendants made or could make against the Debtors' estates.  The Debtors also resolved numerous potential avoidance claims against potential defendants through settlements prior to filing complaints.

### 9.    Post-petition Liquidity, Lending and Financing

#### a.    Post-petition Liquidity and Capital Resources Overview

As a result of the Chapter 11 Cases and the Creditor Protection Proceedings in other jurisdictions, cash of the various Nortel Affiliates subject to such proceedings is available to fund operations in particular jurisdictions, but not available to be freely transferred between jurisdictions, regions or outside joint ventures, other than for normal course intercompany trade and pursuant to specific court-approved agreements.

Since the Initial Petition Date, the Debtors generally have maintained use of their cash management system and consequently have minimized disruption to their operations pursuant to various court approvals and agreements obtained or entered into in connection with the Chapter 11 Cases.

---

finally approved by the Bankruptcy Court, the Wind-Down Debtors may be required to expend additional estate resources defending the Wanland Claim. A copy of the Wanland Settlement Agreement is available at D.I. 17226.

As of August 31, 2016, NNI (including the Debtors in the NNI Reporting Group)[17] had approximately $598.7 million in cash on hand and the other Debtors collectively had approximately $55.4 million, in addition to their interest in the proceeds of the various divestitures being held in escrow accounts.

### b.    Intercompany Revolving Loan Agreement

On January 15, 2009, NNI, as lender, entered into a post-petition revolving loan agreement with NNL, as borrower (which agreement was amended and restated on March 27, 2009), to provide NNL liquidity to continue its operations, thus benefitting NNI's estate as well as the other Nortel entities around the world.  This revolving loan agreement was approved by the Canadian Court and, subject to certain conditions, approved by the Bankruptcy Court.  The outstanding amount of the loan was not to exceed $200 million at any time under the terms of the loan agreement, and NNL only made a single draw under the facility in the amount of $75 million, the total loan amount approved by the Bankruptcy Court.  The loan agreement terminated by its terms on December 17, 2010, and NNL repaid approximately $76.6 million to NNI, which constituted the outstanding principal and accrued but unpaid interest as of that date.

### c.    Interim Funding and Settlement Agreement

TPA Payments among parties to the Master R&D Agreement were suspended after the Initial Petition Date, with the exception of one $30 million payment made by NNI to NNL in January 2009 in respect of amounts that were alleged to have been owed in connection with the Transfer Pricing Agreements.  Notwithstanding such suspension, limited amounts of goods, services, research and development and corporate support continued to be provided by various Nortel Affiliates after the Initial Petition Date.  Concluding it was in the best interests of their estates and their creditors, the Debtors (other than NNCALA and NNIII), with the support of the Creditors' Committee and the Bondholder Group, entered into an Interim Funding and Settlement Agreement, dated June 9, 2009 (the "IFSA"), with the Canadian Debtors and the EMEA Debtors (other than NNSA) to address certain liquidity constraints facing NNL and certain other matters, including with respect to asset sales, release of licenses and rights and escrow arrangements with respect to the Sale Proceeds.

Under the IFSA, NNI paid $157 million to NNL, which represented an amount that the Debtors, the Canadian Debtors, the Creditors' Committee, the Bondholder Group, the Monitor and the Joint Administrators agreed to be an appropriate estimate (taking into account the $30 million payment in January 2009) of the value of corporate overhead and research and development activities provided by NNL to NNI and related costs (subject to the terms of the IFSA) from the Initial Petition Date through August 31, 2009, and forecasted by NNL to be due from NNI under the Master R&D Agreement.  Under the terms of the IFSA, this payment was made in full and final settlement of TPA Payments owed for the period from the Initial Petition Date to September 30, 2009.  The parties entered into the IFSA without any definitive and binding determination regarding the interpretation and applicability of the Transfer Pricing

---

[17]     The NNI Reporting Group includes the following Debtors: NNI, NNCC, NN Cable, NNII, NN Optical, NN HPOCS, NNCALA, NTI, Qtera and NNIII.  Additional information may be found in the Debtors' monthly operating reports, filed monthly on the docket of these Chapter 11 Cases and available at:  http://dm.epiq11.com/nortel.

Agreements.  Under the terms of the IFSA, the "Selling Debtors" agreed to coordinate sale efforts and not make allocation a prerequisite to closing the sales.  The Selling Debtors agreed to escrow the Sales Proceeds, and the IFSA allows release and distribution of the escrowed sale proceeds pursuant to an "agreement of all of the Selling Debtors" or, alternatively if agreement is not reached among the Selling Debtors, following a determination by the "relevant dispute resolver(s)," as provided for under the IFSA. The IFSA further provides that any settlement of the allocation of Sale Proceeds is subject to the consent of the Bondholder Group and the Creditors' Committee acting in good faith.  Each of the remaining Selling Debtors that has not relinquished their rights over the Escrow Accounts holding the Sale Proceeds are signatories to the SPSA, as are the Bondholder Group and Creditors' Committee.

The IFSA was approved by the Bankruptcy Court and the Canadian Court on June 29, 2009, and on June 23, 2009, the U.K. Court approved entry into the IFSA by the Joint Administrators (except for NNSA, which was authorized to enter into the IFSA by the French Court on July 7, 2009).  NNSA and Nortel Networks AG acceded to the IFSA on September 11, 2009.

### d.    Final Canadian Funding and Settlement Agreement

The payment arrangements under the IFSA extended through September 30, 2009, in the case of the Debtors, and through December 31, 2009, in the case of the EMEA Debtors and NNSA.  In connection with the expiration of the IFSA, the Debtors (other than NNCALA and NNIII), together with the Creditors' Committee and the Bondholder Group, commenced additional negotiations with the Canadian Debtors and the Monitor to address NNL's ongoing liquidity concerns, which culminated in the Final Canadian Funding and Settlement Agreement (the "CFSA"), which was executed as of December 23, 2009 by the Canadian Debtors, the Monitor and the Debtors (other than NNCALA and NNIII).  The CFSA provided, among other things, for the settlement of certain intercompany claims, including in respect of any claims of the Debtors against the Canadian Debtors for overpayments to the Canadian Debtors under the transfer pricing agreements for, or with respect to, the period from January 1, 2001 to December 31, 2005.

As part of the settlement, the parties agreed to the establishment of a pre-petition intercompany claim in favor of NNI in the Canadian Proceedings in the aggregate amount of approximately $2.1 billion (the "CFSA Claim"), not subject to any setoff or reduction, on account of overpayments to NNL under the Transfer Pricing Agreements, and reconciling certain pre-petition obligations of NNI and NNL.  This amount represents a $2 billion unsecured pre-filing claim and a $62.7 million secured pre-filing claim, of NNI against NNL, which settles (i) any claims of the Debtors (other than NNCALA) against the Canadian Debtors for overpayments to the Canadian Debtors under the Transfer Pricing Agreements for the period from January 1, 2001 to December 31, 2005, whether or not resulting from any adjustment of taxable income of the Debtors as determined by the IRS, (ii) certain claims of NNI against NNL for amounts due and owing under a revolving loan agreement dated March 21, 2008 and (iii) any claims of the Canadian Debtors (x) for reimbursement of corporate overhead, research and development costs or such other payments or costs incurred pursuant to Transfer Pricing Agreements or otherwise for the benefit of the Debtors, during the period prior to the Initial Petition Date, or (y) relating to intercompany trading of goods and services during the period prior to the Initial Petition Date.

Also, as part of the settlement, the Canadian Debtors and the Monitor agreed to acknowledge the CFSA Claim, defend, if necessary, the CFSA Claim, and obtain a final order of the Canadian Court approving and allowing the CFSA Claim.  The Canadian Debtors and the Monitor also irrevocably waived any and all rights that may exist at law, in equity or otherwise to set off against, assert any counterclaims with respect to the amount or validity of or otherwise reduce the amount of the CFSA Claim in any way.

In addition, under the CFSA, the Canadian Debtors and the Monitor agreed to waive any and all rights that may exist at law, in equity or otherwise to assert any claims against the Debtors (other than NNCALA and NNIII) relating to the period prior to the Initial Petition Date; however, subject to certain exceptions, this waiver automatically terminates if the Debtors (other than NNCALA and NNIII) assert certain pre-petition claims (other than the CFSA Claim) against the Canadian Debtors in the Canadian Proceedings or subsequent proceedings.  In addition, under the terms of the CFSA, NNI has paid to NNL $191.8 million, which represents (i) the maximum payment that the Debtors may or could owe in respect of certain settled obligations, (ii) the maximum post-filing or administrative claim (or such other applicable priority claim) that any of the Canadian Debtors may have or could assert against one or more Debtors in any proceeding with respect to certain corporate overhead, research and development costs, transition services in respect of the asset sale transactions and certain other reimbursement obligations, whether pursuant to sections 503 and 507 of the Bankruptcy Code or otherwise, and (iii) constitutes a full and final settlement of any and all claims for corporate overhead, research and development costs, transition services in respect of the asset sale transactions and certain other reimbursement obligations.  The CFSA also provides for the allocation of certain other anticipated costs to be incurred by the parties, including those relating to the divestiture of Nortel's various businesses, among the various estates.  The parties entered into the CFSA without any definitive and binding determination regarding the interpretation and applicability of the Transfer Pricing Agreements.

On January 26, 2010, the Debtors and Canadian Debtors obtained approvals from the Bankruptcy Court and the Canadian Court, respectively, of the CFSA and the creation and allowance of the CFSA Claim.  Also in connection with the CFSA, the Debtors and NNL received the authorization of the Bankruptcy Court and the Canadian Court, respectively, to enter into advance pricing agreements with the U.S. and Canadian tax authorities to resolve certain transfer pricing issues, on a retrospective basis, for the taxable years 2001 through 2005, which was a condition to the effectiveness of the CFSA.

### e.  Export Development Canada Support Facility

Effective January 14, 2009, NNL entered into an agreement with EDC (the "Short-Term Support Agreement") to permit NNL continued access to the EDC Facility for an interim period that was extended several times, for up to $30 million of support based on its then-estimated requirements over the period.  The EDC Facility, which was guaranteed by NNI prior to the Initial Petition Date, provided for the issuance of support in the form of guarantee bonds or guarantee-type documents issued to financial institutions that issue letters of credit or guarantee, performance or surety bonds or other instruments in support of Nortel's contract performance.  EDC has filed a Claim against NNI, as discussed in Section III.D.7.b (*EDC Claims*) above.

**f.      Post-petition L/C and Bonding Facilities**

On June 30, 2009, the Bankruptcy Court entered a final order authorizing the Debtors to negotiate and enter into L/C and Bonding Facilities and to grant the issuers under the L/C and Bonding Facilities automatically perfected first priority security interests in and liens upon deposits and cash collateral pledged by the Debtors to support the issuance of surety bonds or letters of credit, primarily in support of certain obligations to their customers.

On July 20, 2009, NNI entered into a collateral agreement (the "Collateral Agreement") with Westchester Fire Insurance Company and ACE INA Insurance (collectively, the "Sureties"), with Westchester Fire Insurance Company acting as agent for the Sureties.  On the same date, NNI executed an indemnity agreement (the "Indemnity Agreement," and together with the Collateral Agreement, the "ACE Facility Agreements"), whereby NNI agreed to indemnify the Sureties in connection with the issuance of up to $30 million in bonds.  The ACE Facility Agreements allowed for the issuance of performance, surety or other bonds to NNI's customers in support of NNI's contract performance (the "ACE Support").  Pursuant to the ACE Facility Agreements, any ACE Support issued under the ACE Facility Agreements is secured by up to 110% cash collateral.  In July 2010, NNI's rights and obligations under bonds totaling approximately $3.1 million were transferred to GENBAND (as defined below) in connection with the sale of the Carrier VoIP and Applications Solutions ("CVAS") business, and the Sureties released NNI from all liability with respect thereto and returned approximately $3.1 million of cash collateral to NNI.  ACE has filed a Claim against NNI in an unliquidated amount (the "ACE Claim"). The Debtors have not yet resolved the ACE Claim.

On July 22, 2009, NNI entered into an agreement for standby letters of credit (the "Standby L/C Agreement") and a related pledge agreement (together with the Standby L/C Agreement, the "Citibank Facility Agreements"), each with Citibank, N.A.  The Citibank Facility Agreements allow for the issuance of letters of credit to NNI's customers in support of NNI's contract performance up to an aggregate stated amount of $6.2 million (the "Citibank Support").  Pursuant to the Citibank Facility Agreements, any Citibank Support would be secured by 110% cash collateral.  No Citibank Support is currently outstanding.

**10.      Cascade Indemnity**

As of 2010, certain Nortel Affiliates had not filed for bankruptcy or other creditor protection.  Under the laws of various jurisdictions in which these Affiliates operate, the directors, officers and agents of the Affiliates may be subject to personal liability in certain circumstances.  In order to enable those individuals designated by NNL or NNI, as applicable, to serve as directors, officers or agents of such Affiliates (the "Cascade Subsidiaries") and to facilitate the participation by the Cascade Subsidiaries in the various sales of businesses and assets by Nortel as well as the continuation of the orderly wind down of such Cascade Subsidiaries, NNL and NNI established a trust (the "Cascade Trust") which indemnifies individuals in their capacities as directors, officers or agents of a Cascade Subsidiary and their successors, if any (the "Cascade Beneficiaries"), for any claims resulting from their service as a director, officer or agent of a Cascade Subsidiary, subject to limited exceptions.

Subject to certain limitations, Cascade Beneficiaries of the Cascade Trust may seek payment for any costs relating to any indemnified claim only in the following order: first, against the assets of the Cascade Subsidiary to which such indemnified claim is related; second, any insurance policy currently maintained by Nortel with respect to director and officer liabilities, including any insurance policies maintained by the Cascade Subsidiaries available to such Cascade Beneficiary to cover such costs; and third, against the remaining Cascade Trust property. Additionally, NNI and NNL entered into a side agreement (the "Cascade Trust Side Letter") that requires each to share the net amounts contributed by each of them in establishing the Cascade Trust on a pro rata basis based on the weighted average of proceeds allocated to each of them from certain global sales as well as to use commercially reasonable efforts to recover from other Nortel Affiliates that are benefiting from the global sales (with certain exceptions as set forth in the Cascade Trust Side Agreement) a reasonable portion of the net amounts contributed to establish the Cascade Trust. The establishment of the Cascade Trust and the Cascade Trust Side Agreement was approved by the Canadian Court and the Bankruptcy Court on March 31, 2010. The SPSA contemplates the Settlement of various claims, pursuant to which NNI will have a 27% interest in the remaining assets of the Cascade Trust, and the Canadian Estate will have a 73% interest in the remaining assets of the Cascade Trust. The current principal balance in the Cascade Trust is approximately $35,000,000.

## E.    Post-petition Sales and Other Dispositions of Assets

After Nortel determined, in June 2009, that selling its businesses was the best path forward, Nortel commenced a process to evaluate its business lines and provide for the potential disposition of certain assets. It quickly became clear to the Debtors and other Nortel Affiliates subject to the Creditor Protection Proceedings that the best means of maximizing recovery for the creditors of all estates was through the expeditious monetization of Nortel's operations and assets. In furtherance of this goal, the Debtors and other Nortel Affiliates agreed to participate in the asset sales and other dispositions in the IFSA and as described in greater detail below. The current escrow balances related to these sales are reflected in the Debtors' Monthly Operating Report, filed each month by the Debtors on the docket of these Chapter 11 Cases, available at http://dm.epiq11.com/nortel.

### 1.    Mobile WiMAX Business and Alvarion Agreement

On January 29, 2009, Nortel announced its decision to discontinue its mobile WiMAX business and end its joint agreement with Alvarion Ltd. Nortel worked closely with Alvarion and Nortel's mobile WiMAX customers to transition or settle Nortel's contractual obligations during 2009 to help ensure that ongoing support commitments were met without interruption or alternative settlements were reached that mutually benefitted Nortel and its customers. There have been no asset sales relating to the WiMAX business.

### 2.    Layer 4-7 Assets

On February 19, 2009, Nortel announced that certain Nortel Affiliates, including NNI and certain other Debtors, had entered into a "stalking horse" asset purchase agreement to sell certain portions of Nortel's Layer 4-7 data portfolio, including certain Nortel Application Accelerators, Nortel Application Switches and the Virtual Services Switch, to Radware Ltd.

("Radware") for approximately $17.7 million.  The Bankruptcy Court and Canadian Court entered orders establishing bidding procedures for an auction that allowed other qualified bidders to submit higher or otherwise better offers on February 27, 2009.  No higher bids were submitted, and the Bankruptcy Court and Canadian Court entered orders approving the transaction with Radware as the successful bidder on March 26, 2009 and on March 30, 2009, respectively.  The sale transaction closed on March 31, 2009.  As of August 31, 2016, the proceeds of approximately $18.1 million were held in escrow by the New York branch of JPMorgan Chase Bank, N.A. ("JPMorgan"), as provided under the orders approving the sale.

### 3.    CDMA and LTE Access Assets

On June 19, 2009, Nortel announced that certain Nortel Affiliates, including NNI and certain other Debtors, had entered into a "stalking horse" asset purchase agreement with Nokia Siemens Networks B.V. ("Nokia") for substantially all of Nortel's Code Division Multiple Access ("CDMA") business and Long Term Evolution ("LTE") Access assets for $650 million, subject to certain purchase price adjustments under certain circumstances.  The Bankruptcy Court and the Canadian Court entered orders on June 30, 2009 establishing bidding procedures for an auction that allowed other qualified bidders to submit higher or otherwise better offers. Competing bids were required to be submitted by July 21, 2009, and an auction with the qualified bidders was completed on July 24, 2009.  Telefonaktiebolaget LM Ericsson (publ) ("Ericsson") emerged as the successful bidder for a purchase price of approximately $1.1 billion, subject to certain post-closing purchase price adjustments.  Ultimately, pursuant to the contractual purchase price adjustment procedures, the parties agreed to a post-closing reduction of the final purchase by $1 million.  On July 28, 2009, the Bankruptcy Court and Canadian Court entered orders approving this sale, and the sale transaction closed on November 13, 2009.

In connection with this sale, NNI, Architel Systems (U.S.) Corporation, CoreTek, Inc., Nortel Altsystems Inc., Nortel Altsystems International Inc., Nortel Networks Applications Management Solutions Inc., Nortel Networks Cable Solutions Inc., NNCC, Nortel Networks HPOCS Inc., Nortel Networks International Inc., Nortel Networks Optical Components Inc., Northern Telecom International Inc., Sonoma Systems, Qtera Corporation and Xros, Inc. (the "U.S. Debtor Licensees"), as well as certain other Nortel Affiliates, executed a license termination agreement.

Approximately 2,500 Nortel employees received offers of employment from Ericsson.

In connection with this transaction, NNL and NNI paid an aggregate break-up fee of $19.5 million plus $3.0 million in expense reimbursements to Nokia.  NNL and NNI each paid half of this aggregate break-up fee, and these payments were reimbursed from the proceeds from the sale.

As of August 31, 2016, the remaining portion of the proceeds, after post-closing adjustments, related transaction fees and the release of other funds by agreement and Court orders, in the amount of approximately $1.0546 billion, is held in escrow by JPMorgan, pending allocation, as provided under the orders approving the sale.

4.    **Enterprise Solutions Business**

On July 20, 2009, Nortel announced that certain Nortel Affiliates had entered into a "stalking horse" asset and share sale agreement with Avaya Inc. ("Avaya") for Nortel's North American, Central America and Latin America ("CALA") and Asian Enterprise Solutions ("ES") business, and an asset sale agreement with Avaya for the EMEA portion of the ES business for a purchase price of $475 million.  These agreements provided for the sale of substantially all of the assets of the ES business globally, as well as the shares of NGS and DiamondWare (the "Enterprise Sale"). The Bankruptcy Court and Canadian Court entered orders establishing bidding procedures for an auction that allowed other qualified bidders to submit higher or otherwise better offers on August 4, 2009.  Competing bids were required to be submitted by September 4, 2009, and an auction with the qualified bidders commenced on September 11, 2009.  On September 14, 2009, Avaya emerged as the successful bidder for a purchase price of $900 million in cash, subject to certain post-closing purchase price adjustments, with an additional pool of $15 million reserved for an employee retention program.  The Bankruptcy Court and the Canadian Court entered orders approving the sale to Avaya on September 16, 2009, and the sale transaction closed on December 18, 2009.  The sale of certain ES assets held by Israeli subsidiaries was subsequently approved by an Israeli Court on December 21, 2009.

Under the terms of the Enterprise Sale, approximately 6,000 Nortel employees accepted employment with Avaya.

On October 1, 2010, the Bankruptcy Court approved a stipulation resolving a dispute between Nortel and Avaya concerning each party's final calculation of certain purchase price adjustments.  As a result of the settlement, $5,944,945 of the approximately $14.4 million that had previously been held in escrow by the New York branch of Wells Fargo Bank, N.A. to secure Nortel's purchase price adjustment obligations was released to Avaya and $8,502,141 was released and added to the proceeds that had already been held in escrow by JPMorgan.  As of August 31, 2016, the remaining proceeds of approximately $844.3 million were held in escrow by JPMorgan, pending allocation, as provided under the orders approving the sale.

In connection with the Enterprise Sale, the Bankruptcy Court approved stipulations entered between NNI, NNC, NNL and the PBGC related to the Enterprise Solutions Business.

5.    **Packet Core Assets**

On September 21, 2009, Nortel announced its plan to sell, by "open auction," the assets of Nortel's Wireless Networks business associated with the development of its Next Generation Packet Core network components ("Packet Core Assets"). The Packet Core Assets consist of software to support the transfer of data over existing wireless networks and the next generation of wireless communications technology including relevant non-patent intellectual property, equipment and other related tangible assets.  The Packet Core Assets exclude legacy packet core components for Nortel's Universal Mobile Telecommunications System Access and GSM businesses.  The Bankruptcy Court and the Canadian Court entered orders establishing bidding procedures that allowed qualified bidders to submit offers to purchase the Packet Core Assets on September 30, 2009 and September 29, 2009, respectively.  On October 25, 2009, in

63

accordance with bidding procedures approved by the Bankruptcy Court and the Canadian Court, certain Nortel Affiliates, including NNI and certain other Debtors, entered into an agreement with Hitachi, Ltd. ("Hitachi") for the sale of the Packet Core Assets for a purchase price of $10 million.  On October 28, 2009, the Bankruptcy Court and Canadian Court entered orders approving the sale to Hitachi, and the sale transaction closed on December 8, 2009.  The Bankruptcy Court and the Canadian Court entered orders on May 28, 2010 and May 20, 2010, respectively, approving amendments to the intellectual property license agreement and the (now expired) transition services agreement that had been executed in connection with the transaction, which provided for an expansion of certain sublicensing rights of Hitachi in exchange for additional consideration of $500,000.

In connection with this sale, the U.S. Debtor Licensees as well as certain other Nortel Affiliates executed a license termination agreement.

As of August 31, 2016, the proceeds of approximately $10.4 million were held in escrow by JPMorgan, pending allocation, as provided under the orders approving the sale.

### 6. Optical Networking and Carrier Ethernet Businesses

On October 7, 2009, Nortel announced that certain Nortel Affiliates had entered into a "stalking horse" asset sale agreement with Ciena Corporation ("Ciena") for Nortel's North American, CALA and Asian Optical Networking and Carrier Ethernet businesses, and an asset sale agreement with Ciena for the European, Middle Eastern and African ("EMEA") portion of Nortel's Optical Networking and Carrier Ethernet businesses for a purchase price of $390 million in cash, and 10 million shares of Ciena common stock.  These agreements included the planned sale of substantially all the assets of Nortel's Optical Networking and Carrier Ethernet businesses globally.  The Bankruptcy Court and the Canadian Court entered orders establishing bidding procedures for an auction that allowed other qualified bidders to submit higher or otherwise better offers on October 15, 2009.  Qualified bidders were ultimately required to submit offers by November 17, 2009.  On November 22, 2009, in accordance with court approved procedures, Nortel concluded an auction for the sale of these assets to Ciena, which emerged as the successful bidder, agreeing to pay $530 million in cash, subject to certain post-closing purchase price adjustments, plus $239 million principal amount of Ciena convertible notes due June 2017.  The Bankruptcy Court and Canadian Court entered orders approving the sale to Ciena on December 3, 2009, and the sale transaction closed on March 19, 2010.

Ciena elected, as permitted by the terms of the sale agreement, to replace the $239 million principal amount of convertible notes with cash consideration of $244 million, and thus pay an all cash purchase price of approximately $773.8 million.  After closing, this amount was reduced pursuant to the working capital adjustment mechanism of the asset sale agreement by approximately $81 million.

In connection with this sale, the U.S. Debtor Licensees as well as certain other Nortel Affiliates executed a license termination agreement.

As of August 31, 2016, the remaining proceeds of approximately $611.2 million were held in escrow by the New York branch of JPMorgan, pending allocation, as provided under the orders approving the sale.

### 7.    GSM/GSM-R Business

On September 30, 2009, Nortel announced that certain Nortel Affiliates, including NNI, planned to sell by "open auction" substantially all of Nortel's global GSM/GSM-R business. The Bankruptcy Court and the Canadian Court entered orders establishing bidding procedures that allowed other qualified bidders to submit offers to purchase the GSM/GSM-R business on October 15, 2009. Competing bids were required to be submitted by November 16, 2009. An auction with the qualified bidders concluded on November 24, 2009, with Ericsson and Kapsch CarrierCom AG ("Kapsch") emerging as the successful bidders for the sale of the North American and European assets for a purchase price of $103 million in cash, subject to certain purchase price adjustments. On November 18, 2009, Kapsch filed its bid for the GSM/GSM-R assets of NNSA with the relevant French authority. The Bankruptcy Court and the Canadian Court entered orders approving the sale to Ericsson and Kapsch on December 2, 2009. The French Court entered an order approving the sale to Kapsch on March 30, 2010. The sale transaction closed on March 31, 2010. Pursuant to the contractual purchase price adjustment procedures, Ericsson and Nortel agreed to a post-closing reduction of the final purchase price by $6 million, and Nortel and Kapsch agreed to a post-closing increase of the final purchase price by $3.2 million.

As of August 31, 2016, the remaining portion of the proceeds of approximately $106.2 million (such amount including approximately $1.5 million of proceeds from the supplemental GSM sale described below) is held in escrow by JPMorgan pending allocation as provided under the orders approving the sale.

On May 28, 2010 and May 20, 2010, the Bankruptcy Court and the Canadian Court, respectively, entered orders authorizing the sale of assets associated with the CALA region GSM/GSM-R business of Nortel to Ericsson for a purchase price of $2 million in cash. This supplemental sale transaction closed on June 4, 2010. On August 7, 2012, upon the closing of the Non-Filed Entity Settlement Agreement, $500,000 was released from the escrow account holding sale proceeds to various Nortel entities. As of August 31, 2016, the remaining proceeds of approximately $1.5 million were held in escrow by JPMorgan, pending allocation, as provided under the orders approving the sale.

In connection with each of these sales, the U.S. Debtor Licensees as well as certain other Nortel Affiliates executed a license termination agreement.

### 8.    CVAS Business

On December 23, 2009, Nortel announced that certain Nortel Affiliates had entered into a "stalking horse" asset sale agreement with GENBAND Inc. (now known as GENBAND US LLC, following a conversion completed May 27, 2010) ("GENBAND") for Nortel's North American, CALA and Asian CVAS business, and an asset sale agreement with GENBAND for the EMEA portion of Nortel's CVAS business for a purchase price of

65

$282 million, subject to balance sheet and other adjustments then estimated at approximately $100 million, resulting in net proceeds of approximately $182 million. These agreements included the planned sale of substantially all the assets of the CVAS business globally. The Bankruptcy Court and the Canadian Court entered orders establishing bidding procedures for an auction that allowed other qualified bidders to submit higher or otherwise better offers on January 8, 2010 and on January 6, 2010, respectively. Competing bids were required to be submitted by February 23, 2010. On February 24, 2010, Nortel announced that it would not proceed to auction and would work toward closing the asset sale agreements with GENBAND. The Bankruptcy Court and the Canadian Court entered orders approving the sale to GENBAND on March 4, 2010, and the sale transaction closed on May 28, 2010.

Nortel and GENBAND disputed each other's calculation of the final purchase price as contained in GENBAND's closing statement delivered September 15, 2010 and Nortel's written disagreement notice delivered on October 13, 2010 (as amended on November 16, 2010 and January 18, 2011). The amount in dispute was approximately $36.3 million. Following various motion practice by the parties, the purchase price dispute was resolved by a settlement agreement between the parties. On August 23, 2011, the Bankruptcy Court and the Canadian Court issued orders approving the settlement agreement, resulting in the final purchase price of approximately $157.7 million after a downward final purchase price adjustment of approximately $24.9 million. The parties also settled certain TSA disputes.

As of August 31, 2016, the remaining proceeds of approximately $140.4 million were held in escrow by the New York branch of JPMorgan, pending allocation, as provided under the orders approving the sale.

9.    **LGN Joint Venture**

On April 20, 2010, Nortel announced that NNL had entered into a share purchase agreement with Ericsson for the sale of NNL's 50% plus one share interest, including preferred shares, in LGN for a purchase price of $242 million in cash, subject to certain purchase price adjustments. The Canadian Court entered an order approving this sale on May 3, 2010, and the sale transaction closed on June 29, 2010, without any purchase price adjustments. Pursuant to the Canadian Court order approving the sale, the purchase price proceeds have been deposited in a segregated account held in the name of NNL, and such proceeds may not be distributed except upon further order of the Canadian Court, on notice to the Debtors. The SPSA provides that the Debtors will not assert further claims against these proceeds, as part of the integrated settlement terms.

10.    **Relay Sale**

On June 17, 2010, NNL and Nortel Networks Technology Corporation entered into an asset sale agreement with 7522312 Canada Inc. for the sale of certain assets related to the wireless backhaul and multi-hop digital repeater/relay research and development program, for a purchase price of $600,000 plus applicable transfer taxes. The Canadian Court entered an order approving this sale on June 29, 2010, and the sale transaction closed on June 30, 2010.

Pursuant to the Canadian Court order approving the sale, the purchase price proceeds have been deposited in a segregated account held in the name of NNL, and such proceeds may not be allocated or distributed except upon either agreement of the U.S. Debtor Licensees as to the distribution of such proceeds (subject to the prior consent of the Creditors' Committee and the Bondholder Group acting in good faith) or upon orders of the Canadian Court and the Bankruptcy Court after notice and a joint hearing.

In connection with this sale, the U.S. Debtor Licensees as well as certain other Nortel Affiliates executed a license termination agreement. The SPSA provides that the Debtors would not assert further claims against these proceeds, as part of the integrated settlement terms.

### 11.    MSS Business

On August 27, 2010, Nortel announced that certain Nortel Affiliates had entered into a "stalking horse" asset sale agreement with PSP Holding LLC ("PSP Holding") for Nortel's North American, CALA and Asian Multi-Service Switch ("MSS") business, and an asset sale agreement with PSP Holding for the EMEA portion of Nortel's MSS business, for an aggregate purchase price of $39 million, subject to working capital and other adjustments. These agreements include the planned sale of substantially all the assets of the MSS business globally. On September 1, 2010, the Bankruptcy Court and the Canadian Court entered orders establishing bidding procedures for an auction that allowed other qualified bidders to submit higher or otherwise better offers. Competing bids were required to be submitted by September 21, 2010, and an auction with the qualified bidders was completed on September 24, 2010. Ericsson emerged as the successful bidder with a cash purchase price of $65 million, subject to certain post-closing purchase price adjustments. The Bankruptcy Court and Canadian Court entered orders approving the sale to Ericsson on September 30, 2010 and October 1, 2010, respectively, and the sale transaction closed on March 11, 2011.

In connection with this transaction, Nortel paid an aggregate break-up fee of $1.0 million, plus $1.5 million in expense reimbursements to PSP Holding.

As of August 31, 2016, the remaining proceeds, taking into account certain post-closing purchase price adjustments, of approximately $46.1 million was held in escrow by JPMorgan, pending allocation, as provided under the orders approving the sale.

### 12.    Sales of Certain Equity and Limited Partnership Interests

On September 27, 2010, NNI and Nortel Altsystems Inc. announced that they had entered into an agreement to sell their shares of Blade Network Technologies, Inc. ("Blade") as part of a merger transaction between Blade and International Business Machines Corporation. The Bankruptcy Court approved the transaction on October 14, 2010. Nortel Altsystems Inc. received $52 million in proceeds on October 29, 2010 and NNI received $5 million in proceeds on November 4, 2010, which amounts are governed by the terms of the court order approving the transaction.

On November 4, 2010, NNI and Nortel Ventures LLC announced that they had entered into an agreement to sell certain venture capital limited partnership interests to CS Strategic Partners IV VC Holdings, L.P. and Amberbrook V, LLC for approximately $23.0

million.  The Bankruptcy Court approved the transactions on November 23, 2010 and they closed during December 2010 and January 2011.  Nortel Ventures LLC deposited its portion of the sale proceeds in a separate bank account that solely holds those proceeds.

### 13.    Internet Protocol Numbers Sale

On March 16, 2011, NNI and Microsoft Corporation ("Microsoft") entered into an asset sale agreement for the sale of 666,624 internet protocol numbers for a purchase price of $7.5 million.  The Bankruptcy Court entered an order approving the sale on April 26, 2011, and the sale transaction closed on May 11, 2011.

### 14.    Richardson Campus Sale

On April 15, 2011, NNI entered into an agreement with Pillar Commercial, LLC ("Pillar") for the sale of a corporate campus in Richardson, Texas, which historically served as Nortel's U.S. headquarters, for $43.1 million.  The Bankruptcy Court entered an order approving the sale to Pillar on May 10, 2011, and the transaction closed on June 3, 2011.  After certain adjustments, the net proceeds of the sale to NNI totaled approximately $41.4 million.

### 15.    Residual Patent and Related Assets Sale

On April 4, 2011, Nortel announced that certain Nortel Affiliates had entered into a "stalking horse" sale agreement for the sale of Nortel's residual patents and certain related assets for a purchase price of $900 million.  On May 2, 2011, the Bankruptcy Court and the Canadian Court entered orders establishing bidding procedures for an auction that allowed other qualified bidders to submit higher or otherwise better offers.  Competing bids were required to be submitted by June 13, 2011, and an auction with the qualified bidders commenced on June 27, 2011.  On June 30, 2011, a consortium emerged as the winning bidder with a cash purchase price of $4.5 billion.  The consortium consists of Apple, Inc., EMC, Ericsson, Microsoft, Research in Motion and Sony.  The Bankruptcy Court and the Canadian Court entered orders approving the sale on July 11, 2011, and the sale transaction closed on July 29, 2011.

As of August 31, 2016, the proceeds from this sale, less approximately $6.5 million paid to NNL, NNI and NNUK as reimbursement for certain professional fees related to the sale and $29 million paid to the stalking horse purchaser as a break-up fee and expense reimbursement, as approved by the Bankruptcy Court and the Canadian Court, which total approximately $4.4625 billion, are being held in escrow by JPMorgan, pending allocation, as provided under the orders approving the sale.

### 16.    De Minimis Asset Sales

On February 18, 2009, the Bankruptcy Court entered an order establishing procedures for the sale or abandonment of de minimis assets.  Pursuant to the terms of such order, from time to time the Debtors have sold or abandoned and may continue to sell or abandon certain de minimis assets in order to maximize the value of any such assets in connection with the wind down of the Debtors' estates.

17.     **Purchase Price Adjustments**

Nortel's sale agreements generally provide for post-closing adjustments to the stated purchase price based on the actual value of certain assets and liabilities as of the closing date relative to an estimate of those amounts at closing.  Certain of those adjustments that have been made are described above. The period within which claims for additional adjustments may have been made, has passed and no further adjustments are anticipated.

18.     **Transition Services Agreements**

In connection with the sales of certain of its global businesses and assets, Nortel entered into various transition services agreements with the purchasers of such businesses and assets (the "TSAs").  Nortel was contractually obligated under each TSA to provide certain information technology, business transition and related services to the relevant purchaser of its various global businesses and assets for a period following the closing of the transaction.

The compensation the Nortel Affiliates received under each TSA for providing services was either cost-based or, in most cases, a fixed amount agreed upon with each purchaser on the basis of a projection of the costs to be incurred by Nortel in providing such services to the business sold.  Under each TSA, Nortel's compensation could be and may have been adjusted periodically based on certain changes in the product volume and headcount estimates for the relevant divested business.  Unless otherwise agreed, each Nortel Affiliate providing services under a TSA bore the initial costs of providing such services.  The revenue received from the relevant purchaser was distributed among the relevant Nortel Affiliates.  All work under the TSAs has been completed.

19.     **Remaining Intellectual Property Assets**

Nortel retains some intellectual property rights and an interest in certain IP addresses that were not transferred pursuant to any of the Sales or the residual patents sale.  The primary retained intellectual property assets include certain trademarks, domain names and IP addresses.  However, the Debtors believe that all material value has been extracted from Nortel's intellectual property assets through the foregoing sales, such that any value in the remaining intellectual property assets is not expected to be material to Creditor recoveries.  Moreover, under the SPSA, the Debtors (and NNIII) have agreed to release and waive Claims related to all remaining IP addresses registered in the name of a Canadian Debtor or corporate predecessor of a Canadian Debtor as part of the integrated settlement.

**F.      Certain Other Post-petition Operations of the Debtors and Other Nortel Affiliates**

**1.      Creation of Nortel Business Services Group and the Corporate Group**

          In addition to monetizing their assets, the Debtors undertook other restructuring efforts to maximize value for their creditors.  One of such efforts was to establish two internal groups in 2009: the Corporate Group (the "Corporate Group"), which was responsible for strategic planning to maximize the value of Nortel's assets and restructuring matters, and Nortel Business Services ("NBS"), which managed Nortel's ongoing operations and transition services to the buyers of Nortel's business units as required under the TSAs.  Various Nortel Affiliates, including certain of the Debtors and their non-Debtor subsidiaries, provided services as part of the Corporate Group and NBS.  These groups discontinued providing such services when the various divestitures were completed and the Debtors' obligations under the relevant operational agreements expired.

**2.      Employee Information**

**a.      Restructuring**

          As of the Petition Date, the Debtors employed approximately 8,911 regular full-time employees (excluding employees on notice of termination).  The Debtors also employed individuals on a regular part-time basis and on a temporary full- or part-time basis, and also engaged the services of contractors as required.

          Following the Initial Petition Date, through cost reduction initiatives under the Chapter 11 Cases and transfers of employees in connection with the various sales, the Debtors reduced their headcount over time, consistent with the divestitures of their business lines and decreased operations.  Further, approximately 4,933 jobs for employees of the Debtors were preserved through creation of jobs for former employees in connection with sales of businesses during the same period.

          In May 2013, the Debtors transferred certain of their remaining employees to the Mergis Group. The Bankruptcy Court approved the retention of the Mergis Group on May 17, 2013 [D.I. 10555], and certain of the Debtors former employees continue to be employed by the Mergis Group and perform essential services for the Debtors.

**b.      Employee Benefit Plans**

*i.      Nortel Plans Generally*

          The Debtors historically maintained various retirement programs covering substantially all of their employees, consisting of tax-qualified and non tax-qualified defined benefit, defined contribution and investment plans.  Since the Initial Petition Date, the Debtors have ceased payment under their non-tax qualified plans and, as discussed further below, the tax-qualified defined benefit plan has been terminated by the PBGC.

          The Debtors also historically provided other benefits, including post-retirement benefits and post-employment benefits.  Employees previously enrolled in programs offering

post-retirement benefits continued to participate in those programs until they were terminated as of June 30, 2013 pursuant to the terms of a settlement agreement with the Official Committee of Retired Employees. The Debtors also maintained certain severance plans and arrangements, but they have ceased payment under such plans since the Initial Petition Date.

Generally, the employees of the Debtors participated in plans sponsored or maintained by the Debtors solely for U.S. employees, including the Nortel Networks Long-Term Investment Plan (to which the Debtors' employees and the Debtors themselves made employee and matching contributions, respectively) and its own welfare and post-retirement benefit programs. The Nortel Networks Long-Term Investment Plan was terminated effective June 30, 2012, and the Debtors' health, welfare and fringe benefit plans, including all post-retirement welfare and benefit plans, were terminated as of June 30, 2013.

ii.     *Termination of the U.S. Retirement Income Plan*

On July 17, 2009, the PBGC provided a notice to NNI that the PBGC had determined under the Employee Retirement Income Securities Act of 1974, as amended ("ERISA"), that: (i) the Nortel Networks Retirement Income Plan (the "Retirement Income Plan"), a defined benefit pension plan sponsored by NNI, would be unable to pay benefits when due, (ii) under section 4042(c) of ERISA, the Retirement Income Plan must be terminated in order to protect the interests of participants and to avoid any unreasonable increase in the liability of the PBGC insurance fund and (iii) July 17, 2009 was to be established as the date of termination of the Retirement Income Plan. On the same date, the PBGC filed a complaint in the United States District Court for the Middle District of Tennessee against NNI and the Retirement Plan Committee of the Nortel Networks Retirement Income Plan (the "Retirement Plan Committee") seeking to proceed with termination of the Retirement Income Plan, though this complaint was not served against NNI. NNI worked to voluntarily assign trusteeship of the Retirement Income Plan to the PBGC and avoid further court involvement in the termination process. On September 8, 2009, pursuant to an agreement between the PBGC and the Retirement Plan Committee, the Retirement Income Plan was terminated with a termination date of July 17, 2009, and the PBGC was appointed trustee of the plan. The PBGC withdrew the complaint it had filed in the United States District Court for the Middle District of Tennessee.

The PBGC has filed joint and several claims, originally filed in the aggregate liquidated amount of $593.1 million and, as amended in 2014, in the aggregate amount of $624.6 million against each of the Debtors in the Chapter 11 Cases for the unfunded benefit liabilities of the Retirement Income Plan, and in the amount of $83.4 million for the termination premium associated with the termination of the Retirement Income Plan. The PBGC also has filed unliquidated Claims for contributions necessary to satisfy the minimum funding standards for insurance premiums, interest and penalties, and for shortfall and amortization charges.

The Debtors are conducting their review of these Claims and intend to raise all objections and defenses available to them.[18]

---

[18]     Specifically, on September 29, 2009, the PBGC filed the following four proofs of claim, asserted against each of the Debtors on a joint and several basis: Claim 4735, which asserted an estimated claim of $593,100,000 for the unfunded benefit liabilities in the Retirement Income Plan; Claim 4736, which asserted an unliquidated claim for

### iii.    U.S. Retiree Welfare and Long-Term Disability Plans

The Debtors historically have provided a number of welfare benefits to their active employees and retirees through benefit plans, including the Nortel Networks Inc. Retiree Medical Plan and the Nortel Networks Inc. Retiree Life Insurance and Long-Term Care Plan (together, the "Retiree Welfare Plans") and the Nortel Networks Inc. Long-Term Disability Plan (the "LTD Plan").  Under the Retiree Welfare Plans, the Debtors provided employer-paid (i) post-employment medical benefits for current retirees, their spouses, surviving spouses, domestic partners and dependents and (ii) term life insurance coverage and long-term care expense coverage for current retirees. Under the LTD Plan, the Debtors provided employer-paid long-term disability benefits for current participants.

As discussed above in Section III.D.6.b.iii (*Retiree & LTD Settlements*), the Debtors terminated these plans as of June 30, 2013 pursuant to the terms of separate settlement agreements with the Official Committee of Retired Employees and the Official Committee of Long-Term Disability Participants.

### iv.    Annual Incentive Plans

The Debtors historically sponsored the Nortel Networks Limited Annual Incentive Plan (the "Incentive Plan"), an ordinary course of business compensation program in which nearly all Nortel employees in non-sales positions were eligible to participate.  The last payments made under the Incentive Plan occurred in 2013.

### v.    Other Benefits and Plans

In addition, after the Initial Petition Date, the Debtors and certain Nortel Affiliates developed a key employee incentive and retention program for employees in (a) North America, (b) CALA and (c) Asia. The program consisted of the Nortel Networks Corporation Key Executive Incentive Plan (the "KEIP") and Nortel Networks Corporation Key Employee Retention Plan (the "KERP").  The KEIP was developed in order to provide incentives to the executives to streamline Nortel's business and guide Nortel out of the Chapter 11 Cases and the Canadian Proceedings as swiftly as possible, while the KERP was aimed at retaining key employees by providing a degree of job security and preventing attrition of key employees before a confirmed plan of reorganization was obtained.  The final payments to employees of the Debtors under the KEIP and KERP were made on June 18, 2010 and July 16, 2010, respectively.

---

minimum funding contributions that the Debtors may have failed to make; Claim 4737, which asserted an unliquidated claim for certain insurance premiums, interest and penalties (including termination penalties); and Claim 4738, which asserted an unliquidated claim for any shortfall amortization and waiver amortization charges. On July 7, 2014, the PBGC filed the following amendments to these four proofs of claim, also asserted against each of the Debtors on a joint and several basis:  Claim 8763, which purports to amend Claim 4735, the unfunded benefit liabilities in the Retirement Income Plan, upward from $593,100,000 to $624,601,972; Claim 8762, which purports to amend Claim 4737 to assert $83,392.500 as an estimated amount of certain insurance premiums, interest and penalties (including termination penalties); Claim 8761, which purports to amend Claim 4736, asserting an unliquidated claim for contributions to satisfy minimum funding standards; and Claim 8760, which purports to amend Claim 4738, asserting an unliquidated claim for any shortfall amortization and waiver amortization charges.

       *vi.*    *Nortel Special Incentive Plan*

      Nortel obtained Bankruptcy Court approval on March 4, 2010 and Canadian Court approval on March 8, 2010 of a special incentive plan developed by Nortel (excluding Nortel Affiliates in the EMEA region) as well as a number of its significant creditors (the "Special Incentive Plan").  The Special Incentive Plan was designed to provide cash incentive payments to certain employees (other than those domiciled in the EMEA region or employed by joint ventures) holding positions with NBS and the Corporate Group to encourage the achievement of certain performance targets and other business goals important to Nortel, including the successful conclusion of the Chapter 11 Cases, the compliance with Nortel's obligations under various transaction agreements and the wind down of various Nortel Affiliates. Approximately 1,475 Nortel employees were initially eligible to participate in the plan, of which approximately 866 were employees of the Debtors.

      Approximately 88% of the Special Incentive Plan's costs were funded by the purchasers of Nortel's businesses, pursuant to and during the terms of the sales agreements, which required that Nortel continue to operate, on a contract basis, substantial elements of the day-to-day business functions relating to the divested businesses until such functions could be transferred to the relevant purchaser.  This meant that Nortel had to retain certain key employees to ensure that the transition of the acquired businesses would be as effective and efficient as possible.

      As of  November 3, 2016, 1,204 employees of the Debtors had received approximately $49.7 million in Special Incentive Plan payments. In addition, 65 of the Debtors' employees had forfeited 100% of their potential awards under the Special Incentive Plan, representing a total of approximately $2.1 million. No potential payments remain outstanding under the Special Incentive Plan.

**3.**     **Non-Creditor Protection Legal Proceedings**

**a.**     **ERISA Litigation**

      Beginning in December 2001, NNI, NNC and NNL, together with certain of their then-current and former directors, officers and employees, were named as defendants in several purported class action lawsuits pursuant to ERISA.  These lawsuits were subsequently consolidated into a single proceeding in the United States District Court for the Middle District of Tennessee (the "ERISA Lawsuit"), but the court did not rule as to whether plaintiffs' proposed class should be certified.  This lawsuit was on behalf of participants and beneficiaries of the Nortel Networks Long-Term Investment Plan who held shares of the Nortel Networks Stock Fund during the class period, which has yet to be determined by the court.  The ERISA Lawsuit alleged, among other things, material misrepresentations and omissions to induce participants and beneficiaries to continue to invest in and maintain investments in NNC common shares through the investment plan.  As a result of the Chapter 11 Cases, as well as the Bankruptcy Court's order recognizing the Canadian Proceedings as foreign main proceedings under chapter 15 of the Bankruptcy Code and the resulting enforcement of the Canadian stay of proceedings, on September 25, 2009, the district court ordered that the action be stayed and administratively closed.

In August 2011, the parties to the action agreed to a Stipulation of Settlement, under which the settling defendants shall cause their underwriter, Chubb Insurance Company of Canada ("Chubb"), to pay $21.5 million into an escrow account on behalf of the defendants as full and final settlement of the action and in consideration for the releases, discharges, and claim withdrawals provided under the Stipulation of Settlement.  In a side agreement, NNC, NNL, NNI and Chubb stipulated that existing claims filed by Chubb in the Canadian Proceedings and in the Chapter 11 Cases shall be reduced and allowed as General Unsecured Claims upon Chubb's deposit of the final settlement payment.  The Stipulation of Settlement and the side agreement were subject to, among other things, approvals of the United States District Court for the Middle District of Tennessee, the Bankruptcy Court and the Canadian Court.  The Bankruptcy Court entered an order approving the Stipulation of Settlement on September 20, 2011.

### b.    The UK Pension Parties' Claims

On September 30, 2009, the Trustee of NNUK's Pension Plan (the "U.K. Pension Trustee") and the Board of Pension Protection Fund (the "PPF" and, together with the U.K. Pension Trustee, the "UK Pension Parties") jointly filed proofs of claim against the Debtors in the amount of $3.1 billion with respect to an alleged shortfall in the NNUK defined benefit pension plan. The Debtors filed an objection to these Claims and a motion for a more definite statement of claim on June 11, 2012.  The Bankruptcy Court granted the motion on July 11, 2012, and ordered the U.K. Pension Parties to file a more definite statement of their Claims on or before September 5, 2012 and provide supporting documentation.  On September 5, 2012, the U.K. Pension Parties filed amended proofs of claim against the Debtors seeking no less than $1.335 billion.  These Claims were settled as part of the U.S.-EMEA Claims Settlement Agreement, as discussed in Section III.D.6.a.v (*EMEA and UK Pension Claims Settlement*) above.

### c.    Securities Class Action Claim against Former CEO and CFO

On May 18, 2009, a complaint was filed in the United States District Court for the Southern District of New York alleging violations of federal securities law between the period of May 2, 2008 through September 17, 2008, against Mike Zafirovski (NNC's former President and Chief Executive Officer) and Pavi Binning (NNC's former Executive Vice President, Chief Financial Officer and Chief Restructuring Officer).  Although no Nortel Affiliate (including the Debtors) is a named defendant, this lawsuit has been stayed as a result of the Bankruptcy Court's order recognizing the Canadian Proceedings as foreign main proceedings under chapter 15 of the Bankruptcy Code, and the resulting enforcement of the Canadian stay of proceedings.  Messrs. Zafirovski and Binning have filed Claims in the Bankruptcy Court for indemnification and contribution for potential liability arising out of this matter in amounts to be determined.  On November 8, 2010, the United States District Court for the Southern District of New York ordered that the matter be placed on the suspense docket pending relevant developments in the Canadian Proceedings.  The Debtors reserve their right to raise all objections and defenses available to them.

### d.    Other Legal Proceedings

The Debtors also are defendants in various other suits, claims, proceedings and investigations that have arisen in the normal course of business.

### 4.    Insurance

Prior to the Initial Petition Date, the Debtors maintained numerous insurance policies from third-party insurance carriers providing coverage for claims relating to workers' compensation and automobile liability. These policies were and are still subject to various deductibles and per-occurrence and annual aggregate limits and are supported by various letters of credit issued by NNL.

The Debtors currently maintain director and officer insurance, fiduciary duty insurance (and excess fiduciary duty insurance), commercial general liability insurance and general criminal insurance.

### 5.    Environmental Matters

The Debtors' businesses have been subject to a wide range of continuously evolving environmental laws in various jurisdictions, including the United States. The Debtors have sought to operate their businesses in compliance with these changing laws. Existing and new laws may cause the Debtors to incur additional costs.

The Debtors are exposed to liabilities and compliance costs arising from their past generation, management and disposal of hazardous substances and wastes. Specifically, NNI has remedial activities under way at one site that its predecessor, Northern Telecom Electronics, Inc., previously operated. At another of its former U.S. sites, an agreement has been reached to settle the Debtors' remedial obligations through the claims resolution process.

Nortel also is listed as a potentially responsible party under the U.S. Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA", or "Superfund") at two Superfund sites in the United States. At both of the Superfund sites, Nortel is considered a de minimis potentially responsible party. A de minimis potentially responsible party is generally considered to have contributed less than 1% (depending on the circumstances) of the total hazardous substances at a Superfund site. At one additional Superfund site, an agreement has been reached to settle the Debtors' obligations through the claims resolution process. Liability under CERCLA may be imposed on a joint and several basis, without regard to the extent of Nortel's (or any individual Debtor's) involvement. In addition, the accuracy of Nortel's estimate of environmental remediation costs is affected by several uncertainties, such as additional requirements that may be identified in connection with remedial activities, the complexity and evolution of environmental laws and regulations, the identification of presently unknown contamination, the Debtors' volumetric share of hazardous substances and the financial viability of other potentially responsible parties. Consequently, the Debtors' liabilities under CERCLA could be greater than their current expectations.

An estimate of Nortel's anticipated remediation costs associated with all such sites, including its former site in the United States with identified remediation issues and the

three identified Superfund sites, to the extent probable and reasonably estimable, is estimated at less than $300,000. The Debtors may need to contribute to these remediation costs. Additional sites for which the Debtors have remediation liability may be identified in the future.

### 6.    Supply Chain Agreements

As previously discussed, the Debtors, the Canadian Debtors, certain EMEA Debtors and Flextronics entered into the Flextronics Amending Agreement that, among other things, provides a mechanism for the transfer of Nortel's supply relationship to purchasers of Nortel's other businesses or assets.

After the Initial Petition Date, the Debtors also periodically entered into agreements with other suppliers to address issues and concerns as they arose in order to ensure an ongoing supply of goods and services and minimize any disruption in their global supply chain. As of October 17, 2016, these agreements have all been terminated, fully performed or expired.

## G.    Description of Non-Debtor Subsidiaries of the Debtors

### 1.    Non-Debtor Subsidiaries Held by NNI

NNI has a number of directly held subsidiaries that no longer have active operations and that in many cases have little or no assets. The majority of these entities have been liquidated and dissolved according to the applicable procedures in each entity's jurisdiction.

#### a.    EMEA Region

In the EMEA region, Clarify Limited and Penril Datacomm Limited, both dormant U.K. entities, were struck off the U.K. company registry and were dissolved as of August 31, 2010. Bay Networks Redes de Dados para Sistemas Informaticos, Lda. registered for liquidation in October 2006 and was dissolved as of October 14, 2010.

Bay Networks Redes de Dados para Sistemas Informaticos, Lda. provided sales, technical and marketing support and other similar services in connection with the sale of computer networking hardware and software. Bay Networks Redes de Dados para Sistemas Informaticos, Lda. was liquidated in March 2012.

Nortel Networks (Shannon) Limited and Nortel Networks Europe Sales Limited were dissolved as of September 2013. Their immediate parent, Nortel Networks Technology Ltd., a Cayman company, was dissolved as of September 2013.

#### b.    Asia Region

Tasman Networks Private Limited was acquired in 2006 as part of the acquisition of Tasman Networks, Inc. and subsequently renamed Nortel Technology Excellence Centre Private Limited ("NTEC"). NTEC provided computer software and hardware and services including networking connectivity, systems engineering, product support, remote diagnostics, system integration, remote management and other related computer services for its only

customer, NNI.  NNI holds 99.01% of the NTEC's shares, while Nortel Networks Mauritius Ltd., which in turn is held by NNL, holds the remaining 0.99%.  NTEC is currently dormant and is proceeding toward liquidation.

Nortel Networks Japan (also known as Nortel Networks Kabushiki Kaisha) was a wholly owned subsidiary of NNI and was responsible for sales and marketing of Nortel telecommunications equipment in Japan.  Nortel Networks Japan dissolved in August 2014.

Nortel Networks Technology K.K. was a wholly owned subsidiary of NNI based in Japan that provided support sales and services.  The company was liquidated in the first quarter of 2012.

Nortel Networks Technology (Thailand) Limited ("NNTT") was a subsidiary of NNI that provided sales and service support in Thailand. NNI held 99.94% of NNTT's shares, while two wholly owned subsidiaries of NNI, Nortel Networks Technology Ltd. and Nortel Networks International Inc., held 0.05% and 0.01%, respectively.  NNTT was liquidated in May 2013.

Nortel Networks Southeast Asia Pte Ltd. was a wholly owned subsidiary of NNI based in Singapore that supported regional sales and service of Nortel's products and services. The company was dissolved in the second quarter of 2012.

Nortel Networks Eastern Mediterranean Ltd. was utilized to support Nortel sales and service in Israel and throughout the Middle East, and was dissolved in May 2013.

### c.    CALA Region

Bay Networks do Brasil Ltda. was engaged in the importing and exporting of Nortel computer products, as well as the rendering of support services to clients and distributors of the products manufactured or sold in Brazil and other Latin American countries.  The company was dissolved as of October 14, 2010.

### d.    Other

Nortel Ventures LLC was a special-purpose investment subsidiary with respect to NNI's former investment in certain offshore funds.  The sole member of Nortel Ventures LLC was NNI.  Nortel Ventures LLC was liquidated in September 2013.

### 2.    Non-Debtor Subsidiaries Held by Nortel AltSystems Inc.

### a.    Nortel AltSystems AB

Nortel AltSystems AB was a wholly owned subsidiary of Nortel AltSystems Inc. that was responsible for product development of Nortel's IntelligentEdge products.  The company was liquidated as of August 16, 2011.

### b.    Nortel Altsystems International Limited

Nortel AltSystems International Limited was a wholly owned subsidiary of Nortel AltSystems Inc. that provided Internet infrastructure equipment and manufactured and marketed web switches.  The company was struck off the Bermuda Registrar of Companies as of October 26, 2011.

### 3.    Non-Debtor Subsidiaries Held by Sonoma Systems

### a.    Sonoma Limited

Sonoma Limited was a wholly owned subsidiary of Sonoma Systems that was struck off the U.K. company register and dissolved as of August 31, 2010.

### b.    Sonoma Systems Europe Limited

Sonoma Systems Europe Limited was a wholly owned subsidiary of Sonoma Limited that was struck off the U.K. company register and dissolved as of September 28, 2010.

### 4.    Non-Debtor Subsidiaries Held by NNCALA

### a.    Nortel Networks de Guatemala, Ltda.

Nortel Networks de Guatemala, Ltda. is owned by NNCALA and NNL, which hold 98% and 2% ownership interests, respectively.  Nortel Networks de Guatemala, Ltda. sold telecommunications equipment and services.  The entity is currently dormant, and is proceeding toward liquidation.

### b.    Nortel Trinidad and Tobago Limited

Nortel Trinidad and Tobago Limited was a wholly owned subsidiary of NNCALA that supplied data and telephone networks solutions and services in Trinidad and Tobago.  Nortel Trinidad and Tobago Limited was liquidated in March 2014.

## H.    Allocation of Sale Proceeds and Global Settlement of Allocation Dispute

In connection with each of the major asset sales, each Nortel Affiliate party to the sales and certain other Nortel Affiliates, as depositors, entered into escrow agreements with JPMorgan as escrow agent to hold the proceeds from the sales in escrow, pending allocation, as contemplated by the relevant orders approving each sale.

The allocation of the sale proceeds (the "Allocation") proceeded in three general phases:  pre-trial negotiations, trial and post-trial settlement.

### 1.    Pre-Trial Negotiation

In 2009 and 2010, the Debtors, the Canadian Debtors, the Monitor, the EMEA Debtors, NNSA, the Joint Administrators, the Creditors' Committee, the Bondholder Group and certain other interested parties ("Mediation Parties") held discussions in an attempt to agree upon

an Allocation of the sale proceeds held in escrow and to reach resolution of all inter-estate matters in accordance with the terms of the IFSA. The Mediation Parties agreed that such discussions, as well as discussions related to the process for settling certain inter-estate claims, would be aided by the appointment of a neutral mediator. Confidential, non-binding mediation sessions were held in November 2010 and April 2011, with the oversight of Layn Phillips as Court-appointed mediator. The mediation sessions did not result in the resolution of the issues presented.

On April 25, 2011, the Debtors and the Creditors' Committee filed a joint motion for an order establishing an allocation protocol for the Allocation of the Sale Proceeds among various Nortel entities pursuant to the IFSA and for related relief. By the motion, the Debtors requested the Bankruptcy Court and the Canadian Court to establish procedures and an expedited schedule for the cross-border resolution by the Bankruptcy Court and the Canadian Court with respect to the Allocation (the "Allocation Trial"). This proposed allocation protocol was agreed to by the Canadian Debtors, the Monitor and the Canadian Creditors Committee ("CCC"), and the Canadian Debtors subsequently filed a motion for an order approving the protocol in the Canadian Court. On May 19, 2011, the Joint Administrators filed an (i) Objection to Joint Motion for Entry of an Order Establishing an Allocation Protocol Pursuant to the Interim Funding and Settlement Agreement and (ii) Cross-Motion to Compel Arbitration. The motion was heard at a joint hearing of the Bankruptcy Court and Canadian Court on June 7, 2011.

At the June 7, 2011 hearing, the Bankruptcy Court and the Canadian Court reserved decision on the motions and directed the Mediation Parties to participate in a joint mediation of the issues raised in the motions. On June 17, 2011, and as supplemented on June 29, 2011, the Bankruptcy Court and the Canadian Court appointed The Honorable Warren K. Winkler, Chief Justice of Ontario, as the mediator. The mediation was ordered because of both courts' concerns that the time required to prepare their decisions or the approval of an Allocation protocol would also delay allocation proceedings and, therefore, distributions to creditors of the various Nortel estates. This mediation likewise failed to resolve the issues presented, and the mediation process was terminated on January 24, 2013.

## 2.    The Allocation Trial and Appeals

The parties proceeded to trial following the dissolution of the mediation process. On March 8, 2013, the Bankruptcy Court and the Canadian Court granted the respective motions for establishment of an allocation protocol and denied the Joint Administrators' Cross-Motion to Compel Arbitration. The Bankruptcy Court then issued an order retaining jurisdiction over the proceedings, notwithstanding the Joint Administrators' appeal from denial of their cross-motion to compel arbitration, asking the Debtors to submit a revised allocation protocol and trial schedule on May 7, 2013. The allocation protocol, approved on May 17, 2013, "set forth binding procedures for determining the allocation of the Sale Proceeds"[19] and listed the "Core Parties" for the Allocation Trial: the Debtors, the Creditors' Committee, the Bondholder Group,

---

[19]    The allocation protocol also provided for the Bankruptcy Court and the Canadian Court to hold simultaneous hearings on the Joint Administrators' and UK Pension Parties' claims against the Debtors and Canadian Debtors. As a result of the EMEA Claims Settlement, described above, the claims against the Debtors were not heard during the Allocation Trial.

the Monitor, the Canadian Debtors, the CCC, the Joint Administrators, the EMEA Debtors (including NNSA), the UK Pension Parties, the NNC/NNL Notes Indenture Trustee, the NNCC Bonds Indenture Trustee and Wilmington Trust, indenture trustee for certain notes issued by NNL.[20]

Following extensive pretrial discovery, the Allocation Trial commenced on May 12, 2014, and the Core Parties presented evidence during nineteen non-consecutive trial days, concluding on June 24, 2014.  The Bankruptcy Court and the Canadian Court, connected by video link, heard testimony from (i) fact witnesses and (ii) expert witnesses, and received into evidence (iii) trial exhibits and (iv) deposition designations.  After post-trial briefing, closing arguments were heard on September 22 through September 24, 2014.

On May 12, 2015, the Bankruptcy Court and Canadian Court simultaneously issued opinions deciding the Allocation Trial ("Allocation Decisions").  The Allocation Decisions generally adopted an allocation methodology not advanced by any party at trial, described as "modified pro rata," under which each Nortel debtor's allocation of the sale proceeds would be based on the relative amount of some, but not all, claims against a given debtor as compared to the amount of claims against other debtors.  The Debtors, the Creditors' Committee, the Bondholder Group and certain other parties sought reconsideration and/or clarification of the Allocation Decisions before both the Bankruptcy Court and the Canadian Court, and those motions were largely denied and clarified on July 6, 2015 [D.I. 15830].

Numerous parties appealed the Bankruptcy Court's Allocation Decision to the United States District Court for the District of Delaware ("District Court").  The appellants included the Debtors, the Creditors' Committee, the Bondholder Group, the Bank of New York Mellon (as indenture trustee) and the Conflicts Administrator on behalf of NNSA.  The NTCC and the PBGC also filed appeal submissions. The Joint Administrators (on behalf of the EMEA Debtors other than NNSA), the CCC and the Canadian Debtors each filed conditional or contingent cross-appeals.  The UK Pension Parties and Wilmington Trust N.A. (solely in its capacity as successor indenture trustee and not in its individual capacity) are the only appellees who are not also contingent or conditional cross-appellants.

As part of the appeal process in the District Court, Magistrate Judge Mary Pat Thynge received submissions from and met with the appellants and appellees about whether further mediation would be productive.  The parties agreed to brief the appeals while simultaneously proceeding with mediation, led by retired Chief Judge of the District Court, Joseph J. Farnan.  Confidential, non-binding mediation sessions were held starting in October 2015.

Those mediation sessions did not produce a settlement, and on May 5, 2016, following full briefing and argument before the District Court, the District Court issued an oral order asking for letter briefs on whether the appeals of the Allocation Decisions should be certified directly to the Third Circuit.  The District Court entered an order on May 24, 2016 certifying all appeals and contingent-cross appeals to the United States Court of Appeals for the

---

[20]    These notes were issued by NNL on November 30, 1988 in the aggregate principal amount of $200 million, due in 2023 and bearing an interest rate of 6.875%.

Third Circuit ("Third Circuit").  On June 22, 2016, the appellees petitioned the Third Circuit to accept the appeal.  The Third Circuit granted the petitions for leave to appeal on August 9, 2016.

Concurrently with the appeal process in the United States, the Canadian Court's Allocation Decision has been contested in the Canadian courts.  On July 16, 2015, the Debtors, the Creditors' Committee, the Bondholder Group, the Bank of New York Mellon (as indenture trustee), the Conflicts Administrator on behalf of NNSA, and the NTCC filed notices of motion for leave to appeal the Allocation Decision to the Court of Appeal for Ontario.  Following coordinated briefing, the Court of Appeal for Ontario dismissed the motions for leave to appeal on May 3, 2016.  Between July 29 and August 1, 2016, the moving parties applied to the Supreme Court of Canada for leave to appeal the decision denying leave to appeal.  The parties agreed to extend the deadline for responses to that motion until November 30, 2016 to enable settlement discussions to continue.

During the pendency of the appellate process, the parties continued to engage in mediation discussions under the oversight of Judge Farnan as mediator.  Those discussions ultimately resulted in a proposed settlement of the Allocation Dispute and certain other matters among the parties, as memorialized in the SPSA filed with the Bankruptcy Court on October 12, 2016 [D.I. 17249], as summarized below.

In its appellate submission, the NTCC – which was not a party to the Allocation Trial – argued that the Allocation Decision constitutes a de facto substantive consolidation of the Nortel Debtors around the world, and that therefore allowing the Crossover Bonds Claims in full against the Debtors under a U.S. chapter 11 plan would give the Bondholders a disproportionate share of the value in the Debtors' estate.  The NTCC contends that (i) the Crossover Bonds Claims should not be given pari passu distributions under a Chapter 11 Plan; (ii) the allowance of the Crossover Bonds Claims under the PPI Settlement Order should be reconsidered, including under Bankruptcy Code Section 502(j); and (iii) in light of the de facto substantive consolidation attributable to the Allocation Decision, the Crossover Bonds Claims are not an allowable claim based on the Supreme Court's decision in Ivanhoe Bldg & Loan Ass'n v. Orr, 295 U.S. 243 (1935) or otherwise.  The Bondholder Group has argued in response that the Crossover Bonds Claims are not subject to challenge on appeal, or through a motion for reconsideration under Bankruptcy Code Section 502(j), because the Bankruptcy Court previously allowed those claims in full under the PPI Settlement Order, and no party, including the NTCC, filed an appeal of that aspect of the PPI Settlement Order.  The Bondholder Group has further argued that reducing or disallowing the Crossover Bonds Claims would directly conflict with the Supreme Court's decision in Ivanhoe, which held that a creditor holding a contractual guarantee claim may, in the event of the obligor's insolvency, assert the full amount of its claim against both the primary obligor and the guarantor.  Finally, the Bondholder Group has argued that the Allocation Decision did not order the global substantive consolidation of the Nortel Debtors, even though it shares many of the same characteristics as substantive consolidation, because it did not leave assets in a single comingled pool for all creditors to claim against.  The NTCC and PBGC are not parties to the SPSA and in filings with the Bankruptcy Court have indicated they do not  support the Plan or the SPSA and intend to object to the confirmation of the Plan. The NTCC  also has indicated its intention to continue to vigorously pursue its appeal of the Allocation  Decision, to challenge the treatment of Bondholder claims under the Plan and to seek to have the  Debtors escrow funds sufficient to pay the NTCC an enhanced recovery if the NTCC  successfully

litigated its pending appeal and such litigation were to result in higher recoveries to it under a plan of reorganization later approved by the Court. LSI has stated that to the extent such an escrow were granted it should be in an amount sufficient to pay all holders of unsecured claims such enhanced recoveries. The Debtors and all parties in interests reserve all rights with respect to any such request for an escrow.

The NTCC has informed the Debtors and the Court that it does not support either (a) the payment of up to $5.0 million in fees to the NNCC Bonds Trustee and counsel to Solus Alternative Asset Management LP and PointState Capital LP or (b) the reservation by NNI of $7.5 million from cash otherwise available for distributions to be paid in respect of the NNCC Bonds Claims in the event that distributions on account of such claims are less than $150,951,562 and the NTCC has requested additional disclosure why it is justified. The Debtors note that these terms, along with the various other terms of the SPSA, constitute part of an integrated settlement among the Debtors and the other parties to the SPSA, and the settlement in its totality, including all of its components, are in the best interests of the Debtors and their creditors.

### 3.    The Settlement and Plans Support Agreement

The SPSA memorializes a settlement intended to fully and finally resolve the allocation of the Sale Proceeds among the Nortel Affiliates, which dispute is currently the subject of the litigation before the Canadian Court and U.S. Court, as permitted under the IFSA and as part of an integrated settlement that also resolves certain other claims among the Nortel Affiliates. The parties to the SPSA include: (i) the Canadian Debtors; (ii) the Monitor; (iii) the Debtors; (iv) the EMEA Debtors; (v) the EMEA Non-Filed Entities;[21] (vi) the Joint Administrators; (vii) NNSA; (viii) the NNSA Conflicts Administrator; (ix) the French Liquidator; (x) the Bondholder Group; (xi) the members of the CCC; (xii) the Creditors' Committee; (xiii) the U.K. Pension Trustee; (xvi) the PPF; (xv) the Joint Liquidators and (xvi) the NNCC Bondholder Signatories (collectively, the "SPSA Parties," and each a "SPSA Party").

### a.    Allocation of the Sale Proceeds

The SPSA contains various settlement terms which are integrated and are subject to various terms and conditions. Among those integrated settlement terms, the SPSA Parties have agreed to allocate the Sale Proceeds as follows, subject to the additional terms of Section 2 (*Settlement of Allocation Dispute*) of the SPSA:

| Party | Percentage of Proceeds | US$ | Name |
|---|---|---|---|
| Debtors | 24.3500 | 1,766,417,002 | U.S. Allocation |
| Canadian Debtors | 57.1065 | 4,142,665,131 | Canadian Allocation |

---

[21]    Terms not defined herein shall have the meaning ascribed to them in the SPSA solely for this Section III.H.3 (*The Settlement and Plans Support Agreement*).

| EMEA (other than NNSA and NNUK Debtors) | 1.4859 | 107,788,879 | EMEA (Non-NNSA/Non-NNUK) Allocation[22] |
| NNUK | 14.0249 | 1,017,408,257 | NNUK Allocation |
| NNSA | N/A | 220,000,000 | NNSA Allocation[23] |

The U.S. Allocation is to be distributed among the Debtors in the amounts and proportions as set forth in Annex F (*U.S. Debtor Allocation Proportion*) to the SPSA reflected below (subject to the additional terms of Section 2 (*Settlement of Allocation Dispute*) of the SPSA).

| **U.S. Debtor** | **Allocation Amount** |
| --- | --- |
| Nortel Networks Inc. (inclusive of consolidated Nortel Networks Capital Corporation estate) | $1,716,346,052.00 |
| Nortel Networks (CALA) Inc. | $50,070,950.00 |
| Nortel Altsystems Inc. | $0.00 |
| Nortel Altsystems International Inc. | $0.00 |
| Xros, Inc. | $0.00 |
| Sonoma Systems | $0.00 |
| Qtera Corporation | $0.00 |
| CoreTek, Inc. | $0.00 |
| Nortel Networks Applications Management Solutions Inc. | $0.00 |
| Nortel Networks Optical Components Inc. | $0.00 |
| Nortel Networks HPOCS Inc. | $0.00 |
| Architel Systems (U.S.) Corporation | $0.00 |
| Nortel Networks International Inc. | $0.00 |
| Northern Telecom International Inc. | $0.00 |
| Nortel Networks Cable Solutions Inc. | $0.00 |
| | $1,766,417,002.00 |

---

[22]    Such allocation is to be distributed among the EMEA Debtors (other than NNUK) in the amounts and proportions set forth in Annex E (*EMEA Debtor Allocation Proportion*) to the SPSA.

[23]    Collectively, the EMEA (Non-NNSA/Non-NNUK) Allocation, the NNUK Allocation, and the NNSA Allocation is to be known as the "EMEA Allocation." The EMEA Allocation shall be 18.5435%, *provided*, *however*, within the EMEA Allocation, the NNSA Allocation is fixed at U.S.$220,000,000 and NNSA shall not share proportionally with any increase or decrease in the Sale Proceeds as the result of the matters contemplated in Section 2(d) (*Settlement for Allocation Dispute*) of the SPSA, and any such increase or decrease in the Sale Proceeds that would have been allocated to NNSA but for Section 2(c)(v) (*Settlement for Allocation Dispute*) of the SPSA shall be allocated to NNUK.

### b.    Settlement of Certain Claims

The SPSA provides, consistent with previous orders from the CCAA Court, that NNI's $2.0 billion U.S. Canadian Claim and NNI's $62.7 secured U.S. Canadian Priority Claim shall be unchanged and allowed against the Canadian Debtors and that the U.S.-Canadian Priority Claim shall retain its priority status granted by the CCAA Court in the order dated January 21, 2010.

In addition, the SPSA provides that in full and final resolution of any side letters between the Debtors and the Canadian Debtors, including the IFSA, CFSA and the T&T Claims,[24] the Consolidated Debtors shall receive a payment from the Canadian Estate of $77.5 million and the Consolidated Debtors shall have a 27% interest in the remaining assets of the Cascade Trust.  A list of released side letters is included in Annex C (*Canada-U.S. Side Letters*) of the SPSA.

The SPSA also provides that NNI will receive $2.8 million on account of the Iceberg Amendment Fee and $20 million on account of the M&A Cost Reimbursement from the Iceberg Escrow Account.  The SPSA also provides that the $2.0 billion U.S. Canadian Unsecured Claim shall be paid *pari passu* with all unsecured creditors holding claims against the Canadian Estate.

The SPSA also provides for various other settlements and the exchanges of certain releases among the SPSA Parties.  Additional details on these releases can be found in Section 8 (*Releases*) of the SPSA and Section 13.4 (*SPSA Releases*) of the Plan.

The SPSA includes certain terms regarding the substantive consolidation of certain Nortel affiliates and regarding the treatment of certain claims between the Nortel Affiliates. The SPSA provides that the Canadian Debtors shall be substantively consolidated and all unsecured creditors holding claims against the Canadian Debtors will be paid *pari passu*. Pursuant to the SPSA, claims against the Canadian Debtors that will be paid *pari passu* with other general Unsecured Claims against the Canadian Debtors include: the Debtors' U.S. $2.0 billion CFSA Claim,  the Crossover Bondholders' Proven Claims of U.S. $3,940,750,260 in the aggregate and the NNCC Bondholders' Proven Claim of U.S. $150,951,562.  In addition, the SPSA states that NNCC shall be substantively consolidated with NNI.  Further, the SPSA provides that the PBGC claim shall be allowed at a maximum of $708,000,000 against the Debtors.

The Crossover Bonds Claims (a) against NNL and NNC shall be allowed as unsecured Proven Claims against the Canadian Estate in the aggregate amount of $3,940,750,260 and (b) against NNI shall be allowed as a general unsecured claim in the aggregate amount of $3,934,521,442, as specified in Schedule A to the Agreement Settling The NNI Post-Petition Interest Dispute And Related Matters, dated July 24, 2014, as approved by the Bankruptcy Court

---

[24]    The T&T Claims refers to the claims made by Nortel Networks (CALA) Inc. in respect of customer receipts from Telecommunications Services of Trinidad and Tobago deposited into Nortel Networks International Corporation's bank account related to invoices issued to Telecommunications Services of Trinidad and Tobago by Nortel Networks (CALA) Inc.

by order dated December 18, 2014 [D.I. 14950]. The NNCC Bonds Claims (a) against NNI (into which NNCC shall be substantively consolidated on the Plans Effective Date) shall be allowed as a general unsecured claim in the amount of $150,951,562 and (b) against NNL shall be allowed as an unsecured Proven Claim against the Canadian Estate in the amount of $150,951,562, all as further set forth in the SPSA and the Plan.[25]

  The SPSA further provides for the resolution of certain Fee Claims regarding the payment of certain professional fees. Under the existing fee letter dated June 23, 2011 between various advisors to the Bondholder Group and NNC and NNL, the amount to be deducted from distributions to Crossover Bondholders and NNCC Bondholders in respect of their Proven Claims against the Canadian Estate shall be $47 million (which includes $3.0 million in respect of the deferred compensation fee payable to FTI Consulting). An additional $7,000,000 shall be deducted from Canadian Estate distributions to holders of Crossover Bonds Claims and NNCC Bonds Claims on account of their Proven Affected Unsecured Claims (as such term is defined in the Canadian Plan) against the Canadian Estate in further payment of the deferred compensation fee payable to FTI Capital Advisors, LLC if the Canadian Estate is so directed in writing by all of the Crossover Bondholders and NNCC Bondholders who are Participating Creditors under the Settlement and Support Agreement. All such deductions shall be borne by the Crossover Bondholders and NNCC Bondholders on a pro rata basis based on the amount of the Proven Affected Unsecured Claims of the Crossover Bondholders and the NNCC Bondholders. In addition, the Consolidated Debtors shall pay the reasonable and documented fees of (a) the NNCC Bonds Trustee, in an amount not to exceed $4.25 million, and (b) counsel to Solus Alternative Asset Management LP and PointState Capital LP, in an amount not to exceed $750,000.

### c.  Crossover Claims

  Provisions of the SPSA govern the treatment of claims arising out of a debt or other obligation of one or more of the Debtors that is guaranteed or indemnified by one or more of the Canadian Debtors, or a debt or other obligation of one or more of the Canadian Debtors that is guaranteed or indemnified by one or more of the Debtors ("Crossover Claim"). If a creditor holds a Proven Claim against the Canadian Estate and an allowed claim against a Debtor, the issuer (or primary) Global Debtor estate and any guarantor (or secondary) Global Debtor estate shall pay distributions on the full amount of the allowed claim or the full amount of the Proven Claim, as applicable, on a *pari passu* basis with all other creditors holding allowed claims (in the case of the Debtors) or Proven Claims (in the case of the Canadian Debtors) with the same priority without discrimination of any kind. In no case shall a creditor holding a Crossover Claim be entitled to receive (i) any further distributions from the Debtors where the aggregate distributions made by the Debtors and the Canadian Estate in respect of such Crossover Claim equal the total allowed amount of such Crossover Claim against the Debtors or (ii) any further distributions from the Canadian Estate where the aggregate distributions made by the Debtors and the Canadian Estate in respect of such Crossover Claim equal the total Proven Claim amount of such Crossover Claim against the Canadian Estate. For the avoidance of doubt,

---

[25]  NNI also agrees to reserve $7.5 million from cash otherwise available for distributions to NNI unsecured creditors, to be made available to be paid in respect of the NNCC Bonds Claims in the event that distributions (including deemed distributions related to the Crossover Bondholder Fee Letter) in respect of the NNCC Bonds Claims will be less than $150,951,562.

in no event shall a holder of a Crossover Claim be entitled to receive aggregated distributions in respect of its allowed Crossover Claim of more than 100% of the greater of (i) its pre-filing allowed claim (U.S.) and (ii) Proven Claim (Canada) when taking into account distributions received from both the issuer (or primary) estate and guarantor (or secondary) estate (the "Creditor's Maximum"). Any amounts paid pursuant to Section 4(m) (*NNCC Fees*) of the SPSA shall not be included in calculating the Creditor's Maximum as it pertains to the NNCC Bonds.

### d.    Cooperation

The Debtors shall cooperate with the other Nortel estates in the implementation of the SPSA in accordance with the cooperation provisions therein in furtherance of the execution and implementation of the SPSA.  With respect to Crossover Claims, the issuer Global Debtor estate and the guarantor Global Debtor estate shall reasonably cooperate to give effect to the provisions of Section 4(c) (*Coordination of Crossover Claims (Issuer Pays First)*) of the SPSA, including sharing information regarding the Crossover Claims and intended and actual distributions thereon.

### e.    Right to Subrogation

In the event that a creditor holds a Crossover Claim and has received an aggregate amount of distributions on account of such Crossover Claim equal to the Creditor's Maximum, then the guarantor (or secondary) Debtor or Canadian Debtor estate, as applicable, shall be immediately subrogated into the Crossover Claim against the issuer (or primary) Debtor estate (for the NNCC Bonds, the issuer Debtor estate is NNCC before the Plans Effective Date, but will be deemed to be NNI on and after the Plans Effective Date) and will be entitled to receive any and all subsequent distributions from the issuer (or primary) Debtor estate or Canadian Debtor estate on account of such Crossover Claims on a *pari passu* basis with all other holders of Allowed Claims or Proven Claims (Canada) with the same priority from the issuer (or primary) Debtor estate or Canadian Debtor estate without discrimination of any kind, *provided* that (i) the guarantor (or secondary) Debtor estate or Canadian Debtor estate (as applicable) shall not receive any distributions on such claim in excess of payments the guarantor (or secondary) Debtor estate or Canadian Debtor estate (as applicable) has made to the underlying holder of such Crossover Claim and (ii) in the case of the Crossover Bonds Claims, NNI shall receive distributions from the Canadian Estate as a result of such subrogation for distributions NNI has made on the Allowed Crossover Bonds Claims only to the extent that NNI makes distributions in respect of the Allowed Crossover Bonds Claims in excess of U.S.$1.25 billion and such subrogation shall be only in respect of amounts distributed in excess of U.S.$1.25 billion, it being understood that NNI's right of subrogation pursuant to Section 7.10 (*Right to Subrogation*) of the Plan and Section 4(c)(i)(C) (*Coordination of Crossover Claims (Issuer Pays First)*) of the SPSA, if any, against the Canadian Estate in respect of the Crossover Bonds Claims remains subject to distributions equal to the Creditor's Maximum first being received by holders of the Crossover Bonds Claims on account of such claims.  For the avoidance of doubt, notwithstanding Section 10.12 (*Setoffs and Recoupment*) of the Plan, the subrogation rights of the Canadian Debtors pursuant to Section 7.10 (*Right to Subrogation*) of the Plan shall not be subject to setoff.

No right of subrogation or indemnity (however described) will arise in favor of any Debtor against any EMEA Debtor, NNSA or any EMEA Non-Filed Entity in respect of any amount paid by any Debtor pursuant to any guarantee or indemnity in respect of a liability of any EMEA Debtor, NNSA or EMEA Non-Filed Entity, and no Debtor shall pursue or file any such claims or assert any right of subrogation against any EMEA Debtor, NNSA or EMEA Non-Filed Entity.

The authorized representatives of the issuer Debtor estate and the guarantor Debtor estates (including any authorized representative of such estates) shall reasonably cooperate to give effect to the provisions of Section 4(c) (*Coordination of Crossover Claims (Issuer Pays First)*) of the SPSA, including sharing information regarding the Crossover Claims and intended and actual distributions thereon.

### f.    No Double Recovery

Section 7.11 (*No Double-Recovery*) of the Plan provides that in no circumstance shall a Creditor receive aggregate distributions from a Debtor or Wind-Down Debtor and any other Nortel entity on account of an Allowed Claim in excess of 100% of the amount of such Allowed Claim. In order to be eligible for any distribution under the Plan, a Creditor who holds an Allowed Claim against a Debtor or Wind-Down Debtor  (other than a Crossover Bonds Claim or NNCC Bonds Claim) and a related claim against any other Nortel entity, including a Crossover Claim  (an "Other Nortel Claim"), shall, upon the written request of the Debtor or Wind-Down Debtor (which may be made from time to time), provide such information to the Debtor or Wind-Down Debtor as it may reasonably request in respect of the Other Nortel Claim, including the amount in which the Other Nortel Claim has been allowed, the amount of distributions received or expected to be received on account of such Other Nortel Claim and any and all supporting documentation relating to the foregoing. Subject to further Order of the Bankruptcy Court, the Debtor or Wind-Down Debtor is authorized to delay and/or withhold distributions to Creditors holding Other Nortel Claims pending receipt of documentation acceptable to the Debtor or Wind-Down Debtor, acting reasonably, to allow it to confirm that a Creditor has not and will not receive amounts on account of its Allowed Claim in excess of 100% of the amount of such Allowed  Claim.

### g.    Post-Petition Date Interest.

No post-Petition Date interest (or make-whole premium, no-call payment or similar claim accruing post-Petition Date) shall be included in any Allowed Claim, nor be paid on Allowed Claims by any Debtor.

### h.    Currency Conversion

The SPSA obligates the Debtors to seek authorization from the Bankruptcy Court to enter into the Canadian Escrow Agreement which allows for the conversion of up to $1.2 billion of the Post-Petition Sales Proceeds into Canadian Dollars to be held in escrow by Royal Trust. On October 21, 2016, the Debtors obtained an order from the Bankruptcy Court authorizing such conversion [D.I. 17296], and the Debtors have entered into the Canadian Escrow Agreement and the Monitor has elected to convert $1.06 billion, without waiving its right to convert up to a total amount of $1.2 billion, of the Post-Petition Sales proceeds into

Canadian Dollars.  The conversion of $1.06 billion was completed in two tranches on October 27, 2016 and November 3, 2016 by Court Order [D.I. 17289].  On October 19, 2016, the Canadian Debtors obtained a similar order from the CCAA Court.  The SPSA further provides that, if requested by an EMEA Debtor or NNSA, the Debtors will support the conversion of currency up to the amount specified for that EMEA Debtor or NNSA in Annex E (*EMEA Debtor Allocation Proportion*) to the SPSA. Should the SPSA terminate, the Debtors are not liable for any fees associated with currency conversion, nor are they liable for any foreign exchange loss incurred as a result of such currency conversion.

### i.    Dismissal of Certain Pending Litigation

As set forth in additional detail in Section 5 (*Litigation Resolution*) of the SPSA, the SPSA Parties have agreed that promptly following the Plans Effective Date, the SPSA Parties shall each dismiss with prejudice certain pending litigation, including all appeals related to the Allocation Decision.

### j.    Certain SPSA Conditions

The SPSA is also conditioned upon various conditions and deadlines, including: entry of an order or orders by no later than November 4, 2016 by the U.K. Court that the Joint Administrators be at liberty to perform and procure the relevant EMEA Debtor in respect of which they are appointed to perform their respective obligations under the SPSA; entry of an order or orders by no later than November 4, 2016 by the U.K. Court that the NNSA Conflicts Administrator and NNSA (in the French Main Proceeding) be at liberty to perform their obligations under the SPSA; entry of an order or orders by no later than November 4, 2016 by the French Court approving and authorizing the entry into the SPSA by NNSA (in the French Secondary Proceeding) and authorizing NNSA to perform its obligations under the SPSA; entry of an order or orders by no later than November 4, 2016 by the Beddoes Court authorizing the U.K. Pension Trustee to implement the SPSA and perform its obligations under the SPSA; the issuance of a Sanction Order by the CCAA Court by no later than February 17, 2017; the Debtors' Plans having been confirmed by February 17, 2017; and appropriate notices and other documents dismissing with prejudice the various litigation between the Nortel Affiliates and the Debtors' Plans and Canadian Plans having become effective by August 31, 2017.  The SPSA also requires entry of a Currency Conversion Order, which was obtained from the Bankruptcy Court on October 21, 2016 [D.I. 17296] and from the CCAA Court on October 19, 2016.

In the event the aforementioned conditions to effectiveness, including confirmation of a Plan for each Debtor and sanction of a CCAA plan of compromise or arrangement, do not occur, each of the SPSA Parties has agreed to reserve all rights related to the Allocation Dispute.  The Debtors expect that a failure to effectuate the SPSA and a resumption of litigation between certain of the SPSA Parties regarding the Allocation Dispute would result in significant additional costs to the Debtors' estates and further delays in the Debtors' ability to make distributions to their creditors.  Moreover, the claims and disputes resolved by the SPSA are legally and factually complex, and there is no certainty that the Debtors could obtain an ultimate determination of such matters that would result in distributions for their creditors equal to or greater than those contemplated under the SPSA, should the SPSA fail to be effectuated. Accordingly, the Debtors have concluded that it is in the best interests of the Debtors and their

creditors to settle the Allocation Dispute on the terms and conditions provided for under the SPSA.

### k.        Benefit of the SPSA to Creditors

The various terms of the SPSA, including the allocation of the Sale Proceeds both between the Canadian Debtors, the EMEA Debtors, NNSA and the Debtors, and among the Debtors; the Allowance of certain intercompany claims and other Claims against the Debtors; the Substantive Consolidation of NNI and NNCC, the consolidation of the Canadian Debtors, and the non-consolidation of the other Debtors; the provisions regarding Crossover Claims and the *pari passu* treatment of creditors; and the other terms contained therein constitute an integrated settlement among the Debtors, their worldwide affiliates and the other creditors that are signatories to the SPSA.  Certain creditors and groups, including the PBGC and NTCC, have indicated their intention to object to the confirmation of the Plan including based on provisions of the Plan that incorporate the SPSA terms.  However, the Debtors believe that the SPSA settlement is beneficial to the Debtors and their creditors and the Plan is in the best interests of the Debtors' creditors because, among other reasons: (1) absent a settlement the Debtors would be required to continue litigation of the Allocation Dispute and there is no assurance that a better outcome could be obtained for the Debtors in light of the Court's decision and the current status of the U.S. and Canadian appeals; (2) if the Allocation Decision is affirmed on appeal, it is expected that further litigation would be necessary to determine the Debtors' ultimate allocation of Sale Proceeds and based on the current ruling, and the expected costs to continued litigation, it is expected that the final allocation to the Debtors under such a scenario would provide the Debtors with less Sale Proceeds than is contemplated under the SPSA and Plan, (3) in the absence of the SPSA settlement, the Debtors would be forced to resume and commence further time-consuming and costly litigation regarding the resolution of numerous other intercompany claims settled by the SPSA, without any guarantee of success and with an increased likelihood that the amounts available for recovery by creditors of all Debtors would be reduced, as well as potential litigation regarding the terms of the Canadian Debtors' CCAA plan and a chapter 11 plan for each of the Debtors, (4) the Debtors would continue to incur significant administrative and professional costs during the pendency of their cases, which would reduce the amount available for recovery by Creditors, and (5) such further litigation and disputes would result in additional delays in the Debtors' ability to make distributions to their creditors.  The SPSA and the Plan reduce or eliminate significant uncertainties regarding the Debtors' respective assets, claims and the expected recoveries for their creditors, and avoid the incurrence of the substantial costs that otherwise likely would be required to resolve these issues.

# IV.
# CHAPTER 11 PLAN

As noted above, the fundamental purpose of a chapter 11 case is to formulate a plan to restructure a debtor's finances so as to maximize recoveries to its creditors. Accordingly, a chapter 11 plan sets forth and governs the treatment and rights to be afforded to creditors and interestholders with respect to their claims against and equity interests in the debtor's bankruptcy estate.

THE FOLLOWING IS A BRIEF SUMMARY OF CERTAIN OF THE MORE SIGNIFICANT MATTERS CONTEMPLATED BY OR IN CONNECTION WITH THE CONFIRMATION OF THE PLAN. THUS, THE FOLLOWING SUMMARY IS QUALIFIED IN ITS ENTIRETY BY THE PLAN, WHICH IS INCLUDED IN THIS DISCLOSURE STATEMENT AS APPENDIX A (*FIRST AMENDED JOINT CHAPTER 11 PLAN OF THE DEBTORS*), AND THE PLAN SUPPLEMENT. THIS SUMMARY ONLY HIGHLIGHTS CERTAIN SUBSTANTIVE PROVISIONS OF THE PLAN. CONSIDERATION OF THIS SUMMARY WILL NOT, NOR IS IT INTENDED TO, YIELD A THOROUGH UNDERSTANDING OF THE PLAN WITHOUT A CONCOMMITANT FULL AND COMPLETE READING OF THE PLAN. ALL HOLDERS OF CLAIMS AND INTERESTS ARE URGED TO REVIEW THE PLAN CAREFULLY AND, IF NECESSARY, TO CONSULT WITH COUNSEL. THE PLAN, IF CONFIRMED, WILL BE BINDING ON EACH OF THE DEBTORS AND ALL HOLDERS OF CLAIMS AND INTERESTS.

## A.    Summary of the Plan

The overriding purpose of the Plan is to enable the expeditious distribution of the Sale Proceeds and other assets of each Debtor to holders of Allowed Claims of such Debtor, to maximize the ability of each Wind-Down Debtor to monetize any residual assets it may hold after the Effective Date and to administer its remaining assets and obligations.

The Bankruptcy Code requires that, for purposes of treatment and voting, a chapter 11 plan divide the different claims against, and equity interests in, the debtor into separate classes based upon their legal nature. Claims of a substantially similar legal nature are usually classified together, as are equity interests of a substantially similar legal nature.

Under a chapter 11 plan of reorganization, the separate classes of claims and equity interests must be designated either as "impaired" (affected by the plan) or "unimpaired" (unaffected by the plan). If a class of claims is "impaired," the Bankruptcy Code affords certain rights to the holders of such claims, such as the right to vote on the plan, and the right to receive, under the chapter 11 plan, no less value than the holder would receive if the debtor were liquidated in a case under chapter 7 of the Bankruptcy Code. Under section 1124 of the Bankruptcy Code, a class of claims or interests is "impaired" unless the plan (i) does not alter the legal, equitable and contractual rights of the holders or (ii) irrespective of the holders' acceleration rights, cures all defaults (other than those arising from the debtor's insolvency, the commencement of the case or nonperformance of a non-monetary obligation), reinstates the maturity of the claims or interests in the class, compensates the holders for actual damages incurred as a result of their reasonable reliance upon any acceleration rights and does not

otherwise alter their legal, equitable and contractual rights. Typically, this means that the holder of an unimpaired claim will receive its distribution on the later of the consummation date or the date on which amounts owing are actually due and payable. Thus, other than its right to accelerate the debtor's obligations, the holder of an unimpaired claim will be placed in the position it would have been in had the debtor's case not been commenced.

The Debtors believe that the Plan represents a fair economic solution for all of the Debtors' Creditors and Interestholders, will expedite the administration of the Chapter 11 Cases and will maximize and accelerate recoveries to holders of Allowed Claims, particularly compared to the alternative recoveries that a failure to confirm the Plan would provide.

The Plan recognizes the corporate integrity of each Debtor and, therefore, Allowed Claims against a particular Debtor will be satisfied only from the assets of that Debtor's bankruptcy estate (with the exception of Allowed Claims against NNCC, which will be satisfied out of the estate of the Consolidated Debtors in accordance with the substantive consolidation of NNI and NNCC pursuant to Section 6.2 (*Substantive Consolidation of NNI and NNCC*) of the Plan). The distributions to Creditors and Interestholders of each Debtor, as well as other aspects of the Plan, apply separately to each of the Debtors. A Creditor or Interestholder of any particular Debtor, by virtue of its Claims against or Interests in that Debtor, has no direct claim against or interest in any other Debtor and has no direct claim against or interest in any other Affiliate of that Debtor.

As described in greater detail below, the Plan contemplates payment of all Allowed Administrative Expense Claims against each Debtor in full in Cash, inclusive of Allowed Claims against each Debtor arising under section 503(b) of the Bankruptcy Code and Allowed Priority Tax Claims against each Debtor (subject to permitted installment payments for certain Allowed Priority Tax Claims).

The Plan also provides for the treatment of Allowed Claims against and Interests in each Debtor as follows: (i) with respect to each holder of an Allowed Secured Claim against a Debtor, at the option of such Debtor, (a) payment in full in Cash, (b) the disposition proceeds of the Collateral securing such Claim to the extent of such Claim, (c) surrender of the Collateral securing such Claim to the holder of such Claim or (d) other treatment that leaves the holder of such Claim's legal, equitable and contractual rights unaltered, or such other treatment to which the parties may agree; (ii) with respect to each holder of an Allowed General Unsecured Claim against a Debtor, its Pro Rata Share of the Creditor Proceeds of such Debtor; and (iii) with respect to any Allowed Subordinated Claim against, Interest in or Interest Securities Fraud Claim against any Debtor, no anticipated distribution, except with respect to each Interestholder of NNCALA, NNCC, Nortel Altsystems International Inc., Qtera Corporation, Nortel Networks HPOCS Inc., Nortel Networks International Inc., Nortel Telecom International Inc. and Nortel Networks Cable Solutions Inc., which shall receive its Pro Rata Share of limited liability interests in the relevant Wind-Down Debtor.

In addition, the Plan provides for the appointment of a Plan Administrator, who shall have the authority to carry out and implement the provisions of the Plan with respect to and on behalf of the Debtors and the Wind-Down Debtors, in accordance with the provisions of the Plan Administration Agreement.

The Plan also provides that NNI (before the Effective Date) or the Plan Administrator (on and following the Effective Date) shall have the authority to make (before the Effective Date) or to authorize the Consolidated Debtors to make (on and following the Effective Date) certain de minimis transfers of assets to other Debtors for the purpose of aiding such Debtor or Debtors' ability to make distributions to its creditors in accordance with the confirmation or implementation of such Debtor's Plan and the SPSA.

Under the provisions of the Plan, the Wind-Down Debtors will distribute Sale Proceeds in accordance with the Plan, continuing to resolve each Debtor's wind-down obligations, and fulfilling their other obligations under the Plan. Upon completion of such obligations, each Wind-Down Debtor may be dissolved by the Plan Administrator without further corporate action, subject to appropriate governmental filings.

The Plan shall serve as a motion by the Debtors seeking an order pursuant to sections 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019 approving the SPSA and authorizing the Debtors to perform their obligations under the SPSA. In the event of an inconsistency between the Plan and the SPSA, the SPSA shall govern.

Confirmation of the Plan and entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the settlement needed among the Global Debtors with respect to the SPSA and that approval of the settlement is in good faith and in the best interests of the Debtors, their Estates and the Debtors' creditors.

Statements in this Disclosure Statement as to the rationale underlying the treatment of Claims and Interests under the Plan are not intended to, and shall not, waive, compromise or limit any rights, claims or causes of action in the event the Plan is not confirmed.

## B.    Substantive Consolidation of NNI and NNCC

The substantive consolidation of NNI and NNCC is a significant component of the SPSA and is therefore also a key component of the global resolution of the insolvency proceedings of the Debtors and the Debtors' affiliates. Accordingly, the Plan shall serve as a motion by NNI and NNCC seeking entry of an order pursuant to sections 105(a), 363(b) and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 substantively consolidating the NNI and NNCC Estates into a single consolidated estate for all purposes associated with Confirmation and Consummation. The tabulation of votes to accept or reject the Plan with respect to NNI and NNCC shall be counted on a consolidated basis.

Entry of the Confirmation Order shall constitute the approval, pursuant to sections 105(a), 541, 1123 and 1129 of the Bankruptcy Code, effective as of the Effective Date, of the Consolidation of the Consolidated Debtors (NNI and NNCC) for all purposes. On and after the Effective Date, (i) all assets and liabilities of the Consolidated Debtors shall be pooled and shall be vested in Wind-Down NNI; (ii) all of the Intercompany Claims between the Consolidated Debtors shall be disallowed and expunged and no Distributions shall be made on account of such Intercompany Claims; (iii) all guarantees of either of the Consolidated Debtors of the obligations of the other Consolidated Debtor shall be eliminated so that any Claim against either Consolidated Debtor and any guarantee thereof executed by the other Consolidated Debtor, and

any joint or several liability of either of the Consolidated Debtors, shall be one obligation of NNI following the Consolidation of the Consolidated Debtors; (iv) for purposes of determining the availability of the right of set off under section 553 of the Bankruptcy Code, the Consolidated Debtors shall be treated as one entity so that, subject to the other provisions of section 553 of the Bankruptcy Code, debts due to either NNI or NNCC may be set off against the debts of the other and (v) each and every Claim Filed or to be Filed in the case of either NNI or NNCC shall be deemed Filed against the Consolidated Debtors.

The Consolidation of the Consolidated Debtors (other than as expressly set forth in the Plan) shall not affect: (i) the legal and corporate structures of either of the Consolidated Debtors; (ii) pre- and post-Effective Date guarantees, liens and security interests that are required to be maintained, if any; (iii) distributions from any insurance policies or proceeds of such policies; and (iv) vesting of the Estate Assets in the Wind-Down Debtors.  If the Bankruptcy Court does not approve the Consolidation, then the Debtors reserve all of their rights to amend, modify or revoke the Plan in accordance with Section 15.4 (*Amendment or Modification of the Plan*) of the Plan.

The Debtors believe that the substantive consolidation of NNI and NNCC, an integrated provision of the SPSA, is in the best interests of NNI and NNCC and their creditors. Notably, prior to the Petition Date, NNCC was a wholly owned subsidiary of NNI formed solely for the purpose of raising financing for Nortel.  The officers and directors of NNCC substantially overlapped with those of NNI and NNCC never had its own employees or its own separate operations other than its role as a source of financing through its issuance of the NNCC Bonds and NNCC 2006 Notes.  NNCC also did not have its own assets, other than its right to receive payments from NNI.  Moreover, prior to the Petition Date, NNI and NNCC (and other subsidiaries) also were accounted for in NNC's financial statements as "consolidated subsidiaries."  Accordingly, as the Debtors will demonstrate at the Confirmation Hearing, for these and other reasons, the substantive consolidation of NNI and NNCC is appropriate under applicable law and in the best interests of their creditors.

Notwithstanding the Consolidation provided for herein, U.S. Trustee Fees payable pursuant to section 1930 of title 28 of the United States Code shall continue to accrue for each and every Debtor until a particular Debtor's case is closed, dismissed or converted to a case under Chapter 7 of the Bankruptcy Code.

## C.    Treatment of Unclassified Claims

### 1.    Administrative Expense Claims

Administrative Expense Claims are Claims constituting a cost or expense of administration (including Professional Claims) of the Chapter 11 Cases allowed under sections 503(b), 507(a)(2) or 507(b) of the Bankruptcy Code up to and including the Effective Date.  Such Claims include (i) all actual and necessary costs and expenses of preserving the estates of the Debtors or operating the business of the debtors in possession arising on or after the Petition Date; (ii) any payments made under the Plan to cure a default under an executory contract or unexpired lease assumed by the Debtors; and (iii) all compensation or reimbursement of expenses of Professionals arising on or after the Petition Date unless the holder of an

Administrative Expense Claim and the relevant Debtor agree to different treatment, in each case to the extent allowed by the Bankruptcy Court under the Bankruptcy Code.  Any fees or charges assessed against the Debtors' estates under section 1930 of chapter 123 of title 28 of the United States Code also are included in the definition of Administrative Expense Claim.

Allowed Administrative Expense Claims will be paid in full, on the later of the Effective Date and the date the Administrative Expense Claim becomes an Allowed Claim, or as soon thereafter as is practicable by the Debtor obligated for the payment of such Administrative Expense Claim, in (a) Cash or (b) such other treatment as to which the applicable Debtor and the holder of such Allowed Administrative Expense Claim have agreed upon in writing, which, prior to the Effective Date, shall be subject to consent of the Creditors' Committee and Bondholder Group, acting reasonably.  Administrative Expenses Claims with respect to liabilities arising under a written agreement incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases will be paid in the ordinary course.

## 2.   Professional Claims

Professional Claims are Administrative Expense Claims for the compensation of Professionals and reimbursement of expenses incurred by such professionals pursuant to sections 105(a), 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code.

Pursuant to the Plan, other than a Professional retained by the Debtors pursuant to the Ordinary Course Professional Order, each holder of a Professional Claim shall file its final application for the allowance of compensation for services rendered and reimbursement of expenses incurred by no later than the first Business Day that is sixty (60) days after the Effective Date or such other date as may be fixed by the Bankruptcy Court and be paid by or on behalf of such Debtor (a) in full and in Cash in the amounts Allowed upon the date the order granting such award becomes a Final Order, or as soon thereafter as practicable, or (b) upon such other terms as may be mutually agreed upon by the claimant and such Debtor obligated for the payment for such Allowed Claim.

Except as otherwise specifically provided in the Plan, on and after the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code or the Interim Compensation Order in seeking retention or compensation for services rendered after such date shall terminate, and, subject to the terms of the Plan Administration Agreement, the Plan Administrator and any Wind-Down Debtor may employ and pay any Professional for services rendered or expenses incurred after the Effective Date in the ordinary course to facilitate the wind down of the Wind-Down Debtors and effectuate the Plan without any further notice to any party or action, order or approval of the Bankruptcy Court.

## 3.   Priority Tax Claims

Priority Tax Claims are any Claims entitled to priority pursuant to sections 502(i) and 507(a)(8) of the Bankruptcy Code.

Pursuant to the Plan, at the option of each Debtor, the holder of an Allowed Priority Tax Claim will be entitled to receive, in full satisfaction, settlement and release of and in exchange for such Allowed Priority Tax Claim:

a.      cash in an amount equal to such Allowed Priority Tax Claim on the later of the Effective Date and the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, or as soon thereafter as practicable;

b.      treatment in accordance with section 1129(a)(9)(C) of the Bankruptcy Code; or

c.      such other treatment as to which the applicable Debtor and the holder of such Allowed Priority Tax Claim have agreed upon in writing, which other treatment, prior to the Effective Date, shall be subject to the consent of the Creditors' Committee and Bondholder Group, acting reasonably.

On the Effective Date, the Liens (if any) securing any Priority Tax Claims shall be deemed released, terminated and extinguished, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person.

Because certain taxes carry joint and/or several liability, taxing authorities may file duplicative Priority Tax Claims against multiple Debtors.  However, because the taxing authorities do not collect more than once for a particular joint and/or several tax liability, the amount of any actual payments in respect of duplicative Allowed Priority Tax Claims would be less than the aggregate total of such duplicative claims.

The amount of Allowed Priority Tax Claims depends in part on the resolution of net and gross income tax timing and other issues related to the receipt and payment by the Debtors of amounts in respect of the Sale Proceeds and Allocation Dispute, and other related issues.  Additionally, the Debtors are currently engaged in dispute resolution processes with respect to their state and local disputed tax issues. Because the parties have not yet completed the dispute resolution processes, it is difficult at this stage to predict precisely the expected amount of Allowed Priority Tax Claims.

## D.      Treatment of Classified Claims and Interests

The Plan places all Claims and Interests with respect to each Debtor, except Administrative Expense Claims, Priority Tax Claims and Professional Fee Claims, in the classes listed below for all purposes including voting, Confirmation and Distributions under the Plan and pursuant to sections 1122 and 1123(A)(1) of the Bankruptcy Code.  A Claim or Interest is placed in a particular Class only to the extent that it falls within the description of that Class, and is classified in any other Class to the extent that any portion thereof falls within the description of such other Class.  A Claim is also classified in a particular Class for the purpose of receiving Distributions under the Plan only to the extent that such Claim is an Allowed Claim in that Class and has not been paid, released or otherwise satisfied prior to the Effective Date.

Unless otherwise specified below, a holder of Claims against or Interests in a Debtor in each Class will receive its Pro Rata Share of Creditor Proceeds from the Debtor against which it holds an Allowed Claim. For further detail regarding the classification and treatment of the Claims and Interests, see the Plan included in this Disclosure Statement as <u>Appendix A</u> (*First Amended Joint Chapter 11 Plan of the Debtors*).

1.      **Class 1 — Priority Non-Tax Claims**

Class 1 Claims consist of all Allowed Priority Non-Tax Claims against a Debtor, including any Claim against such Debtor, other than an Administrative Expense Claim or a Priority Tax Claim, entitled to priority of payment under section 507(a) of the Bankruptcy Code.

Each holder of Allowed Priority Non-Tax Claims against a Debtor will be entitled to be paid by the applicable Debtor in Cash in the full amount of the holder's Allowed Claim under the Plan.

2.      **Class 2 — Secured Claims**

Class 2 Claims consist of all Allowed Secured Claims, if any, against a Debtor, including any Claim (a) reflected as a Secured Claim either in the Schedules or upon a proof of claim as a Secured Claim or (b) that is subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

Unless the holder of a Allowed Secured Claim agrees to different treatment, each Holder of an Allowed Secured Claim against a Debtor will be entitled to receive, at the option of such Debtor, a Distribution of (i) payment in Cash by that Debtor in an amount equal to the Allowed amount of such Secured Claim on the later of the Effective Date and the date on which such Secured Claim becomes an Allowed Secured Claim; (ii) payment of the sale or disposition proceeds of the Collateral securing such Allowed Secured Claim to the extent of the value of the Collateral securing such Allowed Secured Claim; (iii) delivery of the Collateral securing such Allowed Secured Claim to the holder of such Allowed Secured Claim; or (iv) such treatment that leaves unaltered the legal, equitable and contractual rights to which the holder of the Allowed Secured Claim is entitled. In the event an Allowed Secured Claim is treated under clause (i) through (iii) above, the Liens securing such Claim shall be deemed released and extinguished without further order of the Bankruptcy Court.

3.      **Class 3A — General Unsecured Claims and NNCC Bonds Claims**

Class 3A Claims consist of all Allowed General Unsecured Claims against a Debtor, including the NNCC Bonds Claims and any Unsecured Claim against such Debtor other than Crossover Bonds Claims, EDC Claims, Convenience Claims, Subordinated Claims and Interests Securities Fraud Claims.

Each holder of an Allowed General Unsecured Claim against a Debtor will receive its Pro Rata Share of Creditor Proceeds from such Debtor on the Initial Distribution Date or the first Interim Distribution Date after the date such Claim becomes Allowed.

4.      **Class 3B — Crossover Bonds Claims and EDC Claims**

Class 3B Claims consist of all Allowed Crossover Bonds Claims and Allowed EDC Claims against the Consolidated Debtors.

Each holder of an Allowed Crossover Bonds Claim or Allowed EDC Claim against a Debtor will receive its Pro Rata Share of Creditor Proceeds from such Debtor on the Initial Distribution Date or the first Interim Distribution Date after the date such Claim becomes Allowed.

5.      **Class 3C — Convenience Claims**

Class 3C Claims consist of all Allowed Convenience Claims against the Consolidated Debtors, NNCALA, and Nortel Altsystems.

A Convenience Claim  is, solely with respect to any Class 3A General Unsecured Claim, any Claim (i) in an Allowed amount equal to or less than $25,000 whose holder elects on its ballot for such Claim to be Allowed as a Class 3C Convenience Claim and receive treatment as a Class 3C Convenience Claim in accordance with the Plan, or, (ii) in an Allowed amount larger than $25,000, whose holder elects on its ballot for such  Allowed Claim to be reduced and Allowed at $25,000 in order to receive treatment as a Class 3C Convenience Claim in accordance with the Plan.

For holders of General Unsecured Claims against NNI, NNCC, NNCALA or Nortel Altsystems, the Ballots included as a part of the Solicitation Package mailed in connection with this Disclosure Statement provide for a Convenience Class Election.  A Convenience Class Election is an irrevocable election made on the Ballot by a holder of a claim against NNI, NNCC, NNCALA or Nortel Altsystems that would otherwise be a General Unsecured Claim to have their claim treated as a Convenience Claim.  For holders of General Unsecured Claims above $25,000, electing the Convenience Class Election on the Ballot will result in the Claim being reduced to $25,000 and treated as a Convenience Claim.

Each holder of an Allowed Convenience Claim against the Consolidated Debtors will receive a one-time payment of Cash in an amount equal to 55% of the amount of the Allowed Convenience Claim on the Initial Distribution Date or the first Interim Distribution Date after the date such Claim becomes Allowed.  The amount of the Allowed Convenience Claim on which such 55% payment will be made is the full amount of the original Claim for Claims $25,000 or under and $25,000 for Claims over $25,000 that the holder elects to reduce in order to receive treatment as a Convenience Claim.

Each holder of an Allowed Convenience Claim against NNCALA will receive a one-time payment of Cash in an amount equal to 12% of the amount of the Allowed Convenience Claim on the Initial Distribution Date or the first Interim Distribution Date after the date such Claim becomes Allowed.  The amount of the Allowed Convenience Claim on which such 12% payment will be made is the full amount of the original Claim for Claims $25,000 or under and $25,000 for Claims over $25,000 that the holder elects to reduce in order to receive treatment as a Convenience Claim.

Each holder of an Allowed Convenience Claim against Nortel Altsystems will receive a one-time payment of Cash in an amount equal to 7% of the amount of the Allowed Convenience Claim on the Initial Distribution Date or the first Interim Distribution Date after the

date such Claim becomes Allowed.  The amount of the Allowed Convenience Claim on which such 7% payment will be made is the full amount of the original Claim for Claims $25,000 or under and $25,000 for Claims over $25,000 that the holder elects to reduce in order to receive treatment as a Convenience Claim.

6.      **Class 4 — Subordinated Claims**

Class 4 Claims consist of all Allowed Subordinated Claims, including any Debt Securities Fraud Claims and any other Claims, except for Interests Securities Fraud Claims, that would be subject to subordination under section 510 of the Bankruptcy Code.

Each holder of an Allowed Subordinated Claim against a Debtor is not expected to receive any Distribution on account of such Claim; *provided*, *however*, that in the event that all Allowed Claims in Classes 1 through 3 of such Debtor have been satisfied in full, each holder of an Allowed Subordinated Claim in Class 4 shall receive its Pro Rata Share of any remaining Creditor Proceeds from such Debtor.

7.      **Class 5A — Interests**

(a)      Class 5A Claims consist of all Interests in a Debtor, including any shares of common stock, preferred stock, other form of ownership interest or any interest or right to convert into such an equity or ownership interest or acquire any equity or ownership interest, including, without limitation, vested and/or unvested restricted stock units, contingent stock awards, contingent equity awards, performance stock units and stock options or restricted stock awards granted under management ownership plans, stock incentive plans or employee incentive plans that was in existence immediately prior to or on the Petition Date for such Debtor.

a.      **NNI Class 5A**

Each holder of an Interest in one of the Consolidated Debtors is not expected to receive any Distributions under the Plan.  On the Effective Date, all Interests in NNI shall be cancelled and one new share of NNI's common stock will be issued to the Plan Administrator which will hold such share for the benefit of the holders of the former Interests in NNI.  Each holder of an Interest in the Consolidated Debtors will neither receive nor retain any property or any interest in property on account of such Interests; *provided*, *however*, that in the event that all Allowed Claims in the Consolidated Debtors Classes 1 through 4 have been satisfied in full in accordance with the Bankruptcy Code and the Plan, each holder of an Interest in the Consolidated Debtors will receive its Pro Rata Share of any remaining Creditor Proceeds from the Consolidated Debtors consistent with such holder's rights of priority of payment existing immediately prior to the Petition Date.  Unless otherwise determined by the Plan Administrator, all outstanding Interests in the Consolidated Debtors will be deemed cancelled and of no force and effect as of the closing of the Consolidated Debtors' Chapter 11 Cases, in accordance with the Plan, *provided* that such cancellation does not adversely affect the Debtors' Estates.

      **b.**      **Class 5A of Nortel Altsystems Inc., Xros, Inc., Sonoma Systems, CoreTek, Inc., Nortel Networks Applications Management Solutions Inc., Nortel Networks Optical Components Inc. and Architel Systems (U.S.) Corporation.**

      The holders of Interests in Nortel Altsystems, Xros, Sonoma, CoreTek, NN Applications, NN Optical, and Architel are not expected to receive any Distributions under the Plan. On the Effective Date, all Interests in Nortel Altsystems, Xros, Sonoma, CoreTek, NN Applications, NN Optical, and Architel will be cancelled and one new share of the common stock of Nortel Altsystems, Xros, Sonoma, CoreTek, NN Applications, NN Optical, and Architel will be issued to the Plan Administrator which will hold such share for the benefit of the holders of the former Interests in each of Nortel Altsystems, Xros, Sonoma, CoreTek, NN Applications, NN Optical, and Architel, respectively. The holders of Interests in Nortel Altsystems, Xros, Sonoma, CoreTek, NN Applications, NN Optical, and Architel will neither receive nor retain any property or any interest in property on account of such Interests; *provided*, *however*, that in the event that all Allowed Claims in Classes 1, 2, 3 and 4 of Nortel Altsystems, Xros, Sonoma, CoreTek, NN Applications, NN Optical, and Architel, respectively, have been satisfied in full in accordance with the Bankruptcy Code and the Plan, each holder of an Interest in Nortel Altsystems, Xros, Sonoma, CoreTek, NN Applications, NN Optical, and Architel will receive its Pro Rata Share of any remaining Creditor Proceeds from Nortel Altsystems, Xros, Sonoma, CoreTek, NN Applications, NN Optical, and Architel, respectively, consistent with such holder's rights of priority of payment existing immediately prior to the Petition Date. Unless otherwise determined by the Plan Administrator, all outstanding Interests in Nortel Altsystems, Xros, Sonoma, CoreTek, NN Applications, NN Optical, and Architel will be deemed cancelled and of no force and effect as of the closing the Chapter 11 Cases of Nortel Altsystems, Xros, Sonoma, CoreTek, NN Applications, NN Optical, and Architel, respectively, in accordance with the Plan, *provided* that such cancellation does not adversely affect the Debtors' Estates.

      **c.**      **Class 5A of NNCALA, NNCC, Nortel Altsystems International Inc., Qtera Corporation, Nortel Networks HPOCS Inc., Nortel Networks International Inc., Nortel Telecom International Inc. and Nortel Networks Cable Solutions Inc.**

      All Interests in each of NNCALA, NNCC, Nortel Altsystems International Inc., Qtera Corporation, Nortel Networks HPOCS Inc., Nortel Networks International Inc., Nortel Telecom International Inc. and Nortel Networks Cable Solutions Inc. will continue to be held by its corporate parent until the closing of its Chapter 11 Case, solely for Plan administrative purposes. No Interestholder shall receive Distributions on account of its Interests or its corporation interests until such time that all Allowed Claims in Classes 1 through 4 of any Debtor have been satisfied in full in accordance with the Bankruptcy Code and the Plan. At such time, each holder of an Interest in Class 5A of the applicable Debtor will receive its Pro Rata Share of any remaining Creditor Proceeds from the applicable Debtor.

      **8.**      **Class 5B — Interests Securities Fraud Claims**

      Class 5B Claims consist of all Interests Securities Fraud Claims against a Debtor, including unknown claims, demands, rights, liabilities and Causes of Action of any kind

whatsoever, known or unknown, that have been or could be asserted in a direct, derivative or other capacity against that Debtor arising out of, relating to or in connection with (a) the purchase, sale or other decision or action made or taken, or declined, failed or refused to be made or taken, or otherwise foregone, concerning or relating to the Interests in such Debtor; (b) the purchase, ownership or sale of such Interests of that Debtor; and (c) any other claims arising out of, relating to or in connection with such Interests that would be subject to subordination under section 510(b) of the Bankruptcy Code.

Each holder of an Allowed Interests Securities Fraud Claim against a Debtor will receive no Distribution under the Plan in respect of such Claim.

**E.      Implementation of the Plan**

**1.      General Settlement of Claims and Interests**

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases and other benefits provided under the Plan, and as applicable, the SPSA, on the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan and the SPSA.

**2.      Plan Administrator**

**a.      Appointment and Authority of the Plan Administrator**

The Plan appoints Greylock Partners, LLC as the Plan Administrator for each of the Debtors and the Wind-Down Debtors.

The Plan Administrator will have the authority and right on behalf of each of the Debtors and the Wind-Down Debtors, without the need for Bankruptcy Court approval (unless otherwise indicated), to carry out and implement the Plan, the SPSA and the Plan Administration Agreement in accordance with their terms.

**b.      Liability and Compensation of the Plan Administrator**

The Plan Administrator will have no liability whatsoever for any acts or omissions to the Debtors or the Wind-Down Debtors or to holders of Claims against or Interests in the Debtors or the Wind-Down Debtors other than for gross negligence, willful misconduct, fraud or breach of fiduciary duty by the Plan Administrator as determined by a Final Order.  The Plan Administrator will be indemnified and held harmless by each of the Debtors and the Wind-Down Debtors for any losses, liabilities and costs incurred in such capacity to the fullest extent allowed by Delaware law other than for gross negligence, willful misconduct, fraud or breach of fiduciary duty as determined by a Final Order.

The Plan Administrator shall be entitled to receive reasonable compensation for services rendered on behalf of the Debtors and the Wind-Down Debtors.

### c.    Resignation and Removal of the Plan Administrator

Subject to change and definitive documentation in the Plan Administration Agreement, it is anticipated that the following terms will be included in the Plan Administration Agreement.  The  Plan Administration Agreement will provide that the Plan Administrator will be able to resign as Plan Administrator upon delivery of sixty (60) days' written notice to the Bankruptcy Court. However, if a successor Plan Administrator has not been appointed by the end of such sixty (60) day period, the current Plan Administrator shall continue as Plan Administrator pursuant to the terms specified herein until such time as a successor is appointed by the Bankruptcy Court.  The Plan Administrator shall have the authority to name a successor Plan Administrator, subject to Bankruptcy Court approval or, if the Plan Administrator is unable to make such an appointment, counsel to the Debtors also may identify a successor Plan Administrator, subject to Bankruptcy Court approval.

The Plan Administrator may be removed by the Bankruptcy Court on the grounds of: (i) the Plan Administrator's theft or embezzlement or attempted theft or embezzlement of money or tangible or intangible Assets or property; (ii) the Plan Administrator's violation of any law (whether foreign or domestic), which results in a felony indictment or similar judicial proceeding; (iii) the Plan Administrator's willful misconduct or fraud in the performance of his duties.

In the event of the death, resignation or removal of the Plan Administrator, the Bankruptcy Court shall appoint a successor Plan Administrator.  Such appointment shall specify and establish the date on which such appointment shall be effective.  Every successor Plan Administrator, without any further act, deed, conveyance or Bankruptcy Court order, shall become vested with all rights, powers, trusts and duties of the retiring Plan Administrator hereunder and under the Plan; provided, however, that no Plan Administrator shall be liable for the acts or omissions of any prior or subsequent Plan Administrator.

### d.    Establishment of Reserve Accounts for Disputed Claims

On the Effective Date, the Debtors shall account for the Disputed Claims in such amounts, as agreed by the Debtors and the Plan Administrator in accordance with the terms of the Plan Administration Agreement to be necessary, to make sufficient future payments with respect to Disputed Claims as provided by the Plan

### 3.    Post-Effective Date Management

### a.    Wind-Down NNI

On the Effective Date, the board of directors of Wind-Down NNI will consist of one natural person, which may be the Plan Administrator, selected by the Plan Administrator to serve through the closing of its Chapter 11 Case.  The current officers of Wind-Down NNI will continue to serve in such capacity in accordance with applicable non-bankruptcy law, employment agreements executed after the Petition Date and Wind-Down NNI's by-laws through the closing of Wind-Down NNI's Chapter 11 Case, unless such officer resigns or is removed prior to such time.

The Debtors anticipate that John J. Ray, III will be appointed as the sole director of Wind-Down NNI. The Plan Administrator will have the authority to appoint the officers of Wind-Down NNI. The Debtors also expect that Kathryn Schultea of RLKS Executive Solutions LLC will be named as the Vice President and Secretary and Mary Cilia of RLKS Executive Solutions LLC will be named as the Chief Financial Officer of Wind-Down NNI.

### b.      Other Wind-Down Debtors

On the Effective Date, the director of each Wind-Down Debtor other than Wind-Down NNI will consist of one natural person, which may be the Plan Administrator, selected by the Plan Administrator to serve through the closing of such Wind-Down Debtor's Chapter 11 Case. The current officers of such Wind-Down Debtor will continue to serve in such capacity in accordance with applicable non-bankruptcy law, employment agreements executed after the Petition Date and each Wind-Down Debtor's by-laws, through the closing of such Wind-Down Debtor's Chapter 11 Case, unless such officer resigns or is removed prior to such time.

The Debtors anticipate that John J. Ray, III will be appointed as the sole director of each of the Wind-Down Debtors. The Plan Administrator will have the authority to appoint the officers of each of the Wind-Down Debtors. The Debtors also expect that Kathryn Schultea of RLKS Executive Solutions LLC will be named as the Vice President and Secretary and Mary Cilia of RLKS Executive Solutions LLC will be named as the Chief Financial Officer of each of the Wind-Down Debtors.

### 4.      Corporate Existence of Debtors

After the Effective Date, the Plan Administrator may, in accordance with the Plan Administration Agreement, (a) maintain any Wind-Down Debtor as a corporation in good standing until such time as all aspects of the Plan pertaining to such Wind-Down Debtor have been completed, (b) subject to Section 8.3 (*Dissolution of the Wind-Down Debtors*) of the Plan, dissolve any Wind-Down Debtor or complete the winding up of such Wind-Down Debtor without the necessity for (i) any approval by the board of directors or stockholders of any such Wind-Down Debtor of the dissolution or any plan of distribution, to the extent as such otherwise may be required by applicable law or (ii) any further approvals or actions to be taken by or on behalf of such Wind-Down Debtor, its shareholder or for any payments to be made in connection therewith, subject to the filing of a certificate of dissolution with the appropriate governmental authorities (including, without limitation, transferring all or part of the Residual Assets of such Wind-Down Debtor to a liquidating trust) at such time as the Plan Administrator considers appropriate and consistent with the implementation of the Plan pertaining to such Wind-Down Debtor, or (c) dissolve any Controlled Non-Debtor Affiliate or complete the winding up of such Controlled Non-Debtor Affiliate in accordance with applicable law; *provided*, *however*, that the foregoing does not limit the Plan Administrator's ability to otherwise abandon an interest in a Controlled Non-Debtor Affiliate.

### 5.      Effectuating Documents and Further Transactions

Each of the Debtors and the Wind-Down Debtors and, on and after the Effective Date, the Plan Administrator shall be authorized to execute, deliver, file or record such contracts,

instruments, releases, consents, certificates, resolutions, programs and other agreements or documents and take such acts and actions as may be reasonable, necessary or appropriate to effectuate, implement, consummate or further evidence the terms and conditions of the Plan, the Confirmation Order and any transactions described in or contemplated by the Plan, without the need for any approvals, authorization or consents except for those expressly required pursuant to the Plan.

6.      **Funding of Individual Debtors for Plan Confirmation**

NNI (before the Effective Date) or the Plan Administrator (on and following the Effective Date) shall have the authority, but not the obligation, to make or authorize NNI (before the Effective Date) or Wind-Down NNI (on and following the Effective Date) to make certain transfers of assets to other Debtors or Wind-Down Debtors, not to exceed $50,000 in the aggregate, and not to exceed $5,000 per Debtor or Wind-Down Debtor, for the purpose of aiding such Debtor or Wind-Down Debtor's ability to effectuate the Plan and the wind-down of its estate, including to make distributions to its creditors in accordance with the confirmation or implementation of such Wind-Down Debtor Plan and the SPSA.

F.      **Provisions Governing Voting and Distributions**

1.      **Voting of Claims**

Section 10.1 (*Voting of Claims*) of the Plan provides that each holder of an Allowed Claim in an Impaired Class of Claims that is entitled to vote on the Plan pursuant to Article 3 (*Classification of Claims and Interests*) and Article 4 (*Treatment of Claims Against and Interests in Debtors*) of the Plan will be entitled to vote separately to accept or reject the Plan, as provided in the order entered by the Bankruptcy Court establishing procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan, or any other order or orders of the Bankruptcy Court.  With respect to Impaired Classes of Claims or Interests that are deemed to reject the Plan, the Debtors shall request that the Bankruptcy Court confirm the Plan pursuant to section 1129(b) of the Bankruptcy Code.

2.      **Minimum Distribution**

No payment of Creditor Proceeds of less than $100 will be made by any Debtor to any holder of an Allowed Claim against such Debtor.  Such amounts will be deemed reallocated for distribution to holders of Allowed Claims against such Debtor and accordingly will be distributed in accordance with the provisions of the Plan and the Bankruptcy Code.  Any payment of Cash made pursuant to the Plan may be made at the option of the Disbursing Agent either by check or by wire transfer.

3.      **Distributions of Creditor Proceeds**

After the satisfaction in full of Allowed Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims and Allowed Secured Claims (to the extent the Plan Administrator determines in accordance with the Plan Administration Agreement that the relevant Debtor will pay such Allowed Secured Claim in Cash) against a Debtor, the Disbursing Agent will make a Distribution of the  Creditor Proceeds in accordance with the

provisions of the Plan (i) to each holder of an Allowed Claim as of the Distribution Record Date against such Debtor, within 60 days of the Effective Date or as soon thereafter as practicable and (ii) to each holder of an Allowed Claim that is allowed after the Effective Date against such Debtor, in accordance with the Class priorities set forth in Article 4 (*Treatment of Claims Against and Interests in Debtors*) and Section 10.3 (*Distributions of Creditor Proceeds*) of the Plan. After the Initial Distribution with respect to any Allowed Claim, the Disbursing Agent will make Distributions of Creditor Proceeds in accordance with the Plan to holders of Allowed Claims against such Debtor quarterly on March 31, June 30, September 30 and December 31 of each year (each such Distribution, an "Interim Distribution") and on the Final Distribution Date. Notwithstanding the foregoing, the Plan Administrator may determine in accordance with the terms of the Plan Administration Agreement to direct the Disbursing Agent (a) to make Distributions more frequently than quarterly on dates other than the Interim Distribution dates, (b) not to make an Interim Distribution on the basis that the costs of making such Interim Distribution would be disproportionate to the expected amount of such Distribution or (c) not to make a Distribution to the holder of an Allowed Claim on the basis that it has not yet determined whether to object to such Claim, in which case such Claim shall be treated as a Disputed Claim for purposes of Distributions under the Plan until the Plan Administrator (i) determines not to object to such Claim (or the time to object to Claims expires), (ii) agrees with the holder of such Claim to allow such Claim in an agreed upon amount or (iii) objects to such Claim and such Claim is Allowed by a Final Order.

Payments made pursuant to the Plan shall be made by the Disbursing Agent in Cash and by (i) checks drawn on or (ii) wire transfer from a domestic bank selected by the Disbursing Agent. Any Cash distributions required under the Plan to foreign Creditors may be made, at the option of the Disbursing Agent, by such means as are necessary or customary in a particular foreign jurisdiction. Any check issued by the Disbursing Agent shall be null and void if not negotiated within ninety (90) days.

4.     **Distributions to Indenture Trustees**

Subject to Section 7.9 (*Treatment of Crossover Claims*) and Section 7.10 (*Right to Subrogation*) of the Plan, the Debtors or the Disbursing Agent, as applicable, shall deliver the initial Distribution and any subsequent Distributions on account of the Allowed NNCC Bonds Claims to the NNCC Bonds Indenture Trustee on the Initial Distribution Date and each subsequent Distribution Date thereafter. The NNCC Bonds Indenture Trustee shall administer such Distributions as soon as is reasonably practicable in accordance with the NNCC Bonds Indenture and the Plan (and such Distributions shall remain subject to the NNCC Bonds Indenture Trustee's charging Lien for payment of its reasonable fees and expenses, including all reasonable fees and expenses of its counsel and other professionals and including the fees and expenses incurred by the NNCC Bonds Indenture Trustee in making all Distributions to holders of Allowed NNCC Bonds Claims). Any Distribution made to the NNCC Bonds Indenture Trustee shall be deemed a distribution to the holders of the NNCC Bonds Claims.

Subject to Section 7.9 (*Treatment of Crossover Claims*) and Section 7.10 (*Right to Subrogation*), the Debtors or the Disbursing Agent, as applicable, shall deliver the initial Distributions and any subsequent Distributions on account of Crossover Bonds Claims to the NNC/NNL Notes Indenture Trustee on the Initial Distribution Date and each subsequent

Distribution Date thereafter.  The NNC/NNL Notes Indenture Trustee shall administer such Distributions as soon as is reasonably practicable in accordance with the Plan, including Section IV.F.5 (*Cancellation of Notes, Instruments and Debentures*) hereof  (and such Distributions shall remain subject to the NNC/NNL Notes Indenture Trustee's charging Lien against Distributions to holders of Crossover Bonds Claims for payment of its reasonable fees and expenses, including all reasonable fees and expenses of its counsel and other professionals and including the fees and expenses incurred by the NNC/NNL Notes Indenture Trustee in making all Distributions to holders of Crossover Bonds Claims). Any Distribution made to the NNC/NNL Notes Indenture Trustee shall be deemed a distribution to the holders of the Crossover Bonds Claims.

To the extent that, prior to the Confirmation Hearing, the NNCC Bondholder Signatories dispute the reasonableness of any of the fees and expenses incurred by the NNCC Bonds Indenture Trustee for which the NNCC Bonds Indenture Trustee seeks compensation by application of a charging lien or other offset or deduction from distributions with respect to the Allowed NNCC Bonds Claims, then the NNCC Bondholder Signatories intend to request an Order from the Bankruptcy Court in connection with confirmation directing that (a) amounts equal to the disputed portion of the asserted amount of the fees and expenses of the NNCC Bonds Indenture Trustee be held back from the distributions with respect to the Allowed NNCC Bonds Claims and segregated; provided, however, the reasonable and documented fees of the Indenture Trustee, up to an amount equal to $4.25 million, shall be paid pursuant to Section 7.13 of the Plan; (b) such segregated funds shall not be released until the Bankruptcy Court has determined whether the NNCC Bonds Indenture Trustee's fees and expenses were adequately documented and reasonable; and (c) the NNCC Bonds Indenture Trustee shall not exercise a charging lien with respect to the other amounts distributed.

The NNCC Bonds Indenture Trustee asserts that the fees and expenses it has incurred in these cases, including the fees and expenses of its professionals, are reasonable and compensable by exercise of the charging lien or otherwise.  The NNCC Bondholder Signatories have not agreed with this assertion.  The NNCC Bonds Indenture Trustee reserves all rights in connection with the payment of its reasonable fees and expenses, including the fees and expenses of its professionals, and will oppose entry of the Order described above unless it also protects the right of the NNCC Bonds Indenture Trustee to be paid the reasonable fees and expenses it has incurred and any additional fees and expenses it will incur after the date hereof and after the Effective Date.  The NNCC Bondholder Signatories similarly reserve all rights and defenses in connection with the payment of fees to the NNCC Bonds Indenture Trustee.

### 5.    Cancellation of Notes, Instruments and Debentures

On the Effective Date, except as otherwise provided in the Plan or the Confirmation Order, (a) the NNCC Bonds, the NNCC Bonds Indenture, the Senior Notes NNI Guarantee Obligations and any other notes, bonds (with the exception of any surety bonds outstanding), indentures, guarantees or other instruments or documents evidencing or creating any indebtedness or obligations of the Debtors that are Impaired under the Plan will be deemed cancelled and extinguished as to the Debtors and (b) the obligations of the Debtors under any agreements, documents, indentures, guarantees or certificates of designation governing the

Senior Notes, the Senior Notes NNI Guarantee Obligations, the Senior Notes Indentures and any other notes, bonds, indentures, guarantees or other instruments or documents evidencing or creating any indebtedness or obligations of the Debtors that are Impaired under the Plan will be, and are hereby, discharged as to the Debtors, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or any requirement of further action, vote or other approval or authorization by the Security holders, officers or directors of the Debtors or by any other Person.

Notwithstanding the foregoing, the NNCC Bonds Indenture shall continue in effect solely for the purposes of allowing and preserving:  (i) the rights of the NNCC Bonds Indenture Trustee to assert its charging Lien against such Distributions for payment of its reasonable fees and expenses (including reasonable fees and expenses of counsel and other professionals and including the fees and expenses incurred by the NNCC Bonds Indenture Trustee in making all Distributions to holders of Allowed NNCC Bonds Claims), (ii) the rights of holders of Allowed Claims in respect of the NNCC Bonds to receive Distributions under the Plan, (iii) the rights of the NNCC Bonds Indenture Trustee to make Distributions in satisfaction of Allowed Claims in respect of the NNCC Bonds (after application of its charging Lien) and (iv) the rights of the NNCC Bonds Trustee and any NNCC Bondholder to pursue the NNCC Bonds Guarantee Obligations in the Canadian Proceedings, but in all cases subject to the terms and conditions of the NNCC Bonds Indenture.  As of September 30, 2016, the amount of Law Debenture Trust's fees and expenses, including the fees and expenses of its counsel and other professionals, in addition to the amount to be paid by NNI pursuant to Section 7.13 (*Additional NNCC Bondholder Payments*) of the Plan, was approximately $3.5 million.

Notwithstanding the foregoing, the NNC Notes Indenture and the NNL Notes Indenture will continue in effect as against the Debtors solely for the purposes of allowing and preserving: (i) the rights and Liens of the NNC/NNL Notes Indenture Trustee (including the NNC/NNL Notes Indenture Trustee's right to assert its charging Lien against Distributions to holders of Crossover Bonds Claims for payment of its reasonable fees and expenses, including all reasonable fees and expenses of counsel and other professionals and including the fees and expenses incurred by the NNC/NNL Notes Indenture Trustee in making all Distributions to holders of Crossover Bonds Claims); (ii) the rights of holders of Crossover Bonds Claims to receive Distributions under the Plan; (iii) the rights of the NNC/NNL Notes Indenture Trustee to make Distributions in satisfaction of Crossover Bonds Claims (after application of its charging Lien) and (iv) the rights of holders of claims in respect of the Crossover Bonds against any Canadian Debtors to pursue such claims in the Canadian Proceedings, but in all cases subject to the terms and conditions of the NNC Notes Indenture and the NNL Notes Indenture, as applicable.  As of September 30, 2016, BNYM's fees and expenses (including the fees and expenses of its legal counsel) with respect to these Chapter 11 Cases and the CCAA Proceedings were approximately $4 million.

6.      **Distribution Record Date**

Except with respect to Allowed Crossover Bonds and Allowed NNCC Bonds Claims, as of the close of business on the Distribution Record Date, the register for each Debtor shall be closed and there shall be no further changes to the record holder of any of the Claims or Interests.  The Debtors and the Plan Administrator shall have no obligation to recognize any

transfer of any Claims or Interests occurring after the close of business on the Distribution Record Date and shall be entitled instead to recognize and deal for all purposes hereunder only with those record holders stated on the transfer ledgers as of the close of business on the Distribution Record Date, to the extent applicable.

PLEASE NOTE THAT IF YOU ACQUIRE A CLAIM FOLLOWING THE DISTRIBUTION RECORD DATE, YOU WILL NOT RECEIVE A DISTRIBUTION FROM THE DEBTORS OR THE WIND-DOWN DEBTORS ON ACCOUNT OF SUCH CLAIM.  IN ADDITION, IF YOU SELL OR TRANSFER YOUR CLAIM BEFORE THE DISTRIBUTION RECORD DATE YOU WILL NOT RECEIVE A DISTRIBUTION ON ACCOUNT OF SUCH CLAIM.

7.      **Limitation on Recovery**

Section 10.7 (*Limitation on Recovery*) of the Plan provides that, in the event that the sum of the Distributions of Creditor Proceeds and other Distributions with respect to an Allowed Claim under the Plan or in connection with a Foreign Proceeding are in excess of one hundred percent (100%) of a holder's Allowed Claim, then the Creditor Proceeds remaining to be distributed to such holder in excess of such one hundred percent (100%) shall be deemed available for distribution to other holders of Allowed Claims against such Debtor and, accordingly, will be distributed in accordance with the provisions of the Plan and the Bankruptcy Code.

In no event shall any holder of any Allowed Claim receive Distributions under the Plan in excess of the Allowed amount of such Claim.

8.      **Allocation of Distributions**

Distributions to any holder of an Allowed Claim shall be allocated first to the principal portion of any such Allowed Claim (as determined for federal income tax purposes) and, only after the principal portion of any such Allowed Claim is satisfied in full, to any portion of such Allowed Claim comprising interest (but solely to the extent that interest is an allowable portion of such Allowed Claim).

9.      **Delivery of Distributions and Undeliverable Distributions**

Distributions to holders of Allowed Claims of each Debtor will be made at the address of each such holder as set forth on the Schedules Filed, unless superseded by a new address as set forth (a) on a proof of claim Filed by a holder of an Allowed Claim or (b) in another writing notifying the Claims Agent (at the address listed in Section I (*Introduction*) hereof) of a change of address.  If any holder's Distribution is returned as undeliverable, no further Distributions shall be made or notices delivered to such holder on account of such Claim until the Claims Agent is notified in writing by such holder of such holder's current address, at which time all such distributions shall be made to such holder. Any holder of an Allowed Claim (or any successor or assignee or other Person or Entity claiming by, through or on behalf of, such holder) that does not assert a claim pursuant to the Plan for such undeliverable or unclaimed distribution within six (6) months after the later of the Effective Date or the date such distribution was made shall be deemed to have forfeited its Allowed Claim and shall be forever

barred and enjoined from asserting any such Claim for an undeliverable or unclaimed distribution against the Debtors, or their Estates, the Wind-Down Debtors or their property.  In such cases, any Cash held for Distribution on account of such Claim shall become the property of the relevant Estate and distributed to other holders of Allowed Claims against such Debtor in accordance with the terms of the Plan and the Bankruptcy Code.

10.     **Time Bar to Cash Payment Rights**

Checks issued in respect of Allowed Claims will be null and void if not negotiated within ninety (90) days after the date of issuance thereof.  Requests for reissuance of any check shall be made to the Plan Administrator by the holder of the Allowed Claim to whom such check originally was issued.  Any claim in respect of a voided check shall be made on or before thirty (30) days after the expiration of the ninety (90)-day period following the date of issuance of such check.  Thereafter, the amount represented by such voided check will irrevocably revert to the relevant Debtor's Estate, to be distributed to other holders of Allowed Claims against such Debtor in accordance with the terms of the Plan and the Bankruptcy Code, and any Claim in respect of such voided check will be discharged and forever barred from assertion against such Debtor, its Estate and its respective property, *provided* that at the discretion of the Plan Administrator, any such amounts may be escheated pursuant to applicable law.  In the case of any check issued in respect of an Allowed Claim that is returned as an undeliverable distribution, such check shall be null and void if not negotiated within ninety (90) days after the date of issuance, and the Allowed Claim for which such distribution was issued shall be discharged and forever barred pursuant to Section 10.11 (*Time Bar to Cash Payment Rights*) of the Plan only after the time period to claim such undeliverable distribution provided in Section 10.9 (*Delivery of Distributions and Undeliverable Distributions* ) has passed.

11.     **Withholding and Reporting Requirements**

In connection with the Plan and all instruments issued in connection therewith and distributed thereon, the Debtors, the Plan Administrator and the Disbursing Agent will comply with all applicable withholding and reporting requirements imposed by any federal, state or local taxing authority, and all Distributions under the Plan will be subject to any such withholding or reporting requirements.  Notwithstanding the above, each holder of an Allowed Claim that is to receive a Distribution under the Plan has the sole and exclusive responsibility for the satisfaction and payment of any Tax obligations imposed by any Governmental Unit, including income, withholding and other Tax obligations, on account of such Distribution.  The Disbursing Agent will have the right, but not the obligation, not to make a Distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such Tax obligations.  The Disbursing Agent may require, as a condition to receipt of a Distribution, that the holder of an Allowed Claim complete and return a Form W-8 or W-9, as applicable, to each such holder.  If the Disbursing Agent makes such a request and the holder fails to comply before the date that is 180 days after the request is made, no further Distributions will be made to the holder on account of such Claim.  The amount of such Distribution will irrevocably revert to the applicable Debtor and such Claim will be discharged and the holder of such Claim will be forever barred from asserting such Claim against such Debtor, its Estate or its respective property.  In such cases, any Cash held for Distribution on account of such Claim will become

the property of the relevant Estate and distributed to other holders of Allowed Claims against such Debtor in accordance with the terms of the Plan and the Bankruptcy Code.

## 12.    Setoffs and Recoupment

The Debtors may setoff against any Claim the payments or other Distributions to be made pursuant to the Plan in respect of such Claim, or claims of any nature whatsoever that the Debtors may have against the holder of such Claim.

Unless otherwise stipulated in writing by the Debtors, any party against whom a claim or counterclaim is asserted by the Estates (an "Estate Claim") must assert any setoff rights, right of subrogation or recoupment of any kind against such Estate Claim prior to the Confirmation Date, or such right of setoff, subrogation or recoupment will be deemed waived and forever barred; *provided*, *however*, that nothing herein shall limit the assertion of such right of setoff, subrogation or recoupment through an amended or supplemental pleading to the extent permitted by Rule 15 of the Federal Rules of Civil Procedure or Bankruptcy Rule 7015.

## 13.    Disputed Claims

### a.    Objections

Unless otherwise ordered by the Bankruptcy Court after notice and a hearing, as of the Effective Date, objections to, and requests for estimation of, all Claims against the Debtors may be interposed and prosecuted only by the Plan Administrator, who shall consult with the applicable Wind-Down Debtor regarding the same.  Objections to and requests for estimation of Claims shall be Filed and served on the claimant on or before the first Business Day that is one hundred and eighty (180) days after the Effective Date (the "Claims Objection Deadline") or such later date as is established by the filing of a notice by the Wind-Down Debtors or Plan Administrator prior to the expiration of the then-current Claims Objection Deadline.

### b.    No Distributions Pending Allowance

Notwithstanding any other provision hereof, if any portion of a Claim is a Disputed Claim, no Distribution shall be made on account of the disputed portion of such Claim unless and until such Disputed portion of such Claim becomes Allowed.

### c.    Estimation of Claims

The Debtor, the Wind-Down Debtors and/or the Plan Administrator may at any time request that the Bankruptcy Court estimate for any purpose including Distribution any contingent, unliquidated or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code or otherwise, regardless of whether such Debtor previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection.  The Bankruptcy Court will retain exclusive jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any proceedings relating to any such Disputed Claim or any appeal relating to any such objection to a Disputed Claim.  In the event that the Bankruptcy Court estimates any contingent, unliquidated or Disputed Claim, the amount so estimated will constitute either the Allowed amount of such Claim or a maximum

limitation on such Claim, as determined by the Bankruptcy Court estimating such Claim.  If the estimated amount constitutes a maximum limitation on the amount of such Claim, such Debtor may pursue supplementary proceedings to object to the allowance of such Claim.  All of the aforementioned objection, estimation and resolution procedures are intended to be cumulative and not exclusive of one another.  Claims may be estimated and subsequently disallowed, reduced, compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

### d.         Resolution of Disputed Claims

On and after the Effective Date, the Plan Administrator will have the authority to compromise, settle or otherwise resolve or withdraw any objections to Claims and to compromise, enter into protocols for the resolution of, settle or otherwise resolve any Disputed Claims.  On the date of the first Distribution that is at least 60 days after the date on which the order allowing a Disputed Claim becomes a Final Order, such Debtor will remit, to the holder of such Allowed Claim, Creditor Proceeds equal to the amount such holder would have received as of that date under the Plan if the Allowed portion of the Disputed Claim had been an Allowed Claim as of the Effective Date.  To the extent that a Disputed Claim against a Debtor is not Allowed or becomes an Allowed Claim in an amount less than the amount of the Disputed Claim set forth in the proof of claim, or as previously estimated by the Bankruptcy Court, the excess of the amount of Creditor Proceeds that would have been distributed to the holder of the Disputed Claim if the Claim had been Allowed in full, over the amount of Creditor Proceeds actually distributed on account of such Disputed Claim, will become Creditor Proceeds for Distribution to other holders of Allowed Claims in the Class corresponding to the Disputed Claim at issue in accordance with the terms of the Plan and the Bankruptcy Code.

### e.         No Interest

Holders of Disputed Claims will not be entitled to interest if such Disputed Claim becomes an Allowed Claim.

### 14.       No Payment on Saturday, Sunday or Legal Holiday

If any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

### 15.       No Distributions on Late-Filed Claims

Except as otherwise provided in a Final Order of the Bankruptcy Court, any Claim as to which a proof of Claim was required to be filed and was first filed after the applicable bar date in the Chapter 11 Cases, including, without limitation, the General Bar Date and any bar date established in the Plan or in the Confirmation Order, shall automatically be deemed a late-filed Claim that is disallowed in the Chapter 11 Cases and shall be expunged from the Claims Register, without the need for (a) any further action by the Plan Administrator or (b) an order of the Bankruptcy Court.

### 16.    Post-petition Interest

Except as specifically provided for in the Plan or under the Bankruptcy Code, no Allowed Administrative Expense Claim or Allowed Claim shall be entitled to receive any post-petition interest on such Claim under any circumstances.

## G.    Treatment of Executory Contracts and Unexpired Leases

### 1.    Previous Assumption, Assignment and Rejection

Throughout the Chapter 11 Cases, the Bankruptcy Court has established deadlines and procedures for the assumption and rejection of executory contracts and unexpired leases by the Debtors, including in connection with the Sale Orders and Sales, and allocated responsibility for payment of cure amounts with respect to such contracts and leases. Any executory contracts and unexpired leases of the Debtors not assumed and assigned or rejected prior to the Confirmation Date or with respect to which the Debtors have not otherwise Filed a notice of assumption and assignment or obtained an order assuming or rejecting the contract or lease prior to the Confirmation Date (the "Remaining Contracts") will be rejected pursuant to Section 9.5 (*Rejection*) of the Plan unless assumed, or assumed and assigned, pursuant to Section 9.2 (*Assumption and Assignment of Remaining Contracts*) of the Plan. To the extent the Debtors have Filed a notice of assumption and assignment or motion for the assumption or assumption and assignment prior to the Confirmation Date with respect to an executory contract or unexpired lease, but the Bankruptcy Court has not yet entered an order approving such assumption or assumption and assignment and fixing the cure amount therefor or the assumption or assumption and assignment has otherwise not yet become effective, the assumption or assumption and assignment of the contract or lease and any cure amount that may be owing in connection therewith will be governed by the terms of the applicable order or procedure.

### 2.    Assumption and Assignment of Remaining Contracts

As of the Effective Date, the Debtors will assume or assume and assign, as applicable, pursuant to sections 365 and 1123(b)(2) of the Bankruptcy Code, each of the Remaining Contracts of the Debtors that are identified in Exhibit C (*Executory Contracts and Unexpired Leases Assumed by the Debtors*) to the Plan that have not expired under their own terms prior to the Effective Date. Under the Plan, the Debtors reserve the right to amend such exhibit not later than ten (10) days prior to the Confirmation Hearing either to: (a) delete any executory contract or unexpired lease listed therein and provide for its rejection, or (b) add any executory contract or unexpired lease to such exhibit, thus providing for its assumption or assumption and assignment, as applicable. The Debtors will provide notice of any such amendment of such exhibit to the parties to the executory contract or lease affected thereby and counsel for the Creditors' Committee not later than ten days prior to the Confirmation Hearing. The Confirmation Order will constitute an order of the Bankruptcy Court pursuant to section 365 of the Bankruptcy Code approving all such assumptions or assumptions and assignments, as applicable, described in the Section 9.2 (*Assumption and Assignment of Remaining Contracts*) of the Plan, as of the Effective Date. If any provision of an executory contract to be assumed by any of the Debtors under the Plan limits such Debtor's ability to assign such executory contract,

the effectiveness of such provision shall be limited or nullified to the full extent provided in section 365(f) of the Bankruptcy Code.

### 3.      Cure of Defaults

Any monetary defaults under each Remaining Contract to be assumed under the Plan will be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, in either of the following ways: (a) by payment of the monetary default amount in Cash, in full, on the Effective Date, or as soon as practicable thereafter; or (b) by payment of the monetary default amount on such other terms as may be agreed to by the Debtors and the non-Debtor parties to such Remaining Contract.  In the event of a dispute regarding (i) the amount or timing of any cure payments, (ii) the ability of the Debtor or Debtors assuming such Remaining Contract, or an assignee thereof, to provide adequate assurance of future performance under the Remaining Contract to be assumed or assumed and assigned, as applicable, or (iii) any other matter pertaining to assumption or assumption and assignment of the Remaining Contract to be assumed, the Debtor or Debtors assuming such Remaining Contract will pay all required cure amounts promptly following the entry of a Final Order resolving the dispute.  Under the Plan, the Debtors reserve the right (i) to withdraw their request for assumption of any Remaining Contract at any time prior to the entry of such an order and (ii) either to reject or nullify the assumption of any executory contract no later than five Business Days after the entry of a final order of the Bankruptcy Court determining the cure amount or any request for adequate assurance of future performance required to assume such executory contract.

### 4.      Objections to Assumption of Remaining Contracts

To the extent that any party to a Remaining Contract identified for assumption asserts a claim for arrearages or damages pursuant to section 365(b)(1) of the Bankruptcy Code, or has any other objection with respect to any proposed assumption, revestment, cure or assignment on the terms and conditions provided in the Plan (including, without limitation, in Exhibit C (*Executory Contracts and Unexpired Leases Assumed by the Debtors*) thereto), all such Claims for arrearages and damages and objections must be filed and served: (a) as to any Remaining Contract identified in Exhibit C (*Executory Contracts and Unexpired Leases Assumed by the Debtors*) to the Plan that is mailed to any party to any such Remaining Contract, along with all other solicitation materials accompanying the Plan, within the same deadline and in the same manner established for the filing and service of objections to Confirmation of the Plan, and (b) as to any Remaining Contract identified in any subsequent amendments to Exhibit C (*Executory Contracts and Unexpired Leases Assumed by the Debtors*) to the Plan that is mailed to any party to any such Remaining Contract not later than ten days prior to the Confirmation Hearing, in such a manner as to be Filed and received by the Bankruptcy Court and the Debtors and counsel thereto, as the case may be, if applicable, no later than the earlier of (i) twenty (20) days after such subsequent amendment is served and (ii) three (3) days prior to the Confirmation Hearing.

Under the Plan, a party's failure to assert such claims for arrearages and damages or objections in the manner described above will constitute consent to the proposed assumption, revestment, cure or assignment on the terms and conditions provided in the Plan, including an acknowledgement that the proposed assumption and/or assignment provides adequate assurance

of future performance and that the amount identified for "cure" in <u>Exhibit C</u> (*Executory Contracts and Unexpired Leases Assumed by the Debtors*) to the Plan is the amount necessary to cover any and all outstanding defaults under the Remaining Contract to be assumed, as well as an acknowledgement and agreement that no other defaults exist under such Remaining Contract.

If any assumption or assumption and assignment of a Remaining Contract proposed in the Plan for any reason is not approved by the Bankruptcy Court, then the Debtors will be entitled, in their sole discretion, upon written notice to the applicable non-Debtor party to such Remaining Contract, to deem such Remaining Contract to have been rejected pursuant to the provisions of <u>Section 9.5</u> (*Rejection*) of the Plan.

## 5.    Rejection and Approval of Rejection

Except for those executory contracts and unexpired leases that (a) are assumed pursuant to the Plan, (b) have been assumed, assumed and assigned or rejected pursuant to previous orders of the Bankruptcy Court or (c) are the subject of a pending motion before the Bankruptcy Court with respect to the assumption or assumption and assignment of such executory contracts and unexpired leases, as of the Effective Date, all executory contracts and unexpired leases of the Debtors will be rejected pursuant to section 365 of the Bankruptcy Code; *provided*, *however*, that neither the inclusion by the Debtors of a contract or lease on <u>Exhibit E</u> (*Quarterly Administrative Wind-Down Reimbursement Payments*) to the Plan nor anything contained in <u>Article 9</u> (*Treatment of Executory Contracts*) of the Plan will constitute an admission by any Debtor that such contract or lease is an executory contract or unexpired lease or that any Debtor or its successors and assigns has any liability thereunder.

The Confirmation Order will constitute an Order of the Bankruptcy Court approving the rejection of executory contracts and unexpired leases under <u>Section 9.5</u> (*Rejection*) of the Plan pursuant to section 365 of the Bankruptcy Code as of the Effective Date.  Any Claim for damages arising from any such rejection must be filed within thirty (30) days after the Effective Date, or such Claim shall receive no distribution under the Plan or otherwise on account of such Claim.

## 6.    Post-petition Modification of Executory Contracts

Unless otherwise agreed by the parties and approved by the Bankruptcy Court, modifications, amendments, supplements and restatements to pre-petition executory contracts that have been executed by the Debtors during the Chapter 11 Cases will not be deemed to alter the pre-petition nature of the executory contract, or the validity, priority or amount of any Claims that may arise in connection therewith.

## 7.    Pre-existing Obligations to the Debtors under Executory Contracts

Rejection or repudiation of any executory contract pursuant to the Plan or otherwise will not constitute a termination of pre-existing obligations owed to the Debtors under such contracts.

**H.      Conditions Precedent to Plan's Confirmation and Effective Date**

**1.      Conditions to Confirmation of the Plan**

The following are conditions precedent to Confirmation of the Plan:

(a)      <u>Confirmation Order</u>. The Bankruptcy Court shall have entered the Confirmation Order; and

(b)      <u>CCAA Sanction Order</u>.  The Sanction Order shall have been issued by the CCAA Court by no later than February 17, 2017 and entered and thereafter shall have become a Final Order;

**2.      Canadian and U.S. Plans Effectiveness**

The Plan and the Canadian Plan shall become effective at the same time on the Plans Effective Date. On the Plans Effective Date: (i) the Monitor shall deliver a certificate to the Debtors declaring the effectiveness of the Canadian Plan; and (ii) the Debtors shall deliver a certificate to the Canadian Debtors and the Monitor declaring the effectiveness of the Plan ((i) and (ii), collectively, the "<u>Plan Certificates</u>").  Such Plan Certificates shall be held in escrow and released simultaneously, thereby triggering the effectiveness of the Plan and the Canadian Plan and the occurrence of the Plans Effective Date (as such term is defined in the Settlement and Support Agreement).

**3.      Conditions to the Effective Date**

The following are conditions precedent to the Effective Date of the Plan with respect to each Debtor:

(a)      All actions and agreements, instruments, certificates or other documents necessary to implement the terms and provisions of the Plan are effected or executed and delivered, as applicable, in form and substance satisfactory to the Debtors;

(b)      All authorizations, consents and regulatory approvals, if any required by the Debtors in connection with the consummation of the Plan, are obtained and not revoked;

(c)      The amended organizational documents of Wind-Down NNI and the Wind-Down Subsidiaries shall have been filed with the applicable authority of each of such Wind-Down Debtor's respective jurisdiction of incorporation or formation in accordance with such jurisdiction's applicable laws;

(d)      All statutory fees then due to the U.S. Trustee shall have been paid in full by the Debtors pursuant to the Plan;

(e)      The conditions precedent in <u>Section 12.3</u> (*Conditions to the Effective Date*) of the Plan to the effectiveness of each other Debtor's separate Plans have been satisfied;

(f)      The Confirmation Order shall have been entered by the Bankruptcy Court by no later than February 17, 2017 and thereafter shall have become a Final Order; and

(g)     The U.S. Escrow Release Order shall have been entered by the Bankruptcy Court and the Canadian Escrow Release Order shall have been entered by the Canadian Court[26];

(h)     Appropriate notices and other documents dismissing with prejudice the various pending litigations specified in Section 7.23 (*Litigation Resolution*) of the Plan shall have been executed by the SPSA Parties party to such litigation and delivered to one another in escrow;

(i)     The Sanction Order shall have been issued by the CCAA Court by no later than February 17, 2017 and entered and thereafter shall have become a Final Order;

(j)     All conditions precedent to the effectiveness of the Canadian Plan (excluding, for the avoidance of doubt, the occurrence of the Effective Date) shall have been satisfied or waived and the Debtors and Canadian Debtors shall have exchanged and released the Plan Certificates in accordance with Section 12.2 (*Canadian and U.S. Plans Effectiveness*) of the Plan such that the Canadian Plan shall become effective in accordance with its terms simultaneously with the occurrence of the Effective Date;

(k)     Entry of an order or orders by no later than November 4, 2016 by the U.K. Court that the Joint Administrators be at liberty to perform and procure the relevant EMEA Debtor in respect of which they are appointed to perform their respective obligations under the SPSA, including, without limitation, delivering the SPSA Releases, and any other actions necessary to implement the SPSA[27];

(l)     Entry of an order or orders by no later than November 4, 2016 by the U.K. Court that the NNSA Conflicts Administrator and NNSA (in the French Main Proceeding) be at liberty to perform their obligations under the SPSA, including, without limitation, delivering the SPSA Releases, and any other actions necessary to implement the SPSA[28];

(m)     Entry of an order or orders by no later than November 4, 2016 by the French Court approving and authorizing the entry into the SPSA by NNSA (in the French Secondary Proceeding), and authorizing NNSA to perform its obligations under the SPSA, including, without limitation, delivering the SPSA Releases, and any other actions necessary to implement the SPSA[29];

(n)     Entry of an order or orders by no later than November 4, 2016 by the Beddoes Court authorizing the U.K. Pension Trustee to implement the SPSA and perform its

---

[26]    The Canadian Court issued the Canadian Escrow Release Order on October 19, 2016.

[27]    The U.K. Court entered such an order on November 3, 2016.

[28]    The U.K. Court entered such an order on October 13, 2016.

[29]    The French Court entered such an order on October 27, 2016.

obligations under the SPSA, including, without limitation, delivering the SPSA Releases, and any other actions necessary to implement the SPSA[30];

(o)    All conditions of Section 9(a) (*Conditions*) of the SPSA, except for the occurrence of the Plans Effective Date, shall have been satisfied or have been waived by the required waiver parties as set forth in Section 9(a) (*Conditions*) of the SPSA, including with respect to the Debtors, such waiver being subject to the prior consent of the Creditors' Committee and the Bondholder Group, acting reasonably and in good faith; and

(p)    The SPSA shall not have been terminated, including based on the non-occurrence of the Plans Effective Date on or prior to August 31, 2017, or such later date as is agreed upon in writing by the Debtors and the SPSA Parties in accordance with any applicable provision of the SPSA.

(q)    An order recognizing the Confirmation Order shall have been granted by the CCAA Court in the proceedings commenced in respect of the U.S. Debtors under section 18.6 of the CCAA.

(r)    A Final Order shall have been entered in NNIII's chapter 11 case approving the SPSA pursuant to Bankruptcy Rule 9019, including allowing NNL's claim against NNIII listed on Annex L (*Book Intercompany Claims*) to the SPSA as a general unsecured claim entitled to receive distributions under a plan on a *pari passu* basis with other general unsecured claims against NNIII.

## 4.    Creditor Proceeds Distribution Conditions

The distribution of Creditor Proceeds is subject to the satisfaction or express written waiver by the Debtors of the following conditions:

(a)    the Plans Effective Date shall have occurred and the SPSA shall have become effective and fully enforceable in accordance with its terms;

(b)    the dismissal with prejudice of all litigation referenced in Section 5 (*Litigation Resolution*) of the SPSA, including the pending leave to appeals, appeals and cross-appeals in respect of the Allocation Dispute pending before the Canadian Court and Bankruptcy Court, shall have occurred; and

(c)    the Debtors shall have received the U.S. Allocation, as set forth in Section 7.6 (*Allocation of Sale Proceeds Among the Debtors*) of the Plan.

## 5.    Waiver of Conditions

Notwithstanding the foregoing, each Debtor reserves its right, with respect to such Debtor's Chapter 11 Case only, to waive the occurrence of the conditions precedent to the Effective Date set forth in Section 12.3 (*Conditions to the Effective Date*) of the Plan, other than Section 12.3(o) and Section 12.3(p) of the Plan.  Any such waiver may be given effect at any

---

[30]    The Beddoes Court entered such an order on October 13, 2016.

time, without notice, without leave, hearing or order of the Bankruptcy Court, and without any formal action other than proceeding to consummate the Plan, provided that notice of any such waiver shall promptly be provided to the SPSA Parties.  Any actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action.  If any of the Debtors decide that one of the conditions precedents to the Effective Date of its Plan cannot be satisfied and the occurrence or such condition is not waived or cannot be waived, then such Debtor shall file a notice of the inability to satisfy such condition with the Bankruptcy Court.  The failure of a Debtor to exercise any of the foregoing rights shall not be deemed a waiver of any other rights and each right shall be deemed an ongoing right that may be asserted at any time.

6.      **Limited Severability of the Plan**

Subject to the Debtors' obligations under the SPSA, the Plan shall be deemed a separate chapter 11 plan for each individual Debtor (except in the case of the Consolidated Debtors, NNI and NNCC) and the Confirmation and effectiveness of any Debtor's Plan is not conditioned on the Confirmation and effectiveness of any other Debtor's Plan.  In the event that the Plan is not confirmed for any individual Debtor, the Plan shall be treated at the Confirmation Hearing as a motion seeking approval of the SPSA pursuant to Bankruptcy Rule 9019 as to any such individual Debtor that does not confirm a Plan.  Following the approval of the SPSA, any individual Debtor may dismiss or convert its chapter 11 case, as necessary, to effectuate the SPSA and the settlement contemplated therein or to wind down and cease operations.

The Debtors shall coordinate with the SPSA Parties to make any required amendments to the SPSA in order to implement any such actions, subject to the SPSA Parties' rights under the SPSA.

7.      **Notice of Effective Date**

Upon satisfaction of all the other conditions to the Effective Date listed above, or if waivable, waiver pursuant to Section 12.5 (*Notice of Effective Date*) of the Plan, or as soon thereafter as is reasonably practicable, the Debtors will File with the Bankruptcy Court the "Notice of Effective Date" in a form reasonably acceptable to the Debtors in their sole discretion, which notice shall constitute appropriate and adequate notice that the Plan has become effective; *provided*, *however*, that the Debtors will have no obligation to notify any Person other than counsel to the Creditors' Committee and the Bondholder Group of such fact.  The Plan shall be deemed to be effective as of 12:01 A.M. (prevailing Eastern Standard Time), on the date of such filing.  A courtesy copy of the Notice of Effective Date may be sent by United States mail, postage prepaid (or at the Debtors' option, by courier, facsimile or electronic mail) to those Persons who have Filed with the Bankruptcy Court requests for notices pursuant to Bankruptcy Rule 2002.

I.      **Effect of the Plan on Assets, Claims and Interests**

1.      **Binding Effect; Plan Binds All Holders of Claims and Equity Interests**

Except as otherwise provided in section 1141(d) of the Bankruptcy Code, on and after the Effective Date, the provisions of the Plan shall, and shall be deemed to, be binding on any holder of a Claim against or Interest in the Debtors and its respective successors and assigns, regardless of whether the Claim or Interest of such holder is Impaired under the Plan and whether or not such holder has voted or failed to vote to accept or reject the Plan.

Further, pursuant to section 1142 of the Bankruptcy Code and in accordance with the Confirmation Order, the Debtors and any other necessary party shall execute, deliver and join in the execution or delivery (as applicable) of any instrument, document or agreement required to consummate the Plan, and to perform any other act, and the execution of documents contemplated in the Plan, including in the Plan Supplement, that are necessary for the consummation of the Plan and the transactions contemplated herein.

2.      **Release and Discharge of Directors and Wind-Down Debtors**

**EFFECTIVE AS OF THE EFFECTIVE DATE, FOR GOOD AND VALUABLE CONSIDERATION, TO THE FULLEST EXTENT PERMISSIBLE UNDER APPLICABLE LAW, THE HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS AND EACH OF SUCH HOLDERS' PREDECESSORS, SUCCESSORS, ASSIGNS AND EACH OF THEIR PRESENT AND FORMER OFFICERS, DIRECTORS, EMPLOYEES, CONSULTANTS AND AGENTS (ACTING IN SUCH CAPACITY) WILL BE DEEMED TO HAVE WAIVED, RELEASED, VOIDED AND DISCHARGED EACH OF THE DEBTORS AND THE WIND-DOWN DEBTORS FROM ANY AND ALL CLAIMS, OBLIGATIONS, DAMAGES, DEMANDS, DEBTS, RIGHTS, SUITS, JUDGMENTS OR LIABILITIES (OTHER THAN THE RIGHT TO ENFORCE THE DEBTORS' OR THE WIND-DOWN DEBTORS' OBLIGATIONS UNDER THE PLAN AND THE CONTRACTS, INSTRUMENTS, RELEASES, AGREEMENTS AND DOCUMENTS DELIVERED UNDER THE PLAN), WHETHER LIQUIDATED OR UNLIQUIDATED, FIXED OR CONTINGENT, MATURED OR UNMATURED, KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, THEN EXISTING OR THEREAFTER ARISING, IN LAW, EQUITY OR OTHERWISE, THAT ARE BASED IN WHOLE OR IN PART ON ANY ACT OR OMISSION, TRANSACTION, EVENT OR OTHER OCCURRENCE TAKING PLACE ON OR PRIOR TO THE EFFECTIVE DATE IN ANY WAY RELATING TO THE DEBTORS, THE CHAPTER 11 CASES, THE DISCLOSURE STATEMENT OR THE PLAN (INCLUDING, WITHOUT LIMITATION, THE SOLICITATION OF VOTES ON THE PLAN) THAT COULD HAVE BEEN ASSERTED BY THE HOLDERS OF CLAIMS AGAINST OR INTERESTS IN THE DEBTORS, IN THEIR INDIVIDUAL CAPACITIES OR ON BEHALF (WHETHER DIRECTLY OR DERIVATIVELY) OF THE DEBTORS, THEIR ESTATES, THE WIND-DOWN DEBTORS, EACH OF THEIR PREDECESSORS, SUCCESSORS, ASSIGNS AND EACH OF THEIR PRESENT AND FORMER OFFICERS, DIRECTORS, EMPLOYEES, CONSULTANTS AND AGENTS (ACTING IN SUCH CAPACITY), IN EACH CASE WITHOUT FURTHER NOTICE TO OR**

**ORDER OF THE BANKRUPTCY COURT, ACT OR ACTION UNDER APPLICABLE LAW, REGULATION, ORDER OR RULE OR THE VOTE, CONSENT OR AUTHORIZATION OR APPROVAL OF ANY PERSON.**

3.      **Release and Discharge of the Plan Released Parties**

**EFFECTIVE AS OF THE EFFECTIVE DATE, FOR GOOD AND VALUABLE CONSIDERATION, TO THE FULLEST EXTENT PERMISSIBLE UNDER APPLICABLE LAW, THE HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS AND EACH OF SUCH HOLDERS' PREDECESSORS, SUCCESSORS, ASSIGNS AND EACH OF THEIR PRESENT AND FORMER OFFICERS, DIRECTORS, EMPLOYEES, CONSULTANTS AND AGENTS (ACTING IN SUCH CAPACITY) WHO: (I) EITHER VOTE TO ACCEPT THE PLAN OR ARE PRESUMED TO HAVE VOTED FOR THE PLAN UNDER SECTION 1126(F) OF THE BANKRUPTCY CODE OR (II) ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN AND REJECT THE PLAN OR ABSTAIN FROM VOTING AND DO NOT MARK THEIR BALLOTS TO INDICATE THEIR REFUSAL TO GRANT THE RELEASES PROVIDED HEREIN WILL BE DEEMED TO HAVE WAIVED, RELEASED, VOIDED AND DISCHARGED EACH OF THE PLAN RELEASED PARTIES FROM ANY AND ALL CLAIMS, OBLIGATIONS, DAMAGES, DEMANDS, DEBTS, RIGHTS, SUITS, JUDGMENTS OR LIABILITIES (OTHER THAN THE RIGHT TO ENFORCE THE PLAN RELEASED PARTIES' OBLIGATIONS UNDER THE PLAN, THE SPSA AND THE CONTRACTS, INSTRUMENTS, RELEASES, AGREEMENTS AND DOCUMENTS DELIVERED UNDER THE PLAN), WHETHER LIQUIDATED OR UNLIQUIDATED, FIXED OR CONTINGENT, MATURED OR UNMATURED, KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, THEN EXISTING OR THEREAFTER ARISING, IN LAW, EQUITY OR OTHERWISE, THAT ARE BASED IN WHOLE OR IN PART ON ANY ACT OR OMISSION, TRANSACTION, EVENT OR OTHER OCCURRENCE TAKING PLACE ON OR PRIOR TO THE EFFECTIVE DATE IN ANY WAY RELATING TO THE DEBTORS, THE CHAPTER 11 CASES, THE DISCLOSURE STATEMENT, THE SPSA OR THE PLAN (INCLUDING, WITHOUT LIMITATION, THE SOLICITATION OF VOTES ON THE PLAN) THAT COULD HAVE BEEN ASSERTED BY THE HOLDERS OF CLAIMS AGAINST OR INTERESTS IN THE DEBTORS, IN THEIR INDIVIDUAL CAPACITIES OR ON BEHALF (WHETHER DIRECTLY OR DERIVATIVELY) OF THE DEBTORS, THEIR ESTATES, THE WIND-DOWN DEBTORS, EACH OF THEIR PREDECESSORS, SUCCESSORS, ASSIGNS AND EACH OF THEIR PRESENT AND FORMER OFFICERS, DIRECTORS, EMPLOYEES, CONSULTANTS AND AGENTS (ACTING IN SUCH CAPACITY), IN EACH CASE WITHOUT FURTHER NOTICE TO OR ORDER OF THE BANKRUPTCY COURT, ACT OR ACTION UNDER APPLICABLE LAW, REGULATION, ORDER OR RULE OR THE VOTE, CONSENT OR AUTHORIZATION OR APPROVAL OF ANY PERSON.**

**NOTWITHSTANDING ANYTHING TO THE CONTRARY IN SECTIONS 13.2 (*RELEASE AND DISCHARGE OF DIRECTORS AND WIND-DOWN DEBTORS*) OR 13.3 (*RELEASE AND DISCHARGE OF THE PLAN RELEASED PARTIES*) OF THE PLAN, THE RELEASES SET FORTH IN THE PLAN DO NOT RELEASE ANY POST-**

EFFECTIVE DATE OBLIGATIONS OF ANY PARTY OR ENTITY UNDER THE
PLAN, OR ANY DOCUMENT, INSTRUMENT OR AGREEMENT (INCLUDING
THOSE SET FORTH IN THE PLAN SUPPLEMENT) EXECUTED TO IMPLEMENT
THE PLAN, INCLUDING THE SPSA, AND EXCEPT AS OTHERWISE PROVIDED BY
PRIOR OR SUBSEQUENT FINAL ORDER OF THE BANKRUPTCY COURT,
NOTHING IN SECTIONS 13.2 (*RELEASE AND DISCHARGE OF DIRECTORS AND
WIND-DOWN DEBTORS*) OR 13.3 (*RELEASE AND DISCHARGE OF THE PLAN
RELEASED PARTIES*) OF THE PLAN SHALL OPERATE AS A WAIVER OR
RELEASE OF (A) ANY PERSON (I) NAMED PRIOR TO THE EFFECTIVE DATE AS
A DEFENDANT IN ANY ACTION COMMENCED BY OR ON BEHALF OF THE
DEBTORS-IN-POSSESSION, INCLUDING ANY ACTIONS PROSECUTED BY THE
CREDITORS' COMMITTEE AND THE BONDHOLDER GROUP  OR (II)
ADJUDICATED PRIOR TO THE EFFECTIVE DATE BY A COURT OF COMPETENT
JURISDICTION TO HAVE ENGAGED IN ACTS OF DISHONESTY OR WILLFUL
MISCONDUCT DETRIMENTAL TO THE INTEREST OF THE DEBTORS OR (B) ANY
CLAIM (I) WITH RESPECT TO ANY LOAN, ADVANCE OR SIMILAR PAYMENT BY
THE DEBTORS TO ANY SUCH PERSON, (II) WITH RESPECT TO ANY
CONTRACTUAL OBLIGATION OWED BY SUCH PERSON TO THE DEBTORS OR
(III) RELATING TO SUCH PERSON'S KNOWING FRAUD, GROSS NEGLIGENCE
OR WILLFUL MISCONDUCT; AND *PROVIDED*, *FURTHER*, THAT THE
FOREGOING IS NOT INTENDED, NOR SHALL IT BE CONSTRUED, TO RELEASE
ANY OF THE DEBTORS' CLAIMS THAT MAY EXIST AGAINST THE DEBTORS'
DIRECTORS AND OFFICERS LIABILITY INSURANCE; AND *PROVIDED*,
*FURTHER*, THAT, NOTWITHSTANDING THE FOREGOING, ALL SUCH CLAIMS
SHALL BE PRESERVED BY THE DEBTORS FOR SETOFF PURPOSES.

    4.    **SPSA Releases**

UPON THE EFFECTIVE DATE, AS PROVIDED IN SECTION 8 (*Releases*)
OF THE SPSA AND IN CONSIDERATION FOR THE SETTLEMENTS PROVIDED
FOR UNDER THE SPSA INCLUDING THE RELEASES GRANTED IN FAVOR OF
THE DEBTOR RELEASING PARTIES UNDER THE SPSA, EACH OF THE DEBTOR
RELEASING PARTIES (I) SHALL BE DEEMED TO HAVE RELEASED AND
FOREVER DISCHARGED EACH OF THE OTHER SPSA RELEASED PARTIES
FROM ANY AND ALL LIABILITY FOR CLAIMS, DEFENSES, DEMANDS,
LIABILITIES, DAMAGES, ACTIONS, CONTRIBUTIONS, SUBROGATION, CAUSES
OF ACTION, SETOFFS, RECOUPMENTS, COSTS AND EXPENSES (INCLUDING
LAWYERS' OR OTHER FEES OR EXPENSES), THE FOREGOING TERMS TO BE
CONSTRUED AS BROADLY AS POSSIBLE, WHETHER KNOWN OR UNKNOWN,
PAST OR PRESENT, FIXED OR CONTINGENT, LIQUIDATED OR UNLIQUIDATED,
WHICH ANY OF THE DEBTOR RELEASING PARTIES HAVE, HAD, MAY HAVE
HAD OR HEREAFTER MAY HAVE HOWEVER SO ARISING OUT OF OR IN
CONNECTION WITH THE ALLOCATION DISPUTE, ANY OTHER MATTERS
RESOLVED UNDER THE SPSA OR ANY OTHER MATTER RELATING TO THE
CHAPTER 11 CASES OR THE FOREIGN PROCEEDINGS OR THE NORTEL GROUP
(COLLECTIVELY, AND EXCLUDING THE NON-RELEASED MATTERS, THE "SPSA
RELEASED CLAIMS") AND UNDERTAKE, COVENANT AND AGREE NOT TO

MAKE ANY CLAIM, PARTICIPATE IN ANY PROCEEDING OR TAKE ANY ACTION AGAINST ANY OTHER PERSON OR ENTITY WHO WOULD AS A RESULT OF SUCH CLAIM, PROCEEDING OR ACTION HAVE A CLAIM FOR CONTRIBUTION OR INDEMNITY AGAINST ANY OF THE OTHER SPSA RELEASED PARTIES IN RELATION TO THE SPSA RELEASED CLAIMS, *PROVIDED HOWEVER*, THAT THE DEBTORS' RIGHT TO OBJECT TO, OR ASSERT COUNTERCLAIMS FOR PURPOSES OF SETOFF AGAINST, CLAIMS MADE AGAINST THEM BY DIRECTORS AND OFFICERS OF ANY NORTEL ENTITY AGAINST SUCH DEBTORS IS NOT RELEASED OR IN ANY WAY COMPROMISED. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS PARAGRAPH, THE RELEASES SET FORTH IN <u>SECTION 13.4</u> (*SPSA RELEASES*) OF THE PLAN DO NOT CONSTITUTE A RELEASE, WAIVER OR DISCHARGE OF ANY PROVEN CLAIMS AGAINST THE CANADIAN ESTATE FOR PAYMENT OF THE CROSSOVER BONDS OR THE NNCC BONDS, THE U.S. CANADIAN CLAIM, THE U.S. CANADIAN PRIORITY CLAIM, THE INTERCOMPANY CLAIMS SPECIFIED ON <u>ANNEX L</u> (*BOOK INTERCOMPANY CLAIMS*) TO THE SPSA, NNI'S RIGHT TO RECEIVE PAYMENT FROM THE CANADIAN ESTATE IN THE AMOUNT OF $77.5 MILLION, AS PROVIDED FOR IN <u>SECTION 4(E)</u> (*SIDE LETTERS, IFSA, CFSA AND T&T CLAIMS*) OF THE SPSA, ANY CLAIM BETWEEN OR AMONG ANY OF THE DEBTORS AND THEIR SUBSIDIARIES, ANY CLAIM BETWEEN THE PBGC AND THE DEBTORS OR ANY OF THEIR U.S. SUBSIDIARIES, ANY PROFESSIONAL CLAIM, ANY CLAIM TO ENFORCE THE TERMS OF THE SPSA, THE PLAN, THE CANADIAN PLAN, AND ANY ORDER OF THE BANKRUPTCY COURT OR THE CCAA COURT RELATED THERETO, OR ANY OTHER MATTER LISTED UNDER SECTION 8(i) OF THE SPSA (COLLECTIVELY, THE "NON-RELEASED MATTERS").

5.      Exculpation

Pursuant to <u>Section 13.5</u> (*Exculpation and Limitation of Liability*) of the Plan, none of the Exculpated Parties shall have or incur any liability to any Entity for any act taken or omitted to be taken in connection with and subsequent to the commencement of the Chapter 11 Cases, the formulation, preparation, dissemination, implementation, solicitation of votes, confirmation or approval of the Plan or any compromises or settlements contained therein, the administration of the Plan or Distributions under the Plan, the Disclosure Statement and any ancillary documents related thereto or any contract, instrument, release or other agreement or document provided for or contemplated in connection with the consummation of the transactions set forth in the Plan; *provided*, *however*, the foregoing provisions of this Section shall not affect the liability of any Exculpated Party that otherwise would result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted gross negligence or willful misconduct, including, without limitation, fraud and criminal misconduct, and in all respects the Exculpated Parties shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.

6.      **Injunction on Claims**

Except as otherwise expressly provided in the Plan, the Confirmation Order or such other order of the Bankruptcy Court that may be applicable, all holders of Claims or other debt or liability that is treated under the Plan or Interest or other right of interest that is terminated or cancelled pursuant to the Plan are permanently enjoined, from and after the Effective Date, from (a) commencing or continuing in any manner any action or other proceeding of any kind on any such Claim or other debt or liability or Interest or other right of equity interest that is terminated or cancelled pursuant to the Plan against the Debtors, the Estates or the Wind-Down Debtors or any properties or interest in properties of the Debtors or the Wind-Down Debtors, (b) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against the Debtors, the Estates or the Wind-Down Debtors or any properties or interest in properties of the Debtors or the Wind-Down Debtors, (c) creating, perfecting or enforcing any encumbrance of any kind against the Debtors, the Estates or the Wind-Down Debtors or any properties or interest in properties of the Debtors or the Wind-Down Debtors, (d) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from the Debtors, the Estates or the Wind-Down Debtors or any properties or interest in properties of the Debtors or the Wind-Down Debtors, (e) acting or proceeding in any manner that does not conform to or comply with the provisions of the Plan and (f) taking any actions to interfere with the implementation or consummation of the Plan, with respect to any such Claim or other debt or liability that is discharged or Interest or other right of equity interest that is terminated or cancelled pursuant to the Plan.

7.      **Terms of Injunctions or Stays**

Unless otherwise provided in the Plan, the Confirmation Order or a separate order of the Bankruptcy Court, all injunctions or stays arising under or entered during the Chapter 11 Cases under sections 105 and 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until each Debtor's Effective Date. Upon each Debtor's respective Effective Date, all injunctions or stays provided for in each Chapter 11 Case under sections 105 or 362 of the Bankruptcy Code, or otherwise, shall be lifted and of no further force or effect—being replaced, to the extent applicable, by the injunctions, discharges, releases and exculpations of Article 13 (*Effect of Confirmation*) of the Plan.

8.      **Retention of Litigation Claims and Reservation of Rights**

Section 13.8 (*Retention of Litigation Claims and Reservation of Rights*) of the Plan provides that, except as expressly provided in the Plan, nothing contained in the Plan or in the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights with respect to Litigation Claims that the Debtors, the Wind-Down Debtors or the Plan Administrator may have or choose to assert on behalf of the respective Estates or Wind-Down Debtors under any provision of the Bankruptcy Code or any applicable nonbankruptcy law, including, without limitation, any and all claims against any Person or Entity, to the extent such Person or Entity asserts a cross-claim, counterclaim or claim for setoff that seeks affirmative relief against the Debtors, their officers, directors or representatives.

Except as expressly provided in the Plan, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any Litigation Claim, right of setoff or other legal or equitable defense that the Debtors had immediately prior to the Petition Date, against or with respect to any Claim. The Debtors, the Wind-Down Debtors and the Plan Administrator shall have, retain, reserve and be entitled to assert all such Litigation Claims, rights of setoff, and other legal or equitable defenses that the relevant Debtor had immediately prior to the Petition Date fully as if the Chapter 11 Cases had not been commenced, and all of the Debtors' legal and equitable rights respecting any Claim may be asserted after the Confirmation Date to the same extent as if the Chapter 11 Cases had not been commenced.

Except as expressly provided in the Plan, the Plan Administrator, shall, after the Effective Date, retain the rights of each Debtor to prosecute any Litigation Claims that could have been brought by such Debtor at any time.

## J.  Retention of Rights

The Plan Administrator and the Wind-Down Debtors shall retain the rights of each Debtor to enforce all orders entered and relief granted in the Chapter 11 Cases

## K.  Vesting

Except as otherwise expressly provided in the Plan or the SPSA, or any documents or instruments executed in accordance therewith, on the Effective Date, pursuant to section 1141(b) and section 1141(c) of the Bankruptcy Code, the Wind-Down Debtors shall be vested with all of the Assets of such Debtors' Estates free and clear of all Claims, Interests, Liens, encumbrances, charges and other interests of Creditors and holders of Interests, and may operate free of any restrictions imposed by the Bankruptcy Code or by the Bankruptcy Court, including, without limitation, performing any contract or lease entered into or assumed by any of the Debtors after the Petition Date. The Debtors shall continue as Debtors-in-Possession under the Bankruptcy Code until the Effective Date, and thereafter, subject to the terms of the Plan, the Wind-Down Debtors may operate free of any restrictions imposed by the Bankruptcy Code or the Bankruptcy Court

## L.  Defenses with Respect to Unimpaired Claims

Except as otherwise provided in the Plan, nothing shall affect the rights and legal and equitable defenses of the Debtors, the Wind-Down Debtors or the Plan Administrator with respect to any Unimpaired Claim, including all rights in respect of legal and equitable defenses to setoffs or recoupments against Unimpaired Claims.

## M.  The Debtors' Post-Emergence Wind-Down Activities

After the Effective Date, each Wind-Down Debtor will operate to fulfill its remaining obligations under the Plan, distribute Creditor Proceeds and otherwise effectuate the provisions of the Plan. In accordance with the Plan Administration Agreement and the Plan, each Wind-Down Debtor may be maintained by the Plan Administrator for the purpose of fulfilling such obligations or may be dissolved or wound down in the Plan Administrator's sole discretion without the necessity of further corporate action or approval by the Wind-Down Debtor or the Bankruptcy Court.

N.      **Summary of Other Provisions of the Plan**

1.      **Retention of Jurisdiction**

Article 14 (*Retention of Jurisdiction*) of the Plan provides that, notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court will retain exclusive jurisdiction over all matters arising in, arising under or related to the Chapter 11 Cases and the Plan to the fullest extent legally permissible, including jurisdiction to, among other things:

(a)      Allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Interest, including the resolution of any request for payment of any Administrative Expense Claim and the resolution of any and all objections to the allowance or priority of all Claims and Interests;

(b)      Hear and determine any and all Causes of Action against any Person, and rights of the Debtors and the Wind-Down Debtors that arose before or after the Petition Date, including, but not limited to, the rights and powers of a trustee and Debtor-in-Possession against any Person whatsoever, including, but not limited to, all avoidance powers granted to the Debtors under the Bankruptcy Code and all Causes of Action and remedies granted pursuant to sections 502, 506, 510, 541, 542, 543, 544, 545, 547 through 551 and 553 of the Bankruptcy Code;

(c)      Grant or deny any applications for allowance of compensation for Professionals authorized pursuant to the Bankruptcy Code or the Plan, for periods ending on or before the Effective Date; *provided*, *however*, that the payment of all fees and expenses of the Wind-Down Debtors and the Plan Administrator incurred from and after the Effective Date, including counsel fees, shall be made in the ordinary course and without further notice or Bankruptcy Court approval;

(d)      Resolve any matters relating to the assumption, assumption and assignment or rejection of any executory contract or unexpired lease to which any Debtor is or was a party or with respect to which any of the Debtors may be liable, including, without limitation, the determination of whether such contract is executory for the purposes of section 365 of the Bankruptcy Code, and hear, determine and, if necessary, liquidate any Claims arising therefrom;

(e)      Enter orders approving the Wind-Down Debtors' post-Confirmation sale or other disposition of Residual Assets upon motion by the Plan Administrator;

(f)      Ensure that Distributions to holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

(g)      Decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications involving any Debtor that may be pending in the Chapter 11 Cases on the Effective Date;

(h)    Hear and determine matters concerning state, local or federal taxes in accordance with sections 346, 505, 1129 or 1146 of the Bankruptcy Code, including all matters related to any Tax Dispute;

(i)    Enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and the Confirmation Order and all contracts, instruments, releases and other agreements or documents created in connection with the Plan, the Disclosure Statement or the Confirmation Order;

(j)    Hear and determine any matters concerning the enforcement of the provisions of Article 13 (*Effect of Confirmation*) of the Plan and any other exculpations, limitations of liability or injunctions contemplated by the Plan;

(k)    Resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of the Plan or the Confirmation Order;

(l)    Permit the Debtors to the extent authorized pursuant to section 1127 of the Bankruptcy Code, to modify the Plan, Confirmation Order or any agreement, contract, instrument release or document created in connection with the Plan, the Disclosure Statement or the Confirmation Order, or remedy any defect or omission or reconcile any inconsistency in the Plan or any agreement, contract, instrument, release or document created in connection with the Plan;

(m)    Issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any entity with respect to consummation, implementation or enforcement of the Plan or the Confirmation Order;

(n)    Enforce all orders, judgments, injunctions, releases, exculpations, indemnifications and rulings, including with respect to the Plan and the Confirmation Order, entered in connection with the Chapter 11 Cases;

(o)    Hear and determine Causes of Action by or on behalf of the Debtors or the Wind-Down Debtors or the Plan Administrator;

(p)    Enter and enforce such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated, or Distributions pursuant to the Plan are enjoined or stayed;

(q)    Hear and determine all claims, rights or disputes arising under or in connection with the orders previously entered in the Chapter 11 Cases;

(r)    Hear and determine any other matters that may arise in connection with or relating to the Plan, the SPSA, the Plan Administration Agreement or any agreement or the Confirmation Order;

(s)    Enter any orders in aid of and resolve any matters relating to or arising under prior orders of the Bankruptcy Court; and

(t)        Enter final decrees closing the Chapter 11 Cases.

**2.        Plan Supplement**

The Plan Administration Agreement, including the amended certificate and by-laws of Wind-Down NNI, the certificate of formation and the operating agreement of each of the Wind-Down Subsidiaries and a list of any contracts or leases to be assumed or assumed and assigned by the Debtors in accordance with Section 9.2 (*Assumption and Assignment of Remaining Contracts*) of the Plan that shall be contained in the Plan Supplement, that will be filed at least ten (10) days prior to the last day upon which holders of Claims may vote to accept or reject the Plan.  Upon its filing with the Bankruptcy Court, the Plan Supplement may be obtained at no charge on the Debtors' independent website at http://dm.epiq11.com/nortel or by request to the Debtors in accordance with Section 15.26 (*Notices*) of the Plan.

**3.        Administrative Expense Claims Reserve**

On or before the Effective Date, the Debtors shall reserve for (i) Disputed Administrative Expense Claims, Disputed Cure Amounts, Disputed Priority Tax Claims and Disputed Priority Non-Tax Claims, if any, in an amount equal to what would be distributed to holders of Disputed Administrative Expense Claims, Disputed Priority Tax Claims, Disputed Other Priority Claims or Disputed Cure Amounts if their Disputed Claims had been deemed Allowed Claims on the Effective Date or on the Administrative Expense Claims Bar Date to the extent such amounts are known, in an amount reasonably determined by the Debtors to the extent such claims have not yet been filed or are unliquidated, or in such other amount as may be approved by the Bankruptcy Court and (ii) an estimated amount for unpaid Professional Claims and any other Administrative Expense Claims that have not been Filed as of the Effective Date (together, the "Administrative Expense Claims Reserve"). With respect to such Disputed Claims, if, when and to the extent any such Disputed Claim becomes an Allowed Claim by Final Order, the relevant portion of the Cash held in reserve therefore shall be distributed by the Debtors to the claimant in a manner consistent with distributions to similarly situated Allowed Claims.  The balance of such Cash, if any, remaining after all Professional Claims, Disputed Administrative Expense Claims, Disputed Cure Amounts, Disputed Priority Tax Claims and Disputed Other Priority Claims have been resolved, and distributions made in accordance with the Plan, shall be available for Distribution to holders of Allowed Claims, in accordance with the provisions of the Plan and the Confirmation Order.  No payments or distributions shall be made with respect to a Claim that is a Disputed Claim pending the resolution of the dispute by Final Order or agreement of the parties.

**4.        Amendment or Modification of the Plan**

Subject to Section 6(c) (*Support of Settlement, Disclosure Statements and Plans*) of the SPSA and subject to section 1127 of the Bankruptcy Code and, to the extent applicable, sections 1122, 1123 and 1125 of the Bankruptcy Code, the Debtors reserve the right to alter, amend or modify the Plan at any time prior to the Confirmation Date but prior to the substantial consummation of the Plan.  Notwithstanding the foregoing, the Debtors shall not alter, amend, withdraw, replace or modify the Plan in a manner that is inconsistent with their obligations under the SPSA.  A holder of a Claim that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended or modified, if the proposed alteration, amendment or modification

126

does not materially and adversely change the treatment of the Claims of such holder and is consistent with Section 15.4 (*Amendment or Modification of the Plan*) of the Plan. For the avoidance of doubt, nothing in Section 15.4 of the Plan shall limit any SPSA Party's rights pursuant to Section 6(h) of the SPSA with respect to any proposed amendment, restatement, modification and/or supplement to the Plan.

5.    **Approval of SPSA Under Bankruptcy Rule 9019**

In the event that the Plan is not confirmed for any individual Debtor, the Plan shall be treated at the Confirmation Hearing as a motion seeking approval of the SPSA pursuant to Bankruptcy Rule 9019 as to any such individual Debtor that does not confirm a Plan. The Debtors reserve their right that, if and after such a Debtor's entry into the SPSA is approved, any such individual Debtor may dismiss or convert its chapter 11 case, as necessary to effectuate the SPSA and the settlement contemplated therein or to wind down. The Debtors shall coordinate with the SPSA Parties to make any required amendments or seek any required waivers to or under the SPSA in order to implement any such actions, subject to the SPSA Parties' rights under the SPSA.

6.    **Fees and Expenses**

From and after the Effective Date, the Wind-Down Debtors shall, in the ordinary course and without the necessity for any approval by the Bankruptcy Court, pay the reasonable and necessary fees and expenses incurred by the Disbursing Agent (other than the NNCC Bonds Indenture Trustee and the NNC/NNL Notes Indenture Trustee) and Plan Administrator in accordance with and from the funds provided for such use in the Plan.

7.    **Revocation or Withdrawal of the Plan**

Pursuant to Section 15.7 (*Revocation or Withdrawal of the Plan*) of the Plan, the Debtors reserve the right to revoke or withdraw the Plan prior to the Effective Date. If any Debtor revokes or withdraws the Plan with respect to such Debtor, or if Confirmation does not occur or if the Plan does not become effective, then the Plan will be null and void with respect to such Debtor, and nothing contained in the Plan or this Disclosure Statement will: (a) constitute a waiver or release of any Claims by or against, or any Interests in, such Debtor or any other Person, (b) constitute an admission of any fact or legal conclusion by such Debtor or any other Entity or (c) prejudice in any manner the rights of such Debtor in any further proceedings involving such Debtor.

8.    **Exemption from Certain Transfer Taxes**

Pursuant to section 1146 of the Bankruptcy Code, any transfers from any of the Debtors, the Wind-Down Debtors or the Plan Administrator pursuant to, in furtherance of, or in connection with the Plan, will not be subject to any stamp tax, recording tax, personal property tax, real estate transfer tax, sales tax, use tax, transaction privilege tax, privilege taxes or other similar tax, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forgo the collection of any such tax or governmental assessment and to

accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

## 9.      Governing Law

The rights and obligations arising under the Plan and any agreements, contracts, documents and instruments executed in connection with the Plan will be governed by, and construed and enforced in accordance with, the laws of the State of Delaware without giving effect to the principles of conflict of laws thereof, unless a rule of law or procedure is supplied by (a) U.S. federal law (including the Bankruptcy Code and Bankruptcy Rules) or (b) an express choice of law provision in any agreement, contract, instrument or document provided for, or executed in connection with, the Plan.

## 10.      Severability of Plan Provisions

Pursuant to Section 15.15 (*Severability of Plan Provisions*) of the Plan, if, prior to Confirmation, any term or provision of the Plan that does not govern the treatment of Claims or Interests is held by the Bankruptcy Court to be invalid, void or unenforceable, at the request of the Debtors the Bankruptcy Court will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision will then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation.  The Confirmation Order will constitute a final judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

## 11.      Notices of Retention on Abandonment of Documents and Property

After the Effective Date, notwithstanding Bankruptcy Rule 6007(a), or any prior order of the Bankruptcy Court, the Plan Administrator shall give notice of a proposed abandonment or disposition of property, including the Debtors' books and records, by filing a notice on the docket of the Chapter 11 Cases and delivering a copy of such notice to the Canadian Debtors, the Monitor and the EMEA Debtors.  Such filing of a notice of abandonment or disposition on the docket shall constitute good and sufficient notice of such proposed disposal, abandonment or destruction, and no other or further notice of proposed abandonment or disposition is necessary.  If no party serves an objection within thirty (30) days of the posting of such notice, the Plan Administrator shall be authorized immediately to abandon, destroy or otherwise dispose of such property.

## 12.      Dissolution of the Creditors' Committee

Effective on the Effective Date, the Creditors' Committee shall dissolve automatically and its members shall be released from any further duties and responsibilities in the Chapter 11 Cases and under the Bankruptcy Code without need for a further order of the Bankruptcy Court; *provided*, *however*, that (a) following the Effective Date the Creditors Committee shall continue in existence and have standing and a right to be heard solely for the

following limited purposes: (1) Claims and/or applications for compensation by Professionals and requests for allowance of Administrative Expense Claims for substantial contribution pursuant to section 503(b)(3)(D) of the Bankruptcy Code; (2) any appeals relating to the Plan to which the Creditors' Committee is a party; and (3) to respond to creditor inquiries and with respect to reporting under Section 6.3(g) of the Plan for ninety (90) days following the Effective Date. Except for the purposes described above, the Debtors, the Wind-Down Debtors and the Plan Administrator shall not have any obligation to pay or reimburse any fees of any official or unofficial committee of creditors incurred after the Effective Date.  For the avoidance of doubt, any obligations arising under confidentiality agreements, joint interest agreements and protective orders, if any, entered during the Chapter 11 Cases shall remain in full force and effect in accordance with their terms.

### 13.      Dissolution of the Wind-Down Debtors

The Debtors shall retain the right to dissolve any Wind-Down Debtor, after the occurrence of such Wind-Down Debtors' Final Distribution Date, on or shortly following the Effective Date without the necessity for (i) any further approval by the board of directors or stockholders of any such Wind-Down Debtor of the dissolution or any plan of distribution as may be required by applicable law or (ii) any other or further actions to be taken by or on behalf of such Wind-Down Debtors or payments to be made in connection therewith, subject to the filing of a certificate of dissolution with the appropriate governmental authorities. Should the Debtors choose to dissolve any Wind-Down Debtors pursuant to Section 8.3 (*Dissolution of the Wind-Down Debtors*) of the Plan, the Debtors shall include a list of the Wind-Down Debtors to be dissolved as an exhibit to the Plan Supplement.

### 14.      Post-Effective Date Rule 2002 Notice List

After the Effective Date, any Entity that, prior to the Effective Date, had requested from the Debtors or the Claims Agent to receive notice in the Chapter 11 Cases pursuant to Bankruptcy Rule 2002 must renew such request in writing to the Claims Agent in order to be included on the Wind-Down Debtors' Post-Effective Date Notice List.  On and after the Effective Date, the Wind-Down Debtors are authorized to limit the list of entities receiving documents pursuant to Bankruptcy Rule 2002 to those entities that request to be included on the Debtors' Post Effective Date Notice List.  The following parties (and counsel representing such parties) shall continue to receive documents pursuant to Bankruptcy Rule 2002 without filing a renewed request after the Effective Date: the Bondholder Group, the Creditors' Committee, the United States Trustee and the Trade Claims Consortium.

### 15.      Notice

Any notice required or permitted to be provided under the Plan shall be in writing and served by either (a) certified mail, return receipt requested, postage prepaid, (b) hand delivery or (c) reputable overnight delivery service, freight prepaid, to be addressed as follows:

Counsel for the Debtors

Cleary Gottlieb Steen & Hamilton LLP      Morris, Nichols, Arsht & Tunnell LLP
One Liberty Plaza                         1201 North Market Street, 18th Floor

New York, New York 10006                  P.O. Box 1347
(212) 225-3999 (facsimile)                Wilmington, Delaware 19899
Attention:  James L. Bromley, Esq.        (302) 658-3989 (facsimile)
            Lisa M. Schweitzer, Esq.      Attention:  Derek C. Abbott, Esq.
                                                      Andrew R. Remming, Esq.


The Plan Administrator

Greylock Partners, LLC
Attention:  John J. Ray, III
c/o Counsel for the Plan Administrator

Counsel for the Plan Administrator

Cleary Gottlieb Steen & Hamilton LLP      Morris, Nichols, Arsht & Tunnell LLP
One Liberty Plaza                         1201 North Market Street, 18th Floor
New York, New York 10006                  P.O. Box 1347
(212) 225-3999 (facsimile)                Wilmington, Delaware 19899
Attention:  James L. Bromley, Esq.        (302) 658-3989 (facsimile)
            Lisa M. Schweitzer, Esq.      Attention:  Derek C. Abbott, Esq.
                                                      Andrew R. Remming, Esq.


Counsel for the Creditors' Committee

Akin Gump Strauss Hauer & Feld LLP        Whiteford, Taylor and Preston LLP
One Bryant Park                           The Renaissance Centre, Suite 500
New York, New York 10036                  405 North King Street
(212) 872-1002 (facsimile)                Wilmington, Delaware 19801
Attention:  Fred S. Hodara, Esq.          (302) 357-3288 (facsimile)
            David H. Botter, Esq.         Attention:  Christopher M. Samis, Esq.
            Brad M. Kahn, Esq.



Counsel for the Bondholder Group

Milbank, Tweed, Hadley & McCloy
LLP
28 Liberty Street
New York, New York 10005
(212) 530-5219 (facsimile)
Attention:  Albert A. Pisa, Esq.

# V.
# CONFIRMATION OF THE PLAN

## A.    Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of a chapter 11 plan.  The Bankruptcy Court has scheduled the Confirmation Hearing for 10:00 A.M. on January 24, 2017 (prevailing Eastern time) before the Honorable Kevin Gross, Judge for the United States Bankruptcy Court for the District of Delaware, located at 824 Market Street, Wilmington, Delaware 19801.  The Confirmation Hearing may be adjourned from time to time without notice except as given at the Confirmation Hearing or any subsequent adjourned Confirmation Hearing.

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of a plan. Any objection to confirmation of the Plan must: (i) be in writing; (ii) state the name and address of the objecting party and the nature of the Claim or Interest that such party holds; (iii) state, if appropriate, the amount and nature of the objecting party's Claim or Interest; (iv) state the grounds for the responses or objections and the legal basis therefore; (v) reference with specificity the text of the Plan to which the responses or objections are made and provide proposed language changes or insertions to the Plan to resolve the responses or objections; and (vi) be filed with the Bankruptcy Court, together with proof of service, with one copy to chambers, such that the responses or objections are actually received on or before 4:00 P.M. on January 9, 2017 (prevailing Eastern time) by (i) counsel to the Debtors and (ii) counsel to the Committee at the addresses listed in Section 15.26 (*Notices*) of the Plan, as well as (iii) the U.S. Trustee (collectively, the "Notice Parties" and each a "Notice Party").

Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014.

UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY AND PROPERLY FILED AND SERVED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.

## B.    Confirmation Standards

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan of a Debtor only if all of the requirements of section 1129 of the Bankruptcy Code are met with respect to such Debtor.

Among the statutory requirements for confirmation of a chapter 11 plan are that the plan is: (i) accepted by all impaired classes of claims and equity interests, or if rejected by an impaired class, that the plan "does not discriminate unfairly" and is "fair and equitable" as to such class, (ii) in the "best interests" of creditors and interestholders that are impaired under the plan and (iii) feasible.

The votes of Holders of Claims who are entitled to vote and yet abstain from voting, return a ballot with no boxes checked, or return a ballot voting both to accept and reject the Plan, will not be counted for purposes of accepting or rejecting the Plan.

The Debtors believe that the Plan will satisfy all of the requirements for confirmation with respect to each Debtor.

## C.    Acceptance by an Impaired Class

In accordance with section 1126(c) of the Bankruptcy Code and except as provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims accepts a chapter 11 plan if the holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims in the class that actually cast ballots in favor of the plan.

Class 4 Creditors of each Debtor are not expected to receive any distributions and Class 5A Interestholders and Class 5B Creditors of each Debtor will receive no distributions, in each case, on account of their respective Claims or Interests and are therefore deemed to have rejected the Plan.  With respect to Classes 4, 5A and 5B, therefore, the Debtors will seek confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code.  Under section 1129(b) of the Bankruptcy Code, the Bankruptcy Court may confirm the Plan if at least one of the Impaired Classes of Claims for each Debtor (not including any acceptances by "insiders" as defined in section 101(31) of the Bankruptcy Code) accepts the Plan and certain additional conditions are met.

Any Class of Claims or Interests that, as of the commencement of the Confirmation Hearing, does not have, at least one holder of a Claim or Interest that is Allowed in an amount greater than zero (including temporarily Allowed under Bankruptcy Rule 3018) shall be considered vacant and deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to that Class.

## D.    No Unfair Discrimination and Fair and Equitable Test

Section 1129(b) of the Bankruptcy Code is generally referred to as the "cramdown" provision.  Pursuant to this Section, the Bankruptcy Court may confirm a chapter 11 plan notwithstanding the plan's rejection (or deemed rejection) by one or more impaired classes as long as the plan is accepted by at least one impaired class (by meeting the acceptance requirement described above), "does not discriminate unfairly," is "fair and equitable" as to each impaired class that has not accepted it and meets certain other statutory requirements.

AS EXPLAINED ABOVE, THE BANKRUPTCY CODE CONTAINS PROVISIONS FOR CONFIRMATION OF A PLAN EVEN IF IT IS NOT ACCEPTED BY ALL CLASSES OF CLAIMS AND INTERESTS.  THESE SO-CALLED "CRAMDOWN" PROVISIONS ARE SET FORTH IN SECTION 1129(b) OF THE BANKRUPTCY CODE, WHICH PROVIDES THAT A CHAPTER 11 PLAN CAN BE CONFIRMED EVEN IF IT HAS NOT BEEN ACCEPTED BY ALL IMPAIRED CLASSES OF CLAIMS AND INTERESTS AS LONG AS AT LEAST ONE IMPAIRED CLASS OF NON-INSIDER CLAIMS FOR EACH DEBTOR HAS VOTED TO ACCEPT THE PLAN.

### 1. No Unfair Discrimination Test

A plan does not "discriminate unfairly" within the meaning of the Bankruptcy Code with respect to a non-accepting class if the value of the cash and/or securities to be distributed to the non-accepting class is equal to, or otherwise fair when compared to, the value of the distributions to other classes whose legal rights are the same as those of the non-accepting class.

The Debtors believe that the Plan does not discriminate unfairly against any Impaired Class of any Debtor within the meaning of the Bankruptcy Code.

### 2. Fair and Equitable Test

#### a. Secured Creditors

A plan is fair and equitable as to a non-accepting class of secured claims if the plan satisfies one of the alternative requirements of section 1129(b)(2)(A) of the Bankruptcy Code. These requirements are fulfilled if either (i) each impaired secured creditor will retain its liens securing its secured claim and will receive on account of its secured claim deferred cash payments having a present value equal to the amount of its allowed secured claim, (ii) each impaired secured creditor will realize the "indubitable equivalent" of its allowed secured claim or (iii) the property securing the claim will be sold free and clear of liens with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds to be as provided in clause (i) or (ii) above.

#### b. Unsecured Creditors

Likewise, a plan is fair and equitable as to a non-accepting class of unsecured claims if the plan satisfies one of the alternative requirements of section 1129(b)(2)(B) of the Bankruptcy Code. These requirements are fulfilled if (i) the non-accepting claimants will receive the full value of their claims or (ii) if the non-accepting claimants receive less than full value, no class of junior priority will receive anything on account of their pre-petition claims or interests. The Debtors believe that the Plan is fair and equitable as to each Impaired Class.

If the Bankruptcy Court determines that the Plan does not meet the "cramdown" requirements as set forth above with respect to any Debtor, in the Debtors' sole discretion, subject to Section 15.7 (*Revocation or Withdrawal of the Plan*) of the Plan and the terms of the SPSA, the Plan may be revoked with respect to some or all of the Debtors, and such Debtors' cases may be continued, converted to chapter 7 liquidation or dismissed in such Debtors' sole discretion upon the Bankruptcy Court's approval where required.

### E. Best Interests Test

In order for a chapter 11 plan to be confirmed, the Bankruptcy Code requires that, with respect to each impaired class of creditors or interestholders, that each of such impaired creditors or interestholders either (i) accept the plan or (ii) receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the amount such class members would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy

Code on the effective date. This test is imposed by section 1129(a)(7) of the Bankruptcy Code and is referred to as the "best interests" test. Accordingly, if an Impaired Class does not unanimously accept the Plan, the best interests test requires the Bankruptcy Court to find, before confirming the Plan, that the Plan provides to each member of such Impaired Class a recovery on account of the Class member's Claim or Interest that has a value, as of the Effective Date, at least equal to the value of the distribution that each such Class member would receive if the relevant Debtor was liquidated under chapter 7 of the Bankruptcy Code on the Effective Date.

To estimate the recovery members of each Impaired Class of unsecured Creditors and Interestholders would receive if the Debtors were liquidated under chapter 7, the Bankruptcy Court must first determine the aggregate dollar amount that would be generated from each Debtor's assets if each of the Chapter 11 Cases were converted to a chapter 7 case under the Bankruptcy Code and the assets were liquidated by a trustee in bankruptcy (the "Liquidation Value" of such assets). The Liquidation Value for a Debtor would consist of the net proceeds from the disposition of that Debtor's Assets and would be augmented by any Cash held by that Debtor.

As detailed in the liquidation analysis prepared by the Debtors' management in consultation with their advisors, using information provided by the Debtors and other sources (the "Liquidation Analysis"), a copy of which is included herein as Appendix D (*Liquidation Analysis*, the Liquidation Value of each Debtor's Assets available to general unsecured Creditors would be reduced by the costs and expenses of the liquidation, as well as other administrative expenses that would have been incurred in the hypothetical chapter 7 cases. Each Debtor's costs of liquidation under chapter 7 would include the compensation of a trustee or trustees, as well as counsel and other professionals retained by the trustee(s), disposition expenses, all unpaid expenses incurred by that Debtor during its Chapter 11 Case (such as compensation for attorneys and accountants) which are allowed in the chapter 7 proceedings, and litigation costs and claims against that Debtor arising from its business operations during the pendency of the Chapter 11 Cases and chapter 7 liquidation proceedings. Section 326(a) of the Bankruptcy Code permits reasonable compensation not to exceed 3% of the proceeds in excess of $1 million distributable to creditors. These costs, expenses and claims would be paid in full out of that Debtor's liquidation proceeds before the balance would be made available to pay unsecured claims.

Once the percentage recoveries in liquidation of secured claimants, priority claimants, general unsecured Creditors and Interestholders are ascertained, the value of the distribution available out of the Liquidation Value is compared with the value of the property offered to each Class of Claims and Interests under the Plan to determine whether the Plan is in the best interests of each such Class.

The Debtors believe that the Plan satisfies the best interests test because, if the Plan is not confirmed and, instead, the Chapter 11 Cases are converted to chapter 7 liquidation proceedings, the value of each Debtor's estate would diminish because (i) each estate would need to pay fees and other costs to the chapter 7 trustee, (ii) each estate would incur increased professional fees and other costs associated with supporting the chapter 7 proceedings and associated litigation costs and claims and (iii) the conversion to chapter 7 liquidation would likely result in additional delay for the distribution of assets to creditors due to the time it would

likely take a chapter 7 trustee to familiarize him or herself with the complexity of the Debtors' estates and the history of this case.

Comparing the estimated recoveries set forth in <u>Section I.B.3</u> (*Estimated Recoveries for Each Class of Claims*) with the Liquidation Analysis included herein as <u>Appendix D</u> (*Liquidation Analysis*), the Debtors believe that distributions under the Plan will provide at least the same recovery to holders of Allowed Claims against or Interests in each of the Debtors on account of such Allowed Claims or Interests as would distributions by a chapter 7 trustee. Conversion of the Chapter 11 Cases to chapter 7 liquidation proceedings also likely would delay the ultimate distributions to Creditors and Interestholders.

## F.    Feasibility

To confirm a chapter 11 plan, the Bankruptcy Court must find that the confirmation of the plan is not likely to be followed by the liquidation or the need for further financial reorganization of the debtor, unless and to the extent liquidation is contemplated by the plan. This requirement is imposed by section 1129(a)(11) of the Bankruptcy Code and is referred to as the "feasibility" requirement. The Debtors believe that they will be able to timely perform all obligations described in the Plan, and therefore, that the Plan satisfies the feasibility requirement.

To demonstrate the feasibility of the Plan, the Debtors have prepared the Budget and Recovery Analysis, a copy of which is included herein as <u>Appendix C</u> (*Budget and Recovery Analysis*). The Budget and Recovery Analysis indicate estimated expenses and costs arising after the Effective Date of the Plan taking into account the expected costs to administer and wind down the Debtors' estates. Accordingly, the Debtors believe that the Plan satisfies the feasibility requirement. The Debtors caution, however, that no representations can be made as to the accuracy of the Budget and Recovery Analysis. See <u>Section VI</u> (*Certain Risk Factors To Be Considered*) for a discussion of certain risk factors that may affect financial feasibility of the Plan.

THESE ARE COMPLEX STATUTORY PROVISIONS THAT HAVE BEEN THE SUBJECT OF SUBSTANTIAL JUDICIAL INTERPRETATION, AND THE PRECEDING PARAGRAPHS ARE NOT INTENDED TO BE A COMPLETE SUMMARY OF THE LAW. PLEASE CONSULT WITH YOUR ATTORNEY TO OBTAIN A COMPLETE UNDERSTANDING OF THE LAW AND YOUR RIGHTS UNDER THE LAW.

# VI.
# CERTAIN RISK FACTORS TO BE CONSIDERED

THE PLAN AND ITS IMPLEMENTATION ARE SUBJECT TO CERTAIN RISKS, INCLUDING, BUT NOT LIMITED TO, THE RISK FACTORS SET FORTH BELOW. BEFORE VOTING TO ACCEPT OR REJECT THE PLAN, SOLICITED CREDITORS SHOULD READ AND CONSIDER CAREFULLY THE RISK FACTORS BELOW, AS WELL AS OTHER RISKS AND UNCERTAINTIES IDENTIFIED IN THIS DISCLOSURE STATEMENT, IN THEIR ENTIRETY.  SUCH RISKS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.  THE ORDER IN WHICH RISK FACTORS ARE HEREIN PRESENTED DOES NOT NECESSARILY REFLECT THEIR ORDER OF IMPORTANCE.

## A.      General Considerations

The Plan sets forth the means for satisfying the Claims against and Interests in the Debtors.  Certain Claims may receive partial distributions pursuant to the Plan, and in some instances, no distributions at all.  Please see Section IV (*Chapter 11 Plan*) and Article 4 (*Treatment of Claims Against and Interests in Debtors*) of the Plan.

## B.      Certain Bankruptcy Considerations

The Debtors are parties to various contractual arrangements under which the commencement of the Chapter 11 Cases and the other transactions contemplated by the Plan could, subject to the Debtors' rights and powers under the Bankruptcy Code (and in particular, sections 105, 362 and 365 of the Bankruptcy Code) (i) result in a breach, violation, default or conflict, (ii) give other parties thereto rights of termination or cancellation and/or (iii) have other adverse consequences for the Debtors.  The magnitude of any such adverse consequences may depend upon, among other factors, the diligence and vigor with which other parties to such arrangements may seek to assert any such rights and pursue any such remedies in respect of such matters, and the ability of the Debtors to resolve such matters on acceptable terms through negotiations with such other parties or otherwise.

There can be no assurance that the requisite acceptances to confirm the Plan will be obtained.  Even if the requisite acceptances are received and the requirements for "cramdown" are met with respect to relevant Classes of Creditors and Interestholders, there can be no assurance that the Bankruptcy Court will confirm the Plan.  Although the Bankruptcy Court has determined that this Disclosure Statement and the balloting procedures are appropriate, the Bankruptcy Court could still decline to confirm the Plan if it were to find that any of the statutory requirements for confirmation had not been met.  While there can be no assurance that the Bankruptcy Court will conclude that these requirements have been met, the Debtors believe that the Plan meets all of the requirements set forth in section 1129 of the Bankruptcy Code.  See Section V (*Confirmation of the Plan*).

The confirmation and consummation of the Plan are also subject to satisfaction or waiver of certain conditions.  There can be no assurance that all of the various conditions to

effectiveness of the Plan will be timely satisfied or waived.  If the Plan were not to become effective for not meeting such conditions, it is unclear whether and when Creditors and Interestholders ultimately would receive a distribution, if any, with respect to their Claims and Interests.

If the Bankruptcy Court determines that the Plan does not meet the "cramdown" requirements with respect to any Debtor, in the Debtors' sole discretion, the Plan may be revoked with respect to some or all of the Debtors, and such Debtors' cases may be continued, converted to chapter 7 liquidation or dismissed in such Debtors' sole discretion upon the Bankruptcy Court's approval where required.

The continuation of the Chapter 11 Cases, particularly if the Plan is not confirmed or consummated in the timeframe currently contemplated, could further adversely affect the Debtors' ability to maximize value.  If confirmation and consummation of the Plan do not occur expeditiously, the Chapter 11 Cases could result in, among other things, increased costs for professional fees and similar expenses.

## C.      Inherent Uncertainty of Projections and Estimations

The Budget and Recovery Analysis included herein as <u>Appendix C</u> (*Budget and Recovery Analysis*) relating to operations of the Wind-Down Debtors and their non-Debtor subsidiaries (collectively, the "<u>Wind-Down Debtor Group</u>") are based on numerous assumptions including the timing, confirmation and consummation of the Plan in accordance with their terms and the resolution of litigation and other matters, many of which are beyond the control of the Wind-Down Debtor Group and some or all of which may not materialize.  In addition, unanticipated events and circumstances occurring subsequent to the date that this Disclosure Statement was approved by the Bankruptcy Court may affect the Wind-Down Debtors' ability to achieve the projections included in the Budget and Recovery Analysis.  Such variations may be material.  Because the actual results achieved throughout the periods covered by the Budget and Recovery Analysis may vary from the projected budgets and projections, the Budget and Recovery Analysis should not be relied upon as a guaranty, representation or other assurance of the actual costs that will be realized.

Except with respect to the Budget and Recovery Analysis and except as otherwise specifically and expressly stated herein, this Disclosure Statement does not reflect any events that may occur subsequent to the date hereof and that may have a material effect on the information contained in this Disclosure Statement.  The Wind-Down Debtors do not intend to update the Budget and Recovery Analysis; thus, the Budget and Recovery Analysis will not reflect the effect of any subsequent events not already accounted for in the assumptions underlying the Budget and Recovery Analysis.

Furthermore, the recovery estimates in the Disclosure Statement are based on the assumption that no tax withholding will be made on the expected recoveries from the Canadian Debtors. If the Canadian Debtors are required under applicable law to withhold any taxes in connection with their payment of the U.S. Canadian Unsecured Claim, the U.S. Canadian Priority Claim or the $77.5 million payment required by section 4(e) of the SPSA,  distributions made to NNI with respect to such obligations would be reduced by the amount of the required

withholding tax.  The Debtors do not expect that any such withholding tax would apply on a payment or distribution by the Canadian Debtors on account of the U.S. Canadian Unsecured Claim, U.S. Canadian Priority Claim or  the $77.5 million payment required by section 4(e) of the SPSA and do not have any reason to believe that the Canadian Debtors would take a different position.  However, if any amounts are withheld by the Canadian Debtors, such withholding would reduce the payment the Debtors receive in respect of the U.S. Canadian Unsecured Claim, U.S. Canadian Priority Claim or the $77.5 million payment required by section 4(e) of the SPSA and there is no certainty that the Debtors would be able to recover all or any portion of the withheld amounts through a refund or credit.

**D.      Liquidation Analysis**

        The Debtors have prepared the Liquidation Analysis included herein as Appendix D (*Liquidation Analysis*) based on certain assumptions that they believe are reasonable under the circumstances.  Those assumptions that the Debtors consider significant are described in the liquidation analysis.  The underlying projections have not been compiled or examined by independent accountants.  The Debtors make no representations regarding the accuracy of the projections or a chapter 7 trustee's ability to achieve the forecasted results.  Many of the assumptions underlying the projections are subject to significant uncertainties.  Inevitably, some assumptions will not materialize and unanticipated events and circumstances may affect the ultimate financial results.  In the event the Chapter 11 Cases are converted to chapter 7 proceedings, actual results may vary materially from the estimates and projections set forth in the liquidation analysis.  Therefore, the liquidation analysis is speculative in nature.  In evaluating the Plan, Creditors, Interestholders and other parties in interest are urged to examine carefully all of the assumptions underlying the liquidation analysis.

**E.      Claims Estimations**

        The Debtors' estimates of the distributions certain Classes of Creditors or Interestholders will receive under the Plan depend on numerous assumptions, including assumptions concerning the ultimate amount of Allowed Claims in relevant Classes.

        There can be no assurance that the estimated amounts of Claims set forth in this Disclosure Statement are correct, and the actual Allowed amounts of Claims may differ materially from the estimates.  Because the estimated amounts are based solely upon (i) a review of the Debtors' books and records; (ii) a review of the proofs of claim filed in the Chapter 11 Cases; (iii) the Debtors' estimates as to additional claims that may be filed in the Chapter 11 Cases; and (iv) the Debtors' estimates of Claims that will be Allowed following the objections to Claims by the Debtors, such estimated amounts are subject to certain risks, uncertainties and assumptions.  This may include the allowance of administrative expense and priority claims in amounts greater than estimated, which would dilute the recoveries for Unsecured Creditors. Should one or more of these risks or uncertainties materialize or should underlying assumptions prove incorrect, the actual Allowed amounts of Claims may vary materially from those estimated.

Any allowance of Claims in any Class in an amount materially in excess of the Debtors' estimate could have a significant negative effect on the distributions received by certain Classes of Creditors.

## F.    Distributions under the Plan

As discussed above, the Claims of Creditors are subject to the risk of dilution if the total amount of Allowed Claims is higher than the Debtors' estimates.  Many Disputed Claims are material.  Accordingly, the amount of the Distribution that will ultimately be received by any particular holder of a Claim may be adversely affected by the aggregate amount of all Allowed Claims.  In order to account for such risk of dilution, Distributions to General Unsecured Creditors (and certain other Creditors, to the extent necessary and appropriate) of each Debtor will be made on an incremental basis until all Disputed Claims have been resolved.

A substantial amount of time may elapse between the Effective Date and the receipt of Distributions, including, but not limited to, the Distributions received on the Final Distribution Date under the Plan for certain holders of Claims because of the time required to achieve recovery of certain assets and final resolution of Disputed Claims.

## G.    Conditions to Effectiveness of the Plan

The Plan becomes effective only when and if all of the conditions to its effectiveness are satisfied as provided in Section 12.3 (*Conditions to the Effective Date*) of the Plan or waived pursuant to Section 12.4 (*Waiver of Conditions*) of the Plan.  Creditors, Interestholders and other parties in interest are therefore advised to read carefully the conditions listed above in Section IV.H (*Conditions Precedent to Plan's Confirmation and Effective Date*) and Sections 12.3 (*Conditions to the Effective Date*) and Section 12.4 (*Waiver of Conditions*) of the Plan.  Two of the conditions will be of particular importance to the Creditors, Interestholders and other parties in interest:

(i)    The Debtors and other relevant parties in interest in these Chapter 11 Cases, including NNIII, the Canadian Debtors, the EMEA Debtors and NNSA, have negotiated the SPSA with respect to allocation issues and related matters.  However, the SPSA will be effective only if, among other conditions, the Confirmation Order is entered by the Court no later than February 17, 2017, the Effective Date occurs no later than August 31, 2017 and similar approvals are obtained by other parties to the SPSA.  If the Plan is not confirmed or does not become effective by these dates, respectively, there can be no assurance that the Debtors and other relevant parties would again reach a consensual agreement with respect to the allocation of such proceeds and related matters.  If the Debtors and other relevant parties decide or otherwise are forced to litigate the allocation and related disputes, such litigation proceedings may take significant time and the Debtors may incur substantial professional fees and other litigation-related costs and expenses.  Please see discussion of litigation and mediation proceedings in Section III.H (*Allocation of Sale Proceeds and Global Settlement of Allocation Dispute*).

(ii)    The failure of a condition to the effectiveness of the Plan with respect to any Debtor may prevent or delay the effectiveness of the Plan with respect to another Debtor,

unless such condition is amended or waived in accordance with the provisions of the Plan or the SPSA, as applicable.

## H.     Monetization of Remaining Assets

The Debtors and their Affiliates are considering whether and how to monetize any remaining assets, if any, and the value the Debtors ultimately may realize from such assets, if any, is uncertain at this time.

## I.     Greater Than Budgeted Wind-Down Costs

Winding down the Debtors' estates may be more prolonged and result in greater costs than currently anticipated.  The Debtors' wind-down process will require navigating complex legal and regulatory issues, coordinating with other Nortel affiliates, disposing of the Debtors' remaining assets and dissolving the Debtors and their affiliates.  The Debtors have incurred significant costs to date for personnel and professional services.  Due to the uncertainty of the effort, cost and time necessary to wind down the Debtors' estates, including the uncertainty posed by unliquidated claims and any remaining litigation against the Debtors' estates, the future expenditures may be materially different than anticipated and may affect the ultimate value of the estates.

## J.     Intercompany Claims and Causes of Action

Under the settlements embodied in the CFSA and the IFSA, the Debtors (other than NNCALA and NNIII) and the Canadian Debtors previously settled and waived certain intercompany claims.  The SPSA, including the releases provided for in Section 8 (*Releases*) thereunder, settles and resolves other remaining intercompany claims between and among the debtors and various of their affiliates, including claims against the Debtors' (and NNIII's) officers and employees, arising from the Allocation Dispute or related matters. This includes claims for indemnification or contribution arising from lawsuits against one of the Debtors (or NNIII) by third parties, though each Debtor (or NNIII) has an obligation to reasonably cooperate with other Debtors (or NNIII) in such lawsuits to the extent it can do so without prejudicing its own interests if the third party claim would otherwise have given rise to a claim for indemnity or contribution against the Debtor or NNIII, as applicable.  These releases under the SPSA do not include the U.S. Canadian Claim, the U.S. Canadian Priority Claim, any other allowed claims against the Debtors (or NNIII) for payment of the Crossover Bonds or the NNCC Bonds, any claim between or among any of the Debtors (or NNIII) and their U.S. subsidiaries, any claim between the PBGC and the Debtors (or NNIII) or any of their U.S. subsidiaries, any Professional Claim or any claim to enforce the terms of the SPSA, the Plan or any order of the U.S. Court or the CCAA Court related thereto.

Allowed Book Intercompany Claims shall be included in the determination of the Allowed General Unsecured Claims against each of the Debtors.  Annex L (*Book Intercompany Claims*) to the SPSA shall be treated as the definitive position for all Allowed Book Intercompany Claims between the Nortel Group entities specified thereon.  Any and all other pre-filing books and records claims between (A) any of the Canadian Debtors, on the one hand, and (B) any of the Debtors and their other subsidiaries as specified on Annex L (*Book*

*Intercompany Claims*) to the SPSA, on the other hand, which are not preserved specifically in the SPSA (including, without limitation, the claims referenced in Sections 4(b)(i) (*Estate Consolidation*) and 4(g) (*Resolution of Certain Claims*) of the SPSA), are forever released and barred as of the Effective Date.  Other than the Allowed Book Intercompany Claims, all pre-filing books and records claims, including any claims that a Debtor now holds as a consequence of an assignment (excluding claims against an EMEA Debtor assigned to NNUK in connection with the EMEA Canada Settlement Agreement), between (G) any of the EMEA Debtors, NNSA or the EMEA Non-Filed Entities, on the one hand, and (H) any of the Debtors, on the other hand, are forever released and barred as of the Effective Date.  The SPSA Parties agreed and acknowledged that, as of October 12, 2016, there are no post-filing books and records claims owing between (Y) any of the Canadian Debtors, on the one hand, and any of the Debtors, the EMEA Debtors, NNSA and the EMEA Non-Filed Entities, on the other hand, and (Z) any of the Debtors, on the one hand, and any of the EMEA Debtors, NNSA and the EMEA Non-Filed Entities, on the other hand.

## K.    Other Creditor Protection Proceedings

Certain Affiliates of the Debtors are subject to Creditor Protection Proceedings in various jurisdictions, including, without limitation, the Canadian Proceedings, the EMEA Proceedings, the Israeli Administration Proceedings and the French Proceedings.  In addition, other Affiliates of the Debtors may become subject to additional bankruptcy, insolvency or other creditor protection proceedings.  As required by the SPSA, in order for the Debtors' Plan to become effective, the courts and other authorities overseeing certain of these Creditor Protection Proceedings must approve transactions in those proceedings.  There can be no assurance that the courts and other authorities in those Creditor Protection Proceedings will not make any factual finding or legal determination that may have a materially adverse effect on the Debtors' businesses (including their assets and liabilities) or the confirmation and consummation of the Plan.  Similarly, there can be no assurance that the confirmation and consummation of the Plan will be fully recognized in those Creditor Protection Proceedings or that the courts and other authorities in such Proceedings will not make any factual finding or legal determination or otherwise take positions that may be inconsistent with the Plan or have a materially adverse effect on the Debtors or the Plan.

## L.    Environmental Regulation

The Debtors' operations have been subject to various federal, state and local environmental laws and regulations, including those addressing air emission, wastewater discharges, hazardous substances and waste materials.  The Debtors believe that they have been in substantial compliance with existing environmental laws and regulations.  However, the Debtors' operations, including their past generation, management and disposal of hazardous substances and wastes, have been occasionally subject to proceedings, orders and notices of violation under environmental laws and regulations that may result in fines, penalties, sanctions or other liabilities and costs.  Future changes in environmental laws and regulations may result in additional liabilities and costs beyond those currently projected.

Nortel has liabilities for remediation of contamination at one of its former sites and has been listed as a potentially responsible party at certain Superfund sites, and the Debtors may need to contribute to such remediation costs.  Additional sites for which the Debtors have

remediation liability may be identified in the future.  The Debtors' ultimate liability in connection with such remediation will depend on many factors.  For more information, please see Section III.F.5 (*Environmental Matters*).

## M.    Certain Tax Considerations

There are a number of material income tax considerations, risks and uncertainties associated with consummation of the Plan.  Creditors, Interestholders and other interested parties should read carefully the discussion set forth in Section VII (*Certain U.S. Federal Income Tax Considerations*) for a discussion of certain federal income tax consequences of the transactions contemplated under the Plan.  In addition, as discussed in Section VI.C above, the recovery estimates for Creditors under the Plan are based on certain assumptions about tax withholding that, if they were to change, could materially affect recoveries for Creditors of the Debtors.

# VII.
## CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS

### A.    In General

The following discussion summarizes certain anticipated U.S. federal income tax consequences relating to the Plan.  This summary is based on the IRC, U.S. Treasury regulations (proposed, temporary and final) issued thereunder and administrative and judicial interpretations thereof, all as they currently exist as of the date of this Disclosure Statement and all of which are subject to change, possibly with retroactive effect, so as to result in U.S. federal income tax consequences different from those discussed below.

The following summary is for general information only.  The tax treatment of a beneficial owner of Claims (each a "Holder," and collectively, the "Holders") may vary depending upon such Holder's particular situation.  This summary does not address all of the tax consequences that may be relevant to a Holder, including any alternative minimum tax consequences, and does not address the tax consequences to a Holder that has made an agreement to resolve its Claim in a manner not explicitly provided for in the Plan.  This summary also does not address the U.S. federal income tax consequences to persons not entitled to vote on the Plan; Holders that are non-U.S. persons or Holders subject to special treatment under the U.S. federal income tax laws, such as brokers or dealers in securities or currencies, certain securities traders, tax-exempt entities, financial institutions, insurance companies, foreign persons, partnerships and other pass-through entities; Holders that hold Claims as a position in a "straddle" or as part of a "synthetic security," "hedging," "conversion" or other integrated transaction; Holders that have a "functional currency" other than the United States dollar; and Holders that have acquired Claims in connection with the performance of services.  The following summary assumes that the Claims are held by Holders as "capital assets" (as defined in the IRC) and that all Claims denominated as indebtedness are properly treated as debt for U.S. federal income tax purposes.

The tax treatment of Holders and the character, amount and timing of income, gain or loss recognized as a consequence of the Plan and the distributions provided for by the Plan may vary depending upon, among other things:  (i) whether the Claim (or portion thereof) constitutes a Claim for principal or interest; (ii) the type of consideration received by the Holder in exchange for the Claim and whether the Holder receives distributions under the Plan in more than one taxable year; (iii) whether the Holder is a citizen or resident of the United States for tax purposes, is otherwise subject to U.S. federal income tax on a net basis or falls into any special class of taxpayers, such as those that are excluded from this discussion as noted above; (iv) the manner in which the Holder acquired the Claim; (v) the length of time that the Claim has been held; (vi) whether the Claim was acquired at a discount; (vii) whether the Holder has taken a bad debt deduction with respect to the Claim (or any portion thereof) in the current or prior years; (viii) whether the Holder has previously included in income accrued but unpaid interest with respect to the Claim; (ix) the method of tax accounting of the Holder; (x) whether the Claim is an installment obligation for U.S. federal income tax purposes; and (xi) whether the "market discount" rules are applicable to the Holder.  Therefore, each Holder should consult its tax advisor for information that may be relevant to its particular situation and circumstances, and the particular tax consequences to such Holder of the transactions contemplated by the Plan.

THE FOLLOWING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN U.S. FEDERAL TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL.  THE FOLLOWING DISCUSSION IS FOR INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE.  THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES.  ACCORDINGLY, EACH HOLDER IS STRONGLY URGED TO CONSULT ITS TAX ADVISOR REGARDING THE U.S. FEDERAL, STATE, LOCAL AND APPLICABLE NON-U.S. INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

**B.      U.S. Federal Income Tax Consequences to the Debtors**

  **1.      Cancellation of Debt and Reduction of Tax Attributes**

If there is a discharge of a debt obligation by a debtor (in the case of indebtedness with multiple obligors, indebtedness that is allocable to such debtor) for an amount less than the adjusted issue price (in most cases, the amount the debtor received on incurring the obligation, with certain adjustments), such discharge generally would give rise to cancellation of debt ("COD") income, which must be included in the debtor's income.  Settlement of a guarantee should not give rise to COD.

The Debtors should be able to utilize a special tax provision which excludes from income COD income attributable to debts discharged in a chapter 11 case (the "Bankruptcy Exception").

Under section 108(b) of the IRC and Treasury regulations that apply to members of a consolidated group, each Debtor that does not include COD income in computing taxable income under the Bankruptcy Exception will be required to reduce certain tax attributes, including consolidated attributes, such as net operating losses (and consolidated net operating losses in the case of Debtors that are in the NNI Consolidated Group) and net operating loss carryforwards (and certain other losses, credits and carryforwards, if any), attributable to such Debtor; attributes that arose in separate return limitation years of such Debtor (if any); and the Debtor's tax basis in its assets (but not below the amount of its liabilities remaining immediately after the discharge of indebtedness), in an amount generally equal to the amount of such Debtor's COD income excluded from income under the Bankruptcy Exception.  In the case of Debtors that are members of the NNI Consolidated Group, a "look-through rule" applies when asset basis reduction reduces the basis of stock of another member of the consolidated group and requires corresponding adjustments to be made to the attributes attributable to the lower-tier member.

The Debtors believe that, to the extent the Debtors have any remaining net operating losses ("NOLs") and tax credit carryforwards after taking into account gains, if any, from the Sales that closed in 2009, 2010 and 2011, and any income or gain resulting from implementation of the Plan, and the required attribute reduction resulting from the discharge of indebtedness, such remaining NOLs and tax carryforwards (and alternative minimum tax NOLs) of the Debtors should be eliminated as of the end of the taxable year which includes the Effective Date of the Plan.

144

2.        **Taxable Income Resulting From the Sales**

The Sales will trigger income or gain recognition by the Debtors, in an amount based on the proportion of sale proceeds attributable to the Sales that is allocated to the Debtors. The Debtors' existing NOLs and tax credit carryforwards (prior to being reduced as a result of any attribute reduction resulting from COD Income under the Plan) should generally first be available to offset such income or gain.  Based on the amount of the Debtors' NOLs and other tax attributes, including the Debtors' estimation of other deductible payments it will make in the taxable year that includes the Effective Date, the Debtors do not anticipate owing significant regular U.S. federal income tax with respect to the Sales for taxable years ending after the Initial Petition Date, aside from potential alternative minimum tax liability.  However, if the IRS were to prevail in assessing U.S. federal income tax for taxable years ending after the Initial Petition Date, payments of such taxes could reduce the amounts otherwise available for distribution under the Plan.

A corporation or a consolidated group of corporations may incur alternative minimum tax ("AMT") liability even where an NOL is generated for regular corporate income tax purposes or where NOL carryovers and certain other tax attributes are sufficient to eliminate taxable income as computed under the regular corporate income tax.  In general, the AMT is imposed on a corporation's alternative minimum taxable income at a 20% rate to the extent such tax exceeds the corporation's regular U.S. federal income tax.  For purposes of computing taxable income for AMT purposes, certain tax deductions and other beneficial allowances allowed in computing a corporation's regular U.S. federal income tax are modified or eliminated. In particular, even though a corporation otherwise might be able to offset all of its taxable income for regular tax purposes by available NOL, a portion of a corporation's taxable income for AMT purposes may not be offset by available NOL (as computed for AMT purposes).  At this time, the Debtors expect to incur some amount of AMT resulting from its utilization of NOLs to offset items of income and gain from the Sales that closed during the 2009, 2010 and 2011 taxable years.

3.        **Limitation of NOL Carryforwards and Other Tax Attributes**

The Debtors do not expect to continue their business after the Effective Date, and they therefore do not expect to have any use for NOL carryovers and other tax attributes available after the Effective Date, if any, to the extent such carryovers and attributes were not used to offset taxable income and gain resulting from the Sales.  However, in the event the Debtors are able to utilize such NOL carryovers and other tax attributes, the discussion below describes the potential availability of such NOL carryovers and other tax attributes after the Effective Date.

Under section 382 of the IRC ("Section 382"), if a corporation (or consolidated group) undergoes an "ownership change," the amount of its pre-change losses (including NOL carryforwards from periods before the ownership change and certain losses or deductions which are "built-in" (*i.e.*, economically accrued but unrecognized) as of the date of the ownership change) and tax credits that may be utilized to offset future taxable income generally is subject to an annual limitation.

Notwithstanding the general rule, if the corporation (or the consolidated group) does not continue its historic business or use a significant portion of its historic assets in a new business for two years after the ownership change, the annual limitation resulting from the ownership change is zero, thereby precluding any utilization of the corporation's pre-change losses (absent any increases due to any recognized built-in gains) or tax credits.

If the Debtors have any NOL carryovers and other tax attributes available as of the Effective Date, the following results should occur.  Based on a historical Section 382 analysis of the changes in the Debtors' stock ownership, as well as the order entered by the Bankruptcy Court effective January 14, 2009, as amended, imposing certain restrictions on the trading of interests in the Debtors' equity, the Debtors believe that no ownership change under Section 382 has occurred to date, nor will occur prior to the Effective Date, that would limit the availability of such NOL carryovers and other tax attributes to offset taxable income of Wind-Down NNI. Moreover, pursuant to the Plan, the current holders of NNI Interests will maintain their economic interests in any residual assets of NNI after the satisfaction of all Allowed Claims, which economic interests will be nontransferable.  Accordingly, the Debtors do not believe that an ownership change of NNI will occur on the Effective Date of the Plan.  Nevertheless, due to a lack of direct authoritative guidance in the context of a liquidating chapter 11 plan, and to circumstances beyond the control of the Debtors, there is no assurance that an ownership change would not occur, or that the IRS would not take a contrary position.  We do note that if an ownership change of Wind-Down NNI were to occur in the future, the Debtors would be unable to use any NOL carryovers or other tax attributes remaining as of the Effective Date (to the extent any exist).

## C.    Disputed Claims Reserve

On or after the Effective Date, the Plan Administrator shall reserve an aggregate amount of Cash sufficient to pay to each holder of a Disputed Claim the amount of any Distributions that such holder would have been entitled to receive under the Plan if such Claim had been an Allowed Claim; *provided*, *however*, that the amount of such Disputed Claims is to be determined, solely for the purposes of establishing reserves and for maximum distribution purposes, to be the lesser of (a) the asserted amount of the Disputed Claim filed with the Bankruptcy Court as set forth in the non-duplicative Proof of Claim , (b) the amount, if any, estimated by the Bankruptcy Court pursuant to section 502(c) of the Bankruptcy Code or ordered by other order of the Bankruptcy Court or (c) the amount otherwise agreed to by the Debtors or the Plan Administrator, as applicable, in consultation with the Holder of such Disputed Claim for distribution purposes. With respect to all Disputed Claims that are unliquidated or contingent and/or for which no dollar amount is asserted on a Proof of Claim, the Wind-Down Debtors or Plan Administrator, as applicable, will reserve Cash equal to the amount reasonably determined by the Debtors, Wind-Down Debtors or Plan Administrator.

## D.    U.S. Federal Income Tax Consequences to Holders of Claims

### 1.    Generally

Generally, a Holder of an Allowed Claim will realize gain or loss on the exchange under the Plan of its Allowed Claim for Cash or other property, in an amount equal to the

difference between (i) the sum of the amount of any Cash and the fair market value on the date of the exchange of any other property received by the holder (other than any consideration attributable to a Claim for accrued but unpaid interest) and (ii) the adjusted tax basis of the Allowed Claim exchanged (other than basis attributable to accrued but unpaid interest previously included in the Holder's taxable income).  With respect to the treatment of accrued but unpaid interest and amounts allocable thereto, please see Section VII.D.4 (*Interest Income with Respect to Allowed Claims*).  When gain or loss is recognized as discussed below, such gain or loss may be long-term capital gain or loss if the Claim disposed of is a capital asset in the hands of the Holder and is held for more than one year.  Each Holder of an Allowed Claim should consult its own tax advisor to determine whether gain or loss recognized by such holder will be long-term capital gain or loss and the specific tax effect thereof on such Holder.

## 2.        Holders of Allowed General Unsecured Claims

A Holder of Allowed General Unsecured Claims of a Debtor as of the Effective Date should be treated as receiving from that Debtor the Holder's share of the Creditor Proceeds (net of any applicable liabilities) of the relevant Class after distributions to Holders of Administrative Expense Claims, Priority Tax Claims, Priority Non-Tax Claims and Secured Claims of that Debtor in satisfaction of those Holders' Allowed Claims.  Accordingly, a Holder of such a Class 3 Claim should generally recognize gain or loss in an amount equal to the amount of Cash received in the exchange (as described above) less the adjusted tax basis of its Claim.  It is possible that any loss, or a portion of the gain, realized by a Holder may be deferred until all of the distributions to such Holder are received.  As discussed in Section VII.D.4 (*Interest Income with Respect to Allowed Claims*), the amount of Cash received in respect of Claims for accrued but unpaid interest will be taxed as ordinary income, except to the extent previously included in income by a Holder under his or her method of accounting.

Because a Holder's ultimate amount realized in exchange for its Allowed Class 3 Claim may be increased after the Effective Date, as provided for in the Plan, due to the existence of Disputed Claims, such Holder should recognize additional or offsetting gain if, and to the extent that, the aggregate amount of cash ultimately received by such Holder is greater than the amount used in initially determining gain or loss in accordance with the procedures described in the preceding paragraph.  Because, as discussed in Section VII.D.3 (*Holders of Disputed Claims*), the treatment of the Disputed Claims Reserve is unclear, it is unclear when a Holder of an Allowed General Unsecured Claim of any Debtor should recognize, as an additional amount received for purposes of computing gain or loss, an amount attributable to the disallowance of a Disputed Claim.

The character of any gain or loss as capital gain or loss or ordinary income or loss and, in the case of capital gain or loss, as short-term or long-term, will depend on a number of factors, including: (i) the nature and origin of the Claim; (ii) the tax status of the Holder of the Claim; (iii) whether the Claim has been held for more than one year; (iv) the extent to which the Holder previously claimed a loss or bad debt deduction with respect to the Claim; and (v) whether the Claim was acquired at a market discount.  A Holder that purchased its Claim from a prior Holder at a market discount may be subject to the market discount rules of the IRC.  Under those rules (subject to a de minimis exception), assuming that such Holder has made no election to accrue the market discount and include it in income on a current basis, any gain recognized on

the exchange of such Claim generally would be characterized as ordinary income to the extent of the accrued market discount on such Claim as of the date of the exchange.

### 3. Holders of Disputed Claims

Although not free from doubt, Holders of Disputed Claims should not recognize any gain or loss on the date that the assets of the Debtors are transferred to the Disputed Claims Reserve, but should recognize gain or loss in an amount equal to: (i) the amount of cash and the fair market value of any other property actually distributed to such Holder less (ii) the adjusted tax basis of its Claim. Holders of Disputed Claims should note the tax treatment of the Disputed Claims Reserve is unclear and should consult their tax advisors as to the tax consequences to them of the establishment of, the income on and distributions from, the Disputed Claims Reserve.

### 4. Interest Income with Respect to Allowed Claims

Pursuant to Section 10.14 (*Allocation of Distributions*) of the Plan, all distributions in respect of Allowed Claims will be allocated first to the principal amount of the Allowed Claim (as determined for federal income tax purposes), with any excess allocated to accrued but unpaid interest. However, there is no assurance that such allocation would be respected by the IRS for U.S. federal income tax purposes. In general, to the extent any amount received (whether stock, cash or other property) by a holder of a debt is received in satisfaction of accrued interest during its holding period, such amount will be taxable to the holder as interest income (if not previously included in the holder's gross income). Conversely, a holder generally recognizes a deductible loss to the extent any accrued interest claimed was previously included in its gross income and is not paid in full. Each holder of an Allowed Claim is urged to consult its own tax advisor regarding the allocation of consideration and the deductibility of unpaid interest for tax purposes.

## E. Backup Withholding and Information Reporting

Under federal income tax law, interest and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then applicable withholding rate. Backup withholding generally applies if the Holder (a) fails to furnish its social security number or other taxpayer identification number, (b) furnishes an incorrect taxpayer identification number, (c) fails properly to report interest or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the tax identification number provided is its correct number and that it is not subject to backup withholding. Backup withholding is not an additional tax. but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions. These categories are very broad; however, there are numerous exceptions. Holders of Allowed Claims are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

In addition, Treasury regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated,

including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds.  Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the holder's tax returns.

Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holder's tax returns.

THE FOREGOING DISCUSSION OF CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS IS FOR GENERAL INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE.  ACCORDINGLY, EACH HOLDER SHOULD CONSULT ITS TAX ADVISOR WITH RESPECT TO THE TAX CONSEQUENCES OF THE PLAN DESCRIBED HEREIN AND THE APPLICATION OF FEDERAL, STATE, LOCAL AND FOREIGN TAX LAWS.  NONE OF THE DEBTORS, THE CREDITORS' COMMITTEE OR THEIR RESPECTIVE COUNSEL, ADVISORS OR OTHER PROFESSIONALS SHALL HAVE ANY LIABILITY TO ANY PERSON OR HOLDER ARISING FROM OR RELATED TO THE U.S. FEDERAL, STATE, LOCAL OR FOREIGN TAX CONSEQUENCES OF THE PLAN OR THE FOREGOING DISCUSSION.

# VIII.
# ALTERNATIVES TO THE PLAN

The Debtors believe that the Plan affords holders of Allowed Claims the potential for the greatest realization of the Debtors' assets and, therefore, is in the best interests of such holders.  If, however, the requisite acceptances are not received, or the requisite acceptances are received, but the Plan is not confirmed and consummated, the theoretical alternatives include: (a) confirmation of another chapter 11 plan, (b) conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code or (c) dismissal of the Chapter 11 Cases leaving Creditors and Interestholders to pursue available non-bankruptcy remedies.  In addition, because the Plan embodies the SPSA between the primary parties to the Allocation Dispute, if the Plan is not confirmed, it is expected the appeals of the Allocation Decisions and other litigation among such Parties would resume, where there is no assurance that greater recoveries would result for the Debtors.  If the Plan is not confirmed as to any of the Debtors, the Debtors will nonetheless seek to have entry into the SPSA authorized by the Bankruptcy Court under Bankruptcy Rule 9019.

These alternatives to the Plan are very limited and not likely to benefit creditors. Although the Debtors could theoretically file a new plan, the most likely result if the Plan is not confirmed is that the Chapter 11 Cases will be converted to cases under chapter 7 of the Bankruptcy Code.  The Debtors believe that conversion of the Chapter 11 Cases to chapter 7 cases would result in (i) significant delay in distributions to all Creditors and Interestholders who would have received a distribution under the Plan and (ii) diminished recoveries for certain Classes of Creditors.  If the Chapter 11 Cases are dismissed, Creditors and Interestholders would be free to pursue non-bankruptcy remedies in their attempts to satisfy claims against each respective Debtor.  However, in that event, Creditors and Interestholders would be faced with the costs and difficulties of attempting, each on its own, to collect claims from, depending upon the Debtor, a Debtor with very limited or no operations.

## IX.
## CONCLUSION

For all of the reasons set forth in this Disclosure Statement, the Debtors and the Creditors' Committee believe that confirmation of the Plan is preferable to all other alternatives. Consequently, the Debtors recommend all Solicited Creditors of each Debtor to vote to **ACCEPT** the Plan, and to complete and return their Ballots so that they will be **RECEIVED** by Epiq on or before 4:00 P.M. (prevailing Eastern time) on January 9, 2017.

**Nortel Networks Inc.**

By:  /s/ John J. Ray, III_____
      Name:  John J. Ray, III
      Title: Principal Officer

**Nortel Networks Capital Corporation**

By:  /s/ John J. Ray, III_____
      Name:  John J. Ray, III
      Title: Principal Officer

**Nortel Altsystems Inc.**

By:  /s/ John J. Ray, III_____
      Name:  John J. Ray, III
      Title: Principal Officer

**Nortel Altsystems International Inc.**

By:  /s/ John J. Ray, III_____
      Name:  John J. Ray, III
       Title: Principal Officer

**Xros, Inc.**

By:  /s/ John J. Ray, III_____
      Name:  John J. Ray, III
      Title: Principal Officer

**Sonoma Systems**

By:  /s/ John J. Ray, III_____
      Name:  John J. Ray, III
      Title: Principal Officer

**Qtera Corporation**

By: /s/ John J. Ray, III
      Name:  John J. Ray, III
      Title: Principal Officer

**CoreTek, Inc.**

By: /s/ John J. Ray, III
      Name:  John J. Ray, III
      Title: Principal Officer

**Nortel Networks Applications Management Solutions Inc.**

By: /s/ John J. Ray, III
      Name:  John J. Ray, III
      Title: Principal Officer

**Nortel Networks Optical Components Inc.**

By: /s/ John J. Ray, III
      Name:  John J. Ray, III
      Title: Principal Officer

**Nortel Networks HPOCS Inc.**

By: /s/ John J. Ray, III
      Name:  John J. Ray, III
      Title: Principal Officer

**Architel Systems (U.S.) Corporation**

By: /s/ John J. Ray, III
      Name:  John J. Ray, III
      Title: Principal Officer

**Nortel Networks International Inc.**

By:  /s/ John J. Ray, III
      Name:  John J. Ray, III
      Title: Principal Officer

**Northern Telecom International Inc.**

By:  /s/ John J. Ray, III
      Name:  John J. Ray, III
      Title: Principal Officer

**Nortel Networks Cable Solutions Inc.**

By:  /s/ John J. Ray, III
      Name:  John J. Ray, III
      Title: Principal Officer

**Nortel Networks (CALA) Inc.**

By:  /s/ John J. Ray, III
      Name:  John J. Ray, III
      Title: Principal Officer