## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
-------------------------------------------------  x
                                                   :
In re                                              :    Chapter 11
                                                   :
Nortel Networks Inc., et al.,¹                     :    Case No. 09-10138 (KG)
                                                   :
                                                   :    (Jointly Administered)
                                                   :
                                                   :    Re: D.I. 17492, 17555
                            Debtors.               :
                                                   :    Hearing Date: December 20, 2016
-------------------------------------------------  x
```

**OBJECTION AND RESPONSE OF THE *AD HOC* GROUP OF BONDHOLDERS TO (A) THE NORTEL TRADE CLAIMS CONSORTIUM'S (I) MOTION FOR RECONSIDERATION AND VACATION OF THE BANKRUPTCY COURT'S DECEMBER 18, 2014 PPI SETTLMENT ORDER AND (II) OBJECTION TO CROSSOVER BONDS CLAIMS AND (B) THE MOTION, OBJECTION AND JOINDER OF LIQUIDITY SOLUTIONS, INC. TO THE NORTEL TRADE CLAIM CONSORTIUM'S MOTION**

The *ad hoc* group of bondholders (the "Bondholder Group")² hereby objects and

responds to (a) the Nortel Trade Claims Consortium's (the "TCC") (i) Motion for

Reconsideration and Vacation of the Bankruptcy Court's December 18, 2014 PPI Settlement

Order and (ii) Objection to Crossover Bonds Claims (the "Motion") [D.I. 17492] and (b) the

---

¹  The Debtors in the chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are:   Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).

²  The Bondholder Group consists of entities ("Bondholders") that hold certain bonds ("Bonds") issued or guaranteed by Nortel Networks Corporation ("NNC"), Nortel Networks Limited ("NNL" and, together with NNC and certain of their subsidiaries, the "Canadian Debtors"), Nortel Networks Inc. ("NNI"), and Nortel Networks Capital Corporation ("NNCC" and, together with NNI and certain of its subsidiaries, the "U.S. Debtors").

Motion, Objection and Joinder of Liquidity Solutions, Inc. ("LSI") to the Motion [D.I. 17555] (the "LSI Joinder") and in support thereof, respectfully submits as follows:

## PRELIMINARY STATEMENT

1.      Two years ago, on December 18, 2014, the Court entered an order (the "9019 Order"),[3] allowing Bondholders' claims against NNI for principal and pre-petition accrued interest.  The TCC,[4] despite having every right to do so, neither appeared before the Court to voice its objection to the allowance of Bondholders' claims prior to the entry of the 9019 Order nor appealed that order once it was entered.[5]  Now, on the eve of plan confirmation, an event eight long years in the making, the TCC has emerged from the shadows to seek "reconsideration" of the allowance of Bondholders' guarantee claims.  The true objective of the Motion is readily apparent:  despite the undisputed fact that the Settlement and Plans Support Agreement (the "SPSA") and related chapter 11 plan (the "Plan") are far better for all U.S. creditors than the outcome dictated by the Court's decision on allocation (the "Allocation Decision"),[6] the TCC simply wants more and is prepared to burn the entire carefully negotiated outcome down if the TCC does not get more.  And make no mistake:  if the Court concludes not to allow the Bondholders' claims in full, the TCC will have succeeded.  The SPSA includes as a

---

[3]   "9019 Order" refers to the Order Granting Debtors' Motion Pursuant to Bankruptcy Rule 9019 Approving Settlement Agreement By and Among Nortel Networks Inc., the Supporting Bondholders, and The Bank of New York Mellon With Respect to the NNI Post-Petition Interest Dispute and Related Issues [D.I. 14950] entered by the United States Bankruptcy Court for the District of Delaware (the "Court").

[4]   Although ostensibly a group comprised of trade creditors, the TCC is in fact a collection of financial institutions who purchased the claims of trade creditors during the chapter 11 proceedings.  (See First Amended Verified Statement of Counsel to the Nortel Trade Claim Consortium Pursuant to Bankruptcy Rule 2019 [D.I. 17493] (listing as group members ASM Capital LP, Farallon Capital Management, LLC, Hain Capital Group, LLC, Silver Point Capital, L.P., and Bowery Investment Management, LLC).)

[5]   LSI was likewise absent from the proceedings that culminated in the 9019 Order.

[6]   "Allocation Decision" refers to the Allocation Trial Opinion [D.I. 15544] (the "Allocation Opinion") and related Order [D.I. 15545] (the "Allocation Order") entered by Court on May 12, 2015, together with

critical component the allowance of Bondholders' claims in their full amount; absent that provision, the deal falls apart, sending all parties back to their respective corners to continue the acrimonious litigation that has already delayed distributions for far too long. The Court should not permit this to happen. Because the Motion is blatantly untimely and wholly without merit, it should be denied.

2.      The central thrust of the Motion is that, as a result of the Court's Allocation Decision, the operative facts surrounding the 9019 Order have so "drastically" changed that it would no longer be appropriate to enforce it. Missing from the Motion, however, is any explanation as to why, two years after the 9019 Order was handed down, and 19 months after the Allocation Decision was issued, the TCC should be rewarded for its inaction. Rule 9024 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 60 of the Federal Rules of Civil Procedure (the "Federal Rules"), which indisputably apply to the Motion, require that a motion for reconsideration be filed within one year of the order allowing the claim. The TCC's belated Motion fails to satisfy this requirement; it is therefore untimely and must be denied on that basis alone.

3.      Even if the Motion were timely, it is meritless. The purported "cause" that the TCC offers for reconsideration of the 9019 Order—the "unexpected" insolvency of NNI and the purported substantive consolidation of the Nortel Debtors' estates—is pure fiction. The Court's allowance of Bondholders' guarantee claims in the 9019 Order was unconditional and express— it was not in any way contingent upon NNI being solvent, the Nortel Debtors not being substantively consolidated (which they are not), or any other event. Thus, no cause exists to vacate the 9019 Order.

_____

the Memorandum Order on Motions for Reconsideration [D.I. 15830] (the "Reconsideration Decision") entered by the Court on July 6, 2015.

DOCS_DE:211246.1 61026/001

4.      LSI's Joinder, which also cites the Allocation Decision as "cause" to reconsider to 9019 Order, is also flawed.  Despite failing to appear during the allocation litigation or seek reconsideration or appeal of the Allocation Decision, LSI now argues that the Court's decision to allow Bondholders' claims without also giving the U.S. Debtors an allocation from the sales proceeds on account of those claims is inequitable.  The ship sailed a long time ago on this argument.  LSI's attempt to seek a second re-reconsideration of the Allocation Decision should be rejected.

5.      Finally, even if the Court were to revisit the 9019 Order and consider the TCC's claim objection on its merits, the objection should be denied because it mischaracterizes the Allocation Decision and would upend black letter bankruptcy law.  In *Ivanhoe Building & Loan Association v. Orr*, 295 U.S. 243 (1935), the Supreme Court held that a creditor holding a contractual guarantee may, in the event of the obligor's insolvency, assert the full amount of its claim against both the primary obligor and the guarantor, subject only to the limitation that it receive no more than a 100 percent recovery.  The TCC claims that this 80-year old principle of bankruptcy law cannot coexist with the doctrine substantive consolidation, but that argument is purely academic, because neither the SPSA nor the Plan calls for the substantive consolidation of NNI with NNC or NNL, the other obligors of Bondholders' claims.

6.      The TCC contends that the Plan implements the Allocation Decision, which the TCC says calls for substantive consolidation, but this is wrong for two different reasons.  First, the Plan does not implement the Allocation Decision—it reflects the parties' agreement on how to allocate the sales proceeds among the estates, which therefore renders the Allocation Decision moot.  Second, as the Court has made clear, the Allocation Decision does ***not*** call for substantive consolidation in its traditional form.  Although the Bondholder Group and other parties have

- 4 -

appealed the Allocation Decision on the grounds that it, like substantive consolidation, has objectionable effects on creditors, the "modified pro rata" method adopted by the Court is critically different from a typical substantive consolidation in that it does not consolidate all assets at a single debtor for every creditor to claim against. Accordingly, nothing in the Allocation Decision overrides the plain terms of Bondholders' contractual guarantees or the longstanding principle set forth in *Ivanhoe*, and Bondholders are entitled to assert claims against the assets of all obligors. The Motion must therefore be denied.

## RELEVANT FACTUAL BACKGROUND

7.    Between 1988 and 2009, Nortel issued several series of bonds (the "Nortel Bonds"), including the following:

- A series of notes issued by NNL, pursuant to an indenture dated as of November 30, 1988, in aggregate principal amount of $200 million (the "Non-Guaranteed Notes");

- A series of notes issued by NNCC and NNL and guaranteed by NNL, pursuant to an indenture dated as of February 15, 1996, in aggregate principal amount of $150 million (the "NNCC Notes");

- Multiple series of senior notes issued by NNL and guaranteed by NNI and NNC, pursuant to an indenture dated as of July 5, 2006, in aggregate principal amount of $2.675 billion (the "2006 Indenture Notes"); and

- Multiple series of senior notes issued by NNC and guaranteed by NNI and NNL, pursuant to an indenture dated as of March 28, 2007, in aggregate principal amount of $1.15 billion (the "2007 Indenture Notes").

8.    The funds raised through the issuance of the Nortel Bonds were used by Nortel to finance significant business functions, including funding for the businesses and intellectual property sold during the course of these cases. As of January 14, 2009 (the petition date), the aggregate principal amount outstanding under the Nortel Bonds was approximately $4.2 billion.

9.    On September 25, 2009, The Bank of New York Mellon ("BNY") filed a timely proof of claim against NNI, on behalf of the holders of the 2006 Indenture Notes, seeking, *inter*

*alia*, (i) $2,785,241,840.28 in principal plus accrued pre-petition interest and (ii) "an unliquidated amount for the continuing post-petition (a) accrual of interest (including interest upon the overdue installments of interest)[.]"  (Attachment to Claim No. 3972 ¶¶ 6, 8.)  Also on September 25, 2009, BNY, as indenture trustee, filed a timely proof of claim against NNI, on behalf of the holders of the 2007 Indenture Notes, seeking, *inter alia*, (i) $1,155,508,420.14 in principal plus accrued pre-petition interest and (ii) "an unliquidated amount for the continuing post-petition (a) accrual of interest (including interest upon the overdue installments of interest)[.]"  (Attachment to Claim No. 3971 ¶¶ 6, 8.)

10.    On October 25, 2013, Wilmington Trust, N.A., as successor indenture trustee for the Non-Guaranteed Notes, filed an objection [D.I. 12116] (the "<u>Wilmington Objection</u>") to the two proofs of claim filed by BNY and a separate proof of claim filed by Law Debenture Trust Company, on behalf of the holders of the NNCC Notes.  On November 15, 2013, this Court issued an order [D.I. 12399] adjourning the Wilmington Objection.

11.    On July 23, 2014, holders of the 2006 Indenture Notes and the 2007 Indenture Notes (the "<u>Supporting Bondholders</u>") and the U.S. Debtors entered into a settlement agreement [D.I. 14076-2] (the "<u>Settlement Agreement</u>") that:  (i) fixed the amount of Bondholders' guarantee claims against NNI at the total outstanding principal and prepetition interest amounts; and (ii) set a cap on the accrual of post-petition interest on such claims.  (Settlement Agreement §§ 2.1, 2.2, 3.1.)

12.    On July 24, 2014, the U.S. Debtors filed a motion, pursuant to Bankruptcy Rule 9019, seeking approval of the Settlement Agreement [D.I. 14076] (the "<u>9019 Motion</u>").  The Supporting Bondholders [D.I.14653] and the Official Committee of Unsecured Creditors [D.I. 14189] filed briefs supporting the U.S. Debtors' 9019 Motion.  The Monitor [D.I. 14117, 14173,

14496, 14497] and Wilmington Trust [D.I. 14498] filed objections to the 9019 Motion; their objections were joined by the U.K. Pension Claimants [D.I. 14543] and Canadian Creditors Committee [D.I. 14564].  In August and September of 2014, the parties to the 9019 Motion exchanged discovery requests and expert reports, produced documents, and conducted fact and expert depositions.

13.    On November 4 and 5, 2014, after briefing and discovery were concluded, the Court held a hearing to determine whether or not to approve the Settlement Agreement.  The Court heard testimony from three witnesses, including an expert witness propounded by the Monitor, and "admitted into evidence approximately 250 documentary exhibits regarding the" 9019 Motion.  (9019 Op.[7] at 14.)  The TCC and LSI did not appear, did not participate in discovery, and did not submit briefing in connection with the Settlement Agreement or the two-day hearing in respect of the 9019 Motion.

14.    On December 18, 2014, the Court issued the 9019 Order and related 9019 Opinion approving the Settlement Agreement.  In relevant part, the 9019 Order held both that the "Settlement Agreement, including, without limitation, the PPI Settlement Amount **and the allowance of the Bondholder claims**, and this Order shall be binding upon the Debtors, the Bondholders, the Indenture Trustee, and **all parties-in-interest in these Chapter 11 Cases** . . ." and that "[t]he Settlement Agreement shall constitute a **full and final settlement** of . . . (ii) the allowed claims for outstanding principal obligations and accrued prepetition interest obligations (each as set forth on Schedule A to the Settlement Agreement)[.]"  (9019 Order ¶¶ 4, 5 (emphasis

---

[7]    "9019 Opinion" or "9019 Op." refers to the Opinion Regarding Debtors' Motion Pursuant to Bankruptcy Rule 9019 Approving Settlement Agreement by and Among Nortel Networks Inc., the Supporting Bondholders, and The Bank of New York Mellon With Respect to the NNI Post-Petition Interest Dispute and Related Issues [D.I. 14949].

DOCS_DE:211246.1 61026/001

added).)    Specifically, Bondholders' claims against NNI were allowed in the amount of $3,934,521,442.  (Settlement Agreement, Schedule A.)[8]

15.    On December 31, 2014, the Monitor filed a Notice of Appeal [D.I. 14999] stating its intent to appeal the 9019 Order.  On March 30, 2015, the Monitor filed its opening brief challenging only the Court's decision to approve the portion of the settlement that determined the rate at which post-petition interest would accrue in respect of the Bondholders' allowed claims. *Ernst & Young Inc. v. Nortel Networks Inc.*, 14-cv-00104-LPS, D.I. 15 (D. Del. Mar. 30, 2015).[9] The Monitor did not challenge the Court's allowance of Bondholders' claims against NNI, and no other party filed an appeal of any aspect of the 9019 Order.

16.    On May 12, 2015, the Court issued its Allocation Order and related Opinion, both of which held that the Bondholders held allowed guarantee claims against NNI.  Specifically, the Opinion stated that "for allocation purposes the Bondholder claims will be included only against the primary obligor, but the guarantees will be entitled to seek distribution from the appropriate Debtor of any deficiency resulting from the allocation."  (Allocation Op. at 112.)  The Allocation Order contained slightly different language, which arguably created an ambiguity as to the amount of Bondholders' claims, noting that "the claims on Bonds are to be made on the Estate of the Issuer.  A claim for the shortfall can be recognized by the Estate that guaranteed the bond." (Allocation Order ¶ 2(e) (emphasis added).)

---

[8]  Bondholders' claims with respect to the Non-Guaranteed Notes and the NNCC Notes were not subject to the Settlement Agreement and were not determined in connection with the litigation that culminated in the 9019 Order.

[9]  The Monitor's appeal is currently pending before the U.S. District Court for the District of Delaware (the "District Court").

17.     On May 26, 2015, several parties, including the Bondholder Group, moved the Court for reconsideration and/or clarification of the Allocation Opinion and Order.[10]   The Bondholder Reconsideration Motion addressed only a single, discrete issue:  whether the Court's use of the word "shortfall" was intended to limit the amount of Bondholders' guarantee claims against NNI for distribution purposes, after the allocation of the Sales Proceeds to the Nortel Debtors' estates has occurred.   (Bondholder Reconsideration Mot. ¶ 1.)   The Bondholder Reconsideration Motion argued that the Court could not have intended to so limit Bondholders' claims for three reasons, each of which was independently sufficient to support the relief sought:  (i) such a limitation would conflict with the 9019 Order, which previously granted the Supporting Bondholders allowed claims against NNI in an amount equal to the full outstanding principal amount of their bonds, plus accrued prepetition interest; (ii) such a limitation would be inconsistent with *Ivanhoe* and its progeny, which establish that a creditor is entitled to assert the full amount of its claim against a debtor-guarantor, regardless of any recovery received from the primary obligor; and (iii) the Court itself had stated that the Allocation Order did not purport to (and did not) address distribution issues, including the size of allowed claims against each estate.

18.     The TCC filed a joinder [D.I. 15780] (the "<u>TCC Reconsideration Joinder</u>") to the U.S. Debtors' motion for reconsideration of certain other aspects of the Allocation Opinion and Order.   The central thrust of the TCC Joinder was that the Allocation Opinion and Order improperly and unfairly failed to provide the U.S. Debtors with an allocation in respect of Bondholders' allowed guarantee claims against NNI, thereby causing prejudice to the TCC.  (*See* TCC Reconsideration Joinder ¶ 3.)  In a footnote, the TCC "reserve[d] all rights as to whether

---

[10]   *See, e.g.*, *Ad Hoc* Group of Bondholders' Motion for Reconsideration of Opinion and Order Allocating Proceeds from Asset Sales of Nortel Networks, Inc., its Affiliates and Subsidiaries [D.I. 15612] (the "<u>Bondholder Reconsideration Motion</u>").

[*Ivanhoe*] requires that the full amount of the Bond Guarantee Claims may be asserted against the U.S. Debtors for distribution purposes." (*Id.* ¶ 5, n.5.) Despite this reservation of rights, the TCC correctly acknowledged that "the Bond Guarantee Claims were allowed by the Court" in connection with the Settlement Agreement and 9019 Order. (*Id.*) LSI did not appear or submit any briefing in connection with the allocation litigation or reconsideration of the Allocation Opinion.

19.     On July 6, 2015, the Court granted the Bondholder Group's request for clarification, stating that it did not intend to increase or decrease the size of Bondholders' claims. According to the Court, such a result "would be inconsistent with the Court's Opinion and Order approving the settlement agreement between the U.S. Debtors and the Bondholders (D.I. Nos. 14949 and 14950) and *Ivanhoe Building & Loan Association v. Orr*, 295 U.S. 243 (1935)." (Reconsideration Decision at 4.)[11]

20.     On July 17, 2015, the Bondholder Group, TCC, and several other parties timely filed notices of appeal of the Allocation Decision. As required by Bankruptcy Rule 8009, each appellant subsequently filed a statement of issues to be presented on appeal.[12] The TCC Statement of Issues identified seven separate issues, none of which included any argument challenging the allowance of the Bondholders' full guarantee claims against NNI.

21.     On December 3, 2015, the appellants submitted their opening briefs on appeal. Throughout its brief, the TCC (correctly) conceded that Bondholders' guarantee claims against

---

[11]   The Court rejected the TCC's argument, which was also advanced by the U.S. Debtors, that the Bondholders' guarantee claims should be counted against the U.S. Debtors' estates for allocation purposes. *Id.*

[12]   *See, e.g.*, Statement of the Nortel Trade Claims Consortium of the Issues to be Presented on Appeal [D.I. 15999] (the "TCC Statement of Issues").

NNI "were allowed by the Bankruptcy Court against the U.S. Debtors."[13]  Yet, despite not identifying the allowance of Bondholders' guarantee claims as an issue on appeal, the TCC included in its appellate brief a "prophylactic" argument protecting its members from "an interpretation of the Decision which could further dilute their recoveries under a U.S. plan" by allowing "unreduced Bond Guarantee Claims against the U.S. Debtors."  (TCC Brief at 2-3.)

22.    Because the TCC failed to identify this issue in the TCC Statement of Issues, and despite the lengthy negotiation of a briefing schedule among the parties to the allocation appeal, the Bondholder Group was forced to seek leave of the District Court to file an opposition to the TCC Brief.  (*See* Letter to Hon. Leonard P. Stark from Peter J. Keane, dated Dec. 12, 2015 [D.D.I. 41.])[14]  The Bondholder Group's request for leave was granted and, on January 12, 2016, the Bondholder Group filed an opposition to the TCC Brief [D.D.I. 68] arguing, *inter alia*, that the TCC had waived any challenge to Bondholders' guarantee claims and, in any event, such arguments were without merit.

23.    On October 12, 2016, the Debtors filed a Notice of Execution of Settlement and Plans Support Agreement [D.I. 17249] notifying the Court and parties-in-interest that the Core Parties to the allocation dispute had, as a result of court-ordered mediation, reached a global resolution of the allocation dispute.  The SPSA, which is a fully integrated agreement among sixteen separate constituencies, provides that "the Crossover Bonds Claims . . . (b) against NNI shall be allowed as a general unsecured claim in the aggregate amount of U.S.$3,934,521,442, as

---

[13]    Opening Brief of Appellant the Nortel Trade Claims Consortium In Support of Appeal from the Allocation Decision [D.D.I. 74] (the "TCC Brief") at 19; *see also id.* at 6 ("the Bankruptcy Court already had allowed $4.0 billion of claims asserted by the Crossover Bondholders that were issued by NNC and/or NNL but guaranteed by NNI[.]"); *id.* at 10 (referring to "the Bankruptcy Court's previous allowance of the Bond Guarantee Claims against the U.S. Debtors"); *id.* at 11 (referring to "the Bankruptcy Court's prior allowance of the Bond Guarantee Claims").

[14]    Citations to "D.D.I" refer to the docket in *Nortel Networks Inc. v. Ernst & Young Inc.*, 15-624 (LPS) (D. Del.).

specified in Schedule A to the Agreement Settling the NNI Post-Petition Interest Dispute and Related Matters dated July 24, 2014." (SPSA § 4(g)(iv).) The SPSA has the support of all "key holders" under the Interim Funding and Settlement Agreement [D.I. 874-3] (the "IFSA"), including the Bondholder Group, whose consent is required for a release of the sale proceeds from the lockbox. (*See* IFSA §§ 12(b), 12(g).) The TCC, who is not a "key holder" whose consent is required for an agreed allocation of sale proceeds under the IFSA, does not support the SPSA and has been vocal about its intention to object to the proposed chapter 11 plan.

24.    On November 18, 2016, the TCC filed an objection [D.I. 17415] (the "TCC DS Objection") to the U.S. Debtors' proposed disclosure statement and solicitation procedures. In its DS Objection, the TCC sought additional disclosures concerning its objection to the allowance of Bondholders' guarantee claims, but *again* acknowledged that the Court had approved the Settlement Agreement "grant[ing] an allowed General Unsecured Claim to the Crossover Bonds in the aggregate amount of $3,934,521,442.00." (TCC DS Objection ¶ 17.)

## OBJECTION

### I.    THE TCC'S MOTION IS TIME-BARRED

25.    Contrary to the TCC's suggestions, the time for filing a motion to reconsider an order granting an allowed claim is not limitless. Any such motion, including one brought pursuant to section 502(j) of the Bankruptcy Code, is subject to the time limitations set out in Federal Rule 60, made applicable to these proceedings by Bankruptcy Rule 9024. These rules require a party who, like the TCC, is seeking reconsideration on the basis of purported new evidence or changed circumstances to do so within one year. And they require a party seeking reconsideration on other grounds to do so within a "reasonable time." The Motion, filed two years after the 9019 Order and more than a year and a half after the purported "new evidence"

arising as a result of the Allocation Decision, satisfies neither of these requirements. Accordingly, the Motion is untimely and must be denied on that basis.

26.    Pursuant to Federal Rule 60, "the court may relieve a party . . . from a final judgment, order, or proceeding" for one of six enumerated reasons, including "newly discovered evidence that, with reasonable diligence, could not have been discovered" within 28 days after the entry of the judgment, Fed. R. Civ. P. 60(b)(2), or "any other reason that justifies relief," Fed R. Civ. P. 60(b)(6).  Federal Rule 60 includes a timing provision that requires all motions made under that Rule, including a motion under Rule 60(b)(6), to be made "within a ***reasonable time***" and, for motions made on grounds of newly discovered evidence under Rule 60(b)(2), "***no more than a year after*** the entry of the judgment or order of the date of the proceeding."  Fed. R. Civ. P. 60(c) (emphasis added).

27.    Pursuant to Bankruptcy Rule 9024, Federal Rule 60 "applies in cases under the Code except that a motion . . . for the reconsideration of an order allowing or disallowing a claim against the estate entered ***without a contest***" is exempt from the one-year limitation set forth in Federal Rule 60(c).  Fed. R. Bankr. P. 9024 (emphasis added).   "The key language is 'without contest.'  ***If the allowance of a claim was contested, then Federal Rule 60(c)'s one year time limit for reconsideration applies***."  *In re Pearlman*, No. 6:07-BK-00761-KSJ, 2014 WL 103214, at *1–2 (Bankr. M.D. Fla. Jan. 10, 2014) (emphasis added).  Even an order entered without contest, however, is still subject to the limitation of Rule 60(c) that it be filed within a "reasonable time."  Fed. R. Civ. P. 60(c).

28.    The 9019 Order was entered after months of intense litigation involving the Bondholder Group, the U.S. Debtors, and other parties and, as such, was not entered "without a contest."  (*See supra* ¶¶ 12-14.)  Moreover, the TCC's Motion appears to invoke Rule 60(b)(2) in

that it seeks reconsideration because the Allocation Decision represents a "fundamental change in factual circumstances that has occurred since the Order was issued in December 2014." (Mot. ¶ 20.)[15]  To the extent this argument amounts to a claim of "newly discovered evidence" under Rule 60(b)(2), the Motion is subject to Federal Rule 60(c)'s one year time limit applicable to motions for reconsideration.  Fed. R. Civ. P. 60(c).  As such, the deadline for the relief sought by the Motion was December 18, *2015*, nearly one year ago.[16]

29.     Despite invoking "changed factual circumstances," and perhaps recognizing that a motion under Rule 60(b)(2) would be clearly barred by Rule 60(c)'s one-year limitation, the TCC purports to seek reconsideration under the catchall provision of Rule 60(b)(6), covering "any other reason that justifies relief."  (Mot. ¶ 24.)  Even assuming the Motion is appropriately characterized as a motion under Federal Rule 60(b)(6), the TCC's Motion is still untimely because it was not filed "within a reasonable time."  Fed. R. Civ. P. 60(c).  Whether a Rule 60(b)(6) motion was filed within a "reasonable time" is "determined by considering the interest of finality, the reason for delay, the practical ability of the litigant to learn earlier of the grounds relied upon, and the consideration of prejudice, if any, to other parties."  *Reed v. Pierce*, No. CV 06-445-LPS, 2014 WL 3919656, at *1 (D. Del. Aug. 11, 2014) (Stark, J.).  "As a general rule, a Rule 60(b)(6) motion filed more than one year after final judgment is untimely unless 'extraordinary circumstances' excuse the party's failure to proceed sooner."  *Id.* at *1 (citation

---

[15]  *See also id.* ¶ 28 ("Here, 'cause' exists to reconsider and vacate the PPI Settlement Order because the factual circumstances under which the Order was entered have most assuredly changed.").)

[16]  Even if the deadline for a Rule 60(b)(2) motion were based on the date on which the movant discovered the "new" evidence—a reading of Rule 60(b)(2) that is not supported by the text—the TCC's Motion would still be untimely.  The Allocation Decision was handed down on May 12, 2015, more than 19 months before the Motion was filed.

omitted).[17]  The Allocation Decision, which purports to form the basis of the TCC's Motion, was handed down in May of 2015.  The TCC has only itself to blame for the more than 19 months it has waited since that time, without justification, to seek reconsideration of the 9019 Order.  While the TCC sat on its hands, the parties to the allocation litigation relied on the 9019 Order to negotiate the SPSA, which includes non-severable provisions resolving certain creditors' claims, including the allowance of Bondholders' guarantee claims at the amounts ordered by the Court.  (SPSA §§ 4(g), 15(k).)  If granted at this juncture, the Motion would prejudice Bondholders and all other parties to the SPSA by unraveling the carefully negotiated resolution.  Thus, the TCC's Motion was not filed within a "reasonable time."  *See Truskoski v. ESPN, Inc.*, 60 F.3d 74, 76 (2d Cir. 1995) (motion filed 17 months after grounds for motion became apparent not filed within a "reasonable time" under Federal Rule 60(b)(6).)

30.      In another attempt to evade the clear deadlines set out in Rule 60 and Bankruptcy Rule 9024, the TCC argues, without any support, that a motion for reconsideration brought pursuant to section 502(j) of the Bankruptcy Code[18] is somehow exempt from those deadlines.  This is simply wrong.  Courts have held unequivocally that a motion for reconsideration under section 502(j), which allows a bankruptcy court to reconsider an allowed claim for "cause," 11 U.S.C. § 502(j), *is* subject to Rule 60's time limitations.   *See In re Tender Loving Care Health Servs., Inc.*, 562 F.3d 158, 163 (2d Cir. 2009) (emphasis added) (section 502(j) "does not grant a court power to reconsider a claim at any time. Absent any indication to the contrary, ***there is no reason that a motion to reconsider pursuant to [section] 502(j) should not be governed by the***

---

[17]  *See also Inv. Servs. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 393 (1993) (noting that party moving under Rule 60(b)(6) "must show 'extraordinary circumstances' suggesting that the party is faultless in the delay").

[18]  *See also* Mot. ¶ 20 ("Through this Motion, the Consortium request that the Court reconsider and vacate the PPI Settlement Order pursuant to section 502(j) of the Bankruptcy Code.").

*time limit set in Rule 9024*.")  Accordingly, "when a proof of claim **has in fact been litigated** between parties to a bankruptcy proceeding, the litigants must seek reconsideration of the bankruptcy court's determination pursuant to the [one-year limitation set out in Rule 60(c)] if they elect not to pursue a timely appeal of the original order allowing or disallowing the claim." *In re Colley*, 814 F.2d 1008, 1010 (5th Cir. 1987) (emphasis added).

31.     Other courts have rejected similar attempts to use section 502(j) to sidestep the limitations periods set out in the Federal Rules.  In *Pearlman*, for example, the trustee sought reconsideration of a bankruptcy court order approving the settlement of certain adversary proceedings and allowing the related claims four years after the order's entry.  *Pearlman*, 2014 WL 103214 at *1.  The court rejected the trustee's argument that the time for moving for reconsideration under section 502(j) never expires:

> For legal support, the Trustee cites Bankruptcy Rule 3008 and § 502(j) of the Bankruptcy Code as the legal basis for his motion. . . . Notably, however, the Trustee does not discuss or consider the application of Rule 60 of the Federal Rules of Civil Procedure to his motion.
>
> Federal Rule 60, which governs relief from judgments or orders, applies to bankruptcy proceedings through Bankruptcy Rule 9024.  Bankruptcy Rule 9024 in turn provides that 'a motion. . . for the reconsideration of an order allowing or disallowing a claim against the estate entered without contest is not subject to the one year limitation prescribed in Federal Rule 60(c).'

*Id.* at *1.  Accordingly, the court dismissed the trustee's motion as untimely.  *Id.* at *3.

32.     Having failed to either seek reconsideration of, or file a timely appeal of, the 9019 Order, in the **two years** since it was entered (or the **19 months** since the Allocation Decision was issued), the TCC can no longer challenge, under section 502(j) or otherwise, Bondholders' allowed guarantee claims against the estate of NNI.[19]

---

[19]   The TCC also invokes the Court's equitable authority under section 105(a) of the Bankruptcy Code as a basis for reconsideration of the 9019 Order.  (Mot. ¶¶ 30-33.)  However, it is well settled that "[t]he general grant of equitable power contained in § 105(a) cannot trump specific provisions of the

## II.     THE TCC'S MOTION FOR RECONSIDERATION IS MERITLESS BECAUSE THERE ARE NO CHANGED CIRCUMSTANCES RELEVANT TO THE ALLOWANCE OF BONDHOLDERS' GUARANTEE CLAIMS

33.     Even if the TCC's Motion were timely, which it is not, it is entirely without merit because the "cause" the TCC points to as justification for reconsideration of the 9019 Order flatly mischaracterizes that order, the Settlement Agreement, and the factual circumstances surrounding both.

34.     The TCC argues that "[a]mple 'cause' exists to reconsider and vacate the [9019] Order under Bankruptcy Code section 502(j) due to the fundamental change in factual circumstances that has occurred since the Order was issued in December 2014." (Mot. ¶ 20.) Specifically, the TCC claims that the 9019 Order "was issued based upon two key premises that plainly no longer exist: (i) that NNI was a solvent entity . . . and (ii) that the global Nortel Group *would not* be substantively consolidated." (*Id.* ¶ 22.) Both of these "key premises" are fictional.

35.     Contrary to the TCC's assertions,[20] the 9019 Order was not conditioned on the occurrence or non-occurrence of *any* future events, let alone those asserted by the TCC. As it relates to Bondholders' guarantee claims, the 9019 Order stated, unequivocally, that "[t]he

---

Bankruptcy Code, and must be exercised within the parameters of the Code itself." *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 236 (3d Cir. 2004) (citation omitted). As discussed *supra*, the Bankruptcy Code contains specific provisions concerning the allowance and reconsideration of claims. Section 105(a) is therefore inapplicable to the TCC's Motion.

[20]  The TCC claims, with reference to the 9019 Motion, that under the terms of the Settlement Agreement, Bondholders' guarantee claims "would be *conditionally* allowed against NNI in the aggregate amount of $3,934,521,442." (Mot. ¶ 11 (emphasis in original) (citing 9019 Mot. ¶ 21, p. 12).) The source referenced by the TCC, however, states as follows: "The Bondholder claims *shall be allowed* in the amount . . . [which] constitutes an aggregate of $3,934,521,442 allowed against NNI." (9019 Mot. ¶ 21 (emphasis added).) Characterizing that statement as "conditional" is, at best, misleading.

LSI takes the TCC's head-fake one step further. In the first paragraph of its Joinder, LSI claims that the 9019 Order "'*provisionally*' allowed" Bondholders' guarantee claims. (LSI Joinder ¶ 1 (emphasis added).) Despite purporting to quote from the text of the 9019 Order, the word "provisionally" does not appear anywhere in the document. If the TCC's characterization of the 9019 Order is misleading, LSI's falls far short of the candor expected of all parties to these cases.

- 17 -

Settlement Agreement shall constitute a ***full and final settlement*** of . . . (ii) the allowed claims for outstanding principal obligations and accrued prepetition interest obligations (each as set forth on Schedule A to the Settlement Agreement)[.]"  (9019 Order ¶¶ 4, 5 (emphasis added).)  Moreover, in its 9019 Opinion, the Court described the "core terms of the Settlement Agreement" as follows:

> (1) The Supporting Bondholders ***shall be allowed*** a general unsecured claim against NNI in the aggregate amount of $3,934,521,442.00;
>
> (2) In the event that the NNI bankruptcy estate has more than sufficient funds to pay all administrative, priority, secured, and general unsecured claims, the Supporting Bondholders shall be entitled to payment of post-petition interest from NNI in accordance with a confirmed chapter 11 plan until the PPI Dispute settlement amount is paid in full.

(9019 Op. at 11 (emphasis added).)

36.    These statements make clear that the allowance of Bondholders' prepetition claims against the estate of NNI was in no way contingent on future events.  Although the Court understood that Bondholders' entitlement to post-petition interest was contingent on the solvency of the U.S. Debtors' estates, the same limitation plainly did ***not*** apply to the allowance of Bondholders' claims.  (*Id.*; *see also* 9019 Order ¶ 5(iii).)  Similarly, the 9019 Order contained no statement indicating that it was dependent upon the Court adopting any particular allocation theory, including one that involves substantive consolidation.  To the contrary, the Court made clear that the 9019 Order "***does not constitute a factual or legal finding by the Court as to any allocation theory or the solvency of any of the U.S. or Canadian Debtors***."  (9019 Op. at 8, n.7 (emphasis added).)

37.    Because the circumstances the TCC's urges constitute cause for reconsideration of the 9019 Order never existed, the Motion should be denied on the merits.

### III.   THE ALLOWANCE OF BONDHOLDERS' GUARANTEE CLAIMS IS REQUIRED BY SUPREME COURT PRECEDENT

38.     To the extent the Court agrees to reconsider its allowance of Bondholders' guarantee claims (which it should not), it should not disallow or reduce those claims because the TCC's claim objection is meritless.[21] A ruling to the contrary would require this Court to both overturn its own Allocation Decision[22] and disregard Supreme Court precedent.  The Court should not permit either of those things to happen.

39.     As the Court is well aware, eighty years ago, the Supreme Court held in *Ivanhoe* that a creditor may assert the full amount of its claim against both a primary obligor and a guarantor.  *See generally Nuveen Mun. Tr. v. Withumsmith Brown, P.C.*, 692 F.3d 283, 295 (3d Cir. 2012) (recognizing that *Ivanhoe* "provides that a creditor may file a proof of claim for the total amount it is owed by a debtor even if it has received or may recover all or a portion of that amount from a non-debtor.").  In the context of Nortel's insolvency proceedings, this means that, irrespective of the 9019 Order, Bondholders have the unequivocal right to assert the full amount of their primary claims against the estates of all Nortel Bond obligors and the full amount of their guarantee claims against the estates of all Nortel Bond guarantors.

---

[21]  The TCC erroneously fails to characterize its objection as contingent on the Court granting its Motion. (*See* Mot. at 16 ("***In any case***, the Crossover Bonds Claims Should be Disallowed . . . ."); *id.* ¶ 34 ("***In addition***, the Consortium objects to the allowance of the Crossover Bonds . . . .") (emphasis added). Because the 9019 Order allowed Bondholders' guarantee claims, the TCC's objection to that claim is timely ***only if*** the Court grants the TCC's motion for reconsideration.

[22]  The TCC's Motion, although purportedly a motion seeking reconsideration of the 9019 Order, is in reality a motion to reconsider the Joinder With Reservation of Rights of the Trade Claims Consortium to the U.S. Debtors' Motion for Reconsideration [D.I. 15780] (the "TCC Reconsideration Joinder") of the Allocation Decision.  In the instant Motion, the TCC argues that "under the Court's claims-based Allocation Decision, the U.S. Debtors receive no allocation 'credit' for the $4.0 billion of Crossover Bonds Claims for which they are liable," allowing Bondholders to "sop up an inordinately high percentage of the (diminished) value in the U.S. estate."  (Mot. ¶ 29.)  This is precisely the argument the TCC made in its joinder, where it argued that "[b]y ignoring the $4 billion Bond Guarantee Claims in the U.S. claims allocation base, the Court depletes the allocation proceeds to be distributed to all other U.S. Creditors and works a particularly harsh and unanticipated injustice upon the holders of U.S. Trade Claims."  (TCC Reconsideration Joinder ¶ 3.)  The Court rejected that argument in its Reconsideration Decision (at 3-4), and the TCC should not be given another bite at that apple.

40.    The TCC does not challenge this fundamental principle of U.S. bankruptcy law. Instead, the TCC argues that Bondholders' guarantee claims are unenforceable against NNI under "the law of substantive consolidation."  (TCC Brief ¶¶ 34, 35.)  According to the TCC, the Allocation Decision substantively consolidates the Nortel Group, and the *Ivanhoe* rule "does not apply in substantively consolidated cases."  (Mot. ¶¶ 37, 38.)

41.    But neither the SPSA nor the Plan implements the Allocation Decision.  To the contrary, the Plan, which implements the SPSA, expressly states that the "U.S. Debtors' estates ***shall not be substantively consolidated***[.]"[23]  (SPSA § 4(b)(ii).)  Thus, whether *Ivanhoe* and the doctrine of substantive consolidation can "coexist" is irrelevant because NNI ***will not be substantively consolidated*** with NNC and NNL, the other obligors of Bondholders' guarantee claims, upon confirmation of the Plan.  The Court need therefore need not go any further, and the TCC's objection can be denied on those grounds.

42.    Even accepting as true the TCC's assertion that the Allocation Decision (as opposed to the SPSA and Plan) is somehow relevant to the treatment of Bondholders' guarantee claims, the TCC's objection still fails.  According to the TCC, "the Allocation Decision is legally indistinguishable from the prototypical form of substantive consolidation" and, because "the doctrine of substantive consolidation simply cannot coexist with the allowance of *Ivanhoe*-type claims," Bondholders' guarantee claims must be disallowed.   (Mot. ¶¶ 36, 38, 39.)   Put differently, the TCC asserts that (i) because the Allocation Decision offends many of the same legal principles as does substantive consolidation, it is the same as substantive consolidation, and (ii) guarantee claims are not respected when substantive consolidation is imposed.  But even assuming the truth of the second assertion, the first is incorrect.

---

[23]  Although the SPSA calls for the substantive consolidation of NNCC and NNI, SPSA § 4(b)(ii), NNCC is not an obligor of the claims allowed pursuant to the 9019 Order.  (*See supra* n. 8.)

- 20 -

43.     When a court imposes a "prototypical" substantive consolidation, "[i]t brings all of the assets of a group of entities into a single survivor" and "merges liabilities as well." *In re Owens Corning*, 419 F.3d 195, 206 (3d Cir. 2010).  The result is that "claims of creditors against separate debtors morph to claims against the consolidated survivor." *Id.* (internal quotations and citation omitted).  Some courts have disregarded guarantee claims in such situations to avoid giving guaranteed creditors two claims against the exact same assets.

44.     But, as the Court itself took pains to make clear, it did not order a prototypical substantive consolidation.  (*See*, *e.g.*, Allocation Op. at 101 ("Pro Rata Allocation is Not Substantive Consolidation").)  The Court instead found that "Nortel respected and maintained corporate separateness among its distinct legal entities both before and during its insolvency" and, as a result, "substantive consolidation cannot be applied in this case." (*Id.* at 104.)  Thus, although the Bondholder Group has argued on appeal that the Court impermissibly aggregated all of the Nortel Debtors' assets together (Allocation Order at 1), it did so only ephemerally, before reallocating them back to the various Debtor groups.  (*Id.*)  It did not leave all of those assets in a single comingled pool for all creditors to claim against.[24]  Thus, it is *not* the case that the Allocation Order leaves the Bondholders with "the right to take two *full* bites at the same apple:  one bite against the Canadian Debtors, and a second against the U.S. Debtors."  (Mot. ¶ 29.)

45.     To the contrary, under the Court's Allocation Decision, there is no merged estate to lodge a claim against.  Bondholders' guarantee claims allow them to assert claims against different assets—those allocated to the U.S. Debtors and those allocated to the Canadian Debtors—which is exactly the point of Bondholders' contractual guarantees.  As a result,

---

[24]  *See* Allocation Op. at 100 ("All claims against each Nortel Debtor . . . will receive distributions from the separate Debtor Estates."); *id.* at 106-07 (characterizing the "modified pro rata" approach as "an allocation to separate interests" that "will ultimately be utilized to make distributions to creditors[.]").

regardless of whether *Ivanhoe* and substantive consolidation can "coexist," the TCC's argument

must fail because it assumes that the Allocation Decision has, for the purposes of its argument, a

characteristic of substantive consolidation—the consolidation of assets and liabilities in a single

debtor—that it plainly does not have.

## IV.    THE LSI JOINDER IS A FRIVOLOUS ATTEMPT TO RE-LITIGATE THE RECONSIDERATION DECISION

46.    In addition to joining in the arguments and relief requested by the TCC,[25] the LSI

Joinder argues that because the 9019 Order "constitutes the basis for the Plan's *pari passu*

treatment of the Crossover Bonds Claims and U.S. General Unsecured Claims, the distinction

drawn by the Court with respect to such claims in the Allocation Opinion surely constitutes

cause' for the Court to reconsider" the 9019 Order.  (LSI Joinder ¶ 4.)  This effort to re-package

arguments the Court heard and rejected in its Reconsideration Decision in the form of an

untimely[26] motion for reconsideration should be rejected.

47.    Following the Allocation Decision, the Bondholder Group, the U.S. Debtors, and

other parties asked the Court to reconsider whether "Sales Proceeds must be allocated to the U.S.

Debtors on account of the allowed Guaranteed Bondholder claims" to avoid an inequitable result.

(Reconsideration Decision at 2.)  The Court denied reargument on that issue, stating clearly that

it "understood the implications of its decision when rendering the Allocation Opinion."  (*Id.* at

4.)  Now, 17 months later, LSI makes the same argument, asserting that "the practical result of

the Court's rationale in the Allocation Opinion" "causes significant inequitable harm to holders

---

[25]  LSI states that it "agrees with the Trade Consortium . . . and joins in the arguments set forth, and relief sought, in the" Motion.  (LSI Joinder ¶ 1.)  The arguments set forth above therefore apply equally to the LSI Joinder.

[26]  According to LSI, the Allocation Decision is the purported "cause" upon which the LSI Joinder rests. (*See, e.g.*, LSI Joinder ¶¶ 4 ("reconsideration of the PPI Settlement Order in light of the Allocation Opinion is the least the Court could do.").)  Thus, as with the TCC's Motion, the LSI Joinder is time-barred.  (*See supra* Objection, Section I.)

- 22 -

of Non-Bonds Claims and potentially violates precedent regarding substantive consolidation."
(LSI Joinder ¶¶ 4, 5.)  The time for making this argument has long passed; the only remaining
avenue for challenging the Allocation Decision is on appeal to the Third Circuit.  LSI cites no
authority—and there is none—allowing it to insert appellate arguments into its time-barred
Joinder.  LSI did not appear during the allocation litigation and chose not to appeal the
Allocation Decision—it should not be permitted do so now.

<h2 style="text-align:center"><u>CONCLUSION</u></h2>

For the reasons set forth herein, the Bondholder Group respectfully requests that
the Court:  (a) deny the Motion; (b) deny the LSI Joinder; and (c) grant such other and further
relief as the Court deems appropriate.

*[Remainder of page intentionally left blank]*

Dated:  December 13, 2016
        Wilmington, Delaware

PACHULSKI STANG ZIEHL & JONES LLP

/s/ *Peter J. Keane*
Laura Davis Jones (No. 2436)
Peter J. Keane (No. 5503)
919 N. Market Street, 17th Floor
PO Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone:  (302) 652-4100
Facsimile:  (302) 652-4400

-and-

MILBANK, TWEED, HADLEY & McCLOY LLP
Dennis F. Dunne
Andrew M. Leblanc
Atara Miller
28 Liberty Street
New York, New York 10005-1413
Telephone:  (212) 530-5000
Facsimile:  (212) 530-5219

-and-

Thomas R. Kreller
2029 Century Park East, 33rd Floor
Los Angeles, California 90067
Telephone: (213) 892-4463
Facsimile: (213) 629-5063

*Attorneys for Ad Hoc Group of Bondholders*

DOCS_DE:211246.1 61026/001