# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
-------------------------------------------------------X
                                          :
In re                                     :    Chapter 11
                                          :
Nortel Networks Inc., et al.,[1]          :    Case No. 09-10138 (KG)
                                          :
                   Debtors.               :    Jointly Administered
                                          :
                                          :    Hearing Date: January 24, 2017 at 10:00 a.m. (ET)
                                          :    Objections Due: January 9, 2017 at 4:00 p.m. (ET)
                                          :
-------------------------------------------------------X
```

## DEBTORS' MOTION FOR ENTRY OF AN ORDER PURSUANT TO 11 U.S.C. §§ 105(a) AND 363(b) AND FEDERAL RULE OF BANKRUPTCY PROCEDURE 9019 APPROVING SETTLEMENT AND PLANS SUPPORT AGREEMENT

Nortel Networks Inc. ("NNI"), and certain of its affiliates, as debtors and debtors in

possession (collectively, the "Debtors"), hereby move this Court (the "Motion") for the entry of

an order substantially in the form attached hereto as Exhibit A, pursuant to sections 105(a) and

363(b) of title 11 of the United States Code (the "Bankruptcy Code") and Rule 9019 of the

Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), (a) authorizing and approving

the Settlement and Plans Support Agreement (the "SPSA" or "Settlement Agreement")[2] dated

---

[1]    The debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567), Nortel Networks (CALA) Inc. (4226) and Nortel Networks India International Inc. (8667). Contact information for the Debtors and their petitions are available at http://dm.epiq11.com/nortel.

[2]    The SPSA was filed with the Court on October 12, 2016 as Exhibit A to the Notice of Execution of Settlement and Plans Support Agreement [D.I. 17249], and is available for download free of charge at the website of the Debtors' claims and noticing agent, Epiq Bankruptcy Solutions, LLC, at http://dm.epiq11.com/nortel or by contacting Epiq Bankruptcy Solutions, LLC via telephone at (646) 282-2400.

October 12, 2016 and entered into by and among (i) the Debtors, (ii) the Canadian Debtors,[3] (iii)

the Monitor, (iv) the EMEA Debtors, (v) the EMEA Non-Filed Entities; (vi) the Joint

Administrators, (vii) Nortel Networks S.A. ("NNSA"), (viii) the NNSA Conflicts Administrator,

(ix) the French Liquidator, (x) the Bondholder Group, (xi) the Canadian Creditors Committee

("CCC"), (xii) the Creditors' Committee,  (xiii) the U.K. Pension Trustee, (xiv) the Board of the

Pension Protection Fund ("PPF"), (xv) the Joint Liquidators and (xvi) those bondholders of

Nortel Networks Capital Corporation ("NNCC") who are signatories to the SPSA ("NNCC

Bondholder Signatories") (collectively, the "Parties" and each a "Party"), and (b) granting them

such other and further relief as this Court deems just and proper.  In support of this Motion, the

Debtors respectfully represent as follows:

### PRELIMINARY STATEMENT

1.        Through this Motion, as well as their filing and pursuit of confirmation of the

First Amended Joint Chapter 11 Plan of Nortel Networks Inc. and Certain Of Its Affiliated

Debtors, dated December 1, 2016 [D.I. 17501] (the "Chapter 11 Plan" or the "Plan") for which a

confirmation hearing is scheduled for January 24, 2017, the Debtors seek to bring closure to the

long-running, complex and costly disputes that have consumed these cases since the closing of

the $4.5 billion patent sale in 2011.  As the Court is aware, the Debtors and their creditor

constituencies have made substantial efforts in recent years to resolve the allocation of the over

$7 billion in sale proceeds held in escrow through a series of mediations, a cross-border 21-day

trial, appeals to courts in the United States and in Canada and, most recently, several months of

mediation efforts overseen by the experienced former Chief Judge of the United States District

Court for the District of Delaware, Joseph J. Farnan.

---

[3]        Capitalized terms used but not otherwise defined shall have the meanings subsequently ascribed to them
herein or set forth in the SPSA.

2.     The complexity of these Chapter 11 Cases, the various inter-relationships between the Debtors and their foreign affiliates, and the disputes between and among the Debtors, their affiliates and their respective creditors regarding the allocation of sale proceeds are well known to the Court and the parties in interest in these cases.  The Proposed Disclosure Statement for the First Amended Joint Chapter 11 Plan of Nortel Networks Inc. and Certain of Its Affiliated Debtors, dated December 1, 2016 [D.I. 17502] (the "Disclosure Statement"), filed by the Debtors, summarizes the various milestones, including the sales, litigations and settlements that have occurred since the commencement of these cases in 2009, and other claims that remain outstanding.  However, written summaries of the history of these cases do not and cannot fully capture the zealousness and seriousness with which the Debtors and their creditor constituencies have pursued the interests of their creditors throughout these cases.  The public record speaks volumes about the various relief sought and the arguments pursued by the Debtors in their efforts to preserve and maximize the value of their estates and to resolve claims and disputes.  These efforts have resulted in significant cross-border settlements, including various claims settlements with the Canadian Debtors and the EMEA Debtors, as well as other settlements with the Debtors' trade creditors, former employees, retirees and others.

3.     The allocation of the sale proceeds held in escrow has proven particularly difficult to resolve for many reasons, including the starkly different allocation theories advanced throughout the litigation process, the number of parties to the litigation and the cross-jurisdictional nature of the litigation.  In addition, the value of the Debtors' estates are necessarily and importantly dependent on the resolution of various claims between and among their estates and their affiliates, including NNI's right to receive distributions on its $62.5 million secured claim and its $2 billion unsecured claim against its Canadian affiliate, NNL, as well as

claims by and against the Debtors relating to other inter-estate agreements and pre-bankruptcy transactions.

4.      While the Debtors firmly stand by the ownership theory of allocation they advanced at trial, they are both mindful and respectful of the fact that the Court and the Canadian Court did not accept that allocation principle.  They also recognize that further litigation would be quite costly and would likely delay the final resolution of these cases by months or years, without any assurance of an improved allocation of sale proceeds to the Debtors individually or as a whole.  Similarly, in contrast to the terms of the SPSA, continued litigation would not provide for the resolution of any of the other intercompany matters and disputes that create uncertainties regarding NNI's expected recoveries on its intercompany claims and the assets that ultimately would be available for distribution to the Debtors' creditors.

5.      With that backdrop, one cannot overstate the significance of the SPSA, both as a free-standing settlement and as incorporated into the Plan, in enabling the Debtors to bring closure to these cases.  The Debtors and their various constituents – including the Committee (of which the PBGC is a member), the Bondholder Group and the NTCC – participated in an approximately year-long mediation process following the issuance of the Allocation Decisions that resulted in the complex and fragile integrated settlement that is embodied in the SPSA.  That settlement, which is supported by all the parties to the original escrow of sale proceeds and the IFSA that governs the Allocation Dispute, provides for the full and final settlement of the Allocation Dispute and various other claims and disputes that clears the underbrush and develops a certain path for completion of these cases.

6.      As contemplated by the SPSA, the Debtors (other than NNIII) have filed and are seeking confirmation of the Plan to incorporate and effectuate the various settlements reached

with their foreign affiliates and other parties in interest.  The Canadian Debtors similarly have

filed a CCAA Plan of Compromise, and the EMEA Debtors and their relevant creditors have

sought the requisite approvals of the SPSA in their home jurisdictions.  While the Plan was and

is intended to serve as a motion by the Debtors for approval of the SPSA settlement terms and

authorization for the Debtors to perform their obligations under the SPSA, the Debtors are filing

this Motion in an abundance of caution in the event the Chapter 11 Plan is not confirmed by this

Court with respect to any of the Debtors included in the Chapter 11 Plan, and also as a motion to

approve the SPSA with regard to NNIII, in order to further its Chapter 11 case and satisfy one of

the conditions to the effectiveness of the Plan, pending NNIII's filing and prosecution of its own

Chapter 11 plan.[4]

7.      By creating a path for the resolution of the Debtors' bankruptcy cases in

coordination with the creditor protection proceedings of their foreign affiliates, the SPSA

represents a significant step forward in the ultimate completion of these Chapter 11 Cases and

the winding-down of the Nortel estates.  The terms of the SPSA provide the Debtors, their

creditor constituencies and other parties in interest with significantly more certainty and finality

in respect of the amounts that will be available for distribution to creditors on a debtor-by-debtor

basis, and significantly greater aggregate recoveries vis-à-vis those under the Allocation

Decision.  Moreover, the SPSA is fair and reasonable and should be approved as a compromise

that is in the best interests of each of the Debtors, their estates, their creditors and other

stakeholders.

8.      The traditional <u>Martin</u> factors considered by the Court in deciding whether to

approve a settlement under Rule 9019 weigh heavily in favor of approving the SPSA settlement,

---

[4]      NNIII anticipates filing a Chapter 11 plan in the first quarter of 2017 that similarly will propose to implement the terms of the SPSA.

on a standalone basis and as incorporated into the Plan.  The integrated settlement of these

complex and long-running disputes is the Debtors' best opportunity – indeed, likely the only

opportunity – to avoid further protracted and value-eroding litigation with their other affiliates

and among the Debtors' own creditors, where such litigation would have no certainty of

delivering improved recoveries to any of the Debtors' creditors.  While certain discrete creditors

or creditor groups, including the PBGC and the NTCC, have expressed their intention to oppose

certain aspects of the SPSA and the Plan in the hope of improving their own recoveries, such

self-serving tactics should not be countenanced, and the Debtors respectfully request that the

Court approve the SPSA under Rule 9109 for the reasons forth in this Motion in order to permit

the Debtors to promptly bring the various pending litigations to conclusion, distribute their

remaining assets and wind down their estates for the benefit of all of their creditors.

## JURISDICTION

9.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and

1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue is

proper pursuant to 28 U.S.C. §§ 1408 and 1409.

10.     The statutory bases for the relief requested herein are sections 105(a) and 363(b)

of the Bankruptcy Code and Bankruptcy Rule 9019.

## FACTUAL BACKGROUND

### A.      Procedural Background

11.     On January 14, 2009 (the "Petition Date"), the Debtors, other than Nortel

Networks (CALA) Inc. ("NN CALA")[5] and Nortel Networks India International Inc. ("NNIII"),[6]

---

[5]      NN CALA filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on July 14, 2009, which was consolidated and is being jointly administered with the other Debtors' Chapter 11 Cases for procedural purposes [D.I. 1098].

filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States

Bankruptcy Court for the District of Delaware (the "Court"), which cases are consolidated for

procedural purposes only (the "Chapter 11 Cases").  The Debtors continue to operate as debtors

in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

12.     The Office of the United States Trustee for the District of Delaware (the "U.S.

Trustee") has appointed an Official Committee of Unsecured Creditors (the "Creditors'

Committee," formerly the "UCC") in respect of the Debtors [D.I.s 141, 142], and an ad hoc

group of bondholders has been organized (the "Bondholder Group").  An ad hoc consortium of

creditors holding trade claims against the Debtors (the "Nortel Trade Claims Consortium" or

"NTCC") was organized in 2015.

13.     On the Petition Date, the Debtors' ultimate corporate parent Nortel Networks

Corporation ("NNC"), NNI's direct corporate parent Nortel Networks Limited ("NNL," and

together with NNC and their affiliates, including the Debtors, "Nortel"), and certain of their

Canadian affiliates (collectively, the "Canadian Debtors")[7] commenced a proceeding with the

Ontario Superior Court of Justice (the "Canadian Court") under the Companies' Creditors

Arrangement Act (Canada) (the "CCAA"), seeking relief from their creditors (collectively, the

"Canadian Proceedings") and a monitor, Ernst & Young Inc. (the "Monitor"), was appointed by

the Canadian Court.  The CCC is an ad hoc committee of major creditors having claims only

against the Canadian Debtors.  Also on the Petition Date, the High Court of Justice in England

and Wales (the "English Court") placed nineteen of Nortel's European affiliates, including

---

[6]     NNIII filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on July 22, 2016, which was consolidated and is being jointly administered with the other Debtors' Chapter 11 Cases for procedural purposes [D.I. 17090].

[7]     The Canadian Debtors include the following entities:  NNC, NNL, Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation, as well as Nortel Communications Inc., Architel Systems Corporation and Northern Telecom Canada Limited, which subsequently commenced their own Canadian Proceedings.

Nortel Networks UK Limited ("NNUK") and certain of its affiliates located in Europe, the Middle East and Africa (collectively, the "EMEA Debtors"),[8] into administration (the "UK Proceedings") under the control of court-appointed administrators and foreign representatives (the "Joint Administrators").  Additionally, certain of the EMEA Debtors' affiliates have not commenced administration proceedings, but are under the control of their respective directors (the "EMEA Non-Filed Entities").

14.   On May 28, 2009, NNSA commenced secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC) No. 1346/2000 on Insolvency Proceedings in the Republic of France  (the "French Secondary Proceedings," and together with the Chapter 11 Cases, the Canadian Proceedings and the U.K. Proceedings, the "Nortel Insolvency Proceedings") pursuant to which a liquidator, Maître Cosme Rogeau (the "French Liquidator"), and an administrator were appointed by the Commercial Court of Versailles, France (the "French Court") [D.I. 2009P00492] for NNSA.  On June 3, 2016, Stephen Taylor was appointed as the Conflicts Administrator for NNSA (the "NNSA Conflicts Administrator").

15.   Other Nortel affiliates have commenced and in the future may commence additional creditor protection, insolvency and dissolution proceedings around the world.

16.   For further information regarding these Chapter 11 Cases, references may be made to the Monthly Operating Reports filed by the Debtors at http://dm.epiq11.com/nortel and the Disclosure Statement.

---

[8]     The EMEA Debtors include the following entities:  NNUK, Nortel Networks (Ireland) Limited ("NNIR"), Nortel GmbH, Nortel Networks France S.A.S., Nortel Networks Oy, Nortel Networks Romania SRL, Nortel Networks AB, Nortel Networks N.V., Nortel Networks S.p.A., Nortel Networks B.V., Nortel Networks Polska Sp. z.o.o., Nortel Networks Hispania, S.A., Nortel Networks (Austria) GmbH, Nortel Networks, s.r.o., Nortel Networks Engineering Service Kft, Nortel Networks Portugal S.A., Nortel Networks Slovensko, s.r.o. and Nortel Networks International Finance & Holding B.V, but does not include, for the purposes of the SPSA and this Motion, NNSA.

B.      **The Allocation Dispute**

17.      Soon after the commencement of the Nortel Insolvency Proceedings, the Debtors

and their various affiliates entered into a series of transactions by which they sold various

business units and other assets to various purchasers (the "Sales Transactions").  In furtherance

of these efforts, among other things, the Debtors, the Canadian Debtors and certain of the EMEA

Debtors entered into that certain Interim Funding and Settlement Agreement, dated June 9, 2009

(the "IFSA").[9]  Following a joint hearing on June 29, 2009, the IFSA was approved by this Court

[D.I. 993] and the Canadian Court.  Among other terms, the parties to the IFSA agreed not to

condition the sale of Nortel's businesses and assets on a prior agreement among the selling

parties regarding the allocation of the ultimate sale proceeds (plus accrued interest, the "Sale

Proceeds") from the relevant Sales Transaction.  See IFSA, ¶¶ 12(a), (b).  With this framework

in place, from 2009 to 2011, Nortel conducted an extensive series of court-approved sale

transactions generating in excess of $7.3 billion in net Sale Proceeds.

18.      As more fully set forth in the IFSA, the Selling Debtors,[10] the Joint

Administrators, the Creditors' Committee and the Monitor entered into various court-approved

escrow agreements with JP Morgan Chase Bank, N.A. and Citibank, N.A., as escrow agents (the

"Escrow Agreements") to hold all Sale Proceeds in escrow accounts (the "Escrow Accounts"),

pending either the agreement of the relevant parties or filed decisions of this Court and the

Canadian Court regarding the allocation of the Sale Proceeds.  See id.  As of the date of this

Motion, the Escrow Accounts hold approximately $7.3 billion in Sale Proceeds.

---

[9]        See Exhibit B to the Motion Pursuant to 11 U.S.C. § 105(a), § 363, § 503 and Fed. R. Bankr. P. 9019 for an Order (A) Approving the Interim Funding and Settlement Agreement, and (B) Granting Related Relief [D.I. 874].

[10]       The term "Selling Debtors" refers to any Nortel debtor that signed or acceded to the IFSA or that signed one or more of the Escrow Agreements (as defined below).

19.     In 2009 and 2010, the Debtors, the Canadian Debtors, the EMEA Debtors, the Creditors' Committee, the Bondholder Group and certain other interested parties held discussions in an attempt to agree upon an allocation of the Sale Proceeds held in escrow and to reach resolution of all inter-estate matters.  These efforts were unsuccessful, and the parties proceeded to engage in litigation before this Court and the Canadian Court, including a 21-day cross-border trial, in order to have a dispute resolver determine the allocation of the Sales Proceeds among the various Selling Debtors (the "Allocation Dispute").

20.     On May 12, 2015, this Court and the Canadian Court simultaneously issued opinions deciding the Allocation Dispute (the "Allocation Decisions").  The Debtors, the Creditors' Committee, the Bondholder Group and certain other parties sought reconsideration and/or clarification of the decisions before both this Court and the Canadian Court, which motions were largely denied on July 6, 2015 [D.I. 15830].  Around this time, the Nortel Trade Claims Consortium organized itself as an ad hoc group comprised of a handful of entities that have purchased and sold claims against the Debtors over time through claims trading with creditors and other parties and joined the Debtors' reconsideration motion.[11]

21.     Numerous parties appealed this Court's Allocation Decision to the United States District Court for the District of Delaware (the "U.S. Allocation Appeal").  In the fall of 2015, Judge Farnan was appointed as a mediator by the District Court.  After such mediation efforts did not result in an immediate settlement, the District Court entered an order on May 24, 2016 certifying all U.S. appeals directly to the United States Court of Appeals for the Third Circuit, and certain parties petitioned the Third Circuit to accept the appeal.  The Third Circuit granted the petitions for leave to appeal on August 9, 2016.

---

[11]     The NTCC originally also included a few individuals who purported to hold claims against the Debtors, but such individuals are no longer members of the NTCC.

22.     Concurrently with the appeal process in the United States, the Canadian Court's Allocation Decision has been contested in the Canadian courts.  On July 16, 2015, the Debtors, the Creditors' Committee, the Bondholder Group and certain other parties filed notices of their motions for leave to appeal the Canadian Court's Allocation Decision to the Court of Appeal for Ontario.  On May 3, 2016, the Court of Appeal of Ontario dismissed the motions for leave to appeal.  Between July 29 and August 1, 2016, the moving parties applied to the Supreme Court of Canada for leave to appeal the Court of Appeal's decision denying leave to appeal.  The deadline to respond to that motion was extended until November 30, 2016 to enable settlement discussions to continue.

23.     During the pendency of the appellate process, the parties continued the mediation overseen by Judge Farnan.  The mediation process ultimately led to a proposed settlement of the Allocation Dispute as well as various other inter-estate matters and claims, through the terms of a fully integrated settlement, as memorialized in the SPSA and described below.  Further information regarding the history of the Debtors' cases, the SPSA and various claims and disputes resolved thereunder is contained in the Disclosure Statement.

C.     **The Proposed Chapter 11 Plan**

24.     On December 1, 2016, the Debtors filed their amended Chapter 11 Plan on behalf of all Debtors (other than NNIII) and accompanying amended Disclosure Statement.  The Court held a hearing to consider the adequacy of the Disclosure Statement, and on December 1, 2016 entered an order approving the adequacy of the Disclosure Statement for the solicitation of votes on the Plan and set a hearing date of January 24, 2017 to consider confirmation of the Plan. [D.I. 17516].

D.      **Summary Of The Proposed Settlement Agreement**

25.      The SPSA is a key component of the Chapter 11 Plan.  In accordance with

Section 12(b)(i) of the IFSA, the SPSA provides for the full and final resolution of litigation

relating to the Allocation Dispute as well as various other claims and disputes among the Parties

and resolves the various remaining issues in the Debtors' Chapter 11 Cases in order to create a

path to the conclusion of these cases.

26.      The SPSA, as ultimately memorialized by the Parties, includes various complex

and integrated terms regarding the resolution of various matters including the following:[12]

- Settlement of the Allocation Dispute: The Parties agree to settle the Allocation
  Dispute and distribute the Sale Proceeds in a manner that conforms with the
  following percentages and corresponding amounts (subject to Section 2 of the
  SPSA):[13]

| Party | Percentage of Proceeds | US$ |
|-------|------------------------|-----|
| **Debtors** | 24.3500% | 1,766,417,002 |
| **Canadian Debtors** | 57.1065% | 4,142,665,131 |
| **EMEA (Non-NNSA/Non-NNUK) Debtors** | 1.4859% | 107,788,879 |
| **NNUK** | 14.0249% | 1,017,408,257 |
| **NNSA** | 3.0327% | 220,000,000[14] |

---

[12]      This discussion is intended as a summary of the terms of the SPSA.  To the extent that the summary and the
terms of the SPSA are inconsistent, the terms of the SPSA shall control.  Capitalized terms used but not defined
herein shall have the meanings ascribed to them in the SPSA.

[13]      Any changes in the Escrow Accounts' balances between the execution date of the SPSA, October 12, 2016,
and the date that all conditions of the Debtor's Plan are satisfied (the "Plan Effective Date") shall be allocated
according to the percentages in the above table.

[14]      Under the SPSA, the EMEA (Non-NNSA/Non-NNUK) Debtors, NNUK, and NNSA will collectively
receive 18.5435% of the Sale Proceeds, provided, however, that the NNSA Allocation is fixed at U.S.$220,000,000
and NNSA shall not share proportionally with any increase or decrease in the Sale Proceeds pursuant to Section 2(d)
("Settlement for Allocation Dispute") of the SPSA, and any such increase or decrease in the Sale Proceeds that
would have been allocated to NNSA but for Section 2(c)(v) ("Settlement for Allocation Dispute") of the SPSA will
be allocated to NNUK.

- <u>Distribution of Debtors' Sale Proceeds Allocation</u>: Among the Debtors, NNI shall receive U.S.$1,716,346,052 and NN CALA shall receive U.S.$50,070,950.  All other Debtors shall receive U.S.$0.00.[15]

- <u>Treatment of Crossover Claims</u>: In the event that a creditor shall have a Proven Claim against the Canadian Estate and an allowed claim against a Debtor, the issuer (or primary) Debtor estate or Canadian Debtor estate and any guarantor (or secondary) Debtor estate or Canadian Debtor estate shall pay distributions on the full amount of the allowed claim or Proven Claim (as the case may be) on a *pari passu* basis with all other creditors holding allowed claims or Proven Claims (as the case may be) with the same priority and without discrimination of any kind.  The total allowed amount of such claim is determined by the greater of the creditor's pre-filing allowed claim or Proven Claim when taking into account distributions received from both the issuer (or primary) Debtor estate or Canadian Debtor estate and guarantor (or secondary) Debtor estate or Canadian Debtor estate (such greater amount, the "<u>Creditor's Maximum</u>").[16]

- <u>Right to Subrogation</u>: Subject to certain limitations, if a creditor holding a Crossover Claim has received an amount equal to its Creditor's Maximum, the guarantor (or secondary) Debtor estate or Canadian Debtor Estate, as applicable, shall be immediately subrogated into the Crossover Claim against the issuer (or primary) Debtor or Canadian Debtor estate and will be entitled to receive any and all distributions on a *pari passu* basis with all other holders of allowed claims or Proven Claims with the same priority from the issuer (or primary) Debtor estate or Canadian Debtor estate without setoff or discrimination.[17]

- <u>No Double-Recovery</u>: No creditor shall receive aggregate distributions from the Nortel estates on account of an allowed claim in excess of 100% of the amount of such allowed claim.  In no case shall a creditor holding a Crossover Claim be entitled to receive any further distributions from the Debtor (or Canadian Estate) once aggregate distributions made by the Debtors and Canadian Estate in respect of such Crossover Claim equal the total allowed amount (or Proven Claim amount) of such Crossover Claim against the Debtors (or Canadian Estate).[18]

- <u>Post-Petition Date Interest</u>: No post-Petition Date interest shall be included in any allowed Claim, nor be paid on allowed Claims by any Debtor.[19]

- <u>Additional NNCC Bondholder Payments</u>: NNI shall pay the reasonable and documented fees of (a) the NNCC Bonds Indenture Trustee, in an amount not to

---

[15]    <u>See</u> SPSA, Section 2(c) and Annex F.

[16]    <u>See</u> SPSA, Section 4(c).

[17]    <u>See</u> SPSA, Section 4(c).

[18]    <u>See</u> SPSA, Section 4(c).

[19]    <u>See</u> SPSA, Section 4(d).

exceed $4.25 million and (b) counsel to Solus Alternative Asset Management LP and PointState Capital LP in an amount not to exceed $750,000. If any amount remains in the cash reserve established for such purpose, NNI shall pay or reimburse reasonable and documented fees (up to an additional $2.0 million) incurred by professionals in connection with the assertion of rights related to the NNCC Bonds.[20]

- <u>Resolution of Certain Claims</u>:[21]

    o The allowed PBGC claim asserted against each of the Debtors (and any U.S. non-debtor Nortel entity) shall be a maximum of $708,000,000.

    o The Crossover Bonds Claims shall be allowed as one or more general unsecured claims in the aggregate amount of $3,934,521,442.

    o The NNCC Bonds Claims against NNI (into which NNCC shall be substantively consolidated on the Plan Effective Date) shall be allowed as a general unsecured claim in the amount of $150,951,562. However, if distributions prove to be less than such amount, NNI shall reserve $7.5 million to be made available to be paid in respect of the NNCC Bond Claims.

    o No Debtor shall have any claim against any other Debtor or Foreign Affiliate Debtor in respect to any liability that may become due to SNMP, and no Debtor or other Party shall assist SNMP in bringing any claim against any Debtor or Foreign Affiliate Debtor.

- <u>Book Intercompany Claims</u>: Allowed Book Intercompany Claims shall be included in the determination of the allowed General Unsecured Claims against each of the Debtors. Any and all other pre-filing books and records claims between any Canadian Debtor and any Debtor, which are not preserved specifically in the SPSA, are forever released and barred.[22]

- <u>Resolution of Side Letters and Cascade Trust</u>: In full and final resolution of all entitlements and obligations arising under side letters to which any Debtor is a party and certain claims made by NN CALA in respect of certain customer receipts deposited into NNC's bank account, NNI shall receive payment from the Canadian Estate in the amount of $77.5 million. After receipt of such payment by NNI, NNI shall have a 27% interest in the remaining assets of the Cascade Trust.[23]

- <u>Cooperation</u>: Notwithstanding the separate administration of the estates of the Canadian Debtors, the EMEA Debtors, NNSA, the Debtors and of the EMEA Non-Filed Entities, the Debtors shall work cooperatively and use reasonable efforts to

---

[20]    <u>See</u> SPSA, Section 4(m).

[21]    <u>See</u> SPSA, Section 4(g).

[22]    <u>See</u> SPSA, Section 4(h).

[23]    <u>See</u> SPSA, Section 4(e).

implement the SPSA and the transactions and actions contemplated thereby and take any and all reasonably necessary and appropriate actions in furtherance of consummation of the SPSA, the Disclosure Statement and the Chapter 11 Plan.[24]

- Releases: The Debtors will exchange certain mutual releases with each of the Parties and certain other parties with respect to claims arising out of the Allocation Dispute or any other matter relating to the Nortel Insolvency Proceedings or the Nortel entities unless otherwise specifically preserved.[25]

- Litigation Resolution: Promptly following the Plan Effective Date, the Debtors shall dismiss with prejudice all appeals, leave to appeal applications and other litigations among any of the Parties, save and except for the Non-Released Matters and provided that rights are reserved to enforce the SPSA.[26]

- Conditions to Effectiveness: The SPSA shall become effective upon the approval of the SPSA by this Court and by the U.K. Court, the French Court and the Beddoes Court[27] and Court confirmation of the U.S. Plan and the Canadian Plan by February 17, 2017[28], and the satisfaction of the other enumerated terms and conditions thereto.

Such provisions, along with the other terms and conditions of the SPSA, reflect the collective package of terms that enabled the SPSA Parties to resolve the Allocation Dispute.

### RELIEF REQUESTED

27.    The Debtors have incorporated the terms of the SPSA into the Plan and intend to seek confirmation of the Plan at the scheduled January 24, 2017 confirmation hearing.  In furtherance of the confirmation of the Plan, for NNIII, and in the event the Plan is not confirmed for any other individual Debtors, the Debtors also seek approval of the SPSA as a standalone settlement under Bankruptcy Rule 9019.  Accordingly, by this Motion, the Debtors seek,

---

[24]    See SPSA, Section 4(a).

[25]    See SPSA, Section 8.

[26]    See SPSA, Section 5.

[27]    The Debtors understand that (i) the U.K. Court authorized the EMEA Debtors, the Joint Administrators and the NNSA Conflicts Administrator to perform the SPSA on November 3, 2016; (ii) entry into the SPSA by the French Liquidator was approved by the French Court on October 27, 2016; and (iii) the Beddoes Court authorized the SPSA on October 13, 2016.  The Canadian Debtors are seeking approval of the SPSA from the Canadian Court pursuant to their proposed Plan of Compromise and Arrangement dated November 4, 2016.

[28]    See SPSA, Section 9.

pursuant to sections 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019, entry

of an order (i) authorizing the Debtor Parties' entry into and approving the SPSA; and (ii)

granting them such other and further relief as this Court deems just and proper.

## BASIS FOR RELIEF

28.     The approval of the SPSA as an integrated settlement of various litigations and

other unresolved and disputed matters between and among the Debtors, their various foreign

affiliates and other creditors and parties in interest in the various Nortel insolvency proceedings

pending worldwide, is squarely authorized by sections 105(a) and 363(b) of the Bankruptcy

Code and easily meets the applicable standards of Bankruptcy Rule 9019.[29]

29.     Bankruptcy Rule 9019 provides, in pertinent part, that, "[o]n motion by the trustee

and after notice and a hearing, the court may approve a compromise or settlement." Fed. R.

Bankr. P. 9019(a). Citing this authority, the Third Circuit has emphasized that "[t]o minimize

litigation and expedite the administration of a bankruptcy estate, [c]ompromises are favored in

bankruptcy." In re Martin, 91 F.3d at 393 (second alteration in original) (internal quotation

marks omitted) (quoting 9 Collier on Bankruptcy ¶ 9019.03[1] (15th ed. 1993)); see also In re

World Health Alts., Inc., 344 B.R. 291, 296 (Bankr. D. Del. 2006) (finding settlements

"generally favored in bankruptcy"). Additionally, the Third Circuit has recognized that "'(i)n

administering reorganization proceedings in an economical and practical manner it will often be

wise to arrange the settlement of claims as to which there are substantial and reasonable

doubts.'" In re Penn Cent. Transp. Co., 596 F.2d 1102, 1113 (3d Cir. 1979) (quoting Protective

---

[29]     Section 105(a) of the Bankruptcy Code also provides that "[t]he court may issue any order . . . that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Approval of the SPSA is consistent with the broad equitable authority of the bankruptcy courts, in furtherance of the above provisions of the Bankruptcy Code and Bankruptcy Rules. See, e.g., United States v. Energy Res. Co., 495 U.S. 545, 549 (1990); In re Kaiser Aluminum Corp., 456 F.3d 328, 340 (3d Cir. 2006) ("[B]ankruptcy courts have broad authority to act in a manner that will prevent injustice or unfairness in the administration of bankruptcy estates.").

Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424 (1968)).

30.     Before approving a settlement under Bankruptcy Rule 9019, a court must determine whether "'the compromise is fair, reasonable, and in the interest of the estate.'" In re Marvel Entm't Grp., Inc., 222 B.R. 243, 249 (D. Del. 1998) (quoting In re Louise's, Inc., 211 B.R. 798, 801 (D. Del. 1997)).  Basic to the process of evaluating proposed settlements is "the need to compare the terms of the compromise with the likely rewards of litigation."  Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 425 (1968).  The court need not be convinced that the settlement is the best possible compromise in order to approve it.  In re Coram Healthcare Corp., 315 B.R. at 330.

31.     The Third Circuit has set out four criteria for a bankruptcy court to consider when evaluating a settlement proposal (the "Martin Factors"):  "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors."  In re Martin, 91 F.3d at 393 (citing In re Neshaminy Office Bldg. Assocs., 62 B.R. 798, 803 (E.D. Pa. 1986)); see also Fry's Metals, Inc. v. Gibbons (In re RFE Indus., Inc.), 283 F.3d 159, 165 (3d Cir. 2002); In re eToys, Inc., 331 B.R. 176, 198 (Bankr. D. Del. 2005). Other courts have considered additional factors, including "the extent to which the settlement is truly the product of 'arms-length' bargaining, and not of fraud or collusion." See, e.g., In re Texaco, Inc., 84 B.R. 893, 902 (Bankr. S.D.N.Y. 1988).

32.     In keeping with the stated public policy in favor of settlement, courts in this Circuit have repeatedly found that "[i]n analyzing the compromise or settlement agreement under the Martin factors, courts should not have a 'mini-trial' on the merits, but rather should canvass

the issues and see whether the settlement falls below the lowest point in the range of

reasonableness." <u>W.R. Grace & Co.</u>, 475 B.R. at 77-78 (internal citations omitted); <u>Pulver Com, Inc. v. Medialive Int'l Inc. (In re Key3Media Grp., Inc.)</u>, 336 B.R. 87, 93 (Bankr. D. Del. 2005), aff'd, 2006 WL 2842462.  Nevertheless, courts in this District have recognized that the approval of a proposed compromise and settlement is committed to the sound discretion of the bankruptcy court.  See, e.g., <u>In re Coram Healthcare Corp.</u>, 315 B.R. 321, 329 (Bankr. D. Del. 2004). Moreover, courts generally defer to a debtor's judgment so long as there is a legitimate business justification for its action.  <u>In re Coram Healthcare Corp.</u>, 315 B.R. 321, 330 (Bankr. D. Del. 2004); <u>Key3Media Grp., Inc.</u>, 336 B.R. at 93.

**A.    The SPSA Falls Well Within the Range of Reasonableness and Satisfies the Requirements of Bankruptcy Rule 9019 and the Martin Factors**

33.    In this case, the principles underlying the <u>Martin</u> Factors and set forth in applicable caselaw – the importance of compromise in complex disputes where success from further litigation is not assured; the balancing of finality against the time, cost and delay of further litigation; and the public policy in favor of settlements – tip wholly in favor of approval of the SPSA.  The SPSA provides a fair, reasonable and final resolution of the Allocation Dispute that (as no creditor, to the Debtors' knowledge, appears to dispute) establishes an allocation of the Sale Proceeds far above the lowest point in the range of reasonable outcomes when coupled with the significant costs, risks and delay that would arise from the continued litigation of the Allocation Dispute, as to which the Parties have consistently demonstrated their willingness and intention to pursue to conclusion absent a settlement.

34.    The SPSA also provides various other benefits to the Debtors, including by: (i) securing NNI's right to payment on account of its $2 billion claim as a claim against the consolidated Canadian Debtors' estate; (ii) providing the Debtors with subrogation rights on

18

account of distributions made on the guaranteed Crossover Claims, which provides a potential

additional source of recovery for the Debtors' unsecured creditors if creditor distributions

ultimately are greater than conservatively expected; (iii) establishing mechanics with respect to

distributions on account of Crossover Claims that ensure that creditors are not able to over-

recover to the extent they hold claims against multiple affiliates; (iv) requiring the payment in

the amount of $77.5 million from the Canadian Debtors to NNI for various payment and true-up

obligations arising from allocation of the Sale Proceeds as contemplated by the IFSA and other

agreements among the Parties;[30] (vi) requiring the EMEA Debtors to reimburse the Debtors and

Canadian Debtors $55 million[31] related to fees and expenses incurred in connection with the

sales generating the Sale Proceeds; and (v) ensuring the Debtors' exchange of broad releases

with the other settling parties will avoid further litigation over known and unknown disputes.[32]

The foregoing list is offered to provide examples of the complex terms that are included in the

SPSA and the nature of the disputes that are being compromised.  However, the terms of the

SPSA are not susceptible to being parsed, with each element separately scrutinized to consider

the pros and cons of resolving that issue in isolation.  Rather, the SPSA terms either are approved

---

[30]     The amounts owed to NNI have been contested by the Canadian Debtors and in the absence of a settlement, determination of such amounts might need to be determined through litigation on a cross-border basis.

[31]     In the absence of a settlement, this $55 million payment might also need to be determined through litigation on a cross-border basis.  Under the SPSA, NNI will receive $20 million of Sales Proceeds as reimbursement for these costs.

[32]     The SPSA also includes a multitude of other terms that comprise the integrated settlements, which are equally important to the settlement as a whole.  For example, the SPSA provides: (i) currency conversion rights to the Canadian Debtors, the EMEA Debtors and NNSA; (ii) protections against double recovery by any creditor holding claims against both the Debtors and the Canadian Debtors; (iii) a prohibition on the payment of post-petition interest on any claim, except with respect to the estates of the EMEA Debtors, subject to certain limitations; and (iv) the resolution of a number of cross-border claims disputes, including the allowance of the NNCC Bonds Claims against the Canadian Debtors.  In addition, the SPSA requires the Parties to cooperate in furtherance of the settlement and the transactions it contemplates, prohibits interference with the Debtors' administration of their cases and secures significant inter-estate support for the confirmation of the Plan.

or fail as a whole, which further speaks to the value and importance of the settlement and why it is in the interests of the Debtors and their creditors.

35.    Accordingly, the Debtors submit that the settlement terms embodied in the SPSA are fair, reasonable and in the best interests of the Debtors' estates, and satisfy all governing standards. Resolving years of complex litigation among multiple parties of countless issues, the SPSA clearly falls well above the lowest point in the range of reasonableness and should be approved.

### 1. The SPSA Is Reasonable in Light of the Probability of Success of Continued Litigation of the Various Disputes

36.    The SPSA provides for the resolution of the long-running and hotly contested Allocation Dispute as the cornerstone of the settlement. To that end, the Debtors face significant risk regarding their ability to achieve a better outcome than either the Allocation Decision or the SPSA terms provide through further litigation in the U.S. Courts. This is especially the case in the event the Canadian Supreme Court were to affirm the denial of the Debtors' right to appeal the Canadian Court's Allocation Decision, in which case the best outcome for the Debtors would be to obtain conflicting decisions and generate a stalemate on allocation. The Allocation Dispute is not the only matter being compromised, however, and unlike the risks associated with the Allocation Dispute, which has been litigated for years, the probabilities of success with respect to various other issues resolved by the SPSA that are not subject to pending decisions are inherently more uncertain. Accordingly, while it is difficult to separately and specifically quantify the Debtors' probability of success with respect to each such issue, the SPSA's collective resolution of these various matters, each of which was perceived as an important settlement term to one or more parties to the SPSA, provides a significant benefit to the Debtors and their respective estates.

### a.  Resolution of the Allocation Dispute

37.    Given the extensive briefing in connection with the Allocation Trial, the lengthy cross-border Allocation Trial itself and the subsequent appeals and cross-appeals taken from the Allocation Decisions, the Court and the parties in interest in these cases are more than familiar with the various positions and theories advanced by the parties to the litigation.  Needless to say, the parties hold wildly divergent views as to the proper outcome of the Allocation Dispute, and even the Court and the Canadian Court, while ultimately adopting the same allocation methodology, made starkly different factual findings and reached conclusions regarding the parties' respective allocation theories that in many important aspects clash with each other. Accordingly, it is clear that even if considered on a clean slate, it would be hard to quantify the likelihood of success of any particular theory advanced at trial.

38.    Such issues cannot be considered in the abstract, however, given the issuance of the Allocation Decisions and the subsequent appellate process in the United States and Canadian courts.  It is beyond dispute that there is no assurance the Debtors would obtain a more favorable allocation of sale proceeds on appeal than under the SPSA and, rather, a significant risk exists that the Allocation Decisions would be affirmed, resulting in a lower allocation of Sale Proceeds to the Debtors than under the SPSA, even before accounting for the costs associated with such further litigation.  The compromises embodied in the SPSA are thus well within the range of reasonable outcomes, and, in any event, more favorable to the Debtors than the lowest point in the range of reasonableness.[33]

---

[33]    The Debtors note that a determination that the SPSA's settlement of the Allocation Dispute is below the lowest point in the range of reasonableness would require a finding that this Court's Allocation Decision is outside the range of reasonable outcomes of the Allocation Dispute.  It is inconceivable that this Court would reach that conclusion.

39.     By providing that NNI[34] will receive approximately $1.716 billion of the U.S.

Allocation and NN CALA will receive an approximate $50 million allocation, the SPSA resolves

the allocation of Sale Proceeds payable to each of the Debtors on a final basis (where, as a result

of the integrated compromises, the remaining Debtors will not receive a direct allocation of sale

proceeds).  Such individual debtor allocations similarly fall within the range of reasonableness,

including based on (i) the allocation methodology advocated by the Debtors at the Allocation

Trial;[35] (ii) the lower allocation which the Debtors expect they would receive were the Allocation

Decisions to stand; (iii) the continued litigation that would be required, and risk that would be

borne, to determine the exact portion of the Sale Proceeds that would be allocated to any

individual Debtor under the Allocation Decisions as issued or as they could be modified on

appeal;[36] and (iv) the costs borne by NNI on behalf of the Debtors in pursuit of the sales and the

resulting litigation that would fairly have to be absorbed by each Debtor that was to receive an

allocation of Sale Proceeds.  The Debtors other than NNI and NN CALA largely were not sellers

in any of the Sales Transactions and none conveyed material assets in such transactions as

compared to NNI or NN CALA.  Even assuming, *arguendo*, that any of these other Debtors were

entitled to any portion of the Sale Proceeds, such amounts would be wholly absorbed by a claim

---

[34]     The SPSA contemplates the substantive consolidation of NNCC into NNI, as provided for under the Plan, and therefore any distribution to NNI is available to the Consolidated Debtors' estate.  Notably, NNCC did not sell assets or seek a separate allocation of Sale Proceeds in the Allocation Dispute.

[35]     See Expert Report of Jeffrey H. Kinrich, dated January 24, 2014, Allocation Trial Ex. TR00051, Exhibit 33.

[36]     For example, the final allocation of Sale Proceeds would depend on various issues not finally resolved by the Allocation Decision, such as whether intercompany claims are allowed for purposes of allocation and a determination of whether any claims in a specific Debtor's claims base are duplicative or should be counted for allocation purposes.

by NNI for reimbursement of sale-related costs and other costs related to the administration of their Chapter 11 Cases.[37]

### b. Resolution of Other Claims and Estate Related Matters and Risks to the Debtors' Estates and Assets

40.    As discussed above, the SPSA achieves far more than the resolution of the Allocation Dispute.  Importantly, the SPSA secures clarity and protections for the Debtors with respect to their claims against the Canadian Debtors in the Canadian Proceedings.  In particular, the SPSA provides that the Canadian Debtors will be substantively consolidated, such that all intercompany claims between and among the Canadian Debtors will be eliminated, and that all unsecured creditors holding claims against any of the Canadian Debtors (including the Debtors' $2 billion claim) will be paid on a *pari passu* basis.  In addition, the SPSA resolves various foreign exchange issues associated with the distributions to be made by the Canadian Debtors.[38] These provisions, fixing various claims allowed against the Canadian Debtors and the timelines governing the Canadian plan process, and the other SPSA terms taken as a whole, reduce the Debtors' risk with respect to the expected distributions on NNI's claims against the Canadian estates.  Given that such matters have not yet even been teed up in the Canadian Debtors' cases, there is no reason to expect the Debtors could have achieved a better result in litigation.

41.    The SPSA also resolves various other claims between and among the Debtors, their foreign affiliates and their respective creditors.  The SPSA fixes various intercompany claims between and among the various Nortel affiliates arising under pre- and post-petition side

---

[37]    NNIII did not sell material assets in the Sales Transactions and did not seek an allocation of Sale Proceeds in the Allocation Trial.  Nevertheless, NNIII is still the beneficiary of the resolution of other intercompany claims and the exchange of releases under the SPSA that further its ability to move toward resolution of its later-filed Chapter 11 case.

[38]    See SPSA, Section 4(b).

letters and agreements and transactions.[39]  The SPSA also resolves a number of additional cross-border claims and issues, including: (i) the SPSA Parties' agreement to the "Issuer Pays First" approach to distributions on Crossover Claims;[40] (ii) the fixing of various pension claims as against the Canadian Debtors and the EMEA Debtors; and (iii) the allowance of the NNCC Bonds Claims against NNI and NNCC (as the Consolidated Debtors) and against NNL.[41]  In addition, the SPSA minimizes the prospect of future litigation by providing that the Debtors' estates will be administered by the U.S. Principal Officer without interference from any of the foreign Nortel affiliates.[42]  These provisions, which are each essential components of the integrated global settlement, avoid the inherent risks and costs of litigating these issues.

42.    In addition to allowing the NNCC Bonds Claims against both NNI and the Canadian Estate, and providing for certain other payments to the NNCC Bondholders related to their claims,[43] the SPSA resolves a number of other matters related to NNCC and the NNCC Bonds Claims that had not been resolved previously.  For example, the SPSA ensures *pari passu* treatment of all creditors of the Canadian Debtors via the substantive consolidation of the Canadian Debtors and other SPSA terms.  This ensures both that the Canadian Estate will pay a fair portion of the NNCC Bonds Claims and that those claims will not be disproportionately paid out by the Debtors.[44]  The SPSA further provides that the Debtors will partially offset reasonable professional fees incurred by the NNCC Bonds to compensate them for the cost of maintaining

---

[39]    See SPSA, Section 4(e).

[40]    See SPSA, Section 4(c).

[41]    See SPSA, Section 4(g)(v).

[42]    See SPSA, Section 4(a).

[43]    See SPSA, Section 4(g)(v)

[44]    See SPSA, Section 4(b)(i).

their claim throughout the Nortel insolvency.[45]  The SPSA also resolves the Canadian Debtors'

right to seek subrogation against NNCC related to any payments made under the guaranty of the

NNCC Bonds.  Additionally, as part of the settlement, all of the SPSA Parties would give and

receive releases that eliminate any other litigation risks associated with the NNCC Bonds

Claims.

      43.      The SPSA also contemplates the substantive consolidation of NNI and NNCC,

which reflects the economic reality of their existence and accounts for and resolves any

intercompany claims that may exist between the two estates.[46]  Since its formation in 1996,

NNCC has been a wholly-owned subsidiary of NNI.[47]  NNCC's pre- and post-petition operations

(or lack thereof) wholly support its substantive consolidation into NNI, given that NNCC was

created, and functioned, exclusively as a pass-through financing entity for NNI.[48]  As a financing

vehicle, NNCC had no assets, operations or purpose of its own, other than to raise money that

was immediately lent to NNI.  As such, NNCC had no ability to repay such public debt other

than by NNI providing it such funds; to the extent the 1996 Support Agreement entered into

between NNI and NNCC has any meaning or enforceability at all, it only reinforces that point.

Indeed, the prospectus provided to investors at the time the NNCC Notes were issued stated that

NNCC "has no independent operations other than acting as a finance company for its

affiliates."[49]

---

[45]      See SPSA, Section 4(m).

[46]      See SPSA, Sections 4(b)(ii), 4(h).

[47]      See NNCC Stock Ledger and Action by Written Consent of Sole Incorporator dated February 12, 1996.

[48]      See, e.g., NNCC, Prospectus Supplement, June 12, 1996 at 2 (informing investors that the proceeds of NNCC's bond issuance were to be "loaned or advanced to, or otherwise invested in [NNI]").

[49]      Id. at 3.

44.    Consistent with this, when NNCC borrowed money, the promissory note and subsequent revolving loan agreements under which NNCC immediately lent the proceeds to NNI were set up to mirror the terms of the debt issuance itself, where payments of interest or principal from NNI to NNCC would come due at the same time as, and in amounts commensurate with, the payments owing from NNCC to the NNCC Bondholders.[50]  Therefore, the NNCC Bondholders, NNCC's only pre-petition creditors other than NNI for obligations it paid on behalf of NNCC, could only rely on the assets and credit of NNI for repayment of their bonds (other than any amounts they may receive pursuant to the guaranty issued by NNL), making the consolidation of NNCC into NNI consistent with the expectations of NNCC Bondholders and satisfying the requirements for substantive consolidation in the Third Circuit.[51]

45.    The substantive consolidation of NNI and NNCC simply consolidates a parent and its wholly owned subsidiary and is easily distinguished from cases where substantive consolidation is sought for sister companies or entities across multiple branches of a corporate structure.  Indeed, the consolidation of NNCC into NNI is in essence a merger of the two companies, which is wholly permitted under Delaware law and the governing debt agreements.[52]  Therefore, in light of these facts, the substantive consolidation of NNCC and NNI is consistent

---

[50]    NNCC, Prospectus Supplement May 2, 1996 at 1, 3; see also July 23, 1996 Promissory Note (lending the proceeds of NNCC's debt issuance to NNI); February 14, 2006 Loan Agreement; June 15, 2006 Loan Agreement; June 15, 2008 Revolving Loan Agreement.

[51]    See In re Owens Corning, 419 F.3d 195, 212 (3d Cir. 2005) (establishing the required showing for substantive consolidation in the Third Circuit); see also In re Lisanti, No. 05-3912, 2007 WL 2212720, at *2 (3d Cir. 2007) (emphasizing several factors that demonstrate debtor unity, including:  having the same officers, directors and shareholders; "conduct[ing] the same general business operations;" not charging each other for services rendered; and "moving profits between and among the debtors").

[52]    See Glassman v. Unocal Exploration Corp., 777 A.2d 242, 244 (Del. 2001) ("The short-form merger statute, as enacted in 1937, authorized a parent corporation to merge with its wholly-owned subsidiary by filing and recording a certificate evidencing the parent's ownership and its merger resolution.").  See also June 15, 2008 Revolving Loan Agreement ("nothing contained in this Agreement shall prevent [NNI], from amalgamating, merging or consolidating with or into any related party, affiliate or subsidiary.").  The indenture governing the NNCC Bonds permits NNCC to merge with NNI if NNI assumes NNCC's obligations for the bond issuance, as it does under the Plan.  NNCC Bonds Indenture, Section 801 ("Amalgamations and Consolidations of Issuers or Guarantor and Conveyances Permitted Subject to Certain Conditions").

with both the operations of NNI and NNCC, Delaware corporate law and the reasonable expectations of creditors.

46.     Notably, to the extent the PBGC opposes the consolidation of NNCC, it would necessarily be arguing for a transfer of assets away from NNI – the plan sponsor against whom it holds its primary claim – to a shell affiliate solely in order for the PBGC to be able to double dip out of NNI's assets, and thereby allow the PBGC to better position itself as compared to other creditors of NNI and NNCC.  Such an argument defies logic and indeed, runs directly contrary to the reason that the PBGC is granted statutory joint and several liability against affiliates in the first place.  The PBGC can in no way claim harm or prejudice by having NNI's assets and obligations remain at NNI, as is the case in the proposed substantive consolidation.

47.     The SPSA further benefits the Debtors and their creditors by avoiding needless litigation with respect to the NNCC Bonds and other issues.  In October 2014, the NNCC Bondholders filed a motion seeking to estimate their claim against NNCC in the amount of $227,273,437, including more than $70 million in post-petition interest as of June 2015 [D.I. 14639 at 13].  In their motion to estimate, the NNCC Bondholders also argued that, pursuant to the Support Agreement between NNI and NNCC, NNI is required to maintain NNCC's net worth at $1.00 to allow NNCC to pay its creditors in full and that such obligation constitutes an administrative claim against NNI  [D.I. 14639 at 2-3].  Such arguments, taken together, could be read as a claim that NNI must pay NNCC as much as $1 billion in cash (*i.e.* the allowed amount of the NNCC Bonds Claim; the amount of the PBGC's claim against NNCC, as it may be ultimately allowed; plus post-petition interest), and would effectively negate NNL's guaranty of the NNCC Bonds.  Such claims would be subject to extensive litigation, including with respect to the validity and meaning of the Support Agreement; the priority of any claim against NNI if

the Support Agreement were found to create a liability; and whether post-petition interest could

be claimed by NNCC creditors, and, if so, at what rate.  The Debtors do not concede the validity

of any such arguments, all of which are novel and have no certainty of success.  Rather, the

settlements embodied in the SPSA avoid the risks, costs and delays that would result from

protracted litigation over these issues, in a manner consistent with both the governing contractual

agreements and creditors' expectations.  In addition, the full and final resolution of all issues

relating to the NNCC Bonds Claims against both the Debtors and the Canadian Debtors results in

the treatment of the NNCC Bonds and their guarantees in a manner consistent with treatment of

the Crossover Bonds, and eliminates the payment of post-petition interest by the Debtors, a

settlement term important to many of the SPSA Parties.

48.     While the above matters do not reflect the entire web of terms and compromises

contained in the SPSA, they provide a flavor for the nature of the significant matters being

compromised and the interconnected nature of the SPSA terms as they affect the Debtors, the

Debtors' creditors and the various other parties to the SPSA here and abroad.  There is no sure

way to handicap the likelihood that absent a settlement, all of these matters would be resolved in

a manner more favorable than on the terms included in the SPSA.  However, given the sheer

number and complexity of matters resolved under the SPSA, and the significance of the

unresolved matters to the ultimate assets that may be available in the Debtors' estates, the record

clearly demonstrates the importance and benefits that flow from the entirety of the SPSA

bargains as compared to continued litigation on these various fronts.

## 2.   The SPSA Increases the Likelihood of Collection and Satisfies the Second Martin Factor

49.     While this factor is arguably somewhat inapplicable to the Allocation Dispute, in

that the Sale Proceeds are currently held in escrow, the SPSA terms improve the Debtors' ability

28

to collect on their intercompany claims, particularly with respect to NNI's $2 billion claim

against NNL.  For example, the SPSA contemplates the substantive consolidation of the

Canadian Debtors' estates and the fixing of other claims against such estates as a requirement for

the approval and implementation of the Canadian Debtors' CCAA plan of compromise, and

provides an outside date for the Canadian Debtors to file and implement their CCAA plan.  The

collective resolution of various pending disputes and the negotiation of a timeline for the

distribution of money to the various estates and to their creditors also greatly improves

collectability on claims as a whole and furthers the Debtors' ability to distribute money to their

creditors in the coming months.

     **3.  The Complexity of Continued Litigation, and the Attending Expense, Inconvenience and Delay Weigh Heavily in Favor of Approval of the SPSA**

     50.    The unique complexity of the Allocation Dispute is well-known to the Court, the

Canadian Court, the parties in interest and those who have followed these Chapter 11 Cases.

Creditors of the different Nortel estates unsatisfied with progress or otherwise seeking to press

their own issues before the Court, in other courts and in the popular press routinely and

reflexively complain that these proceedings already have gone on too long and have cost too

much.  The Debtors reject those criticisms and assert that they have been diligent and focused in

pursuing litigation that will protect and improve the value of their respective estates.  Rather, the

Debtors ascribe the substantial litigation costs in these cases in no small part to the number of

constituents that have been included, or injected themselves into, the inter-estate litigations,

including constituents who have advanced arguments and litigation theories that conflict with

their own debtor estates and have attempted to use the Allocation Dispute to advance their own

particular claims and interests, thereby adding to the complexity of the litigation and the cost at

every stage.  However, regardless of the reason why litigation in these cases has been costly, it is

beyond dispute that a failure to effectuate the SPSA and a resumption of litigation regarding the Allocation Dispute, as well as the unraveling of the other settlement terms, would result in significant additional costs to the Debtors' estates and further delays in the Debtors' ability to make distributions to their creditors, thereby eroding the value of any potential gains that could be achieved.  Such additional delays, costs and risks would be wholly borne by the Debtors' creditors, which is why it is significant that the Committee and the Bondholder Group – both of whom have been involved with these cases from the start – signed on to and support the SPSA.[53] The IFSA contemplates that the Debtors, with the consent of the Committee and Bondholder Group, can settle the Allocation Dispute[54] and these parties have collectively concluded that it is in the Debtors' interest to do so for the reasons described above.  It should not be lost on any creditor or party in interest that a challenge to any part of the settlement is a challenge to the settlement in its entirety, and that consideration of the risks and costs of future litigation should be considered through that lens.

51.      As a result, through the settlements of the Allocation Dispute and the other claims resolutions, inter-estate matters and terms embodied therein, the SPSA preserves precious resources for distribution to creditors, and creates a pathway toward distributions to creditors and resolution of the Debtors' Chapter 11 Cases without incurring such additional costs and enduring

---

[53]      Further litigation would be required to reach a final resolution of the Allocation Dispute regardless of the outcome of the appeals.  For example, if the Allocation Decisions were upheld, further determinations by this Court regarding the value and inclusion (or exclusion) of claims for purposes of the allocation calculation would be required.  In addition, if either Allocation Decision were reversed or remanded as a result of either the US or Canadian appeals, all or a portion of the allocation dispute could need to be re-litigated.

[54]      The IFSA provides that release of the Sale Proceeds from the relevant escrow account requires either "agreement of all of the Selling Debtors" or "in the case where the Selling Debtors fail to reach agreement, determination by the relevant dispute resolver(s)…"  IFSA, ¶ 12(b).  Furthermore, the IFSA mandates that the "[t]he Selling Debtors shall, immediately following entry into any Sale Transaction, negotiate in good faith and on a timely basis to attempt to reach agreement regarding the allocation of the Sale Proceeds from such Sale Transaction…"  IFSA, ¶ 12(d).

such additional delay.  Accordingly, the third Martin Factor weighs heavily in favor of approval of the SPSA.

**4.    The SPSA is in the Best Interests of the Debtors' Creditors**

52.    The Debtors believe that the compromises embodied in the SPSA are solidly in the best interests of the Debtors and their creditors and provide significant benefit to the Debtors' estates when compared with the alternatives.  The SPSA increases the Debtors' allocation of Sale Proceeds when compared with the allocation provided in the Allocation Decisions; resolves a number of significant disputes among the SPSA Parties that would likely require litigation; avoids significant additional costs and delays to distributions to creditors; and forges a pathway to resolution of the Debtors' Chapter 11 Cases.  The Debtors have reached a stage in their cases where, given the complexity of these cases and the number of parties active in the Nortel cases worldwide who have proven their willingness to continue litigation without end, the benefits of a reasonable global settlement outweigh the potential upside that can be gained by further litigation.  While individual creditors may perceive an advantage to pressing objections and challenging the settlements embodied in the SPSA in an effort to drive more value towards their own claims, further litigation and negotiations are each a zero-sum game, if a complicated one, such that there is no room to improve one set of creditors' recoveries other than at the expense of other parties.  It is in the interests of all of the Debtors' creditors, taken as a whole, to bring these cases to conclusion and to put an end to such gamesmanship, and the Debtors seek to do so through the implementation of the SPSA and the confirmation of the Plan.

**B.    The SPSA was Vigorously Negotiated by the SPSA Parties and is Proposed in Good Faith by the Debtors**

53.    The SPSA was vigorously negotiated and is the result of arms-length settlement discussions between and among the SPSA Parties, many of whom have been involved in this

case since they were commenced in 2009.  The SPSA results from years of mediations that have been undertaken in parallel with various litigation efforts.  For all of the reasons set forth in this Motion, and based on the entire record of these cases, the SPSA is a good faith means to fully and finally resolve the Allocation Dispute and the various other inter-estate claims settled by the SPSA under terms that are reasonable and fair under the circumstances.[55]

54.      For all of the reasons discussed herein, the SPSA is a key step in facilitating the orderly wind-down of the Nortel Insolvency Proceedings and moving these Chapter 11 Cases toward distributions to creditors. In light of the history of these Chapter 11 Cases, the complexity of the Allocation Dispute, the uniqueness of the cross-border issues, and the increased likelihood of collection and the costs that would be incurred to litigate further, the settlements among the SPSA Parties embodied in the SPSA and contained in the Plan are fair, reasonable and a noteworthy accomplishment benefitting the Debtors' estates and their creditors.  Accordingly, the SPSA satisfies all applicable standards and requirements and should be approved as a comprehensive compromise that is in the best interests of the Debtors' estates and their creditors.

## NOTICE

55.      Notice of the Motion has been given via electronic transmission, first class mail, hand delivery or overnight mail to (i) the SPSA Parties; (ii) the U.S. Trustee; (iii) all creditors and interest holders who have filed claims or have scheduled claims against the Debtors that have not been disallowed; and (iv) the general service list established in these Chapter 11 Cases. Accordingly, the Debtors submit that under the circumstances no other or further notice is necessary.

---

[55]      As noted above, the settlement of allocation issues is expressly contemplated by the IFSA, ¶¶ 12(b) and (d), and all relevant parties to the IFSA have consented to the SPSA.  Moreover, the Court previously approved the Non-Filed Entity Settlement Agreement, a similar settlement agreement among certain of the Parties by which a portion of the Sale Proceeds were released from escrow to certain non-debtor subsidiaries of NNI that participated in the various global business sales [D.I. 7985].

## NO PRIOR REQUEST

56.    No prior request for the relief sought herein has been made to this or any other

court.

WHEREFORE, the Debtors respectfully request that this Court (i) grant this Motion and

the relief requested herein; (ii) enter the proposed order attached as Exhibit A hereto; and

(iii) grant such other and further relief as it deems just and proper.

Dated: December 16, 2016         CLEARY GOTTLIEB STEEN & HAMILTON LLP
      Wilmington, Delaware

James L. Bromley (admitted *pro hac vice*)
Lisa M. Schweitzer (admitted *pro hac vice*)
One Liberty Plaza
New York, New York 10006
Telephone:  (212) 225-2000
Facsimile:  (212) 225-3999

     - and -

MORRIS, NICHOLS, ARSHT & TUNNELL LLP


*/s/ Tamara K. Minott*
Derek C. Abbott (No. 3376)
Andrew R. Remming (No. 5120)
Tamara K. Minott (No. 5643)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19801
Telephone:  (302) 658-9200
Facsimile: (302) 658-3989

*Counsel for the Debtors
and Debtors in Possession*

33