# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------X
:
*In re*                                                     :   Chapter 11
                                                            :
Nortel Networks Inc., *et al.*,[1]                          :   Case No. 09-10138 (KG)
                                                            :
                        Debtors.                            :   Jointly Administered
                                                            :
                                                            :   **Hearing Date: January 9, 2017 at 10:00 a.m. (ET)**
                                                            :   **Objections Due: January 5, 2017 at 11:30 a.m. (ET)**
                                                            :
------------------------------------------------------------X

### DEBTORS' MOTION FOR ENTRY OF AN ORDER PURSUANT TO BANKRUPTCY RULE 9019 APPROVING SETTLEMENT AGREEMENT BY AND AMONG THE DEBTORS AND THE PENSION BENEFIT GUARANTY CORPORATION WITH RESPECT TO THE PBGC CLAIMS AND RELATED ISSUES

Nortel Networks Inc. ("NNI"), and certain of its affiliates, as debtors and debtors in possession (collectively, the "Debtors") hereby move this Court (the "Motion") for the entry of an order substantially in the form attached hereto as Exhibit A, pursuant to sections 105(a), 363 and 502 of title 11 of the United States Code (the "Bankruptcy Code") and Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), (a) authorizing and approving the entry of the Debtors into the agreement settling the PBGC Claims and related issues, dated December 20, 2016, attached as Exhibit 1 to the proposed Order attached as Exhibit A hereto (the "Settlement Agreement") and entered into by and among (i) the Debtors and (ii) the Pension Benefit Guaranty Corporation (the "PBGC" and together with the Debtors, the "Parties") and (b)

---

[1] The debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226). Contact information for the U.S. Debtors and their petitions are available at http://dm.epiq11.com/nortel.

granting them such other and further relief as the Court deems just and proper. In support of this Motion, the Debtors respectfully represent as follows:

## PRELIMINARY STATEMENT

1. The Debtors, by this Motion, request the approval of a settlement that would resolve one of the largest claims filed against the Debtors and further the Debtors' efforts to confirm a chapter 11 plan in their cases and to wind down their estates. As a result of a mediation overseen by the Court-appointed mediator, Judge Joseph Farnan, the Debtors and the PBGC have reached an agreement that provides the PBGC with a single allowed general unsecured claim against each of the Debtors in their respective Chapter 11 Cases (defined below) in the amount of $624,601,972, subject to a cap on the PBGC's right to receive distributions on such allowed claims in the maximum aggregate amount of $565,000,000. This allowed claim, as capped, would be granted in full satisfaction of any claims the PBGC may have against the Debtors, which have been asserted in an amount in excess of $700,000,000. As part of the settlement, the PBGC also has agreed to support the approval of the Settlement and Support Agreement (the "SPSA") and to vote in favor of the Debtors' First Amended Joint Chapter 11 Plan of Nortel Networks Inc. and Certain of Its Affiliated Debtors, filed on December 1, 2016 [D.I. 17501] (the "Plan").

2. The Settlement Agreement provides substantial benefits to the Debtors, their estates and their creditors. First and foremost, the Settlement Agreement represents a material compromise by the PBGC of the PBGC Claims (as defined below), in significantly reducing the amount the PBGC stands to recover under the Plan compared to the amounts of the claims it has asserted against the Debtors, and granting only a general unsecured claim in favor of the PBGC as compared to the various administrative priority claims it asserted. Equally important, the PBGC's agreement to support the Plan avoids the cost and distraction of addressing any

2

objections that had been or may have been lodged by the PBGC against the Plan and further clears a path for bringing the Debtors' bankruptcy cases to a close.

3.  These compromises, which were vigorously negotiated by the Parties, also provide further certainty and reduce risks to the Debtors, their creditors and other parties in interest. The Debtors previously filed a 53-page Objection (accompanied by 296 pages of supporting Declaration and exhibits) to the Amended PBGC Claims (defined below), raising a number of substantial factual and legal challenges to the PBGC Claims including an important issue of administrative law that is apparently one of first impression. The Objection raises at least six distinct grounds of attack, including the material questions of whether the regulation used by the PBGC to value its claims is arbitrary and capricious under the Administrative Procedure Act, 5 U.S.C. § 706(2)(A) (the "APA"), and whether the PBGC acted in bad faith in amending its claims five years after the Bar Date. As the Court ruled, the Objection raised difficult factual and legal questions that would require accelerated discovery and an evidentiary hearing to resolve and that were important to resolve prior to plan confirmation if possible. The Settlement Agreement has the added benefit of providing the desired certainty before the Plan confirmation hearing, and without the need to litigate to judgment highly complex and fact-bound questions at significant expense to the Parties.

4.  By striking the balanced and reasonable compromises in the Settlement Agreement that fall well within the range of reasonableness, the Debtors eliminate costly and likely protracted litigation over the PBGC's sizable claims and are able to further focus their resources and attention on the remaining steps necessary to obtain approval of the SPSA and confirmation of the Plan. Accordingly, the Debtors respectfully submit that the Settlement Agreement can and should be approved under the applicable standards of Bankruptcy Rule 9019.

**JURISDICTION AND VENUE**

5. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference from the United States District Court for the District of Delaware, dated February 29, 2012. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2) and the Court may enter a final order consistent with Article III of the United States Constitution. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

6. The statutory bases for the relief requested herein are sections 105(a), 363 and 502 of the Bankruptcy Code and Bankruptcy Rule 9019.

**FACTUAL BACKGROUND**

**A.    Procedural Background**

7. On January 14, 2009 (the "Petition Date"), the Debtors, other than Nortel Networks (CALA) Inc. ("NN CALA") and Nortel Networks India International, Inc. ("NNIII"),[2] filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Court"), which cases are consolidated for procedural purposes only (the "Chapter 11 Cases"). The Debtors continue to operate their remaining businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

8. The Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed the Official Committee of Unsecured Creditors (the "Committee") in respect of the Debtors [D.I.s 141, 142]. The PBGC was one of the original five members of the

---

[2] NN CALA filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on July 14, 2009, Chapter 11 Voluntary Pet., In re Nortel Networks (CALA) Inc., (Bankr. D. Del. filed July 14, 2009) [D.I. 1],which was consolidated and is being jointly administered with the other Debtors' chapter 11 cases for procedural purposes. Order Directing Joint Administration, July 17, 2009 [D.I. 1098]. NNIII filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on July 26, 2016, Chapter 11 Voluntary Pet., In re Nortel Networks India International, Inc., (Bankr. D. Del. filed July 26, 2016) [D.I. 1],which was consolidated and is being jointly administered with the other Debtors' chapter 11 cases for procedural purposes. Order Directing Joint Administration, August 16, 2016 [D.I. 17090].

4

Committee and remains, as of the date hereof, a member of the Committee. An ad hoc group of bondholders holding claims against certain of the Debtors and certain of the Canadian Nortel affiliates has also been organized (the "Bondholder Group"). No trustee or examiner has been appointed in the Debtors' cases.

9.  On the Petition Date, the Debtors' ultimate corporate parent Nortel Networks Corporation ("NNC"), NNI's direct corporate parent Nortel Networks Limited ("NNL," and together with NNC and their affiliates, including the Debtors, "Nortel"), and certain of their Canadian affiliates (collectively, the "Canadian Debtors")[3] commenced a proceeding with the Ontario Superior Court of Justice (the "Canadian Court") under the Companies' Creditors Arrangement Act (Canada), seeking relief from their creditors and a monitor, Ernst & Young Inc., was appointed by the Canadian Court. Also on the Petition Date, the High Court of England and Wales placed nineteen of Nortel's European affiliates (collectively, the "EMEA Debtors"),[4] into administration under the control of individuals from Ernst & Young LLP.

10.  Since the Petition Date, Nortel has sold its business units and other assets to various purchasers, generating proceeds ("Sale Proceeds") of over $7.3 billion that have been placed in escrow accounts pending allocation among the various selling entities. Having failed to negotiate a consensual allocation, a cross-border trial (the "Allocation Trial") to determine such allocation was held in 2014 before this Court and the Canadian Court. Decisions on the allocation were issued in May and June 2015 (collectively, the "Allocation Decisions"), and are

---

[3] The Canadian Debtors include the following entities: NNC, NNL, Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation.

[4] The EMEA Debtors include the following entities: Nortel Networks UK Limited, Nortel Networks S.A., Nortel Networks (Ireland) Limited, Nortel GmbH, Nortel Networks France S.A.S., Nortel Networks Oy, Nortel Networks Romania SRL, Nortel Networks AB, Nortel Networks N.V., Nortel Networks S.p.A., Nortel Networks B.V., Nortel Networks Polska Sp. z.o.o., Nortel Networks Hispania, S.A., Nortel Networks (Austria) GmbH, Nortel Networks, s.r.o., Nortel Networks Engineering Service Kft, Nortel Networks Portugal S.A., Nortel Networks Slovensko, s.r.o. and Nortel Networks International Finance & Holding B.V.

under appeal in both the U.S. and Canada (the appeals and all controversies regarding allocation, the "<u>Allocation Dispute</u>").  The only task remaining for these Debtors is the distribution of their assets to their creditors.

11.     On October 12, 2016, the Debtors entered into the global settlement embodied in the SPSA and filed with this Court on the same date [D.I. 17501-1], which provides for the resolution of the Allocation Dispute, subject to the satisfaction of certain conditions.  The PBGC previously stated that it opposed the SPSA and intended to object to confirmation of the Plan, including based on the proposed substantive consolidation of NNI and Nortel Networks Capital Corporation.

        **B.**     **<u>The Debtors' Pension Plan and the PBGC</u>**

12.     Effective May 1, 1974, the Debtors established the Nortel Networks Retirement Income Plan (the "<u>Pension Plan</u>").  <u>See</u> Nortel Networks Retirement Income Plan Annual Return/Report of Employee Benefit Plan (I.R.S. Form 5500) (Sept. 8, 2009) at 1 [D.I. 17326-1] (the "<u>Nortel Networks Retirement Income Plan Form 5500</u>").  The Pension Plan provided retirement benefits for certain of the Debtors' employees, and was a single-employer defined benefit pension plan covered by Title IV of the Employee Retirement Income Security Act of 1974 ("<u>ERISA</u>").  <u>See</u> 29 U.S.C. § 1321(a); PBGC and Nortel Networks Retirement Income Plan Retirement Plan Committee Trusteeship Agreement (Sept. 8, 2009) at ¶¶ C-D [D.I. 17326-2] (the "<u>Trusteeship Agreement</u>").

13.     The PBGC is a United States government corporation that administers the defined benefit plan termination insurance program under Title IV of ERISA.  <u>See, e.g.</u>, Claim No. 8763 (July 7, 2014) at ¶ 1 [D.I. 17326-14].  The PBGC guarantees payment of certain pension benefits upon termination of qualified plans such as the Debtors' Pension Plan.  <u>Id.</u>  When a qualified

6

plan terminates, the PBGC generally becomes trustee, takes custody of the terminated plan's assets, and subject to statutory limitations, pays plan beneficiaries their accrued benefits. Id.

14. On July 16, 2009, the PBGC commenced an action in the United States District Court for the Middle District of Tennessee captioned <u>PBGC v. Retirement Plan Committee of the Nortel Networks Retirement Income Plan</u>, No. 3:09-00657 (M.D. Tenn. Filed July 17, 2009) (the "<u>Termination Action</u>"). The Termination Action sought an order terminating the Debtors' Pension Plan as of July 17, 2009, and appointing the PBGC as trustee. See Compl. for Pension Plan Termination, No. 3:09-00657 (M.D. Tenn. July 17, 2009), at 6-7 [D.I. 17326-3]. On July 17, 2009, the PBGC then issued a notice of determination that the Debtors' Pension Plan should be terminated pursuant to Section 4042(c) of ERISA. See Nortel Networks Retirement Income Plan Form 5500 at Notes to Financial Statements at 13 [D.I. 17326-1].

15. The PBGC and the Debtors subsequently negotiated the Trusteeship Agreement, which provided for termination of the Pension Plan with a July 17, 2009 termination date (the "<u>Termination Date</u>"). See Trusteeship Agreement [D.I. 17326-2]. The Trusteeship Agreement was approved by the Court by order dated August 31, 2009,[5] and provided that the PBGC's trusteeship of the Pension Plan would take effect on the date that the last signatory executed the agreement. Id. at 3. The representative of the Pension Plan executed the Trusteeship Agreement on August 31, 2009, after which the PBGC counter-signed on September 8, 2009 (the "<u>Trusteeship Date</u>"), on which date the Pension Plan's assets were conveyed to the PBGC. That same day, the PBGC filed a notice of dismissal with prejudice of its Termination Action. See Notice of Dismissal, No. 3:09-00657 (M.D. Tenn. Sept. 8, 2009) [D.I. 17326-4].

---

[5] See Order Authorizing Debtors to Take Actions in Furtherance of an Agreement with the PBGC [D.I. 1406].

7

### C. The PBGC Claims

16. On August 4, 2009, this Court entered an order fixing September 30, 2009 at 4:00 p.m. (Eastern Time) as the Bar Date for filing proofs of claim or interests against the Debtors (other than NN CALA and NNIII) [D.I. 1280]. On December 3, 2009 this Court entered an order fixing January 25, 2010 at 4:00 p.m. (Eastern Time) as the bar date for filing proofs of claim or interests against NN CALA [D.I. 2059], and subsequently set a bar date for filing proofs of claim or interests against NNIII.

17. On September 24, 2009, the Debtors entered into a stipulation with the PBGC that streamlined the claims process for the benefit of both parties. See Stipulation Regarding Filing of Claims by Pension Benefit Guaranty Corporation executed on Sept. 24, 2009 [D.I. 1546-1] (the "Claims Stipulation"). Given that each of the Debtors is jointly and severally liable in respect of the Original PBGC Claims (as defined below), the Claims Stipulation averted the need for the PBGC to file separate proofs of claim in all sixteen of the Debtors' cases. See Order Approving Stipulation Regarding Filing of Claims by PBGC, Sept. 24, 2009 [D.I. 1546]. Instead, the Debtors agreed that upon the PBGC's filing of the Original PBGC Claims in Chapter 11 Case No. 09-10138, each of the Original PBGC Claims would be deemed filed in the remaining fifteen cases. See Claims Stipulation at ¶ 1 [D.I. 1546-1].

18. In accordance with the Claims Stipulation, on September 29, 2009, the PBGC filed the following four proofs of claim (collectively, the "Original PBGC Claims"), asserted against each of the Debtors on a joint and several basis:

- Claim 4735, which asserted an estimated claim of $593,100,000 in respect of the Pension Plan's unfunded benefit liabilities pursuant to 29 U.S.C. § 1362 (the "Unfunded Benefits Liability Claim");

- Claim 4736, which asserted an unliquidated claim for any minimum funding contributions that the Debtors may have failed to make pursuant to 29 U.S.C. § 1342 (the "Minimum Funding Contribution Claim");

8

- Claim 4737, which asserted an unliquidated claim for certain insurance premiums, interest and penalties (including termination penalties) (the "Insurance Claim"); and

- Claim 4738, which asserted an unliquidated claim for any shortfall amortization and waiver amortization charges pursuant to 29 U.S.C. § 1342(b) and (c) (the "Amortization Claim").[6]

19.    Subsequently, on July 7, 2014, the PBGC filed the following four proofs of claims (collectively, the "Amended PBGC Claims", and together with the Original PBGC Claims, the "PBGC Claims")[7], asserted against each of the Debtors on a joint and several basis, purporting to amend their previously filed proofs of claim:

- Claim 8763, which purports to amend the Unfunded Benefits Liability Claim upward from $593,100,000 to $624,601,972;[8]

- Claim 8762, which purports to amend the Insurance Claim to assert $83,392,500 as an estimated amount of certain insurance premiums, interest and penalties (including termination penalties) (the "Amended Insurance Claim");

- Claim 8761, which apparently amends the Minimum Funding Contribution Claim for contributions to satisfy minimum funding standards (unliquidated);

- Claim 8760, which apparently amends the Amortization Claim, asserting an unliquidated claim for any shortfall amortization and waiver amortization charges.[9]

---

[6]    Copies of the Original PBGC Claims are available on the docket at D.I.s 17326-8, 17326-9, 17326-10, and 17326-11, respectively.

[7]    On September 15, 2016, the PBGC filed two proofs of claim against NNIII, Claim 8813 and Claim 8814 (collectively, the "PBGC-NNIII Claims"). The Parties have also agreed to settle the PBGC-NNIII Claims pursuant to the Settlement Agreement and are included in the definition of the PBGC Claims for purposes of the discussion of the Settlement Agreement in this Motion.

[8]    The PBGC asserted that its Unfunded Benefits Liability Claim is entitled to administrative or other priority under Sections 503(b)(1)(B), 507(a)(2) and/or 507(a)(8) of the Bankruptcy Code. See Unfunded Benefits Liability Claim at ¶¶ 11-12 [D.I. 17326-8].

[9]    Copies of the Amended PBGC Claims are available on the docket at D.I.s 17326-12, 17326-13, 17326-14, and 17326-15, respectively.

### D. The Debtors' Objection to the Original PBGC Claims and the Amended PBGC Claims

20. On November 2, 2016, the Debtors filed an objection to the Original PBGC Claims and the Amended PBGC Claims [D.I. 17325] (the "Objection"), creating a contested matter under Bankruptcy Rule 9014. The Objection requested that the Court (a) disallow and expunge the Amended PBGC Claims as time-barred; (b) reduce and allow the Unfunded Benefits Liability Claim as a general unsecured claim; (c) disallow and expunge the Minimum Funding Contribution Claim; (d) disallow and expunge the Insurance Claim; and (e) disallow and expunge the Amortization Claim.

21. On November 10, 2016, the PBGC filed a motion [D.I. 17380] (the "Briefing Motion") seeking "a briefing schedule for the parties to address the legal issues in the Debtors' Objection to PBGC's claims . . . before allowing discovery." The Debtors opposed the Briefing Motion, and the Court scheduled a hearing for November 22, 2016 [D.I. 17381].

22. On November 22, 2016, the Court denied the PBGC's Briefing Motion, ordered the Parties to proceed with discovery, and scheduled an evidentiary hearing for January 9-11, 2017 to determine the issues raised in the Objection. The Court's Scheduling order, dated December 7, 2016 [D.I. 17543], set a document production deadline of December 21, 2016, with expert reports due December 28, 2016 and depositions to be held on January 2-6, 2017.

23. From time to time over the course of the Debtors' cases, the Parties had engaged in settlement discussions to explore a potential resolution of the PBGC Claims, without success. As a member of the Committee, the PBGC also participated in various mediations and settlement discussions related to the larger Allocation Dispute; however, the PBGC was not a party to the SPSA. As proposed during a telephonic conference held by the Court on December 13, 2016 addressing certain discovery-related disputes, the Parties and other parties agreed to another

attempt at mediation to resolve (a) the potential objections to the confirmation of the Plan of the PBGC (as well as other objections raised by the Nortel Trade Claims Consortium to the Plan) and (b) the PBGC Claims as well as the Objection filed by the Debtors.  By Order dated December 15, 2016 [D.I. 17585], the Court appointed Judge Joseph J. Farnan "as mediator to conduct a confidential mediation concerning the potential objections of the NTCC and the PBGC to confirmation of the Plan and the Objection."  On December 20, 2016, (a) the Debtors; (b) the Committee; (c) the Bondholder Group; (d) the NTCC; and (e) the PBGC attended a one-day mediation session with Judge Joseph J. Farnan.

24.     After vigorous arms-length negotiations, the Debtors and the PBGC were able to reach a compromise to settle the dispute over the PBGC Claims and the Objection.  Subject to the Court's approval, the Settlement Agreement provides, in pertinent part, that (a) the PBGC shall receive a single allowed general unsecured claim against each of the Debtors in the amount of $624,601,972 (the "Allowed Unsecured Claim"); (b) the allowance of the Allowed Unsecured Claim shall be granted in full satisfaction of any and all claims that have been or could have been asserted by the PBGC against the Debtors; (c) the PBGC shall not have any further claims against any of the Debtors; (d) the maximum aggregate distributions the PBGC shall receive on its Allowed Unsecured Claim from the Debtors is $565 million; (e) the PBGC shall not be entitled to an allowed administrative expense or priority claim against any of the Debtors in their Chapter 11 cases; (f) the PBGC waives any right to seek to recover termination premiums purportedly provided by Section 4007 of ERISA; (g) the PBGC shall support the motion to approve the SPSA, and shall case a vote in favor of the Plan; and (h) the Parties release each

other from all liability related to the PBGC Claims. The full terms of the Settlement Agreement are set forth in Exhibit 1 to the Order, which is attached as Exhibit A hereto.[10]

25. The Debtors believe, in the exercise of their reasonable business judgment, that the resolution of the PBGC Claims and the Objection through the Settlement Agreement is appropriate and in the best interests of both their estates and their creditors.

## RELIEF REQUESTED

26. By this Motion, the Debtors seek, pursuant to sections 105(a), 363 and 502 of the Bankruptcy Code and Bankruptcy Rule 9019, entry of an order (i) authorizing the Debtors' entry into and approving the Settlement Agreement; and (ii) granting them such other and further relief as the Court deems just and proper.

## BASIS FOR RELIEF

27. The approval of the Settlement Agreement is authorized by sections 105(a), 363 and 502 of the Bankruptcy Code and meets the applicable standards of Bankruptcy Rule 9019.[11]

28. Bankruptcy Rule 9019 provides, in pertinent part, that, "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019(a). Citing this authority, the Third Circuit has emphasized that "[t]o minimize litigation and expedite the administration of a bankruptcy estate, [c]ompromises are favored in bankruptcy." Myers v. Martin (In re Martin), 91 F.3d 389, 393 (3d Cir. 1996) (second alteration

---

[10] The summary and discussion of the terms of the Settlement Agreement is provided herein for background purposes and remains in all cases subject to the terms of the Settlement Agreement itself.

[11] Section 105(a) of the Bankruptcy Code provides that "[t]he court may issue any order . . . that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Approval of the Settlement Agreement is consistent with the broad equitable authority of the bankruptcy courts, in furtherance of the above provisions of the Bankruptcy Code and Bankruptcy Rules. See, e.g., United States v. Energy Res. Co., 495 U.S. 545, 549 (1990); In re Kaiser Aluminum Corp., 456 F.3d 328, 340 (3d Cir. 2006) ("[B]ankruptcy courts have broad authority to act in a manner that will prevent injustice or unfairness in the administration of bankruptcy estates."). The Debtors have not separately set forth the applicable standards governing approval under Bankruptcy Code section 363, which standards are well-established and well-known by the Court and are similarly satisfied by the facts and arguments set forth herein.

in original) (internal quotation marks omitted) (quoting 9 Collier on Bankruptcy ¶ 9019.03[1] (15th ed. 1993)); see also In re World Health Alts., Inc., 344 B.R. 291, 296 (Bankr. D. Del. 2006) (finding settlements "generally favored in bankruptcy"). Additionally, the Third Circuit has recognized that "'(i)n administering reorganization proceedings in an economical and practical manner it will often be wise to arrange the settlement of claims as to which there are substantial and reasonable doubts.'" In re Penn Cent. Transp. Co., 596 F.2d 1102, 1113 (3d Cir. 1979) (quoting Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424 (1968)).

29.     Before approving a settlement under Bankruptcy Rule 9019, a court must determine whether "'the compromise is fair, reasonable, and in the interest of the estate.'" In re Marvel Entm't Grp., Inc., 222 B.R. 243, 249 (D. Del. 1998) (quoting In re Louise's, Inc., 211 B.R. 798, 801 (D. Del. 1997)). Basic to the process of evaluating proposed settlements is "the need to compare the terms of the compromise with the likely rewards of litigation." Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 425 (1968). The court need not be convinced that the settlement is the best possible compromise in order to approve it. In re Coram Healthcare Corp., 315 B.R. 321, 330 (Bankr. D. Del. 2004).

30.     The Third Circuit has set out four criteria for a bankruptcy court to consider when evaluating a settlement proposal (the "Martin Factors"): "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors." In re Martin, 91 F.3d at 393 (citing In re Neshaminy Office Bldg. Assocs., 62 B.R. 798, 803 (E.D. Pa. 1986)); see also Fry's Metals, Inc. v. Gibbons (In re RFE Indus., Inc.), 283 F.3d 159, 165 (3d Cir. 2002).

31. In keeping with the stated public policy in favor of settlement, courts in this Circuit have repeatedly found that "[i]n analyzing the compromise or settlement agreement under the Martin factors, courts should not have a 'mini-trial' on the merits, but rather should canvass the issues and see whether the settlement falls below the lowest point in the range of reasonableness." W.R. Grace & Co., 475 B.R. 34, 77-78 (D. Del. 2012) (internal citations omitted); aff'd sub nom. In re WR Grace & Co., 729 F.3d 332 (3d Cir. 2013), and aff'd, 532 F. App'x 264 (3d Cir. 2013), and aff'd, 729 F.3d 311 (3d Cir. 2013), and aff'd sub nom. In re WR Grace & Co., 729 F.3d 332 (3d Cir. 2013). Ultimately, the approval of a proposed compromise and settlement is committed to the sound discretion of the bankruptcy courts, which generally defer to a debtor's judgment so long as there is a legitimate business justification for its action. See, e.g., In re Coram Healthcare Corp., 315 B.R. 321, 329-30 (Bankr. D. Del. 2004).

### A. The Settlement Agreement Satisfies the Requirements of Bankruptcy Rule 9019 and the Martin Factors

32. In this case, the principles underlying the Martin Factors and set forth in applicable case law tip wholly in favor of approval of the Settlement Agreement.[12] The Settlement Agreement provides a fair, reasonable and final resolution of the PBGC Claims and the Debtors' Objection thereto that fixes the size of the PBGC Claims in an amount that is squarely within the range of likely and reasonable outcomes, particularly when considering the significant costs, risks and delay that would arise from the continued litigation of the Objection that are avoided. In addition, the Settlement Agreement removes one of the last remaining obstacles to confirmation of the Plan, which will bring the Debtors even closer to the completion of their cases and the making of distributions to their creditors. Accordingly, the Debtors submit

---

[12] The likelihood of collection factor is inapplicable to this dispute, where the Debtors are resolving a claim asserted against their estates and objections to the Plan.

14

that the Settlement Agreement's terms are fair, reasonable and in the best interests of the Debtors' estates, and satisfy all governing standards.

### 1. The Settlement Agreement is Reasonable in Light of the Probability of Success and the Complexity, Expense, Inconvenience and Delay of Continued Litigation

33.  The Settlement Agreement provides for the resolution of the hotly contested dispute between the Debtors and the PBGC over a number of thorny issues, including most notably the validity under the APA of the PBGC's regulatory discount rate, applied by the PBGC in all instances of terminated pension plans where the PBGC asserts a claim for unfunded benefit liabilities.  While the Debtors are fully prepared to litigate the merits of these issues to judgment, there is considerable litigation risk for both sides in failing to reach a consensual resolution.  The negotiated resolution in the Settlement Agreement offers the Debtors and the PBGC certainty of a reasonable outcome without the need for continued complex and expensive litigation.

34.  The Debtors' 53-page Objection (accompanied by 296 pages of supporting Declaration and exhibits), raises at least six distinct grounds of attack,[13] which collectively raise myriad factual and legal issues, the ultimate disposition of which are uncertain and pose risks for both parties.  Chief among these questions are (1) whether the regulation set by the PBGC in 29 C.F.R. §§ 4044.41-75 (the "Valuation Regulation") is arbitrary and capricious, and (2) whether the PBGC acted in bad faith in amending its claims five years after the Bar Date.

---

[13] The issues raised in the Objection include without limitation:  (1) whether the PBGC's attempt to amend their claims upward by $114 million nearly five years after the September 30, 2009 Bar Date was effective (Objection ¶¶ 26-33); (2) whether the PBGC's underfunding claims are based on discount rates that do not approximate the damage suffered (Objection ¶¶ 34-56); (3) whether the PBGC's claims are overstated because they fail to account for the change in asset values between the Termination Date to the Trusteeship Date (Objection ¶¶ 57-58); (4) whether the PBGC's attempts to claim administrative or other priority for certain of the PBGC Claims, whether as taxes or otherwise, are valid (Objection ¶¶ 59-67); (5) whether the PBGC's claims for unpaid minimum funding contributions have value given that the Debtors made all of their required minimum funding payments (Objection ¶¶ 68-70); and (6) whether the claim for $83 million in Termination Premiums applies to debtors that do not emerge from chapter 11 as reorganized operating entities (Objection ¶¶ 76-78).

35. The Court has already rejected any suggestion that these matters can be disposed of quickly and easily. As the Court held in ruling that both discovery and an evidentiary hearing would be necessary, the factual issues for resolution are "numerous," including: (i) "[W]hy the PBGC did not move to file amended claims pursuant Bankruptcy Rule 7015?" (ii) "Were the amended claims made in bad faith?" (iii) "Will permitting the amended claims prejudice debtors and creditors?" (iv) "Does the PBGC's discount rate reflect the money needed as of the [Pension] Plan termination date to enable the PBGC to satisfy the forthcoming pension obligations?" (v) "Does the PBGC discount rate reflect the difference between the value of the assets transferred and what is necessary to pay the Pension Plan's projected benefit liabilities?" (vi) "Why did the PBGC delay the transfer of the Pension Plan assets?" (vii) "Why is the PBGC entitled to administrative or other priority claims?" (viii) "Why is the PBGC making its amended insurance claim for $83 million when the Debtors are not reorganizing?" and (ix) "[a]s of the [Pension] Plan termination date, how much money is required to enable the PBGC to meet all pension obligations?" (11/22/2016 Tr. at 54-55.) While the Debtors believe their positions on these questions are meritorious, all of these questions are fair grounds for dispute and uncertain in outcome.

36. Perhaps most fraught is the question of whether the PBGC's Valuation Regulation is arbitrary and capricious under the APA. While this issue and the Debtors' arguments are set forth at length in the Objection, in short this dispute relates to the valuation of the PBGC's determination of the value of its claim for "unfunded benefit liabilities" as of the Termination Date. The disputes between the PBGC and the Debtors related to this issue are novel and complex and, absent resolution would require extensive factual discovery and analysis, and rulings on unsettled areas of law.

37. Moreover, resolving the Debtors' Objection also requires the Court to assess the interplay between ERISA (and the PBGC's regulations) and the Bankruptcy Code. If the Debtors are correct about the disparity between the Amended PBGC Claims and the true amount of the PBGC's damages, such inequitable treatment would arguably run afoul of basic tenets of bankruptcy law, particularly here, given that the PBGC has made no effort to seek recoveries from other entities in the corporate group, as it is empowered by statute to do. (See Objection ¶¶ 52-54.). The Debtors also have raised other objections including with regards to the PBGC's alleged bad faith in amending its claims five years after the Bar Date. The Debtors expect that absent settlement, this issue similarly would be hotly contested and involve extensive discovery and Court rulings on the specific facts at hand. Ultimately, while the Debtors believe they have raised substantial objections to the PBGC Claims, the ultimate outcome of these disputes is uncertain and undoubtedly would require significant amounts of the Debtors' time and resources to resolve.

**2. The Settlement Agreement is in the Best Interests of the Debtors' Creditors**

38. The best interests of the Debtors and their creditors are served by the compromises included in the Settlement Agreement. The Settlement Agreement compromises the PBGC Claims in various ways, including by allowing the claims solely on a general unsecured claim basis and in an amount that is over $75 million less than the amount in the Amended PBGC Claims, and by providing for a maximum aggregate distribution to the PBGC that is significantly less than the asserted claims. By limiting the size, priority and distributions on the PBGC Claims, the Debtors expect they will be able to preserve assets and reduce risk for other creditors. In addition, the Settlement Agreement grants the Debtors the authority to marshal the PBGC Claims such that the PBGC Claims will be paid first by Debtors other than NNI and NN CALA, which gives the Debtors the flexibility to administer the claims in a manner

that is in the best interests of the Debtors and their creditors. As importantly, the Settlement Agreement removes risks, uncertainties, costs and delays by further clearing the way for the confirmation of the Plan and implementation of the SPSA.

39. As one of the largest creditors of the Debtors, the PBGC's support of the SPSA and commitment to vote in favor of the Plan increases the likelihood of the Plan's confirmation for the benefit of all creditors. The SPSA includes a timetable to settle the Allocation Dispute, that contemplates that the Debtors will confirm their Plan by February 17, 2017. The PBGC previously expressed its intention to object to confirmation of the Plan and to challenge the fundamental terms of the SPSA, thereby potentially jeopardizing the ability of the Debtors to comply with the terms of the SPSA and to achieve and implement the settlements contemplated thereunder.[14] While the Debtors do not believe the PBGC had any valid basis on which to oppose the Plan, the Debtors nevertheless would have been forced to spend time and resources litigating these issues, with attendant costs that would have been to the detriment of all other creditors. Instead, the Settlement Agreement provides a clear path toward confirmation of the Plan, effectuation of the SPSA, and timely distributions to the Debtors' creditors.[15]

40. The PBGC's support of the SPSA and commitment to vote in favor of the Plan under the Settlement Agreement is important to the resolution of the Debtors' cases and the resolution of the Allocation Dispute as a whole. If the SPSA were to fail, the parties around the globe would be cast back into the throes of the complex disputes that have plagued the estates for

---

[14] See SPSA, Section 9(a) [D.I. 17501-1].

[15] Some courts have considered additional factors, including "the extent to which the settlement is truly the product of 'arms-length' bargaining, and not of fraud or collusion." See, e.g., In re Texaco, Inc., 84 B.R. 893, 902 (Bankr. S.D.N.Y. 1988). To the extent the Court finds that factor relevant here, there can be no doubt that the Settlement Agreement was a result of arms-lengths negotiations between the Debtors and the PBGC. While actively litigating over the size of the PBGC's claims and the PBGC's possible objections to the Plan, the Debtors and the PBGC engaged in mediation overseen by Judge Farnan. The Settlement Agreement both allows the PBGC's claims at a set amount and ensures their support of the Plan. The Settlement Agreement is a good faith effort to resolve one of the last remaining obstacles to a consensual plan and the prompt payment of creditors.

years. The value of improved certainty and decreased risk for creditors through the resolution of a material claim asserted against the Debtors, and the additional support for the Plan, far exceeds any value potentially relinquished or compromised by the Debtors via the Settlement Agreement.

## NOTICE

41. Notice of the Motion has been given via electronic transmission, first class mail, hand delivery or overnight mail to (i) the PBGC; (ii) the U.S. Trustee; and (iii) the general service list established in these chapter 11 cases. Accordingly, the Debtors submit that under the circumstances no other or further notice is necessary.

## NO PRIOR REQUEST

42. No prior request for the relief sought herein has been made to this or any other court.

WHEREFORE, the Debtors respectfully request that this Court (i) grant this Motion and the relief requested herein; (ii) enter the proposed order attached as Exhibit A hereto; and (iii) grant such other and further relief as it deems just and proper.

Dated:  December 21, 2016  
       Wilmington, Delaware

CLEARY GOTTLIEB STEEN & HAMILTON LLP

James L. Bromley (admitted *pro hac vice*)  
Lisa M. Schweitzer (admitted *pro hac vice*)  
One Liberty Plaza  
New York, New York 10006  
Telephone:  (212) 225-2000  
Facsimile:  (212) 225-3999

- and -

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

 */s/ Tamara K. Minott*  
Derek C. Abbott (No. 3376)  
Eric D. Schwartz (No. 3134)  
Tamara K. Minott (No. 5643)  
1201 North Market Street  
P.O. Box 1347  
Wilmington, Delaware 19801  
Telephone:  (302) 658-9200  
Facsimile: (302) 658-3989

*Counsel for the Debtors  
and Debtors in Possession*