**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| NORTEL NETWORKS INC., *et al.*,[1] | Case No. 09-10138 (KG) |
| Debtors. | (Jointly Administered) |
| | Re: D.I. 17501 & 17589 |

**OBJECTION OF THE NORTEL TRADE CLAIMS CONSORTIUM TO
CONFIRMATION OF FIRST AMENDED JOINT CHAPTER 11 PLAN OF NORTEL
NETWORKS INC. AND CERTAIN OF ITS AFFILIATED DEBTORS**

The Nortel Trade Claims Consortium (the "Consortium")[2], as holders of certain U.S.

Trade Claims against Nortel Networks Inc. ("NNI") (NNI and certain of its U.S. affiliates, as

debtors and debtors-in-possession in the above-captioned proceedings, collectively, the

"Debtors"), by and through its undersigned counsel, hereby objects (this "Objection") to

confirmation of the Debtors' *First Amended Joint Chapter 11 Plan of Nortel Networks Inc. and

Certain of its Affiliated Debtors* [D.I. 17501] (as amended or modified from time to time, the

---

[1]     The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567), Nortel Networks (CALA) Inc. (4226) and Nortel Networks India International, Inc. (8667).  For the avoidance of doubt, the terms "Debtors" and "U.S. Debtors" are used interchangeably herein, and the chapter 11 cases of the Debtors are referenced collectively herein as the "Cases".

[2]     The Consortium represents a group of creditors holding over $149 million in unsecured (non-funded debt) claims, including but not limited to trade (supplier) claims and employee severance and pension claims (all such types of claims in these Cases, the "U.S. Trade Claims") against the Debtors.  See *First Amended Verified Statement of Counsel to the Nortel Trade Claims Consortium Pursuant to Bankruptcy Rule 2019* [D.I. 17493].  The U.S. Trade Claims are part of a body of general unsecured creditors with claims only against the U.S. Debtors (the "U.S.-only Unsecured Creditors," and the claims held thereby, the "U.S.-only Unsecured Claims").

"Plan").  In support hereof, the Consortium respectfully states as follows:[3]

## PRELIMINARY STATEMENT

1.     The fact that the Plan is based on a mediated resolution of all but one remaining objection to the Plan and to the "allocation" settlement (and related, underlying appeal) does not, by the hands of those in favor, render the Plan confirmable.  Nor does the fact that these Cases were filed in 2009.  The Plan must still satisfy the Bankruptcy Code—and it does not.  Unless and until the Plan is modified to clearly preserve the Consortium's pending appeal of the Allocation Decision, including the set aside of funds to satisfy the Consortium's potential upside recovery from a successful appeal, the Consortium objects to the Plan.

2.     First, as a threshold matter, the Court lacks jurisdiction to even hold the confirmation hearing to approve the Plan because the Consortium has a pending appeal before the Third Circuit of the Allocation Decision.  And here, unlike the bankruptcy court decisions that support jurisdiction of a plan process while an appeal is pending, this confirmation hearing is *not* round 2 of a plan process following a court decision rejecting a plan, and a narrow point of the decision has been appealed.  Here, the decision on appeal is 20 months old, has wound its way to the Third Circuit and strikes at the very heart of this Plan—in that the Debtors now attempt to completely settle the dispute over the Allocation Decision in the form of the SPSA and Plan.[4]

3.     Second, confirmation of this Plan would cement into place all of the flaws of the Allocation Decision that continue to taint the SPSA and, correspondingly, the Plan.  Chief among these flaws is the assertion of a full $4.0 billion claim against the U.S. estate by the

---

[3]     Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Plan and Disclosure Statement.

[4]     Indeed, the Third Circuit recently ordered that in the event the Consortium's objections to the SPSA and Plan are not resolved prior to the submission of this Objection, the Consortium's pending appeal is to proceed and an appropriate briefing schedule shall be established.

Crossover Bondholders.  This flaw was identified by the Debtors as a critical flaw—yet despite the Consortium's vocal advocacy of this issue, both in and out of the mediation process, the Debtors chose a path that left this flaw unremedied.

4.      The Divestiture Rule employed by courts within this Circuit makes clear that this Court lacks jurisdiction to approve the Plan.  The Consortium timely filed a notice of appeal of the Allocation Decision and that appeal remains pending at the Third Circuit.  The docketing of the Consortium's initial appeal at the District Court is an event of jurisdictional significance that has divested this Court of its control over all aspects of these Cases at issue in the appeal.  An order by the Court approving the Plan would absolutely constitute an impermissible modification of the Allocation Dispute.

5.      Moreover, the Consortium's appeal cannot be dismissed or mooted by the Debtors or any other party without the Consortium's consent.  The SPSA, which establishes the framework for the Plan, adversely affects the rights of holders of U.S. only Trade Claims—and the Consortium does not consent to the SPSA or the Plan.

6.      Equally important, the Plan and SPSA constitute a total surrender by the Debtors with respect to the flaws in the Allocation Decision that the Debtors themselves have previously identified and argued strenuously before this Court and the District Court.  For instance, in briefing before this Court, the Debtors observed—correctly—that "[t]he Court's decision…has the effect of severely depressing the amount of Lockbox proceeds available for distribution to general unsecured creditors holding claims solely against the U.S. Debtors."  The Debtors went on to describe the amount of Lockbox proceeds allocated to the U.S. estate as a result of the Allocation Decision as "disproportionately and inequitably low…compared to the creditors of the other Debtor estates."  Far from rectifying these problems, through the Plan the Debtors now

seek to cement them permanently in place. The Plan does nothing to resolve the improper substantive consolidation of the Lockbox funds or the Allocation Decision's flawed treatment of the Crossover Bonds Claims for allocation purposes. Both of these flaws continue to drag down U.S. recoveries.

7.      In addition, the Plan suffers from numerous other fatal flaws that preclude its confirmation. These defects include, *inter alia*:

- The Plan's treatment of the Crossover Bonds Claims is forbidden by law pursuant to Bankruptcy Code section 1129(a)(3). The Plan allows the Crossover Bonds to assert a full $4.0 billion Ivanhoe claim against NNI notwithstanding that the Allocation Decision substantively consolidated the Lockbox funds. Because Ivanhoe claims cannot coexist with a substantively consolidated case, the Plan is forbidden by law.

- The Plan cannot be approved because the foundation upon which it rests—the SPSA—does not pass muster under the Third Circuit's Martin test for the approval of settlements under Bankruptcy Rule 9019. The SPSA fails the first Martin factor because the Debtors have failed to justify the SPSA in view of the high likelihood of success of the pending appeals of the Allocation Decision before the Third Circuit. The SPSA also fails the fourth Martin factor because it demonstrates a disregard for the paramount interest of U.S.-only Unsecured Creditors by failing to take into account the flaws in such creditors' treatment pursuant to the Allocation Decision.

- In the event that the Debtors are forced to seek confirmation of the Plan through a cram-down, the Plan cannot satisfy the cram-down requirements of Bankruptcy Code section 1129(b). The Plan unfairly discriminates against U.S.-only Unsecured Creditors due to the materially lower percentage recovery it provides to Class A-3A (anticipated to be an impaired dissenting class) as compared to the treatment it provides to the Crossover Bonds Claims in Class A-3B.

8.      As discussed in greater detail below, these numerous defects, whether considered on an individual or aggregate basis, render the Plan incapable of confirmation. Confirmation of the Plan must therefore be denied.

## BACKGROUND

9.      On January 14, 2009 (the "Petition Date"), the Debtors, other than NNCALA and NNIII, filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

10.     Since the Petition Date, Nortel has sold its business units and other assets to various purchasers, generating proceeds ("Sale Proceeds") of over $7.3 billion that have been placed in escrow accounts pending allocation among the various selling entities (the "Nortel Sellers"). Having failed to negotiate a consensual allocation consistent with the requirements of the escrow agreement, a cross-border trial (the "Allocation Trial") to determine such allocation was held in 2014 before this Court and the Canadian Court.

11.     On May 14, 2015, the Bankruptcy Court and Canadian Court simultaneously issued opinions deciding the Allocation Trial (the Bankruptcy Court decision, the "Allocation Decision"). The Allocation Decision adopted an allocation methodology not advanced by any party at trial, described as "modified pro rata" ("MPR"), under which each Nortel debtor's allocation of the Sale Proceeds would be based on the relative amount of some, but not all, claims against a given debtor as compared to the amount of claims against other debtors.

12.     Numerous parties, including the Consortium, appealed the Allocation Decision to the United States District Court for the District of Delaware (the "District Court"). As part of the appeal process in the District Court, the parties agreed to brief the appeals while simultaneously proceeding with a mediation process led by the retired Chief Judge of the District Court, Joseph J. Farnan. Confidential, non-binding mediation sessions were held starting in October 2015.

13.     The mediation sessions that began in October 2015 did not produce a settlement as of the time that briefing and oral argument were scheduled. Oral argument took place on

April 5, 2016.  Following oral argument, on May 24, 2016 the District Court entered an order certifying all appeals and contingent cross-appeals to the United States Court of Appeals for the Third Circuit (the "Third Circuit").  On June 22, 2016, the appellees petitioned the Third Circuit to accept the appeal.  The Third Circuit granted the petitions for leave to appeal on August 9, 2016.

14.     During this time, the parties continued to engage in mediation under the oversight of Judge Farnan as mediator.  Those discussions ultimately resulted in a proposed settlement of the Allocation Dispute and certain other matters between certain of the parties, as memorialized in the SPSA.  The Consortium, among others, did not agree to enter into the SPSA.

15.     On October 12, 2016, the Debtors filed the *Notice of Execution of Settlement and Plans Support Agreement* [D.I. 17249], attached to which as Exhibit A is that certain Settlement and Plans Support Agreement dated October 12, 2016 (the "SPSA").  The SPSA purports to resolve the Allocation Dispute, subject to the satisfaction of certain conditions.

16.     On November 4, 2016, the Debtors filed (i) the *Proposed Disclosure Statement for the First Amended Joint Chapter 11 Plan of Nortel Networks Inc. and Certain of its Affiliated Debtors* [D.I. 17348] (as subsequently amended, the "Disclosure Statement"); and (ii) the *First Amended Joint Chapter 11 Plan of Nortel Networks Inc. and Certain of its Affiliated Debtors* [D.I. 17347] (as subsequently amended, the "Plan").

17.     On September 7, 2016, a status conference was held before the Third Circuit to discuss appellate briefing, following which the Third Circuit ordered the parties to submit a proposed briefing schedule by October 7, 2016.  This deadline was subsequently extended until December 7, 2016.  On December 7, 2016, the Debtors filed a letter on behalf of themselves and the other SPSA Parties requesting that the deadline to submit a proposed briefing schedule be

extended until thirty days after the SPSA's outside date of August 31, 2017.  In the same letter, the Consortium proposed that its pending appeal be adjourned only until January 10, 2017 (the day after the deadline to file Plan objections), at which time the Consortium requested that a status conference be held in order to establish an appropriate briefing schedule in the event the Consortium's objections had not been resolved.

18.    In an Order dated December 9, 2016, the Third Circuit ordered, with respect to the consolidated appeals, that "[t]he pending appeal is carried over only until January 10, 2017.  If no resolution is reached prior to the Plan Objection Deadline of January 9, 2017, the pending appeals shall proceed as set by the Court."  See *Order of Circuit Judge Thomas L. Ambro Dated December 9, 2016* (attached hereto as **Exhibit A**).  The parties to the appeals have been advised that the Third Circuit has requested a proposed briefing schedule be submitted by January 10, 2017.

19.    On December 16, 2016, the Debtors filed the *Debtors' Motion for Entry of an Order Pursuant to 11 U.S.C. §§ 105(a) and 363(b) and Federal Rule of Bankruptcy Procedure 9019 Approving Settlement and Plans Support Agreement* [D.I. 17589] (the "SPSA Approval Motion").

20.    On December 21, 2016, the Debtors filed the *Debtors' Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 Approving Settlement Agreement By and Among The Debtors and the Pension Benefit Guaranty Corporation With Respect to The PBGC Claims and Related Issues* [D.I. 17625].

## ARGUMENT

21.    Plan proponents bear the burden of proving to the Court, by a preponderance of the evidence standard, that a proposed plan satisfies every applicable confirmation requirement under Bankruptcy Code sections 1129(a) and (b).  See, e.g., In re Armstrong World Indus., Inc.,

7

348 B.R. 111, 120 (D. Del. 2006); In re Exide Techs., 303 B.R. 48, 58 (Bankr. D. Del. 2003).

This burden is a heavy one, and requires careful consideration of each of the relevant inquiries

articulated by Bankruptcy Code section 1129.  See In re Vita Corp., 380 B.R. 525, 528 (C.D. Ill.

2008).   This is especially so where, as here, a debtor acts as the plan proponent.  See, e.g.,

Everett v. Perez (In re Perez), 30 F.3d 1209, 1214 n.5 (9th Cir. 1994) ("The burden of proposing

a plan that satisfies the requirements of the Code always falls on the party proposing it, but it

falls particularly heavily on the debtor-in-possession or trustee since they stand in a fiduciary

relationship to the estate's creditors.").

22.    As discussed more fully below, the Debtors cannot satisfy these burdens.

Accordingly, the Court should not approve the Plan.

## I.    The Court Lacks Jurisdiction To Approve The Plan On Account Of The Consortium's Pending Appeal Of The Allocation Decision.

23.    As a threshold matter, upon the filing of the appeals of the Allocation Decision

the Court was divested of jurisdiction over all aspects of these Cases related to that order—

including the Plan.   That remains the case today as the Consortium has an appeal of the

Allocation Decision pending before the Third Circuit that it has not agreed to waive (or defer to

permit the Plan confirmation process).[5]   Accordingly, the Court does not have jurisdiction to

confirm the Plan and, as ordered by the Third Circuit in its December 9, 2016 Order, the

Consortium's pending appeal "shall proceed as set by the Court."  See Exhibit A, p. 2.

### A.    The Consortium's Pending Third Circuit Appeal Of The Allocation Decision Has Divested The Bankruptcy Court Of Jurisdiction To Confirm The Plan.

24.    The Plan cannot be confirmed because, due to the consolidated appeals of the

Allocation Decision currently pending before the Third Circuit, including in particular the

---

[5]    At present, the Debtors, the UCC, the Crossover Bondholders, The Bank of New York Mellon as Indenture Trustee, the PBGC, and Stephen Taylor as Conflicts Administrator for Nortel Networks S.A. (collectively, the "Appellees") also have pending appeals of the Allocation Decision before the Third Circuit.

Consortium's pending appeal, the Court has been divested of jurisdiction to approve the Plan. Specifically, the Divestiture Rule precludes the Court from taking any action offensive to the Third Circuit's jurisdiction over the pending appeal of the Allocation Decision.

25.     It is well-settled that the filing of a notice of appeal is an event "of jurisdictional significance" that divests the lower court "of its control over those aspects of the case involved in the appeal." Griggs v. Provident Consumer Discount Co., 459 U.S. 56, 58 (1982); Whispering Pines Estates, Inc. v. Flash Island, Inc. (In re Whispering Pines Estates, Inc.), 369 B.R. 752, 757 (B.A.P. 1st Cir. 2007). The purpose behind this judge-made rule is "to prevent the confusion and inefficiency that would result if both the district court and the court of appeals were adjudicating the same issues simultaneously." Mary Ann Pensiero, Inc. v. Lingle, 847 F.2d 90, 97 (3d Cir. 1988). This principle applies equally to a pending appeal from a bankruptcy court decision. See In re Neuman, 67 B.R. 99, 101 (S.D.N.Y. 1986). For this reason, courts have consistently held that a bankruptcy court lacks jurisdiction to vacate or modify an order which is the subject of a pending appeal. See In re Eddis, 37 B.R. 217, 218 (E.D. Pa. 1984); Kates v. Fox, Rothschild, O'Brien, Frankel (In re Mazzocone), No. 93-12296S, 1995 WL 113110, *4 (E.D. Pa. Mar. 16, 1995). "Courts have also consistently held that if an issue is raised on appeal, a bankruptcy court cannot reconsider that issue even in the context of another Order." Id.

26.     Pursuant to the Divestiture Rule, "an appeal divests the lower court of any further jurisdiction over the subject of the appeal." See In re Wash. Mut., Inc., 461 B.R. 200, 217 (Bankr. D. Del. 2011), vacated in part on other grounds, No. 08-12229, 2012 WL 1563880 (Bankr. D. Del. Feb. 24, 2012). Where the lower court is "altering the appealed order," the lower court lacks jurisdiction to enforce the order. See id. at 219 ("The correct statement of the Divestiture Rule is that so long as the lower court is not altering the appealed order, the lower

court retains jurisdiction to enforce it."). Accordingly, bankruptcy courts have "recognized a distinction in the divestment of jurisdiction between acts undertaken to enforce the judgment and acts which expand upon or alter it; the former being permissible and the latter prohibited." In re Sabine Oil & Gas Corp., 548 B.R. 674, 679 (Bankr. S.D.N.Y. 2016) (internal citations omitted).

27.    To be sure, courts have found that bankruptcy courts retain jurisdiction to enforce, implement, and otherwise validate judgments and orders that are the subject of pending appeals, *as long as that enforcement and implementation does not require re-deciding issues that are on appeal*. See Dicola v. American Steamship Owners Mut. Prot. and Indem. Ass'n (In re Prudential Lines), 170 B.R. 222, 243-45 (S.D.N.Y. 1994). Put another way, "[d]uring the pendency of an appeal of a bankruptcy court order . . . the bankruptcy court is not divested of jurisdiction to enforce or implement that order being appealed, nor is the bankruptcy court divested of jurisdiction 'to decide issues and proceedings different from and collateral to those involved in the appeal.'" In re Sabine Oil & Gas Corp., 548 B.R. at 679.

28.    The Court's most recent explanation of its authority under the Divestiture Rule can be found in Washington Mutual and Tribune, two decisions that are readily distinguishable from the present circumstances. For instance, in Washington Mutual the Court was considering the confirmation of a proposed plan pursuant to which certain securities were to be sold. In re Washington Mut., Inc., 461 B.R. at 218. The ownership of the securities had been the subject of a prior adversary proceeding under the jurisdiction of the Court; the party adjudged to have lost its ownership interest then appealed the result to the district court. Id. at 211-12. Notwithstanding the fact that the debtors' ownership right in the securities was the subject of the pending appeal, the Court ruled it retained jurisdiction to consider confirmation of the plan even though the plan authorized the transfer of the securities. Id. at 219-20. In her decision, Judge

10

Walrath explained that the Court was not being asked to *modify* the order on appeal, but rather was only being asked to *enforce* the order, since the modified treatment of the securities was consistent with the Court's prior order.  Id. at 220.

29.     Similarly, Tribune involved an appeal of a reconsideration decision that did not even address the issues specific to the allocation disputes at issue in that case, which were conditioned upon the confirmation of a plan.  In re Tribune Co., 472 B.R. 223, 230-31 (Bankr. D. Del. 2012), aff'd in part, vacated in part on other grounds, No. 08-13141, 2014 WL 2797042 (D. Del. June 18, 2014).  In Tribune, the reconsideration decision subject to appeal determined that certain fraudulent transfer claims being pursued by the Litigation Trustee were not assets belonging to the debtors and therefore could not be "assets of the Company" subject to subordination provisions of certain indentures.  Id. at 227.  However, the Court was presented with the issue regarding the applicability of the indentures' subordination provisions to *other distributions*, specifically to settlement proceeds and the creditors' trust proceeds.  Id. at 231-32. Since the allocation disputes were not seeking to modify the reconsideration decision, this Court reached the conclusion that it retained jurisdiction.  Id. at 232.

30.     The decisions reached in Washington Mutual and Tribune are easily distinguishable.  This is not the typical situation where an order confirming a chapter 11 plan is subsequently appealed to the district court.  Here, an order that gets to the heart of the dispute in these Cases (the Allocation Decision) was appealed to the Third Circuit *well in advance* of the Plan Confirmation Hearing.  In Washington Mutual, the issue on appeal was entirely consistent with the modified plan: the adversary proceeding determined ownership rights in the securities, and the modified plan enforced those same rights.  In re Washington Mut., Inc., 461 B.R. at  220. Here, the issue on appeal is entirely inconsistent with the proposed Plan.  In the event the

11

Consortium succeeds on appeal in overturning the Allocation Decision, confirmation of this Plan would ensure that there would be no assets from which the Consortium could recover.  And, unlike in Tribune, here an Order by the Court approving the Plan would *alter* the Allocation Decision—very likely, irrevocably—that is at the heart of the Consortium's pending appeal.  See In re Tribune Co., 472 B.R. at 231.  Very simply, there is no question that the Plan and Allocation Decision address the same issue: namely, the allocation of recoveries to U.S.-only Unsecured Creditors.  The Allocation Decision determined the allocation of the Lockbox proceeds which, in turn, established the baseline for U.S. recoveries under the SPSA and Plan.  And the Plan, if approved, plainly will determine U.S. recoveries.  Thus, an Order by the Court approving the Plan would impermissibly alter the allocation of recoveries to U.S.-only Unsecured Creditors.

31.    Instead, the circumstances here are much more analogous to those in Whispering Pines, in which the First Circuit Bankruptcy Appellate Panel found that the bankruptcy court had been divested of jurisdiction to alter an order on appeal.  369 B.R. 752, 761.  In Whispering Pines, a secured creditor obtained a confirmation order entitling the creditor to relief from stay to foreclose upon its collateral upon the expiration of a scheduled period of time.  Id. at 755-56.  The debtor appealed.  Id.  During the pendency of the appeal, the bankruptcy court granted the secured creditor relief from the automatic stay to foreclose upon the property prior to the expiration of the scheduled period.  Id. at 756.  The First Circuit Bankruptcy Appellate Panel, however, reversed the stay order, finding that the bankruptcy court was divested of jurisdiction to address the order.  Id. at 761.  This is because, as noted by this Court in Washington Mutual, the lower court in Whispering Pines modified the order on appeal (confirmation of the creditor's

plan that gave the trustee time to sell the property before the creditor could foreclose on it) by granting the lender immediate relief from the stay to foreclose upon its collateral.  Id. at 760-61.

32.     Here, an Order by the Bankruptcy Court approving the Plan would most assuredly constitute an act that "expand[s] upon or alter[s]" the Allocation Decision, which itself is currently the subject of the Consortium's pending appeal before the Third Circuit.  See In re Sabine Oil & Gas Corp., 548 B.R. at 679.  The Plan defines the Allocation Dispute as that "certain litigation before…the Bankruptcy Court in which the allocation of the Sale Proceeds is at issue."  Plan, p. 3.  As set forth in section 7.4 of the Plan, an Order by this Court approving the Plan would "settle the Allocation Dispute on the terms set forth in the SPSA" and authorize the Debtors "to direct releases of the Allocation Proceeds to the Global Debtors in accordance with the terms of the SPSA."  Plan § 7.4.  Accordingly, as the Debtors would write the script, confirmation of the Plan will foreclose the U.S. Trade Claims from receiving the potentially more favorable recoveries subject to the pending appeal.  Confirming this Plan, which purports to modify (i.e., settle) the allocation scheme set by the Allocation Decision, alters the literal results of that order.  Such a result is impermissible under Whispering Pines.  See 369 B.R. at 761.

33.     The Debtors have recently argued that the Allocation Decision is somehow divorced from, and has been supplanted by, the SPSA and Plan.  See Debtors' Objection to the Nortel Trade Claims Consortium's (I) Motion for Reconsideration and Vacation of the Bankruptcy Court's December 18, 2014 PPI Settlement Order and (II) Objection to Crossover Bonds Claims [D.I. 17569] (the "Reconsideration Objection"), ¶ 18.  Not so.  First, as noted above, the SPSA and Plan cover the same subject matter as the Allocation Decision and the SPSA and Plan alter the Allocation Decision.  Second, the SPSA and Plan proceed from the

artificially-low baseline established by the Allocation Decision. Like an anchor, the improbably-low recovery to U.S.-only Unsecured Creditors under the Allocation Decision continues to depress recoveries to U.S.-only Unsecured Creditors under the SPSA and Plan. Indeed, it is no coincidence that recoveries to U.S.-only Unsecured Creditors under the SPSA are between 1.8x - 3.0x closer to the recoveries set by the Allocation Decision than they are to the allocation position advanced by the Debtors during the Allocation Trial.

**B.      The Consortium's Pending Appeal Cannot Be Dismissed Or Otherwise Mooted Without Its Consent.**

34.     It is beyond cavil that neither the Debtors nor any other party in these Cases may dismiss or otherwise "moot" the Consortium's pending appeal before the Third Circuit without the Consortium's consent. Nevertheless, due to certain meritless assertions leveled by the Debtors in their recent briefing, the Consortium is compelled herein to address what should be self-evident: namely, that *even if* this Court approves the Plan, the Consortium's pending appeal before the Third Circuit will proceed uninterrupted.[6] This, of course, does not impact the Consortium's objection to the Plan since—as noted above—maintaining the appeal in the face of a confirmed Plan would be a pyrrhic victory unless it is coupled with the escrow of funds required to make the Consortium whole in the event of an appellate success.

35.     Section 7.23 of the Plan provides in relevant part that "[p]romptly following the Effective Date, the Debtors shall comply with their obligations under Section 5(b) of the SPSA to dismiss with prejudice and with no order as to costs all appeals, leave to appeal applications and other litigations among any of the SPSA Parties (including, with respect to the Debtors, the

---

[6]      See Debtors' *Reply to PBGC "Response" to Debtors' Motion for an Order Authorizing Entry into Canadian Currency Escrow Agreement to Facilitate Global Settlement* [D.I. 17280] (the "PBGC Reply"). In this pleading, the Debtors asserted that "[t]here can be no question that the settlement embodied in the SPSA moots the appeal of the Allocation Opinion." PBGC Reply, p. 3. Likewise, in their Reconsideration Objection, the Debtors suggested that the Consortium's pending appeal before the Third Circuit can potentially be "mooted." Reconsideration Objection, ¶ 18.

pending appeals and cross-appeals in respect of the Allocation Dispute)." Plan §7.23.[7]  Section 10.4(b) of the Plan requires, as a condition precedent to the distribution of Creditor Proceeds, "the dismissal with prejudice of all litigation referenced in Section 5(b) of the SPSA, including the pending leave to appeals, appeals and cross-appeals in respect of the Allocation Dispute pending before the . . . Bankruptcy Court." Plan §10.4(b).  Accordingly, the instant this Court approves the Plan, the SPSA Parties will move to dismiss the pending appeals before the Third Circuit.

36.    Dismissing their own appeals is one thing, but the Debtors and other SPSA Parties absolutely may not dismiss, set aside, or otherwise "moot" the Consortium's pending Third Circuit appeal without the Consortium's consent.  Under the law of this Circuit, a court cannot take action that adversely affects the rights of third-party creditors.  See Eddy v. Nat'l Union Fire Inc. Co. (In re Medical Asset Mgmt. Inc.), 249 B.R. 659, 663-64 (Bankr. W.D. Pa. 2000); see also Cullen v. Riley (In re Masters Mates & Pilots Pension Plan & IRAP Litig.), 957 F.2d 1020, 1026 (2d Cir. 1992) ("[T]he fairness of the settlement to the settling parties is not enough to earn the judicial stamp of approval.").  In other words, "[t]he fairness to the settling parties ... may not warrant its approval if the rights of others who are not parties to the settlement agreement are unduly prejudiced." In re Medical Asset Mgmt., 249 B.R. at 663.  Rather, the bankruptcy court must determine that no creditor group has been singled out for unfair treatment.  See id.

37.    In Medical Asset Management, a post-confirmation settlement agreement between a D&O insurer and a liquidation agent included a requirement that the court

---

[7]    Section 5(b) of the SPSA provides in relevant part that "[p]romptly following the Plans Effective Date, the Parties shall dismiss with prejudice and with no order as to costs all appeals, leave to appeal applications and other litigations among any of the Parties (including the pending appeals and cross-appeals in respect of the Allocation Dispute) . . . Such dismissals will be effected by the filing of the appropriate documents with the appropriate courts in each jurisdiction, the form of which documents must be reasonably acceptable to the Parties party to such litigation." SPSA § 5(b).

permanently enjoin all parties in an ongoing non-bankruptcy litigation against the directors and officers from filing any lawsuits against the insurer relating to the D&O policy. Id. The plaintiffs also had asserted general unsecured claims; under the plan, however, the plaintiffs would receive a distribution of less than one percent of the settlement proceeds. Id. at 665-66. The court found that limiting the plaintiffs to one percent recovery under the plan, as opposed to what they might recover under the D&O policy in the litigation, was not reasonable consideration for the surrender of their right to proceed against the insurer and accordingly "would be exceedingly unfair." Id.

38.     Here, in contravention of Medical Asset Management, the confirmation and effectiveness of the Plan is conditioned upon dismissal of pending litigation, i.e., the pending appeals before the Third Circuit.  Given that the result of the pending appeal may lead to additional recoveries to members of the Consortium, requiring the Consortium to relinquish its appeal in exchange for a lower distribution under the Plan is not "reasonable compensation." Accordingly, the Debtors and other SPSA parties cannot moot the Consortium's pending appeal and an escrow is required to avoid mooting the appeal while at the same time confirming the Plan.

**C.     The Only Avenue For Confirmation Is For The Plan To Provide For An Escrow Of The Consortium's Potential Additional Recoveries.**

39.     In order to be confirmed without improperly undermining the Consortium's appeal, the Plan must be amended to provide for an escrow of the Consortium's potential, additional recoveries while the Consortium's appeal of the Allocation Decision remains pending. Failing this, the Debtors will have succeeded in impermissibly mooting the Consortium's appeal, because the Plan does not have a mechanism to free up cash to pay the members of Consortium at such time as the appeal process is concluded and even if such a mechanism could be added

there is a material risk that the Debtors will not have sufficient cash reserves on hand at the relevant time.

40.     The Disclosure Statement projects that U.S.-only Unsecured Creditors will receive a distribution within a range of 55.1% - 61.2%.  <u>See</u> Disclosure Statement at 80-81. However, during the Allocation Trial the approach argued by the Debtors would have resulted in a 100% distribution to U.S.-only Unsecured Creditors.   Thus, if the Consortium's appeal succeeds in the Third Circuit (and in any further proceeding that may be directed by the Third Circuit), holders of U.S. Trade Claims could be entitled to up to a par recovery—which would constitute an additional recovery of between 38.8% - 44.9%.  Based on the Consortium's total holdings of U.S. Trade Claims (approximately $150 million), and allowing for the risk that even the Debtor's low-end recovery estimate turns out to be wrong, the Debtors must escrow a minimum of $75 million (using a cushion based upon a minimum 50% Plan distribution).

41.     A reasonable and commonly-employed alternative to a complete stay of this Court's proceedings, and one the Court could employ here, would be to deposit the disputed property (the U.S. Trade Claims' potential additional recovery) into an escrow account and hold in abeyance any Plan provision that would interfere with the pending appeal of the Decision. <u>See</u> <u>Premier Entm't Biloxi LLC v. Pacific Inv. Mgmt. Co., LLC (In re Premier Entm't Biloxi LLC)</u>, No. 08-60349, 2009 WL 1616681, (5th Cir. 2009) (finding that the bankruptcy court properly deposited disputed funds into an escrow account, with a determination of which party was entitled to those funds to be made through an ordered process at a later date, for purposes of continuing the plan confirmation process).

## II.   Various Plan Provisions Are "Forbidden By Law" In Contravention Of Bankruptcy Code Section 1129(a)(3).

42.     The Plan contravenes Bankruptcy Code section 1129(a)(3)'s requirement that a plan be "proposed . . . not by any means forbidden by law."  See 11 U.S.C. §1129(a)(3).  A plan fails to satisfy section 1129(a)(3)'s requirement that it not be proposed "by any means forbidden by law" when one or more of its provisions violate non-bankruptcy law.  See In re Hickey Props. Ltd., 181 B.R. 173, 174 (Bankr. D. Vt. 1995) ("The proposal for a post-confirmation . . . lien would violate §1129(a)(3), because state law would not allow the priming of a secured creditor"); 7 Collier on Bankruptcy, ¶ 1129.02[3][a][i] ("section 1129(a)(3) requires that the proposal of the plan comply with all applicable law, not merely bankruptcy law").  At bottom, the "forbidden by law" language of Bankruptcy Code section 1129(a)(3) requires a plan to "fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code." See In re PWS Holding Corp., 228 F.3d 224, 242 (3d. Cir. 2000).

43.     As discussed below, at least two Plan provisions constitute "means forbidden by law" within the meaning of Bankruptcy Code section 1129(a)(3).  All three provisions operate to achieve a result entirely *inconsistent* with the objectives and purposes of the Bankruptcy Code, and therefore prevent confirmation of the Plan.  See id.

### A.     The Plan's Treatment Of The Crossover Bonds Claims Is Forbidden By Law Because Ivanhoe Claims Cannot Be Allowed In Substantively Consolidated Estates.

44.     The Plan proposes to make a full, unreduced distribution out of the U.S. estate on account of the nearly $4.0 billion in Crossover Bonds Claims.  Plan § 4.4.  The Plan's allowance of the Crossover Bonds Claims against NNI is based solely on NNI's status as a guarantor of the Crossover Bonds and application of the Ivanhoe doctrine, which ordinarily allows creditors holding guaranteed debt to assert one claim against the primary obligor and a second claim

18

against the guarantor.  At the same time, the Crossover Bondholders already benefit from a full Proven Claim against the Canadian Debtors.  SPSA § 4(g)(iv).  As a result, the Crossover Bondholders are poised to recoup a par or near-par recovery under the Plan.

45.    This result is not only demonstrably inequitable—it also violates applicable law, and thus is "forbidden by law" pursuant to Bankruptcy Code section 1129(a)(3).  Through its Allocation Decision—which established the baseline upon which the SPSA and Plan stand—the Court effected the substantive consolidation of the Lockbox proceeds.  Because the *only* legal basis for the assertion of the full amount of the Crossover Bonds Claims against NNI is by virtue of NNI's role as guarantor of the Crossover Bonds, the Crossover Bonds Claims are quintessential Ivanhoe claims under the Supreme Court's seminal 1935 decision in Ivanhoe Building & Loan Assn. v. Orr, 295 U.S. 243 (1935) ("Ivanhoe").[8]  However, the substantive consolidation doctrine and the Ivanhoe rule are mutually-exclusive: Ivanhoe has *never* been applied in substantively consolidated cases.  This makes intuitive sense, because the two doctrines are fundamentally incompatible: whereas Ivanhoe respects corporate separateness (multiple asset pools, multiple claims), substantive consolidation does the exact opposite (one consolidated asset pool, one claim).  See In re Panolam Holdings, Co., No. 09-13889, 2009 WL 7226968, at *13 (Bankr. D. Del. Dec. 10, 2009) (guarantee claims eliminated and cancelled at time of substantive consolidation).  Further, this truism is borne out by the post-Ivanhoe line of cases: since decided, Ivanhoe has been cited in fifty-nine (59) decisions, *none* of which have

---

[8]    In Ivanhoe, the Supreme Court held that a creditor was permitted to assert the full value of its claim against a debtor co-obligor, unreduced by the stipulated value of the collateral (owned by a non-debtor co-obligor), subject only to the single-satisfaction rule that no creditor may retain value beyond full repayment.  See Ivanhoe, 295 U.S. at 245.  There, the trustee sought to reduce a creditor's claim by the market value of the property (owned by a third party) that the creditor had foreclosed upon prior to the commencement of the bankruptcy case.  Id.  In reversing the holding of the lower courts, the Supreme Court held that the creditor was not requested to set off the value it realized from the foreclosure against its claim filed against the debtor.  Id. at 245-46.

applied the Ivanhoe doctrine to substantively consolidated cases.  The complete dearth of *any* reported caselaw in which Ivanhoe and substantive consolidation have coexisted mandates that, here, the Crossover Bondholders cannot avail themselves of a full Ivanhoe claim against NNI under the Plan.

46.    The Debtors have repeatedly acknowledged the harm that the Allocation Decision has caused to U.S.-only Unsecured Creditors.  In their Reconsideration Motion[9], the Debtors assailed the Allocation Decision as "severely depressing the amount of Lockbox proceeds available for distribution to general unsecured creditors holding claims solely against the U.S. Debtors."  Reconsideration Motion at 4.  Indeed, U.S.-only Unsecured Creditors are the constituency most harmed by the Allocation Decision.

47.    Until the Consortium's appeal is resolved, the Debtors should not be permitted to siphon value away to the Crossover Bondholders that otherwise belongs to U.S.-only Unsecured Creditors.  Such treatment surely does not comport with the "objectives and purposes of the Bankruptcy Code."  See In re PWS Holding Corp., 228 F.3d at 242.  The harm caused to U.S.-only Unsecured Creditors by the Plan's treatment of the Crossover Bondholders is substantial. The Consortium estimates that but for the Crossover Bondholders' full $4.0 billion claim against NNI, recoveries to all U.S.-only Unsecured Creditors would be at or near 100 cents on the dollar—substantially more than the 55.1 - 61.2 percent recovery projected in the Disclosure Statement.  See Disclosure Statement at 10.  But instead, under the SPSA and the Plan, the Crossover Bondholders' recovery will be at or close to par, as the Crossover Bonds recover from both the U.S. and Canadian estates.  Further, the Court should not lose sight of the irony here that but for the existence of the U.S.-only Unsecured Claims, the Allocation Decision would have

---

[9]    See *U.S. Debtors' Motion for Clarification and/or Reconsideration of the May 12, 2015 Allocation Trial Opinion and Order* [D.I. 15611] (the "Reconsideration Motion").

afforded the U.S. estate no allocation from the Lockbox—the same source of value from which the Crossover Bondholders are given the right to recover under the Plan and substantially dilute the recovery of U.S.-only Unsecured Claims.

48.     One obvious solution exists to solve this otherwise intractable problem: The Court could condition any order approving the Plan on the Crossover Bonds asserting a full claim in the U.S. *only* against the non-Lockbox proceeds that were not substantively consolidated by the Allocation Decision.  This approach would preserve the Crossover Bonds' <u>Ivanhoe</u> claim in a manner that is consistent with the Allocation Decision.

### B.     The Plan Makes An Unjustifiably High Allocation To NNCALA.

49.     Third, the Plan is proposed by "means forbidden by law" insofar as it attempts to allocate to NNCALA a sum that exceeds by *a factor of three* NNCALA's value entitlement under any reasonable allocation of the Lockbox.  <u>See</u> 11 U.S.C. §1129(a)(3).

50.     Under section 7.6 of the Plan, NNCALA is scheduled to receive an allocation in the amount of $50,070,950.  Plan § 7.6.  However, an application of the methods espoused in the Kinrich Report[10] (which the U.S. Debtors used as support for their position in the Allocation Trial) to the total Lockbox allocation to the U.S. estate demonstrates that NNCALA should receive an allocation of only approximately $13.5 million.  Accordingly, the SPSA and Plan create an unjustifiable value leakage from NNI of approximately $36.5 million.  This treatment is contrary to the "objectives and purposes of the Bankruptcy Code" and should not be permitted.  <u>See</u> <u>In re PWS Holding Corp.</u>, 228 F.3d at 242.

---

[10]     <u>See</u> *Expert Report of Jeffrey H. Kinrich* [D.I. 13659] (the "<u>Kinrich Report</u>") filed May 28, 2014.

III.    **The SPSA Does Not Pass Muster Under Bankruptcy Rule 9019.**

51.    In addition, the Plan cannot be approved because its centerpiece—the SPSA—cannot pass muster under this Circuit's well-settled Martin test for the approval of bankruptcy settlements.

52.    Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") authorizes the Court "to approve a compromise or settlement[.]"  Fed. R. Bankr. P. 9019(a).  Approving settlements under Bankruptcy Rule 9019 is committed to the discretion of this Court.  Key3Media Group, Inc. v. Pulver.com, Inc. (In re Key3Media Group, Inc.), 336 B.R. 87, 92 (Bankr. D. Del. 2005).  In exercising this discretion, the Court must decide whether "the compromise is fair, reasonable, and in the best interest of the estate."  In re TSIC, Inc., 393 B.R. 71, 78 (Bankr. D. Del. 2008).  Simply put, in order to pass muster under Bankruptcy Rule 9019, a proposed settlement must be "fair and equitable."  In re Capmark Fin. Grp., Inc., 438 B.R. 471, 475 (Bankr. D. Del. 2010).  The mandatory nature of Bankruptcy Rule 9019 is borne out of courts' concerns regarding the unfair treatment to non-settling creditors that could result from a settlement that is not subjected to judicial scrutiny.  See In re Med. Asset Mgmt., 249 B.R. at 663 ("The fairness to the settling parties of a proposed settlement agreement may not warrant its approval if the rights of others who are not parties to the settlement agreement are unduly prejudiced. We must further determine that no one has been set apart for unfair treatment.") (quotation marks omitted).

53.    Under Bankruptcy Rule 9019, the bankruptcy court should "canvass the issues to determine whether the settlement falls above the lowest point in the range of reasonableness."  In re Capmark Fin. Corp., 438 B.R. at 475-76.  The Court must evaluate the fairness of the settlement to all parties in interest.  Will v. Northwestern Univ. (In re Nutraquest, Inc.), 434 F.3d 639, 645 (3d Cir. 2006).  Moreover, when considering the best interest of the estate, the Court

must "assess and balance the value of the claim that is being compromised against the value to the estate of the acceptance of the compromise proposal." Myers v. Martin (In re Martin), 91 F.3d 389, 393 (3d Cir. 1996) (hereinafter, "Martin") (citing Protective Comm. for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424-25 (1968)).

54.     In striking this balance, the Court should consider the four Martin factors: (1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of creditors.  Martin, 91 F.3d at 393; Law Debenture Trust Co. v. Kaiser Aluminum Corp. (In re Kaiser Aluminum Corp.), 339 B.R. 91, 96 (D. Del. 2006); Fry's Metals, Inc. v. Gibbons (In re RFE Indus., Inc.), 283 F.3d 159, 165 (3d. Cir. 2002).  As discussed below, the SPSA fails the first and fourth Martin factors and accordingly cannot be approved.

### A.     The SPSA Fails The First Martin Factor Because The Pending Appeals Have A High Likelihood Of Success.

55.     With respect to the first Martin factor, for a settlement to be approved as fair and equitable, a debtor must demonstrate a risk of failure should the matter be litigated.  In re Martin, 91 F.3d at 393.  When a debtor does not suffer much risk of loss in the litigation, payment of a substantial settlement is not appropriate.  See In re Coram Healthcare Corp., 315 B.R. 321, 330 (Bankr. D. Del. 2004) ("The fact that the settlement is reasonable to [a settling claimant] does not mean that it is reasonable to the Debtors and their creditors. In fact, a one-sided settlement would be cheered by the side it favors even though it is a terrible deal for the side it disfavors.").

56.     Here, the Debtors have provided little evidence, apart from broad conclusory and speculative statements, that would allow the Court to evaluate the merits of the SPSA.  In re Spansion, Inc., No. 09-10690, 2009 WL 1531788, at *9 (Bankr. D. Del. June 2, 2009) (rejecting settlement agreement because evidence presented in support of the settlement was "largely

conclusory"). In In re Exide Techs, this Court considered a debtor's authority enter into a settlement. In re Exide Techs, 303 B.R. at 66-67. The court rejected the proposed settlement as "not fair and equitable" and "not in the paramount interests of creditors." Id. at 71. The first Martin factor weighed against approval of the settlement because the evidence presented was inconclusive with respect to the settling parties' probability of success on the merits, and the debtors failed to demonstrate that the adverse party was not likely to succeed at trial. Id. at 69.

57.    Similarly, here, the Debtors make several references to the *difficulty* faced with quantifying the probability of success, yet fail to provide the requisite evidence to show the *probability* of success. The SPSA Approval Motion is bereft of any real discussion of the likelihood that the Debtors can recover a more favorable allocation of sale proceeds, other than relying on pure speculation. See SPSA Approval Motion, ¶ 37 ("Accordingly, it is clear that even if considered on a clean slate, it would be hard to quantify the likelihood of success of any particular theory advanced at trial."). Moreover, the Debtors do not provide sufficient information as to how they reached these conclusions. See In re Spansion, Inc., 2009 WL 1531788, at *7-8 (finding that merits of litigation could not be reasonably evaluated because testimony of chief restructuring officer indicated that he did not take into account the advice of patent counsel).

58.    What is more, the Debtors' empty assertions regarding the difficulty of succeeding in the Allocation Litigation contrast sharply with the Debtors' recent arguments in their appellate briefing before the District Court. There, the Debtors decried the decision as "fl[ying] in the face of well-established Third Circuit law" and "unprecedented and legally indefensible." Regarding the issue of substantive consolidation, the Debtors argued that "[w]hether the [Allocation Decision] is identical, or merely similar, to substantive consolidation,

it is prohibited under <u>Owens Corning</u> given the Bankruptcy Court's own factual findings that the Debtors carefully maintained corporate separateness." *Opening Brief of Debtors-Appellants Nortel Networks Inc. in Support of Appeal from the Allocation Opinion* [District Court D.I. 64], filed on March 11, 2016.  The Debtors' complete about-face on the merits of the Allocation Litigation ought to preclude approval of the SPSA.  <u>See</u> <u>In re Spansion, Inc.</u>, 2009 WL 1531788, at *8.

      **B.**     **The SPSA Fails The Fourth <u>Martin</u> Factor Because It Is Neither Fair Nor Equitable To Non-Settling Parties.**

     59.    A settlement will not pass muster under the fourth <u>Martin</u> factor where it is unfair to parties who did not settle.  <u>See</u> <u>In re Spansion, Inc.</u>, 2009 WL 1531788, at *3 ("Under the fair and equitable standard, [the court looks] to the fairness of the settlement to the other persons, i.e., *the parties who did not settle*.") (emphasis added).  Indeed, a basic notion of fairness requires consideration of the effect on all involved parties.  <u>Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)</u>, 478 F.3d 452, 464 (2d Cir. 2007) (citing <u>U.S. v. AWECO, Inc. (In re AWECO, Inc.)</u>, 725 F.2d 293, 298 (5th Cir. 1984)).  A settlement will also fail the fourth <u>Martin</u> factor where it severely or adversely impacts creditors whose interests were not adequately represented during settlement negotiations.  <u>See</u> <u>In re Nutritional Sourcing Corp.</u>, 398 B.R. 816, 835 (Bankr. D. Del. 2008) (settlement will not be approved where it "severely adversely impacts . . . creditors who were not at the negotiating table and who were not adequately represented in their absence").  Here, the SPSA is manifestly unfair to members of the Consortium, which is not a party to the SPSA.

     60.    This Court's decision in <u>Nutritional Sourcing</u> is particularly instructive here.  <u>Nutritional Sourcing</u> involved a compromise with respect to the scope of the definition of "trade creditors" under a plan.  After considering the four <u>Martin</u> factors, the court also observed that

"all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise should be considered as well." Id. at 833. Particularly relevant was that "[u]nder the fair and equitable standard, [courts] look to the fairness of the settlement to other persons, i.e., the parties who did not settle." Id. (quoting In re Nutraquest, 434 F.3d at 645). Although the court found that factors 1 and 3 of the Martin test weighed in favor of approving the settlement, the court rejected the settlement under the fourth Martin factor. Id. at 834-35. This was because "[t]he compromise . . . severely adversely impacts 'non-goods' trade creditors who were not at the negotiating table and who were not adequately represented in their absence." Id. at 835. The court observed that the recovery of "non-goods" trade creditors decreased from 100% to 13.2% based on the settlement. Id. at 836-37. However, no "non-goods" trade creditors participated in the negotiations. Id. at 835. About half of the parties to the negotiations had an incentive to narrow the definition in order to increase their own recoveries to the detriment of the "non-goods" trade creditors, and although the debtors' interests aligned with those of the "non-goods" trade creditors, the debtors had an incentive to create a plan that would receive the requisite percentage of votes. Id. at 835-36. Therefore, there was no one to adequately represent the interests of "non-goods" trade creditors in the negotiations and the settlement was not "fair and reasonable." Id. at 836.

61.     As in Nutritional Sourcing, here Nortel's U.S.-only Unsecured Creditors were not adequately represented in the SPSA negotiations. While the Consortium was present at the mediation, the other parties decided to settle around the Consortium. In effect, the Consortium was permitted to be present at the mediation only superficially. And, while the UCC is supposed to act as fiduciary for all U.S. unsecured creditors, the facts and circumstances here indicate that none of the members of the UCC is representative of the U.S.-only Unsecured Creditors

(notwithstanding the fact that members of the Consortium attempted to join the UCC).   The

UCC is comprised of three members—the Pension Benefit Guaranty Corporation ("PBGC"), The

Bank of New York Mellon ("BNYM") (as indenture trustee to the Crossover Bonds), and Law

Debenture Trust Company of New York ("Law Debenture") (as indenture trustee to the NNCC

Bonds).  Not one of these entities can be said to have the same concerns or interests as a typical

U.S.-only Unsecured Creditor.

62.     Moreover, U.S.-only Unsecured Creditors are severely and adversely impacted by

the SPSA because it cements in place the Allocation Decision's impermissible and dilutive

impact on U.S.-only Unsecured Creditors.  In addition, here, as in Nutritional Sourcing, creditors

who are not parties to the SPSA are being asked to "take one for the team" for the benefit of

those who are parties to that agreement.  See In re Nutritional Sourcing Corp., 398 B.R. at 833-

34.  Such treatment does not comport with the Bankruptcy Code's "fair and equitable" standard

for settlement approval.  See id.

63.     It is clear that in agreeing to the SPSA, the Debtors paid little mind to the

"paramount interest of" U.S.-only Unsecured Creditors—the precise creditor constituent that the

Debtors identified as suffering, comparatively, much more pain by the Allocation Decision than

any other class of U.S. creditor.  The dubious value of the SPSA to U.S.-only Unsecured

Creditors is perhaps best illustrated by comparing (a) the positions taken by the Debtors during

the Allocation Trial with respect to the allocation of the Sale Proceeds, with (b) the U.S.

Allocation under the SPSA and the Plan that the Debtors now claim is "good enough" under the

circumstances.

64.     During the Allocation Trial in the spring of 2014, the Debtors advanced a position

which corresponded to a dividend recovery of approximately 100.0% to U.S.-only Unsecured

Creditors.  Under the Allocation Opinion, the recovery to U.S.-only Unsecured Creditors fell

from 100.0% (nearly universally agreed to, by each of the Debtor estates, during the Allocation

Trial) to approximately 40.0%.[11]  Against this backdrop, the Debtors now ask the Court to bless

the SPSA, under which recoveries to U.S.-only Unsecured Creditors will amount to only

between 55.1% - 61.2%.  See id. at 10.  Meanwhile, the Crossover Bonds' recovery will be at or

close to par as, per the SPSA and Plan, the Crossover Bonds are entitled to assert a full claim at

both the U.S. and Canadian Estates.

65.    As a result, the recoveries to U.S.-only Unsecured Creditors under the SPSA are

between 38.8% - 44.9% lower than the par recovery for which the Debtors argued during the

Allocation Trial.  The Debtors provide not one scintilla of explanation as to why U.S.-only

Unsecured Creditors should accept a 55.1% - 61.2% recovery as being within the range of

reasonable settlement outcomes.  Moreover, that recoveries to U.S.-only Unsecured Creditors are

higher under the SPSA than they are under the Allocation Decision is of no moment: as the

Debtors themselves have argued strenuously before the District Court, the Allocation Decision is

legally indefensible and, accordingly, it establishes an artificially low baseline for purposes of

determining whether the SPSA is fair and equitable to U.S.-only Unsecured Creditors.

66.    The SPSA does not satisfy the Martin factors.  Accordingly, the SPSA Approval

Motion must be denied.

**IV.**    **The Plan Cannot Satisfy The Cram-Down Provisions of Bankruptcy Code Section
1129(b) Because the Plan Unfairly Discriminates Against U.S.-only Unsecured
Creditors.**

67.    Although the voting tabulation is still to be filed, the Consortium believes that its

members, along with similarly-situated creditors, may hold sufficient claims such that a "no"

---

[11]    See *Opening Brief of Appellant the Nortel Trade Claims Consortium in Support of Appeal from the
Allocation Opinion* [D. Ct. Docket No. 74] (the "Consortium Op. Br.") at 2.

vote on the Plan by such creditors may result in Class A-3A rejecting the Plan, thereby creating an impaired dissenting class.  See 11 U.S.C. §1126(c).  The Debtors will therefore be forced to avail themselves of the "cram-down" provision of Bankruptcy Code section 1129(b).  The Debtors, however, will be unable to satisfy the "cram-down" rule because the Plan unfairly discriminates against U.S.-only Unsecured Creditors.  See 11 U.S.C. §1129(b).

68.     In a non-consensual case such as this may prove to be, in which an impaired class (Class A-3A) rejects the Plan, "the plan proponent must also show that the plan meets the additional requirements of §1129(b), including the requirements that the plan does not unfairly discriminate against dissenting classes and the treatment of dissenting classes is fair and equitable."  See In re Exide Techs., 303 B.R. at 58; In re Genesis Health Ventures, 266 B.R. 591, 599 (Bankr. D. Del. 2001) ("A nonconsensual plan requires the proponent to prove all but one of the thirteen elements [of Bankruptcy Code section 1129(a)], that all classes consent or are unimpaired, 11 U.S.C. §1129(a)(8), plus the additional requirements of section 1129(b), that the plan does not unfairly discriminate against dissenting classes and that treatment of such dissenting classes is fair and equitable.").  As Plan proponent, it is the Debtors' burden to prove to this Court, by a preponderance of the evidence, that the Plan does not unfairly discriminate against U.S.-only Unsecured Creditors.  See, e.g., In re Armstrong World Indus., 348 B.R. at 120 (plan proponent must establish by preponderance of the evidence the satisfaction of requirements of both Bankruptcy Code section 1129(a) and 1129(b)); 7 Collier on Bankruptcy ¶ 1129.02[4] ("If nonconsensual confirmation is sought, the proponent of such a plan will have to satisfy the court that the requirements of section 1129(b) are also met.  In either situation, the plan proponent bears the burden of proof by a preponderance of the evidence.").

69.     This Circuit adopts the rebuttable presumption test (also known as the "Markell Test"), under which a rebuttable presumption of unfair discrimination arises when there is: (i) a dissenting class; (ii) another class of the same priority; and (iii) a difference in the plan's treatment of the two classes that results in either (a) a materially lower percentage recovery for the dissenting class (measured in terms of the net present value of all payments) or (b) regardless of percentage recovery, an allocation under the plan of materially greater risk to the dissenting class in connection with its proposed distribution.  See In re Armstrong World Indus., Inc., 348 B.R. at 121; In re Dura Auto. Sys., 379 B.R. 257 at 271; In re Exide Techs., 303 B.R. at 78-79; In re Genesis Health Ventures, 266 B.R. at 611.  In other words, the prohibition on unfair discrimination "ensures that a dissenting class will receive relative value equal to the value given to all other similarly situated classes."  In re 222 Liberty Assocs., 108 B.R. 971, 990-91 (Bankr. E.D. Pa. 1990).

70.     Courts disapprove of discrimination where the difference in percentage recovery is large.  See In re Sentry Operating Co. of Tex., Inc., 264 B.R. 850, 863-64 (Bankr. S.D. Tex. 2001) (denial of plan confirmation where plan paid 100% to one class of unsecured creditors, while remaining unsecured creditors were paid 1% of claims); In re Aztec Co., 107 B.R. 585, 588 (Bankr. M.D. Tenn. 1989) (unfair discrimination to pay insider unsecured claims in full while paying other unsecured claims 3%).  The Sentry case is particularly instructive.  In Sentry, the debtor and its secured lender proposed a plan that would pay a class of trade claims in full while paying 1% on other unsecured claims.  See 264 B.R. at 862.  In applying the Markell Test, the Court observed that whether a lower recovery for the dissenting class is consistent with the results that would obtain outside of bankruptcy is a factor that is best viewed in the context of the prepetition rights of creditors and their respective legitimate expectations about relative rights

30

and likelihood of payment.  See id. at 864.  Because the two classes of creditors in Sentry had equal prepetition rights, the court concluded the payout differential was unjustified and therefore the debtors could not rebut the presumption of unfair discrimination.  See id. at 864.

71.    Here, as in Sentry, the Plan fails the Markell Test.  Under the Plan, Crossover Bondholders enjoy an allowed, unreduced general unsecured claim against NNI in the amount of nearly $4.0 billion.  See Plan § 7.14 ("the Crossover Bonds Claims shall be Allowed as one or more general unsecured claims in the aggregate amount of $3,934,521,442, as specified in [the PPI Settlement Order]").  This allows the Crossover Bondholders to take two *full* bites at the same apple: one bite against the Canadian Debtors, and a second against the U.S. Debtors.  Yet under the Court's claims-based Allocation Decision, which established the baseline for the SPSA's proposed allocation scheme, the U.S. Debtors receive no allocation "credit" for the $4.0 billion of Crossover Bonds Claims for which they are liable.  As a consequence, not only is the U.S. share of the Lockbox pie artificially low, but the Crossover Bondholders are also able to soak up a disproportionately high percentage of the (already diminished) value in the U.S. estate. This unfair discrimination precludes confirmation of the Plan.  See In re Barney & Carey Co., 170 B.R. 17, 25 (Bankr. D. Mass. 1994) (finding unfair discrimination where debtor offered "[no] reason or legitimate basis" for paying one unsecured creditor a 100 percent recovery while a similarly situated creditor would receive only a 15 percent recovery).

## NOTICE

72.    The Consortium has provided notice of this Motion via electronic transmission, first class mail, hand delivery, or overnight mail to: (i) the U.S. Debtors; (ii) the U.S. Trustee; and (iii) the general service list established in these Cases.  Accordingly, the Consortium submits that under the circumstances no other or further notice is necessary.

## NO PRIOR REQUEST

73.     No prior request for the relief sought herein has been made to this or any other court.

## CONCLUSION

For the reasons set forth herein, the Consortium respectfully requests that the Court (a) deny confirmation of the Plan absent modifications that obviate the objections set forth herein, and (b) grant such other and further relief as it deems just and proper.


Dated:  January 9, 2017
Wilmington, Delaware

**FOX ROTHSCHILD LLP**

*/s/ Jeffrey M. Schlerf*
Jeffrey M. Schlerf (DE No. 3047)
Citizens Bank Center
919 North Market Street, Suite 300
Wilmington, DE 19801
Telephone: (302) 654-7444
Facsimile: (302) 656-8920
Email: jschlerf@foxrothschild.com

and

**BROWN RUDNICK LLP**
Steven D. Pohl, Esq.
Christopher M. Floyd, Esq.
One Financial Center
Boston, MA 02111
Telephone:  (617) 856-8200
Facsimile:  (617) 856-8201
Email: spohl@brownrudnick.com
            cfloyd@brownrudnick.com

*Counsel    to    the    Nortel    Trade    Claims Consortium*

43942516.v1-1/9/17