**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| ------------------------------------------------------x | | Chapter 11 |
| *In re* | : | Case No. 09-10138 (KG) |
| | : | (Jointly Administered) |
| **NORTEL NETWORKS, INC., et al.,** | : | |
| | : | Hearing Date: January 24, 2017 |
| Debtors.[1] | : | Related ECF Nos.: 17501, 17589 |
| ------------------------------------------------------x | | |

**STATEMENT OF SOLUS ALTERNATIVE ASSET MANAGEMENT LP AND POINTSTATE CAPITAL LP WITH RESPECT TO (I) FIRST AMENDED JOINT CHAPTER 11 PLAN OF NORTEL NETWORKS INC. AND CERTAIN OF ITS AFFILIATED DEBTORS AND (II) DEBTORS' MOTION FOR ENTRY OF AN ORDER PURSUANT TO 11 U.S.C. §§ 105(a) AND 363(b) AND FEDERAL RULE OF BANKRUPTCY PROCEDURE 9019 APPROVING SETTLEMENT AGREEMENT AND PLAN SUPPORT AGREEMENT AND OBJECTION TO ASSERTED FEES AND EXPENSES OF INDENTURE TRUSTEE**

Solus Alternative Asset Management LP and PointState Capital LP (collectively, the "NNCC Noteholders"), in their capacities as holders of certain fixed rate senior notes due June 15, 2026 (the "7.875% Notes") issued by Nortel Networks Capital Corporation f/k/a Northern Telecom Corporation ("NNCC") and Nortel Networks Limited f/k/a Northern Telecom Limited ("NNL"), and guaranteed by NNL, pursuant to an Indenture, dated February 15, 1996 (the "Indenture"), submit this (I) statement with respect to (A) the First Amended Joint Chapter 11 Plan Of Nortel Networks Inc. And Certain Of Its Affiliated Debtors [ECF No. 17501] (the "Plan")[2] and (B) the Motion For Entry Of An Order Pursuant To 11 U.S.C. §§ 105(a) And 363(b) And Federal Rule Of Bankruptcy Procedure 9019 Approving Settlement And Plan Support Agreement [ECF No. 17589] (the "SPSA Motion") and (II) objection (the "Objection") to the fees and expenses asserted by the NNCC Bonds Indenture Trustee (hereinafter, the

---

[1] The Debtors, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769),Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).

[2] Capitalized terms not defined herein have the meanings ascribed to them in the Plan.

1

"Indenture Trustee") totaling approximately $7.8 million for the period from January 14, 2009 through September 30, 2016 (hereinafter, with any additional amounts asserted by the Indenture Trustee for any period, the "Asserted Fees") and, in support thereof, respectfully state as follows.

### I. PRELIMINARY STATEMENT

1. The NNCC Noteholders support the SPSA Motion and confirmation of the Plan. Both incorporate the heavily-negotiated compromise reached by the NNCC Noteholders with the Debtors concerning the Plan's treatment of the 7.875% Notes as well as the claims between NNCC and NNI relating to the Support Agreement and Intercompany Loan (as defined below).

2. The NNCC Noteholders find themselves in a difficult position. While they have no desire to cast aspersions on the efforts of professionals, the Asserted Fees (if allowed) will negate the benefits the NNCC Noteholders secured under the Plan following hard-fought negotiations. Litigation over the reasonableness of professional fees is anathema to the NNCC Noteholders. While they will continue to endeavor to resolve the dispute consensually, absent a resolution before the confirmation hearing, the NNCC Noteholders request that the Confirmation Order include the following procedures to resolve this dispute (the "Proposed Fee Procedures"):

- the sum of $3.75 million, that is (i) the Asserted Fees (approximately $8 million) less (ii) the $4.25 million available under the Plan pursuant to section 7.13 (the "Plan Fee Consideration") shall be held back from distributions to holders of the 7.875% Notes and placed in a segregated account (the "Trustee-Fee Holdback");

- consistent with section 7.13 of the Plan—which requires that the Indenture Trustee's fees must be reasonable and documented—the Indenture Trustee shall not exercise a charging lien with respect to the amounts distributed to holders of the 7.875% Notes and shall not deduct any portion of those funds to pay the Asserted Fees unless and until the Court enters an order determining the portion of the Asserted Fees that is allowable under the indenture and applicable law (the "Trustee-Fee Approval Order");

- the Indenture Trustee and the NNCC Noteholders will agree on an appropriate briefing schedule for submitting the issue to the Court for decision; and

- no portion of either the Plan Fee Consideration or the Trustee-Fee Holdback shall be released to the Indenture Trustee, and the Indenture Trustee shall not assert any charging lien or otherwise use distributions to pay the Asserted Fees unless and until the Bankruptcy Court enters the Trustee-Fee Approval Order.

3. The Proposed Fee Procedures inure to the benefit of the Indenture Trustee, the NNCC Noteholders, and the NNI estate (which has a residual interest in the Plan Fee Consideration). Without these procedures, the Indenture Trustee will simply satisfy its $8 million claim and require the NNCC Noteholders and the NNI estate to pursue it for refunds. Accordingly, the NNCC Noteholders request that the Confirmation Order include these protections.

## II.    RELEVANT FACTUAL BACKGROUND

### A.    7.875% NOTES

4. NNCC is a special purpose financing vehicle that issued the 7.875% Notes. The 7.875% Notes have a separate guaranty of payment from NNL.

5. The NNCC Noteholders hold approximately 90% of the 7.875% Notes.

6. NNCC immediately lent the proceeds of the 7.875% Notes to Nortel Networks Inc. ("NNI") under a Revolving Loan Agreement dated as of June 15, 2008 (the "Revolving Loan Agreement") with NNI as Borrower and NNCC as Lender. NNCC has an allowed and undisputed intercompany claim against NNI under the Revolving Loan Agreement in the amount of $147,634,914.66 (the "Intercompany Loan Claim").

7. NNI and NNCC entered into the Support Agreement in favor of NNCC dated as of February 15, 1996 (the "Support Agreement," and NNCC's claim thereunder, the "Support Agreement Claim") in connection with NNCC's issuance of the 7.875% Notes.[3] The

---

[3]    The Support Agreement states specifically that "[a]t all times prior to the termination of this Agreement, [NNI] shall cause [NNCC] to have and to maintain a net worth of at least $1.00. For purposes hereof, 'net

3

Support Agreement requires NNI to ensure NNCC's solvency at all times. NNI's obligations under the Support Agreement are not fixed in time and instead continue post-petition until all liabilities, including the 7.875% Notes, are repaid in full.

8. Pursuant to the Allocation Decision,[4] NNCC stood to receive its allocated portion of the lock-box proceeds based on the claims asserted against the NNCC estate by, <u>inter alia</u>, the NNCC Noteholders.

### B. ESTIMATION MOTION AND AMENDED SCHEDULES

9. In 2014, the NNCC Noteholders filed the Estimation Motion[5] requesting that the Court estimate the Support Agreement Claim and direct NNI to allow the Intercompany Loan Claim, which was scheduled as "disputed" at the time.

10. The Estimation Motion followed a series of pleadings the NNCC Noteholders filed that, among other things, (a) highlighted the Support Agreement and Intercompany Loan Claims that are specific to the 7.875% Notes and (b) argued they entitled the 7.875% Notes to unique treatment under any chapter 11 plan.[6]

11. In response to the Estimation Motion, NNI agreed to amend its schedules to allow the Intercompany Loan Claim.[7] Thereafter, the NNCC Noteholders agreed to adjourn

---

worth' shall mean a sum equal to [NNCC's] tangible net worth, as determined in accordance with generally accepted accounting principles." <u>See</u> Support Agreement § 2.

[4] <u>In re Nortel Networks, Inc.</u>, 532 B.R. 494 (Bankr. D. Del. 2015) (the "<u>Allocation Decision</u>").

[5] <u>See</u> Motion Of Solus Alternative Asset Management LP And Macquarie Capital (USA) Inc. For Entry Of An Order, Pursuant To 11 U.S.C. §§ 105(a), 502(c), 521, Fed. R. Bankr. P. 1009(a) And L.R. Bankr. P. 1009-2, Estimating Nortel Networks Capital Corporation's Support Agreement Claim And Directing NNI To Amend Its Schedules With Respect To Intercompany Loan Claim [ECF. No. 14639] (the "<u>Estimation Motion</u>").

[6] <u>See</u> Joinder of Solus Alternative Asset Management LP and Macquarie Capital (USA) Inc. In Bondholder Pleading [ECF No. 14029]; Statement Of Solus Alternative Asset Management LP And Macquarie Capital (USA) Inc. With Respect To Debtors' Motion For Entry Of An Order Pursuant To Bankruptcy Rule 9019 Approving Settlement Agreement By And Among Nortel Networks Inc., The Supporting Bondholders, And The Bank Of New York Mellon With Respect To NNI Post-Petition Interest Dispute And Related Issues [ECF No. 14340].

[7] <u>See</u> Amended Schedules of Nortel Networks, Inc., dated December 10, 2014 [Dkt. No. 14918].

the balance of the Estimation Motion, including the portion seeking an Order estimating the Support Agreement Claim, to a date to be determined.[8]

12.    At that time, the NNCC Noteholders made clear they were prepared to enter into direct discussions with any party in interest in the cases with respect to their claims and the appropriate treatment of the 7.875% Notes.[9]

13.    During the summer of 2016, the NNCC Noteholders ultimately engaged in discussions with the Debtors and negotiated the treatment of the 7.875% Notes that is reflected in the Plan.

### C.    PLAN COMPROMISE

14.    The NNCC Noteholders have long argued their claims are entitled to unique treatment given the ability of the 7.875% Notes to look to three different sources to fund distributions *in addition* to the NNL guaranty claim.  The NNCC Noteholders submit that together with NNCC's lock-box allocation, NNCC's recovery on the Intercompany Loan and Support Agreement Claims would have rendered NNCC solvent—unlike every other U.S. and Canadian debtor.  The NNCC Noteholders nonetheless agreed to settle these claims in exchange for the Plan's treatment of the 7.875% Notes, which generally provides (subject to the terms of the Plan and the SPSA) for the following:

- the 7.875% Notes will be allowed against NNI (into which NNCC shall be substantively consolidated) and NNL in their face amount, with pre-petition interest ($150,951,562);

---

[8]    See Second Amended Notice Of Motion Of Solus Alternative Asset Management LP And Macqaurie Capital (USA) Inc. For Entry Of An Order, Pursuant To 11 U.S.C. §§ 105(a), 502(c), 521(a), Fed. R. Bankr. P. 1009(a) And L.R. Bankr. P. 1009-2, Estimating Nortel Networks Capital Corporation's Support Agreement Claim And Directing NNI To Amend Its Schedules With Respect To Intercompany Loan Claim [ECF No. 14886].

[9]    See Transcript, Hearing, May 5, 2015 [ECF No. 15542] at 16:16-25 ("Solus and Macquarie are fully prepared to engage in any discussions with any party in interest in the cases …. with respect to their claim. And they're also fully prepared to sign any confidentiality agreement that is required or considered a precondition for their participation in those discussions.").

- NNI shall reserve $7.5 million to provide a supplemental distribution to holders of the 7.785% Notes beyond the distributions afforded to other unsecured creditors of NNI to the extent NNI does not pay the 7.875% Notes in full; and

- the reasonable and documented fees and expenses of (a) the Indenture Trustee and (b) counsel to the NNCC Noteholders shall be paid by NNI in an amount not to exceed $4.25 million and $750,000, respectively.[10]

15.  During the cases, Law Debenture Trust Company of New York, as successor Trustee to The Bank of New York under the Indenture ("Law Debenture"), was the Indenture Trustee. Law Debenture, however, is no longer the Indenture Trustee. Recently, in a transaction that closed in December 2016, Law Debenture sold its corporate trust services business to Delaware Trust Company. Delaware Trust Company is the current Indenture Trustee.[11]

---

[10] See Plan at 48 (§ 7.13 ("NNI (or the Disbursing Agent on its behalf) shall pay the reasonable and documented fees of (a) the NNCC Bonds Indenture Trustee, in an amount not to exceed $4.25 million and (b) counsel to Solus Alternative Asset Management LP and PointState Capital LP in an amount not to exceed $750,000 …. If any amount remains in the cash reserve … NNI shall pay or reimburse out of such funds reasonable and documented fees (up to an additional $2.0 million) incurred by professionals in connection with the assertion of rights related to the NNCC Bonds. Any amount payable by NNI under this Section shall include an amount equal to, and be in addition to, any fees paid by the Canadian Debtors under the Crossover Bondholder Fee Letter allocated to the NNCC Bondholders that are deducted from distributions made by the Canadian Estate to the NNCC Bondholders as described in Section 4(k) of the SPSA"), § 7.14(c) ("the NNCC Bonds Claims against NNI (into which NNCC shall be substantively consolidated on the Plan's Effective Date) shall be Allowed as a general unsecured claim in the amount of $150,951,562, provided, however, that in the event that distributions (including deemed distributions related to the Crossover Bondholder Fee Letter) in respect of the NNCC Bonds Claims is less than $150,951,562 (exclusive of any amount paid pursuant to Section 4(m) of the SPSA) upon the completion of distributions in respect of the NNCC Bonds Claims on the allowed claim against NNI (which claim against NNI results from the consolidation of NNCC with and into NNI) and the Proven Claim against the Canadian Estate, NNI shall reserve $7.5 million from cash otherwise available for distributions to NNI unsecured creditors, to be made available to be paid in respect of the NNCC Bonds Claims, but further provided that NNI shall use such reserves to make distributions in respect of the NNCC Bond Claims only in the amount of the lesser of (A) $150,951,562 less total distributions from NNI and the Canadian Estate (exclusive of any amount paid pursuant to Section 4(m) of the SPSA), and (B) $7.5 million."); SPSA at 24 (¶ 4(g)(v) (NNCC Bonds Claims against NNL "shall be allowed as an unsecured Proven Claim against the Canadian Estate in the amount of U.S. $150,951,562"); ¶ 4(g)(vi); ¶ 4(m)).

[11] See Businesswire December 8, 2016 ("Delaware Trust Company Finalizes Acquisition of Law Debenture Corporate Trust Business, Welcomes Thomas Musarra to Team") available at http://www.businesswire.com/news/home/20161208005782/en/Delaware-Trust-Company-Finalizes-Acquisition-Law-Debenture.

### III. STATEMENT

16. The NNCC Noteholders fully support the Plan and the SPSA and the treatment provided with respect to the 7.875% Notes. They have voted in favor of the Plan and request that it be confirmed. The Asserted Fees, however, should not be paid unless and until the Indenture Trustee has proven their reasonableness. The Proposed Fee Procedures, as incorporated into the Confirmation Order, will provide a process for that review that protects the NNCC Noteholders, the Indenture Trustee, and the NNI estate. Importantly, under the Plan and the SPSA, any amounts reserved for the payment of the Indenture Trustee's fees that are not allowed will be available to NNI to pay other claims.

### IV. OBJECTION

17. Section 606 of the Indenture requires that the Trustee's expenses, including the "charges and expenses of its counsel," must be "reasonable and documented." The Asserted Fees are unreasonable and constitute:

- on information and belief, approximately twice the amount asserted by the indenture trustee for the Crossover Bonds—The Bank Of New York—who is responsible for debt that is twenty times greater than the 7.875% Notes, i.e., nearly $3.5 billion in face amount, and is also a member of the Creditors' Committee; and

- five percent (5%) of the Plan recovery of holders of the 7.875% Notes; cf., In re Worldwide Direct, Inc., 334 B.R. 112, 130 (Bankr. D. Del. 2005) (examining qualitative factors and using lodestar approach in disallowing portions of indenture trustee's $1.6 million in fees incurred over 2½-year case that constituted 2.8%-3.9% of recovery for holders of notes totaling $153 million).

18. To the extent the Asserted Fees were incurred by the Indenture Trustee in its capacity as a member of the Creditors' Committee, then they should not be charged to holders of the 7.875% Notes. The Creditors' Committee owes a fiduciary duty to all unsecured creditors—not just holders of the 7.875% Notes. See, e.g., In re PWS Holding Corp., 228 F.3d 224, 246 (3d Cir. 2000) (noting section 1103(c) has been interpreted to imply "a fiduciary duty to

committee constituents"); In re E Toys, Inc., 331 B.R. 176, 199 (D. Del. 2005) (observing "TBF is acting as counsel for the Committee and has a fiduciary duty to all creditors. This is significantly different from acting as counsel for one individual creditor or group of creditors.").

19. As a fiduciary for all unsecured creditors, the Creditors' Committee did not singularly advance the interests of holders of the 7.875% Notes. Indeed, acting through their own counsel, the NNCC Noteholders prosecuted the Estimation Motion[12] (resulting in an amendment to the schedules and the allowance of NNCC's $147 million Intercompany Loan Claim), advanced the Support Agreement Claim against NNI, and negotiated the settlement reflected in the Plan with respect to the 7.875% Notes.

20. It is unreasonable for the Indenture Trustee to charge the NNCC Noteholders for fees incurred in the performance of duties that, as a matter of law, had to benefit *all* unsecured creditors. To the extent the Asserted Fees were incurred for work performed as a member of the Creditors' Committee, they do not satisfy the reasonableness standard imposed under the Indenture. See In re Worldwide Direct, Inc., 334 B.R. at 132-134 (disallowing substantial portion of counsel fees incurred by indenture trustee that served as committee co-chair for failure to satisfy indenture's reasonableness standard: "[Counsel] attended almost every Committee meeting, performed such business-related tasks as interviewing prospective crisis managers, interviewing counsel in litigation against third parties and claims against the estate, and serving (in lieu of his client or any other Committee member) as a member of the Plan working group. This he did regardless of whether the meeting or call impacted on the senior

---

[12] While the NNCC Noteholders did not need to prosecute the Estimation Motion to conclusion in light of the settlement, the Creditors' Committee reserved its right to take issue with the substantive relief requested in the Estimation Motion. See Tr., Hearing May 5, 2015 at 21:16-24 ("[COMMITTEE COUNSEL]: [A]t the time of the original adjournment of the [Estimation] motion, the Debtors and the Committee both reserved all their rights to respond to the substance of the motion itself, including … whether or not the estimation [is] the appropriate vehicle for resolution of these claims. So we're in the same position, obviously, the progress the Debtors made was excellent with respect to the technical issues of the allowance of the specific numbers, but with respect to substance, we are in the reserved rights position.").

debt issue or matters peculiar to the Noteholders' interests."); In re General Homes Corp. FMGC, Inc., 143 B.R. 99, 103 (Bankr. S.D. Tex. 1992) ("The services provided by [indenture trustee] and its various counsel to the noteholders … in attending Committee meetings and in bringing in-house and outside counsel to meetings of the Committee, were not beneficial to the estate or its unsecured creditors, and arguably were not beneficial to the noteholders themselves."); In re Global Tech., Inc., 344 B.R. 382, 386 (Bankr. W.D. Pa. 2006) (denying allowance of indenture trustee's post-petition fees as general unsecured claim).

21. Unlike the Creditors' Committee, the Indenture Trustee owes a singular fiduciary duty to holders of the 7.875% Notes.[13] It therefore must act "in the best interest of its debenture holders." In re Worldwide Direct, Inc., 334 B.R. at 121 (citations omitted). The significant fees incurred suggest that the Indenture Trustee did not properly manage its retained professionals in a way that either avoided duplication, minimized expense, or limited the scope of their work to activities directly benefitting holders of the 7.875% Notes. See id. at 131-132 ("While it was prudent of WTC to hire its own attorneys, it had an obligation to assure that the firm only did what was necessary to protect the Noteholders' interests;" accepting argument that indenture trustee "did not exercise the care required under the prudent person standard because it allowed duplication resulting in a reduced recovery for the Noteholders").

---

[13]   See, e.g., Royal Park Inv. SA/NV v. HSBC Bank USA, 109 F. Supp. 3d 587, 597 (S.D.N.Y. 2015) ("Following a contractually defined 'Event of Default' …. [the trustee] now must, as prudence dictates, exercise those singularly conferred prerogatives in order to secure the basic purpose of any trust indenture, the repayment of the underlying obligation."); BNP Paribas Mortg. Corp. v. Bank of Am., N.A., 778 F. Supp. 2d 375, 401 (S.D.N.Y. 2011) ("After an event of default, the indenture trustee's fiduciary duties expand by operation of New York common law …. [It owes a] fiduciary duty of undivided loyalty to trust beneficiaries … [and its] obligations come more closely to resemble those of an ordinary fiduciary, regardless of any limitations or exculpatory provisions contained in the indenture."). See also Indenture § 601(a) ("If an Event of Default has occurred and is continuing, the Trustee shall exercise such rights and powers vested in it by this Indenture, and use the same degree of care and skill in their exercise, as a prudent person would exercise or use under the circumstances in the conduct of his own affairs."); In re Worldwide Direct, Inc., 334 B.R. at 121 ("[A]n indenture trustee owes its fiduciary duty to the debenture holders, not the bankruptcy estate.").

22.     While more granular issues may be raised with respect to the work performed by each firm that the Indenture Trustee retained when this dispute is submitted in accordance with the Proposed Fee Procedures, at bottom, the Indenture Trustee cannot satisfy a reasonableness standard because approximately $8 million of fees are not commensurate with the role the Indenture Trustee played in these cases or the activities it conducted for the benefit of holders of the 7.875% Notes.  It is true that these cases spanned several years and involved complex litigation over the allocation of sale proceeds and issues relating to post-petition interest.  But these issues were prosecuted for the U.S. estates primarily by the Debtors, the Bondholder Committee, and the Creditors' Committee.  Except with respect to issues that were peculiar to the 7.875% Notes and NNCC, the interests of the Indenture Trustee and these parties were aligned, e.g., in arguing that a substantial portion of the sale proceeds should be allocated to the U.S. estates and that post-petition interest should be payable to the extent the U.S. estates are solvent.  See, e.g., In re Worldwide Direct, Inc., 334 B.R. at 132 (noting with respect to asset sale and plan treatment that "[t]he Noteholders were in the same class and had the same interests as all other unsecured creditors …. The time records reveal an excessive amount of work on matters that were unnecessary or duplicative …. With the exception of the senior debt issue, the Noteholders' interests could be adequately represented by Committee counsel").

23.     Over the course of the cases, the Indenture Trustee filed (a) eight joinders in, supplements to, or reservations of rights with respect to other pleadings;[14] (b) two motions;[15]

---

[14]  See ECF No. 10690 (Joinder In Motion To Approve Allocation Position Of US Debtors And Official Committee Of Unsecured Creditors And Opening Allocation Position Of Ad Hoc Group Of Bondholders); ECF No. 10691 (Joinder In Response Of US Debtors And Official Committee Of Unsecured Creditors To Core Parties Allocation Positions); ECF No. 13496 (Joinder In (A) Pre-Trial Brief Of US Interests And (B) Pre-Trial Brief Of Ad Hoc Group Of Bondholders); ECF No. 14028 (Supplemental Brief [To ECF No. 14025] With Respect To Monitors' Request That Court Determine Bondholder Entitlement To Post-Petition Interest And Additional Bondholder Claims Issues Under U.S. Law); ECF No. 14057 (Supplemental Reply Brief [To ECF No. 14053] With Respect To Monitors' Request That Court Determine Bondholder Entitlement To Post-Petition Interest And Additional Bondholder Claims Issues Under U.S. Law); ECF No. 14184 (Joinder In (1) Post-Trial Brief Of US Interests And (2) Post-Trial Brief Of Ad Hoc Group Of Bondholders); ECF No. 14389 (Joinder In (1) Post-Trial Reply Brief Of US Interests And (2) Post-Trial Reply Brief Of Ad Hoc Group Of Bondholders); and ECF No. 16806 (Statement And


(c) one response;[16] and (d) proofs of claim relating to the 7.875% Notes. With respect to several of these pleadings, the Indenture Trustee and its counsel worked in concert with the NNCC Noteholders and their counsel. That cooperative effort, however, is not tantamount to and should not be misconstrued as a waiver of the NNCC Noteholders' rights to object to millions of dollars in fees because they, <u>inter alia</u>, predated the effort, were incurred in connection with matters that were unrelated to the effort, did not inure to the benefit of the NNCC Noteholders, or otherwise were unnecessary. <u>See</u>, <u>e.g.</u>, <u>In re Worldwide Direct, Inc.</u>, 334 B.R. at 128 (rejecting argument that noteholders were "barred" from objecting to reasonableness of indenture trustee's counsel's fees when they "never objected to [indenture trustee] serving on the Committee or serving as Committee co-chair …. urged [indenture trustee] to be active in the AT&T sale process and in objections to certain claims …. contacted [indenture trustee's counsel] for updates on the status of the case …. [and never told indenture trustee] its services were unnecessary;" noting "none of these factors prevents [the noteholders] (or the Court) from reviewing the reasonableness of the fees sought under the Indenture"); <u>cf.</u>, <u>Becker v. Bank of New York Mellon Trust Co.</u>, 172 F. Supp. 3d 777, 799 (E.D. Pa. 2016) (indenture provisions compensating trustee for "reasonable services" and providing for payment of its "reasonable expenses and disbursements" did not

---

Reservation Of Rights With Respect To Supplement To Motion Of Liquidity Solutions, Inc. For Entry Of Order (A) Authorizing And Directing Debtor, Nortel Networks Inc., To Make Interim Distributions On Allowed Administrative, Priority And Unsecured Claims Or (B) Converting Cases To Chapter 7 Pursuant To Section 1112(b) Of Bankruptcy Code)).

[15] <u>See</u> ECF No. 15615 (Motion Pursuant To Fed. R. Civ. P. 52(b), 59(e), And 60 For Partial Reconsideration Of Courts Order And Allocation Trial Opinion) and ECF No. 9168 (Motion For Leave to Amend Proof Of Claim Filed by Law Debenture Trust Company of New York).

[16] <u>See</u> ECF No. 15734 (Response To U.S. Debtors Motion For Clarification And/Or Reconsideration Of May 12, 2015 Allocation Trial Opinion And Order)). The Indenture Trustee also was a party to briefing submitted by the Bondholder Committee and the indenture trustee for the Crossover Bonds with respect to post-petition interest. <u>See</u> ECF No. 14025 (Opening Brief Of Ad Hoc Group Of Bondholders, Law Debenture Trust Company Of New York, As Trustee, And The Bank of New York Mellon, As Trustee, With Respect To Monitors' Request That Court Determine Bondholder Entitlement To Post-Petition Interest And Additional Bondholder Claims Issues Under U.S. Law Filed by Ad Hoc Group of Bondholders); ECF No. 14053 (Response)).

mean that "the bondholders would compensate the Indenture Trustee for any services, expenses, or disbursements whatsoever").

24. It is important to note that 90% of the NNCC Notes have at all relevant times been held by *two* institutions. At no point during the cases did the Indenture Trustee provide a budget, estimate, work plan, or fee update to the two NNCC Noteholders. That initiative might have avoided the instant dispute.

25. Lastly, while the Plan provides for the Debtors to fund *up to* $4.25 million of the Indenture Trustee's reasonable and documented fees, that provision does not constitute a finding of reasonableness. The portion of the Asserted Fees that is determined to be allowable ultimately may be less than $4.25 million, and the Plan's provisions are not admissions to the contrary. Indeed, the Plan contemplates that any portion of the $4.25 million that is not used to satisfy the Asserted Fees will be returned to NNI for distributions to other unsecured creditors. See Plan at 48 (§ 7.13(b)).

**RESERVATION OF RIGHTS**

26. The NNCC Noteholders expressly reserve any and all rights, claims, and defenses with respect to the Objection, including the right to file pleadings in further support of the Objection and in response to any pleading(s) filed by the Indenture Trustee.

**CONCLUSION**

WHEREFORE, the NNCC Noteholders respectfully request that the Court (A) sustain the Objection; (B) enter the Confirmation Order confirming the Plan, approving the SPSA, and containing the Proposed Fee Procedures; (C) following a briefing schedule agreed to by the Indenture Trustee and the NNCC Noteholders, enter the Trustee-Fee Approval Order awarding the Indenture Trustee only those fees and expenses that are determined to be allowable under the Indenture and applicable law; and (D) award such other, further relief as the Court deems appropriate.

Dated: Wilmington, Delaware
January 9, 2017

Respectfully submitted,

/s/ *Joanne Pileggi Pinckney*
Joanne Pileggi Pinckney (DE No. 3344)
Seton C. Mangine (DE No. 5574)
**PINCKNEY, WEIDINGER, URBAN & JOYCE LLC**
(302) 504 1497 (Telephone)
3711 Kennett Pike, Suite 210
Greenville, Delaware 19807

-and-

James C. Tecce (admitted pro hac)
Daniel S. Holzman (admitted pro hac)
**QUINN, EMANUEL, URQUHART & SULLIVAN LLP**
52 Madison Avenue, 22nd Floor
(212) 849-7000 (Telephone)
New York, New York 10010

*Counsel to Solus Alternative Asset Management LP and PointState Capital LP*