FILED
2017 JAN 10 AM 10:47
CLERK
US BANKRUPTCY COURT
DISTRICT OF DELAWARE

3417 Locust Cove Rd
Gainesville, GA 30504

January 3, 2017

Case No 09-10138(KG)
Nortel Networks Inc., et al

**Opposition to motion to approve Settlement and Support Agreement**

To the Debtors, and the Clerk of the US Bankruptcy Court

It is with considerable concern that I am writing this letter to file an Opposition to the Motion presented by the Debtors to approve the Settlement and Plans Support Agreement (SPSA).

Since I appeared in Court, in 2011 and 2012, as a member of the "Ad Hoc DCP Group" of ex-employees of Nortel Networks Inc involved in the Deferred Compensation Settlement, I have kept reasonably in touch with the proceedings for the last four years. Back then, in 2012, it appeared that the Debtors were finally moving toward a settlement with a substantial amount of cash in the bank from the sale of assets. However, through these recent four plus years, I have not understood why so much time has been taken to come to an agreement to agree to the distribution of the significant quantity of cash, other than that the negotiators had no incentive to reach an agreement while they could continue to charge large fees for "no progress services."

I am now age 78. I was originally recruited by John Roth, then CEO of Nortel in Canada to join the company because of my experience in three large global companies. I had managed the Central and South America manufacturing operations of a Fortune 100 Company during the Peron era of high inflation and unstable currency, and then been a vice-president at Digital Equipment Corporation during the early days of the internet. I then went to Silicon Valley to be President of two successful start-up companies, and had learned about the Venture Capital culture. In addition, I had knowledge of Canadian management style as I had, in my early career, reported to the CEO of Canadian Industries Limited, specifically dealing with US Anti-Trust regulations for the DuPont empire in the 1960s and 1970s. When I was hired by Nortel Networks Inc, with a title of Vice-President, it was understood that I would be given, specially identified, short-term assignments to help with the strategic direction for Nortel, partially worldwide, and partially in the United States, where activities were still relatively new, following the Justice Department break-up of Bell Corporation in 1984, as a result of which Nortel had

essentially no operations in the United States, but began to build them after 1984. My last activity before joining Nortel was to be sent by US State Department to Moscow, soon after the Berlin Wall came tumbling down, to help set up systems to encourage small companies to grow in a free world. I had an office in Atlanta, GA – not in Richardson, TX, and travelled the world, as needed.

I eventually reached retirement age, and have remained in Atlanta, GA since then. Back in 2008, the year before Petition Day, I had been a Nortel retiree for some time, with a reasonable sized pension, deferred compensation plan distribution, Nortel retiree healthcare plan and other retiree benefits. With the disaster of January, 2009, all those retirement benefits hit a brick wall. Despite numerous attempts to reach a "quick and reasonable" settlement, there was a series of bureaucratic hurdles to navigate around, and I was forced to fall back on Medicare for healthcare insurance. The Deferred Compensation negotiations were not initiated until two years after Petition Day, and it then took two years of frustrating negotiation to reach a Settlement. Since that Settlement, four further years have passed with, apparently, little further progress.

It has been, however, clear that a detailed, hard line strategy has being taken for many years, to reduce claims, without recognition of rights. I experienced it during the Deferred Compensation negotiation. A more recent example is the 100 page Document 16997, which was filed with the Court on July 15, 2016, listing actions to close out, or modify, many of the claims of Nortel retirees eg pension, healthcare. Included in the Exhibit A, page 26, of that Document was a reduction of my pension claim # 3511, filed Sept 23, 2009, from $95,416.24 to $91,709.00. No explanation of this adjustment has been given to me other than that it was "...based on careful review..." Further review of the Document showed, on page 23, that an Objection had to be received by 4pm, August 5, 2016. It's not now clear when I received this Document, but given its filing date of July 15, 2016, and the time it takes for mail to be delivered, it is unlikely that I had much time to read and file an objection in the 21 days between July 15, and August 5. In summary, I was glad that I had only suffered a 3.89% reduction, and had not had to scramble to request an extension of the August 5, 2016 deadline. But the thought did cross my mind that there had probably been no recognition, or adjustment, for the time value of money over the last eight years.

I did then read several newspaper articles in November 2016, outlining the prospect of increased pension distributions in Canada and UK (partially as a result of the Brexit impact on the British currency). These articles raised my hopes that progress was finally being made. The number of letters I received from organizations offering to buy my claims also increased. A final resolution was perhaps coming soon.

It therefore came as a surprise, and disappointment, when I received the Ballot letter on December 13, 2016, asking for a vote on the Settlement and Plans Support Agreement to be received by January 9, 2017. The very detailed Document 17502 was filed with the Court on December 1, 2016. It is understandable that it took a few days to print and mail. But reading all the material that had to be found on the Epiq website and responded to by January 7, 2017 seemed an unreasonable requirement at this time of year. It also reminded me of a similar timeline crisis back in 2010 when the Debtors had used a similar schedule (Motion filed on December 22, 2010) to get approval to get the release of the money held in trust for the Deferred Compensation Plan if we did not object within a few days. This December 2016/January 2017 timeline has been made yet more difficult by the receipt in the mail on December 27, 2016 of Document 17589, which had apparently been filed with the Court on December 16, 2016, but still requiring a January 9 receipt of Objections.

There were several surprises in the extensive Document 17502. I was not surprised by the large amount of money that is available for distribution. During the Deferred Compensation negotiations, in 2010-2, I was aware of the sale of operating assets for substantial amounts of money. I was also well aware of the sale of the patents/ intellectual property to Rockstar, for $4.5 billion in 2011. However, I was surprised to read on pages 56-60 the very small amount of money that was injected post-Petition, to keep operations moving, and how quickly that was paid off.

I was also interested to read (Document 17502, page 27) that, on Petition Date in January 2009, there were 8,843 employees at Nortel Networks Inc (NNI), with "headquarters in Richardson, TX", and revenue was "over $4 billion in 2008" . Detail on page 62 shows that in July 2009, 5000 Nortel employees received job offers as a result of the sale in July 2009, of the CDMA and LTE Access Units to Ericsson for $1.1 billion. Detail on page 63, shows that in September 2009, "approximately 6,000 employees accepted employment offers with Avaya", when Avaya emerged as the highest bidder, at $900 million, in an auction of the Enterprise Solutions Business". Page 64 shows that in November 2009, the Optical Networking and Carrier Ethernet Business was sold to Ciena for $773 million, but there is no information about the number of employees that were involved. Several other operations, including the wireless business, were sold for substantial amounts of money and the Richardson, Texas headquarters building was sold in April 2011,for a net proceeds of $41 million. The remaining patents were sold in June 2011, after an extensive "stalking horse" agreement and auction, to Rockstar for $4.5 billion. Thus, there was a lot of cash in the JPMorgan escrow account by the end of 2011, when we were only half way through the Deferred Compensation Plan negotiations. Furthermore, it is clear that most of the 8,843 NNI employees, and most of the Members of the Deferred Compensation Plan, had found continuing jobs in their

same roles. A reasonable conclusion after reading Document 17502, is that there might only be a small number of NNI people in retirement, whose retirement might be open to a new review.

However, I also read in Document 17502, page 71, that "all post-retirement welfare and benefit plans were terminated as of June 30, 2013." At the time of Petition Date in January 2009, it had been understandable that certain benefits might be in jeopardy. Nobody had a good understanding of what was happening at Nortel at that time. However, I had spent some time, in 1996, as a project at Nortel, to evaluate the benefit of buying Hayes Computer Systems out of Chapter 11 bankruptcy. The name Hayes was well known at the time as the primary manufacturer of DSL modems to connect a computer in the home, via the telephone line, to the internet. I spent several days attending the bankruptcy court hearings, and negotiating with the appropriate people. It was clear that Hayes was still a profitable entity, which had fallen into bankruptcy as a result of an error, caused by a merger between its bank lenders. The benefits of buying the brand name and distribution channel for some of Nortel's planned new internet products, was very interesting. With that background and the knowledge that there was a lot of cash in the bank in the Nortel banks in 2011, it startled me to see that the "post-retirement welfare and benefit plans were closed as of June 30, 2013." I have received no communication in response to my enquiries back in 2012 about the status of my retiree benefits. It is possible that my enquiries were lost in the system. While I was an employee of NNI, always with an office in Atlanta, GA, I had changed assignments frequently, as I was reporting to the Canadian executive team, and undertook projects as they requested them. Much of my work was international. For a while I reported to the President of Bell Canada for the sale of some research programs to Silicon Valley based organizations. For some months the Voice Recognition business in Montreal reported to me, and I managed the Canadian based spin-off ventures in Ottawa. As a result, my travel expenses, and possibly my salary and benefit costs were transferred to other entities, and the accounting department records in Tennessee were lost after Petition Day. I know that when I retired, the HR Department in Bell Canada, Toronto reviewed my retirement benefits.

Perhaps the biggest surprise to me in Document 17502 was on page 46, where there is a detailed one page summary of the Deferred Compensation Plan Settlement. I got involved quickly in the Deferred Compensation Plan negotiation in December 2010, when the Debtors filed the Motion to get US Bank to release the money in the trust, because I was in retirement and understood just a little about how to gather information and resolve similar problems. Shortly after retirement from Nortel, I had been brought in as a consultant to an Israel headquartered, US public company, which had detected fraud in its US subsidiary, and that included the 401(k) Plan. It turned out to be a simple

problem to understand and resolve, but I also learned a lot about benefit plans, and 401(k) plans in US public companies. So in December 2010, when the Debtors filed the Motion to release the trust money from US Bank, I had some understanding of the issues. Some two years later, at the time of the Deferred Compensation Plan Settlement in December 2013, the terms offered by the Debtors included a complex three tiered approach for different groups of ex-employees, based on the size of their Claims. The offer appeared acceptable to several of the Members – especially as progress had been slow and difficult over the two years. However, a significant number of Members were penalized quite heavily by the offer. This caused a conflict between the Members, and subjected the minority to a significant reduction in order for the majority to reach an "acceptable settlement". During the negotiations, the Debtors acknowledged that the money had been put into a separate bank account (US Trust Bank), in a trust protected by law (a Rabbi trust, not excluded by "top hat" exclusions) – and that is all acknowledged in Document 17502, pages 45-46. However, the argument was made, during negotiations, by the Debtors, that there was not enough money in the Trust at the time of Settlement to pay any more than the offer. The Debtors refused to disclose the amount of money in the bank – and the negotiations reached a brick wall – and risked a collapse. So the Settlement was finally entered, after two years of frustrating negotiation, on December 14, 2012 with "$34.25 million to the Members, together with legal fees". Against this background, it is now horrifying to read (Document 17502, page 46) that, just a few days later, on February 15, 2013, US Bank turned over to NNI $44,127,775.52. This was considerably more than the payments to Members and the significant amount paid to attorneys. Furthermore, the distributions caused an additional problem for every Member, as the one time distributions caused a significant marginal income tax load, versus the annual income tax load to be incurred on a multi-year distribution plan. Thus, on reflection, the Settlement cannot be considered reasonable, or fair. A simple Settlement could have been reached that distributed all Claims at 100% from the Trust. It could have been done with four or five annual distributions from US Bank, a classical holder of 401(k) plan assets, to reduce the tax burden. The Settlement could have been done with fewer non-productive meetings, negotiated offers, counter-arguments and less frustration. The attorney fees would also have been less. Instead the Debtors negotiated hard and long, and grabbed $10 million from the bank, at the ex-employees expense. It is, therefore, also disturbing to go back and re-read carefully the Document 17502, page 46:

> "On December 14, 2012, the Debtors entered into a settlement agreement with the DCP Plaintiffs, pursuant to which the Debtors agreed to settle the claims of all participants in the Deferred Compensation Plan and their beneficiaries, transferees and assigns arising out of the Deferred Compensation Plan, including all claims against the Deferred Compensation Plan Trust and the assets held by

the Deferred Compensation Trust for a total payment of $34.25 million to the participants or their beneficiaries, successors, transferees or assigns as well as in satisfaction of certain fees and expenses of the DCP Plaintiffs and their attorneys. In exchange, the Debtors and certain other third parties received, among other things, broad releases from the participants in the Deferred Compensation Plan and their beneficiaries, successors, transferees and assigns, and an agreement that US Bank could turn over the assets held by Deferred Compensation Plan Trust."

The wording appears very positive, and the word "all" appears twice. However, it does not recognize that essentially all Members took a reduction on their claims, which had also been backdated to Petition Day, and some Members suffered a significant reduction. There had also been extensive, tiring negotiations, for which the Debtors negotiators received extensive compensation.

Continuing the same paragraph on Document 17502, page 46, the next two sentences give clear information about what happened in the next few days:

> "On January 23, 2013, the Bankruptcy Court approved the settlement. On February 15, 2013, US Bank turned over to NNI the assets held by the Deferred Compensation Plan Trust, which totaled $44,127,775.52"

There is no indication that the $10 million "left-over" went to JPMorgan. It was probably buried somewhere, or used as compensation for negotiators. Perhaps there should be a re-evaluation of the Settlement, wherein the $10 million, which belonged to the Members, should be returned to them.

With this background reading, I returned to the information in Document 17502 about my revised pension claim. It is clear that this is classified as a Class 3A claim. Clearly retiree benefits have also been classified with large buckets of other debt, for which the "estimated plan recovery" will be 55-61% (Document 17502, page 10). I called the voting information number in the Voting package (1-844-319-7735), and had a polite conversation with a lady who confirmed my observation that my pension claim would be considered a Class 3A. When I asked for information about other claims eg for discontinued retiree healthcare, she said that she did not have such information, but would put in a request for information to be sent to me. So far, no response has been received. Thus retiree benefits have once again been "pushed deeper into the black hole".

Given the circumstances, a Class 2 level Claim would appear more appropriate for Retirees. A very small change to the debt load could avoid further extensive negotiation, and respect the rights of retirees.

With this overview, I was surprised to receive the Document 17589, a few days later, on December 27, 2016. I think I understand the theme of the 37 page Document 17589. The big new concern appears to be that the US Pension Benefit Guarantee Corporation (PBGC), will be opposing the SPSA plan "in order for the PBGC to double dip out of NNI's assets, and thereby allow PBGC to better position itself as compared to other creditors of NNI and NNCC." (page 27). This sounds like a potential lengthy extension of the legal costs of resolving the issues. It appears to be made worse by the involvement by the Nortel Trade Claims Consortium (NTCC), who have bought claims, at a discount, and a are working to optimize their situation. The issue appears (page 26) to involve the status of NNCC (Nortel Networks Capital Corporation) which was formed in 1996 "exclusively as a pass-through financing entity for NNI". While I was not involved in the legal side of NNCC, I understood the purpose at the time. It was not easy to quantify the risks of such events as currency crises, because the corporate debt was spread out amongst several subsidiaries. It was important for operating executives to be able to review the balances easily, and that is why a consolidation strategy was chosen. My involvement in the role of NNCC increased in 1997 when the Asian Currency Crisis occurred. I spent several weeks in Hong Kong, Singapore and other important Asian financial centers in 1997, establishing financial balance sheet strategies to avoid negative impacts. History reports show that the crisis first became visible on July 2, 1997, when the Thai baht was forced to float and eventually dropped by more than 50%. That caused the regional crisis which the IMF moved to stabilize. The market stabilized for a few weeks until companies started announcing the financial impact on their balance sheets. Between October 20 and 23, the Hong Kong Hong Seng index dropped by 23%. (I was in Hong Kong on October 20). Surprisingly, the effect was not fully felt in the US until October 27, 1997, when the Dow Jones plunged 554 points, or 7.2% (I was back in Canada on that day discussing what Nortel needed to do). Fortunately, the Nortel Asian balance sheets were balanced and there was little impact to the financials -- but proposing a Budget for 1998 was very difficult.

I fully support the drive to get the big settlement completed. However, it would appear that there is a way to protect the NNI retirees, and that is to re-assign the pension and other retiree benefits to Class 2. That withdraws them from the costs and delays caused by further litigation.

My conclusion at this point is that I will oppose the Motion to approve the SPSA as presented. I will also file an Objection with this letter. Here are the grounds for my Objection and some simple recommended actions:

- ❖ The rights of Nortel retirees have not been correctly recognized.

I will not try to argue the legal case. However, it is clear from Document 17502, that there is now $7.3 billion cash in escrow with JPMorgan. There also appear to be other amounts that are in other corporate accounts, as detailed in several documents. Thus, there is enough money to settle a significant number of claims, and the NNI retiree claims should be recognized and not kept in negotiation and litigation.

- ❖ Too much time and money is being spent on litigation.

The charges for attorneys and their services now appear to be of the order of $2 billion, and rising steadily. When the Deferred Compensation Settlement was reached in 2012, practically all the $7.3 billion was in the escrow account. Since then, four years have passed, and little movement forward has occured – other than the expenditure of the second billion dollars on legal proceedings.

- ❖ Improper procedures are being used for negotiation and litigation.

  - At the time of the Deferred Compensation Plan Settlement, the terms offered included a complex three tiered approach for different groups of ex-employees, based on the size of the Claims. The offer appeared acceptable to several of the Members – especially as progress had been slow over the two years. However, a significant number of ex-employees were penalized quite heavily. This caused a conflict between the Members, and subjected the minority to a significant reduction in order to reach a total settlement. While the Debtors acknowledged that the money had been put into a separate bank account (US Trust Bank), in a trust protected by law (a Rabbi trust, not excluded by "top hat" exclusions). However, the argument was then made that there was not enough money in the Trust at the time of settlement to pay any more. The Debtors refused to disclose the amount of money in the bank – and the negotiations continued. So the Settlement was finally entered, after two years of frustrating negotiation, on December 14, 2012 for $34.25 million to the Members, together with legal fees. Against this background, it is horrifying to read (Document 17502, page 46) that on February 15, 2013, US Bank

turned over to NNI $44,127,775.52. This was considerably more than the payments to Members and attorneys. Furthermore, the distributions caused an additional problem for everyone, as the one time distribution caused a significant marginal tax load, versus the annual load to be incurred on a multi-year plan. Thus, on reflection, the Settlement cannot be considered reasonable, or fair. A simple Settlement could have been reached that distributed all Claims at 100% from the Trust. It could have been done with four or five annual distributions from the US Bank to reduce the tax burden. The Settlement could have been done with fewer non-productive meetings, negotiated offers, counter-arguments and less frustration. The attorney fees would also have been less. Instead the Debtors negotiated hard and grabbed $10 million from the bank, at the ex-employees expense.

- The July 2016 Document 16996 indicated what may be another simple way of reducing Claims – a simple 3.89% reduction in my pension claim, without any communication or explanation.

- Document 17052, page 10, indicates that my pension, and any other Claim, is designated Class 3A, and that this Class is expected to be allowed at only 55-61%.

- Other Retiree benefits, eg retiree healthcare, have been terminated.

With this background, I recommend two simple actions:

1. The NNI Retiree Benefits, including pensions and retiree healthcare, be classified as Class 2, and paid out at 100%. This will accelerate settlement and reduce further negotiations, which cost time and money.

2. The $10 million, taken by the Debtors from the Deferred Compensation Trust at US Bank, should be returned for distribution to the Members, at the discretion of the DCP Ad Hoc Committee.

In the event that immediate action is taken on these two recommendations, it is reasonable to re-classify my vote on the SPSA as a Class 2 vote – no vote. It appears that the Motion filed on December 16, 2016, would allow this. Document 17589, page 16, under Relief Requested, states "and granting them such other relief as this Court deems just and proper".

I look forward to the Court's response on my attempt to simplify, prioritize and resolve a few, relatively minor issues.

Faithfully submitted,

Robert Horne

Robert Horne

To: Clerk of United States Bankruptcy Court for District of Delaware,
824 Market Street, 3rd Floor,
Wilmington, DE 19801

Cleary Gottlieb Steen and Hamilton LLC
One Liberty Plaza,
New York, NY 10006
Attn: James Bromley and Liza Schweitzer

Morris, Nichols, Arsht and Tunnel LLP
1201 North Market Street,
PO Box 1347
Wilmington, DE 19801