## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------X
              :

*In re*                :     Chapter 11
               :

Nortel Networks Inc., *et al.*,[1]    :     Case No. 09-10138 (KG)
               :

           Debtors.      :     Jointly Administered
               :
               :
               :
---------------------------------------------------------X

## DEBTORS' MEMORANDUM OF LAW IN SUPPORT OF CONFIRMATION AND OMNIBUS REPLY TO OBJECTIONS TO CONFIRMATION OF THE FIRST AMENDED JOINT CHAPTER 11 PLAN OF NORTEL NETWORKS, INC. AND CERTAIN OF ITS AFFILIATED DEBTORS UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

**James L. Bromley, Esq. (admitted *pro hac vice*)**
**Lisa M. Schweitzer, Esq. (admitted *pro hac vice*)**
**CLEARY GOTTLIEB STEEN & HAMILTON LLP**
**One Liberty Plaza**
**New York, NY 10006**

-and-
**Derek C. Abbott, Esq. (No. 3376)**
**Andrew R. Remming, Esq. (No. 5120)**
**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**
**1201 North Market Street, 16th Floor**
**P.O. Box 1347**
**Wilmington, DE 19899**

*Attorneys for the Debtors and*
*Debtors-in-Possession*

Dated: January 19, 2017

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567), Nortel Networks (CALA) Inc. (4226) and Nortel Networks India International, Inc. (8667). The First Amended Joint Chapter 11 Plan of Nortel Networks Inc. and Certain of its Affiliated Debtors does not include a Chapter 11 Plan for Nortel Networks India International Inc. Contact information for the Debtors and their petitions are available at http://dm.epiq11.com/nortel.

## **Table of Contents**

PRELIMINARY STATEMENT ................................................................................1

BACKGROUND ................................................................................................4

    A.  Procedural History ................................................................................4

    B.  The Allocation Dispute ........................................................................6

    C.  The SPSA ............................................................................................9

    D.  The Plan ............................................................................................11

ARGUMENT ..................................................................................................11

I.       THE COURT HAS JURISDICTION AND NOTICE HAS PROPERLY BEEN
        GIVEN ......................................................................................11

    A.  Jurisdiction and Venue ......................................................................11

    B.  Notice and Solicitation ......................................................................11

    C.  Adequate Notice of Confirmation Hearing ........................................12

II.      SETTLEMENTS IMPLEMENTED UNDER THE PLAN ........................12

III.    RESPONSES TO OBJECTIONS ......................................................13

    A.  The NTCC Objection ........................................................................13

        i.    The Court Has Jurisdiction To Confirm The Plan ....................14

        ii.   The Allocation Order Has No Bearing on Jurisdiction..............17

        iii.  The Plan Complies With Applicable Law and Should Be Confirmed ......................25

            a.   The Crossover Bond Claims Are Properly Allowed Against the Debtors'
               Estates ............................................................................25

            b.   The Plan Does Not Unfairly Discriminate Against Any  Dissenting Class..........27

            c.   The SPSA Satisfies the Martin Factors and Should be Approved........................28

                a.   The SPSA Satisfies the First Martin Factor Because it Cements Increased
                  Recoveries for the Debtors' Creditors Notwithstanding Uncertain
                  Litigation Risks ............................................................29

                b.   The SPSA Satisfies the Fourth Martin Factor Because it Treats All
                  Creditors Equitably ......................................................30

            d.   The Allocation of Sale Proceeds to NNCALA Under the SPSA Is Reasonable ...34

    B.  The NNCC Noteholders Statement and Objection Confirmation......................35

    C.  The Debtors Have Resolved the Iowa Department of Revenue Objection ......................36

    D.  The Hanneman Objection Should be Overruled ............................................37

E.  The Amick Objection and the Demel Objections are Requests to Reconsider Resolved Claims and are Not Proper Objections to Plan Confirmation.............................................37

    i.  The Amick Objection.................................................37

    ii.  The Demel Objections .............................................38

        a.  Res Judicata and Waiver..................................40

        b.  The Purported Confirmation Objection .........................41

F.  The Horne Objection is Improper and Should be Overruled .............................................42

    i.  Classification of the NNI Retiree Benefits ...................................43

    ii.  The Deferred Compensation Settlement......................................44

G.  The Releases and Exculpation Comply with Third Circuit Law and Should Be Approved Over the U.S. Trustee Objection.........................................45

    i.  The SPSA Releases are a Necessary and Appropriate Aspect of the SPSA...............45

    ii.  The Binding Nature of the Third Party Releases Should Not be Disturbed .................46

    iii.  Exculpation of Key Contributors is Appropriate and Necessary................................48

IV.  THE PLAN MEETS ALL APPLICABLE REQUIREMENTS OF THE BANKRUPTCY CODE................................................54

A.  The Plan Complies with Section 1129(a)(1) of the Bankruptcy Code .............................54

    i.  The Plan Satisfies the Classification Requirements of Section 1122 of the Bankruptcy Code .................................................54

    ii.  The Plan Satisfies the Mandatory Plan Requirements of Section 1123 of the Bankruptcy Code. .................................................56

        a.  The Plan Designates Classes of Claims and Interests – § 1123(a)(1)....................56

        b.  The Plan Specifies Unimpaired Classes – § 1123(a)(2) .......................................56

        c.  The Plan Adequately Specifies the Treatment of Impaired Classes – § 1123(a)(3) .................................................56

        d.  The Plan Provides for the Same Treatment for Claims or Interests within the Same Class – § 1123(a)(4)...................................................56

        e.  The Plan Provides Adequate Means for its Implementation – § 1123(a)(5) .........57

        f.  The Plan Prohibits the Issuance of Non-Voting Equity Securities – § 1123(a)(6) .................................................58

        g.  The Plan Contains Appropriate Provisions with Respect to the Selection of Officers, Directors and Trustees – § 1123(a)(7) ...................................................58

    iii.  The Plan Appropriately Provides for Certain Discretionary Contents as Permitted by Section 1123(b) of the Bankruptcy Code.................................................59

    iv.  The Plan Complies with Section 1123(d) of the Bankruptcy Code.............................61

B.  The Plan Complies with Section 1129(a)(2) of the Bankruptcy Code .............................61

C.   The SPSA and Plan's Substantive Consolidation of NNI and NNCC is Appropriate.......62

D.   The Plan Has Been Proposed in Good Faith Pursuant to Section 1129(a)(3) of the Bankruptcy Code .................................................................................................................63

E.   The Plan Provides for Bankruptcy Court Approval of Payments for Services or Costs and Expenses Pursuant to Section 1129(a)(4) of the Bankruptcy Code ...........................66

F.   All Necessary Information Regarding Directors and Officers of the Debtors and Wind-Down Debtors Has Been Disclosed Pursuant to Section 1129(a)(5) of the Bankruptcy Code .................................................................................................................67

G.   The Plan Does Not Require Governmental Regulatory Approval Pursuant to Section 1129(a)(6) of the Bankruptcy Code ...................................................................................69

H.   The Plan Satisfies the Best Interest of Creditors and Interest Holders Test Pursuant to Section 1129(a)(7) of the Bankruptcy Code ....................................................................69

I.   Section 1129(a)(8) of the Bankruptcy Code Does Not Preclude Confirmation ................72

J.   The Plan Provides for Payment in Full Of All Allowed Priority Claims Pursuant to Section 1129(a)(9) of the Bankruptcy Code ....................................................................72

K.   At Least One Impaired Class of Claims That Is Entitled to Vote Has Accepted the Plan, Pursuant to Section 1129(a)(10) of the Bankruptcy Code ........................................73

L.   The Plan Is Feasible Pursuant to Section 1129(a)(11) of the Bankruptcy Code ..............73

M.   The Plan Provides for the Payment Of All Fees Under 28 U.S.C. § 1930 Pursuant to Section 1129(a)(12) of the Bankruptcy Code ....................................................................73

N.   Sections 1129(a)(13)-(16) of the Bankruptcy Code Are Inapplicable..............................74

O.   The Plan Complies with Section 1129(b) of the Bankruptcy Code...................................75

P.   Section 1129(c) of the Bankruptcy Code is Inapplicable .................................................77

Q.   The Plan Complies with Section 1129(d) of the Bankruptcy Code Because It Is Not an Attempt to Avoid Tax Obligations...............................................................................77

V.   THE CONFIRMATION ORDER SHOULD BE EFFECTIVE IMMEDIATELY...........77

CONCLUSION...................................................................................................................78

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

<u>Cases</u>

Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship,
526 U.S. 434 (1999)................................................................ 69-70

Boese v. Randolph-Wells Bldg. Corp (In re Randolph-Wells Bldg. Corp.),
332 F.2d 963 (7th Cir. 1964) ................................................ 47

Cullen v. Riley (In re Masters Mates & Pilots Pension Plan & IRAP Litig.),
957 F.2d 1020 (2d Cir. 1992)................................................ 23

DeVore v. Marshack (In re DeVore),
223 B.R. 193 (B.A.P. 9th Cir. 1998)...................................... 47

DeVore v. Am. S.S. Owners Mut. Prot. & Indem. Ass'n, Inc. (In re Prudential Lines, Inc.),
170 B.R. 222 (S.D.N.Y. 1994)..............................................17-18, 20

E. Minerals & Chems. Co. v. Mahan,
225 F.3d 330 (3d Cir. 2000)................................................ 40

Eddy v. Nat'l Union Fire Ins. Co. ( In re Medical Asset Mgmt.),
249 B.R. 659 (W.D. Pa. 2000) ............................................ 23

Greyhound Lines, Inc. v. Rogers (In re Eagle Bus Mfg., Inc.),
62 F.3d 730 (5th Cir.1995) ................................................ 46-47

In re Adelphia Commc'ns Corp.,
368 B.R. 140 (Bankr. S.D.N.Y. 2007) ................................ 70

In re ANC Rental Corp., Inc.,
278 B.R. 714 (Bankr. D. Del. 2002) .................................... 60

In re Apex Oil Co.,
118 B.R. 683 (Bankr. E.D. Mo. 1990) ................................ 67, 68

In re Armstrong World Indus.,
348 B.R. 136 (D. Del. 2006) ................................................ 54-55

In re Bd. of Dirs. of Hopewell Int'l Ins. Ltd.,
258 B.R. 580 (Bankr. S.D.N.Y. 2001) ................................................................ 20

In re Beyond.com Corp.,
289 B.R. 138 (Bankr. N.D. Cal. 2003) ............................................................... 67

In re Calpine Corp.,
2007 WL 4565223, No. 05-60200(BRL), (Bankr. S.D.N.Y. Dec. 19, 2007) .................... 46-47

In re DBSD N. Am., Inc.,
419 B.R. 179 (Bankr. S.D.N.Y. 2009) ................................................................ 47

In re Drexel Burnham Lambert Grp., Inc.,
138 B.R. 723 (Bankr. S.D.N.Y. 1992) ................................................................ 66

In re Genco Shipping & Trading Ltd.,
513 B.R. 233 (Bankr. S.D.N.Y. 2014) ................................................................ 46

In re Genesis Health Ventures, Inc.,
266 B.R. 591 (Bankr. D. Del. 2001) ............................................................. 64, 65

In re Indianapolis Downs, LLC
486 B.R. 286 (Bankr. D. Del. 2013) ............................................................. 46, 47

In re Jersey City Med. Ctr.,
817 F.2d 1055 (3d Cir. 1987) .......................................................................... 55

In re Lapworth,
No. 97-34529 (DWS), 1998 WL 767456 (Bankr. E.D. Pa. Nov. 2, 1998) ..................... 61

In re Leslie Controls, Inc.,
Case No. 10-12199 (CSS), 2010 WL 4386935 (Bankr. D. Del. Oct. 28, 2010) ............... 50

In re Lisanti Foods Inc.,
No. 05-3912, 2007 WL 2212720 (3d Cir. 2007) .................................................... 62

In re Martin,
91 F.3d 389 (3d Cir. 1996) ............................................................................. 13

In re Nortel Networks, Corp.,
2016 ONCA 332 (Can. Ont. Ct. Appeal) ............................................................... 8

In re Nortel Networks, Inc.,
522 B.R. 491 (Bankr. D. Del. 2014) ................................................................... 33

In re Nutritional Sourcing Corp.,
398 B.R. 816 (Bankr. D. Del. 2008) ................................................................... 32-33

In re Ponton,
446 F. App'x 427 (3d Cir. 2011) ....................................................................... 23

In re Printing Dimensions, Inc.,
153 B.R. 715 (Bankr. D. Md. 1993) .................................................................. 66

In re PTL Holdings LLC,
No. 11–12676 (BLS), 2011 WL 5509031 (Bankr. D. Del. Nov. 10, 2011) ...................... 50

In re PWS Holding Corp.,
228 F.3d 224 (3d Cir. 2000).............................................................................. 50

In re S & W Enter.,
37 B.R. 153 (Bankr. N.D. Ill. 1984) ................................................................... 54

In re Sabine Oil & Gas Corp.,
548 B.R. 674 (Bankr. S.D.N.Y. 2016).............................................................. 21, 22

In re Sherwood Square Assocs.,
107 B.R. 872 (Bankr. D. Md. 1989) ................................................................... 67

In re St. Hill,
2005 Bankr. Lexis 3326 (Bankr. E.D. Pa. 2005) ................................................... 40

In re Stratford Assocs. Ltd. P'ship,
145 B.R. 689 (Bankr. D. Kan. 1992) .................................................................. 67

In re Texaco, Inc.,
84 B.R. 893 (Bankr. S.D.N.Y. 1988) ................................................................. 68

In re Trans World Airlines, Inc.,
261 B.R. 103 (Bankr. D. Del. 2001) ................................................................... 60

In re Tribune Co.,
472 B.R. 223 (Bankr. D. Del. 2012), aff'd in part, vacated in part on other grounds, No.
08-13141, 2014 WL 2797042 (D. Del. June 18, 2014) ...................................... 18

In re W.R. Grace & Co.,
475 B.R. 34 (D. Del. 2012)...................................................................28, 63-64, 65

In re Wash. Mut., Inc.,
442 B.R. 314 (Bankr. D. Del. 2011) ................................................................... 49

In re Wash. Mut., Inc.,
461 B.R. 200 (Bankr. D. Del. 2011), vacated in unrelated part, No. 08-12229 (MFW),
2012 WL 1563880 (Bankr. D. Del. Feb. 24, 2012) ........................................18, 22-23, 25

In re Wash. Mut., Inc.,
No. 12-272(GMS), 2015 WL 470551 (D. Del. Feb. 2, 2015) ........................................... 22

Ivanhoe Bldg. & Loan Ass'n v. Orr,
295 U.S. 243 (1935).................................................................................... 25, 75

John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.,
987 F.2d 154 (3d Cir. 1993)............................................................................... 55

Lubrizol Enters., Inc. v. Richmond Metal Finishers, Inc.,
756 F.2d 1043 (4th Cir. 1985) ............................................................................ 60

MW Post Portfolio Fund Ltd. v. Norwest Bank Minn (In re Onco Investment Co.),
Nos. 04-10558, 04-54122(JBR), Civ. 04-1543-SLR, 2005 WL 2401908 (D. Del. Sept.
29, 2005) .................................................................................................. 23

Nat'l Labor Relations Bd. v. Bildisco & Bildisco (In re Bildisco),
682 F.2d 72 (3d Cir. 1982), aff'd, 465 U.S. 513 (1984).................................................. 59-60

The Pines at Edgewood Ctr. V. Flash Island (In re Whispering Pines Estates, Inc.),
369 B.R. 752 (B.A.P. 1st Cir. 2007).................................................................18, 20-21

Pulver Com, Inc. v. Medialive Int'l Inc. (In re Key3Media Grp., Inc.),
336 B.R. 87 (Bankr. D. Del. 2005), aff'd, Nos. 03-10323 (MFW), 05-828-SLR, 2006 WL
2842462 (D. Del. Oct. 2, 2006) ........................................................................... 28

Selkridge v. United of Omaha Life Ins. Co.,
360 F.3d 155 (3d Cir. 2004)............................................................................... 40

Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.,
872 F.2d 36 (3d Cir. 1989)................................................................................ 59

U.S. Bank Nat'l Ass'n v. Wilmington Tr. Co. (In re Spansion),
426 B.R. 114 (Bankr. D. Del. 2010) ...................................................................... 45

**Rules and Statutes**

11 U.S.C. § 101 ..................................................................................................... 68

11 U.S.C. § 105 ..................................................................................................... 10

11 U.S.C. § 363 ................................................................................................. 15, 22

11 U.S.C. § 503 ....................................................................................................... 6

11 U.S.C. § 1114 ................................................................................................... 73

11 U.S.C. § 1122 ................................................................................................... 54

11 U.S.C. § 1123 ................................................................................................... 59

11 U.S.C. §§ 1126 ................................................................................................. 72

11 U.S.C. §§ 1129 ................................................................................................. 72

28 U.S.C. § 157 ..................................................................................................... 11

28 U.S.C. § 1334 ................................................................................................... 11

28 U.S.C. § 1408 ................................................................................................... 11

28 U.S.C. § 1409 ................................................................................................... 11

28 U.S.C. § 1930 ................................................................................................... 73

Fed. R. Bankr. P. 3020 ........................................................................................... 77

Fed. R. Bankr. P. 6004 ........................................................................................... 78

Fed. R. Bankr. P. 6006 ........................................................................................... 78

Fed. R. Bankr. P. 8007 ........................................................................................... 19

Fed. R. Bankr. P. 9019 .................................................................................. 6, 10, 13

**Other Authorities**

H.R. Rep. No. 95-595 (1977) ............................................................................ 54, 61

S. Rep. No. 95-989 (1978) ................................................................................ 54, 61

Nortel Networks Inc. ("NNI"), a Delaware corporation, and certain of its affiliated

Debtors and Debtors-in-Possession[2] (excluding Nortel Networks India International, Inc.

("NNIII")) (collectively with NNI and excluding NNIII, the "Debtors") hereby submit this

memorandum of law (the "Memorandum") in support of entry of an order (the "Confirmation

Order") confirming the First Amended Joint Chapter 11 Plan of Nortel Networks Inc. and

Certain of Its Affiliated Debtors, dated December 1, 2016 [D.I. 17501] (the "Plan"), as

supplemented by the Plan Supplement [D.I. 17644] (the "Plan Supplement"), and in opposition

to (i) the Objection of the Nortel Trade Claims Consortium [D.I. 17686] (the "NTCC

Objection"), (ii) the joinder of Liquidity Solutions, Inc. to the NTCC Objection [D.I. 17689] (the

"LSI Joinder"), (iii) the Objection of Solus Alternative Asset Management LP and PointState

Capital LP [D.I. 17687] (the "NNCC Noteholders Statement and Objection"), (iv) the Objection

of the Iowa Department of Revenue [D.I. 17678] (the "Iowa Department of Revenue

Objection"), (v) the Objection of Kent Hanneman [D.I. 17684] (the "Hanneman Objection"), (vi)

the Objection of Linda Amick [D.I. 17685] (the "Amick Objection"), (vii) the Objection of

Ernest Demel [D.I. 17673] and the accompanying Motion to Replace the Stipulation Agreement

with a New Contract [D.I. 17700] (together, the "Demel Objections"), (viii) the Limited

Objection of the U.S. Trustee [D.I. 17683] (the "U.S. Trustee Objection") and (ix) the

Opposition of Robert Horne to the Motion to Approve the Settlement and Support Agreement

[D.I. 17701] (the "Horne Objection") (collectively, the "Objections").

## PRELIMINARY STATEMENT

1.      The Plan represents the culmination of the Debtors' efforts over the last several

years, working closely with their creditor constituents, to finally resolve the contentious disputes

---

[2]      Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the First Amended Joint Chapter 11 Plan.

regarding the allocation of the billions of dollars of escrowed sale proceeds, and to reach closure

by resolving various other claims by and against the Debtors, their foreign affiliates and major

creditors of the various estates.  The overwhelming acceptance of the Plan by the Debtors'

creditors and the lack of significant objections filed against the Plan, excluding the votes and

objections by the members of the Nortel Trade Claims Consortium and a few other claims

traders, resoundingly speak to the success of the Debtors' efforts.  The implementation of the

SPSA and the Plan finally allow the Debtors to distribute the Sale Proceeds and the Debtors'

remaining assets to their creditors, and to wind down their estates and close these cases.

Confirmation of the Plan represents the best and only prospect for bringing an end to these cases

while preserving and maximizing the value of the Debtors' estates.  Absent the settlements that

have been heavily bargained for and achieved, the Debtors expect that protracted and expensive

litigation would continue on between and among the various Nortel estates and their creditors,

related to the allocation of proceeds, other intercompany claims, and the distribution of assets by

the Debtors and their foreign affiliates to their respective creditors.  Indeed, the settlements today

result from zealous advocacy and hard bargaining over the course of years of mediations, a

cross-border 21-day trial, appeals to courts in the United States and in Canada and, most

recently, several months of mediation efforts overseen by the experienced former Chief Judge of

the United States District Court for the District of Delaware, Joseph J. Farnan.  It is time to bring

these cases to conclusion, and the Debtors strongly believe the SPSA and the Plan is the path to

do so.  Through their votes in favor of the Plan and their lack of confirmation objections, the

Debtors' creditors have shown that they overwhelmingly agree.

        2.      A mere handful of objections have been filed to the Plan and remain outstanding,

most of which can be summarily addressed, as discussed herein.  The most strident objectors to

the Plan – five claims traders comprising the NTCC – continue to complain that the SPSA is

unfair, the Plan treats them unfairly and that as creditors who hold and continue to purchase

claims against the Debtors, they have a blocking vote on any settlement of the Allocation

Dispute that they intend to exercise until they are given more money.  Each of these arguments

fails on its face.  The SPSA falls well within the range of reasonable settlements as evidenced,

among one of many ways, in that the NTCC does not dispute that the SPSA allocates more

dollars to the Debtors than the Court's own prior Allocation Decision ever would have.  The

Debtors' unsecured creditors are in no way being discriminated against under the Plan as

compared to bondholders.  Indeed, the NTCC's complaint is not that they should receive *pari*

*passu* distributions with the bondholders and other unsecured creditors, as the Plan provides and

the law requires, but that they should be treated better and receive more than others.  Finally, it

would defy logic or reason that the NTCC either had or ever could have the right to block a

settlement of the Allocation Dispute and a release of the Sale Proceeds that is supported by every

Debtor and Debtor affiliate that has a claim to the cash as well as all of the required parties under

the governing IFSA (as defined below), escrow agreements and Court orders.  The NTCC's

efforts to throw up phantom roadblocks, dressed up as baseless jurisdictional arguments, should

be rejected outright.

        3.      The Debtors, the Committee, and their various major creditors have worked hard

to develop the Plan and to bring these cases to conclusion.  As set forth in detail herein, the Plan

implements the SPSA, expedites the resolution of these Chapter 11 Cases and complies with all

applicable provisions of the Bankruptcy Code.  In light of such compliance, the overwhelming

support of impaired classes and the steadfast support from the SPSA parties of the fair and

equitable settlement contemplated therein, the Debtors respectfully request that the Court

confirm the Plan and close an important chapter in these Chapter 11 Cases.

## BACKGROUND

### A.    Procedural History

4.    On January 14, 2009 (the "Petition Date"), the Debtors, other than Nortel

Networks (CALA) Inc. ("NNCALA")[3] and NNIII,[4] filed voluntary petitions for relief under

chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States

Bankruptcy Court for the District of Delaware (the "Court"), which cases are consolidated for

procedural purposes only (the "Chapter 11 Cases").  The Debtors continue to operate as debtors

in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5.    The Office of the United States Trustee for the District of Delaware (the "U.S.

Trustee") has appointed an Official Committee of Unsecured Creditors (the "Creditors'

Committee," formerly the "UCC") in respect of the Debtors [D.I.s 141, 142], and an ad hoc

group of bondholders has been organized (the "Bondholder Group").  An ad hoc consortium of

claims traders holding approximately $150 million in trade claims[5] they acquired against the

Debtors (the "Nortel Trade Claims Consortium" or the "NTCC") organized itself and first

appeared in the Debtors' cases in 2015, after the Allocation Decision (defined below) was

handed down.

---

[3]    NNCALA filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on July 17, 2009, which was consolidated and is being jointly administered with the other Debtors' chapter 11 cases for procedural purposes [D.I. 1098].

[4]    NNIII filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on August 16, 2016, which was consolidated and is being jointly administered with the other Debtors' chapter 11 cases for procedural purposes [D.I. 17090].

[5]    Given that the NTCC's objection rests primarily on complaints about the amount of sale proceeds allocated to the Debtors compared to other estates and the Crossover Bonds' right to receive *pari passu* distributions under the Plan, as detailed herein, it is noteworthy that in addition to the approximately $150 million in U.S. trade claims held by the NTCC members, they also hold nearly $98 million in Crossover Bonds Claims and $22 million of purchased unsecured claims against the Canadian Debtors.  See First Am. Verified Statement of Counsel to the NTCC Pursuant to Bankruptcy Rule 2019, Nov. 30, 2016 [D.I. 17493].

6.　　　On the Petition Date, the Debtors' ultimate corporate parent Nortel Networks Corporation ("NNC"), NNI's direct corporate parent Nortel Networks Limited ("NNL," and together with NNC and their affiliates, including the Debtors, "Nortel"), and certain of their Canadian affiliates (collectively, the "Canadian Debtors")[6] commenced a proceeding with the Ontario Superior Court of Justice (the "Canadian Court") under the Companies' Creditors Arrangement Act (Canada) (the "CCAA"), seeking relief from their creditors (collectively, the "Canadian Proceedings") and a monitor, Ernst & Young Inc. (the "Monitor"), was appointed by the Canadian Court.  The CCC is an ad hoc committee of major creditors having claims only against the Canadian Debtors.  Also on the Petition Date, the High Court of Justice in England and Wales (the "English Court") placed nineteen of Nortel's European affiliates, including Nortel Networks UK Limited ("NNUK") and certain of its affiliates located in Europe, the Middle East and Africa (collectively, the "EMEA Debtors"),[7] into administration (the "UK Proceedings") under the control of court-appointed administrators and foreign representatives (the "Joint Administrators").  Additionally, certain of the EMEA Debtors' affiliates have not commenced administration proceedings, but are under the control of their respective directors (the "EMEA Non-Filed Entities").

7.　　　On May 28, 2009, NNSA commenced secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC) No. 1346/2000 on Insolvency Proceedings in the Republic of France  (the "French Secondary Proceedings," and

---

[6]　　　The Canadian Debtors include the following entities:  NNC, NNL, Nortel Networks Technology Corporation, Nortel Networks Global Corporation, Nortel Networks International Corporation, Nortel Communications Inc., Architel Systems Corporation, and Northern Telecom Canada Limited.

[7]　　　The EMEA Debtors include the following entities:  NNUK, Nortel Networks (Ireland) Limited ("NNIR"), Nortel GmbH, Nortel Networks France S.A.S., Nortel Networks Oy, Nortel Networks Romania SRL, Nortel Networks AB, Nortel Networks N.V., Nortel Networks S.p.A., Nortel Networks B.V., Nortel Networks Polska Sp. z.o.o., Nortel Networks Hispania, S.A., Nortel Networks (Austria) GmbH, Nortel Networks, s.r.o., Nortel Networks Engineering Service Kft, Nortel Networks Portugal S.A., Nortel Networks Slovensko, s.r.o. and Nortel Networks International Finance & Holding B.V, but does not include, for the purposes of the SPSA and this Motion, NNSA.

together with the Chapter 11 Cases, the Canadian Proceedings and the U.K. Proceedings, the

"Nortel Insolvency Proceedings") pursuant to which a liquidator, Maître Cosme Rogeau (the

"French Liquidator"), and an administrator were appointed by the Commercial Court of

Versailles, France (the "French Court")[8] for NNSA.  On June 3, 2016, Stephen Taylor was

appointed as the Conflicts Administrator for NNSA (the "NNSA Conflicts Administrator").

### B.     The Allocation Dispute

8.     In the months following the commencement of the Nortel Insolvency Proceedings

in 2009, the Debtors and their various affiliates entered into the first of a series of transactions

pursuant to which they sold various business units and other assets to various purchasers in joint

sales with various of their foreign affiliates.  In furtherance of these efforts, the Debtors, the

Canadian Debtors and certain of the EMEA Debtors entered into the Interim Funding and

Settlement Agreement, dated as of June 9, 2009 (the "IFSA"),[9] which was approved by this

Court and the Canadian Court following a joint hearing on June 29, 2009.  Order Approving the

IFSA, June 29, 2009 [D.I. 993].  Among other things, the parties to the IFSA agreed not to

condition any joint sale of Nortel's businesses and assets on a prior agreement among the selling

parties regarding the allocation of the ultimate sale proceeds (plus accrued interest, the "Sale

Proceeds") from the relevant sale transaction.  See IFSA, ¶¶ 12(a), (b).  With this framework in

place, from 2009 to 2011, Nortel conducted an extensive series of court-approved sale

transactions generating in excess of $7.3 billion in net Sale Proceeds.

---

[8]     Lettre Recommandée, In re Nortel Networks SA, No. 2009J00465 (Fr. Versailles Comm. Ct. Jul. 11, 2011).

[9]     See Mot. Pursuant to 11 U.S.C. § 105(a), § 363, § 503 and Fed. R. Bankr. P. 9019 for an Order (A)
Approving the Interim Funding and Settlement Agreement, and (B) Granting Related Relief Ex.B [D.I. 874] (IFSA).

9.      As more fully set forth in the IFSA, the Selling Debtors,[10] the Joint Administrators, the Creditors' Committee and the Monitor entered into various court-approved escrow agreements with JP Morgan Chase Bank, N.A. and Citibank, N.A., as escrow agents (the "Escrow Agreements") to hold all Sale Proceeds in escrow accounts (the "Escrow Accounts"), pending either the agreement of the relevant parties or filed decisions of this Court and the Canadian Court regarding the allocation of the Sale Proceeds.  See id.  As of the date of this Motion, the Escrow Accounts hold approximately $7.3 billion in Sale Proceeds.

10.     The IFSA parties participated in a series of formal mediations in 2010, 2011, 2012, 2013 and 2015, as well as other information settlement discussions, but were unable to reach agreement as to the allocation of the escrowed Sale Proceeds.  Accordingly, the parties proceeded to engage in a joint trial before this Court and the Canadian Court in which the allocation of the Sales Proceeds were at issue (the "Allocation Dispute").

11.     On May 12, 2015, this Court and the Canadian Court simultaneously issued opinions deciding the Allocation Dispute (the "Allocation Decisions").  The Debtors, the Creditors' Committee, the Bondholder Group and certain other parties sought reconsideration and/or clarification of the decisions (such motion by the Debtors, the "Reconsideration Motion") before both this Court and the Canadian Court, which motions were largely denied on July 6, 2015.  Mem. Order on Mots. for Recons., July 6, 2015 [D.I. 15830].

12.     Numerous parties, including the Debtors, appealed this Court's Allocation Decision to the United States District Court for the District of Delaware (the "U.S. Allocation Appeal").  After further unsuccessful attempts by the Parties to resolve the Allocation Dispute through mediation, the District Court entered an order on May 24, 2016 certifying all U.S.

---

[10]     The term "Selling Debtors" refers to any Nortel debtor that signed or acceded to the IFSA or that signed one or more of the Escrow Agreements (as defined below).

appeals directly to the United States Court of Appeals for the Third Circuit, and the parties petitioned the Third Circuit to accept the appeal. The Third Circuit granted the parties' petitions for leave to appeal on August 9, 2016. Order Granting Certification, Case No. 16-8049 (3d Cir. Aug. 9, 2016) [D.I. 003112376646]. A briefing schedule for the appeal has not yet been set by the appeals court.

13. Concurrently with the appeal process in the United States, the Canadian Court's Allocation Decision has been contested in the Canadian courts. On July 16, 2015, the Debtors, the Creditors' Committee, the Bondholder Group and certain other parties filed notices of motion for leave to appeal the Canadian Court's Allocation Decision to the Court of Appeal for Ontario.[11] On May 3, 2016, the Court of Appeal of Ontario dismissed the motions for leave to appeal.[12] Between July 29 and August 1, 2016, the moving parties applied to the Supreme Court of Canada for leave to appeal the Court of Appeal's decision denying leave to appeal.[13] At the request of the parties to the SPSA, the deadline to respond to that motion has been extended to 30 days after the earlier of: (i) August 31, 2017; or (2) the date on which the settlement reached by the parties is terminated in accordance with its terms.[14]

---

[11]    U.S. Debtors' Notice of Mot. for Leave to Appeal, In re Nortel Networks Corp., No. M45309 (Can. Ont. App. Ct. July 16, 2015); UCC's Notice of Mot. for Leave to Appeal, In re Nortel Networks Corp., No. M45309 (Can. Ont. App. Ct. July 16, 2015); Bondholders' Notice of Mot. for Leave to Appeal, In re Nortel Networks Corp., No. M45309 (Can. Ont. App. Ct. July 16, 2015); Bank of New York Mellon's Notice of Mot. for Leave to Appeal, In re Nortel Networks Corp., No. M45309 (Can. Ont. App. Ct. July 16, 2015); NNSA Conflicts Administrator's Notice of Mot. for Leave to Appeal, In re Nortel Networks Corp., No. M45309 (Can. Ont. App. Ct. July 15, 2015); NTCC's Notice of Mot. for Leave to Appeal, In re Nortel Networks Corp., No. M45309 (Can. Ont. App. Ct. July 16, 2015).

[12]    In re Nortel Networks Corp., 2016 ONCA 332 (Can. Ont. Ct. Appeal).

[13]    U.S. Debtors' Notice of Application for Leave to Appeal, In re Nortel Networks Corp., No. 37117 (Can. S. Ct. July 28, 2016); UCC's Notice of Application for Leave to Appeal, In re Nortel Networks Corp., No. 37117 (Can. S. Ct. July 28, 2016); Bondholders' Application Record for Leave to Appeal, In re Nortel Networks Corp., No. 37117 (Can. S. Ct. July 29, 2016); Bank of New York Mellon's Notice of Application for Leave to Appeal, In re Nortel Networks Corp., No. 37117 (Can. S. Ct. July 29, 2016); NNSA Conflicts Administrator's Notice of Application for Leave to Appeal, In re Nortel Networks Corp., No. 37117 (Can. S. Ct. July 28, 2016); NTCC's Notice of Application for Leave to Appeal, In re Nortel Networks Corp., No. 37117 (Can. S. Ct. Aug. 1, 2016).

[14]    See Order Granting Stay Mot., In re Nortel Networks Corp., No. 37117 (Can. S. Ct. Nov. 18, 2016).

C.    **The SPSA**

14.    During the pendency of the appellate process, in 2016, the Canadian Debtors, the

Debtors, their affiliates and various other parties engaged in further settlement discussions,

overseen by former Judge Joseph Farnan, Jr. as mediator appointed by the U.S. District Court for

the District of Delaware.  These discussions ultimately led to a proposed settlement that resolved,

on an integrated basis, the Allocation Dispute and various other inter-estate matters and claims,

as memorialized in the Settlement and Plans Support Agreement (the "SPSA"), executed on

October 12, 2016.  U.S. Debtors' Notice of Execution of SPSA, Oct. 12, 2016 [D.I. 17249].

15.    The SPSA resolves the amounts that will be available to each Debtor estate for

distribution to creditors on a debtor-by-debtor basis as well as other inter-estate matters,

providing for, among other terms, (i) the percentages by which the Sale Proceeds will be

distributed to each Debtor and Global Debtor; (ii) the treatment of Crossover Claims; (iii) a cap

on recoveries for creditors who receive 100% of the amount of an Allowed Claim; (iv) the

elimination of post-Petition Date interest on any Allowed Claim against the Debtors or Canadian

Debtors; and (v) the cooperation and reasonable efforts of all signatories to implement the SPSA

and the transactions and actions contemplated therein and take any and all reasonably necessary

and appropriate actions in furtherance of consummation of the SPSA, the Disclosure Statement

and the Plan.  The SPSA also resolves various other intercompany claims, including claims of

the Debtors against the Canadian Debtors for various pre-bankruptcy and post-bankruptcy

transactions.[15]

16.    In addition, the SPSA sets out certain material conditions to the effectiveness of

the SPSA, including (i) obtaining approval orders from the Canadian Court and this Court

---

[15]    See Plan Ex. A § 4(c)-(d) for specific provisions.

authorizing the currency conversion of a portion of the Sale Proceeds from U.S. Dollars to

Canadian Dollars (completed on October 21, 2016)[16]; (ii) entry of an order or orders from the

U.K. Court, the U.K. Court for the French Main Proceeding, the French Court and the Beddoes

Court authorizing the respective Global Debtors to implement the SPSA (completed on

November 3, 2016); (iii) confirmation of a U.S. Plan and the Canadian Plan by the respective

courts; (iv) the dismissal with prejudice of various pending litigations; and (v) the condition that

the Plans Effective Date shall have occurred by no later than August 31, 2017.  The non-

satisfaction of any such conditions to the effectiveness of the SPSA can trigger termination of the

SPSA.[17]  On December 16, 2016, in furtherance of the Plan and implementation of the SPSA, the

Debtors, along with NNIII, filed their Motion for Entry of an Order Pursuant to 11 U.S.C. §§

105(a) and 363(b) and Federal Rule of Bankruptcy Procedure 9019 Approving Settlement and

Plans Support Agreement [D.I. 17589] (the "SPSA 9019 Motion").  Although the Plan is

intended to serve as a motion by the Debtors for approval of the SPSA settlement terms, the

Debtors and NNIII filed the SPSA 9019 Motion in furtherance of the SPSA as a plan settlement,

in an abundance of caution in the event the Plan is not confirmed by this Court with respect to

any of the Debtors included in the Plan, and also as a motion to approve the SPSA with regard to

NNIII, in order to further its Chapter 11 case and satisfy one of the conditions to the

effectiveness of the Plan, pending NNIII's filing and prosecution of its own Chapter 11 plan.[18]

---

[16]    See Order Approving Debtors' Entry into Additional Sale Proceeds Escrow Agreement, Oct. 21, 2016 [D.I. 17296].

[17]    See Plan Ex. A § 9(a) and 10(a) for specific provisions.

[18]    NNIII anticipates filing a Chapter 11 plan in the first quarter of 2017 that similarly will propose to implement the terms of the SPSA.

D.      **The Plan**

17.      On November 4, 2016, the Debtors filed with this Court their initial draft of the

Plan on behalf of all Debtors (other than NNIII) [D.I. 17347], and the accompanying Proposed

Disclosure Statement for the First Amended Joint Chapter 11 Plan [D.I. 17348].  Revised

versions of the Plan [D.I. 17452] and the Disclosure Statement [D.I. 17456] were filed on

November 29, 2016.  The Court held a hearing to consider the adequacy of the Disclosure

Statement on December 1, 2016, and approved the Disclosure Statement and the solicitation

procedures for soliciting votes on the Plan by an order dated December 1, 2016 [D.I. 17516] (the

"Disclosure Statement Approval Order").  The final version of the Plan [D.I. 17501] and

Disclosure Statement [D.I. 17502] were filed by the Debtors on December 1, 2016.

18.      The Court has scheduled a hearing (the "Confirmation Hearing") for Tuesday,

January 24, 2017, at 10:00 a.m. (E.T.) to consider confirmation of the Plan.

**ARGUMENT**

I.      **THE COURT HAS JURISDICTION AND NOTICE HAS PROPERLY BEEN GIVEN**

A.      **Jurisdiction and Venue**

19.      This Court has jurisdiction over these Chapter 11 Cases pursuant to 28 U.S.C.

§§ 157 and 1334.  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

This matter is a core proceeding under 28 U.S.C. § 157(b)(2), and the Bankruptcy Court has

exclusive jurisdiction to determine whether the Plan complies with the applicable provisions of

the Bankruptcy Code and should be confirmed.

B.      **Notice and Solicitation**

20.      In accordance with the Disclosure Statement Approval Order and Bankruptcy

Rule 3017(d), the Debtors, through their voting agent, Epiq Bankruptcy Solutions, LLC (the

"Voting Agent") served ballots, election forms, and associated documents on all holders of claims and interests in the Debtors, as appropriate, as follows: (1) for all parties in Classes 1, 2, 4, 5A and 5B, a Confirmation Hearing Notice and Notice of Non-Voting Status (each as defined in the Disclosure Statement Approval Order) and (2) for all parties in Classes 3A, 3B and 3C entitled to vote pursuant to the relevant provisions of the Bankruptcy Code, a Confirmation Hearing Notice, pre-addressed, pre-stamped return envelopes, the Disclosure Statement with all exhibits including the Plan, appropriate Ballots, and, as applicable, Beneficial Owner Ballots and Master Ballots.  See Aff. of Service of Solicitation Materials, Jan. 13, 2017 [D.I. 17710] (the "Solicitation Affidavit").

### C.    Adequate Notice of Confirmation Hearing

21.    In accordance with Bankruptcy Rules 2002, 3018, 3019, 6004, 6006, 9007, and 9014 and the Disclosure Statement Approval Order, including the solicitation procedures set forth therein, adequate notice of (i) the time for filing objections to confirmation of the Plan and (ii) the transactions contemplated thereby, (iii) the Confirmation Hearing, and (iv) the proposed rejection and assumption of executory contracts and unexpired leases set forth in the Plan (respectively, the "Rejected Contracts" and the "Assumed Contracts") was provided to all holders of Claims and Interests, counterparties to the Rejected Contracts, if any, and other parties in interest entitled to receive such notice under the Bankruptcy Code and the Bankruptcy Rules. See Solicitation Aff.  No other or further notice of the Confirmation Hearing is necessary or required.

### II.    SETTLEMENTS IMPLEMENTED UNDER THE PLAN

22.    The cornerstone of the Plan is a global compromise between and among the Debtors, the Canadian Debtors, the EMEA Debtors, and various of their respective creditor constituencies, as incorporated in the SPSA, regarding the Allocation Dispute and other open

inter-estate and claims matters, that enable the Debtors to begin distributions to their creditors and complete the winding down of their estates.  The SPSA results from years of hard bargaining among the various parties, and yields greater value to the Debtors than existing Court rulings and, for this reason and for all of the reasons explained in this Memorandum, the Plan should be confirmed.  As discussed in additional detail in the Disclosure Statement and the Plan, the Plan incorporates the fair, reasonable and equitable settlement agreement reached between the various Nortel estates under the SPSA and the Debtors therefore respectfully request the Court's approval of the SPSA through confirmation of the Plan.

23.     As noted previously, notwithstanding the Plan's provisions approving the SPSA as part of each confirmed Plan, the Debtors filed the SPSA Rule 9019 Motion that contains a more detailed description of the SPSA and the reasons the Debtors believe it should be approved. U.S. Debtors' Mot. for Entry of an Order Approving SPSA, Dec. 16, 2016 [D.I. 17589].  The Debtors hereby incorporate the SPSA Rule 9019 Motion into this Memorandum and request that the Court approve the SPSA through the SPSA 9019 Motion and through confirmation of the Plan.  As discussed below in Section III of this Memorandum, the objections to approval of the SPSA, including the objection of the NTCC, do not provide any basis for the Court to conclude that the SPSA does not satisfy the requirements of Bankruptcy Rule 9019 and the Third Circuit's decision in In re Martin and accordingly should be overruled.  91 F.3d 389 (3d Cir. 1996).

## III.    RESPONSES TO OBJECTIONS

### A.    The NTCC Objection

24.     On January 9, 2017, the NTCC filed the NTCC Objection.[19]  By its objection, the NTCC argues that (i) the Court has been divested of jurisdiction to confirm the Plan as a result of

---

[19]     Liquidity Solutions, Inc. ("LSI") filed a joinder and reservation of rights to the NTCC Objection (the "LSI Joinder") insisting that any reserve established to provide for a potential recovery by the NTCC in the event the

the NTCC's pending appeal of the Allocation Decision;[20] and (ii) the Plan includes provisions that are forbidden by law and is thus not confirmable.[21]  As discussed below, each of the NTCC's arguments is unsupported by the facts and applicable law, and accordingly the NTCC Objection should be overruled.

            i.       <u>The Court Has Jurisdiction To Confirm The Plan</u>

      25.    Before entering into the asset sales, the Selling Debtors agreed under the terms of the Court-approved IFSA that any distribution of the escrowed Sale Proceeds would be governed by the terms of the IFSA.  IFSA Art. 12.  And even though that agreement specifically provides for distribution upon agreement of the Debtors, Canadian Debtors and the other IFSA Parties, and even though all necessary parties have agreed to such a distribution, the NTCC questions the Court's jurisdiction to enter an order releasing the Sale Proceeds in accordance with the IFSA terms.  The NTCC is simply wrong in its position that its members — five claims traders holding approximately $150 million of claims against the Debtors — can frustrate the authority granted to the Debtors and retained by the Court under the IFSA merely through the NTCC's joinder in the Debtors' appeal of the Allocation Decision. The Court's Allocation Decision, which spoke to how Sale Proceeds would be distributed <u>in the absence of an agreement</u>, simply has no bearing on the rights of the Debtors, Canadian Debtors and the other IFSA Parties to enter into an agreement on a consensual allocation of Sale Proceeds pursuant to the Court-approved processes set forth in the IFSA and the Escrow Agreements.

---

NTCC's appeal of the Allocation Decision is successful must be in an amount sufficient to provide for the potential recovery to all general unsecured creditors.  LSI Joinder, Jan. 9, 2017 [D.I. 17689].  As discussed below, the objections of the NTCC and LSI are meritless and should be overruled.

[20]      NTCC Obj. ¶¶ 24-33.

[21]      <u>Id.</u> ¶¶ 42-50.

26.     The IFSA provides two distinct ways the Debtors can obtain a release of the
escrowed Sale Proceeds.  First, the IFSA permits a distribution of Sale Proceeds with an
"agreement of all of the Selling Debtors" as well as the "consent of the Creditors' Committee
and the Bondholders' Committee acting in good faith."  IFSA § 12(b)(i); IFSA § 12(g)(i).
Second, if a consensual resolution cannot be reached, the final and unappealable decision (or
decisions) of the relevant "dispute resolver" could release the escrow funds.  IFSA § 12(b)(ii).
This Court approved the Debtors' entry into the IFSA, and that order authorized the Debtors "to
take any and all actions that may be reasonably necessary or appropriate to perform all
obligations contemplated thereunder."  Order Approving the IFSA ¶, 2 June 29, 2009 [D.I. 993].
The Escrow Agreements, which also were approved by this Court, likewise mirror the IFSA,
allowing for the release of the Sale Proceeds with "a letter of direction jointly executed by the
Depositors and the Estate Fiduciaries."  See, e.g., Order Pursuant to 11 U.S.C. § 105(a) and
§ 363(b) (A) Approving Debtors' Entry Into the Enterprise Solutions Business Escrow
Agreement and (B) Granting Related Relief, Ex. A § 5(a)(i) Dec. 17, 2009 [D.I. 2167].

27.     The consensual resolution of the Allocation Dispute and release of Sale Proceeds
contemplated by the IFSA is now before the Court.  Each and every one of the remaining Selling
Debtors, as defined in the IFSA, along with the Monitor, the Creditors' Committee and the
Bondholder Group (collectively, the "IFSA Parties"), are signatories to the SPSA.  Because that
agreement determines the allocation of the Sale Proceeds, the IFSA and the Escrow Agreements
permit the release of the Sale Proceeds.  Indeed, the IFSA Parties recently exercised this
authority by transferring, with the Court's approval, over a billion dollars of Sale Proceeds from
escrow accounts with JP Morgan Chase Bank, N.A. in the U.S. to escrow accounts with Royal
Trust Corporation of Canada and converting the transferred currency into Canadian dollars.

Debtors' Mot. for an Order Authorizing Entry into Canadian Currency Escrow Agreement to

Facilitate Global Settlement, Oct. 12, 2016 [D.I. 17250]; Order Approving Debtors' Entry into

Additional Sale Proceeds from Escrow Agreement, Oct. 21, 2016  [D.I. 17296].

28.     While the NTCC, like any other creditor, may exercise its right to object to the

Debtors' consensual resolution of the Allocation Dispute based on the <u>Martin</u> factors (discussed

below), that is the extent of their voice as creditors in these cases.  The members of the NTCC

sold nothing in the asset sales.  The NTCC was not a party to the IFSA, let alone given a key to

the lockbox.  Nor was the NTCC a core party or even a participant in the Allocation Trial that it

purports to appeal from.  Rather, the NTCC is merely an unofficial agglomeration of five

claimsholders, formed <u>after</u> the Allocation Decisions were issued, and it does not purport to act

for the interests of anyone else other than its members.  Hr'g Tr. at 68:3-69:9, June 25, 2015

[D.I. 15810] (counsel to NTCC describing the NTCC as "newly formed"); Hr'g Tr. at 83:9-12,

December 20, 2016 (NTCC counsel confirming that it represents only the members of the

NTCC).

29.     Now, some six years after the execution of the IFSA, the NTCC brings an

unfounded procedural objection to the approval of the SPSA and confirmation of the Plan in a

transparent attempt to extract value for its members from other U.S. creditors by threatening to

derail the global settlement.  Because nothing in the Confirmation Order would "alter or modify"

the Allocation Order, the Court undoubtedly has jurisdiction to approve the SPSA and confirm

the Plan, and the NTCC's efforts to hijack this proceeding are entirely without merit.  While this

Court previously reached a decision about how the Sale Proceeds could be distributed in the

absence of an agreement—pursuant to the terms of the allocation protocol adopted by the Court

under the IFSA—that decision is now irrelevant to approval of the SPSA and confirmation of the

Plan.  Indeed, as the IFSA provides, and as this Court and numerous others have implored, the

IFSA Parties have agreed to a global settlement that determines the allocation, among other

things, and ends years of ongoing litigation.  The Court has jurisdiction to approve the settlement

and allow it to be effectuated.

ii.    <u>The Allocation Order Has No Bearing on Jurisdiction</u>

30.    The IFSA Parties bargained for the right to allocate the Sale Proceeds by

agreement, and this Court not only recognized that right when it approved the IFSA but

continually affirmed it as the allocation litigation proceeded.[22]  The NTCC nonetheless argues

that the IFSA Parties' bargained-for right to consensually distribute the Sale Proceeds has

evaporated, arguing that a notice of appeal completely divests this Court of jurisdiction over

matters related to the allocation and release of Sale Proceeds.  But the order sought by the

Debtors to approve the SPSA and confirm the Plan does not alter or modify the Allocation

Order, and thus the divestiture rule has no bearing.  Far from re-deciding the issue of how the

Sale Proceeds should be distributed absent an agreement, the Confirmation Order (which

implements an IFSA-authorized consensual resolution) merely renders the non-final Allocation

Order (which decided an alternative litigated IFSA resolution) irrelevant.  As the Confirmation

Order is collateral to the issues under appeal, the divestiture rule is inapplicable.  The NTCC's

contortion of this prudential doctrine in a meritless effort to further prolong these bankruptcy

proceedings turns the principles of judicial economy and certainty that animate the divestiture

rule on their head.

---

[22]    In establishing procedures for the dispute resolvers to determine allocation, this Court ordered that the parties' rights under the IFSA were preserved.  Order Approving Allocation Protocol ¶ 7, Apr. 3, 2013 [D.I. 9947] ("Nothing in this Order or the Allocation Protocol shall supersede or constitute a waiver of any rights and obligations under the IFSA.").  The parties also continued settlement discussions during the Allocation Trial.  <u>See e.g.</u> Trial Tr. 4949:21-23; Trial Tr. 5098: 11-13.

17

31.     As bankruptcy courts addressing the divestiture rule have noted, bankruptcy cases "involve[] the court's issuance of innumerable orders involving a myriad of issues, one or more of which may be on appeal at any given moment." Dicola v. Am. S.S. Owners Mut. Prot. & Indem. Ass'n, Inc. (In re Prudential Lines, Inc.), 170 B.R. 222, 244 (S.D.N.Y. 1994). Given the multifaceted nature of such proceedings, it would "severely hamper a bankruptcy court's ability to administer its cases in a timely manner" to divest such a court of jurisdiction during the pendency of appeals. In re Wash. Mut., Inc., 461 B.R. 200, 219 (Bankr. D. Del. 2011), vacated in unrelated part, No. 08-12229 (MFW), 2012 WL 1563880 (Bankr. D. Del. Feb. 24, 2012) (quoting The Pines at Edgewood Ctr. V. Flash Island (In re Whispering Pines Estates, Inc.), 369 B.R. 752, 758 (B.A.P. 1st Cir. 2007)).

32.     Bankruptcy courts in the Third Circuit have thus applied the divestiture rule sparingly, and in recent years have rejected attempts to filibuster bankruptcy cases by invoking the doctrine. See In re Washington Mut., Inc., 461 B.R. at 220 (observing that applying a creditor's interpretation of the divestiture doctrine could "possibly stall these bankruptcy cases indefinitely); In re Tribune Co., 472 B.R. 223, 231-32 (Bankr. D. Del. 2012), aff'd in part, vacated in part on other grounds, No. 08-13141, 2014 WL 2797042 (D. Del. June 18, 2014) (finding that the bankruptcy court retained jurisdiction to consider the distribution effects of subordination agreement despite the fact that the reconsideration decision subject to appeal addressed the effects of the same subordination agreement on a different distribution).

33.     Indeed, courts have repeatedly rejected broad applications of the divestiture rule and instead embraced a more tailored interpretation that "allows the least disruption of the court's administration of a bankruptcy plan." In re Prudential Lines, Inc., 170 B.R. at 244; see also In re Whispering Pines Estates, Inc., 369 B.R. at 758 ("The application of a broad rule that a

18

bankruptcy court may not consider any request filed while an appeal is pending has the potential to severely hamper a bankruptcy court's ability to administer its cases in a timely manner.").

34.    Bankruptcy courts frequently consider and approve settlements while other appeals are pending.  See Hr'g Tr. 4:23-5:23, In re L.A. Dodgers LLC, Case No. 11-12010 (KG) (Bankr. D. Del. Jan. 11, 2012) [D.I. 1176] (pending D. Del. appeal) (determining that the bankruptcy court had jurisdiction to consider the settlement where the court's approval would "essentially vacate the order" before the district court and not substantively change it); Hr'g Tr. 28:13-29:3, 36:16-20, 169:13-14, In re Trump Entm't Resorts, Inc., Case No. 14-12103 (KG) (Bankr. D. Del. Mar. 12, 2015) [D.I. 1129-3] (pending D. Del. appeal) (approving settlement linked to plan confirmation despite pending appeal of earlier ruling).  Indeed, appellate courts will often stay briefing schedules to permit bankruptcy courts the opportunity to approve settlements that would moot the pending appeals.[23]

35.    While this Court could not re-decide Allocation Order issues pending appeal, the Confirmation Order does no such thing.  Whereas the Allocation Decision determined the allocation of the Sale Proceeds in the absence of an agreement, the proposed Confirmation Order effectuates an alternative consensual allocation and release of the Sale Proceeds that is expressly authorized under the IFSA.  That is to say, the SPSA's consensual route forward obviates the need for the Court to decide allocation as if no such agreement existed.

36.    Indeed, the proposed Confirmation Order here stands independently from the decision this Court made acting as a dispute resolver. Fed. R. Bankr. P. 8007(e).  As other

_____

[23]    In In re Flinkote Co., the Third Circuit stayed appeals briefing to allow the bankruptcy court to consider a proposed settlement.  Letter Mot. to Stay Briefing Schedule Pending Settlement Negotiations, In re Flintkote Co., Case No. 14-3367 (3d Cir. Oct. 21, 2014).  The bankruptcy court subsequently approved the proposed settlement.  Debtors' Mot. for Order Approving Settlement Agreement at 8, In re Flintkote Co., Case No. 04-11300 (Bankr. D. Del. June 30, 2015) [D.I. 8977]; Order Approving Settlement Agreement, In re Flintkote Co., Case No. 04-11300 (Bankr. D. Del. July 22, 2015) [D.I. 9014].

bankruptcy courts have noted, a pending appeal does not divest jurisdiction to "decide issues and proceedings different from and collateral to those involved in the appeal." See also In re Bd. of Dirs. of Hopewell Int'l Ins. Ltd., 258 B.R. 580, 583 (Bankr. S.D.N.Y. 2001).  The relief sought here—approval of a chapter 11 plan and the compromises embodied within that plan—is squarely within this Court's jurisdiction under section 1129 of the Bankruptcy Code and leaves untouched the Allocation Order's rulings regarding the framework principles for allocation in the absence of agreement.[24]  Thus while the divestiture rule bars the Court from "tampering in some manner with the appealed order" or deciding "a contested issue identical to the one on appeal," a decision rendering an earlier order superfluous implicates neither scenario.  In re Prudential Lines, Inc., 170 B.R. at 244.

37.    The distinction between re-deciding issues and collateral orders speaks to the core principle behind the divestiture rule.  A lower court's alteration of an order pending appeal risks confusion as to which version of the order binds the parties, or what happens to the orders after an appellate decision.  Regardless of the answer, judicial resources would be expended needlessly, and the parties would be left without certainty.

38.    The Confirmation Order presents no such issues.  The Sale Proceeds will be distributed pursuant to the SPSA and the Plan, once effective.  If the agreement were not approved or effectuated, for whatever reason, the Allocation Order (once final and nonappealable) and any further court decisions would govern.  Judicial resources need not be spent litigating the appeal of the now-irrelevant Allocation Order, and the interested parties will have no question how the Sale Proceeds will be distributed:  regardless of which allocation theory applies in the absence of an agreement—whether the Allocation Order or whatever the

---

[24]    Notably, the Allocation Decisions did not finally allocate the Sale Proceeds but rather created a framework for subsequent rulings.

Third Circuit might decide—the SPSA will govern in this case. The NTCC's reliance on In re Whispering Pines Estates, Inc. underscores this distinction. 369 B.R. 752 (B.A.P. 1st Cir. 2007). There, the bankruptcy appellate panel held that the bankruptcy court erred when it allowed a secured creditor immediate relief from the automatic stay to foreclose on a property because it altered a prior order (embodied in a plan it had confirmed and which was pending on appeal) that allowed relief from the automatic stay several months in the future. Id. at 755-56, 761. Such a contradiction speaks to the core purpose of the divestiture rule to avoid confusion—could foreclosure happen immediately or only later? Was the appealed order vacated by the subsequent order? Here, by contrast, there is no such confusion or uncertainty. The proposed Confirmation Order here merely renders the prior Allocation Order irrelevant.

39.     Because there is no textual basis to argue that the Confirmation Order modifies the Allocation Order, the NTCC suggests that a notice of appeal divests a court's jurisdiction much more broadly, to all issues covering "the same subject matter" as the appealed order. NTCC Obj. ¶ 33. But courts have consistently defined the "subject matter" divested by reference to alterations of the prior orders. When presented with an interpretation of the divestiture rule now espoused by the NTCC, the bankruptcy court in In re Sabine Oil & Gas Corp. rejected it as an "absurd result" to "divest[] bankruptcy courts of jurisdiction over all issues relevant to confirmation on which the court has previously ruled and are the subject of a pending appeal." In re Sabine Oil & Gas Corp., 548 B.R. 674, 680 (Bankr. S.D.N.Y. 2016).

40.     Indeed, the NTCC's view of the divestiture rule contravenes both the principles of judicial economy and the rule it aims to advance, as well as the purpose of the bankruptcy regime. Requiring lengthy litigation on any appeal, however remotely related, before the consideration of settlements would waste judicial resources, delay proceedings in matters that

require flexibility and dispatch, and discourage consensual agreements that are the core of the bankruptcy regime. Expanding the divestiture rule to prevent a pending appeal from being found moot without a specific creditor's consent would give creditors unfathomable leverage over settlements.[25] As the <u>Sabine</u> court found, when faced with such an untenable prospect: "This cannot be, and is not the law." 548 B.R. at 680 (observing that such an expansion of the divestiture doctrine "would effectively cede control of the conduct of a chapter 11 case to disappointed litigants").

41.     The NTCC makes two further arguments, neither of which provide a basis to reject the Plan. First, the NTCC's assertion that the pending appeal cannot be dismissed or otherwise mooted without its consent is contradicted by appellate decisions within the Third Circuit. In <u>In re Washington Mutual, Inc.</u>, the bankruptcy court found it had jurisdiction to confirm a plan that incorporated a global settlement agreement, despite the possibility that confirmation might render moot a pending appeal. <u>In re Wash. Mut., Inc.</u>, 461 B.R. 200, 220 (Bankr. D. Del. 2011) (<u>vacated in part on other grounds</u>) ("[T]he [c]ourt declines to exercise its discretion under Rule 8005 not to consider the [m]odified [p]lan simply because it might render moot the [creditor]'s appeal . . . [Creditors] could have avoided this by seeking a stay pending appeal."). The district court later agreed, determining that the appeal had in fact been mooted by the intervening settlement, because the treatment of the securities at issue was "independently governed" by the settlement, and issuing an opinion would have been "merely advisory." <u>In re</u>

---

[25]     While the NTCC's contention that the Plan implements the flawed Allocation Decision is flatly incorrect—the Confirmation Order makes distributions on the basis of an agreement, not on the basis of some but not all claims against the various Nortel Debtors—the NTCC concedes that further orders implementing a decision under appeal are valid. NTCC Obj. ¶ 27. The Confirmation Order does, however, implement the Court's numerous other orders providing for consensual distribution of the Sale Proceeds. This Court approved the IFSA, the sale agreements and the Escrow Agreements all of which contemplated that the Sale Proceeds could be released consensually. IFSA; Enterprise Sale Order, Sept. 16, 2009 [D.I. 1514]; Order Pursuant to 11 U.S.C. § 105(a) and § 363(b) (A) Approving Debtors' Entry Into the Enterprise Solutions Business Escrow Agreement and (B) Granting Related Relief, Dec. 17, 2009 [D.I. 2167].

<u>Washington Mut., Inc.</u>, No. 12-272(GMS), 2015 WL 470551, at *4 (D. Del. Feb. 2, 2015).

Tellingly, the NTCC fails to cite a single case finding that a pending appeal cannot be mooted

without a creditors' consent, particularly where the creditor did not participate in the underlying

trial on the merits.[26]   Creditors are protected by bankruptcy law through both the <u>Martin</u> factors

as well as a consideration of whether the settlement is "fair and equitable."  <u>Eddy v. Nat'l Union</u>

<u>Fire Ins. Co. (In re Medical Asset Mgmt.)</u>, 249 B.R. 659, 663 (W.D. Pa. 2000).[27]   With these

protections in place, creditors are not permitted to demand an automatic stay of the plan

confirmation process whenever they have a pending appeal.  <u>See</u> <u>MW Post Portfolio Fund Ltd. v.</u>

<u>Norwest Bank Minn (In re Onco Investment Co.)</u>,  Nos. 04-10558, 04-54122(JBR), Civ. 04-

1543-SLR, 2005 WL 2401908 (D. Del. Sept. 29, 2005) (concluding that dismissal on the

grounds of mootness was required as the bankruptcy court's confirmation of the plan foreclosed

the possibility of relief to creditor-appellants); <u>In re Ponton</u>, 446 F. App'x 427, 429 (3d Cir.

2011) (dismissing as moot a debtor's appeal from the bankruptcy court's order lifting an

automatic stay because, while the appeal was pending, the bankruptcy court dismissed the

debtor's case).  The NTCC's rights, like those of every creditor of the Debtors, are embodied in

the <u>Martin</u> factors and the requirement that the Plan complies with the Bankruptcy Code, not in

---

[26]       The two cases cited by the NTCC in support of their argument on mootness are inapposite.  Neither <u>Medical Asset Management</u> nor <u>Cullen v. Riley</u> discuss mootness, let alone insulate a creditor's appeal from being found moot against their consent.  Both merely stand for the proposition that the bankruptcy court must consider the effect of the settlement on the rights of third parties. <u>Eddy v. Nat'l Union Fire Ins. Co. (</u> <u>In re Medical Asset Mgmt.)</u>, 249 B.R. 659, 633 (W.D. Pa. 2000); <u>Cullen v. Riley (In re Masters Mates & Pilots Pension Plan & IRAP Litig.)</u>, 957 F.2d 1020, 1026 (2d Cir. 1992).

[27]       The NTCC's view of the divestiture rule would essentially stay both Appellate and Bankruptcy Court proceedings, thereby incentivizing frivolous appeals.  As the <u>Washington Mutual</u> Court noted, when presented with a similar interpretation of the divestiture doctrine: "[t]o do as the [objecting creditor] requests would preclude the Court from dealing with confirmation of any plan of reorganization that implicates the [objecting creditor's appeal] and possibly stall these bankruptcy cases indefinitely."  461 B.R. at 220.

the nearly unfettered power to stay a bankruptcy proceeding on the grounds of a tenuous appeal

seeking an advisory opinion.[28]

     42.     Second, as an alternative to its jurisdictional argument, the NTCC proposes that

the Debtors establish an escrow account to fund any recovery if the NTCC successfully

prosecutes its appeal.  As an initial matter, the NTCC has no direct claim to the Sale Proceeds,

and thus a successful decision on appeal (which in any event would be moot if the Plan is

confirmed) would accrue to the benefit of the Debtors to only later be shared pro-rata with all

unsecured creditors.  Indeed, even assuming *arguendo* the NTCC had a right to continue to

pursue its appeal, any ruling that altered the Allocation Decision would inure to the benefit of all

of the affected Debtors' creditors (or at least similarly situated creditors) and not merely to the

benefit of the five creditors that comprise the NTCC, creditors who may at any time sell their

claims, as they have from time to time during the pendency of these cases.  In addition to the

other infirmities of the NTCC's proposal, it would unfairly discriminate against creditors in the

same class by reserving any gains to one group of creditors.  See Statement of the Creditors'

Committee in Supp. of Debtors' SPSA 9019 Mot. ¶ 2 [D.I. 17669].

     43.     Moreover, the NTCC's request for an escrow also would fundamentally reverse

the principle that a party seeking a stay pending appeal of a court order should post a bond.

Having failed to seek a stay of the Allocation Order, the NTCC effectively asks the Debtors to

post a bond to avoid staying enforcement of the Plans.  That is not the requirement of

Bankruptcy Rule 8007, which allows the Bankruptcy Court to require the appellant to post a

---

[28]     While this issue is not before this Court, the Debtors note that the NTCC's notice of appeal may not even be jurisdictionally valid, insofar as they may lack standing. The order under appeal followed the Allocation Trial, the Core Parties of which did not include the NTCC, which had not even been formed at that point.  Accordingly, if the Plan is confirmed, the Debtors will move to dismiss the NTCC's appeal in the Third Circuit.  Letter from U.S. Debtors at 3, Case No. 16-3446 (3d Cir. Jan. 10, 2017) [D.I. 3112508097] ("The Settlement and Support Agreement and the Plans require that these appeals will be dismissed with prejudice as of the effective date of the Plans.").

bond while seeking a stay of the matter subject to appeal.  Rather, the NTCC asks this Court to require the Debtors to bond a potential NTCC appeal through the proposed escrow account.  The NTCC's extortionate request for the Debtors to pay so that the NTCC may continue seeking its advisory opinion should be rejected out of hand.  See In re Wash. Mut., Inc., 461 B.R. at 218-20 (refusing objecting creditor's request to escrow securities during pending appeal).

iii.    The Plan Complies With Applicable Law and Should Be Confirmed

44.    The NTCC also argues that the Plan is not confirmable because a number of Plan provisions are purportedly forbidden by law.  The NTCC (i) objects to the allowance of the Crossover Bond Claims against the Debtors in the full amount of the Crossover Bonds principal and pre-petition interest;  (ii) objects to the size of the allocation of Sale Proceeds to NNCALA under the SPSA; (iii) asserts that the SPSA does not satisfy the standards of Bankruptcy Rule 9019 and the Martin factors; and (iv) asserts that the Plan does not satisfy the cram-down provisions of section 1129(b) of the Bankruptcy Code.  As the Debtors demonstrate below and elsewhere in this Memorandum, the Plan complies unequivocally with all confirmation requirements under the Bankruptcy Code and the SPSA amply satisfies the requirements for approval pursuant to Bankruptcy Rule 9019.  Accordingly, the Court can and should confirm the Plan.

a.    *The Crossover Bond Claims Are Properly Allowed Against the Debtors' Estates*

45.    The NTCC's argument that the Crossover Bond Claims should not be allowed in full as against the Debtors is entirely inconsistent with the facts and prior rulings of these Chapter 11 Cases and with governing law, including the Supreme Court precedent of Ivanhoe Bldg. & Loan Ass'n v. Orr, 295 U.S. 243 (1935), which declared that a holder of guaranteed debt is entitled to assert the full amount of its claim against both the primary obligor and the

25

guarantor.  The NTCC's argument is premised on a fundamental misunderstanding of both the

Allocation Decision and of the Plan.  Despite the NTCC's insistence otherwise, the Allocation

Decision in no way constituted a substantive consolidation of the Debtors and the Canadian

Debtors, and in fact, the Court expressly stated that "[t]o be clear, the Court is not ordering cross-

border, global substantive consolidation."  See Allocation Decision at 63; see also id. at 101

("Pro Rata Allocation is Not Substantive Consolidation.").

46.    Moreover, even if the Allocation Decision could be interpreted to somehow

effectuate a substantive consolidation of the Debtors and the Canadian Debtors (which it clearly

did not), the Plan does not implement the Allocation Decision, but incorporates the agreement

reached among the SPSA Parties with respect to numerous inter-estate matters, including the

allocation of the Sale Proceeds among the various Nortel estates in amounts different from – and

in fact more favorable to the Debtors than – the Allocation Decision. The SPSA is a separate

good-faith, arm's-length negotiated resolution of the Allocation Dispute.  The NTCC does not

(and cannot) argue that the SPSA and the Plan effectuate a substantive consolidation of the

Debtors and the Canadian Debtors and thus has put forward no valid basis for the inapplicability

of Ivanhoe to the Crossover Bond Claims.  The SPSA separately allocates Sale Proceeds to,

among others, the relevant Debtors, on the one hand, and the Canadian Debtors, on the other.

See Plan Ex. A § 2(c).  The Canadian Debtors' and the Debtors' assets are then separately and

independently distributed to the creditors of their respective estates.  Accordingly, the Crossover

Bondholders, who, as the NTCC itself acknowledges, hold "quintessential Ivanhoe claims,"

NTCC Obj. ¶ 45, are entitled to assert their claims in full against the Debtors (as guarantor) in

these Chapter 11 Cases and the Canadian Debtors (as primary obligor) in the Canadian Debtors'

proceedings and are entitled to receive separate distributions on these separate claims from the separate estates.

47.     In addition, the SPSA and the Plan are entirely consistent with the Court's order dated December 18, 2014 allowing the Crossover Bond Claims as general unsecured claims against NNI in the amount of outstanding principal and prepetition interest on account of NNI's guarantees of the Crossover Bonds, Order, Dec. 18, 2014 [D.I. 14950] (the "PPI Settlement Order"), of which the NTCC moved for reconsideration in the weeks leading up to the Confirmation Hearing.  The Court properly denied the NTCC's motion for reconsideration and the PPI Settlement Order remains in full effect in these cases.  Order, Dec. 20, 2016 [D.I. 17603]. Accordingly, the Plan simply implements the provisions of the PPI Settlement Order by recognizing the allowance of the Crossover Bond Claims and providing for the *pari passu* treatment of such claims with other General Unsecured Claims allowed against NNI and NNCC. The NTCC's objection to the Plan's treatment of the Crossover Bond Claims therefore has no support in the law or facts of these cases.

b.    *The Plan Does Not Unfairly Discriminate Against Any  Dissenting Class*

48.     The Plan does not unfairly discriminate against any dissenting Class and squarely satisfies section 1129(b) of the Bankruptcy Code.  As relates to the NTCC Objection, under Section 7.9 of the Plan, Class A-3A, in which the members of the NTCC hold a significant number of claims and which voted to reject the Plan, is treated on a *pari passu* basis with Classes containing claims of the same priority, including Class A-3B, which contains the Crossover Bond Claims.  The NTCC's argument that the Plan somehow unfairly favors the Crossover Bond Claims relies on a fundamental misreading of the Plan to confuse (i) the Crossover Bondholders' total potential recovery from the Debtors' and the Canadian Debtors' separate proceedings with

27

(ii) the Crossover Bondholders' pro-rata, *pari passu* treatment with all other holders of General Unsecured Claims — including the NTCC — in the Debtors' Chapter 11 Cases.[29]  Under the Plan, the Crossover Bondholders will receive the *same* recovery from the Consolidated Debtors as will the NTCC and the other creditors in Class A-3A, up until the Crossover Bondholders' recovery reaches 100% from aggregate distributions made by the Debtors and the Canadian Debtors, at which point creditors in Class A-3A alone (e.g., the NTCC) would be entitled to any additional recovery from the Consolidated Debtors.[30]  The Crossover Bondholders' ability to recover up to 100% of their claims from aggregate distributions in separate proceedings pursuant to Ivanhoe as a result of their bargained-for contractual guarantees does not render the recoveries to Class A-3A under the Plan, which are the same as recoveries provided to Class A-3B under the Plan, in any way discriminatory, unfair or inequitable.

c.        *The SPSA Satisfies the Martin Factors and Should be Approved*

49.        Unable to demonstrate any flaw in the Plan, despite admitting that the SPSA's projected recoveries are "higher under the SPSA than under the Allocation Decision," NTCC Obj. ¶ 65, the NTCC argues that the SPSA should not be approved, which would require this Court to find that it falls below the "lowest point in the range of reasonableness."  In re W.R. Grace & Co., 475 B.R. 34, 77-78 (D. Del. 2012) (citations omitted); Pulver Com, Inc. v. Medialive Int'l Inc. (In re Key3Media Grp., Inc.), 336 B.R. 87, 93 (Bankr. D. Del. 2005), aff'd, Nos. 03-10323 (MFW), 05-828-SLR, 2006 WL 2842462 (D. Del. Oct. 2, 2006).

---

[29]        For this reason, the cases cited by the NTCC, in which one class of claims received substantially greater recovery from the debtor than another class of claims with the same priority, are inapposite here.

[30]        As provided in the Disclosure Statement and the Budget and Recovery Analysis, both Class A-3A and Class A-3B have an estimated low-end recovery of 55.1%, while Class A-3A has an estimated high-end recovery of 61.2%, compared with an estimated high-end recovery of 56.7% for Class A-3B.

        a.        <u>The SPSA Satisfies the First Martin Factor Because it<br>Cements Increased Recoveries for the Debtors' Creditors<br>Notwithstanding Uncertain Litigation Risks</u>

50.      The NTCC argues that the SPSA does not satisfy the first <u>Martin</u> factor because the NTCC believes that the pending appeal of the Allocation Decision has a "high likelihood of success." NTCC Obj. at 23.  In its objection, the NTCC conveniently ignores fundamental facts, including that (i) the compromise of the Allocation Dispute is only one part of the SPSA, which settles a number of other inter-estate matters; (ii) if upheld, the Allocation Decision likely would result in a substantially lower allocation to the Debtors than the SPSA provides and also leaves various allocation and distribution issues unresolved for determination at a later time;  (iii) even if the Debtors could successfully overturn the Allocation Decision on appeal in the U.S. courts, no certainty exists that the Debtors' allocation arguments would be adopted by a U.S. court, and substantial uncertainty exists as to whether the Debtors could even obtain leave to appeal the Canadian Allocation Decision, with the Court of Appeal of Ontario having already dismissed the motions for leave to appeal and the issue pending before the Supreme Court of Canada.  In the event the Canadian Supreme Court were to affirm the denial of the Debtors' right to appeal the Canadian Court's Allocation Decision, the best outcome for the Debtors through a continued appeal in the U.S. would be to obtain conflicting decisions and generate a stalemate on allocation, with the associated uncertainties, delays and costs that would follow from that result. Therefore, while the Debtors did indeed zealously advocate for the ownership theory of allocation at trial and on appeal, there is no assurance that the Debtors could win on such a theory in the current posture of the litigation or otherwise obtain a more favorable allocation of Sale Proceeds pursuing the appeal of the Allocation Decision than under the SPSA.  Rather, a significant risk exists that the Allocation Decision would be affirmed, resulting in a lower allocation to the Debtors than under the SPSA.

51.     As provided in the Debtors' motion for approval of the SPSA, the Court has

ample basis to evaluate the SPSA pursuant to Bankruptcy Rule 9019 and the <u>Martin</u> factors,

including based on the record of these Chapter 11 Cases and of the Allocation Trial and appeal.[31]

There can be no legitimate dispute that the SPSA is well above the lowest point in the range of

reasonableness in light of the probability of success of continued litigation of the various dispute

settled by the SPSA, including the Allocation Dispute.

b.     <u>The SPSA Satisfies the Fourth Martin Factor Because it
Treats All Creditors Equitably</u>

52.     The SPSA and the Plan are solidly in the best interests of the Debtors and their

creditors and provide significant benefit to the Debtors' estates when compared with the

alternatives of continued costly litigation, as made clear from the overwhelming support of the

Plan by the Debtors' creditors and the absence of other Plan objections challenging the

settlement.  The NTCC's self-serving arguments against the Plan in the hope of improving its

own recoveries at the expense of the Debtors' other creditors should not be countenanced.  The

SPSA resolves a number of issues favorably for the Debtors, without the need for the various

parties to incur the costs and delay that would be required to reach resolution absent the

settlement, when compared with both the Allocation Decision, which either did not address such

issues or left such issues to be resolved by subsequent rulings with respect to the global claims

base, and the assumptions used by the Debtors in their Reconsideration Motion, which were

based on the model of Mr. Thomas Britven, which also did not address a number of issues

---

[31]     The NTCC's argument that the Court is unable to evaluate the Debtors' probability of success in further litigating the Allocation Dispute is illogical, and the cases it cites in support of that argument are inapposite here for a number of reasons, including that in each, the settlement at issue was entered into prior to the issuance of a decision as to the underlying issues.  Here, the Court oversaw a three-week trial and issued a lengthy decision on the Allocation Dispute, and thus has a more than adequate record on which to evaluate the probability of success of the appeal of the Allocation Decision.

resolved under the SPSA.[32]  Specifically, the SPSA provides the following benefits to the

Debtors' estates: (i) a greater allocation of Sale Proceeds to the Debtors than under the

Allocation Decision; (ii) a fixed, final and reasonable allocation of Sale Proceeds among the

Debtors; (iii) the assurance that creditors of NNL, including NNI, will receive their pro rata

portion of Sale Proceeds; (iv) the elimination of the risk of asset diversion or claim dilution of

NNI's recovery on its unsecured claim against NNL; (v) the resolution on a fixed and final basis

of certain payments to NNI from the Canadian Debtors and certain foreign affiliates; and (vi) the

granting of subrogation rights to NNI in connection with guaranteed claims.  As a result of the

resolution of these issues, the SPSA forges a pathway to the resolution of the Debtors' eight-year

long Chapter 11 Cases.

53.     In its objection, the NTCC invokes its dissatisfaction with the Allocation Decision

as a basis to criticize the SPSA and the Plan, and compares recoveries under the SPSA to

recoveries if the Court had adopted the Debtors' ownership theory at the Allocation Trial.  But

such a comparison has little relevance and is misleading in light of the Allocation Decision, in

which the Court rejected the Debtors' allocation theory.  The relevant comparison for purposes

of evaluating the reasonableness of the SPSA is to the allocation to the Debtors under the

Allocation Decision, which the NTCC acknowledges is lower than under the SPSA.  Logically,

the SPSA's improvement on recoveries to the Debtors' creditors, including the NTCC, compared

to the Allocation Decision is clearly in the best interests of those creditors.

54.     The NTCC also is wrong in its misleading suggestion that the Plan's pro-rata *pari

passu* treatment of all General Unsecured Creditors and implementation of the SPSA is somehow

---

[32] In the Reconsideration Motion, the Debtors offered recovery percentages based on Mr. Britven's model (with certain adjustments), solely by way of example to demonstrate the directional and proportional effect of the Court's Allocation Decision on creditor recoveries, noting that ultimate recoveries would remain subject to the final determination of each Debtor's claims base and other contingencies. Moreover, the Britven model includes various simplifying assumptions that the Debtors do not adopt or certify in any way.

"manifestly unfair" to members of the NTCC as a non-party to the SPSA.  NTCC Obj. ¶ 59.  To

the contrary, the SPSA and Plan provide NTCC and the Debtors' other general unsecured

creditors (including the Crossover Bonds Claims) with the same pro rata recoveries and

distributions from the Debtors.  See Plan Art. 4 (providing each Class 3A and 3B creditor

receives its pro rata share of Creditor Proceeds); Disclosure Statement App. C.  The SPSA does

not single out the NTCC (or any other unsecured creditor or creditor group) to "take one for the

team."  NTCC Obj. ¶ 62.  For that very reason, any suggestion that the Creditors' Committee

failed to act in the interests of U.S.-only Unsecured Creditors during negotiations of the SPSA

falls flat, belied by the fact that the NTCC's recoveries from the Debtors rank equally with the

other General Unsecured Creditors.

        55.     What is more, the NTCC's objection is not that its members are receiving worse

treatment than other general unsecured creditors are receiving, but rather that the Crossover

Bondholders are receiving the same treatment as all other general unsecured creditors of the

Consolidated Debtors.  But equal treatment of the Crossover Bondholders is entirely consistent

with, and in fact required by, the Bankruptcy Code and applicable law, and further follows from

the fact that, as discussed above, the Crossover Bond Claims were allowed as general unsecured

claims against NNI by the Court's PPI Settlement Order.  Just as it failed to do in its motion for

reconsideration of the PPI Settlement Order in December 2016, the NTCC once again fails to

offer any legitimate basis for revisiting the settled issue of the allowance of the Crossover Bond

Claims in the Plan context.

        56.     The NTCC's argument that the SPSA should not be approved because it was not

adequately represented in the SPSA negotiations is also baseless.  The NTCC attended and

participated in the mediation sessions that led to the SPSA Parties' agreement.  The interest of its

members, as purchasers of unsecured claims against the Debtors, also have been ably represented throughout these Cases, including in the mediation, by the Creditors' Committee, which is a party to the SPSA.[33]  The NTCC's reliance on In re Nutritional Sourcing Corp., 398 B.R. 816 (Bankr. D. Del. 2008) is misplaced.  As explained above, while the NTCC dwells on being absent from the final documentation of the SPSA, it overlooks the fact that in no way was it or other U.S.-only Unsecured Creditors "severely adversely impact[ed]" by the SPSA.  NTCC Obj. ¶ 59; In re Nutritional Sourcing Corp., 398 B.R. at 835.  Far from the situation in In re Nutritional Sourcing Corporation, where the settlement at issue treated those creditors not at the negotiating table unfairly by providing a recovery of only 13.2% when compared with a recovery of 100% to similarly situated creditors who were involved in the negotiations, the Plan and SPSA provide the Debtors' General Unsecured Creditors with the same *pari passu* pro rata distributions from the Debtors' estates.

57.    Finally, as this Court has previously recognized, in evaluating a settlement pursuant to Bankruptcy Rule 9019, a court need not ensure that the settlement is the best possible compromise for all affected parties, and there is no requirement that all parties in interest be involved in the settlement negotiations.  See In re Nortel Networks, Inc., 522 B.R. 491, 516 (Bankr. D. Del. 2014) (in overruling the objection of the Monitor and the Canadian Debtors to the claims and post-petition interest settlement with the Bondholder Group, holding that there is no *per se* requirement that all parties in interest are included in settlement negotiations).  Therefore, regardless of whether the NTCC believes it is in its own selfish best interest to continue to try to extract value from the Debtors through further litigation, that is not the relevant

---

[33]    As discussed above, the IFSA gives the Creditors' Committee certain rights with respect to any consensual settlement of the Allocation Dispute.  See e.g. IFSA § 12(g)(i).

test.  Rather, where the settlement is in the best interests of the Debtors' creditors generally, the

SPSA satisfies the fourth <u>Martin</u> factor and should be approved.

           d.      <u>The Allocation of Sale Proceeds to NNCALA Under the SPSA Is</u>
                     <u>Reasonable</u>

        58.      The NTCC is simply wrong in its unsubstantiated argument that the allocation of

Sale Proceeds to NNCALA under the SPSA and Plan is too high by a factor of three "under any

reasonable allocation of the Lockbox."  <u>See</u> NTCC Obj. ¶ 49.  Indeed, the allocation to

NNCALA of approximately $50 million of the Sale Proceeds under the terms of the SPSA is

well within the range of  reasonable allocations, whether considered individually or in the

context of the integrated SPSA settlement that enables the release of proceeds generally.[34]  The

NTCC's bald and unsupported assertion that "application of the methods espoused in the Kinrich

Report…demonstrates that NNCALA should receive an allocation of only approximately $13.5

million" is fundamentally mistaken.  A careful review of the record of the Allocation Trial makes

clear that the Kinrich Report proposed a $40.6 million allocation to NNCALA.  <u>See</u> Jeffrey H.

Kinrich, Expert Report at 33 (Jan. 24, 2014) [D.I. 13723] (the "<u>Kinrich Report</u>").[35]  While the

NTCC does not explain the manner in which it purports to "appl[y] the methods" espoused in the

Kinrich Report to get it to its $13.5 million, to the extent it merely relies on the relative

allocation of Sale Proceeds Kinrich proposes to allocate to NNI and NNCALA as its "method" to

allocate the SPSA proceeds, such back of the envelope math misreads the basis for the allocation

proposed by Kinrich.  In any event, putting aside these various infirmities, the NTCC also

ignores that the Plan grants NNI a $34 million administrative claim against NNCALA for

---

[34]      The Debtors note that three of the NTCC's members holding claims against NNCALA voted to <u>reject</u> the
NNCALA Plan, directly undermining the NTCC's assertion that the allocation of Sale Proceeds to NNCALA is in
some way a windfall.

[35]      The Kinrich Report can be found in the Notice of Filing of U.S. Interests Expert and Rebuttal Expert
Reports, Apr. 15, 2014 [D.I. 13325] (the Kinrich Report is filed under seal as Tab 1).

various administrative costs borne by NNI on NNCALA's behalf throughout these cases.  Once

that administrative reimbursement obligation is accounted for, NNCALA will only have

approximately $16 million in net Sale Proceeds available for distribution to its creditors – well

within the range of the $13.5 million figure the NTCC appears to suggest would be a reasonable

allocation.[36]  The NTCC similarly fails to consider the amount of Sale Proceeds that NNCALA

could potentially claim under alternative allocation theories, such as the Allocation Decision,

which  also could be greater than the $16 million amount NNCALA will retain under the Plan

settlements.

59.     Accordingly, the allocation to NNCALA under the SPSA is well within the range

of reasonable outcomes and is otherwise appropriate under the Bankruptcy Code.  The NTCC's

objection to the allocation to NNCALA should be overruled.

### B.     The NNCC Noteholders Statement and Objection Confirmation

60.     Solus Alternative Asset Management LP and PointState Capital LP (together, the

"NNCC Noteholders") filed the NNCC Noteholders Statement and Objection with respect to the

Plan and the SPSA 9019 Approval Motion objecting to certain asserted fees and expenses of the

Indenture Trustee for the NNCC Notes.  In the NNCC Noteholders Statement and Objection, the

NNCC Noteholders state without reservation that they "[s]upport the SPSA Motion and

confirmation of the Plan," but request certain amendments to the Confirmation Order to resolve a

fee dispute between the NNCC Noteholders and the NNCC Bonds Indenture Trustee.  See NNCC

Noteholder Statement and Obj. ¶1-3.

---

[36]     See NNCALA Budget and Recovery Analysis, attached as Appendix C to the Disclosure Statement [D.I. 17502-3] (showing a $34 million Intercompany Administrative Claim).  See also Section 6.7 of the Plan, providing that NNI shall be entitled to an one-time payment from NNCALA in the amount of $34 million "in full and final satisfaction of the Intercompany Administrative Expense Claims attributable to NNCALA that have accrued to date."

61.     As an initial matter, the Debtors submit that this dispute between third parties regarding fees should not delay confirmation of the Plan.  The Debtors note that both the Plan and SPSA provide that NNI shall pay the reasonable and documented fees of the NNCC Bonds Indenture Trustee in an amount not to exceed $4.25 million (emphasis added). See Plan §7.13; SPSA §4(m).  This cap on fees for the NNCC Bonds Indenture Trustee is but one component among the integrated and comprehensive terms of the SPSA.  By agreeing to the fee reimbursement provision, the Debtors did not signal any judgment regarding the reasonableness of the aggregate fees incurred by the NNCC Bonds Indenture Trustee or its advisors; indeed, the Debtors have not been provided an itemization of the fees incurred by the Indenture Trustee to date.  The Debtors intend to honor their obligation regarding payment of such fees up to this cap, but submit that any dispute regarding additional fees above this cap is not a dispute involving the Debtors and should be resolved between the NNCC Noteholders and the NNCC Bonds Indenture Trustee without delay or interference with the confirmation of the Debtors' Plan.

62.     The Debtors would strongly oppose any delay in confirmation of the Plan because of this dispute, as such a delay would undoubtedly harm all creditors of the Debtors' estates.  The Debtors therefore request that this Court (or the relevant parties) address or resolve the NNCC Noteholders Statement and Objection in a manner that does not disrupt the larger Plan confirmation process.

### C.     The Debtors Have Resolved the Iowa Department of Revenue Objection

63.     The Iowa Department of Revenue (the "IDR") filed the Iowa Department of Revenue Objection concerning potential ambiguity in certain Plan provisions applicable to potential tax claims. To resolve these objections, the IDR and the Debtors agreed to add the following language to the Confirmation Order:

> Notwithstanding any other provision in the Plan, including but not limited to paragraphs 1.2, 2.1, 7.12, 11.5, and 11.8, (a) no bar date shall apply to any claim by the Iowa Department of Revenue ("IDR") for administrative taxes and the IDR shall not be required to file an application, or proof of claim, requesting allowance as a condition to receiving payment in full pursuant to paragraph 2.1, and (b) interest, to the extent required under Iowa law, shall be paid on any such post-petition tax claims held by the IDR at the rate specified by applicable non-bankruptcy law. Nothing herein shall prevent or otherwise limit the Debtors from seeking and obtaining relief or raising objections or defenses in the Bankruptcy Court or through administrative proceedings with the IDR with respect to any such administrative tax claims.

64. The IDR has agreed with the Debtors that the addition of this language resolves the Iowa Department of Revenue Objection.

**D.    The Hanneman Objection Should be Overruled**

65. The Hanneman Objection, filed by Mr. Kent Hanneman, is a perfunctory objection to the Plan in which Mr. Hanneman indicates that, as a former employee of Nortel, he currently receives pension checks from the PBGC and that he is "[o]n the side of the PBGC." See Hanneman Obj., at 1. While this objection does not appear to speak to any particular Plan provision, the Debtors note that the PBGC has voted in favor of the Plan and supports its confirmation. Therefore, the Debtors request that the Hanneman Objection be overruled.

**E.    The Amick Objection and the Demel Objections are Requests to Reconsider Resolved Claims and are Not Proper Objections to Plan Confirmation**

i.    The Amick Objection

66. Ms. Linda Hollenbec Amick filed the Amick Objection, which appears to relate solely to the disallowance of claim 8247.  In her objection, Ms. Amick states that she wishes to contest the "original rejection of [her] claim…" and  asks that the Debtors "[c]onsider this document my formal Objection to my claim denial."  See Amick Obj. at 1-2.  Because the Amick Objection does not address the Plan itself, but is concerned with disallowance of an individual

claim, the Debtors request that the Court overrule the Amick Objection for Plan confirmation purposes.

67.     The Debtors note that Ms. Amick no longer holds claim 8247, as claim 8247 is held by Hain Capital Holdings, LLC.  The Debtors executed a final stipulation resolving such claim with Hain Capital Holdings, LLC on March 1, 2016.  See D.I. 16597.  Such stipulation was subsequently approved by this Court in an order dated March 18, 2016 [D.I. 16633]. See also Notice of Transfer of Claim Other Than for Security, Mar. 21, 2013 [D.I. 9736] (transferring claim 8247 from Linda Hollenbec Amick to Hain Capital Holdings, LLC).

68.     Notwithstanding the fact that claim number 8247 is not owned by Ms. Amick and therefore any objection to the Plan based on Ms. Amick's purported ownership of claim 8247 is improper, the Debtors have reviewed their books and records and the documentation regarding claim number 8247 and believe that it was appropriately disallowed.  Any collateral dispute between Ms. Amick and Hain Capital Holdings, LLC regarding the value of such claim does not implicate the Debtors or the confirmation of the Debtors' Plan and the Amick Objection should therefore be overruled.

ii.     The Demel Objections

69.     Mr. Ernest Demel filed two documents before the Objection Deadline, each seeking to revisit the validity of a consensual stipulation entered into between the Debtors and Mr. Demel in 2010 regarding the treatment of claim number 4643 that he filed against NNI.  In the first filing entitled "Motion in Response/Objection to the Confirmation of Chapter 11 Settlement Plan" on Jan. 4, 2017 [D.I. 17673] (the "First Demel Objection"), Mr. Demel objects to Plan confirmation, but, instead of substantively objecting to the Plan or any of its provisions, focuses exclusively on the history of the treatment of claim 4643 and the validity of a consensual stipulation entered into between Mr. Demel and the Debtors regarding the allowance of claim

4643.  Mr. Demel makes nearly identical arguments in his second filing entitled "Creditor's Motion to Replace the Stipulation Agreement With a New Contract. Re: Claim # 4643" on Jan. 9, 2017 [D.I. 17700] (the "<u>Second Demel Objection</u>").  Insofar as neither of the motions raise substantive objections to the Plan and instead both focus exclusively on the amount of Mr. Demel's individual claim and the related stipulation allowing such claim, the Debtors request that this Court overrule the motions.[37]

70.     Although Mr. Demel purports to object to the Plan in the First Demel Objection and not in the Second Demel Objection, a cursory review of each filing reveals that each motion makes substantively identical arguments and neither raises any argument that is relevant to confirmation of the Plan.  Taken together, such filings are simply another attempt by Mr. Demel to use every conceivable avenue to relitigate the validity of a consensual stipulation at the expense of the Debtors' estates. Notwithstanding the fact that every court to review the stipulation and the related orders upholding the validity of the stipulation—including the Third Circuit—has affirmed this Court's order denying Mr. Demel's motion to amend the stipulation, Mr. Demel now attempts to inject his dissatisfaction with the results of his appeals into the Plan confirmation process.  Mem. Order, <u>Demel v. Nortel Networks (In re Nortel Networks)</u>, Case No. 14-cv-01215(LPS) (D. Del. Sept. 10, 2015); <u>Demel v. Nortel Networks (In re Nortel Networks)</u>, Case No. 15-3363, (3d Cir. Nov. 4, 2016).  Mr. Demel's attempt to circumvent the appellate process and prevent Plan confirmation due to his dissatisfaction with the amount of his individual claim is both procedurally precluded by principles of res judicata and substantively lacking insofar as he provides no basis as to why the Plan should not be confirmed.

---

[37]     So as to preserve estate resources that have repeatedly been expended on litigating Mr. Demel's claims over the previous six years and in light of the recent ruling in the United States Court of Appeal for the Third Circuit denying Mr. Demel's appeal regarding this claim, See <u>Demel v. Nortel Networks Inc., (In re Nortel Networks Inc.)</u>, No. 15-3363 (3d. Cir. Nov. 4, 2016), the Debtors will address both the First Demel Objection and Second Demel Objection in this brief and request that this Court overrule each motion.

a.    Res Judicata and Waiver

71.    While the Debtors take no issue with Mr. Demel vigorously pursuing his appellate

rights, now that they are fully exhausted, his attempt to re-litigate settled issues after three years

of litigation is a step too far and now precluded by principles of res judicata.

72.    On November 4, 2016, the United States Court of Appeals for the Third Circuit

affirmed this Court's order denying Mr. Demel's attempt to amend the consensual stipulation.

Demel v. Nortel Networks (In re Nortel Networks), Case No. 15-3363 (3d Cir. Nov. 4, 2016).

The Third Circuit's opinion was the culmination of more than three years of litigation regarding

the stipulation and the Debtors had hoped the Third Circuit's clear opinion would resolve Mr.

Demel's litigation. While the Debtors have worked with Mr. Demel over the years to reasonably

assist him as a *pro se* litigant in the appellate process, such appellate rights are not infinite and

Mr. Demel's recent attempt to relitigate such appeals should be dismissed.

73.    The common law doctrine of res judicata, also known as claim preclusion, is

applicable in bankruptcy cases and exists so as to prevent perpetual litigation where a court has

issued a final order adjudicating a claim or cause of action. See, e.g., E. Minerals & Chems. Co.

v. Mahan, 225 F.3d 330, 337-38 (3d Cir. 2000); In re St. Hill, 2005 Bankr. Lexis 3326 (Bankr.

E.D. Pa. 2005) ("Although application of this preclusion principle in bankruptcy cases most

often involves prepetition state court judgments, it also applies to all bankruptcy court rulings

that are final orders.") (citations omitted).  The elements of claim preclusion are (1) identity of

the causes of action, (2) identity of the parties, and (3) a final judgment on the merits. Selkridge

v. United of Omaha Life Ins. Co., 360 F.3d 155, 172 (3d Cir. 2004).  Here, Mr. Demel's appeal

regarding his attempted amendment of the stipulation allowing claim 4643 involves the same

arguments and the same parties as his previous appeal and the Third Circuit issued a final

judgment on the merits. Each court has affirmed this Court's order and Mr. Demel simply cannot

expect the Debtors and this Court to continue to expend estate and court resources on re-litigating this dispute in perpetuity.  As such, the Debtors request that this Court recognize that Mr. Demel's motions are precluded by the doctrine of res judicata and dismiss such motions.

74.     Notwithstanding the fact that Mr. Demel's attempt to relitigate his stipulation is precluded by the doctrine of res judicata, Mr. Demel has also waived his primary substantive argument – that his attorney did not have the authority to enter into the stipulation. See Second Demel Obj., at 1 ("The said counsels have no legal authority to represent the parties and to sign the stipulation").  As the Third Circuit clearly stated, Mr. Demel did not raise this argument in front of this Court and has consequently waived it.  Demel v. Nortel Networks (In re Nortel Networks), Case No. 15-3363, (3d Cir. Nov. 4, 2016) ("In any event, as the District Court explained, Demel did not raise that argument before the Bankruptcy Court and consequently waived it." (citing In re Kaiser Grp. Int'l Inc., 399 F.3d 558, 565 (3d Cir. 2005)).

### b.     The Purported Confirmation Objection

75.     Although Mr. Demel purports to object to the classification of his claim under the Plan ("By this motion creditor object to the allowed claim number # 4643 and it's classification. (class 3 A : general unsecured claim ) against NNI/NNCC."), First Demel Obj. ¶ 1, Mr. Demel provides no support for this objection.  In fact, as previously discussed, Mr. Demel's objection actually reasserts arguments regarding his desire to unwind the consensual settlement regarding claim number 4643 — arguments which have been denied by this Court, the United States District Court for the District of Delaware and, most recently, by the United States Court of Appeals for the Third Circuit.  See Demel v. Nortel Networks Inc. (In re Nortel Networks Inc.), No. 15-3363 (3d. Cir. Nov. 4, 2016).

76.     If the Plan is confirmed, following the Effective Date, the Debtors intend to make distributions on allowed claims in accordance with the terms of the Plan, including distributions

on claim 4643 held by Mr. Demel and allowed in the amount of $125,000.00 against NNI.

Pursuant to Article 4 of the Plan, such distributions will be made in full and final satisfaction,

settlement, release and discharge of such allowed claim.  See Plan, Art. 4.  Should Mr. Demel

continue to seek to relitigate the allowance of his claim, the Debtors reserve all rights with

respect to distributions on such claims.  For the reasons stated herein, the Debtors respectfully

request that this Court overrule the Demel Objections and confirm the Plan, thereby permitting

Mr. Demel to receive the distributions to which he is entitled and bringing this dispute to its long

overdue conclusion.

### F.    The Horne Objection is Improper and Should be Overruled

77.    Mr. Robert Horne filed the Horne Objection to the Debtors' SPSA Approval

Motion.  Mr. Horne, a former employee of the Debtors who was previously involved in the

Deferred Compensation Settlement, states that he "fully support[s] the drive to get the big

settlement completed," but suggests that "it would appear that there is a way to protect the NNI

retirees, and that is to re-assign the pension and other retiree benefits to Class 2." See Horne

Obj., at 7.  While the Debtors sympathize with the reality that the Debtors' former employees

will not receive full payment on their allowed unsecured claims against the Debtors, there is

simply no legal or factual justification to give NNI retirees 100 percent recoveries on their

unsecured claims while other creditors (including other former employees of the Debtors)

receive less than full recoveries from the Debtors on their claims.

78.    Mr. Horne makes two specific requests in his objection: (i) that the "NNI Retiree

Benefits, including pensions and retiree healthcare, be classified as Class 2, and paid out at

100%" and (ii) that "[t]he $10 million, taken by the Debtors from the Deferred Compensation

Trust at US Bank, should be returned for distribution to the Members, at the discretion of the

DCP Ad Hoc Committee." Horne Obj., at 9. The Debtors submit that neither of these requests is proper and address each request in turn below.[38]

        i.    <u>Classification of the NNI Retiree Benefits</u>

79.    Mr. Horne's first request is that "NNI Retiree Benefits, including pensions and retiree healthcare, be classified as Class 2, and paid out at 100%." Horne Obj., at 9. There is simply no basis in the Bankruptcy Code or the specific facts of this case to classify retiree claims as secured claims or as claims that should receive 100 percent recoveries. Further, Mr. Horne does not make clear exactly which types of claims he proposes should be eligible for this 100% treatment.

80.    Class 2 in the Plan consists of secured claims. Plan §4.2. Bankruptcy Code §506 provides that secured claims are only secured to the extent they are secured by a lien on property or subject to setoff. 11 U.S.C. § 506. As such, there is no legal basis to classify any retiree claims as secured claims eligible for 100 percent recoveries, nor does Mr. Horne suggest that a basis exists.

81.    To the extent Mr. Horne requests that the Debtors create a new class for retiree claims that would recover 100 percent on their claims, he does not offer a valid legal or factual basis to justify a classification in which such retiree claims would receive preferential treatment over other general unsecured claims. Mr. Horne does not allege any facts (other than a desire for a 100% recovery) that would justify creating a separate class for retiree claims, to the detriment of all other general unsecured creditors in Class 3A, including other former employees, and no such basis exists.

---

[38]    In his objection, Mr. Horne makes a host of assertions regarding these cases and his dealings with the Debtors. The Debtors dispute these various baseless complaints and allegations and the failure to specifically respond to each statement should not be viewed as an agreement by the Debtors with any portion of the Horne Objection.

ii.      The Deferred Compensation Settlement

82.      In his objection, Mr. Horne also requests that the Debtors return $10 million that the Debtors allegedly "took" from the Deferred Compensation Trust to the DCP Ad Hoc Committee so that it can be distributed  to members eligible for payment under the Deferred Compensation Settlement. See Horne Obj. at 9.  Mr. Horne revisits a settlement reached between the Debtors and holders of deferred compensation claims in 2012, raising spurious concerns regarding the settlement process and the terms of the settlement.  Such unsubstantiated claims provide no basis to refuse approval of the SPSA and simply lack merit. The terms of the Deferred Compensation Settlement expressly state that the balance of assets held by the Plan Trust was approximately $42,137,471 as of October 31, 2012 and that the aggregate Settlement Amount to be distributed to the class of claimants would be $31,166,369.13, less any withholdings for applicable taxes. See Deferred Compensation Settlement Agreement at Ex. A at 3-5, Dec. 27, 2012 [D.I. 9127].  The settlement terms were heavily negotiated and the Bankruptcy Court approved the settlement after notice and a hearing. See Order Approving Compromise Among the Debtors, the Official Committee of Unsecured Creditors, and the Ad Hoc Group of Beneficiaries of the Nortel Networks U.S. Deferred Compensation Plan, Jan. 23, 2013 [D.I. 9323].  As such, the Debtors have no obligation to revisit the settlement and make additional distributions to these members, as Mr. Horne requests, and he does not offer a valid basis for doing so.

83.      Given that neither of Mr. Horne's requests are justified under the facts or the law, the Debtors respectfully request that this Court overrule the Horne Objection.

**G.** **The Releases and Exculpation Comply with Third Circuit Law and Should Be Approved Over the U.S. Trustee Objection**

84.     The U.S. Trustee objects to the Plan's release and exculpation provisions, suggesting that (i) the Debtors have not sufficiently demonstrated that the voluntarily granted, mutual SPSA Releases satisfy the Zenith factors; (ii) the third-party releases should not apply to holders of claims whose solicitation materials were returned as undeliverable; and (iii) that the Plan's exculpation provisions should not apply to those non-estate fiduciaries despite their substantial contributions to the resolution of these Chapter 11 Cases.  U.S. Trustee Obj. ¶¶ 15, 22, 27.  As discussed below, the releases and exculpations are appropriate under governing law and are justified by the specific facts and circumstances of these Chapter 11 Cases.

       i.     The SPSA Releases are a Necessary and Appropriate Aspect of the SPSA

85.     Part and parcel of the heavily negotiated and integrated SPSA are the voluntary releases by parties to the SPSA of certain causes of action against other SPSA parties.  These were a key component to the negotiations between the Debtors and their major creditor constituencies in reaching the compromises embodied in the SPSA and they appropriately recognize the contributions made by the Released Parties to these Chapter 11 Cases.  Additionally, the Debtor Releases do not release claims relating to fraud, gross negligence, or willful misconduct.  The SPSA Releases are proper, reflect the sound business judgment of the Debtors, and are in the best interests of the Estate.  See U.S. Bank Nat'l Ass'n v. Wilmington Tr. Co. (In re Spansion), 426 B.R. 114, 143 (Bankr. D. Del. 2010).

86.     The U.S. Trustee incorrectly suggests that the SPSA Releases granted in section 13.4 of the Plan, entitled "SPSA Releases," can only be granted if they satisfy the Zenith factors. The SPSA Releases, however, are voluntarily provided as part of the settlement embodied in the SPSA between the Debtors and the SPSA Released Parties.  As such, the SPSA Releases in

section 13.4 of the Plan need only satisfy the less burdensome Rule 9019 <u>Martin</u> standard, which

as set forth above, is clearly met.  As the Debtors have set forth in detail in the SPSA 9019

Motion, which is incorporated herein, the SPSA is a fully integrated settlement containing terms

that individually and collectively fall well within the range of reasonableness.  The SPSA

Releases are bargained-for, voluntary releases granted between and among the SPSA Parties in

order to further the implementation of the SPSA, further the final resolution of claims between

and among the SPSA Parties and resolve the Allocation Dispute.  For the reasons set forth in the

SPSA 9019 Motion, the SPSA — including the SPSA Releases — should be approved in its

entirety and as a sound exercise of the Debtors' business judgment.

      ii.     <u>The Binding Nature of the Third Party Releases Should Not be Disturbed</u>

    87.    The Plan also provides appropriately tailored Third Party Releases that will be

granted only to those parties who have played an integral role in these Chapter 11 Cases.

The Third Party Releases are consensual as holders of Claims in all Classes entitled to vote on

the Plan were given the opportunity to opt out of the Third Party Releases by (a) voting to reject

the Plan or  (b) indicating on their returned Ballot that they were electing to opt out of the Third

Party Releases.  <u>See, e.g.</u>, Disclosure Statement Order Exs. E-1, F; <u>see also</u> <u>In re Indianapolis

Downs, LLC</u> 486 B.R. 286, 304–06 (Bankr. D. Del. 2013).  Claim holders that did not respond

with an opt-out election (or object to the confirmation of the Plan) are therefore deemed to have

consented to the Third Party Releases.  <u>See</u> <u>Indianapolis Downs</u>, 486 B.R. at 306; <u>Spansion</u>, 426

B.R. at 144; <u>In re Genco Shipping & Trading Ltd.</u>, 513 B.R. 233, 271–72 (Bankr. S.D.N.Y.

2014).  The solicitation procedures provided voting creditors with sufficient notice regarding the

Plan and the Third Party Releases.  <u>See</u> <u>Greyhound Lines, Inc. v. Rogers (In re Eagle Bus Mfg.,

Inc.)</u>, 62 F.3d 730, 736 (5th Cir.1995); <u>In re Calpine Corp.</u>, 2007 WL 4565223,at *5, No. 05-

60200(BRL), (Bankr. S.D.N.Y. Dec. 19, 2007).  Accordingly, the Third Party Releases should be approved.

88.     The U.S. Trustee does not argue that the Third Party Releases are non-consensual. To the contrary, the U.S. Trustee states that "it appears that the Debtors have made a *substantial effort* to ensure that the third party releases are consensual."  U.S. Trustee Obj. ¶ 21 (emphasis added).  Rather, without citing to supporting authority, the U.S. Trustee argues that "holders of claims or interest whose solicitation materials were returned . . . as undeliverable . . . should not be deemed to have failed to opt out of the third-party releases, and should instead excluded [sic] from those releases."  U.S. Trustee Obj. ¶ 22.  This misapplies the applicable standard and unnecessarily burdens the Debtors.

89.     The question of whether a party consented to a release in a plan is largely a question of whether the party received sufficient notice of the proposed plan and nonetheless did not respond.  Indianapolis Downs, LLC, 486 B.R. at 305–06; In re DBSD N. Am., Inc., 419 B.R. 179, 218–19 (Bankr. S.D.N.Y. 2009).  Notice does not need to be perfect in order to be sufficient.  Generally, mailing a notice by first class mail to the last known address is sufficient to satisfy due process.  In re Eagle Bus Mfg., Inc., 62 F.3d at 736; Boese v. Randolph-Wells Bldg. Corp (In re Randolph-Wells Bldg. Corp.), 332 F.2d 963, 967 (7th Cir. 1964); DeVore v. Marshack (In re DeVore), 223 B.R. 193, 197 (B.A.P. 9th Cir. 1998).  If a party changes its mailing address after the petition date, the burden is on that party, not the debtor, to advise of the new address.  In re Calpine Corp., 2007 WL 4565223, at *5.

90.     The Debtors caused a Ballot and copies of the Plan and Disclosure Statement to be delivered via first class mail to the last known address of each holder of a Claim entitled to vote.  See Solicitation Aff.  Additionally, the Debtors provided publication notice of their intent

to confirm the Plan [D.I. 17692] and made available online copies of the Plan on the website of their solicitation agent, Epiq Bankruptcy Solutions, LLC.  As a result, the Debtors gave sufficient notice of the Plan, including the Third Party Releases, regardless of whether solicitation materials were returned as undeliverable.

91.    The U.S. Trustee's argument attempts to work around the established precedent in this district regarding implied consent and improperly saddles the Debtors with the obligation of keeping track of the whereabouts of their creditors.  Should an issue arise in the future concerning a party's receipt of notice, mechanisms exist to allow the creditor to seek relief from the provisions that bind all other similarly situated creditors (although the Debtors believe that the robust Court-approved solicitation procedures would withstand any such later review).  For these reasons, and those discussed above, the Debtors request that the Court overrule this objection and permit the Third Party Releases to bind those creditors that did not return a ballot either rejecting the claim or opting out of the Third Party Releases in accordance with the terms of the approved with the terms of the procedures approved by the Court in the Disclosure Statement Approval Order.

iii.    Exculpation of Key Contributors is Appropriate and Necessary

92.    Contrary to arguments of the U.S. Trustee, under certain circumstances the exculpation of non-estate fiduciaries has been approved by courts in this jurisdiction.  As discussed below, courts in this district have approved exculpation for non-fiduciaries where the parties made extraordinary contributions to the reorganization—as the Released Parties have done in these cases.

93.    The Exculpation has a narrow and discrete purpose: to protect the Exculpated Parties, who made important contributions to the success of these cases, from lawsuits based on action taken by the Exculpated Parties in connection with the Debtors' Plan and related matters,

without relieving any party of liability for willful misconduct, gross negligence, or fraud.  See

Plan § 13.5.  These Exculpated Parties include (i) the Debtors, (ii) the Wind-Down Debtors, (iii)

the U.S. Principal Officer; (iv) the Creditors' Committee, (v) the Bondholder Group, (vi) the

NNC/NNL Notes Indenture Trustee, (vii) the NNCC Bonds Indenture Trustee, and with respect

to each of the foregoing, (viii) any of their respective directors, officers, employees, members,

attorneys, consultants, accountants, advisors, agents and other professionals (each acting solely

in such capacity), and, collectively, all of them.  To the extent that the Exculpated Parties include

non-estate fiduciaries, the U.S. Trustee objects to the Exculpation as overly broad and argues that

such exculpation "does not comply with the applicable case law."  See U.S. Trustee Obj., ¶¶ 25.

But, as this Court and others in this district have recognized, there is no absolute bar on

exculpation of non-estate fiduciaries where such exculpation is justified under the circumstances.

See Order Confirming First Am. Plan, In re Venoco, Inc., Case No. 16-10655 (KG) (Bankr. D.

Del. Jul. 14, 2016) [D.I. 370] (approving an exculpation provision that included prepetition

noteholders who supported a restructuring support agreement, the agents under the notes'

indentures, and the directors and officers and affiliates for each of the foregoing as well as the

debtors); In re Verso Corp., Case No. 16-10163 (KG) (Bankr. D. Del. June 23, 2016) [D.I. 1223]

(same); see also Findings of Fact, Conclusions of Law, and Order Confirming Third Am. Plan,

In re Magnum Hunter Res. Corp., Case No. 15-12533 (KG) (Bankr. D. Del. April 18, 2016) [D.I.

1175]; Confirmation Hr'g Tr. 35-36, In re Lab. Partners, Inc., Case No. 13-12769 (LSS) (Bankr.

D. Del. July 10, 2014) [D.I. 612]; Order Confirming Debtors' Modified Fourth Am. Plan, In re

NewPage Corp., Case No. 11-12804 (KG) (Bankr. D. Del. Dec. 14, 2012) [D.I. 2945]; Findings

of Fact, Conclusions of Law, and Order Confirming First Am. Plan, In re Constar Int'l Inc., Case

No. 11–10109 (CSS) (Bankr. D. Del. May 20, 2011); In re Leslie Controls, Inc., Case No. 10-12199 (CSS), 2010 WL 4386935, at *25 (Bankr. D. Del. Oct. 28, 2010).

94.    The Debtors recognize that other courts in this district have adopted a bright-line rule that exculpation of non-estate fiduciaries is not appropriate under a chapter 11 plan.  See In re Wash. Mut., Inc., 442 B.R. 314, 350–51 (Bankr. D. Del. 2011); In re PTL Holdings LLC, No. 11–12676 (BLS), 2011 WL 5509031, at *12 (Bankr. D. Del. Nov. 10, 2011).  These courts trace their bright-line rule to the Third Circuit's decision in In re PWS Holding Corp., 228 F.3d 224 (3d Cir. 2000).  See, e.g., Wash. Mut., 442 B.R. at 351 ("The standard for exculpations has been extant in this district since the Third Circuit's PWS decision in 2000.").  But PWS establishes no such rule; in fact, in assessing the plan exculpation in that case, the Third Circuit rejected any "per se rule barring any provision in a reorganization plan limiting the liability of third parties" by virtue of section 524(e) of the Bankruptcy Code.  See PWS, 228 F.3d at 247.  Rather, the Third Circuit was clear that, where a plan seeks to limit liability, such as through exculpation, such provisions must be assessed in light of the particular circumstances at issue.

95.    This Court has rejected the argument that the Third Circuit adopted a per se rule limiting exculpation to estate fiduciaries.  See Hr'g Tr. 41:11-14, In re Venoco, Inc., Case No. 16-10655 (KG) (Bankr. D. Del. July 13, 2016) [D.I. 419] ("I don't read [PWS] as limiting exculpation to estate fiduciaries."); Hr'g Tr. 27, In re FAH Liquidating Corp., Case No. 13-13087 (KG) (Bankr. D. Del. July 28, 2014) [D.I. 1152]  (recognizing other decisions limiting exculpation to non-estate fiduciaries but finding that the Third Circuit allows such exculpation in "particular circumstances"); Hr'g Tr. 50, In re Nassau Broad. Partners, Case No. 11-12934 (KG) (Bankr. D. Del. July 31, 2013) [D.I. 1000] (stating that "the Third Circuit has not ruled that exculpation clauses or protections are limited to fiduciaries").

96.     Instead, this Court has allowed exculpation to those parties that have provided

significant contributions to a debtor's case and plan of reorganization. See In re Verso Corp.,

Case No. 16-10163 (KG) (Bankr. D. Del. June 23, 2016); Hr'g Tr. 168:24-169:8 In re Trump

Entm't Resorts, Inc., Case No. 14-12103 (KG) (Bankr. D. Del, Mar. 17, 2015) [D.I. 1129-3]

(approving non-estate fiduciary exculpation, noting PWS does not rule against exculpation

clauses, but calls for examination of the case-specific circumstances); Hr'g Tr. 103:10-23, In re

FKF Madison Group Owner, LLC, Case No. 10-11867 (KG) (Bankr. D. Del Apr. 10, 2012) [D.I.

1343] (overruling U.S. Trustee's objection and approving exculpation of non-estate fiduciaries

under the circumstances); Confirmation Hr'g Tr. 26:21-28:8, In re FAH Liquidating Corp., Case

No. 13-13087 (KG) (Bankr. D. Del July 28, 2014) [D.I. 1152] (allowing exculpation for non-

estate fiduciary in "an exceptional situation," and where the party played a "key role" and

provided "significant contribution" in the chapter 11 case); Hr'g Tr. 54:9-15,  In re Nassau

Broad. Partners, Case No. 11-12934 (KG) (Bankr. D. Del. July 31, 2013) [D.I. 1000] (overruling

objection of U.S. Trustee and permitting exculpation of certain lenders who contributed money

to ensure the case progressed smoothly and waived unsecured deficiency claims); see also

Confirmation Hr'g Tr. 35-36 In re Lab. Partners, Inc., Case No. 13-12769 (PJW) (Bankr. D. Del.

July 10, 2014) [D.I. 612].  This Court has also allowed exculpation to non-estate fiduciaries

where such exculpation was part of a bargained-for exchange and no party other than the U.S.

Trustee objected.  Hr'g Tr. 43:23-25, 44:1-12, In re Venoco, Inc., Case No. 16-10655 (KG)

(Bankr. D. Del. July 13, 2016) [D.I. 419].

97.     This Court's decisions in In re FAH Liquidating Corp. and In re Venoco are

particularly instructive.  In both cases, the Court overruled the U.S. Trustee's objection to an

exculpation provision that provided exculpation to non-estate fiduciaries.  See Debtors' Second

Am. Joint Plan of Liquidation at 39, In re FAH Liquidating Corp., Case No. 13-13087 (KG)

(Bankr. D. Del. July 9, 2014) [D.I. 1059]; U.S. Trustee's Limited Obj., In re FAH Liquidating

Corp., Case No. 13-13087 (KG) (Bankr. D. Del. July 16, 2014) [D.I. 1095]; Confirmation Hr'g

Tr. 24-27, In re FAH Liquidating Corp., (Bankr. D. Del. July 28, 2014) [D.I. 1152]; Debtors'

First Am. Joint Plan, In re Venoco, Inc., Case No. 16-10655 (KG)  (Bankr. D. Del. May 17,

2016) [D.I. 220]; Confirmation Hr'g Tr. 38, 46:4-13, In re Venoco, Inc., Case No. 16-10655

(KG) (Bankr. D. Del. July 13, 2016) [D.I. 419].  In both cases, the Court recognized the

"significant contribution" of the exculpated parties, including, among other things, their decision

to execute a settlement agreement and thereby forgo litigation that had the potential to materially

reduce creditor recoveries.  See id. Disclosure Statement 1-4, In re FAH Liquidating Corp., ,

(Bankr. D. Del. June 10, 2014) [D.I. 984]; Debtors' Mem. of Law in Supp. of Confirmation ¶ 73,

In re Venoco, Inc.,  Case No. 16-10655 (KG) (Bankr. D. Del. Jul. 8, 2016) [D.I. 349].

98.    The unique circumstances of these cases and the extraordinary contributions of

certain non-estate fiduciaries justify the scope of the Exculpation in the Plan.  The Exculpated

Parties were each heavily involved in the negotiation of terms in the SPSA and, ultimately, the

Plan.  The Exculpated Parties' direct and substantial participation in the Chapter 11 Cases

warrants the granting of exculpation.  In addition, the scope of the Exculpation is targeted and

appropriately limited to liability not determined to have resulted from actual fraud, gross

negligence, or willful misconduct.  Without the significant concessions and contributions made

in connection with the SPSA by each of the Exculpated Parties – each of the Debtors, the Wind-

Down Debtors, the U.S. Principal Officer, the Creditors' Committee, the Bondholder Group, the

NNC/NNL Notes Indenture Trustee, the NNCC Bonds Indenture Trustee and each of the

foregoing's respective directors, officers, employees, attorneys and certain other advisors – these

Chapter 11 Cases would look very different than they do today. The Debtors would still be mired in a protracted litigation regarding the Allocation Dispute and other claims and distribution matters, without a clear path to resolution. The SPSA compromises allowed the Debtors and their stakeholders to avoid the deleterious consequences of ongoing litigation.

99.     Without a doubt, non-estate fiduciary Exculpated Parties made essential contributions. For instance, the NNC/NNL Notes Indenture Trustee and the NNCC Bonds Indenture Trustee, along with the Bondholder Group, facilitated and helped marshal the complex settlement negotiations that yielded the SPSA and its benefits to all parties in interest. Additionally, while the U.S. Trustee does not challenge the granting of exculpation to estate fiduciaries and their professionals, it is important to note that, as previously discussed, the U.S. Principal Officer and the directors, officers, employees, members, attorneys, consultants, accountants, advisors, agents and other professionals advising the Debtors, as well as the Creditors' Committee and its respective agents, have provided ongoing services, both pre- and post-petition and have been instrumental parties to the successful outcome of these Chapter 11 Cases.

100.     Fortunately for the Debtors and their Estates, these contributions allowed the Debtors to set these cases on a successful trajectory. As a result of the collaboration among the parties in these cases, made possible by the concessions of the non-estate fiduciary Exculpated Parties, the Debtors were able to resolve years of preclusive litigation and are in a position to confirm their Plan. Limiting the potential liability of the parties who made this outcome possible is justified under the unique circumstances of these cases. Moreover, such cooperation and consensual efforts should not be discouraged by preventing reasonable exculpation in such circumstances.

101.    Accordingly, the Debtors respectfully submit that the Exculpation should be approved in its current form and that the objection of the U.S. Trustee should be overruled.

## IV.    THE PLAN MEETS ALL APPLICABLE REQUIREMENTS OF THE BANKRUPTCY CODE

102.    Having established that the responses and objections are without merit or resolved, the Debtors hereafter demonstrate that the Plan complies with the requirements for confirmation of a Chapter 11 plan enumerated in the Bankruptcy Code.

### A.    The Plan Complies with Section 1129(a)(1) of the Bankruptcy Code

103.    Under Section 1129(a)(1) of the Bankruptcy Code, a plan must "compl[y] with the applicable provisions of [the Bankruptcy Code]."  11 U.S.C. § 1122(a)(1).  The legislative history of section 1129(a)(1) explains that this provision also encompasses the requirements of Sections 1122 and 1123 of the Bankruptcy Code, which govern the classification of claims and the contents of a plan of reorganization, respectively.  S. Rep. No. 95-989, at 126 (1978); H.R. Rep. No. 95-595,at 412 (1977); In re S & W Enter., 37 B.R. 153, 158 (Bankr. N.D. Ill. 1984) ("An examination of the Legislative History of [Section 1129(a)(1)] reveals that although its scope is certainly broad, the provisions it was most directly aimed at were Sections 1122 and 1123.").  As explained below, the Plan complies with the requirements of Sections 1122, 1123, and 1129 of the Bankruptcy Code, as well as other applicable provisions.

### i.    The Plan Satisfies the Classification Requirements of Section 1122 of the Bankruptcy Code

104.    Section 1122 provides, in pertinent part, that "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class."  11 U.S.C. § 1122(a).  This is not to say that all substantially similar claims or interests must be grouped in the same class, but rather, that all claims or interests designated to a particular class be substantially similar to each other.  See In re

Armstrong World Indus., 348 B.R. 136, 159 (D. Del. 2006).  The Court of Appeals for the Third

Circuit, among others, has recognized that plan proponents have significant flexibility in placing

similar claims into different classes, provided there is a rational basis to do so.  See John

Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs., 987 F.2d 154, 158–59 (3d Cir. 1993)

(holding that as long as each class represents a voting interest that is "sufficiently distinct and

weighty to merit a separate voice in the decision whether the proposed reorganization should

proceed," the classification is proper); In re Jersey City Med. Ctr., 817 F.2d 1055, 1061 (3d Cir.

1987) (allowing a plan proponent to group similar claims in different classes, but recognizing

that separate classes of claims must be reasonable).

105.     The Plan assigns a letter to each of the fifteen Debtors and classifies Claims

against and Interests in the Debtors into eight Classes, namely: (a) Class 1 – Priority Non-Tax

Claims; (b) Class 2 – Secured Claims; (c) Class 3A – General Unsecured Claims; (d) Class 3B –

Crossover Bonds Claims and EDC Claims; (e) Class 3C – Convenience Claims; (f) Class 4 –

Subordinated Claims; (g) Class 5A – Interests; and (h) Class 5B – Interests Securities Fraud

Claims.  Plan § 3.4.  Each Class comprises only Claims or Interests that are substantially similar

to one another, and the Classes themselves are all based on valid business, factual, or legal

considerations.  Secured Claims are classified separately from unsecured Claims.  Unsecured

Claims are placed in separate classifications based on the nature of the claims and the claimants'

relationship with the Debtors.  Specifically, Crossover Bonds Claims and EDC Claims have been

separately classified in Class 3B because these claims involve cross-border guarantee obligations

of certain Debtors on account of certain debt or guarantee obligations incurred by certain of the

Canadian Debtors. All Interests in a Debtor occupy a separate class.  No entity has objected to

the Plan based on the classification of Claims or Interests .  Accordingly, the Plan meets the

classification requirements of Section 1122.

    ii.    <u>The Plan Satisfies the Mandatory Plan Requirements of Section 1123 of the Bankruptcy Code.</u>

    *a.*    *<u>The Plan Designates Classes of Claims and Interests – § 1123(a)(1)</u>*

106.    Section 1123(a)(1) of the Bankruptcy Code requires a plan to designate classes of

claims and interests.  11 U.S.C. § 1123(a)(1).  As described above, Section 3.4 of the Plan

designates eight Classes of Claims and Interests.  The Plan, therefore, complies with Section

1123(a)(1) of the Bankruptcy Code.

    *b.*    *<u>The Plan Specifies Unimpaired Classes – § 1123(a)(2)</u>*

107.    Section 1123(a)(2) of the Bankruptcy Code requires that the Plan "specify any

class of claims or interests that is not impaired under the plan." 11 U.S.C. § 1123(a)(2).  The

Plan meets this requirement by identifying Classes 1 and  2 as unimpaired. Plan § 4.1, 4.2.

    *c.*    *<u>The Plan Adequately Specifies the Treatment of Impaired Classes – § 1123(a)(3)</u>*

108.    Section 1123(a)(3) of the Bankruptcy Code requires that the Plan "specify the

treatment of any class of claims or interests that is impaired under the plan."  11 U.S.C. §

1123(a)(3).  The Plan meets this requirement by setting forth the treatment of the impaired

classes under the Plan: Classes 3A, 3B, 3C, 4, 5A and 5B.  Plan § 4.3-4.10.

    *d.*    *<u>The Plan Provides for the Same Treatment for Claims or Interests within the Same Class – § 1123(a)(4)</u>*

109.    Section 1123(a)(4) of the Bankruptcy Code requires that the Plan "provide the

same treatment for each claim or interest of a particular class, unless the holder of a particular

claim or interest agrees to a less favorable treatment of such particular claim or interest."  11

U.S.C. § 1123(a)(4).  The Plan meets this requirement because holders of Allowed Claims or

Interests will receive the same rights and treatment as other holders of Allowed Claims or

Interests in the same Class.

> e.    *The Plan Provides Adequate Means for its Implementation –*
> *§ 1123(a)(5)*

110.    Section 1123(a)(5) of the Bankruptcy Code requires that the Plan provide

"adequate means" for its implementation.  11 U.S.C. § 1123(a)(5).  Article 6 of the Plan, as well

as other provisions thereof, provide for the means by which the Plan will be implemented.

Among other things, Article 6 of the Plan, and the exhibits, attachments, and Plan Supplement

and Disclosure Statement:  (a) constitute a good faith compromise and settlement of all Claims

and Interests and controversies resolved pursuant to the Plan and SPSA; (b) serve as a motion by

NNI and NNCC seeking entry of an order  pursuant to sections 105(a), 363(b), and 1123 of the

Bankruptcy Code and Bankruptcy Rule 9019 substantively consolidating the NNI and NNCC

Estates into a single consolidated Estate for all purposes associated with Confirmation and

Consummation; (c) appoint Greylock Partners, LLC as Plan Administrator for each of the

Debtors and the Wind-Down Debtors; (d) entitle the Debtors and the Wind-Down Debtors to

transfer funds between and among themselves and their respective subsidiaries in all cases

consistent with the terms of the Cash Management Order; (e) provide that entry of the

Confirmation Order will constitute the Court's approval, pursuant to Rule 9019, of the settlement

among the SPSA Parties with regard to the Allocation Proceeds, the Intercompany Claims and

other matters settled under the SPSA; (f) provide NNI or the Plan Administrator the authority to

make or authorize NNI to make certain transfers of assets to other Debtors or Wind-Down

Debtors in order to effectuate implementation of the Plan; and (g) after a Chapter 11 Case has

been fully administered, obligate the Plan Administrator to file all documents required by

Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close such Chapter

11 Case in accordance with the Bankruptcy Code and the Bankruptcy Rules.  Therefore, the

Debtors submit that the Plan provides adequate means for its implementation and satisfies

Section 1123(a)(5) of the Bankruptcy Code.

> f.      *The Plan Prohibits the Issuance of Non-Voting Equity Securities –*
> *§ 1123(a)(6)*

111.    Section 1123(a)(6) of the Bankruptcy Code requires that a debtor's corporate

constituent documents prohibit the issuance of non-voting equity securities.  11 U.S.C. §

1123(a)(6).  Section 8.6 of the Plan provides that the certificate of incorporation, certificate of

formation, by-laws and operating agreement, as applicable, of each Wind-Down Debtor shall

include, among other things, such a provision, but only to the extent required by section

1123(a)(6) of the Bankruptcy Code.  The Wind-Down Debtors' proposed amended corporate

constituent documents, included as Exhibit G to the Plan, do precisely this.  See Plan Suppl.

Ex. G.  Therefore, the Plan complies with Section 1123(a)(6) of the Bankruptcy Code.

> g.      *The Plan Contains Appropriate Provisions with Respect to the*
> *Selection of Officers, Directors and Trustees – § 1123(a)(7)*

112.    Section 1123(a)(7) of the Bankruptcy Code requires that the Plan's provisions

with respect to the manner of selection of any director, officer or trustee, or any other successor

thereto, be "consistent with the interests of creditors and equity security holders and with public

policy."  11 U.S.C. § 1123 (a)(7).  Section 8.4 of the Plan provides that the Plan Administrator

shall have the power to select the director of each Wind-Down Debtor and that the current

officers of each Wind-Down Debtor shall continue to serve in such capacity in accordance with

applicable non-bankruptcy law.  Plan Exhibit F identifies the individuals that will serve as

officers and the director of the Wind-Down Debtors:  John J. Ray, III; Kathryn Schultea; and

Mary Cilia.  Each has extensive experience with the Debtors, the claims against the Debtors and

their continued involvement in the wind down of the Debtors, and implementation of the Plan

will benefit all creditors and parties in interest.  The Plan therefore satisfies  section 1123(a)(7) of the Bankruptcy Code.

> ### iii.    The Plan Appropriately Provides for Certain Discretionary Contents as Permitted by Section 1123(b) of the Bankruptcy Code

113.    Section 1123(b) of the Bankruptcy Code sets forth various discretionary provisions that may be incorporated into a Chapter 11 plan.  Among other things, Section 1123(b) provides that a plan may:  (i) impair or leave unimpaired any class of claims or interests; (ii) provide for the assumption or rejection of executory contracts and unexpired leases; (iii) provide for the settlement or adjustment of any claim or interest belonging to the debtor or the estates; and (iv) include any other appropriate provision not inconsistent with the applicable provisions of the Bankruptcy Code.  11 U.S.C. § 1123(b)(1)-(3)(A), (6).

114.    Consistent with Section 1123(b) of the Bankruptcy Code, (i) the Plan impairs certain claims and interests (specifically, those in Classes 3A, 3B, 3C, 4, 5A and 5B); (ii) the Plan leaves unimpaired other claims and interests (specifically, those in Classes 1 and 2); and (iii) Section 9.2 of the Plan provides for the assumption of all executory contracts and unexpired leases under Section 365 of the Bankruptcy Code identified on Exhibit C to the Plan, the rejection of all other executory contracts (if any) pursuant to Section 9.1 of the Plan, or previously rejected by order of this Court, or subject of a motion to reject filed with this Court on or before the Effective Date.

115.    Courts routinely approve a debtor's assumption, assumption and assignment, or rejection of executory contracts or unexpired leases where such decision is made in the exercise of such debtor's sound business judgment and benefits its estate.  See, e.g., Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp., 872 F.2d 36, 39 (3d Cir. 1989); see also Nat'l Labor RelationsBd. v. Bildisco & Bildisco (In re Bildisco), 682 F.2d 72, 79 (3d Cir. 1982), aff'd, 465 U.S. 513

(1984); In re ANC Rental Corp., Inc., 278 B.R. 714, 723 (Bankr. D. Del. 2002).  The business judgment standard requires that the court approve the debtor's business decision unless that judgment is the product of bad faith, whim or caprice.  See In re Trans World Airlines, Inc., 261 B.R. 103, 121 (Bankr. D. Del. 2001); see also Lubrizol Enters., Inc. v. Richmond Metal Finishers, Inc., 756 F.2d 1043, 1047 (4th Cir. 1985).  The Debtors' decisions regarding executory contracts are the result of the exercise of the Debtors' sound business judgment, and should therefore be approved.

116.    Also consistent with Section 1123(b), the Plan includes (i) the release by holders of Claims against and Interests in the Debtors of each of the Debtors and the Wind-Down Debtors; (ii) the consensual release by certain holders of Claims against and Interests in the Debtors of the Plan Released Parties; (iii) the release by each of the Debtor Releasing Parties of the other SPSA Released Parties, as provided  in Section 8 of the SPSA; (iv) an exculpation provision; and (v) an injunction provision prohibiting parties from commencing or continuing any action or other proceeding on any released Claim or Interest, enforcing or attaching any properties or interests of the Debtors or the Wind-Down Debtors, creating or perfecting any encumbrance, asserting any right of setoff, subrogation or recoupment, acting or proceeding in a manner that does not conform with the Plan and taking actions to interfere with the consummation or implementation of the Plan.  See Plan Art. 13.  As set forth in full detail in the Disclosure Statement and the Plan, these releases, exculpations, discharges and injunctions are the product of a global compromise and settlement with various parties in interest in the Debtors' cases, are in return for substantial consideration and are reasonably tailored and necessary for the Debtors to exit Chapter 11.  Parties that voted to accept the Plan and the implementation of the SPSA consented to the releases.  See Disclosure Statement Approval Order Exs. E–1–G (ballots).

Parties that rejected the Plan were deemed to opt-out of the releases. As such, as set forth in more detail above in paragraphs III.G.84-III.G.iii.101, the releases, exculpations, discharges and injunctions are appropriate.

iv. <u>The Plan Complies with Section 1123(d) of the Bankruptcy Code</u>

117. Section 1123(d) of the Bankruptcy Code states that "if it is proposed in a plan to cure a default the amount necessary to cure the default shall be determined in accordance with the underlying agreement and applicable nonbankruptcy law." 11 U.S.C. § 1123(d). Subject to certain limitations, Section 9.3 of the Plan provides for the satisfaction of monetary defaults, if any, under any Remaining Contract assumed under the Plan, by payment of the Cure Amount in Cash on the Effective Date or as soon as practicable thereafter or on such terms as may be agreed to by the Debtors and the non-Debtor parties to such Remaining Contract. No Cure Amounts are due on the two executory contracts the Wind-Down Debtors propose to assume. <u>See</u> Plan Ex. C. Accordingly, the Plan complies with Section 1123(d) of the Bankruptcy Code.

**B. The Plan Complies with Section 1129(a)(2) of the Bankruptcy Code**

118. The Debtors satisfy Section 1129(a)(2) of the Bankruptcy Code, which requires that the proponent of a plan of reorganization comply with the applicable provisions of the Bankruptcy Code. The legislative history of Section 1129(a)(2) of the Bankruptcy Code indicates that this provision is intended to encompass the disclosure and solicitation requirements set forth in Sections 1125 and 1126 of the Bankruptcy Code. S. Rep. No. 95-989, at 26 (1978); H.R. Rep. No. 95-595, at 407 (1977) ("Paragraph (2) [of Section 1129(a)] requires that the proponent of the plan comply with the applicable provisions of chapter 11, such as section 1125 regarding disclosure."); <u>see</u> <u>In re Lapworth</u>, No. 97-34529 (DWS), 1998 WL 767456, at *3 (Bankr. E.D. Pa. Nov. 2, 1998) ("The legislative history of § 1129(a)(2) specifically identifies compliance with the disclosure requirements of § 1125 as a requirement of § 1129(a)(2)."). As discussed in § *I.B.*

– *Notice and Solicitation* above, the Debtors have complied with Sections 1125 and 1126 of the Bankruptcy Code regarding disclosure and solicitation of the Plan.

### C.    The SPSA and Plan's Substantive Consolidation of NNI and NNCC is Appropriate

119.    The SPSA also provides for the substantive consolidation of NNI and NNCC. The substantive consolidation of NNI and NNCC comports with Third Circuit law on substantive consolidation, as NNCC and NNI shared a "substantial identity."  In re Lisanti Foods Inc., No. 05-3912, 2007 WL 2212720, at *2 (3d Cir. 2007) (substantive consolidation on the basis of "substantial identity" satisfied the test for substantive consolidation explained in In re Owens Corning, 419 F.3d 195 (3d Cir. 2005)).  In Lisanti, the Third Circuit emphasized several factors supporting such a finding of substantial identity:  having the same officers, directors and shareholders; "conduct[ing] the same general business operations;" not charging each other for services rendered; and "moving profits between and among the debtors."  In re Lisanti Foods Inc., 2007 WL 2212720, at *2.

120.    The relationship between NNI and NNCC demonstrates they shared a substantial identity.  NNCC's sole purpose was to serve as a financing vehicle for the Nortel group.  POC Claim No. 8446, Ex. B at 3 May 2, 1996 (the "Prospectus Supplement.").[39]  NNCC had no assets or operations separate from NNI.  Prospectus Supplement at 3.  NNCC did not have a single employee of its own and instead relied on NNI and other members of the corporate group's employees for all of its operations (i.e. its financing activities).  Prospectus Supplement at 3. NNCC's lack of employees and operations indicate it shared a substantial identity with NNI.

---

[39]    This document also appeared as evidence in the Allocation Trial as exhibit number TR43730.  See TR43730 at 6 (Northern Telecom Capital Corp. Prospectus Suppl., May 2, 1996).

121.    Consistent with NNCC's role as a financial conduit to NNI, NNCC issued $300

million in bonds, the proceeds of which were almost entirely passed directly to NNI, excluding

only the debt issuance expenses incurred by NNCC.  Prospectus Supplement at 1; Monthly

Operating Report No. 30 Ex. A, Sept. 1, 2011 [D.I. 6290] (Promissory Note, July 23, 1996).

NNI entered into a series of intercompany loans with NNCC with terms that mirrored the NNCC

Bonds' repayment terms.  See e.g. Monthly Operating Report No. 30 Ex. C, Sept. 1, 2011 [D.I.

6290] (Revolving Loan Agreement, Feb. 14, 2006).  While NNL guaranteed the bonds, to the

extent guaranty fee payments were made to NNL in connection with this role, NNI made those

payments.  Notice of Amendments to Schedules of Assets and Liabilities of NNI and Nortel

Networks Capital Corporation at 2, Dec. 10, 2014 [D.I. 14923].  Consistent with this, the only

pre-petition creditors of NNCC were the NNCC Bondholders (for the Bonds) and NNI (for the

guaranty fees).  NNCC's role as a financial conduit to NNI and NNI's payment of NNCC's

guarantee fee demonstrate that profits and expenses were moved between the two without regard

for corporate separateness, further supporting a finding of "substantial identity" and justifying

the substantive consolidation of NNI and NNCC.

122.    The few creditors of NNCC — the PBGC, the NNCC Bondholders and NNI —

all support the substantive consolidation of NNCC and NNI.  Given the lack of opposition and

the substantial identity between NNI and NNCC, the substantive consolidation of NNI and

NNCC should be approved.

**D.    The Plan Has Been Proposed in Good Faith Pursuant to Section 1129(a)(3) of
the Bankruptcy Code**

123.    The Third Circuit has held that the "touchstone" of an 1129(a)(3) good faith

inquiry is whether the plan will "achieve a result consistent with the objectives and purposes of

the Bankruptcy Code."  See In re W.R. Grace & Co., 475 B.R. 34, 87 (D. Del. 2012), aff'd 729

F.3d 332 (3d Cir. 2013) (citations omitted).  The factors that a Court should consider in making a determination of good faith are:  (1) whether the plan fosters a result consistent with the Bankruptcy Code's objectives; (2) whether the plan has been proposed with honesty and good intentions and with a basis for expecting that reorganization can be effected; and (3) whether the plan exhibited fundamental fairness in dealing with the creditors.  See In re Genesis Health Ventures, Inc., 266 B.R. 591, 609 (Bankr. D. Del. 2001); see also In re W.R. Grace, 475 B.R. at 87.

124.    The Debtors' Plan unequivocally meets all of these standards.  First, given that "[t]he determination of good faith must be based on the totality of the circumstances,"  In re Genesis Health Ventures, Inc., 266 B.R. at 609, it is worth reviewing the process by which the Debtors' Plan was negotiated and agreed-upon.  The Debtors' Plan is the product of good-faith, arm's length negotiations between the Debtors and a wide assortment of parties in interest in these Chapter 11 Cases, negotiations which ultimately resulted in the execution of the SPSA. The SPSA is an integrated settlement reflecting a compromise among the various Nortel estates which was negotiated in recognition of the allocation of the  Sales Proceeds among the various Nortel estates as provided by this Court and the Canadian Court under the Allocation Decision, as well as a compromise of various other matters. The execution of the SPSA by the SPSA Parties was a significant milestone in these cases and the Debtors believe approval of the SPSA and confirmation of the Plan present the best—and likely only—opportunity for the Debtors to maximize value for creditors of the Debtors, given the Allocation Decision and the significant risk of continued litigation and depletion of the Debtors' estates' assets in the future should the SPSA and Plan fail to become effective and the parties return to litigation.

125.    Furthermore, it is also worth noting that under the good faith inquiry, the Debtors are granted broad discretion in negotiating a Plan.  Indeed, the plan the Debtors propose "may satisfy good faith even if it may not be one which the creditors would themselves design and indeed may not be confirmable."  In re W.R. Grace, 475 B.R. at 90 (quotations and citations omitted).  This deference to the Debtors stems from courts' recognition of the expense of remaining in bankruptcy and the resulting importance to achieving a plan in a timely and efficient manner, which, given the multi-year history of these cases and the significant costs incurred by the Debtors during the pendency of these cases, would continue to be a significant concern in the Debtors' cases if they are not confirmed.  See In re Genesis, 266 B.R. at 609 (finding that rather than imputing bad faith, a prompt confirmation process "must be lauded" because it spares the Debtors various expenses and thus "enhance[s] the value" of the estate).  Given these standards, the Debtors' Plan, which was carefully and vigorously negotiated and which is not only confirmable (having received overwhelming support from all voting classes, other than the five members of the NTCC) but which also would finally set these long-pending cases on a path to finality, falls squarely within the boundaries of good faith.

126.    Here, the Debtors have formulated a plan that distributes the Sales Proceeds to creditors in accordance with the terms of the SPSA and in conformance with the requirements of the Bankruptcy Code.  Given that the Debtors' Plan achieves a result consistent with the Bankruptcy Code, was proposed with the honest goal of effecting a wind down of the Debtors and an equitable distribution of the Debtors' estates' assets, and treats all creditors fairly and equitably, the Debtors' Plan should be found to have been proposed in good faith.

E.    **The Plan Provides for Bankruptcy Court Approval of Payments for Services or Costs and Expenses Pursuant to Section 1129(a)(4) of the Bankruptcy Code**

127.    Section 1129(a)(4) of the Bankruptcy Code requires that certain professional fees and expenses paid by the plan proponent, by the debtor or by a person receiving distributions of property under the plan, be subject to approval by the Court as reasonable.  11 U.S.C. § 1129(a)(4).  Section 1129(a)(4) states:

> Any payment made or to be made by the proponent, by the debtor, or by a person issuing securities or acquiring property under the plan, for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable.

11 U.S.C. § 1129(a)(4).  This section of the Bankruptcy Code has been construed to require that all payments of professional fees that are made from estate assets be subject to review and approval by the bankruptcy court as to their reasonableness.  In re Drexel Burnham Lambert Grp., Inc., 138 B.R. 723, 760 (Bankr. S.D.N.Y. 1992); In re Printing Dimensions, Inc., 153 B.R. 715, 719 (Bankr. D. Md. 1993).

128.    In this instance, all payments made or to be made by the Debtors for services or for costs or expenses in connection with the Chapter 11 Cases before the Effective Date, including all Professional Fee Claims, have been approved by, or remain subject to approval of, the Court as reasonable.  To that end, Section 2.3 of the Plan provides that all Professionals seeking final approval of compensation in the Chapter 11 Cases are required to file applications for approval of Professional Fee Claims with the Bankruptcy Court and the U.S. Trustee prior to a date certain.  After these claims are filed, Section 2.3 of the Plan allows parties in interest to object to Professional Fee Claims, and requires such claims to be allowed before receiving any payment.  Accordingly, the Plan ensures that any Professional Fee Claims may be reviewed by

the Bankruptcy Court and complies with the requirements of section 1129(a)(4) of the

Bankruptcy Code.

      **F.**      **All Necessary Information Regarding Directors and Officers of the Debtors and Wind-Down Debtors Has Been Disclosed Pursuant to Section 1129(a)(5) of the Bankruptcy Code**

      129.     Section 1129(a)(5) of the Bankruptcy Code requires that a plan of reorganization

disclose the identity and affiliations of those individuals who will serve as a director, officer or

voting trustee of the reorganized debtor, the identity of any insider to be employed or retained

and the nature of the compensation proposed to be paid to such insider.  11 U.S.C. § 1129(a)(5).

      130.     The Plan satisfies the requirements of section 1129(a)(5)(A)(i) of the Bankruptcy

Code because Exhibit F to the Plan, as filed with the Plan Supplement, provides the necessary

disclosure of the identities and affiliations of each of the individuals that will serve as officers

and directors in the Wind-Down Debtors.

      131.     Section 1129(a)(5)(A)(ii) of the Bankruptcy Code requires that this Court find the

appointment or continuation in office of existing management is "consistent with the interests of

creditors and equity security holders and with public policy."  11 U.S.C. § 1129(a)(5)(A)(ii).

This section asks a court to ensure that the post-confirmation affairs of the debtor are in "good

hands," which has been interpreted by courts to mean experience in financial and management

matters, see In re Stratford Assocs. Ltd. P'ship, 145 B.R. 689, 696 (Bankr. D. Kan. 1992); that

the debtor and creditors' committee believe control of the entity by proposed individuals will be

beneficial, see In re Apex Oil Co., 118 B.R. 683, 704-05 (Bankr. E.D. Mo. 1990); and does not

perpetuate incompetence, lack of discretion, inexperience, or affiliation with groups inimical to

the best interests of the debtor, see In re Beyond.com Corp., 289 B.R. 138, 145 (Bankr. N.D. Cal.

2003).  "The Debtor should have first choice of its management, unless compelling cause to the

contrary exists."  In re Sherwood Square Assocs., 107 B.R. 872, 878 (Bankr. D. Md. 1989).

132.    As described in additional detail in Exhibit F to the Plan and in the Disclosure Statement, the Wind-Down Debtors' proposed directors and officers have extensive experience in these Chapter 11 Cases and their continued involvement will streamline the administration of the Wind-Down Debtors' estates—to the benefit of all parties in interest.  The following individuals will serve the following roles:  John J. Ray, III – President, Director; Mary Cilia – Treasurer; Kathryn Schultea – Vice President and Secretary and, as fully set forth in Exhibit F to the Plan, the Debtors have disclosed the affiliations of these individuals.  Their long-running familiarity with these cases will facilitate an orderly wind-down to these cases, to the benefit of all parties in interest.  To the extent that these individuals are considered insiders, they will be compensated as set forth in the Plan Administrator Agreement included as Exhibit B to the Plan.

133.    Section 1129(a)(5)(B) of the Bankruptcy Code requires a plan proponent to disclose the identity of an "insider" (as defined by 11 U.S.C. § 101(31)) to be employed or retained by the reorganized debtor and the "nature of any compensation for such insider."  11 U.S.C.§ 1129(a)(5)(B); see also In re Texaco, Inc., 84 B.R. 893, 908 (Bankr. S.D.N.Y. 1988) (finding requirements of § 1129(a)(5)(B) satisfied where the plan discloses debtors' existing officers and directors who will continue to serve after plan confirmation); In re Apex Oil Co., 118 B.R. at 704-05 (finding § 1129(a)(5)(B) satisfied where plan fully disclosed that certain insiders will be employed by reorganized debtor and the terms of employment of such insiders). The Plan discloses that John J. Ray, III; Mary Cilia and Kathryn Schultea, who are all presently affiliated with the Debtors, will be employed and retained by the Wind-Down Debtors after the Effective Date and compensated according to the Plan Administration Agreement.  See Plan Ex. B.

134.     For these reasons, the Debtors have satisfied the requirements of section

1129(a)(5) of the Bankruptcy Code.

**G.     The Plan Does Not Require Governmental Regulatory Approval Pursuant to Section 1129(a)(6) of the Bankruptcy Code**

135.     Section 1129(a)(6) of the Bankruptcy Code permits confirmation only if any

regulatory commission that has or will have jurisdiction over a debtor after confirmation has

approved any rate change provided for in the plan.  11 U.S.C. § 1129(a)(6).  The Plan does not

provide for rate changes by the Debtors subject to the jurisdiction of any governmental

regulatory commission and will not require governmental regulatory approval.

**H.     The Plan Satisfies the Best Interest of Creditors and Interest Holders Test Pursuant to Section 1129(a)(7) of the Bankruptcy Code**

136.     The Bankruptcy Code protects individual creditors and equity security holders

who are impaired by the Plan and who have not voted to accept the Plan through the "best

interests" test of Section 1129(a)(7)(A) of the Bankruptcy Code, which provides that a court

shall confirm a plan of reorganization if, with respect to each impaired class of claims or

interests:

> each holder of a claim or interest of such class– (i) has accepted the plan;
> or (ii) will receive or retain under the plan on account of such claim or
> interest property of a value, as of the effective date of the plan, that is not
> less than the amount that such holder would so receive or retain if the
> debtor were liquidated under chapter 7 of this title on such date.

11 U.S.C. § 1129(a)(7)(A).

137.     The "best interests" test applies to individual dissenting creditors or interest

holders rather than classes of claims and is generally satisfied through a comparison of the

estimated recoveries for a debtor's stakeholders in a hypothetical liquidation of that debtors'

estate under Chapter 7 of the Bankruptcy Code against the estimated recoveries under that

debtor's Chapter 11 plan.  See Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St.

P'ship, 526 U.S. 434, 442 n.13 (1999) (explaining that "[t]he 'best interests' test applies to individual creditors holding impaired claims, even if the class as a whole votes to accept the plan"); In re Adelphia Commc'ns Corp., 368 B.R. 140, 251 (Bankr. S.D.N.Y. 2007) (explaining that § 1129(a)(7) is satisfied when impaired holder of claim would receive "no less than such holder would receive in a hypothetical chapter 7 liquidation").

138.    The first step in meeting the best interests test is to determine the proceeds that the hypothetical liquidation of a debtor's assets and properties would generate in the context of a chapter 7 liquidation.  The gross amount available would be the sum of the proceeds from liquidating the debtor's assets plus the cash held by the debtor at the time the hypothetical chapter 7 case is commenced.  The amount of any claims secured by these assets, the costs and expenses of the liquidation, and any additional administrative expenses and priority claims that may result from the termination of the debtor's businesses and the use of chapter 7 for the purposes of a hypothetical liquidation would reduce the amount of these proceeds.  Any remaining net cash would be allocated to creditors and equity interest holders in strict priority in accordance with section 726 of the Bankruptcy Code.

139.    The Debtors believe that liquidation under chapter 7 would result in smaller distributions to creditors than those provided for in the Plan because of  the additional administrative expenses involved in the appointment of a chapter 7 trustee, including significant fees and compensation for the chapter 7 trustee, as discussed below, additional costs that would likely be incurred by a chapter 7 trustee in becoming familiar with the complex structure and history of the Debtors' cases and additional costs for data retention and financial reporting functions over the extended period of time that would be required for a chapter 7 liquidation.

The Debtors undertook a liquidation analysis, which was approved to be circulated with their Disclosure Statement, that sets forth this analysis.  See Disclosure Statement App. D.

140.    Additionally, the Debtors' costs of liquidation under chapter 7 of the Bankruptcy Code would include the fees payable to a chapter 7 trustee, as well as those fees that might be payable to attorneys and other professionals that a trustee must engage.  At the late stage of these cases, such fees would be wasteful and unnecessary given the cases' lengthy history and the wide array of case knowledge required to implement the settlements embodied in the SPSA and Plan. Other claims that might arise in a chapter 7 liquidation case (including claims from potentially redundant activities that could be engaged in by a chapter 7 trustee) or result from the pending Chapter 11 Cases, including any unpaid expenses incurred by the Debtors and the Creditors' Committee during the Chapter 11 Cases such as compensation for attorneys, financial advisors, and accountants, also would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available for distribution to creditors.

141.    After considering the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to the Holders of Claims and Interests in the Chapter 11 Cases, including the increased costs and expenses of a liquidation under chapter 7 of the Bankruptcy Code arising from fees payable to a trustee in bankruptcy and professional advisors to such trustee and the cost of the Chapter 7 Trustee becoming familiar with the complexity of these cases, the Debtors assert that confirmation of the Plan will provide each Holder of a Claim with a recovery that is not less than such Holder would receive pursuant to a liquidation of the Debtors under chapter 7 of the Bankruptcy Code.  Tellingly, no creditor has objected to the confirmation of the Plan on this ground.  Thus, the Debtors submit that they have satisfied the requirements of § 1129(a)(7) of the Bankruptcy Code.

### I.      Section 1129(a)(8) of the Bankruptcy Code Does Not Preclude Confirmation

142.    Section 1129(a)(8) requires acceptance of a plan by each class of claim or

interests that is impaired by the Plan.  11 U.S.C. § 1129(a)(8).  Pursuant to section 1126(c) of the

Bankruptcy Code, a class of impaired clams accepts a plan if holders of at least two-thirds in

dollar amount and more than one-half in number of the allowed claims in that class vote to

accept the plan.  Here, all impaired Classes entitled to vote accepted the Plan, other than Class A-

3A, comprised of general unsecured claims against the Consolidated Debtors.  See Voting

Record.  Notably, while 1,255 votes were received to reject the Plan by Class A-3A holders, all

but 48 of these votes are held by the five members of the NTCC.  Therefore, only approximately

3.82% of votes to reject the Plan by Class A-3A holders were cast by non-NTCC members. See

Voting Record.  In addition, holders of Interests, classified in Class 5 for each Debtor, are

impaired and deemed to have rejected the Plan.[40]  Accordingly, the Plan does not satisfy section

1129(a)(8) of the Bankruptcy Code.  Nevertheless, because, as discussed below, the Plan

satisfies section 1129(b), the Plan may still be confirmed under the Bankruptcy Code.

### J.      The Plan Provides for Payment in Full Of All Allowed Priority Claims Pursuant to Section 1129(a)(9) of the Bankruptcy Code

143.    Section 1129(a)(9) of the Bankruptcy Code generally requires that the Plan satisfy

administrative and priority tax claims in full and in cash unless the holder of a particular claim

agrees to a different treatment with respect to such claim.  See 11 U.S.C. §§ 1126(g), 1129(a)(9).

144.    As required by section 1129(a)(9) of the Bankruptcy Code, Sections 2.1 of the

Plan allows for payment in full of Allowed Administrative Claims, Section 2.4 of the Plan

provides for payment in full of Allowed Priority Tax Claims, and Section 4.1 of the Plan allows

---

[40]      Classes D1-O1 (Priority Non-Tax Claims), C2 through O2 (Secured Claims), C-3C (Convenience Claims) at Altsystems, 4 (Subordinated Claims) and  5B (Interest Securities Fraud Claims) at every Debtors were vacant and have been eliminated for purposes of voting in accordance with Section 5.4 of the Plan.

for the payment in full of all other Allowed Priority Non-Tax Claims.  Therefore, the Debtors

submit that the Plan complies with section 1129(a)(9) of the Bankruptcy Code.

### K.        At Least One Impaired Class of Claims That Is Entitled to Vote Has Accepted the Plan, Pursuant to Section 1129(a)(10) of the Bankruptcy Code

145.    Section 1129(a)(10) of the Bankruptcy Code provides that, to the extent there is

an impaired class of claims under a plan, at least one impaired class of claims must accept the

plan, "without including any acceptance of the plan by any insider."  11 U.S.C. § 1129(a)(10).

As already noted, Classes A-3B and A-3C, B-3A and B-3C and C-3A through O-3A, each of

which was impaired, have all voted to accept the Plan. Therefore, the Debtors submit that the

Plan complies with section 1129(a)(10) of the Bankruptcy Code.

### L.        The Plan Is Feasible Pursuant to Section 1129(a)(11) of the Bankruptcy Code

146.    Section 1129(a)(11) of the Bankruptcy Code requires that the Court find that

"confirmation of the plan is not likely to be followed by the liquidation, or the need for further

financial reorganization, of the debtor or any successor to the debtor under the plan, unless such

liquidation or reorganization is proposed in the plan."  11 U.S.C. § 1129(a)(11).

147.    The Plan contemplates the wind-down of the Debtors and, ultimately, the

liquidation or dissolution of each Debtor. Insofar as the Debtors will not continue to operate as

going concerns and the Plan contemplates a final wind-down of each of the Debtors and the

ultimate distribution of the value of the Debtors to creditors, the Plan satisfies Section

1129(a)(11) of the Bankruptcy Code.  No party states otherwise.

### M.        The Plan Provides for the Payment Of All Fees Under 28 U.S.C. § 1930 Pursuant to Section 1129(a)(12) of the Bankruptcy Code

148.    Section 1129(a)(12) of the Bankruptcy Code requires that certain fees listed in 28

U.S.C. § 1930, determined by the court at the hearing on confirmation of a plan, be paid or that

provisions be made for their payment.  11 U.S.C. § 1129(a)(12).  Section 2.2 of the Plan states

that all such fees shall be paid.  Thus, the Plan satisfies the requirements of Section 1129(a)(12).

### N.    Sections 1129(a)(13)-(16) of the Bankruptcy Code Are Inapplicable

149.    Section 1129(a)(13) of the Bankruptcy Code requires that all retiree benefits, as

defined in Section 1114 of the Bankruptcy Code, continue to be paid post-confirmation at any

levels established in accordance with Section 1114 of the Bankruptcy Code.  See 11 U.S.C.

§ 1129(a)(13).  Section 1114 of the Bankruptcy Code defines "retiree benefits" as those

payments made for the purpose of providing or reimbursing payments for retired employees,

their spouses, and their dependents for medical benefits.  See 11 U.S.C. § 1114(a).  All retiree

benefit liabilities of the Debtors have been settled pursuant to a settlement agreement (the

"Retiree Welfare Settlement Agreement") reached between the Debtors and the official

committee of retired employees of the Debtors.  The Retiree Welfare Settlement Agreement was

approved by the Bankruptcy Court on April 2, 2013 [D.I. 9938].  Pursuant to the terms of the

Retiree Welfare Settlement Agreement, the Debtors have settled all retiree benefit liabilities and

have thereby satisfied the requirements of Section 1129(a)(13) of the Bankruptcy Code.

150.    Section 1129(a)(14) of the Bankruptcy Code requires domestic support

obligations to be paid, if required by judicial or administrative order or statute, which first

become payable after the date of filing the petition.  See 11 U.S.C. § 1129(a)(14).  The Debtors

do not owe any domestic support obligations.  Therefore, the Plan need not comply with Section

1129(a)(14) of the Bankruptcy Code.

151.    Section 1129(a)(15) of the Bankruptcy Code requires that an individual Chapter

11 debtor, in a case in which the holder of an allowed unsecured claim objects to plan

confirmation, either pay all unsecured claims in full or that the debtor's plan devote an amount

equal to five years' worth of the debtor's disposable income to unsecured creditors.  See 11

U.S.C. § 1129(a)(15). The Debtors are not an "<u>individual</u>" as contemplated by this section of the Bankruptcy Code. Therefore, the Plan need not comply with Section 1129(a)(15) of the Bankruptcy Code.

152.    Section 1129(a)(16) of the Bankruptcy Code conditions confirmation of a plan on the fact that all transfers under the plan will be made in accordance with applicable provisions of "nonbankruptcy law that govern the transfer of property by a corporation or trust that is not a moneyed, business, or commercial corporation or trust." 11 U.S.C. § 1129(a)(16). None of the Debtors is a nonprofit corporation or trust as contemplated by this section of the Bankruptcy Code. Therefore, the Plan need not comply with Section 1129(a)(16) of the Bankruptcy Code.

**O.      The Plan Complies with Section 1129(b) of the Bankruptcy Code**

153.    Section 1129(b) of the Bankruptcy Code applies when the requirements of 1129(a)(8) are not met, as is the case here. Because the Plan (i) does not discriminate unfairly; and (ii) is fair and equitable, with respect to each impaired class of claims or interests that has not accepted the Plan, the Plan satisfies section 1129(b) of the Bankruptcy Code.

154.    Although the Plan separately classifies certain claims with the same priority (General Unsecured Claims against the Consolidated Debtors in Class A-3A and Crossover Bonds Claims and EDC Claims against the Consolidated Debtors in Class A-3B), these Classes are receiving *pari passu* treatment under the Plan.[41] The Crossover Bondholders are entitled to recover from both the Debtors and the Canadian Debtors as a result of their contractual guarantees and the Supreme Court's decision in <u>Ivanhoe</u>, 295 U.S. 243, and therefore are likely to receive aggregate distributions from the Canadian Debtors and the Debtors greater, in total, than the distributions received by Class A-3A Claims solely from the Debtors. Additionally, the

---

[41]    <u>See</u> Art. 4, Section 6.7 of the Plan (providing *pari passu* treatment of Crossover Bonds Claims with claims of the same priority.

Canadian Debtors have granted NNI certain subrogation rights with respect to the Class 3B claims, if they are repaid in full. Notably, the Debtors estimate that the low-end of the recovery range from the Debtors under the Plan for Class A-3A (e.g., the NTCC) and Class A-3B (e.g., the Crossover Bond Claims) from Debtor distributions is the *same*, while the high-end of the recovery range *is in fact greater for Class A-3A* than for Class A-3B, as a result of the cap provided in the SPSA and the Plan of 100% on aggregate recovery on account of the Crossover Bond Claims. Put simply, once the Crossover Bond Claims have received aggregate distributions from the Debtors and the Canadian Debtors resulting in a 100% recovery on their claims, any additional distribution on account of unsecured claims would flow to those unsecured claims other than the Crossover Bond Claims. Accordingly, the Plan does not discriminate (unfairly or otherwise) against Class A-3A. Because the Plan also does not discriminate in any way against any of the Classes of Interests that are also impaired and rejecting Classes, the Plan does not unfairly discriminate in satisfaction of section 1129(b)(1) of the Bankruptcy Code.

155.    The Plan also is fair and equitable with respect to Class A-3A and Class 5 at each Debtor. With respect to Class A-3A, which is comprised of general unsecured claims, section 1129(b)(2)(B) of the Bankruptcy Code provides that the condition that a plan be fair and equitable with respect to a class includes the requirement that: (i) each holder of a claim of such class receive payment in full on its claim; or (ii) no holder of a claim or interest junior to such claim receives any distribution on account of such junior claim or interest. Section 1129(b)(2)(C) of the Bankruptcy Code provides a similar standard as to fair and equitable with respect to a class of interests. The Plan does not provide any recovery on account of any claim

junior to the claims in Class A-3A or on account of any Interest, and therefore satisfies sections

1129(b)(2)(B)(ii) and 1129(b)(2)(C)(ii).  Therefore, the Plan complies with section 1129(b).

### P.    Section 1129(c) of the Bankruptcy Code is Inapplicable

156.    Section 1129(c) of the Bankruptcy provides that the bankruptcy court may

confirm only one plan.  *See* 11 U.S.C. § 1129(c).  Because the Plan is the only plan before the

Court, Section 1129(c) of the Bankruptcy Code is inapplicable.

### Q.    The Plan Complies with Section 1129(d) of the Bankruptcy Code Because It Is Not an Attempt to Avoid Tax Obligations

157.    Section 1129(d) of the Bankruptcy Code provides that a court may not confirm a

plan if the principal purpose of the plan is to avoid taxes or the application of Section 5 of the

Securities Act of 1933.  The Plan meets these requirements because, as discussed above, the Plan

was proposed in good faith and not for the avoidance of taxes or avoidance of the requirements

of Section 5 of the Securities Act of 1933, nor has there been any filing by any governmental

agency asserting such avoidance.

### V.    THE CONFIRMATION ORDER SHOULD BE EFFECTIVE IMMEDIATELY

158.    The Debtors respectfully request that the Court direct that the Confirmation Order

shall be effectively immediately upon its entry notwithstanding the 14-day stay imposed by

operation of Bankruptcy Rule 3020(e).  Bankruptcy Rule 3020(e) provides that:  "An order

confirming a plan is stayed until the expiration of 14 days after the entry of the order, unless the

court orders otherwise."  Fed. R. Bankr. P. 3020(e).  The Advisory Committee notes to Rule

3020(e) state that "the court may, *in its discretion*, order that Rule 3020(e) is not applicable so

that the plan may be implemented and distributions may be made immediately."  Fed. R. Bankr.

P. 3020(e) advisory committee's note to 1999 amendment (emphasis added).  Such use of

discretion is particularly warranted here because such relief is in the best interests of the Debtors'

estates and Creditors and will not prejudice any parties in interest.  Moreover, the Debtors and all parties in interest will benefit from the immediate effectiveness of the Confirmation Order and prompt progression toward the Plan Effective Date, which must be harmonized with the implementation of the Debtors' affiliates' Plans worldwide and should not be delayed. SPSA ¶ 9(a)(xi).

159.    As a result, the Debtors submit, it is appropriate for the Court to exercise its discretion to find and order that Bankruptcy Rule 3020(e) is not applicable and permit the Debtors to consummate the Plan and commence its implementation without delay after the entry of the Confirmation Order.  Bankruptcy Rules 6004(h) and 6006(d) provide similar means for the Court to modify stays or orders authorizing the use, sale or lease of property (other than cash collateral) and orders authorizing a debtor to assign an executory contract or unexpired lease under section 365(f) of the Bankruptcy Code.  See Fed. R. Bankr. P. 6004(h), 6006(d). The Debtors submit that this relief is in the best interests of the Debtors' creditors and will not prejudice any parties in interest.  The Debtors therefore respectfully request that the Court direct that the Confirmation Order be effective immediately upon its entry notwithstanding the stay otherwise imposed pursuant to Rule 3020(e).

## CONCLUSION

For the reasons set forth in this Memorandum, the Debtors request that the Court enter an order, in a form substantially similar to the proposed Confirmation Order filed simultaneously herewith, (i) confirming the Plan; (ii) waiving the 14-day stay of the Confirmation Order; and (iii) granting such other and further relief as it deems appropriate.

Dated:  January 19, 2017
       Wilmington, Delaware

CLEARY GOTTLIEB STEEN & HAMILTON LLP

James L. Bromley (admitted *pro hac vice*)
Lisa M. Schweitzer (admitted *pro hac vice*)
One Liberty Plaza
New York, New York 10006
Telephone:  (212) 225-2000
Facsimile:  (212) 225-3999

   - and -

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

    */s/ Tamara K. Minott*
Derek C. Abbott (No. 3376)
Andrew R. Remming, Esq. (No. 5120)
Tamara K. Minott (No. 5643)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19801
Telephone:  (302) 658-9200
Facsimile: (302) 658-3989

*Counsel for the Debtors*
*and Debtors in Possession*