# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
----------------------------------------------------- X
                                               :      Chapter 11
In re                                          :
                                               :      Case No. 09-10138 (KG)
Nortel Networks Inc., et al.,                  :
                         Debtors.1             :      Jointly Administered
                                               :
                                               :      Re: Docket No. 17501
----------------------------------------------------- X
```

## MEMORANDUM OF LAW OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS IN SUPPORT OF CONFIRMATION OF THE FIRST AMENDED JOINT CHAPTER 11 PLAN OF NORTEL NETWORKS INC. AND CERTAIN OF ITS AFFILIATED DEBTORS

Christopher M. Samis (No. 4909)
Whiteford, Taylor & Preston LLC
The Renaissance Centre
405 North King Street, Suite 500
Wilmington, Delaware 19801
Tel.:  (302) 353-4144

David H. Botter (*pro hac vice*)
Abid Qureshi (*pro hac vice*)
Brad M. Kahn (*pro hac vice*)
Robert A. Johnson (*pro hac vice*)
Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, NY  10036
Tel.:  (212) 872-1000

*Co-counsel to the Official Committee of Unsecured Creditors*

January 19, 2017

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226) ("NN CALA").  Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://chapter11.epiqsystems.com/nortel.

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ......................................................................................................1

BACKGROUND ...........................................................................................................................2

ARGUMENT ...............................................................................................................................11

I.    THE SPSA EMBODIED IN THE PLAN SATISFIES THE *MARTIN* FACTORS .............11

    A.    Probability of Success in the Litigation ............................................................13

    B.    Likely Difficulties of Collection ......................................................................14

    C.    Complexity, Expense, Inconvenience and Delay ..............................................15

    D.    The Paramount Interest of Creditors .................................................................16

II.    THE RESERVE REQUESTED BY THE TCC WOULD VIOLATE BANKRUPTCY CODE SECTION 1123(A)(4)....................................................................................................18

CONCLUSION ............................................................................................................................19

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Begier v. IRS*,
  496 U.S. 53 (1990)..................................................................................................18

*In re Coram Healthcare Corp.*,
  315 B.R. 321 (Bankr. D. Del. 2004) .......................................................................12

*Cosoff v. Rodman (In re W.T. Grant Co.)*,
  699 F.2d 599 (2d Cir. 1983).....................................................................................12

*In re Key3Media Grp., Inc.*,
  336 B.R. 87 (Bankr. D. Del. 2005) ..........................................................................12

*Law Debenture Tr. Co. of N.Y. v. Kaiser Aluminum Corp. (In re Kaiser Aluminum Corp.)*,
  339 B.R. 91 (D. Del. 2006) ......................................................................................12

*In re Louise's, Inc.*,
  211 B.R. 798 (D. Del. 1997)......................................................................................12

*In re Marvel Entm't Grp., Inc.*,
  222 B.R. 243 (D. Del. 1998)......................................................................................12

*Myers v. Martin (In re Martin)*,
  91 F.3d 389 (3d Cir. 1996)..........................................................................11, 12, 16

*Newman v. Stein*,
  464 F.2d 689 (2d Cir. 1972)......................................................................................12

*In re Nortel Networks, Inc.*,
  669 F.3d 128 (3d Cir. 2011).....................................................................................14

*In re Nutritional Sourcing Corp.*,
  398 B.R. 816 (Bankr. D. Del. 2008) ........................................................................17

*Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*,
  390 U.S. 414 (1968)..................................................................................................12

*Schroeder v. New Century Liquidating Tr. (In re New Century TRS Holdings, Inc.)*,
  407 B.R. 576 (D. Del. 2009) ....................................................................................19

*In re Summit Metals, Inc.*
  477 F. App'x 18 (3d Cir. 2012) ...............................................................................18

*In re Tribune Co.*,
    464 B.R. 126 (Bankr. D. Del. 2011) .......................................................................................16

*In re Turner Eng'g, Inc.*,
    109 B.R. 956 (Bankr. D. Mont. 1989) ...................................................................................16

*In re World Health Alts., Inc.*,
    344 B.R. 291 (Bankr. D. Del. 2006) .......................................................................................12

**Statutes**

11 U.S.C. 1123(a)(4).............................................................................................................11, 18

The Official Committee of Unsecured Creditors (the "Committee") of Nortel Networks

Inc. ("NNI") and certain of its U.S. affiliates, as debtors and debtors in possession (collectively,

the "U.S. Debtors"), by and through its undersigned counsel, hereby submits this memorandum

of law (the "Memorandum") in support of the *First Amended Joint Chapter 11 Plan of Nortel*

*Networks Inc. and Certain of its Affiliated Debtors* [D.I. 17501] (the "Plan").[2]

## PRELIMINARY STATEMENT

1.        The Committee supports confirmation of the Plan and approval of the Settlement

and Plans Support Agreement ("SPSA") because they are fair and reasonable, in the best

interests of the U.S. unsecured creditors, and, most importantly, a path to certain distributions to

the unsecured creditors who have been waiting patiently for recoveries on their claims.

2.        The SPSA is a reasonable and fair compromise of complex issues resulting from

years of hard-fought litigation and arm's length negotiations between sophisticated parties.

While the agreed allocation of the Sale Proceeds to the U.S. estates falls short of the allocation

for which the Committee advocated in the Allocation Trial, the result is reasonable given the

facts and circumstances of these proceedings.  Moreover, as the Nortel Trade Claims Consortium

(the "TCC") — which is the only remaining party objecting to approval of the SPSA — does not

dispute, the SPSA results in a significant increase in recoveries for *all* unsecured creditors, both

bondholders and General Unsecured Creditors, as compared to the projected outcome of the

Modified Pro Rata methodology in the Allocation Decision.

3.        Speed and certainty of distributions are of paramount importance to U.S.

unsecured creditors.  Pressing forward with appeals of the Allocation Decision achieves only the

opposite:  delay and uncertainty.  Indeed, the TCC fails to mention that, even if it succeeded in

overturning the Allocation Decisions at the Third Circuit, there is no similar appellate path

---

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Plan.

available as of right in the Canadian proceeding.  The potential resulting discordance in decisions would prevent any distribution of Sale Proceeds and leave the parties in continuing limbo on resolving the Allocation Dispute.  The time to resolve these matters has come, and the SPSA represents a reasonable and fair resolution.  For these reasons, the Committee is a signatory to the SPSA and a supporter of the Plan that seeks to implement it.

4.      The Committee joins in the Debtors' memorandum of law in support of confirmation of the Plan, and for the additional reasons set forth below, urges this Court to approve the SPSA and confirm the Plan.

## BACKGROUND

5.      On January 14, 2009 (the "Petition Date"), each of the Debtors other than NN CALA[3] filed a voluntary petition for relief (the "U.S. Proceeding") under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Court" or "U.S. Court").

6.      On January 14, 2009, the Debtors' ultimate corporate parent, Nortel Networks Corporation ("NNC"), together with Nortel Networks Limited ("NNL") and certain of their Canadian affiliates (collectively, the "Canadian Debtors") commenced a proceeding (the "Canadian Proceeding") before the Ontario Superior Court of Justice (the "Canadian Court" and, together with the Court, the "Courts") for a plan of compromise or arrangement under Canada's Companies' Creditors Arrangement Act ("CCAA").  The Canadian Debtors' proceedings have been under the supervision of the Canadian Court, and Ernst & Young Inc. was appointed as monitor (the "Monitor") on January 14, 2009.[4]

---

[3] NN CALA filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on July 14, 2009.

[4] Additionally, following the business line sales, the cessation of public reporting obligations, and the resignations of the officers and directors of the Canadian Debtors, the Canadian Court, by order dated October 3,

7.        On January 14, 2009, the High Court of Justice in England (the "U.K. Court")
placed nineteen of the Debtors' European affiliates (collectively, the "EMEA Debtors" and,
together with the Debtors and the Canadian Debtors, the "Nortel Debtors"), including Nortel
Networks U.K. Limited ("NNUK"), into administration (the "European Proceedings" and,
together with the U.S. Proceeding and Canadian Proceeding, the "Insolvency Proceedings") with
certain individuals at Ernst & Young LLC serving as Administrators (the "Administrators").

*The Committee's Formation*

8.        The Committee was formed initially on January 26, 2009, pursuant to section
1102 of the Bankruptcy Code.  On that date, the Acting United States Trustee for Region 3 (the
"U.S. Trustee") appointed a Committee that originally consisted of five members: one indenture
trustee, three trade creditors, and the Pension Benefit Guaranty Corporation.  *See* D.I. 141.  That
same day, one of the trade creditors resigned from the Committee, leaving a four member
Committee.  *See* D.I. 142.  On February 19, 2009, the Committee's membership was again
modified to include the NNCC Bonds Indenture Trustee.  *See* D.I. 340.  Over the course of the
following 18 months, the two remaining trade creditors resigned from the Committee after the
Debtors assumed and assigned their contracts to the purchasers of certain of Nortel's business
lines.  *See* D.I. 3778.  Accordingly, since August 2010, the Committee has been functioning with
its three current members: (i) Delaware Trust Company (as successor to Law Debenture Trust
Company of New York), as indenture trustee; (ii) the Pension Benefit Guaranty Corporation; and
(iii) The Bank of New York Mellon, as indenture trustee.

9.        Despite their individual interests, these three Committee members have worked
cooperatively throughout these cases to maximize value for all unsecured creditors of the

---

2012, expanded the powers of the Monitor to include the exercise of any powers properly exercised by a board of
directors of any of the Canadian Debtors.  *See* Allocation Opinion [D.I. 15544], at 47.

Debtors, fulfilling their fiduciary duties for all unsecured creditors while strongly advocating for their individual interests.  Their interests have been aligned in obtaining maximum recovery for the claims of U.S. unsecured creditors, whether General Unsecured Claims or Crossover Bonds Claims or NNCC Bonds Claims.  Since its formation, the Committee has worked arduously to maximize value for distribution to *all* U.S. unsecured creditors.  Indeed, the Committee's role in these proceedings has been to inextricably involve itself in all aspects of the Debtors' restructuring efforts in order to ensure that the interests of U.S. unsecured creditors are protected and that their recoveries are maximized.  This has been the Committee's charge, and one that the Committee has faithfully executed, including with respect to the SPSA and Plan presently before the Court.  Over the entire eight-year history of these cases, the Committee has functioned well and efficiently, and has acquitted its fiduciary duties to take actions that inured to the benefit of all unsecured creditors of the Debtors, including holders of trade claims and other non-funded debt claims.

*The Committee's Involvement in the Insolvency Proceedings*

10.    Immediately upon its formation and selection of professionals, the Committee became actively involved in all aspects of the Nortel insolvency proceedings around the globe.  At the outset of these cases, the Committee, in its role to protect the interests of all unsecured creditors of the U.S. Debtors, focused on important tasks relating to the management and financing of the global Insolvency Proceedings.  These matters included:

- Cross-Border Court-to-Court Protocol: Following the "first day" hearing, the Court entered an order approving a cross-border protocol to govern the procedures by which the proceedings in the United States and Canada were to be coordinated.  D.I. 54.  The Committee insisted on significantly greater protections for NNI and U.S. unsecured creditors, including providing that certain material actions either required the consent of the Committee or must be subject to joint hearings of the U.S. and Canadian Courts regardless of which Nortel entity was seeking the relevant relief.

These modifications were incorporated into an amended Cross-Border Protocol that was approved by the Bankruptcy Court on June 29, 2009.  *See* D.I. 990.

- Intercompany Revolving Loan: On the first day of the cases, the Debtors sought approval of an intercompany revolving loan between NNI, as lender, and NNL, as borrower, pursuant to which NNI agreed to lend up to $200 million to fund NNL's liquidity needs.  *See* D.I. 9.  The Bankruptcy Court entered an order approving the intercompany revolving loan on an interim basis in an amount up to $75 million.  *See* D.I. 58.  Concerned with NNI agreeing to fund insolvency proceedings without understanding the path of a potential Nortel restructuring and the intercompany assets and liabilities of the U.S. Debtors, the Committee immediately worked with the parties to prevent any further draws on the intercompany revolving loan.  Indeed, no further draws were made on the loan and the intercompany revolving loan was repaid in 2010.

- Cross-Border Claims Protocol: The Committee worked with the Debtors and the Canadian Debtors to formulate a protocol for the resolution of material claims that impacted both the U.S. and Canadian estates.  On September 16, 2010, the Bankruptcy Court entered an order approving the Cross-Border Claims Protocol.  *See* D.I. 3956.  Pursuant to the Cross-Border Claims Protocol, the Committee was given information access and certain consent and objection rights with respect to material cross-border claims.  The Committee's knowledge of the U.S. and Canadian claims bases was critical to its understanding of the impacts of the resolution of large cross-border claims on unsecured creditor recoveries and its negotiation of the resolutions of certain claims settlements and related terms leading up to and incorporated into the SPSA and the Plan.

11.    As the first few months of these cases passed, the critical task presented to the parties, including the Committee, was evaluating the manner in which the Nortel entities could maximize value for their stakeholders.  In light of the significant cash burn and capital expenditures needed to fund Nortel's businesses on an ongoing basis, the global fiduciaries determined that an orderly sale process for all of Nortel's lines of business would be the approach that created the most value for unsecured creditors.  The Committee and its professionals were involved in all aspects of the evaluation of various restructuring alternatives and the ultimate decision to advance the Nortel insolvency proceedings through a series of going concern sales.

12.     At that same time, as the decision was made to conduct the sales, it became
evident to all parties that there were significant intercompany issues and potential disputes
regarding the allocation of any Sale Proceeds among the Nortel estates.  It also became apparent
that there would be substantial funding required for the Canadian estates to continue operating
the businesses while conducting the sales process.  The Committee, along with the Nortel
Debtors and the Bondholder Group, believed that value would be preserved and, indeed,
maximized by the immediate sale of the Nortel lines of business.  Thus, rather than engaging in
the allocation dispute while marketing and selling the Nortel assets, the decision was made by
the global Nortel Debtors and their creditor constituents for all parties to work in concert to sell
the business lines as going concerns and defer the allocation dispute to a later date.

13.     The foregoing considerations were incorporated into a broad-ranging agreement
between and among the various Nortel Debtors, the Committee, and the Bondholder Group
called the Interim Funding and Settlement Agreement (the "IFSA").  The IFSA addressed certain
outstanding transfer pricing and other intercompany payments and provided much-needed
funding to NNL to continue its operations during the sale process.  More importantly for present
purposes, embedded in the IFSA were the processes and procedures by which the Nortel entities
would cooperate in the sale of the Nortel businesses and ultimately determine the allocation of
the resulting Sale Proceeds.  *See* IFSA, §§ 11, 12.  Specifically, the parties would work together
to consummate sales of the Nortel businesses and, where appropriate, agree to terminate certain
licenses to Nortel intellectual property, in consideration for the right to an allocation of Sale
Proceeds to be determined at some point in the future.

14.     The Committee was involved in all aspects of the negotiation of the IFSA, and the
Committee's approval of the terms became integral to the agreement's execution and ultimate

approval by the Bankruptcy Court.  The Committee considered, and still considers, the process

implemented in the IFSA to provide for the maximization of value for U.S. unsecured creditors.

The importance of the Committee to the process envisioned by the IFSA was documented in

section 12(g)(i), pursuant to which (a) the Committee was required to be included in any

negotiation or proceedings relating to the allocation of Sale Proceeds, and (b) the U.S. Debtors

could not enter into any agreement or determination regarding the allocation of Sale Proceeds

without the consent of the Committee.  The IFSA, as the Court may recall, included the

framework under which the U.S. and Canadian Courts approved the Allocation Protocol and

their jurisdiction over the Allocation Trial.  At each step of this process, the Committee remained

vigilant in protecting the interests of the entire body of U.S. unsecured creditors and in seeking to

maximize value for the benefit of such creditors.  The IFSA was approved by order of this Court

dated June 29, 2009 [D.I. 993].

15.     The Committee played a similarly important role in seeking to maximize value for

U.S. unsecured creditors in the negotiation of the Final Canadian Funding and Settlement

Agreement (the "CFSA") in late 2009.  The CFSA, much like the IFSA, provided certain funding

to NNL through transfer pricing and other intercompany payments, as the Nortel entities sought

to complete the various sale processes.  While the CFSA did not directly address allocation

issues, the agreement resolved a material dispute that has had implications in the Allocation

Dispute and the ultimate resolution thereof in the SPSA and Plan.  Specifically, as a result of

certain overpayments made by NNI to NNL under the Nortel transfer pricing system, NNI

asserted an entitlement to a significant claim against NNL.  In the CFSA, the parties agreed to an

allowed $2 billion unsecured claim in favor of NNI against NNL arising from these transfer

pricing overpayments.  This intercompany claim was ultimately allowed pursuant to the orders

7

approving the CFSA entered by the U.S. and Canadian Courts.  (The CFSA was approved by

order of this Court dated January 21, 2010 [D.I. 2347].)  The Committee was engaged in all

aspects of the negotiation of the CFSA and the NNI-NNL intercompany claim with the goal of

maximizing value for U.S. unsecured creditors in any ultimate allocation scenario.

*The Committee's Role in the Allocation Dispute and Allocation Trial*

16.     As contemplated in the IFSA, the Committee was actively involved in the

Allocation Dispute from its commencement, negotiating on behalf of the interests of all U.S.

unsecured creditors to maximize the amount of Sale Proceeds ultimately allocated to the U.S.

estates.  The Committee's efforts began in 2010 in initial settlement meetings between the

estates, and ultimately in the first mediation overseen by former United States District Judge

Layn Phillips.  Once the initial mediation reached an impasse, the Committee and the Debtors

filed a joint motion for an order establishing the Allocation Protocol.  [D.I. 5307.]  While the

motion for the Allocation Protocol was pending, the U.S. and Canadian Courts ordered the

parties to participate in a second mediation with former Chief Justice of Ontario Warren Winkler

as mediator (the "Winkler Mediation").  The Winkler Mediation lasted from June 2011 through

January 2013, and included a week-long in-person mediation session in Toronto, attended by all

"Core Parties."   Ultimately, however, the Winkler Mediation did not result in a consensual

resolution of the Allocation Dispute, so the Courts considered a renewed request by the U.S

Debtors and the Canadian Debtors for entry of the Allocation Protocol.  The Allocation Protocol

was ultimately approved by the U.S. and Canadian Courts in May 2013 [D.I. 9946, 9947, 10565]

and paved the way for the prosecution of the Allocation Trial.

17.     The Committee was a "Core Party" to the Allocation Trial and was active in

advancing the interests of the U.S. unsecured creditors in seeking to maximize the allocation to

the U.S. estates.  The Allocation Trial demonstrated, if anything, that the issues involved in the allocation of Sale Proceeds were complex and the procedure unprecedented.  Parties, including the Committee, presented evidence over the course of 21 trial days, to the U.S. and Canadian Courts.  The Committee worked with the U.S. Debtors to advance a fair market value theory of allocation that, if successful, likely would have resulted in par recoveries for all unsecured creditors.  Ultimately, however, the Allocation Decisions rendered by the U.S. and Canadian Courts on May 12, 2015, dictated a much different result.

18.      While the Allocation Trial did not result in the outcome sought by the U.S. interests, the Committee worked with the U.S. Debtors following the Allocation Decisions to achieve a better result for U.S. unsecured creditors.  To that end, the Committee filed a joinder to the Debtors' motion to reconsider the Allocation Decisions, which motion was largely denied by the Bankruptcy Court on July 6, 2015.  *See* D.I. 15830.  The Committee, among numerous other parties, then appealed the Allocation Decisions in both the U.S. and Canada.  The Committee was an active party in the appeals, working with the U.S. Debtors and other U.S. interests on appellate briefing and, ultimately, argument before the District Court.  The United States Court of Appeals for the Third Circuit (the "Third Circuit") accepted direct certification of the appeals of the Allocation Decision after argument was heard by the District Court.

19.      In the Canadian Proceeding, the Debtors and the Committee, among others, filed notices of motion for leave to appeal the Allocation Decision to the Court of Appeal for Ontario.  On May 3, 2016, the Court of Appeal for Ontario denied the motions for leave to appeal.  The moving parties then applied to the Supreme Court of Canada for leave to appeal that decision.  The parties agreed to extend the deadline for responses to that motion to permit settlement discussions to continue.  Unlike in the United States, parties do not have the ability to appeal

lower court decisions as of right.  Given the denial of the motions for leave to appeal by the

Court of Appeal for Ontario, the remaining appellate path to the Supreme Court of Canada is

quite narrow.

*The SPSA and Plan*

20.     Following the Allocation Decisions, the parties once again engaged in mediation

in an effort to consensually resolve the appeals of the Allocation Decisions and the continuing

and costly litigation of the Allocation Dispute.  Under the supervision of retired Chief District

Court Judge Joseph J. Farnan, Jr., the parties participated in numerous mediation sessions while

continuing to brief the appeals.  While these mediation efforts initially failed to bear any fruit,

the parties continued to participate and seek compromises with Judge Farnan's assistance.  The

Committee actively participated in these final mediation sessions, ensuring that any settlement

would be in the best interests of all U.S. unsecured creditors.  Ultimately, the Nortel debtor

estates, the Committee, the Bondholder Group and certain other creditor constituencies in

Canada and the U.K. were able to reach a global settlement of the Allocation Dispute and related

intercompany issues that is in the best interests of all U.S. unsecured creditors.  These

agreements were incorporated into the SPSA and, ultimately, the Plan.

21.     On December 1, 2016, the Bankruptcy Court entered an order approving the

Disclosure Statement and the procedures for soliciting votes on the Plan [D.I. 17516] (the "DS

Order").  The DS Order also set a deadline for filing objections to confirmation of the Plan for

January 9, 2017.  Among the parties objecting to confirmation of the Plan are: (a) the TCC [D.I.

17686][5]; (b) the U.S. Trustee [D.I. 17683]; (c) the Iowa Department of Revenue [D.I. 17678];

---

[5] Liquidity Solutions, Inc. filed a joinder to the objection of the TCC [D.I. 17689].

and (d) certain holders of the NNCC Notes [D.I. 17687] [6] (collectively, the "<u>Confirmation Objections</u>").

## ARGUMENT

22.    As described above, the Committee participated robustly in the litigation of the Allocation Dispute, the multiple mediations, and in the negotiation of the SPSA.  The Committee thereby, through the fully informed exercise of its fiduciary duties, came to the view that the SPSA is a fair and reasonable settlement that is in the best interests of creditors.  The SPSA easily satisfies the well-known *Martin* factors for a Bankruptcy Court's approval of a settlement agreement.  Accordingly, this Court should approve the SPSA and confirm the Plan. Additionally, this Court should reject the reserve requested by the TCC as contrary to section 1123(a)(4) of the Bankruptcy Code.

## I.    THE SPSA EMBODIED IN THE PLAN SATISFIES THE *MARTIN* FACTORS

23.    This Court should approve the SPSA because it satisfies the standards applicable in the Third Circuit for approval of a settlement agreement in a bankruptcy case.  A starting point in analyzing any proposed settlement is the general policy of encouraging settlements and favoring compromises.  *See Myers v. Martin (In re Martin)*, 91 F.3d 389, 394 (3d Cir. 1996).  To

---

[6] Solus Alternative Asset Management LP and PointState Capital LP (the "<u>NNCC Noteholders</u>") filed a "statement" with respect to confirmation of the Plan wherein they request that certain procedures be implemented for litigating the NNCC Noteholders' objections to fees incurred by the NNCC Bonds Indenture Trustee.  The NNCC Noteholders assert, among other things, that fees and expenses incurred by the NNCC Bonds Indenture Trustee in its capacity as a member of the Committee cannot be reasonably charged against distributions to the NNCC Noteholders under the terms of the NNCC Bonds Indenture because the Committee did not "singularly advance the interests of the [NNCC Bonds]."  The Committee believes that the issues raised by the NNCC Noteholders do not constitute an objection to confirmation of the Plan and should not in any way delay confirmation of the Plan.  While the Committee does not otherwise take a position with respect to the relief requested by the NNCC Noteholders, as it views the dispute as one between the NNCC Noteholders and the NNCC Bonds Indenture Trustee, the Committee believes that all of the actions taken by the Committee and each of its members, including the two Indenture Trustees that were appointed by the Office of the United States Trustee, as is their practice in all cases where an indenture trustee represents the interests of unsecured bondholders, throughout these cases were entirely in compliance with their fiduciary duties to all general unsecured creditors of these estates.  The Committee believes that each of its members, including the NNCC Bonds Indenture Trustee and its counsel, provided material and important benefits to all general unsecured creditors, including the NNCC Noteholders individually and as members of the unsecured creditor body of the U.S. Debtors.

approve a settlement, a bankruptcy court must determine that such settlement is in the best interest of a debtor's estate. *Law Debenture Tr. Co. of N.Y. v. Kaiser Aluminum Corp.* (*In re Kaiser Aluminum Corp.*), 339 B.R. 91, 95-96 (D. Del. 2006). In addition, a court must "assess and balance the value of the claim that is being compromised against the value to the estate of the acceptance of the compromise proposal" in light of the four factors set forth by the Court of Appeals for the Third Circuit in *Martin*: "(1) the probability of success in the litigation, (2) the likely difficulties in collection, (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it, and (4) the paramount interests of the creditors." *Martin*, 91 F.3d at 393; *see Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968). The United States District Court for the District of Delaware has explained that a court's ultimate inquiry is whether a settlement is fair, reasonable, and in the best interests of a debtor's estate. *In re Marvel Entm't Grp., Inc.*, 222 B.R. 243, 249 (D. Del. 1998) (quoting *In re Louise's, Inc.*, 211 B.R. 798, 801 (D. Del. 1997)).

24.     "The court does not have to be convinced that the settlement is the best possible compromise, but only that the settlement falls within a reasonable range of litigation possibilities." *In re Coram Healthcare Corp.*, 315 B.R. 321, 330 (Bankr. D. Del. 2004); *Cosoff v. Rodman (In re W.T. Grant Co.)*, 699 F.2d 599, 608 (2d Cir. 1983) (explaining that a court need not decide the numerous issues of law and fact raised by the settlement, but rather should "canvass the issues and see whether the settlement 'fall[s] below the lowest point in the range of reasonableness.'") (quoting *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972)); *see also In re World Health Alts., Inc.*, 344 B.R. 291, 296 (Bankr. D. Del. 2006); *In re Key3Media Grp., Inc.*, 336 B.R. 87, 92-93 (Bankr. D. Del. 2005).

25.     The Committee believes the settlement embodied in the SPSA and the Plan falls well within the range of litigation possibilities and substantially exceeds the lowest point in the range of reasonableness.  Furthermore, an analysis of the four *Martin* factors demonstrates that the SPSA is fair, reasonable, and in the best interests of the U.S. Debtors and all parties in interest.

### A.     Probability of Success in the Litigation

26.     The first *Martin* factor — the probability of success in the litigation — favors approval of the SPSA.  Despite the best efforts of the Committee, the U.S. Debtors, and the Bondholder Group to convince this Court and the Canadian Court, the Allocation Trial resulted in Allocation Decisions that were unfavorable to the U.S. estates and their creditors.  Although the Committee believes strongly that its position at the Allocation Trial was supported by the evidence and the law, and was fair and equitable, the Bankruptcy Court obviously concluded otherwise and adopted a Modified Pro Rata allocation rather than an allocation based on the fair market value of the interests that each of the Selling Debtors surrendered.  *See* Allocation Opinion, D.I. 15544.  The U.S. Debtors, the Committee, and the Bondholder Group then pursued a motion for reconsideration, which was, for the most part, denied.  *See* Reconsideration Opinion, D.I. 15830.  The parties then appealed to the District Court, where the appeals were extensively briefed and argued, and then certified to the Third Circuit.  In Canada, the motion for leave to appeal in Ontario was denied in a detailed, sharply-worded opinion from the Ontario Court of Appeal.

27.     Although the Committee continues to believe in the correctness of its arguments, the Committee also must accept the reality that the U.S. Debtors, the Committee, and the Bondholder Group have not, to date, prevailed in the legal arguments that the TCC chides the Debtors for purportedly abandoning.  No matter how many times the TCC may say it, or how

loudly they may cry foul, there can be no certainty of obtaining a reversal from the Court of

Appeals for the Third Circuit.  The probability of the Third Circuit reversing the Allocation

Decision cannot be known with mathematical precision.  But having lost in the Bankruptcy

Court and in seeking leave to appeal at the Ontario Court of Appeal, despite our continuing belief

in our arguments, it is very difficult to say that the appellants have a high probability of success

on the merits in the Third Circuit.  In assessing the likelihood that the Third Circuit would

reverse, the Committee also must be mindful of the admonition of the Third Circuit five years

ago, in December 2011, in a prior appeal in these cases:  "Mediation, or continuation of whatever

mediation is ongoing, by the parties in good faith is needed to resolve the differences.  No party

will benefit if the parties continue to clash over every statement and over every step in the

process.  This will result in wasteful depletion of the available assets from which each seeks a

portion."  *In re Nortel Networks, Inc.*, 669 F.3d 128, 143 (3d Cir. 2011).  Accordingly, the first

*Martin* factor favors approval of the settlement.

### B.    Likely Difficulties of Collection

28.    The second *Martin* factor — the likely difficulties of collection if litigation

continues without a settlement — likewise favors approval of the SPSA.  The Sale Proceeds are

escrowed pursuant to the IFSA.  There are only two mechanisms by which the escrows may be

released:  (i) agreement by the Selling Debtors, with consent of the Committee and the

Bondholder Group, or (ii) final adjudication by the "relevant dispute resolver(s)".  IFSA,

§ 12(b)(i) and (ii).  The SPSA provides for the escrows to be released pursuant to the consensual

mechanism embodied in section 12(b)(i) of the IFSA.  If the U.S. Debtors chose not to enter into

the SPSA and instead to continue litigation, they would face enormous "difficulties of collection"

from the escrows because the IFSA would require final adjudication of both the U.S. and the

Canadian courts.  Even if the Third Circuit were to reverse the Allocation Decision, the

14

Allocation Decision rendered by the Canadian Court, for which leave to appeal has not been granted, would be inconsistent with the results in the United States, leading to inconsistent decisions and the inability for release of Sale Proceeds from the escrow accounts. The result is tantamount to legal purgatory, and entering a hopeless stalemate would likely lead to years of additional litigation and estate-borne costs. Because the SPSA's consensual release provision eliminates this difficulty in collection from the escrow accounts, the second *Martin* factor strongly supports approval of the SPSA.

### C.    Complexity, Expense, Inconvenience and Delay

29.    The third *Martin* factor — "the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it" — favors approval of the SPSA as well. As the Bankruptcy Court, the Third Circuit in prior appeals, and the Canadian courts have all noted, these cases have presented an extraordinarily complex set of questions — many of first impression — and disputes that have required a great deal of time to resolve. As described in the Allocation Decision, the Bankruptcy Court was faced with wildly divergent allocation theories with no common ground. Alloc. Op. at 91-92. The allocation trial required careful consideration of complex contractual and transfer pricing matters, involving more than 125 fact witnesses and approximately 35 expert witnesses. These same issues remain in dispute in the Third Circuit appeals. Moreover, as noted, the appeals are further complicated procedurally because if a reversal is obtained, the result will be inconsistent with the Canadian appellate outcome to date. Continuation of the litigation would only increase the "expense, inconvenience and delay" attending this complex litigation. Accordingly, the third *Martin* factor strongly supports approval of the SPSA.

15

###### D.    The Paramount Interests of Creditors

30.    Finally, the fourth *Martin* factor asks whether a proposed settlement serves the paramount interests of the creditors.  91 F.3d at 393.  In considering this issue, courts have given substantial weight to the support of creditors, particularly the official committee of unsecured creditors.  *See In re Tribune Co.*, 464 B.R. 126, 176 (Bankr. D. Del. 2011) ("[The Creditor Committee's] support, as well as the votes of creditors in favor of the plan, weigh heavily in favor of approval of the settlement."); *In re Turner Eng'g, Inc.*, 109 B.R. 956, 960-61 (Bankr. D. Mont. 1989) (noting that in deciding between two competing plans, the "creditor's preference should be looked to in deciding which plan to confirm.").

31.    The paramount interests of creditors are best served in this instance by the certainty and expediency of distributions that would result from approval of the SPSA and confirmation of the Plan.  These cases commenced eight years ago, and the burden felt by many creditors awaiting distribution has been well-documented.  Confirmation of the Plan will finally set U.S. creditors on a clear path to receiving distributions.

32.    The Plan provides significantly greater certainty as to the amount and timing of distributions to creditors than continued litigation.  The value of this cannot be overstated. Continuing to pursue the Allocation Appeals would leave these cases with no predictable outcome and no end in sight.  A favorable decision by the Third Circuit would not bring about a quick resolution to these cases, because, as noted above, there is not an analogous appellate path in Canada.  Further, because there is no parallel appellate path available as of right in Canada, significant litigation costs and delays likely would be required before any funds could be distributed from the Sale Proceeds escrow accounts.  Moreover, even affirmation of the Allocation Decisions (as compared to the global resolution set forth in the SPSA) would still require significant claims litigation in a multitude of jurisdictions before parties would have a

firm understanding of allocations to the various estates and ultimate distributions to creditors. The SPSA, on the other hand — a thoroughly negotiated settlement in which unsecured creditors receive distributions well within the range of reasonableness — will give such creditors peace of mind and money in hand in the near future.  The alternative of throwing creditor recoveries back into turmoil with no guarantee of a better outcome and no timely distributions in sight is a decidedly worse outcome from the Committee's perspective.

33.     To support its argument that the SPSA is not in the paramount interests of creditors, despite being supported by the Committee, the TCC asserts that the entities serving on the Committee did not have the same interests as a "typical" U.S.-only unsecured creditor.[7] While the TCC is correct that none of the Committee members were U.S.-only trade creditors, this fact does not bear on the Committee's ability to negotiate, and ultimately approve, the SPSA as being in the best interests of *all* U.S. unsecured creditors.  As described in detail above, the Committee has vigorously worked to achieve the best outcome for all unsecured creditors for the duration of these cases, and it would not have entered into the SPSA if it did not believe this outcome was in the best interests of all U.S. unsecured creditors under the circumstances. The TCC cites to *In re Nutritional Sourcing Corp.* to support its position that a settlement's unfairness to non-supportive parties weighs against its approval. 398 B.R. 816, 837 (Bankr. D. Del. 2008).  However, unlike in *Nutritional Sourcing*, the TCC was at the negotiating table here and had the chance to make its views known.  The Committee sympathizes with the TCC's frustration that distributions to unsecured creditors will not be as great as hoped at the outset of the Allocation Trial, but the desire for a larger distribution does not render unreasonable a settlement for less than everything each creditor wants.

---

[7] *See Objection of the Nortel Trade Claims Consortium to Confirmation of First Amended Joint Chapter 11 Plan of Nortel Networks Inc. and Certain of its Affiliated Creditors* [D.I. 17686] (the "TCC Objection"), ¶ 61.

34.     The Third Circuit has upheld a settlement over creditors' objections, finding that the fourth *Martin* factor still weighed in favor of approving a settlement despite such objections. *See In re Summit Metals, Inc.* 477 F. App'x 18, 22 (3d Cir. 2012).  In *Summit Metals*, the court upheld the bankruptcy and district courts' approval of a settlement between a liquidating trustee and a claimant despite other creditors objecting and indicating they were willing to "wait longer for the slightest chance of a more substantial recovery," as the TCC is indicating in these cases. *Id*.  The Third Circuit noted that maximizing value for creditors "often involves an exercise of risk/reward of cost benefit," trusting that the liquidating trustee had made the appropriate analysis.  *Id*.  The Committee has thoroughly considered the risks and benefits of supporting the SPSA and the Plan and did not come to the decision lightly.  The Committee argued at the Allocation Trial for higher distributions for U.S. unsecured creditors, but those arguments did not win the day.  After careful consideration, the Committee has concluded that receiving certain distributions at an amount within the range of reasonableness is in the paramount interests of creditors, particularly when the alternative is costly litigation and an indefinite delay in distributions.

## II.     THE RESERVE REQUESTED BY THE TCC WOULD VIOLATE BANKRUPTCY CODE SECTION 1123(A)(4)

35.     The TCC's request for the establishment of a reserve to provide the payment in full of its claims should be denied as violating Bankruptcy Code section 1123(a)(4).  It is well settled that "[e]quality of distribution among creditors is a central policy of the Bankruptcy Code." *Begier v. IRS*, 496 U.S. 53, 58 (1990).  Bankruptcy Code section 1123 provides that a plan "shall … provide the same treatment for each claim … of a particular class …."  11 U.S.C. § 1123(a)(4).  "Accordingly, if claims within the same class are not receiving the same treatment, and the holders of those claims being treated less favorably have not consented to the

18

discrimination, the plan is not confirmable." *Schroeder v. New Century Liquating Tr. (In re New Century TRS Holdings, Inc.)*, 407 B.R. 576, 592 (D. Del. 2009).

36.     The TCC seeks a reserve of $75 million to account for the possibility of their soon-to-be-mooted appeal of the Allocation Decision succeeding in the Third Circuit, and to provide par recoveries solely for the claims held by the members of the TCC.  This proposed use of estate assets solely for the benefit of the TCC would be a clear violation of 1123(a)(4), granting disparate and more favorable treatment to the TCC above and beyond that being provided to other General Unsecured Creditors.  In the Committee's view, the settlement embodied in the SPSA eliminates the need for the sort of reserve the TCC requests.  However, to the extent such funds were to be reserved for the potential favorable outcomes on appeal of the Allocation Decision, such amounts would need to afford par recoveries to *all* unsecured creditors (not just the TCC) and would exceed $400 million.  Such a reserve would be contrary to the purpose of compromising the Allocation Dispute, jeopardize the SPSA, and prevent meaningful distributions from being made to U.S. creditors.  Accordingly, the Committee opposes the establishment of a reserve as requested by the TCC.  The SPSA and the Plan are intended to bring finality to these Insolvency Proceedings, and the reserve requested by the TCC, if implemented fairly for all unsecured creditors, would hinder the achievement of that goal.

## CONCLUSION

37.     For all of the foregoing reasons, the Committee respectfully requests that the Court (i) approve the SPSA, (ii) confirm the Plan, and (iii) grant such other relief as the Court deems just, equitable and proper.

Dated: January 19, 2017
      Wilmington, Delaware

Respectfully submitted,

By:    /s/ Christopher M. Samis
      Christopher M. Samis (No. 4909)
      Whiteford, Taylor & Preston LLC
      The Renaissance Centre
      405 North King Street, Suite 500
      Wilmington, Delaware 19801
      Tel.:  (302) 353-4144

      and

      David H. Botter (*pro hac vice*)
      Abid Qureshi (*pro hac vice*)
      Brad M. Kahn (*pro hac vice*)
      Robert A. Johnson (*pro hac vice*)
      Akin Gump Strauss Hauer & Feld LLP
      One Bryant Park
      New York, NY  10036
      Tel.:  (212) 872-1000

      *Co-counsel to the Official Committee of*
      *Unsecured Creditors*

112565976 v9