EXHIBIT A

Excerpt of *Fisker Automotive Holdings, Inc.* Confirmation Hearing Transcript

```
 1
 2   UNITED STATES BANKRUPTCY COURT
 3   DISTRICT OF DELAWARE
 4   Case No. 13-13087(KG)
 5   - - - - - - - - - - - - - - - - - - -x
 6   In the Matter of:
 7
 8   FAH LIQUIDATING CORP., ET AL.,
 9   f/k/a FISKER AUTOMOTIVE HOLDINGS, INC.,
10
11              Debtors.
12
13   - - - - - - - - - - - - - - - - - - -x
14
15              United States Bankruptcy Court
16              824 North Market Street
17              Wilmington, Delaware
18
19              July 28, 2014
20              10:05 AM
21
22   B E F O R E:
23   HON. KEVIN GROSS
24   U.S. BANKRUPTCY JUDGE
25   ECR OPERATOR:  GINGER MACE
```

1

2  Interim Fee Applications

3

4  Confirmation of the Debtors' Second Amended Joint Plan of

5  Liquidation Pursuant to Chapter 11 of the Bankruptcy Code (with

6  Technical Modifications) (Filed 7/9/14) [Docket No. 1059]

7

8  Motion of the Debtors for Entry of an Order Authorizing Payment

9  of Restructuring Fee (Filed 7/3/14) [Docket No. 1051]

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25  Transcribed by:  Ellen S. Kolman

FAH LIQUIDATING CORP., ET AL.                    21

1   or declaration which clearly evidences the voting on the plan

2   and Mr. Beilinson's declaration satisfies, I think, or

3   addresses other elements of Section 1129.  So I think that it

4   would make sense for you to proceed with the open issue under

5   these circumstances.

6            MR. DAHL:  With that, then, Your Honor, as Your Honor

7   may have seen in the pleadings, the United States Trustee

8   objected to the debtors' plan on two basis both of which relate

9   to the exculpation.  Namely, the exculpation's, then, omission

10  of carve-outs for gross negligence or willful misconduct.

11           THE COURT:  Yes.

12           MR. DAHL:  And the inclusion in the exculpation of

13  nonestate fiduciaries.  Mark Kenney, I should note, is in the

14  courtroom today, and I think he'd be able to confirm, but I

15  think we've resolved the first prong of Mr. Kenney of the

16  United States Trustee's objection by including, via the

17  confirmation order, carve-outs to the exculpation for gross

18  negligence and willful misconduct --

19           THE COURT:  Yes.

20           MR. DAHL:  -- leaving, then, the question of inclusion

21  of nonestate fiduciaries in the exculpation.

22           Your Honor, I won't belabor the point we made in our

23  papers.  We do think it's appropriate under the particular

24  circumstances of this case that those parties be included.

25  I've given, for example, the contributions of parties such as

1    Wanxiang.  But to resolve the issue for today, because I don't

2    think it's necessary today, we have proposed to provide a

3    further modification to the exculpation to provide that it

4    would apply to nonestate fiduciaries only to the extent

5    permitted by applicable law.  So to the extent this issue does

6    require litigation in the future, effectively, all parties

7    rights are reserved and preserved rather than requiring an

8    adjudication today.  But with that, I want to cede the podium

9    to Mr. Kenney.

10              THE COURT:  All right.  Thank you, Mr. Dahl.

11              Mr. Kenney, good morning.

12              MR. KENNEY:  Good morning, Your Honor.  Mark Kenney

13   for the United States Trustee.

14              Your Honor, I appreciate the changes they've made with

15   respect to carving out willful misconduct and gross negligence,

16   but Your Honor, as far as exculpation goes, I think the Third

17   Circuit hit it on the head by drawing a straight -- by drawing

18   a bright line.  And I think the court in Washington Mutual and

19   Tribune drew the same bright line that nonestate fiduciaries

20   don't receive exculpation.

21              And the benefit to that bright line it's that we don't

22   get stuck trying to interpret what the plan meant later and

23   especially -- I appreciate Mr. Dahl's suggestion about saying,

24   well, to the extent provided by -- to the extent permitted by

25   applicable law.  Unfortunately, Judge, what that does it pushes

1  that decision about the extent of the exculpation onto some

2  hapless state court judge somewhere who, perhaps, doesn't

3  understand anything at all about bankruptcy.

4          We see all too often that issues get reserved, and

5  it's not as if it's being reserved to this Court to interpret

6  the order; it's left to some state court judge somewhere else

7  to interpret what that order means.  And sometimes even worse

8  than some state court judge, it's some state court justice of

9  the peace or some member of the minor judiciary who probably

10  doesn't understand anything at all about bankruptcy law or in

11  some instances may not even be aware that there is a Bankruptcy

12  Code.  And I think maintaining that bright line does a lot to

13  preserve the integrity of the Code.  It does a lot to,

14  basically, just let everybody understand right where they

15  stand.  I mean, obviously, if there's litigation somewhere,

16  somebody -- they can defend themselves.

17          THE COURT:  Have the exculpation clauses ever

18  been -- have they ever been raised in a case that you're aware

19  of?

20          MR. KENNEY:  Your Honor, not that I'm aware of.

21          THE COURT:  Okay.

22          MR. KENNEY:  And it could very well be, Your Honor,

23  that the exculpation clause is a belt and suspenders that

24  everybody thinks is going to protect them.  Do a belt and

25  suspenders work?  Theoretically.  Are they necessary?  Perhaps

1  not, Your Honor.  Perhaps the garment can hold itself up.  And

2  I would think that this is a plan that does not really require

3  that level of exculpation.

4        The purchaser in this case is certainly, to

5  characterize it, they're a big boy and I don't think they

6  really need the protection of that provision, especially if the

7  interpretation of that provision is going to be left to another

8  court someplace else --

9        THE COURT:  Sure.

10       MR. KENNEY:  -- and not to this Court.

11       THE COURT:  I under -- I appreciate that.

12       And as far as the bright line is concerned, I know

13  what the Third Circuit has said, and certainly I know what

14  other judges in this district have said and certainly in the

15  two cases you cited.  But didn't the Third Circuit say there

16  may be particular circumstances which warrant permitting an

17  exculpation clause for a nonfiduciary?

18       MR. KENNEY:  Your Honor, I'm not really sure they left

19  the door open to that.  I think what they determined is -- was

20  what the appropriate scope of -- extent of exculpation was and

21  in that particular case they said that what was before them was

22  appropriate as an exculpation but it was specifically for

23  creditors' committee --

24       THE COURT:  Yes.

25       MR. KENNEY:  -- which was, of course, an estate

1  fiduciary.

2        THE COURT:  Sure.  All right.  All right.  Mr. Kenney,

3  I appreciate your comments and -- so what you're urging me to

4  do, really, is to rule on your objection rather than to defer

5  it, in effect?

6        MR. KENNEY:  We would appreciate that, Your Honor.

7        THE COURT:  Okay.

8        MR. KENNEY:  I think -- again, the bright line is

9  important.

10       THE COURT:  All right.

11       MR. KENNEY:  Thank you, Your Honor.

12       THE COURT:  Thank you.

13       Mr. Dahl, I want to ask you a question because my

14  understanding is that Wanxiang negotiated for this exculpation

15  provision in agreeing to the accommodations it was making.

16       MR. DAHL:  They did, Your Honor, and this was part of

17  the overall package of the settlement reached with Wanxiang and

18  memorialized in the term sheet --

19       THE COURT:  Sure.

20       MR. DAHL:  -- which was actually filed

21  contemporaneously with the plan modification.

22       THE COURT:  All right.  All right.  Would you like to

23  address any of the -- go into more substance at this point or

24  rest on your memorandum?

25       MR. DAHL:  At this point, Your Honor, I would just

 1   note that -- Wanxiang, in particular, I think, is a good
 2   example of being entitled to a contra -- entitled is the wrong
 3   phrase -- but the exculpation, as Your Honor pointed out, is
 4   part of an overall negotiation and a settlement which resolved
 5   what could've otherwise been significant if not potentially
 6   catastrophic litigation, certainly, for unsecured creditor
 7   recoveries.  And Wanxiang, in that settlement, though, is not
 8   simply taking a payment and walking away but contributing
 9   significant value to the debtors at the same time in the form
10   of both claims waivers and then an enhanced warranty program
11   which is directly administered by Wanxiang itself, not the
12   Chapter 11 estates and is something that Fisker car owners, I
13   think, have been vocal about from the beginning which is
14   something that they very much wanted into the plan and Wanxiang
15   is committed to do in a materially enhanced way.
16             THE COURT:  All right.  Thank you, Mr. Dahl.  Anyone
17   else wish to be heard on this point?
18             Mr. Baldiga?
19             MR. BALDIGA:  Not on the exculpation.
20             THE COURT:  Not on exculpation.  Very well.
21             Well, I do recognize that colleagues of mine in this
22   court have found that the exculpation clauses that appear in
23   plans are applicable only to fiduciaries, but I don't think
24   that in those cases they had quite the circumstances that we
25   have here, and I think this is what the Third Circuit meant

1  when it spoke of particular circumstances.  And the particular

2  circumstances are a very significant contribution by Wanxiang

3  which protects the unsecured creditors and protects, as well,

4  car owners who will benefit from the enhanced warranty program.

5  And under those circumstances, I think that the exculpation

6  provision is appropriate and is permissible.

7        Wanxiang has played a particularly key role in

8  this -- in this bankruptcy case, and I think to reject its

9  desire for an exculpation clause would really, I believe, not

10  give recognition to all of the benefits that the debtors'

11  estates have received as a result of Wanxiang's activities in

12  the case.  And I certainly am not telling people and not ruling

13  that in other cases an exculpation provision would be applied

14  to a nonfiduciary.  I think that it has to be extremely

15  restricted, as we're doing here, to an exceptional situation,

16  and I think that Wanxiang has satisfied the particular

17  circumstances, very exceptional circumstances, situation.  So

18  I'll overrule that objection.

19        MR. DAHL:  Thank you, Your Honor.  I did want to note,

20  though, for the record --

21        THE COURT:  Yes.

22        MR. DAHL:  -- that Hybrid, as a nonestate fiduciary,

23  would also be included.

24        THE COURT:  Forgive me.  And Hybrid as well has

25  also -- thank you, thank you.  I did not mean to restrict it to

 1  Wanxiang and I'm glad you raised that point.

 2          You know, Hybrid came in with different expectations

 3  in this case, and rather than fight to the end which would have

 4  only, I think, driven expenses very high and reduced recoveries

 5  for creditors, Hybrid worked with everyone to resolve its

 6  issues.  And I think that under those circumstances it, too,

 7  satisfies a particular circumstances test and I will also

 8  permit that exculpation provision as applicable to Hybrid.

 9          MR. DAHL:  Thank you, Your Honor.

10          THE COURT:  Thank you, Mr. Dahl.

11          MR. DAHL:  Your Honor, then moving to what may be the

12  last open issue and as I'll discuss we really don't think it's

13  necessarily an issue that's a confirmation issue.  And before I

14  do, I did want to note that -- and reiterate my prior

15  statements which is that the debtors could not be more pleased

16  than we are today having a fully consensual plan supported by

17  every layer of our capital structure and, frankly, every major

18  creditor constituency.

19          This has been a tremendous accomplishment.  There's

20  been a significant amount of work that's gone into it from all

21  involved, certainly, the Court itself, and we appreciate the

22  burdens that sometimes we have present duly placed on the Court

23  but we are very pleased to be here.  So --

24          THE COURT:  I'm pleased to have you here under these

25  circumstances, Mr. Dahl.

EXHIBIT B

Excerpt of *NewPage Corporation* Confirmation Hearing Transcript

Page 1

1   UNITED STATES BANKRUPTCY COURT

2   DISTRICT OF DELAWARE

3   Case No. 11-12804(KG)

4   - - - - - - - - - - - - - - - - - - - - - - - - - x

5   In the Matter of:

6

7   NEWPAGE CORPORATION, et al.,

8

9          Debtors.

10

11  - - - - - - - - - - - - - - - - - - - - - - - - - x

12

13                          United States Bankruptcy Court

14                          824 North Market Street

15                          Wilmington, Delaware

16

17                          December 13, 2012

18                          12:12 PM

19

20

21   B E F O R E :

22   HON KEVIN GROSS, CHIEF JUDGE

23   U.S. BANKRUPTCY JUDGE

24

25   ECR OPERATOR:   GINGER MACE

Page 2

1   HEARING re Motion for Order Pursuant to Bankruptcy Rule 9019

2   Approving Settlement Agreement By and Between Debtors and

3   Cerberus [including Exhibits A through E; Exhibit C through

4   E are the subject of Motion to Seal at Docket No.

5   2659](Docket No. 2657, 11/12/12).

6

7   HEARING re  Debtor's Fourth Amended Joint Plan (Docket No.

8   2635, 11/07/12)

9

10  HEARING re Motion to Shorten Notice for Motion of the Direct

11  Purchaser Plaintiffs for entry of an Order Authorizing the

12  Direct Purchaser Plaintiffs to File Under Seal the Objection

13  to Confirmation of Debtors' Fourth Amended Joint Chapter 11

14  Plan [Filed by Parliament Paper, Inc., Austin Printing

15  Company, Inc. and Digital Color Imaging, Inc.](Docket No.

16  2848, 12/06/12)

17

18  HEARING re Debtors' Motion to Approve Compromise under Rule

19  9019 for Stipulation By and among the Debtors and the United

20  States of America Establishing Agreed Reserve for Plan

21  Distribution (Docket No. 2878, 12/10/12)

22

23

24

25  Transcribed by:  Dawn South

1    creditors did not opt out.

2          So the -- there's no objection pending as I speak

3    of the -- to the releases by the debtors' estates, the

4    releases by third parties, or the injunctions enforcing the

5    releases.

6          THE COURT:  That's how I read the objection as

7    well.

8          MR. BIENENSTOCK:  There is an objection to the

9    exculpation of two groups I believe, maybe more, but

10   essentially it's the first and second ad hoc lienholder

11   groups, and the theory is that they are not within the ambit

12   of court officers who start out with at least a quasi

13   immunity, the Third Circuit refers to it as a limited

14   immunity, and we understand of course where the United

15   States Trustee is coming from.

16         Based on the Third Circuit law in Continental

17   Airlines that essentially says that to approve such types of

18   protections the Court needs evidence of their fairness and

19   that they are necessary for reorganization.

20         I'd like to start with some basics in the record

21   here.  The -- the statutory creditors' committee, which is

22   normally the major focal point for plan negotiations with

23   the debtor, in this case represented a large constituency of

24   out of the money creditors, because in this case the first

25   lienholders held a lien against virtually the entire estate

Page 41

1    except for the stock of a utility that we refer to as Quebco

2    (ph), and then there are some avoidance actions that were

3    unencumbered that they're getting the benefit of.  But that

4    left basically the entire business to be negotiated by the

5    first lienholders and for a large part of the case until it

6    was clear that the second lienholders were totally out of

7    the money, which it wasn't clear at the outset.  It was the

8    first lienholders and the second lienholders who were doing

9    what is normally done by the statutory committee, and not

10    because of any negative attributes of the committee, but

11    simply because when the cookie crumbled the economics were

12    in the hands of the first and second lienholders.

13            THE COURT:  Right.

14            MR. BIENENSTOCK:  That was anticipated way back

15    when we filed the case.  And the reason I think I can

16    comfortably say that, Your Honor, is that as part of the

17    adequate protection that we provided for the first and

18    second lienholders they retained financial advisors who we

19    have paid --

20            THE COURT:  Right.

21            MR. BIENENSTOCK:  -- monthly fees, which is highly

22    unusual when you don't know yet who's in the money and who's

23    not and they're not a statutory committee.  It was highly

24    unusual, but it was obvious from the first day of this case

25    that they were the main proponents of -- they had -- I

Page 42

1    shouldn't say proponents -- they were the main ingredients

2    of the reorganization that the debtor had to content with,

3    and it was recognized by them, it was recognized by the

4    debtors, and I think it was recognized by the Court.

5            Now the Court has not yet been -- its not yet

6    received their applications for transaction fees and its not

7    yet approved them and it's not obligated to approve them.

8            That said, Your Honor, normally courts, and that

9    certainly includes this one, does not allow groups of

10   professionals to go merrily along lightly.  There'd have to

11   be some serious reason why it seemed at least plausible that

12   they might be the real parties in interest and might be

13   effectively functioning as the main negotiators on the

14   creditor's side of the Chapter 11 plan.

15           That is a unique circumstance.  Not that this is

16   the only case where that happens, it's not, and the Court

17   has probably seen a few others at least.

18           THE COURT:  Yes.

19           MR. BIENENSTOCK:  But it's not the norm.  It's a

20   unique circumstance.  And they were essentially thrust into

21   the role of statutory committees without being statutory

22   committees.  And it was a necessary role.

23           One of them brought into the case the notion of a

24   potential acquisition of the debtor by another party, by a

25   competitor, and that was fully vetted by all sides, and

Page 43

1    everyone, the statutory committee, the debtors, and the

2    first lienholders committee.  And the first lienholders of

3    course had to decide, because they were the real money

4    parties in interest at all times, how they wanted the

5    company to emerge from Chapter 11 consistent with

6    Chapter 11, but there were a lot of options.  And so they

7    both functioned consistently.

8             I said to the Court at the Monday telephonic

9    hearing that everyone's participation, the -- both the

10   clients, the creditors, and the advisors were constructive

11   as Your Honor can tell by the result.  That doesn't mean

12   they were always our best friends throughout the case, but

13   that means they did what needed to be done to make this a

14   successful reorganization.

15             THE COURT:  Yes.

16             MR. BIENENSTOCK:  The second factor here, which is

17   not unique, but it's material I think to the Court's

18   determination, is that what claims that anyone knew about

19   were both investigated and negotiated in the context of the

20   Cerberus settlement negotiations.  There are no claims --

21   and frankly I think it would be very farfetched to think

22   that there could be in this case -- against the first

23   lienholders or the second lienholders.  And they had to go

24   to great lengths, some of them to get restricted so they

25   could give their lawyers and financial advisors instructions

Page 44

1    in negotiating.  And some of them who didn't get restricted.

2    But those who didn't even have less possible exposure to any

3    type of claim.  We're not dealing here with any claim on the

4    table or frankly any claim that's even possible to conjure

5    up without a lot of imagination and legal gymnastics.

6            So the -- now, I realize Your Honor could say,

7    well then, there's no -- there's no risk, why is the debtor

8    asking for the Court to approve the exculpation?  Well for

9    the same reason that the most important portion of the

10   debtors' and officers' liability policy are defense costs.

11   No one wants to be sued in -- sued anywhere let along

12   outlying courts knowing that they can vindicate their rights

13   but knowing it will take years and millions of dollars.

14           And because there are no claims on the table we

15   think it's appropriate that the parties who did step into

16   the breach, because they were not statutory committees but

17   who did participate to make the case successful, do get the

18   comfort of knowing that claims against them are released.

19           Yet another aspect of this case for which there's

20   a record -- and I'm not simply asking the Court to base its

21   decision of whether it's common sense, prior experience, or

22   whatever -- is any litigation would tie up senior management

23   time, the CEO, the CFO, and the general counsel.

24           And as we said in the declaration of Mr. Epstein,

25   that is not a guess, that's a certainty, because we saw it

Page 45

1    happen in connection with the Cerberus litigation.  Mr.

2    George Martin was deposed, the same for Jay Epstein, the

3    CFO, same for Doug Cooper, the general counsel.  And we're

4    not talking about merely the day they spent outside of the

5    business being deposed, we're talking about the preparation

6    for the deposition.  First the production of thousands of

7    documents and screening them all for privilege, and then

8    finding the documents that might come up in the deposition

9    and going over them with the witnesses so they could refresh

10   their recollection and look at their diaries and remember

11   what happened.  This is a lot of work.

12           Clearly the first lienholders do not want the

13   company they're about to own to have its senior management,

14   who I would say Your Honor would find is the best in the

15   business and in the industry, taken away through more

16   litigation when there are no claims on the table that anyone

17   knows of that should be brought in the first place.

18           So we think these amount to compelling reasons

19   only in the context of this case with the unique facts that

20   I've mentioned for the Court not to carve a chink (ph) out

21   of the three protections we built into the plan, but rather

22   to provide the exculpation and the Court acknowledgment of

23   same through the exculpation.

24           And the final thing I'd like to mention is this.

25   There was a -- one reason I suppose, but whether I'm right

Page 46

1   or not doesn't matter, that the U.S. Trustee might object to

2   exculpation to non-court officers are that non-court --

3   court officers have quasi immunity and non-court officers

4   don't.

5           I just want to tie back to what I started with.

6   The first and second lienholders and their advisors stepped

7   into the breach of doing what normally the committee members

8   do who have quasi immunity, and it's just unfair in this

9   context that they not ultimately get the same protection

10  that the committee members would have had because of what

11  they did.

12          Your Honor, obviously I'm available to take any of

13  the Court's questions and I'm sure the U.S. Trustee wants to

14  respond.

15          THE COURT:  And I'm assuming that these

16  exculpation provisions were important components of your

17  negotiations, and the mediation of course.

18          MR. BIENENSTOCK:  Your Honor, I'm glad you raised

19  that.  And we do make this case in the Epstein affidavit --

20          THE COURT:  Yes.

21          MR. BIENENSTOCK:  -- but let me elaborate just a

22  bit.

23          The settlement with -- with the statutory

24  committee last week that resulted in a change to

25  Section 8.4 --

Page 47

1           THE COURT:  Right.

2           MR. BIENENSTOCK:  -- I don't think anyone involved

3    would testify that that would have happened absent all the

4    protections in the plan.

5           THE COURT:  Uh-huh.

6           MR. BIENENSTOCK:  And although the protections

7    that 8.4 went to were only the debtors' present and former

8    officers and directors, as I mentioned earlier, litigation

9    against them impacts the first and seconds, especially the

10   first because that takes management time out of the -- out

11   of running the business.  So it does all tie together.  We

12   would not be standing here today I think with a plan that

13   the first lienholders who are secured are voting for and

14   consenting to take stock absent that settlement could not

15   have happened.

16          THE COURT:  Absolutely.

17          MR. BIENENSTOCK:  Thank you.

18          THE COURT:  All right.  Thank you,

19   Mr. Bienenstock.

20          Ms. Leamy, good afternoon.

21          MS. LEAMY:  Good afternoon, Your Honor.  Jane

22   Leamy for the United States Trustee.

23          As I understand counsel's argument -- the argument

24   I understand, but what he's listing essentially are reasons

25   that those parties should get releases.  There is a

Page 48

1    different standard for exculpation and that's why there's

2    been at least three written opinions by other judges in this

3    district with regard to that.

4            I think what happens, parties are negotiating

5    plans, they want to -- they see that they're getting

6    releases, they also want exculpation.  The same parties are

7    often put in both sections.  Whether it's been done

8    correctly in every case, you know, is not for today.  But

9    you know, the reason is that certain parties aren't estate

10   fiduciaries.

11           Now, counsel argues that these parties jumped into

12   the breach and performed the role of the committee but they

13   weren't official committees, and there's a distinction

14   that's been drawn in the Code and in the case law.

15           And the other cases where the judges have refused

16   to extend exculpation to non-fiduciaries are large cases

17   where there have been settlements.  Washington Mutual, Judge

18   Walrath, that was a very large case where there were -- was

19   a global settlement that was reached that enabled a plan to

20   be confirmed.  The Tribune case, that was Judge Carey, he

21   said that exculpation must exclude non-fiduciaries as well.

22   And then Judge Shannon has also written in the PTL Holdings

23   case.

24           THE COURT:  Right.

25           MS. LEAMY:  And just to draw your attention to

Page 49

1    Article 10.9 of the plan that deals with exculpation.  It's

2    not just the first lien notes steering committee and the

3    members and the second lien group, there's also the exit

4    financing group.  They're clearly not appropriate for

5    exculpation.

6               And then I note that the Cerberus entities was

7    added in the modified fourth amended plan that was just

8    filed.

9               There's no problem obviously with the fiduciaries

10   of the debtors, D and O's, the committee, and their members

11   and the estate professionals, those would be appropriate

12   parties to be estate fiduciaries.

13              So in conclusion, Your Honor, we would just

14   request that existing case law be recognized, that

15   exculpation be limited to the estate fiduciaries.  All the

16   parties that are included in the exculpation clause I

17   believe are getting releases under the plan, and it's not

18   that -- you know, they're similar but there has to be a line

19   drawn and it's really duplicative of the releases, and

20   that's why we would ask that the parties that are not

21   fiduciaries be stricken.

22              And I realize that it may be that they also

23   believe that they're entitled to that because of the

24   release, but I just want to draw Your Honor's attention to

25   the fact that there are written opinions in this district

1   that are recognizing the importance of the fiduciary

2   distinction.

3           Thank you.

4           THE COURT:  All right, thank you, Ms. Leamy.

5           Mr. Bienenstock, what about the exit financing

6   parties?  The group, the exit financing group.  Because

7   they're in a little different category I think.

8           MR. BIENENSTOCK:  Well, they're just pure angels,

9   they're just coming in with the money that's replacing our

10  debtor-in-possession financing and enabling us to have

11  working capital going forward.

12          Your Honor, the debtor has no claims against them.

13          I think probably in the context here to have them

14  of all parties who came in with money be carved out would be

15  awkward and inappropriately point a finger.

16          Let me emphasize this though, no one is asking as

17  that the exit financer's be released from their obligations

18  under the new credit agreements and their obligations to

19  adhere to those agreements in good faith under the Uniform

20  Commercial Code Provision 1203 that all contracts have to be

21  administered in good faith.  So they're not -- no one is

22  asking that they be let off the hook of any obligations, and

23  we never would.

24          What the exculpation basically says is no one is

25  going to come back next year and say you did something wrong

Page 51

1    in the negotiation of it and therefore you should pay

2    millions of dollars.  I mean that would just increase the

3    reorganized debtors credit cost going forward, and probably

4    not just no this reorganized debtor but for others.

5            So -- also, Your Honor, some of the exit financers

6    are also in other of these groups.  They could easily be

7    second lienholders, first lienholders, holders of debtor-in-

8    possession loan, et cetera.

9            And the U.S. Trustee's points are well taken.  I

10   do understand having checked very recently with our co-

11   counsel that exculpations are granted in this district,

12   including occasionally by bankruptcy Judge Walrath.  WAMU

13   was a very exceptional case --

14           THE COURT:  Yes.

15           MR. BIENENSTOCK:  -- and that's why unique

16   circumstances matter.  In WAMU there was all sorts of

17   allegations and investigations about the groups that were

18   negotiating having some of them or their members having

19   inappropriately used inside information to trade their debt.

20           THE COURT:  That's right.  That's right.

21           MR. BIENENSTOCK:  Your Honor, that's not this

22   case.

23           THE COURT:  Yeah.

24           MR. BIENENSTOCK:  And that's why I don't think

25   that and the other situations are really precedent once you

Page 52

1     pierce the facts as to a reason why the exculpation should

2     not be granted here.

3              THE COURT:  All right, thank you.  Thank you,

4     Mr. Bienenstock.

5              Yes?

6              MR. LEVY:  Your Honor, Rick Levy from Latham &

7     Watkins on behalf of the from exit financing arrangers.

8              THE COURT:  Yes, sir, thank you.  Thank you.

9              MR. LEVY:  I'll be brief.  Mr. Bienenstock covered

10    most of the points that I would make.  But I want to say a

11    couple things.

12             One is, and they can attest to this, when we were

13    negotiating the terms of the exit financing we made

14    absolutely clear both in the documents and in the course of

15    the negotiations that the exit arrangers and the lenders

16    providing the financing were not going to be in a position

17    where on the one hand they were going to be providing

18    indispensable financing that was going to allow this plan to

19    be consummated on the one hand and on the other hand be at

20    risk of being sued by someone.

21             Now again, no one knows -- is aware of any claim

22    -- any conceivable claim that can be asserted against us

23    with respect to the manner in which we negotiated the terms

24    of the exit financing, but that was always a critical

25    precondition.

Page 53

1           And in fact, you know, were Your Honor to modify

2    the exculpation provision with respect to us the problem

3    that would create is that would be a material change to the

4    plan with respect to the interests and rights of the exit

5    lenders and then we'd have to go back to -- you know, this

6    has already been allocated, which is the good news, the

7    financing is in place -- we'd have to go back to everybody

8    to see whether they're still willing to provide the

9    financing in the absence of that protection.

10           THE COURT:  Yes.

11           MR. LEVY:  So I think that would be a periless,

12    you know, route to go down.

13           I represent a lot of exit lenders, a lot of DIP

14    lenders in my many years as a bankruptcy lawyer and I've

15    actually never had to encounter this resistance to include a

16    reference to exit lenders, you know, in what's a pretty

17    typical exculpatory provision.

18           The other thing I would mention is the exculpatory

19    provision actually tracks what's in the credit agreement and

20    there's standard boilerplate language that's typically

21    included in any credit agreement, including ours, which

22    provides for this kind of protection.

23           So I don't think we're -- you know, we're not like

24    getting a windfall here, we're providing consideration, you

25    know, for the exculpatory language, no one, you know, has

Page 54

1    identified any conceivable claim that might be asserted

2    against us, and I realize that may cut both ways, but I

3    really don't want to have to go back to the bank group that

4    we've put together and take the risk that we don't get the

5    necessary consent if the plan gets modified.

6              THE COURT:  Thank you.  I certainly understand.

7              Mr. Khalil?

8              MR. KHALIL:  Hello, Your Honor.

9              I rise simply just to emphasize one of the points

10   Mr. Bienenstock made, which we fully agree with.  If ever

11   there was a case where creditor constituencies earned

12   exculpation, earned the protection of their efforts it's

13   this one.

14             The first lien group and the other creditor

15   constituencies entered these cases early on and they

16   negotiated it in good faith from day one.  Some of the first

17   lien lenders became restricted to participate firsthand in

18   mediation, which eventually produced what -- a virtually

19   fully consensual plan.  Those creditors have the expectation

20   that they will not be sued for their good-faith efforts and

21   their hard work.  They relied on those provisions, and in

22   fact their -- frankly they're paying for these provisions,

23   Your Honor, by virtue of the plan.

24             We would hope that, you know, the policy of

25   encouraging creditors to walk into the fray and negotiate in

Page 55

1    good faith and build consensus among parties, as was

2    achieved in NewPage, would be respected.

3              That's all, Your Honor.

4              THE COURT:  All right.  Thank you, Mr. Khalil.

5              Anything further from anyone?

6              Well, I recognize that opinions have been issued

7    on exculpation, but I must say that although each case I

8    think is obviously unique, this case is uniquely unique and

9    it really was the result of a mediation, very hard fought

10   settlement negotiations, we had a committee that was very

11   active and thorough in its investigation in testing

12   liability issues right along, and I am satisfied that --

13   well, first of all to undo any piece of this plan, and I'm

14   so pleased to see the word "joint" on this fourth amended

15   modified plan, that in and of itself is quite a coo for

16   counsel and the parties -- but I think that exculpation of

17   the party provided in the fourth amended plan is

18   appropriate.

19             These parties all negotiated for this, and again,

20   the Court is not prepared to place at risk such a thorough

21   and vital settlement.

22             And for that reason I will overrule the -- I

23   understand the objection, I think that no one should walk

24   out of the courtroom thinking that there's been a sea change

25   in the law in this district, but in this particular case

Page 56

1   these exculpation provisions are certainly appropriate and I

2   will approve -- approve the provisions.

3          MR. BIENENSTOCK:  Thank you, Your Honor.

4          THE COURT:  Yes.

5          MR. BIENENSTOCK:  I'm going to turn things back to

6   Ms. Liu if she'll accept them.

7          THE COURT:  All right.  Ms. Liu?

8          You know, when I walked out here, Ms. Liu, I

9   thought gee, if only my wife could see all of these people

10  here in my courtroom maybe it would change the balance of

11  power at home, and then you made your comment, so I --

12       (Laughter)

13         THE COURT:  -- it's thrown me off my game a little

14  bit.

15         MS. LIU:  And so, Your Honor, I think now would be

16  an appropriate time to address the mechanic's liens.

17         THE COURT:  All right.

18         MS. LIU:  Now, I'll tell you what we've discussed

19  with four out of the five, but first I just want to refresh

20  Your Honor's recollection, give you a little context, and

21  then I'll -- I'll explain the proposal.

22         You may recall that the debtors objected to the

23  mechanic's liens --

24         THE COURT:  Yes.

25         MS. LIU:  -- on the basis that the secured portion

EXHIBIT C

Excerpt of 2006 Indenture

#415 P. 001/102

01/16/2009 13:51

12128155802

From:Bank of NY Mellon

NORTEL NETWORKS LIMITED

*as Issuer,*

NORTEL NETWORKS CORPORATION

AND

NORTEL NETWORKS INC.

*as Guarantors,*

AND

THE BANK OF NEW YORK

*as Trustee*

---

*INDENTURE*

*Dated as of July 5, 2006*

---

[New York #1331721 v17]

SECTION 510.    *TRUSTEE MAY FILE PROOFS OF CLAIM.*

The Trustee may file such proofs of claim and other papers or documents as may be necessary or advisable in order to have the claims of the Trustee and the Holders allowed in any judicial proceedings relative to the Issuer or a Guarantor, its creditors or its property.

SECTION 511.    *UNDERTAKING FOR COSTS.*

In any suit for the enforcement of any right or remedy under this Indenture or in any suit against the Trustee for any action taken or omitted by it as Trustee, a court in its discretion may require the filing by any party litigant in the suit of an undertaking to pay the costs of the suit, and the court in its discretion may assess reasonable costs, including reasonable attorneys' fees and expenses, against any party litigant in the suit, having due regard to the merits and good faith of the claims or defenses made by the party litigant. This Section does not apply to a suit by the Trustee, a suit by a Holder pursuant to Section 507, or a suit by any Holder or group of Holders of more than 10% in principal amount of the Outstanding Debt Securities.

SECTION 512.    *DELAY OR OMISSION NOT WAIVER.*

No delay or omission of the Trustee or of any Holder of any Debt Security to exercise any right or remedy accruing upon any Event of Default shall impair any such right or remedy or constitute a waiver of any such Event of Default or an acquiescence therein. Every right and remedy given by this Article or by law to the Trustee or to the Holders may be exercised from time to time, and as often as may be deemed expedient, by the Trustee or by the Holders, as the case may be.

SECTION 513.    *WAIVER OF STAY OR EXTENSION LAWS.*

The Issuer and each Guarantor, severally and not jointly, covenants (to the extent that it may lawfully do so) that it will not at any time insist upon, or plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay or extension law wherever enacted, now or at any time hereafter in force, that may affect the covenants or the performance of this Indenture; and the Issuer and the Guarantors each, severally and not jointly (to the extent that it may lawfully do so), hereby expressly waives all benefit or advantage of any such law, and covenants that it will not hinder, delay or impede the execution of any power herein granted to the Trustee, but will suffer and permit the execution of every such power as though no such law had been enacted.

## ARTICLE SIX

### THE TRUSTEE

SECTION 601.    *DUTIES OF TRUSTEE.*

(a)    If an Event of Default has occurred and is continuing, the Trustee shall exercise such of the rights and powers vested in it by this Indenture, and use the same degree of care and skill in their exercise, as a prudent person would exercise or use under the circumstances in the conduct of his own affairs.

[New York #1531721 v17]                                    58

(b)    Except during the continuance of an Event of Default:

    (i)    the Trustee need perform only those duties that are specifically set forth in this Indenture and no others shall be inferred or implied; and

    (ii)    in the absence of bad faith on its part, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates or opinions furnished to the Trustee and conforming to the requirements of this Indenture; however, the Trustee shall examine the certificates and opinions required to be delivered to it pursuant to the terms of this Indenture to determine whether or not they so conform.

(c)    The Trustee may not be relieved from liability for its own negligent action, its own negligent failure to act, or its own willful misconduct, except that:

    (i)    this paragraph does not limit the effect of paragraph (b) of this Section;

    (ii)    the Trustee shall not be liable for any error of judgment made in good faith by a Responsible Officer, unless it is proved that the Trustee was negligent in ascertaining the pertinent facts;

    (iii)    the Trustee shall not be liable with respect to any action it takes or omits to take in good faith in accordance with a direction received by it pursuant to Section 506; and

    (iv)    no provision of this Indenture shall require the Trustee to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers, if it shall have reasonable grounds for believing that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it.

(d)    Every provision of this Indenture that in any way relates to the Trustee is subject to the above paragraphs of this Section. The Trustee may refuse to perform any duty or exercise any right or power under this Indenture (including with respect to Section 506) unless it receives indemnity reasonably satisfactory to it for actions taken under this Indenture. The Trustee shall not be liable for interest on any money received by it except as the Trustee may agree in writing with the Issuer or the applicable Guarantor. Money held in trust by the Trustee need not be segregated from other funds except to the extent required by law.

SECTION 602.    *RIGHTS OF TRUSTEE.*

The Trustee may rely on any document (whether in its original or facsimile form) believed by it to be genuine and to have been signed or presented by the proper person. The Trustee need not investigate any fact or matter stated in the document, but the Trustee, in its discretion, may make such further inquiry or investigation into such facts or matters as it may see fit, and, if the Trustee shall determine to make such further inquiry or investigation, it shall be entitled to examine the books, records and premises of the Issuer, personally or by agent or attorney at the sole cost of the Issuer and shall incur no liability or additional liability of any kind by reason of

[New York #1531721 v17]                59

such inquiry or investigation. Before the Trustee acts or refrains from acting, it may require an Officers' Certificate or an Opinion of Counsel. The Trustee shall not be liable for any action it takes or omits to take in good faith in reliance thereon. The Trustee may act through agents or attorneys and shall not be responsible for the misconduct or negligence of any agent or attorney appointed with due care. The Trustee shall not be liable for any action it takes or omits to take in good faith, except as otherwise provided in this Indenture, which it reasonably believes to be authorized or within its rights or powers. The Trustee may consult with counsel of its selection and the advice of such counsel or any Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken, suffered or omitted by it hereunder in good faith and in reliance thereon.

The rights, privileges, protections, immunities and benefits given to the Trustee, including, without limitation, its right to be indemnified, are extended to, and shall be enforceable by, the Trustee in each of its capacities hereunder as Security Registrar and Security Custodian and each agent, custodian and other Person employed by the Trustee to act hereunder.

SECTION 603.        *INDIVIDUAL RIGHTS OF TRUSTEE.*

The Trustee in its individual or any other capacity may become the owner or pledgee of Debt Securities and may otherwise deal with the Issuer or the Guarantors with the same rights it would have if it were not Trustee. Any agent of the Trustee may do the same with like rights. However, the Trustee is at all times subject to Sections 609 and 610.

SECTION 604.        *TRUSTEE'S DISCLAIMER.*

The recitals contained herein and in the Debt Securities, except the Trustee's certificate of authentication, shall be taken as the statements of the Issuer and the Trustee assumes no responsibility for the correctness of same. The Trustee makes no representations as to the validity or sufficiency of any offering materials, this Indenture or of the Debt Securities. The Trustee shall not be accountable for the use or application by the Issuer of any of the Debt Securities or proceeds of the Debt Securities.

SECTION 605.        *NOTICE OF DEFAULTS.*

(a)        If an Event of Default with respect to a series of Debt Securities occurs and is continuing, the Trustee shall mail to Holders of Debt Securities of such series a notice of the Event of Default within 90 days after it occurs. Except in the case of an Event of Default resulting from nonpayment on any Debt Securities, the Trustee may withhold the notice if and so long as a committee of its Responsible Officers in good faith determines that withholding the notice is in the interests of the Holders of Debt Securities.

(b)        The Trustee shall not be deemed to have notice of any Default or Event of Default unless a Responsible Officer of the Trustee has knowledge thereof or unless written notice of any event which is in fact such a Default is received by the Trustee at the Corporate Trust Office of the Trustee, and such notice references the Debt Securities and this Indenture.

[New York #1531721 v17]                                    60

SECTION 606.    *COMPENSATION AND INDEMNITY.*

(a)    The Issuer shall pay to the Trustee from time to time compensation for its services as agreed separately by the Issuer and the Trustee. The Trustee's compensation shall not be limited by any law on compensation of a trustee of an express trust.

(b)    The Issuer shall fully indemnify the Trustee and any predecessor Trustee and their agents for, and to hold them harmless against, any and all loss, damage, claims, liability or expense (including reasonable attorneys' fees and expenses) arising out of or in connection with the acceptance or administration of the trust or trusts hereunder, including the costs and expenses of defending itself against any claim or liability in connection with the exercise or performance of any of its rights, powers, trusts or duties hereunder, except to the extent that such loss, damage, claim, liability or expense is caused by its own negligent action or failure to act, willful misconduct or bad faith or, with respect to indemnification of an agent hereunder, the negligent action or failure to act, willful misconduct or bad faith of such agent. The Trustee shall notify the Issuer promptly of any claim for which it may seek indemnity. The Issuer need not pay for any settlement made without its consent.

(c)    Except as otherwise expressly provided herein, the Issuer agrees to reimburse the Trustee upon its request for all reasonable and documented expenses, disbursements and advances incurred or made by the Trustee in accordance with any provision of this Indenture (including the reasonable and documented compensation, expenses and disbursements of its agents and counsel), except any such expense, disbursement or advance as may be attributable to its negligent action or failure to act, willful misconduct or bad faith or, with respect to documented compensation, expenses and disbursements of an agent or attorney, the negligent action or failure to act, willful misconduct or bad faith of such agent or attorney.

(d)    To secure the Issuer's respective payment obligations in this Section, the Trustee shall have a lien prior to Debt Securities on all money or property held or collected by the Trustee, except that held in trust to pay principal of, premium, if any, on and interest on Debt Securities.

When the Trustee incurs expenses or renders services in connection with an Event of Default specified in Section 501(5) or Section 501(6), the reasonable and documented expenses (including the reasonable and documented charges and expenses of its counsel) and compensation for the services are intended to constitute expenses of administration under any applicable Federal or state bankruptcy, insolvency or other similar law.

The provisions of this Section shall survive the satisfaction and discharge of the Debt Securities, termination of this Indenture and the resignation or removal of the Trustee.

SECTION 607.    *REPLACEMENT OF TRUSTEE.*

(a)    A resignation or removal of the Trustee and appointment of a successor Trustee for the Debt Securities of any series shall become effective only upon the successor Trustee's acceptance of appointment as provided in this Section.

(b)    The Trustee may resign at any time with respect to Debt Securities of one or more series by giving written notice thereof to the Issuer and the Guarantors. If an instrument of acceptance

[New York #1531721 v17]                                  61

EXHIBIT D

Excerpt of 2007 Indenture

**NORTEL NETWORKS CORPORATION,**
*as Issuer,*

**NORTEL NETWORKS LIMITED**

**AND**

**NORTEL NETWORKS INC.**
*as Guarantors,*

**and**

**THE BANK OF NEW YORK,**
*as Trustee, Registrar, Paying Agent and Conversion Agent*

$575,000,000 1.75% Convertible Senior Notes due 2012 and

$575,000,000 2.125% Convertible Senior Notes due 2014

---

**INDENTURE**

Dated as of March 28, 2007

[New York #1699265 v7]

First: to the Trustee and the Agents for amounts due under Section 7.07, including payment of all compensation, expenses and liabilities incurred by the Trustee, and the costs and expenses of collection;

Second: to holders of Notes of such series (treated as a single series for such purposes) for amounts due and unpaid on such Notes for principal, premium, if any, and interest and Additional Interest, if any, ratably, without preference or priority of any kind, according to the amounts due and payable on the Notes of such series for principal, premium, if any, and interest and Additional Interest, if any, respectively; and

Third: to the Issuer or, to the extent the Trustee collects any amount pursuant to the Guarantee from the Guarantor, to the Guarantor.

Except as otherwise provided in Section 2.12, the Trustee may fix a record date and payment date for any payment to holders of Notes of a series.

SECTION 6.11. Undertaking for Costs.

In any suit for the enforcement of any right or remedy under this Indenture or in any suit against the Trustee for any action taken or omitted by it as a Trustee, a court in its discretion may require the filing by any party litigant in the suit, other than the Trustee, of an undertaking to pay the costs of the suit, and the court in its discretion may assess reasonable costs, including reasonable attorneys fees, against any party litigant in the suit, having due regard to the merits and good faith of the claims or defenses made by the party litigant. This Section does not apply to a suit by the Trustee, a suit by a holder pursuant to Section 6.07 or a suit by holders of more than 10% in aggregate principal amount of the then outstanding Notes of a series.

## ARTICLE 7
## THE TRUSTEE

The Trustee hereby accepts the trust imposed upon it by this Indenture and covenants and agrees to perform the same, as herein expressed. Whether or not herein expressly so provided, every provision of this Indenture relating to the conduct or affecting the liability of or affording protection to the Trustee shall be subject to the provisions of this Article 7.

SECTION 7.01. Duties of the Trustee.

(a)     If an Event of Default actually known to a Trust Officer of the Trustee has occurred and is continuing, the Trustee shall exercise such of the rights and powers vested in it by this Indenture and use the same degree of care and skill in their exercise as a prudent person would exercise or use under the circumstances in the conduct of his or her own affairs.

(b)     Except during the continuance of an Event of Default known to the Trustee:

(1)     The duties of the Trustee shall be determined solely by the express provisions of this Indenture and the Trustee need perform only those duties that are specifically

44

[New York #1699265 v7]

set forth in this Indenture and no others and no implied covenants or obligations shall be read into this Indenture against the Trustee; and

(2) In the absence of bad faith on its part, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon any statements, certificates or opinions furnished to the Trustee and conforming to the requirements of this Indenture. However, the Trustee shall examine the certificates and opinions required to be delivered to it pursuant to the terms of this Indenture to determine whether or not they conform to the form required by this Indenture.

(c) The Trustee may not be relieved from liability for its own negligent action, its own negligent failure to act or its own willful misconduct, except that:

(1) This paragraph does not limit the effect of paragraph (b) of this Section;

(2) The Trustee shall not be liable for any error of judgment made in good faith by a Trust Officer, unless it is proved that the Trustee was negligent in ascertaining the pertinent facts; and

(3) The Trustee shall not be liable with respect to any action it takes or omits to take in good faith in accordance with a direction received by it pursuant to Section 6.05.

(4) No provision of this Indenture shall require the Trustee to expend or risk its own funds or incur any financial liability in the performance of any of its duties or the exercise of any of its rights and powers hereunder, if it shall have reasonable grounds for believing that repayment of such funds or adequate indemnity against such risk of liability is not reasonably assured to it.

(d) Whether or not therein expressly so provided, every provision of this Indenture that is in any way related to the Trustee is subject to paragraphs (a), (b) and (c) of this Section 7.01.

(e) The Trustee shall not be liable for interest on any money received by it except as the Trustee may agree in writing with the Issuer. Money held in trust by the Trustee need not be segregated from other funds except to the extent required by law.

SECTION 7.02. Rights of the Trustee.

(a) The Trustee may conclusively rely on and shall be fully protected in acting or refraining from acting upon any resolution, Officers' Certificate, or any other certificate, statement, instrument, opinion, report, notice, request, consent, order, security or other document believed by it to be genuine and to have been signed or presented by the proper person or persons. The Trustee need not investigate any fact or matter contained therein but the Trustee, in its discretions, may make such further inquiry or investigation into such facts or matters as it may see fit, and, if the Trustee shall determine to make such further inquiry or investigation, it shall be entitled to examine the books, records and premises of the Issuer, personally or by agent or attorney at the sole cost of the Issuer and shall incur no liability or additional liability of any kind by reason of such inquiry or investigation.

45

[New York #1699265 v7]

(b)    Any request, direction, order or demand of the Issuer or any Guarantor mentioned herein shall be sufficiently evidenced by an Officers' Certificate (unless other evidence in respect thereof is herein specifically prescribed). In addition, before the Trustee acts or refrains from acting, it may require an Officers' Certificate, an Opinion of Counsel or both. The Trustee shall not be liable for any action it takes or omits to take in good faith in reliance on such Officers' Certificate or Opinion of Counsel. The Trustee may consult with counsel and the written advice of such counsel or any Opinion of Counsel shall be full and complete authorization and protection from liability in respect of any action taken, suffered or omitted by it hereunder in good faith and in reliance thereon.

(c)    The Trustee may execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through the appointment of co-trustees or through its attorneys, agents, custodians or nominees and other persons not regularly in its employ and shall not be responsible for the misconduct or negligence of any attorneys, agents, custodians or nominees appointed with due care.

(d)    The Trustee shall not be liable for any error of judgment made in good faith by a Trust Officer, unless it is proved that the Trustee was negligent in ascertaining the pertinent facts; and

(e)    The Trustee shall not be liable with respect to any action it takes or omits to take in good faith in accordance with a direction received by it pursuant to Section 6.05.

(f)    Unless otherwise specifically provided in this Indenture, any demand, request, direction or notice from the Issuer shall be sufficient if signed by any two Authorized Officers of the Issuer or NNL or any Authorized Officer of NNI, as the case may be.

(g)    The Trustee shall be under no obligation to exercise any of the rights or powers vested in it by this Indenture at the request, order or direction of any of the holders of Notes pursuant to the provisions of this Indenture, unless such holders have offered to the Trustee security or indemnity satisfactory to it against the costs, expenses and liabilities which might be incurred therein or thereby.

(h)    The permissive rights of the Trustee to do things enumerated in this Indenture shall not be construed as a duty and the Trustee shall not be answerable for other than its negligence or willful misconduct.

(i)    The Trustee shall not be responsible for the computation of any Additional Interest of the type described in clause (i) of the definition thereof or of any adjustment to the Conversion Rate or Conversion Price or for any determination as to whether an adjustment is required and shall not be deemed to have knowledge of any adjustment unless and until it shall have received written notice from the Issuer of such adjustment.

(j)    The rights, privileges, protections, immunities and benefits given to the Trustee, including, without limitation, its right to be indemnified, are extended to, and shall be enforceable by, the Trustee in each of its capacities hereunder as Registrar, Paying Agent and Conversion Agent, each Agent and each other agent, custodian and person employed to act hereunder.

46

[New York #1699265 v7]

SECTION 7.03. Individual Rights of the Trustee.

Subject to Sections 7.10 and 7.11, the Trustee in its individual or any other capacity may become the owner or pledgee of Notes with the same rights it would have if it were not the Trustee and may otherwise deal with the Issuer or an Affiliate of the Issuer and receive, collect, hold and retain collections from the Issuer with the same rights it would have if it were not Trustee. Any Agent may do the same with like rights.

SECTION 7.04. Trustee's Disclaimer.

The Trustee shall not be responsible for and makes no representation as to the validity or adequacy of the Offering Memorandum, this Indenture, the Notes or the Guarantee. It shall not be accountable for the Issuer's use of the proceeds from the Notes or any money paid to the Issuer or upon the Issuer's direction under any provision of this Indenture. It shall not be responsible for the use or application of any money received by any Paying Agent other than the Trustee, and it shall not be responsible for any statement or recital in any offering materials, herein or any statement in the Notes or any other document in connection with the sale of the Notes or pursuant to this Indenture other than its certificate of authentication.

SECTION 7.05. Notice of Defaults.

If a Default or Event of Default occurs and is continuing and if it is actually known to a Trust Officer of the Trustee, the Trustee shall mail to each holder of a Note a notice of the Default or Event of Default within 90 days after it occurs. A Default or an Event of Default shall not be considered known to the Trustee unless it is a Default or Event of Default in the payment of principal or interest when due under Section 6.01(a) or (b) or the Trustee shall have received written notice thereof, in accordance with this Indenture, from the Issuer or from the holders of a majority in aggregate principal amount of the outstanding Notes of the relevant series. Except in the case of a Default or Event of Default in payment of principal of, premium, if any, or interest or Additional Interest, if any, on any Note, the Trustee may withhold the notice if and so long as a committee of its Trust Officers in good faith determines that withholding the notice is in the interest of the holders of the Notes.

SECTION 7.06. Reports by the Trustee to Holders.

Within 60 days after May 15 of each year, the Trustee shall mail to holders of Notes a brief report dated as of such reporting date that complies with TIA § 313(a). The Trustee also shall comply with TIA § 313(b)(2). The Trustee shall also transmit by mail all reports as required by TIA § 313(c).

A copy of each report at the time of its mailing to holders of Notes shall be filed by the Trustee with the Commission and each stock exchange or securities market, if any, on which the Notes are listed.

SECTION 7.07. Compensation and Indemnity.

The Issuer shall pay to the Trustee from time to time and the Trustee shall be entitled to reasonable compensation for its acceptance of this Indenture and its services hereunder as agreed

47

[New York #1699265 v7]

to in writing. The Trustee's compensation shall not be limited by any law on compensation of a trustee of an express trust. The Issuer shall reimburse the Trustee promptly upon request for all reasonable disbursements and expenses incurred or made by or on behalf of it in addition to the compensation for its services.

Each of the Issuer and the Guarantors, jointly and severally, shall indemnify and hold harmless the Trustee and its agents against any loss, damages, claims, liability or expense (including reasonable attorney's fees and expenses) incurred by it arising out of or in connection with the acceptance or administration of its duties or the exercise of its rights under this Indenture and the trusts hereunder, including the costs and expenses of defending itself against or investigating any claim of liability in the premises, except as set forth in the next paragraph. The Trustee shall notify the Issuer promptly of any claim for which it may seek indemnity. The Issuer shall defend the claim with counsel designated by the Issuer and the Guarantors, who may be outside counsel to the Issuer but shall in all events be reasonably satisfactory to the Trustee, and the Trustee shall cooperate in the defense, *provided* that the Issuer will not be liable for any settlement made without its consent; *provided further* that the Trustee may defend any such claim with another counsel selected by the Trustee and reasonably acceptable to the Issuer and the Guarantors if the Trustee determines, acting reasonably, that a conflict of interest exists between the Trustee and the Issuer in the defense of such claim.

The Issuer need not reimburse any expense or indemnify against any loss or liability incurred by the Trustee or its agent through its or such agent's own negligence, bad faith or willful misconduct.

The Trustee shall have a lien prior to the Notes on all money or property held or collected by the Trustee to secure the Issuer's payment obligations in this Section 7.07, except that held in trust to pay principal and interest and Additional Interest, if any, on Notes.

When the Trustee incurs expenses or renders services after an Event of Default specified in Section 6.01(g) or (h) occurs, the expenses and the compensation for the services (including the fees and expenses of its agents and counsel) are intended to constitute expenses of administration under any bankruptcy, insolvency or other similar applicable law.

The provisions of this Section 7.07 shall survive payment of the Notes, the termination of this Indenture and the resignation or removal of the Trustee.

SECTION 7.08. Replacement of the Trustee.

A resignation or removal of the Trustee and appointment of a successor Trustee shall become effective only upon the successor Trustee's acceptance of appointment as provided in this Section 7.08.

The Trustee may resign at any time and be discharged from the trust hereby created by so notifying the Issuer; *provided* that such resignation . The holders of a majority in aggregate principal amount of the then outstanding Notes (treated as a single series for such purposes) may remove the Trustee by so notifying the Trustee and the Issuer in writing and may appoint a successor Trustee if:

48

[New York #1699265 v7]