# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| NORTEL NETWORKS INC., *et al.*, | Case No. 09-10138 (KG) |
| Debtors. | (Jointly Administered) |
|  | **Re: D.I. 17501, 17687** |
|  | **Hearing Date: January 24, 2017 at 10:00 a.m.** |

**INDENTURE TRUSTEE DELAWARE TRUST COMPANY'S (A) RESPONSE TO STATEMENT OF SOLUS ALTERNATIVE ASSET MANAGEMENT LP AND POINTSTATE CAPITAL LP WITH RESPECT TO (I) FIRST AMENDED JOINT CHAPTER 11 PLAN OF NORTEL NETWORKS INC. AND CERTAIN OF ITS AFFILIATED DEBTORS AND (II) DEBTORS' MOTION FOR ENTRY OF AN ORDER PURSUANT TO 11 U.S.C. §§ 105(a) AND 363(b) AND FEDERAL RULE OF BANKRUPTCY PROCEDURE 9019 APPROVING SETTLEMENT AGREEMENT AND PLAN SUPPORT AGREEMENT AND OBJECTION TO ASSERTED FEES AND EXPENSES OF INDENTURE TRUSTEE AND (B) JOINDER AND RESERVATION OF RIGHTS**

9067831

# TABLE OF CONTENTS

<u>Page</u>

PRELIMINARY STATEMENT ............................................................................................1

BACKGROUND ...............................................................................................................6

    A.    The 7.875% Notes.................................................................................6

    B.    The Rights and Duties of the Trustee ....................................................8

RESPONSE......................................................................................................................10

I.    The Asserted Fees are Reasonable on Their Face, and the Trustee Will Provide Invoices to the Court if it Wants to Review Them..............................10

    A.    The Asserted Fees are Reasonable......................................................10

    B.    The Proposed Fee Procedures are Not Reasonable...............................12

II.    The Noteholders' Objections to the Reasonableness of the Fees are Without Merit and Should be Denied. ...................................................................13

    A.    The Noteholders' Reliance on Skewed and Incomplete Data Points to Question the Reasonableness of the Asserted Fees is Misleading.........13

           i.    There Were Three Indenture Trustees in These Cases. ............13

           ii.    The Face Amount of the Notes is Not a Proxy for the Reasonableness of the Asserted Fees. ..........................................................14

    B.    The Trustee's Service on the Committee, Which the Noteholders Have Known About Since 2009, was Consistent with its Duties and Benefitted All Holders of the 7.875% Notes.......................................................15

III.    The Noteholders Sought and Accepted the Benefits of the Trustee's Work Without Ever Inquiring About Fees Until Their Own Settlement Left Them Short of a Par Recovery. ..............................................................................17

    A.    The Noteholders Had Actual Knowledge of the Asserted Fees When They Agreed to Settle..............................................................................18

    B.    The Noteholders Demanded and Accepted Considerable Benefits from the Work Performed by the Trustee Throughout These Cases....................19

CONCLUSION................................................................................................................21

JOINDER AND RESERVATION OF RIGHTS .................................................................22

9067831

Delaware Trust Company ("Delaware Trust")[1] by and through its attorneys, Patterson Belknap Webb & Tyler LLP and Morris James LLP, hereby submits this response ("Response") to the *Statement of Solus Alternative Asset Management LP and PointState Capital LP with Respect to (I) First Amended Joint Chapter 11 Plan of Nortel Networks Inc. and Certain of its Affiliated Debtors and (II) Debtors' Motion for Entry of an Order Pursuant to 11 U.S.C. §§ 105(a) and 363(b) and Federal Rule of Bankruptcy Procedure 9019 Approving Settlement Agreement and Plan Support Agreement and Objection to Asserted Fees and Expenses of Indenture Trustee*, dated January 9, 2017 (the "Objection") [D.I. No. 17687][2] and supports Plan confirmation. The Trustee respectfully states that:

## PRELIMINARY STATEMENT

1.       The Trustee has scrupulously and unfailingly discharged the contractual and statutory duties it undertook after succeeding to The Bank of New York Mellon ("BNYM") as the indenture trustee for the 7.875% Notes in 2009. With the help of its retained professionals, the Trustee has, among other things: filed proofs of claims in the U.S. and Canada; sent notices to holders; monitored key issues; reviewed Court papers; attended hearings in person or by phone; pursued interests unique to the 7.875% Notes in both the U.S. and Canada; sought and obtained membership on the Committee (as defined below) and served on the Committee on behalf of all holders of the 7.875% Notes; worked with other key stakeholders – the Debtors, the *ad hoc* group of bondholders ("Ad Hoc Group"), BNYM, and the Pension Benefit Guaranty

---

[1] On December 6, 2016, Delaware Trust succeeded to Law Debenture Trust Company of New York ("Law Debenture") as indenture trustee under the Indenture (as defined below). Accordingly, "Trustee" is used herein to refer to Law Debenture for the period before December 6, 2016 and to refer to Delaware Trust for the period from and after December 6, 2016.

[2] The Objection was filed by Solus Alternative Asset Management LP and PointState Capital LP ("Noteholders"). On information and belief, Solus has owned the 7.875% Notes for years while PointState acquired its position in 2016. Any other capitalized terms used in this Response but not defined have the meanings given to them in the Objection.

9067831

Corporation ("PBGC") – throughout the entire allocation dispute; participated in the allocation trial; attended conferences at the Court's direction; attended selected depositions while relying on summaries provided by the Committee's professionals for others; persuaded the other Core Parties that any party, such as the Trustee, that would not testify at the allocation trial would not have to sit for a Rule 30(b)(6) deposition; worked with the Committee's financial advisor to stay current on recovery scenarios for the 7.875% Notes and others; successfully prosecuted motions for reconsideration of the allocation decisions in the U.S. and Canada for the specific benefit of the holders of the 7.875% Notes; worked with the Debtors' professionals and others to refine the distribution mechanics in the Plan; and (as detailed below) worked throughout these eight years with the Noteholders and their counsel on all aspects of these cases.[3]

     2.     Pursuant to the Indenture, the Debtors are obligated to pay the reasonable fees and expenses of the Trustee and its professionals. If they do not, the Trustee is entitled to exercise a charging lien on any amounts it collects for distribution to the holders of the 7.875% Notes to satisfy any unpaid fees and expenses.[4] The Asserted Fees for the work the Trustee and its professionals have performed in these cases total approximately $7.97 million. This amount is entirely reasonable, especially in light of the length and complexity of these bankruptcy cases, as well as the unique features of the 7.875% Notes. So much so, in fact, that the Court could find that the fees are *per se* reasonable and reject the Noteholders' challenge summarily. Nevertheless, the Trustee and its professionals will submit their invoices to the Court as the

---

[3] As discussed below, unique features of the 7.875% Notes added another layer of complexity to the Trustee's work. *See* ¶ 13, below.

[4] Because indenture trustee fees are often paid in whole or in part out of distributions to noteholders, neither the Trustee nor the professionals it retained has been paid anything for their work in these cases. These firms have carried these receivables since the day they were retained by the Trustee, and in some cases as far back as the beginning of 2009.

9067831

2

Noteholders request (or, if the Court prefers, to the Fee Committee). Each firm knows that Bankruptcy Courts routinely review professional fees in complex chapter 11 cases and has maintained detailed time records. This process is familiar to all chapter 11 practitioners; it requires neither the briefing schedule nor the one-sided holdback that the Noteholders also request. *See* Section I.

3.      The handful of objections that the Noteholders lodge to reasonableness of the fees all lack merit. First, their selective comparison between the Trustee's fees and those of one of the two other indenture trustees omits any reference to the fees incurred by the third indenture trustee, which are comparable to those of the Trustee.[5] Second, the face amount of debt instruments is hardly an appropriate proxy for the reasonableness of fees in any case, let alone one as lengthy and complex as this one. Third, indenture trustees routinely serve on creditors' committees in this District and in others because they typically hold one of the largest claims against the debtor; doing so is wholly consistent with their duties and benefits their holders, as was the case here. *See* Section II.

4.      The Noteholders' own conduct underscores the reasonableness of the Asserted Fees. After making regular demands of the Trustee and relying on the Trustee's professionals in the U.S. and Canada for assistance throughout these cases in order to refrain from becoming restricted, the Noteholders should be precluded from objecting to the Asserted Fees at all. If ever the doctrines of estoppel, laches and unjust enrichment should apply, it is here. *See* Section III.

5.      Finally, the Court may wonder why this issue has surfaced now. Why, with professional fees in these cases totaling over $1 billion, do the Noteholders take issue with $3.75

---

[5] Wilmington Trust Company ("WTC"), a creditor of only the Canadian Debtors, incurred $7.15 million in fees in connection with these cases. Those fees were approved by the Canadian Court. (*See* January 12, 2017 Order of Justice Newbould approving the 1988 Bond Claims in the Canadian Debtors' cases.)

9067831

3

million[6] of reasonable fees and expenses billed over eight years, particularly after the Noteholders and their counsel worked so closely with the Trustee's professionals during this period and never once raised any issue about fees until virtually all the work was done?  The answer to that question reveals the real motive behind the Noteholders' Objection:  they regret one feature of the deal they struck with the Debtors and seek to remedy their problem at the expense of the Trustee and its professionals.

6.    On information and belief, the Noteholders own approximately 90% percent of the 7.875% Notes.  But neither the Noteholders nor their counsel became restricted until recently.  While they remained unrestricted, the Noteholders and their counsel leaned heavily on the Trustee and its professionals to monitor discovery, participate in the allocation trial in the U.S. and Canada and the four mediations, and work with the Committee and its advisors, among other things.  During this time, the Noteholders and their counsel were in regular contact with the Trustee's counsel:  the Trustee's counsel agreed to share drafts of all papers they filed in this Court and the Canadian Court; worked with the Noteholders' counsel on motions and joinders; supported the Noteholders when they filed a motion to estimate the Trustee's claim; discussed crucial issues such as the no-call provision, the PBGC's claim for joint and several liability, and post-petition interest; strategized concerning mediation and the appeals in the U.S. and Canada; and otherwise worked to maximize the recoveries of the holders of the 7.875% Notes.  Indeed, despite having a claim of more than $150 million against NNL, the Noteholders did not even retain Canadian counsel and were instead content to work with the Trustee's Canadian lawyer.

---

[6] As discussed in ¶ 8, ¶ 13, ¶ 18 and ¶ 29, below, the Debtors have agreed to pay $4.25 million of the Asserted Fees, leaving $3.75 million that will be satisfied through application of the charging lien.

9067831

7.    In the summer of 2016, however, the framework of the SPSA emerged in mediation, and the other Core Parties agreed that no creditor would receive post-petition interest, including the holders of the 7.875% Notes.  Finally, the Noteholders decided to get in the game. Following negotiations with the U.S. Debtors (and with the Noteholders still not restricted), and without consulting the Trustee's counsel, the Noteholders' counsel reached a deal that surrendered much of the value associated with the unique features of the 7.875% Notes.  All the while, the Noteholders' counsel knew that the Trustee's fees totaled approximately $7.5 million and urged the Debtors to agree to pay that entire amount.  But, with limited funds available for distribution and multiple creditor factions demanding attention, the Debtors agreed to pay only $4.25 million of the Asserted Fees.[7]

8.    The Noteholders' counsel ultimately agreed to the $4.25 million offered by the Debtors.  But this agreement only governs the *allocation* of the Asserted Fees; the Debtors and the Noteholders have no authority to limit the Trustee's fees.  This caused a problem for the Noteholders: they wanted a par recovery, but the deal their counsel agreed to results in a deduction of approximately $3.75 million from the distribution to the holders of the 7.875% Notes as a result of the exercise of the charging lien by the Trustee.  So the Noteholders contrived this dispute knowing that virtually all of the $3.75 million they can keep from the Trustee and its professionals will go to them.  At no time before their discussions with the Debtors did the Noteholders or their counsel raise any concerns with the Trustee about the fees or the work that the Trustee had done.  On the contrary, the Noteholders and their counsel thanked the Trustee for its work and cooperation.  It was not until their counsel surrendered a par

---

[7] Significantly, the Debtors' counsel have confirmed to the Trustee's counsel that this was an economic decision and not a conclusion about the reasonableness of the Trustee's fees.

9067831

or better recovery at the bargaining table that the Noteholders launched a belated and transparent challenge to the reasonableness of the Asserted Fees.

## **BACKGROUND**

9.       On January 14, 2009 (the "Petition Date"), Nortel Networks Inc. ("NNI"), Nortel Networks Capital Corporation ("NNCC"), and the other above-referenced debtors and debtors in possession (collectively, the "Debtors") each filed petitions for relief under 11 U.S.C. § 101, et seq. (the "Bankruptcy Code"). Also on the Petition Date, Nortel Networks Corporation ("NNC"), the Debtors' ultimate corporate parent, Nortel Networks Limited ("NNL"), NNI's direct corporate parent, and certain of its affiliates in Canada ("Canadian Debtors") commenced a proceeding with the Ontario Superior Court of Justice (the "Canadian Court") under the Companies' Creditors Arrangement Act (Canada), seeking relief from their creditors. The Canadian Court appointed Ernst & Young Inc. to serve as monitor for the Canadian proceedings.

10.       On January 22, 2009, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed an Official Committee of Unsecured Creditors (the "Committee") for the Debtors. On February 19, 2009, the U.S. Trustee appointed the Trustee to the Committee [D.I. No. 340].[8]

### A.       **The 7.875% Notes**

11.       Pursuant to: (a) an indenture, dated as of February 15, 1996 (the "Indenture"), by and among NNL (f/k/a Northern Telecom Limited), as issuer and guarantor, NNCC (f/k/a Northern Telecom Capital Corporation), as issuer, and BNYM, as trustee, (b) the Prospectus for Northern Telecom Capital Corporation's $150,000,000 7.40% Notes Due 2006 and

---

[8] Delaware Trust succeeded to Law Debenture's position on the Committee when it took over as indenture trustee for the 7.875% Notes.

9067831

$150,000,000 7.875% Notes due 2026, dated May 2, 1996 ("Prospectus"), and (c) the Prospectus

Supplement for Northern Telecom Capital Corporation's $150,000,000 7.875% Notes due 2026,

dated June 12, 1996 ("Prospectus Supplement"), NNCC issued and NNL guaranteed $150

million in aggregate principal amount of 7.875% Notes Due 2026.

12.     NNCC is a direct and wholly-owned subsidiary of NNI.  NNCC issued the

7.875% Notes and loaned the proceeds to NNI in exchange for a Promissory Note issued by NNI

on July 23, 1996, which was subsequently replaced by certain Revolving Loan Agreements,

dated as of February 14, 2006, June 15, 2006, and June 15, 2008, between NNCC, as lender, and

NNI, as borrower.  The Debtors' amended schedules reflect that NNCC has an undisputed

intercompany claim against NNI under the Revolving Loan Agreement in the amount of

$147,634,914.66.[9]

13.     The 7.875% Notes are unique debt securities and the claims on account of these

notes go beyond just principal and interest.  In addition to the NNL guarantee, holders of 7.875%

Notes have the benefit of a Support Agreement that was entered into between NNCC and NNI on

February 15, 1996 (the "Support Agreement, and, with the Indenture, the Prospectus and the

Prospectus Supplement, the "Indenture Documents").  The Support Agreement provides that

NNI is contractually obligated to maintain NNCC's solvency at all times: "at all times prior to

the termination of this Agreement, NTI [NNI] shall cause the Company [NNCC] to have and to

maintain a net worth of at least $1.00."  As a result, the holders of the 7.875% Notes are entitled

to payment of principal, prepetition interest, and the other contractual entitlements embodied in

---

[9] *See Amended Schedules of Nortel Networks Inc.*, dated December 10, 2014 [D.I. No. 14918].  The Trustee filed timely proofs of claim against NNCC and NNL for all principal, interest, and other amounts due on account of the 7.875% Notes.  The Trustee subsequently amended the proofs of claim it filed against NNCC and NNL.  Copies of the Indenture Documents were included with the claims.

9067831

the Indenture Documents, including post-petition interest at the contract rate.  The Trustee has

also argued throughout these cases that the holders of 7.875% Notes are entitled to damages for

breach of a no-call provision that prohibits repayment of the 7.875% Notes before their stated

maturity date.[10]  Finally, while all of the so-called "crossover bonds" were issued by a Canadian

Debtor and guaranteed by a U.S. Debtor, the 7.875% Notes were issued by a U.S. Debtor (a

special-purpose financing entity) and guaranteed by a Canadian Debtor.  These and other unique

features of the 7.875% Notes distinguish them from the other crossover bonds, which resulted in

a divergence of interest between the Trustee and the Ad Hoc Group on certain issues and

contributed to much of the work performed by the Trustee in these cases.

### B.    The Rights and Duties of the Trustee

14.      Section 601 of the Indenture requires that, upon an event of default (such as the

commencement of the Debtors' bankruptcy cases), "the Trustee shall exercise such of the rights

and powers vested in it by this Indenture, and use the same degree of care and skill in their

exercise, as a prudent person would exercise or use under the circumstances in the conduct of his

own affairs."[11]  In order to assist the Trustee in the performance of these duties, Section 602 of

---

[10] *See Prospectus Supplement*, S-3.  ("The Offered Notes may not be redeemed prior to maturity[.]").  A no-call serves to "protect [a] bargained-for yield [. . .] by expressly prohibit[ing] prepayment." *In re S. Side House, LLC*, 451 B.R. 248, 268 (Bankr. E.D.N.Y. 2011).  Courts have not specifically enforced a no-call provision against a debtor in bankruptcy, *see, e.g., In re Calpine Corp.*, 365 B.R. 392, 397 (Bankr. S.D.N.Y. 2007) ("*Calpine I*") (collecting cases), but prepayment of a note in contravention of a no-call provision gives rise to damages because the prepayment "deprives [the holder] of the present value of an expected payment stream." *In re Premier Entm't Biloxi LLC*, 445 B.R. 582, 641 (Bankr. S.D. Miss. 2010).

[11] Indenture, § 601.  This contractual obligation is also codified in Federal law.  *See* 15 U.S.C. §77ooo(c) ("Trust Indenture Act") ("The indenture trustee shall exercise in case of default (as such term is defined in such indenture) such of the rights and powers vested in it by such indenture, and to use the same degree of care and skill in their exercise, as a prudent man would exercise or use under the circumstances in the conduct of his own affairs").

9067831

the Indenture provides that it "may act through agents or attorneys," and "may consult with counsel of its selection."

15.     At the outset of these cases, the Trustee retained the law firm of Dewey & LeBoeuf LLP and, upon that firm's cessation of business in 2012, the Trustee retained the law firm of Patterson Belknap Webb & Tyler LLP as lead bankruptcy counsel. The Trustee has retained the law firm of Morris James LLP to act as Delaware counsel and Edmond Lamek to act as its Canadian counsel.[12] As of December 31, 2016, the Trustee and its professionals have incurred fees and expenses totaling approximately $7.97 million.[13]

16.     The Trustee and its professionals are entitled to be paid by the Debtors for the services they have provided pursuant to the Indenture.[14] To secure that obligation, the Indenture gives the Trustee the rights of a secured creditor with respect to any distribution it receives for the benefit of the holders of the 7.875% Notes ("the Trustee shall have a lien prior to Debt Securities on all money or property held or collected by the Trustee"). The Noteholders do not "pay" anything to the Trustee under the Indenture; they are simply subordinated in respect of any distributions from the Debtors or the Canadian Debtors to the prior payment in full of the Trustee's reasonable fees and expenses.

17.     The Plan strikes a balance between the Debtors' obligation to pay the fees and expenses of its indenture trustee and their inability to satisfy the claims of all creditors in full.

---

[12] During the course of these cases, Mr. Lamek has been a partner at Fasken Martineau DuMoulin LLP, Borden Ladner Gervais LLP, and Weir Foulds LLP.

[13] A table summarizing the Asserted Fees is attached as <u>Exhibit A</u>. In connection with the parties' efforts to resolve this dispute consensually, the Trustee gave the Noteholders copies of invoices substantiating these amounts in December 2016, pursuant to a non-disclosure agreement. The Trustee has incurred and may continue to incur additional fees and expenses in connection with its duties under the Indenture, and reserves all rights to collect payment of such amounts.

[14] Indenture, § 606(c).

9067831

9

Section 7.13 of the Plan, which embodies paragraph 4(m) of the SPSA, obligates the Debtors to pay a portion of the Trustee's fees and expenses and preserves the Trustee's right to exercise its charging lien with respect to any fees and expenses in excess of the $4.25 million:

> On the Effective Date, or as soon thereafter as practicable, NNI (or the Disbursing Agent on its behalf) shall pay the reasonable and documented fees of (a) the NNCC Bonds Indenture Trustee, in an amount not to exceed $4.25 million and (b) counsel to Solus Alternative Asset Management LP and PointState Capital LP in an amount not to exceed $750,000. For the avoidance of doubt, nothing contained herein shall alter or limit the right of the NNCC Bonds Indenture Trustee to assert its charging Lien against Distributions on account of Allowed NNCC Bonds Claims for payment of its reasonable fees and expenses in excess of $4.25 million, including all reasonable fees and expenses of its counsel and other professionals, as provided in the NNCC Bonds Indenture and in Section 10.6 and 10.15 of the Plan.

Plan, § 7.13.

18.     Because the Debtors will not pay the full amount of the fees and expenses due to the Trustee under the Indenture, the Trustee has the right to exercise a charging lien on distributions to pay any and all remaining fees and expenses so long as they are reasonable. For the reasons set forth below, the Trustee is confident that the Court will determine that the Asserted Fees are reasonable.

**RESPONSE**

I.      **The Asserted Fees are Reasonable on Their Face, and the Trustee Will Provide Invoices to the Court if it Wants to Review Them.**

    A.      **The Asserted Fees are Reasonable.**

19.     The Noteholders assert that "the significant fees incurred suggest that the Indenture Trustee did not properly manage its retained professionals in a way that either avoided duplication, minimized expense, or limited the scope of their work to activities directly benefitting holders of the [NNCC] Notes." Objection, ¶ 21. This is preposterous. The Trustee has been an active participant in these bankruptcy cases for eight years because it has duties that

9067831

it is required to perform by the Indenture and the Trust Indenture Act. Despite the Noteholders'

efforts to trivialize the Trustee's work, the record shows otherwise. For example:

- The Trustee's counsel reviewed relevant pleadings in the U.S. and Canada, remained abreast of developments in these cases, and provided updates to the Trustee;

- The Trustee sought and obtained membership on the Committee and, for the duration of these cases, represented the interests of all holders of the 7.875% Notes on the Committee;

- The Trustee filed proofs of claim in the United States and Canada, amended those claims to ensure that the holders of the 7.875% Notes would be entitled to receive all of the benefits described above, and defended the claims against an objection to the payment of post-petition interest filed by WTC;

- The Trustee participated in four rounds of formal mediation in the U.S. and Canada;

- The Trustee, with other stakeholders, successfully opposed the Monitor's request that this Court issue an advisory opinion regarding post-petition interest, and actively opposed the Monitor's position regarding post-filing interest before the Canadian Court and the Court of Appeal for Ontario;

- The Trustee was one of the "Core Parties" to the year-long allocation trial, participating in discovery, pre-trial briefing, the trial itself in Canada and the U.S., and post-trial briefing;

- The Trustee was the only party that prosecuted successful motions for reconsideration of the allocation decisions in the U.S. and Canada and, after extensive post-trial consultation with the Noteholders' counsel, has actively monitored the appeals of the allocation decisions in the U.S. and Canada; and

- The Trustee negotiated provisions of the Plan and Disclosure Statement, with particular attention to the voting and distribution mechanics, to ensure that all holders of the 7.875% Notes receive their distributions without complication or unnecessary delay.

20.    Even if the Noteholders had not been on actual notice of all the work the Trustee

performed throughout these cases (and, as discussed below, they were), they cannot seriously

contend that such work exceeded what a prudent person would do in the conduct of its own

9067831

11

affairs.  Indeed, despite the duration of these cases, the myriad complexities attendant to cross-border practice, the unique features of the 7.875% Notes, and the need for counsel in multiple jurisdictions, the Asserted Fees for the entire eight-year period are less than $8 million (and the portion that will be borne by the holders of the 7.875% Notes is approximately $3.75 million).

21.     The Noteholders have recently suggested that the parties submit to non-binding mediation to resolve this dispute.  This might be a productive exercise if the Noteholders merely wanted to quibble with specific staffing decisions, the amount of time spent on a particular brief or pleading, or the number of lawyers at a meeting.  The Trustee is amenable to reasonable, good-faith questions about one or more line items in one or more invoices.  But the Noteholders take issue with virtually *all* of the Trustee's fees and expenses, refusing to acknowledge even that $4.25 million of the Asserted Fees, which will have zero impact on their recoveries, are reasonable.  Objection, ¶ 25.  The Noteholders do not seek a reasonable haircut of fees; they want a decapitation.  The Trustee does not believe mediation can bridge such a divide.

**B.      The Proposed Fee Procedures are Not Reasonable.**

22.     With total professional fees in these cases reportedly well over $1 billion, and with the Canadian Court already having approved fees and expenses of Wilmington Trust Company that are comparable to those of the Trustee, this Court can easily conclude that the Asserted Fees are reasonable on their face, and that no further submission is required.  Nevertheless, as noted above, the Trustee will gladly provide the Court with copies of its invoices.

23.     However, the Trustee does not agree to the rest of the Noteholders' "Proposed Fee Procedures."  Objection, ¶ 2.  First, a briefing schedule is not required because there is no legal issue to brief.  The sole issue is whether the Asserted Fees are reasonable.  It is routine in large

9067831

chapter 11 cases for legal and financial professionals to submit their invoices to the Court for an assessment of their reasonableness and there is no need to do anything different here. The established process, with which the Court and all other parties are familiar, should suffice. If the Court needs additional information after reviewing the invoices, the Trustee and its professionals will supply it. Second, there is no basis under the Indenture for distributions to be made to Noteholders other than by a distribution to the Trustee. So it is neither practical nor permissible to authorize distributions to Noteholders without first making a distribution to the Trustee, against which it is authorized to exercise its charging lien. As an alternative, the Court could order the Debtors to delay any distribution on account of the 7.875% Notes until after this dispute has been resolved.

## II.    The Noteholders' Objections to the Reasonableness of the Fees are Without Merit and Should be Denied.

24.    The Objection contains just three actual objections to the Asserted Fees: they are higher than one of the other indenture trustees, they are too high as a percentage of the Noteholders' expected recovery, and a portion of the fees were incurred in connection with the Trustee's service on the Committee. The Trustee respectfully submits that each of these objections should be overruled.

### A.    The Noteholders' Reliance on Skewed and Incomplete Data Points to Question the Reasonableness of the Asserted Fees is Misleading.

*i.    There Were Three Indenture Trustees in These Cases.*

25.    The Objection isolates a single data point – the fees and expenses of one indenture trustee – as evidence that the Asserted Fees are not reasonable. Objection, ¶ 17 ("on information and belief, approximately twice the amount asserted by the indenture trustee for the Crossover Bonds—The Bank Of New York—who is responsible for debt that is twenty times greater than

the 7.875% Notes, *i.e.*, nearly $3.5 billion in face amount, and is also a member of the Creditors'

Committee"). The Trustee disputes that the magnitude of the Asserted Fees relative to the fees

and expenses of any other party is probative of reasonableness. In large bankruptcy cases,

multiple indenture trustees regularly represent stakeholders in different parts of a debtor's capital

structure and with different issues of importance. The indenture trustee with the lowest fee at the

end of a case is not necessarily the only one whose fees are reasonable. Nevertheless, if the

Court is inclined to perform a comparison among the indenture trustees in these cases, it should

be apples-to-apples.

26.     For one thing, the Objection completely ignores the fees and expenses incurred by

the third indenture trustee in these cases, WTC, which were approved by the Canadian Court in

the amount of US$7.15 million on January 12, 2017. Like the Trustee, WTC is the indenture

trustee for public debt (in WTC's case, with face amount of approximately $200 million). Like

the Trustee, WTC has been subject to a prudent person standard throughout these cases. And

like the Trustee, WTC has been actively engaged in all key aspects of these cases, including

multiple mediations and as a Core Party to the allocation trial. If comparisons between indenture

trustees are in order, then this is *per se* evidence of the reasonableness of the Asserted Fees.

27.     In any event, the comparison to BNYM is particularly inapt because BNYM was

aligned on all significant issues in these cases with the Ad Hoc Group. By contrast, the Trustee

was required to devote a significant amount of attention to the unique features of the 7.875%

Notes (*i.e.*, the Support Agreement, the no-call, etc.).

      ii.     *The Face Amount of the Notes is Not a Proxy for the Reasonableness of the Asserted Fees.*

28.     The Noteholders' reliance on *In re Worldwide Direct, Inc.*, 334 B.R. 112 (Bankr.

D. Del. 2005) to focus the Court on the percentage of the Asserted Fees relative to the face

9067831

14

amount of the 7.875% Notes is misleading.  The Objection implies that the partial disallowance of indenture trustee fees in that case was a function of their having been "2.8%-3.9% of recovery for holders of notes totaling $153 million."  Objection, ¶ 17.  Judge Walrath, however, explicitly rejected the notion of tying the reasonableness of fees to the percentage of the debt or the holders' recovery.  334 B.R. 112 at 130 ("The Court must determine the reasonableness of fees **based on more than simply the percentage of recovery**")(emphasis added).[15]

29.    The Noteholders' statement that the Asserted Fees constitute "five percent (5%) of the Plan recovery of holders of the [NNCC] Notes," Objection, ¶ 17, is equally misleading. As noted above, the Debtors will pay up to $4.25 million of the Asserted Fees, which payment will drastically reduce the amount that must be paid through the charging lien.  Moreover, the total amount that would be due on account of the 7.875% Notes assuming allowance of all principal, pre- and post-petition interest, and claims for breach of the no-call would exceed $300 million.  The fees that will impact the Noteholders recovery are therefore just over 1% of the total amount that the Trustee (and the Noteholders themselves) has asserted to be due on account of the 7.875% Notes.

**B.    The Trustee's Service on the Committee, Which the Noteholders Have Known About Since 2009, was Consistent with its Duties and Benefitted All Holders of the 7.875% Notes.**

30.    The Objection highlights that the Trustee was a member of the Committee, Objection, ¶¶ 18-21, arguing that "[t]o the extent the Asserted Fees were incurred by the Indenture Trustee in its capacity as a member of the Creditors' Committee, then they should not

---

[15] The Noteholders rely heavily on *Worldwide Direct*, citing it six different times, but the differences between that case and this one are stark.  Worldwide Direct, Inc. filed a voluntary petition for relief in January 1999.  Within two months, it had secured entry of an order approving the sale of substantially all of its assets.  Less than two years after that, the debtors had secured entry of an order confirming a plan of liquidation.  The duration, complexity and contentiousness of the Nortel bankruptcy cases are without equal, and are just not comparable to a relatively brief and straightforward case filed nearly 20 years ago.

9067831

be charged to holders of the [NNCC] Notes." According to the Noteholders, the "singular

fiduciary duty" that the Trustee owes to holders of the 7.875% Notes renders it ineligible to serve

on the Committee (or, at least, to be compensated for its time in connection with such service).

This is absurd. Do the Noteholders believe that every indenture trustee that serves on an official

committee does so in violation of its duties to holders? All manner of businesses and individuals

serve on creditors' committees and undertake certain duties attendant to that service. They do

not check their pre-existing fiduciary duties at the door when they do so, and neither does an

indenture trustee.

31.    Given its duty to act as a prudent person, it is entirely reasonable and, indeed,

customary, for the Trustee to have sought appointment to and served on the Committee.[16]

Noteholders themselves often cannot or will not become restricted, so the indenture trustee is

usually the only entity capable of acting as a representative of their interests on a committee.

The United States Trustee has recognized the essential contributions indenture trustees make to

the reorganization process as members of creditors' committees, and regularly appoints them in

large chapter 11 cases. Precluding indenture trustees from serving on a key statutory body to

help negotiate the terms of a debtor's restructuring and oversee its bankruptcy case would

frustrate their ability to discharge their duties and would be detrimental to the interests of

noteholders.

32.    In any event, there was nothing unusual about the Trustee's service on the

Committee, nor did it interfere in any way with the Trustee's duties to the Noteholders. To the

contrary, the ability of the Trustee to rely on legal and financial advisors to the Committee to be

---

[16] In fact, it is not hard to envision one or more noteholders criticizing an indenture trustee if it failed to seek appointment to a creditors' committee.

9067831

16

fully apprised in real time in connection with issues on which the interests of the Noteholders were aligned with the interests of unsecured creditors generally inured to the *benefit* of the Noteholders. There can be no doubt that significantly more work would have been required of the Trustee and its professionals, giving rise to additional charging lien fees, had the Trustee not been a member of the Committee. To give just one example, by serving on the Committee, the Trustee saved considerable costs since it could work with the Committee's financial advisor and did not need to hire its own.[17]

33.    Naturally, in a case as complex as this one, there were occasions when the Trustee's obligations to the holders of the 7.875% Notes came in conflict with the Committee's position on a particular issue (e.g., the Trustee's advocacy for an allowed claim on account of the no-call feature of the 7.875% Notes). This is neither surprising nor unusual; it happens in large chapter 11 cases all the time. So much so, in fact, that the by-laws of creditors' committees, including this one, contain procedures for the recusal of a Committee member when such conflicts arise. When it was necessary to do so, the Trustee recused itself from Committee meetings, deliberations, and votes. The Trustee never recused itself from being Trustee.

### III.    The Noteholders Sought and Accepted the Benefits of the Trustee's Work Without Ever Inquiring About Fees Until Their Own Settlement Left Them Short of a Par Recovery.

34.    The Trustee is confident that the foregoing supplies the Court with ample reasons to overrule the Objection and confirm the reasonableness of the Asserted Fees. The Trustee had a duty under the Indenture and it has discharged that duty. Nevertheless, the Noteholders' actual

---

[17] The timing of the Noteholders' objection to the Trustee's service on the Committee also deserves considerable scrutiny. The Trustee was appointed to the Committee in February 2009, almost eight years ago. The Trustee's role on the Committee was well-known to the Noteholders for the entire duration of these cases. And yet at no time – not once – did the Noteholders or their counsel ever question the propriety, wisdom, or efficiency of the Trustee serving on the Committee. For them to do so now is further evidence of the ulterior motive behind the Objection. *See* ¶¶ 5-8, above, and ¶¶ 34-36, below.

9067831

knowledge of the amount of the Asserted Fees when they decided to accept less than that amount

from the Debtors, as well as their frequent and repeated requests and demands of the Trustee and

its professionals throughout these cases, reveal the actual motive underlying the Objection.

### A. The Noteholders Had Actual Knowledge of the Asserted Fees When They Agreed to Settle.

35.     The Noteholders maintain that "their claims are entitled to unique treatment given

the ability of the 7.875% Notes to look to three different sources to fund distributions in addition

to the NNL guaranty claim." Objection, ¶ 14.  The Trustee agrees with this position and has

forcefully advocated it in public filings with this Court,[18] as well as in multiple mediations, in

Committee meetings, and in conversations with the Debtors and other parties.  Nevertheless, as

consensus emerged among more and more stakeholders in the second half of 2016, the

Noteholders decided to settle their claims in the U.S. and Canada in exchange for the Plan's

treatment of the 7.875% Notes, *i.e.*, a par recovery plus the payment of a portion of the fees and

expenses of the Trustee that would otherwise be paid out of the charging lien.  They did so

without consulting the Trustee or enlisting the assistance of its professionals and with full

knowledge that the Trustee's fees and expenses were estimated to be as much as $7.5 million

when the deal was struck.[19]  Yet the Noteholders now insist that any Asserted Fees in excess of

the $4.25 million to be paid by the Debtors, fees they knew the Trustee had incurred and would

be seeking payment for, "will negate the benefits the NNCC Noteholders secured under the Plan

following hard-fought negotiations." Objection, ¶ 2.

---

[18] *See, e.g., Supplemental Opening Brief of Law Debenture Trust Company of New York, as Indenture Trustee for the NNCC Notes, with Respect to Monitor's Request That The Court Determine Bondholder Entitlement to Post-Petition Interest and Additional Bondholder Claims Issues Under U.S. Law*, dated July 15, 2014 [D.I. No. 14028].

[19] The Noteholders' counsel has confirmed to the Trustee's counsel that he was aware during negotiations with the Debtors that the Trustee's fees were approximately $7.5 million at that time.

9067831

36.    It is <u>unfathomable</u> that the Noteholders would enter into a settlement to resolve claims well in excess of $150 million if the benefits of that deal could be "negated" by $3.75 million in fees and expenses that they <u>knew</u> the Trustee would assert by exercise of the charging lien.  As explained in detail in the Preliminary Statement, it is far more plausible that, with peace breaking out across the Debtors' capital structure, the Noteholders took the best deal they could get from the Debtors and only then decided to look to the fees of the Trustee and its professionals to augment their already substantial recoveries.

**B.    The Noteholders Demanded and Accepted Considerable Benefits from the Work Performed by the Trustee Throughout These Cases.**

37.    Throughout these cases, the Noteholders routinely requested, sought, demanded, and availed themselves of the expertise that the Trustee and its counsel in New York, Delaware, and Toronto developed in these cases, particularly in respect of the unique features of the 7.875% Notes.  The Objection gives short shrift to and largely dismisses as incidental the extent and frequency of contact between the Trustee's counsel and the Noteholders' counsel, *see* Objection, ¶ 23, but this is revisionist history.  For the last eight years, the Noteholders and their counsel were in regular contact with the Trustee's counsel regarding a wide range of issues including the Support Agreement, the claims of the PBGC and other creditors, research regarding the no-call feature of the 7.875% Notes, the allocation trial and the allocation decisions, the motions for reconsideration, the appeals of the allocation decisions, issues and proceedings in both jurisdictions pertaining to post-petition interest, and the consensus that emerged in the SPSA, to give just a few examples.[20]

---

[20] The Trustee believes that the reasonableness of the Asserted Fees can be confirmed from a review of the invoices alone, which invoices are replete with descriptions of the coordination between and among the parties.  However, if the Court prefers, the Trustee is prepared to submit copies of the correspondence between its counsel and the Noteholders' counsel.

9067831

38.     In addition to their frequent consultation and collaboration with the Trustee's professionals, the Noteholders and their counsel often relied on the Trustee's participation in the allocation trial, other court proceedings, and mediations rather than appearing on their own at these critical junctures.  For example, the Noteholders' counsel chose not to attend mediations in these cases specifically because the Trustee's counsel would be there.  (The Noteholders or their counsel could just as easily have asked the Trustee's counsel to stand down so that they could attend, but elected not to do so.)  This coordination between the parties produced considerable efficiencies, without which the Noteholders almost certainly would have incurred more legal fees of their own.[21]

39.     Finally, the Noteholders criticize the Trustee because it did not provide "a budget, estimate, work plan, or fee update," Objection, ¶ 24.  But of all the many requests the Noteholders and their counsel made of the Trustee and its professionals from the Petition Date until the summer of 2016, they never asked for so much as an update regarding the Trustee's fees and expenses, let alone a budget.  The Noteholders and their counsel were quite capable of making demands of the Trustee when they wanted or needed something, but it was not until they were ready to settle their claims with the Debtors – almost eight years into these cases – that their counsel made any inquiry at all regarding the Asserted Fees.

---

[21] Perhaps in anticipation of this argument, the Noteholders cite *Worldwide Direct* for the proposition that neither they nor this Court are estopped "from reviewing the reasonableness of the fees sought under the Indenture." 334 B.R. at 128; Objection, ¶23.  That's true, but neither is this Court barred from taking notice of their conduct, including their sudden concern for fees after ignoring them for eight years, in considering whether to reward their dilatory tactics.  Or, as Judge Walrath explained in the very same paragraph of that case, "[t]he Court agrees with [the indenture trustee] that [the noteholder] cannot now argue that none of [the indenture trustee's] services benefitted the Noteholders when [the noteholder] itself relied on [the indenture trustee] and its counsel to keep it advised of the progress in the case. The Court is also persuaded that [the noteholder's] delay in restricting the activities of [indenture trustee] is evidence that [the noteholder] believed that those activities did provide a benefit to the Noteholders." *Id.*

9067831

## CONCLUSION

The Noteholders, through their counsel, made it clear to the Trustee throughout these cases that they expected the Trustee to be informed and involved on all key matters – an expectation wholly consonant with the Trustee's duties under the Indenture and the Trust Indenture Act – and the Trustee proceeded accordingly.   The resulting fees are eminently reasonable; the Trustee respectfully requests that this Court approve them in full and overrule the Objection.   The Noteholders are sophisticated and experienced investors whose reliance on and cooperation with the Trustee throughout these cases discredits their sudden grievance over fees.

## JOINDER AND RESERVATION OF RIGHTS

The Trustee supports confirmation of the Plan. The Trustee also joins BNYM's response to the U.S. Trustee's limited objection to the Plan. The exculpation provisions set forth in the Plan are reasonable and consistent with applicable law. The Trustee reserves the right to supplement or amend this Response and to appear and be heard on any issue at the hearing to consider the confirmation of the Plan.

Dated: January 19, 2017

**MORRIS JAMES LLP**

Stephen M. Miller (DE Bar. No. 2610)
500 Delaware Avenue, Suite 1500
P.O. Box 2306
Wilmington, DE 19899-2306
Telephone: (302) 888-6800
Facsimile: (302) 571-1750
Email: smiller@morrisjames.com

- and -

Daniel A. Lowenthal
Brian P. Guiney
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, NY 10036-6710
Telephone: (212) 336-2000
Facsimile: (212) 336-2222
Email: dalowenthal@pbwt.com
bguiney@pbwt.com

*Attorneys for Delaware Trust Company, as Indenture Trustee*

9067831

22