**<u>EXHIBIT A</u>**

Court File No.  09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION, NORTEL NETWORKS TECHNOLOGY
CORPORATION, NORTEL COMMUNICATIONS INC., ARCHITEL SYSTEMS
CORPORATION AND NORTHERN TELECOM CANADA LIMITED

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

**MOTION RECORD**
**(Plan Sanction and Canadian Escrow Release Order)**
**(returnable January 24, 2017)**

January 20, 2017

**GOODMANS LLP**
333 Bay Street, Suite 3400
Toronto, Ontario M5H 2S7

Jay Carfagnini  LSUC#: 22293T
Joseph Pasquariello LSUC#: 38390C
Christopher G. Armstrong LSUC#: 55148B
Tel: 416.979.2211
Fax: 416.979.1234

Lawyers for the Monitor, Ernst & Young Inc.

# INDEX

Court File No.  09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION, NORTEL NETWORKS TECHNOLOGY
CORPORATION, NORTEL COMMUNICATIONS INC., ARCHITEL SYSTEMS
CORPORATION AND NORTHERN TELECOM CANADA LIMITED**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED**

**INDEX**

| DOCUMENT | TAB |
|---|---|
| Notice of Motion (Plan Sanction and Canadian Escrow Release Order) | 1 |
| One Hundred and Thirty Fifth Report of the Monitor dated January 20, 2017 | 2 |
| **Appendices** | |
| Plan of Compromise and Arrangement dated November 30, 2016 | A |
| Information Circular dated November 30, 2016 | B |
| Plan Filing and Meeting Order dated December 1, 2016 | C |
| Email sent to Service List from counsel to Monitor serving Meeting Materials dated December 1, 2016 | D |
| Copies of the Newspaper Publications | E |
| Affidavit of Jane Sullivan sworn January 16, 2017 | F |
| Minutes of the Meeting held January 17, 2017 | G |
| Unresolved Affected Unsecured Claim Reserve Account | H |
| Fifty First Report of the Monitor dated August 27, 2010 (excl. appendices) | I |

| | |
|---|---|
| Representation Order for Disabled Employees dated July 30, 2009 | J |
| Settlement Approval Order dated March 31, 2010 including Amended and Restated Settlement Agreement dated March 30, 2010 | K |
| One Hundred and Thirty Third Report of the Monitor dated November 23, 2016 | 3 |
| Proposed form of Sanction Order | 4 |
| Proposed form of Canadian Escrow Release Order | 5 |

# TAB 1

Court File No.  09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,**
**R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,**
**NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS**
**INTERNATIONAL CORPORATION, NORTEL NETWORKS TECHNOLOGY**
**CORPORATION, NORTEL COMMUNICATIONS INC., ARCHITEL SYSTEMS**
**CORPORATION AND NORTHERN TELECOM CANADA LIMITED**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,**
**R.S.C. 1985, c. C-36, AS AMENDED**

**NOTICE OF MOTION**
**(Plan Sanction and Canadian Escrow Release Order)**
**(returnable January 24, 2017)**

Nortel Networks Corporation, Nortel Networks Limited ("**NNL**"), Nortel Networks Technology Corporation, Nortel Networks International Corporation, Nortel Networks Global Corporation, Nortel Communications Inc., Architel Systems Corporation and Northern Telecom Canada Limited (collectively, the "**Canadian Debtors**") jointly with Ernst & Young Inc. in its capacity as monitor (the "**Monitor**") of the Canadian Debtors will make a motion to Justice Newbould of the Commercial List court on January 24, 2017, at 10:00 a.m., or as soon after that time as the motion can be heard, at 330 University Avenue, Toronto, Ontario.

**PROPOSED METHOD OF HEARING:** The motion is to be heard:

☐ in writing under subrule 37.12.1(1) because it is on consent or unopposed or made without notice;

☐ in writing as an opposed motion under subrule 37.12.1(4);

☒ orally.

**THIS MOTION IS FOR AN ORDER:**

(a)     validating service of this Notice of Motion and the Motion Record and dispensing with further service thereof;

(b)     sanctioning the Plan of Compromise and Arrangement pursuant to the *Companies' Creditors Arrangement Act* concerning, affecting and involving the Canadian Debtors dated November 30, 2016 (the "**Plan**")[i] and granting related relief;

(c)     authorizing and directing the Escrow Agents to release the Sale Proceeds in the manner contemplated by the Settlement and Support Agreement and the Plan; and

(d)     such further and other relief as counsel may request and this Court deems just.

**THE GROUNDS FOR THE MOTION ARE:**

*General Background*

(a)     On January 14, 2009, this Court made an initial order (as amended and restated from time to time, the "**Initial Order**") granting, among other things, a stay of proceedings in favour of the Canadian Debtors pursuant to the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended to January 14, 2009 (the "**CCAA**"), and appointing Ernst & Young Inc. as Monitor in the CCAA proceedings;

(b)     Nortel Networks Inc. and certain of its U.S. subsidiaries and affiliates concurrently filed voluntary petitions under Chapter 11 of the U.S. Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "**U.S. Bankruptcy Court**") on January 14, 2009;

(c)     Nortel Networks UK Limited and certain of its affiliates located in EMEA were granted administration orders by the High Court of England and Wales on January 14, 2009;

---

[i] As defined below. Capitalized terms used herein and not otherwise defined have the meaning given to them in the Plan.

*Settlement and Support Agreement*

(a)     On October 12, 2016, the Canadian Debtors, Monitor, U.S. Debtors, EMEA Debtors, EMEA Non-Filed Entities, Joint Administrators, NNSA Conflicts Administrator, French Liquidator, Bondholder Group, Committee, Representatives, Unifor, U.K. Pension Trustee, PPF, Joint Liquidators and NNCC Bondholder Signatories entered into that certain Settlement and Plans Support Agreement (the "**Settlement and Support Agreement**") which, among other things, contains the terms of settlement of the Allocation Dispute (as defined therein) among the estates and certain other significant claims and matters;

(b)     In summary, the Settlement and Support Agreement will resolve the Allocation Dispute by allocating the escrowed sale proceeds among the three Estates as follows: (i) payment of the Iceberg Amendment Fee in the amount of $2.8 million to NNI and $2.2 million to NNUK and, in settlement of the M&A Cost Reimbursement, payments in the amount of $20 million to NNI and $35 million to the Canadian Debtors; then (ii) to the Canadian Debtors: 57.1065% (being $4,142,665,131 as at July 31, 2016); (iii) to the U.S. Debtors: 24.350% (being $1,766,417,002 as at July 31, 2016); (iv) to the EMEA Debtors (excluding NNUK and NNSA): 1.4859% (being $107,788,879 as at July 31, 2016); (v) to NNUK: 14.0249% (being $1,017,408,257 as at July 31, 2016); and (vi) to NNSA: $220,000,000;

(c)     The Settlement and Support Agreement is to be implemented, in part, by the U.S. Debtors and Canadian Debtors pursuing coordinated Plan processes in the U.S. and Canada;

(d)     The effectiveness of the Settlement and Support Agreement is subject to a number of conditions, including this Court having issued a Sanction Order approving the Plan by no later than February 17, 2017 and the Plan becoming effective in accordance with its terms;

*The Plan*

(e)    On November 4, 2016, the Monitor served and filed its One Hundred and Thirty First Report which contained the Canadian Debtors' proposed Plan of Compromise and Arrangement dated November 4, 2016 (the "**November 4 Plan**") and related information circular dated November 4, 2016 (the "**November 4 Information Circular**");

(f)    The November 4 Plan and November 4 Information Circular were subsequently updated and on November 30, 2016, the Monitor served an updated proposed Plan of Compromise and Arrangement dated November 30, 2016 (the "**Plan**") and related information circular dated November 30, 2016 (the "**Information Circular**");

(g)    The Plan and the Information Circular were authorized for filing pursuant to the Meeting Order of this Court dated December 1, 2016;

(h)    The Plan provides for, among other things, the following: (i) a compromise of all Affected Unsecured Claims in exchange for a *pro rata* distribution of the cash assets of the Canadian Estate available for distribution to Affected Unsecured Creditors, and the full and final release and discharge of all Affected Claims which consist of all Claims against the Canadian Debtors and their former Directors and Officers other than Unaffected Claims; (ii) substantive consolidation of the Canadian Debtors into the Canadian Estate; (iii) authorization of the Canadian Debtors and Monitor to direct the Escrow Agents to effect the allocation and distribution of the Sale Proceeds as contemplated by the Settlement and Support Agreement and to otherwise implement the Settlement and Support Agreement, including the giving and receiving of the Settlement and Support Agreement Releases; (iv) release of all amounts held by NNL pursuant to the Canadian Only Sale Proceeds Orders or held as Unavailable Cash to the Canadian Estate; (v) the establishment of a single class of voting creditors, being the Affected Unsecured Creditors Class; (vi) the mechanics for making *pro rata* distributions to holders of Proven Affected Unsecured Claims; (vii) the establishment of certain reserves for the ongoing administration of the Canadian Estate and in respect of Unresolved Claims; (viii) the payment in full of certain Proven Priority

Claims and other payments contemplated by the Plan; and (ix) the release and discharge of all Affected Claims and Released Claims as against, among others, the Canadian Debtors, the Directors and Officers and the Monitor;

### The Meeting

(i)     Notice of the Meeting was given in accordance with the Meeting Order, including by completing the various mailings and publications contemplated by the Meeting Order;

(j)     The Meeting was duly convened and held pursuant to the Meeting Order on January 17, 2017;

(k)     At the Meeting, the Plan was overwhelmingly approved by the Required Majority, with 99.24% (by value) and 99.97% (by number) of Affected Unsecured Creditors with Voting Claims who were present and voting in person or by proxy voting to approve the resolution approving the Plan;

### The U.S. Plans

(l)     The U.S. Debtors have proceeded with a parallel plan and solicitation process with respect with the U.S. Plans;

(m)     A confirmation hearing in respect of the U.S. Plans is schedule to be heard by the U.S. Bankruptcy Court on January 24, 2017, which hearing will be a joint hearing with this Court to consider sanctioning the Plan;

### Substantive Consolidation

(n)     The consolidation of the Canadian Debtors into a single estate is fundamental to the implementation of the Settlement and Support Agreement and the Plan, both of which are prefaced on the substantive consolidation of the Canadian Debtors into the Canadian Estate and could not be effected or implemented without the substantive consolidation of the Canadian Estate;

(o)    This Court has previously made findings regarding the highly integrated nature of the Nortel group's and Canadian Debtors' business and operations, which, in part, has given rise to years of litigation regarding the ownership of those assets and the proceeds arising therefrom;

(p)    The vast majority of claims filed against the Canadian Debtors by quantum have been asserted against two or more of the Canadian Debtors. Substantive consolidation of the Canadian Debtors into the Canadian Estate and the elimination of Duplicative Claims under the Plan obviates the need for the determination of (and potentially time consuming and costly litigation in respect of) whether these types of claims are provable against more than one Canadian Debtor;

(q)    Substantive consolidation of the Canadian Debtors is supported by all key stakeholders pursuant to the Settlement and Support Agreement and by the overwhelming majority of Creditors voting to accept the Plan;

(r)    Substantive consolidation will simplify the implementation of the Plan and the ongoing administration and wind-down of the Canadian Debtors;

*Setting of Reserve Amounts for Unresolved Claims*

(s)    The claim amount in respect of which a reserve is being established for each Unresolved Affected Unsecured Claims (excluding Compensation Claims) is set forth at Appendix "H" to the One Hundred and Thirty Fifth Report (as defined below);

(t)    The claim amount that has been reserved for each Unresolved Affected Unsecured Claim represents the liquidated claim amount of the applicable Creditor based on the most recent notice delivered by the Creditor pursuant to the relevant Claims Order (i.e. either the Creditor's Proof of Claim or dispute notice), in some cases rounded up;

(u)    Reserves have been set in this regard notwithstanding the Monitor's view that certain Unresolved Affected Unsecured Claims (particularly those related to environmental matters) are duplicative;

(v)     Pursuant to the Claims Orders, Creditors were required to specify the amount of their claim or disputed claim in their Proof of Claim or a dispute notice, as applicable;

(w)     Certain holders of Unresolved Affected Unsecured Claims assert unliquidated claims, and in certain instances, Creditors have purported to assert liabilities (in, for instance, pleadings delivered in the context of Claim disputes) against the Canadian Debtors in excess of the amounts set forth in their dispute notice or Proof of Claim, as applicable;

(x)     In light of the uncertainty caused by the foregoing with respect to establishing reserve amounts, the proposed form of Sanction Order sought would cap the claims of the holders of Unresolved Affected Unsecured Claims at a maximum of the reserve claim amount established with respect to such Unresolved Affected Unsecured Claim as indicated on Appendix "H" to the One Hundred and Thirty Fifth Report;

### *The Canadian Escrow Release Order*

(y)     The Settlement and Support Agreement contemplates each of the U.S. Debtors and Canadian Debtors obtaining Escrow Release Orders from the U.S. Bankruptcy Court and this Court, respectively, authorizing and directing the release of the Sale Proceeds from the Escrow Accounts in the manner contemplated by the Settlement and Support Agreement;

(z)     The Escrow Release Orders: (i) constitute the order required under Section 12(b) of the Interim Funding and Settlement Agreement dated June 9, 2009; and (ii) constitute the orders of the "dispute resolvers" contemplated by the Escrow Agreements to permit and authorize the Escrow Agents to distributed the Sale Proceeds;

(aa)    The granting of the Canadian Escrow Release Order is in furtherance of the Settlement and Support Agreement and the Plan and is fair and reasonable in the circumstances;

### *The Plan is Fair and Reasonable and Should be Sanctioned*

(bb)    The Canadian Debtors have complied with all statutory requirements for the sanctioning of the Plan and the prior Orders of this Court and nothing has been done that is not authorized by the CCAA;

(cc)    The Canadian Debtors have acted in good faith and with due diligence;

(dd)    The Plan reflects the terms of the Settlement and Support Agreement entered into by, among others, the Canadian Debtors, U.S. Debtors, EMEA Debtors, Monitor, the members of the CCC, the Committee, UKPI, NNSA, the NNSA Conflicts Administrator, Joint Administrators and Joint Liquidators, each of whom support the Plan pursuant to the terms of the Settlement and Support Agreement;

(ee)    Each of the Settlement and Support Agreement and the Plan are the result of difficult but good faith negotiations among the Estates and their key creditor constituents following on extensive litigation and other attempts at settlement;

(ff)    The Plan, and the Settlement and Support Agreement incorporated therein, are supported by all key stakeholders of the Canadian Debtors and more than 99% of Affected Unsecured Creditors voting at the Meeting (by both value and number) have voted to accept the Plan;

(gg)    Subject to their implementation, the Settlement and Support Agreement and Plan provide a path for distributions to creditors being made in the near term;

(hh)    The Settlement and Support Agreement and Plan provide for a settlement of almost all outstanding remaining significant disputes in these CCAA Proceedings and, in the view of the Monitor, are fair and reasonable in the circumstances;

(ii)    The Monitor supports and recommends the sanctioning of the Plan;

(jj)    Sections 6,  11(1) and 11(4) of the CCAA; and

(kk)    Such further and other grounds as counsel may advise and this Court permits.

**THE FOLLOWING DOCUMENTARY EVIDENCE** will be used at the hearing of the motion:

(a)     One Hundred and Thirty Fifth Report of the Monitor dated January 20, 2017 (the "**One Hundred and Thirty Fifth Report**") and the appendices thereto;

(b)     the One Hundred and Thirty Third Report of the Monitor dated November 23, 2016; and

(c)     Such further and other material as counsel may advise and this Court may permit.

January 20, 2017

**GOODMANS LLP**
333 Bay Street, Suite 3400
Toronto, Ontario M5H 2S7

Jay Carfagnini  LSUC#: 22293T
Joseph Pasquariello LSUC#: 38390C
Christopher G. Armstrong LSUC#: 55148B

Tel: 416.979.2211
Fax: 416.979.1234

Lawyers for the Monitor, Ernst & Young Inc.

**TO**:        **SERVICE LIST**

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED
AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION et al.

Court File No.  09-CL-7950

|  |  |
|---|---|
|  | ***ONTARIO***<br>**SUPERIOR COURT OF JUSTICE**<br>**(COMMERCIAL LIST)**<br><br>**Proceeding commenced at Toronto** |
|  | **NOTICE OF MOTION**<br>**(Plan Sanction and Canadian Escrow**<br>**Release Order)** |
|  | **GOODMANS LLP**<br>Barristers & Solicitors<br>Bay Adelaide Centre<br>333 Bay Street, Suite 3400<br>Toronto, ON  M5H 2S7<br><br>**Jay A. Carfagnini**  LSUC#: 22293T<br>jcarfagnini@goodmans.ca<br>**Joseph Pasquariello**  LSUC#: 38390C<br>jpasquariello@goodmans.ca<br>**Christopher G. Armstrong**  LSUC#: 55148B<br>carmstrong@goodmans.ca<br><br>Tel: 416.979.2211<br>Fax: 416.979.1234<br><br>Lawyers for the Monitor, Ernst & Young Inc. |

6653348

# TAB 2

Court File No. 09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS***
***ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF**
**COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL**
**NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL**
**CORPORATION, NORTEL NETWORKS TECHNOLOGY CORPORATION,  NORTEL**
**COMMUNICATIONS INC., ARCHITEL SYSTEMS CORPORATION AND**
**NORTHERN TELECOM CANADA LIMITED**

**ONE HUNDRED AND THIRTY FIFTH REPORT OF THE MONITOR**
**DATED JANUARY 20, 2017**

## INTRODUCTION

1.   On January 14, 2009 (the "**Filing Date**"), Nortel Networks Corporation ("**NNC**" and collectively with all its subsidiaries "**Nortel**" or the "**Company**"), Nortel Networks Limited ("**NNL**"), Nortel Networks Technology Corporation, Nortel Networks International Corporation and Nortel Networks Global Corporation (collectively, with the New Applicants (as defined below), the "**Canadian Debtors**") filed for and obtained protection under the *Companies' Creditors Arrangement Act* ("**CCAA**"). Pursuant to the Order of this Court dated January 14, 2009, as amended and restated (the "**Initial Order**"), Ernst & Young Inc. was appointed as the Monitor of the Canadian Debtors (the "**Monitor**") in the CCAA proceedings (the "**CCAA Proceedings**"). The stay of proceedings was extended to March 31, 2017, by this Court in its Order dated September 29, 2016.

2.   Nortel Networks Inc. ("**NNI**") and certain of its U.S. subsidiaries and affiliates concurrently filed voluntary petitions under Chapter 11 of the U.S. Bankruptcy Code (the "**Code**") in the United States Bankruptcy Court for the District of Delaware (the "**U.S. Court**") on January 14, 2009 (the "**Chapter 11 Proceedings**").  As required by U.S. law,

an official committee of unsecured creditors (the "**Committee**") was established in January, 2009.

3.      An ad hoc group of holders of bonds issued by NNL, NNC and Nortel Networks Capital Corporation has been organized and is participating in these proceedings as well as the Chapter 11 Proceedings (the "**Bondholder Group**"). In addition, pursuant to Orders of this Court, representative counsel was appointed on behalf of the former employees of the Canadian Debtors, the continuing employees of the Canadian Debtors and the LTD Beneficiaries (collectively, "**Representative Counsel**") and each of these groups is participating in the CCAA Proceedings.

4.      Nortel Networks (CALA) Inc. ("**NN CALA**" and together with NNI and certain of its subsidiaries and affiliates that filed on January 14, 2009, the "**U.S. Debtors**") filed a voluntary petition under Chapter 11 of the Code in the U.S. Court on July 14, 2009.

5.      Nortel Networks UK Limited ("**NNUK**") and certain of its affiliates located in EMEA were granted administration orders (the "**U.K. Administration Orders**") by the High Court of England and Wales on January 14, 2009 (collectively the "**EMEA Debtors**" and with the Canadian Debtors and the U.S. Debtors, the "**Estates**" and each an "**Estate**"). The UK Administration Orders appointed Alan Bloom, Stephen Harris, Alan Hudson and Chris Hill of Ernst & Young LLP as administrators of the various EMEA Debtors, except for Nortel Networks (Ireland) Limited, to which David Hughes (Ernst & Young LLP Ireland) and Alan Bloom were appointed (collectively, the "**Joint Administrators**").

6.      Subsequent to the filing date, Nortel Networks S.A. ("**NNSA**") commenced secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings in the Republic of France pursuant to which a liquidator (the "**French Liquidator**") and an administrator were appointed by the Versailles Commercial Court.

7.      The CCAA Proceedings and the U.K. Administration proceedings of NNUK and the other EMEA Debtors have been recognized by the U.S. Court as foreign main proceedings under Chapter 15 of the Code.

8.      Subsequent to the Filing Date, certain other Nortel subsidiaries have filed for creditor protection or bankruptcy proceedings in the local jurisdiction in which they are located.

9.      On March 18, 2016, Nortel Communications Inc., Architel Systems Corporation and Northern Telecom Canada Limited (collectively, the "**New Applicants**") sought and were granted an Order (New Applicants) of this Court pursuant to the CCAA (the "**New Applicants Order**"). Pursuant to the New Applicants Order, each of the New Applicants was deemed to be an "Applicant" (as defined in the Initial Order) in the CCAA Proceedings, entitled to all of the rights, benefits and protections granted by, and otherwise subject to, among other Orders of this Court entered in the CCAA Proceedings, the Initial Order as if it were an Applicant thereunder. The New Applicants Order also procedurally consolidated the CCAA proceedings of the New Applicants with the CCAA Proceedings.

**PURPOSE**

10.     The purpose of this One Hundred and Thirty Fifth Report of the Monitor ("**One Hundred and Thirty Fifth Report**") is to provide this Court and stakeholders with information regarding the results of the Meeting held on January 17, 2017, and the Monitor and Canadian Debtors' motion seeking approval of the Sanction Order (defined below), and to provide the Monitor's recommendation that the Court sanction the Plan.

**TERMS OF REFERENCE**

11.     In preparing this One Hundred and Thirty Fifth Report, the Monitor has relied upon unaudited financial information, the Company's books and records, financial information prepared by the Company and discussions with the Company. The Monitor has not audited, reviewed or otherwise attempted to verify the accuracy or completeness of this information. Unless otherwise stated, all monetary amounts contained herein are expressed in U.S. dollars.

12.     Capitalized terms used herein and not otherwise defined in this One Hundred and Thirty Fifth Report are as defined in the Plan, the Settlement and Support Agreement, Meeting Order (as each such term is defined below) or previous Reports of the Monitor.

13.     The Monitor has made various materials relating to the CCAA Proceedings available on its website at www.ey.com/ca/nortel (the "**Website**"). The Website also contains a dynamic link to Epiq Bankruptcy LLC's website where materials relating to the Chapter 11 Proceedings are posted.

**THE STATUS OF THE CCAA PROCEEDINGS**

14.     The background of the CCAA Proceedings and the events that have occurred over the last eight years during the pendency of these CCAA Proceedings have been extensively reported to this Court and are not reported herein.

*Settlement and Support Agreement*

15.     As previously reported, on October 12, 2016, the Canadian Debtors, Monitor, U.S. Debtors, EMEA Debtors, EMEA Non-Filed Entities, Joint Administrators, NNSA Conflicts Administrator, French Liquidator, Bondholder Group, Committee, Representatives, Unifor, U.K. Pension Trustee, PPF, Joint Liquidators and NNCC Bondholder Signatories entered into a certain Settlement and Plans Support Agreement (the "**Settlement and Support Agreement**") which, among other things, contains the terms of settlement of the Allocation Dispute (as defined therein) among the estates and certain other significant claims and matters.  A copy of the Settlement and Support Agreement is Exhibit "A" to the Plan.

16.     In summary, the Settlement and Support Agreement will resolve the Allocation Dispute by allocating the escrowed sale proceeds among the three Estates as follows:

    a)  payment of the Iceberg Amendment Fee in the amount of $2.8 million to NNI and $2.2 million to NNUK and, in settlement of the M&A Cost Reimbursement, payments in the amount of $20 million to NNI and $35 million to the Canadian Debtors; then,

    b)  to the Canadian Debtors: 57.1065% (being $4,142,665,131 as at July 31, 2016) (the "**Canadian Allocation**");

    c)  to the U.S. Debtors: 24.350% (being $1,766,417,002 as at July 31, 2016);

d) to the EMEA Debtors (excluding NNUK and NNSA): 1.4859% (being $107,788,879 as at July 31, 2016);

e) to NNUK: 14.0249% (being $1,017,408,257 as at July 31, 2016); and

f) to NNSA: $220,000,000.[1]

17. Other key aspects of the Settlement and Support Agreement as they relate to the Canadian Debtors include as follows:

a) it is contemplated the Canadian Debtors will be substantively consolidated into one Canadian Estate;

b) the Canadian Estate will make priority payments to NNI in the amounts of $62.7 million (in payment of the Remaining Revolver Claim under the CFSA) and $77.5 million (resolving obligations under the Side Letters and the T&T Claim), and upon receipt by NNI of the $77.5 million payment, NNI will have a 27% interest and the Canadian Estate will have a 73% interest in the Cascade Trust;

c) the Canadian Estate will retain the value of its remaining assets, which means, among other things, the release to the Canadian Estate of approximately $237 million of proceeds from the Canada Only Sales plus further amounts in respect of the sale of the IP Addresses currently held as Unavailable Cash for the benefit of the Canadian Estate;

d) the following claims will be allowed as Proven Affected Unsecured Claims against the Canadian Estate:

i. in accordance with the CFSA and as previously approved by this Court, the Canadian Debtors will allow an unsecured claim by NNI in the amount of $2.0 billion;

---

[1] The allocation amounts set forth above are subject to certain potential adjustments as further specified in the Settlement and Support Agreement.

ii.      in accordance with the EMEA Claims Settlement Agreement and as previously approved by this Court, the Canadian Debtors will allow an unsecured claim by NNUK in the amount of $97,655,094, which may increase to $122,655,094 under conditions set out in that agreement, and an unsecured claim by Nortel Networks SpA in the amount of $2,344,906; and

iii.     in accordance with this Court's decision, UKPI will be allowed a single unsecured claim against the Canadian Estate in the amount of £339.75 million (being $494,879,850 when converted to U.S. dollars in accordance with the Plan) in settlement of any and all of the UKPI Claims;

iv.     the Canadian Pension Claims will be allowed in the amount of CA$1,889,479,000;

v.     the Crossover Bondholder Claims will be $3,940,750,260 in the aggregate; and

vi.     the NNCC Bondholder Claims will be $150,951,562 in the aggregate;

e) the U.S. Debtors and Canadian Debtors will treat all unsecured claims against them rateably;

f) once a holder of a Crossover Claim has received aggregate distributions equal to 100% of its claim, the guarantor Estate will be entitled to subrogate to any subsequent distributions by the principal Estate in respect of that creditor's claim on a *pari passu* basis with other creditors of the same priority, to the extent of the amount paid by the guarantor Estate, and subject to certain additional restrictions in certain instances;

g) no post-petition interest will be included on any creditor claims or paid by any Estate (with certain limited exceptions required by Applicable Law with respect to the EMEA Debtors);

h)  solely for determining *pari passu* distributions in respect of unsecured claims against the Canadian Estate, all non-U.S. dollar denominated claims against the Canadian Estate will be converted to U.S. Dollars at the prevailing exchange rate reported by Reuters on January 14, 2009 (as reflected at Appendix "A" to the Claims Procedure Order);

i)  distributions on claims against the Canadian Estate predominantly denominated in Canadian dollars will be paid from the Canadian Estate in Canadian dollars, and distributions on all other claims will be paid in U.S. dollars;

j)  the Canadian Debtors and the U.S. Debtors will both propose Plans implementing the terms of the Settlement and Support Agreement as relates to their respective Estates for approval by vote of affected unsecured creditors and approval of their respective Courts;

k)  the Settlement Parties will dismiss all litigation and release all other claims among them, subject to the terms and conditions contained in the Settlement and Support Agreement; and

l)  the Settlement Parties will not take any action that interferes with the implementation of the Settlement and Support Agreement or the Canadian or U.S. Plans.

18.  The effectiveness of the Settlement and Support Agreement is subject to a number of conditions.  Certain conditions have been satisfied, including the execution and delivery of Crossover Bondholder Joinders and NNCC Bondholder Joinders at threshold amounts, the granting of Orders regarding currency conversion by this Court and the U.S. Court and the entry of orders by the U.K. Court, U.K. Court for the French Main Proceeding, French Court and Beddoes Court as contemplated by the Settlement and Support Agreement.

19.  Remaining outstanding conditions to the Settlement and Support Agreement include:

a)  confirmation of the U.S. Plans by the U.S. Court and the Confirmation Order
becoming a Final Order;

b)  sanction of the Plan by this Court and the Sanction Order becoming a Final
Order;

c)  the execution and delivery of appropriate notices and other documents
dismissing certain outstanding litigation among the parties to the Settlement
and Support Agreement, including the appeals relating to the Allocation and
Claims Litigation and the PPI Settlement (as defined in the Settlement and
Support Agreement); and

d)  the effectiveness of the Plan and the U.S. Plans shall have occurred by no later
than August 31, 2017.

**THE PLAN**

20.     On November 4, 2016, the Monitor served and filed its One Hundred and Thirty First
report which contained the Canadian Debtors' proposed Plan of Compromise and
Arrangement dated November 4, 2016 (the "**November 4 Plan**") and related information
circular dated November 4, 2016 (the "**November 4 Information Circular**").   The
November 4 Plan and November 4 Information Circular were subsequently updated and
on November 30, 2016, the Monitor served on the Service List an updated proposed Plan
of Compromise and Arrangement dated November 30, 2016 (the "**Plan**") and related
information circular dated November 30, 2016 (the "**Information Circular**"), the forms
of which were authorized for filing pursuant to the Meeting Order. A summary overview
of the Plan is provided in the paragraphs that follow.[2] Copies of the Plan and Information
Circular are attached as Appendices "A" and "B" hereto.

21.     The Plan provides for, among other things, the following:

a)  a compromise of all Affected Unsecured Claims in exchange for a *pro rata*
distribution of the cash assets of the Canadian Estate available for distribution

_____

[2] The following is intended as a summary overview of the Plan and is qualified entirely by the actual terms of the
Plan. Reference should be made directly to the Plan for a complete understanding of its terms.

to Affected Unsecured Creditors, and the full and final release and discharge of all Affected Claims which consist of all Claims against the Canadian Debtors and their former Directors and Officers other than Unaffected Claims;

b)   substantive consolidation of the Canadian Debtors into the Canadian Estate;

c)   authorization of the Canadian Debtors and Monitor to direct the Escrow Agents to effect the allocation and distribution of the Sale Proceeds as contemplated by the Settlement and Support Agreement and to otherwise implement the Settlement and Support Agreement, including the giving and receiving of the Settlement and Support Agreement Releases;

d)   release of all amounts held by NNL pursuant to the Canadian Only Sale Proceeds Orders or held as Unavailable Cash to the Canadian Estate;

e)   the establishment of a single class of voting creditors, being the Affected Unsecured Creditors Class;

f)   the mechanics for making *pro rata* distributions to holders of Proven Affected Unsecured Claims;

g)   the establishment of certain reserves for the ongoing administration of the Canadian Estate and in respect of Unresolved Claims;

h)   the payment in full of certain Proven Priority Claims and other payments contemplated by the Plan; and

i)   the release and discharge of all Affected Claims and Released Claims as against, among others, the Canadian Debtors, the Directors and Officers and the Monitor.

*Substantive Consolidation*

22.   The Plan requires and will result in the substantive consolidation of all assets of, and Claims (excluding Canadian Intercompany Claims) against, the Canadian Debtors.  All assets and rights of the Canadian Debtors (excluding Canadian Intercompany Claims)

will become assets of the Canadian Estate.  All Canadian Intercompany Claims, being intercompany Claims between and among the Canadian Debtors themselves, will not be entitled to vote on or receive distributions under the Plan and will not be affected, impaired or settled by the Plan. On the Plan Effective Date, NNL will become the corporate body through which the transactions and other steps contemplated by the Plan regarding the continuing administration and wind-down of the Canadian Estate shall be conducted.

*Affected Unsecured Claims*

23.     In full and final satisfaction of its Claim, an Affected Unsecured Creditor that has a Proven Affected Unsecured Claim will be entitled to receive its Pro-Rata Share as calculated by the Monitor prior to the Initial Distribution Date and each subsequent Distribution Date.

*Certain Proven Affected Unsecured Claims and Proven Priority Claims*

24.     As contemplated by the Settlement and Support Agreement, the Claims outlined at paragraph 17.d) hereof will be allowed as Proven Affected Unsecured Claims under the Plan along with the Intercompany Claims listed on Schedule "C" to the Plan (without duplication).

25.     The Plan also provides for payment of the $62,700,000 Proven Priority Claim of NNI, the $77,500,000 payment contemplated by Section 4(e) of the Settlement and Support Agreement, as well as a distribution of CA$3,000 to each of the Former Employee Priority Creditors in full satisfaction of their outstanding Termination Payments as contemplated pursuant to an Order of this Court dated March 18, 2016.

26.     Additionally, on January 12, 2017, this Court granted an Order approving the acceptance of the total aggregate Proven Affected Unsecured Claim of the 1988 Bondholders in the amount of $212,229,861.

*Other Affected Claims*

27.    The Canadian Debtors have publicly indicated they do not expect there will be any value for shareholders.  Equity Claims are Affected Claims under the Plan; however, Equity Claimants or other holders of Equity Interests are not entitled to receive distributions under the Plan.  All Equity Claims will be fully and finally released on the Plan Effective Date.

28.    Director/Officer Claims are Affected Claims under the Plan. Creditors with Director/Officer Claims, if any, will not be entitled to vote or receive distributions under the Plan on account of their Director/Officer Claims.   To the extent any part of a Director/Officer Claim is a Non-Released Claim, that part of the Director/Officer Claim will not be compromised, released, discharged, cancelled or barred. The Directors' Charge will be discharged and expunged on the Plan Effective Date and all rights of the Directors and Officers pursuant to paragraphs 20 and 21 of the Initial Order will be released and discharged on the Plan Effective Date.

*No Double-Recovery*

29.    In no circumstance will a Creditor receive aggregate distributions from the Canadian Estate and any other Nortel entity on account of a Proven Affected Unsecured Claim in excess of 100% of the amount of such Proven Affected Unsecured Claim, including in respect of a Crossover Claim.[3]   For the avoidance of doubt, as it relates to Crossover Claims, to determine the maximum recovery available to holders of Crossover Claims, the greater of such Creditor's (a) Allowed Claim (as defined in the U.S. Plans) against a U.S. Debtor; and (b) its Proven Unsecured Claim against the Canadian Estate will be used.

---

[3] "Crossover Claims" has the meaning given to it in the Plan and means Claims in respect of a debt owing by one or more of the Canadian Debtors or U.S. Debtors, and guaranteed by a Canadian Debtor or U.S. Debtor in the other Estate.

*No Post-Filing Date Interest*

30.     No Post-Filing Date Interest will be included in any Claims provable under the Plan, and no distributions will be made on account of Post-Filing Date Interest. All claims for Post-Filing Date Interest are released, discharged and barred pursuant to the terms of the Plan.

*Unaffected Claims*

31.     Certain Claims are unaffected by the Plan and are considered Unaffected Claims. Unaffected Claims are: (a) Canadian Intercompany Claims; (b) Insured Claims; (c) Proven Priority Claims; (d) Post-Filing Claims (unless otherwise ordered by this Court); and (e) any Director/Officer Claim that cannot be compromised under Section 5.1(2) of the CCAA.

32.     Unaffected Creditors will not receive any consideration or distributions under the Plan in respect of their Unaffected Claims (except to the extent their Unaffected Claims are paid in full in accordance with the express terms of the Plan).

*Plan Releases*

33.     Under the Plan, various releases will be provided.  On the Plan Effective Date: (i) the Canadian Debtors (including the Canadian Estate) and their respective current and former employees, auditors, financial advisors, legal counsel and agents (in each case, in that capacity only); (ii) the Directors and Officers; and (iii) the Monitor, the Monitor's legal counsel, and each and every current and former shareholder, affiliate, affiliate's shareholder, director, officer, member (including members of any committee or governance council), partner, employee, auditor, financial advisor and agent of any of the foregoing Persons (in each case, in that capacity only) (each of the Persons specified in (i), (ii) or (iii), in their capacity as such, being herein referred to individually as a "**Released Party**" and collectively referred to as the "**Released Parties**") will be fully, finally and irrevocably released and discharged from any and all Released Claims and all Released Claims will be fully, finally, irrevocably and forever waived, discharged, released, cancelled and barred as against the Released Parties, all to the fullest extent permitted by Applicable Law. Nothing in the Plan releases Non-Released Claims.

34.    In addition, the Settlement and Support Releases given and received by the Canadian Debtors and Monitor under the Settlement and Support Agreement are authorized pursuant to the Plan and incorporated therein by reference.  Pursuant to the Settlement and Support Agreement Releases, each of the Settlement Parties and Participating Creditors and their respective representatives, agents, successors and assigns (each a "**Releasor**") releases each of the other Releasors and each other Releasor's respective employees, officers, directors, agents, advisors, lawyers, successors and assigns and the directors and officers, both former and current, of any Nortel Group entity from any claims which any of the Releasors now have, had, may have had or hereafter may have however so arising out of or in connection with the Allocation Dispute, any other matters resolved in the Settlement and Support Agreement or any other matter relating to the global Nortel insolvency proceedings or the Nortel Group, except for certain specified claims which are expressly preserved.

35.    The Plan also provides for the exchange of certain releases between the Canadian Debtors and Monitor, on the one hand, and the Indenture Trustees, on the other, as reflected at Section 7.4 of the Plan.

*Injunctions*

36.    From and after the Plan Effective Date, all Persons are permanently and forever barred, estopped, stayed and enjoined, with respect to any and all Released Claims, from: (i) commencing, conducting, continuing or making in any manner, directly or indirectly, any action, suit, claim, demand or other proceeding of any nature or kind whatsoever (including any proceeding in a judicial, arbitral, administrative or other forum) against the Released Parties; (ii) enforcing, levying, attaching, collecting or otherwise recovering or enforcing by any manner or means, directly or indirectly, any judgment, award, decree or order against the Released Parties or their property; (iii) commencing, conducting, continuing or making in any manner, directly or indirectly, any action, suit, claim, demand or other proceeding of any nature or kind whatsoever (including any proceeding in a judicial, arbitral, administrative or other forum) against any Person who makes a claim or might reasonably be expected to make a claim, in any manner or forum, including by way of contribution or indemnity or other relief, against one or more of the

Released Parties; (iv) creating, perfecting, asserting or otherwise enforcing, directly or indirectly, any lien or Encumbrance of any kind against the Released Parties or their property; or (v) taking any actions to interfere with the implementation or consummation of the Plan.

### Conditions to Effectiveness and Plan Implementation

37.     The effectiveness of the Plan is subject to a number of conditions including (a) approval of the Plan by the Required Majority (which, as described below, has occurred); (b) the issuance of the Sanction Order and expiration of relevant appeal periods or the final resolution of any appeals taken; and (c) confirmation of the U.S. Plans by the U.S. Court.

38.     The implementation of the Plan, including distributions thereunder, is conditional on certain additional conditions being satisfied, including (x) the full effectiveness of the Settlement and Support Agreement; (y) dismissal of all outstanding litigation pending in respect of the Allocation Dispute; and (z) receipt of the Canadian Allocation by NNL.

### Creditor Advisor Fee Arrangements

39.     The Canadian Debtors have been paying the fees and expenses of certain advisors to the Bondholder Group and Court Appointed Representative Counsel throughout the CCAA Proceedings. The Plan provides for the cessation of these obligations after the Plan Implementation Date, subject to certain terms and conditions in connection with the fees and expenses of Court Appointed Representative Counsel. The Monitor has requested the service of certain Court Appointed Representative Counsel (Koskie Minsky LLP and the financial advisor to the former employees) from and after the Plan Implementation Date in connection with specific matters pertaining to the Plan on terms agreed to between the Monitor and Court Appointed Representative Counsel. Those terms include the payment of such reasonable fees and expenses of Court Appointed Representative Counsel and their financial advisor by the Canadian Estate for a twelve month period following the Plan Implementation Date to a maximum of CA$1.5 million (plus reasonable disbursements and applicable taxes). Subject to future Court approval, for services other than those the Canadian Estate has agreed to pay for and for any and all services following the twelve month period or exceeding the maximum threshold, the reasonable

fees and expenses of such Representative Counsel shall be deducted, dollar for dollar, from the distributions pursuant to the Plan to Compensation Creditors whom Koskie Minsky LLP represents.

### *Wind-Down of the Canadian Estate*

40.    The Monitor will continue to administer and wind-down the Canadian Estate after the Plan Implementation Date.  Such activities may include:

    a)  taking all steps and actions contemplated by the Plan and the Settlement and Support Agreement including effecting distributions and payments;

    b)  the resolution of remaining Unresolved Claims and Post-Filing Claims (both of which are discussed in more detail below);

    c)  the sale of any remaining assets (including remaining IP addresses) and repatriation of foreign funds;

    d)  the resolution of outstanding Canadian tax matters;

    e)  the wind-down of the Canadian Estate and their direct and indirect controlled subsidiaries (other than the U.S. Debtors, the EMEA Debtors and the EMEA Non-Filed Entities); and

    f)  the disposal of the Canadian Debtors' books and records, including their remaining information technology infrastructure.

## THE U.S. PLANS

41.    On November 4, 2016, as contemplated by the Settlement and Support Agreement, the U.S. Debtors filed the First Amended Joint Chapter 11 Plan of Nortel Networks Inc. and certain of its Affiliated Debtors and related proposed disclosure statement. Also on November 4, 2016, the U.S. Debtors filed a notice of hearing to consider the U.S. Disclosure Statement on December 2, 2016.

42.     On December 1, 2016, the U.S. Debtors filed an Amended First Amended Joint Chapter 11 Plan of Nortel Networks Inc. and certain of its Affiliated Debtors (the "**U.S. Plans**") and amended related proposed disclosure statement (the "**U.S. Disclosure Statement**").

43.     On December 1, 2016, the U.S. Court granted an Order, among other things, approving the U.S. Disclosure Statement; establishing voting procedures for voting on the U.S. Plans; requiring all objections to confirmation of the U.S. Plans to be filed no later than January 9, 2017 (the "**U.S. Plan Objection Deadline**"), and setting the date for the confirmation hearing for January 24, 2017 (the "**Confirmation Hearing**").

44.     Two objections to confirmation of the U.S. Plans were filed in the Chapter 11 Proceedings by the U.S. Plan Objection Deadline.   The United States Trustee,  who is responsible for overseeing the administration of bankruptcy cases in the United States, filed a limited objection to certain of the releases and exculpation provisions contained in the U.S. Plans.   The only other objection was filed by an *ad hoc* group of creditors operating under the title of the Nortel Trade Claims Consortium (the "**NTCC**") that hold approximately $150 million of unsecured claims against NNI. The NTCC objection was subsequently joined by Liquidity Solutions, Inc.  The NTCC objects to confirmation of the U.S. Plans on various grounds, including the NTCC's appeal of the U.S. Court's Allocation Decision that is currently pending in the United States Court of Appeals for the Third Circuit has divested the U.S. Court of jurisdiction to approve the Settlement and Support Agreement and confirm the U.S. Plans and that the U.S. Plans inappropriately authorize the holders of the Crossover Bonds to assert full guarantee claims against NNI to the detriment of NNI's other unsecured creditors. The U.S. Debtors report that they have also received several informal objections, many of which have been resolved through modifications to the U.S. Plans to address such objections consensually. The U.S. Debtors and certain other parties in interest in the Chapter 11 Proceedings, including the Committee and Bondholder Group, have filed responsive pleadings in support of the Plan and are requesting that the U.S. Court overrule all objections that have not been otherwise resolved consensually.

45.     On January 19, 2017, Epiq (as defined below) filed a declaration reporting the results of voting on the U.S. Plans. Each class of claims entitled to vote has voted to accept the U.S.

Plans save for class A-3A, which class voted to reject the proposed chapter 11 plan in respect of NNI and NN CALA after failing to reach the requisite majority in number of claims voting to accept.  The U.S. Debtors are seeking confirmation of the U.S. Plans notwithstanding the failure of each voting class to vote to accept the U.S. Plans by satisfying the relevant "cramdown" provisions of the Code with respect to class A-3A.

**PLAN FILING AND MEETING ORDER**

46.    On December 1, 2016, this Court granted the Plan Filing and Meeting Order (the "**Meeting Order**").  A copy of the Meeting Order is attached as Appendix "C" hereto. The terms of the Meeting Order were outlined in the Monitor's One Hundred and Thirty Third Report.

47.    The Meeting Order set out the procedures for, among other things, (a) publication and mailing of notice of the Meeting; (b) the voting procedure including Persons entitled to vote and the process for calculation of votes; and (c) the conduct of the Meeting.

*Publication and Mailing*

48.    In accordance with the Meeting Order,

a)    On December 1, 2016, counsel to the Monitor served the Meeting Materials on the Service List via email.  A copy of the email is attached as Appendix "D".

b)    On December 1, 2016, the Monitor posted an electronic copy of the Meeting Materials on the Website. French versions of the Meeting Materials were subsequently posted on the Website shortly thereafter.

c)    The Monitor published the Notice in English in The Globe and Mail (National and Local Edition), Wall Street Journal (Global Edition), Ottawa Citizen and Calgary Herald on December 9, 2016. The Monitor published the Notice in French in Le Journal de Montreal on December 9, 2016.  Attached hereto as Appendix "E" are copies of the advertisements.

d) On December 7, 2016, the Monitor mailed English versions of the Ordinary Creditor Mailing Materials to the Ordinary Creditors with Voting Claims and/or Unresolved Claims and to the Representatives by prepaid first class mail to the Latest Known Address of such Ordinary Creditor or as otherwise provided for in the Meeting Order.

e) On December 7, 2016, the Monitor mailed the Compensation Creditor Mailing Materials to each Compensation Creditor at the Compensation Creditor's Latest Known Address. Compensation Creditor Mailing Materials were delivered in English or French depending on the language preference previously indicated by the Compensation Creditor and on file with the Monitor.

49. As set out in the One Hundred and Thirty Third Report and pursuant to the Meeting Order, Epiq Bankruptcy Solutions LLC ("**Epiq**") was retained to act as the Monitor's agent to assist in the solicitation and voting procedures as it related to the Bondholders. In order to facilitate the timeline contemplated by the Settlement and Support Agreement and Meeting Order, prior to the Meeting Order being granted, the Monitor, Canadian Debtors and U.S. Debtors agreed to a proposed Voting Record Date of November 21, 2016.  The Monitor, with the assistance of Epiq, submitted requests to The Depository Trust Company ("**DTC**") for Participant Holder Lists for the Crossover Bonds and 1988 Bonds as of the Voting Record Date.  The U.S. Debtors, with the assistance of Epiq, submitted a requests for a Participant Holder List for the NNCC Bonds as of the Voting Record Date.

50. Attached as Appendix "F" is a copy of the affidavit of Jane Sullivan of Epiq sworn January 16, 2017 (the "**Sullivan Affidavit**") summarizing Epiq's service process. As set out in the Sullivan Affidavit, Epiq prepared a CD-Rom (the "**Solicitation CD-ROM**") containing the Notice and Information Circular. On December 7, 2016, Epiq couriered the Solicitation CD-ROM along with the other Bondholder Mailing Materials (other than the Master Authentication Forms and Instructions to Participant Holders) and a cover memo to the Participants Holders listed on Exhibit "B" to the Sullivan Affidavit (the "**First Mailing**").  The Participants in this distribution consisted of those Participant

Holders listed on the Participant Holder Lists that Epiq had received by that date as well as others who, based on Epiq's knowledge and expertise, were believed by Epiq to be Participant Holders. On December 12, 2016, Epiq couriered the same package of materials to the Participant Holders listed on Exhibit "C" to the Sullivan Affidavit, which consisted of Participant Holders listed on Participant Holder lists received after the First Mailing and who were not otherwise included in the First Mailing. Epiq also sent by courier the Master Authentication Forms and Instructions to Participant Holders separately on December 7 and 12, 2016.

### *Voting Procedure*

51.    Pursuant to the Plan and Meeting Order, there is only one class of voting creditors, being the Affected Unsecured Creditor Class.  The Meeting Order set out the voting process for the Affected Unsecured Creditors which consist of: (a) Ordinary Creditors; (b) Compensation Creditors; and (c) Bondholders.

52.    Ordinary Creditors were required to complete and sign Voting Proxies and either return them to the Monitor at least three (3) Business Days prior to the Meeting or bring them in person to the Meeting.

53.    Compensation Creditors consist of virtually all current and former employees of the Canadian Debtors. There are three (3) individuals who validly opted out of representation in accordance with the Representation Orders and who were provided materials to vote as Ordinary Creditors.  All remaining current and former employees of the Canadian Debtors are "Compensation Creditors" for the purposes of the Meeting Order and are represented by Court appointed Representatives pursuant to various Representation Orders and by representative counsel, or by Unifor.  Pursuant to the Meeting Order, this Court appointed Representatives and Unifor, as applicable, who have sole authority to vote on behalf of the Compensation Creditors.  Compensation Creditors were not entitled to vote individually.

54.    Beneficial Bondholders holding Bonds issued or guaranteed by the Canadian Debtors were entitled to vote by completing and signing Beneficial Bondholder Proxies.  Once a Beneficial Bondholder completed its Proxies, it had to return the Proxy to the relevant

Participant Holder through which it held Bonds for authentication. The Participant Holders were then to authenticate the holdings outlined in each Bondholder Proxy they received by completing Master Authentication Forms and returning completed Master Authentication Forms (with Bondholder Proxies attached) to Epiq by no later than January 10, 2017. On or about January 6, 2017, the Monitor and Epiq became aware that notwithstanding the instructions given in the Bondholder Mailing Materials, a number of Beneficial Bondholders had not received voting materials or were receiving incorrect information regarding the voting process from their Participant Holders. Further clarifying communications were delivered by Epiq to the Participant Holders and the deadline for receiving Master Authentication Forms and Bondholder Proxies was extended to January 12, 2017.

**THE MEETING**

55.     The Meeting was conducted pursuant to and in accordance with the terms of the Meeting Order. Murray McDonald, president of Ernst & Young Inc. (the "**Chair**"), chaired the Meeting. Jay Carfagnini, a partner at Goodmans LLP, counsel to the Monitor, acted as secretary. Tom Ayres and Brent Beekenkamp of Ernst & Young Inc., acted as scrutineers (the "**Scrutineers**"). The Meeting was conducted in English. Simultaneous translation into French and sign language translation were also provided. A quorum for the purposes of the Meeting was one (1) Affected Unsecured Creditor with a Voting Claim being present in person or by proxy. The Scrutineers confirmed a quorum was present and the Chair declared the Meeting validly constituted.

56.     The Chair provided an overview of the process for providing notice of the Plan and dispensed with the reading of the Notice. The Chair then provided a brief overview of the CCAA Proceedings, Settlement and Support Agreement, Plan and certain information regarding anticipated timing and quantum of distributions.

57.      After questions and discussion, the Chair reviewed the guidelines for the voting process as set out in the Meeting Order and other Meeting Materials. Specifically, the Chair noted that virtually all current and former employees of the Canadian Debtors are represented by Court appointed Representatives who will be voting on their behalf and as such, they should not vote. The Chair also reviewed the bondholder voting process

which required Participant Holders to authenticate Beneficial Bondholder holdings before their votes could be counted.

58.  Don Sproule, a court appointed Representative then proposed the resolution as read out loud by the Chairman.  There was then a short recess to tabulate the final vote.  Upon resuming the Meeting, the Chair announced the Scrutineers had tabulated the proxies indicating the votes received for both Voting Claims and Unresolved Claims.

59.  The following table shows the voting results in respect of Voting Claims:

|  | Number | Value | % Number | % Value |
|---|---|---|---|---|
| In Favour | 14,922 | $9,254,874,847 | 99.97% | 99.24% |
| Against | 4 | $70,530,494 | 0.03% | 0.76% |
| **Total** | **14,926** | **$9,325,405,341** | **100%** | **100%** |

60.  The following table shows the voting results of Unresolved Claims:

|  | Number | Value | % Number | % Value |
|---|---|---|---|---|
| In Favour | 131 | $111,538,898 | 100% | 100% |
| Against | 0 | 0 | 0 | 0 |
| **Total** | **131** | **$111,538,898** | **100%** | **100%** |

61.  The following table shows the overall impact on the approval of the Plan if all Unresolved Claims were counted in the vote on the Plan:

|  | Number | Value | % Number | % Value |
|---|---|---|---|---|
| In Favour | 15,053 | $9,366,413,745 | 99.97% | 99.25% |
| Against | 4 | $70,530,494 | 0.03% | 0.75% |
| **Total** | **15,057** | **$9,436,944,239** | **100%** | **100%** |

62.    A copy of the Minutes of the Meeting including a copy of the Scrutineers' report is attached as Appendix "G".

63.    The resolution to approve the Plan was carried and the Meeting was terminated at 1:27 p.m.

## THE SANCTION ORDER

### *The Proposed Sanction Order*

64.    The terms of the proposed Sanction Order contemplate, among other things, that this Court sanction the Plan, effect the substantive consolidation of the Canadian Debtors into the Canadian Estate, approve the Settlement and Support Agreement and authorize the various distributions from the Escrow Accounts contemplated thereby and otherwise order the matters contemplated by Section 8.2 of the Plan. A draft of the proposed Sanction Order is included in the Monitor and Canadian Debtors' motion record served in respect of the within motion.

65.    The Canadian Debtors and Monitor are also seeking the Canadian Escrow Release Order which authorizes and directs the Escrow Agents to release the Sale Proceeds from the Escrow Accounts in the matter contemplated by the Settlement and Support Agreement.

### *The Plan is Fair and Reasonable*

66.    The Monitor has been extensively involved in all aspects of these CCAA Proceedings since they were commenced and has issued 135 reports to this Court outlining the various activities of the Canadian Debtors and itself throughout the CCAA Proceedings. To the best of the knowledge of the Monitor, the Canadian Debtors have complied with all statutory requirements for the sanctioning of a Plan and the prior Orders of this Court and nothing has been done that is not authorized by the CCAA. The Canadian Debtors have also acted in good faith and with due diligence.

67.     The Plan reflects the terms of the Settlement and Support Agreement entered into by, among others, the Canadian Debtors, U.S. Debtors, EMEA Debtors, Monitor, members of the CCC, Committee, UKPI, NNSA, NNSA Conflicts Administrator, Joint Administrators and Joint Liquidators, each of whom support the Plan pursuant to the terms of the Settlement and Support Agreement.

68.     At the Meeting, Creditors with Voting Claims overwhelmingly voted in favour of the Plan.

69.     The approval by this Court of the Plan represents a key step in satisfying the conditions to both the Plan and Settlement and Support Agreement.  As set out above, the Settlement and Support Agreement was reached after years of extensive mediation, litigation and negotiation.  If implemented, the Settlement and Support Agreement will provide for the release of over $4 billion from the lockbox accounts to the Canadian Debtors and provide for the release of over $237 million of currently restricted cash held by the Canadian Debtors.  Most importantly, the Settlement and Support Agreement and the Plan permit the Canadian Debtors to make distributions to their Creditors.

70.     If the Plan is not sanctioned by this Court or the Settlement and Support Agreement is not implemented for any other reason, the most likely result will be that the current Appeals of the Allocation Decisions will be resumed and litigation regarding the Allocation Dispute and certain significant claims will resume.  There will be no monies released from the lock box accounts and no distributions will be made to any Canadian creditors in the foreseeable future.

71.     The Settlement and Support Agreement and Plan provide for a settlement of almost all outstanding significant disputes in these CCAA Proceedings and, in the view of the Monitor, are fair and reasonable in the circumstances.

*Substantive Consolidation of the Canadian Debtors is Appropriate and Required*

72.     The consolidation of the Canadian Debtors into a single estate is fundamental to the implementation of the Settlement and Support Agreement and the Plan.

73.     The Monitor notes the following with respect to the appropriateness and effect of the substantive consolidation of the Canadian Debtors pursuant to the Plan:

a)  This Court has previously made findings regarding the highly integrated nature of the Nortel group of companies and their business operations, including as set forth in its Reasons for Judgement in respect of the Allocation Dispute dated May 12, 2015.

b)  The highly integrated nature of Nortel's business led to competing positions regarding the ownership of Nortel's assets (in particular its valuable intellectual property) and the proceeds derived therefrom by the individual Nortel legal entities and their respective creditors, and ultimately to years of contested litigation in respect of that issue, which disputes have now been resolved pursuant to the Settlement and Support Agreement.

c)  Many obligations of a Canadian Debtor, including nearly $4 billion of bond debt, are guaranteed by another Canadian Debtor. Moreover, many claims filed against the Canadian Debtors were filed against two or more of the Canadian Debtors on the basis of some form of alleged joint and several liability, including approximately $3 billion of former employee and pension related claims. Indeed, the vast majority of claims filed against the Canadian Debtors by quantum have been asserted against two or more of the Canadian Debtors. The substantive consolidation of the Canadian Debtors into the Canadian Estate and the elimination of Duplicative Claims obviates the need for the determination of (and potentially litigation in respect of) whether these types of claims are provable against more than one Canadian Debtor.

d)  Substantive consolidation is supported by all major creditor constituencies of the Canadian Debtors pursuant to the Settlement and Support Agreement and by the overwhelming majority of creditors who have voted to approve the Plan.

e)  In addition to avoiding potential further time consuming and costly litigation regarding claim liability, substantive consolidation will simplify the

implementation of the Plan and the ongoing administration and wind-down of the Canadian Debtors.

*Reserves*

Administrative Reserve

74.    The implementation of the Plan represents a significant milestone in moving towards the completion and wind up of the CCAA Proceedings and Canadian Estate.  However, there will continue to be ongoing administrative and wind-down steps. As contemplated by the Plan, the Monitor expects to establish an Administrative Reserve in the amount of $155 million (the "**Administrative Reserve Amount**"). The Administrative Reserve Amount will be used to fund these ongoing activities and obligations.

75.    Approximately $55 million of the Administrative Reserve Amount relates primarily to wind-down costs and obligations secured by the Administration Charge, including the anticipated future professional fees and expenses of the Monitor, its counsel and the Canadian Debtors' counsel from and after the Plan Implementation Date. The balance of the Administrative Reserve Amount relates primarily to a reserve established in respect of the continuing performance of the obligations of NNL pursuant to certain orders (the "**MOECC Orders**") issued against it by the Ministry of the Environment and Climate Change (Ontario) ("**MOECC**") in relation to environmental impacts at various properties in Ontario. This reserve amount is being established and held without prejudice both as to whether NNL will continue to perform such obligations following the Plan Implementation Date as well as with respect to the nature and quantum of NNL's liability, if any, pursuant to the MOECC Orders and any related Proofs of Claims, including on the basis previously agreed among the MOECC, NNL and Monitor pursuant to the Agreement re: Kingston Property Settlement and Other Nortel ERT Proceedings dated February 25, 2015. For the avoidance of doubt, no relief is sought at present with respect to NNL's obligations pursuant to the MOECC Orders. The Monitor expects to engage with the MOECC and other relevant stakeholders with respect to the MOECC Orders and related Proofs of Claim with a view to achieving full and final resolution of NNL's environmental obligations over the course of 2017.

76.     In view of the foregoing, the Monitor believes the Administrative Reserve Amount is fair and reasonable in the circumstances. To the extent that funds remain in the Administrative Reserve on the completion of the wind-down of the Canadian Estate, remaining funds would be made available in a final distribution to creditors or as otherwise ordered by the Court.

Unresolved Claims Reserve

77.     In addition to the Administrative Reserve, the Plan contemplates an Unresolved Claims Reserve. The Monitor currently anticipates the Unresolved Claims Reserve will be approximately $591 million.[4] The Unresolved Claims Reserve relates to 35 Unresolved Affected Unsecured Claims in the amount of approximately $531 million as identified on Appendix "H" plus a further $60 million related to 129 unresolved Compensation Claims.

78.     The Plan contemplates reserves for Unresolved Affected Unsecured Claims equal to the amount that would have been paid if the full amount of all Unresolved Affected Unsecured Claims had been Proven Affected Unsecured Claims on the applicable Distribution Date, or such lesser amount as may be ordered by the CCAA Court.

79.     At this time, the Monitor proposes to establish reserves for Unresolved Affected Unsecured Claims equal to the amount that would have been paid if the full amount of all Unresolved Affected Unsecured Claims had been Proven Affected Unsecured Claims on the applicable Distribution Date. Reserves have been set in this regard notwithstanding the Monitor's view that certain Unresolved Affected Unsecured Claims (particularly those related to environmental matters) are duplicative.

80.     However, the Monitor notes: (i) certain holders of Unresolved Affected Unsecured Claims have asserted unliquidated claims; and (ii) in certain instances, Creditors have purported to assert liabilities (in, for instance, pleadings delivered in the context of Claim disputes) against the Canadian Debtors in excess of the amounts set forth in their Proof of Claim or dispute notice (which documents form the basis for the Monitor's reserve

---

[4] The Unresolved Claims Reserve remains subject to further adjustment by the Monitor as contemplated by the Plan, including based on developments with respect to individual Unresolved Affected Unsecured Claims.

calculation and pursuant to which a Creditor was required to specify the amount of its claim or disputed claim, as the case may be).

81.     In light of the uncertainty caused by the foregoing with respect to establishing reserve amounts, the proposed form of Sanction Order sought will cap the maximum Proven Affected Unsecured Claim that could be proven in respect of an Unresolved Affected Unsecured Claims specified on Appendix "H" at the corresponding claim reserve amount ("**Claim Reserve Amount**") specified on Appendix "H". The Claim Reserve Amount is based on the liquidated claim asserted by the Creditor in either their Proof of Claim or dispute notice, as applicable. For clarity: (i) the Claim Reserve Amount listed on Appendix "H" caps the maximum Proven Affected Unsecured Claim the relevant Creditor could establish pursuant to the Plan and be entitled to a pro-rata distribution on (and not the amount of actual Available Cash to be reserved on account of such Unresolved Affected Unsecured Claim); and (ii) the Claim Reserve Amount is based on the liquidated claim asserted by the Creditor in either their Proof of Claim or dispute notice, as applicable.

82.     The Monitor believes the approach outlined above is a fair and balanced approach to addressing the potential uncertainty relating to the Unresolved Claim Reserve at this juncture. The Monitor may seek further relief or direction from the Court with respect to the Unresolved Claim Reserve at a later date (including as relates to Post-Filing Claims, as detailed below).

83.     The Monitor notes the reserves contemplated hereby do not include any amount in respect of the CA$44 million priority claim sought by two former LTD recipients on behalf of the LTD Beneficiaries (as defined and discussed below beginning at paragraph 103).

*Post-Filing Claims*

84.     The Monitor notes that 11 Post-Filing Claims were filed against the Canadian Debtors pursuant to the Post-Filing Claims Bar Date Order, including certain unliquidated Post-Filing Claims. Six of the claims were filed by the Canada Revenue Agency. Based on its preliminary review, the Monitor does not believe any of the Post-Filing Claims filed are

appropriately asserted (or provable) as Post-Filing Claims. The Monitor has or intends to engage with those parties who filed Post-Filing Claims to seek to have such claims withdrawn, failing which the Monitor will address the Post-Filing Claims in the manner contemplated by the Post-Filing Claims Bar Date Order, including seeking the assistance of the Court as may be necessary to expeditiously resolve them or fix reserve amounts so that maximum distributions can be made to Affected Unsecured Creditors on the Initial Distribution pursuant to the Plan.

85.    As at the writing of this Report, the Monitor and one claimant asserting a Post-Filing Claim (The Northern Trust Company, Canada) have agreed to establish a CA$1 million reserve in respect of the unliquidated Post-Filing Claim asserted by such claimant. The proposed Sanction Order caps such Post-Filing Claim at CA$1 million.

### Releases

86.    The releases contemplated by the Plan, Sanction Order and Settlement and Support Agreement are fair and reasonable in the circumstances.  Any Insured Claims or claims which cannot be compromised under the CCAA are not released under the Plan.

### Extension of CCAA Stay

87.    The proposed Sanction Order provides for the stay of proceedings in favour of the Canadian Debtors (including the Canadian Estate) to be extended indefinitely, subject to further Order of this Court.

88.    Although an initial distribution to creditors is expected in the April 2017 timeframe, as alluded to in Section 10.1 of the Plan, there remains many activities to be completed, including the resolution of Unresolved Claims, the realization of remaining residual assets and the wind-down and repatriation of funds from the Canadian Debtors' foreign controlled subsidiaries. The extension of the CCAA stay on an indefinite basis will facilitate the implementation of the Plan and the continuation of these and other restructuring activities, and avoid the cost incurred by the Canadian Estate having to return to the Court to seek periodic stay extensions post-Plan implementation.

89.     Pursuant to the Sanction Order, reporting to the Court and stakeholders by the Monitor will occur on no less than an annual basis. Moreover, it will always be open to stakeholders to contact the Monitor with any questions or requests, or to move to the Court on appropriate notice, for a modification of the CCAA stay or any other relief which may be appropriate. In the circumstances, the Monitor is of the view that an indefinite extension of the CCAA stay is fair and reasonable and will not be prejudicial to any Creditor.

## DISTRIBUTIONS

### *Distributions Generally*

90.     All distributions to Affected Unsecured Creditors to be effected pursuant to the Plan will be made by the Canadian Estate pursuant to Article 6 of the Plan.  Distribution Dates will be set from time to time by and at the discretion of the Monitor, provided that the Initial Distribution Date will be no more than sixty (60) days after the Plan Implementation Date. The Monitor will set a further Distribution Date within ninety (90) days of the date it determines the Available Cash of the Canadian Estate is sufficient to establish an Affected Unsecured Creditor Pool of not less than $150,000,000 (the "**Determination Date**"), provided that if the Monitor believes the Canadian Estate will be in a position to make a Final Distribution within six (6) months of the Determination Date, it will be authorized to delay such Distribution Date for up to six (6) months from the Determination Date in order to attempt to complete a Final Distribution.

### *Distribution Mechanics*

91.     Prior to the Initial Distribution Date and each subsequent Distribution Date, the Monitor will calculate the Pro-Rata Share to be paid to each Affected Unsecured Creditor with a Proven Affected Unsecured Claim.

92.     Subject to the Plan, the Canadian Estate will, on or about the respective Distribution Date, cause to be distributed from the Affected Unsecured Creditor Pool to each Affected Unsecured Creditor with a Proven Affected Unsecured Claim its Pro-Rata Share by way of (in the sole discretion of the Monitor): (i) cheque sent by prepaid ordinary mail to the

address on file with the Monitor on the date that is twenty-one (21) days after notice of a Distribution Date is given by the Monitor by notice posted on the Website; or (ii) wire transfer of immediately available funds to an account designated in writing by the Creditor to the Monitor (with any wire transfer or similar fee being satisfied from the distribution amount), subject to logistical arrangements for distribution to Bondholders which have been agreed on by the Indenture Trustees.

93.    Additionally, distributions to Compensation Creditors will be subject to the Canadian Estate and Monitor first obtaining EI Confirmation in respect of such Compensation Creditor as well as resolving any issues regarding applicable withholdings in respect of such distribution to the satisfaction of the Canadian Estate and the Monitor, acting reasonably. Further, in accordance with the terms of the Hardship Process, any payments made to a Compensation Creditor pursuant to the Hardship Process will be deducted, dollar for dollar, from any distributions to such Compensation Creditor pursuant to the Plan.

***Unresolved Claims and Post-Filing Claims***

94.    An Affected Unsecured Creditor holding an Unresolved Affected Unsecured Claim will not be entitled to receive a distribution under the Plan in respect of such Unresolved Affected Unsecured Claim or any portion thereof unless and until, and then only to the extent that, such Unresolved Affected Unsecured Claim becomes a Proven Affected Unsecured Claim. To the extent that any Unresolved Affected Unsecured Claim becomes a Proven Affected Unsecured Claim, the Canadian Estate will distribute to the holder of such Proven Affected Unsecured Claim, on or before the next following Distribution Date, an amount from the Unresolved Claims Reserve equal to the Pro-Rata Share that such Affected Unsecured Creditor would have been entitled to receive in respect of its Proven Affected Unsecured Claim on the previous Distribution Date(s) had such Unresolved Affected Unsecured Claim been a Proven Affected Unsecured Claim on the Initial Distribution Date. Notwithstanding the foregoing: (i) NNUK shall be entitled to receive distributions under the Plan on account of the Proven NNUK Claim pending final resolution of the Contingent Additional NNUK Claim; and (ii) Compensation Creditors holding Unresolved Affected Unsecured Claims shall be entitled to receive distributions

on account of such Unresolved Affected Unsecured Claims solely to the extent portions thereof have been admitted or proven pursuant to the Compensation Claims Procedure Order.

95.    Once an Unresolved Affected Unsecured Claim is finally resolved and all distributions (if any) have been made out of the Unresolved Claims Reserve in respect of such claim, any remaining Cash in the Unresolved Claims Reserve with respect to such Unresolved Affected Unsecured Claim will become Available Cash.

*Allocation of Distributions and Payments*

96.    All distributions and payments made pursuant to the Plan will be allocated first towards the repayment of the amount of the Proven Affected Unsecured Claim or Proven Priority Claim, as applicable, attributable to principal and, if greater than the amount of principal, second, towards the repayment of any amount of such Proven Affected Unsecured Claim or Proven Priority Claim attributable to unpaid interest.

*Undeliverable Distributions*

97.    If any distribution to a Creditor under the Plan is returned as undeliverable (an "**Undeliverable Distribution**"), no further distributions to such Creditor will be made unless and until the Monitor is notified in writing by such Creditor of such Creditor's current address, at which time all such distributions will be made to such Creditor.  Upon the Monitor becoming aware of an Undeliverable Distribution, the Canadian Estate will, prior to the next following Distribution Date, reserve from the Affected Unsecured Creditor Pool the amount of Cash equal to the Undeliverable Distribution.  All claims for an Undeliverable Distribution existing prior to the Final Distribution must be made in writing to the Monitor (in the manner contemplated by Section 11.10 of the Plan) on or before the date that is thirty (30) days following the date the Monitor posts a copy of the Final Distribution Certificate on the Monitor's Website, after which date any entitlement with respect to any Undeliverable Distributions will be forever discharged and forever barred, without any compensation therefor, notwithstanding any federal, state or provincial laws to the contrary, and the amount of any Undeliverable Distributions will be included in the Affected Unsecured Creditor Pool for distribution on the Final

Distribution. Any Undeliverable Distributions remaining following the Final Distribution will be dealt with in such manner as this Court may direct.  Nothing in the Plan will require the Canadian Estate or the Monitor to attempt to locate any Creditor or other Person with respect to an Undeliverable Distribution. No interest will be payable in respect of an Undeliverable Distribution.

### Withholding Rights

98.     The Canadian Estate and any other Person facilitating distributions under the Plan will be entitled to deduct and withhold from any distribution or payment to any Person pursuant to the Plan such amounts as may be required to be deducted or withheld with respect to such distribution or payment under the Canadian Tax Act or other Applicable Laws and to remit such amounts to the appropriate Taxing Authority or other Person entitled thereto. To the extent that amounts are so withheld or deducted and remitted to the appropriate Taxing Authority or other Person, such withheld or deducted amounts will be treated for all purposes as having been paid to such Person as the remainder of the distribution or payment in respect of which such withholding or deduction was made. Without in any way limiting the generality of the foregoing, the Canadian Estate will deduct from any distribution to a Creditor any amounts as indicated by Employment and Social Development Canada in an EI Confirmation, and remit such amounts to Employment and Social Development Canada pursuant to the EI Act. Any Creditor whose address on file with the Monitor on the Distribution Record Date for the Initial Distribution is not a Canadian address will be treated as a non-resident of Canada for purposes of any applicable non-resident withholding Tax on all distributions hereunder, subject to receipt by the Monitor of information satisfactory to it (in its sole discretion) that such Creditor is not a non-resident. For the avoidance of doubt, no gross-up or additional amount will be paid on any distribution or payment under the Plan to the extent the Canadian Estate or any other Person deducts or withholds amounts pursuant to Section 6.8 of the Plan.

### Final Distribution

99.     After (i) all Unresolved Affected Unsecured Claims, Post-Filing Claims and any other Claims (but excluding, for the avoidance of doubt, any Equity Claims) have been finally

resolved; (ii) any remaining Cash held in the Unresolved Affected Unsecured Claims Reserve has been transferred into the Affected Unsecured Creditor Pool; and (iii) the administration and wind-down matters set out in Article 10 of the Plan have been substantially completed, the Monitor will set a Distribution Date for the purposes of effecting a final distribution of Available Cash to Affected Unsecured Creditors with Proven Affected Unsecured Claims (the "**Final Distribution**").  The Final Distribution will include, among other things, any remainder of the Administrative Reserve (except for an amount to be set aside for fees and costs to be incurred by or on behalf of the Monitor (including the fees and expenses of the Monitor's counsel) in effecting the Final Distribution, the completion of any remaining administration matters and the discharge of the Monitor).  After completing the Final Distribution and upon being granted a discharge and release, the Monitor will pay any remaining Cash of the Canadian Estate, including any Cash on account of Undeliverable Distributions remaining following the Final Distribution, as this Court may direct.

### *Timeline to Initial Distribution*

100.   If the Plan is sanctioned by this Court and the U.S. Plans are confirmed by the U.S. Court on January 24, 2017 and the other conditions to effectiveness occur, the current estimated timeline to implement the Plan is as follows:

(b)   Plan Effective Date: February 15, 2017;

(c)   Plan Implementation Date: as soon as practical following the Plan Effective Date; and

(d)   Initial Distribution Date: within 60 days of the Plan Implementation Date.

101.   Based on the above timeline and subject to implementation of the Plan and the full effectiveness of the Settlement and Support Agreement, it is estimated an initial distribution to creditors may be possible in April 2017.  Creditors holding Proven Affected Unsecured Claims will receive distributions in U.S. dollars, unless such claim is predominantly denominated in Canadian dollars (i.e. more than 50% of the Proven

Affected Unsecured Claim is denominated in Canadian dollars) (a "**CAD Claim**"), in which case creditors will receive distributions in Canadian dollars.

102.    With respect to Proven Affected Unsecured Claims, the Monitor currently estimates the range of recovery (per U.S. dollar) of Proven Affected Unsecured Claims will be approximately 41.5 cents to 45 cents.  Given currency conversion matters as described in the Plan and the Information Circular, the Monitor estimates the range of recovery (per CA dollar) for CAD Claims will be approximately CA 45 cents to CA 49 cents (assuming an Applicable F/X Rate of $1.00 = CA $1.337650).

***Objection by Certain LTD Beneficiaries***

103.    On January 12, 2017, Joseph Greg McAvoy and Jennifer Holley, two former LTD recipients, filed a "Notice of Intention to Appear and Submission for Anticipated January 24, 2017 Fairness Hearing to Sanction the Nortel CCAA Plan". The submission requests that CA$44 million be set aside and paid to the Canadian Debtors former LTD recipients (the "**LTD Beneficiaries**") in "…full payment of the Nortel LTD income and medical and dental claims…".

104.    The request would appear to seek to treat the LTD Claimants as priority claimants pursuant to the Plan who will have their claims paid in full. Pursuant to the Settlement and Support Agreement, the Canadian Estate, Monitor and Court appointed representatives of the Former Employees (including the LTD representative) (the "**Representatives**" and the "**LTD Rep**", respectively) have agreed that all unsecured creditors holding claims against the Canadian Estate will be paid *pari passu* by the Canadian Estate with all other general unsecured creditor distributions without discrimination of any kind. Accordingly, the request is contrary to the Canadian Estate's, Monitor's and Representatives' agreement under the Settlement and Support Agreement and cannot be agreed by those Parties. Moreover, were the Court to grant the relief requested, the other parties to the Settlement and Support Agreement could take the position such relief is contrary to the Settlement and Support Agreement, putting the settlement contemplated thereby and the implementation of the Plan and Settlement and Support Agreement at risk.

105.    By way of background, LTD benefits were funded through the Nortel Health and Welfare
Trust (the "**HWT**"). The HWT has previously been described in detail in prior reports to
this Court, including the Fifty First Report of the Monitor dated August 27, 2010, a copy
of which (excluding the voluminous appendices) is attached as Appendix "I" hereto.
Pursuant to various prior Orders of this Court, substantially all of the assets of the HWT
have been distributed to beneficiaries thereof. In the case of LTD Beneficiaries,
distributions from the HWT have satisfied approximately 38% of the LTD obligations
owing to them pursuant to the HWT Allocation Order.

106.    The LTD Beneficiaries, including the two individuals filing the request, are subject to the
terms of the Order (Representation Order for Disabled Employees) of this Court dated
July 30, 2009 (the "**LTD Rep Order**"), a copy of which is attached as Appendix "J"
hereto. Pursuant to the LTD Rep Order:

   a)    The LTD Rep was appointed as representative of the LTD Beneficiaries in the
   CCAA Proceedings, including, without limitation, for the purpose of settling
   or compromising claims by the LTD Beneficiaries in the CCAA Proceedings;
   and

   b)    LTD Beneficiaries had the option to "opt-out" from the LTD Rep Order in
   accordance with its terms. Neither of the individuals filing the request (nor any
   other LTD Beneficiary) elected to opt-out of representation pursuant to the
   terms of the LTD Rep Order.

107.    As noted above, the LTD Rep is a party to the Settlement and Support Agreement and
has bound the LTD Beneficiaries to support the Settlement and Support Agreement
pursuant to the terms of the LTD Rep Order.

108.    This Court has previously acknowledged the adverse impact of the Canadian Debtors'
insolvency on the LTD Beneficiaries.[5] The LTD Rep, with the assistance of
Representative Counsel and a financial advisor, has advocated on behalf of the LTD
Beneficiaries throughout these CCAA Proceedings, including seeking to mitigate the

---

[5] See *Nortel Networks Corporation (Re)*, 2010 ONSC 5584 at para. 75.

difficulties faced by the LTD Beneficiaries. These activities, which the Monitor has also been involved in and assisted in as appropriate, have included: (i) assisting in the development of the Hardship Process which has provided advance distributions to LTD Beneficiaries suffering hardship to a maximum of CA$24,200; (ii) urging the administrator of the Canadian Registered Pension Plans to seek FSCO approval for interim transfers of up to 50% of the estimated commuted value of pensions for LTD Beneficiaries with service in Ontario, Alberta and Nova Scotia who were suffering financial hardship; (iii) lobbying the provincial and federal governments to provide assistance to LTD Beneficiaries which resulted in automatic acceptance to the Trillium Drug Program for all LTD Beneficiaries who are Ontario residents and a request made to the Minister to have case workers designated to assist LTD Beneficiaries in obtaining information about Trillium and gaining access to specific drugs they require; and (iv) obtaining an advance tax ruling providing that lump sum distributions relating to disability income from the HWT are not taxable (LTD Basic Life and LTD Optional Life were held to be taxable, which Representative Counsel is appealing);

109.   On March 30, 2010, certain of the Canadian Debtors, Monitor, the Representatives (including the LTD Rep) and Representative Counsel entered into an Amended and Restated Settlement Agreement (the "**Employee Settlement Agreement**", as approved by this Court in its Settlement Approval Order dated March 31, 2010 (the "**Settlement Approval Order**"), a copy of which (including the Employee Settlement Agreement) is attached as Appendix "K" hereto. Pursuant to the Employee Settlement Agreement and the Settlement Approval Order:

  a) the Canadian Debtors agreed to continue paying LTD benefits for the remainder of 2010;

  b) the Canadian Debtors agreed to establish a CA$4.3 million fund pursuant to which CA$3,000 termination payments were made to former employees, including the individual LTD Beneficiaries making the request;

  c) claims of LTD Beneficiaries were agreed to rank as ordinary unsecured claims on a *pari passu* basis with the claims of the ordinary unsecured creditors of the Canadian Debtors;

d)  the Representatives (including the LTD Rep) agreed, on behalf of those they represent and on their own behalf, that in respect of any funding deficit in the HWT or any HWT related claims in these CCAA Proceedings or in any subsequent receivership or bankruptcy proceedings (among other situations) they would not advance, assert or make any claim that any HWT claims are entitled to any priority or preferential treatment over ordinary unsecured claims and that to the extent allowed against the Canadian Debtors, such HWT claims would rank as ordinary unsecured claims on a *pari passu* basis with the claims of the ordinary unsecured creditors of the Canadian Debtors;

e)  the Representatives (including the LTD Rep) agreed on their own behalf and on behalf of the Pension HWT Claimants (as defined in the Employee Settlement Agreement) that under no circumstances shall any CCAA plan be proposed or approved if, among other things, the Pension HWT Claimants and the other ordinary unsecured creditors of the Canadian Debtors do not receive the same *pari passu* treatment of their allowed ordinary unsecured claims against the Canadian Debtors pursuant to the Plan;

f)  the Settlement Approval Order approved the Employee Settlement Agreement, including specifically ordering and declaring that: (i) the HWT Claims rank as ordinary unsecured claims on a *pari passu* basis, and no part of any such HWT Claims shall rank as a preferential or priority claim or shall be the subject of a constructive trust or trust or any nature or kind; (ii) no person shall assert or make any claim that any HWT Claims are entitled to any priority or preferential treatment over ordinary unsecured claims; and (iii) under no circumstances shall any CCAA plan be proposed or approved by the Court if, among other things, employee claimants and the other ordinary unsecured creditors do not receive the same *pari passu* treatment of their allowed claims against the Canadian Debtors pursuant to a CCAA plan; and

g)  certain LTD Beneficiaries, including the individual LTD beneficiaries making the request, sought leave to appeal the Settlement Approval Order, which leave to appeal was denied by the Ontario Court of Appeal and subsequently

by the Supreme Court of Canada such that the Settlement Approval Order is no longer subject to or capable of appeal.

110.    In light of the potential risk to the implementation of the Plan and the Settlement and Support Agreement as well as based on the terms of the LTD Rep Order, the Employee Settlement Agreement and the Settlement Approval Order, the Monitor does not endorse the request of the individual LTD beneficiaries.

**CONCLUSION**

111.    The Plan follows on and implements the Settlement and Support Agreement that provides for a comprehensive resolution of all significant outstanding matters in dispute in these CCAA Proceedings and paves the way for distribution of the lockbox funds to the Canadian and other Nortel Estates, and subsequently to their respective creditors. Each of the Settlement and Support Agreement and the Plan are the result of difficult but good faith negotiations among the Estates and their key creditor constituents following on extensive litigation and other attempts at settlement.  Importantly, the Plan and the Settlement and Support Agreement are supported by all major stakeholders of the Canadian Estate and have also been approved by the overwhelming majority of all Affected Unsecured Creditors, both as to number and quantum.

112.    The Monitor is of the view the Settlement and Support Agreement represents a fair and reasonable resolution of the Allocation Dispute and the other matters resolved therein and that, collectively, the Settlement and Support Agreement and the Plan represent the best option available to creditors of the Canadian Debtors to finally resolve the major issues in this case and achieve a fair and reasonable distribution of the Canadian Debtors' distributable assets to them.

113.    For these and the other reasons outlined in this One Hundred and Thirty Fifth Report, the Monitor supports the granting of the Sanction Order and the Canadian Escrow Release Order.

All of which is respectfully submitted this 20th day of January, 2017.

**ERNST & YOUNG INC.**
**in its capacity as Monitor of Nortel Networks Corporation** *et al.*
**and not its personal capacity**

Per:

Murray A. McDonald
President

6654304



Court File No. 09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**COMMERCIAL LIST**

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,**
**R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,**
**NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS**
**INTERNATIONAL CORPORATION, NORTEL NETWORKS**
**TECHNOLOGY CORPORATION, NORTEL COMMUNICATIONS INC., ARCHITEL**
**SYSTEMS CORPORATION AND NORTHERN TELECOM CANADA LIMITED**

---

**PLAN OF COMPROMISE AND ARRANGEMENT**
**pursuant to the *Companies' Creditors Arrangement Act***
**concerning, affecting and involving the Canadian Debtors**

---

**November 30, 2016**

# TABLE OF CONTENTS

**ARTICLE 1 INTERPRETATION**.........................................................................................1
1.1     Definitions..........................................................................................................1
1.2     Certain Rules of Interpretation.........................................................................19
1.3     Successors and Assigns.....................................................................................20
1.4     Governing Law and Jurisdiction.......................................................................20
1.5     Schedules...........................................................................................................20

**ARTICLE 2 PURPOSE AND EFFECT OF THE PLAN**.........................................20
2.1     Purpose..............................................................................................................20
2.2     Substantive Consolidation of the Canadian Debtors........................................21
2.3     Persons Affected...............................................................................................22
2.4     Persons Not Affected........................................................................................22
2.5     Equity Claimants...............................................................................................23

**ARTICLE 3 CLASSIFICATION AND TREATMENT OF CREDITORS AND
RELATED MATTERS**......................................................................................................23
3.1     Claims Procedure..............................................................................................23
3.2     Classification of Creditors................................................................................23
3.3     Creditors' Meeting............................................................................................24
3.4     Treatment of Affected Unsecured Claims........................................................24
3.5     Canada – U.S. Crossover Claims......................................................................25
3.6     No Double-Recovery.........................................................................................26
3.7     No Post-Filing Date Interest.............................................................................26
3.8     Unaffected Claims.............................................................................................26
3.9     Unresolved Affected Unsecured Claims...........................................................27
3.10    Director/Officer Claims and the Directors' Indemnity and Directors' Charge.................27
3.11    Extinguishment of Claims.................................................................................28
3.12    Guarantees and Similar Covenants...................................................................28
3.13    Set-Off...............................................................................................................28

**ARTICLE 4 ALLOCATION DISPUTE RESOLUTION, SETTLEMENT AND
SUPPORT AGREEMENT AND RELATED PROVISIONS**.......................................29
4.1     Authority to Effectuate and Implement the Settlement and Support Agreement.............29
4.2     Allocation and Distribution of the Sale Proceeds............................................29
4.3     Release of Canada Only Sale Proceeds and Unavailable Cash........................30
4.4     Canadian Pension Claims..................................................................................30
4.5     Crossover Bondholder Claims..........................................................................30
4.6     NNCC Bondholder Claim.................................................................................30
4.7     UKPI Claim.......................................................................................................30
4.8     EMEA Debtors' Claims....................................................................................30
4.9     NNI Claims........................................................................................................31
4.10    Intercompany Claims.........................................................................................31
4.11    Bondholder Group Fees.....................................................................................31
4.12    Other Canadian Fees.........................................................................................32
4.13    Settlement and Support Agreement Releases....................................................32

**ARTICLE 5 CASH POOLS AND RESERVES**................................................................**32**
5.1     Administrative Reserve................................................................................32
5.2     Affected Unsecured Creditor Pool................................................................32
5.3     Unresolved Claims Reserve.........................................................................32
5.4     Bank Accounts, Reserves and Cash Pools Generally ....................................32

**ARTICLE 6 PROVISIONS REGARDING DISTRIBUTIONS, PAYMENTS AND
CURRENCY**....................................................................................................**33**
6.1     Distributions Generally................................................................................33
6.2     Certain Payments and Distributions on Proven Priority Claims.......................33
6.3     Distribution Mechanics for Proven Affected Unsecured Claims .....................34
6.4     Currency Matters .......................................................................................36
6.5     Distributions After Unresolved Affected Unsecured Claims and Post-Filing Claims
        Resolved...................................................................................................37
6.6     Allocation of Distributions ..........................................................................37
6.7     Treatment of Undeliverable Distributions .....................................................37
6.8     Withholding Rights.....................................................................................38
6.9     Cancellation of Certificates and Notes, etc...................................................38
6.10    Calculations...............................................................................................39
6.11    Final Distribution .......................................................................................39

**ARTICLE 7 RELEASES** ......................................................................................**39**
7.1     Plan Releases ............................................................................................39
7.2     Insured Claims ..........................................................................................40
7.3     Injunctions................................................................................................41
7.4     Indenture Trustee Release ...........................................................................41

**ARTICLE 8 COURT SANCTION**.........................................................................**41**
8.1     Application for Sanction Order.....................................................................41
8.2     Sanction Order ..........................................................................................42

**ARTICLE 9 PLAN CONDITIONS PRECEDENT AND IMPLEMENTATION** .................**44**
9.1     Canadian and U.S. Plans Effectiveness ........................................................44
9.2     Conditions Precedent to Plan Effectiveness ...................................................45
9.3     Conditions Precedent to Plan Implementation................................................45
9.4     Monitor's Certificate – Plan Effectiveness ....................................................46
9.5     Monitor's Certificate – Plan Implementation .................................................46
9.6     Waiver of Plan Effective Conditions and Plan Implementation Conditions ...................46

**ARTICLE 10 CONTINUING ADMINISTRATION AND WIND-DOWN OF THE
CANADIAN ESTATE AND RELATED MATTERS** ...................................................**46**
10.1    Continuing Administration and Wind Down of the Canadian Estate................................46
10.2    Stakeholder Advisor Fee Arrangements .......................................................47

**ARTICLE 11 GENERAL**......................................................................................**48**
11.1    Binding Effect...........................................................................................48
11.2    Deeming Provisions ...................................................................................48
11.3    Non-Consummation/Termination of Settlement and Support Agreement .......................48

11.4    Modification of the Plan ...........................................................................................49
11.5    Paramountcy ...............................................................................................................50
11.6    Severability of Plan Provisions ..................................................................................50
11.7    Force Majeure .............................................................................................................50
11.8    Responsibilities of the Monitor and Protections of the Monitor .........................51
11.9    Different Capacities ....................................................................................................51
11.10   Notices ........................................................................................................................51
11.11   Further Assurances.....................................................................................................52
11.12   Subsequent Bankruptcy, etc.......................................................................................52
11.13   Cross-Border Protocol and Cross-Border Claims Protocol .................................53
11.14   Language......................................................................................................................53
11.15   Acts to Occur on Next Business Day.........................................................................53

## SCHEDULES AND EXHIBITS

| | |
|---|---|
| Schedule "A" | Escrow Agreements |
| Schedule "B" | Crossover Bondholder Claims |
| Schedule "C" | Intercompany Claims - Proven Affected Unsecured Claims |
| Schedule "D" | Exchange Rates from Claims Procedure Order |
| Exhibit "A" | Settlement and Support Agreement |

## PLAN OF COMPROMISE AND ARRANGEMENT

**WHEREAS** Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Global Corporation, Nortel Networks International Corporation, Nortel Networks Technology Corporation, Nortel Communications Inc., Architel Systems Corporation and Northern Telecom Canada Limited (each, a "**Canadian Debtor**" and collectively, the "**Canadian Debtors**" ) are debtor companies under the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended to and including January 14, 2009 (the "**CCAA**");

**AND WHEREAS** Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Global Corporation, Nortel Networks International Corporation and Nortel Networks Technology Corporation obtained an Initial Order (as amended and restated from time to time, the "**Initial Order**") of the Ontario Superior Court of Justice (the "**CCAA Court**") under the CCAA dated January 14, 2009;

**AND WHEREAS** Nortel Communications Inc., Architel Systems Corporation and Northern Telecom Canada Limited (collectively, the "**New Applicants**") obtained an Order of the CCAA Court dated March 18, 2016, that, among other things, deemed each of the New Applicants to be an "Applicant" (as defined in the Initial Order) and entitled to all of the rights, benefits and protections granted by, and otherwise subject to, among other Orders, the Initial Order as if it were an Applicant thereunder;

**AND WHEREAS** on October 12, 2016, the Canadian Debtors, the Monitor, the U.S. Debtors, the EMEA Debtors and the other Settlement Parties entered into the Settlement and Support Agreement, which agreement, subject to its effectiveness, fully and finally resolves the Allocation Dispute and certain claims and other disputes amongst the Settlement Parties;

**AND WHEREAS** the Settlement and Support Agreement contemplates coordinated plan processes in the CCAA Proceedings and the U.S. Proceedings as a means of implementing and effectuating the Settlement and Support Agreement;

**AND WHEREAS** the Canadian Debtors hereby propose and present this plan of compromise and arrangement to the Affected Unsecured Creditors Class (as defined below) under and pursuant to the CCAA.

## ARTICLE 1
## INTERPRETATION

### 1.1    Definitions

In the Plan, unless otherwise stated or unless the subject matter or context otherwise requires:

"**1988 Bondholder**" means a holder of one or more 1988 Bonds, including any holder of a beneficial interest in 1988 Bonds.

"**1988 Bondholder Claim**" means a Claim by a 1988 Bondholder in respect of the 1988 Bonds, including as asserted by the 1988 Bonds Trustee.

- 2 -

"**1988 Bonds**" means the 6.875% Senior Notes due 2023, governed by the 1988 Bonds Indenture, issued by Northern Telecom Limited (now NNL).

"**1988 Bonds Indenture**" means that certain Indenture dated November 30, 1988, made by Northern Telecom Limited (now NNL), as issuer, and The Toronto-Dominion Bank Trust Company, as trustee.

"**1988 Bonds Trustee**" means Wilmington Trust, National Association in its capacity as replacement trustee under the 1988 Bonds Indenture.

"**2006 Bonds**" means the Floating Rate Senior Notes due 2011, the 10.125% Senior Notes due 2013 and the 10.750% Senior Notes due 2016, governed by the Indenture dated as of July 5, 2006, as supplemented by the First Supplemental Indenture dated as of July 5, 2006, the Second Supplemental Indenture dated as of May 1, 2007, and the Third Supplemental Indenture dated as of May 28, 2008, issued by NNL and guaranteed by NNC and NNI.

"**2007 Bonds**" means the 1.75% Convertible Senior Notes due 2012 and the 2.125% Convertible Senior Notes due 2014, governed by the Indenture dated as of March 28, 2007,  issued by NNC and guaranteed by NNL and NNI.

"**Additional Bondholder Fee Amount**" has the meaning ascribed thereto in Section 4.11.

"**Administration Charge**" has the meaning ascribed thereto in the Initial Order.

"**Administrative Reserve**" means a reserve of Available Cash in an amount to be determined by the Monitor to be held by the Canadian Estate for the purpose of maintaining security for obligations secured by the Administration Charge and funding the ongoing obligations, administration and wind-down of the Canadian Estate and the implementation of this Plan, including the professional fees and expenses of the Monitor and its counsel.

"**Affected Claim**" means (i) any Claim that is not an Unaffected Claim, and (ii) any Director/Officer Claim that is a Released Claim and, for greater certainty, includes any Affected Unsecured Claim, Intercompany Claim (excluding any Canadian Intercompany Claim and the Remaining Revolver Claim) or Equity Claim.

"**Affected Creditor**" means any Creditor with an Affected Claim, but only with respect to and to the extent of such Affected Claim.

"**Affected Unsecured Claim**" means any Affected Claim that is not a Director/Officer Claim or Equity Claim.

"**Affected Unsecured Creditor**" means any holder of an Affected Unsecured Claim, but only with respect to and to the extent of such Affected Unsecured Claim.

"**Affected Unsecured Creditor Pool**" means, on a Distribution Date, the amount of Available Cash, less: (i) the Unresolved Claims Reserve; (ii) the Administrative Reserve; and (iii) the amounts necessary to satisfy any outstanding Proven Priority Claims.

"**Affected Unsecured Creditors Class**" means the class of Creditors comprised solely of Affected Unsecured Creditors grouped for the purposes of considering and voting on this Plan and receiving distributions hereunder.

"**Allocation Dispute**" means that certain litigation before the Canadian Court and the U.S. Court in which the allocation of the Sale Proceeds is at issue.

"**Applicable FX Rate**" means the spot or blended rate (as applicable, which blended rate shall take into account the amounts converted and the rates at which such conversion occurred) at which Sale Proceeds are or have been converted from U.S. dollars to Canadian dollars as contemplated by Section 7(b) of the Settlement and Support Agreement.

"**Applicable Law**" means any law, statute, order, decree, consent decree, judgment, rule, regulation, ordinance or other pronouncement having the effect of law whether in Canada, the United States or any other country, or any domestic or foreign state, county, province, city or other political subdivision or of any Governmental Entity.

"**Allowed Claims**" shall have the meaning given to such term in the U.S. Plans.

"**Applicant**" has the meaning ascribed thereto in the Initial Order.

"**Available Cash**" means, from time to time, all Cash of the Canadian Estate, including but not limited to the Canadian Debtors' cash on hand and amounts released to the Canadian Estate as contemplated pursuant to Section 4.2 and Section 4.3 of this Plan, and includes any Cash received by the Canadian Estate from the sale or other disposition or monetization of any residual assets or any other Cash received by the Canadian Estate from time to time.

"**Bankruptcy Proceeding**" means any bankruptcy or receivership proceeding pursuant to the BIA, whether commenced by application for a bankruptcy or receivership order or by an assignment in bankruptcy made or deemed to be made, and shall include any proceeding in which a receiver is appointed in respect of a Person or its assets, including pursuant to provincial law.

"**BIA**" means the *Bankruptcy and Insolvency Act* (R.S.C. 1985, c. B-3, as amended) or any successor legislation thereto.

"**Bondholder Advisor Fee Letter**" means that certain fee letter dated June 23, 2011, among certain of the Canadian Debtors, Bennett Jones LLP, Milbank, Tweed, Hadley & McCloy LLP and FTI Capital Advisors, LLC and shall include, for the avoidance of doubt, the "2009 Engagement Letter" as such term is defined in the fee letter.

"**Bondholder Fee Amount**" has the meaning ascribed thereto in Section 4.11.

"**Bondholder Group**" means the ad hoc group of bondholders that hold notes issued and/or guaranteed by NNC, NNL, NNI and NNCC that has been organized and is participating in the CCAA Proceedings and the U.S. Proceedings, as such group may have been and may be constituted from time to time.

- 4 -

"**Business Day**" means a day, other than Saturday, Sunday or a statutory holiday, on which banks are generally open for business in both Toronto, Ontario, Canada and New York, New York, USA.

"**CAD Claims**" has the meaning ascribed thereto in Section 6.4(c).

"**Canada Only Sale Proceeds Orders**" means the following orders of the CCAA Court: (i) Approval and Vesting Order (Strandherd Lands) dated November 19, 2009; (ii) Approval and Vesting Order (Nortel-LGE Joint Venture) dated May 3, 2010; (iii) Approval and Vesting Order (Relay) dated June 29, 2010; (iv) Approval and Vesting Order (IP Address Sale – Salesforce.com, Inc.) dated February 17, 2012; (v) Approval and Vesting Order (IP Address Sale) dated February 17, 2012; (vi) Approval and Vesting Order (IP Address Sale – Bell Aliant Regional Communications Limited Partnership) dated April 4, 2012; (vii) Approval and Vesting Order (IP Address Sale – Vodafone Americas Inc.) dated May 7, 2012; (viii) Approval and Vesting Order (IP Address Sale – Beyond Excellent Technology Ltd.) dated September 9, 2014; (ix) Approval and Vesting Order (IP Address Sale – Charter Communications Operating, LLC) dated December 17, 2014; (x) Approval and Vesting Order (IP Address Sale – Zhejiang Tmall Technology Co., Ltd. and Alibaba Cloud Computing Limited) dated February 3, 2015; (xi) Approval and Vesting Order (IP Address Sale – Alibaba.com LLC) dated April 16, 2015; (xii) Approval and Vesting Order (IP Address Sale – Frontier Communications) dated August 5, 2015; (xiii) Approval and Vesting Order (IP Address Sale – Suddenlink Communications) dated August 5, 2015; (xiv) Approval and Vesting Order (IP Address Sale – Reliance Jio Infocomm Pte Ltd.) dated January 6, 2016; (xv) Approval and Vesting Order (IP Address Sale – Zhejiang Alibaba Cloud Computing Limited and Alibaba.com LLC) dated February 1, 2016, and any other order of the CCAA Court pursuant to which proceeds of sale arising solely from the assets of the Canadian Debtors are held (but excluding, for the avoidance of doubt, the orders of the CCAA Court approving the Escrow Agreements).

"**Canadian Allocation**" means the Sale Proceeds to be received by the Canadian Estate pursuant to Section 2 of the Settlement and Support Agreement as described in Section 4.2(c)(i) of this Plan.

"**Canadian Court**" means the CCAA Court, the Ontario Court of Appeal, the Supreme Court of Canada or any other court of competent jurisdiction overseeing the CCAA Proceedings or any Bankruptcy Proceeding in respect of any of the Canadian Debtors or their assets (including any appeals) from time to time.

"**Canadian Debtors**" has the meaning ascribed thereto in the recitals to this Plan.

"**Canadian Dollar Escrow Account**" means the account with the Canadian Escrow Agent established pursuant to the Canadian Escrow Agreement to hold the Canadian dollar denominated Cash resulting from the conversion of up to $1,200,000,000 of Sale Proceeds into Canadian dollars as contemplated in the Settlement and Support Agreement.

"**Canadian Escrow Agent**" means Royal Trust Corporation of Canada in its capacity as Canadian distribution agent under the Canadian Escrow Agreement.

- 5 -

"**Canadian Escrow Agreement**" means that certain Canadian distribution escrow agreement dated October 24, 2016, among NNC, NNL, NNI, NNUK, NNSA, certain other Nortel Group entities, the Monitor, the UCC and the Canadian Escrow Agent governing that portion of the Sale Proceeds that has been or will be converted into Canadian dollars as contemplated in the Settlement and Support Agreement.

"**Canadian Escrow Release Order**" means an order issued by the CCAA Court authorizing and directing the Escrow Agents to release the Sale Proceeds from the Escrow Accounts in the manner contemplated by the Settlement and Support Agreement.

"**Canadian Estate**" means the Canadian Debtors as substantively consolidated pursuant to this Plan, the corporate body of which shall be NNL. From and after the Plan Effective Date, references to the Canadian Estate shall be deemed to be references to NNL, and *vice versa*.

"**Canadian Intercompany Claims**" has the meaning ascribed thereto in Section 2.2(f).

"**Canadian Pension Claim**" means any and all Claims arising from or related to deficits and alleged deficits in the Canadian Registered Pension Plans.

"**Canadian Registered Pension Plans**" means: (i) the Managerial Plan; and (ii) the Negotiated Plan.

"**Canadian Tax Act**" means the *Income Tax Act* (Canada) and the Income Tax Regulations, in each case as amended from time to time.

"**Cash**" means cash, certificates of deposit, bank deposits, commercial paper, treasury bills and other cash equivalents.

"**CCAA**" has the meaning ascribed thereto in the recitals to this Plan.

"**CCAA Court**" has the meaning ascribed thereto in the recitals to this Plan.

"**CCAA Proceedings**" means the proceedings commenced by certain of the Canadian Debtors in the CCAA Court under the CCAA on the Filing Date, having Court File Number 09-CL-7950, and shall include the CCAA proceedings of the New Applicants.

"**CCC**" means the ad hoc committee of creditors having claims only against the Canadian Debtors comprised of: the former and disabled Canadian employees of the Canadian Debtors through their court-appointed representatives, Unifor, Morneau Shepell Ltd. as Administrator of the Canadian Registered Pension Plans, the Superintendent of Financial Services of Ontario as Administrator of the Pension Benefits Guarantee Fund and the court-appointed representatives of the current and transferred employees of the Canadian Debtors.

"**CFSA**" means the Final Canadian Funding and Settlement Agreement among, *inter alia*, certain of the Canadian Debtors, the Monitor and certain of the U.S. Debtors dated December 23, 2009, and approved by the CCAA Court by Order dated January 21, 2010.

"**CFSA Approval Order**" means the Order of the CCAA Court dated January 21, 2010.

- 6 -

"**Chapter 15 Proceedings**" means the foreign recognition proceedings of the Canadian Debtors pursuant to Chapter 15 of the United States Bankruptcy Code pending before the U.S. Bankruptcy Court (Case No. 09-10164(KG)).

"**Charges**" means the Administration Charge, the Excess Funding Charge, the Directors' Charge, the Inter-Company Charge, the Shortfall Charge, the Payments Charge and the Nortel Special Incentive Plan Charge, each as defined in the Initial Order.

"**Claim**" means:

(a)     any right of any Person against the Canadian Debtors, or any of them, in connection with any indebtedness, liability or obligation of any kind of the Canadian Debtors, or any of them, whether liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, unsecured, perfected, unperfected, present, future, known or unknown, by guarantee, surety or otherwise and whether or not such right is executory or anticipatory in nature, including the right or ability of any Person to advance a claim for contribution or indemnity or otherwise with respect to any matter, action, cause or chose in action, whether existing at present or commenced in the future, which indebtedness, liability or obligation (A) is based in whole or in part on facts existing prior to the Filing Date, (B) relates to a time period prior to the Filing Date, or (C) would have been a claim provable in bankruptcy had the Canadian Debtors become bankrupt on the Filing Date; and

(b)     any indebtedness, liability or obligation of any kind arising out of the restructuring, termination, repudiation or disclaimer of any lease, contract, or other agreement or obligation on or after the Filing Date,

and shall include any "Claim", "EMEA Claim" or "Intercompany Claim" (as such terms are defined in the Claims Orders, in each case without any reference to the exclusion of any claims in such definitions), provided that the definition of Claim herein shall not include a Director/Officer Claim.

"**Claims Orders**" means, as the context requires, any or all of the following orders of the CCAA Court: (i) the Claims Procedure Order; (ii) the Claims Resolution Order dated September 16, 2010; (iii) the Order Approving Cross-Border Claims Protocol dated September 16, 2010; (iv) the Compensation Claims Procedure Order; (v) the EMEA Claims Procedure Order dated January 14, 2011; (vi) the Intercompany Claims Procedure Order dated July 27, 2012; (vii) paragraphs 12 to 18 of the Order (Stay Extension and Various Other Matters – September 2016) dated September 29, 2016; and (viii) the Post-Filing Claims Bar Date Order.

"**Claims Procedure Order**" means the Claims Procedure Order of the CCAA Court dated July 30, 2009, as amended and restated on October 7, 2009.

"**Compensation Claims Procedure Order**" means the Compensation Claims Procedure Order of the CCAA Court dated October 6, 2011, including the Compensation Claims Methodology Order of the CCAA Court dated October 6, 2011.

"**Compensation Creditors**" means Creditors who are holders of Compensation Claims (as such term is defined in the Compensation Claims Procedure Order).

"**Contingent Additional NNUK Claim**" has the meaning ascribed thereto in Section 4.8.

"**Court Appointed Representative Counsel**" shall mean Koskie Minsky LLP, Shibley Righton LLP and Nelligan O'Brien Payne LLP in their capacity as CCAA Court appointed representative counsel to certain Compensation Creditors pursuant to orders of the CCAA Court dated May 27, 2009 (former employees), July 22, 2009 (current employees) and July 30, 2009 (long term disability beneficiaries), and shall include any financial advisor retained by such counsel.

"**Creditor**" means any Person having a Claim, but only with respect to and to the extent of such Claim, including the transferee or assignee of a transferred Claim that is recognized as a Creditor in accordance with the Claims Orders or a trustee, executor, liquidator, receiver, receiver and manager, or other Person acting on behalf of or through such Person, and shall include the Former Employee Priority Creditors.

"**Creditor's Maximum**" has the meaning ascribed thereto in Section 3.5(b).

"**Crossover Bondholder**" means a holder of one or more Crossover Bonds, including any holder of a beneficial interest in Crossover Bonds.

"**Crossover Bondholder Claim**" means a Claim by a Crossover Bondholder in respect of the Crossover Bonds, including as asserted by the Crossover Bonds Trustee.

"**Crossover Bonds**" means the 2006 Bonds and the 2007 Bonds.

"**Crossover Bonds Indentures**" means: (i) the Indenture dated as of March 28, 2007, by NNC as issuer and NNL and NNI as guarantors, governing the 2007 Bonds; (ii) the Indenture dated as of July 5, 2006, as supplemented by the First Supplemental Indenture dated as of July 5, 2006, the Second Supplemental Indenture dated as of May 1, 2007, and the Third Supplemental Indenture dated as of May 28, 2008, by NNL as issuer and NNC and NNI as guarantors, governing the 2006 Bonds, in each case with the Crossover Bonds Trustee as trustee.

"**Crossover Bonds Trustee**" means The Bank of New York Mellon in its capacity as indenture trustee under the Crossover Bonds Indentures.

"**Crossover Claim**" means a claim arising out of a debt or other obligation of one or more of the U.S. Debtors that is guaranteed or indemnified by one or more of the Canadian Debtors, or a debt or other obligation of one or more of the Canadian Debtors that is guaranteed or indemnified by one or more of the U.S. Debtors, including the Crossover Bondholder Claims, the NNCC Bondholder Claims and the claims of Export Development Canada against the U.S. Debtors and the Canadian Debtors, but excluding, in relation to the Canadian Debtors, any obligation of a Canadian Debtor guaranteed by another Canadian Debtor.

"**Cross-Border Claims Protocol**" means the cross-border claims protocol attached as Schedule "A" to the Order Approving Cross-Border Claims Protocol of the CCAA Court dated September 16, 2010.

"**Cross-Border Protocol**" means the Cross-Border Insolvency Protocol originally approved by the CCAA Court and the U.S. Court on or about January 14, 2009, as the same has been amended from time to time as approved by the CCAA Court and the U.S. Bankruptcy Court.

"**Debtor estate**" shall mean either the Canadian Estate or the U.S. Debtors (or any of them), as the context requires.

"**Determination Date**" has the meaning ascribed thereto in Section 6.1.

"**Directors**" means all former directors (or their estates) of the Canadian Debtors, in such capacity, and "**Director**" means any one of them.

"**Directors' Charge**" has the meaning ascribed thereto in the Initial Order.

"**Director Indemnity Claim**" has the meaning ascribed thereto in Section 3.10(c).

"**Director/Officer Claim**" means any right or claim of any Person howsoever arising against one or more of the Directors or Officers that relates to a Claim for which any Director or Officer of a Canadian Debtor is alleged to be by statute or otherwise by law liable to pay in his or her capacity as a Director or Officer, whether or not such right or claim is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, unsecured, perfected, unperfected, present, future, known, or unknown, by guarantee, surety or otherwise, and whether or not such right is executory or anticipatory in nature, including the right or ability of any Person to advance a claim for contribution or indemnity or otherwise with respect to any claim, matter, action, cause or chose in action, whether existing at present or commenced in the future, and shall include any "Director/Officer Claim" (as such term is defined in the Claims Procedure Order without any reference to the exclusion of any claims in such definition).

"**Distribution Date**" means the date or dates from time to time set in accordance with the provisions of the Plan to effect distributions in respect of the Proven Affected Unsecured Claims, and includes the Initial Distribution Date.

"**Distribution Record Date**" has the meaning ascribed thereto in Section 6.3(b).

"**Duplicative Claims**" has the meaning ascribed thereto in Section 2.2(d).

"**EI Act**" means the *Employment Insurance Act* (S.C. 1996, c. 23, as amended).

"**EI Confirmation**" means, in respect of a Compensation Creditor, confirmation from Employment and Social Development Canada of the amount, if any, owing by such Compensation Creditor pursuant to Section 45 of the EI Act.

"**EMEA Claims Settlement Agreement**" means the Agreement Settling EMEA Canadian Claims and Related Claims dated July 9, 2014, and approved by Order (Approving Agreement Settling EMEA Canadian Claims and Related Claims) of the CCAA Court dated July 16 , 2014.

"**EMEA Debtors**" means, collectively, NNUK (in administration), Nortel Networks (Ireland) Limited  (in administration), Nortel Networks NV (in administration), Nortel Networks SpA (in

administration), Nortel Networks BV (in administration), Nortel Networks Polska Sp. z.o.o. (in administration), Nortel Networks Hispania SA (in administration), Nortel Networks (Austria) GmbH (in administration), Nortel Networks s.r.o. (in administration), Nortel Networks Engineering Service Kft (in administration), Nortel Networks Portugal SA (in administration), Nortel Networks Slovensko, s.r.o. (in administration), Nortel Networks Romania SRL (in administration), Nortel GmbH (in administration), Nortel Networks Oy (in administration), Nortel Networks AB (in administration), Nortel Networks International Finance & Holding BV (in administration), Nortel Networks France S.A.S. (in administration) and, except where expressly excluded, includes NNSA.

"**EMEA Non-Filed Entities**" means, collectively, Nortel Networks AS, Nortel Networks AG, Nortel Networks South Africa (Pty) Limited, Nortel Networks (Northern Ireland) Limited and Nortel Networks Optical Components Limited.

"**EMEA Proceedings**" means, collectively, the U.K. administration proceedings that were commenced before the U.K. Court on or about January 14, 2009 in respect of the EMEA Debtors.

"**Encumbrance**" means any charge, mortgage, lien, pledge, claim, restriction, hypothec, adverse interest, security interest or other encumbrance whether created or arising by agreement, statute or otherwise at law, attaching to property, interests or rights and shall be construed in the widest possible terms and principles known under the law applicable to such property, interests or rights and whether or not they constitute specific or floating charges as those terms are understood under the laws of the Province of Ontario.

"**Equity Claim**" means a Claim that is in respect of an Equity Interest, including a claim for, among others: (a) a dividend or similar payment, (b) a return of capital, (c) a redemption or retraction obligation, (d) a monetary loss resulting from the ownership, purchase or sale of an Equity Interest or from the rescission, or, in Quebec, the annulment, of a purchase or sale of an Equity Interest, or (e) contribution or indemnity in respect of a claim referred to in any of the foregoing (a) to (d).

"**Equity Claimant**" means any Person with an Equity Claim or holding an Equity Interest, but only in such capacity.

"**Equity Interest**" means a share of a Canadian Debtor, or a warrant or option or another right to acquire a share in a Canadian Debtor, including the common shares of NNC and the preferred shares of NNL.

"**Escrow Accounts**" means the escrow accounts established pursuant to the Escrow Agreements to hold the Sale Proceeds, including the Canadian Dollar Escrow Account and the Iceberg Escrow Account.

"**Escrow Agents**" means JPMorgan Chase Bank, N.A., the Canadian Escrow Agent and any other "Escrow Agent" as defined in the Settlement and Support Agreement.

"**Escrow Agreements**" means the various court-approved escrow agreements listed in Schedule "A" pursuant to which the Sale Proceeds are held by the Escrow Agents, and shall include the

- 10 -

Canadian Escrow Agreement and any other "Escrow Agreement" as such term is defined in the Settlement and Support Agreement.

"**Filing Date**" means January 14, 2009, provided that in the case of the New Applicants it shall be construed so as to mean March 18, 2016.

"**Final Distribution**" has the meaning ascribed thereto in Section 6.11.

"**Final Distribution Certificate**" means a certificate of the Monitor to be posted by the Monitor on the Monitor's Website indicating that the Canadian Estate intends to make a Final Distribution, a copy of which shall be served on the service list in the CCAA Proceedings and filed with the CCAA Court.

"**Final Order**" means (a) with respect to an order of a Canadian Court, an order:  (i) as to which no appeal, leave to appeal, notice of appeal, motion to amend or make additional findings of fact, motion to alter or amend judgment, motion for rehearing or motion for new trial has been timely filed (in cases in which there is a date by which such filing is required to occur, it being understood that with respect to an order issued by the CCAA Court, the time period for seeking leave to appeal shall be deemed to have elapsed on the date that is 22 days after the rendering of such order unless a motion has been made to extend such time period) or, if any of the foregoing has been timely filed, it has been disposed of in a manner that upholds and affirms the subject order in all material respects without the possibility for further appeal thereon; (ii) in respect of which the time period for instituting or filing an appeal, leave to appeal, motion for rehearing or motion for new trial shall have expired (in cases in which such time period is capable of expiring, it being understood that with respect to an order issued by the CCAA Court, the time period for seeking leave to appeal shall be deemed to have elapsed on the date that is 22 days after the rendering of such order unless a motion has been made to extend such time period); and (iii) as to which no stay is in effect; or (b) with respect to an order of a U.S. Court, an order that has not been reversed, stayed, superseded or vacated or, to the extent it has been stayed such stay shall have expired.

"**Force Majeure**" means any circumstance or act beyond the reasonable control of the Canadian Estate or the Monitor, including an intervening act of God or public enemy, war, terrorist act, blockade, civil commotion, fire, flood, tidal wave, earthquake, epidemic, quarantine restriction, a stop-work order or injunction issued by a Governmental Entity having jurisdiction, embargo, changes in laws or regulations by a Governmental Entity that have the effect of prohibiting or suspending the performance of any obligation pursuant to this Plan, any strike or labour dispute, all or any of which delays the performance of any obligation created by this Plan beyond its scheduled time.

"**Force Majeure Event**" has the meaning ascribed thereto in Section 11.7.

"**Foreign Related Claim**" has the meaning ascribed thereto in Section 3.6.

"**Former Employee Priority Creditors**" means the former employees of the Canadian Debtors who are entitled to a CA$3,000 priority claim in these CCAA Proceedings in lieu of receiving their Termination Payment pursuant to the Order (Stay Extension and Various Other Matters – March 2016) of the CCAA Court dated March 18, 2016.

"**French Court**" means the Versailles Commercial Court, any court hearing appeals therefrom and any other court of competent jurisdiction overseeing the French Secondary Proceeding from time to time.

"**French Liquidator**" means Maître Cosme Rogeau in his capacity as Liquidator for NNSA under the French Secondary Proceeding.

"**French Secondary Proceeding**" means the secondary insolvency proceedings that were commenced before the French Court on May 28, 2009, in respect of NNSA.

"**Governmental Entity**" means any government, regulatory authority, governmental department, agency, commission, bureau, official, minister, Crown corporation, court, board, tribunal or dispute settlement panel or other law, rule or regulation-making organization or entity: (a) having or purporting to have jurisdiction on behalf of any nation, province, territory or state or any other geographic or political subdivision of any of them; or (b) exercising, or entitled or purporting to exercise any administrative, executive, judicial, legislative, policy, regulatory or taxing authority or power.

"**Hardship Process**" means the former employee hardship application process that was established pursuant to Order of the CCAA Court dated July 30, 2009, as same has been amended and extended from time to time as approved by the CCAA Court.

"**Iceberg**" means the residual intellectual property remaining following the Nortel Group business line sales, which intellectual property was sold to a consortium in July 2011.

"**Iceberg Amendment Fee**" means the $5,000,000 cumulative fee previously agreed by the Canadian Debtors, U.S. Debtors and EMEA Debtors to be funded directly as follows: $2,800,000 to NNI, and $2,200,000 to NNUK, all from the Iceberg Sale Proceeds prior to any other agreed upon allocation of the Sale Proceeds.

"**Iceberg Escrow Account**" means the Escrow Account established to hold the Iceberg Sale Proceeds and the Iceberg Amendment Fee.

"**Iceberg Sale**" means the sale of the Iceberg assets.

"**Iceberg Sale Proceeds**" means that portion of the Sale Proceeds generated from the Iceberg Sale.

"**Indenture Trustee**" means each of the 1988 Bonds Trustee, the Crossover Bonds Trustee and the NNCC Bonds Trustee.

"**Initial Distribution**" means the first distribution to Affected Unsecured Creditors pursuant to Section 6.3.

"**Initial Distribution Date**" means the date on which the Initial Distribution is made, which date shall be a Business Day.

"**Initial Order**" has the meaning ascribed thereto in the recitals to this Plan.

"**Inter-company Charge**" has the meaning ascribed thereto in the Initial Order.

"**Insurance Policy**" means any insurance policy pursuant to which any Canadian Debtor or any Director or Officer is insured.

"**Insured Claim**" means all or that portion of a Claim or a Director/Officer Claim that is insured under an Insurance Policy, but solely to the extent that such Claim or Director/Officer Claim, or portion thereof, is so insured, and only as against such insurance.

"**Intercompany Claims**" means a Claim by a Nortel Group entity (including by any administrator, liquidator, receiver, trustee, office holder or similar official appointed in respect thereof) against a Canadian Debtor, including  those unsecured intercompany claims against the Canadian Debtors set out on  Schedule "C" hereto.

"**Joint Administrators**" means Alan Robert Bloom, Christopher John Wilkinson Hill, Alan Michael Hudson and Stephen John Harris, as the administrators of all EMEA Debtors except Nortel Networks (Ireland) Limited (in administration), and Alan Robert Bloom and David Martin Hughes as administrators for Nortel Networks (Ireland) Limited, and in the case of NNSA shall include the NNSA Conflicts Administrator.

"**Joint Liquidators**" means Richard Barker and Joseph Luke Charleton as joint liquidators of Nortel Networks (Northern Ireland) Limited (in liquidation) and Richard Barker and Samantha Keen as joint liquidators of Nortel Networks Optical Components Limited (in liquidation).

"**M&A Cost Reimbursement**" means the reimbursement of certain costs related to fees and expenses incurred in connection with the sale of assets which generated the Sale Proceeds.

"**Managerial Plan**" means the Nortel Networks Limited Managerial and Non-Negotiated Pension Plan (Registration No. 0342048).

"**Meeting**" means the meeting of the Affected Unsecured Creditors Class to be held on the Meeting Date called pursuant to the Meeting Order for the purpose of considering and voting on the Plan pursuant to the CCAA, and includes any adjournment, postponement or other rescheduling of such meeting in accordance with the Meeting Order.

"**Meeting Date**" means the date on which the Meeting is held in accordance with the Meeting Order.

 "**Meeting Order**" means the Plan Filing and Meeting Order of the CCAA Court to be requested that, among other things, sets the date for the Meeting, as same may be amended, restated or varied from time to time.

"**Monitor**" means Ernst & Young Inc. in its capacity as court-appointed monitor in the CCAA Proceedings in respect of the Canadian Debtors.

"**Monitor Related Parties**" has the meaning ascribed thereto in Section 11.8.

"**Monitor's Powers Orders**" means the following orders of the CCAA Court: (i) the Initial Order; (ii) the Claims Orders; (iii) the Order dated August 14, 2009; (iv) the Order (Monitor's

- 13 -

Expansion of Power Order #2) dated October 3, 2014; (v) the Order (New Applicants) dated March 18, 2016; and (vi) the Meeting Order.

"**Monitor's Website**" means the webpage maintained by the Monitor in respect of the CCAA Proceedings, which address is currently: www.ey.com/ca/nortel.

"**Negotiated Plan**" means the Nortel Networks Negotiated Pension Plan (Registration No. 08587766).

"**New Applicants**" has the meaning ascribed thereto in the recitals to this Plan.

"**NNC**" means Nortel Networks Corporation, a Canadian Debtor.

"**NNCC**" means Nortel Networks Capital Corporation, a U.S. Debtor.

"**NNCC Bondholder**" means a holder of one or more NNCC Bonds, including any holder of a beneficial interest in NNCC Bonds.

"**NNCC Bondholder Claim**" means a Claim of an NNCC Bondholder in respect of the NNCC Bonds, including as asserted by the NNCC Bonds Trustee.

"**NNCC Bondholder Signatories**" means the holders of NNCC Bonds that executed the Settlement and Support Agreement as parties thereto.

"**NNCC Bonds**" means the 7.875% Notes due 2026 governed by the NNCC Bonds Indenture, issued by Northern Telecom Capital Corporation (now NNCC) and guaranteed by Northern Telecom Limited (now NNL).

"**NNCC Bonds Indenture**" means the Indenture dated as of February 15, 1996, by Northern Telecom Capital Corporation (now NNCC) as issuer, Northern Telecom Limited (now NNL) as guarantor and The Bank of New York, as trustee, governing the NNCC Bonds.

"**NNCC Bonds Trustee**" means Law Debenture Trust Company of New York in its capacity as replacement trustee under the NNCC Bonds Indenture.

"**NNI**" means Nortel Networks Inc., a U.S. Debtor.

"**NNI Claim**" has the meaning ascribed thereto in Section 4.9.

"**NNL**" means Nortel Networks Limited, a Canadian Debtor.

"**NNSA**" means Nortel Networks S.A., an EMEA Debtor.

"**NNSA Conflicts Administrator**" means Stephen Jonathan Taylor of Isonomy Limited as Conflicts Administrator solely in relation to NNSA.

"**NNUK**" means Nortel Networks UK Limited, an EMEA Debtor.

"**Non-Released Claims**" has the meaning ascribed thereto in Section 7.1(b).

"**Nortel Group**" means, collectively, NNC and all of its present and former direct and indirect subsidiaries.

"**Officers**" means all former officers (or their estates) of the Canadian Debtors, in such capacity, and "**Officer**" means any one of them.

"**Order**" means any order of the Canadian Court made in connection with the CCAA Proceedings.

"**Other Canadian Debtors**" means the Canadian Debtors other than NNL.

"**Participating Creditors**" has the meaning ascribed thereto in the Settlement and Support Agreement.

"**Person**" means any individual, firm, corporation, limited or unlimited liability company, general or limited partnership, association, trust, unincorporated organization, union, joint venture, government or any agency, officer or instrumentality thereof or any other entity.

"**Personnel Files Agreement**" means that certain Agreement re: Hard Copy Personnel Files dated December 3, 2015, among certain of the Canadian Debtors, the Monitor, certain of the U.S. Debtors and Morneau Shepell Ltd. in its capacity as administrator of the Canadian Registered Pension Plans and not in its personal capacity.

"**Plan**" means this Plan of Compromise and Arrangement filed by the Canadian Debtors under the CCAA, as it may be amended, supplemented or restated from time to time in accordance with the terms hereof.

"**Plan Certificates**" has the meaning ascribed to such term in Section 9.1.

"**Plan Documents**" has the meaning ascribed thereto in Section 11.14.

"**Plan Effectiveness Certificate**" has the meaning ascribed thereto in Section 9.4

"**Plan Effective Conditions**" has the meaning ascribed thereto in Section 9.2.

"**Plan Effective Date**" means the date which is the first Business Day on which the Plan Effective Conditions have been satisfied or waived in accordance with the terms of this Plan.

"**Plan Implementation Certificate**" has the meaning ascribed thereto in Section 9.5.

"**Plan Implementation Conditions**" means the conditions set out in Section 9.3.

"**Plan Implementation Date**" means the date which is the first Business Day on which the Plan Implementation Conditions have been satisfied or waived in accordance with the terms of this Plan.

"**Post-Filing Claim**" has the meaning ascribed thereto in the Post-Filing Claims Bar Date Order.

- 15 -

"**Post-Filing Claims Bar Date Order**" means the Order of the CCAA Court to be requested that establishes a claims bar date for Post-Filing Claims and a procedure to resolve any Post-Filing Claims.

"**Post-Filing Date Interest**" means interest or a similar amount on a Claim accruing or relating to the period from and after the Filing Date, and includes (i) a make whole premium, early redemption payment, optional redemption payment, no-call payment or similar amount, and (ii) any interest accruing or relating to the period from and after the Filing Date that purports to be included as a component of a liquidated damages or similar provision under an agreement.

"**PPF**" means the Board of the Pension Protection Fund, a statutory corporation established under the provisions of the Pensions Act 2004 (U.K.), whose principal place of business is Renaissance, 12 Dingwall Road, Croydon, United Kingdom, CRO 2NA.

"**Proof of Claim**" has the meaning ascribed thereto in the Claims Orders.

"**Pro-Rata Share**" means, as at any Distribution Date with respect to an Affected Unsecured Creditor with a Proven Affected Unsecured Claim, the product of (A/B) x C where:

> A = the Proven Affected Unsecured Claim of such Affected Unsecured Creditor stated in U.S. dollars (with all non-U.S. dollar denominated Proven Affected Unsecured Claims, or portions thereof, being converted to U.S. dollars in the manner specified in Section 6.4(a));

> B = the total of all Proven Affected Unsecured Claims stated in U.S. dollars (with all non-U.S. dollar denominated Proven Affected Unsecured Claims, or portions thereof, being converted to U.S. dollars in the manner specified in Section 6.4(a)); and

> C = the total amount of Cash in the Affected Unsecured Creditor Pool stated in U.S. dollars (with all Canadian dollar denominated Cash being valued in U.S. dollars in the manner specified in Section 6.4(b)),

> provided that distributions on CAD Claims shall be paid in Canadian dollars, with the amount of such distribution in U.S. dollars being converted to Canadian dollars at the Applicable FX Rate, all as contemplated in Section 6.4(c).

"**Proven Affected Unsecured Claim**" means any Affected Unsecured Claim or portion thereof that has been finally determined to be a "Proven Claim" (as that term is defined in the Claims Orders) for distribution purposes, and includes the Claims referenced in Sections 4.4 through 4.10 hereof (excluding, for the avoidance of doubt, the Remaining Revolver Claim and the Canadian Intercompany Claims).

"**Proven NNUK Claim**" has the meaning ascribed thereto in Section 4.8.

"**Proven Priority Claims**" means: (i) the $62,700,000 Remaining Revolver Claim of NNI; (ii) the CA$3,000 (subject to applicable withholdings) payment to each Former Employee Priority Creditor in respect of any entitlement to an outstanding Termination Payment; and (iii) any other Claim or Post-Filing Claim established pursuant to an order of the CCAA Court and allowed as a

- 16 -

proven priority claim against the Canadian Estate entitled to be paid in full, or otherwise entitled to be paid in priority to Proven Affected Unsecured Claims.

"**Records Assistance Side Letter**" means that certain letter agreement re: records assistance dated October 12, 2016 between the Joint Administrators and the Canadian Debtors.

"**Released Claims**" has the meaning ascribed thereto in Section 7.1(a).

"**Released Director/Officer Claim**" means any Director/Officer Claim that is not a Non-Released Claim.

"**Released Party**" and "**Released Parties**" have the meaning ascribed thereto in Section 7.1.

"**Remaining Revolver Claim**" has the meaning ascribed thereto in the CFSA.

"**Required Majority**" means, with respect to the Affected Unsecured Creditors Class, a majority in number of Affected Unsecured Creditors holding Voting Claims representing at least two thirds in value of the Voting Claims of Affected Unsecured Creditors, in each case who are entitled to vote at the Meeting in accordance with the Meeting Order and who are present and voting in person or by proxy on the resolution approving the Plan at the Meeting.

"**Sale Proceeds**" means the remaining sale proceeds generated by the sales of the various Nortel Group business lines and the Iceberg Sale between 2009 and 2011 plus interest accrued thereon, being approximately $7,254,279,269 as at July 31, 2016 (excluding, for the avoidance of doubt, the Iceberg Amendment Fee and the M&A Cost Reimbursement).

"**Sanction Order**" means the Order of the CCAA Court sanctioning and approving this Plan.

"**Settlement and Support Agreement**" means that certain Settlement and Plans Support Agreement  dated as of October 12, 2016 and entered into by and among the Settlement Parties, together with all Annexes thereto, in each case as amended, supplemented or otherwise modified from time to time in accordance with the terms thereof, a copy of which is attached as Exhibit "A" hereto.

"**Settlement and Support Agreement Releases**" means the "Releases" as such term is defined in the Settlement and Support Agreement.

"**Settlement Parties**" means, collectively, the Canadian Debtors, the Monitor, the U.S. Debtors, the EMEA Debtors, the EMEA Non-Filed Entities, the Joint Administrators, the NNSA Conflicts Administrator, the French Liquidator, the Bondholder Group, the members of the CCC, the UCC, the U.K. Pension Trustee, the PPF, the Joint Liquidators and the NNCC Bondholder Signatories.

"**Tax**" or "**Taxes**" means any and all federal, provincial, municipal, local and foreign taxes, assessments, reassessments and other Governmental Entity charges, duties, impositions and liabilities including for greater certainty taxes based upon or measured by reference to income, gross receipts, profits, capital, transfer, land transfer, sales, goods and services, harmonized sales, use, value-added, excise, withholding, business, franchising, property, development, occupancy, employer health, payroll, employment, health, social services, education and social security, all

surtaxes, all customs duties and import and export taxes, all licence, franchise and registration fees and all employment insurance, health insurance and Canada, Quebec and other government pension plan premiums or contributions, together with all interest, penalties, fines and additions with respect to such amounts.

"**Taxing Authorities**" means Her Majesty the Queen in right of Canada, Her Majesty the Queen in right of any province or territory of Canada, the Canada Revenue Agency, any similar revenue or taxing authority of Canada and each and every province or territory of Canada and any political subdivision thereof, the United States Internal Revenue Service, any similar revenue or taxing authority of the United States and each and every state of the United States, and any Canadian, United States or other Governmental Entity exercising taxing authority or power, and "**Taxing Authority**" means any one of the Taxing Authorities.

"**Termination Payments**" has the meaning ascribed thereto in the Amended and Restated Settlement Agreement among, *inter alia*, certain of the Canadian Debtors, the Monitor and the CCAA Court appointed representatives of former employees and certain long term disability beneficiaries of the Canadian Debtors dated March 30, 2010.

"**U.K. Court**" means the High Court of Justice of England and Wales in London, any court hearing appeals therefrom and any other court of competent jurisdiction overseeing the EMEA Proceedings from time to time, including any appeals.

"**U.K. Pension Trustee**" means the Nortel Networks UK Pension Trust Limited as trustee of the Nortel Networks Pension Plan (U.K.).

"**U.S. Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware.

"**U.S. Court**" means any and all of the U.S. Bankruptcy Court, the United States District Court for the District of Delaware, the United States Court of Appeals for the Third Circuit, the United States Supreme Court or any other court of competent jurisdiction overseeing the U.S. Proceedings (including appeals) from time to time.

"**U.S. Debtors**" means, collectively, NNI, NNCC, Nortel Altsystems Inc., Nortel Altsystems International Inc., Xros, Inc., Sonoma Systems, Qtera Corporation, CoreTek, Inc., Nortel Networks Applications Management Solutions Inc., Nortel Networks Optical Components Inc., Nortel Networks HPOCS Inc., Architel Systems (U.S.) Corporation, Nortel Networks International Inc., Northern Telecom International Inc., Nortel Networks Cable Solutions Inc., Nortel Networks (CALA) Inc. and Nortel Networks India International Inc.

"**U.S. Plans**" means the Chapter 11 of the United States Bankruptcy Code plans (including any exhibits, annexes and schedules thereto) for the U.S. Debtors that effectuate the settlement contemplated by the Settlement and Support Agreement, consistent with the terms of the Settlement and Support Agreement, as they may be modified or supplemented in accordance with their terms.

- 18 -

"**U.S. Proceedings**" means, collectively, those insolvency proceedings that were commenced before the U.S. Bankruptcy Court on or after January 14, 2009 in respect of the U.S. Debtors pursuant to Chapter 11 of the United States Bankruptcy Code.

"**UCC**" means the Official Committee of Unsecured Creditors of the U.S. Debtors appointed pursuant to an order entered by the U.S. Bankruptcy Court on January 26, 2009, as the same may be constituted from time to time.

"**UKPI**" means, collectively, the U.K. Pension Trustee and the PPF.

"**Unaffected Claim**" means any:

      (a)      Canadian Intercompany Claim;

      (b)      Insured Claim;

      (c)      Proven Priority Claim;

      (d)      Post-Filing Claim (except to the extent otherwise ordered by the CCAA Court); and

      (e)      any Director/Officer Claim that is not permitted to be compromised pursuant to Section 5.1(2) of the CCAA.

"**Unaffected Creditor**" means a Creditor or other Person who holds an Unaffected Claim, but only in respect of and to the extent of such Unaffected Claim.

"**Unavailable Cash**" means any Cash of the Canadian Debtors that has been identified or described by the Monitor as "Unavailable Cash" in its reports to the CCAA Court.

"**Unresolved Affected Unsecured Claim**" means an Affected Unsecured Claim which on the Initial Distribution Date or any subsequent Distribution Date, in whole or in part: (i) has not been finally determined to be a Proven Affected Unsecured Claim in accordance with the Claims Orders; (ii) is validly disputed in accordance with the Claims Orders; and/or (iii) remains subject to review and/or resolution in accordance with the Claims Orders, including both as to proof and/or quantum.

"**Undeliverable Distribution**" has the meaning ascribed thereto in Section 6.7 hereof.

"**Unresolved Claims Reserve**" means a reserve of Available Cash to be held by the Canadian Estate (in an amount to be calculated by the Monitor on the Initial Distribution Date, and recalculated as at any subsequent Distribution Date) equal to (i) the amount that would have been paid if the full amount of all Unresolved Affected Unsecured Claims had been Proven Affected Unsecured Claims as of such date, plus (ii) the full amount of any unresolved Post-Filing Claims filed in accordance with the Post-Filing Claims Bar Date Order, or, in each case, such lesser amount as may be ordered by the CCAA Court.

"**Voting Claim**" shall have the meaning ascribed to such term in the Meeting Order.

- 19 -

## 1.2    Certain Rules of Interpretation

For the purposes of the Plan:

    (a)    any reference in the Plan to a contract, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions;

    (b)    any reference in the Plan to an Order or an existing document or exhibit filed or to be filed means such Order, document or exhibit as it may have been or may be amended, modified, or supplemented;

    (c)    unless otherwise specified, all references to currency are in U.S. dollars;

    (d)    the division of the Plan into "articles" and "sections" and the insertion of a table of contents are for convenience of reference only and do not affect the construction or interpretation of the Plan, nor are the descriptive headings of "articles" and "sections" intended as complete or accurate descriptions of the content thereof;

    (e)    the use of words in the singular or plural, or with a particular gender, including a definition, shall not limit the scope or exclude the application of any provision of the Plan or a schedule hereto to such Person (or Persons) or circumstances as the context otherwise permits;

    (f)    the words "includes" and "including" and similar terms of inclusion shall not, unless expressly modified by the words "only" or "solely", be construed as terms of limitation, but rather shall mean "includes but is not limited to" and "including but not limited to", so that references to included matters shall be regarded as illustrative without being either characterizing or exhaustive;

    (g)    unless otherwise specified, all references to time herein and in any document issued pursuant hereto mean local time in Toronto, Ontario and any reference to an event occurring on a Business Day shall mean prior to 4:00 p.m. (Toronto time) on such Business Day;

    (h)    unless otherwise specified, time periods within or following which any payment is to be made or act is to be done shall be calculated by excluding the day on which the period commences and including the day on which the period ends and by extending the period to the next succeeding Business Day if the last day of the period is not a Business Day;

    (i)    unless otherwise provided, any reference to a statute or other enactment of parliament or a legislature or Governmental Entity includes all regulations made thereunder, all amendments to or re-enactments of such statute or regulations in force from time to time, and, if applicable, any statute or regulation that supplements or supersedes such statute or regulation; and

- 20 -

(j)    references to a specified "article" or "section" shall, unless something in the subject matter or context is inconsistent therewith, be construed as references to that specified article or section of the Plan, whereas the terms "the Plan", "hereof", "herein", "hereto", "hereunder" and similar expressions shall be deemed to refer generally to the Plan and not to any particular article, section or other portion of the Plan and includes any documents supplemental hereto.

### 1.3    Successors and Assigns

The Plan shall be binding upon and shall enure to the benefit of the heirs, administrators, executors, legal personal representatives, successors and permitted assigns of any Person or party named or referred to in the Plan.

### 1.4    Governing Law and Jurisdiction

The Plan shall be governed by and construed in accordance with the laws of the Province of Ontario and the federal laws of Canada applicable therein. All questions as to the interpretation of or application of the Plan and all proceedings taken in connection with the Plan and its provisions shall be subject to the exclusive jurisdiction of the CCAA Court. For the avoidance of doubt, the CCAA Court shall maintain exclusive jurisdiction over the CCAA Proceedings, including the Plan, following the Plan Effective Date.

### 1.5    Schedules

The following are the Schedules to the Plan, which are incorporated by reference into the Plan and form a part of it:

| | |
|---|---|
| Schedule "A" | Escrow Agreements |
| Schedule "B" | Crossover Bondholder Claims |
| Schedule "C" | Intercompany Claims - Proven Affected Unsecured Claims |
| Schedule "D" | Exchange Rates from Claims Procedure Order |

### ARTICLE 2
### PURPOSE AND EFFECT OF THE PLAN

### 2.1    Purpose

The purpose of the Plan is to:

(a)    effectuate and implement the terms of the Settlement and Support Agreement, including the settlement of the Allocation Dispute and certain other claims, disputes and other matters contemplated therein, the release of the Sale Proceeds to the Canadian Debtors, the U.S. Debtors and the EMEA Debtors as provided for therein, and the payment contemplated pursuant to Section 4(e) of the Settlement and Support Agreement;

- 21 -

(b)    provide for the substantive consolidation of each of the Canadian Debtors into the Canadian Estate on the terms contemplated by this Plan;

(c)    provide for payment in full of the Proven Priority Claims;

(d)    provide for a pro rata distribution or distributions from the Canadian Estate to holders of all Proven Affected Unsecured Claims; and

(e)    effect a release and discharge of all Affected Claims and Released Claims.

### 2.2    Substantive Consolidation of the Canadian Debtors

The Plan fundamentally requires and shall result in the substantive consolidation of all assets of, and Claims against, the Canadian Debtors. As a result of the foregoing (and without limiting the generality of the foregoing provision):

(a)    On the Plan Effective Date: (i) NNL shall become the corporate body through which the transactions and other steps involving the Canadian Estate contemplated by this Plan and the wind-down and continuing administration of the Canadian Estate shall be conducted, it being understood that each Other Canadian Debtor shall maintain its independent corporate form; (ii) all assets and rights of the Other Canadian Debtors (but excluding the Canadian Intercompany Claims) shall vest in NNL pursuant to the Sanction Order, and NNL shall be authorized and appointed as attorney in fact of each of the Other Canadian Debtors, authorized to take all steps and actions necessary for and on behalf of the Other Canadian Debtors and to execute any and all documents and make any and all filings for and on behalf of each of the Other Canadian Debtors as may be necessary or desirable; and (iii) subject to the qualifications regarding Duplicative Claims, all Proven Affected Unsecured Claims (whether now existing or hereafter coming into existence) against the Other Canadian Debtors shall be deemed to be claims against NNL pursuant to the Sanction Order.

(b)    Each Canadian Registered Pension Plan shall only have one Proven Affected Unsecured Claim against the Canadian Estate in the respective amounts specified in Section 4.4.

(c)    Holders of Crossover Bonds that were issued by one Canadian Debtor and guaranteed by another Canadian Debtor shall only have one Proven Affected Unsecured Claim against the Canadian Estate in the aggregate respective amounts specified on Schedule "B".

(d)    Creditors shall not be permitted to have Duplicative Claims against the Canadian Estate.  To the extent that, absent substantive consolidation and this Plan, an Affected Unsecured Creditor has or would have had Proven Affected Unsecured Claims against more than one of the Canadian Debtors based on the same underlying debt or obligation ("**Duplicative Claims**"), the Affected Unsecured Creditor shall only be entitled to one Proven Affected Unsecured Claim against the Canadian Estate equal to the amount of the largest of such Duplicative Claims.

- 22 -

By way of illustration of the foregoing, where the principal debtor on a Claim is a Canadian Debtor and a guarantor of that Claim is another Canadian Debtor, or where there is joint and several liability of two or more Canadian Debtors in respect of a Claim or portion thereof, the holder of such Claims shall (to the extent such Claims are proven in accordance with the applicable Claims Order) only be entitled to one Proven Affected Unsecured Claim against the Canadian Estate, and shall only be entitled to receive distributions hereunder on one Proven Affected Unsecured Claim.

(e)     Creditors holding Proven Affected Unsecured Claims against more than one Canadian Debtor where such Proven Affected Unsecured Claims are based on separate and distinct underlying debts shall have one Proven Affected Unsecured Claim against the Canadian Estate in the aggregate amount of all such separate and distinct Proven Affected Unsecured Claims. By way of illustration of the foregoing, if a Creditor holds a Proven Affected Unsecured Claim against NNC for $1,000 on account of an invoice, and a Proven Affected Unsecured Claim against NNL for $500 on account of a separate and distinct invoice, the Creditor shall have an aggregate Proven Affected Unsecured Claim against the Canadian Estate of $1,500.

(f)     For purposes of this Plan, all Intercompany Claims between or among the Canadian Debtors (collectively, the "**Canadian Intercompany Claims**") shall be treated as Unaffected Claims and shall not be entitled to any distributions hereunder. Subject to the foregoing sentence and notwithstanding any other provision of this Plan, nothing in this Plan shall affect, impair or settle the Canadian Intercompany Claims and the Canadian Intercompany Claims shall remain in place unaffected by this Plan in all respects following the Plan Effective Date.

### 2.3     Persons Affected

The Plan provides for a full and final release and discharge of the Affected Claims and Released Claims, and a settlement of, and consideration for, all Proven Affected Unsecured Claims. Except as otherwise expressly indicated herein, the Plan will become effective on the Plan Effective Date in accordance with its terms and shall be binding on and enure to the benefit of the Canadian Debtors, the Affected Creditors, the Released Parties and all other Persons named or referred to in, or subject to, the Plan.

### 2.4     Persons Not Affected

The Plan does not affect the Unaffected Creditors, subject to the express provisions hereof providing for the payment of certain Unaffected Claims and/or the treatment of Insured Claims. Nothing in the Plan shall affect the Canadian Debtors' rights and defences, both legal and equitable, with respect to any Unaffected Claims including all rights with respect to legal and equitable defences or entitlements to set-offs or recoupments against such Unaffected Claims.

- 23 -

### 2.5    Equity Claimants

(a)    On the Plan Effective Date, the Plan will be binding on all Equity Claimants. Equity Claimants and holders of Equity Interests shall not receive a distribution or other consideration under the Plan and shall not be entitled to vote on the Plan in respect of their Equity Claims or Equity Interests.  On the Plan Effective Date all Equity Claims shall be fully, finally, irrevocably and forever compromised, released, discharged and barred without any compensation of any kind whatsoever.

(b)    Nothing in this Section 2.5 or this Plan shall impact NNL's shares held by NNC or any shares held by NNC, NNL or any other Canadian Debtor of any other entity, including any other Nortel Group entity. Notwithstanding Section 2.5(a) or any other provision of this Plan, NNC's common shares and NNL's preferred shares shall remain issued and outstanding following the Plan Effective Date, it being understood that in no circumstance shall the holders of such Equity Interests be entitled to any distribution or other consideration pursuant to this Plan.

(c)    Notwithstanding Sections 2.5(a) and 2.5(b), in the event that all obligations of the Canadian Estate owing to Creditors are satisfied in full, including the payment in full of all Proven Affected Unsecured Claims and such other amounts as may be determined to be payable to Creditors in the event of the solvency of the Canadian Estate, the holders of Equity Interests in NNC and NNL will, following payment of all amounts owing to Creditors in full and subject to further order of the Canadian Court, have an entitlement to any remaining Available Cash or other assets of the Canadian Estate in accordance with their respective legal entitlements based on the terms of such Equity Interests. For the avoidance of doubt, in no circumstance is it contemplated that the obligations of the Canadian Estate to Creditors will be satisfied in full.

## ARTICLE 3
## CLASSIFICATION AND TREATMENT OF CREDITORS AND RELATED MATTERS

### 3.1    Claims Procedure

The procedure for determining the validity and quantum of the Proven Affected Unsecured Claims for voting and distribution purposes under the Plan shall be governed by the Claims Orders, the Meeting Order, the CCAA, the Plan and any further Order of the CCAA Court. For the avoidance of doubt the Claims Orders shall remain in full force and effect from and after the Plan Effective Date.

### 3.2    Classification of Creditors

In accordance with the Meeting Order, the only class of creditors for the purposes of considering and voting on the Plan shall be the Affected Unsecured Creditors Class.  For greater certainty, Equity Claimants and holders of Equity Interests shall not be entitled to vote on the Plan or to receive any distributions hereunder.

- 24 -

### 3.3    Creditors' Meeting

The Meeting shall be held in accordance with the Meeting Order and any further Order of the CCAA Court.  The only Persons entitled to attend the Meeting are those specified in the Meeting Order and any further Order of the CCAA Court.

### 3.4    Treatment of Affected Unsecured Claims

(a)    Subject to Section 3.4(b), 3.5, 3.6 and 3.7, in full and final satisfaction of all Affected Unsecured Claims, each Affected Unsecured Creditor with a Proven Affected Unsecured Claim shall be entitled to receive its Pro-Rata Share pursuant to Section 6.3. An Affected Unsecured Claim shall receive distributions as set forth in Section 6.3 only to the extent that such Claim is a Proven Affected Unsecured Claim and has not been paid, released, or otherwise satisfied previously. All Affected Unsecured Claims shall be fully, finally, irrevocably and forever compromised, released, discharged, cancelled and barred on the Plan Effective Date, subject to the right of Affected Unsecured Creditors to receive distributions pursuant to this Plan in respect of Proven Affected Unsecured Claims.

(b)    In order to give effect to Section 4.11 hereof, solely for purposes of determining the Pro-Rata Share of Affected Unsecured Creditors and amounts to be distributed on the Initial Distribution:

   (i)    the total amount of Cash in the Affected Unsecured Creditor Pool shall be deemed to be increased by the Bondholder Fee Amount;

   (ii)    the Pro-Rata Share of each Affected Unsecured Creditor with a Proven Affected Unsecured Claim (excluding the Crossover Bondholders and the NNCC Bondholders) shall be its Pro-Rata Share calculated as if an amount equal to the Bondholder Fee Amount was included in the Affected Unsecured Creditor Pool (with such additional entitlement being funded from the deduction on distributions to Crossover Bondholders and NNCC Bondholders contemplated in Section 3.4(b)(iii));

   (iii)    the aggregate Pro-Rata Share on account of the Crossover Bondholder Claims and NNCC Bondholder Claims shall be: (x) the aggregate Pro-Rata Share on account of the Crossover Bondholder Claims and NNCC Bondholder Claims calculated as if an amount equal to the Bondholder Fee Amount was included in the Affected Unsecured Creditor Pool; minus (y) the Bondholder Fee Amount; and

   (iv)    the Additional Bondholder Fee Amount may also be deducted from distributions to Crossover Bondholders and NNCC Bondholders as contemplated pursuant to Section 4.11.

- 25 -

### 3.5    Canada – U.S. Crossover Claims

(a)    In the event that a Creditor holds a Proven Affected Unsecured Claim that is also a Crossover Claim, then, subject to Sections 3.4(b) and 3.5(b), the Canadian Estate shall pay distributions on the full amount of the Proven Affected Unsecured Claim on a *pari passu* basis with all other Proven Affected Unsecured Claims without discrimination of any kind.

(b)    In no case shall a Creditor holding a Crossover Claim be entitled to receive any further distributions from the Canadian Estate where the aggregate distributions made by the U.S. Debtors and the Canadian Estate in respect of such Crossover Claim equal the total Proven Affected Unsecured Claim amount of such Crossover Claim against the Canadian Estate.  For the avoidance of doubt, in no event shall a holder of a Crossover Claim be entitled to receive aggregated distributions in respect of its allowed Crossover Claim of more than 100% of the greater of (i) its Allowed Claim against a U.S. Debtor, and (ii) its Proven Affected Unsecured Claim against the Canadian Estate when taking into account distributions received from both the issuer (or primary) Debtor estate and guarantor (or secondary) Debtor estate (such greater amount, the "**Creditor's Maximum**").  For the further avoidance of doubt, in relation to a specific Crossover Claim, if the amount in U.S. dollars of the Allowed Claim against a U.S. Debtor for such Crossover Claim is not the same as the amount of the Proven Affected Unsecured Claim against the Canadian Estate for such Crossover Claim, the Creditor's Maximum shall not be reached until the greater of the two amounts has been distributed to the Creditor. Any amounts paid by NNI pursuant to Section 4(m) of the Settlement and Support Agreement shall not be included in calculating the Creditor's Maximum as it pertains to the NNCC Bonds.

(c)    Notwithstanding Section 3.5(b), if the relevant Creditor receives an aggregate amount of distributions equal to the Creditor's Maximum on account of its Crossover Claim, then the guarantor (or secondary) Debtor estate shall subrogate into the Crossover Claim against the issuer (or primary) Debtor estate (for the NNCC Bonds, the issuer Debtor estate is NNCC as of the date hereof, but shall be deemed to be NNI on the effective date of the U.S. Plans when NNCC is consolidated into NNI) and will be entitled to receive any and all subsequent distributions from the issuer (or primary) Debtor estate on account of such Crossover Claim on a *pari passu* basis with all other creditors holding Allowed Claims against a U.S. Debtor or Proven Affected Unsecured Claims against the Canadian Estate with the same priority from the issuer (or primary) Debtor estate without setoff or discrimination of any kind, provided that (i) the guarantor (or secondary) Debtor estate shall not receive any distributions on such claim in excess of payments the guarantor (or secondary) Debtor estate has made to the underlying holder of such Crossover Claim and (ii) in the case of the Crossover Bondholder Claims, NNI shall receive distributions from the Canadian Estate as a result of such subrogation for distributions NNI has made on Allowed Claims in respect of the Crossover Bonds only to the extent that NNI makes distributions in respect of Allowed Claims in respect of the Crossover Bonds claims in excess of $1,250,000,000 and such subrogation shall be only in respect of amounts

- 26 -

distributed in excess of $1,250,000,000, it being understood that NNI's right of subrogation pursuant to this Section 3.5(c), if any, against the Canadian Estate in respect of the Crossover Bonds claims remains subject to distributions equal to the Creditor's Maximum first being received by holders of the Crossover Bonds claims on account of such claims. For the avoidance of doubt, notwithstanding Section 3.13, the subrogation rights of NNI pursuant to this Section 3.5(c) shall not be subject to set-off.

(d)     The Canadian Estate and the U.S. Debtors shall reasonably cooperate to give effect to the provisions of this Section 3.5, including sharing information regarding the Crossover Claims and intended and actual distributions thereon.

### 3.6     No Double-Recovery

In no circumstance shall a Creditor receive aggregate distributions from the Canadian Estate and any other Nortel Group entity on account of a Proven Affected Unsecured Claim and any related claim established against another Nortel Group entity (a "**Foreign Related Claim**") in excess of 100% of the amount of such Proven Affected Unsecured Claim. In order to be eligible for any distribution under this Plan, an Affected Unsecured Creditor who holds a Proven Affected Unsecured Claim (but excluding Crossover Bondholders and NNCC Bondholders) against the Canadian Estate and a Foreign Related Claim against any other Nortel Group entity, including a Crossover Claim, shall, upon the written request of the Monitor (which may be made from time to time), provide such information to the Monitor as it may reasonably request in respect of the Foreign Related Claim, including the amount in which the Foreign Related Claim has been admitted for proof, the amount of distributions received or expected to be received on account of such Foreign Related Claim and any and all supporting documentation relating to the foregoing. Subject to further Order of the CCAA Court, the Canadian Estate and Monitor are authorized to delay and/or withhold distributions to Creditors holding Foreign Related Claims pending receipt of documentation acceptable to the Monitor, acting reasonably, to allow it to confirm that a Creditor has not and will not receive amounts on account of its Proven Affected Unsecured Claim and any Foreign Related Claim in excess of 100% of the amount of such Proven Affected Unsecured Claim.

### 3.7     No Post-Filing Date Interest

No Post-Filing Date Interest will be included in any Proven Affected Unsecured Claims, Proven Priority Claims or any other Claims provable hereunder, and no distributions will be made on account of Post-Filing Date Interest. For the avoidance of doubt, all claims for Post-Filing Date Interest shall be released, discharged and barred pursuant to the terms of this Plan.

### 3.8     Unaffected Claims

(a)     Unaffected Creditors will not receive any consideration or distributions under the Plan in respect of their Unaffected Claims (except to the extent their Unaffected Claims are contemplated to be paid in full in accordance with the express terms of this Plan), and they shall not be entitled to vote on the Plan at the Meeting in respect of their Unaffected Claims.

- 27 -

(b)     Notwithstanding anything to the contrary herein, Insured Claims shall not be compromised, released, discharged, cancelled and barred by this Plan, provided that from and after the Plan Effective Date, any Person having an Insured Claim shall be irrevocably limited to recovery in respect of such Insured Claim solely from the proceeds of the applicable Insurance Policies, and Persons with any Insured Claims shall have no right to, and shall not, directly or indirectly, make any claim or seek any recoveries from any Person, other than enforcing such Person's rights to be paid by the applicable insurer(s) from the proceeds of the applicable Insurance Policies.  This section 3.8(b) may be relied upon and raised or pled by the Canadian Debtors or any Released Party in defence or estoppel of or to enjoin any claim, action or proceeding brought in contravention of this section.  Nothing in this Plan shall prejudice, compromise, release or otherwise affect any right or defence of any insured or insurer in respect of an Insured Claim.

### 3.9     Unresolved Affected Unsecured Claims

No Affected Unsecured Creditor shall be entitled to receive any distribution hereunder with respect to an Unresolved Affected Unsecured Claim or any portion thereof unless and until, and then only to the extent that, such Claim is finally resolved in the manner set out in the applicable Claims Order and becomes a Proven Affected Unsecured Claim entitled to the treatment described in Section 3.4. A distribution shall be paid from the Unresolved Claims Reserve pursuant to Section 6.5 in respect of any Unresolved Affected Unsecured Claim that is finally determined to be a Proven Affected Unsecured Claim in accordance with the applicable Claims Order. Notwithstanding the foregoing: (i) NNUK shall be entitled to receive distributions hereunder on account of the Proven NNUK Claim pending final resolution of the Contingent Additional NNUK Claim; and (ii) Compensation Creditors holding Unresolved Affected Unsecured Claims shall be entitled to receive distributions on account of such Unresolved Affected Unsecured Claims solely to the extent portions thereof have been admitted or proven pursuant to the Compensation Claims Procedure Order.

### 3.10    Director/Officer Claims and the Directors' Indemnity and Directors' Charge

Under this Plan:

(a)     All Released Director/Officer Claims shall be fully, finally, irrevocably and forever compromised, released, discharged, cancelled and barred without consideration on the Plan Effective Date pursuant to the provisions of Article 7 of the Plan.  To the extent that any part of a Director/Officer Claim is a Non-Released Claim that part of the Director/Officer Claim will not be compromised, released, discharged, cancelled or barred.

(b)     The Directors' Charge shall be discharged and expunged on the Plan Effective Date and all rights of the Directors and Officers pursuant to paragraphs 20 and 21 of the Initial Order shall be released and discharged on the Plan Effective Date.

- 28 -

(c)     Subject to Section 3.10(d) and the rule against double proofs, any Claim of a Director or Officer for indemnification from the Canadian Debtors in respect of any Director/Officer Claim (including any subrogated claim by an insurer) ("**Director Indemnity Claim**") shall be treated for all purposes under this Plan as an Affected Unsecured Claim.

(d)     To the extent a Director Indemnity Claim is in respect of an Equity Claim or Equity Interest, such Director Indemnity Claim shall be treated for all purposes under this Plan as an Equity Claim.

### 3.11     Extinguishment of Claims

On the Plan Effective Date, in accordance with the terms of this Plan and in accordance with the provisions of the Sanction Order, the treatment of Affected Claims (including Proven Affected Unsecured Claims and Unresolved Affected Unsecured Claims) and all Released Claims, in each case as set forth herein, shall be final and binding on the Canadian Debtors, all Affected Creditors (and their respective heirs, executors, administrators, legal personal representatives, successors and assigns) and any Person holding a Released Claim, and all Affected Claims and all Released Claims shall be fully, finally, irrevocably and forever released, discharged, cancelled and barred, and the Released Parties shall thereupon have no further obligation whatsoever in respect of the Affected Claims and the Released Claims, as applicable; *provided that* nothing herein releases the Canadian Estate from the obligation to make distributions in the manner and to the extent provided for in the Plan and *provided further* that such discharge and release of the Canadian Debtors shall be without prejudice to the right of a Creditor in respect of an Unresolved Affected Unsecured Claim to prove such Unresolved Affected Unsecured Claim in accordance with the applicable Claims Order so that such Unresolved Affected Unsecured Claim may become a Proven Affected Unsecured Claim entitled to receive a distribution under Section 3.4 hereof.

### 3.12     Guarantees and Similar Covenants

No Person who has a Claim under any guarantee, surety, indemnity or similar covenant in respect of any Claim which is compromised and released under this Plan or who has any right to claim over in respect of or to be subrogated to the rights of any Person in respect of a Claim which is compromised under this Plan shall be entitled to any greater rights as against the Canadian Debtors than the Person whose Claim is compromised under the Plan. For the avoidance of doubt, nothing in this Section 3.12 shall limit the U.S. Debtors' rights pursuant to Section 3.5(c) hereof.

### 3.13     Set-Off

The law of set-off applies to all Claims in accordance with Applicable Law. Without limiting the generality of the foregoing, the Canadian Debtors shall be entitled to set-off from any distributions to be made to a Creditor hereunder any amounts due and owing to the Canadian Debtors from such Creditor, including on account of any cost award owing or that may become owing to the Canadian Debtors.

- 29 -

## ARTICLE 4
## ALLOCATION DISPUTE RESOLUTION, SETTLEMENT AND SUPPORT AGREEMENT AND RELATED PROVISIONS

### 4.1    Authority to Effectuate and Implement the Settlement and Support Agreement

This Plan and the Sanction Order authorizes and approves the execution, delivery and performance of the Settlement and Support Agreement by the Canadian Debtors and Monitor and the transactions and agreements contemplated therein, including the resolution of the Allocation Dispute contemplated therein and the granting of the Settlement and Support Agreement Releases, and the Canadian Debtors and Monitor are authorized and directed to take such additional steps and execute such additional documents as may be reasonably necessary to effectuate and implement the terms of the Settlement and Support Agreement. The failure of this Plan to incorporate a provision of the Settlement and Support Agreement shall not derogate from the enforceability of such provision.

### 4.2    Allocation and Distribution of the Sale Proceeds

Without limiting the generality of Section 4.1, on the Plan Effective Date the Canadian Debtors and Monitor shall be authorized and directed by the Plan, the Sanction Order and the Canadian Escrow Release Order to take such steps as may be reasonably necessary to effect the following distributions from the Escrow Accounts, all in accordance with and subject to the terms of the Settlement and Support Agreement, including Section 2 thereof:

(a)    payments of $35,000,000 to NNL, and $20,000,000 to NNI, shall be made from the Iceberg Escrow Account in satisfaction of the M&A Cost Reimbursement;

(b)    payments of $2,800,000 to NNI, and $2,200,000 to NNUK, shall be made from the Iceberg Escrow Account in satisfaction of the Iceberg Amendment Fee; and

(c)    after making the payments described in paragraphs (a) and (b) above, the Sale Proceeds shall be allocated and paid from the Escrow Accounts on and subject to the terms of the Settlement and Support Agreement as follows:

(i)    Canadian Debtors: 57.1065% (the "**Canadian Allocation**"), being $4,142,665,131 as at July 31, 2016;

(ii)    U.S. Debtors: 24.350%, being $1,766,417,002 as at July 31, 2016;

(iii)    EMEA Debtors (excluding NNUK and NNSA): 1.4859%, being $107,788,879 as at July 31, 2016;

(iv)    NNUK: 14.0249%, being $1,017,408,257 as at July 31, 2016, subject to adjustment as contemplated in Section 2(c)(v) of the Settlement and Support Agreement; and

(v)    NNSA: $220,000,000.

- 30 -

For the avoidance of doubt, all distributions from the Escrow Accounts (including the specific amounts to be distributed to each of the Canadian Debtors, the U.S. Debtors and the EMEA Debtors) shall be strictly in accordance with the Settlement and Support Agreement. To the extent of any conflict between the provisions of the Settlement and Support Agreement and this Plan as relates to distributions from the Escrow Accounts, the provisions of the Settlement and Support Agreement shall govern in all respects.

### 4.3    Release of Canada Only Sale Proceeds and Unavailable Cash

On the Plan Effective Date, all amounts held by NNL pursuant to the Canada Only Sale Proceeds Orders or held as Unavailable Cash by the Canadian Debtors shall be released to the Canadian Estate without any restriction whatsoever, and shall be used to fund the distributions and reserves contemplated under this Plan.

### 4.4    Canadian Pension Claims

The Canadian Pension Claims are Affected Unsecured Claims. The total Proven Affected Unsecured Claim under this Plan on account of the Managerial Plan shall be CA$1,368,644,000, and the total Proven Affected Unsecured Claim on account of the Negotiated Plan shall be CA$520,835,000.

### 4.5    Crossover Bondholder Claims

A Crossover Bondholder Claim is an Affected Unsecured Claim.  The aggregate total of all Proven Affected Unsecured Claims against the Canadian Estate on account of the Crossover Bonds under this Plan shall be $3,940,750,260, with the individual Proven Affected Unsecured Claims on account of the Crossover Bonds being as set forth on Schedule "B". Distributions on account of the Proven Affected Unsecured Claims relating to the Crossover Bonds shall be made as provided for in Section 6.3(b).

### 4.6    NNCC Bondholder Claim

An NNCC Bondholder Claim is an Affected Unsecured Claim.  The total Proven Affected Unsecured Claims on account of the NNCC Bonds under this Plan shall be $150,951,562. Distributions on account of the Proven Affected Unsecured Claims relating to the NNCC Bonds shall be made as provided for in Section 6.3(b).

### 4.7    UKPI Claim

The Claims of the UKPI are Affected Unsecured Claims. UKPI shall have a single Proven Affected Unsecured Claim under this Plan in the amount of £339,750,000 (being $494,879,850 when converted to U.S. dollars in accordance with this Plan).

### 4.8    EMEA Debtors' Claims

The Claims of the EMEA Debtors are Affected Unsecured Claims. In accordance with the EMEA Claims Settlement Agreement: (i) NNUK shall have a Proven Affected Unsecured Claim under the Plan in the amount of $97,655,094 (the "**Proven NNUK Claim**"), the amount of which may increase to $122,655,094 solely in the circumstances set out in Section 2.2 of the EMEA

- 31 -

Claims Settlement Agreement (such additional contingent claim, the "**Contingent Additional NNUK Claim**"); and (ii) Nortel Networks SpA shall have a Proven Affected Unsecured Claim under the Plan in the amount of $2,344,906.

### 4.9    NNI Claims

In accordance with the CFSA: (i) NNI shall have a Proven Affected Unsecured Claim under the Plan in the amount of $2,000,000,000; and (ii) a Proven Priority Claim of $62,700,000 on account of the Remaining Revolver Claim ((i) and (ii), collectively, the "**NNI Claim**"). Notwithstanding Section 3.13, in accordance with the CFSA and the CFSA Approval Order, the NNI Claim shall not be subject to set-off, off set, deduction, counterclaim, reduction, or challenge as to amount or validity.

### 4.10    Intercompany Claims

Intercompany Claims are Affected Unsecured Claims (excluding, for the avoidance of doubt, the Canadian Intercompany Claims and the Remaining Revolver Claim). The total Proven Affected Unsecured Claims on account of Intercompany Claims under this Plan shall be as set forth on Schedule "C" (without duplication for the Proven Affected Unsecured Claims of the EMEA Debtors and U.S. Debtors that are referred to in Section 4.8 and Section 4.9, respectively).

### 4.11    Bondholder Group Fees

The aggregate amount of fees under the Bondholder Advisor Fee Letter to be deducted from distributions to Crossover Bondholders and NNCC Bondholders under this Plan in respect of their Proven Affected Unsecured Claims against the Canadian Estate shall be $47,000,000 (the "**Bondholder Fee Amount**") (which includes $3,000,000 in respect of the deferred compensation fee payable to FTI Capital Advisors, LLC).   An additional $7,000,000 (the "**Additional Bondholder Fee Amount**") shall be deducted from Canadian Estate distributions under this Plan to Crossover Bondholders and NNCC Bondholders on account of their Proven Affected Unsecured Claims in further payment of the deferred compensation fee payable to FTI Capital Advisors, LLC if the Canadian Estate is so directed in writing by all of the Crossover Bondholders and NNCC Bondholders who were Participating Creditors under the Settlement and Support Agreement as at October 12, 2016. All such deductions shall be borne by the Crossover Bondholders and the NNCC Bondholders on a pro rata basis based on the amount of the Proven Affected Unsecured Claims of the Crossover Bondholders and the NNCC Bondholders. The deduction of the Bondholder Fee Amount from distributions to Crossover Bondholders and NNCC Bondholders shall be effected in the manner contemplated in Section 3.4(b) hereof. If the Canadian Estate is so directed as contemplated pursuant to this Section 4.11, the deduction of the Additional Bondholder Fee Amount from distributions to Crossover Bondholders and NNCC Bondholders shall be deducted in full from the distributions to be made for the benefit of the Crossover Bondholders and NNCC Bondholders on the Initial Distribution Date as contemplated pursuant to Section 3.4(b)(iv).

- 32 -

### 4.12    Other Canadian Fees

The Canadian Debtors will not pay voluntarily, or seek permission to pay, legal or advisor fees of any stakeholder that the Canadian Debtors are not currently paying. Payment of any such further legal or advisor fees will be done only pursuant to an order of the CCAA Court.

### 4.13    Settlement and Support Agreement Releases

The Settlement and Support Agreement Releases given and received by the Canadian Debtors and the Monitor are authorized and approved pursuant to this Plan and incorporated herein by reference. The Settlement and Support Agreement Releases shall be binding on and enure to the benefit of the Canadian Debtors (including the Canadian Estate), the Monitor, the other Settlement Parties, the Participating Creditors and their respective employees, officers, directors, agents, advisors, lawyers, successors and assigns and the directors and officers, both former and current, of any Nortel Group entity pursuant to this Plan as if set out herein in full.

## ARTICLE 5
## CASH POOLS AND RESERVES

### 5.1    Administrative Reserve

On the Plan Implementation Date, the Canadian Estate shall establish the Administrative Reserve and thereafter hold the Administrative Reserve and use the Administrative Reserve to fund the ongoing administration and wind-down of the Canadian Estate. Any balance remaining in the Administrative Reserve at the conclusion of the CCAA Proceedings shall be distributed in accordance with Section 6.11.

### 5.2    Affected Unsecured Creditor Pool

Following the Plan Implementation Date, prior to the Initial Distribution Date and prior to all subsequent Distribution Dates, the Canadian Estate shall establish an Affected Unsecured Creditor Pool. On the Initial Distribution Date and any subsequent Distribution Dates, the Canadian Estate shall distribute the Affected Unsecured Creditor Pool to Affected Unsecured Creditors on and subject to the terms of Article 6.

### 5.3    Unresolved Claims Reserve

Following the Plan Implementation Date, prior to the Initial Distribution Date, the Canadian Estate shall establish the Unresolved Claims Reserve. The Canadian Estate shall maintain and distribute the Unresolved Claims Reserve in accordance with the provisions of Section 6.5.

### 5.4    Bank Accounts, Reserves and Cash Pools Generally

The reserves and cash pools contemplated pursuant to this Article 5 are notional only, and neither the Canadian Estate nor the Monitor shall have any obligation to establish separate accounts or funds, or to otherwise segregate Available Cash, in respect of any of the Administrative Reserve, an Affected Unsecured Creditor Pool, the Unresolved Claims Reserve or any other reserve, cash pool, fund, payment or distribution contemplated hereunder, provided that the Canadian Estate and the Monitor shall maintain appropriate records in respect of the

- 33 -

calculation and determination of all such reserves and cash pools. Following the Plan Effective Date, the Canadian Estate, with the assistance of the Monitor, shall work to consolidate and hold all Available Cash in the Canadian Estate's U.S. dollar and Canadian dollar operating bank accounts, as applicable.

# ARTICLE 6
# PROVISIONS REGARDING DISTRIBUTIONS, PAYMENTS AND CURRENCY

### 6.1    Distributions Generally

All distributions to Affected Creditors and other payments to be effected pursuant to this Plan shall be made by the Canadian Estate pursuant to this Article 6 and shall occur in the manner set out in this Article 6 under the supervision of the Monitor. Distribution Dates shall be set from time to time by and at the discretion of the Monitor, provided that: (i) the Initial Distribution Date shall be no more than sixty (60) days after the Plan Implementation Date; and (ii) the Monitor shall set a Distribution Date within ninety (90) days of the date (the "**Determination Date**") it determines the Available Cash of the Canadian Estate is sufficient to establish an Affected Unsecured Creditor Pool of not less than $150,000,000, provided that if the Monitor believes the Canadian Estate will be in a position to make a Final Distribution within six (6) months of the Determination Date, it shall be authorized to delay such Distribution Date for up to six (6) months from the Determination Date in order to attempt to complete a Final Distribution. Notwithstanding any other provision of this Plan, any distribution to a Compensation Creditor (including the distributions contemplated pursuant to Section 6.2(b) hereof) will be subject to the Canadian Estate and Monitor first obtaining EI Confirmation in respect of such Compensation Creditor as well as resolving any issues regarding applicable withholdings in respect of such distribution to the satisfaction of the Canadian Estate and the Monitor, acting reasonably. For the avoidance of doubt, all distributions to Creditors and other payments to be made hereunder shall be subject to satisfaction or waiver of the Plan Implementation Conditions specified in Section 9.3 hereof and the occurrence of the Plan Implementation Date. Notwithstanding any provision of the Claims Orders, but subject to Section 6.3(b)(i) to Section 6.3(b)(iii), all distributions pursuant to this Plan on account of a Proven Affected Unsecured Claim shall be made to the holder of such Proven Affected Unsecured Claim on file with the Monitor as at the Plan Effective Date.

### 6.2    Certain Payments and Distributions on Proven Priority Claims

(a)    Within five (5) Business Days of the Plan Implementation Date the Canadian Estate shall make the following payments and distributions by wire transfer of immediately available funds in full satisfaction and discharge of the following:

(i)    $62,700,000 to NNI in full satisfaction of the Remaining Revolver Claim; and

(ii)    $77,500,000 to NNI in full satisfaction of the payment contemplated by Section 4(e) of the Settlement and Support Agreement, which payment shall not be subject to set-off pursuant to Section 3.13.

- 34 -

(b)     On the Initial Distribution Date, the Canadian Estate shall make a distribution of CA$3,000 (subject to applicable withholdings) to each Former Employee Priority Creditor in full satisfaction and discharge of his or her Proven Priority Claim in respect of any entitlement to a Termination Payment. This distribution shall be made in addition to any distributions to that Former Employee Priority Creditor in respect of his or her Proven Affected Unsecured Claim as contemplated by Section 6.3.

(c)     Any distributions on account of Proven Priority Claims other than those Proven Priority Claims specified in Sections 6.2(a)(i) and 6.2(b) shall be made at the time and in the manner as may be determined by the Monitor, or as may be ordered by the CCAA Court.

(d)     For the avoidance of doubt, all payments and distributions pursuant to this Section 6.2 shall be subject to satisfaction or waiver of the Plan Implementation Conditions specified in Section 9.3 hereof and the occurrence of the Plan Implementation Date.

### 6.3     Distribution Mechanics for Proven Affected Unsecured Claims

(a)     Prior to the Initial Distribution Date and each subsequent Distribution Date, the Monitor shall calculate the Pro-Rata Share to be paid to each Affected Unsecured Creditor with a Proven Affected Unsecured Claim.

(b)     Subject in all cases to Article 3 and Sections 4.11, 6.1, 6.3(c), 6.4 and 6.8 hereof, the Canadian Estate shall, on or about the respective Distribution Date, cause to be distributed from the Affected Unsecured Creditor Pool to each Affected Unsecured Creditor with a Proven Affected Unsecured Claim its Pro-Rata Share by way of (in the sole discretion of the Monitor): (i) cheque sent by prepaid ordinary mail to the address on file with the Monitor on the date that is twenty-one (21) days after notice of a Distribution Date is given by the Monitor by notice posted on the Monitor's Website (a "**Distribution Record Date**"); or (ii) wire transfer of immediately available funds to an account designated in writing by the Creditor to the Monitor (with any wire transfer or similar fee being satisfied from the distribution amount), provided that distributions on account of the 1988 Bondholder Claims, the Crossover Bondholder Claims and NNCC Bondholder Claims, shall be made as follows on or about the respective Distribution Date:

(i)     1988 Bondholder Claims – Distributions for the benefit of the 1988 Bondholders on account of the 1988 Bondholder Claims shall be made to the 1988 Bonds Trustee by wire transfer of immediately available funds to an account designated in writing by the 1988 Bonds Trustee to the Monitor (with any wire transfer or similar fee being satisfied from the distribution amount). The 1988 Bonds Trustee shall administer such distributions as soon as is reasonably practicable in accordance with the 1988 Bonds Indenture and this Plan, including Section 6.6, and such distributions shall remain subject to the 1988 Bonds Trustee's charging lien against distributions to holders of 1988 Bondholder Claims for

payment of the 1988 Bonds Trustee's reasonable fees and expenses, including all reasonable fees and expenses of its counsel and other professionals and including the fees and expenses incurred by the 1988 Bonds Trustee in making all distributions to holders of 1988 Bondholder Claims. Receipt by the 1988 Bonds Trustee of distributions for the benefit of the 1988 Bondholders shall be deemed to constitute receipt of all such distributions by the 1988 Bondholders.

(ii)     <u>Crossover Bondholder Claims</u> - Distributions for the benefit of the Crossover Bondholders on account of the Crossover Bondholder Claims shall be made to the Crossover Bonds Trustee by wire transfer of immediately available funds to an account (or accounts) designated in writing by the Crossover Bonds Trustee to the Monitor (with any wire transfer or similar fee being satisfied from the distribution amount). The Crossover Bonds Trustee shall administer such distributions as soon as is reasonably practicable in accordance with this Plan, including Section 6.6, and such distributions shall remain subject to the Crossover Bonds Trustee's charging lien against distributions to holders of Crossover Bondholder Claims for payment of the Crossover Bonds Trustee's reasonable fees and expenses, including all reasonable fees and expenses of its counsel and other professionals and including the fees and expenses incurred by the Crossover Bonds Trustee in making all distributions to holders of Crossover Bonds. Receipt by the Crossover Bonds Trustee of distributions for the benefit of the Crossover Bondholders shall be deemed to constitute receipt of all such distributions by the Crossover Bondholders.

(iii)    <u>NNCC Bondholder Claims</u> - Distributions for the benefit of the NNCC Bondholders on account of the NNCC Bondholder Claims shall be made to the NNCC Bonds Trustee by wire transfer of immediately available funds to an account (or accounts) designated in writing by the NNCC Bonds Trustee to the Monitor (with any wire transfer or similar fee being satisfied from the distribution amount). The NNCC Bonds Trustee shall administer such distributions as soon as is reasonably practicable in accordance with the NNCC Bonds Indenture and this Plan, including Section 6.6, and such distributions shall remain subject to the NNCC Bonds Trustee's charging lien against distributions to holders of NNCC Bondholder Claims for payment of the NNCC Bonds Trustee's reasonable fees and expenses, including all reasonable fees and expenses of its counsel and other professionals and including the fees and expenses incurred by the NNCC Bonds Trustee in making all distributions to holders of NNCC Bonds. Receipt by the NNCC Bonds Trustee of distributions for the benefit of the NNCC Bondholders shall be deemed to constitute receipt of all such distributions by the NNCC Bondholders.

(c)     In accordance with the terms of the Hardship Process, any payments made to a Compensation Creditor pursuant to the Hardship Process shall be deducted, dollar

- 36 -

for dollar, from any distributions to such Compensation Creditor pursuant to this Plan.

### 6.4    Currency Matters

(a)    For the purposes of voting on the Plan, calculating the Required Majority and other calculations in this Plan that involve a totalling of, or other calculation involving, Affected Unsecured Claims or Proven Affected Unsecured Claims, including in factors A and B of the calculation of any Pro-Rata Share, all Claims (including Proven Affected Unsecured Claims) shall be valued in U.S. dollars and all non-U.S. dollar denominated Claims (or portions thereof) will be converted into U.S. dollars by the Monitor at the exchange rates set out at Appendix "A" to the Claims Procedure Order, a copy of which is attached at Schedule "D" hereto. For the avoidance of doubt, for purposes of effecting the foregoing conversions, any non-Canadian dollar and non-U.S. dollar denominated claims shall first be converted to Canadian dollars at the exchange rate specified on Schedule "D" hereto, and then such Canadian dollar amount shall be converted to U.S. dollars at the exchange rate specified on Schedule "D" hereto.

(b)    For the purposes of determining factor C of any Pro-Rata Share calculations, any Canadian dollar denominated Cash in the Affected Unsecured Creditor Pool shall be valued in U.S. dollars at: (i) in the case of Canadian dollar denominated Cash received by the Canadian Estate from the Canadian Dollar Escrow Account, the Applicable FX Rate; and (ii) in the case of all other Canadian dollar denominated Cash held or received by the Canadian Estate, the then applicable foreign exchange rate between Canadian and U.S. dollars at the time of making the Pro-Rata Share calculation. All Canadian dollar denominated Cash in the Affected Unsecured Creditor Pool and distributed on account of CAD Claims shall be deemed to first be taken and made from the Canadian dollar denominated Cash received by the Canadian Estate from the Canadian Dollar Escrow Account.

(c)    Distributions to Creditors holding Proven Affected Unsecured Claims predominately denominated in Canadian dollars ("**CAD Claims**") shall be paid in Canadian dollars, and distributions to all other Creditors holding Proven Affected Unsecured Claims shall be paid in U.S. dollars. For purposes of determining the amount of Canadian dollars to be paid by the Canadian Estate on distributions on a CAD Claim, the amount of such distribution in U.S. dollars (i.e. the relevant Pro-Rata Share in U.S. dollars) shall be converted to Canadian dollars at the Applicable FX Rate. A Proven Affected Unsecured Claim is considered "predominantly denominated" in Canadian dollars if more than fifty percent (50%) of such Proven Affected Unsecured Claim is denominated in Canadian dollars.

(d)    The Canadian Estate and the Monitor shall be authorized to effect such exchange(s) of currency between Canadian dollars and U.S. dollars as may be necessary to effect the distributions and other payments (including in respect of the continuing administration of the Canadian Estate) contemplated pursuant to this Plan in the currency contemplated for such distributions or payments.

- 37 -

### 6.5 Distributions After Unresolved Affected Unsecured Claims and Post-Filing Claims Resolved

(a) The Canadian Estate shall hold the Unresolved Claims Reserve (as may be reduced from time to time as contemplated pursuant to Section 6.5(b) and Section 6.5(c)) until the final determination of all Unresolved Affected Unsecured Claims and Post-Filing Claims in accordance with the applicable Claims Order and this Plan.

(b) To the extent that an Unresolved Affected Unsecured Claim becomes a Proven Affected Unsecured Claim in accordance with this Plan, the Canadian Estate shall distribute to the holder of such Proven Affected Unsecured Claim, on or before the next following Distribution Date, an amount from the Unresolved Claims Reserve equal to the Pro-Rata Share that such Affected Unsecured Creditor would have been entitled to receive in respect of its Proven Affected Unsecured Claim on the previous Distribution Date(s) had such Unresolved Affected Unsecured Claim been a Proven Affected Unsecured Claim on such Distribution Date(s).

(c) After an Unresolved Affected Unsecured Claim or Post-Filing Claim has been finally resolved in accordance with the applicable Claims Order and any required distributions contemplated in Sections 6.2(c) or 6.5(b) have been made with respect to such claim, any remaining Cash held in the Unresolved Claims Reserve in respect of such Unresolved Affected Unsecured Claim or Post-Filing Claim shall no longer be held in the Unresolved Claims Reserve and shall become Available Cash.

### 6.6 Allocation of Distributions

All distributions made pursuant to the Plan shall be allocated first towards the repayment of the amount of the Proven Affected Unsecured Claim or Proven Priority Claim, as applicable, attributable to principal and, if greater than the amount of principal, second, towards the repayment of any amount of such Proven Affected Unsecured Claim or Proven Priority Claim attributable to unpaid interest.

### 6.7 Treatment of Undeliverable Distributions

If any distribution to a Creditor under this Article 6 is returned as undeliverable (an "**Undeliverable Distribution**"), no further distributions to such Creditor shall be made unless and until the Monitor is notified in writing by such Creditor of such Creditor's current address, at which time all such distributions shall be made to such Creditor.  Upon the Monitor becoming aware of an Undeliverable Distribution, the Canadian Estate shall, prior to the next following Distribution Date, reserve from the Affected Unsecured Creditor Pool the amount of Cash equal to the Undeliverable Distribution.  All claims for an Undeliverable Distribution existing prior to the Final Distribution must be made in writing to the Monitor (in the manner contemplated by Section 11.10 hereof) on or before the date that is thirty (30) days following the date the Monitor posts a copy of the Final Distribution Certificate on the Monitor's Website, after which date any entitlement with respect to any Undeliverable Distributions shall be forever discharged and forever barred, without any compensation therefor, notwithstanding any federal, state or

provincial laws to the contrary, and the amount of any Undeliverable Distributions shall be included in the Affected Unsecured Creditor Pool for distribution on the Final Distribution. Any Undeliverable Distributions remaining following the Final Distribution shall be dealt with in such manner as the CCAA Court may direct.  Nothing herein shall require the Canadian Estate or the Monitor to attempt to locate any Creditor or other Person with respect to an Undeliverable Distribution. No interest shall be payable in respect of an Undeliverable Distribution. Following each Distribution Date, the Canadian Estate, the Monitor and the U.S. Debtors shall exchange information and consult with one another with respect to any Undeliverable Distributions on account of Crossover Claims.

### 6.8    Withholding Rights

The Canadian Estate and any other Person facilitating distributions hereunder shall be entitled to deduct and withhold from any distribution or payment to any Person pursuant to this Plan such amounts as may be required to be deducted or withheld with respect to such distribution or payment under the Canadian Tax Act or other Applicable Laws and to remit such amounts to the appropriate Taxing Authority or other Person entitled thereto. To the extent that amounts are so withheld or deducted and remitted to the appropriate Taxing Authority or other Person, such withheld or deducted amounts shall be treated for all purposes hereof as having been paid to such Person as the remainder of the distribution or payment in respect of which such withholding or deduction was made. Without in any way limiting the generality of the foregoing, the Canadian Estate shall deduct from any distribution to a Creditor hereunder any amounts as indicated by Employment and Social Development Canada in an EI Confirmation, and remit such amounts to Employment and Social Development Canada pursuant to the EI Act. Any Creditor whose address on file with the Monitor on the Distribution Record Date for the Initial Distribution is not a Canadian address shall be treated as a non-resident of Canada for purposes of any applicable non-resident withholding Tax on all distributions hereunder, subject to receipt by the Monitor of information satisfactory to it (in its sole discretion) that such Creditor is not a non-resident. No gross-up or additional amount will be paid on any distribution or payment hereunder to the extent the Canadian Estate or any other Person deducts or withholds amounts pursuant to this Section 6.8 (it being understood, for the avoidance of doubt, that this sentence shall have no impact on any such gross-up amount proven as part of a Proven Affected Unsecured Claim in accordance with the Claims Orders).

### 6.9    Cancellation of Certificates and Notes, etc.

On the Plan Effective Date, all debentures, notes, certificates, indentures, guarantees, agreements, invoices and other instruments evidencing Affected Claims, including the 1988 Bonds, the 1988 Bonds Indenture, the Crossover Bonds, the Crossover Bonds Indenture, the NNCC Bonds and the NNCC Bonds Indenture (and all guarantees associated with each of the foregoing), will not entitle any holder thereof to any compensation or participation other than as expressly provided for in the Plan and shall be deemed cancelled  and extinguished and be null and void. Notwithstanding the foregoing: (a) the 1988 Bonds Indenture, the Crossover Bonds Indenture and the NNCC Bonds Indenture shall remain in effect solely for the purpose of and to the extent necessary to: (i) allow the relevant Indenture Trustee to make distributions as contemplated in Section 6.3(b) above; (ii) maintain all of the protections the Indenture Trustees enjoy with respect to carrying out their duties thereunder against the beneficial holders, including lien rights with respect to any distributions contemplated in Section 6.3(b) under this Plan, until

all such distributions are made; (iii) preserve the rights of the 1988 Bondholders, the Crossover Bondholders and the NNCC Bondholders to receive distributions pursuant to this Plan; and (iv) allow and preserve the rights of the Crossover Bonds Trustee, the Crossover Bondholders, the NNCC Bonds Trustee and the NNCC Bondholders to pursue their claims in the U.S. Proceedings; and (b) the Canadian Registered Pension Plans shall remain in effect solely for the purposes of and to the extent necessary to permit the continuing administration and wind-up of the Canadian Registered Pension Plans.

### 6.10    Calculations

All amounts to be paid by the Canadian Estate hereunder will be calculated by the Monitor. All calculations made by the Monitor shall be conclusive, final and binding upon the Affected Creditors, the Canadian Estate and all other Persons, absent manifest error.

### 6.11    Final Distribution

After (i) all Unresolved Affected Unsecured Claims, Post-Filing Claims and any other Claims (excluding, for the avoidance of doubt, any Equity Claims) have been finally resolved; (ii) any remaining Cash held in the Unresolved Claims Reserve has been transferred into the Affected Unsecured Creditor Pool; and (iii) the administration and wind-down matters set out in Article 10 have been substantially completed, the Monitor shall set a Distribution Date for the purposes of effecting a final distribution of Available Cash to Affected Unsecured Creditors with Proven Affected Unsecured Claims (the "**Final Distribution**"). The Final Distribution shall include, among other things, any remainder of the Administrative Reserve (except for an amount to be set aside for fees and costs to be incurred by or on behalf of the Monitor (including the fees and expenses of the Monitor's counsel) in effecting the Final Distribution, the completion of any remaining administration matters and the discharge of the Monitor). After completing the Final Distribution and upon being granted a discharge and release, the Monitor shall pay any remaining Cash of the Canadian Estate, including any Cash on account of Undeliverable Distributions remaining following the Final Distribution, as the CCAA Court may direct.

### ARTICLE 7
### RELEASES

### 7.1    Plan Releases

On the Plan Effective Date: (i) the Canadian Debtors (including the Canadian Estate) and their respective current and former employees, auditors, financial advisors, legal counsel and agents (in each case, in that capacity only); (ii) the Directors and Officers; and (iii) the Monitor, the Monitor's legal counsel, and each and every current and former shareholder, affiliate, affiliate's shareholder, director, officer, member (including members of any committee or governance council), partner, employee, auditor, financial advisor and agent of any of the foregoing Persons (in each case, in that capacity only) (each of the Persons specified in (i), (ii) or (iii) of this Section 7.1, in their capacity as such, being herein referred to individually as a "**Released Party**" and collectively referred to as the "**Released Parties**") shall be fully, finally and irrevocably released and discharged from any and all Released Claims and all Released Claims shall be fully, finally, irrevocably and forever waived, discharged, released, cancelled and barred as against the

- 40 -

Released Parties, all to the fullest extent permitted by Applicable Law. Notwithstanding the foregoing, nothing herein shall release or discharge Non-Released Claims.

For the purposes of the foregoing:

(a)     "**Released Claims**" means any and all demands, claims, actions, causes of action, counterclaims, suits, debts, sums of money, liabilities, accounts, covenants, damages, judgments, orders (including for injunctive relief or specific performance and compliance orders), expenses, executions, Encumbrances and recoveries on account of any liability, obligation, demand or cause of action of whatever nature, including claims for contribution or indemnity, which any Creditor or other Person has or may be entitled to assert (including any and all of the foregoing in respect of the payment and receipt of proceeds and statutory or common law liabilities of directors or officers, and any alleged fiduciary, statutory or other duty (in any capacity whatsoever)), whether known or unknown, matured or unmatured, direct, indirect or derivative, at common law, equity or under statute, foreseen or unforeseen, existing or hereafter arising, based in whole or in part on any act, omission, transaction, duty, responsibility, indebtedness, liability, obligation, dealing, matter or occurrence existing or taking place on or prior to the Plan Effective Date, or such later date as actions are taken to implement the Plan, that in any way relate to, or arise out of or in connection with, any Claims, any Director/Officer Claims, the business and affairs of the Canadian Debtors or the Nortel Group whenever, wherever or however conducted, the administration and/or management of the Canadian Debtors or the Nortel Group, the CCAA Proceedings or any matter or transaction involving any of the Canadian Debtors occurring in or in connection with the CCAA Proceedings, including the Plan or the development thereof, but excluding Non-Released Claims; and

(b)     "**Non-Released Claims**" means, collectively: (i) the Canadian Estate's obligations under this Plan (including the right of Affected Unsecured Creditors to receive distributions pursuant to this Plan in respect of Proven Affected Unsecured Claims), the Settlement and Support Agreement, the Records Assistance Side Letter and the Personnel Files Agreement; (ii) any claim against a Released Party if the Released Party is determined by a Final Order of a court of competent jurisdiction to have committed fraud or wilful misconduct; (iii) solely as against a Director in his or her capacity as such, any Director/Officer Claim that is not permitted to be released pursuant to Section 5.1(2) of the CCAA; (iv) the Canadian Intercompany Claims; (v) the rights of the Canadian Debtors and the U.S. Debtors preserved in Section 8(b)(iii) of the Settlement and Support Agreement; and (vi) any obligation secured by the Administration Charge.

### 7.2     Insured Claims

Notwithstanding anything to the contrary in Section 7.1, Insured Claims shall not be compromised, released, discharged, cancelled and barred by this Plan, provided that from and after the Plan Effective Date, any Person having an Insured Claim shall be irrevocably limited to recovery in respect of such Insured Claim solely from the proceeds of the applicable Insurance

- 41 -

Policies, and Persons with any Insured Claim shall have no right to, and shall not, directly or indirectly, make any claim or seek any recoveries from any Released Party or their assets, other than enforcing such Person's rights to be paid by the applicable insurer(s) from the proceeds of the applicable Insurance Policies.

### 7.3    Injunctions

From and after the Plan Effective Date, all Persons are permanently and forever barred, estopped, stayed and enjoined, with respect to any and all Released Claims, from: (i) commencing, conducting, continuing or making in any manner, directly or indirectly, any action, suit, claim, demand or other proceeding of any nature or kind whatsoever (including any proceeding in a judicial, arbitral, administrative or other forum) against the Released Parties; (ii) enforcing, levying, attaching, collecting or otherwise recovering or enforcing by any manner or means, directly or indirectly, any judgment, award, decree or order against the Released Parties or their property; (iii) commencing, conducting, continuing or making in any manner, directly or indirectly, any action, suit, claim, demand or other proceeding of any nature or kind whatsoever (including any proceeding in a judicial, arbitral, administrative or other forum) against any Person who makes a claim or might reasonably be expected to make a claim, in any manner or forum, including by way of contribution or indemnity or other relief, against one or more of the Released Parties; (iv) creating, perfecting, asserting or otherwise enforcing, directly or indirectly, any lien or Encumbrance of any kind against the Released Parties or their property; or (v) taking any actions to interfere with the implementation or consummation of this Plan.

### 7.4    Indenture Trustee Release

Upon the occurrence of the Plans Effective Date (as such term is defined in the Settlement and Support Agreement) and subject to each Indenture Trustee supporting the Settlement and Support Agreement, this Plan and all of the transactions and actions contemplated thereby and hereby and taking any and all reasonably necessary and appropriate actions in furtherance of consummation of the Settlement and Support Agreement and this Plan, the Canadian Debtors and the Monitor hereby release all Released Claims (as such term is defined in the Settlement and Support Agreement) against the Indenture Trustees and their current and former employees, legal counsel and agents, provided that the obligations of the Indenture Trustees as contemplated under this Plan shall not be released. Upon the occurrence of the Plans Effective Date (as such term is defined in the Settlement and Support Agreement), each of the Indenture Trustees shall be deemed to have released all Released Claims (as such term is defined in the Settlement and Support Agreement) against the Released Parties (as such term is defined in Section 7.1). For the avoidance of doubt, the releases in Section 7.1 in favour of the Released Parties shall also be applicable to any claim of an Indenture Trustee against a Released Party.

### ARTICLE 8
### COURT SANCTION

### 8.1    Application for Sanction Order

If the Required Majority approves the Plan, the Monitor and the Canadian Debtors shall apply for the Sanction Order and the Canadian Escrow Release Order on or before the date set for the Sanction Order hearing or such later date as the CCAA Court may set.

- 42 -

## 8.2    Sanction Order

The Sanction Order shall, among other things:

(a)    effect the substantive consolidation of the Canadian Debtors into the Canadian Estate on the terms contemplated by Section 2.2 hereof, including vesting all of the assets of the Other Canadian Debtors in NNL (excluding any Canadian Intercompany Claims held by the Other Canadian Debtors), deeming all Proven Affected Unsecured Claims (whether now existing or hereafter coming into existence) against the Other Canadian Debtors to be claims against NNL and barring and extinguishing all Duplicative Claims;

(b)    declare that (i) the Plan has been approved by the Required Majority in conformity with the CCAA; (ii) the activities of the Canadian Debtors have been in reasonable compliance with the provisions of the CCAA and the Orders of the CCAA Court made in this CCAA Proceeding in all respects; (iii) the CCAA Court is satisfied that the Canadian Debtors have not done or purported to do anything that is not authorized by the CCAA; and (iv) the Plan and the transactions contemplated thereby are fair and reasonable;

(c)    declare that the Settlement and Support Agreement is fair and reasonable and authorize and direct the Canadian Debtors and the Monitor to perform their obligations under the Settlement and Support Agreement and carry out the transactions contemplated thereby;

(d)    approve and authorize the giving of the Settlement and Support Agreement Releases by the Canadian Debtors and the Monitor;

(e)    declare that the Plan and all associated steps, compromises, transactions, arrangements, releases and reorganizations effected thereby are approved, binding and effective, subject to the terms set out in the Plan, upon and with respect to the Canadian Debtors, all Affected Creditors, the Directors and Officers, any Person with a Released Director/Officer Claim, the Released Parties and all other Persons named or referred to in, or subject to, the Plan;

(f)    as of the Plan Effective Date, compromise, discharge and release the Canadian Debtors from any and all Affected Claims of any nature in accordance with the Plan, and declare that the ability of any Person to proceed against any one or more of the Canadian Debtors in respect of or relating to any Affected Claims shall be forever discharged and restrained, and all proceedings with respect to, in connection with or relating to such Affected Claims be permanently stayed, subject only to the right of Affected Creditors to receive distributions pursuant to the Plan in respect of their Affected Claims (to the extent they become Proven Affected Unsecured Claims);

(g)    as of the Plan Effective Date, subject to Section 7.2, compromise, discharge and release the Directors and Officers from any and all Released Claims of any nature in accordance with the Plan, and declare that the ability of any Person to proceed

- 43 -

against the Directors and Officers (or any of them) in respect of or relating to any Released Claim shall be forever discharged and restrained, and all proceedings with respect to, in connection with or relating to such Released Claims be permanently stayed;

(h)     as of the Plan Effective Date, discharge and release the Released Parties on the terms set forth in Article 7 hereof and implement the injunctions contemplated thereby;

(i)     as of the Plan Effective Date, bar, stop, stay and enjoin the commencing, taking, applying for or issuing or continuing of any and all steps or proceedings, including without limitation, administrative hearings and orders, declarations or assessments, commenced, taken or proceeded with or that may be commenced, taken or proceeded with against any Released Party in respect of all Released Claims and any matter which is released pursuant to Article 7 hereof;

(j)     authorize the Canadian Estate and the Monitor to perform their obligations and functions under the Plan, including the establishment of the Administrative Reserve and the Unresolved Claims Reserve, and to perform all such other acts and execute such documents as may be required in connection with the foregoing;

(k)     authorize the Monitor to continue its administration and wind-down of the Canadian Estate in accordance with the Monitor's Powers Orders and the Plan;

(l)     declare that no shareholder approval is required in respect of the Settlement and Support Agreement, the Plan or any transaction or act contemplated thereby;

(m)     authorize and direct that all amounts held by NNL pursuant to the Canada Only Sale Proceeds Orders or held as Unavailable Cash by the Canadian Debtors shall form part of the Available Cash without any restriction thereon;

(n)     declare that each of the Charges (except for the Administration Charge) shall be terminated, discharged, expunged and released on the Plan Effective Date, subject to, in the case of the Inter-company Charge (but solely to the extent it benefits NNI), payment of the Remaining Revolver Claim as contemplated pursuant to Section 6.2(a) hereof;

(o)     declare that the tolling of any Claims, Director/Officer Claims or other claims or rights pursuant to prior orders of the CCAA Court shall cease on the Plan Effective Date, without prejudice to the rights all Affected Unsecured Creditors with Proven Affected Unsecured Claims (whether now existing or hereafter coming into existence) to receive all distributions contemplated by this Plan;

(p)     order that the CCAA stay of proceedings provided for in the Initial Order shall be extended indefinitely, subject to further order of the CCAA Court, and provided that the Monitor shall serve on the service list in the CCAA Proceedings and file with the CCAA Court a report on the progress of the continuing administration

- 44 -

and wind-down of the Canadian Estate, including the implementation of this Plan, on no less than an annual basis;

(q)     declare that any obligation of the Monitor to provide cash flow forecasting or reconciliations and monthly claims reporting (whether pursuant to paragraph 11 of the Claims Resolution Order dated September 16, 2010, or any other agreement or order) shall cease as at the Plan Effective Date, provided that the Monitor shall provide cash flow reporting and claims reporting in the reports contemplated in the foregoing subsection;

(r)     provide for the termination of the Hardship Process and that all remaining amounts relating to the Hardship Process shall become Available Cash on the Plan Effective Date;

(s)     authorize and effect the matters contemplated pursuant to Section 10.2   and Section 11.12 hereof;

(t)     declare that, notwithstanding: (i) the pendency of this proceeding; (ii) any applications for a bankruptcy, receivership or other order now or hereafter issued pursuant to the BIA, the CCAA or otherwise in respect of any of the Canadian Debtors and any bankruptcy, receivership or other order issued pursuant to any such applications; and (iii) any assignment in bankruptcy made or deemed to be made in respect of any of the Canadian Debtors, the transactions contemplated by this Plan and by the Settlement and Support Agreement shall be binding on any trustee in bankruptcy or receiver that may be appointed in respect of the Canadian Debtors or their assets and shall not be void or voidable by creditors of the Canadian Debtors, nor shall the Plan, the Settlement and Support Agreement or the payments and distributions contemplated pursuant thereto constitute nor be deemed to constitute a fraudulent preference, assignment, fraudulent conveyance, transfer at undervalue, or other reviewable transaction under the BIA, CCAA or any other applicable federal or provincial legislation, nor shall the Plan or the Settlement and Support Agreement constitute oppressive or unfairly prejudicial conduct pursuant to any applicable federal or provincial legislation;

(u)     authorize and approve the releases contemplated in Section 7.4 hereof; and

(v)     declare that the Canadian Debtors and the Monitor may apply to the CCAA Court for advice and direction in respect of any matters arising from or in relation to this Plan.

## ARTICLE 9
## PLAN CONDITIONS PRECEDENT AND IMPLEMENTATION

### 9.1     Canadian and U.S. Plans Effectiveness

This Plan and the U.S. Plans shall become effective at the same time on the Plan Effective Date. On the Plan Effective Date: (i) the Monitor shall deliver a certificate to the U.S. Debtors declaring the effectiveness of this Plan; and (ii) the U.S. Debtors shall deliver a certificate to the

- 45 -

Canadian Debtors and the Monitor declaring the effectiveness of the U.S. Plans ((i) and (ii), collectively, the "**Plan Certificates**"), such Plan Certificates to be held in escrow and released simultaneously, thereby triggering the effectiveness of this Plan and the U.S. Plans and the occurrence of the Plans Effective Date (as such term is defined in the Settlement and Support Agreement).

### 9.2    Conditions Precedent to Plan Effectiveness

The effectiveness of this Plan is subject to the satisfaction of the following conditions  (the "**Plan Effective Conditions**"):

    (a)    the Plan shall have been approved by the Required Majority;

    (b)    the Sanction Order shall have been issued and entered and shall have become a Final Order;

    (c)    the Canadian Escrow Release Order shall have been issued and entered and shall have become a Final Order;

    (d)    the U.S. Plans shall have been confirmed by Final Order in the U.S. Proceedings in a form that, to the satisfaction of the Monitor and its counsel, contains the terms contemplated by and referred to in the Settlement and Support Agreement as being contained in the U.S. Plans;

    (e)    the U.S. Escrow Release Order (as defined in the Settlement and Support Agreement) shall have been issued and entered and shall have become a Final Order in a form satisfactory to the Monitor and its counsel;

    (f)    the Sanction Order shall have been recognized and given full force and effect in the United States by an order of the U.S. Bankruptcy Court in the Chapter 15 Proceedings;

    (g)    all conditions precedent to the Settlement and Support Agreement (excluding the condition specified in Section 9(a)(xi)) shall have been satisfied or waived in accordance with the terms of the Settlement and Support Agreement;

    (h)    all conditions precedent to the effectiveness of the U.S. Plans (but excluding the occurrence of the Plan Effective Date hereunder) shall have been satisfied or waived in accordance with their respective terms, and the U.S. Debtors and Canadian Debtors shall have exchanged the Plan Certificates in escrow; and

    (i)    the Settlement and Support Agreement shall not have been terminated.

### 9.3    Conditions Precedent to Plan Implementation

The establishment of the cash pools and reserves contemplated in Article 5 and the making of the distributions and payments contemplated pursuant to Article 6 is subject to the satisfaction of the following conditions (the "**Plan Implementation Conditions**"):

- 46 -

(a)     the Plans Effective Date (as defined in the Settlement and Support Agreement) shall have occurred and the Settlement and Support Agreement shall have become fully effective and enforceable in accordance with its terms;

(b)     the with prejudice dismissal of all litigation referenced in Section 5(b) of the Settlement and Support Agreement, including the pending leave to appeals, appeals and cross-appeals in respect of the Allocation Dispute pending before the Canadian Courts and the U.S. Courts, shall have occurred; and

(c)     NNL shall have received the Canadian Allocation.

### 9.4     Monitor's Certificate – Plan Effectiveness

As soon as practicable following the occurrence of the Plan Effective Date, the Monitor shall serve on the service list in the CCAA Proceedings and post on the Monitor's Website a certificate confirming that the Plan Effective Date has occurred (the "**Plan Effectiveness Certificate**"). The Monitor shall file the Plan Effectiveness Certificate with the CCAA Court as soon as practicable after it has been delivered.

### 9.5     Monitor's Certificate – Plan Implementation

As soon as practicable following the occurrence of the Plan Implementation Date, the Monitor shall serve on the service list in the CCAA Proceedings and post on the Monitor's Website a certificate confirming that the Plan Implementation Date has occurred (the "**Plan Implementation Certificate**").  The Monitor shall file the Plan Implementation Certificate with the CCAA Court as soon as practicable after it has been delivered.

### 9.6     Waiver of Plan Effective Conditions and Plan Implementation Conditions

Notwithstanding Sections 9.2 and 9.3, each of the Plan Effective Conditions and Plan Implementation conditions (except for the Plan Effective Conditions specified in Sections 9.2(a), 9.2(g) and 9.2(i)) can be waived, in whole or in part, solely by the Monitor with prior approval of the CCAA Court.

## ARTICLE 10
## CONTINUING ADMINISTRATION AND WIND-DOWN OF THE CANADIAN ESTATE AND RELATED MATTERS

### 10.1     Continuing Administration and Wind Down of the Canadian Estate

The administration and wind-down of the Canadian Estate will continue to be conducted by the Monitor pursuant to the Monitor's Powers Orders and this Plan, including following the Plan Effective Date and the Plan Implementation Date. Without in any way limiting the powers of the Monitor pursuant to the CCAA, the Initial Order, this Plan or the Monitor's Powers Orders, such continuing administration and wind-down may include:

- 47 -

(a)     taking all steps and actions contemplated by this Plan and the Settlement and Support Agreement, including effecting distributions and payments contemplated hereby and thereby;

(b)     the resolution of any remaining unresolved Claims or Post-Filing Claims;

(c)     the sale or other realization of the Canadian Debtors' residual assets and the repatriation of funds from foreign controlled subsidiaries, all to be used to make the distributions and payments contemplated pursuant to this Plan;

(d)     the resolution of the Canadian Debtors' Tax matters and recovery of any Tax refunds;

(e)     the wind-down of the Canadian Debtors and their direct and indirect controlled subsidiaries (which, for the avoidance of doubt, does not include any of the U.S. Debtors, the EMEA Debtors or the EMEA Non-Filed Entities); and

(f)     the disposal of the Canadian Debtors' books and records, including their remaining information technology infrastructure.

**10.2     Stakeholder Advisor Fee Arrangements**

(a)     The Bondholder Advisor Fee Letter shall terminate on the Plan Implementation Date, and the Canadian Debtors (including the Canadian Estate) shall have no obligation to pay any fees and expenses of the advisors to the Bondholder Group from and after the Plan Implementation Date.

(b)     From and after the Plan Implementation Date, the fees and expenses of Court Appointed Representative Counsel shall no longer be borne by the Canadian Estate and instead shall be borne by the Compensation Creditors. Any fees and expenses incurred by Court Appointed Representative Counsel from and after the Plan Implementation Date shall be deducted, dollar for dollar, from the distributions pursuant to this Plan to Compensation Creditors whom such Court Appointed Representative Counsel represent. Any such deductions shall be borne by the applicable Compensation Creditors on a *pro rata* basis based on the amount of their respective Proven Affected Unsecured Claims. Notwithstanding the foregoing, from and after the Plan Implementation Date, to the extent the Monitor requests in writing that Court Appointed Representative Counsel provide any service relating to such Court Appointed Representative Counsel responding to inquiries of Compensation Creditors regarding distributions under this Plan, the Canadian Estate shall pay the associated reasonable fees and expenses of such Court Appointed Representative Counsel as may be agreed to in writing between the Canadian Estate, the Monitor and the applicable Court Appointed Representative Counsel.

(c)     The obligation of the Canadian Debtors to pay the fees and expenses of counsel to the Directors and Officers (whether pursuant to the Initial Order or otherwise) shall terminate on the Plan Implementation Date and the Canadian Debtors

- 48 -

(including the Canadian Estate) shall have no obligation to pay any fees and expenses of counsel to the Directors and Officers from and after the Plan Implementation Date.

## ARTICLE 11
## GENERAL

### 11.1   Binding Effect

The Plan will become effective and binding on the Plan Effective Date, provided that the establishment of the cash pools and reserves contemplated in Article 5 and the making of the distributions contemplated pursuant to Article 6 shall be conditional upon satisfaction or waiver of the Plan Implementation Conditions and the occurrence of the Plan Implementation Date. Without limiting the generality of the foregoing, on the Plan Effective Date:

    (a)    the treatment of Affected Claims and Released Claims under the Plan shall be final and binding for all purposes and shall be binding upon and enure to the benefit of the Canadian Debtors, the Released Parties, all Affected Creditors, any Person having a Released Claim and all other Persons named or referred to in, or subject to, the Plan and their respective heirs, executors, administrators and other legal representatives, successors and assigns;

    (b)    all Affected Claims shall be forever discharged and released, excepting only the distribution thereon in the manner and to the extent provided for in the Plan;

    (c)    all Released Claims shall be forever discharged and released;

    (d)    each Affected Creditor and each Person holding a Released Claim shall be deemed to have consented and agreed to all of the provisions of the Plan, in its entirety; and

    (e)    each Affected Creditor and each Person holding a Released Claim shall be deemed to have executed and delivered to the Canadian Debtors and to the other Released Parties, as applicable, all consents, releases, assignments and waivers, statutory or otherwise, required to implement and carry out the Plan in its entirety.

### 11.2   Deeming Provisions

In the Plan, the deeming provisions are not rebuttable and are conclusive and irrevocable.

### 11.3   Non-Consummation/Termination of Settlement and Support Agreement

If the Plan Effective Date does not occur on or prior to August 31, 2017 (or such later date as the date for the Plans Effective Date (as defined in the Settlement and Support Agreement) to have occurred pursuant to Section 9(a)(xi) of the Settlement and Support Agreement may be extended to), then, notwithstanding any other provision hereof: (a) the Plan shall be null and void in all respects, (b) any settlement or compromise embodied in the Plan shall be deemed null and void, and (c) nothing contained in the Plan, and no acts taken in preparation for consummation of the

- 49 -

Plan, shall (i) constitute or be deemed to constitute a waiver or release of any Claims by or against the Canadian Debtors or any other Person; (ii) prejudice in any manner the rights of the Canadian Debtors or any other Person in any further proceedings involving the Canadian Debtors; or (iii) constitute an admission of any sort by the Canadian Debtors or any other Person; provided, however, that nothing in this Section 11.3 shall impair the enforceability of the Settlement and Support Agreement in accordance with its terms. In the event the Settlement and Support Agreement is terminated or does not become effective in accordance with its terms, the Canadian Debtors and Monitor reserve all of their rights and defenses with respect to the claims and other matters resolved by the Settlement and Support Agreement, including the Allocation Dispute, and nothing contained in this Plan nor the proposed settlement set forth in the Settlement and Support Agreement shall constitute an admission by the Canadian Debtors or the Monitor regarding the validity of the litigations, claims or defenses resolved by the Settlement and Support Agreement or that the Canadian Debtors have any liability in connection with such litigations, claims or defenses. In the event of the termination of the Settlement and Support Agreement, or if this Plan does not become effective in accordance with its terms, all rights of the Canadian Debtors (excluding the New Applicants) and the Monitor with regard to the Allocation Dispute and with respect to the interest of the Canadian Debtors in the Sale Proceeds be and are hereby reserved.

### 11.4    Modification of the Plan

(a)    Subject to Section 6(b) of the Settlement and Support Agreement, the Monitor and Canadian Debtors reserve the right, at any time and from time to time, to amend, restate, modify and/or supplement the Plan, provided that any such amendment, restatement, modification or supplement must be contained in a written document which is filed with the CCAA Court and (i) if made prior to or at the Meeting, communicated to the Affected Creditors in the manner contemplated by the Meeting Order; and (ii) if made following the Meeting, approved by the CCAA Court following notice to the Affected Creditors. Notwithstanding the foregoing, the Canadian Debtors shall not amend, restate, modify and/or supplement the Plan in a manner that is inconsistent with their obligations under the Settlement and Support Agreement. For the avoidance of doubt, nothing in this Section 11.4(a) limits any Settlement Party's rights pursuant to Section 6(h) of the Settlement and Support Agreement with respect to any amendment, restatement, modification and/or supplement to the Plan.

(b)    Notwithstanding Section 11.4(a), any amendment, restatement, modification or supplement to the Plan may be made by the Monitor and Canadian Debtors at any time and from time to time, provided that it: (i) concerns a matter which is of an administrative nature required to better give effect to the implementation of the Plan; or (ii) is to cure any errors, omissions or ambiguities, and in either case is not materially adverse to the financial or economic interests of the Affected Creditors.

(c)    Any amended, restated, modified or supplementary Plan or Plans filed with the CCAA Court and, if required by this section, approved by the CCAA Court, shall, for all purposes, be and be deemed to be a part of and incorporated in the Plan.

- 50 -

### 11.5    Paramountcy

From and after the Plan Effective Date, any conflict between:

    (a)      the Plan or the Sanction Order; and

    (b)      the covenants, warranties, representations, terms, conditions, provisions or obligations, expressed or implied, of any contract, mortgage, security agreement, indenture, trust indenture, note, loan agreement, commitment letter, agreement for sale, lease or other agreement, written or oral and any and all amendments or supplements thereto existing between one or more of the Affected Creditors and the Canadian Debtors as at the Plan Effective Date;

will be deemed to be governed by the terms, conditions and provisions of the Plan and the Sanction Order, which shall take precedence and priority, provided that the Settlement and Support Agreement and any settlement agreement executed by the Canadian Debtors and any Person asserting a Claim or a Director/Officer Claim that was entered into from and after the Filing Date shall be read and interpreted in a manner that assumes that such settlement agreement is intended to operate congruously with, and not in conflict with, the Plan, and, provided further, that to the extent of any inconsistency between the Settlement and Support Agreement and the Plan, the Settlement and Support Agreement shall govern. For the avoidance of doubt: (i) all distributions from the Escrow Accounts (including the specific amounts to be distributed to each of the Canadian Debtors, the U.S. Debtors and the EMEA Debtors) shall be strictly in accordance with the Settlement and Support Agreement; and (ii) to the extent of any conflict between the provisions of the Settlement and Support Agreement and this Plan as relates to distributions from the Escrow Accounts, the provisions of the Settlement and Support Agreement shall govern in all respects.

### 11.6    Severability of Plan Provisions

If any term or provision of the Plan is held by the Canadian Court to be invalid, void or unenforceable, the Canadian Court, at the request of the Canadian Debtors and the Monitor, shall have the power to either (a) sever such term or provision from the balance of the Plan and provide the Canadian Debtors with the option to proceed with the implementation of the balance of the Plan, or (b) alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as so altered or interpreted. Notwithstanding any such holding, alteration or interpretation, and provided that the Canadian Debtors proceed with the implementation of the Plan, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation.

### 11.7    Force Majeure

If the Canadian Estate's or Monitor's performance of any obligation pursuant to this Plan, including, without limitation, pursuant to Article 6 hereof, is prevented, hindered or delayed by reason of Force Majeure (a **"Force Majeure Event"**), then the Canadian Estate and Monitor shall be excused from performance to the extent that either of them is prevented, hindered or

- 51 -

delayed as a result of such Force Majeure Event during the continuance of such Force Majeure Event, and the Canadian Estate's and Monitor's obligations hereunder shall be excused so long as and to the extent that such Force Majeure Event prevents or delays performance.

### 11.8    Responsibilities of the Monitor and Protections of the Monitor

The Monitor is acting and will continue to act in all respects in its capacity as Monitor in the CCAA Proceedings (and not in its personal capacity), including to implement the Plan and the Settlement and Support Agreement and to otherwise continue the ongoing administration and wind-down of the Canadian Debtors. The Monitor will not be responsible or liable for any obligations of the Canadian Debtors (including, for the avoidance of doubt, the Canadian Estate). The Monitor shall have the powers and protections granted to it by the Plan, the CCAA, the Monitor's Powers Orders and any other Order made in the CCAA Proceedings. None of the Monitor or its affiliates, shareholders, affiliate's shareholders (including Ernst & Young LLP, a Canadian limited liability partnership), employees, advisors, lawyers, representatives or agents ("**Monitor Related Parties**") shall incur any personal liability whatsoever whether on their own part or in respect of any failure on the part of any Canadian Debtor to observe, perform or comply with any of its obligations under this Plan or under or in relation to any associated arrangements or negotiations. Any release, discharge or other benefit conferred upon the Monitor pursuant to this Plan shall enure to the benefit of the Monitor Related Parties and Ernst & Young Inc. in its personal capacity, and each of the Monitor Related Parties and Ernst & Young Inc. in its personal capacity shall be a third party beneficiary to this Plan entitled to enforce such releases, discharges and benefits in accordance with the terms of this Plan.

### 11.9    Different Capacities

Persons who are affected by this Plan may be affected in more than one capacity. Unless expressly provided herein to the contrary, a Person will be entitled to participate hereunder in each such capacity. Any action taken by a Person in one capacity will not affect such Person in any other capacity, unless expressly agreed by the Canadian Debtors and the Person in writing or unless its Claims overlap or are otherwise duplicative.

### 11.10    Notices

Any notice or other communication to be delivered hereunder must be in writing and reference the Plan and may, subject as hereinafter provided, be made or given by personal delivery, ordinary mail or by facsimile or email addressed to the respective parties as follows:

     If to the Canadian Debtors:

          c/o Ernst & Young Inc.
          Court-appointed Monitor of Nortel Networks Corporation *et al*.
          222 Bay Street, Suite 2400
          Toronto, Ontario M5K 1J7

          Attention:      Nortel Monitor

- 52 -

Telephone:    1-416-943-4439 or 1-866-942-7177
Fax:    1-416-943-2808
Email    nortel.monitor@ca.ey.com

If to an Affected Creditor: to the mailing address, facsimile number or email address provided on such Affected Creditor's Proof of Claim or such more recent address particulars of  an Affected Creditor as noted in the files of the Canadian Debtors or the Monitor;

If to the Monitor:

Ernst & Young Inc.
Court-appointed Monitor of Nortel Networks Corporation *et al.*
222 Bay Street, Suite 2400
Toronto, Ontario M5K 1J7

Attention:    Nortel Monitor

Telephone:    1-416-943-4439 or 1-866-942-7177
Fax:    1-416-943-2808
Email    nortel.monitor@ca.ey.com

or to such other address as any party may from time to time notify the others in accordance with this section, or, in the case of an address change for the Canadian Debtors or the Monitor, by posting notice of such address change on the Monitor's Website. Any such communication so given or made shall be deemed to have been given or made and to have been received on the day of delivery if delivered, or on the day of faxing or sending by other means of recorded electronic communication, provided that such day in either event is a Business Day and the communication is so delivered, faxed or sent before 4:00 p.m. (Toronto time) on such day. Otherwise, such communication shall be deemed to have been given and made and to have been received on the next following Business Day.

### 11.11   Further Assurances

Each of the Persons named or referred to in, or subject to, the Plan will execute and deliver all such documents and instruments and do all such acts and things as may be necessary or desirable to carry out the full intent and meaning of the Plan and to give effect to the transactions contemplated herein.

### 11.12   Subsequent Bankruptcy, etc.

If, following the Plan Effective Date, a Bankruptcy Proceeding occurs in respect of the Canadian Debtors (or any of them or their assets), the Proven Affected Unsecured Claims compromised and released hereby shall be deemed to be reinstated in their full amounts solely for purposes of giving effect to any distributions to be made in such a Bankruptcy Proceeding, it being the intention that holders of Proven Affected Unsecured Claims under this Plan shall share rateably with holders of any additional claims (including any Post-Filing Claims) asserted against the

- 53 -

Canadian Debtors (or any of them) in a Bankruptcy Proceeding, provided that any distributions made on account of Proven Affected Unsecured Claims pursuant to this Plan shall also be accounted for in any distributions in a Bankruptcy Proceeding. All Proven Affected Unsecured Claims pursuant to this Plan and the Claims Orders shall be deemed to constitute proven claims in any Bankruptcy Proceeding without any need for a Creditor to file an additional proof of claim in any such Bankruptcy Proceeding. All Claims and Post-Filing Claims as finally resolved pursuant to the Claims Orders shall be final and binding for all purposes in a Bankruptcy Proceeding without any ability on the part of any Creditor or any trustee in bankruptcy or receiver to further dispute, re-assert or re-litigate such claims in a Bankruptcy Proceeding.

### 11.13   Cross-Border Protocol and Cross-Border Claims Protocol

The Cross-Border Protocol and Cross-Border Claims Protocol shall each remain in full force and effect in accordance with their respective terms.

### 11.14   Language

This Plan, as well as any notices, schedules or other documents related thereto (collectively, including the Plan, the "**Plan Documents**"), has been and shall be prepared in the English language only. To the extent a French language or other translation of a Plan Document is prepared, any such translation shall be for informational purposes only, it being intended that the English language version of any Plan Document shall govern and prevail in all respects.

### 11.15   Acts to Occur on Next Business Day

If any distribution, payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such distribution, payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

**DATED** as of the 30th day of November, 2016.

6639004

- 54 -

**SCHEDULE "A"**

**ESCROW AGREEMENTS**

1. Escrow Agreement dated March 31, 2009 with JP Morgan Chase Bank, N.A., as escrow agent (re: Layer 4-7)

2. Escrow Agreement dated November 11, 2009 with JP Morgan Chase Bank, N.A., as escrow agent (re: CDMA)

3. Escrow Agreement dated December 1, 2009 with JP Morgan Chase Bank, N.A., as escrow agent (re: Packet Core)

4. Escrow Agreement dated December 18, 2009 with JP Morgan Chase Bank, N.A., as escrow agent (re: Enterprise)

5. MEN Distribution Escrow Agreement dated March 19, 2010 with JP Morgan Chase Bank, N.A., as escrow agent

6. GSM/GSM-R Distribution Escrow Agreement dated March 31, 2010 with JP Morgan Chase Bank, N.A., as escrow agent

7. GSM Retained Contracts Distribution Escrow Agreement dated June 3, 2010 with JP Morgan Chase Bank, N.A., as escrow agent

8. CVAS Distribution Escrow Agreement dated May 27, 2010 with JP Morgan Chase Bank, N.A., as escrow agent

9. MSS Distribution Escrow Agreement dated March 11, 2011 with JP Morgan Chase Bank, N.A., as escrow agent

10. Patent Portfolio Distribution Escrow Agreement dated July 28, 2011 with JP Morgan Chase Bank, N.A., as escrow agent

**SCHEDULE "B"**

**CROSSOVER BONDHOLDER CLAIMS**

1. 2006 Bonds - 10.750% Senior Notes due 2016          $1,185,132,812

2. 2006 Bonds - 10.125% Senior Notes due 2013          $577,689,063

3. 2006 Bonds - Floating Rate Senior Notes due 2011          $1,022,419,965

4. 2007 Bonds - 2.125% Convertible Senior Notes due 2014          $578,020,746

5. 2007 Bonds - 1.75% Convertible Senior Note Due 2012          $577,487,674

SCHEDULE "C"

INTERCOMPANY CLAIMS - PROVEN AFFECTED UNSECURED CLAIMS

All amounts in USD

| Legal company code | Legal company name | Legal trading partner code | Legal trading partner name | Grand Total |
|---|---|---|---|---|
| 1107 | Architel Systems Corp | 2114 | Architel Systems (U.S.) Corp | (1,912,993) |
| 1002 | Nortel Networks Limited | 2001 | Nortel Networks Inc. | (2,000,000,000) |
| 1002 | Nortel Networks Limited[1] | 4360 | Nortel Networks UK Limited | (122,655,094) |
| 1002 | Nortel Networks Limited | 4220 | Nortel Networks S.p.A. | (2,344,906) |
| 1002 | Nortel Networks Limited | 7120 | Nortel (China) Ltd | (104,218,075) |
| 1002 | Nortel Networks Limited | 6210 | Nortel Networks Singapore Pte | (91,167,570) |
| 1101 | Nortel Technology Corp | 6210 | Nortel Networks Singapore Pte | (8,212) |
| 1101 | Nortel Technology Corp | 3171 | Nortel de México | (276,176) |
| 1101 | Nortel Technology Corp | 7100 | Nortel Networks (Asia) Limited | (176,933) |
| 1101 | Nortel Technology Corp | 6160 | Nortel Malaysia Sdn. Bhd. | (3,222) |
| 1102 | Nortel Int Corp | 7120 | Nortel (China) Ltd | (734,289) |
| 1102 | Nortel Int Corp | 6100 | Nortel Networks Australia Pty | (1,480) |
| 1001 | Nortel Networks Corporation | 3171 | Nortel de México | (59) |

1. Balance includes USD 25M subject to satisfaction of paragraph 2.2 of the Agreement Settling EMEA Canadian Claims and Related Claims

## SCHEDULE "D"

## EXCHANGE RATES FROM CLAIMS PROCEDURE ORDER

Currency conversion factors
Source: Reuters, January 14, 2009

|  |  | CAD per unit of Currency |
|---|---|---|
| CAD | Canadian Dollar | 1 |
| USD | United States Dollar | 1.22025 |
| EUR | Euro | 1.6170753 |
| GBP | United Kingdom: Pnd Ster | 1.77741615 |
| JPY | Japan: Yen | 0.01362647 |

| | | | | | |
|---|---|---|---|---|---|
| AED | United Arab Emir.: Dirham | 0.33221709 | LTL | Lithuanian Litas | 0.46830925 |
| ARS | Argentine Peso | 0.35410621 | LVL | Latvian Lats | 2.29456567 |
| AUD | Australian Dollar | 0.82275356 | MAD | Moroccan Dirham | 0.14500201 |
| BBD | Barbados Dollar | 0.61319095 | MXN | Mexican Peso | 0.08842392 |
| BDT | Bangladeshi Taka | 0.01772331 | MYR | Malaysian Ringgit | 0.34156754 |
| BGN | Bulgaria: New Lev | 0.82683968 | NGN | Nigerian Naira | 0.00816494 |
| BOB | Bolivian Boliviano | 0.17345416 | NOK | Norwegian Krone | 0.17167276 |
| BRL | Brazilian Real | 0.52726527 | NZD | New Zealand Dollar | 0.6711375 |
| CHF | Swiss Franc | 1.09468915 | OMR | Oman: Rial Omani | 3.16980987 |
| CLP | Chilean Peso | 0.0019827 | PAB | Panama: Balb0A | 1.22025 |
| CNY | China: Yuan Renminbi | 0.17854268 | PEN | Peru: Nuevo Sol | 0.3889243 |
| COP | Colombian Peso | 0.00054867 | PGK | Papua New Guinea Kina | 0.4671117 |
| CRC | Costa Rican Colon | 0.00219273 | PHP | Philippine Peso | 0.02592415 |
| CZK | Czech Koruna | 0.06004872 | PKR | Pakistan Rupee | 0.015414 |
| DKK | Danish Krone | 0.21701242 | PLN | Poland: Zloty | 0.39077386 |
| DOP | Dominican Peso | 0.03444601 | PYG | Paraguay: Guarani | 0.0002498 |
| DZD | Algerian Dinar | 0.01682672 | QAR | Qatar: Qatari Rial | 0.33516446 |
| EEK | Estonian Kroon | 0.10334226 | RON | New Romania Leu | 0.37703348 |
| EGP | Egyptian Pound | 0.22086973 | RUB | Russian Ruble | 0.03847246 |
| FJD | Fiji Dollar | 0.67418812 | SAR | Saudi Arabia: Saudi Riyal | 0.32539566 |
| GTQ | Guatemala: Quetzal | 0.15495238 | SEK | Swedish Krona | 0.14788041 |
| HKD | Hong Kong Dollar | 0.15732068 | SGD | Singapore Dollar | 0.82052921 |
| HUF | Hungary: Forint | 0.00583154 | THB | Thailand: Baht | 0.03495417 |
| IDR | Indonesia: Rupiah | 0.00010993 | TND | Tunisian Dinar | 0.89144172 |
| ILS | Israel: Shekel | 0.31449742 | TRY | New Turkish Lira | 0.76914592 |
| INR | Indian Rupee | 0.02499872 | TTD | Trinidad & Tobago Dollar | 0.19524 |
| ISK | Iceland Krona | 0.00966994 | UAH | Ukraine: Hryvnia | 0.13945714 |
| JMD | Jamaican Dollar | 0.01515838 | UYU | Uruguay: Peso | 0.05016444 |
| JOD | Jordanian Dinar | 1.72084329 | VEF | Bolivar Fuerte | 0.56827178 |
| KPW | North Korean Won | 0.00853023 | VND | Vietnam: Dong | 0.00006981 |
| KRW | Republic Of Korea: Won | 0.00090543 | XCD | East Caribbean Dollar | 0.4587406 |
| KWD | Kuwaiti Dinar | 4.28157891 | ZAR | South Africa: Rand | 0.12249969 |
| LBP | Lebanese Pound | 0.00080945 | ZMK | Zambia: Kwacha | 0.00024601 |
| LKR | Sri Lanka Rupee | 0.01072276 | | | |

**EXHIBIT "A"**

**SETTLEMENT AND SUPPORT AGREEMENT**

**[ATTACHED]**

CONFIDENTIAL
FOR SETTLEMENT PURPOSES ONLY
SUBJECT TO FRE 408 AND ANALOGS IN ALL RELEVANT JURISDICTIONS
(EXECUTION VERSION)

### SETTLEMENT AND PLANS SUPPORT AGREEMENT

This **SETTLEMENT AND PLANS SUPPORT AGREEMENT** (together with all Annexes hereto, in each case as amended, supplemented or otherwise modified from time to time in accordance with the terms hereof, this "**Settlement and Support Agreement**") is dated as of October 12, 2016 and entered into by and among: (i) the Canadian Debtors;[1] (ii) the Monitor; (iii) the U.S. Debtors; (iv) the EMEA Debtors; (v) the EMEA Non-Filed Entities; (vi) the Joint Administrators; (vii) NNSA; (viii) the NNSA Conflicts Administrator; (ix) the French Liquidator; (x) the Bondholder Group; (xi) the members of the CCC; (xii) the UCC; (xiii) the U.K. Pension Trustee; (xiv) the PPF; (xv) the Joint Liquidators and (xvi) the NNCC Bondholder Signatories (collectively, the "**Parties**" and each a "**Party**").

**WHEREAS**, NNC, NNL, NNI, NNSA and NNUK and various other members of the Nortel Group commenced insolvency proceedings as early as January 14, 2009 (collectively, the "**Nortel Insolvency Proceedings**");

**WHEREAS,** during the course of the Nortel Insolvency Proceedings various assets were sold and certain Sale Proceeds are held in the Existing Escrow Accounts pending either the agreement of the relevant parties or final CCAA Court and Bankruptcy Court decisions regarding the allocation of said proceeds;

**WHEREAS**, various of the Parties have or may have claims as against other Parties which are to be resolved in the context of the Nortel Insolvency Proceedings;

**WHEREAS**, certain of the Parties are parties to certain litigation before the Canadian Court and U.S. Court in which the allocation of the Sale Proceeds is at issue (the "**Allocation Dispute**");

**WHEREAS**, the CCAA Court and the Bankruptcy Court each issued separate decisions on or about May 12, 2015 and July 6, 2015 regarding the Allocation Dispute and such decisions remain subject to appeal in both jurisdictions (the "**Allocation Decisions**");

**WHEREAS**, the Parties acknowledge and agree that the ultimate outcome of continued litigation in relation to the Allocation Dispute and the potential claim matters among them is uncertain, that further appeals are likely, that the cost of such litigation is substantial and burdensome to each of the Parties and their respective constituencies and that settlement of such

---

[1] Capitalized terms not otherwise defined in the main body of this Settlement and Support Agreement shall have the meaning ascribed to them in Section 1 hereof.

matters is key to advancing the Nortel Insolvency Proceedings to facilitate distributions to creditors of the various Debtors' estates;

**WHEREAS**, the Parties desire to settle fully and finally the Allocation Dispute and key potential claims matters among them and each Party has concluded it is appropriate and in the best interest of each to enter into this Settlement and Support Agreement;

**WHEREAS,** the Parties wish to effectuate a full and final settlement of the Allocation Dispute and certain other matters in accordance with terms and conditions set forth herein (the "**Settlement**"); and

**WHEREAS**, to effect the Settlement, the Parties have agreed to enter into this Settlement and Support Agreement.

**NOW, THEREFORE**, in consideration of the foregoing and the promises, mutual covenants, and agreements set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound, agrees as follows:

**Section 1.  Definitions**

"**Allocation Decisions**" has the meaning set forth in the recitals hereto.

"**Allocation Dispute**" has the meaning set forth in the recitals hereto.

"**Applicable FX Rate**" has the meaning set forth in Section 7(g) hereof.

"**Bankruptcy Code**" means title 11 of the United States Code, as amended.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware.

"**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, 28 U.S.C. § 2075, as applicable to the Chapter 11 Cases and the general, local and chambers rules of the Bankruptcy Court.

"**Beddoes Court**" means the High Court of Justice of England and Wales that has the power to provide directions to the U.K. Pension Trustee authorizing the U.K. Pension Trustee to execute and implement this Settlement and Support Agreement.

"**Bondholder Group**" means the ad hoc group of bondholders that hold notes issued and/or guaranteed by NNC, NNL, NNI, and NNCC, which on June 15, 2016, filed with the Bankruptcy Court a disclosure form under Bankruptcy Rule 2019, as such group may be constituted from time to time.

"**Business Day**" means any day (other than a Saturday, Sunday or legal holiday, as such term is defined in Bankruptcy Rule 9006(a)) on which banks are open for general business in all of New York City, New York, U.S.A.; Toronto, Ontario, Canada; London, England; and Paris France.

"**Buyer Escrow Accounts**" means the escrow accounts established pursuant to certain escrow agreements among certain Nortel Group entities, certain purchasers of Nortel assets and escrow agents governing the holding and release of certain amounts held in escrow in connection with such transactions as set forth on Annex B under the heading "Buyer Escrow Accounts."

"**Buyer Escrow Amount**" has the meaning set forth in Section 2(g) hereof.

"**CAD Claims**" has the meaning set forth in Section 4(n)(i) hereof.

"**Canadian Allocation**" has the meaning set forth in Section 2(c)(ii) hereof.

"**Canadian Court**" means any and all of the CCAA Court, the Ontario Court of Appeal, the Supreme Court of Canada or any other court of competent jurisdiction overseeing the Canadian Proceedings (including any appeals) from time to time.

"**Canadian Debtors**" means, collectively, NNC, NNL, Nortel Networks Global Corporation, Nortel Networks International Corporation, Nortel Networks Technology Corporation, Nortel Communications Inc., Architel Systems Corporation and Northern Telecom Canada Limited.

"**Canadian Escrow Account**" means the account with the Canadian Escrow Agent established pursuant to the Canadian Escrow Agreement to hold that portion of the Sale Proceeds to be converted into Canadian Dollars.

"**Canadian Escrow Agent**" means Royal Trust Corporation of Canada.

"**Canadian Escrow Agreement**" means that certain distribution escrow agreement, substantially in the form attached hereto as Annex K to be entered into among NNC, NNL, NNI, NNUK, the other existing Depositors under the relevant Existing Escrow Agreements, NNSA, the Monitor and the UCC to hold that portion of the Sale Proceeds to be converted into Canadian Dollars.

"**Canadian Escrow Release Order**" means an order issued by the CCAA Court authorizing and directing the release of the Sale Proceeds from the Escrow Accounts in the manner contemplated hereby.

"**Canadian Estate**" means the Canadian Debtors as substantively consolidated as contemplated herein.

"**Canadian Information Circular**" means the information circular to be provided to the Canadian Voting Creditors relating to the Canadian Plan as approved by the CCAA Court.

"**Canadian Meeting Order**" means an order of the CCAA Court granted pursuant to Section 4 and/or 5 of the CCAA that, among other things, authorizes the holding of a meeting or meetings of the Canadian Debtors' creditors for purposes of considering and voting upon the Canadian Plan and approves the Canadian Information Circular.

"**Canadian Pension Claim**" has the meaning set forth in Section 4(g)(i) hereof.

"**Canadian Plan**" means the CCAA plan of compromise or arrangement (including any exhibits, annexes and schedules thereto) for the Canadian Debtors that effectuates the Settlement, consistent with the terms of this Settlement and Support Agreement, as it may be modified or supplemented in accordance with its terms.

"**Canadian Proceedings**" means, collectively, those Nortel Insolvency Proceedings that were commenced before the CCAA Court pursuant to the CCAA on or after January 14, 2009 in respect of the Canadian Debtors.

"**Canadian Surplus Amount**" has the meaning set forth in Section 7(j)(i)(B).

"**Canadian Voting Creditors**" means creditors holding Proven Claims against the Canadian Debtors and such other creditors that are permitted to vote on the Canadian Plan.

"**Cascade Trust**" means the trust established pursuant to that certain Trust Indenture dated April 5, 2010 among NNL and NNI, as settlors, and John T. Evans, as trustee.

"**Cascade Trust Side Letter**" means the Trust Indenture Side Agreement, dated April 5, 2010, between NNL and NNI relating to the Cascade Trust.

"**CCAA**" means the Companies' Creditors Arrangement Act, R.S.C. 1985, c C-36.

"**CCAA Court**" means the Ontario Superior Court of Justice (Commercial List).

"**CCC**" means the ad hoc committee of creditors having claims only against the Canadian Debtors comprised of the former and disabled Canadian employees of the Canadian Debtors through their court-appointed representatives, Unifor, Morneau Shepell Ltd. as Administrator of Nortel's Canadian registered pension plans, the Superintendent of Financial Services of Ontario as Administrator of the Pension Benefits Guarantee Fund and the court-appointed representatives of the current and transferred employees of the Canadian Debtors.

"**CFSA**" means the Final Canadian Funding and Settlement Agreement among, inter alia, certain of the Canadian Debtors, the Monitor and certain of the U.S. Debtors, dated December 23, 2009.

"**Chapter 11 Cases**" means the cases filed by the U.S. Debtors pursuant to Chapter 11 of the Bankruptcy Code.

"**Claims Procedure Order**" means the Claims Procedure Order entered by the CCAA Court dated July 30, 2009, as amended and restated on October 7, 2009.

"**Confirmation Order**" means an order of the Bankruptcy Court entered on the docket in the Chapter 11 Cases confirming the U.S. Plans.

"**Conversion Elections**" has the meaning set forth in Section 7(c)(i)(A) hereof.

"**Conversion Election Request**" has the meaning set forth in Section 7(c)(iii) hereof.

"**Converting Debtor**" has the meaning set forth in Section 7(i)(i) hereof.

"**Creditor Joinder**" means a joinder to this Settlement and Support Agreement, substantially in the form annexed hereto as Annex D.

"**Creditor's Maximum**" has the meaning set forth in Section 4(c)(i)(B) hereof.

"**Cross-Border Protocol**" means the Cross-Border Protocol originally approved by the Bankruptcy Court on or about January 14, 2009 and by the CCAA Court on January 14, 2009, as the same has been amended, as approved by both the Bankruptcy Court and the CCAA Court, from time to time.

"**Crossover Bondholder Fee Letter**" has the meaning set forth in Section 4(k) hereof.

"**Crossover Bondholders**" means beneficial owners of Crossover Bonds as of the earlier of (a) the date each such holder executes a Creditor Joinder or a Transferee Joinder; and (b) the record date that will be established under the U.S. Plans and the Canadian Meeting Order.

"**Crossover Bonds**" means those bonds issued pursuant to the indentures listed on Annex G hereto, but excluding the NNCC Bonds.

"**Crossover Bonds Claims**" means those Crossover Claims relating to the Crossover Bonds.

"**Crossover Claims**" has the meaning set forth in Section 4(c)(i) hereof.

"**Debtors**" means, collectively, the U.S. Debtors, the Canadian Debtors, the EMEA Debtors and NNSA.

"**Depositors**" has the meaning given to such term in the Escrow Agreements.

"**Disclosure Statements**" means, collectively, the U.S. Disclosure Statement and the Canadian Information Circular.

"**EDC**" means Export Development Canada.

"**EMEA Allocation**" has the meaning set forth in Section 2(c)(v) hereof.

"**EMEA Canada Settlement Agreement**" has the meaning set forth in Section 4(b)(i) hereof.

"**EMEA Canadian Claim**" has the meaning set forth in Section 4(b)(i) hereof.

"**EMEA Debtors**" means, collectively, NNUK, Nortel Networks (Ireland) Limited (in administration), Nortel Networks NV (in administration), Nortel Networks SpA (in administration), Nortel Networks BV (in administration), Nortel Networks Polska Sp z.o.o. (in administration), Nortel Networks Hispania SA (in administration), Nortel Networks (Austria) GmbH (in administration), Nortel Networks s.r.o. (in administration), Nortel Networks Engineering Service Kft (in administration), Nortel Networks Portugal SA (in administration), Nortel Networks Slovensko s.r.o. (in administration), Nortel Networks Romania SRL (in administration), Nortel GmbH (in administration), Nortel Networks OY (in administration), Nortel Networks AB (in administration), NNIF, and Nortel Networks France S.A.S. (in

administration), but does not include, for purposes of this Settlement and Support Agreement, NNSA.

"**EMEA Escrow Accounts**" means, collectively, the EMEA Sterling Escrow Account and the EMEA Euro Escrow Account.

"**EMEA Escrow Agreements**" means, collectively, the EMEA Sterling Escrow Agreement and the EMEA Euro Escrow Agreement.

"**EMEA Euro Escrow Account**" means the account with the EMEA Euro Escrow Agent that will be established pursuant to the EMEA Euro Escrow Agreement to hold that portion of the Sale Proceeds to be converted into Euros, in the event that the Euro Conversion Election is requested.

"**EMEA Euro Escrow Agent**" means the escrow agent named in the EMEA Euro Escrow Agreement, which escrow agent shall be reasonably acceptable to NNL, NNI, NNUK, NNSA, the other existing Depositors under the relevant Existing Escrow Agreements, the Monitor and the UCC.

"**EMEA Euro Escrow Agreement**" means the distribution escrow agreement, to be entered into among NNC, NNL, NNI, NNUK, NNSA the other existing Depositors under the relevant Existing Escrow Agreements, the Monitor and the UCC, to hold that portion of the Sale Proceeds to be converted into Euros in the event that the Euro Conversion Election is requested, which agreement shall be in a form reasonably acceptable to NNL, NNI, NNUK, NNSA, the other existing Depositors under the relevant Existing Escrow Agreements, the Monitor and the UCC.

"**EMEA Non-Filed Entities**" means, collectively, Nortel Networks AS, Nortel Networks AG, Nortel Networks South Africa (Pty) Limited, NNNI, and NNOCL.

"**EMEA (Non-NNSA/Non-NNUK) Allocation**" has the meaning set forth in Section 2(c)(iii) hereof.

"**EMEA (Non-NNSA/Non-NNUK) Debtors**" means, collectively, Nortel Networks (Ireland) Limited (in administration), Nortel Networks NV (in administration), Nortel Networks SpA (in administration), Nortel Networks BV (in administration), Nortel Networks Polska Sp z.o.o. (in administration), Nortel Networks Hispania SA (in administration), Nortel Networks (Austria) GmbH (in administration), Nortel Networks s.r.o. (in administration), Nortel Networks Engineering Service Kft (in administration), Nortel Networks Portugal SA (in administration), Nortel Networks Slovensko s.r.o. (in administration), Nortel Networks Romania SRL (in administration), Nortel GmbH (in administration), Nortel Networks OY (in administration), Nortel Networks AB (in administration), NNIF and Nortel Networks France S.A.S. (in administration), but does not include NNSA or NNUK.

"**EMEA Proceedings**" means, collectively, those Nortel Insolvency Proceedings that were commenced before the U.K. Court on or about January 14, 2009 in respect of the EMEA Debtors and NNSA, which, for the avoidance of doubt, excludes the French Secondary Proceeding.

"**EMEA Sterling Escrow Account**" means the account with the EMEA Sterling Escrow Agent that will be established pursuant to the EMEA Sterling Escrow Agreement to hold that portion of the Sale Proceeds to be converted into U.K. pounds Sterling, in the event that the Sterling Conversion Election is requested.

"**EMEA Sterling Escrow Agent**" means the escrow agent named in the EMEA Sterling Escrow Account, which agent shall be reasonably acceptable to NNL, NNI, NNUK, NNSA, the other existing Depositors under the relevant Existing Escrow Agreements, the Monitor and the UCC.

"**EMEA Sterling Escrow Agreement**" means the distribution escrow agreement to be entered into among NNC, NNL, NNI, NNUK, the other existing Depositors under the relevant Existing Escrow Agreements, the Monitor and the UCC, to hold that portion of the Sale Proceeds to be converted into U.K. pounds Sterling in the event the Sterling Conversion Election is requested, which agreement shall be in a form reasonably acceptable to NNL, NNI, NNUK, NNSA, the other existing Depositors under the relevant Existing Escrow Agreements, the Monitor and the UCC.

"**EMEA Surplus Amount**" has the meaning set forth at Section 7(k)(i)(B) hereof.

"**Escrow Accounts**" means, collectively, the Existing Escrow Accounts and the New Escrow Accounts.

"**Escrow Agents**" means the Existing Escrow Agents, the Canadian Escrow Agent, the EMEA Euro Escrow Agent and the EMEA Sterling Escrow Agent, as applicable.

"**Escrow Agreements**" means, collectively, the Existing Escrow Agreements and the New Escrow Agreements governing the Escrow Accounts.

"**Escrow Release Orders**" means, collectively, the Canadian Escrow Release Order and the U.S. Escrow Release Order.

"**Estate Fiduciaries**" has the meaning given to such term in the Escrow Agreements.

"**Euro Conversion Election**" has the meaning set forth in Section 7(c)(i)(A) hereof.

"**Existing Escrow Accounts**" means the escrow accounts established to hold the Sale Proceeds, as set forth on Annex B under the heading "Distribution Escrow Accounts."

"**Existing Escrow Agents**" means JPMorgan Chase Bank, N.A. and Citibank, N.A., as applicable, as escrow agents in respect of the Existing Escrow Accounts.

"**Existing Escrow Agreements**" means the agreements among the various Depositors, Estate Fiduciaries and the Escrow Agents governing the Existing Escrow Accounts, as set forth on Annex B under the heading "Distribution Escrow Accounts."

"**Final Allocation Amount**" has the meaning set forth in Section 7(h) hereof.

"**Final Allocation Determination**" has the meaning set forth in Section 7(h) hereof.

"**Final Order**" means (a) with respect to an order of a Canadian Court, an order: (i) as to which no appeal, leave to appeal, notice of appeal, motion to amend or make additional findings of fact, motion to alter or amend judgment, motion for rehearing or motion for new trial has been timely filed (in cases in which there is a date by which such filing is required to occur, it being understood that with respect to an order issued by the CCAA Court, the time period for seeking leave to appeal shall be deemed to have elapsed on the date that is 22 days after the rendering of such order unless a motion has been made to extend such time period) or, if any of the foregoing has been timely filed, it has been disposed of in a manner that upholds and affirms the subject order in all material respects without the possibility for further appeal thereon; (ii) in respect of which the time period for instituting or filing an appeal, leave to appeal, motion for rehearing or motion for new trial shall have expired (in cases in which such time period is capable of expiring, it being understood that with respect to an order issued by the CCAA Court, the time period for seeking leave to appeal shall be deemed to have elapsed on the date that is 22 days after the rendering of such order unless a motion has been made to extend such time period); and (iii) as to which no stay is in effect; or (b) with respect to an order of a U.S. Court, an order that has not been reversed, stayed, superseded or vacated or, to the extent it has been stayed such stay shall have expired.

"**First French Order**" has the meaning set forth in Section 15(p) hereof.

"**Flextronics**" means Flextronics Telecom Systems Ltd. or any affiliate thereof.

"**French Court**" means the judge appointed in the French Secondary Proceeding, the Versailles Commercial Court, any court hearing appeals therefrom and any other court of competent jurisdiction overseeing the French Secondary Proceeding from time to time.

"**French Liquidator**" means Maître Cosme Rogeau in his capacity as Liquidator for NNSA under the French Secondary Proceeding.

"**French Main Proceeding**" means the U.K. administration of NNSA commencing on January 14, 2009.

"**French Secondary Proceeding**" means the Nortel Insolvency Proceeding that was commenced before the French Court on May 28, 2009 in respect of NNSA.

"**French Supervisory Judge**" has the meaning set forth in Section 15(p) hereof.

"**HOC**" means Nortel Networks Pénzügyi Szolgáltató Korlátolt Felelősségű Társaság.

"**Iceberg**" means the residual intellectual property remaining following the Nortel Group business line sales, which intellectual property was sold to a consortium in July 2011.

"**Iceberg Amendment Fee**" means the U.S.$5 million[2] cumulative fee previously agreed by the Canadian Debtors, U.S. Debtors, EMEA Debtors and NNSA to be funded directly as follows:  U.S.$2.8 million to NNI, and U.S.$2.2 million to NNUK, all from the Iceberg Sale Proceeds prior to any other agreed upon allocation of the Sale Proceeds.

---

[2] All amounts in this Settlement and Support Agreement are expressed in U.S. Dollars unless expressly noted otherwise.

"**Iceberg Escrow Account**" means the escrow account established to hold the Iceberg Sale Proceeds and the Iceberg Amendment Fee, as set forth on Annex B.

"**Iceberg Sale**" means the sale of the Iceberg assets.

"**Iceberg Sale Proceeds**" means that portion of the Sale Proceeds generated from the Iceberg Sale.

"**IFSA**" means the Interim Funding and Settlement Agreement, dated as of June 9, 2009, entered into among various of the Parties, as approved by the CCAA Court on June 29, 2009 and by the Bankruptcy Court on June 29, 2009.

"**IP Addresses**" means internet protocol addresses registered in the name of a Canadian Debtor or a corporate predecessor thereto.

"**Joint Administrators**" means Alan Robert Bloom, Christopher John Wilkinson Hill, Alan Michael Hudson and Stephen John Harris, as the administrators of all EMEA Debtors and NNSA except Nortel Networks (Ireland) Limited (in administration), and Alan Robert Bloom and David Martin Hughes as Administrators of Nortel Networks (Ireland) Limited (in administration). To the extent that this Settlement and Support Agreement refers to the "Joint Administrators of NNSA" this means Alan Robert Bloom, Christopher John Wilkinson Hill, Alan Michael Hudson, Stephen John Harris and the NNSA Conflicts Administrator.

"**Joint Liquidators**" means Richard Barker and Joseph Luke Charleton as joint liquidators of NNNI and Richard Barker and Samantha Keen as joint liquidators of NNOCL.

"**LG-N**" means LG-Nortel Co. Ltd., a Korean joint venture between NNL and LG Electronics.

"**M&A Cost Reimbursement**" means the reimbursement of certain costs related to fees and expenses incurred in connection with the sale of assets which generated the Sale Proceeds.

"**MEN**" means the Nortel Group business line known as Metro Ethernet Networks.

"**Monitor**" means Ernst & Young Inc. in its capacity as the court-appointed monitor in the proceedings commenced under the CCAA in respect of the Canadian Debtors.

"**Negative Converting Debtor**" has the meaning set forth at Section 7(i)(iv) hereof.

"**New Escrow Accounts**" means, collectively, the Canadian Escrow Account and the EMEA Escrow Accounts.

"**New Escrow Agreements**" means, collectively, the Canadian Escrow Agreement and the EMEA Escrow Agreements.

"**NNC**" means Nortel Networks Corporation, a Canadian Debtor.

"**NNCC**" means Nortel Networks Capital Corporation, a U.S. Debtor.

"**NNCC Bondholder Signatories**" means the holders of NNCC Bonds that execute this Settlement and Support Agreement.

"**NNCC Bondholders**" means holders of NNCC Bonds as of the record date that will be established under the U.S. Plans.

"**NNCC Bonds**" means those bonds issued by NNCC and guaranteed by NNL.

"**NNCC Bonds Claims**" means those Crossover Claims relating to the NNCC Bonds.

"**NNCC Bonds Trustee**" means Law Debenture Trust Company of New York, as indenture trustee for the NNCC Bonds.

"**NNI**" means Nortel Networks Inc., a U.S. Debtor.

"**NNIF**" means Nortel Networks International Finance & Holding B.V. (in administration), an EMEA Debtor.

"**NNL**" means Nortel Networks Limited, a Canadian Debtor.

"**NNNI**" means Nortel Networks (Northern Ireland) Limited (in liquidation), an EMEA Non-Filed Entity.

"**NNOCL**" means Nortel Networks Optical Components Limited (in liquidation), an EMEA Non-Filed Entity.

"**NNSA**" means Nortel Networks S.A. (in administration and in *liquidation judiciaire*).

"**NNSA Allocation**" has the meaning set forth in Section 2(c)(v) hereof.

"**NNSA Conflicts Administrator**" means Stephen Jonathan Taylor of Isonomy Limited as Conflicts Administrator solely in relation to NNSA.

"**NNSA Surplus Amount**" has the meaning set forth at Section 7(k)(iii)(B) hereof.

"**NNUK**" means Nortel Networks U.K. Limited (in administration), an EMEA Debtor.

"**NNUK Allocation**" has the meaning set forth in Section 2(c)(iv) hereof.

"**Non-Converting Debtor**" has the meaning set forth in Section 7(i)(ii) hereof.

"**Non-Released Matters**" has the meaning set forth in Section 8(i) hereof.

"**Nortel Group**" means, collectively, NNC and all of its direct and indirect subsidiaries, whether current or former.

"**Nortel Insolvency Proceedings**" has the meaning set forth in the recitals hereto.

"**Nortel U.S. Trade Claims Consortium**" means a group of creditors holding over U.S.$125 million in unsecured (non-funded debt) claims, including but not limited to trade

(supplier) claims, employee severance and pension claims against one or more of the U.S. Debtors.

"**Other Currencies**" has the meaning set forth in Section 7(a) hereof.

"**Participating Creditor**" means a creditor of any of the Debtors that (i) is a Party to this Settlement and Support Agreement; or (ii) delivers a Creditor Joinder or a Transferee Joinder.

"**Party**" and "**Parties**" have the meanings set forth in the recitals hereto.

"**PBGC**" means the Pension Benefit Guaranty Corporation, a United States government corporation.

"**Petition Date**" means January 14, 2009.

"**Person**" means a "person" as defined in Section 101(41) of the Bankruptcy Code.

"**Plans**" means, collectively, the U.S. Plans and the Canadian Plan.

"**Plans Effective Date**" means the first date that (i) all of the U.S. Plans, and (ii) the Canadian Plan are effective in accordance with their respective terms.

"**Positive Converting Debtor**" has the meaning set forth in Section 7(i)(iii) hereof.

"**PPF**" means the Board of the Pension Protection Fund, a statutory corporation established under the provisions of the Pensions Act 2004, whose principal place of business is Renaissance, 12 Dingwall Road, Croydon, United Kingdom, CRO 2NA.

"**PPI Settlement**" means that certain Settlement Agreement entered into between NNI and certain of the Crossover Bondholders dated July 24, 2014 as approved by the Bankruptcy Court on December 18, 2014.

"**Proceeding**" has the meaning set forth in Section 5(e).

"**Proven Claim**" shall, with respect to a claim against one or more of the Canadian Debtors, have the meaning ascribed to such term in the Claims Procedure Order, the Claims Resolution Order of the CCAA Court, dated September 16, 2010, the Compensation Claims Procedure Order of the CCAA Court, dated October 6, 2011, and the Intercompany Claims Procedure Order of the CCAA Court, dated July 27, 2012 and shall include the U.S. Canadian Claim, the Crossover Bondholders' Proven Claim, the NNCC Bondholders' Proven Claim, the EMEA Canadian Claim, the Canadian Pension Claim and the UKPI Canadian Claim.

"**Qualified Marketmaker**" has the meaning set forth in Section 6(j)(ii) hereof.

"**Relay**" means the June 2010 sale of NNL's and NNTC's assets related to the wireless backhaul and multi-hop digital repeater/relay research development program.

"**Released Claims**" has the meaning set forth in Section 8(b)(i) hereof.

"**Releases**" has the meaning set forth in Section 8(b)(ii) hereof.

"**Releasee**" has the meaning set forth in Section 8(b)(i) hereof.

"**Releasor**" has the meaning set forth in Section 8(b) hereof.

"**Remaining HOC Claim**" has the meaning set forth in Section 4(h) hereof.

"**Sale Proceeds**" means the remaining proceeds generated by the sales of various Nortel Group business lines and the Iceberg Sale between 2009 and 2011 plus interest accrued thereon such amounts being as currently set forth in Annex A hereto,[3] less (i) US$55 million of M&A Cost Reimbursement; and (ii) the Iceberg Amendment Fee.

"**Sanction Hearing**" means the hearing before the CCAA Court to consider sanction of the Canadian Plan.

"**Sanction Order**" means the order of the CCAA Court sanctioning the Canadian Plan and shall include, for the avoidance of doubt, any order of a Canadian Court affirming such order.

"**Settlement**" has the meaning set forth in the recitals hereto.

"**Settlement and Support Agreement**" has the meaning set forth in the recitals hereto.

"**Side Letters**" has the meaning set forth in Section 4(e) hereof.

"**SNMP**" has the meaning set forth in Section 4(f) hereof.

"**Sterling Conversion Election**" has the meaning set forth in Section 7(c)(i)(A) hereof.

"**Strandherd Lands**" means certain vacant lands of the Canadian Debtors in Ottawa, Ontario, sold in November 2009.

"**Surplus Amount**" has the meaning set forth at Section 7(i)(v) hereof.

"**T&T Claim**" means any and all claims made by Nortel Networks (CALA) Inc. in respect of customer receipts from Telecommunications Services of Trinidad and Tobago deposited into Nortel Networks International Corporation's bank account related to invoices issued to Telecommunications Services of Trinidad and Tobago by Nortel Networks (CALA) Inc.

"**Tax Disputes**" has the meaning set forth in Section 4(a)(v) hereof.

"**Third Circuit**" means the United States Court of Appeals for the Third Circuit.

"**Third Party Claims**" has the meaning set forth in Section 8(c) hereof.

"**Timetable**" has the meaning set forth in Section 9(b) hereof.

---

[3] The total Sale Proceeds available for allocation and distribution may differ from the amounts detailed in Annex A, as described in Section 2(d) hereto.

"**Termination Event**" has the meaning set forth in Section 10(a) hereof.

"**Transfer**" has the meaning set forth in Section 6(j)(i) hereof.

"**Transferee Joinder**" has the meaning set forth in Section 6(j)(i) hereof.

"**Transferor**" has the meaning set forth in Section 6(j)(i) hereof.

"**UCC**" means the Official Committee of Unsecured Creditors appointed pursuant to an order entered by the Bankruptcy Court on January 26, 2009, as the same may be constituted from time to time.

"**UKPI**" means, collectively, the U.K. Pension Trustee and the PPF.

"**UKPI Canadian Claim**" has the meaning set forth in Section 4(b)(i) hereof.

"**U.K. Court**" means the High Court of Justice of England and Wales in London, any court hearing appeals therefrom and any other court of competent jurisdiction overseeing the EMEA Proceedings (including appeals) from time to time.

"**U.K. Pension Trustee**" means Nortel Networks U.K. Pension Trust Limited as trustee of the Nortel Networks Pension Plan.

"**U.S. Allocation**" has the meaning set forth in Section 2(c)(i) hereof.

"**U.S. Canadian Claim**" has the meaning set forth in Section 4(b)(i) hereof.

"**U.S. Canadian Priority Claim**" has the meaning set forth in Section 4(b)(i) hereof.

"**U.S. Court**" means any and all of the Bankruptcy Court, the United States District Court for the District of Delaware, the Third Circuit, the United States Supreme Court or any other court of competent jurisdiction overseeing the U.S. Proceedings (including appeals) from time to time.

"**U.S. Debtors**" means, collectively, NNI, NNCC, Nortel Altsystems Inc., Nortel Altsystems International Inc., Xros, Inc., Sonoma Systems, Qtera Corporation, CoreTek, Inc., Nortel Networks Applications Management Solutions Inc., Nortel Networks Optical Components Inc., Nortel Networks HPOCS Inc., Architel Systems (U.S.) Corporation, Nortel Networks International Inc., Northern Telecom International Inc., Nortel Networks Cable Solutions Inc., Nortel Networks (CALA) Inc., and Nortel Networks India International Inc.

"**U.S. Disclosure Statement**" means a disclosure statement to be provided to the U.S. Voting Creditors relating to the U.S. Plans that complies with sections 1125 and 1126(b) of the Bankruptcy Code.

"**U.S. Escrow Release Order**" means an order issued by the Bankruptcy Court authorizing and directing the release of the Sale Proceeds from the Escrow Accounts in the manner contemplated hereby.

"**U.S. Plans**" means the chapter 11 plans of reorganization (including any exhibits, annexes and schedules thereto) for the U.S. Debtors that effectuate the Settlement, consistent with the terms of this Settlement and Support Agreement, as they may be modified or supplemented in accordance with their respective terms.

"**U.S. Principal Officer**" means John J. Ray III, who was appointed Principal Officer of each of the U.S. Debtors pursuant to an order entered by the Bankruptcy Court on January 6, 2010.

"**U.S. Proceedings**" means, collectively, those Nortel Insolvency Proceedings that were commenced before the Bankruptcy Court on or after January 14, 2009 in respect of the U.S. Debtors pursuant to chapter 11 of the Bankruptcy Code.

"**U.S. Voting Creditors**" means unsecured creditors of the U.S. Debtors that are entitled to vote on one or more of the U.S. Plans and whose votes will count toward acceptance of such plans.

"**Worldwide Ds&Os**" has the meaning set forth in Section 8(b)(i) hereof.

The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise (a) any reference herein to any Person shall be construed to include such Person's successors and assigns, (b) the words "herein," "hereof" and "hereunder," and words of similar import, shall be construed to refer to this Settlement and Support Agreement in its entirety and not to any particular provision hereof, and (c) all references herein to Sections and Annexes shall be construed to refer to Sections of, and Annexes to, this Settlement and Support Agreement. The division of this Settlement and Support Agreement into Sections and the insertion of headings are for convenience only and are not to affect or be used in the construction or interpretation of this Settlement and Support Agreement.

**Section 2.  Settlement of Allocation Dispute**

(a)     For the avoidance of doubt, this Section 2 is subject to the satisfaction of the conditions contained in Section 9(a) hereof, except to the extent expressly indicated in Section 9(c) hereof.

(b)     The Parties hereby agree to settle the Allocation Dispute on the terms set forth herein and enter into coordinated processes which shall include, among other things, (i) the drafting of the Canadian Plan and its submission to Canadian Voting Creditors for voting under the CCAA and to the CCAA Court for sanction, (ii) the drafting of the U.S. Plans and their submission to U.S. Voting Creditors for voting and to the Bankruptcy Court for confirmation, each on the schedule set forth in the Timetable, (iii) the submission of the Settlement and Support Agreement to the U.K. Court and the French Court, and (iv) submission to the Beddoes Court for authorization of the U.K. Pension Trustee to implement the Settlement and Support Agreement, as contemplated by Section 6 hereof.

(c)    The Parties hereto agree to allocate the Sale Proceeds as follows:

    (i)    U.S. Debtors: 24.350%, U.S.$1,766,417,002 (the "**U.S. Allocation**")[4];

    (ii)    Canadian Debtors:  57.1065%, U.S.$4,142,665,131 (the "**Canadian Allocation**");

    (iii)    EMEA (Non-NNSA/Non-NNUK) Debtors: 1.4859%, U.S.$ 107,788,879 (the "**EMEA (Non-NNSA/Non-NNUK) Allocation**")[5];

    (iv)    NNUK:  14.0249%, U.S.$1,017,408,257 (the "**NNUK Allocation**"); and

    (v)    NNSA:  U.S.$220,000,000 (the "**NNSA Allocation**," and collectively with the EMEA (Non-NNSA/Non-NNUK) Allocation and the NNUK Allocation, the "**EMEA Allocation**").  The EMEA Allocation shall be 18.5435%, provided, however, within the EMEA Allocation, the NNSA Allocation is fixed at U.S.$220,000,000 and NNSA shall not share proportionally with any increase or decrease in the Sale Proceeds as the result of the matters contemplated in Section 2(d) hereof, and any such increase or decrease in the Sale Proceeds that would but for this Section 2(c)(v) have been allocated to NNSA shall be allocated to NNUK.

(d)    The Sale Proceeds to be allocated in accordance with Section 2(c) hereof include the Buyer Escrow Amount. To the extent that the amount of Sale Proceeds ultimately released from the Buyer Escrow Accounts to the Debtors is less than the Buyer Escrow Amount, any such shortfall shall be allocated among the Debtors in the percentages set forth in Section 2(c), subject to Section 2(c)(v) hereof, so that the amount of Sale Proceeds to be allocated in accordance with Section 2(c), subject to Section 2(c)(v) hereof, shall be reduced by the amount of such shortfall.

    (i)    Any fees and costs of the Escrow Agents for the Existing Escrow Agreements (other than costs and fees relating to any currency conversion that occurs pursuant to Section 7) shall be borne and allocated among the Debtors in the percentages set forth in Section 2(c), subject to Section 2(c)(v) hereof.

    (ii)    Any further amounts credited to the Escrow Accounts following the date of this Agreement, including any accrued interest not otherwise reflected in Annex A earned on the Sale Proceeds, shall be allocated among the Debtors in the percentages set forth in Section 2(c), subject

---

[4] Such allocation is to be distributed among the U.S. Debtors in the amounts and proportions set forth in Annex F.

[5] Such allocation is to be distributed among the EMEA Debtors (other than NNUK) in the amounts and proportions set forth in Annex E.

to the provisions of Sections 2(c)(v) and 7(b)(vi), 7(c)(x) and 7(e) hereof.

(e)     The Parties hereto further agree first to distribute the following amounts from the Iceberg Escrow Account, which amounts shall not be subject to the Section 2(c) allocation percentages or be deemed to constitute Sale Proceeds:

    (i)     U.S.$2.8 million of the Iceberg Amendment Fee to NNI and U.S.$2.2 million of the Iceberg Amendment Fee to NNUK, and

    (ii)    U.S.$20 million to NNI and U.S.$35 million to the Canadian Debtors on account of the M&A Cost Reimbursement.

(f)     Distributions of the Sale Proceeds will next be made as follows:

    (i)     all amounts in the Canadian Escrow Account shall be released to the Canadian Estate, with the funds received by the Canadian Estate being credited against the Canadian Allocation set forth in Section 2(c)(ii) in the manner set forth in Section 7(g);

    (ii)    all amounts (if any) in the EMEA Euro Escrow Account shall be released to NNSA with the funds received by NNSA being credited against the NNSA Allocation as set forth in Section 2(c)(v), in the manner set forth in Section 7(g);

    (iii)   all amounts (if any) in the EMEA Sterling Escrow Account shall be released to the EMEA Debtors who are Converting Debtors in proportion to their allocation set out at Annex E, with the funds received by such Converting Debtors being credited against the allocation of such Converting Debtors in the manner set forth in Section 7(g);

    (iv)   remaining amounts in the Existing Escrow Accounts shall be released (A) in accordance with  the allocations set forth in Section 2(c) hereof, and (B) taking into account the funds to be released from the New Escrow Accounts under Sections 2(f)(i), (ii) and (iii) hereof; and

    (v)    for the avoidance of doubt, total distributions under Sections 2(f)(i)(ii)(iii) and (iv) hereof, will be strictly in accordance with the allocations set forth in Section 2(c) hereof.

(g)     NNC, NNL, NNI and NNUK shall use reasonable best efforts to obtain the release of the remaining amounts held in the Buyer Escrow Accounts, totaling approximately U.S.$21.8 million (the "**Buyer Escrow Amount**"), into the Escrow Account holding that portion of the Sale Proceeds attributable to the particular sale (or such other accounts as jointly agreed to and directed by NNC, NNL, NNI, and NNUK for their respective shares).  Any amount so obtained shall be allocated in accordance with the percentages set forth in Section 2(c).

(h)     In connection with the distribution of Sale Proceeds contemplated pursuant to Section 2(f), NNIF shall pay U.S. $3 million to the Canadian Estate within 30 days of the conditions in Section 9(a) being satisfied and such payment obligation shall rank as an administration expense of NNIF.   Subject to receipt by the Canadian Estate of such amount, such payment shall be in full satisfaction of the Remaining HOC Claim.

## Section 3.   Release of Sale Proceeds

(a)     For the avoidance of doubt, this Section 3 is subject to the satisfaction of the conditions contained in Section 9(a) hereof, except to the extent expressly indicated in Section 9(c) hereof.

(b)     As set forth in Section 6(b) hereof, the Canadian Debtors and Monitor shall seek entry of the Canadian Escrow Release Order, which order shall be entered with, or promptly following entry of, the Sanction Order and will be conditioned on the occurrence of the Plans Effective Date.

(c)     As set forth in Section 6(c) hereof, the U.S. Debtors shall seek entry of the U.S. Escrow Release Order, which order shall be entered with, or promptly following entry of, the Confirmation Order and will be conditioned on the occurrence of the Plans Effective Date.

(d)     The Escrow Release Orders shall:  (i) constitute the order required under Section 12(b) of the IFSA to permit and authorize the distribution of the Sale Proceeds in accordance with the allocation set forth in Section 2(c) hereof; (ii) constitute the orders of the "dispute resolvers" contemplated by the Escrow Agreements to permit and authorize the Escrow Agents to distribute the Sale Proceeds; and (iii) be in form and substance reasonably satisfactory to the Parties.

(e)     In addition to any Escrow Release Orders, the parties to the Escrow Agreements may also provide joint instructions to the Escrow Agents, as permitted by the Escrow Agreements, directing the release of the Sale Proceeds in accordance with this Settlement and Support Agreement, the form and substance of such joint instructions being reasonably satisfactory to the Parties.

(f)     Immediately following the occurrence of the Plans Effective Date, the Canadian Debtors, the Monitor, the EMEA Debtors, NNSA, the EMEA Non-Filed Entities, the U.S. Debtors and the UCC shall jointly provide copies of the Escrow Release Orders to the Escrow Agents and the parties to the Escrow Agreements shall take such other and further steps as are reasonably necessary, including but not limited to the provision of joint instructions or other notices to the Escrow Agents under Section 3(e) above, in order to cause the Escrow Agents to release the Sale Proceeds in accordance with the terms of this Settlement and Support Agreement.

(g)     It is understood and agreed that the Canadian Debtors, the Monitor, the U.S. Debtors, the UCC, the EMEA Debtors, NNSA, and the EMEA Non-Filed Entities, to the extent necessary, may provide more specific instructions to the Escrow Agents in connection with the Escrow Release Orders or any instruction

provided pursuant to Section 3(e) hereof, to direct payment to specific Debtor estates subject always to the collective maximum allocation and distribution of Sale Proceeds allocated to each of the U.S. Debtors, Canadian Debtors, EMEA Debtors and NNSA, respectively, as set forth in Section 2(c) hereof (and, in the case of the U.S. Debtors and the EMEA Debtors subject to the agreed allocations set forth in Annexes F and E, respectively) and each of the U.S. Debtors, the Canadian Debtors, the EMEA Debtors, NNSA, and the EMEA Non-Filed Entities in their capacity as Depositors under the Escrow Agreements (to the extent they are Depositors under any specific Escrow Agreement), and the Monitor and the UCC in their capacity as Estate Fiduciaries under the Escrow Agreements, shall give such instructions or consents as may be reasonably required in connection with the foregoing.  In relation to NNSA, any such instructions shall be given conjointly by the NNSA Conflicts Administrator and the French Liquidator following agreement with the Joint Administrators. The Bondholder Group and the UCC shall provide any consent as may be reasonably necessary under the IFSA in connection with any such instruction.  If, following the Plans Effective Date, all or any portion of the remaining Buyer Escrow Amount is to be released in accordance with this Settlement and Support Agreement then the parties to such escrows shall give the necessary instructions to the relevant Escrow Agent to apportion and release those proceeds to the Debtors in the respective allocation percentages set forth in Section 2(c).

**Section 4.  Additional Settlement Provisions**

The following provisions are also essential terms of the Settlement, which provisions, in respect of the U.S. Debtors, shall be incorporated into the U.S. Plans and, in respect of the Canadian Debtors, shall be incorporated into the Canadian Plan, as applicable.  For the avoidance of doubt, this Section 4 is subject to the satisfaction of the conditions contained in Section 9(a) hereof, except to the extent expressly indicated in Section 9(c) hereof.

(a)    Estate Administration

(i)    The Canadian Debtor estates will be administered by the Monitor.

(ii)    The EMEA Debtor and NNSA (in the French Main Proceeding) estates will be administered by their respective representatives being the Joint Administrators in respect of each EMEA Debtor and being the Joint Administrators and the NNSA Conflicts Administrator in respect of NNSA in the French Main Proceeding.

(iii)    The French Secondary Proceeding will be administered by its representative, being the French Liquidator.

(iv)    The U.S. Debtor estates will be administered by the U.S. Principal Officer.

(v)    Notwithstanding the separate administration of the estates of the Canadian Debtors, the EMEA Debtors, NNSA, the U.S. Debtors and of the EMEA Non-Filed Entities, the Parties shall work cooperatively and

use reasonable efforts to implement this Settlement and Support Agreement and the Plans in a tax efficient manner. In addition, the Debtors shall, upon the written request of a Debtor to another Debtor and to the extent permitted by applicable local law and not inconsistent with the statutory duties of the Debtor, or the Debtor's representatives and fiduciaries, to which a request is made, reasonably cooperate with each other, including providing such documents, other information, access to current personnel and/or permission to communicate with former personnel as may reasonably be requested by the requesting Debtor, in connection with the preparation and filing of tax returns and responding to or contesting any challenges, inquiries, audits or other disputes by tax authorities in relation thereto (collectively, "**Tax Disputes**"); provided, however, that no Debtor shall be obligated to cooperate to the extent such requested cooperation would prejudice the interests of such Debtor. The Debtor requesting cooperation shall bear all costs and expenses, including reasonable attorney fees, of the Debtor providing such cooperation, including the reasonable costs of accessing, processing, reviewing and making available any documents, other information and/or personnel requested. For the avoidance of doubt, each Debtor shall be solely responsible for preparing and filing its own tax returns and contesting or challenging any Tax Disputes in relation thereto, and no other Debtor shall have any obligation to respond to, contest, challenge, dispute or appear in any other Debtor's Tax Disputes. It is acknowledged that the Debtors intend to progress the wind-up of their respective estates, including the continuing disposal of records and decommissioning of their electronic data infrastructure (such as servers), and that the cooperation contemplated pursuant to this Section 4(a)(v) shall in no way preclude any of the Debtors from taking any steps in connection with such wind-up. To the extent that any Debtor receiving a request under this Section 4(a)(v) takes the position that it is unable to provide the assistance requested, such Debtor shall confer with the Debtor making the request as to the basis for such position.

(vi)    No Party will interfere with or oppose any Debtor regarding such Debtor's asset monetization, subsidiary wind-downs, tax positions, distributions, or marshalling, to the extent such actions are not inconsistent with this Settlement and Support Agreement, provided however, that the foregoing shall not compromise (x) the right, if any, of a creditor to (A) object, if such creditor has a claim that remains outstanding and unpaid against the relevant Debtor or Debtors against which the claim is to be allowed, after the date of this Settlement and Support Agreement, in the U.S. Court allowing a claim against the U.S. Debtors or in the Canadian Court allowing a claim as a Proven Claim against the Canadian Estate, in each case, other than claims expressly referred to in this Settlement and Support Agreement, and/or (B) exercise any right it may have as a creditor in respect of its claim including in respect of a Debtor's asset monetization, except in a

manner that directly contradicts any term of this Settlement and Support Agreement, or (y) the Parties' rights and obligations, if any, under the Cross-Border Protocol, the Cross-Border Protocol on the Resolution of Claims approved by the CCAA Court by Order dated September 16, 2010 and by the Bankruptcy Court by order dated September 16, 2010, or the Claims Resolution Order of the CCAA Court, dated September 16, 2010 .

(b)   Estate Consolidation

(i)   Canadian Debtors – The Canadian Debtors shall be substantively consolidated pursuant to the Canadian Plan on the Plans Effective Date with all intercompany claims between and among the Canadian Debtors being thereby eliminated for purposes of the Canadian Plan and no distributions or payments will be made by the Canadian Debtors on account of such claims under the Canadian Plan or otherwise, and all unsecured creditors holding claims against the Canadian Estate (including the U.S. Debtors' $2.0 billion Proven Claim (the "**U.S. Canadian Claim**"), the Crossover Bondholders' Proven Claims of U.S.$3,940,750,260 in the aggregate, the NNCC Bondholders' Proven Claim of U.S.$150,951,562, the Proven Claims held by certain of the EMEA Debtors in an aggregate amount not to exceed U.S.$125,000,000 (subject to the contractually agreed upon conditions in clause 2.2 of the Agreement Settling EMEA Canadian Claims and Related Claims among, *inter alia*, the Canadian Debtors, the Monitor, the EMEA Debtors and NNSA, dated July 9, 2014) (respectively, the "**EMEA Canadian Claim**" and the "**EMEA Canada Settlement Agreement**") and the UKPI's Proven Claim of £339.75 million[6] (the "**UKPI Canadian Claim**") and the Canadian Pension Claim) will be paid *pari passu* by the Canadian Estate with all other general unsecured creditor distributions without discrimination of any kind. The U.S. Debtors' allowed U.S.$62.7 million secured claim (defined as the "Remaining Revolver Claim" in the CFSA) (the "**U.S. Canadian Priority Claim**") will retain its priority status granted by the CCAA Court in the order dated January 21, 2010.

(ii)   U.S. Debtors – The U.S. Debtors' estates shall not be substantively consolidated, provided, however, that NNCC shall be substantively consolidated with and into NNI on the Plans Effective Date.

(iii)   EMEA Debtors – The EMEA Debtors' estates and NNSA (or any of them) shall not be substantively consolidated.

(c)   Coordination of Crossover Claims (Issuer Pays First)

---

[6] Being U.S.$494,879,850 when converted from £339.75 million in accordance with Appendix "A" to the Claims Procedure Order.

(i)     The U.S. Plans and the Canadian Plan shall contain the following provisions with respect to claims arising out of a debt or other obligation of one or more of the U.S. Debtors that is guaranteed or indemnified by one or more of the Canadian Debtors, or a debt or other obligation of one or more of the Canadian Debtors that is guaranteed or indemnified by one or more of the U.S. Debtors (such claims, including, without limitation, the Crossover Bonds Claims, NNCC Bonds Claims and EDC claims, but excluding, in relation to the Canadian Debtors, any obligation of a Canadian Debtor guaranteed by another Canadian Debtor, being the "**Crossover Claims**"):

(A)     In the event that the creditor shall have a Proven Claim against the Canadian Estate and an allowed claim against the relevant U.S. Debtor, then, subject to Section 4(c)(i)(B) and 4(g)(vi), the issuer (or primary) Debtor estate and any guarantor (or secondary) Debtor estate shall pay distributions on the full amount of the allowed claim, if a claim against a U.S. Debtor estate, or the full amount of the Proven Claim, if a claim against the Canadian Estate, on a *pari passu* basis with all other creditors holding allowed claims (in the case of the U.S. Debtors) or Proven Claims (in the case of the Canadian Debtors) with the same priority without discrimination of any kind.

(B)     In no case shall a creditor holding a Crossover Claim be entitled to receive (i) any further distributions from the U.S. Debtors where the aggregate distributions made by the U.S. Debtors and the Canadian Estate in respect of such Crossover Claim equal the total allowed amount of such Crossover Claim against the U.S. Debtors, or (ii) any further distributions from the Canadian Estate where the aggregate distributions made by the U.S. Debtors and the Canadian Estate in respect of such Crossover Claim equal the total Proven Claim amount of such Crossover Claim against the Canadian Estate.  For the avoidance of doubt, in no event shall a holder of a Crossover Claim be entitled to receive aggregated distributions in respect of its allowed Crossover Claim of more than 100% of the greater of (i) its pre-filing allowed claim (U.S.), and (ii) Proven Claim (Canada) when taking into account distributions received from both the issuer (or primary) Debtor estate and guarantor (or secondary) Debtor estate (such greater amount, the "**Creditor's Maximum**").  For the further avoidance of doubt, in relation to a specific Crossover Claim, if the amount in U.S. Dollars of the allowed claim (U.S.) for such Crossover Claim is not the same as the amount of the Proven Claim (Canada) for such Crossover Claim, the Creditor's Maximum shall not be reached until the greater of the two amounts has been distributed to the creditor.  Any amounts paid pursuant to Section 4(m) shall not be included in calculating the Creditor's Maximum as it pertains to the NNCC Bonds.

(C) Notwithstanding Section 4(c)(i)(B) above, if the relevant creditor receives an aggregate amount of distributions equal to the Creditor's Maximum on account of its Crossover Claim, then the guarantor (or secondary) Debtor estate shall subrogate into the Crossover Claim against the issuer (or primary) Debtor estate (for the NNCC Bonds, the issuer Debtor estate is NNCC as of the date hereof, but shall be deemed to be NNI on the Plans Effective Date when NNCC is consolidated into NNI) and will be entitled to receive any and all subsequent distributions from the issuer (or primary) Debtor estate on account of such Crossover Claim on a *pari passu* basis with all other creditors holding allowed claims (U.S.) or Proven Claims (Canada) with the same priority from the issuer (or primary) Debtor estate without discrimination of any kind, provided that (i) the guarantor (or secondary) Debtor estate shall not receive any distributions on such claim in excess of payments the guarantor (or secondary) Debtor estate has made to the underlying holder of such Crossover Claim and (ii) in the case of the Crossover Bonds Claims, NNI shall receive distributions from the Canadian Estate as a result of such subrogation for distributions NNI has made on the allowed Crossover Bonds Claims only to the extent that NNI makes distributions in respect of the allowed Crossover Bonds Claims in excess of U.S.$1.25 billion and such subrogation shall be only in respect of amounts distributed in excess of U.S.$1.25 billion, it being understood that NNI's right of subrogation pursuant to this Section 4(c)(i)(C), if any, against the Canadian Estate in respect of the Crossover Bonds Claims remains subject to distributions equal to the Creditor's Maximum first being received by holders of the Crossover Bonds Claims on account of such claims.

(ii) For the avoidance of doubt, no right of subrogation or indemnity (however described) will arise in favour of any Canadian Debtor or any U.S. Debtor against any EMEA Debtor, NNSA, or any EMEA Non-Filed Entity in respect of any amount paid by a Canadian Debtor or any U.S. Debtor pursuant to any guarantee or indemnity in respect of a liability of any EMEA Debtor, NNSA or EMEA Non-Filed Entity, and no Canadian Debtor nor any U.S. Debtor shall pursue or file any such claims or assert any right of subrogation against any EMEA Debtor, NNSA or EMEA Non-Filed Entity.

(iii) The issuer Debtor estate and the guarantor Debtor estate shall reasonably cooperate to give effect to the provisions of this Section 4(c), including sharing information regarding the Crossover Claims and intended and actual distributions thereon.

(d) <u>Post-Petition Date Interest</u> — No post-Petition Date interest (or make whole premium or similar claim accruing post-Petition Date) shall be included in any creditor claims, nor be paid on creditor claims in any Debtor estate, save and

except with respect to any EMEA Debtor estate, and then only to the extent payment is required under applicable law (and, if interest is payable by an EMEA Debtor, nothing herein shall restrict the right of the EMEA Debtor to compromise in whole or in part the amount of interest due and payable), provided, however, that the Canadian Debtors agree that they shall not receive post-Petition Date interest on the Remaining HOC Claim.

(e)    <u>Side Letters, IFSA, CFSA and T&T Claims</u> – In full and final resolution of (i) all entitlements and obligations arising under side letters to which any of the U.S. Debtors and Canadian Debtors are party (as further specified on Annex C hereto and which, for purposes of this Section 4(e) and Annex C shall include the IFSA and CFSA, collectively, the "**<u>Side Letters</u>**"), and (ii) the T&T Claim, NNI shall receive payment from the Canadian Estate in the amount of U.S.$77.5 million. After receipt of such payment by NNI, NNI shall have a 27% interest in the remaining assets of the Cascade Trust and the Canadian Estate shall have a 73% interest in the remaining assets of the Cascade Trust.  The Parties agree that except in relation to the Iceberg Amendment Fee, in respect of which NNUK will be entitled to a payment of U.S.$2.2 million from the Iceberg Sale Proceeds, neither the EMEA Debtors (nor NNSA) nor the EMEA Non-Filed Entities shall have any other entitlements or obligations under the Side Letters.

(f)    <u>SNMP</u> – There shall be no holdback of Sale Proceeds with respect to any liability that may be due or become due to one or both of SNMP Research International Inc. or SNMP Research Inc. (either or together, "**<u>SNMP</u>**").  No Debtor has or shall have any claim (whether by way of contribution, indemnity or otherwise) against any other Debtor in respect of any liability due or which may become due to SNMP and no Debtor or any other Party will assist SNMP in bringing any claim against any other Debtor.

(g)    <u>Resolution of Certain Claims</u> – The Parties have agreed to the following treatment for the following claims:

    (i)    the Canadian registered pension plans deficit claims against each of the Canadian Debtors shall be allowed as unsecured Proven Claims against the Canadian Estate in the aggregate amount of CAD$1,889,479,000 (the "**<u>Canadian Pension Claim</u>**");

    (ii)    the PBGC claim against each of the U.S. Debtors (and against any non-debtor U.S. Nortel Group entity) shall be a maximum of U.S.$708,000,000 and all rights of the U.S. Debtors and other U.S. based parties-in-interest in the U.S. Proceedings to contest such PBGC claims are expressly reserved and the allocation percentages provided for in Section 2(c) shall not change if the PBGC claims are admitted or allowed for a different amount;

    (iii)    the Parties (other than NNUK and the UKPI) agree that they will not challenge the adjudication by the Joint Administrators of NNUK of the UKPI's claim arising under section 75 of the U.K. Pension Act 1995 (presently filed in the amount of £2,147,000,000) against NNUK and

the allocation percentages provided for in Section 2(c) shall not change if the UKPI claim is admitted or allowed for a different amount;

(iv)    the Crossover Bonds Claims (a) against NNL and NNC shall be allowed as unsecured Proven Claims against the Canadian Estate in the aggregate amount of U.S.$3,940,750,260, as specified in Annex G hereto, and (b) against NNI shall be allowed as a general unsecured claim in the aggregate amount of U.S.$3,934,521,442, as specified in Schedule A to the Agreement Settling The NNI Post-Petition Interest Dispute And Related Matters dated July 24, 2014;

(v)    the NNCC Bonds Claims (a) against NNI (into which NNCC shall be substantively consolidated on the Plans Effective Date) shall be allowed as a general unsecured claim in the amount of U.S.$150,951,562, and (b) against NNL shall be allowed as an unsecured Proven Claim against the Canadian Estate in the amount of U.S.$150,951,562;

(vi)    the U.S. Plans shall provide that NNI shall reserve U.S.$7.5 million from cash otherwise available for distributions to NNI unsecured creditors, to be made available to be paid in respect of the NNCC Bonds Claims in the event that distributions (including deemed distributions related to the Crossover Bondholder Fee Letter) in respect of the NNCC Bonds Claims will be less than U.S.$150,951,562 (exclusive of any amount paid pursuant to Section 4(m)) upon the completion of distributions in respect of the NNCC Bonds Claims on the allowed claim against NNI (which claim against NNI results from the consolidation of NNCC with and into NNI) and the Proven Claim against the Canadian Estate, provided, however, that NNI shall use such reserves to make distributions in respect of the NNCC Bond Claims only in the amount of the lesser of (A) U.S.$150,951,562 less total distributions from NNI and the Canadian Estate (exclusive of any amount paid pursuant to Section 4(m)), and (B) U.S.$7.5 million;

(vii)    The Bondholder Group agrees that it will negotiate in good faith with the Nortel U.S. Trade Claims Consortium regarding additional terms that would cause such group to support the Settlement and the U.S. Plans; and

(viii)    the UKPI Canadian Claim and the EMEA Canadian Claim shall be allowed as unsecured Proven Claims against the Canadian Estate.

(h)    Book Intercompany Claims – Pre-filing intercompany claims in the amounts recorded in the books and records of companies comprising the Nortel Group as set out in Annex L shall be included in the determination of the allowed unsecured claims against a Debtor (except to the extent such claims are between Canadian Debtors, where no distributions or payments will be made by the Canadian Debtors on account of such claims under the Canadian Plan or otherwise).  Annex L shall be treated as the definitive position for all pre-filing intercompany claims between the Nortel Group entities specified thereon.  Any

and all other pre-filing books and records claims between (A) any of the Canadian Debtors, on the one hand, and (B) any of the U.S. Debtors and their other subsidiaries as specified on Annex L, on the other hand, which are not preserved specifically herein (including, without limitation the claims referenced in Sections 4(b)(i) and 4(g)), are forever released and barred.  Other than the EMEA Canadian Claim, the Remaining HOC Claim and any other pre-filing intercompany claims set forth on Annex L, all pre-filing books and records claims, including any claims that a Debtor now holds as a consequence of an assignment (excluding claims against an EMEA Debtor assigned to NNUK in connection with the EMEA Canada Settlement Agreement), between (G) any of the EMEA Debtors, NNSA or the EMEA Non-Filed Entities, on the one hand, and (H) any of the Canadian Debtors or the U.S. Debtors, on the other hand, are forever released and barred.  The EMEA Debtors and the Canadian Debtors agree that in full and final settlement of:  (Q) the Tranche 2 Payment (as such term is defined in the Q1 2010 Transfer Pricing Settlement Agreement among, *inter alia*, certain of the Canadian Debtors, the Joint Administrators and the EMEA Debtors, dated September 8, 2011); and (R) the U.S.$7,621,249 claim of certain of the Canadian Debtors against NNIF related to HOC, the Canadian Estate shall have an accepted post-Petition Date claim against NNIF in the amount of U.S.$3 million (the "**Remaining HOC Claim**"). The Remaining HOC Claim shall rank as an administration expense of NNIF payable in full in accordance with Section 2(h) and not subject to compromise or reduction.  For the avoidance of doubt, the Tranche 2 Payment (being the remaining amount of the Shortfall Payments (as defined in the IFSA)) is forever released and barred.  The Parties agree and acknowledge that, as at the date hereof, there are no post-filing books and records claims owing between (Y) any of the Canadian Debtors, on the one hand, and any of the U.S. Debtors, the EMEA Debtors, NNSA and the EMEA Non-Filed Entities, on the other, and (Z) any of the U.S. Debtors, on the one hand, and any of the EMEA Debtors, NNSA and the EMEA Non-Filed Entities, on the other.

(i)     Intra-EMEA Claims – Nothing in this Settlement and Support Agreement affects claims as between or among any of the EMEA Debtors and/or NNSA and/or the EMEA Non-Filed Entities, which shall be dealt with separately between the EMEA Debtors, NNSA and the EMEA Non-Filed Entities.  Nothing in this Settlement and Support Agreement affects claims between or among the UKPI, any EMEA Debtor, NNSA, or the EMEA Non-Filed Entities, the Joint Administrators, the NNSA Conflicts Administrator or the French Liquidator, which shall be dealt with separately between and among the EMEA Debtors, NNSA, the EMEA Non-Filed Entities, the Joint Administrators, the NNSA Conflicts Administrator, the French Liquidator and the UKPI.

(j)     Remaining Assets and Other Proceeds – Each Debtor estate has the right to retain the value of its respective remaining assets, if any, and shall not be subject to any claims thereto by any other Debtor save and except those acknowledged herein.  Other than those claims acknowledged herein to receive distributions from the proceeds of such assets, the U.S. Debtors, the EMEA Debtors, NNSA, the UKPI and the EMEA Non-Filed Entities release any claims they have asserted or may assert or have as against (i) those proceeds held by the Canadian Debtors as

"Restricted Cash" or "Unavailable Cash" (as noted in Monitor's Reports to the CCAA Court), including in respect of the realization of the interests in LG-N, the Strandherd Lands, Relay and IP Addresses, and (ii) the remaining IP Addresses, including any proceeds arising therefrom.  For the avoidance of doubt, nothing in this subsection shall (i) prohibit the assertion of claims to enforce this Settlement and Support Agreement and claims that are reserved in this Settlement and Support Agreement (including without limitation, the claims referenced in Section 4(b)(i) hereof) or (ii) affect the Parties' rights to receive distributions as creditors of the various Debtors' estates.

(k)  <u>Bondholder Group Fees</u> – The aggregate amount of fees under the existing fee letter dated June 23, 2011 between various advisors to the Bondholder Group and NNC and NNL (the "**Crossover Bondholder Fee Letter**") to be deducted from distributions to Crossover Bondholders and NNCC Bondholders in respect of their Proven Claims against the Canadian Estate shall be U.S.$47 million (which includes U.S.$3.0 million in respect of the deferred compensation fee payable to FTI Consulting).  An additional U.S.$7.0 million may be deducted from Canadian Estate distributions to Crossover Bondholders and NNCC Bondholders in further payment of the deferred compensation fee payable to FTI Consulting.  All such deductions shall be borne by the Crossover Bondholders and the NNCC Bondholders on a pro rata basis based on the amount of the Proven Claims of the Crossover Bondholders and the NNCC Bondholders as set forth on Annex G hereto.

(l)  <u>Canadian Fees</u> – The Canadian Debtors and Monitor agree that the Canadian Debtors will not pay voluntarily, or seek permission to pay, legal or advisor fees of any stakeholder that the Canadian Debtors are not paying as of the date hereof. Payment of any such further legal or advisor fees will be done only pursuant to an order of the CCAA Court.

(m)  <u>NNCC Fees</u> – The U.S. Plans shall provide that NNI shall pay the reasonable and documented fees of (a) the NNCC Bonds Trustee, in an amount not to exceed U.S.$4.25 million, and (b) counsel to Solus Alternative Asset Management LP and PointState Capital LP in an amount not to exceed U.S.$750,000. Notwithstanding any other term in this Settlement and Support Agreement, if any amount remains in the cash reserve established pursuant to Section 4(g)(vi) hereof after the making of payments required thereunder, the U.S. Plans shall provide that, out of such funds, NNI shall pay or reimburse reasonable and documented fees (up to an additional U.S.$2.0 million) incurred by professionals in connection with the assertion of rights related to the NNCC Bonds.  Any amount payable by NNI under this Section 4(m) shall include an amount equal to, and be in addition to, any fees paid by the Canadian Debtors under the Crossover Bondholder Fee Letter allocated to the NNCC Bondholders that are deducted from distributions made by the Canadian Estate to the NNCC Bondholders as described in Section 4(k).

(n)  <u>Canadian Debtor Claim Distributions</u> – Solely for determining *pari passu* distributions in respect of unsecured claims against the Canadian Estate, claims

will be valued in U.S. Dollars and all non-U.S. Dollar denominated Proven Claims against the Canadian Estate will be converted to U.S. Dollars at the prevailing exchange rate reported by Reuters on January 14, 2009 (as reflected at Appendix "A" to the Claims Procedure Order).

(i)     Proven Claims against the Canadian Estate predominantly denominated in Canadian Dollars ("**CAD Claims**") will be paid from Canadian Estate assets in Canadian Dollars.

(ii)    All other Proven Claims against the Canadian Estate will be paid in U.S. Dollars.

(iii)   For purposes of determining the amount of Canadian Dollars to be paid by the Canadian Estate on distributions on CAD Claims, the amount of such distribution in U.S. Dollars (as calculated in accordance with this Section 4(n)), shall be converted to Canadian Dollars at the Applicable FX Rate at which Sale Proceeds are converted from U.S. Dollars to Canadian Dollars as contemplated by Section 7 hereof.

(o)    <u>Plans Effective Date</u> – Each of the Plans shall contain a term to the effect that the U.S. Plans and the Canadian Plan shall become effective at the same time.

**Section 5.  <u>Litigation Resolution</u>**

(a)    For the avoidance of doubt, this Section 5 is subject to the satisfaction of the conditions set forth in Section 9(a) hereof, except to the extent expressly indicated in Section 9(c) hereof.

(b)    Promptly following the Plans Effective Date, the Parties shall dismiss with prejudice and with no order as to costs all appeals, leave to appeal applications and other litigations among any of the Parties (including the pending appeals and cross-appeals in respect of the Allocation Dispute, the pending appeal of the PPI Settlement by the Canadian Debtors, the pending appeal of the SNMP impleader action and related denial of a chapter 15 stay to which the U.S. Debtors and the EMEA Debtors and SNMP are parties, and the pending appeal and cross-appeal in respect of the claims of the UKPI against the Canadian Debtors), save and except for the Non-Released Matters and provided that rights are reserved to enforce this Settlement and Support Agreement.  Such dismissals will be effected by the filing of the appropriate documents with the appropriate courts in each jurisdiction, the form of which documents must be reasonably acceptable to the Parties party to such litigation.

(c)    The Parties hereby agree that immediately upon this Settlement and Support Agreement being executed by all Parties, in a coordinated fashion the Parties shall contact the CCAA Court, the Bankruptcy Court, the Ontario Court of Appeal, the Supreme Court of Canada, the U.S. District Court for the District of Delaware, the Third Circuit, the U.K. Court, the French Court, and such other courts as may be necessary, and notify them that the Settlement and Support Agreement has been executed.  Counsel to the Monitor shall coordinate contacting the Canadian

Courts (except with respect to contacting the Supreme Court of Canada in connection with the leave application filed therewith, which shall be coordinated by counsel to the U.S. Debtors in consultation with counsel to the Monitor), counsel to the U.S. Debtors shall coordinate contacting the U.S. Courts, counsel to the Joint Administrators shall coordinate contacting the U.K. Court and counsel to each of the French Liquidator and NNSA Conflicts Administrator shall coordinate contacting the French Court.

(d)     Subject to Section 5(e), the Parties hereby agree that immediately upon this Settlement and Support Agreement being executed by all Parties, in a coordinated fashion the Parties shall request that the Canadian Courts and the U.S. Courts stay any and all matters pending before those courts between any of the Parties to, or that are otherwise related to, this Settlement and Support Agreement, including, without limitation, the litigation described in Section 5(b) hereof, pending satisfaction of the conditions set forth in Section 9(a) hereof.

(e)     The Parties hereby agree not to commence or take any step to advance any action, claim, appeal, objection or other similar proceeding (a "**Proceeding**") seeking relief that is the subject of the matters addressed in this Settlement and Support Agreement; provided, however, that (i) to the extent that a stay contemplated by subsection 5(d) above is not granted or ceases to exist in respect of any Proceeding, the Parties shall be entitled to take all reasonably necessary steps to preserve their rights in all relevant jurisdictions in respect of such Proceeding prior to the Plans Effective Date, provided, further, however, in accordance with Section 10 hereof, in the event of a termination of this Settlement and Support Agreement, upon the occurrence of such termination, the Parties agree to notify the relevant courts of such termination and immediately thereafter recommence, or continue, as applicable, litigation.  For the avoidance of doubt, the Parties rights to propose or oppose expedition of any Proceeding in the event of such termination are preserved as set forth in Section 10(c) herein.

## Section 6.  Support of Settlement, Disclosure Statements and Plans

(a)     For the avoidance of doubt, this Section 6 is subject to the satisfaction of the conditions set forth in Section 9(a) hereof, except to the extent expressly indicated in Section 9(c) hereof.

(b)     The Canadian Debtors and Monitor hereby agree to take any and all reasonably necessary and appropriate actions (including, without limitation, obtaining requisite corporate approvals, if any) to (i) file the Canadian Plan and Canadian Information Circular with the CCAA Court (each of which shall be in a form and substance that contains, implements and accurately reflects the terms and conditions of this Settlement and Support Agreement), seek approval of the Canadian Meeting Order and solicit votes from Canadian Voting Creditors to accept the Canadian Plan, and (ii) seek entry of the Sanction Order and the Canadian Escrow Release Order.  The sanction of the Canadian Plan will be conditioned on, among other things, confirmation of the U.S. Plans.

Consideration of the Canadian Plan and the U.S. Plans will take place in joint hearings conducted in accordance with the Cross-Border Protocol.

(c)     The U.S. Debtors hereby agree to take any and all reasonably necessary and appropriate actions (including, without limitation, obtaining requisite corporate approvals, if any) to (A) file the U.S. Plans and Disclosure Statement with the U.S. Court (each of which shall be in a form and substance that contains, implements and accurately reflects the terms and conditions of this Settlement and Support Agreement) and seek approval of the Disclosure Statement by the Bankruptcy Court, (B) solicit votes from U.S. Voting Creditors to accept the U.S. Plans, and (C) seek entry of the Confirmation Order and the U.S. Escrow Release Order.   Confirmation of the U.S. Plans will be conditioned on, among other things, sanction of the Canadian Plan.   Consideration of the Canadian Plan and the U.S. Plans will take place in joint hearings conducted in accordance with the Cross-Border Protocol.

(d)     The EMEA Debtors hereby agree to take any and all reasonably necessary and appropriate actions (including, without limitation, obtaining requisite corporate approvals, if any) to (A) file with the U.K. Court materials (which shall be, *inter alia*, in a form and substance that accurately reflects the terms and conditions of this Settlement and Support Agreement) as contemplated by Section 9(a)(iv) hereof, and (B) seek entry of the order or orders from the U.K. Court as contemplated by Section 9(a)(iv) hereof.

(e)     The French Liquidator hereby agrees to take any and all reasonably necessary and appropriate actions (including, without limitation, obtaining requisite corporate approvals, if any) to (A) file with the French Court materials (which shall be, *inter alia,* in a form and substance that accurately reflects the terms and conditions of this Settlement and Support Agreement) seeking the approval required by Section 9(a)(vi) hereof, and (B) seek entry of an order or orders from the French Court granting such approval.

(f)     The NNSA Conflicts Administrator hereby agrees to take any and all reasonably necessary and appropriate actions (including, without limitation, obtaining requisite corporate approvals, if any) to (A) file with the U.K. Court materials (which shall be, *inter alia,* in a form and substance that accurately reflects the terms and conditions of this Settlement and Support Agreement) as contemplated by Section 9(a)(v) hereof, and (B) seek entry of the order or orders from the U.K. Court as contemplated by 9(a)(v) hereof.

(g)     The U.K. Pension Trustee hereby agrees to take any and all reasonably necessary and appropriate actions (including, without limitation, obtaining requisite corporate approvals, if any) to (A) file with the Beddoes Court materials (which shall be in a form and substance that accurately reflects the terms and conditions of this Settlement and Support Agreement) seeking the approval required by Section 9(a)(vii) hereof, and (B) seek entry of an order or orders from the Beddoes Court authorizing the U.K. Pension Trustee to implement this Settlement and Support Agreement.

(h)     Subject to the Plans and the Disclosure Statements (A) accurately incorporating the terms and conditions of this Settlement and Support Agreement, and (B) being in form and substance reasonably satisfactory to the respective Parties (including in respect of any material amendments to the Plans), each of the Parties and each of the Participating Creditors hereby agrees to:

    (i)     support the Settlement and all of the transactions and actions contemplated hereby (including the Plans) and take any and all reasonably necessary and appropriate actions in furtherance of consummation of the Settlement, the Plans and this Settlement and Support Agreement;

    (ii)    support approval of the Disclosure Statements, the granting of the Canadian Meeting Order (and not object to approval of the Disclosure Statements or the granting of the Canadian Meeting Order, or support the efforts of any other Person to oppose or object to, approval of the Disclosure Statements or the granting of the Canadian Meeting Order) and the granting of the approvals from the U.K. Court, the French Court and the Beddoes Court;

    (iii)   subject to receipt of the Disclosure Statements and solicitation in accordance with (as applicable) Sections 1125 and 1126 of the Bankruptcy Code and/or the Canadian Meeting Order,

        (A)     (1) as necessary given its creditor status, deliver its duly-completed ballot(s) and/or proxy(ies) for receipt (at the address specified therein) by the required date (or to attend at the meeting of creditors to be held pursuant to the Canadian Meeting Order) in order to vote its claims to accept the Plans, (2) with respect to voting of any claim held by a Participating Creditor for trades not settled (but which claims will be bound by the terms hereof upon the closing of such trade), to direct the delivery of duly-completed ballot(s) and/or proxy(ies) for receipt (at the address specified therein) by the required date in order to vote such claims to accept the Plans, and (3) not change or withdraw (or cause to be changed or withdrawn) any such vote, unless the Plan related thereto is modified to be inconsistent with this Settlement and Support Agreement or is otherwise modified in a manner not permitted by such Plan;

        (B)     (1) support the granting of the Confirmation Order, the Sanction Order and the Escrow Release Orders (and not object to approval of the granting of such orders, or support the efforts of any other Person to oppose or object to, the granting of such orders), unless the Plan related thereto is modified to be inconsistent with this Settlement and Support Agreement or is otherwise modified in a manner not permitted by such Plan, and (2) refrain from taking any action not required by law that is inconsistent with, or that would delay or impede sanction, confirmation or consummation of the

Plans or that is otherwise inconsistent with the express terms of this Settlement and Support Agreement; and

(C)     not, directly or indirectly, propose, support, solicit, encourage, or participate in the formulation of any alternative plan or plans of compromise, arrangement, reorganization or liquidation in the Chapter 11 Cases or the Canadian Proceedings other than the Plans.

(iv)    in the case of Participating Creditors who are Crossover Bondholders, issue directions to the trustees under the indentures governing the Crossover Bonds to support this Settlement and Support Agreement and the Plans and to act in a manner as contemplated pursuant to this Section 6(h); and

(v)     in the case of Participating Creditors who are NNCC Bondholders, issue directions to the NNCC Bonds Trustee to cause the NNCC Bonds Trustee to support this Settlement and Support Agreement and the Plans and to act in a manner as contemplated pursuant to this Section 6(h).

(i)     For the avoidance of doubt, each of the Parties and each Participating Creditor also agrees that it will not take any action (or refrain from taking an action) that, directly or indirectly, would interfere with, delay, impede, or postpone or take any other action that interferes with, the implementation of the Settlement, the confirmation and consummation of the U.S. Plans, the sanction and consummation of the Canadian Plan and/or the granting of the approvals by the U.K. Court, the French Court and the Beddoes Court.

(j)     Transfers of Claims and Interests.

(i)     No Participating Creditor shall (i) sell, transfer, assign, pledge, grant a participation interest in, or otherwise dispose of, directly or indirectly, its right, title, or interest in respect of any of such Participating Creditor's claims against any Debtor in whole or in part, or (ii) deposit any of such Participating Creditor's claims against any Debtor, as applicable, into a voting trust, or grant any proxies, or enter into a voting agreement with respect to any such claims or interests (the actions described in clauses (i) and (ii) are collectively referred to herein as a "**Transfer**" and the Participating Creditor making such Transfer is referred to herein as the "**Transferor**"), unless such Transfer is to another Party or Participating Creditor or any other Person that first agrees in writing to be bound by the terms of this Settlement and Support Agreement by executing and delivering a Transferee Joinder substantially in the form attached hereto as Annex H (the "**Transferee Joinder**") to the Debtors or, if to a Party or Participating Creditor, which Party or Participating Creditor has already executed this Settlement and Support Agreement, in which case, the Party or Participating Creditor receiving such Transferee Joinder shall deliver same to the Debtors.  With respect to claims against or interests in a

Debtor held by the relevant transferee upon consummation of a Transfer in accordance herewith, such transferee is deemed to make all of the representations, warranties, and covenants of a Participating Creditor, as applicable, set forth in this Agreement. Upon compliance with the foregoing, the Transferor shall be deemed to relinquish its rights (and be released from its obligations, except for any claim for breach of this Settlement and Support Agreement or any related non-disclosure agreement that occurs prior to such Transfer) under this Agreement to the extent of such transferred rights and obligations. Any Transfer made in violation of this Sub-Clause (i) of this Section 6(j) shall be deemed null and void *ab initio* and of no force or effect, regardless of any prior notice provided to the Debtors, and shall not create any obligation or liability of any Debtor or any other Party to the purported transferee.

(ii)    Notwithstanding Sub-Clause (i) of this Section 6(j), an entity that is acting in its capacity as a Qualified Marketmaker shall not be required to execute and deliver a Transferee Joinder on its own behalf to effect any transfer (by purchase, sale, assignment, participation, or otherwise) of any claim against any Debtor, by a Participating Creditor to a transferee; *provided that* (A) such transfer by a Participating Creditor to a transferee shall be in all other respects in accordance with and subject to Section 6(j)(i), including in that the ultimate transferee shall execute a Transferee Joinder, and (B) to the extent that a Participating Creditor, acting in its capacity as a Qualified Marketmaker, acquires any claim against, or interest in, any Debtor from a holder of such claim who is not a Participating Creditor, it may transfer (by purchase, sale, assignment, participation, or otherwise) such claim or interest without the requirement that the transferee be or become a Party in accordance with this Section 6(j). For purposes of this Section 6(j)(ii), a "**Qualified Marketmaker**" means an entity that (Y) holds itself out to the market as standing ready in the ordinary course of its business to purchase from customers and sell to customers claims against any of the Debtors (including debt securities or other debt) or enter with customers into long and short positions in claims against the Debtors (including debt securities or other debt), in its capacity as a dealer or market maker in such claims against the Debtors, and (Z) is in fact regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt). For the avoidance of doubt, if a Qualified Marketmaker purchases a claim against a Debtor from a Participating Creditor for its own account or otherwise has a beneficial ownership interest in a claim being acquired from a Participating Creditor, it shall be required to execute and deliver a Transferee Joinder to the Debtors.

## Section 7.  <u>Currency Conversion</u>

(a)    The Parties hereby agree to cooperate and coordinate efforts to convert portions of the Sale Proceeds from U.S. Dollars to, as the case may be, Canadian Dollars, Sterling and Euros (collectively, the "**<u>Other Currencies</u>**").

(b)    Canadian Dollar Conversion.

    (i)    The Canadian Debtors have elected to convert a portion of the Sale Proceeds, not to exceed US$1.2 billion, into Canadian Dollars.  The Parties hereto agree to such conversion subject to the terms of this Section 7.

    (ii)    Within seven (7) Business Days of the date the conditions specified in Sections 9(a)(i) and 9(a)(ii) hereof are satisfied or waived in writing by the Parties:

        (A)    NNC, NNL, NNI, NNUK, NNSA, the other existing Depositors under the relevant Existing Escrow Agreements, the Monitor and the UCC shall enter into the Canadian Escrow Agreement, which agreement shall be subject to the separate approvals of the Bankruptcy Court and the CCAA Court; and

        (B)    the U.S. Debtors agree to make a motion to the Bankruptcy Court, and the Canadian Debtors agree to make a motion to the CCAA Court, for orders approving the conversion contemplated by this Section 7(b).

    (iii)    Each Party appearing at the hearings on the motions contemplated by Section 7(b)(ii)(B) will confirm to the Bankruptcy Court and/or the CCAA Court its support for the conversion and will take all necessary steps to support the conversion motions before the Bankruptcy Court and CCAA Court.

    (iv)    Forthwith upon the granting of the approvals of the Bankruptcy Court and the CCAA Court contemplated by Section 7(b)(ii)(B), the Parties (and in particular the relevant Depositors and Estate Fiduciaries) shall issue such instructions and/or directions to the existing Escrow Agents as may be necessary to give effect to the transfer of an amount of the Sale Proceeds as specified by the Monitor in writing (not to exceed the amount specified in Section 7(b)(i)) to the Canadian Escrow Agent.

    (v)    Following receipt by the Canadian Escrow Agent of such Sale Proceeds, the Monitor shall direct the conversion of such Sale Proceeds by the Canadian Escrow Agent (or its affiliate) on the date(s) and in the manner specified from time to time by the Monitor.

    (vi)    Any foreign exchange gain or loss made in respect of any amount in the Canadian Escrow Account (following conversion from U.S. Dollars to Canadian Dollars) shall be solely for the credit or debit of the Canadian Debtors.

(c)    Sterling and Euro Conversion Elections.

(i)    The EMEA Debtors and NNSA have not yet elected to convert a portion of Sale Proceeds into Sterling or Euros.

    (A)    Any of the EMEA Debtors and NNSA may, subject to the conditions set forth in this Section 7, elect to convert, in the case of an EMEA Debtor, up to the amount specified for that EMEA Debtor in Annex E into Sterling (a "**Sterling Conversion Election**") and, in the case of NNSA, up to $220 million into Euros, and in each case, less the pro rata percentage of the Buyer Escrow Amount attributable to NNSA and each EMEA Debtor (the "**Euro Conversion Election**," and together with any Sterling Conversion Election, the "**Conversion Elections**").

(ii)    A Conversion Election may be requested at any time following the satisfaction of the conditions contained in Section 9(a)(i),(ii), (iv), (v) and (vi).

(iii)    A Conversion Election must be made in writing to the Parties (a "**Conversion Election Request**") and be accompanied by the form of the EMEA Sterling Escrow Agreement in the event the Sterling Conversion Election is requested and/or the EMEA Euro Escrow Agreement in the event the Euro Conversion Election is requested, which agreements shall be on terms and conditions that are substantially similar to the terms and conditions of the Existing Escrow Agreements governing the Existing Escrow Accounts and shall include, without limitation:

    (A)    provisions that provide for the same level of joint control by the Bankruptcy Court and the CCAA Court over the EMEA Escrow Accounts that such courts now have over the Existing Escrow Accounts; and

    (B)    provisions that provide for the release of funds from the EMEA Escrow Accounts on the same terms and conditions that govern the release of funds from the Existing Escrow Accounts; and

    (C)    a requirement that the funds shall be held in a bank in London (U.K.) acceptable to the U.S. Debtors, the Canadian Debtors, the EMEA Debtors and NNSA.

(iv)    Promptly following delivery of a Conversion Election Request, the U.S. Debtors, the Canadian Debtors, the EMEA Debtors, NNSA, the Monitor and the UCC shall work together in good faith to agree the terms of the EMEA Euro Escrow Agreement and the EMEA Sterling Escrow Agreement, as applicable.

(v)    Promptly following delivery of a Conversion Election Request, the Debtors shall agree on the U.S. Dollar amount of Sale Proceeds to be

transferred from each of the Existing Escrow Accounts to satisfy the Conversion Election Request.

(vi)     Each of the EMEA Escrow Agreements shall be subject to the approval of the Bankruptcy Court and the CCAA Court, respectively.   The Parties agree that within seven (7) Business Days of agreement on the form of the relevant EMEA Escrow Agreement:

(A)     the U.S. Debtors shall apply to the Bankruptcy Court; and

(B)     the Canadian Debtors shall apply to the CCAA Court,

in each case for permission to complete the relevant conversion and for approval to enter into the relevant EMEA Escrow Agreement.

(vii)    Each Party appearing at the motions contemplated by Section 7(c)(vi) will confirm to the Bankruptcy Court and/or the CCAA Court its support for the conversion and will take all necessary steps to support the conversion motions before the Bankruptcy Court and the CCAA Court.

(viii)   Within:

(A)     seven (7) Business Days; or

(B)     such longer period as the Party making the Conversion Election Request may require,

of obtaining the approvals of the Bankruptcy Court and the CCAA Court contemplated by Section 7(c)(vi), the Parties (and in particular the relevant Depositors and Estate Fiduciaries) shall issue such instructions and/or directions to the Existing Escrow Agents as may be necessary to give effect to the Conversion Election Request(s) and to the transfer of the requisite amount to the EMEA Euro Escrow Agent and/or the EMEA Sterling Escrow Agent, as the case may be, for conversion in accordance with Section 7(c)(ix) below.

(ix)     The Parties agree that the currency conversions contemplated under this Section 7(c) shall occur:

(A)     in the case of a Conversion Election by an EMEA Debtor, on the date(s) and in the manner specified from time to time by the Joint Administrators of that EMEA Debtor (which in the case of NNUK shall follow consultation between the Joint Administrators and the UKPI); and

(B)     in the case of a Conversion Election by NNSA, on the date(s) and in the manner specified from time to time by the NNSA Conflicts

Administrator following consultation with the French Liquidator and the agreement of the Joint Administrators of NNSA.

(x) Any foreign exchange gain or loss made in respect of any amount in the relevant EMEA Escrow Account pursuant to a Conversion Election (following conversion from U.S. Dollars to Euros or Sterling) shall be solely for the credit or debit of the EMEA Debtor who requested such Conversion Election or NNSA, as the case may be.

(d) The Parties undertake and agree to cooperate with the Escrow Agents to establish appropriate steps necessary to effect the necessary and timely conversion contemplated in this Section 7.

(e) The fees and costs of the Escrow Agents (including reasonable attorneys' fees costs), if any, associated with any currency conversion shall be borne by the Debtor(s) requesting such conversion and shall be paid out of the amount of their respective Sale Proceeds allocation or directly by the relevant Debtor out of its estate assets.

(f) Without in any way limiting the right of the EMEA Debtors and NNSA to convert any amount to Sterling or Euros in accordance with Section 7(c), it is the current intention of the EMEA Debtors and NNSA that:

(i) they will not issue a Conversion Election Request prior to the Plans Effective Date; and

(ii) they will receive their respective allocations pursuant to Section 2 (or following a Final Allocation Determination) in U.S. Dollars.

(g) For purposes of determining the allocation entitlements of the Debtors either pursuant to Section 2(c) hereof or pursuant to a Final Allocation Determination, any Sale Proceeds converted into Other Currencies as contemplated by this Section 7 (for the avoidance of doubt, plus interest on such converted amount) shall, when distributed to a Debtor, be valued as a U.S. Dollar equivalent of such Other Currency at the spot rate or blended rate (as applicable, which blended rate shall take into account the amounts converted and the rates at which such conversion occurred) at which such Sale Proceeds were converted from U.S. Dollars to such Other Currency (any such spot or blended conversion rate, the "**Applicable FX Rate**").  Solely for illustrative purposes, if U.S.$10 of Sale Proceeds was converted to CAD$13 (spot rate or blended rate of U.S.$1.00 to CAD$1.30), receipt by the Canadian Debtors of CAD$13 from the Canadian Escrow Account would constitute receipt of US$10 for purposes of determining the Canadian Debtors' allocation entitlement pursuant to Section 2(c) hereof or pursuant to a Final Allocation Determination regardless of the actual relative value of U.S. Dollars to Canadian Dollars at the date of distribution of such Sale Proceeds to the Canadian Estate.

(h)    If this Agreement terminates after the date of any currency conversion pursuant to this Section 7, then any amount so converted shall, absent any agreement among the parties to the relevant New Escrow Agreement, remain in the relevant New Escrow Account in the form of the converted Other Currency until such time as the Allocation Dispute has been finally resolved and the amount to be distributed to each Debtor estate has been finally determined (the "**Final Allocation Determination**", and the amount calculated as payable to each Debtor pursuant to the Final Allocation Determination, its "**Final Allocation Amount**").  In assisting the U.S. Court and the Canadian Court to come to a Final Allocation Determination, the Parties hereby agree to inform the U.S. Court and the Canadian Court that the Final Allocation Determination should be made as though no currency conversion had taken place.

(i)    For the purpose of Section 7(j) to (k), inclusive, the following terms shall have the following meaning:

(i)    "**Converting Debtor**" means any Debtor that has elected to convert a portion of the Sale Proceeds and has a New Escrow Account established into which converted currency is paid pursuant to this Section 7;

(ii)    "**Non-Converting Debtor**" means any Debtor that is not a Converting Debtor;

(iii)    "**Positive Converting Debtor**" means any Converting Debtor in respect of which the Sale Proceeds in the relevant New Escrow Account (as expressed in U.S. Dollars using the Applicable FX Rate) exceeds the Final Allocation Amount due to such Converting Debtor;

(iv)    "**Negative Converting Debtor**" means any Converting Debtor who is not a Positive Converting Debtor; and

(v)    "**Surplus Amount**" means any, all of or any combination of a Canadian Surplus Amount, an EMEA Surplus Amount or an NNSA Surplus Amount.

(j)    In respect of the Canadian Debtors, upon a Final Allocation Determination:

(i)    If the amount of Sale Proceeds in the Canadian Escrow Account plus any fees and costs paid pursuant to Section 7(e) from such Sale Proceeds (in each case as expressed in U.S. Dollars using the Applicable FX Rate) is greater than the aggregate of the Final Allocation Amounts due to the Canadian Debtors, then the Canadian Debtors shall pay into the Existing Escrow Accounts an amount, in U.S. Dollars, equal to the amount by which:

(A)    the amount of Sale Proceeds in the Canadian Escrow Account plus any fees and costs paid pursuant to Section 7(e) from such Sale

Proceeds (in each case as expressed in U.S. Dollars using the Applicable FX Rate), *exceeds*

(B) the aggregate of the Final Allocation Amounts due to the Canadian Debtors (such excess amount, the "**Canadian Surplus Amount**").

(ii) The Canadian Surplus Amount shall, at the election of the Canadian Debtors and the Monitor, be satisfied from: (A) the Canadian Debtors' own assets; (B) the Canadian Escrow Account; or (C) any combination of the foregoing (A) and (B). If all or part of the Canadian Surplus Amount is to be transferred from the Canadian Escrow Account then all of the Parties agree that they shall issue such instructions or other directions to the Canadian Escrow Agent as may be required in order to effect such transfer to the Existing Escrow Accounts. Any fees or costs associated with the transfer of such funds from the Canadian Escrow Account or the conversion of such funds back to U.S. Dollars for the purpose of transfer, including without limitation any fees and costs of the Escrow Agents or their counsel, shall be borne by the Canadian Debtors either directly or from the Canadian Escrow Account.

(iii) Once the Canadian Surplus Amount has been paid into the Existing Escrow Accounts then:

(A) the amounts in the Existing Escrow Accounts (less any costs of the Existing Escrow Agents) shall be applied in payment of the amounts due to the Non-Converting Debtors in proportion to their respective Final Allocation Amounts; and

(B) the amounts in the Canadian Escrow Account shall be paid to the Canadian Debtors.

(iv) If there is no Canadian Surplus Amount upon a Final Allocation Determination:

(A) the amounts in the Canadian Escrow Account shall be paid to the Canadian Debtors; and

(B) the amounts in the Existing Escrow Accounts (less any costs of the Existing Escrow Agents) shall be paid to all Debtors as necessary to satisfy their respective Final Allocation Amounts (taking into account the amount of Sale Proceeds to be paid to the Canadian Debtors pursuant to the foregoing (A) plus any fees and costs paid pursuant to Section 7(e) from such Sale Proceeds (in each case as expressed in U.S. Dollars using the Applicable FX Rate)).

(k) If an EMEA Debtor and/or NNSA also becomes a Converting Debtor then Section 7(j)(iii) and (iv) shall not apply and the following provisions shall apply upon a Final Allocation Determination:

(i)     If the amount of Sale Proceeds in the EMEA Sterling Escrow Account attributable to a Conversion Election made by that EMEA Debtor plus any fees and costs paid pursuant to Section 7(e) from such Sale Proceeds attributable to that EMEA Debtor (in each case as expressed in U.S. Dollars using the Applicable FX Rate) is greater than the Final Allocation Amount due to that EMEA Debtor, then that EMEA Debtor shall pay into the Existing Escrow Accounts an amount, in U.S. Dollars, equal to the amount by which:

   (A)     the amount of Sale Proceeds in the EMEA Sterling Escrow Account attributable to a Conversion Election made by that EMEA Debtor plus any fees and costs paid pursuant to Section 7(e) from such Sale Proceeds attributable to that EMEA Debtor (in each case as expressed in U.S. Dollars using the Applicable FX Rate), *exceeds*

   (B)     the Final Allocation Amount due to that EMEA Debtor (such excess amount, the "**EMEA Surplus Amount**").

(ii)    The EMEA Surplus Amount shall, at the election of that EMEA Debtor, be satisfied from: (A) the EMEA Debtor's own assets; (B) the EMEA Sterling Escrow Account; or (C) any combination of the foregoing (A) and (B). If all or part of the EMEA Surplus Amount is to be transferred from the EMEA Sterling Escrow Account then all of the Parties agree that they shall issue such instructions or other directions to the EMEA Sterling Escrow Agent as may be required in order to effect such transfer to the Existing Escrow Accounts. Any fees or costs associated with the transfer of such funds from the EMEA Sterling Escrow Account or the conversion of such funds back to U.S. Dollars for the purpose of transfer, including without limitation any fees and costs of the Escrow Agents or their counsel, shall be borne by that EMEA Debtor either directly or from the EMEA Sterling Escrow Account.

(iii)   If the amount of Sale Proceeds in the EMEA Euro Escrow Account plus any fees and costs paid pursuant to Section 7(e) from such Sale Proceeds (in each case as expressed in U.S. Dollars using the Applicable FX Rate) is greater than the aggregate of the Final Allocation Amount due to NNSA, then NNSA shall pay into the Existing Escrow Accounts an amount, in U.S. Dollars, equal to the amount by which:

   (A)     the amount of Sale Proceeds in the EMEA Euro Escrow Account plus any fees and costs paid pursuant to Section 7(e) from such Sale Proceeds (as expressed in U.S. Dollars using the Applicable FX Rate), *exceeds*

   (B)     the Final Allocation Amount due to NNSA (such excess amount, the "**NNSA Surplus Amount**").

(iv)    The NNSA Surplus Amount shall, at the election of NNSA, be satisfied from:  (A) NNSA's own assets; (B) the EMEA Euro Escrow Account; or (C) any combination of the foregoing (A) and (B).  If all or part of the NNSA Surplus Amount is to be transferred from the EMEA Euro Escrow Account then all of the Parties agree that they shall issue such instructions or other directions to the EMEA Euro Escrow Agent as may be required in order to effect such transfer to the Existing Escrow Accounts.  Any fees or costs associated with the transfer of such funds from the EMEA Euro Escrow Account or the conversion of such funds back to U.S. Dollars for the purpose of transfer, including without limitation any fees and costs of the Escrow Agents or their counsel, shall be borne by NNSA either directly or from the EMEA Euro Escrow Account.

(v)    If there is a Surplus Amount then once such Surplus Amount has been paid into the Existing Escrow Accounts in accordance with Sections 7(j)(i), 7(j)(ii) and 7(k)(i-iv), as applicable:

(A)    the amounts in the Existing Escrow Accounts (less any costs of the Existing Escrow Agents) shall be applied in payment of the amounts due to (i) all Non-Converting Debtors; and (ii) all Negative Converting Debtors (taking into account the amount of Sale Proceeds to be paid to such Negative Converting Debtors pursuant to the following (B), (C) and (D), as expressed in U.S. Dollars using the Applicable FX Rate), in proportion to their respective Final Allocation Amounts;

(B)    the amounts in the Canadian Escrow Account shall be paid to the Canadian Debtors;

(C)    the amounts in the EMEA Sterling Escrow Account shall be paid to the EMEA Debtors who are Converting Debtors in proportion to their respective Final Allocation Amounts; and

(D)    the amounts in the EMEA Euro Escrow Account shall be paid to NNSA.

(vi)    If there is no Surplus Amount:

(A)    the amounts in the Canadian Escrow Account shall be paid to the Canadian Debtors;

(B)    the amounts in the EMEA Sterling Escrow Account shall be paid to the EMEA Debtors who are Converting Debtors in proportion to their respective Final Allocation Amounts;

(C)    the amounts in the EMEA Euro Escrow Account shall be paid to NNSA; and

(D)    the amounts in the Existing Escrow Accounts (less any costs of the Existing Escrow Agents) shall be paid to all Debtors as necessary to satisfy their respective Final Allocation Amounts (taking into account the amount of Sale Proceeds to be paid pursuant to the foregoing (A), (B) and (C) plus any fees and costs paid pursuant to Section 7(e) from such Sale Proceeds (in each case as expressed in U.S. Dollars using the Applicable FX Rate)).

(l)    Notwithstanding the terms of any New Escrow Agreement, the Parties acknowledge that, in the event of the termination of this Settlement and Plan Support Agreement, each of the Debtors (other than Nortel Communications Inc., Architel Systems Corporation, Northern Telecom Canada Limited and Nortel Networks India International Inc.) reserves its rights pursuant to the Allocation Decisions with respect to any interest it may have in the Sale Proceeds on deposit in the New Escrow Accounts.

## Section 8.  Releases

(a)    For the avoidance of doubt, this Section 8 is subject to the satisfaction of the conditions contained in Section 9(a) hereof.

(b)    Subject to Section 8(b)(iii) and 8(i) hereof, upon the Plans Effective Date, each of the Parties and the Participating Creditors and their respective representatives, agents, successors and assigns (each a "**Releasor**"):

    (i)    release and forever discharge the other Releasors and each other Releasor's respective employees, officers, directors, agents, advisors, lawyers, successors and assigns and the directors and officers, both former and current, of any Nortel entity ("**Worldwide Ds&Os**") (each being a "**Releasee**") from any and all liability for claims, defences, demands, liabilities, damages, actions, contributions, subrogation, causes of action, setoffs, recoupments, costs and expenses (including lawyers' or other fees or expenses), the foregoing terms to be construed as broadly as possible, whether known or unknown, past or present, fixed or contingent, liquidated or unliquidated, which any of the Releasors now have, had, may have had or hereafter may have however so arising out of or in connection with the Allocation Dispute, any other matters resolved herein or any other matter relating to the Nortel Insolvency Proceedings or the Nortel Group (collectively and excluding the Non-Released Matters, "**Released Claims**"); and

    (ii)    undertakes, covenants and agrees not to make any claim, participate in any proceeding or take any action against any other person or entity who would as a result of such claim, proceeding or action have a claim for contribution or indemnity against any of the Releasees in relation to the matters herein resolved and released (collectively, the "**Releases**").

    (iii)    Notwithstanding the above Sections 8(b)(i) and 8(b)(ii), each of the Canadian Debtors and U.S. Debtors do not release or in any way

compromise their right to object to, or assert counterclaims for purposes of setoff against, claims made against them by Worldwide Ds&Os against such Debtors.

(c)     Notwithstanding the Releases provided in Section 8(b), the Debtors shall, upon the written request of a Debtor to another Debtor and to the extent permitted by applicable local law and not inconsistent with the statutory duties of the Debtor, or the Debtor's representatives and fiduciaries, to which a request is made, reasonably cooperate with each other, including providing such documents, other information, access to current personnel and/or permission to communicate with former personnel as may reasonably be requested by the requesting Debtor, in connection with opposing claims asserted by third parties against one or more of the Debtors ("**Third Party Claims**"), which Third Party Claims would have, but for the Releases, given rise to claims for indemnity and/or contribution among one or more of the Debtors; provided, however, that no Debtor shall be obligated to cooperate to the extent such requested cooperation would prejudice the interests of such Debtor.  Further, a Debtor shall only be obligated to provide cooperation in respect of a Third Party Claim pursuant to this Section 8(c) if, but for the Releases, such Third Party Claim would have given rise to a claim for indemnity and/or contribution against such Debtor.  The Debtor requesting cooperation shall bear all costs and expenses, including reasonable attorney fees, of the Debtor providing such cooperation, including the costs of accessing, processing, reviewing and making available any documents, other information and/or personnel requested.  For the avoidance of doubt (i) each Debtor shall be solely responsible for responding to and defending any Third Party Claims against it, and no other Debtor shall have any obligation to respond to, defend, appear in or become party to any Third Party Claims asserted against another Debtor, and (ii) this Section 8(c) shall not create any rights on the part of any person asserting a Third Party Claim, including any discovery or similar rights.  It is acknowledged that the Debtors intend to progress the wind-up of their respective estates, including the continuing disposal of records and decommissioning of their electronic data infrastructure (such as servers), and that the cooperation contemplated pursuant to this Section 8(c) shall in no way preclude any of the Debtors from taking any steps in connection with such wind-up.  To the extent that a Debtor receiving a request under this Section 8(c) takes the position that it is unable to provide the assistance requested, such Debtor shall confer with the Debtor making the request as to the basis for such position.

(d)     The U.S. Plans will include the Releases and the delivery thereof will be authorized by the Confirmation Order.  With respect to any Participating Creditor, such Releases shall be effective regardless of whether such Participating Creditor elects or opts out of any third-party release in the U.S. Plans.

(e)     The Canadian Plan will include the Releases and the effectiveness thereof will be authorized by the Sanction Order.

(f)     The Releases provided by the Joint Administrators, the NNSA Conflicts Administrator, NNSA (in the French Main Proceeding) and the EMEA Debtors

will be effective on the occurrence of the Plans Effective Date and the foregoing will be obliged to give effect to the releases as a result of the orders of the U.K. Court referred to in Section 9(a)(iv) and 9(a)(v).

(g)    The Releases provided by the French Liquidator and NNSA (in the French Secondary Proceeding) will be authorized by the French Court to be effective on the occurrence of the Plans Effective Date.

(h)    The Releases provided by the U.K. Pension Trustee will be authorized by the Beddoes Court to be effective on the occurrence of the Plans Effective Date.

(i)    Nothing in this Settlement and Support Agreement shall constitute a release, waiver or discharge of:

    (i)    any claims advanced by any party represented by a member of the CCC as against any of the Canadian Debtors or their directors, and any claims of the Canadian registered pension plans (or their administrator or other authorized representative on their behalf) against the Pension Benefits Guarantee Fund (Ontario);

    (ii)    any allowed claims (U.S.) or Proven Claims (Canadian) against the U.S. Debtors or the Canadian Estate for payment of the Crossover Bonds or the NNCC Bonds;

    (iii)    the U.S. Canadian Claim, the U.S. Canadian Priority Claim, the EMEA Canadian Claim, the UKPI Canadian Claim, the Remaining HOC Claim and the pre-filing intercompany claims specified on Annex L;

    (iv)    any claim advanced by any EMEA Debtor or EMEA Non-Filed Entity against any other EMEA Debtor or EMEA Non-Filed Entity, or NNSA;

    (v)    any claim advanced by NNSA against any EMEA Debtor or the Joint Administrators;

    (vi)    any claim advanced by the UKPI against any EMEA Debtor, the Joint Administrators, or NNSA;

    (vii)    any claim advanced by any EMEA Debtor or NNSA against the UKPI;

    (viii)    any claim between or among any of the U.S. Debtors and their subsidiaries;

    (ix)    any claim between the PBGC and the U.S. Debtors or any of their U.S. subsidiaries;

    (x)    any claim between or among the Canadian Debtors, provided no distributions or payments will be made by the Canadian Debtors on account of such claims under the Canadian Plan or otherwise; and

(xi)    any claim to enforce the terms of this Settlement and Support Agreement, the Plans and any orders of the U.S. Court or the CCAA Court related thereto (collectively, (i) through (xi), the "**Non-Released Matters**").

**Section 9.  Conditions**

(a)    The effectiveness of the Settlement and this Settlement and Support Agreement and each of the provisions hereof is subject to the satisfaction or the express written waiver by each of the Canadian Debtors (such waiver by the Canadian Debtors being subject to the prior consent of the CCC acting reasonably and in good faith), the EMEA Debtors (such waiver by NNUK being subject to the prior consent of the U.K. Pension Trustee and the PPF acting reasonably and in good faith), NNSA and the U.S. Debtors (such waiver by the U.S. Debtors being subject to the prior consent of the UCC and the Bondholder Group acting reasonably and in good faith) of the following conditions:

(i)    <u>Crossover Bondholder Joinder</u>.  Execution and delivery by the date that is fourteen (14) days from the date of this Settlement and Support Agreement of Creditor Joinders from Crossover Bondholders beneficially holding notes representing at least 67% of the principal amount (as of the Petition Date) of the Crossover Bonds Claims outstanding as at the Petition Date.

(ii)    <u>NNCC Bondholder Joinder</u>.  Execution and delivery by the date that is fourteen (14) days from the date of this Settlement and Support Agreement of Creditor Joinders from NNCC Bondholders beneficially holding notes representing at least 67% of the principal amount (as of the Petition Date) of the NNCC Bonds Claims outstanding as at the Petition Date.

(iii)    <u>Currency Conversion</u>.  Approval orders shall have been obtained from the CCAA Court and the Bankruptcy Court authorizing the Canadian Debtors and U.S. Debtors, respectively, to enter into the Canadian Escrow Agreement, open the Canadian Escrow Account, and convert a portion of the Sale Proceeds from U.S. Dollars to Canadian Dollars, all as contemplated by Section 7, by no later than October 21, 2016.

(iv)    <u>Order by U.K. Court</u>.  Entry of an order or orders by no later than November 4, 2016 by the U.K. Court that the Joint Administrators be at liberty to perform and procure the relevant EMEA Debtor in respect of which they are appointed to perform their respective obligations under this Settlement and Support Agreement, including, without limitation, delivering the Releases, and any other actions necessary to implement the Settlement.

(v)    <u>Order by U.K. Court for French Main Proceeding</u>.  Entry of an order or orders by no later than November 4, 2016 by the U.K. Court that the NNSA Conflicts Administrator and NNSA (in the French Main

Proceeding) be at liberty to perform their obligations under this Settlement and Support Agreement, including, without limitation, delivering the Releases, and any other actions necessary to implement the Settlement.

(vi) <u>Approval by French Court</u>.  Entry of an order or orders by no later than November 4, 2016 by the French Court approving and authorizing the entry into this Settlement and Support Agreement by NNSA (in the French Secondary Proceeding), and authorizing NNSA to perform its obligations under this Settlement and Support Agreement, including, without limitation, delivering the Releases, and any other actions necessary to implement the Settlement.

(vii) <u>Authorization by Beddoes Court</u>.  Entry of an order or orders by no later than November 4, 2016 by the Beddoes Court authorizing the U.K. Pension Trustee to implement this Settlement and Support Agreement and perform its obligations under this Settlement and Support Agreement, including, without limitation, delivering the Releases, and any other actions necessary to implement the Settlement.

(viii) <u>Confirmation of U.S. Plans</u>.  The Confirmation Order shall have been entered by the Bankruptcy Court by no later than February 17, 2017 and thereafter shall have become a Final Order.

(ix) <u>Sanction of Canadian Plan</u>.  The Sanction Order shall have been issued by the CCAA Court by no later than February 17, 2017 and entered and thereafter shall have become a Final Order.

(x) <u>Litigation Dismissal Notices Exchanged in Escrow</u>.  Appropriate notices and other documents dismissing with prejudice the various pending litigations specified in Section 5(b) shall have been executed by the requisite Parties party to such litigation and delivered to one another in escrow.

(xi) <u>Plans Implementation</u>.  The Plans Effective Date shall have occurred by no later than August 31, 2017.

(b) The Parties agree to work in good faith and provide such reasonable cooperation to one another as may be necessary or desirable to achieve the satisfaction of the conditions specified in Section 9(a) and certain related steps on the timetable specified in Annex I (the "**Timetable**"), it being understood and agreed that a failure to achieve the satisfaction of a particular condition by the specified date on the Timetable shall not constitute a breach of this Agreement or result in a failure of such condition except as expressly contemplated by Section 9(a) hereof.  The following Parties shall have responsibility for seeking to satisfy the conditions specified in the Section(s) indicated next to the Party's name, it being understood and agreed that such Parties will, upon request, keep the other Parties reasonably informed as to their progress in satisfying such conditions and share drafts of any

proposed court filings (except that there shall be no obligations to share any court filings, or drafts thereof, in respect of which a confidential order shall be sought):

  (i)   Bondholder Group – Section 9(a)(i) and (a)(iii)

  (ii)  NNCC Bondholders – Section 9(a)(ii)

  (iii) Joint Administrators and NNSA Conflicts Administrator – Section 9(a)(iii), (a)(iv) and (a)(v)

  (iv)  French Liquidator – Section 9(a)(iii) and (a)(vi)

  (v)   U.K. Pension Trustee – Section 9(a)(vii)

  (vi)  U.S. Debtors – Sections 9(a)(iii), (a)(viii) and (a)(xi)

  (vii) Canadian Debtors/Monitor – Sections 9(a)(iii), (a)(ix) and (a)(xi)

  (viii) Parties that are parties to the litigations specified in Section 5(b) – Section 9(a)(x)

(c)    Notwithstanding the foregoing Section 9(a): (i) the following provisions of this Settlement and Support Agreement shall be enforceable immediately upon execution of this Settlement and Support Agreement by the Parties: Sections 1 (as necessary to the implementation of the Sections referenced in this Section 9(c)), 5(c), 5(d), 5(e), 7, 9, 10, 11, 12, 13, 14 and 15 (other than Section 15(b)(i)); and (ii) the following provisions of this Settlement and Support Agreement shall be enforceable immediately upon satisfaction of the conditions specified in Section 9(a)(i) and 9(a)(ii): Sections 2(g) (but only the first sentence thereof), 3(b), 3(c), 4(g)(vii), 4(l), the other provisions of Section 4 (but solely to the extent of obligating the U.S. Debtors and the Canadian Debtors to include such provisions in the Canadian Plan and the U.S. Plan, as applicable) and Section 6.  All other provisions of this Settlement and Support Agreement shall be enforceable upon the satisfaction or waiver of all the conditions set forth in Section 9(a).

## Section 10.  Termination

  (a)    Upon the non-satisfaction of any condition set forth in Section 9(a) hereof (a "**Termination Event**"), unless such condition is waived by the Debtors in accordance with Sections 9(a) hereof, this Settlement and Support Agreement may be terminated by any of the Canadian Debtors, the EMEA Debtors, NNSA or the U.S. Debtors after the passage of ten (10) Business Days following the delivery of a written notice by any of the foregoing Parties to each of the other Parties in the manner set forth in Section 12 hereof.  Prior to the expiration of such ten (10) Business Day period, the Parties shall meet and confer with respect to such Termination Event to discuss alternatives to termination.  No Party may terminate this Settlement and Support Agreement in accordance with this Section 10(a) if the non-satisfaction of that condition was caused by a breach of that Party.

(b)     In the event this Settlement and Support Agreement is terminated, the Parties reserve all of their rights and defenses with respect to the claims and other matters resolved by this Settlement and Support Agreement and this proposed settlement shall not constitute an admission by any Party regarding the validity of the litigations, claims or defenses resolved by this Settlement and Support Agreement or that they have any liability in connection with such litigations, claims or defenses.  Upon termination, Parties are free to notify courts of such termination and to immediately thereafter recommence litigation.

(c)     In the event this Settlement and Support Agreement is terminated, the Parties agree that such termination shall be deemed an occurrence arising more than fourteen (14) days after the opening of the appeals from the Allocation Decisions currently pending before the Third Circuit for purposes of Third Circuit Local Rule of Appellate Procedure 4.1.  If a motion to expedite is made after such termination, the Parties agree not to oppose such motion on the grounds that it was not timely filed, but the Parties reserve all rights to support or oppose such motion on any other grounds.

(d)     The termination of this Settlement and Support Agreement for any reason shall:

(i)     not affect this Section 10(d), Sections 7(b)(vi), 7(c)(x), 7(e) and (g)-(l), Section 11, Section 12, and Sections 15(a), 15(d), 15(e), 15(h), 15(i) and 15(j), which provisions shall continue in force after such termination; and

(ii)     otherwise result in this Settlement and Support Agreement being no longer effective and the rights of all Parties, including all rights advanced in litigation (including in respect of the Allocation Dispute), shall be restored to the *status quo ante*.

## Section 11.  Limitations of Liability

(a)     <u>Joint Administrators' and NNSA Representatives' Limited Liability</u> – The Joint Administrators of the EMEA Debtors (including for the purpose of this subsection, NNSA) and the NNSA Conflicts Administrator have entered into and signed this Settlement and Support Agreement as agents for the EMEA Debtors and NNSA for the purpose of obtaining the releases contained in this clause and neither they, their firm, nor its affiliates, shareholders, employees, advisors, lawyers, representatives or agents shall incur any personal liability whatsoever in respect of any of the obligations undertaken by the EMEA Debtors or NNSA or in respect of any failure on the part of the EMEA Debtors or NNSA to observe, perform or comply with any obligation under this Settlement and Support Agreement or under or in relation to any associated arrangements or negotiations or under any document or assurance made pursuant to this Settlement and Support Agreement. The French Liquidator and the NNSA Conflicts Administrator have entered into and signed this Settlement and Support Agreement as agents for NNSA and neither they, their firms, nor their attorneys or other representatives shall incur any personal liability whatsoever in respect of any of the obligations undertaken by NNSA or in respect of any failure on the part of NNSA to observe, perform or comply with any obligation under this Settlement and Support

Agreement or under or in relation to any associated arrangements or negotiations or under any document or assurance made pursuant to this Settlement and Support Agreement. Any release, discharge or other benefit conferred upon the Joint Administrators, the NNSA Conflicts Administrator, and the French Liquidator pursuant to this Settlement and Support Agreement or the Plans shall enure to their benefit in their personal capacities and each of the Joint Administrators, the NNSA Conflicts Administrator, and the French Liquidator in their personal capacity shall be a third party beneficiary to this Settlement and Support Agreement and the Plans entitled to enforce such releases, discharges and benefits in accordance with the terms of this Settlement and Support Agreement and the Plans.

(b)    <u>Joint Liquidators' Liability</u> - Each of the Joint Liquidators is a Party to this Agreement: (i) as an agent of NNOCL or NNNI, respectively, in such appointed capacity; and (ii) in their own capacity solely for taking the benefit of this Section 11. Notwithstanding anything else to the contrary herein, any claim, action or proceeding against the Joint Liquidators in their personal capacity (and not as agent for NNOCL or NNNI respectively) under this Settlement and Support Agreement shall be governed exclusively by English law and subject to the exclusive jurisdiction of the U.K. Courts. None of the Joint Liquidators, their firms, partners, employees, advisors, representatives or agents shall incur any personal liability whatsoever whether on their own part or in respect of any failure on the part of any company in the Nortel Group to observe, perform or comply with any of its obligations under this Settlement and Support Agreement or under or in relation to any associated arrangements or negotiations.

(c)    <u>Monitor's Limited Liability</u> – The Monitor is a party to this Settlement and Support Agreement solely in its capacity as the CCAA Court appointed Monitor of the Canadian Debtors and not in its personal capacity and shall have all of the protections granted to it under the CCAA and the orders of the CCAA Court, including the Initial Order dated January 14, 2009 (as amended and restated), the Order dated August 14, 2009, the Claims Procedure Order, the Claims Resolution Order dated September 16, 2010, the EMEA Claims Procedure Order dated January 14, 2011, the Intercompany Claims Procedure Order dated July 27, 2012 and the Order (Monitor's Expansion of Power Order #2) dated October 3, 2014. None of the Monitor or its affiliates, shareholders, employees, advisors, lawyers, representatives or agents shall incur any personal liability whatsoever whether on their own part or in respect of any failure on the part of any Nortel Group company to observe, perform or comply with any of its obligations under this Settlement and Support Agreement or under or in relation to any associated arrangements or negotiations.  Any release, discharge or other benefit conferred upon the Monitor pursuant to this Settlement and Support Agreement or the Plans shall enure to the benefit of Ernst & Young Inc. in its personal capacity and Ernst & Young Inc. in its personal capacity shall be a third party beneficiary to this Settlement and Support Agreement and the Plans entitled to enforce such releases, discharges and benefits in accordance with the terms of this Settlement and Support Agreement and the Plans.

(d)    <u>U.S. Principal Officer's Limited Liability</u> – The U.S. Principal Officer has signed this Settlement and Support Agreement solely in its capacity as the Bankruptcy Court appointed Principal Officer of the U.S. Debtors and not in his personal capacity.  None of the U.S. Principal Officer or his firm or its affiliates, shareholders, employees, advisors, lawyers, representatives or agents shall incur any personal liability whatsoever whether on their own part or in respect of any failure on the part of any Nortel Group company to observe, perform or comply with any of its obligations under this Settlement and Support Agreement or under or in relation to any associated arrangements or negotiations.  Any release, discharge or other benefit conferred upon the U.S. Principal Officer pursuant to this Settlement and Support Agreement or the Plans shall enure to the benefit of the U.S. Principal Officer in his personal capacity and his firm, in its personal capacity shall be a third party beneficiary to this Settlement and Support Agreement entitled to enforce such releases, discharges and benefits in accordance with the terms of this Settlement and Support Agreement and the Plans.

## Section 12.  <u>Notice</u>

All demands, notices and communications provided for in this Settlement and Support Agreement shall be in writing and shall be sent by facsimile transmission with confirmation to the number specified on Annex J, electronic format via email, personally delivered or sent by reputable overnight courier service (delivery charges prepaid) to any Party at the address and other particulars specified on Annex J, or at such other address or particulars as the recipient Party has specified by prior written notice to the other Parties pursuant to the provisions of this Section 12.

## Section 13.  <u>Further Acquisition of Claims</u>

Except as set forth in Section 6(j), nothing in this Settlement and Support Agreement shall be construed as precluding any Party or any of its affiliates from acquiring additional Crossover Bonds, NNCC Bonds, claims, or interests in the instruments underlying the Crossover Bonds, NNCC Bonds or claims; provided, however, that any additional Crossover Bonds, NNCC Bonds, claims, or interests in the underlying instruments acquired by any Party and with respect to which such Party is the legal owner, beneficial owner, and/or investment advisor or manager of or with power and/or authority to bind any claims or interests held by it shall automatically be subject to the terms and conditions of this Settlement and Support Agreement.  Upon any such further acquisition, such Party shall promptly notify the Debtors, the Monitor and counsel to the Bondholder Group.

## Section 14.  <u>Relationship Among Parties.</u>

Notwithstanding anything in this Settlement and Support Agreement to the contrary, the duties and obligations of the Parties under this Settlement and Support Agreement shall be several, and not joint. No Party shall have any responsibility by virtue of this Settlement and Support Agreement for any trading by any other entity.  No prior history, pattern, or practice of sharing confidences among or between the Parties shall in any way affect or negate this Settlement and Support Agreement.  The Parties acknowledge that this Settlement and Support Agreement does not constitute an agreement, arrangement, or understanding with respect to

acting together for the purpose of acquiring, holding, voting, or disposing of any equity securities of the Debtors and they (or any combination of them) do not constitute a "group" within the meaning of Rule 13d-5 under the U.S. Securities Exchange Act of 1934, as amended.  No action taken by any Party pursuant to this Settlement and Support Agreement shall be deemed to constitute or to create a presumption by any of the Parties that the Parties are in any way acting in concert or as such a "group."

## Section 15.  **Miscellaneous Provisions**

(a)  <u>Evidentiary Limitations/No Waiver or Admission</u> – This Settlement and Support Agreement is being entered into as part of a comprehensive resolution of multiple disputes, each element of which is consideration for the other elements and an integral aspect of the proposed resolution.  The Parties may submit this Settlement and Support Agreement to any court of competent jurisdiction in connection with seeking approval of this Settlement and Support Agreement, provided, however, except for purposes of seeking to implement or enforce this Settlement and Support Agreement, its terms and the transactions, agreements and actions contemplated hereby, no Party shall introduce, tender, reference or otherwise seek to rely on the Settlement, this Settlement and Support Agreement or any term, compromise or agreement reflected herein in any litigation in or related to the Nortel Insolvency Proceedings, including the Allocation Dispute, and this Settlement and Support Agreement is entitled to protection as a settlement communication pursuant to Federal Rule of Evidence 408 and any other rule of similar effect in any relevant jurisdiction.  As the terms of this Settlement and Support Agreement constitute a settlement, nothing herein shall constitute or shall be argued to constitute an admission of any fact or legal position, waiver of any legal or factual argument or defense, or estop any Party from advancing or defending against any legal or factual argument for any other purpose.

(b)  <u>Costs and Expenses</u> – Each Party shall:  (i) pay its own costs incurred in relation to the litigation which is resolved by this Settlement and Support Agreement, except as otherwise agreed, and no Party shall contest such costs in any manner; and (ii) bear its own costs and expenses (including legal fees and expenses) incurred in connection with this Settlement and Support Agreement, the Plans and the transactions contemplated hereby and thereby. Nothing in the foregoing sentence or in Section 8(b) shall alter any pre-existing arrangement, order or agreement pursuant to which a Debtor estate has agreed or is obligated to pay the professional costs of a Party hereto, save and except as outlined in Sections 4(k) and 4(m).

(c)  <u>Adjudication of Claims</u> – For the avoidance of doubt, nothing in this Settlement and Support Agreement is intended to affect the rights of the respective Debtor estate representatives to resolve and adjudicate claims in their estates, except as set out in Sections 4(b)(i), 4(g), and 4(h) hereof.

(d)  <u>Disputes</u> – To the fullest extent permitted by applicable law, each Party (i) agrees to submit to the non-exclusive jurisdiction of the Bankruptcy Court and the CCAA Court (in a joint hearing conducted under the Cross-Border Protocol), for

purpose of all legal proceedings to the extent relating to the matters agreed in this Settlement and Support Agreement (which shall not include legal proceedings relating to the adjudication of claims not resolved herein, which proceedings shall take place before the supervising court of the Debtor against whom such claims have been asserted, subject to the Cross-Border Protocol, where applicable), (ii) agrees that any claim, action or proceeding by such Party seeking any relief whatsoever to the extent relating to the matters agreed in this Settlement and Support Agreement may be brought in the Bankruptcy Court and the CCAA Court, (iii) waives and agrees not to assert any objection that it may now or hereafter have to the laying of venue of any such action brought in such court, or any claim that any such action brought in such a court, has been brought in an inconvenient forum, (iv) agrees that email service of process or other papers in connection with any such action or proceeding shall be valid and sufficient service thereof, and (v) agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable law. Notwithstanding anything in this Section 15(d), any claim, action or proceeding against (x) the Joint Administrators or the NNSA Conflicts Administrator in their personal capacities under this Settlement and Support Agreement shall be governed exclusively by English law and subject to the exclusive jurisdiction of the U.K. Court, and any such claim, action or proceeding against the French Liquidator in his personal capacity under this Settlement and Support Agreement shall be governed exclusively by French law and subject to the exclusive jurisdiction of the French Court; (y) the U.S. Principal Officer in his personal capacity under this Settlement and Support Agreement shall be governed exclusively by law of the State of New York and subject to the exclusive jurisdiction of the Bankruptcy Court; and (z) the Monitor in its personal capacity under this Settlement and Support Agreement shall be governed exclusively by the law of Ontario and the federal laws of Canada applicable therein and subject to the exclusive jurisdiction of the CCAA Court.  For the avoidance of doubt, nothing in this Section 15(d) shall apply to (A) any claim between or among the UKPI, any EMEA Debtor, any EMEA Non-Filed Entity, the Joint Administrators or NNSA or any claim of any EMEA Debtor against any other EMEA Debtor, EMEA Non-Filed Entity or NNSA, (B) any claim of the PBGC against any U.S. Debtor or affiliate or any claim of any U.S. Debtor against any other U.S. Debtor, or (C) any claim of any creditor against any Debtor or affiliate, in each case except to the extent relating to the matters agreed in this Settlement and Support Agreement.

(e)     **Waiver of Jury Trial.  Each Party hereby waives, to the fullest extent permitted by applicable law, any right it may have to a trial by jury in respect of any litigation directly or indirectly arising out of or in connection with this Settlement and Support Agreement or any transaction contemplated hereby or thereby.  Each Party (i) certifies that no representative, agent or attorney of any other Party has represented, expressly or otherwise, that such other Party would not, in the event of litigation, seek to enforce the foregoing waiver, and (ii) acknowledges that it has entered into this Settlement and Support Agreement as a result of,**

**among other things, the mutual waivers and certifications in this Section 15(e).**

(f)     <u>Injunctive Relief</u> – All remedies available at law or equity, including specific performance, to any Party for a breach of this Settlement and Support Agreement by another Party shall be available to the non-breaching Parties.  The Parties further agree that irreparable damage would occur in the event that any of the provisions of this Settlement and Support Agreement were not performed in accordance with their specific terms or were otherwise breached.  Accordingly, each of the Parties shall be entitled to equitable relief to prevent or remedy breaches of this Settlement and Support Agreement prior to the Plans Effective Date, without the proof of actual damages, including in the form of an injunction or injunctions or orders for specific performance in respect of such breaches. Each Party agrees, to the extent that such Party is subject to any equitable remedy, to waive any requirement for the security or posting of any bond in connection with any such equitable remedy.

(g)     <u>Further Assurances</u> – The Parties undertake and agree to cooperate in good faith to effectuate the terms of this Settlement and Support Agreement, obtain confirmation of the U.S. Plans, obtain sanction of the Canadian Plan and obtain approvals from the U.K. Court, the French Court and the Beddoes Court.

(h)     <u>Governing Law</u> – This Settlement and Support Agreement shall be interpreted, construed and enforced in accordance with the laws of the State of New York without giving effect to the choice of law provisions thereof that would result in the application of the law of another jurisdiction.

(i)     <u>Entire Agreement</u> – This Settlement and Support Agreement constitutes the entire agreement among the Parties and supersedes all prior or contemporaneous written or oral communications, understandings and agreements with respect to the settlement of the Allocation Dispute and the other matters and disputes among the Parties that are resolved herein.  For the avoidance of doubt, the EMEA Debtors, NNSA, the Joint Administrators, the NNSA Conflicts Administrator, the French Liquidator, the EMEA Non-Filed Entities, the Joint Liquidators, the U.K. Pension Trustee and the PPF are party to certain side agreements amongst some or all of them related to this Settlement and Support Agreement, which side agreements shall bind solely the parties to such side agreements for the purposes of those side agreements, it being understood and agreed that any such side agreement shall have no impact on the Parties' rights and obligations under this Settlement and Support Agreement or the interpretation of this Settlement and Support Agreement.

(j)     <u>Amendments and Waivers</u> – This Settlement and Support Agreement may not be amended, supplemented or modified except by a written instrument executed by each of the Parties to this Settlement and Support Agreement.  No Party shall be deemed to have waived any provision of this Settlement and Support Agreement unless such waiver is in writing, and then such waiver shall be limited to the circumstances set forth in such written waiver.

(k)     <u>Non-Severability</u> – Each of the provisions of this Settlement and Support Agreement is an integrated, essential and non-severable part of this Settlement and Support Agreement.

(l)     <u>Representative Capacity</u> – Each person executing this Settlement and Support Agreement in a representative capacity represents and warrants that he or she is empowered to do so.

(m)     <u>Successors and Assigns</u> – This Settlement and Support Agreement shall enure to the benefit of, and shall be binding upon, each Party and its respective agents, successors and assigns.

(n)     <u>Authorization</u> – Each Party represents and warrants, severally and not jointly, that as of the date of this Settlement and Support Agreement, it has the requisite power and authorization to enter into this Settlement and Support Agreement and carry out the transactions contemplated hereby, provided, however, that in the case of the U.S. Debtors, the Canadian Debtors and the Monitor, the EMEA Debtors, NNSA and the U.K. Pension Trustee, such power and authorization to carry out the transactions contemplated herein is subject to the granting of the Confirmation Order, the Sanction Order, and the orders of the U.K. Court, the French Court and the Beddoes Court, respectively.

(o)     <u>Manner of Execution</u> – This Settlement and Support Agreement may be executed in counterparts, each of which shall be an original, and such counterparts shall be construed together as one instrument.  The signature of any of the Parties hereto may be evidenced by a facsimile, scanned email or internet transmission copy of this Settlement and Support Agreement bearing such signature.

(p)     <u>French Court Approval</u> – Immediately upon receipt of an order (the "**First French Order**") from the French supervisory judge (*Juge-commissaire*) (the "**French Supervisory Judge**") appointed in respect of NNSA in form and substance satisfactory to the Parties, acting reasonably, each of the Parties shall execute and deliver a release and waiver to the French Liquidator that: (i) waives the requirement for notification of the First French Order; (ii) consents to the terms of the First French Order; and (ii) waives any appeal or other remedy in respect of the First French Order. The French Liquidator shall deliver a draft of the First French Order with a certified English translation thereof to the other Parties within five (5) Business Days of execution of this Settlement and Support Agreement. Forthwith following entry of the First French Order by the French Supervisory Judge, the French Liquidator shall deliver a certified copy of the First French Order together with a certified English translation thereof to the other Parties for their review and consideration.

IN WITNESS WHEREOF, the Parties have executed this Agreement on the date first above written.

**Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Global Corporation, Nortel Networks International Corporation, Nortel Networks Technology Corporation, Nortel Communications Inc., Architel Systems Corporation and Northern Telecom Canada Limited.**

By: _____

Name:   Tanecia Wong Ken

Title:    Authorized Representative

**Ernst & Young Inc. in its capacity as Monitor of Nortel Networks Corporation, *et al.*, and not in its personal capacity.**

By: _____

Name:   Murray A. McDonald

Title:   President

**Nortel Networks Inc., Nortel Networks Capital Corporation, Nortel Altsystems Inc., Nortel Altsystems International Inc., Xros, Inc., Sonoma Systems, Qtera Corporation, CoreTek, Inc., Nortel Networks Applications Management Solutions Inc., Nortel Networks Optical Components Inc., Nortel Networks HPOCS Inc., Architel Systems (U.S.) Corporation, Nortel Networks International Inc., Northern Telecom International Inc., Nortel Networks Cable Solutions Inc., Nortel Networks (CALA) Inc. and Nortel Networks India International Inc.**

By: _____

Name:   John J. Ray III

Title:   U.S. Principal Officer

IN WITNESS WHEREOF, the Parties have executed this Agreement on the date first above

written.


**Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Global Corporation, Nortel Networks International Corporation, Nortel Networks Technology Corporation, Nortel Communications Inc., Architel Systems Corporation and Northern Telecom Canada Limited.**


By:_____
Name:
Title:




**Ernst & Young Inc. in its capacity as Monitor of Nortel Networks Corporation, *et al.*, and not in its personal capacity.**


By:_____
Name:  Murray A. McDonald
Title:  President




**Nortel Networks Inc., Nortel Networks Capital Corporation, Nortel Altsystems Inc., Nortel Altsystems International Inc., Xros, Inc., Sonoma Systems, Qtera Corporation, CoreTek, Inc., Nortel Networks Applications Management Solutions Inc., Nortel Networks Optical Components Inc., Nortel Networks HPOCS Inc., Architel Systems (U.S.) Corporation, Nortel Networks International Inc., Northern Telecom International Inc., Nortel Networks Cable Solutions Inc., Nortel Networks (CALA) Inc. and Nortel Networks India International Inc.**


By:_____
Name:  John J. Ray III
Title:  U.S. Principal Officer

IN WITNESS WHEREOF, the Parties have executed this Agreement on the date first above

written.

**Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Global Corporation, Nortel Networks International Corporation, Nortel Networks Technology Corporation, Nortel Communications Inc., Architel Systems Corporation and Northern Telecom Canada Limited.**

By:_____
Name:
Title:

**Ernst & Young Inc. in its capacity as Monitor of Nortel Networks Corporation, *et al.*, and not in its personal capacity.**

By:_____
Name:  Murray A. McDonald
Title:  President

**Nortel Networks Inc., Nortel Networks Capital Corporation, Nortel Altsystems Inc., Nortel Altsystems International Inc., Xros, Inc., Sonoma Systems, Qtera Corporation, CoreTek, Inc., Nortel Networks Applications Management Solutions Inc., Nortel Networks Optical Components Inc., Nortel Networks HPOCS Inc., Architel Systems (U.S.) Corporation, Nortel Networks International Inc., Northern Telecom International Inc., Nortel Networks Cable Solutions Inc., Nortel Networks (CALA) Inc. and Nortel Networks India International Inc.**

By:_____
Name:  John J. Ray III
Title:  U.S. Principal Officer

**The EMEA Debtors**

**Nortel Networks UK Limited (in administration)**

acting by
:_____

as joint administrator (acting as agent and without personal liability)

**Nortel Networks NV (in administration)**

acting by
:_____

as joint administrator (acting as agent and without personal liability)

**Nortel Networks B.V. (in administration)**

acting by
:_____

as joint administrator (acting as agent and without personal liability)

**Nortel Networks Hispania SA (in administration)**

acting by
:_____

as joint administrator (acting as agent and without personal liability)

**Nortel Networks (Ireland) Limited (in administration)**

acting by
:_____

as joint administrator (acting as agent and without personal liability)

**Nortel Networks SpA (in administration)**

acting by
:_____

as joint administrator (acting as agent and without personal liability)

**Nortel Networks Polska Sp z.o.o. (in administration)**

acting by
:_____

as joint administrator (acting as agent and without personal liability)

**Nortel Networks (Austria) GmbH (in administration)**

acting by
:_____

as joint administrator (acting as agent and without personal liability)

**The EMEA Debtors**

**Nortel Networks UK Limited (in administration)**

**Nortel Networks (Ireland) Limited (in administration)**

acting by
:_____

acting by
: DAVID   HUGHES

as joint administrator (acting as agent and without personal liability)

as joint administrator (acting as agent and without personal liability)

**Nortel Networks NV (in administration)**

**Nortel Networks SpA (in administration)**

acting by
:_____

acting by
:_____

as joint administrator (acting as agent and without personal liability)

as joint administrator (acting as agent and without personal liability)

**Nortel Networks B.V. (in administration)**

**Nortel Networks Polska Sp z.o.o. (in administration)**

acting by
:_____

acting by
:_____

as joint administrator (acting as agent and without personal liability)

as joint administrator (acting as agent and without personal liability)

**Nortel Networks Hispania SA (in administration)**

**Nortel Networks (Austria) GmbH (in administration)**

acting by
:_____

acting by
:_____

as joint administrator (acting as agent and without personal liability)

as joint administrator (acting as agent and without personal liability)

**Nortel Networks s.r.o. (in administration)**

acting by
:

as joint administrator (acting as agent and
without personal liability)

**Nortel Networks Portugal SA (in
administration)**

acting by
:

as joint administrator (acting as agent and
without personal liability)

**Networks Romania SRL (in administration)**

acting by
:

as joint administrator (acting as agent and
without personal liability)

**Nortel Networks OY (in administration)**

acting by
:

as joint administrator (acting as agent and
without personal liability)

**Nortel Networks Engineering Service Kft
(in administration)**

acting by
:

as joint administrator (acting as agent and
without personal liability)

**Nortel Networks Slovensko s.r.o. (in
administration)**

acting by
:

as joint administrator (acting as agent and
without personal liability)

**Nortel GmbH (in administration)**

acting by
:

as joint administrator (acting as agent and
without personal liability)

**Nortel Networks AB (in administration)**

acting by
:

as joint administrator (acting as agent and
without personal liability)

**Nortel Networks International Finance &
Holding B.V. (in administration)**

_____

acting by
: _____

as joint administrator (acting as agent and
without personal liability)

**Nortel Networks France S.A.S. (in
administration)**

_____

acting by
: _____

as joint administrator (acting as agent and
without personal liability)

**The EMEA Non-Filed Entities**

**Nortel Networks AS**

_____

acting by
: DAVE QUANE (DIRECTOR )

**Nortel Networks AG**

_____

acting by
: DAVE QUANE (DIRECTOR )

**Nortel Networks South Africa (Pty) Limited**

_____

acting by
: DAVE QUANE (DIRECTOR )

**Nortel Networks (Northern Ireland) Limited (in liquidation)**

_____

acting by
:_____

as joint liquidator (acting as agent and without personal liability)

**Nortel Networks Optical Components Limited (in liquidation)**

_____

acting by
:_____

as joint liquidator (acting as agent and without personal liability)

**The EMEA Non-Filed Entities**

**Nortel Networks AS**

_____

acting by
:_____

**Nortel Networks South Africa (Pty) Limited**

_____

acting by
:_____

**Nortel Networks Optical Components Limited (in liquidation)**

_____ *[signature]* _____

acting by
:   RICHARD  BARKER

as joint liquidator (acting as agent and without personal liability)

**Nortel Networks AG**

_____

acting by
:_____

**Nortel Networks (Northern Ireland) Limited (in liquidation)**

_____ *[signature]* _____

acting by
:   RICHARD  BARKER

as joint liquidator (acting as agent and without personal liability)

**Alan Robert Bloom, Christopher John Wilkinson Hill, Alan Michael Hudson and Stephen John Harris, as the administrators of all EMEA Debtors and Nortel Networks S.A. except Nortel Networks (Ireland) Limited (in administration), and Alan Robert Bloom and David Martin Hughes as Administrators for Nortel Networks (Ireland) Limited (in administration).**

By: _____

Name:

Title:

By: _____

Name:

Title:

By: _____

Name:

Title:

**Nortel Networks S.A. (in administration and in *liquidation judiciaire*)**

_____

acting by

: _____

as joint administrator (acting as agent and without personal liability)

_____

acting by :Stephen Jonathan Taylor

as NNSA Conflicts Administrator (acting as agent and without personal liability)

_____

acting by : Maître Cosme Rogeau as French Liquidator (acting as agent and without personal liability)

**Alan Robert Bloom, Christopher John Wilkinson Hill, Alan Michael Hudson and Stephen John Harris, as the administrators of all EMEA Debtors and Nortel Networks S.A. except Nortel Networks (Ireland) Limited (in administration), and Alan Robert Bloom and David Martin Hughes as Administrators for Nortel Networks (Ireland) Limited (in administration).**

By:_____

Name:

Title:


By:_____

Name:

Title:


By:_____

Name:

Title:


**Nortel Networks S.A. (in administration and in *liquidation judiciaire*)**

_____

acting by

:_____

as joint administrator (acting as agent and without personal liability)

_____

acting by :Stephen Jonathan Taylor

as NNSA Conflicts Administrator (acting as agent and without personal liability)


_____

acting by : Maître Cosme Rogeau as French Liquidator (acting as agent and without personal liability)

**Alan Robert Bloom, Christopher John Wilkinson Hill, Alan Michael Hudson and Stephen John Harris, as the administrators of all EMEA Debtors and Nortel Networks S.A. except Nortel Networks (Ireland) Limited (in administration), and Alan Robert Bloom and David Martin Hughes as Administrators for Nortel Networks (Ireland) Limited (in administration).**

By:_____
Name:
Title:


By:_____
Name:
Title:


By:_____
Name:
Title:


**Nortel Networks S.A. (in administration and in *liquidation judiciaire*)**

_____

acting by

:_____

as joint administrator (acting as agent and without personal liability)


_____

acting by :Stephen Jonathan Taylor

as NNSA Conflicts Administrator (acting as agent and without personal liability)


_____

acting by : Maître Cosme Rogeau as French Liquidator (acting as agent and without personal liability)

**Stephen Jonathan Taylor of Isonomy Limited as Conflicts Administrator of Nortel Networks S.A.**

By:_____

Name:  Stephen Taylor

Title:  Conflicts Administrator


**Maître Cosme Rogeau in his capacity as Liquidator for Nortel Networks S.A. under the French Secondary Proceeding.**

By:_____

Name: Maître Cosme Rogeau

Title: French Liquidator


**The ad hoc group of bondholders that hold notes issued and/or guaranteed by Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Inc., and Nortel Networks Capital Corporation, which on June 15, 2016, filed with the Bankruptcy Court a disclosure form under Bankruptcy Rule 2019, as such group may be constituted from time to time.**

By:_____

Name:

Title:


By:_____

Name:

Title:


By:_____

Name:

Title:

Stephen Jonathan Taylor of Isonomy Limited as Conflicts Administrator of Nortel Networks S.A.

By:_____

Name:  Stephen Taylor

Title:  Conflicts Administrator

Maître Cosme Rogeau in his capacity as Liquidator for Nortel Networks S.A.
  under the French Secondary Proceeding.

By:_____

Name: Maître Cosme Rogeau

Title: French Liquidator

The ad hoc group of bondholders that hold notes issued and/or guaranteed by Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Inc., and Nortel Networks Capital Corporation, which on June 15, 2016, filed with the Bankruptcy Court a disclosure form under Bankruptcy Rule 2019, as such group may be constituted from time to time.

By:_____

Name:

Title:

By:_____

Name:

Title:

By:_____

Name:

Title:

**Stephen Jonathan Taylor of Isonomy Limited as Conflicts Administrator of Nortel Networks S.A.**

By: _____

Name:  Stephen Taylor
Title:  Conflicts Administrator

**Maître Cosme Rogeau in his capacity as Liquidator for Nortel Networks S.A. under the French Secondary Proceeding.**

By: _____

Name: Maître Cosme Rogeau
Title: French Liquidator

**The ad hoc group of bondholders that hold notes issued and/or guaranteed by Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Inc., and Nortel Networks Capital Corporation, which on June 15, 2016, filed with the Bankruptcy Court a disclosure form under Bankruptcy Rule 2019, as such group may be constituted from time to time.**

**MILBANK, TWEED, HADLEY & MCCLOY LLP**, as counsel to the Bondholder Group

By: _Albert Pisa_
Name: Albert Pisa
Title:  Partner

**Bennett Jones LLP**, as counsel to the Bondholder Group

By: _____
Name:
Title:  Partner

**FTI Capital Advisors LLC**, as financial advisor to the Bondholder Group

By: _____
Name:
Title:

**Stephen Jonathan Taylor of Isonomy Limited as Conflicts Administrator of Nortel Networks S.A.**

By:_____
Name:  Stephen Taylor
Title:  Conflicts Administrator

**Maître Cosme Rogeau in his capacity as Liquidator for Nortel Networks S.A. under the French Secondary Proceeding.**

By:_____
Name: Maître Cosme Rogeau
Title: French Liquidator

**The ad hoc group of bondholders that hold notes issued and/or guaranteed by Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Inc., and Nortel Networks Capital Corporation, which on June 15, 2016, filed with the Bankruptcy Court a disclosure form under Bankruptcy Rule 2019, as such group may be constituted from time to time.**

**MILBANK, TWEED, HADLEY & MCCLOY LLP**, as counsel to the Bondholder Group

By: _____
Name: Albert Pisa
Title:  Partner

**Bennett Jones LLP**, as counsel to the Bondholder Group

By: _____
Name: Kevin Zych
Title:  Partner

**FTI Capital Advisors LLC**, as financial advisor to the Bondholder Group

By: _____
Name:
Title:

**Stephen Jonathan Taylor of Isonomy Limited as Conflicts Administrator of Nortel Networks S.A.**

By:_____
Name:  Stephen Taylor
Title:  Conflicts Administrator

**Maître Cosme Rogeau in his capacity as Liquidator for Nortel Networks S.A. under the French Secondary Proceeding.**

By:_____
Name: Maître Cosme Rogeau
Title: French Liquidator

**The ad hoc group of bondholders that hold notes issued and/or guaranteed by Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Inc., and Nortel Networks Capital Corporation, which on June 15, 2016, filed with the Bankruptcy Court a disclosure form under Bankruptcy Rule 2019, as such group may be constituted from time to time.**

**MILBANK, TWEED, HADLEY& MCCLOY LLP**, as counsel to the Bondholder Group

By: _____
Name: Albert Pisa
Title:  Partner

**Bennett Jones LLP**, as counsel to the Bondholder Group

By: _____
Name:
Title:  Partner

**FTI Capital Advisors LLC,** as financial advisor to the Bondholder Group

By: _____
Name: Mark Spragg
Title:  Senior Managing Director

Ad hoc committee of creditors having claims only against the Canadian Debtors comprised of: the former and disabled Canadian employees of the Canadian Debtors through their court-appointed representatives, Unifor, Morneau Shepell Ltd. as Administrator of Nortel's Canadian registered pension plans, Superintendent of Financial Services of Ontario as Administrator of the Pension Benefits Guarantee Fund and the court-appointed representatives of the current and transferred employees of the Canadian Debtors.

By: _____
Name: DONALD E SPROULE
Title: COURT APPOINTED REP FORMER NORTEL EMPLOYEES

By: _____
Name:
Title:

By: _____
Name:
Title:

The Official Committee of Unsecured Creditors of Nortel Networks Inc., et al. appointed pursuant to an order entered by the Bankruptcy Court on January 26, 2009, as the same may be constituted from time to time.

By: _____
Name:
Title:

Nortel Networks U.K. Pension Trust Limited as trustee of the Nortel Networks U.K. Pension Plan

By: _____
Name:
Title:

Ad hoc committee of creditors having claims only against the Canadian Debtors comprised of: the former and disabled Canadian employees of the Canadian Debtors through their court-appointed representatives, Unifor, Morneau Shepell Ltd. as Administrator of Nortel's Canadian registered pension plans, Superintendent of Financial Services of Ontario as Administrator of the Pension Benefits Guarantee Fund and the court-appointed representatives of the current and transferred employees of the Canadian Debtors.

By:_____
Name:
Title:

By:_____
Name: DAVID D. ARCHIBALD,
Title: COURT APPOINTED REP.

By:_____
Name:
Title:

The Official Committee of Unsecured Creditors of Nortel Networks Inc., et al. appointed pursuant to an order entered by the Bankruptcy Court on January 26, 2009, as the same may be constituted from time to time.

By:_____
Name:
Title:

Nortel Networks U.K. Pension Trust Limited as trustee of the Nortel Networks U.K. Pension Plan

By:_____
Name:
Title:

Ad hoc committee of creditors having claims only against the Canadian Debtors comprised of: the former and disabled Canadian employees of the Canadian Debtors through their court-appointed representatives, Unifor, Morneau Shepell Ltd. as Administrator of Nortel's Canadian registered pension plans, Superintendent of Financial Services of Ontario as Administrator of the Pension Benefits Guarantee Fund and the court-appointed representatives of the current and transferred employees of the Canadian Debtors.

By: _M.G. Campbell P.ENG._
Name: M.A. CAMPBELL, P.ENG.
Title: COURT APPOINTED REP.

By: _____
Name:
Title:

By: _____
Name:
Title:

The Official Committee of Unsecured Creditors of Nortel Networks Inc., et al. appointed pursuant to an order entered by the Bankruptcy Court on January 26, 2009, as the same may be constituted from time to time.

By: _____
Name:
Title:

Nortel Networks U.K. Pension Trust Limited as trustee of the Nortel Networks U.K. Pension Plan

By: _____
Name:
Title:

Ad hoc committee of creditors having claims only against the Canadian Debtors comprised of:  the former and disabled Canadian employees of the Canadian Debtors through their court-appointed representatives, Unifor, Morneau Shepell Ltd. as Administrator of Nortel's Canadian registered pension plans, Superintendent of Financial Services of Ontario as Administrator of the Pension Benefits Guarantee Fund and the court-appointed representatives of the current and transferred employees of the Canadian Debtors.

By: _Susan Kennedy_
Name: Susan Kennedy
Title: Court-Appointed Representative for Disabled Employees

By:_____
Name:
Title:

By:_____
Name:
Title:

The Official Committee of Unsecured Creditors of Nortel Networks Inc., et al. appointed pursuant to an order entered by the Bankruptcy Court on January 26, 2009, as the same may be constituted from time to time.

By:_____
Name:
Title:

Nortel Networks U.K. Pension Trust Limited as trustee of the Nortel Networks U.K. Pension Plan

By:_____
Name:
Title:

Ad hoc committee of creditors having claims only against the Canadian Debtors comprised of: the former and disabled Canadian employees of the Canadian Debtors through their court-appointed representatives, Unifor, Morneau Shepell Ltd. as Administrator of Nortel's Canadian registered pension plans, Superintendent of Financial Services of Ontario as Administrator of the Pension Benefits Guarantee Fund and the court-appointed representatives of the current and transferred employees of the Canadian Debtors.

By: _____
Name: Jerry Dias
Title: President, Unifor

By: _____
Name:
Title:

By: _____
Name:
Title:

The Official Committee of Unsecured Creditors of Nortel Networks Inc., et al. appointed pursuant to an order entered by the Bankruptcy Court on January 26, 2009, as the same may be constituted from time to time.

By: _____
Name:
Title:

Nortel Networks U.K. Pension Trust Limited as trustee of the Nortel Networks U.K. Pension Plan

By: _____
Name:
Title:

Ad hoc committee of creditors having claims only against the Canadian Debtors comprised of:  the former and disabled Canadian employees of the Canadian Debtors through their court-appointed representatives, Unifor, Morneau Shepell Ltd. as Administrator of Nortel's Canadian registered pension plans, Superintendent of Financial Services of Ontario as Administrator of the Pension Benefits Guarantee Fund and the court-appointed representatives of the current and transferred employees of the Canadian Debtors.

By: _____

Name: HAMISH DUNLOP

Title: PRINCIPAL, MORNEAU SHEPELL IN ITS CAPACITY AS ADMINISTRATOR OF NORTEL'S CANADIAN REGISTERED PENSION PLANS

By: AND NOT IN ITS PERSONAL CAPACITY

Name:

Title:

By: _____

Name:

Title:

The Official Committee of Unsecured Creditors of Nortel Networks Inc., et al. appointed pursuant to an order entered by the Bankruptcy Court on January 26, 2009, as the same may be constituted from time to time.

By: _____

Name:

Title:

Nortel Networks U.K. Pension Trust Limited as trustee of the Nortel Networks U.K. Pension Plan

By: _____

Name:

Title:

Ad hoc committee of creditors having claims only against the Canadian Debtors comprised of:  the former and disabled Canadian employees of the Canadian Debtors through their court-appointed representatives, Unifor, Morneau Shepell Ltd. as Administrator of Nortel's Canadian registered pension plans, Superintendent of Financial Services of Ontario as Administrator of the Pension Benefits Guarantee Fund and the court-appointed representatives of the current and transferred employees of the Canadian Debtors.

By:_____
Name:
Title:

By:_____
Name:
Title:

By:_____
Name: Brian Mills
Title:  Superintendent of Financial Services of Ontario

The Official Committee of Unsecured Creditors of Nortel Networks Inc., et al. appointed pursuant to an order entered by the Bankruptcy Court on January 26, 2009, as the same may be constituted from time to time.

By:_____
Name:
Title:

Nortel Networks U.K. Pension Trust Limited as trustee of the Nortel Networks U.K. Pension Plan

By:_____
Name:
Title:

Ad hoc committee of creditors having claims only against the Canadian Debtors comprised of: the former and disabled Canadian employees of the Canadian Debtors through their court-appointed representatives, Unifor, Morneau Shepell Ltd. as Administrator of Nortel's Canadian registered pension plans, Superintendent of Financial Services of Ontario as Administrator of the Pension Benefits Guarantee Fund and the court-appointed representatives of the current and transferred employees of the Canadian Debtors.

By: _____
Name: Kent Felske
Title: Representative NCCE
(Nortel Canadian Continuing Employees)

By: _____
Name:
Title:

By: _____
Name:
Title:

The Official Committee of Unsecured Creditors of Nortel Networks Inc., et al. appointed pursuant to an order entered by the Bankruptcy Court on January 26, 2009, as the same may be constituted from time to time.

By: _____
Name:
Title:

Nortel Networks U.K. Pension Trust Limited as trustee of the Nortel Networks U.K. Pension Plan

By: _____
Name:
Title:

**Ad hoc committee of creditors having claims only against the Canadian Debtors comprised of:  the former and disabled Canadian employees of the Canadian Debtors through their court-appointed representatives, Unifor, Morneau Shepell Ltd. as Administrator of Nortel's Canadian registered pension plans, Superintendent of Financial Services of Ontario as Administrator of the Pension Benefits Guarantee Fund and the court-appointed representatives of the current and transferred employees of the Canadian Debtors.**

By:_____
Name:   Dany Sylvain
Title:   Representative NCCE
( Nortel Canadian Continuing Employees)


By:_____
Name:
Title:


By:_____
Name:
Title:


**The Official Committee of Unsecured Creditors of Nortel Networks Inc., et al. appointed pursuant to an order entered by the Bankruptcy Court on January 26, 2009, as the same may be constituted from time to time.**


By:_____
Name:
Title:


**Nortel Networks U.K. Pension Trust Limited as trustee of the Nortel Networks U.K. Pension Plan**


By:_____
Name:
Title:

The Official Committee of Unsecured Creditors of Nortel Networks Inc., et al. appointed pursuant to an order entered by the Bankruptcy Court on January 26, 2009, as the same may be constituted from time to time.

By: AKIN GUMP STRAUSS HAUER & FELD LLP, as Counsel to the Committee and authorized signatory and not in its individual capacity

By: _____
Name: David H. Botter
Title:   Partner

Ad hoc committee of creditors having claims only against the Canadian Debtors comprised of: the former and disabled Canadian employees of the Canadian Debtors through their court-appointed representatives, Unifor, Morneau Shepell Ltd. as Administrator of Nortel's Canadian registered pension plans, Superintendent of Financial Services of Ontario as Administrator of the Pension Benefits Guarantee Fund and the court-appointed representatives of the current and transferred employees of the Canadian Debtors.

By:_____
Name:
Title:


By:_____
Name:
Title:


By:_____
Name:
Title:


The Official Committee of Unsecured Creditors of Nortel Networks Inc., et al. appointed pursuant to an order entered by the Bankruptcy Court on January 26, 2009, as the same may be constituted from time to time.

By:_____
Name:
Title:


Nortel Networks U.K. Pension Trust Limited as trustee of the Nortel Networks U.K. Pension Plan

By:_____
Name:    DAVID DAVIES
Title:        DIRECTOR

**Board of the Pension Protection Fund, a statutory corporation established under the provisions of the Pensions Act 2004, whose principal place of business is Renaissance, 12 Dingwall Road, Croydon, England, CRO 2NA.**

By: _Malcolm Weir_

Name: MALCOLM WEIR

Title: HEAD OF RESTRUCTURING & INSOLVENCY

**Richard Barker and Joseph Luke Charleton, as the liquidators of Nortel Networks (Northern Ireland) Limited (in liquidation) and Richard Barker and Samantha Keen as liquidators of Nortel Networks Optical Components Limited (in liquidation).**

By:_____

Name:

Title:

By:_____

Name:

Title:

By:_____

Name:

Title:

**Board of the Pension Protection Fund, a statutory corporation established under the provisions of the Pensions Act 2004, whose principal place of business is Renaissance, 12 Dingwall Road, Croydon, England, CRO 2NA.**

By:_____

Name:

Title:

**Richard Barker and Joseph Luke Charleton, as the liquidators of Nortel Networks (Northern Ireland) Limited (in liquidation) and Richard Barker and Samantha Keen as liquidators of Nortel Networks Optical Components Limited (in liquidation).**

By:_____

Name: RICHARD BARKER

Title: JOINT LIQUIDATOR

By:_____

Name:

Title:

By:_____

Name:

Title:

**Holders of Nortel Networks Capital Corporation Bonds**

Solus Alternative Asset Management LP

By: _C. J. Larktree_____
Name: CJ Larktree
Title: Authorized Signatory

PointState Capital LP

By:_____
Name:
Title:

**Holders of Nortel Networks Capital Corporation Bonds**

Solus Alternative Asset Management LP

By:_____
Name:
Title:

PointState Capital LP

By:\_
Alfred J. Barbagallo
Managing Director & General Counsel

## ANNEX A

### Sale Proceeds[7]

| Transaction | Purchaser | Account Type | Account Description | Escrow Agent | July 31, 2016 Balance |
|---|---|---|---|---|---|
| Layer 4-7 | Radware | Escrow | Purchase Price | JP Morgan | 18,135,907 |
| CDMA | Ericsson | Escrow | Purchase Price | JP Morgan | 1,054,408,277 |
| Enterprise | Avaya | Escrow | Purchase Price | JP Morgan | 844,174,607 |
| GSM | Ericsson & Kapsch | Escrow | Purchase Price | JP Morgan | 104,664,988 |
| GSM-CALA | Ericsson | Escrow | Purchase Price | JP Morgan | 1,503,009 |
| Packet Core | Hitachi | Escrow | Purchase Price | JP Morgan | 10,390,694 |
| MEN | Ciena | Escrow | Purchase Price | JP Morgan | 611,047,234 |
| CVAS | Genband | Escrow | Purchase Price | JP Morgan | 140,337,608 |
| MSS | Ericsson | Escrow | Purchase Price | JP Morgan | 46,112,548 |
| Iceberg | Rockstar | Escrow | Purchase Price | JP Morgan | 4,461,637,286 |
| | | | | | 7,292,412,156 |
| | | | | | |
| MEN Buyer Escrow | Ciena | Escrow | Tax | Citibank | 10,047,067 |
| MEN Buyer Escrow | Ciena | Escrow | EMEA Tax | Citibank | 2,513,188 |
| MEN Buyer Escrow | Ciena | Escrow | Italian Tax | Citibank | 753,950 |
| MEN Buyer Escrow | Ciena | Escrow | Poland | Citibank | 1,005,272 |
| MEN Buyer Escrow | Ciena | Escrow | TSA | Citibank | 7,545,535 |
| MEN Buyer Escrow | Ciena | Escrow | Working Capital | Citibank | 2,101 |
| Buyer Escrows | | | | | 21,867,113 |
| | | | | | |
| **Total** | | | | | **7,314,279,269** |
| | | Less: M&A Cost Reimbursement | | | (55,000,000) |
| | | Less: Iceberg Amendment Fee | | | (5,000,000) |
| | | **Sale Proceeds for Allocation** | | | **$7,254,279,269** |

---

[7] All amounts in U.S. dollars.

## ANNEX B

## EXISTING ESCROW ACCOUNTS

### Distribution Escrow Accounts

| Escrow Agreement | Date | Account Number | Escrow Agent |
|---|---|---|---|
| Layer 4-7 | March 31, 2009 | *[8] | JP Morgan |
| CDMA | November 11, 2009 | * | JP Morgan |
| Enterprise | December 18, 2009 | * | JP Morgan |
| GSM | March 31, 2010 | * | JP Morgan |
| GSM-CALA | June 3, 2010 | * | JP Morgan |
| Packet Core | December 1, 2009 | * | JP Morgan |
| MEN | March 19, 2010 | * | JP Morgan |
| CVAS | May 27, 2010 | * | JP Morgan |
| MSS | March 11, 2011 | * | JP Morgan |
| Iceberg | July 28, 2011 | * | JP Morgan |

### Buyer Escrow Accounts

| Escrow Agreement | Date | Account Number | Escrow Agent |
|---|---|---|---|
| MEN Buyer Escrow | March 19, 2010 | * | Citibank |
| MEN Buyer Escrow | March 19, 2010 | * | Citibank |
| MEN Buyer Escrow | March 19, 2010 | * | Citibank |
| MEN Buyer Escrow | March 19, 2010 | * | Citibank |
| MEN Buyer Escrow | March 19, 2010 | * | Citibank |
| MEN Buyer Escrow | March 19, 2010 | * | Citibank |

[8] Redacted

## ANNEX C

## CANADA-U.S. SIDE LETTERS

1. Side Agreement in respect of Enterprise dated July 20, 2009;

2. China Side Agreement dated November 2, 2009;

3. Side Agreement in respect of Flextronics dated November 20, 2009;

4. Incentive Fee Side Agreement in respect of GSM dated January 8, 2010;

5. Jabil Side Agreement dated February 5, 2010;

6. Metro Ethernet Networks Side Agreement dated February 26, 2010;

7. Offer in respect of Argentina dated March 19, 2010;

8. GSM/GSM-R Side Agreement dated March 31, 2010;

9. CVAS Side Agreement;[9]

10. Cascade Trust Side Letter;

11. Lazard Fees Side Agreement dated November 23, 2010;

12. Amended and Restated MSS Side Agreement dated March 10, 2011 (including any prior version of this agreement);

13. IP Transaction Side Agreement dated April 4, 2011;

14. Supplemental IP Transaction Side Agreement re Certain Transaction Costs and Related Matters dated July 27, 2011;

15. Second Amended and Restated IP Transaction Side Agreement re: Certain Structural Matters dated July 27, 2011 (including any prior version of this agreement); and

16. The so-called "Canada/U.S. Interstate Term Sheet" (styled "August 2011 – Timeline for and Proposed Resolution of U.S./Canada Issues") executed on or about September 8, 2011.

---

[9] This side agreement was never executed but is included for the avoidance of doubt.

## ANNEX D

## FORM OF CREDITOR JOINDER

This joinder (this "**Creditor Joinder**") to the Settlement and Plans Support Agreement (the "**Settlement and Support Agreement**")[5] dated as of [__], 2016 and entered into by and among: (i) the Canadian Debtors;  (ii) the Monitor; (iii) the U.S. Debtors; (iv) the EMEA Debtors; (v) the EMEA Non-Filed Entities; (vi) the Joint Administrators; (vii) NNSA; (viii) the NNSA Conflicts Administrator; (ix) the French Liquidator; (x) the Bondholder Group; (xi) the members of the CCC; (xii) the UCC; (xiii) the U.K. Pension Trustee; (xiv) the PPF; (xv) the Joint Liquidators; and (xvi) the NNCC Bondholder Signatories (collectively, the "**Parties**" and each a "**Party**"), is executed and delivered by [_____] (the "**Joining Creditor**") as of [_____], 2016.

1.    Agreement to be Bound. The Joining Creditor hereby agrees to be bound by all of the terms of the Settlement and Support Agreement, a copy of which is attached to this Joinder as Exhibit 1 (as the same has been or may be hereafter amended, restated, or otherwise modified from time to time in accordance with the provisions thereof). The Joining Creditor shall hereafter be deemed to be a Participating Creditor for all purposes under the Settlement and Support Agreement.

2.    Representations and Warranties. The Joining Creditor hereby represents and warrants to each Party to the Settlement and Support Agreement that, as of the date hereof, such Joining Party (a) is the legal or beneficial owner of, and has all necessary authority (including authority to bind any other legal or beneficial owner) with respect to, the claims identified below its name on the signature page hereof, and (b) makes, as of the date hereof, the representations, warranties and covenants of a Participating Creditor set forth in the Settlement and Support Agreement to each Party.

3.    Governing Law. This Joinder shall be governed by and construed in accordance with the laws of the state of New York.

4.    Notice. All notices and other communications given or made pursuant to the Settlement and Support Agreement shall be sent to:

To the Joining Creditor at:

---

[5] Each capitalized term used herein but not otherwise defined shall have the meaning ascribed to it in the Settlement and Support Agreement.

[JOINING     PARTY]
[ADDRESS]

Attn:

Facsimile:        [FAX]
EMAIL:

IN WITNESS WHEREOF, the Joining Creditor has caused this Joinder to be executed as of the date first written above.

[JOINING CREDITOR]

**Aggregate Face Amounts Beneficially Owned or Managed on Account of**:

10.75% Notes:  $_____

10.125% Notes:  $_____

Floating Rate Notes:  $_____

2.125% Notes:  $_____

1.75% Notes:  $_____

7.875% Notes:  $_____

Other:

Name of Institution:

_____

By _____

    Name:

    Title:


For signatories requiring a second signature
   line:


By _____

    Name:

    Title:

**ANNEX E**

**EMEA DEBTOR ALLOCATION PROPORTION**

| EMEA Debtor | Allocation Proportion | Allocation Amount |
|---|---|---|
| Ireland | 0.5473% | 39,700,848 |
| NNF | 0.0536% | 3,888,460 |
| Germany | 0.2985% | 21,657,395 |
| Spain | 0.1171% | 8,494,707 |
| Portugal | 0.0119% | 859,908 |
| Belgium | 0.0538% | 3,901,159 |
| Netherlands | 0.1310% | 9,505,530 |
| Austria | 0.0117% | 846,210 |
| Poland | 0.0888% | 6,441,991 |
| Italy | 0.0734% | 5,321,673 |
| Czech | 0.0258% | 1,870,623 |
| Slovakia | 0.0098% | 713,284 |
| Hungary | 0.0130% | 940,938 |
| Romania | 0.0049% | 353,402 |
| Finland | 0.0004% | 31,282 |
| Sweden | 0.0071% | 518,276 |
| NNIF | 0.0378% | 2,743,194 |
| NNUK | 14.0249% | 1,017,408,257 |
| | 15.5108% | 1,125,197,136 |
| NNSA | | 220,000,000 |
| **Total** | | 1,345,197,136 |

6557501

## ANNEX F

## U.S. DEBTOR ALLOCATION PROPORTION

| U.S. Debtor | Allocation Amount[10] |
|---|---|
| Nortel Networks Inc. | $1,716,346,052 |
| Nortel Networks (CALA) Inc. | $50,070,950 |
| Nortel Networks Capital Corporation (see Note (9) below) | 0 |
| Nortel Altsystems Inc. | 0 |
| Nortel Altsystems International Inc. | 0 |
| Xros, Inc. | 0 |
| Sonoma Systems | 0 |
| Qtera Corporation | 0 |
| CoreTek, Inc. | 0 |
| Nortel Networks Applications Management Solutions Inc. | 0 |
| Nortel Networks Optical Components Inc. | 0 |
| Nortel Networks HPOCS Inc. | 0 |
| Architel Systems (U.S.) Corporation | 0 |
| Nortel Networks International Inc. | 0 |
| Northern Telecom International Inc. | 0 |
| Nortel Networks Cable Solutions Inc. | 0 |
| Nortel Networks India International Inc. | 0 |
| | $1,766,417,002 |

---

[10] Such allocation amounts are based on Sale Proceeds included in Annex A, which includes the MEN Buyer Escrow Amount.  NNCC is consolidated into NNI for the purposes of this Annex.

## ANNEX G

## CROSSOVER BONDS PROVEN CLAIMS AGAINST CANADIAN ESTATE[11]

| | |
|---|---|
| 1. Nortel Networks Limited and Nortel Networks Corporation and Nortel Networks Inc. and the Bank of New York as indenture trustee for 10.750% Senior Notes due 2016 | $1,185,132,812 |
| 2. Nortel Networks Limited and Nortel Networks Corporation and Nortel Networks Inc. and the Bank of New York as indenture trustee for 10.125% Senior Notes due 2013 | $577,689,063 |
| 3. Nortel Networks Limited and Nortel Networks Corporation and Nortel Networks Inc. and the Bank of New York as indenture trustee for Floating Rate Senior Notes due 2011 | $1,022,419,965 |
| 4. Nortel Networks Corporation and Nortel Networks Limited and Nortel Networks Inc. and the Bank of New York as indenture trustee for 2.125% Convertible Senior Notes due 2014 | $578,020,746 |
| 5. Nortel Networks Corporation and Nortel Networks Limited and Nortel Networks Inc. and the Bank of New York as indenture trustee for 1.75% Convertible Senior Note Due 2012 | $577,487,674 |

## NNCC BONDS PROVEN CLAIMS AGAINST CANADIAN ESTATE

| | |
|---|---|
| 1.    Northern Telecom Limited and the Northern Telecom Capital Corporation and the Bank of New York as indenture trustee for 7.875% Notes due June 15, 2026 | $150,951,562 |

---

[11] All amounts in U.S. Dollars.

## ANNEX H

## Form of Transferee Joinder

This joinder (this "**Transferee Joinder**") to the Settlement and Plans Support Agreement (the "**Settlement and Support Agreement**")[12] dated as of [___], 2016 and entered into by and among: (i) the Canadian Debtors;   (ii) the Monitor; (iii) the U.S. Debtors; (iv) the EMEA Debtors; (v) the EMEA Non-Filed Entities; (vi) the Joint Administrators; (vii) NNSA; (viii) the NNSA Conflicts Administrator; (ix) the French Liquidator; (x) the Bondholder Group; (xi) the members of the CCC; (xii) the UCC; (xiii) the U.K. Pension Trustee; (xiv) the PPF; (xv) the Joint Liquidators; and (xvi) the NNCC Bondholder Signatories (collectively, the "**Parties**" and each a "**Party**"), is executed and delivered by [_____] (the "**Joining Creditor**") as of [_____], 2016.

1.      Agreement to be Bound.  The Joining Party hereby agrees to be bound by all of the terms of the Settlement and Support Agreement, a copy of which is attached to this Joinder as Exhibit 1 (as the same has been or may be hereafter amended, restated, or otherwise modified from time to time in accordance with the provisions thereof). The Joining Creditor shall hereafter be deemed to be a Participating Creditor for all purposes under the Settlement Support Agreement.

2.      Representations and Warranties.  The Joining Creditor hereby represents and warrants to each Party to the Settlement and Support Agreement that, as of the date hereof, such Joining Creditor (a) is the legal or beneficial holder of, and has all necessary authority (including authority to bind any other legal or beneficial holder) with respect to, the claims identified below its name on the signature page hereof, and (b) makes, as of the date hereof, the representations, warranties and covenants of a Participating Creditor, as applicable, set forth in the Settlement and Support Agreement to each Party.

3.      Governing Law.  This Joinder shall be governed by and construed in accordance with the laws of the State of New York.

4.      Notice.  All notices and other communications given or made pursuant to the Support Agreement shall be sent to:

To the Joining Creditor at:


[JOINING          PARTY]
[ADDRESS]

---

[12] Each capitalized term used herein but not otherwise defined shall have the meaning ascribed to it in the Settlement and Support Agreement.

Attn:

Facsimile:          [FAX]
EMAIL:

IN WITNESS WHEREOF, the Joining Creditor has caused this Joinder to be executed as of the date first written above.

[JOINING PARTY]

**Aggregate Face Amounts Beneficially Owned or Managed on Account of**:

10.75% Notes:  $_____

10.125% Notes:  $_____

Floating Rate Notes:  $_____

2.125% Notes:  $_____

1.75% Notes:  $_____

7.875% Notes:  $_____

Other:

Name of Institution:

_____

By  _____

   Name:

Title:

For signatories requiring a second signature line:

By _____

Name:

Title:

**<u>Exhibit 1 to the Form of Transferee Joinder</u>**

**Settlement and Plans Support Agreement**

**ANNEX I**

**TIMETABLE**

| Step | | Target Date[8] |
|---|---|---|
| 1. | Entry of orders authorizing currency conversion | October 14, 2016 |
| 2. | Filing of U.S. Plans and Disclosure Statement with Bankruptcy Court and Canadian Plan and Canadian Information Circular with CCAA Court | October 28, 2016 |
| 3. | Canadian Meeting Order Hearing (CCAA Court) | December 1, 2016 |
| 4. | Disclosure Statement Hearing (Bankruptcy Court) | December 1, 2016 |
| 5. | Creditors' Meeting (Canada) | By January 17, 2017 |
| 6. | Plan Confirmation Hearing (Bankruptcy Court) and Sanction Hearing (CCAA Court) | January 24, 2017 |
| 7. | Plans Effective Date | February 15, 2017 |
| 8. | Long Stop Date | August 31, 2017 |

## ANNEX J

## NOTICE PARTICULARS

(a)    Notice to Canadian Debtors/Monitor:

>   Goodmans LLP
>   Bay Adelaide Centre
>   333 Bay Street, Suite 3400
>   Toronto, ON M5H 2S7
>   Canada
>   Attention:  Jay Carfagnini
>   Facsimile:  416-979-1234
>   Email:  jcarfagnini@goodmans.ca
>
>   Attention:  Joseph Pasquariello
>   Facsimile:  416-979-1234
>   Email:  jpasquariello@goodmans.ca
>
>   Allen & Overy LLP
>   1221 Ave of the Americas
>   New York, NY 10020
>   United States
>   Attention:  Ken Coleman
>   Facsimile:  212-610-6399
>   Email:  ken.coleman@allenovery.com

(b)    Notice to U.S. Debtors

>   Cleary Gottlieb Steen & Hamilton
>   One Liberty Plaza
>   New York, New York 10006
>   United States
>   Attention:  James Bromley
>   Facsimile:  212-225-3999
>   Email:  jbromley@cgsh.com
>
>   Attention:  Lisa Schweitzer
>   Facsimile:  212-225-3999
>   Email:  lschweitzer@cgsh.com

Torys LLP
79 Wellington St. W. 30th Floor
Box 270 TD South Tower
Toronto, Ontario M5K 1N2
Canada
Attention:  Scott Bomhof
Facsimile:  416-865-7380
Email:  sbomhof@torys.com

(c)      Notice to EMEA Debtors (other than NNSA)

Debevoise & Plimpton
65 Gresham Street
London EC2V 7NQ
United Kingdom
Attention:  Kevin Lloyd
Facsimile:  +44-20-7588-4180
Email:  klloyd@debevoise.com

Herbert Smith Freehills
Exchange House
Primrose Street
London EC2A 2EG
United Kingdom
Attention:  Kevin Pullen
Facsimile:  +44 20-7098-4976
Email:  kevin.pullen@hsf.com

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004
United States
Attention:  Derek Adler
Facsimile:  212-422-4726
Email:  derek.adler@hugheshubbard.com

(d)    Notice to NNSA

       Skadden, Arps, Slate, Meagher & Flom LLP
       4 Times Square
       New York, New York 10036
       United States
       Attention:  Susan Salzstein
       Facsimile:  917-777-4132
       Email:  susan.saltzstein@skadden.com

       Stikeman Elliot LLP
       5300 Commerce Court West
       199 Bay Street
       Toronto, ON M5L 1B9
       Canada
       Attention:  Daniel Murdoch
       Facsimile:  416-947-0866
       Email:  DMurdoch@stikeman.com

(e)    Notice to UCC

       Akin, Gump, Strauss, Hauer & Feld LLP
       Bank of America Tower,
       One Bryant Park, 42nd Floor
       New York, New York 10036
       United States
       Attention:  Fred Hodara
       Facsimile:  212-872-1002
       Email:  fhodara@akingump.com

       Attention:  David Botter
       Facsimile:  212-872-1002
       Email:  dbotter@akingump.com

       Cassels Brock & Blackwell LLP
       Suite 2010, Scotia Plaza
       40 King Street West
       Toronto, Ontario M5H 3C2
       Canada
       Attention:  Michael Wunder
       Facsimile:  416-640-3206
       Email:  mwunder@casselsbrock.com

(f)    Notice to CCC

> Koskie Minsky LLP
> 20 Queen Street West
> Suite 900, Box 52
> Toronto, Ontario M5H 3R3
> Canada
> Attention:  Mark Zigler
> Facsimile:  416-977-8353
> Email:  mzigler@kmlaw.ca
>
> McCarthy Tétrault LLP
> Suite 5300, TD Bank Tower
> Box 48, 66 Wellington Street West
> Toronto ON M5K 1E6
> Canada
> Attention:  James D. Gage
> Facsimile:  416-868-0673
> Email:  jgage@mccarthy.ca
>
> Paliare Roland Rosenberg Rothstein LLP
> 155 Wellington St. W., Suite 3500
> Toronto, ON M5V 3H1
> Attention:  Ken Rosenberg
> Facsimile:  416-646-4301
> Email:  ken.rosenberg@paliareroland.com

(g)    Notice to Ad Hoc Bondholder Group

> Milbank, Tweed, Hadley & McCloy LLP
> 28 Liberty Street
> New York, New York 10005
> United States
> Attention:  Albert Pisa
> Facsimile:  212-822-5319
> Email:  apisa@milbank.com
>
> Bennett Jones
> 3400 One First Canadian Place
> P.O. Box 130
> Toronto, Ontario M5X 1A4
> Canada
> Attention:  Kevin Zych
> Facsimile:  416-863-1716
> Email:  zychk@bennettjones.com

(h)      Notice to UKPI

        Hogan Lovells International LLP
        Atlantic House
        Holborn Viaduct
        London EC1A 2FG
        United Kingdom
        Attention:  Angela Dimsdale Gill
        Facsimile:  +44 20-7296-2001
        Email:  amdg@hoganlovells.com

        Willkie Farr & Gallagher LLP
        787 Seventh Avenue
        New York, New York 10019
        United States
        Attention:  Marc Abrams
        Facsimile:  212-728-9200
        Email:  mabrams@willkie.com

        Thornton Grout Finnigan LLP
        Suite 3200, 100 Wellington Street West
        P.O. Box 329, Toronto-Dominion Centre
        Toronto, ON M5K 1K7, Canada
        Attention:  D.J. Miller
        Facsimile:  416-304-1313
        Email:  djmiller@tgf.ca

        Blake, Cassels & Graydon LLP
        199 Bay Street, Suite 4000
        Toronto, Ontario M5L 1A9
        Canada
        Attention:  Michael Barrack
        Facsimile:  416-863-2653
        Email:  michael.barrack@blakes.com

(i)      Notice to NNCC Bondholder Signatories

        Quinn Emanuel Urquardt & Sullivan, LLP
        51 Madison Avenue
        New York, New York 10010
        United States
        Attention:  James Tecce
        Facsimile:  212-849-7100
        Email:  jamestecce@quinnemanuel.com

## ANNEX K

**Canadian Distribution Escrow Agreement**

**CANADIAN DISTRIBUTION ESCROW AGREEMENT**

**among**

**NORTEL NETWORKS CORPORATION
NORTEL NETWORKS LIMITED
NORTEL NETWORKS INC.
NORTEL NETWORKS UK LIMITED**

**and**

**THE OTHER DEPOSITORS**

**and**

**THE ESTATE FIDUCIARIES**

**and**

**Royal Trust Corporation of Canada, as Canadian Distribution Agent**

**dated as of September ●, 2016**

**This CANADIAN DISTRIBUTION ESCROW AGREEMENT** (the "**Agreement**"), dated as of September ●, 2016, by and among

(i)      Nortel Networks Corporation ("**NNC**"), a corporation organized under the laws of Canada;

(ii)     Nortel Networks Limited ("**NNL**"), a corporation organized under the laws of Canada;

(iii)    Nortel Networks Inc. ("**NNI**"), a corporation organized under the laws of Delaware;

(iv)     Nortel Networks UK Limited (in administration) ("**NNUK**"), a corporation organized under the laws of the United Kingdom acting by Alan Robert Bloom, Stephen John Harris, Alan Michael Hudson and Christopher John Wilkinson Hill of Ernst & Young LLP (the "**Joint Administrators**");

(v)      the affiliates of NNC, NNL, NNI and NNUK specified on Schedule "A" hereto (collectively, the "**Other Depositors**" and with NNC, NNL, NNI and NNUK, the "**Depositors**");

(vi)     the Estate Fiduciaries (as defined below) with the exclusion from liability set forth in Section 26; and

(vii)    Royal Trust Corporation of Canada, a trust company organized and existing under the laws of Canada (in its capacity as distribution escrow agent hereunder, the "**Canadian Distribution Agent**").

**WHEREAS**, on January 14, 2009 (the "**Petition Date**"), NNC, NNL and certain of their affiliates (collectively, the "**Canadian Debtors**") filed with the Ontario Superior Court of Justice (the "**Canadian Court**") an application for protection under the *Companies' Creditors Arrangement Act* (Canada) (the "**CCAA**") and were granted certain creditor protection pursuant to an order issued by the Canadian Court on the same date, which has been extended from time to time by further order of the Canadian Court (such proceedings, together with any other formal insolvency proceedings commenced in Canada in respect of NNL, the "**Canadian Cases**");

**WHEREAS**, NNI and certain of its affiliates (collectively, the "**U.S. Debtors**") are debtors-in-possession under Title 11 of the United States Code (the "**U.S. Bankruptcy Code**"), which commenced cases under Chapter 11 of the U.S. Bankruptcy Code on the Petition Date by filing voluntary petitions for relief in the U.S. Bankruptcy Court for the District of Delaware (the "**U.S. Court**") (the "**U.S. Cases**" and together with the Canadian Cases, the "**Bankruptcy Cases**");

**WHEREAS**, the Canadian Court has appointed Ernst & Young Inc. as Monitor in the Canadian Cases (the "**Monitor**"), and the Office of the United States Trustee for the District of Delaware has appointed an Official Committee of Unsecured Creditors as representative for the unsecured creditors of the U.S. Debtors (the "**Committee**" and, together with the Monitor, the "**Estate Fiduciaries**"), and in addition, an *ad hoc* group of bondholders holding claims against certain of the U.S. Debtors and certain of the Canadian Debtors has also been organized (the "**Bondholder Group**");

- 2 -

**WHEREAS**, on the Petition Date, the High Court of Justice in London, England (the "**English Court**") ordered that NNUK and certain of its affiliates (collectively, the "**EMEA Debtors**") be placed into administration under the English Insolvency Act 1986, as amended (the "**Insolvency Act**") and European Union's Council Regulation (EC) No. 1346/2000 on Insolvency Proceedings (the "**EC Regulation**") and appointed the Joint Administrators to manage the affairs, business and property of NNUK and certain of its affiliates;

**WHEREAS**, while the administration proceedings in respect of Nortel Networks S.A. ("**NNSA**"), being main proceedings pursuant to Article 3(1) of the EC Regulation and under the Insolvency Act are continuing, subsequent to the Petition Date, NNSA commenced secondary insolvency proceedings within the meaning of Article 27 of the EC Regulation pursuant to which the Commercial Court of Versailles (the "**French Court**") appointed Maître Cosme Rogeau, 26, avenue Hoche, 78000 Versailles as the "Mandataire Liquidateur" of NNSA (the "**French Liquidator**");

**WHEREAS**, Stephen Taylor of Isonomy Limited has been appointed as conflicts administrator of NNSA (the "**Conflicts Administrator**");

**WHEREAS** the Depositors and certain other parties (together, the "**IFSA Parties**") have entered into that certain agreement to address interim funding and the settlement of certain intercompany matters dated June 9, 2009 (the "**IFSA**"), pursuant to clause 12.c and clause 12.g of which, the IFSA Parties agreed to negotiate in good faith a protocol for resolving disputes concerning the allocation of sale proceeds from sale transactions;

**WHEREAS** the Depositors and certain of their affiliates sold certain of their assets pursuant to various sale transactions approved by the Canadian Court and the U.S. Court over the period 2009 through 2011, the sale proceeds of which (the "**Sale Proceeds**") were placed into escrow with JPMorgan Chase Bank, N.A., as distribution escrow agent (the "**U.S. Distribution Agent"**);

**WHEREAS** by order of the Canadian Court dated April 3, 2013 and order of the U.S. Court dated May 17, 2013, the Canadian Court and U.S. Court approved an allocation protocol (the "**Allocation Protocol**") to resolve the allocation of the Sale Proceeds amongst the Depositors and certain of their affiliates;

**WHEREAS** the Depositors, certain of their affiliates, certain of their respective creditors and the Estate Fiduciaries participated in a joint trial pursuant to the Allocation Protocol before the Canadian Court and U.S. Court pursuant to which decisions concerning the allocation of the Sale Proceeds were issued and various appeals have been taken and sought from such decisions (collectively, the "**Allocation Dispute**");

**WHEREAS** the Depositors, certain of their affiliates, certain of their respective creditors and the Estate Fiduciaries have entered into a Settlement and Plans Support Agreement dated September ●, 2016 (the "**Settlement and Support Agreement**"), pursuant to which, subject to the effectiveness of the Settlement and Support Agreement, they have agreed to resolve the Allocation Dispute and certain other matters on the terms contemplated by the Settlement and Support Agreement;

- 3 -

**WHEREAS** the Settlement and Support Agreement contemplates the conversion of an amount of the Sale Proceeds not exceeding US$1.2 billion (the "**CAD Sale Proceeds**") from U.S. dollars to Canadian dollars and the Depositors and Estate Fiduciaries are desirous of entering into this Agreement so that the Canadian Distribution Agent can receive, hold, convert such funds from U.S. dollars to Canadian dollars and release such funds in furtherance of the Settlement and Support Agreement and in accordance with the terms and conditions of the Settlement and Support Agreement and this Agreement;

**WHEREAS**, the U.S. Debtors shall seek authorization from the U.S. Court to enter into this Agreement, to cause the transfer of the CAD Sale Proceeds to the Canadian Distribution Agent and to convert certain of the Sale Proceeds as contemplated hereby (the "**U.S. Court Approval**");

**WHEREAS** the Canadian Debtors and the Monitor shall seek authorization from the Canadian Court to enter into this Agreement, to cause the transfer of the CAD Sale Proceeds to the Canadian Distribution Agent and to convert certain of the Sale Proceeds as contemplated hereby (the "**Canadian Court Approval**" and with the U.S. Court Approval, the "**Court Approvals**"); and

**WHEREAS**, the Depositors and the Estate Fiduciaries wish to appoint the Canadian Distribution Agent as escrow and distribution agent and the Canadian Distribution Agent is willing to accept such appointment and to act as escrow and distribution agent, in each case upon the terms and conditions of the Agreement.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and adequacy of which is hereby irrevocably acknowledged, the Depositors, the Estate Fiduciaries and the Canadian Distribution Agent agree as follows:

1.      Appointment of Canadian Distribution Agent.

The Depositors and the Estate Fiduciaries hereby jointly nominate, constitute and appoint the Canadian Distribution Agent as escrow and distribution agent to hold the Escrow Property (as defined below) in the Distribution Account (as defined below) upon the terms and conditions set forth herein. The Canadian Distribution Agent hereby accepts such appointment and agrees that deposits to, and disbursements from, the Distribution Account, or applicable portions thereof, shall only be made in accordance with the terms and conditions of this Agreement. The Canadian Distribution Agent hereby represents to each of the Depositors that it has the corporate power and legal authority to execute this Agreement and to perform its obligations hereunder. The Depositors and the Canadian Distribution Agent agree that any action specified in this Agreement as to be taken by all of the Depositors, acting jointly, when taken by all of the Depositors, shall be binding upon each of the Depositors and the Canadian Distribution Agent shall be entitled to act and rely upon any action taken by all of the Depositors, acting jointly, and to the extent required hereunder, the Estate Fiduciaries, as provided in this Agreement.

2.      Deposit of Escrow Property and Conversion of CAD Sale Proceeds.

(a)      Forthwith upon the granting of the Court Approvals, the Depositors, certain of their affiliates and the Estate Fiduciaries shall instruct the U.S. Distribution Agent

- 4 -

to transfer the CAD Sale Proceeds to the Canadian Distribution Agent by wire transfer of immediately available funds (such funds as received by the Canadian Distribution Agent, the "**Escrow Funds**") to an account established with the Canadian Distribution Agent (the "**Distribution Account**"). The Canadian Distribution Agent shall forthwith notify the Depositors and the Estate Fiduciaries in writing of the account number for the Distribution Account upon the Distribution Account being established. The Escrow Funds and all interest and other income therefrom received by the Canadian Distribution Agent, together with any investments of the Escrow Property, less any funds distributed or paid in accordance with this Agreement are collectively referred to herein as "**Escrow Property**". The Canadian Distribution Agent shall provide written confirmation to the Depositors, the Estate Fiduciaries, the Bondholder Group and the U.S. Distribution Agent upon its receipt of the Escrow Funds. Prior to the deposits made in accordance with this Section 2, there shall be no other funds in the Distribution Account. The Escrow Property shall at all times, until disbursement as provided herein, remain segregated and separately identified by the Canadian Distribution Agent and shall not be commingled with the other assets held by the Canadian Distribution Agent.

(b)    The Monitor shall be entitled to instruct the Canadian Distribution Agent (or its affiliated financial institutions as specified on Schedule E) on not less than one (1) Business Days' notice to the Canadian Distribution Agent, and the Canadian Distribution Agent shall be entitled to solely rely on such instruction, to convert the CAD Sale Proceeds from U.S. dollars to Canadian dollars on the date(s) and in the manner specified from time to time by the Monitor, provided that such specifications allow the Canadian Distribution Agent to convert the CAD Sale Proceeds from U.S. dollars to Canadian dollars in an orderly manner. NNL shall provide notice to the other Depositors within three Business Days of any conversion of the amount of U.S. dollars converted, the date of such conversion and the rate(s) at which such conversion occurred.

3.    Investment of Escrow Property.

(a)    The Canadian Distribution Agent shall hold, invest and reinvest the Escrow Property strictly in accordance with joint, written instructions executed by all of the Depositors and the Estate Fiduciaries and delivered to the Canadian Distribution Agent; provided, however, that any investment of the Escrow Property shall be limited to Government of Canada treasury bills ("**Canadian T-Bills**"). Until otherwise jointly directed by all of the Depositors and the Estate Fiduciaries, the Canadian Distribution Agent shall invest the Escrow Property (once converted into Canadian dollars) in Canadian T-Bills having maturities of up to two months, on a rolling basis. In the event that Canadian T-Bills having maturities of up to two months are not available, the Canadian Distribution Agent shall invest the Escrow Property in Canadian T-Bills with the next available maturity date(s) available in the relevant market. For greater certainty, depending on market availability, the Escrow Property may be invested in one or more Canadian T-Bills having various maturity dates. The parties hereto further understand and agree that, notwithstanding the Canadian Distribution Agent's

- 5 -

obligations hereunder to invest and reinvest the Escrow Property, depending on market availability, the Canadian Distribution Agent may not be able to invest all of the Escrow Property in Canadian T-Bills, and that any cash balances constituting that portion of the Escrow Property unable to be invested in Canadian T-Bills, that is required to be held in cash in contemplation of the conversions contemplated hereby, that is required for a distribution to be made hereunder, or that is earned as a result of the investment or holding of the Escrow Property (the "**Cash Balances**") may be deposited as provided for in Section 3(b). The Canadian Distribution Agent makes no representation as to the yield available upon the Escrow Property and shall bear no liability for any failure to achieve any yield from the Escrow Property. The Canadian Distribution Agent shall use reasonable efforts to obtain the requested maturity dates for any such investments, however, the Canadian Distribution Agent shall have no responsibility whatsoever with respect to the availability of maturity dates and will not be liable in any respect for: (i) any investment-related loss resulting from the sale of an investment prior to its maturity date or for the unavailability of all or any portion of the Escrow Funds resulting from an investment maturity date, or (ii) any investment of the Escrow Property in a particular investment made in accordance with the terms of this Agreement.

(b)     The Canadian Distribution Agent may deposit any Cash Balances in an interest bearing cash account with the Canadian Distribution Agent, Royal Bank of Canada or any financial institution affiliated or related to the Royal Bank of Canada as listed on Schedule E hereto (collectively, "**Authorized Depositaries**") notwithstanding that the Canadian Distribution Agent and/or any of the other Authorized Depositaries may benefit therefrom, and the Canadian Distribution Agent or other Authorized Depositaries shall not be required to account for, or to give up, any such benefit. In particular, it shall not be improper for the Canadian Distribution Agent to deposit moneys with, or give custody of the Escrow Property to any other Authorized Depositaries, notwithstanding any benefit realized as a result, including retaining a profit in excess of interest paid (if any) on, or fees payable to any affiliated or related companies in respect of, such deposit or custody arrangement.

(c)     The Canadian Distribution Agent shall be authorized to sell any investment of the Escrow Property from time to time, including prior to any maturity date, in order to make a payment or release Escrow Property pursuant to this Agreement or a written direction executed by all of the Depositors and the Estate Fiduciaries.

(d)     Any written notice to remit payment received by the Canadian Distribution Agent after 11:00 a.m. Toronto time shall be treated as if received on the following Business Day. For purposes of this Agreement, "**Business Day**" shall mean any day, other than a Saturday or Sunday, on which Schedule I Canadian chartered banks are open for business in Toronto, Ontario, Canada.

- 6 -

4.    Ownership of Escrow Property; Taxes.

(a)    The Escrow Property at all times is and shall be the exclusive property of the Depositors. All T-5 slips and other tax information related to the Distribution Account will be reported by the Canadian Distribution Agent (i) based upon the disbursement of the Escrow Property to Depositors pursuant to Section 5 if such Escrow Property was disbursed during such calendar year, or (ii) with respect to any Escrow Property not disbursed during such calendar year, in the name of NNL (it being understood that the designation of NNL on such T-5 slip or other tax information shall not be presented by any Depositor or Estate Fiduciary as being indicative of the final allocation of the Escrow Property). The Canadian Distribution Agent acknowledges and agrees that the foregoing Section 4(a)(ii) is not indicative of the final allocation of the Escrow Property. Each Depositor acknowledges and agrees that any taxes payable from the income earned by such Depositor on the investment of any sums held in the Escrow Property shall be paid by such Depositor.

(b)    Notwithstanding the provisions of Section 4(a), to the extent that the Canadian Distribution Agent becomes liable for the payment of any taxes in respect of income derived from the investment of the Escrow Property, the Canadian Distribution Agent shall satisfy such liability to the extent possible from the Escrow Property. The Depositors shall jointly and severally indemnify, defend and save harmless the Canadian Distribution Agent from and against any and all tax, late payment, interest, penalty or other costs and expenses (including, without limitation, the reasonable fees and expenses of outside counsel) that may be assessed against or incurred by the Canadian Distribution Agent on or with respect to the Escrow Property and the investment thereof, except to the extent such tax, late payment, interest, penalty or other expense are finally adjudicated (and not subject to appeal) by a court of competent jurisdiction to have been a direct result of the gross negligence or willful misconduct of the Canadian Distribution Agent. The indemnification provided for by this Section 4(b) shall be initially satisfied out of the Escrow Property to the extent available. The indemnification provided by this Section 4(b) is in addition to the limitations of liability and indemnification provisions set out in Sections 9 and 10 and shall survive the resignation or removal of the Canadian Distribution Agent and the termination or expiration of this Agreement. As among themselves, the Depositors agree that the costs of any such indemnification shall be borne on a pro rata basis by the Depositors in accordance with the percentage of the Escrow Property allocable to each of the Depositors pursuant to the Allocation Protocol or a letter of direction as described in Section 5(a) and, notwithstanding anything to the contrary in the Settlement and Support Agreement, any Depositor paying in excess of its pro rata share of the cost of such indemnification shall have rights of contribution vis-à-vis any Depositor that has paid less than its pro rata share of such costs either directly to the Canadian Distribution Agent or by payment to another Depositor pursuant to this sentence; provided, that if the costs of any such indemnification arise from a breach of this Agreement or other fault of a Depositor, the Depositor(s) so in breach or at fault shall bear the cost of such

- 7 -

indemnification and any Depositor paying in excess of its share of the cost of such indemnification, after taking into account the breach or fault of the other Depositors, shall, notwithstanding anything to the contrary in the Settlement and Support Agreement, have rights of contribution vis-à-vis any Depositor that has paid less than its share of such costs either directly to the Canadian Distribution Agent or by payment to another Depositor.

(c)      In connection with making a distribution hereunder, the Canadian Distribution Agent shall be entitled to withhold any taxes required to be withheld by applicable law in connection with such distribution, including but not limited to applicable withholding taxes, and shall remit such taxes to the appropriate tax authority; provided, however, that the Canadian Distribution Agent shall not withhold any taxes if it receives documentation from the Depositors demonstrating to the Canadian Distribution Agent, acting reasonably, that no such withholding is required.

5.      Distribution of Escrow Property.

The Depositors, the Estate Fiduciaries and the Canadian Distribution Agent hereby agree that, until the termination of the escrow established pursuant to this Agreement, the Canadian Distribution Agent shall hold the Escrow Property and not disburse any amounts from the Distribution Account except in accordance with the following terms and conditions:

(a)      The Canadian Distribution Agent shall disburse to any person amounts from the Escrow Property if and as so instructed pursuant to (i) a letter of direction substantially in the form attached as Exhibit B hereto jointly executed by the Depositors and the Estate Fiduciaries, a copy of which shall be provided by the Depositors to the Bondholder Group, or (ii) any Depositor's delivery to the Canadian Distribution Agent, with copies to the other Depositors, the Estate Fiduciaries and the Bondholder Group, of a duly authenticated copy of the binding decision made by the relevant dispute resolver(s) under the Allocation Protocol (a "**Decision**") which is not stayed or subject to appeal, accompanied by a certificate from such Depositor certifying as to the finality of the Decision.

(b)      Any joint instruction given by the Depositors and Estate Fiduciaries pursuant to Section 5(a) shall be executed by the respective Authorized Representatives (as defined below) of such Depositors and Estate Fiduciaries. In relation to NNSA, any instructions shall be executed jointly by the French Liquidator and the Conflicts Administrator with the agreement of the Joint Administrators. The Canadian Distribution Agent is authorized but not required to seek confirmation of such instructions by telephone call-back to the person or persons designated on Schedule D hereto (each an "**Authorized Representative**" of the applicable Depositor or Estate Fiduciary), and the Canadian Distribution Agent may rely upon the confirmations of anyone purporting to be the person or persons so designated. The Authorized Representative(s) and telephone numbers for call-backs may be changed only in writing from the applicable Depositor or Estate Fiduciary actually received and acknowledged by the Canadian Distribution Agent (with a copy of such writing to be delivered to the other Depositors, the

- 8 -

Estate Fiduciaries and the Bondholder Group) it being understood that each Depositor and Estate Fiduciary shall have the right to replace its Authorized Representative from time to time by providing written notice to the Canadian Distribution Agent, the other Depositors, the Estate Fiduciaries and the Bondholder Group or by providing a copy of a final and non-appealable court order of a court of competent jurisdiction (as provided in Section 21 below) to the Canadian Distribution Agent designating a successor Authorized Representative. The Depositors and Estate Fiduciaries acknowledge that such security procedure is commercially reasonable. Concurrent with the execution of this Agreement, the Depositors and the Estate Fiduciaries shall deliver to the Canadian Distribution Agent sample signatures of the Authorized Representatives as set forth on Schedule D.

(c)     The Canadian Distribution Agent shall have no responsibility or obligation for investigating or determining the validity or sufficiency of any matter asserted in a letter of instruction or of any pending claim for entitlement to release of funds from the Distribution Account. The Canadian Distribution Agent shall have the right to withhold an amount equal to the amount due and owing to the Canadian Distribution Agent under the terms of this Agreement, plus any reasonable costs and expenses incurred by Canadian Distribution Agent in accordance with the terms of this Agreement in connection with the termination of the Distribution Account.

(d)     No Depositor shall submit to the Canadian Distribution Agent a certificate that falsely certifies to the finality of a Decision.

6.     <u>Termination of Distribution Account.</u>

The Agreement shall terminate upon the distribution of all Escrow Property from the Distribution Account established hereunder in accordance with Section 5(a) hereof, subject to the survival of provisions which expressly survive the termination of this Agreement. Without limiting the foregoing, Sections 4(b), 9, 10 and 12 shall survive the termination of this Agreement.

7.     <u>Method of Payment.</u>

Any payments to be made hereunder shall be made by wire transfer in immediately available funds to the account of such Depositor designated on Schedule B annexed hereto (collectively, the "**Standing Settlement Instructions**"). Any Depositor shall have the right, from time to time, to provide written notice to the Canadian Distribution Agent and the other Depositors updating its Standing Settlement Instructions, and the Canadian Distribution Agent shall thereafter use such revised Standing Settlement Instructions for purposes of any subsequent distributions to such Depositor pursuant to Section 5(a) until such Standing Settlement Instructions have been further updated pursuant to this Section 7. The Depositors acknowledge that the Canadian Distribution Agent may rely upon all identifying information set forth in the Standing Settlement Instructions. The Depositors acknowledge that such Standing Settlement Instructions are a security procedure and are commercially reasonable.

- 9 -

8.    <u>Monthly Reports.</u>

The Canadian Distribution Agent shall, following the end of each calendar month, provide monthly account statements to the Depositors with respect to the Distribution Account, with copies to the Estate Fiduciaries and the Bondholder Group.

9.    <u>Liability of Canadian Distribution Agent.</u>

    (a)    Notwithstanding any other provision of this Agreement, the Canadian Distribution Agent shall:

        (i)    have only those duties as are specifically provided herein, which shall be deemed purely procedural and administerial in nature, and shall under no circumstance be deemed a fiduciary of any of the Depositors, the Estate Fiduciaries, the Bondholder Group, the U.S. Distribution Agent or of any of their respective officers, directors, employees, agents, representatives, members, attorneys, successors or assigns. The Canadian Distribution Agent shall neither be responsible for nor chargeable with knowledge of the terms and conditions of any other agreement, instrument or document between or involving the other parties hereto, including the Settlement and Support Agreement, the IFSA or the Allocation Protocol, nor shall the Canadian Distribution Agent be required to determine if any person or entity has complied with any such agreements, nor shall any additional obligations of the Canadian Distribution Agent be inferred from the terms of such agreements, even though reference thereto may be made in this Agreement.  This Agreement sets forth all matters pertinent to the escrow contemplated hereunder and no additional duties or obligations of the Canadian Distribution Agent shall be inferred from the terms of this Agreement or any other agreement, instrument or document. The permissive rights of the Canadian Distribution Agent to do things enumerated in this Agreement shall not be construed as duties or obligations;

        (ii)    be entitled to rely exclusively upon, and shall have no responsibility to investigate, inquire into or determine the genuineness, authenticity or sufficiency of, any document, notice, direction, request, demand, instrument or other instruction (or, in each case, any signature thereon) submitted to it or otherwise given in connection with this Agreement;

        (iii)    be entitled to assume that any person who is an Authorized Representative of a Depositor or Estate Fiduciary has the full power and authority to act on behalf of and to bind, for all intents and purposes, such party, as applicable;

        (iv)    be entitled to rely upon and have no liability in acting on the opinion, advice of or information obtained from its counsel (including in-house counsel) or other advisors in relation to any matter arising in connection

- 10 -

with this Agreement, provided that the Canadian Distribution Agent does not act with gross negligence or wilful misconduct;

(v)    have the right, but not the obligation, to consult with any counsel (including in-house counsel) or other advisors of its choice in relation to any matter arising in connection with this Agreement;

(vi)    have the right to perform any of its duties hereunder through agents, attorneys, custodians or nominees; and

(vii)    not be responsible for any failure to act or other omission as a result of causes beyond the reasonable control of the Canadian Distribution Agent.

(b)    None of the Canadian Distribution Agent, nor any of the officers, directors, employees, agents, representatives, attorneys, successors or assigns of the Canadian Distribution Agent, shall be liable, directly or indirectly, to any person or entity, including any of the other parties, for any costs, expenses, damages, claims, actions, demands or liabilities arising out of or relating to any of the services provided hereunder, except to the extent such costs, expenses, damages, claims, actions, demands or liabilities have been finally adjudicated to have resulted from the Canadian Distribution Agent's or its officers, directors, employees, agents, representatives or attorneys gross negligence or willful misconduct. Without limiting the generality of the foregoing, none of the Canadian Distribution Agent, nor any of the officers, directors, employees, agents, representatives, attorneys, successors or assigns of the Canadian Distribution Agent, shall:

(i)    have any duty or responsibility, and shall not incur any liability, with respect to the adequacy of the Escrow Property to meet and discharge any payments, obligations, liabilities or other commitments of any person or entity;

(ii)    have any duty to solicit any payments which may be due to it in connection with the Distribution Account, including without limitation, the Escrow Funds or any amounts due on any investments of the Escrow Property; provided, that the Canadian Distribution Agent shall advise the Depositors and the Estate Fiduciaries in writing forthwith upon it becoming aware of any amounts due to it in connection with the Distribution Account having not been paid;

(iii)    have no duty or obligation to make any calculations of any kind in connection with any distribution or allocation of the Escrow Property;

(iv)    be responsible for any loss to, or diminution of, the Escrow Property resulting from the acquisition, retention, investment or sale of any investments made in accordance with this Agreement or pursuant to any investment direction delivered pursuant to this Agreement; or

- 11 -

(v)    be liable for any special, indirect or consequential damages or losses of any kind whatsoever (including but not limited to lost profits), even if the Canadian Distribution Agent has been advised of the likelihood of such losses or damages and regardless of the form of action.

(c)    Notwithstanding any other provision of this Agreement, in the event that the Canadian Distribution Agent is uncertain as to how to proceed in any situation not explicitly addressed by the terms of this Agreement, whether because of any conflicting notice, direction, instruction, claim, allegation or demand of a Depositor or Estate Fiduciary or for any other reason whatsoever, the Canadian Distribution Agent shall be entitled, at its option and in its sole discretion, to refuse to comply with any such notice, direction, instruction, claim, allegation or demand with respect thereto as long as such uncertainty is continuing, and in so refusing, the Canadian Distribution Agent may elect, at its option and in its sole discretion, to make no release or delivery of any Escrow Property and its sole obligation shall be to keep safely all property held in escrow until it shall be given a joint instruction in writing by the Depositors and Estate Fiduciaries pursuant to Section 5(a) which eliminates such ambiguity or uncertainty to the satisfaction of the Canadian Distribution Agent or by a final and non-appealable order or judgment of a court of competent jurisdiction (as set forth in Section 21, below).

10.    <u>Indemnification of Canadian Distribution Agent.</u>

(a)    The Depositors shall jointly and severally indemnify, defend and save harmless the Canadian Distribution Agent and its affiliates and their respective officers, directors, employees, agents, representatives, attorneys, successors and assigns (collectively, "**Indemnitees**") from and against any and all losses, costs, expenses (including without limitation, the reasonable fees and expenses of outside counsel), damages, claims, actions, demands and liabilities incurred by or asserted against any of them directly or indirectly arising out of or relating to this Agreement, including, without limitation, in connection with tax reporting or withholding and the enforcement by the Canadian Distribution Agent of any of its rights or remedies under or in connection with this Agreement, except to the extent such costs, expenses, losses, damages, claims, actions, demands or liabilities are finally adjudicated by a court of competent jurisdiction (as set forth in Section 21 below) to have been a direct result of an Indemnitee's gross negligence or wilful misconduct. For greater certainty, the commencement of formal legal proceedings shall not be a precondition for indemnification hereunder. Further, none of the provisions of this Agreement shall require the Canadian Distribution Agent to expend or risk its own funds, appear in, prosecute or defend proceedings, or otherwise incur financial liability in the performance of any of its duties or in the exercise of any of its rights or powers hereunder, unless the Canadian Distribution Agent is first indemnified to its reasonable satisfaction.

(b)    Any indemnity payments to the Canadian Distribution Agent arising from the indemnification provided by Section 4(b) or this Section 10 shall be initially satisfied from the Escrow Property to the extent available. As among themselves, the Depositors agree that the costs of any such indemnification shall be borne on a

- 12 -

pro rata basis by the Depositors in accordance with the percentage of the Escrow Property allocable to each of the Depositors pursuant to the Allocation Protocol or a letter of direction as described in Section 5(a)(i), and any Depositor paying in excess of its pro rata share of such indemnification shall, notwithstanding anything to the contrary in the Settlement and Support Agreement, have rights of contribution vis-à-vis any Depositor that has paid less than its pro rata share of such costs either directly to the Canadian Distribution Agent or by payment to another Depositor pursuant to this sentence; provided, that if the costs of any such indemnification arise from a breach of this Agreement or other fault of a Depositor, the Depositor(s) so in breach or at fault shall bear the cost of such indemnification and any Depositor paying in excess of its share of the cost of such indemnification, after taking into account the breach or fault of the other Depositors, shall, notwithstanding anything to the contrary in the Settlement and Support Agreement, have rights of contribution vis-à-vis any Depositor that has paid less than its share of such costs either directly to the Canadian Distribution Agent or by payment to another Depositor. The indemnification provided by this Section 10 is in addition to the indemnification provided in Section 4(b) and shall survive the resignation or removal of the Canadian Distribution Agent and the termination of this Agreement.

11.    Resignation or Removal of Canadian Distribution Agent.

The Canadian Distribution Agent may, at any time and for any reason or for no reason, in its sole discretion, resign as escrow holder under this Agreement by giving the Depositors and the Estate Fiduciaries at least thirty (30) Business Days' notice in writing of its intention to resign, or such shorter notice as the Depositors and the Estate Fiduciaries may accept in writing as sufficient. The Depositors and the Estate Fiduciaries may, at any time and for any reason or for no reason, in their sole discretion, remove the Canadian Distribution Agent as escrow holder under this Agreement by giving the Canadian Distribution Agent at least thirty (30) Business Days' notice in writing of their intention to remove, or such shorter notice as the Canadian Distribution Agent may accept in writing as sufficient. Each of the Depositors and the Estate Fiduciaries agree that they shall forthwith, upon receipt of such notice from the Canadian Distribution Agent or upon the giving of such notice to the Canadian Distribution Agent, as applicable, work diligently to find and appoint a new escrow holder to act in the place and stead of the Canadian Distribution Agent and if they fail to agree on such appointment, any of the Depositors, the Estate Fiduciaries or the Canadian Distribution Agent may apply to a court of competent jurisdiction (as set forth in Section 21, below) for the appointment of a new escrow holder and any such resulting appointment shall be binding upon all of the parties hereto. Upon any such appointment, the new escrow holder shall be vested with the same powers, rights, duties and obligations as if it had been originally named herein as escrow holder and such new escrow holder shall enter into an agreement with the Depositors and the Estate Fiduciaries with respect to such replacement escrow arrangement. If at any time or for any reason the Canadian Distribution Agent is authorized or directed to release and deliver the Escrow Property to a new escrow holder or to any other person, the Canadian Distribution Agent shall, prior to effecting such release and transfer, be paid all of its unpaid fees, non-reimbursed expenses and costs arising pursuant to this Agreement.

- 13 -

Notwithstanding any other provision of this Agreement, upon the release from escrow by the Canadian Distribution Agent of all of the Escrow Property pursuant to or as contemplated by this Agreement (whether such release occurs before or after any termination of this Agreement), the Canadian Distribution Agent and each of the officers, directors, employees, agents, representatives, attorneys, successors and assigns of the Canadian Distribution Agent shall be fully and unconditionally relieved, discharged and released from any and all claims, duties, obligations and liabilities arising under or in connection with this Agreement, and none of them shall be subject to or liable for any claim whatsoever made against it by or on behalf of any other person or entity (including any party to this Agreement) with respect to this Agreement.

12.    Compensation of Canadian Distribution Agent.

The Canadian Distribution Agent shall be entitled to compensation for its services as stated in the Fees of Escrow Agent, attached hereto as Exhibit A, which compensation shall be paid by NNL. The Canadian Distribution Agent will invoice NNL monthly in arrears for such compensation and NNL shall pay such invoices upon receipt. The fees agreed upon for the services rendered hereunder as outlined on Exhibit A are intended as full compensation for the Canadian Distribution Agent's services as contemplated by this Agreement; provided, however, that in the event that the conditions for the disbursement of the Escrow Property under this Agreement are not fulfilled, or the Canadian Distribution Agent renders any service not contemplated in this Agreement, or there is any assignment of interest in the subject matter of this Agreement, or any material modification hereof, or if any material controversy arises hereunder, or the Canadian Distribution Agent is made a party to any litigation pertaining to this Agreement or the subject matter hereof, the Canadian Distribution Agent shall be compensated for such extraordinary services (at a rate of $300 per hour) and reimbursed for all costs and expenses, including reasonable attorneys' fees and expenses, occasioned by any such delay, controversy, litigation or event (collectively, the "**Extraordinary Fees and Expenses**"), it being understood that any Extraordinary Fees and Expenses shall be satisfied and borne by the Depositors in the same manner as the indemnity payments contemplated by Section 10(b). If any amount due to the Canadian Distribution Agent hereunder is not paid within thirty (30) days after the date due, the Canadian Distribution Agent in its sole discretion may charge interest on such amount in an amount equal to the lesser of 10% per annum or the highest rate permitted by applicable law. The Depositors acknowledge and agree that the fees to which the Canadian Distribution Agent is entitled to under this Agreement do not include applicable taxes, whether federal or provincial, including but not limited to goods and services tax and harmonized sales tax, which taxes shall be an additional charge payable by NNL or the Depositors, as applicable.

13.    Notices and Discharge/Dissolution.

All communications hereunder shall be in writing and shall be deemed to be duly given and received: (i) upon delivery, if delivered personally, or upon confirmed transmittal, if by facsimile; (ii) on the next Business Day if sent by overnight courier; or (iii) four (4) Business Days after mailing if mailed by prepaid registered mail, return receipt requested, to the appropriate notice address set forth in Schedule C or at such other address as any party hereto may have furnished to the other parties hereto in writing in accordance with this Section 13.

If, at any time prior to the termination of this Agreement, any of the Estate Fiduciaries is discharged, removed or dissolved, whether pursuant to an approved plan of reorganization or

- 14 -

liquidation by order of the Canadian Court or U.S. Court or otherwise, any Depositor or Estate Fiduciary may present to the Canadian Distribution Agent evidence of such discharge, removal or dissolution in the form of a court order or other officially certified document which upon receipt by the Canadian Distribution Agent shall constitute an effective amendment to this Agreement, and such Estate Fiduciary by operation of this Agreement, as amended, shall cease to be such for all purposes of this Agreement and the consent of such removed or dissolved Estate Fiduciary shall no longer be required for any purposes hereunder; provided that, for the avoidance of doubt, nothing in this Section 13 shall affect the rights of the Estate Fiduciaries under Section 26 hereof. If such discharge, removal or dissolution provides for a successor to the duties and responsibilities of such removed or dissolved Estate Fiduciary, or a successor to the same or substantially similar duties and responsibilities of such removed or dissolved Estate Fiduciary (including, without limitation, a trustee in bankruptcy) is otherwise appointed, then the preceding sentence shall be of no effect with respect to such successor entity, the rights and responsibilities of such Estate Fiduciary hereunder shall, subject to Section 30, pass automatically to such successor entity and such successor entity shall be deemed to be a party to this Agreement as if it were a signatory hereto.

If, at any time prior to the termination of this Agreement, any of the Depositors is liquidated or dissolved, whether pursuant to an approved plan of reorganization or liquidation by order of the Canadian Court or U.S. Court or otherwise, any Depositor, or Estate Fiduciary (as the case may be) shall present to the Canadian Distribution Agent evidence of such dissolution or liquidation in the form of a court order or other officially certified document which upon receipt by the Canadian Distribution Agent shall constitute an effective amendment to this Agreement, and such dissolved or liquidated Depositor by operation of this Agreement, as so amended, shall cease to be such for all purposes of this Agreement, as amended, and the consent of such dissolved or liquidated Depositor shall no longer be required for any purposes hereunder. If such dissolution or liquidation provides for a successor to such dissolved or liquidated Depositor, then such rights and responsibilities shall, subject to Section 30, pass automatically to such successor entity. Any person appointed as a liquidator of an EMEA Debtor under the Insolvency Act 1986 (U.K.) shall, subject to Section 30, be treated as a successor of such EMEA Debtor.

14.    Counterparts.

This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but such counterparts shall constitute one and the same agreement. Delivery of an executed counterpart of a signature page to this Agreement by facsimile or electronic mail shall be as effective as delivery of a manually executed counterpart of a signature page to this Agreement. Each of the parties hereto agrees to deliver an original executed signature page to this Agreement to the Canadian Distribution Agent within five (5) Business Days of the date hereof. The Canadian Distribution Agent shall be entitled in its sole and absolute discretion to freeze the Distribution Account until such time as all of the original executed signature pages have been delivered to it.

15.    Section Headings.

The Section headings of this Agreement are for convenience of reference only and shall not be deemed to limit or affect any of the provisions hereof.

- 15 -

16.    Amendments; No Waivers.

(a)    Except for the resignation, removal or replacement of an Estate Fiduciary as set forth in Section 13 or the liquidation or dissolution of a Depositor as set forth in Section 13, any provision of this Agreement may be waived or amended if, and only if, such amendment or waiver is in writing and is signed by the Depositors, the Estate Fiduciaries and the Canadian Distribution Agent (with a copy thereof to the Bondholder Group) and, if prior to the entry of a final decree closing the Bankruptcy Cases, such amendment or waiver is approved by both the U.S. Court and the Canadian Court; provided, however, that (i) court approval shall not be required of any applicable court (whether the U.S. Court or the Canadian Court) if a final decree closing the Bankruptcy Cases pending before such court shall have been entered by such court and (ii) court approval shall not be required of any court if final decrees terminating the Bankruptcy Cases shall have been entered by the U.S. Court and the Canadian Court.

(b)    No failure by any party hereto to insist upon the strict performance of any covenant, duty, agreement or condition of this Agreement, or to exercise any right or remedy consequent upon a breach hereof, shall constitute a waiver of any such breach or any other covenant, duty, agreement or condition hereof.

17.    Entire Agreement; No Third Party Beneficiaries.

This Agreement (including any exhibits, schedules and amendments hereto) and (solely with respect to the parties that are party or subject thereto) the IFSA, the Allocation Protocol and the Settlement and Support Agreement (a) constitute the entire agreement and understanding of the parties hereto and supersede all prior agreements and understandings, both written and oral, among the parties hereto with respect to the subject matter hereof and (b) are not intended to confer upon any other person any rights or remedies hereunder; provided, however, that the Joint Administrators shall be entitled to enforce and take the benefit of Section 20 hereof.

18.    Governing Law.

Subject to Section 20, this Agreement shall be governed by and construed in accordance with the laws of the Province of Ontario and the federal laws of Canada applicable therein.

19.    Severability.

If any provision of this Agreement is determined by a court of competent jurisdiction (as set forth in Section 21 below) to be prohibited or unenforceable by reason of any applicable law of a jurisdiction, then such provision shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions thereof, and any such prohibition or unenforceability in such jurisdiction shall not invalidate or render unenforceable such provisions in any other jurisdiction.

- 16 -

20.     Exclusion of Liability for the Joint Administrators, Conflict Administrator and the French Liquidator.

(a)     Subject to Section 20(c) below, the parties hereto agree that the Joint Administrators have negotiated this Agreement both in their capacities as administrators of NNUK and the other EMEA Debtors party hereto and for and on behalf of NNUK and the other EMEA Debtors party hereto and that none of the Joint Administrators or their respective firm, partners, employees, advisers, representatives or agents shall incur any personal liability whatsoever whether on their own part or in respect of any failure on the part of NNUK or the other EMEA Debtors party hereto to observe, perform or comply with any of its obligations under this Agreement or under or in relation to any associated arrangements or negotiations whether such liability would arise under Section 99(4) of Schedule B1 to the Insolvency Act or otherwise howsoever.

(b)     Subject to Section 20(c) below, the parties hereto agree that the Conflicts Administrator and French Liquidator have negotiated this Agreement for and on behalf of NNSA, and that none of the Conflicts Administrator, the French Liquidator or their respective firm, partners, employees, advisers, representatives or agents shall incur any personal liability whatsoever whether on their own part or in respect of any failure on the part of NNSA to observe, perform or comply with any of its obligations under this Agreement or under or in relation to any associated arrangements or negotiations whether such liability would arise under applicable laws or otherwise howsoever.

(c)     Nothing in this Section 20 or any other provision of this Agreement shall prevent the Depositors or the Canadian Distribution Agent from bringing any action against NNUK, NNSA, the other EMEA Debtors, the Joint Administrators, the Conflict Administrator or the French Liquidator for wilful misconduct or fraud.

(d)     Notwithstanding Section 18 or anything in Section 21, (i) any claim, action or proceeding against the Joint Administrators in their personal capacities (and not as agents for any EMEA Debtor) under this Agreement shall be governed exclusively by English law and subject to the exclusive jurisdiction of the English Court; (ii) any claim, action or proceeding against the Conflicts Administrator in his personal capacity (and not as agent for NNSA) under this Agreement shall be governed exclusively by English law and subject to the exclusive jurisdiction of the English Court, and (iii) any claim, action or proceeding against the French Liquidator in his personal capacity (and not as agent for NNSA) under this Agreement shall be governed by the laws of France and subject to the exclusive jurisdiction of the French Court.

(e)     Notwithstanding Section 21, any claim, action or proceeding against the Canadian Distribution Agent asserting any personal liability on the part of the Canadian Distribution Agent shall be subject to the exclusive jurisdiction of the Canadian Court.

(f)     This Section 20 shall survive the termination of this Agreement.

- 17 -

21.    JURISDICTION.

SUBJECT TO SECTION 20, FOR ANY CLAIM, ACTION OR PROCEEDING ARISING UNDER OR OUT OF, IN RESPECT OF, OR IN CONNECTION WITH THIS AGREEMENT, EACH PARTY HEREBY IRREVOCABLY SUBMITS TO AND ACCEPTS FOR ITSELF AND ITS PROPERTIES, GENERALLY AND UNCONDITIONALLY TO THE EXCLUSIVE JURISDICTION OF AND SERVICE OF PROCESS PURSUANT TO THE RULES OF BOTH (I) THE U.S. COURT AND THE CANADIAN COURT, IF SUCH CLAIM, ACTION OR PROCEEDING IS BROUGHT PRIOR TO THE ENTRY OF A FINAL DECREE CLOSING THE BANKRUPTCY CASES INVOLVING THE RELEVANT DEPOSITORS PENDING BEFORE SUCH COURTS, INCLUDING THAT CERTAIN CROSS-BORDER INSOLVENCY PROTOCOL APPROVED BY THE U.S. COURT PURSUANT TO SECTION 105(A) OF THE BANKRUPTCY CODE IN AN ORDER DATED JANUARY 15, 2009, AND BY THE CANADIAN COURT PURSUANT TO AN ORDER DATED JANUARY 14, 2009, AS AMENDED OR AS AMENDED AND RESTATED FROM TIME TO TIME, AND (II) THE CANADIAN COURT, IF BROUGHT AFTER ENTRY OF SUCH FINAL DECREE CLOSING SUCH BANKRUPTCY CASES INVOLVING THE RELEVANT DEPOSITORS PENDING BEFORE THE U.S. COURT OR THE CANADIAN COURT, WAIVES ANY DEFENSE OF *FORUM NON CONVENIENS* AND AGREES TO BE BOUND BY ANY JUDGMENT RENDERED THEREBY ARISING UNDER OR OUT OF, IN RESPECT OF, OR IN CONNECTION WITH THIS AGREEMENT. EXCEPT AS PROVIDED IN THE FOREGOING NO PARTY HERETO SHALL INITIATE ANY CLAIM, ACTION OR PROCEEDING ARISING UNDER OR OUT OF, IN RESPECT OF, OR IN CONNECTION WITH THIS AGREEMENT IN ANY OTHER STATE, PROVINCIAL OR FEDERAL COURT IN THE UNITED STATES OF AMERICA, CANADA OR ANY COURT IN ANY OTHER COUNTRY. EACH PARTY FURTHER IRREVOCABLY DESIGNATES AND APPOINTS THE INDIVIDUAL(S) IDENTIFIED AS ITS AUTHORIZED REPRESENTATIVES TO RECEIVE NOTICES ON ITS BEHALF, AS ITS AGENT TO RECEIVE ON ITS BEHALF SERVICE OF ALL PROCESS IN ANY SUCH CLAIM, ACTION OR PROCEEDING BEFORE ANY BODY, SUCH SERVICE BEING HEREBY ACKNOWLEDGED TO BE EFFECTIVE AND BINDING SERVICE IN EVERY RESPECT. A COPY OF ANY SUCH PROCESS SO SERVED SHALL BE MAILED BY REGISTERED MAIL TO EACH PARTY AT ITS ADDRESS PROVIDED PURSUANT TO SECTION 13; PROVIDED THAT, UNLESS OTHERWISE PROVIDED BY APPLICABLE LAW, ANY FAILURE TO MAIL SUCH COPY SHALL NOT AFFECT THE VALIDITY OF THE SERVICE OF SUCH PROCESS. IF ANY AGENT SO APPOINTED REFUSES TO ACCEPT SERVICE, THE DESIGNATING PARTY HEREBY AGREES THAT SERVICE OF PROCESS SUFFICIENT FOR PERSONAL JURISDICTION IN ANY CLAIM, ACTION OR PROCEEDING AGAINST IT IN THE APPLICABLE JURISDICTION MAY BE MADE BY REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO ITS ADDRESS PROVIDED PURSUANT TO SECTION 13. EACH PARTY HEREBY ACKNOWLEDGES THAT SUCH SERVICE SHALL BE EFFECTIVE AND BINDING IN EVERY RESPECT. NOTHING HEREIN SHALL AFFECT THE RIGHT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR SHALL LIMIT THE RIGHT OF ANY PARTY TO BRING ANY CLAIM, ACTION OR PROCEEDING AGAINST AN OTHER PARTY IN ANY OTHER JURISDICTION. NOTWITHSTANDING ANYTHING IN THIS SECTION 21 TO THE CONTRARY, ANY CLAIM, ACTION OR PROCEEDING SET FORTH IN SECTION 20 SHALL BE BROUGHT

- 18 -

EXCLUSIVELY IN THE COURTS CONTEMPLATED IN SECTION 20. FINALLY, REGARDLESS OF THE JURISDICTION OF THE APPLICABLE COURT, THE PARTIES FURTHER HEREBY WAIVE ANY RIGHT TO A TRIAL BY JURY WITH RESPECT TO ANY LAWSUIT OR JUDICIAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT.

22.    Interpretation.

As used in this Agreement (including all exhibits, schedules and amendments hereto), the masculine, feminine or neuter gender and the singular or plural number shall be deemed to include the others whenever the context so requires. References to Sections refer to Sections of this Agreement, unless the context otherwise requires. Words such as "herein," "hereinafter," "hereof," "hereto," "hereby" and "hereunder," and words of like import, unless the context requires otherwise, refer to this Agreement. "Including", "includes" and similar words shall mean including without limiting the generality of the foregoing. The captions contained herein are for convenience only and shall not control or affect the meaning or construction of any provision of this Agreement.

23.    Compliance with Court Orders.

In the event that any of the Escrow Property shall be attached, garnished or levied upon by any court order, or the distribution or disbursement thereof shall be stayed or enjoined by an order of a court of competent jurisdiction (as set forth in Section 21 above), or any order, judgment or decree shall be made or entered by any court order affecting the property deposited under this Agreement, the Canadian Distribution Agent is hereby expressly authorized, in its sole discretion, to obey and comply with all writs, orders or decrees so entered or issued, which it is advised by legal counsel of its own choosing is binding upon it, whether with or without jurisdiction, and in the event that the Canadian Distribution Agent obeys or complies with any such writ, order or decree it shall not be liable to any of the parties hereto or to any other person, firm or corporation, by reason of such compliance notwithstanding such writ, order or decree be subsequently reversed, modified, annulled, set aside or vacated.

24.    Force Majeure.

In the event that any party hereto is unable to perform its obligations under the terms of this Agreement because of acts of God, strikes, equipment or transmission failure or damage reasonably beyond its control, or other cause reasonably beyond its control, the Canadian Distribution Agent shall not be liable for damages to the other parties for any damages resulting from such failure to perform otherwise from such causes. Performance under this Agreement shall resume when the Canadian Distribution Agent is able to perform its obligations hereunder.

25.    Merger or Consolidation.

Any corporation or association into which the Canadian Distribution Agent may be converted or merged, or with which it may be consolidated, or to which it may sell or transfer all or substantially all of its corporate escrow business and assets as a whole or substantially as a whole, or any corporation or association resulting from any such conversion, sale, merger, consolidation or transfer to which the Canadian Distribution Agent is a party, shall be and

- 19 -

become the successor escrow agent under this Agreement and shall have and succeed to the rights, powers, duties, immunities and privileges of the Canadian Distribution Agent, without the execution or filing of any instrument or paper or the performance of any further act except for the giving of written notice by the Canadian Distribution Agent to the Depositors and the Estate Fiduciaries.

26.    Exclusion of Liability for Estate Fiduciaries.

The Depositors and the Canadian Distribution Agent agree that (a) each of the Estate Fiduciaries has negotiated and is entering into this Agreement as a representative of its applicable creditor constituency for the purpose of benefiting from the rights being granted hereunder and to allow the Canadian Distribution Agent to be able to rely on any joint instructions signed by the Estate Fiduciaries and (b) none of the Estate Fiduciaries, their firms, members or affiliates of such parties and such parties respective partners, associates, employees, advisers, representatives or agents shall incur any liability whatsoever under this Agreement. This Section 26 shall survive termination of this Agreement.

27.    No Agency.

Each of Depositors and Estate Fiduciaries acknowledge and agree that the Canadian Distribution Agent does not have any interest in the Escrow Property and is acting solely as an escrow holder at the request and for the convenience of the Depositors, having only possession of the Escrow Property. The Canadian Distribution Agent shall not be deemed to be the agent or trustee of any party in respect of the escrow herein referred to and none of the Depositors or the Estate Fiduciaries shall be deemed to be the agent or trustee of the Canadian Distribution Agent in respect of the escrow herein referred to.

28.    Regulatory Compliance.

(a)    If the Canadian Distribution Agent is subject to any legislation, including anti-money laundering legislation and privacy legislation, that requires it to collect information or obtain undertakings, agreements, documents or the like from the parties to this Agreement, their representatives, employees, officers, directors, or any agent or agents of such parties, the parties hereto agree that they shall fully cooperate with the reasonable requests of the Canadian Distribution Agent in this regard, including delivery of information, agreements, or documents or providing signatures or executing documents and to take all reasonable steps to cause the parties' representatives, employees, officers, directors, or agents as the case may be to do the same, all to the extent required to ensure that the Canadian Distribution Agent satisfies applicable legislative requirements, and the parties hereto agree that if for any reason such requirements are not satisfied, the Canadian Distribution Agent may, at its option and in its sole discretion, refuse to act as may otherwise be required under this Agreement until such requirements are satisfied.

(b)    The parties may exchange personal information ("**Confidential Information**"), but only such information as is required in order for the parties to fulfill their duties under this Agreement.

- 20 -

(c)     The parties agree to use the Confidential Information solely for performing their duties under this Agreement. The parties will hold the Confidential Information in confidence and will not use or disclose the Confidential Information to any third party; provided, however, that the parties may disclose any such Confidential Information to their directors, officers, employees, agents, service providers, advisors, internal and external auditors or regulatory authorities as well as those of their affiliates with a need to know such Confidential Information and who agree to be bound by these confidentiality obligations, or as required or permitted by law.

(d)     The parties acknowledge that the Confidential Information may include personal information about identifiable individuals.  Each of the parties hereto agree to act in accordance with the Personal Information Protection and Electronic Documents Act ("**PIPEDA**") and applicable provincial private sector privacy legislation which has by order by a court of competent jurisdiction been declared as substantially similar to PIPEDA with respect to collection, use, disclosure, retention of and access to personal information

(e)     The Canadian Distribution Agent will correct or amend any inaccuracy with any Confidential Information promptly after it is notified of the inaccuracy by the parties.  If the Canadian Distribution Agent otherwise becomes aware of any inaccuracy with any Confidential Information, the Canadian Distribution Agent will promptly advise the parties.

29.    Service Providers.

The Canadian Distribution Agent's services to the parties hereto are not exclusive and the Canadian Distribution Agent is hereby expressly authorized from time to time in its discretion, for any purpose, including for the purpose of assisting the Canadian Distribution Agent with its duties under, and the administration of, this Agreement, to appoint, employ, invest in, contract or deal with any individual, firm, partnership, association, trust or body corporate, including without limitation, itself and any individual, firm, partnership, association, trust or body corporate with which it may directly or indirectly be affiliated or related or in which it may be directly or indirectly interested, whether on its own account, for this Agreement, or for the account of another (in a fiduciary capacity or otherwise) without being liable to account therefor and without being in breach of this Agreement.

30.    Successors and Assigns.

This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors (including any receiver or trustee in bankruptcy or any such party) and permitted assigns. The Canadian Distribution Agent shall have no obligation in performing this Agreement to recognize any successor or assign of another party hereto unless the Canadian Distribution Agent, acting reasonably, receives authoritative and conclusive written evidence of the change of such party and any documentation required to ensure that the Canadian Distribution Agent satisfies applicable legislative requirements.

*[Signature pages follow]*

**IN WITNESS WHEREOF**, each of the parties hereto has caused this Agreement to be executed on the day and year first above written.

**NORTEL NETWORKS CORPORATION**

By: _____
  Name: Tanecia Wong Ken
  Title:  Authorized Representative

**NORTEL NETWORKS LIMITED**

By: _____
  Name: Tanecia Wong Ken
  Title:  Authorized Representative

**NORTEL NETWORKS INC.**

By: _____
       Name:  John J. Ray III
       Title:    Principal Officer

**SIGNED for and on behalf of Nortel Networks UK Limited (in administration) by Alan Bloom and Stephen Harris as Joint Administrators (acting as agent and without personal liability):**

_____
Alan Bloom

_____
Stephen Harris

_____
Witness Signature
Name:
Address:

_____
Witness Signature
Name:
Address:

**SIGNED for and on behalf of Nortel Networks S.A. (in administration and** *liquidation judiciare***) by Alan Bloom as Joint Administrator and Stephen Taylor as Conflict Administrator (both acting as agent and without personal liability):**

_____      _____
            Alan Bloom                            Stephen Taylor

_____      _____
Witness Signature                     Witness Signature
Name:                                 Name:
Address:                              Address:

**SIGNED for and on behalf of Nortel Networks S.A. (in administration and** *liquidation judiciare***) by Maître Cosme Rogeau as** *Mandataire Liquidateur* **(acting as agent and without personal liability) in the presence of:**

_____      _____
Witness signature                             Maître Cosme Rogeau
Name:
Address:

Signature Page to Canadian Distribution Escrow Agreement

**ERNST & YOUNG INC. IN ITS CAPACITY AS THE MONITOR OF NORTEL NETWORKS CORPORATION ET AL., AND NOT IN ITS PERSONAL CAPACITY**

By: _____
         Name:  Murray A. McDonald
         Title:    President

**THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF NORTEL NETWORKS INC., ET. AL.**

**By: AKIN GUMP STRAUSS HAUER & FELD LLP, as Counsel to the Committee and authorized signatory and not in its individual capacity**

By: _____

      Name:

      Title:

**CANADIAN DISTRIBUTION AGENT**

**Royal Trust Corporation of Canada, as
Canadian Distribution Agent**

By:    _____
      Name:
      Title:

**SCHEDULE A**

**OTHER DEPOSITORS**

1. NNSA

2. **[NTD: Any other depositors under existing escrow agreements from which cash to be transferred to Canadian Escrow Agent to be specified herein as Other Depositors and added as signatories. Entities to be specified as Canadian Debtor, U.S. Debtor or EMEA Debtor.]**

**SCHEDULE B**

**REDACTED**

**SCHEDULE C**

**NOTICE ADDRESSES**

<u>Depositors:</u>

| | |
|---|---|
| **NNC and NNL [and the other Canadian Debtors]:** | 5945 Airport Road<br>Suite 152<br>Mississauga, Ontario, Canada  L4V 1R9<br>Attn: Tanecia Wong Ken<br>Phone: 905-863-1184<br>Facsimile: 416-4789-9688<br><br>With a copy to:<br><br>The Monitor and Goodmans LLP at the address particulars set forth below. |
| **NNI [and the other U.S. Debtors]:** | c/o Cleary Gottlieb Steen & Hamilton LLP<br>One Liberty Plaza<br>New York, NY  10006<br>United States<br>Attention: Lisa Schweitzer<br>Facsimile: +1-212-225-3999 |
| **NNUK [and the other EMEA Debtors]:** | c/o Herbert Smith LLP<br>Exchange House<br>Primrose Street<br>London<br>EC2A 2HS<br>United Kingdom<br>Attn: John Whiteoak and Kevin Pullen<br>Phone: +44 20 7374 8000<br>Facsimile: +44 20 7374 0888 |
| **NNSA:** | c/o Herbert Smith LLP<br>Exchange House<br>Primrose Street<br>London<br>EC2A 2HS<br>United Kingdom<br>Attn: John Whiteoak and Kevin Pullen<br>Phone: +44 20 7374 8000<br>Facsimile: +44 20 7374 0888<br><br>-and- |

c/o Skadden, Arps, Slate, Meagher & Flom
(UK) LLP
40 Bank Street
Canary Wharf
London
E14 5DS
United Kingdom
Attn: Christopher Mallon
Phone: +44 20 7519 7236
Facsimile: +44 20 7072 7236

Canadian Distribution Agent:

Royal Trust Corporation of Canada
155 Wellington St. West, 20th Floor
Toronto, Ontario  M5V 3K7
Attention: Sharon Yeung, Director,
Institutional Trust Services
Facsimile: (416) 955-3268

Estate Fiduciaries:

The Official Committee of Unsecured
Creditors in connection with the Chapter 11
cases of Nortel Networks Inc., et al. (Case
No. 09-10138):

c/o Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, New York  10036
Attn: Fred S. Hodara, Brad Kahn and
David H. Botter
Phone: 212-872-1000
Facsimile: 212-872-1002

Monitor:

Ernst & Young Inc. in its capacity as Monitor
of Nortel Networks Corporation et al.
Ernst & Young Tower
222 Bay Street, P. O. Box 251
Toronto, Ontario, Canada
M5K 1J7
Facsimile: (416) 943-3300
Attn: Murray A. McDonald

With a copy to:

Goodmans LLP
Bay Adelaide Centre
333 Bay St., Suite 3400
Toronto, ON  M5H 2S7
Attn: Jay A. Carfagnini, Joe Pasquariello and
Chris Armstrong
Phone: (416) 979-2211
Facsimile: (416) 979-1234

Bondholder Group:                                c/o Milbank, Tweed, Hadley & McCloy LLP
                                                 1 Chase Manhattan Plaza
                                                 New York, New York  10005
                                                 Attn: Albert A. Pisa
                                                 Phone: 212-530-5000
                                                 Facsimile: 212-822-5735

**SCHEDULE D**

**REDACTED**

**SCHEDULE E**

**AFFILIATED FINANCIAL INSTITUTIONS OF CANADIAN DISTRIBUTION AGENT**

1.   RBC Dominion Securities Inc.

## EXHIBIT A

## FEES OF ESCROW AGENT

INITIAL SERVICES FEE

A one-time fee of $25,000.00 plus legal costs incurred by Royal Trust on a time cost basis will be charged for the review  and modification of escrow document and setting up of the escrow account.

(A)      ANNUAL FEES

For custody and safekeeping of assets, monthly administration, including correspondence, payments, record-keeping, reporting, and related Escrow Agent duties and responsibilities including investments in Government of  Canada Treasury Bills and/or Bankers Acceptances and/or Forward Exchange Contracts, fees will be charged  monthly on the market value of assets held at the previous month at the following:

|  |  |
| --- | --- |
| **Annual Fee:** | 1 basis points or 0.01% |
| **Minimum Annual Fee:** | $20,000.00 CAD |
| **Investment Transactions (e.g., Trades)*:** | $300.00 CAD per transaction |
| **Disbursements:** | $500.00 CAD per transaction |

*excludes any 3rd party fees applicable to investments

(B)      TAX PREPARATION FEES

A fee of $325.00 per hour is applied for the preparation, filing, review of income tax returns and other required tax filings, including issuance of tax slips.

**EXHIBIT B**

**FORM OF LETTER OF INSTRUCTION**

Reference is made to the Canadian Distribution Escrow Agreement dated September ●, 2016 (the "**Agreement**") among the Depositors, the Estate Fiduciaries and the Canadian Distribution Agent. Capitalized terms used herein that are otherwise undefined shall have the meanings ascribed thereto in the Agreement.

Subject to the terms and conditions of the Agreement, each of the Depositors and the Estate Fiduciaries hereby irrevocably authorizes and directs the Canadian Distribution Agent to:

release from the Distribution Account the amount of CAD$_____ and disburse such amount by wire transfer to_____ using the following wiring transfer instructions:

Bank Name: _____
ABA Number: _____
Account Name: _____
Account Number: _____

and this shall be your good and sufficient authority for so doing.

**[Depositors and Estate Fiduciaries]**

by: _____

Name: ●
Title: ●

6603416

## ANNEX L

## BOOK INTERCOMPANY CLAIMS

US Debtors Pre-filing Intercompany Obligations as at January 14, 2009, except for NNCALA, which is as at July 14, 2009, and NIII, which is at July 26, 2016
Excludes claims filed by the Nortel Joint Ventures (GDNT and NETAS)
The schedule below excludes net intercompany receivables vis-à-vis non-filed entities; however this is not a reflection on the validity and the collectibility of such amounts
All amounts in USD

| Legal company code | Legal company name | Legal trading partner code | Legal trading partner name | Grand Total |
|---|---|---|---|---|
| **Claims as per Nortel Books and Records** | | | | |
| 2001 | Nortel Networks Inc. | 1107 | Architel Systems Corp | (72,538) |
| 2001 | Nortel Networks Inc. | 2103 | Sonoma Systems | (725,588) |
| 2001 | Nortel Networks Inc. | 2106 | Nortel AMS Inc. | (93,032) |
| 2001 | Nortel Networks Inc. | 2113 | Nortel HPOCS Inc. | (813,713) |
| 2001 | Nortel Networks Inc. | 2114 | Architel Systems (U.S.) C | (4,890,419) |
| 2001 | Nortel Networks Inc. | 2117 | Northern Telecom Int Inc. | (9,226) |
| 2001 | Nortel Networks Inc. | 2121 | Nortel Networks Cable Solutions Inc | (840) |
| 2001 | Nortel Networks Inc. | 6211 | Nortel Southeast Asia | - |
| 2001 | Nortel Networks Inc. | 6221 | Nortel Technology Thailand | - |
| 2001 | Nortel Networks Inc. | 3110 | Nortel Industria e Comerc | - |
| 2001 | Nortel Networks Inc. | 3140 | Nortel Networks Colombia | - |
| 2002 | Nortel Networks (CALA) Inc | 1002 | Nortel Networks Limited | (42,983,870) |
| 2002 | Nortel Networks (CALA) Inc | 2001 | Nortel Networks Inc. | (161,910,186) |
| 2002 | Nortel Networks (CALA) Inc | 2107 | Alteon WebSystems, Inc. | (2,700,910) |
| 2002 | Nortel Networks (CALA) Inc | 3140 | Nortel Networks Colombia | - |
| 2101 | Alteon Websystems Int Inc | 2107 | Alteon WebSystems, Inc. | (30,267,270) |
| 2102 | XROS Inc. | 2001 | Nortel Networks Inc. | (44,655,372) |
| 2104 | QTERA Corp | 2001 | Nortel Networks Inc. | (179,966,010) |
| 2105 | CoreTek Inc. | 2001 | Nortel Networks Inc. | (81,325,779) |
| 2107 | Alteon WebSystems, Inc. | 2001 | Nortel Networks Inc. | (6,075,811) |
| 2108 | Nortel Optical Comp Inc. | 2001 | Nortel Networks Inc. | (152,044) |
| 2115 | Nortel Int Inc. | 2001 | Nortel Networks Inc. | (63,972,219) |
| 2112 | Nortel Networks India Int | 1002 | Nortel Networks Limited | (17,695,763) |
| 2112 | Nortel Networks India Int | 2001 | Nortel Networks Inc. | (53,663,414) |
| **Settled Claims** | | | | |
| 2001 | Nortel Networks Inc. | 2110 | Nortel Capital Corp | (144,371,388) |
| 2001 | Nortel Networks Inc. | 3171 | Nortel de México | (4,658,948) |
| 2001 | Nortel Networks Inc. | 6140 | Nortel Korea Ltd | (2,166,851) |
| 2002 | Nortel Networks (CALA) Inc | 3170 | Nortel Networks de Mexico S.A. | (563,142) |
| 2002 | Nortel Networks (CALA) Inc | 3171 | Nortel de México | (3,045,862) |
| 2002 | Nortel Networks (CALA) Inc | 6111 | Nortel (India) Pvt. Ltd. | (167,634) |
| 2002 | Nortel Networks (CALA) Inc | 7100 | Nortel Networks (Asia) Limited | (7,694) |
| 2107 | Alteon WebSystems, Inc. | 3171 | Nortel de México | (5,164) |
| 2115 | Nortel Int Inc. | 3171 | Nortel de México | (836) |
| 2115 | Nortel Int Inc. | 6111 | Nortel (India) Pvt. Ltd. | (17,184) |

**Canadian Debtors Pre-filing Intercompany Obligations as at January 14, 2009**
**Excludes claims filed by the Nortel Joint Ventures (GDNT and NETAS)**
**The schedule below excludes net intercompany receivables vis-à-vis non-filed entities; however this is not a reflection on the validity and the collectibility of such amounts**
**All amounts in USD**

| Legal company code | Legal company name | Legal trading partner code | Legal trading partner name | Grand Total |
|---|---|---|---|---|
| **Claims as per Nortel Books and Records** | | | | |
| 1107 | **Architel Systems Corp** | 2114 | Architel Systems (U.S.) C | (1,912,993) |
| | | | | |
| **Settled Claims** | | | | |
| 1002 | **Nortel Networks Limited** | 2001 | Nortel Networks Inc. | (2,062,700,000) |
| 1002 | **Nortel Networks Limited**[1] | 4360 | Nortel Networks UK Limited | (122,655,094) |
| 1002 | **Nortel Networks Limited** | 4220 | Nortel Networks S.p.A. | (2,344,906) |
| 1002 | **Nortel Networks Limited** | 7120 | Nortel (China) Ltd | (104,218,075) |
| 1002 | **Nortel Networks Limited** | 6210 | Nortel Networks Singapore Pte | (91,167,570) |
| 1101 | **Nortel Technology Corp** | 6210 | Nortel Networks Singapore Pte | (8,212) |
| 1101 | **Nortel Technology Corp** | 3171 | Nortel de México | (276,176) |
| 1101 | **Nortel Technology Corp** | 7100 | Nortel Networks (Asia) Limited | (176,933) |
| 1101 | **Nortel Technology Corp** | 6160 | Nortel Malaysia Sdn. Bhd. | (3,222) |
| 1102 | **Nortel Int Corp** | 7120 | Nortel (China) Ltd | (734,289) |
| 1102 | **Nortel Int Corp** | 6100 | Nortel Networks Australia Pty | (1,480) |
| 1001 | **Nortel Networks Corporation** | 3171 | Nortel de México | (59) |

1. Balance includes USD 25M subject to satisfaction of paragraph 2.2 of the Agreement Settling EMEA Canadian Claims and Related Claims

EMEA Debtors and NNSA Pre-filing Intercompany Obligations as at January 14, 2009.
The schedule below excludes any balances between the EMEA Debtors and/or NNSA and/or the
EMEA Non-Filed Entities; however this is not a reflection on the validity and the collectibility of such amounts
All amounts in USD

| Legal Company Code | Legal Company name | Legal trading partner code | Legal trading partner name | Grand Total |
|---|---|---|---|---|
| **Claim as per Nortel Books and Records** | | | | |
| 4100 | Nortel Networks (Austria) GmbH | 3171 | Nortel de México, S. de R.L. de C.V. | (8,821) |
| 4110 | Nortel Networks N.V. | 6111 | Nortel Networks (India) Private Limited | (5,030) |
| 4130 | Nortel Networks, s.r.o. | 3171 | Nortel de México, S. de R.L. de C.V. | (3,613) |
| 4160 | Nortel Networks S.A. | 3140 | Nortel Networks de Colombia S.A. | (17,220) |
| 4160 | Nortel Networks S.A. | 3150 | Nortel Comunicaciones de Colombia S.A. en Liquidación | (22,228) |
| 4160 | Nortel Networks S.A. | 3160 | Nortel Networks de Guatemala Ltda. | (158,007) |
| 4160 | Nortel Networks S.A. | 3170 | Nortel Networks de México, S.A. de C.V. | (1,457) |
| 4160 | Nortel Networks S.A. | 6100 | Nortel Networks Australia Pty. Limited | (2,417) |
| 4160 | Nortel Networks S.A. | 6160 | Nortel Networks Malaysia Sdn. Bhd. | (2,977) |
| 4160 | Nortel Networks S.A. | 6220 | Nortel Networks (Thailand) Limited | (30,065) |
| 4160 | Nortel Networks S.A. | 6231 | Nortel Vietnam Limited | (9,842) |
| 4160 | Nortel Networks S.A. | 7100 | Nortel Networks (Asia) Limited | (265,892) |
| 4160 | Nortel Networks S.A. | 7124 | Guandong Nortel Telecommunications Company Limited | (8,432,851) |
| 4162 | Nortel Networks France S.A.S | 3171 | Nortel de México, S. de R.L. de C.V. | (3,315) |
| 4162 | Nortel Networks France S.A.S | 6111 | Nortel Networks (India) Private Limited | (200) |
| 4162 | Nortel Networks France S.A.S | 7110 | Nortel Networks (Asia) Limited - Taiwan Branch | (22,406) |
| 4180 | Nortel GmbH (formerly 4180 Nortel Network Germany GmbH & Co KG) | 3171 | Nortel de México, S. de R.L. de C.V. | (29,481) |
| 4200 | Nortel Networks Engineering Service Kft. | 3171 | Nortel de México, S. de R.L. de C.V. | (4,928) |
| 4210 | Nortel Networks (Ireland) Limited | 3171 | Nortel de México, S. de R.L. de C.V. | (4,336) |
| 4210 | Nortel Networks (Ireland) Limited | 6100 | Nortel Networks Australia Pty. Limited | (75) |
| 4210 | Nortel Networks (Ireland) Limited | 6111 | Nortel Networks (India) Private Limited | (341) |
| 4210 | Nortel Networks (Ireland) Limited | 6120 | PT Nortel Networks Indonesia | (70) |
| 4210 | Nortel Networks (Ireland) Limited | 7110 | Nortel Networks (Asia) Limited - Taiwan Branch | (10,045) |
| 4220 | Nortel Networks S.p.A. | 7110 | Nortel Networks (Asia) Limited - Taiwan Branch | (5,145) |
| 4260 | Nortel Networks Polska Sp. z o.o. | 3171 | Nortel de México, S. de R.L. de C.V. | (1,823) |
| 4270 | Nortel Networks Portugal S.A. | 3110 | Nortel Networks Telecommunicacoes Industria e Comercio Ltda. | (121,067) |
| 4270 | Nortel Networks Portugal S.A. | 3171 | Nortel de México, S. de R.L. de C.V. | (3,103) |
| 4280 | Nortel Networks Romania SRL | 3171 | Nortel de México, S. de R.L. de C.V. | (532) |
| 4310 | Nortel Networks Hispania, S.A. | 6199 | Nortel Networks (Asia) Limited - Pakistan Branch | (1,294) |
| 4310 | Nortel Networks Hispania, S.A. | 7100 | Nortel Networks (Asia) Limited | (901) |
| 4360 | Nortel Networks UK Limited | 1107 | Architel Systems Corporation | (1,476,623) |
| 4360 | Nortel Networks UK Limited | 3171 | Nortel de México, S. de R.L. de C.V. | (58,159) |
| 4360 | Nortel Networks UK Limited | 4321 | Alteon WebSystems AB | (228,195) 1 |
| 4360 | Nortel Networks UK Limited | 6100 | Nortel Networks Australia Pty. Limited | (354,095) |
| 4360 | Nortel Networks UK Limited | 6130 | Nortel Networks Kabushiki Kaisha | (81,375) 2 |
| 4360 | Nortel Networks UK Limited | 6140 | Nortel Networks Korea Limited | (33,761) |
| 4360 | Nortel Networks UK Limited | 6160 | Nortel Networks Malaysia Sdn. Bhd. | (98,358) |
| 4360 | Nortel Networks UK Limited | 7120 | Nortel Networks (China) Limited | (100,633) |
| 4360 | Nortel Networks UK Limited | 7124 | Guandong Nortel Telecommunications Company Limited | (4,888) |
| 4360 | Nortel Networks UK Limited | 7125 | Nortel Networks Communications Engineering Limited | (1,812) |

1. Subsequent to the liquidation of Alteon WebSystems AB, the balance of $228,195 is due to Nortel Altsystems Inc.
2. Subsequent to the liquidation of Nortel Networks Kabushiki Kaisha, the balance of $81,375 is due to Nortel Networks Inc.



# INFORMATION CIRCULAR

### relating to a proposed

## PLAN OF COMPROMISE AND ARRANGEMENT

### under the

### *COMPANIES' CREDITORS ARRANGEMENT ACT* (CANADA)

### concerning, affecting and involving

## NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION, NORTEL NETWORKS TECHNOLOGY CORPORATION, NORTEL COMMUNICATIONS INC., ARCHITEL SYSTEMS CORPORATION AND NORTHERN TELECOM CANADA LIMITED

### November 30, 2016

**This Information Circular is being distributed to creditors of the above-named Canadian Debtors in connection with a meeting called to consider and vote on a plan of compromise and arrangement.  The Meeting is presently planned to be held on or about January 17, 2017, subject to the terms of a Meeting Order to be granted by the CCAA Court on or about December 1, 2016.**

*These materials require your immediate attention. You should consult your legal, financial, tax or other professional advisors in connection with the contents of these documents.*

# TABLE OF CONTENTS

**Page**

IMPORTANT DISCLAIMERS ...................................................................................................................2

INFORMATION FOR UNITED STATES CREDITORS ......................................................................3

CAUTIONARY NOTICE REGARDING FORWARD LOOKING INFORMATION ...........................4

TERMS OF REFERENCE ......................................................................................................................4

SUMMARY INFORMATION.................................................................................................................5

INFORMATION REGARDING NORTEL ...........................................................................................11

    Corporate Structure ........................................................................................................................11
    Operations.......................................................................................................................................11
    Capital Structure ............................................................................................................................12

CCAA PROCEEDINGS AND OTHER MATTERS .............................................................................13

    Commencement of CCAA Proceedings.........................................................................................13
    U.S. Proceedings............................................................................................................................13
    EMEA Proceedings........................................................................................................................13
    Initial Restructuring Efforts ...........................................................................................................14
    The Line of Business Sales ............................................................................................................14
    Lockbox Funds ...............................................................................................................................15
    The IFSA, CFSA, NNI Claim and other Inter-Estate Matters .......................................................15
    The Rest of the World.....................................................................................................................16
    Claims Orders ................................................................................................................................17
    Certain Employee Matters: The Health & Welfare Trust, the Employee Settlement and Hardship Process........18
    Certain Significant Claims .............................................................................................................19

THE ALLOCATION DISPUTE AND THE ALLOCATION AND CLAIMS LITIGATION ...................21

    Allocation Protocol Negotiation Efforts and Phillips Mediation ....................................................21
    Allocation Protocol Motions and Winkler Mediation.....................................................................21
    Fourth Estate Settlement Agreement ..............................................................................................22
    Allocation and Claims Litigation ...................................................................................................22
    Settlement of the Allocation Dispute – Settlement and Support Agreement .......................................26

DESCRIPTION OF THE PLAN ...........................................................................................................29

    Purpose of the Plan ........................................................................................................................29
    Substantive Consolidation ..............................................................................................................30
    Classification of Creditors .............................................................................................................30
    Allocation and Distribution of Sale Proceeds .................................................................................30
    Release of Canada Only Sale Proceeds and other Restricted or Unavailable Cash ............................31
    Treatment of Claims Pursuant to the Plan.......................................................................................31
    Plan Releases .................................................................................................................................36
    Injunctions .....................................................................................................................................37

REQUIRED APPROVALS UNDER THE CCAA AND OTHER CONDITIONS TO IMPLEMENTATION..........38

    Creditor Approval by a Required Majority ......................................................................................38
    Court Approval of the Plan under the CCAA ..................................................................................38
    Conditions to the Effectiveness and Implementation of the Plan.....................................................41

IMPLEMENTATION OF THE PLAN ..................................................................................................42

    Timing of Implementation ..............................................................................................................42
    Cash Pools and Reserves ...............................................................................................................42
    Distributions under the Plan............................................................................................................43
    Continuing Administration and Wind-Down of the Canadian Estate and Related Matters ...................47

ESTIMATED DISTRIBUTIONS TO CREDITORS WITH PROVEN AFFECTED UNSECURED CLAIMS ........49

ALTERNATIVES TO THE PLAN....................................................................................................................49

STATUS OF CLAIMS PROCESS..................................................................................................................50

RECOMMENDATION OF THE MONITOR.................................................................................................50

SUPPORT OF OTHER SIGNIFICANT STAKEHOLDERS ......................................................................50

MEETING AND VOTING ...............................................................................................................................50

WITHHOLDING FROM DISTRIBUTIONS AND CERTAIN OTHER TAX MATTERS......................51

RISK FACTORS ...............................................................................................................................................52

    Risks Relating to Non-Implementation of the Plan .......................................................................52
    Risks Relating to the Plan and its Implementation ........................................................................52
    Risks Related to Recovery under the Plan .......................................................................................53

DOCUMENTS INCORPORATED BY REFERENCE ................................................................................55

SCHEDULE "A" – FORM OF RESOLUTION
SCHEDULE "B" – GLOSSARY OF CERTAIN TERMS
SCHEDULE "C" – EXCHANGE RATES

**INFORMATION CIRCULAR**

**relating to a proposed**

**PLAN OF COMPROMISE AND ARRANGEMENT**

**pursuant to the**

***COMPANIES' CREDITORS ARRANGEMENT ACT*** **(CANADA)**

**concerning, affecting and involving**

**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION, NORTEL NETWORKS TECHNOLOGY CORPORATION, NORTEL COMMUNICATIONS INC., ARCHITEL SYSTEMS CORPORATION AND NORTHERN TELECOM CANADA LIMITED**

**(the "Plan")**

**November 30, 2016**

## IMPORTANT DISCLAIMERS

THIS INFORMATION CIRCULAR HAS BEEN PREPARED BASED ON THE INFORMATION AVAILABLE TO THE CANADIAN DEBTORS AND THE MONITOR AS AT THE DATE HEREOF.

SUBJECT TO THE FOREGOING, THIS INFORMATION CIRCULAR CONTAINS IMPORTANT INFORMATION THAT SHOULD BE READ BY AFFECTED CREDITORS BEFORE ANY DECISION IS MADE WITH RESPECT TO THE MATTERS REFERRED TO HEREIN.

NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION IN CONNECTION WITH THE MATTERS TO BE CONSIDERED AT THE MEETING OTHER THAN THOSE CONTAINED IN THIS INFORMATION CIRCULAR, AND IF GIVEN OR MADE, ANY SUCH INFORMATION OR REPRESENTATION SHOULD BE CONSIDERED AS NOT HAVING BEEN AUTHORIZED AND MUST NOT BE RELIED UPON. THIS INFORMATION CIRCULAR DOES NOT CONSTITUTE THE SOLICITATION OF A PROXY, IN ANY JURISDICTION, TO OR FROM ANY PERSON TO WHOM IT IS UNLAWFUL TO MAKE SUCH PROXY SOLICITATION IN SUCH JURISDICTION. NEITHER THE DELIVERY OF THIS INFORMATION CIRCULAR NOR ANY DISTRIBUTION PURSUANT TO THE PLAN REFERRED TO IN THIS INFORMATION CIRCULAR SHALL, UNDER ANY CIRCUMSTANCES, CREATE ANY IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION SET FORTH HEREIN SINCE THE DATE OF THIS INFORMATION CIRCULAR.

ANY FINANCIAL ANALYSIS OR OTHER ESTIMATIONS CONTAINED HEREIN, INCLUDING ANY ANALYSIS CONTAINING NUMERICAL SPECIFITY, IS BASED ON ASSUMPTIONS AND ESTIMATES WHICH MAY NOT BE ACHIEVED AND SUBJECT TO BUSINESS, ECONOMIC, REGULATORY AND OTHER UNCERTAINTIES WHICH MAY BE BEYOND THE CONTROL OF THE CANADIAN DEBTORS.

Affected Creditors should not construe the contents of this Information Circular as investment, legal or tax advice. An Affected Creditor should consult its own legal, financial, tax or other professional advisors with respect to the legal, tax, business, financial and related consequences of the Plan for such Affected Creditor. In making a decision regarding the Plan, Affected Creditors must rely on their own examination of the Canadian Debtors and the advice of their own advisors. Affected Creditors should seek advice from their own advisors concerning the income tax consequences of the Plan.

The solicitation presented in this Information Circular does not extend to Affected Creditors residing in jurisdictions where solicitations of proxies under this Information Circular are unlawful, or to Affected Creditors to whom it is unlawful to direct these types of activities. The solicitation of proxies for the implementation of the Plan is being made on the basis of this Information Circular and is subject to the terms and conditions described herein.

Each Affected Creditor must comply with all Applicable Laws and regulations in force in any jurisdiction in which it participates in the solicitation of proxies for the Resolution approving the Plan, or in which it possesses or distributes this Information Circular, and must obtain any consent, approval or permission required by it for participation in the solicitation of proxies for

the Resolution approving the Plan under the laws and regulations in force in any jurisdiction to which it is subject, and none of the Canadian Debtors or the Monitor nor any of their respective representatives shall have any responsibility therefor.

The information contained in this Information Circular is given as of November 4, 2016, unless otherwise specifically stated, and is subject to change or amendment without notice. Any statement contained in this Information Circular, a document incorporated by reference or referred to in this Information Circular, or any amendment hereof or supplement hereto, is to be considered modified or replaced to the extent that a statement contained herein or in any amendment or supplement or any subsequently filed document modifies or replaces such statement. Any statement so modified or replaced is not to be considered, except as so modified or replaced, to be a part of this Information Circular.

This Information Circular provides summaries and descriptions of events, Orders and other matters relating to the CCAA Proceedings. Any such summaries or descriptions are provided for convenience purposes only. The Monitor has been providing ongoing reporting regarding events impacting the Canadian Debtors throughout the CCAA Proceedings. Copies of all such Monitor reports are available on the Monitor's website at www.ey.com/ca/nortel in the Section entitled "Monitor's Reports". Affected Creditors should refer to such Monitor reports in the event that such Affected Creditor wishes to receive more detailed information regarding specific events described herein.

All summaries of and references to certain documents in this Information Circular, including the summary of the Plan in this Information Circular, are qualified in their entirety by reference to the complete text of each of those documents.  Copies of documents referred to herein are either attached as Schedule(s) hereto or will be made available to Affected Creditors upon request to the Monitor.  Affected Creditors are urged to carefully read the full text of the Plan posted on the Monitor's website at www.ey.com/ca/nortel in the Section entitled "Plan and Other Creditor Meeting Documents".

Affected Creditors are urged to carefully read the "*Risk Factors*" section of this Information Circular before making any decision regarding the Plan.

All references to this Information Circular shall be deemed to include the Schedule(s) attached hereto.

## INFORMATION FOR UNITED STATES CREDITORS

The Canadian Debtors are corporations governed by the laws of Canada or a province thereof. The proxy solicitation rules under the U.S. Securities Exchange Act of 1934, as amended, are not applicable to this solicitation, and, accordingly, this solicitation is not being effected in accordance with such rules.

**NEITHER THIS INFORMATION CIRCULAR NOR THE PLAN HAS BEEN APPROVED OR DISAPPROVED BY THE U.S. SECURITIES AND EXCHANGE COMMISSION ("SEC"), ANY U.S. STATE SECURITIES REGULATORY AUTHORITY OR ANY U.S. BANKRUPTCY COURT, NOR HAS THE SEC, ANY U.S. SECURITIES REGULATORY AUTHORITY OR ANY U.S. BANKRUPTCY COURT PASSED UPON THE FAIRNESS OR MERITS OF THE PLAN OR UPON THE ADEQUACY, COMPLETENESS OR ACCURACY OF THE INFORMATION**

**CONTAINED IN THIS INFORMATION CIRCULAR.  ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENCE.**

This Information Circular does not discuss any U.S. federal or state tax consequences of the Plan.  Certain information concerning Canadian federal income tax consequences of the Plan for Affected Creditors who are not resident in Canada is set forth under the heading "*Withholding from Distributions and Certain Other Tax Matters*".  Affected Creditors resident in the United States should be aware that the transactions contemplated herein may have tax consequences both in Canada and the United States.  Such consequences are not described herein.  Affected Creditors should consult with their own tax advisors with respect to their particular circumstances and the tax considerations applicable to them.

## CAUTIONARY NOTICE REGARDING FORWARD LOOKING INFORMATION

The forward looking statements expressed or implied by this Information Circular are subject to important risks and uncertainties. When used in this Information Circular, the words "expect", "anticipate", "may", "will", "should", "intend", "believe", "plan" and similar expressions are intended to identify forward-looking statements, although not all forward-looking statements contain such words. Forward-looking statements are based on estimates and assumptions made by the Canadian Debtors in light of their experience and perception of historical trends, current conditions and expected future developments, as well as other factors that the Canadian Debtors believe are appropriate in the circumstances.  The results or events predicted in these statements may differ materially from actual results or events and are not guarantees of future performance. Factors which could cause results or events to differ from current expectations include, among other things: (a) uncertainty regarding future asset realizations; (b) the applicable foreign exchange rate at various dates of conversion or realization of remaining assets; (c) the resolution of unresolved Claims as to quantum and/or priority; (d) the cost to monetize the remaining assets, resolve Claims and complete the wind down and administration of the Canadian Debtors; (e) the other risks identified in the "Risk Factors" section of this Information Circular, and other factors not currently viewed as material that could cause actual results to differ materially from those described in the forward-looking statements.  The Canadian Debtors and the Monitor disclaim any intention or obligation to update or revise any forward-looking statements, whether as a result of new information, future events or otherwise, except as required by law.

## TERMS OF REFERENCE

The Monitor has made various materials relating to the CCAA Proceedings available on its website at www.ey.com/ca/nortel (the "**Monitor's Website**").  The Monitor's Website also contains a dynamic link to Epiq Bankruptcy Solutions, LLC's website where materials relating to the Chapter 11 Proceedings are posted.

Unless otherwise stated, all monetary amounts contained herein are expressed in U.S. dollars. References to "CA" are to Canadian dollars.

Unless otherwise defined or referenced herein, all capitalized terms used herein have the meaning given to them in the Plan which have also been included in the glossary attached as Schedule "B" hereto (the "**Glossary**").  Definitions in the Glossary are included for convenience purposes only and reference should be made to the Plan or other original source document.

# SUMMARY INFORMATION

*The following is a summary of certain information contained elsewhere in this Information Circular, including the Schedule(s) hereto, and is qualified in its entirety by reference to the more detailed disclaimers and information contained or referred to elsewhere in this Information Circular or the Schedule(s) hereto.*

| | |
|---|---|
| **Monitor's Website** | All references to the "Monitor's Website" mean the Monitor's website maintained for these CCAA Proceedings at www.ey.com/ca/nortel. |
| | Among other things, the Monitor's Website contains all of the Monitor's Reports issued in the CCAA Proceedings which provide information and reporting regarding the significant events and processes in the CCAA Proceedings. |
| **Meeting and Voting on the Plan** | The Meeting is targeted to be held on or about January 17, 2017. |
| | The actual date for calling the Meeting and the process for voting on the Plan (including the forms of proxy and instructions for voting) will be subject to a Plan Filing and Meeting Order (the "**Meeting Order**") which will be subject to CCAA Court approval on or about December 1, 2016.  Once granted, the Meeting Order will be posted on the Monitor's Website and distributed in accordance with the terms of the Meeting Order. |
| **Purpose of the Plan** | The purpose of the Plan is to: (a) effectuate and implement the terms of the Settlement and Support Agreement, including the settlement of the Allocation Dispute and certain other claims, disputes and other matters contemplated therein, and the release of the Sale Proceeds to the Canadian Debtors, the U.S. Debtors and the EMEA Debtors; (b) provide for the substantive consolidation of each of the Canadian Debtors into the Canadian Estate on the terms contemplated by the Plan; (c) provide for payment in full of the Proven Priority Claims; (d) provide for a pro rata distribution or distributions from the Canadian Estate to holders of all Proven Affected Unsecured Claims; and (e) effect a release and discharge of all Affected Claims and Released Claims. |
| **Classification and Voting** | The Plan provides for one class of Affected Unsecured Creditors for the purpose of considering and voting on the Plan, namely the Affected Unsecured Creditors Class. |
| **Treatment of Affected Claims** | Generally, the Plan provides for treatment of claims as follows: |
| | Affected Unsecured Claims.  In full and final satisfaction of their Claims, Affected Unsecured Creditors holding Proven Affected Unsecured Claims shall be entitled to vote on and receive their Pro-Rata Share of cash available to be distributed to Affected Unsecured Creditors under the Plan. |

Directors/Officer Claims. Director/Officer Claims are Affected Claims under the Plan. A Creditor holding a Director/Officer Claim, if any, is not entitled to vote on the Plan or receive any distributions under the Plan. The Plan provides for releases in favour of the Directors and Officers. However, certain types of claims will not be released pursuant to the Plan, including: (a) claims determined to be on account of fraud or willful misconduct; and (b) claims not permitted to be released by section 5.1(2) of the CCAA.

Equity Claims. Equity Claims are Affected Claims under the Plan. Holders of Equity Claims are not entitled to vote on or receive distributions under the Plan.

Unresolved Affected Unsecured Claims. Potential distributions in respect of Unresolved Affected Unsecured Claims will be maintained in the Unresolved Claims Reserve until such claims are finally resolved. If an Unresolved Affected Unsecured Claim becomes a Proven Affected Unsecured Claim, on or before the next Distribution Date, the Canadian Estate shall distribute funds from the Unresolved Claims Reserve equal to the Affected Unsecured Creditor's Pro-Rata Share that it/he/she would have been entitled to receive on the previous Distribution Date(s). Once an Unresolved Affected Unsecured Claim is finally resolved and all distributions (if any) have been made out of the Unresolved Claims Reserve in respect of such claim, any remaining Cash in the Unresolved Claims Reserve with respect to such Unresolved Affected Unsecured Claim shall become Available Cash.

Unaffected Claims. Certain other claims are "unaffected claims", and holders of those unaffected claims will not be entitled to vote on the Plan. Unaffected claims include: (a) Canadian Intercompany Claims; (b) Insured Claims; (c) Proven Priority Claims; (d) Post-Filing Claims (except to the extent otherwise ordered by the CCAA Court); and (e) any Director/Officer Claim that is not permitted to be compromised pursuant to Section 5.1(2) of the CCAA. The treatment of Unaffected Claims is described in further detail below.

See "*Description of the Plan – Treatment of Claims Pursuant to the Plan*".

| | |
|---|---|
| **Certain Proven Affected Unsecured Claims** | Certain Claims have been agreed as Proven  Affected Unsecured Claims under the Plan pursuant to the Settlement and Support Agreement. |
| | See "*Description of the Plan – Treatment of Claims Pursuant to the Plan – Certain Proven Affected Unsecured Claims*" |
| **Creditor Approval of Plan** | In order for the Plan to be approved pursuant to the CCAA, the Resolution must receive the affirmative vote of the Required Majority of the Affected Unsecured Creditors Class, being a majority in number |

of Affected Unsecured Creditors with Voting Claims who vote (in person or by proxy) on the Plan at the relevant Meeting, <u>and</u> two-thirds in value of the Voting Claims held by such Affected Unsecured Creditors who vote (in person or by proxy) on the Plan at the Meeting.

Creditors who have Affected Unsecured Claims that are Crossover Claims must vote on the Plan in addition to any vote that such Creditor may cast in respect of the U.S. Plans. Voting on the U.S. Plans will not be considered a vote on the Plan and *vice versa*.

See "*Required Approvals Under the CCAA and Other Conditions to Implementation – Creditor Approval by a Required Majority*".

|  |  |
|---|---|
| **Court Approval under the CCAA** | If the Plan is approved by the Required Majority the Canadian Debtors and Monitor shall apply for the Sanction Order. The hearing in respect of the Sanction Order is presently planned for on or about January 24, 2017. The specific date and place of hearing for the Sanction Order will be posted on the Monitor's Website.<br><br>See "*Required Approvals Under the CCAA and Other Conditions to Implementation – Court Approval of the Plan Under the CCAA*". |
| **Conditions to the Effectiveness and Implementation of the Plan** | The effectiveness of the Plan is conditional upon satisfaction of a number of conditions, including (a) approval of the Plan by the Required Majority; (b) the issuance of the Sanction Order and expiration of relevant appeal periods or the final resolution of any appeals taken; and (c) confirmation of the U.S. Plans by the U.S. Bankruptcy Court. The implementation of the Plan, including distributions thereunder, is conditional on certain additional conditions being satisfied, including (x) the full effectiveness of the Settlement and Support Agreement; (y) dismissal of all outstanding litigation pending in respect of the Allocation Dispute; and (z) receipt of the Canadian Allocation by NNL.<br><br>(See "*Required Approvals Under the CCAA and Other Conditions to Implementation – Conditions to the Effectiveness and Implementation of the Plan*".) |
| **Settlement and Support Agreement** | The full effectiveness of the Settlement and Support Agreement is conditional upon satisfaction of, among others, the following conditions: (a) receipt of Creditor Joinders from Crossover Bondholders beneficially holding notes representing at least 67% of the principal amount of the Crossover Bondholder Claim; (b) receipt of Creditor Joinders from NNCC Bondholders beneficially holding notes representing at least 67% of the principal amount of the NNCC Bondholder Claim; (c) Orders from the CCAA Court and the U.S. Bankruptcy Court regarding the conversion of currency; (d) Certain Orders of the U.K. Court, the French Court and the Beddoes Court regarding the Settlement and Support Agreement having been obtained; (e) sanction and confirmation of the Plan and the U.S. Plans |

by the CCAA Court and the U.S. Bankruptcy Court, respectively; and (f) the Plans Effective Date having occurred. The conditions specified in the foregoing (a), (b) and (c) have been satisfied as at the date of this Information Circular and the Canadian Debtors and Monitor have also been advised the conditions specified in the foregoing (d) have been satisfied.

Certain of these conditions have already been satisfied. See "*CCAA Proceedings and Other Matters – Settlement of the Allocation Dispute – Settlement and Support Agreement*" and "*Support of Other Significant Stakeholders*"

**Timing**

The current estimated timeline to implementation of the Plan is as follows:

(a) Meeting – January 17, 2017

(b) Sanction Hearing – January 24, 2017

(c) Plan Effective Date – February 15, 2017

(d) Plan Implementation Date – as soon as possible following the Plan Effective Date

(e) Initial Distribution Date – within 60 days of the Plan Implementation Date

The actual timing of the steps contemplated above will be set in accordance with the Meeting Order, Sanction Order or as otherwise contemplated by the Plan and, where applicable, will be posted on the Monitor's Website.

See "*Implementation of the Plan – Timing of Implementation*"

**Distributions**

The Plan provides for the creation of various notional Cash pools and reserves for the purposes of implementing the Plan, including making payments to holders of Proven Priority Claims and distributions in respect of Proven Affected Unsecured Claims.

See "*Implementation of the Plan – Cash Pools and Reserves and Distributions Under the Plan*"

**Estimate of Distribution to Affected Unsecured Creditors**

Pursuant to the Plan, distributions to Creditors holding Proven Affected Unsecured Claims predominantly denominated in Canadian dollars ("**CAD Claims**") shall be paid in Canadian dollars and distributions to all other Creditors holding Proven Affected Unsecured Claims shall be paid in U.S. dollars. A Proven Affected Unsecured Claim is considered "predominantly denominated" in Canadian dollars if more than 50% of such Claim is denominated in Canadian dollars.

For information on the method for conversion of Claims, see "*Description of the Plan – Treatment of Claims Pursuant to the Plan – Currency Conversion Matters*"

Pursuant to the Currency Conversion Orders (defined below), on October 24, 2016, directions were issued to the U.S. Distribution Agent to transfer approximately $1.06 billion to the Canadian Distribution Agent. The funds have been transferred and converted from U.S. dollars to Canadian dollars at a blended foreign exchange rate of $1.00 = CA$1.337650. The blended foreign exchange rate at which such funds together with any other funds transferred are converted from U.S. dollars to Canadian dollars shall constitute the Applicable F/X Rate for the Plan.

With respect to Proven Affected Unsecured Claims, the Monitor currently  estimates that the range of recovery (per U.S. dollar) of Proven Affected Unsecured Claims will be approximately 41.5 cents to 45 cents.  Given currency conversion matters as described in the Plan (See *Description of the Plan - Treatment of Claims Pursuant to the Plan – Currency Conversion Matters* ) the Monitor estimates that the range of recovery (per CA dollar) for CAD Claims will be approximately CA 45 cents to CA 49 cents <u>assuming</u> an Applicable F/X Rate of approximately $1.00 = CA $1.337650.

See "*Estimated Distributions to Creditors with Proven Affected Unsecured Claims*"

| | |
|---|---|
| **Monitor** | The Monitor and its counsel have been involved throughout the course of negotiations regarding the Plan. The Monitor supports the Plan and recommends that Affected Unsecured Creditors vote to approve the Plan. |
| **Support of Certain Stakeholders** | Certain significant Affected Unsecured Creditors of the Canadian Estate, including Crossover Bondholders holding Crossover Bonds in the principal amount of approximately $3 billion representing approximately 80% of the principal amount of the Crossover Bonds, NNCC Bondholders holding NNCC Bonds in the principal amount of approximately $135,665,000 representing approximately 90% of the principal amount of the NNCC Bonds, members of the CCC, UKPI, EMEA Debtors and NNI support the Plan, subject to the terms and conditions set out in the Settlement and Support Agreement.<br><br>(See "*Support of Other Significant Stakeholders*") |
| **Tax Considerations** | Certain tax considerations relating to the Plan are described in "*Withholding from Distributions and Certain Other Tax Matters*". Affected Creditors should consult their own tax advisors with respect to their individual circumstances.<br><br>(See "*Withholding from  Distributions  and  Certain  Other  Tax* |

*Matters*")

| | |
|---|---|
| **Risk Factors** | Affected Creditors should carefully consider certain risk factors relating, among other things, to the non-implementation of the Plan, the Plan and its implementation and recoveries under the Plan.<br><br>(See "*Risk Factors*") |
| **Important Disclaimers** | The information contained in this Information Circular is subject to a number of important qualifications and disclaimers.  See "*Important Disclaimers*" and "*Risk Factors*". |

## INFORMATION REGARDING NORTEL

**Corporate Structure**

As at January 14, 2009 (the "**Filing Date**") [1], NNC was the parent holding company and NNL was the primary Canadian operating entity of the Nortel group of companies ("**Nortel**"), a multi-national telecommunications company with approximately 126 subsidiaries that operated in virtually every country in the world.

**Operations**

*Business Segments and Lines of Business*

Nortel operated through various lines of business ("**LOB**").

As at the Filing Date, Nortel's three core business segments were Carrier Networks, Enterprise Solutions ("**Enterprise**") and Metro Ethernet Networks ("**MEN**"). A fourth business segment, Global Services (Nortel's support and services arm), was a separate reportable segment until December 31, 2008, before being integrated into the other LOBs.

The Carrier Networks segment provided wireless networking solutions that enabled service providers and cable operators to supply mobile voice, data and multimedia communications to individuals and enterprises using mobile phones and other wireless computing and communications devices. The Carrier Networks segment included the code division multiple access ("**CDMA**"), carrier voice over internet protocol and applications solutions ("**CVAS**") and global system for mobile communications ("**GSM**") LOBs.

The LOBs operated across jurisdictional boundaries and in many cases on a world-wide basis. The assets, contracts and employees relevant to the operation of a particular LOB were owned or employed by various individual Nortel legal entities, including NNL, but also including NNI, NNUK and numerous other debtor and non-debtor Nortel entities around the globe.

*Employees*

At its peak in the early 2000s, Nortel employed nearly 93,000 people worldwide. As at the Filing Date, the Canadian Debtors employed approximately 6,000 employees. The Canadian Debtors also administered two registered defined benefit pension plans, the Nortel Networks Limited Managerial and Non-Negotiated Pension Plan (Registration No. 0342048) and the Nortel Networks Negotiated Pension Plan (Registration No. 08587766), that provided pension benefits to more than 11,000 former employees and their survivors at the time of the Filing Date. In addition, the Canadian Debtors administered a Capital Accumulation and Retirement Program, which consisted of a combination of separate pension and other retirement savings plans and various other pension and benefits programs for the Canadian Debtors' former and current employees. Total participation in Nortel's Canadian Registered Pension Plans at the Filing Date was approximately 21,000 members. Finally, the Canadian Debtors also funded various current and post-employment employee benefits through Nortel's Health & Welfare Trust ("**HWT**"), a trust that provided benefits to approximately 9,000 current and former employees at the time of the Filing Date.

---

[1] In respect of the New Applicants, references to the "Filing Date" shall mean March 18, 2016.

## Capital Structure

### *Equity*

NNC is a public company whose shares traded on the Toronto Stock Exchange and the New York Stock Exchange ("**NYSE**").  As at December 31, 2008, NNC had approximately 497 million common shares issued and outstanding.

As at December 31, 2008, NNL had approximately 1.4 million common shares (all owned by NNC), as well as 16 million Series 5 preferred shares and 14 million Series 7 preferred shares issued and outstanding. NNL's preferred shares were listed on the Toronto Stock Exchange.

### *Bond Debt*

As at the Filing Date, one or more of the Canadian Debtors had either issued or guaranteed outstanding Bonds in the principal amount of approximately $4.175 billion pursuant to the Crossover Bonds Indentures, the NNCC Bonds Indenture and the 1988 Bonds Indenture as follows:

(a)     the 1988 Bonds issued by NNL, in the principal amount of approximately $200 million;

(b)     the 2006 Bonds issued by NNL and guaranteed by NNC and NNI, in the principal amount of approximately $2.675 billion;

(c)     the 2007 Bonds issued by NNC and guaranteed by NNL and NNI, in the principal amount of approximately $1.150 billion; and

(d)     the NNCC Bonds issued by Northern Telecom Capital Corporation (now NNCC, a U.S. Debtor) and guaranteed by Northern Telecom Limited (now NNL), in the principal amount of approximately $150 million.

### *Reporting Issuer Status & Stock Exchange Listings*

Prior to the Filing Date, NNC was a reporting issuer under U.S. and Canadian securities laws and its common shares were traded on the NYSE and the Toronto Stock Exchange.

On January 14, 2009, NNC received notice from the NYSE that it had decided to suspend the listing of NNC's common shares on the NYSE. Subsequently, on February 2, 2009, NNC common shares were delisted from the NYSE. On June 19, 2009, and several times subsequently, Nortel publicly announced it did not expect that holders of NNC common shares and NNL preferred shares would receive any value from the CCAA Proceedings and that such proceedings would ultimately result in the cancellation of those equity interests. As a result, NNC and NNL applied to delist the NNC common shares and the NNL preferred shares, respectively, from trading on the Toronto Stock Exchange, and such delisting occurred on June 26, 2009.

On August 9, 2012, NNC issued a press release announcing that as a result of the current status of the Canadian Debtors' restructuring proceedings, NNC and NNL would discontinue further preparation of quarterly and annual financial statements.  In connection with this announcement,

the Ontario Securities Commission issued a final cease trade order dated December 24, 2012 (the "**Cease Trade Order**") prohibiting further trading of Nortel securities. The Cease Trade Order contained certain exceptions to the prohibition on trading, including allowing certain trading of the Bonds to continue by "accredited investors" and trades for nominal consideration for the purposes of crystallizing tax losses. Cease trade orders were also issued in Alberta, Manitoba and Quebec.

## CCAA PROCEEDINGS AND OTHER MATTERS

**Commencement of CCAA Proceedings**

On the Filing Date, NNC, NNL, Nortel Networks Technology Corporation, Nortel Networks International Corporation and Nortel Networks Global Corporation (collectively, with the New Applicants (as defined below), the "**Canadian Debtors**") filed for and obtained protection under the *Companies' Creditors Arrangement Act* ("**CCAA**"). Pursuant to the Initial Order of the CCAA Court dated January 14, 2009 (as amended and restated from time to time, the "**Initial Order**"), Ernst & Young Inc. was appointed as the Monitor of the Canadian Debtors (the "**Monitor**") in the CCAA Proceedings. The stay of proceedings under the Initial Order was most recently extended to March 31, 2017 by Order dated September 29, 2016.

On March 18, 2016, Nortel Communications Inc., Architel Systems Corporation and Northern Telecom Canada Limited (collectively, the "**New Applicants**") sought and were granted an Order (New Applicants) of the CCAA Court (the "**New Applicants Order**"). Pursuant to the New Applicants Order, each of the New Applicants was deemed to be an "Applicant" (as defined in the Initial Order) in the CCAA Proceedings, entitled to all of the rights, benefits and protections granted by, and otherwise subject to, among other Orders of the CCAA Court entered in the CCAA Proceedings, the Initial Order as if it were an Applicant thereunder. The New Applicants Order also procedurally consolidated the CCAA Proceedings of the New Applicants with the CCAA Proceedings.

**U.S. Proceedings**

Nortel Networks Inc. ("**NNI**") and certain of its U.S. subsidiaries and affiliates (the "**Initial Chapter 11 Debtors**") filed voluntary petitions under Chapter 11 of the U.S. Bankruptcy Code (the "**Code**") in the United States Bankruptcy Court for the District of Delaware (the "**U.S. Bankruptcy Court**") on January 14, 2009 (the "**Chapter 11 Proceedings**"). As required by U.S. law, an official committee of unsecured creditors (the "**UCC**") was established on January 26, 2009.

Subsequently, Nortel Networks (CALA) Inc. ("**NN CALA**") filed a voluntary petition under Chapter 11 of the Code in the U.S. Bankruptcy Court on July 14, 2009.

Nortel Networks India International Inc. filed a voluntary petition under Chapter 11 of the Code in the U.S. Bankruptcy Court on July 26, 2016 ("**NNIII**" and together with NN CALA and the Initial Chapter 11 Debtors, the "**U.S. Debtors**").

**EMEA Proceedings**

On January 14, 2009, Nortel Networks UK Limited ("**NNUK**") and certain of its affiliates located in EMEA (collectively, the "**EMEA Debtors**" and with the Canadian Debtors and the

U.S. Debtors, the "**Estates**" and each an "**Estate**") were granted administration orders (the "**U.K. Administration Orders**") by the High Court of Justice of England and Wales (the "**EMEA Proceedings**"). The U.K. Administration Orders appointed Alan Bloom, Stephen Harris, Alan Hudson and Chris Hill of Ernst & Young LLP as administrators of the various EMEA Debtors, except for Nortel Networks (Ireland) Limited, to which David Hughes (Ernst & Young LLP Ireland) and Alan Bloom were appointed (collectively, the "**Joint Administrators**").

Subsequent to the Filing Date, Nortel Networks S.A. ("**NNSA**") commenced secondary insolvency proceedings ("**French Secondary Proceeding**") within the meaning of Article 27 of the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings in the Republic of France pursuant to which a liquidator and an administrator were appointed by the Versailles Commercial Court (the "**French Court**"). Pursuant to the French Secondary Proceeding, Maitre Cosme Rogeau was appointed as liquidator in the French Secondary Proceeding. Stephen Jonathan Taylor of Isonomy Limited was subsequently appointed as conflicts administrator of NNSA (the "**NNSA Conflicts Administrator**").

Subsequent to the Filing Date, various other Nortel Group entities have filed for bankruptcy protection or commenced liquidation in their local jurisdictions.

**Initial Restructuring Efforts**

Before and immediately after the Filing Date, the Estates considered a restructuring pursuant to which Nortel's LOBs except the CDMA (2G) wireless business and its next generation (4G) LTE wireless technology would be sold. Under this option, a smaller Nortel would emerge centered on the legacy CDMA business and the potential LTE business.

However, by June 2009, the Estates, in consultation with their advisors and key stakeholders, determined that the best means for the realization of value was the sale of all the LOBs including CDMA. On June 19, 2009, Nortel issued a press release announcing, among other things, that it had entered into a stalking horse agreement for the sale of its CDMA business and certain LTE assets and that it also intended to pursue sales of its other LOBs.

**The Line of Business Sales**

Sales of LOBs occurred from mid-2009 through late 2010, with the last LOB transaction, MSS, closing in March 2011.  With limited exceptions, the LOB sale processes generally utilized a stalking-horse auction process that ultimately generated sale proceeds in excess of $3.28 billion. The transactions were going concern sales and resulted in more than 10,600 of Nortel's global employees being transferred to the various purchasers and the preservation of most Nortel supplier and customer relationships. Nortel entered into and closed nine LOB transactions, generating gross proceeds of approximately $3.28 billion ($3.09 billion after purchase price adjustments).

**The Residual IP**

Following the completion of the LOB sales, approximately 7,000 patents and patent applications remained with Nortel that had not been sold in the LOB sales.

Prior to the completion of the LOB sales, it was anticipated that there would be a retained patent portfolio and efforts commenced in early 2010 to consider the means to maximize the value of

this portfolio. An IP leadership team (consisting of representatives of each of the Estates) was formed to consider the issue.

After significant negotiation with two prospective purchasers, on April 4, 2011, NNC, NNL, NNI and NNUK (amongst other Nortel entities) entered into a stalking-horse asset sale agreement with Ranger Inc., a wholly owned subsidiary of Google Inc., to sell the Residual IP (which included the approximately 7,000 remaining patents and patent applications) for $900 million. Following an auction held at the end of June 2011, the Residual IP was ultimately sold to a consortium of technology companies for $4.5 billion.

**Lockbox Funds**

Gross proceeds of approximately $7.8 billion resulted from the LOB sales and the Residual IP sale.  As proceeds were received from the sales, cash was placed into various escrow accounts (the "**Escrow Accounts**") pursuant to the terms of the IFSA and associated escrow agreements (discussed in further detail below - See "*The IFSA, CFSA, NNI Claim and other Inter-Estate Matters*").

The current cash balance in the Escrow Accounts is approximately $7.3 billion (the "**Lockbox Funds**") after taking into consideration negative purchase price and working capital adjustments of approximately $186 million and various prior Court approved distributions out of the Escrow Accounts, including approximately $45 million in respect of the Fourth Estate Settlement, $73 million on account of certain fees and expenses relating to the sales, and $53 million payable to NNI in respect of cash on hand of certain wholly owned subsidiaries sold in the LOB sales.

**The "Canada Only" Sales**

In addition to the various LOB sales, from May 2009 onwards the Monitor oversaw Court-approved sales processes for various assets owned by one of more of the Canadian Debtors (the "**Canada Only Sales**"). These Canada Only Sales processes generated gross proceeds of approximately CA $615 million (plus a further amount in respect of 12 IP Addresses (as defined in the Settlement and Support Agreement) transactions, the financial terms of which are sealed pursuant to orders of the CCAA Court).

Proceeds generated by the Canada Only Sales (other than to the extent sealed by the CCAA Court in the case of the IP Address Sales) have been reported by the Monitor in the Canadian Debtors' cash-flow reports from time to time throughout the course of the CCAA Proceedings and, generally, have either been classified as Unavailable Cash as a result of the terms of the applicable approval and vesting order, or used to fund the ongoing costs of the administration of the CCAA Proceedings.

**The IFSA, CFSA, NNI Claim and other Inter-Estate Matters**

Two issues central to the CCAA Proceedings during the first six months included: (i) the aforementioned attempts to develop and implement a global restructuring plan; and (ii) a means of addressing the significant cash burn being experienced by NNL as result of it continuing to incur significant corporate overhead and research and development costs in the course of the restructuring proceedings.

On June 9, 2009, NNL, NNI, NNUK and the Joint Administrators (among other parties) entered into the Interim Funding and Settlement Agreement (the "**IFSA**") that assisted in addressing these issues. Pursuant to the IFSA, NNI agreed to pay $157 million to the Canadian Debtors which, together with a $30 million payment made in January 2009, was in satisfaction of any claims of NNL for corporate overhead and research and development costs incurred by NNL for the benefit of certain of the U.S. Debtors for the period from the Filing Date to September 30, 2009. In addition, NNL agreed to pay NNUK $20 million on a deferred basis (secured by a Court-ordered charge) and the EMEA Debtors, on the one hand, and the Canadian Debtors and U.S. Debtors, on the other, agreed to the settlement of any transfer pricing obligations between them for the period from the Filing Date to December 31, 2009. Pursuant to the IFSA, the Estates also reached certain agreements that facilitated the LOB transactions that would be entered into in the coming months, including an agreement that the execution of sale documentation or closing of a transaction of material assets would not be conditioned upon reaching agreement on either allocation of the sale proceeds of such sale or a binding procedure for the allocation of such sale proceeds and that all sale proceeds would be deposited in the Escrow Accounts pending resolution of allocation.

The cash burn of NNL and the Canadian Debtors continued throughout 2009 necessitating further funding discussions for the period post-September 2009. On December 23, 2009, the Canadian Debtors, the Monitor and the U.S. Debtors entered into the Final Canadian Funding and Settlement Agreement (the "**CFSA**").  The CFSA was entered into to address certain funding needs of the Canadian Estate as well as to settle various outstanding claim matters between NNI and NNL.  Pursuant to the CFSA, among other things, NNI agreed to pay to NNL $190 million in satisfaction of certain obligations of NNI to NNL for the period from October 1, 2009 to the end of the CCAA Proceedings, subject to certain "true-up" obligations relating to the allocation of the Lockbox Funds.  Additionally, NNL agreed to grant to NNI a $2.0627 billion Claim (the "**NNI Claim**") in connection with historical transfer pricing overpayments by NNI to NNL as well as amounts owing under an existing secured revolving loan between NNI and NNL. $2.0 billion of the Claim was agreed to be unsecured, with the balance (relating to the revolving loan) being a secured priority claim.  The NNI Claim was approved by the CCAA Court on January 21, 2010 as part of the approval of the CFSA.

In addition to the foregoing, over the course of the CCAA Proceedings, the Canadian Debtors have also entered into various side letters and other agreements with the U.S. Debtors, often to provide interim financial arrangements regarding costs and other matters but subject to re-allocation upon resolution of the Allocation Dispute.

**The Rest of the World**

As set out above, Nortel operated throughout the world including in jurisdictions where there were no insolvency proceedings commenced.  Given the integration of Nortel's businesses, the assistance and cooperation of these entities were required in many cases in order to, among other things, facilitate the sales described above and wind down any remaining operations.  However, with the insolvency proceedings in Canada, the U.S. and EMEA, many of these entities and their directors and officers expressed ongoing concerns as to the funding and solvency of these entities as well as other liabilities for which the directors and officers might become personally liable. Many of these directors and officers resigned and, pursuant to Applicable Laws in the applicable jurisdictions, had to be replaced with new directors.

In order to find new individuals willing to serve on these boards of directors, NNL and NNI created a trust, generally referred to as the "**Cascade Trust**", pursuant to which NNL and NNI would settle a $35 million trust to be claimed against, subject to certain terms and conditions, by the directors of these non-filed entities.  Pursuant to the terms of a side agreement entered into between NNL and NNI relating to the Cascade Trust, each of NNL and NNI agreed to initially contribute $17.5 million to the Cascade Trust, provided, however, that such contribution would be reallocated on the overall weighted average based on each entities ultimate entitlement to the Sale Proceeds.  The Cascade Trust was approved by the CCAA Court on March 31, 2010.  As discussed below, the resolution of the interests in the Cascade Trust as between NNL and NNI is included in the proposed settlement terms under the Settlement and Support Agreement.

See also "*The Allocation Dispute and the Allocation and Claims Litigation – Fourth Estate Settlement Agreement*".

**Claims Orders**

Throughout the course of the CCAA Proceedings, the CCAA Court has issued and entered the following Orders pertaining to the calling for Claims against the Canadian Debtors and their Directors and Officers:

| Order | Claims Filed |
|---|---|
| 1. Claims Procedure Order dated July 30, 2009, as amended and restated | Pursuant to the Claims Procedure Order, the Canadian Debtors called for most third party, non-employee related Claims as of the Filing Date against the Canadian Debtors and their current and former directors and officers.<br><br>For the status on the resolution of these claims, see "*Status of Claims Process*". |
| 2. Compensation Claims Procedure Order dated October 6, 2011 and the Compensation Claims Methodology Order dated October 6, 2011 (the "**Compensation Claims Orders**") | Pursuant to the Compensation Claims Orders, former employees of the Canadian Debtors were given "Form C" letters notifying them of their proposed Compensation Claim based on the calculation methodology approved pursuant to the Compensation Claims Orders. Compensation Creditors could dispute the underlying information pursuant to the terms of the Compensation Claims Orders, and additional claims could also be filed.<br><br>For the status on the resolution of these claims, see "*Status of Claims Process*". |

| 3. | EMEA Claims Procedure Order dated January 14, 2011 | Claims filed pursuant to the EMEA Claims Procedure Order are described below in the subsection entitled "*EMEA Claims Against the Canadian Debtors*".<br><br>The EMEA Claims were resolved pursuant to the EMEA Claims Settlement Agreement, see "*The Allocation Dispute and the Allocation and Claims Litigation – Allocation and Claims Litigation - EMEA Claims Settlement*". |
| 4. | Intercompany Claims Procedure Order dated July 27, 2012 | Pursuant to the Intercompany Claims process, the Monitor sent balance statements to certain of the Canadian Debtors' affiliates (whose claims had not otherwise been settled pursuant to the Fourth Estate Settlement Agreement or otherwise) ("**Non-Fourth Estate Entities**") indicating where there were balances owing or owed based on the Canadian Debtors books and records.  Any Non-Fourth Estate Entity could either accept the statement, dispute the statement or file a new Proof of Claim.  This process did not apply to the U.S. Debtors, EMEA Debtors or the APAC/CALA Affiliates who were party to the Fourth Estate Settlement Agreement described below. |
| 5. | An Order calling for Claims against the New Applicants dated September 29, 2016 (the "**September 29 Order**") | The Claims Bar Date was October 31, 2016.  The Monitor received placeholder claims filed by Canada Revenue Agency and no other proofs of claim were filed. |

In addition to the above Orders, the Canadian Debtors intend to request an Order from the CCAA Court calling for certain "Post-Filing Claims" pursuant to an Order of the CCAA Court.

**Certain Employee Matters: The Health & Welfare Trust, the Employee Settlement and Hardship Process**

The current and former employees of the Canadian Debtors including pensioners, employees on disability and terminated employees, have been actively represented by Court Appointed Representative Counsel in the CCAA Proceedings who have the ability to act on their behalf and

bind them in matters relating to the CCAA Proceedings, including in the settling of their Compensation Claims.

Throughout the course of the CCAA Proceedings, the Canadian Debtors, Monitor and Court Appointed Representative Counsel have worked to resolve many issues faced by the former and current employee group including as it related to the HWT, rights to termination and severance amounts and transitioning of benefits.  In particular:

- The Canadian Debtors, with the approval and support of the Monitor, established an employee hardship process (the "**Hardship Process**") pursuant to which former employees who were experiencing financial hardship resulting from loss of income and/or medical benefit coverage could receive certain cash distributions. The Hardship Process has allowed eligible claimants to receive a timely interim distribution in advance of a general distribution to creditors. Total approved funding for the Hardship Process to date is currently CA$2.3 million.

- In February 2010, the Canadian Debtors entered into a settlement agreement with, among others, Court Appointed Representative Counsel and Unifor (then the CAW) (the "**Employee Settlement Agreement**").  The Employee Settlement Agreement provided certainty to the Canadian Debtors and their stakeholders by establishing the date on which the Canadian Debtors would terminate ongoing pension funding and the payment of benefits to pensioners, long term disability beneficiaries and survivors, facilitating the distribution of the HWT, providing advance notice of such termination and preserving the corpus of the HWT to the extent possible pending a CCAA Court approved distribution. Additionally, the Employee Settlement Agreement provided for termination payments of CA$3,000 made to eligible former employees ("**Termination Payments**").

Pursuant to an Order of the CCAA Court on November 9, 2010, the methodology for the allocation of the corpus of the HWT was determined.  Since that time, various distributions have been made out of the HWT.  The Plan will not impact any further distributions from the HWT. Distributions made to Compensation Creditors out of the HWT result in the reduction of such Compensation Creditor's claim.

**Certain Significant Claims**

For information regarding the NNI Claim, see "*CCAA Proceedings and Other Matters – The IFSA, CFSA, NNI Claim and other Inter-Estate Matters*".

*Crossover and NNCC Bond Claims*

Pursuant to the Claims Procedure Order, the Indenture Trustee in respect of each of the Crossover Bonds and the NNCC Bonds filed proofs of claim which included liquidated claims for the principal amounts plus accrued interest owing under the Crossover Bonds and NNCC Bonds plus an unliquidated amount in respect of additional fees, expenses and post-filing interest.

See "*Crossover Bondholder Claims Litigation*" and "*Settlement of the Allocation Dispute-Settlement and Support Agreement*" for a summary of the resolution of the Crossover and NNCC Bondholder Claims.

*1988 Bonds*

Pursuant to the Claims Procedure Order, the Indenture Trustee in respect of the 1988 Bonds filed a proof of claim which included liquidated claims for the principal amounts plus accrued interest owing under the 1988 Bonds, plus an unliquidated amount in respect of additional fees, expenses and post-petition interest. The 1988 Bondholder Claim amount was not settled under the Settlement and Support Agreement. However, pursuant to the Plan, no post-filing interest will be paid in respect of the 1988 Bondholder Claim.

*UKPI Claims*

On or about September 30, 2009, the Board of Trustees of NNUK's U.K. Pension Plan (the "**Trustee**") and the Pension Protection Fund (the "**PPF**" and with the Trustee, the "**UKPI**") filed proofs of claim against each of the Canadian Debtors in accordance with the Claims Procedure Order (the "**Original UKPI Proofs of Claim**"). Although a total liquidated claim amount was not specified, the Original UKPI Proofs of Claim filed by the Trustee against NNL claimed:

(a)    £495.25 million in respect of amounts alleged owing pursuant to a guarantee made by NNL in favour of the Trustee dated November 21, 2006 (the "**Funding Guarantee**");

(b)    $150 million in respect of amounts alleged owing pursuant to a guarantee made by NNL in favour of the Trustee dated December 21, 2007 (the "**Insolvency Guarantee**"); and

(c)    an unspecified placeholder claim in respect of liability owing pursuant to the "financial support direction" ("**FSD**") regime under the U.K. Pensions Act 2004, as amended.

On November 29, 2010, UKPI filed amended proofs of claim against NNC and NNL (collectively, the "**Amended UKPI Proofs of Claim**" and with the Original UKPI Proofs of Claim, the "**UKPI Claims**"). The Amended UKPI Proofs of Claim did not specify a total liquidated claim amount, but did assert an FSD related claim of up to £2.1 billion against each of NNC and NNL. They were filed in addition to and did not replace the Original UKPI Claim against NNL in respect of the Funding Guarantee and the Insolvency Guarantee. As alternatives to the FSD claim, the Amended UKPI Proofs of Claim also asserted an oppression claim under Canadian corporate law and a claim for a breach of an "implied obligation of good faith" under U.K. pension law. See "*Settlement of the Allocation Dispute-Settlement and Support Agreement*" below for summary of resolution of the UKPI Claims.

*EMEA Claims Against the Canadian Debtors*

On March 18, 2011, more than 80 proofs of claim were filed against the Canadian Debtors and their current or former Directors and Officers for and on behalf of the EMEA Debtors by the Joint Administrators and the French Liquidator (the "**EMEA Claims**") pursuant to the EMEA Claims Procedure Order. Although not capable of precise quantification, the total amount of quantified EMEA Claims filed against NNL alone exceeded CA$9.8 billion.

The EMEA Claims included claims and allegations relating to: (i) inter-company trading debts; (ii) the implementation and operation of Nortel's transfer pricing regime; (iii) intercompany

loans; (iv) an internal corporate reorganization known as "Project Swift"; (v) mismanagement; (vi) breach of fiduciary duty; (vii) the funding of the NNUK pension fund; (viii) customer revenue recognition; and (ix) the allocation of pre-Filing Date asset sale proceeds. The EMEA Claims were advanced under both Canadian and foreign laws (i.e. English, French, Irish and laws of 11 other European countries) and included allegations of, among other things, contractual breach, breach of duties, bankruptcy, insolvency and corporate law based claims and various tort based claims. They also included both unsecured claims and trust and/or proprietary claims to the Canadian Debtors' assets. Certain of these claims were also asserted against the Directors and Officers.

See "*The Allocation Dispute and the Allocation and Claims Litigation – Allocation and Claims Litigation - EMEA Claims Settlement*" and "*Settlement of the Allocation Dispute-Settlement and Support Agreement*" below for summary of resolution of the EMEA Claims.

### Compensation Claims

The total value of Compensation Claims has previously been estimated by the Monitor in October 2013 to be approximately CA $1.084 billion, which amount was exclusive of the Compensation Claims of active employees but reflected a reduction for Termination Payments made.

### THE ALLOCATION DISPUTE AND THE ALLOCATION AND CLAIMS LITIGATION

### Allocation Protocol Negotiation Efforts and Phillips Mediation

Pursuant to the IFSA, the Estates were obligated to negotiate in good faith and attempt to reach agreement on a timely basis on a protocol for resolving disputes concerning the allocation of sale proceeds from sale transactions governed by the IFSA, which protocol was to provide binding procedures for the allocation of such sale proceeds where agreement had not been reached. From approximately mid-2009 into 2010, the Monitor, U.S. Debtors, the Joint Administrators and certain stakeholders, including the Bondholder Group, UCC and CCC engaged in negotiations regarding the terms of such a protocol. During the course of these negotiations it became apparent that the parties had differing views as to the proper scope of such a protocol and the parties agreed to cease negotiations and instead focus on a process to facilitate comprehensive settlement discussions of all inter-estate matters.

The Estates and certain of their stakeholders ultimately agreed this process would be aided by the appointment of Layn R. Phillips, a former U.S. federal district court judge and commercial arbitrator and mediator, to act as mediator (the "**Phillips Mediation**"). The first mediation sessions with Mr. Phillips took place over four days in November 2010 and continued over the course of a further four days in April 2011 before concluding unsuccessfully.

### Allocation Protocol Motions and Winkler Mediation

Following the failure of negotiations and the Phillips Mediation, the U.S. Debtors and Canadian Debtors (supported by the Monitor) brought parallel motions to the CCAA Court and the U.S. Bankruptcy Court in June 2011 seeking approval of an allocation protocol ("**Allocation Protocol**") pursuant to which the CCAA Court and the U.S. Bankruptcy Court would determine the allocation of the Sale Proceeds amongst the Estates and certain other Nortel parties (the

"**Allocation Dispute**") as well as the significant claims advanced against the Canadian Debtors and the U.S. Debtors by the EMEA Debtors.

Following the initial Allocation Protocol hearings on June 7, 2011, the CCAA Court and the U.S. Bankruptcy Court ordered the parties to mediate the disputes raised in the Allocation Protocol hearings before former Chief Justice of Ontario Warren Winkler (the "**Winkler Mediation**"). Mediation sessions were held throughout the second half of 2012 and in January 2013. On January 24, 2013 Chief Justice Winkler declared that further efforts at mediation were no longer worthwhile.

## Fourth Estate Settlement Agreement

In addition to the three Estates, various non-debtor Nortel affiliates in the Asia Pacific/Asia Central ("**APAC**") region and the Central America/Latin America ("**CALA**") region (the "**Fourth Estate Entities**") participated in the LOB transactions as sellers and were made party to certain of the distribution escrow agreements that govern the holding and distribution of the LOB sale proceeds. The consent of these parties was required to effect a consensual release of sale proceeds from a particular escrow account. As time passed without a resolution of the Allocation Dispute, this became an increasingly pressing issue for two reasons. First, in some cases, not having received their entitlement was preventing certain Fourth Estate Entities from commencing liquidation or wind-up proceedings and distributing any equity to their parent (being, in many cases, NNL). Second, the Fourth Estate Entities' potential entitlements to the global sale proceeds made the ongoing Allocation Dispute settlement discussions and mediation more complicated insofar as it involved a greater number of parties, and also made the mechanics of consensually distributing sale proceeds more complicated.

To address these issues, the Estates and the Fourth Estate Entities (among others) entered into the Allocation Settlement Agreement (APAC/CALA) dated June 19, 2012 (the "**Fourth Estate Settlement Agreement**"). Pursuant to this agreement, the Fourth Estate Entities agreed to settle their allocation entitlement for payments totalling $44.9 million. In addition, under the Fourth Estate Settlement Agreement, the parties agreed to fix both the pre-filing and post-filing balances owing amongst the Fourth Estate Entities and between the Fourth Estate Entities and the other Nortel parties, including fixing significant claims against NNL by Nortel Networks (China) Limited (approximately $104 million) and Nortel Networks Singapore Pte Ltd. (approximately $91 million). Further, in some cases certain Fourth Estate Entities agreed to direct some or all of their allocation entitlement to various inter-company creditors. The Canadian Debtors were the recipients of approximately $11.6 million under the Fourth Estate Settlement Agreement as a result of such payments.

## Allocation and Claims Litigation

On March 7, 2013, the CCAA Court and the U.S. Bankruptcy Court heard further argument regarding the appropriate forum to resolve the Allocation Dispute. Ultimately, the CCAA Court determined that it and the U.S. Bankruptcy Court were the appropriate forums to determine the Allocation Dispute (rejecting the positions of the EMEA Debtors and the UKPI that the Allocation Dispute should be arbitrated) and ordered a trial start date of January 6, 2014, to hear the Allocation Dispute.

Given the overlap of evidence and certain issues between the Allocation Dispute, on the one hand, and the EMEA Claims and UKPI Claims, on the other, as well as the significance of each

of these issues to the CCAA Proceedings and the other Nortel insolvency proceedings, the Allocation Protocol proposed by the Canadian Debtors and the Monitor (and ultimately approved by the Courts) contemplated a joint discovery and litigation process to resolve the Allocation Dispute, EMEA Claims and UKPI Claims (the "**Allocation and Claims Litigation**").

Since the EMEA Debtors and the UKPI had also asserted claims against the U.S. Debtors substantially similar to the EMEA Claims and the UKPI Claims asserted against the Canadian Debtors, the Allocation Protocol contemplated a joint trial before both the CCAA Court and the U.S. Bankruptcy Court for all aspects of the Allocation and Claims Litigation. The claims of the EMEA Debtors and the UKPI as against the U.S. Debtors ultimately settled in December 2013, and therefore only the Allocation Dispute was conducted by way of a joint trial.

### Trial and Court Decisions Regarding the Allocation Dispute

The opening and evidentiary phase of the Allocation Dispute joint trial began on May 12, 2014 and ended on June 24, 2014. Closing arguments were heard on September 22 through 24, 2014.

On May 12, 2015, the CCAA Court issued its Reasons for Judgment and the U.S. Bankruptcy Court issued its Allocation Trial Opinion (collectively, the "**Allocation Decisions**" and each an "**Allocation Decision**") in respect of the Allocation Dispute. The Allocation Decisions provide for a modified pro rata allocation of the Lockbox Funds amongst the Canadian Debtors, the U.S. Debtors and the EMEA Debtors which pro rata allocation was to be based on the estimated claims into each Estate as determined by the Courts.

### Reconsideration Motions and Appeals

At a June 25, 2015 joint hearing, the CCAA Court and the U.S. Bankruptcy Court heard motions for clarification, reconsideration or amendment of the Allocation Decisions brought by the U.S. Debtors, the Bondholder Group and Law Debenture Trust Company of New York. On July 6, 2015, the CCAA Court issued a Ruling on Reconsideration/Clarification Motion and the U.S. Bankruptcy Court issued a Memorandum Order on Motions for Reconsideration that denied most of the relief requested.

On July 16, 2015, the U.S. Debtors, UCC, Bondholder Group, Nortel U.S. Trade Claims Consortium (as defined in the Settlement and Support Agreement), The Bank of New York Mellon and the NNSA Conflicts Administrator (the "**Moving Parties**") filed motions to the Ontario Court of Appeal for leave to appeal the CCAA Court's Allocation Decision. On May 3, 2016, the Ontario Court of Appeal denied the motions seeking leave to appeal the CCAA Court's Allocation Decision. The Moving Parties have sought leave to appeal the Ontario Court of Appeal's decision to the Supreme Court of Canada. In light of the continuing discussions regarding resolution of the Allocation Dispute, pursuant to a consent order of the Supreme Court of Canada dated August 17, 2016, the time period for serving and filing any responses to the Moving Parties' leave applications to the Supreme Court of Canada was extended to November 30, 2016, or such earlier date as may be compelled by the service by a Moving Party of a notice requiring responses within 30 days.

Appeals of the U.S. Bankruptcy Court's Allocation Decision were also filed by the Moving Parties as well as the Pension Benefit Guaranty Corporation. The Canadian Debtors and Monitor, Joint Administrators and CCC have also filed contingent cross-appeals of the U.S. Bankruptcy Court's Allocation Decision solely to preserve arguments on appeal in the event the U.S.

Bankruptcy Court's Allocation Decision is altered on appeal. Contemporaneously with filing their notices of appeal, the Canadian Debtors and the Monitor, joined by the CCC, filed a motion for certification of the U.S. Bankruptcy Court's Allocation Decision for direct appeal to the United States Court of Appeals for the Third Circuit (the "**Third Circuit**") and a motion for leave to appeal on the basis that the U.S. Bankruptcy Court's Allocation Decision is interlocutory but the appeal should be permitted because it would advance the final resolution of the Allocation Dispute and conclusion of the CCAA Proceedings and the Chapter 11 Proceedings. On July 30, 2015, the U.S. Bankruptcy Court entered an order denying certification of the U.S. Bankruptcy Court's Allocation Decision for direct appeal to the Third Circuit.

Oral argument on the appeals of the U.S. Bankruptcy Court's Allocation Decision were heard by the United States District Court for the District of Delaware (the "**District Court**") on April 5, 2016. Following the Ontario Court of Appeal's denial of leave to appeal the CCAA Court's Allocation Decision, in May 2016, the District Court, on its own motion, certified the U.S. allocation appeals, including the contingent cross-appeals, directly to the Third Circuit. In light of the continuing discussions regarding resolution of the Allocation Dispute and related matters, at a status hearing with judges of the Third Circuit held September 7, 2016, the parties to the appeal sought an extension of time to report back to the Third Circuit on various matters relating to briefing and a timeline for the appeal. All parties' rights to seek or oppose expediting the appeal in the Third Circuit were preserved through that date.  The parties have since notified the Third Circuit as to the execution of the Settlement and Support Agreement and requested that the appeal and all timelines thereunder be stayed pending the effectiveness of the Settlement and Support Agreement and the Canadian and U.S. Plans.

### *The Farnan Mediation*

On July 13, 2015, pursuant to its standing order directing all bankruptcy appeals to mediation, the District Court requested that the parties submit a joint statement regarding their positions on mediation and defer briefing of the appeal until resolution of the mediation. Consistent with the U.S. Federal Rules of Bankruptcy Procedure, the parties to the appeal filed statements of issues on appeal and designated items for the record on appeal.

On July 27, 2015, the Monitor and Canadian Debtors and the other parties to the appeal submitted a joint statement expressing their respective views on mediation. On August 25, 2015, the Magistrate Judge assigned to determine the appropriateness of mediation pursuant to the District Court's standing order scheduled a status conference for September 2, 2015, for the purpose of discussing details of the mediation, including selection of a mediator, length of mediation and adoption of protocols to govern the conduct of the mediation. The parties to the appeal ultimately submitted a joint mediation proposal to the Magistrate Judge and a mediation began in late October 2015 before retired Chief Judge Joseph J. Farnan (the "**Farnan Mediation**").

### *EMEA Claims Settlement*

The EMEA Claims in Canada were settled just prior to the commencement of the EMEA Claims and UKPI Claims trial for a maximum admitted general unsecured claim against NNL of $125 million.  Pursuant to the Plan, certain of the EMEA Debtors have aggregate Proven Affected Unsecured Claims of $100 million and a $25 million Contingent Additional NNUK Claim which Claim may become a Proven Affected Unsecured Claim if certain conditions are met.

The CCAA Court approved the settlement of the EMEA Claims pursuant to an Order dated July 16, 2010.  The settlement also resulted in the withdrawal and/or discontinuation of proceedings pending against the Canadian Debtors and certain former Nortel Directors and Officers in the U.K., France and Ireland.

### Trial Decision Regarding the UKPI Claims

The opening and evidentiary phase of the UKPI Claims trial took place between July 7, 2014, and July 22, 2014. Closing arguments were heard September 29 through October 1, 2014.

By decision dated December 9, 2014, the CCAA Court upheld the Monitor's disallowance of the billions of dollars of claims asserted by the UKPI against NNL and the Other Canadian Debtors. The CCAA Court allowed a single claim against NNL pursuant to the Funding Guarantee in the amount of £339.75 million, which amount was approximately £152 million less than the amount sought by the UKPI on account of such claim.

The UKPI sought and was granted leave to appeal the UKPI Claims trial decision with respect to the disallowance of the Insolvency Guarantee. The Monitor and the Canadian Debtors filed a cross-appeal with respect to the allowance of the Funding Guarantee claim and a cross-cross appeal was filed by the UKPI with respect to the quantum under the Funding Guarantee claim.

The various appeals and motions seeking leave to appeal were heard by the Court of Appeal for Ontario on February 17 and 18, 2016.  The UKPI's motion seeking leave to cross-cross appeal on the quantum of the Funding Guarantee was denied from the bench.  Decisions on the UKPI's appeal in respect of the Insolvency Guarantee and the Canadian Debtors and Monitor's cross-appeal  are under reserve. In light of the Settlement and Support Agreement (which resolves the UKPI Claim), the Monitor and the UKPI have requested that the Court of Appeal for Ontario reserve its decision until further notice from the parties.

### Crossover Bondholder Claims Litigation

During the course of the Allocation Dispute, the CCAA Court and the U.S. Bankruptcy Court directed a joint hearing to determine whether the Crossover Bondholders and the NNCC Bondholders were entitled to claim amounts under the respective trust indentures beyond principal and pre-filing interest amounts.  At the time, the Monitor estimated the Post-Filing Date interest potentially claimable by the Crossover Bondholders and NNCC Bondholders to be approximately $1.6 billion (if claimed at the contractual rate). The Monitor opposed the ability of the Crossover Bondholders and the NNCC Bondholders to claim amounts in excess of $4.092 billion (being principal plus pre-filing accrued interest), including any interest accruing after the Filing Date.

On August 19, 2014, the CCAA Court issued an Endorsement holding and declaring that the Crossover Bondholders and NNCC Bondholders are not legally entitled to claim or receive any amounts under the trust indentures above and beyond the outstanding principal debt and pre-filing interest (namely, above and beyond $4.092 billion). On September 9, 2014, the Bondholder Group filed a motion seeking leave to appeal the CCAA Court's Order in respect of the claims of the Crossover Bondholders. On November 27, 2014, the Ontario Court of Appeal denied leave to appeal on two of three issues on which the Bondholder Group sought leave to appeal and granted leave to appeal on one issue, namely whether the Crossover Bondholders were legally entitled to post-filing interest and other amounts owing under the Trust Indentures

for the post-filing period. The Bondholder Group's appeal was heard on April 29, 2015. On October 13, 2015, the Ontario Court of Appeal dismissed the Bondholder Group's appeal. The Bondholder Group subsequently sought leave to appeal the Ontario Court of Appeal's decision to the Supreme Court of Canada. On May 5, 2016, the Supreme Court of Canada dismissed the Bondholder Group's application for leave to appeal.

In the U.S., the hearing was adjourned after the U.S. Debtors announced they had entered into a settlement with certain bondholders resolving post-filing interest.  The Monitor and Canadian Debtors unsuccessfully objected to the settlement and subsequently pursued an appeal of the decision to approve the settlement. The parties have notified the U.S. Court as to the execution of the Settlement and Support Agreement and requested that the appeal and all timelines thereunder be stayed pending the effectiveness of the Settlement and Support Agreement and the Canadian and U.S. Plans.

**Settlement of the Allocation Dispute – Settlement and Support Agreement**

*Settlement Discussions*

Following the cessation of the formal Farnan Mediation, the Canadian Debtors, U.S. Debtors, EMEA Debtors, Monitor and certain other key stakeholders continued to meet and discuss resolution of the Allocation Dispute and related matters, including with the assistance of Judge Farnan in some cases, which has led to the execution of the Settlement and Support Agreement.

*Settlement and Support Agreement*

On October 12, 2016 the Settlement and Plans Support Agreement ("**Settlement and Support Agreement**") was signed by the Canadian Debtors, Monitor, U.S. Debtors, EMEA Debtors, EMEA Non-Filed Entities, Joint Administrators, NNSA, NNSA Conflicts Administrator, French Liquidator, Bondholder Group, the members of the CCC, UCC, UKPI, Joint Liquidators and NNCC Bondholder Signatories (collectively, the "**Settlement Parties**"). A copy of the Settlement and Support Agreement is attached as Exhibit "A" to the Plan and also available on the Monitor's Website.

The Settlement and Support Agreement, when implemented, will fully and finally settle the Allocation Dispute and certain key potential claims among the Settlement Parties.  By resolving all of the outstanding issues between the Estates as well as the claims of certain key creditors, it is believed that the Estates will be able to proceed with the final stages of their respective insolvency proceedings on a timely basis instead of expending continued efforts on lengthy and costly appeals in the Allocation Dispute, UKPI Claims litigation and Crossover Bondholder and NNCC Bondholder post-filing interest litigation, among other disputes and potential disputes.

In summary, the Settlement and Support Agreement would resolve the Allocation Dispute by allocating the escrowed sale proceeds among the three Estates as follows:

      (a)      payment of the Iceberg Amendment Fee in the amount of $2.8 million to NNI and $2.2 million to NNUK, and, in settlement of the M&A Cost Reimbursement, payments in the amount of $20 million to the U.S. Debtors and $35 million to the Canadian Debtors; then,

(b)     to the Canadian Debtors: 57.1065% (being $4,142,665,131 as at July 31, 2016) (the "**Canadian Allocation**");

(c)     to the U.S. Debtors: 24.350% (being $1,766,417,002 as at July 31, 2016);

(d)     to the EMEA Debtors (excluding NNUK and NNSA): 1.4859% (being $107,788,879 as at July 31, 2016);

(e)     to NNUK: 14.0249% (being $1,017,408,257 as at July 31, 2016); and

(f)     to NNSA: $220,000,000.[2]

Other key aspects of the Settlement and Support Agreement as relates to the Canadian Debtors include as follows:

• it is contemplated the Canadian Debtors shall be substantively consolidated into one Canadian Estate;

• the Canadian Estate shall make priority payments to NNI in the amounts of $62.7 million (in payment of the Remaining Revolver Claim under the CFSA) and $77.5 million (resolving obligations under the Side Letters and the T&T Claim (each as defined in the Settlement and Support Agreement), and upon receipt by NNI of the $77.5 million payment, NNI shall have a 27% interest in the Cascade Trust and the Canadian Estate shall have a 73% interest in the Cascade Trust;

• the Canadian Estate shall retain the value of its remaining assets, which means, among other things, the release to the Canadian Estate of approximately $237 million of the proceeds from the Canada Only Sales plus further amounts in respect of the sale of the IP Addresses currently held as Unavailable Cash for the benefit of the Canadian Estate;

• the following claims will be allowed as Proven Affected Unsecured Claims against the Canadian Estate:

   o in accordance with the CFSA and as previously approved by the CCAA Court, the Canadian Debtors shall allow an unsecured claim by NNI in the amount of $2.0 billion, which claim is not subject to set-off, off set, deduction, counterclaim, reduction, or challenge as to amount or validity;

   o in accordance with the EMEA Claims Settlement Agreement and as previously approved by the CCAA Court, the Canadian Debtors shall allow an unsecured claim by NNUK in the amount of $97,655,094, which may increase to $122,655,094 under conditions set out in that agreement, and an unsecured claim by Nortel Networks SpA in the amount of $2,344,906;

   o In accordance with the CCAA Court's decision, UKPI shall be allowed a single unsecured claim against the Canadian Estate in the amount of £339.75 million (being $494,879,850 when converted to U.S. dollars in accordance with the Plan) in settlement of any and all of the UKPI Claims;

---

[2] The allocation amounts set forth above are subject to certain potential adjustments as further specified in the Settlement and Support Agreement.

- o   The Canadian Pension Claims shall be for a total of CA$1,889,479,000;[3]

- o   The Crossover Bondholder Claim shall be $3,940,750,260; and

- o   the NNCC Bondholder Claim shall be $150,951,562;

- the U.S. Debtors and the Canadian Debtors shall treat all unsecured claims against them rateably;

- once a holder of a Crossover Claim has received aggregate distributions equal to 100% of its claim, the guarantor Estate shall be entitled to subrogate to any subsequent distributions by the principal Estate in respect of that creditor's claim on a *pari passu* basis with other creditors of the same priority, to the extent of the amount paid by the guarantor Estate, and subject to certain additional restrictions in certain instances;

- no post-petition interest will be included on any creditor claims or paid by any Estate (with certain limited exceptions required by Applicable Law with respect to the EMEA Debtors);

- solely for determining *pari passu* distributions in respect of unsecured claims against the Canadian Estate, all non-U.S. dollar denominated claims against the Canadian Estate will be converted to U.S. Dollars at the prevailing exchange rate reported by Reuters on January 14, 2009;

- distributions on claims against the Canadian Estate predominantly denominated in Canadian dollars will be paid from the Canadian Estate in Canadian dollars, and distributions on all other claims shall be paid in U.S. dollars;

- the Canadian Debtors have elected to convert a portion of the sale proceeds, not to exceed $1.2 billion, into Canadian dollars, in advance of the effective date of the Plan, for the purpose of paying distributions on the predominantly Canadian dollar denominated claims on and after Plan implementation;

- the Canadian Debtors and the U.S. Debtors (other than NNIII) shall both propose Plans implementing the terms of the Settlement and Support Agreement as relates to their respective Estates for approval by vote of affected unsecured creditors and approval of their respective Courts;

- the Settlement Parties shall dismiss all litigation and release all other claims among them, subject to the terms and conditions contained in the Settlement and Support Agreement; and

- the Settlement Parties will not take any action that interferes with the implementation of the Settlement and Support Agreement or the Canadian or U.S. Plans.

Since the execution of the Settlement and Support Agreement, Crossover Bondholders holding Crossover Bonds in the principal amount of approximately $3 billion representing approximately 80% of the principal amount of the Crossover Bonds and NNCC Bondholders holding NNCC

---

[3] Pursuant to the Plan, the Canadian Pension Claims shall be Proven Affected Unsecured Claims in the following amounts: (a) on account of the Managerial Plan: CA$1,368,644,000; and (b) on account of the Negotiated Plan: CA$520,835,000.

Bonds in the principal amount of approximately $135,665,000 representing approximately 90% of the principal amount of the NNCC Bonds have executed and delivered Creditor Joinders indicating their support of the Settlement and Support Agreement.

*Currency Conversion*

As set out above, pursuant to the Settlement and Support Agreement and the Plan, distributions made by the Canadian Debtors on account of Proven Affected Unsecured Claims that are predominantly denominated in Canadian dollars will be paid in Canadian dollars and distributions on all other Proven Affected Unsecured Claims will be paid in U.S. dollars.  In order to facilitate this aspect of the Settlement and Support Agreement and to crystallize certain aspects of the economic resolution set forth therein, the parties agreed to convert up to $1.2 billion of the Sale Proceeds from U.S. dollars to Canadian dollars and deposit such proceeds with a Canadian escrow agent.  The parties also agreed to potentially convert certain Sale Proceeds from U.S. dollars to Sterling and Euros in respect of potential distributions or payments to creditors of the EMEA Debtors, although no such conversions are currently contemplated.

On October 19, 2016, the Monitor sought and obtained an Order (the "**Canadian Currency Conversion Order**") from the CCAA Court that, among other things, authorized the Canadian Debtors and the Monitor to enter into and perform their obligations under a Canadian escrow agreement with a subsidiary of Royal Bank of Canada (the "**Canadian Distribution Agent**") and authorized the conversion of up to $1.2 billion of the Sale Proceeds into Canadian dollars. On October 21, 2016, the U.S. Bankruptcy Court also issued an order (together with the Canadian Currency Conversion Order, the "**Currency Conversion Orders**") approving the entering into of the Canadian escrow agreement and the conversion of up to $1.2 billion of the Sale Proceeds into Canadian dollars.

Pursuant to the Currency Conversion Orders, on October 24, 2016, directions were issued to the U.S. Distribution Agent to transfer approximately $1.06 billion to the Canadian Distribution Agent. The funds have been transferred and converted from U.S. dollars to Canadian dollars at a blended foreign exchange rate of $1.00 = CA$1.337650. The blended foreign exchange rate at which such funds together with any other funds transferred are converted from U.S. dollars to Canadian dollars shall constitute the Applicable F/X Rate for the Plan. In accordance with the terms of the Canadian escrow agreement, funds that have been received and converted were invested in Government of Canada treasury bills.

## DESCRIPTION OF THE PLAN

*A copy of the Plan is available on the Monitor's Website under the heading "Plan and Other Creditor Meeting Documents". A Glossary of certain terms used in the Plan is included on Schedule "B" hereto. The Glossary and the following summary of certain material terms of the Plan are included for reference purposes only. Creditors are urged to read the Plan in its entirety.*

## Purpose of the Plan

The purpose of the Plan is to (a) effectuate and implement the terms of the Settlement and Support Agreement, including the settlement of the Allocation Dispute and certain other claims, disputes and other matters contemplated therein, the release of the Sale Proceeds to the Canadian Debtors, the U.S. Debtors and the EMEA Debtors as provided for therein, and the payment

contemplated pursuant to Section 4(e) of the Settlement and Support Agreement; (b) provide for the substantive consolidation of each of the Canadian Debtors into the Canadian Estate on the terms contemplated by the Plan; (c) provide for payment in full of the Proven Priority Claims; (d) provide for a pro rata distribution or distributions from the Canadian Estate to holders of all Proven Affected Unsecured Claims; and (e) effect a release and discharge of all Affected Claims and Released Claims.

**Substantive Consolidation**

The Plan requires and will result in the substantive consolidation of all assets of, and Claims (excluding Canadian Intercompany Claims) against, the Canadian Debtors. All assets and rights of the Canadian Debtors (excluding Canadian Intercompany Claims) will become the assets of the Canadian Estate. All Canadian Intercompany Claims, being intercompany Claims between and among the Canadian Debtors themselves, will not be entitled to vote on or receive distributions under the Plan but shall otherwise not be affected, impaired or settled by the Plan.

Creditors shall not be allowed to have Duplicative Claims against the Canadian Estate. To the extent that, absent substantive consolidation and the Plan, an Affected Unsecured Creditor would have had Duplicative Claims against more than one of the Canadian Debtors, the Affected Unsecured Creditor will be entitled to one Proven Affected Unsecured Claim equal to the amount of the largest Duplicative Claims. The resolution of Crossover Claims (defined below) shall be coordinated between the Canadian Debtors and the U.S. Debtors, and creditors holding Crossover Claims against the Canadian Debtors and U.S. Debtors shall not be entitled to receive more than 100% of their Creditor's Maximum after taking into account distributions from both the Canadian Estate and the U.S. Debtors. Creditors holding Proven Affected Unsecured Claims against more than one Canadian Debtor where such Proven Affected Unsecured Claims are based on separate and distinct underlying debts shall have one Proven Affected Unsecured Claim against the Canadian Estate in the aggregate amount of all such separate and distinct Proven Affected Unsecured Claims;

**Classification of Creditors**

The only class of Creditors for the purposes of considering and voting on the Plan will be the Affected Unsecured Creditors Class.

**Allocation and Distribution of Sale Proceeds**

The Plan and contemplated orders will authorize the Canadian Debtors and the Monitor to direct the Escrow Agents to effect the allocation and distribution of the Sale Proceeds as follows:[4]

    (a)    payment of the Iceberg Amendment Fee in the amount of $2.8 million to NNI and $2.2 million to NNUK, and, in settlement of the M&A Cost Reimbursement, payments in the amount of $20 million to the U.S. Debtors and $35 million to the Canadian Debtors, then;

---

[4] For the avoidance of doubt, all distributions from the Escrow Accounts shall be strictly in accordance with the Settlement and Support Agreement. To the extent that there is any conflict between the provisions of the Settlement and Support Agreement and the Plan as it relates to distributions from the Escrow Accounts, the provisions of the Settlement and Support Agreement shall govern in all respects.

(b)    after making the payments described in (a) above, the balance of the Sale Proceeds will be paid as follows:

(i)    to Canadian Debtors: 57.1065% (being $4,142,665,131 as at July 31, 2016)

(ii)    to the U.S. Debtors: 24.350% (being $1,766,417,002 as at July 31, 2016);

(iii)    to the EMEA Debtors (excluding NNUK and NNSA): 1.4859% (being $107,788,879 as at July 31, 2016);

(iv)    to NNUK: 14.0249% (being $1,017,408,257 as at July 31, 2016); and

(v)    to NNSA: $220,000,000.

**Release of Canada Only Sale Proceeds and other Restricted or Unavailable Cash**

On the Plan Effective Date, all amounts held by NNL pursuant to the Canada Only Sale Proceeds Orders or otherwise held as Unavailable Cash by the Canadian Debtors shall be released to the Canadian Estate without any restriction whatsoever, and shall be used to fund the distributions and reserves contemplated under the Plan.  The estimated amount to be released is approximately $237,000,000 plus an additional amount in respect of the sale of the IP Addresses. Restricted cash held in the trust established for certain Directors and Officers at the outset of the CCAA Proceedings will remain restricted and not available for distribution at this time.  Additionally, funds in the HWT will continue to be distributed pursuant to the terms of the Employee Settlement Agreement and are not affected by the terms of the Plan.

**Treatment of Claims Pursuant to the Plan**

*Affected Unsecured Claims*

In full and final satisfaction of its Claim, an Affected Unsecured Creditor that has a Proven Affected Unsecured Claim will be entitled to receive its Pro-Rata Share as calculated by the Monitor prior to the Initial Distribution Date and each subsequent Distribution Date.[5]

For the purposes of the Plan, an Affected Unsecured Creditor's Pro-Rata Share is:

---

***Pro-Rata Share***: as at any Distribution Date with respect to an Affected Unsecured Creditor with a Proven Affected Unsecured Claim, the product of (A/B) x C where:

A = the Proven Affected Unsecured Claim of such Affected Unsecured Creditor stated in U.S. dollars (with all non-U.S. dollar denominated Proven Affected Unsecured Claims, or portions thereof, being converted to U.S. dollars in the manner specified in Section 6.4(a) of the Plan);

B = the total of all Proven Affected Unsecured Claims stated in U.S. dollars (with all non-U.S. dollar denominated Proven Affected Unsecured Claims, or portions thereof, being converted to U.S. dollars in the manner specified in Section 6.4(a) of the Plan);  and

C = the total amount of Cash in the Affected Unsecured Creditor Pool stated in U.S. dollars

---

[5] In order to determine what currency will be used to make distributions, see the sub-heading "*Currency Conversion Matters*" below.

> (with all Canadian dollar denominated Cash being valued in U.S. dollars in the manner specified in Section 6.4(b)) of the Plan,
>
> provided that distributions on CAD Claims shall be paid in Canadian dollars, with the amount of such distribution in U.S. dollars being converted to Canadian dollars at the Applicable FX Rate, all as contemplated in Section 6.4(c) of the Plan.

In order to give effect to the payment of the Bondholder Fee Amount (see "*Implementation of the Plan – Continuing Administration and Wind-Down of the Canadian Estate and Related Matters – Creditor Fee Arrangements*"), solely for purposes of determining the Pro-Rata Share of Affected Unsecured Creditors and amounts to be distributed on the Initial Distribution: (a) the total amount of Cash in the Affected Unsecured Creditor Pool shall be deemed to be increased by the Bondholder Fee Amount; (b) the Pro-Rata Share of each Affected Unsecured Creditor with a Proven Affected Unsecured Claim (excluding the Crossover Bondholders and the NNCC Bondholders) shall be its Pro-Rata Share calculated as if an amount equal to the Bondholder Fee Amount was included in the Affected Unsecured Creditor Pool (with such additional entitlement being funded from the deduction on distributions to Crossover Bondholders and NNCC Bondholders contemplated in Section 3.4(b)(iii) of the Plan); and (c) the aggregate Pro-Rata Share on account of the Crossover Bondholder Claims and NNCC Bondholder Claims shall be: (x) the aggregate Pro-Rata Share on account of the Crossover Bondholder Claims and NNCC Bondholder Claims calculated as if an amount equal to the Bondholder Fee Amount was included in the Affected Unsecured Creditor Pool, minus (y) the Bondholder Fee Amount. The Additional Bondholder Fee Amount may also be deducted from distributions to Crossover Bondholders and NNCC Bondholders as contemplated pursuant to Section 4.11 of the Plan.

### Certain Proven Affected Unsecured Claims and Proven Priority Claims

As contemplated by the Settlement and Support Agreement, the following Claims shall be allowed as Proven Affected Unsecured Claims under the Plan:

- The Canadian Pension Claims of CA$1,368,644,000 in respect of the Managerial Plan and CA$520,835,000 in respect of the Negotiated Plan;

- Crossover Bondholder Claims in the total amount of $3,940,750,260;

- NNCC Bondholder Claims in the total amount of $150,951,562;

- The UKPI Claim of £339,750,000 (being $494,879,850 when converted to U.S. dollars in accordance with the Plan); and

- The Intercompany Claims listed on Schedule "C" to the Plan.

The Plan also affirms the Proven Affected Unsecured Claim and Proven Priority Claim of NNI in respect of the NNI Claim and the Proven Affected Unsecured Claims of certain EMEA Debtors in respect of the EMEA Claims previously allowed pursuant to prior Orders of the CCAA Court.

### *Other Affected Claims*

Equity Claims are Affected Claims under the Plan; however, Equity Claimants or other holders of Equity Interests are not entitled to vote at the Meeting or receive distributions under the Plan. All Equity Claims shall be fully and finally released on the Plan Effective Date provided that nothing in the Plan impacts NNL's shares held by NNC or any shares held by NNC, NNL or any other Canadian Debtor of any other entity. In addition, NNC's common shares and NNL's preferred shares shall not be cancelled and shall remain issued and outstanding following the Plan Effective Date, it being understood that in no circumstance shall the holders of such Equity Interests be entitled to any distribution or other consideration pursuant to the Plan.

The Canadian Debtors have publicly indicated that they do not expect that there will be any value for their shareholders. However, out of an abundance of caution, the Plan provides that in the event that all obligations of the Canadian Estate owing to Creditors are satisfied in full, including the payment in full of all Proven Affected Unsecured Claims and such other amounts as may be determined to be payable to Creditors in the event of the solvency of the Canadian Estate, the holders of Equity Interests in NNC and NNL will, following payment of all amounts owing to Creditors in full and subject to further order of the CCAA Court, have an entitlement to any remaining Available Cash or other assets of the Canadian Estate in accordance with their respective legal entitlements based on the terms of such Equity Interests.

Director/Officer Claims are Affected Claims under the Plan. Creditors with Director/Officer Claims, if any, will not be entitled to vote or receive distributions under the Plan on account of their Director/Officer Claims. To the extent that any part of a Director/Officer Claim is a Non-Released Claim that part of the Director/Officer Claim will not be compromised, released, discharged, cancelled or barred. The Directors' Charge shall be discharged and expunged on the Plan Effective Date and all rights of the Directors and Officers pursuant to paragraphs 20 and 21 of the Initial Order shall be released and discharged on the Plan Effective Date.

### *Proven Priority Claims and Other Payments under the Plan*

Under the Plan the Canadian Estate shall satisfy certain Proven Priority Claims and other payment obligations under the Settlement and Support Agreement as follows: (i) within five (5) Business Days of the Plan Implementation Date, pay to NNI the amounts of $62.7 million (in satisfaction of the Remaining Revolver Claim under the CFSA) and $77.5 million (in satisfaction of the payment contemplated by Section 4(e) of the Settlement and Support Agreement, which payment shall not be subject to set-off pursuant to Section 3.13 of the Plan) (the "**NNI Payments**"); and (ii) on the Initial Distribution Date, distribute CA$3,000 to each of the Former Employee Priority Creditors in full satisfaction of the Canadian Estate's obligations for their Termination Payments.

### No Double-Recovery

In no circumstance shall a Creditor receive aggregate distributions from the Canadian Estate and any other Nortel entity on account of a Proven Affected Unsecured Claim in excess of 100% of the amount of such Proven Affected Unsecured Claim, including in respect of a Crossover Claim.  For the avoidance of doubt, as it relates to Crossover Claims, to determine the maximum recovery available to holders of Crossover Claims, the greater of such Creditor's (a) Allowed Claim (as defined in the U.S. Plans) against a U.S. Debtor; and (b) its Proven Unsecured Claim against the Canadian Estate shall be used.

"Crossover Claims" has the meaning given to it in the Plan and means Claims in respect of a debt owing by one or more of the Canadian Debtors or U.S. Debtors, and guaranteed by a Canadian Debtor or U.S. Debtor in the other Estate.

### Currency Conversion Matters

The Plan contemplates currency conversion in a number of contexts. Certain aspects are summarized below:

| Purpose | Method |
|---|---|
| • Voting on the Plan<br><br>• Calculating the Required Majority<br><br>• Other calculations where indicated in the Plan that involve a totalling of or comparison to all Affected Unsecured Claims or including Proven Affected Unsecured Claims, including in factors A and B of the calculation of any Pro-Rata Share | • U.S. dollar Claims: no conversion necessary.<br><br>• All non-U.S. dollar denominated Claims will be converted to U.S. dollars at the exchange rates set out on Schedule "C" hereto (being also Schedule "D" to the Plan).  For the avoidance of doubt, all dollar amounts that are not Canadian dollar amounts or U.S. dollar amounts shall first be converted into Canadian dollar amounts pursuant to Schedule "C" and then converted to U.S. dollar amounts pursuant to Schedule "C". |
| For the purposes of determining factor C of any Pro-Rata Share calculations | Any Canadian dollar denominated Cash in the Affected Unsecured Creditor Pool shall be valued in U.S. dollars at: (i) in the case of Canadian dollar denominated Cash received by the Canadian Estate from the Canadian Dollar Escrow Account, the Applicable FX Rate; and (ii) in the case of all other Canadian dollar denominated Cash held or received by the Canadian Estate, the then applicable foreign exchange rate between Canadian and U.S. dollars at the time of making the Pro-Rata Share calculation.<br><br>All Canadian dollar denominated Cash in the |

| Purpose | Method |
|---|---|
|  | Affected Unsecured Creditor Pool and distributed on account of CAD Claims shall be deemed to first be taken and made from the Canadian dollar denominated Cash received by the Canadian Estate from the Canadian Dollar Escrow Account. |
| Distributions to Affected Unsecured Creditors in respect of Proven Affected Unsecured Claims | Distributions will be made in the following currencies:<br><br>• CAD Claims will be paid from the Canadian Estate in Canadian dollars. The calculation of the distribution made on account of any such CAD Claim will be as set out in the definition of "Pro-Rata Share".<br><br>• For Proven Affected Unsecured Claims that are not CAD Claims:<br><br>   o U.S. dollar Proven Affected Unsecured Claims shall be paid in U.S. dollars.<br><br>   o A Proven Affected Unsecured Claim in any other currency shall be paid in U.S. dollars. |

*Unaffected Claims*

The Plan does not affect Unaffected Creditors. Unaffected Creditors will not receive any consideration or distributions under the Plan in respect of their Unaffected Claims (except to the extent their Unaffected Claims are paid in full in accordance with the express terms of the Plan or, with respect to Post-Filing Claims, as may be ordered by the CCAA Court), and they shall not be entitled to vote on the Plan in respect of their Unaffected Claims.

Insured Claims are Unaffected Claims under the Plan. Insured Claims shall not be compromised, released, discharged, cancelled or barred by the Plan, provided that from and after the Plan Effective Date, any Person having an Insured Claim shall be irrevocably limited to recovery in respect of such Insured Claim solely from the proceeds of the applicable Insurance Policies, and Persons with any Insured Claims shall have no right to, and shall not, directly or indirectly, make any claim or seek any recoveries from any Person, other than enforcing such Person's rights to be paid by the applicable insurer(s) from the proceeds of the applicable Insurance Policies.

Nothing in the Plan shall prejudice, compromise, release or otherwise affect any right or defence of any insurer or insured in respect of an Insured Claim.

*Unresolved Affected Unsecured Claims*

No Affected Unsecured Creditor shall be entitled to receive any distribution under the Plan with respect to an Unresolved Affected Unsecured Claim unless and until such Claim is finally resolved in the manner set out in the applicable Claims Order and becomes a Proven Affected Unsecured Claim entitled to the treatment described in Section 3.4 of the Plan. A distribution shall be paid from the Unresolved Claims Reserve pursuant to Section 6.5 of the Plan, in respect of any Unresolved Affected Unsecured Claim that is finally determined to be a Proven Affected Unsecured Claim in accordance with the applicable Claims Order. However: (i) NNUK shall be entitled to receive distributions under the Plan on account of the Proven NNUK Claim pending final resolution of the Contingent Additional NNUK Claim; and (ii) Compensation Creditors holding Unresolved Affected Unsecured Claims shall be entitled to receive distributions on account of such Unresolved Affected Unsecured Claims solely to the extent portions thereof have been admitted or proven pursuant to the Compensation Claims Procedure Order.

**Plan Releases**

On the Plan Effective Date: (i) the Canadian Debtors (including the Canadian Estate) and their respective current and former employees, auditors, financial advisors, legal counsel and agents (in each case, in that capacity only); (ii) the Directors and Officers; and (iii) the Monitor, the Monitor's legal counsel, and each and every current and former shareholder, affiliate, affiliate's shareholder, director, officer, member (including members of any committee or governance council), partner, employee, auditor, financial advisor and agent of any of the foregoing Persons (in each case, in that capacity only) (each of the Persons specified in (i), (ii) or (iii), in their capacity as such, being herein referred to individually as a "**Released Party**" and collectively referred to as the "**Released Parties**") shall be fully, finally and irrevocably released and discharged from any and all Released Claims and all Released Claims shall be fully, finally, irrevocably and forever waived, discharged, released, cancelled and barred as against the Released Parties, all to the fullest extent permitted by Applicable Law. Nothing in the Plan shall release Non-Released Claims.

For the purposes of the foregoing:

"**Released Claims**" means any and all demands, claims, actions, causes of action, counterclaims, suits, debts, sums of money, liabilities, accounts, covenants, damages, judgments, orders (including for injunctive relief or specific performance and compliance orders), expenses, executions, Encumbrances and recoveries on account of any liability, obligation, demand or cause of action of whatever nature, including claims for contribution or indemnity, which any Creditor or other Person has or may be entitled to assert (including any and all of the foregoing in respect of the payment and receipt of proceeds and statutory or common law liabilities of directors or officers, and any alleged fiduciary, statutory or other duty (in any capacity whatsoever)), whether known or unknown, matured or unmatured, direct, indirect or derivative, at common law, equity or under statute, foreseen or unforeseen, existing or hereafter arising, based in whole or in part on any act, omission, transaction, duty, responsibility, indebtedness, liability, obligation, dealing, matter or occurrence existing or taking place on or prior to the Plan Effective Date, or such later date as actions are taken to implement the Plan, that in any way relate to, or arise out of or in connection with, any Claims, any Director/Officer Claims, the business and affairs of the Canadian Debtors or the Nortel Group whenever,

wherever or however conducted, the administration and/or management of the Canadian Debtors or the Nortel Group, the CCAA Proceedings or any matter or transaction involving any of the Canadian Debtors occurring in or in connection with the CCAA Proceedings, including the Plan or the development thereof, but excluding Non-Released Claims; and

"**Non-Released Claims**" means, collectively: (i) the Canadian Estate's obligations under the Plan (including the right of Affected Unsecured Creditors to receive distributions pursuant to the Plan in respect of Proven Affected Unsecured Claims),  the Settlement and Support Agreement, the Records Assistance Side Letter and the Personnel Files Agreement; (ii) any claim against a Released Party if the Released Party is determined by a Final Order of a court of competent jurisdiction to have committed fraud or wilful misconduct; (iii) solely as against a Director in his or her capacity as such, any Director/Officer Claim that is not permitted to be released pursuant to Section 5.1(2) of the CCAA; (iv) the Canadian Intercompany Claims; and (v) the rights of the Canadian Debtors and the U.S. Debtors preserved in Section 8(b)(iii) of the Settlement and Support Agreement; (vi) any obligation secured by the Administration Charge.

In addition, the Settlement and Support Releases given and received by the Canadian Debtors and the Monitor under the Settlement and Support Agreement are authorized pursuant to the Plan and incorporated therein by reference.  Pursuant to the Settlement and Support Agreement Releases, each of the Settlement Parties and Participating Creditors and their respective representatives, agents, successors and assigns (each a "**Releasor**") releases each of the other Releasors their respective employees, officers, directors, agents, advisors, lawyers, successors and assigns and the directors and officers, both former and current, of any Nortel Group entity from any claims which any of the Releasors now have, had, may have had or hereafter may have however so arising out of or in connection with the Allocation Dispute, any other matters resolved in the Settlement and Support Agreement or any other matter relating to the global Nortel insolvency proceedings or the Nortel Group, except for certain specified claims which are expressly preserved.

The Plan also provides for the exchange of certain releases between the Canadian Debtors and the Monitor and the Indenture Trustees as reflected at Section 7.4 of the Plan.

**Injunctions**

From and after the Plan Effective Date, all Persons are permanently and forever barred, estopped, stayed and enjoined, with respect to any and all Released Claims, from: (i) commencing, conducting, continuing or making in any manner, directly or indirectly, any action, suit, claim, demand or other proceeding of any nature or kind whatsoever (including any proceeding in a judicial, arbitral, administrative or other forum) against the Released Parties; (ii) enforcing, levying, attaching, collecting or otherwise recovering or enforcing by any manner or means, directly or indirectly, any judgment, award, decree or order against the Released Parties or their property; (iii) commencing, conducting, continuing or making in any manner, directly or indirectly, any action, suit, claim, demand or other proceeding of any nature or kind whatsoever (including any proceeding in a judicial, arbitral, administrative or other forum) against any Person who makes a claim or might reasonably be expected to make a claim, in any manner or forum, including by way of contribution or indemnity or other relief, against one or more of the Released Parties; (iv) creating, perfecting, asserting or otherwise enforcing, directly or indirectly,

any lien or Encumbrance of any kind against the Released Parties or their property; or (v) taking any actions to interfere with the implementation or consummation of the Plan.

## REQUIRED APPROVALS UNDER THE CCAA
## AND OTHER CONDITIONS TO IMPLEMENTATION

### Creditor Approval by a Required Majority

In order for the Plan to be approved and binding in accordance with the CCAA, the Canadian Debtors must hold a Meeting pursuant to a Meeting Order[6] (to be sought from the CCAA Court on or about December 1, 2016) and the Resolution to approve the Plan must receive the affirmative vote of the Required Majority of the Affected Unsecured Creditors Class, being a majority in number of Affected Unsecured Creditors, and two-thirds in value of the Voting Claims of Affected Unsecured Creditors, in each case who vote (in person or by proxy) on the Plan at the Meeting.

Creditors who have Affected Unsecured Claims that are Crossover Claims must vote on the Plan in addition to any vote that such Creditor may cast in respect of the U.S. Plans. Voting on the U.S. Plans will not be considered a vote on the Plan and *vice versa.*

### Court Approval of the Plan under the CCAA

Prior to the Plan becoming effective, the CCAA requires that the Plan be approved by the CCAA Court if it is approved by the Required Majority of Affected Unsecured Creditors with Voting Claims voting at the Meeting (in person or by proxy).

Pursuant to the Settlement and Support Agreement and subject to the approval of the Resolution in respect of the Plan, it is contemplated the hearing for the Sanction Order will be scheduled for no later than January 24, 2017.

Interested parties should consult their legal advisors with respect to the legal rights available to them in relation to the Plan, Meeting and the Sanction Order.

The authority and discretion of the CCAA Court is very broad under the CCAA. The CCAA Court will consider, among other things, the fairness and reasonableness of the terms and conditions of the Plan. The CCAA Court must issue the Sanction Order before the Plan can be implemented. If the CCAA Court grants the Sanction Order, and other conditions are satisfied, the Plan will become binding on the Affected Creditors and all Persons named or referred to in, or subject to, the Plan.

The Plan states that the Sanction Order will, among other things:

> (a)    effect the substantive consolidation of the Canadian Debtors into the Canadian Estate on the terms contemplated in Section 2.2 of the Plan, including vesting all of the assets of the Canadian Debtors in NNL (excluding any Canadian Intercompany Claims held by the Other Canadian Debtors), deeming all Proven Affected Unsecured Claims (whether now existing or hereafter coming into

---

[6] Upon being granted by the CCAA Court, the Meeting Order will be posted on the Monitor's Website and distributed in accordance with the terms of the Meeting Order.

existence) against the Other Canadian Debtors to be claims against NNL and barring and extinguishing all Duplicative Claims;

(b) declare that (i) the Plan has been approved by the Required Majority in conformity with the CCAA; (ii) the activities of the Canadian Debtors have been in reasonable compliance with the provisions of the CCAA and the Orders of the CCAA Court made in this CCAA Proceeding in all respects; (iii) the CCAA Court is satisfied that the Canadian Debtors have not done or purported to do anything that is not authorized by the CCAA; and (iv) the Plan and the transactions contemplated thereby are fair and reasonable;

(c) declare that the Settlement and Support Agreement is fair and reasonable and authorize and direct the Canadian Debtors and the Monitor to perform their obligations under the Settlement and Support Agreement and carry out the transactions contemplated thereby;

(d) approve and authorize the granting of the Settlement and Support Agreement Releases by the Canadian Debtors and the Monitor;

(e) declare that the Plan and all associated steps, compromises, transactions, arrangements, releases and reorganizations effected thereby are approved, binding and effective, subject to the terms set out in the Plan, upon and with respect to the Canadian Debtors, all Affected Creditors, the Directors and Officers, any Person with a Released Director/Officer Claim, the Released Parties and all other Persons named or referred to in, or subject to, the Plan;

(f) as of the Plan Effective Date, compromise, discharge and release the Canadian Debtors from any and all Affected Claims of any nature in accordance with the Plan, and declare that the ability of any Person to proceed against any one or more of the Canadian Debtors in respect of or relating to any Affected Claims shall be forever discharged and restrained, and all proceedings with respect to, in connection with or relating to such Affected Claims be permanently stayed, subject only to the right of Affected Creditors to receive distributions pursuant to the Plan in respect of their Affected Claims (to the extent they become Proven Affected Unsecured Claims);

(g) as of the Plan Effective Date, subject to Section 7.2 of the Plan, compromise, discharge and release the Directors and Officers from any and all Released Claims of any nature in accordance with the Plan, and declare that the ability of any Person to proceed against the Directors and Officers (or any of them) in respect of or relating to any Released Claim shall be forever discharged and restrained, and all proceedings with respect to, in connection with or relating to such Released Claims be permanently stayed;

(h) as of the Plan Effective Date, discharge and release the Released Parties on the terms set forth in Article 7 of the Plan and implement the injunctions contemplated under the Plan;

(i) as of the Plan Effective Date, bar, stop, stay and enjoin the commencing, taking, applying for or issuing or continuing of any and all steps or proceedings,

including without limitation, administrative hearings and orders, declarations or assessments, commenced, taken or proceeded with or that may be commenced, taken or proceeded with against any Released Party in respect of all Released Claims and any matter which is released pursuant to Article 7 of the Plan;

(j)     authorize the Canadian Estate and the Monitor to perform their obligations and functions under the Plan including the establishment of the Administrative Reserve and the Unresolved Claims Reserve, and to perform all such other acts and execute such documents as may be required in connection with the foregoing;

(k)     authorize the Monitor to continue its administration and wind-down of the Canadian Estate in accordance with the Monitor's Powers Orders and the Plan;

(l)     declare that no shareholder approval is required in respect of the Settlement and Support Agreement, the Plan or any transaction contemplated thereby;

(m)     authorize and direct that all amounts held by NNL pursuant to the Canada Only Sale Proceeds Orders or held as Unavailable Cash by the Canadian Debtors shall form part of the Available Cash without any restriction thereon;

(n)     declare that each of the Charges (except for the Administration Charge) shall be terminated, discharged, expunged and released on the Plan Effective Date, subject to, in the case of the Inter-company Charge (but solely to the extent it benefits NNI), payment of the Remaining Revolver Claim as contemplated pursuant to Section 6.2(a)(i) of the Plan;

(o)     declare that the tolling of any Claims, Director/Officer Claims or other claims or rights pursuant to prior orders of the CCAA Court shall cease on the Plan Effective Date, without prejudice to the rights of all Affected Unsecured Creditors with Proven Affected Unsecured Claims (whether now existing or hereafter coming into existence) to receive all distributions contemplated by the Plan;

(p)     order that the CCAA stay of proceedings provided for in the Initial Order shall be extended indefinitely, subject to further order of the CCAA Court, and provided that the Monitor shall serve on the service list in the CCAA Proceedings and file with the CCAA Court a report on the progress of the continuing administration and wind-down of the Canadian Estate, including the implementation of the Plan, on no less than an annual basis;

(q)     declare that any obligation of the Monitor to provide cash flow forecasting or reconciliations and monthly claims reporting (whether pursuant to paragraph 11 of the Claims Resolution Order dated September 16, 2010, or any other agreement or order) shall cease as at the Plan Effective Date, provided that the Monitor shall provide cash flow reporting and claims reporting in the reports contemplated in the foregoing subsection;

(r)     provide for the termination of the Hardship Process as of the Plan Effective Date;

(s)     effect the matters contemplated pursuant to Section 10.2 and 11.12 of the Plan;

(t)     declare that, notwithstanding: (i) the pendency of the CCAA proceeding; (ii) any applications for a bankruptcy, receivership or other order now or hereafter issued pursuant to the BIA, the CCAA or otherwise in respect of any of the Canadian Debtors and any bankruptcy, receivership or other order issued pursuant to any such applications; and (iii) any assignment in bankruptcy made or deemed to be made in respect of any of the Canadian Debtors, the transactions contemplated by the Plan and by the Settlement and Support Agreement shall be binding on any trustee in bankruptcy or receiver that may be appointed in respect of the Canadian Debtors or their assets and shall not be void or voidable by creditors of the Canadian Debtors, nor shall the Plan, the Settlement and Support Agreement or the payments and distributions contemplated pursuant thereto constitute nor be deemed to constitute a fraudulent preference, assignment, fraudulent conveyance, transfer at undervalue, or other reviewable transaction under the BIA, CCAA or any other applicable federal or provincial legislation, nor shall the Plan or the Settlement and Support Agreement constitute oppressive or unfairly prejudicial conduct pursuant to any applicable federal or provincial legislation; and

(u)     declare that the Canadian Debtors and the Monitor may apply to the CCAA Court for advice and direction in respect of any matters arising from or in relation to the Plan.

## Conditions to the Effectiveness and Implementation of the Plan

The effectiveness of the Plan is conditional upon satisfaction or waiver of the following conditions:

(a)     the Plan shall have been approved by the Required Majority;

(b)     the Sanction Order shall have been issued and entered and shall have become a Final Order;

(c)     the Canadian Escrow Release Order shall have been issued and entered and shall have become a Final Order;

(d)     the U.S. Plans shall have been confirmed in the U.S. Proceedings in a form that, to the satisfaction of the Monitor and its counsel, contains the terms contemplated by and referred to in the Settlement and Support Agreement as being contained in the U.S. Plans;

(e)     the U.S. Escrow Release Order (as defined in the Settlement and Support Agreement) shall have been issued and entered and shall have become a Final Order in a form satisfactory to the Monitor and its counsel;

(f)     the Sanction Order shall have been recognized and given full force and effect in the United States by an order of the U.S. Bankruptcy Court in the Chapter 15 Proceedings;

(g)     all conditions precedent to the Settlement and Support Agreement (excluding the condition specified in Section 9(a)(xi)) shall have been satisfied or waived in accordance with the terms of the Settlement and Support Agreement;

(h)     all conditions precedent to the effectiveness of the U.S. Plans (but excluding the occurrence of the Plan Effective Date hereunder) shall have been satisfied or waived in accordance with their respective terms, and the U.S. Debtors and Canadian Debtors shall have exchanged Plan Certificates in escrow; and

(i)     The Settlement and Support Agreement shall not have been terminated.

The implementation of the Plan is conditional upon satisfaction or waiver of the following conditions:

(a)     the Plans Effective Date (as defined in the Settlement and Support Agreement) shall have occurred and the Settlement and Support Agreement shall have become fully effective and enforceable in accordance with its terms;

(b)     the with prejudice dismissal of all litigation referenced in Section 5(b) of the Settlement and Support Agreement, including all leave to appeals, appeals and cross-appeals in respect of the Allocation Dispute pending before the Canadian Courts and U.S. Courts, shall have occurred; and

(c)     NNL shall have received the Canadian Allocation.

## IMPLEMENTATION OF THE PLAN

**Timing of Implementation**

The current estimated timeline to implementation of the Plan is as follows:

(a) Meeting: January 17, 2017;

(b) Sanction Hearing: January 24, 2017;

(c) Plan Effective Date: February 15, 2017;

(d) Plan Implementation Date: as soon as possible following the Effective Date; and

(e) Initial Distribution Date: within sixty (60) days of the Plan Implementation Date.

The actual timing of the steps contemplated above will be set in accordance with the Meeting Order, Sanction Order or as otherwise contemplated by the Plan and, where applicable, will be posted on the Monitor's Website.

**Cash Pools and Reserves**

On the Plan Implementation Date, the Canadian Estate shall establish the Administrative Reserve in accordance with the terms of the Sanction Order and thereafter hold the Administrative Reserve and use the Administrative Reserve to fund the ongoing administration, obligations and wind-down of the Canadian Estate. Any balance remaining in the Administrative Reserve at the conclusion of the CCAA Proceedings shall be distributed in accordance with Section 6.11 of the Plan. Following the Plan Implementation Date, prior to the Initial Distribution Date, the Canadian Estate shall establish the Unresolved Claims Reserve in accordance with the terms of the Sanction Order. The Canadian Estate shall maintain and distribute the Unresolved Claims

Reserve in accordance with the provisions of Section 6.5 of the Plan. See "*Implementation of the Plan - Distributions Under the Plan – Distributions After Unresolved Affected Unsecured Claims and Post-Filing Claims Resolved*"

Following the Plan Implementation Date, prior to the Initial Distribution Date and prior to all subsequent Distribution Dates, the Canadian Estate shall establish an Affected Unsecured Creditor Pool. On the Initial Distribution Date and any subsequent Distribution Dates, the Canadian Estate shall distribute the Affected Unsecured Creditor Pool to Affected Unsecured Creditors on and subject to the terms of Article 6 of the Plan.

## Distributions under the Plan

### Distributions Generally

All distributions to Affected Creditors to be effected pursuant to the Plan shall be made by the Canadian Estate pursuant to Article 6 of the Plan. Distribution Dates shall be set from time to time by and at the discretion of the Monitor, provided that the Initial Distribution Date shall be no more than sixty (60) days after the Plan Implementation Date, and the Monitor shall set a Distribution Date within ninety (90) days of the date (the "**Determination Date**") it determines the Available Cash of the Canadian Estate is sufficient to establish an Affected Unsecured Creditor Pool of not less than $150,000,000, provided that if the Monitor believes the Canadian Estate will be in a position to make a Final Distribution within six (6) months of the Determination Date, it shall be authorized to delay such Distribution Date for up to six (6) months from the Determination Date in order to attempt to complete a Final Distribution.

### Distribution Mechanics

See "*Description of the Plan – Treatment of Claims Pursuant to the Plan – Proven Priority Claims and Other Payments under the Plan*" for a description of the NNI Payments and distribution of the Termination Payments.

Prior to the Initial Distribution Date and each subsequent Distribution Date, the Monitor shall calculate the Pro-Rata Share to be paid to each Affected Unsecured Creditor with a Proven Affected Unsecured Claim.

Subject to the Plan, the Canadian Estate shall, on or about the respective Distribution Date cause to be distributed from the Affected Unsecured Creditor Pool to each Affected Unsecured Creditor with a Proven Affected Unsecured Claim its Pro-Rata Share by way of (in the sole discretion of the Monitor): (i) cheque sent by prepaid ordinary mail to the address on file with the Monitor on the date that is twenty-one (21) days after notice of a Distribution Date is given by the Monitor by notice posted on the Monitor's Website; or (ii) wire transfer of immediately available funds to an account designated in writing by the Creditor to the Monitor (with any wire transfer or similar fee being satisfied from the distribution amount), subject to the following:

- 1988 Bondholder Claims – Distributions for the benefit of the 1988 Bondholders on account of the 1988 Bondholder Claims shall be made to the 1988 Bonds Trustee by wire transfer of immediately available funds to an account designated in writing by the 1988 Bonds Trustee to the Monitor (with any wire transfer or similar fee being satisfied from the distribution amount). The 1988 Bonds Trustee shall administer such distributions as soon as is reasonably practicable in accordance with the 1988 Bonds Indenture and the

Plan, including Section 6.6 of the Plan, and such distributions shall remain subject to the 1988 Bonds Trustee's charging lien against distributions to holders of 1988 Bondholder Claims for payment of the 1988 Bonds Trustee's reasonable fees and expenses, including all reasonable fees and expenses of its counsel and other professionals and including the fees and expenses incurred by the 1988 Bonds Trustee in making all distributions to holders of 1988 Bondholder Claims. Receipt by the 1988 Bonds Trustee of distributions for the benefit of the 1988 Bondholders shall be deemed to constitute receipt of all such distributions by the 1988 Bondholders. Neither the Canadian Debtors nor the Monitor are aware of the current fees and expenses of the 1988 Bonds Trustee.

- <u>Crossover Bondholder Claims</u> - Distributions for the benefit of the Crossover Bondholders on account of the Crossover Bondholder Claims shall be made to the Crossover Bonds Trustee by wire transfer of immediately available funds to an account (or accounts) designated in writing by the Crossover Bonds Trustee to the Monitor (with any wire transfer or similar fee being satisfied from the distribution amount). The Crossover Bonds Trustee shall administer such distributions as soon as is reasonably practicable in accordance with the Plan, including Section 6.6 of the Plan, and such distributions shall remain subject to the Crossover Bonds Trustee's charging lien against distributions to holders of Crossover Bondholder Claims for payment of the Crossover Bonds Trustee's reasonable fees and expenses, including all reasonable fees and expenses of its counsel and other professionals and including the fees and expenses incurred by the Crossover Bonds Trustee in making all distributions to holders of Crossover Bonds. Receipt by the Crossover Bonds Trustee of distributions for the benefit of the Crossover Bondholders shall be deemed to constitute receipt of all such distributions by the Crossover Bondholders. Neither the Canadian Debtors nor the Monitor are aware of the current fees and expenses of the Crossover Bonds Trustee. The Canadian Debtors and Monitor have been advised that as at September 30, 2016, the fees and expenses of the Crossover Bonds Trustee (including the fees and expenses of its legal counsel) with respect to the CCAA Proceedings and the U.S. Proceedings were approximately $4 million.

- <u>NNCC Bondholder Claims</u> - Distributions for the benefit of the NNCC Bondholders on account of the NNCC Bondholder Claims shall be made to the NNCC Bonds Trustee by wire transfer of immediately available funds to an account (or accounts) designated in writing by the NNCC Bonds Trustee to the Monitor (with any wire transfer or similar fee being satisfied from the distribution amount). The NNCC Bonds Trustee shall administer such distributions as soon as is reasonably practicable in accordance with the NNCC Bonds Indenture and the Plan, including Section 6.6 of the Plan, and such distributions shall remain subject to the NNCC Bonds Trustee's charging lien against distributions to holders of NNCC Bondholder Claims for payment of the NNCC Bonds Trustee's reasonable fees and expenses, including all reasonable fees and expenses of its counsel and other professionals and including the fees and expenses incurred by the NNCC Bonds Trustee in making all distributions to holders of NNCC Bonds. Receipt by the NNCC Bonds Trustee of distributions for the benefit of the NNCC Bondholders shall be deemed to constitute receipt of all such distributions by the NNCC Bondholders. The Canadian Debtors and Monitor have been advised that as at September 30, 2016, the fees and expenses of the NNCC Bonds Trustee (including the fees and expenses of its counsel and other professionals), in addition to the amount to be paid by NNI pursuant to the U.S. Plans (being up to $4.25 million), was approximately $3.5 million.

- <u>Distributions to Compensation Creditors</u> - Distributions to Compensation Creditors will be subject to the Canadian Estate and Monitor first obtaining EI Confirmation in respect of such Compensation Creditor as well as resolving any issues regarding applicable withholdings in respect of such distribution to the satisfaction of the Canadian Estate and the Monitor, acting reasonably.  Further, in accordance with the terms of the Hardship Process, any payments made to a Compensation Creditor pursuant to the Hardship Process shall be deducted, dollar for dollar, from any distributions to such Compensation Creditor pursuant to the Plan.

### *Distributions After Unresolved Affected Unsecured Claims and Post-Filing Claims Resolved*

An Affected Unsecured Creditor holding an Unresolved Affected Unsecured Claim will not be entitled to receive a distribution under the Plan in respect of such Unresolved Affected Unsecured Claim or any portion thereof unless and until, and then only to the extent that, such Unresolved Affected Unsecured Claim becomes a Proven Affected Unsecured Claim. To the extent that any Unresolved Affected Unsecured Claim becomes a Proven Affected Unsecured Claim, the Canadian Estate shall distribute to the holder of such Proven Affected Unsecured Claim, on or before the next following Distribution Date, an amount from the Unresolved Claims Reserve equal to the Pro-Rata Share that such Affected Unsecured Creditor would have been entitled to receive in respect of its Proven Affected Unsecured Claim on the previous Distribution Date(s) had such Unresolved Affected Unsecured Claim been a Proven Affected Unsecured Claim on the Initial Distribution Date.

Once an Unresolved Affected Unsecured Claim is finally resolved and all distributions (if any) have been made out of the Unresolved Claims Reserve in respect of such claim, any remaining Cash in the Unresolved Claims Reserve with respect to such Unresolved Affected Unsecured Claim shall become Available Cash.

### *Allocation of Distributions*

All distributions made pursuant to the Plan shall be allocated first towards the repayment of the amount of the Proven Affected Unsecured Claim or Proven Priority Claim, as applicable, attributable to principal and, if greater than the amount of principal, second, towards the repayment of any amount of such Proven Affected Unsecured Claim or Proven Priority Claim attributable to unpaid interest.

### *Treatment of Undeliverable Distributions*

If any distribution to a Creditor under the Plan is returned as undeliverable (an "**Undeliverable Distribution**"), no further distributions to such Creditor shall be made unless and until the Monitor is notified in writing by such Creditor of such Creditor's current address, at which time all such distributions shall be made to such Creditor.  Upon the Monitor becoming aware of an Undeliverable Distribution, the Canadian Estate shall, prior to the next following Distribution Date, reserve from the Affected Unsecured Creditor Pool the amount of Cash equal to the Undeliverable Distribution.  All claims for an Undeliverable Distribution existing prior to the Final Distribution must be made in writing to the Monitor (in the manner contemplated by Section 11.10 of the Plan) on or before the date that is thirty (30) days following the date the Monitor posts a copy of the Final Distribution Certificate on the Monitor's Website, after which date any entitlement with respect to any Undeliverable Distributions shall be forever discharged and forever barred, without any compensation therefor, notwithstanding any federal, state or

provincial laws to the contrary, and the amount of any Undeliverable Distributions shall be included in the Affected Unsecured Creditor Pool for distribution on the Final Distribution. Any Undeliverable Distributions remaining following the Final Distribution shall be dealt with in such manner as the CCAA Court may direct. Nothing in the Plan shall require the Canadian Estate or the Monitor to attempt to locate any Creditor or other Person with respect to an Undeliverable Distribution. No interest shall be payable in respect of an Undeliverable Distribution.

### Withholding Rights

The Canadian Estate and any other Person facilitating distributions under the Plan shall be entitled to deduct and withhold from any distribution or payment to any Person pursuant to the Plan such amounts as may be required to be deducted or withheld with respect to such distribution or payment under the Canadian Tax Act or other Applicable Laws and to remit such amounts to the appropriate Taxing Authority or other Person entitled thereto. To the extent that amounts are so withheld or deducted and remitted to the appropriate Taxing Authority or other Person, such withheld or deducted amounts shall be treated for all purposes as having been paid to such Person as the remainder of the distribution or payment in respect of which such withholding or deduction was made. Without in any way limiting the generality of the foregoing, the Canadian Estate shall deduct from any distribution to a Creditor any amounts as indicated by Employment and Social Development Canada in an EI Confirmation, and remit such amounts to Employment and Social Development Canada pursuant to the EI Act. Any Creditor whose address on file with the Monitor on the Distribution Record Date for the Initial Distribution is not a Canadian address shall be treated as a non-resident of Canada for purposes of any applicable non-resident withholding Tax on all distributions hereunder, subject to receipt by the Monitor of information satisfactory to it (in its sole discretion) that such Creditor is not a non-resident. For the avoidance of doubt, no gross-up or additional amount will be paid on any distribution or payment hereunder to the extent the Canadian Estate or any other Person deducts or withholds amounts pursuant to Section 6.8 of the Plan.

### Cancellation of Certificates and Notes, etc.

Following the Plan Effective Date all debentures, notes, certificates, indentures, guarantees, agreements, invoices and other instruments evidencing Affected Claims, including the 1988 Bonds, the 1988 Bonds Indenture, the Crossover Bonds, the Crossover Bonds Indenture, the NNCC Bonds and the NNCC Bonds Indenture (and all guarantees associated with each of the foregoing), will not entitle any holder thereof to any compensation or participation other than as expressly provided for in the Plan and shall be cancelled and be null and void. Notwithstanding the foregoing, (a) the 1988 Bonds Indenture, the Crossover Bonds Indenture and the NNCC Bonds Indenture shall remain in effect solely for the purpose of and to the extent necessary to: (i) allow the relevant Indenture Trustee to make distributions as contemplated in Section 6.3(b) of the Plan; (ii) maintain all of the protections the Indenture Trustees enjoy with respect to carrying out their duties thereunder against the beneficial holders, including lien rights with respect to any distributions contemplated in Section 6.3(b) of the Plan, until all such distributions are made; (iii) preserve the rights of the 1988 Bondholders, the Crossover Bondholders and the NNCC Bondholders to receive distributions pursuant to the Plan; and (iv) allow and preserve the rights of the Crossover Bonds Trustee, the Crossover Bondholders, the NNCC Bonds Trustee and the NNCC Bondholders to pursue their claims in the U.S. Proceedings; and (b) the Canadian Registered Pension Plans shall remain in effect solely for the purposes of and to the extent

necessary to permit the continuing administration and wind-up of the Canadian Registered Pension Plans.

## Continuing Administration and Wind-Down of the Canadian Estate and Related Matters

### Wind-Down of the Canadian Estate

The administration and wind-down of the Canadian Estate will continue to be conducted by the Monitor pursuant to the Monitor's Powers Orders and the Plan, including following the Plan Effective Date and the Plan Implementation Date. Without in any way limiting the powers of the Monitor pursuant to the CCAA, the Initial Order, the Plan or the Monitor's Powers Orders, such continuing administration and wind-down may include:

(a) taking all steps and actions contemplated by the Plan and the Settlement and Support Agreement, including effecting distributions and payments contemplated thereby;

(b) the resolution of any remaining unresolved Claims or Post-Filing Claims;

(c) the sale or other realization of the Canadian Debtors' residual assets and the repatriation of funds from foreign controlled subsidiaries all to be used to make distributions and payments contemplated pursuant to the Plan;

(d) the resolution of the Canadian Debtors' Tax matters and recovery of any Tax refunds;

(e) the wind-down of the Canadian Debtors and their direct and indirect controlled subsidiaries (but not the U.S. Debtors, the EMEA Debtors or the EMEA Non-Filed Entities); and

(f) the disposal of the Canadian Debtors' books and records, including their remaining information technology infrastructure.

### Creditor Fee Arrangements

The Canadian Debtors have been paying the fees and expenses of certain advisors to the Bondholder Group pursuant to the CCAA Court approved Bondholder Advisor Fee Letter. Under the Plan, fees in the aggregate amount of $47 million (the "**Bondholder Fee Amount**") (which includes $3 million in respect of the deferred compensation fee payable to FTI Capital Advisors, LLC) under the Bondholder Advisor Fee Letter will be deducted from distributions to Crossover Bondholders and NNCC Bondholders under the Plan in respect of their Proven Affected Unsecured Claims against the Canadian Estate. In addition, an additional $7,000,000 (the "**Additional Bondholder Fee Amount**") shall be deducted from Canadian Estate distributions under the Plan to Crossover Bondholders and NNCC Bondholders on account of their Proven Affected Unsecured Claims in further payment of the deferred compensation fee payable to FTI Capital Advisors, LLC if the Canadian Estate is so directed in writing by all of the Crossover Bondholders and NNCC Bondholders who are Participating Creditors under the Settlement and Support Agreement. All such deductions shall be borne by the Crossover Bondholders and the NNCC Bondholders on a pro rata basis based on the amount of the Proven Affected Unsecured Claims of the Crossover Bondholders and the NNCC Bondholders. The

Bondholder Advisor Fee Letter shall terminate on the Plan Implementation Date, and the Canadian Debtors (including the Canadian Estate) shall have no obligation to pay any fees and expenses of the advisors to the Bondholder Group from and after the Plan Implementation Date.

The Canadian Debtors will not pay voluntarily, or seek permission to pay, legal or advisor fees of any stakeholder that the Canadian Debtors are not currently paying. Payment of any such further legal or advisor fees will be done only pursuant to an order of the CCAA Court.

From and after the Plan Implementation Date, the fees and expenses of Court Appointed Representative Counsel shall no longer be borne by the Canadian Estate and shall instead be borne by the Compensation Creditors. Any fees and expenses incurred by Court Appointed Representative Counsel from and after the Plan Implementation Date shall be deducted, dollar for dollar, from distributions to Compensation Creditors pursuant to the Plan. Any such deductions shall be borne by Compensation Creditors on a *pro rata* basis based on the amount of their respective Proven Affected Unsecured Claims. Notwithstanding the foregoing, from and after the Plan Implementation Date, to the extent the Monitor requests in writing that Court Appointed Representative Counsel provide any service relating to such Court Appointed Representative Counsel responding to inquiries of Compensation Creditors regarding distributions under the Plan, the Canadian Estate shall pay the associated reasonable fees and expenses of such Court Appointed Representative Counsel as may be agreed to in writing between the Canadian Estate, the Monitor and the applicable Court Appointed Representative Counsel.

### *Final Distribution*

After (i) all Unresolved Affected Unsecured Claims, Post-Filing Claims and any other Claims (but excluding, for the avoidance of doubt, any Equity Claims) have been finally resolved; (ii) any remaining Cash held in the Unresolved Affected Unsecured Claims Reserve has been transferred into the Affected Unsecured Creditor Pool; and (iii) the administration and wind-down matters set out in Article 10 of the Plan have been substantially completed, the Monitor shall set a Distribution Date for the purposes of effecting a final distribution of Available Cash to Affected Unsecured Creditors with Proven Affected Unsecured Claims (the "**Final Distribution**"). The Final Distribution shall include, among other things, any remainder of the Administrative Reserve (except for an amount to be set aside for fees and costs to be incurred by or on behalf of the Monitor (including the fees and expenses of the Monitor's counsel) in effecting the Final Distribution, the completion of any remaining administration matters and the discharge of the Monitor). After completing the Final Distribution and upon being granted a discharge and release, the Monitor shall pay any remaining Cash of the Canadian Estate, including any Cash on account of Undeliverable Distributions remaining following the Final Distribution, as the CCAA Court may direct.

### *Non-Consummation/ Termination of the Settlement and Support Agreement*

If the Plan Effective Date does not occur on or prior to August 31, 2017 (or such later date as the date for the Plans Effective Date (as defined in the Settlement and Support Agreement) to have occurred pursuant to Section 9(a)(xi) of the Settlement and Support Agreement may be extended to) (the "**Outside Date**"), then, notwithstanding any other provision of the Plan: (a) the Plan shall be null and void in all respects, (b) any settlement or compromise embodied in the Plan shall be deemed null and void, and (c) nothing contained in the Plan, and no acts taken in preparation for consummation of the Plan, shall (i) constitute or be deemed to constitute a waiver

or release of any Claims by or against the Canadian Debtors or any other Person; (ii) prejudice in any manner the rights of the Canadian Debtors or any other Person in any further proceedings involving the Canadian Debtors; or (iii) constitute an admission of any sort by the Canadian Debtors or any other Person; provided, however, that nothing in Section 11.3 of the Plan shall impair the enforceability of the Settlement and Support Agreement in accordance with its terms.

In the event the Settlement and Support Agreement is terminated or does not become effective in accordance with its terms, the Canadian Debtors and Monitor reserve all of their rights and defenses with respect to the claims and other matters resolved by the Settlement and Support Agreement, including the Allocation Dispute, and nothing contained in the Plan nor the proposed settlement set forth in the Settlement and Support Agreement shall constitute an admission by the Canadian Debtors or the Monitor regarding the validity of the litigations, claims or defenses resolved by the Settlement and Support Agreement or that the Canadian Debtors have any liability in connection with such litigations, claims or defenses.

In the event of the termination of the Settlement and Support Agreement, or if the Plan does not become effective in accordance with its terms, all rights of the Canadian Debtors (excluding the New Applicants) and the Monitor with regard to the Allocation Dispute and with respect to the interest of the Canadian Debtors in the Sale Proceeds are reserved.

## ESTIMATED DISTRIBUTIONS TO CREDITORS WITH PROVEN AFFECTED UNSECURED CLAIMS

Pursuant to the Plan, distributions to Creditors holding Proven Affected Unsecured Claims predominantly in Canadian dollars shall be paid in Canadian dollars and all other Proven Affected Unsecured Claims will be paid in U.S. dollars.  A Proven Affected Unsecured Claim is considered "predominantly denominated" in Canadian dollars if more than 50% of such Claim is denominated in Canadian dollars.  For information on the method for conversion of Claims, see "*Description of the Plan - Treatment of Claims Pursuant to the Plan – Currency Conversion Matters*".

With respect to Proven Affected Unsecured Claims:

(a) for CAD Claims, the Monitor estimates that the range of recovery per CA dollar of Proven Affected Unsecured Claims will be approximately CA 45 cents to CA 49 cents assuming an Applicable F/X Rate of approximately $1.00 to CA $1.337650; and

(b) for all other Proven Affected Unsecured Claims, the Monitor estimates that the range of recovery per U.S. dollar of Proven Affected Unsecured Claims will be approximately 41.5 cents to 45 cents.

## ALTERNATIVES TO THE PLAN

The CCAA Proceedings (as well as the U.S. Proceedings and EMEA Proceedings) have been ongoing for nearly eight (8) years with the Allocation Dispute and certain significant Claims being settled pursuant to the Settlement and Support Agreement after years of mediations, negotiations and litigation.  There is no reasonable basis to support a view that an alternative process available to the Canadian Debtors at this time would provide equivalent value in a timely fashion to Affected Unsecured Creditors with Proven Affected Unsecured Claims.  If the Plan is not approved by the Required Majority and sanctioned by the CCAA Court, the most likely

alternatives are for the Canadian Debtors to remain in CCAA Proceedings indefinitely or be put into bankruptcy or receivership. In any such scenario, litigation regarding the Allocation Dispute and other significant unresolved Claims would likely continue until finally resolved, which could take a significant period of further time, and delay distributions to Creditors pending such final resolution.

## STATUS OF CLAIMS PROCESS

Assuming the Settlement and Support Agreement and the Plan become effective, the total Proven Affected Unsecured Claims as at the date of this Information Circular is approximately $9.8 billion. The Monitor continues to work to resolve significant unresolved Claims on an ongoing basis.

## RECOMMENDATION OF THE MONITOR

The Monitor and its counsel have been involved throughout the course of negotiations regarding the Plan and the Monitor supports the Canadian Debtors' request to convene a meeting to consider the Plan. After careful consideration of all relevant factors relating to the Plan, and after receiving the advice of its advisors, the Monitor supports the Plan and is of the view that the Plan is in the best interests of the Affected Creditors and recommends that Affected Unsecured Creditors vote to approve the Plan.

## SUPPORT OF OTHER SIGNIFICANT STAKEHOLDERS

The Plan reflects the terms of the Settlement and Support Agreement entered into by, among others, the Canadian Debtors, U.S. Debtors, EMEA Debtors, Monitor, the members of the CCC, UCC, UKPI, NNSA, the NNSA Conflicts Administrator, Joint Administrators and Joint Liquidators each of whom support the Plan pursuant to the terms of the Settlement and Support Agreement. Additionally, Crossover Bondholders with a principal amount of $3 billion representing 80% of the principal amount of the Crossover Bonds and NNCC Bondholders holding NNCC Bonds with a total principal amount of $135,665,000 representing 90.44% of the principal amount of the NNCC Bonds support the Plan, subject to the terms of the Settlement and Support Agreement.

See also "*Required Approvals under the CCAA and Other Conditions to Implementation – Conditions to the Effectiveness and Implementation of the Plan*."

## MEETING AND VOTING

Pursuant to the Settlement and Support Agreement, the Meeting is targeted to be held by January 17, 2017.

The actual date for calling the Meeting and the process for voting on the Plan will be subject to the Meeting Order which will be subject to CCAA Court approval on or about December 1, 2016. Once granted, the Meeting Order will be posted on the Monitor's Website and distributed in accordance with the terms of the Meeting Order. The Meeting Order will also set the forms of proxy, instructions for voting and other matters relevant to the voting on the Plan and conduct of the Meeting.

Pursuant to the CCAA and the Plan, in order for the Plan to be approved, the Resolution must receive the affirmative vote of the Required Majority of the Affected Unsecured Creditors Class, being a majority in number of Affected Unsecured Creditors with Voting Claims who vote (in person or by proxy) on the Plan at the Meeting, and two-thirds in value of the Voting Claims held by such Affected Unsecured Creditors who vote (in person or by proxy) on the Plan at the Meeting.

For the purpose of calculating the two-thirds majority in value of Voting Claims in the Affected Unsecured Creditors Class, the aggregate amount (in U.S. dollars) of Voting Claims held by those Affected Unsecured Creditors who vote in favour of the Plan (in person or by proxy) shall be divided by the aggregate amount (in U.S. dollars) of all Voting Claims held by all Affected Unsecured Creditors who vote on the Plan (in person or by proxy). For the purpose of calculating a majority in number of Affected Unsecured Creditors voting on the Plan, each Affected Unsecured Creditor that votes on the Plan (in person or by proxy) shall only be counted once, without duplication.

Pursuant to the Plan, for the purposes of considering and voting on the Resolution there shall be one class of Affected Creditors, the Affected Unsecured Creditors Class.

### WITHHOLDING FROM DISTRIBUTIONS AND CERTAIN OTHER TAX MATTERS

**The following discussion is not and is not intended to be, nor should it be construed to be, legal or tax advice to any particular Affected Creditor as to the consequences of receiving any distributions or payments under the Plan. Affected Creditors are urged to consult their own tax advisors for advice as to the tax considerations in respect of the Plan having regard to their particular circumstances.**

The Canadian Estate and any other Person making distributions under the Plan (a "**Payer**") will deduct and withhold from any distribution or payment to any Person made pursuant to the Plan such amounts as are required to be deducted or withheld with respect to such distribution or payment under Applicable Laws and will remit such amounts to the appropriate Taxing Authority or other Person entitled thereto. Any amount deducted or withheld and remitted to the appropriate Taxing Authority or other Person shall be treated for all purposes as having been paid to the Person receiving the distribution or payment as part of the distribution or payment to the Person under the Plan. Where a Payer deducts or withholds amounts from a distribution or payment under the Plan, no gross-up or additional amount will be paid on, or in respect of, such distribution or payment.

Without limiting the generality of the foregoing paragraph, the following are certain of the distributions or payments contemplated by the Plan that will be subject to deduction and withholding: (a) payments as, on account or in lieu of payment of, or in satisfaction of, interest to a Person who is a non-resident of Canada (other than a Person who is a qualifying person for the purposes of the Canada-United States Income Tax Convention) who does not deal at arm's length with the Canadian Debtors, or a Person who is a "Specified non-resident Shareholder" (as defined in the Canadian Tax Act) of a Canadian Debtor; (b) distributions or payments made as, or on account of, salary, wages and other remuneration, a superannuation or pension benefit, a retiring allowance, or a death benefit; and (c) distributions or payments made to a Person who is a non-resident of Canada in respect of services rendered in Canada. In addition, certain

distributions or payments to Creditors may be subject to deductions on account of any employment insurance overpayment received by a Creditor.

Pursuant to the Plan, any Creditor whose latest address on file with the Monitor as at the Distribution Record Date for the Initial Distribution is not a Canadian address shall be treated as a non-resident of Canada for all Applicable Laws, including for purposes of any applicable withholding taxes. The Canadian Estate or the Monitor may request documentation from a Creditor regarding its residency status. If, upon such request, a Creditor fails to provide satisfactory evidence that it is a resident of Canada, the Creditor shall be treated as a non-resident for all Applicable Laws, including for the purposes of any applicable withholding taxes.

***Transfer Taxes***

Payments or distributions made pursuant to the Plan will be inclusive of any applicable Canadian federal goods and services tax, harmonized sales tax, and any other applicable Canadian provincial, U.S. or other foreign sales tax. These taxes may be required to be remitted by the recipient to the appropriate Taxing Authority.

## RISK FACTORS

*In evaluating the Plan and determining whether to vote for the Resolution, Affected Creditors should read and consider carefully the risk factors set forth below. These risk factors should not, however, be regarded as the only risks associated with the Plan. You should carefully consider information about these risks and uncertainties, together with all of the other information contained within this document.*

**Risks Relating to Non-Implementation of the Plan**

***Failure to Implement the Plan and the Settlement and Support Agreement***

If the Plan is not implemented before the Outside Date the Canadian Debtors may remain under CCAA protection for an indefinite period of time. The most likely alternative to the Plan is continued litigation among the Canadian Debtors, EMEA Debtors and U.S. Debtors and various stakeholders, including over the resolution of claims and the outstanding appeals and cross-appeals of the Allocation Decisions, which could be protracted, expensive and uncertain in outcome.

If the Plan and the Settlement and Support Agreement are not implemented, there is no assurance that any distributions to the Affected Creditors will be on terms that provide equivalent value to Affected Creditors compared to the distributions to be received by Affected Creditors pursuant to the Plan.

**Risks Relating to the Plan and its Implementation**

***Consummation of the CCAA Plan is subject to Affected Unsecured Creditors' acceptance and Court approval***

Before the Plan can be consummated, it must have been approved by the Required Majority and sanctioned, after notice and a hearing on any objection, by the CCAA Court. Although the Support and Settlement Agreement binds various significant Creditors to vote to approve the

Plan, there can be no assurance that the Plan will be approved by the Required Majority, and that even if approved, the CCAA Court will sanction the Plan. The failure of any of these conditions will delay or prevent the consummation of the Plan.

***The Implementation of the Plan and the Settlement and Support Agreement is subject to a number of other significant conditions***

Implementation of the Plan is subject to numerous other conditions, which must be satisfied (or waived, if applicable) prior to effectiveness and implementation of the Plan. This includes the dismissal of all of the remaining litigation relating to the Allocation Dispute.  Not all of the parties to the litigation are party to the Settlement and Support Agreement and such parties may object to the dismissal of the remaining litigation.  In addition, the effectiveness of the Settlement and Support Agreement is subject to confirmation of the U.S. Plans and receipt of various foreign Court approvals.

As of the date hereof, there can be no assurance that any or all of the conditions in the Plan or in the Settlement and Support Agreement will be satisfied (or waived, if applicable). In addition, there can be no assurance that the Plan or the Settlement and Support Agreement will be consummated even if the Plan is approved by the Affected Unsecured Creditors and sanctioned by the CCAA Court. See "*Required Approvals under the CCAA and Other Conditions to Implementation*".

***If any of the conditions to consummation are not satisfied or an alternative plan is not approved, the Canadian Debtors may be forced to continue litigation over claims and the allocation of Sale Proceeds***

If any of the conditions precedent as described in the Plan, including Court sanction and the satisfaction of the implementation conditions, are not satisfied (or waived, if applicable) and the Plan or the Settlement and Support Agreement is not consummated, there can be no assurance when distributions to Affected Unsecured Creditors may be possible, or that such distributions would be comparable to those contemplated under the Plan. The most likely alternative to the Plan is continued litigation among the Canadian Debtors, the EMEA and U.S. Estates and various stakeholders, including over the resolution of claims and the outstanding appeals and cross-appeals of the Allocation Decisions, which could be protracted, expensive and uncertain in outcome.

**Risks Related to Recovery under the Plan**

*Financial Analysis Subject to Other factors*

Financial analysis or other estimations contained herein, including any financial analysis containing numerical specificity, is based on assumptions and estimates which may not be achieved and is subject to business, economic, regulatory and other uncertainties which may be beyond the control of the Canadian Debtors and the Monitor.  Without limiting the foregoing, the foreign exchange rate applicable to any remaining asset realizations or other conversions (including for the conversion of funds from U.S. dollars to Canadian dollars or vice versa as contemplated by the Plan) could adversely impact the ultimate return to Creditors.

*Remaining Estate Recoveries may differ from Monitor's Current estimated Calculations*

The Monitor has based its estimated recoveries on certain assumptions as to the remaining asset realizations available to the Canadian Estate, including on account of recovery of funds from foreign subsidiaries and the sale of the remaining IP Addresses.  The actual amount realized may vary depending on the final resolution of claims and legal, political and tax matters in respect of foreign entities as they complete their formal or informal wind up proceedings. Further, there is no guarantee that the Canadian Estate will be able to sell its remaining IP Addresses or for what price.

*The actual amount of Proven Claims may differ from the estimated Affected Unsecured Claims and adversely affect the percentage recovery of each individual Affected Unsecured Creditor*

Recovery estimates for Affected Unsecured Creditors have been based on certain assumptions regarding the total quantum and priority of proven Claims against, and other liabilities of, the Canadian Estate, which assumptions may not be borne out. The resolution of unresolved Claims, including as to quantum or priority, or the assertion of any new Claims, including in respect of the post-Filing Date period, could impact the actual distributions received by Affected Unsecured Creditors pursuant to the Plan.

*The Timing of Distributions may Vary*

The Canadian Debtors and Monitor cannot estimate the amount of time that will lapse between the Effective Date of the Plan and certain Distributions under the Plan, including the Final Distribution which will depend on, among other factors, the amount of time required to recover funds from foreign subsidiaries and resolve all remaining Affected Unsecured Unresolved Claims and other obligations of the Canadian Debtors, including any Post-Filing Claims that may be filed.

*The Canadian Debtors remain subject to environmental laws and regulations and the environmental liabilities and obligations of the Canadian Debtors have yet to be finally determined and may not be determined in a timely fashion*

NNL's historical operations included the management and disposal of hazardous substances. The Canadian Debtors are subject to environmental laws and regulations, including certain director's orders issued against NNL pursuant to the *Environmental Protection Act* (R.S.O. 1990, c. E.19) relating to environmental risk management and remediation of hazardous substances alleged to be relating to certain of NNL's former operations at properties which it owned or continues to own in Ontario. In addition, the Canadian Debtors have received related notices and Claims in these CCAA Proceedings relating to environmental liabilities and obligations, some of which remain unresolved as of the date of this Information Circular.  NNL may have ongoing statutory obligations for an indefinite period of time for carrying out various risk assessment and risk management measures relating to these matters which may include the identification, investigation and analysis of environmental impacts as well as the mitigation of such impacts. The ability of NNL to cease performing these statutory obligations post-Plan implementation is uncertain, as is the timeline for the final determination of any related obligations or liabilities. The Canadian Debtors' ultimate liabilities, if any, relating to these matters, including any Claim that may become a Proven Affected Unsecured Claim under the Plan, has yet to be determined.

*Certain Tax Impacts*

There are a number of material income tax considerations, risks and uncertainties related to the Plan.  Creditors are urged to obtain their own tax advice as to these tax considerations and risks.

***Canadian Debtors' income tax position remains unresolved and the Plan may have a negative impact on the Canadian Debtors' income tax position***

The final income tax position of the Canadian Debtors has yet to be resolved or determined. Although the Canadian Debtors do not expect to have any income tax payable as a result of receipt of the Canadian Allocation or the other transactions contemplated in, or related to, the Plan or the Settlement and Support Agreement, there can be no guarantee that the Canadian Debtors will not be required to pay any such taxes, or that the Canadian Debtors' outstanding tax matters, including pending audits, will be resolved in a timely or favourable manner. Further, there can be no guarantee or other assurance that the transactions and other matters contemplated by the Plan, including the proposed substantive consolidation of the Canadian Debtors, will not have a negative impact on the Canadian Debtors' tax position or attributes.

***Distributions and payments to Creditors may be subject to withholdings and have tax impacts for individual Creditors***

Distributions or payments to Creditors pursuant to the Plan may have income tax consequences for Creditors depending on their circumstances, including that such distributions and payments may subject the recipient to liability for income tax or be subject to non-resident withholding tax or other taxes. The potential distributions may be inclusive of amounts in respect of Canadian federal goods and services, harmonized sales taxes and any other applicable Canadian federal, provincial, U.S. or other foreign sales taxes, which may be required to be remitted by the recipient to the appropriate Taxing Authority. Creditors are urged to obtain their own tax advice with respect to the matters contemplated in the Plan, including the tax impact of receipt of distributions and payments on them.

*Costs of Administration*

Even if the Plan is implemented, the Monitor and Canadian Debtors will need to take various steps to wind down the Canadian Estate, including as set out in Section 10.1 of the Plan.  The costs of the wind-down efforts and ongoing administration of the CCAA Proceedings could exceed those currently forecast by the Monitor and reduce distributions pursuant to the Plan.

## DOCUMENTS INCORPORATED BY REFERENCE

The Plan, including all Schedules and Exhibits thereto, which has been filed with the CCAA Court, is specifically incorporated by reference into and form is an integral part of this Information Circular.

Any statement contained in a document incorporated or deemed to be incorporated by reference herein shall be deemed to be modified or superseded for purposes of this Information Circular to the extent that a statement contained herein or any other subsequently filed document that also is or is deemed to be incorporated by reference herein modifies or supersedes that statement.  The modifying or superseding statement need not state that it has modified or superseded a prior statement or include any other information set forth in the document that it modifies or

supersedes.    The making of a modifying or superseding statement shall not be deemed an admission for any purposes that the modified or superseded statement, when made, constituted a misrepresentation, an untrue statement of a material fact or an omission to state a material fact that is required to be stated or that is necessary to make a statement not misleading in light of the circumstances in which it was made.    Any statement so modified or superseded shall not be deemed, except as so modified or superseded, to constitute a part of this Information Circular.

## SCHEDULE A

## FORM OF RESOLUTION

**BE IT RESOLVED THAT:**

1.      The plan of compromise and arrangement dated November 30, 2016 (as such Plan may be amended, varied or supplemented from time to time in accordance with its terms, the "**Plan**") under the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended to and including January 14, 2009 (the "**CCAA**"), concerning, affecting and involving Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Global Corporation, Nortel Networks International Corporation, Nortel Networks Technology Corporation, Nortel Communications Inc., Architel Systems Corporation and Northern Telecom Canada Limited (each, a "**Canadian Debtor**" and collectively, the "**Canadian Debtors**"), substantially in the form served on the service list in the CCAA proceedings on November 30, 2016, and the transactions contemplated therein be and is hereby accepted, approved, agreed to and authorized; and

2.      Any authorized representative of the Canadian Debtors be and is hereby authorized, for and on behalf of the Canadian Debtors, to execute and deliver, or cause to be executed and delivered, any and all documents and instruments and to take or cause to be taken such other actions as he or she may deem necessary or desirable to implement this resolution and the matters authorized hereby, including the transactions required by the Plan, such determination to be conclusively evidenced by the execution and delivery of such documents or other instruments or taking of any such action.

## SCHEDULE "B" – GLOSSARY OF CERTAIN TERMS

"**1988 Bondholder**" means a holder of one or more 1988 Bonds, including any holder of a beneficial interest in 1988 Bonds.

"**1988 Bondholder Claim**" means a Claim by a 1988 Bondholder in respect of the 1988 Bonds, including as asserted by the 1988 Bonds Trustee.

"**1988 Bonds**" means the 6.875% Senior Notes due 2023, governed by the 1988 Bonds Indenture, issued by Northern Telecom Limited (now NNL).

"**1988 Bonds Indenture**" means that certain Indenture dated November 30, 1988, made by Northern Telecom Limited (now NNL), as issuer, and The Toronto-Dominion Bank Trust Company, as trustee.

"**1988 Bonds Trustee**" means Wilmington Trust, National Association in its capacity as replacement trustee under the 1988 Bonds Indenture.

"**2006 Bonds**" means the Floating Rate Senior Notes due 2011, the 10.125% Senior Notes due 2013 and the 10.750% Senior Notes due 2016, governed by the Indenture dated as of July 5, 2006, as supplemented by the First Supplemental Indenture dated as of July 5, 2006, the Second Supplemental Indenture dated as of May 1, 2007, and the Third Supplemental Indenture dated as of May 28, 2008, issued by NNL and guaranteed by NNC and NNI.

"**2007 Bonds**" means the 1.75% Convertible Senior Notes due 2012 and the 2.125% Convertible Senior Notes due 2014, governed by the Indenture dated as of March 28, 2007,  issued by NNC and guaranteed by NNL and NNI.

"**Additional Bondholder Fee Amount**" has the meaning ascribed thereto in Section 4.11 of the Plan.

"**Administration Charge**" has the meaning ascribed thereto in the Initial Order.

"**Administrative Reserve**" means a reserve of Available Cash in an amount to be determined by the Monitor to be held by the Canadian Estate for the purpose of maintaining security for obligations secured by the Administration Charge and funding the ongoing obligations, administration and wind-down of the Canadian Estate and the implementation of the Plan, including the professional fees and expenses of the Monitor and its counsel.

"**Affected Claim**" means (i) any Claim that is not an Unaffected Claim, and (ii) any Director/Officer Claim that is a Released Claim and, for greater certainty, includes any Affected Unsecured Claim, Intercompany Claim (excluding any Canadian Intercompany Claim and the Remaining Revolver Claim) or Equity Claim.

"**Affected Creditor**" means any Creditor with an Affected Claim, but only with respect to and to the extent of such Affected Claim.

"**Affected Unsecured Claim**" means any Affected Claim that is not a Director/Officer Claim or Equity Claim.

"**Affected Unsecured Creditor**" means any holder of an Affected Unsecured Claim, but only with respect to and to the extent of such Affected Unsecured Claim.

"**Affected Unsecured Creditor Pool**" means, on a Distribution Date, the amount of Available Cash, less: (i) the Unresolved Claims Reserve; (ii) the Administrative Reserve; and (iii) the amounts necessary to satisfy any outstanding Proven Priority Claims.

"**Affected Unsecured Creditors Class**" means the class of Creditors comprised solely of Affected Unsecured Creditors grouped for the purposes of considering and voting on the Plan and receiving distributions hereunder.

"**Allocation Dispute**" means that certain litigation before the Canadian Court and the U.S. Court in which the allocation of the Sale Proceeds is at issue.

"**Applicable FX Rate**" means the spot or blended rate (as applicable, which blended rate shall take into account the amounts converted and the rates at which such conversion occurred) at which Sale Proceeds are or have been

converted from U.S. dollars to Canadian dollars as contemplated by Section 7(b) of the Settlement and Support Agreement.

"**Applicable Law**" means any law, statute, order, decree, consent decree, judgment, rule regulation, ordinance or other pronouncement having the effect of law whether in Canada, the United States or any other country, or any domestic or foreign state, county, province, city or other political subdivision or of any Governmental Entity.

"**Allowed Claims**" shall have the meaning given to such term in the U.S. Plans.

"**Available Cash**" means, from time to time, all Cash of the Canadian Estate, including but not limited to the Canadian Debtors' cash on hand and amounts released to the Canadian Estate as contemplated pursuant to Section 4.2 and Section 4.3 of the Plan, and includes any Cash received by the Canadian Estate from the sale or other disposition or monetization of any residual assets or any other Cash received by the Canadian Estate from time to time.

"**Bankruptcy Proceeding**" means any bankruptcy or receivership proceeding pursuant to the BIA, whether commenced by application for a bankruptcy or receivership order or by an assignment in bankruptcy made or deemed to be made, and shall include any proceeding in which a receiver is appointed in respect of a Person or its assets, including pursuant to provincial law.

"**BIA**" means the *Bankruptcy and Insolvency Act* (R.S.C. 1985, c. B-3, as amended) or any successor legislation thereto.

"**Bonds**" means the Crossover Bonds, NNCC Bonds and 1988 Bonds.

"**Bondholder Advisor Fee Letter**" means that certain fee letter dated June 23, 2011, among certain of the Canadian Debtors, Bennett Jones LLP, Milbank, Tweed, Hadley & McCloy LLP and FTI Capital Advisors, LLC and shall include, for the avoidance of doubt, the "2009 Engagement Letter" as such term is defined in the fee letter.

"**Bondholder Group**" means the ad hoc group of bondholders that hold notes issued and/or guaranteed by NNC, NNL, NNI and NNCC that has been organized and is participating in the CCAA Proceedings and the U.S. Proceedings, as such group may have been and may be constituted from time to time.

"**Business Day**" means a day, other than Saturday, Sunday or a statutory holiday, on which banks are generally open for business in both Toronto, Ontario, Canada and New York, New York, USA.

"**Canada Only Sale Proceeds Orders**" means the following orders of the CCAA Court: (i) Approval and Vesting Order (Strandherd Lands) dated November 19, 2009; (ii) Approval and Vesting Order (Nortel-LGE Joint Venture) dated May 3, 2010; (iii) Approval and Vesting Order (Relay) dated June 29, 2010; (iv) Approval and Vesting Order (IP Address Sale – Salesforce.com, Inc.) dated February 17, 2012; (v) Approval and Vesting Order (IP Address Sale) dated February 17, 2012; (vi) Approval and Vesting Order (IP Address Sale – Bell Aliant Regional Communications Limited Partnership) dated April 4, 2012; (vii) Approval and Vesting Order (IP Address Sale – Vodafone Americas Inc.) dated May 7, 2012; (viii) Approval and Vesting Order (IP Address Sale – Beyond Excellent Technology Ltd.) dated September 9, 2014; (ix) Approval and Vesting Order (IP Address Sale – Charter Communications Operating, LLC) dated December 17, 2014; (x) Approval and Vesting Order (IP Address Sale – Zhejiang Tmall Technology Co., Ltd. and Alibaba Cloud Computing Limited) dated February 3, 2015; (xi) Approval and Vesting Order (IP Address Sale – Alibaba.com LLC) dated April 16, 2015; (xii) Approval and Vesting Order (IP Address Sale – Frontier Communications) dated August 5, 2015; (xiii) Approval and Vesting Order (IP Address Sale – Suddenlink Communications) dated August 5, 2015; (xiv) Approval and Vesting Order (IP Address Sale – Reliance Jio Infocomm Pte Ltd.) dated January 6, 2016; (xv) Approval and Vesting Order (IP Address Sale – Zhejiang Alibaba Cloud Computing Limited and Alibaba.com LLC) dated February 1, 2016, and any other order of the CCAA Court pursuant to which proceeds of sale arising solely from the assets of the Canadian Debtors are held (but excluding, for the avoidance of doubt, the orders of the CCAA Court approving the Escrow Agreements).

"**Canadian Allocation**" means the Sale Proceeds to be received by the Canadian Estate pursuant to Section 2 of the Settlement and Support Agreement as described in Section 4.2(c)(i) of the Plan.

"**Canadian Court**" means the CCAA Court, the Ontario Court of Appeal, the Supreme Court of Canada or any other court of competent jurisdiction overseeing the CCAA Proceedings or any Bankruptcy Proceeding in respect of any of the Canadian Debtors or their assets (including any appeals) from time to time.

"**Canadian Dollar Escrow Account**" means the account with the Canadian Escrow Agent established pursuant to the Canadian Escrow Agreement to hold the Canadian dollar denominated Cash resulting from the conversion of up to $1,200,000,000 of Sale Proceeds into Canadian dollars as contemplated in the Settlement and Support Agreement.

"**Canadian Escrow Agent**" means Royal Trust Corporation of Canada in its capacity as Canadian distribution agent under the Canadian Escrow Agreement.

"**Canadian Escrow Agreement**" means that certain Canadian distribution escrow agreement dated October 24, 2016, among NNC, NNL, NNI, NNUK, NNSA certain other Nortel Group entities, the Monitor, the UCC and the Canadian Escrow Agent governing that portion of the Sale Proceeds that has been or will be converted into Canadian dollars as contemplated in the Settlement and Support Agreement.

"**Canadian Escrow Release Order**" means an order issued by the CCAA Court authorizing and directing the Escrow Agents to release the Sale Proceeds from the Escrow Accounts in the manner contemplated by the Settlement and Support Agreement.

"**Canadian Estate**" means the Canadian Debtors as substantively consolidated pursuant to the Plan, the corporate body of which shall be NNL. From and after the Plan Effective Date, references to the Canadian Estate shall be deemed to be references to NNL, and *vice versa*.

"**Canadian Intercompany Claims**" has the meaning ascribed thereto in Section 2.2(f) of the Plan.

"**Canadian Pension Claim**" means any and all Claims arising from or related to deficits and alleged deficits in the Canadian Registered Pension Plans.

"**Canadian Registered Pension Plans**" means: (i) the Managerial Plan; and (ii) the Negotiated Plan.

"**Canadian Tax Act**" means the *Income Tax Act* (Canada) and the Income Tax Regulations, in each case as amended from time to time.

"**Cash**" means cash, certificates of deposit, bank deposits, commercial paper, treasury bills and other cash equivalents.

"**CCAA**" has the meaning ascribed thereto in the recitals to the Plan.

"**CCAA Court**" has the meaning ascribed thereto in the recitals to the Plan.

"**CCAA Proceedings**" means the proceedings commenced by certain of the Canadian Debtors in the CCAA Court under the CCAA on the Filing Date, having Court File Number 09-CL-7950, and shall include the CCAA proceedings of the New Applicants.

"**CCC**" means the ad hoc committee of creditors having claims only against the Canadian Debtors comprised of: the former and disabled Canadian employees of the Canadian Debtors through their court-appointed representatives, Unifor, Morneau Shepell Ltd. as Administrator of the Canadian Registered Pension Plans, the Superintendent of Financial Services of Ontario as Administrator of the Pension Benefits Guarantee Fund and the court-appointed representatives of the current and transferred employees of the Canadian Debtors.

"**Chapter 15 Proceedings**" means the foreign recognition proceedings of the Canadian Debtors pursuant to Chapter 15 of the United States Bankruptcy Code pending before the U.S. Bankruptcy Court (Case No. 09-10164(KG)).

"**Charges**" means the Administration Charge, the Excess Funding Charge, the Directors' Charge, the Inter-Company Charge, the Shortfall Charge, the Payments Charge and the Nortel Special Incentive Plan Charge, each as defined in the Initial Order.

"**Claim**" means:

(a)    any right of any Person against the Canadian Debtors, or any of them, in connection with any indebtedness, liability or obligation of any kind of the Canadian Debtors, or any of them, whether liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, unsecured, perfected, unperfected, present, future, known or unknown, by guarantee, surety or otherwise and whether or not such right is executory or anticipatory in nature, including the right or ability of any Person to advance a claim for contribution or indemnity or otherwise with respect to any matter, action, cause or chose in action, whether existing at present or commenced in the future, which indebtedness, liability or obligation (A) is based in whole or in part on facts existing prior to the Filing Date, (B) relates to a time period prior to the Filing Date, or (C) would have been a claim provable in bankruptcy had the Canadian Debtors become bankrupt on the Filing Date; and

(b)    any indebtedness, liability or obligation of any kind arising out of the restructuring, termination, repudiation or disclaimer of any lease, contract, or other agreement or obligation on or after the Filing Date,

and shall include any "Claim", "EMEA Claim" or "Intercompany Claim" (as such terms are defined in the Claims Orders, in each case without any reference to the exclusion of any claims in such definitions), provided that the definition of Claim herein shall not include a Director/Officer Claim.

"**Claims Orders**" means, as the context requires, any or all of the following orders of the CCAA Court: (i) the Claims Procedure Order; (ii) the Claims Resolution Order dated September 16, 2010; (iii) the Order Approving Cross-Border Claims Protocol dated September 16, 2010; (iv) the Compensation Claims Procedure Order; (v) the EMEA Claims Procedure Order dated January 14, 2011; (vi) the Intercompany Claims Procedure Order dated July 27, 2012; (vii) paragraphs 12 to 18 of the Order (Stay Extension and Various Other Matters – September 2016) dated September 29, 2016; and (viii) the Post-Filing Claims Bar Date Order.

"**Claims Procedure Order**" means the Claims Procedure Order of the CCAA Court dated July 30, 2009, as amended and restated on October 7, 2009.

"**Compensation Creditors**" means Creditors who are holders of Compensation Claims (as such term is defined in the Compensation Claims Procedure Order).

"**Contingent Additional NNUK Claim**" has the meaning ascribed thereto in Section 4.8 of the Plan.

"**Court Appointed Representative Counsel**" shall mean Koskie Minsky LLP, Shibley Righton LLP and Nelligan O'Brien Payne LLP in their capacity as CCAA Court appointed representative counsel to certain Compensation Creditors pursuant to orders of the CCAA Court dated May 27, 2009 (former employees), July 22, 2009 (current employees) and July 30, 2009 (long term disability beneficiaries), and shall include any financial advisor retained by such counsel.

"**Creditor**" means any Person having a Claim, but only with respect to and to the extent of such Claim, including the transferee or assignee of a transferred Claim that is recognized as a Creditor in accordance with the Claims Orders or a trustee, executor, liquidator, receiver, receiver and manager, or other Person acting on behalf of or through such Person, and shall include the Former Employee Priority Creditors.

"**Creditor Joinder**" means a joinder to the Settlement and Support Agreement, substantially in the form annexed thereto as Annex D.

"**Creditor's Maximum**" has the meaning ascribed thereto in Section 3.5(b) of the Plan.

"**Crossover Bondholder**" means a holder of one or more Crossover Bonds, including any holder of a beneficial interest in Crossover Bonds.

"**Crossover Bondholder Claim**" means a Claim by a Crossover Bondholder in respect of the Crossover Bonds, including as asserted by the Crossover Bonds Trustee.

"**Crossover Bonds**" means the 2006 Bonds and the 2007 Bonds.

"**Crossover Bonds Indentures**" means: (i) the Indenture dated as of March 28, 2007, by NNC as issuer and NNL and NNI as guarantors, governing the 2007 Bonds; (ii) the Indenture dated as of July 5, 2006, as supplemented by the First Supplemental Indenture dated as of July 5, 2006, the Second Supplemental Indenture dated as of May 1, 2007, and the Third Supplemental Indenture dated as of May 28, 2008, by NNL as issuer and NNC and NNI as guarantors, governing the 2006 Bonds, in each case with the Crossover Bonds Trustee as trustee.

"**Crossover Bonds Trustee**" means The Bank of New York Mellon in its capacity as indenture trustee under the Crossover Bonds Indentures.

"**Crossover Claim**" means a claim arising out of a debt or other obligation of one or more of the U.S. Debtors that is guaranteed or indemnified by one or more of the Canadian Debtors, or a debt or other obligation of one or more of the Canadian Debtors that is guaranteed or indemnified by one or more of the U.S. Debtors, including the Crossover Bondholder Claims, the NNCC Bondholder Claims and the claims of Export Development Canada against the U.S. Debtors and the Canadian Debtors, but excluding, in relation to the Canadian Debtors, any obligation of a Canadian Debtor guaranteed by another Canadian Debtor.

"**Directors**" means all former directors (or their estates) of the Canadian Debtors, in such capacity, and "**Director**" means any one of them.

"**Directors' Charge**" has the meaning ascribed thereto in the Initial Order.

"**Director/Officer Claim**" means any right or claim of any Person howsoever arising against one or more of the Directors or Officers that relates to a Claim for which any Director or Officer of a Canadian Debtor is alleged to be by statute or otherwise by law liable to pay in his or her capacity as a Director or Officer, whether or not such right or claim is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, unsecured, perfected, unperfected, present, future, known, or unknown, by guarantee, surety or otherwise, and whether or not such right is executory or anticipatory in nature, including the right or ability of any Person to advance a claim for contribution or indemnity or otherwise with respect to any claim, matter, action, cause or chose in action, whether existing at present or commenced in the future, and shall include any "Director/Officer Claim" (as such term is defined in the Claims Procedure Order without any reference to the exclusion of any claims in such definition).

"**Distribution Date**" means the date or dates from time to time set in accordance with the provisions of the Plan to effect distributions in respect of the Proven Affected Unsecured Claims, and includes the Initial Distribution Date.

"**Distribution Record Date**" has the meaning ascribed thereto in Section 6.3(b) of the Plan.

"**Duplicative Claims**" has the meaning ascribed thereto in Section 2.2(d) of the Plan.

"**EI Act**" means the *Employment Insurance Act* (S.C. 1996, c. 23, as amended).

"**EI Confirmation**" means, in respect of a Compensation Creditor, confirmation from Employment and Social Development Canada of the amount, if any, owing by such Compensation Creditor pursuant to Section 45 of the EI Act.

"**EMEA Claims Settlement Agreement**" means the Agreement Settling EMEA Canadian Claims and Related Claims dated July 9, 2014, and approved by Order (Approving Agreement Settling EMEA Canadian Claims and Related Claims) of the CCAA Court dated July 16 , 2014.

"**EMEA Non-Filed Entities**" means, collectively, Nortel Networks AS, Nortel Networks AG, Nortel Networks South Africa (Pty) Limited, Nortel Networks (Northern Ireland) Limited and Nortel Networks Optical Components Limited.

"**Encumbrance**" means any charge, mortgage, lien, pledge, claim, restriction, hypothec, adverse interest, security interest or other encumbrance whether created or arising by agreement, statute or otherwise at law, attaching to property, interests or rights and shall be construed in the widest possible terms and principles known under the law

applicable to such property, interests or rights and whether or not they constitute specific or floating charges as those terms are understood under the laws of the Province of Ontario.

"**Equity Claim**" means a Claim that is in respect of an Equity Interest, including a claim for, among others: (a) a dividend or similar payment, (b) a return of capital, (c) a redemption or retraction obligation, (d) a monetary loss resulting from the ownership, purchase or sale of an Equity Interest or from the rescission, or, in Quebec, the annulment, of a purchase or sale of an Equity Interest, or (e) contribution or indemnity in respect of a claim referred to in any of the foregoing (a) to (d).

"**Equity Claimant**" means any Person with an Equity Claim or holding an Equity Interest, but only in such capacity.

"**Equity Interest**" means a share of a Canadian Debtor, or a warrant or option or another right to acquire a share in a Canadian Debtor, including the common shares of NNC and the preferred shares of NNL.

"**Escrow Agents**" means JPMorgan Chase Bank, N.A., the Canadian Escrow Agent and any other "Escrow Agent" as defined in the Settlement and Support Agreement.

"**Escrow Agreements**" means the various court-approved escrow agreements listed in Schedule A to the Plan pursuant to which the Sale Proceeds are held by the Escrow Agents, and shall include the Canadian Escrow Agreement and any other "Escrow Agreement" as such term is defined in the Settlement and Support Agreement.

"**Estate**" means either the Canadian Estate, the U.S. Debtors, or the EMEA Debtors (or any of them), as the context requires.

"**Final Distribution Certificate**" means a certificate of the Monitor to be posted by the Monitor on the Monitor's Website indicating that the Canadian Estate intends to make a Final Distribution, a copy of which shall be served on the service list in the CCAA Proceedings and filed with the CCAA Court.

"**Final Order**" means (a) with respect to an order of a Canadian Court, an order:  (i) as to which no appeal, leave to appeal, notice of appeal, motion to amend or make additional findings of fact, motion to alter or amend judgment, motion for rehearing or motion for new trial has been timely filed (in cases in which there is a date by which such filing is required to occur, it being understood that with respect to an order issued by the CCAA Court, the time period for seeking leave to appeal shall be deemed to have elapsed on the date that is 22 days after the rendering of such order unless a motion has been made to extend such time period) or, if any of the foregoing has been timely filed, it has been disposed of in a manner that upholds and affirms the subject order in all material respects without the possibility for further appeal thereon; (ii) in respect of which the time period for instituting or filing an appeal, leave to appeal, motion for rehearing or motion for new trial shall have expired (in cases in which such time period is capable of expiring, it being understood that with respect to an order issued by the CCAA Court, the time period for seeking leave to appeal shall be deemed to have elapsed on the date that is 22 days after the rendering of such order unless a motion has been made to extend such time period); and (iii) as to which no stay is in effect; or (b) with respect to an order of a U.S. Court, an order that has not been reversed, stayed, superseded or vacated or, to the extent it has been stayed such stay shall have expired.

"**Former Employee Priority Creditors**" means the former employees of the Canadian Debtors who are entitled to a CA$3,000 priority claim in these CCAA Proceedings in lieu of receiving their Termination Payment pursuant to the Order (Stay Extension and Various Other Matters – March 2016) of the CCAA Court dated March 18, 2016.

"**French Liquidator**" means Maître Cosme Rogeau in his capacity as Liquidator for NNSA under the French Secondary Proceeding.

"**Iceberg**" means the residual intellectual property remaining following the Nortel Group business line sales, which intellectual property was sold to a consortium in July 2011.

"**Iceberg Amendment Fee**" means the $5,000,000 cumulative fee previously agreed by the Canadian Debtors, U.S. Debtors and EMEA Debtors to be funded directly as follows: $2,800,000 to NNI, and $2,200,000 to NNUK, all from the Iceberg Sale Proceeds prior to any other agreed upon allocation of the Sale Proceeds.

"**Iceberg Sale**" means the sale of the Iceberg assets.

"**Iceberg Sale Proceeds**" means that portion of the Sale Proceeds generated from the Iceberg Sale.

"**Indenture Trustee**" means each of the 1988 Bonds Trustee, the Crossover Bonds Trustee and the NNCC Bonds Trustee.

"**Initial Distribution**" means the first distribution to Affected Unsecured Creditors pursuant to Section 6.3 of the Plan.

"**Initial Distribution Date**" means the date on which the Initial Distribution is made, which date shall be a Business Day.

"**Inter-company Charge**" has the meaning ascribed thereto in the Initial Order.

"**Insurance Policy**" means any insurance policy pursuant to which any Canadian Debtor or any Director or Officer is insured.

"**Insured Claim**" means all or that portion of a Claim or a Director/Officer Claim that is insured under an Insurance Policy, but solely to the extent that such Claim or Director/Officer Claim, or portion thereof, is so insured, and only as against such insurance.

"**Intercompany Claims**" means a Claim by a Nortel Group entity (including by any administrator, liquidator, receiver, trustee, office holder or similar official appointed in respect thereof) against a Canadian Debtor, including those unsecured intercompany claims against the Canadian Debtors set out on Schedule "C" to the Plan.

"**Joint Liquidators**" means Richard Barker and Joseph Luke Charleton as joint liquidators of Nortel Networks (Northern Ireland) Limited (in liquidation) and Richard Barker and Samantha Keen as joint liquidators of Nortel Networks Optical Components Limited (in liquidation).

"**M&A Cost Reimbursement**" means the reimbursement of certain costs related to fees and expenses incurred in connection with the sale of assets which generated the Sale Proceeds.

"**Managerial Plan**" means the Nortel Networks Limited Managerial and Non-Negotiated Pension Plan (Registration No. 0342048).

"**Meeting**" means the meeting of the Affected Unsecured Creditors Class to be held on the Meeting Date called pursuant to the Meeting Order for the purpose of considering and voting on the Plan pursuant to the CCAA, and includes any adjournment, postponement or other rescheduling of such meeting in accordance with the Meeting Order.

"**Monitor's Powers Orders**" means the following orders of the CCAA Court: (i) the Initial Order; (ii) the Claims Orders; (iii) the Order dated August 14, 2009; (iv) the Order (Monitor's Expansion of Power Order #2) dated October 3, 2014; (v) the Order (New Applicants) dated March 18, 2016; and (vi) the Meeting Order.

"**MSS**" means Nortel's North American, CALA and Asian Multi-Service Switch business.

"**Negotiated Plan**" means the Nortel Networks Negotiated Pension Plan (Registration No. 08587766).

"**NNC**" means Nortel Networks Corporation, a Canadian Debtor.

"**NNCC**" means Nortel Networks Capital Corporation, a U.S. Debtor.

"**NNCC Bondholder**" means a holder of one or more NNCC Bonds, including any holder of a beneficial interest in NNCC Bonds.

"**NNCC Bondholder Claim**" means a Claim of an NNCC Bondholder in respect of the NNCC Bonds, including as asserted by the NNCC Bonds Trustee.

"**NNCC Bondholder Signatories**" means the holders of NNCC Bonds that executed the Settlement and Support Agreement as parties thereto.

"**NNCC Bonds**" means the 7.875% Notes due 2026 governed by the NNCC Bonds Indenture, issued by Northern Telecom Capital Corporation (now NNCC) and guaranteed by Northern Telecom Limited (now NNL).

"**NNCC Bonds Indenture**" means the Indenture dated as of February 15, 1996, by Northern Telecom Capital Corporation (now NNCC) as issuer, Northern Telecom Limited (now NNL) as guarantor and The Bank of New York, as trustee, governing the NNCC Bonds.

"**NNCC Bonds Trustee**" means Law Debenture Trust Company of New York in its capacity as replacement trustee under the NNCC Bonds Indenture.

"**NNI**" means Nortel Networks Inc., a U.S. Debtor.

"**NNL**" means Nortel Networks Limited, a Canadian Debtor.

"**Nortel Group**" means, collectively, NNC and all of its present and former direct and indirect subsidiaries.

"**Officers**" means all former officers (or their estates) of the Canadian Debtors, in such capacity, and "**Officer**" means any one of them.

"**Order**" means any order of the Canadian Court made in connection with the CCAA Proceedings.

"**Other Canadian Debtors**" means the Canadian Debtors other than NNL.

"**Participating Creditors**" has the meaning ascribed thereto in the Settlement and Support Agreement.

"**Person**" means any individual, firm, corporation, limited or unlimited liability company, general or limited partnership, association, trust, unincorporated organization, union, joint venture, government or any agency, officer or instrumentality thereof or any other entity.

"**Personnel Files Agreement**" means that certain Agreement re: Hard Copy Personnel Files dated December 3, 2015, among certain of the Canadian Debtors, the Monitor, certain of the U.S. Debtors and Morneau Shepell Ltd. in its capacity as administrator of the Canadian Registered Pension Plans and not in its personal capacity.

"**Plan**" means the Plan of Compromise and Arrangement filed by the Canadian Debtors under the CCAA, as it may be amended, supplemented or restated from time to time in accordance with the terms hereof.

"**Plan Certificates**" has the meaning ascribed to such term in Section 9.1 of the Plan.

"**Plan Effective Conditions**" has the meaning ascribed thereto in Section 9.2 of the Plan.

"**Plan Effective Date**" means the date which is the first Business Day on which the Plan Effective Conditions have been satisfied or waived in accordance with the terms of the Plan.

"**Plan Implementation Conditions**" means the conditions set out in Section 9.3 of the Plan.

"**Plan Implementation Date**" means the date which is the first Business Day on which the Plan Implementation Conditions have been satisfied or waived in accordance with the terms of the Plan.

"**Post-Filing Claim**" has the meaning ascribed thereto in the Post-Filing Claims Bar Date Order.

"**Post-Filing Claims Bar Date Order**" means the Order of the CCAA Court to be requested that establishes a claims bar date for Post-Filing Claims and a procedure to resolve any Post-Filing Claims.

"**Post-Filing Date Interest**" means interest or a similar amount on a Claim accruing or relating to the period from and after the Filing Date, and includes (i) a make whole premium, early redemption payment, optional redemption

payment, no-call payment or similar amount, and (ii) any interest accruing or relating to the period from and after the Filing Date that purports to be included as a component of a liquidated damages or similar provision under an agreement.

"**Proof of Claim**" has the meaning ascribed thereto in the Claims Orders.

"**Proven Affected Unsecured Claim**" means any Affected Unsecured Claim or portion thereof that has been finally determined to be a "Proven Claim" (as that term is defined in the Claims Orders) for distribution purposes, and includes the Claims referenced in Sections 4.4 through 4.10 of the Plan (excluding, for the avoidance of doubt, the Remaining Revolver Claim and the Canadian Intercompany Claims).

"**Proven NNUK Claim**" has the meaning ascribed thereto in Section 4.8 of the Plan.

"**Proven Priority Claims**" means: (i) the $62,700,000 Remaining Revolver Claim of NNI; (ii) the CA$3,000 (subject to applicable withholdings) payment to each Former Employee Priority Creditor in respect of any entitlement to an outstanding Termination Payment; and (iii) any other Claim or Post-Filing Claim established pursuant to an order of the CCAA Court and allowed as a proven priority claim against the Canadian Estate entitled to be paid in full, or otherwise entitled to be paid in priority to Proven Affected Unsecured Claims.

"**Records Assistance Side Letter**" means that certain letter agreement re: records assistance dated October 12, 2016 between the Joint Administrators and the Canadian Debtors.

"**Released Director/Officer Claim**" means any Director/Officer Claim that is not a Non-Released Claim.

"**Remaining Revolver Claim**" has the meaning ascribed thereto in the CFSA.

"**Required Majority**" means, with respect to the Affected Unsecured Creditors Class, a majority in number of Affected Unsecured Creditors holding Voting Claims representing at least two thirds in value of the Voting Claims of Affected Unsecured Creditors, in each case who are entitled to vote at the Meeting in accordance with the Meeting Order and who are present and voting in person or by proxy on the resolution approving the Plan at the Meeting.

"**Residual IP**" means certain remaining intellectual property assets of Nortel including its approximately 7,000 patent portfolio.

"**Sale Proceeds**" means the remaining sale proceeds generated by the sales of the various Nortel Group business lines and the Iceberg Sale between 2009 and 2011 plus interest accrued thereon, being approximately $7,254,279,269 as at July 31, 2016 (excluding, for the avoidance of doubt, the Iceberg Amendment Fee and the M&A Cost Reimbursement).

"**Sanction Order**" means the Order of the CCAA Court sanctioning and approving the Plan.

"**Settlement and Support Agreement Releases**" means the "Releases" as such term is defined in the Settlement and Support Agreement.

"**Tax**" or "**Taxes**" means any and all federal, provincial, municipal, local and foreign taxes, assessments, reassessments and other Governmental Entity charges, duties, impositions and liabilities including for greater certainty taxes based upon or measured by reference to income, gross receipts, profits, capital, transfer, land transfer, sales, goods and services, harmonized sales, use, value-added, excise, withholding, business, franchising, property, development, occupancy, employer health, payroll, employment, health, social services, education and social security, all surtaxes, all customs duties and import and export taxes, all licence, franchise and registration fees and all employment insurance, health insurance and Canada, Quebec and other government pension plan premiums or contributions, together with all interest, penalties, fines and additions with respect to such amounts.

"**Taxing Authorities**" means Her Majesty the Queen in right of Canada, Her Majesty the Queen in right of any province or territory of Canada, the Canada Revenue Agency, any similar revenue or taxing authority of Canada and each and every province or territory of Canada and any political subdivision thereof, the United States Internal Revenue Service, any similar revenue or taxing authority of the United States and each and every state of the United

States, and any Canadian, United States or other Governmental Entity exercising taxing authority or power, and "**Taxing Authority**" means any one of the Taxing Authorities.

"**U.K. Court**" means the High Court of Justice of England and Wales in London, any court hearing appeals therefrom and any other court of competent jurisdiction overseeing the EMEA Proceedings from time to time, including any appeals.

"**U.S. Distribution Agent**" means JPMorgan Chase Bank, N.A.

"**U.K. Pension Trustee**" means the Nortel Networks UK Pension Trust Limited as trustee of the Nortel Networks Pension Plan (U.K.).

"**U.S. Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware.

"**U.S. Plans**" means the Chapter 11 of the United States Bankruptcy Code plans (including any exhibits, annexes and schedules thereto) for the U.S. Debtors that effectuate the settlement contemplated by the Settlement and Support Agreement, consistent with the terms of the Settlement and Support Agreement, as they may be modified or supplemented in accordance with their terms.

"**U.S. Proceedings**" means, collectively, those insolvency proceedings that were commenced before the U.S. Bankruptcy Court on or after January 14, 2009 in respect of the U.S. Debtors pursuant to Chapter 11 of the United States Bankruptcy Code.

"**Unaffected Creditor**" means a Creditor or other Person who holds an Unaffected Claim, but only in respect of and to the extent of such Unaffected Claim.

"**Unavailable Cash**" means any Cash of the Canadian Debtors that has been identified or described by the Monitor as "Unavailable Cash" in its reports to the CCAA Court.

"**Unresolved Affected Unsecured Claim**" means an Affected Unsecured Claim which on the Initial Distribution Date or any subsequent Distribution Date, in whole or in part: (i) has not been finally determined to be a Proven Affected Unsecured Claim in accordance with the Claims Orders; (ii) is validly disputed in accordance with the Claims Orders; and/or (iii) remains subject to review and/or resolution in accordance with the Claims Orders, including both as to proof and/or quantum.

"**Unresolved Claims Reserve**" means a reserve of Available Cash to be held by the Canadian Estate (in an amount to be calculated by the Monitor on the Initial Distribution Date, and recalculated as at any subsequent Distribution Date) equal to (i) the amount that would have been paid if the full amount of all Unresolved Affected Unsecured Claims had been Proven Affected Unsecured Claims as of such date, plus (ii) the full amount of any unresolved Post-Filing Claims filed in accordance with the Post-Filing Claims Bar Date Order, or, in each case, such lesser amount as may be ordered by the CCAA Court.

"**Voting Claim**" shall have the meaning ascribed to such term in the Meeting Order.

**SCHEDULE "C" – EXCHANGE RATES**

Currency conversion factors
Source: Reuters, January 14, 2009

| | | CAD per unit of Currency |
|---|---|---|
| CAD | Canadian Dollar | 1 |
| USD | United States Dollar | 1.22025 |
| EUR | Euro | 1.6170753 |
| GBP | United Kingdom: Pnd Ster | 1.77741615 |
| JPY | Japan: Yen | 0.01362647 |

| | | | | | |
|---|---|---|---|---|---|
| AED | United Arab Emir.: Dirham | 0.33221709 | LTL | Lithuanian Litas | 0.46830925 |
| ARS | Argentine Peso | 0.35410621 | LVL | Latvian Lats | 2.29456567 |
| AUD | Australian Dollar | 0.82275356 | MAD | Moroccan Dirham | 0.14500201 |
| BBD | Barbados Dollar | 0.61319095 | MXN | Mexican Peso | 0.08842392 |
| BDT | Bangladeshi Taka | 0.01772331 | MYR | Malaysian Ringgit | 0.34156754 |
| BGN | Bulgaria: New Lev | 0.82683968 | NGN | Nigerian Naira | 0.00816494 |
| BOB | Bolivian Boliviano | 0.17345416 | NOK | Norwegian Krone | 0.17167276 |
| BRL | Brazilian Real | 0.52726527 | NZD | New Zealand Dollar | 0.6711375 |
| CHF | Swiss Franc | 1.09468915 | OMR | Oman: Rial Omani | 3.16980987 |
| CLP | Chilean Peso | 0.0019827 | PAB | Panama: Balb0A | 1.22025 |
| CNY | China: Yuan Renminbi | 0.17854268 | PEN | Peru: Nuevo Sol | 0.3889243 |
| COP | Colombian Peso | 0.00054867 | PGK | Papua New Guinea Kina | 0.4671117 |
| CRC | Costa Rican Colon | 0.00219273 | PHP | Philippine Peso | 0.02592415 |
| CZK | Czech Koruna | 0.06004872 | PKR | Pakistan Rupee | 0.015414 |
| DKK | Danish Krone | 0.21701242 | PLN | Poland: Zloty | 0.39077386 |
| DOP | Dominican Peso | 0.03444601 | PYG | Paraguay: Guarani | 0.0002498 |
| DZD | Algerian Dinar | 0.01682672 | QAR | Qatar: Qatari Rial | 0.33516446 |
| EEK | Estonian Kroon | 0.10334226 | RON | New Romania Leu | 0.37703348 |
| EGP | Egyptian Pound | 0.22086973 | RUB | Russian Ruble | 0.03847246 |
| FJD | Fiji Dollar | 0.67418812 | SAR | Saudi Arabia: Saudi Riyal | 0.32539566 |
| GTQ | Guatemala: Quetzal | 0.15495238 | SEK | Swedish Krona | 0.14788041 |
| HKD | Hong Kong Dollar | 0.15732068 | SGD | Singapore Dollar | 0.82052921 |
| HUF | Hungary: Forint | 0.00583154 | THB | Thailand: Baht | 0.03495417 |
| IDR | Indonesia: Rupiah | 0.00010993 | TND | Tunisian Dinar | 0.89144172 |
| ILS | Israel: Shekel | 0.31449742 | TRY | New Turkish Lira | 0.76914592 |
| INR | Indian Rupee | 0.02499872 | TTD | Trinidad & Tobago Dollar | 0.19524 |
| ISK | Iceland Krona | 0.00966994 | UAH | Ukraine: Hryvnia | 0.13945714 |
| JMD | Jamaican Dollar | 0.01515838 | UYU | Uruguay: Peso | 0.05016444 |
| JOD | Jordanian Dinar | 1.72084329 | VEF | Bolivar Fuerte | 0.56827178 |
| KPW | North Korean Won | 0.00853023 | VND | Vietnam: Dong | 0.00006981 |
| KRW | Republic Of Korea: Won | 0.00090543 | XCD | East Caribbean Dollar | 0.4587406 |
| KWD | Kuwaiti Dinar | 4.28157891 | ZAR | South Africa: Rand | 0.12249969 |
| LBP | Lebanese Pound | 0.00080945 | ZMK | Zambia: Kwacha | 0.00024601 |
| LKR | Sri Lanka Rupee | 0.01072276 | | | |

6638992



Court File No. 09-CL-7950

### ONTARIO
### SUPERIOR COURT OF JUSTICE
### COMMERCIAL LIST

| | | |
|---|---|---|
| THE HONOURABLE MR. | ) | THURSDAY, THE 1ST DAY |
| | ) | |
| JUSTICE NEWBOULD | ) | OF DECEMBER, 2016 |



IN THE MATTER OF THE COMPANIES' CREDITORS
ARRANGEMENT ACT,

R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR
ARRANGEMENT OF NORTEL NETWORKS CORPORATION,
NORTEL NETWORKS LIMITED, NORTEL NETWORKS
GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION, NORTEL NETWORKS
TECHNOLOGY CORPORATION, NORTEL
COMMUNICATIONS INC., ARCHITEL SYSTEMS
CORPORATION AND NORTHERN TELECOM CANADA
LIMITED

APPLICATION UNDER THE COMPANIES' CREDITORS
ARRANGEMENT ACT,

R.S.C. 1985, c. C-36, AS AMENDED

### PLAN FILING AND MEETING ORDER

THIS MOTION, made by Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Technology Corporation, Nortel Networks Global Corporation, Nortel Networks International Corporation, Nortel Communications Inc., Architel Systems Corporation and Northern Telecom Canada Ltd. (collectively, the "**Canadian Debtors**") jointly with Ernst & Young Inc. in its capacity as monitor of the Canadian Debtors (the "**Monitor**" and together with the Canadian Debtors, the "**Moving Parties**") for an order, *inter alia*, (a) accepting the filing of the Plan, (b) authorizing the classification of creditors for purposes of voting on the Plan, (c) authorizing and directing the Monitor to call, hold and conduct a meeting of Affected Unsecured

1

Creditors to consider and vote on a resolution to approve the Plan, (d) authorizing and directing the mailing and distribution of the Meeting Materials, (e) approving the procedures to be followed with respect to the meeting of Affected Unsecured Creditors, and (f) setting a date for the hearing of the Moving Parties' motion for Court approval of the Plan, was heard this day at 330 University Avenue, Toronto, Ontario.

ON READING the Notice of Motion, the One Hundred and Thirty Third report of the Monitor dated November 23, 2016 (the "**One Hundred and Thirty Third Report**"), the responding Motion Record of the UKPI (defined below), and on hearing the submissions of counsel for the Monitor and those other parties present, no other parties appearing for the other parties served with the Motion Record, although duly served as appears from the affidavit of service, filed:

## SERVICE

1.    THIS COURT ORDERS that the time for service of the Notice of Motion, the Motion Record and the One Hundred and Thirty Third Report is hereby abridged and validated such that this Motion is properly returnable today and service upon any interested party other than those parties served is hereby dispensed with.

## DEFINITIONS

2.    THIS COURT ORDERS that for the purposes of this Meeting Order, in addition to the terms defined elsewhere in this Meeting Order or in the Plan, the following terms shall have the following meanings:

   (a)    "**1988 Bondholder**" means a holder of one or more 1988 Bonds on the Voting Record Date including any Beneficial Bondholder holding 1988 Bonds;

   (b)    "**1988 Bondholder Claim**" means a Voting Claim by a 1988 Bondholder in respect of 1988 Bonds;

   (c)    "**1988 Bonds**" has the meaning given to it in subparagraph 2(bbbbb)(iii);

   (d)    "**Affected Claim**" means an Affected Claim under the Plan;

(e)    **"Affected Creditor"** means an Affected Creditor under the Plan;

(f)    **"Affected Unsecured Claim"** means any Affected Claim that is not a Director/Officer Claim or an Equity Claim;

(g)    **"Affected Unsecured Creditor"** means any holder of an Affected Unsecured Claim, but only with respect to and to the extent of such Affected Unsecured Claim;

(h)    **"Affected Unsecured Creditors Class"** has the meaning given to it in paragraph 10;

(i)    **"Beneficial Bondholder"** means a beneficial owner of any Bonds as at the Voting Record Date;

(j)    **"Bondholder"** means, as at the Voting Record Date, a registered or beneficial holder of a Bond, as the context requires, in such capacity;

(k)    **"Bondholder Claim"** means a Claim held by a Bondholder in respect of the Bonds;

(l)    **"Bondholder Claim Amount"** has the meaning given to it in paragraph 44;

(m)    **"Bondholder Mailing Materials"** has the meaning given to it in paragraph 21;

(n)    **"Bondholder Meeting Materials"** has the meaning given to it in subparagraph 2(iii)(vi);

(o)    **"Bondholder Proxy"** means a proxy substantially in the form of Schedule **"C-3"**, to be completed by Beneficial Bondholders in accordance with the terms of this Meeting Order and the Instructions to Bondholders;

(p)    **"Bonds"** means the Crossover Bonds, 1988 Bonds and NNCC Bonds and any bond, notes or debenture issued in substitution or replacement thereof and **"Bond"** means any one of them;

(q)     **"Business Day"** means a day, other than Saturday, Sunday or a statutory holiday, on which banks are generally open for business in both Toronto, Ontario, Canada and New York, New York, U.S.A.;

(r)     **"Canadian Debtors"** has the meaning given to it in the preamble;

(s)     **"Canadian Pension Claims"** has the meaning given to it in the Plan;

(t)     **"Canadian Registered Pension Plans"** has the meaning given to it in the Plan;

(u)     **"CCAA Court"** means the Ontario Superior Court of Justice (Commercial List);

(v)     **"CCAA Proceedings"** means these proceedings commenced by the Canadian Debtors pursuant to the CCAA;

(w)     **"Chair"** has the meaning given to it in paragraph 31;

(x)     **"Claim"** has the meaning given to it in the applicable Claims Orders but shall not include a Director/Officer Claim;

(y)     **"Claims Orders"** means, as the context requires, any or all of the following Orders of the CCAA Court: the Claims Procedure Order, the Compensation Claims Procedure Order, the Claims Resolution Order, the Order approving the Cross-Border Claims Protocol dated September 16, 2010; the EMEA Claims Procedure Order dated January 14, 2011, the Intercompany Claims Procedure Order dated July 27, 2012, the Order dated September 29, 2016 in respect of Claims against the New Applicants; and the Post-Filing Claims Bar Date Order;

(z)     **"Claims Procedure Order"** means the Claims Procedure Order made by the CCAA Court dated July 30, 2009, as amended and restated on October 7, 2009;

(aa)    **"Claims Resolution Order"** means the Claims Resolution Order dated September 16, 2010;

(bb)    **"Compensation Claims"** has the meaning given to it in the Compensation Claims Procedure Order;

(cc)  **"Compensation Claims Procedure Order"** means the Compensation Claims Procedure Order of the CCAA Court dated October 6, 2011, including the Compensation Claims Methodology Order of the CCAA Court dated October 6, 2011;

(dd)  **"Compensation Creditor"** means a Creditor who is a holder of a Compensation Claim and who, as of the date of this Meeting Order, continues to be represented by a Representative and Representative Counsel pursuant to the Representation Orders or by Unifor;

(ee)  **"Compensation Creditor Mailing Materials"** has the meaning given to it in paragraph 15;

(ff)  **"Compensation Creditor Meeting Materials"** has the meaning given to it in subparagraph 2(iii)(vii);

(gg)  **"Crossover Bondholder Claim"** means a Voting Claim of a Crossover Bondholder in respect of Crossover Bonds, the aggregate amount of all Crossover Bondholder Claims being US$3,940,750,260;

(hh)  **"Crossover Bondholder"** means a holder of one or more Crossover Bonds on the Voting Record Date including any Beneficial Bondholder holding Crossover Bonds;

(ii)  **"Crossover Bonds"** has the meaning given to it in subparagraph 2(bbbbb)(ii);

(jj)  **"Depository"** means The Depository Trust Company or agency of similar nature;

(kk)  **"Directors"** means all former directors (or their estates) of the Canadian Debtors, in such capacity, and **"Director"** means any one of them;

(ll)  **"Directors / Officer Claim"** means any right or claim of any Person howsoever arising against one or more of the Directors or Officers for which any Director or Officer of a Canadian Debtor is alleged to be by statute or otherwise by law liable to pay in his or her capacity as a Director or Officer, whether or not such right or

claim is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, unsecured, perfected, unperfected, present, future, known, or unknown, by guarantee, surety or otherwise, and whether or not such right is executory or anticipatory in nature, including the right or ability of any Person to advance a claim for contribution or indemnity or otherwise with respect to any claim, matter, action, cause or chose in action, whether existing at present or commenced in the future, and shall include any "Director/Officer Claim" (as such term is defined in the Claims Procedure Order without reference to the exclusion of any claims in such definition);

(mm)    **"Duplicative Voting Claim"** means a Voting Claim that, absent substantive consolidation under this Meeting Order and the Plan, would have been a Voting Claim against more than one of the Canadian Debtors based on the same underlying debt or obligation;

(nn)    **"Epiq"** means Epiq Bankruptcy Solutions, LLC;

(oo)    **"Equity Claim"** means a Claim that is in respect of an Equity Interest, including a claim for, among others: (i) a dividend or similar payment; (ii) a return of capital; (iii) a redemption or retraction obligation; (iv) a monetary loss resulting from the ownership, purchase or sale of an Equity Interest or from the rescission or, in Quebec, annulment, of a purchase or sale of an Equity Interest, or (v) contribution or indemnity in respect of a claim referred to in any of the foregoing (i) through (iv);

(pp)    **"Equity Claimant"** means any Person with an Equity Claim or holding an Equity Interest, but only in such capacity;

(qq)    **"Equity Interest"** means a share of a Canadian Debtor, or a warrant or option or another right to acquire a share in a Canadian Debtor, including the common shares of NNC and the preferred shares of NNL;

(rr)    **"Indenture Trustees"** means the indenture trustees (or their successors and assigns) under the Trust Indentures;

(ss)  **"Information Circular"** means the information circular dated November 30, 2016 in respect of the Plan, as the same may be amended, supplemented or restated from time to time;

(tt)  **"Intercompany Claims"** means a Claim by a Nortel Group entity (including by any administrator, liquidator, receiver, trustee, office holder or similar official appointed in respect thereof) against a Canadian Debtor, including those unsecured intercompany claims against the Canadian Debtors set out in Schedule "C" to the Plan;

(uu)  **"Initial Order"** means initial order dated January 14, 2009, as amended and restated from time to time;

(vv)  **"Instructions"** means the Instructions to Bondholders and Instructions to Ordinary Creditors;

(ww)  **"Instructions to Bondholders"** means, as the context requires, the Instructions to Participant Holders or Instructions to Beneficial Bondholders;

(xx)  **"Instructions to Ordinary Creditors"** means the instructions substantially in the form attached as Schedule "**B-1**" hereto;

(yy)  **"Instructions to Participant Holders"** means the instructions to Participant Holders substantially in the form attached as Schedule "**C-1**" hereto;

(zz)  **"Instructions to Beneficial Bondholders"** means the instructions to Beneficial Bondholders substantially in the form attached as Schedule "**C-2**" hereto;

(aaa)  **"Latest Known Address"** means, with respect to any Creditor, the address on file with the Canadian Debtors or the Monitor as of the date of this Meeting Order as the primary address for contact for such Creditor and shall not include any secondary or additional addresses that may have been provided by such Creditor;

(bbb)  "**Letter to Compensation Creditors**" means the form of letter to be sent to Compensation Creditors substantially in the form attached as Schedule "**A-3**" hereto;

(ccc)  "**Letter to Ordinary Creditors and Bondholders**" means the form of letter to be sent to Ordinary Creditors and Bondholders substantially in the form attached as Schedule "**A-2**" hereto;

(ddd)  "**Mailing Agent**" means Broadridge Financial Solutions, Inc. and any other mailing agent used by any Participant Holder to distribute materials to Beneficial Bondholders;

(eee)  "**Mailing Date**" means the date to be selected by the Monitor on which the Monitor shall make the mailings contemplated by paragraphs 13, 21 and 24 of this Meeting Order, which date shall be within seven (7) Business Days of the date of this Meeting Order;

(fff)  "**Master Authentication Form**" means the form of master authentication form to be submitted by Participant Holders to Epiq attaching the Beneficial Bondholder Proxies received by Participant Holders and validating the holdings of such Beneficial Bondholders, substantially in the form attached as Schedule "**C-4**" hereto;

(ggg)  "**Meeting**" means the meeting of the Affected Unsecured Creditors Class, and any extension or adjournment thereof, that is called and conducted in accordance with this Meeting Order for the purpose of considering and voting on the Plan;

(hhh)  "**Meeting Date**" means the date and time for the Meeting to be selected by the Monitor, which date shall be on or about January 17, 2017 (unless extended in accordance with the terms of this Meeting Order);

(iii)  "**Meeting Materials**" means:

(i)  the Publication Notice;

(ii)     the Plan;

(iii)    the Information Circular;

(iv)    the Meeting Order and any endorsement or reasons;

(v)     as it relates to Ordinary Creditors, the Letter to Ordinary Creditors and Bondholders, a blank form of the Voting Proxy and Instructions to Ordinary Creditors (together with the documents set out in (i) through (iv) above, the **"Ordinary Creditor Meeting Materials"**);

(vi)    as it relates to Bondholders, the Letter to Ordinary Creditors and Bondholders and (A) with respect to Beneficial Bondholders, a blank form of Bondholder Proxy and Instructions to Beneficial Bondholders, and (B) with respect to Participant Holders, a blank form of Master Authentication Form and Instructions to Participant Holders (together with the documents set out in (i) through (iv) above, the **"Bondholder Meeting Materials"**);

(vii)   as it relates to Compensation Creditors, the Letter to Compensation Creditors (together with the documents set out in (i) through (iv) above, the **"Compensation Creditor Meeting Materials"**);

(jjj)    **"Meeting Order"** means this Meeting Order, as it may be amended by any further Order of the CCAA Court;

(kkk)   **"Monitor"** has the meaning given to it in the preamble;

(lll)    **"Monitor's Powers Orders"** means the following orders of the CCAA Court: (i) the Initial Order; (ii) the Claims Orders; (iii) the Order dated August 14, 2009; (iv) the Order (Monitor's Expansion of Power Order #2) dated October 3, 2014; (v) the New Applicants Order; and (vi) this Meeting Order;

(mmm)  **"Monitor's Website"** means the website maintained by the Monitor in respect of the CCAA Proceedings at the following address: www.ey.com/ca/nortel;

(nnn)   **"Moving Parties"** has the meaning given to it in the preamble;

(ooo)  **"New Applicants"** means Nortel Communications Inc., Architel Systems Corporation and Northern Telecom Canada Ltd;

(ppp)  **"New Applicants Order"** means the Order of the CCAA Court dated March 18, 2016 in Court File No. CV-16-11312-00CL;

(qqq)  **"New Restructuring Claim"** means a Restructuring Claim (as defined in the Claim Procedure Order) arising after the Mailing Date;

(rrr)  **"NNC"** means Nortel Networks Corporation;

(sss)  **"NNCC Bondholder"** means a Registered, Unregistered or Beneficial Bondholder holding one or more NNCC Bonds;

(ttt)   **"NNCC Bondholder Claim"** means a Voting Claim of a NNCC Bondholder in respect of NNCC Bonds, the aggregate amount all NNCC Bondholder Claims being US$150,951,562;

(uuu)  **"NNCC Bonds"** has the meaning given to it in subsection 2(bbbbb)(iv);

(vvv)  **"NNI Unsecured Claim"** means the allowed unsecured Voting Claim of Nortel Networks Inc. against Nortel Networks Limited in the amount of US$2.0 billion pursuant to the Final Canadian Funding and Settlement Agreement dated as of December 23, 2009 and approved by an Order of the CCAA Court dated January 21, 2010;

(www) **"NNL"** means Nortel Networks Limited;

(xxx)  **"NNUK Claim"** means the Proven NNUK Claim and, the Contingent Additional NNUK Claim (as both terms are defined in the Plan);

(yyy)  **"Notice to Affected Unsecured Creditors"** means the notice to Affected Unsecured Creditors substantially in the form attached as Schedule "**A-1**" hereto;

(zzz)  **"Officers"** means all former officers (or their estates) of the Canadian Debtors, in such capacity, and **"Officer"** means any one of them;

(aaaa) **"One Hundred and Thirty First Report"** means the one hundred and thirty-first report of the Monitor dated November 4, 2016;

(bbbb) **"Ordinary Creditor"** means a Creditor with an Ordinary Creditor Claim, other than Compensation Creditors;

(cccc) **"Ordinary Creditor Claim"** means an Affected Unsecured Claim that is not a Bondholder Claim and, for greater certainty, includes the UKPI Claim, NNUK Claim, Canadian Pension Claims, Compensation Claims, Intercompany Claims and NNI Unsecured Claim;

(dddd) **"Ordinary Creditor Mailing Materials"** has the meaning given to it in paragraph 13;

(eeee) **"Ordinary Creditor Meeting Materials"** has the meaning given to it in subparagraph 2(iii)(v);

(ffff) **"Participant Holder"** means a Person whose name appears on any of the Participant Holders Lists as at the Voting Record Date but who is not a Beneficial Bondholder;

(gggg) **"Participant Holders List"** means the list of Participant Holders to be provided by the Depositories in accordance with the terms of this Meeting Order;

(hhhh) **"Person"** means any individual, firm, corporation, limited or unlimited liability company, general or limited partnership, association, trust, unincorporated organization, union, joint venture, government or any agency, officer or instrumentality thereof or any other entity;

(iiii) **"Plan"** means the plan of compromise and arrangement dated November 30, 2016 filed by the Moving Parties, as such plan of compromise and arrangement may be amended, supplemented or restated from time to time in accordance with the terms hereof;

(jjjj) **"Post-Filing Claims"** has the meaning given to it in the Post-Filing Claims Bar Date Order;

(kkkk) **"Post-Filing Claims Bar Date Order"** means the Order of the CCAA Court dated December 1, 2016 calling for Post-Filing Claims;

(llll)  **"Proof of Claim"** means the "Proof of Claim" referred to in any of the Claims Orders, as applicable;

(mmmm)    **"Proven Affected Unsecured Claim"** means a Proven Affected Unsecured Claim under the Plan;

(nnnn) **"Proxy"** means a Voting Proxy or Bondholder Proxy, as applicable;

(oooo) **"Publication Notice"** means the notice to Affected Unsecured Creditors substantially in the form attached as Schedule "**A-1**" hereto to be published in accordance with paragraph 11;

(pppp) **"Registered Bondholder"** means a Bondholder who is the legal owner or holder of one or more Bonds and whose name appears on a Registered Bondholder List;

(qqqq) **"Representation Orders"** means, collectively: (i) the Order of the CCAA Court dated May 27, 2009 appointing Koskie Minsky LLP as counsel for former employees, including pensioners, of the Canadian Debtors; (ii) the Order of the CCAA Court dated July 22, 2009 appointing Nelligan O'Brien Payne, LLP and Shibley Righton LLP as counsel for all Canadian non-unionized employees of the Canadian Debtors whose employment with the Canadian Debtors continued throughout the CCAA Proceedings; (iii) the Order of the CCAA Court dated July 30, 2009 appointing Koskie Minsky LLP as counsel for LTD Beneficiaries (as defined therein) receiving or entitled to receive disability income benefits by or through the Canadian Debtors;

(rrrr)  **"Representatives"** means the Court appointed representatives appointed pursuant to the Representation Orders;

(ssss)  **"Representative Counsel"** means the Court appointed representative counsel appointed pursuant to the Representation Orders;

(tttt)  "**Required Majority**" means, with respect to the Affected Unsecured Creditors Class, a majority in number of Affected Unsecured Creditors holding Voting Claims representing at least two thirds in value of the Voting Claims of Affected Unsecured Creditors, in each case who are entitled to vote at the Meeting in accordance with the this Meeting Order and who are present and voting in Person or by proxy on the resolution approving the Plan at the Meeting;

(uuuu)  "**Sanction Hearing**" has the meaning given to it in paragraph 60;

(vvvv)  "**Sanction Hearing Date**" means the date to be selected by the Monitor for the Sanction Hearing, which is targeted to be scheduled on or about January 24, 2017 (or such other date on or after the Meeting Date as may be set by the Monitor or the CCAA Court);

(wwww)  "**Sanction Order**" has the meaning given to it in the Plan;

(xxxx)  "**Scrutineers**" has the meaning given to it in paragraph 32;

(yyyy)  "**Secretary**" has the meaning given to it in paragraph 32;

(zzzz)  "**Service List**" means the service list maintained for the CCAA Proceedings posted on the Monitor's Website;

(aaaaa) "**Settlement and Support Agreement**" means that certain settlement and plans support agreement dated as of October 12, 2016 entered into by and among the Settlement Parties (as defined in the Plan), together with all Annexes thereto, in each case, as amended, supplemented or otherwise modified from time to time in accordance with the terms thereof;

(bbbbb)  "**Trust Indentures**" means collectively:

(i)  the Indenture dated as of March 28, 2007 governing the 1.75% Convertible Senior Bonds due 2012 and the 2.125% Convertible Senior Bonds due 2014 (the "**2007 Bonds**") issued by Nortel Networks Corporation and guaranteed by Nortel Networks Limited and Nortel Networks Inc.;

(ii)  the Indenture dated as of July 5, 2006, as supplemented by the First Supplemental Indenture dated as of July 5, 2006, the Second Supplemental Indenture dated as of May 1, 2007, and the Third Supplemental Indenture dated as of May 28, 2008, governing the Floating Rate Senior Bonds due 2011, the 10.125% Senior Bonds due 2013 and the 10.750% Senior Bonds due 2016 (together with the 2007 Bonds, the "**Crossover Bonds**") issued by Nortel Networks Limited and guaranteed by Nortel Networks Corporation and Nortel Networks Inc.;

(iii)  the Indenture dated as of November 30, 1988, governing the 6.875% Bonds due 2023 (the "**1988 Bonds**") issued by Northern Telecom Limited (now Nortel Networks Limited); and

(iv)  the Indenture dated as of February 15, 1996, governing the 7.875% Bonds due 2026 (the "**NNCC Bonds**") issued by Northern Telecom Capital Corporation (now Nortel Networks Capital Corporation) and guaranteed by Northern Telecom Limited (now NNL);

(ccccc)  "**UKPI**" means the Nortel Networks UK Ltd Pension Trust Limited and the Board of the Pension Protection Fund;

(ddddd)  "**UKPI Claim**" means UKPI's allowed Voting Claim in the amount of £339.75 million (being US $494,879,850 when converted in accordance with the Plan and paragraph 71 of this Meeting Order);

(eeeee) "**Unaffected Claim**" means any Unaffected Claim under the Plan;

(fffff)  "**Unresolved Claim**" means an Affected Unsecured Claim which by the date of the Meeting in whole or in part: (i) has not been finally determined to be a Voting Claim; (ii) is validly disputed in accordance with the Claims Orders; and/or (iii) remains subject to review and/or resolution in accordance with the Claims Orders, including both as to proof and/or quantum, but shall not include the Contingent Additional NNUK Claim, which is a Voting Claim;

(ggggg)    "**U.S. Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware;

(hhhhh)    "**Voting Claim**" means an Affected Unsecured Claim to the extent that such Affected Unsecured Claim has been accepted by the Monitor solely for the purpose of voting on the Plan (which acceptance for the purpose of voting shall have no effect on whether such Claim is a Proven Affected Unsecured Claim for purposes of the Plan), in each case in accordance with the provisions of the Claims Orders or any other Order, as applicable;

(iiiii)    "**Voting Proxy**" means a proxy substantially in the form attached as Schedule "**B-2**" hereto, to be submitted to the Monitor by any Ordinary Creditor or Representative who wishes to vote by proxy at the Meeting; and

(jjjjj)    "**Voting Record Date**" means November 21, 2016.

3.    THIS COURT ORDERS that all references to time herein shall mean local time in Toronto, Ontario, Canada, and any reference to an event occurring on a Business Day shall mean prior to 4:00 P.M. on such Business Day unless otherwise indicated herein.

4.    THIS COURT ORDERS that all references to the word "including" or "includes" shall mean "including without limitation" or "includes without limitation", as the case may be.

5.    THIS COURT ORDERS that, unless the context otherwise requires, words importing the singular shall include the plural and *vice versa*, and words importing any gender shall include all genders.

**THE PLAN**

6.    THIS COURT ORDERS that the Plan is hereby accepted for filing, and the Monitor is hereby authorized and directed to call and hold a meeting of Affected Unsecured Creditors to vote on the Plan in the manner set forth herein.

7.      THIS COURT ORDERS that the Moving Parties may, at any time and from time to time prior to or at the Meeting, amend, restate, modify and/or supplement the Plan, subject to the terms of the Plan, provided that:

    (a)      the Monitor or the Chair shall communicate the details of any such amendments, restatements, modifications and/or supplements to Affected Unsecured Creditors present at the Meeting prior to any vote being taken at the Meeting;

    (b)      the Monitor shall provide notice to the Service List of any such amendments, restatements, modifications and/or supplements and shall forthwith file a copy thereof with the CCAA Court and in any event prior to the Sanction Hearing; and

    (c)      the Monitor shall post an electronic copy of any such amendments, restatements, modifications and/or supplements on the Monitor's Website prior to the Sanction Hearing.

**FORMS OF DOCUMENTS**

8.      THIS COURT ORDERS that the following documents be and are hereby approved:

    (a)      Notices:

        (i)      Publication Notice (Schedule "**A-1**");

        (ii)      Letter to Ordinary Creditors and Bondholders (Schedule "**A-2**");

        (iii)      Letter to Compensation Creditors (Schedule "**A-3**");

    (b)      Ordinary Creditors:

        (i)      Instructions to Ordinary Creditors (Schedule "**B-1**");

        (ii)      form of Voting Proxy (Schedule "**B-2**");

    (c)      Bondholders:

        (i)      Instructions to Participant Holders (Schedule "**C-1**");

        (ii)      Instructions to Beneficial Bondholders (Schedule "**C-2**");

        (iii)      form of Bondholder Proxy (Schedule "**C-3**"); and

(iv)    form of Master Authentication Form (Schedule "**C-4**").

9.    THIS COURT ORDERS that the Monitor may (i) make any changes to the Meeting Materials as are necessary or desirable to conform the content thereof to the terms of the Plan or this Meeting Order, and (ii) at any time and from time to time prior to or at the Meeting, amend, restate, modify and/or supplement any of such materials, subject to the terms of the Plan, provided that:

(a)    the Monitor or the Chair shall communicate the details of any such amendments, restatements, modifications and/or supplements to Affected Unsecured Creditors present at the Meeting prior to any vote being taken at the Meeting;

(b)    the Monitor shall provide notice to the Service List of any such amendments, restatements, modifications and/or supplements and shall forthwith file a copy thereof with the CCAA Court and in any event prior to the Sanction Hearing; and

(c)    the Monitor shall post an electronic copy of any such amendments, restatements, modifications and/or supplements on the Monitor's Website prior to the Sanction Hearing.

## CLASSIFICATION OF CREDITORS

10.    THIS COURT ORDERS that the only class of creditors for the purposes of considering and voting on the Plan shall be the "**Affected Unsecured Creditors Class**".

## PUBLICATION OF NOTICE

11.    THIS COURT ORDERS that the Monitor shall, as soon as practical, cause the Notice to Affected Unsecured Creditors to be published in English in The Globe and Mail (National and Local Edition), The Wall Street Journal (Global Edition), Ottawa Citizen and Calgary Herald and in French in Le Journal de Montreal.

12.    THIS COURT ORDERS that the Monitor shall, no later than three (3) Business Days following the date of this Meeting Order, post an electronic copy of the Meeting Materials in

English and in French on the Monitor's Website under the heading "Plan and Other Creditor Meeting Documents" and serve the Meeting Materials on the Service List.

## NOTICE TO ORDINARY CREDITORS

13.    THIS COURT ORDERS that the Monitor shall, on the Mailing Date, deliver the Publication Notice, Letter to Ordinary Creditors and Bondholders, Information Circular, Instructions to Ordinary Creditors and a blank form of Voting Proxy (the "**Ordinary Creditor Mailing Materials**") by pre-paid first class mail, courier, personal delivery or email to each Ordinary Creditor with a Voting Claim and/or an Unresolved Claim and to the Representatives at the Latest Known Address provided, however, that (i) with respect to the NNUK Claim, Canadian Pension Claims, NNI Unsecured Claim and UKPI Claim, the Monitor may deliver the Ordinary Creditor Mailing Materials to counsel appearing on the Service List for such Affected Unsecured Creditors; and (ii) with respect to any other Intercompany Claim that is a Voting Claim, the Monitor may deliver the Ordinary Creditor Mailing Materials to any last known officer, director or administrator of such Intercompany Creditor.

14.    THIS COURT ORDERS that in addition to the Ordinary Creditor Mailing Materials, upon request of any Ordinary Creditor, the Monitor shall provide hard copies of any of the other Ordinary Creditor Meeting Materials to such Ordinary Creditor. The Monitor shall also provide French translations of the Ordinary Creditor Meeting Materials upon request.

## NOTICE TO COMPENSATION CREDITORS

15.    THIS COURT ORDERS that the Monitor shall, on the Mailing Date, deliver (a) the Publication Notice and Letter to Compensation Creditors (the "**Compensation Creditors Mailing Materials**") by pre-paid first class mail, courier, personal delivery or email to each Compensation Creditor at the Compensation Creditor's Latest Known Address; and (b) a blank form of Voting Proxy and Instructions to Ordinary Creditors to Representative Counsel and counsel for Unifor by email. Compensation Creditor Mailing Materials shall be provided in English or French depending on the language preference previously indicated by Compensation Creditors and on file with the Monitor. On request, the Monitor will provide the Compensation Creditor Meeting Materials in the other language.

16.    THIS COURT ORDERS that in addition to the Compensation Creditor Mailing Materials, upon request of any Compensation Creditor, the Monitor shall provide hard copies of any of the other Compensation Creditor Meeting Materials to such Compensation Creditor. The Monitor shall also provide French translations of the Compensation Creditor Meeting Materials upon request.

17.    THIS COURT ORDERS that votes by Compensation Creditors shall be effected through: (a) the Compensation Creditors' respective Representatives, who are hereby authorized and empowered to vote on behalf of each of the Compensation Creditors whom they currently represent pursuant to the Representation Orders; and (b) Unifor for the Compensation Creditors it represents. The Representatives and Unifor shall each be entitled to submit a single Voting Proxy and shall not be required to submit individual proxies or ballots in respect of individual Compensation Claims.

## NOTICE TO BONDHOLDERS

18.    THIS COURT ORDERS that the Monitor and the Canadian Debtors' retention of Epiq to act as the Monitor's agent in connection with the mailing and solicitation process in connection with Bondholder Claims be and is hereby approved.

19.    THIS COURT ODERS that, without limiting the generality of paragraphs 18 or 69, for the purposes of paragraphs 20 through 29, 54 and 64, references to the Monitor shall be deemed to mean "the Monitor or Epiq".

*Indenture Trustees and Registered Bondholders*

20.    THIS COURT ORDERS that, to the extent such information has not been obtained prior to the date of this Meeting Order:

(a)    as soon as possible after the date of the Meeting Order and in any event no later than two (2) Business Days following the date of the Meeting Order each of the Indenture Trustees shall confirm to the Monitor in writing (in accordance with paragraph 65) that the only Registered Bondholders are one or more Depositories (and identify and provide contact information for the applicable Depository); and

(b)    immediately thereafter, the Monitor shall request Participant Holders Lists in respect of the Bonds from the Depositories and as soon as practicable thereafter, each Depository shall provide all relevant Participant Holders Lists to the Monitor as at the Voting Record Date. In each case, any Participant Holder List so provided shall list the Participant Holders as at the Voting Record Date and their respective addresses and telephone numbers, fax numbers and email addresses, to the extent available.

21.    THIS COURT ORDERS that on the Mailing Date (or such later date where the Monitor does not have requisite information) the Monitor shall deliver the Publication Notice, Letter to Ordinary Creditors and Bondholders, Information Circular, Instructions to Bondholders and blank form of Bondholder Proxy (the "**Bondholder Mailing Materials**") by pre-paid first class mail, courier, personal delivery or email to the Depositories.

22.    THIS COURT ORDERS that to the extent that an Indenture Trustee or a Depository has a standard process for providing notice of the entry of this Meeting Order to its Participant Holders, it shall post notice of the mailing to its Participant Holders.

*Participant Holders and Beneficial Bondholders*

23.    THIS COURT ORDERS that each Participant Holder or any Mailing Agent shall advise the Monitor as to the number of hard copies of the Bondholder Mailing Materials required by each Participant Holder and such information shall be provided within two (2) Business Days of the date of the request is made.

24.    THIS COURT ORDERS that on the Mailing Date (or such later date where the Monitor does not have the requisite information), the Monitor shall provide to each Participant Holder the Bondholder Mailing Materials in electronic form or, where such Participant Holder has advised it requires hard copies, the number of hard copies of the Bondholder Mailing Materials so advised by such Participant Holder and shall subsequently provide each Participant Holder with a blank form of the Master Authentication Form and Instructions to Participant Holders, all to be sent by way of pre-paid first class mail, courier or personal delivery.

25.    THIS COURT ORDERS that, within five (5) Business Days of any Participant Holder's receipt of the Bondholder Mailing Materials from the Monitor pursuant to paragraph 24, such Participant Holder shall:

(a)    deliver to each Beneficial Bondholder that has an account (directly or through an agent or custodian) with such Participant Holder, the Bondholder Mailing Materials; and

(b)    request that such Beneficial Bondholders complete one or more Bondholder Proxies (one per CUSIP and per Participant Holder) and return such Bondholder Proxy or Proxies to their Participant Holder with sufficient time to allow such Participant Holder to complete and return one or more Master Authentication Forms by the deadline set out in paragraph 26 below.

26.    THIS COURT ORDERS upon receipt of the Bondholder Proxies from Beneficial Bondholders, each Participant Holder shall complete and sign one or more Master Authentication Forms (one per CUSIP) in respect of all Bondholder Proxies it receives from Beneficial Bondholders and deliver such Master Authentication Form or Forms to the return address indicated in the Instructions to Participant Holders.  To the extent that a Participant Holder receives further Bondholder Proxies after a Master Authentication Form is submitted, a Participant Holder may submit one or more Master Authentication Forms in respect of such further Bondholder Proxies. All Master Authentication Forms must be received at least four (4) Business Days prior to the Meeting. To the extent a Participant Holder submits multiple Master Authentication Forms in respect of the same Bondholder Proxy, the last dated, timely received, validly executed Master Authentication Form shall be deemed to supersede any previously submitted Master Authentication Forms.

27.    THIS COURT ORDERS that where: (a) a Participant Holder or its Mailing Agent has a standard practice for distributing meeting materials to Beneficial Bondholders and for gathering information and proxies or voting instructions from Beneficial Bondholders; (b) the Participant Holder has discussed such standard practice in advance with the Monitor; and (c) such standard practice is acceptable to the Monitor; such Participant Holder or its agent may, in lieu of following the procedure set out in paragraphs 25 and 26 above, follow such standard practice provided that

all applicable Bondholder Proxies, Master Authentication Forms and Instructions are delivered in accordance with the terms of this Meeting Order.

28.     THIS COURT ORDERS that to the extent a Beneficial Bondholder holds Bonds through multiple Participant Holders, it must submit one or more Bondholder Proxies (one per CUSIP and per Participant Holder) to each Participant Holder through which it holds Bonds.

## NOTICE, SERVICE AND DELIVERY

29.     THIS COURT ORDERS that the Monitor's fulfillment of the notice, delivery and Monitor's Website posting requirements set out in this Meeting Order shall constitute good and sufficient notice, service and delivery thereof on all Persons who may be entitled to receive notice, service or delivery thereof or who may wish to be present or vote (in person or by proxy) at the Meeting, and that no other form of notice, service or delivery need be given or made on such Persons and no other document or material need be served on such Persons.

## CONDUCT OF MEETING AND DELIVERY OF PROXIES

30.     THIS COURT ORDERS that the Monitor is hereby authorized and directed to call, hold and conduct the Meeting on the Meeting Date at The International Centre Conference Centre (6900 Airport Road, Mississauga, Ontario), (or such other venue as may be determined by the Monitor), for the purpose of seeking approval of the Plan by the Affected Unsecured Creditors with Voting Claims at the Meeting in the manner set forth herein.  In the event that the Meeting Date is extended after the Mailing Date, the Monitor shall post notice of the extension of the Meeting Date on the Monitor's Website and provide notice of the extension of the Meeting Date to the Service List.

31.     THIS COURT ORDERS that Murray McDonald or another representative of the Monitor, designated by the Monitor, shall preside as the chair of the Meeting (the "**Chair**") and, subject to this Meeting Order or any further Order of the Court, shall decide all matters relating to the conduct of the Meeting.

32.     THIS COURT ORDERS that the Monitor may appoint scrutineers for the supervision and tabulation of the attendance, quorum, and votes cast at the Meeting (the "**Scrutineers**").  A Person designated by the Monitor shall act as secretary of the Meeting (the "**Secretary**").

33.    THIS COURT ORDERS that the quorum required at the Meeting shall be one (1) Affected Unsecured Creditor with a Voting Claim present at the Meeting (in person or by proxy).

34.    THIS COURT ORDERS that the Chair shall be entitled to adjourn and further adjourn the Meeting at the Meeting or at any adjourned Meeting or change the venue for the Meeting.  In the event of any adjournment or change of venue described in this paragraph, no Person shall be required to deliver any notice of the adjournment of the Meeting or adjourned Meeting or change of venue, provided that the Monitor shall: (a) announce the adjournment at the Meeting, adjourned Meeting or change of venue, as applicable; (b) post notice of any adjournment (or further adjournment), or if the venue is changed within one (1) Business Day of the Meeting Date of the Meeting, at the location where the Meeting was scheduled to be held at the time the Meeting was scheduled to start; (c) forthwith post notice of the adjournment or change of venue on the Monitor's Website; and (d) provide notice of the adjournment or change of venue to the Service List forthwith.  Subject to the terms of the Plan, Proxies validly delivered in connection with the Meeting shall be accepted as Proxies in respect of any adjourned Meeting.

35.    THIS COURT ORDERS that the only Persons entitled to attend and speak at the Meeting are: (a) the Affected Unsecured Creditors entitled to vote at the Meeting (or, if applicable, any Person holding a valid Proxy or on behalf of one or more such Affected Unsecured Creditors); (b) the Chair, the Scrutineers and the Secretary; (c) the Monitor; (d) the Representatives; (e) the Indenture Trustees; and (f) Canadian Debtors' legal counsel and any legal counsel or financial advisors to any of the foregoing Persons in (a) through (e) above.  Any other Person may only be admitted to the Meeting on invitation of the Chair.

36.    THIS COURT ORDERS that the Monitor may waive in writing the time limits imposed on Affected Unsecured Creditors as set out in this Meeting Order (including the schedules hereto), generally or in individual circumstances, if the Monitor deems it advisable to do so.

## ASSIGNMENT OF AFFECTED CLAIMS PRIOR TO THE MEETING

37.    THIS COURT ORDERS that, subject to any restrictions contained in Applicable Laws and subject further to the terms of the Plan, the Claims Orders and the Settlement and Support Agreement, an Ordinary Creditor or Compensation Creditor may transfer or assign the whole of

its Voting Claim prior to the Meeting (or any adjournment thereof), provided that the Monitor shall not be obliged to deal with any transferee or assignee thereof as an Affected Unsecured Creditor in respect of such Voting Claim, including allowing such transferee or assignee to attend or vote at the Meeting, unless and until actual notice of the transfer or assignment, together with satisfactory evidence of such transfer or assignment, has been received and acknowledged by the Monitor, which receipt and acknowledgment must have occurred on or before 4 p.m. (Toronto time) on the date that is seven (7) days prior to the date of the Meeting (or any adjournment thereof), failing which the original transferor shall have all applicable rights as the "Ordinary Creditor" or "Compensation Creditor" as the case may be with respect to such Voting Claim as if no transfer of the Voting Claim had occurred. If such receipt and acknowledgment by the Monitor have occurred on or before 4 p.m. (Toronto time) on the date that is seven (7) days prior to the date of the Meeting (or any adjournment thereof): (a) the transferor of the applicable Voting Claim shall no longer constitute an Affected Unsecured Creditor in respect of such Voting Claim; and (b) the transferee or assignee of the applicable Voting Claim shall, for all purposes in accordance with this Meeting Order, constitute an Ordinary Creditor or Compensation Creditor as the case may be in respect of such Voting Claim, and shall be bound by any and all notices previously given to the transferor or assignor in respect thereof, the voting process set out in this Meeting Order applicable to such Ordinary Creditor Claim, and any Proxy duly submitted to the Monitor in accordance with this Meeting Order. For greater certainty, the Monitor shall not recognize partial transfers or assignments of Ordinary Creditor Claims.

38.    THIS COURT ORDERS that only those Beneficial Bondholders that have beneficial ownership of one or more Bonds as at the Voting Record Date shall be entitled to vote at the Meeting (whether in person or by proxy). Nothing in this Meeting Order restricts the Beneficial Bondholders from transferring or assigning such Bonds prior to or after the Voting Record Date, provided that if such transfer or assignment occurs after the Voting Record Date, only the original Beneficial Bondholder of such Bonds as at the Voting Record Date (and not any transferee) shall be treated as a Beneficial Bondholder for purposes of this Meeting Order and the Meeting, provided, however, that the Settlement and Support Agreement shall continue to apply to the transferee of any Beneficial Bondholder bound thereby.

## VOTING PROCEDURE

39.    THIS COURT ORDERS that at the Meeting, the Chair shall direct a vote, by written Proxy, on a resolution to approve the Plan and any amendments thereto.

**Persons Entitled to Vote**

40.    THIS COURT ORDERS that, subject to paragraphs 57 - 58, the only Persons entitled to vote at the Meeting (whether in person or by proxy) are:

(a)    Beneficial Bondholders with Voting Claims that have beneficial ownership of one or more Bonds as at the Voting Record Date (or any such Beneficial Bondholder's validly appointed holder of its Bondholder Proxy) whose holdings have been validated by such Beneficial Bondholder's Participant Holder or Participant Holders or a Master Authentication Form;

(b)    Ordinary Creditors with Voting Claims as at the Voting Record Date including, without limitation, the holders of all Intercompany Claims (including the NNI Unsecured Claim and the NNUK Claim) that are Voting Claims (or any such Ordinary Creditor's validly appointed holder of its Voting Proxy);

(c)    Representatives, on behalf of all Compensation Creditors with Voting Claims as at the Voting Record Date;

(d)    Unifor, on behalf of Compensation Creditors that it currently represents with Voting Claims as at the Voting Record Date; and

(e)    Morneau Shepell Ltd., in its capacity as administrator of the Canadian Registered Pension Plans, in respect of the Canadian Pension Claims.

41.    THIS COURT ORDERS that Unaffected Creditors (in such capacity) and Equity Claimants (in such capacity) shall not, and shall have no right to, attend the Meeting or vote on the Plan.

42.     THIS COURT ORDERS that each Ordinary Creditor with a Voting Claim shall be entitled to one (1) vote as a member of the Affected Unsecured Creditors Class, which vote shall have a value equal to the dollar value of such Ordinary Creditor's Voting Claim. For the avoidance of doubt, the Voting Claim amounts in respect of the NNI Unsecured Claim, NNUK Claim and the other Intercompany Claims listed in Schedule "C" to the Plan, UKPI Claim, and Canadian Pension Claims shall be the dollar amounts ascribed to them in the Plan.

43.     THIS COURT ORDERS that each Beneficial Bondholder with a Voting Claim shall be entitled to one vote as a member of the Affected Unsecured Creditors Class, which vote shall have a value equal to such Beneficial Bondholder's Bondholder Claim Amount. For greater certainty, with respect to voting by Beneficial Bondholders, only the Beneficial Bondholders, and not Depositories or Participant Holders (unless any such Depository or Participant Bondholder is itself a Beneficial Bondholder or such Depository or Participant Holder is voting as proxy holder for one or more Beneficial Bondholders), shall be entitled to vote on the Plan as provided for in this Meeting Order.

44.     THIS COURT ORDERS that for the purposes of this Meeting Order, a Beneficial Bondholder's "**Bondholder Claim Amount**" shall be the total of such Beneficial Bondholder's:

    (a)     pro rata share of the aggregate amount of the 1988 Bondholder Claims, if any; <u>plus</u>

    (b)     pro rata share of the aggregate amount of the Crossover Bondholder Claims, if any; <u>plus</u>

    (c)     pro rata share of the aggregate amount of the NNCC Bondholder Claims, if any.

45.     THIS COURT ORDERS that for greater certainty, the aggregate amount of the Bondholder Claims for voting purposes shall be as follows:

    (a)     1988 Bondholder Claims: US$205,079,861;

    (b)     Crossover Bondholder Claims: US$3,940,750,260; and

    (c)     NNCC Bondholder Claims: US$150,951,562.

46.     THIS COURT ORDERS that the Representatives and Unifor shall be entitled to vote on behalf of their applicable Compensation Creditors, which votes shall constitute, in number, the number of individuals that each Representative or Unifor represents as indicated on the Voting

Proxy and shall have a dollar value equal to the aggregate value of such Compensation Claims voted.

47.     THIS COURT ORDERS that any Proxies or votes received from Compensation Creditors which are not submitted by a Representative or Unifor shall be disregarded by the Monitor and shall be considered a nullity with no force and effect. For greater certainty, the Monitor shall have no obligation to record or report on any such Proxies or votes.

**Calculation of Votes**

48.     THIS COURT ORDERS that notwithstanding any other provision of this Meeting Order, an Affected Unsecured Creditor holding a Voting Claim or Voting Claims regardless of whether such Voting Claim or Voting Claims is held against more than one Canadian Debtor, whether directly, by way of guarantee or otherwise shall have only one (1) vote in respect of the Plan without duplication, and including, without limitation:

    (a)    any transferee(s) of multiple Voting Claims shall have one (1) vote in an amount equal to the aggregate of all of the Voting Claims assigned to such transferee (other than any Compensation Claim which is subject to the vote of the Representatives);

    (b)    regardless of the number of Bondholder Proxies that are submitted by any one Beneficial Bondholder, each Beneficial Bondholder shall have one (1) vote in an amount equal to such Beneficial Bondholders' Bondholder Claim Amount;

    (c)    holders of Duplicative Voting Claims shall only be entitled to one (1) Voting Claim in an amount equal to the largest of such Duplicative Voting Claims; and

    (d)    holders of Voting Claims against more than one Canadian Debtor which Voting Claims are based on separate and distinct underlying debts shall have one (1) Voting Claim equal to the aggregate amount of all such separate and distinct Voting Claims.

49.     THIS COURT ORDERS that for the purpose of calculating the two-thirds majority in value of Voting Claims, the aggregate amount of Voting Claims held by all Affected Unsecured Creditors that vote in favour of the Plan (in person or by proxy) shall be divided by the aggregate

amount of all Voting Claims held by all Affected Unsecured Creditors that vote on the Plan (in person or by proxy). For greater certainty, an Affected Unsecured Creditor having Voting Claims against more than one Canadian Debtor shall only be entitled to one vote in respect of such Voting Claims at the Meeting and the Monitor shall have no obligation to tabulate or report on votes with respect to the Canadian Debtors individually.

50.    THIS COURT ORDERS that, for purposes of tabulating the votes cast on any matter that may come before the Meeting, the Chair shall be entitled to rely on any vote cast by a holder of a Voting Proxy or a Bondholder Proxy that has been duly submitted to the Monitor in the manner set forth in this Meeting Order.

**Submission of Proxies and Voting At the Meeting**

51.    THIS COURT ORDERS that regardless of whether an Affected Unsecured Creditor wishes to attend the Meeting in person or submit its Proxy in advance of the Meeting, any Affected Unsecured Creditor that is entitled to vote on the Plan, must, in accordance with applicable Instructions:

   (a)    duly complete and sign the applicable Proxy;

   (b)    identify himself, herself or another individual in the applicable Proxy as the Person with the power to attend and vote at the Meeting on behalf of such Affected Unsecured Creditor; and

   (c)    submit its Proxy to the Monitor by:

      (i)    delivering its Proxy to the Monitor in accordance with paragraph 65, on the date set out in the applicable Instructions, which shall be the date that is three (3) Business Days prior to the scheduled Meeting; or

      (ii)    where the Affected Unsecured Creditor has not submitted its Proxy at least three (3) Business Days in advance of the Meeting, attend the Meeting in Person (or through a nominee) and submit the Proxy to the Monitor at the Meeting at the time specified by the Chair at the Meeting.

52.    THIS COURT ORDERS that in order to be effective, and in addition to the criteria in paragraphs 51(a) and 51(b) above, any Bondholder Proxy must:

(a)    be in respect of single CUSIP;

(b)    state the applicable account number or numbers of the account or accounts maintained by the applicable Beneficial Bondholder with such Participant Holder;

(c)    state the principal amount of Bonds for such CUSIP number that such Beneficial Bondholder holds in each such account or accounts;

(d)    acknowledge that the Beneficial Bondholder has read the Bondholder Meeting Materials; and

(e)    authorize the Participant Holder to provide a copy of the Bondholder's Proxy to Epiq and the Monitor.

53.    THIS COURT ORDERS all Master Authentication Forms must:

(a)    be in respect of a single CUSIP;

(b)    state the name and account number of the Beneficial Bondholder whose Proxies it is authenticating, and the principal amount of such Bonds for such CUSIP number (excluding any accrued interest or Post-Filing Date Interest); and

(c)    attach copies of all relevant Bondholder's Proxies for which the Participant Holder is authenticating the holdings.

54.    THIS COURT ORDERS that notwithstanding paragraph 51(c), all Beneficial Bondholders wishing to vote either in person or by proxy must have submitted its Bondholder Proxy to its Participant Holder and such Participant Holder must have submitted a Master Authentication Form in respect of such Bondholder Proxy so that it is received by Epiq at least four (4) Business Days prior to the Meeting.

55.    THIS COURT ORDERS that if there is any dispute as to the principal amount of Bonds held by any Beneficial Bondholder, the Monitor will request the Participant Holder, if any, who

maintains book entry records or other records evidencing such Beneficial Bondholder's ownership of Bonds, to confirm to the Monitor the information provided by such Beneficial Bondholder and such Participant Holder shall provide such requested information forthwith. If any such dispute is not resolved by such Beneficial Bondholder and the Monitor by the date of the Meeting (or any adjournment thereof), the Monitor shall tabulate the vote for or against the Plan in respect of the disputed principal amount of such Beneficial Bondholder's Bonds separately. If: (a) any such dispute remains unresolved as of the date of the Sanction Hearing; and (b) the approval or non-approval of the Plan would be affected by the vote cast in respect of such disputed principal amount of Bonds, then such result shall be reported to the Court at the Sanction Hearing and, if necessary, the Monitor may make a request to the Court for directions.

56.    THIS COURT ORDERS that notwithstanding anything in paragraphs 51 - 55 or any minor error or omission in any Proxy that is submitted to the Monitor, the Chair shall have the discretion to accept for voting purposes any Proxy submitted to the Monitor in accordance with the Meeting Order.

**VOTING OF UNRESOLVED CLAIMS**

57.    THIS COURT ORDERS that except as otherwise provided for herein or as may otherwise be ordered by the CCAA Court at the Sanction Hearing, the dollar value of any Unresolved Claims for voting purposes at the Meeting shall be as follows:

(a)    Unresolved Claims that are liquidated in whole or in part:

(i)    for which no notice of disallowance or statement of defence has been issued: the face value of the Affected Unsecured Claim, as filed; or

(ii)    for which a notice of disallowance or statement of defence has been issued: the greater of US$1.00 and the amount allowed by the Monitor in the notice of disallowance or set out in the statement of defence or, where there is a decision of a Claims Officer (as defined in the Claims Resolution Order) or Order of the CCAA Court, the amount of the Affected Unsecured Claim as set out in such decision or Order; or

(b)      Unresolved Claims that are unliquidated in their entirety: US$1.00

58.    THIS COURT ORDERS that the Monitor shall keep a separate record of votes cast by Affected Unsecured Creditors with Unresolved Claims and shall report to the Court with respect thereto at the Sanction Hearing.  If approval or non-approval of the Plan by Affected Unsecured Creditors could be altered by the votes cast in respect of Unresolved Claims: (a) such result shall be reported to the Court as soon as reasonably practicable after the Meeting; (b) if a deferral of the Sanction Hearing is deemed to be necessary or advisable by the Monitor, the Monitor shall request an appropriate deferral of the Sanction Hearing; and (c) the Monitor may make a request to the Court for directions.

## NEW RESTRUCTURING CLAIMS

59.    THIS COURT ORDERS that the Monitor shall, no later than three (3) Business Days following the receipt of a Proof of Claim from any Person asserting a New Restructuring Claim, deliver the Ordinary Creditor Meeting Materials by pre-paid first class mail, courier, personal delivery or email to such Person at the Latest Known Address set out in any such Proof of Claim.

## PLAN SANCTION

60.    THIS COURT ORDERS that the Monitor shall report to the Court the results of any votes taken at the Meeting as soon as reasonably practicable after the Meeting (or any adjournment thereof).  If the Plan is approved by the Required Majority, the Moving Parties may apply to the Court at 10 a.m. on the Sanction Hearing Date for the Sanction Order (the "**Sanction Hearing**").

61.    THIS COURT ORDERS that service of this Meeting Order by the Moving Parties to the parties on the Service List shall constitute good and sufficient service of notice of the Sanction Hearing on all Persons entitled to receive such service and no other form of notice or service need be made and no other materials need be served in respect of the Sanction Hearing, except that any party shall also serve the Service List with any additional materials that it intends to use in support of the Sanction Hearing.

## APPROVAL OF THE PLAN

62.     THIS COURT ORDERS that the Plan must receive an affirmative vote from the Required Majority in order to be approved by the Affected Unsecured Creditors.

63.     THIS COURT ORDERS that the result of any vote at the Meeting shall be binding on all Affected Unsecured Creditors, regardless of whether such Affected Unsecured Creditor was present at or voted at the Meeting.

## SERVICE AND NOTICE

64.     THIS COURT ORDERS that any delivery of any documents, packages, notices or otherwise contemplated by this Meeting Order by the Monitor shall be by way of pre-paid first class mail, courier, personal delivery, facsimile or e-mail to such Persons (or any director, officer or known representative) and that any such service or notice by courier, personal delivery, facsimile or e-mail shall be deemed to be received on the next Business Day following the date of forwarding thereof, or if sent by pre-paid first class mail, on the fourth Business Day after mailing.

65.     THIS COURT ORDERS that any notice or other communication to be given under this Meeting Order by any Person to the Monitor shall be in writing in substantially the form, if any, provided for in this Meeting Order and will be sufficiently given only if delivered by courier, personal delivery, facsimile or e-mail addressed to:

> Ernst & Young Inc.
> Court Appointed Monitor of Nortel Networks Corporation & others
> 222 Bay Street, Suite 2400
> Toronto, Ontario M5K 1J7
>
> Attention:     Nortel Monitor
> Telephone:    1.866.942.7177 or 416.943.4439
> Facsimile:      416.943.2808
> Email:          nortel.monitor@ca.ey.com

66.     THIS COURT ORDERS that any such notice or other communication by any such Person shall be deemed received only upon actual receipt thereof during normal business hours on a Business Day.

## MONITOR'S ROLE

67.    THIS COURT ORDERS that the Monitor, in addition to its prescribed rights and obligations under the CCAA or any Order made in these CCAA Proceedings including the Monitor's Powers Orders and the New Applicants Order, is hereby directed and empowered to take such other actions and fulfill such other roles as are authorized by this Meeting Order.

68.    THIS COURT ORDERS that: (i) in carrying out the terms of this Meeting Order, the Monitor shall have all the protections given to it by the CCAA, the Monitor's Powers Orders and the New Applicants Order, including the stay of proceedings in its favour; (ii) the Monitor shall incur no liability or obligation as a result of carrying out the provisions of this Meeting Order, save and except for any gross negligence or wilful misconduct on its part; (iii) the Monitor shall be entitled to rely on the books and records of the Canadian Debtors and any information provided by the Canadian Debtors without independent investigation; and (iv) the Monitor shall not be liable for any claims or damages resulting from any errors or omissions in such books, records or information.

69.    THIS COURT ORDERS that the Monitor and the Canadian Debtors are hereby authorized to retain such agents as they deem to be advisable to assist them in connection with calling and conducting the Meeting, including with respect to the distribution of Meeting Materials, the identification of the applicable Affected Unsecured Creditors, and the solicitation of proxies from Persons entitled to vote at the Meeting.

**MISCELLANEOUS**

70.    THIS COURT ORDERS that nothing in this Meeting Order (including the acceptance or determination of any Claim, or any part thereof, as a Voting Claim in accordance with this Meeting Order) has any impact on the status of Voting Claims as Proven Affected Unsecured Claims for purposes of the Plan and, for greater certainty, to the extent that any Voting Claim is also a Proven Affected Unsecured Claim pursuant to any Order of the CCAA Court, agreement (including under the Settlement and Support Agreement) or otherwise, reference to such Proven Affected Unsecured Claims as "Voting Claims" herein shall not alter the status of such Claims as Proven Affected Unsecured Claims.

71.    THIS COURT ORDERS that, for the purposes of this Meeting Order (including the calculation of the Required Majority), all Voting Claims shall be deemed to be denominated in U.S. dollars using the exchange rate specified on Schedule "D" to the Plan. Any Voting Claims that are not denominated in U.S. dollars or Canadian dollars shall be deemed to be converted first to Canadian dollars at the applicable F/X rate and then converted to U.S. dollars pursuant to Schedule "D" to the Plan.

72.    THIS COURT ORDERS that the Moving Parties may from time to time apply to the CCAA Court for advice and directions in the discharge of their powers and duties hereunder.

73.    THIS COURT HEREBY REQUESTS the aid and recognition of any court, tribunal, regulatory or administrative body having jurisdiction in Canada, the United States, the United Kingdom or elsewhere, to give effect to this Order and to assist the Canadian Debtors, the Monitor and their respective agents in carrying out the terms of this Meeting Order.  All courts, tribunals, regulatory and administrative bodies are hereby respectfully requested to make such orders and to provide such assistance to the Canadian Debtors and to the Monitor, as an officer of this CCAA Court, as may be necessary or desirable to give effect to this Meeting Order, to grant representative status to the Monitor in any foreign proceeding, or to assist the Canadian Debtors and the Monitor and their respective agents in carrying out the terms of this Meeting Order.

ENTERED AT / INSCRIT À TORONTO
ON / BOOK NO:
LE / DANS LE REGISTRE NO:

DEC 0 1 2016

PER / PAR:

SCHEDULE "A-1" – PUBLICATION NOTICE

NOTICE TO AFFECTED UNSECURED CREDITORS

OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION, NORTEL NETWORKS TECHNOLOGY CORPORATION, NORTEL COMMUNICATIONS INC., ARCHITEL SYSTEMS CORPORATION AND NORTHERN TELECOM CANADA LIMITED (THE "CANADIAN DEBTORS")

NOTICE IS HEREBY GIVEN that a Plan of Compromise and Arrangement (as amended from time to time, the "**Plan**") has been filed with the Ontario Superior Court of Justice (Commercial List) (the "**CCAA Court**") in respect of the Canadian Debtors pursuant to the *Companies' Creditors Arrangement Act,* R.S.C. 1985, c. C-36, as amended (the "**CCAA**").

> TAKE NOTE THAT THESE MATERIALS relate to the <u>CANADIAN CCAA</u> <u>PROCEEDINGS ONLY</u> and do not apply to any other restructuring proceeding including the Chapter 11 Proceedings of Nortel Networks Inc. and the other U.S. Debtors. If you have claims in both the Canadian and U.S. proceedings, you <u>MUST</u> vote your claims in respect of the Canadian Debtors in this CCAA Proceeding in order for your vote to count with respect to the Canadian Plan and must comply with the applicable procedures in the U.S. Debtors' cases for your claim in respect of the U.S. Debtors. A vote in the U.S. Proceedings will not be recognized in the Canadian CCAA Proceedings and *vice versa.*

A copy of the Plan and the Information Circular (the "**Information Circular**") are available at www.ey.com/ca/nortel (the "**Monitor's Website**") under the section entitled "Plan and Other Creditor Meeting Documents". If you wish to receive a printed copy of the Plan or the Information Circular please contact the Monitor at the contact information below.

NOTICE IS ALSO HEREBY GIVEN that a meeting of Affected Unsecured Creditors (the "**Meeting**") will be held at **1 p.m.** on **Tuesday, January 17, 2017** (or such other date as may be set and announced in accordance with the Meeting Order) at **The International Centre Conference Centre (6900 Airport Road, Mississauga, Ontario)**, for the purpose of considering and, if thought advisable, passing, with or without variation, a resolution to approve the Plan (the full text of which resolution is set out in Schedule "A" to the Information Circular) and to transact such other business as may properly come before the Meeting (or any adjournment thereof). The Meeting is being held pursuant to the Order of the Court made on December 1, 2016 (the "**Meeting Order**"). A copy of the Meeting Order is available on the Monitor's Website under the Section "Plan and Other Creditor Meeting Documents". Capitalized terms used but not otherwise defined in this notice have the meaning ascribed to them in the Meeting Order, Information Circular or Plan.

The Plan must receive an affirmative vote of the Required Majority in order to be approved by the Affected Unsecured Creditors. The Required Majority is a majority in number of Affected

Unsecured Creditors with Voting Claims, and two-thirds in value of the Voting Claims held by such Affected Unsecured Creditors, in each case who vote (in person or by proxy) on the Plan at the Meeting. The Plan must also be sanctioned by a final order of the CCAA Court (the "**Sanction Order**") pursuant to the CCAA. Notice is also hereby given that, if the Plan is approved by the Required Majority at the Meeting, the Sanction Order will be sought in an application before the CCAA Court at 10:00 AM on January 24, 2017, (or such other date or time as may be set by the CCAA Court), to seek approval of the Plan. If the Plan is approved by the Required Majority and sanctioned by the CCAA Court, then, subject to the satisfaction or waiver of the conditions to effectiveness and implementation of the Plan, all Persons referred to in the Plan (including the Affected Unsecured Creditors) will receive the treatment set out in the Plan.

## AMENDMENTS TO THE PLAN

The Canadian Debtors and Monitor may, at any time and from time to time prior to or at the Meeting, amend, restate, modify and/or supplement the Plan, subject to the terms of the Plan, provided that: (i) the Monitor or the Chair shall communicate the details of any such amendment, restatement and/or supplement to all Affected Unsecured Creditors present at the Meeting prior to any vote being taken at the Meeting; (ii) the Monitor shall provide notice to the Service List of any such amendment, restatement and/or supplement and shall file a copy thereof with the CCAA Court prior to the Sanction Hearing; and (iii) the Monitor shall post an electronic copy of any such amendment, restatement and/or supplement on the Monitor's Website prior to the Sanction Hearing.

## COMPLETION OF PROXIES

Any Affected Unsecured Creditor who is entitled to vote at the Meeting and that wishes to vote by proxy or in Person at the Meeting must complete, sign and return the applicable form of proxy included in its creditor package and deliver its proxy to the Monitor in accordance with applicable Instructions.

### Compensation Creditors

**IF YOU ARE A COMPENSATION CREDITOR COVERED BY THE REPRESENTATION ORDERS OR REPRESENTED BY UNIFOR, A REPRESENTATIVE OR UNIFOR WILL BE VOTING ON YOUR BEHALF AND WILL BE VOTING IN FAVOUR OF THE PLAN. YOU SHOULD NOT SUBMIT A SEPARATE PROXY.**

### Participant Holders and Beneficial Bondholders

**IF YOU ARE A PARTICIPANT HOLDER OR BENEFICIAL BONDHOLDER, YOU MUST CLOSELY FOLLOW THE INSTRUCTIONS FOR THE COMPLETION AND RETURN OF BONDHOLDER PROXIES AND MASTER AUTHENTICATION FORMS.**

The Monitor's contact information is:

Ernst & Young Inc.
Court Appointed Monitor of Nortel Networks Corporation & others

**Canadian CCAA Proceedings Only**

222 Bay Street, Suite 2400
Toronto, Ontario M5K 1J7

Attention:      Nortel Monitor
Telephone:    1.866.942.7177 or 416.943.4439
Facsimile:     416.943.2808
Email:          nortel.monitor@ca.ey.com

This notice is given by the Monitor pursuant to the Meeting Order.

Si vous avez besoin d'une copie du plan ou de l'un des documents relatifs à l'assemblée des créanciers en français, veuillez consulter le site Web du contrôleur ou communiquer avec le contrôleur à l'adresse figurant ci-dessus.

**Canadian CCAA Proceedings Only**

## SCHEDULE "A-2" LETTER TO ORDINARY CREDITORS AND BONDHOLDERS

December ____, 2016

Dear Ordinary Creditors and Bondholders:

Re:    Meeting of Affected Unsecured Creditors of Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Global Corporation, Nortel Networks International Corporation, Nortel Networks Technology Corporation, Nortel Communications Inc., Architel Systems Corporation and Northern Telecom Canada Limited (the "**Canadian Debtors**") to vote on the Plan of Compromise and Arrangement pursuant to the *Companies' Creditors Arrangement Act* (the "**Plan**")

We enclose in this package the following documents for your review and consideration:

1. Publication Notice;
2. Information Circular; and
3. blank form of applicable Proxy and instructions for voting.

---

**TAKE NOTE THAT THESE MATERIALS** relate to the **CANADIAN CCAA PROCEEDINGS ONLY** and do not apply to any other restructuring proceeding including the Chapter 11 Proceedings of Nortel Networks Inc. and the other U.S. Debtors. If you have claims in both the Canadian and U.S. proceedings, you **MUST** vote your claims in respect of the Canadian Debtors in this CCAA Proceeding in order for your vote to count with respect to the Canadian Plan and must comply with the applicable procedures in the U.S. Debtors' cases for your claim in respect of the U.S. Debtors. A vote in the U.S. Proceedings will not be recognized in the Canadian CCAA Proceedings and *vice versa*.

---

Please take note that these materials as well as the other Meeting Materials are also available at www.ey.com/ca/nortel under the section entitled "Plan and Other Creditor Meeting Documents".

You are entitled to attend the Meeting of Affected Unsecured Creditors (the "**Meeting**") of Canadian Debtors as defined in the Meeting Order dated December 1, 2016. The Meeting will be held at **1 p.m. (Toronto time) on Tuesday, January 17, 2017 at The International Centre Conference Centre (6900 Airport Road, Mississauga, Ontario)**. At the Meeting, you will be asked to consider a resolution to approve the Plan.

### ORDINARY CREDITORS

Please follow the enclosed "Instructions to Ordinary Creditors" and complete the enclosed form of proxy and submit it to the Monitor as soon as possible but no later than **4:00 p.m. (Toronto time) on January 11, 2017.** Should you plan on attending the Meeting, you may also submit your proxy at that time.

### BONDHOLDERS

Please follow the enclosed "Instructions to Beneficial Bondholders" and complete the enclosed form of proxy and submit to each of your Participant Holder(s) through which you hold Bonds no later than the deadline set out by your Participant Holder(s). Please submit one Proxy per CUSIP, per Participant Holder.

**Canadian CCAA Proceedings Only**

The Participant Holder(s) will provide Epiq Bankruptcy Solutions, LLC (the Monitor's agent) with a summary of voting Proxies received from their clients and copies of your proxies.

You may attend and vote at the Meeting in person but you must have previously had holdings validated by all Participant Holders through which you hold Bonds in order for your vote to count.

**Expected Recovery Range**

The current estimated range of recovery per U.S. dollar is approximately 41.5 cents to 45 cents. The estimated range of recovery per Canadian dollar is CA 45 cents to 49 cents, assuming an exchange rate of approximately US $1.00 = CA $1.337650.

Pursuant to the Plan, holders of proven affected unsecured claims will receive distributions in U.S. dollars, unless such claim is predominantly denominated in Canadian dollars (i.e. more than 50% of a claim is in Canadian dollars), in which case creditors will be paid in Canadian dollars. The initial distribution is currently anticipated to be made during April 2017.

**Plan Approval**

The Plan must be approved by a majority of creditors voting representing at least two thirds in value of the votes cast by proven affected unsecured creditors, voting as a single class, present in person or represented by proxy at the Meeting. Effectiveness of the Plan is subject to the approval of the Ontario Superior Court of Justice (Commercial List), expiration or final resolution of any appeals taken and confirmation of U.S. Plans by the U.S. Bankruptcy Court.

**Additional Information**

For additional information with respect to the Plan, see the section in the accompanying Information Circular entitled *"Summary Information"* (pages 5 - 10). These pages contain important information relating to the distributions under the Plan.

The accompanying Information Circular contains a detailed description of the Plan, as well as certain *pro forma* information. It also includes certain risk factors relating to the implementation of the Plan.

Please give this material your careful consideration and, if you require assistance, consult your financial, tax or other professional advisors.

Si vous avez besoin d'une copie du plan ou de l'un des documents relatifs à l'assemblée des créanciers en français, veuillez consulter le site Web du contrôleur ou communiquer avec le contrôleur à l'adresse figurant ci-dessus.

**Sincerely,**

**ERNST & YOUNG INC., solely in its capacity as Monitor in the CCAA Proceedings of the Canadian Debtors and not in its personal capacity.**

## SCHEDULE "A-3" – LETTER TO COMPENSATION CREDITORS

December _____, 2016

Dear Compensation Creditor,

Re:    Meeting of Affected Unsecured Creditors of Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Global Corporation, Nortel Networks International Corporation, Nortel Networks Technology Corporation, Nortel Communications Inc., Architel Systems Corporation and Northern Telecom Canada Limited (the "**Canadian Debtors**") to vote on the Plan of Compromise and Arrangement pursuant to the *Companies' Creditors Arrangement Act* (the "**Plan**")

We enclose in this package the Publication Notice for your review and consideration, in the language of your choice as indicated on file with the Monitor.

Please take note that the other Meeting Materials are available at www.ey.com/ca/nortel (the "**Monitor's Website**") in both English and French under the section entitled "Plan and Other Creditor Meeting Documents".

The purpose of these materials is to provide you with information relating to the Plan and the Meeting of Affected Unsecured Creditors of the Canadian Debtors (the "**Meeting**"). **YOU ARE NOT REQUIRED TO ATTEND THE MEETING OR CAST A VOTE. AS EXPLAINED BELOW, YOUR REPRESENTATIVES OR UNION WILL VOTE ON YOUR BEHALF.**

### Expected Recovery Range

Pursuant to the Plan, holders of Compensation Creditor Claims will receive distributions in U.S. dollars, unless such claim is predominantly denominated in Canadian dollars (i.e. more than 50% of a claim is in Canadian dollars), in which case creditors will be paid in Canadian dollars. The current estimated recovery range per U.S. dollar of claim is approximately 41.5 cents to 45 cents. The estimated range of recovery per Canadian dollar of claim is CA 45 cents to 49 cents, assuming an exchange rate of approximately US $1.00 = CA $1.337650. The initial distribution is currently anticipated to be made during April 2017.

### *Certain Issues Affecting Amount and Timing of Distributions*

Further to previous court orders issued in the CCAA Proceedings,

- Compensation Creditor Claims will be reduced by the amount of any payments received by creditors from the Health and Welfare Trust (HWT).

- Compensation Creditor distributions will be reduced by the amount of any payments received by creditors through the employee hardship process.

Compensation Creditors with reductions for HWT payments or payments received through the employee hardship process will be provided these amounts on their distribution statement.

Distributions to Compensation Creditors will not be made until the Monitor receives a confirmation regarding employment insurance ("**EI Confirmation**") from Employment and Social Development Canada (ESDC), pursuant to the *Employment Insurance Act*. These Compensation Creditors may therefore receive their initial distributions after the target date of April 2017 and such distributions will be subject to standard source deductions and deductions on account of any employment insurance overpayment received. The amount of any employment insurance overpayment deduction will be determined by ESDC and, in any event, all deductions will be shown on a distribution statement.

If your address on file with the Monitor on the Distribution Record Date is not a Canadian address, you will be treated as a non-resident of Canada for purposes of any applicable non-resident withholding tax. You will not receive a gross-up for any amounts deducted or withheld.

## Voting

Pursuant to certain Representation Orders made in these CCAA Proceedings, Kent Felske, Dany Sylvain, Donald Sproule, David Archibald, Michael Campbell and Sue Kennedy (the "**Representatives**") were appointed as representatives of all current and former non Union represented employees of the Canadian Debtors with the authority to represent you in these CCAA Proceedings. Copies of the Representation Orders can be found on the Monitor's Website under the section entitled "Employees, Former Employee and Disabled Employee Representative Orders".

If you are a member of Unifor (formerly CAW, the "**Union**") or retained the Union to represent you in the CCAA Proceedings, your Union representative will be voting on your behalf at the meeting.

Your Representatives or Union representative continue to represent you in the CCAA Proceedings and will be voting on your behalf at the Meeting. **As such, you are not required to vote or submit a proxy to the Monitor or to your Representatives.**

The Representatives and Unifor are parties to the Settlement and Support Agreement dated as of October 12, 2016 and **will be voting in favour of the Plan.**

The Meeting is to be held at **1 p.m.** on **Tuesday, January 17, 2017** (or such other date and time as may be set and announced in accordance with the Meeting Order) at **The International Centre Conference Centre (6900 Airport Road, Mississauga, Ontario)**. Although you are welcome to attend the Meeting to observe, your Representatives will vote on your behalf in favour of the Plan.

## Plan Approval

The Plan must be approved by a majority of creditors voting and representing at least two thirds in value of the votes cast by proven affected unsecured creditors, voting as a single class and present in person or represented by proxy at the Meeting. Effectiveness of the Plan is subject to the approval of the Ontario Superior Court of Justice (Commercial List), expiration or final resolution of any appeals taken and confirmation of U.S. Plans by the U.S. Bankruptcy Court.

## Additional Information

For additional information with respect to the Plan, see the section in the Information Circular (available on the Monitor's Website under "Plan and Other Creditor Meeting Documents") entitled *"Summary Information"* (pages 5 - 10). These pages contain important information relating to distributions under the Plan.

Please give this material your careful consideration and, if you require assistance, consult your Court-appointed Representative Counsel or other financial or tax advisors.

Si vous avez besoin d'une copie du plan ou de l'un des documents relatifs à l'assemblée des créanciers en français, veuillez consulter le site Web du contrôleur ou communiquer avec le contrôleur à l'adresse figurant ci-dessus.

**Sincerely,**


**ERNST & YOUNG INC., solely in its capacity as Monitor in the CCAA Proceedings of the Canadian Debtors and not in its personal capacity**

## SCHEDULE "B-1" - INSTRUCTIONS TO ORDINARY CREDITORS

■, 2016

TO:   ORDINARY CREDITORS OF NORTEL NETWORKS CORPORATION, NORTEL
      NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL
      NETWORKS   INTERNATIONAL   CORPORATION,   NORTEL   NETWORKS
      TECHNOLOGY CORPORATION, NORTEL COMMUNICATIONS INC., ARCHITEL
      SYSTEMS CORPORATION AND NORTHERN TELECOM CANADA LIMITED (THE
      "CANADIAN DEBTORS")

Re:   **Meeting of Affected Unsecured Creditors of the Canadian Debtors to vote on the Plan
      of Compromise and Arrangement pursuant to the *Companies' Creditors Arrangement
      Act* (the "Plan")**

> **TAKE NOTE THAT THESE MATERIALS relate to the CANADIAN CCAA
> PROCEEDINGS ONLY and do not apply to any other restructuring proceeding
> including the Chapter 11 Proceedings of Nortel Networks Inc. and the other U.S. Debtors.
> If you have claims in both the Canadian and U.S. proceedings, you MUST vote your claims
> in respect of the Canadian Debtors in this CCAA Proceeding in order for your vote to
> count with respect to the Canadian Plan and must comply with the applicable procedures
> in the U.S. Debtors' cases for your claim in respect of the U.S. Debtors. A vote in the U.S.
> Proceedings will not be recognized in the Canadian CCAA Proceedings and *vice versa*.**

All of the Meeting Materials, including the Meeting Order, the Plan and the Information Circular
are available at www.ey.com/ca/nortel under the section entitled "Plan and Other Creditor Meeting
Documents". If you require a copy of any other of the Meeting Materials please contact the
Monitor at the below address and a copy will be provided to you.

The purpose of these materials is to enable you to consider the Plan and vote to accept or reject
the resolution to approve the Plan at the Meeting of Affected Unsecured Creditors of the Canadian
Debtors to be held at **1 p.m.** on **Tuesday, January 17, 2017** (or such other date as may be set and
announced in accordance with the Meeting Order) at **The International Centre Conference
Centre (6900 Airport Road, Mississauga, Ontario)**, (the "**Meeting**").

## PROXIES

Ordinary Creditors who wish to vote must complete the enclosed Proxy and provide it to the
Monitor by (a) email; (b) courier or personal delivery; or (c) facsimile transmission all at the
contact information below, so that it is received by the Monitor no later than **4:00 p.m. (Toronto
time) on January 11, 2017,** or else such Person (or its nominee) must attend the Meeting and
submit the completed proxy to the Monitor at the Meeting at the time specified by the Chair.

## FURTHER INFORMATION

**Canadian CCAA Proceedings Only**

If you have any questions regarding the process or any of the enclosed forms, please contact Ernst & Young Inc. at the following address:

> Ernst & Young Inc.
> Court Appointed Monitor of Nortel Networks Corporation & others
> 222 Bay Street, Suite 2400
> Toronto, Ontario M5K 1J7

> Attention:     Nortel Monitor
> Telephone:     1.866.942.7177 or 416.943.4439
> Facsimile:     416.943.2808
> Email:         nortel.monitor@ca.ey.com

Si vous avez besoin d'une copie du plan ou de l'un des documents relatifs à l'assemblée des créanciers en français, veuillez consulter le site Web du contrôleur ou communiquer avec le contrôleur à l'adresse figurant ci-dessus.

**Canadian CCAA Proceedings Only**

## SCHEDULE "B-2" – ORDINARY CREDITORS' VOTING PROXY

### MEETING OF AFFECTED UNSECURED CREDITORS OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION, NORTEL NETWORKS TECHNOLOGY CORPORATION, NORTEL COMMUNICATIONS INC., ARCHITEL SYSTEMS CORPORATION AND NORTHERN TELECOM CANADA LIMITED (THE "CANADIAN DEBTORS")

to be held pursuant to an Order of the Ontario Superior Court of Justice (the "**Meeting Order**") in connection with the Plan of Compromise and Arrangement (the "**Plan**") under the *Companies' Creditors Arrangement Act* (Canada) in respect of the Canadian Debtors at **1 p.m.** on **Tuesday, January 17, 2017** (or such other date as may be set and announced in accordance with the Meeting Order) at **The International Centre Conference Centre (6900 Airport Road, Mississauga, Ontario)** and any adjournment thereof.

*Before completing this Proxy, please read carefully the Instructions accompanying this Proxy for information respecting the proper completion and return of this Proxy.*

**IN ORDER TO VOTE ON THE PLAN, THIS PROXY MUST BE COMPLETED AND SIGNED BY THE ORDINARY CREDITOR AND PROVIDED TO THE MONITOR, ERNST & YOUNG INC., PRIOR TO 4:00 P.M. TORONTO TIME ON JANUARY 11, 2017 OR DELIVERED TO THE MONITOR IN PERSON OR THROUGH ITS NOMINEE AT THE MEETING AT THE TIME SPECIFIED BY THE CHAIR**

**THE UNDERSIGNED ORDINARY CREDITOR** hereby revokes all proxies previously given and nominates, constitutes and appoints _____ (must be an individual – corporations may not be appointed as proxies) or, if no Person is named, Murray McDonald, President of Ernst & Young Inc., the Canadian Monitor (or his designee), as nominee of the Ordinary Creditor, with power of substitution, to attend on behalf of and act for the Ordinary Creditor at the Meeting of Affected Unsecured Creditors of the Canadian Debtors to be held in connection with the Plan and at any and all adjournments thereof, and to vote the Ordinary Creditor's Claim as follows:

A.  (mark one only)       -and-      B.  vote at the nominee's discretion and otherwise act for and on behalf of the undersigned Ordinary Creditor with respect to

❑  VOTE FOR approval of the Plan; or     any amendments or variations to the Plan and to any other matters that may come before the

❑  VOTE AGAINST approval of the Plan;     Meeting of the Ordinary Creditors of the Canadian Debtors or any adjournment thereof

If you submit a proxy but do not indicate your vote in part "A" above: (a) if Murray McDonald (or his designee) is your nominee, he will vote this proxy FOR approval of the Plan; and (b) if you have named another individual as your nominee and that person does not vote in person at the meeting, your proxy will be deemed to vote FOR approval of the Plan.

| | |
|---|---|
| Date: | |
| Ordinary Creditor Name (**please print legibly**): | |
| Phone Number: | |
| Email Address: | |
| Mailing Address: | |

**Canadian CCAA Proceedings Only**

| Signature of Ordinary Creditor or, if a corporation, signature of an authorized signing officer of the corporation and such officer's name and title: | |
|---|---|

## INSTRUCTIONS FOR COMPLETION OF VOTING PROXY

1.  Each Ordinary Creditor has the right to appoint an individual (who need not be an Ordinary Creditor) to attend, act and vote on the Ordinary Creditor's behalf. Such right may be exercised by inserting in the space provided the name of the Person to be appointed.  An individual Ordinary Creditor wishing to attend and vote in person at the Meeting of Affected Unsecured Creditors of the Canadian Debtors should insert his or her name in the space provided.  **If no name has been inserted in the space provided, the Ordinary Creditor will be deemed to have appointed Murray McDonald, President of Ernst & Young Inc. the Canadian Monitor (or his designee) as the Ordinary Creditor's proxyholder.**

2.  **If you submit a proxy but do not indicate your vote in part "A" of the Proxy: (a) if Murray McDonald (or his designee) is your nominee, he will vote this proxy FOR approval of the Plan; and (b) if you have named another individual as your nominee and that person does not vote in person at the meeting, your proxy will be deemed to vote FOR approval of the Plan.**

3.  If this Proxy is not dated in the space provided, it will be deemed to bear the date on which it is received by the Monitor.

4.  This Proxy must be signed by the Ordinary Creditor or by the Ordinary Creditor's attorney duly authorized in writing or, if the Ordinary Creditor is a corporation, by a duly authorized officer or attorney of the corporation specifying the title of such officer or attorney.

5.  Valid proxies bearing or deemed to bear a later date will revoke this Proxy.  If more than one valid proxy for the same Ordinary Creditor and bearing or deemed to bear the same date are received with conflicting instructions, such proxies will be treated as disputed proxies and will not be counted.

6.  Unless you plan to vote in Person at the meeting, you must complete the Voting Proxy and provide it to the Monitor by (a) email; (b) courier or personal delivery; or (c) facsimile transmission all at the contact information below, so that it is received by the Monitor no later than 4:00 p.m. (Toronto time) on January 11, 2017:

    Ernst & Young Inc.
    Court Appointed Monitor of Nortel Networks Corporation & others
    222 Bay Street, Suite 2400
    Toronto, Ontario M5K 1J7

    Attention:      Nortel Monitor
    Telephone:    1.866.942.7177 or 416.943.4439
    Facsimile:      416.943.2808
    Email:  nortel.monitor@ca.ey.com

### SCHEDULE "C-1" - INSTRUCTIONS TO PARTICIPANT HOLDERS

### URGENT – IMMEDIATE ACTION REQUIRED

■, 2016

TO:    ALL PARTICIPANT HOLDERS IN RESPECT OF THE FOLLOWING BONDS ISSUED OR GUARANTEED BY NORTEL NETWORKS CORPORATION AND NORTEL NETWORKS LIMITED:

(i)    US$1,000,000,000 LIBOR + 4.250% FLOATING RATE NOTES DUE 2011 (CUSIP NO. 656569AH3; 656569AK6) PURSUANT TO AN INDENTURE DATED AS OF JULY 5, 2006, AS AMENDED

(ii) US$550,000,000 10.125% FIXED RATE NOTES DUE 2013 (CUSIP NO. 656569AG5) PURSUANT TO AN INDENTURE DATED AS OF JULY 5, 2006, AS AMENDED

(iii)US$1,125,000,000 10.75% FIXED RATE NOTES DUE 2016 (CUSIP NO. 656569AD2) PURSUANT TO AN INDENTURE DATED AS OF JULY 5, 2006, AS AMENDED

(iv) US$575,000,000 1.75% CONVERTIBLE SENIOR NOTES DUE 2012 (CUSIP NO. 656568AC6; 656568AF9) PURSUANT TO AN INDENTURE DATED AS OF MARCH 28, 2007, AS AMENDED

(v) US$575,000,000 2.125% CONVERTIBLE SENIOR NOTES DUE 2014 (CUSIP NO. 656568AD4; 656568AE2) PURSUANT TO AN INDENTURE DATED AS OF MARCH 28, 2007, AS AMENDED

(vi) US$150,000,000 7.875% NOTES DUE 2026 (CUSIP NO. 665810AB3) PURSUANT TO AN INDENTURE DATED AS OF FEBRUARY 15, 1996, AS AMENDED

(vii)  US$200,000,000 6.875% UNSECURED SENIOR NOTES DUE 2023 (CUSIP NO. 665815AH9) PURSUANT TO AN INDENTURE DATED AS OF NOVEMBER 30, 1988, AS AMENDED

(collectively, the "**Bonds**")

Re:    Meeting of Affected Unsecured Creditors of Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Global Corporation, Nortel Networks International Corporation, Nortel Networks Technology Corporation, Nortel Communications Inc., Architel Systems Corporation and Northern Telecom Canada Limited (the "**Canadian Debtors**") to vote on the Plan of Compromise and Arrangement pursuant to the *Companies' Creditors Arrangement Act* (the "**Plan**")

---

TAKE NOTE THAT THESE MATERIALS relate to the <u>CANADIAN CCAA PROCEEDINGS ONLY</u> and do not apply to any other restructuring proceeding including the Chapter 11 Proceedings of Nortel Networks Inc. and the other U.S. Debtors. If you have claims in both the Canadian and U.S. proceedings, you <u>MUST</u> vote your claims in respect of the Canadian Debtors in this CCAA Proceeding in order for your vote to count with respect to the Canadian Plan and must comply with the applicable procedures in the U.S. Debtors' cases for your claim in respect of the U.S. Debtors.  A vote in the U.S. Proceedings will not be recognized in the Canadian CCAA Proceedings and *vice versa.*

---

<u>ALL MASTER AUTHENTICATION FORMS MUST BE RECEIVED BY EPIQ BANKRUPTCY SOLUTIONS, LLC ("EPIQ") PRIOR TO THE DEADLINE OF 4:00 P.M. ON JANUARY 10, 2017 (THE "DEADLINE")</u>

**Canadian CCAA Proceedings Only**

**PROOF OF CLAIM**

THE TOTAL AMOUNT OF ALL THE BONDHOLDER CLAIMS HAS BEEN FILED BY THE INDENTURE TRUSTEES.  YOU DO NOT HAVE TO PROVIDE A PROOF OF CLAIM.

**PROXY INSTRUCTIONS**

According to the records of the Depository or the applicable Indenture Trustee, you are the holder or custodian (the "**Participant Holder**") on behalf of a beneficial holder of Bonds.

We enclose Bondholder Mailing Materials to be forwarded by you or your agent to each of the Beneficial Bondholders recorded in your account records or book entry records. Shortly, we will also be providing you a form of Master Authentication Form to be used by you or your agent to validate the holdings of your Beneficial Bondholders and to be completed and returned to Epiq prior to the Deadline. Please direct any questions you may have on the mailing requirements or the Master Authentication Forms to Epiq at the contact information below.

**THE BONDHOLDER MAILING MATERIALS ARE TIME SENSITIVE. PURSUANT TO THE ORDER OF THE CCAA COURT DATED DECEMBER 1, 2016, MUST BE FORWARDED TO EACH OF THE BENEFICIAL BONDHOLDERS TOGETHER WITH THE BONDHOLDER PROXY FOR THAT BENEFICIAL BONDHOLDER WITHOUT DELAY AND NO LATER THAN FIVE (5) BUSINESS DAYS FROM YOUR RECEIPT OF THE BONDHOLDER MAILING MATERIALS.**

Please instruct Beneficial Bondholders to return completed Bondholders Proxies to you to allow sufficient time as may be required by you to complete and submit one or more Master Authentication Forms by the Deadline.  Upon receipt of such completed Bondholder Proxies, you must complete Master Authentication Forms (one per CUSIP) validating the holdings of such Beneficial Bondholders and attaching copies of the Bondholder Proxies received by you.  All Master Authentication Forms must be received by Epiq no later than **4 p.m. (Eastern Time) on January 10, 2017.**

By completing and signing the Bondholder Proxy, the Beneficial Bondholder acknowledges and agrees that it has read the Plan and other Bondholder Meeting Materials and authorizes its Participant Holder to provide a copy of the Bondholder Proxy to Epiq and the Monitor.

**If you have a standard practice for distributing meeting materials to Beneficial Bondholders and for gathering information and proxies or voting instructions from Beneficial Bondholders that differs from the process described above, please contact Epiq immediately to determine whether you are able to use such standard practice as an alternative to the process described above. Epiq may be contacted via email at tabulation@epiqsystems.com with a reference "Nortel Canada" in the subject line.**

All Master Authentication Forms should be returned by (a) mail; (b) courier; or (c) personal delivery to:

<div align="center">

**Epiq Bankruptcy Solutions, LLC**
**Attn: Nortel Networks Corporation**
**Master Authentication Form Processing**
**777 Third Avenue, 12th Floor**
**New York, NY 10017**

</div>

**Canadian CCAA Proceedings Only**

You can also view copies of documents relating to this process on the following Monitor's Website www.ey.com/ca/nortel in the section entitled "Plan and Other Creditor Meeting Documents".

Si vous avez besoin d'une copie du plan ou de l'un des documents relatifs à l'assemblée des créanciers en français, veuillez consulter le site Web du contrôleur ou communiquer avec le contrôleur à l'adresse figurant ci-dessus.

## SCHEDULE "C-2" - INSTRUCTIONS TO BENEFICIAL BONDHOLDERS

## URGENT – IMMEDIATE ACTION REQUIRED

■, 2016

TO:    ALL BENEFICIAL BONDHOLDERS IN RESPECT OF THE FOLLOWING BONDS ISSUED OR GUARANTEED BY NORTEL NETWORKS CORPORATION AND NORTEL NETWORKS LIMITED:

(i)    US$1,000,000,000 LIBOR + 4.250% FLOATING RATE NOTES DUE 2011 (CUSIP NO. 656569AH3; 656569AK6) PURSUANT TO AN INDENTURE DATED AS OF JULY 5, 2006, AS AMENDED

(ii) US$550,000,000 10.125% FIXED RATE NOTES DUE 2013 (CUSIP NO. 656569AG5) PURSUANT TO AN INDENTURE DATED AS OF JULY 5, 2006, AS AMENDED

(iii) US$1,125,000,000 10.75% FIXED RATE NOTES DUE 2016 (CUSIP NO. 656569AD2) PURSUANT TO AN INDENTURE DATED AS OF JULY 5, 2006, AS AMENDED

(iv) US$575,000,000 1.75% CONVERTIBLE SENIOR NOTES DUE 2012 (CUSIP NO. 656568AC6; 656568AF9) PURSUANT TO AN INDENTURE DATED AS OF MARCH 28, 2007, AS AMENDED

(v) US$575,000,000 2.125% CONVERTIBLE SENIOR NOTES DUE 2014 (CUSIP NO. 656568AD4; 656568AE2) PURSUANT TO AN INDENTURE DATED AS OF MARCH 28, 2007, AS AMENDED

(vi) US$150,000,000 7.875% NOTES DUE 2026 (CUSIP NO. 665810AB3) PURSUANT TO AN INDENTURE DATED AS OF FEBRUARY 15, 1996, AS AMENDED

(vii) US$200,000,000 6.875% UNSECURED SENIOR NOTES DUE 2023 (CUSIP NO. 665815AH9) PURSUANT TO AN INDENTURE DATED AS OF NOVEMBER 30, 1988, AS AMENDED

(collectively, the "**Bonds**")

Re:    Meeting of Affected Unsecured Creditors of Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Global Corporation, Nortel Networks International Corporation, Nortel Networks Technology Corporation, Nortel Communications Inc., Architel Systems Corporation and Northern Telecom Canada Limited (the "**Canadian Debtors**") to vote on the Plan of Compromise and Arrangement pursuant to the *Companies' Creditors Arrangement Act* (the "**Plan**")

TAKE NOTE THAT THESE MATERIALS relate to the <u>CANADIAN CCAA PROCEEDINGS ONLY</u> and do not apply to any other restructuring proceeding including the Chapter 11 Proceedings of Nortel Networks Inc. and the other U.S. Debtors. If you have claims in both the Canadian and U.S. proceedings, you <u>MUST</u> vote your claims in respect of the Canadian Debtors in this CCAA Proceeding in order for your vote to count with respect to the Canadian Plan and must comply with the applicable procedures in the U.S. Debtors' cases for your claim in respect of the U.S. Debtors.  A vote in the U.S. Proceedings will not be recognized in the Canadian CCAA Proceedings and *vice versa*.

Please take note that the Meeting Materials are available at www.ey.com/ca/nortel in the section entitled "Plan and Other Creditor Meeting Documents".

The purpose of these materials is to provide Beneficial Bondholders (i.e., those who own Bonds beneficially themselves and do not hold such Bonds for the benefit of another person) with the documents required to enable them to consider the Plan and to cast their vote to accept or reject the resolution to approve the Plan at the meeting of the Affected Unsecured Creditors to be held at **1 p.m.** on **Tuesday, January 17, 2017** (or such other date as may be set and announced in accordance with the Meeting Order) at **The International Centre Conference Centre (6900 Airport Road, Mississauga, Ontario)**, (the "**Meeting**").

## PROOF OF CLAIM

THE TOTAL AMOUNT OF ALL THE BONDHOLDER CLAIMS HAS BEEN FILED BY THE INDENTURE TRUSTEES. THEREFORE, YOU DO NOT HAVE TO PROVIDE A PROOF OF CLAIM.

## PROXY INSTRUCTIONS

Proxies are only to be filed by Beneficial Bondholders (or their nominee). If you are a trust company, depository, broker, book entry system, agent, custodian or any other entity that holds bonds for another Person, please refer to the Instructions to Participant Holders or contact Epiq or Ernst & Young Inc. for the information applicable to you.

IF YOU ARE A BENEFICIAL BONDHOLDER AND YOU WISH TO VOTE ON THE PLAN, YOU MUST COMPLETE THE ENCLOSED BONDHOLDER PROXY IN ACCORDANCE WITH THE INSTRUCTIONS SET OUT THEREIN AND RETURN IT TO YOUR PARTICIPANT HOLDER PRIOR TO THE DEADLINE REQUIRED BY YOUR PARTICIPANT HOLDER.

**IF YOU ARE A BENEFICIAL BONDHOLDER AND HAVE SIGNED A CREDITOR JOINDER TO THE SETTLEMENT AND SUPPORT AGREEMENT DATED OCTOBER 12, 2016, YOU ARE OBLIGATED TO VOTE IN FAVOUR OF THE PLAN. IF YOU APPOINT A PROXY OR OTHER NOMINEE OR REPRESENTATIVE TO VOTE ON YOUR BEHALF, YOU MUST INSTRUCT SUCH PROXYHOLDER OR NOMINEE TO VOTE IN FAVOUR OF THE PLAN.**

## INSTRUCTIONS FOR BENEFICIAL BONDHOLDERS

If you are a Beneficial Bondholder and you wish to vote at the Meeting, you must complete the enclosed Bondholder Proxy and return it to your Participant Holder in the manner you are instructed to by your Participant Holder. **Whether you vote in person or by proxy you must return your completed Bondholder Proxy to your Participant Holder and your Participant Holder must submit a Master Authentication Form validating your holdings and attaching a copy of your Bondholder Proxy by the deadline of 4:00 p.m. on January 10, 2017 (please note this is not the date by which you must have completed your Bondholder Proxy, but the date Master Authentication Forms must be delivered to Epiq after you send back your Bondholder Proxies to your Participant Holder).**

You must:

1. complete a separate Bondholder Proxy for each CUSIP and each Participant Holder through which you hold Bonds;

2. provide a copy of your completed Bondholder Proxy to each Participant Holder through which you hold Bonds no later than the deadline set out by your Participant Holder so that it may submit a

Master Authentication Form by 4:00 p.m. (Toronto time) on January 10, 2017 (please note this is not the date by which you must have completed your Bondholder Proxy, but the date Master Authentication Forms must be delivered to Epiq after you send back your Bondholder Proxies to your Participant Holder); and

3. authorize your Participant Holder to provide a copy of your Bondholder Proxy to Epiq or the Monitor.

If no name is indicated in your Proxy, Murray McDonald, President of Ernst & Young Inc., the Canadian Monitor (or his designee) will be named as your proxyholder. If you do not indicate your vote and Murray McDonald (or his designee) is your proxyholder, he will vote FOR approval of the Plan. If you have named another individual as your nominee and have not indicated a vote, unless your nominee votes in person at the Meeting your proxy will be voted FOR approval of the Plan.

In completing and signing your Bondholder Proxy you will be acknowledging that you have read the Canadian Plan and other Bondholder Meeting Materials.

Si vous avez besoin d'une copie du plan ou de l'un des documents relatifs à l'assemblée des créanciers en français, veuillez consulter le site Web du contrôleur ou communiquer avec le contrôleur à l'adresse figurant ci-dessus.

**Canadian CCAA Proceedings Only**

## SCHEDULE "C-3" - BONDHOLDER PROXY

**For Use by Beneficial Bondholders of the following Bonds Issued or Guaranteed by Nortel Networks Corporation or Nortel Networks Limited:**

(i)    US$1,000,000,000 LIBOR + 4.250% FLOATING RATE NOTES DUE 2011 (CUSIP NO. 656569AH3; 656569AK6) PURSUANT TO AN INDENTURE DATED AS OF JULY 5, 2006, AS AMENDED

(ii) US$550,000,000 10.125% FIXED RATE NOTES DUE 2013 (CUSIP NO. 656569AG5) PURSUANT TO AN INDENTURE DATED AS OF JULY 5, 2006, AS AMENDED

(iii) US$1,125,000,000 10.75% FIXED RATE NOTES DUE 2016 (CUSIP NO. 656569AD2) PURSUANT TO AN INDENTURE DATED AS OF JULY 5, 2006, AS AMENDED

(iv) US$575,000,000 1.75% CONVERTIBLE SENIOR NOTES DUE 2012 (CUSIP NO. 656568AC6; 656568AF9) PURSUANT TO AN INDENTURE DATED AS OF MARCH 28, 2007, AS AMENDED

(v) US$575,000,000 2.125% CONVERTIBLE SENIOR NOTES DUE 2014 (CUSIP NO. 656568AD4; 656568AE2) PURSUANT TO AN INDENTURE DATED AS OF MARCH 28, 2007, AS AMENDED

(vi) US$150,000,000 7.875% NOTES DUE 2026 (CUSIP NO. 665810AB3) PURSUANT TO AN INDENTURE DATED AS OF FEBRUARY 15, 1996, AS AMENDED

(vii) US$200,000,000 6.875% UNSECURED SENIOR NOTES DUE 2023 (CUSIP NO. 665815AH9) PURSUANT TO AN INDENTURE DATED AS OF NOVEMBER 30, 1988, AS AMENDED

(collectively, the **"Bonds"**)

**MEETING OF AFFECTED UNSECURED CREDITORS OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION, NORTEL NETWORKS TECHNOLOGY CORPORATION, NORTEL COMMUNICATIONS INC., ARCHITEL SYSTEMS CORPORATION AND NORTHERN TELECOM CANADA LIMITED (THE "CANADIAN DEBTORS")**

to be held pursuant to an Order of the Ontario Superior Court of Justice (the **"Meeting Order"**) in connection with the Plan of Compromise and Arrangement (the **"Plan"**) under the *Companies' Creditors Arrangement Act* (Canada) in respect of the Canadian Debtors  at **1 p.m.**  on **Tuesday, January 17, 2017** (or such other date as may be set and announced in accordance with the Meeting Order) at **The International Centre Conference Centre (6900 Airport Road, Mississauga, Ontario)** and any adjournment thereof.

*Before completing this Proxy, please read carefully the instructions accompanying this Proxy for information respecting the proper completion and return of this Proxy.*

A BENEFICIAL BONDHOLDER MUST COMPLETE AND SIGN ONE OR MORE PROXIES (ONE FOR EACH CUSIP AND/OR PARTICIPANT HOLDER) AND RETURN SUCH PROXY TO EACH PARTICIPANT HOLDER THROUGH WHICH IT HOLDS BONDS NO LATER THAN THE DATE SPECIFIED BY EACH SUCH PARTICIPANT HOLDER.

Principal Amount Held by Beneficial Bondholder as of November 21, 2016.

$_____

**Canadian CCAA Proceedings Only**

**THE UNDERSIGNED BENEFICIAL BONDHOLDER** hereby revokes all proxies previously given and nominates, constitutes and appoints _____ or, if no Person is named, Murray McDonald, President of Ernst & Young, Inc., the Canadian Monitor (or his designee), as nominee of the Beneficial Bondholder, with power of substitution, to attend on behalf of and act for the Beneficial Bondholder at the Meeting of Affected Unsecured Creditors of the Canadian Debtors be held in connection with the Plan and at any and all adjournments thereof, and to vote the Beneficial Bondholder's Claims in respect of the Bonds beneficially owned by it as follows:

A. (mark one only)                                      -and-    B.  vote at the nominee's discretion and otherwise act for and on behalf of the undersigned Beneficial Bondholder with respect to any amendments or variations to the Plan and to any other matters that may come before the Meeting of the Affected Unsecured Creditors of the Canadian Debtors or any adjournment thereof

❏  VOTE FOR approval of the Plan; or

❏  VOTE AGAINST approval of the Plan;

If you submit a proxy but do not indicate your vote in part "A" above: (a) if Murray McDonald (or his designee) is your nominee, he will vote this proxy FOR approval of the Plan; and (b) if you have named another individual as your nominee and that person does not vote in person at the meeting, your proxy will be deemed to vote FOR approval of the Plan.

You will receive a separate Proxy for each account you hold. Please complete and return each Proxy you receive.

**The Beneficial Bondholder hereby acknowledges and agrees that it has read the Plan and other Bondholder Meeting Materials and authorizes its Participant Holder to provide a copy of this Bondholder Proxy to Epiq and the Monitor.**

| | |
|---|---|
| Date: | |
| Beneficial Bondholder Name: **(please print legibly)** | |
| Phone Number: | |
| Email Address: | |
| Mailing Address: | |
| Signature of Beneficial Bondholder or, if a corporation, signature of an authorized signing officer of the corporation and such officer's name and title: | |

**DELIVERY**

Completed Bondholder Proxies must be returned to each relevant Participant Holder as directed by such Participant Holder and by the deadline specified by the applicable Participant Holder.

**Canadian CCAA Proceedings Only**

## INSTRUCTIONS FOR COMPLETION OF PROXY

1.  Each Beneficial Bondholder has the right to appoint an individual (who need not be a Bondholder) to attend, act and vote for and on the Beneficial Bondholder's behalf and such right may be exercised by inserting the name of the Person to be appointed. A Beneficial Bondholder wishing to have a representative attend and vote in Person at the Meeting of Affected Unsecured Creditors of the Canadian Debtors should insert such individual representative's name in the space provided. **If no name has been inserted in the space provided, the Beneficial Bondholder will be deemed to have appointed Murray McDonald, President of Ernst & Young Inc., the Canadian Monitor (or his designee) as the Beneficial Bondholder's proxyholder.**

2.  If you submit a proxy but do not indicate your vote in part "A" of the Proxy: (a) if Murray McDonald (or his designee) is your nominee, he will vote this proxy FOR approval of the Plan; and (b) if you have named another individual as your nominee and that person does not vote in person at the meeting, your proxy will be deemed to vote FOR approval of the Plan.

3.  If this Proxy is not dated in the space provided, it will be deemed to bear the date on which it is received by the Monitor.

4.  This Proxy must be signed by the Beneficial Bondholder of the applicable Bonds or by his or her attorney duly authorized in writing or, if the Beneficial Bondholder is a corporation, by a duly authorized officer or attorney of the corporation specifying the title of such officer or attorney.

5.  Separate Proxies must be completed for each CUSIP and for each Participant Holder through whom your Bonds are held. Completed Proxies must be returned to the applicable Participant Holder. Participant Holders will be required to submit Master Authentication Forms validating the holdings of such Beneficial Bondholders and attaching copies of all Proxies to Epiq.

6.  Valid proxies bearing or deemed to bear a later date will revoke this Proxy. If more than one valid proxy for the same Beneficial Bondholder in respect of the same Bonds and bearing or deemed to bear the same date are received with conflicting instructions, such proxies will be treated as disputed proxies and will not be counted.

## SCHEDULE "C-4" – MASTER AUTHENTICATION FORM

**For Use by Participant Holders validating the holdings of Beneficial Bondholder holding
the following Bonds Issued or Guaranteed by
Nortel Networks Corporation or Nortel Networks Limited:**

(i)  US$1,000,000,000 LIBOR + 4.250% FLOATING RATE NOTES DUE 2011 (CUSIP NO. 656569AH3; 656569AK6) PURSUANT TO AN INDENTURE DATED AS OF JULY 5, 2006, AS AMENDED

(ii)  US$550,000,000 10.125% FIXED RATE NOTES DUE 2013 (CUSIP NO. 656569AG5) PURSUANT TO AN INDENTURE DATED AS OF JULY 5, 2006, AS AMENDED

(iii) US$1,125,000,000 10.75% FIXED RATE NOTES DUE 2016 (CUSIP NO. 656569AD2) PURSUANT TO AN INDENTURE DATED AS OF JULY 5, 2006, AS AMENDED

(iv)  US$575,000,000 1.75% CONVERTIBLE SENIOR NOTES DUE 2012 (CUSIP NO. 656568AC6; 656568AF9) PURSUANT TO AN INDENTURE DATED AS OF MARCH 28, 2007, AS AMENDED

(v)  US$575,000,000 2.125% CONVERTIBLE SENIOR NOTES DUE 2014 (CUSIP NO. 656568AD4; 656568AE2) PURSUANT TO AN INDENTURE DATED AS OF MARCH 28, 2007, AS AMENDED

(vi) US$150,000,000 7.875% NOTES DUE 2026 (CUSIP NO. 665810AB3) PURSUANT TO AN INDENTURE DATED AS OF FEBRUARY 15, 1996, AS AMENDED

(vii)  US$200,000,000 6.875% UNSECURED SENIOR NOTES DUE 2023 (CUSIP NO. 665815AH9) PURSUANT TO AN INDENTURE DATED AS OF NOVEMBER 30, 1988, AS AMENDED

(collectively, the **"Bonds"**)

**MEETING OF AFFECTED UNSECURED CREDITORS OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION, NORTEL NETWORKS TECHNOLOGY CORPORATION, NORTEL COMMUNICATIONS INC., ARCHITEL SYSTEMS CORPORATION AND NORTHERN TELECOM CANADA LIMITED (THE "CANADIAN DEBTORS")**

to be held pursuant to an Order of the Ontario Superior Court of Justice (the "**Meeting Order**") in connection with the Plan of Compromise and Arrangement (the "**Plan**") under the *Companies' Creditors Arrangement Act* (Canada) in respect of the Canadian Debtors at **1 p.m.** on **Tuesday, January 17, 2017,** (or such other date as may be set and announced in accordance with the Meeting Order) at **The International Centre Conference Centre (6900 Airport Road, Mississauga, Ontario)** and any adjournment thereof.

*Before completing this Master Authentication Form, please carefully read the accompanying instructions for information respecting the proper completion and return of this Master Authentication Forms.*

THIS MASTER AUTHENTICATION FORM MUST BE COMPLETED AND SIGNED IN ACCORDANCE WITH THE INSTRUCTIONS. PURSUANT TO THE ORDER OF THE CCAA COURT DATED DECEMBER 1, 2016, YOU MUST ATTACH COPIES OF ALL BONDHOLDER PROXIES RELEVANT TO THE MASTER AUTHENTICATION FORM AND IT MUST BE PROVIDED TO EPIQ BANKRUPTCY SOLUTIONS, LLC PRIOR TO **4:00 P.M. EASTERN TIME ON JANUARY 10, 2017.**

**Canadian CCAA Proceedings Only**

**USE ONE MASTER AUTHENTICATION FORM PER CUSIP. PLEASE CHECK A BOX BELOW TO INDICATE TO WHICH CUSIP THIS MASTER AUTHENTICATION FORM PERTAINS**

| | | | |
|---|---|---|---|
| ❑ | 656568AC6 | ❑ | 656569AG5 |
| ❑ | 656568AD4 | ❑ | 656569AH3 |
| ❑ | 656568AE2 | ❑ | 656569AK6 |
| ❑ | 656568AF9 | ❑ | 665810AB3 |
| ❑ | 656569AD2 | ❑ | 665815AH9 |

**PART I:  Principal Amount of Bonds as at November 21, 2016 (the "Voting Record Date"):**

| Beneficial Bondholder Name | Account # | Principal Amount of Bonds at Voting Record Date |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

(If additional space is required, please attach extra pages)

Copies of all Proxies received and reflected above (or on the attached extra pages) are attached to this Master Authentication Form.

## PART II: PARTICIPANT HOLDER CERTIFICATION AND INFORMATION

The undersigned certifies that as of the Voting Record Date (listed above), the principal value of the holdings of the Beneficial Bondholders listed above (or on the attached extra pages) is true and accurate.

Date Submitted: _____, 2016        Participant No.    _____

Print Name of Participant Holder (**please print legibly**): _____

Signature: _____

Authorized Participant Holder Employee Contact (Print Name): _____

Title: _____

Tel. No.: _____Fax No.: _____

E-Mail: _____

**MEDALLION STAMP BELOW**:

**DELIVERY**

Completed Master Authentication Forms should be sent to:

Epiq Bankruptcy Solutions, LLC
Attn: Nortel Networks Corporation
Master Authentication Form Processing
777 Third Avenue, 12th Floor
New York, NY 10017

Master Authentication Forms may be delivered by mail, courier or personal delivery, all at the contact information above, and must be received by Epiq **no later than 4:00 p.m. (Eastern Time) on January 10, 2017.**

**IF YOU HAVE ANY QUESTIONS REGARDING THIS FORM OR THE PROCEDURES, PLEASE CONTACT THE MONITOR'S AGENT BY EMAIL AT TABULATION@EPIQSYSTEMS.COM AND REFERENCE "NORTEL CANADA" IN THE SUBJECT LINE.**

Canadian CCAA Proceedings Only

## INSTRUCTIONS FOR COMPLETION OF MASTER AUTHENTICATION FORMS

1.   **You must use a separate Master Authentication Form for each CUSIP.**

2.   Each Participant Holder providing a Master Authentication Form must complete Parts I and II of the Master Authentication Form and provide all information requested therein. Please take notice of the following:

    A.   Part I relates to Bonds for which you have received Proxies from Beneficial Bondholders; and

    B.   Part II is your certification – you must complete this section and sign it.

3.   You must attach copies of each Bondholder Proxy to the Master Authentication Form.  **If you receive further Proxies after you have submitted a Master Authentication Form, you may submit one or more further Master Authentication Forms as long as all Master Authentication Forms are received by the Deadline (defined below).**

4.   If this Master Authentication Form is not dated in the space provided, it will be deemed to bear the date on which it is received by Epiq.

5.   The Participant Holder must complete the Master Authentication Form, sign, and certify in order for it to be valid.

6.   Master Authentication Forms (including the attached Bondholder Proxies) may be delivered to Epiq at the address below, and must be received by Epiq **no later than 4:00 p.m. (Eastern Time) on January 10, 2017 (the "Deadline").**

        Epiq Bankruptcy Solutions, LLC
        Attn: Nortel Networks Corporation
        Master Authentication Form Processing
        777 Third Avenue, 12th Floor
        New York, NY 10017

**IF YOU HAVE ANY QUESTIONS REGARDING THIS FORM OR THE PROCEDURES, PLEASE CONTACT THE MONITOR'S AGENT BY EMAIL AT TABULATION@EPIQSYSTEMS.COM AND REFERENCE "NORTEL CANADA" IN THE SUBJECT LINE.**

Court File No.:  09-CL-7950

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED
AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION, NORTEL NETWORKS TECHNOLOGY CORPORATION, NORTEL COMMUNICATIONS INC., ARCHITEL SYSTEMS CORPORATION AND NORTHERN TELECOM CANADA LIMITED

|  |  |
|---|---|
|  | ***ONTARIO***<br>**SUPERIOR COURT OF JUSTICE**<br>**(COMMERCIAL LIST)**<br><br>Proceeding commenced at Toronto, Ontario Canada |
|  | **PLAN FILING AND MEETING ORDER**<br>**(Returnable December 1, 2016)** |
|  | **GOODMANS LLP**<br>333 Bay Street, Suite 3400<br>Toronto, Ontario M5H 2S7<br><br>Jay Carfagnini LSUC#: 22293T (jcarfagnini@goodmans.ca)<br>Joseph Pasquariello LSUC#: 38390C (jpasquariello@goodmans.ca)<br>Christopher G. Armstrong LSUC#: 55148B (carmstrong@goodmans.ca)<br><br>Tel: 416.979.2211<br>Fax: 416.979.1234<br><br>Lawyers for the Monitor, Ernst & Young Inc.<br><br>**GOWLING WLG (CANADA) LLP**<br>One First Canadian Place<br>100 King Street West, Suite 1600<br>TORONTO, Ontario<br>M5X 1G5<br><br>Derrick Tay LSUC#: 21152A (derrick.tay@gowlingwlg.com)<br>Jennifer Stam LSUC#: 46735J (jennifer.stam@gowlingwlg.com)<br><br>Tel: 416.862.5697<br>Fax: 416.862.7661<br><br>Lawyers for the Canadian Debtors |



**From:** Armstrong, Christopher
**Sent:** Thursday, December 01, 2016 2:08 PM
**To:** 'catherine.ma@nortonrosefulbright.com'; 'derrick.tay@gowlingwlg.com';
'jennifer.stam@gowlingwlg.com'; 'nortel.monitor@ca.ey.com'; Carfagnini, Jay;
Pasquariello, Joe; Rubenstein, Gale; Ruby, Peter; 'lbarnes@osler.com';
'ahirsh@osler.com'; 'akauffman@fasken.com'; 'jlevin@fasken.com'; 'jsullivan@edc.ca';
'lwilliams@tgf.ca'; 'john.stringer@mcinnescooper.com';
'stephen.kingston@mcinnescooper.com'; 'jcarhart@millerthomson.com';
'barry.wadsworth@unifor.org'; 'rjaipargas@blgcanada.com'; 'ray.leach@siskinds.com';
'emilie.maxwell@siskinds.com'; 'mzigler@kmlaw.ca'; 'sphilpott@kmlaw.ca';
'akaplan@kmlaw.ca'; 'bwalancik@kmlaw.ca'; 'zychk@bennettjones.com';
'orzyr@bennettjones.com'; 'finlaysong@bennettjones.com';
'swanr@bennettjones.com'; 'mclachlana@bennettjones.com';
'ken.rosenberg@paliareroland.com'; 'max.starnino@paliareroland.com';
'lily.harmer@paliareroland.com'; 'karen.jones@paliareroland.com';
'tina.lie@paliareroland.com'; 'michelle.jackson@paliareroland.com';
'harvey@chaitons.com'; 'George@chaitons.com'; 'patrick.shea@gowlingwlg.com';
'skukulowicz@casselsbrock.com'; 'mwunder@casselsbrock.com';
'rjacobs@casselsbrock.com'; 'jwigley@gardiner-roberts.com'; 'hfogul@airdberlis.com';
'pczegledy@airdberlis.com'; 'rslattery@mindengross.com';
'dullmann@mindengross.com'; 'sgraff@airdberlis.com'; 'iaversa@airdberlis.com';
'renglish@airdberlis.com'; 'smitra@airdberlis.com'; 'paige.honeycutt@verint.com';
'surquhart@ahbl.ca'; 'andrew.kent@mcmillan.ca'; 'bdarlington@davis.ca';
'brett.harrison@mcmillan.ca'; 'jeffrey.levine@mcmillan.ca'; 'Laura.Brazil@mcmillan.ca';
'adam.maerov@mcmillan.ca'; 'jsirivar@mccarthy.ca'; 'ghall@mccarthy.ca';
'dcharach@mccarthy.ca'; 'frank.spizzirri@bakermckenzie.com'; 'kjohnson@imk.ca';
'ryanbellr@bennettjones.com'; 'laugesenm@bennettjones.com';
'janice.payne@nelligan.ca'; 'christopher.rootham@nelligan.ca';
'mgaggino@gaggino.ca'; 'raffy.lorentzian@ntscorp.com'; 'tdunn@mindengross.com';
'ibrady@baldwinlaw.ca'; 'david.cohen@gowlingwlg.com'; Arthur Jacques;
'thomas.mcrae@shibleyrighton.com'; 'raffy.lorentzian@ntscorp.com';
'tosullivan@counsel-toronto.com'; 'slaubman@counsel-toronto.com';
'rschwill@dwpv.com'; 'jdoris@dwpv.com'; 'lsarabia@dwpv.com';
'scampbell@dwpv.com'; 'mgottlieb@counsel-toronto.com'; 'pmichell@counsel-
toronto.com'; 'jzhi@counsel-toronto.com'; 'puneet@sdslawfirm.com';
'dwinters@justice.gc.ca'; 'hmeredith@mccarthy.ca'; 'susan.grundy@blakes.com';
'jeff.galway@blakes.com'; 'barbra.parlin@hklaw.com'; 'pamela.huff@blakes.com';
'milly.chow@blakes.com'; 'hugh.desbrisay@blakes.com'; 'craig.thorburn@blakes.com';
'thomas.wallis@vdg.ca'; 'rferguson@stikeman.com'; 'jeremy.forgie@blakes.com';
'jbromley@cgsh.com'; 'lschweitzer@cgsh.com'; 'bboake@mccarthy.ca';
'jgage@mccarthy.ca'; 'davidsteer127@sympatico.ca'; 'tdemarinis@torys.com';
'sbomhof@torys.com'; 'sblock@torys.com'; 'agray@torys.com'; 'aslavens@torys.com';
'jspiegelman@aclaw.ca'; 'hvw@tmlegal.ca'; 'dwd@tmlegal.ca'; 'tstorms@tmlegal.ca';
'wael.rostom@mcmillan.ca'; 'brad.hanna@mcmillan.ca'; 'steven.weisz@blakes.com';
'michael.barrack@blakes.com'; 'William.MacLarkey@ontario.ca';
'Danielle.Meuleman@ontario.ca'; 'Paul.McCulloch@ontario.ca'; 'jwigley@gardiner-
roberts.com'; 'doug@chaitons.com'; 'adsilva@stikeman.com'; 'lpillon@stikeman.com';
'ataylor@stikeman.com'; 'kesaw@stikeman.com'; 'dbyers@stikeman.com';
'dmurdoch@stikeman.com'; 'david.quagliana@constellation.com';
'craig.barbarosh@kattenlaw.com'; 'david.crichlow@kattenlaw.com';

**To:**   'karen.dine@kattenlaw.com'; 'John.Salmas@dentons.com';
'Kenneth.Kraft@dentons.com'; 'sara.vanallen@dentons.com'; 'elamek@weirfoulds.com';
'dalowenthal@pbwt.com'; 'djmiller@tgf.ca'; 'rlewis@tgf.ca'; 'amcewan@tgf.ca';
'mshakra@tgf.ca'; 'jfeistritzer@mofo.com'; 'sbrown@lrlaw.com';
'fhodara@akingump.com'; 'jyecies@akingump.com'; 'rajohnson@akingump.com';
'sreisman@curtis.com'; 'jdrew@curtis.com'; 'TKreller@milbank.com';
'JHarris@milbank.com'; 'APisa@milbank.com'; 'mschein@vedderprice.com';
'eric.prezant@bryancave.com'; 'mriela@vedderprice.com';
'jonathan.edwards@alston.com'; 'chris.edwards-earl@hoganlovells.com';
'jopolsky@torys.com'; 'lpillon@stikeman.com'; 'psteep@mccarthy.ca';
'bdshaw@mccarthy.ca'; 'stephen.brown-okruhlik@mcmillan.ca';
'kgianis@contrariancapital.com'; 'JFinnigan@tgf.ca'
**Cc:**   'Stitt, Evan (Evan.Stitt@gowlingwlg.com)'
**Subject:**   RE: CCAA Proceedings of Nortel Networks Corporation et al. - Court File No. 09-
CL-7950 - Motion Record re: Meeting Order, Post-Filing Claims Bar Date Order and
Additional Misfiled Claim Order
**Attachments:**   Post-Filing Claims Bar Date Order.pdf; Additional Misfiled Claim Order.pdf; Plan Filing
and Meeting Order.pdf; GOODMANS-#6639004-v1-Nortel_-_CCAA_Plan_(Final_-_Dec_
1).pdf; GOODMANS-#6638992-v1-Nortel_-_CCAA_Info_Circular_(Final_-_Dec_1).pdf;
Nortel - CCAA Info Circular - Final vs. Nov 30.pdf

**TO: THE SERVICE LIST**

Please find attached for service upon you:

1.  Copies of the Plan Filing and Meeting Order, Post-Filing Claims Bar Date Order and Additional Misfiled Claims
    Orders, as issued and entered;
2.  A copy of the CCAA Plan as filed, which is the same as the version circulated yesterday evening except for
    updating the table of contents to conform to the updated Plan; and
3.  A copy of CCAA Information Circular as approved, together with a blackline against the version circulated
    yesterday evening.

Service of these materials constitutes service of the Meeting Materials on the Service List pursuant to paragraph 12 of
the Meeting Order. To the extent that blank forms of proxy and instructions need to be provided separately under the
Meeting Order, they will be provided by the Mailing Date.

Regards,

Chris

_____

**Chris Armstrong**
Goodmans LLP

416.849.6013
carmstrong@goodmans.ca
goodmans.ca



FOOD AND BEVERAGE

# McDonald's to move international tax base

Move to Britain comes amid EU investigation into tax deals offered by smaller bloc states

**McDonald's Corp.** said on Thursday it would move its international tax base to Britain from Luxembourg after coming under increased scrutiny from European Union regulators over its tax arrangements in the small country.

McDonald's said it would create a new international holding company domiciled in Britain that would receive the majority of royalties from licensing deals outside the United States.

"We are aligning our corporate structure with the way we do business, which is no longer in geographies, but in segments that group together countries with common market and growth characteristics," McDonald's said in a statement.

The move will also help to cut costs, McDonald's said.

The reorganization comes amid an investigation by the EU into what it says are sweetheart tax deals that smaller states in the bloc offer to multinational companies to lure jobs and investment.

In August, the EU ordered Apple Inc. to pay Ireland unpaid taxes of up to €13-billion ($14-billion), ruling that the iPhone maker had received illegal state aid.

McDonald's potentially faced an order from the bloc to pay back taxes of $500-million (U.S.) to Luxembourg, the Financial Times reported in September.

The company said in July it would create over 5,000 jobs in Britain by the end of 2017, in a sign of its commitment to the country after the vote on June 23 to leave the EU.

A number of international companies have shifted their corporate registration or primary tax residence to Britain since it relaxed its rules on the taxation of companies' foreign subsidiaries in 2012.

These include U.S. drug maker Allergan, U.S. insurer Aon and Italian tractor maker CNH Industrial. Under British rules, profits earned by overseas arms or a British-registered company are effectively exempt from British tax even if the income is untaxed.

Tax campaigners say this allows companies to shift profits out of Britain before being taxed and then allows companies bring the money back tax free.

The moves studied by Reuters create few if any jobs and have helped the companies slash their tax bills.

McDonald's shares were up 0.6 per cent at $120.63 at midday on Thursday.

*Reuters*

**McDonald's (MCD)**
*Close: $120.45 (U.S.), up 53¢*

**By moving its international tax base, McDonald's said it would create a new holding company based in Britain that would receive the majority of royalties from licensing deals outside the United States.** MIKE BLAKE/REUTERS

## TICKER

### Worst may be over for Alberta: board

The Conference Board of Canada says it expects Alberta to emerge next year from one of the worst recessions to ever hit the province.

However, the independent research organization is forecasting only modest economic recovery in 2017.

The board says Alberta should see real gross domestic product growth of about 2.2 per cent. Part of that growth will be fuelled by rebuilding in the wake of the Fort McMurray wildfires last May.

Marie-Christine Bernard, an associate director with the board, says recent stability in oil prices is forecast to set the pace for a recovery over the next few years.

She says the recent election in the United States also offers hope for getting more Canadian crude to markets.

*– The Canadian Press*

### CETA will lead to EU job losses: panel

An EU-Canada free trade deal will destroy jobs in Europe and should be rejected, a committee of the European Parliament concluded on Thursday.

The European Union and Canada signed the Comprehensive Economic and Trade Agreement (CETA) in October, but only after hesitation in Austria and other countries and opposition from a region of Belgium.

CETA needs backing from the European Parliament and that vote is expected in February.

The employment committee voted 27-24 for a motion saying the 751-seat parliament should not give its approval to the deal, saying studies showed it could lead to 204,000 EU job losses.

Even after the European Parliament vote, CETA would only enter force provisionally, most likely in the form of import tariff removal, as it needs approval from the EU's 28 member states and Belgium's regions.

*– Reuters*

### SNC-Lavalin to cut 405 jobs in Canada

Engineering giant **SNC-Lavalin Group Inc.** is cutting another 405 jobs in Canada due to the weakness in the mining sector and ongoing efforts to boost its profit margin.

Spokesman Louis-Antoine Paquin says the company will eliminate 186 positions in Montreal, 195 in Ontario and 24 in Saskatoon. About 70 per cent of the positions are in the mining and metallurgy division.

SNC-Lavalin's office in Sudbury, Ont., will close, although employees will work directly with customers at their operations.

SNC-Lavalin has a goal of increasing its adjusted margin to 7 per cent next year, up from 4.3 per cent in the first nine months of 2016.

Earlier this year, the Montreal-based company cut 950 jobs around the world, including 600 in Canada. That followed the elimination of 4,000 positions in 2014.

Despite the series of job cuts, SNC-Lavalin's global work force will be a little more than 39,000 at the end of the year, up 2,000 from a year ago owing to hirings in other sectors.

More hirings are expected next year as the firm opens an office in Kingston, Ont., that specializes in transportation.

The company also plans to add 1,200 positions if it wins big infrastructure contracts and 300 positions in nuclear energy.

*– The Canadian Press*

### Vanaselja to chair TransCanada Corp.

**TransCanada Corp.**, Canada's No. 2 pipeline operator, said on Thursday it named Siim Vanaselja chairman of the board.

Mr. Vanaselja succeeds Barry Jackson, who will retire after TransCanada's annual shareholders meeting in 2017.

Mr. Jackson, who has been in the position since 2005, will continue to be a board member, subject to his re-election at the meeting. Mr. Vanaselja, who was the chief financial officer of Canada's largest telecommunications company BCE Inc. and Bell Canada, has been TransCanada's board member since May, 2014. He is also the chairman of TransCanada's audit committee.

*– Reuters*

OIL

# Italian bank to help fund Glencore's Rosneft deal, sources say

LONDON/MOSCOW

Italian bank **Intesa Sanpaolo** is expected to provide a large chunk of funds to a consortium of Qatar and commodities trader **Glencore PLC** to finance their purchase of a stake in the Kremlin oil major **OAO Rosneft**, two sources familiar with the transaction said.

Russia said on Wednesday it had sold a 19.5 per cent government stake in Rosneft for €10.5-billion ($14.7-billion) to Qatar's sovereign wealth fund and Glencore.

Glencore said it would finance part of the deal by putting up €300-million of its own equity, with the rest being financed by the Qatar Investment Authority (QIA) and by non-recourse bank financing. QIA and Intesa declined to comment. Intesa was one of the advisers to Rosneft on the privatization.

The sale of Rosneft's stake, announced on Wednesday by Russian President Vladimir Putin and Rosneft's chief Igor Sechin, confounded expectations that the Kremlin's standoff with the West would scare off major investors.

The deal suggests the lure of taking a share in one of the world's biggest oil companies outweighs the risks that come with Western sanctions imposed on Russia.

"We have once again seen that Russian assets, especially leading assets, are of great interest for investors inside and outside Russia," Kremlin spokesman Dmitry Peskov told reporters.

The transaction pointed to a possible reassessment by foreign investors of the risks of dealing with Russia, at a time when the election of Donald Trump as U.S. president has heightened expectations of a thaw between Moscow and Washington.

The deal was announced days after Russia and the Organization of Petroleum Exporting Countries – dominated by Saudi Arabia and its allies Qatar, the United Arab Emirates and Kuwait – agreed to co-ordinated output cuts to support oil prices, the first time they have cut in tandem in 15 years.

The Italian government, banks and firms have long-standing relationships with Russia, although ties have cooled somewhat since the times of former Italian prime minister Silvio Berlusconi, who called Mr. Putin a friend.

The involvement of Qatar in a Russian privatization deal comes as a surprise, especially given years of tensions over Syria.

*Reuters*

LEGALS

**NOTICE TO AFFECTED UNSECURED CREDITORS OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION, NORTEL NETWORKS TECHNOLOGY CORPORATION, NORTEL COMMUNICATIONS INC., ARCHITEL SYSTEMS CORPORATION AND NORTHERN TELECOM CANADA LIMITED (THE "CANADIAN DEBTORS")**

NOTICE IS HEREBY GIVEN that a Plan of Compromise and Arrangement (as amended from time to time, the "**Plan**") has been filed with the Ontario Superior Court of Justice (Commercial List) (the "**CCAA Court**") in respect of the Canadian Debtors pursuant to the Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, as amended (the "**CCAA**").

**TAKE NOTE THAT THESE MATERIALS relate to the CANADIAN CCAA PROCEEDINGS ONLY and do not apply to any other restructuring proceeding including the Chapter 11 Proceedings of Nortel Networks Inc. and the other U.S. Debtors. If you have claims in both the Canadian and U.S. proceedings, you MUST vote your claims in respect of the Canadian Debtors in this CCAA Proceeding in order for your vote to count with respect to the Canadian Plan and must comply with the applicable procedures in the U.S. Debtors' cases for your claim in respect of the U.S. Debtors. A vote in the U.S. Proceedings will not be recognized in the Canadian CCAA Proceedings and vice versa.**

A copy of the Plan and the Information Circular (the "**Information Circular**") are available at www.ey.com/ca/nortel (the "**Monitor's Website**") under the section entitled "Plan and Other Creditor Meeting Documents". If you wish to receive a printed copy of the Plan or the Information Circular please contact the Monitor at the contact information below.

NOTICE IS ALSO HEREBY GIVEN that a meeting of Affected Unsecured Creditors (the "**Meeting**") will be held at **1 p.m. on Tuesday, January 17, 2017** (or such other date as may be set and announced in accordance with the Meeting Order) at **The International Centre Conference Centre (6900 Airport Road, Mississauga, Ontario)**, for the purpose of considering and, if thought advisable, passing, with or without variation, a resolution to approve the Plan (the full text of which resolution is set out in Schedule "A" to the Information Circular) and to transact such other business as may properly come before the Meeting (or any adjournment thereof). The Meeting is being held pursuant to the Order of the Court made on December 1, 2016 (the "**Meeting Order**"). A copy of the Meeting Order is available on the Monitor's Website under the Section "Plan and Other Creditor Meeting Documents". Capitalized terms used but not otherwise defined in this notice have the meaning ascribed to them in the Meeting Order, Information Circular or Plan.

The Plan must receive an affirmative vote of the Required Majority in order to be approved by the Affected Unsecured Creditors. The Required Majority is a majority in number of Affected Unsecured Creditors with Voting Claims, and two-thirds in value of the Voting Claims held by such Affected Unsecured Creditors, in each case who vote (in person or by proxy) on the Plan at the Meeting. The Plan must also be sanctioned by a final order of the CCAA Court (the "**Sanction Order**") pursuant to the CCAA. Notice is also hereby given that, if the Plan is approved by the Required Majority at the Meeting, the Sanction Order will be sought in an application before the CCAA Court at 10:00 AM on January 24, 2017, (or such other date or time as may be set by the CCAA Court), to seek approval of the Plan. If the Plan is approved by the Required Majority and sanctioned by the CCAA Court, then, subject to the satisfaction or waiver of the conditions to effectiveness and implementation of the Plan, all Persons referred to in the Plan (including the Affected Unsecured Creditors) will receive the treatment set out in the Plan.

**AMENDMENTS TO THE PLAN**

The Canadian Debtors and Monitor may, at any time and from time to time prior to or at the Meeting, amend, restate, modify and/or supplement the Plan, subject to the terms of the Plan, provided that: (i) the Monitor or the Chair shall communicate the details of any such amendment, restatement and/or supplement to all Affected Unsecured Creditors present at the Meeting prior to any vote being taken at the Meeting; (ii) the Monitor shall provide notice to the Service List of any such amendment, restatement and/or supplement and shall file a copy thereof with the CCAA Court prior to the Sanction Hearing; and (iii) the Monitor shall post an electronic copy of any such amendment, restatement and/or supplement on the Monitor's Website prior to the Sanction Hearing.

**COMPLETION OF PROXIES**

Any Affected Unsecured Creditor who is entitled to vote at the Meeting and that wishes to vote by proxy or in Person at the Meeting must complete, sign and return the applicable form of proxy included in its creditor package and deliver its proxy to the Monitor in accordance with applicable instructions.

**Compensation Creditors**

**IF YOU ARE A COMPENSATION CREDITOR COVERED BY THE REPRESENTATION ORDERS OR REPRESENTED BY UNIFOR, A REPRESENTATIVE OF UNIFOR WILL BE VOTING ON YOUR BEHALF AND WILL BE VOTING IN FAVOUR OF THE PLAN. YOU SHOULD NOT SUBMIT A SEPARATE PROXY.**

**Participant Holders and Beneficial Bondholders**

**IF YOU ARE A PARTICIPANT HOLDER OR BENEFICIAL BONDHOLDER, YOU MUST CLOSELY FOLLOW THE INSTRUCTIONS FOR THE COMPLETION AND RETURN OF BONDHOLDER PROXIES AND MASTER AUTHENTICATION FORMS.**

The Monitor's contact information is:

Ernst & Young Inc.,
Court Appointed Monitor of
Nortel Networks Corporation & others
Ernst & Young Tower
222 Bay Street, Suite 2400
Toronto, Ontario M5K 1J7

Attention: Nortel Monitor
Telephone: 1.866.942.7177 or 416.943.4439
Facsimile: 416.943.3300
Email: nortel.monitor@ca.ey.com

This notice is given by the Monitor pursuant to the Meeting Order.

Si vous avez besoin d'une copie du plan ou de l'un des documents relatifs à l'assemblée des créanciers en français, veuillez consulter le site Web du contrôleur ou communiquer avec le contrôleur à l'adresse figurant ci-dessus.

© 2016 Ernst & Young Inc. All rights reserved.

EY



THE WALL STREET JOURNAL.    • • • •    Friday, December 9, 2016 | B7

## BUSINESS WATCH

### Hovnanian Is Pinched by Climbing Expenses

Home builder Hovnanian Enterprises Inc., which has struggled under a massive debt load, said earnings declined in the latest period even though revenue rose, hurt by climbing expenses.

Hovnanian has faced maturing public debt from land purchases and acquisitions during the boom years.

The company increased its use of land-bank financing and joint ventures and called four underperforming markets in 2016, which Chief Executive Ara Hovnanian said was a "challenging year."

But the company said it would start to actively seek out land investment opportunities, which should lead to higher levels of profitability, Mr. Hovnanian said.

Over all, net income was $22.3 million, or 14 cents a share, for the fiscal fourth quarter ended Oct. 31, compared with $35.5 million, or 17 cents a share, in the prior-year period. Revenue rose 16% to $905.1 million.

Total home-building expenses rose to $719.9 million from $653.9 million in the prior-year period.

—Joshua Jamerson



### HEARST MAGAZINES
**Ree Drummond Title To Launch Next Year**

Ree Drummond, the entertaining food blogger who has translated her life on a ranch in Pawhuska, Okla, into a mini-empire of books, housewares products and a cooking show on Food Network, is hitting the newsstands next year.

Hearst Magazines, in partnership with Food Network majority owner Scripps Networks Interactive, is launching a magazine in June titled The Pioneer Woman, named after the brand Ms. Drummond has built. The first issue will be sold exclusively at Wal-Mart Stores Inc., which also sells Ms. Drummond's housewares line.

—Jeffrey A. Trachtenberg

### QIAODAN SPORTS
**Michael Jordan Wins Ruling in China**

NBA great Michael Jordan claimed a victory in China, with the nation's high court ruling that a Chinese sportswear company can't sell merchandise using his name in Chinese characters.

China's Supreme People's Court overturned rulings by Beijing courts against Mr. Jordan on Thursday, saying Fujian-based Qiaodan Sports Co. can't use his Chinese name as a trademark.

"Nothing is more important than protecting your own name, and today's decision shows the importance of that principle," Mr. Jordan said in a statement.

Qiaodan said on its verified social-media account it would abide by the high court's ruling.

—Pei Li

### COCA-COLA
**Howard Buffett To Leave Board**

Coca-Cola Co. director Howard G. Buffett, the eldest son of billionaire investor Warren Buffett, won't seek re-election in April, the company said Thursday.

The 61-year-old said he intends to focus on his work with the nonprofit he founded and leads, the Howard G. Buffett Foundation, which focuses on humanitarian and conservation projects around the world.

—Maria Armental

### MAERSK LINE
**Hyundai Merchant Receives a Setback**

Maersk Line, the senior member of the world's largest container-shipping alliance, Thursday said it is no longer considering Hyundai Merchant Marine for membership in the group.

Membership in the 2M alliance—made up of Maersk and Mediterranean Shipping Co.—would have guaranteed the troubled South Korean shipping company a steady income.

"The parties have discussed the possibility of HMM joining 2M as an operating partner and now decided to look at other cooperation possibilities," Maersk Line spokesman Michael Storgaard said Thursday.

HMM spokeswoman Hannah Yang declined to comment on whether HMM was out of the alliance, saying that talks are ongoing. Mediterranean Shipping didn't respond to requests for comment.

—Costas Paris

### INSYS THERAPEUTICS
**Former Executives Face Charges**

Six former executives and managers at Insys Therapeutics Inc. were arrested on Thursday and charged with conspiring to defraud health insurers and bribe doctors in exchange for prescribing the company's fentanyl painkiller, Subsys, the Justice Department said.

Among those arrested were former Chief Executive Michael Babich, who resigned from the company in November 2015. Neither Mr. Babich nor Insys immediately responded to requests for comment. Thursday's arrests were the latest to result from investigations into Insys, a once-highflying pharmaceuticals company based in Chandler, Ariz.

Earlier this year, Insys said it "committed to complying with all laws and regulations that govern our products and business practices."

—Joseph Walker

### APOLLO GLOBAL
**Gary Parr Joins Firm in Senior Role**

Apollo Global Management LLC tapped veteran financial-services deal maker Gary Parr to serve in a senior role at the investment firm.

Mr. Parr, who has been a vice chairman at Lazard, has advised at firms including J.P. Morgan Chase & Co. and Blackstone Group LP. He will serve as a senior managing director and co-chairman of the management group's committee, reporting to co-founder Joshua Harris, according to the firm.

—Matt Jarzemsky



ALWAYS ARRIVE WITH A PRISTINE SUIT

    

on the go          upon arrival



Get $25 off with code "FD6R"
www.VOCIER.com

ADVERTISEMENT

## Legal Notices
To advertise: 800-366-3975 or WSJ.com/classifieds

NOTICE TO AFFECTED UNSECURED CREDITORS OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION, NORTEL NETWORKS TECHNOLOGY CORPORATION, NORTEL COMMUNICATIONS INC., ARCHITEL SYSTEMS CORPORATION AND NORTHERN TELECOM CANADA LIMITED (THE "CANADIAN DEBTORS")

[legal notice text]



THE WALL STREET JOURNAL

IN THE HIGH COURT OF JUSTICE



THE MART

ADVERTISE TODAY

(800) 366-3975

THE WALL STREET JOURNAL
LEGAL NOTICES
(800) 366-3975 | sales.legalnotices@wsj.com

ADVERTISEMENT

# Legal Notices

## NOTICE TO AFFECTED UNSECURED CREDITORS OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION, NORTEL NETWORKS TECHNOLOGY CORPORATION, NORTEL COMMUNICATIONS INC., ARCHITEL SYSTEMS CORPORATION AND NORTHERN TELECOM CANADA LIMITED (THE "CANADIAN DEBTORS")

NOTICE IS HEREBY GIVEN that a Plan of Compromise and Arrangement (as amended from time to time, the "Plan") has been filed with the Ontario Superior Court of Justice (Commercial List) (the "**CCAA Court**") in respect of the Canadian Debtors pursuant to the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended (the "**CCAA**").

**TAKE NOTE THAT THESE MATERIALS relate to the CANADIAN CCAA PROCEEDINGS ONLY and do not apply to any other restructuring proceeding including the Chapter 11 Proceedings of Nortel Networks Inc. and the other U.S. Debtors. If you have claims in both the Canadian and U.S. proceedings, you MUST vote your claims in respect of the Canadian Debtors in this CCAA Proceeding in order for your vote to count with respect to the Canadian Plan and must comply with the applicable procedures in the U.S. Debtors' cases for your claim in respect of the U.S. Debtors. A vote in the U.S. Proceedings will not be recognized in the Canadian CCAA Proceedings and *vice versa*.**

A copy of the Plan and the Information Circular (the "**Information Circular**") are available at www.ey.com/ca/nortel (the "**Monitor's Website**") under the section entitled "Plan and Other Creditor Meeting Documents". If you wish to receive a printed copy of the Plan or the Information Circular please contact the Monitor at the contact information below.

NOTICE IS ALSO HEREBY GIVEN that a meeting of Affected Unsecured Creditors (the "**Meeting**") will be held at **1 p.m.** on **Tuesday, January 17, 2017** (or such other date as may be set and announced in accordance with the Meeting Order) at **The International Centre Conference Centre (6900 Airport Road, Mississauga, Ontario)**, for the purpose of considering and, if thought advisable, passing, with or without variation, a resolution to approve the Plan (the full text of which resolution is set out in Schedule "A" to the Information Circular) and to transact such other business as may properly come before the Meeting (or any adjournment thereof). The Meeting is being held pursuant to the Order of the Court made on December 1, 2016 (the "**Meeting Order**"). A copy of the Meeting Order is available on the Monitor's Website under the Section "Plan and Other Creditor Meeting Documents". Capitalized terms used but not otherwise defined in this notice have the meaning ascribed to them in the Meeting Order, Information Circular or Plan.

The Plan must receive an affirmative vote of the Required Majority in order to be approved by the Affected Unsecured Creditors. The Required Majority is a majority in number of Affected Unsecured Creditors with Voting Claims, and two thirds in value of the Voting Claims held by such Affected Unsecured Creditors, in each case who vote (in person or by proxy) on the Plan at the Meeting. The Plan must also be sanctioned by a final order of the CCAA Court (the "**Sanction Order**") pursuant to the CCAA. Notice is also hereby given that, if the Plan is approved by the Required Majority at the Meeting, the Sanction Order will be sought in an application before the CCAA Court at 10:00 AM on January 24, 2017, (or such other date or time as may be set by the CCAA Court), to seek approval of the Plan. If the Plan is approved by the Required Majority and sanctioned by the CCAA Court, then, subject to the satisfaction or waiver of the conditions to effectiveness and implementation of the Plan, all Persons referred to in the Plan (including the Affected Unsecured Creditors) will receive the treatment set out in the Plan.

**AMENDMENTS TO THE PLAN**

The Canadian Debtors and Monitor may, at any time and from time to time prior to or at the Meeting, amend, restate, modify and/or supplement the Plan, subject to the terms of the Plan, provided that: (i) the Monitor or the Chair shall communicate the details of any such amendment, restatement and/or supplement to all Affected Unsecured Creditors present at the Meeting prior to any vote being taken at the Meeting; (ii) the Monitor shall provide notice to the Service List of any such amendment, restatement and/or supplement and shall file a copy thereof with the CCAA Court prior to the Sanction Hearing; and (iii) the Monitor shall post an electronic copy of any such amendment, restatement and/or supplement on the Monitor's Website prior to the Sanction Hearing.

**COMPLETION OF PROXIES**

Any Affected Unsecured Creditor who is entitled to vote at the Meeting and that wishes to vote by proxy or in Person at the Meeting must complete, sign and return the applicable form of proxy included in its creditor package and deliver its proxy to the Monitor in accordance with applicable Instructions.

**Compensation Creditors**

**IF YOU ARE A COMPENSATION CREDITOR COVERED BY THE REPRESENTATION ORDERS OR REPRESENTED BY UNIFOR, A REPRESENTATIVE OR UNIFOR WILL BE VOTING ON YOUR BEHALF AND WILL BE VOTING IN FAVOUR OF THE PLAN. YOU SHOULD NOT SUBMIT A SEPARATE PROXY.**

**Participant Holders and Beneficial Bondholders**

**IF YOU ARE A PARTICIPANT HOLDER OR BENEFICIAL BONDHOLDER, YOU MUST CLOSELY FOLLOW THE INSTRUCTIONS FOR THE COMPLETION AND RETURN OF BONDHOLDER PROXIES AND MASTER AUTHENTICATION FORMS.**

The Monitor's contact information is:

Ernst & Young Inc.,
Court Appointed Monitor of
Nortel Networks Corporation & others
Ernst & Young Tower
222 Bay Street, Suite 2400
Toronto, Ontario M5K 1J7

Attention: Nortel Monitor
Telephone: 1.866.942.7177 or 416.943.4439
Facsimile: 416.943.2808
Email: nortel.monitor@ca.ey.com

This notice is given by the Monitor pursuant to the Meeting Order.

Si vous avez besoin d'une copie du plan ou de l'un des documents relatifs à l'assemblée des créanciers en français, veuillez consulter le site Web du contrôleur ou communiquer avec le contrôleur à l'adresse figurant ci-dessus.

EY

© 2016 Ernst & Young Inc. All rights reserved.

THE WALL STREET JOURNAL.

LEGAL NOTICES

ADVERTISE TODAY

(44) 20-7572-2124

Robert.Monaghan@wsj.com

Place an ad using the self service option at: wsj.com/classifieds

© 2016 Dow Jones & Company, Inc. All Rights Reserved.

IN THE HIGH COURT OF JUSTICE CR-2016-006817
CHANCERY DIVISION
COMPANIES COURT

IN THE MATTER OF
MARKEL INTERNATIONAL INSURANCE COMPANY LIMITED
(and formerly Terra Nova Insurance Company Limited)
AND
RIVERSTONE INSURANCE (UK) LIMITED
AND
IN THE MATTER OF PART VII OF THE FINANCIAL SERVICES AND MARKETS ACT 2000
TRANSFER OF INSURANCE BUSINESS

NOTICE IS HEREBY GIVEN that, by application dated 17 November 2016, Markel International Insurance Company Limited (the "Transferor"), applied to the High Court of Justice of England and Wales, for amongst other things, an order under Section 111(1) of the Financial Services & Markets Act 2000 (the "Act") sanctioning an insurance business transfer scheme (the "Scheme") providing for the transfer of insurance business (comprising policies, assets and liabilities) to RiverStone Insurance (UK) Limited (the "Transferee") and for an order making provision under Section 112 of the Act.

The business included in the proposed transfer comprises substantially all of the insurance and reinsurance business [illegible] or assumed (in whole or in part) by the Transferor and which incepted between 1970 and 1992 (inclusive). The Scheme excludes awards, quota share [illegible] between the Transferor as [illegible] and Highlands Insurance Company Limited as [illegible] during the period 1985 to 1992 inclusive).

If you are in any doubt as to whether your insurance policy is included in the proposed transfer please contact either the Transferor or the Transferee, contact details of each are set out below.

Copies of a report on the terms of the Scheme prepared by an independent expert in accordance with section 109 of the Act (the "Scheme Report") and copies of a statement setting out the terms of the Scheme and containing a summary of the Scheme Report may be obtained free of charge by contacting RiverStone Insurance (UK) Limited, F.A.O. Fraser Henry, Park Gate, 161-163 Preston Road, Brighton, BN1 6AU or Markel International Insurance Company Limited, F.A.O. Henry Gardener, Head of Legal & Regulatory Affairs, 20 Fenchurch Street, London, EC3M 3AZ or may be downloaded from the website [illegible]

Anyone who has questions regarding the proposed transfer or who requires any further information regarding the transfer may wish to contact the following telephone numbers, email addresses and postal addresses for assistance

Transferee Contact Details

+44 (0) 1273 792 475 or email [illegible] (please mark in the subject header "The Terra Nova Transfer") or write to RiverStone Insurance (UK) Limited, F.A.O. Fraser Henry, Park Gate, 161-163 Preston Road, Brighton, BN1 6AU

Transferor Contact Details

+44 (0)20 [illegible] or email [illegible] (please mark in the subject header "The RiverStone Transfer") or write to Markel International Insurance Company Limited, F.A.O. Henry Gardener, Head of Legal & Regulatory Affairs, 20 Fenchurch Street, London, EC3M 3AZ

The application will be heard on Thursday 23 March 2017 before a Judge of the Chancery Division of the High Court at 7 Rolls Building, Fetter Lane, London, EC4A 1NL, United Kingdom.

Any person (including an employee of the Transferor or the Transferee) who alleges that he or she would be adversely affected by the carrying out of the Scheme a) can make a representation by contacting the Transferor or Transferee through calling, emailing or writing to them via the contact details above; b) is entitled to:

(i) appear at the hearing and make representations in person;
(ii) instruct a barrister or solicitor advocate to appear at the hearing and make representations on his/her behalf; or
(iii) make representations in writing.

If you intend to appear at the hearing in person, or to instruct someone to appear on your behalf, you are requested to give notice of your intention to do so in writing, setting out the reasons why you believe you may be adversely affected.

You are requested to send such notice, or if you are not intending to appear in person or by your legal representative, any written representations that you may have, to the addresses of the Transferor or Transferee provided above or to Berwin Leighton Paisner LLP, Adelaide House, London Bridge, London, EC4R 9HA (ref. Geraldine Quirk). Please provide such notice or such written representations by close of business on Thursday 16 March 2017.

If the Scheme is sanctioned by the Court it will result in the transfer of all the contracts, property, assets and liabilities, within its scope, of the Transferor to the Transferee, notwithstanding that a person would otherwise be entitled to terminate, modify, acquire or claim an interest or right or to treat an interest or right as terminated or modified in respect thereof. Any such right will only be enforceable to the extent the order of the Court makes provision to that effect.

Berwin Leighton Paisner LLP, Adelaide House, London Bridge, London, EC4R 9HA
Solicitors to the Transferor and the Transferee (Ref. Geraldine Quirk)

Businesses For Sale

Advertise in The Mart

Call +44 (0) 207 572 2123

THE WALL STREET JOURNAL.

## BUSINESS NEWS

# McDonald's Will Move Overseas Tax Base to U.K.

By Natalia Drozdiak

A McDonald's restaurant near a Metro station entrance in Paris.

BRUSSELS—McDonald's Corp. on Thursday said a large portion of its non-U.S. income would be taxed in the U.K. following a restructuring that shifts operations away from Luxembourg amid a probe by the European Union competition authority over its tax arrangements.

McDonald's said it had created a U.K.-based international holding company that would have "responsibility for the majority of royalties received from licensing the company's global intellectual property rights outside the United States." It added in a statement that the profits of the new international holding company would be subject to U.K. corporation tax.

The Luxembourg office will retain responsibility for restaurants in the country, but other functions will transfer to the U.K. holding company, McDonald's said.

The move comes as the European Commission, the EU's executive arm, investigates the company's tax affairs in Luxembourg. The commission, which opened the probe last December, alleges that a deal Luxembourg granted the fast-food chain in 2009 may have illegally reduced its tax burden and breached competition rules.

Brussels could order the fast-food giant to pay back as much as €1.5 billion ($1.6 billion) in unpaid taxes between 2009 and 2015 to Luxembourg, according to an October statement by U.S. and European trade unions, based largely on the company's public financial statements.

McDonald's says it received no special treatment and paid all taxes it owes. On Thursday, the company said it paid more than $2.5 billion in corporate taxes in the EU between 2011 and 2015.

McDonald's said it chose the U.K. for its new holding structure because of the language, connections to other markets and the large number of staff working there. The fast-food company said the new structure would help reduce expenses and support growth plans, particularly for refranchising projects.

U.K. tax authorities are also scrutinizing McDonald's, according to a company filing uploaded on a government website. In the report, McDonald's said it has set aside £11.5 million ($14.5 million), related to discussions with the British tax authorities "in an ongoing transfer pricing review initiated in 2011 covering the years since 2009."

McDonalds's move is the latest from multinational corporations that are rearranging their legal structures to keep up with a global shake-up in tax rules.

There have been efforts by governments, particularly in Europe, to wring more revenue from multinationals that shift profits to jurisdictions where they are subject to little or no income tax. This is often done by paying intracompany royalties that reduce taxable income in certain countries.

In 2015, **Amazon.com Inc.**, which is also under investigation by the EU, changed its European structure so it would collect customer revenue from subsidiaries in additional member countries, instead of funneling it all through Luxembourg. The company hsa said it received no special treatment from Luxembourg.

# Scouting Lego's Next Frontier

By Ellen Emmerentze Jervell

Jørgen Vig Knudstorp says the digital area is ripe for growth.

Lego A/S's outgoing boss said he would be eager to hear more business proposals when he takes on his new assignment in January as global custodian of the Lego brand. He warned, however, that part of his job will be to say no.

After a 12-year tenure as chief executive of the Danish toy-brick maker, Jørgen Vig Knudstorp has been appointed chairman of an umbrella entity called Lego Brand Group, where his mission will be to find new opportunities for the brand in areas ranging from merchandising to charity, while safeguarding its image.

"I'm going to do brand protection and development, in parallel," Mr. Knudstorp said in an interview. "Our history is fraught with mistakes, and we don't plan to repeat them."

Mr. Knudstorp knows firsthand how botched diversification can hurt a company and its brand. When he took the helm at Lego in 2004, the family-owned company was in pieces, with dwindling sales and swelling losses.

In a bid to generate new revenue streams, Lego had ventured into running theme parks and launching clothing lines, dolls, baby toys and many other products with little commercial success.

Many companies are grappling with the challenge of harnessing a brand without harming it. German sportswear maker Puma SE only recently recovered from years of dismal sales and uncontrolled diversification that tarnished its image. In the early part of the last decade, trying to leverage a well-known brand, Puma started putting its name on goods from perfumes to sunglasses. Its numbers didn't return to the black until it refocused on its sportswear business.

During Mr. Knudstorp's time as CEO, Lego got rid of all noncore assets and took a cautious approach to investments. Lego-related films, videogames and theme parks are now largely handled by outside companies.

"There may be a limit to how much Lego can really do outside of construction toys," said Matthew Hudak, an analyst at consulting firm Euromonitor, adding, "It may be that consumers interest in the Lego brand does not extend too far outside of the construction toy category."

Mr. Knudstorp has some ideas. The biggest untapped growth potential for Lego is digital, he says, adding that potential partners keep coming. Lego has been approached to develop more educational games, he said.

Although Lego doesn't break out revenue from digital operations, the company has built up a solid videogame franchise with partners. It has also teamed with Warner Bros. Interactive Entertainment, a unit of **Time Warner Inc.**, to deliver "Lego Worlds," a building-block game similar to "Minecraft," to consoles in early 2017. "There is an endless range of opportunities," Mr. Knudstorp said.

While focusing on the brand, Mr. Knudstorp said he intends to retain some other duties. These include meeting partners in countries like China to guide them in local business decisions and spending more time with retail and media associates like **Toys-R-Us Inc.** and **Walt Disney Co.**

Lego Chief Operating Officer Bali Padda, who becomes CEO on Jan. 1, said he wasn't worried about him and Mr. Knudstorp stepping on each other's toes. "It's the brick-based business that I'm really wanting to drive," he said. "The other things, he can do."

# Swiss Buy Back Luxury Watches

By Brian Blackstone

ZURICH—Switzerland is buying back its luxury watches from abroad at an increasing rate, as the industry grapples with weaker global growth, slowdowns in Asia and reduced tourism in Europe.

Of the 3.3 billion Swiss francs' ($3.28 billion) worth of watches imported into Switzerland in the first 10 months of 2016, 1.3 billion francs, or 40%, had previously been exported out of the country, the Swiss federal customs office said Thursday. Swiss watch exports totaled nearly 16 billion francs from January to October, of which 8% were reimported.

Much of this reimportation came from high-end watches that were exported for exhibitions but went unsold. According to the customs office, the average price of an exported Swiss watch is 723 francs. The average price of a reimported one is 7,000 francs.

This trend has accelerated in recent years. In 2011, only 22% of Swiss watch imports were previously exported to other countries.

The luxury-watch industry has been pummeled in recent years. Changes to visa requirements in Hong Kong for mainland Chinese tourists have hampered spending, while terror attacks in Europe cut the number of foreign visitors in tourist centers such as Paris, a key source of shopper traffic for luxury companies.

The strong franc is an added problem for watchmakers, whose local production costs are largely denominated in the Swiss currency but much of whose revenue comes from foreign countries where currencies are weak against the franc.

"A lot of factors came together at the same time," said Karine Szegedi, partner at Deloitte in Geneva.

Switzerland's biggest luxury watchmakers—**Swatch Group AG** and **Cie. Financière Richemont SA**—issued profit warnings this summer amid tumbling sales. Richemont owns high-end brands including Cartier and IWC Schaffhausen. Although Swatch is best known for its inexpensive plastic watches, its portfolio includes pricey brands such as Omega and Breguet.

Richemont said in November that it had bought back about €200 million ($215 million) in unsold inventory from April to September.

A spokesman for Swatch said the company hadn't bought back unsold inventory.

B4 | Friday - Sunday, December 9 - 11, 2016

THE WALL STREET JOURNAL.

ADVERTISEMENT

## Legal Notices

*[Legal notices text illegible due to fine print]*



EY

---

# TECHNOLOGY

WSJ.com/Tech

# Chinese Airlines Increase Their Long-Haul Flights

BY TREFOR MOSS

SHANGHAI—Chinese airlines are capitalizing on the wanderlust of China's rising middle class by expanding their long-haul routes, and at a pace that is fast upending global aviation's hierarchy.

Since September, Chinese carriers have added seven direct flights to North America—including routes from second-tier cities less known abroad, such as Zhengzhou and Xiamen. By comparison, U.S. carriers launched just two China routes in all of 2016.

Sichuan Airlines opened a new direct route between Los Angeles and the northern Chinese city of Jinan on Tuesday. It is the third nonstop U.S. flight the airline has started operating since October. Hainan Airlines Co., China's biggest privately owned carrier, by itself launched 13 long-range routes this year, including a new Beijing-Las Vegas flight initiated last week.

The result is that trans-Pacific travel, where U.S. carriers were once the most complicated, is becoming an increasingly Chinese affair.

"Chinese airlines are going to be so dominant, if not more dominant, than the big three U.S. carriers within the next decade," said John Grant, a U.K.-based aviation industry consultant.

Mr. Grant characterized the situation as a "land grab," with China's airlines rushing to secure new routes—even commercially shaky ones—in the hope they will become viable in the future.

Last year, for the first time, Chinese airlines overtook their American counterparts in the number of scheduled U.S.-China flights. Now the gap is widening: Chinese airlines are scheduled to operate 781 China-U.S. flights this month, compared with 596 by U.S. carriers, according to aviation-data firm OAG.

Several factors are driving the trend, starting with the growing Chinese appetite for travel. Last year, 120 million Chinese tourists journeyed abroad, four times the number that ventured overseas a decade earlier, according to China-based government figures.

Having first tested the waters with regional vacations,



### Air Superiority
Chinese airlines now fly more nonstop routes between the U.S. and China than their U.S. counterparts.

Direct flights per month

Source: OAG

THE WALL STREET JOURNAL.

many Chinese are now taking trips to North America, Europe and Australia that few could afford until recently.

Dandan Zou, who is from Chengdu but now lives in Maryland, said new direct flights are making visits home easier. "Chinese airlines have better food, better service and most of the time, cheaper tickets," said Ms. Zou, 27 years old. "If there are both Chinese and American flights on the same routes, I will definitely choose the Chinese ones."

While low fuel prices and newly acquired fleets of fuel-efficient jets make it even cheaper for Chinese airlines to fly long-haul journeys, turning a profit on these unproven routes might still take years.

In November, Sichuan Airlines started flying between Vancouver and Zhengzhou, a city 645 kilometers south of Beijing. The route might take 10 years to become profitable without factoring in subsidies, a representative for the subsidiary of China Southern Airlines Co. acknowledged.

No matter, Chinese airlines care more about "long-term prospects" than about near-term viability, the representative said. That means Chinese airlines are willing to accept more empty seats than their foreign rivals. China's big three state carriers boast about 80% of seats on long-haul flights this year, compared with 82% at their U.S. rivals, the data show.

Deals abound: Round-trip flights from Changsha to Los

Angeles, or from Zhengzhou to Vancouver, start near $570.

"The biggest difference is mind-set," said Will Horton, senior analyst at the CAPA-Center for Aviation, a provider of aviation-market intelligence. "Chinese airlines understand how quickly their market expands, and they have a much longer leash to take risk and make investments."

United Airlines, owned by United Continental Holdings Inc., is one of only a few foreign carriers still trying to compete in Chinese markets beyond the hubs of Beijing and Shanghai. It now offers 12 U.S.-China routes, having opened two nonstop routes this year from San Francisco to Hangzhou and Xi'an. It also flies direct to Chengdu.

"United sees huge business potential in these nontier-one markets," said Walter Dias, United's managing director for China and Korea sales.

American Airlines Group Inc., meanwhile, will launch a nonstop Beijing-Los Angeles flight next year—ending Air China LAX's monopoly on the lucrative route.

But Chinese airlines aren't sitting back. Hainan Airlines will soon operate 10 U.S.-China routes, having received approval to connect Chengdu with New York and Los Angeles next year. In August, Air China topped United for the first time as the airline offering the most monthly China-U.S. flights, operating 296 to United's 293, OAG says.

—Jenny Qian contributed to this article.

---

## BUSINESS WATCH

### SANTOS

#### Energy Firm to Focus On Five Gas Assets

Santos Ltd. said Thursday it would focus on five large natural-gas projects as it forgoes a deep reduction in debt and stronger cash flow, creating a separate company that will house unwanted assets from the Australian Outback to Vietnam.

Santos said it is targeting a US$1.5 billion reduction in net debt to less than US$3 billion by the end of 2019 through an improvement in operating cash flow and by raising money from sales of infrastructure and noncore assets.

The Adelaide-based company tied its future to five natural-gas assets: the operational GLNG facility in Queensland and in eastern Australia, and projects in the Cooper Basin straddling South Australia and Queensland states, Papua New Guinea, Northern Australia and Western Australia.

—David Winning

### MEDTRONIC

#### China Levies Fine; Crackdown Possible

The Chinese government's punishment of a medical-equipment supplier for price-fixing could be the opening to wider scrutiny of health-care costs.

The National Development and Reform Commission this week fined Medtronic PLC 118.5 million yuan ($17.3 million) for refusing to let dealers and distributors discount prices for the company's medical pumps, pacemakers and other medical devices. It said this raised costs to patients.

This was the first time the commission had fined a medical-device maker, according to the state broadcaster CCTV. The news was widely covered in official media—usually a sign of a major investigation push.

—Vu Trong Khanh

### VINAMILK

#### Fraser & Neave To Raise Stake

Two units of Fraser & Neave Ltd. are seeking to buy a combined 78.38 million more shares in Vietnam's largest dairy company, Vinamilk, in a deal that could be valued at $506.6 million.

F&N BEV Manufacturing Pte. Ltd. and F&N Dairy Investments Pte. Ltd. have placed tenders to buy a 5.4% stake in Vinamilk between Dec. 12 and Jan. 10, the Vietnamese company said. Fraser & Neave is owned by Thai tycoon Charoen Sirivadhanabhakdi.

If successful, the purchases would raise Fraser & Neave's combined stake in Vinamilk, formally known as Vietnam Dairy Products JSC, to 16.35%.

Vinamilk said Fraser & Neave's units would buy the shares through public auction, put-through transaction or order-matching transactions on the stock market.

The Vietnamese government, which holds about 45% of Vinamilk, will put 130.63 million shares, or a 9% stake, in Vinamilk on Monday at a starting price of 144,000 dong ($6.35) each.

—Vu Trong Khanh



### DELL

DeB Technologies' third-quarter net loss widened to $2.06 billion

A spokesman for Dublin-based Medtronic said the company accepted the decision and would pay the fine.

"We are absolutely committed to ensuring that we are in full compliance with local laws and regulations," he added.

—Joanthan Cheng

#### Revenue Increases As Loss Broadens

Dell Technologies said revenue rose in its third quarter despite a wider net loss, months after the merger of Dell and EMC was completed.

Dell said the results include the impact of the merger as well as 52 days of financial results from EMC and VMware, a virtualization company in which EMC held a majority stake.

Revenue from Dell's legacy businesses remained relatively unchanged and the EMC deal increased revenue 26% to $16.23 billion, Dell said. The company posted a net loss of $2.06 billion for the quarter, compared with a year-earlier loss of $680 million.

—Austen Hufford

### HONDA

#### Car Maker Confirms Plan for China Plant

Honda Motor Co. said Thursday that one of its Chinese joint ventures would build a plant, helping the company stay ahead of rivals as demand for SUVs rises. The three billion yuan ($436 million) factory will be run by Dongfeng Honda, a joint venture between Honda and China's state-run Dongfeng Motor Group Co. When the factory comes on line in the first half of 2019, it will be able to churn out 120,000 vehicles a year, raising Dongfeng Honda's production capacity to 600,000 vehicles a year.

—Sean McLain

FINANCIAL POST

# Eurozone gets new $579B economic prod

### Markets startled as central bank to reduce bond buying after March

DAVID McHUGH

FRANKFURT The European Central Bank will pour another half-trillion euros (US$579 billion) in newly printed money into the eurozone economy to support its recovery as the currency union heads into what could be a tumultuous election year.

The bank's 25-member governing council extended the duration of its bond-buying stimulus program by at least nine months, from March until December next year.

But the council startled markets Thursday by reducing the monthly amount of bonds it will buy after March, to 60 billion euros from 80 billion euros currently.

ECB President Mario Draghi said the reduction did not mean the bank was tapering, or phasing out, the stimulus.

He said there was "no question of tapering" and that such a phase-out of the program was not even discussed at the meeting.

Draghi said the central bank could increase the monthly purchases if needed and that there is still no firm end date for the stimulus program. He said it meant "a more lasting transmission of our monetary stimulus," not a reduction in support.

The bond purchases pump freshly created money into the banking system in hopes of increasing weak inflation and boosting growth. The flood of cash also helps keep financial markets afloat as Europe faces elections in the Netherlands and France next year where anti-EU, populist candidates are expected to do well.

Draghi said stimulus was still needed despite a somewhat brighter economic picture because "uncertainty is everywhere ... just look at the election calendar for next year."

He said it was the central bank's job to "keep a steady hand" in supporting the economy.

The stimulus extension adds at least 540 billion euros to the existing 1.74 trillion effort, whose earliest end date had been March. After December, the bank would likely not abruptly end the purchases, but start phasing them out.

The euro fell in international markets, declining 1.3 per cent against the dollar, while stocks rose.

Economist Holger Schmieding at Berenberg Bank said that the two surprises — less stimulus for longer — "should roughly offset each other."

"After some volatility, the economic and financial impact should remain modest," he said in an emailed research note.

By adding stimulus, the ECB is moving in the opposite direction to that of the U.S. Federal Reserve. The U.S. central bank is contemplating another interest rate increase at its Dec. 13-14 meeting. Markets have been betting that president-elect Donald Trump will carry through on promises to spend more on infrastructure such as roads and bridges after he is inaugurated Jan. 20, boosting growth and inflation in the months and years ahead. That would give the Fed more reason to raise rates.

Beyond the stimulus program, the ECB kept its key interest rate benchmarks unchanged. It left at zero its financing rate, at which it lends money to commercial banks, and minus 0.4 per cent on deposits it takes from banks.

Draghi had made clear that the bank was not seeing a convincing upturn in inflation. It aims for two per cent annual inflation, considered best for growth and jobs, and right now inflation is only 0.6 per cent annually. Meanwhile, economic growth is only modest at a quarterly rate of 0.3 per cent in the July-September period.

On top of that, the euro could be facing serious political turbulence.

The British vote to leave the European Union and the election of Trump in the United States are considered to have boosted the prospects of anti-elite and anti-EU politicians. Next year could see a strong showing by anti-immigration politician Geert Wilders and his Party For Freedom in the Netherlands in March.

In France, National Front leader Marine Le Pen is expected to make it past the first round of president's vote in April, although she isn't the favourite to win in the second round in May. She wants France, a member of the euro, to follow Britain in leaving the European Union.

There's more.

Italian Prime Minister Matteo Renzi resigned after voters rejected his proposed constitutional changes in a referendum Sunday. That means political uncertainty about who will be the next prime minister, just as the government faces troubles with the country's banks. The third-largest, Monte dei Paschi di Siena, is struggling under the weight of bad loans and may need a government-funded rescue soon.

So far, markets have taken Renzi's downfall in stride. The ECB's bond purchases are aimed at raising inflation by adding to the supply of money in the financial system in hopes it will be used for loans and increase business activity.

But the purchases also have the side effect of depressing borrowing rates for governments.
The Associated Press



Mario Draghi



Anti-Brexit demonstrators protest Monday outside the Supreme Court building in London on the first day of a four-day hearing. DANIEL LEAL-OLIVAS/AFP/GETTY IMAGES

# Rating agencies revisiting standards for creditworthiness

SID VERMA

On Wednesday, S&P Global Inc. dropped a bombshell on the sovereign-credit rating community.

Sounding the alarm over the rise of populism in Europe and the U.S., the credit agency said key historic drivers of the creditworthiness of advanced economies over their emerging-market counterparts — the strength of institutions and quality of policy making — can no longer be taken for granted.

That represents a potential game-changer for a slew of developed markets, which have historically enjoyed uplifts in their ratings simply by virtue of the strength of their political architecture relative to emerging markets.

"We believe it may no longer be possible to separate advanced economies from emerging markets by describing their political systems as displaying superior levels of stability, effectiveness, and predictability of policy making and political institutions," wrote Moritz Kraemer, chief sovereign ratings officer, in a 2017 outlook report entitled, A Spotlight On Rising Political Risks.

In other words, S&P are gearing up for the prospect of ratings convergence: advanced economies becoming more like emerging-markets with weaker political systems.

"We believe that political and institutional uncertainties are on the rise in so-called emerging and advanced economies alike," Kraemer added.

"This represents a big shift in views," says Richard Segal, emerging market analyst at Manulife Asset Management Ltd.

"One of the main arguments for higher ratings for developed markets relative to emerging markets has been institutional quality. If that differential — the quality of institutions between the two groups — is narrowing, so might the differential between their credit ratings."

The report cites, among other things, the policy uncertainty associated with U.S. president-elect Donald Trump's victory (which clouds the credit outlook for the AA+ rated economy) and the U.K., where the firm says a hard Brexit outcome now looks more likely, threatening full-scale access to export goods and services in the world's largest-trading bloc.

It also mentions political risks in a clutch of emerging markets as well as the one region that may destabilize sovereign ratings across the region.

In the wake of the global crisis and the eurozone debt debacle, the three big ratings agencies have revisited their methodologies.

Now, the S&P report suggests there may be a more intensive focus on institutional effectiveness, one of its five rating factors after economic prospects, external liquidity and investment position, fiscal performance, and monetary flexibility.
Financial Post

NOTICE TO AFFECTED UNSECURED CREDITORS

OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS
GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION, NORTEL
NETWORKS TECHNOLOGY CORPORATION, NORTEL COMMUNICATIONS INC., ARCHITEL SYSTEMS
CORPORATION AND NORTHERN TELECOM CANADA LIMITED (THE "CANADIAN DEBTORS")

NOTICE IS HEREBY GIVEN that a Plan of Compromise and Arrangement (as amended from time to time, the "Plan") has been filed with the Ontario Superior Court of Justice (Commercial List) (the "CCAA Court") in respect of the Canadian Debtors pursuant to the Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, as amended (the "CCAA").

TAKE NOTE THAT THESE MATERIALS relate to the CANADIAN CCAA PROCEEDINGS ONLY and do not apply to any other restructuring proceeding including the Chapter 11 Proceedings of Nortel Networks Inc. and the other U.S. Debtors. If you have claims in both the Canadian and U.S. proceedings, you MUST vote your claims in respect of the Canadian Debtors in the CCAA Proceeding in order for your vote to count with respect to the Canadian Plan and must comply with the applicable procedures in the U.S. Debtors' cases for your claim in respect of the U.S. Debtors. A vote in the U.S. Proceedings will not be recognized in the Canadian CCAA Proceedings and vice versa.

A copy of the Plan and the Information Circular (the "Information Circular") are available at www.ey.com/ca/nortel (the "Monitor's Website") under the section entitled "Plan and Other Creditor Meeting Documents". If you wish to receive a printed copy of the Plan or the Information Circular please contact the Monitor at the contact information below.

NOTICE IS ALSO HEREBY GIVEN that a meeting of Affected Unsecured Creditors (the "Meeting") will be held at 1 p.m. on Tuesday, January 17, 2017 (or such other date as may be set and announced in accordance with the Meeting Order) at The International Centre Conference Centre (6900 Airport Road, Mississauga, Ontario), for the purpose of considering and, if thought advisable, passing, with or without variation, a resolution to approve the Plan (the full text of which resolution is set out in Schedule "A" to the Information Circular) and to transact such other business as may properly come before the Meeting (or any adjournment thereof). The Meeting is being held pursuant to the Order of the Court made on December 1, 2016 (the "Meeting Order"). A copy of the Meeting Order is available on the Monitor's Website under the section "Plan and Other Creditor Meeting Documents". Capitalized terms used but not otherwise defined in this notice ha ve the meaning ascribed to them in the Meeting Order, Information Circular or Plan.

The Plan must receive an affirmative vote of the Required Majority in order to be approved by the Affected Unsecured Creditors. The Required Majority is a majority in number of Affected Unsecured Creditors with Voting Claims, and two-thirds in value of the Voting Claims held by such Affected Unsecured Creditors, in each case who vote (in person or by proxy) on the Plan at the Meeting. The Plan must also be sanctioned by a final order of the CCAA Court (the "Sanction Order") pursuant to the CCAA. Notice is also hereby given that, if the Plan is approved by the Required Majority at the Meeting, the Sanction Order will be sought in an application before the CCAA Court at 10:00 AM on January 24, 2017, or such other date or time as may be set by the CCAA Court, to seek approval of the Plan. If the Plan is approved by the Required Majority and sanctioned by the CCAA Court, then, subject to the satisfaction or waiver of the conditions to effectiveness and implementation of the Plan, all Persons referred to in the Plan (including the Affected Unsecured Creditors) will receive the treatment set out in the Plan.

AMENDMENTS TO THE PLAN
The Canadian Debtors and Monitor may, at any time and from time to time prior to or at the Meeting, amend, restate, modify and/or supplement the Plan, subject to the terms of the Plan, provided that: (i) the Monitor or the Chair shall communicate the details of any such amendment, restatement and/or supplement to all Affected Unsecured Creditors present at the Meeting prior to any vote being taken at the Meeting; (ii) the Monitor shall provide notice to the Service List of any such amendment, restatement and/or supplement and shall file a copy thereof with the CCAA Court prior to the Sanction Hearing; and (iii) the Monitor shall post an electronic copy of any such amendment, restatement and/or supplement on the Monitor's Website prior to the Sanction Hearing.

COMPLETION OF PROXIES
Any Affected Unsecured Creditor who is entitled to vote at the Meeting and that wishes to vote by proxy or in Person at the Meeting must complete, sign and return the applicable form of proxy included in its creditor package and deliver its proxy to the Monitor in accordance with applicable instructions.

Compensation Creditors
IF YOU ARE A COMPENSATION CREDITOR COVERED BY THE REPRESENTATION ORDERS AND REPRESENTED BY UNIFOR, A REPRESENTATIVE OR UNIFOR WILL BE VOTING ON YOUR BEHALF AND WILL BE VOTING IN FAVOUR OF THE PLAN. YOU SHOULD NOT SUBMIT A SEPARATE PROXY.

Participant Holders and Beneficial Bondholders
IF YOU ARE A PARTICIPANT HOLDER OR BENEFICIAL BONDHOLDER, YOU MUST CLOSELY FOLLOW THE INSTRUCTIONS FOR THE COMPLETION AND RETURN OF BONDHOLDER PROXIES AND MASTER AUTHENTICATION FORMS.

The Monitor's contact information is:

Ernst & Young Inc.,                          Attention: Nortel Monitor
Court Appointed Monitor of                   Telephone: 1.866.942.7177 or 416.943.4439
Nortel Networks Corporation & others         Facsimile: 416.943.2808
Ernst & Young Tower                          Email: nortel.monitor@ca.ey.com
222 Bay Street, Suite 2400
Toronto, Ontario M5K 1J7

This notice is given by the Monitor pursuant to the Meeting Order.

Si vous avez besoin d'une copie du plan ou de l'un des documents relatifs à l'ensemble des créanciers en français, veuillez consulter le site Web du contrôleur ou communiquer avec le contrôleur à l'adresse figurant ci-dessus.

© 2016 Ernst & Young Inc. All rights reserved.          EY



The European Central Bank in Frankfurt. The ECB has kept its interest rate benchmarks unchanged. DANIEL ROLAND/AFP/GETTY IMAGES FILES

FRIDAY, DECEMBER 9, 2016  CALGARY HERALD  B5



Illinois small business owner Eileen Barlow said she backed Donald Trump because he boosts business. *SARA BONNETT/THE ASSOCIATED PRESS*

# U.S. small business owners in hiring mood after election

NEW YORK  Small business owners had a postelection surge in optimism and say they are stepping up their plans to hire new workers.

That's the finding of a survey released Thursday by Wells Fargo & Co., which questioned 602 small business owners from Nov. 11 to 17.

Just over half the owners surveyed said they believed actions by the administration of Republican president-elect Donald Trump and Congress will make their companies better off. Sixty-one per cent believed Trump will focus on issues important to them as business owners.

The Wells Fargo Small Business Index, which measures owners' optimism, rose to 80 from a reading of 68 taken in July and 54 in a survey year earlier. It was the highest reading since it registered 83 in January 2008, in the early days of the Great Recession.

Thirty-six per cent of the owners surveyed said they plan to hire in the next 12 months, up from 21 per cent in July.

Small business owners have been cautious since the recession, and surveys by banks and small business advocacy groups have consistently shown owners were reluctant to hire or expand. Expectations that the incoming administration will be friendly to business are likely adding to owners' more upbeat mood. During the campaign, Trump said he would endorse government regulations that he called a burden to businesses. His cabinet choices, which have been announced since the survey was conducted, include officials who support a reduction in federal regulations.

Revenue expectations helped feed the boost in optimism in the Wells Fargo survey.

Fifty-eight per cent of owners forecast their revenue would be up in the next 12 months, an improvement from 48 per cent in July. That is also increasing owners' plans to spend on computers, machinery and other big-ticket items — 35 per cent plan such expenditures in the next 12 months, up from 25 per cent.

Seventy-seven per cent forecast their companies' financial situation would be good over the next 12 months, up from 73 per cent in July.
*The Associated Press*

NOTICE TO AFFECTED UNSECURED CREDITORS OF NORTEL NETWORKS CORPORATION, et al. — EY



*Thank you to all of our amazing trade and industry partners for helping make 2016 a fantastic year at Stepper Homes!*

Their hard work and dedication to our customers has been shown every day, and we could not have built homes in Calgary for 60 years without them.

Congratulations to our Annual Winners of our Trade & Industry Partner Awards. These partners have gone above and beyond in 2016 to help us build high quality homes in Calgary and surrounding areas.

THE MUSTARD SEED

*As a thanks for all of their hard work, we will be making a donation to The Mustard Seed in their names. This will go a long way in helping those experiencing homelessness in Calgary this Christmas.*

## TRADE & INDUSTRY PARTNER AWARDS

**TRADE PARTNER OF THE YEAR**
Great Western Interiors

**CONSTRUCTION PARTNER OF THE YEAR**
GSN Cribbing Ltd.

**TOP WARRANTY SERVICES PERFORMER**
Service Experts Heating & A/C

**TOP SAFETY PERFORMER**
Breckenridge Excavating Ltd.

**MOST IMPROVED SAFETY PERFORMER**
ROM Paint Ltd.

STEPPER HOMES
SINCE 1956



*To find out more about Stepper Homes, our trade & industry partners, and our charitable efforts, visit stepperhomes.com.*

VENDREDI 9 DÉCEMBRE 2016    LE JOURNAL DE MONTRÉAL    ARGENT    33

**Transport**

# Vers une pénurie de camionneurs

**SHANNY HALLÉ**
Agence QMI

Avec le départ progressif des baby-boomers vers la retraite, l'industrie du camionnage fera face à une pénurie de main-d'œuvre. Au cours des quatre prochaines années, des milliers de postes seront à pourvoir.

«Le métier de camionneur ces années-ci, ce n'est pas terrible. On ne fait pas assez de jours de travail pour être capable de se payer une voiture qui a du bon sens», explique le camionneur Rodrigue Roy.

Au Québec, on estime que plus de 50 000 postes de routiers seront à pourvoir d'ici 2020.

«Il va manquer 52 000 gars qui veulent faire ça. Il faut vraiment réussir à attirer ce monde-là», raconte Jacques Dionne.

**LA RELÈVE EST RARE**

La relève se fait rare chez les camionneurs. Plusieurs déplorent les conditions de travail, les réglementations contraignantes, l'équipement dispendieux, et les courtes périodes de travail.

«Si tu veux t'acheter un camion, ça te prend de l'argent d'avance pour payer ton diesel, les cotisations, les dépenses que ça occasionne. Parce que tu n'es pas payé au bout d'une semaine, ça peut prendre un mois, deux mois, et même aller au-delà de ça. Un nouveau qui veut acheter et qui a une famille c'est dur parce qu'il n'y a pas d'ouvrage. Ça fait trois ans que c'est tranquille», a affirmé Sonia Gagné.

Certains estiment que le gouvernement devrait donner un coup de pouce aux jeunes qui se lancent dans le métier, une sorte d'aide au démarrage.

**« TROP DE LOIS DURES »**

L'industrie peine à attirer de nouveaux routiers, malgré les offres d'emplois récurrentes dont certaines proposent bon nombre d'avantages sociaux.

«Il y a trop de lois dures pour les camionneurs. Je crois qu'on va avoir beaucoup de difficulté à trouver des jeunes qui vont s'établir là-dedans. Il va en avoir, mais moins qu'anciennement», explique Yves Rioux.



**Consulter notre page Facebook**
facebook.com/jdemontreal

**Suivez-nous sur TWITTER**
@JdeMontreal

---

Procédure en vertu de la LACC canadienne seulement

**AVIS AUX CRÉANCIERS NON GARANTIS VISÉS DE CORPORATION NORTEL NETWORKS, NORTEL NETWORKS LIMITÉE, NORTEL NETWORKS GLOBAL CORPORATION, CORPORATION INTERNATIONALE NORTEL NETWORKS, CORPORATION TECHNOLOGIE NORTEL NETWORKS, NORTEL COMMUNICATIONS INC., ARCHITEL SYSTEMS CORPORATION ET NORTHERN TELECOM CANADA LIMITÉE (LES «DÉBITRICES CANADIENNES»)**

AVIS EST PAR LES PRÉSENTES DONNÉ qu'un plan de transaction et d'arrangement (dans sa version modifiée, le cas échéant, le «**plan**») a été déposé auprès de la Cour supérieure de justice de l'Ontario (rôle commercial) (le «**tribunal saisi de la procédure en vertu de la LACC**») relativement aux débitrices canadiennes en vertu de la *Loi sur les arrangements avec les créanciers des compagnies*, L.R.C. (1985), ch. C-36, dans sa version modifiée (la «**LACC**»).

**SACHEZ QUE CES DOCUMENTS** se rapportent **UNIQUEMENT À LA PROCÉDURE EN VERTU DE LA LACC CANADIENNE** et ne s'appliquent **à aucune autre procédure de restructuration, dont la procédure en vertu du chapitre 11 de Nortel Networks Inc. et des autres débitrices américaines. Si vous avez une réclamation à la fois dans le cadre de la procédure canadienne et dans celui de la procédure américaine, vous DEVEZ exercer le droit de vote rattaché à vos réclamations visant les débitrices canadiennes dans le cadre de la présente procédure en vertu de la LACC pour que votre vote soit pris en compte relativement au plan canadien, et vous devez suivre les procédures applicables dans les affaires concernant les débitrices américaines en ce qui a trait à vos réclamations visant les débitrices américaines. Un vote dans le cadre de la procédure américaine ne sera pas pris en compte dans le cadre de la procédure en vertu de la LACC canadienne, et vice-versa.**

Une copie du plan de la circulaire d'information (la «**circulaire d'information**») est disponible à l'adresse www.ey.com/ca/nortel (le «**site Web du contrôleur**») à la rubrique «Plan et autres documents relatifs à l'assemblée des créanciers». Si vous souhaitez obtenir une copie imprimée du plan ou de la circulaire d'information, veuillez communiquer avec le contrôleur à l'aide des coordonnées précisées ci-après.

AVIS EST ÉGALEMENT DONNÉ qu'une assemblée des créanciers non garantis visés (l'«**assemblée**») aura lieu le **mardi 17 janvier 2017** (ou à toute autre date pouvant être fixée et annoncée conformément à l'ordonnance relative à l'assemblée) au **Conference Centre of The International Centre (6900 Airport Road, Mississauga, Ontario)** afin d'examiner et, s'il est jugé opportun, d'adopter, avec ou sans modification, une résolution en vue de l'approbation du plan de texte intégral de ladite résolution étant joint à la circulaire d'information à titre d'annexe A) et de traiter de toute autre question pouvant être dûment soumise à l'assemblée (ou à toute reprise de celle-ci). L'assemblée est tenue conformément à l'ordonnance du tribunal prononcée le 1er décembre 2016 (l'«**ordonnance relative à l'assemblée**»). Une copie de l'ordonnance relative à l'assemblée peut être consultée sur le site Web du contrôleur sous la rubrique «Plan et autres documents relatifs à l'assemblée des créanciers». Les mots et expressions qui ne sont pas définis dans le présent avis doivent recevoir le sens qui leur est donné dans l'ordonnance relative à l'assemblée, dans la circulaire d'information ou dans le plan, le cas échéant.

Pour être approuvé par les créanciers non garantis visés, le plan doit recevoir le vote affirmatif de la majorité exigée, soit une majorité numérique de créanciers non garantis visés ayant des réclamations conférant droit de vote et représentant au moins les deux tiers de la valeur des réclamations conférant droit de vote de l'ensemble des créanciers non garantis visés qui, chaque cas, votent (en personne ou par bureau de pouvoir) à l'égard du plan à l'assemblée. Le plan doit aussi être homologué par une ordonnance définitive du tribunal saisi de la procédure en vertu de la LACC (l'«**ordonnance d'homologation**») aux termes de la LACC. Avis est également donné que si le plan est approuvé par la majorité exigée à l'assemblée, l'ordonnance d'homologation sera demandée au tribunal saisi de la procédure en vertu de la LACC à 10 heures le 24 janvier 2017 (ou à toute autre date ou heure pouvant être fixée par le tribunal saisi de la procédure en vertu de la LACC) et à ce moment, s'il y a lieu, de l'approbation du plan. Si le plan est approuvé par la majorité exigée et homologué par le tribunal saisi de la procédure en vertu de la LACC, toutes les personnes mentionnées dans le plan (y compris les créanciers non garantis visés) recevront alors le traitement prévu dans le plan, sous réserve que les conditions d'entrée en vigueur et les conditions de mise en œuvre du plan aient été remplies ou aient fait l'objet d'une renonciation.

**MODIFICATION DU PLAN**

Les débitrices canadiennes et le contrôleur peuvent, sous réserve des modalités du plan, modifier, mettre à jour ou compléter le plan en tout temps avant l'assemblée ou lors de celle-ci, étant toutefois entendu que i) le contrôleur ou le président doit communiquer les détails de pareille modification ou mise à jour ou de pareil complément à tous les créanciers non garantis visés présents à l'assemblée avant qu'un vote soit pris à l'assemblée; ii) le contrôleur doit aviser les parties figurant sur la liste de signification de pareille modification ou mise à jour ou de pareil complément et en déposer copie auprès du tribunal saisi de la procédure en vertu de la LACC avant l'audience relative à l'homologation; et iii) le contrôleur doit publier une version électronique de pareille modification ou mise à jour ou de pareil complément sur le site Web du contrôleur avant l'audience relative à l'homologation.

**SIGNATURE DES PROCURATIONS**

Tout créancier non garanti visé ayant droit de vote à l'assemblée et souhaitant voter par procuration ou en personne à l'assemblée doit remplir, signer et retourner le formulaire de procuration applicable inclus dans la documentation à l'intention des créanciers qu'il a reçue et transmettre sa procuration au contrôleur conformément aux instructions applicables.

**Créanciers au titre de la rémunération**

**SI VOUS ÊTES UN CRÉANCIER AU TITRE DE LA RÉMUNÉRATION VISÉ PAR LES ORDONNANCES DE REPRÉSENTATION OU REPRÉSENTÉ PAR UNIFOR, UN REPRÉSENTANT OU UNIFOR VOTERA EN VOTRE NOM ET EN FAVEUR DU PLAN. VOUS NE DEVEZ PAS SOUMETTRE UNE AUTRE PROCURATION.**

**Détenteurs participants et détenteurs véritables d'obligations**

**SI VOUS ÊTES UN DÉTENTEUR PARTICIPANT OU UN DÉTENTEUR VÉRITABLE D'OBLIGATIONS, VOUS DEVEZ SUIVRE RIGOUREUSEMENT LES INSTRUCTIONS SUR LA MANIÈRE DE REMPLIR ET DE RETOURNER LES PROCURATIONS DE DÉTENTEUR D'OBLIGATIONS ET LES FORMULAIRES D'AUTHENTIFICATION PRINCIPALE.**

Coordonnées du contrôleur :

Ernst & Young Inc.
Contrôleur nommé par le tribunal de
Corporation Nortel Networks Corporation *et al.*
222 Bay Street, Suite 2400
Toronto, Ontario M5K 1J7

À l'attention du contrôleur de Nortel
Téléphone : 1 866 942 7177 ou 416 943 4439
Télécopieur : 416 943 2808
Courriel : nortel.monitor@ca.ey.com

Le présent avis est donné par le contrôleur aux termes de l'ordonnance relative à l'assemblée.

*If you require a copy of any Plan and Other Creditor Meeting Documents in English, please go to the Monitor's Website or contact the Monitor at the address above.*

© 2016 Ernst & Young Inc. Tous droits réservés.





Court File No: 09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

IN THE MATTER OF THE ***COMPANIES' CREDITORS ARRANGEMENT ACT***,
**R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL**
**NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL**
**CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION**

**APPLICATION UNDER THE ***COMPANIES' CREDITORS ARRANGEMENT ACT***,**
**R.S.C. 1985, c. C-36, AS AMENDED**

---

## AFFIDAVIT OF SERVICE
## OF JANE SULLIVAN

---

I, **Jane Sullivan** of New York City, New York, Jane Sullivan, being duly sworn, deposes and says, under the penalty of perjury:

1.    I am an Executive Vice President, of Epiq Bankruptcy Solutions, LLC ("Epiq") located at 777 Third Avenue, New York, 12th Floor, New York 10017.   As such I knowledge of the matters of which I hereinafter depose.

2.    Capitalized terms used in this affidavit and not otherwise defined have the meaning given to them in the Plan Filing and Meeting Order dated December 1, 2016 (the "Meeting Order").

3.    I supervised service of the following materials:

   a.  A CD-ROM (the "Solicitation CD-ROM") with PDF copies of the following:

      i.  Notice to Affected Unsecured Creditors of Nortel Networks Corporation, Nortel Networks Limited, Nortel, Networks Global Corporation, Nortel Networks International Corporation, Nortel Networks Technology Corporation, Nortel Communications Inc., Architel Systems Corporation and Northern Telecom Canada Limited (the "Canadian Debtors") in the form attached as Schedule A-1 ; and

   ii. Information Circular;

b. A Bondholder Package Cover Memo attached as **Exhibit "A"** to this Affidavit (the "Cover Memo");

c. Letter to Bondholders regarding Meeting of Affected Unsecured Creditors for the Canadian Debtors (the "<u>Bondholder Letter</u>") in the form attached as Schedule A-2 to the Meeting Order;

d. Bondholder Proxy, for use by Beneficial Bondholders of bonds issued by or guaranteed by Nortel Networks Corporation or Nortel Networks Limited (the "<u>Nortel Bonds</u>") and Instructions to Beneficial Bondholders in the form attached as Schedule C-3 to the Meeting Order;

e. Master Authentication Form, for use by Participant Holders validating the holdings of Nortel Bonds") and Instructions to Participant Holders in the form attached as Schedule C-4 to the Meeting Order.

4. Epiq received Participant Holder Lists for the NNCC Bonds, and the 1988 Bonds and the Crossover Bonds, prepared by DTC as of the November 21, 2016 Voting Record Date.

5. Epiq served, via next business day service, the Solicitation CD-Rom, the Bondholder Package Cover Memo, the Bondholder Letter, Bondholder Proxy and Instructions to Beneficial Bondholders, on the banks, brokers, dealers, agents or other nominees (collectively, "<u>Participant Holders</u>"):

a. On December 7, 2016, to those Participant Holders listed on **Exhibit "B"** attached hereto and holding Nortel Bonds on behalf of the Beneficial Bondholder entitled to vote in the CCAA Proceedings being those Participant Holders listed on the Participant Holder List for the NNCC Bonds and those other Participant Holders who were known to Epiq as being Participant Holders based on Epiq's expertise and experience in the U.S. Proceedings; and

b. On December 12, 2016, via next business day service to the Participant Holders listed on **Exhibit "C"** attached hereto, being the balance of the Participant Holders appearing on the Participant Holder Lists for the 1988 Bonds and the Crossover Bonds who were not served on December 7, 2016.

6. The Participant Holders on Exhibit B and Exhibit C were provided with instructions and with sufficient quantities to distribute the aforementioned documents to the beneficial holders of the Nortel Bonds.

7. The master forms were served separately, and on December 7, 2016 via second day service, the Solicitation CD-Rom, Master Authentication Form and Instructions to Participant Holders were served to the Participant Holders listed on attached Exhibit B, and on December 12, 2016, via next business day service, the aforementioned documents were served on the Participant Holders listed on attached Exhibit C.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.


_Jane Sullivan_ _____

Jane Sullivan
Executive Vice President
Epiq Bankruptcy Solutions, LLC


SUBSCRIBED AND SWORN TO BEFORE ME
this ___ day of January 2017.


_____
Notary Public

Cassandra Murray
NOTARY PUBLIC STATE OF NEW YORK
No 01MU6220179
Qualified in the County of Queens
Commission Expires April 12, 20__

# Exhibit "A"

**This is Exhibit "A" to the Affidavit of Jane Sullivan**
**Sworn before me this 16th day of January, 2017**

_____
                    **Notary Public**

REGINA AMPORFRO
Notary Public, State of New York
No. 01AA6064508
Qualified in Bronx County
Certificate Filed in New York County
Commission Expires Sept. 24, 20___

Dear Bondholder:

You have been identified as a November 21, 2016 Record Date holder of bonds issued by or guaranteed by Nortel Networks Corporation and Nortel Networks Limited ("Nortel").

In this package you are receiving a Proxy to vote on the Plan of Compromise and Arrangement pursuant to the *Companies' Creditors Arrangement Act* (the "**Plan**") for the Canadian CCAA Proceedings. In a SEPARATE PACKAGE you will receive information and a Beneficial Ballot regarding the Plan proposed in the U.S. Chapter 11 Bankruptcy proceedings.

If you hold multiple Nortel bonds or if you hold the same bond issue through multiple accounts, you will receive a separate Proxy and Ballot for each one.  These are different proceedings with different Plans, a vote on the Proxy for the Canadian Plan will not count in the U.S. Proceedings and vice versa.

**You are entitled and encouraged to return each and every Proxy or Ballot you receive.**

# Exhibit "B"

**This is Exhibit "B" to the Affidavit of Jane Sullivan
Sworn before me this 16th day of January, 2017**

_____
Notary Public

REGIN/ AMPORFRO
Notary Public, State of New York
No. 01AM6064508
Qualified in Bronx County
Certificate Filed in New York County
Commission Expires Sept. 24, 20

| Claim Name | Address Information |
|---|---|
| BANC OF AMERICA SECURITIES LLC (0773) | JOHN DOLAN OR REORG MGR 100 W. 33RD STREET 3RD FLOOR , NEW YORK, NY, 10001 |
| BANK OF NEW YORK MELLON (0901/8275/2196) | ENIS SULJIC OR REORG MGR 525 WILLIAM PENN PLACE THIRD FLOOR , PITTSBURGH, PA, 15259 |
| BARCLAYS CAPITAL INC. (5101) | ANTHONY SCIARAFFO OR REORG DEPT. 400 JEFFERSON PARK  , WHIPPANY, NJ, 07981 |
| BMO NESBITT BURNS INC. /CDS (5043) | LOUISE TORANGEAU OR REORG MGR 1 FIRST CANADIAN PLACE 13TH FL P. O. BOX 150 , TORONTO, ON, M5X 1H3 CANADA |
| BNY MELLON/ NEW ENGLAND (0954) | BETH STIFFLER OR REORG DEPT. 525 WILLIAM PENN PLACE SUITE 300 , PITTSBURGH, PA, 15259 |
| BROADRIDGE | JOB NUMBER: E99850; E99853 CUSIPS: 656569; 656568; 665810; 665815 5970 CHEDWORTH WAY , MISSISSAUGA, ON, L5R 4G5 CANADA |
| BROADRIDGE | JOB NUMBER: E99847; E99845; E99849; E99851; E99852 51 MERCEDES WAY , EDGEWOOD, NY, 11717 |
| BROWN BROTHERS HARRIMAN & CO. (0010) | PAUL NONNON OR REORG MGR 525 WASHINGTON BLVD. NEW PORT TOWERS , JERSEY CITY, NJ, 07310-1607 |
| CHARLES SCHWAB & CO., INC. (0164) | Corporate Actions Dept.: 01-1B572 2423 EAST LINCOLN DRIVE  , PHOENIX, AZ, 85016 |
| CITIBANK, N.A. (0908) | CAROLYN TREBUS OR REORG MGR 3800 CITIBANK CENTER B3-12 , TAMPA, FL, 33610 |
| CITIGROUP GLOBAL MARKETS INC. (0418) | SHERRYL NASH-COOK OR REORG MGR 388 GREENWICH ST 11TH FLOOR , NEW YORK, NY, 10013 |
| CITIGROUP PRIVATE BANK/ (2032) | STEPHANIE LUCKEY OR REORG MGR 111 WALL STREET 6TH FLOOR , NEW YORK, NY, 10005 |
| COR CLEARING (0052) | ATTN: CORPORATE ACTIONS DEPT. 1299 FARNAM STREET, SUITE 800  , OMAHA, NE, 68102 |
| CREDIT SUISSE (0355) | EMILY CONNORS OR REORG DEPT. C/O REORGANIZATION DEPT. 7033 LOUIS STEPHENS DRIVE 4TH FLOOR, RESEARCH TRIANGLE PARK, NC, 27709 |
| DEPOSITORY TRUST CO. | ROBERT GIORDANO 570 WASHINGTON BLVD  , JERSEY CITY, NJ, 07310 |
| DEUTSCHE BANK SECURITIES, INC. (0573) | SARA BATTEN OR REORG MGR 5022 GATE PARKWAY SUITE 100 , JACKSONVILLE, FL, 32256 |
| E*TRADE/APEX (0385 / 0158) | C/O BROADRIDGE SECURITIES PROCESSING SOLUTIONS ATTN: YASMINE CASSEUS 2 JOURNAL SQUARE PLAZA, 5TH FLOOR , JERSEY CITY, NJ, 07306 |
| EDWARD JONES (0057) | GERRI KAEMPFE  OR REORG MGR CORPORATE ACTIONS & DISTRIBUTION 12555 MANCHESTER ROAD , ST. LOUIS, MO, 63131 |
| EDWARD JONES (0057) | DEREK ADAMS OR REORG DEPT. CORPORATE ACTIONS & DISTRIBUTION 12555 MANCHESTER ROAD , ST. LOUIS, MO, 63131 |
| EDWARD JONES/CDS (5012) | NICK HUMMELL OR REORG MGR 1255 MANCHESTER ROAD  , ST. LOUIS, MO, 63131 |
| FIRST CLEARING, LLC (0141) | MATT BUETTNER OR REORG MGR 2801 MARKET STREET H0006-09B , ST. LOUIS, MO, 63103 |
| GOLDMAN SACHS (0005 / 0501 / 5208) | MEGHAN SULLIVAN 30 HUDSON STREET ANNOUCEMENT HUB , JERSEY CITY, NJ, 07302 |
| HILLTOP SECURITIES INC. (0279) | RHONDA JACKSON OR REORG DEPT. 1201 ELM STREET SUITE 3700 , DALLAS, TX, 75270 |
| HUNTINGTON NATIONAL BANK (2305) | RIA BOLTON OR REORG MGR 7 EASTON OVAL - EA4 E78  , COLUMBUS, OH, 43219 |
| INVESHARE (0338/ 0271/ 0595) | ATTN: RECEIVING CORPORATE ACTIONS 156 FERNWOOD AVENUE , EDISON, NJ, 08837-3857 |
| J.P. MORGAN CLEARING CORP. (0352/ 0902/ 2357) | RAMZY SHREIM / GREGORY WINKELMAN 500 STANTON CHRISTIANA ROAD, OPS 4 , NEWARK, DE, 19713-2107 |
| MEDIANT COMMUNICATIONS | STEPHANIE FITZHENRY 100 DEMAREST DRIVE  , WAYNE, NJ, 07470 |
| MORGAN STANLEY & CO.   (0050) | MICHELLE FORD OR REORG DEPT. 901 SOUTH BOND ST 6TH FLOOR , BALTIMORE, MD, 21231 |
| MORGAN STANLEY SMITH BARNEY LLC (0015) | JOHN BARRY OR REORG DEPT 1300 THAMES STREET WHARF 6TH FLOOR , BALTIMORE, MD, 21231 |
| NATIONAL FINANCIAL SVCS.   (0226) | PAUL GALENO OR REORG MGR NEWPORT OFFICE CENTER III 499 WASHINGTON BOULEVARD , JERSEY CITY, NJ, 07310 |
| NORTHERN TRUST CO (2669) | ROBERT VALENTIN OR REORG MGR 801 S CANAL STREET REORG DEPT  FLOOR C1N , CHICAGO, IL, 60607 |
| PERSHING LLC (0443) | JOE LEVARA OR REORG MGR SECURITIES CORPORATION 1 PERSHING PLAZA 7TH FLOOR - REORG., JERSEY CITY, NJ, 07399 |
| RBC CAPITAL MARKETS CORPORATION (0235) | STEVE SCHAEFER OR REORG DEPT. 510 MARQUETTE AVE SOUTH  , MINNEAPOLIS, MN, 55402 |

| Claim Name | Address Information |
|---|---|
| RBC DOMINION /CDS (5002) | REORG MGR 2 BLOOR STREET E # 2300  , TORONTO, ON, M4W 1A8 CANADA |
| STATE STREET (0997) | MIKE FEELEY/ROB RAY  OR REORG MGR CORP ACTIONS - JAB5E 1776 HERITAGE DRIVE , NORTH QUINCY, MA, 02171 |
| STIFEL, NICOLAUS & CO (0793) | CHRIS WIEGAND OR REORG MGR 501 N. BROADWAY  7TH FLOOR STOCK RECORD DEPT , ST. LOUIS, MO, 63102 |
| TD AMERITRADE CLEARING, INC. (0188) | GARY SWAIN OR REORG DEPT. 1005 NORTH AMERITRADE PLACE  , BELLEVUE, NE, 68005 |
| TRADESTATION (0271) | ANDREA AUGUSTIN OR REORG MGR 8050 SW 10TH ST, STE 2000  , PLANTATION, FL, 33324 |
| U.S. BANK N.A. (2803) | PAUL KUXHAUS OR REORG MGR 1555 N. RIVER CENTER DRIVE SUITE 302 , MILWAUKEE, WI, 53212 |
| UBS FINANCIAL SERVICES LLC (0221) | SALVATORE SCHIAVONE OR REORG MGR 1000 HARBOR BLVD  , WEEHAWKEN, NJ, 07086 |
| UBS SECURITIES LLC (0642) | GREGORY CONTALDI OR REORG MGR 1000 HARBOR BLVD - 5TH FLOOR  , WEEHAWKEN, NJ, 07086 |
| VISION FINANCIAL MK (0595) | HOWARD BRUNN OR REORG MGR 4 HIGH RIDGE PARK SUITE 100 , STAMFORD, CT, 06905 |
| WELLS FARGO SECURITIES, LLC (0250) | SCOTT NELLIS OR REORG MGR CORPORATE ACTIONS - MAC D109-010 1525 WEST W.T. HARRIS BLVD, 1B1 , CHARLOTTE, NC, 28262 |

Total Creditor count  43

# Exhibit "C"

**This is Exhibit "C" to the Affidavit of Jane Sullivan**
**Sworn before me this 16th day of January, 2017**

_____
**Notary Public**

REGINA AMPORFRO
Notary Public, State of New York
No. 01AM6064508
Qualified in Bronx County
Certificate Filed in New York County
Commission Expires Sept. 24, 2017

| Claim Name | Address Information |
|---|---|
| BANK OF NEW YORK MELLON (2731) | ENIS SULJIC OR REORG MGR 525 WILLIAM PENN PLACE THIRD FLOOR , PITTSBURGH, PA, 15259 |
| BARCLAYS CAPITAL /BARCLAYS BANK (7254) | NELLIE FOO OR PROXY MGR 200 CEDAR KNOLLS ROAD CORPORATE ACTIONS , WHIPPANY, NJ, 07981 |
| BARCLAYS CAPITAL INC. (0229) | Attn: Corporate Actions 400 Convergence Way  , JERSEY CITY, NJ, 07981 |
| CITADEL SECURITIES LLC (0395) | KEVIN NEWSTEAD OR PROXY MGR 131 SOUTH DEARBORN STREET 35TH FLOOR , CHICAGO, IL, 60603 |
| CITIGROUP/SALOMON (0274) | PATRICIA HALLER OR PROXY DEPT. 111 WALL ST. 4TH FLOOR , NEW YORK, NY, 10005 |
| DESERET TRUST COMPANY – I (2497) | JIM COWAN OR PROXY MGR GATEWAY TOWER EAST 10 EAST SOUTH TEMPLE SUITE 470, SALT LAKE CITY, UT, 84133 |
| INT BROKERS (0534) | KARIN MCCARTHY OR PROXY DEPT. 8 GREENWICH OFFICE PARK  0, GREENWICH, CT, 06831 |
| J.P. MORGAN SECURITIES INC. (0187/ 2424/ 2467) | RAMZY SHREIM / GREGORY WINKELMAN 500 STANTON CHRISTIANA ROAD, OPS 4 0, NEWARK, DE, 19713-2107 |
| LAURENTIAL BANK OF CANADA/CDS (5001) | ESTELLE COLLE OR PROXY MGR 1981 MCGILL COLLEGE AVE SUITE 100 , MONTREAL, QC, H3A 3K3 CANADA |
| NBCN INC. /CDS (5008) | DANIEL NTAP OR PROXY MGR 1010 RUE DE LA GAUCHETIERE ST. WEST SUITE 1925 , MONTREAL, QC, H3B 5J2 CANADA |
| NORTHERN TRUST CO (2778/ 8101) | ROBERT VALENTIN OR REORG MGR 801 S CANAL STREET REORG DEPT  FLOOR C1N , CHICAGO, IL, 60607 |
| RAYMOND JAMES & ASSOCIATES, INC. (0725) | ROBERTA GREEN OR PROXY MGR 880 CARILION PARKWAY TOWER 2, 4TH FLOOR , ST. PETERSBURG, FL, 33716 |
| WELLS FARGO BANK NA (2027) | LORA DAHLE OR PROXY DEPT. 550 South 4th Street MAC N9310-141 , MINNEAPOLIS, MN, 55415 |

Total Creditor count  13



## MINUTES OF THE MEETING OF CREDITORS OF
## NORTEL NETWORKS CORPORATION AND THE OTHER CANADIAN DEBTORS
### RELATING TO THE PLAN OF COMPROMISE
### AND ARRANGEMENT UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT* (CANADA) DATED NOVEMBER 30, 2016

**held at the International Centre Conference Centre
6900 Airport Road, Mississauga Ontario starting at 1pm (Toronto time)**

---

### OPENING REMARKS AND APPOINTMENT OF SECRETARY AND SCRUTINEERS

On January 17, 2017 at 1:01 p.m., Murray McDonald, president of Ernst & Young Inc., the Court-appointed Monitor in the CCAA proceedings of Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Technology Corporation, Nortel Networks Global Corporation, Nortel Networks International Corporation, Nortel Communications Inc., Architel Systems Corporation and Northern Telecom Canada Limited (collectively, the "**Canadian Debtors**"), took the Chair and commenced the meeting (the "**Meeting**").

As a preliminary matter, the Chairman announced the Meeting would be conducted in English but that simultaneous translation was available in French. The Chairman asked anyone who required a headset for French language translation to raise his or her hand. The French translator also made the same announcement. The Chairman also confirmed that sign language translation was being provided.

The Monitor had been directed to chair the Meeting pursuant to an order issued by the Honourable Mr. Justice Newbould of the Ontario Superior Court of Justice on December 1, 2016 (the "**Meeting Order**"). The Chairman appointed (a) Jay Carfagnini, partner at Goodmans LLP, counsel to the Monitor, to act as Secretary of the Meeting; and (b) Brent Beekenkamp and Tom Ayres of the Monitor, to act as Scrutineers to report on the number of Affected Unsecured Creditors present in person or represented by proxy at the Meeting and to report the results of the voting of Affected Unsecured Claims at the Meeting.

### QUORUM

The Chairman announced that the Scrutineers had confirmed there was at least one (1) Affected Unsecured Creditor with a Voting Claim voting in person or by proxy present at the Meeting and that quorum had been met.

As a quorum was present, the Chairman called the Meeting to order to consider and vote on the Canadian Debtors' plan of compromise and arrangement under the *Companies' Creditors Arrangement Act* dated November 30, 2016.

**NOTICE OF MEETING**

The Chairman advised that notice of the Meeting has been provided through publication in various local and international newspapers, email communications to the service list and direct mailings to creditors. The Chairman dispensed with the reading of the notice of Meeting.

**THE SETTLEMENT AND SUPPORT AGREEMENT AND PLAN**

The Chairman indicated that he believed most people were already aware of the Settlement and Support Agreement, which is a significant milestone and paves the way to allow approximately $7.3 billion of sale proceeds to be distributed to the Nortel estates and ultimately to creditors. The Chairman indicated the Settlement and Support Agreement not only settles the disputes relating to the allocation of asset sale proceeds but also settles certain significant claims. The Chairman also indicated the Settlement and Support Agreement has the support of the Canadian, U.S. and EMEA estates as well as the Monitor and several key creditors in each of the estates.

The Chairman provided a very brief overview of the Plan and proceeded to provide certain information regarding anticipated timing for distribution. The Chairman indicated that before funds could be distributed, all of the conditions to both the Settlement and Support Agreement and the Plan had to have satisfied including approval by the U.S. Court of the U.S. Plans.

The Chairman outlined that pursuant to the Settlement and Support Agreement, the Canadian estate will be receiving approximately $4.1 billion of the sale proceeds and that a further $237 million of previously restricted cash would be released and made available for distribution. There will be certain priority payments made but the Chairman indicated that current estimates for distributions would be 45-49 cents for claims denominated predominantly in Canadian dollars and 41.5 to 45 cents for all other claims.

The Chairman then opened the floor for questions. Two individuals asked claims specific questions and were directed to speak to the Monitor representatives after the conclusion of the Meeting. A third individual asked whether the anticipated April distribution timeline was certain. The Chairman confirmed that it was not certain because it was dependent on a number of factors including appeals and resolution of certain tax matters.

**APPROVAL OF THE PLAN**

The Chairman then proceeded to address certain voting procedures as set out in the Meeting Order. Specifically, the Chairman confirmed:

- all voting was done through written proxy;
- virtually all current and former employees of the Canadian Debtors are represented by Court appointed Representatives who have the authority to vote on their behalf and therefore such current and former employees should not vote;

- the bondholder voting process was done by written proxy and bondholders were required to have their holdings validated by their participants before any proxies were to be sent back to the Monitor's agent; and
- the Meeting Order outlined the process for voting of Unresolved Claims.

Don Sproule, a proxyholder, proposed the following resolution, which was read to the Meeting by the Chairman:

> *BE IT RESOLVED THAT:*
>
> *1.     The plan of compromise and arrangement dated November 30, 2016 (as such Plan may be amended, varied or supplemented from time to time in accordance with its terms, the "Plan") under the Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, as amended to and including January 14, 2009 (the "CCAA"), concerning, affecting and involving Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Global Corporation, Nortel Networks International Corporation, Nortel Networks Technology Corporation, Nortel Communications Inc., Architel Systems Corporation and Northern Telecom Canada Limited (each, a "Canadian Debtor" and collectively, the "Canadian Debtors"), substantially in the form served on the service list in the CCAA proceedings on November 30, 2016, and the transactions contemplated therein be and is hereby accepted, approved, agreed to and authorized; and*
>
> *2.     Any authorized representative of the Canadian Debtors be and is hereby authorized, for and on behalf of the Canadian Debtors, to execute and deliver, or cause to be executed and delivered, any and all documents and instruments and to take or cause to be taken such other actions as he or she may deem necessary or desirable to implement this resolution and the matters authorized hereby, including the transactions required by the Plan, such determination to be conclusively evidenced by the execution and delivery of such documents or other instruments or taking of any such action.*

The Chairman then opened the floor for discussion. No further questions or discussion points were raised.

The Chairman requested that any creditor who was entitled to vote and had not yet submitted a proxy raise his or her hand so such proxy could be collected. No remaining proxies needed to be collected.

The Scrutineer tabulated the votes for Voting Claims and Unresolved Claims submitted by proxy for and against the foregoing resolution. The Chairman reported the results of the voting as follows, which, in addition to the calculation of votes necessary to determine whether the motion was carried, included voting calculations that were required to be made pursuant to the Meeting Order:

A.    *Votes of Affected Unsecured Creditors with Voting Claims*:

|  | Number | Value | % Number | % Value |
|---|---|---|---|---|
| In Favour | 14,922 | $9,254,874,847 | 99.97% | 99.24% |
| Against | 4 | $70,530,494 | 0.03% | 0.76% |
| **Total** | **14,926** | **$9,325,405,341** | **100%** | **100%** |

B.    *Votes in respect of Unresolved Claims*

|  | Number | Value | % Number | % Value |
|---|---|---|---|---|
| In Favour | 131 | $111,538,898 | 100% | 100% |
| Against | 0 | 0 | 0 | 0 |
| **Total** | **131** | **$111,538,898** | **100%** | **100%** |

C.    *Voting Results if all Unresolved Claims were included in the vote on the Plan:*

|  | Number | Value | % Number | % Value |
|---|---|---|---|---|
| In Favour | 15,053 | $9,366,413,745 | 99.97% | 99.25% |
| Against | 4 | $70,530,494 | 0.03% | 0.75% |
| **Total** | **15,057** | **$9,436,944,239** | **100%** | **100%** |

The report of the Scrutineers on attendance and voting is annexed to these minutes of the Meeting as Schedule "A".

The Chairman declared the motion carried and the foregoing resolutions passed.

Before the Chairman terminated the Meeting, he advised that the anticipated Court date for the Sanction hearing was January 24, 2017.

**TERMINATION**

There being no further business to be brought before the Meeting, the Chairman terminated the Meeting at 1:27 p.m.

**MURRAY MCDONALD**
**Chairman of the Meeting**

**JAY CARFAGNINI**
**Secretary of the Meeting**

*A.    Votes of Affected Unsecured Creditors with Voting Claims*:

|  | Number | Value | % Number | % Value |
|---|---|---|---|---|
| In Favour | 14,922 | $9,254,874,847 | 99.97% | 99.24% |
| Against | 4 | $70,530,494 | 0.03% | 0.76% |
| **Total** | **14,926** | **$9,325,405,341** | **100%** | **100%** |

*B.    Votes in respect of Unresolved Claims*

|  | Number | Value | % Number | % Value |
|---|---|---|---|---|
| In Favour | 131 | $111,538,898 | 100% | 100% |
| Against | 0 | 0 | 0 | 0 |
| **Total** | **131** | **$111,538,898** | **100%** | **100%** |

*C.    Voting Results if all Unresolved Claims were included in the vote on the Plan:*

|  | Number | Value | % Number | % Value |
|---|---|---|---|---|
| In Favour | 15,053 | $9,366,413,745 | 99.97% | 99.25% |
| Against | 4 | $70,530,494 | 0.03% | 0.75% |
| **Total** | **15,057** | **$9,436,944,239** | **100%** | **100%** |

The report of the Scrutineers on attendance and voting is annexed to these minutes of the Meeting as Schedule "A".

The Chairman declared the motion carried and the foregoing resolutions passed.

Before the Chairman terminated the Meeting, he advised that the anticipated Court date for the Sanction hearing was January 24, 2017.

**TERMINATION**

There being no further business to be brought before the Meeting, the Chairman terminated the Meeting at 1:27 p.m.

_____
**MURRAY MCDONALD**
**Chairman of the Meeting**

_____
**JAY CARFAGNINI**
**Secretary of the Meeting**



**Prefiling Unresolved Claims**

| Creditor Name | Claim Reserve Amount in USD |
|---|---|
| Alberta Finance and Enterprise | 5,690 |
| Apex Logistics Inc. | 13,521,819 |
| Canada Revenue Agency | 415,990 |
| Chen, Kien | - |
| Continuous Computing Corporation | 208,980 |
| Convergys Emea Limited | 766,275 |
| Directors & Officers | - |
| Dunn, Frank Andrew | 90,000,000 |
| Employee Benefit Plan | 1,639,008 |
| Gardener, William Kenneth | 2,787,277 |
| Gie Les Jeunes Bois | 23,531,118 |
| Gollogly, Michael | 6,000,000 |
| Her Majesty the Queen in right of Canada, as represented by the Minister of National Revenue | - |
| Her Majesty the Queen in right on Ontario as represented by the Ministry of the Environment | 81,950,420 |
| Industrial Development Agency Ireland | 7,098,655 |
| Jaco Electronics Inc. | 479,000 |
| Lead Plaintiffs on behalf of the Class in Lucescu v Zafirovski et al. | - |
| Lucescu, David | - |
| Microsoft Licensing, GP | 9,994,666 |
| Minto, Moreno | - |
| Nortel Networks Pass-Through Trust, Series 2001-1 | 38,566,714 |
| Ontario Ministry of Revenue | 1,421,796 |
| Oracle Canada ULC | 1,134,233 |
| Owens, William A. | 2,278,679 |
| SCI Brockville Corp. | 21,465,324 |
| Sidney Street Properties Corp. | 42,147,921 |
| SNMP Research International, Inc. | 7,549,323 |
| Sun Microsystems of Canada, Inc. | - |
| Sun Microsystems, Inc. | 8,510,153 |
| The Algonquin and Lakeshore Catholic District School Board | 47,556,648 |
| The Corporation of the City of Belleville | 52,637,574 |
| The Superintendent of Financial Services as administrator of the PBGF | - |
| Wireless (TX) LP | 60,137,123 |
| Zafirovski, Mike | 8,497,000 |
| **Total Claim Reserve Amount** | **530,301,386** |

**Post-filing Unresolved Claims**

| Creditor Name | Claim Reserve Amount in USD |
|---|---|
| The Northern Trust Company, Canada | 819,504 |

*The reserves contemplated hereby do not include any amount in respect of the CA$44 million priority claim sought by two former LTD recipients on behalf of the LTD Beneficiaries



Court File No. 09-CL-7950

### *ONTARIO*
### SUPERIOR COURT OF JUSTICE
### (COMMERCIAL LIST)

### IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

### AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

### FIFTY-FIRST REPORT OF THE MONITOR
### DATED AUGUST 27, 2010

# TABLE OF CONTENTS

Page

I.     INTRODUCTION ........................................................................................1

II.    PURPOSE ...................................................................................................3

III.   TERMS OF REFERENCE ..........................................................................5

IV.    BACKGROUND ..........................................................................................6

       Appointment of Representatives..................................................................6

       The Settlement Agreement ..........................................................................7

V.     PROCESS LEADING TO THIS MOTION .................................................9

VI.    FACTS CONCERNING THE HWT ..........................................................10

       Overview of the HWT ...............................................................................10

       Revenue Canada Ruling.............................................................................12

       The Trust Agreement .................................................................................13

       Current Plans .............................................................................................14

       Sun Life .....................................................................................................15

       Pensioner Benefits .....................................................................................15

              (a)     Pensioner Life ....................................................... 16

              (b)     Medical and Dental Benefits................................. 17

       LTD Benefits .............................................................................................18

              (a)     LTD Life Insurance Benefits ................................ 18

              (b)     Medical and Dental Benefits................................. 19

              (c)     Income Benefits .................................................... 19

       Survivor Income Benefits ..........................................................................19

       Survivor Transition Benefits......................................................................20

       Optional Life Benefit .................................................................................21

       Basic and Optional Life Cross-Experience Rating .....................................22

       Financial Reports on the HWT ...................................................................23

              (a)     Tax Returns ........................................................... 23

              (b)     HWT Financial Statements ................................... 23

       HWT Valuations ........................................................................................24

       Funding and Administration .......................................................................25

       Available Cash ...........................................................................................26

**Page**

VII.   MERCER 2010 PRELIMINARY HWT VALUATION ....................................................27

VIII.  PROPOSED ALLOCATION METHODOLOGY ...........................................................29

     Illustrative Scenarios.................................................................................................29

     Proposed Allocation Methodology ...................................................................34

     Independent Legal Counsel........................................................................................36

     Specific Process Matters ...........................................................................................39

     Operational Steps.......................................................................................................42

IX.   RECOMMENDATION ................................................................................................44

Court File No. 09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS***
***ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF**
**COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,**
**NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS**
**INTERNATIONAL CORPORATION AND NORTEL NETWORKS**
**TECHNOLOGY CORPORATION**

**FIFTY-FIRST REPORT OF THE MONITOR**
**DATED AUGUST 27, 2010**

## I.    INTRODUCTION

1.    On January 14, 2009 (the "**Filing Date**") Nortel Networks Corporation ("**NNC**" and collectively with all its subsidiaries "**Nortel**" or the "**Company**"), Nortel Networks Limited ("**NNL**"), Nortel Networks Technology Corporation, Nortel Networks International Corporation and Nortel Networks Global Corporation (collectively the "**Applicants**") filed for and obtained protection under the *Companies' Creditors Arrangement Act* ("**CCAA**").    Pursuant to the Order of this Honourable Court dated January 14, 2009, as amended and restated (the "**Initial Order**"), Ernst & Young Inc. was appointed as the Monitor of the Applicants (the "**Monitor**") in the CCAA proceedings.    The stay of proceedings was extended to October 29, 2010, by this Honourable Court in its Order dated July 16, 2010.

2.    Nortel Networks Inc. ("**NNI**") and certain of its U.S. subsidiaries concurrently filed voluntary petitions under Chapter 11 of Title 11 of the U.S. Bankruptcy Code (the "**Code**") in the United States Bankruptcy Court for the District of Delaware (the "**U.S.**

**Court**") on January 14, 2009 (the "**Chapter 11 Proceedings**").  As required by U.S. law, an official unsecured creditors committee (the "**Committee**") was established in January, 2009.

3.      An *ad hoc* group of holders of bonds issued by NNL, NNC and Nortel Networks Capital Corporation has been organized and is participating in these proceedings as well as the Chapter 11 Proceedings (the "**Bondholder Group**").  In addition, pursuant to Orders of this Honourable Court dated May 27, 2009, July 22, 2009 and July 30, 2009, representative counsel was appointed on behalf of the former employees of the Applicants, the continuing employees of the Applicants and the LTD Beneficiaries, respectively, and each of these groups is participating in the CCAA proceedings.

4.      Nortel Networks (CALA) Inc. (together with NNI and certain of its subsidiaries that filed on January 14, 2009, the "**U.S. Debtors**") filed a voluntary petition under Chapter 11 of Title 11 of the Code in the U.S. Court on July 14, 2009.

5.      Nortel Networks UK Limited ("**NNUK**") and certain of its subsidiaries located in EMEA were granted Administration orders (the "**UK Administration Orders**") by the High Court of England and Wales on January 14, 2009 (collectively the "**EMEA Debtors**"). The UK Administration Orders appointed Alan Bloom, Stephen Harris, Alan Hudson and Chris Hill of Ernst & Young LLP as Administrators of the various EMEA Debtors, except for Ireland, to which David Hughes (Ernst & Young LLP Ireland) and Alan Bloom were appointed (collectively the "**Joint Administrators**").

6.      Subsequent to the Filing Date, Nortel Networks SA commenced secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings in the Republic of France

pursuant to which a liquidator and an administrator have been appointed by the Versailles Commercial Court.

7.      The CCAA proceedings and the UK Administration proceedings of NNUK have been recognized by the U.S. Court as foreign main proceedings under Chapter 15 of the Code.

8.      Subsequent to the Filing Date, certain other Nortel subsidiaries have filed for creditor protection or bankruptcy proceedings in the local jurisdiction in which they are located.

## II.     PURPOSE

9.      The purpose of this Fifty-First Report of the Monitor (the "**Fifty-First Report**") is:

(a)      to seek this Honourable Court's approval of a proposed allocation methodology[1] (the "**Proposed Allocation Methodology**") for the allocation of funds held in the Applicants' Health and Welfare Trust (the "**HWT**") and such ancillary relief as is just and convenient to terminate the HWT and implement the Proposed Allocation Methodology to distribute the funds held in the HWT to the beneficiaries who are entitled thereto; and

(b)      to provide this Honourable Court with information about the HWT relevant to its termination and more specifically to the allocation and distribution of its corpus and the process that has been followed by the Applicants and the Monitor to resolve these issues in a reasonable and practical manner.

10.     The Settlement Agreement (defined below) provides and this Court has ordered that benefit payments by the Applicants will end on December 31, 2010.  It is therefore timely to seek approval of the Proposed Allocation Methodology, which will enable a distribution of the HWT corpus.

---

[1] Described in Section VIII below.  An illustrative example of the application of the Proposed Allocation Methodology to the participating benefits on an aggregate basis (not an individual basis) is attached as Appendix D-1, Column 2.

11.    It is appropriate for the Monitor to bring this motion in these proceedings and seek

approval of the Proposed Allocation Methodology in order to assist this Honourable

Court and the parties, given, among other things:

(a)    the Applicants administer the HWT and, as they are under the supervision of this Honourable Court in these proceedings, require approval of this Honourable Court prior to taking those proposed steps that are not in the ordinary course of the Applicants' business;

(b)    a resolution of HWT allocation and distribution matters is required in order to determine certain claims (in that distributions from the HWT will reduce them) against the Applicants, assist in the development of a CCAA Plan and advance the administration of the Applicants' estates;

(c)    the provisions of the Settlement Agreement;

(d)    The Northern Trust Company, Canada, the current trustee of the HWT (the "**Trustee**"), has an extremely limited mandate, pursuant to which virtually all decisions concerning the HWT are the Applicants' responsibility and the Trustee merely acts in accordance with instructions from the Applicants;

(e)    the Applicants' have no financial interest in the HWT corpus; and

(f)    the Monitor's role as an independent Court-appointed officer to balance the interests of the various parties, particularly in light of the uncertainties with respect to the interpretation of the Trust Agreement and the number of potential outcomes.

12.    Counsel has advised the Monitor that the Trust Agreement (defined below) does not

provide clear guidance on which individuals are entitled to participate in a distribution on

termination of the HWT and there are a number of interpretations and possible outcomes.

To assist this Honourable Court and the parties, counsel to the Monitor has prepared a

memorandum of law considering the potential interpretations of the Trust Agreement and

issues related thereto, a copy of which is attached as Appendix "B".

13.    The Monitor recommends the Proposed Allocation Methodology based on the advice of

counsel with respect to the interpretation of the Trust Agreement and, in the Monitor's

view, it represents a fair and reasonable balancing of various interests in a trust fund inadequate to fully meet all claims.  It is also a practical methodology which can be implemented without undue cost and delay.  Further, the Proposed Allocation Methodology is, in general, consistent with the way in which the HWT has been administered, in that, with the exception of the LTD Optional Life Benefit and the STBs, these benefits are not paid on a pay-as-you-go basis by Nortel and assets of the HWT are shown as reserved for payment of these benefits on the HWT financial statements.

14.    The Proposed Allocation Methodology is set out in paragraph 101 below.  In brief, it provides that those beneficiaries whose claims are in pay (that is, those with income claims presently being paid) and those whose claims are certain to be payable at some future date will share in the distribution.  Therefore, the following benefits would share *pro rata*: (a) LTD Income; (b) LTD Life; (c) LTD Optional Life Benefit; (d) SIBs and STBs in pay; and (e) Pensioner Life.

15.    The Proposed Allocation Methodology and subsequent distributions are based on the Mercer 2010 HWT Preliminary Valuation, a copy of which is attached as Appendix "C".  An illustrative example of the application of the Proposed Allocation Methodology to the participating benefits on an aggregate basis (not on an individual basis) is attached as Appendix D-1, Column 2.  Schedules providing illustrative examples under various allocation scenarios are attached as Appendix "D".

## III.    TERMS OF REFERENCE

16.    In preparing this Fifty-First Report, the Monitor has relied upon unaudited financial information, the Company's books and records, financial information prepared by the Company and discussions with Nortel management.  The Monitor has not audited,

- 6 -

reviewed or otherwise attempted to verify the accuracy or completeness of the information and, accordingly, expresses no opinion or other form of assurance on the information contained in this Fifty-First Report.

17.     Capitalized terms used herein (including in the preceding paragraphs) shall have the meanings given to them herein or in the Monitor's Thirty-Ninth Report dated February 18, 2010 (the "**Thirty-Ninth Report**"), which terms from the Thirty-Ninth Report are reproduced on Appendix "A" attached hereto for ease of reference.

18.     Unless otherwise stated, all monetary amounts contained herein are expressed in Canadian dollars.

## IV.     BACKGROUND

**Appointment of Representatives**

19.     As set out in detail in the Monitor's Thirty-Sixth Report dated February 8, 2010 and the Affidavit of Elena King sworn February 18, 2010, all but a very few individuals are represented in these proceedings by Court appointed representative counsel; namely, Former Employees' Representative Counsel, LTD Beneficiaries' Representative Counsel, Continuing Employees' Representative Counsel or CAW Counsel, and also Court appointed representatives; namely, the Former Employees' Representatives, the LTD Beneficiaries' Representative (collectively, the "**Employee Representatives**") or the Continuing Employees' Representatives.

20.     The only individuals (collectively referred to as the "**Individual Parties**") not represented by the above appointments are:

- 7 -

(a)    3 former employees and one working employee who opted out of such representation; and

(b)    any former chief executive officer or chairman of the board of directors, any non-employee member of the board of directors, or such former employees or officers that are subject to investigation and charges by the Ontario Securities Commission or the United States Securities and Exchange Commission.

21.    The Court Orders appointing the Employee Representatives expressly state that they may represent their constituents for the purpose of settling or compromising their claims in insolvency proceedings "or in any other proceeding which has been or may be brought before this Honourable Court".  The administration of the HWT, the benefits which it provides and its termination are all being overseen within the CCAA proceedings. Payments by Nortel of certain benefits funded through the HWT are included in the Applicants' cash flows approved in the CCAA proceedings.  Employee and pensioner benefit claims against the Applicants will be dealt with in a compensation claims process to be subsequently brought before this Court for approval.  These claims will be reduced by the amount of any distributions made to the claimant from the HWT.  Therefore, an allocation and distribution of the corpus of the HWT impacts on, and relates to, employee and pensioner claims against the Applicants in the CCAA proceedings.  As a result, the Court approved Settlement Agreement (discussed below) contemplated the involvement of the Employee Representatives in the allocation and distribution process for the HWT.

22.    The Employee Representatives engaged RSM Richter Inc. as their financial advisor and The Segal Company Ltd. ("**Segal**") as their actuarial advisor.

**The Settlement Agreement**

23.    Although Nortel is insolvent, it continued for more than a year to fund its pre-filing obligations for medical, dental and certain other benefits to its pensioners, their survivors

and disabled employees; however, it could not continue to do so indefinitely. In the absence of special arrangements, Nortel's benefits payments would have ceased on March 31, 2010. At the conclusion of the payment of benefits in accordance with the Settlement Agreement, these benefits will have been funded for two years.

24.     The Applicants, the Monitor, the Former Employee Representatives (on their own behalf and on behalf of the parties they represent), the LTD Employee Representative (on her own behalf and on behalf of the parties she represents), the Former Employees' Representative Counsel, the LTD Beneficiaries' Representative Counsel and the CAW (the "**Settlement Parties**") reached an agreement regarding certain issues related to, among other things, the Applicants' registered Pension Plans, certain employee benefits for, among others, Pensioners and LTD Beneficiaries and certain employment related issues. The agreement was amended and restated on March 30, 2010 (as amended and restated, the "**Settlement Agreement**") following issuance of this Honourable Court's reasons on March 26, 2010. Additional information on the Settlement Agreement and the process leading up to the Settlement Agreement can be found in the Thirty-Ninth Report, the supplements to the Thirty-Ninth Report and the Forty-Second Report of the Monitor dated March 30, 2010.

25.     The Settlement Agreement was approved by this Honourable Court by Order dated March 31, 2010 (the "**Settlement Approval Order**"). Leave to appeal the Settlement Approval Order was denied by Endorsement of the Ontario Court of Appeal dated June 3, 2010. Copies of the Settlement Approval Order (which attaches a copy of the Settlement Agreement) and of the Endorsement of the Court of Appeal are attached hereto as Appendices "E" and "F", respectively.

26.    In summary, the Settlement Agreement addresses the payment of benefits during 2010 to, among others, Pensioners and LTD Beneficiaries, confirms that claims in respect of benefits and relating to the HWT rank as ordinary unsecured claims on a *pari passu* basis with the claims of the ordinary unsecured creditors of the Applicants and releases directors, officers, the Trustee and others from all direct and indirect claims related to the HWT (other than against a director of Nortel for a matter referred to in subsection 5.1(2) of the CCAA or with respect to fraud.)

27.    The Settlement Agreement also provides:

> Resolution:  *The Parties will work towards a Court approved distribution of the Health and Welfare Trust ("**HWT**") corpus in 2010 to its beneficiaries entitled thereto and the resolution of any issues necessarily incident thereto.*  For greater certainty, nothing in this Settlement Agreement affects the determination on any basis whatsoever of the entitlement of any beneficiary to a distribution from the corpus of the HWT.  Any fees or expenses incurred in connection with any dispute or litigation among the beneficiaries of the HWT concerning entitlement (including without limitation all legal, actuarial and other fees and expenses of the trustee of the HWT and other service providers of the HWT) shall not be paid by Nortel, but shall be paid by the HWT corpus. For greater certainty, such fees or expenses shall not include those of the Monitor and incurred by Nortel in connection with any motion for termination of the HWT or for directions with respect to the HWT, which shall be paid by Nortel.  (Section C.1)  (Emphasis added.)

28.    This provision was in recognition of the importance and significance of achieving an allocation of the HWT corpus before the end of 2010 (when payment of benefits will cease) in order for distributions to be made to individuals based on such an allocation.

## V.    PROCESS LEADING TO THIS MOTION

29.    The Monitor has worked closely with the Applicants, the Trustee, Sun Life Assurance Company of Canada ("**Sun Life**") (party to an administrative services only arrangement with Nortel in respect of certain benefit plans and a provider of certain life insurance

- 10 -

policies) and Mercer (the Applicants' actuarial advisor) on all major aspects of the

Applicants' current employee and former employee benefit plans and has sought their

assistance in assembling facts and documents relevant to this motion.  Section VI below

summarizes the material facts relating to the HWT and refers to documents relevant to

the HWT that are attached as Appendices to this Fifty-First Report.

30.    In order to analyze the options available for distribution of the funds held in the HWT,

the Monitor and its advisors reviewed documentation relevant to the HWT that was

available.  Not all supporting records are available as the HWT was established 30 years

ago.   The Monitor also shared this information with Representative Counsel and

Independent Counsel (discussed in Section VIII below) so as to ensure that all

constituencies had the same available information.

31.    The information provided included:

(a)    the documents basic to the establishment of the HWT, being the Revenue
        Canada ruling and the trust documents;

(b)    benefits information, including policies with Sun Life and experience reports;
        and

(c)    financial reports and valuations.

## VI.    FACTS CONCERNING THE HWT

## Overview of the HWT

32.    Nortel established the HWT on January 1, 1980 as a tax-efficient vehicle through which

Nortel would continue to provide employee benefits by agreement between Northern

Telecom Limited (a predecessor company to NNL) and Montreal Trust Company (as

trustee), amended by agreements made as of September 24, 1984, June 1, 1994 and

- 11 -

December 1, 2005 and further amended by letter agreement dated December 1, 2005 (collectively, the "**Trust Agreement**").   The Trust Agreement (with an appendix respecting administrative services) is attached as Appendix "G".   Northern Telecom Canada, Limitée, Montreal Trust Company (a predecessor trustee) and Association D'Hospitalisation du Québec entered into an administrative services only agreement dated January 1, 1981 in respect of benefits provided under medical and dental plans, a copy of which agreement is attached as Appendix "H".

33.    As the successor to Northern Telecom Limited, Nortel is bound by the Trust Agreement pursuant to Article IX.

34.    Most of Nortel's non-pension employee benefits, including life insurance, long term disability, medical, dental and survivor income benefits, are funded by Nortel on a pay-as-you-go basis but as an administrative matter are paid using the HWT as a payment mechanism.   In respect of certain other benefit plans, the benefits have been funded (in part) by the HWT using trust assets (referred to as "**Reserved Plans**").   Assets were notionally allocated in the HWT financial statements with respect to the Reserved Plans; however, assets were not segregated in the HWT by benefit plan and no separate bank accounts were established.   As a result, all the HWT assets are commingled.

35.    Employees and former employees of Nortel were not informed of the existence of the HWT until at least 2007 nor were they promised that their benefits would be provided through a health and welfare trust. None of Nortel's collective bargaining agreements referenced the HWT or promised to provide benefits through a health and welfare trust.

**Revenue Canada Ruling**

36.    In 1979, prior to the establishment of the HWT, Nortel sought and obtained an advance

income tax ruling from Revenue Canada (as it then was) regarding the tax treatment of

the HWT.  Nortel's letter to Revenue Canada dated December 16, 1979 (the "**Ruling**

**Request Letter**"), attached as Appendix "I", and the ruling obtained on December 28,

1979 (the "**Ruling**"), attached as Appendix "J", described the facts relevant to the

proposed health and welfare trust and benefit plans, including how the trust was to be

operated.

37.    The Ruling Request Letter and the Ruling referred to:

(a)    the establishment of a single health and welfare trust fund by Nortel through
       which certain benefit plans would be provided;

(b)    the following benefit plans as comprising the plans within the HWT: health care
       (medical and dental); sickness and accident; long term disability; survivor
       income benefit and group life insurance;

(c)    the Trustee being responsible for receiving Nortel's contributions and employee
       contributions and arranging for payment of benefits to eligible employees and
       dependents and payment of premiums to the insurance company;

(d)    the transfer to the HWT of the Pensioners' Insurance Fund (in respect of the
       group life insurance plan – part I) of $11 million held by Mutual Life Assurance
       of Canada representing a surplus in a prior retirement life insurance arrangement;

(e)    employee contributions in respect of optional life insurance (group life insurance
       - part II), stating they would form part of the Trust Fund (as defined below) but
       be kept in a separate sub-account; and

(f)    the following proposed funding arrangements:

       (i)    Health Care Plan - Nortel to make contributions to the HWT to satisfy the
              claims liability and may fund expected future claims, as actuarially
              determined by the insurance carrier;

- 13 -

<table>
<tr><td>(ii)</td><td>Long Term Disability Plan - Nortel's contributions to be sufficient to satisfy all claims and may make additional/increased contributions based on an actuarial valuation or some other reasonable basis;</td></tr>
</table>

(ii)    Long Term Disability Plan - Nortel's contributions to be sufficient to satisfy all claims and may make additional/increased contributions based on an actuarial valuation or some other reasonable basis;

(iii)    Survivor Income Benefit Plan - funding to be identical to that of long term disability, but employees required to make contributions;

(iv)    Group Life Insurance Plan (Part I – Basic & Part II – Optional)

A.    Nortel to make contributions to the HWT sufficient to pay premiums. Contributions (both active employees' and Nortel's) not immediately applied against claims and expenses of the insurer to be deposited/transferred to a sub-account of the HWT called the 'Pensioners Insurance Fund'.[2]

B.    At the time of the Ruling, the Pensioners' Insurance Fund of approximately $11 million, with Mutual Life Assurance of Canada, to be transferred into the HWT.

C.    Group Life Insurance (Part II) to be paid totally by the employees, to form part of the Trust Fund but be kept in a separate account.

## The Trust Agreement

38.    In summary, the Trust Agreement provides that:

(a)    the Trust Fund is created for the purpose of providing the Health and Welfare Plan benefits for the benefit of the Applicants' active and retired employees;

(b)    Nortel may designate as the "Health and Welfare Plan" certain of the following health and welfare plans (and such other similar plan or plans as Nortel may from time to time place in effect): health care; management long term disability; union long term disability; a management survivor income benefit; management short term disability; and group life insurance;

(c)    all contributions (from both Nortel and employees) will be held in a single fund (the "**Trust Fund**"), including all profits, increments, and earnings thereon (Article I, Section 6);

---

[2] This funding arrangement is applicable to Part I – Basic life insurance.

- 14 -

(d)     with respect to record-keeping, the Trustee shall keep accurate and detailed accounts of all investments and transactions and separate records for each of the separate Plans (Article III, Section 2(p)); and

(e)     on termination of the HWT, the following shall apply:

Upon sixty (60) days prior written notice to the Trustee, the Corporation may terminate its obligation to make Employer's contributions in respect of benefits after the date of written notice to the Trustee (hereinafter called the "Notice of Termination"). Upon receipt of the Notice of Termination the Trustee shall within one hundred twenty (120) days determine and satisfy all expenses, claims and obligations arising under the terms of the Trust Agreement and Health and Welfare Plan up to the date of the Notice of Termination. The Trustee shall also determine upon a sound actuarial basis, the amount of money necessary to pay and satisfy all future benefits and claims to be made under the Plan up to the date of the Notice of Termination. The Corporation and the designated affiliated or subsidiary corporations shall be responsible to pay to the Trustee sufficient funds to satisfy all such expenses, claims and obligations, and such future benefits and claims. The final accounts of the Trustee shall be examined and the correctness thereof ascertained and certified by the auditors appointed by the Trustee. Any funds remaining in the Trust Fund after the satisfaction of all expenses, claims and obligations and future benefits and claims, arising under the terms of the Trust Agreement and the Health and Welfare Plan shall revert to the Corporation. (Article VI, section 2.)

**Current Plans**

39.     According to the 2005 Valuation (as defined below) (the most recent actuarial valuation of the obligations of the HWT located by the Monitor), the following plans (collectively, the "**Plans**") formed the Health and Welfare Plan as at that date:

• medical, dental and life insurance benefits provided to pensioners,

• income payments to disabled employees (long term disability and short term disability),

• medical, dental and life insurance benefits provided to disabled employees,

- income benefits for beneficiaries of deceased employees (survivor income benefit and survivor transition benefit[3]),

- medical and dental benefits provided to active employees,

- employer-paid basic life insurance provided to active employees, and

- employee-paid optional life insurance provided to active employees.

Handbooks concerning certain of Nortel's benefit plans are attached as Appendix "K". We will discuss each of the pensioner benefits, LTD benefits, survivor income benefits, survivor transition benefits and optional life in turn.

**Sun Life**

40.    Nortel has an administrative services only arrangement with Sun Life in respect of benefits provided under health, dental, survivor transition, survivor income and long-term disability plans, all of which are self-insured by Nortel.  Sun Life insures pensioner life and active employee life benefits (Life Part I – Basic and Part II – Optional).  Copies of certain Sun Life policies and history summaries and amendments with respect thereto are attached as Appendix "L".

**Pensioner Benefits**

41.    The Pensioner benefits are paid to pensioners of Nortel or eligible dependents. Approximately 11,000 pensioners are entitled to pensioner benefits, comprised of (a) pensioner life (10,461 pensioners), and (b) medical and dental benefits (11,180 pensioners and 6,251 spouses).

---

[3]    STBs are listed in the 2005 Valuation.  However, as set out below, since closure of the STB plan in 2003, the STB plan has not been referenced in the HWT financial statements since the 2004 HWT financial statement.

*(a)*    *Pensioner Life*

42.    Pensioners are entitled to a group life insurance benefit ("**Pensioner Life**").  The benefit amount varies and generally decreases with age but it is permanent and not term insurance.  Pensioner Life premiums were historically paid from HWT assets and this has continued throughout the CCAA proceedings.

43.    Sun Life insures Pensioner Life by a policy issued to Nortel, as policyholder.  The policy is experience rated.  Each year, the accounts between Nortel and Sun Life are adjusted based on claims experience.  Essentially, if the claims experience in a year was less than the premiums paid, Sun Life paid a refund to Nortel and, if the claims experience was more than the premiums paid, the deficiency was paid to Sun Life from the HWT, subject to the cross-experience rating described in paragraph 74.

44.    The basic life insurance policy and the optional life insurance policy (discussed below) contain conversion privileges entitling a participant, without evidence of insurability, to convert to an individual life policy with Sun Life, to a maximum of $200,000 for basic and optional life insurance combined.

45.    The Settlement Agreement does not require Nortel to pay the premiums in respect of Pensioner Life for 2010.  These premiums continue to be paid from the corpus of the HWT.

46.    The HWT financial statements indicate reserve assets in respect of Pensioner Life of $30.7 as at December 31, 2009[4] and $49.6 million as at December 31, 2008.

---

[4] The reserved asset amounts as at December 31, 2009 are lower than the comparable December 31, 2008 amounts primarily due to the payment of benefits during 2009 and a reduction in the net assets reflected in the 2009

Accordingly, this is a Reserved Plan.

47.    Pensioner Life premiums for 2009 were approximately $5.7 million.  The estimated cost of Pensioner Life premiums for 2010 is approximately $7.8 million.  For the period January 1 to June 30, 2010, Pensioner Life premiums amount to approximately $3.9 million, including taxes and administrative costs relating thereto.

48.    In addition, there are 77 Pensioners (most of whom retired prior to 1983) entitled to receive an additional death benefit of 1 x preretirement earnings, with no reductions ("**ADB**").  From January 1, 2010 to June 30, 2010, Nortel has paid approximately $0.2 million in ADB.  For the purposes of the Proposed Allocation Methodology and the illustrative scenarios, ADB forms part of Pensioner Life.

### (b)    *Medical and Dental Benefits*

49.    Medical and dental benefits for Pensioners ("**Pensioner M&D**") were historically funded by Nortel on a pay-as-you-go basis but, as an administrative matter, were paid using the HWT as a payment mechanism.  This has continued throughout the CCAA proceedings.  Under the Settlement Agreement, the cost of Pensioner M&D will continue to be paid by Nortel on a pay-as-you-go basis until December 31, 2010.

50.    Pensioner M&D costs for 2009 were approximately $16.7 million.  The estimated cost of the Pensioner M&D for 2010 is between $17.1 million and $20.9 million.  For the period January 1 to June 30, 2010, Pensioner M&D costs amount to approximately $7.4 million, including taxes and administrative costs relating thereto.

---

HWT financial statements as a result of a reserve established on the amount Due from Sponsoring Company. This reserve has been allocated to the reserved assets *pro rata* based on their asset balances.

**LTD Benefits**

51.     Long-term disability ("**LTD**") benefits are provided when short-term disability benefits end and continue for the duration of the employee's disability or until age 65 when the employee qualifies for pensioner benefits.   Approximately 360 people are entitled to receive LTD benefits, comprised of: (a) LTD life (358 individuals); (b) medical and dental benefits (360 individuals and 318 dependents); and (c) income benefits (351 individuals).

52.     LTD Beneficiaries are active employees.  Under the Settlement Agreement, LTD benefits are to be paid by Nortel on a pay-as-you-go basis until December 31, 2010.   The Settlement Agreement further provides that the employment of LTD beneficiaries terminates as of December 31, 2010 and that such termination does not affect in any manner their rights against Nortel arising out of their employment.

*(a)     LTD Life Insurance Benefits*

53.     Life insurance benefits for LTD employees ("**LTD Life**") end when a disabled employee attains age 65.  At that time, the disabled employee is eligible for Pensioner Life.

54.     LTD Life premiums were historically paid on a pay-as-you-go basis by Nortel through the HWT.  This has continued throughout the CCAA proceedings.   However, the premium for Optional Life (defined below) is waived while an individual is on LTD benefits (the "**LTD Optional Life .**").  These premiums were generally treated as part of the experience under the Optional Life policy, which was then cross-rated with the basic life policy as described in paragraph 74.

**(b)**    *Medical and Dental Benefits*

55.    Medical and dental benefits for LTD employees ("**LTD M&D**") were funded by Nortel on a pay-as-you-go basis, but as an administrative matter, were paid using the HWT as a payment mechanism.  This has continued throughout the CCAA proceedings.

56.    LTD M&D and LTD Life costs for 2009 were approximately $2.5 million.    The estimated cost of LTD M&D and LTD Life for 2010 is between $2.1 million and $2.6 million.    The LTD M&D costs and life insurance premiums are included with the payment of medical, dental and life benefits for all active employees.

**(c)**    *Income Benefits*

57.    Income replacement benefits ("**LTD Income**") for Nortel employees on long-term disability were historically paid from HWT assets.  This has continued throughout the CCAA proceedings.

58.    The HWT financial statements indicate reserve amounts in respect of LTD Income of $15.7 million as at December 31, 2009 and $30.7 million as at December 31, 2008. Accordingly, this is a Reserved Plan.

59.    LTD Income costs for 2009 were approximately $12.0 million.  The estimated cost of LTD Income for 2010 is between $12.0 million and $12.2 million.  For the period January 1 to June 30, 2010, LTD Income costs amount to approximately $5.3 million, including taxes and administrative costs relating thereto.

**Survivor Income Benefits**

60.    Survivor income benefits ("**SIBs**") are life-time income benefits for survivors of certain non-unionized Nortel employees.  SIBs are no longer offered and have not been since

before the commencement of the CCAA proceedings but continue to be paid to a group of surviving spouses. SIBs were historically paid by the HWT from HWT assets. This has continued throughout the CCAA proceedings.

61.    Approximately 80 survivors of former employees of Nortel are currently in receipt of SIB ("**SIB Beneficiaries**").

62.    The HWT financial statements indicate reserve amounts in respect of SIBs of $12.1 million as at December 31, 2009 and $17.1 million as at December 31, 2008. Accordingly, this is a Reserved Plan.

63.    The cost of the SIBs for 2009 was approximately $1.4 million. The estimated cost of the SIBs for 2010 is approximately $1.4 million. For the period January 1 to June 30, 2010, the cost of SIBs amounts to approximately $0.7 million, including taxes and administrative costs relating thereto.

**Survivor Transition Benefits**

64.    Survivor transition benefits ("**STBs**") are income benefits for survivors of certain unionized former Nortel employees, payable for a five year period. STBs are paid on a pay-as-you-go basis by Nortel but, as an administrative matter, were paid using the HWT as a payment mechanism. This has continued throughout the CCAA proceedings.

65.    STBs were closed during 2003. Those people who were entitled to STBs at that time (namely, survivors then in pay, survivors of individuals that retired prior to April 1, 2003 and who remained LTD Beneficiaries with no interruptions of more than 60 days) were grandfathered. As of 2005, certain disabled employees continued to have STB coverage (the "**STB Beneficiaries**").

66.    It does not appear that there have been any reserve amounts in respect of STBs.  The 2004 HWT financial statements were the last to show the present value of future payments related to STBs.

67.    The actuarial liabilities associated with the STBs consist of three components: (i) liability for approximately 305 survivors currently receiving STBs (approximately $4.1 million as at December 31, 2010); (ii) an accrual for the approximately 2,900 pensioners on whose death their survivors would be eligible for STBs (approximately $30 million as at December 31, 2010); and (iii) an accrual for the approximately 101 LTD Beneficiaries on whose death their survivors would be eligible for STBs (approximately $0.3 million as at December 31, 2010).

68.    The cost of the STBs for 2009 was approximately $2.8 million.  The estimated cost of the STBs for 2010 is approximately $2.8 million.  For the period January 1 to June 30, 2010, the cost of STBs amounts to approximately $1.2 million, including taxes and administrative costs relating thereto.

**Optional Life Benefit**

69.    Nortel provides basic, core group life insurance (group life – part I), for all active employees.  In addition, there is an optional life insurance program (also known as group life – part II) ("**Optional Life**"), available to active employees at their own cost. Participants in the Optional Life program ("**Optional Life Participants**") may change from year to year as they decide to opt in or out or their employment is terminated.

70.    As set out above, the basic life and Optional Life insurance policies contain conversion privileges.

71.     In summary, under Optional Life coverage:

    (a)    Benefits are insured by Sun Life in a policy naming Nortel as the policyholder. Premiums are paid entirely by Optional Life Participants (other than those on long term disability, whose premiums are waived by Nortel).

    (b)    The insurance is term life, with benefits terminating no later than January 1st following an Optional Life Participant's 65th birthday.  Each Optional Life Participant chooses the amount of benefit by applying the benefit formula. When an Optional Life Participant dies, Sun Life pays the beneficiary the benefit in effect on the date of death.

    (c)    The policy is experience-rated.  Each year, the accounts between Nortel and Sun Life are adjusted, depending on the claims experience.  Essentially, if the claims experience in a year was less than premiums paid, Sun Life paid a refund to Nortel and if the claims experience was more than the premiums paid, the deficiency was paid to Sun Life from the HWT, subject to the cross-experience rating described in paragraph 74.  Premiums for Optional Life were reduced for the Optional Life Participants from about 2007 to reflect favourable experience.

    (d)    Within 30 days of leaving Nortel, an Optional Life Participant is entitled, without evidence of insurability, to convert to an individual life policy with Sun Life, to a maximum of $200,000 for basic and Optional Life insurance coverage combined.

    (e)    Neither the policies nor employee communications provided to the Monitor indicate any employee entitlement to a refund of premium.

72.     The HWT financial statements indicate reserve amounts in respect of Optional Life of $17.9 million as at December 31, 2009 and $26.0 million as at December 31, 2008   . Accordingly, Optional Life is a Reserved Plan.

73.     The number of working employees and LTD Beneficiaries that elected Optional Life coverage is being determined.

**Basic and Optional Life Cross-Experience Rating**

74.     Typically, each year Sun Life and Nortel agreed to cross-rate Optional Life (group life - part II) with basic life insurance (group life - part I).  Accordingly, at the end of each year, any surplus or deficit under the two group policies was netted together.  Sun Life

returned any net surplus to Nortel and Nortel deposited it in the HWT.  If there was a net deficit, this was paid as a lump sum to Sun Life from the HWT or carried over to the next year to be included in the next year's claims experience.  Generally, the surplus or deficit was allocated to the reserve accounts for Optional Life or Pensioner Life, depending on their respective experience.  Copies of Sun Life letters available in respect of the Sun Life policies for 2004, 2005, 2008, 2009 and 2010 and Sun Life financial reports available in respect of the Sun Life policies for 2005 to 2009 are attached as Appendix "M".  Certain portions of these documents are redacted for privacy purposes.

## Financial Reports on the HWT

### (a)    Tax Returns

75.    For taxation purposes, the HWT files only one return in respect of the HWT.  Attached as Appendix "N" are the HWT tax returns for the years 2005 to 2010.

### (b)    HWT Financial Statements

76.    Nortel has prepared financial statements in respect of the HWT, certain of which were audited, since 1982.  The financial statements for 1982 through 2009 are attached as Appendices "O" to "PP".

77.    To assist in a review of the financial statements:

(a)    A summary including certain notes that have evolved over the years from the years in which the notes first appeared is attached as Appendix "QQ"; and

(b)    A chart summarizing amounts from the financial statements called accounts receivable or "due from sponsoring corporations or company" is attached as Appendix "RR".  As indicated therein, almost from the inception of the HWT, there have been amounts receivable from the sponsoring companies.  As set out in the Thirty-Ninth Report, the Monitor has been advised by the Applicants that these amounts are primarily related to benefit payments made to beneficiaries of

- 24 -

the HWT prior to the filing date.  The Monitor has found nothing to indicate that these amounts represent anything other than accumulated contributions owing.

78.    The 2009 financial statements disclose cash on hand and investments of $80.0 million, net assets available for payment of benefits of $76.4 million, total claims paid and accrued of $23.9 million, employer contributions of $0.1 million and employee contributions of $1.6 million.   For purposes of the 2009 financial statements, certain amounts are included in cash and investments that were excluded from the $78.0 million reported in the Thirty-Ninth Report.   These amounts predominately related to stale-dated cheques.


**HWT Valuations**

79.    Various valuations were performed in respect of the HWT from time to time.   The Monitor has located:

    (a)    analyses of the funding status of the Pensioners' Insurance Fund in the years 1993, 1998 and 2002 (the "**PIF Valuations**");

    (b)    certain valuations of post-employment benefit liabilities for accounting purposes in the years 2003, 2004, 2006, 2007, 2008 and 2009 (the "**Accounting Valuations**"), the purpose of which valuations is to determine the unfunded liability related to post-employment benefits;

    (c)    certain reports on non-pension post-retirement benefit net periodic benefit cost and disclosure for accounting purposes in the years 2005, 2006, 2007, 2008 and 2009 (the "**Accounting Cost Reports**"), which provide information related to the Applicants' non-pension post-retirement benefit plans intended for use in accounting for the costs of the plans and preparing financial statements;

    (d)    a valuation of liabilities for the year 2005 (the "**2005 Valuation**"), which sets out the actuarial present value of the obligations of the HWT as at September 30, 2005 and the assumptions and data used therein; and

    (e)    Mercer letters dated January 15, 2008 and April 30, 2008 (the "**Mercer Letters**"), which provide an estimate of the fiscal 2008 incremental expense for post-employment benefits, intended for use in the 2008 interim financial reporting, and the results of Mercer's analysis and calculations to determine the

estimated historical adjustments to certain post-retirement benefit expenses for certain years, respectively.

The PIF Valuations, Accounting Valuations, Accounting Cost Reports, 2005 Valuation and Mercer Letters are attached as Appendices "SS" to "III".

80.    To assist in a review of the above valuations, a summary including certain notes to the valuations is attached as Appendix "JJJ".

**Funding and Administration**

81.    Nortel's general funding practices are described in the HWT financial statements and the 2005 Mercer Valuation.  Though certain benefit plans were funded on a pay-as-you-go-basis, an exception to this funding practise occurred from May 2005 until April 2006 when Nortel was contemplating the termination of the HWT.  The pay-as-you-go amounts were paid from the HWT and no corresponding contributions were made by Nortel.  Once Nortel decided to keep the HWT in place, it made catch up payments through extra contributions in subsequent years in the amount of one month each year.

82.    The Monitor also located a policy manual in respect of the HWT, which appears to be the first policy manual.  A copy of this manual is attached as "KKK".  The funding policy in respect of the HWT is set out at page 32 of this manual; however, Nortel's funding policies changed over time.  The Company has advised the Monitor there is not a current policy manual.

83.    In general:

(a)    contributions to the HWT (including employee contributions in respect of Optional Life) have been made to the Trustee and the Trustee has held all contributions in a single fund, as required by Article I, section 6 of the Trust Agreement;

- 26 -

(b)    the Trustee has made payments out of the HWT upon receipt of directions from Nortel in accordance with Article II, section 3 of the Trust Agreement;

(c)    there was only one trust account established for the HWT; and

(d)    one investment account and one bank account in respect of the HWT have been maintained with all contributions to the HWT co-mingled in such accounts.

## Available Cash

84.    The cash and investments of the HWT were reported to be approximately $80.0 million as at December 31, 2009 in the 2009 HWT financial statements.  At that time, the majority of investments held by the HWT were of a long term nature, which potentially subjected their value at any point to significant volatility.

85.    As a result of this volatility and in anticipation of the distribution of the corpus of the HWT, Nortel determined a more appropriate asset mix would include holding of investments with a shorter average duration.  Accordingly, during May 2010 Nortel directed the disposal of the long term bonds and their replacement with a portfolio of short term interest-bearing government issued instruments.

86.    The value of investments held at June 30, 2010 is approximately $77.2 million, comprised of $4.1 million of cash and $73.2 million of short term investments.

87.    According to Nortel's financial statements for the quarter ended June 30, 2010, Nortel's restricted cash includes, in part, US$72.0 million as of June 30, 2010 related to assets held in the HWT and restricted as to their use in operations by Nortel.  The difference between the value of cash and investments as at June 30, 2010 reported in paragraph 86 and the amount disclosed in the Nortel June 30, 2010 financial statements primarily relates to foreign exchange.

88.    For purposes of the illustrative scenarios discussed in Section VIII below, the cash balance available for distribution at December 31, 2010 is $80 million, including Pensioner Life premiums for 2010 of $7.8 million, which will be treated as a charge against any distribution in respect of Pensioner Life.  The actual amount of cash available as at the date of termination of the HWT is subject to adjustment for factors which include:

    (a)    investment returns;

    (b)    treatment of stale-dated cheques;

    (c)    the actual amount of Pensioner Life premiums paid during 2010;

    (d)    the treatment of costs related to expenses incurred prior to the termination of the HWT but not submitted by February 28, 2010 and therefore not paid by Nortel pursuant to the Settlement Agreement;

    (e)    taxes and administrative costs; and

    (f)    any fees paid from HWT assets pursuant to the Settlement Agreement with respect to any dispute or litigation regarding the HWT.

## VII.    MERCER 2010 PRELIMINARY HWT VALUATION

89.    Attached as Appendix "C" is a report of Mercer dated August 27, 2010 (the "**Mercer 2010 HWT Preliminary Valuation**"), providing a preliminary valuation of certain non-pension post retirement benefit plans and post employment benefit plans, estimated as at December 31, 2010, when it is expected that the HWT will be terminated and such plans will be discontinued.

90.    The Mercer 2010 HWT Preliminary Valuation was prepared solely for the purpose of providing a preliminary valuation of the non-pension post retirement benefit plans and post employment benefit plans to assist with the analysis of the Proposed Allocation

- 28 -

Methodology and is the basis for distribution of the HWT corpus.   As mentioned previously, the Applicants have not yet initiated a compensation claims process relating to, among other things, employee benefit claims.   The Monitor anticipates that Mercer will prepare a separate valuation report for the purposes of the compensation claims process.   The Mercer 2010 HWT Preliminary Valuation has not been prepared for and is not to be used for the purpose of determining the value, if any, of non-pension post retirement and post employment benefits for submission in a compensation claims process.   Accordingly the assumptions used, the valuation date, the beneficiary data and the resulting values in the Mercer 2010 HWT Preliminary Valuation may differ materially from those relevant to a compensation claims process.

91.     In addition, the Mercer 2010 HWT Preliminary Valuation does not address those beneficiaries that have a right to the HWT corpus but only the valuation associated with each benefit.

92.     No amount has been included in the valuation for individuals who were employees of Nortel prior to being transferred as part of a pre-filing divestiture transaction.   It has not been determined at this time whether these individuals have a claim against Nortel or the HWT in respect of certain benefits.   If they have a claim against the HWT, under the Proposed Allocation Methodology this would result in an aggregate distribution from the HWT of approximately $2.0 million to these individuals.

93.     In addition, no amount has been included in the valuation for LTD Optional Life Benefit as there is insufficient data at this time to determine the present value of this benefit to LTD Beneficiaries participating under Optional Life.   In the 2005 Valuation, Mercer estimated that the present value of the LTD Optional Life as at September 30, 2005 was

$3.0 million relative to a present value of LTD Life and LTD M&D of approximately $28.8 million in the aggregate.   As set out in the Mercer 2010 HWT Preliminary Valuation, the present value of LTD Life and LTD M&D as at December 31, 2010 aggregates approximately $27.0 million.   For reference purposes, if the present value of the LTD Optional Life Benefit as at December 31, 2010 were $3.0 million, under the Proposed Allocation Methodology this would result in an aggregate distribution from the HWT of approximately $1.0 million to individuals participating in the LTD Optional Life Benefit.   The Applicants and the Monitor will continue to work with Mercer to provide sufficient data to determine the present value of the LTD Optional Life Benefit as at December 31, 2010.

94.     Mercer has used the most recent data available.   The actuarial assumptions do not attempt to reflect individuals' specific historical health experience or current health circumstances, as that may not be predictive of their future health experience.   Faced with the uncertainty of future events and the conflict inherent in each beneficiary seeking to maximize his or her recovery by obtaining the highest possible valuation, the Monitor believes the use of actuarial assumptions is a reasonable and equitable approach to the required valuation.

95.     The data and assumptions on which the Mercer 2010 HWT Preliminary Valuation is based are set out in Sections 3 and 4 of the Valuation.

## VIII.   PROPOSED ALLOCATION METHODOLOGY

### Illustrative Scenarios

96.     It was apparent that a number of outcomes relating to an allocation of the HWT corpus is possible given, among other things: (a) ambiguities within the Trust Agreement; and (b)

the evolution of Nortel's practices, business, benefits and record keeping over the 30 years of the HWT's existence.  In working with counsel, the Monitor has considered a number of potential interpretations of the Trust Agreement, and specifically the provisions dealing with the termination of the HWT, and has also taken into account other relevant documents and the manner in which the HWT was historically administered.  The interpretations and issues related thereto included the following:

(a)    whether the HWT constitutes one trust or several trusts;

(b)    who is entitled to the assets in the reserve account on the HWT financial statements referred to as Group Life – Part II (optional life insurance);

(c)    which benefits should participate on a termination of the HWT; and

(d)    how the corpus of the HWT should be shared among participating beneficiaries.

97.    As mentioned above, to assist this Honourable Court and the parties, counsel to the Monitor has prepared a memorandum of law considering the potential interpretations of the Trust Agreement and issues related thereto, a draft of which was provided to Representative Counsel and Independent Counsel.  A copy of the memorandum of law is attached as Appendix "B".

98.    The Monitor has prepared charts indicating the financial results of various allocation scenarios resulting from interpretations counsel has identified.  In order to provide a basis for comparison, the resulting allocations are described using both a distribution percentage, where applicable (namely, the percentage of the present value of a particular benefit that is represented by the aggregate distribution amount for that benefit), and the aggregate distribution amount in dollars.  The resulting allocations are expressed as an aggregate amount for each benefit type under the HWT and therefore relate to an

- 31 -

aggregate group of individuals participating in those benefits, not to individual beneficiaries. The illustrative scenarios use the following categories of benefits in accordance with the Mercer 2010 HWT Preliminary Valuation, except that they include an Optional Life category and an LTD Optional Life Benefit category and subdivide STBs into those in pay and those accrued but not in pay:

(a)     Pensioner Life (including ADB);

(b)     Pensioner M&D;

(c)     LTD Income (including IBNR[5]);

(d)     LTD M&D;

(e)     LTD – STB accrued;

(f)     LTD Life;

(g)     LTD Optional Life Benefit;

(h)     SIB;

(i)     STB – in pay;

(j)     STB – accrued; and

(k)     Optional Life,

(collectively, the "**Potential Participating Benefits**").

---

[5] "Incurred but not reported". As set out in the Mercer 2010 HWT Preliminary Valuation, there are 6 individuals whose status as LTD Beneficiaries as at December 31, 2010 cannot be known for certain at this time.

- 32 -

99.     Schedules prepared under the various scenarios are attached as Appendix "D" and

described in more detail below[6]:

    (a)    **Appendix D-1** – Optional Life is not a participating benefit, the surplus associated with Optional Life forms part of the assets available for allocation to other assets and:

        (i)    **Column 1** – The HWT is to be treated as one trust.  On termination, all Potential Participating Benefits except Optional Life share *pro rata* in the HWT corpus (based on each such Potential Participating Benefit's respective share of the present value of all such Potential Participating Benefits).

        (ii)    **Column 2** – This scenario reflects the Proposed Allocation Methodology. The HWT is to be treated as one trust.  On termination, certain of the Potential Participating Benefits share *pro rata* in the HWT corpus (based on each such Potential Participating Benefit's respective share of the present value of all such Potential Participating Benefits.  A determination of which Potential Participating Benefits share *pro rata* in this scenario was based on an analysis of the beneficiaries with claims that have been or would certainly be made with no contingency except timing.

        Claims that have been or would certainly be made are claims of:

            A.    Pensioners (including those active employees who will vest by the valuation date and LTD Beneficiaries) for Pensioner Life;

---

[6] Under all applicable scenarios, it is assumed the Pensioner Life premiums paid from the HWT during 2010 are to be treated as a reduction only to the allocation otherwise made to Pensioner Life.  The reason for this treatment is that the only beneficiaries of this allocation are those with a claim for Pensioner Life.  In the scenarios set out in Columns 3, 7, 11 and 14, there is no allocation to Pensioner Life and, accordingly, the participating benefits in these scenarios bear the approximately $7.8 million in Pensioner Life premiums *pro rata*.  The estimated assets upon which the allocation under all scenarios is based are the cash and investments set out in the HWT financial statements as at December 31, 2009 since, except for the reduction in assets due to the payment of Pensioner Life premiums from the HWT, the December 31, 2009 cash and investments will be similar to the December 31, 2010 cash and investments.  To the extent the actual December 31, 2010 asset base differs from the December 31, 2009 asset base (other than for Pensioner Life premiums paid in 2010), that difference would apply equally to each benefit.

In addition, these illustrative scenarios include a line item for LTD Optional Life Benefit; however, amounts are not inserted as insufficient data is available at this time.  As set out in paragraph 93 above, for reference purposes, if the present value of the LTD Optional Life Benefit as at December 31, 2010 were $3 million (as estimated in the 2005 Valuation as at September 30, 2005), it would result in an aggregate distribution from the HWT of approximately $1.0 million to the participants in the LTD Optional Life Benefit.  Further, these illustrative scenarios do not include an amount relating to individuals who were employees of Nortel prior to being transferred as part of a pre-filing divestiture transaction.  As set out in paragraph 92, if these individuals are determined to have a claim against the HWT, under the Proposed Allocation Methodology, this would result in an aggregate distribution from the HWT of approximately $2.0 million to these individuals.

        B.      LTD Beneficiaries for LTD Income and LTD Life;

        C.      LTD Beneficiaries participating under Optional Life for LTD Optional Life Benefit;

        D.      STB Beneficiaries currently in pay for STBs; and

        E.      SIB Beneficiaries currently in pay for SIBs.

(iii)    **Column 3** – The HWT is to be treated as one trust.  On termination, certain of the Potential Participating Benefits share *pro rata* in the HWT corpus (based on each such Potential Participating Benefit's respective share of the present value of all such Potential Participating Benefits).  A determination of which Potential Participating Benefits share *pro rata* in this scenario was based on an analysis of the beneficiaries currently in pay who have claims for benefits in pay.

Claims for benefits in pay are claims of:

        A.      LTD Beneficiaries for LTD Income;

        B.      STB Beneficiaries currently in pay for STBs; and

        C.      SIB Beneficiaries currently in pay for SIBs;

(iv)    **Column 4** – The HWT is to be treated as separate trusts.  Plans with reserved assets (the "**Reserved Asset Plans**") are each treated as a separate trust.  On termination, the beneficiaries of each Reserved Asset Plan share pro rata in the assets reserved in respect of that plan.  The estimated assets available at December 31, 2010 are allocated to the reserves proportionate to the values included in the HWT financial statements as at December 31, 2009.

(b)    **Appendix D-2** – Optional Life is a participating benefit with resulting allocations shown in Columns 5 to 8 on the same basis as indicated with respect to Columns 1 to 4 (except that a claim for Optional Life is included as a claim that has been or would certainly be made or a claim for benefits in pay).

(c)    **Appendix D-3** – STB is not a participating benefit and Optional Life is a participating benefit, with allocations shown in Columns 9 to 11 on the same basis as indicated with respect to Columns 1 to 3 (except that a claim for STBs is not included as a claim that has been or would certainly be made or a claim for benefits in pay and a claim for Optional Life is included as a claim that has been or would certainly be made or a claim for benefits in pay); however, as there are

no reserved assets for STBs, the allocation using the reserved asset method set out in Appendix D-1 is applicable and is not reproduced in Appendix D-3.

(d)    **Appendix D-4** – STB is a participating benefit and Optional Life is not a participating benefit, with allocations shown in Columns 12 to 14 on the same basis as indicated with respect to Columns 1 to 3; however, as there are no reserved assets for STBs, the allocation using the reserved asset method set out in Appendix D-2 is applicable and is not reproduced in Appendix D-4.

100.    The scenarios are illustrative examples only to assist this Honourable Court and the interested parties in considering the Proposed Allocation Methodology.  The actual dollar amount available may differ from the illustrative scenarios.  There is also the potential for an adjustment to an allocation relating only to a particular benefit, thereby reducing the *pro rata* share relating to that particular benefit, for example, were this Honourable Court to award costs against a distribution otherwise available for a particular benefit.

**Proposed Allocation Methodology**

101.    The Proposed Allocation Methodology (illustrated in Appendix D-1, Column 2) is as follows:

(a)    the HWT is to be treated as one trust;

(b)    on termination, the following Potential Participating Benefits share *pro rata* in the HWT corpus (based on each such Potential Participating Benefit's respective share of the present value of all such Potential Participating Benefits):

(i)    Pensioner Life;

(ii)    LTD Income;

(iii)    LTD Life;

(iv)    LTD Optional Life Benefit;

(v)    STBs – in pay; and

    (vi)    SIBs – in pay;

    (collectively, the "**Proposed Participating Benefits**");

(c)    the following beneficiaries will receive distributions from the Proposed Participating Benefits' *pro rata* share of the HWT corpus:

    (i)    Pensioners (including those active employees who will vest by the valuation date and LTD Beneficiaries) for Pensioner Life;

    (ii)    LTD Beneficiaries for LTD Income and LTD Life;

    (iii)    LTD Beneficiaries participating under Optional Life for LTD Optional Life Benefit;

    (iv)    STB Beneficiaries currently in pay for STBs; and

    (v)    SIB Beneficiaries currently in pay for SIBs;

    (collectively, the "**Proposed Participating Beneficiaries**");

(d)    the amount of the distribution to each Proposed Participating Beneficiary from the Proposed Participating Benefits' *pro rata* share of the HWT corpus will be calculated pursuant to the assumptions in the Mercer 2010 HWT Preliminary Valuation, with data as of December 31, 2010, and the Pensioner Life premiums paid from the HWT during 2010 will be treated as a reduction only to the allocation otherwise made to Pensioner Life;

(e)    the present value of the Proposed Participating Benefits will be calculated pursuant to the assumptions in the Mercer 2010 HWT Preliminary Valuation, with data as of December 31, 2010; and

(f)    there will be no payment from the HWT on account of any conversion privilege, if any, relating to the Pensioner Life or Optional Life that is exercised by any holder of such right.

102.    The Monitor recognizes the hardship felt by the beneficiaries of the HWT as a result of Nortel's insolvency and the deficit in the HWT. The Monitor believes the Proposed Allocation Methodology reasonably and equitably addresses this hardship as far as available funds of the HWT allow and in the most economical and practical manner available, by balancing the interests of the beneficiaries of the HWT in the circumstances,

and, as discussed with counsel, is consistent with the most reasonable interpretation of the Trust Agreement.

## **Independent Legal Counsel**

103.   Analysis of the HWT reveals there could be a multitude of potential differing interests among the beneficiaries.  Each individual seeks to maximize his/her recovery from the HWT assets.  Since the assets are insufficient to pay all claims, each has an interest in minimizing the claims of others.  Through their Court-appointed representative counsel, Employee Representatives informed the Monitor that, as a result of the potential for conflicts arising from the different interpretations of the Trust Agreement, they would retain independent counsel to provide advice concerning the HWT and sought funding from the Applicants for this purpose.  The Applicants and the Monitor agreed to: (a) the retention of independent legal counsel to consider the Proposed Allocation Methodology and provide the Employee Representatives with legal advice thereon; and (b) the Applicants providing funding for the retention of independent legal advice, subject to a fee cap.

104.   In June 2010, the LTD Beneficiaries' Representative retained Sack Goldblatt Mitchell LLP ("**Sack**") to represent the interests of her constituents in the HWT.  In July 2010, the Former Employees' Representatives retained Lerners LLP ("**Lerners**") to represent the interests of their constituents in the HWT (Lerners and Sack together are referred to as "**Independent Counsel**").  CAW Counsel also ensured that the Pensioners and STB Beneficiaries they represent were advised by the same independent counsel as the Former Employees' Representatives.  As it became evident that Independent Counsel would be required to attend this motion, the Applicants and Monitor agreed to increase the fee cap

to $85,000 for each firm, with an additional $7,500 available for Sack to retain an actuarial advisor.  As part of the relief requested on the within motion, the Monitor is seeking that, for certainty, this Honourable Court approve the retention of Independent Counsel.

105.    Independent Counsel signed confidentiality agreements in June 2010 and were then provided with access to documents, financial and actuarial information and other analysis related to the HWT.  Attached hereto as Appendix "LLL" is a list of the documents provided to each Independent Counsel.  The Monitor has confirmed that the same information has been provided to each Independent Counsel.  The Monitor provided Continuing Employees' Representative Counsel with the same information and engaged in discussions with such counsel.  All of the documents provided to Independent Counsel are attached as Appendices to this Fifty-First Report except for certain documents subject to confidentiality restrictions with third parties or portions of certain documents that have been redacted for privacy purposes.

106.    Since June 2010, there have been many in person meetings and telephone discussions concerning the HWT among various combinations of the Monitor, the Applicants, Mercer, Former Employees' Representatives, Former Employees' Representative Counsel, certain members of the NRPC, CAW Counsel, Lerners, LTD Beneficiaries' Representative, LTD Beneficiaries' Representative Counsel, Segal, certain members of the CNELTD and Sack.

107.    At the meetings and calls in which the Monitor participated, the Monitor discussed the Proposed Allocation Methodology, and the Monitor's process in developing and

- 38 -

presenting the scenarios provided above.  The Monitor and its advisors have remained available for discussion and continue to respond to information requests.

108.    Independent Counsel are considering the Proposed Allocation Methodology and will advise the Court of their position prior to the return of the within motion.

109.    As mentioned above, there could be a multitude of potential differing interests among the beneficiaries.  The Monitor is of the view that with the retention of Independent Counsel, the interests of the beneficiaries are appropriately represented and that retaining yet further counsel is not required and would not assist with the fair, practical and timely resolution of the issues at hand.  There are already four sets of counsel appearing on this motion: two Independent Counsel, Continuing Employees' Representative Counsel and CAW counsel.  The Monitor has been advised by Koskie Minsky LLP that it will not appear on this motion.  A copy of a letter from Koskie Minsky LLP dated August 26, 2010 to the Monitor and the Service List is attached as Appendix "MMM".

110.    Each individual beneficiary may be a participant in multiple benefit plans or may only participate in a single benefit plan.  For example, some LTD Beneficiaries do not or will not receive LTD Income because they receive or will receive income or income benefits from another source.  Furthermore, the specific interests of individual participants in any one benefit may differ from those of another participant because of individual employment history or particular circumstances.  Therefore, interests may differ between members in the same general group and interests may differ between participants in the same benefit plan.  The Monitor has also considered the impracticality of hearing representations from thousands of individuals, including the timing and the costs of any attempt to do so.

- 39 -

111.　The Monitor is aware that a motion record has been served by Arlene Borenstein (Plante) on behalf of a group of dissident LTD Beneficiaries (the "**Dissident Beneficiaries**").  The motion seeks, among other things, the appointment of Rochon Genova LLP as counsel for the LTD Beneficiaries at Nortel's expense and the replacement of the LTD Beneficiaries' Representative.  Sack has already been retained as independent counsel for the LTD Beneficiaries as noted above.  The Monitor has corresponded with Rochon Genova LLP and advised it that the motion is unnecessary and the Dissident Beneficiaries may wish instead to make their submissions on the merits in response to the within motion.  The Monitor reserves the right to deliver material in reply should the Dissident Beneficiaries choose to deliver material in response to this motion.  The Monitor notes the Dissident Beneficiaries have not opted out of the various representation orders and are already represented by LTD Beneficiaries' Representative Counsel in these proceedings.  Pursuant to the Settlement Agreement, the fees and disbursements of counsel are a cost to the HWT to the extent they are incurred in respect of disputes concerning entitlement to a distribution of the HWT corpus.

**Specific Process Matters**

112.　The Monitor will serve the within Motion Record and this Fifty-First Report on the Service List, including Independent Legal Counsel, and the Individual Parties not otherwise represented by counsel on the Service List.

113.　In addition, as discussed above, the Mercer 2010 HWT Preliminary Valuation was prepared on an aggregate basis to assist in an analysis of the effect of various scenarios, including the proposed allocation methodology, on the various benefits covered by the HWT and thereby on the aggregate group of individuals participating in those benefits.

The LTD Beneficiaries' Employee Representative advised the Monitor that it is very important for those she represents to have an estimate of the amount they would receive individually as a result of an allocation and requested that such estimates be provided to LTD Beneficiaries.  The Monitor considered the request and agreed to provide such a statement to those individuals in receipt of income benefits, namely, all LTD Beneficiaries in receipt of LTD Income, STB Beneficiaries in receipt of STBs and SIB Beneficiaries in receipt of SIBs (a "**Beneficiary Estimated Allocation Statement**"). Accordingly, the Monitor instructed Mercer to prepare such statements for delivery to such individuals subsequent to service of this Fifty-First Report and the within Motion Record, with the proviso that the statements must clearly indicate, among other things, that they are estimates only and subject to change, including as a result of an allocation of the HWT corpus different from the Proposed Allocation Methodology.

114.   In preparing the Beneficiary Estimated Allocation Statements, Mercer will apply the same actuarial assumptions and data dates used to value the benefits on an aggregate basis to each LTD Beneficiary, STB Beneficiary and SIB Beneficiary and will also apply unique employee information to determine the individual amounts for LTD Income, SIBs and STBs as indicated in Section 5 of the Mercer 2010 HWT Preliminary Valuation.  The LTD Beneficiaries' Employee Representative and its independent counsel, Sack, reviewed and approved the form of Beneficiary Estimated Allocation Statement.  The Beneficiary Estimated Allocation Statement substantially in the form attached hereto as Appendix "NNN" will be available in both English and French.

115.   The Monitor was provided with the spreadsheet used to produce the individual statements.  The Monitor compared that spreadsheet to information available from the

- 41 -

Company, including addresses and recipient information, and was satisfied that the spreadsheet was suitable for producing Beneficiary Estimated Allocation Statements.

116.    Each Beneficiary Estimated Allocation Statement will include the actuarial value (expressed as a dollar amount) of: (a) the LTD Income[7], SIB or STB the respective LTD Beneficiary, SIB Beneficiary or STB Beneficiary would be entitled to on a distribution based on the Proposed Allocation Methodology; and (b) if the recipient of such income benefits is also a recipient of LTD Life, the actuarial value (expressed as a dollar amount) of the LTD Life such individual would be entitled to on a distribution based on the Proposed Allocation Methodology.  The Beneficiary Estimated Allocation Statement will also indicate that the dollar amounts set out therein reflect such individual's share of a distribution representing an estimated 34.5% of the present value of the Proposed Participating Benefits.

117.    The Beneficiary Estimated Allocation Statements clearly indicate they are illustrative only and subject to change for such things as:

(a)    changes to the estimated actuarial value of benefits as a result of status changes occurring with respect to the individual, such as recovery or death; and

(b)    changes to the estimated distribution percentage and consequently the estimated distribution amount as a result of:

(i)    a different allocation of the HWT corpus;

(ii)    the distributable assets being more or less than estimated;

(iii)    the resolution of contingencies;

---

[7] LTD Beneficiaries entitled to an income benefit will receive a Beneficiary Estimated Allocation Statement; however, certain LTD Beneficiaries with health and/or life insurance coverage may not receive an income benefit from Nortel because they receive income benefits from certain other sources.

(iv)    updating of data to December 31, 2010; and

(v)    the award of fees against any particular benefit type.

118.    It is not proposed that individual statements be provided to participants under Pensioner

Life as the number of participants is very large (approximately 10,400) and the average

claim value and distribution to such participants is much smaller on an individual basis

than the average claim and distribution of a participant under LTD Income.

119.    The distribution amount for each participant under Pensioner Life will be calculated

using the assumptions in the Mercer 2010 HWT Preliminary Valuation (including

Section 5 thereof) based on data as of December 31, 2010.

**Operational Steps**

120.    Court approval of a proposed allocation methodology is one of a number of steps that

must take place in order to implement a distribution of the HWT corpus.  Many steps

facilitating such allocation and distribution have already occurred, and many must still be

implemented, particularly since the HWT continues to operate.  Accordingly, many

variables may still affect the assets available for distribution and the benefits in respect of

which those assets will be distributed.

121.    To date, the Applicants and the Monitor have taken a number of steps to facilitate the

allocation and distribution of the HWT corpus, including:

(a)    reducing the term of the investments held by the HWT;

(b)    establishing a new banking arrangement for payment of current employee health
benefits;

(c)    requesting a tax ruling with respect to the taxability to recipients of funds to be
distributed from the HWT;

- 43 -

(d)     instructing Mercer to prepare the Mercer 2010 HWT Preliminary Valuation and working with Mercer on such valuation;

(e)     analyzing the impact of various allocation scenarios;

(f)     amassing and organizing documents;

(g)     terminating the current LTD program for working employees;

(h)     investigating options with respect to life insurance; and

(i)     ongoing data review and reconciliation.

Settlement Representative Counsel and CAW Counsel were involved and consulted with respect to the tax ruling referred to in (c) above.

122.   A further step required to facilitate the allocation and ultimate distribution of the corpus of the HWT is Court approval of the provisions in the requested Order deeming December 31, 2010 as the date of notice of termination of the HWT for the purposes of the Trust Agreement and dispensing with Nortel sending a notice of termination to the Trustee.  This will create synergy between the date of termination of benefits and the LTD Beneficiary termination date of December 31, 2010 pursuant to the Settlement Agreement, the valuation date in the Mercer 2010 HWT Preliminary Valuation and the expected date of termination of the HWT.  Otherwise, a date at least sixty days prior to termination of the HWT would have to be used (depending on the date of written notice to the Trustee).  A deemed notice of termination date of December 31, 2010 creates certainty and consistency and avoids confusion.

123.   With Court approval of an allocation methodology, including a deemed notice of termination date of December 31, 2010, the Monitor, the Applicants and the Trustee can look to distributing the HWT corpus.

- 44 -

## IX.    RECOMMENDATION

124.    The Monitor believes the Proposed Allocation Methodology represents the most equitable, reasonable and practical approach to the distribution of the HWT funds, balancing the interests of the beneficiaries in the circumstances, particularly given the following:

   (a)    the Trust Agreement does not provide clear guidance on the issue of who is entitled to participate in a distribution on termination of the HWT and there are a number of interpretations and possible outcomes;

   (b)    based on its counsel's legal analysis, the Proposed Allocation Methodology is consistent with the most reasonable interpretation of the Trust Agreement;

   (c)    in general, the Proposed Allocation Methodology is consistent with the manner in which the HWT has been administered; and

   (d)    the resolution of HWT allocation and distribution matters is a necessary step to completion of the Applicants' claims process, development of a CCAA plan and administration of the Applicants' estates.

125.    The Monitor believes the retention of Independent Counsel by the respective Employee Representatives will facilitate the fair, timely and practical resolution of the within motion and recommends the approval of their retention.

126.    Accordingly, the Monitor requests that this Honourable Court grant the Order in the form submitted.

- 45 -

All of which is respectfully submitted this 27th day of August, 2010.

**ERNST & YOUNG INC.**
In its capacity as Monitor of the Applicants

Per:
Murray A. McDonald
President

\5879303

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

Court File No: 09-CL-7950

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION *et al.*

---

### *ONTARIO*
### SUPERIOR COURT OF JUSTICE
### (COMMERCIAL LIST)

Proceeding commenced at Toronto

---

### FIFTY-FIRST REPORT
### OF THE MONITOR
### DATED AUGUST 27, 2010

---

**GOODMANS LLP**
Barristers & Solicitors
Bay Adelaide Centre, 333 Bay Street
Toronto, Canada  M5H 2S7

Jay A. Carfagnini  (LSUC#: 222936)
Fred Myers  (LSUC#: 26301A)
Gale Rubenstein (LSUC# 17088E)
Melaney J. Wagner (LSUC# 44063B)

Tel: 416.979.2211
Fax: 416.979.1234

Lawyers for the Monitor, Ernst & Young Inc.



Court File No.  09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**COMMERCIAL LIST**

THE HONOURABLE MR. JUSTICE ) THURSDAY, THE 30TH DAY OF
)
MORAWETZ ) JULY, 2009

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,**
**R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,**
**NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS**
**INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY**
**CORPORATION (the "Applicants")**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,**
**R.S.C. 1985, c. C-36 AS AMENDED**

**ORDER**
**(Representation Order for Disabled Employees)**

**THIS MOTION**, made by the Applicants (collectively, "Nortel") for an order appointing representative counsel for those employees of Nortel who are currently not working due to an injury, illness or medical condition in respect of which they are receiving or entitled to receive disability income benefits by or through Nortel, and who may assert an existing or future claim for payment, reimbursement or coverage arising in connection with their employment with Nortel or termination thereof, a pension or benefit plan sponsored by Nortel, including in relation to medical, dental, long-term or short-term disability benefits, life insurance or any other benefit, obligation or payment to which such person (or others who may be entitled to claim under or through such person) may be entitled from or through Nortel (referred to individually as an "LTD Beneficiary" and collectively, as the "LTD Beneficiaries") save and except those LTD Beneficiaries who are currently employed and whose benefit or other payments, as described above, arise directly or inferentially out of a

collective agreement between the Applicants, or any of them, and the CAW-Canada was heard this day at 330 University Avenue, Toronto, Ontario.

**ON READING** the Motion Record of the Applicants and on hearing the submissions of counsel for the Representative, the CAW-Canada, Nortel, the Monitor and other parties,

1.    **THIS COURT ORDERS** that the time for the service of the Notice of Motion and the Motion Record is hereby abridged so that this Motion is properly returnable today and hereby dispenses of further service thereof.

2.    **THIS COURT ORDERS** that further service of the Notice of Motion and Motion Record on any party not already served is hereby dispensed with, such that this motion was properly returnable July 9, 2009.

3.    **THIS COURT ORDERS** that, subject to paragraph 9 hereof, Sue Kennedy is hereby appointed as representative of all LTD Beneficiaries in the proceedings under the *Companies' Creditors Arrangement Act (Canada)* ("CCAA"), the *Bankruptcy and Insolvency Act* (Canada) (the "BIA") or in any other proceeding which has been or may be brought before this Honourable Court (the "Proceedings"), including, without limitation, for the purpose of settling or compromising claims by the LTD Beneficiaries in the Proceedings.

4.    **THIS COURT ORDERS** that, subject to paragraph 9 hereof, Koskie Minsky LLP is hereby appointed as counsel for all LTD Beneficiaries in the Proceedings for any issues affecting the LTD Beneficiaries in the Proceedings.

5.    **THIS COURT ORDERS** that Nortel shall provide to the Representatives and their counsel, without charge:

   (a)    the names, last known addresses and last known e-mail addresses (if any) of all the Former Employees, whom they represent, as well as applicable data regarding their entitlements, subject to a confidentiality agreement and to only be used for the purposes of the Proceedings; and

   (b)    upon request of the Representatives and their counsel, such documents and data, as may be relevant to matters relating to the issues in the Proceedings,

including documents and data, pertaining to the various long term disability, pension, benefit, supplementary pension, termination allowance plans, severance and termination payments and other arrangements for group health, life insurance, retirement and severance payments, including up to date financial information regarding the funding and investments of any of these arrangements.

6.      **THIS COURT ORDERS** that all reasonable legal, actuarial and financial expert and advisory fees and all other incidental fees and disbursements, as may have been or shall be incurred by the Representatives and their counsel, shall be paid by Nortel on a bi-weekly basis, forthwith upon the rendering of accounts to Nortel. In the event of any disagreement regarding such fees, such matters may be remitted to this Court for determination.

7.      **THIS COURT ORDERS** that notice of the granting of this Order be provided to the LTD Beneficiaries by regular mail to their last know address under such terms and conditions as to be agreed upon by the Representative, the Applicants and the Monitor.

8.      **THIS COURT ORDERS** that the Representative, or her counsel on her behalf, are authorized to take all steps and to do all acts necessary or desirable to carry out the terms of this Order, including dealing with any Court, regulatory body and other government ministry, department or agency, and to take all such steps as are necessary or incidental thereto.

9.      **THIS COURT ORDERS** that any individual LTD Beneficiary who does not wish to be bound by this Order and all other related Orders which may subsequently be made in these proceedings shall, within 30 days of mailing of notice of this Order, notify the Monitor, in writing, by facsimile, mail or delivery, and in the form attached as Schedule "A" hereto and shall thereafter not be bound and shall be represented themselves as an independent individual party to the extent they wish to appear in these Proceedings.

10.     **THIS COURT ORDERS** that the Representative and Koskie Minsky LLP shall have no liability as a result of their respective appointment or the fulfilment of their duties in carrying out the provisions of this Order from and after January 14, 2009 save and except for any gross negligence or unlawful misconduct on their part.

11.   **THIS COURT ORDERS** that the Representatives shall be at liberty and are authorized at any time to apply to this Honourable Court for advice and directions in the discharge or variation of theirs powers and duties.

ENTERED AT / INSCRIT À TORONTO
ON / BOOK NO:
LE / DANS LE REGISTRE NO.:

JUL 3 0 2009

PER / PAR:

## SCHEDULE "A"

Court File No.: 09-CL-7950

### *ONTARIO*
### SUPERIOR COURT OF JUSTICE
### (COMMERCIAL LIST)

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT,*
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL
NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL
CORPORATION and NORTEL NETWORKS TECHNOLOGY CORPORATION

APPLICATION UNDER THE *COMPANIES CREDITORS' ARRANGEMENT ACT,*
R.S.C. 1985, c. C-36, AS AMENDED

### OPT-OUT LETTER

Ernst & Young Inc.
Ernst & Young Tower
222 Bay Street
P.O. Box 251
Toronto, Ontario M5K 1J7

Attention: Lee K. Close
Tel: 1.866.942.7177
Fax: 416.943.3300

I, _____, am an employee of the Nortel companies, and am
            [Insert Name]
currently in receipt of or have applied for disability income benefits.

Under Paragraph 9 of the Representation Order for Disabled Employees, LTD Beneficiaries who
do not wish Koskie Minsky LLP to act as their representative counsel may opt out.

I hereby notify the Monitor that I do not wish to be bound by the Order and will be represented
as an independent individual party to the extent I wish to appear in these proceedings.

_____          _____

Date                                      *Signature*

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

Court File No: 09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**COMMERCIAL LIST**

Proceeding commenced at Toronto

**O R D E R**

**OGILVY RENAULT LLP**
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
Toronto, Ontario M5J 2Z4

**Derrick Tay LSUC#: 21152A**
Tel: (416) 216-4832
Email: dtay@ogilvyrenault.com

**Mario Forte LSUC#: 27293F**
Tel: (416) 216-4870
Email: mforte@ogilvyrenault.com

**Jennifer Stam LSUC #46735J**
Tel: (416) 216-2327
Email: jstam@ogilvyrenault.com
Fax: (416) 216-3930

Lawyers for the Applicants



Court File No.  09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**COMMERCIAL LIST**

| | | |
|---|---|---|
| THE HONOURABLE MR. | ) | WEDNESDAY, THE 31ST DAY |
| | ) | |
| JUSTICE MORAWETZ | ) | OF MARCH, 2010 |

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION and NORTEL NETWORKS TECHNOLOGY
CORPORATION (the "Applicants")**

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

**S E T T L E M E N T   A P P R O V A L   O R D E R**

    **THIS MOTION**, made by the Applicants (collectively, "Nortel") for an order
approving the amended and restated settlement agreement made as of the 30th day of March,
2010, attached as Schedule "A" to this Order (the "Amended and Restated Settlement
Agreement") and for the other relief set out in the Notice of Motion dated March 30, 2010
was heard this day at 393 University Avenue, Toronto, Ontario.

    **ON READING** the affidavit of Elena King sworn March 30, 2010 and the Forty-
Second Report of Ernst & Young Inc. dated March 30, 2010 (the "Forty-Second Report") in
its capacity as monitor (the "Monitor"), and on hearing submissions of counsel for the
Applicants, the Monitor, The Northern Trust Company, Canada, in its capacity as trustee of
the HWT and it is capacity as trustee and custodian for the trust funds maintained in respect of
the Pension Plans and the master trust for the Pension Plans, the Northern Telecom Limited
Pension Trust Fund, the Opposing LTD Employees and the Board of Directors of Nortel
Networks Corporation and Nortel Networks Limited and on the consent of CAW, the Former

Employees Representatives, the LTD Representative and Representative Counsel (as those terms are defined in the Amended and Restated Settlement Agreement); the UCC, the Bondholder Committee (as those terms are defined in the Amended and Restated Settlement Agreement) and the Superintendent of Financial Services of Ontario (the "Superintendent") as the administrator of and on behalf of the Pension Benefits Guarantee Fund (the "PBGF") not opposing, no one else appearing although duly served as appears from the affidavit of service of Katie Legree dated March 30, 2010, filed.

1.      **THIS COURT ORDERS** that service of the Notice of Motion, the Forty-Second Report and the Motion Record is hereby validated so that this Motion is properly returnable today and further service thereof is hereby dispensed with.

2.      **THIS COURT ORDERS** that capitalized terms used herein and not otherwise defined shall have the meaning given to them in the Affidavit of Elena King dated February 18, 2010 or the Amended and Restated Settlement Agreement.

**Amended and Restated Settlement Agreement**

3.      **THIS COURT ORDERS** that the Amended and Restated Settlement Agreement is hereby approved in its entirety, including all schedules attached thereto, and that the Parties thereto (including by representation) are hereby bound by this Order and the Amended and Restated Settlement Agreement and authorized and directed to comply with their obligations thereunder, including, without limitation, to make the payments provided for therein. The Amended and Restated Settlement Agreement supersedes all prior arrangements and understandings among the Parties thereto (including by representation) with respect to such subject matter, including, without limitation, the Settlement Agreement made as of the 8th day of February, 2010.

**Pension Plans**

4.      **THIS COURT ORDERS AND DECLARES** that any Pension Claims made in these proceedings or in any subsequent receivership or bankruptcy proceedings or in any other proceedings or in any other forum whatsoever concerning Nortel, any Nortel Worldwide Entity or the Pension Plans shall, to the extent they are allowed pursuant to any claims

adjudication procedure established in such proceedings, rank as ordinary unsecured claims on a *pari passu* basis with the claims of ordinary unsecured creditors of Nortel, such that no part of any Pension Claims shall be entitled to any preferential treatment or enjoy any priority in any manner over the claims of ordinary unsecured creditors made against Nortel, or rank as a priority claim, as a trust (whether deemed or otherwise) or a lien or charge.

5.     **THIS COURT ORDERS AND DECLARES** that no person or entity, including without limitation, (i) the Representatives, (ii) the Superintendent, as administrator of and on behalf of the PBGF, (iii) NNL, as the administrator of the Pension Plans, (iv) all successor administrators of the Pension Plans (whether appointed by the Superintendent or otherwise), and (v) the Pension HWT Claimants, all future members and beneficiaries of the Pension Plans, the trustee and custodian of the Pension Plans, the employees and former employees of Nortel and others who may have or make claims against Nortel or any Nortel Worldwide Entity with respect to employment or post employment or post retirement benefits (collectively, with the Pension HWT Claimants, the "Employee Claimants"), shall directly or indirectly assert, advance, re-assert or re-file any claim or initiate any legal proceedings or actions of any nature or kind in these proceedings or in any subsequent receivership or bankruptcy proceedings, or in any other proceedings, or in any other forum whatsoever concerning Nortel, any Nortel Worldwide Entity (to the extent such claims are provable) or the Pension Plans except as an ordinary unsecured claim ranking on a *pari passu* basis with the claims of ordinary unsecured creditors of Nortel, and shall not assert or advance any claim, directly or indirectly, that the Pension Claims, or any part thereof, ranks as a priority or preferential claim over the claims of ordinary unsecured creditors or Nortel, including, without limitation, that it is the subject of a trust (whether deemed or otherwise) or a lien or charge, or under other legal or equitable theory, and all such priority, trust, lien or charge claims are hereby forever barred, enjoined, released and extinguished as against Nortel, any Nortel Worldwide Entity, the Pension Plans, the trustee and custodian of the Pension Plans, and their respective officers, directors, employees, agents, members, legal counsel, financial advisors and each of the heirs, executors, administrators, legal representatives, successors and assigns of each of the foregoing.

DOCSTOR: 1911631\2

6.     **THIS COURT ORDERS** that the portion of proofs of claim already or hereafter filed by the Superintendent as the administrator of and on behalf of the PBGF, by Nortel, by any Employee Claimants or by any other person or entity claiming, asserting or advancing priority or preferential treatment of any kind, including, without limitation, trusts (whether deemed or otherwise) liens or charges in respect of any Pension Claims or payments by the PBGF with respect to the Pension Plans be and they hereby are disallowed, but only to the extent that they claim such priority or preferential treatment, without prejudice to the ordinary unsecured claims included in such proofs of claim.  For greater certainty, such disallowance shall not otherwise affect the quantum or validity of such claims,  which shall rank as ordinary unsecured creditors on a *pari passu* basis with the claims of the ordinary unsecured creditors of Nortel, in each case, to the extent allowed against Nortel pursuant to any claims adjudication procedure established in these proceedings.

7.     THIS COURT ORDERS that with respect to claims by the Superintendent on behalf of the PBGF, and any administrator appointed by the Superintendent, paragraphs 4, 5 and 6 shall only apply if: (i) the Pension Payments are made in accordance with the Amended and Restated Settlement Agreement; and (ii) no bankruptcy order is made with respect to Nortel on or before September 30, 2010.

8.     **THIS COURT ORDERS** that as long as NNL continues to administer the Pension Plans, there shall be no change whatsoever to the plan terms of the Pension Plans without the approval of the Court, and no change to the current asset mix or investment policies with respect to the Pension Plans other than at the request, and with the consent, of the Representative Counsel and the approval of the Court.

9.     **THIS COURT ORDERS** that Nortel shall make all current service payments and special payments to the Pension Plans in respect of defined benefit entitlements thereunder in the same manner as it has been doing over the course of the proceedings under the CCAA, through to March 31, 2010 in accordance with the last actuarial valuation for the Pension Plans filed with the Financial Services Commission of Ontario ("FSCO") in the aggregate amount of $2,216,254.00 per month.  Thereafter and through to September 30, 2010, Nortel shall make only current service payments to the Pension Plans (in accordance with the last

actuarial valuation for the Pension Plans filed with FSCO) in the aggregate amount of $379,837.00 per month. For greater certainty, Nortel shall not be required to make any special payment contributions to the Pension Plans after March 31, 2010. Nortel shall also make current service contributions in respect of defined contribution entitlements under the Nortel Networks Limited Managerial and Non-Negotiated Pension Plan (Registration No. 0342048) in accordance with the terms thereof, through to September 30, 2010 and shall not be precluded from doing so by the terms of the Amended and Restated Settlement Agreement. Nortel shall not be required to make any payments to the Pension Plans after September 30, 2010, except in respect of any claims in respect of the Pension Plans allowed against Nortel (which claims shall rank on a *pari passu* basis with the unsecured claims of the ordinary unsecured creditors of Nortel) pursuant to any claims adjudication procedure established in these proceedings. Neither Nortel, nor any Nortel Worldwide Entity shall have any liability regarding any contributions, fees, indemnities, charges or costs of any kind in respect of the administration of the Pension Plans that occurs after September 30, 2010. For greater certainty, nothing in this paragraph affects any obligation or liability of Nortel regarding any contributions, fees, indemnities, charges or costs of any kind in respect of the administration of the Pension Plans that occurs before 11:59 p.m. on September 30, 2010.

**Health and Welfare Trust**

10. **THIS COURT ORDERS AND DECLARES** that any HWT Claims made in these proceedings or in any subsequent receivership or bankruptcy proceedings, or in any other proceedings, or in any other forum whatsoever concerning Nortel, any Nortel Worldwide Entity or the HWT shall, to the extent they are allowed against Nortel pursuant to any claims adjudication procedure established in such proceedings, rank as ordinary unsecured claims on a *pari passu* basis with the claims of ordinary unsecured creditors of Nortel, and no part of any such HWT Claims shall rank as a preferential or priority claim or shall be the subject of a constructive trust or trust of any nature or kind.

11. **THIS COURT ORDERS AND DECLARES** that no person or entity, including without limitation, the trustee of the HWT, the Employee Claimants and the Representatives, shall, directly or indirectly (i) advance, assert, re-assert, re-file or make any HWT Claim in

these proceedings or in any subsequent receivership or bankruptcy proceedings, or in any other proceedings, or in any other forum whatsoever concerning Nortel, any Nortel Worldwide Entity (to the extent that such claims are provable) or the HWT except as an ordinary unsecured claim ranking on a *pari passu* basis with the claims of ordinary unsecured creditors of Nortel, or (ii) advance, assert, re-assert, re-file or make any claim that any HWT Claims are entitled to any priority or preferential treatment over ordinary unsecured claims, including without limitation that they rank as preferential or priority claims against Nortel or any Nortel Worldwide Entity, or are the subject of a constructive trust or trust of any nature or kind, and all such claims are hereby forever barred, enjoined, released and extinguished as against Nortel, any Nortel Worldwide Entity, the HWT and the trustee of the HWT, and their respective officers, directors, employees, agents, members, legal counsel, financial advisors and each of the heirs, executors, administrators, legal representatives, successors and assigns of each of the foregoing.

12.     **THIS COURT ORDERS AND DECLARES THAT** nothing in this Order, including, without limiting the generality of the foregoing, the provisions of paragraphs 10 and 11, affects the determination on any basis whatsoever of the entitlement of any beneficiary to a distribution from the corpus of the HWT.

**Release and Charge**

13.     **THIS COURT ORDERS** that the M&D Beneficiaries and former employees entitled to payment from the Termination Fund shall be entitled to the benefit of a charge on Nortel's Property (as defined in the Initial Order) to secure payment of the Medical and Dental Payments, Income Payments, Termination Payments and Pension Payments (the "Payments Charge"), which Payments Charge shall: (i) not exceed an aggregate amount of FIFTY-SEVEN MILLION DOLLARS ($57,000,000.00); (ii) rank subordinate in priority to the Inter-company Charge and the Shortfall Charge (as both terms are defined in the Initial Order); (iii) apply in these proceedings and in any subsequent bankruptcy or receivership; (iv) be reduced in amount as the Medical and Dental Payments, Income Payments, Termination Payments and Pension Payments are paid by an amount equal to each such payment made; and (v) automatically terminate and be extinguished on the filing with this Honourable Court

by the Monitor of a certificate certifying that the terms of the Amended and Restated Settlement Agreement have been complied with by Nortel.

14.    **THIS COURT ORDERS** that the Payments Charge shall constitute a "Charge" pursuant to the Initial Order, and shall be subject to the provisions relating to Charges including, without limitation, paragraphs 42 through 47 thereof and that the creation of the Payments Charge shall not preclude this Court from creating additional charges under the Initial Order that rank in priority to or *pari passu* with the Payments Charge.

15.    **THIS COURT ORDERS AND DECLARES** that the Releasees, the trustee and custodian of the Pension Plans, the CAW, the Representatives, and if and only if paragraphs 4, 5 and 6 apply as provided in paragraph 7, the Superintendent in his capacity as administrator of and on behalf of the PBGF, and their respective officers, directors, employees, agents, members, legal counsel and financial advisors and each of the heirs, executors, administrators, legal representatives, successors and assigns of each of the foregoing, be and they are hereby released, discharged and remised from any and all direct and indirect claims (contingent, liquidated or unliquidated, proven or unproven, known or unknown, in the nature of damages or otherwise, whether or not asserted and whether arising by contract, agreement (whether written or oral), under statute, civil law, common law, or in equity, or otherwise in any jurisdiction) related to (i) the Pension Plans, including without limitation, the administration of the Pension Plans, any obligation to assert or advance in these proceedings, or in any subsequent receivership or bankruptcy proceedings or in any other proceedings or in any other forum whatsoever concerning Nortel, any Nortel Worldwide Entity or the Pension Plans, any claim ranking in preference or priority to claims of unsecured creditors, as a trust (whether deemed or otherwise) or a lien or charge, the funding of the Pension Plans (including any obligation to contribute to the Pension Plans, except as required by paragraph 9 of this Order) and the investment of the Pension Plan assets, and (ii) the HWT, including without limitation, the administration of the HWT, the funding of the HWT, any obligation to contribute to the HWT and the investment of the HWT assets, provided that nothing herein shall release a director of Nortel from any matter referred to in subsection 5.1(2) of the CCAA or with respect to fraud on the part of any Releasee, with respect to that Releasee only.

16.    **THIS COURT ORDERS AND DECLARES** that the Nortel Releasees be and they are hereby released, discharged and remised from any and all direct and indirect claims (contingent, liquidated or unliquidated, proven or unproven, known or unknown, in the nature of damages or otherwise, whether or not asserted and whether arising by contract, agreement (whether written or oral), under statute, civil law, common law, or in equity, or otherwise in any jurisdiction) that the Pension Claims and the HWT Claims, or any part thereof, rank as a preferential or priority claim over the claims of ordinary unsecured creditors of Nortel, as a trust (whether deemed or otherwise) or a lien or charge, or under any other legal or equitable theory. For greater certainty, notwithstanding the foregoing, nothing in this Order shall release or discharge the Nortel Releasees from any Pension Claims and HWT Claims to the extent such claims are allowed as ordinary unsecured claims (which claims shall rank as on a *pari passu* basis with the unsecured claims of the ordinary unsecured creditors of Nortel) against the Nortel Releasees pursuant to any claims adjudication procedure established in these proceedings.

17.    **THIS COURT ORDERS** that the Employee Claimants shall not assert, advance or make any claims of any nature whatsoever against any person or entity whatsoever that could reasonably be expected to result in a claim over (including, without limitation, a claim for contribution or indemnity) being made against any of the Releasees or Nortel Releasees with respect to the subject matter of the release provisions hereof.

**CCAA Plan or Subsequent Bankruptcy**

18.    **THIS COURT ORDERS AND DECLARES** that under no circumstances shall any CCAA Plan of Arrangement in the Nortel proceedings (the "Plan") be proposed or approved by the Court if: (i) the Plan provides for separate classification of any Employee Claimants from ordinary unsecured creditors of Nortel, including, without limitation, bondholders and Nortel Networks Inc.; or (ii) the Employee Claimants and the other ordinary unsecured

creditors do not receive the same *pari passu* treatment of their allowed claims against Nortel pursuant to the Plan.

ENTERED AT / INSCRIT A **TORONTO**
ON / BOOK NO:
LE / DANS LE REGISTRE NO.:

APR 0 1 2010

PER / PAR·

# SCHEDULE "A"

\5805980.22

# AMENDED AND RESTATED SETTLEMENT AGREEMENT

**THIS AGREEMENT** made as of the 30th day of March, 2010

**AMONG :**

> **NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS TECHNOLOGY CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION, NORTEL NETWORKS GLOBAL CORPORATION**
>
> (collectively, "**Nortel**" and individually a **"Nortel Entity"**)
>
> - and –
>
> **ERNST & YOUNG INC.,** solely in its capacity as monitor in the CCAA proceedings of Nortel and not in its personal capacity
>
> (the **"Monitor"**)
>
> - and -
>
> **DONALD SPROULE, DAVID ARCHIBALD and MICHAEL CAMPBELL,** court appointed representatives of the Nortel Former Employees (as hereinafter defined)
>
> (the **"Former Employees Representatives"**)
>
> - and -
>
> **SUE KENNEDY,** court appointed representative of the Represented LTD Beneficiaries (as hereinafter defined)
>
> (the "**LTD Representative**")
>
> - and -
>
> **KOSKIE MINSKY LLP,** court appointed counsel to the Former Employees of Nortel and the Represented LTD Beneficiaries
>
> (**"Representative Counsel"**)

- 2 -

- and -

**NATIONAL AUTOMOBILE, AEROSPACE,
TRANSPORTATION AND GENERAL WORKERS
UNION OF CANADA** (CAW-Canada) and its Locals 27,
1525, 1530, 1837, 1839, 1905 and/or 1915 and George
Borosh et al.

**("CAW")**

## A.   *RECITALS*

**WHEREAS** Nortel filed for and obtained protection under the *Companies' Creditors Arrangement Act* (**"CCAA"**) by order of the Ontario Superior Court of Justice (Commercial List) (the **"Court"**) dated January 14, 2009, as amended and restated (the **"Initial Order"**);

**AND WHEREAS** by Order of the Court dated May 27, 2009, the Former Employees Representatives were appointed representatives of all former employees, including pensioners, of Nortel or any person claiming an interest under or on behalf of such former employees or pensioners and surviving spouses in receipt of a Nortel pension, or group or class of them, other than (a) those represented by counsel to the CAW, and (b) those who elected pursuant to the requirements of such Order not to be bound by such Order (the individuals in respect of whom the Former Employees Representatives were appointed pursuant to such Order, are referred to herein as the **"Nortel Former Employees"**);

**AND WHEREAS** certain employees and former employees of Nortel are represented by counsel to the CAW;

**AND WHEREAS** by Order of the Court dated July 30, 2009, the LTD Representative was appointed representative of those employees of Nortel who are currently not working due to an injury, illness or medical condition in respect of which they are receiving or entitled to receive disability income benefits by or through Nortel, and who may assert an existing or future claim for payment, reimbursement or coverage arising in connection with their employment with Nortel or termination thereof, a pension or benefit plan sponsored by Nortel, including in relation to medical, dental, long-term or short-term disability benefits, life insurance or any other benefit, obligation or payment to which such person (or others who may be entitled to claim under or through such person) may be entitled from or through Nortel , other than (a) those individuals who are currently employed and whose benefit or other payments, as described above, arise directly or inferentially out of a collective agreement between any Nortel Entity and the CAW, and (b) those individuals who elected pursuant to the requirements of such Order not to be bound by such Order (the individuals in respect of whom the LTD Representative was appointed pursuant to such Order are referred to herein as the **"Represented LTD Beneficiaries"**);

- 3 -

**AND WHEREAS** Representative Counsel was appointed as counsel to the Nortel Former Employees and the Represented LTD Beneficiaries by Court orders dated May 27, 2009 and dated July 30, 2009, respectively, for the purpose of, among other things, settling or compromising the claims of the individuals they represent;

**AND WHEREAS** the parties to this Settlement Agreement (the **"Parties"**) have reached an agreement for the benefit of Nortel and all of its stakeholders, as well as the Official Committee of Unsecured Creditors of Nortel Networks Inc. and certain of its affiliates in the chapter 11 proceedings before the U.S. Bankruptcy Court for the District of Delaware (the **"UCC"**) and the Informal Nortel Noteholder Group (the **"Bondholder Committee"**) regarding certain issues related to, among other things, Nortel's Pension Plans, HWT (both as defined below) and certain employment related issues (collectively, the **"Settlement"**); and

**NOW THEREFORE** for value received (the receipt and sufficiency of which are hereby acknowledged), the Parties agree as follows:

### *B.   BENEFITS AND EMPLOYEES*

1.      For the remainder of 2010, Nortel shall continue in accordance with current practice to pay medical and dental benefits and life insurance benefits to Nortel pensioners and their beneficiaries and survivors, whether or not represented by Representative Counsel, and for greater certainty, including without limitation all of the individuals referenced in paragraphs (a) and (b) of the second recital above (collectively, the **"Pensioners"**) and the Nortel employees receiving or who become entitled during 2010 to receive long term disability benefits, whether or not represented by Representative Counsel, and for greater certainty, including without limitation all of the individuals referenced in paragraphs (a) and (b) of the fourth recital above (collectively, the **"LTD Beneficiaries"**) in accordance with the current benefit plan terms and conditions. The Pensioners and the LTD Beneficiaries shall be referred to collectively as the **"M&D Beneficiaries"**. Medical and dental benefits to be paid to the M&D Beneficiaries shall be funded solely from Nortel's funds on a "pay as you go basis" in respect of benefits for the coverage period ending December 31, 2010 (the **"Medical and Dental Payments"**), provided that no Medical and Dental Payments claims submitted after February 28, 2011 shall be accepted, honoured or paid. Life insurance benefits to the M&D Beneficiaries shall continue unchanged until December 31, 2010 and shall be funded in the same manner as for 2009 (the **"Life Insurance Benefits"**). For greater certainty, no Medical and Dental Payments or Life Insurance Benefits shall be paid by Nortel for any benefit coverage period following December 31, 2010.

2.      Nortel shall pay income benefits to the LTD Beneficiaries and to those people receiving or who become entitled during 2010 to receive survivor income benefits and survivor transition benefits under Nortel benefit plans (as such plans exist at the date of this Settlement Agreement) solely from Nortel funds on a "pay as you

- 4 -

go basis" for benefits in respect of the coverage period from January 1, 2010 to December 31, 2010 (the "**Income Payments**"). For greater certainty, no Income Payments shall be paid by Nortel for the benefit coverage period following December 31, 2010.

3. Upon the satisfaction of all of the conditions in paragraph I.1 of this Settlement Agreement, Nortel shall create a pool of $4.3 million (inclusive of Representative Counsel's costs in respect of the motion for leave to appeal referred to in paragraph B.4 below to a maximum of $100,000.00, based on documented and reasonable fees and disbursements) (the "**Termination Fund**") to be set aside for employees and former employees of Nortel whose employment has been terminated or is terminated prior to or on June 30, 2010 to whom amounts are or may become owing for termination or severance payments, who have not been offered employment with a purchaser of Nortel's assets and who have not received or are not entitled to receive (i) gross cumulative Annual Incentive Plan payments from and after October 1, 2009 of $3,000.00 or more; or (ii) a Key Employee Incentive Plan or Key Employee Retention Plan payment in 2009; or (iii) payment from any Court approved equivalent 2010 plan.   Each such individual shall be paid a maximum of $3,000.00 (subject to applicable withholding taxes) from the Termination Fund (the "**Termination Payments**"). Any Termination Payments paid to such individuals shall be credited against allowed claims of such individuals and such claims shall be correspondingly reduced.  To the extent that funds are unused in respect of terminations prior to or on June 30, 2010, or payment of Representative Counsel's costs referred to above, the Termination Fund may be used to make payments on account of terminations after June 30, 2010.  If such unused funds are to be used for another purpose, such purpose shall be approved by the Court, on such basis as is agreed to between Representative Counsel and the Monitor.

4. Upon the issuance of an order by the Court approving this Settlement Agreement in its entirety, including all schedules thereto, and upon the expiry of all appeals and rights of appeal in respect thereof (the "**Final Approval Order**"), Representative Counsel shall promptly withdraw their application for leave to appeal the decision of the Court of Appeal, dated November 26, 2009, to the Supreme Court of Canada (the "**Leave Application**") on a with prejudice basis. No claim for costs in respect of the Leave Application shall  be made by or against Nortel, or any creditor participants (including the UCC and the Bondholder Committee).

5. The employment of the LTD Beneficiaries shall terminate on December 31, 2010. However, such termination shall not affect in any manner any rights the LTD Beneficiaries or anyone claiming through them may have, either under a collective agreement, at common law or pursuant to any statute in relation to ordinary unsecured claims against Nortel arising out of their employment or termination thereof, including but not limited to claims for future lost long term

- 5 -

disability or income continuation benefits, pension benefits or pension benefit accruals, and medical, dental and life insurance benefits, nor should affect in any manner their ability to participate in any program of benefits for which they are eligible that is established as a successor to the plans in which they currently participate. For greater certainty, such claims, to the extent they are allowed as claims against Nortel pursuant to any claims adjudication procedure established in these proceedings, shall rank as ordinary unsecured claims on a *pari passu* basis with the claims of the ordinary unsecured creditors of Nortel. Nothing in this paragraph will affect the rights of the LTD Beneficiaries to make claims in respect of the HWT (as defined below).

### C. HEALTH AND WELFARE TRUST

1. Resolution: The Parties will work towards a Court approved distribution of the Health and Welfare Trust ("**HWT**") corpus in 2010 to its beneficiaries entitled thereto and the resolution of any issues necessarily incident thereto. For greater certainty, nothing in this Settlement Agreement affects the determination on any basis whatsoever of the entitlement of any beneficiary to a distribution from the corpus of the HWT. Any fees or expenses incurred in connection with any dispute or litigation among the beneficiaries of the HWT concerning entitlement (including without limitation all legal, actuarial and other fees and expenses of the trustee of the HWT and other service providers of the HWT) shall not be paid by Nortel, but shall be paid by the HWT corpus. For greater certainty, such fees or expenses shall not include those of the Monitor and incurred by Nortel in connection with any motion for termination of the HWT or for directions with respect to the HWT, which shall be paid by Nortel.

2. Ranking: The CAW, Representative Counsel, the LTD Representative and the Former Employee Representatives (the "**Representatives**") agree, on behalf of those they represent and on their own behalf, that in respect of any funding deficit in the HWT or any HWT related claims (the "**HWT Claims**"), in these proceedings or in any subsequent receivership or bankruptcy proceedings, or in any other proceedings, or in any other forum whatsoever concerning Nortel, any of the entities listed in Schedule "A" (collectively the "**Nortel Worldwide Entities**" and individually, a "**Nortel Worldwide Entity**") or the HWT, they shall not advance, assert or make any claim that any HWT Claims are entitled to any priority or preferential treatment over ordinary unsecured claims, including without limitation that they rank as priority claims against Nortel or any Nortel Worldwide Entity, or are the subject of a constructive trust or trust of any nature or kind in respect of the property and assets of Nortel or any Nortel Worldwide Entity, nor shall they take any action or support any party, person or entity, directly or indirectly, who advances, asserts or makes such claims, and such claims, to the extent allowed against Nortel pursuant to any claims adjudication procedure established in these proceedings, shall rank as ordinary unsecured

claims on a *pari passu* basis with the claims of the ordinary unsecured creditors of Nortel.

### D.  REGISTERED PENSION PLANS

1.  Administration:  Nortel shall continue to administer the Nortel Networks Negotiated Pension Plan (Registration No. 08587766) and the Nortel Networks Limited Managerial and Non-Negotiated Pension Plan (Registration No. 0342048) (collectively, the **"Pension Plans"**) until 11:59 p.m. on September 30, 2010.  For greater certainty, Nortel Networks Limited shall remain the administrator (as defined in the *Pension Benefits Act*) of the Pension Plans until 11:59 p.m. on September 30, 2010.  Neither Nortel nor the Monitor will take any steps to initiate a wind up, in whole or in part, of the Pension Plans with an effective date prior to September 30, 2010 at 11:59 p.m.  Nortel shall cease to administer the Pension Plans on September 30, 2010 at 11:59 p.m. and thereafter shall have no further responsibility or liability for administration thereof (including any windup).  So long as Nortel continues to administer the Pension Plans, there shall be no change whatsoever to the plan terms of the Pension Plans without the approval of the Court, and no change to the current asset mix or investment policies with respect to the Pension Plans other than at the request, and with the consent, of the Representative Counsel and the approval of the Court.

2.  Payments:  Nortel shall continue to make contributions to the Pension Plans in the same manner as it has been doing over the course of the proceedings, under the CCAA, through to March 31, 2010, and for greater certainty, shall continue to make all current service payments and special payments related to the Pension Plans through that date in accordance with the last actuarial valuation for the Pension Plans filed with the Financial Services Commission of Ontario in the aggregate amount of $2,216,254.00 per month (the "**March Pension Payments**").  Thereafter and through to September 30, 2010, Nortel shall make only current service payments to the Pension Plans in the aggregate amount of $379,837.00 per month (the "**September Pension Payments**").  For greater certainty, Nortel shall not make any special payment contributions to the Pension Plans after March 31, 2010.  The March Pension Payments and the September Pension Payments shall be referred to collectively as the **"Pension Payments"**.  Nortel shall not make any payments or contributions whatsoever to the Pension Plans after September 30, 2010, except in respect of any claims in respect of the Pension Plans allowed against Nortel (which claims shall rank on a *pari passu* basis with the claims of the ordinary unsecured creditors of Nortel) pursuant to any claims adjudication procedure established in these proceedings.  Neither Nortel, nor any Nortel Worldwide Entity shall have any obligation or liability regarding any contributions, fees, indemnities, charges or costs of any kind in respect of the administration of the Pension Plans after September 30, 2010.   For greater certainty, nothing in this paragraph affects any obligation or liability of Nortel regarding any contributions, fees, indemnities, charges or costs of any kind in

respect of the administration of the Pension Plans before 11:59 p.m. on September 30, 2010.

3.  Transition: With the assistance of the Monitor, Nortel shall use reasonable efforts to cause all books, records, data and other information relating to the Pension Plans or beneficial to the administration or winding-up of the Pension Plans in the possession or control of Nortel to be consolidated in Toronto, Ontario, Canada by no later than March 31, 2010. The Monitor and Nortel shall take all reasonable steps, at the sole cost and expense of Nortel, to complete the orderly transfer of the records of administration of the Pension Plans to a new administrator appointed by the Superintendent of Financial Services (the **"Superintendent'**), on September 30, 2010 (the **"New Administrator"**).    Any non-compliance or allegation of non-compliance by Nortel or the Monitor under this paragraph D.3 shall have no effect on the enforceability or effectiveness of any other provision of this Agreement.

## *E.    RANKING OF PENSION CLAIMS*

1.  The Representatives agree on behalf of the members of the Pension Plans their and beneficiaries and surviving spouses who are entitled to benefits from the Pension Plans and whom they represent and on their own behalf (collectively, the **"Pension Claimants"**) that in respect of any claim for payment of or damages related to any solvency or wind up deficiencies, unfunded liabilities, or unpaid or accrued contributions (including, for greater certainty, any special payments whatsoever), any liability regarding the Pension Benefits Guarantee Fund (the **"PBGF"**) or any obligation of or claim arising against any person with respect to the Pension Plans or the administration thereof (the **"Pension Claims"**): (a) no Pension Claims shall enjoy any priority in any manner over the claims of ordinary unsecured creditors made against Nortel; (b) the Pension Claimants hereby waive, and shall not directly or indirectly assert, advance, re-assert or re-file any claims or initiate any legal proceedings or actions of any nature or kind in these proceedings or in any subsequent receivership or bankruptcy proceedings, or in any other proceedings, or in any other forum whatsoever concerning Nortel or any Nortel Worldwide Entity or the Pension Plans, that the Pension Claims or any part thereof rank as a priority claim over the claims of ordinary unsecured creditors, as a trust (whether deemed or otherwise) or a lien or charge (hereinafter referred to as a **"lien"**), or under any other legal or equitable theory; and (c) the Pension Claimants shall not support, directly or indirectly, any application, claim or action by Nortel, in its capacity as administrator of the Pension Plans, the New Administrator,    any    successor    administrator    howsoever    appointed,    the Superintendent, as the administrator of and on behalf of the PBGF, or any other person or entity, to directly or indirectly assert, advance, re-assert or re-file any claims or initiate any legal proceedings or actions of any nature or kind in these proceedings or in any subsequent receivership or bankruptcy proceedings, or in any other proceedings, or in any other forum whatsoever concerning Nortel or any

- 8 -

Nortel Worldwide Entity or the Pension Plans, that the Pension Claims or any part thereof rank as a priority claim over the claims of ordinary unsecured creditors, as a trust (whether deemed or otherwise) or a lien, or under any other legal or equitable theory, and such claims shall be treated as ordinary unsecured claims, and for greater certainty, any such claims, to the extent allowed against Nortel pursuant to any claims adjudication procedure established in these proceedings, shall rank on a *pari passu* basis with the claims of the ordinary unsecured creditors of Nortel.

2.      That portion of any proofs of claim already or hereafter filed by the Superintendent as the administrator of and on behalf of the PBGF, by Nortel or by any person claiming that any payments by the PBGF or that the Pension Claims or any part thereof rank as a priority or preferential claim over the claims of ordinary unsecured creditors of Nortel, as a trust (whether deemed or otherwise) or a lien, or under any other legal or equitable theory shall be disallowed, but only to the extent that they claim such priority or preference, and such disallowance shall not be opposed or appealed, directly or indirectly, by such claimants. For greater certainty, such disallowance shall not otherwise affect the quantum or validity of such claims, which shall rank as ordinary unsecured creditors on a *pari passu* basis with the claims of the ordinary unsecured creditors of Nortel, in each case, to the extent allowed against Nortel pursuant to any claims adjudication procedure established in these proceedings.

**F.   *NON-OPPOSITION***

1.      The Representatives agree, on their own behalf and on behalf of those they represent, that they shall not oppose, directly or indirectly, any employee incentive program, including any charge therefor, that is determined by the Monitor to be reasonable and necessary for the continued operation of Nortel. They further agree that they shall not oppose, directly or indirectly, the creation of a trust with respect to claims or potential claims against persons who accept directorships of a Nortel Worldwide Entity in order to facilitate the restructuring, provided that: (i) such trust is approved and recommended by the Monitor; (ii) no part of the corpus of the trust may be used to pay bonuses or any other compensation to the directors; and (iii) any corpus of the trust remaining on the termination of the trust reverts to Nortel.

**G.   *RELEASE AND CHARGE***

1.      The CAW, the LTD Representative and the Former Employees Representatives agree on their own behalf and on behalf of the Pension Claimants and the beneficiaries of the HWT who they represent (collectively, the "**Pension HWT Claimants**") that each of the trustee of the HWT, the Monitor, and all members of Pension Plans' committees, (in their personal capacity), and their respective officers, directors, employees, agents, members, legal counsel, financial advisors,

against any person or entity whatsoever that could reasonably be expected to result in a claim over (including, without limitation, a claim for contribution or indemnity) being made against any of the Releasees or the Nortel Releasees with respect to the subject matter of the release provisions of this Settlement Agreement.

4.     The M&D Beneficiaries and former employees entitled to payment from the Termination Fund shall be entitled to the benefit of a charge on Nortel's Property (as defined in the Initial Order) to secure payment of the Medical and Dental Payments, Income Payments, Termination Payments and Pension Payments (the **"Payments Charge"**), which Payments Charge shall not exceed an aggregate amount of FIFTY-SEVEN MILLION DOLLARS ($57,000,000.00) and which Payments Charge shall rank subordinate in priority to the Inter-company Charge (as defined in the Initial Order). The Payments Charge shall apply in these proceedings and in any subsequent bankruptcy or receivership. The maximum amount secured by the Payments Charge shall be reduced as the Medical and Dental Payments, Income Payments, Termination Payments and Pension Payments are paid by an amount equal to each such payment made. Once the last payment is made, the Monitor shall file a certificate (the **"Monitor's Certificate"**) with the Court certifying that the terms of the Settlement have been complied with by Nortel, and the Payments Charge shall automatically terminate and be extinguished by the filing of the Monitor's Certificate.

### *H.     CCAA PLAN OR SUBSEQUENT BANKRUPTCY*

1.     The Representatives agree on their own behalf and on behalf of the Pension HWT Claimants that under no circumstances shall any CCAA Plan of Arrangement in the Nortel proceedings (the **"Plan"**) be proposed or approved if: (i) the Plan provides for separate classification of any Pension HWT Claimants from ordinary unsecured creditors of Nortel, including, without limitation, bondholders and Nortel Networks Inc.; or (ii) the Pension HWT Claimants and the other ordinary unsecured creditors of Nortel do not receive the same *pari passu* treatment of their allowed ordinary unsecured claims against Nortel pursuant to the Plan.

### *I.     CONDITIONS*

1.     This Settlement Agreement is conditional upon (i) Nortel obtaining the Final Approval Order substantially in the form attached as Schedule "B" with such changes as the parties may agree to, acting reasonably; (ii) the Superintendent in his capacity as administrator of the PBGF, Nortel and the Monitor executing the letter attached as Schedule "C"; and (iii) the Leave Application having been withdrawn on a with prejudice basis.

2.     It is the intention of the Parties that these terms be binding upon, and enure to the benefit of the Pension HWT Claimants, the Releasees and the Nortel Releasees, and that: (i) as beneficiaries hereof, the Releasees and the Nortel Releasees shall

- 11 -

be entitled to rely upon and to seek the enforcement of these terms, which cannot be varied without further order of the Court on full and proper notice to them; and (ii) the ordinary unsecured creditors of Nortel shall be entitled to rely upon and benefit from the provisions and agreements herein and to seek their enforcement, which provisions and agreements cannot be varied without further order of the Court on full and proper notice to them.

### J.    GENERAL

1.    The Monitor shall post the motion record for approval of the Settlement, including the Settlement Agreement and the proposed Final Approval Order on the Monitor's website at www.ey.com/ca/Nortel and on the website of Representative Counsel at www.kmlaw.ca.

2.    The Representatives, the Representative Counsel and the CAW shall co-operate with Nortel and the Monitor on all communications related to this settlement, as required.

3.    This Settlement Agreement will be governed by and interpreted and enforced in accordance with the laws of the Province of Ontario and the federal laws of Canada applicable therein. The Parties hereby irrevocably consent and submit to the non-exclusive jurisdiction of the Ontario Superior Court of Justice and waive any objection based on venue or forum non conveniens with respect to any action commenced in connection with this Settlement Agreement.

4.    This Settlement Agreement may be executed in any number of counterparts (including by way of facsimile and PDF) and all of such counterparts taken together will be deemed to constitute one and the same instrument.

*[Signature pages to follow]*

**IN WITNESS WHEREOF** the Parties have duly executed this Agreement as of the date first written above:

**NORTEL NETWORKS CORPORATION**

Per:

Name: John Doolittle
Title: Senior Vice-President, Corporate Services and Chief Financial Officer

Per:

Name: Clarke Glaspell
Title: Controller

**NORTEL NETWORKS LIMITED**

Per:

Name: John Doolittle
Title: Senior Vice-President, Corporate Services and Chief Financial Officer

Per:

Name: Clarke Glaspell
Title: Controller

**NORTEL NETWORKS TECHNOLOGY CORPORATION**

Per:

Name: Clarke Glaspell
Title: President and Controller

- 13 -

**NORTEL NETWORKS INTERNATIONAL CORPORATION**

Per: _____

Name: John Doolittle
Title: President

Per: _____

Name: Clarke Glaspell
Treasurer

**NORTEL NETWORKS GLOBAL CORPORATION**

Per: _____

Name: John Doolittle
Title: President

Per: _____

Name: Clarke Glaspell
Title: Controller

**ERNST & YOUNG INC.**, solely in its capacity as monitor in the CCAA proceedings of Nortel and not in its personal capacity

Per: _____

Name:
Title:

**DONALD SPROULE,** court appointed representative of the Nortel Former Employees

Per: _____

Name:
Title:

- 13 -

**NORTEL NETWORKS GLOBAL CORPORATION**

Per:
_____

Name:

Title:

**ERNST & YOUNG INC.,** solely in its capacity as monitor in the CCAA proceedings of Nortel and not in its personal capacity

Per:
_____

Name: Murray A- McDonald

Title: President

**DONALD SPROULE,** court appointed representative of the Nortel Former Employees

Per:
_____

Name:

Title:

**DAVID ARCHIBALD,** court appointed representative of the Nortel Former Employees

Per:
_____

Name:

Title:

13 -

**NORTEL NETWORKS GLOBAL
CORPORATION**

Per:

    Name:
    Title:

**ERNST & YOUNG INC.,** solely in its capacity
as monitor in the CCAA proceedings of Nortel
and not in its personal capacity

Per:

    Name:
    Title:

**DONALD SPROULE,** court appointed
representative of the Nortel Former Employees

Per: _____

    Name:
    Title: NRPC National Chair

**DAVID ARCHIBALD,** court appointed
representative of the Nortel Former Employees

Per:

    Name:
    Title:

**MICHAEL CAMPBELL,** court appointed
representative of the Nortel Former Employees

Per:

    Name:
    Title:

- 13 -

### NORTEL NETWORKS GLOBAL CORPORATION

Per:      _____

     Name:
     Title:

**ERNST & YOUNG INC.,** solely in its capacity
as monitor in the CCAA proceedings of Nortel
and not in its personal capacity

Per:      _____

     Name:
     Title:

**DONALD SPROULE,** court appointed
representative of the Nortel Former Employees

Per:      _____

     Name:
     Title:

**DAVID ARCHIBALD,** court appointed
representative of the Nortel Former Employees

Per:      _____

     Name: DAVID D. ARCHIBALD
     Title: RETIREE

**MICHAEL CAMPBELL,** court appointed
representative of the Nortel Former Employees

Per:      _____

     Name:
     Title:

- 13 -

**NORTEL NETWORKS GLOBAL CORPORATION**

Per: _____

      Name:

      Title:

**ERNST & YOUNG INC.,** solely in its capacity as monitor in the CCAA proceedings of Nortel and not in its personal capacity

Per: _____

      Name:

      Title:

**DONALD SPROULE,** court appointed representative of the Nortel Former Employees

Per: _____

      Name:

      Title:

**DAVID ARCHIBALD,** court appointed representative of the Nortel Former Employees

Per: _____

      Name:

      Title:

**MICHAEL CAMPBELL,** court appointed representative of the Nortel Former Employees

Per: _Mía Campbell /.our._

      Name: _MICHAEL CAMPBELL._

      Title: _C. A. R._

- 14 -

**SUE KENNEDY,** court appointed representative of the Represented LTD Beneficiaries

Per:    *Sue Kennedy*

Name:

Title:

**KOSKIE MINSKY LLP,** court appointed counsel to the Former Employees of Nortel and the Represented LTD Beneficiaries

Per:

Name:

Title:

**NATIONAL AUTOMOBILE, AEROSPACE, TRANSPORTATION AND GENERAL WORKERS UNION OF CANADA** (CAW-Canada) and its Locals 27, 1525, 1530, 1837, 1839, 1905 and/or 1915 and George Borosh et al.

Per:

Name:

Title:

\5830538.1

- 14 -

**SUE KENNEDY,** court appointed representative of the Represented LTD Beneficiaries

Per: _____

     Name:

     Title:

**KOSKIE MINSKY LLP,** court appointed counsel to the Former Employees of Nortel and the Represented LTD Beneficiaries

Per: 

     Name: Susan Philpott

     Title: Representative Counsel

**NATIONAL AUTOMOBILE, AEROSPACE, TRANSPORTATION AND GENERAL WORKERS UNION OF CANADA** (CAW-Canada) and its Locals 27, 1525, 1530, 1837, 1839, 1905 and/or 1915 and George Borosh et al.

Per: _____

     Name:

     Title:

\5830538.1

- 14 -

**SUE KENNEDY,** court appointed representative
of the Represented LTD Beneficiaries

Per:    _____

      Name:
      Title:

**KOSKIE MINSKY LLP,** court appointed
counsel to the Former Employees of Nortel and
the Represented LTD Beneficiaries

Per:    _____

      Name:
      Title:

**NATIONAL AUTOMOBILE, AEROSPACE,
TRANSPORTATION AND GENERAL
WORKERS UNION OF CANADA** (CAW-
Canada) and its Locals 27, 1525, 1530, 1837,
1839, 1905 and/or 1915 and George Borosh et al.

Per:    _____

      Name:
      Title:

## SCHEDULE "A"

## NORTEL NETWORKS CORPORATION

### Direct and Indirect Subsidiaries

| |
|---|
| Sonoma Systems |
| Sonoma Limited |
| Sonoma Systems Europe Limited |
| Nortel Networks Optical Components (Switzerland) GmbH |
| Xros, Inc. |
| Architel Systems Corporation |
| Architel Systems (U.S.) Corporation |
| Architel Systems (UK) Limited |
| NN Applications Management Solutions Inc. |
| CoreTek, Inc. |
| Alteon WebSystems Inc. |
| Alteon WebSystems International Inc. |
| Alteon WebSystems AB |
| Alteon WebSystems International Limited |
| Nortel Networks Limited |
| Capital Telecommunications Funding Corporation |
| PT Nortel Networks Indonesia |
| Nortel Networks Peru S.A.C. |
| Nortel Networks (Thailand) Ltd. |
| Nortel Networks Telecommunicacoes do Brazil Ltda. |
| Nortel Networks Malaysia Sdn Bhd. |
| Nortel Networks New Zealand Limited |
| Nortel Networks Global Corporation |
| Nortel Networks de Colombia S.A. |
| Nortel Networks Chile S.A. |
| Nortel Networks de Argentina S.A. |
| Nortel Networks del Paraguay S.A. |
| Nortel Networks de Venezuela C.A. |

- 2 -

| |
|---|
| Nortel Networks del Ecuador S.A. |
| Nortel Networks de Mexico S.A. de C.V. |
| Nortel de Mexico, S. De R.L. de C.V. |
| Nortel Networks del Uruguay S.A. |
| Nortel Networks Technology Corporation |
| Nortel Vietnam Limited |
| Nortel Networks Korea Limited |
| Nortel Networks Singapore Pte Ltd |
| Nortel Networks Telecommunications Equipment (Shanghai) Co., Ltd. |
| Nortel Networks International Corporation |
| Shenyang Nortel Telecommunications Company Limited |
| Nortel Networks (Ireland) Limited |
| Northern Telecom Maroc SA |
| Nortel Networks Electronics Corporation |
| Regional Telecommunications Funding Corporation |
| Nortel Networks de Bolivia S.A. |
| 1328556 Ontario Inc. |
| CTFC Canada Inc. |
| Northern Telecom Canada Limited |
| Nortel Networks de Panama S.A. |
| TSFC Canada Inc. |
| Nortel Networks Mauritius Ltd. |
| Nortel Networks (India) Private Limited |
| Nortel Networks S.A. |
| Northern Telecom France SA |
| Nortel Networks France SAS |
| Matra Communications Business Systeme GmbH |
| Nortel Networks (China) Limited |
| Nortel Networks Communications Engineering Ltd. |
| Nortel Networks (Asia) Limited |
| Guangdong – Nortel Telecommunications Equipment Co. Ltd. |
| LG-Nortel Co. Ltd. |

- 3 -

| |
|---|
| 6141-Sub Novera Optics Korea Inc. |
| Novera Optics Inc. |
| LN Srithai Comm Co Ltd |
| Nortel Communications Inc. |
| Nortel Networks Financial Services Limited Liability Co. |
| Nortel Networks Inc. |
| Bay Networks do Brasil Ltda. |
| Bay Networks Fedes de Dados para Sistemas Informaticos, da. |
| Clarify Limited |
| Clarify K.K. |
| Nortel Networks Cable Solutions Inc. |
| Nortel Networks Capital Corporation |
| Nortel Networks Technology K.K. |
| Nortel Networks Eastern Mediterranean Ltd. |
| Nortel Networks International Inc. |
| Nortel Ventures LLC |
| Nortel Networks Japan |
| Penril Datacomm Limited |
| Nortel Networks Southeast Asia Pte Ltd. |
| Nortel Networks Technology (Thailand) Ltd. |
| Nortel Technology Excellence Centre Private Limited |
| Diamondware, Ltd. |
| Northern Telecom International Inc. |
| Nortel Networks Optical Components Inc. |
| The Nortel Foundation |
| Nortel Networks India International Inc. |
| Nortel Networks (CALA) Inc. |
| Nortel Networks de Guatemala, Ltda. |
| Nortel Trinidad and Tobago Limited |
| Qtera Corporation |
| Nortel Networks Technology Ltd. |
| Nortel Networks (Shannon) Limited |

- 4 -

| |
|---|
| Nortel Networks Europe Sales Limited |
| Nortel Government Solutions Incorporated |
| AC Technologies, Inc. |
| Integrated Information Technology Corporation |
| Nortel Networks UK Limited |
| Northern Telecom International Limited |
| Nor. Web DLP Limited |
| Nortel Limited |
| Nortel Networks (Northern Ireland) Limited |
| Networks Employee Benefit Trustee Company Limited |
| Nortel-SE d.o.o. Beograd |
| Nortel Networks Properties Limited |
| Promatory Communications  Limited |
| X-CEL Communications Limited |
| Nortel Networks Optical Components Limited |
| Nortel Networks (Photonics) Pty. Ltd. |
| Northern Telecom PCN Limited |
| Telephone Switching International Limited |
| Frisken Investments Pty. Ltd. |
| Betts Investments Pty. Ltd. |
| Periphonics Limited |
| Nortel Networks Australia Pty Limited |
| Nortel Australia Communication Systems Pty. Limited |
| Star 21 Networks GmbH |
| Star 21 Networks (Schweiz) AG |
| Star 21 Networks Deutschland GmbH |
| Star 21 Facility Management Verwaltung GmbH |
| Star 21 Operations GmbH |
| Star 21 Facility Management GmbH & Co. KG |
| Nortel Networks International Finance & Holding BV |
| Uni-Nortel Communication Technologies (Hellas), S.A. |
| Nortel Networks (Austria) GmbH |

- 5 -

| |
|---|
| Nortel Networks AG |
| Nortel Networks AS |
| Nortel Networks S.R.O. |
| Nortel Networks S.p.A. |
| Nortel Networks S.A. |
| Nortel Networks South Africa (Proprietary) Limited |
| Nortel Networks NV |
| Matra Communication Cellular Terminals GmbH |
| Nortel Networks Engineering Service Kft. |
| Nortel Networks (Bulgaria) EOOD |
| Nortel Networks Slovensko, s.r.o. |
| Nortel Networks Romania Srl |
| Nortel Networks O.O.O |
| Nortel Networks Portugal, S.A. |
| Nortel Communications Holdings (1997) Limited |
| Nortel Networks Israel (Sales and Marketing) Limited |
| Nortel Networks Communications (Israel) Limited |
| Nortel Networks Polska Sp. z.o.o. |
| Nortel GmbH |
| Nortel Networks BV |
| Nortel Networks Malta Limited |
| Nortel Ukraine Ltd. |
| Nortel Networks AB |
| Nortel Networks OY |
| Nortel Networks, Hispania S.A. |
| Nortel Networks Netas Telekomunikasyon A.S. |

# SCHEDULE "B" TO AMENDED AND RESTATED SETTLEMENT AGREEMENT

## [ATTACHED]

Court File No. 09-CL-7950

### *ONTARIO*
### SUPERIOR COURT OF JUSTICE
### COMMERCIAL LIST

THE HONOURABLE MR.   )        WEDNESDAY, THE 31ST DAY

                     )

JUSTICE MORAWETZ      )                OF MARCH, 2010

### IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

### AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION and NORTEL NETWORKS TECHNOLOGY CORPORATION (the "Applicants")

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

### SETTLEMENT APPROVAL ORDER

**THIS MOTION**, made by the Applicants (collectively, "Nortel") for an order approving the amended and restated settlement agreement made as of the 30th day of March, 2010, attached as Schedule "A" to this Order (the "Amended and Restated Settlement Agreement") and for the other relief set out in the Notice of Motion dated March 30, 2010 was heard this day at 393 University Avenue, Toronto, Ontario.

**ON READING** the affidavit of Elena King sworn March 30, 2010 and the Forty-Second Report of Ernst & Young Inc. dated March 30, 2010 (the "Forty-Second Report") in its capacity as monitor (the "Monitor"), and on hearing submissions of counsel for the Applicants, the Monitor, The Northern Trust Company, Canada, in its capacity as trustee of the HWT and it is capacity as trustee and custodian for the trust funds maintained in respect of the Pension Plans and the master trust for the Pension Plans, the Northern Telecom Limited Pension Trust Fund, the Opposing LTD Employees and the Board of Directors of Nortel Networks Corporation and Nortel Networks Limited and on the consent of CAW, the Former

Employees Representatives, the LTD Representative and Representative Counsel (as those terms are defined in the Amended and Restated Settlement Agreement); the UCC, the Bondholder Committee (as those terms are defined in the Amended and Restated Settlement Agreement) and the Superintendent of Financial Services of Ontario (the "Superintendent") as the administrator of and on behalf of the Pension Benefits Guarantee Fund (the "PBGF") not opposing, no one else appearing although duly served as appears from the affidavit of service of Katie Legree dated March 30, 2010, filed.

1.      **THIS COURT ORDERS** that service of the Notice of Motion, the Forty-Second Report and the Motion Record is hereby validated so that this Motion is properly returnable today and further service thereof is hereby dispensed with.

2.      **THIS COURT ORDERS** that capitalized terms used herein and not otherwise defined shall have the meaning given to them in the Affidavit of Elena King dated February 18, 2010 or the Amended and Restated Settlement Agreement.

**Amended and Restated Settlement Agreement**

3.      **THIS COURT ORDERS** that the Amended and Restated Settlement Agreement is hereby approved in its entirety, including all schedules attached thereto, and that the Parties thereto (including by representation) are hereby bound by this Order and the Amended and Restated Settlement Agreement and authorized and directed to comply with their obligations thereunder, including, without limitation, to make the payments provided for therein. The Amended and Restated Settlement Agreement supersedes all prior arrangements and understandings among the Parties thereto (including by representation) with respect to such subject matter, including, without limitation, the Settlement Agreement made as of the 8th day of February, 2010.

**Pension Plans**

4.      **THIS COURT ORDERS AND DECLARES** that any Pension Claims made in these proceedings or in any subsequent receivership or bankruptcy proceedings or in any other proceedings or in any other forum whatsoever concerning Nortel, any Nortel Worldwide Entity or the Pension Plans shall, to the extent they are allowed pursuant to any claims

adjudication procedure established in such proceedings, rank as ordinary unsecured claims on a *pari passu* basis with the claims of ordinary unsecured creditors of Nortel, such that no part of any Pension Claims shall be entitled to any preferential treatment or enjoy any priority in any manner over the claims of ordinary unsecured creditors made against Nortel, or rank as a priority claim, as a trust (whether deemed or otherwise) or a lien or charge.

5.    **THIS COURT ORDERS AND DECLARES** that no person or entity, including without limitation, (i) the Representatives, (ii) the Superintendent, as administrator of and on behalf of the PBGF, (iii) NNL, as the administrator of the Pension Plans, (iv) all successor administrators of the Pension Plans (whether appointed by the Superintendent or otherwise), and (v) the Pension HWT Claimants, all future members and beneficiaries of the Pension Plans, the trustee of the Pension Plans, the employees and former employees of Nortel and others who may have or make claims against Nortel or any Nortel Worldwide Entity with respect to employment or post employment or post retirement benefits (collectively, with the Pension HWT Claimants, the "Employee Claimants"), shall directly or indirectly assert, advance, re-assert or re-file any claim or initiate any legal proceedings or actions of any nature or kind in these proceedings or in any subsequent receivership or bankruptcy proceedings, or in any other proceedings, or in any other forum whatsoever concerning Nortel, any Nortel Worldwide Entity (to the extent such claims are provable) or the Pension Plans except as an ordinary unsecured claim ranking on a *pari passu* basis with the claims of ordinary unsecured creditors of Nortel, and shall not assert or advance any claim, directly or indirectly, that the Pension Claims, or any part thereof, ranks as a priority or preferential claim over the claims of ordinary unsecured creditors or Nortel, including, without limitation, that it is the subject of a trust (whether deemed or otherwise) or a lien or charge, or under other legal or equitable theory, and all such priority, trust, lien or charge claims are hereby forever barred, enjoined, released and extinguished as against Nortel, any Nortel Worldwide Entity, the Pension Plans, the trustee of the Pension Plans, and their respective officers, directors, employees, agents, members, legal counsel, financial advisors and each of the heirs, executors, administrators, legal representatives, successors and assigns of each of the foregoing.

6.    **THIS COURT ORDERS** that the portion of proofs of claim already or hereafter filed by the Superintendent as the administrator of and on behalf of the PBGF, by Nortel, by any

Employee Claimants or by any other person or entity claiming, asserting or advancing priority or preferential treatment of any kind, including, without limitation, trusts (whether deemed or otherwise) liens or charges in respect of any Pension Claims or payments by the PBGF with respect to the Pension Plans be and they hereby are disallowed, but only to the extent that they claim such priority or preferential treatment, without prejudice to the ordinary unsecured claims included in such proofs of claim. For greater certainty, such disallowance shall not otherwise affect the quantum or validity of such claims, which shall rank as ordinary unsecured creditors on a *pari passu* basis with the claims of the ordinary unsecured creditors of Nortel, in each case, to the extent allowed against Nortel pursuant to any claims adjudication procedure established in these proceedings.

7.      THIS COURT ORDERS that with respect to claims by the Superintendent on behalf of the PBGF, and any administrator appointed by the Superintendent, paragraphs 4, 5 and 6 shall only apply if: (i) the Pension Payments are made in accordance with the Amended and Restated Settlement Agreement; and (ii) no bankruptcy order is made with respect to Nortel on or before September 30, 2010.

8.      **THIS COURT ORDERS** that as long as NNL continues to administer the Pension Plans, there shall be no change whatsoever to the plan terms of the Pension Plans without the approval of the Court, and no change to the current asset mix or investment policies with respect to the Pension Plans other than at the request, and with the consent, of the Representative Counsel and the approval of the Court.

9.      **THIS COURT ORDERS** that Nortel shall make all current service payments and special payments to the Pension Plans in respect of defined benefit entitlements thereunder in the same manner as it has been doing over the course of the proceedings under the CCAA, through to March 31, 2010 in accordance with the last actuarial valuation for the Pension Plans filed with the Financial Services Commission of Ontario ("FSCO") in the aggregate amount of $2,216,254.00 per month. Thereafter and through to September 30, 2010, Nortel shall make only current service payments to the Pension Plans (in accordance with the last actuarial valuation for the Pension Plans filed with FSCO) in the aggregate amount of $379,837.00 per month. For greater certainty, Nortel shall not be required to make any

special payment contributions to the Pension Plans after March 31, 2010. Nortel shall also make current service contributions in respect of defined contribution entitlements under the Nortel Networks Limited Managerial and Non-Negotiated Pension Plan (Registration No. 0342048) in accordance with the terms thereof, through to September 30, 2010 and shall not be precluded from doing so by the terms of the Amended and Restated Settlement Agreement. Nortel shall not be required to make any payments to the Pension Plans after September 30, 2010, except in respect of any claims in respect of the Pension Plans allowed against Nortel (which claims shall rank on a *pari passu* basis with the unsecured claims of the ordinary unsecured creditors of Nortel) pursuant to any claims adjudication procedure established in these proceedings. Neither Nortel, nor any Nortel Worldwide Entity shall have any liability regarding any contributions, fees, indemnities, charges or costs of any kind in respect of the administration of the Pension Plans that occurs after September 30, 2010. For greater certainty, nothing in this paragraph affects any obligation or liability of Nortel regarding any contributions, fees, indemnities, charges or costs of any kind in respect of the administration of the Pension Plans that occurs before 11:59 p.m. on September 30, 2010.

**Health and Welfare Trust**

10.   **THIS COURT ORDERS AND DECLARES** that any HWT Claims made in these proceedings or in any subsequent receivership or bankruptcy proceedings, or in any other proceedings, or in any other forum whatsoever concerning Nortel, any Nortel Worldwide Entity or the HWT shall, to the extent they are allowed against Nortel pursuant to any claims adjudication procedure established in such proceedings, rank as ordinary unsecured claims on a *pari passu* basis with the claims of ordinary unsecured creditors of Nortel, and no part of any such HWT Claims shall rank as a preferential or priority claim or shall be the subject of a constructive trust or trust of any nature or kind.

11.   **THIS COURT ORDERS AND DECLARES** that   no person or entity, including without limitation, the Employee Claimants and the Representatives, shall, directly or indirectly (i) advance, assert, re-assert, re-file or make any HWT Claim in these proceedings or in any subsequent receivership or bankruptcy proceedings, or in any other proceedings, or in any other forum whatsoever concerning Nortel, any Nortel Worldwide Entity (to the extent

6

that such claims are provable) or the HWT except as an ordinary unsecured claim ranking on a *pari passu* basis with the claims of ordinary unsecured creditors of Nortel, or (ii) advance, assert, re-assert, re-file or make any claim that any HWT Claims are entitled to any priority or preferential treatment over ordinary unsecured claims, including without limitation that they rank as preferential or priority claims against Nortel or any Nortel Worldwide Entity, or are the subject of a constructive trust or trust of any nature or kind, and all such claims are hereby forever barred, enjoined, released and extinguished as against Nortel, any Nortel Worldwide Entity, the HWT and the trustee of the HWT, and their respective officers, directors, employees, agents, members, legal counsel, financial advisors and each of the heirs, executors, administrators, legal representatives, successors and assigns of each of the foregoing.

12.     **THIS COURT ORDERS AND DECLARES THAT** nothing in this Order, including, without limiting the generality of the foregoing, the provisions of paragraphs 10 and 11, affects the determination on any basis whatsoever of the entitlement of any beneficiary to a distribution from the corpus of the HWT.

**Release and Charge**

13.     **THIS COURT ORDERS** that the M&D Beneficiaries and former employees entitled to payment from the Termination Fund shall be entitled to the benefit of a charge on Nortel's Property (as defined in the Initial Order) to secure payment of the Medical and Dental Payments, Income Payments, Termination Payments and Pension Payments (the "Payments Charge"), which Payments Charge shall: (i) not exceed an aggregate amount of FIFTY-SEVEN MILLION DOLLARS ($57,000,000.00); (ii) rank subordinate in priority to the Inter-company Charge and the Shortfall Charge (as both terms are defined in the Initial Order); (iii) apply in these proceedings and in any subsequent bankruptcy or receivership; (iv) be reduced in amount as the Medical and Dental Payments, Income Payments, Termination Payments and Pension Payments are paid by an amount equal to each such payment made; and (v) automatically terminate and be extinguished on the filing with this Honourable Court by the Monitor of a certificate certifying that the terms of the Amended and Restated Settlement Agreement have been complied with by Nortel.

14.     **THIS COURT ORDERS** that the Payments Charge shall constitute a "Charge" pursuant to the Initial Order, and shall be subject to the provisions relating to Charges including, without limitation, paragraphs 42 through 47 thereof and that the creation of the Payments Charge shall not preclude this Court from creating additional charges under the Initial Order that rank in priority to or *pari passu* with the Payments Charge.

15.     **THIS COURT ORDERS AND DECLARES** that the Releasees, the CAW, the Representatives, and if and only if paragraphs 4, 5 and 6 apply as provided in paragraph 7, the Superintendent in his capacity as administrator of and on behalf of the PBGF, and their legal counsel and financial advisors and each of the heirs, executors, administrators, legal representatives, successors and assigns of each of the foregoing, be and they are hereby released, discharged and remised from any and all direct and indirect claims (contingent, liquidated or unliquidated, proven or unproven, known or unknown, in the nature of damages or otherwise, whether or not asserted and whether arising by contract, agreement (whether written or oral), under statute, civil law, common law, or in equity, or otherwise in any jurisdiction) related to (i) the Pension Plans, including without limitation, the administration of the Pension Plans, any obligation to assert or advance in these proceedings, or in any subsequent receivership or bankruptcy proceedings or in any other proceedings or in any other forum whatsoever concerning Nortel, any Nortel Worldwide Entity or the Pension Plans, any priority claim, as a trust (whether deemed or otherwise) or a lien or charge, the funding of the Pension Plans (including any obligation to contribute to the Pension Plans, except as required by paragraph 9 of this Order) and the investment of the Pension Plan assets, and (ii) the HWT, including without limitation, the administration of the HWT, the funding of the HWT, any obligation to contribute to the HWT and the investment of the HWT assets, provided that nothing herein shall release a director of Nortel from any matter referred to in subsection 5.1(2) of the CCAA or with respect to fraud on the part of any Releasee, with respect to that Releasee only.

16.     **THIS COURT ORDERS AND DECLARES** that the Nortel Releasees be and they are hereby released, discharged and remised from any and all direct and indirect claims (contingent, liquidated or unliquidated, proven or unproven, known or unknown, in the nature of damages or otherwise, whether or not asserted and whether arising by contract, agreement

(whether written or oral), under statute, civil law, common law, or in equity, or otherwise in any jurisdiction) that the Pension Claims and the HWT Claims, or any part thereof, rank as a preferential or priority claim over the claims of ordinary unsecured creditors of Nortel, as a trust (whether deemed or otherwise) or a lien or charge, or under any other legal or equitable theory.   For greater certainty, notwithstanding the foregoing, nothing in this Order shall release or discharge the Nortel Releasees from any Pension Claims and HWT Claims to the extent such claims are allowed as ordinary unsecured claims (which claims shall rank as on a *pari passu* basis with the unsecured claims of the ordinary unsecured creditors of Nortel) against the Nortel Releasees pursuant to any claims adjudication procedure established in these proceedings.

17.     **THIS COURT ORDERS** that the Employee Claimants shall not assert, advance or make any claims of any nature whatsoever against any person or entity whatsoever that could reasonably be expected to result in a claim over (including, without limitation, a claim for contribution or indemnity) being made against any of the Releasees or Nortel Releasees with respect to the subject matter of the release provisions hereof.

**CCAA Plan or Subsequent Bankruptcy**

18.     **THIS COURT ORDERS AND DECLARES** that under no circumstances shall any CCAA Plan of Arrangement in the Nortel proceedings (the "Plan") be proposed or approved by the Court if: (i) the Plan provides for separate classification of any Employee Claimants from ordinary unsecured creditors of Nortel, including, without limitation, bondholders and Nortel Networks Inc.; or (ii) the Employee Claimants and the other ordinary unsecured creditors do not receive the same *pari passu* treatment of their allowed claims against Nortel pursuant to the Plan.

## SCHEDULE "A"

Court File No: 09-CL-7950

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION *et al.*

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

Proceeding commenced at Toronto

**SETTLEMENT APPROVAL ORDER**

**OGILVY RENAULT LLP**
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
Toronto, Ontario  M5J 2Z4
CANADA

**Derrick Tay LSUC#: 21152A**
Tel: (416) 216-4832
Email: dtay@ogilvyrenault.com

**Mario Forte  LSUC#: 27293F**
Tel: (416) 216-4870
Email: mforte@ogilvyrenault.com

**Jennifer Stam LSUC #46735J**
Tel: (416) 216-2327
Email: jstam@ogilvyrenault.com
Fax: (416) 216-3930

Lawyers for the Applicants

# SCHEDULE "C" TO AMENDED AND RESTATED SETTLEMENT AGREEMENT

## [ATTACHED]



# N⦸RTEL

March **30**, 2010

Pension Benefits Guarantee Fund (Ontario)
c/o Financial Services Commission of Ontario
4th Floor
5160 Yonge Street
Toronto, ON
M2N 6L9

**Attention: K. David Gordon, Deputy Superintendent, Pensions**

Dear Sirs:

**Re:    Court File No. 09-CL-7950
    In the Matter of the Companies' Creditors Arrangement Act and Nortel
    Networks Corporation et al (Nortel")**

This letter sets out, among other things, the understanding among Nortel, the Monitor and
the Superintendent of Financial Services in his capacity as Administrator of the Pension
Benefits Guarantee Fund concerning the administration of Nortel's registered pension
plans (the "Pension Plans") and the transition of the Pension Plans to a new
administrator, in order to provide for an orderly, cost effective transition that will be in
the best interests of the members of the Pension Plans.

Defined terms used herein shall have the meaning given to them in the agreement made
as of the **30**th day of March, 2010 a copy of which is attached hereto as Schedule "A"
(the "Amended and Restated Settlement Agreement"):

1. Conditional Understanding: It is acknowledged that the terms of this letter
   are conditional on (a) the Amended and Restated Settlement Agreement
   having been fully executed and delivered, and (b) the order of the Court
   approving the Amended and Restated Settlement Agreement having been
   issued and entered substantially in the form of the Order attached as
   Schedule "B".

2. Pension Plan Administration: Nortel will continue to administer the
   Pension Plans until September 30, 2010 at 11:59 p.m. Neither Nortel nor
   the Monitor will take any steps to initiate a wind up, in whole or in part, of
   the Pension Plans with an effective date prior to October 1, 2010. So long
   as Nortel is the administrator of the Pension Plans, there will be no change
   to the current asset mix, investment policies or the plan terms with respect
   to the Pension Plans without the consent of the Representative Counsel
   and the approval of the Court.

3.    Pension Plan Transition: (a) Nortel will ensure that all books, records, data and other information relating to the Pension Plans or beneficial to the administration or winding-up of the Pension Plans are consolidated in Toronto, Ontario, Canada by no later than March 31, 2010; and (b) the Monitor and Nortel will take all reasonable steps, at the sole cost and expense of Nortel, to complete the orderly transfer of the administration of the Pension Plans to a new administrator appointed by the Superintendent effective October 1, 2010 (the "New Administrator").

4.    Amended and Restated Settlement Agreement and Settlement Appoval Order: The Superintendent will not oppose the granting of an Order substantially in the form attached hereto as Schedule "B".

5.    Employee Incentive and Director Charge Order: The Superintendent will not oppose the granting of a court order approving (a) any employee incentive program, including any charge therefor, that is determined by the Monitor to be reasonable and necessary for the continued operation of Nortel, or (b) the creation of a trust for persons who accept the directorship of Nortel worldwide subsidiaries in order to facilitate the restructuring, provided that: (i) such trust is approved and recommended by the Monitor; (ii) no part of the corpus of the trust may be used to pay bonuses or any other compensation to the directors; and (iii) any corpus of the trust remaining on the termination of the trust reverts to Nortel.

6.    Directors: The Superintendent confirms that as of January 15, 2010, he is not aware of any claims against directors, officers or the Monitor, other than such claims as may arise as a result of the transfer of pension information and other records outside of Canada.

Please sign and return the copy of this letter attached.

Yours very truly,

attachments

\5812988

Page 3

## NORTEL NETWORKS CORPORATION

Per:

Name:   John Doolittle
Title:   Senior Vice-President, Corporate
           Services and Chief Financial
           Officer

Per:

Name:   Clarke Glaspell
Title:   Controller

## NORTEL NETWORKS LIMITED

Per:

Name:   John Doolittle
Title:   Senior Vice-President, Corporate
           Services and Chief Financial
           Officer

Per:

Name:   Clarke Glaspell
Title:   Controller

## NORTEL NETWORKS GLOBAL CORPORATION

Per:

Name:   John Doolittle
Title:   President

Per:

Name:   Clarke Glaspell
Title:   Controller

Page 4

**NORTEL NETWORKS INTERNATIONAL CORPORATION**

Per:

    Name: John Doolittle
    Title: President

Per:

    Name: Clarke Glaspell
    Treasurer

**NORTEL NETWORKS TECHNOLOGY CORPORATION**

Per:

    Name: Clarke Glaspell

    Title: President and Controller

**ERNST & YOUNG INC.**, solely in its capacity as monitor in the CCAA proceedings of Nortel and not in its personal capacity

Per:

    Name:
    Title:

**SUPERINTENDENT OF FINANCIAL SERVICES OF ONTARIO** as administrator of the Pension Benefits Guarantee Fund, without personal liability

Per:

    Name:
    Title:

Page 4

**NORTEL NETWORKS INTERNATIONAL CORPORATION**

Per: _____
      Name:
      Title:

Per: _____
      Name:
      Title:

**NORTEL NETWORKS TECHNOLOGY CORPORATION**

Per: _____
      Name:
      Title:

**ERNST & YOUNG INC.,** solely in its capacity as monitor in the CCAA proceedings of Nortel and not in its personal capacity

Per: _____
      Name: Murray A. McDonald
      Title: President

**SUPERINTENDENT OF FINANCIAL SERVICES OF ONTARIO** as administrator of the Pension Benefits Guarantee Fund. without personal liability

Per: _____
      Name:
      Title:

Page 4

**NORTEL NETWORKS INTERNATIONAL CORPORATION**

Per:

　　　　Name:
　　　　Title:

Per:

　　　　Name:
　　　　Title:

**NORTEL NETWORKS TECHNOLOGY CORPORATION**

Per:

　　　　Name:
　　　　Title:

**ERNST & YOUNG INC.**, solely in its capacity as monitor in the CCAA proceedings of Nortel and not in its personal capacity

Per:

　　　　Name: Murray A. McDonald
　　　　Title: President

**SUPERINTENDENT OF FINANCIAL SERVICES OF ONTARIO** as administrator of the Pension Benefits Guarantee Fund, without personal liability

Per:

　　　　Name: K David Gordon
　　　　Title: Deputy Superintendent, Pensions

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION *et al.*

Court File No: 09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE (COMMERCIAL LIST)**

Proceeding commenced at Toronto

**SETTLEMENT APPROVAL ORDER**

**OGILVY RENAULT LLP**
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
P.O. Box 84
Toronto, Ontario M5J 2Z4, Canada

**Derrick Tay LSUC#: 21152A**
Tel: (416) 216-4832
Email: dtay@ogilvyrenault.com

**Mario Forte LSUC#: 27293F**
Tel: (416) 216-4870
Email: mforte@ogilvyrenault.com

**Jennifer Stam LSUC #46735J**
Tel: (416) 216-2327
Email: jstam@ogilvyrenault.com
Fax: (416) 216-3930

Lawyers for the Applicants

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

Court File No: 09-CL-7950

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION *et al.*

---

**ONTARIO
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)**

Proceeding commenced at Toronto

---

**ONE HUNDRED AND THIRTY FIFTH REPORT
OF THE MONITOR DATED
JANUARY 20, 2017**

---

**GOODMANS LLP**
Barristers & Solicitors
Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto, ON  M5H 2S7

Jay A. Carfagnini  (LSUC#: 22293T)
jcarfagnini@goodmans.ca
Joseph Pasquariello (LSUC# 38390C)
jpasquariello@goodmans.ca
Christopher G. Armstrong (LSUC# 55148B)
carmstrong@goodmans.ca

Tel: 416.979.2211
Fax: 416.979.1234

Lawyers for the Monitor, Ernst & Young Inc.

# TAB 3

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS***
***ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF**
**COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL**
**NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL**
**CORPORATION, NORTEL NETWORKS TECHNOLOGY CORPORATION,  NORTEL**
**COMMUNICATIONS INC., ARCHITEL SYSTEMS CORPORATION AND**
**NORTHERN TELECOM CANADA LIMITED**

**ONE HUNDRED AND THIRTY THIRD REPORT OF THE MONITOR**
**DATED NOVEMBER 23, 2016**

## INTRODUCTION

1.      On January 14, 2009 (the "**Filing Date**"), Nortel Networks Corporation ("**NNC**" and collectively with all its subsidiaries "**Nortel**" or the "**Company**"), Nortel Networks Limited ("**NNL**"), Nortel Networks Technology Corporation, Nortel Networks International Corporation and Nortel Networks Global Corporation (collectively, with the New Applicants (as defined below), the "**Canadian Debtors**") filed for and obtained protection under the *Companies' Creditors Arrangement Act* ("**CCAA**"). Pursuant to the Order of this Court dated January 14, 2009, as amended and restated (the "**Initial Order**"), Ernst & Young Inc. was appointed as the Monitor of the Canadian Debtors (the "**Monitor**") in the CCAA proceedings (the "**CCAA Proceedings**"). The stay of proceedings was extended to March 31, 2017, by this Court in its Order dated September 29, 2016.

2.      Nortel Networks Inc. ("**NNI**") and certain of its U.S. subsidiaries and affiliates concurrently filed voluntary petitions under Chapter 11 of the U.S. Bankruptcy Code (the "**Code**") in the United States Bankruptcy Court for the District of Delaware (the "**U.S. Court**") on January 14, 2009 (the "**Chapter 11 Proceedings**").  As required by U.S. law,

an official committee of unsecured creditors (the "**Committee**") was established in January, 2009.

3.     An ad hoc group of holders of bonds issued by NNL, NNC and Nortel Networks Capital Corporation has been organized and is participating in these proceedings as well as the Chapter 11 Proceedings (the "**Bondholder Group**"). In addition, pursuant to Orders of this Court, representative counsel was appointed on behalf of the former employees of the Canadian Debtors, the continuing employees of the Canadian Debtors and the LTD Beneficiaries (collectively, "**Representative Counsel**") and each of these groups is participating in the CCAA Proceedings.

4.     Nortel Networks (CALA) Inc. ("**NN CALA**" and together with NNI and certain of its subsidiaries and affiliates that filed on January 14, 2009, the "**U.S. Debtors**") filed a voluntary petition under Chapter 11 of the Code in the U.S. Court on July 14, 2009.

5.     Nortel Networks UK Limited ("**NNUK**") and certain of its affiliates located in EMEA were granted administration orders (the "**U.K. Administration Orders**") by the High Court of England and Wales on January 14, 2009 (collectively the "**EMEA Debtors**" and with the Canadian Debtors and the U.S. Debtors, the "**Estates**" and each an "**Estate**"). The UK Administration Orders appointed Alan Bloom, Stephen Harris, Alan Hudson and Chris Hill of Ernst & Young LLP as administrators of the various EMEA Debtors, except for Nortel Networks (Ireland) Limited, to which David Hughes (Ernst & Young LLP Ireland) and Alan Bloom were appointed (collectively, the "**Joint Administrators**").

6.     Subsequent to the filing date, Nortel Networks S.A. ("**NNSA**") commenced secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings in the Republic of France pursuant to which a liquidator (the "**French Liquidator**") and an administrator were appointed by the Versailles Commercial Court.

7.     The CCAA Proceedings and the U.K. Administration proceedings of NNUK and the other EMEA Debtors have been recognized by the U.S. Court as foreign main proceedings under Chapter 15 of the Code.

8.      Subsequent to the Filing Date, certain other Nortel subsidiaries have filed for creditor protection or bankruptcy proceedings in the local jurisdiction in which they are located.

9.      On March 18, 2016, Nortel Communications Inc., Architel Systems Corporation and Northern Telecom Canada Limited (collectively, the "**New Applicants**") sought and were granted an Order (New Applicants) of this Court pursuant to the CCAA (the "**New Applicants Order**"). Pursuant to the New Applicants Order, each of the New Applicants was deemed to be an "Applicant" (as defined in the Initial Order) in the CCAA Proceedings, entitled to all of the rights, benefits and protections granted by, and otherwise subject to, among other Orders of this Court entered in the CCAA Proceedings, the Initial Order as if it were an Applicant thereunder. The New Applicants Order also procedurally consolidated the CCAA proceedings of the New Applicants with the CCAA Proceedings.

**PURPOSE**

10.     The purpose of this one hundred and thirty third report of the Monitor ("**One Hundred and Thirty Third Report**") is to provide this Court and stakeholders with information regarding the Monitor and Canadian Debtors' motion:

a) seeking an Order, among other things, authorizing the filing of the Canadian Plan[1], convening the Meeting to be held on or about January 17, 2017 to consider and vote upon the Canadian Plan, authorizing the mailing and delivery of notices and materials for consideration at the Meeting, setting the voting procedures to be followed by voting creditors and setting a date for the Sanction Hearing;

b) seeking an Order to call for Post-Filing Claims and setting a bar date for the filing of any such claims; and

c) seeking an Order deeming a specified claim filed against the U.S. Debtors to be filed against the Canadian Debtors,

---

[1] Capitalized terms used in this introductory section are defined later in this One Hundred and Thirty Third Report.

and to provide an update in respect of certain matters pertaining to the Canadian Plan and Information Circular.

**TERMS OF REFERENCE**

11.  In preparing this One Hundred and Thirty Third Report, the Monitor has relied upon unaudited financial information, the Company's books and records, financial information prepared by the Company and discussions with the Company. The Monitor has not audited, reviewed or otherwise attempted to verify the accuracy or completeness of this information. Unless otherwise stated, all monetary amounts contained herein are expressed in U.S. dollars.

12.  Capitalized terms used herein and not otherwise defined in this One Hundred and Thirty Third Report are as defined in the Canadian Plan, the Settlement and Support Agreement or the Meeting Order (as each such term is defined below).

13.  The Monitor has made various materials relating to the CCAA Proceedings available on its website at www.ey.com/ca/nortel (the "**Monitor's Website**"). The Monitor's Website also contains a dynamic link to Epiq Bankruptcy LLC's website where materials relating to the Chapter 11 Proceedings are posted.

**CANADIAN PLAN AND INFORMATION CIRCULAR UPDATE**

14.  As previously reported, on October 12, 2016, the Canadian Debtors, Monitor, U.S. Debtors, EMEA Debtors, EMEA Non-Filed Entities, Joint Administrators, NNSA Conflicts Administrator, French Liquidator, Bondholder Group, Committee, Representatives (defined below), Unifor, U.K. Pension Trustee, PPF, Joint Liquidators and the NNCC Bondholder Signatories, entered into a certain Settlement and Plans Support Agreement (the "**Settlement and Support Agreement**") which, among other things, contains the terms of settlement of the Allocation Dispute (as defined therein) among the estates and certain other significant claims. The Settlement and Support Agreement also contemplates the filing of a consolidated plan in Canada by the Canadian Debtors and one or more plans in the U.S. by the U.S. Debtors and sets out a target timeline for various related milestones, including the creditors' meeting and Sanction Hearing in Canada and the confirmation hearing in the U.S.

15.    On November 4, 2016, the Monitor served and filed its One Hundred and Thirty First report which contained the Canadian Debtors' proposed Plan of Compromise and Arrangement dated November 4, 2016 (the "**Canadian Plan**") and related information circular dated November 4, 2016 (the "**Information Circular**").

16.    Also on November 4, 2016, as contemplated by the Settlement and Support Agreement, the U.S. Debtors filed the First Amended Joint Chapter 11 Plan of Nortel Networks Inc. and Certain of its Affiliated Debtors (the "**U.S. Plans**") and related proposed disclosure statement (the "**U.S. Disclosure Statement**") with the U.S. Court.

17.    The purpose of the Canadian Plan is to:

    a)  effectuate and implement the terms of the Settlement and Support Agreement, including the settlement of the Allocation Dispute and certain other claims, disputes and other matters contemplated therein, the release of the Sale Proceeds to the Canadian Debtors, U.S. Debtors and EMEA Debtors as provided for therein, and the payment contemplated pursuant to Section 4(e) of the Settlement and Support Agreement;

    b)  provide for the substantive consolidation of each of the Canadian Debtors into the Canadian Estate on the terms contemplated by the Canadian Plan;

    c)  provide for payment in full of Proven Priority Claims;

    d)  provide for a pro rata distribution or distributions from the Canadian Estate to holders of all Proven Affected Unsecured Claims; and

    e)  effect a release and discharge of all Affected Claims and Released Claims.

18.    The current estimated timeline to seek approval of and implement the Canadian Plan is as follows:

    (a)    Meeting Order Hearing: December 1, 2016;

    (b)    Creditor Meeting: January 17, 2017;

    (c)    Sanction Hearing: January 24, 2017;

(d)    Plan Effective Date: February 15, 2017;

(e)    Plan Implementation Date: as soon as practical following the Plan Effective Date; and

(f)    Initial Distribution Date: within 60 days of the Plan Implementation Date.

19.    Based on the above timeline and subject to implementation of the Canadian Plan and the full effectiveness of the Settlement and Support Agreement, it is estimated an initial distribution to creditors may be possible in April 2017.  Creditors holding Proven Affected Unsecured Claims will receive distributions in U.S. dollars, unless such claim is predominantly denominated in Canadian dollars (i.e. more than 50% of the Proven Affected Unsecured Claim is denominated in Canadian dollars) (a "**CAD Claim**"), in which case creditors will receive distributions in Canadian dollars.

20.    On October 19, 2016, the Monitor sought and obtained an Order (the "**Canadian Currency Conversion Order**") from this Court that, among other things, authorized the Canadian Debtors and Monitor to enter into and perform their obligations under a Canadian distribution escrow agreement with certain of the U.S. Debtors, EMEA Debtors and a subsidiary of Royal Bank of Canada (the "**Canadian Distribution Agent**") and authorized the conversion of up to $1.2 billion of the Sale Proceeds into Canadian dollars. On October 21, 2016, the U.S. Court also issued an order (together with the Canadian Currency Conversion Order, the "**Currency Conversion Orders**") approving the U.S. Debtors entry into the Canadian distribution escrow agreement and authorizing the conversion of up to $1.2 billion of the Sale Proceeds into Canadian dollars.

21.    On October 24, 2016, pursuant to the Currency Conversion Orders, directions were issued to the U.S. Distribution Agent to transfer approximately $1.06 billion to the Canadian Distribution Agent. Such funds have been transferred and converted from U.S. dollars to Canadian dollars at a blended foreign exchange rate of $1.00 = CA$1.337650. The blended foreign exchange rate at which such funds together with any other funds transferred are converted from U.S. dollars to Canadian dollars shall constitute the Applicable F/X Rate for the Canadian Plan.

22.    With respect to Proven Affected Unsecured Claims, the Monitor currently  estimates that the range of recovery (per U.S. dollar) of Proven Affected Unsecured Claims will be

approximately 41.5 cents to 45 cents.  Given currency conversion matters as described in the Canadian Plan, the Monitor estimates that the range of recovery (per CA dollar) for CAD Claims will be approximately CA 45 cents to CA 49 cents (assuming an Applicable F/X Rate of $1.00 = CA $1.337650).

## MEETING ORDER

23.    Under the terms of the Settlement and Support Agreement and as contemplated by the Canadian Plan, the Monitor and Canadian Debtors plan to hold a meeting of Affected Unsecured Creditors (the "**Meeting**") on January 17, 2017 starting at 1:00 p.m. (Toronto time) at The International Centre Conference Centre (6900 Airport Road, Mississauga, Ontario), and have proposed the terms of a meeting order (the "**Meeting Order**") to set out the process for the mailing of certain Meeting materials and notices, voting and the conduct of the Meeting.

24.    Consistent with the Canadian Plan, the Meeting Order contemplates a single class of creditors, namely the Affected Unsecured Creditors Class.  The Affected Unsecured Creditors Class consists of those unsecured creditors with Affected Unsecured Claims against the Canadian Debtors. No other creditors or holders of interests, including holders of Director and Officer Claims, Equity Claims or Equity Interests, are permitted to vote on the Canadian Plan.

## Voting Claims

25.    Pursuant to the Canadian Plan and the proposed Meeting Order, Affected Unsecured Creditors with Voting Claims will be entitled to vote on the Canadian Plan.  Voting Claims generally fall into two categories:

    a)  "**Bondholder Claims**" – claims in respect of the Bonds that have been either issued or guaranteed by one or more of the Canadian Debtors (the "**Bonds**"); and

    b)  "**Ordinary Creditor Claims**" **–** all other Affected Unsecured Claims (except for Bondholder Claims) including, without limitation, trade claims,

Compensation Claims, NNI Unsecured Claim, UKPI Claim, Canadian Pension Claims and other Intercompany Claims that are Voting Claims.

26. Certain Affected Unsecured Claims will be finally settled and resolved pursuant to the Settlement and Support Agreement and, as such, will only become Proven Affected Unsecured Claims upon the effectiveness of the Settlement and Support Agreement. Under the Meeting Order, the amounts ascribed to those claims in the Settlement and Support Agreement and reflected in the Canadian Plan will be the amounts of those claims for voting purposes.   Any other Affected Unsecured Claims that remain unresolved as at the Meeting will be permitted to vote as set out below in the section describing the voting of "Unresolved Claims".

**The Affected Unsecured Creditors Class**

27. The proposed Meeting Order divides Affected Unsecured Creditors into three different groups:

(a) Beneficial Bondholders – Beneficial Bondholders are the unregistered holders of the Bonds who have the actual beneficial interest in the Bonds;

(b) Compensation Creditors – Compensation Creditors are current and former employees of the Canadian Debtors (or their survivors) who have "Compensation Claims" (which are treated as Ordinary Claims) and who, as of the date of the Meeting Order, are represented by Representatives and Representative Counsel in the CCAA Proceedings under Representation Orders, or by Unifor; and

(c) Ordinary Creditors – Ordinary Creditors are the balance of the Affected Unsecured Creditors.

28. Although all three groups are part of the single "Affected Unsecured Creditors Class" (and in the case of Compensation Creditors and Ordinary Creditors, both have "Ordinary Claims"), they are described differently because of the nuances in relation to either (a) the proposed process under the Meeting Order for mailing and distribution of materials to them; and/or (b) the proposed process for voting.

**Meeting Materials and Publication of Notice of Meeting**

29. The proposed Meeting Order authorizes the filing of the Canadian Plan and the approval and distribution of the Information Circular as well as the forms of notices, proxies and

instructions for voting to be distributed to Affected Unsecured Creditors (collectively, the "**Meeting Materials**").  French translations of the Meeting Materials will also be made available to Affected Unsecured Creditors upon request to the Monitor and will be available for download from the Monitor's Website.

30.    Publication and posting of notice of the Meeting and the Meeting Materials will be as follows:

(a)    notice of the Meeting (the "**Publication Notice**"), as well as all of the Meeting Materials will be posted on the Monitor's Website;

(b)    the Publication Notice will be sent to the service list in the CCAA Proceedings (the "**Service List**"); and

(c)    as soon as practical after the making of the Meeting Order, the Monitor will publish the Publication Notice: (A) in English in the *Globe and Mail* (National and Local Edition), *Wall Street Journal* (Global Edition), *Ottawa Citizen* and *Calgary Herald*; and (B) in French in *Journal de Montreal*.

**Mailing of Certain Meeting Materials**

*Mailing Materials*

31.    The Monitor and Canadian Debtors have considered what will be the most effective manner for distributing the Meeting Materials, including whether all Meeting Materials need to be mailed.  The Monitor and Canadian Debtors have also consulted with Representative Counsel regarding the set of materials to be mailed to Compensation Creditors.  Based on these considerations and consultations, the Monitor and Canadian Debtors are proposing to include a sub-set of the Meeting Materials in the mailing which they believe provide clear and concise information to creditors. In addition, copies of all of the Meeting Materials will be available on the Monitor's Website (in both English and French) and also will be provided in hard copy upon request.  The proposed mailing materials consist of:

(a)    To Compensation Creditors: a cover letter outlining certain key information regarding the Meeting Order, the Canadian Plan and distributions thereunder, and confirming that individual Compensation Creditors will not individually vote on the Plan (discussed in detail below) as their Representative or Unifor will be voting on their behalf, as well as a copy of the Publication Notice (the "**Compensation Creditor Mailing Materials**").  Compensation Creditor Mailing

Materials will be mailed out in English or French depending on the language preference the Monitor has on file for such Compensation Creditor. Compensation Creditor Mailing Materials in both English and French translation will be available on the Monitor's Website and copies will be provided by the Monitor in hard copy upon request; and

(b)    <u>To Beneficial Bondholders and Ordinary Creditors</u>: a cover letter outlining certain key information regarding the Canadian Plan and distributions thereunder, the Publication Notice, Information Circular, applicable form of proxy and voting instructions (the "**Bondholder Mailing Materials**" and "**Ordinary Creditor Mailing Materials**"). Bondholder Mailing Materials and Ordinary Creditor Mailing Materials will be mailed in English. The French translation of these materials will be available on the Monitor's Website and will be provided by the Monitor in hard copy upon request.

*Mailing to Compensation Creditors and Ordinary Creditors*

32.    The Monitor will mail the Compensation Creditor Mailing Materials and the Ordinary Creditor Mailing Materials within seven business days after the Meeting Order is made.

*Mailing to Bondholders*

33.    The Bonds were issued under four trust indentures.  The Monitor and Canadian Debtors have been working with the various indenture trustees and have been advised that all the Bonds are held through The Depository Trust Company ("**DTC**").

34.    In the normal course, correspondence to bondholders from an issuer is transmitted through a general chain of communication beginning with the indenture trustee, then through the depositories, to participants (brokers and banks) and ultimately to the beneficial holders of the Bonds.  The participants, being the parties responsible for direct communications with beneficial holders, are generally large institutions and many of these participants use mailing agents (such as Broadridge Financial Solutions, Inc.) or have multiple internal departments responsible for handling the various mailings.

35.    The Canadian Debtors, with the Monitor's consent, have retained Epiq Bankruptcy Solutions, LLC ("**Epiq**") to assist them with various matters relating to the mailing, solicitation, voting process and tabulation for the Beneficial Bondholders.  Epiq has extensive experience handling similar communications. Epiq is also the U.S. Debtors' claims agent.  The retention of Epiq will ensure the Beneficial Bondholder solicitation

and voting process in respect of the Canadian Plan is efficiently coordinated with the U.S. Plans solicitation process. The Monitor will work with Epiq to ensure separate administration and solicitation procedures are in place in respect of the Canadian Plan.

36.     The Monitor and Canadian Debtors propose that Epiq, as agent, will print and mail the Bondholder Mailing Material packages (along with authentication forms and instructions, as discussed below) to the Participant Holders (or their mailing agents) for distribution to Beneficial Holders as at November 21, 2016, being the Voting Record Date.   The Monitor is advised that Epiq will be able to provide affidavits of mailing in connection with this process.

**The Meeting**

37.     As set out above, the Meeting is anticipated to be held on January 17, 2017 starting at 1:00 p.m. (Toronto time) at The International Centre Conference Centre, 6900 Airport Road, Mississauga, Ontario.

38.     The Meeting will be conducted by the Monitor and chaired by Murray McDonald, President of Ernst & Young Inc.  A Quorum for the Meeting will consist of at least one holder of an Affected Unsecured Claim voting at the Meeting (in person or by proxy). The chair will be entitled to adjourn the Meeting and notice of any adjournment will be sent to the Service List, posted on the Monitor's Website and posted at the meeting location.

**Voting**

*Ordinary Creditors*

39.     An Ordinary Creditor who has a voting claim will be entitled to vote for or against the approval of the Canadian Plan by either returning their proxy so it is received by the Monitor at least three business days prior to the Meeting or attending the Meeting in person and submitting its proxy at the time designated by the chair.   An Ordinary Creditor will be entitled to one vote only (even if it has multiple voting claims or has accumulated multiple voting claims through assignment of claims) and the value of that

voting claim will be equal to the total value of the separate and distinct voting claims such Ordinary Creditor holds.

*Compensation Creditors*

40.    In 2009, this Court issued the following orders with respect to the appointment of representatives (the "**Representatives**") and Representative Counsel to represent certain employee groups of the Canadian Debtors in respect of all matters in these CCAA Proceedings:

> a)    an Order dated May 27, 2009 appointing Donald Sproule, David Archibald and Michael Campbell as representatives of all former non-unionized employees of the Canadian Debtors and appointing Koskie Minsky LLP as their representative counsel;

> b)    an Order dated July 22, 2009 appointing Kent Felske and Dany Sylvain as representatives for all Canadian non-unionized employees of the Canadian Debtors whose employment with the Canadian Debtors continued through the CCAA Proceedings and appointing Nelligan O'Brien Payne LLP and Shibley Righton LLP as their representative counsel; and

> c)    an Order dated July 30, 2009 appointing Sue Kennedy as representative for LTD Beneficiaries (as defined therein) receiving or entitled to receive disability income benefits by or through the Canadian Debtors and appointing Koskie Minsky LLP as their representative counsel.

41.    Further, certain former unionized employees are represented by Unifor (formerly CAW).

42.    Pursuant to the proposed Meeting Order, a Court appointed Representative and Unifor will vote on behalf of the Compensation Creditors they represent.  Such Representatives and Unifor will submit a proxy which will count in number based on the number of individual claimants they represent for a total dollar amount based on the total amount of the claims of those individuals.  There are only a few former employees of the Canadian Debtors who opted out of representation by the Representatives.  To the extent those

individuals have Voting Claims, they are Ordinary Creditors under the Meeting Order and are entitled to vote on their own behalf.

*Bondholders*

43.     Beneficial Bondholders (and not the indenture trustees, Registered Bondholder or Participant Holders) are entitled to vote on the Canadian Plan.  As set out above, there is a chain of communications that must take place in order for the Beneficial Bondholders to receive the mailings regarding the Meeting.  A similar process, working itself back up the chain, is required in order to ensure the proxies are completed (and voted) by the Beneficial Bondholders and the holdings of such holder are validated by the applicable Participant Holders before the proxies are returned to Epiq (as agent for the Monitor).  As such, the process for the submission of proxies by Beneficial Bondholders is a two-step process.  First, Beneficial Bondholders complete their proxies (one per CUSIP and per Participant Holder through whom they hold Bonds) and return the completed proxies back to their Participant Holder(s).  Second, Participant Holders: (i) receive back the completed proxies, (ii) validate the holdings by completing one or more "Master Authentication Forms" (one per CUSIP), (iii) attach copies of the completed proxies they have received to the Master Authentication Forms, and (iv) forward the completed Master Authentication Forms (with the attached proxies) to Epiq.  Upon receipt, Epiq will provide copies of the Master Authentication Forms (with the attached proxies) to the Monitor.

44.     The Monitor believes this process to be the most thorough and efficient option as it: (a) provides the Beneficial Bondholders the right to vote through submitting a proxy; (b) ensures validation of the Beneficial Bondholder's holdings by requiring all Beneficial Bondholders to return their completed proxies to their Participant Holder for validation; (c) ensures the vote is being cast by the Beneficial Bondholder (and not the Participant Holder or Registered Bondholder) by requiring copies of the completed proxies to be attached to the Master Authentication Forms; and (d) is capable of being executed by Beneficial Bondholders and Participant Holders within the parameters of their communication systems.

45.    As set out above, each Beneficial Bondholder must submit a separate completed proxy for each CUSIP and each Participant Holder through which it holds Bonds so that such holdings may be validated by the Participant Holder. Proxies returned to Epiq and the Monitor will be aggregated such that each Beneficial Bondholder receives one vote equal to the total value of the bond claims it holds.

46.    Master Authentication Forms must be received back by Epiq at least four Business Days prior to the Meeting to be verified by both Epiq and the Monitor. Beneficial Bondholders wishing to attend the Meeting and vote at the Meeting must first return a proxy to their Participant Holder and have its holdings validated through a Master Authentication Form. Beneficial Bondholders whose holdings have not been validated by the Participant Holder through a Master Authentication Form will not have a voting claim by proxy or in person.

*Voting of Unresolved Claims*

47.    Pursuant to the proposed Meeting Order, holders of Affected Unsecured Claims which remain unresolved for distribution purposes are entitled to vote as follows:

(a)    any liquidated claim in whole or in part:

    (i)    if no notice of disallowance has been issued, at the face value of the Affected Unsecured Claim, as filed; or

    (ii)    where a notice of disallowance has been issued, at the amount that is the greater of $1 and the amount allowed by the Monitor in the notice of disallowance or, where there is a decision of a Claims Officer or Order of the CCAA Court, the amount of the Affected Unsecured Claim as set out in such decision or Order; or

(b)    any unresolved claim that is unliquidated in its entirety will be valued at $1.

48.    The dollar value ascribed to an Unresolved Claim for voting purposes will be deemed to be solely for the purpose of voting on the Canadian Plan. Such ascribed value for voting purposes will not influence or impact the ultimate allowance or disallowance of such claim or its value, if any, for distribution purposes under the Canadian Plan.

49.    If an Affected Unsecured Creditor disputes the value attributed to its claim for voting purposes, such creditor will be entitled to seek relief in this regard at the Sanction

Hearing. The Monitor believes this is an appropriate means of addressing any potential disputes regarding the value of unresolved Affected Unsecured Claims for voting purposes, including in that it will defer any disputes to a point in time when stakeholders and the Court will be able to assess whether the value of an Unresolved Claim for voting purposes could have an impact on the outcome of the vote to approve the Canadian Plan.

**Required Majority and Sanction Hearing**

50.    If the Canadian Plan is approved by the Required Majority (a majority of Affected Unsecured Creditors voting representing at least two thirds in value of those Affected Unsecured Claims that are being voted), the Monitor and Canadian Debtors will bring a motion seeking approval of the Canadian Plan by the Court on or about January 24, 2017.

51.    Pursuant to the Settlement and Support Agreement, creditors with Claims in excess of the Required Majority (in number and in value) have agreed to support and vote in favour if the Canadian Plan.  Those creditors include bondholders with claims of approximately $3.0 billion, representatives of the former employee and pension groups representing over 15,000 former employees and retirees with claims of approximately CA $3 billion and NNI, UKPI and NNUK with claims totalling approximately $2.5 billion.

**POST-FILING CLAIMS BAR DATE ORDER**

52.    During the course of the CCAA Proceedings, the Canadian Debtors and Monitor have called for various claims pursuant to several different Orders.  In general, to qualify the claim had to arise in the "pre-filing period" (i.e. prior to January 14, 2009, except in respect of the New Applicants for which the pre-filing period was prior to March 18, 2016).

53.    In order to determine no additional claims exist in the "post-filing" period against any of the Canadian Debtors (or their former officers and directors), the Canadian Debtors and Monitor are seeking an Order to call for Post-Filing Claims and setting a bar date for the filing of any such claims.  In recognition of the ongoing administration of the Canadian Debtors, the call for Post-Filing Claims excludes claims relating to payment for post-filing goods and services provided to the Canadian Debtors relating to the ongoing administration of the Canadian Debtors, any claim secured by the Administration Charge

(under the Initial Order), professional fees that are currently being paid by the Canadian Debtors, any claims that are already covered by another claims order (including restructuring claims) and any claim that is proposed to be settled under the Settlement and Support Agreement.

54.    Notice of the call and bar dates for Post-Filing Claims will be placed in the *Globe and Mail* (National Edition) and in the *Wall Street Journal* (Global Edition) and all materials will be posted on the Monitor's Website.  As there are no known Post-Filing Claims, no individual notices will be mailed.

55.    The bar date for filing a Post-Filing Claim will be: (a) for Post-Filing Claims existing as of December 1, 2016, January 6, 2017; and (b) for Post-Filing Claims that come into existence after December 1, 2016, the later of January 6, 2017 and the date that is 30 days after the facts giving rise to the Post-Filing Claim occur but in any event no later than 15 days after the Plan Effective Date.

56.    The proposed procedure to review and resolve any Post-Filing Claims filed is substantially similar to the review and resolution procedures prescribed by prior Claims Orders issued by the Court, except that the Monitor shall have the authority to treat a Proof of Claim as a nullity and not capable of creating any claim, right or liability against the Canadian Debtors where such Proof of Claim asserts a claims that is excluded pursuant to the terms of the proposed Order, including any claim that has already been asserted, addressed, claimed, alleged, or otherwise dealt with in the CCAA Proceedings. Any creditor wishing to dispute such a determination by the Monitor shall be required to bring a motion before this Court within seven days of receiving notice of such determination from the Monitor.

**ADDITIONAL MISFILED CLAIMS**

57.    As more fully described in the Eightieth Report, certain claims were originally filed against a U.S. Debtor prior to the Claims Bar Date that should have been filed against a Canadian Debtor (the "**Misfiled Claims**") and vice versa.  By Orders dated February 17, 2012, July 27, 2012, October 29, 2013, and September 29, 2016, this Court has deemed

similar such Misfiled Claims as validly filed against the appropriate Canadian Debtor in accordance with the Claims Procedure Order.

58.     The Canadian Debtors, Monitor and U.S. Debtors have identified an additional claim where the creditor filed a claim against the incorrect Nortel legal entity.

59.     The Coface North America Insurance Company, as assignee of the creditor Jaco Electronics, Inc., filed a claim totalling approximately $479,290 against a U.S. Debtor in the Chapter 11 Proceedings prior to the September 30, 2009 claims bar date which, based upon a review of the books and records of the Canadian Debtors, is properly a claim against a Canadian Debtor (the "**Additional Misfiled Claim**").  The Additional Misfiled Claim relates to invoice based liabilities where a Canadian Debtor issued the purchase order for the goods or services underlying the claim in question.

60.     To permit the timely resolution of the Additional Misfiled Claim, the Monitor is seeking an Order to deem such claim as validly filed against the appropriate Canadian Debtor in accordance with the Claims Procedure Order such that it may be resolved in accordance with the Claims Resolution Order.

61.     Such relief will allow for the timely resolution of the Additional Misfiled Claim consistent with the manner in which similar claims have been resolved and assist in advancing the claims process in these CCAA Proceedings.  The Monitor is of the view such relief is appropriate as a result of the factors described above.

**CONCLUSION**

62.     For the reasons outlined in this One Hundred and Thirty Third Report, the Monitor supports the granting of:

    a)  the motion seeking approval of the Meeting Order which, among other things, authorizes the filing of the Canadian Plan and convening a meeting of creditors to be held on or about January 17, 2017, to consider and vote upon the Canadian Plan;

b)  the motion seeking an Order to call for Post-Filing Claims and setting a bar date for the filing of any such claims; and

c)  the motion deeming the Additional Misfiled Claim to be validly filed against the appropriate Canadian Debtor in accordance with the Claims Procedure Order.

All of which is respectfully submitted this 23rd day of November, 2016.

**ERNST & YOUNG INC.**
**in its capacity as Monitor of Nortel Networks Corporation** *et al.*
**and not its personal capacity**

Per:

Murray A. McDonald
President

6635696

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION *et al.*

Court File No:  09-CL-7950

---

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

Proceeding commenced at Toronto

---

**ONE HUNDRED AND THIRTY THIRD REPORT OF THE MONITOR DATED NOVEMBER 23, 2016**

---

**GOODMANS LLP**
Barristers & Solicitors
Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto, ON  M5H 2S7

Jay A. Carfagnini  (LSUC#: 22293T)
jcarfagnini@goodmans.ca
Joseph Pasquariello (LSUC# 38390C)
jpasquariello@goodmans.ca
Christopher G. Armstrong (LSUC# 55148B)
carmstrong@goodmans.ca

Tel: 416.979.2211
Fax: 416.979.1234

Lawyers for the Monitor, Ernst & Young Inc.

# TAB 4

Court File No. 09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**COMMERCIAL LIST**

| | | |
|---|---|---|
| THE HONOURABLE MR. JUSTICE | ) | TUESDAY, THE 24TH DAY OF |
| | ) | |
| NEWBOULD | ) | JANUARY, 2017 |
| | ) | |

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION, NORTEL NETWORKS TECHNOLOGY CORPORATION, NORTEL COMMUNICATIONS INC., ARCHITEL SYSTEMS CORPORATION AND NORTHERN TELECOM CANADA LIMITED**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

**SANCTION ORDER**

**THIS MOTION** made by Nortel Networks Corporation ("**NNC**"), Nortel Networks Limited ("**NNL**"), Nortel Networks Technology Corporation, Nortel Networks Global Corporation, Nortel Networks International Corporation, Nortel Communications Inc., Architel Systems Corporation and Northern Telecom Canada Limited (collectively, the "**Canadian Debtors**") jointly with Ernst & Young Inc. in its capacity as monitor of the Canadian Debtors (the "**Monitor**") for the relief set out in the Notice of Motion dated January ●, 2017, including sanctioning the Plan of Compromise and Arrangement pursuant to the *Companies' Creditors Arrangement Act* concerning, affecting and involving the Canadian Debtors dated November 30, 2016 (as the same may be amended, varied or supplemented from time to time in accordance with the terms thereof, the "**Plan**") was heard this day at 330 University Avenue, Toronto, Ontario.

- 2 -

ON READING the One Hundred and Thirty Fifth Report of the Monitor dated January ●, 2017 (the "Report"), and on hearing submissions of counsel for the Monitor and counsel for [list other counsel], no one appearing for any other person on the service list although duly served as appears from the affidavit of Christopher Armstrong sworn January ●, 2017, filed.

## SERVICE

1. THIS COURT ORDERS that the time for the service of the Notice of Motion and the Motion Record is hereby abridged and validated so that this motion is properly returnable today and hereby dispenses with further service thereof.

## DEFINED TERMS, CURRENCY AND INTERPRETATION OF THIS ORDER

2. THIS COURT ORDERS that capitalized terms used herein and not otherwise defined shall have the meaning given to them in the Plan.

3. THIS COURT ORDERS that, unless otherwise specified, all amounts referred to herein are in U.S. dollars.

4. THIS COURT ORDERS that for purposes of this Order the use of words in the singular or plural, or with a particular gender, including a definition, shall not limit the scope or exclude the application of any provision of this Order to such Person (or Persons) or circumstances as the context otherwise permits.

5. THIS COURT ORDERS that for purposes of this Order the words "includes" and "including" and similar terms of inclusion shall not, unless expressly modified by the words "only" or "solely", be construed as terms of limitation, but rather shall mean "includes but is not limited to" and "including but not limited to", so that references to included matters shall be regarded as illustrative without being either characterizing or exhaustive.

6. THIS COURTS ORDERS that under this Order any reference to a statute or other enactment of parliament or a legislature or Governmental Entity includes all

- 3 -

regulations made thereunder, all amendments to or re-enactments of such statute or regulations in force from time to time, and, if applicable, any statute or regulation that supplements or supersedes such statute or regulation.

## NOTICE AND MEETING

7.     **THIS COURT ORDERS AND DECLARES** that there has been good and sufficient notice, service and delivery of the Meeting Materials (as defined in the Plan Filing and Meeting Order granted by this Court on December 1, 2016 (the "**Meeting Order**")) and that the  Meeting was duly called, convened, held and conducted, all in conformity with the CCAA and the Orders of this Court made in the CCAA Proceedings, including, without limitation, the Meeting Order.

## SANCTION OF THE PLAN

8.     **THIS COURT ORDERS AND DECLARES** that:

(a)     the Plan has been approved by the Required Majority of Affected Unsecured Creditors with Voting Claims as required by the Meeting Order and the Plan, and in conformity with the CCAA;

(b)     the  Canadian Debtors have complied with the provisions of the CCAA and the Orders of the Court made in the CCAA Proceedings in all respects;

(c)     the Court is satisfied that the Canadian Debtors have not done or purported to do anything that is not authorized by the CCAA; and

(d)     the Canadian Debtors have acted in good faith and with due diligence, and the Plan and the Settlement and Support Agreement incorporated therein are fair and reasonable.

9.     **THIS COURT ORDERS** that the Plan is hereby sanctioned and approved pursuant to Section 6 of the CCAA.

- 4 -

10.    **THIS COURT ORDERS AND DECLARES** that the Plan and all associated steps, compromises, transactions, arrangements, agreements, releases and reorganizations effected thereby are approved, binding and effective, subject to the terms set out in the Plan, upon and with respect to the Canadian Debtors (including the Canadian Estate), all Affected Creditors, the Directors and Officers, any Person with a Released Director/Officer Claim, the Released Parties and all other Persons named or referred to in, or subject to, the Plan. The fact that this Order does not refer to a specific provision of the Plan shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Plan be approved in its entirety.

**SUBSTANTIVE CONSOLIDATION OF CANADIAN DEBTORS**

11.    **THIS COURT ORDERS** that all assets and liabilities of the Canadian Debtors be and are hereby substantively consolidated into the Canadian Estate. Without limiting the generality of the foregoing provision, on the Plan Effective Date:

(a)    NNL shall be the corporate body through which the transactions and other steps involving the Canadian Estate contemplated by the Plan and the wind-down and continuing administration of the Canadian Estate shall be conducted, it being understood that each Other Canadian Debtor shall continue to exist and maintain its independent corporate form;

(b)    all assets and rights of the Other Canadian Debtors (but excluding the Canadian Intercompany Claims) shall vest absolutely in NNL free and clear of any Claim, Post-Filing Claim or Encumbrance except for the obligations of the Canadian Debtors (including the Canadian Estate) pursuant to or recognized under the Plan;

(c)    NNL is hereby appointed as attorney in fact of each of the Other Canadian Debtors, authorized to take all steps and actions necessary for and on behalf of the Other Canadian Debtors and to execute any and all documents and make

- 5 -

any and all filings for and on behalf of each of the Other Canadian Debtors as may be necessary or desirable; and

(d)     subject to the qualifications under the Plan regarding Duplicative Claims, all Proven Affected Unsecured Claims (whether now existing or hereafter coming into existence) against the Other Canadian Debtors shall be deemed to be claims against NNL.

12.     **THIS COURT ORDERS** that as a result of the substantive consolidation of the Canadian Debtors:

(a)     Each Canadian Registered Pension Plan shall only have one Proven Affected Unsecured Claim against the Canadian Estate in the respective amounts specified in Section 4.4 of the Plan;

(b)     Holders of Crossover Bonds that were issued by one Canadian Debtor and guaranteed by another Canadian Debtor shall only have one Proven Affected Unsecured Claim against the Canadian Estate in the aggregate respective amounts specified on Schedule "B" to the Plan;

(c)     Creditors shall not be permitted to have Duplicative Claims against the Canadian Estate; and

(d)     Creditors holding Proven Affected Unsecured Claims against more than one Canadian Debtor where such Proven Affected Unsecured Claims are based on separate and distinct underlying debts shall have one Proven Affected Unsecured Claim against the Canadian Estate in the aggregate amount of all such separate and distinct Proven Affected Unsecured Claims.

13.     **THIS COURT ORDERS** that for purposes of the Plan, the Canadian Intercompany Claims shall be treated as Unaffected Claims and shall not be entitled to any distributions thereunder. Subject to the foregoing sentence and notwithstanding any other provision of the Plan or this Order, nothing in the Plan or this Order shall affect, impair or settle the Canadian Intercompany Claims and the

- 6 -

Canadian Intercompany Claims shall remain in place unaffected by the Plan in all respects following the Plan Effective Date.

## SETTLEMENT AND SUPPORT AGREEMENT

14.    **THIS COURT ORDERS** that the Settlement and Support Agreement, including the resolution of the Allocation Dispute and the Settlement and Support Agreement Releases described therein, be and is hereby approved in its entirety. The fact that this Order does not describe or include any particular provision of the Settlement and Support Agreement shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Settlement and Support Agreement be approved in its entirety.

15.    **THIS COURT ORDERS** that the execution and delivery of the Settlement and Support Agreement by the Canadian Debtors and the Monitor is hereby authorized and approved *nunc pro tunc* and the performance by the Canadian Debtors and the Monitor of their respective obligations thereunder is hereby approved. The Canadian Debtors and the Monitor are hereby authorized to take such steps and execute such additional documents as may be necessary or desirable to effectuate and implement the terms of the Settlement and Support Agreement.

16.    **THIS COURTS ORDERS** that, without limiting the generality of paragraphs 14 and 15 hereof, on the Plan Effective Date the Canadian Debtors and Monitor be and are hereby authorized to take such steps as may be necessary to effect the following distributions from the Escrow Accounts, all in accordance with and subject to the terms of the Settlement and Support Agreement, including Section 2 thereof:

(a)    payments of $35,000,000 to NNL, and $20,000,000 to NNI, shall be made from the Iceberg Escrow Account in satisfaction of the M&A Cost Reimbursement;

- 7 -

(b)     payments of $2,800,000 to NNI, and $2,200,000 to NNUK, shall be made from the Iceberg Escrow Account in satisfaction of the Iceberg Amendment Fee; and

(c)     after making the payments described in paragraphs (a) and (b) above, the Sale Proceeds shall be allocated and paid from the Escrow Accounts on and subject to the terms of the Settlement and Support Agreement as follows:

(i)     Canadian Debtors: 57.1065%, being $4,142,665,131 as at July 31, 2016;

(ii)     U.S. Debtors: 24.350%, being $1,766,417,002 as at July 31, 2016;

(iii)     EMEA Debtors (excluding NNUK and NNSA): 1.4859%, being $107,788,879 as at July 31, 2016;

(iv)     NNUK: 14.0249%, being $1,017,408,257 as at July 31, 2016, subject to adjustment as contemplated in Section 2(c)(v) of the Settlement and Support Agreement; and

(v)     NNSA: $220,000,000.

17.    **THIS COURT ORDERS** that, for the avoidance of doubt, all distributions from the Escrow Accounts (including the specific amounts to be distributed to each of the Canadian Debtors, the U.S. Debtors and the EMEA Debtors) shall be strictly in accordance with the Settlement and Support Agreement. To the extent of any conflict between the provisions of the Settlement and Support Agreement, the Plan or this Order as relates to distributions from the Escrow Accounts, the provisions of the Settlement and Support Agreement shall govern in all respects.

18.    **THIS COURT ORDERS** that within five (5) Business Days of the Plan Implementation Date the Canadian Estate shall make the following payments by wire transfer of immediately available funds in full satisfaction and discharge of the following:

- 8 -

(a) $62,700,000 to NNI in full satisfaction of the Remaining Revolver Claim;

(b) $77,500,000 to NNI in full satisfaction of the payment contemplated by Section 4(e) of the Settlement and Support Agreement, which payment shall not be subject to set-off pursuant to Section 3.13 of the Plan.

19. **THIS COURT ORDERS** that the Settlement and Support Agreement Releases given and received by the Canadian Debtors and the Monitor be and are hereby authorized and approved. The Settlement and Support Agreement Releases shall be binding on and enure to the benefit of the Canadian Debtors (including the Canadian Estate), the Monitor, the other Settlement Parties, the Participating Creditors and their respective employees, officers, directors, agents, advisors, lawyers, successors and assigns and the directors and officers, both former and current, of any Nortel Group entity.

## RELEASE OF CANADA ONLY SALE PROCEEDS AND UNAVAILABLE CASH

20. **THIS COURT ORDERS** that on the Plan Effective Date all amounts held by NNL pursuant to the Canada Only Sale Proceeds Orders or held as Unavailable Cash by the Canadian Debtors shall be released to the Canadian Estate without any restriction whatsoever, and shall be used to fund the distributions and reserves contemplated under the Plan.

## CERTAIN ACCEPTED CLAIMS

21. **THIS COURT ORDERS** that the following Creditors shall have the following accepted claims against the Canadian Estate pursuant to the Plan:

(a) The total Proven Affected Unsecured Claim of Morneau Shepell Ltd. as Administrator of the Canadian Registered Pension Plans on account of the Managerial Plan shall be CA$1,368,644,000, and the total Proven Affected Unsecured Claim on account of the Negotiated Plan shall be CA$520,835,000;

- 9 -

(b)     The aggregate total of all Proven Affected Unsecured Claims on account of the Crossover Bonds shall be $3,940,750,260, with the individual Proven Affected Unsecured Claims on account of the Crossover Bonds being as set forth on Schedule "B" to the Plan;

(c)     The Proven Affected Unsecured Claim on account of the NNCC Bonds shall be $150,951,562;

(d)     UKPI shall have a single Proven Affected Unsecured Claim in the amount of £339,750,000 (being $494,879,850 when converted to U.S. dollars in accordance with the Plan);

(e)     NNUK shall have a Proven Affected Unsecured Claim under the Plan in the amount of $97,655,094, the amount of which may increase to $122,655,094 solely in the circumstances set out in Section 2.2 of the EMEA Claims Settlement Agreement;

(f)     Nortel Networks SpA shall have a Proven Affected Unsecured Claim under the Plan in the amount of $2,344,906; and

(g)     NNI shall have: (i) a Proven Affected Unsecured Claim under the Plan in the amount of $2,000,000,000; and (ii) a Proven Priority Claim of $62,700,000 on account of the Remaining Revolver Claim, which claims of NNI shall not be subject to set-off, off set, deduction, counterclaim, reduction, or challenge as to amount or validity.

**NO DOUBLE-RECOVERY**

22.     **THIS COURT ORDERS** that no Creditor shall receive aggregate distributions from the Canadian Estate and any other Nortel Group entity on account of a Proven Affected Unsecured Claim and any related claim established against another Nortel Group entity (a "**Foreign Related Claim**") in excess of 100% of the amount of such Proven Affected Unsecured Claim. Subject to further Order of the CCAA Court, the Canadian Estate and Monitor are authorized to delay and/or withhold

- 10 -

distributions to Creditors holding Foreign Related Claims pending receipt of documentation acceptable to the Monitor, acting reasonably, to allow it to confirm that a Creditor has not and will not receive amounts on account of its Proven Affected Unsecured Claim and any Foreign Related Claim in excess of 100% of the amount of such Proven Affected Unsecured Claim.

## NO POST-FILING DATE INTEREST

23. **THIS COURT ORDERS** that no Post-Filing Date Interest will be included in any Proven Affected Unsecured Claims, Proven Priority Claims or any other Claims provable under the Plan, and no distributions will be made on account of Post-Filing Date Interest. For the avoidance of doubt, all claims for Post-Filing Date Interest shall be released, discharged and barred pursuant to the terms of the Plan and this Order.

## PLAN IMPLEMENTATION

24. **THIS COURT ORDERS** that each of the Canadian Estate and the Monitor be and are hereby authorized and directed to perform their obligations and functions under the Plan, including the establishment of the Administrative Reserve and the Unresolved Claims Reserve, and to take all steps and actions and to do all things necessary or appropriate to implement the Plan in accordance with its terms and to enter into, execute, deliver, complete, implement and consummate all of the steps, transactions, distributions, disbursements, payments, deliveries, allocations, instruments and agreements contemplated pursuant to the Plan, and such steps and actions are hereby authorized, ratified and approved. None of the Canadian Debtors (including the Canadian Estate) or the Monitor shall incur any liability as a result of acting in accordance with the terms of the Plan and this Order, other than any liability arising out of the gross negligence or wilful misconduct of such parties.

25. **THIS COURT ORDERS AND DECLARES** that the Plan and all associated steps, compromises, settlements, transactions, arrangements, distributions and releases effected thereby are hereby approved, shall be deemed to be implemented

- 11 -

and shall be binding and effective as of the Plan Effective Date or the Plan Implementation Date, as the case may be, in accordance with the terms of the Plan or at such other time, times or manner as may be set forth in the Plan in the sequence provided therein, and shall enure to the benefit of and be binding and effective upon the Canadian Debtors (including the Canadian Estate), all Affected Creditors, the Released Parties and all other Persons named or referred to in, or subject to, the Plan.

26.     **THIS COURT ORDERS** that the Monitor be and is hereby authorized to execute and deliver or serve (as the case may be):

    (a)     on the Plan Effective Date, the Plan Certificate relating to the Plan to the U.S. Debtors substantially in the form attached hereto as Schedule "●";

    (b)     on the Plan Effective Date, the Plan Effectiveness Certificate to the service list in the CCAA Proceedings (the "**Service List**") substantially in the form attached hereto as Schedule "●"; and

    (c)     on the Plan Implementation Date, the Plan Implementation Certificate to the Service List substantially in the form attached hereto as Schedule "●",

all on and subject to the terms contemplated by the Plan. The Monitor is hereby directed to file the Plan Effectiveness Certificate and the Plan Implementation Certificate with the Court as soon as reasonably practicable on or forthwith following the service of such certificate on the Service List and post copies of same on the Monitor's Website.

27.     **THIS COURTS ORDERS** that, notwithstanding: (i) the pendency of the CCAA Proceedings; (ii) any applications for a bankruptcy, receivership or other order now or hereafter issued pursuant to the BIA, the CCAA or otherwise in respect of any of the Canadian Debtors and any bankruptcy, receivership or other order issued pursuant to any such applications; and (iii) any assignment in bankruptcy made or deemed to be made in respect of any of the Canadian Debtors, the transactions

- 12 -

contemplated by the Plan and by the Settlement and Support Agreement shall be binding on any trustee in bankruptcy or receiver that may be appointed in respect of the Canadian Debtors or their assets and shall not be void or voidable by creditors of the Canadian Debtors, nor shall the Plan, the Settlement and Support Agreement or the payments and distributions contemplated pursuant thereto constitute nor be deemed to constitute a fraudulent preference, assignment, fraudulent conveyance, transfer at undervalue, or other reviewable transaction under the BIA, CCAA or any other applicable federal or provincial legislation, nor shall the Plan or the Settlement and Support Agreement constitute oppressive or unfairly prejudicial conduct pursuant to any applicable federal or provincial legislation.

28.    **THIS COURT ORDERS AND DECLARES** that no shareholder approval is required in respect of the Canadian Debtors entry into or performance of the Plan, the Settlement and Support Agreement or any transaction, step or action contemplated by any of the foregoing or this Order and any such requirement for shareholder holder approval be and is hereby dispensed with.

## COMPROMISE OF CLAIMS AND EFFECT OF PLAN

29.    **THIS COURT ORDERS** that, on the Plan Effective Date, all Affected Claims shall be fully, finally, irrevocably and forever compromised, discharged, released, cancelled and barred with prejudice, and the ability of any Person to proceed against the Released Parties in respect of or relating to any Affected Claims shall be forever discharged, extinguished, released and restrained, and all proceedings with respect to, in connection with or relating to such Affected Claims shall permanently be stayed against the Released Parties, subject only to the right of Affected Creditors to seek to prove their claims pursuant to the Claims Orders and to receive distributions pursuant to the Plan in respect of their Affected Claims, in the manner and to the extent provided for in the Plan.

30.    **THIS COURT ORDERS** that each Person named or referred to in, or subject to, the Plan shall be and is hereby deemed to have consented and agreed to all of the

- 13 -

provisions in the Plan, in its entirety, and each Person named or referred to in, or subject to, the Plan shall be and is hereby deemed to have executed and delivered to the Canadian Debtors all consents, releases, assignments and waivers, statutory or otherwise, required to implement and carry out the Plan in its entirety.

31.    **THIS COURT ORDERS** that, on the Plan Effective Date, subject to Section 7.2 of the Plan, all Released Claims shall be fully, finally, irrevocably and forever compromised, discharged, released, cancelled and barred with prejudice, and the ability of any Person to proceed against the Canadian Debtors (including the Canadian Estate), the Directors and Officers or any other Released Party in respect of or relating to any Affected Claims shall be forever discharged, extinguished, released and restrained, and all proceedings with respect to, in connection with or relating to such Affected Claims shall permanently be stayed against the Canadian Debtors, the Directors and Officers and any other Released Parties, subject only to the right of Affected Creditors to seek to prove their claims pursuant to the Claims Orders and to receive  distributions pursuant to the Plan in respect of their Affected Claims, in the manner and to the extent provided for in the Plan.

32.    **THIS COURT ORDERS** that nothing in the Plan shall be interpreted as extending or amending the Claims Orders or gives or shall be interpreted as giving any rights to any Person in respect of Claims or Post-Filing Claims that have been barred or extinguished pursuant to the Claims Orders. Any Affected Claim or Post-Filing Claim for which a Proof of Claim, dispute notice or other document has not been filed by the applicable bar date or other deadline established in accordance with the Claims Order, whether or not the holder of such Affected Claim or Post-Filing Claim has received actual notice of the Claims Order, shall be and is hereby forever barred, extinguished and released with prejudice. Without limiting the foregoing: (i) no Person shall be permitted to supplement, amend or assert any additional Claim or Post-Filing Claim, including a Compensation Claim, pursuant to an existing Proof of Claim, whether as the nature and substance of any such claim or the amount of such claim and whether pursuant to a document authorized pursuant to a Claims Order, a pleading or other filing made in a claim dispute or otherwise; and

- 14 -

(ii) no Person (but excluding any current, whether active or inactive, employee of the Canadian Debtors) shall be permitted to file a Proof of Claim (whether in respect of a Claim, a Post-Filing Claim, or any other alleged liability of the Canadian Debtors or the Canadian Estate), in each case without the prior leave of this Court. To the extent any Person seeks to do either of the foregoing (i) or (ii), the Monitor shall notify such Person such act is a nullity and the sole recourse of such Person shall be to bring a motion before this Court to seek leave within seven (7) days of receiving such notice from the Monitor.

33.   **THIS COURTS ORDERS** on the Plan Effective Date, the Plan shall be binding on all Equity Claimants and all Equity Claims shall be fully, finally, irrevocably and forever compromised, released, discharged and barred without any compensation of any kind whatsoever in accordance with the terms of the Plan.

34.   **THIS COURT ORDERS** that notwithstanding paragraph 32 or any other provision of this Order or the Plan, NNC's common shares and NNL's preferred shares shall remain issued and outstanding following the Plan Effective Date.

35.   **THIS COURT ORDERS AND DECLARES** that if, following the Plan Effective Date, a Bankruptcy Proceeding occurs in respect of the Canadian Debtors (or any of them or their assets, including the Canadian Estate), the Proven Affected Unsecured Claims compromised and released pursuant to the Plan and this Order shall be deemed to be reinstated in their full amounts solely for purposes of giving effect to any distributions to be made in such a Bankruptcy Proceeding, it being the intention that holders of Proven Affected Unsecured Claims under the Plan shall share rateably with holders of any additional claims (including any Post-Filing Claims) asserted against the Canadian Debtors (or any of them, including the Canadian Estate) in a Bankruptcy Proceeding, provided that any distributions made on account of Proven Affected Unsecured Claims pursuant to the Plan shall also be accounted for in any distributions in a Bankruptcy Proceeding. All Proven Affected Unsecured Claims pursuant to the Plan and the Claims Orders, including the claims set out in paragraph 21 hereof, shall be deemed to constitute proven claims in any

- 15 -

Bankruptcy Proceeding without any need for a Creditor to file an additional proof of claim in any such Bankruptcy Proceeding.

36.    **THIS COURT ORDERS** that all Claims and Post-Filing Claims as finally resolved pursuant to the Claims Orders, including the claims set out in paragraph 21 hereof, shall be final and binding for all purposes in a Bankruptcy Proceeding without any ability on the part of any Creditor or any trustee in bankruptcy or receiver to further dispute, re-assert or re-litigate such claims in a Bankruptcy Proceeding.

**CERTAIN DISTRIBUTION MATTERS**

37.    **THIS COURT ORDERS** that no Affected Unsecured Creditor shall be entitled to receive any distribution under the Plan with respect to an Unresolved Affected Unsecured Claim or any portion thereof unless and until, and then only to the extent that, such Claim is finally resolved in the manner set out in the applicable Claims Order and becomes a Proven Affected Unsecured Claim. Notwithstanding the foregoing: (i) NNUK shall be entitled to receive distributions hereunder on account of the Proven NNUK Claim pending final resolution of the Contingent Additional NNUK Claim; and (ii) Compensation Creditors holding Unresolved Affected Unsecured Claims shall be entitled to receive distributions on account of such Unresolved Affected Unsecured Claims solely to the extent portions thereof have been admitted or proven pursuant to the Compensation Claims Procedure Order.

38.    **THIS COURT ORDERS AND DECLARES** that the Canadian Estate shall be authorized, in connection with the making of any payment or distribution, and in connection with the taking of any step or transaction or performance of any function under or in connection with the Plan, to apply to any Governmental Entity for any consent, authorization, certificate or approval in connection therewith.

39.    **THIS COURT ORDERS** that the Canadian Estate and any other Person facilitating distributions under the Plan shall be entitled to deduct and withhold from any distribution or payment to any Person pursuant to the Plan such amounts

- 16 -

as may be required to be deducted or withheld with respect to such distribution or payment under the Canadian Tax Act or other Applicable Laws and to remit such amounts to the appropriate Taxing Authority or other Person entitled thereto. To the extent that amounts are so withheld or deducted and remitted to the appropriate Taxing Authority or other Person, such withheld or deducted amounts shall be treated for all purposes under the Plan as having been paid to such Person as the remainder of the distribution or payment in respect of which such withholding or deduction was made.

40.    **THIS COURT ORDERS AND DECLARES** that any distributions, disbursements or payments made under the Plan (including, without limitation, distributions made to or for the benefit of the Affected Creditors and payments made on account of Proven Priority Claims) shall not constitute a "distribution" by any Person for the purposes of section 107 of the *Corporations Tax Act* (Ontario), section 22 of the *Retail Sales Tax Act* (Ontario), section 117 of the *Taxation Act, 2007* (Ontario), section 34 of the *Income Tax Act* (British Columbia), section 104 of the *Social Service Tax Act* (British Columbia), section 49 of the *Alberta Corporate Tax Act,* section 22 of the *Income Tax Act* (Manitoba), section 73 of *The Tax Administration and Miscellaneous Taxes Act* (Manitoba), section 14 of *An Act respecting the Ministere du Revenu* (Quebec), section 85 of *The Income Tax Act,* 2000 (Saskatchewan), section 48 *of The Revenue and Financial Services Act* (Saskatchewan), section 56 of the *Income Tax Act* (Nova Scotia), section 159 of the Canadian Tax Act, section 270 of the *Excise Tax Act* (Canada), section 86 of the *Employment Insurance Act* (Canada), or any other similar federal, provincial or territorial tax legislation (collectively, the "**Tax Statutes**"), and the Canadian Estate, in making any such distributions, disbursements or payments, as applicable, is merely a disbursing agent under the Plan and is not exercising any discretion in making payments under the Plan and no Person is "**distributing**" such funds for the purpose of the Tax Statutes, and the Canadian Estate and any other Person, including the Monitor, shall not incur any liability under the Tax Statutes in respect of distributions, disbursements or payments made by it and the Canadian Estate, the

- 17 -

Monitor and any other Person is hereby forever released, remised and discharged from any claims against it under or pursuant to the Tax Statutes or otherwise at law, arising in respect of or as a result of distributions, disbursements or payments made by it in accordance with the Plan and any claims of this nature are hereby forever barred.

## CURRENCY MATTERS

41.  **THIS COURT ORDERS** that distributions to Creditors holding CAD Claims shall be paid in Canadian dollars, and distributions to all other Creditors holding Proven Affected Unsecured Claims shall be paid in U.S. dollars, and that for purposes of determining the amount of Canadian dollars to be paid by the Canadian Estate on distributions on a CAD Claim, the amount of such distribution in U.S. dollars (i.e. the relevant Pro-Rata Share in U.S. dollars) shall be converted to Canadian dollars at the Applicable FX Rate.

42.  **THIS COURT ORDERS** that the Canadian Estate and the Monitor shall be authorized to effect such exchange(s) of currency between Canadian dollars and U.S. dollars as may be necessary to effect the distributions and other payments (including in respect of the continuing administration of the Canadian Estate) contemplated pursuant to the Plan in the currency contemplated for such distributions or payments.

## ESTABLISHMENT OF RESERVES

43.  **THIS COURT ORDERS** that on the Plan Implementation Date, the Canadian Estate be and is hereby authorized and directed to establish the Administrative Reserve from Available Cash in the amount of $● or such other amount as may be determined by the Monitor and approved by the Court.

44.  **THIS COURT ORDERS** that:

(a)    following the Plan Implementation Date and prior to the Initial Distribution Date, the Canadian Estate be and is hereby authorized and directed to

- 18 -

establish the Unresolved Claims Reserve, including the individual claim reserve amounts (a "**Claim Reserve Amount**") specified at Appendix "●" to the One Hundred and Thirty Fifth Report for each Unresolved Affected Unsecured Claim specified therein;

(b)    the maximum provable amount of any Unresolved Affected Unsecured Claim is hereby capped at the related Claim Reserve Amount and no holder of an Unresolved Affected Unsecured Claim shall be permitted to prove (or seek to prove) such claim for an amount in excess of the related Claim Reserve Amount or be entitled to a distribution pursuant to the Plan (or otherwise) on an Unresolved Affected Unsecured Claim in excess of the Pro-Rata Share applicable to the Claim Reserve Amount for such Unresolved Affected Unsecured Claim;

(c)    the reserve for the Post-Filing Claim of The Northern Trust Company, Canada is hereby fixed at CA$1 million, which amount shall constitute the maximum Post-Filing Claim that can be established by The Northern Trust Company, Canada;

(d)    the Monitor be at liberty to apply to this Court to address the Unresolved Claims Reserve to the extent any issues regarding reserves in respect of Unresolved Affected Unsecured Claims or Post-Filing Claims are not addressed to the satisfaction of the Monitor in its sole discretion.

45.    **THIS COURT ORDERS** that neither the Canadian Estate nor the Monitor shall have any obligation to establish separate accounts or funds, or to otherwise segregate Available Cash, in respect of any of the Administrative Reserve, an Affected Unsecured Creditor Pool, the Unresolved Claims Reserve or any other reserve, cash pool, fund, payment or distribution contemplated under the Plan, provided that the Canadian Estate and the Monitor shall maintain appropriate records in respect of the calculation and determination of all such reserves and cash pools.

- 19 -

**PLAN RELEASES AND INJUNCTIONS**

46.    **THIS COURT ORDERS** that the releases set forth in Article 7 of the Plan be and are hereby approved and on the Plan Effective Date the Released Parties be and are hereby fully, finally and irrevocably released and discharged from any and all Released Claims and all Released Claims shall be fully, finally, irrevocably and forever waived, discharged, released, cancelled and barred as against the Released Parties, all to the fullest extent permitted by Applicable Law.

47.    **THIS COURT ORDERS** that from and after the Plan Effective Date all Persons are permanently and forever barred, estopped, stayed and enjoined, with respect to any and all Released Claims, from: (i) commencing, conducting, continuing or making in any manner, directly or indirectly, any action, suit, claim, demand or other proceeding of any nature or kind whatsoever (including any proceeding in a judicial, arbitral, administrative or other forum) against the Released Parties; (ii) enforcing, levying, attaching, collecting or otherwise recovering or enforcing by any manner or means, directly or indirectly, any judgment, award, decree or order against the Released Parties or their property; (iii) commencing, conducting, continuing or making in any manner, directly or indirectly, any action, suit, claim, demand or other proceeding of any nature or kind whatsoever (including any proceeding in a judicial, arbitral, administrative or other forum) against any Person who makes a claim or might reasonably be expected to make a claim, in any manner or forum, including by way of contribution or indemnity or other relief, against one or more of the Released Parties; (iv) creating, perfecting, asserting or otherwise enforcing, directly or indirectly, any lien or Encumbrance of any kind against the Released Parties or their property; or (v) taking any actions to interfere with the implementation or consummation of the Plan.

48.    **THIS COURT ORDERS** that the releases provided for in Section 7.4 of the Plan be and are hereby authorized and approved.

- 20 -

## CCAA CHARGES AND OTHER ENCUMBRANCES

49.    **THIS COURT ORDERS** that on the Plan Effective Date each of the Charges (except for the Administration Charge) shall be and is hereby terminated, discharged, expunged and released, subject to, in the case of the Inter-company Charge (but solely to the extent it benefits NNI), payment of the Remaining Revolver Claim. For the avoidance of doubt, upon payment of the Remaining Revolver Claim, the Inter-company Charge shall be and is hereby terminated, discharged, expunged and released.

50.    **THIS COURT ORDERS** that from and after the Plan Effective Date the Administration Charge shall continue as a first-ranking super-priority charge on the Property (as defined in the Initial Order) and the Canadian Estate's assets, undertakings and properties of every nature and kind whatsoever and wherever situated (including all proceeds thereof and including the Available Cash), ranking in priority to any other security interest, trusts, liens, charges or other Encumbrances in favour of any Person.

51.    **THIS COURTS ORDERS** that on the Plan Effective Date all charges, security interests or claims evidenced by registrations pursuant to the *Personal Property Security Act* (Ontario) or any other personal property registry system shall be expunged and discharged as against the Canadian Debtors (including the Canadian Estate) and all of the Property (as defined in the Initial Order).

52.    **THIS COURT ORDERS** that on the Plan Effective Date all rights of the Directors and Officers pursuant to paragraphs 20 and 21 of the Initial Order be and are hereby released and discharged.

## EXTENSION OF CCAA STAY AND ONGOING REPORTING TO THE COURT

53.    **THIS COURT ORDERS** that, subject to further order of the Court, the Stay Period (as defined in the Initial Order) shall be and is hereby extended indefinitely. For the avoidance of doubt, the stay provided for in paragraphs 14 and 15 of the

- 21 -

Initial Order and the other rights and protections afforded to the Canadian Debtors pursuant to the Initial Order shall extend to the Canadian Estate and the stay in favour of the Directors and Officers provided for in paragraph 19 of the Initial Order shall continue during the Stay Period notwithstanding the sanctioning of the Plan.

54.  **THIS COURT ORDERS**  that the Monitor shall serve on the Service List in the CCAA Proceedings and file with the Court a report on the progress of the continuing administration and wind-down of the Canadian Estate, including the implementation of the Plan, on no less than an annual basis.

55.  **THIS COURT ORDERS AND DECLARES** that any obligation of the Monitor to provide cash flow forecasting or reconciliations and monthly claims reporting (whether pursuant to paragraph 11 of the Claims Resolution Order dated September 16, 2010, or any other agreement or order) shall cease as at the Plan Effective Date, provided that the Monitor shall provide cash flow reporting and claims reporting in the reports contemplated in the foregoing paragraph.

56.  **THIS COURT ORDERS** that, for the avoidance of doubt, the Cross-Border Protocol and the Cross-Border Claims Protocol shall each remain in full force and effect in accordance with their respective terms.

**CESSATION OF TOLLING**

57.  **THIS COURT ORDERS AND DECLARES** that the tolling of any Claims, Director/Officer Claims or other claims or rights pursuant to prior orders of this Court shall cease on the Plan Effective Date, without prejudice to the rights of Affected Unsecured Creditors with Proven Affected Unsecured Claims (whether now existing or hereafter coming into existence) to receive all distributions contemplated by the Plan.

- 22 -

**TERMINATION OF HARDSHIP PROCESS**

58.    **THIS COURTS ORDERS** that on the Plan Effective Date the Hardship Process shall be and is hereby terminated and that all remaining amounts, if any, relating to the Hardship Process shall become Available Cash.

**STAKEHOLDER ADVISOR FEE ARRANGEMENTS**

59.    **THIS COURT ORDERS** that on the Plan Implementation Date the Bondholder Advisor Fee Letter shall be and is hereby terminated and the Canadian Debtors (including the Canadian Estate) shall have no obligation to pay any fees and expenses of the advisors to the Bondholder Group from and after the Plan Implementation Date.

60.    **THIS COURT ORDERS** that from and after the Plan Implementation Date, the fees and expenses of Court Appointed Representative Counsel shall no longer be borne by the Canadian Estate and instead shall be borne by the Compensation Creditors on the terms contemplated by Section 10.2(b) of the Plan. Notwithstanding the foregoing, the Canadian Estate shall pay the reasonable fees and expenses of Koskie Minsky LLP and their financial advisor for providing certain services relating to the Plan and distributions thereunder to Compensation Creditors for the twelve (12) month period following the Plan Implementation Date to a maximum of CA$1.5 million on the terms that have been agreed to in writing between the Canadian Estate, the Monitor, Koskie Minsky LLP and their financial advisor.

61.    **THIS COURT ORDERS** that the obligation of the Canadian Debtors to pay the fees and expenses of counsel to the Directors and Officers (whether pursuant to the Initial Order or otherwise) shall terminate on the Plan Implementation Date and the Canadian Debtors (including the Canadian Estate) shall have no obligation to pay any fees and expenses of counsel to the Directors and Officers from and after the Plan Implementation Date.

- 23 -

**THE MONITOR**

62.     **THIS COURT ORDERS** that from and after the Plan Effective Date the administration and wind-down of the Canadian Estate will continue to be conducted by the Monitor pursuant to the Monitor's Powers Orders and the Plan and the Monitor shall be and is hereby authorized to continue such administration and wind-down, including, without limitation, to undertake the matters contemplated pursuant to Section 10.1 of the Plan.

63.     **THIS COURT ORDERS** that, for the avoidance of doubt: (i) the Monitor shall continue to have all of the powers and protections granted to it by the Plan, the CCAA, the Monitor's Powers Orders and any other Order made in the CCAA Proceedings; and (ii) the Canadian Estate shall be an "Applicant" or "Canadian Debtor" for purposes of construing the Monitor's Powers Orders and any other Order made in the CCAA Proceedings.

64.     **THIS COURT ORDERS** that, without limiting the provisions of the Monitor's Powers Orders or any other Order granted in the CCAA Proceeding, the Canadian Estate shall remain in possession and control of the Property (as defined in the Initial Order) and the Monitor shall not take possession or be deemed to be in possession and/or control of the Property.

65.     **THIS COURT ORDERS AND DECLARES** that: (i) in carrying out the terms of this Order and the Plan, the Monitor shall have all the protections given to it by the CCAA, the Monitor's Powers Orders and any other order of this Court, including the stay of proceedings and other protections pursuant to paragraphs 14 and 15 of the Initial Order, in its favour; (ii) the Monitor shall incur no liability or obligation as a result of carrying out the provisions of this Order and/or the Plan, other than any liability arising out of or in connection with the gross negligence or wilful misconduct of the Monitor; (iii) the Monitor shall be entitled to rely on the books and records of the Canadian Debtors; and (iv) the Monitor shall not be liable for any

- 24 -

claims or damages resulting from any errors or omissions in such books, records or information.

66. **THIS COURT ORDERS** that none of the Monitor or its affiliates, shareholders, affiliate's shareholders (including Ernst & Young LLP, a Canadian limited liability partnership), employees, advisors, lawyers, representatives or agents shall incur any personal liability whatsoever whether on their own part or in respect of any failure on the part of any Canadian Debtor (including the Canadian Estate) to observe, perform or comply with any of its obligations under the Plan or under or in relation to any associated arrangements or negotiations.

## MISCELLANEOUS

67. **THIS COURT ORDERS** that the Canadian Debtors (including the Canadian Estate) and the Monitor may apply to this Court from time to time for advice and direction with respect to any matter arising from or under the Plan or this Order.

68. **THIS COURT ORDERS** that this Order shall have full force and effect in all provinces and territories of Canada and abroad as against all Persons against whom it may be enforced.

69. **THIS COURT HEREBY REQUESTS** the aid and recognition of any court, tribunal, regulatory or administrative body having jurisdiction in Canada, the United States, the United Kingdom or elsewhere, to give effect to this Order and to assist the Canadian Debtors (including the Canadian Estate), the Monitor and their respective agents in carrying out the terms of this Order.  All courts, tribunals, regulatory and administrative bodies are hereby respectfully requested to make such orders and to provide such assistance to the Canadian Debtors (including the Canadian Estate) and to the Monitor, as an officer of this Court, as may be necessary or desirable to give effect to this Order, to grant representative status to the Monitor in any foreign proceeding, or to assist the Canadian Debtors  (including the Canadian Estate) and the Monitor and their respective agents in carrying out the terms of this Order.

- 25 -

70.    **THIS COURT ORDERS** that each of the Canadian Debtors (including the Canadian Estate) and the Monitor shall be at liberty and are hereby authorized and empowered to apply to any court, tribunal, regulatory or administrative body, wherever located, for the recognition of this Order and for assistance in carrying out the terms of this Order.

_____

SCHEDULE "●"

**FORM OF MONITOR'S CERTIFICATE RE: PLAN CERTIFICATE**

Court File No. 09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**COMMERCIAL LIST**

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION, NORTEL NETWORKS
TECHNOLOGY CORPORATION, NORTEL COMMUNICATIONS INC.,
ARCHITEL SYSTEMS CORPORATION AND NORTHERN TELECOM CANADA
LIMITED**

**PLAN CERTIFICATE**

**TO:    NORTEL NETWORKS INC. AND ITS AFFILIATED U.S. DEBTORS**

**RE:    EFFECTIVENESS OF CANADIAN PLAN**

Reference is made to the Plan of Compromise and Arrangement pursuant to the *Companies' Creditors Arrangement Act* concerning, affecting and involving the Canadian Debtors dated November 30, 2016 (the "**Canadian Plan**") sanctioned by the Ontario Superior Court of Justice pursuant to a Sanction Order dated January 24, 2017.

Pursuant to Section 9.1 of the Canadian Plan, the Monitor hereby declares the effectiveness of the Canadian Plan in accordance with its terms.

**DATED** the _____ day of ●, 2017.

**ERNST & YOUNG INC. in its capacity as
Monitor of Nortel Networks Corporation *et al*.
and not in its personal capacity**

Per:  _____

Name:  Murray McDonald
Title:    President

SCHEDULE "●"

**FORM OF PLAN EFFECTIVENESS CERTIFICATE**

Court File No. 09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**COMMERCIAL LIST**

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION, NORTEL NETWORKS
TECHNOLOGY CORPORATION, NORTEL COMMUNICATIONS INC.,
ARCHITEL SYSTEMS CORPORATION AND NORTHERN TELECOM CANADA
LIMITED**

**PLAN EFFECTIVENESS CERTIFICATE**

**TO:    THE SERVICE LIST**

**RE:    EFFECTIVENESS OF CANADIAN PLAN**

Reference is made to the Plan of Compromise and Arrangement pursuant to the *Companies' Creditors Arrangement Act* concerning, affecting and involving the Canadian Debtors dated November 30, 2016 (the "**Canadian Plan**") sanctioned by the Ontario Superior Court of Justice pursuant to a Sanction Order dated January 24, 2017.

Capitalized terms used herein and not otherwise defined have the meaning given to them in the Canadian Plan.

Pursuant to Section 9.4 of the Canadian Plan, the Monitor hereby confirms the occurrence of the Plan Effective Date under the Canadian Plan on **[date]**.

**DATED** the _____ day of ●, 2017.

**ERNST & YOUNG INC. in its capacity as
Monitor of Nortel Networks Corporation *et al.*
and not in its personal capacity**

Per:    _____
         Name:  Murray McDonald
         Title:   President

SCHEDULE "●"

**FORM OF PLAN IMPLEMENTATION CERTIFICATE**

Court File No. 09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**COMMERCIAL LIST**

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION, NORTEL NETWORKS TECHNOLOGY CORPORATION, NORTEL COMMUNICATIONS INC., ARCHITEL SYSTEMS CORPORATION AND NORTHERN TELECOM CANADA LIMITED**

**PLAN IMPLEMENTATION CERTIFICATE**

**TO:   THE SERVICE LIST**

**RE:   IMPLEMENTATION OF CANADIAN PLAN**

Reference is made to the Plan of Compromise and Arrangement pursuant to the *Companies' Creditors Arrangement Act* concerning, affecting and involving the Canadian Debtors dated November 30, 2016 (the "**Canadian Plan**") sanctioned by the Ontario Superior Court of Justice pursuant to a Sanction Order dated January 24, 2017.

Capitalized terms used herein and not otherwise defined have the meaning given to them in the Canadian Plan.

Pursuant to Section 9.5 of the Canadian Plan, the Monitor hereby confirms the occurrence of the Plan Implementation Date under the Canadian Plan on **[date]**.

**DATED** the _____ day of ●, 2017.

> **ERNST & YOUNG INC. in its capacity as Monitor of Nortel Networks Corporation *et al*. and not in its personal capacity**
>
> Per: _____
> Name:  Murray McDonald
> Title:   President

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED
AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION et al.

Court File No.  09-CL-7950

|  |
| --- |
| ***ONTARIO***<br>**SUPERIOR COURT OF JUSTICE**<br>**(COMMERCIAL LIST)**<br>**Proceeding commenced at Toronto** |
| **SANCTION ORDER** |
| **GOODMANS LLP**<br>Barristers & Solicitors<br>Bay Adelaide Centre<br>333 Bay Street, Suite 3400<br>Toronto, ON  M5H 2S7<br>**Jay A. Carfagnini**  LSUC#: 22293T<br>**Joseph Pasquariello**  LSUC#: 38390C<br>**Christopher G. Armstrong**  LSUC#: 55148B<br>Tel: 416.979.2211<br>Fax: 416.979.1234<br>Lawyers for the Monitor, Ernst & Young Inc. |

6649376

# TAB 5

Court File No. 09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**COMMERCIAL LIST**

| | | |
|---|---|---|
| THE  HONOURABLE  MR.  JUSTICE | ) | TUESDAY, THE 24TH DAY OF |
| | ) | |
| NEWBOULD | ) | JANUARY, 2017 |
| | ) | |

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION, NORTEL NETWORKS TECHNOLOGY CORPORATION, NORTEL COMMUNICATIONS INC., ARCHITEL SYSTEMS CORPORATION AND NORTHERN TELECOM CANADA LIMITED**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

**CANADIAN ESCROW RELEASE ORDER**

**THIS MOTION** made by Nortel Networks Corporation ("**NNC**"), Nortel Networks Limited ("**NNL**"), Nortel Networks Technology Corporation, Nortel Networks Global Corporation, Nortel Networks International Corporation, Nortel Communications Inc., Architel Systems Corporation and Northern Telecom Canada Limited (collectively, the "**Canadian Debtors**") jointly with Ernst & Young Inc. in its capacity as monitor of the Canadian Debtors (the "**Monitor**") for the relief set out in the Notice of Motion dated January ●, 2017, was heard this day at 330 University Avenue, Toronto, Ontario.

**ON READING** the One Hundred and Thirty Fifth Report of the Monitor dated January ●, 2017 (the  "**Report**"), and on hearing submissions of counsel for the Monitor and counsel for **[list other counsel]**, no one appearing for any other person on the service list

- 2 -

although duly served as appears from the affidavit of Christopher Armstrong sworn January ●, 2017, filed.

**SERVICE**

1.    **THIS COURT ORDERS** that the time for the service of the Notice of Motion and the Motion Record is hereby abridged and validated so that this motion is properly returnable today and hereby dispenses with further service thereof.

**DEFINED TERMS AND CURRENCY**

2.    **THIS COURT ORDERS** that capitalized terms used herein and not otherwise defined shall have the meaning given to them in the Settlement and Plans Support Agreement dated October 12, 2016 (the "**Settlement and Support Agreement**"), attached as Exhibit "A" to the Plan of Compromise and Arrangement pursuant to the *Companies' Creditors Arrangement Act* concerning, affecting and involving the Canadian Debtors dated November 30, 2016.

3.    **THIS COURT ORDERS** that, unless otherwise specified, all amounts referred to herein are in U.S. dollars.

**PAYMENT OF ICEBERG AMENDMENT FEE AND M&A COST REIMBURSEMENT**

4.    **THIS COURT ORDERS** that, subject to the occurrence of the Plans Effective Date, JPMorgan Chase Bank, N.A be and is hereby authorized and directed to make the following distributions from the Escrow Accounts:

(a)    $2.8 million to NNI from the Iceberg Escrow Account in satisfaction of the Iceberg Amendment Fee due to NNI;

(b)    $2.2 million to NNUK from the Iceberg Escrow Account in satisfaction of the Iceberg Amendment Fee due to NNUK;

- 3 -

(c)     $20 million to NNI from the Escrow Accounts in satisfaction of the M&A Cost Reimbursement due to NNI; and

(d)     $35 million to NNL from the Escrow Accounts in satisfaction of the M&A Cost Reimbursement due to NNL.

## DISTRIBUTION OF SALE PROCEEDS

5.     **THIS COURT ORDERS** that, subject to the occurrence of the Plans Effective Date, Royal Trust Corporation of Canada be and is hereby authorized and directed to release the entire amount in the Canadian Escrow Account to NNL.

6.     **THIS COURT ORDERS** that, subject to the occurrence of the Plans Effective Date, JPMorgan Chase Bank, N.A be and is hereby authorized and directed to release the Sale Proceeds to each of the U.S. Debtors, the Canadian Debtors, the EMEA (Non-NNSA/Non-NNUK) Debtors, NNUK and NNSA in the percentages set forth in Section 2(c) of the Settlement and Support Agreement, including as further specified in Annex E and F thereof with respect to the EMEA (Non-NNSA/Non-NNUK) Allocation and the U.S. Allocation, all on and subject to the terms of the Settlement and Support Agreement. For the avoidance of doubt, the amount of Sale Proceeds to be released by JPMorgan Chase Bank, N.A to the Canadian Debtors pursuant to this paragraph 6 shall take into account the amount of Sale Proceeds received by NNL from the Canadian Escrow Account in the manner contemplated by Section 7(g) of the Settlement and Support Agreement.

7.     **THIS COURT ORDERS** that, subject to the occurrence of the Plans Effective Date, the Depositors and the Estate Fiduciaries (as such terms are defined in the Escrow Agreements) shall be at liberty to issue such joint written instructions to the Escrow Agents pursuant to the terms of the relevant Escrow Agreement as may be necessary to effect the distributions contemplated in this Order and the Settlement and Support Agreement, including to identify the specific Escrow Accounts from which Sale Proceeds are to be distributed and the specific amounts to be distributed from each Escrow Account, and the Escrow Agents be and are hereby authorized

- 4 -

and directed to rely on any such joint written instruction duly delivered to them in accordance with the terms of the relevant Escrow Agreement.

**MISCELLANEOUS**

8.  **THIS COURT HEREBY REQUESTS** the aid and recognition of any court, tribunal, regulatory or administrative body having jurisdiction in Canada, the United States, the United Kingdom or elsewhere, to give effect to this Order and to assist the Canadian Debtors (including the Canadian Estate), the Monitor and their respective agents in carrying out the terms of this Order.  All courts, tribunals, regulatory and administrative bodies are hereby respectfully requested to make such orders and to provide such assistance to the Canadian Debtors (including the Canadian Estate) and to the Monitor, as an officer of this Court, as may be necessary or desirable to give effect to this Order, to grant representative status to the Monitor in any foreign proceeding, or to assist the Canadian Debtors (including the Canadian Estate) and the Monitor and their respective agents in carrying out the terms of this Order.

9.  **THIS COURT ORDERS** that each of the Canadian Debtors  (including the Canadian Estate) and the Monitor be at liberty and are hereby authorized and empowered to apply to any court, tribunal, regulatory or administrative body, wherever located, for the recognition of this Order and for assistance in carrying out the terms of this Order.

_____

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED
AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION et al.

Court File No.  09-CL-7950

| |
|---|
| ***ONTARIO*** <br> **SUPERIOR COURT OF JUSTICE** <br> **(COMMERCIAL LIST)** <br> **Proceeding commenced at Toronto** |
| **CANADIAN ESCROW RELEASE ORDER** |
| **GOODMANS LLP** <br> Barristers & Solicitors <br> Bay Adelaide Centre <br> 333 Bay Street, Suite 3400 <br> Toronto, ON  M5H 2S7 <br> **Jay A. Carfagnini**  LSUC#: 22293T <br> **Joseph Pasquariello**  LSUC#: 38390C <br> **Christopher G. Armstrong**  LSUC#: 55148B <br> Tel: 416.979.2211 <br> Fax: 416.979.1234 <br> Lawyers for the Monitor, Ernst & Young Inc. |

6653177

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED
AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION et al.

Court File No.  09-CL-7950

| |
|---|
| *ONTARIO*<br>**SUPERIOR COURT OF JUSTICE**<br>**(COMMERCIAL LIST)**<br>**Proceeding commenced at Toronto** |
| **MOTION RECORD**<br>**(Plan Sanction and Canadian Escrow Release Order)** |
| **GOODMANS LLP**<br>Barristers & Solicitors<br>Bay Adelaide Centre<br>333 Bay Street, Suite 3400<br>Toronto, ON  M5H 2S7<br><br>**Jay A. Carfagnini**  LSUC#: 22293T<br>jcarfagnini@goodmans.ca<br>**Joseph Pasquariello**  LSUC#: 38390C<br>jpasquariello@goodmans.ca<br>**Christopher G. Armstrong**  LSUC#: 55148B<br>carmstrong@goodmans.ca<br><br>Tel: 416.979.2211<br>Fax: 416.979.1234<br><br>Lawyers for the Monitor, Ernst & Young Inc. |

6653809