**<u>EXHIBIT B</u>**

Court File No. 09-CL-7950

ONTARIO

SUPERIOR COURT OF JUSTICE

(COMMERCIAL LIST)

IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTERL NETWORKS LIMITED, NORTEL
NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL
CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

APPLICATION UNDER THE COMPANIES' CREDITORS ARRANGEMENT ACT,
R.S.C. 1985, c. C-36, AS AMENDED

Notice of Intention to Appear and Submission for Anticipated January 24, 2017 Fairness Hearing
to Sanction the Nortel CCAA Plan from Greg McAvoy and Jennifer Holley

Date: January 13, 2017

Joseph Greg McAvoy
Nortel CCAA LTD Creditor
Kingsland Terrace Supportive Living Facility
Suite 1, Room 2
835 68 Ave SW
Calgary AB, T2V ON5
 (587) 582-8804
**dignum.mcavoy@gmail.com**

Jennifer Holley
Nortel CCAA LTD Creditor
2034 River Road
Ompah, ON, K0H 2J0
(613) 479-2653
**jholley@xplornet.com**


Self-Represented


**To: Service List**

1

**THIS SUBMISSION IS FOR AN ORDER**

1. This submission is filed by Gregory McAvoy and Jennifer Holley, who have standing as Nortel CCAA LTD creditors. Gregory McAvoy and Jennifer Holley exercise their option to opt out of representation of the Nortel long term disabled former employees by representative Sue Kennedy and representative legal counsel Koskie Minsky LLP.

2. This submission requests that the CCAA judge make an adjustment of the Nortel CCAA Plan of Arrangement and Compromise ("Nortel Plan") to make it compliant with the Charter, fair and reasonable for the LTD, fair in regard to the interests of Greg McAvoy, Jennifer Holley and other members of the LTD and in the LTD's best interests. This adjustment requires reconsideration of the **March 30, 2010 revised interim settlement agreement[1].** The requested adjustment is Cdn$44 million more for full payment of the Nortel LTD income and medical and dental claims (assuming the CCAA cash ratio is 45%). This is just 0.8% of the expected Nortel Canada estate of Cdn$5.7 billion.

3. The incremental Cdn$44 million requested for the LTD could be placed in a reserve account, in order to allow the Nortel Plan's allocation and distribution of cash, less the Cdn$44 million reserve account, be paid to all creditors by April 2017 as currently intended. The court would then, if necessary, have greater time to consider the grounds for the order to make an adjustment and reconsideration as requested in this submission.

**THE GROUNDS FOR THE ORDER ARE:**

4. The Nortel Plan is unfair and unreasonable for Greg McAvoy, Jennifer Holley and other members of LTD. It unfairly disregards the interests of the LTD, who are deprived of substantive equality in Canadian society and adequate disability income for basic housing, food, clothing and high medical and dental expenses. The Nortel Plan is not in the best interests of the LTD. The LTD group had 360 members at 2010, including 158 members with spouses and 85 members with 160 dependent children.

---

[1] *Nortel Networks Corporation (Re), [2010] ONSC, March 31, 2010 P. C2*

5. Approval of the Nortel Plan by the CCAA judge constitutes the use of his discretionary authority within the CCAA to force severe deleterious impacts on the LTD from violation of their Charter[2] rights: S. 15(1) on deprivation of substantive equality; and, S. 7 on deprivation of life, liberty and security.  Individuals with mental or physical disability are expressly protected in the Charter. This is a case where equal treatment of the LTD with other unsecured creditors results in LTD Charter violations. None of the Charter tests for acceptable limitation of Charter rights are met: reasonable limits demonstrably justified in a free and democratic society in S.1; in accordance with principles of fundamental justice in S. 7; or, due to a S. 33 notwithstanding clause within the statute.

6. The Constitution is the supreme law of Canada, and any law that is inconsistent with its provisions, to the extent of the inconsistency, is of no force or effect. A judge, who exercises delegated powers pursuant to a law, does not have the power to make an order that would result in an infringement of the Charter. The SCC's *Slaight*[3] decision specifically addresses a judge's discretionary authority within a law cannot be used in violation of the Charter, and if it is, this discretionary authority must be struck down under S. 52 and be of no force or effect, unless it can be demonstrably justified under S. 1 as a necessary discretionary authority to limit Charter rights in order to serve the purpose of the law.  The requisite SCC *Oaks*[4] and *Big M Drug Mart*[5] tests for a demonstrable justification of limitation of LTD Charter rights under S. 1 are not met in the Nortel Plan.

7. Sue Kennedy being the court-appointed representative of the LTD with court-appointed legal counsel and her authority to vote for the Nortel Plan on behalf of the LTD under the representation order are all court processes that have resulted in LTD Charter violations.  The CCAA judge cannot use discretionary authority within the CCAA to approve a Plan simply because there is construed majority support for it under these court processes, when these violate LTD Charter rights, for one, many or even all members of the LTD group.  LTD not opting out of representation by Sue Kennedy should not change the assessment of whether or not the CCAA

[2] *The Constitution Act, 1982, PART 1 Charter of Rights and Freedoms*
[3] *Slaight Communications Inc. v. Davidson,* [1989] 1 SCR 1038, 1989 CanLII 92 (SCC)
[4] *R. v. Oakes,* [1986] 1 SCR 103, [1986] CanLII 46 (SCC)  P. 64, 69, 70, 71
[5] *R. v. Big M Drug Mart Ltd.,* [1985] 1 SCR 295, 1985 CanLII 69 (SCC) P. 139, 163

is an unconstitutional law in respect to its discretionary authority for judges to approve a CCAA Plan that limits LTD Charter rights, if such limitations are not demonstrably justified to serve the purpose of the CCAA.

## MATERIAL FACTS ON THE IMPACTS OF THE NORTEL PLAN ON LTD

8. The affidavit of Diane Urquhart, a financial expert, provides Tables 1-8, containing material facts on the absolute and relative impact of the Nortel Plan on members of the long term disabled former employees group ("LTD").

9. Approval of the Nortel Plan, combined with the 2010 revised interim settlement agreement, results in LTD being:

  i) deprived of adequate disability income for basic housing, food, clothing and high medical and dental expenses, and so cannot live independently and with dignity:

   a) 66% to 68% estimated combined HWT and CCAA recovery of the amount owed for Nortel disability income, is applied to Nortel's pre bankruptcy disability income that was already reduced to 50% to 70% of their working income before disability (most employees opted for the higher 70% coverage paid for by employee contributions.) The LTD outcome is Nortel disability income reduced to 33% to 48% of pre-disability income. The 160 dependent children cannot help but be seriously deprived compared to their peers with parents able to work.  See TABLE 1 and TABE 2.
   b) medical and dental expenses claim has only 45% to 49% recovery, of an average of Cdn$7,291 per year for the LTD at 2010. See TABLE 1, TABLE 2 and TABLE 6.
   c) LTD unable to preserve capital from both the HWT and CCAA settlements, due to the six year delay of the CCAA settlement.  The deeply compromised 38% HWT and 45% to 49% CCAA settlements' capital is already used up by 2018 to cover the deficiencies in CPP disability income relative to reasonable basic housing, food and clothing expenses and the high medical and dental expenses during 2011 to 2017.  The estimated average annual deficiencies of income over expenses have grown from $27,015 in 2011 to

4

$33,223 in 2017. The 2017 average basic living costs are estimated at $36,220 derived from adjustments made to the Statistics Canada average household expenditures in Canada. See TABLE 3 and TABLE 4.

d) due to settlement capital depletion by 2018, the LTD receives only CPP disability income, at a maximum of Cdn$15,763 in 2017. See TABLE 3.

ii) LTD deprived of substantive equality in Canadian society, through their loss of dignity, and exclusion and marginalization.  An LTD, who once worked and who actively sought group LTD insurance coverage at Nortel, is by 2018 reduced to annual income at the maximum CPP disability income of Cdn$15,763 in 2017.

## MATERIAL FACTS ON THE RELATIVE IMPACTS OF THE NORTEL PLAN

10. The Canadian long term disabled former employees are the worst impacted claimant group in Canada and in the US and UK/EMEA estates.

i) Junk bond holders are paid 98 cents to full payment per $1 of claim.  See TABLE 1.

ii) US pensioners and UK pensioners are paid in full under the US Pension Benefit Guaranty Corporation and the UK Pension Protection Fund, subject to their maximum limits.

iii) Canadian pensioners have much higher combined pension plan and CCAA settlements:

a) 88% to 100% in Ontario, that are substantially subsidized by the Ontario Government grant of Cdn$384 million under the OPBG program guarantying the first $12,000 per year of pension income.

b) 82% in Nova Scotia

c) 77% in the other Provinces.

Canadian pensioners have same compromise of their lower medical and dental claims that averaged $1,961 in 2010. Canada pensioners have much higher CPP and OAS pension

income at a maximum of $20,312 in 2017, compared to the maximum CPP disability income of $15,763 in 2017. See TABLE 6.

iv)  Nortel Canadian bankruptcy professionals are paid Cdn$698 million in fees and disbursements. Nortel global bankruptcy professionals are paid Cdn$2,580 million. See TABLE 7.

   a)  **Monitor's Report 132nd Nov. 16, 2016,  Monitor Fees and Disbursements** discloses total Ernst & Young CCAA Court Monitor fees of US $108.0 million, Goodmans LLP Court Monitor's Legal Counsel fees of US$86.4 and disbursements of US$5.6 million before HST, between Jan. 14, 2019 and May 31, 2016.  The combined fees and disbursement for performing delegated Court Monitor's duties, including the HST is US$226 million, or Cdn$301 million.

   b)  Ernst & Young received fees of US$428 million, or Cdn$570 million, for its roles as CCAA Court Monitor, UK Court Administrator, and US Tax Advisor to the Nortel Networks Inc.

   c)  **Monitor's Report 132nd Nov. 16, 2016,  Monitor Fees and Disbursements** discloses for the first time that Former Employees (Representative Counsel) received fees of US$38 million, or Cdn$51 million.  This was paid to DLA Piper LLP, Koskie Minsky LLP, Nelligan O'Brien Payne LLP, RSM Richter, Segal Consulting, Shepell FGI, Shibley Righton LLP and Wardle Daley Bernstein LLP.

v) Nortel executives are paid US$190 million, or over Cdn$250 million, in retention bonuses, without separate disclosure for the Canada estate. See TABLE 8.

11. 9 Nortel senior executives were granted a constructive trust and an uncompromised settlement equivalent to monthly payments (ranging from $991 to $31,950) for a Supplementary Pension and Retirement Allowance at June 25, 2010 in *Nortel Networks Corporation (Re)* [6], where Koskie Minsky LLP represented the executives. LTD were not

---

[6] *Nortel Networks Corporation (Re)*, [2010] ONSC 3061, June 25, 2010 P. 55, 56

given any consideration for a constructive trust claim before the interim settlement agreement was approved by the court.

## JUDGE'S USE OF DISCRETION WITHIN THE CCAA VIOLATES THE CHARTER IN RESPECT TO LTD

12. Diane Urquhart has provided research to Gregory McAvoy and Jennifer Holley on Supreme Court of Canada cases interpreting the Charter of Rights and Freedoms and the CCAA's purpose and judicial powers to sanction a CCAA Plan.

13. Approval of the Nortel Plan by the CCAA judge constitutes the use of his discretion to force a deep compromise of the LTD claims that results in deleterious impacts from violation of LTD Charter rights:  S. 15(1) on deprivation of equality; and, S. 7 on deprivation of life, liberty and security. None of the Charter tests for acceptable limitation of Charter rights have been met, that is: reasonable limits demonstrably justified in a free and democratic society in S.1; in accordance with principles of fundamental justice in S. 7; or, due to a notwithstanding clause within the statute enabled in S. 33.

14. The SCC's *Slight*[7] decision specifically addresses a judge's discretionary authority within a law cannot be used in violation of the Charter, and if it is, this discretionary authority must be struck down under S. 52 and be of no force or effect, unless it can be demonstrably justified under S. 1 as a necessary discretionary authority to limit Charter rights in order to serve the purpose of the law.

15. **Reconciling the Charter and Administrative Law by Dean of Osgoode Hall Law School Lorne Sossin** says:

"In *Slight* the Court for the first time attempted to reconcile the *Charter* and Administrative Law protections where they overlap. With respect to exercises of discretion in particular, the Court reasoned that no legislature could grant discretionary authority to act in violation of *Charter* rights – therefore, all such authority should be interpreted by Courts in a manner consistent with *Charter* protections unless the wording of the statute itself is inconsistent with a *Charter* right, in which case, if it could not be justified under s.1 of the *Charter*, that provision would have to be struck down…

---

[7] *Ibid, Slight Communications Inc. v. Davidson (SCC)*

16. ***Slaight*** says:

   " The Charter applies to orders made by the adjudicator.  The adjudicator is a creature of
   statute.  He is appointed pursuant to a legislative provision and derives all his powers from
   statute.  The Constitution is the supreme law of Canada, and any law that is inconsistent with
   its provisions is, to the extent of the inconsistency, of no force or effect.  It is thus impossible
   to interpret legislation conferring discretion as conferring a power to infringe the Charter,
   unless, of course, that power is expressly conferred or necessarily implied.  Such an
   interpretation would require this Court to declare the legislation to be of no force or effect,
   unless it could be justified under s. 1 of the Charter.   It follows that an adjudicator, who
   exercises delegated powers, does not have the power to make an order that would result in an
   infringement of the Charter."

17. The principle of an overly broad law described in ***Heywood***[8] applies to the CCAA because
   its enablement of judicial discretion to deprive the Charter rights of disabled persons is
   going beyond what is needed to accomplish the governmental objectives of the CCAA.

   "Overbreadth analysis looks at the means chosen by the state in relation to its purpose.  A court must consider
   whether those means are necessary to achieve the state objective.  If the state, in pursuing a legitimate objective,
   uses means which are broader than is necessary to accomplish that objective, the principles of fundamental
   justice will be violated because the individual's rights will have been limited for no reason.  The effect of
   overbreadth is that in some applications the law is arbitrary or disproportionate."

   "Section 7 of the *Charter* has a wide scope.  An enactment, before it can be found to be so broad that it
   infringes s. 7 of the *Charter*, must clearly infringe life, liberty or security of the person in a manner that is
   unnecessarily broad, going beyond what is needed to accomplish the governmental objective.  In determining
   whether a provision is overly broad and not in accordance with the principles of fundamental justice, it must be
   determined whether the means chosen to accomplish the provision's objectives are reasonably tailored to effect
   its purpose.  Where legislation limits the liberty of an individual in order to protect the public, that limitation
   should not go beyond what is necessary to accomplish that goal."

18. The SCC ***Ravndahl v. Saskatchewan***[9] case distinguishes that personal claims under S.
   24(1) of the Charter are subject to the provincial limitation period statutes, while any
   remedies flowing from S. 52 of the Charter are not personal remedies but rather remedies
   from which an affected person might benefit.

   Personal claims for constitutional relief are claims brought as an individual *qua* individual for a personal
   remedy and must be distinguished from claims enuring to affected members generally under an action for a
   declaration that a law is unconstitutional.  [16]

   *The Limitation of Actions Act* applies to personal claims…

---

[8] ***R. v. Heywood*, [1994] 3 SCR 761, [1994] CanLII 34 (SCC)**
[9] ***Ravndahl v. Saskatchewan*, [2009] 1 SCR 181, 2009 SCC 7 (CanLII)**

The claim for a declaration of constitutional invalidity and, if granted, what remedies are to issue, is for the trial judge to determine.  Any remedies flowing from s. 52 of the *Constitution Act, 1982*, would not be personal remedies but rather remedies from which the appellant, as an affected person, might benefit.  [26]

**19. Alberta Civil Liberties Research Centre – Striking Down an Unconstitutional Law?**

says:

"If you are seeking to have an unconstitutional law struck down, there is no limitation period. You can bring the action so long as the law is in force."

## S. 15(1) AND S. 7 CHARTER VIOLATIONS FOR LTD HAVE OCCURRED

20. It must first be determined that violations of S. 15(1) and S. 7 have occurred. The often cited identical treatment of the LTD to other Nortel unsecured creditors actually produces "substantive inequality" as defined in *Eldridge[10]*.

"61. This Court has consistently held that s. 15(1) of the *Charter* protects against this type of discrimination.  In *Andrews*, *supra*, McIntyre J. found that facially neutral laws may be discriminatory.  "It must be recognized at once", he commented, at p. 164, ". . . that every difference in treatment between individuals under the law will not necessarily result in inequality and, as well, that identical treatment may frequently produce serious inequality"; see also *Big M Drug Mart Ltd*., *supra*, at p. 347.  Section 15(1), the Court held, was intended to ensure a measure of substantive, and not merely formal equality."

21. The **Law Commission of Ontario - Charter of Rights and Freedoms, 2016** also says that "a law applying in a uniform way, which, in implementation, has a disproportionately negative impact on "enumerated" classes of persons will be in violation of section 15."  The Charter cites persons with mental or physical disability as an "enumerated" class for specific protection.

*22.* The Nortel Plan creates "discrimination" under S. 15(1) in the sense that they harm the LTD's dignity and fail to respect their full and equal membership in society, as defined in *Gosselin[11]*. The CCAA judge's use of discretion to force a compromise and poverty on the LTD results in their exclusion and marginalization described in *Granovsky[12]*, which is not within the values of our free and democratic society for persons with mental and physical disability that were expressly protected by the Charter.

---

[10] *Eldridge v. British Columbia (Attorney General)*, [1997] 3 SCR 624, 1997 CanLII 327 (SCC) P. 61
[11] *Gosselin v. Québec (Attorney General)*, [2002] 4 SCR 429, CanLII 84 (SCC)  P. 18, 81
[12] *Granovsky v. Canada (Minister of Employment and Immigration)*, [2000] 1 S.C.R. 703,CanLII 28 (SCC) P. 30

23. The Supreme Court, in *Eldridge, Gosselin* and *Granovsky*, has already accepted that deprivation of economic rights to the extent of substantive inequality is a violation of S. 15(1) of the Charter. **Bruce Porter, 20 Years of Equality Rights- Reclaiming Expectations, 2002** says that Eldridge is about as clear a statement in support of the positive vision of equality presented by equality seekers as one could hope for…"

24. The Supreme Court has also already decided in **_Baker_**[13] and **_Slaight_**[14] that its interpretation of S. 7 deprivation of rights to life, liberty and security needs to be consistent with international human rights documents ratified by the Federal Government, such as the **International Covenant on Economic, Social and Cultural Rights**[15] (ICESC) and **United Nations Convention on the Rights of Persons with Disabilities**[16] (UNRPD.) Both of these international human rights documents ratified by Canada state that States Parties must recognize the right of persons with disabilities to an adequate standard of living for themselves and their families, including adequate food, clothing and housing.

25. The Supreme Court decided in **_Irwin Toy_**[17] that all commercial economic rights do not have the protection of the Charter. It has, however, specifically indicated in *Irwin Toy* that it is open to a case on depletion of personal economic rights being a S. 7 deprivation of rights to life, liberty and security.

26. The LTD having their S. 7 Charter rights violated is not founded on the Charter imposing a positive obligation on the government to provide for a minimum standard of living to enable life, liberty and security. It is based on the government not making laws (or judges not using discretion enabled within laws) that result in the deprivation of life, liberty and security, as distinguished in *Gosselin.*

27. The **Law Commission of Ontario - Charter of Rights and Freedoms, 2016** provides S.7 interpretations for Liberty being the enjoyment of individual dignity and independence.

---

[13] *Baker v. Canada (Minister of Citizenship and Immigration)*, [1999] 2 SCR 817, CanLII 699 (SCC) P. 69, 70
[14] *Ibid, Slaight Communications Inc. v. Davidson (SCC)*
[15] *International Covenant on Economic, Social and Cultural Right Articles, 4, 11, 12s*
[16] *United Nations Convention on the Rights of Persons with Disabilities Articles 10, 14, 28*
[17] *Irwin Toy Ltd. v. Quebec (Attorney General)*, [1989] 1 SCR 927, CanLII 87 (SCC) P. 282

## WHAT ARE THE CHARTER TESTS FOR ACCEPTABLE LIMITATION OF LTD CHARTER RIGHTS?

28. In order for the S. 15(1) and S. 7 violations for disabled persons to be acceptable according to the SCC *Oakes* [18] decision,  two central criteria must be met:

i) First, the statute's objective is of sufficient importance to warrant over-riding disabled persons' constitutionally protected rights;

ii) Second, the means of over-riding disabled persons' rights chosen to obtain the objective are reasonable and demonstrably justified in a free and democratic society.

29. There are three components to be satisfied in the second central criteria:

a)   the measures adopted "must not be arbitrary, unfair or based on irrational considerations. In short, they must be rationally connected to the objective."

b)   "the means, even if rationally connected to the objective in this first sense, should impair "as little as possible" the right or freedom in question."

c)   "there must be a proportionality between the effects of the measures which are responsible for limiting the *Charter* right or freedom, and the objective which has been identified as of "sufficient importance"" *Big M Drug Mart* [19] also spoke of the need for proportionality.

30. *Oakes* defines the onus to prove a S.1 limitation on the party who is relying upon it and when the severity of deleterious impacts from Charter violations cannot be justified by the purposes it is intended to serve.

"The onus of proving that a limitation on any *Charter* right is reasonable and demonstrably justified in a free and democratic society rests upon the party seeking to uphold the limitation. Limits on constitutionally guaranteed rights are clearly exceptions to the general guarantee. The presumption is that *Charter* rights are guaranteed unless the party invoking s. 1 can bring itself within the exceptional criteria justifying their being limited."

---

[18] *Ibid, R v. Oakes,* (SCC) P. 64, 69, 70, 71
[19] *Ibid, R. v. Big M Drug Mart Ltd.,*(SCC) P. 139, 163

"Even if a statute's objective is of sufficient importance, and the elements of the proportionality test are satisfied, it is still possible that, because of the severity of the deleterious effects of a measure on individuals or groups, the measure will not be justified by the purposes it is intended to serve. The more severe the deleterious effects of a measure, the more important the objective must be if the measure is to be reasonable and demonstrably justified in a free and democratic society."

## JUDGE'S USE OF DISCRETION TO APPROVE NORTEL PLAN FAILS THE *OAKES* LIMITATION TESTS FOR THE LTD

31. The CCAA judge's use of discretion under the CCAA to approve the Nortel Plan does not meet the tests in the SCC *Oakes* decision.  The first central criteria of the Oakes test passes as the SCC ***Century*[20]** decision confirms there are important objectives for the CCAA to avoid the social and economic costs of liquidating a debtor's assets and paying its debts from the proceeds according to the BIA's priority rules. Restructuring or reorganization of the corporation with a court bound compromise of creditor claims is considered a way to avoid the social and economic costs of liquidation. This serves the public interest by facilitating the survival of companies supplying goods or services crucial to the health of the economy or saving large numbers of jobs.

32. However, the second central criteria of the *Oakes* test fails because the LTD compromise to the extent it violates LTD Charter rights must be demonstrably justified in a free and democratic society. All three of the *Oakes* components to pass the second criteria fail in the Nortel case:

   a)   Firstly, the LTD' compromise is not rationally connected to the objective of the CCAA.
   - Nortel was liquidated and not restructured or reorganized as a going concern.  There were social and economic benefits from Nortel selling its businesses to competitors, because the buyers took on employees, kept using trade suppliers, and continued to produce goods and services in the Canadian economy.  However, full payment of the LTD claims would not have produced lower social or economic benefits by causing a disorderly or distressed sale of businesses.  The **March 30, 2010 revised interim settlement agreement** that

---

[20] *Century Services Inc. v. Canada (Attorney General)*, [2010] 3 SCR 379, CanLII 60 (SC C) P. 12, 17, 18

forces equal treatment of the LTD claims to other unsecured creditors, did not produce quicker or higher priced sales for Nortel businesses, as the small $ and % incremental amount owed to the LTD could not have impacted any sale process.  Full payment of the LTD CCAA claims would be paid later from the business sales' proceeds, or deferred further to the Nortel Plan's final distribution.

- There is not a reasonable argument that the LTD's claims had to be equally compromised so that other creditor groups were more apt to negotiate a compromise and not petition the Applicants into bankruptcy under the Bankruptcy and Insolvency Act ("BIA"), where LTD claims are treated equally with all unsecured creditors.  The $ and % incremental amount owed to the LTD was always de minimis relative to the expected Canada estate size, even at 2010 when the interim settlement agreement was being considered.  The other creditors, including the bond holders, trade suppliers and pension plan members, had much more to lose from disruptive fire sale liquidation under the BIA than the incremental amount they would be paying for an LTD settlement that complies with the Charter.

- The Nortel liquidation occurred under the CCAA, which is an unconstitutional law to the extent of its judicial discretionary authority to violate LTD Charter rights, without a demonstrably justified limitation under S. 1. Having the liquidation occur under the BIA moves it to another unconstitutional law to the extent of its equal treatment of LTD claims, violating the same LTD Charter rights, without a demonstrably justified limitation under S. 1.

b)   Secondly, the Nortel Plan does not impair the disabled Charter rights "as little as possible." The Nortel Canada estate has the money to not deprive substantial equality and not to deprive adequate income for housing, food, clothing and high medical and dental expenses of the LTD, while having a de minimis impact on other creditors.

c)   Thirdly, there must be a proportionality between the effects of the measures which are responsible for limiting the Charter right and the benefits to society from meeting the CCAA's objective.  There are no demonstrably justified incremental social and economic benefits exceeding the LTD's negative impacts from their Charter violations.  More

importantly, *Oakes* says the severity of the deleterious effects of a person's Charter violation may be so great, that the measure will not be justified by the purposes it is intended to serve under the Act. This is certainly so in the Nortel Plan's impact on the LTD.

## CHARTER PROTECTS THE RIGHTS OF MINORITIES, AND PERSONS WITH DISABILITIES ARE AN EXPRESSLY PROTECTED GROUP

**33.** The values and principles essential to a free and democratic society described in the Charter are broader than the majority rules of Parliament and the majority rules in the CCAA for approval of settlements. This is established in ***Vriend[21].*** The Charter is intended to protect the rights of minorities and to be the supreme law of the people, especially for groups historically the target of prejudice and discrimination, such as minority French or English speaking persons, women and the mentally or physically disabled.

## NO PRINCIPLES OF FUNDAMENTAL JUSTICE TO LIMIT DISABLED'S S. 7 CHARTER RIGHTS

34. As defined in ***Rodriguez[22]*** there are no principles of fundamental justice to warrant the deprivation of disabled person Charter S. 7 rights in the CCAA process.

"The expression "principles of fundamental justice" in s. 7 of the *Charter* implies that there is some consensus that these principles are vital or fundamental to our societal notion of justice.  They must be capable of being identified with some precision and applied to situations in a manner which yields an understandable result.  They must also be legal principles."

## OTHER NORTEL CREDITOR GROUPS DO NOT HAVE VIOLATIONS OF CHARTER RIGHTS

35. Other creditors in the Nortel Plan do not have their Charter rights violated.  In ***Irwin Toy[23]*** the Supreme Court has decided that economic rights of commercial and government

---

[21] ***Vriend v. Alberta,* [1998] 1 SCR 493, [1998] CanLII 816 (SCC) P. 146, 176**
[22] ***Rodriguez v. British Columbia (Attorney General),* [1993] 3 SCR 519, CanLII 75 (SCC)**
[23] ***Ibid, Irwin Toy Ltd. v. Quebec (Attorney General)* (SCC) P. 282**

creditors do not have the protection of the Charter.  Pensioners are not an expressed protected group in the Charter.

36. The Supreme Court, in **_Sun Indalex Finance[24]_**, has also decided that compromise of pensioners' economic rights may be necessary to achieve the CCAA's objectives; these persons are not impacted in respect to the Charter rights not to be deprived of substantive equality and deprived of life, liberty and security due to their safety net of both CPP and OAS and generally substantial pension plan under government regulation of defined benefit pension plans; and, the benefits of not paying in full multi-billion dollar pension plan deficits  are significant to the CCAA objectives for restructuring, reorganizing and not liquidating the corporation.  Long term disabled employees are a defined small number and minority of persons who are unfortunately struck by illnesses or accidents (typically less than 1% of the workforce), and are vulnerable because they cannot work to pay for basic living and high medical and dental expenses.  Severed employees are not a minority and they are able to find new jobs.

**37.** The other creditor groups have to respect that the Charter is the supreme law of Canada and that the CCAA judge is obliged to implement it in respect to Canadian persons with mentally and physical disabilities, when limitation of their Charter rights is not demonstrably demonstrated in a free and democratic society under S. 1 of the Charter.

## PRECEDENT FOR RECONSIDERATION OF ORDERS IN THE NORTEL CCAA PROCEEDING

38. J. Newbould and US J. Gross both set the precedent for reconsideration of orders they made in the Nortel joint CCAA and Chapter 11 proceedings in their **Ruling on Reconsideration Motions on July 6, 2015[25].**  In this order, US bond holders received permission to apply their full $3,936 million bond claims that were guaranteed by US Nortel Networks Inc.

---

[24] **_Sun Indalex Finance, LLC v. United Steelworkers,_ [2013] 1 SCR 271, CanLII 6 (SCC) P. 2**

[25] **_Re Nortel Networks Corporation et al,_ [2015] ONSC 4170,  July 6, 2015 P. 23,44,45,46**

against the US estate. The **Nortel Allocation Decision May 12, 2015**[26] had permitted only the residual of the $3,936 million bond claims with guaranties not paid for by the Canada estate distribution to be applied against the US estate. The impact of the reconsideration decision was for the bond holders to get an additional distribution of US$208 million and imposing a 6% reduction in the recovery % for the other US creditors.  See TABLE 5.

39. This reconsideration value to the bond holders had a much higher adverse impact on other creditors than the requested adjustment of the Nortel Plan and reconsideration of the March 30, 2010 revised interim settlement agreement for the LTD. The requested LTD adjustment and reconsideration costs the other Canada estate creditors just -0.8% lower recovery %. See TABLE 5.

## REASONS FOR RECONSIDERATION OF THE MARCH 30, 2010 REVISED INTERIM SETTLEMENT AGREEMENT

40. Adjustment of the Nortel Plan in the manner requested requires the Ontario court to reconsider the equal treatment of unsecured creditors in the **March 30, 2010 revised interim settlement agreement**[3].  The final certain deleterious impact on LTD Charter violations from the Nortel Plan is sufficient grounds for the reconsideration of the interim settlement agreement and it would be fair to do so, since every other creditor group has fared better than this most vulnerable one and the court set the precedent for a significant reconsideration of a prior court order for bond holders that made them whole.

41. Furthermore, The **Sue Kennedy Affidavit, Feb. 23, 2010** had four seriously flawed arguments for supporting the March 30, 2010 revised interim settlement agreement, when it is considered in retrospect after taking into account developments in this CCAA proceeding between Feb. 2010 and today:

i) "..however, our counsel advised us that (i) there was no statutory obligation under the terms of the Trust Agreement which required Nortel to fund in full the HWT benefits." Point 41

---

[26] *Nortel Networks Corporation (Re),* **[2015] ONSC 2987,  May 12, 2015**

a)  J. Paul Perell decided there was a tenable constructive fraud claim in his **Justice Perell Decision on Holley v. Northern Trust and Royal Trust Feb. 11, 2014**[27]. If there was no unlawful conduct and no funding requirement within the HWT Trustee Agreement, there would be no tenable constructive fraud claim.

> [143] The problem for Ms. Holley, however, is that although she has pleaded a tenable constructive fraud claim, the claim is caught by the CCAA release.
>
> [ 148] … There may be a breach of contract or a breach of trust, or a constructive fraud, but there is no dishonesty or moral turpitude of the degree necessary to constitute common law fraud, which is a very serious tort precisely because it responds to genuine and not constructive dishonesty and moral turpitude.

ii) "There was the limited cash flow within the Canada estate" Point 52

a)  The Nortel Canada estate has approximately Cdn$5,653 million available for distribution in 2017. At March 2010, the cash flow in the Canada estate was expected to improve substantially, first from the proceeds of the sale of the Ottawa campus in October 2010 at of US$208 million and later from the expected billions of dollars allocation to the Canada estate from business sales.  In 2017, the Canada estate has a US$4,143 million allocation of the lock-box cash. See TABLE 5.

iii)  "…we had achieved a good result and it the best outcome obtainable in the circumstances." Point 60

a)  It cannot be a best outcome when only nine months of LTD benefits were paid in exchange for a broad legal release, without the full disclosure of evidence on the material issues affecting disabled persons.   Adjustment to the Nortel Plan for full payment of the LTD income and medical and dental expense claims costs just 0.8% lower recovery %'s for the other creditors.  The other Canadian creditors have a dramatically better final total financial position than the LTD. See TABLE 1 and TABLE 6.

iv)  "… we traded away the right to file risky and uncertain litigation and the right to argue that the LTD beneficiaries should be in a separate class or have priority in any CCAA Plan,

---

[27] *Holley v. The Northern Trust Company, Canada,* **[2014] ONSC 889,  Feb. 11, 2014  P. 143, 148**

for guaranteed money and benefits for a one year period, while we sort out our futures. We did not give up our claims …the rights of the LTD beneficiaries to object to any CCAA Plan." Point 60

a)   Nine months of benefits as the quid pro quo for concession of legal rights did not enable the LTD to sort out their futures; rather it doomed their futures to live in poverty.  While the dissenting LTD suspected they were being forced into poverty at the time of the March 30, 2010 interim settlement decision and the November 2010 HWT settlement decision, they now know with certainty the severity of the deleterious impact of the Nortel Plan's compromise on the LTD.

b)   The dissenting LTD opposition to the interim settlement agreement and the HWT fraud litigation was unsuccessful, but this was without the court considering the merit of the alleged wrongdoing claims based on the full body of HWT evidence and a trial.

- The court did not implement **Rule 7.08(4) of the Rules of Civil Procedure for the Ontario Courts**[28] as interpreted in **Rivera v. LeBlond**[29] on settlements with disabled persons. All three aspects of this Rule for settlements with disabled persons were not met: (i) intentional denial of evidence **by the Court Monitor** and **Court**[30] that is not full disclosure  of evidence regarding  the material issues affecting disabled persons;

- Tthe disabled representative legal counsel, Court Monitor and Court not conducting an appropriate investigation and assessment on the alleged wrongdoings of misrepresentations, breach of trust, constructive trust, constructive fraud (or fraud) harming the disabled persons, although a trial is not necessary under this Rule provided sufficient evidence has been submitted to enable the court to make the required assessment.

- No  disclosure of the legal fees of lawyers representing the disabled persons.

c)   **J. Perell summarily dismissed the HWT fraud class**[31] action for three reasons: (i) his assessment that the settlement agreement legal release covered constructive fraud and that J. Morawetz knew about the constructive fraud at the time he approved the settlement

---

[28]  **Rule 7.08(4) of the *Rules of Civil Procedure for the Ontario Courts***
[29]  **Rivera v. LeBlond, [2007] CanLII 7396 (ON SC) P. 19, 23, 24, 25, 26, 27, 30**
[30]  **Nortel Networks Corporation (Re), [2010] ONSC Transcript,  March 3-5, 2010 Pg. 20 P. 2 0**
[31]  **Ibid, Holley v. Northern Trust, Canada, ONSC**

agreement; (ii)  the HWT fraud class action was filed six months too late based on his interpretation that the limitation period began at the time of the interim settlement agreement February 2010 disclosure of the HWT 2008 financial statement  (**Court of Appeal of Ontario agreed to the summary dismissal**[32] for this reason); and, (iii)  the fraud claim had no possibility of success as there was no dishonesty in the trustee actions. The HWT fraud class action was summarily dismissed before the body of HWT evidence was submitted and without a trial on the substantive issues of merit.

d)  The court's rush to approve the interim settlement with the LTD in 2010 in order to be expeditious in its administration of the Nortel CCAA proceeding looks unreasonable in retrospect in the context of this Nortel CCAA proceeding taking six more years after the interim settlement agreement.  There have been countless mediations, trials, reconsideration of the bond allocation and appeals on the allocation of the lock-box assets.  During this extensive delay, there was court approval of US$3 billion cross-border claims against the Canada estate for the benefit of the US creditors, including the bond holders, and the UK Pension Protection Fund. These cross-border claim decisions and the cross-border bond guaranties, are the main reasons why the May 12, 2015 allocation decision was a modified pro-rata decision, resulting in the Canada estate getting such a low recovery % compared to the US and UK estate creditors.  The LTD is the worst impacted group by the cross-border claims and the six year delay when considering that the combined HWT and CCAA settlements deprive the LTD of  substantive equality and adequate income for housing, food, clothing and high medical and dental expenses.

---

[32] *Holley v. Northern Trust, Canada,* [2014] ONCA 719,  Oct. 21, 2014 P. 12, 13, 14, 15

Court File No. 09-CL-7950

ONTARIO
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTERL NETWORKS LIMITED, NORTEL
NETWORKS GLOBAL CORPORATION, NORTEL NETWORLS INTERNATIONAL
CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

APPLICATION UNDER THE COMPANIES' CREDITORS ARRANGEMENT ACT,
R.S.C. 1985, c. C-36, AS AMENDED

Affidavit of DIANE A. URQUHART

**I, DIANE A. URQUHART,** an independent financial analyst, of the City of Mississauga, in the Province of Ontario, **SOLEMNLY AFFIRM AS FOLLOWS:**

1.  I prepared TABLES 1 to 8 in this affidavit at the request of Greg McAvoy and Jennifer Holley, two Nortel long term disabled former employees.

2.  TABLES 1 to 8 contain my calculations for the absolute and relative impact on the LTD of the Nortel CCAA Plan of Arrangement and Compromise. The sources of disclosure are listed at the bottom of each table.

3.  I have served before as a financial expert before the Ontario Superior Court of Justice in the Non Bank Asset Backed Commercial Paper CCAA proceeding, the CIBC Misrepresentation Class Action proceeding, and this Nortel CCAA proceeding.

4.  I swear this affidavit for the purpose of Greg McAvoy and Jennifer Holley making reference to it in their Submission for the Anticipated January 24, 2017 Fairness Hearing to Sanction the Nortel CCAA Plan.

AFFIRMED BEFORE ME at the
City of Mississauga, Province of Ontario,
this 12th day of January, 2017

_____
DIANE URQUHART

A COMMISSIONER FOR TAKING
OATHS IN ONTARIO

Robert Aubin
Barrister & Solicitor
Notary Public & Commissioner of Oaths
in and for the Province of Ontario
My commission is of unlimited duration.
No legal advise given.

Red Seal Notary Inc.
50 Burnhamthorpe Rd. W #401
Mississauga, ON  L5B 3C2
Tel: 416-922-7325

## TABLE 1:  NORTEL CREDITORS' RECOVERY %'S

| Nortel Bankruptcy Recovery %'s = | Recovery % | |
| Cents on the Dollar of Claim | Low | High |
|---|---|---|
| Canada [(1)] | 45 | 49 |
| US Bond Holders | 98 | 100 |
| US Pensioners | | 100 |
| US Pension Benefit Guaranty Corporation | | 81 |
| US Other Unsecured Creditors | 55 | 61 |
| UK Pensioners | | 100 |
| UK Pension Protection Fund (DU Estimate) | | 54 |
| UK /EMEA Other Unsecured Creditors (DU Estimate) | | 46 |
| Global | 70 | |

Sources:
Nortel CCAA Information Circular Nov. 30, 2016
Nortel Chapter 11 Disclosure Docket 17502 Dec. 1, 2016
Pensions & Investments - PBGC reaches settlement with Nortel …, Dec. 22, 2016
UK High Court of Justice Approved Judgement Nov. 3, 2016
Nortel UK Pension Plan Accounts March 31, 2009

Note (1)
   * Canada Canadian dollar denominated claims
     Canada US dollar denominated claims                    42            45

Prepared by Diane Urquhart

**TABLE 2:   NORTEL CANADIAN LONG TERM DISABLED COMBINED HWT AND CCAA SETTLEMENTS**

| Nortel Canadian Long Term Disabled | Aggregate | In Aggregate | | | | |
|---|---|---|---|---|---|---|
| Canadian Dollars Millions | Act. Liab. | HWT Settlement | CCAA Settlement (1) | Loss | Loss % | Settlement % |
| | | 38% | 45% | | | |
| Income Actuarial Liability | 79.9 | 30.4 | 22.3 | 27.2 | 34% | 66% |
| Medical Expenses Actuarial Liability | 29.7 | 0.0 | 13.4 | 16.3 | 55% | 45% |
| Combined | 109.6 | 30.4 | 35.7 | 43.6 | 40% | 60% |

| Nortel Canadian Long Term Disabled | | Per Person | | | | | |
|---|---|---|---|---|---|---|---|
| Canadian Dollars | # Persons (2) | Act. Liab. | HWT Settlement | CCAA Settlement | Loss | Loss % | Settlement % |
| | | | 38% | 45% | | | |
| Income Actuarial Liability | 357 | 223,810 | 85,048 | 62,443 | 76,319 | 34% | 66% |
| Medical Expenses Actuarial Liability | 360 | 82,500 | 0 | 37,125 | 45,375 | 55% | 45% |
| Combined | | 306,310 | 85,048 | 99,568 | 121,694 | 40% | 60% |

Sources:
Nortel HWT Illustrative Allocation Scenarios - Revised
Nortel CCAA Information Circular Nov. 30, 2016
Monitor's Report 99th Nov. 13, 2013
Appendix C- Mercers Actuarial Report for LTD and Other Plans 2010

Note
(1):

| At the upper end of CCAA recovery % | | | 49% | | | |
|---|---|---|---|---|---|---|
| Income Actuarial Liability | 79.9 | 30.4 | 24.3 | 25.3 | 32% | 68% |
| Medical Expenses Actuarial Liability | 29.7 | 0.0 | 14.6 | 15.1 | 51% | 49% |
| Combined | 109.6 | 30.4 | 39.3 | 40.4 | 37% | 63% |

(2) There are also 158 spouses and 160 children covered for benefits (85 members with children)

Prepared by Diane Urquhart

**TABLE 3:  NORTEL CANADIAN LONG TERM DISABLED CAPITAL AND INCOME OVER TIME**

| | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **KEY ASSUMPTIONS** | | | | | | | | | | | | | | | | | | | | | |
| CPI - Mercers | 2.4% | 2.3% | 0.8% | 1.2% | 1.5% | 1.4% | 1.5% | 1.8% | 1.8% | 1.8% | 1.8% | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% |
| Medical Inflation - Mercers | | 8.4% | 8.2% | 8.0% | 7.8% | 7.6% | 7.4% | 7.2% | 7.0% | 6.8% | 6.6% | 6.4% | 6.2% | 6.0% | 5.8% | 5.6% | 5.4% | 5.2% | 5.0% | 5.0% | 5.0% |
| Dental Inflation - Mercers | | 4.8% | 4.8% | 4.8% | 4.8% | 4.8% | 4.8% | 4.8% | 4.8% | 4.8% | 4.8% | 4.8% | 4.8% | 4.8% | 4.8% | 4.8% | 4.8% | 4.8% | 4.8% | 4.8% | 4.8% |
| Investment Return | | 1.01% | 0.95% | 0.78% | 1.13% | 0.82% | 0.82% | 1.3% | 1.8% | 2.3% | 2.8% | 2.8% | 2.8% | 2.8% | 2.8% | 2.8% | 2.8% | 2.8% | 2.8% | 2.8% | 2.8% |
| Age | 45 | 46 | 47 | 48 | 49 | 50 | 51 | 52 | 53 | 54 | 55 | 56 | 57 | 58 | 59 | 60 | 61 | 62 | 63 | 64 | 65 |
| Pre- Disability Income | 60,000 | | | | | | | | | | | | | | | | | | | | |
| Disability Income | | | | | | | | | | | | | | | | | | | | | |
| Coverage | 70% | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | |
| **HWT + CCAA SETTLEMENTS WITH 6 YEAR DELAY ON CCAA SETTLEMENT** | | | | | | | | | | | | | | | | | | | | | |
| Settlement Capital | | 85,048 | | | | | | | 99,568 | | | | | | | | | | | | |
| Capital Beginning of Year | | 85,048 | 58,033 | 29,919 | 868 | -29,404 | -60,750 | 6,227 | -26,948 | -61,904 | -99,052 | -138,844 | -181,241 | -226,361 | -274,324 | -325,253 | -379,271 | -436,506 | -497,083 | -561,133 | -628,823 |
| Capital Income | | 859 | 551 | 233 | 10 | -241 | -498 | 82 | -490 | -1,436 | -2,793 | -3,915 | -5,111 | -6,383 | -7,736 | -9,172 | -10,695 | -12,309 | -14,018 | -15,824 | -17,733 |
| Nortel Disability Income | 28,328 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| CPP Disability Income | 13,672 | 13,986 | 14,098 | 14,555 | 14,773 | 15,175 | 15,490 | 15,763 | 16,041 | 16,323 | 16,611 | 17,025 | 17,448 | 17,883 | 18,328 | 18,785 | 19,252 | 19,732 | 20,223 | 20,727 | 21,243 |
| Combined Income | 42,000 | 14,845 | 14,650 | 14,788 | 14,783 | 14,934 | 14,992 | 15,845 | 15,550 | 14,887 | 13,818 | 13,109 | 12,337 | 11,500 | 10,592 | 9,612 | 8,557 | 7,422 | 6,205 | 4,903 | 3,510 |
| Medical Expenses | 6,186 | 6,705 | 7,255 | 7,836 | 8,447 | 9,089 | 9,761 | 10,464 | 11,197 | 11,958 | 12,747 | 13,563 | 14,404 | 15,268 | 16,154 | 17,059 | 17,980 | 18,915 | 19,860 | 20,853 | 21,896 |
| Dental Expenses | 1,750 | 1,833 | 1,920 | 2,011 | 2,106 | 2,206 | 2,311 | 2,421 | 2,536 | 2,657 | 2,783 | 2,915 | 3,053 | 3,198 | 3,350 | 3,509 | 3,676 | 3,851 | 4,034 | 4,225 | 4,426 |
| Medical & Dental Exp. | 7,935 | 8,538 | 9,175 | 9,847 | 10,553 | 11,295 | 12,073 | 12,885 | 13,733 | 14,615 | 15,530 | 16,478 | 17,458 | 18,467 | 19,504 | 20,568 | 21,656 | 22,766 | 23,894 | 25,079 | 26,322 |
| Other Expenses | 32,573 | 33,322 | 33,589 | 33,992 | 34,502 | 34,985 | 35,510 | 36,135 | 36,772 | 37,420 | 38,080 | 39,028 | 40,000 | 40,996 | 42,017 | 43,063 | 44,135 | 45,234 | 46,360 | 47,515 | 48,698 |
| Net Loss | 1,491 | -27,015 | -28,114 | -29,050 | -30,272 | -31,346 | -32,591 | -33,176 | -34,955 | -37,148 | -39,792 | -42,397 | -45,120 | -47,963 | -50,929 | -54,019 | -57,234 | -60,577 | -64,049 | -67,691 | -71,510 |
| | | | | | | | | | | | | | | | | | | | | | |
| **WITHOUT BANKRUPTCY** | | | | | | | | | | | | | | | | | | | | | |
| Settlement Capital | | 0 | | | | | | 0 | | | | | | | | | | | | | |
| Capital Beginning of Year | | 0 | 9,383 | 18,839 | 28,613 | 38,534 | 48,612 | 58,830 | 69,388 | 80,392 | 91,955 | 104,200 | 116,721 | 129,519 | 142,595 | 155,950 | 169,586 | 183,502 | 197,700 | 212,178 | 226,938 |
| Capital Income | | 0 | 89 | 147 | 323 | 316 | 399 | 777 | 1,263 | 1,865 | 2,593 | 2,938 | 3,292 | 3,652 | 4,021 | 4,398 | 4,782 | 5,175 | 5,575 | 5,983 | 6,400 |
| Nortel Disability Income | 28,328 | 28,719 | 28,857 | 29,065 | 29,326 | 29,572 | 29,839 | 30,154 | 30,473 | 30,795 | 31,121 | 31,586 | 32,058 | 32,537 | 33,023 | 33,516 | 34,017 | 34,525 | 35,041 | 35,564 | 36,096 |
| CPP Disability Income | 13,672 | 13,986 | 14,098 | 14,555 | 14,773 | 15,175 | 15,490 | 15,763 | 16,041 | 16,323 | 16,611 | 17,025 | 17,448 | 17,883 | 18,328 | 18,785 | 19,252 | 19,732 | 20,223 | 20,727 | 21,243 |
| Combined Income | 42,000 | 42,705 | 43,044 | 43,766 | 44,423 | 45,064 | 45,727 | 46,693 | 47,776 | 48,984 | 50,325 | 51,549 | 52,798 | 54,072 | 55,372 | 56,698 | 58,051 | 59,432 | 60,839 | 62,274 | 63,738 |
| Medical Expenses | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Dental Expenses | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Medical & Dental Exp. | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Other Expenses | 32,573 | 33,322 | 33,589 | 33,992 | 34,502 | 34,985 | 35,510 | 36,135 | 36,772 | 37,420 | 38,080 | 39,028 | 40,000 | 40,996 | 42,017 | 43,063 | 44,135 | 45,234 | 46,360 | 47,515 | 48,698 |
| Net Loss | 9,427 | 9,383 | 9,455 | 9,774 | 9,921 | 10,079 | 10,217 | 10,558 | 11,004 | 11,563 | 12,245 | 12,521 | 12,798 | 13,076 | 13,355 | 13,636 | 13,916 | 14,197 | 14,479 | 14,760 | 15,040 |

Sources:
Bank of Canada Consumer Price Index
Bank of Canada Guaranteed Investment Certificate 1-Year V122524
Nortel HWT Illustrative Allocation Scenarios - Revised
Nortel CCAA Information Circular Nov. 30, 2016
Monitor's Report 99th Nov. 13, 2013
Appendix C- Mercers Actuarial Report for LTD and Other Plans 2010
Prepared by Diane Urquhart

**TABLE 4:   NORTEL CANADIAN LONG TERM DISABLED REASONABLE EXPENSES EXCLUDING MEDICAL AND DENTAL EXPENSES**

| Average Household Expenditure (Canada) | | | Ex Health Care Per Person | |
|---|---|---|---|---|
| Year | 2014 | | 2014 | |
| Number of Persons Per Household 2011 | | | 2.5 | |
| Food expenditures | 8,109 | | 3,244 | |
| Shelter | 17,160 | | 17,160 | Not prorated |
| Household operation | 4,393 | | 4,393 | Not prorated |
| Household furnishings and equipment | 2,067 | | 827 | |
| Clothing and accessories | 3,503 | | 1,401 | |
| Transportation | 11,891 | | 4,756 | |
| Health care | 2,251 | | 0 | |
| Personal care | 1,207 | | 483 | |
| Recreation | 3,843 | | 1,537 | |
| Education | 1,502 | | 0 | |
| Reading materials and other printed matter | 144 | | 58 | |
| Tobacco products and alcoholic beverages | 1,222 | | 0 | |
| Games of chance | 156 | | 0 | |
| Miscellaneous expenditures | 1,608 | | 643 | |
| Income taxes | 14,867 | | 0 | |
| Personal insurance payments and pension contributions | 4,871 | | 0 | |
| Gifts of money, alimony and contributions to charity | 1,934 | | 0 | |
| **Sum** | **80,728** | | **34,502** | |

**Source:**

Statistics Canada, CANSIM, table **203-0021** and Catalogue no. **62F0026M**.

Last modified: 2016-04-06.

Prepared by Diane Urquhart

**TABLE 5:    IMPACT ON OTHER CREDITORS OF BOND HOLDERS AND LTD RECONSIDERATIONS**

IMPACT OF RECONSIDERATION FOR BOND OWNERS

US $ Millions

| | Bonds | US Ratio | US Claims Tot. | US | Canada | SUM | US Limit | Tot. Limit | Recovery |
|---|---|---|---|---|---|---|---|---|---|
| | | | | Bond Payments | | | | | |
| @ 100% of Bond Claim | 3,936 | 61% | 5,459 | 2,409 | 1,771 | 4,180 | 2,165 | 3,936 | 100% |
| @ 55% of Bond Claim | 2,165 | 91% | 3,688 | 1,961 | 1,771 | 3,732 | 1,961 | 3,732 | 95% |
| Impact of Reconsideration | | | | 448 | | 448 | 204 | 204 | |

IMPACT OF RECONSIDERATION FOR LTD COMPARED TO BOND OWNERS

| % | US Estate | Canada Estate | Cost of Reconsideration Bonds | Disabled |
|---|---|---|---|---|
| US $ | 3,341 | 4,244 | 204 | |
| Cdn$ | 4,450 | 5,653 | | 44 |
| % of Local Estate | | | 6.1% | 0.8% |

Notes:

| Cdn$/US$ | 1.332 |
|---|---|

Prepared by Diane Urquhart

## TABLE 6:  NORTEL CANADIAN LONG TERM DISABLED COMPARED TO PENSIONERS

| | HWT % | CCAA % | Combined % | Max. CPP/OAS Income | |
|---|---|---|---|---|---|
| LTD Plan | | 45% | | | |
| HWT Income | 38% | 28% | 66% | $15,763 | |
| Medical and Dental Expenses | 0% | 45% | 45% | $7,291 | LTD M & D |

| Pension Plans | Pension Plan % | CCAA % | Combined % | Max. CPP + OAS | |
|---|---|---|---|---|---|
| | | 45% | | | |
| Ontario Nortel Pension <= $12,000 | 100% | 0% | 100% | $20,312 | |
| Ontario Nortel Pension Portion > $12,000 | 78% | 10% | 88% | $20,312 | |
| Nova Scotia | 67% | 15% | 82% | $20,312 | |
| Other | 57% | 19% | 77% | $20,312 | |
| Medical and Dental Expenses | 0% | 45% | 45% | $1,961 | Pensioners M & D |

Sources:

CPP and OAS Maximum Benefits 2016

Nortel HWT Illustrative Allocation Scenarios - Revised

Appendix C- Mercers Actuarial Report for LTD and Other Plans 2010
Nortel Negotiated Pension Plan Webinar Nov. 26, 2015
Nortel Managerial Pension Plan Webinar Nov. 24, 2016

LTD Life
Pensioners
Life

Notes:

| Comparison of HWT & Pension Plan Funding Canadian $ Millions | # of Members Receiving Income | Pre OPGF Assets | Liabilities | Pre OPBG Deficit | Pre OPGG Funding % | OPBG Payment | Ontario Funding % | Nova Scotia Funding % |
|---|---|---|---|---|---|---|---|---|
| Managerial Pension Plan | 6,500 | 1,762 | 3,110 | -1,348 | 56.64% | 287 | 77.12% | 66.00% |
| Negotiated Pension Plan | 6,000 | 760 | 1,280 | -520 | 59.38% | 97 | 79.59% | 69.00% |
| Two Pension Plans | 12,500 | 2,522 | 4,390 | -1,868 | 57.44% | 384 | 77.84% | 66.87% |

August 2011 – Managerial Plan Pensions cut back to est. funded ratio of 70% for Ontario service, and 59% for other provinces (later adjusted to 66% for Nova Scotia service).

August 2011 – Negotiated Plan Pensions cut back to est. funded ratio of 75% for Ontario service, and 57% for other provinces (later adjusted to 69% for Nova Scotia service).

Jan. 1, 2010 - LTD disability Income reduced to zero, upon 38% HWT settlement.

Prepared by Diane Urquhart

**TABLE 7:    BANKRUPTCY PROFESSIONAL FEES AND DISBURSEMENTS**

| Nortel Bankruptcy  Professional Fees | | US $ Millions | Cdn $ Millions | |
|---|---|---|---|---|
| Canada | Jan. 14, 2009 to Sept. 10, 2016 | 524 | 698 | 27% |
| U.S. | Jan. 14, 2009 to Aug. 30, 2016 | 685 | 912 | 35% |
| U.K. (Inc. 18 EMEA Entities) | Jan. 14, 2009 to July 13, 2016 | 729 | 970 | 38% |
| **Total Professional Fees** | | **1937** | **2580** | **100%** |

Sources:

U.S. Debtor-In-Possession Monthly Operating Reports for Feb. 2009 to August 2016

Ernst & Young Canada Court Monitor Report Numbers 8, 15,16, 25, 33, 35, 43, 50, 55,
59, 70, 78, 84, 87, 89, 91, 94, 98, 103, 104, 108, 114, 121, 127, 129 (to Sept. 10, 2016)
U.K. Joint Administrators Progress Reports Aug. 8, 2016 (to July 13, 2016)

| Bankruptcy Fees & Disbursement %'s | | Global Estate US $ M. | | Canada Estate Cdn $ M. |
|---|---|---|---|---|
| Percentage of Peak Assets | 18% | 10,500 | 11% | 6,351 |
| Percentage of Current Assets | 23% | 8,464 | 12% | 5,653 |
| Canadian $ Per US $ | | | Jan. 4, 2017 | 1.3320 |

Prepared by Diane Urquhart

## TABLE 8: EXECUTIVE RETENTION BONUSES

| Court Document | Date Approved | | Period | US $ M |
|---|---|---|---|---|
| US Debtors' Motion Feb. 27, 2009 | March 11, 2009 | KEIP | 2009 | 23.0 |
| Monitor's Report 4th, March 2, 2009 | March 11, 2009 | KERP | 2009 | 22.0 |
| | | | | |
| CBC Investigation Undisclosed | | | | |
| Bonuses | Nov. 28, 2009 | | 2009 | 7.5 |
| | | | | |
| US Debtors' Motion Feb. 11, 2010 | March 4, 2010 | Special Incentive Plan | 2010&2011 | 92.4 |
| Monitor's Report 37th Feb. 11, 2010 | March 4, 2010 | Reserve Plan | 2010&2011 | 7.0 |
| | March 4, 2010 | Discretionary Plan | 2010&2011 | 20.0 |
| | March 4, 2010 | Special Employee Agreements | 2010&2011 | 4.5 |
| | | | | |
| Monitor's Report 78th Dec. 7, 2011 | Dec. 14, 2011 | Retention Plan | 2012 | 3.9 |
| Debtors' Motion Oct. 25, 2011 | Nov. 14, 2011 | Incentive Plan | 2012 | 3.5 |
| | | Special Employee Agreements | 2012 | 1.0 |
| | | | | |
| Monitor's Report 89th Oct. 24, 2012 | Oct. 30, 2012 | Retention Plan | 2013 | 1.4 |
| Debtors' Motion Dec. 19, 2012 | | Incentive Plan | 2013 | 1.1 |
| | | Special Employee Agreements | 2013 | 0.8 |
| | | | | |
| Monitor's Report 98th Oct. 22, 2013 | Oct. 29, 2013 | Retention Plan | 2014 | 0.9 |
| | | | | |
| Monitor's Report 108th Sept. 24, 2014 | Oct. 2, 2014 | Retention Plan | 2015 | 0.5 |
| | | | | |
| Monitor's Report 121st Sept. 22, 2015 | Oct. 1, 2015 | Retention Plan | 2016 | 0.5 |
| | | | | |
| Monitor's Report 129th Sept. 23, 2016 | Sept. 29, 2016 | Retention Plan | 2017 | 0.5 |
| TOTAL US $ MILLIONS | | | | 190.0 |
| CDN$/US$ | Jan. 4, 2017 | | | 1.3320 |
| CDN $ MILLIONS | | | | 253.1 |

Prepared by Diane Urquhart