## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------- X
                    :

*In re*                              :      Chapter 11

                              :

Nortel Networks Inc., *et al.*,[1]    :      Case No. 09-10138 (KG)

                              :

               Debtors.    :      Jointly Administered

                              :

                              :      **Re: D.I. 17501, 17731**

-------------------------------------------------------- X

## DECLARATION OF JOHN J. RAY III IN SUPPORT OF CONFIRMATION OF THE DEBTORS' FIRST AMENDED JOINT CHAPTER 11 PLAN

I, John J. Ray III, do hereby declare as follows:

      1.      I am the Principal Officer of Nortel Networks Inc. ("NNI") and certain of its

affiliates, as debtors and debtors in possession (collectively, the "Debtors"), in the above-

captioned case. I was appointed by this Court as Principal Officer of the Debtors in January

2010, *nunc pro tunc* to December 2009. As Principal Officer, I oversee and am familiar with all

affairs of the Debtors, including efforts to settle any remaining claims relating to the Debtors'

affiliates and the allocation of proceeds from global sales of certain assets of the Debtors.

      2.      I submit this declaration (the "Declaration") in support of confirmation of the

*First Amended Joint Chapter 11 Plan of Nortel Networks Inc. and Certain of its Affiliated*

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567), Nortel Networks (CALA) Inc. (4226) and Nortel Networks India International, Inc. (8667). The First Amended Joint Chapter 11 Plan of Nortel Networks Inc. and Certain of its Affiliated Debtors does not include a Chapter 11 Plan for Nortel Networks India International Inc. Contact information for the Debtors and their petitions are available at http://dm.epiq11.com/nortel.

*Debtors*, dated December 1, 2016 [D.I. 17501] (as it may be further amended, the "Plan"),[2]
together with the exhibits thereto, including the documents included in the Plan Supplement
[D.I. 17644], pursuant to section 1129 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et
seq.* (the "Bankruptcy Code"). Specifically, I submit this Declaration to provide certain
background facts and opinions relevant to: (i) the standards for confirmation under section 1129
of the Bankruptcy Code, including the good faith standard set forth in section 1129(a)(3) of the
Bankruptcy Code; (ii) the standards for approval of the release, exculpation and injunction
provisions provided in the Plan; and (iii) the standards for approval of the Settlement and Plans
Support Agreement and NTCC Settlement embodied in the Plan under Bankruptcy Rule 9019.

3.      I have reviewed and am generally familiar with the terms and provisions of the
Plan, as well as the documents comprising the Plan Supplement. Except as otherwise indicated
herein, all facts set forth in this Declaration are based upon my personal knowledge, belief and
understanding upon my review of applicable books and records and other information made
available to me, including discussions with the Debtors' advisors and agents, as well as my
familiarity and experience with and knowledge of the Debtors' business and financial affairs. I
am duly authorized to make this Declaration and submit this Declaration on behalf of the
Debtors and if I were called upon to testify, I could and would testify competently to the facts set
forth herein.

## I.   Plan Formulation Process

4.      On January 14, 2009 (the "Petition Date"), the Debtors, other than Nortel
Networks (CALA) Inc. and Nortel Networks India International Inc.,[3] filed voluntary petitions

---

[2]      Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Plan.

[3]      Nortel Networks (CALA) Inc. filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code
on July 14, 2009 which was consolidated and is being jointly administered with the other Debtors' chapter 11 cases

for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Court").

5.        Soon after the Petition Date, the Debtors and their various affiliates began to conduct an extensive series of court-approved sale transactions that ultimately generated net Sale Proceeds in excess of $7.3 billion (the "Sales Transactions"). In furtherance of these efforts, among other things, the Debtors, the Canadian Debtors and certain of the EMEA Debtors entered into that certain Interim Funding and Settlement Agreement, dated June 9, 2009 (the "IFSA"). Among other terms, the parties to the IFSA agreed not to condition a joint sale of Nortel's businesses and assets on a prior agreement among the selling parties regarding the allocation of the ultimate sale proceeds (plus accrued interest, the "Sale Proceeds") from the relevant Sales Transaction.

6.        Thereafter, the Selling Debtors,[4] the Joint Administrators, the Creditors' Committee and the Monitor entered into various court-approved escrow agreements with JP Morgan Chase Bank, N.A. and Citibank, N.A., as escrow agents (the "Escrow Agreements") to hold all Sale Proceeds in escrow accounts (the "Escrow Accounts"), pending either the agreement of the relevant parties or filed decisions of this Court and the Canadian Court regarding the allocation of the Sale Proceeds.

7.        In 2009 and 2010, the Debtors, the Canadian Debtors, the EMEA Debtors, the Creditors' Committee, the Bondholder Group and certain other interested parties held discussions and partook in formal mediations in an attempt to agree upon an allocation of the Sale Proceeds held in escrow and to reach resolution of all inter-estate matters.  These efforts

---

for procedural purposes only [D.I. 1098].  NNIII filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on July 22, 2016, but has not yet proposed a plan in its chapter 11 case [D.I. 17090].

[4]        The term "Selling Debtors" refers to any Nortel debtor that signed or acceded to the IFSA or that signed one or more of the Escrow Agreements (as defined below).

were unsuccessful, and the parties proceeded to engage in litigation before this Court and the Canadian Court, including a 21-day cross-border trial, in order to have a dispute resolver determine the allocation of the Sales Proceeds among the various Selling Debtors (the "Allocation Dispute").

8.      On May 12, 2015, this Court and the Canadian Court simultaneously issued opinions deciding the Allocation Dispute (the "Allocation Decisions").  The Debtors, the Creditors' Committee, the Bondholder Group and certain other parties sought reconsideration and/or clarification of the decisions before both this Court and the Canadian Court, which motions were largely denied on July 6, 2015 [D.I. 15830].  Around this time, the Nortel Trade Claims Consortium, an ad hoc group comprised of a handful of entities that have purchased and sold claims against the Debtors over time through claims trading with creditors and other parties, organized itself and joined the Debtors' reconsideration motion.[5]

9.      Numerous parties appealed this Court's Allocation Decision to the United States District Court for the District of Delaware (the "U.S. Allocation Appeal").  In the fall of 2015, Judge Joseph J. Farnan was appointed as a mediator by the District Court.  After such mediation efforts did not result in an immediate settlement, the District Court entered an order on May 24, 2016 certifying all U.S. appeals directly to the United States Court of Appeals for the Third Circuit, and certain parties petitioned the Third Circuit to accept the appeal.  The Third Circuit granted the petitions for leave to appeal on August 9, 2016.  On January 23, 2017, the Third Circuit issued a schedule for the briefing of the appeal, under which initial briefing is due February 10, 2017, and briefing continues through May 10, 2017.

---

[5]      The NTCC originally also included a few individuals who purported to hold claims against the Debtors, but such individuals are no longer members of the NTCC.

10.     Concurrently with the appeal process in the United States, the Canadian Court's Allocation Decision has been contested in the Canadian courts.  I have been informed by Canadian counsel to the Debtors that no appeal as of right exists in Canada from the Allocation Decision issued by the Canadian Court.  On July 16, 2015, the Debtors, the Creditors' Committee, the Bondholder Group and certain other parties filed notices of their motions for leave to appeal the Canadian Court's Allocation Decision to the Court of Appeal for Ontario.  On May 3, 2016, the Court of Appeal of Ontario dismissed the motions for leave to appeal.  Between July 29 and August 1, 2016, the moving parties applied to the Supreme Court of Canada for leave to appeal the Court of Appeal's decision denying leave to appeal.  At the request of the parties to that appeal that entered into the SPSA, the deadline to respond to that motion has been extended to 30 days after the earlier of: (i) August 31, 2017; or (2) the date on which the settlement reached by the parties is terminated in accordance its terms.

11.     During the pendency of the appellate process, the Debtors and other parties, including the NTCC, continued to participate in the mediation process overseen by Judge Farnan.  The mediation process ultimately led the Debtors to negotiate and enter into the Settlement and Plans Support Agreement (the "SPSA"), which, among other things, settles the Allocation Dispute as well as various other inter-estate matters and claims, through the terms of a fully integrated settlement [D.I. 17249].[6]  On December 1, 2016, the Debtors filed their amended Chapter 11 Plan on behalf of all Debtors (other than NNIII) and an accompanying amended Disclosure Statement.  The Plan incorporates the terms and settlements contained in the SPSA.

---

[6]      The SPSA was entered into by and among (i) the Debtors, (ii) the Canadian Debtors,[6] (iii) the Monitor, (iv) the EMEA Debtors, (v) the EMEA Non-Filed Entities; (vi) the Joint Administrators, (vii) Nortel Networks S.A. ("NNSA"), (viii) the NNSA Conflicts Administrator, (ix) the French Liquidator, (x) the Bondholder Group, (xi) the Canadian Creditors Committee ("CCC"), (xii) the Creditors' Committee,  (xiii) the U.K. Pension Trustee, (xiv) the Board of the Pension Protection Fund ("PPF"), (xv) the Joint Liquidators and (xvi) those bondholders of Nortel Networks Capital Corporation ("NNCC") who are signatories to the SPSA ("NNCC Bondholder Signatories").

The NTCC is not a party to the SPSA, but representatives of and advisors to the NTCC attended and participated in the formal sessions and other discussions and negotiations that occurred as part of the mediation process, and as part of the SPSA terms, the Bondholder Group agreed to negotiate in good faith with the NTCC regarding additional terms that would cause the NTCC to support the SPSA.

## II.   The Plan Complies With All Applicable Confirmation Requirements

12.     It is my understanding that the Plan complies with all requirements for confirmation of a Chapter 11 plan, including all applicable provisions of section 1129.  To the best of my understanding, the Plan complies with all applicable provisions of the Bankruptcy Code and has been proposed in good faith and not by any means forbidden by law.  In addition, to the best of my understanding, the Debtors, as plan proponents, also have complied with all applicable provisions of the Bankruptcy Code.  Accordingly, I believe that the Court should confirm the Plan.

### A.  The Plan Complies With Section 1129(a)(1) of the Bankruptcy Code

13.     It is my understanding that the Plan satisfies the confirmation requirements of section 1129(a)(1) of the Bankruptcy Code, which requires that the Plan comply with Bankruptcy Code sections 1122 and 1123 in all respects.

14.     I understand that each Class of Claims or Interests for each Debtor under the Plan is composed of substantially similar Claims or Interests, and each instance of separate classifications of similar Claims and Interests was based on valid business, factual and legal reasons and that no classification was made for purposes of gerrymandering votes.  For example, the Consolidated Debtors (NNI and NNCC) have created three classes of unsecured creditor claims under their Plan.  The Consolidated Debtors' Class 3A consists of most general unsecured creditors, including the NNCC Bondholders and holders of other trade and employee claims.

The Consolidated Debtors' Class 3B consists of claims held against the Consolidated Debtors that relate to guarantees of obligations of the Canadian Debtors. With respect to such claims, the SPSA grants the Consolidated Debtors certain subrogation rights against the Canadian Debtors under the Canadian Debtors' CCAA Plan for payments made on such guarantee claims. Class 3C of the Consolidated Debtors consists of certain general unsecured creditors of the Consolidated Debtors that have elected to receive a single fixed distribution on their allowed general unsecured claims rather than pro rata distributions of the Debtors' assets over time. NNCALA and Nortel Altsystems Inc. also have a Class 3C Convenience Class, although the recovery percentages for such claims vary by Debtor. I understand that the classification of Claims and Interests under the Plan satisfies sections 1122 and 1123(a)(1) of the Bankruptcy Code.

15.     In addition, the Plan specifies the Classes of Claims or Interests that are impaired and unimpaired under the Plan, as I understand is required by sections 1123(a)(2) and 1123(a)(3) of the Bankruptcy Code. Subject to the provisions of the Plan relating to the payment in full of claims, the Plan also provides that holders of General Unsecured Claims against each Debtor will receive their proportional share of cash available for distribution to all such creditors, which I understand is required by section 1123(a)(4). For the Consolidated Debtors, holders of Crossover Bond Claims, trade claims, and other General Unsecured Claims all will participate in distributions on a pro rata basis, unless any such holder opts into treatment under the Plan as Class A-3C Convenience Claims. In addition, I understand that the Plan provides adequate means for the Plan's implementation as required by section 1123(a)(5) of the Bankruptcy Code, in that the Plan contemplates that the Debtors will distribute their available cash to creditors in accordance with the priorities and classification of claims under the Plan, and ultimately will

wind down and dissolve.  As such, the Debtors do not expect to need to seek further financial

reorganization to implement the Plan.

16.      I understand that proposed amended organizational documents for each Wind-

Down Debtor are attached to the Plan as Exhibit G and I believe that such documents include

provisions that the Wind-Down Debtors will not issue non-voting equity securities to the extent

prohibited by such provision of the Bankruptcy Code, which I understand is required by section

1123(a)(6) of the Bankruptcy Code.

17.      I believe that the Plan satisfies section 1123(a)(7) of the Bankruptcy Code to the

best of my understanding because the manner of selecting any officer, director or trustee of the

Wind-Down Debtors under the Plan is entirely consistent with applicable law, the Bankruptcy

Code and the interests of creditors, interestholders and public policy.  Specifically, the Plan

provides that the Plan Administrator shall have the power to select the director of each Wind-

Down Debtor and that the current officers of each Wind-Down Debtor shall continue to serve in

such capacity in accordance with applicable non-bankruptcy law.  Exhibit F to the Plan identifies

that after the Effective Date, I will serve as Director and President of the Wind-Down Debtors

(in addition to my role as Plan Administrator), Mary Cilia will serve as Treasurer and Kathryn

Schultea will serve as Vice President and Secretary in accordance with the Wind-Down Debtors'

respective Plans and bylaws.

### B.   The Plan Complies With Section 1129(a)(3) of the Bankruptcy Code

18.      I believe that the Plan satisfies section 1129(a)(3) of the Bankruptcy Code

because it has been proposed by the Debtors in good faith and to the best of my understanding

not by any means forbidden by law.

19.      Having been extensively involved in the Debtors' cases since 2010 in my role as

Principal Officer of the Debtors, including in the development of the Plan and the negotiations

relating to the SPSA and the Plan, I believe that the Debtors are proposing the Plan in good faith consistent with section 1129(a)(3), with honest and good intentions, and on the basis that the Plan is consistent with applicable law. I believe that the SPSA is the result of substantial good-faith, arms' length negotiations between and among the parties to the Allocation Dispute and their respective advisors in the context of the over eight years that the Debtors' Chapter 11 cases have been pending.

20.     The Debtors negotiated and ultimately entered into the SPSA following extensive litigation, ongoing discussions and prior efforts at settlement with other parties, and following substantial discussions, deliberations and consultation with their legal and financial advisors, directors and creditor constituents, as to the various options and alternatives that would further the best interests of the Debtors' estates and their creditors. The SPSA is the result of a successful mediation overseen by Judge Farnan, which consisted of a series of formal mediation sessions spanning a total of ten days between October 2015 and June 2016, as well as numerous other discussions and negotiations by and between the Debtors and various other parties in furtherance of a potential settlement (collectively, the "Farnan Mediation"). Even prior to the Farnan Mediation, from the time of the sales of the Debtors' assets and businesses in 2011 and 2012, the Debtors and other parties, including those who participated during the Farnan Mediations, have engaged in formal and informal negotiations relating to, among other things, the allocation of Sale Proceeds. Such negotiations included four formal mediation sessions in November 2010 and April 2011, as overseen by Judge Layn R. Phillips, and April 2012 and January 2013, as overseen by Judge Warren K. Winkler, as well as various other discussions and meetings both related to and in addition to those mediation sessions.

21.     The SPSA contemplates that its terms are subject to approval by the Bankruptcy Court, as a settlement and as incorporated into and implemented through the Plan.  The board of directors of each of the Debtors has approved entry into the SPSA and authorized the Debtors to take any and all required action to implement the terms of the SPSA, including pursuing the confirmation of a Chapter 11 plan embodying such terms.

### C.  The Substantive Consolidation of NNI and NNCC Comports With Applicable Third Circuit Law

22.     Based on my understanding of the applicable standard for substantive consolidation, I believe that the substantive consolidation of NNI and NNCC contemplated by the Plan is appropriate because NNI and NNCC share a "substantial identity."  Specifically, I understand that (i) NNCC's sole purpose was to serve as a financing vehicle for the Nortel entities; (ii) NNCC had no assets or operations separate from NNI; and (iii) NNCC did not have any of its own employees and instead relied on the employees of NNI and the other members of the corporate group for the performance of all of its operations.  In addition, the various transaction documents relating to the $300 million of bonds that NNCC issued describe and demonstrate that nearly all of the proceeds of the bond issuances passed directly to NNI in the form of an intercompany loan, the terms of which mirrored the repayment terms of such bonds.  I also understand that NNI provided the funds used by NNCC to make payments under the bonds through intercompany loan repayments and paid certain guaranty fees related to the bonds.

### III.     Recovery Analysis and Liquidation Analysis

23.     I have reviewed the Recovery Analysis prepared by the Debtors' financial advisor, Chilmark Partners, LLC ("Chilmark") and attached as Appendix C to the Disclosure Statement, which provides estimates of a range of possible recoveries of various Claims depending on the possible outcome of numerous contingencies.  I am generally familiar with the

Recovery Analysis and the underlying assumptions, assets and financial estimates upon which

the Recovery Analysis is based, which are described and set forth in the Recovery Analysis and

its accompanying notes.  I believe that the estimates of the recoveries on claims for each Debtor

are fair and reasonable based on the assumptions set forth therein.

24.      I have reviewed the hypothetical liquidation analysis (the "Liquidation Analysis")

prepared by Chilmark and attached as Appendix D to the Disclosure Statement, which reflects

the estimated assets of the Debtors if each Debtor were to be liquidated in a separate chapter 7

case.  I am generally familiar with the Liquidation Analysis and the underlying financial data and

assumptions upon which the Liquidation Analysis is based, which are described in the

Liquidation Analysis and accompanying notes.  I believe that the estimated liquidation values set

forth in the Liquidation Analysis are fair and reasonable estimates of the value of the Debtors'

assets based on the assumptions set forth therein.

**IV.      The Plan's Release, Exculpation and Injunction Provisions Are Appropriate**

25.      I understand that the Plan includes various other provisions that are permitted but

not required under section 1123(b) of the Bankruptcy Code.  In particular, sections 13.2 through

13.7 of the Plan provide for the granting of certain releases, exculpations and injunctions, which

are discussed below.  I believe these releases, exculpations and injunctions are the product of

good faith, arm's length-negotiations by and among the Debtors, their creditors and creditor

representatives and other parties to the Farnan Mediation and the SPSA; are given in return for

substantial consideration by each of the parties; and are reasonably tailored and necessary for the

Debtors to exit Chapter 11 as part of a comprehensive Plan that brings closure to the various

litigations and disputes that have been pending over the course of these cases.  As such, I believe

that the release, exculpation and injunction provisions are fair, equitable and in the best interests of the Debtors' respective estates.

### A. The Debtor Releases

26.    Section 13.4 of the Plan provides for the release by each of the Debtors (the "Debtor Releases"), as of the Effective Date, of, among other things, any and all claims, defenses, demands, liabilities, subrogation, causes of action, setoffs, recoupments and costs and expenses that the Debtors may have against other SPSA Parties and participating creditors (the "Debtor Released Parties").  These releases are an integral and integrated part of the settlements contained in the SPSA, and I believe that the Debtor Releases are based on the Debtors' reasonable business judgment and are an essential part of the Plan.  The Debtors have entered into various compromises with the other SPSA Parties in order to reach the settlements, including the compromises of various inter-estate matters between and among the SPSA Parties, in order to finally resolve disputes and unliquidated or contingent claims among the parties consistent with the terms of the SPSA.  I believe that the Debtor Releases appropriately recognize the contributions made by the Debtor Released Parties to these Chapter 11 Cases and are voluntarily provided as part of the settlement embodied in the SPSA.  Therefore, I believe that the Debtor Releases, as part of the total compromises contained in the SPSA, will serve to eliminate the costs, risks and distraction of pending litigation and other potential litigation, allowing the Wind-Down Debtors' directors and officers to focus on implementation of the Plan.

27.    In addition, the Debtor Released Parties include the SPSA Parties and the creditors participating in the SPSA, and those parties whose consent is required for the release of the Sale Proceeds from the Escrow Accounts.  Without the Debtor Released Parties, the Debtors would not have been able to formulate a plan that unilaterally settles the Allocation Dispute, or

that resolves various other issues relating to the Debtors and the Canadian Debtors and the other

SPSA parties on terms more holistic and favorable to the Debtors than the Allocation Decision.

The agreement to the SPSA and the support of the Plan by the Debtor Released Parties are

crucial to the Debtors' ability to wind down and make distributions to their creditors.  For these

reasons, I believe the Debtor Releases are being given in exchange for good and valuable

consideration contributed by the Debtor Released Parties and are in the best interests of the

Debtors' estates.

### B.  The Consensual Third-Party Releases

28.    Section 13.2 of the Plan provides for the release by holders of Claims against and

Interests in the Debtors, as of the Effective Date, of, among other things, any and all claims,

rights, demands and liabilities that such holders may have against each of the Debtors and the

Wind-Down Debtors (the "Third Party Debtor Releases").  Section 13.3 of the Plan provides

for the release by certain holders of Claims against and Interests in the Debtor, as of the Effective

Date, of, among other things, any and all claims, rights, demands and liabilities that such holders

may have against: (i) the U.S. Principal Officer, (ii) the Creditors' Committee, (iii) the

Bondholder Group, (iv) the NNC/NNL Notes Indenture Trustee, (v) the NNCC Bonds Indenture

Trustee, and (vi) with respect to each of the foregoing, any of their respective directors, officers,

employees, members, attorneys, consultants, accountants, advisors, agents and other

professionals (each acting solely in such capacity) (the "Third Party Non-Debtor Releases", and

together with the Third Party Debtor Releases, the "Third Party Releases").  The Third Party

Releases do not release any post-Effective Date obligations of any party or entity under the Plan

to implement the Plan, including the terms of the SPSA.

29.     The Plan contains provisions that permit voting creditors to opt out of granting the Third Party Releases in order to make the releases consensual.  The Plan, Disclosure Statement, and the Ballots each include provisions disclosing the existence of the Third Party Releases and informing those parties voting on the Plan of their ability to opt out of the Third Party Releases by abstaining from voting and indicating their intention to opt out of the releases, or by voting to reject the Plan.  Accordingly, I believe that the Third Party Releases are consensual and I understand these procedures are consistent with those used in other chapter 11 cases.

30.     Additionally, I believe that the Third Party Releases are important to the Plan and constitute the release of parties who have actively participated in these cases and contributed to the successful completion of the Debtors' cases.  The Third Party Releases release many of the same parties benefitting from the Debtor Releases who participated in negotiations over the SPSA and the Plan; and/or participated in the investigation, litigation, prosecution and settlement of other material claims in the Debtors' cases, including for certain individuals through their participation on creditor committees in these cases.  The Debtors are not aware of material claims that likely would be asserted against any of these parties absent the granting of such releases where no claims have asserted to date; however, given the length of these cases and the substantial efforts of the various parties over the course of these cases and the various claims being compromised under the Plan, the granting of the Third Party Releases is important to the implementation of the Plan and to bring closure to the Debtors' cases.

31.     For these reasons, I believe the Third Party Releases are in exchange for good and valuable consideration and are in the best interests of the estates.

### C. **Exculpation**

32.     I believe that the exculpation provision proposed in Section 13.5 of the Plan (the

"Exculpation Provision") is appropriate and essential under the circumstances of these Chapter

11 Cases.  The Chapter 11 Cases and the related transactions have been negotiated as part of the

integrated SPSA and implemented in good faith, including the extensive negotiations among the

Debtors and other parties.  The Exculpation Provision, which includes a carve-out for gross

negligence and willful misconduct, including fraud and criminal misconduct, was important to

the development of a feasible, confirmable Plan.  I submit that the Exculpation Provision is

necessary to insulate the parties who have made significant contributions to the Debtors' cases,

the resolution of various claims and disputes over the course of the cases, the collection and

monetization of assets and the pursuit of litigation and resolution of disputes related to the

Debtors' assets and claims to sale proceedings, from future challenges or claims related to

actions taken in good faith in connection with the Debtors' cases, the development and pursuit of

the Plan, and the Debtors' wind down.  The parties benefiting from the Exculpated Provision

provided direct and substantial participation in the Chapter 11 Cases, including the facilitation

and marshaling of the complex settlement negotiations that resulted in the SPSA and the benefits

it provides to the Debtors' estates.  Accordingly, under these circumstances, I believe the

protections afforded by the Exculpation Provision are reasonable and appropriate.

### D. **Injunction**

33.     The injunction provisions set forth in Sections 13.6 and 13.7 of the Plan

implement the Plan's release and exculpation provisions and channel all claims through the Plan

itself.  I believe that the injunction is a key provision of the Plan because it preserves and

enforces the releases of the Debtors, Wind-Down Debtors, the Plan Released Parties, the SPSA

15

Released Parties and the Exculpation Provision, as well as the compromise of various other Debtor claims through the Plan, all of which are centrally important to the Plan. Moreover, I believe that the injunction provision is necessary to protect the Wind-Down Debtors after the Effective Date, from, among other things, any potential actions, enforcements, attachments, encumbrances of any kind, setoffs, subrogation and recoupments as they implement the provisions of the Plan after the Effective Date, and that the injunction provision is narrowly tailored to achieve its purpose.

## V.    The SPSA Satisfies the Requirements of Bankruptcy Rule 9019

34.    I believe that the SPSA fully satisfies Bankruptcy Rule 9019 and the <u>Martin</u> factors based on my understanding of the factors and relevant requirements.

35.    I understand that the Plan incorporates the terms of the SPSA, including, but not limited to, the allocation of Sale Proceeds. I believe that the SPSA provides a fair, reasonable and final resolution of the Allocation Dispute as well as various other inter-estate claims and disputes. The SPSA separately allocates Sale Proceeds to, among others, the Debtors and the Canadian Debtors for distribution to the creditors of their respective estates. The SPSA allocates a greater portion of the Sale Proceeds to the Debtors than likely would be allocated to the Debtors pursuant to the Allocation Decisions, and also removes various risks related to the issues that remain unresolved under the Allocation Decisions, including the allowance of various claims against the Debtors' estates and the Canadian Debtors, the manner in which sale proceeds will be allocated among the Debtors and among the Canadian Debtors (where NNI holds a $2 billion unsecured claim against one of the Canadian Debtors), and other inter-estate claims between and among the Debtors and their various foreign affiliates.

36.     After the issuance of the Allocation Decision, the Debtors pursued a reconsideration motion to obtain further clarity about the meaning of the Allocation Decisions and to have the courts modify certain aspects of the rulings, and further pursued appeals of the Allocation Decisions in both the U.S. and Canadian courts.  Based on the subsequent decisions handed down by the Canadian courts and the appellate process to date in the United States courts, the Debtors have concluded that there is no assurance the Debtors ultimately would be able to obtain a more favorable allocation of Sale Proceeds on appeal than under the Allocation Decisions or the SPSA.  The Court of Appeal of Ontario has denied the motions of the Debtors and other parties for leave to appeal the Canadian Court's Allocation Decision and, while the Debtors have appealed the denial of leave to appeal, there is no assurance that the Debtors ultimately would be given an opportunity to appeal the Allocation Decision in the Canadian courts.  Accordingly, even if the Debtors continue to pursue their appeal in the United States courts, a significant risk exists that the Allocation Decisions either would be affirmed, resulting in a lower allocation of Sale Proceeds to the Debtors than under the SPSA, even before accounting for the costs associated with such further litigation, or, even if the Allocation Decision were modified by the United States court, that a stalemate would result that ultimately would need to be resolved through a settlement among the SPSA parties.  Moreover, even if the Allocation Decision were upheld, various allocation and distribution issues would be left unresolved for determination at a later time.  Given the current procedural status of the appeals, the substantial litigation history of the Allocation Dispute and the lengthy efforts between and among the various SPSA parties to resolve the Allocation Dispute, I believe that the allocation of Sale Proceeds under the SPSA falls far above the lowest point in the range of reasonable

outcomes of further litigation both as a resolution of the Allocation Dispute and as part of the

comprehensive settlement that also resolves other inter-estate claims and potential disputes.

37.     The SPSA also resolves a number of other inter-estate matters and claims, which,

unlike the Allocation Dispute, are not subject to pending litigation and absent settlement would

have to be separately litigated or resolved.  Such issues include, without limitation, the Debtors'

claims against the Canadian Debtors relating to various agreements and transactions during the

course of their cases, the Debtors' subrogation rights against the Canadian Debtors, the

allowance of various claims against the Canadian Debtors including pension and bond claims,

the coordination between the Debtors and Canadian Debtors with respect to the payment of

overlapping claims under their respective plans, and other matters each of which would carry

inherent risk and uncertainties for the Debtors and which may not have been easily compromised

absent a consensual global resolution of inter-estate matters under the terms of the SPSA.  While

it is difficult to separately and specifically predict or quantify the Debtors' probability of success

with respect to each issue, these various issues could individually and collectively have a

material effect on the assets ultimately available to the Debtors' creditors.  Moreover, based on

the foregoing and given the number and complexity of matters resolved under the SPSA, and the

significance of the unresolved matters to the ultimate assets that may be available in the Debtors'

estates, and based on my consultation with the various creditor constituents in the Debtors' cases

that support the settlements embodied in the terms of the SPSA and that are party to the SPSA, I

have concluded that the SPSA's collective resolution of these matters provides significant benefit

to the Debtors.

38.     I believe that the SPSA also improves the Debtors' ability to collect on their inter-

estate claims, in particular with respect to NNI's $2 billion claim against NNL as a result of the

substantive consolidation of the Canadian Debtors' estates and the fixing of other claims against

such estates as a condition for approval of the Canadian Debtors' CCAA plan of compromise.

The collective resolution of various pending disputes and the negotiation of a timeline for the

distribution of money to the various estates and to their creditors also greatly improves

collectability on claims as a whole.

39.     I have considered the complexity of continued litigation of the Allocation Dispute

and of the other matters resolved by the SPSA, as well as the attendant expense, inconvenience

and delay and I believe that the SPSA is reasonable and appropriate in light of such

considerations.  The unique complexity of the Allocation Dispute – arising from the number of

parties that participated in the trials, the various competing theories of allocation advanced and

the inter-tangled effects of any allocation among the Debtors and their affiliates with other

claims between and among the Nortel affiliates and claims of creditors against various Nortel

estates, among other issues – is well-known to the Court and is evidenced by the lengthy record

of the Debtors' Chapter 11 Cases and specifically the record of the Allocation Trial and

subsequent appeals.  I believe that a resumption of litigation and the rejection of the SPSA terms

would result in significant additional costs to the Debtors and further delays in making

distributions to the Debtors' creditors, without any certainty of a better result in the end.

Moreover, because the SPSA resolved a number of significant inter-estate matters, including

certain distribution mechanics and claims allowance issues with respect to the Canadian estates

and NNI's subrogation rights against the Canadian estates with respect to guaranteed claims, that

were not addressed by the Allocation Decision, the Court's denial of approval of the SPSA

would subject the Debtors' estates to significant risk with respect to the eventual resolution of

these issues, including through potential cross-border litigation.  Accordingly, I believe that the

SPSA creates and preserves precious resources for distribution to creditors, and creates a pathway toward distributions to creditors and resolution of the Debtors' Chapter 11 Cases without incurring substantial costs and enduring additional delay.

40.     I firmly believe that the SPSA is in the best interests of the Debtors' creditors and provides substantial benefit to the Debtors' estates when compared with the alternatives.  The SPSA increases the Debtors' allocation of Sale Proceeds when compared with the allocation provided in the Allocation Decisions; resolves a number of significant disputes among the SPSA Parties that would likely require litigation; avoids significant additional costs and delays to distributions to creditors; and forges a pathway to resolution of the Debtors' Chapter 11 Cases.  I believe that it is in the interests of all of the Debtors' creditors, taken as a whole, to bring these cases to conclusion and the SPSA does that pursuant to reasonable and beneficial terms.

41.     The negotiations among the Debtors and the other parties to the various mediations and ultimately to the SPSA in which I participated were vigorous and conducted at arms' length, and I believe that the SPSA has been proposed in good faith by the Debtors to fully and finally resolve the Allocation Dispute and the various other inter-estate claims settled by the SPSA under terms that are reasonable and fair.

42.     For these reasons, I believe that the SPSA satisfies all applicable standards and should be approved pursuant to Bankruptcy Rule 9019 based on my understanding of the applicable standards.

### VI.     The Plan Settlement with the NTCC Satisfies the Requirements of Bankruptcy Rule 9019

43.     I believe that the settlement with the NTCC and Bondholder Group with respect to certain Plan issues fully satisfies Bankruptcy Rule 9019 and the Martin factors based on my understanding of the factors and relevant requirements.

44.    The NTCC Settlement requires the NTCC to withdraw its objection to the Plan, as well as its appeal of the Allocation Decision pending before the Third Circuit.  Although it is my belief that the NTCC's objections to the Plan ultimately should not serve as a basis to deny confirmation of the Plan, I understand that there is always inherent risk to plan confirmation when a creditor (or group of creditors) objects, and in this instance, the NTCC raised additional arguments specific to its involvement in the Allocation Dispute and the pending appeal of the Allocation Decision, which may not have been fully and finally resolved even if the Plan otherwise could be confirmed.  Even if the Court were amenable to confirming the Plan over the objection of the NTCC, the Debtors, their affiliates and other parties, some of whose advisor fees are being paid or reimbursed by Nortel affiliates, still would have to devote further time and resources to seeking dismissal of the NTCC's pending appeal of the Allocation Decision over the NTCC's expected objection.  Indeed, by order of the Third Circuit, briefing of the appeal will commence immediately and continue through May 2017, suggesting that oral argument would not take place until late summer, at the earliest, and an opinion would not be issued for months thereafter.  Such additional litigation is always subject to some inherent risk and, as importantly, could delay the Debtors' ability to effectuate the Plan and distributions to creditors pursuant to the Plan.  The costs associated with participating in such further litigation also will deplete assets otherwise available for distribution to creditors.

45.    As an integral part of the NTCC Settlement, the Bondholder Group also has agreed to waive and not pursue any claim against the Debtors for reimbursement of professional fees, other than as already provided under Section 7.13 of the Plan.  The Debtors understand that a portion of the Bondholder Group's professional fees are being paid by the Canadian Debtors. However, the Bondholder Group's representatives have requested reimbursement from the

Debtors of a portion of its professional fees paid by the Canadian Debtors but treated as deemed distributions on the Crossover Bonds' and NNCC Bonds' claims.  Absent a settlement, I understand that the Bondholder Group could make a claim of substantial contribution to the Debtors' cases pursuant to section 503(b) with respect to such fees.  The Debtors understand that such a substantial contribution claim could exceed $50 million.

46.    The NTCC Settlement requires the NTCC's withdrawal of its appeal of the Allocation Decision, thereby providing certainty and finality with respect to the release of the Sale Proceeds from the lockbox escrow accounts as agreed to in the SPSA without further delay or risk of interference.  This certainty improves the Debtors' ability to collect the assets that will fund the Plan and also expedites the distribution of money to the various estates and creditors as contemplated by the Plan and related Plan documents.

47.    I have considered the complexity of continued litigation of the NTCC's objections to the Plan, its appeal of the Allocation Dispute and of the other matters resolved by the NTCC Settlement, as well as the expected attendant expense, inconvenience and delay, and I believe that the settlement is reasonable and appropriate in light of such considerations.  As described above, the Debtor's Chapter 11 Cases have been, and continue to be, rife with complicated and challenging issues, both legal and factual.  Moreover, even upon confirmation of the Plan, the status of the NTCC's appeal of the Allocation Decision would continue to remain an issue that the parties would have to litigate for several months before the Third Circuit in the absence of a settlement.  That litigation, as well as even the risk of the assertion of a substantial contribution claim by the Bondholder Group, could have resulted in significant costs to the Debtors' estates, depleting assets otherwise available for distribution to unsecured creditors, and could have delayed any distributions to the Debtors' creditors under the Plan.

48.     I believe that the NTCC Settlement is in the best interests of the Debtors'
creditors and provides a substantial benefit to the Debtors' estates.  The settlement achieves a
resolution of one of the last remaining obstacles to confirmation of the Plan, as well as a
significant obstacle to the release of the Sale Proceeds from escrow.  The total settlement
payment to the NTCC is also shared by the Debtors and the Bondholder Group.  The Bondholder
Group will direct that $4 million of its initial distributions be reserved and held for distribution to
the NTCC in the event the NTCC recoveries do not exceed a certain threshold (the "<u>Bondholder
Contribution</u>").  The settlement also contemplates that Debtors will make a payment of $6.5
million to the NTCC (the "<u>Debtor Payment</u>") and will reimburse certain fees of the NTCC,
which payment constitutes a portion of the aggregate consideration exchanged among the parties
for the waiver of substantial claims by the Bondholder Group and the abandonment both of Plan
objections and the appeal of the Allocation Decision by the NTCC.   In addition, the NTCC has
agreed that if the NTCC achieves a 70% recovery on account of their Class A-3A Claims against
the Consolidated Debtors and the Debtor Payment, then 75% of any further distributions that
otherwise would be available for distribution to the NTCC would be redirected for distribution to
the non-NTCC holders of Class A-3A Claims until such time as the redirected distributions total
$6.5 million.

**VII.     <u>Conclusion</u>**

49.     Based on the matters described above, I believe that (i) the Plan satisfies the
standards for confirmation under section 1129 of the Bankruptcy Code; (ii) the release,
exculpation and injunction provisions provided in the Plan meet the applicable standard; (iii) the
SPSA Settlement and Plans Support Agreement and NTCC Settlement embodied falls well
above the lowest point in the range of reasonableness and should be approved; and (iv) the

NTCC Settlement falls well above the lowest point in the range of reasonableness and should be approved.

50.    I hereby reserve the right to amend and supplement the testimony set forth herein as necessary at the hearing to consider confirmation of the Plan.


*[Remainder of Page Intentionally Left Blank]*

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed on :  January 23, 2017
              Wilmington, Delaware

_____
John J. Ray III
Chief Reorganization Officer
Nortel Networks Inc.