**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

----------------------------------------------------------X
                                                          :
*In re*                                                   :   Chapter 11
                                                          :
Nortel Networks Inc., *et al.*,[1]                        :   Case No. 09-10138 (KG)
                                                          :
                          Debtors.                        :   Jointly Administered
                                                          :
                                                          :   **Re: D.I. 17501, 17731**
                                                          :
----------------------------------------------------------X

**DECLARATION OF MICHAEL J. KENNEDY IN SUPPORT OF**
**CONFIRMATION OF THE DEBTORS' FIRST AMENDED JOINT CHAPTER 11 PLAN**

I, Michael J. Kennedy, do hereby declare as follows:

1. I am a partner at Chilmark Partners ("Chilmark"), a financial advisory firm with expertise in bankruptcy, merger and acquisition, financing and litigation resolution issues. Chilmark maintains a central office in Chicago located at 875 N. Michigan Avenue, Suite 3460, Chicago, Illinois 60611.

2. I submit this declaration (the "Declaration") in support of confirmation of the *First Amended Joint Chapter 11 Plan of Nortel Networks Inc. and Certain of its Affiliated Debtors*, dated December 1, 2016 [D.I. 17501] (as it may be further amended, the "Plan"), together with the exhibits thereto, including the documents included in the Plan Supplement [D.I.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567), Nortel Networks (CALA) Inc. (4226) and Nortel Networks India International, Inc. (8667). The First Amended Joint Chapter 11 Plan of Nortel Networks Inc. and Certain of its Affiliated Debtors does not include a Chapter 11 Plan for Nortel Networks India International Inc. Contact information for the Debtors and their petitions are available at http://dm.epiq11.com/nortel.

17644], pursuant to section 1129 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code").

3. I am duly authorized to make this Declaration and submit this Declaration on behalf of Nortel Networks Inc. ("NNI") and certain of its affiliates, as debtors and debtors in possession (collectively, the "Debtors"). The statements in this Declaration are, except where specifically noted, (a) based on my personal knowledge or opinion, experience, review of relevant documents and information concerning the operation of the Debtors and their financial condition, (b) based on information that I have received from the Debtors' employees or advisors and/or employees or agents of Chilmark working under my supervision, direction or control, or (c) from the Debtors' business records maintained in the ordinary course of their businesses. I am authorized to submit this Declaration on behalf of the Debtors, and if called upon to testify, I would testify competently to the facts set forth herein. I am not being compensated specifically for this testimony other than payments received by Chilmark as a retained professional in these cases.

**I.  Qualifications of Declarant and Chilmark**

4. I joined Chilmark in 1999 and became a partner in 2010. Prior to Chilmark, I was a senior consultant in Arthur Anderson's Transaction Advisory Group, where I was employed from 1996 to 1999. While employed at Arthur Anderson, I led financial due diligence on numerous acquisitions and assisted with operations, synergy and valuation analysis. I have 20 years of experience in restructuring and financial advisory industry.

5. The nature of my work at Chilmark has been primarily focused on providing restructuring and financial advisory services to companies and/or their stakeholders, both in and out of chapter 11. The scope of this work includes, but is not limited to, review of debtors'

operations, review and analysis of restructuring and liquidation plans, review and assistance in the preparation and/or compilation of liquidation analyses, negotiations with creditors, analysis of valuations and ranges of debt capacity and potential capital structures, advice on mergers and acquisitions and review of other bankruptcy related issues.

6. On March 31, 2010, the Court approved Chilmark's retention by the Debtors' counsel, Cleary Gottlieb Steen & Hamilton LLP ("<u>Cleary Gottlieb</u>"), as consulting expert in connection with the Debtors' Chapter 11 cases [D.I. 2814] (the "<u>Retention Order</u>"). Pursuant to the Retention Order, Chilmark was authorized to provide consulting services to Cleary Gottlieb with respect to the processes and proceedings regarding the potential allocation of value of the proceeds from the sale of certain assets of the Debtors and any other contested matters. Since Chilmark's retention, I, along with certain other professionals at Chilmark, have been providing such advisory services to Cleary Gottlieb. Most recently, Chilmark has assisted in modeling the Debtors' budget and recovery analysis, attached as Appendix C to the Disclosure Statement[2] dated December 1, 2016 [D.I. 17502] (the "<u>Recovery Analysis</u>") and in the preparation of a liquidation analysis, attached as Appendix D to the Disclosure Statement (the "<u>Liquidation Analysis</u>") in connection with the Debtors' wind down efforts.

## II. <u>Recovery Analysis</u>

### A. **Summary of Recovery Analysis**

7. The Recovery Analysis is based on the assets and financial estimates of the Debtors as of August 31, 2016, as well as the incorporation of certain settlements contemplated under the Plan. The estimates included in the Recovery Analysis were prepared solely to estimate a range of possible recoveries to holders of Allowed Claims on a Debtor by Debtor

---

[2] Capitalized terms used herein but not otherwise defined shall have the meaning given to them in the Plan.

3

basis pursuant to the Plan depending on the possible outcome of numerous contingencies, and based on various assumptions as set forth in the Plan, the Disclosure Statement and the Recovery Analysis. The estimated recoveries are based on the implementation of the SPSA and the Plan terms, and the expected undiscounted cash flows from assets managed in an orderly wind down over the period from August 31, 2016 through December 31, 2018, and include estimated recoveries by way of payment on Intercompany Claims or other Interests, and also reflect the treatment of Intercompany Claims asserted against the Debtors in accordance with the terms of the Plan.

8. In preparing the Recovery Analysis, Chilmark made various estimates and assumptions based on information available to the Debtors. Accordingly, the estimates may change as more information becomes available, including the outcome of various claim disputes and litigation. Therefore, actual results may differ from estimated recoveries and could have a material effect on the recovery percentages.

9. In preparing the Recovery Analysis, the other estimates and assumptions made by Chilmark include that the assets available for distribution pursuant to the Plan will consist of (i) the estimated cash balance as of August 31, 2016 for each Debtor; (ii) Sale Proceeds that the Debtors are entitled to receive from the Escrow Accounts pursuant to the terms of the SPSA in the amount of approximately $1,766.4 million, plus an additional approximately $100 million that NNI will receive from the Sale Proceeds and from the Canadian Estate under the SPSA terms; (iii) NNI's interest in the Cascade Trust that it will retain pursuant to the SPSA , estimated solely for Recovery Analysis purposes at $4.7 million; (iv) $3 million of proceeds arising from certain of the Debtors' interests in certain non-Debtor subsidiaries, primarily including Nortel Networks de Guatemala, Ltda; and (v) estimated recoveries on the various Intercompany Claims

held by the Debtors against their affiliates, including NNI's $2 billion unsecured claim and $62.7 million priority claim against the Canadian Estate. The Recovery Analysis further includes additional estimates and assumptions regarding the administrative expenses that have been and are expected to be incurred through the Effective Date of the Plan, a reserve for potential priority tax claims, the estimated costs, fees and expenses expected to be associated with the orderly wind down of the Debtors' estates as well as other costs and obligations under the Plan.

### B. Additional Assumptions Underlying Recovery Analysis

10. The Recovery Analysis is based on additional assumptions with respect to the Claims asserted against the Debtors in light of the significant uncertainties, including with respect to the Debtors' estimated Claim amounts. Given those uncertainties, the Recovery Analysis provides a range of estimated Claims recoveries, from a "low end" to a "high end." Generally, the low end of the estimated recovery range was estimated by utilizing higher estimated amounts of Claims, while the high end of the estimated recovery range was estimated by utilizing lower estimated amounts of Claims. In addition, at the request of SNMP, the Recovery Analysis includes an estimate of potential recoveries based on the inclusion of SNMP's claims in the amounts alleged in SNMP's expert reports served on the Debtors on November 2, 2016, and the assumption that the Consolidated Debtors (NNI and NNCC) would be responsible for paying the entire amount of the claims asserted the adversary proceeding brought by SNMP and that any such claim would qualify as an administrative expense claim (the "<u>SNMP High Claims Case</u>"). For the avoidance of doubt, this alternative recovery analysis is purely for modeling purposes and the purposes of fulfilling SNMP's request in connection with the approval of the Disclosure Statement, and by including it the Debtors do not in any way intend to suggest or concede the validity or amount of any claims that have been asserted by

SNMP. I note that the Debtors have subsequently agreed to the amount of reserves to be established by NNI and NNCALA for SNMP's claims, which amounts in the aggregate are slightly higher than the claims amounts included in the Recovery Analysis. In addition, SNMP has agreed to withdraw all of its prepetition and administrative claims filed against all of the Debtors other than NNI and NNCALA. I understand the Debtors continue to dispute the validity and amount of the claims asserted by SNMP.

11. The Recovery Analysis is intended to model ultimate expected recoveries to the Debtors' creditors without regard to the length of time actually required to make distributions, where such timing may depend on, among other things, (i) the timing of the Debtors' recoveries against affiliates; (ii) the amounts of cash held in contingency reserves taken by the Debtors; and (iii) the timing of resolving any claims accounted for in such reserves. In addition, in preparing the Recovery Analysis, the Debtors and their advisors did not perform an independent analysis of the Canadian Debtors' estimated recovery range for claims against their estates because the Debtors do not have sufficient access to the relevant underlying data to perform such an analysis. Accordingly, the Debtors rely solely on the information presented by the Monitor in the Information Statement with respect to such expected recoveries.

### III. Liquidation Analysis

#### A. Summary of Liquidation Analysis

12. The Liquidation Analysis was prepared by the Debtors and Chilmark and represents the estimated assets available to the Debtors if each Debtor were to be liquidated in a hypothetical chapter 7 case. The information is presented on a Debtor by Debtor basis and recoveries include estimated recoveries from other Debtors by way of payment on Intercompany Claims and other Interests. Intercompany Claims against the Debtors asserted by other Debtors and Foreign Affiliate Debtors are treated in accordance with the terms of the Plan.

13. The Liquidation Analysis is premised upon a number of estimates and assumptions that, although developed and considered reasonable by the Debtors and their financial advisors, are inherently subject to significant business, economic and competitive uncertainties and contingencies that are beyond the control of the Debtors. Accordingly, the Liquidation Analysis is for illustrative purposes only solely to provide an estimated range of possible liquidation recoveries for various Classes of Claims. There is no assurance that the recoveries reflected in the Liquidation Analysis would be realized if the Debtors were, in fact, to undergo such a liquidation.

### B. Assumptions Underlying Liquidation Analysis

14. The Liquidation Analysis assumes that certain economic settlements achieved in the SPSA also would be achieved in a chapter 7 liquidation, including, but not limited to, the allocation and release of Sales Proceeds in accordance with the SPSA and the allowance of NNI's claims against a consolidated Canadian Estate, including on the terms and in the amounts contemplated under the Canadian Plan. While the Debtors believe these settlements potentially could be replicated in a chapter 7 liquidation, there is no certainty that such results could be obtained and a liquidation under chapter 7 likely would, at minimum, cause the Debtors to incur additional costs and risk not achieving similar settlements as set forth in the Plan. A liquidation also would introduce additional risks that could materially reduce the ultimate assets available to each of the Debtors for distribution to their creditors. For purposes of the Liquidation Analysis, these various risks associated with the assets that would be available to the Debtors in a liquidation were not quantified.

15. In addition, in preparing the Liquidation Analysis, Chilmark estimated the assets available for liquidation and distribution and the claims against the Debtors in a liquidation

scenario on the same basis that it estimated those figures in the Recovery Analysis, with the following changes: (i) an estimated 30% increase in fees and expenses at NNI for additional counsel or professionals that would be engaged to assist a chapter 7 trustee in the liquidation and for expected inefficiencies associated with changing or adding new professionals at this advanced stage of the proceedings; (ii) increased fees and expenses at the Debtors other than NNI, estimated by increasing the time that the Quarterly Administrative Wind Down Reimbursement Payments will be in effect; (iii) estimated compensation for a hypothetical chapter 7 trustee or trustees as 3% of assets distributable to creditors at each Debtor; (iv) an estimated 30% increase in other costs to address additional data retention and financial reporting costs over an extended period of time required to facilitate a hypothetical chapter 7 liquidation; and (v) an assumption that the holders of Convenience Class Claims at NNI and NNCALA would receive pro rata distributions as part of the Class of General Unsecured Creditors, rather than a single Distribution of Cash as provided for under the Plan.

**IV.  Best Interests Test**

16.     Pursuant to section 1129(a)(7) of the Bankruptcy Code, I understand, based on discussions with Cleary Gottlieb, that the best interests test applies only to holders of non-accepting Impaired Claims or Interests. I understand that Classes 1 and 2 are deemed to accept the Plan and that Impaired Classes A-3B and A-3C, B-3A and B-3C, and C-3A through O-3A voted to accept the Plan. I understand that Class A-3A voted to reject the Plan and that holders of Interests in Class 5A for each Debtor are deemed to have rejected the Plan. I also understand that Class C-3C and Classes 4 and 5B at each Debtor were vacant and have been eliminated for purposes of voting in accordance with Section 5.4 of the Plan. I understand that the Debtors have subsequently resolved a settlement of various matters with the NTCC whereby the NTCC is

prepared to change its vote to be in favor of the Plan; however, I understand that, absent that change, the Debtors would be required to demonstrate satisfaction of the best interests test with respect to Class A-3A, which Class is comprised of general unsecured claims against the Consolidated Debtors (NNI and NNCC) and voted to reject the Plan, and regardless, the Debtors must make such a demonstration with regard to Classes A-5A through O-5A, which are comprised of Interests in each Debtor, by showing that each such holder of a Claim or Interest will receive at least as much under the Plan as such holder would receive in a chapter 7 liquidation.

17. Pursuant to the Liquidation Analysis, the projected recoveries under the Plan and the results of the Liquidation Analysis for the non-accepting Impaired Classes are as follows:

| **Class** | **Claim or Interest** | **Estimated Plan Recovery** | **Estimated Liquidation Recovery** |
|---|---|---|---|
| Class A-3A | General Unsecured Claims | 55.1%-61.2% | 52.7%-55.3% |
| Classes A-5A – O-5A | Interests | 0% | 0% |

I note that the Recovery Analysis also provides estimated Plan recoveries reflecting the SNMP High Claims Case, in which Class A-3A Claims would receive an estimated recovery of 53.5%. While a comparable liquidation analysis was not included in the hypothetical chapter 7 scenario analysis, it would yield a lower expected recovery on such claims than is provided in the SNMP High Claims Case.

18. The Debtors estimate that holders of Claims in Class A-3A will receive at least as much under the Plan as such holders would receive in a chapter 7 liquidation and in fact it is likely that the recoveries under the Plan to such holders will exceed the recoveries to such holders in a hypothetical chapter 7 liquidation. It is my understanding that holders of Interests in

9

Classes A-5A through O-5A would not receive any recovery in either a hypothetical chapter 7 liquidation and do not receive any recovery under the Plan.

19. Based on the Liquidation Analysis, I believe that the Plan satisfies the best interests test.

## V. Reasonableness and Benefits of the SPSA and the Plan

20. I understand that the SPSA provides, among other things, a distribution of the Sale Proceeds allocated to the Debtors to NNI, in the amount of approximately $1.716 billion, and to NNCALA, in the amount of approximately $50 million, and that the other Debtors will not directly receive any of the Sale Proceeds.

21. I believe that the distributions among the Debtors contemplated by the SPSA are appropriate because (i) as compared to NNI and NNCALA, the other Debtors did not convey material assets in the Sale Transactions; and (ii) the costs borne by NNI on behalf of the Debtors in pursuit of the sales and the resulting litigation would fairly have to be absorbed by each Debtor that was to receive an allocation of Sale Proceeds, such that any distribution of Sale Proceeds to a Debtor other than NNI and NNCALA would be wholly absorbed by such reimbursement claim. Consistent with that, and as shown in the Budget and Recovery Analysis for NNCALA, the distribution of approximately $50 million to NNCALA under the SPSA is subject to an approximate $34 million intercompany administrative claim held by NNI against NNCALA, which claim will reduce the net Sale Proceeds retained by NNCALA to approximately $16 million. The $50 million allocation to NNCALA also is largely consistent with the allocation to NNCALA that I understand the Debtors advocated at the Allocation Trial, as reflected in the Expert Report of Jeffrey H. Kinrich, which provided a $40.6 million allocation to NNCALA.

22. Furthermore, in connection with the Debtors' efforts to obtain approval of the Plan, Cleary Gottlieb requested that Chilmark analyze the economic benefits of the resolution of certain issues by the SPSA when compared to (i) the effect of the Allocation Decision as to such issues; and (ii) the assumptions reflected in the Debtors' motion for reconsideration of the Allocation Decision as to such issues. A summary of that analysis is included as Exhibit A hereto.

23. Based on this analysis, I believe that the SPSA provides significant economic benefits to the Debtors' estates when compared with both the Allocation Decision and the assumptions reflected in the Debtors' motion for reconsideration of the Allocation Decision. Importantly, the SPSA resolves a number of issues that the Allocation Decision did not address, thereby eliminating significant risk to the Debtors as to the possible resolution of each of those issues in the absence of a settlement. Moreover, I believe that the estimated recoveries by creditors pursuant to the SPSA and the Plan are substantially greater than the expected recoveries by such creditors under the Allocation Decision.

24. The Plan provides that holders of General Unsecured Claims against each Debtor will receive their proportional share of cash available for distribution to all such creditors, subject to the provisions of the Plan relating to the payment in full of claims. For the Consolidated Debtors, holders of Crossover Bond Claims, trade claims, and other General Unsecured Claims all will participate in distributions on a pro rata basis, unless any such holder opts into treatment under the Plan as Class A-3C Convenience Claims.

## VI.    Benefits of the NTCC Settlement

25. I am familiar with the NTCC Settlement, which I understand requires the withdrawal of the NTCC's objection to confirmation of the Plan and appeal of the Allocation

Decision pending before the Third Circuit, and precludes the Bondholder Group from pursuing a claim for substantial contribution for the payment of their professional fees. The settlement achieves these significant benefits to the Debtors and their creditors at a very low cost. I have analyzed the NTCC Settlement and estimate that the pro rata cost to holders of General Unsecured Claims against the Consolidated Debtors would potentially reduce recoveries compared to the range of estimates in the Recovery Analysis by approximately 0.14% - 0.6% (i.e. 14/100th to 3/5th of a cent for each dollar of claims). The NTCC Settlement also includes an agreement by the NTCC to redirect certain distributions they otherwise would be entitled to under the Plan once certain distribution thresholds are reached, which, if achieved, would mitigate the cost of the NTCC Settlement to the Debtors, and as part of the settlement, the Bondholder Group has waived any potential substantial contribution claim against the Debtors' estates. However, such an estimate does not account for the additional costs to the Debtors that would result from continued litigation with the NTCC and relate to the pending appeal of the Allocation Decision absent a settlement with the NTCC, which could reduce cash available for distribution to the Consolidated Debtors and which could exceed the cost to the Debtors of the NTCC Settlement.

## VII. <u>Conclusion</u>

26. Based on the matters described above and the Recovery Analysis and Liquidation Analysis, and the limitations and assumptions set forth therein, I believe that (i) as of the Effective Date, and after taking into account the transactions contemplated by the Plan, creditors will likely receive recoveries under the Plan that are equal to or superior to the recoveries that they would likely receive if the Debtors were liquidated under chapter 7; (ii) the terms of the SPSA, including the distribution of Sale Proceeds among the Debtors, is reasonable; (iii) the

SPSA provides significant economic benefits to the Debtors when compared to the alternatives; and (iv) the NTCC Settlement does not materially affect expected creditor recoveries under the Plan and provides additional benefits to the Debtors, including through the avoidance of other potential costs to the estates.

27. I hereby reserve the right to amend and supplement the testimony set forth herein as necessary at the hearing to consider confirmation of the Plan.

*[Remainder of Page Intentionally Left Blank]*

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed on : January 23, 2017
Wilmington, Delaware

_____
Michael J. Kennedy
Partner
Chilmark Partners