**Exhibit A-2**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| ———————————————X | |
| *In re* | Chapter 11 |
| Nortel Networks Inc., *et al.*,[1] | Case No. 09-10138 (KG) |
| Debtors. | Jointly Administered |
| ———————————————X | |

## FIRST AMENDED JOINT CHAPTER 11 PLAN OF
## NORTEL NETWORKS INC. AND CERTAIN OF ITS AFFILIATED DEBTORS

**James L. Bromley, Esq. (admitted *pro hac vice*)**
**Lisa M. Schweitzer, Esq. (admitted *pro hac vice*)**
**CLEARY GOTTLIEB STEEN & HAMILTON LLP**
**One Liberty Plaza**
**New York, NY 10006**

-and-

**Derek C. Abbott, Esq. (No. 3376)**
**Andrew R. Remming, Esq. (No. 5120)**
**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**
**1201 North Market Street, 18th Floor**
**P.O. Box 1347**
**Wilmington, DE 19899**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567), Nortel Networks (CALA) Inc. (4226) and Nortel Networks India International, Inc. (8667). The First Amended Joint Chapter 11 Plan of Nortel Networks Inc. and Certain of its Affiliated Debtors does not include a Chapter 11 Plan for Nortel Networks India International Inc. Contact information for the Debtors and their petitions are available at http://dm.epiq11.com/nortel.

**TABLE OF CONTENTS**
(continued)

**Page**

*Attorneys for the Debtors and*
*Debtors-in-Possession*
~~2016~~2017

Dated: ~~December 1~~January 23,

# TABLE OF CONTENTS

**Page**

ARTICLE 1.
DEFINITIONS, INTERPRETATION AND RULES OF CONSTRUCTION

1.1      Scope of Definitions ................................................... 3

1.2      Definitions ................................................................ 3

1.3      Rules of Interpretation ............................................ 2728

1.4      Exhibits to this Plan ................................................ 2830

1.5      Computation of Time ............................................... 2930

ARTICLE 2.
TREATMENT OF UNCLASSIFIED CLAIMS

2.1      Administrative Expense Claims ............................... 2930

2.2      Statutory Fees ......................................................... 3031

2.3      Professional Claims ................................................ 3031

2.4      Priority Tax Claims ................................................. 3031

ARTICLE 3.
CLASSIFICATION OF CLAIMS AND INTERESTS

3.1      Summary of Classifications ..................................... 3132

3.2      Substantive Consolidation of NNI and NNCC ........ 3132

3.3      The Debtors ............................................................ 3132

3.4      Classification of Claims and Interests ..................... 3334

3.5      Treatment of Classes of Claims Against and Interests in the Consolidated
         Debtors (NNI/NNCC) ............................................. 3334

3.6      Treatment of Classes of Claims Against and Interests in NNCALA ........ 3334

3.7      Treatment of Classes of Claims Against and Interests in Nortel Altsystems
         3435

3.8      Treatment of Classes of Claims Against and Interests in All Other Debtors
         3536

ARTICLE 4.
TREATMENT OF CLAIMS AGAINST AND INTERESTS IN DEBTORS

4.1      Class 1 – Priority Non-Tax Claims ........................... 3536

4.2      Class 2 – Secured Claims ....................................... 3637

4.3      Class 3A – General Unsecured Claims .................... 3637

4.4      Class A-3B – Crossover Bonds Claims and EDC Claims ........ 3738

# TABLE OF CONTENTS
(continued)

**Page**

| | | |
|---|---|---|
| **4.5** | **Class A-3C – Convenience Claims against the Consolidated Debtors (NNI/NNCC)** | ~~37~~38 |
| **4.6** | **Class B-3C – Convenience Claims against NNCALA** | ~~37~~38 |
| **4.7** | **Class C-3C – Convenience Claims against Nortel Altsystems** | ~~38~~39 |
| **4.8** | **Class 4 – Subordinated Claims** | ~~38~~39 |
| **4.9** | **Class 5A – Interests** | ~~38~~39 |
| **4.10** | **Class 5B – Interests Securities Fraud Claims** | ~~40~~41 |

ARTICLE 5.
ACCEPTANCE OR REJECTION OF THE PLAN

| | | |
|---|---|---|
| **5.1** | **Impaired Classes of Claims and Interests Entitled to Vote** | ~~40~~41 |
| **5.2** | **Acceptance by an Impaired Class** | ~~40~~41 |
| **5.3** | **Presumed Acceptances by Unimpaired Classes** | ~~40~~41 |
| **5.4** | **Elimination of Vacant Classes; Deemed Acceptance by Non-Voting Classes** | ~~40~~41 |
| **5.5** | **Conversion or Dismissal of Certain of the Chapter 11 Cases** | ~~41~~42 |
| **5.6** | **Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code** | ~~41~~42 |

ARTICLE 6.
IMPLEMENTATION OF THE PLAN

| | | |
|---|---|---|
| **6.1** | **General Settlement of Claims and Interests** | ~~41~~42 |
| **6.2** | **Substantive Consolidation of NNI and NNCC** | ~~41~~42 |
| **6.3** | **Plan Administrator** | ~~42~~43 |
| **6.4** | **Intercompany Account Settlement** | ~~44~~45 |
| **6.5** | **Settlement of Intercompany Claims and Other Matters** | ~~44~~45 |
| **6.6** | **Funding of Individual Debtors for Plan Confirmation** | ~~44~~45 |
| **6.7** | **Administrative Expense Contribution and Quarterly Administrative Wind-Down Reimbursement Payments** | ~~44~~45 |
| **6.8** | **Closing of Chapter 11 Case** | ~~45~~46 |

ARTICLE 7.
THE SETTLEMENT AND PLANS SUPPORT AGREEMENT

| | | |
|---|---|---|
| **7.1** | **SPSA** | ~~45~~46 |
| **7.2** | **Cooperation** | ~~45~~46 |

**TABLE OF CONTENTS**
(continued)

**Page**

**7.3      Conditions Precedent** .......................................... ~~45~~46

**7.4      Settlement of Allocation Dispute** ........................... ~~45~~46

**7.5      Allocation and Distribution of Sale Proceeds** ......... ~~45~~46

**7.6      Allocation of Sale Proceeds Among the Debtors** ..... ~~46~~47

**7.7      Changes in Escrow Accounts' Balances** ................. ~~46~~47

**7.8      Estate Administration** ........................................... ~~46~~47

**7.9      Treatment of Crossover Claims** ............................. ~~47~~48

**7.10    Right to Subrogation** ............................................ ~~47~~48

**7.11    No Double-Recovery** ............................................. ~~48~~49

**7.12    Post-Petition Date Interest** ................................... ~~48~~49

**7.13    Additional NNCC Bondholder Payments** ............... ~~48~~49

**7.14    Resolution of Certain Claims** ............................... ~~48~~49

**7.15    Book Intercompany Claims** ................................... ~~49~~50

**7.16    Remaining Assets and Other Proceeds** ................... ~~50~~51

**7.17    Resolution of Side Letters and Cascade Trust** ......... ~~50~~51

**7.18    Debtor Disputes** .................................................... ~~50~~51

**7.19    Currency Conversion** ............................................ ~~50~~51

**7.20    SPSA Releases** ..................................................... ~~50~~51

**7.21    Escrow Release Order** ........................................... ~~50~~51

**7.22    Release of Sale Proceeds From the Escrow Accounts** . ~~51~~52

**7.23    Litigation Resolution** ............................................ ~~51~~52

**7.24    NTCC Debtor Payment.** ........................................ 52

ARTICLE 8.
CORPORATE FORM AND ACTION

**8.1      NNI Corporate Form and Vesting** .......................... ~~51~~52

**8.2      Corporate Form and Vesting of Other Wind-Down Debtors** . ~~51~~52

**8.3      Dissolution of the Wind-Down Debtors** .................. ~~52~~53

**8.4      Post-Effective Date Management** ........................... ~~52~~53

**8.5      Corporate Existence** .............................................. ~~53~~54

**8.6      Certificate of Incorporation or Certificate of Formation** . ~~53~~54

**TABLE OF CONTENTS**
(continued)

**Page**

**8.7    Wind-Down** .......................................................... ~~53~~54

**8.8    Quarterly Administrative Wind-Down Reimbursement Payments** .......................................................... ~~53~~54

**8.9    Other Corporate Action** .......................................................... ~~54~~55

ARTICLE 9.
TREATMENT OF EXECUTORY CONTRACTS

**9.1    Previous Assumption, Assignment and Rejection** .......................................................... ~~54~~55

**9.2    Assumption and Assignment of Remaining Contracts** .......................................................... ~~54~~55

**9.3    Cure Payments; Assurance of Performance** .......................................................... ~~55~~56

**9.4    Objections to Assumption of Remaining Contracts** .......................................................... ~~55~~56

**9.5    Rejection** .......................................................... ~~56~~57

**9.6    Approval of Rejection; Rejection Damages Claims Bar Date** .......................................................... ~~56~~57

**9.7    Postpetition Modification of Executory Contracts** .......................................................... ~~56~~57

**9.8    Pre-existing Obligations to the Debtors under Executory Contracts** .......................................................... ~~56~~57

ARTICLE 10.
PROVISIONS REGARDING VOTING AND DISTRIBUTIONS UNDER THE PLAN

**10.1    Voting of Claims** .......................................................... ~~57~~58

**10.2    Nonconsensual Confirmation** .......................................................... ~~57~~58

**10.3    Distributions of Creditor Proceeds** .......................................................... ~~57~~58

**10.4    Creditor Proceeds Distribution Conditions** .......................................................... ~~57~~59

**10.5    Minimum Distribution and Manner of Payment** .......................................................... ~~58~~59

**10.6    Distributions to Indenture Trustees** .......................................................... ~~58~~59

**10.7    Limitation on Recovery** .......................................................... ~~59~~60

**10.8    Distributions Free and Clear** .......................................................... ~~59~~60

**10.9    Delivery of Distributions and Undeliverable Distributions** .......................................................... ~~59~~60

**10.10    Withholding and Reporting Requirements** .......................................................... ~~59~~60

**10.11    Time Bar to Cash Payment Rights** .......................................................... ~~60~~61

**10.12    Setoffs and Recoupment** .......................................................... ~~60~~61

**10.13    Distribution Record Date** .......................................................... ~~61~~62

**10.14    Allocation of Distributions** .......................................................... ~~61~~62

**10.15    Cancellation of Notes, Instruments and Debentures** .......................................................... ~~61~~62

iv

**TABLE OF CONTENTS**
(continued)

**Page**

ARTICLE 11.
PROCEDURES FOR TREATING DISPUTED CLAIMS

11.1    Objections .................................................................... 6263

11.2    No Distributions Pending Allowance ........................... 6263

11.3    Estimation of Claims .................................................... 6263

11.4    Resolution of Disputed Claims .................................... 6364

11.5    No Interest .................................................................... 6364

11.6    Disputed Claims Reserve ............................................. 6364

11.7    No Amendments to Claims ........................................... 6365

11.8    No Late-Filed Claims ................................................... 6465

ARTICLE 12.
CONDITIONS PRECEDENT

12.1    Conditions to Confirmation ......................................... 6465

12.2    Canadian and U.S. Plans Effectiveness ....................... 6466

12.3    Conditions to the Effective Date ................................. 6566

12.4    Waiver of Conditions ................................................... 6668

12.5    Notice of Effective Date .............................................. 6768

12.6    Limited Severability of the Plan ................................. 6768

12.7    Consequences of Non-Occurrence of Effective Date .. 6768

ARTICLE 13.
EFFECT OF CONFIRMATION

13.1    Binding Effect; Plan Binds All Holders of Claims and Equity Interests ... 6869

13.2    Release and Discharge of Debtors and Wind-Down Debtors. ... 6869

13.3    Release and Discharge of the Plan Released Parties .... 6970

13.4    SPSA Releases ............................................................. 7071

13.5    Exculpation and Limitation of Liability ...................... 7172

13.6    Injunction on Claims .................................................... 7173

13.7    Terms of Injunctions or Stays ...................................... 7273

13.8    Retention of Litigation Claims and Reservation of Rights ... 7273

13.9    Retention of Rights ...................................................... 7374

13.10   Vesting ......................................................................... 7374

v

# TABLE OF CONTENTS
(continued)

**Page**

ARTICLE 14.
RETENTION OF JURISDICTION

ARTICLE 15.
MISCELLANEOUS PROVISIONS

| | | |
|---|---|---|
| **15.1** | **Effectuating Documents and Further Transactions** | ~~75~~76 |
| **15.2** | **Authority to Act** | ~~75~~77 |
| **15.3** | **Plan Supplement** | ~~76~~77 |
| **15.4** | **Amendment or Modification of the Plan** | ~~76~~77 |
| **15.5** | **Administrative Expense Claims Reserve** | ~~76~~77 |
| **15.6** | **Fees and Expenses** | ~~77~~78 |
| **15.7** | **Revocation or Withdrawal of the Plan** | ~~77~~78 |
| **15.8** | **Insurance Preservation** | ~~77~~78 |
| **15.9** | **Exemption from Certain Transfer Taxes** | ~~77~~78 |
| **15.10** | **Subordinated Claims** | ~~77~~78 |
| **15.11** | **Cross-Border Protocol and Cross-Border Claims Protocol** | ~~77~~79 |
| **15.12** | **Governing Law** | ~~77~~79 |
| **15.13** | **No Admissions** | ~~78~~79 |
| **15.14** | **Effect of Termination of SPSA** | ~~78~~79 |
| **15.15** | **Severability of Plan Provisions** | ~~78~~79 |
| **15.16** | **Successors and Assigns** | ~~78~~80 |
| **15.17** | **Defenses with Respect to Unimpaired Claims** | ~~78~~80 |
| **15.18** | **Section 1125(e) Good Faith Compliance** | ~~79~~80 |
| **15.19** | **No Injunctive Relief** | ~~79~~80 |
| **15.20** | **Payment of Statutory Fees** | ~~79~~80 |
| **15.21** | **Saturday, Sunday or Legal Holiday** | ~~79~~80 |
| **15.22** | **Dissolution of Creditors' Committee** | ~~79~~80 |
| **15.23** | **Reservation of Rights** | ~~79~~81 |
| **15.24** | **Post-Effective Date Rule 2002 Notice List** | ~~80~~81 |
| **15.25** | **Right to Abandon and Dispose of Debtor Property, Books & Records** | ~~80~~81 |
| **15.26** | **Notices** | ~~80~~81 |

PLAN EXHIBITS

| | |
|---|---|
| Exhibit A | Settlement and Plans Support Agreement |
| Exhibit B | Plan Administration Agreement |
| Exhibit C | Executory Contracts and Unexpired Leases Assumed by the Wind Down Debtors |
| Exhibit D | Debtor Administrative Expense Claims Resolved by Plan |
| Exhibit E | Quarterly Administrative Wind-Down Reimbursement Payments |
| Exhibit F | List of Directors and Officers of the Wind Down Debtors |
| Exhibit G | Amended By-Laws and Organizational Documents of the ~~Wind Down~~ Wind Down Debtors |
| Exhibit H | Wind Down Debtors to be Dissolved Following Final Distribution Date |

# INTRODUCTION

Nortel Networks Inc. ("NNI"), a Delaware corporation, and certain of its affiliated Debtors and Debtors-in-Possession (excluding Nortel Networks India International Inc. ("NNIII")) (collectively with NNI and excluding NNIII, the "Debtors")[2] propose this First Amended Joint Chapter 11 Plan of Nortel Networks Inc. and certain of its affiliated Debtors (the "Plan") for the resolution and satisfaction of all Claims against and Interests in the Debtors.  The Debtors are the proponents of this Plan within the meaning of section 1129 of the Bankruptcy Code.  All capitalized terms not defined in this introduction have the meanings ascribed to them in Article 1 of this Plan.

Although the Chapter 11 Cases are jointly administered pursuant to an order of the Bankruptcy Court, the Debtors are not currently proposing the substantive consolidation of their respective Estates other than with respect to the substantive consolidation of NNI and NNCC on the Plan Effective Date.  Thus, although the Plan generally applies to all of the Debtors, except where otherwise indicated, (i) the Plan constitutes 15 distinct chapter 11 plans, one for each Debtor other than NNI and NNCC (which shall be treated under a single, joint chapter 11 plan) and excluding NNIII; (ii) for voting purposes, each holder of a Claim in a Class shall vote its Claim in such Class by individual Debtor; and (iii) the classification scheme set forth in Article 3 of this Plan applies to each Debtor; but to the extent there are no Claims in a certain Class against a particular Debtor, that Class shall be deemed not to exist for any purpose whatsoever in respect of that Debtor.

Under section 1125(b) of the Bankruptcy Code, a vote to accept or reject the Plan may not be solicited from holders of Claims and/or Interests until such time as the Disclosure Statement relating to the Plan is approved by the Bankruptcy Court.  THE DEBTORS URGE ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.  To the extent, if any, that the Disclosure Statement is inconsistent with the Plan, the Plan will govern.  No solicitation materials, other than the Disclosure Statement and any schedules, exhibits and other documents attached thereto or referenced therein or otherwise enclosed with the Disclosure Statement served by the Debtors on interested parties, have been authorized by the Debtors or the Bankruptcy Court for use in soliciting acceptances of the Plan.  Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code, Bankruptcy Rule 3019 and Article 15 of this Plan, each of the Debtors expressly reserves the right to alter, amend, modify,

---

[2]      The Debtors proposing the Plan, along with the last four digits of each Debtor's tax identification number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).

revoke or withdraw from this Plan with respect to such Debtor, one or more times, prior to its substantial consummation.

# ARTICLE 1.
## DEFINITIONS, INTERPRETATION AND RULES OF CONSTRUCTION

**1.1    Scope of Definitions.**  For the purposes of this Plan, except as expressly provided or unless the context otherwise requires, all capitalized terms not otherwise defined shall have the meanings ascribed to them in this Article 1 of the Plan.  Any term used in this Plan that is not defined herein, but is defined in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules, respectively.

**1.2    Definitions.**  The following terms (which appear in the Plan as capitalized terms) shall have the meanings ascribed to them in this Article 1 of the Plan.

**Administrative Expense Claim** means any right to payment for any cost or expense of administration of any of the Chapter 11 Cases asserted or arising under sections 503(b), 507(a)(2) or 507(b) of the Bankruptcy Code up to and including the Effective Date, including, to the extent allowable under such sections, any (i) actual and necessary cost or expense of preserving the Debtors' Estates or operating the business of the Debtors arising on or after the Petition Date, (ii) payment to be made under this Plan to cure a default under an executory contract or unexpired lease that is assumed pursuant to section 365 of the Bankruptcy Code, (iii) compensation or reimbursement of expenses of Professionals arising on or after the Petition Date, to the extent allowed by the Bankruptcy Court under section 330(a) or section 331 of the Bankruptcy Code and (iv) fees or charges assessed against the Debtors' Estates under section 1930, chapter 123 of title 28 of the United States Code.

**Administrative Expense Claims Bar Date** means the deadline for filing an Administrative Expense Claim, other than a Professional Claim, which Claims must be Filed so as to be actually received by the Bankruptcy Court on or before 5:00 p.m., prevailing Eastern Standard Time, on the date that is the first Business Day that is thirty (30) days following the Effective Date, unless otherwise ordered by the Bankruptcy Court.

**Administrative Expense Claims Reserve** has the meaning set forth in Section 15.5 of this Plan.

**Affiliate** shall have the meaning as set forth in section 101(2) of the Bankruptcy Code.

**Allocation Decisions** means the separate decisions issued by the CCAA Court and the Bankruptcy Court on or about May 12, 2015 and July 6, 2015 regarding the Allocation Dispute, which remain subject to appeal in both jurisdictions.

**Allocation Dispute** means certain litigation before the Canadian Court and the Bankruptcy Court in which the allocation of the Sale Proceeds is at issue.

3

**Allocation Proceeds** means the Sale Proceeds allocated to each of (a) the Debtors, collectively, and (b) the Foreign Affiliate Debtors, as provided for under Section 2(c) of the SPSA.

**Allowed** means, with reference to any Claim against the Debtors, (a) any Claim that has been listed by the Debtors in their Schedules, as such Schedules may be amended by the Debtors from time to time in accordance with Bankruptcy Rule 1009, as liquidated in amount and not disputed or contingent and for which no contrary proof of claim has been Filed within the periods of limitation fixed by the Plan, the Bankruptcy Code or by any order of the Bankruptcy Court, (b) any Claim allowed hereunder, (c) any Claim that is not a Disputed Claim, (d) any Claim that is compromised, settled or otherwise resolved pursuant to the authority granted to the Debtors pursuant to a Final Order of the Bankruptcy Court or under Article 11 of the Plan or (e) any Claim that, if it is a Disputed Claim, has been allowed by a Final Order; *provided*, *however*, that Claims allowed solely for the purpose of voting to accept or reject the Plan pursuant to an order of the Bankruptcy Court shall not be considered "Allowed Claims" hereunder.  Unless otherwise specified herein or by order of the Bankruptcy Court, "Allowed Administrative Expense Claim" or "Allowed Claim" shall not, for any purpose under the Plan, include interest on such Administrative Expense Claim or Claim from and after the Petition Date.

**Allowed Book Intercompany Claims** means the pre-filing claims between and among the companies comprising the Nortel Group in the amounts recorded in their books and records, as set out in Annex L to the SPSA.

**Allowed Claim** means any Claim that is Allowed in accordance with the Plan.

**Allowed Crossover Bonds Claims** has the meaning set forth in Section 7.14.

**Allowed NNCC Bonds Claims** means the NNCC Bonds Claims against NNI that are Allowed against NNI as a general unsecured claim in the amount of $150,951,562.

**Architel** means Architel Systems (U.S.) Corporation, a Delaware corporation.

**Assets** means, with respect to a Debtor, (a) all "property" of such Debtor's Estate, as defined in section 541 of the Bankruptcy Code and (b) all Causes of Action that have been or may be commenced by such Debtor or its authorized representative for the benefit of such Debtor's Estate, unless modified pursuant to the Plan or a Final Order.

**Available Cash** means (a) all Cash of a Wind-Down Debtor, including, without limitation, the Cash realized from its business operations, the sale or other disposition of its Assets, the Allocation Proceeds, the Residual Assets Proceeds, the interest earned on invested funds, Cash on hand, recoveries from Litigation Claims and from any other source or otherwise, *less* (b) the amount of Cash estimated and reserved by such Wind-Down Debtor and the Plan Administrator in accordance with the Plan Administration Agreement to (i) adequately fund the reasonable and necessary projected costs to carry out the provisions of the Plan with respect to such Wind-Down Debtor on and after the Effective Date, including, without limitation, any fees and expenses incurred by Professionals, (ii) pay holders of all Disputed

Claims against such Wind-Down Debtor the amount such holders would be entitled to receive under the Plan if all such Disputed Claims were to become Allowed Claims, (iii) pay all fees payable under section 1930, chapter 123 of title 28 of the United States Code and (iv) pay all other amounts required to be paid to manage and/or liquidate such Wind-Down Debtor's Assets on and after the Effective Date and (v) pay holders of Allowed Administrative Expense Claims, Priority Tax Claims, Priority Non-Tax Claims and, (if applicable) Convenience Claims, in accordance with the Plan.

**Bankruptcy Code** means title 11 of the United States Code, as in effect on the Petition Date and as thereafter amended, as applicable in the Chapter 11 Cases.

**Bankruptcy Court** means the United States Bankruptcy Court for the District of Delaware or any other court of the United States having jurisdiction over the Chapter 11 Cases.

**Bankruptcy Rules** means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, 28 U.S.C. § 2075, as applicable to the Chapter 11 Cases, and the local and chambers rules of the Bankruptcy Court, as in effect on the Petition Date and as thereafter amended.

**Beddoes Court** means the High Court of Justice of England and Wales that has the power to provide directions to the U.K. Pension Trustee authorizing the U.K. Pension Trustee to execute and implement the SPSA.

**Bondholder Contribution** means the segregated accounting reserve established by the Debtors to hold the first $4,000,000 of the Creditor Proceeds otherwise available for distribution by the Debtors to holders of allowed Class A-3B Crossover Bonds Claims, which shall be held by the Debtors until the occurrence of the Bondholder Contribution Release Condition and which shall constitute a distribution to the holders of Crossover Bond Claims for all purposes under the Plan.

**Bondholder Contribution Release Condition** means the earlier of the time that (a) the NTCC achieves the NTCC Threshold, in which case the Bondholder Contribution shall be released for distribution to the holders of Crossover Bonds Claims or (b) the Debtors have made final distributions on account of the NTCC Settlement Claims and the NTCC Threshold has not been achieved, in which case, all or a portion of the Bondholder Contribution shall be released for distribution to holders of the NTCC Settlement claims allocated on account of the NTCC Settlement Claims (for avoidance of doubt, the only portion of the Bondholder Contribution that shall be released to be distributed on account of NTCC Settlement Claims is the amount required to meet the NTCC Pro Rata Threshold, with the remainder, if any, to be released to the holders of Crossover Bonds Claims for distribution).  Notwithstanding the foregoing, if after 18 months following the Effective Date, or following the end of any fiscal quarter thereafter, the Distribution Agent, in consultation with FTI, reasonably determines that the Threshold will not be reached, the Bondholder Contribution will be released for distribution to the holders of NTCC Settlement Claims allocated on account of the NTCC Settlement

Claims in accordance with (b) above on the date the next Distributions are made to Class A-3A Claims under the Plan.

**Bondholder Group** means the ad hoc group of bondholders that hold notes issued and/or guaranteed by NNC, NNL, NNI and NNCC, which on June 15, 2016 filed with the Bankruptcy Court a disclosure form under Bankruptcy Rule 2019, as such group may been and may be constituted from time to time.

**Business Day** means any day (other than a Saturday, Sunday or legal holiday, as such term is defined in Bankruptcy Rule 9006(a)) on which banks are open for general business in New York City, New York, U.S.A. and Toronto, Ontario, Canada, and also, when used in connection with the Plan provisions related to the SPSA, in London, England and Paris, France.

**Business Line Sales** means the sales of various Nortel Group business lines, as identified on Annex A to the SPSA. For the avoidance of doubt, the Business Line Sales do not include the Iceberg Sale.

**Canadian Court** means any and all of the CCAA Court, the Ontario Court of Appeal, the Supreme Court of Canada or any other court of competent jurisdiction overseeing the Canadian Proceedings (including any appeals) from time to time.

**Canadian Debtors** means NNC, NNL, Nortel Networks Technology Corporation, Nortel Networks Global Corporation, Nortel Networks International Corporation, Nortel Communications Inc., Architel Systems Corporation and Northern Telecom Canada Limited.

**Canadian Escrow Account** means the account with the Canadian Escrow Agent established pursuant to the Canadian Escrow Agreement to hold that portion of the Sale Proceeds to be converted into Canadian Dollars.

**Canadian Escrow Agent** means Royal Trust Corporation of Canada.

**Canadian Escrow Agreement** means that certain distribution escrow agreement, dated October 24, 2016, entered into among NNC, NNL, NNI, NNUK, the other existing depositors under the relevant Existing Escrow Agreements, NNSA, the Monitor and the Creditors' Committee regarding the Canadian Escrow Account, in accordance with the terms of the SPSA.

**Canadian Escrow Release Order** means an order issued by the CCAA Court authorizing and directing the release of the Sale Proceeds from the Escrow Accounts in the manner contemplated hereby.

**Canadian Estate** means the Canadian Debtors as substantively consolidated in accordance with the SPSA.

**Canadian Information Circular** means the information circular to be provided to the Canadian Voting Creditors relating to the Canadian Plan as approved by the CCAA Court.

**Canadian Meeting Order** means an order of the CCAA Court granted pursuant to section 4 and/or 5 of the CCAA that, among other things, authorizes the holding of a meeting or meetings of the Canadian Debtors' creditors for purposes of considering and voting upon the Canadian Plan and approves the Canadian Information Circular.

**Canadian Plan** means the CCAA plan of compromise or arrangement (including any exhibits, annexes and schedules thereto) for the Canadian Debtors filed in the CCAA Court on November 30, 2016 that, among other things, effectuates the settlement consistent with the terms of the SPSA, as it may be modified or supplemented in accordance with its terms.

**Canadian Proceedings** means the proceedings that were commenced before the CCAA Court pursuant to the CCAA on or after January 14, 2009 in respect of the Canadian Debtors.

**Canadian Voting Creditors** means creditors holding Proven Claims against the Canadian Debtors and such other creditors that are permitted to vote on the Canadian Plan.

**Cash** means legal tender accepted in the United States of America for the payment of public and private debts, currently denominated in United States Dollars.

**Cascade Trust** means the trust established pursuant to that certain Trust Indenture, dated April 5, 2010 between NNL and NNI, as settlors, and John T. Evans, as trustee.

**Cash Management Order** means the Order of the Bankruptcy Court, pursuant to sections 345, 363(c)(l), 364(a) and 503(b)(1) of the Bankruptcy Code, approving the Debtors' continued use of the Cash Management System (as defined therein), entered by the Bankruptcy Court January 15, 2009 [D.I. 58], as amended or supplemented.

**Causes of Action** means, without limitation, any and all actions, causes of action, controversies, liabilities, obligations, rights, suits, damages, judgments, claims and demands whatsoever, whether known or unknown, reduced to judgment, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, secured or unsecured, assertable directly or derivatively, existing or hereafter arising, in law, equity or otherwise, based in whole or in part upon any act or omission or other event occurring prior to or during the course of the Chapter 11 Cases through the Effective Date.

**CCAA** means the Companies' Creditors Arrangement Act, R.S.C. 1985, c C-36.

**CCAA Court** means the Ontario Superior Court of Justice (Commercial List).

**CCAA Sanction Order(s)** means the order of the CCAA Court sanctioning the Canadian Plan and shall include, for the avoidance of doubt, any order of a Canadian Court affirming such order.

**CCC** means the ad hoc committee of creditors having claims only against the Canadian Debtors comprised of the former and disabled Canadian employees of the Canadian Debtors through their court-appointed representatives, Unifor, Morneau Shepell Ltd. as Administrator of Nortel's Canadian registered pension plans, the Superintendent of Financial Services of Ontario as Administrator of the Pension Benefits Guarantee Fund and the court-appointed representatives of the current and transferred employees of the Canadian Debtors.

**CFSA** means the Final Canadian Funding and Settlement Agreement among, inter alia, certain of the Canadian Debtors, the Monitor and certain of the Debtors, dated December 23, 2009, approved by order of the Bankruptcy Court on January 21, 2010 [D.I. 2347].

**Chapter 11 Cases** means the chapter 11 cases of the Debtors pending before the Bankruptcy Court and as jointly administered with one another under Case No. 09-10138 (KG), and as to any Debtor individually, its chapter 11 case, and for the avoidance of doubt, for purposes of this Plan, excludes the chapter 11 case of NNIII.

**Claim** means a right of an Entity against any Debtor, whether or not asserted or Allowed, as defined in section 101(5) of the Bankruptcy Code and as construed pursuant to section 102(2) of the Bankruptcy Code.

**Claims Agent** means Epiq Bankruptcy Solutions, LLC, the claims and noticing agent retained in the Chapter 11 Cases, or any successor thereto.

**Claims Objection Deadline** has the meaning set forth in Section 11.1 of this Plan.

**Claims Register** means the official register of Claims against, and Interests in, the Debtors, maintained by the Claims Agent.

**Class** means, with respect to each Debtor, a group of Claims or Interests as classified in a particular class under the Plan pursuant to section 1122 of the Bankruptcy Code.

**Collateral** means any property or interest in property of a Debtor's Estate subject to a Lien to secure the payment of a Claim, which Lien is not subject to avoidance or otherwise invalid and unenforceable under the Bankruptcy Code or applicable non-bankruptcy law.

**Confirmation** means entry of the Confirmation Order by the Bankruptcy Court.

**Confirmation Date** means the date on which the Bankruptcy Court enters the Confirmation Order on its docket, within the meaning of Bankruptcy Rules 5003 and 9021.

**Confirmation Hearing** means the duly noticed hearing held by the Bankruptcy Court to consider Confirmation of the Plan pursuant to section 1128 of the Bankruptcy Code, including any continuances thereof.

**Confirmation Order** means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code as applicable to each Debtor, which order shall be in form and substance reasonably acceptable to the Creditors' Committee and the Bondholder Group.

**Consolidated Debtors** means NNI and NNCC as substantively consolidated under the Plan.

**Consolidation** means the consolidation of NNI and NNCC.

**Consummation** means the occurrence of the Effective Date.

**Controlled Non-Debtor Affiliate** means any non-Debtor Entity that is managed and controlled by the Wind-Down Debtors.

**Convenience Claim** means, solely with respect to any Class 3A General Unsecured Claim, any Claim (i) in an Allowed amount equal to or less than $25,000 whose holder elects on its ballot for such Claim to be Allowed as a Class 3C Convenience Claim and receive treatment as a Class 3C Convenience Claim in accordance with the Plan, or, (ii) in an Allowed amount larger than $25,000, whose holder elects on its ballot for such Allowed Claim to be reduced and Allowed at $25,000 in order to receive treatment as a Class 3C Convenience Claim in accordance with the Plan.

**Conversion Election** has the meaning set forth in Section 7(c)(i)(A) of the SPSA.

**CoreTek** means CoreTek, Inc., a Delaware corporation.

**Creditor** means any Entity that holds a Claim against any of the Debtors.

**Creditor Joinder** means a joinder to the SPSA, substantially in the form annexed as Annex D of the SPSA

**Creditor Proceeds** means, with respect to each Debtor, (a) Available Cash plus (b) any non-Cash proceeds (including, without limitation, any securities or other interests) of any sale of Residual Assets.

**Creditor Proceeds Distribution Conditions** shall have the meaning set forth in Section 10.4 herein.

**Creditors' Committee** means the statutory committee of unsecured creditors appointed in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code.

**Creditor's Maximum** has the meaning set forth in Section 7.9 hereof.

**Cross-Border Claims Protocol** means the Cross-Border Claims Protocol originally approved by the Bankruptcy Court and CCAA Court on or about September 16, 2010, as the same has been amended, with the approval of both the Bankruptcy Court and the CCAA Court, from time to time.

**Cross-Border Protocol** means the Cross-Border Protocol originally approved by the Bankruptcy Court and the CCAA Court on or about January 14, 2009, as the same has been amended, with the approval of both the Bankruptcy Court and the CCAA Court, from time to time.

**Crossover Bondholder** means a beneficial owner of Crossover Bonds as of the earlier of (a) the date such holder executes a Creditor Joinder or a Transferee Joinder; and (b) the record date that will be established under the Plan and the Canadian Meeting Order.

**Crossover Bonds** means those bonds issued pursuant to the indentures listed on Annex G of the SPSA, but excluding the NNCC Bonds.

**Crossover Bonds Claims** means the Crossover Claims arising from the Crossover Bonds that include Claims (a) against NNL and NNC as unsecured Proven Claims against the Canadian Estate in the aggregate amount of $3,940,750,260 and (b) against NNI as a General Unsecured Claim in the amount of $3,934,521,442.

**Crossover Bondholder Fee Letter** means that certain fee letter dated June 23, 2011 between various advisors to the Bondholder Group and NNC and NNL.

**Crossover Claim** means any Claim arising out of a debt or other obligation of one or more of the Debtors that is guaranteed or indemnified by one or more of the Canadian Debtors, or a debt or other obligation of one or more of the Canadian Debtors that is guaranteed or indemnified by one or more of the Debtors (including, without limitation, the Crossover Bonds Claims, NNCC Bonds Claims and EDC claims, but excluding, in relation to the Canadian Debtors, any obligation of a Canadian Debtor guaranteed by another Canadian Debtor).

**Cure Amount** means the amount required to cure any defaults under an executory contract or unexpired lease as a condition for such contract or lease to be assumed by the Debtors pursuant to sections 365 or 1123 of the Bankruptcy Code (or such other amount as may be agreed upon by the parties to such executory contract or unexpired lease).

**Currency Conversion Order** means the order entered by the Bankruptcy Court on October 21, 2016 [D.I. 17296] and by the CCAA Court on October 19, 2016 authorizing and providing procedures for the conversion into Other Currency of certain portions of the Sale Proceeds.

**Debt Securities Fraud Claims** means the Claims, including unknown claims, demands, rights, liabilities and Causes of Action of any kind whatsoever, known or unknown,

which have been or could be asserted in a direct, derivative or other capacity against any Debtor arising out of, relating to or in connection with (a) the purchase, sale or other decision or action made or taken, or declared, failed or refused to be made or taken, or otherwise foregone, concerning or relating to the Senior Notes; (b) the purchase, ownership or sale of the Senior Notes; and (c) any other claims arising out of, relating to or in connection with the Senior Notes that would be subject to subordination under section 510(b) of the Bankruptcy Code.  Debt Securities Fraud Claims do not include claims for payment for principal, interest, fees or expenses due under the Senior Notes.

**Debtor(s)** or **Debtor(s)-in-Possession** shall have the meaning set forth in the Introduction herein, including in the Debtors' capacity as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

**Debtor Releasing Parties** means the Debtors and each of their representatives, agents, successors and assigns.

**Deficiency Claim** means, with respect to any Claim secured by a Lien on any interest of any Debtor in property having a value of less than the Allowed amount of such Claim (after taking into account other Liens of higher priority in such property), the portion of such Claim equal to the difference between (a) the Allowed amount of the Claim and (b) the Allowed amount of the secured portion of such Claim (which Allowed secured amount may be set pursuant to this Plan).

**Depositors** has the meaning given to such term in the Escrow Agreements.

**Disbursing Agent** means the Plan Administrator or any party designated by the Debtors to serve as their disbursing agent under the Plan; *provided* that the NNC/NNL Notes Indenture Trustee shall be the Disbursing Agent with respect to the Crossover Bonds, and that the NNCC Bonds Indenture Trustee shall be the Disbursing Agent with respect to the NNCC Bonds.

**Disclosure Statement** means the written disclosure statement that relates to this Plan Filed in the Chapter 11 Cases by the Debtors, including the schedules and exhibits attached thereto, as it may be amended, modified or supplemented from time to time, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code.

**Disputed Claim** means a Claim that the Debtors have Scheduled as "disputed," "contingent" or "unliquidated," or as to which a proof of claim has been Filed or deemed Filed as contingent or as to which an objection has been or may be timely Filed by the Debtors or any other party in interest entitled to do so, which objection, if timely Filed, has not been withdrawn or has not been overruled or denied by a Final Order.

**Disputed Claims Reserve** means, in the event there exist Disputed Claims against a Debtor on or after the Effective Date, an aggregate amount of Cash reserved that is sufficient to pay to each holder of such Disputed Claim the Pro Rata Share of any distributions

that such holder would have been entitled to receive under the Plan if such Claim had been an Allowed Claim as of the Effective Date.

**Disputed Cure Amount** means a Cure Amount that the Debtors have Scheduled as "disputed," "contingent" or "unliquidated," or as to which a proof of claim has been Filed or deemed Filed as contingent or as to which an objection has been or may be timely Filed by the Debtors or any other party in interest entitled to do so, which objection, if timely Filed, has not been withdrawn or has not been overruled or denied by a Final Order.

**Distribution** means any payment or transfer made under the Plan.

**Distribution Date** means any date on which a Distribution is made in accordance with the Plan, including the Initial Distribution Date, an Interim Distribution Date, and the Final Distribution Date

**Distribution Record Date** means, except with respect to Allowed Crossover Bonds Claims and Allowed NNCC Bonds Claims, the record date for the purposes of making Distributions under the Plan on account of Allowed Claims, which date shall be the Confirmation Date.

**DTC** means The Depository Trust & Clearing Corporation.

**EDC** means Export Development Canada.

**EDC Claims** means the claims set forth in proof of claim number 3948 filed by EDC against NNI on September 28, 2009 related to certain guaranty obligations of NNI to EDC pursuant to a Guaranty Agreement dated as of July 4, 2006 among NNI, NNL and EDC.

**Effective Date** means the date selected by the Debtors in consultation with the Canadian Debtors that is the first Business Day on which all conditions to the Effective Date set forth in Article 12 of the Plan have been satisfied with respect to a Debtor or, if waivable, waived pursuant to Section 12.4 hereof, provided that no stay of the Confirmation Order is in effect.

**EMEA Allocation** has the meaning set forth in Section 2(c)(v) of the SPSA.

**EMEA Canada Settlement Agreement** means the Agreement Settling EMEA Canadian Claims and Related Claims among, inter alia, the Canadian Debtors, the Monitor, the EMEA Debtors and NNSA, dated July 9, 2014.

**EMEA Debtors** means, collectively, NNUK, Nortel Networks (Ireland) Limited, Nortel Networks NV (in administration), Nortel Networks SpA (in administration), Nortel Networks BV (in administration), Nortel Networks Polska Sp z.o.o. (in administration), Nortel Networks Hispania SA (in administration), Nortel Networks (Austria) GmbH (in administration), Nortel Networks s.r.o. (in administration), Nortel Networks Engineering Service Kft (in administration), Nortel Networks Portugal SA (in administration), Nortel Networks Slovensko, s.r.o. (in administration), Nortel Networks Romania SRL (in administration), Nortel GmbH (in administration), Nortel Networks OY (in administration),

Nortel Networks AB (in administration), Nortel Networks International Finance & Holding BV (in administration) and Nortel Networks France S.A.S. (in administration), but, for the avoidance of doubt, for purposes of the Plan, does not include NNSA.

**EMEA Escrow Accounts** means, collectively, the EMEA Sterling Escrow Account and the EMEA Euro Escrow Account.

**EMEA Escrow Agreements** means, collectively, the EMEA Sterling Escrow Agreement and the EMEA Euro Escrow Agreement.

**EMEA Euro Escrow Account** means the account with the EMEA Euro Escrow Agent that will be established pursuant to the EMEA Euro Escrow Agreement to hold that portion of the Sale Proceeds to be converted into Euros, in the event that the Euro Conversion Election is requested.

**EMEA Euro Escrow Agent** means the escrow agent named in the EMEA Euro Escrow Agreement, which escrow agent shall be reasonably acceptable to NNL, NNI, NNUK, NNSA, the other existing Depositors under the relevant Existing Escrow Agreements, the Monitor and the Creditors' Committee.

**EMEA Euro Escrow Agreement** means the distribution escrow agreement, to be entered into among NNC, NNL, NNI, NNUK, NNSA the other existing Depositors under the relevant Existing Escrow Agreements, the Monitor and the Creditors' Committee, to hold that portion of the Sale Proceeds to be converted into Euros in the event that the Euro Conversion Election is requested, which agreement shall be in a form reasonably acceptable to NNL, NNI, NNUK, NNSA, the other existing Depositors under the relevant Existing Escrow Agreements, the Monitor and the Creditors' Committee.

**EMEA Non-Filed Entities** means, collectively, Nortel Networks AS, Nortel Networks AG, Nortel Networks South Africa (Pty) Limited, NNNI, and NNOCL.

**EMEA Sterling Escrow Account** means the account with the EMEA Sterling Escrow Agent that will be established pursuant to the EMEA Sterling Escrow Agreement to hold that portion of the Sale Proceeds to be converted into U.K. Pounds Sterling, in the event that the Sterling Conversion Election is requested.

**EMEA Sterling Escrow Agent** means the escrow agent named in the EMEA Sterling Escrow Account, which agent shall be reasonably acceptable to NNL, NNI, NNUK, NNSA, the other existing Depositors under the relevant Existing Escrow Agreements, the Monitor and the Creditors' Committee.

**EMEA Sterling Escrow Agreement** means the distribution escrow agreement to be entered into among NNC, NNL, NNI, NNUK, the other existing Depositors under the relevant Existing Escrow Agreements, the Monitor and the Creditors' Committee, to hold that portion of the Sale Proceeds to be converted into U.K. Pounds Sterling in the event the Sterling Conversion Election is requested, which agreement shall be in a form reasonably

acceptable to NNL, NNI, NNUK, NNSA, the other existing Depositors under the relevant Existing Escrow Agreements, the Monitor and the Creditors' Committee.

**Entity** means an entity as defined in section 101(15) of the Bankruptcy Code.

**Escrow Agents** means JPMorgan Chase Bank, N.A. and Citibank, N.A., as applicable, as escrow agents in respect of the Existing Escrow Accounts, and the Canadian Escrow Agent, the EMEA Euro Escrow Agent and the EMEA Sterling Escrow Agent, as applicable.

**Escrow Accounts** means, collectively, the Existing Escrow Accounts and the New Escrow Accounts.

**Escrow Agreements** means, collectively, the Existing Escrow Agreements and the New Escrow Agreements governing the Escrow Accounts.

**Escrow Release Orders** means, collectively, the Canadian Escrow Release Order and the U.S. Escrow Release Order, which orders shall, in all respects, conform to the requirements of Section 3(d) of the SPSA.

**Estate** means, with regard to each Debtor, the estate that was created by the commencement by such Debtor of its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code, and shall be deemed to include, without limitation, any and all rights, powers and privileges of such Debtor and any and all Assets and interests in property, whether real, personal or mixed, rights, Causes of Action, avoidance powers or extensions of time that such Debtor or such estate shall have had as of the Petition Date, or which such Estate acquired after the commencement of the Chapter 11 Case, whether by virtue of sections 541, 544, 545, 546, 547, 548, 549 or 550 of the Bankruptcy Code or otherwise.

**Estate Claim** has the meaning set forth in Section 10.12(b) to this Plan.

**Estate Fiduciaries** has the meaning given to such term in the Existing Escrow Agreements.

**Euro Conversion Election** has the meaning set forth in Section 7(c)(i)(A) of the SPSA.

**Exculpated Party** means each of (i) the Debtors, (ii) the Wind-Down Debtors, (iii) the U.S. Principal Officer; (iv) the Creditors' Committee, (v) the Bondholder Group, (vi) the NNC/NNL Notes Indenture Trustee, (vii) the NNCC Bonds Indenture Trustee, and with respect to each of the foregoing, (viii) any of their respective directors, officers, employees, members, attorneys, consultants, accountants, advisors, agents and other professionals (each acting solely in such capacity), and, collectively, all of them.

**Existing Escrow Accounts** means the escrow accounts established to hold the Sale Proceeds, as set forth on Annex B of the SPSA under the heading "Distribution Escrow Accounts".

**Existing Escrow Agreements** means the agreements among the various Depositors, Estate Fiduciaries and the Escrow Agents governing the respective Existing Escrow Accounts, as set forth in Annex B to the SPSA under the heading "Distribution Escrow Accounts."

**File** or **Filed** means file or filed on the docket of the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

**Final Distribution Date** means the date upon which the Plan Administrator or Disbursing Agent makes a final Distribution on account of all Allowed Claims against a Debtor, including Allowed Administrative, Priority Non-Tax, Priority Tax, Other Secured Claims and General Unsecured Claims, Crossover Bonds Claims, EDC Claims and Convenience Claims. As determined by the Plan Administrator, the Final Distribution Date shall be a date (a) which is after the liquidation into Cash of all Residual Assets of the relevant Wind-Down Debtor (other than those Residual Assets abandoned by such Wind-Down Debtor) and the collection of other sums due or otherwise remitted or returned to the relevant Estate and (b) on which there remain no Disputed Claims against such Debtor.

**Final Order** means (a) with respect to an order of a Canadian Court, an order: (i) as to which no appeal, leave to appeal, notice of appeal, motion to amend or make additional findings of fact, motion to alter or amend judgment, motion for rehearing or motion for new trial has been timely filed (in cases in which there is a date by which such filing is required to occur, it being understood that with respect to an order issued by the CCAA Court, the time period for seeking leave to appeal shall be deemed to have elapsed on the date that is twenty-two days after the rendering of such order unless a motion has been made to extend such time period) or, if any of the foregoing has been timely filed, it has been disposed of in a manner that upholds and affirms the subject order in all material respects without the possibility for further appeal thereon; (ii) in respect of which the time period for instituting or filing an appeal, leave to appeal, motion for rehearing or motion for new trial shall have expired (in cases in which such time period is capable of expiring, it being understood that with respect to an order issued by the CCAA Court, the time period for seeking leave to appeal shall be deemed to have elapsed on the date that is twenty-two days after the rendering of such order unless a motion has been made to extend such time period); and (iii) as to which no stay is in effect; or (b) with respect to an order of a U.S. court, an order (i) as to which the fourteen-day appeal period under Bankruptcy Rule 8002(a) has passed or has been waived by the Bankruptcy Court and (ii) that has not been reversed, stayed, superseded, vacated or, to the extent it has been stayed such stay has expired.

**Foreign Affiliate Debtors** means each of (a) the Canadian Debtors, (b) the EMEA Debtors and (c) NNSA.

**Foreign Proceeding** means, collectively, the Canadian Proceedings, the French Main Proceeding, the French Secondary Proceeding, the Israeli Administration Proceedings, the U.K. Proceedings and any other insolvency or similar proceeding filed after the Petition Date in a jurisdiction other than the United States involving an Affiliate of the Debtors.

15

**French Court** means the judge appointed in the French Secondary Proceeding, the Versailles Commercial Court, any court hearing appeals therefrom and any other court of competent jurisdiction overseeing the French Secondary Proceeding from time to time.

**French Liquidator** means Maître Cosme Rogeau in his capacity as liquidator for NNSA under the French Secondary Proceeding.

**French Main Proceeding** means the U.K. administration of NNSA commencing on January 14, 2009.

**French Secondary Proceeding** means the secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC) No. 1346/2000 on Insolvency Proceedings in the Republic of France that was commenced before the French Court on May 28, 2009 in respect of NNSA.

**General Unsecured Claims** means all Unsecured Claims against the Debtors other than the Crossover Bonds Claims, EDC Claims, Convenience Claims, Subordinated Claims and the Interests Securities Fraud Claims.

**Global Debtors** means the Debtors and the Foreign Affiliate Debtors.

**Governmental Unit** shall have the meaning assigned to such term in section 101(27) of the Bankruptcy Code.

**Iceberg Assets** means the residual intellectual property remaining after the Business Line Sales, which intellectual property was sold to a consortium in July 2011.

**Iceberg Amendment Fee** means the $5 million from the Iceberg Sale Proceeds previously agreed by the Debtors and each of the Foreign Affiliate Debtors to be funded directly as follows: $2.8 million to NNI and $2.2 million to NNUK, prior to any other agreed upon allocation of the Sale Proceeds.

**Iceberg Escrow Account** means the escrow account established to hold the Iceberg Sale Proceeds and the Iceberg Amendment Fee.

**Iceberg Sale** means the sale of the Iceberg Assets.

**Iceberg Sale Proceeds** means that portion of the Sale Proceeds generated from the Iceberg Sale.

**IFSA** means the Interim Funding and Settlement Agreement, dated as of June 9, 2009, entered into among various of the SPSA Parties, as approved by the CCAA Court on June 29, 2009 and by the Bankruptcy Court on June 29, 2009 [D.I. 993].

**Impaired** shall have the meaning assigned to such term in section 1124 of the Bankruptcy Code when used with reference to a Claim or an Interest.

**Initial Distribution Date** means the date as determined by the Debtors upon which the initial distributions of property under this Plan will be made to holders of Allowed Claims and Allowed Interests, which date shall be within sixty (60) days of the Effective Date or as soon thereafter as practicable.

**Intellectual Property** means any and all intellectual property rights in any jurisdiction including, without limitation, rights in or to any of the following: (a) Trademarks; (b) Patents and inventions (whether or not patentable); (c) copyrights and works of authorship of any type in any medium; (d) mask works; (e) trade secrets, know-how and confidential information; (f) databases, including, without limitation, computerized databases and compilations; (g) software and computer programs; and (h) domain names and Internet protocol addresses, including, in each case, any applications or registrations for any of the foregoing.

**Intercompany Claim** means any Claim against a Debtor asserted by its Affiliate other than an Administrative Expense Claim, a Priority Non-Tax Claim, a Secured Claim, a Subordinated Claim or an Interests Securities Fraud Claim.

**Intercompany Administrative Expense Claim** means any Administrative Expense Claim against a Debtor asserted by any other Debtor.

**Interest(s)** means shares of common stock, preferred stock, other forms of ownership interest or any interest or right to convert into such an equity or ownership interest or acquire any equity or ownership interest, including, without limitation, vested and/or unvested restricted stock units, contingent stock awards, contingent equity awards, performance stock units and stock options or restricted stock awards granted under management ownership plans, stock incentive plans or employee incentive plans, in any Debtor that was in existence immediately prior to or on the Petition Date for such Debtor.

**Interests Securities Fraud Claims** means Claims, including unknown claims, demands, rights, liabilities and Causes of Action of any kind whatsoever, known or unknown, that have been or could be asserted in a direct, derivative or other capacity against any Debtor arising out of, relating to or in connection with (a) the purchase, sale or other decision or action made or taken, or declined, failed or refused to be made or taken, or otherwise foregone, concerning or relating to the Interests in such Debtor; (b) the purchase, ownership or sale of such Interests; and (c) any other Claims arising out of, relating to or in connection with such Interests that would be subject to subordination under section 510(b) of the Bankruptcy Code.

**Interim Compensation Order** means the Order under 11 U.S.C. §§ 105(a) and 331, Fed. R. Bankr. P. 2016 and Del. Bankr. L.R. 2016-2 Establishing Procedures for Interim Compensation and Reimbursement of Fees and Expenses for Professionals and Official Committee Members entered by the Bankruptcy Court on February 4, 2009 [D.I. 222].

**Interim Distribution** means the quarterly Distributions of Creditor Proceeds made by the Disbursing Agent to holders of Allowed Claims against a Debtor.

17

**Interim Distribution Date** means any date on which an Interim Distribution is made, which dates shall be March 31st, June 30th, September 30th, and December 31st of each year.

**IP Addresses** means internet protocol addresses registered in the name of a Canadian Debtor or a corporate predecessor thereto.

**Israeli Administration Proceedings** means the administration proceedings of Nortel Networks Israel (Sales and Marketing) Limited and its subsidiaries commenced on January 19, 2009 pursuant to the Israeli Companies Law, 1999, and the regulations relating thereto for a stay of proceedings

**Joint Administrators** means Alan Robert Bloom, Christopher John Wilkinson Hill, Alan Michael Hudson and Stephen John Harris as the administrators of all EMEA Debtors and NNSA except Nortel Networks (Ireland) Limited (in administration), and Alan Robert Bloom and David Martin Hughes as the administrators of Nortel Networks (Ireland) Limited (in administration).

**Joint Liquidators** means Richard Barker and Joseph Luke Charleton as joint liquidators of NNNI and Richard Barker and Samantha Keen as joint liquidators of NNOCL.

**LG-N** means LG-Nortel Co. Ltd., a Korean joint venture between NNL and LG Electronics.

**Lien** means a charge against, interest in or other encumbrance upon property to secure payment of a debt or performance of an obligation.

**Litigation Claims** means all claims, rights and Causes of Action of any Debtor or its Estate of every kind or nature whatsoever, whether arising prior to, during or after the Chapter 11 Cases (including, without limitation, Intellectual Property enforcement rights and all rights, claims and Causes of Action arising under sections 544 through 551 of the Bankruptcy Code, except for any Released Claims).

**M&A Costs** means the fees and expenses incurred in connection with the Sales.

**M&A Cost Reimbursement** means the reimbursement of certain of the M&A Costs, which amounts shall be reimbursed from the Iceberg Escrow Account as follows: $20 million to the Debtors and $35 million to the Canadian Debtors.

**Monitor** means Ernst & Young Inc. in its capacity as the court-appointed monitor in the Canadian Proceedings.

**New Escrow Accounts** means, collectively, the Canadian Escrow Account and the EMEA Escrow Accounts.

**New Escrow Agreements** means, collectively, the Canadian Escrow Agreement and the EMEA Escrow Agreements.

**NN Applications** means Nortel Networks Applications Management Solutions Inc., a Delaware corporation.

**NN Cable** means Nortel Networks Cable Solutions Inc., a Delaware corporation.

**NN HPOCS** means Nortel Networks HPOCS Inc., a Delaware corporation.

**NN Optical** means Nortel Networks Optical Components Inc., a Delaware corporation.

**NNC** means Nortel Networks Corporation, a Canadian Debtor.

**NNC 2012 Convertible Notes** means those certain convertible senior notes issued by NNC on March 28, 2007 and guaranteed jointly and severally by NNL and NNI in an aggregate principal amount of $575 million due on April 15, 2012, and bearing an interest rate of 1.75%.

**NNC 2014 Convertible Notes** means those certain convertible senior notes issued by NNC on May 28, 2007 and guaranteed jointly and severally by NNL and NNI in an aggregate principal amount of $575 million due on April 15, 2014, and bearing an interest rate of 2.125%.

**NNC Notes Indenture** means that certain indenture, dated as of March 28, 2007, governing the issuance of the NNC 2012 Convertible Notes and the NNC 2014 Convertible Notes, as amended, supplemented or modified from time to time.

**NNC/NNL Notes Indenture Trustee** means The Bank of New York Mellon (f/k/a The Bank of New York), in its capacity as indenture trustee under the NNC Notes Indenture and NNL Notes Indenture, or any successor thereto.

**NNCALA** means Nortel Networks (CALA), Inc., a Florida corporation.

**NNCALA Administrative Expense Contribution** shall have the meaning set forth in Section 6.7.

**NNCC** means Nortel Networks Capital Corporation, a Delaware corporation.

**NNCC Bonds** means those certain senior notes issued by NNCC on February 15, 1996 and guaranteed by NNL in an aggregate principal amount of $150 million due on June 15, 2026, and bearing an interest rate of 7.875%.

**NNCC Bonds Claims** means those Crossover Claims relating to the NNCC Bonds.

**NNCC Bondholder** means a beneficial owner of one or more NNCC Bonds.

**NNCC Bondholder Signatories** means the holders of NNCC Bonds that executed the SPSA.

**NNCC Bonds Reserve** means a reserve to be funded by NNI with the NNCC Bonds Reserve Amount.

**NNCC Bonds Reserve Amount** means a reserve of $7.5 million established by NNI from Cash otherwise available for distributions to NNI unsecured creditors.

**NNCC Bonds Indenture** means that certain indenture, dated as of February 15, 1996, governing the issuance of the NNCC Bonds, as amended, supplemented or modified from time to time.

**NNCC Bonds Indenture Trustee** means Law Debenture Trust Company of New York, in its capacity as indenture trustee under the NNCC Bonds Indenture, or any successor thereto.

**NNCC Bonds Guarantee Obligations** means the guarantee, indemnity and other obligations of NNL under the NNCC Bonds Indenture.

**NNI** means Nortel Networks Inc., a Delaware corporation.

**NNII** means Nortel Networks International Inc., a Delaware corporation.

**NNIII** means Nortel Networks India International Inc., a Delaware corporation.

**NNL** means Nortel Networks Limited, a Canadian Debtor.

**NNL 2011 Notes** means those certain senior notes issued by NNL on July 5, 2006 and guaranteed jointly and severally by NNC and NNI in an aggregate principal amount of $1 billion due on July 15, 2011, and bearing a floating interest rate.

**NNL 2013 Notes** means those certain senior notes issued by NNL on July 5, 2006 and guaranteed jointly and severally by NNC and NNI in an aggregate principal amount of $550 million due on July 15, 2013, and bearing an interest rate of 10.125%.

**NNL 2016 Notes** means those two tranches of senior notes issued by NNL on July 5, 2006 and May 28, 2008 and guaranteed jointly and severally by NNC and NNI in aggregate principal amounts of $450 million and $675 million, respectively, due on July 15, 2016, and each bearing an interest rate of 10.75%.

**NNL Notes Indenture** means that certain indenture, dated as of July 5, 2006, governing the issuance of the NNL 2011 Notes, the NNL 2013 Notes and the NNL 2016 Notes, as amended, supplemented or modified from time to time.

**NNNI** means Nortel Networks (Northern Ireland) Limited (in liquidation), an EMEA Non-Filed Entity.

**NNOCL** means Nortel Networks Optical Components Limited (in liquidation), an EMEA Non-Filed Entity.

**NNSA** means Nortel Networks S.A. (in administration and in liquidation judiciaire).

**NNSA Allocation** means U.S. $220,000,000.

**NNSA Conflicts Administrator** means Stephen Jonathan Taylor of Isonomy Limited as Conflicts Administrator solely in relation to NNSA.

**NNUK** means Nortel Networks UK Limited (in administration), an EMEA Debtor.

**Non-Released Matters** shall have the meaning set forth in Section 13.4 herein.

**Nortel Altsystems** means Nortel Altsystems Inc., a Delaware corporation.

**Nortel Altsystems Int'l** means Nortel Altsystems International Inc., a Delaware corporation.

**Nortel Group** means, collectively, NNC and all of its direct and indirect subsidiaries, whether current or former.

**Nortel Trade Claims Consortium or NTCC** means a group of Creditors holding over $125 million in unsecured (non-funded debt) Claims, including but not limited to trade (supplier) claims, employee severance and pension Claims against one or more of the Debtors.

**NTCC Debtor Payment** means a payment of $6,500,000 by the Debtors to the holders of NTCC Settlement Claims allocated on account of the NTCC Settlement Claims on a pro rata basis on account of the NTCC Settlement Claims in consideration of the compromise of the NTCC Litigations, the Bondholder Group's waiver of substantial contribution and related claims, and other related matters.

**NTCC Debtor Settlement Redirection** means, once the NTCC Threshold has been achieved, the redirection of 75% of further distributions to which the holders of the NTCC Settlement Claims on account of the NTCC Settlement Claims otherwise would have been entitled to receive as holders of Class A-3A claims, for distribution to the other holders of allowed Class A-3A Claims until such time as such redirected distributions equal $6,500,000. Following such time, holders of the NTCC Settlement Claims shall resume their entitlement to receive 100 percent of future pro-rata distributions under the Plan.

**NTCC Litigations** means any and all litigation and objections by the NTCC or its members relating to the confirmation of the Plan and approval of the SPSA, including, without limitation, all proceedings at the United States Court of Appeals for the Third Circuit, and any potential claim for reimbursement for the fees and costs incurred by counsel or advisors to the NTCC or by their members, including in connection with their prosecution of

21

the appeal and their objection to the Plan and the SPSA (other than the payment of up to $1,250,000 of certain fees and costs as authorized in the Confirmation Order).

**NTCC Threshold** means the point at which the holders of the NTCC Settlement Claims achieve a 70% recovery on account of the NTCC Settlement Claims, including  Plan distributions to Class A-3A holders and, solely for purposes of determining when the NTCC Threshold is met, distributions of the NTCC Debtor Payment on account of the NTCC Settlement Claims.

**NTCC Settlement**  means the settlement agreement reached between the NTCC, the Bondholder Group and the Debtors resolving various disputes and potential claims and pending litigations, as memorialized in the term sheet filed as Exhibit A to the Debtors' Notice of Resolution of Nortel Trade Claim Consortium Plan Confirmation Objection and Related Matters [D.I. 17749].

**NTCC Settlement Claims** means the allowed Class A-3A Claims owned by members of the NTCC in an aggregate amount not to exceed $153,582,485.78, that are identified on a schedule delivered by the NTCC to the Debtors within ten (10) business days following the entry of the Confirmation Order, which schedule is subject to review and verification by the Debtors.

**NTI** means Northern Telecom International Inc., a Delaware corporation.

**Ordinary Course Professional Order** means the Order Authorizing the Debtors to Retain and Employ Professionals Used in the Ordinary Course of Business *Nunc Pro Tunc* to the Petition Date entered by the Bankruptcy Court on February 5, 2009 [D.I. 236], as may be amended, supplemented or modified from time to time.

**Other Currency** means Canadian Dollars, Pound Sterling or Euros.

**Other Nortel Claim** shall have the meaning set forth in Section 7.11 herein.

**Participating Creditor** means any creditor of any of the Global Debtors that is a party to the SPSA or has delivered a Creditor Joinder or a Transferee Joinder.

**Patents** mean all national and multinational patents and utility models (petty patents), including, without limitation, all reissues, divisions, continuations, continuations-in-part, extensions and reexaminations thereof, and all rights therein provided by multinational treaties or conventions.

**PBGC** means the Pension Benefit Guaranty Corporation, a United States government corporation.

**Person** means an individual, a corporation, a limited liability company, a partnership, an association, a joint stock company, a joint venture, an unincorporated organization or a Governmental Unit as defined in section 101(41) of the Bankruptcy Code.

22

**Petition Date** means January 14, 2009; *provided*, *however*, that with respect to those Debtors, including NNCALA, that commenced their Chapter 11 Cases subsequent to January 14, 2009, "Petition Date" shall refer to the respective dates on which such Chapter 11 Cases were commenced.

**Plan** means the chapter 11 plans of the Debtors (other than NNIII), collectively, and (where specified herein) as to each Debtor, the chapter 11 plan of such Debtor, including without limitation, the Plan Supplement and all exhibits, appendices and schedules hereto and thereto, either in its present form or as the same may be altered, amended, modified or supplemented from time to time in accordance with the provisions of the Plan or the Bankruptcy Code and Bankruptcy Rules.

**Plan Administration Agreement** means the agreement describing the powers, duties and rights of the Plan Administrator in administering the Plan, which agreement shall be in form and substance reasonably satisfactory to the Creditors' Committee and the Bondholder Group and in substantially the form included in the Plan Supplement.

**Plan Administrator** means Greylock Partners, LLC, retained, as of the Effective Date, by each of the Debtors as the Person responsible for, among other things, the matters described in Section 6.3 hereof.

**Plan Certificates** shall have the meaning set forth in Section 12.2 herein.

**Plans Effective Date** means the first date that both (i) the Plan for each of the Debtors and (ii) the Canadian Plan are effective in accordance with their respective terms.

**Plan Released Parties** means each of (i) the U.S. Principal Officer, (ii) the Creditors' Committee, (iii) the Bondholder Group, (iv) the NNC/NNL Notes Indenture Trustee, (v) the NNCC Bonds Indenture Trustee, and with respect to each of the foregoing, (vi) any of their respective directors, officers, employees, members, attorneys, consultants, accountants, advisors, agents and other professionals (each acting solely in such capacity), and, collectively, all of them.

**Plan Supplement** means the supplement containing the forms of documents specified in Section 15.3 of the Plan, which shall be Filed at least ten (10) days prior to the last day upon which holders of Claims may vote to accept or reject the Plan.

**PPF** means the Board of the Pension Protection Fund, a statutory corporation established under the provisions of the Pensions Act 2004, whose principal place of business is Renaissance, 12 Dingwall Road, Croydon, United Kingdom, CRO 2NA.

**PPI Settlement** means that certain Settlement Agreement entered into between NNI and certain of the Crossover Bondholders, dated July 24, 2014, as approved by the Bankruptcy Court on December 18, 2014.

**Priority Non-Tax Claim** means any Claim, other than an Administrative Expense Claim or a Priority Tax Claim, entitled to priority in payment under section 507(a) of the Bankruptcy Code.

**Priority Tax Claim** means any Claim entitled to priority pursuant to sections 502(i) and 507(a)(8) of the Bankruptcy Code.

**Pro Rata Share** means, as at any Distribution Date, with respect to the holder of an Allowed Claim in any Class against a Debtor, the product of (A/B) x C where:

A = the amount of the particular Allowed Claim;

B = the aggregate amount of all Allowed Claims in the Class; and

C = the total amount of available Creditor Proceeds to be distributed to holders of Allowed Claims in such Class on the particular Distribution Date.

For purposes of calculating the Pro-Rata Share for holders of Allowed Claims in Classes 3A and 3B using the above formula, "B" shall equal the aggregate amount of all Allowed Claims in Classes 3A and 3B together, and "C" shall equal the aggregate amount of available Creditor Proceeds to be distributed to holders of Allowed Claims in Classes 3A and 3B together, on the particular Distribution Date.

The Pro-Rata Share shall be subject in all respects to the Creditor's Maximum set forth in Section 7.9 herein, and in no case shall the holder of an Allowed Claim in Class 3A or 3B receive more than 100% of the amount of its Allowed Claim, when taking into account distributions received from any Debtor, on the one hand, and the Canadian Estates, on the other.

**Professional** means a Person (a) employed in the Chapter 11 Cases pursuant to a Final Order in accordance with sections 327, 328 and 1103 of the Bankruptcy Code and to be compensated for services rendered prior to the Effective Date, pursuant to sections 327, 328, 329, 330 and 331 of the Bankruptcy Code, or (b) for which compensation and reimbursement has been allowed by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

**Professional Claim** means a Claim of a Professional for compensation for services rendered or reimbursement of costs, expenses or other charges incurred after the Petition Date and prior to and including the Effective Date.

**Proven Claim** has the meaning set forth in the SPSA.

**Qtera** means Qtera Corporation, a Delaware corporation.

**Quarterly Administrative Wind-Down Reimbursement Payments** means certain quarterly payments authorized to be made from an individual Debtor to NNI to reimburse NNI for the cost of administering and winding down such individual Debtor's estate (including costs for professionals retained to assist with such administration or wind-down)

from and after the Effective Date, in an amount not to exceed the maximum quarterly amount for such individual Debtor, as reflected in <u>Exhibit E</u>.

**Rejected Contract** means any executory contract that a Debtor has rejected in accordance with Section 9.5 of this Plan.

**Relay** means NNL's and NNTC's assets related to the wireless backhaul and multi-hop digital repeater/relay research development program, sold in June 2010.

**Released Claim** means any claim, right or Cause of Action of any of the Debtors or their Estates released pursuant to the Sale Agreements, the Sale Orders, the Plan, the Confirmation Order or the SPSA but does not include any claim, right or Causes of Action of any SPSA Party to enforce the SPSA.

**Releases** means the releases as set forth herein in Section 13.3.

**Remaining Contract** has the meaning set forth in Section 9.1.

**Residual Assets** means all Assets of a Wind-Down Debtor from and after the Effective Date.

**Residual Assets Proceeds** means the net Cash proceeds of the Residual Assets and any income or proceeds therefrom, as determined in accordance with the Plan Administration Agreement.

**Sale(s)** means the Business Line Sales and the Iceberg Sale between 2009 and 2011.

**Sale Agreement(s)** means, individually, each of the agreements relating to the Sales and, collectively, all of them.

**Sale Order(s)** means, individually, each of the orders entered by the Bankruptcy Court relating to the Sales.

**Sale Proceeds** means the remaining proceeds generated by the Sales, such amounts as set forth in Annex A of the SPSA, plus interest accrued thereon, less (i) US$55 million of M&A Cost Reimbursement; and (ii) the Iceberg Amendment Fee.

**Sanction Order** means the order of the CCAA Court sanctioning the Canadian Plan and shall include, for the avoidance of doubt, any order of a Canadian Court affirming such order.

**Scheduled** means as listed on the Schedules.

**Schedules** means the Schedules of Assets and Liabilities Filed by the Debtors in accordance with section 521 of the Bankruptcy Code and Bankruptcy Rule 1007, as the same

may be amended from time to time prior to the Effective Date in accordance with Bankruptcy Rule 1009.

**Secured Claim** means any Claim (a) to the extent reflected in the Schedules or upon a proof of claim to which the Debtors have not objected as a "secured claim," which is secured by a Lien on Collateral to the extent of the value of such Collateral, as determined in accordance with section 506(a) of the Bankruptcy Code or (b) that is subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

**Security** means any instrument issued by, or interest in, any Debtor of the type described in section 101(49) of the Bankruptcy Code.

**Senior Notes** means, collectively, the NNC 2012 Convertible Notes, NNC 2014 Convertible Notes, NNCC Bonds, NNL 2011 Notes, NNL 2013 Notes and NNL 2016 Notes.

**Senior Notes Claims** means any Unsecured Claim that arises out of, or is attributable to, ownership of the Senior Notes, other than Debt Securities Fraud Claims.

**Senior Notes NNI Guarantee Claims** means any Unsecured Claim that arises out of, or is attributable to, the Senior Notes NNI Guarantee Obligations other than Debt Securities Fraud Claims.

**Senior Notes NNI Guarantee Obligations** means the guarantee, indemnity and other obligations of NNI under the Senior Notes Indentures and the Senior Notes.

**Senior Notes Indenture(s)** means, individually, as applicable, the NNC Notes Indenture, NNCC Bonds Indenture and NNL Notes Indenture, and, collectively, all of them.

**Side Letters** means side letters to which any of the Debtors and Canadian Debtors are party (as further specified on Annex C to the SPSA and which, for purposes of Section 7.17 herein and Annex C to the SPSA, include the IFSA and CFSA).

**Solicitation Procedures** means the Bankruptcy Court-approved procedures related to soliciting votes on the Plan from holders of Claims entitled to vote on the Plan.

**SPSA** means that certain Settlement and Plans Support Agreement executed on October 12, 2016, a copy of which is attached hereto as Exhibit A, by (i) the Canadian Debtors; (ii) the Monitor; (iii) the Debtors; (iv) the EMEA Debtors; (v) the EMEA Non-Filed Entities, (vi) the Joint Administrators; (vii) NNSA; (viii) the NNSA Conflicts Administrator; (ix) the French Liquidator; (x) the Bondholder Group; (xi) the members of the CCC; (xii) the Creditors' Committee; (xiii) the U.K. Pension Trustee; (xiv) the PPF; (xv) the Joint Liquidators and (xvi) the NNCC Bondholder Signatories.

**SPSA Party** means, individually, each of the signatories to the SPSA.

**SPSA Released Parties** means each SPSA Releasor and each of their respective employees, officers, directors, agents, advisors, lawyers, successors and assigns and their directors and officers, both former and current, in their respective capacities as such.

**SPSA Released Claims** has the meaning set forth in Section 13.4 hereof.

**SPSA Releasors** means the (i) SPSA Parties and (ii) Participating Creditors.

**SNMP** means, collectively, SNMP Research International Inc. and SNMP Research Inc.

**Sonoma** means Sonoma Systems, a California corporation.

**Sterling Conversion Election** means an EMEA Debtor's election to convert Sales Proceeds into Sterling in an amount up to the amount specified for that EMEA Debtor in Annex E to the SPSA.

**Strandherd Lands** means certain vacant lands of the Canadian Debtors in Ottawa, Ontario, sold in November 2009.

**Subordinated Claims** means Debt Securities Fraud Claims and any other Claims, except for Interests Securities Fraud Claims, that would be subject to subordination under section 510 of the Bankruptcy Code.

**Tax or Taxes** means all net income, gross income, capital, value added, goods and services, gross receipts, ad valorem, transfer, profits, business, environmental, gaming, franchise, excise, stamp, stamp duty reserve, customs, sales, use, employment, withholding, property, payroll and all other taxes, fees, duties, levies, assessments, deductions, withholdings or governmental charges, together with any interest, penalties, additions to tax, fines and similar amounts relating thereto, imposed or collected by or on behalf of any federal, state, local or foreign governmental authority on or from any of the Debtors.

**Tax Dispute** means the preparation and filing of tax returns by a Debtor and any challenges, inquiries, audits or other disputes by tax authorities in relation thereto.

**Trademarks** means all trademarks, service marks, trade dress, logos, trade names, corporate names and business names, whether or not registered, together with all goodwill associated therewith, and including all common law rights and all rights therein provided by multinational treaties or conventions.

**Transferee Joinder** means the form attached to the SPSA as Annex H.

**T&T Claim** means any and all claims made by Nortel Networks (CALA) Inc. in respect of customer receipts from Telecommunications Services of Trinidad and Tobago deposited into Nortel Networks International Corporation's bank account related to invoices issued to Telecommunications Services of Trinidad and Tobago by Nortel Networks (CALA) Inc.

**UKPI** means, collectively, the U.K. Pension Trustee and the PPF.

**U.K. Court** means the High Court of Justice of England and Wales in London, any court hearing appeals therefrom and any other court of competent jurisdiction overseeing the U.K. Proceedings (including appeals) from time to time.

**U.K. Pension Trustee** means Nortel Networks U.K. Pension Trust Limited as trustee of the Nortel Networks Pension Plan.

**U.K. Proceedings** means the administration proceedings of the EMEA Debtors and NNSA commenced on January 14, 2009 in the High Court of England and Wales, pursuant to the Insolvency Act 1986.

**U.S. Allocation** means the Allocation Proceeds to be distributed to the Debtors in accordance with the percentages as set forth in Section 2(c) of the SPSA.

**U.S. Canadian Claim** means NNI's $2.0 billion unsecured Proven Claim against the Canadian Debtors.

**U.S. Canadian Priority Claim** means NNI's allowed $62.7 million secured claim against the Canadian Debtors (defined as the "Remaining Revolver Claim" in the CFSA).

**U.S. Escrow Release Order** means an order issued by the Bankruptcy Court authorizing and directing the release of the Sale Proceeds from the Escrow Accounts in the manner contemplated hereby.

**U.S. Principal Officer** means John J. Ray III, who was appointed Principal Officer of each of the Debtors pursuant to an order entered by the Bankruptcy Court on January 6, 2010.

**U.S. Trustee** means the Office of the United States Trustee for the District of Delaware.

**U.S. Trustee Fees** means the fees payable to the U.S. Trustee pursuant to section 1930 of title 28 of the United States Code.

**Unimpaired** means any Claim or Interest that is not Impaired.

**Unsecured Claim** means any Claim against a Debtor, including, without limitation, (a) Claims arising from the rejection of executory contracts and unexpired leases, (b) Deficiency Claims, (c) Intercompany Claims, (d) Senior Notes Claims and (e) Senior Notes NNI Guarantee Claims, but excluding Administrative Expense Claims, Priority Tax Claims, Priority Non-Tax Claims and Secured Claims.

**Wind-Down Architel** means a Delaware corporation into which Architel shall transfer its Assets pursuant to the Plan.

28

**Wind-Down CoreTek** means a Delaware corporation into which CoreTek shall transfer its Assets pursuant to the Plan.

**Wind-Down Debtor(s)** means, individually, as applicable, Wind-Down NNI or any of the Wind-Down  Subsidiaries and, collectively, Wind-Down NNI and all of the Wind-Down Subsidiaries.

**Wind-Down NN Applications** means NN Applications on and after the Effective Date.

**Wind-Down NN Cable** means NN Cable on and after the Effective Date.

**Wind-Down NN HPOCS** means NN HPOCS on and after the Effective Date.

**Wind-Down NN Optical** means NN Optical on and after the Effective Date.

**Wind-Down NNCALA** means NNCALA on and after the Effective Date.

**Wind-Down NNCC** means NNCC on and after the Effective Date.

**Wind-Down NNI** means NNI on and after the Effective Date.

**Wind-Down NNII** means NNII on and after the Effective Date.

**Wind-Down Nortel Altsystems** means Nortel Altsystems on and after the Effective Date.

**Wind-Down Nortel Altsystems Int'l** means Nortel Altsystems Int'l on and after the Effective Date.

**Wind-Down NTI** means NTI on and after the Effective Date.

**Wind-Down Qtera** means Qtera on and after the Effective Date.

**Wind-Down Sonoma** means Sonoma on and after the Effective Date.

**Wind-Down Subsidiary** means, individually, as applicable, any of Wind-Down NNCALA, Wind-Down NNCC, Wind-Down Nortel Altsystems, Wind-Down Nortel Altsystems Int'l, Wind-Down Xros, Wind-Down Sonoma, Wind-Down Qtera, Wind-Down CoreTek, Wind-Down NN Applications, Wind-Down NN Optical, Wind-Down NN HPOCS, Wind-Down Architel, Wind-Down NNII, Wind-Down NTI and Wind-Down NN Cable, and, collectively, all of them.

**Wind-Down Xros** means Xros on and after the Effective Date.

**Xros** means Xros, Inc., a Delaware corporation.

**1.3    Rules of Interpretation.**

29

1.      In the event of an inconsistency: (a) the provisions of the Plan shall control over the contents of the Disclosure Statement; and (b) the provisions of the Confirmation Order shall control over the contents of the Plan.

2.      For the purposes of the Plan:

(a)      unless the context requires otherwise, any reference in the Plan to a contract, instrument, release or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; *provided, however*, that any change to such form, terms or conditions that is material to a party to such document shall not be modified without such party's consent unless such document or this Plan expressly provide otherwise;

(b)      unless the context requires otherwise, any reference in the Plan to an existing document, exhibit or schedule Filed or to be Filed means such document, exhibit or schedule, as it may have been or may be amended, modified or supplemented as of the Effective Date;

(c)      unless otherwise specified, all references in the Plan to "Sections," "Articles," "Exhibits" and "Schedules" are references to sections, articles, exhibits and schedules of or to the Plan;

(d)      the words "herein," "hereof," "hereto," "hereunder" and others of similar import refer to the Plan in its entirety rather than to only a particular portion of the Plan;

(e)      captions and headings are inserted for convenience of reference only and are not intended to be part or to affect interpretations of the Plan;

(f)      the words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation";

(g)      the definitions of terms herein shall apply equally to the singular and plural forms of the terms defined;

(h)      whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms;

(i)      the word "will" shall be construed to have the same meaning and effect as the word "shall"; and

(j)      unless the context requires otherwise, any reference herein to any Person shall be construed to include such Person's successors and assigns;

(k)      unless otherwise specified, the rules of construction set forth in section 102 of the Bankruptcy Code will apply to this Plan.

3.      Whenever a Distribution of property is required to be made on a particular date, the Distribution shall be made on such date or as soon as reasonably practicable thereafter.

4.      All Exhibits and Schedules to the Plan are incorporated into the Plan and shall be deemed to be included in the Plan, regardless of when they are Filed.

5.      Unless otherwise specified, all currency amounts are in U.S. Dollars.

**1.4      Exhibits to this Plan.**  All Exhibits, including those in the Plan Supplement, are incorporated into and are a part of this Plan as if set forth in full herein. Holders of Claims and Interests may obtain a copy of the Exhibits, including those in the Plan Supplement, upon written request to the Debtors.  The Exhibits, including those in the Plan Supplement, may be inspected in the office of the clerk of the Bankruptcy Court or its designee during normal business hours, obtained by written request to counsel to the Debtors or obtained on the website of the Claims Agent at http://dm.epiq11.com/nortel.

**1.5      Computation of Time.**  In computing any period of time prescribed or allowed by the Plan, unless otherwise expressly provided, the provisions of Bankruptcy Rule 9006(a) shall apply.

## ARTICLE 2.
## TREATMENT OF UNCLASSIFIED CLAIMS

**2.1      Administrative Expense Claims.**  Subject to the allowance procedures and deadlines provided herein, on the later to occur of (a) the Effective Date, (b) the date on which an Administrative Expense Claim shall become an Allowed Claim and (c) to the extent an Allowed Administrative Expense Claim relates to a liability arising under another agreement incurred by the Debtors in the ordinary course, the date such liability is owed in accordance with the terms and conditions of any agreement or course of dealing relating thereto and consistent with past practice, the holder of an Allowed Administrative Expense Claim shall receive on account of its Allowed Administrative Expense Claim, and in full satisfaction, settlement and release of and in exchange for such Allowed Administrative Expense Claim, (a) Cash equal to the unpaid portion of such Allowed Administrative Expense Claim, or (b) such other treatment as to which the applicable Debtor and the holder of such Allowed Administrative Expense Claim have agreed upon in writing, which, prior to the Effective Date, shall be subject to the consent of the Creditors' Committee and Bondholder Group, acting reasonably; *provided*, *however*, that Professional Claims shall be paid in accordance with Section 2.3.

A notice setting forth the Effective Date of the Plan and the Administrative Expense Claims Bar Date shall be (i) Filed on the Bankruptcy Court's docket and (ii) posted on the Debtors' case information website at http://dm.epiq11.com/nortel.  Further notice of the Administrative Expense Claims Bar Date shall be provided as may be directed by the Bankruptcy Court.  All requests for payment of an Administrative Expense Claim that accrued on or before the Effective Date other than Administrative Expense Claims that have been paid or that relate to payment of Professionals must be Filed with the Claims Agent and served on

counsel for the Debtors by the Administrative Expense Claims Bar Date. Absent further order of the Bankruptcy Court, any requests for payment of Administrative Expense Claims that are not properly Filed and served by the Administrative Expense Claims Bar Date shall not appear on the register of Claims maintained by the Claims Agent and shall be disallowed automatically without the need for any objection from the Debtors or any action by the Bankruptcy Court.

The Debtors and the Plan Administrator may settle Administrative Expense Claims in the ordinary course without further notice or Bankruptcy Court approval, in accordance with the Plan Administration Agreement, as applicable. The Debtors shall have the right to object to any Administrative Expense Claim within 180 days after the Administrative Expense Claims Bar Date, subject to further extensions that may be granted by the Bankruptcy Court. Unless the Debtors or the Wind-Down Debtors object to a timely Filed and properly served Administrative Expense Claim, such Administrative Expense Claim shall be deemed Allowed in the amount requested. In the event that the Debtors or the Wind-Down Debtors object to an Administrative Expense Claim, the parties may confer to try to reach a settlement and, failing that, the Bankruptcy Court shall determine whether such Administrative Expense Claim should be allowed and, if so, in what amount.

**2.2    Statutory Fees.** On or before the Effective Date, all fees due and payable pursuant to section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid in full, in Cash.

**2.3    Professional Claims.** Other than a Professional retained by the Debtors pursuant to the Ordinary Course Professional Order, any entity seeking an award of the Bankruptcy Court of compensation for services rendered and/or reimbursement of expenses incurred through the Effective Date under sections 105(a), 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code shall File its final application for allowance of such compensation and/or reimbursement by no later than the first Business Day that is sixty (60) days after the Effective Date or such other date as may be fixed by the Bankruptcy Court and be paid by or on behalf of the Debtor (a) in full and in Cash in the amounts Allowed upon the date the order granting such award becomes a Final Order, or as soon thereafter as practicable or (b) upon such other terms as may be mutually agreed upon by the claimant and the Debtor obligated for the payment of such Allowed Claim.

Except as otherwise specifically provided in this Plan, on and after the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code or the Interim Compensation Order in seeking retention or compensation for services rendered after such date shall terminate, and, subject to the terms of the Plan Administration Agreement, the Plan Administrator may employ and pay any Professional for services rendered or expenses incurred after the Effective Date in the ordinary course to facilitate the wind down of the Wind-Down Debtors and effectuate the Plan without any further notice to any party or action, order or approval of the Bankruptcy Court.

**2.4    Priority Tax Claims.** With respect to each Allowed Priority Tax Claim, at the option of each Debtor, the holder of an Allowed Priority Tax Claim shall be entitled to receive, in full satisfaction, settlement and release of and in exchange for such Allowed Priority Tax Claim, (a) Cash in an amount equal to such Allowed Priority Tax Claim on the later of the

Effective Date and the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, or as soon thereafter as practicable, (b) treatment in accordance with section 1129(a)(9)(C) of the Bankruptcy Code or (c) such other treatment as to which the applicable Debtor and the holder of such Allowed Priority Tax Claim have agreed upon in writing, which other treatment, prior to the Effective Date, shall be subject to the consent of the Creditors' Committee and Bondholder Group, acting reasonably.  On the Effective Date, the Liens (if any) securing any Priority Tax Claims shall be deemed released, terminated and extinguished, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person.

## ARTICLE 3.
## CLASSIFICATION OF CLAIMS AND INTERESTS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, Priority Tax Claims, Priority Non-Tax Claims and Professional Fee Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in this Article.

### 3.1      Summary of Classifications.

All Claims and Interests, other than Administrative Expense Claims, Priority Tax Claims and Professional Fee Claims, are classified in the Classes set forth in this Article for all purposes, including voting, Confirmation, and Distributions under this Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.  A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest fits within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest fits within the description of such other Classes.  A Claim is also classified in a particular Class for the purpose of receiving Distributions under this Plan only to the extent that such Claim is an Allowed Claim in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.  Subject to Section 15.7 hereof, the Debtors reserve the right to withdraw this Plan with respect to one or more Debtors while seeking Confirmation or approval of this Plan with respect to all other Debtors.

Except as set forth herein, the Plan constitutes a separate Plan for each of the Debtors, and the classification of Claims and Interests set forth herein shall apply separately to each of the Debtors.

### 3.2      Substantive Consolidation of NNI and NNCC.

Pursuant to Section 6.2 hereof, this Plan provides for the substantive consolidation of NNI and NNCC for all purposes associated with Confirmation (including voting) and Consummation. As a result of the substantive consolidation of NNI and NNCC, Claims against and Interests in NNI and NNCC shall be combined in the same Classes.

### 3.3    The Debtors.

There are a total of fifteen Plans, including one Plan for NNI and NNCC.  Each Debtor has been assigned a letter below for the purposes of classifying and treating Claims against and Interests in each Debtor.  The Claims against and Interests in each Debtor, in turn, have been assigned to separately numbered Classes with respect to each Debtor based on the type of Claim or Interest involved.  Accordingly, the classification of any particular Claim or Interest in any of the Debtors depends on the particular Debtor against which such Claim is asserted or in which such Interest is held and the type of Claim or Interest in question.  The letters applicable to the various Debtors are as follows:

| Letter | Debtor Name | Case Number |
|:------:|:-----------:|:-----------:|
| A | The Consolidated Debtors (NNI/NNCC) | 09-10138/09-10139 |
| B | NNCALA | 09-12515 |
| C | Nortel Altsystems | 09-10140 |
| D | Nortel Altsystems Int'l | 09-14141 |
| E | Xros | 09-10142 |
| F | Sonoma | 09-10143 |
| G | Qtera | 09-10144 |
| H | CoreTek | 09-10145 |
| I | NN Applications | 09-10146 |
| J | NN Optical | 09-10147 |
| K | NN HPOCS | 09-10148 |
| L | Architel | 09-10149 |
| M | NNII | 09-10150 |
| N | NTI | 09-10151 |
| O | NN Cable | 09-10152 |

### 3.4    Classification of Claims and Interests.

Claims against and Interests in the Debtors are divided into the following numbered Classes for each Debtor "A" through "O":

| Class | Designation |
|---|---|
| 1 | Priority Non-Tax Claims |
| 2 | Secured Claims |
| 3A | General Unsecured Claims |
| 3B | Crossover Bonds Claims and EDC Claims |
| 3C | Convenience Claims |
| 4 | Subordinated Claims |
| 5A | Interests |
| 5B | Interests Securities Fraud Claims |

### 3.5    Treatment of Classes of Claims Against and Interests in the Consolidated Debtors (NNI/NNCC).

The following chart designates the Classes of Claims against and Interests in Debtor "A" – the Consolidated Debtors (NNI/NNCC) – and specifies which of those Classes are (a) Impaired or Unimpaired by the Plan, (b) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code and (c) deemed to accept or reject the Plan.

| Class | Designation | Status | Entitlement to Vote |
|---|---|---|---|
| A1 | Priority Non-Tax Claims | Unimpaired | No (deemed to accept) |
| A2 | Secured Claims | Unimpaired | No (deemed to accept) |
| A-3A | General Unsecured Claims | Impaired | Yes |
| A-3B | Crossover Bonds Claims and EDC Claims | Impaired | Yes |
| A-3C | Convenience Claims | Impaired | Yes |
| A4 | Subordinated Claims | Impaired | No (deemed to reject) |
| A-5A | Interests | Impaired | No (deemed to reject) |
| A-5B | Interests Securities Fraud Claims | Impaired | No (deemed to reject) |

### 3.6    Treatment of Classes of Claims Against and Interests in NNCALA.

The following chart designates the Classes of Claims against and Interests in Debtor "B" – NNCALA – and specifies which of those Classes are (a) Impaired or Unimpaired by the Plan, (b) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code and (c) deemed to accept or reject the Plan.

| Class | Designation | Status | Entitlement to Vote |
|---|---|---|---|
| B1 | Priority Non-Tax Claims | Unimpaired | No (deemed to accept) |
| B2 | Secured Claims | Unimpaired | No (deemed to accept) |
| B-3A | General Unsecured Claims | Impaired | Yes |
| B-3C | Convenience Claims | Impaired | Yes |
| B4 | Subordinated Claims | Impaired | No (deemed to reject) |
| B-5A | Interests | Impaired | No (deemed to reject) |
| B-5B | Interests Securities Fraud Claims | Impaired | No (deemed to reject) |

### 3.7    Treatment of Classes of Claims Against and Interests in Nortel Altsystems.

The following chart designates the Classes of Claims against and Interests in Debtor "C" – Nortel Altsystems – and specifies which of those Classes are (a) Impaired or Unimpaired by the Plan, (b) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code and (c) deemed to accept or reject the Plan.

| Class | Designation | Status | Entitlement to Vote |
|---|---|---|---|
| C1 | Priority Non-Tax Claims | Unimpaired | No (deemed to accept) |
| C2 | Secured Claims | Unimpaired | No (deemed to accept) |
| C-3A | General Unsecured Claims | Impaired | Yes |
| C-3C | Convenience Claims | Impaired | Yes |
| C4 | Subordinated Claims | Impaired | No (deemed to reject) |
| C-5A | Interests | Impaired | No (deemed to reject) |

| | | | |
|---|---|---|---|
| C-5B | Interests Securities Fraud Claims | Impaired | No (deemed to reject) |

**3.8    Treatment of Classes of Claims Against and Interests in All Other Debtors.**

The following chart designates the Classes of Claims against and Interests in Debtors "D" through "O" (which includes all Debtors other than the Consolidated Debtors) and specifies which of those Classes are (a) Impaired or Unimpaired by the Plan, (b) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code and (c) deemed to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code.

| Class | Designation | Status | Entitlement to Vote |
|---|---|---|---|
| D1-O1 | Priority Non-Tax Claims | Unimpaired | No (deemed to accept) |
| D2 – O2 | Secured Claims | Unimpaired | No (deemed to accept) |
| D-3A – O-3A | General Unsecured Claims | Impaired | Yes |
| D4 – O4 | Subordinated Claims | Impaired | No (deemed to reject) |
| D-5A – O-5A | Interests | Impaired | No (deemed to reject) |
| D-5B – O-5B | Interests Securities Fraud Claims | Impaired | No (deemed to reject) |

# ARTICLE 4.
# TREATMENT OF CLAIMS AGAINST AND INTERESTS IN DEBTORS

Except to the extent that a holder of an Allowed Claim against or Interest in any of the Debtors, as applicable, agrees to a less favorable treatment, such holder shall receive under the Plan the treatment described below in full and final satisfaction, settlement, release and discharge of and in exchange for such holder's Allowed Claim or Interest.  Unless otherwise indicated, the holder of an Allowed Claim or Interest, as applicable, shall receive such treatment on the Effective Date, or as soon as reasonably practicable thereafter.

**4.1    Class 1 – Priority Non-Tax Claims.**

(a)    <u>Classification</u>.  Classes A1 through O1 consist of all Priority Non-Tax Claims against the applicable Debtor.

(b)     <u>Impairment and Voting</u>.  Classes A1 through O1 are Unimpaired by the Plan.  The holders of Allowed Priority Non-Tax Claims in these Classes are not entitled to vote to accept or reject the Plan and are deemed to accept the Plan.

(c)     <u>Distributions</u>.  Except to the extent that the holder of an Allowed Priority Non-Tax Claim in Classes A1 through O1 agrees to less favorable treatment or has been paid by or on behalf of the applicable Debtor on account of such Allowed Priority Non-Tax Claim prior to the Effective Date, on the later of the Effective Date and the date on which such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, or as soon thereafter as is practicable, each holder of an Allowed Priority Non-Tax Claim in Classes A1 through O1 shall be paid by the applicable Debtor in Cash in the amount equal to the Allowed amount of such Priority Non-Tax Claim.

### 4.2     Class 2 – Secured Claims.

(a)     <u>Classification</u>.  Classes A2 through O2 consist of all Secured Claims against the applicable Debtor.

(b)     <u>Impairment and Voting</u>.  Classes A2 through O2 are Unimpaired by the Plan.  The holders of Allowed Secured Claims in these Classes are not entitled to vote to accept or reject the Plan and are deemed to accept the Plan.

(c)     <u>Distributions</u>.  Except to the extent that the holder of an Allowed Secured Claim agrees to less favorable treatment, each holder of an Allowed Secured Claim in Classes A2 through O2 shall be satisfied by, at the option of the applicable Debtor: (i) payment in Cash by the applicable Debtor in the amount equal to the Allowed amount of such Secured Claim on the later of the Effective Date and the date on which such Secured Claim becomes an Allowed Secured Claim; (ii) the Distribution of the sale or other disposition proceeds of the Collateral securing such Allowed Secured Claim; (iii) surrender of the Collateral securing such Allowed Secured Claim to the holder of such Allowed Secured Claim; or (iv) such treatment that leaves unaltered the legal, equitable and contractual rights to which the holder of the Allowed Secured Claim is entitled. In the event an Allowed Secured Claim is treated under clause (i) through (iii) above, the Liens securing such Claim shall be deemed released and extinguished without further order of the Bankruptcy Court.

### 4.3     Class 3A – General Unsecured Claims.

(a)     <u>Classification</u>. Classes A-3A through O-3A consist of all General Unsecured Claims against the applicable Debtor, including the NNCC Bonds Claims.

(b)     <u>Impairment and Voting</u>.  Classes A-3A through O-3A are Impaired by the Plan.  Each holder of an Allowed General Unsecured Claim in one of these Classes is entitled to vote to accept or reject the Plan.

(c)     <u>Distributions</u>.  Each holder of an Allowed General Unsecured Claim in Classes A-3A through O-3A shall, on the Initial Distribution Date or the first Interim Distribution Date after the date such Claim becomes Allowed, receive its Pro Rata Share of the

Creditor Proceeds as of the applicable Distribution Date from the applicable Debtor, subject, in the case of holders of Allowed General Unsecured Claims that are Crossover Claims, to Sections 7.9, 7.10 and 7.11 of the Plan, and subject, in the case of holders of Class A-3A NTCC Settlement Claims, to the NTCC Debtor Settlement Redirection.  In accordance with Section 10.3 herein, the Disbursing Agent shall make periodic Interim Distributions of the remaining available Creditor Proceeds to holders of Allowed General Unsecured Claims in Classes A-3A through O-3A until the Final Distribution Date.  For the avoidance of doubt, Distributions on account of Allowed NNCC Bonds Claims shall be made to the NNCC Bonds Indenture Trustee in accordance with Section 10.6(a) of this Plan.

### 4.4   Class A-3B – Crossover Bonds Claims and EDC Claims.

(a)   <u>Classification</u>.  Class A-3B consists of all Crossover Bonds Claims and EDC Claims against the Consolidated Debtors.

(b)   <u>Impairment and Voting</u>.  Class A-3B is Impaired by the Plan. Each holder of a Crossover Bonds Claim or EDC Claim in this Class is entitled to vote to accept or reject the Plan.

(c)   <u>Distributions</u>.  Each holder of a Crossover Bonds Claim or EDC Claim in Class A-3B shall, on the Initial Distribution Date or the first Interim Distribution Date after the date such Claim becomes Allowed, receive its Pro Rata Share of the Creditor Proceeds from the Consolidated Debtors, such distributions to be made in accordance with Sections 7.9, 7.10 and 7.11 of the Plan, subject, in the case of holders of Allowed Claims that are Crossover Bonds Claims, to the Bondholder Contribution.  In accordance with Section 10.3 herein, the Disbursing Agent shall make periodic Interim Distributions of the remaining available Creditor Proceeds to holders of Allowed Crossover Bonds Claims and EDC Claims in Class A-3B until the Final Distribution Date.  For the avoidance of doubt, Distributions on account of Allowed Crossover Bonds Claims shall be made to the NNC/NNL Notes Indenture Trustee in accordance with Section 10.6(b) of the Plan.

### 4.5   Class A-3C – Convenience Claims against the Consolidated Debtors (NNI/NNCC).

(a)   <u>Classification</u>.  Class A-3C consists of all Convenience Claims against the Consolidated Debtors (NNI/NNCC).

(b)   <u>Impairment and Voting</u>.  Class A-3C is Impaired by the Plan. Each holder of a Convenience Claim in this Class is entitled to vote to accept or reject the Plan.

(c)   <u>Distributions</u>.  Each holder of a Convenience Claim in Class A-3C shall, on the date of the initial Distribution or on the first Distribution Date after the date such

Convenience Claim becomes Allowed, receive Cash in an amount equal to 55% of the amount of the Allowed Convenience Claim in full and final satisfaction of such Allowed Convenience Claim.

**4.6     Class B-3C – Convenience Claims against NNCALA.**

(a)     <u>Classification</u>. Class B-3C consists of all Convenience Claims against NNCALA.

(b)     <u>Impairment and Voting</u>.  Class B-3C is Impaired by the Plan. Each holder of a Convenience Claim in this Class is entitled to vote to accept or reject the Plan.

(c)     <u>Distributions</u>.  Each holder of a Convenience Claim in Class B-3C shall, on the date of the initial Distribution or within the first Distribution Date after the date such Convenience Claim becomes Allowed, receive Cash in an amount equal to 12% of the amount of the Allowed Convenience Claim in full and final satisfaction of such Allowed Convenience Claim.

**4.7     Class C-3C – Convenience Claims against Nortel Altsystems.**

(a)     <u>Classification</u>. Class C-3C consists of all Convenience Claims against Nortel Altsystems.

(b)     <u>Impairment and Voting</u>.  Class C-3C is Impaired by the Plan. Each holder of a Convenience Claim in this Class is entitled to vote to accept or reject the Plan.

(c)     <u>Distributions</u>.  Each holder of a Convenience Claim in Class C-3C shall, on the date of the initial Distribution or on the first Distribution Date after the date such Convenience Claim becomes Allowed, receive Cash in an amount equal to 7% of the amount of the Allowed Convenience Claim in full and final satisfaction of such Allowed Convenience Claim.

**4.8     Class 4 – Subordinated Claims.**

(a)     <u>Classification</u>.  Classes A4 through O4 consist of all Subordinated Claims against the applicable Debtor.

(b)     <u>Impairment and Voting</u>.  Classes A4 through O4 are Impaired by the Plan.  The holders of Allowed Subordinated Claims in these classes are not entitled to vote to accept or reject the Plan and are deemed to have rejected the Plan.

(c)     Distributions.  Each holder of an Allowed Subordinated Claim in Classes A4 through O4 shall not receive or retain any interest or property under the Plan on account of such Claims; *provided*, *however*, that in the event that all Allowed Claims in Classes A1 through O3 have been satisfied in full, in accordance with the Bankruptcy Code and the Plan, each holder of an Allowed Subordinated Claim in Classes A4 through O4 shall receive its Pro Rata Share of any Creditor Proceeds that remain after Classes A1 through O3 have been satisfied in full from the applicable Debtor.

### 4.9     Class 5A – Interests.

(a)     Classification.  Classes A5A through O5A consist of all Interests in a Debtor that were in existence immediately prior to or on the Petition Date for such Debtor.

(b)     Impairment and Voting.  Classes A5A through O5A are Impaired by the Plan.  The holders of Interests in these Classes are not entitled to vote to accept or reject the Plan and are deemed to have rejected the Plan.

(c)     Distributions.  The holders of Interests in NNI are not expected to receive any Distributions under the Plan.  On the Effective Date, all Interests in NNI will be cancelled and one new share of NNI's common stock will be issued to the Plan Administrator which will hold such share for the benefit of the holders of the former Interests in NNI.  The holders of Interests in NNI will neither receive nor retain any property or any interest in property on account of such Interests; *provided*, *however*, that in the event that all Allowed Claims in NNI Classes A1, A2, A3 and A4 have been satisfied in full in accordance with the Bankruptcy Code and the Plan, each holder of an Interest in NNI will receive its Pro Rata Share of any remaining Creditor Proceeds from NNI consistent with such holder's rights of priority of payment existing immediately prior to the Petition Date.  Unless otherwise determined by the Plan Administrator, all outstanding Interests in NNI will be deemed cancelled and of no force and effect as of the closing of NNI's Chapter 11 Case, in accordance with the Plan, *provided* that such cancellation does not adversely affect the Debtors' Estates.

The holders of Interests in Nortel Altsystems, Xros, Sonoma, CoreTek, NN Applications, NN Optical, and Architel are not expected to receive any Distributions under the Plan. On the Effective Date, all Interests in Nortel Altsystems, Xros, Sonoma, CoreTek, NN Applications, NN Optical, and Architel will be cancelled and one new share of the common stock of Nortel Altsystems, Xros, Sonoma, CoreTek, NN Applications, NN Optical, and Architel will be issued to the Plan Administrator which will hold such share for the benefit of the holders of the former Interests in each of Nortel Altsystems, Xros, Sonoma, CoreTek, NN Applications, NN Optical, and Architel, respectively. The holders of Interests in Nortel Altsystems, Xros, Sonoma, CoreTek, NN Applications, NN Optical, and Architel will neither receive nor retain any property or any interest in property on account of such Interests; *provided*, *however*, that in the event that all Allowed Claims in Classes 1, 2, 3 and 4 of Nortel Altsystems, Xros, Sonoma, CoreTek, NN Applications, NN Optical, and Architel, respectively, have been satisfied in full in accordance with the Bankruptcy Code and the Plan, each holder of an Interest in Nortel Altsystems, Xros, Sonoma, CoreTek, NN Applications, NN Optical, and Architel will receive its Pro Rata Share of any remaining Creditor Proceeds from Nortel

41

Altsystems, Xros, Sonoma, CoreTek, NN Applications, NN Optical, and Architel, respectively, consistent with such holder's rights of priority of payment existing immediately prior to the Petition Date.  Unless otherwise determined by the Plan Administrator, all outstanding Interests in Nortel Altsystems, Xros, Sonoma, CoreTek, NN Applications, NN Optical, and Architel will be deemed cancelled and of no force and effect as of the closing the Chapter 11 Cases of Nortel Altsystems, Xros, Sonoma, CoreTek, NN Applications, NN Optical, and Architel, respectively, in accordance with the Plan, *provided* that such cancellation does not adversely affect the Debtors' Estates.

All Interests in each of NNCALA, NNCC, Nortel Altsystems Int'l, Qtera, NN HPOCS, NNII, NTI and NN Cable will continue to be held by its corporate parent until the closing of its Chapter 11 Case, solely for Plan administrative purposes.  No holder of Interests shall receive Distributions on account of its Interests until such time that all Allowed Claims in Classes 1 through 4 of any Debtor have been satisfied in full in accordance with the Bankruptcy Code and the Plan.  At such time, each holder of an Interest in Class 5A of the applicable Debtor will receive its Pro Rata Share of any remaining Creditor Proceeds from the applicable Debtor.

**4.10    Class 5B – Interests Securities Fraud Claims.**

(a)    <u>Classification</u>.  Classes A5B through O5B consist of all the Interests Securities Fraud Claims against the applicable Debtor.

(b)    <u>Impairment and Voting</u>.  Classes A5B through O5B are Impaired by the Plan.  The holders of Allowed Interests Securities Fraud Claims in these Classes are not entitled to vote to accept or reject the Plan and are deemed to have rejected the Plan.

(c)    <u>Distributions</u>.  The holders of Allowed Interests Securities Fraud Claims in Classes A5B through O5B shall receive no Distribution under the Plan in respect of their Allowed Interests Securities Fraud Claims.

**ARTICLE 5.**
**ACCEPTANCE OR REJECTION OF THE PLAN**

**5.1    Impaired Classes of Claims and Interests Entitled to Vote.**

Holders of Claims in Classes A-3A, A-3B, A-3C, B-3C, C-3C and B-3A through O-3A are entitled to vote to accept or reject this Plan as provided above or as otherwise set forth in such order as may be entered by the Bankruptcy Court establishing certain procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan, or any other order(s) of the Bankruptcy Court.  The votes of Holders of Claims who are entitled to vote and yet abstain from voting, return a ballot with no boxes checked, or return a ballot voting both to accept and reject the Plan, will not be counted for purposes of accepting or rejecting the Plan.

**5.2    Acceptance by an Impaired Class.**

42

In accordance with section 1126(c) of the Bankruptcy Code and except as provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims shall have accepted this Plan if this Plan is accepted by the Holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims in such Class that have timely and properly voted to accept or reject this Plan.

### 5.3    Presumed Acceptances by Unimpaired Classes.

Classes A1, A2, B1 through O1 and B2 through O2 are Unimpaired by this Plan.  Accordingly, under section 1126(f) of the Bankruptcy Code, Holders of such Claims are conclusively presumed to accept this Plan, and the votes of the Holders of such Claims will not be solicited.

### 5.4    Elimination of Vacant Classes; Deemed Acceptance by Non-Voting Classes.

(a)    Any Class of Claims or Interests that, as of the commencement of the Confirmation Hearing, does not have at least one holder of a Claim or Interest that is Allowed in an amount greater than zero (including temporarily Allowed under Bankruptcy Rule 3018) shall be considered vacant and deemed eliminated from this Plan for purposes of voting to accept or reject this Plan and for purposes of determining whether this Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to that Class.

(b)    If no votes to accept or reject this Plan are received with respect to a Class that is solicited in accordance with the Solicitation Procedures (other than a Class that is deemed eliminated pursuant to the foregoing Section 5.4(a)), such Class shall be deemed to have voted to accept this Plan, unless the Bankruptcy Court, for cause, orders otherwise.

### 5.5    Conversion or Dismissal of Certain of the Chapter 11 Cases.

If the requisite Classes do not vote to accept this Plan with respect to any particular Debtor or the Bankruptcy Court does not confirm this Plan with respect to any particular Debtor, the Debtors reserve the right, subject to Section 15.7 hereof, to have any Debtor's Chapter 11 Case dismissed or converted, or to liquidate or dissolve such Debtor under applicable non-bankruptcy procedure or chapter 7 of the Bankruptcy Code.

### 5.6    Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code.

The Debtors intend to request that the Bankruptcy Court confirm this Plan in accordance with section 1129(b) of the Bankruptcy Code with respect to any Impaired Class of Claims that rejects or is deemed to reject the Plan, where this Plan shall constitute a motion for such relief.

## ARTICLE 6.
## IMPLEMENTATION OF THE PLAN

### 6.1    General Settlement of Claims and Interests.

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under this Plan, and, as applicable, the SPSA, on the Effective Date, the provisions of this Plan shall constitute a good faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to this Plan and the SPSA.

### 6.2    Substantive Consolidation of NNI and NNCC.

The Plan shall serve as a motion by NNI and NNCC seeking entry of an order pursuant to sections 105(a), 363(b), and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 substantively consolidating the NNI and NNCC Estates into a single consolidated Estate for all purposes associated with Confirmation and Consummation.  The tabulation of votes to accept or reject this Plan with respect to NNI and NNCC shall be counted on a consolidated basis.

Entry of the Confirmation Order shall constitute the approval, pursuant to sections 105(a), 541, 1123 and 1129 of the Bankruptcy Code, effective as of the Effective Date, of the Consolidation of the Consolidated Debtors (NNI and NNCC) for all purposes. On and after the Effective Date, (i) all assets and liabilities of the Consolidated Debtors shall be pooled and shall be vested in Wind-Down NNI; (ii) all of the Intercompany Claims between the Consolidated Debtors shall be disallowed and expunged and no Distributions shall be made on account of such Intercompany Claims; (iii) all guarantees of either of the Consolidated Debtors of the obligations of the other Consolidated Debtor shall be eliminated so that any Claim against either Consolidated Debtor and any guarantee thereof executed by the other Consolidated Debtor, and any joint or several liability of either of the Consolidated Debtors, shall be one obligation of NNI following the Consolidation of the Consolidated Debtors; (iv) for purposes of determining the availability of the right of set off under section 553 of the Bankruptcy Code, the Consolidated Debtors shall be treated as one Entity so that, subject to the other provisions of section 553 of the Bankruptcy Code, debts due to either of the Consolidated Debtors may be set off against the debts of the other Consolidated Debtor, and (v) each and every Claim Filed or to be Filed in the case of either of the Consolidated Debtors shall be deemed Filed against NNI.

The Consolidation of the Consolidated Debtors (other than as expressly set forth in this Plan) shall not affect: (i) the legal and corporate structures of either of the Consolidated Debtors; (ii) pre- and post-Effective Date guarantees, liens and security interests that are required to be maintained, if any; (iii) distributions from any insurance policies or proceeds of such policies; and (iv) vesting of the Estate Assets in the Wind-Down Debtor.

Notwithstanding the Consolidation provided for herein, U.S. Trustee Fees payable pursuant to section 1930 of title 28 of the United States Code shall continue to accrue

for each and every Debtor until a particular Debtor's case is closed, dismissed or converted to a case under Chapter 7 of the Bankruptcy Code.

### 6.3    Plan Administrator.

(a)    <u>Appointment</u>.  Greylock Partners, LLC, shall serve as Plan Administrator for each of the Debtors and the Wind-Down Debtors pursuant to and in accordance with the provisions of the Plan, the SPSA and the Plan Administration Agreement.

(b)    <u>Authority</u>.  The Plan Administrator shall have the authority and right on behalf of each of the Debtors and the Wind-Down Debtors, without the need for Bankruptcy Court approval (unless otherwise indicated), to carry out and implement all provisions of the Plan, the SPSA and the Plan Administration Agreement in accordance with the provisions therein.  These rights shall include, without limitation, the authority to: (i) except to the extent Claims have been previously allowed, control and effectuate the Claims reconciliation process, including to object to, seek to subordinate, compromise or settle any and all Claims against the Debtors; (ii) make Distributions to holders of Allowed Claims in accordance with the Plan (other than to the holders of the NNCC Bonds Claims and the Crossover Bonds Claims, for whom the Notes Indenture Trustee or the NNCC Bonds Indenture Trustee, as applicable, shall be the Disbursing Agent); (iii) exercise its reasonable business judgment to direct and control the wind-down, liquidation, sale and/or abandonment of the remaining assets of the Debtors under the Plan and in accordance with applicable law as reasonably necessary to maximize Distributions to holders of Allowed Claims; (iv) prosecute all Causes of Action on behalf of the Debtors, elect not to pursue any Causes of Action, and determine whether and when to compromise, settle, abandon, dismiss, or otherwise dispose of any such Causes of Action, as the Plan Administrator may determine is in the best interests of the Debtors; (v) make payments to existing professionals who will continue to perform in their current capacities; (vi) retain professionals to assist in performing its duties under the Plan; (vii) maintain the books and records and accounts of the Debtors and the Wind-Down Debtors, as applicable; (viii) invest Cash of the Debtors, including any Cash proceeds realized from the liquidation of any assets of the Debtors, including any Causes of Action, and any income earned thereon; (ix) incur and pay reasonable and necessary expenses in connection with the performance of duties under the Plan, including the reasonable fees and expenses of professionals retained by the Plan Administrator; (x) administer each Debtor's tax obligations, including filing tax returns and paying tax obligations, requesting, if necessary, an expedited determination of any unpaid tax liability of each Debtor or its estate under section 505(b) of the Bankruptcy Code for all taxable periods of such Debtor ending after the Petition Date through the liquidation of such Debtor as determined under applicable tax laws, and representing the interest and account of each Debtor or its estate before any taxing authority in all matters, including, without limitation, any action, suit, proceeding or audit; (xi) prepare and file any and all informational returns, reports, statements, returns or disclosures relating to the Debtors that are required hereunder, by any Governmental Unit or applicable law; (xii) pay statutory fees in accordance with Section 15.20 of the Plan; and (xiv) perform other duties and functions that are reasonable, necessary, or appropriate for the implementation of the Plan.

(c)    <u>Compensation of the Plan Administrator</u>.  In addition to reimbursement for actual out-of-pocket expenses incurred by the Plan Administrator, the Plan

Administrator shall be entitled to receive reasonable compensation for services rendered on behalf of the Debtors and the Wind-Down Debtors in an amount and on such terms as may be reflected in the Plan Administration Agreement.

        (d)    <u>No Liability of Plan Administrator</u>.  The Plan Administrator shall have no liability whatsoever for any acts or omissions to the Debtors, the Wind-Down Debtors or holders of claims against or interests in the Debtors or the Wind-Down Debtors other than for willful misconduct, fraud or breach of fiduciary duty by the Plan Administrator as determined by a Final Order *provided, that*, the Plan Administrator shall have no liability for such acts or omissions if approved by the Bankruptcy Court.  Each of the Debtors and the Wind-Down Debtors shall indemnify and hold harmless the Plan Administrator for any losses, liabilities and costs incurred in such capacity to the fullest extent allowed by applicable law.

        (e)    <u>Termination, Resignation and Removal of Plan Administrator</u>. The duties, responsibilities and powers of the Plan Administrator shall terminate pursuant to the terms of the Plan Administration Agreement. The resignation and removal of the Plan Administrator shall occur pursuant to the terms of the Plan Administration Agreement.

        (f)    <u>Establishment of Reserves</u>.  On the Effective Date, the Debtors shall account for the Disputed Claims in such amounts, as agreed by the Debtors and the Plan Administrator, in accordance with the terms of the Plan Administration Agreement, as may be necessary to make sufficient future payments with respect to Disputed Claims as provided by the Plan.

        (g)    <u>Periodic Reporting of the Plan Administrator</u>.  After the Effective Date, the Plan Administrator shall periodically consult with FTI Consulting, as financial advisor to the Bondholder Group, a financial advisor or similar representative designated by the Nortel Trade Claims Consortium and, to the extent the Creditors' Committee is in existence during the first ninety (90) days after the Effective Date, its counsel, regarding the status of the resolution of any remaining Disputed Claims and Distributions expected to be made pursuant to this Plan.

        **6.4**    **Intercompany Account Settlement.**  The Debtors and the Wind-Down Debtors will be entitled to transfer funds between and among themselves and their respective subsidiaries in all cases consistent with the terms of the Cash Management Order.  Any changes in intercompany account balances resulting from such transfers will be accounted for and settled in accordance with the ordinary course intercompany account settlement practices and will not violate the terms of this Plan.  For the avoidance of doubt, the NNCALA Administrative Expense Contribution, as defined in Section 6.7, is hereby authorized and shall not violate the terms of this Plan.

        **6.5**    **Settlement of Intercompany Claims and Other Matters.**  Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the settlement that has been reached among the SPSA Parties with regard to (a) the Allocation Proceeds and (b) the Intercompany Claims (including, for the avoidance of doubt, the Allowed Book Intercompany Claims) in each case subject to the terms and conditions of the SPSA and the Plan and (c) the other matters settled under the SPSA. Entry

of the Confirmation Order shall constitute the Bankruptcy Court's finding that such settlement is: (1) in exchange for the good and valuable consideration provided by each of the Debtors and SPSA Parties; (2) a good-faith settlement and compromise of the claims released by the Debtors; (3) in the best interests of the Debtors, their Estates, and all holders of Claims and Interests; (4) fair, equitable and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to the assertion of any claim or Cause of Actions released pursuant to the SPSA.

**6.6     Funding of Individual Debtors for Plan Confirmation.**  NNI (before the Effective Date) or the Plan Administrator (on and following the Effective Date) shall have the authority, but not the obligation, to make or authorize NNI to make certain transfers of assets to other Debtors or Wind-Down Debtors, not to exceed $50,000 in the aggregate, and not to exceed $5,000 per Debtor or Wind-Down Debtor, for the purpose of aiding such Debtor or Wind-Down Debtor's ability to effectuate the Plan and the wind down of its estate, including to make distributions to its creditors in accordance with the confirmation or implementation of such Debtor's Plan and the SPSA.

**6.7     Administrative Expense Contribution and Quarterly Administrative Wind-Down Reimbursement Payments.**  The Debtors have agreed that in full and final satisfaction of NNI's claims against the Debtors (other than NNCALA) resulting from the Intercompany Administrative Expense Claims, on the one hand, and the Debtors' (other than the Consolidated Debtors' and NNCALA's) claims for entitlements to the Sale Proceeds, the Sale Proceeds shall be allocated among the Debtors in accordance with the terms of the SPSA and the Plan as reflected in Section 2 of the SPSA, and that with respect to NNCALA, NNCALA shall be entitled to the allocation of Sale Proceeds specified on Annex F of the SPSA, subject to Section 2 of the SPSA, and that NNI shall be entitled to a one-time reimbursement payment from NNCALA in the amount of $34 million in full and final satisfaction of the Intercompany Administrative Expense Claims attributable to NNCALA that have accrued to date (the "NNCALA Administrative Expense Contribution").

In addition, from and after the Effective Date, each Debtor listed on Exhibit E to the Plan shall make a Quarterly Administrative Wind-Down Reimbursement Payment to NNI in accordance with Section 8.8 herein.  For the avoidance of doubt, NNI shall retain the right to assert Administrative Expense Claims against any other Debtor or Wind-Down Debtor, as applicable, for any Priority Tax Claims that are asserted against and or paid by NNI that reasonably could be allocated or attributable to any other Debtor or Wind-Down Debtor, as applicable, subject to the caps specified in Exhibit E.

**6.8     Closing of Chapter 11 Case.**  After a Chapter 11 Case has been fully administered, the Plan Administrator shall File all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close such Chapter 11 Case in accordance with the Bankruptcy Code and the Bankruptcy Rules.  The Plan Administrator's authority shall continue until such time as all of the Chapter 11 Cases have been fully administered and closed.

## ARTICLE 7.
## THE SETTLEMENT AND PLANS SUPPORT AGREEMENT

**7.1    SPSA.**  The Plan shall serve as a motion by the Debtors seeking an order pursuant to sections 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019 approving the SPSA and authorizing the Debtors to perform their obligations under the SPSA.  In the event of an inconsistency between the Plan and the SPSA, the SPSA shall govern.

**7.2    Cooperation.**  The Debtors shall cooperate in the implementation of the SPSA in accordance with its cooperation provisions therein in furtherance of the execution and implementation of the SPSA.

**7.3    Conditions Precedent.**  The terms of the SPSA incorporated into the Plan and the effectiveness of the SPSA and the settlements contained therein are subject to the satisfaction of the conditions contained in the SPSA, including the occurrence of the Plans Effective Date.

**7.4    Settlement of Allocation Dispute.**  Pursuant to the resolution procedures of the IFSA, the SPSA Parties have agreed to settle the Allocation Dispute on the terms set forth in the SPSA.  As part of the integrated settlements contained in the SPSA, and subject to the terms and conditions thereof, the Debtors shall be entitled to receive the Allocation Proceeds as described in Sections 7.5 and 7.6 herein.  The Debtors shall be authorized by the Confirmation Order to take any actions necessary or appropriate to direct releases of the Allocation Proceeds to the Global Debtors in accordance with the terms of the SPSA.

**7.5    Allocation and Distribution of Sale Proceeds**.  Without limiting the generality of Section 7.1, on the Effective Date, the Debtors shall be authorized and directed by the Plan, the Confirmation Order and the U.S. Escrow Release Order to take such steps as may be reasonably necessary to effect the distributions from the Escrow Accounts as set forth in Section 2(c) of the SPSA, in accordance with and subject to the terms of the SPSA.

**7.6    Allocation of Sale Proceeds Among the Debtors**.  Upon entry of the Confirmation Order and the Escrow Release Orders and subject to the satisfaction of the additional conditions set forth in Article 12 herein, the Sale Proceeds shall be allocated among the Debtors in the amounts as set forth in Annex F to the SPSA reflected  below (subject to the terms of Section 2 of the SPSA).

| Debtor | Allocation Amount |
|---|---|
| Nortel Networks Inc. (inclusive of consolidated Nortel Networks Capital Corporation estate) | $1,716,346,052.00 |
| Nortel Networks (CALA) Inc. | $50,070,950.00 |
| Nortel Altsystems Inc. | $0.00 |
| Nortel Altsystems International Inc. | $0.00 |
| Xros, Inc. | $0.00 |

| | |
|---|---|
| Sonoma Systems | $0.00 |
| Qtera Corporation | $0.00 |
| CoreTek, Inc. | $0.00 |
| Nortel Networks Applications Management Solutions Inc. | $0.00 |
| Nortel Networks Optical Components Inc. | $0.00 |
| Nortel Networks HPOCS Inc. | $0.00 |
| Architel Systems (U.S.) Corporation | $0.00 |
| Nortel Networks International Inc. | $0.00 |
| Northern Telecom International Inc. | $0.00 |
| Nortel Networks Cable Solutions Inc. | $0.00 |
| | $1,766,417,002.00 |

**7.7    Changes in Escrow Accounts' Balances.**  Pursuant to Section 2(d) and Sections 7(b), 7(c) and 7(d) of the SPSA, any changes in the Escrow Accounts' balances between the execution date of the SPSA and the Effective Date shall be allocated among the Nortel Group in the percentages reflected in Section 2(c) of the SPSA and Section 7.6 above, respectively, subject to the following conditions: (i) any foreign exchange gain or loss made in respect of any amount in the Canadian Escrow Account (following conversion from U.S. Dollars to Canadian Dollars) shall be solely for the credit or debit of the Canadian Debtors; (ii) any foreign exchange gain or loss made in respect of any amount in the relevant EMEA Escrow Account pursuant to a Conversion Election (following conversion from U.S. Dollars to Euros or Pound Sterling) shall be solely for the credit or debit of the EMEA Debtor that requested such Conversion Election or NNSA, as the case may be; and (iii) the fees and costs of the Escrow Agents (including reasonable attorneys' fees costs), if any, associated with any currency conversion shall be borne by the Debtor(s) requesting such conversion and shall be paid out of the amount of their respective Sale Proceeds allocations  or directly by the relevant Debtor out of its estate assets.

**7.8    Estate Administration.**  From the Confirmation Date to the Effective Date, the Debtors will be administered by the U.S. Principal Officer.

**7.9    Treatment of Crossover Claims.**  In the event that a creditor shall have a Proven Claim against the Canadian Estate and an Allowed Claim against the relevant Debtor, then, as contemplated by Section 4(c)(i)(B) and 4(g)(vi) of the SPSA, the issuer (or primary) Debtor estate or Canadian Debtor estate and any guarantor (or secondary) Debtor estate or Canadian Debtor estate shall pay distributions on the full amount of the Allowed Claim, if a claim against a Debtor, or the full amount of the Proven Claim, if a claim against the Canadian Estate, on a *pari passu* basis with all other creditors holding Allowed Claims (in the case of the Debtors) or Proven Claims (in the case of the Canadian Estate) with the same priority without discrimination of any kind.  In no case shall a creditor holding a Crossover Claim be entitled to receive (i) any further distributions from the Debtors where the aggregate distributions made by the Debtors and the Canadian Estate in respect of such Crossover Claim equal the total allowed amount of such Crossover Claim against the Debtors or (ii) any further distributions from the Canadian Estate where the aggregate distributions made by the Debtors

49

and the Canadian Estate in respect of such Crossover Claim equal the total Proven Claim amount of such Crossover Claim against the Canadian Estate.  For the avoidance of doubt, in no event shall a holder of a Crossover Claim be entitled to receive aggregated distributions in respect of its allowed Crossover Claim of more than 100% of the greater of (i) its pre-filing allowed claim (U.S.), and (ii) Proven Claim (Canada) when taking into account distributions received from both the issuer (or primary) Debtor estate or Canadian Debtor estate and guarantor (or secondary) Debtor estate or Canadian Debtor estate (such greater amount, the "Creditor's Maximum").  Any amounts paid pursuant to Section 7.13 of the Plan shall not be included in calculating the Creditor's Maximum as it pertains to the NNCC Bonds.  The issuer estate and the guarantor shall reasonably cooperate to give effect to this Section and the provisions of Section 4(c) of the SPSA, including sharing information regarding the Crossover Claims and intended and actual distributions thereon.

      **7.10**    **Right to Subrogation.**  Notwithstanding Section 7.9 above, if a creditor holds a Crossover Claim and has received an aggregate amount of distributions on account of such Crossover Claim equal to the Creditor's Maximum, then the guarantor (or secondary) Debtor or Canadian Debtor estate, as applicable, shall be immediately subrogated into the Crossover Claim against the issuer (or primary) Debtor estate (for the NNCC Bonds, the issuer Debtor estate is NNCC before the Plans Effective Date, but will be deemed to be NNI on and after the Plans Effective Date) and will be entitled to receive any and all subsequent distributions from the issuer (or primary) Debtor estate or Canadian Debtor estate on account of such Crossover Claims on a *pari passu* basis with all other holders of Allowed Claims or Proven Claims (Canada) with the same priority from the issuer (or primary) Debtor estate or Canadian Debtor estate without setoff or discrimination of any kind, *provided* that (i) the guarantor (or secondary) Debtor estate or Canadian Debtor estate (as applicable) shall not receive any distributions on such claim in excess of payments the guarantor (or secondary) Debtor estate or Canadian Debtor estate (as applicable) estate has made to the underlying holder of such Crossover Claim and (ii) in the case of the Crossover Bonds Claims, NNI shall receive distributions from the Canadian Estate as a result of such subrogation for distributions NNI has made on the Allowed Crossover Bonds Claims only to the extent that NNI makes distributions in respect of the Allowed Crossover Bonds Claims in excess of U.S.$1.25 billion and such subrogation shall be only in respect of amounts distributed in excess of U.S.$1.25 billion, it being understood that NNI's right of subrogation pursuant to this Section 7.10 of the Plan and Section 4(c)(i)(C) of the SPSA, if any, against the Canadian Estate in respect of the Crossover Bonds Claims remains subject to distributions equal to the Creditor's Maximum first being received by holders of the Crossover Bonds Claims on account of such claims.  For the avoidance of doubt, notwithstanding Section 10.12, the subrogation rights of the Canadian Debtors pursuant to this Section 7.10 shall not be subject to setoff.

      **7.11**    **No Double-Recovery.**  In no circumstance shall a Creditor receive aggregate distributions from a Debtor or Wind-Down Debtor and any other Nortel entity on account of an Allowed Claim in excess of 100% of the amount of such Allowed Claim. In order to be eligible for any distribution under this Plan, a Creditor who holds an Allowed Claim against a Debtor or Wind-Down Debtor (other than a Crossover Bonds Claim or NNCC Bonds Claim) and a related claim against any other Nortel entity, including a Crossover Claim (an "Other Nortel Claim"), shall, upon the written request of the Debtor or Wind-Down

Debtor (which may be made from time to time), provide such information to the Debtor or Wind-Down Debtor as it may reasonably request in respect of the Other Nortel Claim, including the amount in which the Other Nortel Claim has been allowed, the amount of distributions received or expected to be received on account of such Other Nortel Claim and any and all supporting documentation relating to the foregoing. Subject to further Order of the Bankruptcy Court, the Debtor or Wind-Down Debtor is authorized to delay and/or withhold distributions to Creditors holding Other Nortel Claims pending receipt of documentation acceptable to the Debtor or Wind-Down Debtor, acting reasonably, to allow it to confirm that a Creditor has not and will not receive amounts on account of its Allowed Claim in excess of 100% of the amount of such Allowed Claim.

       **7.12    Post-Petition Date Interest.**  No post-Petition Date interest (or make whole premium, no-call payment or similar claim accruing post-Petition Date) shall be included in any Allowed Claim, nor be paid on Allowed Claims by any Debtor.

       **7.13    Additional NNCC Bondholder Payments.**  On the Effective Date, or as soon thereafter as practicable, NNI (or the Disbursing Agent on its behalf) shall pay the reasonable and documented fees of (a) the NNCC Bonds Indenture Trustee, in an amount not to exceed $4.25 million and (b) counsel to Solus Alternative Asset Management LP and PointState Capital LP in an amount not to exceed $750,000. For the avoidance of doubt, nothing contained herein shall alter or limit the right of the NNCC Bonds Indenture Trustee to assert its charging Lien against Distributions on account of Allowed NNCC Bonds Claims for payment of its reasonable fees and expenses in excess of $4.25 million, including all reasonable fees and expenses of its counsel and other professionals, as provided in the NNCC Bonds Indenture and in Section 10.6 and 10.15 of the Plan. If any amount remains in the cash reserve established pursuant to Section 4(g)(vi) of the SPSA after the making of payments required thereunder, NNI shall pay or reimburse out of such funds reasonable and documented fees (up to an additional $2.0 million) incurred by professionals in connection with the assertion of rights related to the NNCC Bonds.  Any amount payable by NNI under this Section shall include an amount equal to, and be in addition to, any fees paid by the Canadian Debtors under the Crossover Bondholder Fee Letter allocated to the NNCC Bondholders that are deducted from distributions made by the Canadian Estate to the NNCC Bondholders as described in Section 4(k) of the SPSA.

       **7.14    Resolution of Certain Claims.**  (a) The allowed PBGC claim asserted against each of the Debtors (and against any U.S. non-debtor Nortel Group entity) shall be a maximum of $708,000,000 and all rights of the Debtors and other U.S. based parties-in-interest in the Chapter 11 Cases to contest such PBGC claims are expressly reserved and the allocation percentages provided for in Section 2(c) of the SPSA shall not change if the PBGC claims are admitted or Allowed for a different amount;  (b) the Crossover Bonds Claims shall be Allowed as one or more general unsecured claims in the aggregate amount of $3,934,521,442, as specified in Schedule A to the Agreement Settling The NNI Post-Petition Interest Dispute And Related Matters, dated July 24, 2014, (such claims the "Allowed Crossover Bonds Claims"); (c) the NNCC Bonds Claims against NNI (into which NNCC shall be substantively consolidated on the Plans Effective Date) shall be Allowed as a general unsecured claim in the amount of $150,951,562, *provided*, *however*, that in the event that distributions (including

deemed distributions related to the Crossover Bondholder Fee Letter) in respect of the NNCC Bonds Claims is less than $150,951,562 (exclusive of any amount paid pursuant to Section 4(m) of the SPSA) upon the completion of distributions in respect of the NNCC Bonds Claims on the allowed claim against NNI (which claim against NNI results from the consolidation of NNCC with and into NNI) and the Proven Claim against the Canadian Estate, NNI shall reserve $7.5 million from cash otherwise available for distributions to NNI unsecured creditors, to be made available to be paid in respect of the NNCC Bonds Claims, but *further provided* that NNI shall use such reserves to make distributions in respect of the NNCC Bond Claims only in the amount of the lesser of (A) $150,951,562 less total distributions from NNI and the Canadian Estate (exclusive of any amount paid pursuant to Section 4(m) of the SPSA), and (B) $7.5 million; and (d) there shall be no holdback of Sale Proceeds with respect to any liability that may be due or become due to SNMP, as set forth in Section 4(f) of the SPSA. No Global Debtor has or shall have any claim (whether by way of contribution, indemnity or otherwise) against any other Global Debtor in respect of any liability due or which may become due to SNMP and no Global Debtor or any other SPSA Party will assist SNMP in bringing any claim against any other Global Debtor.

7.15    **Book Intercompany Claims.**  Allowed Book Intercompany Claims shall be included in the determination of the Allowed General Unsecured Claims against each of the Debtors.  Annex L to the SPSA shall be treated as the definitive position for all Allowed Book Intercompany Claims between the Nortel Group entities specified thereon.  Any and all other pre-filing books and records claims between (A) any of the Canadian Debtors, on the one hand, and (B) any of the Debtors and their other subsidiaries as specified on Annex L to the SPSA, on the other hand, which are not preserved specifically in the SPSA (including, without limitation the claims referenced in Sections 4(b)(i) and 4(g) of the SPSA), are forever released and barred as of the Effective Date.  Other than the Allowed Book Intercompany Claims, all pre-filing books and records claims, including any claims that a Debtor now holds as a consequence of an assignment (excluding claims against an EMEA Debtor assigned to NNUK in connection with the EMEA Canada Settlement Agreement), between (G) any of the EMEA Debtors, NNSA or the EMEA Non-Filed Entities, on the one hand, and (H) any of the Debtors, on the other hand, are forever released and barred as of the Effective Date.  The SPSA Parties agreed and acknowledged that, as of October 12, 2016, there are no post-filing books and records claims owing between (Y) any of the Canadian Debtors, on the one hand, and any of the Debtors, the EMEA Debtors, NNSA and the EMEA Non-Filed Entities, on the other hand, and (Z) any of the Debtors, on the one hand, and any of the EMEA Debtors, NNSA and the EMEA Non-Filed Entities, on the other hand.

7.16    **Remaining Assets and Other Proceeds.**  Each of the Debtors has the right to retain the value of its respective remaining assets, if any, and shall not be subject to any claims thereto by any other Global Debtor except those acknowledged in the SPSA.  Other than the claims acknowledged in the SPSA to receive distributions from the proceeds of such assets, the Debtors release any claims they have asserted or may assert or have as against (i) the proceeds held by the Canadian Debtors as "Restricted Cash" or "Unavailable Cash" (as noted in Monitor's Reports to the CCAA Court), including in respect of the realization of the interests in LG-N, the Strandherd Lands, Relay and IP Addresses and (ii) the remaining IP Addresses, including any proceeds arising therefrom.  For the avoidance of doubt, nothing in

this Section 7.16 shall (i) prohibit the assertion of claims to enforce the SPSA and claims that are reserved in the SPSA (including without limitation, the claims referenced in Section 4(b)(i) thereof) or (ii) affect the Debtors' rights to receive distributions as creditors of the various Global Debtors' estates.

> **7.17    Resolution of Side Letters and Cascade Trust.**  In full and final resolution of (i) all entitlements and obligations arising under side letters to which any of the Debtors and Canadian Debtors are party, and (ii) the T&T Claim, NNI shall receive payment from the Canadian Estate pursuant to Section 4(e) of the SPSA in the amount of $77.5 million. After receipt of such payment by NNI, NNI shall have a 27% interest in the remaining assets of the Cascade Trust.

> **7.18    Debtor Disputes.**  Notwithstanding the separate administration of the estates of the Canadian Debtors, the EMEA Debtors, NNSA, the U.S. Debtors and of the EMEA Non-Filed Entities, the Debtors shall work cooperatively and use reasonable efforts to implement the SPSA and the Plan in a tax efficient manner. The Debtors shall, upon the written request of a Global Debtor to a Debtor and to the extent permitted by applicable local law and not inconsistent with the statutory duties of the Debtor to which a request is made, reasonably cooperate with each other, including providing such documents, other information, access to current personnel and/or permission to communicate with former personnel as may reasonably be requested by the requesting Global Debtor, in connection with the preparation and filing of tax returns and responding to or contesting any challenges, inquiries, audits or other disputes by tax authorities in relation thereto; *provided, however*, that no Debtor shall be obligated to cooperate to the extent such requested cooperation would prejudice the interests of such Debtor and all such cooperation conforms to the requirements in Section 4(a)(v) of the SPSA.

> **7.19    Currency Conversion.**  The Debtors have agreed to cooperate and coordinate efforts to convert portions of the Sale Proceeds from U.S. Dollars to Other Currency, as provided in the Currency Conversion Order entered by the Bankruptcy Court on October 21, 2016 [D.I. 17296].

> **7.20    SPSA Releases.**  The Debtors have entered into certain releases pursuant to the terms of the SPSA, the terms of which are set forth in additional detail in Section 13.4 herein.

> **7.21    Escrow Release Order.**  The Debtors shall seek entry of the U.S. Escrow Release Order such that the Order is entered with, as part of or promptly following entry of, the Confirmation Order.  The U.S. Escrow Release Order will be conditioned on the occurrence of the Effective Date and the effectiveness of the Canadian Plan.

> **7.22    Release of Sale Proceeds From the Escrow Accounts.**  Conditional on entry of the Confirmation Order, the U.S. Escrow Release Order and the occurrence of the Effective Date and satisfaction or waiver of the additional conditions to the SPSA as set forth in Section 9(a) therein, the Debtors shall submit a copy of the U.S. Escrow Release Order to the Escrow Agents simultaneously with submission of the Canadian Escrow Release Order together with any other documents contemplated by Section 3(f) of the SPSA, in order to

cause the Escrow Agents to release the Sale Proceeds in accordance with the SPSA and the Plan.

        **7.23    Litigation Resolution.**  Promptly following the Effective Date, the Debtors shall comply with their obligations under Section 5(b) of the SPSA to dismiss with prejudice and with no order as to costs all appeals, leave to appeal applications and other litigations among any of the SPSA Parties (including, with respect to the Debtors, the pending appeals and cross-appeals in respect of the Allocation Dispute, the pending appeal of the PPI Settlement by the Canadian Debtors and the pending appeal of the SNMP impleader action and related denial of a chapter 15 stay to which the Debtors, the EMEA Debtors, NNSA and SNMP are parties), save and except for the Non-Released Matters and *provided* that rights are reserved to enforce the SPSA and the Plan.  Such dismissals will be effected by the filing of the appropriate documents with the appropriate courts in each jurisdiction, the form of which documents must be reasonably acceptable to the SPSA Parties to such litigation, and to the extent that any motions or applications are required to obtain or effectuate such dismissals, the SPSA Parties shall make such motions or applications on a joint basis and each SPSA Party shall bear its own costs in seeking such relief.

        **7.24    NTCC Debtor Payment.**  In consideration and in furtherance of the NTCC Settlement, including without limitation the resolution of the NTCC Litigations, subject to the occurrence of the Effective Date, the Debtors shall make the NTCC Debtor Payment on or before the Initial Distribution Date.

<div align="center">

**ARTICLE 8.**
**CORPORATE FORM AND ACTION**

</div>

        **8.1    NNI Corporate Form and Vesting.**

        (a)    On the Effective Date, Wind-Down NNI shall maintain its current corporate form, with all powers of a corporation under the laws of its state of incorporation and without prejudice to any right to alter or terminate such existence (whether by merger or otherwise) under such applicable state law, for the purpose of effectuating all aspects of the Plan pertaining to Wind-Down NNI.  From and after the Effective Date, until dissolved in accordance with this Plan or by the Plan Administrator, Wind-Down NNI shall exist in order to effectuate all aspects of the Plan and wind down.

        (b)    On the Effective Date, Wind-Down NNI shall be vested with the Assets of NNI and NNCC as provided in Section 13.10 of the Plan.

        **8.2    Corporate Form and Vesting of Other Wind-Down Debtors.**

        (a)    On the Effective Date, each Wind-Down Debtor shall maintain its current corporate form, with all powers of a corporation under the laws of its state of incorporation and without prejudice to any right to alter or terminate such existence (whether by merger or otherwise) under such applicable state law, for the purpose of effectuating all aspects of the Plan pertaining to such Wind-Down Debtors.  From and after the Effective Date, until dissolved in accordance with this Plan or by the Plan Administrator, the Wind-Down

Debtors shall exist in order to effectuate all aspects of the Plan and wind down.  For Debtors incorporated under laws of a state other than Delaware, the Debtors reserve the right to reincorporate such entities under the laws of the State of Delaware.

(b)    On the Effective Date, each Wind-Down Debtor shall be vested with the respective Debtor's Assets as provided in Section 13.10 of the Plan.

**8.3    Dissolution of the Wind-Down Debtors.**  The Debtors shall retain the right to dissolve any Wind-Down Debtor, after the occurrence of such Wind-Down Debtors' Final Distribution Date, on or shortly following the Effective Date without the necessity for (i) any further approval by the board of directors or stockholders of any such Wind-Down Debtor of the dissolution or any plan of distribution, to the extent as such otherwise may be required by applicable law, and to the extent such shareholder approval may be required by applicable law such approval shall be deemed previously provided; or (ii) any other or further actions to be taken by or on behalf of such Wind-Down Debtors or payments to be made in connection therewith, subject to the filing of a certificate of dissolution with the appropriate governmental authorities.  The Debtors shall include a list of the Wind-Down Debtors to be dissolved in the Plan Supplement.

**8.4    Post-Effective Date Management.**

(a)    On the Effective Date, the board of directors of Wind-Down NNI shall consist of one natural person selected by the Plan Administrator, which person may be the Plan Administrator or an employee thereof, to serve as the board of directors of Wind-Down NNI through the closing of Wind-Down NNI's Chapter 11 Case in accordance with Section 6.8 of the Plan.  The current officers of NNI shall continue to serve as the officers of Wind-Down NNI in accordance with applicable non-bankruptcy law, any employment agreement with NNI entered into after the Petition Date, and NNI's by-laws, as the same may be amended from time to time, through the closing of Wind-Down NNI's Chapter 11 Case, unless an officer resigns or is removed by the board of directors of Wind-Down NNI.

(b)    On the Effective Date, the director of each Wind-Down Subsidiary shall consist of one natural person selected by the Plan Administrator, which person may be the Plan Administrator, to serve as the director of such Wind-Down Subsidiary through the closing of such Wind-Down Subsidiary's Chapter 11 Case in accordance with Section ~~6.8~~ 6.8 of the Plan.  The director shall act at the direction of the Plan Administrator and in accordance with the Plan.

(c)    The current officers of each Wind-Down Subsidiary shall continue to serve in such capacity for the respective Wind-Down  Subsidiary in accordance with applicable non-bankruptcy law, any employment agreement with such applicable Debtor or Wind-Down  Subsidiary entered into after the Petition Date, and such Wind-Down Subsidiary's certificate of formation and operating agreement, as the same may be amended from time to time, through the closing of such Wind-Down Subsidiary's Chapter 11 Case, unless a current officer resigns or is removed by the director of such Wind-Down Subsidiary.

**8.5    Corporate Existence.**  After the Effective Date, the Plan Administrator may in accordance with the Plan Administration Agreement (a) maintain any Wind-Down Debtor as a corporation in good standing until such time as all aspects of the Plan pertaining to such Wind-Down Debtor have been completed, (b) subject to Section 8.3, dissolve any Wind-Down Debtor or complete the winding up of such Wind-Down Debtor without the necessity for (i) any further approval by the board of directors or stockholders of any such Wind-Down Debtor of the dissolution or any plan of distribution, to the extent as such otherwise may be required by applicable law or (ii) any further approvals or actions to be taken by or on behalf of such Wind-Down Debtor, its shareholder or for any payments to be made in connection therewith, subject to the filing of a certificate of dissolution with the appropriate governmental authorities (including, without limitation, transferring all or part of the Residual Assets of such Wind-Down Debtor to a liquidating trust) at such time as the Plan Administrator considers appropriate and consistent with the implementation of the Plan pertaining to such Wind-Down Debtor, or (c) dissolve any Controlled Non-Debtor Affiliate or complete the winding up of such Controlled Non-Debtor Affiliate in accordance with applicable law; *provided*, *however*, that the foregoing does not limit the Plan Administrator's ability to otherwise abandon an interest in a Controlled Non-Debtor Affiliate.

**8.6    Certificate of Incorporation or Certificate of Formation.**  As of the Effective Date, the certificate of incorporation, certificate of formation, by-laws and operating agreement, as applicable, of each Wind-Down Debtor shall be amended to satisfy the provisions of the Plan and the Bankruptcy Code and shall (a) include, among other things, pursuant to section 1123(a)(6) of the Bankruptcy Code, a provision prohibiting the issuance of non-voting equity securities, but only to the extent required by section 1123(a)(6) of the Bankruptcy Code, and (b) to the extent necessary or appropriate, include such provisions as may be needed to effectuate and consummate the Plan and the transactions contemplated herein, in each case, without further action under applicable law, regulation, order or rule, including, without limitation, any action by the stockholders, managers or members of the Wind-Down Debtors. The amended certificate and by-laws, as applicable, of such Wind-Down Debtor shall be included in the Plan Supplement.

**8.7    Wind-Down.**  The Plan Administrator shall effectuate the monetization, wind-down and liquidation of each Wind-Down Debtors' Residual Assets (it being understood that such may include the transfer of all or part of the Residual Assets of such Wind-Down Debtor to one or more liquidating trusts within the meaning of Treas. Reg. §301.7701-4).

**8.8    Quarterly Administrative Wind-Down Reimbursement Payments.**  Effective on the Effective Date, the Consolidated Debtors shall bear the costs of administering and winding down each of the Debtor's estates and shall be reimbursed quarterly for such costs from each such Debtor in an amount not to exceed the maximum Quarterly Administrative Wind-Down Reimbursement Payment amount listed for such Debtor on Exhibit E hereto, and in the case of NNCALA and Nortel Altsystems, to be paid quarterly in the amount listed on such exhibit.  The payment of such Quarterly Administrative Wind-Down Reimbursement Payment shall continue until each such Debtor has been fully and finally liquidated and all costs and expenses related to such administration and wind-down have been incurred.

8.9     **Other Corporate Action.**  Without limiting the foregoing, in accordance with the requirements of the Plan and the terms of the Plan Administration Agreement, from and after the Effective Date, the Wind-Down Debtors and the Plan Administrator may take any and all actions they deem appropriate in order to consummate the transactions contemplated herein, including, without limitation, to sell or otherwise dispose of any respective Residual Assets and wind up their respective affairs and, notwithstanding any provision contained in the Wind-Down Debtors' articles of incorporation, articles of formation or by-laws to the contrary, such Wind-Down Debtors shall not require the affirmative vote of holders of interests in order to take any corporate action, including to (i) compromise and settle Claims and Causes of Action of or against the Wind-Down Debtors and their Estates and (ii) dissolve, merge or consolidate with any other Entity.

## ARTICLE 9.
## TREATMENT OF EXECUTORY CONTRACTS

9.1     **Previous Assumption, Assignment and Rejection.**  Throughout the Chapter 11 Cases, the Bankruptcy Court has established deadlines and procedures for the assumption and rejection of certain executory contracts and unexpired leases by the Debtors, and allocated responsibility for payment of Cure Amounts with respect to such contracts and leases.  Any executory contracts and unexpired leases of the Debtors not assumed and assigned or rejected prior to the Confirmation Date or with respect to which the Debtors have not otherwise Filed a Notice of Assumption and Assignment or obtained an order assuming or rejecting the contract or lease prior to the Confirmation Date (the "Remaining Contracts"), if any, shall be rejected pursuant to Section 9.5 of this Plan unless assumed or assumed and assigned pursuant to Section 9.2 of this Plan.  Notwithstanding anything in this Article 9 to the contrary, to the extent the Debtors have Filed a Notice of Assumption and Assignment or motion for the assumption or assumption and assignment of an executory contract or unexpired lease prior to the Confirmation Date, but the Bankruptcy Court has not yet entered an order approving such assumption or assumption and assignment and fixing the Cure Amount therefor or the assumption or assumption and assignment has otherwise not yet become effective, the assumption or assumption and assignment of the contract or lease and any Cure Amount that may be owing in connection therewith shall be governed by the terms of the applicable order or procedure.

9.2     **Assumption and Assignment of Remaining Contracts.**  As of the Effective Date, the Debtors shall assume or assume and assign, as applicable, pursuant to sections 365 and 1123(b)(2) of the Bankruptcy Code, each of the Remaining Contracts of the Debtors that are identified in Exhibit C hereto that have not expired under their own terms prior to the Effective Date.  Each Remaining Contract identified in Exhibit C hereto shall include modifications, amendments, supplements, restatements or other agreements, including guarantees thereof, made directly or indirectly by any Debtor in any agreement, instrument or other document that in any manner affects such Remaining Contract, without regard to whether such agreement, instrument or other document is identified in Exhibit C.  The Debtors reserve the right to amend such Exhibit not later than ten (10) days prior to the Confirmation Hearing either to: (a) delete any executory contract or unexpired lease listed therein and provide for its rejection pursuant to Section 9.5 hereof; or (b) add any executory contract or unexpired lease

to such Exhibit, thus providing for its assumption or assumption and assignment, as applicable, pursuant to this Section 9.2.  The Debtors shall provide notice of any such amendment of such Exhibit to the parties to the executory contract or lease affected thereby and counsel for the Creditors' Committee not later than ten (10) days prior to the Confirmation Hearing.  The Confirmation Order shall constitute an order of the Bankruptcy Court pursuant to section 365 of the Bankruptcy Code approving all such assumptions or assumptions and assignments, as applicable, described in this Section 9.2, as of the Effective Date.  If any provision of an executory contract to be assumed by any of the Debtors under the Plan limits such Debtor's ability to assign such executory contract, the effectiveness of such provision shall be limited or nullified to the fullest extent provided under section 365(f) of the Bankruptcy Code.

      **9.3**    **Cure Payments; Assurance of Performance.**  Any monetary defaults under each Remaining Contract to be assumed under the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, in either of the following ways: (a) by payment of the monetary default amount in Cash, in full, on the Effective Date or as soon as practicable thereafter; or (b) by payment of the monetary default amount on such other terms as may be agreed to by the Debtors and the non-Debtor parties to such Remaining Contract.  In the event of a dispute regarding (i) the amount or timing of any cure payments, (ii) the ability of the Debtor or Debtors assuming such Remaining Contract, or an assignee thereof, to provide adequate assurance of future performance under the Remaining Contract to be assumed or assumed and assigned, as applicable or (iii) any other matter pertaining to assumption or assumption and assignment of the Remaining Contract to be assumed, the Debtor or Debtors assuming such Remaining Contract shall pay all required Cure Amounts promptly following the entry of a Final Order resolving the dispute; *provided* that the Debtors reserve the right to withdraw their request for assumption of any Remaining Contract at any time prior to the entry of such an order. The Debtors may reject or nullify the assumption of any executory contract no later than five (5) Business Days after the entry of a Final Order of the Bankruptcy Court determining the Cure Amount or any request for adequate assurance of future performance required to assume such executory contract.

      **9.4**    **Objections to Assumption of Remaining Contracts.**

          (a)    To the extent that any party to a Remaining Contract identified for assumption asserts a claim for arrearages or damages pursuant to section 365(b)(1) of the Bankruptcy Code, or has any other objection with respect to any proposed assumption, cure or assignment on the terms and conditions provided herein (including, without limitation, in Exhibit C hereto), all such Claims for arrearages and damages and objections must be Filed and served: (a) as to any Remaining Contract identified in Exhibit C hereto that is mailed to any party to any such Remaining Contract, along with all other solicitation materials accompanying the Plan, within the same deadline and in the same manner established for the filing and service of objections to Confirmation of the Plan; and (b) as to any Remaining Contract identified in any subsequent amendments to Exhibit C hereto that is mailed to any party to any such Remaining Contract not later than ten (10) days prior to the Confirmation Hearing, in such a manner as to be Filed and received by the Bankruptcy Court and the Debtors and counsel thereto, no later than the earlier of (i) twenty (20) days after such subsequent amendment is served and (ii) three (3) days prior to the Confirmation Hearing.

(b)     Failure to assert such claims for arrearages and damages and any objections in the manner described above shall constitute consent to the proposed assumption, revestment, cure or assignment on the terms and conditions provided herein, including an acknowledgement that the proposed assumption and/or assignment provides adequate assurance of future performance and that the amount identified for "cure" in Exhibit C hereto is the amount necessary to cover any and all outstanding defaults under the Remaining Contract to be assumed, as well as an acknowledgement and agreement that no other defaults exist under such Remaining Contract.

(c)     If any assumption or assumption and assignment of a Remaining Contract proposed herein for any reason is not approved by the Bankruptcy Court, then the Debtors shall be entitled, in their sole discretion, upon written notice to the applicable non-Debtor party to such Remaining Contract, to deem such Remaining Contract to have been rejected pursuant to the provisions of Section 9.5 below.

**9.5     Rejection.**  Except for those executory contracts and unexpired leases that (a) are assumed pursuant to this Plan, (b) have been assumed, assumed and assigned or rejected pursuant to previous orders of the Bankruptcy Court or (c) are the subject of a pending motion or notice before the Bankruptcy Court with respect to the assumption or assumption and assignment of such executory contracts and unexpired leases, as of the Effective Date, all executory contracts and unexpired leases of the Debtors shall be rejected pursuant to section 365 and 1123(b)(2) of the Bankruptcy Code; *provided*, *however*, that neither the inclusion by the Debtors of a contract or lease in Exhibit C nor anything contained in this Article 9 shall constitute an admission by any Debtor that such contract or lease is an executory contract or unexpired lease or that any Debtor or its successors and assigns has any liability thereunder.

**9.6     Approval of Rejection; Rejection Damages Claims Bar Date.**  The Confirmation Order shall constitute an order of the Bankruptcy Court approving the rejection of executory contracts and unexpired leases under Section 9.5 above pursuant to section 365 and 1123(b)(2) of the Bankruptcy Code as of the Effective Date.  Any Claim for damages arising from any such rejection must be Filed within thirty (30) days after the Effective Date, or such Claim shall receive no Distribution under the Plan or otherwise on account of such Claim.

**9.7     Postpetition Modification of Executory Contracts.**  Unless otherwise agreed by the parties and approved by the Bankruptcy Court, modifications, amendments, supplements and restatements to prepetition executory contracts that have been executed by the Debtors during the Chapter 11 Cases will not be deemed to alter the pre-petition nature of the executory contract, or the validity, priority or amount of any Claims that may arise in connection therewith.

**9.8     Pre-existing Obligations to the Debtors under Executory Contracts.** Rejection or repudiation of any executory contract pursuant to the Plan or otherwise will not constitute a termination of pre-existing obligations owed to the Debtors under such contracts. In particular, notwithstanding any nonbankruptcy law to the contrary, the Wind-Down Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a

counterparty to provide, warranties or continued maintenance obligations on goods previously purchased by the contracting Debtors or Wind-Down Debtors, as applicable, from counterparties to any Rejected Contract.

## ARTICLE 10.
## PROVISIONS REGARDING VOTING AND DISTRIBUTIONS UNDER THE PLAN

       **10.1    Voting of Claims.**    Each holder of an Allowed Claim in an Impaired Class of Claims that is entitled to vote on the Plan pursuant to Article 3 and Article 4 of the Plan shall be entitled to vote separately to accept or reject the Plan, as provided in the order entered by the Bankruptcy Court establishing procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan, or any other order or orders of the Bankruptcy Court.

       **10.2    Nonconsensual Confirmation.**    If any Impaired Class of Claims entitled to vote on the Plan does not accept the Plan by the requisite majority provided in section 1126(c) of the Bankruptcy Code, the Debtors reserve the right to amend the Plan in accordance with Section 15.4 of the Plan or to undertake to have the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code or both.  With respect to Impaired Classes of Claims or Interests that are deemed to reject the Plan, the Debtors shall request that the Bankruptcy Court confirm the Plan pursuant to section 1129(b) of the Bankruptcy Code.

       **10.3    Distributions of Creditor Proceeds.**    After the satisfaction in full of Allowed Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims and Allowed Secured Claims (to the extent the Plan Administrator determines in accordance with the Plan Administration Agreement that the relevant Debtor will pay such Allowed Secured Claim in Cash) against a Debtor, the Disbursing Agent shall make a Distribution of its Creditor Proceeds in accordance with the provisions of the Plan (i) to each holder of an Allowed Claim as of the Distribution Record Date against such Debtor, within sixty (60) days of the Effective Date, or as soon thereafter as practicable, and (ii) to each holder of an Allowed Claim that is allowed after the Effective Date against such Debtor, in accordance with the Class priorities set forth in Article 4 herein and the provisions of Article 10 herein.  After the initial Distribution with respect to any Allowed Claim, the Disbursing Agent shall make Distributions of Creditor Proceeds in accordance with the Plan to holders of Allowed Claims against such Debtor quarterly on March 31st, June 30th, September 30th and December 31st of each year (each such Distribution, an "Interim Distribution") and on the Final Distribution Date.  Notwithstanding the foregoing, the Plan Administrator may determine in accordance with the terms of the Plan Administration Agreement to direct the Disbursing Agent (a) to make Distributions more frequently than quarterly on dates other than the Interim Distribution dates or (b) not to make an Interim Distribution if it determines that the costs of making such Interim Distribution would be disproportionate to the Distribution amount.  No Distributions shall be made on account of a claim that is not yet an Allowed Claim until the Plan Administrator (i) determines not to object to such Claim (or the time to object to Claims expires), (ii) agrees with the holder of such Claim to allow such Claim in an agreed upon amount or (iii) objects to such Claim and such Claim is Allowed by a Final Order, during which time such Claim shall be treated as a Disputed Claim.

**10.4    Creditor Proceeds Distribution Conditions.** The distribution of Creditor Proceeds is subject to the satisfaction or express written waiver by the Debtors of the following conditions (the "Creditor Proceeds Distribution Conditions"):

(a)    the Plans Effective Date shall have occurred and the SPSA shall have become effective and fully enforceable in accordance with its terms;

(b)    the dismissal with prejudice of all litigation referenced in Section 5(b) of the SPSA, including the pending leave to appeals, appeals and cross-appeals in respect of the Allocation Dispute pending before the Canadian Court and Bankruptcy Court, shall have occurred; and

(c)    the Debtors shall have received the U.S. Allocation, as set forth in Section 7.6 hereof.

**10.5    Minimum Distribution and Manner of Payment.** No payment of Creditor Proceeds of less than $100 shall be made by any Debtor to any holder of an Allowed Claim against such Debtor.  Such amounts shall be deemed redistributed to other holders of Allowed Claims against such Debtor and, accordingly, shall be distributed in accordance with the provisions of the Plan and the Bankruptcy Code.  Any payment of Cash made pursuant to the Plan may be made at the option of the Disbursing Agent either by check or by wire transfer.

**10.6    Distributions to Indenture Trustees.**

(a)    Subject to Section 7.9 and Section 7.10, the Debtors or the Disbursing Agent, as applicable, shall deliver the initial Distribution and any subsequent Distributions on account of the Allowed NNCC Bonds Claims to the NNCC Bonds Indenture Trustee on the Initial Distribution Date and each subsequent Distribution Date thereafter.  The NNCC Bonds Indenture Trustee shall administer such Distributions as soon as is reasonably practicable in accordance with the NNCC Bonds Indenture and this Plan (and such Distributions shall remain subject to the NNCC Bonds Indenture Trustee's charging Lien for payment of its reasonable fees and expenses, including all reasonable fees and expenses of its counsel and other professionals and including the fees and expenses incurred by the NNCC Bonds Indenture Trustee in making all Distributions to holders of Allowed NNCC Bonds Claims).  Any Distribution made to the NNCC Bonds Indenture Trustee in accordance with this Section 10.6(a) shall be deemed a distribution to the holders of the NNCC Bonds Claims.

(b)    Subject to Section 7.9 and Section 7.10, the Debtors or the Disbursing Agent, as applicable, subject to the Bondholder Contribution, shall deliver the initial Distributions and any subsequent Distributions on account of Crossover Bonds Claims to the NNC/NNL Notes Indenture Trustee on the Initial Distribution Date and each subsequent Distribution Date thereafter.  The NNC/NNL Notes Indenture Trustee shall administer such Distributions as soon as is reasonably practicable in accordance with this Plan, including Section 10.14 hereof  (and such Distributions shall remain subject to the NNC/NNL Notes Indenture Trustee's charging Lien against Distributions to holders of Crossover Bonds Claims for payment of its reasonable fees and expenses, including all reasonable fees and expenses of

its counsel and other professionals and including the fees and expenses incurred by the NNC/NNL Notes Indenture Trustee in making all Distributions to holders of Crossover Bonds Claims). Any Distribution made to the NNC/NNL Notes Indenture Trustee in accordance with this Section 10.6(b) shall be deemed a distribution to the holders of the Crossover Bonds Claims.  Any Distribution made to the NNC/NNL Notes Indenture Trustee in accordance with this Section 10.6(b) and the Bondholder Contribution shall be deemed a distribution to the holders of the Crossover Bonds Claims.

**10.7    Limitation on Recovery.**  Notwithstanding anything contained herein to the contrary, subject to Section 7.10 and 7.11 hereof, in the event that the sum of the Distributions of Creditor Proceeds and other Distributions with respect to an Allowed Claim hereunder or in connection with a Foreign Proceeding are in excess of one hundred percent (100%) of such holder's Allowed Claim, then the Creditor Proceeds remaining to be distributed to such holder in excess of such one hundred percent (100%) shall be deemed available for distribution to other holders of Allowed Claims against such Debtor and, accordingly, shall be distributed in accordance with the provisions of the Plan and the Bankruptcy Code.

**10.8    Distributions Free and Clear.**  Except as otherwise provided herein, any Distributions under the Plan shall be free and clear of any Liens (other than the charging Lien of an indenture trustee), Claims and encumbrances, and no other Entity, including the Debtors, the Wind-Down Debtors and the Plan Administrator shall have any interest, legal, beneficial or otherwise, in the Creditor Proceeds, Assets or Residual Assets once transferred to holders of Allowed Claims pursuant to the Plan.

**10.9    Delivery of Distributions and Undeliverable Distributions.**

Distributions to holders of Allowed Claims of each Debtor shall be made at the address of each such holder as set forth on the Schedules Filed, unless superseded by a new address as set forth (a) on a proof of claim Filed by a holder of an Allowed Claim or (b) in another writing notifying the Claims Agent (at the address listed in Section I of the Disclosure Statement) of a change of address.  If any holder's Distribution is returned as undeliverable, no further Distributions shall be made or notices delivered to such holder on account of such Claim until the Claims Agent is notified in writing by such holder of such holder's current address, at which time all such distributions shall be made to such holder.  Any holder of an Allowed Claim (or any successor or assignee or other Person or Entity claiming by, through, or on behalf of, such holder) that does not assert a claim pursuant to this Plan for such undeliverable or unclaimed distribution within six (6) months after the later of the Effective Date or the date such distribution was made shall be deemed to have forfeited its Allowed Claim and shall be forever barred and enjoined from asserting any such Claim for an undeliverable or unclaimed distribution against the Debtors or their Estates, the Wind-Down Debtors or their property.  In such cases, any Cash held for Distribution on account of such Claim shall become the property of the relevant Estate and distributed to other holders of Allowed Claims against such Debtor in accordance with the terms of the Plan and the Bankruptcy Code.

**10.10    Withholding and Reporting Requirements.**  In connection with the Plan and all instruments issued in connection therewith and distributed thereon, the Debtors,

the Plan Administrator and the Disbursing Agent shall comply with all applicable withholding and reporting requirements imposed by any federal, state or local taxing authority, and all Distributions under the Plan shall be subject to any such withholding or reporting requirements. Notwithstanding the above, each holder of an Allowed Claim that is to receive a Distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any Tax obligations imposed by any Governmental Unit, including income, withholding and other Tax obligations, on account of such Distribution.  The Disbursing Agent has the right, but not the obligation, to withhold a Distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such Tax obligations.  The Disbursing Agent may require, as a condition to receipt of a Distribution, that the holder of an Allowed Claim complete and return a Form W-8 or W-9, as applicable to each such holder, to the Disbursing Agent, as applicable to each such holder.  If the Disbursing Agent makes such a request and the holder fails to comply before the date that is 180 days after the request is made, no further Distributions shall be made to such holder on account of such Claim.  In such cases, the amount of such Distribution shall irrevocably revert to the applicable Debtor and such Claim shall be discharged and the holder of such Claim shall be forever barred from asserting such Claim against such Debtor, its Estate or its respective property.  Also, in such cases, any Cash held for Distributions on account of such Claim shall become the property of the relevant Estate and distributed to other holders of Allowed Claims against such Debtor in accordance with the terms of the Plan and the Bankruptcy Code.

**10.11  Time Bar to Cash Payment Rights.**  Checks issued in respect of Allowed Claims shall be null and void if not negotiated within ninety (90) days after the date of issuance thereof.  Requests for reissuance of any check shall be made to the Plan Administrator by the holder of the Allowed Claim to whom such check originally was issued. Any claim in respect of a voided check shall be made on or before thirty (30) days after the expiration of the ninety (90) day period following the date of issuance of such check. Thereafter, the amount represented by such voided check shall irrevocably revert to the relevant Debtor's Estate, to be distributed to other holders of Allowed Claims against such Debtor in accordance with the terms of the Plan and the Bankruptcy Code, and any Claim in respect of such voided check shall be discharged and forever barred from assertion against such Debtor, its Estate and its respective property, *provided* that at the discretion of the Plan Administrator, any such amounts may be escheated pursuant to applicable law.  In the case of any check issued in respect of an Allowed Claim that is returned as an undeliverable distribution, such check shall be null and void if not negotiated within ninety (90) days after the date of issuance, and the Allowed Claim for which such distribution was issued shall be discharged and forever barred pursuant to this Section 10.11 only after the time period to claim such undeliverable distribution provided in Section 10.9 has passed.

**10.12  Setoffs and Recoupment.**

(a)    The Debtors may, but shall not be required to, setoff against the payment of any Claim or other Distributions to be made pursuant to the Plan in respect of such Claim of any nature whatsoever that the Debtors may have against the holder of such Claim; *provided*, *however*, that neither the failure to do so nor the allowance of any Claim hereunder

shall constitute a waiver or release by the Debtors of any such claim the Debtors may have against such holder.

(b)      Unless otherwise stipulated in writing by the Debtors, any party against whom a claim or counterclaim is asserted by the Estates (an "Estate Claim") must assert any setoff rights, right of subrogation or recoupment of any kind against such Estate Claim prior to the Confirmation Date, or such right of setoff, subrogation or recoupment will be deemed waived and forever barred; *provided*, *however*, that nothing herein shall limit the assertion of such right of setoff, subrogation or recoupment through an amended or supplemental pleading to the extent permitted by Rule 15 of the Federal Rules of Civil Procedure or Bankruptcy Rule 7015.

**10.13   Distribution Record Date.**  Except with respect to the Crossover Bonds and the NNCC Bonds, as of the close of business on the Distribution Record Date, the register for each Debtor shall be closed and there shall be no further changes to the record holder of any of the Claims or Interests.  The Debtors and the Plan Administrator shall have no obligation to recognize any transfer of any Claims or Interests occurring after the close of business on the Distribution Record Date and shall be entitled instead to recognize and deal for all purposes hereunder only with those record holders stated on the transfer ledgers as of the close of business on the Distribution Record Date, to the extent applicable.

**10.14   Allocation of Distributions.**  Distributions to any holder of an Allowed Claim shall be allocated first to the principal portion of any such Allowed Claim (as determined for federal income tax purposes) and, only after the principal portion of any such Allowed Claim is satisfied in full, to any portion of such Allowed Claim comprising interest (but solely to the extent that interest is an allowable portion of such Allowed Claim).

**10.15   Cancellation of Notes, Instruments and Debentures.**  On the Effective Date, except as otherwise provided in this Plan or the Confirmation Order, (a) the NNCC Bonds, the NNCC Bonds Indenture, the Senior Notes NNI Guarantee Obligations and any other notes, bonds (with the exception of any surety bonds outstanding), indentures, guarantees or other instruments or documents evidencing or creating any indebtedness or obligations of the Debtors that are Impaired under this Plan shall be deemed cancelled and extinguished as to the Debtors and (b) the obligations of the Debtors under any agreements, documents, indentures, guarantees or certificates of designation governing the Senior Notes, the Senior Notes NNI Guarantee Obligations, the Senior Notes Indentures and any other notes, bonds, indentures, guarantees or other instruments or documents evidencing or creating any indebtedness or obligations of the Debtors that are Impaired under this Plan shall be, and are hereby, discharged as to the Debtors, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or any requirement of further action, vote or other approval or authorization by the Security holders, officers or directors of the Debtors or by any other Person.

Notwithstanding the foregoing, the NNCC Bonds Indenture shall continue in effect solely for the purposes of allowing and preserving: (i) the rights of the NNCC Bonds Indenture Trustee to assert its charging Lien against such Distributions for payment of its reasonable fees and expenses (including reasonable fees and expenses of counsel and other

professionals and including the fees and expenses incurred by the NNCC Bonds Indenture Trustee in making all Distributions to holders of Allowed NNCC Bonds Claims), (ii) the rights of holders of Allowed Claims in respect of the NNCC Bonds to receive Distributions under the Plan, (iii) the rights of the NNCC Bonds Indenture Trustee to make Distributions in satisfaction of Allowed Claims in respect of the NNCC Bonds (after application of its charging Lien) and (iv) the rights of the NNCC Bonds Trustee and any NNCC Bondholder to pursue the NNCC Bonds Guarantee Obligations in the Canadian Proceedings, but in all cases subject to the terms and conditions of the NNCC Bonds Indenture.

Notwithstanding the foregoing, the NNC Notes Indenture and the NNL Notes Indenture will continue in effect solely for the purposes of allowing, preserving and enforcing: (i) the rights and Liens of the NNC/NNL Notes Indenture Trustee (including the NNC/NNL Notes Indenture Trustee's right to assert its charging Lien against Distributions to holders of Crossover Bonds Claims for payment of its reasonable fees and expenses, including all reasonable fees and expenses of counsel and other professionals and including the fees and expenses incurred by the NNC/NNL Notes Indenture Trustee in making all Distributions to holders of Crossover Bonds Claims); (ii) the rights of holders of Crossover Bonds Claims to receive Distributions under the Plan; (iii) the rights of the NNC/NNL Notes Indenture Trustee to make Distributions in satisfaction of Crossover Bonds Claims (after application of its charging Lien) and (iv) the rights of holders of claims in respect of the Crossover Bonds against any Canadian Debtors to pursue such claims in the Canadian Proceedings, but in all cases subject to the terms and conditions of the NNC Notes Indenture and the NNL Notes Indenture, as applicable.

## ARTICLE 11.
## PROCEDURES FOR TREATING DISPUTED CLAIMS

**11.1    Objections.**  Unless otherwise ordered by the Bankruptcy Court after notice and a hearing, as of the Effective Date, objections to, and requests for estimation of, all Claims against the Debtors may be interposed and prosecuted only by the Plan Administrator, who shall consult with the applicable Wind-Down Debtor regarding the same.  Objections to and requests for estimation of Claims shall be Filed and served on the claimant on or before the first Business Day that is one hundred and eighty (180) days after the Effective Date (the "Claims Objection Deadline") or such later date as is established by the filing of a notice by the Wind-Down Debtors or Plan Administrator prior to the expiration of the then-current Claims Objection Deadline.

**11.2    No Distributions Pending Allowance.**  Notwithstanding any other provision hereof, if any portion of a Claim is a Disputed Claim, no Distribution shall be made on account of the disputed portion of such Claim unless and until such Disputed portion of such Claim becomes Allowed.

**11.3    Estimation of Claims.**  The Plan Administrator may at any time request that the Bankruptcy Court estimate for any purpose including Distribution any contingent, unliquidated or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code or otherwise, regardless of whether such Debtor previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection.  The Bankruptcy Court will retain exclusive

jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any proceedings relating to any such Disputed Claim or any appeal relating to any such objection to a Disputed Claim.  In the event that the Bankruptcy Court estimates any contingent, unliquidated or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court estimating such Claim.  If the estimated amount constitutes a maximum limitation on the amount of such Claim, such Debtor may pursue supplementary proceedings to object to the allowance of such Claim.  All of the aforementioned objection, estimation and resolution procedures are intended to be cumulative and not exclusive of one another.  Claims may be estimated and subsequently disallowed, reduced, compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.  Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such holder has filed a motion requesting the right to seek such reconsideration on or before twenty-one (21) days after the date on which such Claim is estimated.

**11.4    Resolution of Disputed Claims.**  On and after the Effective Date, the Plan Administrator shall have the authority to compromise, settle or otherwise resolve or withdraw any objections to Claims and to compromise, enter into protocols for the resolution of, settle or otherwise resolve any Disputed Claims regardless of whether such Claims are in a Class or otherwise (at the applicable Wind-Down Debtor's or Plan Administrator's sole discretion with or without Bankruptcy Court approval), from and after the Effective Date, the Plan Administrator shall have the sole authority to administer and adjust the Claims Register to reflect any such settlements or compromises without further notice to or action, order or hearing of the Bankruptcy Court.  On the date of the first Distribution that is at least sixty (60) days after the date on which the order allowing a Disputed Claim becomes a Final Order, such Debtor shall remit, to the holder of such Allowed Claim, Creditor Proceeds equal to the amount such holder would have received as of that date under the Plan if the Allowed portion of the Disputed Claim had been an Allowed Claim as of the Effective Date.  To the extent that a Disputed Claim against a Debtor is not Allowed or becomes an Allowed Claim in an amount less than the amount of the Disputed Claim set forth in the proof of claim, or as previously estimated by the Bankruptcy Court, the excess of the amount of Creditor Proceeds that would have been distributed to the holder of the Disputed Claim if the Claim had been Allowed in full, over the amount of Creditor Proceeds actually distributed on account of such Disputed Claim, shall become Creditor Proceeds for Distribution to other holders of Allowed Claims in the Class corresponding to the Disputed Claim at issue in accordance with the terms of the Plan and the Bankruptcy Code.

**11.5    No Interest.**  Holders of Disputed Claims shall not be entitled to interest if such Disputed Claim becomes an Allowed Claim.

**11.6    Disputed Claims Reserve.**  On or after the Effective Date, the Plan Administrator shall reserve an aggregate amount of Cash sufficient to pay to each holder of a Disputed Claim the amount of any Distributions that such holder would have been entitled to receive under the Plan if such Claim had been an Allowed Claim; *provided*, *however*, that the

amount of such Disputed Claims is to be determined, solely for the purposes of establishing reserves and for maximum distribution purposes, to be the lesser of (a) the asserted amount of the Disputed Claim filed with the Bankruptcy Court as set forth in the non-duplicative Proof of Claim or (b) the amount, if any, estimated by the Bankruptcy Court pursuant to section 502(c) of the Bankruptcy Code or ordered by other order of the Bankruptcy Court or (c) the amount otherwise agreed to by the Debtors or the Plan Administrator, as applicable, in consultation with the Holder of such Disputed Claim for distribution purposes. With respect to all Disputed Claims that are unliquidated or contingent and/or for which no dollar amount is asserted on a Proof of Claim, the Wind-Down Debtors or Plan Administrator, as applicable, will reserve Cash equal to the amount reasonably determined by the Debtors, Wind-Down Debtors or Plan Administrator.

**11.7    No Amendments to Claims.** A Claim may be amended before the Confirmation Date only as agreed upon by the Debtors and the holder of such Claim or as otherwise permitted by the Bankruptcy Court, the Bankruptcy Rules or applicable law. On or after the Confirmation Date, the holder of a Claim (other than an Administrative Expense Claim or a Professional Claim) must obtain prior authorization from the Bankruptcy Court or Wind-Down Debtors to file or amend a Claim. Any new or amended Claim filed after the Confirmation Date without such prior authorization will not appear on the Claims Register and will be deemed disallowed in full and expunged without any action required of the Debtors or the Wind-Down Debtors and without the need for any court order.

**11.8    No Late-Filed Claims**. In accordance with section 502(b)(9) of the Bankruptcy Code, any entity that failed to file a proof of Claim by the applicable bar date set by the Bankruptcy Court in these Chapter 11 Cases and was not otherwise permitted to file a proof of Claim after the applicable bar date by a Final Order of the Bankruptcy Court is and shall be barred, estopped and enjoined from asserting any Claim against the Debtors (a) in an amount that exceeds the amount, if any, that is identified in the Schedules on behalf of such entity as undisputed, noncontingent and liquidated; or (b) of a different nature or a different classification than any Claim identified in the Schedules on behalf of such Entity. The Debtors and the Wind-Down Debtors shall be entitled, for the purposes of distributions, reserves and other similar purposes under this Plan, to treat all Claims filed after the later of (a) the Effective Date and (b) the Claim's applicable bar date, as disallowed and expunged unless the Holder of such Claim Files a motion to have the late post-Effective Date Claim deemed timely Filed by the Bankruptcy Court. The Debtors and the Wind-Down Debtors have no obligation to review or respond to any Claims Filed after the later of (a) the Effective Date and (b) the Claim's applicable bar date, unless: (y) the filer has obtained an order from the Bankruptcy Court authorizing it to file such Claim after the applicable bar date; or (z) the Wind-Down Debtors have consented to the filing of such Claim in writing, provided that if any such Claim is then Allowed, any amounts due will be payable only from any Disputed Claims Reserves and not by the Wind-Down Debtors.

## ARTICLE 12.
## <u>CONDITIONS PRECEDENT</u>

**12.1    Conditions to Confirmation.**  The following are conditions precedent to the Confirmation of the Plan with respect to each Debtor:

(a)    <u>Confirmation Order</u>. The Bankruptcy Court shall have entered the Confirmation Order; and

(b)    <u>CCAA Sanction Order</u>.  The Sanction Order shall have been issued by the CCAA Court.

**12.2    Canadian and U.S. Plans Effectiveness.**  This Plan and the Canadian Plan shall become effective at the same time on the Plans Effective Date. On the Plans Effective Date: (i) the Monitor shall deliver a certificate to the Debtors declaring the effectiveness of the Canadian Plan; and (ii) the Debtors shall deliver a certificate to the Canadian Debtors and the Monitor declaring the effectiveness of the Plan ((i) and (ii), together, the "<u>Plan Certificates</u>").  Such Plan Certificates shall be held in escrow and released simultaneously, thereby triggering the effectiveness of the Plan and the Canadian Plan and the occurrence of the Plans Effective Date (as such term is defined in the SPSA).

**12.3    Conditions to the Effective Date.**  The following are conditions precedent to the Effective Date of the Plan with respect to each Debtor:

(a)    All actions and agreements, instruments, certificates or other documents necessary to implement the terms and provisions of the Plan are effected or executed and delivered, as applicable, in form and substance satisfactory to the Debtors.

(b)    All authorizations, consents and regulatory approvals, if any, required in connection with the consummation of the Plan are obtained and not revoked.

(c)    The amended organizational documents of Wind-Down NNI and the Wind-Down Subsidiaries shall have been filed with the applicable authority of each Wind-Down Debtor's respective jurisdiction of incorporation or formation in accordance with such jurisdiction's applicable laws.

(d)    All statutory fees then due to the U.S. Trustee shall have been paid in full by the Debtors pursuant to the Plan.

(e)    The conditions precedent in this Section 12.3 to the effectiveness of each other Debtor's separate Plans have been satisfied.

(f)    The Confirmation Order shall have been entered by the Bankruptcy Court by no later than February 17, 2017 and thereafter shall have become a Final Order.

(g)     The U.S. Escrow Release Order shall have been entered by the Bankruptcy Court and the Canadian Escrow Release Order shall have been entered by the Canadian Court.

(h)     Appropriate notices and other documents dismissing with prejudice the various pending litigations specified in Section 7.23 shall have been executed by the SPSA Parties to such litigation and delivered to one another in escrow.

(i)     The Sanction Order shall have been issued by the CCAA Court by no later than February 17, 2017 and entered and thereafter shall have become a Final Order.

(j)     All conditions precedent to the effectiveness of the Canadian Plan (excluding, for the avoidance of doubt, the occurrence of the Effective Date) shall have been satisfied or waived and the Debtors and Canadian Debtors shall have exchanged and released the Plan Certificates in accordance with Section 12.2 such that the Canadian Plan shall become effective in accordance with its terms simultaneously with the occurrence of the Effective Date.

(k)     Entry of an order or orders by no later than November 4, 2016 by the U.K. Court that the Joint Administrators be at liberty to perform and procure the relevant EMEA Debtor in respect of which they are appointed to perform their respective obligations under the SPSA, including, without limitation, delivering the SPSA Releases, and any other actions necessary to implement the SPSA.

(l)     Entry of an order or orders by no later than November 4, 2016 by the U.K. Court that the NNSA Conflicts Administrator and NNSA (in the French Main Proceeding) be at liberty to perform their obligations under the SPSA, including, without limitation, delivering the SPSA Releases, and any other actions necessary to implement the SPSA.

(m)     Entry of an order or orders by no later than November 4, 2016 by the French Court approving and authorizing the entry into the SPSA by NNSA (in the French Secondary Proceeding), and authorizing NNSA to perform its obligations under the SPSA, including, without limitation, delivering the SPSA Releases, and any other actions necessary to implement the SPSA.

(n)     Entry of an order or orders by no later than November 4, 2016 by the Beddoes Court authorizing the U.K. Pension Trustee to implement the SPSA and perform its obligations under the SPSA, including, without limitation, delivering the SPSA Releases, and any other actions necessary to implement the SPSA.

(o)     All conditions of Section 9(a) of the SPSA, except for the occurrence of the Plans Effective Date, shall have been satisfied or have been waived by the required waiver parties set forth in Section 9(a) of the SPSA, including with respect to the Debtors, such waiver being subject to the prior consent of the Creditors' Committee and  the Bondholder Group, acting reasonably and in good faith.

(p)    The SPSA shall not have been terminated, including based on the non-occurrence of the Plans Effective Date on or prior to August 31, 2017, or such later date as is agreed upon in writing by the Debtors and the SPSA Parties in accordance with any applicable provision of the SPSA.

(q)    An order recognizing the Confirmation Order shall have been granted by the CCAA Court in the proceedings commenced in respect of the U.S. Debtors under section 18.6 of the CCAA.

(r)    A Final Order shall have been entered in NNIII's chapter 11 case approving the SPSA pursuant to Bankruptcy Rule 9019, including allowing NNL's claim against NNIII listed on Annex L to the SPSA as a general unsecured claim entitled to receive distributions under a plan on a *pari passu* basis with other general unsecured claims against NNIII.

**12.4    Waiver of Conditions.**  Notwithstanding the foregoing, each Debtor reserves its right, with respect to such Debtor's Chapter 11 Case only, to waive the occurrence of the conditions precedent to the Effective Date set forth in Section 12.3 of the Plan, other than  Section 12.3(o) and Section 12.3(p) of the Plan.  Any such waiver may be given effect at any time, without notice, leave, hearing or order of the Bankruptcy Court, and without any formal action other than proceeding to consummate the Plan, provided that notice of any such waiver shall promptly be provided to the SPSA Parties.  Any actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action. If any of the Debtors decide that one of the conditions precedents to the Effective Date of its Plan cannot be satisfied and the occurrence or such condition is not waived or cannot be waived, then such Debtor shall file a notice of the inability to satisfy such condition with the Bankruptcy Court.  The failure of a Debtor to exercise any of the foregoing rights shall not be deemed a waiver of any other rights and each right shall be deemed an ongoing right that may be asserted at any time.

**12.5    Notice of Effective Date.**  Upon the occurrence of the Plans Effective Date or as soon thereafter as is reasonably practicable, the Debtors shall File with the Bankruptcy Court the "Notice of Effective Date" in a form reasonably acceptable to the Debtors in their sole discretion, which notice shall constitute appropriate and adequate notice that the Plan has become effective; *provided*, *however*, that the Debtors shall have no obligation to notify any Person other than counsel to the Creditors' Committee and the Bondholder Group of such fact.  The Plan shall be deemed to be effective as of 12:01 a.m., prevailing Eastern Standard Time, on the date of such filing.  A courtesy copy of the Notice of Effective Date may be sent by United States mail, postage prepaid (or at the Debtors' option, by courier, facsimile or electronic mail) to those Persons who have Filed with the Bankruptcy Court requests for notices pursuant to Bankruptcy Rule 2002.

**12.6    Limited Severability of the Plan.**  Subject to the Debtors' obligations under the SPSA, the Plan shall be deemed a separate chapter 11 plan for each individual Debtor (except in the case of the Consolidated Debtors, NNI and NNCC) and the Confirmation and effectiveness of any Debtor's Plan is not conditioned on the Confirmation

and effectiveness of any other Debtor's Plan.  In the event that the Plan is not confirmed for any individual Debtor,  the Plan shall be treated at the Confirmation Hearing as a motion seeking approval of the SPSA pursuant to Bankruptcy Rule 9019 as to any such individual Debtor that does not confirm a Plan.  Following the approval of the SPSA, any individual Debtor may dismiss or convert its chapter 11 case, as necessary to effectuate the SPSA and the settlement contemplated therein or to wind down and cease operations. The Debtors shall coordinate with the SPSA Parties to make any required amendments or seek any required waivers to or under the SPSA in order to implement any such actions, subject to the SPSA Parties' rights under the SPSA.

        **12.7    Consequences of Non-Occurrence of Effective Date.**  If, following the entry of the Confirmation Order, the Effective Date does not occur on or before August 31, 2017, or such later date as is agreed upon in writing by the Debtors and the SPSA Parties in accordance with any applicable provision of the SPSA, and the SPSA is terminated in accordance with Section 10 thereof, then the Confirmation Order will be deemed vacated by the Bankruptcy Court without further notice or order. If the Confirmation Order is vacated pursuant to this Section, (a) the Debtors shall File a notice to this effect with the Bankruptcy Court, (b) this Plan shall be null and void in all respects, (c) any settlement of Claims provided for hereby shall be null and void without further order of the Bankruptcy Court, and (d) the time within which the Debtors may assume, assume and assign or reject all executory contracts and unexpired leases shall be extended for a period of sixty (60) days after the date the Confirmation Order is vacated; provided, however, that the Debtors retain their rights to seek further extensions of such deadline in accordance with, and subject to, section 365 of the Bankruptcy Code, and nothing contained in the Plan or Disclosure Statement shall (x) constitute a waiver or release of any Claims, Interests, or Causes of Action, (y) prejudice in any manner the rights of any Debtor or any other Entity or (z) constitute an admission, acknowledgement, offer or undertaking of any sort by any Debtor or any other entity.

<div align="center">

**ARTICLE 13.**
**EFFECT OF CONFIRMATION**

</div>

        **13.1    Binding Effect; Plan Binds All Holders of Claims and Equity Interests.**

        (a)    Except as otherwise provided in section 1141(d) of the Bankruptcy Code, on and after the Effective Date, the provisions of the Plan shall, and shall be deemed to, be binding on any holder of a Claim against or Interest in the Debtors and its respective successors and assigns, regardless of whether the Claim or Interest of such holder is Impaired under the Plan and whether or not such holder has voted or failed to vote to accept or reject the Plan.

        (b)    Further, pursuant to section 1142 of the Bankruptcy Code and in accordance with the Confirmation Order, the Debtors and any other necessary party shall execute, deliver and join in the execution or delivery (as applicable) of any instrument, document or agreement required to consummate the Plan, and to perform any other act, and

<div align="center">

71

</div>

the execution of documents contemplated in the Plan, including in the Plan Supplement, that are necessary for the consummation of the Plan and the transactions contemplated herein.

**13.2    Release and Discharge of Debtors and Wind-Down Debtors.**

**EFFECTIVE AS OF THE EFFECTIVE DATE, FOR GOOD AND VALUABLE CONSIDERATION, TO THE FULLEST EXTENT PERMISSIBLE UNDER APPLICABLE LAW, THE HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS AND EACH OF SUCH HOLDERS' PREDECESSORS, SUCCESSORS, ASSIGNS AND EACH OF THEIR PRESENT AND FORMER OFFICERS, DIRECTORS, EMPLOYEES, CONSULTANTS AND AGENTS (ACTING IN SUCH CAPACITY) WILL BE DEEMED TO HAVE WAIVED, RELEASED, VOIDED AND DISCHARGED EACH OF THE DEBTORS AND THE WIND-DOWN DEBTORS FROM ANY AND ALL CLAIMS, OBLIGATIONS, DAMAGES, DEMANDS, DEBTS, RIGHTS, SUITS, JUDGMENTS OR LIABILITIES (OTHER THAN THE RIGHT TO ENFORCE THE DEBTORS' OR THE WIND-DOWN DEBTORS' OBLIGATIONS UNDER THIS PLAN, THE SPSA AND THE CONTRACTS, INSTRUMENTS, RELEASES, AGREEMENTS AND DOCUMENTS DELIVERED UNDER THIS PLAN), WHETHER LIQUIDATED OR UNLIQUIDATED, FIXED OR CONTINGENT, MATURED OR UNMATURED, KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, THEN EXISTING OR THEREAFTER ARISING, IN LAW, EQUITY OR OTHERWISE, THAT ARE BASED IN WHOLE OR IN PART ON ANY ACT OR OMISSION, TRANSACTION, EVENT OR OTHER OCCURRENCE TAKING PLACE ON OR PRIOR TO THE EFFECTIVE DATE IN ANY WAY RELATING TO THE DEBTORS, THE CHAPTER 11 CASES, THE DISCLOSURE STATEMENT OR THE PLAN (INCLUDING, WITHOUT LIMITATION, THE SOLICITATION OF VOTES ON THE PLAN) THAT COULD HAVE BEEN ASSERTED BY THE HOLDERS OF CLAIMS AGAINST OR INTERESTS IN THE DEBTORS, IN THEIR INDIVIDUAL CAPACITIES OR ON BEHALF (WHETHER DIRECTLY OR DERIVATIVELY) OF THE DEBTORS, THEIR ESTATES, THE WIND-DOWN DEBTORS, EACH OF THEIR PREDECESSORS, SUCCESSORS, ASSIGNS AND EACH OF THEIR PRESENT AND FORMER OFFICERS, DIRECTORS, EMPLOYEES, CONSULTANTS AND AGENTS (ACTING IN SUCH CAPACITY), IN EACH CASE WITHOUT FURTHER NOTICE TO OR ORDER OF THE BANKRUPTCY COURT, ACT OR ACTION UNDER APPLICABLE LAW, REGULATION, ORDER OR RULE OR THE VOTE, CONSENT OR AUTHORIZATION OR APPROVAL OF ANY PERSON.**

**13.3    Release and Discharge of the Plan Released Parties.**

**EFFECTIVE AS OF THE EFFECTIVE DATE, FOR GOOD AND VALUABLE CONSIDERATION, TO THE FULLEST EXTENT PERMISSIBLE UNDER APPLICABLE LAW, THE HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS AND EACH OF SUCH HOLDERS' PREDECESSORS, SUCCESSORS, ASSIGNS AND EACH OF THEIR PRESENT AND FORMER OFFICERS, DIRECTORS, EMPLOYEES, CONSULTANTS AND AGENTS (ACTING IN SUCH CAPACITY) WHO: (I) EITHER VOTE TO ACCEPT THIS PLAN**

OR ARE PRESUMED TO HAVE VOTED FOR THIS PLAN UNDER SECTION 1126(F) OF THE BANKRUPTCY CODE OR (II) ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THIS PLAN AND ABSTAIN FROM VOTING AND DO NOT MARK THEIR BALLOTS TO INDICATE THEIR REFUSAL TO GRANT THE RELEASES PROVIDED HEREIN WILL BE DEEMED TO HAVE WAIVED, RELEASED, VOIDED AND DISCHARGED EACH OF THE PLAN RELEASED PARTIES FROM ANY AND ALL CLAIMS, OBLIGATIONS, DAMAGES, DEMANDS, DEBTS, RIGHTS, SUITS, JUDGMENTS OR LIABILITIES (OTHER THAN THE RIGHT TO ENFORCE THE PLAN RELEASED PARTIES' OBLIGATIONS UNDER THIS PLAN, THE SPSA AND THE CONTRACTS, INSTRUMENTS, RELEASES, AGREEMENTS AND DOCUMENTS DELIVERED UNDER THIS PLAN), WHETHER LIQUIDATED OR UNLIQUIDATED, FIXED OR CONTINGENT, MATURED OR UNMATURED, KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, THEN EXISTING OR THEREAFTER ARISING, IN LAW, EQUITY OR OTHERWISE, THAT ARE BASED IN WHOLE OR IN PART ON ANY ACT OR OMISSION, TRANSACTION, EVENT OR OTHER OCCURRENCE TAKING PLACE ON OR PRIOR TO THE EFFECTIVE DATE IN ANY WAY RELATING TO THE DEBTORS, THE CHAPTER 11 CASES, THE DISCLOSURE STATEMENT, THE SPSA OR THE PLAN (INCLUDING, WITHOUT LIMITATION, THE SOLICITATION OF VOTES ON THE PLAN) THAT COULD HAVE BEEN ASSERTED BY THE HOLDERS OF CLAIMS AGAINST OR INTERESTS IN THE DEBTORS, IN THEIR INDIVIDUAL CAPACITIES OR ON BEHALF (WHETHER DIRECTLY OR DERIVATIVELY) OF THE DEBTORS, THEIR ESTATES, THE WIND-DOWN DEBTORS, EACH OF THEIR PREDECESSORS, SUCCESSORS, ASSIGNS AND EACH OF THEIR PRESENT AND FORMER OFFICERS, DIRECTORS, EMPLOYEES, CONSULTANTS AND AGENTS (ACTING IN SUCH CAPACITY), IN EACH CASE WITHOUT FURTHER NOTICE TO OR ORDER OF THE BANKRUPTCY COURT, ACT OR ACTION UNDER APPLICABLE LAW, REGULATION, ORDER OR RULE OR THE VOTE, CONSENT OR AUTHORIZATION OR APPROVAL OF ANY PERSON.

NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS SECTION 13.3 OR SECTION 13.2 HEREOF, THE RELEASES SET FORTH ABOVE DO NOT RELEASE ANY POST-EFFECTIVE DATE OBLIGATIONS OF ANY PARTY OR ENTITY UNDER THE PLAN, OR ANY DOCUMENT, INSTRUMENT OR AGREEMENT (INCLUDING THOSE SET FORTH IN THE PLAN SUPPLEMENT) EXECUTED TO IMPLEMENT THE PLAN, INCLUDING THE SPSA, AND EXCEPT AS OTHERWISE PROVIDED BY PRIOR OR SUBSEQUENT FINAL ORDER OF THE BANKRUPTCY COURT, NOTHING IN THIS SECTION 13.3 OR SECTION 13.2 SHALL OPERATE AS A WAIVER OR RELEASE OF (A) ANY PERSON (I) NAMED PRIOR TO THE EFFECTIVE DATE AS A DEFENDANT IN ANY ACTION COMMENCED BY OR ON BEHALF OF THE DEBTORS-IN-POSSESSION, INCLUDING ANY ACTIONS PROSECUTED BY THE CREDITORS' COMMITTEE AND THE BONDHOLDER GROUP OR (II) ADJUDICATED PRIOR TO THE EFFECTIVE DATE BY A COURT OF COMPETENT JURISDICTION TO HAVE ENGAGED IN ACTS OF DISHONESTY OR WILLFUL MISCONDUCT DETRIMENTAL TO THE INTEREST OF THE DEBTORS OR (B) ANY CLAIM (I)

**WITH RESPECT TO ANY LOAN, ADVANCE OR SIMILAR PAYMENT BY THE DEBTORS TO ANY SUCH PERSON, (II) WITH RESPECT TO ANY CONTRACTUAL OBLIGATION OWED BY SUCH PERSON TO THE DEBTORS OR (III) RELATING TO SUCH PERSON'S KNOWING FRAUD, GROSS NEGLIGENCE OR WILLFUL MISCONDUCT; AND *PROVIDED*, *FURTHER*, THAT THE FOREGOING IS NOT INTENDED, NOR SHALL IT BE CONSTRUED, TO RELEASE ANY OF THE DEBTORS' CLAIMS THAT MAY EXIST AGAINST THE DEBTORS' DIRECTORS AND OFFICERS LIABILITY INSURANCE; AND *PROVIDED*, *FURTHER*, THAT, NOTWITHSTANDING THE FOREGOING, ALL SUCH CLAIMS SHALL BE PRESERVED BY THE DEBTORS FOR SETOFF PURPOSES.**

       13.4    **SPSA Releases.**

       **UPON THE EFFECTIVE DATE, AS PROVIDED IN SECTION 8 OF THE SPSA AND IN CONSIDERATION FOR THE SETTLEMENTS PROVIDED FOR UNDER THE SPSA INCLUDING THE RELEASES GRANTED IN FAVOR OF THE DEBTOR RELEASING PARTIES UNDER THE SPSA, EACH OF THE DEBTOR RELEASING PARTIES (I) SHALL BE DEEMED TO HAVE RELEASED AND FOREVER DISCHARGED EACH OF THE OTHER SPSA RELEASED PARTIES FROM ANY AND ALL LIABILITY FOR CLAIMS, DEFENSES, DEMANDS, LIABILITIES, DAMAGES, ACTIONS, CONTRIBUTIONS, SUBROGATION, CAUSES OF ACTION, SETOFFS, RECOUPMENTS, COSTS AND EXPENSES (INCLUDING LAWYERS' OR OTHER FEES OR EXPENSES), THE FOREGOING TERMS TO BE CONSTRUED AS BROADLY AS POSSIBLE, WHETHER KNOWN OR UNKNOWN, PAST OR PRESENT, FIXED OR CONTINGENT, LIQUIDATED OR UNLIQUIDATED, WHICH ANY OF THE DEBTOR RELEASING PARTIES HAVE, HAD, MAY HAVE HAD OR HEREAFTER MAY HAVE HOWEVER SO ARISING OUT OF OR IN CONNECTION WITH THE ALLOCATION DISPUTE, ANY OTHER MATTERS RESOLVED UNDER THE SPSA OR ANY OTHER MATTER RELATING TO THE CHAPTER 11 CASES OR THE FOREIGN PROCEEDINGS OR THE NORTEL GROUP (COLLECTIVELY, AND EXCLUDING THE NON-RELEASED MATTERS, THE "SPSA RELEASED CLAIMS") AND UNDERTAKE, COVENANT AND AGREE NOT TO MAKE ANY CLAIM, PARTICIPATE IN ANY PROCEEDING OR TAKE ANY ACTION AGAINST ANY OTHER PERSON OR ENTITY WHO WOULD AS A RESULT OF SUCH CLAIM, PROCEEDING OR ACTION HAVE A CLAIM FOR CONTRIBUTION OR INDEMNITY AGAINST ANY OF THE OTHER SPSA RELEASED PARTIES IN RELATION TO THE SPSA RELEASED CLAIMS, *PROVIDED HOWEVER*, THAT THE DEBTORS' RIGHT TO OBJECT TO, OR ASSERT COUNTERCLAIMS FOR PURPOSES OF SETOFF AGAINST, CLAIMS MADE AGAINST THEM BY DIRECTORS AND OFFICERS OF ANY NORTEL ENTITY AGAINST SUCH DEBTORS IS NOT RELEASED OR IN ANY WAY COMPROMISED. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS PARAGRAPH, THE RELEASES SET FORTH ABOVE IN THIS SECTION 13.4 DO NOT CONSTITUTE A RELEASE, WAIVER OR DISCHARGE OF ANY PROVEN CLAIMS AGAINST THE CANADIAN ESTATE FOR PAYMENT OF THE CROSSOVER BONDS OR THE NNCC BONDS, THE U.S. CANADIAN CLAIM, THE**

74

U.S. CANADIAN PRIORITY CLAIM, THE INTERCOMPANY CLAIMS SPECIFIED ON ANNEX L TO THE SPSA, NNI'S RIGHT TO RECEIVE PAYMENT FROM THE CANADIAN ESTATE IN THE AMOUNT OF $77.5 MILLION, AS PROVIDED FOR IN SECTION 4(E) OF THE SPSA, ANY CLAIM BETWEEN OR AMONG ANY OF THE DEBTORS AND THEIR SUBSIDIARIES, ANY CLAIM BETWEEN THE PBGC AND THE DEBTORS OR ANY OF THEIR U.S. SUBSIDIARIES, ANY PROFESSIONAL CLAIM, ANY CLAIM TO ENFORCE THE TERMS OF THE SPSA, THE PLAN, THE CANADIAN PLAN, AND ANY ORDER OF THE BANKRUPTCY COURT OR THE CCAA COURT RELATED THERETO, OR ANY OTHER MATTER LISTED UNDER SECTION 8(i) OF THE SPSA (COLLECTIVELY, THE "<u>NON-RELEASED MATTERS</u>").

### 13.5    Exculpation and Limitation of Liability.

None of the Exculpated Parties shall have or incur any liability to any Entity for any act taken or omitted to be taken in connection with and subsequent to the commencement of the Chapter 11 Cases, the formulation, preparation, dissemination, implementation, solicitation of votes, confirmation or approval of the Plan or any compromises or settlements contained therein, the administration of the Plan or Distributions under the Plan, the Disclosure Statement and any ancillary documents related thereto or any contract, instrument, release or other agreement or document provided for or contemplated in connection with the consummation of the transactions set forth in the Plan; *provided*, *however*, the foregoing provisions of this Section 13.5 shall not affect the liability of any Exculpated Party that otherwise would result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted gross negligence or willful misconduct, including, without limitation, fraud and criminal misconduct, and in all respects the Exculpated Parties shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under this Plan.

### 13.6    Injunction on Claims.

Except as otherwise expressly provided in the Plan, the Confirmation Order or such other order of the Bankruptcy Court that may be applicable, all holders of Claims or other debt or liability that is treated under the Plan or Interest or other right of interest that is terminated or cancelled pursuant to the Plan are permanently enjoined, from and after the Effective Date, from (a) commencing or continuing in any manner any action or other proceeding of any kind on any such Claim or other debt or liability or Interest or other right of equity interest that is terminated or cancelled pursuant to the Plan against the Debtors, the Estates or the Wind-Down Debtors or any properties or interest in properties of the Debtors or the Wind-Down Debtors, (b) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against the Debtors, the Estates or the Wind-Down Debtors or any properties or interest in properties of the Debtors or the Wind-Down Debtors, (c) creating, perfecting or enforcing any encumbrance of any kind against the Debtors, the Estates or the Wind-Down Debtors or any properties or interest in properties of the Debtors or the Wind-Down Debtors, (d) asserting any right of setoff,

**subrogation or recoupment of any kind against any obligation due from the Debtors, the Estates or the Wind-Down Debtors or any properties or interest in properties of the Debtors or the Wind-Down Debtors, (e) acting or proceeding in any manner that does not conform to or comply with the provisions of the Plan and (f) taking any actions to interfere with the implementation or consummation of the Plan, with respect to any such Claim or other debt or liability that is discharged or Interest or other right of equity interest that is terminated or cancelled pursuant to the Plan.**

        **13.7    Terms of Injunctions or Stays.**  Unless otherwise provided in the Plan, the Confirmation Order or a separate order of the Bankruptcy Court, all injunctions or stays arising under or entered during the Chapter 11 Cases under sections 105 and 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until each Debtor's Effective Date.  Upon each Debtor's respective Effective Date, all injunctions or stays provided for in each Chapter 11 Case under sections 105 or 362 of the Bankruptcy Code, or otherwise, shall be lifted and of no further force or effect — being replaced, to the extent applicable, by the injunctions, discharges, releases and exculpations of this Article 13.

        **13.8    Retention of Litigation Claims and Reservation of Rights.**

        (a)    Except as expressly provided in the Plan, nothing contained in the Plan or in the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights with respect to Litigation Claims that the Debtors, the Wind-Down Debtors or the Plan Administrator may have or choose to assert on behalf of the respective Estates or Wind-Down Debtors under any provision of the Bankruptcy Code or any applicable nonbankruptcy law, including, without limitation, any and all claims against any Person or Entity, to the extent such Person or Entity asserts a cross-claim, counterclaim or claim for setoff that seeks affirmative relief against the Debtors, their officers, directors or representatives.

        (b)    Except as expressly provided in the Plan, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any Litigation Claim, right of setoff or other legal or equitable defense that the Debtors had immediately prior to the Petition Date, against or with respect to any Claim.  The Debtors, the Wind-Down Debtors and the Plan Administrator shall have, retain, reserve and be entitled to assert all such Litigation Claims, rights of setoff, and other legal or equitable defenses that the relevant Debtor had immediately prior to the Petition Date fully as if the Chapter 11 Cases had not been commenced, and all of the Debtors' legal and equitable rights respecting any Claim may be asserted after the Confirmation Date to the same extent as if the Chapter 11 Cases had not been commenced.

        (c)    Except as expressly provided in the Plan, the Plan Administrator, shall, after the Effective Date, retain the rights of each Debtor to prosecute any Litigation Claims that could have been brought by such Debtor at any time.

**13.9    Retention of Rights.**  The Plan Administrator and the Wind-Down Debtors shall retain the rights of each Debtor to enforce all orders entered and relief granted in the Chapter 11 Cases.

**13.10    Vesting.**  Except as otherwise expressly provided in the Plan or the SPSA, or any documents or instruments executed in accordance therewith, on the Effective Date, pursuant to section 1141(b) and section 1141(c) of the Bankruptcy Code, the Wind-Down Debtors shall be vested with all of the Assets of such Debtors' Estates free and clear of all Claims, Interests, Liens, encumbrances, charges and other interests of Creditors and holders of Interests, and may operate free of any restrictions imposed by the Bankruptcy Code or by the Bankruptcy Court, including, without limitation, performing any contract or lease entered into or assumed by any of the Debtors after the Petition Date.  The Debtors shall continue as Debtors-in-Possession under the Bankruptcy Code until the Effective Date, and thereafter, subject to the terms of the Plan, the Wind-Down Debtors may operate free of any restrictions imposed by the Bankruptcy Code or the Bankruptcy Court.

**ARTICLE 14.**
**RETENTION OF JURISDICTION**

Pursuant to sections 105 and 1142 of the Bankruptcy Code, and notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising in, arising under or related to the Chapter 11 Cases and this Plan to the fullest extent permitted by law, including, among other things, jurisdiction to:

(a)    Allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Interest, including the resolution of any request for payment of any Administrative Expense Claim and the resolution of any and all objections to the allowance or priority of all Claims and Interests;

(b)    Hear and determine any and all Causes of Action against any Person and rights of the Debtors and the Wind-Down Debtors that arose before or after the Petition Date, including, but not limited to, the rights and powers of a trustee and Debtor-in-Possession against any Person whatsoever, including, but not limited to, all avoidance powers granted to the Debtors under the Bankruptcy Code and all Causes of Action and remedies granted pursuant to sections 502, 506, 510, 541, 542, 543, 544, 545, 547 through 551 and 553 of the Bankruptcy Code;

(c)    Grant or deny any applications for allowance of compensation for Professionals authorized pursuant to the Bankruptcy Code or the Plan, for periods ending on or prior to the Effective Date; *provided*, *however*, that the payment of all fees and expenses of the Wind-Down Debtors and the Plan Administrator incurred from and after the Effective Date, including counsel fees, shall be made in the ordinary course and without further notice or Bankruptcy Court approval;

(d)    Resolve any matters relating to the assumption, assumption and assignment or rejection of any executory contract or unexpired lease to which any Debtor is or

77

was a party or with respect to which any of the Debtors may be liable, including, without limitation, the determination of whether such contract is executory for the purposes of section 365 of the Bankruptcy Code, and hear, determine and, if necessary, liquidate any Claims arising therefrom;

(e)     Enter orders approving the Wind-Down Debtors' post-Confirmation sale or other disposition of Residual Assets upon motion by the Plan Administrator;

(f)     Ensure that Distributions to holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

(g)     Decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications involving any Debtor that may be pending in the Chapter 11 Cases on the Effective Date;

(h)     Hear and determine matters concerning state, local or federal taxes in accordance with sections 346, 505, 1129 or 1146 of the Bankruptcy Code, including all matters related to any Tax Dispute;

(i)     Enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and the Confirmation Order and all contracts, instruments, releases and other agreements or documents created in connection with this Plan, the Disclosure Statement or the Confirmation Order;

(j)     Hear and determine any matters concerning the enforcement of the provisions of Article 13 of this Plan and any other exculpations, limitations of liability or injunctions contemplated by this Plan;

(k)     Resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of the Plan or the Confirmation Order;

(l)     Permit the Debtors, to the extent authorized pursuant to section 1127 of the Bankruptcy Code, to modify the Plan, Confirmation Order or any agreement, contract, instrument release or document created in connection with the Plan, the Disclosure Statement or the Confirmation Order, or remedy any defect or omission or reconcile any inconsistency in the Plan or any agreement, contract, instrument, release or document created in connection with the Plan;

(m)     Issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any entity with respect to consummation, implementation or enforcement of the Plan or the Confirmation Order;

(n)    Enforce all orders, judgments, injunctions, releases, exculpations, indemnifications and rulings, including with respect to the Plan and the Confirmation Order, entered in connection with the Chapter 11 Cases;

(o)    Hear and determine Causes of Action by or on behalf of the Debtors or the Wind-Down Debtors or the Plan Administrator;

(p)    Enter and enforce such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated, or Distributions pursuant to the Plan are enjoined or stayed;

(q)    Hear and determine all claims, rights or disputes arising under or in connection with the orders previously entered in the Chapter 11 Cases;

(r)    Hear and determine any other matters that may arise in connection with or relating to the Plan, the SPSA, the Plan Administration Agreement, or any agreement or the Confirmation Order;

(s)    Enter any orders in aid of and resolve any matters relating to or arising under prior orders of the Bankruptcy Court; and

(t)    Enter final decrees closing the Chapter 11 Cases.

# ARTICLE 15.
## MISCELLANEOUS PROVISIONS

**15.1    Effectuating Documents and Further Transactions.**  Each of the Debtors and the Wind-Down Debtors and, on and after the Effective Date, the Plan Administrator shall be authorized to execute, deliver, file or record such contracts, instruments, releases, consents, certificates, resolutions, programs and other agreements or documents and take such acts and actions as may be reasonable, necessary or appropriate to effectuate, implement, consummate or further evidence the terms and conditions of this Plan, the Confirmation Order and any transactions described in or contemplated by this Plan, without the need for any approvals, authorization or consents except for those expressly required pursuant to the Plan.

**15.2    Authority to Act.**  All matters expressly provided for under this Plan that would otherwise require approval of the stockholders, security holders, officers, directors, partners, managers, members or other owners of one or more of the Debtors or Wind-Down Debtors shall be deemed to have occurred and shall be in effect prior to, on or after the Effective Date (as appropriate) pursuant to the applicable law of the states in which the Debtors or Wind-Down Debtors are formed, without any requirement of further vote, consent, approval, authorization or other action by such stockholders, security holders, officers, directors, partners, managers, members or other owners of such entities or notice to, order of or hearing before the Bankruptcy Court.

**15.3    Plan Supplement.**  The Plan Administration Agreement, the amended certificate and by-laws of Wind-Down NNI, the certificate of formation and the operating agreement of each of the Wind-Down  Subsidiaries and a list of any contracts or leases to be assumed or assumed and assigned by the Debtors in accordance with Section 9.2 shall be contained in the Plan Supplement that is Filed at least ten (10) days prior to the last day upon which holders of Claims may vote to accept or reject the Plan.  Upon its filing with the Bankruptcy Court, the Plan Supplement may be obtained on the Debtors' independent website at http://dm.epiq11.com/nortel or by request to the Debtors in accordance with Section 15.26 of the Plan.

**15.4    Amendment or Modification of the Plan.**  Subject to Section 6(c) of the SPSA and subject to section 1127 of the Bankruptcy Code and, to the extent applicable, sections 1122, 1123 and 1125 of the Bankruptcy Code, the Debtors reserve the right to alter, amend or modify the Plan at any time prior to the Confirmation Date but prior to the substantial consummation of the Plan.  Notwithstanding the foregoing, the Debtors shall not alter, amend, withdraw, replace or modify the Plan in a manner that is inconsistent with their obligations under the SPSA.  A holder of a Claim that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claims of such holder and is consistent with this Section 15.4.  For the avoidance of doubt, nothing in this Section 15.4 limits any SPSA Party's rights pursuant to Section 6(h) of the SPSA with respect to any proposed amendment, restatement, modification and/or supplement to the Plan.

**15.5    Administrative Expense Claims Reserve.**  On or before the Effective Date, the Debtors shall reserve for (i) Disputed Administrative Expense Claims, Disputed Cure Amounts, Disputed Priority Tax Claims and Disputed Priority Non-Tax Claims, if any, in an amount equal to what would be distributed to holders of Disputed Administrative Expense Claims, Disputed Priority Tax Claims, Disputed Other Priority Claims and Disputed Cure Amounts if their Disputed Claims had been deemed Allowed Claims on the Effective Date or on the Administrative Expense Claims Bar Date to the extent such amounts are known, in an amount reasonably determined by the Debtors to the extent such claims have not yet been filed or are unliquidated, or in such other amount as may be approved by the Bankruptcy Court and (ii) an estimated amount for unpaid Professional Claims and any other Administrative Expense Claims that have not been Filed as of the Effective Date (together, the "Administrative Expense Claims Reserve"). With respect to such Disputed Claims, if, when and to the extent any such Disputed Claim becomes an Allowed Claim by Final Order, the relevant portion of the Cash held in reserve therefore shall be distributed by the Debtors to the claimant in a manner consistent with distributions to similarly situated Allowed Claims.  The balance of such Cash, if any, remaining after all Professional Claims, Disputed Administrative Expense Claims, Disputed Cure Amounts, Disputed Priority Tax Claims and Disputed Other Priority Claims have been resolved, and distributions made in accordance with the Plan, shall be available for Distribution to holders of Allowed Claims, in accordance with the provisions of the Plan and the Confirmation Order.  No payments or distributions shall be made with respect to a Claim that

is a Disputed Claim pending the resolution of the dispute by Final Order or agreement of the parties.

      **15.6    Fees and Expenses.**  From and after the Effective Date, the Wind-Down Debtors shall, in the ordinary course and without the necessity for any approval by the Bankruptcy Court, pay the reasonable and necessary fees and expenses incurred by the Disbursing Agent (other than the NNCC Bonds Indenture Trustee and the NNC/NNL Notes Indenture Trustee) and Plan Administrator in accordance with and from the funds provided for such use in this Plan.

      **15.7    Revocation or Withdrawal of the Plan.**  Subject to the terms of the SPSA, the Debtors reserve the right to revoke or withdraw the Plan prior to the Effective Date.  If any Debtor revokes or withdraws the Plan with respect to such Debtor, or if Confirmation does not occur or if the Plan does not become effective, then the Plan shall be null and void with respect to such Debtor, and nothing contained in the Plan or Disclosure Statement shall: (a) constitute a waiver or release of any Claims by or against, or any Interests in, such Debtor or any other Person; (b) constitute an admission of any fact or legal conclusion by such Debtor or any other Entity; or (c) prejudice in any manner the rights of such Debtor in any further proceedings involving such Debtor.

      **15.8    Insurance Preservation.**  Nothing in the Plan, including any releases, shall diminish or impair the enforceability of any insurance policies or other policies of insurance that may cover insurance claims or other claims against the Debtors or any other Person.

      **15.9    Exemption from Certain Transfer Taxes.**  Pursuant to section 1146 of the Bankruptcy Code, any transfers from any of the Debtors, the Wind-Down Debtors or the Plan Administrator pursuant to, in furtherance of or in connection with this Plan shall not be subject to any stamp tax, recording tax, personal property tax, real estate transfer tax, sales tax, use tax, transaction privilege tax, privilege taxes or other similar tax, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

      **15.10    Subordinated Claims.**  The allowance, classification and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtors reserve the right for the Plan Administrator to re-classify any Allowed Claim or Interest in accordance with any contractual, legal or equitable subordination relating thereto.

**15.11   Cross-Border Protocol and Cross-Border Claims Protocol.**  The Cross-Border Protocol and Cross-Border Claims Protocol shall each remain in full force and effect in accordance with their respective  terms.

**15.12   Governing Law.**  Unless a rule of law or procedure is supplied by (a) United States federal law (including the Bankruptcy Code and Bankruptcy Rules) or (b) an express choice of law provision in any agreement, contract, instrument or document provided for, or executed in connection with, the Plan, the rights and obligations arising under the Plan and any agreements, certificate, by-laws, release, contracts, documents and instruments executed in connection with the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without giving effect to the principles of conflict of laws thereof.

**15.13   No Admissions.**  Notwithstanding anything herein to the contrary, nothing in the Plan shall be deemed as an admission by the Debtors with respect to any matter set forth herein, including liability on any Claim.

**15.14   Effect of Termination of SPSA.**  In the event the SPSA is terminated or the Effective Date does not occur, the SPSA Parties reserve all of their rights and defenses with respect to the claims and other matters resolved by the SPSA and neither anything contained in this Plan nor the proposed settlement set forth in the SPSA shall constitute an admission by any Party regarding the validity of the litigations, claims or defenses resolved by the SPSA or that they have any liability in connection with such litigations, claims or defenses. Except as otherwise provided in the SPSA, the termination of the SPSA for any reason shall result in the SPSA being no longer effective and the rights of all Parties, including all rights advanced in litigation (including in respect of the Allocation Dispute), being restored to the status quo ante.  In the event of the termination of the SPSA, or if the Plan is withdrawn or revoked, each of the Global Debtors (other than Nortel Communications Inc., Architel Systems Corporation, Northern Telecom Canada Limited and Nortel Networks India International Inc.) reserves its rights with regard to the Allocation Decisions and with respect to any interest it may have in the Sale Proceeds on deposit in the New Escrow Accounts.

**15.15   Severability of Plan Provisions.**  Subject to the terms of the SPSA, if, prior to Confirmation, any term or provision of the Plan that does not govern the treatment of Claims or Interests is held by the Bankruptcy Court to be invalid, void or unenforceable, at the request of the Debtors the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation.  The Confirmation Order shall constitute a final judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

**15.16  Successors and Assigns.**  This Plan shall be binding upon and inure to the benefit of the Debtors and their respective successors and assigns, including, without limitation, the Wind-Down Debtors.  The rights, benefits and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such Entity.

**15.17  Defenses with Respect to Unimpaired Claims.**  Except as otherwise provided in this Plan, nothing shall affect the rights and legal and equitable defenses of the Debtors, the Wind-Down Debtors or the Plan Administrator with respect to any Unimpaired Claim, including all rights in respect of legal and equitable defenses to setoffs or recoupments against Unimpaired Claims.

**15.18  Section 1125(e) Good Faith Compliance.**  Confirmation of the Plan shall act as a finding by the Court that the Debtors and each of their respective representatives have acted in "good faith" under section 1125(e) of the Bankruptcy Code**.**

**15.19  No Injunctive Relief.**  Except as otherwise provided in the Plan or Confirmation Order, no Claim or Interest shall under any circumstances be entitled to specific performance or other injunctive, equitable or other prospective relief.

**15.20  Payment of Statutory Fees.**  All fees payable pursuant to section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court, shall be paid for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed or closed, whichever occurs first.

**15.21  Saturday, Sunday or Legal Holiday.**  If any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

**15.22  Dissolution of Creditors' Committee.**  Effective on the Effective Date, the Creditors' Committee shall dissolve automatically and its members shall be released from any further duties and responsibilities in the Chapter 11 Cases and under the Bankruptcy Code without need for a further order of the Bankruptcy Court; *provided*, *however*, that (a) following the Effective Date the Creditors Committee shall continue in existence and have standing and a right to be heard solely for the following limited purposes: (1) Claims and/or applications for compensation by Professionals and requests for allowance of Administrative Expense Claims for substantial contribution pursuant to section 503(b)(3)(D) of the Bankruptcy Code; (2) any appeals relating to the Plan to which the Creditors' Committee is a party; and (3) to respond to creditor inquiries and with respect to reporting under Section 6.3(g) of the Plan for ninety (90) days following the Effective Date. Except for the purposes described above, the Debtors, the Wind-Down Debtors and the Plan Administrator shall not have any obligation to pay or reimburse any fees of any official or unofficial committee of creditors incurred after the Effective Date.  For the avoidance of doubt, any obligations arising under confidentiality agreements, joint interest agreements and protective orders, if any, entered

during the Chapter 11 Cases shall remain in full force and effect in accordance with their terms.

      **15.23   Reservation of Rights**.  Except as expressly set forth herein, the Plan shall have no force or effect unless and until the Effective Date occurs.  Neither the filing of the Plan, any statement or provision contained herein, nor the taking of any action by a Debtor or any Entity with respect to the Plan shall be or shall be deemed to be an admission or waiver of any rights of: (1) any Debtor with respect to the holders of Claims or Interests or other parties-in-interest; or (2) any holder of a Claim or Equity Interest or other party-in-interest prior to the Effective Date.

      **15.24   Post-Effective Date Rule 2002 Notice List**.  After the Effective Date, any Entity that, prior to the Effective Date, had requested from the Debtors or the Claims Agent to receive notice in the Chapter 11 Cases pursuant to Bankruptcy Rule 2002 must renew such request in writing to the Claims Agent in order to be included on the Wind-Down Debtors' Post-Effective Date Notice List.  On and after the Effective Date, the Wind-Down Debtors are authorized to limit the list of entities receiving documents pursuant to Bankruptcy Rule 2002 to those entities that request to be included on the Debtors' Post Effective Date Notice List.

      **15.25   Right to Abandon and Dispose of Debtor Property, Books & Records**. After the Effective Date, notwithstanding any prior order of the Bankruptcy Court, the Plan Administrator shall give notice of a proposed abandonment or disposition of property, including the Debtors' books and records, by filing a notice on the docket of the Chapter 11 Cases and delivering a copy of such notice to the Canadian Debtors, the Monitor and the EMEA Debtors.  Such filing of a notice of abandonment or disposition on the docket shall constitute good and sufficient notice, and no other or further notice of proposed abandonment or disposition is necessary.  If no party serves an objection within thirty (30) days of the posting of such notice, the Plan Administrator shall be authorized immediately to abandon or dispose of such property.

      **15.26   Notices.**  Any notice required or permitted to be provided under this Plan shall be in writing and served by either (a) certified mail, return receipt requested, postage prepaid, (b) hand delivery or (c) reputable overnight delivery service, freight prepaid, to be addressed as follows:

      <u>Counsel for the Debtors</u>

          Cleary Gottlieb Steen & Hamilton LLP
          One Liberty Plaza
          New York, NY 10006
          (212) 225-3999 (facsimile)
          Attn:   James L. Bromley, Esq.
                   Lisa M. Schweitzer, Esq.

- and -

Morris, Nichols, Arsht & Tunnell LLP
1201 North Market Street, 18th Floor
P.O. Box 1347
Wilmington, DE 19899
(302) 658-3989 (facsimile)
Attn:   Derek C. Abbott, Esq.
          Andrew R. Remming, Esq.

The Plan Administrator

Greylock Partners, LLC
Attn:   John J. Ray, III
c/o Counsel for the Plan Administrator

Counsel for the Plan Administrator

Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, NY 10006
(212) 225-3999 (facsimile)
Attn:   James L. Bromley, Esq.
          Lisa M. Schweitzer, Esq.

Morris, Nichols, Arsht & Tunnell LLP
1201 North Market Street, 18th Floor
P.O. Box 1347
Wilmington, DE 19899
(302) 658-3989 (facsimile)
Attn:   Derek C. Abbott, Esq.
          Andrew R. Remming, Esq.

Counsel for the Bondholder Group

Milbank, Tweed, Hadley & McCloy LLP
28 Liberty Street
New York, NY 10005
(212) 530-5219 (facsimile)
Attn:   Albert A. Pisa, Esq.

<u>Counsel for the Creditors' Committee</u>

 Akin Gump Strauss Hauer & Feld LLP
 One Bryant Park
 New York, NY 10036
 (212) 872-1002 (facsimile)
 Attn: Fred S. Hodara, Esq.
   David H. Botter, Esq.
   Brad M. Kahn, Esq.

   - and -

 Whiteford, Taylor & Preston LLP
 The Renaissance Centre, Suite 500
 405 North King Street
 Wilmington, DE 19801-3700
 (302) 661-7950 (facsimile)
 Attn: Christopher M. Samis, Esq.

Dated: ~~December 1~~January 23, ~~2016~~2017

**Nortel Networks Inc.**

By: /s/ John J. Ray, III
    Name: John J. Ray, III
    Title:  Principal Officer

**Nortel Networks Capital Corporation**

By: /s/ John J. Ray, III
    Name: John J. Ray, III
    Title:  Principal Officer

**Nortel Altsystems International Inc.**

By: /s/ John J. Ray, III
    Name: John J. Ray, III
    Title:  Principal Officer

**Sonoma Systems**

By: /s/ John J. Ray, III
    Name: John J. Ray, III
    Title:  Principal Officer

**Coretek, Inc.**

By: /s/ John J. Ray, III
    Name: John J. Ray, III
    Title:  Principal Officer

**Nortel Networks (CALA) Inc.**

By: /s/ John J. Ray, III
    Name: John J. Ray, III
    Title:  Principal Officer

**Nortel Altsystems Inc.**

By: /s/ John J. Ray, III
    Name: John J. Ray, III
    Title:  Principal Officer

**Xros, Inc.**

By: /s/ John J. Ray, III
    Name: John J. Ray, III
    Title:  Principal Officer

**Qtera Corporation**

By: /s/ John J. Ray, III
    Name: John J. Ray, III
    Title:  Principal Officer

**Nortel Networks Applications Management Solutions Inc**.

By: /s/ John J. Ray, III
    Name: John J. Ray, III
    Title:  Principal Officer

**Nortel Networks Optical Components Inc.**


By: /s/ John J. Ray, III
    Name: John J. Ray, III
    Title:  Principal Officer


**Nortel Networks HPOCS Inc.**


By: /s/ John J. Ray, III
    Name: John J. Ray, III
    Title:  Principal Officer


**Architel Systems (U.S.) Corporation**


By: /s/ John J. Ray, III
    Name: John J. Ray, III
    Title:  Principal Officer


**Nortel Networks International Inc.**


By: /s/ John J. Ray, III
    Name: John J. Ray, III
    Title:  Principal Officer


**Northern Telecom International Inc.**


By: /s/ John J. Ray, III
    Name: John J. Ray, III
    Title:  Principal Officer


**Nortel Networks Cable Solutions Inc.**


By: /s/ John J. Ray, III
    Name: John J. Ray, III
    Title:  Principal Officer

**Exhibit A**

CONFIDENTIAL
FOR SETTLEMENT PURPOSES ONLY
SUBJECT TO FRE 408 AND ANALOGS IN ALL RELEVANT JURISDICTIONS
(EXECUTION VERSION)

### SETTLEMENT AND PLANS SUPPORT AGREEMENT

This **SETTLEMENT AND PLANS SUPPORT AGREEMENT** (together with all Annexes hereto, in each case as amended, supplemented or otherwise modified from time to time in accordance with the terms hereof, this "**Settlement and Support Agreement**") is dated as of October 12, 2016 and entered into by and among: (i) the Canadian Debtors;[1] (ii) the Monitor; (iii) the U.S. Debtors; (iv) the EMEA Debtors; (v) the EMEA Non-Filed Entities; (vi) the Joint Administrators; (vii) NNSA; (viii) the NNSA Conflicts Administrator; (ix) the French Liquidator; (x) the Bondholder Group; (xi) the members of the CCC; (xii) the UCC; (xiii) the U.K. Pension Trustee; (xiv) the PPF; (xv) the Joint Liquidators and (xvi) the NNCC Bondholder Signatories (collectively, the "**Parties**" and each a "**Party**").

**WHEREAS**, NNC, NNL, NNI, NNSA and NNUK and various other members of the Nortel Group commenced insolvency proceedings as early as January 14, 2009 (collectively, the "**Nortel Insolvency Proceedings**");

**WHEREAS,** during the course of the Nortel Insolvency Proceedings various assets were sold and certain Sale Proceeds are held in the Existing Escrow Accounts pending either the agreement of the relevant parties or final CCAA Court and Bankruptcy Court decisions regarding the allocation of said proceeds;

**WHEREAS**, various of the Parties have or may have claims as against other Parties which are to be resolved in the context of the Nortel Insolvency Proceedings;

**WHEREAS**, certain of the Parties are parties to certain litigation before the Canadian Court and U.S. Court in which the allocation of the Sale Proceeds is at issue (the "**Allocation Dispute**");

**WHEREAS**, the CCAA Court and the Bankruptcy Court each issued separate decisions on or about May 12, 2015 and July 6, 2015 regarding the Allocation Dispute and such decisions remain subject to appeal in both jurisdictions (the "**Allocation Decisions**");

**WHEREAS**, the Parties acknowledge and agree that the ultimate outcome of continued litigation in relation to the Allocation Dispute and the potential claim matters among them is uncertain, that further appeals are likely, that the cost of such litigation is substantial and burdensome to each of the Parties and their respective constituencies and that settlement of such

---

[1] Capitalized terms not otherwise defined in the main body of this Settlement and Support Agreement shall have the meaning ascribed to them in Section 1 hereof.

matters is key to advancing the Nortel Insolvency Proceedings to facilitate distributions to creditors of the various Debtors' estates;

**WHEREAS**, the Parties desire to settle fully and finally the Allocation Dispute and key potential claims matters among them and each Party has concluded it is appropriate and in the best interest of each to enter into this Settlement and Support Agreement;

**WHEREAS,** the Parties wish to effectuate a full and final settlement of the Allocation Dispute and certain other matters in accordance with terms and conditions set forth herein (the "**Settlement**"); and

**WHEREAS**, to effect the Settlement, the Parties have agreed to enter into this Settlement and Support Agreement.

**NOW, THEREFORE**, in consideration of the foregoing and the promises, mutual covenants, and agreements set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound, agrees as follows:

**Section 1.  Definitions**

"**Allocation Decisions**" has the meaning set forth in the recitals hereto.

"**Allocation Dispute**" has the meaning set forth in the recitals hereto.

"**Applicable FX Rate**" has the meaning set forth in Section 7(g) hereof.

"**Bankruptcy Code**" means title 11 of the United States Code, as amended.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware.

"**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, 28 U.S.C. § 2075, as applicable to the Chapter 11 Cases and the general, local and chambers rules of the Bankruptcy Court.

"**Beddoes Court**" means the High Court of Justice of England and Wales that has the power to provide directions to the U.K. Pension Trustee authorizing the U.K. Pension Trustee to execute and implement this Settlement and Support Agreement.

"**Bondholder Group**" means the ad hoc group of bondholders that hold notes issued and/or guaranteed by NNC, NNL, NNI, and NNCC, which on June 15, 2016, filed with the Bankruptcy Court a disclosure form under Bankruptcy Rule 2019, as such group may be constituted from time to time.

"**Business Day**" means any day (other than a Saturday, Sunday or legal holiday, as such term is defined in Bankruptcy Rule 9006(a)) on which banks are open for general business in all of New York City, New York, U.S.A.; Toronto, Ontario, Canada; London, England; and Paris France.

"**Buyer Escrow Accounts**" means the escrow accounts established pursuant to certain escrow agreements among certain Nortel Group entities, certain purchasers of Nortel assets and escrow agents governing the holding and release of certain amounts held in escrow in connection with such transactions as set forth on Annex B under the heading "Buyer Escrow Accounts."

"**Buyer Escrow Amount**" has the meaning set forth in Section 2(g) hereof.

"**CAD Claims**" has the meaning set forth in Section 4(n)(i) hereof.

"**Canadian Allocation**" has the meaning set forth in Section 2(c)(ii) hereof.

"**Canadian Court**" means any and all of the CCAA Court, the Ontario Court of Appeal, the Supreme Court of Canada or any other court of competent jurisdiction overseeing the Canadian Proceedings (including any appeals) from time to time.

"**Canadian Debtors**" means, collectively, NNC, NNL, Nortel Networks Global Corporation, Nortel Networks International Corporation, Nortel Networks Technology Corporation, Nortel Communications Inc., Architel Systems Corporation and Northern Telecom Canada Limited.

"**Canadian Escrow Account**" means the account with the Canadian Escrow Agent established pursuant to the Canadian Escrow Agreement to hold that portion of the Sale Proceeds to be converted into Canadian Dollars.

"**Canadian Escrow Agent**" means Royal Trust Corporation of Canada.

"**Canadian Escrow Agreement**" means that certain distribution escrow agreement, substantially in the form attached hereto as Annex K to be entered into among NNC, NNL, NNI, NNUK, the other existing Depositors under the relevant Existing Escrow Agreements, NNSA, the Monitor and the UCC to hold that portion of the Sale Proceeds to be converted into Canadian Dollars.

"**Canadian Escrow Release Order**" means an order issued by the CCAA Court authorizing and directing the release of the Sale Proceeds from the Escrow Accounts in the manner contemplated hereby.

"**Canadian Estate**" means the Canadian Debtors as substantively consolidated as contemplated herein.

"**Canadian Information Circular**" means the information circular to be provided to the Canadian Voting Creditors relating to the Canadian Plan as approved by the CCAA Court.

"**Canadian Meeting Order**" means an order of the CCAA Court granted pursuant to Section 4 and/or 5 of the CCAA that, among other things, authorizes the holding of a meeting or meetings of the Canadian Debtors' creditors for purposes of considering and voting upon the Canadian Plan and approves the Canadian Information Circular.

"**Canadian Pension Claim**" has the meaning set forth in Section 4(g)(i) hereof.

"**Canadian Plan**" means the CCAA plan of compromise or arrangement (including any exhibits, annexes and schedules thereto) for the Canadian Debtors that effectuates the Settlement, consistent with the terms of this Settlement and Support Agreement, as it may be modified or supplemented in accordance with its terms.

"**Canadian Proceedings**" means, collectively, those Nortel Insolvency Proceedings that were commenced before the CCAA Court pursuant to the CCAA on or after January 14, 2009 in respect of the Canadian Debtors.

"**Canadian Surplus Amount**" has the meaning set forth in Section 7(j)(i)(B).

"**Canadian Voting Creditors**" means creditors holding Proven Claims against the Canadian Debtors and such other creditors that are permitted to vote on the Canadian Plan.

"**Cascade Trust**" means the trust established pursuant to that certain Trust Indenture dated April 5, 2010 among NNL and NNI, as settlors, and John T. Evans, as trustee.

"**Cascade Trust Side Letter**" means the Trust Indenture Side Agreement, dated April 5, 2010, between NNL and NNI relating to the Cascade Trust.

"**CCAA**" means the Companies' Creditors Arrangement Act, R.S.C. 1985, c C-36.

"**CCAA Court**" means the Ontario Superior Court of Justice (Commercial List).

"**CCC**" means the ad hoc committee of creditors having claims only against the Canadian Debtors comprised of the former and disabled Canadian employees of the Canadian Debtors through their court-appointed representatives, Unifor, Morneau Shepell Ltd. as Administrator of Nortel's Canadian registered pension plans, the Superintendent of Financial Services of Ontario as Administrator of the Pension Benefits Guarantee Fund and the court-appointed representatives of the current and transferred employees of the Canadian Debtors.

"**CFSA**" means the Final Canadian Funding and Settlement Agreement among, inter alia, certain of the Canadian Debtors, the Monitor and certain of the U.S. Debtors, dated December 23, 2009.

"**Chapter 11 Cases**" means the cases filed by the U.S. Debtors pursuant to Chapter 11 of the Bankruptcy Code.

"**Claims Procedure Order**" means the Claims Procedure Order entered by the CCAA Court dated July 30, 2009, as amended and restated on October 7, 2009.

"**Confirmation Order**" means an order of the Bankruptcy Court entered on the docket in the Chapter 11 Cases confirming the U.S. Plans.

"**Conversion Elections**" has the meaning set forth in Section 7(c)(i)(A) hereof.

"**Conversion Election Request**" has the meaning set forth in Section 7(c)(iii) hereof.

"**Converting Debtor**" has the meaning set forth in Section 7(i)(i) hereof.

"**Creditor Joinder**" means a joinder to this Settlement and Support Agreement, substantially in the form annexed hereto as Annex D.

"**Creditor's Maximum**" has the meaning set forth in Section 4(c)(i)(B) hereof.

"**Cross-Border Protocol**" means the Cross-Border Protocol originally approved by the Bankruptcy Court on or about January 14, 2009 and by the CCAA Court on January 14, 2009, as the same has been amended, as approved by both the Bankruptcy Court and the CCAA Court, from time to time.

"**Crossover Bondholder Fee Letter**" has the meaning set forth in Section 4(k) hereof.

"**Crossover Bondholders**" means beneficial owners of Crossover Bonds as of the earlier of (a) the date each such holder executes a Creditor Joinder or a Transferee Joinder; and (b) the record date that will be established under the U.S. Plans and the Canadian Meeting Order.

"**Crossover Bonds**" means those bonds issued pursuant to the indentures listed on Annex G hereto, but excluding the NNCC Bonds.

"**Crossover Bonds Claims**" means those Crossover Claims relating to the Crossover Bonds.

"**Crossover Claims**" has the meaning set forth in Section 4(c)(i) hereof.

"**Debtors**" means, collectively, the U.S. Debtors, the Canadian Debtors, the EMEA Debtors and NNSA.

"**Depositors**" has the meaning given to such term in the Escrow Agreements.

"**Disclosure Statements**" means, collectively, the U.S. Disclosure Statement and the Canadian Information Circular.

"**EDC**" means Export Development Canada.

"**EMEA Allocation**" has the meaning set forth in Section 2(c)(v) hereof.

"**EMEA Canada Settlement Agreement**" has the meaning set forth in Section 4(b)(i) hereof.

"**EMEA Canadian Claim**" has the meaning set forth in Section 4(b)(i) hereof.

"**EMEA Debtors**" means, collectively, NNUK, Nortel Networks (Ireland) Limited (in administration), Nortel Networks NV (in administration), Nortel Networks SpA (in administration), Nortel Networks BV (in administration), Nortel Networks Polska Sp z.o.o. (in administration), Nortel Networks Hispania SA (in administration), Nortel Networks (Austria) GmbH (in administration), Nortel Networks s.r.o. (in administration), Nortel Networks Engineering Service Kft (in administration), Nortel Networks Portugal SA (in administration), Nortel Networks Slovensko s.r.o. (in administration), Nortel Networks Romania SRL (in administration), Nortel GmbH (in administration), Nortel Networks OY (in administration), Nortel Networks AB (in administration), NNIF, and Nortel Networks France S.A.S. (in

administration), but does not include, for purposes of this Settlement and Support Agreement, NNSA.

"**EMEA Escrow Accounts**" means, collectively, the EMEA Sterling Escrow Account and the EMEA Euro Escrow Account.

"**EMEA Escrow Agreements**" means, collectively, the EMEA Sterling Escrow Agreement and the EMEA Euro Escrow Agreement.

"**EMEA Euro Escrow Account**" means the account with the EMEA Euro Escrow Agent that will be established pursuant to the EMEA Euro Escrow Agreement to hold that portion of the Sale Proceeds to be converted into Euros, in the event that the Euro Conversion Election is requested.

"**EMEA Euro Escrow Agent**" means the escrow agent named in the EMEA Euro Escrow Agreement, which escrow agent shall be reasonably acceptable to NNL, NNI, NNUK, NNSA, the other existing Depositors under the relevant Existing Escrow Agreements, the Monitor and the UCC.

"**EMEA Euro Escrow Agreement**" means the distribution escrow agreement, to be entered into among NNC, NNL, NNI, NNUK, NNSA the other existing Depositors under the relevant Existing Escrow Agreements, the Monitor and the UCC, to hold that portion of the Sale Proceeds to be converted into Euros in the event that the Euro Conversion Election is requested, which agreement shall be in a form reasonably acceptable to NNL, NNI, NNUK, NNSA, the other existing Depositors under the relevant Existing Escrow Agreements, the Monitor and the UCC.

"**EMEA Non-Filed Entities**" means, collectively, Nortel Networks AS, Nortel Networks AG, Nortel Networks South Africa (Pty) Limited, NNNI, and NNOCL.

"**EMEA (Non-NNSA/Non-NNUK) Allocation**" has the meaning set forth in Section 2(c)(iii) hereof.

"**EMEA (Non-NNSA/Non-NNUK) Debtors**" means, collectively, Nortel Networks (Ireland) Limited (in administration), Nortel Networks NV (in administration), Nortel Networks SpA (in administration), Nortel Networks BV (in administration), Nortel Networks Polska Sp z.o.o. (in administration), Nortel Networks Hispania SA (in administration), Nortel Networks (Austria) GmbH (in administration), Nortel Networks s.r.o. (in administration), Nortel Networks Engineering Service Kft (in administration), Nortel Networks Portugal SA (in administration), Nortel Networks Slovensko s.r.o. (in administration), Nortel Networks Romania SRL (in administration), Nortel GmbH (in administration), Nortel Networks OY (in administration), Nortel Networks AB (in administration), NNIF and Nortel Networks France S.A.S. (in administration), but does not include NNSA or NNUK.

"**EMEA Proceedings**" means, collectively, those Nortel Insolvency Proceedings that were commenced before the U.K. Court on or about January 14, 2009 in respect of the EMEA Debtors and NNSA, which, for the avoidance of doubt, excludes the French Secondary Proceeding.

"**EMEA Sterling Escrow Account**" means the account with the EMEA Sterling Escrow Agent that will be established pursuant to the EMEA Sterling Escrow Agreement to hold that portion of the Sale Proceeds to be converted into U.K. pounds Sterling, in the event that the Sterling Conversion Election is requested.

"**EMEA Sterling Escrow Agent**" means the escrow agent named in the EMEA Sterling Escrow Account, which agent shall be reasonably acceptable to NNL, NNI, NNUK, NNSA, the other existing Depositors under the relevant Existing Escrow Agreements, the Monitor and the UCC.

"**EMEA Sterling Escrow Agreement**" means the distribution escrow agreement to be entered into among NNC, NNL, NNI, NNUK, the other existing Depositors under the relevant Existing Escrow Agreements, the Monitor and the UCC, to hold that portion of the Sale Proceeds to be converted into U.K. pounds Sterling in the event the Sterling Conversion Election is requested, which agreement shall be in a form reasonably acceptable to NNL, NNI, NNUK, NNSA, the other existing Depositors under the relevant Existing Escrow Agreements, the Monitor and the UCC.

"**EMEA Surplus Amount**" has the meaning set forth at Section 7(k)(i)(B) hereof.

"**Escrow Accounts**" means, collectively, the Existing Escrow Accounts and the New Escrow Accounts.

"**Escrow Agents**" means the Existing Escrow Agents, the Canadian Escrow Agent, the EMEA Euro Escrow Agent and the EMEA Sterling Escrow Agent, as applicable.

"**Escrow Agreements**" means, collectively, the Existing Escrow Agreements and the New Escrow Agreements governing the Escrow Accounts.

"**Escrow Release Orders**" means, collectively, the Canadian Escrow Release Order and the U.S. Escrow Release Order.

"**Estate Fiduciaries**" has the meaning given to such term in the Escrow Agreements.

"**Euro Conversion Election**" has the meaning set forth in Section 7(c)(i)(A) hereof.

"**Existing Escrow Accounts**" means the escrow accounts established to hold the Sale Proceeds, as set forth on Annex B under the heading "Distribution Escrow Accounts."

"**Existing Escrow Agents**" means JPMorgan Chase Bank, N.A. and Citibank, N.A., as applicable, as escrow agents in respect of the Existing Escrow Accounts.

"**Existing Escrow Agreements**" means the agreements among the various Depositors, Estate Fiduciaries and the Escrow Agents governing the Existing Escrow Accounts, as set forth on Annex B under the heading "Distribution Escrow Accounts."

"**Final Allocation Amount**" has the meaning set forth in Section 7(h) hereof.

"**Final Allocation Determination**" has the meaning set forth in Section 7(h) hereof.

"**Final Order**" means (a) with respect to an order of a Canadian Court, an order: (i) as to which no appeal, leave to appeal, notice of appeal, motion to amend or make additional findings of fact, motion to alter or amend judgment, motion for rehearing or motion for new trial has been timely filed (in cases in which there is a date by which such filing is required to occur, it being understood that with respect to an order issued by the CCAA Court, the time period for seeking leave to appeal shall be deemed to have elapsed on the date that is 22 days after the rendering of such order unless a motion has been made to extend such time period) or, if any of the foregoing has been timely filed, it has been disposed of in a manner that upholds and affirms the subject order in all material respects without the possibility for further appeal thereon; (ii) in respect of which the time period for instituting or filing an appeal, leave to appeal, motion for rehearing or motion for new trial shall have expired (in cases in which such time period is capable of expiring, it being understood that with respect to an order issued by the CCAA Court, the time period for seeking leave to appeal shall be deemed to have elapsed on the date that is 22 days after the rendering of such order unless a motion has been made to extend such time period); and (iii) as to which no stay is in effect; or (b) with respect to an order of a U.S. Court, an order that has not been reversed, stayed, superseded or vacated or, to the extent it has been stayed such stay shall have expired.

"**First French Order**" has the meaning set forth in Section 15(p) hereof.

"**Flextronics**" means Flextronics Telecom Systems Ltd. or any affiliate thereof.

"**French Court**" means the judge appointed in the French Secondary Proceeding, the Versailles Commercial Court, any court hearing appeals therefrom and any other court of competent jurisdiction overseeing the French Secondary Proceeding from time to time.

"**French Liquidator**" means Maître Cosme Rogeau in his capacity as Liquidator for NNSA under the French Secondary Proceeding.

"**French Main Proceeding**" means the U.K. administration of NNSA commencing on January 14, 2009.

"**French Secondary Proceeding**" means the Nortel Insolvency Proceeding that was commenced before the French Court on May 28, 2009 in respect of NNSA.

"**French Supervisory Judge**" has the meaning set forth in Section 15(p) hereof.

"**HOC**" means Nortel Networks Pénzügyi Szolgáltató Korlátolt Felelősségű Társaság.

"**Iceberg**" means the residual intellectual property remaining following the Nortel Group business line sales, which intellectual property was sold to a consortium in July 2011.

"**Iceberg Amendment Fee**" means the U.S.$5 million[2] cumulative fee previously agreed by the Canadian Debtors, U.S. Debtors, EMEA Debtors and NNSA to be funded directly as follows:  U.S.$2.8 million to NNI, and U.S.$2.2 million to NNUK, all from the Iceberg Sale Proceeds prior to any other agreed upon allocation of the Sale Proceeds.

---

[2] All amounts in this Settlement and Support Agreement are expressed in U.S. Dollars unless expressly noted otherwise.

"**Iceberg Escrow Account**" means the escrow account established to hold the Iceberg Sale Proceeds and the Iceberg Amendment Fee, as set forth on Annex B.

"**Iceberg Sale**" means the sale of the Iceberg assets.

"**Iceberg Sale Proceeds**" means that portion of the Sale Proceeds generated from the Iceberg Sale.

"**IFSA**" means the Interim Funding and Settlement Agreement, dated as of June 9, 2009, entered into among various of the Parties, as approved by the CCAA Court on June 29, 2009 and by the Bankruptcy Court on June 29, 2009.

"**IP Addresses**" means internet protocol addresses registered in the name of a Canadian Debtor or a corporate predecessor thereto.

"**Joint Administrators**" means Alan Robert Bloom, Christopher John Wilkinson Hill, Alan Michael Hudson and Stephen John Harris, as the administrators of all EMEA Debtors and NNSA except Nortel Networks (Ireland) Limited (in administration), and Alan Robert Bloom and David Martin Hughes as Administrators of Nortel Networks (Ireland) Limited (in administration).  To the extent that this Settlement and Support Agreement refers to the "Joint Administrators of NNSA" this means Alan Robert Bloom, Christopher John Wilkinson Hill, Alan Michael Hudson, Stephen John Harris and the NNSA Conflicts Administrator.

"**Joint Liquidators**" means Richard Barker and Joseph Luke Charleton as joint liquidators of NNNI and Richard Barker and Samantha Keen as joint liquidators of NNOCL.

"**LG-N**" means LG-Nortel Co. Ltd., a Korean joint venture between NNL and LG Electronics.

"**M&A Cost Reimbursement**" means the reimbursement of certain costs related to fees and expenses incurred in connection with the sale of assets which generated the Sale Proceeds.

"**MEN**" means the Nortel Group business line known as Metro Ethernet Networks.

"**Monitor**" means Ernst & Young Inc. in its capacity as the court-appointed monitor in the proceedings commenced under the CCAA in respect of the Canadian Debtors.

"**Negative Converting Debtor**" has the meaning set forth at Section 7(i)(iv) hereof.

"**New Escrow Accounts**" means, collectively, the Canadian Escrow Account and the EMEA Escrow Accounts.

"**New Escrow Agreements**" means, collectively, the Canadian Escrow Agreement and the EMEA Escrow Agreements.

"**NNC**" means Nortel Networks Corporation, a Canadian Debtor.

"**NNCC**" means Nortel Networks Capital Corporation, a U.S. Debtor.

"**NNCC Bondholder Signatories**" means the holders of NNCC Bonds that execute this Settlement and Support Agreement.

"**NNCC Bondholders**" means holders of NNCC Bonds as of the record date that will be established under the U.S. Plans.

"**NNCC Bonds**" means those bonds issued by NNCC and guaranteed by NNL.

"**NNCC Bonds Claims**" means those Crossover Claims relating to the NNCC Bonds.

"**NNCC Bonds Trustee**" means Law Debenture Trust Company of New York, as indenture trustee for the NNCC Bonds.

"**NNI**" means Nortel Networks Inc., a U.S. Debtor.

"**NNIF**" means Nortel Networks International Finance & Holding B.V. (in administration), an EMEA Debtor.

"**NNL**" means Nortel Networks Limited, a Canadian Debtor.

"**NNNI**" means Nortel Networks (Northern Ireland) Limited (in liquidation), an EMEA Non-Filed Entity.

"**NNOCL**" means Nortel Networks Optical Components Limited (in liquidation), an EMEA Non-Filed Entity.

"**NNSA**" means Nortel Networks S.A. (in administration and in *liquidation judiciaire*).

"**NNSA Allocation**" has the meaning set forth in Section 2(c)(v) hereof.

"**NNSA Conflicts Administrator**" means Stephen Jonathan Taylor of Isonomy Limited as Conflicts Administrator solely in relation to NNSA.

"**NNSA Surplus Amount**" has the meaning set forth at Section 7(k)(iii)(B) hereof.

"**NNUK**" means Nortel Networks U.K. Limited (in administration), an EMEA Debtor.

"**NNUK Allocation**" has the meaning set forth in Section 2(c)(iv) hereof.

"**Non-Converting Debtor**" has the meaning set forth in Section 7(i)(ii) hereof.

"**Non-Released Matters**" has the meaning set forth in Section 8(i) hereof.

"**Nortel Group**" means, collectively, NNC and all of its direct and indirect subsidiaries, whether current or former.

"**Nortel Insolvency Proceedings**" has the meaning set forth in the recitals hereto.

"**Nortel U.S. Trade Claims Consortium**" means a group of creditors holding over U.S.$125 million in unsecured (non-funded debt) claims, including but not limited to trade

(supplier) claims, employee severance and pension claims against one or more of the U.S. Debtors.

"**Other Currencies**" has the meaning set forth in Section 7(a) hereof.

"**Participating Creditor**" means a creditor of any of the Debtors that (i) is a Party to this Settlement and Support Agreement; or (ii) delivers a Creditor Joinder or a Transferee Joinder.

"**Party**" and "**Parties**" have the meanings set forth in the recitals hereto.

"**PBGC**" means the Pension Benefit Guaranty Corporation, a United States government corporation.

"**Petition Date**" means January 14, 2009.

"**Person**" means a "person" as defined in Section 101(41) of the Bankruptcy Code.

"**Plans**" means, collectively, the U.S. Plans and the Canadian Plan.

"**Plans Effective Date**" means the first date that (i) all of the U.S. Plans, and (ii) the Canadian Plan are effective in accordance with their respective terms.

"**Positive Converting Debtor**" has the meaning set forth in Section 7(i)(iii) hereof.

"**PPF**" means the Board of the Pension Protection Fund, a statutory corporation established under the provisions of the Pensions Act 2004, whose principal place of business is Renaissance, 12 Dingwall Road, Croydon, United Kingdom, CRO 2NA.

"**PPI Settlement**" means that certain Settlement Agreement entered into between NNI and certain of the Crossover Bondholders dated July 24, 2014 as approved by the Bankruptcy Court on December 18, 2014.

"**Proceeding**" has the meaning set forth in Section 5(e).

"**Proven Claim**" shall, with respect to a claim against one or more of the Canadian Debtors, have the meaning ascribed to such term in the Claims Procedure Order, the Claims Resolution Order of the CCAA Court, dated September 16, 2010, the Compensation Claims Procedure Order of the CCAA Court, dated October 6, 2011, and the Intercompany Claims Procedure Order of the CCAA Court, dated July 27, 2012 and shall include the U.S. Canadian Claim, the Crossover Bondholders' Proven Claim, the NNCC Bondholders' Proven Claim, the EMEA Canadian Claim, the Canadian Pension Claim and the UKPI Canadian Claim.

"**Qualified Marketmaker**" has the meaning set forth in Section 6(j)(ii) hereof.

"**Relay**" means the June 2010 sale of NNL's and NNTC's assets related to the wireless backhaul and multi-hop digital repeater/relay research development program.

"**Released Claims**" has the meaning set forth in Section 8(b)(i) hereof.

"**Releases**" has the meaning set forth in Section 8(b)(ii) hereof.

"**Releasee**" has the meaning set forth in Section 8(b)(i) hereof.

"**Releasor**" has the meaning set forth in Section 8(b) hereof.

"**Remaining HOC Claim**" has the meaning set forth in Section 4(h) hereof.

"**Sale Proceeds**" means the remaining proceeds generated by the sales of various Nortel Group business lines and the Iceberg Sale between 2009 and 2011 plus interest accrued thereon such amounts being as currently set forth in Annex A hereto,[3] less (i) US$55 million of M&A Cost Reimbursement; and (ii) the Iceberg Amendment Fee.

"**Sanction Hearing**" means the hearing before the CCAA Court to consider sanction of the Canadian Plan.

"**Sanction Order**" means the order of the CCAA Court sanctioning the Canadian Plan and shall include, for the avoidance of doubt, any order of a Canadian Court affirming such order.

"**Settlement**" has the meaning set forth in the recitals hereto.

"**Settlement and Support Agreement**" has the meaning set forth in the recitals hereto.

"**Side Letters**" has the meaning set forth in Section 4(e) hereof.

"**SNMP**" has the meaning set forth in Section 4(f) hereof.

"**Sterling Conversion Election**" has the meaning set forth in Section 7(c)(i)(A) hereof.

"**Strandherd Lands**" means certain vacant lands of the Canadian Debtors in Ottawa, Ontario, sold in November 2009.

"**Surplus Amount**" has the meaning set forth at Section 7(i)(v) hereof.

"**T&T Claim**" means any and all claims made by Nortel Networks (CALA) Inc. in respect of customer receipts from Telecommunications Services of Trinidad and Tobago deposited into Nortel Networks International Corporation's bank account related to invoices issued to Telecommunications Services of Trinidad and Tobago by Nortel Networks (CALA) Inc.

"**Tax Disputes**" has the meaning set forth in Section 4(a)(v) hereof.

"**Third Circuit**" means the United States Court of Appeals for the Third Circuit.

"**Third Party Claims**" has the meaning set forth in Section 8(c) hereof.

"**Timetable**" has the meaning set forth in Section 9(b) hereof.

---

[3] The total Sale Proceeds available for allocation and distribution may differ from the amounts detailed in Annex A, as described in Section 2(d) hereto.

"**Termination Event**" has the meaning set forth in Section 10(a) hereof.

"**Transfer**" has the meaning set forth in Section 6(j)(i) hereof.

"**Transferee Joinder**" has the meaning set forth in Section 6(j)(i) hereof.

"**Transferor**" has the meaning set forth in Section 6(j)(i) hereof.

"**UCC**" means the Official Committee of Unsecured Creditors appointed pursuant to an order entered by the Bankruptcy Court on January 26, 2009, as the same may be constituted from time to time.

"**UKPI**" means, collectively, the U.K. Pension Trustee and the PPF.

"**UKPI Canadian Claim**" has the meaning set forth in Section 4(b)(i) hereof.

"**U.K. Court**" means the High Court of Justice of England and Wales in London, any court hearing appeals therefrom and any other court of competent jurisdiction overseeing the EMEA Proceedings (including appeals) from time to time.

"**U.K. Pension Trustee**" means Nortel Networks U.K. Pension Trust Limited as trustee of the Nortel Networks Pension Plan.

"**U.S. Allocation**" has the meaning set forth in Section 2(c)(i) hereof.

"**U.S. Canadian Claim**" has the meaning set forth in Section 4(b)(i) hereof.

"**U.S. Canadian Priority Claim**" has the meaning set forth in Section 4(b)(i) hereof.

"**U.S. Court**" means any and all of the Bankruptcy Court, the United States District Court for the District of Delaware, the Third Circuit, the United States Supreme Court or any other court of competent jurisdiction overseeing the U.S. Proceedings (including appeals) from time to time.

"**U.S. Debtors**" means, collectively, NNI, NNCC, Nortel Altsystems Inc., Nortel Altsystems International Inc., Xros, Inc., Sonoma Systems, Qtera Corporation, CoreTek, Inc., Nortel Networks Applications Management Solutions Inc., Nortel Networks Optical Components Inc., Nortel Networks HPOCS Inc., Architel Systems (U.S.) Corporation, Nortel Networks International Inc., Northern Telecom International Inc., Nortel Networks Cable Solutions Inc., Nortel Networks (CALA) Inc., and Nortel Networks India International Inc.

"**U.S. Disclosure Statement**" means a disclosure statement to be provided to the U.S. Voting Creditors relating to the U.S. Plans that complies with sections 1125 and 1126(b) of the Bankruptcy Code.

"**U.S. Escrow Release Order**" means an order issued by the Bankruptcy Court authorizing and directing the release of the Sale Proceeds from the Escrow Accounts in the manner contemplated hereby.

"**U.S. Plans**" means the chapter 11 plans of reorganization (including any exhibits, annexes and schedules thereto) for the U.S. Debtors that effectuate the Settlement, consistent with the terms of this Settlement and Support Agreement, as they may be modified or supplemented in accordance with their respective terms.

"**U.S. Principal Officer**" means John J. Ray III, who was appointed Principal Officer of each of the U.S. Debtors pursuant to an order entered by the Bankruptcy Court on January 6, 2010.

"**U.S. Proceedings**" means, collectively, those Nortel Insolvency Proceedings that were commenced before the Bankruptcy Court on or after January 14, 2009 in respect of the U.S. Debtors pursuant to chapter 11 of the Bankruptcy Code.

"**U.S. Voting Creditors**" means unsecured creditors of the U.S. Debtors that are entitled to vote on one or more of the U.S. Plans and whose votes will count toward acceptance of such plans.

"**Worldwide Ds&Os**" has the meaning set forth in Section 8(b)(i) hereof.

The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise (a) any reference herein to any Person shall be construed to include such Person's successors and assigns, (b) the words "herein," "hereof" and "hereunder," and words of similar import, shall be construed to refer to this Settlement and Support Agreement in its entirety and not to any particular provision hereof, and (c) all references herein to Sections and Annexes shall be construed to refer to Sections of, and Annexes to, this Settlement and Support Agreement. The division of this Settlement and Support Agreement into Sections and the insertion of headings are for convenience only and are not to affect or be used in the construction or interpretation of this Settlement and Support Agreement.

**Section 2.  Settlement of Allocation Dispute**

(a)     For the avoidance of doubt, this Section 2 is subject to the satisfaction of the conditions contained in Section 9(a) hereof, except to the extent expressly indicated in Section 9(c) hereof.

(b)     The Parties hereby agree to settle the Allocation Dispute on the terms set forth herein and enter into coordinated processes which shall include, among other things, (i) the drafting of the Canadian Plan and its submission to Canadian Voting Creditors for voting under the CCAA and to the CCAA Court for sanction, (ii) the drafting of the U.S. Plans and their submission to U.S. Voting Creditors for voting and to the Bankruptcy Court for confirmation, each on the schedule set forth in the Timetable, (iii) the submission of the Settlement and Support Agreement to the U.K. Court and the French Court, and (iv) submission to the Beddoes Court for authorization of the U.K. Pension Trustee to implement the Settlement and Support Agreement, as contemplated by Section 6 hereof.

(c)     The Parties hereto agree to allocate the Sale Proceeds as follows:

    (i)     U.S. Debtors: 24.350%, U.S.$1,766,417,002 (the "**U.S. Allocation**")[4];

    (ii)     Canadian Debtors: 57.1065%, U.S.$4,142,665,131 (the "**Canadian Allocation**");

    (iii)     EMEA (Non-NNSA/Non-NNUK) Debtors: 1.4859%, U.S.$ 107,788,879 (the "**EMEA (Non-NNSA/Non-NNUK) Allocation**")[5];

    (iv)     NNUK: 14.0249%, U.S.$1,017,408,257 (the "**NNUK Allocation**"); and

    (v)     NNSA: U.S.$220,000,000 (the "**NNSA Allocation**," and collectively with the EMEA (Non-NNSA/Non-NNUK) Allocation and the NNUK Allocation, the "**EMEA Allocation**"). The EMEA Allocation shall be 18.5435%, provided, however, within the EMEA Allocation, the NNSA Allocation is fixed at U.S.$220,000,000 and NNSA shall not share proportionally with any increase or decrease in the Sale Proceeds as the result of the matters contemplated in Section 2(d) hereof, and any such increase or decrease in the Sale Proceeds that would but for this Section 2(c)(v) have been allocated to NNSA shall be allocated to NNUK.

(d)     The Sale Proceeds to be allocated in accordance with Section 2(c) hereof include the Buyer Escrow Amount. To the extent that the amount of Sale Proceeds ultimately released from the Buyer Escrow Accounts to the Debtors is less than the Buyer Escrow Amount, any such shortfall shall be allocated among the Debtors in the percentages set forth in Section 2(c), subject to Section 2(c)(v) hereof, so that the amount of Sale Proceeds to be allocated in accordance with Section 2(c), subject to Section 2(c)(v) hereof, shall be reduced by the amount of such shortfall.

    (i)     Any fees and costs of the Escrow Agents for the Existing Escrow Agreements (other than costs and fees relating to any currency conversion that occurs pursuant to Section 7) shall be borne and allocated among the Debtors in the percentages set forth in Section 2(c), subject to Section 2(c)(v) hereof.

    (ii)     Any further amounts credited to the Escrow Accounts following the date of this Agreement, including any accrued interest not otherwise reflected in Annex A earned on the Sale Proceeds, shall be allocated among the Debtors in the percentages set forth in Section 2(c), subject

---

[4] Such allocation is to be distributed among the U.S. Debtors in the amounts and proportions set forth in Annex F.

[5] Such allocation is to be distributed among the EMEA Debtors (other than NNUK) in the amounts and proportions set forth in Annex E.

to the provisions of Sections 2(c)(v) and 7(b)(vi), 7(c)(x) and 7(e) hereof.

(e)     The Parties hereto further agree first to distribute the following amounts from the Iceberg Escrow Account, which amounts shall not be subject to the Section 2(c) allocation percentages or be deemed to constitute Sale Proceeds:

(i)     U.S.$2.8 million of the Iceberg Amendment Fee to NNI and U.S.$2.2 million of the Iceberg Amendment Fee to NNUK, and

(ii)    U.S.$20 million to NNI and U.S.$35 million to the Canadian Debtors on account of the M&A Cost Reimbursement.

(f)     Distributions of the Sale Proceeds will next be made as follows:

(i)     all amounts in the Canadian Escrow Account shall be released to the Canadian Estate, with the funds received by the Canadian Estate being credited against the Canadian Allocation set forth in Section 2(c)(ii) in the manner set forth in Section 7(g);

(ii)    all amounts (if any) in the EMEA Euro Escrow Account shall be released to NNSA with the funds received by NNSA being credited against the NNSA Allocation as set forth in Section 2(c)(v), in the manner set forth in Section 7(g);

(iii)   all amounts (if any) in the EMEA Sterling Escrow Account shall be released to the EMEA Debtors who are Converting Debtors in proportion to their allocation set out at Annex E, with the funds received by such Converting Debtors being credited against the allocation of such Converting Debtors in the manner set forth in Section 7(g);

(iv)    remaining amounts in the Existing Escrow Accounts shall be released (A) in accordance with  the allocations set forth in Section 2(c) hereof, and (B) taking into account the funds to be released from the New Escrow Accounts under Sections 2(f)(i), (ii) and (iii) hereof; and

(v)     for the avoidance of doubt, total distributions under Sections 2(f)(i)(ii)(iii) and (iv) hereof, will be strictly in accordance with the allocations set forth in Section 2(c) hereof.

(g)     NNC, NNL, NNI and NNUK shall use reasonable best efforts to obtain the release of the remaining amounts held in the Buyer Escrow Accounts, totaling approximately U.S.$21.8 million (the "**Buyer Escrow Amount**"), into the Escrow Account holding that portion of the Sale Proceeds attributable to the particular sale (or such other accounts as jointly agreed to and directed by NNC, NNL, NNI, and NNUK for their respective shares).  Any amount so obtained shall be allocated in accordance with the percentages set forth in Section 2(c).

(h)     In connection with the distribution of Sale Proceeds contemplated pursuant to Section 2(f), NNIF shall pay U.S. $3 million to the Canadian Estate within 30 days of the conditions in Section 9(a) being satisfied and such payment obligation shall rank as an administration expense of NNIF.   Subject to receipt by the Canadian Estate of such amount, such payment shall be in full satisfaction of the Remaining HOC Claim.

**Section 3.   Release of Sale Proceeds**

(a)     For the avoidance of doubt, this Section 3 is subject to the satisfaction of the conditions contained in Section 9(a) hereof, except to the extent expressly indicated in Section 9(c) hereof.

(b)     As set forth in Section 6(b) hereof, the Canadian Debtors and Monitor shall seek entry of the Canadian Escrow Release Order, which order shall be entered with, or promptly following entry of, the Sanction Order and will be conditioned on the occurrence of the Plans Effective Date.

(c)     As set forth in Section 6(c) hereof, the U.S. Debtors shall seek entry of the U.S. Escrow Release Order, which order shall be entered with, or promptly following entry of, the Confirmation Order and will be conditioned on the occurrence of the Plans Effective Date.

(d)     The Escrow Release Orders shall:  (i) constitute the order required under Section 12(b) of the IFSA to permit and authorize the distribution of the Sale Proceeds in accordance with the allocation set forth in Section 2(c) hereof; (ii) constitute the orders of the "dispute resolvers" contemplated by the Escrow Agreements to permit and authorize the Escrow Agents to distribute the Sale Proceeds; and (iii) be in form and substance reasonably satisfactory to the Parties.

(e)     In addition to any Escrow Release Orders, the parties to the Escrow Agreements may also provide joint instructions to the Escrow Agents, as permitted by the Escrow Agreements, directing the release of the Sale Proceeds in accordance with this Settlement and Support Agreement, the form and substance of such joint instructions being reasonably satisfactory to the Parties.

(f)     Immediately following the occurrence of the Plans Effective Date, the Canadian Debtors, the Monitor, the EMEA Debtors, NNSA, the EMEA Non-Filed Entities, the U.S. Debtors and the UCC shall jointly provide copies of the Escrow Release Orders to the Escrow Agents and the parties to the Escrow Agreements shall take such other and further steps as are reasonably necessary, including but not limited to the provision of joint instructions or other notices to the Escrow Agents under Section 3(e) above, in order to cause the Escrow Agents to release the Sale Proceeds in accordance with the terms of this Settlement and Support Agreement.

(g)     It is understood and agreed that the Canadian Debtors, the Monitor, the U.S. Debtors, the UCC, the EMEA Debtors, NNSA, and the EMEA Non-Filed Entities, to the extent necessary, may provide more specific instructions to the Escrow Agents in connection with the Escrow Release Orders or any instruction

provided pursuant to Section 3(e) hereof, to direct payment to specific Debtor estates subject always to the collective maximum allocation and distribution of Sale Proceeds allocated to each of the U.S. Debtors, Canadian Debtors, EMEA Debtors and NNSA, respectively, as set forth in Section 2(c) hereof (and, in the case of the U.S. Debtors and the EMEA Debtors subject to the agreed allocations set forth in Annexes F and E, respectively) and each of the U.S. Debtors, the Canadian Debtors, the EMEA Debtors, NNSA, and the EMEA Non-Filed Entities in their capacity as Depositors under the Escrow Agreements (to the extent they are Depositors under any specific Escrow Agreement), and the Monitor and the UCC in their capacity as Estate Fiduciaries under the Escrow Agreements, shall give such instructions or consents as may be reasonably required in connection with the foregoing.  In relation to NNSA, any such instructions shall be given conjointly by the NNSA Conflicts Administrator and the French Liquidator following agreement with the Joint Administrators. The Bondholder Group and the UCC shall provide any consent as may be reasonably necessary under the IFSA in connection with any such instruction.  If, following the Plans Effective Date, all or any portion of the remaining Buyer Escrow Amount is to be released in accordance with this Settlement and Support Agreement then the parties to such escrows shall give the necessary instructions to the relevant Escrow Agent to apportion and release those proceeds to the Debtors in the respective allocation percentages set forth in Section 2(c).

**Section 4.  <u>Additional Settlement Provisions</u>**

The following provisions are also essential terms of the Settlement, which provisions, in respect of the U.S. Debtors, shall be incorporated into the U.S. Plans and, in respect of the Canadian Debtors, shall be incorporated into the Canadian Plan, as applicable.  For the avoidance of doubt, this Section 4 is subject to the satisfaction of the conditions contained in Section 9(a) hereof, except to the extent expressly indicated in Section 9(c) hereof.

    (a)   <u>Estate Administration</u>

        (i)   The Canadian Debtor estates will be administered by the Monitor.

        (ii)   The EMEA Debtor and NNSA (in the French Main Proceeding) estates will be administered by their respective representatives being the Joint Administrators in respect of each EMEA Debtor and being the Joint Administrators and the NNSA Conflicts Administrator in respect of NNSA in the French Main Proceeding.

        (iii)   The French Secondary Proceeding will be administered by its representative, being the French Liquidator.

        (iv)   The U.S. Debtor estates will be administered by the U.S. Principal Officer.

        (v)   Notwithstanding the separate administration of the estates of the Canadian Debtors, the EMEA Debtors, NNSA, the U.S. Debtors and of the EMEA Non-Filed Entities, the Parties shall work cooperatively and

use reasonable efforts to implement this Settlement and Support Agreement and the Plans in a tax efficient manner. In addition, the Debtors shall, upon the written request of a Debtor to another Debtor and to the extent permitted by applicable local law and not inconsistent with the statutory duties of the Debtor, or the Debtor's representatives and fiduciaries, to which a request is made, reasonably cooperate with each other, including providing such documents, other information, access to current personnel and/or permission to communicate with former personnel as may reasonably be requested by the requesting Debtor, in connection with the preparation and filing of tax returns and responding to or contesting any challenges, inquiries, audits or other disputes by tax authorities in relation thereto (collectively, "**Tax Disputes**"); provided, however, that no Debtor shall be obligated to cooperate to the extent such requested cooperation would prejudice the interests of such Debtor. The Debtor requesting cooperation shall bear all costs and expenses, including reasonable attorney fees, of the Debtor providing such cooperation, including the reasonable costs of accessing, processing, reviewing and making available any documents, other information and/or personnel requested. For the avoidance of doubt, each Debtor shall be solely responsible for preparing and filing its own tax returns and contesting or challenging any Tax Disputes in relation thereto, and no other Debtor shall have any obligation to respond to, contest, challenge, dispute or appear in any other Debtor's Tax Disputes. It is acknowledged that the Debtors intend to progress the wind-up of their respective estates, including the continuing disposal of records and decommissioning of their electronic data infrastructure (such as servers), and that the cooperation contemplated pursuant to this Section 4(a)(v) shall in no way preclude any of the Debtors from taking any steps in connection with such wind-up. To the extent that any Debtor receiving a request under this Section 4(a)(v) takes the position that it is unable to provide the assistance requested, such Debtor shall confer with the Debtor making the request as to the basis for such position.

(vi)    No Party will interfere with or oppose any Debtor regarding such Debtor's asset monetization, subsidiary wind-downs, tax positions, distributions, or marshalling, to the extent such actions are not inconsistent with this Settlement and Support Agreement, provided however, that the foregoing shall not compromise (x) the right, if any, of a creditor to (A) object, if such creditor has a claim that remains outstanding and unpaid against the relevant Debtor or Debtors against which the claim is to be allowed, after the date of this Settlement and Support Agreement, in the U.S. Court allowing a claim against the U.S. Debtors or in the Canadian Court allowing a claim as a Proven Claim against the Canadian Estate, in each case, other than claims expressly referred to in this Settlement and Support Agreement, and/or (B) exercise any right it may have as a creditor in respect of its claim including in respect of a Debtor's asset monetization, except in a

19

manner that directly contradicts any term of this Settlement and Support Agreement, or (y) the Parties' rights and obligations, if any, under the Cross-Border Protocol, the Cross-Border Protocol on the Resolution of Claims approved by the CCAA Court by Order dated September 16, 2010 and by the Bankruptcy Court by order dated September 16, 2010, or the Claims Resolution Order of the CCAA Court, dated September 16, 2010 .

(b)   Estate Consolidation

   (i)   Canadian Debtors – The Canadian Debtors shall be substantively consolidated pursuant to the Canadian Plan on the Plans Effective Date with all intercompany claims between and among the Canadian Debtors being thereby eliminated for purposes of the Canadian Plan and no distributions or payments will be made by the Canadian Debtors on account of such claims under the Canadian Plan or otherwise, and all unsecured creditors holding claims against the Canadian Estate (including the U.S. Debtors' $2.0 billion Proven Claim (the "**U.S. Canadian Claim**"), the Crossover Bondholders' Proven Claims of U.S.$3,940,750,260 in the aggregate, the NNCC Bondholders' Proven Claim of U.S.$150,951,562, the Proven Claims held by certain of the EMEA Debtors in an aggregate amount not to exceed U.S.$125,000,000 (subject to the contractually agreed upon conditions in clause 2.2 of the Agreement Settling EMEA Canadian Claims and Related Claims among, *inter alia*, the Canadian Debtors, the Monitor, the EMEA Debtors and NNSA, dated July 9, 2014) (respectively, the "**EMEA Canadian Claim**" and the "**EMEA Canada Settlement Agreement**") and the UKPI's Proven Claim of £339.75 million[6] (the "**UKPI Canadian Claim**") and the Canadian Pension Claim) will be paid *pari passu* by the Canadian Estate with all other general unsecured creditor distributions without discrimination of any kind. The U.S. Debtors' allowed U.S.$62.7 million secured claim (defined as the "Remaining Revolver Claim" in the CFSA) (the "**U.S. Canadian Priority Claim**") will retain its priority status granted by the CCAA Court in the order dated January 21, 2010.

   (ii)   U.S. Debtors – The U.S. Debtors' estates shall not be substantively consolidated, provided, however, that NNCC shall be substantively consolidated with and into NNI on the Plans Effective Date.

   (iii)   EMEA Debtors – The EMEA Debtors' estates and NNSA (or any of them) shall not be substantively consolidated.

(c)   Coordination of Crossover Claims (Issuer Pays First)

---

[6] Being U.S.$494,879,850 when converted from £339.75 million in accordance with Appendix "A" to the Claims Procedure Order.

(i)     The U.S. Plans and the Canadian Plan shall contain the following provisions with respect to claims arising out of a debt or other obligation of one or more of the U.S. Debtors that is guaranteed or indemnified by one or more of the Canadian Debtors, or a debt or other obligation of one or more of the Canadian Debtors that is guaranteed or indemnified by one or more of the U.S. Debtors (such claims, including, without limitation, the Crossover Bonds Claims, NNCC Bonds Claims and EDC claims, but excluding, in relation to the Canadian Debtors, any obligation of a Canadian Debtor guaranteed by another Canadian Debtor, being the "**Crossover Claims**"):

> (A)     In the event that the creditor shall have a Proven Claim against the Canadian Estate and an allowed claim against the relevant U.S. Debtor, then, subject to Section 4(c)(i)(B) and 4(g)(vi), the issuer (or primary) Debtor estate and any guarantor (or secondary) Debtor estate shall pay distributions on the full amount of the allowed claim, if a claim against a U.S. Debtor estate, or the full amount of the Proven Claim, if a claim against the Canadian Estate, on a *pari passu* basis with all other creditors holding allowed claims (in the case of the U.S. Debtors) or Proven Claims (in the case of the Canadian Debtors) with the same priority without discrimination of any kind.

> (B)     In no case shall a creditor holding a Crossover Claim be entitled to receive (i) any further distributions from the U.S. Debtors where the aggregate distributions made by the U.S. Debtors and the Canadian Estate in respect of such Crossover Claim equal the total allowed amount of such Crossover Claim against the U.S. Debtors, or (ii) any further distributions from the Canadian Estate where the aggregate distributions made by the U.S. Debtors and the Canadian Estate in respect of such Crossover Claim equal the total Proven Claim amount of such Crossover Claim against the Canadian Estate.  For the avoidance of doubt, in no event shall a holder of a Crossover Claim be entitled to receive aggregated distributions in respect of its allowed Crossover Claim of more than 100% of the greater of (i) its pre-filing allowed claim (U.S.), and (ii) Proven Claim (Canada) when taking into account distributions received from both the issuer (or primary) Debtor estate and guarantor (or secondary) Debtor estate (such greater amount, the "**Creditor's Maximum**").  For the further avoidance of doubt, in relation to a specific Crossover Claim, if the amount in U.S. Dollars of the allowed claim (U.S.) for such Crossover Claim is not the same as the amount of the Proven Claim (Canada) for such Crossover Claim, the Creditor's Maximum shall not be reached until the greater of the two amounts has been distributed to the creditor. Any amounts paid pursuant to Section 4(m) shall not be included in calculating the Creditor's Maximum as it pertains to the NNCC Bonds.

(C)     Notwithstanding Section 4(c)(i)(B) above, if the relevant creditor receives an aggregate amount of distributions equal to the Creditor's Maximum on account of its Crossover Claim, then the guarantor (or secondary) Debtor estate shall subrogate into the Crossover Claim against the issuer (or primary) Debtor estate (for the NNCC Bonds, the issuer Debtor estate is NNCC as of the date hereof, but shall be deemed to be NNI on the Plans Effective Date when NNCC is consolidated into NNI) and will be entitled to receive any and all subsequent distributions from the issuer (or primary) Debtor estate on account of such Crossover Claim on a *pari passu* basis with all other creditors holding allowed claims (U.S.) or Proven Claims (Canada) with the same priority from the issuer (or primary) Debtor estate without discrimination of any kind, provided that (i) the guarantor (or secondary) Debtor estate shall not receive any distributions on such claim in excess of payments the guarantor (or secondary) Debtor estate has made to the underlying holder of such Crossover Claim and (ii) in the case of the Crossover Bonds Claims, NNI shall receive distributions from the Canadian Estate as a result of such subrogation for distributions NNI has made on the allowed Crossover Bonds Claims only to the extent that NNI makes distributions in respect of the allowed Crossover Bonds Claims in excess of U.S.$1.25 billion and such subrogation shall be only in respect of amounts distributed in excess of U.S.$1.25 billion, it being understood that NNI's right of subrogation pursuant to this Section 4(c)(i)(C), if any, against the Canadian Estate in respect of the Crossover Bonds Claims remains subject to distributions equal to the Creditor's Maximum first being received by holders of the Crossover Bonds Claims on account of such claims.

(ii)    For the avoidance of doubt, no right of subrogation or indemnity (however described) will arise in favour of any Canadian Debtor or any U.S. Debtor against any EMEA Debtor, NNSA, or any  EMEA Non-Filed Entity in respect of any amount paid by a Canadian Debtor or any U.S. Debtor pursuant to any guarantee or indemnity in respect of a liability of any EMEA Debtor, NNSA or EMEA Non-Filed Entity, and no Canadian Debtor nor any U.S. Debtor shall pursue or file any such claims or assert any right of subrogation against any EMEA Debtor, NNSA or EMEA Non-Filed Entity.

(iii)   The issuer Debtor estate and the guarantor Debtor estate shall reasonably cooperate to give effect to the provisions of this Section 4(c), including sharing information regarding the Crossover Claims and intended and actual distributions thereon.

(d)     <u>Post-Petition Date Interest</u> — No post-Petition Date interest (or make whole premium or similar claim accruing post-Petition Date) shall be included in any creditor claims, nor be paid on creditor claims in any Debtor estate, save and

except with respect to any EMEA Debtor estate, and then only to the extent payment is required under applicable law (and, if interest is payable by an EMEA Debtor, nothing herein shall restrict the right of the EMEA Debtor to compromise in whole or in part the amount of interest due and payable), provided, however, that the Canadian Debtors agree that they shall not receive post-Petition Date interest on the Remaining HOC Claim.

(e)  Side Letters, IFSA, CFSA and T&T Claims – In full and final resolution of (i) all entitlements and obligations arising under side letters to which any of the U.S. Debtors and Canadian Debtors are party (as further specified on Annex C hereto and which, for purposes of this Section 4(e) and Annex C shall include the IFSA and CFSA, collectively, the "**Side Letters**"), and (ii) the T&T Claim, NNI shall receive payment from the Canadian Estate in the amount of U.S.$77.5 million. After receipt of such payment by NNI, NNI shall have a 27% interest in the remaining assets of the Cascade Trust and the Canadian Estate shall have a 73% interest in the remaining assets of the Cascade Trust. The Parties agree that except in relation to the Iceberg Amendment Fee, in respect of which NNUK will be entitled to a payment of U.S.$2.2 million from the Iceberg Sale Proceeds, neither the EMEA Debtors (nor NNSA) nor the EMEA Non-Filed Entities shall have any other entitlements or obligations under the Side Letters.

(f)  SNMP – There shall be no holdback of Sale Proceeds with respect to any liability that may be due or become due to one or both of SNMP Research International Inc. or SNMP Research Inc. (either or together, "**SNMP**"). No Debtor has or shall have any claim (whether by way of contribution, indemnity or otherwise) against any other Debtor in respect of any liability due or which may become due to SNMP and no Debtor or any other Party will assist SNMP in bringing any claim against any other Debtor.

(g)  Resolution of Certain Claims – The Parties have agreed to the following treatment for the following claims:

(i)  the Canadian registered pension plans deficit claims against each of the Canadian Debtors shall be allowed as unsecured Proven Claims against the Canadian Estate in the aggregate amount of CAD$1,889,479,000 (the "**Canadian Pension Claim**");

(ii)  the PBGC claim against each of the U.S. Debtors (and against any non-debtor U.S. Nortel Group entity) shall be a maximum of U.S.$708,000,000 and all rights of the U.S. Debtors and other U.S. based parties-in-interest in the U.S. Proceedings to contest such PBGC claims are expressly reserved and the allocation percentages provided for in Section 2(c) shall not change if the PBGC claims are admitted or allowed for a different amount;

(iii)  the Parties (other than NNUK and the UKPI) agree that they will not challenge the adjudication by the Joint Administrators of NNUK of the UKPI's claim arising under section 75 of the U.K. Pension Act 1995 (presently filed in the amount of £2,147,000,000) against NNUK and

23

the allocation percentages provided for in Section 2(c) shall not change if the UKPI claim is admitted or allowed for a different amount;

(iv)    the Crossover Bonds Claims (a) against NNL and NNC shall be allowed as unsecured Proven Claims against the Canadian Estate in the aggregate amount of U.S.$3,940,750,260, as specified in Annex G hereto, and (b) against NNI shall be allowed as a general unsecured claim in the aggregate amount of U.S.$3,934,521,442, as specified in Schedule A to the Agreement Settling The NNI Post-Petition Interest Dispute And Related Matters dated July 24, 2014;

(v)    the NNCC Bonds Claims (a) against NNI (into which NNCC shall be substantively consolidated on the Plans Effective Date) shall be allowed as a general unsecured claim in the amount of U.S.$150,951,562, and (b) against NNL shall be allowed as an unsecured Proven Claim against the Canadian Estate in the amount of U.S.$150,951,562;

(vi)    the U.S. Plans shall provide that NNI shall reserve U.S.$7.5 million from cash otherwise available for distributions to NNI unsecured creditors, to be made available to be paid in respect of the NNCC Bonds Claims in the event that distributions (including deemed distributions related to the Crossover Bondholder Fee Letter) in respect of the NNCC Bonds Claims will be less than U.S.$150,951,562 (exclusive of any amount paid pursuant to Section 4(m)) upon the completion of distributions in respect of the NNCC Bonds Claims on the allowed claim against NNI (which claim against NNI results from the consolidation of NNCC with and into NNI) and the Proven Claim against the Canadian Estate, provided, however, that NNI shall use such reserves to make distributions in respect of the NNCC Bond Claims only in the amount of the lesser of (A) U.S.$150,951,562 less total distributions from NNI and the Canadian Estate (exclusive of any amount paid pursuant to Section 4(m)), and (B) U.S.$7.5 million;

(vii)    The Bondholder Group agrees that it will negotiate in good faith with the Nortel U.S. Trade Claims Consortium regarding additional terms that would cause such group to support the Settlement and the U.S. Plans; and

(viii)    the UKPI Canadian Claim and the EMEA Canadian Claim shall be allowed as unsecured Proven Claims against the Canadian Estate.

(h)    <u>Book Intercompany Claims</u> – Pre-filing intercompany claims in the amounts recorded in the books and records of companies comprising the Nortel Group as set out in Annex L shall be included in the determination of the allowed unsecured claims against a Debtor (except to the extent such claims are between Canadian Debtors, where no distributions or payments will be made by the Canadian Debtors on account of such claims under the Canadian Plan or otherwise).  Annex L shall be treated as the definitive position for all pre-filing intercompany claims between the Nortel Group entities specified thereon.  Any

and all other pre-filing books and records claims between (A) any of the Canadian Debtors, on the one hand, and (B) any of the U.S. Debtors and their other subsidiaries as specified on Annex L, on the other hand, which are not preserved specifically herein (including, without limitation the claims referenced in Sections 4(b)(i) and 4(g)), are forever released and barred. Other than the EMEA Canadian Claim, the Remaining HOC Claim and any other pre-filing intercompany claims set forth on Annex L, all pre-filing books and records claims, including any claims that a Debtor now holds as a consequence of an assignment (excluding claims against an EMEA Debtor assigned to NNUK in connection with the EMEA Canada Settlement Agreement), between (G) any of the EMEA Debtors, NNSA or the EMEA Non-Filed Entities, on the one hand, and (H) any of the Canadian Debtors or the U.S. Debtors, on the other hand, are forever released and barred. The EMEA Debtors and the Canadian Debtors agree that in full and final settlement of: (Q) the Tranche 2 Payment (as such term is defined in the Q1 2010 Transfer Pricing Settlement Agreement among, *inter alia*, certain of the Canadian Debtors, the Joint Administrators and the EMEA Debtors, dated September 8, 2011); and (R) the U.S.$7,621,249 claim of certain of the Canadian Debtors against NNIF related to HOC, the Canadian Estate shall have an accepted post-Petition Date claim against NNIF in the amount of U.S.$3 million (the "**Remaining HOC Claim**"). The Remaining HOC Claim shall rank as an administration expense of NNIF payable in full in accordance with Section 2(h) and not subject to compromise or reduction. For the avoidance of doubt, the Tranche 2 Payment (being the remaining amount of the Shortfall Payments (as defined in the IFSA)) is forever released and barred. The Parties agree and acknowledge that, as at the date hereof, there are no post-filing books and records claims owing between (Y) any of the Canadian Debtors, on the one hand, and any of the U.S. Debtors, the EMEA Debtors, NNSA and the EMEA Non-Filed Entities, on the other, and (Z) any of the U.S. Debtors, on the one hand, and any of the EMEA Debtors, NNSA and the EMEA Non-Filed Entities, on the other.

(i)    Intra-EMEA Claims – Nothing in this Settlement and Support Agreement affects claims as between or among any of the EMEA Debtors and/or NNSA and/or the EMEA Non-Filed Entities, which shall be dealt with separately between the EMEA Debtors, NNSA and the EMEA Non-Filed Entities. Nothing in this Settlement and Support Agreement affects claims between or among the UKPI, any EMEA Debtor, NNSA, or the EMEA Non-Filed Entities, the Joint Administrators, the NNSA Conflicts Administrator or the French Liquidator, which shall be dealt with separately between and among the EMEA Debtors, NNSA, the EMEA Non-Filed Entities, the Joint Administrators, the NNSA Conflicts Administrator, the French Liquidator and the UKPI.

(j)    Remaining Assets and Other Proceeds – Each Debtor estate has the right to retain the value of its respective remaining assets, if any, and shall not be subject to any claims thereto by any other Debtor save and except those acknowledged herein. Other than those claims acknowledged herein to receive distributions from the proceeds of such assets, the U.S. Debtors, the EMEA Debtors, NNSA, the UKPI and the EMEA Non-Filed Entities release any claims they have asserted or may assert or have as against (i) those proceeds held by the Canadian Debtors as

"Restricted Cash" or "Unavailable Cash" (as noted in Monitor's Reports to the CCAA Court), including in respect of the realization of the interests in LG-N, the Strandherd Lands, Relay and IP Addresses, and (ii) the remaining IP Addresses, including any proceeds arising therefrom. For the avoidance of doubt, nothing in this subsection shall (i) prohibit the assertion of claims to enforce this Settlement and Support Agreement and claims that are reserved in this Settlement and Support Agreement (including without limitation, the claims referenced in Section 4(b)(i) hereof) or (ii) affect the Parties' rights to receive distributions as creditors of the various Debtors' estates.

(k)     <u>Bondholder Group Fees</u> – The aggregate amount of fees under the existing fee letter dated June 23, 2011 between various advisors to the Bondholder Group and NNC and NNL (the "**Crossover Bondholder Fee Letter**") to be deducted from distributions to Crossover Bondholders and NNCC Bondholders in respect of their Proven Claims against the Canadian Estate shall be U.S.$47 million (which includes U.S.$3.0 million in respect of the deferred compensation fee payable to FTI Consulting). An additional U.S.$7.0 million may be deducted from Canadian Estate distributions to Crossover Bondholders and NNCC Bondholders in further payment of the deferred compensation fee payable to FTI Consulting. All such deductions shall be borne by the Crossover Bondholders and the NNCC Bondholders on a pro rata basis based on the amount of the Proven Claims of the Crossover Bondholders and the NNCC Bondholders as set forth on Annex G hereto.

(l)     <u>Canadian Fees</u> – The Canadian Debtors and Monitor agree that the Canadian Debtors will not pay voluntarily, or seek permission to pay, legal or advisor fees of any stakeholder that the Canadian Debtors are not paying as of the date hereof. Payment of any such further legal or advisor fees will be done only pursuant to an order of the CCAA Court.

(m)    <u>NNCC Fees</u> – The U.S. Plans shall provide that NNI shall pay the reasonable and documented fees of (a) the NNCC Bonds Trustee, in an amount not to exceed U.S.$4.25 million, and (b) counsel to Solus Alternative Asset Management LP and PointState Capital LP in an amount not to exceed U.S.$750,000. Notwithstanding any other term in this Settlement and Support Agreement, if any amount remains in the cash reserve established pursuant to Section 4(g)(vi) hereof after the making of payments required thereunder, the U.S. Plans shall provide that, out of such funds, NNI shall pay or reimburse reasonable and documented fees (up to an additional U.S.$2.0 million) incurred by professionals in connection with the assertion of rights related to the NNCC Bonds. Any amount payable by NNI under this Section 4(m) shall include an amount equal to, and be in addition to, any fees paid by the Canadian Debtors under the Crossover Bondholder Fee Letter allocated to the NNCC Bondholders that are deducted from distributions made by the Canadian Estate to the NNCC Bondholders as described in Section 4(k).

(n)     <u>Canadian Debtor Claim Distributions</u> – Solely for determining *pari passu* distributions in respect of unsecured claims against the Canadian Estate, claims

will be valued in U.S. Dollars and all non-U.S. Dollar denominated Proven Claims against the Canadian Estate will be converted to U.S. Dollars at the prevailing exchange rate reported by Reuters on January 14, 2009 (as reflected at Appendix "A" to the Claims Procedure Order).

(i)     Proven Claims against the Canadian Estate predominantly denominated in Canadian Dollars ("**CAD Claims**") will be paid from Canadian Estate assets in Canadian Dollars.

(ii)    All other Proven Claims against the Canadian Estate will be paid in U.S. Dollars.

(iii)   For purposes of determining the amount of Canadian Dollars to be paid by the Canadian Estate on distributions on CAD Claims, the amount of such distribution in U.S. Dollars (as calculated in accordance with this Section 4(n)), shall be converted to Canadian Dollars at the Applicable FX Rate at which Sale Proceeds are converted from U.S. Dollars to Canadian Dollars as contemplated by Section 7 hereof.

(o)     <u>Plans Effective Date</u> – Each of the Plans shall contain a term to the effect that the U.S. Plans and the Canadian Plan shall become effective at the same time.

## Section 5.  <u>Litigation Resolution</u>

(a)     For the avoidance of doubt, this Section 5 is subject to the satisfaction of the conditions set forth in Section 9(a) hereof, except to the extent expressly indicated in Section 9(c) hereof.

(b)     Promptly following the Plans Effective Date, the Parties shall dismiss with prejudice and with no order as to costs all appeals, leave to appeal applications and other litigations among any of the Parties (including the pending appeals and cross-appeals in respect of the Allocation Dispute, the pending appeal of the PPI Settlement by the Canadian Debtors, the pending appeal of the SNMP impleader action and related denial of a chapter 15 stay to which the U.S. Debtors and the EMEA Debtors and SNMP are parties, and the pending appeal and cross-appeal in respect of the claims of the UKPI against the Canadian Debtors), save and except for the Non-Released Matters and provided that rights are reserved to enforce this Settlement and Support Agreement.  Such dismissals will be effected by the filing of the appropriate documents with the appropriate courts in each jurisdiction, the form of which documents must be reasonably acceptable to the Parties party to such litigation.

(c)     The Parties hereby agree that immediately upon this Settlement and Support Agreement being executed by all Parties, in a coordinated fashion the Parties shall contact the CCAA Court, the Bankruptcy Court, the Ontario Court of Appeal, the Supreme Court of Canada, the U.S. District Court for the District of Delaware, the Third Circuit, the U.K. Court, the French Court, and such other courts as may be necessary, and notify them that the Settlement and Support Agreement has been executed.  Counsel to the Monitor shall coordinate contacting the Canadian

Courts (except with respect to contacting the Supreme Court of Canada in connection with the leave application filed therewith, which shall be coordinated by counsel to the U.S. Debtors in consultation with counsel to the Monitor), counsel to the U.S. Debtors shall coordinate contacting the U.S. Courts, counsel to the Joint Administrators shall coordinate contacting the U.K. Court and counsel to each of the French Liquidator and NNSA Conflicts Administrator shall coordinate contacting the French Court.

(d)     Subject to Section 5(e), the Parties hereby agree that immediately upon this Settlement and Support Agreement being executed by all Parties, in a coordinated fashion the Parties shall request that the Canadian Courts and the U.S. Courts stay any and all matters pending before those courts between any of the Parties to, or that are otherwise related to, this Settlement and Support Agreement, including, without limitation, the litigation described in Section 5(b) hereof, pending satisfaction of the conditions set forth in Section 9(a) hereof.

(e)     The Parties hereby agree not to commence or take any step to advance any action, claim, appeal, objection or other similar proceeding (a "**Proceeding**") seeking relief that is the subject of the matters addressed in this Settlement and Support Agreement; provided, however, that (i) to the extent that a stay contemplated by subsection 5(d) above is not granted or ceases to exist in respect of any Proceeding, the Parties shall be entitled to take all reasonably necessary steps to preserve their rights in all relevant jurisdictions in respect of such Proceeding prior to the Plans Effective Date, provided, further, however, in accordance with Section 10 hereof, in the event of a termination of this Settlement and Support Agreement, upon the occurrence of such termination, the Parties agree to notify the relevant courts of such termination and immediately thereafter recommence, or continue, as applicable, litigation.   For the avoidance of doubt, the Parties rights to propose or oppose expedition of any Proceeding in the event of such termination are preserved as set forth in Section 10(c) herein.

## Section 6.  <u>Support of Settlement, Disclosure Statements and Plans</u>

(a)     For the avoidance of doubt, this Section 6 is subject to the satisfaction of the conditions set forth in Section 9(a) hereof, except to the extent expressly indicated in Section 9(c) hereof.

(b)     The Canadian Debtors and Monitor hereby agree to take any and all reasonably necessary and appropriate actions (including, without limitation, obtaining requisite corporate approvals, if any) to (i) file the Canadian Plan and Canadian Information Circular with the CCAA Court (each of which shall be in a form and substance that contains, implements and accurately reflects the terms and conditions of this Settlement and Support Agreement), seek approval of the Canadian Meeting Order and solicit votes from Canadian Voting Creditors to accept the Canadian Plan, and (ii) seek entry of the Sanction Order and the Canadian Escrow Release Order.   The sanction of the Canadian Plan will be conditioned on, among other things, confirmation of the U.S. Plans.

Consideration of the Canadian Plan and the U.S. Plans will take place in joint hearings conducted in accordance with the Cross-Border Protocol.

(c)     The U.S. Debtors hereby agree to take any and all reasonably necessary and appropriate actions (including, without limitation, obtaining requisite corporate approvals, if any) to (A) file the U.S. Plans and Disclosure Statement with the U.S. Court (each of which shall be in a form and substance that contains, implements and accurately reflects the terms and conditions of this Settlement and Support Agreement) and seek approval of the Disclosure Statement by the Bankruptcy Court, (B) solicit votes from U.S. Voting Creditors to accept the U.S. Plans, and (C) seek entry of the Confirmation Order and the U.S. Escrow Release Order.   Confirmation of the U.S. Plans will be conditioned on, among other things, sanction of the Canadian Plan.   Consideration of the Canadian Plan and the U.S. Plans will take place in joint hearings conducted in accordance with the Cross-Border Protocol.

(d)     The EMEA Debtors hereby agree to take any and all reasonably necessary and appropriate actions (including, without limitation, obtaining requisite corporate approvals, if any) to (A) file with the U.K. Court materials (which shall be, *inter alia*, in a form and substance that accurately reflects the terms and conditions of this Settlement and Support Agreement) as contemplated by Section 9(a)(iv) hereof, and (B) seek entry of the order or orders from the U.K. Court as contemplated by Section 9(a)(iv) hereof.

(e)     The French Liquidator hereby agrees to take any and all reasonably necessary and appropriate actions (including, without limitation, obtaining requisite corporate approvals, if any) to (A) file with the French Court materials (which shall be, *inter alia,* in a form and substance that accurately reflects the terms and conditions of this Settlement and Support Agreement) seeking the approval required by Section 9(a)(vi) hereof, and (B) seek entry of an order or orders from the French Court granting such approval.

(f)     The NNSA Conflicts Administrator hereby agrees to take any and all reasonably necessary and appropriate actions (including, without limitation, obtaining requisite corporate approvals, if any) to (A) file with the U.K. Court materials (which shall be, *inter alia,* in a form and substance that accurately reflects the terms and conditions of this Settlement and Support Agreement) as contemplated by Section 9(a)(v) hereof, and (B) seek entry of the order or orders from the U.K. Court as contemplated by 9(a)(v) hereof.

(g)     The U.K. Pension Trustee hereby agrees to take any and all reasonably necessary and appropriate actions (including, without limitation, obtaining requisite corporate approvals, if any) to (A) file with the Beddoes Court materials (which shall be in a form and substance that accurately reflects the terms and conditions of this Settlement and Support Agreement) seeking the approval required by Section 9(a)(vii) hereof, and (B) seek entry of an order or orders from the Beddoes Court authorizing the U.K. Pension Trustee to implement this Settlement and Support Agreement.

(h)     Subject to the Plans and the Disclosure Statements (A) accurately incorporating the terms and conditions of this Settlement and Support Agreement, and (B) being in form and substance reasonably satisfactory to the respective Parties (including in respect of any material amendments to the Plans), each of the Parties and each of the Participating Creditors hereby agrees to:

(i)     support the Settlement and all of the transactions and actions contemplated hereby (including the Plans) and take any and all reasonably necessary and appropriate actions in furtherance of consummation of the Settlement, the Plans and this Settlement and Support Agreement;

(ii)     support approval of the Disclosure Statements, the granting of the Canadian Meeting Order (and not object to approval of the Disclosure Statements or the granting of the Canadian Meeting Order, or support the efforts of any other Person to oppose or object to, approval of the Disclosure Statements or the granting of the Canadian Meeting Order) and the granting of the approvals from the U.K. Court, the French Court and the Beddoes Court;

(iii)     subject to receipt of the Disclosure Statements and solicitation in accordance with (as applicable) Sections 1125 and 1126 of the Bankruptcy Code and/or the Canadian Meeting Order,

(A)     (1) as necessary given its creditor status, deliver its duly-completed ballot(s) and/or proxy(ies) for receipt (at the address specified therein) by the required date (or to attend at the meeting of creditors to be held pursuant to the Canadian Meeting Order) in order to vote its claims to accept the Plans, (2) with respect to voting of any claim held by a Participating Creditor for trades not settled (but which claims will be bound by the terms hereof upon the closing of such trade), to direct the delivery of duly-completed ballot(s) and/or proxy(ies) for receipt (at the address specified therein) by the required date in order to vote such claims to accept the Plans, and (3) not change or withdraw (or cause to be changed or withdrawn) any such vote, unless the Plan related thereto is modified to be inconsistent with this Settlement and Support Agreement or is otherwise modified in a manner not permitted by such Plan;

(B)     (1) support the granting of the Confirmation Order, the Sanction Order and the Escrow Release Orders (and not object to approval of the granting of such orders, or support the efforts of any other Person to oppose or object to, the granting of such orders), unless the Plan related thereto is modified to be inconsistent with this Settlement and Support Agreement or is otherwise modified in a manner not permitted by such Plan, and (2) refrain from taking any action not required by law that is inconsistent with, or that would delay or impede sanction, confirmation or consummation of the

Plans or that is otherwise inconsistent with the express terms of this Settlement and Support Agreement; and

(C)  not, directly or indirectly, propose, support, solicit, encourage, or participate in the formulation of any alternative plan or plans of compromise, arrangement, reorganization or liquidation in the Chapter 11 Cases or the Canadian Proceedings other than the Plans.

(iv)  in the case of Participating Creditors who are Crossover Bondholders, issue directions to the trustees under the indentures governing the Crossover Bonds to support this Settlement and Support Agreement and the Plans and to act in a manner as contemplated pursuant to this Section 6(h); and

(v)  in the case of Participating Creditors who are NNCC Bondholders, issue directions to the NNCC Bonds Trustee to cause the NNCC Bonds Trustee to support this Settlement and Support Agreement and the Plans and to act in a manner as contemplated pursuant to this Section 6(h).

(i)  For the avoidance of doubt, each of the Parties and each Participating Creditor also agrees that it will not take any action (or refrain from taking an action) that, directly or indirectly, would interfere with, delay, impede, or postpone or take any other action that interferes with, the implementation of the Settlement, the confirmation and consummation of the U.S. Plans, the sanction and consummation of the Canadian Plan and/or the granting of the approvals by the U.K. Court, the French Court and the Beddoes Court.

(j)  Transfers of Claims and Interests.

(i)  No Participating Creditor shall (i) sell, transfer, assign, pledge, grant a participation interest in, or otherwise dispose of, directly or indirectly, its right, title, or interest in respect of any of such Participating Creditor's claims against any Debtor in whole or in part, or (ii) deposit any of such Participating Creditor's claims against any Debtor, as applicable, into a voting trust, or grant any proxies, or enter into a voting agreement with respect to any such claims or interests (the actions described in clauses (i) and (ii) are collectively referred to herein as a "**Transfer**" and the Participating Creditor making such Transfer is referred to herein as the "**Transferor**"), unless such Transfer is to another Party or Participating Creditor or any other Person that first agrees in writing to be bound by the terms of this Settlement and Support Agreement by executing and delivering a Transferee Joinder substantially in the form attached hereto as Annex H (the "**Transferee Joinder**") to the Debtors or, if to a Party or Participating Creditor, which Party or Participating Creditor has already executed this Settlement and Support Agreement, in which case, the Party or Participating Creditor receiving such Transferee Joinder shall deliver same to the Debtors. With respect to claims against or interests in a

Debtor held by the relevant transferee upon consummation of a Transfer in accordance herewith, such transferee is deemed to make all of the representations, warranties, and covenants of a Participating Creditor, as applicable, set forth in this Agreement. Upon compliance with the foregoing, the Transferor shall be deemed to relinquish its rights (and be released from its obligations, except for any claim for breach of this Settlement and Support Agreement or any related non-disclosure agreement that occurs prior to such Transfer) under this Agreement to the extent of such transferred rights and obligations. Any Transfer made in violation of this Sub-Clause (i) of this Section 6(j) shall be deemed null and void *ab initio* and of no force or effect, regardless of any prior notice provided to the Debtors, and shall not create any obligation or liability of any Debtor or any other Party to the purported transferee.

(ii)     Notwithstanding Sub-Clause (i) of this Section 6(j), an entity that is acting in its capacity as a Qualified Marketmaker shall not be required to execute and deliver a Transferee Joinder on its own behalf to effect any transfer (by purchase, sale, assignment, participation, or otherwise) of any claim against any Debtor, by a Participating Creditor to a transferee; *provided that* (A) such transfer by a Participating Creditor to a transferee shall be in all other respects in accordance with and subject to Section 6(j)(i), including in that the ultimate transferee shall execute a Transferee Joinder, and (B) to the extent that a Participating Creditor, acting in its capacity as a Qualified Marketmaker, acquires any claim against, or interest in, any Debtor from a holder of such claim who is not a Participating Creditor, it may transfer (by purchase, sale, assignment, participation, or otherwise) such claim or interest without the requirement that the transferee be or become a Party in accordance with this Section 6(j). For purposes of this Section 6(j)(ii), a "**Qualified Marketmaker**" means an entity that (Y) holds itself out to the market as standing ready in the ordinary course of its business to purchase from customers and sell to customers claims against any of the Debtors (including debt securities or other debt) or enter with customers into long and short positions in claims against the Debtors (including debt securities or other debt), in its capacity as a dealer or market maker in such claims against the Debtors, and (Z) is in fact regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt). For the avoidance of doubt, if a Qualified Marketmaker purchases a claim against a Debtor from a Participating Creditor for its own account or otherwise has a beneficial ownership interest in a claim being acquired from a Participating Creditor, it shall be required to execute and deliver a Transferee Joinder to the Debtors.

## Section 7.   <u>Currency Conversion</u>

(a)     The Parties hereby agree to cooperate and coordinate efforts to convert portions of the Sale Proceeds from U.S. Dollars to, as the case may be, Canadian Dollars, Sterling and Euros (collectively, the "**<u>Other Currencies</u>**").

(b)    Canadian Dollar Conversion.

    (i)    The Canadian Debtors have elected to convert a portion of the Sale Proceeds, not to exceed US$1.2 billion, into Canadian Dollars.  The Parties hereto agree to such conversion subject to the terms of this Section 7.

    (ii)    Within seven (7) Business Days of the date the conditions specified in Sections 9(a)(i) and 9(a)(ii) hereof are satisfied or waived in writing by the Parties:

        (A)    NNC, NNL, NNI, NNUK, NNSA, the other existing Depositors under the relevant Existing Escrow Agreements, the Monitor and the UCC shall enter into the Canadian Escrow Agreement, which agreement shall be subject to the separate approvals of the Bankruptcy Court and the CCAA Court; and

        (B)    the U.S. Debtors agree to make a motion to the Bankruptcy Court, and the Canadian Debtors agree to make a motion to the CCAA Court, for orders approving the conversion contemplated by this Section 7(b).

    (iii)    Each Party appearing at the hearings on the motions contemplated by Section 7(b)(ii)(B) will confirm to the Bankruptcy Court and/or the CCAA Court its support for the conversion and will take all necessary steps to support the conversion motions before the Bankruptcy Court and CCAA Court.

    (iv)    Forthwith upon the granting of the approvals of the Bankruptcy Court and the CCAA Court contemplated by Section 7(b)(ii)(B), the Parties (and in particular the relevant Depositors and Estate Fiduciaries) shall issue such instructions and/or directions to the existing Escrow Agents as may be necessary to give effect to the transfer of an amount of the Sale Proceeds as specified by the Monitor in writing (not to exceed the amount specified in Section 7(b)(i)) to the Canadian Escrow Agent.

    (v)    Following receipt by the Canadian Escrow Agent of such Sale Proceeds, the Monitor shall direct the conversion of such Sale Proceeds by the Canadian Escrow Agent (or its affiliate) on the date(s) and in the manner specified from time to time by the Monitor.

    (vi)    Any foreign exchange gain or loss made in respect of any amount in the Canadian Escrow Account (following conversion from U.S. Dollars to Canadian Dollars) shall be solely for the credit or debit of the Canadian Debtors.

(c)    Sterling and Euro Conversion Elections.

(i)     The EMEA Debtors and NNSA have not yet elected to convert a portion of Sale Proceeds into Sterling or Euros.

    (A)     Any of the EMEA Debtors and NNSA may, subject to the conditions set forth in this Section 7, elect to convert, in the case of an EMEA Debtor, up to the amount specified for that EMEA Debtor in Annex E into Sterling (a "**Sterling Conversion Election**") and, in the case of NNSA, up to $220 million into Euros, and in each case, less the pro rata percentage of the Buyer Escrow Amount attributable to NNSA and each EMEA Debtor (the "**Euro Conversion Election**," and together with any Sterling Conversion Election, the "**Conversion Elections**").

(ii)    A Conversion Election may be requested at any time following the satisfaction of the conditions contained in Section 9(a)(i),(ii), (iv), (v) and (vi).

(iii)   A Conversion Election must be made in writing to the Parties (a "**Conversion Election Request**") and be accompanied by the form of the EMEA Sterling Escrow Agreement in the event the Sterling Conversion Election is requested and/or the EMEA Euro Escrow Agreement in the event the Euro Conversion Election is requested, which agreements shall be on terms and conditions that are substantially similar to the terms and conditions of the Existing Escrow Agreements governing the Existing Escrow Accounts and shall include, without limitation:

    (A)     provisions that provide for the same level of joint control by the Bankruptcy Court and the CCAA Court over the EMEA Escrow Accounts that such courts now have over the Existing Escrow Accounts; and

    (B)     provisions that provide for the release of funds from the EMEA Escrow Accounts on the same terms and conditions that govern the release of funds from the Existing Escrow Accounts; and

    (C)     a requirement that the funds shall be held in a bank in London (U.K.) acceptable to the U.S. Debtors, the Canadian Debtors, the EMEA Debtors and NNSA.

(iv)    Promptly following delivery of a Conversion Election Request, the U.S. Debtors, the Canadian Debtors, the EMEA Debtors, NNSA, the Monitor and the UCC shall work together in good faith to agree the terms of the EMEA Euro Escrow Agreement and the EMEA Sterling Escrow Agreement, as applicable.

(v)     Promptly following delivery of a Conversion Election Request, the Debtors shall agree on the U.S. Dollar amount of Sale Proceeds to be

transferred from each of the Existing Escrow Accounts to satisfy the Conversion Election Request.

(vi)     Each of the EMEA Escrow Agreements shall be subject to the approval of the Bankruptcy Court and the CCAA Court, respectively.   The Parties agree that within seven (7) Business Days of agreement on the form of the relevant EMEA Escrow Agreement:

    (A)     the U.S. Debtors shall apply to the Bankruptcy Court; and

    (B)     the Canadian Debtors shall apply to the CCAA Court,

in each case for permission to complete the relevant conversion and for approval to enter into the relevant EMEA Escrow Agreement.

(vii)    Each Party appearing at the motions contemplated by Section 7(c)(vi) will confirm to the Bankruptcy Court and/or the CCAA Court its support for the conversion and will take all necessary steps to support the conversion motions before the Bankruptcy Court and the CCAA Court.

(viii)   Within:

    (A)     seven (7) Business Days; or

    (B)     such longer period as the Party making the Conversion Election Request may require,

of obtaining the approvals of the Bankruptcy Court and the CCAA Court contemplated by Section 7(c)(vi), the Parties (and in particular the relevant Depositors and Estate Fiduciaries) shall issue such instructions and/or directions to the Existing Escrow Agents as may be necessary to give effect to the Conversion Election Request(s) and to the transfer of the requisite amount to the EMEA Euro Escrow Agent and/or the EMEA Sterling Escrow Agent, as the case may be, for conversion in accordance with Section 7(c)(ix) below.

(ix)     The Parties agree that the currency conversions contemplated under this Section 7(c) shall occur:

    (A)     in the case of a Conversion Election by an EMEA Debtor, on the date(s) and in the manner specified from time to time by the Joint Administrators of that EMEA Debtor (which in the case of NNUK shall follow consultation between the Joint Administrators and the UKPI); and

    (B)     in the case of a Conversion Election by NNSA, on the date(s) and in the manner specified from time to time by the NNSA Conflicts

Administrator following consultation with the French Liquidator and the agreement of the Joint Administrators of NNSA.

(x) Any foreign exchange gain or loss made in respect of any amount in the relevant EMEA Escrow Account pursuant to a Conversion Election (following conversion from U.S. Dollars to Euros or Sterling) shall be solely for the credit or debit of the EMEA Debtor who requested such Conversion Election or NNSA, as the case may be.

(d) The Parties undertake and agree to cooperate with the Escrow Agents to establish appropriate steps necessary to effect the necessary and timely conversion contemplated in this Section 7.

(e) The fees and costs of the Escrow Agents (including reasonable attorneys' fees costs), if any, associated with any currency conversion shall be borne by the Debtor(s) requesting such conversion and shall be paid out of the amount of their respective Sale Proceeds allocation or directly by the relevant Debtor out of its estate assets.

(f) Without in any way limiting the right of the EMEA Debtors and NNSA to convert any amount to Sterling or Euros in accordance with Section 7(c), it is the current intention of the EMEA Debtors and NNSA that:

(i) they will not issue a Conversion Election Request prior to the Plans Effective Date; and

(ii) they will receive their respective allocations pursuant to Section 2 (or following a Final Allocation Determination) in U.S. Dollars.

(g) For purposes of determining the allocation entitlements of the Debtors either pursuant to Section 2(c) hereof or pursuant to a Final Allocation Determination, any Sale Proceeds converted into Other Currencies as contemplated by this Section 7 (for the avoidance of doubt, plus interest on such converted amount) shall, when distributed to a Debtor, be valued as a U.S. Dollar equivalent of such Other Currency at the spot rate or blended rate (as applicable, which blended rate shall take into account the amounts converted and the rates at which such conversion occurred) at which such Sale Proceeds were converted from U.S. Dollars to such Other Currency (any such spot or blended conversion rate, the "**Applicable FX Rate**").  Solely for illustrative purposes, if U.S.$10 of Sale Proceeds was converted to CAD$13 (spot rate or blended rate of U.S.$1.00 to CAD$1.30), receipt by the Canadian Debtors of CAD$13 from the Canadian Escrow Account would constitute receipt of US$10 for purposes of determining the Canadian Debtors' allocation entitlement pursuant to Section 2(c) hereof or pursuant to a Final Allocation Determination regardless of the actual relative value of U.S. Dollars to Canadian Dollars at the date of distribution of such Sale Proceeds to the Canadian Estate.

36

(h)     If this Agreement terminates after the date of any currency conversion pursuant to this Section 7, then any amount so converted shall, absent any agreement among the parties to the relevant New Escrow Agreement, remain in the relevant New Escrow Account in the form of the converted Other Currency until such time as the Allocation Dispute has been finally resolved and the amount to be distributed to each Debtor estate has been finally determined (the "**Final Allocation Determination**", and the amount calculated as payable to each Debtor pursuant to the Final Allocation Determination, its "**Final Allocation Amount**").  In assisting the U.S. Court and the Canadian Court to come to a Final Allocation Determination, the Parties hereby agree to inform the U.S. Court and the Canadian Court that the Final Allocation Determination should be made as though no currency conversion had taken place.

(i)     For the purpose of Section 7(j) to (k), inclusive, the following terms shall have the following meaning:

   (i)     "**Converting Debtor**" means any Debtor that has elected to convert a portion of the Sale Proceeds and has a New Escrow Account established into which converted currency is paid pursuant to this Section 7;

   (ii)    "**Non-Converting Debtor**" means any Debtor that is not a Converting Debtor;

   (iii)   "**Positive Converting Debtor**" means any Converting Debtor in respect of which the Sale Proceeds in the relevant New Escrow Account (as expressed in U.S. Dollars using the Applicable FX Rate) exceeds the Final Allocation Amount due to such Converting Debtor;

   (iv)    "**Negative Converting Debtor**" means any Converting Debtor who is not a Positive Converting Debtor; and

   (v)     "**Surplus Amount**" means any, all of or any combination of a Canadian Surplus Amount, an EMEA Surplus Amount or an NNSA Surplus Amount.

(j)     In respect of the Canadian Debtors, upon a Final Allocation Determination:

   (i)     If the amount of Sale Proceeds in the Canadian Escrow Account plus any fees and costs paid pursuant to Section 7(e) from such Sale Proceeds (in each case as expressed in U.S. Dollars using the Applicable FX Rate) is greater than the aggregate of the Final Allocation Amounts due to the Canadian Debtors, then the Canadian Debtors shall pay into the Existing Escrow Accounts an amount, in U.S. Dollars, equal to the amount by which:

      (A)    the amount of Sale Proceeds in the Canadian Escrow Account plus any fees and costs paid pursuant to Section 7(e) from such Sale

37

Proceeds (in each case as expressed in U.S. Dollars using the Applicable FX Rate), *exceeds*

(B)    the aggregate of the Final Allocation Amounts due to the Canadian Debtors (such excess amount, the "**Canadian Surplus Amount**").

(ii)    The Canadian Surplus Amount shall, at the election of the Canadian Debtors and the Monitor, be satisfied from:  (A) the Canadian Debtors' own assets; (B) the Canadian Escrow Account; or (C) any combination of the foregoing (A) and (B). If all or part of the Canadian Surplus Amount is to be transferred from the Canadian Escrow Account then all of the Parties agree that they shall issue such instructions or other directions to the Canadian Escrow Agent as may be required in order to effect such transfer to the Existing Escrow Accounts.  Any fees or costs associated with the transfer of such funds from the Canadian Escrow Account or the conversion of such funds back to U.S. Dollars for the purpose of transfer, including without limitation any fees and costs of the Escrow Agents or their counsel, shall be borne by the Canadian Debtors either directly or from the Canadian Escrow Account.

(iii)    Once the Canadian Surplus Amount has been paid into the Existing Escrow Accounts then:

(A)    the amounts in the Existing Escrow Accounts (less any costs of the Existing Escrow Agents) shall be applied in payment of the amounts due to the Non-Converting Debtors in proportion to their respective Final Allocation Amounts; and

(B)    the amounts in the Canadian Escrow Account shall be paid to the Canadian Debtors.

(iv)    If there is no Canadian Surplus Amount upon a Final Allocation Determination:

(A)    the amounts in the Canadian Escrow Account shall be paid to the Canadian Debtors; and

(B)    the amounts in the Existing Escrow Accounts (less any costs of the Existing Escrow Agents) shall be paid to all Debtors as necessary to satisfy their respective Final Allocation Amounts (taking into account the amount of Sale Proceeds to be paid to the Canadian Debtors pursuant to the foregoing (A) plus any fees and costs paid pursuant to Section 7(e) from such Sale Proceeds (in each case as expressed in U.S. Dollars using the Applicable FX Rate)).

(k)    If an EMEA Debtor and/or NNSA also becomes a Converting Debtor then Section 7(j)(iii) and (iv) shall not apply and the following provisions shall apply upon a Final Allocation Determination:

(i)     If the amount of Sale Proceeds in the EMEA Sterling Escrow Account attributable to a Conversion Election made by that EMEA Debtor plus any fees and costs paid pursuant to Section 7(e) from such Sale Proceeds attributable to that EMEA Debtor (in each case as expressed in U.S. Dollars using the Applicable FX Rate) is greater than the Final Allocation Amount due to that EMEA Debtor, then that EMEA Debtor shall pay into the Existing Escrow Accounts an amount, in U.S. Dollars, equal to the amount by which:

    (A)     the amount of Sale Proceeds in the EMEA Sterling Escrow Account attributable to a Conversion Election made by that EMEA Debtor plus any fees and costs paid pursuant to Section 7(e) from such Sale Proceeds attributable to that EMEA Debtor (in each case as expressed in U.S. Dollars using the Applicable FX Rate), *exceeds*

    (B)     the Final Allocation Amount due to that EMEA Debtor (such excess amount, the "**EMEA Surplus Amount**").

(ii)    The EMEA Surplus Amount shall, at the election of that EMEA Debtor, be satisfied from: (A) the EMEA Debtor's own assets; (B) the EMEA Sterling Escrow Account; or (C) any combination of the foregoing (A) and (B). If all or part of the EMEA Surplus Amount is to be transferred from the EMEA Sterling Escrow Account then all of the Parties agree that they shall issue such instructions or other directions to the EMEA Sterling Escrow Agent as may be required in order to effect such transfer to the Existing Escrow Accounts. Any fees or costs associated with the transfer of such funds from the EMEA Sterling Escrow Account or the conversion of such funds back to U.S. Dollars for the purpose of transfer, including without limitation any fees and costs of the Escrow Agents or their counsel, shall be borne by that EMEA Debtor either directly or from the EMEA Sterling Escrow Account.

(iii)   If the amount of Sale Proceeds in the EMEA Euro Escrow Account plus any fees and costs paid pursuant to Section 7(e) from such Sale Proceeds (in each case as expressed in U.S. Dollars using the Applicable FX Rate) is greater than the aggregate of the Final Allocation Amount due to NNSA, then NNSA shall pay into the Existing Escrow Accounts an amount, in U.S. Dollars, equal to the amount by which:

    (A)     the amount of Sale Proceeds in the EMEA Euro Escrow Account plus any fees and costs paid pursuant to Section 7(e) from such Sale Proceeds (as expressed in U.S. Dollars using the Applicable FX Rate), *exceeds*

    (B)     the Final Allocation Amount due to NNSA (such excess amount, the "**NNSA Surplus Amount**").

(iv)     The NNSA Surplus Amount shall, at the election of NNSA, be satisfied from:  (A) NNSA's own assets; (B) the EMEA Euro Escrow Account; or (C) any combination of the foregoing (A) and (B).  If all or part of the NNSA Surplus Amount is to be transferred from the EMEA Euro Escrow Account then all of the Parties agree that they shall issue such instructions or other directions to the EMEA Euro Escrow Agent as may be required in order to effect such transfer to the Existing Escrow Accounts.  Any fees or costs associated with the transfer of such funds from the EMEA Euro Escrow Account or the conversion of such funds back to U.S. Dollars for the purpose of transfer, including without limitation any fees and costs of the Escrow Agents or their counsel, shall be borne by NNSA either directly or from the EMEA Euro Escrow Account.

(v)      If there is a Surplus Amount then once such Surplus Amount has been paid into the Existing Escrow Accounts in accordance with Sections 7(j)(i), 7(j)(ii) and 7(k)(i-iv), as applicable:

  (A)    the amounts in the Existing Escrow Accounts (less any costs of the Existing Escrow Agents) shall be applied in payment of the amounts due to (i) all Non-Converting Debtors; and (ii) all Negative Converting Debtors (taking into account the amount of Sale Proceeds to be paid to such Negative Converting Debtors pursuant to the following (B), (C) and (D), as expressed in U.S. Dollars using the Applicable FX Rate), in proportion to their respective Final Allocation Amounts;

  (B)    the amounts in the Canadian Escrow Account shall be paid to the Canadian Debtors;

  (C)    the amounts in the EMEA Sterling Escrow Account shall be paid to the EMEA Debtors who are Converting Debtors in proportion to their respective Final Allocation Amounts; and

  (D)    the amounts in the EMEA Euro Escrow Account shall be paid to NNSA.

(vi)     If there is no Surplus Amount:

  (A)    the amounts in the Canadian Escrow Account shall be paid to the Canadian Debtors;

  (B)    the amounts in the EMEA Sterling Escrow Account shall be paid to the EMEA Debtors who are Converting Debtors in proportion to their respective Final Allocation Amounts;

  (C)    the amounts in the EMEA Euro Escrow Account shall be paid to NNSA; and

       (D)    the amounts in the Existing Escrow Accounts (less any costs of the Existing Escrow Agents) shall be paid to all Debtors as necessary to satisfy their respective Final Allocation Amounts (taking into account the amount of Sale Proceeds to be paid pursuant to the foregoing (A), (B) and (C) plus any fees and costs paid pursuant to Section 7(e) from such Sale Proceeds (in each case as expressed in U.S. Dollars using the Applicable FX Rate)).

(l)    Notwithstanding the terms of any New Escrow Agreement, the Parties acknowledge that, in the event of the termination of this Settlement and Plan Support Agreement, each of the Debtors (other than Nortel Communications Inc., Architel Systems Corporation, Northern Telecom Canada Limited and Nortel Networks India International Inc.) reserves its rights pursuant to the Allocation Decisions with respect to any interest it may have in the Sale Proceeds on deposit in the New Escrow Accounts.

## Section 8.  Releases

(a)    For the avoidance of doubt, this Section 8 is subject to the satisfaction of the conditions contained in Section 9(a) hereof.

(b)    Subject to Section 8(b)(iii) and 8(i) hereof, upon the Plans Effective Date, each of the Parties and the Participating Creditors and their respective representatives, agents, successors and assigns (each a "**Releasor**"):

    (i)    release and forever discharge the other Releasors and each other Releasor's respective employees, officers, directors, agents, advisors, lawyers, successors and assigns and the directors and officers, both former and current, of any Nortel entity ("**Worldwide Ds&Os**") (each being a "**Releasee**") from any and all liability for claims, defences, demands, liabilities, damages, actions, contributions, subrogation, causes of action, setoffs, recoupments, costs and expenses (including lawyers' or other fees or expenses), the foregoing terms to be construed as broadly as possible, whether known or unknown, past or present, fixed or contingent, liquidated or unliquidated, which any of the Releasors now have, had, may have had or hereafter may have however so arising out of or in connection with the Allocation Dispute, any other matters resolved herein or any other matter relating to the Nortel Insolvency Proceedings or the Nortel Group (collectively and excluding the Non-Released Matters, "**Released Claims**"); and

    (ii)    undertakes, covenants and agrees not to make any claim, participate in any proceeding or take any action against any other person or entity who would as a result of such claim, proceeding or action have a claim for contribution or indemnity against any of the Releasees in relation to the matters herein resolved and released (collectively, the "**Releases**").

    (iii)    Notwithstanding the above Sections 8(b)(i) and 8(b)(ii), each of the Canadian Debtors and U.S. Debtors do not release or in any way

compromise their right to object to, or assert counterclaims for purposes of setoff against, claims made against them by Worldwide Ds&Os against such Debtors.

(c)     Notwithstanding the Releases provided in Section 8(b), the Debtors shall, upon the written request of a Debtor to another Debtor and to the extent permitted by applicable local law and not inconsistent with the statutory duties of the Debtor, or the Debtor's representatives and fiduciaries, to which a request is made, reasonably cooperate with each other, including providing such documents, other information, access to current personnel and/or permission to communicate with former personnel as may reasonably be requested by the requesting Debtor, in connection with opposing claims asserted by third parties against one or more of the Debtors ("**Third Party Claims**"), which Third Party Claims would have, but for the Releases, given rise to claims for indemnity and/or contribution among one or more of the Debtors; provided, however, that no Debtor shall be obligated to cooperate to the extent such requested cooperation would prejudice the interests of such Debtor.  Further, a Debtor shall only be obligated to provide cooperation in respect of a Third Party Claim pursuant to this Section 8(c) if, but for the Releases, such Third Party Claim would have given rise to a claim for indemnity and/or contribution against such Debtor.  The Debtor requesting cooperation shall bear all costs and expenses, including reasonable attorney fees, of the Debtor providing such cooperation, including the costs of accessing, processing, reviewing and making available any documents, other information and/or personnel requested.  For the avoidance of doubt (i) each Debtor shall be solely responsible for responding to and defending any Third Party Claims against it, and no other Debtor shall have any obligation to respond to, defend, appear in or become party to any Third Party Claims asserted against another Debtor, and (ii) this Section 8(c) shall not create any rights on the part of any person asserting a Third Party Claim, including any discovery or similar rights.  It is acknowledged that the Debtors intend to progress the wind-up of their respective estates, including the continuing disposal of records and decommissioning of their electronic data infrastructure (such as servers), and that the cooperation contemplated pursuant to this Section 8(c) shall in no way preclude any of the Debtors from taking any steps in connection with such wind-up.  To the extent that a Debtor receiving a request under this Section 8(c) takes the position that it is unable to provide the assistance requested, such Debtor shall confer with the Debtor making the request as to the basis for such position.

(d)     The U.S. Plans will include the Releases and the delivery thereof will be authorized by the Confirmation Order.  With respect to any Participating Creditor, such Releases shall be effective regardless of whether such Participating Creditor elects or opts out of any third-party release in the U.S. Plans.

(e)     The Canadian Plan will include the Releases and the effectiveness thereof will be authorized by the Sanction Order.

(f)     The Releases provided by the Joint Administrators, the NNSA Conflicts Administrator, NNSA (in the French Main Proceeding) and the EMEA Debtors

will be effective on the occurrence of the Plans Effective Date and the foregoing will be obliged to give effect to the releases as a result of the orders of the U.K. Court referred to in Section 9(a)(iv) and 9(a)(v).

(g)    The Releases provided by the French Liquidator and NNSA (in the French Secondary Proceeding) will be authorized by the French Court to be effective on the occurrence of the Plans Effective Date.

(h)    The Releases provided by the U.K. Pension Trustee will be authorized by the Beddoes Court to be effective on the occurrence of the Plans Effective Date.

(i)    Nothing in this Settlement and Support Agreement shall constitute a release, waiver or discharge of:

(i)    any claims advanced by any party represented by a member of the CCC as against any of the Canadian Debtors or their directors, and any claims of the Canadian registered pension plans (or their administrator or other authorized representative on their behalf) against the Pension Benefits Guarantee Fund (Ontario);

(ii)    any allowed claims (U.S.) or Proven Claims (Canadian) against the U.S. Debtors or the Canadian Estate for payment of the Crossover Bonds or the NNCC Bonds;

(iii)    the U.S. Canadian Claim, the U.S. Canadian Priority Claim, the EMEA Canadian Claim, the UKPI Canadian Claim, the Remaining HOC Claim and the pre-filing intercompany claims specified on Annex L;

(iv)    any claim advanced by any EMEA Debtor or EMEA Non-Filed Entity against any other EMEA Debtor or EMEA Non-Filed Entity, or NNSA;

(v)    any claim advanced by NNSA against any EMEA Debtor or the Joint Administrators;

(vi)    any claim advanced by the UKPI against any EMEA Debtor, the Joint Administrators, or NNSA;

(vii)    any claim advanced by any EMEA Debtor or NNSA against the UKPI;

(viii)    any claim between or among any of the U.S. Debtors and their subsidiaries;

(ix)    any claim between the PBGC and the U.S. Debtors or any of their U.S. subsidiaries;

(x)    any claim between or among the Canadian Debtors, provided no distributions or payments will be made by the Canadian Debtors on account of such claims under the Canadian Plan or otherwise; and

43

(xi)    any claim to enforce the terms of this Settlement and Support Agreement, the Plans and any orders of the U.S. Court or the CCAA Court related thereto (collectively, (i) through (xi), the "**Non-Released Matters**").

**Section 9.  Conditions**

(a)    The effectiveness of the Settlement and this Settlement and Support Agreement and each of the provisions hereof is subject to the satisfaction or the express written waiver by each of the Canadian Debtors (such waiver by the Canadian Debtors being subject to the prior consent of the CCC acting reasonably and in good faith), the EMEA Debtors (such waiver by NNUK being subject to the prior consent of the U.K. Pension Trustee and the PPF acting reasonably and in good faith), NNSA and the U.S. Debtors (such waiver by the U.S. Debtors being subject to the prior consent of the UCC and the Bondholder Group acting reasonably and in good faith) of the following conditions:

    (i)    <u>Crossover Bondholder Joinder</u>.  Execution and delivery by the date that is fourteen (14) days from the date of this Settlement and Support Agreement of Creditor Joinders from Crossover Bondholders beneficially holding notes representing at least 67% of the principal amount (as of the Petition Date) of the Crossover Bonds Claims outstanding as at the Petition Date.

    (ii)    <u>NNCC Bondholder Joinder</u>.  Execution and delivery by the date that is fourteen (14) days from the date of this Settlement and Support Agreement of Creditor Joinders from NNCC Bondholders beneficially holding notes representing at least 67% of the principal amount (as of the Petition Date) of the NNCC Bonds Claims outstanding as at the Petition Date.

    (iii)    <u>Currency Conversion</u>.  Approval orders shall have been obtained from the CCAA Court and the Bankruptcy Court authorizing the Canadian Debtors and U.S. Debtors, respectively, to enter into the Canadian Escrow Agreement, open the Canadian Escrow Account, and convert a portion of the Sale Proceeds from U.S. Dollars to Canadian Dollars, all as contemplated by Section 7, by no later than October 21, 2016.

    (iv)    <u>Order by U.K. Court</u>.  Entry of an order or orders by no later than November 4, 2016 by the U.K. Court that the Joint Administrators be at liberty to perform and procure the relevant EMEA Debtor in respect of which they are appointed to perform their respective obligations under this Settlement and Support Agreement, including, without limitation, delivering the Releases, and any other actions necessary to implement the Settlement.

    (v)    <u>Order by U.K. Court for French Main Proceeding</u>.  Entry of an order or orders by no later than November 4, 2016 by the U.K. Court that the NNSA Conflicts Administrator and NNSA (in the French Main

Proceeding) be at liberty to perform their obligations under this Settlement and Support Agreement, including, without limitation, delivering the Releases, and any other actions necessary to implement the Settlement.

(vi)   <u>Approval by French Court</u>.  Entry of an order or orders by no later than November 4, 2016 by the French Court approving and authorizing the entry into this Settlement and Support Agreement by NNSA (in the French Secondary Proceeding), and authorizing NNSA to perform its obligations under this Settlement and Support Agreement, including, without limitation, delivering the Releases, and any other actions necessary to implement the Settlement.

(vii)  <u>Authorization by Beddoes Court</u>.  Entry of an order or orders by no later than November 4, 2016 by the Beddoes Court authorizing the U.K. Pension Trustee to implement this Settlement and Support Agreement and perform its obligations under this Settlement and Support Agreement, including, without limitation, delivering the Releases, and any other actions necessary to implement the Settlement.

(viii) <u>Confirmation of U.S. Plans</u>.  The Confirmation Order shall have been entered by the Bankruptcy Court by no later than February 17, 2017 and thereafter shall have become a Final Order.

(ix)   <u>Sanction of Canadian Plan</u>.  The Sanction Order shall have been issued by the CCAA Court by no later than February 17, 2017 and entered and thereafter shall have become a Final Order.

(x)    <u>Litigation Dismissal Notices Exchanged in Escrow</u>.  Appropriate notices and other documents dismissing with prejudice the various pending litigations specified in Section 5(b) shall have been executed by the requisite Parties party to such litigation and delivered to one another in escrow.

(xi)   <u>Plans Implementation</u>.  The Plans Effective Date shall have occurred by no later than August 31, 2017.

(b)   The Parties agree to work in good faith and provide such reasonable cooperation to one another as may be necessary or desirable to achieve the satisfaction of the conditions specified in Section 9(a) and certain related steps on the timetable specified in Annex I (the "**Timetable**"), it being understood and agreed that a failure to achieve the satisfaction of a particular condition by the specified date on the Timetable shall not constitute a breach of this Agreement or result in a failure of such condition except as expressly contemplated by Section 9(a) hereof.  The following Parties shall have responsibility for seeking to satisfy the conditions specified in the Section(s) indicated next to the Party's name, it being understood and agreed that such Parties will, upon request, keep the other Parties reasonably informed as to their progress in satisfying such conditions and share drafts of any

proposed court filings (except that there shall be no obligations to share any court filings, or drafts thereof, in respect of which a confidential order shall be sought):

(i)     Bondholder Group – Section 9(a)(i) and (a)(iii)

(ii)    NNCC Bondholders – Section 9(a)(ii)

(iii)   Joint Administrators and NNSA Conflicts Administrator – Section 9(a)(iii), (a)(iv) and (a)(v)

(iv)    French Liquidator – Section 9(a)(iii) and (a)(vi)

(v)     U.K. Pension Trustee – Section 9(a)(vii)

(vi)    U.S. Debtors – Sections 9(a)(iii), (a)(viii) and (a)(xi)

(vii)   Canadian Debtors/Monitor – Sections 9(a)(iii), (a)(ix) and (a)(xi)

(viii)  Parties that are parties to the litigations specified in Section 5(b) – Section 9(a)(x)

(c)     Notwithstanding the foregoing Section 9(a): (i) the following provisions of this Settlement and Support Agreement shall be enforceable immediately upon execution of this Settlement and Support Agreement by the Parties: Sections 1 (as necessary to the implementation of the Sections referenced in this Section 9(c)), 5(c), 5(d), 5(e), 7, 9, 10, 11, 12, 13, 14 and 15 (other than Section 15(b)(i)); and (ii) the following provisions of this Settlement and Support Agreement shall be enforceable immediately upon satisfaction of the conditions specified in Section 9(a)(i) and 9(a)(ii): Sections 2(g) (but only the first sentence thereof), 3(b), 3(c), 4(g)(vii), 4(l), the other provisions of Section 4 (but solely to the extent of obligating the U.S. Debtors and the Canadian Debtors to include such provisions in the Canadian Plan and the U.S. Plan, as applicable) and Section 6.  All other provisions of this Settlement and Support Agreement shall be enforceable upon the satisfaction or waiver of all the conditions set forth in Section 9(a).

## Section 10.  **Termination**

(a)     Upon the non-satisfaction of any condition set forth in Section 9(a) hereof (a "**Termination Event**"), unless such condition is waived by the Debtors in accordance with Sections 9(a) hereof, this Settlement and Support Agreement may be terminated by any of the Canadian Debtors, the EMEA Debtors, NNSA or the U.S. Debtors after the passage of ten (10) Business Days following the delivery of a written notice by any of the foregoing Parties to each of the other Parties in the manner set forth in Section 12 hereof.  Prior to the expiration of such ten (10) Business Day period, the Parties shall meet and confer with respect to such Termination Event to discuss alternatives to termination.  No Party may terminate this Settlement and Support Agreement in accordance with this Section 10(a) if the non-satisfaction of that condition was caused by a breach of that Party.

(b)     In the event this Settlement and Support Agreement is terminated, the Parties reserve all of their rights and defenses with respect to the claims and other matters resolved by this Settlement and Support Agreement and this proposed settlement shall not constitute an admission by any Party regarding the validity of the litigations, claims or defenses resolved by this Settlement and Support Agreement or that they have any liability in connection with such litigations, claims or defenses.  Upon termination, Parties are free to notify courts of such termination and to immediately thereafter recommence litigation.

(c)     In the event this Settlement and Support Agreement is terminated, the Parties agree that such termination shall be deemed an occurrence arising more than fourteen (14) days after the opening of the appeals from the Allocation Decisions currently pending before the Third Circuit for purposes of Third Circuit Local Rule of Appellate Procedure 4.1.  If a motion to expedite is made after such termination, the Parties agree not to oppose such motion on the grounds that it was not timely filed, but the Parties reserve all rights to support or oppose such motion on any other grounds.

(d)     The termination of this Settlement and Support Agreement for any reason shall:

(i)     not affect this Section 10(d), Sections 7(b)(vi), 7(c)(x), 7(e) and (g)-(l), Section 11, Section 12, and Sections 15(a), 15(d), 15(e), 15(h), 15(i) and 15(j), which provisions shall continue in force after such termination; and

(ii)    otherwise result in this Settlement and Support Agreement being no longer effective and the rights of all Parties, including all rights advanced in litigation (including in respect of the Allocation Dispute), shall be restored to the *status quo ante*.

**Section 11.  <u>Limitations of Liability</u>**

(a)     <u>Joint Administrators' and NNSA Representatives' Limited Liability</u> – The Joint Administrators of the EMEA Debtors (including for the purpose of this subsection, NNSA) and the NNSA Conflicts Administrator have entered into and signed this Settlement and Support Agreement as agents for the EMEA Debtors and NNSA for the purpose of obtaining the releases contained in this clause and neither they, their firm, nor its affiliates, shareholders, employees, advisors, lawyers, representatives or agents shall incur any personal liability whatsoever in respect of any of the obligations undertaken by the EMEA Debtors or NNSA or in respect of any failure on the part of the EMEA Debtors or NNSA to observe, perform or comply with any obligation under this Settlement and Support Agreement or under or in relation to any associated arrangements or negotiations or under any document or assurance made pursuant to this Settlement and Support Agreement. The French Liquidator and the NNSA Conflicts Administrator have entered into and signed this Settlement and Support Agreement as agents for NNSA and neither they, their firms, nor their attorneys or other representatives shall incur any personal liability whatsoever in respect of any of the obligations undertaken by NNSA or in respect of any failure on the part of NNSA to observe, perform or comply with any obligation under this Settlement and Support

Agreement or under or in relation to any associated arrangements or negotiations or under any document or assurance made pursuant to this Settlement and Support Agreement. Any release, discharge or other benefit conferred upon the Joint Administrators, the NNSA Conflicts Administrator, and the French Liquidator pursuant to this Settlement and Support Agreement or the Plans shall enure to their benefit in their personal capacities and each of the Joint Administrators, the NNSA Conflicts Administrator, and the French Liquidator in their personal capacity shall be a third party beneficiary to this Settlement and Support Agreement and the Plans entitled to enforce such releases, discharges and benefits in accordance with the terms of this Settlement and Support Agreement and the Plans.

(b)  <u>Joint Liquidators' Liability</u> - Each of the Joint Liquidators is a Party to this Agreement: (i) as an agent of NNOCL or NNNI, respectively, in such appointed capacity; and (ii) in their own capacity solely for taking the benefit of this Section 11. Notwithstanding anything else to the contrary herein, any claim, action or proceeding against the Joint Liquidators in their personal capacity (and not as agent for NNOCL or NNNI respectively) under this Settlement and Support Agreement shall be governed exclusively by English law and subject to the exclusive jurisdiction of the U.K. Courts. None of the Joint Liquidators, their firms, partners, employees, advisors, representatives or agents shall incur any personal liability whatsoever whether on their own part or in respect of any failure on the part of any company in the Nortel Group to observe, perform or comply with any of its obligations under this Settlement and Support Agreement or under or in relation to any associated arrangements or negotiations.

(c)  <u>Monitor's Limited Liability</u> – The Monitor is a party to this Settlement and Support Agreement solely in its capacity as the CCAA Court appointed Monitor of the Canadian Debtors and not in its personal capacity and shall have all of the protections granted to it under the CCAA and the orders of the CCAA Court, including the Initial Order dated January 14, 2009 (as amended and restated), the Order dated August 14, 2009, the Claims Procedure Order, the Claims Resolution Order dated September 16, 2010, the EMEA Claims Procedure Order dated January 14, 2011, the Intercompany Claims Procedure Order dated July 27, 2012 and the Order (Monitor's Expansion of Power Order #2) dated October 3, 2014. None of the Monitor or its affiliates, shareholders, employees, advisors, lawyers, representatives or agents shall incur any personal liability whatsoever whether on their own part or in respect of any failure on the part of any Nortel Group company to observe, perform or comply with any of its obligations under this Settlement and Support Agreement or under or in relation to any associated arrangements or negotiations.  Any release, discharge or other benefit conferred upon the Monitor pursuant to this Settlement and Support Agreement or the Plans shall enure to the benefit of Ernst & Young Inc. in its personal capacity and Ernst & Young Inc. in its personal capacity shall be a third party beneficiary to this Settlement and Support Agreement and the Plans entitled to enforce such releases, discharges and benefits in accordance with the terms of this Settlement and Support Agreement and the Plans.

(d)     U.S. Principal Officer's Limited Liability – The U.S. Principal Officer has signed this Settlement and Support Agreement solely in its capacity as the Bankruptcy Court appointed Principal Officer of the U.S. Debtors and not in his personal capacity.  None of the U.S. Principal Officer or his firm or its affiliates, shareholders, employees, advisors, lawyers, representatives or agents shall incur any personal liability whatsoever whether on their own part or in respect of any failure on the part of any Nortel Group company to observe, perform or comply with any of its obligations under this Settlement and Support Agreement or under or in relation to any associated arrangements or negotiations.  Any release, discharge or other benefit conferred upon the U.S. Principal Officer pursuant to this Settlement and Support Agreement or the Plans shall enure to the benefit of the U.S. Principal Officer in his personal capacity and his firm, in its personal capacity shall be a third party beneficiary to this Settlement and Support Agreement entitled to enforce such releases, discharges and benefits in accordance with the terms of this Settlement and Support Agreement and the Plans.

## Section 12.  Notice

All demands, notices and communications provided for in this Settlement and Support Agreement shall be in writing and shall be sent by facsimile transmission with confirmation to the number specified on Annex J, electronic format via email, personally delivered or sent by reputable overnight courier service (delivery charges prepaid) to any Party at the address and other particulars specified on Annex J, or at such other address or particulars as the recipient Party has specified by prior written notice to the other Parties pursuant to the provisions of this Section 12.

## Section 13.  Further Acquisition of Claims

Except as set forth in Section 6(j), nothing in this Settlement and Support Agreement shall be construed as precluding any Party or any of its affiliates from acquiring additional Crossover Bonds, NNCC Bonds, claims, or interests in the instruments underlying the Crossover Bonds, NNCC Bonds or claims; provided, however, that any additional Crossover Bonds, NNCC Bonds, claims, or interests in the underlying instruments acquired by any Party and with respect to which such Party is the legal owner, beneficial owner, and/or investment advisor or manager of or with power and/or authority to bind any claims or interests held by it shall automatically be subject to the terms and conditions of this Settlement and Support Agreement.  Upon any such further acquisition, such Party shall promptly notify the Debtors, the Monitor and counsel to the Bondholder Group.

## Section 14.  Relationship Among Parties.

Notwithstanding anything in this Settlement and Support Agreement to the contrary, the duties and obligations of the Parties under this Settlement and Support Agreement shall be several, and not joint. No Party shall have any responsibility by virtue of this Settlement and Support Agreement for any trading by any other entity.  No prior history, pattern, or practice of sharing confidences among or between the Parties shall in any way affect or negate this Settlement and Support Agreement.  The Parties acknowledge that this Settlement and Support Agreement does not constitute an agreement, arrangement, or understanding with respect to

49

acting together for the purpose of acquiring, holding, voting, or disposing of any equity securities of the Debtors and they (or any combination of them) do not constitute a "group" within the meaning of Rule 13d-5 under the U.S. Securities Exchange Act of 1934, as amended.  No action taken by any Party pursuant to this Settlement and Support Agreement shall be deemed to constitute or to create a presumption by any of the Parties that the Parties are in any way acting in concert or as such a "group."

**Section 15.  Miscellaneous Provisions**

    (a)    <u>Evidentiary Limitations/No Waiver or Admission</u> – This Settlement and Support Agreement is being entered into as part of a comprehensive resolution of multiple disputes, each element of which is consideration for the other elements and an integral aspect of the proposed resolution.  The Parties may submit this Settlement and Support Agreement to any court of competent jurisdiction in connection with seeking approval of this Settlement and Support Agreement, provided, however, except for purposes of seeking to implement or enforce this Settlement and Support Agreement, its terms and the transactions, agreements and actions contemplated hereby, no Party shall introduce, tender, reference or otherwise seek to rely on the Settlement, this Settlement and Support Agreement or any term, compromise or agreement reflected herein in any litigation in or related to the Nortel Insolvency Proceedings, including the Allocation Dispute, and this Settlement and Support Agreement is entitled to protection as a settlement communication pursuant to Federal Rule of Evidence 408 and any other rule of similar effect in any relevant jurisdiction.  As the terms of this Settlement and Support Agreement constitute a settlement, nothing herein shall constitute or shall be argued to constitute an admission of any fact or legal position, waiver of any legal or factual argument or defense, or estop any Party from advancing or defending against any legal or factual argument for any other purpose.

    (b)    <u>Costs and Expenses</u> – Each Party shall:  (i) pay its own costs incurred in relation to the litigation which is resolved by this Settlement and Support Agreement, except as otherwise agreed, and no Party shall contest such costs in any manner; and (ii) bear its own costs and expenses (including legal fees and expenses) incurred in connection with this Settlement and Support Agreement, the Plans and the transactions contemplated hereby and thereby. Nothing in the foregoing sentence or in Section 8(b) shall alter any pre-existing arrangement, order or agreement pursuant to which a Debtor estate has agreed or is obligated to pay the professional costs of a Party hereto, save and except as outlined in Sections 4(k) and 4(m).

    (c)    <u>Adjudication of Claims</u> – For the avoidance of doubt, nothing in this Settlement and Support Agreement is intended to affect the rights of the respective Debtor estate representatives to resolve and adjudicate claims in their estates, except as set out in Sections 4(b)(i), 4(g), and 4(h) hereof.

    (d)    <u>Disputes</u> – To the fullest extent permitted by applicable law, each Party (i) agrees to submit to the non-exclusive jurisdiction of the Bankruptcy Court and the CCAA Court (in a joint hearing conducted under the Cross-Border Protocol), for

purpose of all legal proceedings to the extent relating to the matters agreed in this Settlement and Support Agreement (which shall not include legal proceedings relating to the adjudication of claims not resolved herein, which proceedings shall take place before the supervising court of the Debtor against whom such claims have been asserted, subject to the Cross-Border Protocol, where applicable), (ii) agrees that any claim, action or proceeding by such Party seeking any relief whatsoever to the extent relating to the matters agreed in this Settlement and Support Agreement may be brought in the Bankruptcy Court and the CCAA Court, (iii) waives and agrees not to assert any objection that it may now or hereafter have to the laying of venue of any such action brought in such court, or any claim that any such action brought in such a court, has been brought in an inconvenient forum, (iv) agrees that email service of process or other papers in connection with any such action or proceeding shall be valid and sufficient service thereof, and (v) agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable law. Notwithstanding anything in this Section 15(d), any claim, action or proceeding against (x) the Joint Administrators or the NNSA Conflicts Administrator in their personal capacities under this Settlement and Support Agreement shall be governed exclusively by English law and subject to the exclusive jurisdiction of the U.K. Court, and any such claim, action or proceeding against the French Liquidator in his personal capacity under this Settlement and Support Agreement shall be governed exclusively by French law and subject to the exclusive jurisdiction of the French Court; (y) the U.S. Principal Officer in his personal capacity under this Settlement and Support Agreement shall be governed exclusively by law of the State of New York and subject to the exclusive jurisdiction of the Bankruptcy Court; and (z) the Monitor in its personal capacity under this Settlement and Support Agreement shall be governed exclusively by the law of Ontario and the federal laws of Canada applicable therein and subject to the exclusive jurisdiction of the CCAA Court.  For the avoidance of doubt, nothing in this Section 15(d) shall apply to (A) any claim between or among the UKPI, any EMEA Debtor, any EMEA Non-Filed Entity, the Joint Administrators or NNSA or any claim of any EMEA Debtor against any other EMEA Debtor, EMEA Non-Filed Entity or NNSA, (B) any claim of the PBGC against any U.S. Debtor or affiliate or any claim of any U.S. Debtor against any other U.S. Debtor, or (C) any claim of any creditor against any Debtor or affiliate, in each case except to the extent relating to the matters agreed in this Settlement and Support Agreement.

(e)     **Waiver of Jury Trial.  Each Party hereby waives, to the fullest extent permitted by applicable law, any right it may have to a trial by jury in respect of any litigation directly or indirectly arising out of or in connection with this Settlement and Support Agreement or any transaction contemplated hereby or thereby.  Each Party (i) certifies that no representative, agent or attorney of any other Party has represented, expressly or otherwise, that such other Party would not, in the event of litigation, seek to enforce the foregoing waiver, and (ii) acknowledges that it has entered into this Settlement and Support Agreement as a result of,**

**among other things, the mutual waivers and certifications in this Section 15(e).**

(f)     Injunctive Relief – All remedies available at law or equity, including specific performance, to any Party for a breach of this Settlement and Support Agreement by another Party shall be available to the non-breaching Parties.  The Parties further agree that irreparable damage would occur in the event that any of the provisions of this Settlement and Support Agreement were not performed in accordance with their specific terms or were otherwise breached.  Accordingly, each of the Parties shall be entitled to equitable relief to prevent or remedy breaches of this Settlement and Support Agreement prior to the Plans Effective Date, without the proof of actual damages, including in the form of an injunction or injunctions or orders for specific performance in respect of such breaches. Each Party agrees, to the extent that such Party is subject to any equitable remedy, to waive any requirement for the security or posting of any bond in connection with any such equitable remedy.

(g)     Further Assurances – The Parties undertake and agree to cooperate in good faith to effectuate the terms of this Settlement and Support Agreement, obtain confirmation of the U.S. Plans, obtain sanction of the Canadian Plan and obtain approvals from the U.K. Court, the French Court and the Beddoes Court.

(h)     Governing Law – This Settlement and Support Agreement shall be interpreted, construed and enforced in accordance with the laws of the State of New York without giving effect to the choice of law provisions thereof that would result in the application of the law of another jurisdiction.

(i)     Entire Agreement – This Settlement and Support Agreement constitutes the entire agreement among the Parties and supersedes all prior or contemporaneous written or oral communications, understandings and agreements with respect to the settlement of the Allocation Dispute and the other matters and disputes among the Parties that are resolved herein.  For the avoidance of doubt, the EMEA Debtors, NNSA, the Joint Administrators, the NNSA Conflicts Administrator, the French Liquidator, the EMEA Non-Filed Entities, the Joint Liquidators, the U.K. Pension Trustee and the PPF are party to certain side agreements amongst some or all of them related to this Settlement and Support Agreement, which side agreements shall bind solely the parties to such side agreements for the purposes of those side agreements, it being understood and agreed that any such side agreement shall have no impact on the Parties' rights and obligations under this Settlement and Support Agreement or the interpretation of this Settlement and Support Agreement.

(j)     Amendments and Waivers – This Settlement and Support Agreement may not be amended, supplemented or modified except by a written instrument executed by each of the Parties to this Settlement and Support Agreement.  No Party shall be deemed to have waived any provision of this Settlement and Support Agreement unless such waiver is in writing, and then such waiver shall be limited to the circumstances set forth in such written waiver.

(k)     Non-Severability – Each of the provisions of this Settlement and Support Agreement is an integrated, essential and non-severable part of this Settlement and Support Agreement.

(l)     Representative Capacity – Each person executing this Settlement and Support Agreement in a representative capacity represents and warrants that he or she is empowered to do so.

(m)    Successors and Assigns – This Settlement and Support Agreement shall enure to the benefit of, and shall be binding upon, each Party and its respective agents, successors and assigns.

(n)     Authorization – Each Party represents and warrants, severally and not jointly, that as of the date of this Settlement and Support Agreement, it has the requisite power and authorization to enter into this Settlement and Support Agreement and carry out the transactions contemplated hereby, provided, however, that in the case of the U.S. Debtors, the Canadian Debtors and the Monitor, the EMEA Debtors, NNSA and the U.K. Pension Trustee, such power and authorization to carry out the transactions contemplated herein is subject to the granting of the Confirmation Order, the Sanction Order, and the orders of the U.K. Court, the French Court and the Beddoes Court, respectively.

(o)     Manner of Execution – This Settlement and Support Agreement may be executed in counterparts, each of which shall be an original, and such counterparts shall be construed together as one instrument.  The signature of any of the Parties hereto may be evidenced by a facsimile, scanned email or internet transmission copy of this Settlement and Support Agreement bearing such signature.

(p)     French Court Approval – Immediately upon receipt of an order (the "**First French Order**") from the French supervisory judge (*Juge-commissaire*) (the "**French Supervisory Judge**") appointed in respect of NNSA in form and substance satisfactory to the Parties, acting reasonably, each of the Parties shall execute and deliver a release and waiver to the French Liquidator that: (i) waives the requirement for notification of the First French Order; (ii) consents to the terms of the First French Order; and (ii) waives any appeal or other remedy in respect of the First French Order. The French Liquidator shall deliver a draft of the First French Order with a certified English translation thereof to the other Parties within five (5) Business Days of execution of this Settlement and Support Agreement. Forthwith following entry of the First French Order by the French Supervisory Judge, the French Liquidator shall deliver a certified copy of the First French Order together with a certified English translation thereof to the other Parties for their review and consideration.

IN WITNESS WHEREOF, the Parties have executed this Agreement on the date first above written.

**Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Global Corporation, Nortel Networks International Corporation, Nortel Networks Technology Corporation, Nortel Communications Inc., Architel Systems Corporation and Northern Telecom Canada Limited.**

By: _____

Name:  Tanecia Wong Ken

Title:    Authorized Representative

**Ernst & Young Inc. in its capacity as Monitor of Nortel Networks Corporation, *et al.*, and not in its personal capacity.**

By: _____

Name:  Murray A. McDonald

Title:  President

**Nortel Networks Inc., Nortel Networks Capital Corporation, Nortel Altsystems Inc., Nortel Altsystems International Inc., Xros, Inc., Sonoma Systems, Qtera Corporation, CoreTek, Inc., Nortel Networks Applications Management Solutions Inc., Nortel Networks Optical Components Inc., Nortel Networks HPOCS Inc., Architel Systems (U.S.) Corporation, Nortel Networks International Inc., Northern Telecom International Inc., Nortel Networks Cable Solutions Inc., Nortel Networks (CALA) Inc. and Nortel Networks India International Inc.**

By: _____

Name:  John J. Ray III

Title:  U.S. Principal Officer

IN WITNESS WHEREOF, the Parties have executed this Agreement on the date first above

written.

**Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Global Corporation, Nortel Networks International Corporation, Nortel Networks Technology Corporation, Nortel Communications Inc., Architel Systems Corporation and Northern Telecom Canada Limited.**

By:_____

Name:

Title:

**Ernst & Young Inc. in its capacity as Monitor of Nortel Networks Corporation,** *et al.***, and not in its personal capacity.**

By:_____

Name:  Murray A. McDonald

Title:  President

**Nortel Networks Inc., Nortel Networks Capital Corporation, Nortel Altsystems Inc., Nortel Altsystems International Inc., Xros, Inc., Sonoma Systems, Qtera Corporation, CoreTek, Inc., Nortel Networks Applications Management Solutions Inc., Nortel Networks Optical Components Inc., Nortel Networks HPOCS Inc., Architel Systems (U.S.) Corporation, Nortel Networks International Inc., Northern Telecom International Inc., Nortel Networks Cable Solutions Inc., Nortel Networks (CALA) Inc. and Nortel Networks India International Inc.**

By:_____

Name:  John J. Ray III

Title:  U.S. Principal Officer

IN WITNESS WHEREOF, the Parties have executed this Agreement on the date first above

written.

**Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Global Corporation, Nortel Networks International Corporation, Nortel Networks Technology Corporation, Nortel Communications Inc., Architel Systems Corporation and Northern Telecom Canada Limited.**

By:_____
Name:
Title:

**Ernst & Young Inc. in its capacity as Monitor of Nortel Networks Corporation, *et al.*, and not in its personal capacity.**

By:_____
Name:  Murray A. McDonald
Title:  President

**Nortel Networks Inc., Nortel Networks Capital Corporation, Nortel Altsystems Inc., Nortel Altsystems International Inc., Xros, Inc., Sonoma Systems, Qtera Corporation, CoreTek, Inc., Nortel Networks Applications Management Solutions Inc., Nortel Networks Optical Components Inc., Nortel Networks HPOCS Inc., Architel Systems (U.S.) Corporation, Nortel Networks International Inc., Northern Telecom International Inc., Nortel Networks Cable Solutions Inc., Nortel Networks (CALA) Inc. and Nortel Networks India International Inc.**

By:_____
Name:  John J. Ray III
Title:  U.S. Principal Officer

**The EMEA Debtors**

**Nortel Networks UK Limited (in administration)**

_____

acting by
: _____

as joint administrator (acting as agent and without personal liability)

**Nortel Networks NV (in administration)**

_____

acting by
: _____

as joint administrator (acting as agent and without personal liability)

**Nortel Networks B.V. (in administration)**

_____

acting by
: _____

as joint administrator (acting as agent and without personal liability)

**Nortel Networks Hispania SA (in administration)**

_____

acting by
: _____

as joint administrator (acting as agent and without personal liability)

**Nortel Networks (Ireland) Limited (in administration)**

_____

acting by
: _____

as joint administrator (acting as agent and without personal liability)

**Nortel Networks SpA (in administration)**

_____

acting by
: _____

as joint administrator (acting as agent and without personal liability)

**Nortel Networks Polska Sp z.o.o. (in administration)**

_____

acting by
: _____

as joint administrator (acting as agent and without personal liability)

**Nortel Networks (Austria) GmbH (in administration)**

_____

acting by
: _____

as joint administrator (acting as agent and without personal liability)

**The EMEA Debtors**

**Nortel Networks UK Limited (in administration)**

_____

acting by
:_____

as joint administrator (acting as agent and without personal liability)

**Nortel Networks NV (in administration)**

_____

acting by
:_____

as joint administrator (acting as agent and without personal liability)

**Nortel Networks B.V. (in administration)**

_____

acting by
:_____

as joint administrator (acting as agent and without personal liability)

**Nortel Networks Hispania SA (in administration)**

_____

acting by
:_____

as joint administrator (acting as agent and without personal liability)

**Nortel Networks (Ireland) Limited (in administration)**

_____

acting by DAVID HUGHES
:_____

as joint administrator (acting as agent and without personal liability)

**Nortel Networks SpA (in administration)**

_____

acting by
:_____

as joint administrator (acting as agent and without personal liability)

**Nortel Networks Polska Sp z.o.o. (in administration)**

_____

acting by
:_____

as joint administrator (acting as agent and without personal liability)

**Nortel Networks (Austria) GmbH (in administration)**

_____

acting by
:_____

as joint administrator (acting as agent and without personal liability)

**Nortel Networks s.r.o. (in administration)**

acting by
:

as joint administrator (acting as agent and
without personal liability)

**Nortel Networks Engineering Service Kft
(in administration)**

acting by
:

as joint administrator (acting as agent and
without personal liability)

**Nortel Networks Portugal SA (in
administration)**

acting by
:

as joint administrator (acting as agent and
without personal liability)

**Nortel Networks Slovensko s.r.o. (in
administration)**

acting by
:

as joint administrator (acting as agent and
without personal liability)

**Networks Romania SRL (in administration)**

acting by
:

as joint administrator (acting as agent and
without personal liability)

**Nortel GmbH (in administration)**

acting by
:

as joint administrator (acting as agent and
without personal liability)

**Nortel Networks OY (in administration)**

acting by
:

as joint administrator (acting as agent and
without personal liability)

**Nortel Networks AB (in administration)**

acting by
:

as joint administrator (acting as agent and
without personal liability)

**Nortel Networks International Finance &**
**Holding B.V. (in administration)**

acting by
:_____

as joint administrator (acting as agent and
without personal liability)

**Nortel Networks France S.A.S. (in**
**administration)**

acting by
:_____

as joint administrator (acting as agent and
without personal liability)

**The EMEA Non-Filed Entities**

**Nortel Networks AS**

_____

acting by
: DAVE QUANE ( DIRECTOR )

**Nortel Networks AG**

_____

acting by
: DAVE QUANE ( DIRECTOR )

**Nortel Networks South Africa (Pty) Limited**

_____

acting by
: DAVE QUANE ( DIRECTOR )

**Nortel Networks (Northern Ireland) Limited (in liquidation)**

_____

acting by
:_____

as joint liquidator (acting as agent and without personal liability)

**Nortel Networks Optical Components Limited (in liquidation)**

_____

acting by
:_____

as joint liquidator (acting as agent and without personal liability)

**The EMEA Non-Filed Entities**

**Nortel Networks AS**

_____

acting by
: _____

**Nortel Networks South Africa (Pty) Limited**

_____

acting by
: _____

**Nortel Networks Optical Components Limited (in liquidation)**

_____

acting by
: _____
as joint liquidator (acting as agent and without personal liability)

**Nortel Networks AG**

_____

acting by
: _____

**Nortel Networks (Northern Ireland) Limited (in liquidation)**

_____

acting by
: _____
as joint liquidator (acting as agent and without personal liability)

Alan Robert Bloom, Christopher John Wilkinson Hill, Alan Michael Hudson and Stephen John Harris, as the administrators of all EMEA Debtors and Nortel Networks S.A. except Nortel Networks (Ireland) Limited (in administration), and Alan Robert Bloom and David Martin Hughes as Administrators for Nortel Networks (Ireland) Limited (in administration).

By: _____
Name: _____
Title: _____

By: _____
Name: _____
Title: _____

By: _____
Name: _____
Title: _____

**Nortel Networks S.A. (in administration and in *liquidation judiciaire*)**

acting by
: _____

as joint administrator (acting as agent and without personal liability)

acting by :Stephen Jonathan Taylor

as NNSA Conflicts Administrator (acting as agent and without personal liability)

acting by : Maître Cosme Rogeau as French Liquidator (acting as agent and without personal liability)

Alan Robert Bloom, Christopher John Wilkinson Hill, Alan Michael Hudson and Stephen John Harris, as the administrators of all EMEA Debtors and Nortel Networks S.A. except Nortel Networks (Ireland) Limited (in administration), and Alan Robert Bloom and David Martin Hughes as Administrators for Nortel Networks (Ireland) Limited (in administration).

By:_____

Name:

Title:


By:_____

Name:

Title:


By:_____

Name:

Title:


**Nortel Networks S.A. (in administration and in *liquidation judiciaire*)**

_____

acting by :_____

as joint administrator (acting as agent and without personal liability)

acting by :Stephen Jonathan Taylor

as NNSA Conflicts Administrator (acting as agent and without personal liability)

_____

acting by : Maître Cosme Rogeau as French Liquidator (acting as agent and without personal liability)

Alan Robert Bloom, Christopher John Wilkinson Hill, Alan Michael Hudson and Stephen John Harris, as the administrators of all EMEA Debtors and Nortel Networks S.A. except Nortel Networks (Ireland) Limited (in administration), and Alan Robert Bloom and David Martin Hughes as Administrators for Nortel Networks (Ireland) Limited (in administration).

By:_____
Name:
Title:


By:_____
Name:
Title:


By:_____
Name:
Title:


**Nortel Networks S.A. (in administration and in *liquidation judiciaire*)**

_____

acting by
:_____

as joint administrator (acting as agent and without personal liability)

_____

acting by :Stephen Jonathan Taylor

as NNSA Conflicts Administrator (acting as agent and without personal liability)

acting by : Maître Cosme Rogeau as French Liquidator (acting as agent and without personal liability)

Stephen Jonathan Taylor of Isonomy Limited as Conflicts Administrator of Nortel
Networks S.A.

By:
Name:  Stephen Taylor
Title:  Conflicts Administrator


Maître Cosme Rogeau in his capacity as Liquidator for Nortel Networks S.A.
 under the French Secondary Proceeding.

By:
Name: Maître Cosme Rogeau
Title: French Liquidator


The ad hoc group of bondholders that hold notes issued and/or guaranteed by Nortel
Networks Corporation, Nortel Networks Limited, Nortel Networks Inc., and Nortel
Networks Capital Corporation, which on June 15, 2016, filed with the Bankruptcy Court a
disclosure form under Bankruptcy Rule 2019, as such group may be constituted from time
to time.

By:
Name:
Title:


By:
Name:
Title:


By:
Name:
Title:

Stephen Jonathan Taylor of Isonomy Limited as Conflicts Administrator of Nortel
Networks S.A.

By:_____

Name:  Stephen Taylor

Title:  Conflicts Administrator


Maître Cosme Rogeau in his capacity as Liquidator for Nortel Networks S.A.
 under the French Secondary Proceeding.

By:_____

Name: Maître Cosme Rogeau

Title: French Liquidator


The ad hoc group of bondholders that hold notes issued and/or guaranteed by Nortel
Networks Corporation, Nortel Networks Limited, Nortel Networks Inc., and Nortel
Networks Capital Corporation, which on June 15, 2016, filed with the Bankruptcy Court a
disclosure form under Bankruptcy Rule 2019, as such group may be constituted from time
to time.

By:_____

Name:

Title:


By:_____

Name:

Title:


By:_____

Name:

Title:

**Stephen Jonathan Taylor of Isonomy Limited as Conflicts Administrator of Nortel Networks S.A.**

By: _____

_____
Name:  Stephen Taylor
Title:  Conflicts Administrator


**Maître Cosme Rogeau in his capacity as Liquidator for Nortel Networks S.A. under the French Secondary Proceeding.**

By: _____

_____
Name: Maître Cosme Rogeau
Title: French Liquidator


**The ad hoc group of bondholders that hold notes issued and/or guaranteed by Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Inc., and Nortel Networks Capital Corporation, which on June 15, 2016, filed with the Bankruptcy Court a disclosure form under Bankruptcy Rule 2019, as such group may be constituted from time to time.**

**MILBANK, TWEED, HADLEY & MCCLOY LLP**, as counsel to the Bondholder Group

By: _Albert Pisa_ _____
Name: Albert Pisa
Title:  Partner


**Bennett Jones LLP**, as counsel to the Bondholder Group

By: _____
Name:
Title:  Partner


**FTI Capital Advisors LLC**, as financial advisor to the Bondholder Group

By: _____
Name:
Title:

**Stephen Jonathan Taylor of Isonomy Limited as Conflicts Administrator of Nortel Networks S.A.**

By:_____
Name:  Stephen Taylor
Title:  Conflicts Administrator

**Maître Cosme Rogeau in his capacity as Liquidator for Nortel Networks S.A. under the French Secondary Proceeding.**

By:_____
Name: Maître Cosme Rogeau
Title: French Liquidator

**The ad hoc group of bondholders that hold notes issued and/or guaranteed by Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Inc., and Nortel Networks Capital Corporation, which on June 15, 2016, filed with the Bankruptcy Court a disclosure form under Bankruptcy Rule 2019, as such group may be constituted from time to time.**

**MILBANK, TWEED, HADLEY& MCCLOY LLP**, as counsel to the Bondholder Group

By: _____
Name: Albert Pisa
Title:  Partner

**Bennett Jones LLP**, as counsel to the Bondholder Group

By: _____
Name: Kevin Zych
Title:  Partner

**FTI Capital Advisors LLC**, as financial advisor to the Bondholder Group

By: _____
Name:
Title:

Stephen Jonathan Taylor of Isonomy Limited as Conflicts Administrator of
Nortel Networks S.A.

By: _____
Name:  Stephen Taylor
Title:  Conflicts Administrator


Maître Cosme Rogeau in his capacity as Liquidator for Nortel Networks S.A.
 under the French Secondary Proceeding.

By: _____
Name: Maître Cosme Rogeau
Title: French Liquidator

The ad hoc group of bondholders that hold notes issued and/or guaranteed by Nortel
Networks Corporation, Nortel Networks Limited, Nortel Networks Inc., and Nortel
Networks Capital Corporation, which on June 15, 2016, filed with the Bankruptcy Court
a disclosure form under Bankruptcy Rule 2019, as such group may be constituted from
time to time.

**MILBANK, TWEED, HADLEY&
MCCLOY LLP**, as counsel to the
Bondholder Group

By: _____
Name: Albert Pisa
Title:  Partner


**Bennett Jones LLP**, as counsel to the
Bondholder Group

By: _____
Name:
Title:  Partner


**FTI Capital Advisors LLC,** as financial
advisor to the Bondholder Group

By: _____
Name: Mark Spragg
Title:  Senior Managing Director

Ad hoc committee of creditors having claims only against the Canadian Debtors comprised of: the former and disabled Canadian employees of the Canadian Debtors through their court-appointed representatives, Unifor, Morneau Shepell Ltd. as Administrator of Nortel's Canadian registered pension plans, Superintendent of Financial Services of Ontario as Administrator of the Pension Benefits Guarantee Fund and the court-appointed representatives of the current and transferred employees of the Canadian Debtors.

By: _____
Name: DONALD E SPROULE
Title: COURT APPOINTED REP
FORMER NORTEL EMPLOYEES

By: _____
Name:
Title:

By: _____
Name:
Title:

The Official Committee of Unsecured Creditors of Nortel Networks Inc., et al. appointed pursuant to an order entered by the Bankruptcy Court on January 26, 2009, as the same may be constituted from time to time.

By: _____
Name:
Title:

Nortel Networks U.K. Pension Trust Limited as trustee of the Nortel Networks U.K. Pension Plan

By: _____
Name:
Title:

Ad hoc committee of creditors having claims only against the Canadian Debtors comprised of: the former and disabled Canadian employees of the Canadian Debtors through their court-appointed representatives, Unifor, Morneau Shepell Ltd. as Administrator of Nortel's Canadian registered pension plans, Superintendent of Financial Services of Ontario as Administrator of the Pension Benefits Guarantee Fund and the court-appointed representatives of the current and transferred employees of the Canadian Debtors.

By:_____
Name:
Title:

By:_____
Name: DAVID D. ARCHIBALD,
Title: COURT APPOINTED REP.

By:_____
Name:
Title:

The Official Committee of Unsecured Creditors of Nortel Networks Inc., et al. appointed pursuant to an order entered by the Bankruptcy Court on January 26, 2009, as the same may be constituted from time to time.

By:_____
Name:
Title:

Nortel Networks U.K. Pension Trust Limited as trustee of the Nortel Networks U.K. Pension Plan

By:_____
Name:
Title:

Ad hoc committee of creditors having claims only against the Canadian Debtors comprised of: the former and disabled Canadian employees of the Canadian Debtors through their court-appointed representatives, Unifor, Morneau Shepell Ltd. as Administrator of Nortel's Canadian registered pension plans, Superintendent of Financial Services of Ontario as Administrator of the Pension Benefits Guarantee Fund and the court-appointed representatives of the current and transferred employees of the Canadian Debtors.

By: *M.G. Campbell P.Eng.*

Name: M.A. CAMPBELL, P.ENG.

Title: COURT APPOINTED REP.

By:_____

Name:

Title:

By:_____

Name:

Title:

The Official Committee of Unsecured Creditors of Nortel Networks Inc., et al. appointed pursuant to an order entered by the Bankruptcy Court on January 26, 2009, as the same may be constituted from time to time.

By:_____

Name:

Title:

Nortel Networks U.K. Pension Trust Limited as trustee of the Nortel Networks U.K. Pension Plan

By:_____

Name:

Title:

Ad hoc committee of creditors having claims only against the Canadian Debtors comprised of: the former and disabled Canadian employees of the Canadian Debtors through their court-appointed representatives, Unifor, Morneau Shepell Ltd. as Administrator of Nortel's Canadian registered pension plans, Superintendent of Financial Services of Ontario as Administrator of the Pension Benefits Guarantee Fund and the court-appointed representatives of the current and transferred employees of the Canadian Debtors.

By: _Susan Kennedy_
Name: Susan Kennedy
Title: Court-Appointed Representative for Disabled Employees

By: _____
Name:
Title:

By: _____
Name:
Title:

The Official Committee of Unsecured Creditors of Nortel Networks Inc., et al. appointed pursuant to an order entered by the Bankruptcy Court on January 26, 2009, as the same may be constituted from time to time.

By: _____
Name:
Title:

Nortel Networks U.K. Pension Trust Limited as trustee of the Nortel Networks U.K. Pension Plan

By: _____
Name:
Title:

Ad hoc committee of creditors having claims only against the Canadian Debtors comprised of: the former and disabled Canadian employees of the Canadian Debtors through their court-appointed representatives, Unifor, Morneau Shepell Ltd. as Administrator of Nortel's Canadian registered pension plans, Superintendent of Financial Services of Ontario as Administrator of the Pension Benefits Guarantee Fund and the court-appointed representatives of the current and transferred employees of the Canadian Debtors.

By:_____
Name: Jerry Dias
Title: President, Unifor

By:_____
Name:
Title:

By:_____
Name:
Title:

The Official Committee of Unsecured Creditors of Nortel Networks Inc., et al. appointed pursuant to an order entered by the Bankruptcy Court on January 26, 2009, as the same may be constituted from time to time.

By:_____
Name:
Title:

Nortel Networks U.K. Pension Trust Limited as trustee of the Nortel Networks U.K. Pension Plan

By:_____
Name:
Title:

Ad hoc committee of creditors having claims only against the Canadian Debtors comprised of: the former and disabled Canadian employees of the Canadian Debtors through their court-appointed representatives, Unifor, Morneau Shepell Ltd. as Administrator of Nortel's Canadian registered pension plans, Superintendent of Financial Services of Ontario as Administrator of the Pension Benefits Guarantee Fund and the court-appointed representatives of the current and transferred employees of the Canadian Debtors.

By: _____
Name: HAMISH DUNLOP
Title: PRINCIPAL, MORNEAU SHEPELL
IN ITS CAPACITY AS ADMINISTRATOR OF
NORTEL'S CANADIAN REGISTERED PENSION PLANS
By: AND NOT IN ITS PERSONAL CAPACITY
Name:
Title:

By: _____
Name:
Title:

The Official Committee of Unsecured Creditors of Nortel Networks Inc., et al. appointed pursuant to an order entered by the Bankruptcy Court on January 26, 2009, as the same may be constituted from time to time.

By: _____
Name:
Title:

Nortel Networks U.K. Pension Trust Limited as trustee of the Nortel Networks U.K. Pension Plan

By: _____
Name:
Title:

Ad hoc committee of creditors having claims only against the Canadian Debtors comprised of: the former and disabled Canadian employees of the Canadian Debtors through their court-appointed representatives, Unifor, Morneau Shepell Ltd. as Administrator of Nortel's Canadian registered pension plans, Superintendent of Financial Services of Ontario as Administrator of the Pension Benefits Guarantee Fund and the court-appointed representatives of the current and transferred employees of the Canadian Debtors.

By:_____
Name:
Title:

By:_____
Name:
Title:

By:_____
Name: Brian Mills
Title: Superintendent of Financial Services
of Ontario

The Official Committee of Unsecured Creditors of Nortel Networks Inc., et al. appointed pursuant to an order entered by the Bankruptcy Court on January 26, 2009, as the same may be constituted from time to time.

By:_____
Name:
Title:

Nortel Networks U.K. Pension Trust Limited as trustee of the Nortel Networks U.K. Pension Plan

By:_____
Name:
Title:

Ad hoc committee of creditors having claims only against the Canadian Debtors comprised of: the former and disabled Canadian employees of the Canadian Debtors through their court-appointed representatives, Unifor, Morneau Shepell Ltd. as Administrator of Nortel's Canadian registered pension plans, Superintendent of Financial Services of Ontario as Administrator of the Pension Benefits Guarantee Fund and the court-appointed representatives of the current and transferred employees of the Canadian Debtors.

By: _____

Name: Kent Felske

Title: Representative NCCE
(Nortel Canadian Continuing Employees)

By: _____

Name:

Title:

By: _____

Name:

Title:

The Official Committee of Unsecured Creditors of Nortel Networks Inc., et al. appointed pursuant to an order entered by the Bankruptcy Court on January 26, 2009, as the same may be constituted from time to time.

By: _____

Name:

Title:

Nortel Networks U.K. Pension Trust Limited as trustee of the Nortel Networks U.K. Pension Plan

By: _____

Name:

Title:

Ad hoc committee of creditors having claims only against the Canadian Debtors comprised of:  the former and disabled Canadian employees of the Canadian Debtors through their court-appointed representatives, Unifor, Morneau Shepell Ltd. as Administrator of Nortel's Canadian registered pension plans, Superintendent of Financial Services of Ontario as Administrator of the Pension Benefits Guarantee Fund and the court-appointed representatives of the current and transferred employees of the Canadian Debtors.

By:_____
Name:   Dany Sylvain
Title:   Representative NCCE
( Nortel Canadian Continuing Employees)

By:_____
Name:
Title:

By:_____
Name:
Title:

The Official Committee of Unsecured Creditors of Nortel Networks Inc., et al. appointed pursuant to an order entered by the Bankruptcy Court on January 26, 2009, as the same may be constituted from time to time.

By:_____
Name:
Title:

Nortel Networks U.K. Pension Trust Limited as trustee of the Nortel Networks U.K. Pension Plan

By:_____
Name:
Title:

The Official Committee of Unsecured Creditors of Nortel Networks Inc., et al. appointed pursuant to an order entered by the Bankruptcy Court on January 26, 2009, as the same may be constituted from time to time.

By:  AKIN GUMP STRAUSS HAUER & FELD LLP, as Counsel to the Committee and authorized signatory and not in its individual capacity

By: _____

Name:  David H. Botter

Title:   Partner

Ad hoc committee of creditors having claims only against the Canadian Debtors comprised of: the former and disabled Canadian employees of the Canadian Debtors through their court-appointed representatives, Unifor, Morneau Shepell Ltd. as Administrator of Nortel's Canadian registered pension plans, Superintendent of Financial Services of Ontario as Administrator of the Pension Benefits Guarantee Fund and the court-appointed representatives of the current and transferred employees of the Canadian Debtors.

By:_____
Name:
Title:

By:_____
Name:
Title:

By:_____
Name:
Title:

The Official Committee of Unsecured Creditors of Nortel Networks Inc., et al. appointed pursuant to an order entered by the Bankruptcy Court on January 26, 2009, as the same may be constituted from time to time.

By:_____
Name:
Title:

Nortel Networks U.K. Pension Trust Limited as trustee of the Nortel Networks U.K. Pension Plan

By:_____
Name: DAVID DAVIES
Title: DIRECTOR

Board of the Pension Protection Fund, a statutory corporation established under the provisions of the Pensions Act 2004, whose principal place of business is Renaissance, 12 Dingwall Road, Croydon, England, CRO 2NA.

By: _____

Name: MALCOLM WEIR

Title: HEAD OF RESTRUCTURING & INSOLVENCY

Richard Barker and Joseph Luke Charleton, as the liquidators of Nortel Networks (Northern Ireland) Limited (in liquidation) and Richard Barker and Samantha Keen as liquidators of Nortel Networks Optical Components Limited (in liquidation).

By: _____
Name:
Title:

By: _____
Name:
Title:

By: _____
Name:
Title:

Board of the Pension Protection Fund, a statutory corporation established under the provisions of the Pensions Act 2004, whose principal place of business is Renaissance, 12 Dingwall Road, Croydon, England, CRO 2NA.

By:_____
Name:
Title:


Richard Barker and Joseph Luke Charleton, as the liquidators of Nortel Networks (Northern Ireland) Limited (in liquidation) and Richard Barker and Samantha Keen as liquidators of Nortel Networks Optical Components Limited (in liquidation).

By:_____
Name: RICHARD BARKER
Title: JOINT LIQUIDATOR

By:_____
Name:
Title:

By:_____
Name:
Title:

**Holders of Nortel Networks Capital Corporation Bonds**

Solus Alternative Asset Management LP

By: _C. J. Larktree_
Name: CJ Larktree
Title: Authorized Signatory

PointState Capital LP

By:_____
Name:
Title:

**Holders of Nortel Networks Capital Corporation Bonds**

Solus Alternative Asset Management LP

By:_____
Name:
Title:

PointState Capital LP

By:_
Alfred J. Barbagallo
Managing Director & General Counsel

## ANNEX A

### Sale Proceeds[7]

| Transaction | Purchaser | Account Type | Account Description | Escrow Agent | July 31, 2016 Balance |
|---|---|---|---|---|---|
| Layer 4-7 | Radware | Escrow | Purchase Price | JP Morgan | 18,135,907 |
| CDMA | Ericsson | Escrow | Purchase Price | JP Morgan | 1,054,408,277 |
| Enterprise | Avaya | Escrow | Purchase Price | JP Morgan | 844,174,607 |
| GSM | Ericsson & Kapsch | Escrow | Purchase Price | JP Morgan | 104,664,988 |
| GSM-CALA | Ericsson | Escrow | Purchase Price | JP Morgan | 1,503,009 |
| Packet Core | Hitachi | Escrow | Purchase Price | JP Morgan | 10,390,694 |
| MEN | Ciena | Escrow | Purchase Price | JP Morgan | 611,047,234 |
| CVAS | Genband | Escrow | Purchase Price | JP Morgan | 140,337,608 |
| MSS | Ericsson | Escrow | Purchase Price | JP Morgan | 46,112,548 |
| Iceberg | Rockstar | Escrow | Purchase Price | JP Morgan | 4,461,637,286 |
| | | | | | 7,292,412,156 |
| MEN Buyer Escrow | Ciena | Escrow | Tax | Citibank | 10,047,067 |
| MEN Buyer Escrow | Ciena | Escrow | EMEA Tax | Citibank | 2,513,188 |
| MEN Buyer Escrow | Ciena | Escrow | Italian Tax | Citibank | 753,950 |
| MEN Buyer Escrow | Ciena | Escrow | Poland | Citibank | 1,005,272 |
| MEN Buyer Escrow | Ciena | Escrow | TSA | Citibank | 7,545,535 |
| MEN Buyer Escrow | Ciena | Escrow | Working Capital | Citibank | 2,101 |
| Buyer Escrows | | | | | 21,867,113 |
| **Total** | | | | | **7,314,279,269** |
| | | | Less: M&A Cost Reimbursement | | (55,000,000) |
| | | | Less: Iceberg Amendment Fee | | (5,000,000) |
| | | | **Sale Proceeds for Allocation** | | **$7,254,279,269** |

---

[7] All amounts in U.S. dollars.

## ANNEX B

### EXISTING ESCROW ACCOUNTS

#### Distribution Escrow Accounts

| Escrow Agreement | Date | Account Number | Escrow Agent |
|---|---|---|---|
| Layer 4-7 | March 31, 2009 | *[8] | JP Morgan |
| CDMA | November 11, 2009 | * | JP Morgan |
| Enterprise | December 18, 2009 | * | JP Morgan |
| GSM | March 31, 2010 | * | JP Morgan |
| GSM-CALA | June 3, 2010 | * | JP Morgan |
| Packet Core | December 1, 2009 | * | JP Morgan |
| MEN | March 19, 2010 | * | JP Morgan |
| CVAS | May 27, 2010 | * | JP Morgan |
| MSS | March 11, 2011 | * | JP Morgan |
| Iceberg | July 28, 2011 | * | JP Morgan |

#### Buyer Escrow Accounts

| | | | |
|---|---|---|---|
| MEN Buyer Escrow | March 19, 2010 | * | Citibank |
| MEN Buyer Escrow | March 19, 2010 | * | Citibank |
| MEN Buyer Escrow | March 19, 2010 | * | Citibank |
| MEN Buyer Escrow | March 19, 2010 | * | Citibank |
| MEN Buyer Escrow | March 19, 2010 | * | Citibank |
| MEN Buyer Escrow | March 19, 2010 | * | Citibank |

---

[8] Redacted

## ANNEX C

## CANADA-U.S. SIDE LETTERS

1. Side Agreement in respect of Enterprise dated July 20, 2009;

2. China Side Agreement dated November 2, 2009;

3. Side Agreement in respect of Flextronics dated November 20, 2009;

4. Incentive Fee Side Agreement in respect of GSM dated January 8, 2010;

5. Jabil Side Agreement dated February 5, 2010;

6. Metro Ethernet Networks Side Agreement dated February 26, 2010;

7. Offer in respect of Argentina dated March 19, 2010;

8. GSM/GSM-R Side Agreement dated March 31, 2010;

9. CVAS Side Agreement;[9]

10. Cascade Trust Side Letter;

11. Lazard Fees Side Agreement dated November 23, 2010;

12. Amended and Restated MSS Side Agreement dated March 10, 2011 (including any prior version of this agreement);

13. IP Transaction Side Agreement dated April 4, 2011;

14. Supplemental IP Transaction Side Agreement re Certain Transaction Costs and Related Matters dated July 27, 2011;

15. Second Amended and Restated IP Transaction Side Agreement re: Certain Structural Matters dated July 27, 2011 (including any prior version of this agreement); and

16. The so-called "Canada/U.S. Interstate Term Sheet" (styled "August 2011 – Timeline for and Proposed Resolution of U.S./Canada Issues") executed on or about September 8, 2011.

---

[9] This side agreement was never executed but is included for the avoidance of doubt.

## ANNEX D

## FORM OF CREDITOR JOINDER

This joinder (this "**Creditor Joinder**") to the Settlement and Plans Support Agreement (the "**Settlement and Support Agreement**")[5] dated as of [__], 2016 and entered into by and among: (i) the Canadian Debtors;  (ii) the Monitor; (iii) the U.S. Debtors; (iv) the EMEA Debtors; (v) the EMEA Non-Filed Entities; (vi) the Joint Administrators; (vii) NNSA; (viii) the NNSA Conflicts Administrator; (ix) the French Liquidator; (x) the Bondholder Group; (xi) the members of the CCC; (xii) the UCC; (xiii) the U.K. Pension Trustee; (xiv) the PPF; (xv) the Joint Liquidators; and (xvi) the NNCC Bondholder Signatories (collectively, the "**Parties**" and each a "**Party**"), is executed and delivered by [_____] (the "**Joining Creditor**") as of [_____], 2016.

1.    Agreement to be Bound. The Joining Creditor hereby agrees to be bound by all of the terms of the Settlement and Support Agreement, a copy of which is attached to this Joinder as Exhibit 1 (as the same has been or may be hereafter amended, restated, or otherwise modified from time to time in accordance with the provisions thereof). The Joining Creditor shall hereafter be deemed to be a Participating Creditor for all purposes under the Settlement and Support Agreement.

2.    Representations and Warranties. The Joining Creditor hereby represents and warrants to each Party to the Settlement and Support Agreement that, as of the date hereof, such Joining Party (a) is the legal or beneficial owner of, and has all necessary authority (including authority to bind any other legal or beneficial owner) with respect to, the claims identified below its name on the signature page hereof, and (b) makes, as of the date hereof, the representations, warranties and covenants of a Participating Creditor set forth in the Settlement and Support Agreement to each Party.

3.    Governing Law. This Joinder shall be governed by and construed in accordance with the laws of the state of New York.

4.    Notice. All notices and other communications given or made pursuant to the Settlement and Support Agreement shall be sent to:

To the Joining Creditor at:

---

[5] Each capitalized term used herein but not otherwise defined shall have the meaning ascribed to it in the Settlement and Support Agreement.

Case 09-10138-KG   Doc 17769-1   Filed 11/22/16   Page 91 of 146

[JOINING     PARTY]
[ADDRESS]

Attn:

Facsimile:        [FAX]
EMAIL:

       IN  WITNESS  WHEREOF,  the  Joining  Creditor  has  caused  this  Joinder  to  be  executed  as
of the date first written above.

[JOINING CREDITOR]

**Aggregate Face Amounts Beneficially Owned
or Managed on Account of**:

10.75% Notes:  $_____

10.125% Notes:  $_____

Floating Rate Notes:  $_____

2.125% Notes:  $_____

1.75% Notes:  $_____

7.875% Notes:  $_____

Other:

Name of Institution:

_____

By _____

    Name:

    Title:


For signatories requiring a second signature line:


By _____

    Name:

    Title:

## ANNEX E

## EMEA DEBTOR ALLOCATION PROPORTION

| EMEA Debtor | Allocation Proportion | Allocation Amount |
|---|---|---|
| Ireland | 0.5473% | 39,700,848 |
| NNF | 0.0536% | 3,888,460 |
| Germany | 0.2985% | 21,657,395 |
| Spain | 0.1171% | 8,494,707 |
| Portugal | 0.0119% | 859,908 |
| Belgium | 0.0538% | 3,901,159 |
| Netherlands | 0.1310% | 9,505,530 |
| Austria | 0.0117% | 846,210 |
| Poland | 0.0888% | 6,441,991 |
| Italy | 0.0734% | 5,321,673 |
| Czech | 0.0258% | 1,870,623 |
| Slovakia | 0.0098% | 713,284 |
| Hungary | 0.0130% | 940,938 |
| Romania | 0.0049% | 353,402 |
| Finland | 0.0004% | 31,282 |
| Sweden | 0.0071% | 518,276 |
| NNIF | 0.0378% | 2,743,194 |
| NNUK | 14.0249% | 1,017,408,257 |
|  | 15.5108% | 1,125,197,136 |
| NNSA |  | 220,000,000 |
| **Total** |  | 1,345,197,136 |

6557501

## ANNEX F

## U.S. DEBTOR ALLOCATION PROPORTION

| U.S. Debtor | Allocation Amount[10] |
|---|---|
| Nortel Networks Inc. | $1,716,346,052 |
| Nortel Networks (CALA) Inc. | $50,070,950 |
| Nortel Networks Capital Corporation (see Note (9) below) | 0 |
| Nortel Altsystems Inc. | 0 |
| Nortel Altsystems International Inc. | 0 |
| Xros, Inc. | 0 |
| Sonoma Systems | 0 |
| Qtera Corporation | 0 |
| CoreTek, Inc. | 0 |
| Nortel Networks Applications Management Solutions Inc. | 0 |
| Nortel Networks Optical Components Inc. | 0 |
| Nortel Networks HPOCS Inc. | 0 |
| Architel Systems (U.S.) Corporation | 0 |
| Nortel Networks International Inc. | 0 |
| Northern Telecom International Inc. | 0 |
| Nortel Networks Cable Solutions Inc. | 0 |
| Nortel Networks India International Inc. | 0 |
| | $1,766,417,002 |

---

[10] Such allocation amounts are based on Sale Proceeds included in Annex A, which includes the MEN Buyer Escrow Amount. NNCC is consolidated into NNI for the purposes of this Annex.

## ANNEX G

## CROSSOVER BONDS PROVEN CLAIMS AGAINST CANADIAN ESTATE[11]

1. Nortel Networks Limited and Nortel Networks Corporation and Nortel Networks Inc. and the Bank of New York as indenture trustee for 10.750% Senior Notes due 2016                    $1,185,132,812

2. Nortel Networks Limited and Nortel Networks Corporation and Nortel Networks Inc. and the Bank of New York as indenture trustee for 10.125% Senior Notes due 2013                    $577,689,063

3. Nortel Networks Limited and Nortel Networks Corporation and Nortel Networks Inc. and the Bank of New York as indenture trustee for Floating Rate Senior Notes due 2011                    $1,022,419,965

4. Nortel Networks Corporation and Nortel Networks Limited and Nortel Networks Inc. and the Bank of New York as indenture trustee for 2.125% Convertible Senior Notes due 2014                    $578,020,746

5. Nortel Networks Corporation and Nortel Networks Limited and Nortel Networks Inc. and the Bank of New York as indenture trustee for 1.75% Convertible Senior Note Due 2012                    $577,487,674

## NNCC BONDS PROVEN CLAIMS AGAINST CANADIAN ESTATE

1. Northern Telecom Limited and the Northern Telecom Capital Corporation and the Bank of New York as indenture trustee for 7.875% Notes due June 15, 2026                    $150,951,562

---

[11] All amounts in U.S. Dollars.

# ANNEX H

## Form of Transferee Joinder

This joinder (this "**Transferee Joinder**") to the Settlement and Plans Support Agreement (the "**Settlement and Support Agreement**")[12] dated as of [__], 2016 and entered into by and among: (i) the Canadian Debtors; (ii) the Monitor; (iii) the U.S. Debtors; (iv) the EMEA Debtors; (v) the EMEA Non-Filed Entities; (vi) the Joint Administrators; (vii) NNSA; (viii) the NNSA Conflicts Administrator; (ix) the French Liquidator; (x) the Bondholder Group; (xi) the members of the CCC; (xii) the UCC; (xiii) the U.K. Pension Trustee; (xiv) the PPF; (xv) the Joint Liquidators; and (xvi) the NNCC Bondholder Signatories (collectively, the "**Parties**" and each a "**Party**"), is executed and delivered by [_____] (the "**Joining Creditor**") as of [_____], 2016.

1.    <u>Agreement to be Bound</u>.  The Joining Party hereby agrees to be bound by all of the terms of the Settlement and Support Agreement, a copy of which is attached to this Joinder as Exhibit 1 (as the same has been or may be hereafter amended, restated, or otherwise modified from time to time in accordance with the provisions thereof).  The Joining Creditor shall hereafter be deemed to be a Participating Creditor for all purposes under the Settlement Support Agreement.

2.    <u>Representations and Warranties</u>.  The Joining Creditor hereby represents and warrants to each Party to the Settlement and Support Agreement that, as of the date hereof, such Joining Creditor (a) is the legal or beneficial holder of, and has all necessary authority (including authority to bind any other legal or beneficial holder) with respect to, the claims identified below its name on the signature page hereof, and (b) makes, as of the date hereof, the representations, warranties and covenants of a Participating Creditor, as applicable, set forth in the Settlement and Support Agreement to each Party.

3.    <u>Governing Law</u>.  This Joinder shall be governed by and construed in accordance with the laws of the State of New York.

4.    <u>Notice</u>.  All notices and other communications given or made pursuant to the Support Agreement shall be sent to:

To the Joining Creditor at:

[JOINING      PARTY]
[ADDRESS]

---

[12] Each capitalized term used herein but not otherwise defined shall have the meaning ascribed to it in the Settlement and Support Agreement.

Attn:

Facsimile:          [FAX]
EMAIL:

 

IN WITNESS WHEREOF, the Joining Creditor has caused this Joinder to be executed as of the date first written above.

[JOINING PARTY]

**Aggregate Face Amounts Beneficially Owned
or Managed on Account of**:

10.75% Notes:  $_____

10.125% Notes:  $_____

Floating Rate Notes:  $_____

2.125% Notes:  $_____

1.75% Notes:  $_____

7.875% Notes:  $_____

Other:

Name of Institution:

_____

By  _____

Name:

Title:

For signatories requiring a second signature line:

By _____

    Name:

    Title:

**Exhibit 1 to the Form of Transferee Joinder**

**Settlement and Plans Support Agreement**

**ANNEX I**

**TIMETABLE**

| Step | Target Date[8] |
|---|---|
| 1. Entry of orders authorizing currency conversion | October 14, 2016 |
| 2. Filing of U.S. Plans and Disclosure Statement with Bankruptcy Court and Canadian Plan and Canadian Information Circular with CCAA Court | October 28, 2016 |
| 3. Canadian Meeting Order Hearing (CCAA Court) | December 1, 2016 |
| 4. Disclosure Statement Hearing (Bankruptcy Court) | December 1, 2016 |
| 5. Creditors' Meeting (Canada) | By January 17, 2017 |
| 6. Plan Confirmation Hearing (Bankruptcy Court) and Sanction Hearing (CCAA Court) | January 24, 2017 |
| 7. Plans Effective Date | February 15, 2017 |
| 8. Long Stop Date | August 31, 2017 |

# ANNEX J

# NOTICE PARTICULARS

(a)     Notice to Canadian Debtors/Monitor:

        Goodmans LLP
        Bay Adelaide Centre
        333 Bay Street, Suite 3400
        Toronto, ON M5H 2S7
        Canada
        Attention:  Jay Carfagnini
        Facsimile:  416-979-1234
        Email:  jcarfagnini@goodmans.ca

        Attention:  Joseph Pasquariello
        Facsimile:  416-979-1234
        Email:  jpasquariello@goodmans.ca

        Allen & Overy LLP
        1221 Ave of the Americas
        New York, NY 10020
        United States
        Attention:  Ken Coleman
        Facsimile:  212-610-6399
        Email:  ken.coleman@allenovery.com

(b)     Notice to U.S. Debtors

        Cleary Gottlieb Steen & Hamilton
        One Liberty Plaza
        New York, New York 10006
        United States
        Attention:  James Bromley
        Facsimile:  212-225-3999
        Email:  jbromley@cgsh.com

        Attention:  Lisa Schweitzer
        Facsimile:  212-225-3999
        Email:  lschweitzer@cgsh.com

Torys LLP
79 Wellington St. W. 30th Floor
Box 270 TD South Tower
Toronto, Ontario M5K 1N2
Canada
Attention:  Scott Bomhof
Facsimile:  416-865-7380
Email:  sbomhof@torys.com


(c)    Notice to EMEA Debtors (other than NNSA)

Debevoise & Plimpton
65 Gresham Street
London EC2V 7NQ
United Kingdom
Attention:  Kevin Lloyd
Facsimile:  +44-20-7588-4180
Email:  klloyd@debevoise.com

Herbert Smith Freehills
Exchange House
Primrose Street
London EC2A 2EG
United Kingdom
Attention:  Kevin Pullen
Facsimile:  +44 20-7098-4976
Email:  kevin.pullen@hsf.com

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004
United States
Attention:  Derek Adler
Facsimile:  212-422-4726
Email:  derek.adler@hugheshubbard.com

(d)    Notice to NNSA

        Skadden, Arps, Slate, Meagher & Flom LLP
        4 Times Square
        New York, New York 10036
        United States
        Attention:  Susan Salzstein
        Facsimile:  917-777-4132
        Email:  susan.saltzstein@skadden.com

        Stikeman Elliot LLP
        5300 Commerce Court West
        199 Bay Street
        Toronto, ON M5L 1B9
        Canada
        Attention:  Daniel Murdoch
        Facsimile:  416-947-0866
        Email:  DMurdoch@stikeman.com

(e)    Notice to UCC

        Akin, Gump, Strauss, Hauer & Feld LLP
        Bank of America Tower,
        One Bryant Park, 42nd Floor
        New York, New York 10036
        United States
        Attention:  Fred Hodara
        Facsimile:  212-872-1002
        Email:  fhodara@akingump.com

        Attention:  David Botter
        Facsimile:  212-872-1002
        Email:  dbotter@akingump.com

        Cassels Brock & Blackwell LLP
        Suite 2010, Scotia Plaza
        40 King Street West
        Toronto, Ontario M5H 3C2
        Canada
        Attention:  Michael Wunder
        Facsimile:  416-640-3206
        Email:  mwunder@casselsbrock.com

(f)      Notice to CCC

        Koskie Minsky LLP
        20 Queen Street West
        Suite 900, Box 52
        Toronto, Ontario M5H 3R3
        Canada
        Attention:  Mark Zigler
        Facsimile:  416-977-8353
        Email:  mzigler@kmlaw.ca

        McCarthy Tétrault LLP
        Suite 5300, TD Bank Tower
        Box 48, 66 Wellington Street West
        Toronto ON M5K 1E6
        Canada
        Attention:  James D. Gage
        Facsimile:  416-868-0673
        Email:  jgage@mccarthy.ca

        Paliare Roland Rosenberg Rothstein LLP
        155 Wellington St. W., Suite 3500
        Toronto, ON M5V 3H1
        Attention:  Ken Rosenberg
        Facsimile:  416-646-4301
        Email:  ken.rosenberg@paliareroland.com

(g)      Notice to Ad Hoc Bondholder Group

        Milbank, Tweed, Hadley & McCloy LLP
        28 Liberty Street
        New York, New York 10005
        United States
        Attention:  Albert Pisa
        Facsimile:  212-822-5319
        Email:  apisa@milbank.com

        Bennett Jones
        3400 One First Canadian Place
        P.O. Box 130
        Toronto, Ontario M5X 1A4
        Canada
        Attention:  Kevin Zych
        Facsimile:  416-863-1716
        Email:  zychk@bennettjones.com

(h)     Notice to UKPI

        Hogan Lovells International LLP
        Atlantic House
        Holborn Viaduct
        London EC1A 2FG
        United Kingdom
        Attention:  Angela Dimsdale Gill
        Facsimile:  +44 20-7296-2001
        Email:  amdg@hoganlovells.com

        Willkie Farr & Gallagher LLP
        787 Seventh Avenue
        New York, New York 10019
        United States
        Attention:  Marc Abrams
        Facsimile:  212-728-9200
        Email:  mabrams@willkie.com

        Thornton Grout Finnigan LLP
        Suite 3200, 100 Wellington Street West
        P.O. Box 329, Toronto-Dominion Centre
        Toronto, ON M5K 1K7, Canada
        Attention:  D.J. Miller
        Facsimile:  416-304-1313
        Email:  djmiller@tgf.ca

        Blake, Cassels & Graydon LLP
        199 Bay Street, Suite 4000
        Toronto, Ontario M5L 1A9
        Canada
        Attention:  Michael Barrack
        Facsimile:  416-863-2653
        Email:  michael.barrack@blakes.com

(i)     Notice to NNCC Bondholder Signatories

        Quinn Emanuel Urquardt & Sullivan, LLP
        51 Madison Avenue
        New York, New York 10010
        United States
        Attention:  James Tecce
        Facsimile:  212-849-7100
        Email:  jamestecce@quinnemanuel.com

**<u>ANNEX K</u>**

**Canadian Distribution Escrow Agreement**

**CANADIAN DISTRIBUTION ESCROW AGREEMENT**

**among**

**NORTEL NETWORKS CORPORATION**
**NORTEL NETWORKS LIMITED**
**NORTEL NETWORKS INC.**
**NORTEL NETWORKS UK LIMITED**

**and**

**THE OTHER DEPOSITORS**

**and**

**THE ESTATE FIDUCIARIES**

**and**

**Royal Trust Corporation of Canada, as Canadian Distribution Agent**

**dated as of September ●, 2016**

This **CANADIAN DISTRIBUTION ESCROW AGREEMENT** (the "**Agreement**"), dated as of September ●, 2016, by and among

(i)    Nortel Networks Corporation ("**NNC**"), a corporation organized under the laws of Canada;

(ii)   Nortel Networks Limited ("**NNL**"), a corporation organized under the laws of Canada;

(iii)  Nortel Networks Inc. ("**NNI**"), a corporation organized under the laws of Delaware;

(iv)   Nortel Networks UK Limited (in administration) ("**NNUK**"), a corporation organized under the laws of the United Kingdom acting by Alan Robert Bloom, Stephen John Harris, Alan Michael Hudson and Christopher John Wilkinson Hill of Ernst & Young LLP (the "**Joint Administrators**");

(v)    the affiliates of NNC, NNL, NNI and NNUK specified on Schedule "A" hereto (collectively, the "**Other Depositors**" and with NNC, NNL, NNI and NNUK, the "**Depositors**");

(vi)   the Estate Fiduciaries (as defined below) with the exclusion from liability set forth in Section 26; and

(vii)  Royal Trust Corporation of Canada, a trust company organized and existing under the laws of Canada (in its capacity as distribution escrow agent hereunder, the "**Canadian Distribution Agent**").

**WHEREAS**, on January 14, 2009 (the "**Petition Date**"), NNC, NNL and certain of their affiliates (collectively, the "**Canadian Debtors**") filed with the Ontario Superior Court of Justice (the "**Canadian Court**") an application for protection under the *Companies' Creditors Arrangement Act* (Canada) (the "**CCAA**") and were granted certain creditor protection pursuant to an order issued by the Canadian Court on the same date, which has been extended from time to time by further order of the Canadian Court (such proceedings, together with any other formal insolvency proceedings commenced in Canada in respect of NNL, the "**Canadian Cases**");

**WHEREAS**, NNI and certain of its affiliates (collectively, the "**U.S. Debtors**") are debtors-in-possession under Title 11 of the United States Code (the "**U.S. Bankruptcy Code**"), which commenced cases under Chapter 11 of the U.S. Bankruptcy Code on the Petition Date by filing voluntary petitions for relief in the U.S. Bankruptcy Court for the District of Delaware (the "**U.S. Court**") (the "**U.S. Cases**" and together with the Canadian Cases, the "**Bankruptcy Cases**");

**WHEREAS**, the Canadian Court has appointed Ernst & Young Inc. as Monitor in the Canadian Cases (the "**Monitor**"), and the Office of the United States Trustee for the District of Delaware has appointed an Official Committee of Unsecured Creditors as representative for the unsecured creditors of the U.S. Debtors (the "**Committee**" and, together with the Monitor, the "**Estate Fiduciaries**"), and in addition, an *ad hoc* group of bondholders holding claims against certain of the U.S. Debtors and certain of the Canadian Debtors has also been organized (the "**Bondholder Group**");

- 2 -

**WHEREAS**, on the Petition Date, the High Court of Justice in London, England (the "**English Court**") ordered that NNUK and certain of its affiliates (collectively, the "**EMEA Debtors**") be placed into administration under the English Insolvency Act 1986, as amended (the "**Insolvency Act**") and European Union's Council Regulation (EC) No. 1346/2000 on Insolvency Proceedings (the "**EC Regulation**") and appointed the Joint Administrators to manage the affairs, business and property of NNUK and certain of its affiliates;

**WHEREAS**, while the administration proceedings in respect of Nortel Networks S.A. ("**NNSA**"), being main proceedings pursuant to Article 3(1) of the EC Regulation and under the Insolvency Act are continuing, subsequent to the Petition Date, NNSA commenced secondary insolvency proceedings within the meaning of Article 27 of the EC Regulation pursuant to which the Commercial Court of Versailles (the "**French Court**") appointed Maître Cosme Rogeau, 26, avenue Hoche, 78000 Versailles as the "Mandataire Liquidateur" of NNSA (the "**French Liquidator**");

**WHEREAS**, Stephen Taylor of Isonomy Limited has been appointed as conflicts administrator of NNSA (the "**Conflicts Administrator**");

**WHEREAS** the Depositors and certain other parties (together, the "**IFSA Parties**") have entered into that certain agreement to address interim funding and the settlement of certain intercompany matters dated June 9, 2009 (the "**IFSA**"), pursuant to clause 12.c and clause 12.g of which, the IFSA Parties agreed to negotiate in good faith a protocol for resolving disputes concerning the allocation of sale proceeds from sale transactions;

**WHEREAS** the Depositors and certain of their affiliates sold certain of their assets pursuant to various sale transactions approved by the Canadian Court and the U.S. Court over the period 2009 through 2011, the sale proceeds of which (the "**Sale Proceeds**") were placed into escrow with JPMorgan Chase Bank, N.A., as distribution escrow agent (the "**U.S. Distribution Agent**");

**WHEREAS** by order of the Canadian Court dated April 3, 2013 and order of the U.S. Court dated May 17, 2013, the Canadian Court and U.S. Court approved an allocation protocol (the "**Allocation Protocol**") to resolve the allocation of the Sale Proceeds amongst the Depositors and certain of their affiliates;

**WHEREAS** the Depositors, certain of their affiliates, certain of their respective creditors and the Estate Fiduciaries participated in a joint trial pursuant to the Allocation Protocol before the Canadian Court and U.S. Court pursuant to which decisions concerning the allocation of the Sale Proceeds were issued and various appeals have been taken and sought from such decisions (collectively, the "**Allocation Dispute**");

**WHEREAS** the Depositors, certain of their affiliates, certain of their respective creditors and the Estate Fiduciaries have entered into a Settlement and Plans Support Agreement dated September ●, 2016 (the "**Settlement and Support Agreement**"), pursuant to which, subject to the effectiveness of the Settlement and Support Agreement, they have agreed to resolve the Allocation Dispute and certain other matters on the terms contemplated by the Settlement and Support Agreement;

- 3 -

**WHEREAS** the Settlement and Support Agreement contemplates the conversion of an amount of the Sale Proceeds not exceeding US$1.2 billion (the "**CAD Sale Proceeds**") from U.S. dollars to Canadian dollars and the Depositors and Estate Fiduciaries are desirous of entering into this Agreement so that the Canadian Distribution Agent can receive, hold, convert such funds from U.S. dollars to Canadian dollars and release such funds in furtherance of the Settlement and Support Agreement and in accordance with the terms and conditions of the Settlement and Support Agreement and this Agreement;

**WHEREAS**, the U.S. Debtors shall seek authorization from the U.S. Court to enter into this Agreement, to cause the transfer of the CAD Sale Proceeds to the Canadian Distribution Agent and to convert certain of the Sale Proceeds as contemplated hereby (the "**U.S. Court Approval**");

**WHEREAS** the Canadian Debtors and the Monitor shall seek authorization from the Canadian Court to enter into this Agreement, to cause the transfer of the CAD Sale Proceeds to the Canadian Distribution Agent and to convert certain of the Sale Proceeds as contemplated hereby (the "**Canadian Court Approval**" and with the U.S. Court Approval, the "**Court Approvals**"); and

**WHEREAS**, the Depositors and the Estate Fiduciaries wish to appoint the Canadian Distribution Agent as escrow and distribution agent and the Canadian Distribution Agent is willing to accept such appointment and to act as escrow and distribution agent, in each case upon the terms and conditions of the Agreement.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and adequacy of which is hereby irrevocably acknowledged, the Depositors, the Estate Fiduciaries and the Canadian Distribution Agent agree as follows:

1.      Appointment of Canadian Distribution Agent.

The Depositors and the Estate Fiduciaries hereby jointly nominate, constitute and appoint the Canadian Distribution Agent as escrow and distribution agent to hold the Escrow Property (as defined below) in the Distribution Account (as defined below) upon the terms and conditions set forth herein. The Canadian Distribution Agent hereby accepts such appointment and agrees that deposits to, and disbursements from, the Distribution Account, or applicable portions thereof, shall only be made in accordance with the terms and conditions of this Agreement. The Canadian Distribution Agent hereby represents to each of the Depositors that it has the corporate power and legal authority to execute this Agreement and to perform its obligations hereunder. The Depositors and the Canadian Distribution Agent agree that any action specified in this Agreement as to be taken by all of the Depositors, acting jointly, when taken by all of the Depositors, shall be binding upon each of the Depositors and the Canadian Distribution Agent shall be entitled to act and rely upon any action taken by all of the Depositors, acting jointly, and to the extent required hereunder, the Estate Fiduciaries, as provided in this Agreement.

2.      Deposit of Escrow Property and Conversion of CAD Sale Proceeds.

      (a)      Forthwith upon the granting of the Court Approvals, the Depositors, certain of their affiliates and the Estate Fiduciaries shall instruct the U.S. Distribution Agent

- 4 -

to transfer the CAD Sale Proceeds to the Canadian Distribution Agent by wire transfer of immediately available funds (such funds as received by the Canadian Distribution Agent, the "**Escrow Funds**") to an account established with the Canadian Distribution Agent (the "**Distribution Account**"). The Canadian Distribution Agent shall forthwith notify the Depositors and the Estate Fiduciaries in writing of the account number for the Distribution Account upon the Distribution Account being established. The Escrow Funds and all interest and other income therefrom received by the Canadian Distribution Agent, together with any investments of the Escrow Property, less any funds distributed or paid in accordance with this Agreement are collectively referred to herein as "**Escrow Property**". The Canadian Distribution Agent shall provide written confirmation to the Depositors, the Estate Fiduciaries, the Bondholder Group and the U.S. Distribution Agent upon its receipt of the Escrow Funds. Prior to the deposits made in accordance with this Section 2, there shall be no other funds in the Distribution Account. The Escrow Property shall at all times, until disbursement as provided herein, remain segregated and separately identified by the Canadian Distribution Agent and shall not be commingled with the other assets held by the Canadian Distribution Agent.

(b)     The Monitor shall be entitled to instruct the Canadian Distribution Agent (or its affiliated financial institutions as specified on Schedule E) on not less than one (1) Business Days' notice to the Canadian Distribution Agent, and the Canadian Distribution Agent shall be entitled to solely rely on such instruction, to convert the CAD Sale Proceeds from U.S. dollars to Canadian dollars on the date(s) and in the manner specified from time to time by the Monitor, provided that such specifications allow the Canadian Distribution Agent to convert the CAD Sale Proceeds from U.S. dollars to Canadian dollars in an orderly manner. NNL shall provide notice to the other Depositors within three Business Days of any conversion of the amount of U.S. dollars converted, the date of such conversion and the rate(s) at which such conversion occurred.

3.     Investment of Escrow Property.

(a)     The Canadian Distribution Agent shall hold, invest and reinvest the Escrow Property strictly in accordance with joint, written instructions executed by all of the Depositors and the Estate Fiduciaries and delivered to the Canadian Distribution Agent; provided, however, that any investment of the Escrow Property shall be limited to Government of Canada treasury bills ("**Canadian T-Bills**"). Until otherwise jointly directed by all of the Depositors and the Estate Fiduciaries, the Canadian Distribution Agent shall invest the Escrow Property (once converted into Canadian dollars) in Canadian T-Bills having maturities of up to two months, on a rolling basis. In the event that Canadian T-Bills having maturities of up to two months are not available, the Canadian Distribution Agent shall invest the Escrow Property in Canadian T-Bills with the next available maturity date(s) available in the relevant market. For greater certainty, depending on market availability, the Escrow Property may be invested in one or more Canadian T-Bills having various maturity dates. The parties hereto further understand and agree that, notwithstanding the Canadian Distribution Agent's

- 5 -

obligations hereunder to invest and reinvest the Escrow Property, depending on market availability, the Canadian Distribution Agent may not be able to invest all of the Escrow Property in Canadian T-Bills, and that any cash balances constituting that portion of the Escrow Property unable to be invested in Canadian T-Bills, that is required to be held in cash in contemplation of the conversions contemplated hereby, that is required for a distribution to be made hereunder, or that is earned as a result of the investment or holding of the Escrow Property (the "**Cash Balances**") may be deposited as provided for in Section 3(b). The Canadian Distribution Agent makes no representation as to the yield available upon the Escrow Property and shall bear no liability for any failure to achieve any yield from the Escrow Property. The Canadian Distribution Agent shall use reasonable efforts to obtain the requested maturity dates for any such investments, however, the Canadian Distribution Agent shall have no responsibility whatsoever with respect to the availability of maturity dates and will not be liable in any respect for: (i) any investment-related loss resulting from the sale of an investment prior to its maturity date or for the unavailability of all or any portion of the Escrow Funds resulting from an investment maturity date, or (ii) any investment of the Escrow Property in a particular investment made in accordance with the terms of this Agreement.

(b)     The Canadian Distribution Agent may deposit any Cash Balances in an interest bearing cash account with the Canadian Distribution Agent, Royal Bank of Canada or any financial institution affiliated or related to the Royal Bank of Canada as listed on Schedule E hereto (collectively, "**Authorized Depositaries**") notwithstanding that the Canadian Distribution Agent and/or any of the other Authorized Depositaries may benefit therefrom, and the Canadian Distribution Agent or other Authorized Depositaries shall not be required to account for, or to give up, any such benefit. In particular, it shall not be improper for the Canadian Distribution Agent to deposit moneys with, or give custody of the Escrow Property to any other Authorized Depositaries, notwithstanding any benefit realized as a result, including retaining a profit in excess of interest paid (if any) on, or fees payable to any affiliated or related companies in respect of, such deposit or custody arrangement.

(c)     The Canadian Distribution Agent shall be authorized to sell any investment of the Escrow Property from time to time, including prior to any maturity date, in order to make a payment or release Escrow Property pursuant to this Agreement or a written direction executed by all of the Depositors and the Estate Fiduciaries.

(d)     Any written notice to remit payment received by the Canadian Distribution Agent after 11:00 a.m. Toronto time shall be treated as if received on the following Business Day. For purposes of this Agreement, "**Business Day**" shall mean any day, other than a Saturday or Sunday, on which Schedule I Canadian chartered banks are open for business in Toronto, Ontario, Canada.

- 6 -

4.      Ownership of Escrow Property; Taxes.

(a)     The Escrow Property at all times is and shall be the exclusive property of the Depositors. All T-5 slips and other tax information related to the Distribution Account will be reported by the Canadian Distribution Agent (i) based upon the disbursement of the Escrow Property to Depositors pursuant to Section 5 if such Escrow Property was disbursed during such calendar year, or (ii) with respect to any Escrow Property not disbursed during such calendar year, in the name of NNL (it being understood that the designation of NNL on such T-5 slip or other tax information shall not be presented by any Depositor or Estate Fiduciary as being indicative of the final allocation of the Escrow Property). The Canadian Distribution Agent acknowledges and agrees that the foregoing Section 4(a)(ii) is not indicative of the final allocation of the Escrow Property. Each Depositor acknowledges and agrees that any taxes payable from the income earned by such Depositor on the investment of any sums held in the Escrow Property shall be paid by such Depositor.

(b)     Notwithstanding the provisions of Section 4(a), to the extent that the Canadian Distribution Agent becomes liable for the payment of any taxes in respect of income derived from the investment of the Escrow Property, the Canadian Distribution Agent shall satisfy such liability to the extent possible from the Escrow Property. The Depositors shall jointly and severally indemnify, defend and save harmless the Canadian Distribution Agent from and against any and all tax, late payment, interest, penalty or other costs and expenses (including, without limitation, the reasonable fees and expenses of outside counsel) that may be assessed against or incurred by the Canadian Distribution Agent on or with respect to the Escrow Property and the investment thereof, except to the extent such tax, late payment, interest, penalty or other expense are finally adjudicated (and not subject to appeal) by a court of competent jurisdiction to have been a direct result of the gross negligence or willful misconduct of the Canadian Distribution Agent. The indemnification provided for by this Section 4(b) shall be initially satisfied out of the Escrow Property to the extent available. The indemnification provided by this Section 4(b) is in addition to the limitations of liability and indemnification provisions set out in Sections 9 and 10 and shall survive the resignation or removal of the Canadian Distribution Agent and the termination or expiration of this Agreement. As among themselves, the Depositors agree that the costs of any such indemnification shall be borne on a pro rata basis by the Depositors in accordance with the percentage of the Escrow Property allocable to each of the Depositors pursuant to the Allocation Protocol or a letter of direction as described in Section 5(a) and, notwithstanding anything to the contrary in the Settlement and Support Agreement, any Depositor paying in excess of its pro rata share of the cost of such indemnification shall have rights of contribution vis-à-vis any Depositor that has paid less than its pro rata share of such costs either directly to the Canadian Distribution Agent or by payment to another Depositor pursuant to this sentence; provided, that if the costs of any such indemnification arise from a breach of this Agreement or other fault of a Depositor, the Depositor(s) so in breach or at fault shall bear the cost of such

indemnification and any Depositor paying in excess of its share of the cost of such indemnification, after taking into account the breach or fault of the other Depositors, shall, notwithstanding anything to the contrary in the Settlement and Support Agreement, have rights of contribution vis-à-vis any Depositor that has paid less than its share of such costs either directly to the Canadian Distribution Agent or by payment to another Depositor.

(c)    In connection with making a distribution hereunder, the Canadian Distribution Agent shall be entitled to withhold any taxes required to be withheld by applicable law in connection with such distribution, including but not limited to applicable withholding taxes, and shall remit such taxes to the appropriate tax authority; provided, however, that the Canadian Distribution Agent shall not withhold any taxes if it receives documentation from the Depositors demonstrating to the Canadian Distribution Agent, acting reasonably, that no such withholding is required.

5.    <u>Distribution of Escrow Property.</u>

The Depositors, the Estate Fiduciaries and the Canadian Distribution Agent hereby agree that, until the termination of the escrow established pursuant to this Agreement, the Canadian Distribution Agent shall hold the Escrow Property and not disburse any amounts from the Distribution Account except in accordance with the following terms and conditions:

(a)    The Canadian Distribution Agent shall disburse to any person amounts from the Escrow Property if and as so instructed pursuant to (i) a letter of direction substantially in the form attached as Exhibit B hereto jointly executed by the Depositors and the Estate Fiduciaries, a copy of which shall be provided by the Depositors to the Bondholder Group, or (ii) any Depositor's delivery to the Canadian Distribution Agent, with copies to the other Depositors, the Estate Fiduciaries and the Bondholder Group, of a duly authenticated copy of the binding decision made by the relevant dispute resolver(s) under the Allocation Protocol (a "**Decision**") which is not stayed or subject to appeal, accompanied by a certificate from such Depositor certifying as to the finality of the Decision.

(b)    Any joint instruction given by the Depositors and Estate Fiduciaries pursuant to Section 5(a) shall be executed by the respective Authorized Representatives (as defined below) of such Depositors and Estate Fiduciaries. In relation to NNSA, any instructions shall be executed jointly by the French Liquidator and the Conflicts Administrator with the agreement of the Joint Administrators. The Canadian Distribution Agent is authorized but not required to seek confirmation of such instructions by telephone call-back to the person or persons designated on Schedule D hereto (each an "**Authorized Representative**" of the applicable Depositor or Estate Fiduciary), and the Canadian Distribution Agent may rely upon the confirmations of anyone purporting to be the person or persons so designated. The Authorized Representative(s) and telephone numbers for call-backs may be changed only in writing from the applicable Depositor or Estate Fiduciary actually received and acknowledged by the Canadian Distribution Agent (with a copy of such writing to be delivered to the other Depositors, the

- 8 -

Estate Fiduciaries and the Bondholder Group) it being understood that each Depositor and Estate Fiduciary shall have the right to replace its Authorized Representative from time to time by providing written notice to the Canadian Distribution Agent, the other Depositors, the Estate Fiduciaries and the Bondholder Group or by providing a copy of a final and non-appealable court order of a court of competent jurisdiction (as provided in Section 21 below) to the Canadian Distribution Agent designating a successor Authorized Representative. The Depositors and Estate Fiduciaries acknowledge that such security procedure is commercially reasonable. Concurrent with the execution of this Agreement, the Depositors and the Estate Fiduciaries shall deliver to the Canadian Distribution Agent sample signatures of the Authorized Representatives as set forth on Schedule D.

(c)    The Canadian Distribution Agent shall have no responsibility or obligation for investigating or determining the validity or sufficiency of any matter asserted in a letter of instruction or of any pending claim for entitlement to release of funds from the Distribution Account. The Canadian Distribution Agent shall have the right to withhold an amount equal to the amount due and owing to the Canadian Distribution Agent under the terms of this Agreement, plus any reasonable costs and expenses incurred by Canadian Distribution Agent in accordance with the terms of this Agreement in connection with the termination of the Distribution Account.

(d)    No Depositor shall submit to the Canadian Distribution Agent a certificate that falsely certifies to the finality of a Decision.

6.    <u>Termination of Distribution Account.</u>

The Agreement shall terminate upon the distribution of all Escrow Property from the Distribution Account established hereunder in accordance with Section 5(a) hereof, subject to the survival of provisions which expressly survive the termination of this Agreement. Without limiting the foregoing, Sections 4(b), 9, 10 and 12 shall survive the termination of this Agreement.

7.    <u>Method of Payment.</u>

Any payments to be made hereunder shall be made by wire transfer in immediately available funds to the account of such Depositor designated on Schedule B annexed hereto (collectively, the "**Standing Settlement Instructions**"). Any Depositor shall have the right, from time to time, to provide written notice to the Canadian Distribution Agent and the other Depositors updating its Standing Settlement Instructions, and the Canadian Distribution Agent shall thereafter use such revised Standing Settlement Instructions for purposes of any subsequent distributions to such Depositor pursuant to Section 5(a) until such Standing Settlement Instructions have been further updated pursuant to this Section 7. The Depositors acknowledge that the Canadian Distribution Agent may rely upon all identifying information set forth in the Standing Settlement Instructions. The Depositors acknowledge that such Standing Settlement Instructions are a security procedure and are commercially reasonable.

- 9 -

8.     <u>Monthly Reports.</u>

The Canadian Distribution Agent shall, following the end of each calendar month, provide monthly account statements to the Depositors with respect to the Distribution Account, with copies to the Estate Fiduciaries and the Bondholder Group.

9.     <u>Liability of Canadian Distribution Agent.</u>

    (a)     Notwithstanding any other provision of this Agreement, the Canadian Distribution Agent shall:

        (i)     have only those duties as are specifically provided herein, which shall be deemed purely procedural and administerial in nature, and shall under no circumstance be deemed a fiduciary of any of the Depositors, the Estate Fiduciaries, the Bondholder Group, the U.S. Distribution Agent or of any of their respective officers, directors, employees, agents, representatives, members, attorneys, successors or assigns. The Canadian Distribution Agent shall neither be responsible for nor chargeable with knowledge of the terms and conditions of any other agreement, instrument or document between or involving the other parties hereto, including the Settlement and Support Agreement, the IFSA or the Allocation Protocol, nor shall the Canadian Distribution Agent be required to determine if any person or entity has complied with any such agreements, nor shall any additional obligations of the Canadian Distribution Agent be inferred from the terms of such agreements, even though reference thereto may be made in this Agreement.  This Agreement sets forth all matters pertinent to the escrow contemplated hereunder and no additional duties or obligations of the Canadian Distribution Agent shall be inferred from the terms of this Agreement or any other agreement, instrument or document.  The permissive rights of the Canadian Distribution Agent to do things enumerated in this Agreement shall not be construed as duties or obligations;

        (ii)     be entitled to rely exclusively upon, and shall have no responsibility to investigate, inquire into or determine the genuineness, authenticity or sufficiency of, any document, notice, direction, request, demand, instrument or other instruction (or, in each case, any signature thereon) submitted to it or otherwise given in connection with this Agreement;

        (iii)     be entitled to assume that any person who is an Authorized Representative of a Depositor or Estate Fiduciary has the full power and authority to act on behalf of and to bind, for all intents and purposes, such party, as applicable;

        (iv)     be entitled to rely upon and have no liability in acting on the opinion, advice of or information obtained from its counsel (including in-house counsel) or other advisors in relation to any matter arising in connection

- 10 -

with this Agreement, provided that the Canadian Distribution Agent does not act with gross negligence or wilful misconduct;

(v)    have the right, but not the obligation, to consult with any counsel (including in-house counsel) or other advisors of its choice in relation to any matter arising in connection with this Agreement;

(vi)    have the right to perform any of its duties hereunder through agents, attorneys, custodians or nominees; and

(vii)    not be responsible for any failure to act or other omission as a result of causes beyond the reasonable control of the Canadian Distribution Agent.

(b)    None of the Canadian Distribution Agent, nor any of the officers, directors, employees, agents, representatives, attorneys, successors or assigns of the Canadian Distribution Agent, shall be liable, directly or indirectly, to any person or entity, including any of the other parties, for any costs, expenses, damages, claims, actions, demands or liabilities arising out of or relating to any of the services provided hereunder, except to the extent such costs, expenses, damages, claims, actions, demands or liabilities have been finally adjudicated to have resulted from the Canadian Distribution Agent's or its officers, directors, employees, agents, representatives or attorneys gross negligence or willful misconduct. Without limiting the generality of the foregoing, none of the Canadian Distribution Agent, nor any of the officers, directors, employees, agents, representatives, attorneys, successors or assigns of the Canadian Distribution Agent, shall:

(i)    have any duty or responsibility, and shall not incur any liability, with respect to the adequacy of the Escrow Property to meet and discharge any payments, obligations, liabilities or other commitments of any person or entity;

(ii)    have any duty to solicit any payments which may be due to it in connection with the Distribution Account, including without limitation, the Escrow Funds or any amounts due on any investments of the Escrow Property; provided, that the Canadian Distribution Agent shall advise the Depositors and the Estate Fiduciaries in writing forthwith upon it becoming aware of any amounts due to it in connection with the Distribution Account having not been paid;

(iii)    have no duty or obligation to make any calculations of any kind in connection with any distribution or allocation of the Escrow Property;

(iv)    be responsible for any loss to, or diminution of, the Escrow Property resulting from the acquisition, retention, investment or sale of any investments made in accordance with this Agreement or pursuant to any investment direction delivered pursuant to this Agreement; or

- 11 -

(v)    be liable for any special, indirect or consequential damages or losses of any kind whatsoever (including but not limited to lost profits), even if the Canadian Distribution Agent has been advised of the likelihood of such losses or damages and regardless of the form of action.

(c)    Notwithstanding any other provision of this Agreement, in the event that the Canadian Distribution Agent is uncertain as to how to proceed in any situation not explicitly addressed by the terms of this Agreement, whether because of any conflicting notice, direction, instruction, claim, allegation or demand of a Depositor or Estate Fiduciary or for any other reason whatsoever, the Canadian Distribution Agent shall be entitled, at its option and in its sole discretion, to refuse to comply with any such notice, direction, instruction, claim, allegation or demand with respect thereto as long as such uncertainty is continuing, and in so refusing, the Canadian Distribution Agent may elect, at its option and in its sole discretion, to make no release or delivery of any Escrow Property and its sole obligation shall be to keep safely all property held in escrow until it shall be given a joint instruction in writing by the Depositors and Estate Fiduciaries pursuant to Section 5(a) which eliminates such ambiguity or uncertainty to the satisfaction of the Canadian Distribution Agent or by a final and non-appealable order or judgment of a court of competent jurisdiction (as set forth in Section 21, below).

10.    <u>Indemnification of Canadian Distribution Agent.</u>

(a)    The Depositors shall jointly and severally indemnify, defend and save harmless the Canadian Distribution Agent and its affiliates and their respective officers, directors, employees, agents, representatives, attorneys, successors and assigns (collectively, "**Indemnitees**") from and against any and all losses, costs, expenses (including without limitation, the reasonable fees and expenses of outside counsel), damages, claims, actions, demands and liabilities incurred by or asserted against any of them directly or indirectly arising out of or relating to this Agreement, including, without limitation, in connection with tax reporting or withholding and the enforcement by the Canadian Distribution Agent of any of its rights or remedies under or in connection with this Agreement, except to the extent such costs, expenses, losses, damages, claims, actions, demands or liabilities are finally adjudicated by a court of competent jurisdiction (as set forth in Section 21 below) to have been a direct result of an Indemnitee's gross negligence or wilful misconduct. For greater certainty, the commencement of formal legal proceedings shall not be a precondition for indemnification hereunder. Further, none of the provisions of this Agreement shall require the Canadian Distribution Agent to expend or risk its own funds, appear in, prosecute or defend proceedings, or otherwise incur financial liability in the performance of any of its duties or in the exercise of any of its rights or powers hereunder, unless the Canadian Distribution Agent is first indemnified to its reasonable satisfaction.

(b)    Any indemnity payments to the Canadian Distribution Agent arising from the indemnification provided by Section 4(b) or this Section 10 shall be initially satisfied from the Escrow Property to the extent available. As among themselves, the Depositors agree that the costs of any such indemnification shall be borne on a

- 12 -

pro rata basis by the Depositors in accordance with the percentage of the Escrow Property allocable to each of the Depositors pursuant to the Allocation Protocol or a letter of direction as described in Section 5(a)(i), and any Depositor paying in excess of its pro rata share of such indemnification shall, notwithstanding anything to the contrary in the Settlement and Support Agreement, have rights of contribution vis-à-vis any Depositor that has paid less than its pro rata share of such costs either directly to the Canadian Distribution Agent or by payment to another Depositor pursuant to this sentence; provided, that if the costs of any such indemnification arise from a breach of this Agreement or other fault of a Depositor, the Depositor(s) so in breach or at fault shall bear the cost of such indemnification and any Depositor paying in excess of its share of the cost of such indemnification, after taking into account the breach or fault of the other Depositors, shall, notwithstanding anything to the contrary in the Settlement and Support Agreement, have rights of contribution vis-à-vis any Depositor that has paid less than its share of such costs either directly to the Canadian Distribution Agent or by payment to another Depositor. The indemnification provided by this Section 10 is in addition to the indemnification provided in Section 4(b) and shall survive the resignation or removal of the Canadian Distribution Agent and the termination of this Agreement.

11. <u>Resignation or Removal of Canadian Distribution Agent.</u>

The Canadian Distribution Agent may, at any time and for any reason or for no reason, in its sole discretion, resign as escrow holder under this Agreement by giving the Depositors and the Estate Fiduciaries at least thirty (30) Business Days' notice in writing of its intention to resign, or such shorter notice as the Depositors and the Estate Fiduciaries may accept in writing as sufficient. The Depositors and the Estate Fiduciaries may, at any time and for any reason or for no reason, in their sole discretion, remove the Canadian Distribution Agent as escrow holder under this Agreement by giving the Canadian Distribution Agent at least thirty (30) Business Days' notice in writing of their intention to remove, or such shorter notice as the Canadian Distribution Agent may accept in writing as sufficient. Each of the Depositors and the Estate Fiduciaries agree that they shall forthwith, upon receipt of such notice from the Canadian Distribution Agent or upon the giving of such notice to the Canadian Distribution Agent, as applicable, work diligently to find and appoint a new escrow holder to act in the place and stead of the Canadian Distribution Agent and if they fail to agree on such appointment, any of the Depositors, the Estate Fiduciaries or the Canadian Distribution Agent may apply to a court of competent jurisdiction (as set forth in Section 21, below) for the appointment of a new escrow holder and any such resulting appointment shall be binding upon all of the parties hereto. Upon any such appointment, the new escrow holder shall be vested with the same powers, rights, duties and obligations as if it had been originally named herein as escrow holder and such new escrow holder shall enter into an agreement with the Depositors and the Estate Fiduciaries with respect to such replacement escrow arrangement. If at any time or for any reason the Canadian Distribution Agent is authorized or directed to release and deliver the Escrow Property to a new escrow holder or to any other person, the Canadian Distribution Agent shall, prior to effecting such release and transfer, be paid all of its unpaid fees, non-reimbursed expenses and costs arising pursuant to this Agreement.

- 13 -

Notwithstanding any other provision of this Agreement, upon the release from escrow by the Canadian Distribution Agent of all of the Escrow Property pursuant to or as contemplated by this Agreement (whether such release occurs before or after any termination of this Agreement), the Canadian Distribution Agent and each of the officers, directors, employees, agents, representatives, attorneys, successors and assigns of the Canadian Distribution Agent shall be fully and unconditionally relieved, discharged and released from any and all claims, duties, obligations and liabilities arising under or in connection with this Agreement, and none of them shall be subject to or liable for any claim whatsoever made against it by or on behalf of any other person or entity (including any party to this Agreement) with respect to this Agreement.

12.   Compensation of Canadian Distribution Agent.

The Canadian Distribution Agent shall be entitled to compensation for its services as stated in the Fees of Escrow Agent, attached hereto as Exhibit A, which compensation shall be paid by NNL. The Canadian Distribution Agent will invoice NNL monthly in arrears for such compensation and NNL shall pay such invoices upon receipt. The fees agreed upon for the services rendered hereunder as outlined on Exhibit A are intended as full compensation for the Canadian Distribution Agent's services as contemplated by this Agreement; provided, however, that in the event that the conditions for the disbursement of the Escrow Property under this Agreement are not fulfilled, or the Canadian Distribution Agent renders any service not contemplated in this Agreement, or there is any assignment of interest in the subject matter of this Agreement, or any material modification hereof, or if any material controversy arises hereunder, or the Canadian Distribution Agent is made a party to any litigation pertaining to this Agreement or the subject matter hereof, the Canadian Distribution Agent shall be compensated for such extraordinary services (at a rate of $300 per hour) and reimbursed for all costs and expenses, including reasonable attorneys' fees and expenses, occasioned by any such delay, controversy, litigation or event (collectively, the "**Extraordinary Fees and Expenses**"), it being understood that any Extraordinary Fees and Expenses shall be satisfied and borne by the Depositors in the same manner as the indemnity payments contemplated by Section 10(b). If any amount due to the Canadian Distribution Agent hereunder is not paid within thirty (30) days after the date due, the Canadian Distribution Agent in its sole discretion may charge interest on such amount in an amount equal to the lesser of 10% per annum or the highest rate permitted by applicable law. The Depositors acknowledge and agree that the fees to which the Canadian Distribution Agent is entitled to under this Agreement do not include applicable taxes, whether federal or provincial, including but not limited to goods and services tax and harmonized sales tax, which taxes shall be an additional charge payable by NNL or the Depositors, as applicable.

13.   Notices and Discharge/Dissolution.

All communications hereunder shall be in writing and shall be deemed to be duly given and received: (i) upon delivery, if delivered personally, or upon confirmed transmittal, if by facsimile; (ii) on the next Business Day if sent by overnight courier; or (iii) four (4) Business Days after mailing if mailed by prepaid registered mail, return receipt requested, to the appropriate notice address set forth in Schedule C or at such other address as any party hereto may have furnished to the other parties hereto in writing in accordance with this Section 13.

If, at any time prior to the termination of this Agreement, any of the Estate Fiduciaries is discharged, removed or dissolved, whether pursuant to an approved plan of reorganization or

- 14 -

liquidation by order of the Canadian Court or U.S. Court or otherwise, any Depositor or Estate
Fiduciary may present to the Canadian Distribution Agent evidence of such discharge, removal
or dissolution in the form of a court order or other officially certified document which upon
receipt by the Canadian Distribution Agent shall constitute an effective amendment to this
Agreement, and such Estate Fiduciary by operation of this Agreement, as amended, shall cease
to be such for all purposes of this Agreement and the consent of such removed or dissolved
Estate Fiduciary shall no longer be required for any purposes hereunder; provided that, for the
avoidance of doubt, nothing in this Section 13 shall affect the rights of the Estate Fiduciaries
under Section 26 hereof. If such discharge, removal or dissolution provides for a successor to the
duties and responsibilities of such removed or dissolved Estate Fiduciary, or a successor to the
same or substantially similar duties and responsibilities of such removed or dissolved Estate
Fiduciary (including, without limitation, a trustee in bankruptcy) is otherwise appointed, then the
preceding sentence shall be of no effect with respect to such successor entity, the rights and
responsibilities of such Estate Fiduciary hereunder shall, subject to Section 30, pass
automatically to such successor entity and such successor entity shall be deemed to be a party to
this Agreement as if it were a signatory hereto.

If, at any time prior to the termination of this Agreement, any of the Depositors is liquidated or
dissolved, whether pursuant to an approved plan of reorganization or liquidation by order of the
Canadian Court or U.S. Court or otherwise, any Depositor, or Estate Fiduciary (as the case may
be) shall present to the Canadian Distribution Agent evidence of such dissolution or liquidation
in the form of a court order or other officially certified document which upon receipt by the
Canadian Distribution Agent shall constitute an effective amendment to this Agreement, and
such dissolved or liquidated Depositor by operation of this Agreement, as so amended, shall
cease to be such for all purposes of this Agreement, as amended, and the consent of such
dissolved or liquidated Depositor shall no longer be required for any purposes hereunder. If such
dissolution or liquidation provides for a successor to such dissolved or liquidated Depositor, then
such rights and responsibilities shall, subject to Section 30, pass automatically to such successor
entity. Any person appointed as a liquidator of an EMEA Debtor under the Insolvency Act 1986
(U.K.) shall, subject to Section 30, be treated as a successor of such EMEA Debtor.

14.    Counterparts.

This Agreement may be executed in any number of counterparts, each of which shall be deemed
to be an original, but such counterparts shall constitute one and the same agreement. Delivery of
an executed counterpart of a signature page to this Agreement by facsimile or electronic mail
shall be as effective as delivery of a manually executed counterpart of a signature page to this
Agreement. Each of the parties hereto agrees to deliver an original executed signature page to
this Agreement to the Canadian Distribution Agent within five (5) Business Days of the date
hereof. The Canadian Distribution Agent shall be entitled in its sole and absolute discretion to
freeze the Distribution Account until such time as all of the original executed signature pages
have been delivered to it.

15.    Section Headings.

The Section headings of this Agreement are for convenience of reference only and shall not be
deemed to limit or affect any of the provisions hereof.

- 15 -

16.   Amendments; No Waivers.

   (a)   Except for the resignation, removal or replacement of an Estate Fiduciary as set forth in Section 13 or the liquidation or dissolution of a Depositor as set forth in Section 13, any provision of this Agreement may be waived or amended if, and only if, such amendment or waiver is in writing and is signed by the Depositors, the Estate Fiduciaries and the Canadian Distribution Agent (with a copy thereof to the Bondholder Group) and, if prior to the entry of a final decree closing the Bankruptcy Cases, such amendment or waiver is approved by both the U.S. Court and the Canadian Court; provided, however, that (i) court approval shall not be required of any applicable court (whether the U.S. Court or the Canadian Court) if a final decree closing the Bankruptcy Cases pending before such court shall have been entered by such court and (ii) court approval shall not be required of any court if final decrees terminating the Bankruptcy Cases shall have been entered by the U.S. Court and the Canadian Court.

   (b)   No failure by any party hereto to insist upon the strict performance of any covenant, duty, agreement or condition of this Agreement, or to exercise any right or remedy consequent upon a breach hereof, shall constitute a waiver of any such breach or any other covenant, duty, agreement or condition hereof.

17.   Entire Agreement; No Third Party Beneficiaries.

This Agreement (including any exhibits, schedules and amendments hereto) and (solely with respect to the parties that are party or subject thereto) the IFSA, the Allocation Protocol and the Settlement and Support Agreement (a) constitute the entire agreement and understanding of the parties hereto and supersede all prior agreements and understandings, both written and oral, among the parties hereto with respect to the subject matter hereof and (b) are not intended to confer upon any other person any rights or remedies hereunder; provided, however, that the Joint Administrators shall be entitled to enforce and take the benefit of Section 20 hereof.

18.   Governing Law.

Subject to Section 20, this Agreement shall be governed by and construed in accordance with the laws of the Province of Ontario and the federal laws of Canada applicable therein.

19.   Severability.

If any provision of this Agreement is determined by a court of competent jurisdiction (as set forth in Section 21 below) to be prohibited or unenforceable by reason of any applicable law of a jurisdiction, then such provision shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions thereof, and any such prohibition or unenforceability in such jurisdiction shall not invalidate or render unenforceable such provisions in any other jurisdiction.

- 16 -

20.   Exclusion of Liability for the Joint Administrators, Conflict Administrator and the French Liquidator.

(a)   Subject to Section 20(c) below, the parties hereto agree that the Joint Administrators have negotiated this Agreement both in their capacities as administrators of NNUK and the other EMEA Debtors party hereto and for and on behalf of NNUK and the other EMEA Debtors party hereto and that none of the Joint Administrators or their respective firm, partners, employees, advisers, representatives or agents shall incur any personal liability whatsoever whether on their own part or in respect of any failure on the part of NNUK or the other EMEA Debtors party hereto to observe, perform or comply with any of its obligations under this Agreement or under or in relation to any associated arrangements or negotiations whether such liability would arise under Section 99(4) of Schedule B1 to the Insolvency Act or otherwise howsoever.

(b)   Subject to Section 20(c) below, the parties hereto agree that the Conflicts Administrator and French Liquidator have negotiated this Agreement for and on behalf of NNSA, and that none of the Conflicts Administrator, the French Liquidator or their respective firm, partners, employees, advisers, representatives or agents shall incur any personal liability whatsoever whether on their own part or in respect of any failure on the part of NNSA to observe, perform or comply with any of its obligations under this Agreement or under or in relation to any associated arrangements or negotiations whether such liability would arise under applicable laws or otherwise howsoever.

(c)   Nothing in this Section 20 or any other provision of this Agreement shall prevent the Depositors or the Canadian Distribution Agent from bringing any action against NNUK, NNSA, the other EMEA Debtors, the Joint Administrators, the Conflict Administrator or the French Liquidator for wilful misconduct or fraud.

(d)   Notwithstanding Section 18 or anything in Section 21, (i) any claim, action or proceeding against the Joint Administrators in their personal capacities (and not as agents for any EMEA Debtor) under this Agreement shall be governed exclusively by English law and subject to the exclusive jurisdiction of the English Court; (ii) any claim, action or proceeding against the Conflicts Administrator in his personal capacity (and not as agent for NNSA) under this Agreement shall be governed exclusively by English law and subject to the exclusive jurisdiction of the English Court, and (iii) any claim, action or proceeding against the French Liquidator in his personal capacity (and not as agent for NNSA) under this Agreement shall be governed by the laws of France and subject to the exclusive jurisdiction of the French Court.

(e)   Notwithstanding Section 21, any claim, action or proceeding against the Canadian Distribution Agent asserting any personal liability on the part of the Canadian Distribution Agent shall be subject to the exclusive jurisdiction of the Canadian Court.

(f)   This Section 20 shall survive the termination of this Agreement.

- 17 -

21.    <u>JURISDICTION.</u>

SUBJECT TO SECTION 20, FOR ANY CLAIM, ACTION OR PROCEEDING ARISING UNDER OR OUT OF, IN RESPECT OF, OR IN CONNECTION WITH THIS AGREEMENT, EACH PARTY HEREBY IRREVOCABLY SUBMITS TO AND ACCEPTS FOR ITSELF AND ITS PROPERTIES, GENERALLY AND UNCONDITIONALLY TO THE EXCLUSIVE JURISDICTION OF AND SERVICE OF PROCESS PURSUANT TO THE RULES OF BOTH (I) THE U.S. COURT AND THE CANADIAN COURT, IF SUCH CLAIM, ACTION OR PROCEEDING IS BROUGHT PRIOR TO THE ENTRY OF A FINAL DECREE CLOSING THE BANKRUPTCY CASES INVOLVING THE RELEVANT DEPOSITORS PENDING BEFORE SUCH COURTS, INCLUDING THAT CERTAIN CROSS-BORDER INSOLVENCY PROTOCOL APPROVED BY THE U.S. COURT PURSUANT TO SECTION 105(A) OF THE BANKRUPTCY CODE IN AN ORDER DATED JANUARY 15, 2009, AND BY THE CANADIAN COURT PURSUANT TO AN ORDER DATED JANUARY 14, 2009, AS AMENDED OR AS AMENDED AND RESTATED FROM TIME TO TIME, AND (II) THE CANADIAN COURT, IF BROUGHT AFTER ENTRY OF SUCH FINAL DECREE CLOSING SUCH BANKRUPTCY CASES INVOLVING THE RELEVANT DEPOSITORS PENDING BEFORE THE U.S. COURT OR THE CANADIAN COURT, WAIVES ANY DEFENSE OF *FORUM NON CONVENIENS* AND AGREES TO BE BOUND BY ANY JUDGMENT RENDERED THEREBY ARISING UNDER OR OUT OF, IN RESPECT OF, OR IN CONNECTION WITH THIS AGREEMENT. EXCEPT AS PROVIDED IN THE FOREGOING NO PARTY HERETO SHALL INITIATE ANY CLAIM, ACTION OR PROCEEDING ARISING UNDER OR OUT OF, IN RESPECT OF, OR IN CONNECTION WITH THIS AGREEMENT IN ANY OTHER STATE, PROVINCIAL OR FEDERAL COURT IN THE UNITED STATES OF AMERICA, CANADA OR ANY COURT IN ANY OTHER COUNTRY. EACH PARTY FURTHER IRREVOCABLY DESIGNATES AND APPOINTS THE INDIVIDUAL(S) IDENTIFIED AS ITS AUTHORIZED REPRESENTATIVES TO RECEIVE NOTICES ON ITS BEHALF, AS ITS AGENT TO RECEIVE ON ITS BEHALF SERVICE OF ALL PROCESS IN ANY SUCH CLAIM, ACTION OR PROCEEDING BEFORE ANY BODY, SUCH SERVICE BEING HEREBY ACKNOWLEDGED TO BE EFFECTIVE AND BINDING SERVICE IN EVERY RESPECT. A COPY OF ANY SUCH PROCESS SO SERVED SHALL BE MAILED BY REGISTERED MAIL TO EACH PARTY AT ITS ADDRESS PROVIDED PURSUANT TO SECTION 13; PROVIDED THAT, UNLESS OTHERWISE PROVIDED BY APPLICABLE LAW, ANY FAILURE TO MAIL SUCH COPY SHALL NOT AFFECT THE VALIDITY OF THE SERVICE OF SUCH PROCESS. IF ANY AGENT SO APPOINTED REFUSES TO ACCEPT SERVICE, THE DESIGNATING PARTY HEREBY AGREES THAT SERVICE OF PROCESS SUFFICIENT FOR PERSONAL JURISDICTION IN ANY CLAIM, ACTION OR PROCEEDING AGAINST IT IN THE APPLICABLE JURISDICTION MAY BE MADE BY REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO ITS ADDRESS PROVIDED PURSUANT TO SECTION 13. EACH PARTY HEREBY ACKNOWLEDGES THAT SUCH SERVICE SHALL BE EFFECTIVE AND BINDING IN EVERY RESPECT. NOTHING HEREIN SHALL AFFECT THE RIGHT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR SHALL LIMIT THE RIGHT OF ANY PARTY TO BRING ANY CLAIM, ACTION OR PROCEEDING AGAINST AN OTHER PARTY IN ANY OTHER JURISDICTION. NOTWITHSTANDING ANYTHING IN THIS SECTION 21 TO THE CONTRARY, ANY CLAIM, ACTION OR PROCEEDING SET FORTH IN SECTION 20 SHALL BE BROUGHT

- 18 -

EXCLUSIVELY IN THE COURTS CONTEMPLATED IN SECTION 20. FINALLY, REGARDLESS OF THE JURISDICTION OF THE APPLICABLE COURT, THE PARTIES FURTHER HEREBY WAIVE ANY RIGHT TO A TRIAL BY JURY WITH RESPECT TO ANY LAWSUIT OR JUDICIAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT.

22.    Interpretation.

As used in this Agreement (including all exhibits, schedules and amendments hereto), the masculine, feminine or neuter gender and the singular or plural number shall be deemed to include the others whenever the context so requires. References to Sections refer to Sections of this Agreement, unless the context otherwise requires. Words such as "herein," "hereinafter," "hereof," "hereto," "hereby" and "hereunder," and words of like import, unless the context requires otherwise, refer to this Agreement. "Including", "includes" and similar words shall mean including without limiting the generality of the foregoing. The captions contained herein are for convenience only and shall not control or affect the meaning or construction of any provision of this Agreement.

23.    Compliance with Court Orders.

In the event that any of the Escrow Property shall be attached, garnished or levied upon by any court order, or the distribution or disbursement thereof shall be stayed or enjoined by an order of a court of competent jurisdiction (as set forth in Section 21 above), or any order, judgment or decree shall be made or entered by any court order affecting the property deposited under this Agreement, the Canadian Distribution Agent is hereby expressly authorized, in its sole discretion, to obey and comply with all writs, orders or decrees so entered or issued, which it is advised by legal counsel of its own choosing is binding upon it, whether with or without jurisdiction, and in the event that the Canadian Distribution Agent obeys or complies with any such writ, order or decree it shall not be liable to any of the parties hereto or to any other person, firm or corporation, by reason of such compliance notwithstanding such writ, order or decree be subsequently reversed, modified, annulled, set aside or vacated.

24.    Force Majeure.

In the event that any party hereto is unable to perform its obligations under the terms of this Agreement because of acts of God, strikes, equipment or transmission failure or damage reasonably beyond its control, or other cause reasonably beyond its control, the Canadian Distribution Agent shall not be liable for damages to the other parties for any damages resulting from such failure to perform otherwise from such causes. Performance under this Agreement shall resume when the Canadian Distribution Agent is able to perform its obligations hereunder.

25.    Merger or Consolidation.

Any corporation or association into which the Canadian Distribution Agent may be converted or merged, or with which it may be consolidated, or to which it may sell or transfer all or substantially all of its corporate escrow business and assets as a whole or substantially as a whole, or any corporation or association resulting from any such conversion, sale, merger, consolidation or transfer to which the Canadian Distribution Agent is a party, shall be and

- 19 -

become the successor escrow agent under this Agreement and shall have and succeed to the rights, powers, duties, immunities and privileges of the Canadian Distribution Agent, without the execution or filing of any instrument or paper or the performance of any further act except for the giving of written notice by the Canadian Distribution Agent to the Depositors and the Estate Fiduciaries.

26.     Exclusion of Liability for Estate Fiduciaries.

The Depositors and the Canadian Distribution Agent agree that (a) each of the Estate Fiduciaries has negotiated and is entering into this Agreement as a representative of its applicable creditor constituency for the purpose of benefiting from the rights being granted hereunder and to allow the Canadian Distribution Agent to be able to rely on any joint instructions signed by the Estate Fiduciaries and (b) none of the Estate Fiduciaries, their firms, members or affiliates of such parties and such parties respective partners, associates, employees, advisers, representatives or agents shall incur any liability whatsoever under this Agreement. This Section 26 shall survive termination of this Agreement.

27.     No Agency.

Each of Depositors and Estate Fiduciaries acknowledge and agree that the Canadian Distribution Agent does not have any interest in the Escrow Property and is acting solely as an escrow holder at the request and for the convenience of the Depositors, having only possession of the Escrow Property. The Canadian Distribution Agent shall not be deemed to be the agent or trustee of any party in respect of the escrow herein referred to and none of the Depositors or the Estate Fiduciaries shall be deemed to be the agent or trustee of the Canadian Distribution Agent in respect of the escrow herein referred to.

28.     Regulatory Compliance.

(a)     If the Canadian Distribution Agent is subject to any legislation, including anti-money laundering legislation and privacy legislation, that requires it to collect information or obtain undertakings, agreements, documents or the like from the parties to this Agreement, their representatives, employees, officers, directors, or any agent or agents of such parties, the parties hereto agree that they shall fully cooperate with the reasonable requests of the Canadian Distribution Agent in this regard, including delivery of information, agreements, or documents or providing signatures or executing documents and to take all reasonable steps to cause the parties' representatives, employees, officers, directors, or agents as the case may be to do the same, all to the extent required to ensure that the Canadian Distribution Agent satisfies applicable legislative requirements, and the parties hereto agree that if for any reason such requirements are not satisfied, the Canadian Distribution Agent may, at its option and in its sole discretion, refuse to act as may otherwise be required under this Agreement until such requirements are satisfied.

(b)     The parties may exchange personal information ("**Confidential Information**"), but only such information as is required in order for the parties to fulfill their duties under this Agreement.

- 20 -

(c)    The parties agree to use the Confidential Information solely for performing their duties under this Agreement. The parties will hold the Confidential Information in confidence and will not use or disclose the Confidential Information to any third party; provided, however, that the parties may disclose any such Confidential Information to their directors, officers, employees, agents, service providers, advisors, internal and external auditors or regulatory authorities as well as those of their affiliates with a need to know such Confidential Information and who agree to be bound by these confidentiality obligations, or as required or permitted by law.

(d)    The parties acknowledge that the Confidential Information may include personal information about identifiable individuals. Each of the parties hereto agree to act in accordance with the Personal Information Protection and Electronic Documents Act ("**PIPEDA**") and applicable provincial private sector privacy legislation which has by order by a court of competent jurisdiction been declared as substantially similar to PIPEDA with respect to collection, use, disclosure, retention of and access to personal information

(e)    The Canadian Distribution Agent will correct or amend any inaccuracy with any Confidential Information promptly after it is notified of the inaccuracy by the parties. If the Canadian Distribution Agent otherwise becomes aware of any inaccuracy with any Confidential Information, the Canadian Distribution Agent will promptly advise the parties.

29.    Service Providers.

The Canadian Distribution Agent's services to the parties hereto are not exclusive and the Canadian Distribution Agent is hereby expressly authorized from time to time in its discretion, for any purpose, including for the purpose of assisting the Canadian Distribution Agent with its duties under, and the administration of, this Agreement, to appoint, employ, invest in, contract or deal with any individual, firm, partnership, association, trust or body corporate, including without limitation, itself and any individual, firm, partnership, association, trust or body corporate with which it may directly or indirectly be affiliated or related or in which it may be directly or indirectly interested, whether on its own account, for this Agreement, or for the account of another (in a fiduciary capacity or otherwise) without being liable to account therefor and without being in breach of this Agreement.

30.    Successors and Assigns.

This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors (including any receiver or trustee in bankruptcy or any such party) and permitted assigns. The Canadian Distribution Agent shall have no obligation in performing this Agreement to recognize any successor or assign of another party hereto unless the Canadian Distribution Agent, acting reasonably, receives authoritative and conclusive written evidence of the change of such party and any documentation required to ensure that the Canadian Distribution Agent satisfies applicable legislative requirements.

*[Signature pages follow]*

**IN WITNESS WHEREOF**, each of the parties hereto has caused this Agreement to be executed on the day and year first above written.

**NORTEL NETWORKS CORPORATION**

By:    _____
       Name:  Tanecia Wong Ken
       Title:   Authorized Representative

**NORTEL NETWORKS LIMITED**

By:    _____
       Name:  Tanecia Wong Ken
       Title:   Authorized Representative

**NORTEL NETWORKS INC.**

By: _____
      Name:  John J. Ray III
      Title:    Principal Officer

**SIGNED for and on behalf of Nortel Networks UK Limited (in administration) by Alan Bloom and Stephen Harris as Joint Administrators (acting as agent and without personal liability):**

_____
Alan Bloom

_____
Stephen Harris

_____
Witness Signature
Name:
Address:

_____
Witness Signature
Name:
Address:

**SIGNED for and on behalf of Nortel
Networks S.A. (in administration and
*liquidation judiciare*) by Alan Bloom as
Joint Administrator and Stephen Taylor
as Conflict Administrator (both acting as
agent and without personal liability):**

_____          _____
Alan Bloom                                               Stephen Taylor

_____          _____
Witness Signature                                      Witness Signature
Name:                                                        Name:
Address:                                                    Address:

**SIGNED for and on behalf of Nortel
Networks S.A. (in administration and
*liquidation judiciare*) by Maître Cosme
Rogeau as *Mandataire Liquidateur*
(acting as agent and without personal
liability) in the presence of:**

_____          _____
Witness signature                                      Maître Cosme Rogeau
Name:
Address:

**ERNST & YOUNG INC. IN ITS CAPACITY
AS THE MONITOR OF NORTEL
NETWORKS CORPORATION ET AL.,
AND NOT IN ITS PERSONAL CAPACITY**

By: _____

       Name:  Murray A. McDonald
       Title:    President

**THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS OF NORTEL
NETWORKS INC., ET. AL.**

**By: AKIN GUMP STRAUSS HAUER & FELD
LLP, as Counsel to the Committee and
authorized signatory and not in its individual
capacity**

By: _____
    Name:
    Title:

**CANADIAN DISTRIBUTION AGENT**

**Royal Trust Corporation of Canada, as Canadian Distribution Agent**

By: _____
      Name:
      Title:

## SCHEDULE A

## OTHER DEPOSITORS

1.  NNSA

2.  **[NTD: Any other depositors under existing escrow agreements from which cash to be transferred to Canadian Escrow Agent to be specified herein as Other Depositors and added as signatories. Entities to be specified as Canadian Debtor, U.S. Debtor or EMEA Debtor.]**

**SCHEDULE B**

**REDACTED**

## SCHEDULE C

## NOTICE ADDRESSES

<u>Depositors:</u>

| | |
|---|---|
| **NNC and NNL [and the other Canadian Debtors]**: | 5945 Airport Road<br>Suite 152<br>Mississauga, Ontario, Canada  L4V 1R9<br>Attn: Tanecia Wong Ken<br>Phone: 905-863-1184<br>Facsimile: 416-4789-9688<br><br>With a copy to:<br><br>The Monitor and Goodmans LLP at the address particulars set forth below. |
| **NNI [and the other U.S. Debtors]**: | c/o Cleary Gottlieb Steen & Hamilton LLP<br>One Liberty Plaza<br>New York, NY  10006<br>United States<br>Attention: Lisa Schweitzer<br>Facsimile: +1-212-225-3999 |
| **NNUK [and the other EMEA Debtors]**: | c/o Herbert Smith LLP<br>Exchange House<br>Primrose Street<br>London<br>EC2A 2HS<br>United Kingdom<br>Attn: John Whiteoak and Kevin Pullen<br>Phone: +44 20 7374 8000<br>Facsimile: +44 20 7374 0888 |
| **NNSA**: | c/o Herbert Smith LLP<br>Exchange House<br>Primrose Street<br>London<br>EC2A 2HS<br>United Kingdom<br>Attn: John Whiteoak and Kevin Pullen<br>Phone: +44 20 7374 8000<br>Facsimile: +44 20 7374 0888<br><br>-and- |

|  | c/o Skadden, Arps, Slate, Meagher & Flom (UK) LLP<br>40 Bank Street<br>Canary Wharf<br>London<br>E14 5DS<br>United Kingdom<br>Attn: Christopher Mallon<br>Phone: +44 20 7519 7236<br>Facsimile: +44 20 7072 7236 |
| Canadian Distribution Agent: | Royal Trust Corporation of Canada<br>155 Wellington St. West, 20th Floor<br>Toronto, Ontario  M5V 3K7<br>Attention: Sharon Yeung, Director,<br>Institutional Trust Services<br>Facsimile: (416) 955-3268 |
| Estate Fiduciaries: | |
| The Official Committee of Unsecured Creditors in connection with the Chapter 11 cases of Nortel Networks Inc., et al. (Case No. 09-10138): | c/o Akin Gump Strauss Hauer & Feld LLP<br>One Bryant Park<br>New York, New York  10036<br>Attn: Fred S. Hodara, Brad Kahn and David H. Botter<br>Phone: 212-872-1000<br>Facsimile: 212-872-1002 |
| Monitor: | Ernst & Young Inc. in its capacity as Monitor of Nortel Networks Corporation et al.<br>Ernst & Young Tower<br>222 Bay Street, P. O. Box 251<br>Toronto, Ontario, Canada<br>M5K 1J7<br>Facsimile: (416) 943-3300<br>Attn: Murray A. McDonald<br><br>With a copy to:<br><br>Goodmans LLP<br>Bay Adelaide Centre<br>333 Bay St., Suite 3400<br>Toronto, ON  M5H 2S7<br>Attn: Jay A. Carfagnini, Joe Pasquariello and Chris Armstrong<br>Phone: (416) 979-2211<br>Facsimile: (416) 979-1234 |

Bondholder Group:                    c/o Milbank, Tweed, Hadley & McCloy LLP
                                     1 Chase Manhattan Plaza
                                     New York, New York  10005
                                     Attn: Albert A. Pisa
                                     Phone: 212-530-5000
                                     Facsimile: 212-822-5735

**SCHEDULE D**

**REDACTED**

**SCHEDULE E**

**AFFILIATED FINANCIAL INSTITUTIONS OF CANADIAN DISTRIBUTION AGENT**

1. RBC Dominion Securities Inc.

# EXHIBIT A

## FEES OF ESCROW AGENT

INITIAL SERVICES FEE

A one-time fee of $25,000.00 plus legal costs incurred by Royal Trust on a time cost basis will be charged for the review  and modification of escrow document and setting up of the escrow account.

(A)     ANNUAL FEES

For custody and safekeeping of assets, monthly administration, including correspondence, payments, record-keeping, reporting, and related Escrow Agent duties and responsibilities including investments in Government of  Canada Treasury Bills and/or Bankers Acceptances and/or Forward Exchange Contracts, fees will be charged  monthly on the market value of assets held at the previous month at the following:

| | |
|---|---|
| **Annual Fee:** | 1 basis points or 0.01% |
| **Minimum Annual Fee:** | $20,000.00 CAD |
| **Investment Transactions (e.g., Trades)\*:** | $300.00 CAD per transaction |
| **Disbursements:** | $500.00 CAD per transaction |

*excludes any 3rd party fees applicable to investments*

(B)     TAX PREPARATION FEES

A fee of $325.00 per hour is applied for the preparation, filing, review of income tax returns and other required tax filings, including issuance of tax slips.

## EXHIBIT B

### FORM OF LETTER OF INSTRUCTION

Reference is made to the Canadian Distribution Escrow Agreement dated September ●, 2016 (the "**Agreement**") among the Depositors, the Estate Fiduciaries and the Canadian Distribution Agent. Capitalized terms used herein that are otherwise undefined shall have the meanings ascribed thereto in the Agreement.

Subject to the terms and conditions of the Agreement, each of the Depositors and the Estate Fiduciaries hereby irrevocably authorizes and directs the Canadian Distribution Agent to:

release from the Distribution Account the amount of CAD$_____ and disburse such amount by wire transfer to_____ using the following wiring transfer instructions:

Bank Name: _____
ABA Number: _____
Account Name: _____
Account Number: _____

and this shall be your good and sufficient authority for so doing.

**[Depositors and Estate Fiduciaries]**

by:    _____
        Name: ●
        Title: ●

6603416

# ANNEX L

# BOOK INTERCOMPANY CLAIMS

US Debtors Pre-filing Intercompany Obligations as at January 14, 2009, except for NNCALA, which is as at July 14, 2009, and NIII, which is at July 26, 2016
Excludes claims filed by the Nortel Joint Ventures (GDNT and NETAS)
The schedule below excludes net intercompany receivables vis-à-vis non-filed entities; however this is not a reflection on the validity and the collectibility of such amounts
All amounts in USD

| Legal company code | Legal company name | Legal trading partner code | Legal trading partner name | Grand Total |
|---|---|---|---|---|
| **Claims as per Nortel Books and Records** | | | | |
| 2001 | Nortel Networks Inc. | 1107 | Architel Systems Corp | (72,538) |
| 2001 | Nortel Networks Inc. | 2103 | Sonoma Systems | (725,588) |
| 2001 | Nortel Networks Inc. | 2106 | Nortel AMS Inc. | (93,032) |
| 2001 | Nortel Networks Inc. | 2113 | Nortel HPOCS Inc. | (813,713) |
| 2001 | Nortel Networks Inc. | 2114 | Architel Systems (U.S.) C | (4,890,419) |
| 2001 | Nortel Networks Inc. | 2117 | Northern Telecom Int Inc. | (9,226) |
| 2001 | Nortel Networks Inc. | 2121 | Nortel Networks Cable Solutions Inc | (840) |
| 2001 | Nortel Networks Inc. | 6211 | Nortel Southeast Asia | - |
| 2001 | Nortel Networks Inc. | 6221 | Nortel Technology Thailand | - |
| 2001 | Nortel Networks Inc. | 3110 | Nortel Industria e Comerc | - |
| 2001 | Nortel Networks Inc. | 3140 | Nortel Networks Colombia | - |
| 2002 | Nortel Networks (CALA) Inc | 1002 | Nortel Networks Limited | (42,983,870) |
| 2002 | Nortel Networks (CALA) Inc | 2001 | Nortel Networks Inc. | (161,910,186) |
| 2002 | Nortel Networks (CALA) Inc | 2107 | Alteon WebSystems, Inc. | (2,700,910) |
| 2002 | Nortel Networks (CALA) Inc | 3140 | Nortel Networks Colombia | - |
| 2101 | Alteon Websystems Int Inc | 2107 | Alteon WebSystems, Inc. | (30,267,270) |
| 2102 | XROS Inc. | 2001 | Nortel Networks Inc. | (44,655,372) |
| 2104 | QTERA Corp | 2001 | Nortel Networks Inc. | (179,966,010) |
| 2105 | CoreTek Inc. | 2001 | Nortel Networks Inc. | (81,325,779) |
| 2107 | Alteon WebSystems, Inc. | 2001 | Nortel Networks Inc. | (6,075,811) |
| 2108 | Nortel Optical Comp Inc. | 2001 | Nortel Networks Inc. | (152,044) |
| 2115 | Nortel Int Inc. | 2001 | Nortel Networks Inc. | (63,972,219) |
| 2112 | Nortel Networks India Int | 1002 | Nortel Networks Limited | (17,695,763) |
| 2112 | Nortel Networks India Int | 2001 | Nortel Networks Inc. | (53,663,414) |
| **Settled Claims** | | | | |
| 2001 | Nortel Networks Inc. | 2110 | Nortel Capital Corp | (144,371,388) |
| 2001 | Nortel Networks Inc. | 3171 | Nortel de México | (4,658,948) |
| 2001 | Nortel Networks Inc. | 6140 | Nortel Korea Ltd | (2,166,851) |
| 2002 | Nortel Networks (CALA) Inc | 3170 | Nortel Networks de Mexico S.A. | (563,142) |
| 2002 | Nortel Networks (CALA) Inc | 3171 | Nortel de México | (3,045,862) |
| 2002 | Nortel Networks (CALA) Inc | 6111 | Nortel (India) Pvt. Ltd. | (167,634) |
| 2002 | Nortel Networks (CALA) Inc | 7100 | Nortel Networks (Asia) Limited | (7,694) |
| 2107 | Alteon WebSystems, Inc. | 3171 | Nortel de México | (5,164) |
| 2115 | Nortel Int Inc. | 3171 | Nortel de México | (836) |
| 2115 | Nortel Int Inc. | 6111 | Nortel (India) Pvt. Ltd. | (17,184) |

**Canadian Debtors Pre-filing Intercompany Obligations as at January 14, 2009**
**Excludes claims filed by the Nortel Joint Ventures (GDNT and NETAS)**
**The schedule below excludes net intercompany receivables vis-à-vis non-filed entities; however this is not a reflection on the validity and the collectibility of such amounts**
**All amounts in USD**

| Legal company code | Legal company name | Legal trading partner code | Legal trading partner name | Grand Total |
|---|---|---|---|---|
| **Claims as per Nortel Books and Records** | | | | |
| 1107 | **Architel Systems Corp** | 2114 | Architel Systems (U.S.) C | (1,912,993) |
| **Settled Claims** | | | | |
| 1002 | **Nortel Networks Limited** | 2001 | Nortel Networks Inc. | (2,062,700,000) |
| 1002 | **Nortel Networks Limited¹** | 4360 | Nortel Networks UK Limited | (122,655,094) |
| 1002 | **Nortel Networks Limited** | 4220 | Nortel Networks S.p.A. | (2,344,906) |
| 1002 | **Nortel Networks Limited** | 7120 | Nortel (China) Ltd | (104,218,075) |
| 1002 | **Nortel Networks Limited** | 6210 | Nortel Networks Singapore Pte | (91,167,570) |
| 1101 | **Nortel Technology Corp** | 6210 | Nortel Networks Singapore Pte | (8,212) |
| 1101 | **Nortel Technology Corp** | 3171 | Nortel de México | (276,176) |
| 1101 | **Nortel Technology Corp** | 7100 | Nortel Networks (Asia) Limited | (176,933) |
| 1101 | **Nortel Technology Corp** | 6160 | Nortel Malaysia Sdn. Bhd. | (3,222) |
| 1102 | **Nortel Int Corp** | 7120 | Nortel (China) Ltd | (734,289) |
| 1102 | **Nortel Int Corp** | 6100 | Nortel Networks Australia Pty | (1,480) |
| 1001 | **Nortel Networks Corporation** | 3171 | Nortel de México | (59) |

1. Balance includes USD 25M subject to satisfaction of paragraph 2.2 of the Agreement Setting EMEA Canadian Claims and Related Claims

EMEA Debtors and NNSA Pre-filing Intercompany Obligations as at January 14, 2009.
The schedule below excludes any balances between the EMEA Debtors and/or NNSA and/or the
EMEA Non-Filed Entities; however this is not a reflection on the validity and the collectibility of such amounts
All amounts in USD

| Legal Company Code | Legal Company name | Legal trading partner code | Legal trading partner name | Grand Total |
|---|---|---|---|---|
| **Claim as per Nortel Books and Records** | | | | |
| 4100 | Nortel Networks (Austria) GmbH | 3171 | Nortel de México, S. de R.L. de C.V. | (8,821) |
| 4110 | Nortel Networks N.V. | 6111 | Nortel Networks (India) Private Limited | (5,030) |
| 4130 | Nortel Networks, s.r.o. | 3171 | Nortel de México, S. de R.L. de C.V. | (3,613) |
| 4160 | Nortel Networks S.A. | 3140 | Nortel Networks de Colombia S.A. | (17,220) |
| 4160 | Nortel Networks S.A. | 3150 | Nortel Comunicaciones de Colombia S.A. en Liquidación | (22,228) |
| 4160 | Nortel Networks S.A. | 3160 | Nortel Networks de Guatemala Ltda. | (158,007) |
| 4160 | Nortel Networks S.A. | 3170 | Nortel Networks de México, S.A. de C.V. | (1,457) |
| 4160 | Nortel Networks S.A. | 6100 | Nortel Networks Australia Pty. Limited | (2,417) |
| 4160 | Nortel Networks S.A. | 6160 | Nortel Networks Malaysia Sdn. Bhd. | (2,977) |
| 4160 | Nortel Networks S.A. | 6220 | Nortel Networks (Thailand) Limited | (30,065) |
| 4160 | Nortel Networks S.A. | 6231 | Nortel Vietnam Limited | (9,842) |
| 4160 | Nortel Networks S.A. | 7100 | Nortel Networks (Asia) Limited | (265,892) |
| 4160 | Nortel Networks S.A. | 7124 | Guandong Nortel Telecommunications Company Limited | (8,432,851) |
| 4162 | Nortel Networks France S.A.S | 3171 | Nortel de México, S. de R.L. de C.V. | (3,315) |
| 4162 | Nortel Networks France S.A.S | 6111 | Nortel Networks (India) Private Limited | (200) |
| 4162 | Nortel Networks France S.A.S | 7110 | Nortel Networks (Asia) Limited - Taiwan Branch | (22,406) |
| 4180 | Nortel GmbH (formerly 4180 Nortel Network Germany GmbH & Co KG) | 3171 | Nortel de México, S. de R.L. de C.V. | (29,481) |
| 4200 | Nortel Networks Engineering Service Kft. | 3171 | Nortel de México, S. de R.L. de C.V. | (4,928) |
| 4210 | Nortel Networks (Ireland) Limited | 3171 | Nortel de México, S. de R.L. de C.V. | (4,336) |
| 4210 | Nortel Networks (Ireland) Limited | 6100 | Nortel Networks Australia Pty. Limited | (75) |
| 4210 | Nortel Networks (Ireland) Limited | 6111 | Nortel Networks (India) Private Limited | (341) |
| 4210 | Nortel Networks (Ireland) Limited | 6120 | PT Nortel Networks Indonesia | (70) |
| 4210 | Nortel Networks (Ireland) Limited | 7110 | Nortel Networks (Asia) Limited - Taiwan Branch | (10,045) |
| 4220 | Nortel Networks S.p.A. | 7110 | Nortel Networks (Asia) Limited - Taiwan Branch | (5,145) |
| 4260 | Nortel Networks Polska Sp. z o.o. | 3171 | Nortel de México, S. de R.L. de C.V. | (1,823) |
| 4270 | Nortel Networks Portugal S.A. | 3110 | Nortel Networks Telecommunicacoes Industria e Comercio Ltda. | (121,067) |
| 4270 | Nortel Networks Portugal S.A. | 3171 | Nortel de México, S. de R.L. de C.V. | (3,103) |
| 4280 | Nortel Networks Romania SRL | 3171 | Nortel de México, S. de R.L. de C.V. | (532) |
| 4310 | Nortel Networks Hispania, S.A. | 6190 | Nortel Networks (Asia) Limited - Pakistan Branch | (1,294) |
| 4310 | Nortel Networks Hispania, S.A. | 7100 | Nortel Networks (Asia) Limited | (901) |
| 4360 | Nortel Networks UK Limited | 1107 | Architel Systems Corporation | (1,476,623) |
| 4360 | Nortel Networks UK Limited | 3171 | Nortel de México, S. de R.L. de C.V. | (58,159) |
| 4360 | Nortel Networks UK Limited | 4321 | Alteon WebSystems AB | (228,195) 1 |
| 4360 | Nortel Networks UK Limited | 6100 | Nortel Networks Australia Pty. Limited | (354,095) |
| 4360 | Nortel Networks UK Limited | 6130 | Nortel Networks Kabushiki Kaisha | (81,375) 2 |
| 4360 | Nortel Networks UK Limited | 6140 | Nortel Networks Korea Limited | (33,761) |
| 4360 | Nortel Networks UK Limited | 6160 | Nortel Networks Malaysia Sdn. Bhd. | (98,358) |
| 4360 | Nortel Networks UK Limited | 7120 | Nortel Networks (China) Limited | (190,633) |
| 4360 | Nortel Networks UK Limited | 7124 | Guandong Nortel Telecommunications Company Limited | (4,888) |
| 4360 | Nortel Networks UK Limited | 7125 | Nortel Networks Communications Engineering Limited | (1,812) |

1. Subsequent to the liquidation of Alteon WebSystems AB, the balance of $228,195 is due to Nortel Altsystems Inc.
2. Subsequent to the liquidation of Nortel Networks Kabushiki Kaisha, the balance of $81,375 is due to Nortel Networks Inc.

**Exhibit B**

## PLAN ADMINISTRATION AGREEMENT

This PLAN ADMINISTRATION AGREEMENT (this "Agreement") is made this [•] day of [•], 2017, by and among Greylock Partners, LLC ("Greylock"), the Debtors and each of the entities listed on Schedule A hereto (the "Wind-Down Debtors").

WITNESSETH:

WHEREAS, on January 14, 2009, Nortel Networks Inc. ("NNI") and certain of its subsidiaries and affiliates filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code, and on July 14, 2009, Nortel Networks (CALA) Inc., a direct subsidiary of NNI, filed its voluntary petition for relief under chapter 11 of the Bankruptcy Code; and

WHEREAS, by the order, dated [•], 2017, the United States Bankruptcy Court for the District of Delaware confirmed the First Amended Joint Chapter 11 Plan of Nortel Networks Inc. and Certain of its Affiliated Debtors, dated December 1, 2016 (as amended and together with the Plan Supplement and all the schedules and exhibits thereto, the "Plan") pursuant to chapter 11 of the Bankruptcy Code; and

WHEREAS, in accordance with Article 6.3 of the Plan, certain duties and responsibilities shall be borne by the Plan Administrator; and

WHEREAS effective upon the Effective Date, the Debtors and the Wind-Down Debtors desire to appoint Greylock to serve as the Plan Administrator under the Plan, and Greylock is willing to serve in such capacity, in each case upon the terms and conditions set forth herein; and

NOW, THEREFORE, in consideration of the foregoing and the covenants and agreements set forth herein, the parties hereto agree as follows:

1.      Definitions.  Capitalized terms used herein without definition shall have the respective meanings assigned to such terms in the Plan.

2.      Appointment and Acceptance. The Debtors and the Wind-Down Debtors hereby appoint Greylock to serve as the Plan Administrator under the Plan, and Greylock hereby accepts such appointment and agrees to serve in such capacity, in each case effective upon the Effective Date of the Plan (which shall be the effective date of this Agreement).  On the Effective Date, compliance with the provisions of the Plan shall become the general responsibility of the Plan Administrator pursuant to and in accordance with the provisions of the Plan and this Agreement.

3.      Obligations of the Plan Administrator.  Subject to the provisions of Article 6 hereof as provided herein, the Plan Administrator shall have the following obligations:

(a)      General.  The Plan Administrator shall comply with, and shall cause the Debtors and the Wind-Down Debtors  to comply with, the Plan and the Confirmation Order in connection with the performance of his or her duties hereunder and under the Plan.

2

(b)    Reserves.  The Plan Administrator shall cause the Debtors to establish and maintain (i) the Disputed Claims Reserve, in amounts as the Plan Administrator reasonably deems necessary to make sufficient future payments with respect to Disputed Claims in accordance with Section 11.6 of the Plan, (ii) such reserves as the Plan Administrator reasonably deems necessary to provide sufficient Cash to liquidate and wind down the Estates and (iii) such reserves as the Plan Administrator reasonably deems necessary for contingent liabilities, if any, in each case in accordance with the provisions of the Plan.

(c)    Distributions.  The Plan Administrator shall cause the Disbursing Agent (such Disbursing Agent which may be the Plan Administrator itself) to make distributions on account of Allowed Claims, other remaining assets and appropriate fees and expenses in accordance with and subject to the terms of the Plan.

(d)    Liquidation of Assets.  In accordance with the Plan, the Plan Administrator shall exercise its reasonable business judgment to manage, liquidate or otherwise dispose of any remaining assets of each Wind-Down Debtor.

(e)    Accounts.  The Plan Administrator shall maintain or establish one or more accounts for the Debtors into which the Plan Administrator shall deposit all Cash not required or permitted to be deposited into any other account, reserve or escrow.

(f)    Books and Records.  The Plan Administrator shall oversee the maintenance of appropriate books, records and accounts for the Debtors and Wind-Down Debtors to effectuate the Plan.

(g)    Tax Returns.  The Plan Administrator shall file any necessary tax returns and all other appropriate or necessary tax documents on behalf the Debtors or the Wind-Down Debtors and shall make any necessary tax payments from funds held by such entities, and shall represent the interest and account of the Debtors or Wind-Down Debtors before any taxing authority in all matters, including, without limitation, any action, suit proceeding or audit.

(h)    Filings.  After each Chapter 11 Case has been fully administered, the Plan Administrator shall File all documents required by any Governmental Unit or applicable law and any applicable order of the Bankruptcy Court to close such Chapter 11 Case in accordance with the Bankruptcy Code and the Bankruptcy Rules.

(i)    Reports.  Unless otherwise ordered by the Bankruptcy Court, the Plan Administrator shall be responsible for preparing, filing and serving (if applicable) all reports required by the Plan, this Agreement or applicable law, pursuant to Section 6.3(g) of the Plan.

(j)    Fees.  The Plan Administrator shall be obligated to pay from each Debtor's or Wind-Down Debtor's assets, as applicable, fees incurred pursuant to 28 U.S.C. § 1930(a)(6) from each Debtors' Estates' assets until such time as a final decree is entered closing such Debtor's Bankruptcy Case, such Bankruptcy Case is converted or dismissed, or the Bankruptcy Court orders otherwise.

3

(k)     No Other Duties.  Other than the obligations of the Plan Administrator enumerated herein or under the Plan, the Plan Administrator shall have no duties or obligations of any kind or nature respecting implementation of the Plan or this Agreement.

4.     Powers and Rights of the Plan Administrator.

(a)     General.  The Plan Administrator shall retain and have all the rights, powers and duties enumerated hereunder and under the Plan, and otherwise necessary to carry out his or her responsibilities hereunder and under the Plan.

(b)     Resolution of Disputed Claims.  The Plan Administrator shall have authority to (i) control and effectuate the Claims reconciliation process, including to allow, object to, seek to subordinate, compromise, enter into protocols for the resolution of, or settle any and all Claims against the Debtors and (ii) administer the resolution of any and all relevant Claims against the Debtors in accordance with the authority granted under the Plan as well as any claims protocols entered into by any Debtor and approved by the Bankruptcy Court prior to the Effective Date, including without limitation the Bankruptcy Court's *Order Approving Debtors' Motion for an Order Establishing Procedures to Further the Resolution of Claims* [D.I.16551] (the "Omnibus Settlement Procedures Order") and the *Cross-Border Protocol Establishing Resolution of Claims* [D.I. 3922-2], to the extent such procedures remain applicable.

(c)     Prosecution and Settlement of Litigation Claims.  The Plan Administrator shall have the authority to (i) prosecute all Litigation Claims, including Avoidance Actions, on behalf of the Debtors and the Wind-Down Debtors, (ii) elect not to pursue any Litigation Claim and (iii) determine whether and when to compromise, settle, abandon, dismiss or otherwise dispose of any Litigation Claim, in each case as the Plan Administrator may determine is in the best interests of the relevant Debtors and Wind-Down Debtors.

(d)     Professionals.  The Plan Administrator shall have the authority to (i) utilize the services of the Wind-Down Debtors' employees and independent contractors, (ii) employ, retain, utilize supervise and compensate professionals, including, without limitation, claims, disbursing and transfer agents, legal counsel, accountants, experts, independent contractors, employees, other advisors, professionals and Professionals appointed in the Chapter 11 Cases, to assist him or her in performing his or her duties under the Plan or otherwise represent the interests of and serve on behalf of the Debtors and Wind-Down Debtors and (iii) cause the Wind-Down Debtors to indemnify such professionals (including those Professionals previously retained during the Chapter 11 Cases) from any loss (including reasonable attorneys' fees) incurred in connection with the execution and implementation of the Plan other than a loss due to the indemnified party's willful misconduct, gross negligence, breach of contract or fraud. For the avoidance of doubt, the Plan Administrator shall accede to, and control, all privileges of the Debtors and Wind-Down Debtors, including without limitation the attorney-client privilege and any protection afforded attorney work product under applicable rules and law.

(e)     Investment of Cash.  The Plan Administrator shall have the authority to invest the Cash of the Wind-Down Debtors, including any Sales Proceeds, Cash proceeds realized from the monetization, wind-down or liquidation of any assets of the Wind-Down Debtors, including any Litigation Claims, and any income earned thereon, in (i) direct

obligations on the United States of America or obligations of any agency or instrumentality thereof which are guaranteed by the full faith and credit of the United States of America, (ii) short term obligations of any agency or corporation which is or may hereafter be created by or pursuant to an act of the Congress of the United States as an agency or instrumentality thereof or (iii) any other investments that may be permissible under (x) section 345 of the Bankruptcy Code or (y) any order of the Bankruptcy Court entered in the Chapter 11 Cases.

(f)    Fees.  The Plan Administrator shall have the authority to incur and pay reasonable and necessary expenses in connection with the performance of duties under the Plan, including the reasonable fees and expenses of professionals retained by the Plan Administrator.

(g)    Insurance.  The Plan Administrator shall have the authority to purchase or create and carry all insurance policies and pay all insurance premiums and costs the Plan Administrator deems necessary, including all insurance coverage reasonably necessary for himself or herself, his or her employees or contractors and  any agents or professionals hired or retained by him or her and the Wind-Down Debtors.  The Plan Administrator is authorized to retain and renew any and all insurance policies of the Debtors providing coverage with respect to any claims.

(h)    Management of Wind-Down Debtors.  In accordance with Section 8.4 of the Plan, the Plan Administrator shall have the authority to appoint the boards of directors of the Wind-Down Debtors.

(i)    Corporate Existence.  In accordance with Section 8.5 of the Plan, the Plan Administrator shall have the authority to (i) make any filings he deems necessary to memorialize the dissolution of the Debtors and Wind-Down Debtors under the Plan and (ii) maintain or dissolve each Wind-Down Debtor and dissolve or complete the winding-up of any Controlled Non-Debtor Affiliate.

(j)    Disposition of Assets. The Plan Administrator shall have the authority to sell or otherwise dispose of, and liquidate or convert into Cash any non-Cash assets of the Wind-Down Debtors, if any, in a manner compatible with the best interests of the holders of Allowed Claims.  All assets of the Debtors or Wind-Down Debtors shall be used and held by the Plan Administrator solely for the purposes contemplated by the Plan, the Confirmation Order and this Agreement.

(k)    Reports. The Plan Administrator shall have the authority to prepare and file any informational returns, reports, statements, returns or disclosures relating to the Debtors and the Wind-Down Debtors that are required by any Governmental Unit or applicable law; and

(l)    Additional Powers.  The Plan Administrator shall have the authority to exercise all powers and rights, and take all actions contemplated by or provided for in this Agreement, the Plan and the Confirmation Order, including, but not limited to Section 6.3 of the Plan, and to take any and all other actions necessary or appropriate to implement or consummate this Agreement and the Plan.

5.    <u>Compensation and Reimbursement</u>.  The Plan Administrator shall be entitled to receive the following fair and reasonable compensation for his or her services in accordance with its prevailing rates:

(a)    <u>Compensation</u>.

|  | Per Hour |
|---|---|
| Senior Managing Director | $950 |
| Managing Director | $750 - $800 |
| Senior Director | $700 - $750 |
| Director | $650 - $700 |
| Associate | $450 - $590 |

(b)    <u>Computation of Hours; Recordkeeping</u>.  The Plan Administrator shall maintain a record of Greylock's time expended in fulfilling the duties of the Plan Administrator hereunder that shall include a brief description of such activities.

(c)    <u>Reimbursement of Expenses</u>. The Plan Administrator shall be entitled to reimbursement of reasonable expenses incurred in fulfilling the duties of the Plan Administrator hereunder, and shall submit a report of said expenses with each report under Section 2 above.

6.    <u>Exculpation; Indemnification</u>.  Subject to the applicable provisions of the Plan, the Plan Administrator shall have no liability whatsoever for any acts or omissions to the Debtors or the Wind-Down Debtors or holders of claims against or interests in the Debtors or the Wind-Down Debtors other than willful misconduct, fraud or breach of fiduciary duty by the Plan Administrator as determined by a Final Order, *provided, that*, the Plan Administrator shall have no liability for such acts or omissions if approved by the Bankruptcy Court.  Each of the Debtors or Wind-Down Debtors shall indemnify and hold harmless the Plan Administrator for any losses, liabilities and costs incurred in such capacity to the fullest extent allowed by Delaware law.

7.    <u>Termination of Engagement</u>.  This engagement of the Plan Administrator hereunder shall terminate on the earlier of: (a) the removal of the Plan Administrator by Bankruptcy Court  for Cause or the effectiveness of his or her resignation pursuant to Section 8 hereof, and (b) the date the order granting the final decree closing, or dismissing, the last Chapter 11 Case that has not been closed or dismissed becomes a Final Order.

8.    <u>Resignation and Removal</u>.

(a)    <u>Resignation</u>. The  Plan Administrator may resign as Plan Administrator hereunder upon delivery of sixty (60) days written notice to the Bankruptcy Court. However, if a successor Plan Administrator has not been appointed by the end of such sixty (60) day period, the current Plan Administrator shall continue as Plan Administrator pursuant to the terms specified herein until such time as a successor is appointed by the Bankruptcy Court.

(b)    <u>Removal</u>. The Plan Administrator may be removed with Cause by the Bankruptcy Court.  For the purposes of this Agreement, "<u>Cause</u>" shall be defined as: (i) the Plan Administrator's theft or embezzlement or attempted theft or embezzlement of money or tangible

or intangible Assets or property; (ii) the Plan Administrator's violation of any law (whether foreign or domestic), which results in a felony indictment or similar judicial proceeding; (iii) the Plan Administrator's willful misconduct or fraud in the performance of his or her duties.

(c)      Simultaneous Removal and Resignation. To the extent that the Plan Administrator is removed pursuant to the terms specified in Section 8(b) above (a "Removal") or the Plan Administrator resigns pursuant to the terms specified in Section 8(a) above (a "Resignation"), and such Plan Administrator is then serving in any other capacity for or on behalf of any of the Wind-Down Debtors or any of their Affiliates or is serving as Disbursing Agent or as trustee of any trust formed pursuant to the Plan (service by the Plan Administrator in each such additional capacity, a "Position" and collectively, the "Positions"), the Plan Administrator shall be deemed to be terminated (for all purposes and without any further action) from each of his or her other Positions upon his or her Removal or Resignation; *provided*, *that* the indemnification and exculpation provided in Section 6 herein and any insurance coverage provided to the Plan Administrator at the time of the Resignation and Removal shall continue in full force and effect.

(d)      Appointment of Successor Plan Administrator.  The Plan Administrator shall have the authority to name a successor Plan Administrator, subject to Bankruptcy Court approval or, if the Plan Administrator is unable to make such an appointment, counsel to the Debtors also may appoint a successor Plan Administrator, subject to Bankruptcy Court approval. Any order of the Bankruptcy Court approving any such appointment shall specify and establish the date on which such appointment shall be effective.  Every successor Plan Administrator, without any further act, deed, conveyance or Bankruptcy Court order, shall become vested with all rights, powers, trusts and duties of the retiring Plan Administrator hereunder and under the Plan; *provided*, *however*, that no Plan Administrator shall be liable for the acts or omissions of any prior or subsequent Plan Administrator.

(e)      Continuity. Unless otherwise ordered by the Bankruptcy Court, the termination of the Plan Administrator's engagement hereunder or the Resignation of the Plan Administrator shall not operate to invalidate any action theretofore taken by the Plan Administrator.  In event of the termination of the Plan Administrator's engagement hereunder or the resignation of the Plan Administrator, each sole share of Wind-Down NNI, Wind-Down Nortel Altsystems, Wind-Down Xros, Wind-Down Sonoma, Wind-Down CoreTek, Wind-Down NN Applications, Wind-Down NN Optical, and Wind-Down Architel held by the Plan Administrator shall pass to the successor Plan Administrator.  Moreover, in any such event, the Plan Administrator shall (i) execute and deliver by the effective date of such Removal or Resignation such documents, instruments and other writings as may be reasonably requested by the Bankruptcy Court to effect the Removal of the Plan Administrator's and the termination of its capacities under this Agreement, including, but not limited to, the Plan Administrator's capacity as the sole shareholder of Wind-Down NNI; and (ii) assist and cooperate in effecting the assumption of such Plan Administrator's obligations and functions by a successor Plan Administrator.

9.      Notices. Any notices or other communications required or permitted hereunder shall be sufficiently given if in writing and personally delivered or sent by registered or certified

mail, postage prepaid, return receipt requested, or sent by facsimile, addressed as follows or to such other address as any party shall have given notice of pursuant hereto:

> In the case of the Plan Administrator: Greylock Partners, LLC
>
> c/o Cleary Gottlieb Steen & Hamilton LLP
> One Liberty Plaza
> New York, NY 10006
> (212) 225-3999 (facsimile)
> Attn:   James L. Bromley, Esq.
>            Lisa M. Schweitzer, Esq.
>
> with a copy to
>
> Morris, Nichols, Arsht & Tunnell, LLP
> 1201 North Market Street
> Wilmington, Delaware 19801
> (302) 658-3989 (facsimile)
> Attn:   Derek C. Abbot, Es.

10.    <u>Assignment</u>.  Neither this Agreement nor any of the rights, duties or obligations of any of the parties hereto may be assigned without the prior written consent of the other parties hereto.

11.    <u>Governing Law; Jurisdiction</u>.  This Agreement shall be governed and construed in accordance with the laws of the State of Delaware, without giving effect to rules governing the conflict of laws. Without limiting any Person or Entity's right to appeal any order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to interpret and enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby, and (ii) any and all actions related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the exclusive jurisdiction and venue of the Bankruptcy Court.  If for any reason the Bankruptcy Court does not or cannot exercise such jurisdiction, then the parties hereby consent to and submit to the jurisdiction and venue of the state and federal courts located in the State of Delaware.

12.    <u>Counterparts</u>. This Agreement may be executed in one or more counterparts, each of which shall be an original, and which together shall constitute a single instrument.

13.    <u>Relationship to the Plan</u>. The principal purpose of this Agreement is to aid in the implementation of the Plan and, therefore, this Agreement incorporates and is subject to the provisions of the Plan and Confirmation Order.  To that end, the Plan Administrator shall have full power and authority to take any action consistent with the purposes and provisions of the Plan and Confirmation Order.  In the event that the provisions of this Agreement are found to be inconsistent with the provisions of the Plan or Confirmation Order, the provisions of the Confirmation Order and Plan, in that order, shall control; *provided*, *however*, that provisions of

8

this Agreement adopted by amendment and approved by the Bankruptcy Court following substantial consummation (as such term is used in section 1127(b) of the Bankruptcy Code) shall control over provisions of the Plan.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

**Nortel Networks Inc.**                          **Sonoma Systems**


By: _____          By: _____
    Name:                                                  Name:
    Title:                                                   Title:


**Nortel Networks Capital Corporation**          **Qtera Corporation**


By: _____          By: _____
    Name:                                                  Name:
    Title:                                                   Title:


**Nortel Altsystems Inc.**                       **Coretek, Inc.**


By: _____          By: _____
    Name:                                                  Name:
    Title:                                                   Title:


**Nortel Altsystems International Inc.**          **Nortel Networks Applications Management Solutions Inc**.


By: _____          By: _____
    Name:                                                  Name:
    Title:                                                   Title:


**Xros, Inc.**                                   **Nortel Networks Optical Components Inc.**


By: _____          By: _____
    Name:                                                  Name:
    Title:                                                   Title:

**Nortel Networks HPOCS Inc.**

By: _____
    Name:
    Title:

**Architel Systems (U.S.) Corporation**

By: _____
    Name:
    Title:

**Nortel Networks International Inc.**

By: _____
    Name:
    Title:

**Northern Telecom International Inc.**

By: _____
    Name:
    Title:

**Nortel Networks Cable Solutions Inc.**

By: _____
    Name:
    Title:

**Nortel Networks (CALA) Inc.**

By: _____
    Name:
    Title:

**Greylock Partners, LLC**

By: _____
    Title:  Plan Administrator

**Schedule A**

**Wind-Down Debtors**

Nortel Networks Inc. (NNI)
Nortel Networks Capital Corporation (NNCC)
Nortel Altsystems Inc.
Nortel Altsystems International Inc.
Xros, Inc.
Sonoma Systems
Qtera Corporation
CoreTek, Inc.
Nortel Networks Applications Management Solutions Inc.
Nortel Networks Optical Components Inc.
Nortel Networks HPOCS Inc.
Architel Systems (U.S.) Corporation
Nortel Networks International Inc. (NNII)
Northern Telecom International Inc.
Nortel Networks Cable Solutions Inc.
Nortel Networks (CALA) Inc.

**Exhibit C**

**Executory Contracts and Unexpired Leases Assumed by the Wind Down Debtors**

| Debtors | Counterparties | Description | Cure amount |
|---|---|---|---|
| NNCALA | Archive America | Contract for Records Management Storage, Retrieval & Delivery Services | $0 |
| NNI on behalf of itself, NNL and their respective subsidiaries | Ricoh Company Ltd. | License and Development Agreement | $0 |

**Exhibit D**

**EXHIBIT D**

**Debtor Administrative Claims Resolved by Plan**

In accordance with the Section 6.5 of the Plan, in consideration for the Sales Proceeds Allocation and other matters settled under the Plan and SPSA, as of the Effective Date, NNI shall release its intercompany claims against certain Debtor affiliates identified on its books and records[1] and, in the case of all Debtors other than NNCALA, NNI releases its claims for contribution for the administrative costs incurred by NNI on behalf of each of the Debtors from the Petition Date through the Effective Date.

Notwithstanding the foregoing, NNI retains the right to assert administrative claims against the other Debtors relating to any priority tax claims that are asserted against and/or paid by NNI that reasonably could be allocated or attributable to other Debtors.

| Debtor | Administrative Claims Retained by NNI against other Debtors | Administrative Claims Retained by Debtors against NNI |
|---|---|---|
| NNCALA | $34,000,000 | $0 |
| Nortel Altsystems | $0 | $0 |
| Nortel Altsystems Int'l | $0 | $0 |
| Xros | $0 | $50,048 |
| Sonoma | $0 | $0 |
| Qtera | $0 | $78,457 |
| CoreTek | $0 | $0 |
| NN Applications | $0 | $0 |
| NN Optical | $0 | $0 |
| NN HPOCS | $0 | $0 |
| Architel | $0 | $44,885 |
| NNII | $0 | $0 |
| NTI | $0 | $0 |
| NN Cable | $0 | $0 |

---

[1]     NNI's books and records claims against the other Debtors are: $37,755 against Nortel AltSystems; $82,468 against Nortel Altsystems Int'l; $10,580 against Sonoma; $11,829 against CoreTek; $12,222 against NN Applications; $874,193 against NN Optical; $13,074 against NN HPOCS; $517 against NNII; $37,537 against NTI; and $10,443 against NN Cable.

**Exhibit E**

**Exhibit E**

**Quarterly Administrative Wind-Down Reimbursement Payments**

| Debtor Name | Quarterly Amount |
|---|---|
| NNCALA | $200,000 |
| Nortel Altsystems | $100,000 |
| Nortel Altsystems Int'l | no more than $20,000 |
| Xros | no more than $20,000 |
| Sonoma | no more than $20,000 |
| Qtera | no more than $20,000 |
| CoreTek | no more than $20,000 |
| NN Applications | no more than $20,000 |
| NN Optical | no more than $20,000 |
| NN HPOCS | no more than $20,000 |
| Architel | no more than $20,000 |
| NNII | no more than $20,000 |
| NTI | no more than $20,000 |
| NN Cable | no more than $20,000 |

**Exhibit F**

## List of Directors and Officers of the Wind Down Debtors

| Director and Officer | Position | Experience |
|---|---|---|
| John J. Ray, III | Director; President | Mr. John J. Ray, III has served as the Nortel Debtors' Principal Officer since December 2009. In this capacity, Mr. Ray has overseen the restructuring and wind down of the Debtors' domestic and international businesses during the pendency of the Debtors' bankruptcy proceedings. Mr. Ray has previously served as Interim Chief Executive Officer, Chief Reorganization Officer and in similar roles for various public and private companies, including Overseas Shipholding Group, Inc., Enron Corp. and Fruit of the Loom. Mr. Ray is also Senior Managing Director of Greylock Partners, LLC, a provider of restructuring and interim management services.  He received a B.A. from the University of Massachusetts and a J.D. from Drake University Law School. |
| Mary Cilia | Treasurer | Ms. Mary Cilia has served the Nortel Debtors since January 2012, primarily in the claims administration and management role.  Ms. Cilia has over 23 years of experience providing expertise in mergers, acquisitions and divestitures and bankruptcies with focus in the areas of claims management and resolution, avoidance actions, creditor distributions, asset recoveries and financial reporting.  Ms. Cilia served in similar roles for public and private companies, including Overseas Shipholding Group, Inc. and AbitibiBowater.   Previously, Ms. Cilia was responsible for claims and wind down activities at Enron Creditors Recovery Corp. and served as a senior manager at Arthur Andersen LLP with extensive experience in conducting audits, initial and secondary public offerings, acquisitions and divestitures and related due diligence.  Ms. Cilia earned her bachelor of business administration degree in accounting from the University of Houston and is a certified public accountant in the State of Texas. |
| Kathryn Schultea | Vice President & Secretary | Ms. Kathryn Schultea has supported the Nortel Debtors since July 2010, focusing on operations, human resources, facility wind down, document and data retention, and claims management.  Ms. Schultea has over 18 years of experience providing leadership and expertise in bankruptcies, restructuring, divestitures, office closings, outsourcing efforts and downsizing initiatives.  Reporting directly to the Board of Directors, Ms. Schultea was chief administrative officer, assistant secretary and assistant treasurer of Enron Creditors Recovery Corp., assisting with the reorganization of Enron. Ms. Schultea served in similar roles for Overseas Shipholding Group, Inc.  Ms. Schultea earned her bachelor of science in business administration from University of Phoenix. |

**The Debtors include the following Wind-Down Debtor Entities:** Nortel Networks Inc. (NNI); Nortel Networks Capital Corporation (NNCC); Nortel Altsystems Inc.; Nortel Altsystems International Inc.; Xros, Inc.; Sonoma Systems; Qtera Corporation; CoreTek, Inc.; Nortel  Networks Applications Management Solutions Inc.; Nortel Networks Optical Components Inc.; Nortel Networks HPOCS Inc.; Architel Systems (U.S.) Corporation; Nortel Networks International Inc. (NNII); Northern Telecom International Inc.; Nortel Networks Cable Solutions Inc.; and Nortel Networks (CALA) Inc.

**Exhibit G**

# RESTATED CERTIFICATE

## OF

## INCORPORATION

## OF

## NORTEL NETWORKS INC.

Nortel Networks Inc., a corporation organized and existing under the laws of the State of Delaware (the "Corporation"), hereby certifies as follows:

A.    The name of the Corporation is Nortel Networks Inc.  The Corporation's original Certificate of Incorporation was filed with the Secretary of State of the State of Delaware on September 16, 1971 under the name Northern Telecom, Inc. (such original Certificate of Incorporation, as amended, the "Original Certificate of Incorporation").

B.    This Restated Certificate of Incorporation has been approved in accordance with Sections 245 and 303 of the Delaware General Corporation Law in furtherance of that certain order of the United States Bankruptcy Court for the District of Delaware dated [•], 2017 (the "Order") confirming the  First Amended Joint Chapter 11 Plan of Nortel Networks Inc. and Certain of its Affiliated Debtors, approved by the Bankruptcy Court and dated as of [•], 2017 (as amended, restated or superseded from time to time, the "Amended Plan")[1] and this Restated Certificate of Incorporation is required by the Order.

C.    The Original Certificate of Incorporation is hereby amended and restated to read in its entirety as set forth below:

**FIRST:**  The name of the Corporation is Nortel Networks Inc. (the "Corporation").

**SECOND:**  The address of the Corporation's registered office in the State of Delaware is at 1209 Orange Street, Wilmington, New Castle County, Delaware 19801.  The name of the Corporation's registered agent at such address is The Corporation Trust Company.

**THIRD:**  The nature of the business of the Corporation and the objects and purposes proposed to be transacted and carried on by it are the monetization, liquidation and distribution of the Corporation's assets in accordance with the Amended Plan, and any lawful act or activity for which corporations may be organized under the Delaware General Corporation Law.

---

[1]    Terms used, but not defined herein, shall have the meanings ascribed to them in the Amended Plan.

**FOURTH:** The total number of shares of stock which the Corporation is authorized to issue is one (1) share of common stock having a par value of $1.00.

Notwithstanding anything to the contrary herein, the Corporation shall in no event issue any non-voting equity securities in violation of chapter 11 of title 11 of the United States Code; provided, however, that the foregoing prohibition (i) will have no further force and effect beyond that required under Section 1123(a)(6) of the Bankruptcy Code, (ii) will have such force and effect, if any, only for so long as such Section 1123(a)(6) of the Bankruptcy Code is in effect and (iii) may be amended or eliminated in accordance with applicable law. The prohibition on the issuance of nonvoting equity securities is included in this Restated Certificate of Incorporation in compliance with Section 1123(a)(6) of the Bankruptcy Code (11 U.S.C. § 1123(a)(6)).

**FIFTH:** The sole director of the Corporation (the "Director") shall be the person appointed from time to time by the sole shareholder, who on the Effective Date shall be Greylock Partners, LLC, the bankruptcy plan administrator under the Amended Plan (as replaced, substituted or superseded from time to time, the "Plan Administrator") or such other entity as established by the Plan Administrator in its reasonable business judgment to be the new sole shareholder in accordance with the Amended Plan.

The Director shall have the authority to exercise all of the corporate powers and to manage the business and affairs of the Corporation without requiring prior approval from the sole shareholder. Without limiting the generality of the foregoing, in accordance with the requirements of the Amended Plan and the terms of the plan administration agreement describing the powers, duties and rights of the Plan Administrator, approved by the Bankruptcy Court and dated as of [•], 2017 (as amended, restated or superseded from time to time, the "Plan Administration Agreement"), the Director, acting at the direction of the sole shareholder, may take and cause the Corporation to take any and all actions he or she deems appropriate in order to consummate the transactions contemplated in the Amended Plan, including, without limitation, selling or otherwise disposing of all assets of the Corporation and winding down the affairs of the Corporation without the affirmative vote of the sole shareholder. The Director, acting at the direction of the sole shareholder, may take and cause the Corporation to take any and all corporate actions without the affirmative vote of the sole shareholder, including to compromise and settle claims and causes of action of or against the Corporation and its estate, and to dissolve, merge or consolidate the Corporation with any other entity.

**SIXTH:** In furtherance and not in limitation of the powers conferred by the laws of the State of Delaware, the Director is expressly authorized to make, amend and repeal the by-laws.

**SEVENTH:** A director of the Corporation shall not be personally liable to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, except for liability (i) for any breach of the director's duty of loyalty to the Corporation or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) under Section 174 of the Delaware General Corporation Law, or (iv) for any transaction from which the director derived an improper personal benefit. If the Delaware General Corporation Law is amended to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of the Corporation shall be eliminated or limited to the fullest extent permitted by the Delaware General Corporation Law, as so amended. Any repeal or modification of this provision shall not

adversely affect any right or protection of a director of the Corporation existing at the time of such repeal or modification.

**EIGHTH:** The Corporation reserves the right to amend and repeal any provision contained in this Restated Certificate of Incorporation in the manner from time to time prescribed by the laws of the State of Delaware.  All rights herein conferred are granted subject to this reservation.

IN WITNESS WHEREOF, this Restated Certificate of Incorporation has been executed by its duly authorized officer this [•] day of February, 2017.

NORTEL NETWORKS INC.

By: _____

Name: John J. Ray III

Title: President

# NORTEL NETWORKS INC.

# BYLAWS

## ARTICLE I - DIRECTOR

**Section 1.**        **Number.**

The sole director of the Corporation (the "Director") shall be the person appointed from time to time by the sole shareholder, who on the Effective Date shall be Greylock Partners, LLC, the bankruptcy plan administrator under the Amended Plan (as replaced, substituted or superseded from time to time, the "Plan Administrator") or such other entity as established by the Plan Administrator in its reasonable business judgment to be the new sole shareholder in accordance with the Amended Plan.

**Section 2.**        **Powers of the Director.**

The Director shall have the authority to exercise all of the corporate powers and to manage the business and affairs of the Corporation without requiring prior approval from the sole shareholder.  Without limiting the generality of the foregoing, in accordance with the requirements of the Amended Plan and the terms of the plan administration agreement describing the powers, duties and rights of the Plan Administrator, approved by the Bankruptcy Court and dated as of [•], 2017 (as amended, restated or superseded from time to time, the "Plan Administration Agreement"), the Director, acting at the direction of the sole shareholder, may take and cause the Corporation to take any and all actions he or she deems appropriate in order to consummate the transactions contemplated in the Amended Plan, including, without limitation, selling or otherwise disposing of all assets of the Corporation and winding down the affairs of the Corporation without the affirmative vote of the sole shareholder.  The Director, acting at the direction of the sole shareholder, may take and cause the Corporation to take any and all corporate actions without the affirmative vote of the sole shareholder, including to compromise and settle claims and causes of action of or against the Corporation and its estate, and to dissolve, merge or consolidate the Corporation with any other entity.

**Section 3.**        **Vacancies.**

Any vacancy of the Director may be filled by the sole shareholder, who on the Effective Date shall be the Plan Administrator.

**Section 4**        **Compensation of Directors.**

The Director, as such, may receive, pursuant to resolution of the Board of Directors, fixed fees and other compensation for his or her services as director.

## ARTICLE II - OFFICERS

Section 1.    Designation.

The officers of the Corporation shall consist of a President, one or more Vice Presidents, a Secretary and a Treasurer and such other officers as may from time to time be appointed by the Director.    Any number of offices may be held by the same person.

Section 2.    Appointment.    The Director may appoint all officers of the Corporation for whatever terms of office the Director deems appropriate or necessary.

Section 3.    Delegation of Authority.

The Director may from time to time delegate the powers or duties of any officer to any other officers or agents, notwithstanding any provision hereof.

Section 4.    Removal and Resignation.

Any officer of the Corporation may be removed at any time, with or without cause, by the Director.

Any officer may resign at any time by giving written notice to the Director.  Any such resignation shall take effect at the date of the receipt of such notice or at any later time specified therein, and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

Section 5.    Action with Respect to Securities of Other Corporations.

Unless otherwise directed by the Director, the President or any officer of the Corporation authorized by the President shall have power to vote and otherwise act on behalf of the Corporation, in person or by proxy, at any meeting of shareholders of or with respect to any action of shareholders of any other corporation in which this Corporation may hold securities and otherwise to exercise any and all rights and powers which this Corporation may possess by reason of its ownership of securities in such other corporation.

## ARTICLE III - STOCK

Section 1.    Certificates of Stock.

Each holder of stock represented by certificates shall be entitled to a certificate signed by, or in the name of the Corporation by, the President or a Vice President, and by the Secretary or an Assistant Secretary, or the Treasurer or an Assistant Treasurer, certifying the number of shares owned by him or her.  Any or all of the signatures on the certificate may be by facsimile.

- 2 -

## ARTICLE IV - MISCELLANEOUS

Section 1.     Facsimile Signatures.

In addition to the provisions for use of facsimile signatures elsewhere specifically authorized in these Bylaws, facsimile signatures of any officer or officers of the Corporation may be used whenever and as authorized by the Director.

Section 2.     Reliance upon Books, Reports and Records.

The Director, and each officer of the Corporation shall, in the performance of his or her duties, be fully protected in relying in good faith upon the books of account or other records of the Corporation and upon such information, opinions, reports or statements presented to the Corporation by any of its officers or employees, or committees of the Board of Directors so designated, or by any other person as to matters which such director or committee member reasonably believes are within such other person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Corporation.

Section 3.     Fiscal Year.

The fiscal year of the Corporation shall be as fixed by the Director.

Section 4.     Time Periods.

In applying any provision of these Bylaws which requires that an act be done or not be done a specified number of days prior to an event or that an act be done during a period of a specified number of days prior to an event, calendar days shall be used, the day of the doing of the act shall be excluded, and the day of the event shall be included.

## ARTICLE V - INDEMNIFICATION OF DIRECTORS AND OFFICERS

Section 1.     Right to Indemnification.

Each person who was or is made a party or is threatened to be made a party to or is otherwise involved in any action, suit or proceeding, whether civil, criminal, administrative or investigative (hereinafter a "proceeding"), by reason of the fact that he or she is or was a director or an officer of the Corporation or is or was serving at the request of the Corporation as a director, officer, or trustee of another corporation or of a partnership, joint venture, trust or other enterprise, including service with respect to an employee benefit plan (hereinafter an "indemnitee"), whether the basis of such proceeding is alleged action in an official capacity as a director, officer or trustee, or in any other capacity while serving as a director, officer or trustee, shall be indemnified and held harmless by the Corporation to the fullest extent permitted by Delaware law, as the same exists or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the Corporation to provide broader indemnification rights than such law permitted the Corporation to provide prior to such amendment), against all expense, liability and loss (including attorneys' fees, judgments, fines, ERISA excise taxes or penalties and amounts paid in settlement) reasonably incurred or suffered by such indemnitee in connection therewith; provided, however, that, except as provided in

- 3 -

Section 3 of this ARTICLE V with respect to proceedings to enforce rights to indemnification, the Corporation shall indemnify any such indemnitee in connection with a proceeding (or part thereof) initiated by such indemnitee only if such proceeding (or part thereof) was authorized by the Director of the Corporation.

Section 2.    Right to Advancement of Expenses.

In addition to the right to indemnification conferred in Section 1 of this ARTICLE V, an indemnitee shall also have the right to be paid by the Corporation the expenses (including attorney's fees) incurred in defending any such proceeding in advance of its final disposition (hereinafter an "advancement of expenses"); provided, however, that, if the Delaware General Corporation Law requires, an advancement of expenses incurred by an indemnitee in his or her capacity as a director or officer (and not in any other capacity in which service was or is rendered by such indemnitee, including, without limitation, service to an employee benefit plan) shall be made only upon delivery to the Corporation of an undertaking (hereinafter an "undertaking"), by or on behalf of such indemnitee, to repay all amounts so advanced if it shall ultimately be determined by final judicial decision from which there is no further right to appeal (hereinafter a "final adjudication") that such indemnitee is not entitled to be indemnified for such expenses under this Section 2 or otherwise.

Section 3.    Right of Indemnitee to Bring Suit.

If a claim under Section 1 or 2 of this ARTICLE V is not paid in full by the Corporation within 60 days after a written claim has been received by the Corporation, except in the case of a claim for an advancement of expenses, in which case the applicable period shall be 20 days, the indemnitee may at any time thereafter bring suit against the Corporation to recover the unpaid amount of the claim.  To the fullest extent permitted by law, if successful in whole or in part in any such suit, or in a suit brought by the Corporation to recover an advancement of expenses pursuant to the terms of an undertaking, the indemnitee shall be entitled to be paid also the expense of prosecuting or defending such suit.  In (i) any suit brought by the indemnitee to enforce a right to indemnification hereunder (but not in a suit brought by the indemnitee to enforce a right to an advancement of expenses) it shall be a defense that, and (ii) in any suit brought by the Corporation to recover an advancement of expenses pursuant to the terms of an undertaking, the Corporation shall be entitled to recover such expenses upon a final adjudication that, the indemnitee has not met any applicable standard for indemnification set forth in the Delaware General Corporation Law.  Neither the failure of the Corporation (including its directors who are not parties to such action, a committee of such directors, independent legal counsel, or its shareholders) to have made a determination prior to the commencement of such suit that indemnification of the indemnitee is proper in the circumstances because the indemnitee has met the applicable standard of conduct set forth in the Delaware General Corporation Law, nor an actual determination by the Corporation (including its directors who are not parties to such action, a committee of such directors, independent legal counsel, or its shareholders) that the indemnitee has not met such applicable standard of conduct, shall create a presumption that the indemnitee has not met the applicable standard of conduct or, in the case of such a suit brought by the indemnitee, be a defense to such suit.  In any suit brought by the indemnitee to enforce a right to indemnification or to an advancement of expenses hereunder, or brought by the Corporation to recover an advancement of expenses pursuant to the terms of an undertaking, the

burden of proving that the indemnitee is not entitled to be indemnified, or to such advancement of expenses, under this ARTICLE V or otherwise shall be on the Corporation.

<div align="center">Section 4.    <u>Non-Exclusivity of Rights</u>.</div>

The rights to indemnification and to the advancement of expenses conferred in this ARTICLE V shall not be exclusive of any other right which any person may have or hereafter acquire under any statute, the Corporation's Certificate of Incorporation, Bylaws, agreement, vote of shareholders or disinterested directors or otherwise.

<div align="center">Section 5.    <u>Insurance</u>.</div>

The Corporation may maintain insurance, at its expense, to protect itself and any director, officer, employee or agent of the Corporation or another corporation, partnership, joint venture, trust or other enterprise against any expense, liability or loss, whether or not the Corporation would have the power to indemnify such person against such expense, liability or loss under the Delaware General Corporation Law.

<div align="center">Section 6.    <u>Indemnification of Employees and Agents of the Corporation</u>.</div>

The Corporation may, to the extent authorized from time to time by the Director, grant rights to indemnification and to the advancement of expenses to any employee or agent of the Corporation to the fullest extent of the provisions of this Article with respect to the indemnification and advancement of expenses of directors and officers of the Corporation.

<div align="center">Section 7.    <u>Nature of Rights</u>.</div>

The rights conferred upon indemnitees in this ARTICLE V shall be contract rights and such rights shall continue as to an indemnitee who has ceased to be a director, officer or trustee and shall inure to the benefit of the indemnitee's heirs, executors and administrators.  Any amendment, alteration or repeal of this ARTICLE V that adversely affects any right of an indemnitee or its successors shall be prospective only and shall not limit, eliminate, or impair any such right with respect to any proceeding involving any occurrence or alleged occurrence of any action or omission to act that took place prior to such amendment, alteration or repeal.

<div align="center"><u>ARTICLE VI - AMENDMENTS</u></div>

These Bylaws may be amended or repealed by the Director at any meeting or by the shareholders at any meeting.

# RESTATED CERTIFICATE

## OF

## INCORPORATION

## OF

## ARCHITEL SYSTEMS (U.S.) CORPORATION

Architel Systems (U.S.) Corporation, a corporation organized and existing under the laws of the State of Delaware (the "Corporation"), hereby certifies as follows:

A.     The name of the Corporation is Architel Systems (U.S.) Corporation.   The Corporation's original Certificate of Incorporation was filed with the Secretary of State of the State of Delaware on July 31, 1992 under the name Architel Systems Corporation (such original Certificate of Incorporation, as amended, the "Original Certificate of Incorporation").

B.     This Restated Certificate of Incorporation has been approved in accordance with Sections 245 and 303 of the Delaware General Corporation Law in furtherance of that certain order of the United States Bankruptcy Court for the District of Delaware dated [•], 2017 (the "Order") confirming the  First Amended Joint Chapter 11 Plan of Nortel Networks Inc. and Certain of its Affiliated Debtors, approved by the Bankruptcy Court and dated as of [•], 2017 (as amended, restated or superseded from time to time, the "Amended Plan")[1] and this Restated Certificate of Incorporation is required by the Order.

C.     The Original Certificate of Incorporation is hereby amended and restated to read in its entirety as set forth below:

**FIRST:** The name of the Corporation is Architel Systems (U.S.) Corporation (the "Corporation").

**SECOND:**  The address of the Corporation's registered office in the State of Delaware is at 1209 Orange Street, Wilmington, New Castle County, Delaware 19801.  The name of the Corporation's registered agent at such address is The Corporation Trust Company.

**THIRD:** The nature of the business of the Corporation and the objects and purposes proposed to be transacted and carried on by it are the monetization, liquidation and distribution of the Corporation's assets in accordance with the Amended Plan, and any lawful act or activity for which corporations may be organized under the Delaware General Corporation Law.

---

[1]     Terms used, but not defined herein, shall have the meanings ascribed to them in the Amended Plan.

**FOURTH:** The total number of shares of stock which the Corporation is authorized to issue is one (1) share of common stock having a par value of $1.00.

Notwithstanding anything to the contrary herein, the Corporation shall in no event issue any non-voting equity securities in violation of chapter 11 of title 11 of the United States Code; provided, however, that the foregoing prohibition (i) will have no further force and effect beyond that required under Section 1123(a)(6) of the Bankruptcy Code, (ii) will have such force and effect, if any, only for so long as such Section 1123(a)(6) of the Bankruptcy Code is in effect and (iii) may be amended or eliminated in accordance with applicable law. The prohibition on the issuance of nonvoting equity securities is included in this Restated Certificate of Incorporation in compliance with Section 1123(a)(6) of the Bankruptcy Code (11 U.S.C. § 1123(a)(6)).

**FIFTH:** The sole director of the Corporation (the "Director") shall be the person appointed from time to time by the sole shareholder, who on the Effective Date shall be Greylock Partners, LLC, the bankruptcy plan administrator under the Amended Plan (as replaced, substituted or superseded from time to time, the "Plan Administrator") or such other entity as established by the Plan Administrator in its reasonable business judgment to be the new sole shareholder in accordance with the Amended Plan.

The Director shall have the authority to exercise all of the corporate powers and to manage the business and affairs of the Corporation without requiring prior approval from the sole shareholder. Without limiting the generality of the foregoing, in accordance with the requirements of the Amended Plan and the terms of the plan administration agreement describing the powers, duties and rights of the Plan Administrator, approved by the Bankruptcy Court and dated as of [•], 2017 (as amended, restated or superseded from time to time, the "Plan Administration Agreement"), the Director, acting at the direction of the sole shareholder, may take and cause the Corporation to take any and all actions he or she deems appropriate in order to consummate the transactions contemplated in the Amended Plan, including, without limitation, selling or otherwise disposing of all assets of the Corporation and winding down the affairs of the Corporation without the affirmative vote of the sole shareholder. The Director, acting at the direction of the sole shareholder, may take and cause the Corporation to take any and all corporate actions without the affirmative vote of the sole shareholder, including to compromise and settle claims and causes of action of or against the Corporation and its estate, and to dissolve, merge or consolidate the Corporation with any other entity.

**SIXTH:** In furtherance and not in limitation of the powers conferred by the laws of the State of Delaware, the Director is expressly authorized to make, amend and repeal the by-laws.

**SEVENTH:** A director of the Corporation shall not be personally liable to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, except for liability (i) for any breach of the director's duty of loyalty to the Corporation or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) under Section 174 of the Delaware General Corporation Law, or (iv) for any transaction from which the director derived an improper personal benefit. If the Delaware General Corporation Law is amended to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of the Corporation shall be eliminated or limited to the fullest extent permitted by the Delaware General Corporation Law, as so amended. Any repeal or modification of this provision shall not

adversely affect any right or protection of a director of the Corporation existing at the time of such repeal or modification.

**EIGHTH:** The Corporation reserves the right to amend and repeal any provision contained in this Restated Certificate of Incorporation in the manner from time to time prescribed by the laws of the State of Delaware.  All rights herein conferred are granted subject to this reservation.

IN WITNESS WHEREOF, this Restated Certificate of Incorporation has been executed by its duly authorized officer this [•] day of February, 2017.

ARCHITEL SYSTEMS (U.S.) CORPORATION

By: _____

Name: John J. Ray III

Title: President

# ARCHITEL SYSTEMS (U.S.) CORPORATION

# BYLAWS

## ARTICLE I - DIRECTOR

Section 1.        Number.

The sole director of the Corporation (the "Director") shall be the person appointed from time to time by the sole shareholder, who on the Effective Date shall be Greylock Partners, LLC, the bankruptcy plan administrator under the Amended Plan (as replaced, substituted or superseded from time to time, the "Plan Administrator") or such other entity as established by the Plan Administrator in its reasonable business judgment to be the new sole shareholder in accordance with the Amended Plan.

Section 2.        Powers of the Director.

The Director shall have the authority to exercise all of the corporate powers and to manage the business and affairs of the Corporation without requiring prior approval from the sole shareholder.  Without limiting the generality of the foregoing, in accordance with the requirements of the Amended Plan and the terms of the plan administration agreement describing the powers, duties and rights of the Plan Administrator, approved by the Bankruptcy Court and dated as of [•], 2017 (as amended, restated or superseded from time to time, the "Plan Administration Agreement"), the Director, acting at the direction of the sole shareholder, may take and cause the Corporation to take any and all actions he or she deems appropriate in order to consummate the transactions contemplated in the Amended Plan, including, without limitation, selling or otherwise disposing of all assets of the Corporation and winding down the affairs of the Corporation without the affirmative vote of the sole shareholder.  The Director, acting at the direction of the sole shareholder, may take and cause the Corporation to take any and all corporate actions without the affirmative vote of the sole shareholder, including to compromise and settle claims and causes of action of or against the Corporation and its estate, and to dissolve, merge or consolidate the Corporation with any other entity.

Section 3.        Vacancies.

Any vacancy of the Director may be filled by the sole shareholder, who on the Effective Date shall be the Plan Administrator.

Section 4        Compensation of Directors.

The Director, as such, may receive, pursuant to resolution of the Board of Directors, fixed fees and other compensation for his or her services as director.

## ARTICLE II - OFFICERS

Section 1.    Designation.

The officers of the Corporation shall consist of a President, one or more Vice Presidents, a Secretary and a Treasurer and such other officers as may from time to time be appointed by the Director.    Any number of offices may be held by the same person.

Section 2.    Appointment.    The Director may appoint all officers of the Corporation for whatever terms of office the Director deems appropriate or necessary.

Section 3.    Delegation of Authority.

The Director may from time to time delegate the powers or duties of any officer to any other officers or agents, notwithstanding any provision hereof.

Section 4.    Removal and Resignation.

Any officer of the Corporation may be removed at any time, with or without cause, by the Director.

Any officer may resign at any time by giving written notice to the Director.  Any such resignation shall take effect at the date of the receipt of such notice or at any later time specified therein, and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

Section 5.    Action with Respect to Securities of Other Corporations.

Unless otherwise directed by the Director, the President or any officer of the Corporation authorized by the President shall have power to vote and otherwise act on behalf of the Corporation, in person or by proxy, at any meeting of shareholders of or with respect to any action of shareholders of any other corporation in which this Corporation may hold securities and otherwise to exercise any and all rights and powers which this Corporation may possess by reason of its ownership of securities in such other corporation.

## ARTICLE III - STOCK

Section 1.    Certificates of Stock.

Each holder of stock represented by certificates shall be entitled to a certificate signed by, or in the name of the Corporation by, the President or a Vice President, and by the Secretary or an Assistant Secretary, or the Treasurer or an Assistant Treasurer, certifying the number of shares owned by him or her.  Any or all of the signatures on the certificate may be by facsimile.

- 2 -

## ARTICLE IV - MISCELLANEOUS

Section 1.        Facsimile Signatures.

In addition to the provisions for use of facsimile signatures elsewhere specifically authorized in these Bylaws, facsimile signatures of any officer or officers of the Corporation may be used whenever and as authorized by the Director.

Section 2.        Reliance upon Books, Reports and Records.

The Director, and each officer of the Corporation shall, in the performance of his or her duties, be fully protected in relying in good faith upon the books of account or other records of the Corporation and upon such information, opinions, reports or statements presented to the Corporation by any of its officers or employees, or committees of the Board of Directors so designated, or by any other person as to matters which such director or committee member reasonably believes are within such other person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Corporation.

Section 3.        Fiscal Year.

The fiscal year of the Corporation shall be as fixed by the Director.

Section 4.        Time Periods.

In applying any provision of these Bylaws which requires that an act be done or not be done a specified number of days prior to an event or that an act be done during a period of a specified number of days prior to an event, calendar days shall be used, the day of the doing of the act shall be excluded, and the day of the event shall be included.

## ARTICLE V - INDEMNIFICATION OF DIRECTORS AND OFFICERS

Section 1.        Right to Indemnification.

Each person who was or is made a party or is threatened to be made a party to or is otherwise involved in any action, suit or proceeding, whether civil, criminal, administrative or investigative (hereinafter a "proceeding"), by reason of the fact that he or she is or was a director or an officer of the Corporation or is or was serving at the request of the Corporation as a director, officer, or trustee of another corporation or of a partnership, joint venture, trust or other enterprise, including service with respect to an employee benefit plan (hereinafter an "indemnitee"), whether the basis of such proceeding is alleged action in an official capacity as a director, officer or trustee, or in any other capacity while serving as a director, officer or trustee, shall be indemnified and held harmless by the Corporation to the fullest extent permitted by Delaware law, as the same exists or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the Corporation to provide broader indemnification rights than such law permitted the Corporation to provide prior to such amendment), against all expense, liability and loss (including attorneys' fees, judgments, fines, ERISA excise taxes or penalties and amounts paid in settlement) reasonably incurred or suffered by such indemnitee in connection therewith; provided, however, that, except as provided in

- 3 -

Section 3 of this ARTICLE V with respect to proceedings to enforce rights to indemnification, the Corporation shall indemnify any such indemnitee in connection with a proceeding (or part thereof) initiated by such indemnitee only if such proceeding (or part thereof) was authorized by the Director of the Corporation.

<div align="center">Section 2.    <u>Right to Advancement of Expenses</u>.</div>

In addition to the right to indemnification conferred in Section 1 of this ARTICLE V, an indemnitee shall also have the right to be paid by the Corporation the expenses (including attorney's fees) incurred in defending any such proceeding in advance of its final disposition (hereinafter an "advancement of expenses"); provided, however, that, if the Delaware General Corporation Law requires, an advancement of expenses incurred by an indemnitee in his or her capacity as a director or officer (and not in any other capacity in which service was or is rendered by such indemnitee, including, without limitation, service to an employee benefit plan) shall be made only upon delivery to the Corporation of an undertaking (hereinafter an "undertaking"), by or on behalf of such indemnitee, to repay all amounts so advanced if it shall ultimately be determined by final judicial decision from which there is no further right to appeal (hereinafter a "final adjudication") that such indemnitee is not entitled to be indemnified for such expenses under this Section 2 or otherwise.

<div align="center">Section 3.    <u>Right of Indemnitee to Bring Suit</u>.</div>

If a claim under Section 1 or 2 of this ARTICLE V is not paid in full by the Corporation within 60 days after a written claim has been received by the Corporation, except in the case of a claim for an advancement of expenses, in which case the applicable period shall be 20 days, the indemnitee may at any time thereafter bring suit against the Corporation to recover the unpaid amount of the claim.  To the fullest extent permitted by law, if successful in whole or in part in any such suit, or in a suit brought by the Corporation to recover an advancement of expenses pursuant to the terms of an undertaking, the indemnitee shall be entitled to be paid also the expense of prosecuting or defending such suit.  In (i) any suit brought by the indemnitee to enforce a right to indemnification hereunder (but not in a suit brought by the indemnitee to enforce a right to an advancement of expenses) it shall be a defense that, and (ii) in any suit brought by the Corporation to recover an advancement of expenses pursuant to the terms of an undertaking, the Corporation shall be entitled to recover such expenses upon a final adjudication that, the indemnitee has not met any applicable standard for indemnification set forth in the Delaware General Corporation Law.   Neither the failure of the Corporation (including its directors who are not parties to such action, a committee of such directors, independent legal counsel, or its shareholders) to have made a determination prior to the commencement of such suit that indemnification of the indemnitee is proper in the circumstances because the indemnitee has met the applicable standard of conduct set forth in the Delaware General Corporation Law, nor an actual determination by the Corporation (including its directors who are not parties to such action, a committee of such directors, independent legal counsel, or its shareholders) that the indemnitee has not met such applicable standard of conduct, shall create a presumption that the indemnitee has not met the applicable standard of conduct or, in the case of such a suit brought by the indemnitee, be a defense to such suit.  In any suit brought by the indemnitee to enforce a right to indemnification or to an advancement of expenses hereunder, or brought by the Corporation to recover an advancement of expenses pursuant to the terms of an undertaking, the

<div align="center">- 4 -</div>

burden of proving that the indemnitee is not entitled to be indemnified, or to such advancement of expenses, under this ARTICLE V or otherwise shall be on the Corporation.

Section 4.    Non-Exclusivity of Rights.

The rights to indemnification and to the advancement of expenses conferred in this ARTICLE V shall not be exclusive of any other right which any person may have or hereafter acquire under any statute, the Corporation's Certificate of Incorporation, Bylaws, agreement, vote of shareholders or disinterested directors or otherwise.

Section 5.    Insurance.

The Corporation may maintain insurance, at its expense, to protect itself and any director, officer, employee or agent of the Corporation or another corporation, partnership, joint venture, trust or other enterprise against any expense, liability or loss, whether or not the Corporation would have the power to indemnify such person against such expense, liability or loss under the Delaware General Corporation Law.

Section 6.    Indemnification of Employees and Agents of the Corporation.

The Corporation may, to the extent authorized from time to time by the Director, grant rights to indemnification and to the advancement of expenses to any employee or agent of the Corporation to the fullest extent of the provisions of this Article with respect to the indemnification and advancement of expenses of directors and officers of the Corporation.

Section 7.    Nature of Rights.

The rights conferred upon indemnitees in this ARTICLE V shall be contract rights and such rights shall continue as to an indemnitee who has ceased to be a director, officer or trustee and shall inure to the benefit of the indemnitee's heirs, executors and administrators.  Any amendment, alteration or repeal of this ARTICLE V that adversely affects any right of an indemnitee or its successors shall be prospective only and shall not limit, eliminate, or impair any such right with respect to any proceeding involving any occurrence or alleged occurrence of any action or omission to act that took place prior to such amendment, alteration or repeal.

## ARTICLE VI - AMENDMENTS

These Bylaws may be amended or repealed by the Director at any meeting or by the shareholders at any meeting.

# RESTATED CERTIFICATE

## OF

## INCORPORATION

## OF

## NORTEL NETWORKS HPOCS INC.

Nortel Networks HPOCS Inc., a corporation organized and existing under the laws of the State of Delaware (the "Corporation"), hereby certifies as follows:

A.      The name of the Corporation is Nortel Networks HPOCS Inc.  The Corporation's original Certificate of Incorporation was filed with the Secretary of State of the State of Delaware on February 5, 2001 under the name Nortel Networks Optical Components Inc. (such original Certificate of Incorporation, as amended, the "Original Certificate of Incorporation").

B.      This Restated Certificate of Incorporation has been approved in accordance with Sections 245 and 303 of the Delaware General Corporation Law in furtherance of that certain order of the United States Bankruptcy Court for the District of Delaware dated [•], 2017 (the "Order") confirming the  First Amended Joint Chapter 11 Plan of Nortel Networks Inc. and Certain of its Affiliated Debtors, approved by the Bankruptcy Court and dated as of [•], 2017 (as amended, restated or superseded from time to time, the "Amended Plan")[1] and this Restated Certificate of Incorporation is required by the Order.

C.      The Original Certificate of Incorporation is hereby amended and restated to read in its entirety as set forth below:

**FIRST:** The name of the Corporation is Nortel Networks HPOCS Inc. (the "Corporation").

**SECOND:**  The address of the Corporation's registered office in the State of Delaware is at 1209 Orange Street, Wilmington, New Castle County, Delaware 19801.  The name of the Corporation's registered agent at such address is The Corporation Trust Company.

**THIRD:** The nature of the business of the Corporation and the objects and purposes proposed to be transacted and carried on by it are the monetization, liquidation and distribution of the Corporation's assets in accordance with the Amended Plan, and any lawful act or activity for which corporations may be organized under the Delaware General Corporation Law.

---

[1]     Terms used, but not defined herein, shall have the meanings ascribed to them in the Amended Plan.

**FOURTH:** The total number of shares of stock which the Corporation is authorized to issue is fifty thousand (50,000) shares without par value.

Notwithstanding anything to the contrary herein, the Corporation shall in no event issue any non-voting equity securities in violation of chapter 11 of title 11 of the United States Code; provided, however, that the foregoing prohibition (i) will have no further force and effect beyond that required under Section 1123(a)(6) of the Bankruptcy Code, (ii) will have such force and effect, if any, only for so long as such Section 1123(a)(6) of the Bankruptcy Code is in effect and (iii) may be amended or eliminated in accordance with applicable law. The prohibition on the issuance of nonvoting equity securities is included in this Restated Certificate of Incorporation in compliance with Section 1123(a)(6) of the Bankruptcy Code (11 U.S.C. § 1123(a)(6)).

**FIFTH:** The sole director of the Corporation (the "Director") shall be the person appointed from time to time by the sole shareholder, who on the Effective Date shall be Nortel Networks Optical Components Inc., or such other entity as established by Nortel Networks Optical Components Inc. in its reasonable business judgment to be the new sole shareholder in accordance with the Amended Plan.

The Director shall have the authority to exercise all of the corporate powers and to manage the business and affairs of the Corporation without requiring prior approval from the sole shareholder.  Without limiting the generality of the foregoing, in accordance with the requirements of the Amended Plan and the terms of the plan administration agreement describing the powers, duties and rights of the Plan Administrator, approved by the Bankruptcy Court and dated as of [•], 2017 (as amended, restated or superseded from time to time, the "Plan Administration Agreement"), the Director, acting at the direction of the sole shareholder, may take and cause the Corporation to take any and all actions he or she deems appropriate in order to consummate the transactions contemplated in the Amended Plan, including, without limitation, selling or otherwise disposing of all assets of the Corporation and winding down the affairs of the Corporation without the affirmative vote of the sole shareholder.  The Director, acting at the direction of the sole shareholder, may take and cause the Corporation to take any and all corporate actions without the affirmative vote of the sole shareholder, including to compromise and settle claims and causes of action of or against the Corporation and its estate, and to dissolve, merge or consolidate the Corporation with any other entity.

**SIXTH:**  In furtherance and not in limitation of the powers conferred by the laws of the State of Delaware, the Director is expressly authorized to make, amend and repeal the by-laws.

**SEVENTH:** A director of the Corporation shall not be personally liable to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, except for liability (i) for any breach of the director's duty of loyalty to the Corporation or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) under Section 174 of the Delaware General Corporation Law, or (iv) for any transaction from which the director derived an improper personal benefit.  If the Delaware General Corporation Law is amended to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of the Corporation shall be eliminated or limited to the fullest extent permitted by the Delaware General Corporation Law, as so amended.  Any repeal or modification of this provision shall not

adversely affect any right or protection of a director of the Corporation existing at the time of such repeal or modification.

**EIGHTH:** The Corporation reserves the right to amend and repeal any provision contained in this Restated Certificate of Incorporation in the manner from time to time prescribed by the laws of the State of Delaware.  All rights herein conferred are granted subject to this reservation.

IN WITNESS WHEREOF, this Restated Certificate of Incorporation has been executed by its duly authorized officer this [•] day of February, 2017.

NORTEL NETWORKS HPOCS INC.

By: _____

Name: John J. Ray III

Title: President

# NORTEL NETWORKS HPOCS INC.

# BYLAWS

## ARTICLE I - DIRECTOR

Section 1.        Number.

The sole director of the Corporation (the "Director") shall be the person appointed from time to time by the sole shareholder, who on the Effective Date shall be Nortel Networks Optical Components Inc., or such other entity as established by Nortel Networks Optical Components Inc. in its reasonable business judgment to be the new sole shareholder in accordance with the Amended Plan.

Section 2.        Powers of the Director.

The Director shall have the authority to exercise all of the corporate powers and to manage the business and affairs of the Corporation without requiring prior approval from the sole shareholder.  Without limiting the generality of the foregoing, in accordance with the requirements of the Amended Plan and the terms of the plan administration agreement describing the powers, duties and rights of the Plan Administrator, approved by the Bankruptcy Court and dated as of [•], 2017 (as amended, restated or superseded from time to time, the "Plan Administration Agreement"), the Director, acting at the direction of the sole shareholder, may take and cause the Corporation to take any and all actions he or she deems appropriate in order to consummate the transactions contemplated in the Amended Plan, including, without limitation, selling or otherwise disposing of all assets of the Corporation and winding down the affairs of the Corporation without the affirmative vote of the sole shareholder.  The Director, acting at the direction of the sole shareholder, may take and cause the Corporation to take any and all corporate actions without the affirmative vote of the sole shareholder, including to compromise and settle claims and causes of action of or against the Corporation and its estate, and to dissolve, merge or consolidate the Corporation with any other entity.

Section 3.        Vacancies.

Any vacancy of the Director may be filled by the sole shareholder, who on the Effective Date shall be Nortel Networks Optical Components Inc.

Section 4        Compensation of Directors.

The Director, as such, may receive, pursuant to resolution of the Board of Directors, fixed fees and other compensation for his or her services as director.

## ARTICLE II - OFFICERS

Section 1.        Designation.

The officers of the Corporation shall consist of a President, one or more Vice

Presidents, a Secretary and a Treasurer and such other officers as may from time to time be appointed by the Director.    Any number of offices may be held by the same person.

Section 2.    Appointment.    The Director may appoint all officers of the Corporation for whatever terms of office the Director deems appropriate or necessary.

Section 3.    Delegation of Authority.

The Director may from time to time delegate the powers or duties of any officer to any other officers or agents, notwithstanding any provision hereof.

Section 4.    Removal and Resignation.

Any officer of the Corporation may be removed at any time, with or without cause, by the Director.

Any officer may resign at any time by giving written notice to the Director.  Any such resignation shall take effect at the date of the receipt of such notice or at any later time specified therein, and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

Section 5.    Action with Respect to Securities of Other Corporations.

Unless otherwise directed by the Director, the President or any officer of the Corporation authorized by the President shall have power to vote and otherwise act on behalf of the Corporation, in person or by proxy, at any meeting of shareholders of or with respect to any action of shareholders of any other corporation in which this Corporation may hold securities and otherwise to exercise any and all rights and powers which this Corporation may possess by reason of its ownership of securities in such other corporation.

## ARTICLE III - STOCK

Section 1.    Certificates of Stock.

Each holder of stock represented by certificates shall be entitled to a certificate signed by, or in the name of the Corporation by, the President or a Vice President, and by the Secretary or an Assistant Secretary, or the Treasurer or an Assistant Treasurer, certifying the number of shares owned by him or her.  Any or all of the signatures on the certificate may be by facsimile.

## ARTICLE IV - MISCELLANEOUS

Section 1.    Facsimile Signatures.

In addition to the provisions for use of facsimile signatures elsewhere specifically authorized in these Bylaws, facsimile signatures of any officer or officers of the Corporation may be used whenever and as authorized by the Director.

- 2 -

Section 2.        Reliance upon Books, Reports and Records.

The Director, and each officer of the Corporation shall, in the performance of his or her duties, be fully protected in relying in good faith upon the books of account or other records of the Corporation and upon such information, opinions, reports or statements presented to the Corporation by any of its officers or employees, or committees of the Board of Directors so designated, or by any other person as to matters which such director or committee member reasonably believes are within such other person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Corporation.

Section 3.        Fiscal Year.

The fiscal year of the Corporation shall be as fixed by the Director.

Section 4.        Time Periods.

In applying any provision of these Bylaws which requires that an act be done or not be done a specified number of days prior to an event or that an act be done during a period of a specified number of days prior to an event, calendar days shall be used, the day of the doing of the act shall be excluded, and the day of the event shall be included.

## ARTICLE V - INDEMNIFICATION OF DIRECTORS AND OFFICERS

Section 1.        Right to Indemnification.

Each person who was or is made a party or is threatened to be made a party to or is otherwise involved in any action, suit or proceeding, whether civil, criminal, administrative or investigative (hereinafter a "proceeding"), by reason of the fact that he or she is or was a director or an officer of the Corporation or is or was serving at the request of the Corporation as a director, officer, or trustee of another corporation or of a partnership, joint venture, trust or other enterprise, including service with respect to an employee benefit plan (hereinafter an "indemnitee"), whether the basis of such proceeding is alleged action in an official capacity as a director, officer or trustee, or in any other capacity while serving as a director, officer or trustee, shall be indemnified and held harmless by the Corporation to the fullest extent permitted by Delaware law, as the same exists or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the Corporation to provide broader indemnification rights than such law permitted the Corporation to provide prior to such amendment), against all expense, liability and loss (including attorneys' fees, judgments, fines, ERISA excise taxes or penalties and amounts paid in settlement) reasonably incurred or suffered by such indemnitee in connection therewith; provided, however, that, except as provided in Section 3 of this ARTICLE V with respect to proceedings to enforce rights to indemnification, the Corporation shall indemnify any such indemnitee in connection with a proceeding (or part thereof) initiated by such indemnitee only if such proceeding (or part thereof) was authorized by the Director of the Corporation.

Section 2.        Right to Advancement of Expenses.

In addition to the right to indemnification conferred in Section 1 of this ARTICLE

V, an indemnitee shall also have the right to be paid by the Corporation the expenses (including attorney's fees) incurred in defending any such proceeding in advance of its final disposition (hereinafter an "advancement of expenses"); provided, however, that, if the Delaware General Corporation Law requires, an advancement of expenses incurred by an indemnitee in his or her capacity as a director or officer (and not in any other capacity in which service was or is rendered by such indemnitee, including, without limitation, service to an employee benefit plan) shall be made only upon delivery to the Corporation of an undertaking (hereinafter an "undertaking"), by or on behalf of such indemnitee, to repay all amounts so advanced if it shall ultimately be determined by final judicial decision from which there is no further right to appeal (hereinafter a "final adjudication") that such indemnitee is not entitled to be indemnified for such expenses under this Section 2 or otherwise.

<div align="center">Section 3.    Right of Indemnitee to Bring Suit.</div>

If a claim under Section 1 or 2 of this ARTICLE V is not paid in full by the Corporation within 60 days after a written claim has been received by the Corporation, except in the case of a claim for an advancement of expenses, in which case the applicable period shall be 20 days, the indemnitee may at any time thereafter bring suit against the Corporation to recover the unpaid amount of the claim.  To the fullest extent permitted by law, if successful in whole or in part in any such suit, or in a suit brought by the Corporation to recover an advancement of expenses pursuant to the terms of an undertaking, the indemnitee shall be entitled to be paid also the expense of prosecuting or defending such suit.  In (i) any suit brought by the indemnitee to enforce a right to indemnification hereunder (but not in a suit brought by the indemnitee to enforce a right to an advancement of expenses) it shall be a defense that, and (ii) in any suit brought by the Corporation to recover an advancement of expenses pursuant to the terms of an undertaking, the Corporation shall be entitled to recover such expenses upon a final adjudication that, the indemnitee has not met any applicable standard for indemnification set forth in the Delaware General Corporation Law.  Neither the failure of the Corporation (including its directors who are not parties to such action, a committee of such directors, independent legal counsel, or its shareholders) to have made a determination prior to the commencement of such suit that indemnification of the indemnitee is proper in the circumstances because the indemnitee has met the applicable standard of conduct set forth in the Delaware General Corporation Law, nor an actual determination by the Corporation (including its directors who are not parties to such action, a committee of such directors, independent legal counsel, or its shareholders) that the indemnitee has not met such applicable standard of conduct, shall create a presumption that the indemnitee has not met the applicable standard of conduct or, in the case of such a suit brought by the indemnitee, be a defense to such suit.  In any suit brought by the indemnitee to enforce a right to indemnification or to an advancement of expenses hereunder, or brought by the Corporation to recover an advancement of expenses pursuant to the terms of an undertaking, the burden of proving that the indemnitee is not entitled to be indemnified, or to such advancement of expenses, under this ARTICLE V or otherwise shall be on the Corporation.

<div align="center">Section 4.    Non-Exclusivity of Rights.</div>

The rights to indemnification and to the advancement of expenses conferred in this ARTICLE V shall not be exclusive of any other right which any person may have or hereafter acquire under any statute, the Corporation's Certificate of Incorporation, Bylaws,

agreement, vote of shareholders or disinterested directors or otherwise.

Section 5.     Insurance.

The Corporation may maintain insurance, at its expense, to protect itself and any director, officer, employee or agent of the Corporation or another corporation, partnership, joint venture, trust or other enterprise against any expense, liability or loss, whether or not the Corporation would have the power to indemnify such person against such expense, liability or loss under the Delaware General Corporation Law.

Section 6.     Indemnification of Employees and Agents of the Corporation.

The Corporation may, to the extent authorized from time to time by the Director, grant rights to indemnification and to the advancement of expenses to any employee or agent of the Corporation to the fullest extent of the provisions of this Article with respect to the indemnification and advancement of expenses of directors and officers of the Corporation.

Section 7.     Nature of Rights.

The rights conferred upon indemnitees in this ARTICLE V shall be contract rights and such rights shall continue as to an indemnitee who has ceased to be a director, officer or trustee and shall inure to the benefit of the indemnitee's heirs, executors and administrators.  Any amendment, alteration or repeal of this ARTICLE V that adversely affects any right of an indemnitee or its successors shall be prospective only and shall not limit, eliminate, or impair any such right with respect to any proceeding involving any occurrence or alleged occurrence of any action or omission to act that took place prior to such amendment, alteration or repeal.

## ARTICLE VI - AMENDMENTS

These Bylaws may be amended or repealed by the Director at any meeting or by the shareholders at any meeting.

# RESTATED CERTIFICATE

## OF

## INCORPORATION

## OF

## NORTEL NETWORKS INTERNATIONAL INC.

Nortel Networks International Inc., a corporation organized and existing under the laws of the State of Delaware (the "Corporation"), hereby certifies as follows:

A.    The name of the Corporation is Nortel Networks International Inc.   The Corporation's original Certificate of Incorporation was filed with the Secretary of State of the State of Delaware on September 15, 1992 under the name Synoptics Communications International, Inc. (such original Certificate of Incorporation, as amended, the "Original Certificate of Incorporation").

B.    This Restated Certificate of Incorporation has been approved in accordance with Sections 245 and 303 of the Delaware General Corporation Law in furtherance of that certain order of the United States Bankruptcy Court for the District of Delaware dated [•], 2017 (the "Order") confirming the  First Amended Joint Chapter 11 Plan of Nortel Networks Inc. and Certain of its Affiliated Debtors, approved by the Bankruptcy Court and dated as of [•], 2017 (as amended, restated or superseded from time to time, the "Amended Plan")[1] and this Restated Certificate of Incorporation is required by the Order.

C.    The Original Certificate of Incorporation is hereby amended and restated to read in its entirety as set forth below:

**FIRST:** The name of the Corporation is Nortel Networks International Inc. (the "Corporation").

**SECOND:**  The address of the Corporation's registered office in the State of Delaware is at 1209 Orange Street, Wilmington, New Castle County, Delaware 19801.  The name of the Corporation's registered agent at such address is The Corporation Trust Company.

**THIRD:** The nature of the business of the Corporation and the objects and purposes proposed to be transacted and carried on by it are the monetization, liquidation and distribution of the Corporation's assets in accordance with the Amended Plan, and any lawful act or activity for which corporations may be organized under the Delaware General Corporation Law.

---

[1]    Terms used, but not defined herein, shall have the meanings ascribed to them in the Amended Plan.

**FOURTH:** The total number of shares of stock which the Corporation is authorized to issue is three thousand (3,000) shares of common stock each having a par value of $0.01.

Notwithstanding anything to the contrary herein, the Corporation shall in no event issue any non-voting equity securities in violation of chapter 11 of title 11 of the United States Code; provided, however, that the foregoing prohibition (i) will have no further force and effect beyond that required under Section 1123(a)(6) of the Bankruptcy Code, (ii) will have such force and effect, if any, only for so long as such Section 1123(a)(6) of the Bankruptcy Code is in effect and (iii) may be amended or eliminated in accordance with applicable law. The prohibition on the issuance of nonvoting equity securities is included in this Restated Certificate of Incorporation in compliance with Section 1123(a)(6) of the Bankruptcy Code (11 U.S.C. § 1123(a)(6)).

**FIFTH:** The sole director of the Corporation (the "Director") shall be the person appointed from time to time by the sole shareholder, who on the Effective Date shall be Nortel Networks Inc., or such other entity as established by Nortel Networks Inc. in its reasonable business judgment to be the new sole shareholder in accordance with the Amended Plan.

The Director shall have the authority to exercise all of the corporate powers and to manage the business and affairs of the Corporation without requiring prior approval from the sole shareholder.  Without limiting the generality of the foregoing, in accordance with the requirements of the Amended Plan and the terms of the plan administration agreement describing the powers, duties and rights of the Plan Administrator, approved by the Bankruptcy Court and dated as of [•], 2017 (as amended, restated or superseded from time to time, the "Plan Administration Agreement"), the Director, acting at the direction of the sole shareholder, may take and cause the Corporation to take any and all actions he or she deems appropriate in order to consummate the transactions contemplated in the Amended Plan, including, without limitation, selling or otherwise disposing of all assets of the Corporation and winding down the affairs of the Corporation without the affirmative vote of the sole shareholder.  The Director, acting at the direction of the sole shareholder, may take and cause the Corporation to take any and all corporate actions without the affirmative vote of the sole shareholder, including to compromise and settle claims and causes of action of or against the Corporation and its estate, and to dissolve, merge or consolidate the Corporation with any other entity.

**SIXTH:** In furtherance and not in limitation of the powers conferred by the laws of the State of Delaware, the Director is expressly authorized to make, amend and repeal the by-laws.

**SEVENTH:** A director of the Corporation shall not be personally liable to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, except for liability (i) for any breach of the director's duty of loyalty to the Corporation or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) under Section 174 of the Delaware General Corporation Law, or (iv) for any transaction from which the director derived an improper personal benefit.  If the Delaware General Corporation Law is amended to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of the Corporation shall be eliminated or limited to the fullest extent permitted by the Delaware General Corporation Law, as so amended.  Any repeal or modification of this provision shall not adversely affect any right or protection of a director of the Corporation existing at the time of such repeal or modification.

- 2 -

**EIGHTH:** The Corporation reserves the right to amend and repeal any provision contained in this Restated Certificate of Incorporation in the manner from time to time prescribed by the laws of the State of Delaware.  All rights herein conferred are granted subject to this reservation.

IN WITNESS WHEREOF, this Restated Certificate of Incorporation has been executed by its duly authorized officer this [•] day of February, 2017.

NORTEL NETWORKS INTERNATIONAL INC.

By: _____

Name: John J. Ray III

Title: President

# NORTEL NETWORKS INTERNATIONAL INC.

# BYLAWS

## ARTICLE I - DIRECTOR

**Section 1.**     **Number.**

The sole director of the Corporation (the "Director") shall be the person appointed from time to time by the sole shareholder, who on the Effective Date shall be Nortel Networks Inc., or such other entity as established by Nortel Networks Inc. in its reasonable business judgment to be the new sole shareholder in accordance with the Amended Plan.

**Section 2.**     **Powers of the Director.**

The Director shall have the authority to exercise all of the corporate powers and to manage the business and affairs of the Corporation without requiring prior approval from the sole shareholder.  Without limiting the generality of the foregoing, in accordance with the requirements of the Amended Plan and the terms of the plan administration agreement describing the powers, duties and rights of the Plan Administrator, approved by the Bankruptcy Court and dated as of [•], 2017 (as amended, restated or superseded from time to time, the "Plan Administration Agreement"), the Director, acting at the direction of the sole shareholder, may take and cause the Corporation to take any and all actions he or she deems appropriate in order to consummate the transactions contemplated in the Amended Plan, including, without limitation, selling or otherwise disposing of all assets of the Corporation and winding down the affairs of the Corporation without the affirmative vote of the sole shareholder.  The Director, acting at the direction of the sole shareholder, may take and cause the Corporation to take any and all corporate actions without the affirmative vote of the sole shareholder, including to compromise and settle claims and causes of action of or against the Corporation and its estate, and to dissolve, merge or consolidate the Corporation with any other entity.

**Section 3.**     **Vacancies.**

Any vacancy of the Director may be filled by the sole shareholder, who on the Effective Date shall be Nortel Networks Inc.

**Section 4**     **Compensation of Directors.**

The Director, as such, may receive, pursuant to resolution of the Board of Directors, fixed fees and other compensation for his or her services as director.

## ARTICLE II - OFFICERS

**Section 1.**     **Designation.**

The officers of the Corporation shall consist of a President, one or more Vice Presidents, a Secretary and a Treasurer and such other officers as may from time to time be

appointed by the Director.    Any number of offices may be held by the same person.

Section 2.    Appointment.    The Director may appoint all officers of the Corporation for whatever terms of office the Director deems appropriate or necessary.

Section 3.    Delegation of Authority.

The Director may from time to time delegate the powers or duties of any officer to any other officers or agents, notwithstanding any provision hereof.

Section 4.    Removal and Resignation.

Any officer of the Corporation may be removed at any time, with or without cause, by the Director.

Any officer may resign at any time by giving written notice to the Director.  Any such resignation shall take effect at the date of the receipt of such notice or at any later time specified therein, and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

Section 5.    Action with Respect to Securities of Other Corporations.

Unless otherwise directed by the Director, the President or any officer of the Corporation authorized by the President shall have power to vote and otherwise act on behalf of the Corporation, in person or by proxy, at any meeting of shareholders of or with respect to any action of shareholders of any other corporation in which this Corporation may hold securities and otherwise to exercise any and all rights and powers which this Corporation may possess by reason of its ownership of securities in such other corporation.

ARTICLE III - STOCK

Section 1.    Certificates of Stock.

Each holder of stock represented by certificates shall be entitled to a certificate signed by, or in the name of the Corporation by, the President or a Vice President, and by the Secretary or an Assistant Secretary, or the Treasurer or an Assistant Treasurer, certifying the number of shares owned by him or her.  Any or all of the signatures on the certificate may be by facsimile.

ARTICLE IV - MISCELLANEOUS

Section 1.    Facsimile Signatures.

In addition to the provisions for use of facsimile signatures elsewhere specifically authorized in these Bylaws, facsimile signatures of any officer or officers of the Corporation may be used whenever and as authorized by the Director.

- 2 -

Section 2.    Reliance upon Books, Reports and Records.

The Director, and each officer of the Corporation shall, in the performance of his or her duties, be fully protected in relying in good faith upon the books of account or other records of the Corporation and upon such information, opinions, reports or statements presented to the Corporation by any of its officers or employees, or committees of the Board of Directors so designated, or by any other person as to matters which such director or committee member reasonably believes are within such other person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Corporation.

Section 3.    Fiscal Year.

The fiscal year of the Corporation shall be as fixed by the Director.

Section 4.    Time Periods.

In applying any provision of these Bylaws which requires that an act be done or not be done a specified number of days prior to an event or that an act be done during a period of a specified number of days prior to an event, calendar days shall be used, the day of the doing of the act shall be excluded, and the day of the event shall be included.

## ARTICLE V - INDEMNIFICATION OF DIRECTORS AND OFFICERS

Section 1.    Right to Indemnification.

Each person who was or is made a party or is threatened to be made a party to or is otherwise involved in any action, suit or proceeding, whether civil, criminal, administrative or investigative (hereinafter a "proceeding"), by reason of the fact that he or she is or was a director or an officer of the Corporation or is or was serving at the request of the Corporation as a director, officer, or trustee of another corporation or of a partnership, joint venture, trust or other enterprise, including service with respect to an employee benefit plan (hereinafter an "indemnitee"), whether the basis of such proceeding is alleged action in an official capacity as a director, officer or trustee, or in any other capacity while serving as a director, officer or trustee, shall be indemnified and held harmless by the Corporation to the fullest extent permitted by Delaware law, as the same exists or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the Corporation to provide broader indemnification rights than such law permitted the Corporation to provide prior to such amendment), against all expense, liability and loss (including attorneys' fees, judgments, fines, ERISA excise taxes or penalties and amounts paid in settlement) reasonably incurred or suffered by such indemnitee in connection therewith; provided, however, that, except as provided in Section 3 of this ARTICLE V with respect to proceedings to enforce rights to indemnification, the Corporation shall indemnify any such indemnitee in connection with a proceeding (or part thereof) initiated by such indemnitee only if such proceeding (or part thereof) was authorized by the Director of the Corporation.

Section 2.    Right to Advancement of Expenses.

In addition to the right to indemnification conferred in Section 1 of this ARTICLE

V, an indemnitee shall also have the right to be paid by the Corporation the expenses (including attorney's fees) incurred in defending any such proceeding in advance of its final disposition (hereinafter an "advancement of expenses"); provided, however, that, if the Delaware General Corporation Law requires, an advancement of expenses incurred by an indemnitee in his or her capacity as a director or officer (and not in any other capacity in which service was or is rendered by such indemnitee, including, without limitation, service to an employee benefit plan) shall be made only upon delivery to the Corporation of an undertaking (hereinafter an "undertaking"), by or on behalf of such indemnitee, to repay all amounts so advanced if it shall ultimately be determined by final judicial decision from which there is no further right to appeal (hereinafter a "final adjudication") that such indemnitee is not entitled to be indemnified for such expenses under this Section 2 or otherwise.

<div align="center">Section 3.    Right of Indemnitee to Bring Suit.</div>

If a claim under Section 1 or 2 of this ARTICLE V is not paid in full by the Corporation within 60 days after a written claim has been received by the Corporation, except in the case of a claim for an advancement of expenses, in which case the applicable period shall be 20 days, the indemnitee may at any time thereafter bring suit against the Corporation to recover the unpaid amount of the claim. To the fullest extent permitted by law, if successful in whole or in part in any such suit, or in a suit brought by the Corporation to recover an advancement of expenses pursuant to the terms of an undertaking, the indemnitee shall be entitled to be paid also the expense of prosecuting or defending such suit. In (i) any suit brought by the indemnitee to enforce a right to indemnification hereunder (but not in a suit brought by the indemnitee to enforce a right to an advancement of expenses) it shall be a defense that, and (ii) in any suit brought by the Corporation to recover an advancement of expenses pursuant to the terms of an undertaking, the Corporation shall be entitled to recover such expenses upon a final adjudication that, the indemnitee has not met any applicable standard for indemnification set forth in the Delaware General Corporation Law. Neither the failure of the Corporation (including its directors who are not parties to such action, a committee of such directors, independent legal counsel, or its shareholders) to have made a determination prior to the commencement of such suit that indemnification of the indemnitee is proper in the circumstances because the indemnitee has met the applicable standard of conduct set forth in the Delaware General Corporation Law, nor an actual determination by the Corporation (including its directors who are not parties to such action, a committee of such directors, independent legal counsel, or its shareholders) that the indemnitee has not met such applicable standard of conduct, shall create a presumption that the indemnitee has not met the applicable standard of conduct or, in the case of such a suit brought by the indemnitee, be a defense to such suit. In any suit brought by the indemnitee to enforce a right to indemnification or to an advancement of expenses hereunder, or brought by the Corporation to recover an advancement of expenses pursuant to the terms of an undertaking, the burden of proving that the indemnitee is not entitled to be indemnified, or to such advancement of expenses, under this ARTICLE V or otherwise shall be on the Corporation.

<div align="center">Section 4.    Non-Exclusivity of Rights.</div>

The rights to indemnification and to the advancement of expenses conferred in this ARTICLE V shall not be exclusive of any other right which any person may have or hereafter acquire under any statute, the Corporation's Certificate of Incorporation, Bylaws,

agreement, vote of shareholders or disinterested directors or otherwise.

Section 5.    Insurance.

The Corporation may maintain insurance, at its expense, to protect itself and any director, officer, employee or agent of the Corporation or another corporation, partnership, joint venture, trust or other enterprise against any expense, liability or loss, whether or not the Corporation would have the power to indemnify such person against such expense, liability or loss under the Delaware General Corporation Law.

Section 6.    Indemnification of Employees and Agents of the Corporation.

The Corporation may, to the extent authorized from time to time by the Director, grant rights to indemnification and to the advancement of expenses to any employee or agent of the Corporation to the fullest extent of the provisions of this Article with respect to the indemnification and advancement of expenses of directors and officers of the Corporation.

Section 7.    Nature of Rights.

The rights conferred upon indemnitees in this ARTICLE V shall be contract rights and such rights shall continue as to an indemnitee who has ceased to be a director, officer or trustee and shall inure to the benefit of the indemnitee's heirs, executors and administrators.  Any amendment, alteration or repeal of this ARTICLE V that adversely affects any right of an indemnitee or its successors shall be prospective only and shall not limit, eliminate, or impair any such right with respect to any proceeding involving any occurrence or alleged occurrence of any action or omission to act that took place prior to such amendment, alteration or repeal.

## ARTICLE VI - AMENDMENTS

These Bylaws may be amended or repealed by the Director at any meeting or by the shareholders at any meeting.

# RESTATED CERTIFICATE

## OF

## INCORPORATION

## OF

## NORTHERN TELECOM INTERNATIONAL INC.

Northern Telecom International Inc., a corporation organized and existing under the laws of the State of Delaware (the "Corporation"), hereby certifies as follows:

A.  The name of the Corporation is Northern Telecom International Inc.  The Corporation's original Certificate of Incorporation was filed with the Secretary of State of the State of Delaware on August 2, 1982 (such original Certificate of Incorporation, as amended, the "Original Certificate of Incorporation").

B.  This Restated Certificate of Incorporation has been approved in accordance with Sections 245 and 303 of the Delaware General Corporation Law in furtherance of that certain order of the United States Bankruptcy Court for the District of Delaware dated [•], 2017 (the "Order") confirming the First Amended Joint Chapter 11 Plan of Nortel Networks Inc. and Certain of its Affiliated Debtors, approved by the Bankruptcy Court and dated as of [•], 2017 (as amended, restated or superseded from time to time, the "Amended Plan")[1] and this Restated Certificate of Incorporation is required by the Order.

C.  The Original Certificate of Incorporation is hereby amended and restated to read in its entirety as set forth below:

**FIRST:**  The name of the Corporation is Northern Telecom International Inc. (the "Corporation").

**SECOND:**  The address of the Corporation's registered office in the State of Delaware is at 1209 Orange Street, Wilmington, New Castle County, Delaware 19801.  The name of the Corporation's registered agent at such address is The Corporation Trust Company.

**THIRD:**  The nature of the business of the Corporation and the objects and purposes proposed to be transacted and carried on by it are the monetization, liquidation and distribution of the Corporation's assets in accordance with the Amended Plan, and any lawful act or activity for which corporations may be organized under the Delaware General Corporation Law.

---

[1]  Terms used, but not defined herein, shall have the meanings ascribed to them in the Amended Plan.

**FOURTH:** The total number of shares of stock which the Corporation is authorized to issue is ~~one thousa~~nd (1,000) shares of common stock, no par value.

Notwithstanding anything to the contrary herein, the Corporation shall in no event issue any non-voting equity securities in violation of chapter 11 of title 11 of the United States Code; provided, however, that the foregoing prohibition (i) will have no further force and effect beyond that required under Section 1123(a)(6) of the Bankruptcy Code, (ii) will have such force and effect, if any, only for so long as such Section 1123(a)(6) of the Bankruptcy Code is in effect and (iii) may be amended or eliminated in accordance with applicable law. The prohibition on the issuance of nonvoting equity securities is included in this Restated Certificate of Incorporation in compliance with Section 1123(a)(6) of the Bankruptcy Code (11 U.S.C. § 1123(a)(6)).

**FIFTH:** The sole director of the Corporation (the "Director") shall be the person appoint~~ed from~~ time to time by the sole shareholder, who on the Effective Date shall be Nortel Networks Inc., or such other entity as established by Nortel Networks Inc. in its reasonable business judgment to be the new sole shareholder in accordance with the Amended Plan.

The Director shall have the authority to exercise all of the corporate powers and to manage the business and affairs of the Corporation without requiring prior approval from the sole shareholder. Without limiting the generality of the foregoing, in accordance with the requirements of the Amended Plan and the terms of the plan administration agreement describing the powers, duties and rights of the Plan Administrator, approved by the Bankruptcy Court and dated as of [•], 2017 (as amended, restated or superseded from time to time, the "Plan Administration Agreement"), the Director, acting at the direction of the sole shareholder, may take and cause the Corporation to take any and all actions he or she deems appropriate in order to consummate the transactions contemplated in the Amended Plan, including, without limitation, selling or otherwise disposing of all assets of the Corporation and winding down the affairs of the Corporation without the affirmative vote of the sole shareholder. The Director, acting at the direction of the sole shareholder, may take and cause the Corporation to take any and all corporate actions without the affirmative vote of the sole shareholder, including to compromise and settle claims and causes of action of or against the Corporation and its estate, and to dissolve, merge or consolidate the Corporation with any other entity.

**SIXTH:** In furtherance and not in limitation of the powers conferred by the laws of the State of ~~Delawar~~e, the Director is expressly authorized to make, amend and repeal the by-laws.

**SEVENTH:** A director of the Corporation shall not be personally liable to the corpor~~ation or its sto~~ckholders for monetary damages for breach of fiduciary duty as a director, except for liability (i) for any breach of the director's duty of loyalty to the Corporation or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) under Section 174 of the Delaware General Corporation Law, or (iv) for any transaction from which the director derived an improper personal benefit. If the Delaware General Corporation Law is amended to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of the Corporation shall be eliminated or limited to the fullest extent permitted by the Delaware General Corporation Law, as so amended. Any repeal or modification of this provision shall not adversely affect any right or protection of a director of the Corporation existing at the time of such repeal or modification.

**EIGHTH:** The Corporation reserves the right to amend and repeal any provision contained in this Restated Certificate of Incorporation in the manner from time to time prescribed by the laws of the State of Delaware.  All rights herein conferred are granted subject to this reservation.

IN WITNESS WHEREOF, this Restated Certificate of Incorporation has been executed by its duly authorized officer this [•] day of February, 2017.

NORTHERN TELECOM INTERNATIONAL INC.

By: _____

Name: John J. Ray III

Title: President

# NORTHERN TELECOM INTERNATIONAL INC.

# BYLAWS

## ARTICLE I - DIRECTOR

**Section 1.**        **Number.**

The sole director of the Corporation (the "<u>Director</u>") shall be the person appointed from time to time by the sole shareholder, who on the Effective Date shall be Nortel Networks Inc., or such other entity as established by Nortel Networks Inc. in its reasonable business judgment to be the new sole shareholder in accordance with the Amended Plan.

**Section 2.**        **Powers of the Director.**

The Director shall have the authority to exercise all of the corporate powers and to manage the business and affairs of the Corporation without requiring prior approval from the sole shareholder.  Without limiting the generality of the foregoing, in accordance with the requirements of the Amended Plan and the terms of the plan administration agreement describing the powers, duties and rights of the Plan Administrator, approved by the Bankruptcy Court and dated as of [•], 2017 (as amended, restated or superseded from time to time, the "<u>Plan Administration Agreement</u>"), the Director, acting at the direction of the sole shareholder, may take and cause the Corporation to take any and all actions he or she deems appropriate in order to consummate the transactions contemplated in the Amended Plan, including, without limitation, selling or otherwise disposing of all assets of the Corporation and winding down the affairs of the Corporation without the affirmative vote of the sole shareholder.  The Director, acting at the direction of the sole shareholder, may take and cause the Corporation to take any and all corporate actions without the affirmative vote of the sole shareholder, including to compromise and settle claims and causes of action of or against the Corporation and its estate, and to dissolve, merge or consolidate the Corporation with any other entity.

**Section 3.**        **Vacancies.**

Any vacancy of the Director may be filled by the sole shareholder, who on the Effective Date shall be Nortel Networks Inc.

**Section 4**        **Compensation of Directors.**

The Director, as such, may receive, pursuant to resolution of the Board of Directors, fixed fees and other compensation for his or her services as director.

## ARTICLE II - OFFICERS

**Section 1.**        **Designation.**

The officers of the Corporation shall consist of a President, one or more Vice Presidents, a Secretary and a Treasurer and such other officers as may from time to time be

appointed by the Director.   Any number of offices may be held by the same person.

Section 2.   Appointment.   The Director may appoint all officers of the Corporation for whatever terms of office the Director deems appropriate or necessary.

Section 3.   Delegation of Authority.

The Director may from time to time delegate the powers or duties of any officer to any other officers or agents, notwithstanding any provision hereof.

Section 4.   Removal and Resignation.

Any officer of the Corporation may be removed at any time, with or without cause, by the Director.

Any officer may resign at any time by giving written notice to the Director.  Any such resignation shall take effect at the date of the receipt of such notice or at any later time specified therein, and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

Section 5.   Action with Respect to Securities of Other Corporations.

Unless otherwise directed by the Director, the President or any officer of the Corporation authorized by the President shall have power to vote and otherwise act on behalf of the Corporation, in person or by proxy, at any meeting of shareholders of or with respect to any action of shareholders of any other corporation in which this Corporation may hold securities and otherwise to exercise any and all rights and powers which this Corporation may possess by reason of its ownership of securities in such other corporation.

## ARTICLE III - STOCK

Section 1.   Certificates of Stock.

Each holder of stock represented by certificates shall be entitled to a certificate signed by, or in the name of the Corporation by, the President or a Vice President, and by the Secretary or an Assistant Secretary, or the Treasurer or an Assistant Treasurer, certifying the number of shares owned by him or her.  Any or all of the signatures on the certificate may be by facsimile.

## ARTICLE IV - MISCELLANEOUS

Section 1.   Facsimile Signatures.

In addition to the provisions for use of facsimile signatures elsewhere specifically authorized in these Bylaws, facsimile signatures of any officer or officers of the Corporation may be used whenever and as authorized by the Director.

- 2 -

Section 2.    Reliance upon Books, Reports and Records.

The Director, and each officer of the Corporation shall, in the performance of his or her duties, be fully protected in relying in good faith upon the books of account or other records of the Corporation and upon such information, opinions, reports or statements presented to the Corporation by any of its officers or employees, or committees of the Board of Directors so designated, or by any other person as to matters which such director or committee member reasonably believes are within such other person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Corporation.

Section 3.    Fiscal Year.

The fiscal year of the Corporation shall be as fixed by the Director.

Section 4.    Time Periods.

In applying any provision of these Bylaws which requires that an act be done or not be done a specified number of days prior to an event or that an act be done during a period of a specified number of days prior to an event, calendar days shall be used, the day of the doing of the act shall be excluded, and the day of the event shall be included.

## ARTICLE V - INDEMNIFICATION OF DIRECTORS AND OFFICERS

Section 1.    Right to Indemnification.

Each person who was or is made a party or is threatened to be made a party to or is otherwise involved in any action, suit or proceeding, whether civil, criminal, administrative or investigative (hereinafter a "proceeding"), by reason of the fact that he or she is or was a director or an officer of the Corporation or is or was serving at the request of the Corporation as a director, officer, or trustee of another corporation or of a partnership, joint venture, trust or other enterprise, including service with respect to an employee benefit plan (hereinafter an "indemnitee"), whether the basis of such proceeding is alleged action in an official capacity as a director, officer or trustee, or in any other capacity while serving as a director, officer or trustee, shall be indemnified and held harmless by the Corporation to the fullest extent permitted by Delaware law, as the same exists or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the Corporation to provide broader indemnification rights than such law permitted the Corporation to provide prior to such amendment), against all expense, liability and loss (including attorneys' fees, judgments, fines, ERISA excise taxes or penalties and amounts paid in settlement) reasonably incurred or suffered by such indemnitee in connection therewith; provided, however, that, except as provided in Section 3 of this ARTICLE V with respect to proceedings to enforce rights to indemnification, the Corporation shall indemnify any such indemnitee in connection with a proceeding (or part thereof) initiated by such indemnitee only if such proceeding (or part thereof) was authorized by the Director of the Corporation.

Section 2.    Right to Advancement of Expenses.

In addition to the right to indemnification conferred in Section 1 of this ARTICLE

V, an indemnitee shall also have the right to be paid by the Corporation the expenses (including attorney's fees) incurred in defending any such proceeding in advance of its final disposition (hereinafter an "advancement of expenses"); provided, however, that, if the Delaware General Corporation Law requires, an advancement of expenses incurred by an indemnitee in his or her capacity as a director or officer (and not in any other capacity in which service was or is rendered by such indemnitee, including, without limitation, service to an employee benefit plan) shall be made only upon delivery to the Corporation of an undertaking (hereinafter an "undertaking"), by or on behalf of such indemnitee, to repay all amounts so advanced if it shall ultimately be determined by final judicial decision from which there is no further right to appeal (hereinafter a "final adjudication") that such indemnitee is not entitled to be indemnified for such expenses under this Section 2 or otherwise.

Section 3.    Right of Indemnitee to Bring Suit.

If a claim under Section 1 or 2 of this ARTICLE V is not paid in full by the Corporation within 60 days after a written claim has been received by the Corporation, except in the case of a claim for an advancement of expenses, in which case the applicable period shall be 20 days, the indemnitee may at any time thereafter bring suit against the Corporation to recover the unpaid amount of the claim.  To the fullest extent permitted by law, if successful in whole or in part in any such suit, or in a suit brought by the Corporation to recover an advancement of expenses pursuant to the terms of an undertaking, the indemnitee shall be entitled to be paid also the expense of prosecuting or defending such suit.  In (i) any suit brought by the indemnitee to enforce a right to indemnification hereunder (but not in a suit brought by the indemnitee to enforce a right to an advancement of expenses) it shall be a defense that, and (ii) in any suit brought by the Corporation to recover an advancement of expenses pursuant to the terms of an undertaking, the Corporation shall be entitled to recover such expenses upon a final adjudication that, the indemnitee has not met any applicable standard for indemnification set forth in the Delaware General Corporation Law.    Neither the failure of the Corporation (including its directors who are not parties to such action, a committee of such directors, independent legal counsel, or its shareholders) to have made a determination prior to the commencement of such suit that indemnification of the indemnitee is proper in the circumstances because the indemnitee has met the applicable standard of conduct set forth in the Delaware General Corporation Law, nor an actual determination by the Corporation (including its directors who are not parties to such action, a committee of such directors, independent legal counsel, or its shareholders) that the indemnitee has not met such applicable standard of conduct, shall create a presumption that the indemnitee has not met the applicable standard of conduct or, in the case of such a suit brought by the indemnitee, be a defense to such suit.  In any suit brought by the indemnitee to enforce a right to indemnification or to an advancement of expenses hereunder, or brought by the Corporation to recover an advancement of expenses pursuant to the terms of an undertaking, the burden of proving that the indemnitee is not entitled to be indemnified, or to such advancement of expenses, under this ARTICLE V or otherwise shall be on the Corporation.

Section 4.    Non-Exclusivity of Rights.

The rights to indemnification and to the advancement of expenses conferred in this ARTICLE V shall not be exclusive of any other right which any person may have or hereafter acquire under any statute, the Corporation's Certificate of Incorporation, Bylaws,

agreement, vote of shareholders or disinterested directors or otherwise.

Section 5.    Insurance.

The Corporation may maintain insurance, at its expense, to protect itself and any director, officer, employee or agent of the Corporation or another corporation, partnership, joint venture, trust or other enterprise against any expense, liability or loss, whether or not the Corporation would have the power to indemnify such person against such expense, liability or loss under the Delaware General Corporation Law.

Section 6.    Indemnification of Employees and Agents of the Corporation.

The Corporation may, to the extent authorized from time to time by the Director, grant rights to indemnification and to the advancement of expenses to any employee or agent of the Corporation to the fullest extent of the provisions of this Article with respect to the indemnification and advancement of expenses of directors and officers of the Corporation.

Section 7.    Nature of Rights.

The rights conferred upon indemnitees in this ARTICLE V shall be contract rights and such rights shall continue as to an indemnitee who has ceased to be a director, officer or trustee and shall inure to the benefit of the indemnitee's heirs, executors and administrators.  Any amendment, alteration or repeal of this ARTICLE V that adversely affects any right of an indemnitee or its successors shall be prospective only and shall not limit, eliminate, or impair any such right with respect to any proceeding involving any occurrence or alleged occurrence of any action or omission to act that took place prior to such amendment, alteration or repeal.

## ARTICLE VI - AMENDMENTS

These Bylaws may be amended or repealed by the Director at any meeting or by the shareholders at any meeting.

# RESTATED CERTIFICATE

## OF

## INCORPORATION

## OF

## NORTEL ALTSYSTEMS INC.

Nortel Altsytems Inc., a corporation organized and existing under the laws of the State of Delaware (the "Corporation"), hereby certifies as follows:

A.    The name of the Corporation is Nortel Altsytems Inc.  The Corporation's original Certificate of Incorporation was filed with the Secretary of State of the State of Delaware on March 18, 1996 under the name Acteon Networks, Inc. (such original Certificate of Incorporation, as amended, the "Original Certificate of Incorporation").

B.    This Restated Certificate of Incorporation has been approved in accordance with Sections 245 and 303 of the Delaware General Corporation Law in furtherance of that certain order of the United States Bankruptcy Court for the District of Delaware dated [•], 2017 (the "Order") confirming the  First Amended Joint Chapter 11 Plan of Nortel Networks Inc. and Certain of its Affiliated Debtors, approved by the Bankruptcy Court and dated as of [•], 2017 (as amended, restated or superseded from time to time, the "Amended Plan")[1] and this Restated Certificate of Incorporation is required by the Order.

C.    The Original Certificate of Incorporation is hereby amended and restated to read in its entirety as set forth below:

**FIRST:**  The name of the Corporation is Nortel Altsytems Inc. (the "Corporation").

**SECOND:**  The address of the Corporation's registered office in the State of Delaware is at 1209 Orange Street, Wilmington, New Castle County, Delaware 19801.  The name of the Corporation's registered agent at such address is The Corporation Trust Company.

**THIRD:**  The nature of the business of the Corporation and the objects and purposes proposed to be transacted and carried on by it are the monetization, liquidation and distribution of the Corporation's assets in accordance with the Amended Plan, and any lawful act or activity for which corporations may be organized under the Delaware General Corporation Law.

---

[1]    Terms used, but not defined herein, shall have the meanings ascribed to them in the Amended Plan.

**FOURTH:** The total number of shares of stock which the Corporation is authorized to issue is one (1) share of common stock having a par value of $1.00.

Notwithstanding anything to the contrary herein, the Corporation shall in no event issue any non-voting equity securities in violation of chapter 11 of title 11 of the United States Code; provided, however, that the foregoing prohibition (i) will have no further force and effect beyond that required under Section 1123(a)(6) of the Bankruptcy Code, (ii) will have such force and effect, if any, only for so long as such Section 1123(a)(6) of the Bankruptcy Code is in effect and (iii) may be amended or eliminated in accordance with applicable law. The prohibition on the issuance of nonvoting equity securities is included in this Restated Certificate of Incorporation in compliance with Section 1123(a)(6) of the Bankruptcy Code (11 U.S.C. § 1123(a)(6)).

**FIFTH:** The sole director of the Corporation (the "Director") shall be the person appointed from time to time by the sole shareholder, who on the Effective Date shall be Greylock Partners, LLC, the bankruptcy plan administrator under the Amended Plan (as replaced, substituted or superseded from time to time, the "Plan Administrator") or such other entity as established by the Plan Administrator in its reasonable business judgment to be the new sole shareholder in accordance with the Amended Plan.

The Director shall have the authority to exercise all of the corporate powers and to manage the business and affairs of the Corporation without requiring prior approval from the sole shareholder. Without limiting the generality of the foregoing, in accordance with the requirements of the Amended Plan and the terms of the plan administration agreement describing the powers, duties and rights of the Plan Administrator, approved by the Bankruptcy Court and dated as of [•], 2017 (as amended, restated or superseded from time to time, the "Plan Administration Agreement"), the Director, acting at the direction of the sole shareholder, may take and cause the Corporation to take any and all actions he or she deems appropriate in order to consummate the transactions contemplated in the Amended Plan, including, without limitation, selling or otherwise disposing of all assets of the Corporation and winding down the affairs of the Corporation without the affirmative vote of the sole shareholder. The Director, acting at the direction of the sole shareholder, may take and cause the Corporation to take any and all corporate actions without the affirmative vote of the sole shareholder, including to compromise and settle claims and causes of action of or against the Corporation and its estate, and to dissolve, merge or consolidate the Corporation with any other entity.

**SIXTH:** In furtherance and not in limitation of the powers conferred by the laws of the State of Delaware, the Director is expressly authorized to make, amend and repeal the by-laws.

**SEVENTH:** A director of the Corporation shall not be personally liable to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, except for liability (i) for any breach of the director's duty of loyalty to the Corporation or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) under Section 174 of the Delaware General Corporation Law, or (iv) for any transaction from which the director derived an improper personal benefit. If the Delaware General Corporation Law is amended to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of the Corporation shall be eliminated or limited to the fullest extent permitted by the Delaware General Corporation Law, as so amended. Any repeal or modification of this provision shall not

adversely affect any right or protection of a director of the Corporation existing at the time of such repeal or modification.

**EIGHTH:** The Corporation reserves the right to amend and repeal any provision contained in this Restated Certificate of Incorporation in the manner from time to time prescribed by the laws of the State of Delaware.  All rights herein conferred are granted subject to this reservation.

IN WITNESS WHEREOF, this Restated Certificate of Incorporation has been executed by its duly authorized officer this [•] day of February, 2017.

NORTEL ALTSYSTEMS INC.

By: _____

Name: John J. Ray III

Title: President

# NORTEL ALTSYSTEMS INC.

# BYLAWS

## ARTICLE I - DIRECTOR

Section 1.        Number.

The sole director of the Corporation (the "Director") shall be the person appointed from time to time by the sole shareholder, who on the Effective Date shall be Greylock Partners, LLC, the bankruptcy plan administrator under the Amended Plan (as replaced, substituted or superseded from time to time, the "Plan Administrator") or such other entity as established by the Plan Administrator in its reasonable business judgment to be the new sole shareholder in accordance with the Amended Plan.

Section 2.        Powers of the Director.

The Director shall have the authority to exercise all of the corporate powers and to manage the business and affairs of the Corporation without requiring prior approval from the sole shareholder.  Without limiting the generality of the foregoing, in accordance with the requirements of the Amended Plan and the terms of the plan administration agreement describing the powers, duties and rights of the Plan Administrator, approved by the Bankruptcy Court and dated as of [•], 2017 (as amended, restated or superseded from time to time, the "Plan Administration Agreement"), the Director, acting at the direction of the sole shareholder, may take and cause the Corporation to take any and all actions he or she deems appropriate in order to consummate the transactions contemplated in the Amended Plan, including, without limitation, selling or otherwise disposing of all assets of the Corporation and winding down the affairs of the Corporation without the affirmative vote of the sole shareholder.  The Director, acting at the direction of the sole shareholder, may take and cause the Corporation to take any and all corporate actions without the affirmative vote of the sole shareholder, including to compromise and settle claims and causes of action of or against the Corporation and its estate, and to dissolve, merge or consolidate the Corporation with any other entity.

Section 3.        Vacancies.

Any vacancy of the Director may be filled by the sole shareholder, who on the Effective Date shall be the Plan Administrator.

Section 4        Compensation of Directors.

The Director, as such, may receive, pursuant to resolution of the Board of Directors, fixed fees and other compensation for his or her services as director.

## ARTICLE II - OFFICERS

Section 1.    Designation.

The officers of the Corporation shall consist of a President, one or more Vice Presidents, a Secretary and a Treasurer and such other officers as may from time to time be appointed by the Director.    Any number of offices may be held by the same person.

Section 2.    Appointment.    The Director may appoint all officers of the Corporation for whatever terms of office the Director deems appropriate or necessary.

Section 3.    Delegation of Authority.

The Director may from time to time delegate the powers or duties of any officer to any other officers or agents, notwithstanding any provision hereof.

Section 4.    Removal and Resignation.

Any officer of the Corporation may be removed at any time, with or without cause, by the Director.

Any officer may resign at any time by giving written notice to the Director.  Any such resignation shall take effect at the date of the receipt of such notice or at any later time specified therein, and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

Section 5.    Action with Respect to Securities of Other Corporations.

Unless otherwise directed by the Director, the President or any officer of the Corporation authorized by the President shall have power to vote and otherwise act on behalf of the Corporation, in person or by proxy, at any meeting of shareholders of or with respect to any action of shareholders of any other corporation in which this Corporation may hold securities and otherwise to exercise any and all rights and powers which this Corporation may possess by reason of its ownership of securities in such other corporation.

## ARTICLE III - STOCK

Section 1.    Certificates of Stock.

Each holder of stock represented by certificates shall be entitled to a certificate signed by, or in the name of the Corporation by, the President or a Vice President, and by the Secretary or an Assistant Secretary, or the Treasurer or an Assistant Treasurer, certifying the number of shares owned by him or her.  Any or all of the signatures on the certificate may be by facsimile.

## ARTICLE IV - MISCELLANEOUS

Section 1.    Facsimile Signatures.

In addition to the provisions for use of facsimile signatures elsewhere specifically authorized in these Bylaws, facsimile signatures of any officer or officers of the Corporation may be used whenever and as authorized by the Director.

Section 2.    Reliance upon Books, Reports and Records.

The Director, and each officer of the Corporation shall, in the performance of his or her duties, be fully protected in relying in good faith upon the books of account or other records of the Corporation and upon such information, opinions, reports or statements presented to the Corporation by any of its officers or employees, or committees of the Board of Directors so designated, or by any other person as to matters which such director or committee member reasonably believes are within such other person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Corporation.

Section 3.    Fiscal Year.

The fiscal year of the Corporation shall be as fixed by the Director.

Section 4.    Time Periods.

In applying any provision of these Bylaws which requires that an act be done or not be done a specified number of days prior to an event or that an act be done during a period of a specified number of days prior to an event, calendar days shall be used, the day of the doing of the act shall be excluded, and the day of the event shall be included.

## ARTICLE V - INDEMNIFICATION OF DIRECTORS AND OFFICERS

Section 1.    Right to Indemnification.

Each person who was or is made a party or is threatened to be made a party to or is otherwise involved in any action, suit or proceeding, whether civil, criminal, administrative or investigative (hereinafter a "proceeding"), by reason of the fact that he or she is or was a director or an officer of the Corporation or is or was serving at the request of the Corporation as a director, officer, or trustee of another corporation or of a partnership, joint venture, trust or other enterprise, including service with respect to an employee benefit plan (hereinafter an "indemnitee"), whether the basis of such proceeding is alleged action in an official capacity as a director, officer or trustee, or in any other capacity while serving as a director, officer or trustee, shall be indemnified and held harmless by the Corporation to the fullest extent permitted by Delaware law, as the same exists or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the Corporation to provide broader indemnification rights than such law permitted the Corporation to provide prior to such amendment), against all expense, liability and loss (including attorneys' fees, judgments, fines, ERISA excise taxes or penalties and amounts paid in settlement) reasonably incurred or suffered by such indemnitee in connection therewith; provided, however, that, except as provided in

- 3 -

Section 3 of this ARTICLE V with respect to proceedings to enforce rights to indemnification, the Corporation shall indemnify any such indemnitee in connection with a proceeding (or part thereof) initiated by such indemnitee only if such proceeding (or part thereof) was authorized by the Director of the Corporation.

Section 2.    Right to Advancement of Expenses.

In addition to the right to indemnification conferred in Section 1 of this ARTICLE V, an indemnitee shall also have the right to be paid by the Corporation the expenses (including attorney's fees) incurred in defending any such proceeding in advance of its final disposition (hereinafter an "advancement of expenses"); provided, however, that, if the Delaware General Corporation Law requires, an advancement of expenses incurred by an indemnitee in his or her capacity as a director or officer (and not in any other capacity in which service was or is rendered by such indemnitee, including, without limitation, service to an employee benefit plan) shall be made only upon delivery to the Corporation of an undertaking (hereinafter an "undertaking"), by or on behalf of such indemnitee, to repay all amounts so advanced if it shall ultimately be determined by final judicial decision from which there is no further right to appeal (hereinafter a "final adjudication") that such indemnitee is not entitled to be indemnified for such expenses under this Section 2 or otherwise.

Section 3.    Right of Indemnitee to Bring Suit.

If a claim under Section 1 or 2 of this ARTICLE V is not paid in full by the Corporation within 60 days after a written claim has been received by the Corporation, except in the case of a claim for an advancement of expenses, in which case the applicable period shall be 20 days, the indemnitee may at any time thereafter bring suit against the Corporation to recover the unpaid amount of the claim. To the fullest extent permitted by law, if successful in whole or in part in any such suit, or in a suit brought by the Corporation to recover an advancement of expenses pursuant to the terms of an undertaking, the indemnitee shall be entitled to be paid also the expense of prosecuting or defending such suit. In (i) any suit brought by the indemnitee to enforce a right to indemnification hereunder (but not in a suit brought by the indemnitee to enforce a right to an advancement of expenses) it shall be a defense that, and (ii) in any suit brought by the Corporation to recover an advancement of expenses pursuant to the terms of an undertaking, the Corporation shall be entitled to recover such expenses upon a final adjudication that, the indemnitee has not met any applicable standard for indemnification set forth in the Delaware General Corporation Law. Neither the failure of the Corporation (including its directors who are not parties to such action, a committee of such directors, independent legal counsel, or its shareholders) to have made a determination prior to the commencement of such suit that indemnification of the indemnitee is proper in the circumstances because the indemnitee has met the applicable standard of conduct set forth in the Delaware General Corporation Law, nor an actual determination by the Corporation (including its directors who are not parties to such action, a committee of such directors, independent legal counsel, or its shareholders) that the indemnitee has not met such applicable standard of conduct, shall create a presumption that the indemnitee has not met the applicable standard of conduct or, in the case of such a suit brought by the indemnitee, be a defense to such suit. In any suit brought by the indemnitee to enforce a right to indemnification or to an advancement of expenses hereunder, or brought by the Corporation to recover an advancement of expenses pursuant to the terms of an undertaking, the

burden of proving that the indemnitee is not entitled to be indemnified, or to such advancement of expenses, under this ARTICLE V or otherwise shall be on the Corporation.

Section 4.    Non-Exclusivity of Rights.

The rights to indemnification and to the advancement of expenses conferred in this ARTICLE V shall not be exclusive of any other right which any person may have or hereafter acquire under any statute, the Corporation's Certificate of Incorporation, Bylaws, agreement, vote of shareholders or disinterested directors or otherwise.

Section 5.    Insurance.

The Corporation may maintain insurance, at its expense, to protect itself and any director, officer, employee or agent of the Corporation or another corporation, partnership, joint venture, trust or other enterprise against any expense, liability or loss, whether or not the Corporation would have the power to indemnify such person against such expense, liability or loss under the Delaware General Corporation Law.

Section 6.    Indemnification of Employees and Agents of the Corporation.

The Corporation may, to the extent authorized from time to time by the Director, grant rights to indemnification and to the advancement of expenses to any employee or agent of the Corporation to the fullest extent of the provisions of this Article with respect to the indemnification and advancement of expenses of directors and officers of the Corporation.

Section 7.    Nature of Rights.

The rights conferred upon indemnitees in this ARTICLE V shall be contract rights and such rights shall continue as to an indemnitee who has ceased to be a director, officer or trustee and shall inure to the benefit of the indemnitee's heirs, executors and administrators.  Any amendment, alteration or repeal of this ARTICLE V that adversely affects any right of an indemnitee or its successors shall be prospective only and shall not limit, eliminate, or impair any such right with respect to any proceeding involving any occurrence or alleged occurrence of any action or omission to act that took place prior to such amendment, alteration or repeal.

ARTICLE VI - AMENDMENTS

These Bylaws may be amended or repealed by the Director at any meeting or by the shareholders at any meeting.

# RESTATED CERTIFICATE

## OF

## INCORPORATION

## OF

## NORTEL NETWORKS CABLE SOLUTIONS INC.

Nortel Networks Cable Solutions Inc., a corporation organized and existing under the laws of the State of Delaware (the "Corporation"), hereby certifies as follows:

A.  The name of the Corporation is Nortel Networks Cable Solutions Inc.  The Corporation's original Certificate of Incorporation was filed with the Secretary of State of the State of Delaware on February 24, 2000 (such original Certificate of Incorporation, as amended, the "Original Certificate of Incorporation").

B.  This Restated Certificate of Incorporation has been approved in accordance with Sections 245 and 303 of the Delaware General Corporation Law in furtherance of that certain order of the United States Bankruptcy Court for the District of Delaware dated [•], 2017 (the "Order") confirming the First Amended Joint Chapter 11 Plan of Nortel Networks Inc. and Certain of its Affiliated Debtors, approved by the Bankruptcy Court and dated as of [•], 2017 (as amended, restated or superseded from time to time, the "Amended Plan")[1] and this Restated Certificate of Incorporation is required by the Order.

C.  The Original Certificate of Incorporation is hereby amended and restated to read in its entirety as set forth below:

**FIRST:** The name of the Corporation is Nortel Networks Cable Solutions Inc. (the "Corporation").

**SECOND:** The address of the Corporation's registered office in the State of Delaware is at 1209 Orange Street, Wilmington, New Castle County, Delaware 19801.  The name of the Corporation's registered agent at such address is The Corporation Trust Company.

**THIRD:** The nature of the business of the Corporation and the objects and purposes proposed to be transacted and carried on by it are the monetization, liquidation and distribution of the Corporation's assets in accordance with the Amended Plan, and any lawful act or activity for which corporations may be organized under the Delaware General Corporation Law.

---

[1]  Terms used, but not defined herein, shall have the meanings ascribed to them in the Amended Plan.

**FOURTH:** The total number of shares of stock which the Corporation is authorized to issue is one thousand (1,000) shares without par value.

Notwithstanding anything to the contrary herein, the Corporation shall in no event issue any non-voting equity securities in violation of chapter 11 of title 11 of the United States Code; provided, however, that the foregoing prohibition (i) will have no further force and effect beyond that required under Section 1123(a)(6) of the Bankruptcy Code, (ii) will have such force and effect, if any, only for so long as such Section 1123(a)(6) of the Bankruptcy Code is in effect and (iii) may be amended or eliminated in accordance with applicable law. The prohibition on the issuance of nonvoting equity securities is included in this Restated Certificate of Incorporation in compliance with Section 1123(a)(6) of the Bankruptcy Code (11 U.S.C. § 1123(a)(6)).

**FIFTH:** The sole director of the Corporation (the "Director") shall be the person appointed from time to time by the sole shareholder, who on the Effective Date shall be Nortel Networks Inc., or such other entity as established by Nortel Networks Inc. in its reasonable business judgment to be the new sole shareholder in accordance with the Amended Plan.

The Director shall have the authority to exercise all of the corporate powers and to manage the business and affairs of the Corporation without requiring prior approval from the sole shareholder.  Without limiting the generality of the foregoing, in accordance with the requirements of the Amended Plan and the terms of the plan administration agreement describing the powers, duties and rights of the Plan Administrator, approved by the Bankruptcy Court and dated as of [•], 2017 (as amended, restated or superseded from time to time, the "Plan Administration Agreement"), the Director, acting at the direction of the sole shareholder, may take and cause the Corporation to take any and all actions he or she deems appropriate in order to consummate the transactions contemplated in the Amended Plan, including, without limitation, selling or otherwise disposing of all assets of the Corporation and winding down the affairs of the Corporation without the affirmative vote of the sole shareholder.  The Director, acting at the direction of the sole shareholder, may take and cause the Corporation to take any and all corporate actions without the affirmative vote of the sole shareholder, including to compromise and settle claims and causes of action of or against the Corporation and its estate, and to dissolve, merge or consolidate the Corporation with any other entity.

**SIXTH:** In furtherance and not in limitation of the powers conferred by the laws of the State of Delaware, the Director is expressly authorized to make, amend and repeal the by-laws.

**SEVENTH:** A director of the Corporation shall not be personally liable to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, except for liability (i) for any breach of the director's duty of loyalty to the Corporation or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) under Section 174 of the Delaware General Corporation Law, or (iv) for any transaction from which the director derived an improper personal benefit.  If the Delaware General Corporation Law is amended to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of the Corporation shall be eliminated or limited to the fullest extent permitted by the Delaware General Corporation Law, as so amended.  Any repeal or modification of this provision shall not adversely affect any right or protection of a director of the Corporation existing at the time of such repeal or modification.

**EIGHTH:** The Corporation reserves the right to amend and repeal any provision contained in this Restated Certificate of Incorporation in the manner from time to time prescribed by the laws of the State of Delaware.  All rights herein conferred are granted subject to this reservation.

IN WITNESS WHEREOF, this Restated Certificate of Incorporation has been executed by its duly authorized officer this [•] day of February, 2017.

NORTEL NETWORKS CABLE SOLUTIONS INC.

By: _____

Name: John J. Ray III

Title: President

# NORTEL NETWORKS CABLE SOLUTIONS INC.

# BYLAWS

## ARTICLE I - DIRECTOR

Section 1.        Number.

The sole director of the Corporation (the "Director") shall be the person appointed from time to time by the sole shareholder, who on the Effective Date shall be Nortel Networks Inc., or such other entity as established by Nortel Networks Inc. in its reasonable business judgment to be the new sole shareholder in accordance with the Amended Plan.

Section 2.        Powers of the Director.

The Director shall have the authority to exercise all of the corporate powers and to manage the business and affairs of the Corporation without requiring prior approval from the sole shareholder.  Without limiting the generality of the foregoing, in accordance with the requirements of the Amended Plan and the terms of the plan administration agreement describing the powers, duties and rights of the Plan Administrator, approved by the Bankruptcy Court and dated as of [•], 2017 (as amended, restated or superseded from time to time, the "Plan Administration Agreement"), the Director, acting at the direction of the sole shareholder, may take and cause the Corporation to take any and all actions he or she deems appropriate in order to consummate the transactions contemplated in the Amended Plan, including, without limitation, selling or otherwise disposing of all assets of the Corporation and winding down the affairs of the Corporation without the affirmative vote of the sole shareholder.  The Director, acting at the direction of the sole shareholder, may take and cause the Corporation to take any and all corporate actions without the affirmative vote of the sole shareholder, including to compromise and settle claims and causes of action of or against the Corporation and its estate, and to dissolve, merge or consolidate the Corporation with any other entity.

Section 3.        Vacancies.

Any vacancy of the Director may be filled by the sole shareholder, who on the Effective Date shall be Nortel Networks Inc.

Section 4        Compensation of Directors.

The Director, as such, may receive, pursuant to resolution of the Board of Directors, fixed fees and other compensation for his or her services as director.

## ARTICLE II - OFFICERS

Section 1.        Designation.

The officers of the Corporation shall consist of a President, one or more Vice Presidents, a Secretary and a Treasurer and such other officers as may from time to time be

appointed by the Director.    Any number of offices may be held by the same person.

          Section 2.    Appointment.    The Director may appoint all officers of the Corporation for whatever terms of office the Director deems appropriate or necessary.

          Section 3.    Delegation of Authority.

          The Director may from time to time delegate the powers or duties of any officer to any other officers or agents, notwithstanding any provision hereof.

          Section 4.    Removal and Resignation.

          Any officer of the Corporation may be removed at any time, with or without cause, by the Director.

          Any officer may resign at any time by giving written notice to the Director.  Any such resignation shall take effect at the date of the receipt of such notice or at any later time specified therein, and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

          Section 5.    Action with Respect to Securities of Other Corporations.

          Unless otherwise directed by the Director, the President or any officer of the Corporation authorized by the President shall have power to vote and otherwise act on behalf of the Corporation, in person or by proxy, at any meeting of shareholders of or with respect to any action of shareholders of any other corporation in which this Corporation may hold securities and otherwise to exercise any and all rights and powers which this Corporation may possess by reason of its ownership of securities in such other corporation.

## ARTICLE III - STOCK

          Section 1.    Certificates of Stock.

          Each holder of stock represented by certificates shall be entitled to a certificate signed by, or in the name of the Corporation by, the President or a Vice President, and by the Secretary or an Assistant Secretary, or the Treasurer or an Assistant Treasurer, certifying the number of shares owned by him or her.  Any or all of the signatures on the certificate may be by facsimile.

## ARTICLE IV - MISCELLANEOUS

          Section 1.    Facsimile Signatures.

          In addition to the provisions for use of facsimile signatures elsewhere specifically authorized in these Bylaws, facsimile signatures of any officer or officers of the Corporation may be used whenever and as authorized by the Director.

Section 2.    Reliance upon Books, Reports and Records.

The Director, and each officer of the Corporation shall, in the performance of his or her duties, be fully protected in relying in good faith upon the books of account or other records of the Corporation and upon such information, opinions, reports or statements presented to the Corporation by any of its officers or employees, or committees of the Board of Directors so designated, or by any other person as to matters which such director or committee member reasonably believes are within such other person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Corporation.

Section 3.    Fiscal Year.

The fiscal year of the Corporation shall be as fixed by the Director.

Section 4.    Time Periods.

In applying any provision of these Bylaws which requires that an act be done or not be done a specified number of days prior to an event or that an act be done during a period of a specified number of days prior to an event, calendar days shall be used, the day of the doing of the act shall be excluded, and the day of the event shall be included.

## ARTICLE V - INDEMNIFICATION OF DIRECTORS AND OFFICERS

Section 1.    Right to Indemnification.

Each person who was or is made a party or is threatened to be made a party to or is otherwise involved in any action, suit or proceeding, whether civil, criminal, administrative or investigative (hereinafter a "proceeding"), by reason of the fact that he or she is or was a director or an officer of the Corporation or is or was serving at the request of the Corporation as a director, officer, or trustee of another corporation or of a partnership, joint venture, trust or other enterprise, including service with respect to an employee benefit plan (hereinafter an "indemnitee"), whether the basis of such proceeding is alleged action in an official capacity as a director, officer or trustee, or in any other capacity while serving as a director, officer or trustee, shall be indemnified and held harmless by the Corporation to the fullest extent permitted by Delaware law, as the same exists or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the Corporation to provide broader indemnification rights than such law permitted the Corporation to provide prior to such amendment), against all expense, liability and loss (including attorneys' fees, judgments, fines, ERISA excise taxes or penalties and amounts paid in settlement) reasonably incurred or suffered by such indemnitee in connection therewith; provided, however, that, except as provided in Section 3 of this ARTICLE V with respect to proceedings to enforce rights to indemnification, the Corporation shall indemnify any such indemnitee in connection with a proceeding (or part thereof) initiated by such indemnitee only if such proceeding (or part thereof) was authorized by the Director of the Corporation.

Section 2.    Right to Advancement of Expenses.

In addition to the right to indemnification conferred in Section 1 of this ARTICLE

V, an indemnitee shall also have the right to be paid by the Corporation the expenses (including attorney's fees) incurred in defending any such proceeding in advance of its final disposition (hereinafter an "advancement of expenses"); provided, however, that, if the Delaware General Corporation Law requires, an advancement of expenses incurred by an indemnitee in his or her capacity as a director or officer (and not in any other capacity in which service was or is rendered by such indemnitee, including, without limitation, service to an employee benefit plan) shall be made only upon delivery to the Corporation of an undertaking (hereinafter an "undertaking"), by or on behalf of such indemnitee, to repay all amounts so advanced if it shall ultimately be determined by final judicial decision from which there is no further right to appeal (hereinafter a "final adjudication") that such indemnitee is not entitled to be indemnified for such expenses under this Section 2 or otherwise.

<div align="center">Section 3.    Right of Indemnitee to Bring Suit.</div>

If a claim under Section 1 or 2 of this ARTICLE V is not paid in full by the Corporation within 60 days after a written claim has been received by the Corporation, except in the case of a claim for an advancement of expenses, in which case the applicable period shall be 20 days, the indemnitee may at any time thereafter bring suit against the Corporation to recover the unpaid amount of the claim. To the fullest extent permitted by law, if successful in whole or in part in any such suit, or in a suit brought by the Corporation to recover an advancement of expenses pursuant to the terms of an undertaking, the indemnitee shall be entitled to be paid also the expense of prosecuting or defending such suit. In (i) any suit brought by the indemnitee to enforce a right to indemnification hereunder (but not in a suit brought by the indemnitee to enforce a right to an advancement of expenses) it shall be a defense that, and (ii) in any suit brought by the Corporation to recover an advancement of expenses pursuant to the terms of an undertaking, the Corporation shall be entitled to recover such expenses upon a final adjudication that, the indemnitee has not met any applicable standard for indemnification set forth in the Delaware General Corporation Law. Neither the failure of the Corporation (including its directors who are not parties to such action, a committee of such directors, independent legal counsel, or its shareholders) to have made a determination prior to the commencement of such suit that indemnification of the indemnitee is proper in the circumstances because the indemnitee has met the applicable standard of conduct set forth in the Delaware General Corporation Law, nor an actual determination by the Corporation (including its directors who are not parties to such action, a committee of such directors, independent legal counsel, or its shareholders) that the indemnitee has not met such applicable standard of conduct, shall create a presumption that the indemnitee has not met the applicable standard of conduct or, in the case of such a suit brought by the indemnitee, be a defense to such suit. In any suit brought by the indemnitee to enforce a right to indemnification or to an advancement of expenses hereunder, or brought by the Corporation to recover an advancement of expenses pursuant to the terms of an undertaking, the burden of proving that the indemnitee is not entitled to be indemnified, or to such advancement of expenses, under this ARTICLE V or otherwise shall be on the Corporation.

<div align="center">Section 4.    Non-Exclusivity of Rights.</div>

The rights to indemnification and to the advancement of expenses conferred in this ARTICLE V shall not be exclusive of any other right which any person may have or hereafter acquire under any statute, the Corporation's Certificate of Incorporation, Bylaws,

agreement, vote of shareholders or disinterested directors or otherwise.

Section 5.    Insurance.

The Corporation may maintain insurance, at its expense, to protect itself and any director, officer, employee or agent of the Corporation or another corporation, partnership, joint venture, trust or other enterprise against any expense, liability or loss, whether or not the Corporation would have the power to indemnify such person against such expense, liability or loss under the Delaware General Corporation Law.

Section 6.    Indemnification of Employees and Agents of the Corporation.

The Corporation may, to the extent authorized from time to time by the Director, grant rights to indemnification and to the advancement of expenses to any employee or agent of the Corporation to the fullest extent of the provisions of this Article with respect to the indemnification and advancement of expenses of directors and officers of the Corporation.

Section 7.    Nature of Rights.

The rights conferred upon indemnitees in this ARTICLE V shall be contract rights and such rights shall continue as to an indemnitee who has ceased to be a director, officer or trustee and shall inure to the benefit of the indemnitee's heirs, executors and administrators.  Any amendment, alteration or repeal of this ARTICLE V that adversely affects any right of an indemnitee or its successors shall be prospective only and shall not limit, eliminate, or impair any such right with respect to any proceeding involving any occurrence or alleged occurrence of any action or omission to act that took place prior to such amendment, alteration or repeal.

## ARTICLE VI - AMENDMENTS

These Bylaws may be amended or repealed by the Director at any meeting or by the shareholders at any meeting.

# RESTATED CERTIFICATE

## OF

## INCORPORATION

## OF

## NORTEL NETWORKS CAPITAL CORPORATION

Nortel Networks Capital Corporation, a corporation organized and existing under the laws of the State of Delaware (the "Corporation"), hereby certifies as follows:

A.  The name of the Corporation is Nortel Networks Capital Corporation. The Corporation's original Certificate of Incorporation was filed with the Secretary of State of the State of Delaware on February 1, 1996 under the name Northern Telecom Capital Corporation (such original Certificate of Incorporation, as amended, the "Original Certificate of Incorporation").

B.  This Restated Certificate of Incorporation has been approved in accordance with Sections 245 and 303 of the Delaware General Corporation Law in furtherance of that certain order of the United States Bankruptcy Court for the District of Delaware dated [•], 2017 (the "Order") confirming the First Amended Joint Chapter 11 Plan of Nortel Networks Inc. and Certain of its Affiliated Debtors, approved by the Bankruptcy Court and dated as of [•], 2017 (as amended, restated or superseded from time to time, the "Amended Plan")[1] and this Restated Certificate of Incorporation is required by the Order.

C.  The Original Certificate of Incorporation is hereby amended and restated to read in its entirety as set forth below:

**FIRST:** The name of the Corporation is Nortel Networks Capital Corporation (the "Corporation").

**SECOND:** The address of the Corporation's registered office in the State of Delaware is at 1209 Orange Street, Wilmington, New Castle County, Delaware 19801. The name of the Corporation's registered agent at such address is The Corporation Trust Company.

**THIRD:** The nature of the business of the Corporation and the objects and purposes proposed to be transacted and carried on by it are the monetization, liquidation and distribution of the Corporation's assets in accordance with the Amended Plan, and any lawful act or activity for which corporations may be organized under the Delaware General Corporation Law.

---

[1]  Terms used, but not defined herein, shall have the meanings ascribed to them in the Amended Plan.

**FOURTH:** The total number of shares of stock which the Corporation is authorized to issue is one thousand (1,000) shares without par value.

Notwithstanding anything to the contrary herein, the Corporation shall in no event issue any non-voting equity securities in violation of chapter 11 of title 11 of the United States Code; provided, however, that the foregoing prohibition (i) will have no further force and effect beyond that required under Section 1123(a)(6) of the Bankruptcy Code, (ii) will have such force and effect, if any, only for so long as such Section 1123(a)(6) of the Bankruptcy Code is in effect and (iii) may be amended or eliminated in accordance with applicable law. The prohibition on the issuance of nonvoting equity securities is included in this Restated Certificate of Incorporation in compliance with Section 1123(a)(6) of the Bankruptcy Code (11 U.S.C. § 1123(a)(6)).

**FIFTH:** The sole director of the Corporation (the "Director") shall be the person appointed from time to time by the sole shareholder, who on the Effective Date shall be Nortel Networks Inc., or such other entity as established by Nortel Networks Inc. in its reasonable business judgment to be the new sole shareholder in accordance with the Amended Plan.

The Director shall have the authority to exercise all of the corporate powers and to manage the business and affairs of the Corporation without requiring prior approval from the sole shareholder.  Without limiting the generality of the foregoing, in accordance with the requirements of the Amended Plan and the terms of the plan administration agreement describing the powers, duties and rights of the Plan Administrator, approved by the Bankruptcy Court and dated as of [•], 2017 (as amended, restated or superseded from time to time, the "Plan Administration Agreement"), the Director, acting at the direction of the sole shareholder, may take and cause the Corporation to take any and all actions he or she deems appropriate in order to consummate the transactions contemplated in the Amended Plan, including, without limitation, selling or otherwise disposing of all assets of the Corporation and winding down the affairs of the Corporation without the affirmative vote of the sole shareholder.  The Director, acting at the direction of the sole shareholder, may take and cause the Corporation to take any and all corporate actions without the affirmative vote of the sole shareholder, including to compromise and settle claims and causes of action of or against the Corporation and its estate, and to dissolve, merge or consolidate the Corporation with any other entity.

**SIXTH:** In furtherance and not in limitation of the powers conferred by the laws of the State of Delaware, the Director is expressly authorized to make, amend and repeal the by-laws.

**SEVENTH:** A director of the Corporation shall not be personally liable to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, except for liability (i) for any breach of the director's duty of loyalty to the Corporation or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) under Section 174 of the Delaware General Corporation Law, or (iv) for any transaction from which the director derived an improper personal benefit.  If the Delaware General Corporation Law is amended to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of the Corporation shall be eliminated or limited to the fullest extent permitted by the Delaware General Corporation Law, as so amended.   Any repeal or modification of this provision shall not adversely affect any right or protection of a director of the Corporation existing at the time of such repeal or modification.

**EIGHTH:** The Corporation reserves the right to amend and repeal any provision contained in this Restated Certificate of Incorporation in the manner from time to time prescribed by the laws of the State of Delaware.  All rights herein conferred are granted subject to this reservation.

IN WITNESS WHEREOF, this Restated Certificate of Incorporation has been executed by its duly authorized officer this [•] day of February, 2017.

NORTEL NETWORKS CAPITAL CORPORATION

By: _____

Name: John J. Ray III

Title: President

# NORTEL NETWORKS CAPITAL CORPORATION

# BYLAWS

## ARTICLE I - DIRECTOR

Section 1.        Number.

The sole director of the Corporation (the "Director") shall be the person appointed from time to time by the sole shareholder, who on the Effective Date shall be Nortel Networks Inc., or such other entity as established by Nortel Networks Inc. in its reasonable business judgment to be the new sole shareholder in accordance with the Amended Plan.

Section 2.        Powers of the Director.

The Director shall have the authority to exercise all of the corporate powers and to manage the business and affairs of the Corporation without requiring prior approval from the sole shareholder.   Without limiting the generality of the foregoing, in accordance with the requirements of the Amended Plan and the terms of the plan administration agreement describing the powers, duties and rights of the Plan Administrator, approved by the Bankruptcy Court and dated as of [•], 2017 (as amended, restated or superseded from time to time, the "Plan Administration Agreement"), the Director, acting at the direction of the sole shareholder, may take and cause the Corporation to take any and all actions he or she deems appropriate in order to consummate the transactions contemplated in the Amended Plan, including, without limitation, selling or otherwise disposing of all assets of the Corporation and winding down the affairs of the Corporation without the affirmative vote of the sole shareholder.  The Director, acting at the direction of the sole shareholder, may take and cause the Corporation to take any and all corporate actions without the affirmative vote of the sole shareholder, including to compromise and settle claims and causes of action of or against the Corporation and its estate, and to dissolve, merge or consolidate the Corporation with any other entity.

Section 3.        Vacancies.

Any vacancy of the Director may be filled by the sole shareholder, who on the Effective Date shall be Nortel Networks Inc.

Section 4        Compensation of Directors.

The Director, as such, may receive, pursuant to resolution of the Board of Directors, fixed fees and other compensation for his or her services as director.

## ARTICLE II - OFFICERS

Section 1.        Designation.

The officers of the Corporation shall consist of a President, one or more Vice Presidents, a Secretary and a Treasurer and such other officers as may from time to time be

appointed by the Director.    Any number of offices may be held by the same person.

Section 2.    Appointment.    The Director may appoint all officers of the Corporation for whatever terms of office the Director deems appropriate or necessary.

Section 3.    Delegation of Authority.

The Director may from time to time delegate the powers or duties of any officer to any other officers or agents, notwithstanding any provision hereof.

Section 4.    Removal and Resignation.

Any officer of the Corporation may be removed at any time, with or without cause, by the Director.

Any officer may resign at any time by giving written notice to the Director.  Any such resignation shall take effect at the date of the receipt of such notice or at any later time specified therein, and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

Section 5.    Action with Respect to Securities of Other Corporations.

Unless otherwise directed by the Director, the President or any officer of the Corporation authorized by the President shall have power to vote and otherwise act on behalf of the Corporation, in person or by proxy, at any meeting of shareholders of or with respect to any action of shareholders of any other corporation in which this Corporation may hold securities and otherwise to exercise any and all rights and powers which this Corporation may possess by reason of its ownership of securities in such other corporation.

ARTICLE III - STOCK

Section 1.    Certificates of Stock.

Each holder of stock represented by certificates shall be entitled to a certificate signed by, or in the name of the Corporation by, the President or a Vice President, and by the Secretary or an Assistant Secretary, or the Treasurer or an Assistant Treasurer, certifying the number of shares owned by him or her.  Any or all of the signatures on the certificate may be by facsimile.

ARTICLE IV - MISCELLANEOUS

Section 1.    Facsimile Signatures.

In addition to the provisions for use of facsimile signatures elsewhere specifically authorized in these Bylaws, facsimile signatures of any officer or officers of the Corporation may be used whenever and as authorized by the Director.

Section 2.        Reliance upon Books, Reports and Records.

The Director, and each officer of the Corporation shall, in the performance of his or her duties, be fully protected in relying in good faith upon the books of account or other records of the Corporation and upon such information, opinions, reports or statements presented to the Corporation by any of its officers or employees, or committees of the Board of Directors so designated, or by any other person as to matters which such director or committee member reasonably believes are within such other person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Corporation.

Section 3.        Fiscal Year.

The fiscal year of the Corporation shall be as fixed by the Director.

Section 4.        Time Periods.

In applying any provision of these Bylaws which requires that an act be done or not be done a specified number of days prior to an event or that an act be done during a period of a specified number of days prior to an event, calendar days shall be used, the day of the doing of the act shall be excluded, and the day of the event shall be included.

## ARTICLE V - INDEMNIFICATION OF DIRECTORS AND OFFICERS

Section 1.        Right to Indemnification.

Each person who was or is made a party or is threatened to be made a party to or is otherwise involved in any action, suit or proceeding, whether civil, criminal, administrative or investigative (hereinafter a "proceeding"), by reason of the fact that he or she is or was a director or an officer of the Corporation or is or was serving at the request of the Corporation as a director, officer, or trustee of another corporation or of a partnership, joint venture, trust or other enterprise, including service with respect to an employee benefit plan (hereinafter an "indemnitee"), whether the basis of such proceeding is alleged action in an official capacity as a director, officer or trustee, or in any other capacity while serving as a director, officer or trustee, shall be indemnified and held harmless by the Corporation to the fullest extent permitted by Delaware law, as the same exists or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the Corporation to provide broader indemnification rights than such law permitted the Corporation to provide prior to such amendment), against all expense, liability and loss (including attorneys' fees, judgments, fines, ERISA excise taxes or penalties and amounts paid in settlement) reasonably incurred or suffered by such indemnitee in connection therewith; provided, however, that, except as provided in Section 3 of this ARTICLE V with respect to proceedings to enforce rights to indemnification, the Corporation shall indemnify any such indemnitee in connection with a proceeding (or part thereof) initiated by such indemnitee only if such proceeding (or part thereof) was authorized by the Director of the Corporation.

Section 2.        Right to Advancement of Expenses.

In addition to the right to indemnification conferred in Section 1 of this ARTICLE

V, an indemnitee shall also have the right to be paid by the Corporation the expenses (including attorney's fees) incurred in defending any such proceeding in advance of its final disposition (hereinafter an "advancement of expenses"); provided, however, that, if the Delaware General Corporation Law requires, an advancement of expenses incurred by an indemnitee in his or her capacity as a director or officer (and not in any other capacity in which service was or is rendered by such indemnitee, including, without limitation, service to an employee benefit plan) shall be made only upon delivery to the Corporation of an undertaking (hereinafter an "undertaking"), by or on behalf of such indemnitee, to repay all amounts so advanced if it shall ultimately be determined by final judicial decision from which there is no further right to appeal (hereinafter a "final adjudication") that such indemnitee is not entitled to be indemnified for such expenses under this Section 2 or otherwise.

<div align="center">Section 3.        Right of Indemnitee to Bring Suit.</div>

If a claim under Section 1 or 2 of this ARTICLE V is not paid in full by the Corporation within 60 days after a written claim has been received by the Corporation, except in the case of a claim for an advancement of expenses, in which case the applicable period shall be 20 days, the indemnitee may at any time thereafter bring suit against the Corporation to recover the unpaid amount of the claim.  To the fullest extent permitted by law, if successful in whole or in part in any such suit, or in a suit brought by the Corporation to recover an advancement of expenses pursuant to the terms of an undertaking, the indemnitee shall be entitled to be paid also the expense of prosecuting or defending such suit.  In (i) any suit brought by the indemnitee to enforce a right to indemnification hereunder (but not in a suit brought by the indemnitee to enforce a right to an advancement of expenses) it shall be a defense that, and (ii) in any suit brought by the Corporation to recover an advancement of expenses pursuant to the terms of an undertaking, the Corporation shall be entitled to recover such expenses upon a final adjudication that, the indemnitee has not met any applicable standard for indemnification set forth in the Delaware General Corporation Law.  Neither the failure of the Corporation (including its directors who are not parties to such action, a committee of such directors, independent legal counsel, or its shareholders) to have made a determination prior to the commencement of such suit that indemnification of the indemnitee is proper in the circumstances because the indemnitee has met the applicable standard of conduct set forth in the Delaware General Corporation Law, nor an actual determination by the Corporation (including its directors who are not parties to such action, a committee of such directors, independent legal counsel, or its shareholders) that the indemnitee has not met such applicable standard of conduct, shall create a presumption that the indemnitee has not met the applicable standard of conduct or, in the case of such a suit brought by the indemnitee, be a defense to such suit.  In any suit brought by the indemnitee to enforce a right to indemnification or to an advancement of expenses hereunder, or brought by the Corporation to recover an advancement of expenses pursuant to the terms of an undertaking, the burden of proving that the indemnitee is not entitled to be indemnified, or to such advancement of expenses, under this ARTICLE V or otherwise shall be on the Corporation.

<div align="center">Section 4.        Non-Exclusivity of Rights.</div>

The rights to indemnification and to the advancement of expenses conferred in this ARTICLE V shall not be exclusive of any other right which any person may have or hereafter acquire under any statute, the Corporation's Certificate of Incorporation, Bylaws,

<div align="center">- 4 -</div>

agreement, vote of shareholders or disinterested directors or otherwise.

Section 5.    Insurance.

The Corporation may maintain insurance, at its expense, to protect itself and any director, officer, employee or agent of the Corporation or another corporation, partnership, joint venture, trust or other enterprise against any expense, liability or loss, whether or not the Corporation would have the power to indemnify such person against such expense, liability or loss under the Delaware General Corporation Law.

Section 6.    Indemnification of Employees and Agents of the Corporation.

The Corporation may, to the extent authorized from time to time by the Director, grant rights to indemnification and to the advancement of expenses to any employee or agent of the Corporation to the fullest extent of the provisions of this Article with respect to the indemnification and advancement of expenses of directors and officers of the Corporation.

Section 7.    Nature of Rights.

The rights conferred upon indemnitees in this ARTICLE V shall be contract rights and such rights shall continue as to an indemnitee who has ceased to be a director, officer or trustee and shall inure to the benefit of the indemnitee's heirs, executors and administrators. Any amendment, alteration or repeal of this ARTICLE V that adversely affects any right of an indemnitee or its successors shall be prospective only and shall not limit, eliminate, or impair any such right with respect to any proceeding involving any occurrence or alleged occurrence of any action or omission to act that took place prior to such amendment, alteration or repeal.

ARTICLE VI - AMENDMENTS

These Bylaws may be amended or repealed by the Director at any meeting or by the shareholders at any meeting.

- 5 -

# RESTATED CERTIFICATE

## OF

## INCORPORATION

## OF

## QTERA CORPORATION

Qtera Corporation, a corporation organized and existing under the laws of the State of Delaware (the "Corporation"), hereby certifies as follows:

A.    The name of the Corporation is Qtera Corporation.  The Corporation's original Certificate of Incorporation was filed with the Secretary of State of the State of Delaware on February 9, 1998 under the name Nextnet Technologies Corporation (such original Certificate of Incorporation, as amended, the "Original Certificate of Incorporation").

B.    This Restated Certificate of Incorporation has been approved in accordance with Sections 245 and 303 of the Delaware General Corporation Law in furtherance of that certain order of the United States Bankruptcy Court for the District of Delaware dated [•], 2017 (the "Order") confirming the  First Amended Joint Chapter 11 Plan of Nortel Networks Inc. and Certain of its Affiliated Debtors, approved by the Bankruptcy Court and dated as of [•], 2017 (as amended, restated or superseded from time to time, the "Amended Plan")[1] and this Restated Certificate of Incorporation is required by the Order.

C.    The Original Certificate of Incorporation is hereby amended and restated to read in its entirety as set forth below:

**FIRST:**  The name of the Corporation is Qtera Corporation (the "Corporation").

**SECOND:**  The address of the Corporation's registered office in the State of Delaware is at 1209 Orange Street, Wilmington, New Castle County, Delaware 19801.  The name of the Corporation's registered agent at such address is The Corporation Trust Company.

**THIRD:**  The nature of the business of the Corporation and the objects and purposes proposed to be transacted and carried on by it are the monetization, liquidation and distribution of the Corporation's assets in accordance with the Amended Plan, and any lawful act or activity for which corporations may be organized under the Delaware General Corporation Law.

---

[1]    Terms used, but not defined herein, shall have the meanings ascribed to them in the Amended Plan.

**FOURTH:** The total number of shares of all classes of capital stock that the Corporation shall have authority to issue is twenty•six million, five huírded thousand (26,500,000) shares that shall be designated "Common Stock" having $.001 par value per share.

Notwithstanding anything to the contrary herein, the Corporation shall in no event issue any non-voting equity securities in violation of chapter 11 of title 11 of the United States Code; provided, however, that the foregoing prohibition (i) will have no further force and effect beyond that required under Section 1123(a)(6) of the Bankruptcy Code, (ii) will have such force and effect, if any, only for so long as such Section 1123(a)(6) of the Bankruptcy Code is in effect and (iii) may be amended or eliminated in accordance with applicable law. The prohibition on the issuance of nonvoting equity securities is included in this Restated Certificate of Incorporation in compliance with Section 1123(a)(6) of the Bankruptcy Code (11 U.S.C. § 1123(a)(6)).

**FIFTH:** The sole director of the Corporation (the "Director") shall be the person appointed from time to time by the sole shareholder, who on the Effective Date shall be Nortel Networks Inc., or such other entity as established by Nortel Networks Inc. in its reasonable business judgment to be the new sole shareholder in accordance with the Amended Plan.

The Director shall have the authority to exercise all of the corporate powers and to manage the business and affairs of the Corporation without requiring prior approval from the sole shareholder.  Without limiting the generality of the foregoing, in accordance with the requirements of the Amended Plan and the terms of the plan administration agreement describing the powers, duties and rights of the Plan Administrator, approved by the Bankruptcy Court and dated as of [•], 2017 (as amended, restated or superseded from time to time, the "Plan Administration Agreement"), the Director, acting at the direction of the sole shareholder, may take and cause the Corporation to take any and all actions he or she deems appropriate in order to consummate the transactions contemplated in the Amended Plan, including, without limitation, selling or otherwise disposing of all assets of the Corporation and winding down the affairs of the Corporation without the affirmative vote of the sole shareholder.  The Director, acting at the direction of the sole shareholder, may take and cause the Corporation to take any and all corporate actions without the affirmative vote of the sole shareholder, including to compromise and settle claims and causes of action of or against the Corporation and its estate, and to dissolve, merge or consolidate the Corporation with any other entity.

**SIXTH:**  In furtherance and not in limitation of the powers conferred by the laws of the State of Delaware, the Director is expressly authorized to make, amend and repeal the by-laws.

**SEVENTH:** A director of the Corporation shall not be personally liable to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, except for liability (i) for any breach of the director's duty of loyalty to the Corporation or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) under Section 174 of the Delaware General Corporation Law, or (iv) for any transaction from which the director derived an improper personal benefit.  If the Delaware General Corporation Law is amended to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of the Corporation shall be eliminated or limited to the fullest extent permitted by the Delaware General Corporation Law, as so amended.  Any repeal or modification of this provision shall not

- 2 -

adversely affect any right or protection of a director of the Corporation existing at the time of such repeal or modification.

**EIGHTH:** The Corporation reserves the right to amend and repeal any provision contained in this Restated Certificate of Incorporation in the manner from time to time prescribed by the laws of the State of Delaware.  All rights herein conferred are granted subject to this reservation.

IN WITNESS WHEREOF, this Restated Certificate of Incorporation has been executed by its duly authorized officer this [•] day of February, 2017.

<div align="center">QTERA CORPORATION</div>

By: _____

      Name: John J. Ray III

      Title: President

# QTERA CORPORATION

# BYLAWS

## ARTICLE I - DIRECTOR

Section 1.        Number.

The sole director of the Corporation (the "Director") shall be the person appointed from time to time by the sole shareholder, who on the Effective Date shall be Nortel Networks Inc., or such other entity as established by Nortel Networks Inc. in its reasonable business judgment to be the new sole shareholder in accordance with the Amended Plan.

Section 2.        Powers of the Director.

The Director shall have the authority to exercise all of the corporate powers and to manage the business and affairs of the Corporation without requiring prior approval from the sole shareholder.  Without limiting the generality of the foregoing, in accordance with the requirements of the Amended Plan and the terms of the plan administration agreement describing the powers, duties and rights of the Plan Administrator, approved by the Bankruptcy Court and dated as of [•], 2017 (as amended, restated or superseded from time to time, the "Plan Administration Agreement"), the Director, acting at the direction of the sole shareholder, may take and cause the Corporation to take any and all actions he or she deems appropriate in order to consummate the transactions contemplated in the Amended Plan, including, without limitation, selling or otherwise disposing of all assets of the Corporation and winding down the affairs of the Corporation without the affirmative vote of the sole shareholder.  The Director, acting at the direction of the sole shareholder, may take and cause the Corporation to take any and all corporate actions without the affirmative vote of the sole shareholder, including to compromise and settle claims and causes of action of or against the Corporation and its estate, and to dissolve, merge or consolidate the Corporation with any other entity.

Section 3.        Vacancies.

Any vacancy of the Director may be filled by the sole shareholder, who on the Effective Date shall be Nortel Networks Inc.

Section 4        Compensation of Directors.

The Director, as such, may receive, pursuant to resolution of the Board of Directors, fixed fees and other compensation for his or her services as director.

## ARTICLE II - OFFICERS

Section 1.        Designation.

The officers of the Corporation shall consist of a President, one or more Vice Presidents, a Secretary and a Treasurer and such other officers as may from time to time be

appointed by the Director.    Any number of offices may be held by the same person.

Section 2.    Appointment.    The Director may appoint all officers of the Corporation for whatever terms of office the Director deems appropriate or necessary.

Section 3.    Delegation of Authority.

The Director may from time to time delegate the powers or duties of any officer to any other officers or agents, notwithstanding any provision hereof.

Section 4.    Removal and Resignation.

Any officer of the Corporation may be removed at any time, with or without cause, by the Director.

Any officer may resign at any time by giving written notice to the Director.  Any such resignation shall take effect at the date of the receipt of such notice or at any later time specified therein, and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

Section 5.    Action with Respect to Securities of Other Corporations.

Unless otherwise directed by the Director, the President or any officer of the Corporation authorized by the President shall have power to vote and otherwise act on behalf of the Corporation, in person or by proxy, at any meeting of shareholders of or with respect to any action of shareholders of any other corporation in which this Corporation may hold securities and otherwise to exercise any and all rights and powers which this Corporation may possess by reason of its ownership of securities in such other corporation.

## ARTICLE III - STOCK

Section 1.    Certificates of Stock.

Each holder of stock represented by certificates shall be entitled to a certificate signed by, or in the name of the Corporation by, the President or a Vice President, and by the Secretary or an Assistant Secretary, or the Treasurer or an Assistant Treasurer, certifying the number of shares owned by him or her.  Any or all of the signatures on the certificate may be by facsimile.

## ARTICLE IV - MISCELLANEOUS

Section 1.    Facsimile Signatures.

In addition to the provisions for use of facsimile signatures elsewhere specifically authorized in these Bylaws, facsimile signatures of any officer or officers of the Corporation may be used whenever and as authorized by the Director.

Section 2.      Reliance upon Books, Reports and Records.

The Director, and each officer of the Corporation shall, in the performance of his or her duties, be fully protected in relying in good faith upon the books of account or other records of the Corporation and upon such information, opinions, reports or statements presented to the Corporation by any of its officers or employees, or committees of the Board of Directors so designated, or by any other person as to matters which such director or committee member reasonably believes are within such other person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Corporation.

Section 3.      Fiscal Year.

The fiscal year of the Corporation shall be as fixed by the Director.

Section 4.      Time Periods.

In applying any provision of these Bylaws which requires that an act be done or not be done a specified number of days prior to an event or that an act be done during a period of a specified number of days prior to an event, calendar days shall be used, the day of the doing of the act shall be excluded, and the day of the event shall be included.

## ARTICLE V - INDEMNIFICATION OF DIRECTORS AND OFFICERS

Section 1.      Right to Indemnification.

Each person who was or is made a party or is threatened to be made a party to or is otherwise involved in any action, suit or proceeding, whether civil, criminal, administrative or investigative (hereinafter a "proceeding"), by reason of the fact that he or she is or was a director or an officer of the Corporation or is or was serving at the request of the Corporation as a director, officer, or trustee of another corporation or of a partnership, joint venture, trust or other enterprise, including service with respect to an employee benefit plan (hereinafter an "indemnitee"), whether the basis of such proceeding is alleged action in an official capacity as a director, officer or trustee, or in any other capacity while serving as a director, officer or trustee, shall be indemnified and held harmless by the Corporation to the fullest extent permitted by Delaware law, as the same exists or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the Corporation to provide broader indemnification rights than such law permitted the Corporation to provide prior to such amendment), against all expense, liability and loss (including attorneys' fees, judgments, fines, ERISA excise taxes or penalties and amounts paid in settlement) reasonably incurred or suffered by such indemnitee in connection therewith; provided, however, that, except as provided in Section 3 of this ARTICLE V with respect to proceedings to enforce rights to indemnification, the Corporation shall indemnify any such indemnitee in connection with a proceeding (or part thereof) initiated by such indemnitee only if such proceeding (or part thereof) was authorized by the Director of the Corporation.

Section 2.      Right to Advancement of Expenses.

In addition to the right to indemnification conferred in Section 1 of this ARTICLE

V, an indemnitee shall also have the right to be paid by the Corporation the expenses (including attorney's fees) incurred in defending any such proceeding in advance of its final disposition (hereinafter an "advancement of expenses"); provided, however, that, if the Delaware General Corporation Law requires, an advancement of expenses incurred by an indemnitee in his or her capacity as a director or officer (and not in any other capacity in which service was or is rendered by such indemnitee, including, without limitation, service to an employee benefit plan) shall be made only upon delivery to the Corporation of an undertaking (hereinafter an "undertaking"), by or on behalf of such indemnitee, to repay all amounts so advanced if it shall ultimately be determined by final judicial decision from which there is no further right to appeal (hereinafter a "final adjudication") that such indemnitee is not entitled to be indemnified for such expenses under this Section 2 or otherwise.

<div align="center">Section 3.    Right of Indemnitee to Bring Suit.</div>

If a claim under Section 1 or 2 of this ARTICLE V is not paid in full by the Corporation within 60 days after a written claim has been received by the Corporation, except in the case of a claim for an advancement of expenses, in which case the applicable period shall be 20 days, the indemnitee may at any time thereafter bring suit against the Corporation to recover the unpaid amount of the claim.  To the fullest extent permitted by law, if successful in whole or in part in any such suit, or in a suit brought by the Corporation to recover an advancement of expenses pursuant to the terms of an undertaking, the indemnitee shall be entitled to be paid also the expense of prosecuting or defending such suit.  In (i) any suit brought by the indemnitee to enforce a right to indemnification hereunder (but not in a suit brought by the indemnitee to enforce a right to an advancement of expenses) it shall be a defense that, and (ii) in any suit brought by the Corporation to recover an advancement of expenses pursuant to the terms of an undertaking, the Corporation shall be entitled to recover such expenses upon a final adjudication that, the indemnitee has not met any applicable standard for indemnification set forth in the Delaware General Corporation Law.    Neither the failure of the Corporation (including its directors who are not parties to such action, a committee of such directors, independent legal counsel, or its shareholders) to have made a determination prior to the commencement of such suit that indemnification of the indemnitee is proper in the circumstances because the indemnitee has met the applicable standard of conduct set forth in the Delaware General Corporation Law, nor an actual determination by the Corporation (including its directors who are not parties to such action, a committee of such directors, independent legal counsel, or its shareholders) that the indemnitee has not met such applicable standard of conduct, shall create a presumption that the indemnitee has not met the applicable standard of conduct or, in the case of such a suit brought by the indemnitee, be a defense to such suit.  In any suit brought by the indemnitee to enforce a right to indemnification or to an advancement of expenses hereunder, or brought by the Corporation to recover an advancement of expenses pursuant to the terms of an undertaking, the burden of proving that the indemnitee is not entitled to be indemnified, or to such advancement of expenses, under this ARTICLE V or otherwise shall be on the Corporation.

<div align="center">Section 4.    Non-Exclusivity of Rights.</div>

The rights to indemnification and to the advancement of expenses conferred in this ARTICLE V shall not be exclusive of any other right which any person may have or hereafter acquire under any statute, the Corporation's Certificate of Incorporation, Bylaws,

<div align="center">- 4 -</div>

agreement, vote of shareholders or disinterested directors or otherwise.

<u>Section 5</u>.        <u>Insurance</u>.

The Corporation may maintain insurance, at its expense, to protect itself and any director, officer, employee or agent of the Corporation or another corporation, partnership, joint venture, trust or other enterprise against any expense, liability or loss, whether or not the Corporation would have the power to indemnify such person against such expense, liability or loss under the Delaware General Corporation Law.

<u>Section 6</u>.        <u>Indemnification of Employees and Agents of the Corporation</u>.

The Corporation may, to the extent authorized from time to time by the Director, grant rights to indemnification and to the advancement of expenses to any employee or agent of the Corporation to the fullest extent of the provisions of this Article with respect to the indemnification and advancement of expenses of directors and officers of the Corporation.

<u>Section 7</u>.        <u>Nature of Rights</u>.

The rights conferred upon indemnitees in this ARTICLE V shall be contract rights and such rights shall continue as to an indemnitee who has ceased to be a director, officer or trustee and shall inure to the benefit of the indemnitee's heirs, executors and administrators.  Any amendment, alteration or repeal of this ARTICLE V that adversely affects any right of an indemnitee or its successors shall be prospective only and shall not limit, eliminate, or impair any such right with respect to any proceeding involving any occurrence or alleged occurrence of any action or omission to act that took place prior to such amendment, alteration or repeal.

<u>ARTICLE VI - AMENDMENTS</u>

These Bylaws may be amended or repealed by the Director at any meeting or by the shareholders at any meeting.

# RESTATED CERTIFICATE

## OF

## INCORPORATION

## OF

## XROS, INC.

Xros, Inc., a corporation organized and existing under the laws of the State of Delaware (the "Corporation"), hereby certifies as follows:

A.    The name of the Corporation is Xros, Inc.  The Corporation's original Certificate of Incorporation was filed with the Secretary of State of the State of Delaware on December 10, 1996 (such original Certificate of Incorporation, as amended, the "Original Certificate of Incorporation").

B.    This Restated Certificate of Incorporation has been approved in accordance with Sections 245 and 303 of the Delaware General Corporation Law in furtherance of that certain order of the United States Bankruptcy Court for the District of Delaware dated [•], 2017 (the "Order") confirming the  First Amended Joint Chapter 11 Plan of Nortel Networks Inc. and Certain of its Affiliated Debtors, approved by the Bankruptcy Court and dated as of [•], 2017 (as amended, restated or superseded from time to time, the "Amended Plan")[1] and this Restated Certificate of Incorporation is required by the Order.

C.    The Original Certificate of Incorporation is hereby amended and restated to read in its entirety as set forth below:

**FIRST:**  The name of the Corporation is Xros, Inc. (the "Corporation").

**SECOND:**  The address of the Corporation's registered office in the State of Delaware is at 1209 Orange Street, Wilmington, New Castle County, Delaware 19801.  The name of the Corporation's registered agent at such address is The Corporation Trust Company.

**THIRD:**  The nature of the business of the Corporation and the objects and purposes proposed to be transacted and carried on by it are the monetization, liquidation and distribution of the Corporation's assets in accordance with the Amended Plan, and any lawful act or activity for which corporations may be organized under the Delaware General Corporation Law.

**FOURTH:** The total number of shares of stock which the Corporation is authorized to issue is one (1) share of common stock having a par value of $1.00.

---

[1]    Terms used, but not defined herein, shall have the meanings ascribed to them in the Amended Plan.

Notwithstanding anything to the contrary herein, the Corporation shall in no event issue any non-voting equity securities in violation of chapter 11 of title 11 of the United States Code; provided, however, that the foregoing prohibition (i) will have no further force and effect beyond that required under Section 1123(a)(6) of the Bankruptcy Code, (ii) will have such force and effect, if any, only for so long as such Section 1123(a)(6) of the Bankruptcy Code is in effect and (iii) may be amended or eliminated in accordance with applicable law. The prohibition on the issuance of nonvoting equity securities is included in this Restated Certificate of Incorporation in compliance with Section 1123(a)(6) of the Bankruptcy Code (11 U.S.C. § 1123(a)(6)).

**FIFTH:** The sole director of the Corporation (the "Director") shall be the person appointed from time to time by the sole shareholder, who on the Effective Date shall be Greylock Partners, LLC, the bankruptcy plan administrator under the Amended Plan (as replaced, substituted or superseded from time to time, the "Plan Administrator") or such other entity as established by the Plan Administrator in its reasonable business judgment to be the new sole shareholder in accordance with the Amended Plan.

The Director shall have the authority to exercise all of the corporate powers and to manage the business and affairs of the Corporation without requiring prior approval from the sole shareholder. Without limiting the generality of the foregoing, in accordance with the requirements of the Amended Plan and the terms of the plan administration agreement describing the powers, duties and rights of the Plan Administrator, approved by the Bankruptcy Court and dated as of [•], 2017 (as amended, restated or superseded from time to time, the "Plan Administration Agreement"), the Director, acting at the direction of the sole shareholder, may take and cause the Corporation to take any and all actions he or she deems appropriate in order to consummate the transactions contemplated in the Amended Plan, including, without limitation, selling or otherwise disposing of all assets of the Corporation and winding down the affairs of the Corporation without the affirmative vote of the sole shareholder. The Director, acting at the direction of the sole shareholder, may take and cause the Corporation to take any and all corporate actions without the affirmative vote of the sole shareholder, including to compromise and settle claims and causes of action of or against the Corporation and its estate, and to dissolve, merge or consolidate the Corporation with any other entity.

**SIXTH:** In furtherance and not in limitation of the powers conferred by the laws of the State of Delaware, the Director is expressly authorized to make, amend and repeal the by-laws.

**SEVENTH:** A director of the Corporation shall not be personally liable to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, except for liability (i) for any breach of the director's duty of loyalty to the Corporation or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) under Section 174 of the Delaware General Corporation Law, or (iv) for any transaction from which the director derived an improper personal benefit. If the Delaware General Corporation Law is amended to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of the Corporation shall be eliminated or limited to the fullest extent permitted by the Delaware General Corporation Law, as so amended. Any repeal or modification of this provision shall not adversely affect any right or protection of a director of the Corporation existing at the time of such repeal or modification.

**EIGHTH:** The Corporation reserves the right to amend and repeal any provision contained in this Restated Certificate of Incorporation in the manner from time to time prescribed by the laws of the State of Delaware.  All rights herein conferred are granted subject to this reservation.

IN WITNESS WHEREOF, this Restated Certificate of Incorporation has been executed by its duly authorized officer this [•] day of February, 2017.

XROS, INC.

By: _____

Name: John J. Ray III

Title: President

# XROS, INC.

# BYLAWS

## ARTICLE I - DIRECTOR

Section 1.        Number.

The sole director of the Corporation (the "Director") shall be the person appointed from time to time by the sole shareholder, who on the Effective Date shall be Greylock Partners, LLC, the bankruptcy plan administrator under the Amended Plan (as replaced, substituted or superseded from time to time, the "Plan Administrator") or such other entity as established by the Plan Administrator in its reasonable business judgment to be the new sole shareholder in accordance with the Amended Plan.

Section 2.        Powers of the Director.

The Director shall have the authority to exercise all of the corporate powers and to manage the business and affairs of the Corporation without requiring prior approval from the sole shareholder.  Without limiting the generality of the foregoing, in accordance with the requirements of the Amended Plan and the terms of the plan administration agreement describing the powers, duties and rights of the Plan Administrator, approved by the Bankruptcy Court and dated as of [•], 2017 (as amended, restated or superseded from time to time, the "Plan Administration Agreement"), the Director, acting at the direction of the sole shareholder, may take and cause the Corporation to take any and all actions he or she deems appropriate in order to consummate the transactions contemplated in the Amended Plan, including, without limitation, selling or otherwise disposing of all assets of the Corporation and winding down the affairs of the Corporation without the affirmative vote of the sole shareholder.  The Director, acting at the direction of the sole shareholder, may take and cause the Corporation to take any and all corporate actions without the affirmative vote of the sole shareholder, including to compromise and settle claims and causes of action of or against the Corporation and its estate, and to dissolve, merge or consolidate the Corporation with any other entity.

Section 3.        Vacancies.

Any vacancy of the Director may be filled by the sole shareholder, who on the Effective Date shall be the Plan Administrator.

Section 4        Compensation of Directors.

The Director, as such, may receive, pursuant to resolution of the Board of Directors, fixed fees and other compensation for his or her services as director.

## ARTICLE II - OFFICERS

Section 1.    Designation.

The officers of the Corporation shall consist of a President, one or more Vice Presidents, a Secretary and a Treasurer and such other officers as may from time to time be appointed by the Director.    Any number of offices may be held by the same person.

Section 2.    Appointment.    The Director may appoint all officers of the Corporation for whatever terms of office the Director deems appropriate or necessary.

Section 3.    Delegation of Authority.

The Director may from time to time delegate the powers or duties of any officer to any other officers or agents, notwithstanding any provision hereof.

Section 4.    Removal and Resignation.

Any officer of the Corporation may be removed at any time, with or without cause, by the Director.

Any officer may resign at any time by giving written notice to the Director.  Any such resignation shall take effect at the date of the receipt of such notice or at any later time specified therein, and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

Section 5.    Action with Respect to Securities of Other Corporations.

Unless otherwise directed by the Director, the President or any officer of the Corporation authorized by the President shall have power to vote and otherwise act on behalf of the Corporation, in person or by proxy, at any meeting of shareholders of or with respect to any action of shareholders of any other corporation in which this Corporation may hold securities and otherwise to exercise any and all rights and powers which this Corporation may possess by reason of its ownership of securities in such other corporation.

## ARTICLE III - STOCK

Section 1.    Certificates of Stock.

Each holder of stock represented by certificates shall be entitled to a certificate signed by, or in the name of the Corporation by, the President or a Vice President, and by the Secretary or an Assistant Secretary, or the Treasurer or an Assistant Treasurer, certifying the number of shares owned by him or her.  Any or all of the signatures on the certificate may be by facsimile.

- 2 -

## ARTICLE IV - MISCELLANEOUS

Section 1.        Facsimile Signatures.

In addition to the provisions for use of facsimile signatures elsewhere specifically authorized in these Bylaws, facsimile signatures of any officer or officers of the Corporation may be used whenever and as authorized by the Director.

Section 2.        Reliance upon Books, Reports and Records.

The Director, and each officer of the Corporation shall, in the performance of his or her duties, be fully protected in relying in good faith upon the books of account or other records of the Corporation and upon such information, opinions, reports or statements presented to the Corporation by any of its officers or employees, or committees of the Board of Directors so designated, or by any other person as to matters which such director or committee member reasonably believes are within such other person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Corporation.

Section 3.        Fiscal Year.

The fiscal year of the Corporation shall be as fixed by the Director.

Section 4.        Time Periods.

In applying any provision of these Bylaws which requires that an act be done or not be done a specified number of days prior to an event or that an act be done during a period of a specified number of days prior to an event, calendar days shall be used, the day of the doing of the act shall be excluded, and the day of the event shall be included.

## ARTICLE V - INDEMNIFICATION OF DIRECTORS AND OFFICERS

Section 1.        Right to Indemnification.

Each person who was or is made a party or is threatened to be made a party to or is otherwise involved in any action, suit or proceeding, whether civil, criminal, administrative or investigative (hereinafter a "proceeding"), by reason of the fact that he or she is or was a director or an officer of the Corporation or is or was serving at the request of the Corporation as a director, officer, or trustee of another corporation or of a partnership, joint venture, trust or other enterprise, including service with respect to an employee benefit plan (hereinafter an "indemnitee"), whether the basis of such proceeding is alleged action in an official capacity as a director, officer or trustee, or in any other capacity while serving as a director, officer or trustee, shall be indemnified and held harmless by the Corporation to the fullest extent permitted by Delaware law, as the same exists or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the Corporation to provide broader indemnification rights than such law permitted the Corporation to provide prior to such amendment), against all expense, liability and loss (including attorneys' fees, judgments, fines, ERISA excise taxes or penalties and amounts paid in settlement) reasonably incurred or suffered by such indemnitee in connection therewith; provided, however, that, except as provided in

- 3 -

Section 3 of this ARTICLE V with respect to proceedings to enforce rights to indemnification, the Corporation shall indemnify any such indemnitee in connection with a proceeding (or part thereof) initiated by such indemnitee only if such proceeding (or part thereof) was authorized by the Director of the Corporation.

<div align="center">Section 2.    <u>Right to Advancement of Expenses</u>.</div>

In addition to the right to indemnification conferred in Section 1 of this ARTICLE V, an indemnitee shall also have the right to be paid by the Corporation the expenses (including attorney's fees) incurred in defending any such proceeding in advance of its final disposition (hereinafter an "advancement of expenses"); provided, however, that, if the Delaware General Corporation Law requires, an advancement of expenses incurred by an indemnitee in his or her capacity as a director or officer (and not in any other capacity in which service was or is rendered by such indemnitee, including, without limitation, service to an employee benefit plan) shall be made only upon delivery to the Corporation of an undertaking (hereinafter an "undertaking"), by or on behalf of such indemnitee, to repay all amounts so advanced if it shall ultimately be determined by final judicial decision from which there is no further right to appeal (hereinafter a "final adjudication") that such indemnitee is not entitled to be indemnified for such expenses under this Section 2 or otherwise.

<div align="center">Section 3.    <u>Right of Indemnitee to Bring Suit</u>.</div>

If a claim under Section 1 or 2 of this ARTICLE V is not paid in full by the Corporation within 60 days after a written claim has been received by the Corporation, except in the case of a claim for an advancement of expenses, in which case the applicable period shall be 20 days, the indemnitee may at any time thereafter bring suit against the Corporation to recover the unpaid amount of the claim. To the fullest extent permitted by law, if successful in whole or in part in any such suit, or in a suit brought by the Corporation to recover an advancement of expenses pursuant to the terms of an undertaking, the indemnitee shall be entitled to be paid also the expense of prosecuting or defending such suit. In (i) any suit brought by the indemnitee to enforce a right to indemnification hereunder (but not in a suit brought by the indemnitee to enforce a right to an advancement of expenses) it shall be a defense that, and (ii) in any suit brought by the Corporation to recover an advancement of expenses pursuant to the terms of an undertaking, the Corporation shall be entitled to recover such expenses upon a final adjudication that, the indemnitee has not met any applicable standard for indemnification set forth in the Delaware General Corporation Law. Neither the failure of the Corporation (including its directors who are not parties to such action, a committee of such directors, independent legal counsel, or its shareholders) to have made a determination prior to the commencement of such suit that indemnification of the indemnitee is proper in the circumstances because the indemnitee has met the applicable standard of conduct set forth in the Delaware General Corporation Law, nor an actual determination by the Corporation (including its directors who are not parties to such action, a committee of such directors, independent legal counsel, or its shareholders) that the indemnitee has not met such applicable standard of conduct, shall create a presumption that the indemnitee has not met the applicable standard of conduct or, in the case of such a suit brought by the indemnitee, be a defense to such suit. In any suit brought by the indemnitee to enforce a right to indemnification or to an advancement of expenses hereunder, or brought by the Corporation to recover an advancement of expenses pursuant to the terms of an undertaking, the

<div align="center">- 4 -</div>

burden of proving that the indemnitee is not entitled to be indemnified, or to such advancement of expenses, under this ARTICLE V or otherwise shall be on the Corporation.

Section 4.        Non-Exclusivity of Rights.

The rights to indemnification and to the advancement of expenses conferred in this ARTICLE V shall not be exclusive of any other right which any person may have or hereafter acquire under any statute, the Corporation's Certificate of Incorporation, Bylaws, agreement, vote of shareholders or disinterested directors or otherwise.

Section 5.        Insurance.

The Corporation may maintain insurance, at its expense, to protect itself and any director, officer, employee or agent of the Corporation or another corporation, partnership, joint venture, trust or other enterprise against any expense, liability or loss, whether or not the Corporation would have the power to indemnify such person against such expense, liability or loss under the Delaware General Corporation Law.

Section 6.        Indemnification of Employees and Agents of the Corporation.

The Corporation may, to the extent authorized from time to time by the Director, grant rights to indemnification and to the advancement of expenses to any employee or agent of the Corporation to the fullest extent of the provisions of this Article with respect to the indemnification and advancement of expenses of directors and officers of the Corporation.

Section 7.        Nature of Rights.

The rights conferred upon indemnitees in this ARTICLE V shall be contract rights and such rights shall continue as to an indemnitee who has ceased to be a director, officer or trustee and shall inure to the benefit of the indemnitee's heirs, executors and administrators.  Any amendment, alteration or repeal of this ARTICLE V that adversely affects any right of an indemnitee or its successors shall be prospective only and shall not limit, eliminate, or impair any such right with respect to any proceeding involving any occurrence or alleged occurrence of any action or omission to act that took place prior to such amendment, alteration or repeal.

ARTICLE VI - AMENDMENTS

These Bylaws may be amended or repealed by the Director at any meeting or by the shareholders at any meeting.

# RESTATED CERTIFICATE

## OF

## INCORPORATION

## OF

## NORTEL NETWORKS OPTICAL COMPONENTS INC.

Nortel Networks Optical Components Inc., a corporation organized and existing under the laws of the State of Delaware (the "Corporation"), hereby certifies as follows:

A.    The name of the Corporation is Nortel Networks Optical Components Inc.  The Corporation's original Certificate of Incorporation was filed with the Secretary of State of the State of Delaware on February 5, 2001 under the name Nortel Networks HPOCS Inc. (such original Certificate of Incorporation, as amended, the "Original Certificate of Incorporation").

B.    This Restated Certificate of Incorporation has been approved in accordance with Sections 245 and 303 of the Delaware General Corporation Law in furtherance of that certain order of the United States Bankruptcy Court for the District of Delaware dated [•], 2017 (the "Order") confirming the  First Amended Joint Chapter 11 Plan of Nortel Networks Inc. and Certain of its Affiliated Debtors, approved by the Bankruptcy Court and dated as of [•], 2017 (as amended, restated or superseded from time to time, the "Amended Plan")[1] and this Restated Certificate of Incorporation is required by the Order.

C.    The Original Certificate of Incorporation is hereby amended and restated to read in its entirety as set forth below:

**FIRST:**  The name of the Corporation is Nortel Networks Optical Components Inc. (the "Corporation").

**SECOND:**  The address of the Corporation's registered office in the State of Delaware is at 1209 Orange Street, Wilmington, New Castle County, Delaware 19801.  The name of the Corporation's registered agent at such address is The Corporation Trust Company.

**THIRD:**  The nature of the business of the Corporation and the objects and purposes proposed to be transacted and carried on by it are the monetization, liquidation and distribution of the Corporation's assets in accordance with the Amended Plan, and any lawful act or activity for which corporations may be organized under the Delaware General Corporation Law.

---

[1]    Terms used, but not defined herein, shall have the meanings ascribed to them in the Amended Plan.

**FOURTH:** The total number of shares of stock which the Corporation is authorized to issue is one (1) share of common stock having a par value of $1.00.

Notwithstanding anything to the contrary herein, the Corporation shall in no event issue any non-voting equity securities in violation of chapter 11 of title 11 of the United States Code; provided, however, that the foregoing prohibition (i) will have no further force and effect beyond that required under Section 1123(a)(6) of the Bankruptcy Code, (ii) will have such force and effect, if any, only for so long as such Section 1123(a)(6) of the Bankruptcy Code is in effect and (iii) may be amended or eliminated in accordance with applicable law. The prohibition on the issuance of nonvoting equity securities is included in this Restated Certificate of Incorporation in compliance with Section 1123(a)(6) of the Bankruptcy Code (11 U.S.C. § 1123(a)(6)).

**FIFTH:** The sole director of the Corporation (the "Director") shall be the person appointed from time to time by the sole shareholder, who on the Effective Date shall be Greylock Partners, LLC, the bankruptcy plan administrator under the Amended Plan (as replaced, substituted or superseded from time to time, the "Plan Administrator") or such other entity as established by the Plan Administrator in its reasonable business judgment to be the new sole shareholder in accordance with the Amended Plan.

The Director shall have the authority to exercise all of the corporate powers and to manage the business and affairs of the Corporation without requiring prior approval from the sole shareholder. Without limiting the generality of the foregoing, in accordance with the requirements of the Amended Plan and the terms of the plan administration agreement describing the powers, duties and rights of the Plan Administrator, approved by the Bankruptcy Court and dated as of [•], 2017 (as amended, restated or superseded from time to time, the "Plan Administration Agreement"), the Director, acting at the direction of the sole shareholder, may take and cause the Corporation to take any and all actions he or she deems appropriate in order to consummate the transactions contemplated in the Amended Plan, including, without limitation, selling or otherwise disposing of all assets of the Corporation and winding down the affairs of the Corporation without the affirmative vote of the sole shareholder. The Director, acting at the direction of the sole shareholder, may take and cause the Corporation to take any and all corporate actions without the affirmative vote of the sole shareholder, including to compromise and settle claims and causes of action of or against the Corporation and its estate, and to dissolve, merge or consolidate the Corporation with any other entity.

**SIXTH:** In furtherance and not in limitation of the powers conferred by the laws of the State of Delaware, the Director is expressly authorized to make, amend and repeal the by-laws.

**SEVENTH:** A director of the Corporation shall not be personally liable to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, except for liability (i) for any breach of the director's duty of loyalty to the Corporation or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) under Section 174 of the Delaware General Corporation Law, or (iv) for any transaction from which the director derived an improper personal benefit. If the Delaware General Corporation Law is amended to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of the Corporation shall be eliminated or limited to the fullest extent permitted by the Delaware General Corporation Law, as so amended. Any repeal or modification of this provision shall not

adversely affect any right or protection of a director of the Corporation existing at the time of such repeal or modification.

**EIGHTH:** The Corporation reserves the right to amend and repeal any provision contained in this Restated Certificate of Incorporation in the manner from time to time prescribed by the laws of the State of Delaware.  All rights herein conferred are granted subject to this reservation.

IN WITNESS WHEREOF, this Restated Certificate of Incorporation has been executed by its duly authorized officer this [•] day of February, 2017.

NORTEL NETWORKS OPTICAL
COMPONENTS INC.


By: _____

     Name: John J. Ray III

     Title: President

# NORTEL NETWORKS OPTICAL COMPONENTS INC.

# BYLAWS

## ARTICLE I - DIRECTOR

Section 1.        Number.

The sole director of the Corporation (the "Director") shall be the person appointed from time to time by the sole shareholder, who on the Effective Date shall be Greylock Partners, LLC, the bankruptcy plan administrator under the Amended Plan (as replaced, substituted or superseded from time to time, the "Plan Administrator") or such other entity as established by the Plan Administrator in its reasonable business judgment to be the new sole shareholder in accordance with the Amended Plan.

Section 2.        Powers of the Director.

The Director shall have the authority to exercise all of the corporate powers and to manage the business and affairs of the Corporation without requiring prior approval from the sole shareholder.  Without limiting the generality of the foregoing, in accordance with the requirements of the Amended Plan and the terms of the plan administration agreement describing the powers, duties and rights of the Plan Administrator, approved by the Bankruptcy Court and dated as of [•], 2017 (as amended, restated or superseded from time to time, the "Plan Administration Agreement"), the Director, acting at the direction of the sole shareholder, may take and cause the Corporation to take any and all actions he or she deems appropriate in order to consummate the transactions contemplated in the Amended Plan, including, without limitation, selling or otherwise disposing of all assets of the Corporation and winding down the affairs of the Corporation without the affirmative vote of the sole shareholder.  The Director, acting at the direction of the sole shareholder, may take and cause the Corporation to take any and all corporate actions without the affirmative vote of the sole shareholder, including to compromise and settle claims and causes of action of or against the Corporation and its estate, and to dissolve, merge or consolidate the Corporation with any other entity.

Section 3.        Vacancies.

Any vacancy of the Director may be filled by the sole shareholder, who on the Effective Date shall be the Plan Administrator.

Section 4        Compensation of Directors.

The Director, as such, may receive, pursuant to resolution of the Board of Directors, fixed fees and other compensation for his or her services as director.

## ARTICLE II - OFFICERS

Section 1.    Designation.

The officers of the Corporation shall consist of a President, one or more Vice Presidents, a Secretary and a Treasurer and such other officers as may from time to time be appointed by the Director.    Any number of offices may be held by the same person.

Section 2.    Appointment.    The Director may appoint all officers of the Corporation for whatever terms of office the Director deems appropriate or necessary.

Section 3.    Delegation of Authority.

The Director may from time to time delegate the powers or duties of any officer to any other officers or agents, notwithstanding any provision hereof.

Section 4.    Removal and Resignation.

Any officer of the Corporation may be removed at any time, with or without cause, by the Director.

Any officer may resign at any time by giving written notice to the Director.  Any such resignation shall take effect at the date of the receipt of such notice or at any later time specified therein, and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

Section 5.    Action with Respect to Securities of Other Corporations.

Unless otherwise directed by the Director, the President or any officer of the Corporation authorized by the President shall have power to vote and otherwise act on behalf of the Corporation, in person or by proxy, at any meeting of shareholders of or with respect to any action of shareholders of any other corporation in which this Corporation may hold securities and otherwise to exercise any and all rights and powers which this Corporation may possess by reason of its ownership of securities in such other corporation.

## ARTICLE III - STOCK

Section 1.    Certificates of Stock.

Each holder of stock represented by certificates shall be entitled to a certificate signed by, or in the name of the Corporation by, the President or a Vice President, and by the Secretary or an Assistant Secretary, or the Treasurer or an Assistant Treasurer, certifying the number of shares owned by him or her.  Any or all of the signatures on the certificate may be by facsimile.

## ARTICLE IV - MISCELLANEOUS

Section 1.        Facsimile Signatures.

In addition to the provisions for use of facsimile signatures elsewhere specifically authorized in these Bylaws, facsimile signatures of any officer or officers of the Corporation may be used whenever and as authorized by the Director.

Section 2.        Reliance upon Books, Reports and Records.

The Director, and each officer of the Corporation shall, in the performance of his or her duties, be fully protected in relying in good faith upon the books of account or other records of the Corporation and upon such information, opinions, reports or statements presented to the Corporation by any of its officers or employees, or committees of the Board of Directors so designated, or by any other person as to matters which such director or committee member reasonably believes are within such other person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Corporation.

Section 3.        Fiscal Year.

The fiscal year of the Corporation shall be as fixed by the Director.

Section 4.        Time Periods.

In applying any provision of these Bylaws which requires that an act be done or not be done a specified number of days prior to an event or that an act be done during a period of a specified number of days prior to an event, calendar days shall be used, the day of the doing of the act shall be excluded, and the day of the event shall be included.

## ARTICLE V - INDEMNIFICATION OF DIRECTORS AND OFFICERS

Section 1.        Right to Indemnification.

Each person who was or is made a party or is threatened to be made a party to or is otherwise involved in any action, suit or proceeding, whether civil, criminal, administrative or investigative (hereinafter a "proceeding"), by reason of the fact that he or she is or was a director or an officer of the Corporation or is or was serving at the request of the Corporation as a director, officer, or trustee of another corporation or of a partnership, joint venture, trust or other enterprise, including service with respect to an employee benefit plan (hereinafter an "indemnitee"), whether the basis of such proceeding is alleged action in an official capacity as a director, officer or trustee, or in any other capacity while serving as a director, officer or trustee, shall be indemnified and held harmless by the Corporation to the fullest extent permitted by Delaware law, as the same exists or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the Corporation to provide broader indemnification rights than such law permitted the Corporation to provide prior to such amendment), against all expense, liability and loss (including attorneys' fees, judgments, fines, ERISA excise taxes or penalties and amounts paid in settlement) reasonably incurred or suffered by such indemnitee in connection therewith; provided, however, that, except as provided in

Section 3 of this ARTICLE V with respect to proceedings to enforce rights to indemnification, the Corporation shall indemnify any such indemnitee in connection with a proceeding (or part thereof) initiated by such indemnitee only if such proceeding (or part thereof) was authorized by the Director of the Corporation.

<div align="center">Section 2.    <u>Right to Advancement of Expenses</u>.</div>

In addition to the right to indemnification conferred in Section 1 of this ARTICLE V, an indemnitee shall also have the right to be paid by the Corporation the expenses (including attorney's fees) incurred in defending any such proceeding in advance of its final disposition (hereinafter an "advancement of expenses"); provided, however, that, if the Delaware General Corporation Law requires, an advancement of expenses incurred by an indemnitee in his or her capacity as a director or officer (and not in any other capacity in which service was or is rendered by such indemnitee, including, without limitation, service to an employee benefit plan) shall be made only upon delivery to the Corporation of an undertaking (hereinafter an "undertaking"), by or on behalf of such indemnitee, to repay all amounts so advanced if it shall ultimately be determined by final judicial decision from which there is no further right to appeal (hereinafter a "final adjudication") that such indemnitee is not entitled to be indemnified for such expenses under this Section 2 or otherwise.

<div align="center">Section 3.    <u>Right of Indemnitee to Bring Suit</u>.</div>

If a claim under Section 1 or 2 of this ARTICLE V is not paid in full by the Corporation within 60 days after a written claim has been received by the Corporation, except in the case of a claim for an advancement of expenses, in which case the applicable period shall be 20 days, the indemnitee may at any time thereafter bring suit against the Corporation to recover the unpaid amount of the claim. To the fullest extent permitted by law, if successful in whole or in part in any such suit, or in a suit brought by the Corporation to recover an advancement of expenses pursuant to the terms of an undertaking, the indemnitee shall be entitled to be paid also the expense of prosecuting or defending such suit. In (i) any suit brought by the indemnitee to enforce a right to indemnification hereunder (but not in a suit brought by the indemnitee to enforce a right to an advancement of expenses) it shall be a defense that, and (ii) in any suit brought by the Corporation to recover an advancement of expenses pursuant to the terms of an undertaking, the Corporation shall be entitled to recover such expenses upon a final adjudication that, the indemnitee has not met any applicable standard for indemnification set forth in the Delaware General Corporation Law. Neither the failure of the Corporation (including its directors who are not parties to such action, a committee of such directors, independent legal counsel, or its shareholders) to have made a determination prior to the commencement of such suit that indemnification of the indemnitee is proper in the circumstances because the indemnitee has met the applicable standard of conduct set forth in the Delaware General Corporation Law, nor an actual determination by the Corporation (including its directors who are not parties to such action, a committee of such directors, independent legal counsel, or its shareholders) that the indemnitee has not met such applicable standard of conduct, shall create a presumption that the indemnitee has not met the applicable standard of conduct or, in the case of such a suit brought by the indemnitee, be a defense to such suit. In any suit brought by the indemnitee to enforce a right to indemnification or to an advancement of expenses hereunder, or brought by the Corporation to recover an advancement of expenses pursuant to the terms of an undertaking, the

<div align="center">- 4 -</div>

burden of proving that the indemnitee is not entitled to be indemnified, or to such advancement of expenses, under this ARTICLE V or otherwise shall be on the Corporation.

<div align="center">

Section 4.    <u>Non-Exclusivity of Rights</u>.

</div>

The rights to indemnification and to the advancement of expenses conferred in this ARTICLE V shall not be exclusive of any other right which any person may have or hereafter acquire under any statute, the Corporation's Certificate of Incorporation, Bylaws, agreement, vote of shareholders or disinterested directors or otherwise.

<div align="center">

Section 5.    <u>Insurance</u>.

</div>

The Corporation may maintain insurance, at its expense, to protect itself and any director, officer, employee or agent of the Corporation or another corporation, partnership, joint venture, trust or other enterprise against any expense, liability or loss, whether or not the Corporation would have the power to indemnify such person against such expense, liability or loss under the Delaware General Corporation Law.

<div align="center">

Section 6.    <u>Indemnification of Employees and Agents of the Corporation</u>.

</div>

The Corporation may, to the extent authorized from time to time by the Director, grant rights to indemnification and to the advancement of expenses to any employee or agent of the Corporation to the fullest extent of the provisions of this Article with respect to the indemnification and advancement of expenses of directors and officers of the Corporation.

<div align="center">

Section 7.    <u>Nature of Rights</u>.

</div>

The rights conferred upon indemnitees in this ARTICLE V shall be contract rights and such rights shall continue as to an indemnitee who has ceased to be a director, officer or trustee and shall inure to the benefit of the indemnitee's heirs, executors and administrators.  Any amendment, alteration or repeal of this ARTICLE V that adversely affects any right of an indemnitee or its successors shall be prospective only and shall not limit, eliminate, or impair any such right with respect to any proceeding involving any occurrence or alleged occurrence of any action or omission to act that took place prior to such amendment, alteration or repeal.

<div align="center">

<u>ARTICLE VI - AMENDMENTS</u>

</div>

These Bylaws may be amended or repealed by the Director at any meeting or by the shareholders at any meeting.

<div align="center">

- 5 -

</div>

**RESTATED CERTIFICATE**

**OF**

**INCORPORATION**

**OF**

**NORTEL NETWORKS APPLICATIONS MANAGEMENT SOLUTIONS INC.**


Nortel Networks Applications Management Solutions Inc., a corporation organized and existing under the laws of the State of Delaware (the "Corporation"), hereby certifies as follows:

A.    The name of the Corporation is Nortel Networks Applications Management Solutions Inc.  The Corporation's original Certificate of Incorporation was filed with the Secretary of State of the State of Delaware on February 14, 1994 under the name Distributed Technologies Corporation (such original Certificate of Incorporation, as amended, the "Original Certificate of Incorporation").

B.    This Restated Certificate of Incorporation has been approved in accordance with Sections 245 and 303 of the Delaware General Corporation Law in furtherance of that certain order of the United States Bankruptcy Court for the District of Delaware dated [•], 2017 (the "Order") confirming the  First Amended Joint Chapter 11 Plan of Nortel Networks Inc. and Certain of its Affiliated Debtors, approved by the Bankruptcy Court and dated as of [•], 2017 (as amended, restated or superseded from time to time, the "Amended Plan")[1] and this Restated Certificate of Incorporation is required by the Order.

C.    The Original Certificate of Incorporation is hereby amended and restated to read in its entirety as set forth below:

**FIRST:** The name of the Corporation is Nortel Networks Applications Management Solutions Inc. (the "Corporation").

**SECOND:**  The address of the Corporation's registered office in the State of Delaware is at 1209 Orange Street, Wilmington, New Castle County, Delaware 19801.  The name of the Corporation's registered agent at such address is The Corporation Trust Company.

**THIRD:**  The nature of the business of the Corporation and the objects and purposes proposed to be transacted and carried on by it are the monetization, liquidation and distribution of the Corporation's assets in accordance with the Amended Plan, and any lawful act or activity for which corporations may be organized under the Delaware General Corporation Law.

---

[1]    Terms used, but not defined herein, shall have the meanings ascribed to them in the Amended Plan.

**FOURTH:** The total number of shares of stock which the Corporation is authorized to issue is one (1) share of common stock having a par value of $1.00.

Notwithstanding anything to the contrary herein, the Corporation shall in no event issue any non-voting equity securities in violation of chapter 11 of title 11 of the United States Code; provided, however, that the foregoing prohibition (i) will have no further force and effect beyond that required under Section 1123(a)(6) of the Bankruptcy Code, (ii) will have such force and effect, if any, only for so long as such Section 1123(a)(6) of the Bankruptcy Code is in effect and (iii) may be amended or eliminated in accordance with applicable law. The prohibition on the issuance of nonvoting equity securities is included in this Restated Certificate of Incorporation in compliance with Section 1123(a)(6) of the Bankruptcy Code (11 U.S.C. § 1123(a)(6)).

**FIFTH:** The sole director of the Corporation (the "Director") shall be the person appointed from time to time by the sole shareholder, who on the Effective Date shall be Greylock Partners, LLC, the bankruptcy plan administrator under the Amended Plan (as replaced, substituted or superseded from time to time, the "Plan Administrator") or such other entity as established by the Plan Administrator in its reasonable business judgment to be the new sole shareholder in accordance with the Amended Plan.

The Director shall have the authority to exercise all of the corporate powers and to manage the business and affairs of the Corporation without requiring prior approval from the sole shareholder. Without limiting the generality of the foregoing, in accordance with the requirements of the Amended Plan and the terms of the plan administration agreement describing the powers, duties and rights of the Plan Administrator, approved by the Bankruptcy Court and dated as of [•], 2017 (as amended, restated or superseded from time to time, the "Plan Administration Agreement"), the Director, acting at the direction of the sole shareholder, may take and cause the Corporation to take any and all actions he or she deems appropriate in order to consummate the transactions contemplated in the Amended Plan, including, without limitation, selling or otherwise disposing of all assets of the Corporation and winding down the affairs of the Corporation without the affirmative vote of the sole shareholder. The Director, acting at the direction of the sole shareholder, may take and cause the Corporation to take any and all corporate actions without the affirmative vote of the sole shareholder, including to compromise and settle claims and causes of action of or against the Corporation and its estate, and to dissolve, merge or consolidate the Corporation with any other entity.

**SIXTH:** In furtherance and not in limitation of the powers conferred by the laws of the State of Delaware, the Director is expressly authorized to make, amend and repeal the by-laws.

**SEVENTH:** A director of the Corporation shall not be personally liable to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, except for liability (i) for any breach of the director's duty of loyalty to the Corporation or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) under Section 174 of the Delaware General Corporation Law, or (iv) for any transaction from which the director derived an improper personal benefit. If the Delaware General Corporation Law is amended to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of the Corporation shall be eliminated or limited to the fullest extent permitted by the Delaware General Corporation Law, as so amended. Any repeal or modification of this provision shall not

adversely affect any right or protection of a director of the Corporation existing at the time of such repeal or modification.

**EIGHTH:** The Corporation reserves the right to amend and repeal any provision contained in this Restated Certificate of Incorporation in the manner from time to time prescribed by the laws of the State of Delaware. All rights herein conferred are granted subject to this reservation.

IN WITNESS WHEREOF, this Restated Certificate of Incorporation has been executed by its duly authorized officer this [•] day of February, 2017.

NORTEL NETWORKS APPLICATIONS
MANAGEMENT SOLUTIONS INC.

By: _____

Name: John J. Ray III

Title: President

# NORTEL NETWORKS APPLICATIONS

# MANAGEMENT SOLUTIONS INC.

# BYLAWS

## ARTICLE I - DIRECTOR

Section 1.        Number.

The sole director of the Corporation (the "Director") shall be the person appointed from time to time by the sole shareholder, who on the Effective Date shall be Greylock Partners, LLC, the bankruptcy plan administrator under the Amended Plan (as replaced, substituted or superseded from time to time, the "Plan Administrator") or such other entity as established by the Plan Administrator in its reasonable business judgment to be the new sole shareholder in accordance with the Amended Plan.

Section 2.        Powers of the Director.

The Director shall have the authority to exercise all of the corporate powers and to manage the business and affairs of the Corporation without requiring prior approval from the sole shareholder.  Without limiting the generality of the foregoing, in accordance with the requirements of the Amended Plan and the terms of the plan administration agreement describing the powers, duties and rights of the Plan Administrator, approved by the Bankruptcy Court and dated as of [•], 2017 (as amended, restated or superseded from time to time, the "Plan Administration Agreement"), the Director, acting at the direction of the sole shareholder, may take and cause the Corporation to take any and all actions he or she deems appropriate in order to consummate the transactions contemplated in the Amended Plan, including, without limitation, selling or otherwise disposing of all assets of the Corporation and winding down the affairs of the Corporation without the affirmative vote of the sole shareholder.  The Director, acting at the direction of the sole shareholder, may take and cause the Corporation to take any and all corporate actions without the affirmative vote of the sole shareholder, including to compromise and settle claims and causes of action of or against the Corporation and its estate, and to dissolve, merge or consolidate the Corporation with any other entity.

Section 3.        Vacancies.

Any vacancy of the Director may be filled by the sole shareholder, who on the Effective Date shall be the Plan Administrator.

Section 4        Compensation of Directors.

The Director, as such, may receive, pursuant to resolution of the Board of Directors, fixed fees and other compensation for his or her services as director.

## ARTICLE II - OFFICERS

Section 1.        Designation.

The officers of the Corporation shall consist of a President, one or more Vice Presidents, a Secretary and a Treasurer and such other officers as may from time to time be appointed by the Director.    Any number of offices may be held by the same person.

Section 2.        Appointment.    The Director may appoint all officers of the Corporation for whatever terms of office the Director deems appropriate or necessary.

Section 3.        Delegation of Authority.

The Director may from time to time delegate the powers or duties of any officer to any other officers or agents, notwithstanding any provision hereof.

Section 4.        Removal and Resignation.

Any officer of the Corporation may be removed at any time, with or without cause, by the Director.

Any officer may resign at any time by giving written notice to the Director.  Any such resignation shall take effect at the date of the receipt of such notice or at any later time specified therein, and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

Section 5.        Action with Respect to Securities of Other Corporations.

Unless otherwise directed by the Director, the President or any officer of the Corporation authorized by the President shall have power to vote and otherwise act on behalf of the Corporation, in person or by proxy, at any meeting of shareholders of or with respect to any action of shareholders of any other corporation in which this Corporation may hold securities and otherwise to exercise any and all rights and powers which this Corporation may possess by reason of its ownership of securities in such other corporation.

## ARTICLE III - STOCK

Section 1.        Certificates of Stock.

Each holder of stock represented by certificates shall be entitled to a certificate signed by, or in the name of the Corporation by, the President or a Vice President, and by the Secretary or an Assistant Secretary, or the Treasurer or an Assistant Treasurer, certifying the number of shares owned by him or her.  Any or all of the signatures on the certificate may be by facsimile.

## ARTICLE IV - MISCELLANEOUS

Section 1.        Facsimile Signatures.

In addition to the provisions for use of facsimile signatures elsewhere specifically authorized in these Bylaws, facsimile signatures of any officer or officers of the Corporation may be used whenever and as authorized by the Director.

Section 2.        Reliance upon Books, Reports and Records.

The Director, and each officer of the Corporation shall, in the performance of his or her duties, be fully protected in relying in good faith upon the books of account or other records of the Corporation and upon such information, opinions, reports or statements presented to the Corporation by any of its officers or employees, or committees of the Board of Directors so designated, or by any other person as to matters which such director or committee member reasonably believes are within such other person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Corporation.

Section 3.        Fiscal Year.

The fiscal year of the Corporation shall be as fixed by the Director.

Section 4.        Time Periods.

In applying any provision of these Bylaws which requires that an act be done or not be done a specified number of days prior to an event or that an act be done during a period of a specified number of days prior to an event, calendar days shall be used, the day of the doing of the act shall be excluded, and the day of the event shall be included.

## ARTICLE V - INDEMNIFICATION OF DIRECTORS AND OFFICERS

Section 1.        Right to Indemnification.

Each person who was or is made a party or is threatened to be made a party to or is otherwise involved in any action, suit or proceeding, whether civil, criminal, administrative or investigative (hereinafter a "proceeding"), by reason of the fact that he or she is or was a director or an officer of the Corporation or is or was serving at the request of the Corporation as a director, officer, or trustee of another corporation or of a partnership, joint venture, trust or other enterprise, including service with respect to an employee benefit plan (hereinafter an "indemnitee"), whether the basis of such proceeding is alleged action in an official capacity as a director, officer or trustee, or in any other capacity while serving as a director, officer or trustee, shall be indemnified and held harmless by the Corporation to the fullest extent permitted by Delaware law, as the same exists or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the Corporation to provide broader indemnification rights than such law permitted the Corporation to provide prior to such amendment), against all expense, liability and loss (including attorneys' fees, judgments, fines, ERISA excise taxes or penalties and amounts paid in settlement) reasonably incurred or suffered by such indemnitee in connection therewith; provided, however, that, except as provided in

Section 3 of this ARTICLE V with respect to proceedings to enforce rights to indemnification, the Corporation shall indemnify any such indemnitee in connection with a proceeding (or part thereof) initiated by such indemnitee only if such proceeding (or part thereof) was authorized by the Director of the Corporation.

Section 2.    Right to Advancement of Expenses.

In addition to the right to indemnification conferred in Section 1 of this ARTICLE V, an indemnitee shall also have the right to be paid by the Corporation the expenses (including attorney's fees) incurred in defending any such proceeding in advance of its final disposition (hereinafter an "advancement of expenses"); provided, however, that, if the Delaware General Corporation Law requires, an advancement of expenses incurred by an indemnitee in his or her capacity as a director or officer (and not in any other capacity in which service was or is rendered by such indemnitee, including, without limitation, service to an employee benefit plan) shall be made only upon delivery to the Corporation of an undertaking (hereinafter an "undertaking"), by or on behalf of such indemnitee, to repay all amounts so advanced if it shall ultimately be determined by final judicial decision from which there is no further right to appeal (hereinafter a "final adjudication") that such indemnitee is not entitled to be indemnified for such expenses under this Section 2 or otherwise.

Section 3.    Right of Indemnitee to Bring Suit.

If a claim under Section 1 or 2 of this ARTICLE V is not paid in full by the Corporation within 60 days after a written claim has been received by the Corporation, except in the case of a claim for an advancement of expenses, in which case the applicable period shall be 20 days, the indemnitee may at any time thereafter bring suit against the Corporation to recover the unpaid amount of the claim.  To the fullest extent permitted by law, if successful in whole or in part in any such suit, or in a suit brought by the Corporation to recover an advancement of expenses pursuant to the terms of an undertaking, the indemnitee shall be entitled to be paid also the expense of prosecuting or defending such suit.  In (i) any suit brought by the indemnitee to enforce a right to indemnification hereunder (but not in a suit brought by the indemnitee to enforce a right to an advancement of expenses) it shall be a defense that, and (ii) in any suit brought by the Corporation to recover an advancement of expenses pursuant to the terms of an undertaking, the Corporation shall be entitled to recover such expenses upon a final adjudication that, the indemnitee has not met any applicable standard for indemnification set forth in the Delaware General Corporation Law.  Neither the failure of the Corporation (including its directors who are not parties to such action, a committee of such directors, independent legal counsel, or its shareholders) to have made a determination prior to the commencement of such suit that indemnification of the indemnitee is proper in the circumstances because the indemnitee has met the applicable standard of conduct set forth in the Delaware General Corporation Law, nor an actual determination by the Corporation (including its directors who are not parties to such action, a committee of such directors, independent legal counsel, or its shareholders) that the indemnitee has not met such applicable standard of conduct, shall create a presumption that the indemnitee has not met the applicable standard of conduct or, in the case of such a suit brought by the indemnitee, be a defense to such suit.  In any suit brought by the indemnitee to enforce a right to indemnification or to an advancement of expenses hereunder, or brought by the Corporation to recover an advancement of expenses pursuant to the terms of an undertaking, the

burden of proving that the indemnitee is not entitled to be indemnified, or to such advancement of expenses, under this ARTICLE V or otherwise shall be on the Corporation.

<div align="center">Section 4.        Non-Exclusivity of Rights.</div>

The rights to indemnification and to the advancement of expenses conferred in this ARTICLE V shall not be exclusive of any other right which any person may have or hereafter acquire under any statute, the Corporation's Certificate of Incorporation, Bylaws, agreement, vote of shareholders or disinterested directors or otherwise.

<div align="center">Section 5.        Insurance.</div>

The Corporation may maintain insurance, at its expense, to protect itself and any director, officer, employee or agent of the Corporation or another corporation, partnership, joint venture, trust or other enterprise against any expense, liability or loss, whether or not the Corporation would have the power to indemnify such person against such expense, liability or loss under the Delaware General Corporation Law.

<div align="center">Section 6.        Indemnification of Employees and Agents of the Corporation.</div>

The Corporation may, to the extent authorized from time to time by the Director, grant rights to indemnification and to the advancement of expenses to any employee or agent of the Corporation to the fullest extent of the provisions of this Article with respect to the indemnification and advancement of expenses of directors and officers of the Corporation.

<div align="center">Section 7.        Nature of Rights.</div>

The rights conferred upon indemnitees in this ARTICLE V shall be contract rights and such rights shall continue as to an indemnitee who has ceased to be a director, officer or trustee and shall inure to the benefit of the indemnitee's heirs, executors and administrators.  Any amendment, alteration or repeal of this ARTICLE V that adversely affects any right of an indemnitee or its successors shall be prospective only and shall not limit, eliminate, or impair any such right with respect to any proceeding involving any occurrence or alleged occurrence of any action or omission to act that took place prior to such amendment, alteration or repeal.

<div align="center">ARTICLE VI - AMENDMENTS</div>

These Bylaws may be amended or repealed by the Director at any meeting or by the shareholders at any meeting.

# RESTATED CERTIFICATE

## OF

## INCORPORATION

## OF

## CORETEK, INC.

CoreTek, Inc., a corporation organized and existing under the laws of the State of Delaware (the "Corporation"), hereby certifies as follows:

A.    The name of the Corporation is CoreTek, Inc.  The Corporation's original Certificate of Incorporation was filed with the Secretary of State of the State of Delaware on April 8, 1998 (such original Certificate of Incorporation, as amended, the "Original Certificate of Incorporation").

B.    This Restated Certificate of Incorporation has been approved in accordance with Sections 245 and 303 of the Delaware General Corporation Law in furtherance of that certain order of the United States Bankruptcy Court for the District of Delaware dated [•], 2017 (the "Order") confirming the First Amended Joint Chapter 11 Plan of Nortel Networks Inc. and Certain of its Affiliated Debtors, approved by the Bankruptcy Court and dated as of [•], 2017 (as amended, restated or superseded from time to time, the "Amended Plan")[1] and this Restated Certificate of Incorporation is required by the Order.

C.    The Original Certificate of Incorporation is hereby amended and restated to read in its entirety as set forth below:

**FIRST:**  The name of the Corporation is CoreTek, Inc. (the "Corporation").

**SECOND:**  The address of the Corporation's registered office in the State of Delaware is at 1209 Orange Street, Wilmington, New Castle County, Delaware 19801.  The name of the Corporation's registered agent at such address is The Corporation Trust Company.

**THIRD:**  The nature of the business of the Corporation and the objects and purposes proposed to be transacted and carried on by it are the monetization, liquidation and distribution of the Corporation's assets in accordance with the Amended Plan, and any lawful act or activity for which corporations may be organized under the Delaware General Corporation Law.

**FOURTH:** The total number of shares of stock which the Corporation is authorized to issue is one (1) share of common stock having a par value of $1.00.

---

[1]    Terms used, but not defined herein, shall have the meanings ascribed to them in the Amended Plan.

Notwithstanding anything to the contrary herein, the Corporation shall in no event issue any non-voting equity securities in violation of chapter 11 of title 11 of the United States Code; provided, however, that the foregoing prohibition (i) will have no further force and effect beyond that required under Section 1123(a)(6) of the Bankruptcy Code, (ii) will have such force and effect, if any, only for so long as such Section 1123(a)(6) of the Bankruptcy Code is in effect and (iii) may be amended or eliminated in accordance with applicable law. The prohibition on the issuance of nonvoting equity securities is included in this Restated Certificate of Incorporation in compliance with Section 1123(a)(6) of the Bankruptcy Code (11 U.S.C. § 1123(a)(6)).

**FIFTH:** The sole director of the Corporation (the "Director") shall be the person appointed from time to time by the sole shareholder, who on the Effective Date shall be Greylock Partners, LLC, the bankruptcy plan administrator under the Amended Plan (as replaced, substituted or superseded from time to time, the "Plan Administrator") or such other entity as established by the Plan Administrator in its reasonable business judgment to be the new sole shareholder in accordance with the Amended Plan.

The Director shall have the authority to exercise all of the corporate powers and to manage the business and affairs of the Corporation without requiring prior approval from the sole shareholder. Without limiting the generality of the foregoing, in accordance with the requirements of the Amended Plan and the terms of the plan administration agreement describing the powers, duties and rights of the Plan Administrator, approved by the Bankruptcy Court and dated as of [•], 2017 (as amended, restated or superseded from time to time, the "Plan Administration Agreement"), the Director, acting at the direction of the sole shareholder, may take and cause the Corporation to take any and all actions he or she deems appropriate in order to consummate the transactions contemplated in the Amended Plan, including, without limitation, selling or otherwise disposing of all assets of the Corporation and winding down the affairs of the Corporation without the affirmative vote of the sole shareholder. The Director, acting at the direction of the sole shareholder, may take and cause the Corporation to take any and all corporate actions without the affirmative vote of the sole shareholder, including to compromise and settle claims and causes of action of or against the Corporation and its estate, and to dissolve, merge or consolidate the Corporation with any other entity.

**SIXTH:** In furtherance and not in limitation of the powers conferred by the laws of the State of Delaware, the Director is expressly authorized to make, amend and repeal the by-laws.

**SEVENTH:** A director of the Corporation shall not be personally liable to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, except for liability (i) for any breach of the director's duty of loyalty to the Corporation or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) under Section 174 of the Delaware General Corporation Law, or (iv) for any transaction from which the director derived an improper personal benefit. If the Delaware General Corporation Law is amended to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of the Corporation shall be eliminated or limited to the fullest extent permitted by the Delaware General Corporation Law, as so amended. Any repeal or modification of this provision shall not adversely affect any right or protection of a director of the Corporation existing at the time of such repeal or modification.

**EIGHTH:** The Corporation reserves the right to amend and repeal any provision contained in this Restated Certificate of Incorporation in the manner from time to time prescribed by the laws of the State of Delaware.  All rights herein conferred are granted subject to this reservation.

IN WITNESS WHEREOF, this Restated Certificate of Incorporation has been executed by its duly authorized officer this [•] day of February, 2017.

CORETEK INC.

By: _____

Name: John J. Ray III

Title: President

# CORETEK, INC.

# BYLAWS

## ARTICLE I - DIRECTOR

Section 1.        Number.

The sole director of the Corporation (the "Director") shall be the person appointed from time to time by the sole shareholder, who on the Effective Date shall be Greylock Partners, LLC, the bankruptcy plan administrator under the Amended Plan (as replaced, substituted or superseded from time to time, the "Plan Administrator") or such other entity as established by the Plan Administrator in its reasonable business judgment to be the new sole shareholder in accordance with the Amended Plan.

Section 2.        Powers of the Director.

The Director shall have the authority to exercise all of the corporate powers and to manage the business and affairs of the Corporation without requiring prior approval from the sole shareholder.  Without limiting the generality of the foregoing, in accordance with the requirements of the Amended Plan and the terms of the plan administration agreement describing the powers, duties and rights of the Plan Administrator, approved by the Bankruptcy Court and dated as of [•], 2017 (as amended, restated or superseded from time to time, the "Plan Administration Agreement"), the Director, acting at the direction of the sole shareholder, may take and cause the Corporation to take any and all actions he or she deems appropriate in order to consummate the transactions contemplated in the Amended Plan, including, without limitation, selling or otherwise disposing of all assets of the Corporation and winding down the affairs of the Corporation without the affirmative vote of the sole shareholder.  The Director, acting at the direction of the sole shareholder, may take and cause the Corporation to take any and all corporate actions without the affirmative vote of the sole shareholder, including to compromise and settle claims and causes of action of or against the Corporation and its estate, and to dissolve, merge or consolidate the Corporation with any other entity.

Section 3.        Vacancies.

Any vacancy of the Director may be filled by the sole shareholder, who on the Effective Date shall be the Plan Administrator.

Section 4        Compensation of Directors.

The Director, as such, may receive, pursuant to resolution of the Board of Directors, fixed fees and other compensation for his or her services as director.

## ARTICLE II - OFFICERS

Section 1.    Designation.

The officers of the Corporation shall consist of a President, one or more Vice Presidents, a Secretary and a Treasurer and such other officers as may from time to time be appointed by the Director.    Any number of offices may be held by the same person.

Section 2.    Appointment.    The Director may appoint all officers of the Corporation for whatever terms of office the Director deems appropriate or necessary.

Section 3.    Delegation of Authority.

The Director may from time to time delegate the powers or duties of any officer to any other officers or agents, notwithstanding any provision hereof.

Section 4.    Removal and Resignation.

Any officer of the Corporation may be removed at any time, with or without cause, by the Director.

Any officer may resign at any time by giving written notice to the Director.  Any such resignation shall take effect at the date of the receipt of such notice or at any later time specified therein, and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

Section 5.    Action with Respect to Securities of Other Corporations.

Unless otherwise directed by the Director, the President or any officer of the Corporation authorized by the President shall have power to vote and otherwise act on behalf of the Corporation, in person or by proxy, at any meeting of shareholders of or with respect to any action of shareholders of any other corporation in which this Corporation may hold securities and otherwise to exercise any and all rights and powers which this Corporation may possess by reason of its ownership of securities in such other corporation.

## ARTICLE III - STOCK

Section 1.    Certificates of Stock.

Each holder of stock represented by certificates shall be entitled to a certificate signed by, or in the name of the Corporation by, the President or a Vice President, and by the Secretary or an Assistant Secretary, or the Treasurer or an Assistant Treasurer, certifying the number of shares owned by him or her.  Any or all of the signatures on the certificate may be by facsimile.

## ARTICLE IV - MISCELLANEOUS

Section 1.        Facsimile Signatures.

In addition to the provisions for use of facsimile signatures elsewhere specifically authorized in these Bylaws, facsimile signatures of any officer or officers of the Corporation may be used whenever and as authorized by the Director.

Section 2.        Reliance upon Books, Reports and Records.

The Director, and each officer of the Corporation shall, in the performance of his or her duties, be fully protected in relying in good faith upon the books of account or other records of the Corporation and upon such information, opinions, reports or statements presented to the Corporation by any of its officers or employees, or committees of the Board of Directors so designated, or by any other person as to matters which such director or committee member reasonably believes are within such other person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Corporation.

Section 3.        Fiscal Year.

The fiscal year of the Corporation shall be as fixed by the Director.

Section 4.        Time Periods.

In applying any provision of these Bylaws which requires that an act be done or not be done a specified number of days prior to an event or that an act be done during a period of a specified number of days prior to an event, calendar days shall be used, the day of the doing of the act shall be excluded, and the day of the event shall be included.

## ARTICLE V - INDEMNIFICATION OF DIRECTORS AND OFFICERS

Section 1.        Right to Indemnification.

Each person who was or is made a party or is threatened to be made a party to or is otherwise involved in any action, suit or proceeding, whether civil, criminal, administrative or investigative (hereinafter a "proceeding"), by reason of the fact that he or she is or was a director or an officer of the Corporation or is or was serving at the request of the Corporation as a director, officer, or trustee of another corporation or of a partnership, joint venture, trust or other enterprise, including service with respect to an employee benefit plan (hereinafter an "indemnitee"), whether the basis of such proceeding is alleged action in an official capacity as a director, officer or trustee, or in any other capacity while serving as a director, officer or trustee, shall be indemnified and held harmless by the Corporation to the fullest extent permitted by Delaware law, as the same exists or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the Corporation to provide broader indemnification rights than such law permitted the Corporation to provide prior to such amendment), against all expense, liability and loss (including attorneys' fees, judgments, fines, ERISA excise taxes or penalties and amounts paid in settlement) reasonably incurred or suffered by such indemnitee in connection therewith; provided, however, that, except as provided in

- 3 -

Section 3 of this ARTICLE V with respect to proceedings to enforce rights to indemnification, the Corporation shall indemnify any such indemnitee in connection with a proceeding (or part thereof) initiated by such indemnitee only if such proceeding (or part thereof) was authorized by the Director of the Corporation.

<div align="center">Section 2.    Right to Advancement of Expenses.</div>

In addition to the right to indemnification conferred in Section 1 of this ARTICLE V, an indemnitee shall also have the right to be paid by the Corporation the expenses (including attorney's fees) incurred in defending any such proceeding in advance of its final disposition (hereinafter an "advancement of expenses"); provided, however, that, if the Delaware General Corporation Law requires, an advancement of expenses incurred by an indemnitee in his or her capacity as a director or officer (and not in any other capacity in which service was or is rendered by such indemnitee, including, without limitation, service to an employee benefit plan) shall be made only upon delivery to the Corporation of an undertaking (hereinafter an "undertaking"), by or on behalf of such indemnitee, to repay all amounts so advanced if it shall ultimately be determined by final judicial decision from which there is no further right to appeal (hereinafter a "final adjudication") that such indemnitee is not entitled to be indemnified for such expenses under this Section 2 or otherwise.

<div align="center">Section 3.    Right of Indemnitee to Bring Suit.</div>

If a claim under Section 1 or 2 of this ARTICLE V is not paid in full by the Corporation within 60 days after a written claim has been received by the Corporation, except in the case of a claim for an advancement of expenses, in which case the applicable period shall be 20 days, the indemnitee may at any time thereafter bring suit against the Corporation to recover the unpaid amount of the claim.  To the fullest extent permitted by law, if successful in whole or in part in any such suit, or in a suit brought by the Corporation to recover an advancement of expenses pursuant to the terms of an undertaking, the indemnitee shall be entitled to be paid also the expense of prosecuting or defending such suit.  In (i) any suit brought by the indemnitee to enforce a right to indemnification hereunder (but not in a suit brought by the indemnitee to enforce a right to an advancement of expenses) it shall be a defense that, and (ii) in any suit brought by the Corporation to recover an advancement of expenses pursuant to the terms of an undertaking, the Corporation shall be entitled to recover such expenses upon a final adjudication that, the indemnitee has not met any applicable standard for indemnification set forth in the Delaware General Corporation Law.  Neither the failure of the Corporation (including its directors who are not parties to such action, a committee of such directors, independent legal counsel, or its shareholders) to have made a determination prior to the commencement of such suit that indemnification of the indemnitee is proper in the circumstances because the indemnitee has met the applicable standard of conduct set forth in the Delaware General Corporation Law, nor an actual determination by the Corporation (including its directors who are not parties to such action, a committee of such directors, independent legal counsel, or its shareholders) that the indemnitee has not met such applicable standard of conduct, shall create a presumption that the indemnitee has not met the applicable standard of conduct or, in the case of such a suit brought by the indemnitee, be a defense to such suit.  In any suit brought by the indemnitee to enforce a right to indemnification or to an advancement of expenses hereunder, or brought by the Corporation to recover an advancement of expenses pursuant to the terms of an undertaking, the

<div align="center">- 4 -</div>

burden of proving that the indemnitee is not entitled to be indemnified, or to such advancement of expenses, under this ARTICLE V or otherwise shall be on the Corporation.

<div align="center">Section 4.      Non-Exclusivity of Rights.</div>

The rights to indemnification and to the advancement of expenses conferred in this ARTICLE V shall not be exclusive of any other right which any person may have or hereafter acquire under any statute, the Corporation's Certificate of Incorporation, Bylaws, agreement, vote of shareholders or disinterested directors or otherwise.

<div align="center">Section 5.      Insurance.</div>

The Corporation may maintain insurance, at its expense, to protect itself and any director, officer, employee or agent of the Corporation or another corporation, partnership, joint venture, trust or other enterprise against any expense, liability or loss, whether or not the Corporation would have the power to indemnify such person against such expense, liability or loss under the Delaware General Corporation Law.

<div align="center">Section 6.      Indemnification of Employees and Agents of the Corporation.</div>

The Corporation may, to the extent authorized from time to time by the Director, grant rights to indemnification and to the advancement of expenses to any employee or agent of the Corporation to the fullest extent of the provisions of this Article with respect to the indemnification and advancement of expenses of directors and officers of the Corporation.

<div align="center">Section 7.      Nature of Rights.</div>

The rights conferred upon indemnitees in this ARTICLE V shall be contract rights and such rights shall continue as to an indemnitee who has ceased to be a director, officer or trustee and shall inure to the benefit of the indemnitee's heirs, executors and administrators.  Any amendment, alteration or repeal of this ARTICLE V that adversely affects any right of an indemnitee or its successors shall be prospective only and shall not limit, eliminate, or impair any such right with respect to any proceeding involving any occurrence or alleged occurrence of any action or omission to act that took place prior to such amendment, alteration or repeal.

<div align="center">ARTICLE VI - AMENDMENTS</div>

These Bylaws may be amended or repealed by the Director at any meeting or by the shareholders at any meeting.

# RESTATED CERTIFICATE

## OF

## INCORPORATION

## OF

## NORTEL ALTSYSTEMS INTERNATIONAL INC.

Nortel Altsystems International Inc., a corporation organized and existing under the laws of the State of Delaware (the "Corporation"), hereby certifies as follows:

A.    The name of the Corporation is Nortel Altsystems International Inc.  The Corporation's original Certificate of Incorporation was filed with the Secretary of State of the State of Delaware on June 3, 1997 under the name Alteon Networks International, Inc. (such original Certificate of Incorporation, as amended, the "Original Certificate of Incorporation").

B.    This Restated Certificate of Incorporation has been approved in accordance with Sections 245 and 303 of the Delaware General Corporation Law in furtherance of that certain order of the United States Bankruptcy Court for the District of Delaware dated [•], 2017 (the "Order") confirming the  First Amended Joint Chapter 11 Plan of Nortel Networks Inc. and Certain of its Affiliated Debtors, approved by the Bankruptcy Court and dated as of [•], 2017 (as amended, restated or superseded from time to time, the "Amended Plan")[1] and this Restated Certificate of Incorporation is required by the Order.

C.    The Original Certificate of Incorporation is hereby amended and restated to read in its entirety as set forth below:

**FIRST:** The name of the Corporation is Nortel Altsystems International Inc. (the "Corporation").

**SECOND:**  The address of the Corporation's registered office in the State of Delaware is at 1209 Orange Street, Wilmington, New Castle County, Delaware 19801.  The name of the Corporation's registered agent at such address is The Corporation Trust Company.

**THIRD:**  The nature of the business of the Corporation and the objects and purposes proposed to be transacted and carried on by it are the monetization, liquidation and distribution of the Corporation's assets in accordance with the Amended Plan, and any lawful act or activity for which corporations may be organized under the Delaware General Corporation Law.

---

[1]    Terms used, but not defined herein, shall have the meanings ascribed to them in the Amended Plan.

**FOURTH:** The Corporation is authorized to issue only one class of stock, to be designated Common Stock.  The total number of shares of Common Stock presently authorized is One Hundred (100), each having a par value of one-tenth of one cent ($.001) per share.

Notwithstanding anything to the contrary herein, the Corporation shall in no event issue any non-voting equity securities in violation of chapter 11 of title 11 of the United States Code; provided, however, that the foregoing prohibition (i) will have no further force and effect beyond that required under Section 1123(a)(6) of the Bankruptcy Code, (ii) will have such force and effect, if any, only for so long as such Section 1123(a)(6) of the Bankruptcy Code is in effect and (iii) may be amended or eliminated in accordance with applicable law.  The prohibition on the issuance of nonvoting equity securities is included in this Restated Certificate of Incorporation in compliance with Section 1123(a)(6) of the Bankruptcy Code (11 U.S.C. § 1123(a)(6)).

**FIFTH:** The sole director of the Corporation (the "Director") shall be the person appointed from time to time by the sole shareholder, who on the Effective Date shall be Nortel Altsystems Inc., or such other entity as established by Nortel Altsystems Inc. in its reasonable business judgment to be the new sole shareholder in accordance with the Amended Plan.

The Director shall have the authority to exercise all of the corporate powers and to manage the business and affairs of the Corporation without requiring prior approval from the sole shareholder.  Without limiting the generality of the foregoing, in accordance with the requirements of the Amended Plan and the terms of the plan administration agreement describing the powers, duties and rights of the Plan Administrator, approved by the Bankruptcy Court and dated as of [•], 2017 (as amended, restated or superseded from time to time, the "Plan Administration Agreement"), the Director, acting at the direction of the sole shareholder, may take and cause the Corporation to take any and all actions he or she deems appropriate in order to consummate the transactions contemplated in the Amended Plan, including, without limitation, selling or otherwise disposing of all assets of the Corporation and winding down the affairs of the Corporation without the affirmative vote of the sole shareholder.  The Director, acting at the direction of the sole shareholder, may take and cause the Corporation to take any and all corporate actions without the affirmative vote of the sole shareholder, including to compromise and settle claims and causes of action of or against the Corporation and its estate, and to dissolve, merge or consolidate the Corporation with any other entity.

**SIXTH:** In furtherance and not in limitation of the powers conferred by the laws of the State of Delaware, the Director is expressly authorized to make, amend and repeal the by-laws.

**SEVENTH:** A director of the Corporation shall not be personally liable to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, except for liability (i) for any breach of the director's duty of loyalty to the Corporation or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) under Section 174 of the Delaware General Corporation Law, or (iv) for any transaction from which the director derived an improper personal benefit.  If the Delaware General Corporation Law is amended to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of the Corporation shall be eliminated or limited to the fullest extent permitted by the Delaware General Corporation Law, as so amended.  Any repeal or modification of this provision shall not

adversely affect any right or protection of a director of the Corporation existing at the time of such repeal or modification.

**EIGHTH:** The Corporation reserves the right to amend and repeal any provision contained in this Restated Certificate of Incorporation in the manner from time to time prescribed by the laws of the State of Delaware.  All rights herein conferred are granted subject to this reservation.

IN WITNESS WHEREOF, this Restated Certificate of Incorporation has been executed by its duly authorized officer this [•] day of February, 2017.

**NORTEL ALTSYSTEMS INTERNATIONAL INC.**

By: _____

     Name: John J. Ray III

     Title: President

# NORTEL ALTSYSTEMS INTERNATIONAL INC.

# BYLAWS

## ARTICLE I - DIRECTOR

Section 1.        Number.

The sole director of the Corporation (the "Director") shall be the person appointed from time to time by the sole shareholder, who on the Effective Date shall be Nortel Altsystems Inc., or such other entity as established by Nortel Altsystems Inc. in its reasonable business judgment to be the new sole shareholder in accordance with the Amended Plan.

Section 2.        Powers of the Director.

The Director shall have the authority to exercise all of the corporate powers and to manage the business and affairs of the Corporation without requiring prior approval from the sole shareholder.   Without limiting the generality of the foregoing, in accordance with the requirements of the Amended Plan and the terms of the plan administration agreement describing the powers, duties and rights of the Plan Administrator, approved by the Bankruptcy Court and dated as of [•], 2017 (as amended, restated or superseded from time to time, the "Plan Administration Agreement"), the Director, acting at the direction of the sole shareholder, may take and cause the Corporation to take any and all actions he or she deems appropriate in order to consummate the transactions contemplated in the Amended Plan, including, without limitation, selling or otherwise disposing of all assets of the Corporation and winding down the affairs of the Corporation without the affirmative vote of the sole shareholder.  The Director, acting at the direction of the sole shareholder, may take and cause the Corporation to take any and all corporate actions without the affirmative vote of the sole shareholder, including to compromise and settle claims and causes of action of or against the Corporation and its estate, and to dissolve, merge or consolidate the Corporation with any other entity.

Section 3.        Vacancies.

Any vacancy of the Director may be filled by the sole shareholder, who on the Effective Date shall be Nortel Altsystems Inc.

Section 4        Compensation of Directors.

The Director, as such, may receive, pursuant to resolution of the Board of Directors, fixed fees and other compensation for his or her services as director.

## ARTICLE II - OFFICERS

Section 1.        Designation.

The officers of the Corporation shall consist of a President, one or more Vice Presidents, a Secretary and a Treasurer and such other officers as may from time to time be

appointed by the Director.    Any number of offices may be held by the same person.

Section 2.    Appointment.    The Director may appoint all officers of the Corporation for whatever terms of office the Director deems appropriate or necessary.

Section 3.    Delegation of Authority.

The Director may from time to time delegate the powers or duties of any officer to any other officers or agents, notwithstanding any provision hereof.

Section 4.    Removal and Resignation.

Any officer of the Corporation may be removed at any time, with or without cause, by the Director.

Any officer may resign at any time by giving written notice to the Director.  Any such resignation shall take effect at the date of the receipt of such notice or at any later time specified therein, and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

Section 5.    Action with Respect to Securities of Other Corporations.

Unless otherwise directed by the Director, the President or any officer of the Corporation authorized by the President shall have power to vote and otherwise act on behalf of the Corporation, in person or by proxy, at any meeting of shareholders of or with respect to any action of shareholders of any other corporation in which this Corporation may hold securities and otherwise to exercise any and all rights and powers which this Corporation may possess by reason of its ownership of securities in such other corporation.

## ARTICLE III - STOCK

Section 1.    Certificates of Stock.

Each holder of stock represented by certificates shall be entitled to a certificate signed by, or in the name of the Corporation by, the President or a Vice President, and by the Secretary or an Assistant Secretary, or the Treasurer or an Assistant Treasurer, certifying the number of shares owned by him or her.  Any or all of the signatures on the certificate may be by facsimile.

## ARTICLE IV - MISCELLANEOUS

Section 1.    Facsimile Signatures.

In addition to the provisions for use of facsimile signatures elsewhere specifically authorized in these Bylaws, facsimile signatures of any officer or officers of the Corporation may be used whenever and as authorized by the Director.

Section 2.       Reliance upon Books, Reports and Records.

The Director, and each officer of the Corporation shall, in the performance of his or her duties, be fully protected in relying in good faith upon the books of account or other records of the Corporation and upon such information, opinions, reports or statements presented to the Corporation by any of its officers or employees, or committees of the Board of Directors so designated, or by any other person as to matters which such director or committee member reasonably believes are within such other person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Corporation.

Section 3.       Fiscal Year.

The fiscal year of the Corporation shall be as fixed by the Director.

Section 4.       Time Periods.

In applying any provision of these Bylaws which requires that an act be done or not be done a specified number of days prior to an event or that an act be done during a period of a specified number of days prior to an event, calendar days shall be used, the day of the doing of the act shall be excluded, and the day of the event shall be included.

## ARTICLE V - INDEMNIFICATION OF DIRECTORS AND OFFICERS

Section 1.       Right to Indemnification.

Each person who was or is made a party or is threatened to be made a party to or is otherwise involved in any action, suit or proceeding, whether civil, criminal, administrative or investigative (hereinafter a "proceeding"), by reason of the fact that he or she is or was a director or an officer of the Corporation or is or was serving at the request of the Corporation as a director, officer, or trustee of another corporation or of a partnership, joint venture, trust or other enterprise, including service with respect to an employee benefit plan (hereinafter an "indemnitee"), whether the basis of such proceeding is alleged action in an official capacity as a director, officer or trustee, or in any other capacity while serving as a director, officer or trustee, shall be indemnified and held harmless by the Corporation to the fullest extent permitted by Delaware law, as the same exists or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the Corporation to provide broader indemnification rights than such law permitted the Corporation to provide prior to such amendment), against all expense, liability and loss (including attorneys' fees, judgments, fines, ERISA excise taxes or penalties and amounts paid in settlement) reasonably incurred or suffered by such indemnitee in connection therewith; provided, however, that, except as provided in Section 3 of this ARTICLE V with respect to proceedings to enforce rights to indemnification, the Corporation shall indemnify any such indemnitee in connection with a proceeding (or part thereof) initiated by such indemnitee only if such proceeding (or part thereof) was authorized by the Director of the Corporation.

Section 2.       Right to Advancement of Expenses.

In addition to the right to indemnification conferred in Section 1 of this ARTICLE

V, an indemnitee shall also have the right to be paid by the Corporation the expenses (including attorney's fees) incurred in defending any such proceeding in advance of its final disposition (hereinafter an "advancement of expenses"); provided, however, that, if the Delaware General Corporation Law requires, an advancement of expenses incurred by an indemnitee in his or her capacity as a director or officer (and not in any other capacity in which service was or is rendered by such indemnitee, including, without limitation, service to an employee benefit plan) shall be made only upon delivery to the Corporation of an undertaking (hereinafter an "undertaking"), by or on behalf of such indemnitee, to repay all amounts so advanced if it shall ultimately be determined by final judicial decision from which there is no further right to appeal (hereinafter a "final adjudication") that such indemnitee is not entitled to be indemnified for such expenses under this Section 2 or otherwise.

<div align="center">Section 3.        Right of Indemnitee to Bring Suit.</div>

If a claim under Section 1 or 2 of this ARTICLE V is not paid in full by the Corporation within 60 days after a written claim has been received by the Corporation, except in the case of a claim for an advancement of expenses, in which case the applicable period shall be 20 days, the indemnitee may at any time thereafter bring suit against the Corporation to recover the unpaid amount of the claim.  To the fullest extent permitted by law, if successful in whole or in part in any such suit, or in a suit brought by the Corporation to recover an advancement of expenses pursuant to the terms of an undertaking, the indemnitee shall be entitled to be paid also the expense of prosecuting or defending such suit.  In (i) any suit brought by the indemnitee to enforce a right to indemnification hereunder (but not in a suit brought by the indemnitee to enforce a right to an advancement of expenses) it shall be a defense that, and (ii) in any suit brought by the Corporation to recover an advancement of expenses pursuant to the terms of an undertaking, the Corporation shall be entitled to recover such expenses upon a final adjudication that, the indemnitee has not met any applicable standard for indemnification set forth in the Delaware General Corporation Law.   Neither the failure of the Corporation (including its directors who are not parties to such action, a committee of such directors, independent legal counsel, or its shareholders) to have made a determination prior to the commencement of such suit that indemnification of the indemnitee is proper in the circumstances because the indemnitee has met the applicable standard of conduct set forth in the Delaware General Corporation Law, nor an actual determination by the Corporation (including its directors who are not parties to such action, a committee of such directors, independent legal counsel, or its shareholders) that the indemnitee has not met such applicable standard of conduct, shall create a presumption that the indemnitee has not met the applicable standard of conduct or, in the case of such a suit brought by the indemnitee, be a defense to such suit.  In any suit brought by the indemnitee to enforce a right to indemnification or to an advancement of expenses hereunder, or brought by the Corporation to recover an advancement of expenses pursuant to the terms of an undertaking, the burden of proving that the indemnitee is not entitled to be indemnified, or to such advancement of expenses, under this ARTICLE V or otherwise shall be on the Corporation.

<div align="center">Section 4.        Non-Exclusivity of Rights.</div>

The rights to indemnification and to the advancement of expenses conferred in this ARTICLE V shall not be exclusive of any other right which any person may have or hereafter acquire under any statute, the Corporation's Certificate of Incorporation, Bylaws,

<div align="center">- 4 -</div>

agreement, vote of shareholders or disinterested directors or otherwise.

<u>Section 5</u>.        <u>Insurance</u>.

The Corporation may maintain insurance, at its expense, to protect itself and any director, officer, employee or agent of the Corporation or another corporation, partnership, joint venture, trust or other enterprise against any expense, liability or loss, whether or not the Corporation would have the power to indemnify such person against such expense, liability or loss under the Delaware General Corporation Law.

<u>Section 6</u>.        <u>Indemnification of Employees and Agents of the Corporation</u>.

The Corporation may, to the extent authorized from time to time by the Director, grant rights to indemnification and to the advancement of expenses to any employee or agent of the Corporation to the fullest extent of the provisions of this Article with respect to the indemnification and advancement of expenses of directors and officers of the Corporation.

<u>Section 7</u>.        <u>Nature of Rights</u>.

The rights conferred upon indemnitees in this ARTICLE V shall be contract rights and such rights shall continue as to an indemnitee who has ceased to be a director, officer or trustee and shall inure to the benefit of the indemnitee's heirs, executors and administrators. Any amendment, alteration or repeal of this ARTICLE V that adversely affects any right of an indemnitee or its successors shall be prospective only and shall not limit, eliminate, or impair any such right with respect to any proceeding involving any occurrence or alleged occurrence of any action or omission to act that took place prior to such amendment, alteration or repeal.

## ARTICLE VI - AMENDMENTS

These Bylaws may be amended or repealed by the Director at any meeting or by the shareholders at any meeting.

# AMENDED AND RESTATED

# ARTICLES OF INCORPORATION

# OF

# NORTEL NETWORKS (CALA) INC.

Pursuant to Sections 607.1003 and 607.1008 of the Florida Statutes, NORTEL NETWORKS (CALA) INC., a Florida corporation (the "Corporation"), certifies that:

These Amended and Restated Articles of Incorporation amend and restate the Articles of Incorporation in their entirety.  These Amended and Restated Articles of Incorporation were duly adopted by the sole shareholder acting by unanimous written consent, dated as of [•] day of February, 2017.  Further, in accordance with Section 607.1008 of the Florida Statutes, these Amended and Restated Articles of Incorporation were also approved pursuant to a provision contained in an order by the Hon. Judge Kevin Gross of the United States Bankruptcy Court for the District of Delaware, having jurisdiction pursuant to the United States Bankruptcy Code over a proceeding for the reorganization of the Corporation in the matter of In re Nortel Networks Inc., et al., case number 09-10138 (KG), which order was confirmed and approved on [•], 2017.

The text of the Corporation's Articles of Incorporation is hereby amended and restated in its entirety, effective as of the date of filing of these Amended and Restated Articles of Incorporation with the Secretary of State of Florida, to read as follows:

## ARTICLE I

## NAME

The name of this Corporation shall be:

NORTEL NETWORKS (CALA) INC.

## ARTICLE II

## NATURE OF BUSINESS

The nature of the business of the Corporation and the objects and purposes proposed to be transacted and carried on by it are the monetization, liquidation and distribution of the Corporation's assets in accordance with that certain First Amended Joint Chapter 11 Plan of Nortel Networks Inc. and Certain of Its Affiliated Debtors, approved by the United States Bankruptcy Court for the District of Delaware and dated as of [•], 2017, as amended, restated or superseded from time to time, any other lawful act or activity for which a corporation may be organized under the laws of the State of Florida in furtherance thereof and any lawful act or activity for which corporations may be organized under the laws of the State of Florida.

## ARTICLE III

## CAPITAL STOCK

The authorized capital stock of the Corporation shall consist solely of 50,000 shares of Common Stock having a par value of $1.00 per share.

Notwithstanding anything to the contrary herein, the Corporation shall in no event issue any non-voting equity securities in violation of chapter 11 of title 11 of the United States Code; provided, however, that the foregoing prohibition (i) will have no further force and effect beyond that required under Section 1123(a)(6) of the Bankruptcy Code, (ii) will have such force and effect, if any, only for so long as such Section 1123(a)(6) of the Bankruptcy Code is in effect and (iii) may be amended or eliminated in accordance with applicable law. The prohibition on the issuance of nonvoting equity securities is included in these Amended and Restated Articles of Incorporation in compliance with Section 1123(a)(6) of the Bankruptcy Code (11 U.S.C. § 1123(a)(6)).

## ARTICLE IV

## LIMITATION OF LIABILITY

The liability of the directors of the corporation for monetary damages shall be eliminated to the fullest extent permissible under Florida law.

## ARTICLE V

## SHAREHOLDER AGREEMENT

The governance, management and exercise of corporate powers of the Corporation are subject to an agreement of the sole shareholder of the Corporation pursuant to Section 607.0732 of the Florida Statutes and set forth in the by-laws of the Corporation.

## ARTICLE VI

## AMENDMENT

The Corporation reserves the right to amend and repeal any provision contained in these Amended and Restated Articles of Incorporation in the manner from time to time prescribed by the laws of the State of Florida. All rights herein conferred are granted subject to this reservation.

## ARTICLE VII

## TERM OF EXISTENCE

The Corporation shall exist perpetually unless dissolved according to law.

## ARTICLE VIII

## ADDRESS OF PRINCIPAL OFFICE

The initial street address of the principal office of the Corporation in the state of Florida shall be:

> 4001 E. Chapel Hill Nelson Hwy.
> Durham, NC 27709

The director(s) may from time to time move the principal office to any other address within or without the State of Florida.

## ARTICLE IX

## REGISTERED AGENT

The address of the registered agent of the Corporation is 1200 South Pine Island Rd., Plantation, FL 33324.  The name of the registered agent of the Corporation at that address is C T Corporation System.

## ARTICLE X

## INCORPORATOR - NAME AND STREET ADDRESS

The name and street address of the incorporator of the Corporation is as follows:

| Name | Street Address |
|------|----------------|
| Richard J. Bischoff | 1301 Alfred I. duPont Building<br>169 East Flagler Street<br>Miami, Florida  33131 |

*[Remainder of page intentionally left blank. Signature page follows.]*

3

**IN WITNESS WHEREOF**, the undersigned, for the purpose of amending and restating the Corporation's Articles of Incorporation pursuant to Sections 607.1003 and 607.1008 of the Florida Statutes, executed these Amended and Restated Articles of Incorporation on this [•] day of February, 2017.

**NORTEL NETWORKS (CALA) INC.**

_____

John J. Ray, III, President

4

AMENDED AND RESTATED BY-LAWS

OF

NORTEL NETWORKS (CALA) INC.

_____

ARTICLE I

Bankruptcy Proceedings and Background

SECTION 1.  Bankruptcy Proceedings.  On July 14, 2009, the corporation (the "Corporation") filed a voluntary petition for relief with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") under Chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code").

SECTION 2.  Joint Chapter 11 Plan.  In furtherance of the voluntary petition filed with the Bankruptcy Court, the Corporation and certain of its affiliates negotiated and agreed on that certain First Amended Joint Chapter 11 Plan of Nortel Networks, Inc. and Certain of its Affiliated Debtors, approved by the Bankruptcy Court and dated as of [•], 2017 (as amended, restated or superseded from time to time, the "Amended Plan").  Pursuant to the Amended Plan, the sole shareholder of the Corporation approved the governance and management of the Corporation to be as

set forth in these by-laws (these "<u>By-Laws</u>"), which By-Laws shall constitute an agreement by the sole shareholder of a corporation with 100 or fewer shareholders at the time of the agreement pursuant to Section 607.0732 of the Florida Statutes.

## ARTICLE II

### Director of the Corporation

SECTION 1. <u>Director of the Corporation</u>. The sole director of the Corporation (the "<u>Director</u>") shall be the person appointed from time to time by Greylock Partners, LLC, the bankruptcy plan administrator under the Amended Plan (as replaced, substituted or superseded from time to time, the "<u>Plan Administrator</u>"). The Director shall act at the direction of the Plan Administrator and in accordance with the Amended Plan.

SECTION 2. <u>Powers of the Director</u>. The Director shall have the authority to exercise all of the corporate powers and to manage the business and affairs of the Corporation without requiring prior approval from the sole shareholder. Without limiting the generality of the foregoing, in accordance with the requirements of the Amended Plan and the terms of

the plan administration agreement describing the powers, duties and rights of the Plan Administrator, approved by the Bankruptcy Court and dated as of [•], 2017 (as amended, restated or superseded from time to time, the "Plan Administration Agreement"), the Director, acting at the direction of the Plan Administrator, may take and cause the Corporation to take any and all actions he or she deems appropriate in order to consummate the transactions contemplated in the Amended Plan, including, without limitation, selling or otherwise disposing of all assets of the Corporation and winding down the affairs of the Corporation without the affirmative vote of the sole shareholder.  The Director, acting at the direction of the Plan Administrator, may take and cause the Corporation to take any and all corporate actions without the affirmative vote of the sole shareholder, including to compromise and settle claims and causes of action of or against the Corporation and its estate, and to dissolve, merge or consolidate the Corporation with any other entity.

SECTION 3.  Removal.  The Plan Administrator may remove the Director for any reason or for no reason.

SECTION 4.  <u>Vacancies</u>.  Any vacancy of the Director may be filled by the Plan Administrator.

SECTION 5.  <u>Written Consent</u>.  Any action of the Director may be taken by a written consent signed by the Director.

SECTION 6.  <u>Compensation</u>.  The Director, as such, may receive, pursuant to a resolution of the Director, fixed fees and other compensation for his or her services as director.

ARTICLE III

<u>Officers</u>

SECTION 1.  <u>Designation</u>.  The Corporation may have a President, one or more Vice Presidents, a Secretary and a Treasurer.  The Corporation may also have, at the discretion of the Director, such other officers as the Director deems appropriate or necessary.  One person may hold two or more offices.

SECTION 2.  <u>Appointment</u>.  The Director may appoint all officers of the Corporation for whatever terms of office the Director deems appropriate or necessary.

SECTION 3.  <u>Delegation of Authority</u>.  The Director may from time to time delegate the duties of

4

any officer to any other officer or agent, notwithstanding any provision hereof.

SECTION 4.  <u>Removal and Resignation</u>.  Any officer may be removed, either with or without cause, by the Director at any time.

Any officer may resign at any time by giving written notice to the Director.  Any such resignation shall take effect at the date of the receipt of such notice or at any later time specified therein, and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

SECTION 5.  <u>Vacancies</u>.  A vacancy in any office because of death, resignation, removal, disqualification or any other cause shall be filled by the Director.

SECTION 6.  <u>Action with Respect to Securities of Other Corporations</u>.  Unless otherwise directed by the Director, the President or any officer of the Corporation authorized by the President shall have power to vote and otherwise act on behalf of the Corporation, in person or by proxy, at any meeting of stockholders of or with respect to any action of stockholders of any other corporation in which this

Corporation may hold securities and otherwise to exercise any and all rights and powers which this Corporation may possess by reason of its ownership of securities in such other corporation.

ARTICLE IV

Evidence of Stock Ownership

SECTION 1. <u>Certificated Shares</u>. The Corporation may certificate its shares, as determined by the Director. Certificates shall be signed by the officer or officers designated by the Director. The certificates shall set forth: (a) the name of the Corporation and that the Corporation is organized under the laws of the State of Florida; (b) the name of the person to whom the shares are issued; and (c) the number and class of shares and the designation of the series, if any, the certificate represents.

SECTION 2. <u>Certificated Shares: Existence of Shareholder Agreement</u>. Each certificate of stock of the Corporation, if any, shall bear a legend noted conspicuously on the front or back of the certificate substantially in the following form:

THE SECURITIES REPRESENTED BY THIS CERTIFICATE AND THE MANAGEMENT AND

6

GOVERNANCE OF THE CORPORATION ARE SUBJECT TO A SHAREHOLDER'S AGREEMENT PURSUANT TO SECTION 607.0732 OF THE FLORIDA STATUTES SET FORTH IN THE BY-LAWS OF THE CORPORATION. A COPY OF THE BY-LAWS OF THE CORPORATION WILL BE FURNISHED WITHOUT CHARGE BY THE CORPORATION TO THE HOLDER HEREOF UPON WRITTEN REQUEST.

SECTION 3. <u>Uncertificated Shares</u>. To the extent the Corporation does not certificate its shares, the Corporation shall, within a reasonable time after the issue or transfer of shares without certificates, send the shareholder a written statement setting forth: (a) the name of the Corporation and that the Corporation is organized under the laws of the State of Florida; (b) the name of the person to whom the uncertified shares are issued; and (c) the number and class of shares and the designation of the series, if any, the written statement represents.

SECTION 4. <u>Uncertificated Shares: Existence of Shareholder Agreement</u>. To the extent the Corporation does not certificate its shares, the Corporation shall, at or prior to the time of the purchase of the shares, deliver an information

7

statement to the purchaser substantially in the following form:

> THE SECURITIES THAT ARE THE SUBJECT OF THIS INFORMATION STATEMENT AND THE MANAGEMENT AND GOVERNANCE OF THE CORPORATION ARE SUBJECT TO A SHAREHOLDER'S AGREEMENT PURSUANT TO SECTION 607.0732 OF THE FLORIDA STATUTES SET FORTH IN THE BY-LAWS OF THE CORPORATION. A COPY OF THE BY-LAWS OF THE CORPORATION WILL BE FURNISHED WITHOUT CHARGE BY THE CORPORATION TO THE RECIPIENT OF THIS INFORMATION STATEMENT UPON WRITTEN REQUEST.

### ARTICLE V

### Miscellaneous

SECTION 1. Facsimile Signatures. In addition to the provisions for use of facsimile signatures elsewhere specifically authorized in these By-Laws, facsimile signatures of any officer or officers of the Corporation may be used whenever and as authorized by the Director.

SECTION 2. Reliance Upon Books, Reports and Records. The Director and each officer of the Corporation shall, in the performance of his or her duties, be fully protected in relying in good faith

8

upon the books of account or other records of the Corporation and upon such information, opinions, reports or statements presented to the Corporation by any of its officers or employees, or committees of the board of directors of the Corporation so designated, if any, or by any other person as to matters which the Director or such officer reasonably believes are within such other person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Corporation.

SECTION 3.  Fiscal Year.  The fiscal year of the Corporation shall be as fixed by the Director.

SECTION 4.  Time Periods.  In applying any provision of these By-Laws which requires that an act be done or not be done a specified number of days prior to an event or that an act be done during a period of a specified number of days prior to an event, calendar days shall be used, the day of the doing of the act shall be excluded, and the day of the event shall be included.

ARTICLE VI

<u>Amendment to By-Laws and Shareholder's Agreement</u>

These By-Laws and the shareholder's agreement set forth herein may be amended or terminated only by all persons who are shareholders at the time of the termination or amendment, provided that these By-Laws and the shareholder's agreement set forth herein may be amended by the Director to the extent such amendments do not change the designation, rights, preferences or limitations of any of the shares of the Corporation.

ARTICLE VII

<u>Indemnification</u>

SECTION 1. <u>Right to Indemnification</u>. Each person who was or is made a party or is threatened to be made a party to or is otherwise involved in any action, suit or proceeding, whether civil, criminal, administrative or investigative (hereinafter a "<u>proceeding</u>"), by reason of the fact that he or she is or was a director or an officer of the Corporation or is or was serving at the request of the Corporation as a director, officer, or trustee of another corporation or of a partnership, joint venture, trust or other

10

enterprise, including service with respect to an employee benefit plan (hereinafter an "indemnitee"), whether the basis of such proceeding is alleged action in an official capacity as a director, officer or trustee, or in any other capacity while serving as a director, officer or trustee, shall be indemnified and held harmless by the Corporation to the fullest extent permitted by Florida law, as the same exists or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the Corporation to provide broader indemnification rights than such law permitted the Corporation to provide prior to such amendment), against all expense, liability and loss (including attorneys' fees, judgments, fines, ERISA excise taxes or penalties and amounts paid in settlement) reasonably incurred or suffered by such indemnitee in connection therewith; provided, however, that, except as provided in Section 3 of this ARTICLE VII with respect to proceedings to enforce rights to indemnification, the Corporation shall indemnify any such indemnitee in connection with a proceeding (or part thereof) initiated by such indemnitee only if

such proceeding (or part thereof) was authorized by the Director.

SECTION 2. <u>Right to Advancement of Expenses</u>. In addition to the right to indemnification conferred in Section 1 of this ARTICLE VII, an indemnitee shall also have the right to be paid by the Corporation the expenses (including attorney's fees) incurred in defending any such proceeding in advance of its final disposition (hereinafter an "<u>advancement of expenses</u>"); provided, however, that, if the Florida Business Corporation Act requires, an advancement of expenses incurred by an indemnitee in his or her capacity as a director or officer (and not in any other capacity in which service was or is rendered by such indemnitee, including, without limitation, service to an employee benefit plan) shall be made only upon delivery to the Corporation of an undertaking (hereinafter an "<u>undertaking</u>"), by or on behalf of such indemnitee, to repay all amounts so advanced if it shall ultimately be determined by final judicial decision from which there is no further right to appeal (hereinafter a "<u>final adjudication</u>") that such indemnitee is not entitled to be indemnified for such expenses under this Section 2 or otherwise.

12

SECTION 3. <u>Right of Indemnitee to Bring Suit</u>. If a claim under Section 1 or 2 of this ARTICLE VII is not paid in full by the Corporation within 60 days after a written claim has been received by the Corporation, except in the case of a claim for an advancement of expenses, in which case the applicable period shall be 20 days, the indemnitee may at any time thereafter bring suit against the Corporation to recover the unpaid amount of the claim. To the fullest extent permitted by law, if successful in whole or in part in any such suit, or in a suit brought by the Corporation to recover an advancement of expenses pursuant to the terms of an undertaking, the indemnitee shall be entitled to be paid also the expense of prosecuting or defending such suit. In (i) any suit brought by the indemnitee to enforce a right to indemnification hereunder (but not in a suit brought by the indemnitee to enforce a right to an advancement of expenses) it shall be a defense that, and (ii) in any suit brought by the Corporation to recover an advancement of expenses pursuant to the terms of an undertaking, the Corporation shall be entitled to recover such expenses upon a final adjudication that, the indemnitee has not met any

applicable standard for indemnification set forth in the Florida Business Corporation Act. Neither the failure of the Corporation (including its directors who are not parties to such action, if any, independent legal counsel, or its shareholders) to have made a determination prior to the commencement of such suit that indemnification of the indemnitee is proper in the circumstances because the indemnitee has met the applicable standard of conduct set forth in the Florida Business Corporation Act, nor an actual determination by the Corporation (including its directors who are not parties to such action, if any, independent legal counsel, or its shareholders) that the indemnitee has not met such applicable standard of conduct, shall create a presumption that the indemnitee has not met the applicable standard of conduct or, in the case of such a suit brought by the indemnitee, be a defense to such suit. In any suit brought by the indemnitee to enforce a right to indemnification or to an advancement of expenses hereunder, or brought by the Corporation to recover an advancement of expenses pursuant to the terms of an undertaking, the burden of proving that the indemnitee is not entitled to be indemnified, or to such

14

advancement of expenses, under this ARTICLE VII or otherwise shall be on the Corporation.

SECTION 4. <u>Non-Exclusivity of Rights</u>. The rights to indemnification and to the advancement of expenses conferred in this ARTICLE VII shall not be exclusive of any other right which any person may have or hereafter acquire under any statute, the Corporation's articles of incorporation, By-Laws, agreement, vote of shareholders or disinterested directors or otherwise.

SECTION 5. <u>Insurance</u>. The Corporation may maintain insurance, at its expense, to protect itself and any director, officer, employee or agent of the Corporation or another corporation, partnership, joint venture, trust or other enterprise against any expense, liability or loss, whether or not the Corporation would have the power to indemnify such person against such expense, liability or loss under the Florida Business Corporation Act.

SECTION 6. <u>Indemnification of Employees and Agents of the Corporation</u>. The Corporation may, to the extent authorized from time to time by the Director, grant rights to indemnification and to the advancement of expenses to any employee or agent of

15

the Corporation to the fullest extent of the provisions of this ARTICLE VII with respect to the indemnification and advancement of expenses of directors and officers of the Corporation.

SECTION 7. <u>Nature of Rights</u>. The rights conferred upon indemnitees in this ARTICLE VII shall be contract rights and such rights shall continue as to an indemnitee who has ceased to be a director, officer or trustee and shall inure to the benefit of the indemnitee's heirs, executors and administrators. Any amendment, alteration or repeal of this ARTICLE VII that adversely affects any right of an indemnitee or its successors shall be prospective only and shall not limit, eliminate, or impair any such right with respect to any proceeding involving any occurrence or alleged occurrence of any action or omission to act that took place prior to such amendment, alteration or repeal.

ARTICLE VIII

<u>Severability</u>

The provisions of these By-Laws shall be separable each from any and all other provisions of these By-Laws and, if any such provision shall be

16

adjudged to be invalid or unenforceable, such invalidity or unenforceability shall not affect any other provision hereof, or the powers granted to this Corporation by the Articles of Incorporation or these By-Laws.

THIS CERTIFIES that the foregoing constitutes the By-Laws of Nortel Networks (CALA) Inc., as amended and restated by the Corporation's shareholder, on the [•] day of February, 2017.

_____

John J. Ray, III,

President

## CERTIFICATE OF AMENDED AND RESTATED

## ARTICLES OF INCORPORATION

## OF

## SONOMA SYSTEMS

The undersigned hereby certifies that:

1. He is the Principal Officer of Sonoma Systems, a California corporation (the "Corporation").

2. In accordance with Section 1400 of the California Corporations Code, the Amended and Restated Articles of Incorporation of the Corporation set forth below were approved pursuant to a provision contained in an order by the Hon. Judge Kevin Gross of the United States Bankruptcy Court for the District of Delaware, having jurisdiction pursuant to the United States Bankruptcy Code over a proceeding of the Corporation in the matter of In re Nortel Networks Inc., et al., case number 09-10138 (KG), which order was confirmed and approved on [•], 2017.

3. The articles of incorporation of the Corporation are hereby amended and restated in their entirety to read as set forth in Exhibit A hereto.

4. The undersigned declares under penalty of perjury under the laws of the State of California that the matters set forth in this certificate are true and correct of his own knowledge.

*[Remainder of page intentionally left blank. Signature page follows.]*

**IN WITNESS WHEREOF**, the undersigned, for the purpose of amending and restating the Corporation's Articles of Incorporation pursuant to Section 1400 of the California Corporation Code, executed these Amended and Restated Articles of Incorporation on this [•] day of February, 2017.

**SONOMA SYSTEMS**

_____

John J. Ray, III, President

**Exhibit A**

**AMENDED AND RESTATED**

**ARTICLES OF INCORPORATION**

**OF**

**SONOMA SYSTEMS**

---

**I**

The name of the corporation is Sonoma Systems.

**II**

The purpose of the corporation is to monetize, liquidate and distribute the corporation's assets in accordance with that certain First Amended Joint Chapter 11 Plan of Nortel Networks Inc. and Certain of Its Affiliated Debtors, approved by the United States Bankruptcy Court for the District of Delaware and dated as of [•], 2017, as amended, restated or superseded from time to time, and to engage in any lawful act or activity for which a corporation may be organized under the General Corporation Law of California in furtherance thereof, other than the banking business, the trust company business or the practice of a profession permitted to be incorporated by the California Corporations Code.

**III**

The corporation is authorized to issue one class of shares, designated as Common Stock. The number of shares of Common Stock authorized to be issued is one (1) no par value.

**IV**

Notwithstanding anything to the contrary herein, the corporation shall in no event issue any non-voting equity securities in violation of chapter 11 of title 11 of the United States Code; provided, however, that the foregoing prohibition (i) will have no further force and effect beyond that required under Section 1123(a)(6) of the Bankruptcy Code, (ii) will have such force and effect, if any, only for so long as such Section 1123(a)(6) of the Bankruptcy Code is in effect and (iii) may be amended or eliminated in accordance with applicable law. The prohibition on the issuance of nonvoting equity securities is included in these Amended and Restated Articles of Incorporation in compliance with Section 1123(a)(6) of the Bankruptcy Code (11 U.S.C. § 1123(a)(6)).

**V**

The liability of the directors of the corporation for monetary damages shall be eliminated to the fullest extent permissible under California law.

**AMENDED AND RESTATED**

**BY-LAWS**

**OF**

**SONOMA SYSTEMS**

<u>**ARTICLE I**</u>

<u>**Bankruptcy Proceedings and Background**</u>

   1. <u>**Bankruptcy Proceedings.**</u> On January 14, 2009, the corporation (the "Corporation") filed a voluntary petition for relief with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") under Chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code").

   2. <u>**Joint Chapter 11 Plan.**</u> In furtherance of the voluntary petition filed with the Bankruptcy Court, the Corporation and certain of its affiliates negotiated and agreed on that certain First Amended Joint Chapter 11 Plan of Nortel Networks, Inc. and Certain of its Affiliated Debtors, approved by the Bankruptcy Court and dated as of [•], 2017 (as amended, restated or superseded from time to time, the "Amended Plan"). Pursuant to the Amended Plan, and in accordance with an order by the Hon. Judge Kevin Gross of the Bankruptcy Court, having jurisdiction pursuant to the Bankruptcy Code over a proceeding of the Corporation in the matter of <u>In re Nortel Networks Inc., et al.</u>, case number 09-10138 (KG), which order was confirmed and approved on [•], 2017 (the "Order"), the Corporation amended these by-laws (the "By-Laws") as of the date hereof in conformance with Section 1400 of the California Corporations Code.

## ARTICLE II

## Director of the Corporation

1.      **Director of the Corporation.**  The sole director of the Corporation (the "Director") shall be the person appointed from time to time by Greylock Partners, LLC, the bankruptcy plan administrator under the Amended Plan (as replaced, substituted or superseded from time to time, the "Plan Administrator"). As permitted by Section 1400 of the California Corporations Code, the Director shall act at the direction of the Plan Administrator and in accordance with the Amended Plan.

2.      **Powers of the Director.**  As permitted by Section 1400 of the California Corporations Code, the Director shall have the authority to exercise all of the corporate powers and to manage the business and affairs of the Corporation without requiring prior approval from the sole shareholder.  Without limiting the generality of the foregoing, in accordance with Section 1400 of the California Corporations Code and the requirements of the Amended Plan and the terms of the plan administration agreement describing the powers, duties and rights of the Plan Administrator, approved by the Bankruptcy Court and dated as of [•], 2017 (as amended, restated or superseded from time to time, the "Plan Administration Agreement"), the Director, acting at the direction of the Plan Administrator, may take and cause the Corporation to take any and all actions he or she deems appropriate in order to consummate the transactions contemplated in the Amended Plan, including, without limitation, selling or otherwise disposing of all assets of the Corporation and winding down the affairs of the Corporation without the affirmative vote of the sole shareholder.  The Director, acting at the direction of the Plan Administrator, may take and cause the Corporation to take any

and all corporate actions without the affirmative vote of the sole shareholder, including to compromise and settle claims and causes of action of or against the Corporation and its estate, and to dissolve, merge or consolidate the Corporation with any other entity.

3.    **Removal.**  The Plan Administrator may remove the Director for any reason or for no reason.

4.    **Vacancies.**  Any vacancy of the Director may be filled by the Plan Administrator.

5.    **Written Consent.**  Any action of the Director may be taken by a written consent signed by the Director.

6.    **Compensation.**  The Director, as such, may receive, pursuant to a resolution of the Director, fixed fees and other compensation for his or her services as director.

## ARTICLE III

### Officers

1.    **Designation.**  The Corporation may have a President, one or more Vice Presidents, a Secretary and a Treasurer.  The Corporation may also have, at the discretion of the Director, such other officers as the Director deems appropriate or necessary.  One person may hold two or more offices.

2.    **Appointment.**   The Director may appoint all officers of the Corporation for whatever terms of office the Director deems appropriate or necessary.

3.    **Delegation of Authority.**   The Director may from time to time delegate the duties of any officer to any other officer or agent, notwithstanding any provision hereof.

4.    **Removal and Resignation.**  Any officer may be removed, either with or without cause, by the Director at any time.

Any officer may resign at any time by giving written notice to the Director.  Any such resignation shall take effect at the date of the receipt of such notice or at any later time specified therein, and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

5.    **Vacancies.**  A vacancy in any office because of death, resignation, removal, disqualification or any other cause shall be filled by the Director.

6.    **Action with Respect to Securities of Other Corporations.** Unless otherwise directed by the Director, the President or any officer of the Corporation authorized by the President shall have power to vote and otherwise act on behalf of the Corporation, in person or by proxy, at any meeting of stockholders of or with respect to any action of stockholders of any other corporation in which this Corporation may hold securities and otherwise to exercise any and all rights and powers which this Corporation may possess by reason of its ownership of securities in such other corporation.

## ARTICLE IV

### Certificates of Stock

Each holder of stock represented by certificates shall be entitled to a certificate signed by, or in the name of the Corporation by, the President or a Vice President, and by the Secretary or an assistant secretary, or the Treasurer or an assistant treasurer, certifying the number of shares owned by him or her.  Any or all of the signatures on the certificate may be by facsimile.

## **ARTICLE V**

## **Miscellaneous**

1.    **Facsimile Signatures.**  In addition to the provisions for use of facsimile signatures elsewhere specifically authorized in these By-Laws, facsimile signatures of any officer or officers of the Corporation may be used whenever and as authorized by the Director.

2.    **Reliance Upon Books, Reports and Records.**  The Director and each officer of the Corporation shall, in the performance of his or her duties, be fully protected in relying in good faith upon the books of account or other records of the Corporation and upon such information, opinions, reports or statements presented to the Corporation by any of its officers or employees, or committees of the board of directors of the Corporation so designated, if any, or by any other person as to matters which the Director or such officer reasonably believes are within such other person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Corporation.

3.    **Fiscal Year.**  The fiscal year of the Corporation shall be as fixed by the Director.

4.    **Time Periods.**  In applying any provision of these By-Laws which requires that an act be done or not be done a specified number of days prior to an event or that an act be done during a period of a specified number of days prior to an event, calendar days shall be used, the day of the doing of the act shall be excluded, and the day of the event shall be included.

## ARTICLE VI

## Indemnification

1. **Rights to Indemnification.** Each person who was or is made a party or is threatened to be made a party to or is otherwise involved in any action, suit or proceeding, whether civil, criminal, administrative or investigative (hereinafter a "proceeding"), by reason of the fact that he or she is or was a director or an officer of the Corporation or is or was serving at the request of the Corporation as a director, officer, or trustee of another corporation or of a partnership, joint venture, trust or other enterprise, including service with respect to an employee benefit plan (hereinafter an "indemnitee"), whether the basis of such proceeding is alleged action in an official capacity as a director, officer or trustee, or in any other capacity while serving as a director, officer or trustee, shall be indemnified and held harmless by the Corporation to the fullest extent permitted by California law, as the same exists or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the Corporation to provide broader indemnification rights than such law permitted the Corporation to provide prior to such amendment), against all expense, liability and loss (including attorneys' fees, judgments, fines, ERISA excise taxes or penalties and amounts paid in settlement) reasonably incurred or suffered by such indemnitee in connection therewith; provided, however, that, except as provided in Section 3 of this ARTICLE VI with respect to proceedings to enforce rights to indemnification, the Corporation shall indemnify any such indemnitee in connection with a proceeding (or part thereof) initiated by such indemnitee only if such proceeding (or part thereof) was authorized by the Director.

2.    **Right to Advancement of Expenses.**  In addition to the right to indemnification conferred in Section 1 of this ARTICLE VI, an indemnitee shall also have the right to be paid by the Corporation the expenses (including attorney's fees) incurred in defending any such proceeding in advance of its final disposition (hereinafter an "advancement of expenses"); provided, however, that, if the California General Corporation Law requires, an advancement of expenses incurred by an indemnitee in his or her capacity as a director or officer (and not in any other capacity in which service was or is rendered by such indemnitee, including, without limitation, service to an employee benefit plan) shall be made only upon delivery to the Corporation of an undertaking (hereinafter an "undertaking"), by or on behalf of such indemnitee, to repay all amounts so advanced if it shall ultimately be determined by final judicial decision from which there is no further right to appeal (hereinafter a "final adjudication") that such indemnitee is not entitled to be indemnified for such expenses under this Section 2 or otherwise.

3.    **Rights of Indemnitee to Bring Suit.**  If a claim under Section 1 or 2 of this ARTICLE VI is not paid in full by the Corporation within 60 days after a written claim has been received by the Corporation, except in the case of a claim for an advancement of expenses, in which case the applicable period shall be 20 days, the indemnitee may at any time thereafter bring suit against the Corporation to recover the unpaid amount of the claim.  To the fullest extent permitted by law, if successful in whole or in part in any such suit, or in a suit brought by the Corporation to recover an advancement of expenses pursuant to the terms of an undertaking, the indemnitee shall be entitled to be paid also the expense of prosecuting or defending such suit.  In (i) any

7

suit brought by the indemnitee to enforce a right to indemnification hereunder (but not in a suit brought by the indemnitee to enforce a right to an advancement of expenses) it shall be a defense that, and (ii) in any suit brought by the Corporation to recover an advancement of expenses pursuant to the terms of an undertaking, the Corporation shall be entitled to recover such expenses upon a final adjudication that, the indemnitee has not met any applicable standard for indemnification set forth in the California General Corporation Law.  Neither the failure of the Corporation (including its directors who are not parties to such action, if any, independent legal counsel, or its shareholders) to have made a determination prior to the commencement of such suit that indemnification of the indemnitee is proper in the circumstances because the indemnitee has met the applicable standard of conduct set forth in the California General Corporation Law, nor an actual determination by the Corporation (including its directors who are not parties to such action, if any, independent legal counsel, or its shareholders) that the indemnitee has not met such applicable standard of conduct, shall create a presumption that the indemnitee has not met the applicable standard of conduct or, in the case of such a suit brought by the indemnitee, be a defense to such suit.  In any suit brought by the indemnitee to enforce a right to indemnification or to an advancement of expenses hereunder, or brought by the Corporation to recover an advancement of expenses pursuant to the terms of an undertaking, the burden of proving that the indemnitee is not entitled to be indemnified, or to such advancement of expenses, under this ARTICLE VI or otherwise shall be on the Corporation.

4.    **Non-Exclusivity of Rights.**  The rights to indemnification and to the advancement of expenses conferred in this ARTICLE VI shall not be exclusive of

any other right which any person may have or hereafter acquire under any statute, the Corporation's articles of incorporation, By-Laws, agreement, vote of stockholders or disinterested directors, if any, or otherwise.

5.    **Insurance.**    The Corporation may maintain insurance, at its expense, to protect itself and any director, officer, employee or agent of the Corporation or another corporation, partnership, joint venture, trust or other enterprise against any expense, liability or loss, whether or not the Corporation would have the power to indemnify such person against such expense, liability or loss under the California General Corporation Law.

6.    **Indemnification of Employees and Agents of the Corporation.** The Corporation may, to the extent authorized from time to time by the Director, grant rights to indemnification and to the advancement of expenses to any employee or agent of the Corporation to the fullest extent of the provisions of this ARTICLE VI with respect to the indemnification and advancement of expenses of directors and officers of the Corporation.

7.    **Nature of Rights.**    The rights conferred upon indemnitees in this ARTICLE VI shall be contract rights and such rights shall continue as to an indemnitee who has ceased to be a director, officer or trustee and shall inure to the benefit of the indemnitee's heirs, executors and administrators.  Any amendment, alteration or repeal of this ARTICLE VI that adversely affects any right of an indemnitee or its successors shall be prospective only and shall not limit, eliminate, or impair any such right with respect to any proceeding involving any occurrence or alleged occurrence of any action or omission to act that took place prior to such amendment, alteration or repeal.

THIS CERTIFIES that the foregoing constitutes the By-Laws of Sonoma Systems, as amended and restated by the Corporation pursuant to the Order, on the [•] day of February, 2017.

_____

John J. Ray, III, President

4

**Exhibit H**

## Wind Down Debtors to be Dissolved Following Final Distribution Date

Nortel Networks Inc. (NNI)

Nortel Networks Capital Corporation (NNCC)

Nortel Altsystems Inc.

Nortel Altsystems International Inc.

Xros, Inc.

Sonoma Systems

Qtera Corporation

CoreTek, Inc.

Nortel  Networks Applications Management Solutions Inc.

Nortel Networks Optical Components Inc.

Nortel Networks HPOCS Inc.

Architel Systems (U.S.) Corporation

Nortel Networks International Inc. (NNII)

Northern Telecom International Inc.

Nortel Networks Cable Solutions Inc.

Nortel Networks (CALA) Inc.