## Exhibit B-1

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

--------------------------------------------------------------- X
                                                        :
*In re*                                                 :   Chapter 11
                                                        :
Nortel Networks Inc., *et al.*,                         :   Case No. 09-10138 (KG)
                                                        :
             Debtors.[1]                                :   Jointly Administered
                                                        :
                                                        :   **RE:  D.I. 17501**
                                                        :
--------------------------------------------------------------- X

## [PROPOSED] FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER CONFIRMING FIRST AMENDED JOINT CHAPTER 11 PLAN NORTEL NETWORKS, INC. AND CERTAIN OF ITS AFFILIATED DEBTORS

Nortel Networks, Inc. and certain of its affiliated debtors and debtors-in-possession in the

above-captioned cases (collectively, the "Debtors") having, in each case on the terms and to the

extent set forth in the applicable pleadings and orders:

    i.       filed voluntary petitions for relief (the "Chapter 11 Cases") under chapter 11 of the Bankruptcy Code on January 14, 2009 [D.I. 1] for Debtors other than Nortel Networks (CALA) Inc. ("NNCALA"), and on July 14, 2009 for NNCALA (such date for each Debtor in their own case, the "Petition Date");

    ii.      continued to operate their businesses and manage their properties and assets as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, and no trustee or examiner having been appointed in the Chapter 11 Cases;

    iii.     sold various assets of the Debtors in a series of Court-approved sales (collectively, the "Sales") [D.I. 539, 1205, 1514, 1760, 2065, 2070, 2632, 3048, 4054, and 5935];

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567), Nortel Networks (CALA) Inc. (4226) and Nortel Networks India International, Inc. (8667). The First Amended Joint Chapter 11 Plan of Nortel Networks Inc. and Certain of its Affiliated Debtors does not include a Chapter 11 Plan for Nortel Networks India International Inc.  Contact information for the Debtors and their petitions are available at http://dm.epiq11.com/nortel.

iv.     entered into the Interim Funding and Settlement Agreement dated June 9, 2009, as well as various escrow agreements, governing the Sales and escrow of the proceeds from the Sales (the "Sale Proceeds"), which was approved by order of this Court dated June 29, 2009 [D.I. 993];

v.      engaged in litigation with their foreign affiliates and various other parties regarding the allocation of proceeds generated by such sales, which litigation ultimately resulted in (a) the Court's issuance of the Allocation Trial Opinion [D.I. 15544], (b) the Court's granting in part and denying in part the Debtors' Motion for Clarification and/or Reconsideration of the May 12, 2015 Allocation Trial Opinion and Order [D.I. 15611] by order dated July 6, 2015 [D.I. 15830], and (c) subsequent appeals of the Allocation Trial Opinion [D.I. 15846, 15888, 15890, 15893, 15894, 15916, 15878, 15921, 15919];

vi.     engaged in various court-ordered mediations regarding the allocation of the Sale Proceeds, including several months of mediation efforts overseen by the former Chief Judge of the United States District Court for the District of Delaware, Joseph J. Farnan, Recommendation, In re Nortel Networks Inc., No. 15-cv-624 (D. Del. Sept. 25, 2015) [D.I. 17];

vii.    filed the Notice of Execution of the Settlement and Plans Support Agreement (the "SPSA") [D.I. 17249], on October 12, 2016;

viii.   filed the First Amended Joint Chapter 11 Plan of Nortel Networks Inc. and Certain of its Affiliated Debtors (as subsequently amended, the "Plan") [D.I. 17347], on November 4, 2016;

ix.     filed the Proposed Disclosure Statement for the First Amended Joint Chapter 11 Plan of Nortel Networks Inc. and Certain of its Affiliated Debtors (as subsequently amended, the "Disclosure Statement") [D.I. 17348], also on November 4, 2016;

x.      filed the Motion for Entry of an Order Shortening the Objection Deadline and Notice of the Hearing to Consider Approval of Disclosure Statement [D.I. 17349], also on November 4, 2016;

xi.     filed the Debtors' Motion for Entry of an Order (I) Approving Adequacy of Information Contained in Disclosure Statement, (II) Establishing Voting Record Date, (III) Approving Procedures for Soliciting, Receiving and Tabulating Votes on the Plan, and (IV) Scheduling Confirmation Hearing Date and Establishing Notice and Objection Procedures (the "Solicitation Procedures Motion") [D.I. 17350], also on November 4, 2016;

xii.    obtained an Order Granting Debtors' Motion for Entry of an Order Shortening the Objection Deadline and Notice of the Hearing to Consider Approval of the Disclosure Statement [D.I. 17355], on November 7, 2016;

xiii.   received certain Objections to the Disclosure Statement on November 10-18, 2016 (collectively, the "Disclosure Statement Objections") [D.I. 17379, 17413, 17415, 17416, 17417 and 17431];

xiv.    filed a revised Plan [D.I. 17452] and corresponding blackline [D.I. 17453], along with a revised Disclosure Statement [D.I. 17456] and corresponding blackline [D.I. 17457], on November 29, 2016;

xv.     filed a further revised Plan [D.I. 17501], along with a further revised Disclosure Statement [D.I. 17502], on December 1, 2016;

xvi.    obtained approval of the Disclosure Statement and the Solicitation Procedures Motion by that certain Order (I) Approving the Disclosure Statement, (II) Establishing the Voting Record Date and Procedures for Soliciting, Receiving and Tabulating Votes on the Plan and (III) Setting the Confirmation Hearing Date and Establishing Notice and Objection Procedures (the "Disclosure Statement Approval Order") [D.I. 17516], which consensually resolved or overruled the Disclosure Statement Objections, also on December 1, 2016;

xvii.   caused notice regarding the Confirmation Hearing (as defined below) to be published in the Wall Street Journal and the Globe and Mail on December 9, 2016, as evidenced by the Affidavit of Publication Regarding Notice of (I) Hearing to Consider Confirmation of Debtors' Plan of Reorganization, (II) Deadlines and Procedures for Voting on the Plan, and (III) Deadlines and Procedures for Filing Objections to the Confirmation in the Wall Street Journal [D.I. 17692] and the Affidavit of Publication Regarding Notice of (I) Hearing to Consider Confirmation of Debtors' Plan of Reorganization, (II) Deadlines and Procedures for Voting on the Plan, and (III) Deadlines and Procedures for Filing Objections to the Confirmation in the Globe and Mail [D.I. 17692] (together, the "Publication Affidavits");

xviii.  completed, through the Claims Agent,[2] distribution of the Solicitation Materials (as defined below), consistent with the Bankruptcy Code, the Bankruptcy Rules, the Disclosure Statement Approval Order and the Solicitation Procedures Motion approved by the Disclosure Statement Approval Order, on December 2, 2016, as described in the Affidavit of Service of Solicitation Materials (the "Solicitation Affidavit") [D.I. 17710];

xix.    filed a Motion for Entry of an Order Pursuant to 11 U.S.C. §§ 105(a) and 363(b) and Federal Rule of Bankruptcy Procedure 9019 Approving Settlement and Plans Support Agreement (the "SPSA 9019 Motion") [D.I. 17589], on December 16, 2016;

---

[2]   Unless otherwise noted, capitalized terms not defined in this order (the "Confirmation Order") shall have the meanings ascribed to them in the Plan, as defined herein, *provided* that Wind-Down Architel means Architel on and after the Effective Date and Wind-Down CoreTek means CoreTek on and after the Effective Date. The rules of interpretation set forth in Section 1.3 of the Plan shall apply to the Confirmation Order.

xx.    filed the various documents comprising the Plan Supplement [D.I. 17644] on December 30, 2016 (as such documents may be further amended from time to time prior to the Effective Date in accordance with the Plan);

xxi.    received certain formal objections to the Plan on January 9, 2017 (collectively, the "Plan Objections") [D.I. 17673, 17678, 17683, 17684, 17685, 17686, 17687, 17689, 17700 and 17701], as well as certain informal inquiries and responses from other parties in interest;

xxii.    entered into stipulations with certain creditors regarding their right to vote on the Plan, as permitted under the Disclosure Statement Order [D.I. 17629 and 17680];

xxiii.    filed the Declaration of Jane Sullivan on Behalf of Epiq Bankruptcy Solutions, LLC, Regarding Voting and Tabulation of Ballots Cast on the First Amended Joint Chapter 11 Plan of Nortel Networks Inc. and Certain of its Affiliated Debtors (the "Voting Report") [D.I. 17729] on January 19, 2017;

xxiv.    filed the Memorandum of Law in Support of Confirmation and Omnibus Reply to Objections to Confirmation of the First Amended Joint Chapter 11 Plan of Nortel Networks, Inc. and Certain of its Affiliated Debtors (the "Confirmation Brief") [D.I. 17731], on January 19, 2017;

xxv.    filed the Notice of Resolution of Nortel Trade Claims Consortium Plan Confirmation Objection and Related Matters [D.I. 17749], on January 22, 2017; and

xxvi.    filed a further revised Plan [D.I.    ] on January 23, 2017.

This Court having:

i.    entered the Disclosure Statement Approval Order on December 1, 2016 [D.I. 17516];

ii.    held a hearing to consider the Confirmation of the Plan on January 24, 2017 (the "Confirmation Hearing");

iii.    reviewed the Disclosure Statement, the Plan, the Plan Supplement, the Confirmation Brief, the Voting Report, the SPSA 9019 Motion and all other pleadings, evidence, exhibits, statements, documents, and filings regarding confirmation of the Plan; and

iv.    heard and considered the statements of counsel and all other testimony and evidence proffered and/or adduced at the Confirmation Hearing and in respect of confirmation of the Plan.

NOW THEREFORE, it appearing to this Court that notice of the Confirmation Hearing and the

opportunity for any party in interest to object to Confirmation have been adequate and

appropriate as to all parties affected or to be affected by the Plan and the transactions contemplated thereby, and the legal and factual bases set forth in the documents filed in support of Confirmation and presented at the Confirmation Hearing establish just cause for the relief granted herein; and after due deliberation thereon and good cause appearing therefor, this Court hereby makes and issues the following Findings of Fact, Conclusions of Law, and orders:

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### A.    Jurisdiction and Venue

1.    On January 14, 2009, the Debtors, other than NNCALA and Nortel Networks India International Inc.,[3] commenced the Chapter 11 Cases.  On July 14, 2009, NNCALA commenced its Chapter 11 Case, which was consolidated and is being jointly administered with the other Debtors' chapter 11 cases for procedural purposes [D.I. 1098].  Venue in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") was proper as of the Petition Date with respect to each Debtor pursuant to 28 U.S.C. §§ 1408 and 1409 and continues to be proper during the Chapter 11 Cases.  Confirmation of the Plan ("Confirmation") is a core proceeding under 28 U.S.C.§ 157(b)(2).  The Bankruptcy Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and exclusive jurisdiction to determine whether the Plan complies with the applicable provisions of Title 11 of the United States Code (the "Bankruptcy Code") and should be confirmed.

### B.    Eligibility for Relief

2.    The Debtors were and are entities eligible for relief under the Bankruptcy Code.

---

[3]    Nortel Networks India International Inc. filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on July 26, 2016, which was consolidated and is being jointly administered with the other Debtors' chapter 11 cases for procedural purposes [D.I. 17090].

C.    **Commencement and Joint Administration of the Chapter 11 Cases**

3.    On or after the Petition Date, each of the above-captioned Debtors commenced a

case under Chapter 11 of the Bankruptcy Code.  By prior order of the Bankruptcy Court, the

Chapter 11 Cases have been consolidated for procedural purposes only and are being jointly

administered pursuant to Federal Rule of Bankruptcy Procedure 1015 (the "Bankruptcy Rules").

The Debtors have operated their businesses and managed their properties as debtors in

possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or

examiner has been appointed in the Chapter 11 Cases.

D.    **Judicial Notice**

4.    The Bankruptcy Court takes judicial notice of (and deems admitted into evidence

for Confirmation) the docket of the Chapter 11 Cases and all related adversary proceedings and

appeals maintained by the clerk of the applicable court or its duly appointed agent, including all

pleadings, exhibits and other documents on file, all orders entered, all hearing transcripts, and all

evidence and arguments made, proffered, or adduced at the hearings before the applicable court

during the pendency of the Chapter 11 Cases.  The Bankruptcy Court also takes judicial notice of

the official register of Claims against and Interests in the Debtors maintained by the Claims

Agent (the "Claims Register").  Any resolutions of objections to Confirmation explained on the

record at the Confirmation Hearing are incorporated by reference.  All unresolved objections,

statements, and reservations of rights are overruled on the merits.

E.    **Estate Representative**

5.    The Debtors' Plan Administrator, Greylock Partners, LLC, is the authorized

representative of the Debtors and their Estates for all matters relating to consummation and

implementation of the Plan, including, without limitation, for the purposes of obtaining

recognition and enforcement of this Order outside of the United States.

### F.   **Appointment of Creditors' Committee**

6.       On January 26, 2009, the U.S. Trustee appointed the Creditors' Committee to represent the interests of the unsecured creditors of the Debtors in these Chapter 11 Cases.  The Creditors' Committee was reconstituted during the Chapter 11 Cases and currently consists of: (i) Delaware Trust Company (as successor to Law Debenture Trust Company of New York), as indenture trustee; (ii) the Pension Benefit Guaranty Corporation; and (iii) The Bank of New York Mellon, as indenture trustee.

### G.   **Burden of Proof**

7.       Based on its review of the evidence submitted in support of Confirmation, including, without limitation, the declarations proffered as testimony, the Debtors have met their burden of proving the elements of Section 1129 of the Bankruptcy Code by a preponderance of the evidence.  This Court also finds that the Debtors have satisfied the elements of Section 1129 of the Bankruptcy Code by clear and convincing evidence.

### H.   **Disclosure Statement**

8.       The Disclosure Statement, previously approved as containing adequate information within the meaning of section 1125 of the Bankruptcy Code, was included in the Solicitation Packages and properly distributed to holders in connection with solicitation of their acceptance or rejection of the Plan, in accordance with the provisions of the Bankruptcy Code.

### I.   **Service of Solicitation Materials; Notice; Voting Report**

9.       As evidenced in the Solicitation Affidavit, the Debtors complied with the notice and service requirements and procedures with respect to solicitation of votes and distribution of notices of non-voting status or other notices, as approved in the Disclosure Statement Approval Order.  No objections were filed with respect to the Solicitation Affidavit.

10.     All procedures used to (a) provide notice and distribute the materials necessary to vote on the Plan (the "Solicitation Materials") to the applicable voting holders of Claims and Interests and (b) tabulate the Ballots and Master Ballots (as defined in the Solicitation Procedures Motion) were fair and conducted in accordance with the Disclosure Statement Approval Order, the Bankruptcy Code, the Bankruptcy Rules, the local rules of this Court, and all other applicable orders and federal, state, and local laws, rules and regulations (collectively, the "Applicable Laws").

11.     As evidenced by the Voting Report, all Ballots were properly tabulated, and votes for acceptance and rejection of the Plan were solicited in good faith and in compliance with sections 1125 and 1126 of the Bankruptcy Code, Bankruptcy Rules 3017 and 3018, the Disclosure Statement Approval Order and all applicable provisions of the Bankruptcy Code the Bankruptcy Rules and all other Applicable Laws.

12.     Each of the Debtors and, to the extent applicable, their respective affiliates, agents, directors, members, partners, officers, employees, advisors and attorneys have solicited votes on the Plan in good faith and in compliance with the applicable provisions of the Disclosure Statement Approval Order, the Bankruptcy Code, the Bankruptcy Rules and all other Applicable Laws.

**J.     Bankruptcy Rule 3016**

13.     The Plan is dated and identifies the entities submitting it, thereby satisfying Bankruptcy Rule 3016(a).  The filing of the Disclosure Statement with the clerk of the Bankruptcy Court satisfied Bankruptcy Rule 3016(b).  The injunction, release, and exculpation provisions in the Disclosure Statement and Plan describe, in bold font and with specific and conspicuous language, all acts to be enjoined and identify the entities that will be subject to the injunction, thereby satisfying Bankruptcy Rule 3016(c).

**K.**    **Confirmation Hearing Notice**

14.    As evidenced in the Publication Affidavits, the Debtors published a notice of the

Confirmation Hearing in the <u>Wall Street Journal</u> and the <u>Globe and Mail</u>, each on December 9,

2016.  The Debtors also served a notice of the Confirmation Hearing in accordance with the

procedures approved in the Disclosure Statement Approval Order, as evidenced in the

Solicitation Affidavit.

**L.**    **Voting Result**

15.    Classes A-3A through O-3A; A-3B; and A-3C through C-3C are Impaired under

the Plan and therefore eligible to vote on the Plan.  As evidenced by the Voting Report, which is

incorporated herein by reference, Impaired Classes at every Debtor—A-3B and A-3C, B-3A and

B-3C, C-3A, and D-3A through O-3A—voted to accept the Plan.

**M.**    **Classes Deemed to Have Accepted the Plan**

16.    Classes 1 and 2 are Unimpaired under the Plan and the holders of Claims in such

classes are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the

Bankruptcy Code.

**N.**    **Classes Deemed to Have Rejected the Plan**

17.    Classes 4, 5A, and 5B are not entitled to receive or retain any property under the

Plan on account of their Claims or Interests, and therefore the holders of Claims or Interests in

such classes are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the

Bankruptcy Code.

**O.**    **Plan Supplement**

18.    The documents identified in the Plan Supplement were filed as required by the

Applicable Laws.  The Debtors provided adequate and sufficient notice of such documents in

accordance with the Bankruptcy Code, the Bankruptcy Rules, the Disclosure Statement Approval

Order and Applicable Laws, and no other or further notice is or shall be required.  Subject to the terms of the Plan and the SPSA, the Debtors are authorized to modify and amend the Plan Supplement through and including the Effective Date, and to take all actions necessary and appropriate to effect the transactions contemplated therein through, including and following the Effective Date.

       **P.**       **Compliance with the Requirements of Section 1129 of the Bankruptcy Code**

       a.       <u>Section 1129(a)(1)—Compliance of the Plan with Applicable Provisions of the Bankruptcy Code</u>

19.       The Plan complies with all applicable provisions of the Bankruptcy Code as required by section 1129(a)(1) of the Bankruptcy Code, including, without limitation, sections 1122 and 1123 of the Bankruptcy Code.

       b.       <u>Sections 1122 and 1123(a)(1)—Proper Classification</u>

20.       Article 3 of the Plan designates Classes of Claims and Interests other than Administrative Expense Claims and Priority Tax Claims (which are not required to be designated pursuant to section 1123(a)(l) of the Bankruptcy Code).  As required by section 1122(a) of the Bankruptcy Code, each Class of Claims and Interests contains only Claims or Interests that are substantially similar to the other Claims or Interests within that Class, including, without limitation, the convenience classes A-3C, B-3C and C-3C that contain Claims whose holders elected to treat their Claims as Convenience Claims.  Classes A-3C, B-3C and C-3C consist of unsecured claims that are less than or reduced to an amount that is reasonable and necessary for administrative convenience, as authorized by section 1122(b) of the Bankruptcy Code.  The Crossover Bonds Claims and EDC Claims against NNI are appropriately classified in Class A-3B.  Valid reasons exist for separately classifying the various Classes of Claims and Interests

created under the Plan.  The Plan, therefore, satisfies sections 1122 and 1123(a)(1) of the

Bankruptcy Code.

      c.      <u>Sections 1123(a)(2) and 1123(a)(3)—Specific Unimpaired and Impaired Classes</u>

21.      Articles 3 and 4 of the Plan specify that Claims in Classes 1 and 2 are Unimpaired.

Administrative Expense Claims and Priority Tax Claims, which are not classified under the Plan,

also are Unimpaired.  Article 4 of the Plan further specifies the treatment of each Impaired Class

under the Plan, which are Classes A-3A through O-3A; A-3B; and A-3C through C-3C.  The

Plan, therefore, satisfies sections 1123(a)(2) and 1123(a)(3) of the Bankruptcy Code.

      d.      <u>Section 1123(a)(4)—No Discrimination</u>

22.      Article 4 of the Plan provides the same treatment for each Claim or Interest within

a particular Class, unless the Holder of a particular Claim or Interest has agreed to a less

favorable treatment with respect to such Claim or Interest.  The Plan provides that holders of

General Unsecured Claims and Crossover Bonds Claims are to receive distributions on a *pari*

*passu* basis, where certain claimants have the right to elect to have their claims treated as

Convenience Claims.  The Plan, therefore, satisfies the requirements of section 1123(a)(4) of the

Bankruptcy Code.

      e.      <u>Section 1123(a)(5)—Adequate Means for Implementation of the Plan</u>

23.      The Plan, the various documents and agreements set forth in the Plan Supplement

and other related documents provide adequate and proper means for the Plan's implementation,

and the Debtors will have sufficient Cash to make all payments prescribed pursuant to the Plan.

Moreover, the Plan provides adequate means for its implementation, including, without

limitation:  (a) the formation and corporate governance of the Wind-Down Debtors; (b) the

implementation of the settlements and terms incorporated into the SPSA; (c) the authorization of

corporate action, including any transactions necessary to implement the SPSA and the Plan; (d) the exemption from certain transfer taxes and recording fees; (e) the establishment of the Disputed Claims Reserve and Administrative Expense Claims Reserve; (f) the substantive consolidation of NNI and NNCC; (g) the allocation of the Sale Proceeds among the Debtors; (h) the Allowance and settlement of certain intercompany claims and other Claims against the Debtors; (i) the provisions regarding Crossover Claims; (j) the *pari passu* treatment of creditors; and (k) to the extent provided in the Plan, the cancellation or modification of certain Claims and Interests and the securities or indentures related thereto.  The Plan, therefore, satisfies the requirements of section 1123(a)(5) of the Bankruptcy Code.

        f.      <u>Section 1123(a)(6)—Non-Voting Equity Securities</u>

24.      Pursuant to Section 8.6 of the Plan, the certificate of incorporation of each Wind-Down Debtor shall be amended to prohibit the issuance of non-voting equity securities, and to provide an appropriate distribution of voting power among the several classes of securities possessing voting power, to the extent required by section 1123(a)(6) of the Bankruptcy Code. The Plan, therefore, satisfies the requirements of section 1123(a)(6) of the Bankruptcy Code.

        g.      <u>Section 1123(a)(7)—Designation of Directors and Officers</u>

25.      Section 8.4 of the Plan describes the manner of selection of directors and officers of the Wind-Down Debtors.  The identity and affiliations of any person proposed to serve as a director or officer of the Wind-Down Debtors has been disclosed in Exhibit F to the Plan.  The Debtors have properly and adequately disclosed or otherwise identified the procedures for determining the identities and affiliations of all individuals proposed to serve on or after the Effective Date as officers or directors of the Wind-Down Debtors.  The selection of each such director, manager or officer is consistent with the interests of creditors, Interest holders,

Applicable Laws and public policy.  The Plan, therefore satisfies the requirements of section 1123(a)(7) of the Bankruptcy Code.

> h.    Section 1123(b)—Discretionary Contents of the Plan

26.    The other provisions of the Plan, including, without limitation, those relating to the Allowance and settlement of certain intercompany claims and other Claims against the Debtors, the Disputed Claims and the Disputed Claims Reserve, the Released Parties and the Plan's releases, the Exculpated Parties and the Plan's exculpation provisions, the implementation of the SPSA, the substantive consolidation of NNI and NNCC, the allocation of the Sale Proceeds among the Debtors, the treatment of the Crossover Claims, the *pari passu* treatment of creditors and the assumption of certain executory contracts are appropriate and consistent with the applicable provisions of the Bankruptcy Code.  Therefore, the Plan satisfies the requirements of section 1123(b) of the Bankruptcy Code.

> i.    Section 1123(d)—Curing Defaults

27.    The Plan satisfies section 1123(d)'s requirement that any amounts necessary to cure any defaults, if any, associated with each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan in accordance with section 365(b)(1) of the Bankruptcy Code have been determined in accordance with the relevant underlying agreement and any applicable nonbankruptcy law.

> j.    Section 1129(a)(2)—the Debtors' Compliance with Applicable Provisions of the Bankruptcy Code

28.    The Debtors, as Plan proponents, have complied with all applicable provisions of the Bankruptcy Code as required by section 1129(a)(2) of the Bankruptcy Code, including, without limitation, sections 1125 and 1126 of the Bankruptcy Code and Bankruptcy Rules 3017, 3018 and 3019.  In particular, the Debtors are eligible debtors under section 109 of the

Bankruptcy Code and proper Plan proponents under section 1121(a) of the Bankruptcy Code. Furthermore, the solicitation of acceptances and rejections of the Plan: (a) complied with the Disclosure Statement Approval Order; (b) complied with all Applicable Laws governing the adequacy of disclosure in connection with such solicitation; (c) occurred only after disclosing "adequate information," as section 1125(a) of the Bankruptcy Code defines that term, to holders of Claims and Interests; and (d) any modifications made to the Plan in order to implement settlements or resolve objections to Confirmation of the Plan, including the NTCC Settlement, comply with Bankruptcy Rule 3019 and, for the avoidance of doubt, do not require the Debtors to resolicit any creditors. The Debtors and each party to the SPSA, and their respective affiliates, agents, directors, members, partners, officers, employees, advisors, and attorneys, each in their capacities as such, have acted in "good faith" within the meaning of section 1125(e) of the Bankruptcy Code. The Plan, therefore, satisfies the requirements of section 1129(a)(2) of the Bankruptcy Code.

      k.    <u>Section 1129(a)(3)—Proposal of the Plan in Good Faith</u>

29. Based on the record before this Court, including all testimony and evidence proffered or adduced at or prior to the Confirmation Hearing, the Debtors have proposed the Plan in good faith and not by any means forbidden by law. Consistent with the overriding purpose of Chapter 11 of the Bankruptcy Code, the SPSA and the Plan leave Priority and Secured Creditors Unimpaired and maximize recoveries to holders of General Unsecured Claims. The SPSA, as incorporated into the Plan, is an essential element of the Plan, and its terms are in the best interests of the Wind-Down Debtors, the Debtors, their Estates, creditors and Interest holders and was negotiated and obtained in good faith. In so determining, this Court has examined the totality of the circumstances surrounding the filing of the Chapter 11 Cases, the Plan itself, the process leading to the formulation of the Plan and Confirmation, and the Plan Objections. The

Chapter 11 Cases were filed, and the Plan (including, without limitation, the allocation of the Sale Proceeds both between the Canadian Debtors, the EMEA Debtors, NNSA and the Debtors, and among the Debtors; the Allowance and settlement of certain intercompany claims and other Claims against the Debtors; the substantive consolidation of NNI and NNCC, and the non-consolidation of the other Debtors; the provisions regarding Crossover Claims; the *pari passu* treatment of creditors and the other terms contained therein) was proposed with the legitimate purpose of resolving the Allocation Dispute and other unresolved Claims and potential disputes among the Debtors and other Nortel entities and allowing the Debtors to wind down and distribute their remaining assets to creditors.  The Plan, therefore, satisfies the requirements of section 1129(a)(3) of the Bankruptcy Code.

l.    Section1129(a)(4)—Bankruptcy Court Approval of Certain Payments as Reasonable

30.    Payments made or to be made by the Debtors for services or for costs and expenses in connection with the Chapter 11 Cases prior to confirmation, or in connection with the Plan and incidental to the Chapter 11 Cases, including Professional Claims and the U.S. Trustee Fees, have been approved by, or are subject to the approval of, this Court as reasonable. After the Effective Date, the Court will retain jurisdiction with respect to applications for allowance of Professional Claims and expenses incurred up to and through the Effective Date. The Plan, therefore, satisfies the requirements of section 1129(a)(4) of the Bankruptcy Code.

m.    Section 1129(a)(5)—Disclosure of Identity of Proposed Management and Compensation of Insiders and Consistency of Management Proposals with the Interests of Creditors and Public Policy

31.    In Exhibit F to the Plan, the Debtors have adequately disclosed the identity and affiliations of individuals proposed to serve, after confirmation of the Plan, as directors, officers, voting trustees, affiliates of the Debtors participating in a joint Plan with the Debtors, or

15

successors to the Debtors under the Plan, as required by section 1129(a)(5)(A)(i) of the Bankruptcy Code, and such appointments are consistent with the interests of creditors and Interest Holders and with public policy, as required by section 1129(a)(5)(A)(ii) of the Bankruptcy Code.  The Debtors have also disclosed the identity and the nature of compensation of insiders (as section 101 of the Bankruptcy Code defines that term) who will be employed or retained by the Wind-Down Debtors, as required by section 1129(a)(5)(B) of the Bankruptcy Code.  The Plan, therefore, satisfies the requirements of section 1129(a)(5) of the Bankruptcy Code.

> n.    Section 1129(a)(6)—Approval of Rate Changes

32.    The Plan does not contain any rate changes subject to jurisdiction of any governmental regulatory commission and will not require governmental regulatory approval. Therefore, section 1129(a)(6) of the Bankruptcy Code does not apply to the Chapter 11 Cases.

> o.    Section 1129(a)(7)—Best Interests of Creditors and Interest Holders

33.    The Plan satisfies section 1129(a)(7) of the Bankruptcy Code.  The liquidation analysis attached as Appendix D to the Disclosure Statement (the "Liquidation Analysis") and the other evidence related thereto, as supplemented by the evidence proffered or adduced at or prior to the Confirmation Hearing, including the methodology used and assumptions made in the Liquidation Analysis, (a) are persuasive and credible as of the dates such evidence was prepared, presented or proffered, (b) have not been controverted by other persuasive evidence and have not been challenged, (c) are based upon reasonable and sound assumptions, and (d) provide a reasonable estimate of the liquidation value of the Debtors' Estates upon a conversion to a Chapter 7 proceeding.

34.    With respect to Classes A-3A through O-3A; A-3B; and A-3C through C-3C, the Impaired Classes under the Plan, each Holder of a General Unsecured Claim, a Crossover Claim,

or a Convenience Claim has accepted the Plan or will receive under the Plan on account of its

respective Claim property of a value, as of the Effective Date, that is not less than the amount

that each such holder would so receive or retain if the Debtors were liquidated on the Effective

Date under Chapter 7 of the Bankruptcy Code.  The Plan, therefore, satisfies the requirements of

section 1129(a)(7) of the Bankruptcy Code.

        p.        <u>Section 1129(a)(8)—Acceptance of the Plan by Each Impaired Class</u>

35.      Classes 1 and 2 at each Debtor are deemed to accept the Plan.  Impaired Classes

A-3B and A-3C, B-3A and B-3C, C-3A, and D-3A through O-3A voted to accept the Plan.  In

accordance with Section 5.4 of the Plan, all vacant Classes of Claims with respect to each of the

Debtors are deemed eliminated for purposes of voting to Accept or reject the Plan.  Classes D1-

O1 (Priority Non-Tax Claims), C2 through O2 (Secured Claims), C-3C (Convenience Claims) at

Nortel Altsystems, and 4 (Subordinated Claims) and 5B (Interests Securities Fraud Claims) at

every Debtor were vacant and are eliminated.

36.      As of the Voting Deadline, only Class A-3A voted to reject the Plan for

NNI/NNCC.  Holders of Interests in Class 5A of each Debtor are deemed to have rejected the

Plan.  Both Class A-3A and Class 5A of each Debtor are impaired and therefore section

1129(a)(8) of the Bankruptcy Code is not satisfied.  Nevertheless, the Plan is confirmable

because it satisfies section 1129(b) of the Bankruptcy Code with respect to such non-accepting

and impaired Classes of Claims and Interests.

        q.        <u>Section 1129(a)(9)—Treatment of Claims Entitled to Priority Pursuant to Section 507(a) of the Bankruptcy Code</u>

37.      The treatment of (i) Administrative Expense Claims, as set forth in Section 2.1 of

the Plan, (ii) Priority Tax Claims, as set forth in Section 2.4 of the Plan, and (iii) any Allowed

Other Priority Claim, as set forth in Section 4.1 of the Plan, is in accordance with the

requirements of section 1129(a)(9) of the Bankruptcy Code.  The Plan, therefore, satisfies section 1129(a)(9) of the Bankruptcy Code

      r.    <u>Section 1129(a)(10)—Acceptance by at Least One Impaired Class</u>

38.    As set forth in the Voting Report and herein, Classes A-3B and A-3C (NNI/NNCC), B-3A and B-3C (NNCALA), C-3A (Nortel Altsystems) and D-3A-O3A (all other Debtors) voted to accept the Plan.  As such, there is at least one Class of Claims that is Impaired under the Plan that has accepted the Plan as to each Debtor, determined without including any acceptance of the Plan by any insider, thus satisfying section 1129(a)(10) of the Bankruptcy Code.

      s.    <u>Section 1129(a)(11)—Feasibility of the Plan</u>

39.    The Plan is feasible and satisfies the requirements of section 1129(a)(11) of the Bankruptcy Code.  The Disclosure Statement and the Budget and Recovery Analysis attached as Appendix C thereto establish that the Wind-Down Debtors will have sufficient funds available to meet their obligations under the Plan.  Further evidence proffered or adduced at or prior to the Confirmation Hearing—which evidence is reasonable, persuasive and credible, and which has not been controverted by other evidence—establishes the Plan is feasible and Confirmation of the Plan is not likely to be followed by the Wind-Down Debtors, Debtors or any successor to the Wind-Down Debtors under the Plan requiring liquidation or further financial reorganization except as required by the Plan.

      t.    <u>Section 1129(a)(12)—Payment of Statutory Bankruptcy Fees</u>

40.    Section 15.20 of the Plan provides that all fees payable by the Debtors pursuant to section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court, shall be paid for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted,

dismissed or closed, whichever occurs first.  The Plan, therefore, satisfies the requirements of section 1129(a)(12) of the Bankruptcy Code

u.      Section 1129(a)(13)—Retiree Benefits

41.      The Debtors have no continuing obligation to provide "retiree benefits," as defined in section 1114(a) of the Bankruptcy Code, because all such obligations were terminated and settled or otherwise resolved pursuant to prior orders of the Court.  Accordingly, section 1129(a)(13) of the Bankruptcy Code does not apply to the Chapter 11 Cases.

v.      Section 1129(a)(14), 1129(a)(15) or 1129(a)(16)

42.      The Debtors do not owe any domestic support obligations, are not individuals, and are not nonprofit corporations.  Therefore, none of sections 1129(a)(14), 1129(a)(15) or 1129(a)(16) of the Bankruptcy Code apply to the Chapter 11 Cases.

w.      Section 1129(b)—Classification of Claims and Interests and Confirmation of Plan Over Rejecting Classes

43.      The classification and treatment of Claims and Interests in the Plan meets all of the applicable requirements of section 1129(a) of the Bankruptcy Code other than paragraph (8) and satisfies section 1129(b).  Although the Plan separately classifies Claims in Class A-3A and Claims in Class A-3B, which have the same priority, such classification complies with the Bankruptcy Code and Applicable Law, it treats such Claims on a *pari passu* basis and does not unfairly discriminate against any non-accepting and impaired Class of Claims or Interests.  Class A-3C also has accepted the Plan.  The Plan is fair and equitable with respect to each Class of Claims or Interests that is impaired under, and has not accepted, the Plan, because it provides that the holder of any Claim or Interest that is junior to the Claims of such Class will not receive or retain any property on account of such junior Claim or Interest unless the creditors in such

impaired Class receive payment equal to the full Allowed amount of their claim.  Therefore, the Plan meets the requirements of section 1129(b)(1) of the Bankruptcy Code.

        x.       <u>Section 1129(c)—Only One Plan</u>

44.      Other than the Plan (including previous versions thereof), no other plan has been filed for the Debtors in the Chapter 11 Cases. The Plan, therefore, satisfies the requirements of section 1129(c) of the Bankruptcy Code.

        y.       <u>Section 1129(d)—Principal Purpose of Plan is Not Avoidance of Taxes</u>

45.      The principal purpose of the Plan is not the avoidance of taxes or the avoidance of the application of Section 5 of the Securities Act (15 U.S.C. § 77e).  The Plan, therefore, satisfies the requirements of section 1129(d) of the Bankruptcy Code.

**Q.**      **<u>Satisfaction of Confirmation Requirements</u>**

46.      Based upon the foregoing, the Plan satisfies the requirements for confirmation set forth in section 1129 of the Bankruptcy Code.

**R.**      **<u>Good Faith Solicitation</u>**

47.      Based upon the record before the Court in the Chapter 11 Cases, including all testimony and evidence proffered or adduced at or prior to the Confirmation Hearing, the Debtors, the Creditors' Committee, the Bondholder Group, The Bank of New York Mellon as indenture trustee, Delaware Trust Company as indenture trustee, Law Debenture Trust Company of New York as indenture trustee, the other parties to the SPSA and the respective affiliates, agents, directors, members, partners, officers, employees, advisors, attorneys and other professionals retained by all of the foregoing Persons, have acted in good faith (including, without limitation, within the meaning of sections 1125(e) and 1126(e) of the Bankruptcy Code), in respect of the Plan itself and the arm's-length negotiations among the parties with respect to the formulation thereof and will continue to act in good faith if they proceed to:  (a) consummate

the Plan and the agreements, settlements, transactions and transfers contemplated thereby; and (b) take the actions authorized and directed by this Confirmation Order and the Plan.  For the avoidance of doubt, this paragraph only applies to the Debtors' officers, directors and employees in their capacities as such.

### S.    Wind-Down of the Debtors

48.    The wind-down of the Debtors in accordance with Article 8 of the Plan, and the transactions contemplated therein, are necessary and appropriate for consummation of the Plan and the success and feasibility thereof, and are in the best interests of the Debtors, the Wind-Down Debtors, their Estates and creditors.

### T.    Disclosure of Agreements and Other Documents

49.    The Debtors have disclosed all material facts about the Plan, including without limitation, regarding:  (a) the amendment of the by-laws and articles of incorporation, as applicable, of each Wind-Down Debtor; (b) the selection of directors and officers for the Wind-Down Debtors; (c) the SPSA and all rights and obligations therein; (d) the adoption, execution and implementation of the other matters provided for under the Plan involving corporate action to be taken by or required of the Debtors or the Wind-Down Debtors; (e) the exemption under section 1146(a) of the Bankruptcy Code; (f) the Disputed Claims Reserve and Administrative Expense Claims Reserve; and (g) the adoption, execution and delivery of all other material contracts, leases, instruments, releases, indentures, supplemental indentures and other agreements related to any of the foregoing.

### U.    Implementation of Other Necessary Documents and Agreements

50.    All documents and agreements necessary to implement the Plan, including, without limitation, those contained in the Plan Supplement, which are incorporated into and are a part of the Plan as set forth in Sections 1.3(4) and 1.4 of the Plan, and all other relevant and

necessary documents and agreements relating to the Plan or the transactions contemplated thereby are in the best interests of the Debtors, the Wind-Down Debtors, and the holders of Claims and Interests and have been negotiated in good faith and at arm's length.  The Debtors have exercised reasonable business judgment in determining to enter into all such documents and agreements and have provided sufficient and adequate notice of such documents and agreements to parties in interest.

### V.    Executory Contracts and Unexpired Leases; Adequate Assurance

51.    The Debtors have exercised reasonable business judgment in determining whether to assume or reject each of their executory contracts and unexpired leases as set forth in Article 9 of the Plan, Exhibit C to the Plan, or otherwise, and in this Confirmation Order.

52.    The assumption or rejection of executory contracts and unexpired leases pursuant to this Confirmation Order and in accordance with Article 9 of the Plan is integral to the Plan and is in the best interests of the Debtors and their estates, creditors, holders of Interests and other parties in interest.

53.    The Debtors have provided adequate assurance of future performance for each of the assumed executory contracts and unexpired leases that are being assumed by the Wind-Down Debtors, as applicable, pursuant to the Plan.  The Debtors have cured or provided adequate assurance that the Wind-Down Debtors will cure defaults (if any) under or relating to each of the executory contracts and unexpired leases that are being assumed by the Wind-Down Debtors, as applicable, pursuant to the Plan.  No Cure amounts with respect to assumed contracts, as set forth in Exhibit C to the Plan, are necessary under section 365(b) of the Bankruptcy Code.  By the payment of the Cure amounts, if and where applicable, the Debtors shall have cured and/or provided adequate assurance of cure of any monetary default existing as of the Effective Date and provided for compensation or adequate assurance of compensation to any party for actual

pecuniary loss to such party resulting from a default under such assumed contracts and leases.

The Plan, therefore, satisfies the requirements of section 365 of the Bankruptcy Code.

### W.   Substantive Consolidation of NNI and NNCC

54.     Based on the information contained in the Disclosure Statement and all evidence

and arguments made, proffered, or adduced in the Confirmation Brief and at the Confirmation

Hearing, the substantive consolidation of NNI and NNCC as provided in Section 6.2 of the Plan

is justified and appropriate in these Chapter 11 Cases.  Without limiting the foregoing, the Court

makes the following findings of fact:

55.     NNCC's sole purpose was to serve as a financing vehicle for the Nortel group.

NNCC, Prospectus Supplement at 3, May 2, 1996.  Given this role, it had no assets or operations

separate from NNI.  NNCC, Prospectus Supplement at 3, May 2, 1996.  NNCC did not have any

of its own employees and instead relied on NNI and other members of the corporate group's

employees for all of its operations (i.e. its financing activities).  NNCC, Prospectus Supplement

at 3, May 2, 1996.

56.     Shortly after its incorporation, NNCC issued $300 million in bonds, the proceeds

of which were almost entirely passed directly to NNI, excluding only the debt issuance expenses

incurred by NNCC.  NNCC, Prospectus Supplement at 1, May 2, 1996; NNCC, Prospectus

Supplement at 2; June 12, 1996 and July 23, 1996 Promissory Notes.  NNI entered into an

intercompany loan with NNCC with terms that mirrored the NNCC Bonds' repayment terms.

Prospectus Supplement at 1, 3, May 2, 1996.  While NNL guaranteed the bonds, to the extent

guaranty fee payments were made to NNL in connection with this role, NNI made those

payments.  Notice of Amendments to Schedules of Assets and Liabilities of NNI and Nortel

Networks Capital Corporation at 2, December 10, 2014 [D.I. 14923].  Consistent with this, the

only prepetition creditors of NNCC were the NNCC Bondholders (for the amounts owed under the Bonds) and NNI (for the guaranty fees).

### X.    Reserves

57.    The Disputed Claims Reserve and provisions related to such reserve, including, without limitation, section 11.6 of the Plan, are reasonable and appropriate under the circumstances, and adequately protects the interests of holders of Disputed Claims pending determination of such Claims.

58.    The Administrative Expense Claims Reserve and provisions related to such reserve, including, without limitation, section 15.5 of the Plan, are reasonable and appropriate under the circumstances, and adequately protect the interests of holders of Disputed Administrative Expense Claims, Disputed Cure Amounts, Disputed Priority Tax Claims and Disputed Priority Non-Tax Claims pending determination of such Claims.

### Y.    Post-Petition Interest

59.    Pursuant to Section 7.12 of the Plan, no interest shall accrue on any Allowed Claim amount nor shall such interest on Allowed Claims be paid by any Debtor.

### Z.    Settlements and Compromises; Rule 9019

60.    The Plan incorporates an integrated compromise and settlement – the SPSA – of numerous issues, disputes and Claims designed to achieve a beneficial and efficient resolution of these Chapter 11 Cases for all parties in interest.  Based upon the Confirmation Brief, the Declarations, the other pleadings and arguments of counsel for the Debtors and all other testimony given or proffered at the Confirmation Hearing or at any prior hearings and the full record of these Chapter 11 Cases, the findings and conclusions of which are hereby incorporated by reference as if fully set forth herein, the Court hereby finds that, pursuant to sections 1129(a)(3) and 1123(b) of the Bankruptcy Code, Bankruptcy Rule 9019 and other Applicable

Laws, and in consideration of the distributions and other benefits provided under the Plan, the

Plan, including the SPSA, each of the injunctions, releases, exculpation, indemnifications and

discharges set forth in the Plan, and all other settlements embodied in the treatment of Claims

and other provisions of the Plan including, without limitation, the settlements contained in the

SPSA (Exhibit A to the Plan) and the Intercompany Administrative Expense Claims (as reflected

in Exhibit D to the Plan), constitute a good faith global compromise and settlement of all Claims

or controversies relating to the rights that a holder of a Claim or Interest may have with respect

to any Claim or Interest and any distribution to be made pursuant to the Plan on account of any

Allowed Claim or Interest.  Such compromises and settlements are fair, equitable, reasonable,

appropriate in light of the costs, risks, and all relevant facts and circumstances underlying such

compromises and settlements, are within the range of litigated outcomes, and are in the best

interests of the Debtors and Holders of Claims and Interests.

AA.    **The SPSA is a Fair and Reasonable Settlement and Compromise**

61.    The SPSA provides a fair, reasonable and final resolution of the Allocation

Dispute that establishes an allocation of the Sale Proceeds above the lowest point in the range of

reasonable outcomes, particularly when accounting for the significant costs, risks and delay that

would likely arise from the continued litigation of the Allocation Dispute, which the Parties to

that dispute have consistently demonstrated their willingness and intention to pursue to

conclusion absent a settlement.  The SPSA also contains various other compromises and

settlement terms, including the resolution of the manner in which the Sale Proceeds will be

distributed promptly and claims will be administered in the Canadian Debtors' cases, the

resolution of various intercompany claims between and among the Debtors and their affiliates,

the resolution of material claims against the Canadian Debtors' estates and the exchange of

releases between and among the parties to the SPSA, that provide further benefits to the Debtors

in terms of resolving such claims and disputes, thereby providing additional consideration for the Debtors and their estates, avoiding further litigation and risks, costs and delays associated therewith.  The SPSA, including all compromises and settlements contained therein, was negotiated at arms-length and obtained in good faith.

62.    The SPSA meets the criteria for approval based on the factors set out in In re Martin, 91 F.3d 389 (3d Cir. 1996):  (1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors. The following factors, among others, weigh strongly in favor of approval of the SPSA, especially when compared to the alternative of further prolonged litigation in both U.S. and Canadian courts:  (1) the significant risk regarding the Debtors' ability to achieve a better outcome than the Allocation Decisions issued jointly by U.S. and Canadian Courts or the other SPSA terms, whether considered separately or collectively; (2) the uncertainty of the Debtors' probability of success with respect to the various litigations, disputes and other issues settled under the SPSA, including, without limitation, the ongoing Allocation Disputes in the U.S. and Canada; (3) the Debtors' improved ability to collect on intercompany claims through the collective resolution of various pending disputes, the negotiation of a timeline for distributions, and the other provisions of the SPSA; (4) the unique complexity of the Allocation Dispute and the accompanying expense, inconvenience, and delay that would inevitably result from continued litigation in the United States and Canadian courts, and (5) creditors' interest in bringing these cases to conclusion, avoiding additional costs and delays, and obtaining increased and expeditious distributions when compared with the allocation provided in the Allocation Trial Opinion.

### BB.    The NTCC Settlement

63.    The NTCC Settlement meets the criteria for approval based on the factors set out in In re Martin, 91 F.3d 389 (3d Cir. 1996):  (1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors. The following factors, among others, weigh strongly in favor of approval of the NTCC Settlement, especially when compared to the alternative of further prolonged litigation between the NTCC and the Debtors' estates:  (1) the possible litigation risks and uncertainties presented by the pending appeal of the NTCC at the United States Court of Appeals for the Third Circuit and such appeal's possible impact on the Debtors' ability to promptly wind down these cases and distribute funds to their creditors; (2) the savings to the estates associated with the Bondholder Group's waiver of any claims for substantial contribution pursuant to section 503(b) of the Bankruptcy Code or other reimbursement of various fees and costs; (3) the avoidance of the expense associated with the resolution of the NTCC Objection and potential appeals thereof; (4) the shared nature of the consideration being contributed to the NTCC by both the Debtors and the Bondholder Group; and (5) the interest of the Debtors and their creditors in bringing these cases to conclusion, avoiding additional costs and delays, and obtaining increased and expeditious pro rata distributions of Creditor Proceeds, as compared to those that would result from the allocation provided in the Allocation Trial Opinion or as may result from continued litigation absent a settlement.

### CC.    Releases; Exculpation and Injunction

64.    The release, exculpation, and injunction provisions set forth in the Plan, including, without limitation, the releases, exculpations and injunctions contained in Article 13 of the Plan, constitute good faith compromises and settlements of the matters covered thereby.  Such

compromises and settlements are:  (i) made in exchange for good, valuable and adequate consideration provided by the Persons being released or exculpated and represent good faith settlements and compromises of the claims being released; (ii) in the best interests of the Debtors, the Estates, and holders of Claims and Interests; (iii) fair, necessary, equitable, and reasonable; and (iv) integral elements of the resolution of the Chapter 11 Cases in accordance with the Plan. Proper, timely, adequate and sufficient notice of the release, exculpation and injunction provisions set forth in the Plan, including, without limitation, the releases, exculpations and injunctions contained in Article 13 of the Plan, has been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules, the orders of this Court and due process.  Interested parties have had a sufficient and adequate opportunity to object to such provisions and be heard as to their objections, and no further notice of such provisions is required for entry of this Confirmation Order.  Each of the release, exculpation, and injunction provisions set forth in the Plan and this Confirmation Order is:  (a) within the jurisdiction of the Court under 28 U.S.C. §§ 1334(a), 1334(b), and 1334(d); (b) an essential means of implementing the Plan pursuant to section 1123(a)(5) of the Bankruptcy Code; (c) an integral element of the transactions incorporated into the Plan; (d) conferring material benefit on, and is in the best interests of, the Debtors, the Estates, and holders of Claims or Interests; (e) important to the overall objectives of the Plan to finally resolve all Claims among or against the Persons in the Chapter 11 Cases with respect to the Debtors, their organization, capitalization, operation, and reorganization in accordance with the Plan; and (f) consistent with sections 105, 1123 and 1129 of the Bankruptcy Code and other applicable provisions of the Bankruptcy Code.

65.     The releases contained in the Plan were a material negotiation point in connection with the SPSA and instrumental in developing a Plan that maximized value for all of the

Debtors' creditors.  As such, releases appropriately offer certain protection to parties who

constructively participated in the Debtors' Chapter 11 Cases, including by supporting the Plan

through the SPSA.  Furthermore, the third-party releases contained in the Plan are consensual as

the parties in interest were provided notice of the chapter 11 proceedings, the Plan, and the

deadline to object to confirmation of the Plan.  Additionally, voting creditors were given the

opportunity to opt out of the third party releases, and the release provisions of the Plan were

conspicuous, emphasized with boldface type in the Plan, the Disclosure Statement, and the

ballots.  The scope of the releases is appropriately tailored under the facts and circumstances of

these Chapter 11 Cases.

> **DD.**     **Conditions to Confirmation and the Effective Date**

66.     The conditions to confirmation of the Plan set forth in Section 12.1 of the Plan

have been satisfied.

67.     Each of the conditions precedent to the Effective Date, as set forth in Section 12.3

of the Plan, is reasonably likely to be satisfied or waived in accordance with the Plan.

> **EE.**     **Retention of Jurisdiction**

68.     This Court may properly retain jurisdiction over all matters arising out of or

related to the Chapter 11 Cases, the Debtors, the Wind-Down Debtors and the Plan after the

Effective Date, to the fullest extent permitted by law, in accordance with Article 14 of the Plan.

## ORDER

ACCORDINGLY, IT IS HEREBY ORDERED, ADJUDGED, DECREED, AND DETERMINED THAT:

### I.      Confirmation of Plan

69.      The Plan and each of its provisions, all documents and agreements necessary to implement the Plan, including, without limitation, those contained in the Plan Supplement, which are incorporated into and are a part of the Plan as set forth in Sections 1.3(4) and 1.4 of the Plan, the terms of the SPSA which are incorporated into the Plan and all other relevant and necessary documents and agreements are APPROVED and CONFIRMED in accordance with section 1129 of the Bankruptcy Code.  The terms of the Plan, the Plan Supplement, all exhibits and addenda thereto and the Docket are incorporated by reference into, and are an integral part of, this Confirmation Order (subject to any provision incorporated by such reference being governed by an express and contradictory provision herein).  Each term and provision of the Plan, as it may have been altered or interpreted in accordance with section 15.15 of the Plan, is valid and enforceable pursuant to its terms.

### II.      Objections to Plan Overruled

70.      Except as otherwise expressly set forth herein, to the extent that any objections, reservations of rights, requests, statements, or joinders to or related to Confirmation have not been withdrawn, waived, or settled prior to entry of the Confirmation Order or otherwise resolved or adjourned for later adjudication by the Court as stated on the record of the Confirmation Hearing, they are hereby overruled on the merits.

### III.       Findings of Fact and Conclusions of Law

71.       The findings of fact and conclusions of law stated in the Confirmation Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to these Chapter 11 Cases by bankruptcy Rule 9014.  Any and all findings of fact shall constitute findings of fact even if they are stated as conclusions of law, and any and all conclusions of law shall constitute conclusions of law even if they are stated as findings of fact. Further, any findings of fact and conclusions of law announced on the record in open court are incorporated by reference herein.

### IV.       Automatic Stay

72.       The automatic stay under section 362 of the Bankruptcy Code is hereby modified to the extent necessary to implement the Plan.

### V.       Terms Binding

73.       Subject to the satisfaction or waiver of the conditions precedent set forth in Article 12 of the Plan, the terms of the Plan, the Plan Supplement, and all agreements, documents, instruments and certificates relating thereto, including the terms of the SPSA in accordance with the Plan, shall be effective and binding as of the Effective Date of the Plan, or as applicable, when executed or adopted thereafter, and shall be binding in accordance with their respective terms upon the Debtors, the Wind-Down Debtors, all holders of Claims and Interests and all other Persons that are affected in any manner by the Plan.

74.       Notwithstanding the foregoing or any other provision herein, if there is any direct conflict between the Plan, the Plan Supplement, all exhibits and addenda thereto (including the terms of the Plan, the Plan Supplement, all exhibits and addenda thereto, incorporated by reference herein), and the terms of this Confirmation Order, the terms of this Confirmation Order shall control.

### VI.        Separate Plans

75.      Except as otherwise provided in the Plan, the Plan constitutes a separate Chapter 11 Plan for each individual Debtor (except in the case of NNI and NNCC), and the classification of Claims and Interests set forth therein shall apply separately to each of the Debtors.  The Confirmation and effectiveness of any Debtor's Plan is not conditioned on the Confirmation and effectiveness of any other Debtor's Plan.

### VII.        Modifications to Plan

76.      Any modifications to the Plan (as reflected on the record at the Confirmation Hearing and as reflected in this Order) including, without limitation, the modifications made to implement the NTCC Settlement, meet the requirements of sections 1127(i) and (c) of the Bankruptcy Code.  Such amendments do not adversely change the treatment of the Claim of any creditor or Interest of any equity security holder within the meaning of Bankruptcy Rule 3019, and no further solicitation of votes or voting is required.

### VIII.        Provisions of the Plan and Confirmation Order Nonseverable and Mutually Dependent

77.      The Provisions of the Plan and this Confirmation Order, including the findings of fact and conclusions of law set forth herein, are each nonseverable from one another and are mutually dependent.

### IX.        Implementation of Other Necessary Documents and Agreements

78.      The Debtors and Wind-Down Debtors, as applicable, are authorized, without further notice to, or action, order or approval of this Court or any other Person, to execute and deliver all agreements, documents, instruments and certificates relating to such documents and agreements and to perform their obligations thereunder, including, without limitation, to pay all fees, costs and expenses thereunder in accordance with the Plan.  The terms and conditions of

such documents and agreements are reaffirmed or approved, as applicable, and shall, upon completion of documentation and execution, be valid, binding and enforceable and shall not conflict with any Applicable Laws.

### X.        Preparation, Delivery and Execution of Additional Documents By Third Parties

79.        All holders of Claims and Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time and as requested by the Debtors or Wind-Down Debtors, take any reasonable actions as may be necessary or advisable to effectuate the provisions and intent of the Plan and this Confirmation Order.

### XI.        Record Closed

80.        The Record of the Confirmation Hearing is closed.

### XII.        Notice

81.        Good and sufficient notice has been provided with respect to:  (a) the Confirmation Hearing; (b) the deadline for filing and serving objections to the Plan; (c) the proposed Cure amounts and the deadline for filing objections to Cure amounts; (d) settlements, releases, exculpations, injunctions, and related provisions in the Plan; and (e) other hearings described in the Disclosure Statement Approval Order and the Plan.  Such notice has been and is hereby approved.  No other or further notice is required.

### XIII.        Plan Classification Controlling

82.        The terms of the Plan alone shall govern the classification of Claims and Interests for purposes of the distributions to be made thereunder.  The classifications set forth on the Ballots tendered to or returned by the Claims and Interests in connection with voting to accept or reject the Plan:  (a) were set forth on the Ballots solely for purposes of voting to accept or reject the Plan; (b) do not necessarily represent, and in no event shall be deemed to modify or

otherwise affect, the actual classification or amounts of such Claims or Interests under the Plan

for distribution purposes; and (c) may not be relied upon by any Creditor or Holder as

representing the actual classification or amounts of such Claims or Interests under the Plan for

distribution purposes.  In the event of a conflict between the treatment and classifications of

Claims and Interests under the Plan and the classifications set forth on the Ballots, the treatment

and classifications under the Plan shall control and the Debtors' rights and defenses against the

proper classification of a Claim or Interest are expressly preserved.

83.    Any Convenience Class Election, as set forth on the ballots for General

Unsecured Claimants in Classes A-3A, B-3A, and C-3A, made by a creditor is valid, binding,

and enforceable, and the Debtors provided adequate and sufficient notice and information for

creditors to make informed judgments about whether to elect to have their claims treated as

Convenience Claims under the Plan.

### XIV.    Treatment is Full Satisfaction

84.    The treatment of Claims and Interests set forth in Articles 3 and 4 of the Plan is in

full and complete satisfaction of the legal, contractual and equitable rights that each Person

holding a Claim or an Interest may have against the Debtors, the Estates or their respective

property, except as expressly provided in the Plan or this Confirmation Order.  Pursuant to

section 15.19 of the Plan, except as otherwise provided in the Plan or Confirmation Order, no

Claim or Interest shall under any circumstances be entitled to specific performance or other

injunctive, equitable or other prospective relief.

### XV.    Substantive Consolidation of NNI and NNCC

85.    Pursuant to sections 105(a), 541, 1123 and 1129 of the Bankruptcy Code, the

substantive consolidation of NNI and NNCC (as substantively consolidated, the "Consolidated

Debtors") is hereby approved, effective as of the Effective Date.  On and after the Effective

Date, (i) all assets and liabilities of the Consolidated Debtors shall be pooled and shall be vested

in Wind-Down NNI; (ii) all of the Intercompany Claims between the Consolidated Debtors shall

be disallowed and expunged, and no Distributions shall be made on account of such

Intercompany Claims; (iii) all guarantees of either of the Consolidated Debtors of the obligations

of the other Consolidated Debtor shall be eliminated so that any Claim against either

Consolidated Debtor and any guarantee thereof executed by the other Consolidated Debtor, and

any joint or several liability of either of the Consolidated Debtors, shall be a single obligation of

NNI following the Consolidation of the Consolidated Debtors; (iv) for purposes of determining

the availability of the right of set off under section 553 of the Bankruptcy Code, the Consolidated

Debtors shall be treated as one Entity so that, subject to the other provisions of section 553 of the

Bankruptcy Code, debts due to either of the Consolidated Debtors may be set off against the

debts of the other Consolidated Debtor, and (v) each and every Claim filed or allowed by the

Court to be filed in the case of either of the Consolidated Debtors shall be deemed filed against

NNI.

86.    The Court finds that the substantive consolidation of NNI and NNCC is consistent

with Third Circuit law on substantive consolidation, as NNCC and NNI shared a "substantial

identity." *In re Lisanti*, No. 05-3912, 2007 WL 2212720, at *2 (3d Cir. 2007) (substantive

consolidation on the basis of "substantial identity" satisfied the *Owens Corning* test).  In

reaching that decision, the Court has relied on the record in this case and at the hearing,

including the following facts:  (1) NNCC had no independent assets or operations and functioned

exclusively as a financing vehicle for NNI; (2) NNCC substantially relied on NNI, such that

NNCC and NNI did not have a developed history of transacting business with each other at

arm's length; (3) NNCC only had one set of non-affiliated pre-petition creditors, the NNCC

Bondholders, and NNCC informed the NNCC Bondholders that NNCC was borrowing money to provide it to its affiliates and would in turn be supported by assets from its affiliates. Accordingly, the NNCC Bondholders' pre-petition expectations were that NNCC was a pass-through entity to NNI.

87.     The Consolidation of the Consolidated Debtors (other than as expressly set forth in the Plan) shall not affect:  (i) the legal and corporate structures of either of the Consolidated Debtors; (ii) pre- and post-Effective Date guarantees, liens and security interests that are required to be maintained, if any; (iii) distributions from any insurance policies or proceeds of such policies; and (iv) vesting of the Estate Assets in the Wind-Down Debtors.

88.     Notwithstanding the Consolidation provided for herein, U.S. Trustee Fees payable pursuant to section 1930 of title 28 of the United States Code shall continue to accrue for each and every Debtor until a particular Debtor's case is closed, dismissed or converted to a case under Chapter 7 of the Bankruptcy Code.

## XVI.    California Franchise Tax Board

89.     For the avoidance of doubt, notwithstanding anything to the contrary in the Plan or this Order requiring the filing of proofs of claim (or other documents) by the Administrative Expense Claims Bar Date or relating to the payment of interest and penalties on Administrative Expense Claims, a claim of the California Tax Franchise Board (the "FTB") that is an expense under section 503(b)(1)(B) and/or (C) of the Bankruptcy Code, including any interest and penalties due thereon under applicable law, shall be paid when due, without the need for the FTB to file a request for payment of such Administrative Expense Claim, a proof of claim or any other document in the Debtors' chapter 11 cases.  Nothing herein shall prevent or otherwise limit the Debtors from seeking and obtaining relief or raising objections or defenses in the Bankruptcy

Court or through administrative proceedings with the FTB with respect to a Notice of Proposed

Assessment or tax bill issued with respect to any such claims.

90.     Included in the priority tax accounting reserve established by NNI under the Plan,

NNI will hold in reserve $20 million for any claim of the FTB under section 503(b)(1)(B) and/or

(C) of the Bankruptcy Code, pending the final resolution and payment of any amounts owed (if

any) on any such claim.

91.     For the avoidance of doubt, notwithstanding anything to the contrary in the Plan

or this Order, sections 10.9, 10.11 and 10.12(b) do not apply to any payments otherwise owed to

the FTB.

### XVII.     Verizon Communications, Inc.

92.     For the avoidance of doubt, confirmation of the Plan shall not affect the right of

Verizon Communications Inc. or its affiliates ("Verizon") to allowance and payment of the

claims filed by Verizon against NNI (including Proof of Claim No. 5521) in an amount agreed to

between Verizon and NNI or in an amount established by an Order of this Court, or affect

Verizon's right to assert any previously reserved right to setoff such claims (including its motion

at D.I. 3901), or affect any defenses or objections NNI may have with respect to such claims or

claimed setoff rights.

### XVIII.     SNMP Research

93.     The Debtors agree that (i) included in the Administrative Expense Claims Reserve

established by NNI under the Plan, NNI will hold an accounting reserve of $55 million in respect

of the claims asserted by SNMP Research International, Inc. ("SNMPRI") and SNMP Research,

Inc. ("SNMPR," and together with SNMPRI, "SNMP Research") against NNI in the adversary

proceeding (the "SNMP Research Adversary Proceeding") pending the final resolution and

payment of any amounts owed (if any) on any such claims; (ii) included in the Administrative

Expense Claims Reserve established by NNCALA under the Plan, NNCALA will hold an accounting reserve of $2.8 million in respect of the claims asserted by SNMP Research against NNCALA in the SNMP Adversary Proceeding pending the final resolution and payment of any amounts owed (if any) on any such claim; and (iii) the NNI Disputed Claims Reserve will include an accounting reserve in respect of the proofs of claim filed by SNMPRI (and SNMPR, to the extent SNMPR is permitted to be added to the proofs of claim or file stand-alone proofs of claim against NNI as requested in the pending motion to amend the proofs of claim [D.I. 17432] ((the "SNMP Motion to Amend") where the Debtors retain all objections and defenses to their right to do so), reflecting a non-priority general unsecured claim of $85 million against NNI, which in each case shall be reserved pending the final resolution and payment of any amounts owed (if any) on each such claim.  No party in interest shall be permitted to seek to estimate, under 11 U.S.C. § 502(c) or the Plan, SNMP Research's claims in the SNMP Research Adversary Proceeding or the proofs of claim prior to a full trial or hearing on the merits of such claims, and the Debtors and SNMP Research shall use reasonable best efforts to schedule dispositive motions and/or a full trial or hearing on the merits of such claims, as necessary, as promptly as reasonably possible.

94.    Upon the occurrence of the Effective Date, (i) SNMP Research shall be deemed to withdraw with prejudice the claims in the SNMP Adversary Proceeding against each Debtor other than NNI and NNCALA, (ii) SNMPRI shall be deemed to withdraw all the proofs of claim filed against each Debtor other than the proof of claim number 4625 filed against NNI (as amended and as may be further amended as sought in the SNMP Motion to Amend) (the "NNI Claim"), and (iii) SNMPR shall not seek to be added to or file stand-alone proofs of claim against any U.S. Debtor other than NNI in the pending SNMP Motion to Amend, and to the

extent any such relief has been granted on the SNMP Motion to Amend prior to the Effective

Date, SNMPR shall be deemed to withdraw any such proof of claim filed against each Debtor

other than NNI; provided, however that the withdrawal of such claims and proofs of claim shall

neither impair nor enhance (a) SNMP Research's claims against NNI and NNCALA relating to

alleged wrongful conduct of, or actual damages or profits received by, any other foreign affiliates

of the Debtors or (b) SNMPR's request in the SNMP Motion to Amend to be added to the NNI

Claim or to be permitted to file a stand-alone proof of claim against NNI.

95.     No interest shall accrue on any Allowed Claim of SNMP Research (i) for periods

after the Petition Date for any claim allowed as a General Unsecured Claim and (ii) for periods

after the date of allowance for any claims allowed as Administrative Expense Claims.  Subject

to, without limitation, 11 U.S.C. § 502(b) and applicable non-bankruptcy law, nothing in this

Order or the Plan shall prevent SNMP Research from seeking interest as part of its claims against

the Debtors (i) for periods prior to the Petition Date for any claim allowed as a General

Unsecured Claim and (ii) for periods prior to the date of allowance for any claims allowed as

Administrative Expense Claims, each without waiving the Debtors' objections and defenses to

such asserted claims.

96.     Nothing in this Order or the Plan (including, without limitation sections 13.2,

13.3, 13.5 and 13.6) (i) shall be deemed to release, waive or eliminate any claim of SNMP

Research against any purchaser or assignee of assets or the business of the Debtors; (ii) shall be

deemed to enjoin SNMP Research's right to continue to prosecute the SNMP Research

Adversary Proceeding against NNI or NNCALA and to seek payment of any Administrative

Expense Claims based on any judgment obtained in the SNMP Research Adversary Proceeding

(if any) against NNI or NNCALA, or to seek an Allowed Unsecured Claim against NNI relating

to the NNI Claim (and any stand-alone claim against NNI that SNMPR may be permitted to file based on the SNMP Motion to Amend), in each case in accordance with the terms of the Plan. SNMPRI voted to reject the Plan and opted out of the releases in section 13.3 of the Plan. SNMPR and the Debtors agree to deem SNMPR to have opted out of the releases and provisions of section 13.3 of the Plan as well.  Nothing in this Order or the Plan (including, without limitation, section 13.3 of the Plan), shall bind SNMP Research to the releases or provisions of section 13.3 of the Plan.

### XIX.    NTCC Settlement Approval and Implementation

97.    On or prior to the Effective Date, the NTCC shall make all filings determined by the Debtors to be reasonably necessary to withdraw with prejudice all remaining NTCC Litigations, including the appeal of the Allocation Decision.  In full and final satisfaction of any and all claims or causes of action that the NTCC could assert against the Debtors for reimbursement of the fees incurred by advisors to the NTCC or by its members, on the Effective Date the Debtors shall pay directly to Brown Rudnick the reasonable and documented fees and expenses of the NTCC and its advisors, as identified by Brown Rudnick as advisor to the NTCC, in an aggregate amount not to exceed $1,250,000.  For the avoidance of doubt, the NTCC shall not assert any further claim for payment or reimbursement of fees and costs against the Debtors, including without limitation any claim for substantial contribution pursuant to section 503(b) of the Bankruptcy Code.

98.    The Bondholder Group has agreed to waive and shall not be entitled to any claim against the Debtors for reimbursement of fees or costs incurred by counsel and/or advisors to the Bondholder Group, including, without limitation, any claims for substantial contribution pursuant to section 503(b) of the Bankruptcy Code (but for the avoidance of doubt excluding any entitlement to reimbursement of fees under Section 7.13 of the Plan).

99.     The Debtors shall establish a segregated accounting reserve on account of the Bondholder Contribution, which reserve shall be (i) maintained by the Debtors subject to the Bondholder Contribution Release Condition, and (ii) deemed to be a distribution on the Crossover Bond Claims for all purposes under the Plan.

100.     Within ten (10) business days following the entry of this Order, the NTCC shall deliver to the Debtors a schedule of the NTCC Settlement Claims, which schedule shall be subject to review and verification by the Debtors.

101.     Subject to the occurrence of the Effective Date, the Debtors shall make the NTCC Debtor Payment to the holders of NTCC Settlement Claims allocated on account of the NTCC Settlement Claims, in the amount of $6,500,000, on or before the Initial Distribution Date.  The NTCC Settlement Claims shall be subject to the NTCC Debtor Settlement Redirection in the event the NTCC Threshold is achieved.

102.     The provisions of the NTCC Settlement, including the provisions set forth in paragraphs 97- 101, shall be binding upon any transferees, assignees or successors of the holders of the Crossover Bonds Claims and the NTCC Settlement Claims, and the Debtors.

## XX.     Unclassified Claims

### a.     Administrative Expense Claims

103.     Subject to the allowance procedures and deadlines provided herein, on or as soon as reasonably practicable after the later to occur of (a) the Effective Date, (b) the date on which an Administrative Expense Claim shall become an Allowed Claim and (c) to the extent an Allowed Administrative Expense Claim relates to a liability arising under another agreement incurred by the Debtors in the ordinary course, the date such liability is owed in accordance with the terms and conditions of any agreement or course of dealing relating thereto and consistent with past practice, the holder of an Allowed Administrative Expense Claim shall receive on

account of its Allowed Administrative Expense Claim, and in full satisfaction, settlement and release of and in exchange for such Allowed Administrative Expense Claim, (a) Cash equal to the unpaid portion of such Allowed Administrative Expense Claim, or (b) such other treatment as to which the applicable Debtor and the holder of such Allowed Administrative Expense Claim have agreed upon in writing, which, prior to the Effective Date, shall be subject to the consent of the Creditors' Committee and Bondholder Group, acting reasonably; *provided, however*, that Professional Claims shall be paid in accordance with Section 2.3 of the Plan.

> b.     Statutory Fees

104.    On or before the Effective Date, all fees due and payable pursuant to section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid in full, in Cash.

> c.     Professional Claims

105.    In accordance with section 2.3 of the Plan, other than a Professional retained by the Debtors pursuant to the Ordinary Course Professional Order, any entity seeking an award of the Bankruptcy Court of compensation for services rendered and/or reimbursement of expenses incurred through the Effective Date under sections 105(a), 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code shall File its final application for allowance of such compensation and/or reimbursement by no later than the first Business Day that is sixty (60) days after the Effective Date or such other date as may be fixed by the Bankruptcy Court (the "Professional Claims Bar Date") and be paid by or on behalf of the Debtor (a) in full and in Cash in the amounts Allowed upon the date the order granting such award becomes a Final Order, or as soon thereafter as practicable or (b) upon such other terms as may be mutually agreed upon by the claimant and the Debtor obligated for the payment of such Allowed Claim.

106.    Except as otherwise specifically provided in this Plan, on and after the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code or the Interim Compensation Order in seeking retention or compensation for services rendered after such date shall terminate, and, subject to the terms of the Plan Administration Agreement, the Plan Administrator may employ and pay any Professional for services rendered or expenses incurred after the Effective Date in the ordinary course to facilitate the wind down of the Wind-Down Debtors and effectuate the Plan without any further notice to any party or action, order or approval of the Bankruptcy Court.

107.    The Plan Administrator shall have the authority to (i) utilize the services of the Wind-Down Debtors' employees and independent contractors, (ii) employ, retain, utilize supervise and compensate professionals, including, without limitation, claims, disbursing and transfer agents, legal counsel, accountants, experts, independent contractors, employees, other advisors, professionals and Professionals appointed in the Chapter 11 Cases, to assist him or her in performing his or her duties under the Plan or otherwise represent the interests of and serve on behalf of the Debtors and Wind-Down Debtors and (iii) cause the Wind-Down Debtors to indemnify such professionals (including those Professionals previously retained during the Chapter 11 Cases) from any loss (including reasonable attorneys' fees) incurred in connection with the execution and implementation of the Plan other than a loss due to the indemnified party's willful misconduct, gross negligence, breach of contract or fraud.  For the avoidance of doubt, the Plan Administrator shall accede to, and control, all privileges of the Debtors and Wind-Down Debtors, including, without limitation, the attorney-client privilege and any protection afforded attorney work product under applicable rules and law.

d.    Priority Tax Claims

108.    With respect to each Allowed Priority Tax Claim, at the option of each Debtor, the holder of an Allowed Priority Tax Claim shall be entitled to receive, in full satisfaction, settlement and release of and in exchange for such Allowed Priority Tax Claim, (a) Cash in an amount equal to such Allowed Priority Tax Claim on the later of the Effective Date and the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, or as soon thereafter as practicable, (b) treatment in accordance with section 1129(a)(9)(C) of the Bankruptcy Code or (c) such other treatment as to which the applicable Debtor and the holder of such Allowed Priority Tax Claim have agreed upon in writing, which other treatment, prior to the Effective Date, shall be subject to the consent of the Creditors' Committee and Bondholder Group, acting reasonably.  On the Effective Date, the Liens (if any) securing any Priority Tax Claims shall be deemed released, terminated and extinguished, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person.

109.    Notwithstanding any other provision in the Plan, including but not limited to paragraphs 1.2, 2.1, 7.12, 11.5, and 11.8, (a) no bar date shall apply to any claim by the Iowa Department of Revenue ("IDR") for administrative taxes and the IDR shall not be required to file an application, or proof of claim, requesting allowance as a condition to receiving payment in full pursuant to paragraph 2.1, and (b) interest, to the extent required under Iowa law, shall be paid on any such post-petition tax claims held by the IDR at the rate specified by applicable non-bankruptcy law. Nothing herein shall prevent or otherwise limit the Debtors from seeking and obtaining relief or raising objections or defenses in the Bankruptcy Court or through administrative proceedings with the IDR with respect to any such administrative tax claims.

## XXI.    <u>Distributions</u>

110.    The Wind-Down Debtors shall make, cause to be made, or facilitate the

Distributions required under the Plan to the applicable holders of Allowed Claims in accordance

with Article 10 of the Plan including, without limitation, the distribution of Creditor Proceeds

after satisfaction or waiver of the Creditor Proceeds Distribution Conditions as set forth in

section 10.4 of the Plan.

## XXII.    <u>Cash Payments</u>

111.    The sources of all Distributions and payments under the Plan are and will be Cash

or non-Cash proceeds of any sale of Residual assets, to the extent applicable.  Cash Distributions

made pursuant to the Plan shall be in United States funds, by check drawn on a domestic bank, or

by wire transfer from a domestic bank.

112.    Checks issued in respect of Allowed Claims shall be null and void if not

negotiated within ninety (90) days after the date of issuance thereof.  Requests for reissuance of

any check shall be made to the Plan Administrator by the holder of the Allowed Claim to whom

such check originally was issued.  Any claim in respect of a voided check shall be made on or

before thirty (30) days after the expiration of the ninety (90) day period following the date of

issuance of such check.  Thereafter, the amount represented by such voided check shall

irrevocably revert to the relevant Debtor's Estate, to be distributed to other holders of Allowed

Claims against such Debtor in accordance with the terms of the Plan and the Bankruptcy Code,

and any Claim in respect of such voided check shall be discharged and forever barred from

assertion against such Debtor, its Estate and its respective property, *provided* that at the

discretion of the Plan Administrator, any such amounts may be escheated pursuant to applicable

law.  In the case of any check issued in respect of an Allowed Claim that is returned as an

undeliverable distribution, such check shall be null and void if not negotiated within ninety (90)

days after the date of issuance, and the Allowed Claim for which such distribution was issued

shall be discharged and forever barred pursuant to Section 10.11 of the Plan only after the time

period to claim such undeliverable distribution provided in Section 10.9 of the Plan has passed.

### XXIII.    Delivery of Distributions

113.    Pursuant to Section 10.9 of the Plan, Distributions to holders of Allowed Claims

of each Debtor shall be made at the address of each such holder as set forth on the Schedules

filed, unless superseded by a new address as set forth (a) on a Proof of Claim filed by a holder of

an Allowed Claim or (b) in another writing notifying the Claims Agent (at the address listed in

Section I of the Disclosure Statement) of a change of address.  If any holder's Distribution is

returned as undeliverable, no further Distributions shall be made or notices delivered to such

holder on account of such Claim until the Claims Agent is notified in writing by such holder of

such holder's current address, at which time all such distributions shall be made to such holder.

Any holder of an Allowed Claim (or any successor or assignee or other Person or Entity claiming

by, through, or on behalf of, such holder) that does not assert a claim pursuant to the Plan for

such undeliverable or unclaimed distribution within six (6) months after the later of the Effective

Date or the date such distribution was made shall be deemed to have forfeited its Allowed Claim

and shall be forever barred and enjoined from asserting any such Claim for an undeliverable or

unclaimed distribution against the Debtors or their Estates, the Wind-Down Debtors or their

property.  In such cases, any Cash held for Distribution on account of such Claim shall become

the property of the relevant Estate and distributed to other holders of Allowed Claims against

such Debtor in accordance with the terms of the Plan and the Bankruptcy Code. Distributions on

account of the Allowed NNCC Bonds Claims shall be delivered to the NNCC Bonds Indenture

Trustee, and distributions on account of the Crossover Bonds Claims shall be delivered to the

NNC/NNL Notes Indenture Trustee, in accordance with Section 10.6 of the Plan.

## XXIV.    Matters Relating to Implementation of the Plan

### a.    Operation of the Debtors Between the Confirmation Date and the Effective Date

114.    Upon the entry of this Confirmation Order, the Debtors shall continue to operate as debtors in possession pursuant to the Bankruptcy Code and the Bankruptcy Rules during the period from entry of this Confirmation Order (the "Confirmation Date") through and until the Effective Date; *provided, however*, that the Debtors' wind down shall be effectuated in a manner consistent with the Plan, the SPSA and this Confirmation Order.

### b.    Transfer of Assets; No Successor Liability

115.    To the fullest extent permitted by the Applicable Laws, neither the Wind-Down Debtors, nor their respective successors or assigns, nor their respective properties shall, as a result of Confirmation of the Plan, (a) be or be deemed to be a successor to the Debtors or the Estates; (b) have or be deemed to have, de facto or otherwise, merged or consolidated with, or into, the Debtors or the Estates; or (c) be or be deemed to be a continuation or substantial continuation of the Debtors, Estates, or any enterprise of the Debtors.

116.    To the fullest extent permitted by the Applicable Laws, without limiting the effect or scope of the foregoing, except as is expressly set forth in the Plan, as a result of Confirmation of the Plan, no Wind-Down Debtor, any of its respective successors or assigns, or its respective properties shall have any successor or vicarious liabilities of any kind or character, including, without limitation, any theory of antitrust, environmental, successor or transferee liability, labor law, de facto merger or substantial continuity, whether known or unknown, now existing or hereafter arising, asserted or unasserted, fixed or contingent, or liquidated or liquidated with respect to the Debtors, their Estates, any enterprise of the Debtors, or any obligations of the Debtors or their Estates arising prior to the Effective Date.

c.    <u>Post-Effective Date Corporate Existence; Vesting of Assets in the Wind-Down Debtors; Post-Effective Date Rule 2002 and Property Dispsoal</u>

117.    On the Effective Date, Wind-Down NNI is authorized to maintain its current corporate form, with all powers of a corporation under the laws of its state of incorporation and without prejudice to any right to alter or terminate such existence (whether by merger or otherwise) under such applicable state law, for the purpose of effectuating all aspects of the Plan pertaining to Wind-Down NNI.  From and after the Effective Date, until dissolved in accordance with the Plan or by the Plan Administrator, Wind-Down NNI is authorized to exist in order to effectuate all aspects of the Plan and wind down.

118.    On the Effective Date, each Wind-Down Debtor is authorized to maintain its current corporate form, with all powers of a corporation under the laws of its state of incorporation and without prejudice to any right to alter or terminate such existence (whether by merger or otherwise) under such applicable state law, for the purpose of effectuating all aspects of the Plan pertaining to such Wind-Down Debtors.  From and after the Effective Date, until dissolved in accordance with the Plan or by the Plan Administrator, the Wind-Down Debtors are authorized to exist in order to effectuate all aspects of the Plan and wind down.  For Debtors incorporated under laws of a state other than Delaware, the Debtors' right to reincorporate such entities under the laws of the State of Delaware is reserved.

119.    Except as otherwise expressly provided in the Plan or the SPSA, or any documents or instruments executed in accordance therewith, on the Effective Date, pursuant to section 1141(b) and section 1141(c) of the Bankruptcy Code, the Wind-Down Debtors shall be vested with all of the Assets of such Debtors' Estates free and clear of all Claims, Interests, Liens, encumbrances, charges and other interests of Creditors and holders of Interests, and may operate free of any restrictions imposed by the Bankruptcy Code or by the Bankruptcy Court,

including, without limitation, performing any contract or lease entered into or assumed by any of the Debtors after the Petition Date.  The Debtors shall continue as Debtors-in-Possession under the Bankruptcy Code until the Effective Date, and thereafter, subject to the terms of the Plan, the Wind-Down Debtors may operate free of any restrictions imposed by the Bankruptcy Code or the Bankruptcy Court.  Such vesting does not constitute a voidable transfer under the Bankruptcy Code or Applicable Laws.

120.    All actions taken by the Debtors prior to entry of this Confirmation Order, in accordance with the SPSA and the Plan, are hereby approved.  Subject to the terms of the Plan and the SPSA, the Debtors are further authorized, without further notice to or action, order or approval of this Court or any other Person, to enter into and take any additional actions under or in connection with the wind-down of the Debtors, including such actions as the Debtors deem necessary or appropriate to facilitate such wind-down, upon entry of this Confirmation Order in accordance with the requirements set forth in the Plan

121.    On and after the Effective Date, subject to any limitations set forth in the Plan, each Wind-Down Debtor may wind down its Estate, including its remaining assets, may retain, compensate and pay any professionals or advisors, and compromise or settle any Claims or Interests without supervision of or approval by this Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules.  The continued existence, wind down and ownership of the non-Debtor affiliates are a component of the Debtors' businesses.

122.    Pursuant to section 15.24 of the Plan, after the Effective Date, any Entity that, prior to the Effective Date, had requested from the Debtors or the Claims Agent to receive notice in the Chapter 11 Cases pursuant to Bankruptcy Rule 2002 must renew such request in writing to the Claims Agent in order to be included on the Wind-Down Debtors' Post-Effective Date

Notice List.  On and after the Effective Date, the Wind-Down Debtors are authorized to limit the

list of entities receiving documents pursuant to Bankruptcy Rule 2002 to those entities that

request to be included on the Debtors' Post Effective Date Notice List.

123.    Pursuant to section 15.25 of the Plan, after the Effective Date, notwithstanding

any prior order of the Bankruptcy Court, the Plan Administrator shall give notice of a proposed

abandonment or disposition of property, including the Debtors' books and records, by filing a

notice on the docket of the Chapter 11 Cases and delivering a copy of such notice to the

Canadian Debtors, the Monitor and the EMEA Debtors.  Such filing of a notice of abandonment

or disposition on the docket shall constitute good and sufficient notice, and no other or further

notice of proposed abandonment or disposition is necessary.  If no party serves an objection

within thirty (30) days of the posting of such notice, the Plan Administrator shall be authorized

immediately to abandon or dispose of such property.

124.    The transfer of assets as set forth above shall not result in any of the Wind-Down

Debtors (a) having any liability or responsibility for any Claim against the Debtors, the Debtors'

Estates or against any affiliate or insider of the Debtors, or (b) having any liability or

responsibility to the Debtors, except as expressly set forth in the Plan.  Without limiting the

effect or scope of the foregoing, and to the fullest extent permitted by the Applicable Laws, any

transfer of assets contemplated above does not and will not subject the Wind-Down Debtors,

their respective properties or assets or their respective affiliates, successors, or assigns to any

liability for Claims against the Debtors' interests in such assets by reason of such transfer under

any Applicable Laws, including, without limitation, any successor or vicarious liability.

      d.    <u>Treatment of Interests</u>

125.    On the Effective Date, all Interests in NNI, Nortel Altsystems, Xros, Sonoma,

CoreTek, NN Applications, NN Optical and Architel will be cancelled and one new share of the

common stock of NNI, Nortel Altsystems, Xros, Sonoma, CoreTek, NN Applications, NN Optical and Architel will be issued to the Plan Administrator which will hold such share for the benefit of the holders of the former Interests in each of NNI, Nortel Altsystems, Xros, Sonoma, CoreTek, NN Applications, NN Optical and Architel, respectively.  The holders of Interests in NNI, Nortel Altsystems, Xros, Sonoma, CoreTek, NN Applications, NN Optical and Architel will neither receive nor retain any property or any interest in property on account of such Interests; provided, however, that in the event that all Allowed Claims in Classes 1, 2, 3 and 4 of NNI, Nortel Altsystems, Xros, Sonoma, CoreTek, NN Applications, NN Optical and Architel, respectively, have been satisfied in full in accordance with the Bankruptcy Code and the Plan, each holder of an Interest in NNI, Nortel Altsystems, Xros, Sonoma, CoreTek, NN Applications, NN Optical and Architel will receive its Pro Rata Share of any remaining Creditor Proceeds from NNI, Nortel Altsystems, Xros, Sonoma, CoreTek, NN Applications, NN Optical and Architel, respectively, consistent with such holder's rights of priority of payment existing immediately prior to the Petition Date.  Unless otherwise determined by the Plan Administrator, all outstanding Interests in NNI, Nortel Altsystems, Xros, Sonoma, CoreTek, NN Applications, NN Optical and Architel will be deemed cancelled and of no force and effect as of the closing the Chapter 11 Cases of NNI, Nortel Altsystems, Xros, Sonoma, CoreTek, NN Applications, NN Optical and Architel respectively, in accordance with the Plan, provided that such cancellation does not adversely affect the Debtors' Estates.

126.    All Interests in each of NNCALA, NNCC, Nortel Altsystems Int'l, Qtera, NN HPOCS, NNII, NTI and NN Cable will continue to be held by its corporate parent until the closing of its Chapter 11 Case, solely for Plan administrative purposes.  No holder of Interests shall receive Distributions on account of its Interests until such time that all Allowed Claims in

Classes 1 through 4 of any Debtor have been satisfied in full in accordance with the Bankruptcy Code and the Plan.  At such time, each holder of an Interest in Class 5A of the applicable Debtor will receive its Pro Rata Share of any remaining Creditor Proceeds from the applicable Debtor.

127.    Notwithstanding any contrary provision in section 4.9 of the Plan or paragraph 126 of this Confirmation Order, on the Effective Date, all shares of "Preferred Stock" of Qtera will be cancelled as of the Effective Date in accordance with this Confirmation Order.

### XXV.    Wind-Down of the Debtors

128.    Subject to the Plan and the SPSA, the Debtors and Wind-Down Debtors are authorized to enter into such transactions as may be necessary or appropriate to simplify their corporate structure and effect a corporate wind-down.  The Debtors are authorized to direct any third parties, including, without limitation, any incorporator or other corporate actor, to take such steps as may be required to effect, document or otherwise evidence any dissolution, merger or amalgamation of entities in accordance with such transactions.  Without limitation to the foregoing, as of the Effective Date, the Plan Administrator is authorized to (a) dissolve any Wind-Down Debtor or complete the winding up of such Wind-Down Debtor (including, without limitation, transferring all or part of the Residual Assets of such Wind-Down Debtor to a liquidating trust) at such time as the Plan Administrator considers appropriate and consistent with the implementation of the Plan pertaining to such Wind-Down Debtor or (b) dissolve any Controlled Non-Debtor Affiliate or complete the winding up of such Controlled Non-Debtor Affiliate in accordance with applicable law; *provided*, *however*, that the foregoing does not limit the Plan Administrator's ability to otherwise abandon an interest in a Controlled Non-Debtor Affiliate.

129.    All actions taken by the Debtors prior to entry of this Confirmation Order, in accordance with the SPSA and the Plan, are hereby approved.  To the extent that the Debtors

determine that it is necessary or appropriate for any step, transaction, payment or other action in furtherance of, or in preparation for, any transactions related to their wind-down to be effectuated on or prior to the Effective Date, the Debtors are authorized to take such actions upon entry of this Confirmation Order.  Following the Effective Date, the Debtors and Wind-Down Debtors are authorized to effect such transactions and take any and all steps and actions as they deem necessary or appropriate to effect such transactions, including modifications to the same, or otherwise effect a more tax efficient or simpler corporate structure.  For the avoidance of doubt, nothing in this Confirmation Order shall constitute an amendment or modification of the SPSA or a waiver from compliance with its terms.

### XXVI.    **Intercompany Claims**

130.    On the Effective Date, all Intercompany Claims shall be Reinstated or discharged and satisfied by contributions, distributions or otherwise, as contemplated by the Plan and SPSA. As of the Date hereof, the Debtors, the Wind-Down Debtors and their respective affiliates (including non-Debtor affiliates) may transfer funds between and among themselves in order to implement the terms of the Plan and the SPSA.

### XXVII.    **Binding Effect; Effectiveness**

131.    Upon the occurrence of the Effective Date, all provisions of the Plan, including all agreements (including the SPSA), instruments and other documents filed in connection with the Plan or executed by the Debtors or Wind-Down Debtors in connection with the Plan, including the Plan Supplement, shall be immediately effective and enforceable and deemed binding in accordance with their respective terms upon the Debtors, the Wind-Down Debtors, and any and all holders of Claims or Interests (irrespective of whether any such holders of Claims or Interests failed to vote to accept or reject the Plan, voted to accept or reject the Plan, or are deemed to accept or reject the Plan), all Persons that are parties to or are subject to the settlements,

compromises, releases, discharges, and injunctions described in the Plan, each Person acquiring property under the Plan, any and all non-Debtor parties to executory contracts and unexpired leases with the Debtors, and any other Persons affected in any matter by the Plan.

132.    The payments, obligations and benefits of any entity named or referred to in the Plan or SPSA shall be binding upon and inure to the benefit of such entity's heirs, executors, administrators, successors or assigns, including, with respect to the Debtors, the Wind-Down Debtors, any successor to the Debtors or the Wind-Down Debtors or any Estate representative appointed or selected pursuant to section 1123 of the Bankruptcy Code, including any trustee subsequently appointed in any of the Chapter 11 Cases or in any superseding chapter 7 case.

### XXVIII.    Corporate Actions, Documents and Further Transactions

133.    In accordance with section 1142 of the Bankruptcy Code, the implementation and consummation of the Plan in accordance with its terms shall be, and hereby is, authorized and approved, and the Debtors and the Wind-Down Debtors, or any other Person designated pursuant to the Plan, shall be, and hereby are, authorized, empowered, and directed to issue, execute, deliver, file, and record any document whether or not such document is specifically referred to in the Plan, the Plan Supplement, the Disclosure Statement, or any exhibit thereto, and to take any action necessary or appropriate to consummate the Plan and all transactions and agreements therein in accordance with its terms, without the need for any further notice to, or action, order or approval of this Court, or other act or action under Applicable Laws, except in either case, those expressly required pursuant to the Plan or the SPSA.  This Confirmation Order shall constitute all approvals and consents required, if any, by the laws, rules and regulations of all states and any other governmental authority with respect to the implementation or consummation of the Plan and any documents, instruments, or agreements, and any amendments or modifications thereto, and any other acts and transactions referred to in or contemplated by the Plan, the Plan

Supplement, the Disclosure Statement, and any documents, instruments, or agreements, and any amendments or modifications thereto. Without limitation to the foregoing, as of the Effective Date, the by-laws of each Wind-Down Debtor shall be amended in their entirety as set forth respectively in Exhibit G to the Plan Supplement.

134.    Each of the Debtors and Wind-Down Debtors, as applicable, and any of their respective officers and designees, including the Plan Administrator, is authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents (including, without limitation, any documents relating to the SPSA), and take such actions or seek such orders, judgments, injunctions and rulings as the Debtors or Wind-Down Debtors deem necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan and this Confirmation Order, or to otherwise comply with the Applicable Laws.

135.    Each of the matters provided for by the Plan, including those that would otherwise require approval of the shareholders, directors, or members of the Debtors or Wind-Down Debtors, shall, as of the Effective Date, be deemed to have occurred and be effective as provided in the Plan, and shall be authorized, approved, and, to the extent taken prior to the Effective Date, ratified, in each case without any requirement of further action by holders of Claims or Interests, directors or managers of the Debtors, or any other Person.

## XXIX.    Officers and Directors of Reorganized Debtors

136.    The directors and officers of the Wind-Down Debtors shall consist of the persons identified in Exhibit F to the Plan or subsequently appointed in accordance with the provisions of the Plan. On the Effective Date and effective as of the Effective Date, the new directors and officers of the Wind-Down Debtors shall be deemed appointed, without the need for any further notice to or action, order or approval of this Court, or other act or action under Applicable Laws.

### XXX.    <u>Exemption from Transfer Taxes</u>

137.    Pursuant to section 1146(a) of the Bankruptcy Code, the issuance, transfer, or exchange of notes, equity securities, instruments or documents under or in connection with the Plan, the assignment or surrender of any lease or sublease, the creation of any mortgage, deed of trust, Lien, pledge or other security interest or the making, assignment or the delivery of any lease, sublease, deed or any other instrument of transfer under, in furtherance of, or in connection with the Plan or SPSA, including any deeds, bills of sale, assignments, mortgages, deeds of trust or similar documents executed in connection with any assets subject to the Plan, shall not be subject to any stamp, real estate transfer, mortgage recording, sales, use or other similar tax nor any Uniform Commercial Code filing or recording fee or similar or other governmental assessment.  All appropriate state or local government officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

### XXXI.    <u>Exemption from Securities Laws</u>

138.    Pursuant to section 1125(e) of the Bankruptcy Code, the Debtors' transmittal of the Solicitation Materials as set forth herein and their solicitation of acceptances of the Plan are not and will not be governed by or subject to any otherwise Applicable Law, Code, or regulation governing the solicitation or acceptance of a plan of reorganization or the offer, issuance, sale, or purchase of securities.

### XXXII.    <u>Executory Contracts and Unexpired Leases; Cure Costs</u>

139.    In addition to all executory contracts and unexpired leases that have been previously assumed by the Debtors by order of this Court, on the Effective Date, each of the executory contracts and unexpired leases of the Debtors identified in Exhibit C to the Plan shall

be deemed assumed, in accordance with and subject to the provisions and requirements of

sections 365 and 1123 of the Bankruptcy Code and Article 9 of the Plan, unless such executory

contracts and unexpired leases are the subject of a motion to reject filed with the Court on or

before the Effective Date, have been previously rejected by order of the Bankruptcy Court or are

rejected pursuant to the terms of the Plan.

140.    The Cure amounts (if any) owed under each executory contract and unexpired

lease to be assumed pursuant to the Plan, as set forth in Exhibit C to the Plan, shall be satisfied in

accordance with Section 9.3 of the Plan and pursuant to section 365(b)(1) of the Bankruptcy

Code, by payment of the Cure amount in Cash on the Effective Date, or as soon as reasonably

practicable thereafter, or as otherwise may be agreed to by the Debtors or the Wind-Down

Debtors, as applicable, and the counterparty to any such executory contract or unexpired lease.

Each counterparty to an assumed contract shall be deemed to consent to the Cure Amount as

provided for under the Plan, the Confirmation Order, or listed in Exhibit C to the Plan unless

such counterparty filed a timely objection in accordance with Section 9.4 of the Plan.

141.    Entry of this Confirmation Order constitutes an order approving the assumption or

rejection of executory contracts or unexpired leases as set forth in Article 9 of the Plan and

Exhibit C to the Plan and associated Cure amounts, pursuant to sections 365(a) and 1123 of the

Bankruptcy Code.  Entry of this Confirmation Order constitutes an order approving the

assignment of executory contracts or unexpired leases from one Debtor to another Debtor, as

may be necessary.  The Debtors and Wind-Down Debtors are hereby authorized to make all

necessary Cure payments as provided herein without need for further Court order, and shall

make such Cure payments as of the Effective Date or within such a reasonably practicable time

after the Effective Date.  Counterparties to any assumed or assumed and assigned executory

contracts are hereby enjoined from contesting any Cure Amounts or seeking other or further amounts on account of any alleged defaults under such contracts.

142.    Each executory contract and unexpired lease assumed and/or assigned pursuant to the Plan and this Confirmation Order (or pursuant to any other order of the Court) shall remain in full force and effect and be fully enforceable by the applicable Wind-Down Debtor(s) in accordance with its terms, except as modified by the provisions of the Plan, or any order of the Court authorizing and providing for its assumption.

143.    Each assumption or rejection (if any) of an executory contact or unexpired lease pursuant to this Confirmation Order, in accordance with Article 9 of the Plan, Exhibit C to the Plan, or otherwise, shall be legal, valid and binding upon the applicable Debtor or Wind-Down Debtor and all non-Debtor Persons party to such executory contract or unexpired lease, all to the same extent as if such assumption or rejection had been authorized and effectuated pursuant to a separate order of this Court that was entered pursuant to section 365 of the Bankruptcy Code prior to the Effective Date.

144.    Neither the Debtors nor the Wind-Down Debtors shall have any further or ongoing obligations under any of the contracts rejected under the Plan.

### XXXIII.    Reserves

145.    The provisions of Article 11 of the Plan regarding the procedures for resolving Disputed Claims are fair and reasonable and approved.

146.    On or after the Effective Date, the Plan Administrator shall reserve an aggregate amount of Cash sufficient to pay to each holder of a Disputed Claim the amount of any Distributions that such holder would have been entitled to receive under the Plan if such Claim had been an Allowed Claim; *provided*, *however*, that the amount of such Disputed Claims is to be determined, solely for the purposes of establishing reserves and for maximum distribution

purposes, to be the lesser of (a) the asserted amount of the Disputed Claim filed with the Bankruptcy Court as set forth in the non-duplicative Proof of Claim or (b) the amount, if any, estimated by the Bankruptcy Court pursuant to section 502(c) of the Bankruptcy Code or ordered by other order of the Bankruptcy Court or (c) the amount otherwise agreed to by the Debtors or the Plan Administrator, as applicable, in consultation with the Holder of such Disputed Claim for distribution purposes.  With respect to all Disputed Claims that are unliquidated or contingent and/or for which no dollar amount is asserted on a Proof of Claim, the Wind-Down Debtors or Plan Administrator, as applicable, shall reserve Cash equal to the amount reasonably determined by the Debtors, Wind-Down Debtors or Plan Administrator.

147.    For the avoidance of doubt, except as otherwise expressly provided in the Plan or this Confirmation Order, the Disputed Claims Reserve shall be the only source of recovery for prepetition Claims not Allowed as of the Effective Date, and the Wind-Down Debtors shall have no other or further liability to any holders of such Claims.

### XXXIV.   Resolution of Disputed Claims and Interests; Post-Effective Date Claims

148.    Except as expressly provided in this Confirmation Order, the Plan or as ordered by this Court prior to the Effective Date, no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code, or this Court has entered a Final Order allowing such Claim.  Any Claim that is not an Allowed Claim shall be entitled to the reserve provisions set forth in Section 11.6 of the Plan and shall be determined, resolved, or adjudicated in accordance with the terms of Article 11 of the Plan or other applicable provision of the Plan and Applicable Laws.

149.    Subject to sections 11.7 and 11.8 of the Plan, on or after the Effective Date, except as otherwise provided in the Plan, a Claim may not be filed, asserted or amended without the prior authorization of this Court, or unless the Wind-Down Debtors otherwise consent, and,

absent such authorization or consent, any such new or amended Claim filed or asserted shall not appear on the Claims Register and shall be deemed disallowed in full and expunged without any further notice to, or action, order, or approval of this Court or any other Person.  In accordance with section 502(b)(9) of the Bankruptcy Code, any entity that failed to file a proof of Claim by the applicable bar date set by the Bankruptcy Court in these Chapter 11 Cases and was not otherwise permitted to file a proof of Claim after the applicable bar date by a Final Order of the Bankruptcy Court is and shall be barred, estopped and enjoined from asserting any Claim against the Debtors (a) in an amount that exceeds the amount, if any, that is identified in the Schedules on behalf of such entity as undisputed, noncontingent and liquidated; or (b) of a different nature or a different classification than any Claim identified in the Schedules on behalf of such Entity. Other than as expressly set forth in the Plan or this Order, the Debtors and the Wind-Down Debtors shall be entitled, for the purposes of distributions, reserves and other similar purposes under this Plan, to treat all Claims filed after the later of (a) the Effective Date and (b) the Claim's applicable bar date, as disallowed and expunged unless the Holder of such Claim Files a motion to have the late post-Effective Date Claim deemed timely Filed by the Bankruptcy Court. The Debtors and the Wind-Down Debtors have no obligation to review or respond to any Claims Filed after the later of (a) the Effective Date and (b) the Claim's applicable bar date, unless:  (y) the filer has obtained an order from the Bankruptcy Court authorizing it to file such Claim after the applicable bar date; or (z) the Wind-Down Debtors have consented to the filing of such Claim in writing, *provided* that if any such Claim is then Allowed, any amounts due will be payable only from any Disputed Claims Reserves or the Administrative Expense Claims Reserve and not by the Wind-Down Debtors.

XXXV.    **Estimation of Claims**

150.    Other than as expressly set forth in the Plan or this Order, pursuant to section 11.3 of the Plan, the Plan Administrator may at any time request that the Bankruptcy Court estimate for any purpose including Distribution any contingent, unliquidated or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code or otherwise, regardless of whether such Debtor previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection.  The Bankruptcy Court will retain exclusive jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any proceedings relating to any such Disputed Claim or any appeal relating to any such objection to a Disputed Claim.  In the event that the Bankruptcy Court estimates any contingent, unliquidated or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court estimating such Claim.  If the estimated amount constitutes a maximum limitation on the amount of such Claim, such Debtor may pursue supplementary proceedings to object to the allowance of such Claim.  All of the aforementioned objection, estimation and resolution procedures are intended to be cumulative and not exclusive of one another.  Claims may be estimated and subsequently disallowed, reduced, compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.  Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such holder has filed a motion requesting the right to seek such reconsideration on or before twenty-one (21) days after the date on which such Claim is estimated.

### XXXVI.    Release of Funds Escrowed Pursuant to Utilities Order

151.    On or after the Effective Date, the Wind-Down Debtors shall be authorized to use any funds or amounts escrowed in accordance with or pursuant to the Order (I) Restraining Utility Companies From Discontinuing, Altering or Refusing Service, (II) Deeming Utility Companies Adequately Assured of Future Performance, and (III) Establishing Procedures for Determining Adequate Assurance of Payment [D.I. 240], in furtherance of their Wind Down and the implementation of the Plan.

### XXXVII.    Settlement and Plans Support Agreement

152.    Pursuant to sections 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019, the SPSA is hereby approved in its entirety as an integrated settlement of various litigations, Claims and other unresolved and disputed matters between and among the Debtors, their various foreign affiliates and other creditors and parties in interest in the various Nortel insolvency proceedings pending worldwide.  The SPSA is (1) in exchange for the good and valuable consideration provided by each of the Debtors and the SPSA Parties; (2) a good-faith settlement and compromise of the claims released by the Debtors; (3) in the best interests of the Debtors, their Estates, and all holders of Claims and Interests; (4) fair, equitable and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to the assertion of any claim or Cause of Actions released pursuant to the SPSA.

153.    The Debtors are authorized to enter into the SPSA and to take any and all actions that may be reasonably necessary or appropriate to perform their obligations arising under the SPSA, and to enforce their rights arising under the SPSA, in each case on the terms and conditions contained therein.

154.    The SPSA shall constitute a full and final settlement of the Allocation Dispute with respect to the Sale Proceeds and full and final resolution of all other matters resolved by the

SPSA, including without limitation the allocation of the Sale Proceeds among the Debtors and the settlement of claims as set forth in Exhibits D and E to the Plan.

155.    The Debtors, the Debtors' claim agent, Epiq Bankruptcy Solutions, LLC, and the Clerk of this Court are authorized to take all necessary and appropriate actions to give effect to the SPSA.

156.    The failure specifically to describe or include any particular provision of the SPSA in this Order shall not diminish or impair the effectiveness of such a provision, it being the intent of this Court that the SPSA be approved and implemented in its entirety.

157.    The transactions contemplated by the Plan and the SPSA are hereby approved in their entirety.  The SPSA constitutes an agreement of all of the Selling Debtors as contemplated by section 12(b) of the IFSA, and the giving of consent to such an agreement by the Creditors' Committee and Bondholder Group as contemplated by section 12(g)(i) of the IFSA.  This order constitutes all necessary approvals and authorizations required to implement the SPSA and IFSA and shall constitute the U.S. Escrow Release Order as defined in the SPSA.  The Parties are authorized to provide instructions pursuant to Section 12, without limitation, of the IFSA and section 3 of the SPSA, without limitation, to release the Sale Proceeds in accordance with the terms of the SPSA, the Plan and this Order and to take any other action contemplated by the IFSA and SPSA in connection with the release of the Sale Proceeds.

158.    Upon receipt of a notice from NNI and NNL of the occurrence of the Plans Effective Date, JP Morgan Chase Bank N.A. is and hereby shall be authorized and directed to make the following distributions from the Escrow Accounts: (a) $2.8 million to NNI from the Iceberg Escrow Account in satisfaction of the Iceberg Amendment Fee due to NNI; (b) $2.2 million to NNUK from the Iceberg Escrow Account in satisfaction of the Iceberg Amendment

Fee due to NNUK; (c) $20 million to NNI from the Escrow Accounts in satisfaction of the M&A Cost Reimbursement due to NNI; and (d) $35 million to NNL from the Escrow Accounts in satisfaction of the M&A Cost Reimbursement due to NNL.

159.    Upon receipt of a notice from NNI and NNL of the occurrence of the Plans Effective Date, Royal Trust Corporation of Canada is and hereby shall be authorized and directed to release the entire amount in the Canadian Escrow Account to NNL.

160.    Upon receipt of a notice from NNI and NNL of the occurrence of the Plans Effective Date, JPMorgan Chase Bank, N.A is and hereby shall be authorized and directed to release the Sale Proceeds to each of the U.S. Debtors, the Canadian Debtors, the EMEA (Non-NNSA/Non-NNUK) Debtors, NNUK and NNSA in the percentages set forth in Section 2(c) of the SPSA, including as further specified in Annex E and F thereof with respect to the EMEA (Non-NNSA/Non-NNUK) Allocation and the U.S. Allocation, all on and subject to the terms of the SPSA.  For the avoidance of doubt, the amount of Sale Proceeds to be released by JPMorgan Chase Bank, N.A to the Canadian Debtors pursuant to this paragraph 160 shall take into account the amount of Sale Proceeds received by NNL from the Canadian Escrow Account in the manner contemplated by Section 7(g) of the SPSA.

### XXXVIII. Conditions Precedent to Effectiveness and Authority to Implement

161.    The Debtors are authorized, without further notice to, or action, order or approval of this Court or any other Person, to take any actions necessary to effectuate the conditions precedent to the SPSA and the Effective Date of the Plan, including, without limitation:  (a) delivering a certificate to the Canadian Debtors and the Monitor declaring the effectiveness of the Plan, (b) effecting or executing and delivering all actions, agreements, instruments, certificates or other documents necessary to implement the terms and provisions of the Plan, (c) obtaining all authorizations, consents and regulatory approvals, if any, required in connection

with the consummation of the Plan, (d) filing the amended organizational documents of Wind-Down NNI and the Wind-Down Subsidiaries with the applicable authority of each Wind-Down Debtor's respective jurisdiction of incorporation or formation in accordance with such jurisdiction's applicable laws, (e) paying in full all statutory fees due to the U.S. Trustee, (f) executing appropriate notices and other documents dismissing with prejudice the various pending litigations specified in section 7.23 of the Plan and delivering them in escrow to the relevant SPSA parties, and (g) taking any actions the Debtors determine to be necessary or advisable to satisfy or waive the other conditions of Section 9(a) of the SPSA.

162.    Notwithstanding the foregoing, each Debtor may waive the occurrence of the conditions precedent to the Effective Date set forth in Section 12.3 of the Plan, other than Section 12.3(o) and Section 12.3(p) of the Plan.  Any such waiver may be given effect at any time, without notice, leave, hearing or order of the Bankruptcy Court, and without any formal action other than proceeding to consummate the Plan, *provided* that notice of any such waiver shall promptly be provided to the SPSA Parties.  Any actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action.  If any of the Debtors decide that one of the conditions precedents to the Effective Date of its Plan cannot be satisfied and the occurrence or such condition is not waived or cannot be waived, then such Debtor shall file a notice of the inability to satisfy such condition with the Bankruptcy Court.  The failure of a Debtor to exercise any of the foregoing rights shall not be deemed a waiver of any other rights and each right shall be deemed an ongoing right that may be asserted at any time.

163.    Upon the occurrence of the Plans Effective Date or as soon thereafter as is reasonably practicable, the Debtors shall File with the Bankruptcy Court the "Notice of Effective Date" in a form reasonably acceptable to the Debtors in their sole discretion, which notice shall constitute appropriate and adequate notice that the Plan has become effective; *provided*, *however*, that the Debtors shall have no obligation to notify any Person other than counsel to the Creditors' Committee and the Bondholder Group of such fact.  The Plan shall be deemed to be effective as of 12:01 a.m., prevailing Eastern Standard Time, on the date of such filing.  A courtesy copy of the Notice of Effective Date may be sent by United States mail, postage prepaid (or at the Debtors' option, by courier, facsimile or electronic mail) to those Persons who have Filed with the Bankruptcy Court requests for notices pursuant to Bankruptcy Rule 2002.

### XXXIX.    Settlement, Release, Injunction, and Exculpation

164.    The settlement, release, injunction, exculpation, discharge and related provisions set forth in Article 13 of the Plan are hereby approved and authorized:

a.    Compromise and Settlement

165.    Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under this Plan, and, as applicable, the SPSA, on the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan and the SPSA.

166.    Except as otherwise provided in section 1141(d) of the Bankruptcy Code, on and after the Effective Date, the provisions of the Plan shall, and shall be deemed to, be binding on any holder of a Claim against or Interest in the Debtors and its respective successors and assigns, regardless of whether the Claim or Interest of such holder is Impaired under the Plan and whether or not such holder has voted or failed to vote to accept or reject the Plan.

167. Further, pursuant to section 1142 of the Bankruptcy Code and in accordance with this Confirmation Order, the Debtors and any other necessary party shall execute, deliver and join in the execution or delivery (as applicable) of any instrument, document or agreement required to consummate the Plan, and to perform any other act, and the execution of documents contemplated in the Plan, including in the Plan Supplement, that are necessary for the consummation of the Plan and the transactions contemplated herein.

b.    Release and Discharge of Debtors and Wind-Down Debtors

168. **EFFECTIVE AS OF THE EFFECTIVE DATE, FOR GOOD AND VALUABLE CONSIDERATION, TO THE FULLEST EXTENT PERMISSIBLE UNDER APPLICABLE LAW, THE HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS AND EACH OF SUCH HOLDERS' PREDECESSORS, SUCCESSORS, ASSIGNS AND EACH OF THEIR PRESENT AND FORMER OFFICERS, DIRECTORS, EMPLOYEES, CONSULTANTS AND AGENTS (ACTING IN SUCH CAPACITY) WILL BE DEEMED TO HAVE WAIVED, RELEASED, VOIDED AND DISCHARGED EACH OF THE DEBTORS AND THE WIND-DOWN DEBTORS FROM ANY AND ALL CLAIMS, OBLIGATIONS, DAMAGES, DEMANDS, DEBTS, RIGHTS, SUITS, JUDGMENTS OR LIABILITIES (OTHER THAN THE RIGHT TO ENFORCE THE DEBTORS' OR THE WIND-DOWN DEBTORS' OBLIGATIONS UNDER THE PLAN, THE SPSA AND THE CONTRACTS, INSTRUMENTS, RELEASES, AGREEMENTS AND DOCUMENTS DELIVERED UNDER THE PLAN), WHETHER LIQUIDATED OR UNLIQUIDATED, FIXED OR CONTINGENT, MATURED OR UNMATURED, KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, THEN EXISTING OR THEREAFTER ARISING, IN LAW, EQUITY OR OTHERWISE, THAT ARE BASED IN WHOLE OR IN PART ON ANY ACT OR OMISSION, TRANSACTION, EVENT OR**

**OTHER OCCURRENCE TAKING PLACE ON OR PRIOR TO THE EFFECTIVE DATE IN ANY WAY RELATING TO THE DEBTORS, THE CHAPTER 11 CASES, THE DISCLOSURE STATEMENT OR THE PLAN (INCLUDING, WITHOUT LIMITATION, THE SOLICITATION OF VOTES ON THE PLAN) THAT COULD HAVE BEEN ASSERTED BY THE HOLDERS OF CLAIMS AGAINST OR INTERESTS IN THE DEBTORS, IN THEIR INDIVIDUAL CAPACITIES OR ON BEHALF (WHETHER DIRECTLY OR DERIVATIVELY) OF THE DEBTORS, THEIR ESTATES, THE WIND-DOWN DEBTORS, EACH OF THEIR PREDECESSORS, SUCCESSORS, ASSIGNS AND EACH OF THEIR PRESENT AND FORMER OFFICERS, DIRECTORS, EMPLOYEES, CONSULTANTS AND AGENTS (ACTING IN SUCH CAPACITY), IN EACH CASE WITHOUT FURTHER NOTICE TO OR ORDER OF THE BANKRUPTCY COURT, ACT OR ACTION UNDER APPLICABLE LAW, REGULATION, ORDER OR RULE OR THE VOTE, CONSENT OR AUTHORIZATION OR APPROVAL OF ANY PERSON**.

c. <u>Release and Discharge of the Plan Released Parties</u>

169. **EFFECTIVE AS OF THE EFFECTIVE DATE, FOR GOOD AND VALUABLE CONSIDERATION, TO THE FULLEST EXTENT PERMISSIBLE UNDER APPLICABLE LAW, THE HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS AND EACH OF SUCH HOLDERS' PREDECESSORS, SUCCESSORS, ASSIGNS AND EACH OF THEIR PRESENT AND FORMER OFFICERS, DIRECTORS, EMPLOYEES, CONSULTANTS AND AGENTS (ACTING IN SUCH CAPACITY) WHO: (I) EITHER VOTE TO ACCEPT THE PLAN OR ARE PRESUMED TO HAVE VOTED FOR THE PLAN UNDER SECTION 1126(F) OF THE BANKRUPTCY CODE OR (II) ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN AND**

**ABSTAIN FROM VOTING AND DO NOT MARK THEIR BALLOTS TO INDICATE THEIR REFUSAL TO GRANT THE RELEASES PROVIDED HEREIN WILL BE DEEMED TO HAVE WAIVED, RELEASED, VOIDED AND DISCHARGED EACH OF THE PLAN RELEASED PARTIES FROM ANY AND ALL CLAIMS, OBLIGATIONS, DAMAGES, DEMANDS, DEBTS, RIGHTS, SUITS, JUDGMENTS OR LIABILITIES (OTHER THAN THE RIGHT TO ENFORCE THE PLAN RELEASED PARTIES' OBLIGATIONS UNDER THE PLAN, THE SPSA AND THE CONTRACTS, INSTRUMENTS, RELEASES, AGREEMENTS AND DOCUMENTS DELIVERED UNDER THE PLAN), WHETHER LIQUIDATED OR UNLIQUIDATED, FIXED OR CONTINGENT, MATURED OR UNMATURED, KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, THEN EXISTING OR THEREAFTER ARISING, IN LAW, EQUITY OR OTHERWISE, THAT ARE BASED IN WHOLE OR IN PART ON ANY ACT OR OMISSION, TRANSACTION, EVENT OR OTHER OCCURRENCE TAKING PLACE ON OR PRIOR TO THE EFFECTIVE DATE IN ANY WAY RELATING TO THE DEBTORS, THE CHAPTER 11 CASES, THE DISCLOSURE STATEMENT, THE SPSA OR THE PLAN (INCLUDING, WITHOUT LIMITATION, THE SOLICITATION OF VOTES ON THE PLAN) THAT COULD HAVE BEEN ASSERTED BY THE HOLDERS OF CLAIMS AGAINST OR INTERESTS IN THE DEBTORS, IN THEIR INDIVIDUAL CAPACITIES OR ON BEHALF (WHETHER DIRECTLY OR DERIVATIVELY) OF THE DEBTORS, THEIR ESTATES, THE WIND-DOWN DEBTORS, EACH OF THEIR PREDECESSORS, SUCCESSORS, ASSIGNS AND EACH OF THEIR PRESENT AND FORMER OFFICERS, DIRECTORS, EMPLOYEES, CONSULTANTS AND AGENTS (ACTING IN SUCH CAPACITY), IN EACH CASE**

WITHOUT FURTHER NOTICE TO OR ORDER OF THE BANKRUPTCY COURT,
ACT OR ACTION UNDER APPLICABLE LAW, REGULATION, ORDER OR RULE
OR THE VOTE, CONSENT OR AUTHORIZATION OR APPROVAL OF ANY
PERSON.

170.    NOTWITHSTANDING ANYTHING TO THE CONTRARY HEREIN OR
IN SECTIONS 13.3 OR 13.2 OF THE PLAN, THE RELEASES SET FORTH ABOVE
AND IN THE PLAN DO NOT RELEASE ANY POST-EFFECTIVE DATE
OBLIGATIONS OF ANY PARTY OR ENTITY UNDER THE PLAN, OR ANY
DOCUMENT, INSTRUMENT OR AGREEMENT (INCLUDING THOSE SET FORTH
IN THE PLAN SUPPLEMENT) EXECUTED TO IMPLEMENT THE PLAN,
INCLUDING THE SPSA, AND EXCEPT AS OTHERWISE PROVIDED BY PRIOR OR
SUBSEQUENT FINAL ORDER OF THE BANKRUPTCY COURT, NOTHING HEREIN
OR IN SECTIONS 13.3 OR 13.2 SHALL OPERATE AS A WAIVER OR RELEASE OF
(A) ANY PERSON (I) NAMED PRIOR TO THE EFFECTIVE DATE AS A DEFENDANT
IN ANY ACTION COMMENCED BY OR ON BEHALF OF THE DEBTORS-IN-
POSSESSION, INCLUDING ANY ACTIONS PROSECUTED BY THE CREDITORS'
COMMITTEE AND THE BONDHOLDER GROUP OR (II) ADJUDICATED PRIOR TO
THE EFFECTIVE DATE BY A COURT OF COMPETENT JURISDICTION TO HAVE
ENGAGED IN ACTS OF DISHONESTY OR WILLFUL MISCONDUCT
DETRIMENTAL TO THE INTEREST OF THE DEBTORS OR (B) ANY CLAIM (I)
WITH RESPECT TO ANY LOAN, ADVANCE OR SIMILAR PAYMENT BY THE
DEBTORS TO ANY SUCH PERSON, (II) WITH RESPECT TO ANY CONTRACTUAL
OBLIGATION OWED BY SUCH PERSON TO THE DEBTORS OR (III) RELATING

**TO SUCH PERSON'S KNOWING FRAUD, GROSS NEGLIGENCE OR WILLFUL MISCONDUCT; AND *PROVIDED*, *FURTHER*, THAT THE FOREGOING IS NOT INTENDED, NOR SHALL IT BE CONSTRUED, TO RELEASE ANY OF THE DEBTORS' CLAIMS THAT MAY EXIST AGAINST THE DEBTORS' DIRECTORS AND OFFICERS LIABILITY INSURANCE; AND *PROVIDED*, *FURTHER*, THAT, NOTWITHSTANDING THE FOREGOING, ALL SUCH CLAIMS SHALL BE PRESERVED BY THE DEBTORS FOR SETOFF PURPOSES.**

        d.      <u>SPSA Releases</u>

     171.   **UPON THE EFFECTIVE DATE, AS PROVIDED IN SECTION 8 OF THE SPSA AND IN CONSIDERATION FOR THE SETTLEMENTS PROVIDED FOR UNDER THE SPSA INCLUDING THE RELEASES GRANTED IN FAVOR OF THE DEBTOR RELEASING PARTIES UNDER THE SPSA, EACH OF THE DEBTOR RELEASING PARTIES (I) SHALL BE DEEMED TO HAVE RELEASED AND FOREVER DISCHARGED EACH OF THE OTHER SPSA RELEASED PARTIES FROM ANY AND ALL LIABILITY FOR CLAIMS, DEFENSES, DEMANDS, LIABILITIES, DAMAGES, ACTIONS, CONTRIBUTIONS, SUBROGATION, CAUSES OF ACTION, SETOFFS, RECOUPMENTS, COSTS AND EXPENSES (INCLUDING LAWYERS' OR OTHER FEES OR EXPENSES), THE FOREGOING TERMS TO BE CONSTRUED AS BROADLY AS POSSIBLE, WHETHER KNOWN OR UNKNOWN, PAST OR PRESENT, FIXED OR CONTINGENT, LIQUIDATED OR UNLIQUIDATED, WHICH ANY OF THE DEBTOR RELEASING PARTIES HAVE, HAD, MAY HAVE HAD OR HEREAFTER MAY HAVE HOWEVER SO ARISING OUT OF OR IN CONNECTION WITH THE ALLOCATION DISPUTE, ANY OTHER MATTERS RESOLVED UNDER THE SPSA OR ANY OTHER MATTER RELATING TO THE**

CHAPTER 11 CASES OR THE FOREIGN PROCEEDINGS OR THE NORTEL GROUP
(COLLECTIVELY, AND EXCLUDING THE NON-RELEASED MATTERS, THE "SPSA
RELEASED CLAIMS") AND UNDERTAKE, COVENANT AND AGREE NOT TO
MAKE ANY CLAIM, PARTICIPATE IN ANY PROCEEDING OR TAKE ANY ACTION
AGAINST ANY OTHER PERSON OR ENTITY WHO WOULD AS A RESULT OF
SUCH CLAIM, PROCEEDING OR ACTION HAVE A CLAIM FOR CONTRIBUTION
OR INDEMNITY AGAINST ANY OF THE OTHER SPSA RELEASED PARTIES IN
RELATION TO THE SPSA RELEASED CLAIMS, *PROVIDED HOWEVER*, THAT THE
DEBTORS' RIGHT TO OBJECT TO, OR ASSERT COUNTERCLAIMS FOR
PURPOSES OF SETOFF AGAINST, CLAIMS MADE AGAINST THEM BY
DIRECTORS AND OFFICERS OF ANY NORTEL ENTITY AGAINST SUCH
DEBTORS IS NOT RELEASED OR IN ANY WAY COMPROMISED.
NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS PARAGRAPH,
THE RELEASES SET FORTH IN SECTION 13.4 OF THE PLAN DO NOT
CONSTITUTE A RELEASE, WAIVER OR DISCHARGE OF ANY PROVEN CLAIMS
AGAINST THE CANADIAN ESTATE FOR PAYMENT OF THE CROSSOVER BONDS
OR THE NNCC BONDS, THE U.S. CANADIAN CLAIM, THE U.S. CANADIAN
PRIORITY CLAIM, THE INTERCOMPANY CLAIMS SPECIFIED ON ANNEX L TO
THE SPSA, NNI'S RIGHT TO RECEIVE PAYMENT FROM THE CANADIAN ESTATE
IN THE AMOUNT OF $77.5 MILLION, AS PROVIDED FOR IN SECTION 4(E) OF
THE SPSA, ANY CLAIM BETWEEN OR AMONG ANY OF THE DEBTORS AND
THEIR SUBSIDIARIES, ANY CLAIM BETWEEN THE PBGC AND THE DEBTORS
OR ANY OF THEIR U.S. SUBSIDIARIES, ANY PROFESSIONAL CLAIM, ANY

**CLAIM TO ENFORCE THE TERMS OF THE SPSA, THE PLAN, THE CANADIAN PLAN, AND ANY ORDER OF THE BANKRUPTCY COURT OR THE CCAA COURT RELATED THERETO, OR ANY OTHER MATTER LISTED UNDER SECTION 8(i) OF THE SPSA (COLLECTIVELY, THE "NON-RELEASED MATTERS").**

e.     Exculpation and Limitation of Liability

172.    **None of the Exculpated Parties shall have or incur any liability to any Entity for any act taken or omitted to be taken in connection with and subsequent to the commencement of the Chapter 11 Cases, the formulation, preparation, dissemination, implementation, solicitation of votes, confirmation or approval of the Plan or any compromises or settlements contained therein, the administration of the Plan or Distributions under the Plan, the Disclosure Statement and any ancillary documents related thereto or any contract, instrument, release or other agreement or document provided for or contemplated in connection with the consummation of the transactions set forth in the Plan; *provided*, *however*, the foregoing provisions of Section 13.5 of the Plan shall not affect the liability of any Exculpated Party that otherwise would result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted gross negligence or willful misconduct, including, without limitation, fraud and criminal misconduct, and in all respects the Exculpated Parties shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.**

f.     Injunction on Claims

173.    **Except as otherwise expressly provided herein or in the Plan, the Confirmation Order or such other order of the Bankruptcy Court that may be applicable, all holders of Claims or other debt or liability that is treated under the Plan or Interest or**

73

other right of interest that is terminated or cancelled pursuant to the Plan are permanently enjoined, from and after the Effective Date, from (a) commencing or continuing in any manner any action or other proceeding of any kind on any such Claim or other debt or liability or Interest or other right of equity interest that is terminated or cancelled pursuant to the Plan against the Debtors, the Estates or the Wind-Down Debtors or any properties or interest in properties of the Debtors or the Wind-Down Debtors, (b) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against the Debtors, the Estates or the Wind-Down Debtors or any properties or interest in properties of the Debtors or the Wind-Down Debtors, (c) creating, perfecting or enforcing any encumbrance of any kind against the Debtors, the Estates or the Wind-Down Debtors or any properties or interest in properties of the Debtors or the Wind-Down Debtors, (d) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from the Debtors, the Estates or the Wind-Down Debtors or any properties or interest in properties of the Debtors or the Wind-Down Debtors, (e) acting or proceeding in any manner that does not conform to or comply with the provisions of the Plan and (f) taking any actions to interfere with the implementation or consummation of the Plan, with respect to any such Claim or other debt or liability that is discharged or Interest or other right of equity interest that is terminated or cancelled pursuant to the Plan.

## XL.        Existing Injunctions and Stays Remain in Effect Until Effective Date

174.      Unless otherwise provided herein, in the Plan or in a separate order of the Bankruptcy Court, all injunctions or stays arising under or entered during the Chapter 11 Cases under sections 105 and 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until each Debtor's Effective Date.

Upon each Debtor's respective Effective Date, all injunctions or stays provided for in each

Chapter 11 Case under sections 105 or 362 of the Bankruptcy Code, or otherwise, shall be lifted

and of no further force or effect — being replaced, to the extent applicable, by the injunctions,

discharges, releases and exculpations of Article 13 of the Plan.

## XLI.    Retained Actions

175.    Except as expressly provided herein or in the Plan, nothing contained in herein or

in the Plan shall be deemed to be a waiver or relinquishment of any rights with respect to

Litigation Claims that the Debtors, the Wind-Down Debtors or the Plan Administrator may have

or choose to assert on behalf of the respective Estates or Wind-Down Debtors under any

provision of the Bankruptcy Code or any applicable nonbankruptcy law, including, without

limitation, any and all claims against any Person or Entity, to the extent such Person or Entity

asserts a cross-claim, counterclaim or claim for setoff that seeks affirmative relief against the

Debtors, their officers, directors or representatives.

176.    Except as expressly provided herein or in the Plan, nothing contained herein or in

the Plan shall be deemed to be a waiver or relinquishment of any Litigation Claim, right of setoff

or other legal or equitable defense that the Debtors had immediately prior to the Petition Date,

against or with respect to any Claim.  The Debtors, the Wind-Down Debtors and the Plan

Administrator shall have, retain, reserve and be entitled to assert all such Litigation Claims,

rights of setoff, and other legal or equitable defenses that the relevant Debtor had immediately

prior to the Petition Date fully as if the Chapter 11 Cases had not been commenced, and all of the

Debtors' legal and equitable rights respecting any Claim may be asserted after the Confirmation

Date to the same extent as if the Chapter 11 Cases had not been commenced.

177.    Except as otherwise provided herein or in the Plan, nothing shall affect the rights

and legal and equitable defenses of the Debtors, the Wind-Down Debtors or the Plan

Administrator with respect to any Unimpaired Claim, including all rights in respect of legal and equitable defenses to setoffs or recoupments against Unimpaired Claims.

178.    Except as expressly provided herein or in the Plan, the Plan Administrator, shall, after the Effective Date, retain the rights of each Debtor to prosecute any Litigation Claims that could have been brought by such Debtor at any time.

179.    The Plan Administrator and the Wind-Down Debtors shall retain the rights of each Debtor to enforce all orders entered and relief granted in the Chapter 11 Cases.

### XLII.    Waiver or Estoppel

180.    Each Holder of a Claim or Interest shall be deemed to have waived any right to assert any argument, including, without limitation, the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, as secured, or not subordinated by virtue of an agreement made with the Debtors or their counsel, the Creditors' Committee or their respective counsels, or any other Person, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers filed with this Court prior to the Confirmation Date.

### XLIII.    Dissolution of Creditors' Committee

181.    Effective on the Effective Date, the Creditors' Committee shall dissolve automatically and its members shall be released from any further duties and responsibilities in the Chapter 11 Cases and under the Bankruptcy Code without need for a further order of the Bankruptcy Court; *provided*, *however*, that (a) following the Effective Date the Creditors' Committee shall continue in existence and have standing and a right to be heard solely for the following limited purposes:  (1) Claims and/or applications for compensation by Professionals and requests for allowance of Administrative Expense Claims for substantial contribution pursuant to section 503(b)(3)(D) of the Bankruptcy Code; (2) any appeals relating to the Plan to which the Creditors' Committee is a party; and (3) to respond to creditor inquiries and with

respect to reporting under Section 6.3(g) of the Plan for ninety (90) days following the Effective

Date. Except for the purposes described above, the Debtors, the Wind-Down Debtors and the

Plan Administrator shall not have any obligation to pay or reimburse any fees of any official or

unofficial committee of creditors incurred after the Effective Date. For the avoidance of doubt,

any obligations arising under confidentiality agreements, joint interest agreements and protective

orders, if any, entered during the Chapter 11 Cases shall remain in full force and effect in

accordance with their terms.

### XLIV.    NNCC Bonds Indenture Trustee

182.    For the avoidance of doubt, for all purposes under the Plan and this Order,

Delaware Trust Company, as successor to Law Debenture Trust Company of New York, shall be

deemed to be the NNCC Bonds Indenture Trustee.

### XLV.    Payment of Statutory Fees

183.    On or before the Effective Date, all fees due and payable pursuant to section 1930

of title 28 of the United States Code, as determined by this Court at the Confirmation Hearing,

shall be paid in full, in Cash. Such fees shall be paid for each quarter (including any fraction

thereof) until the Chapter 11 Cases are converted, dismissed or closed, whichever occurs first.

### XLVI.    Treatment of Multiple Claims

184.    To the extent that a Claim is Allowed against the Estate of more than one Debtor,

there shall be only a single recovery on account of such Allowed Claim. The aggregate recovery

under the Plan on account of a claim for which more than one Debtor is also liable, whether on

account of a theory of primary or secondary liability, by reason of a guarantee agreement,

indemnity agreement, joint and several liability or otherwise, shall not exceed 100% of the

amount of the Allowed Claim, subject to, without limitation, sections 7.10 and 7.11 of the Plan.

### XLVII.    Bar Date for Allowance and Payment of Administrative Expense Claims

185.    Administrative Expense Claims (other than Professional Claims which must be filed in accordance with section 2.3 of the Plan) must be filed so as to be actually received by the Bankruptcy Court on or before 5:00 p.m., prevailing Eastern Standard Time, on the date that is the first Business Day that is thirty (30) days following the Effective Date, unless otherwise ordered by the Bankruptcy Court (the "Administrative Expense Claims Bar Date").

186.    A notice setting forth the Effective Date of the Plan and the Administrative Expense Claims Bar Date and Professional Claims Bar Date shall be (i) filed on the Bankruptcy Court's docket and (ii) posted on the Debtors' case information website at http://dm.epiq11.com/nortel.  Further notice of the Administrative Expense Claims Bar Date or Professional Claims Bar Date shall be provided as may be directed by the Bankruptcy Court and in accordance with paragraphs 192-194 herein.  All requests for payment of an Administrative Expense Claim that accrued on or before the Effective Date other than Administrative Expense Claims that have been paid or that relate to payment of Professionals must be filed with the Claims Agent and served on counsel for the Debtors by the Administrative Expense Claims Bar Date or the Professional Claims Bar Date, respectively.  Absent further order of the Bankruptcy Court, any requests for payment of Administrative Expense Claims, including Professional Claims, that are not properly filed and served by the applicable bar date shall not appear on the register of Claims maintained by the Claims Agent and shall be disallowed automatically without the need for any objection from the Debtors or any action by the Bankruptcy Court.

187.    The Debtors and the Plan Administrator may settle Administrative Expense Claims in the ordinary course without further notice or Bankruptcy Court approval, in accordance with the Plan Administration Agreement, as applicable.  The Debtors shall have the right to object to any Administrative Expense Claim or Professional Claims within 180 days after

78

the Administrative Expense Claims Bar Date, subject to further extensions that may be granted

by the Bankruptcy Court.  Unless the Debtors or the Wind-Down Debtors object to a timely filed

and properly served Administrative Expense Claim, such Administrative Expense Claim shall be

deemed Allowed in the amount requested.  In the event that the Debtors or the Wind-Down

Debtors object to an Administrative Expense Claim, the parties may confer to try to reach a

settlement and, failing that, the Bankruptcy Court shall determine whether such Administrative

Expense Claim should be allowed and, if so, in what amount.

### XLVIII.    References to Plan Provisions

188.    The Plan is confirmed in its entirety.  The Plan is hereby incorporated into this

Confirmation Order by reference (subject to any provision incorporated by such reference being

governed by an express and contradictory provision herein).  The failure to reference or discuss

any particular provision of the Plan in this Confirmation Order shall not diminish or impair the

effectiveness of, or otherwise affect, the validity, binding effect, and enforceability of such

provision, and each provision of the Plan and Plan Supplement shall have the same validity,

binding effect, and enforceability as if fully set forth in this Confirmation Order.

### XLIX.    Rules Governing Conflicts Between Documents

189.    In the event of a conflict between the terms or provisions of the Plan and any

other Plan-related documents, the terms of the Plan shall control over such documents.  In the

event of a conflict between the terms of the Plan or Plan-related documents, on the one hand, and

the terms of this Confirmation Order, on the other hand, the terms of this Confirmation Order

shall control.  This Confirmation Order shall supersede any orders of the Court issued prior to

the Confirmation Date that may be inconsistent herewith.

L.        **No Admissions**

190.    As to contested matters, adversary proceedings, and other Causes of Action or threatened Causes of Action, nothing in the Plan, the Plan Supplement, or the Disclosure Statement shall constitute or be construed as an admission of any fact or liability, stipulation, or waiver, but rather as a statement made in settlement negotiations.  The Plan shall not be construed to be conclusive advice on the tax, securities, and other legal effects of the Plan as to holders of Claims against, or Interests in, the Debtors or any of their subsidiaries and affiliates, as debtors and debtors in possession in the Chapter 11 Cases.

LI.        **Headings**

191.    Headings utilized herein are for convenience and reference only, and shall not constitute a part of the Plan or this Confirmation Order for any other purpose.

LII.        **Notice of Entry of this Confirmation Order**

192.    In accordance with Bankruptcy Rules 2002 and 3020(c), the Debtors shall serve a notice of the Effective Date (the "<u>Effective Date Notice</u>") by hand, overnight courier service, or United States mail, first-class postage prepaid, to all Persons having been served with the notice of the Confirmation Hearing within a reasonable period of time after the conditions to effectiveness of the Plan set forth in Article 12 of the Plan have been satisfied or waived, which Effective Date Notice shall include notice of the Administrative Expense Claims Bar Date and the Professional Claims Bar Date; *provided, however,* that no notice or service of any kind shall be required to be mailed or made upon any Person to whom the Debtors mailed a notice of the Confirmation Hearing but received such notice returned marked "undeliverable as addressed," "moved, left no forwarding address," "forwarding order expired," or similar reason, unless the Debtors have been informed in writing by such Person, or are otherwise aware, of that Person's new address.

193.    Mailing of the Effective Date Notice in the time and manner set forth in the preceding paragraph shall constitute good and sufficient notice of the information provided in the Effective Date Notice, including without limitation, notice of confirmation of the plan as required by the Bankruptcy Rules and Applicable Laws, the Administrative Expense Claims Bar Date and the Professional Claims Bar Date.  Under the particular circumstances and in accordance with the requirements of Bankruptcy Rules 2002 and 3020(c), no other or further notice of confirmation or the occurrence of the Effective Date or the Administrative Expense Claims Bar Date is necessary.

194.    In addition to mailing the Effective Date Notice, the Debtors shall publish the Effective Date Notice, within a reasonable period of time after the conditions to effectiveness of the Plan set forth in Article 12 of the Plan have been satisfied or waived, once in each of the Wall Street Journal and the Globe and Mail, and electronically at http://dm.epiq11.com/nortel. Publication in this manner shall constitute good and sufficient publication notice of the information provided in the Effective Date Notice, including without limitation the Administrative Expense Claims Bar Date and the Professional Claims Bar Date.  No further notice is necessary or required.

### LIII.    Bankruptcy Code § 345

195.    For the avoidance of doubt, on and after the Effective Date, the requirements of 11 U.S.C. § 345 shall not apply.

### LIV.    Retention of Jurisdiction

196.    Pursuant to sections 105(a) and 1142 of the Bankruptcy Code, and notwithstanding the entry of this Confirmation Order or the occurrence of the Effective Date, this Court shall retain jurisdiction as provided in the Plan over all matters arising out of, or related to, the Chapter 11 Cases, the Debtors, the Wind-Down Debtors, and the Plan, to the fullest extent

permitted by Applicable Laws, including, without limitation, jurisdiction over those matters set forth in Article 12 of the Plan.

**LV.**    **Modifications or Amendments to the Plan, Plan Supplement and Ancillary Documents**

197.    Subject to the terms of the SPSA, and subject to the restrictions and requirements of section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, the Debtors are authorized to modify the Plan, the Plan Supplement and any ancillary documents after the date hereof without further notice to or authorization from this Court to make any of the following modifications: (a) non-material or non-adverse modifications; (b) modifications to remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or this Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan; (c) material or adverse modifications that have been approved by each of the SPSA Parties; or (d) other modifications for which this Court has granted approval.  A Holder of a Claim that has accepted the Plan shall be deemed to have accepted the Plan as altered, amended or modified, if the proposed alteration, amendment, or modification does not materially and adversely change the treatment of the Claim of such Holder and is consistent with Section 15.4 of the Plan and this Order.  For the avoidance of doubt, nothing in Section 15.4 of the Plan or this Order shall limit any SPSA Party's rights pursuant to Section 6(h) of the SPSA with respect to any proposed amendment, restatement, modification and/or supplement to the Plan.

198.    Subject to the terms of the SPSA, each of the Debtors expressly reserves its respective rights to revoke or withdraw, or to alter, amend, or modify the Plan with respect to such Debtor after Confirmation and, to the extent necessary, may initiate proceedings in this Court to so alter, amend, or modify the Plan.  Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with Section 15.4 of the

Plan and the SPSA. For the avoidance of doubt, nothing herein shall modify any SPSA Party's rights pursuant to Section 6(h) of the SPSA with respect to any proposed amendment, restatement, modification and/or supplement to the Plan.

### LVI.    Ownership and Control

199.    The consummation of the Plan and the transactions contemplated thereby shall not constitute a change of ownership or change in control, as such terms are used in any statute, regulation, contract, indenture or agreement (including any employment, severance, termination or insurance agreements) in effect on the Effective Date and to which any of the Debtors is a party under any Applicable Law of any applicable Governmental Unit.

### LVII.    Final Order; Waiver of Stay; Authorization to Consummate

200.    This Confirmation Order is a Final Order. For good cause shown, the stay of Confirmation set for forth in Bankruptcy Rule 3020(e) is hereby waived. The provisions of Federal Rule of Civil Procedure 62, as applicable pursuant to Bankruptcy Rule 7062, and Bankruptcy Rule 3020(e) shall not apply to this Order, and the Debtors are authorized to consummate the Plan immediately upon entry of this Order, subject to satisfaction or waiver of the conditions precedent to consummation in accordance with Article 12 of the Plan, notwithstanding any stay otherwise imposed pursuant to Bankruptcy Rule 3020(e) or any other provision of the Bankruptcy Rules, including Bankruptcy Rule 6004(h), 7062, 9014, or otherwise. The period in which an appeal with respect to this Order must be filed shall commence immediately upon the entry of this Order.

### LVIII.    Rule 2004 Examinations

201.    The power of the Debtors to conduct examinations pursuant to Bankruptcy Rule 2004 is expressly preserved following the Effective Date; *provided, however*, that the Wind-Down Debtors shall not conduct any Rule 2004 examination relating to any Cause of Action that

is expressly waived, relinquished, compromised, or settled in the Plan, the SPSA or any Final

Order (including, without limitation, the Causes of Action against the Released Parties).

### LIX.    <u>Case Closure</u>

202.    Pursuant to section 350 of the Bankruptcy Code, the closing of the Chapter 11

Cases is hereby authorized.  After a Chapter 11 Case has been fully administered, the Plan

Administrator shall File all documents required by Bankruptcy Rule 3022 and any applicable

order of the Bankruptcy Court to close such Chapter 11 Case in accordance with the Bankruptcy

Code and the Bankruptcy Rules.  After proper filing of a Debtor's final report and account as

required by Local Rule 3022-1, provided no objections to such final report are timely filed, the

Plan Administrator is hereby authorized to file a Final Decree under certification of counsel

closing such Debtor's Chapter 11 Case pursuant to Bankruptcy Rule 3022.  The Plan

Administrator's authority shall continue until such time as all of the Chapter 11 Cases have been

fully administered and closed.  All U.S. Trustee fees payable under 28 U.S.C. § 1930 for the

closed cases shall be paid on, or as soon as reasonably practicable following the Effective Date.

The closing of the Chapter 11 Cases will in no way prejudice the Debtors' rights to object or

otherwise contest a proof of Claim properly filed against any of the Debtors (provided that a

Claimant seeking to file a late claim has complied with 11 U.S.C. § 350(b) or Applicable Law, if

such Debtor's case has been closed), commence or prosecute any action to which any of the

Debtors may be a party, or a claimant's rights to receive Distributions under the Plan to the

extent such claimant's Claim is ultimately allowed, nor will the closing of such Chapter 11 Cases

otherwise alter or modify the terms of the Plan.

Dated: _____, 2017
        Wilmington, Delaware

                                           _____
                                         THE HONORABLE KEVIN GROSS
                                         UNITED STATES BANKRUPTCY JUDGE