IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

--------------------------------------------------------- X
                      :

*In re*                     :      Chapter 11
                      :

Nortel Networks Inc., *et al.*,[1]    :      Case No. 09-10138 (KG)
                      :

               Debtors.   :      Jointly Administered
                      :
                      :      **RE: D.I. 17432**
                      :

--------------------------------------------------------- X

## DEBTORS' MEMORANDUM OF LAW IN OPPOSITION TO THE MOTION OF SNMP RESEARCH INTERNATIONAL, INC. AND SNMP RESEARCH, INC. TO AMEND PROOFS OF CLAIM AND ADD SNMP RESEARCH, INC. AS CLAIMANT

---

[1]    The debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567),  Nortel Networks (CALA) Inc. (4226) and Nortel Networks India International Inc. (8667).  Contact information for the Debtors and their petitions are available at http://dm.epiq11.com/nortel.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... ii

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND ...................................................................................................................... 7

    A. International's Previously-Filed Proofs Of Claim Asserted Contractual Claims For
       Royalties Under The Nortel License Agreement ......................................................... 7

    B. The Motion To Amend Seeks To Discard International's Claim For Contractual
       Royalties And Replace It With A New Claim By Inc. For Alleged Infringement Of
       Inc.'s Copyrights ......................................................................................................... 9

    C. In The Motion To Amend, SNMP Research Concedes That Inc. Is The Owner And
       Developer Of The Relevant Copyrights, And That The Licensing Agreement
       Between Inc. And International Is Non-Exclusive ..................................................... 11

    D. The Claims That The Motion To Amend Seeks To Add Are Meritless .................... 11

ARGUMENT .......................................................................................................................... 16

  I. THE MOTION'S LINCHPIN ARGUMENT FAILS, BECAUSE INTERNATIONAL
     NEVER ASSERTED CLAIMS UNDER COPYRIGHTS BELONGING TO INC. ........ 16

  II. EVEN IF INTERNATIONAL HAD ATTEMPTED TO ASSERT COPYRIGHT
     CLAIMS BELONGING TO INC., THOSE CLAIMS WOULD HAVE TO BE
     DISMISSED FOR LACK OF CONSTITUTIONAL STANDING ............................... 17

    A. International Lacks Constitutional Standing To Enforce Inc.'s Copyrights ............... 17

    B. The Court Lacks Subject Matter Jurisdiction To
       Entertain The Motion To Amend ............................................................................. 19

  III. SNMP RESEARCH CANNOT RELY ON EITHER RULE 15 OR RULE 17 TO ADD
      INC. AS A CLAIMANT .............................................................................................. 21

    A. Rule 15 Does Not Permit SNMP Research To Add
       Inc. As An Additional Claimant ............................................................................... 22

    B. Because SNMP Research's Failure To Name Inc. As A Claimant Was Not
       Understandable, It Cannot Rely On Rule 17 To Do So Now ................................... 25

  IV. THE MOTION TO AMEND ALSO SHOULD BE DENIED BASED ON UNEXCUSED
      DELAY AND THE PREJUDICE THE PROPOSED
      NEW CLAIM WOULD CAUSE ................................................................................. 27

    A. SNMP Research Cannot Add New Claims More Than Seven Years After the Bar
       Date ......................................................................................................................... 28

    B. Equitable Considerations Further Compel Denial Of The Motion To Amend .......... 30

CONCLUSION ....................................................................................................................... 34

## TABLE OF AUTHORITIES

**Page(s)**

**Rules and Statutes**

17 U.S.C. § 501(a), (b) ...................................................... 17

Fed. R. Civ. P. 17(a), Advisory Committee Notes, 1966 Amendments ........................... 26

**Cases**

Abraxis Bioscience, Inc. v. Navinta LLC,
625 F.3d 1359 (Fed. Cir. 2010) ...................................................... 21

Advanced Estimating Sys., Inc. v. Rine
130 F.3d 996 (11th Cir. 1997) ...................................................... 25

Arrieta v. Battaglia,
461 F.3d 861 (7th Cir. 2006) ...................................................... 25

Asher v. Unarco Material Holding, Inc.,
596 F.3d 313 (6th Cir. 2010) ...................................................... 22-23

BCC Merchant Sols., Inc. v. Jet Pay, LLC,
129 F. Supp. 3d 440, 459 (N.D. Tex. 2015) ...................................................26-27, 27-28

EMI Entm't World, Inc. v. Karen Records, Inc.,
No. 05 Civ. 390(LAP), 2013 WL 2480212 (S.D.N.Y. June 10, 2013) ........................... 19

Estate of Verkamp v. KDI Corp. (In re KDI Corp.),
119 B.R. 594 (Bankr. S.D. Ohio 1990) ...................................................... 34

Feist v. Consol. Freightways Corp.,
100 F. Supp. 2d 273 (E.D. Pa. 1999) ...................................................... 26

Gardner v. State Farm Fire & Casualty Company,
544 F.3d 553 (3d Cir. 2008) ...................................................... 22

Goss v. Revlon, Inc.,
548 F.2d 405 (2d Cir. 1976) ...................................................... 24

Graphic Commc'ns Int'l Union, Local 12-N v. Quebecor Printing Providence, Inc.,
270 F.3d 1 (1st Cir. 2001) ...................................................... 25

Gym Door Repairs, Inc. v. Young Equipment Sales, Inc.,
No. 15-cv-4244 (JGK), 2016 WL 4747281 (S.D.N.Y. Sept. 9, 2016) .............................   17-18

Hatzel & Buehler, Inc. v. Station Plaza Assocs., L.P.,
150 B.R. 560 (Bankr. D. Del. 1993) ...................................................................................   30

Heady v. PNC Bank National Association
(In re Community Bank of Northern Virginia)
622 F.3d 275 (3d Cir. 2010) ...............................................................................................   23

In re AM Int'l, Inc.,
67 B.R. 79 (N.D. Ill. 1986) ..................................................................................................   31

In re Bazela,
37 B.R. 188 (Bankr. E.D. Pa. 1984) ....................................................................................   30

In re Cont'l Airlines, Inc.,
183 B.R. 698 (Bankr. D. Del. 1995) ....................................................................................   30

In re Enron Creditors Recovery Corp.,
370 B.R. 90 (Bankr. S.D.N.Y. 2007) ..................................................................................   34

In re Gray,
71 B.R. 46 (Bankr. D. Del. 1987) ........................................................................................   34

In re Martinez,
513 B.R. 779 (Bankr. D.P.R. 2014) .....................................................................................   24-25

In re Metro Transp. Co.,
117 B.R. 143 (Bankr. E.D. Pa. 1990) ..................................................................................   28

In re MK Lombard Grp. I, Ltd.,
301 B.R. 812 (Bankr. E.D. Pa. 2003) ..................................................................................   27

In re Nortel Networks, Inc.,
531 B.R. 53 (Bankr. D. Del. 2015) ......................................................................................   24

In re O'Brien Envtl. Energy, Inc.,
188 F.3d 116 (3d Cir. 1999) ................................................................................................   30

In re Stavriotis,
977 F.2d 1202 (7th Cir. 1992) .............................................................................................   31

In re W.R. Grace & Co.,
No. 01-1139 (KG), 2016 WL 7471290 (Bankr. D. Del. Dec. 28, 2016) .......................... 6, 34

Lans v. Gateway 2000, Inc.,
84 F. Supp. 2d 112 (D.D.C. 1999) .................................................................................. 27

Mandelbrot v. Armstrong World Indus. Asbestos Pers. Injury Tr.,
No. 13-1032-GMS, 2014 WL 4626505 (D. Del. Sept. 12, 2014) ..................................... 21

Midland Cogeneration Venture Ltd. P'Ship v. Enron Corp. (In re Enron Corp.),
419 F.3d 115 (2d Cir. 2005) .......................................................................................... 31-32

Miller v. Peregrine Fin. Grp., Inc. (In re Peregrine Fin. Grp., Inc.),
Case No. 12 B 27488, 2015 WL 2237201 (Bankr. N.D. Ill. May 13, 2015) ..................... 30

N.Y.C. Housing Auth. V. G-I Holdings, Inc. (In re G-I Holdings, Inc.),
514 B.R. 720 (Bankr. D.N.J. 2014).................................................................................. 28

Nelson v. County of Allegheny,
60 F.3d 1010 (3d Cir. 1995) ........................................................................................... 23

Plains Mktg., L.P. v. Bank of Am., N.A. (In re SemCrude, L.P.),
443 B.R. 472 (Bankr. D. Del. 2011) ............................................................................... 28-29

Praedium II Broadstone, LLC v. Wall St. Strategies, Inc.,
No. 04 Civ. 3880(WHP), 2004 WL 2624678 (S.D.N.Y. Nov. 18, 2004)......................... 31

Rasberry v. Garcia,
448 F.3d 1150 (9th Cir. 2006) ....................................................................................... 25

Riverside Acquisition Grp. LLC v. Vertis Holdings, Inc. (In re Vertis Holdings, Inc.),
536 B.R. 589 (Bankr. D. Del. 2015) ...............................................................................27, 31, 32, 33

Schafer v. Decision One Mortg. Corp.,
No. 08-8653, 2009 WL 1886071 (E.D. Pa. June 30, 2009) ............................................. 27

Storino v. Borough of Point Pleasant Beach,
322 F.3d 293 (3d Cir. 2003) ........................................................................................... 20

Spinelli v. Nat'l Football League,
96 F. Supp. 3d 81 (S.D.N.Y. 2015)................................................................................. 8-9

Sybersound Records, Inc. v. UAV Corp.,
517 F.3d 1137 (9th Cir. 2008) ....................................................................................... 17

Taliaferro v. Darby Twp. Zoning Bd.,
458 F.3d 181 (3d Cir. 2006) ........................................................................    20

Tech-Sonic Inc. v. Sonics & Materials, Inc.,
No. 3:12-cv-01376 (MPS), 2016 WL 3962767 (D. Conn. July 21, 2016)........................    28

Tex. Am. Oil Corp. v. U.S. Dep't of Energy,
44 F.3d 1557 (Fed. Cir. 1995) ....................................................................    32-33

Troxel Mfg. Co. v. Schwinn Bicycle Co.,
489 F.2d 968 (6th Cir. 1974) ......................................................................    25-26

Vianix Del. LLC v. Nuance Commc'ns, Inc.,
Civil No. 09-0067 (NLH)(JS), 2009 WL 1364346 (D. Del. May 12, 2009).....................4-5, 18, 19, 20

Waldron v. Adams & Reese, L.L.P. (In re Am. Int'l Refinery, Inc.),
676 F.3d 455 (5th Cir. 2012) ......................................................................    30

Zurich Ins. Co. v. Logitrans, Inc.,
297 F.3d 528 (6th Cir. 2002) ......................................................................    21

## **Other Authorities**

3-12 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 12.02 [B] [1]........    18, 26

Nortel Networks Inc. and certain of its affiliates, as debtors and debtors in possession (collectively, the "Debtors"), submit this memorandum of law in opposition to the motion of SNMP Research International, Inc. ("International") and SNMP Research, Inc. ("Inc.") (collectively, "SNMP Research") to amend the proofs of claim previously filed by International and to add Inc. as a claimant (the "Motion to Amend").  Mot. to Am., Nov. 23, 2016 [Bankr. D.I. 17432].[2]

## PRELIMINARY STATEMENT

1.       The so-called Motion to Amend does not involve an amendment of an existing claim.  Rather, it entails a wholesale attempt to withdraw one claim by one party and replace it with a completely different claim by a different party.

2.       The original proofs of claim and every amended proof of claim up to now were brought by International, a company that is engaged in sales and marketing and is the party to the license agreement with Nortel Networks Corporation at issue in this case.  (Decl. of Paul C. Kleist, Jr. ("Kleist Decl.") Ex. 1 (the "Nortel License Agreement"); Dep. of Jeffrey D. Case, August 11, 2015 ("Case Canadian Deposition"), at 9, Kleist Decl. Ex. 2.)  A different company, called "Inc.," develops technology and owns the copyrights for that technology (including the copyrights that the Motion contends are relevant to this action).  Case Canadian Deposition at 9. International and Inc. are separate companies, with different owners and employees.  Id. at 9-13. Indeed, they maintain a "Chinese wall" between them to ensure their separateness.  Id. at 11. They are referred to here by the names their employees use to keep them separate: "International" (or "Int'l" for short), and "Inc."  Id. at 9.

---

[2]       Pleadings marked "Bankr. D.I." refer to filings in the above captioned action In re Nortel Networks, Inc., No. 09-10138 (Bankr. D. Del. filed Jan. 14, 2009).  Pleadings marked "Adv. D.I." refer to filings in the related adversary proceeding SNMP Research International, Inc. v. Nortel Networks Inc., No. 11-53454 (Bankr. D. Del. filed Nov. 2, 2011).

3.        International was the sole claimant in the original proofs of claim and every amended proof of claim until now—totaling five amended claims that International filed over the course of six years between September 2009 and October 2015.  And every one of these prior proofs of claim set forth **contractual** claims for royalties purportedly owed under the Nortel License Agreement.  Confirming that the alleged damages were for contractual claims, and not infringement claims, the prior proofs of claim all specified royalty amounts allegedly owed under the Nortel License Agreement, with contractual interest at the rate specified in the Agreement.

4.        Now, International seeks to change everything.  It has dropped entirely its contractual claim for royalties under the Nortel License Agreement, except for trivial claims for less than $23,000 in royalties.  In place of the contractual claim it now wishes to abandon, International seeks to have a different company—Inc.—assert a claim for copyright infringement under copyrights belonging to Inc.  According to the Motion to Amend, Inc. is the company that developed the relevant technology and owns the copyrights relevant to this case.

5.        The prior proofs of claim presented by International did not assert any claim based on copyrights belonging to Inc.  Further, International admits—and black letter law confirms—that International had no right or ability to do so, because International was at most a non-exclusive licensee of those copyrights.  If International had attempted to assert a claim under copyrights belonging to Inc., that claim would have been dismissed for lack of constitutional standing.  And the Court would have had no jurisdiction to entertain an attempt by International to fix that standing defect by seeking an amendment or addition of a different claimant, such as International proposes here.

6.        Nevertheless, years after the bar date, International now seeks to withdraw the contractual claims that it previously made.  And in place of those abandoned claims, it now seeks

2

to have Inc. make a new claim for copyright infringement under copyrights belonging to Inc.—claims that International never made and could not have made.  Through this wholesale overhaul—bringing in a different claimant, with a different claim and a different damages theory—International and Inc. seek to discard a contractual claim by International for just over $8 million (itself a grossly overstated amount) and replace it with a copyright infringement claim by Inc. in excess of $80 million (a baseless and vastly exaggerated claim).

7.        The Motion to Amend represents just the latest chapter in SNMP Research's efforts to cast about for the most overreaching and overblown claims it can conjure.  As the Court will recall, at an earlier stage SNMP Research focused on a claim that Nortel had somehow "sold" its software and the rights to use it to the purchasers of the various lines of business—despite the fact that the Sales Orders and Sales Agreements stated just the opposite, and buyers knew they were obtaining no rights to SNMP Research's software.  Based on this meritless claim, SNMP Research alleged it was entitled to a share of the proceeds from the sale of the Nortel lines of business, which it contended would be as much as $86 million—or even $100 million or $200 million or more.

8.        But the Court's rulings in the context of summary judgment motions have expressed substantial skepticism about this so-called "profits" claim and made clear that to have any hope of succeeding on this claim, SNMP Research would have to present supporting evidence that it cannot possibly provide.  And in SNMP Research's suit against the Canadian Debtors, Justice Newbould rejected this "profits" claim outright.

9.        As a result, SNMP Research is now switching to a new tactic in its pursuit of a massive windfall.  In seeking to change both the claimant and the claim, the Motion endeavors to multiply the prepetition damages claim ten-fold, from an already vastly exaggerated figure of $8

million to the wildly unfounded claim for $81.1 million.  To put this stunning new claim in

context, it is more than *800 times* greater than the amount Nortel ever paid for any product it

licensed with SNMP.  Indeed, it is more than 25 times greater than the total amount Nortel paid

to International for all of the licensed products covered by the parties' license during the more

than ten years it was in effect.  And it is likewise more than 25 times more than International's

total annual royalties from all of its many customers.

10.        SNMP Research's scheme to pursue this baseless new claim cannot succeed, for

multiple reasons.

11.        First, the Motion to Amend depends on the premise that International's prior

proofs of claim actually asserted claims for copyright infringement under copyrights belonging

to Inc.  But that simply is not true.  The prior proofs of claim had International as the only

claimant, and they did not set forth *any* claim under copyrights (or anything else) belonging to

any other party.  Because this necessary premise of the Motion to Amend—that International's

prior proofs of claim asserted copyright claims belonging to Inc.—is false, the Motion fails at the

threshold.

12.        Second, even if International's prior proofs of claim had tried to assert a claim

under copyrights belonging to Inc., that claim would have to be dismissed for lack of

constitutional standing.  International did not have any license to Inc.'s copyrights at all until

September 2011, and even then it is undisputed that the September 2011 license grants

International only a *non-exclusive* license to Inc.'s copyrights.  As International concedes, as a

mere non-exclusive licensee, it has no standing to assert a claim under copyrights belonging to

Inc.

13.      Moreover, constitutional standing must be present when a claim is first made, and cannot be cured through subsequent amendments or substitution of other parties.  In <u>Vianix Delaware LLC v. Nuance Communications, Inc.</u>, the District of Delaware applied this fundamental rule in circumstances just like those here, rejecting a non-exclusive licensee's attempt to amend its complaint to add the copyright owner as a plaintiff, ruling that the non-exclusive licensee "did not have standing to assert its claims when it filed suit" and "cannot correct the problem in this manner."  Civil No. 09-0067 (NLH)(JS), 2009 WL 1364346, at*2 (D. Del. May 12, 2009).

14.      Hence, even if International's prior proofs of claim were construed as attempting to set forth a claim under copyrights belonging to Inc., the only permissible result would be to dismiss that claim and to reject International's attempt to cure its lack of constitutional standing through a subsequent amendment and addition of Inc. as a claimant, as the Motion to Amend seeks to do here.  Thus, there simply is no viable path for the Motion to Amend to succeed.

15.      Third, even setting aside the two fundamental barriers discussed above—which the Motion to Amend does not even address, let alone overcome—the Motion would fail on its own terms.  International acknowledges that to have any hope of its Motion succeeding, it would have to establish an understandable and excusable mistake to justify allowing a new party to make a new claim more than seven years after the bar date.  International also would have to establish that it did not delay unduly in seeking to make this drastic change to the proofs of claim and that the impact of the proposed change—including the ten-fold increase in the alleged damages—would not be prejudicial to the Debtors and other creditors.  International cannot satisfy *any* of these requirements.

16.      As to the mistake requirement, International's only argument is that the CEO of

Inc., Dr. Jeffrey Case, purportedly had the mistaken belief that a non-exclusive licensee such as

International has standing to assert claims belonging to the licensor.  This "mistake" argument is

a non-starter because, as noted, International did ***not*** assert claims under copyrights belonging to

Inc.—and so the question of whether International had the right to do so is irrelevant.  But

beyond this basic defect in International's argument, it is black letter law that a non-exclusive

licensee lacks standing to assert such claims.  And it is likewise black letter law that claimed

ignorance of the governing law, such as International offers up here, cannot establish an

understandable mistake or excusable neglect.  That result is especially appropriate here, because

International and Inc. have been represented by legal counsel at all times.  Thus, the Motion to

Amend fails on its own terms.

17.      Finally, beyond all of the defects outlined above, the Motion to Amend should be

denied based on undue delay and prejudice.  The attempt to add a new claim by a new

claimant—a claim by Inc. under Inc.'s copyrights—comes more than ***seven years*** after the bar

date.  As this Court recently emphasized, "[a] seven year delay is simply too long."  <u>In re W.R.</u>

<u>Grace & Co.</u>, No. 01-1139 (KG), 2016 WL 7471290, at *7 (Bankr. D. Del. Dec. 28, 2016).

Further, what International and Inc. seek to achieve through their maneuvering is a belated and

prejudicial change in the nature and size of their claim:  to withdraw a contractual claim by

International for approximately $8 million and replace it with a copyright infringement claim by

Inc. in excess of $80 million.  (Again, the amounts of both claims are unfounded and grossly

overstated.)  This is akin to trying to convert an eight-story building to an 80-story skyscraper.

Based on the magnitude of the increase in the damages claim alone, such a massive and belated

change would be unfair and prejudicial to the legitimate creditors of the Debtors.

18.        For all of these reasons, the Motion to Amend should be denied.

## BACKGROUND

**A.    International's Previously-Filed Proofs Of Claim Asserted Contractual Claims For Royalties Under The Nortel License Agreement**

19.        One day prior to the bar date, on September 29, 2009, International filed a proof of claim (the "Original Proof of Claim") against each of the Debtors seeking $22,281 for unpaid contractual royalties purportedly due under the Nortel License Agreement.[3]  The Debtors filed an objection to the Original Proof of Claim on July 9, 2010.[4]

20.        Over the course of the next five years, International filed five purported amended proofs of claim (the "Amended Proofs of Claim," and together with the Original Proof of Claim, the "Proofs of Claim").[5]  Every one of these prior Proofs of Claim asserts contractual claims for royalties purportedly due under the Nortel License Agreement:  they reference the License Agreement and what the Debtors "would have been required to pay" under it, including amounts allegedly "due for licensing fees, royalties, and maintenance fees."  See, e.g., Second Am. Proof of Claim at 1, 5.

---

[3]        The Original Proof of Claim is designated on the Debtors' claims register as claim 4625. Case Decl. Ex. 2, Nov. 23, 2016 [Bankr. D.I. 17433]; International Proof of Claim No. 4625, Sept. 29, 2009.

[4]        The Debtors objected to the Original Proof of Claim on the grounds that (1) International failed to provide supporting documentation for a portion of the royalties allegedly due and; (2) the claim as against multiple Debtors is redundant.   Twelfth Omnibus Obj. at Exs. B, D, July 9, 2010  [Bankr. D.I. 3507].  The Debtors expressly reserved the right to amend, modify, or supplement their objection.  Id. at 18.

[5]        The Amended Proofs of Claim are designated on the Debtors' claims register as claims 7471, 7740, 7923, 8422 and 8801.  Case Decl. at Exs. 3, 4, 6, 8, 10, Nov. 23, 2016 [Bankr. D.I. 17433]; International First Am. Proof of Claim No. 7471, Oct. 19, 2010 (the "First Amended Proof of Claim"); International Second Am. Proof of Claim No. 7740, May 26, 2011 (the "Second Amended Proof of Claim"); International Third Am. Proof of Claim No. 7923, Sept. 1, 2011 (the "Third Amended Proof of Claim"); International Fourth Am. Proof of Claim No. 8422, Dec. 26, 2012 (the "Fourth Amended Proof of Claim"); International Fifth Am. Proof of Claim No. 8801, Oct. 7, 2015 (the "Fifth Amended Proof of Claim").

21.     Confirming that the claimed amounts were for contractual claims under the License Agreement, the Amended Proofs of Claim expressly cite and rely upon the License Agreement's late payment provision—identified with specificity as "Section 3.2(b) on page 7" of the Agreement—and claim interest on that basis.  See, e.g., id. at 5.  Indeed, more than two-thirds of the amount claimed in the Fourth and Fifth Amended Proofs of Claim—in excess of $5.7 million—represents International's claims for contractual interest under the License Agreement's late payment provision.  Id.  In typical fashion, International grossly inflates the claimed interest by compounding it, despite the fact that the License Agreement does not provide for compounding and International's own records show that, over the course of the ten years that the parties operated under the License Agreement, it always calculated interest as simple interest. But the important point here is that the Amended Proofs of Claim expressly cited and relied upon Section 3.2(b) of the License Agreement, making clear that they were asserting contractual claims for amounts allegedly due under that Agreement.

22.     The Second Amended Proof of Claim and subsequent amendments included a one-sentence passing reference to a potential claim by International under the Copyright Act. See, e.g., Second Am. Proof of Claim at 2.  But they set forth no support or details whatsoever for such a claim.  Instead, as noted, they all set forth claims for contractual royalties, with contractual interest, allegedly owed under the Nortel License Agreement.  Such a claim for contractual royalties depends on the premise that the products at issue are within the scope of the license—which is contrary to a claim that the products are outside the scope of the license and are infringing.  See, e.g., Spinelli v. Nat'l Football League, 96 F. Supp. 3d 81, 125 (S.D.N.Y. 2015) ("[A] failure to pay royalties under a valid license agreement could only give rise to a

breach of contract claim against the party with which the copyright owner has contracted to receive royalties" and thus "cannot form the basis of an infringement claim.").

23.        Further, International's prior Proofs of Claim plainly did not assert a claim based on copyrights belonging to Inc., and it is undisputed that they could not have done so because International lacks standing to assert such a claim.  Thus, what the Motion to Amend seeks to add now—a claim by Inc. based on copyrights belonging to Inc.—would be a new claim asserted for the first time more than seven years after the bar date.

**B.        The Motion To Amend Seeks To Discard International's Claim For Contractual Royalties And Replace It With A New Claim By Inc. For Alleged Infringement Of Inc.'s Copyrights**

24.        The Motion to Amend seeks to discard the contractual claim by International and replace it with a massive, and meritless, claim by Inc. for infringement of Inc.'s copyrights.  The proposed new Proof of Claim—the Sixth Amended Proof of Claim—is set forth as Exhibit A to the Motion to Amend.  Bankr. D.I. 17432-2 (the "Sixth Amended Proof of Claim").  Notably, SNMP Research does not include a blackline showing how this proposed new Proof of Claim compares to the prior one, because the blackline would show that they are completely different.

25.        The claim by International for contractual royalties that was set forth in every previous Proof of Claim is now gone, with two trivial exceptions:  a claim for $22,092 for unpaid royalties for the period just before the Debtors filed for bankruptcy; and a claim for $247 for unpaid royalties for the Universal Signaling Point product.  Id. at 1-2, items (ii) and (iii).  Apart from these two trivial exceptions, the Motion to Amend seeks to withdraw the claim by International for contractual royalties under the License Agreement that was set forth in every one of the many Proofs of Claim that International filed over a six year period.  In particular, the proposed new Proof of Claim abandons the claim for contractual royalties for the

BayStack/ES/ERS products and MG9000 products that formed the core of the prior Proofs of Claim.

26.        In place of the now-withdrawn contractual claim for royalties, the proposed new Proof of Claim presents a claim for more than $81 million in alleged infringement damages. Id. at 1, item (i).  The proposed new Proof of Claim does not set forth any basis for this extraordinary figure, but instead refers to the report of SNMP Research's damages expert, Ian Ratner. Id. at 1, n. 2.  The Ratner report in turn makes clear, in the section entitled "Approach And Methodology To The Quantification Of Damages," that the alleged damages are for copyright infringement. See Kleist Decl. Ex. 3 (the "Ratner Report") at 14-16.  Ratner cites and quotes the U.S. Copyright Act, and then sets forth his understanding of the types of damages that may be sought under the Copyright Act. Id. at 14-15 (¶¶ 44-45).[6]  On this basis, he identifies two types of alleged pre-petition damages based on copyright claims:  "Actual Damages" or "Usage Damages" that purportedly amount to $33.12 million, and "Profit Damages" that purportedly amount to $39.27 million. Id. at 4, 15-16 (¶ 47(a)).

27.        Ratner adds to these figures a claim for interest of $8.69 million—which, in yet another reflection of the attempt to fundamentally change the claim, is no longer calculated at the contractual rate under the License Agreement but instead is calculated based on an infringement approach. See Mot. to Am. ¶ 33.  Thus, the grand total of Ratner's copyright-based pre-petition damages is $81.08 million—an utterly groundless figure that is nearly ten times higher than the

---

[6]        This section in which Ratner sets out copyright damages also includes the following footnote:  "We also have been advised that SNMP Research has alleged trade secret misappropriation, and that the damages categories described below could equally apply to such violations.  As such, I am not attempting to suggest that these damages exclusively are limited to alleged violations under the U.S. Copyright Act." Ratner Report at 15 n. 38.  But the Ratner Report does not set forth any purported trade secret damages, and, in any event, neither International nor Inc. has established any trade secret claim.  If International or Inc. were to attempt to make such a claim, the Debtors would certainly object.

contractual damage amounts set forth in the prior Proofs of Claim, which themselves were vastly

inflated.  Ratner Report at 4.

**C.     In The Motion To Amend, SNMP Research Concedes That Inc. Is The Owner And
Developer Of The Relevant Copyrights, And That The Licensing Agreement
Between Inc. And International Is Non-Exclusive**

28.      The Motion to Amend also makes clear that the proposed new claim is by a new

claimant—Inc., rather than International—and that Inc. is attempting to assert claims under Inc.'s

copyrights, which the prior Proofs of Claims did not do and could not have done.  The Motion to

Amend concedes that Inc.—and not International—is the developer and owner of the copyrights

for the "source code [allegedly] shipped by Nortel prior to the Petition Date."  Mot. to Am. ¶¶

10, 68.  Thus, the new claims are to be made under copyrights belonging to Inc.

29.      SNMP Research also concedes that International cannot bring these claims, and

therefore Inc. would have to be added as a new claimant.  The Motion acknowledges that the

license by which Inc. granted International rights in the relevant copyrights is non-exclusive.

See Case Decl. Ex. 1, Nov. 23, 2016 [Bankr. D.I. 17433] (the "Inc.-International License

Agreement"); Mot. to Am. ¶¶ 10, 23.  The Motion further concedes that only the owner of a

copyright or the exclusive licensee has standing to sue for copyright infringement.  Id. ¶ 69.

International therefore lacks standing to assert claims based on Inc.'s copyrights.  Id.

30.      In sum, the Motion to Amend seeks to completely change the asserted claims:

International attempts to withdraw the contractual claims it had made and have Inc. step in as a

new claimant to make new claims under Inc.'s copyrights.

**D.     The Claims That The Motion To Amend Seeks To Add Are Meritless**

31.      Beyond the fact that the Motion to Amend should be denied, it bears emphasis

that the claims the Motion seeks to introduce are meritless.  Nearly all of the damages that the

Motion seeks to add—more than $79 million of the $81.1 million in damages sought in the Sixth

Amended Proof of Claim—are addressed to an Ethernet switch product sold under the names

BayStack/ES/ERS.  See Ratner Report at 2-3, 20, 23, 28.   (The products originally were sold

under the "BayStack" name and later were rebranded with the "ES" and "ERS" names.)

32.    These products in fact were licensed under a paid-up lifetime license that Nortel

inherited from Bay Networks, which developed these products in the 1990s.  Bay Networks had

a license with SNMP Research under which it paid $100,000 for a "royalty buyout" that

provided a lifetime paid-up license for the SNMP Research software at issue for all Bay

products, including the BayStack/ES/ERS switches.  Nortel acquired Bay in 1998 and

subsequently entered into its own license agreement with International, in which the parties

agreed that Nortel would receive the benefit of the paid-up Bay Networks license.  This was set

forth in Schedule 1 to the Nortel License Agreement, which extended the lifetime license and

paid-up royalty from the Bay Networks license to "[a]ll products of units and projects originating

from what was Bay Networks."   Kleist Decl. Ex. 4 ("Schedule 1").

33.    Schedule 1 included language saying it would expire three years after it was

signed, which the International representative responsible for negotiating it (John Southwood)

explained in an email before signing as follows:  "By expire I mean that new products/projects

brought on line after three years would address royalties on their own merit.  Current Bay

products and development projects for the next three years will take advantage of the lifetime

royalty buy out until their products have aged out of the marketplace."  Kleist Decl. Ex. 5.

34.    As noted, the BayStack/ES/ERS switches products were developed by Bay

Networks in the 1990s, and they continued as the same core Ethernet switch product, operating

on the same core codebase, throughout the period following Nortel's acquisition of Bay

Networks and onward.  They therefore were a "current Bay product" when Schedule 1 was signed and were entitled to "take advantage of the lifetime royalty buy out" under the parties' agreement.[7]

35.     The new argument that International and Inc. are advancing now, that the benefit of Schedule 1 expired in June 2003, is contradicted not only by the clear record outlined above but also by International's subsequent statements and conduct.  In January 2006, for example, the International representative who negotiated Schedule 1 (John Southwood) again confirmed in a formal letter that "Nortel Networks has a license with SNMP Research International for [SNMP Research's product] as referenced under Nortel Schedule 1.  That schedule incorporates the paid-up royalties' license previously established by Bay Networks."  Kleist Decl. Ex. 6.  This statement, made in 2006, unequivocally contradicts the current argument by International and Inc. that the benefit of Schedule 1's paid-up license expired in 2003.

36.     Still further, beginning in 1998 and continuing on through 2009, International repeatedly renewed an annual Software Service Agreement with Nortel, pursuant to Schedule 1, under which it provided updated licensed software to the Nortel group responsible for these products (referred to as the former "Bay" group at Nortel).  See Kleist Decl. Ex. 7.  As International's own representative (John Southwood) admitted at his deposition, this course of conduct that repeatedly confirmed the ongoing effectiveness of Schedule 1 is squarely

---

[7]     Even if SNMP Research could succeed in its argument that the ES/ERS switches are "new products" that were not covered by Schedule 1, the result would simply be that a new royalty buyout would need to be paid for them.  This is consistent with the statement by SNMP Research's representative that "new products/projects brought on line after three years would address royalties on their own merit."  Id.  Consistent with this understanding, all of the prior Proofs of Claim treated these products as covered by the parties' license, but as allegedly needing to have additional royalty buyouts paid for them.

"inconsistent" with International's current claim that the benefits of Schedule 1 expired in 2003 and these products were no longer licensed.  Kleist Decl. Ex. 8.

37.     In sum, the claim by International and Inc. that Nortel's BayStack/ES/ERS products were unlicensed is completely unfounded.  But even if these products were not licensed, the record establishes that the royalties that would be owed for them would be no more than a $100,000 lump-sum royalty.  As evidenced by many schedules the parties signed over the course of their relationship, a "royalty buyout" (a paid-up royalty) covering the relevant software would be available for no more than $100,000, and likely less.

38.     Indeed, in 2006, when Nortel was considering using the software for a different operating platform than the one covered by Schedule 1, the parties executed a schedule covering all Nortel "Switch Products"—encompassing the BayStack/ES/ERS switches—that had a $15,000 royalty buyout.  See Kleist Decl. Ex. 6.  That schedule (Schedule 71) was negotiated between the same International representative who negotiated Schedule 1, John Southwood, and the Nortel group responsible for the BayStack/ES/ERS switches.  And Mr. Southwood made clear he expected Nortel to choose the royalty buyout, stating:  "I expect that you will want to take advantage of this buyout because all of the (Bay) Nortel EDN licenses in the past have exercised a similar option."  Kleist Decl. Ex. 6.

39.     Similarly, Nortel and International executed other schedules that provided, for a payment of $100,000, a lifetime royalty buyout for all the software products at issue here for an entire line of Nortel products known as the BCM products.  The sales volume of the BCM products was in line with that of the BayStack/ES/ERS switches, with sales of tens of thousands of units per year.  And, again, a lifetime paid-up license for all of these products was obtained for $100,000.

40.　　　　Further confirming that royalty buyouts were the norm, all of International's previous Proofs of Claim set forth alleged damages for the BayStack/ES/ERS switches based on a royalty buyout.  See, e.g., Fourth Am. Proof of Claim at 6; Second Am. Proof of Claim at 5.  Those figures were grossly overstated, because International wrongly suggested that each model of the BayStack/ES/ERS switches would need a separate royalty buyout and it added other fees unsupported by anything in the record.  But the prior Proofs of Claim make clear that a royalty buyout was the norm.  Moreover, because the royalties for these products would have been paid through a pre-petition royalty buyout in 2003 (if one were to accept International's argument that these products lost the benefit of Schedule 1 in 2003), any amount owed would be a pre-petition claim—and would not involve any post-petition "administrative" claim.

41.　　　　But now, International and Inc. seek to ignore this royalty buyout option, with no explanation or justification.  Instead, they now propose a damages calculation based on a running royalty that produces a figure in excess of $35 million in purported royalties, plus another $48 million in so-called profits damages, for a total in excess of $83 million, of which more than $81 million are the new pre-petition claims that the Motion to Amend seeks to add.[8]  As noted, this preposterous figure is more than 800 times greater than any amount Nortel ever paid in royalties for any product line.  And it is more than 25 times greater than the amounts Nortel paid for all of its products over the period of more than ten years covered by the License Agreement.  Indeed, it

---

[8]　　　　Even on its own terms, these figures are grossly overstated.  They are calculated based on the premise that these products used a product called EMANATE (for which SNMP Research seeks to apply a $60 per unit royalty rate), but in fact these products used a product called EMANATE/Lite (with a $3 per unit royalty rate).  SNMP Research itself confirmed that these products used EMANATE/Lite, based on inspecting the products' build files, and it confirmed this fact in all of its prior proofs of claim.  Further, SNMP Research's calculation improperly includes sales made by entities other than the U.S. Debtors outside of the United States.  Simply correcting these two errors reduces the royalties figure, based on SNMP Research's flawed per-unit royalty approach, to just over $1 million.

is nearly 30 times greater than International's total annual revenue from all of its hundreds of

customers during the period at issue.  For International and Inc. to make such an utterly

unfounded and overreaching claim is deeply concerning, because these products were licensed.

And, even if they had not been licensed, they would have been covered by a royalty buyout for

less than $100,000.

## ARGUMENT

**I.    THE MOTION'S LINCHPIN ARGUMENT FAILS, BECAUSE INTERNATIONAL NEVER ASSERTED CLAIMS UNDER COPYRIGHTS BELONGING TO INC.**

42.    The fundamental problem with the Motion to Amend is that it seeks to jettison the

claim made in the original Proof of Claim and in every one of the amended Proofs of Claim that

were filed over a six-year period:  a contractual claim by International for amounts allegedly

owing to International under the Nortel License Agreement.  And the Motion seeks to add a new

claim—more than seven years after the bar date—that was never made before:  an infringement

claim by Inc. based on copyrights belonging to Inc.  Straining to conjure some justification for

this complete overhaul, the Motion offers up only a purported mistake:  that the CEO of Inc., Dr.

Jeffrey Case, purportedly believed that International could assert claims based on copyrights

belonging to Inc.  See Mot. to Am. ¶¶ 18, 82, 87.

43.    For a party to claim it did not know the governing law cannot serve to establish

excusable neglect or an understandable mistake, as discussed in Point III below.  But even on its

own terms, for its "mistake" argument to work, SNMP Research would first have to establish

that International actually *did* assert claims under Inc.'s copyrights.  A mistaken belief that

International *could* assert claims under copyrights belonging to Inc. would be irrelevant unless

International actually did assert such claims.  But International does not and cannot make that

showing.

16

44.      To the contrary, none of the Amended Proofs of Claim says anything about Inc. as a claimant or makes reference to claimants other than International.  Nor do they reference claims or copyrights belonging to any other party.  Because SNMP Research's motion depends on the premise that International's prior proofs of claim actually asserted claims for copyrights belonging to Inc., and that premise is false, the Motion to Amend fails at the threshold.

## II.   EVEN IF INTERNATIONAL HAD ATTEMPTED TO ASSERT COPYRIGHT CLAIMS BELONGING TO INC., THOSE CLAIMS WOULD HAVE TO BE DISMISSED FOR LACK OF CONSTITUTIONAL STANDING

45.      Even if International's prior proofs of claim had tried to assert claims under copyrights belonging to Inc., those claims would have to be dismissed for lack of constitutional standing.  As a result, the Motion to Amend would have to be denied because the Court would lack jurisdiction to entertain an attempt to cure the standing defect by adding Inc. as a claimant.

### A.   International Lacks Constitutional Standing To Enforce Inc.'s Copyrights

46.      The Copyright Act permits claims only for the violation of "the exclusive rights of the copyright owner."  See 17 U.S.C. § 501(a), (b).  Hence, "only copyright owners and exclusive licensees of copyright may enforce a copyright or a license."  Sybersound Records, Inc. v. UAV Corp., 517 F.3d 1137, 1144 (9th Cir. 2008); Gym Door Repairs, Inc. v. Young Equipment Sales, Inc., No. 15-cv-4244 (JGK), 2016 WL 4747281, at *8 (S.D.N.Y. Sept. 9, 2016) (same); see also Vianix Del. LLC v. Nuance Commc'ns, Inc., Civil No. 09-0067 (NLH)(JS), 2009 WL 1364346, at *1-2 (D. Del. May 12, 2009) (only the "legal or beneficial owner of the copyrights at issue" has constitutional standing to sue).  Indeed, this is hornbook law.  See 3-12 Melville B. Nimmer & David Nimmer, Nimmer on Copyright ("Nimmer") § 12.02 [B] [1] ("[O]nly parties with ownership rights in a copyright have standing to bring claims

for its infringement. . . . [A] nonexclusive licensee has no . . . standing to sue."). And SNMP Research itself concedes the point in its Motion. Mot. to Am. ¶ 69.

47.       Dispositively, as SNMP Research also concedes, International is neither the owner of the copyrights at issue nor an exclusive licensee. In fact, it evidently lacked any license relating to Inc.'s copyrights, at least as far as the Debtors' pre-petition conduct is concerned. In the Motion to Amend, SNMP Research admits that International did not execute a licensing agreement with Inc., the owner and developer of the relevant copyrights, until "late September 2011," more than two years after the Debtors filed for bankruptcy. See Mot. to Am. ¶ 23. And while the Inc.-International License Agreement recites that it is purportedly effective as of 1994, SNMP Research has failed to produce any evidence of a license being executed before 2011. Id. ¶ 23. Indeed, a review of the 1994 draft agreement produced by SNMP Research (which has "draft" stamped on it) and the later-executed Inc.-International License Agreement reveals material differences between the two.[9]

48.       In any event, it is undisputed that International holds, at best, a non-exclusive license in the relevant copyrights. The Inc.-International License Agreement could not be more clear: it expressly states that it is "a non-exclusive license," and uses the term "non-exclusive" no less than five times to describe the license granted to International. Inc.-International Agreement ¶¶ 2-4, 6, 14. SNMP Research itself concedes that "[Inc.] granted to [International] a *non-exclusive* license." Mot. to Am. ¶ 10 (emphasis supplied).

---

[9]       For example, the 1994 draft agreement required International to pay Inc. an initial "Origination fee" plus "per-copy royalties" for each "software" or "source" produced to and used by outside licensees. 1994 Draft Agreement ¶ 23, Nov. 30, 1994, Kleist Decl. Ex. 9. The Inc.-International License Agreement, by contrast, requires International to pay Inc. a flat fee of 90 percent of International's gross revenue. Inc.-International License Agreement ¶ 28.

49.       As a non-exclusive licensee (at best), International lacks constitutional standing, and cannot assert claims for infringement under Inc.'s copyrights—and therefore any such claims would have to be dismissed.  Vianix, a District of Delaware precedent, is directly on point.  There, the defendants moved to dismiss the plaintiff's copyright claim for lack of constitutional standing, because the plaintiff's affiliate, rather than the plaintiff, was the registered owner of the copyrights at issue.  The District Court granted the motion to dismiss, correctly ruling that because the plaintiff was neither the copyright owner nor an exclusive licensee (i.e., a "beneficial owner"), "it could not have suffered an invasion of its legally protected interest," and thus lacked constitutional standing to bring claims for copyright infringement.  Vianix, 2009 WL 1364346, at*2.  Because International is neither the owner of the relevant copyrights nor an exclusive licensee, any attempt by it to assert a claim under copyrights belonging to Inc. would likewise have to be dismissed for lack of constitutional standing.  Id.; EMI Entm't World, Inc. v. Karen Records, Inc., No. 05 Civ. 390(LAP), 2013 WL 2480212, at *2-3 (S.D.N.Y. June 10, 2013) (dismissing complaint because plaintiff's subsidiary, not plaintiff, owned the copyrights at issue, and thus plaintiff lacked "Article III standing").

**B.       The Court Lacks Subject Matter Jurisdiction To Entertain The Motion To Amend**

50.       Absent constitutional standing, which must exist when an action is first filed, a federal court does not have subject matter jurisdiction to address a plaintiff's claims.  Taliaferro v. Darby Twp. Zoning Bd., 458 F.3d 181, 188 (3d Cir. 2006); Storino v. Borough of Point Pleasant Beach, 322 F.3d 293, 296 (3d Cir. 2003).  Hence, even if International had asserted claims based on Inc.'s copyrights, those claims would have to be dismissed, and the Court would lack jurisdiction to entertain International's attempt to cure its lack of standing through the Motion to Amend.

19

51.      The District of Delaware's decision in <u>Vianix</u> is, again, directly on point.

Claiming a "simple drafting error," the plaintiff in that case sought to amend its complaint to

substitute the copyright owner—its affiliate—in "an attempt to cure" the lack of constitutional

standing.  <u>Vianix</u>, 2009 WL 1364346, at *2.  The District Court correctly concluded that the

plaintiff could not cure the defect by seeking to amend its complaint to add the copyright owner:

> In an attempt to cure [the] jurisdictional defect, Vianix Delaware LLC . . . simply renamed Vianix LLC, the owner of the copyrights, as plaintiff.  Plaintiff . . . cannot correct the problem in this manner.  "It has long been the case that 'the jurisdiction of the court depends upon the state of things at the time of the action brought.'"  <u>Grupo Dataflux v. Atlas Global Group, L.P.</u>, 5[41] U.S. 567, 570–571 (2004) (quoting <u>Mollan v. Torrance</u>, 9 Wheat. 537, 539, 6 L.Ed. 154 (1824)).  "This time-of-filing rule is hornbook law (quite literally) taught to first-year law students in any basic course on federal civil procedure."  <u>Id.</u>  Because Vianix Delaware LLC did not have standing to assert its claims when it filed suit, the Court does not have subject matter jurisdiction to consider anything filed thereafter, including the amended complaint.

<u>Id.</u>

52.      Here, International lacks constitutional standing and, like the plaintiff in <u>Vianix</u>,

seeks to "cure" this problem by substituting its affiliate, the owner of the relevant copyrights.

Because International cannot "cure" the jurisdictional defect through a post-filing amendment, its

attempt to add Inc. as a claimant, like the <u>Vianix</u> plaintiff's amended complaint, must be

rejected.  <u>Accord</u> <u>Abraxis Bioscience, Inc. v. Navinta LLC</u>, 625 F.3d 1359, 1364 (Fed. Cir. 2010)

("[I]f the original plaintiff lacked Article III initial standing, the suit must be dismissed, and the

jurisdictional defect cannot be cured after the inception of the lawsuit.") (citation omitted).

53.      Because the lack of constitutional standing goes to the court's core jurisdiction,

International's inability to cure the standing defect persists whether it cites Rule 15 or Rule 17 of

the Rules of Civil Procedure as the basis for the Motion to Amend.  While <u>Vianix</u> concerns Rule

15, other courts have likewise held that, absent constitutional standing, a party cannot move to

substitute or join the real party in interest under Rule 17.  See, e.g., Zurich Ins. Co. v. Logitrans, Inc., 297 F.3d 528, 530-31 (6th Cir. 2002) (affirming the district court's denial of plaintiff's Rule 17 motion to substitute because "standing is a jurisdictional requirement," and where a plaintiff "had no standing to bring [the] action," it had "no standing to make a motion to substitute the real party in interest"); Mandelbrot v. Armstrong World Indus. Asbestos Pers. Injury Tr., No. 13-1032-GMS, 2014 WL 4626505, at *2 n.5 (D. Del. Sept. 12, 2014) (observing that "[t]he Federal Rules of Civil Procedure cannot expand the subject matter jurisdiction of federal courts beyond the limits of [the] U.S. Constitution," and declining to address plaintiff's motion to substitute under Rule 17(a) after concluding that plaintiff lacked constitutional standing).

54.      In sum, even if International's prior proofs had attempted to assert claims under copyrights belonging to Inc., they would have to be dismissed for lack of constitutional standing. And for this same reason, the Court would lack subject matter jurisdiction to entertain the Motion to Amend to add Inc. as a claimant.

55.      The Motion to Amend can and should be denied based on this fundamental ground and the ground set forth in Part I, without any need to consider the other flaws in the Motion.  But even if the Motion could circumvent these two barriers—and it cannot—it would fail in any event, as set forth below.

## III.    SNMP RESEARCH CANNOT RELY ON EITHER RULE 15 OR RULE 17 TO ADD INC. AS A CLAIMANT

56.      SNMP Research cannot rely on either Rule 15 or Rule 17 to support its effort to radically change its Proofs of Claim by adding a new claimant and a new claim.  Rule 15—which SNMP Research invokes as a basis for its attempt to add Inc. as a claimant—simply does

not permit it to do so.  Nor does Rule 17, because SNMP Research cannot satisfy its burden to

show that its failure to make Inc. a claimant was understandable.[10]

## A.    Rule 15 Does Not Permit SNMP Research To Add Inc. As An Additional Claimant

57.    SNMP Research invokes Rule 15(c)(1)(C) as a purported basis to add Inc. as an

additional claimant.  But the Third Circuit has held that this provision of Rule 15 is "simply not

applicable" for that purpose.  Gardner v. State Farm Fire & Casualty Company, 544 F.3d 553,

562 (3d Cir. 2008).  Rather, by its terms, the provision "applies only to amendments to the 'party

. . . *against whom a claim is asserted*,' that is, the defendant."  Id. (quoting Fed. R. Civ. P.

15(c)(1)(C)); see also Asher v. Unarco Material Holding, Inc., 596 F.3d 313, 318 (6th Cir. 2010)

("Rule 15(c)(1)(C) . . . applies, by its plain language, to changes to *defendants*.").  Accordingly,

SNMP Research cannot rely on Rule 15 to add Inc. as a claimant.[11]

58.    Even if Rule 15 were applicable here (and it is not), SNMP Research fails to meet

its requirements.  Critically, "the relation-back rule requires plaintiffs to show," among other

things, "that plaintiffs have not slept on their rights."  Nelson v. County of Allegheny, 60 F.3d

1010, 1014 (3d Cir. 1995).  SNMP Research cannot possibly make that showing here—given

---

[10]    As explained in this section, the rules for adding or substituting parties under Rule 15 and Rule 17 do not permit SNMP Research to add Inc.  The Debtors note that the same standards for amending the Proof of Claim generally—including a consideration of undue delay, bad faith, and prejudice—also apply to and prohibit SNMP Research's attempt to add Inc.  This is discussed in greater detail below.

[11]    Ignoring Gardner, SNMP Research cites Nelson v. County of Allegheny, 60 F.3d 1010 (3d Cir. 1995), for the proposition that Rule 15 permits amendments to the party asserting a claim.  While the Third Circuit, in that case, suggested that Rule 15(c)(1)(C) *may* be used to add new plaintiffs to a timely-filed complaint, it never explicitly so held, and ultimately rejected the plaintiffs' Rule 15 motion.  See id. at 1014-15.  Much the same can be said for Heady v. PNC Bank National Association (In re Community Bank of Northern Virginia), in which the Third Circuit acknowledged—in dicta, in a case concerning class certification—that some courts have "applied [Rule 15's] requirements to the addition of new plaintiffs," but did not, itself, do so to any effect.  622 F.3d 275, 297-98 (3d Cir. 2010).

that it is only now attempting, more than seven years after the bar date, to make a claim by Inc. based on copyrights belonging to it.

59.        SNMP Research's attempt to excuse and overcome this seven-year delay with its "mistake" argument does not work, for the reasons set forth in Points I and II.  And beyond those points, SNMP Research's "mistake" theory is not credible.  The original Proof of Claim and every one of the five amended Proofs of Claim that International subsequently filed set forth, in detail, a contractual claim for royalties allegedly owed under the Nortel License Agreement. International, as the party to the License Agreement, was the right claimant to assert this claim. And International repeatedly and consistently presented this contractual claim in every one of the multiple iterations of its Proofs of Claim from 2009 to 2015.  It simply is not credible for International or Inc. to now contend that what International really meant to present is a claim by Inc. for infringement of Inc.'s copyrights.[12]

60.        In light of this record, the more plausible explanation is that SNMP Research is attempting to make a change in its litigation tactics, to discard the claim it has been making for years and replace it with a different one that it hopes will make for a larger damages claim.  But as this Court has emphasized, "a change of mind, not circumstances" does not excuse late filings. In re Nortel Networks, Inc., 531 B.R. 53, 66-67 (Bankr. D. Del. 2015) (rejecting untimely proof of claim).

61.        In any event, even if SNMP Research's claimed "mistake" were credible as a factual matter, a purported ignorance of the governing law simply does not serve to establish

---

[12]        This point is reinforced by the fact that the adversary complaint filed in September 2011, which set forth claims for copyright infringement in connection with the sale of the Nortel lines of business, included both International and Inc. as plaintiffs.  If SNMP Research had believed, as it now contends, that International was the right party to assert Inc.'s copyrights, there would have been no reason to include Inc. as a plaintiff in the adversary complaint.

excusable neglect or delay.  Dr. Case claims that in 2009, when the Original Proof of Claim was

filed, he harbored a "suspicion" that the Debtors were infringing Inc.'s copyrights, and that by

2010, he "should have asked to file separate proofs of claim for" Inc.  Case Decl. ¶¶ 7, 9.  SNMP

Research's only proffered excuse for the fact that Inc. never filed its own proof of claim is Dr.

Case's assertion that he personally believed that International could assert Inc.'s copyrights.  But

a party's claimed ignorance of the governing law is unavailing—especially where, as here, the

party is represented by counsel.

62.       Ignorance of the law is "an insufficient basis for leave to amend," Goss v. Revlon,

Inc., 548 F.2d 405, 407 (2d Cir. 1976) (citing cases), and does not serve to excuse untimely

filing—particularly where, as here, the law is clear.  See In re Martinez, 513 B.R. 779, 788

(Bankr. D.P.R. 2014) (rejecting creditor's post-bar date amendment to proof of claim to correct

error related to claims allocation, because both the mistake and creditor's "inertia in correcting"

it "can only be attributable to [the creditor] itself"); see also Rasberry v. Garcia, 448 F.3d 1150,

1154 (9th Cir. 2006) (holding that pro se petitioner was not excused from the time bar for filing

habeas petition on basis of his miscalculation of the limitations period because "lack of legal

sophistication is not, by itself, an extraordinary circumstance warranting equitable tolling");

Graphic Commc'ns Int'l Union, Local 12-N v. Quebecor Printing Providence, Inc., 270 F.3d 1, 6

(1st Cir. 2001) (affirming the district court's ruling that counsel's failure to timely file a notice of

appeal, based on a misunderstanding of the procedural rule, did not constitute excusable neglect,

and observing that a finding of excusable neglect is typically not warranted on the basis of "a

party's or counsel's misunderstanding of clear law").  If it were otherwise, the bar date fixed by

this Court would be rendered meaningless.  Cf. Arrieta v. Battaglia, 461 F.3d 861, 867 (7th Cir.

2006) ("[P]ermitting equitable tolling of a statute of limitation for every procedural or strategic

mistake made by a litigant (or his attorney) would render such statutes of no value at all . . . .")
(citation omitted).

63.     Moreover, Inc. and International were at all times represented by counsel.
Whatever Dr. Case may say about his mistaken belief about International's ability to enforce
Inc.'s copyrights, an attorney obviously is obligated to know the governing law.  See Advanced
Estimating Sys., Inc. v. Riney, 130 F.3d 996, 998 (11th Cir. 1997) (observing the general rule
that "attorney error based on a misunderstanding of the law [is] an insufficient basis for excusing
a failure to comply with a deadline").

64.     Further, "[a] misconception of the law is not an excuse for the late presentation of
an alternative theory of recovery."  Troxel Mfg. Co. v. Schwinn Bicycle Co., 489 F.2d 968, 971
(6th Cir. 1974).  Here, SNMP Research cites Dr. Case's mistaken belief that International could
enforce Inc.'s copyrights to excuse its failure to add Inc. as a copyright claimant, and now seeks
to add Inc. *and* to assert new, vastly inflated claims for copyright infringement—a different
theory of recovery as compared to International's earlier, contract-focused proofs of claim.  Rule
15 does not permit such a maneuver.  See id. at 970-71 (affirming district court's denial of
plaintiff's motion for leave to amend under Rule 15 because "[t]he only excuse offered for
[plaintiff's] delayed presentation is that [plaintiff] misconceived the law").

**B.    Because SNMP Research's Failure To Name Inc. As A Claimant Was Not
       Understandable, It Cannot Rely On Rule 17 To Do So Now**

65.     SNMP Research fares no better in its attempt to invoke Rule 17 to justify its
attempt to dramatically and belatedly change both the claimant and the claim.  As the Advisory
Committee's Notes emphasize, Rule 17(a) is intended to allow a substitution of plaintiffs only
"to prevent forfeiture when determination of the proper party to sue is difficult or when an
understandable mistake has been made."  Fed. R. Civ. P. 17(a), Advisory Committee Notes,

1966 Amendments.  "When determination of the correct party to bring the action was not difficult and when no excusable mistake was made . . . Rule 17(a) is inapplicable and the action should be dismissed."  <u>Feist v. Consol. Freightways Corp.</u>, 100 F. Supp. 2d 273, 276 (E.D. Pa. 1999).

66.        It was not difficult to determine that Inc. was the proper party to assert claims under its copyrights.  As set forth above, it is black letter law that only the copyright owner or an exclusive licensee is entitled to sue for copyright infringement.  <u>See</u> Nimmer § 12.02 [B] [1]. Inc., and not International, develops SNMP Research's software and owns the copyrights that the Motion identifies as relevant.  <u>See</u> Mot. to Am. ¶¶ 10-11.  Both Inc. and International are of course aware of their respective roles and what they each own.  <u>Cf.</u> <u>BCC Merchant Sols., Inc. v. Jet Pay, LLC</u>, 129 F. Supp. 3d 440, 459 (N.D. Tex. 2015) (plaintiff's failure to join "its own subsidiary" was not understandable under Rule 17); <u>see also</u> <u>Lans v. Gateway 2000, Inc.</u>, 84 F. Supp. 2d 112, 120 (D.D.C. 1999) (because information concerning an assignment between plaintiff and its affiliate was within such parties' control, plaintiff's failure to name the real party in interest was not an understandable mistake); <u>In re MK Lombard Grp. I, Ltd.</u>, 301 B.R. 812, 818 (Bankr. E.D. Pa. 2003) (rejecting creditor's excuse for untimely amendment to proof of claim in part because creditor "had the requisite documentation to support its claim" well before it sought an amendment).

67.        Yet Inc. was never made a claimant in the Original Proof of Claim or at any time thereafter, despite five subsequent amendments over the period from September 2009 to October 2015.  <u>Cf.</u> <u>Riverside Acquisition Grp. LLC v. Vertis Holdings, Inc. (In re Vertis Holdings, Inc.)</u>, 536 B.R. 589, 613 (Bankr. D. Del. 2015) (declining to excuse untimely amendment in part

because plaintiff had "numerous opportunities to correct any deficiencies" but "failed to take advantage of them") (citation omitted).

68.     In any event, by 2011 it was clear that International possessed a non-exclusive license, at best, to Inc.'s copyrights; this was expressly spelled out in the Inc.-International License Agreement executed that year.  Despite this fact, more than five years passed before SNMP Research has now suddenly—and belatedly—sought to add Inc. as a pre-petition copyright claimant.  This years-long delay is patently unreasonable.  Cf. Schafer v. Decision One Mortg. Corp., No. 08-8653, 2009 WL 1886071, at *6 (E.D. Pa. June 30, 2009) (holding that plaintiff's "clock h[ad] . . . run out" because she waited several months after learning she might lack standing to move to join the correct party under Rule 17); BCC Merchant Solutions, Inc., 129 F. Supp. 3d at 459-60 (denying leave to amend under Rule 17 because plaintiff waited eight months after defendant raised standing objection to seek to join the real party in interest, and "[e]ight months notice is more than reasonable").

69.     Finally, even if Rule 17 applied here, it  "does not permit more than a merely formal alteration of the complaint."  Tech-Sonic Inc. v. Sonics & Materials, Inc., No. 3:12-cv-01376 (MPS), 2016 WL 3962767, at *14 (D. Conn. July 21, 2016) (citation omitted).  Thus, Rule 17 would not permit what the Motion to Amend seeks to do:  add a *new* claim by a *new* claimant.

## IV.     THE MOTION TO AMEND ALSO SHOULD BE DENIED BASED ON UNEXCUSED DELAY AND THE PREJUDICE THE PROPOSED NEW CLAIM WOULD CAUSE

70.     In addition to the other bars set forth above, the Motion to Amend should be denied because it impermissibly attempts to assert a new claim more than seven years after the bar date and because the proposed new claim would prejudice the Debtors and other creditors.

**A.     SNMP Research Cannot Add New Claims More Than Seven Years After the Bar Date**

71.     "[A] creditor may not use the claims amendment process to circumvent the claims bar date," Plains Mktg., L.P. v. Bank of Am., N.A. (In re SemCrude, L.P.), 443 B.R. 472, 477 (Bankr. D. Del. 2011), and thus "purported amendments will not be permitted if they actually constitute new claims," In re Metro Transp. Co., 117 B.R. 143, 147 (Bankr. E.D. Pa. 1990) (citation omitted).   "Stated another way, the amendment must relate back to the initial filing pursuant to [Rule] 15(c) if filed after the bar date; 'otherwise, it will be deemed a "new" claim and will not be permitted.'" N.Y.C. Housing Auth. V. G-I Holdings, Inc. (In re G-I Holdings, Inc.), 514 B.R. 720, 755 (Bankr. D.N.J. 2014) (quoting In re MK Lombard Grp. I, Ltd., 301 B.R. at 816).   Accordingly, "[o]nce the deadline to file claims has passed, 'an amendment to a claim filed post bar-date must be scrutinized to assure that it is not an attempt to file a new claim.'" In re SemCrude, L.P., 443 B.R. at 477 (quoting Hatzel & Buehler, Inc. v. Station Plaza Assocs., L.P., 150 B.R. 560, 562 (Bankr. D. Del. 1993)).

72.     The Motion to Amend is an impermissible attempt to file a new claim, for at least three reasons.  First, as SNMP Research concedes, the copyrights at issue belong to Inc.  But as noted above, only International previously raised copyright claims; Inc. was never a claimant, and International never attempted to add it or referenced claims belonging to any entity besides itself.

73.     Second, the proposed new Proof of Claim relies on an entirely different theory of damages.  The Original Proof of Claim and each of the Amended Proofs of Claim asserted contractual claims for unpaid royalties allegedly due under the Nortel License Agreement, as evidenced by their repeated references to that Agreement, including its late payment provision. The proposed Sixth Amended Proof of Claim, by contrast, is almost exclusively based on alleged

copyright infringement damages.  Indeed, such alleged damages comprise over 99 percent of the $81.1 million in alleged damages set forth in the Ratner Report, as compared to zero in any of the prior Proofs of Claim.

74.      Third, the proposed new Proof of Claim focuses on different Nortel conduct, as evidenced by its focus on different Nortel products.  Only approximately 46 percent of the damages claimed in the prior Amended Proofs of Claim relate to Nortel's BayStack/ES/ERS product, see, e.g., Fifth Am. Proof of Claim at 2, while practically one hundred percent of the damages claimed in the proposed new Proof of Claim (according to the Ratner Report) relate to this product.  See Ratner Report at 2-3, 20, 23, 28.

75.      In sum, the proposed new Proof of Claim, as compared to the Original Proof of Claim and each of the five purported Amended Proofs of Claim, relies on a different theory of damages, relates to different conduct, and requires a different claimant.  It plainly is an impermissible attempt to assert new claims well after the bar date.  For this additional reason, the Motion to Amend should be denied.   See Miller v. Peregrine Fin. Grp., Inc. (In re Peregrine Fin. Grp., Inc.), Case No. 12 B 27488, 2015 WL 2237201, at *5 (Bankr. N.D. Ill. May 13, 2015) (holding that because creditors' purported amendments were new claims, "[t]he amendments . . . do not relate back to the filing of [creditors'] original proofs of claim and are barred as untimely"); In re Cont'l Airlines, Inc., 183 B.R. 698, 699 (Bankr. D. Del. 1995) (observing that amendments to proofs of claim "should not be used to assert an entirely new claim," and rejecting creditor's purported amendment because it was "the assertion of a new claim and not an amendment"); In re Bazela, 37 B.R. 188, 189 (Bankr. E.D. Pa. 1984) (denying a purported amendment to a proof of claim that actually constituted a "new and separate claim"); see also Waldron v. Adams & Reese, L.L.P. (In re Am. Int'l Refinery, Inc.), 676 F.3d 455, 467 (5th Cir.

2012) (affirming district court's denial of creditor's motion to amend adversary complaint in part because creditor sought to assert new claims).

**B.      Equitable Considerations Further Compel Denial Of The Motion To Amend**

76.      It is established Third Circuit precedent that "[a] court will deny leave to amend . . . if there is undue delay, motivated by bad faith, or [it would be] prejudicial to [the] opposing party." Hatzel & Buehler, Inc. v. Station Plaza Assocs., L.P., 150 B.R. 560, 562 (Bankr. D. Del. 1993) (quoting Adams v. Gould Inc., 739 F.2d 858, 868 (3d Cir. 1984)).  In assessing whether a claimant's post-bar date amendment is the result of excusable neglect, courts consider the same factors.  See In re O'Brien Envtl. Energy, Inc., 188 F.3d 116, 125 (3d Cir. 1999).  The presence of any one of these factors—undue delay, bad faith, or prejudice—compels the denial of a motion for leave to amend.  In re Vertis Holdings, Inc., 536 B.R. at 608.  All three factors are present here.

77.      To begin, the Debtors lacked notice of the size of SNMP Research's proposed new claim and would be prejudiced by the massive increase in the claim at this late date.  "[T]o be within the scope of a permissible amendment," an amended proof of claim "should not only be of the same nature as the first but also reasonably within the amount to which the first claim provided notice." In re AM Int'l, Inc., 67 B.R. 79, 82 (N.D. Ill. 1986) (citing cases).  In its most recent purported Amended Proofs of Claim, International claimed damages of just over $8.4 million.  SNMP Research now seeks $81.1 million, nearly ten times that amount.  SNMP Research filed its Motion to Amend on November 23, 2016, nearly three weeks after the Debtors filed their proposed plan of reorganization [Bankr. D.I. 17347] and accompanying disclosure statement [Bankr. D.I. 17348].  The Debtors—operating under the assumption, based on each of International's previous filings, that International was seeking unpaid royalties—lacked fair

notice of this drastic increase, and "had no reason to believe that the [alleged] debt might be so extensive."  <u>In re Stavriotis</u>, 977 F.2d 1202, 1205 (7th Cir. 1992).

78.     The Motion to Amend should be denied on this ground alone.  <u>See</u> <u>In re Stavriotis</u>, 977 F.2d at 1205-06 (affirming denial of a post-bar date claim amendment by IRS which increased claim from $11,000 to $2 million in part because "[the] amendment would prejudice other creditors who had been given no notice of the IRS's ongoing audit and relied on the general amount of the claim listed in the original proof of claim"); <u>Praedium II Broadstone, LLC v. Wall St. Strategies, Inc.</u>, No. 04 Civ. 3880(WHP), 2004 WL 2624678, at *5 (S.D.N.Y. Nov. 18, 2004) (denying a post-bar date claim amendment that increased the claim from $91,000 to over $1 million); <u>see also</u> <u>Midland Cogeneration Venture Ltd. P'Ship v. Enron Corp. (In re Enron Corp.)</u>, 419 F.3d 115, 131 (2d Cir. 2005) (affirming denial of post-bar date claim amendment in part because "while a claim of $12.5 million might seem insignificant in the face of a $900 billion bankruptcy, courts have previously upheld findings of prejudice in cases in which the late-filed claim was a small fraction of the total claims," and, "in absolute terms, $12.5 million is no small amount") (citation omitted).[13]

79.     Moreover, the amount of SNMP Research's claims has a direct impact on the recoveries of other creditors, and could result in lower distributions to creditors who have

---

[13]     In addition to the massive and unexpected increase in the claim amount, the Debtors would be prejudiced by SNMP Research's attempt to change the claimant and claim at this late date.  For the last seven years, the Debtors have prepared to defend against contract-based claims relating to the pre-petition period.  If SNMP Research were now permitted to change its claims in the way it seeks, the Debtors would be forced to respond to radically different causes of action (claims for copyright infringement), putting them at a prejudicial disadvantage.  In this context, International should be held to the claims that it chose to assert.  <u>Cf.</u> <u>In re Vertis Holdings, Inc.</u>, 536 B.R. at 609-610 (finding prejudice because plaintiff sought by its amendment to rely upon a new legal theory, and rejecting plaintiff's claim that the theory was not "new" because plaintiff had pled it in a parallel state action; according to the Court, "Plaintiff defined the scope of [the instant] proceeding through [its instant] Complaint.") (citation omitted).

suffered actual losses.  SNMP Research seeks a massive sum, almost half of which—some $39

million in so-called "profits" damages—is not meant to compensate it for actual losses.  SNMP

Research does not even attempt to argue that these would be actual damages needed to make it

whole, but instead asserts that such profits damages "are entirely separate from and, in many

cases, far in excess of actual damages."  Am. Br. in Opp'n to U.S. Debtors' Mot. for

Clarification at 2,  June 27, 2016 [Adv. D.I. 443].  Permitting SNMP Research to assert a

copyright profits claim here, which under the Debtors' pro rata plan of reorganization would

limit other creditors' ability to recover for actual losses, would thus conflict with "one of the

firmest" principles of the Bankruptcy Code: ensuring "that creditors who have suffered a

pecuniary loss to the bankrupt have priority of claim over those who suffered no pecuniary loss."

Tex. Am. Oil Corp. v. U.S. Dep't of Energy, 44 F.3d 1557, 1569 (Fed. Cir. 1995).

80.        In addition to prejudice, bad faith can be inferred from the timing and background

of SNMP Research's attempt to introduce this massive new claim.  As discussed, SNMP

Research previously focused on its claim for a share of the proceeds from Nortel's sale of its

various business lines, on the baseless theory that Nortel somehow "sold," and was paid for,

SNMP Research's property.  SNMP Research alleged that its damages in connection with this

claim would exceed $86 million—and could be as high as $100 million or $200 million or

higher.  But the Court expressed skepticism about this "profits" claim and made clear that, to

sustain it, SNMP Research would have to present supporting evidence that simply does not exist.

And the Canadian court rejected this "profits" claim outright.

81.        In the wake of those rulings, SNMP Research has changed its tactics, seeking

through its Motion to Amend to introduce a new claim, to which it seeks to append a wildly

unfounded damages demand in excess of $80 million.  Its attempt to do so now, after suffering

setbacks in its previous efforts to win a massive windfall, can only be regarded as suspicious.

Cf. In re Vertis Holdings, Inc., 536 B.R. at 616 (describing as "suspicious" the claimant's

attempt to amend its complaint after receiving the debtor's motion for summary judgment, and

concluding that the motion was filed in bad faith).

82.     Finally, in addition to all the reasons set forth above, SNMP Research's attempt to

assert a new claim by a new claimant must be denied for the simple and dispositive reason that it

is far too late.  In the Original Proof of Claim, filed in September 2009, and the multiple

amended Proofs of Claim that were filed between then and October 2015, there indisputably was

never a claim by Inc. based on copyrights belonging to Inc.  Yet that is what the Motion seeks to

introduce now, more than seven years after the bar date.

83.     As this Court recently emphasized in rejecting such a late claim, "[a] seven year

delay is simply too long" and is "far more than other courts have allowed."  In re W.R. Grace &

Co., No. 01-1139 (KG), 2016 WL 7471290, at *7 (Bankr. D. Del. Dec. 28, 2016) (citing cases).

A claimant such as SNMP Research "cannot escape the thrust of Anglo-American law which

prevails in the bankruptcy field as well as elsewhere, that it is the party who asserts a right which

has the duty to press it, and loses that right if it delays inordinately."  Estate of Verkamp v. KDI

Corp. (In re KDI Corp.), 119 B.R. 594, 599-600 (Bankr. S.D. Ohio 1990).  Id.; accord In re Gray,

71 B.R. 46, 47 (Bankr. D. Del. 1987) (observing that "time limitations for filing proofs of claim

are to be strictly construed," and declining to "extend the bar date more than six years" to permit

a late-filed proof of claim); see also In re Enron Creditors Recovery Corp., 370 B.R. 90, 103

(Bankr. S.D.N.Y. 2007) (rejecting amendment to proof of claim filed fifteen months after the bar

date, which the court characterized as a "substantial" delay).

84.     Thus, while there are many reasons to reject the Motion to Amend, the simple fact that the proposed new claim that it seeks to add comes more than seven years too late is sufficient in itself.

## CONCLUSION

For the reasons set forth above, the Debtors respectfully request that the Court deny the Motion to Amend and grant such other relief as the Court deems just and proper.

Dated: January 30, 2017
      Wilmington, Delaware

Respectfully submitted,

CLEARY GOTTLIEB STEEN & HAMILTON LLP

Lisa M. Schweitzer (admitted *pro hac vice*)
David H. Herrington (admitted *pro hac vice*)
One Liberty Plaza
New York, New York  10006
Telephone: (212) 225-2000
Fax: (212) 225-3999

-and-

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Andrew J. Roth-Moore*
Derek C. Abbott (No. 3376)
Andrew R. Remming (No. 5120)
Tamara K. Minott (No. 5643)
Andrew J. Roth-Moore (No. 5988)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19801
Telephone: (302) 658-9200
Facsimile: (302) 658-3989

*Counsel for the Debtors*
*and Debtors in Possession*