IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------X
:
*In re*                                                     :   Chapter 11
                                                            :
Nortel Networks Inc., *et al.*,[1]                          :   Case No. 09-10138 (KG)
                                                            :
                    Debtors.                :   Jointly Administered
                                                            :
                                                            :   Hearing date: March 7, 2017 10:00 AM (ET)
                                                            :   Objections due: February 27, 2017 4:00 PM (ET)
                                                            :
                                                            :
------------------------------------------------------------X

**DEBTORS' MOTION FOR ENTRY OF AN ORDER PURSUANT
TO 11 U.S.C. §§ 105 AND 363 AND FED. R. BANKR. P. 9019
APPROVING A SETTLEMENT WITH CIENA CORPORATION**

Nortel Networks Inc. ("NNI") and certain of its affiliates, as debtors and debtors in possession (collectively, the "Debtors"), hereby move this Court (the "Motion") for the entry of an order substantially in the form attached hereto as Exhibit A, pursuant to sections 105(a) and 363(b) of title 11 of the United States Code (the "Bankruptcy Code") and Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), (a) authorizing the Debtors to enter into that certain stipulation and settlement agreement (the "Settlement"), dated February 9, 2017, and entered into by and among NNI, Nortel Networks Corporation ("NNC"), Nortel Networks Limited ("NNL"), the EMEA Sellers[2] and certain of the Other Sellers (together with

---

[1]     The debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567), Nortel Networks (CALA) Inc. (4226) and Nortel Networks India International Inc. (8667). Contact information for the Debtors and their petitions are available at http://dm.epiq11.com/nortel.

[2]     Capitalized terms used but not defined herein shall have the meaning ascribed to them in that certain Amended and Restated Asset Sale Agreement by and among NNC, NNL, NNI, the other entities identified therein

NNC, NNL, NNI and the EMEA Sellers, the "Sellers") and Ciena Corporation (the "Purchaser," and with each of the Sellers, the "Parties"), attached hereto as Exhibit B, and (b) granting them such other and further relief as this Court deems just and proper. In support of this Motion, the Debtors respectfully represent as follows:

### Jurisdiction

1. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2. The statutory bases for the relief requested herein are sections 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019.

### Background

#### A.   Procedural Background

3. On January 14, 2009 (the "Petition Date"), the Debtors, other than Nortel Networks (CALA) Inc.[3] and Nortel Networks India International Inc.[4], filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Court"), which cases are consolidated for procedural purposes only (the "Chapter 11 Cases"). The Debtors continue to operate as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

---

as Sellers and Ciena Corporation, dated November 24, 2009, as amended from time to time (the "Sale Agreement"), or in the Escrow Agreement (as defined below).

[3]   Nortel Networks (CALA) Inc. filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on July 14, 2009, which was consolidated and is being jointly administered with the other Debtors' chapter 11 cases for procedural purposes [D.I. 1098].

[4]   Nortel Networks India International Inc. filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on July 26, 2016, which was consolidated and is being jointly administered with the other Debtors' chapter 11 cases for procedural purposes [D.I. 17090].

4.      The Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") has appointed an Official Committee of Unsecured Creditors (the "Committee") in respect of the Debtors [D.I.s 141, 142], and an ad hoc group of bondholders has been organized (the "Bondholder Group").  An ad hoc consortium of creditors holding trade claims against the Debtors (the "Nortel Trade Claims Consortium") was organized in 2015.

5.      On the Petition Date, the Debtors' ultimate corporate parent NNC, NNI's direct corporate parent NNL, and certain of their Canadian affiliates (collectively, the "Canadian Debtors"[5] and together with the EMEA Debtors (as defined below) and the Debtors, "Nortel") commenced a proceeding with the Ontario Superior Court of Justice (the "Canadian Court") under the Companies' Creditors Arrangement Act (Canada) (the "CCAA"), seeking relief from their creditors (collectively, the "Canadian Proceedings") and a Monitor, Ernst & Young Inc. (the "Monitor"), was appointed by the Canadian Court.  The CCC is an ad hoc committee of major creditors having claims only against the Canadian Debtors.  Also on the Petition Date, the High Court of England and Wales placed nineteen of Nortel's European affiliates, including Nortel Networks UK Limited ("NNUK") and certain of its affiliates located in Europe, the Middle East and Africa (collectively, the "EMEA Debtors")[6] into administration under the control court-appointed administrators and foreign representatives (collectively, the "Joint

---

[5]     The Canadian Debtors include the following entities:  NNC, NNL, Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation, as well as Nortel Communications Inc., Architel Systems Corporation and Northern Telecom Canada Limited, which subsequently commenced their own Canadian Proceedings.

[6]     The EMEA Debtors include the following entities: NNUK, Nortel Networks (Ireland) Limited, Nortel GmbH, Nortel Networks France S.A.S., Nortel Networks Oy, Nortel Networks Romania SRL, Nortel Networks AB, Nortel Networks N.V., Nortel Networks S.p.A., Nortel Networks B.V., Nortel Networks Polska Sp. z.o.o., Nortel Networks Hispania, S.A., Nortel Networks (Austria) GmbH, Nortel Networks, s.r.o., Nortel Networks Engineering Service Kft, Nortel Networks Portugal S.A., Nortel Networks Slovensko, s.r.o. and Nortel Networks International Finance & Holding B.V.

Administrators"). Additionally, certain of the EMEA Debtors' affiliates have not commenced administration proceedings, but are under the control of their respective directors.

6.  Other Nortel affiliates have commenced and in the future may commence additional creditor protection, insolvency and dissolution proceedings around the world.

7.  For further information regarding these Chapter 11 Cases, references may be made to the Monthly Operating Reports filed by the Debtors at http://dm.epiq11.com/nortel and the Plan (as defined below).

### B. The Metro Ethernet Networks Transaction

8.  After the commencement of these insolvency proceedings, the Debtors and their various affiliates entered into a series of transactions in which they sold various business units and other assets to various purchasers (the "Sales Transactions"). Among such transactions was the sale of the Canadian Debtors' assets relating to the "Metro Ethernet Networks" business (the "Business") to the Purchaser pursuant to the Sale Agreement and the Ancillary Agreements (as defined below), which was approved by order of the Canadian Court on December 2, 2009, and the sale of the Debtors' assets relating to the Business, which was approved by order of this Court on December 3, 2009 [D.I. 2070]. Additionally, the EMEA Sellers, the Joint Administrators, the Joint Israeli Administrators and the Purchaser entered into a separate agreement providing for the sale of the EMEA Assets relating to the Business.

9.  In furtherance of the Sales Transactions, the Debtors, the Canadian Debtors and certain of the EMEA Debtors entered into that certain Interim Funding and Settlement Agreement, dated as of June 9, 2009 (the "IFSA").[7] Following a joint hearing on June 29, 2009, the IFSA was approved by this Court [D.I. 993] and the Canadian Court. Among other things,

---

[7]  See Exhibit B to the Motion Pursuant to 11 U.S.C. § 105(a), § 363, § 503 and Fed. R. Bankr. P. 9019 for an Order (A) Approving the Interim Funding and Settlement Agreement, and (B) Granting Related Relief [D.I. 874].

4

the parties to the IFSA agreed not to condition the sale of Nortel's businesses and assets on a prior agreement among the selling parties regarding the allocation of the ultimate sale proceeds (plus accrued interest, the "Sale Proceeds") from the relevant sale transaction. See IFSA, ¶¶ 12(a), (b). With this framework in place, from 2009-2011, Nortel conducted an extensive series of court-approved sale transactions generating in excess of $7.3 billion in net Sale Proceeds.

10. As more fully set forth in the IFSA, the Selling Debtors,[8] the Joint Administrators, the Committee and the Monitor entered into various court-approved escrow agreements with JP Morgan Chase Bank, N.A. and Citibank, N.A., as escrow agents (the "Escrow Agreements") to hold all Sale Proceeds in escrow accounts (the "Distribution Escrow Accounts"), pending either the agreement of the relevant parties or filed decisions of this Court and the Canadian Court regarding the allocation of the Sale Proceeds. See id. As of the date of this Motion, the Distribution Escrow Accounts hold approximately $7.3 billion in Sale Proceeds. Among such escrow accounts is the MEN Distribution Escrow Account, as provided in that certain MEN Distribution Escrow Agreement, dated as of March 19, 2010, which holds the portion of the Sale Proceeds generated by the sale of the Business.

11. In connection with the sale of the Business pursuant to the Sale Agreement, certain Sellers (or affiliates of Sellers) entered into certain Ancillary Agreements (the "Ancillary Agreements"), including that certain Transition Services Agreement, dated March 19, 2010 (the "TSA"), by which the Debtors agreed to provide to the Purchaser certain transition services related to the Business, and the Purchaser agreed to escrow certain funds as payment for such services (such funds, the "Transition Services Escrow Amount"), as well as certain other funds in

---

[8] The term "Selling Debtors" refers to any Nortel debtor that signed or acceded to the IFSA or that signed one or more of the Escrow Agreements (as defined below).

5

connection with other obligations of certain Sellers under the Sale Agreement and Ancillary Agreements (together with the Transition Services Escrow Amount, the "Escrow Amount").[9]

12.     In addition, Citibank, N.A. ("Citibank"), NNI, NNL, NNC, Nortel Networks UK Limited (in administration) ("NNUK") and the Purchaser entered into that certain Escrow Agreement, dated as of March 19, 2010 (the "TSA and Tax Escrow Agreement"), and established that certain escrow account (the "TSA and Tax Escrow Account") with Citibank as escrow agent, as contemplated by the Sale Agreement and Ancillary Agreements, to hold the Escrow Amount.

13.     Pursuant to a letter agreement dated April 13, 2011, Nortel Networks Israel (Sales and Marketing) (in administration) and Nortel Communications Holdings (1997) Ltd. (in administration) assigned to NNI and NNUK all of their interests in, among other things, any portion of the proceeds of the sale of the Business.  Pursuant to an agreement entered into by o.o.o. Nortel Networks ("Nortel Russia"), NNC, NNL, NNI, NNUK, and certain other parties, all of the interest, if any, that Nortel Russia had to the proceeds of the sale of the Business was assigned and transferred to Nortel Networks International Finance & Holding B.V.

14.     Finally, the Sellers and certain of their affiliates entered into an Allocation Settlement Agreement (APAC/CALA) dated July 19, 2012 (the "Non-Filed Entities Settlement"), pursuant to which certain of the Other Sellers agreed to a full and final settlement of claims to, among other things, any proceeds of the sale of the Business, such that only the Debtors, the Canadian Debtors and the EMEA Sellers have a remaining interest as sellers in the proceeds of the sale of the Business.

---

[9]     Pursuant to section 2.2.5 of the Sale Agreement, such funds include the Tax Escrow Funds, the EMEA Tax Escrow Funds, the Italian Tax Escrow Funds and the Polish Tax Escrow Funds.

6

15. Subsequent to the sale of the Business, certain disputes have arisen between the Sellers and the Purchaser with respect to the sale of the Business, including, without limitation, with respect to the Transition Services Escrow Amount and the Escrow Amount (the "Disputes"). As discussed in greater detail below, the Sellers and the Purchaser have reached an agreement in principle to resolve the Disputes.

### C. The Debtors' Chapter 11 Plan

16. Despite early and repeated efforts at mediation (including before all of the asset sales were consummated), the key parties were unable to reach an agreement as to the distribution of the Sale Proceeds, and proceeded to engage in litigation before this Court and the Canadian Court (the "Allocation Dispute"). On May 12, 2015, this Court and the Canadian Court simultaneously issued opinions deciding the Allocation Dispute (the "Allocation Decisions"). Numerous parties appealed this Court's Allocation Decision to the United States District Court for the District of Delaware. During the pendency of the appellate process, the parties engaged in court-supervised mediation. The Debtors, their foreign affiliates and other key parties agreed upon a proposed settlement of the Allocation Dispute as well as various other inter-estate matters and claims, through the terms of a fully integrated settlement, as memorialized in the Settlement and Plans Support Agreement executed on October 12, 2016 [D.I. 17249] (the "SPSA").

17. On December 1, 2016, the Debtors filed their amended *First Amended Joint Chapter 11 Plan of Nortel Networks Inc. and Certain of its Affiliated Debtors* [D.I. 17501] (the "Plan") on behalf of all Debtors (other than NNIII), along with an amended *Proposed Disclosure Statement for the First Amended Joint Chapter 11 Plan of Nortel Networks Inc. and Certain of its Affiliated Debtors* [D.I. 17502] (the "Disclosure Statement"). The Plan effectuates the terms of the SPSA, which is fully incorporated therein.

18.     On January 24, 2017, following a hearing, the Court entered an order confirming the Plan [D.I.17795], as well as a separate order approving the SPSA pursuant to Bankruptcy Rule 9019 [D.I. 17794]. On January 30, 2017, the Canadian Court entered a Sanction Order approving the Canadian Plan and an order authorizing the release of the Sale Proceeds from the Distribution Escrow Accounts.

### Relief Requested

By this Motion, the Debtors seek entry of an order, pursuant to sections 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019, (i) authorizing the Debtors to enter into and approving the Settlement and (ii) granting such other and further relief as the Court deems just and proper.

### Basis For Relief

19.     The approval of the Settlement as an integrated resolution of the Disputes between and among the Sellers and the Purchaser is squarely authorized by sections 105(a) and 363(b) of the Bankruptcy Code and easily meets the applicable standards of Bankruptcy Rule 9019.[10]

20.     Section 363(b) of the Bankruptcy Code permits a debtor to use, sell or lease the property of the estate outside of the ordinary course of business after notice and a hearing. 11 U.S.C. § 363. Section 363 applies when an agreement involves the disposition of the estate's assets in such a way that it ventures beyond an ordinary course transaction. Myers v. Martin (In re Martin), 91 F.3d 389, 394-95 (3d Cir. 1996).

---

[10] Section 105(a) of the Bankruptcy Code also provides that "[t]he court may issue any order . . . that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Approval of the Settlement is consistent with the broad equitable authority of the bankruptcy courts, in furtherance of the above provisions of the Bankruptcy Code and Bankruptcy Rules. See, e.g., United States v. Energy Res. Co., 495 U.S. 545, 549 (1990); In re Kaiser Aluminum Corp., 456 F.3d 328, 340 (3d Cir. 2006) ("[B]ankruptcy courts have broad authority to act in a manner that will prevent injustice or unfairness in the administration of bankruptcy estates.").

21. The use or transfer of estate property under this provision must be supported by a sound business purpose. Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1070-71 (2d Cir. 1983); In re Decora Indus., Inc., No. 00-4459, 2002 WL 32332749, at *2 (D. Del. May 20, 2002); Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.), 242 B.R. 147, 153 (D. Del. 1999); In re Del. & Hudson Ry. Co., 124 B.R. 169, 175-76 (D. Del. 1991). A court determining whether a sound business purpose justifies the transaction "should consider all salient factors pertaining to the proceeding and, accordingly, act to further the diverse interests of the debtor, creditors and equity holders, alike." In re Montgomery Ward Holding Corp., 242 B.R. at 153-54 & n.1 (quoting In re Lionel Corp., 722 F.2d at 1071). In addition, a debtor must show that the transaction has been proposed in good faith, that adequate and reasonable notice has been provided and that it is receiving fair and reasonable value in exchange. See In re Decora Indus., Inc., 2002 WL 32332749, at *2; In re Del. & Hudson Ry. Co., 124 B.R. at 176.

22. Bankruptcy Rule 9019 provides, in pertinent part, that, "on motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019. Citing this authority, the Third Circuit has emphasized that "[c]ompromises are favored in bankruptcy." Myers v. Martin (In re Martin), 91 F.3d 389, 393 (3d Cir. 1996) (quoting Collier on Bankruptcy ¶ 9019.03[1] (15th ed. 1993)); see also In re World Health Alts., Inc., 344 B.R. 291, 296 (Bankr. D. Del. 2006) (finding settlements "generally favored in bankruptcy"). Additionally, the Third Circuit has recognized that "'[i]n administering reorganization proceedings in an economical and practical manner it will often be wise to arrange the settlement of claims as to which there are substantial and reasonable doubts.'" In re Pa. Cent. Transp. Co., 596 F.2d 1102, 1113 (3d Cir. 1979) (quoting Protective Comm. for Indep.

Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424 (1968)).  Courts in this District have recognized that the approval of a proposed compromise and settlement is committed to the sound discretion of the bankruptcy court.  See, e.g., In re Coram Healthcare Corp., 315 B.R. 321, 329 (Bankr. D. Del. 2004).

23. Before approving a settlement under Bankruptcy Rule 9019, a court must determine whether "the compromise is fair, reasonable, and in the interest of the estate."  In re Marvel Entm't Grp., Inc., 222 B.R. 243, 249 (D. Del. 1998) (quoting In re Louise's, Inc., 211 B.R. 798, 801 (D. Del. 1997)).  Basic to the process of evaluating proposed settlements is "the need to compare the terms of the compromise with the likely rewards of litigation."  TMT Trailer Ferry, 390 U.S. at 424-25.  The court need not be convinced that the settlement is the best possible compromise in order to approve it.  In re Coram Healthcare Corp., 315 B.R. at 330.

24. The Third Circuit has set out four criteria for a bankruptcy court to consider when evaluating a settlement proposal:  "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors."  In re Martin, 91 F.3d at 393 (citing In re Neshaminy Office Bldg. Assocs., 62 B.R. 798, 803 (E.D. Pa. 1986)); see also Fry's Metals, Inc. v. Gibbons (In re RFE Indus., Inc.), 283 F.3d 159, 165 (3d Cir. 2002); In re eToys, Inc., 331 B.R. 176, 198 (Bankr. D. Del. 2005).

25. In keeping with the stated public policy in favor of settlement, courts in this Circuit have repeatedly found that "[i]n analyzing the compromise or settlement agreement under the Martin factors, courts should not have a 'mini-trial' on the merits, but rather should canvass the issues and see whether the settlement falls below the lowest point in the range of reasonableness."  W.R. Grace & Co., 475 B.R. at 77-78 (internal citations omitted); Pulver Com,

Inc. v. Medialive Int'l Inc. (In re Key3Media Grp., Inc.), 336 B.R. 87, 93 (Bankr. D. Del. 2005), aff'd, 2006 WL 2842462.  Moreover, courts generally defer to a debtor's judgment so long as there is a legitimate business justification for its action.  In re Coram Healthcare Corp., 315 B.R. 321, 330 (Bankr. D. Del. 2004); Key3Media Grp., Inc., 336 B.R. at 93.

       26.     The Debtors respectfully submit that the Settlement meets the requirements under section 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019.  The Settlement is proposed as a good faith means to resolve the Disputes efficiently and expeditiously without incurring additional costs of litigation.

       27.     The Disputes relate to outstanding amounts due from the Purchaser to certain Sellers, including NNI.  In particular, NNI believes that it is owed approximately U.S.$648,552 by the Purchaser in fees for transition services provided pursuant to the TSA.  Other Sellers also have claimed outstanding amounts due from the Purchaser in the additional amount of approximately U.S.$2.6 million.  As relevant to the Debtors, Nortel Networks de Argentina S.A. ("NN Argentina"), which was one of the Other Sellers and a party to the Non-Filed Entities Settlement, claims an outstanding amount due from the Purchaser in the amount of U.S.$1,134,901 as reimbursement for payment of Value Added Tax and severance obligations.

       28.     Under the terms of the Settlement, the Purchaser agrees to pay U.S.$2,300,000 to certain Sellers in full satisfaction of the amounts due from the Purchaser under the Ancillary Agreements.  Of that amount, the Settlement contemplates that U.S.$456,985.49 will be paid to NNI in full satisfaction of amounts owed by the Purchaser to NNI for transition services.  NNI will also receive an additional U.S.$517,134.49, which constitutes NNI's pro-rata share, pursuant to the Non-Filed Entities Settlement, of the Purchaser's payment in full satisfaction of the

amounts owed by the Purchaser to NN Argentina.[11] In aggregate, NNI will receive a payment from the Purchaser in the amount of U.S.$974,119.98.

29. While the Debtors are prepared to litigate the true value of these outstanding amounts and believe that they would prevail in such litigation, litigation carries with it inherent uncertainties and costs, and there is no assurance that such litigation would achieve a better result than the one set forth in the Settlement when accounting for the costs of litigation. In the absence of a settlement between the Parties, the Debtors' estates would be burdened with the time and costs of continuing litigation, which would be disruptive of the estates' efforts to bring finality to these cases and which, given the total amount in dispute, would likely not yield a materially better result for the Debtors' creditors even if successful.

30. Accordingly, the Debtors and other Sellers are willing to compromise the amounts owed by the Purchaser in exchange for the Purchaser's agreement, as embodied in the Settlement, to release the entire Escrow Amount from the TSA and Tax Escrow Account to the applicable Sellers. As a result, the Settlement and the SPSA contemplate that the Escrow Amount will be available for distribution to the various Nortel estates pursuant to the Plan and the SPSA, consistent with the allocation of Sale Proceeds generally under the Plan. The release of these funds as effectuated by the Settlement is in the best interests of the Debtors and their creditors, as it will increase the total amount of money available for distribution to creditors while avoiding the cost and delay of further litigation.

31. Finally, the Settlement includes mutual releases among the Sellers and the Purchaser of liability arising from any and all potential present and future claims related to the

---

[11] NN Argentina claims a total of U.S.$1,134,901 owed by the Purchaser as reimbursement for its payment of Value Added Tax and severance obligations. Under the Settlement, NNL will also receive a portion of the total settlement payment by the Purchaser on account of amounts owed to NN Argentina, in the amount of U.S.$282,544.32.

Sale Agreement. These releases provide finality to the ongoing Disputes regarding the Sale Agreement, and give certainty to the Debtors and their creditors that there will be no further litigation related to the Sale Agreement that could arise in the future.

32.  In light of the foregoing, the Debtors respectfully submit that the Settlement fairly balances the Debtors' likelihood of success on the merits of the Disputes against their interest in avoiding the uncertainty, delay and additional costs associated with litigation, and falls well above the lowest point in the range of reasonableness in satisfaction of the requirements of Bankruptcy Rule 9019. Accordingly, the Debtors request that the Court approve the Settlement and authorize the Debtors to enter into the Settlement.

## Notice

33.  Notice of the Motion has been given via electronic transmission, first class mail, hand delivery or overnight mail to (i) the U.S. Trustee; (ii) counsel to the Committee; (iii) counsel to the Bondholder Group; (iv) counsel to the Purchaser; (v) counsel to the Canadian Debtors; (vi) each of the other Parties; and (vii) the general service list established in these Chapter 11 cases. The Debtors submit that under the circumstances no other or further notice is necessary.

## No Prior Request

34.  No prior request for the relief sought herein has been made to this or any other court.

WHEREFORE, the Debtors respectfully request that this Court (i) grant this Motion and the relief requested herein; (ii) enter the proposed order attached hereto; and (iii) grant such other and further relief as it deems just and proper.

Dated: February 10, 2017
       Wilmington, Delaware

CLEARY GOTTLIEB STEEN & HAMILTON LLP

James L. Bromley (admitted *pro hac vice*)
Lisa M. Schweitzer (admitted *pro hac vice*)
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999

    - and -

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

   */s/ Tamara K. Minott*
Derek C. Abbott (No. 3376)
Andrew R. Remming (No. 5120)
Tamara K. Minott (No. 5643)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19801
Telephone: (302) 658-9200
Facsimile: (302) 658-3989

*Counsel for the Debtors*
*and Debtors in Possession*