## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| NORTEL NETWORKS INC., *et al.*,[1] | Case No. 09-10138 (KG) |
| Debtors. | (Jointly Administered) |
| | **Hearing Date: February 28, 2017 at 9:00 a.m.** |

## AFFIDAVIT OF JAMES D. HEANEY

Commonwealth of Pennsylvania   :

                              : ss.

County of Bucks                 :

      James D. Heaney, being duly sworn, deposes and says:

          1.      I joined Law Debenture Trust Company of New York ("Law Debenture" or the "Trustee") in July 2007. Law Debenture became the successor Indenture Trustee for the 7.875% Notes (the Notes," and all holders of the Notes, the "Noteholders") in January 2009. I was involved, both directly and indirectly, with Law Debenture's work on the Notes from January 2009 to December 6, 2016, when Law Debenture sold its corporate trust business to Delaware Trust Company.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567), and Nortel Networks (CALA) Inc. (4226).

## Background

2.      I received my B.B.A. from Pace University in 1972.  In 2012, I was awarded the title of "Certified Corporate Trust Specialist" by the Institute of Certified Bankers.

3.      Upon graduating from Pace, I accepted a position as a Corporate Trust Administrator at Chase Manhattan Bank.  I remained at Chase for about 34 years – until 2006. Over the years, I was promoted to Corporate Trust Officer, then to Second Vice President and, ultimately, to Vice President.  At any given time, I had direct responsibility for about 60 accounts.  Over the years, I managed dozens of law firms.

4.      I left Chase Manhattan Bank in 2006 when it sold its corporate trust business to The Bank of New York.  I left The Bank of New York about six months later, and joined Law Debenture as a Vice President in July 2007.  In 2010, I became a Managing Director and Senior Trust Officer at Law Debenture.

5.      I retired from Law Debenture on December 30, 2016, after it sold its corporate trust business to Delaware Trust Company on December 6, 2016.

## The Nortel Relationship

6.      In January, 2009, Law Debenture became the successor Indenture Trustee of the Notes. The Notes were issued by a U.S.-based, special-purpose financing affiliate of Nortel, Nortel Networks Capital Corporation ("NNCC"), and they were guaranteed by Nortel's parent company in Canada, Nortel Networks Limited ("NNL").

7.      Nortel filed for bankruptcy on January 14, 2009 (the "Petition Date"), creating an event of default under the indenture governing the Notes (the "Indenture").  (The Indenture is under **Exhibit D**.)    Pursuant to Section 601 of the Indenture, upon an event of

2

default, "the Trustee shall exercise such of the rights and powers vested in it by this Indenture, and use the same degree of care and skill in their exercise, a prudent person would exercise or use under the circumstances in the conduct of his own affairs." Section 504 of the Indenture authorizes the Trustee to "pursue any available remedy to collect the payment of principal of (and premium, if any) or interest in Debt Securities or to enforce the performance of any provision of Debt Securities of this Indenture."

8.     In order to assist the Trustee in the performance of its duties, Section 602 of the Indenture provides that the Trustee "may act through agents or attorneys," and "may consult with counsel of its selection."

9.     On the Petition Date, the Notes were trading at approximately 8 cents on the dollar. Accordingly, Law Debenture did precisely what a prudent person would do in that situation to protect the interests of, and maximize value for, the Noteholders and to discharge its obligations under the Indenture: it hired counsel (Dewey & LeBoeuf LLP) and obtained appointment to the Official Committee of Unsecured Creditors (the "Committee").

10.    In my experience, in bankruptcy cases of this size and complexity, it is in the best interests of Noteholders that they be specifically represented, and have a voice on, the official creditors' committee. But it is usually the case, as here, that the actual beneficial holders of notes affirmatively choose not to sit on such official committees because, among other things, doing so could restrict such noteholders' ability to trade in the debtor's securities. Indeed, to my knowledge, neither Fee Objector sought a seat on the Committee.

11.    Moreover, it is generally the case that indenture trustees retain their own individual counsel to represent them in large, complex bankruptcy cases such as these, including

3

in connection with their duties as official committee members.  While official committees retain

their own committee counsel, that counsel advises the members of the official committee with

respect to their duties as official committee members.  They do not advise indenture trustees as

to their duties to noteholders under the governing indentures.  At times, those duties are aligned.

At other times, those duties diverge.  Accordingly, I have found that it is prudent practice for an

indenture trustee to have its own counsel retained and available to advise it with respect to its

duties under its indenture on all issues in the case – even on those issues for which the official

committee's counsel may also be providing official committee advice.

12.    From the beginning of Law Debenture's work as the successor trustee for

the Notes, I was involved.  In the nearly 45 years I have worked as a corporate trust officer, the

Nortel bankruptcy was one of the most complicated and contentious that I have ever

experienced.

13.    For approximately the first year and five months of the relationship, my

colleague, Robert Bice, acted as the lead trust officer.  But our office was small – perhaps having

only five professionals – so each of us was aware of the day-to-day happenings in the Nortel

matter.  When Mr. Bice took vacations or had business conflicts, for example, I stepped in to the

role of lead trust officer in his stead.

14.    When I permanently assumed the role of lead trust officer for the Notes in

May 2010, my first task was to refresh my recollection about the steps that had been taken to

date.

15.    It is my practice carefully to review all bills that are received from outside

professionals.  I reviewed the files, and was not able to locate bills rendered by Law Debenture's

4

lead counsel, Dewey & LeBoeuf LLP ("Dewey").  Accordingly, I called Larry Miller at Dewey
(the lead attorney on the case), and asked him to send me Dewey's bills.  He did so.

16.     Attached as **Exhibit A** hereto are all of the Dewey bills (including those
rendered after I assumed the role of lead trust officer).

17.     When I received Dewey's bills, I carefully reviewed them.  Based on
(i) my day-to-day knowledge of this matter; and (ii) my almost 44 years in the business, I
concluded that the fees billed to date by Dewey were reasonable and appropriate, particularly in
light of the size and complexity of the cases.

18.     Between May 2010 and May 2012, I worked with Dewey on this matter.
Larry Miller was, in my judgment, an excellent lawyer.  I asked Mr. Miller to keep me informed
of events as they arose, and he did so.  Attached under **Exhibit B** hereto is a selection of periodic
reports that Law Debenture received from Dewey.  I also regularly interacted with Dewey
lawyers – primarily Larry Miller and Mohsin Khambati – by telephone.  Messrs. Miller and
Khambati were very responsive, and I was pleased with their work.

**Patterson Belknap Replaces Dewey**

19.     In the early part of 2012, the Dewey firm experienced well-documented
financial troubles, so I set out to find an equally top-notch law firm that would be able to step in
to this very complicated representation as seamlessly as possible.

20.     I had previously worked with Dan Lowenthal at Patterson Belknap Webb
& Tyler LLP on the Washington Mutual case beginning in 2008.

21.     I was very impressed by Mr. Lowenthal's work on Washington Mutual.
Over the approximately 44 years that I have worked in the corporate trust field, I have supervised

5

dozens of lawyers. Mr. Lowenthal is one of the most skilled, conscientious and careful lawyers with whom I've had the opportunity to work. He is extremely diligent and does a superb job of communicating with his clients. He has excellent judgment.

22.     On the Washington Mutual engagement, I also got to know Mr. Lowenthal's colleagues, Brian Guiney and Craig Dent. I found them to be smart and efficient lawyers. Mr. Guiney and Mr. Dent were closely supervised by Mr. Lowenthal so there were no inefficiencies; they were available to me as a resource whenever Mr. Lowenthal was not available; and they were completely up to speed on all matters pertinent to the Washington Mutual case. I valued having the Patterson Belknap team in place to assist me with this bankruptcy case.

23.     Accordingly, when it became apparent that the Dewey firm might not be able to continue the engagement, I sought and received permission from the Chief Executive Officer of Law Debenture to retain Mr. Lowenthal and Patterson Belknap to replace Mr. Miller and Dewey. Law Debenture retained Patterson Belknap in May 2012.

**The First (and Only) Direction Letter from the Noteholders**

24.     On May 4, 2012, Stephen Blauner, on behalf of a purported majority of the Noteholders, sent Law Debenture a direction letter asking it to hire two law firms – Kirkland & Ellis LLP and Malek Schiffrin LLP – to represent the Indenture Trustee. A copy of the May 4, 2012 direction letter is attached as **Exhibit C**.

25.     Under the Indenture and applicable law, a direction letter does not prevent the Indenture Trustee from retaining counsel of its choosing. And to be effective under the Indenture for the Notes, which is attached as **Exhibit D**, a direction letter needs to be on behalf

of a majority of the Noteholders and must contain a satisfactory indemnity. The direction letter

that Mr. Blauner sent on May 4, however, contained neither proof that his fund, Solus

Alternative Asset Management LP, held a majority of the outstanding notes, nor did it contain

any indemnification.

26.     Mr. Blauner and I spoke by telephone on the morning of May 9, 2012. I

explained to him that the Indenture does not permit the Noteholders to select Law Debentures'

counsel, but that with respect to future direction letters, he would need to supply an acceptable

indemnification pursuant to Section 601 of the Indenture as well as proof that the direction letter

was being submitted on behalf of a majority of Noteholders. (*See, e.g.*, **Exhibit E**.)

27.     To put it mildly, this seemed to upset Mr. Blauner. He screamed at me,

asking if I was "calling him a liar." I explained to him that, as the Indenture Trustee, Law

Debenture owes duties to all Noteholders and that, in order to perform these duties, we require

compliance with the Indenture.

28.     This seemed to make Mr. Blauner even more upset, as he became louder. I

told him that I was ending the call. I then disconnected the call. This is the last time I spoke

with Mr. Blauner.

29.     As I wrote to Mr. Blauner on May 10, 2012: "As we have indicated

previously, we do not believe that the retention of counsel by the Trustee is subject to the

direction of holders. But, to reiterate what I conveyed to you earlier this week, with respect to

matters that could be the subject of a direction, the Trustee requires satisfactory evidence that the

direction holders are in fact the beneficial owners of the required majority and an agreement to

indemnify the Trustee pursuant to Section 601 of the Indenture." **Exhibit E**.

7

**Interaction with the Fee Objectors' Counsel**

      30.     Mr. Blauner's initial counsel in this case, Javier Schiffrin of Malek Schiffrin LLP, worked very closely with both Dewey and Patterson Belknap. Indeed, Mr. Schiffrin arranged a meeting with Patterson Belknap the week after it was retained. *See, e.g.*, **Exhibit F**.

      31.     On December 26, 2012, Mr. Blauner sent an e-mail to Mr. Lowenthal stating: "it would be (at best) inappropriate for Law Debenture to act in any way with respect to the Notes without checking with Solus. If there is a need to discuss this general protocol, we are available." **Exhibit G**. Mr. Lowenthal and I discussed on the telephone Mr. Blauner's position, and I told Mr. Lowenthal to keep Mr. Blauner or his counsel in the loop on all significant matters.

      32.     Indeed, thereafter, Solus' counsel worked hand-in-hand with Patterson Belknap. I have collected a series of e-mails under **Exhibit H**. As this Court will note, Patterson Belknap regularly reported to me on its interaction with Mr. Blauner and his counsel. These communications were extensive, and dealt with most aspects of the case. Mr. Lowenthal and his colleagues took seriously Mr. Blauner's admonition in December 2012 that Law Debenture should not "act in any way with respect to the Notes without checking with Solus." *See* **Exhibit G**.

**Regular Communications with Law Debenture's Counsel**

      33.     Both the Patterson Belknap and Dewey teams also kept Law Debenture regularly informed as events took place in the Nortel case, whether in the U.S., Canada, or the U.K. Collected under **Exhibit I** and **Exhibit B** are a series of e-mails that Patterson Belknap and

Dewey lawyers sent Law Debenture over the years.  These are only examples, but as the Court will note, both firms were extremely conscientious about updating Law Debenture as events unfolded.

        34.     Moreover, this Court will note from the Patterson Belknap and Dewey bills (**Exhibits J and A**) and the Law Debenture records (**Exhibit K**), my colleagues and I regularly spoke with counsel about the Nortel matter.  During these telephone conversations, we would receive updates on the litigation, discuss next steps, and confer with the lawyers about whether to participate in certain activities (*e.g.*, whether to attend a deposition or court hearing in person, by telephone, or not at all).

        35.     The reason for this interaction was so that we could stay informed – and, ultimately, to ensure that Law Debenture, in its role as the Trustee, acted as a prudent person.

        36.     I also requested and received from the lawyers quarterly reports, certain of which are collected under **Exhibit L**.  The purpose of these reports was to keep the Fiduciary Committee of the Board of Directors of Law Debenture informed as to events in the Nortel matter.

        37.     The Fiduciary Committee would review these reports and raise any questions that the members had.

        38.     Based on my almost 44 years working on corporate trust matters, I feel that all of Law Debenture's outside counsel on this matter – Dewey, Patterson Belknap, Morris James LLP, Fasken Martineau DuMoulin LLP, Borden Ladner Gervais LLP and Weir Foulds LLP – were well supervised and otherwise communicated with the Trustee appropriately.

**Work on the Committee**

39.     I understand that the Fee Objectors have taken the position that the Trustee

should not have served on the Committee and/or that even if it was appropriate for the Trustee to

serve on the Committee, it should not have involved its counsel.  In my experience, this is

incorrect.

40.     In my experience, it would not have been prudent for Law Debenture to

decline a seat on the Committee.  At the time of the filing, the Notes were trading at

approximately 8 cents on the dollar and Bank of New York Mellon ("BNYM"), the other

indenture trustee with a claim against the U.S. Debtors, served on the Committee.  For another,

Law Debenture was the only significant creditor of NNCC to seek to serve on the Committee.  I

believed and I still believe that it was beneficial to all of the Noteholders (including the Fee

Objectors) for the Committee to include at least one member with significant claims against

NNCC.  And for the reasons discussed above, no actual beneficial holder appeared willing to

serve.  Finally, Law Debenture's service on the Committee gave it access to the legal and

financial professionals retained by the Committee, whose work on behalf of all creditors was

beneficial to Law Debenture's efforts on behalf of the holders of the Notes (*e.g.*, recovery

projections and other financial analyses).  Without access to the work performed by these parties,

I might have concluded that it was necessary for Law Debenture to hire its own financial advisor,

which would have resulted in a significant additional expense.

41.     But the Fee Objectors could have, had they wished, provided Law

Debenture with a direction letter ordering the Trustee not to participate in Committee meetings

or not to have its lawyers participate.  After all, I understand the fee objectors were aware that

Law Debenture was on the Committee (**Exhibit M**), and, as earlier discussed, Mr. Blauner understood the requirements of a proper direction letter (*see* **Exhibit C** and **Exhibit E**).  Had I received such a direction letter I would have evaluated it and considered it with counsel.  The fact that the Fee Objectors never sent a direction letter regarding Law Debenture's membership on the Committee speaks volumes.

42.     In any event, I participated by telephone or in person in virtually every Committee meeting.  Following the successful conclusion of the Rockstar sale in 2011, 95% or more of Committee time was dedicated to allocating the $7.3 billion in sale proceeds and related issues such as mediation, Court adjudication over post-petition interest on bond claims, preparation for and participation in the allocation trial, reconsideration motions, and the appeal process in both the U.S. and Canada.  Accordingly, in my view and experience, all of the Noteholders, including the Fee Objectors, benefitted directly from Law Debenture's service on the Committee.

**The Allocation Proceedings**

43.     I understand that the Fee Objectors also have objections to fees generated on allocation matters.

44.     On May 17, 2013, this Court entered an Order setting an "Allocation Protocol."  A copy of that Order is attached as **Exhibit N**.

45.     Pursuant to Paragraph 2 of the Allocation Protocol, this Court designated Law Debenture a "Core Party."

46.     As a Core Party, Law Debenture was given the right to participate in all hearings and discovery regarding allocation matters.

11

47.     The Fee Objectors were aware of the Allocation Protocol and that Law
Debenture had been designated a Core Party.  (**Exhibit O**.)

48.     The Fee Objectors had the right to object to the Allocation Protocol.  They
did not.

49.     The Fee Objectors had the right to issue a direction letter telling Law
Debenture not to participate in allocation matters.  They did not.

50.     Instead, the Fee Objectors received briefings from Law Debenture's
counsel (*see, e.g.*, **Exhibit P**); commented on briefs and other court submissions (*see, e.g.*,
**Exhibit Q**); and leaned on Patterson Belknap to remain abreast of key developments in the
process without committing the resources necessary to be a Core Party themselves (the Fee
Objectors did not even retain their own counsel in Canada, relying instead on Law Debenture's
Canadian counsel).

51.     Based on my almost 44 years of experience, I believe the Fee Objectors
and all other holders of the Notes benefitted significantly from Law Debenture's services as a
Core Party.  They did not have to attend the trial each day or participate actively in mediation,
but their interests were well-represented by Law Debenture and its counsel throughout the
process.  Indeed, before professional fees are deducted, the Fee Objectors and the other
Noteholders will receive 100 cents on the dollar with respect to the principal of the Notes.  When
these cases began, their bonds were trading at approximately 8 cents on the dollar and trade
today at approximately 99 cents.  In any event, regardless of the benefit they enjoyed, I believe it
was prudent for Law Debenture to participate actively in a process that would determine the
allocation of sale proceeds and the ultimate recovery enjoyed by the holders of the Notes.  Given

what was at stake, and given the participation of the two other indenture trustees in the allocation trial, I would not have considered it reasonable or prudent to sit on the sidelines while that process played out.

**Review of Fees**

52.    During the entirety of the Nortel case, it was my responsibility to review for reasonableness the legal fees that Law Debenture incurred.

53.    I believe that my day-to-day involvement in this matter, my participation in virtually every Committee meeting and call, and my approximately 44 years in the industry during which I supervised dozens of lawyers and law firms, made me well-suited to this role.

54.    I personally reviewed every time entry on every bill rendered by each of the six law firms that Law Debenture retained:  Dewey (**Exhibit A**); Patterson Belknap (**Exhibit J**); Morris James LLP (**Exhibit R**); Fasken Martineau DuMoulin LLP (**Exhibit S**); Borden Ladner Gervais LLP (**Exhibit T**); and Weir Foulds LLP (**Exhibit U**).  I also believe that the fees incurred by Law Debenture itself were reasonable (**Exhibit V** and **Exhibit K**).

55.    In my judgment, based on my day-to-day management of this litigation, the reports I received from counsel, and my experience, the fees reflected on the bills for the time period from the beginning of this matter through December 5, 2016 that are collected under **Exhibits A**, **J**, **R**, **S**, **T**, **U** and **V** are reasonable.

**The Objections Are Baseless**

56.     As demonstrated above, the Fee Objectors were fully aware that the Trustee was engaged in the activities with respect to which they contend fees should not be paid. Indeed, through their consistent dialog with, and periodic status reports from, Law Debenture and its counsel throughout these cases, they reaped the benefit of those activities.

57.     At all times, the Fee Objectors had the ability to send Law Debenture a direction letter directing Law Debenture to take or not take any action. After it attempted on May 4, 2012 through a deficient direction letter to select counsel for Law Debenture, *see* **Exhibit C**, and after I explained to Mr. Blauner the proper form of a direction letter, *see* **Exhibit E**, the Fee Objectors never again sent Law Debenture a direction letter.

58.     In other words, despite the fact that the Fee Objectors knew through their counsel that Law Debenture (i) sat on the Committee and (ii) had been designated a "Core Party" so was participating in allocation matters, the Fee Objectors never sent a direction letter telling Law Debenture not to participate in such activities or to ask that its counsel not participate.

59.     If the Fee Objectors or any other Noteholder had a question about legal fees, they could have asked Law Debenture for copies of bills, for a budget, or for other information about fees that had been incurred or which were anticipated. The Fee Objectors never requested any such information.

14

60.    This is particularly troubling in light of the fact that Stephen Blauner of Solus was, for 27 years, a member of the Financial Restructuring Group at Milbank, Tweed, Hadley & McCloy LLP.  I would have expected a lawyer who was as experienced and sophisticated as Mr. Blauner to request such information if he was concerned about fees.

Pursuant to 28 U.S.C. § 1746, I state under penalty of perjury that the foregoing is true and correct.  Executed on February 22, 2017

James D. Heaney

15