UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------x  **Chapter 11**
*In re*                                                     :  **Case No. 09-10138 (KG)**
                                                            :  **(Jointly Administered)**
**NORTEL NETWORKS, INC., et al.,**                          :
                                                            :
**Debtors.**[1]                                             :
------------------------------------------------------------x

**AFFIDAVIT OF STEPHEN BLAUNER IN SUPPORT OF OBJECTION OF NNCC NOTEHOLDERS TO ASSERTED FEES AND EXPENSES OF INDENTURE TRUSTEE**

I, Stephen Blauner, being duly sworn, depose and say as follows:

**Background**

1. I am a Managing Director of Solus Alternative Asset Management LP ("Solus"), and its head of restructuring. In that capacity, I am responsible for overseeing all restructurings in which Solus is involved, including the participation of Solus, in its capacity as a holder of the 7.875% Notes issued by NNCC, in the chapter 11 cases of Nortel Networks, Inc. and its affiliated debtors and debtors in possession (the "Chapter 11 Cases").[2] The statements in this affidavit come from my personal knowledge.

2. Prior to joining Solus in 2008, I was a founding partner at Latigo Partners, L.P. Prior to that, I was a partner in the Financial Restructuring Group at Milbank, Tweed, Hadley & M<sup>c</sup>Cloy LLP ("Milbank"), where I practiced for 27 years.

---

[1] The Debtors, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).

[2] Capitalized terms not defined herein have the meanings ascribed to them in the Objection (as defined below).

3. I submit this affidavit in connection with the *Statement Of Solus Alternative Asset Management LP And PointState Capital LP With Respect To (I) First Amended Joint Chapter 11 Plan Of Nortel Networks Inc. And Certain Of Its Affiliated Debtors And (II) Debtors' Motion For Entry Of An Order Pursuant To 11 U.S.C. §§ 105(A) And 363(B) And Federal Rule Of Bankruptcy Procedure 9019 Approving Settlement Agreement And Plan Support Agreement And Objection To Asserted Fees And Expenses Of Indenture Trustee* [ECF No. 17687] and *Reply Of Solus Alternative Asset Management LP And PointState Capital LP With Respect To (I) NNCC Noteholders Statement Concerning Plan And SPSA And Objection To Asserted Fees And Expenses Of Indenture Trustee And (II) Indenture Trustee's Response To Fee Objection* [ECF No. 17747] (collectively, the "Objection").

**Solus' Ownership of the 7.875% Notes**

4. In aggregate, the NNCC Noteholders—Solus and PointState Capital LP—hold approximately 90% of the 7.875% Notes. For the majority of the Chapter 11 Cases, Solus has held approximately 60% of the 7.875% Notes.

5. The NNCC Noteholders are also members of the Bondholder Group represented by Milbank.

**Overview of the Fee Objection**

6. Notwithstanding 38 years in the restructuring business, I have never previously challenged the reasonableness of professional fees. Unfortunately, the Indenture Trustee has not, in my view, fulfilled its duty to holders of the 7.875% Notes to properly manage its lawyers and their fees as a prudent investor. As a consequence, the holders of 7.875% Notes are facing an $8MM+ claim from the Trustee for professional fees that reflect duplication, redundancy, and work that did not directly benefit NNCC or holders of the 7.875% Notes.

2

7. The $8 million that the Indenture Trustee is seeking is not commensurate with or justified by the limited role that the Indenture Trustee played in these cases. Very little of those fees were incurred in advancing the peculiar interests of holders of the 7.875% Notes. Had the Indenture Trustee ever provided Solus with a work plan, a budget, a fee estimate, an interim bill, or any other indication that legal fees might total $8 million, I would have directed them not to incur the vast majority of such fees. Because 90% of the 7.875% Notes were held by two institutions at all relevant times, it was incumbent upon—and would have been easy for—the Indenture Trustee to provide the NNCC Noteholders with such a work plan, budget, fee estimate, or accounting of legal fees incurred.

8. It was only during the summer of 2016 that I learned, through my counsel, that the fees and expenses sought to be charged by the Indenture Trustee might be almost $7MM—an amount that turned out to be understated.

9. In my evaluation of the reasonableness of the disputed fees, the circumstances of the issuer—NNCC—are paramount. NNCC is only a financing vehicle: it has never had operations or physical assets or any type of business. It did not develop any intellectual property. NNCC has two sources of recovery—a (now) undisputed intercompany claim against NNI and the Support Agreement Claim against NNI. The 7.875% Notes also are guaranteed by NNL. Accordingly, apart from the intercompany claim which the Debtors' agreed to allow at the NNCC Noteholders' request, the real disputed issue relevant to the Indenture Trustee (and the holders) has always been the Support Agreement Claim, which provides that NNI is obligated at all times to keep NNCC "solvent" in accordance with GAAP.

10. With respect to the Indenture Trustee's Asserted Fees, to the extent that we have been able to identify legal or administrative work that promoted the interests of holders of the

3

7.875% Notes (as opposed to unsecured creditors generally), the NNCC Noteholders have not objected. For example, we have not objected to time spent by the Indenture Trustee's attorneys communicating with the Indenture Trustee over issues related to the 7.875% Notes, communications with holders of the 7.875% Notes, communications with the Creditors' Committee about issues specific to the 7.875% Notes, drafting motions and other filings on behalf of the 7.875% Notes, and participating in the final mediation of the case.

11.     I do, however, object to the approximately $2.3 million in fees that the Indenture Trustee is requesting in connection with its general role as a member of the Creditors' Committee. Distributions under the Plan to holders of the 7.875% Notes should not be reduced to compensate the Indenture Trustee and its professionals for fees and expenses incurred acting as a fiduciary for all unsecured creditors, especially when the Creditors' Committee's interests were not aligned with, and indeed were often opposed to, the interests of holders of the 7.875% Notes.

12.     Similarly, I object to the more than $1.4 million that the Indenture Trustee's counsel billed for participation in the Allocation Trial. As noted above, NNCC is a "shell" financing SPE with no assets or operations. Not one of the competing allocation methodologies advanced at the Allocation Trial would have yielded any recovery to NNCC or its creditors. It was not prudent for the Indenture Trustee's counsel to participate extensively in all aspects of the allocation litigation, including discovery and trial.

13.     Although entitled to participate in the allocation litigation as a designated "Core Party," I did not reasonably expect or anticipate that the Trustee would spend significantly in excess of a million dollars auditing a trial in which matters specific to NNCC or the 7.875% Notes were not at issue and in which the holders were not themselves a party.

4

14. As for allocations to NNI—our primary source of recovery under the intercompany claim and the Support Agreement—our interests were capably represented by U.S. and Canadian counsel to the Debtors, the Bondholder Committee, and the Creditors' Committee. Those parties had the same objective I did, which was to ensure Lockbox proceeds were appropriately allocated to U.S. entities. Indeed, the NNCC Noteholders agreed to pay their pro rata share of Milbank's fees in these cases precisely because our interests and the interests of the Crossover Bonds (to maximize allocations to NNI) were aligned here.

15. My belief that the Indenture Trustee's fees and expenses are unreasonable is supported by a comparison to the fees requested by the Bank of New York. The Bank of New York acted as trustee for the Crossover Bonds, which had a face amount of $3.5 billion, was also a member of the Creditors' Committee, and was also a Core Party in the allocation litigation. My understanding is that the fees and expenses incurred by Bank of New York in the Chapter 11 Cases and the Canadian Proceedings total approximately $4 million.

16. Similarly, Solus engaged separate counsel in the Chapter 11 Cases to focus on the discrete issues—the Support Agreement, the intercompany loan claim, and post-petition interest—that would affect recoveries of holders of the 7.875% Notes.

### Chapter 11 Cases & Indenture Trustee

17. In 2009, shortly after the Chapter 11 Cases were filed, the Indenture Trustee was appointed to serve as a member of the Creditors' Committee. The NNCC Noteholders did not instruct the Indenture Trustee to serve on the Creditors' Committee.

18. I was aware that the Indenture Trustee sat on the Creditor's Committee. And, of course, we are not objecting to any and all of the Indenture Trustee's fees and expenses with respect to the Creditors' Committee.

5

19. I was not aware, however, that the Indenture Trustee had its own lawyers attending all meetings and calls of the Creditor's Committee. Nor was I aware that legal fees relating to its participation on the Creditors' Committee would amount to nearly $2.3 million dollars. Indeed, given that the Creditor's Committee was represented by Akin Gump and played an active role in the Chapter 11 Cases, I did not anticipate that the Indenture Trustee would have or need separate legal representation with respect to the Creditors' Committee, or that it would not rely on counsel for the Creditors' Committee in connection with discharging its duties to the entire body of unsecured creditors. Nor was I provided a budget, fee summary, estimate, or update with respect to those fees at any time while they were being incurred.

20. Having now reviewed the time records of the Indenture Trustee's lawyers associated with the Indenture Trustee's membership on the Creditor's Committee, the services appear routine and duplicative of services rendered by attorneys for the Creditors' Committee. To the extent that the Indenture Trustee represented the interests of holders of the 7.875% Notes—apart from membership on the Creditor's Committee—we do not question its fees. To the extent that the fees represent the cost of services rendered generally to the entire body of unsecured creditors, it would be unreasonable to charge holders of the 7.875% Notes.

21. Dewey & LeBoeuf LLP ("Dewey") represented the Indenture Trustee in connection with the Chapter 11 Cases from 2009 until shortly before its collapse in 2012.

22. While the Indenture Trustee was represented by Dewey, I had little interaction with either the Trustee or its counsel.

23. In 2011, Solus retained Malek & Schiffrin LLP ("Schiffrin") to act as its counsel in the Chapter 11 Cases. In mid-2014, Solus and Macquarie Capital (USA) Inc. engaged Quinn Emanuel Urquhart & Sullivan, LLP ("Quinn Emanuel") to replace Schiffrin.

6

24. In May 2012, Solus and other holders of the 7.875% Notes—collectively holding a majority—sent a letter to the Indenture Trustee directing it to terminate the engagement of Dewey as its counsel in the Chapter 11 Cases. We further directed the Indenture Trustee to engage Kirkland & Ellis LLP, as counsel, and Schiffrin, as special counsel.

25. Despite the direction letter, and without consulting Solus, the Indenture Trustee replaced Dewey with Patterson Belknap Webb & Tyler LLP ("Patterson") as its counsel.

26. From time-to-time during the Chapter 11 Cases, Patterson communicated with our counsel regarding certain matters in respect of the 7.875% Notes. With respect to these activities, e.g., filing briefs that were reviewed jointly by counsel to the NNCC Noteholders and the Indenture Trustee, attending the final mediation in the Chapter 11 Cases, and arguing a motion for reconsideration of the Allocation Decision, we do not object to the related fees.

**NNCC Noteholders Negotiate Plan Settlement**

27. In the summer of 2016, Solus and PointState, through Quinn Emanuel, began negotiations concerning the treatment of the 7.875% Notes under a chapter 11 plan.

28. During those negotiations, it became known for the first time that the Indenture Trustee intended to assert fees and expenses of $7 million.

29. In July 2016, Solus, through Quinn Emanuel, requested a contact person at Law Debenture to discuss the asserted fees. A name was not provided.

30. The NNCC Noteholders also requested confirmation at that time concerning the amount of the Indenture Trustee's fees.

31. The Indenture Trustee responded to the NNCC Noteholders' request in October 2016 and advised the NNCC Noteholders of the amount of fees it and its professionals had incurred: approximately $7.764 million as of September 30, 2016.

32. The fee reimbursement provisions within the NNCC Plan Settlement are not <u>per se</u> admissions that the $4.25 million reflected a "reasonable" amount of fees. Instead, the $4.25 million was the maximum amount that the NNCC Noteholders were able to negotiate to cover the Indenture Trustee's fees.

Executed in New York, New York on February 22, 2017

_____
Stephen Blauner

Sworn to before me this
22 day of February, 2017

_____
Notary Public

RICHARD T COSGROVE
Notary Public, State of New York
No. 02CO6248091
Qualified in New York County
Commission Expires September 12, 2019