## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| NORTEL NETWORKS INC., *et al.*, | Case No. 09-10138 (KG) |
| Debtors. | (Jointly Administered) |
| | **Re: D.I. 17741, 17942, 17944** |
| | **Hearing Date: February 28, 2017 @ 9:00 a.m.** |

## INDENTURE TRUSTEE DELAWARE TRUST COMPANY'S
## BRIEF IN SUPPORT OF PAYMENT OF FEES AND EXPENSES

PATTERSON BELKNAP WEBB
  & TYLER LLP
Daniel A. Lowenthal
James V. Masella, III
Brian P. Guiney
1133 Avenue of the Americas
New York, NY  10036-6710
Telephone:  (212) 336-2000
Facsimile:  (212) 336-2222
Email:     dalowenthal@pbwt.com
           jmasella@pbwt.com
           bguiney@pbwt.com

MORRIS JAMES LLP
Stephen M. Miller (DE Bar. No. 2610)
Eric J. Monzo (DE Bar No. 5214)
500 Delaware Avenue, Suite 1500
P.O. Box 2306
Wilmington, DE  19899-2306
Telephone:  (302) 888-6800
Facsimile:  (302) 571-1750
Email:     smiller@morrisjames.com
           emonzo@morrisjames.com

*Attorneys for Delaware Trust Company, as Indenture Trustee*

February 24, 2017

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ....................................................................................2

BACKGROUND AND RECENT DEVELOPMENTS ....................................................4

ARGUMENT ...............................................................................................................6

I.    The Indenture and The Trust Indenture Act Require the Trustee to Act as a Prudent Person Following an Event of Default and Ensure Payment of the Reasonable Fees and Expenses it Incurs in the Performance of its Duties. ....................................................6

    A.    The Trustee is Subject to a Prudent Person Standard Following an Event of Default............................................................................................................6

    B.    The Trustee is Entitled to be Paid all of the Reasonable Fees and Expenses that it Incurs in Connection with the Performance of its Duties............................7

II.   The Trustee Acted Prudently Throughout These Cases; the Resulting Fees are Reasonable. ...............................................................................................................9

    A.    Each Firm's Detailed Time Entries Conclusively Establish that the Trustee Acted Prudently and that the Resulting Fees are Reasonable.................................9

    B.    The Reasonableness of the Asserted Fees is Further Bolstered by the Complexity, Difficulty and Duration of these Historic and Unprecedented Cross-Border Insolvency Cases. ..........................................................................10

    C.    The Trustee's Fees are Comparable to the Fees of Another Indenture Trustee and are Negligible Compared to the Fees of Other Stakeholders. .........................12

    D.    The Trustee Was the Only Creditor of NNCC Without a Conflict of Interest and the Only Advocate for the Minority Holders of the 7.875% Notes. ...............14

III.  The Objections to the Asserted Fees Should be Overruled. .............................................15

    A.    The Trustee's Service on the Committee, Which the Fee Objectors Have Known About Since 2009, was Consistent with the Trustee's Duties and Benefitted All Holders of the 7.875% Notes. ........................................................17

        i.    It Was Prudent for the Trustee to Serve on the Committee and Doing So Benefitted All Holders of the 7.875% Notes. ........................................19

        ii.    The Trustee Is Entitled to Rely on the Advice of Counsel of its Choosing. ..........................................................................................20

        iii.    It is Common Practice in Most Large Chapter 11 Cases for Indenture Trustees to Serve on the Creditors' Committee. ........................................21

        iv.    Worldwide Direct Does Not Support the Fee Objectors' Position. ...........22

    B.    The Trustee's Designation as a Core Party to the Allocation Trial, Which the Fee Objectors Have Known About Since 2013, was Consistent with the Trustee's Duties and Benefitted All Holders of the 7.875% Notes. ......................25

# TABLE OF CONTENTS
## (continued)

Page

C.  The Fee Objectors' Remaining Objections Are Also Baseless. ...........................28

    i.  Billing and Invoices ..................................................................................28

    ii.  Duplication.................................................................................................29

    iii.  Transition Time.........................................................................................29

D.  The Fee Objectors' Assertion that the Trustee Failed to Supervise its Professionals is Thoroughly Controverted by the Evidence.................................29

IV.  The Fee Objectors' Conduct Underscores the Reasonableness of the Asserted Fees. .......31

A.  *Worldwide Direct* Does not Require the Court to Blind Itself to the Fee Objectors' Conduct Throughout these Cases.........................................................31

B.  The Fee Objectors are Highly Sophisticated and Experienced Investors with Highly Sophisticated and Experienced Counsel that Solicited and Demanded – then Benefitted from – the Trustee's Active Involvement in these Cases.............32

V.  The Fees and Expenses Incurred by the Trustee in Connection with this Fee Dispute are Compensable Under the Indenture.............................................................................35

CONCLUSION.....................................................................................................................36

## TABLE OF AUTHORITIES

**Cases**

*Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany*,
522 F.3d 182 (2d Cir. 2007) ............................................................................. 8, 11, 13

*Baker Botts LLP v. Asarco LLC*,
135 S.Ct. 2158 (2015) ........................................................................................... 35

*Bankers Fed. Sav. Bank FSB v. Off W. Broadway Developers*,
638 N.Y.S.2d 72 (App. Div. 1996) ................................................................... 8, 9, 11

*Evans v. Port. Auth. of N.Y. & N.J.*,
273 F.3d 346 (3d Cir. 2001) ............................................................................... 7, 16

*Ivanhoe Building & Loan Association of Newark v. Orr*,
295 U.S. 243 (1935) ................................................................................................ 26

*LNC Invs., Inc. v. First Fid. Bank, N.A.*,
1997 U.S. Dist. LEXIS 12858 (S.D.N.Y. Aug. 27, 1997) ...................................... 6

*Small v. New York City Transit Auth.*,
2014 U.S. Dist. LEXIS 39582 (E.D.N.Y. Mar. 25, 2014) ................................ 7, 8, 9

*In re Sonnax Indus., Inc.*,
907 F.2d 1280 (2d Cir. 1990) ................................................................................. 25

*Stark v. United States Trust Co.*,
445 F. Supp. 670 (S.D.N.Y. 1978) ..................................................................... 6, 10

*In re THCR/LP Corp.*,
2008 Bankr. LEXIS 2141 (Bankr. D.N.J. Aug. 1, 2008) ........................................ 9

*UAW Local 259 Soc. Sec. Dep't v. Metro Auto Ctr.*,
501 F.3d 283 (3d Cir. 2007) ............................................................................. 7, 9, 16

*In re Worldwide Direct, Inc.*,
334 B.R. 112 (Bankr. D. Del. 2005) ............................................................... *passim*

**Statutes**

11 U.S.C. § 330(a) .................................................................................................... 35

11 U.S.C. § 330(a)(3)(A)-(F) ..................................................................................... 9

15 U.S.C. §77ooo(c) .................................................................................................. 6

Trust Indenture Act ............................................................................................ *passim*

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

**Other Authorities**

Fed. R. Bankr. P. 8002(a)(1)...........................................................................................................25

N.Y. C.P.L.R. §§5001, 5004...........................................................................................................14

9588889v.2

Delaware Trust Company ("Delaware Trust")[1] by and through its undersigned attorneys, hereby submits this brief (this "Supplemental Brief") in connection with the dispute between Delaware Trust, on the one hand, and Solus Alternative Asset Management LP and PointState Capital LP (together, the "Fee Objectors"), on the other, regarding the fees incurred by the Trustee in connection with these bankruptcy cases.  This Supplemental Brief supplements and expands upon the arguments set forth in *Indenture Trustee Delaware Trust Company's (A) Response to Statement of Solus Alternative Asset Management LP and PointState Capital LP with Respect to (I) First Amended Joint Chapter 11 Plan of Nortel Networks Inc. and Certain of Its Affiliated Debtors and (II) Debtors' Motion for Entry of An Order Pursuant to 11 U.S.C. §§ 105(a) and 363(b) and Federal Rule of Bankruptcy Procedure 9019 Approving Settlement Agreement and Plan Support Agreement and Objection to Asserted Fees and Expenses of Indenture Trustee and (B) Joinder and Reservation of Rights*, dated January 19, 2017 [D.I. 17741] (the "Trustee's Confirmation Response"), which was submitted in advance of the Confirmation Hearing and in response to the Fee Objectors' objection to the Asserted Fees.[2]

---

[1] On December 6, 2016, Delaware Trust succeeded to Law Debenture Trust Company of New York ("Law Debenture") as indenture trustee under the Indenture.  Accordingly, "Trustee" is used to refer to Law Debenture for the period before December 6, 2016 and to refer to Delaware Trust for the period from and after December 6, 2016.

[2] *See Statement of Solus Alternative Asset Management LP and PointState Capital LP with Respect to (I) First Amended Joint Chapter 11 Plan of Nortel Networks Inc. and Certain of its Affiliated Debtors and (II) Debtors' Motion for Entry of an Order Pursuant to 11 U.S.C. §§ 105(a) and 363(b) and Federal Rule of Bankruptcy Procedure 9019 Approving Settlement Agreement and Plan Support Agreement and Objection to Asserted Fees and Expenses of Indenture Trustee*, dated January 9, 2017 (the "Confirmation Objection") [D.I. No. 17687].  Capitalized terms used in this Supplemental Brief but not defined have the meanings given to them in the Trustee's Confirmation Response.

## PRELIMINARY STATEMENT

This dispute hinges almost exclusively on two questions: was it prudent for the Trustee to serve on the Committee and participate in the Allocation Trial?  And, if so, were the resulting fees reasonable?[3]  The answer to both questions is yes.  The obligations placed on the Trustee by the Indenture and other applicable law; the tests that previous courts have developed for measuring what is prudent and reasonable; the complexity and duration of these cases; the frequency with which indenture trustees serve on creditors' committees in other large bankruptcy cases; this Court's Order designating the Trustee as a "Core Party" to the Allocation Trial; and the Fee Objectors' regular and active solicitation of the Trustee's input and assistance throughout these cases without ever voicing any concern whatsoever with the associated legal fees, all compel the conclusion that it was prudent for the Trustee to serve on the Committee and participate in the Allocation Trial, and that the resulting fees are reasonable.

The applicable legal standard is not in dispute.  The Indenture and the Trust Indenture Act require the Trustee to act as a prudent person following an event of default and ensure payment of the reasonable fees it incurs in the performance of those duties.  *See* Section I.  Prudence and reasonableness are evaluated based upon the particular facts and circumstances of the case. As explained in Section II, the evidence before the Court conclusively demonstrates that the Trustee acted prudently by making the sensible choice to serve on the Committee and participate in the Allocation Trial to protect and maximize the value of a claim worth potentially in excess of $300 million (inclusive of principal, interest, and other claims).  The Trustee has more than satisfied its burden to show that the resulting fees are reasonable, especially in light of the unique

---

[3] The Fee Objectors object to approximately $4.36 million of the fees incurred by the Trustee and its professionals through December 31, 2016.  But more than $4 million of that amount – about 93% of the total – is attributable to time the Fee Objectors' assert was incurred in connection with the Trustee's service on the Committee and work in the allocation dispute (including its participation as a Core Party to the Allocation Trial).

2

features of the 7.875% Notes and the circumstances of the Debtors' historic, complex, conten-

tious and lengthy cross-border cases.

The Fee Objectors cannot satisfy their burden to demonstrate that the fees are unreasona-

ble by their mere generalized objections to all fees incurred by the Trustee in connection with the

Allocation Trial and the Trustee's service on the Committee.  This is insufficient as a matter of

law to overcome the *prima facie* showing of reasonableness that the Trustee has made.  Moreo-

ver, as explained in Section III, the Trustee's decision to serve on the Committee and participate

in the Allocation Trial was not only prudent (which is all that the law requires), it also conferred

a significant *benefit* on the Fee Objectors.  The Fee Objectors' knowing acceptance of that bene-

fit, and their frequent requests and demands of the Trustee throughout these cases, are additional

factors that this Court should take into account when considering the merits of their objections to

the Asserted Fees.  *See* Section IV.

Finally, as explained in Section V, the Indenture provides the Trustee with a complete in-

demnity for any costs it incurs defending itself against a claim in connection with the perfor-

mance of its duties.  The Trustee is entitled to satisfy any indemnification claim by exercising its

charging lien.  Accordingly, the fees that the Trustee has incurred defending itself against the Fee

Objectors' objection are also compensable under the terms of the Indenture.

3

## BACKGROUND AND RECENT DEVELOPMENTS

The Trustee respectfully refers the Court to the Trustee's Confirmation Response for detailed background information about the Debtors, the Bankruptcy Cases, the 7.875% Notes and this fee dispute.[4]

On January 24, 2017, the Court held a hearing to consider confirmation of the Debtors' Plan and also began to address the instant dispute. The Court heard from the Trustee and the Fee Objectors again by telephonic hearing on January 25 and then, on January 26, issued two orders pertaining to the dispute: the first established deadlines for discovery, the submission of briefing, and scheduled a hearing on the fee dispute; the second referred the fee dispute to mediation.[5]

The Scheduling Order required the Fee Objectors to "identify the Indenture Trustee's time entries to which they object on or before February 3, 2017." On that date, the Trustee received a letter from the Fee Objectors' counsel (the "Fee Objectors' Letter") listing five categories of objections (time spent in connection with service on the Committee; time spent on allocation issues; duplicative time entries; time spent on billing; and transition time associated with the retention of new counsel in 2012) as well as copies of the invoices of Law Debenture and three of the law firms that have performed work in these cases, all of which were highlighted with one of five different colors to correspond to the five different objections. But this exercise did little to provide any additional clarity or nuance to the Fee Objectors' objections. Instead, the Fee Objectors simply highlighted every single time entry that could conceivably relate to the Trustee's service on the Committee or allocation issues. Of the $4,361,402.18 in fees that the Fee

---

[4] A table summarizing the fees and expenses of the Trustee and its professionals through January 31, 2017, which total $8,167,568.19 after certain voluntary reductions described below, is attached as Exhibit 1 to this Supplemental Brief.

[5] *See Order Regarding Hearing on Fee Objection*, dated January 26, 2017 [D.I. 17805] (the "Scheduling Order") and *Order Appointing Mediator Judge Joseph J. Farnan*, dated January 26, 2017 [D.I. 17809]. On February 6, the Fee Objectors and the Trustee participated in a day-long mediation before the Honorable Joseph J. Farnan (Ret.), but the mediation did not result in a settlement.

9588889v.2

Objectors have objected to, $4,069,784.12 – more than 93% of the total – fall into one of the first two categories (*i.e.*, Committee time and allocation).[6]  This merely confirms what the Court and the Trustee already knew:  the Fee Objectors do not believe that the Trustee or its professionals are entitled to be paid anything at all in connection with the Trustee's service on the Committee or the work the Trustee performed as a Core Party to the Allocation Trial.  For the reasons set forth below, the Fee Objectors' contention is at odds with the facts and the law.[7]

The record before the Court – including the Affidavit of James D. Heaney [D.I. 17944] (the "Heaney Aff."), the Affidavit of Sandra E. Horwitz [D.I. 17942] (the "Horwitz Aff."), and the correspondence between the Trustee and the Fee Objectors – is now fully developed and bolsters the position advanced by the Trustee at the confirmation hearing:  it acted prudently, in accordance with the Indenture, and in the best interests of all of the holders of the 7.875% Notes at all times.  The resulting fees are reasonable and compensable.

---

[6] The Fee Objectors do not object to any of the expenses incurred by the Trustee or its professionals.

[7] A copy of the Fee Objectors' Letter is attached as Exhibit A to the *Affidavit of Eric J. Monzo*, dated February 24, 2017 ("Monzo Aff."), which affidavit is being filed contemporaneously with this Supplemental Brief.

## ARGUMENT

I.    **The Indenture and The Trust Indenture Act Require the Trustee to Act as a Prudent Person Following an Event of Default and Ensure Payment of the Reasonable Fees and Expenses it Incurs in the Performance of its Duties.**

A.    **The Trustee is Subject to a Prudent Person Standard Following an Event of Default.**

Section 601 of the Indenture requires that, upon an event of default (such as the commencement of the Debtors' bankruptcy cases), "the Trustee shall exercise such of the rights and powers vested in it by this Indenture, and use the same degree of care and skill in their exercise, as a prudent person would exercise or use under the circumstances in the conduct of his own affairs." In order to assist the Trustee in the performance of these duties, Section 602 of the Indenture provides that it "may act through agents or attorneys," and "may consult with counsel of its selection." Indenture, § 602. This contractual obligation is also codified in Federal law.[8]

The Trustee's prudence is not evaluated in hindsight. Instead, New York courts have made clear that "a trustee is to be judged by the facts as they existed at the time the trustee acted, and will not be liable for choosing a prudent course of action so long as the choice was the result of an informed judgment." *LNC Invs., Inc. v. First Fid. Bank, N.A.*, 1997 U.S. Dist. LEXIS 12858, *53-54 (S.D.N.Y. Aug. 27, 1997). And, "unless prudence dictated only one course of action, a trustee will not be liable for choosing between two prudent courses so long as an overall and knowledgeable judgment was brought to bear and the trustee's conduct under all the circumstances was prudent." *Id.* at *53 (citing *Stark v. United States Trust Co.*, 445 F. Supp. 670, 681 (S.D.N.Y. 1978) (internal quotations omitted)).

The invoices of the Trustee and its professionals, the Heaney Affidavit, the Horwitz Affi-

---

[8] *See* 15 U.S.C. §77ooo(c) ("Trust Indenture Act") ("The indenture trustee shall exercise in case of default (as such term is defined in such indenture) such of the rights and powers vested in it by such indenture, and to use the same degree of care and skill in their exercise, as a prudent man would exercise or use under the circumstances in the conduct of his own affairs.").

davit, the correspondence between the Trustee and the Fee Objectors, and this Supplemental

Brief prove that the Trustee acted prudently at all times during these cases.

> **B.**   **The Trustee is Entitled to be Paid all of the Reasonable Fees and Expenses that it Incurs in Connection with the Performance of its Duties.**

To compensate the Trustee for the performance of its duties under the Indenture, the issu-

er of the 7.875% Notes (NNCC) is required to pay all of the "reasonable and documented ex-

penses . . . including the reasonable and documented compensation, expenses and disbursements

of its agents and counsel." Indenture, § 606(c). But defaulting issuers often lack sufficient li-

quidity to pay the fees and expenses incurred by an indenture trustee following an event of de-

fault. To secure the issuer's payment obligation, the Indenture gives the Trustee the rights of a

secured creditor with respect to any distribution it receives for the benefit of the holders of the

7.875% Notes. *See* Indenture, § 606(d) ("the Trustee shall have a lien prior to Debt Securities on

all money or property held or collected by the Trustee").

The Fee Objectors do not dispute any of this. Instead, they have alleged that the Asserted

Fees are not reasonable and, therefore, are not entitled to be paid pursuant to the terms of the

Indenture. The Fee Objectors are wrong.

Federal courts employ the lodestar method to determine "a presumptively reasonable

fee," which is "the number of hours reasonably expended on the litigation multiplied by a rea-

sonable hourly rate." *Small v. New York City Transit Auth.*, 2014 U.S. Dist. LEXIS 39582, *10

(E.D.N.Y. Mar. 25, 2014); *see also UAW Local 259 Soc. Sec. Dep't v. Metro Auto Ctr.*, 501 F.3d

283, 290 (3d Cir. 2007). Reasonable hourly rates are based on "rates prevailing in the communi-

ty for similar services of lawyers of reasonably comparable skill, experience, and reputa-

tion." *Small*, 2014 U.S. Dist. LEXIS 39582 at *11 (citing *Cruz v. Local Union No. 3 of IBEW*,

34 F.3d 1148, 1159 (2d Cir. 1994)); *see also Evans v. Port. Auth. of N.Y. & N.J.*, 273 F.3d 346,

7

360-61 (3d Cir. 2001).  The range of reasonable attorney rates depends on "the type of case, the nature of the litigation, the size of the firm, and the expertise of its attorneys." *Small*, 2014 U.S. Dist. LEXIS at *12.  Attorneys should be compensated "at hourly rates in line with the prevailing rates in [the] district. " *Id.* at *18.[9]

Courts look at case-specific factors to help determine the reasonableness of the hourly rates and the number of hours expended.  These factors include, but are not limited to:  "the complexity and difficulty of the case, the available expertise and capacity of the client's other counsel (if any), the resources required to prosecute the case effectively (taking account of the resources being marshaled on the other side but not endorsing scorched earth tactics), [and] the timing demands of the case." *Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany*, 522 F.3d 182, 184 (2d Cir. 2007).

New York state courts[10] also follow the lodestar method, and consider the following factors to determine whether an attorney's fees are reasonable: "the difficulty of the issues and the skill required to resolve them; the lawyers' experience, ability and reputation; the time and labor required; the amount involved and benefit resulting to the client from the services; the customary fee charged for similar services; the contingency or certainty of compensation; [and] the results obtained and the responsibility involved." *Bankers Fed. Sav. Bank FSB v. Off W. Broadway De-*

---

[9] The Fee Objectors do not argue at any point that the hourly rates charged by the Trustee and its professionals are not reasonable.  They could not plausibly do so, because the rates charged by the Trustee and each of its professionals (as reflected on the invoices submitted to the Court) are comparable to or lower than the prevailing rates in the marketplace and in these cases.  *See, e.g.*, *Thirty-First Quarterly Fee Application Request Of Cleary Gottlieb Steen & Hamilton LLP, As Attorneys For Debtors And Debtors-In-Possession, for the period August 1, 2016 to October 31, 2016*, November 29, 2016 [D.I. 17461]; *Ninety-Second Monthly Application of Akin Gump Struass Hauer & Feld LLP, Co-Counsel for the Official Committee of Unsecured Creditors, for Interim Allowance of Compensation and for the Reimbursement of Expenses for Services Rendered for the period September 1, 2016 to September 30, 2016*, November 4, 2016 [D.I. 17345]; *Ninety-Fourth Interim Application Of Morris, Nichols, Arsht & Tunnell LLP, As Delaware And General Bankruptcy Counsel To Debtors And Debtors-In-Possession, For Allowance Of Interim Compensation And For Interim Reimbursement Of All Actual And Necessary Expenses Incurred for the period October 1, 2016 to October 31, 2016*, November 16, 2016 [D.I. 17405].

[10] The Indenture is governed by New York law.  Indenture, § 112.

*velopers*, 638 N.Y.S.2d 72, 74 (App. Div. 1996).  Finally, while the Trustee is not an estate professional subject to the type of fee review typically conducted by a Bankruptcy Court, the standards for determining reasonableness of fees under the Bankruptcy Code is similar to the standard used in other federal and state cases.[11]

## II.    The Trustee Acted Prudently Throughout These Cases; the Resulting Fees are Reasonable.

### A.    Each Firm's Detailed Time Entries Conclusively Establish that the Trustee Acted Prudently and that the Resulting Fees are Reasonable.

A party seeking attorneys' fees bears the burden of supporting its claim by detailed contemporaneous time records.  *Small*, 2014 U.S. Dist. LEXIS 39582 at *11; *UAW Local 259*, 501 F.3d at 291.  *See also Bankers Fed. Sav. Bank FSB,* 638 N.Y.S. 2d  at 74 (the party seeking fees must provide a "proper and sufficient affidavit of services").  The detailed day-note entries of the Trustee and each of its professionals offer a comprehensive accounting – a daily journal – of the work performed by the Trustee and its professionals.  Those invoices, together with the Heaney Affidavit, the Horwitz Affidavit, and the other record evidence before the Court, amply demonstrate the Trustee's prudent approach to these cases and the reasonableness of the resulting fees. Among other things:

- The Trustee's counsel reviewed pleadings in the United States and Canada, remained abreast of developments in these cases, monitored key issues, and provided regular updates to the Trustee (including detailed updates on a quarterly basis).

- The Trustee was appointed to the Committee and, for the duration of these cases, represented the interests of all holders of the 7.875% Notes on the Committee.

- The Trustee's professionals researched and developed considerable expertise regarding the Support Agreement, the no-call and the other unique features of the 7.875% Notes (an expertise that the Fee Objectors drew upon for years and when

---

[11] 11 U.S.C. § 330(a)(3)(A)-(F).  *See also In re THCR/LP Corp.*, 2008 Bankr. LEXIS 2141, *20-21 (Bankr. D.N.J.  Aug. 1, 2008) (citing *In re Busy Beaver Bldg. Centers, Inc.*, 19 F.3d 833, 856 (3d Cir. 1994)) ("To determine whether such compensation is 'reasonable,' consideration of the first two factors listed under section 330(a)(3), the time spent and the rate charged, or 'lodestar,' is ordinarily presumed to be a reasonable fee.").

they settled their claims in the summer of 2016).

- The Trustee filed proofs of claim in the United States and Canada, amended those claims to ensure that the holders of the 7.875% Notes would be entitled to receive all of the benefits associated with the 7.875% Notes, and defended the claims against an objection to the payment of post-petition interest filed by Wilmington Trust Company ("Wilmington Trust").

- The Trustee, with other stakeholders, successfully opposed the Monitor's request that this Court issue an advisory opinion regarding post-petition interest, and actively opposed the Monitor's position regarding post-filing interest before the Canadian Court and the Court of Appeal for Ontario.

- The Trustee, like the other two indenture trustees in these cases, participated in four rounds of formal mediation in the United States and Canada.

- The Trustee, like the other two indenture trustees in these cases, was designated by this Court as one of the "Core Parties" to the year-long Allocation Trial, participating in discovery, pre-trial briefing, the trial itself in the United States and Canada, and post-trial briefing.

- The Trustee was the only party that prosecuted successful motions for reconsideration of the allocation decisions in the United States and Canada and, after extensive post-trial consultation with the Fee Objectors' counsel, actively monitored the appeals of the allocation decisions in the United States and Canada and participated in the appellate briefing with respect to the allocation appeal.

- The Trustee negotiated provisions of the Plan and Disclosure Statement, with particular attention to the voting and distribution mechanics, to ensure that all holders of the 7.875% Notes receive their distributions without complication or unnecessary delay.

Under the circumstances, the Trustee's work was judicious, sensible and prudent; there can be no doubt that it brought "overall and knowledgeable judgment" to bear.  *Stark v. United States Trust Co.*, 445 F. Supp. at 681.  In fact, had the Trustee neglected to do any of the foregoing, other holders of the 7.875% Notes may have complained that it failed to act prudently.

**B.     The Reasonableness of the Asserted Fees is Further Bolstered by the Complexity, Difficulty and Duration of these Historic and Unprecedented Cross-Border Insolvency Cases.**

The Court should also consider the "complexity and difficulty of the case" as well as "the difficulty of the issues and the skill required to resolve them" when considering whether the As-

serted Fees are reasonable. *Arbor Hill*, 522 F.3d at 184; *Bankers Fed. Sav. Bank FSB*, 638 N.Y.S.2d at 74. These factors overwhelmingly favor approval of all of the Trustee's fees. The duration, complexity and contentiousness of the Nortel bankruptcy cases may be without equal. After a lengthy mediation failed to achieve a resolution in 2013, Justice Winkler called it "one of the most complex transnational legal proceedings in history."[12] And this Court has characterized the dispute at the heart of this bankruptcy case – the allocation dispute – as "unprecedented, complex and massive."[13] It is also "one of the most expensive on record."[14]

In addition to navigating this complicated case, the Trustee was also required to master an atypical debt security. As explained in detail in the Trustee's Confirmation Response (¶¶ 11-13), the 7.875% Notes are unique; the claims associated with these notes go beyond just principal and interest. Holders of 7.875% Notes have the benefit of the Support Agreement, which unlocks claims for principal, prepetition interest, and post-petition interest at the contract rate. In addition, a no-call provision prohibits repayment of the 7.875% Notes before maturity, which gives rise to a claim for damages. Finally, while the "crossover bonds" were issued by a Canadian Debtor and guaranteed by a U.S. Debtor, the 7.875% Notes were issued by a U.S. Debtor and guaranteed by a Canadian Debtor. The Trustee has argued for years that the 7.875% Notes are different from the other crossover bonds and has advocated to maximize the value of its claim on account of these notes. This divergence of interest between the Trustee and the Ad Hoc Group meant that the Trustee was not always aligned with those holders, or the Debtors and the Committee. This required the utmost vigilance on the part of the Trustee.

---

[12] *See* Monzo Aff., Exh. B ("Nortel cleared to end bankruptcy, distribute $7 billion to creditors," Reuters, January 24, 2017. http://www.reuters.com/article/us-nortelnetworks-bankruptcy-idUSKBN1582TO).

[13] *See Allocation Trial Opinion* [D.I. 15544], May 12, 2015, at 98.

[14] *See* Monzo Aff., Exh. C ("Nortel Networks Wins Approval to Distribute $7.3 Billion to Creditors," WALL STREET JOURNAL, January 25, 2017. https://www.wsj.com/articles/nortel-networks-wins-approval-to-distribute-7-3-billion-to-creditors-1485296882).

### C.    The Trustee's Fees are Comparable to the Fees of Another Indenture Trustee and are Negligible Compared to the Fees of Other Stakeholders.

In correspondence with the Trustee and in their original objection to the Asserted Fees, the Fee Objectors have seized upon the fees of The Bank of New York Mellon ("BNYM") as allegedly dispositive evidence that the Trustee's fees are not reasonable.[15]  The Trustee addressed this objection in the Trustee's Confirmation Response and disputes that the magnitude of the Asserted Fees relative to the fees of just one other party is probative of reasonableness.  *See* Trustee's Confirmation Response, ¶¶25-27.  The comparison to BNYM is particularly inapt because BNYM was aligned on all significant issues in these cases with the Ad Hoc Group.  By contrast, the Trustee had to devote a significant amount of attention to the unique features of the 7.875% Notes (*i.e.*, the Support Agreement, the no-call, etc.).  So while the Trustee often had to "go it alone," BNYM had the support of an Ad Hoc Group that has incurred in excess of $95 million in professional fees as of December 2015.[16]

The Fee Objectors also ignore the fees incurred by another indenture trustee, Wilmington Trust, which were approved by the Canadian Court in the amount of US $7.15 million.[17]  Like the Trustee, Wilmington Trust is the indenture trustee for public debt (although Wilmington Trust only had claims against the Canadian Debtors; the Trustee had claims in the U.S. and Canada).  Like the Trustee, Wilmington Trust has been subject to a prudent person standard throughout these cases.  And like the Trustee, Wilmington Trust has been engaged in all key aspects of these cases, including mediations and as a Core Party to the Allocation Trial.  If comparisons between indenture trustees are in order, then this confirms that the Trustee's fees are reasonable.

---

[15] Fee Objectors' Confirmation Objection, ¶ 17 ("The Asserted Fees are unreasonable and constitute . . . twice the amount asserted by the indenture trustee for the Crossover Bonds – The Bank of New York.").

[16] *See* Monzo Aff., Ex. D (132nd Report of the Monitor (November 16, 2016), ¶ 44, n. 6 ("Monitor's Report")).

[17] *See* Monzo Aff., Ex. E (January 12, 2017 Order of Justice Newbould approving the 1988 Bond Claims in the Canadian Debtors' cases).

Finally, the Court should take into consideration "the resources being marshaled on the other side" in its assessment of the reasonableness of the Asserted Fees. *Arbor Hill*, 522 F.3d at 184. The total professional fees in these cases exceed $2 billion. In order to enforce the rights of the holders of the 7.875% Notes – and help obtain the par recovery that the Fee Objectors are poised to receive from the U.S. and Canadian Debtors – the Trustee negotiated with and against stakeholders with armies of professionals and resources far in excess of what was available to the Trustee. Compared to the fees of those parties, the Trustee's fees are miniscule.

**Figure 1**. *Fees and Expenses of Certain Constituencies in Nortel Bankruptcy Cases.*[18]



When considered in their proper context – compared not only to the fees of both of the other indenture trustees but also compared to the other parties in interest in these cases – the Asserted Fees are entirely reasonable.

Finally, while estate professionals have generally been paid on a current basis during

---

[18] All data is from the Monitor's Report, except: (1) the fees and expenses of the Trustee have been supplied from internal records; (2) the fees and expenses of Wilmington Trust are based on the amount approved by the Canadian Court, and (3) the amount of the fees and expenses of BNYM are taken from the Disclosure Statement.

13

these cases (subject to a holdback), the Trustee and its professionals have not been paid anything for their work over the last eight years.  They have carried the entire balance of their fees, without interest, from the Petition Date.  The Trustee calculates that this interest-free loan is worth at least $2.5 million.  See N.Y. C.P.L.R. §§5001, 5004 (providing for prejudgment interest at 9% per annum).  This is another factor the Court can consider in assessing the reasonableness of the Asserted Fees

      **D.**      **The Trustee Was the Only Creditor of NNCC Without a Conflict of Interest and the Only Advocate for the Minority Holders of the 7.875% Notes.**

The extensive coordination between the Trustee and the Fee Objectors reflects the Trustee's recognition of the prudence of working with and being responsive to majority holders.  But it was also necessary and prudent for the Trustee to remain independent of the Fee Objectors and make its own determinations with respect to the enforcement of its claim.  <u>First</u>, the Trustee's duties under the Indenture are to <u>all</u> holders of the 7.875% Notes, including the minority that is not held by the Fee Objectors.  The Trustee could not stand down and ignore its obligations to the other noteholders merely because most of the notes were held by two investors.  <u>Second</u>, the Fee Objectors did not become restricted until very late in the case.  Until then, they could have sold out of their position in the notes at any time.  If the Trustee had abdicated its duties under the Indenture to the then-current majority of holders, subsequent holders of the 7.875% Notes might have had a basis to challenge the Trustee's prudence.[19]

<u>Finally</u>, and most importantly, the Fee Objectors hold multiple claims against the Debtors, not just 7.875% Notes.  Solus holds more than $20 million of trade claims against NNI (and, at other times during these cases, has held $28 million of other crossover bonds, too).  PointState

---

[19] As long as they remained holders of the 7.875% Notes, the Fee Objectors had all the rights given to holders under the Indenture, including the right to give a direction letter to the Trustee backed by an indemnity.  They never did.

holds more than $100 million of other crossover bonds and $10 million of the Canada-only bonds.[20]  This is not uncommon; distressed debt investors often take multiple positions in a debtor's capital structure in order to mitigate risk and/or to obtain a favorable *overall* return.  The Trustee had an obligation to act prudently on behalf of all holders of the 7.875% Notes.  It was the only "pure" creditor of NNCC and it acted accordingly.

## III.    The Objections to the Asserted Fees Should be Overruled.

The Fee Objectors have objected to a total of $4,361,402.18 of the Trustee's fees, which they have placed in five different categories.  But the overwhelming majority of this amount – $4,069,784.12 – is attributable to time the Fee Objectors' assert was spent in connection with the Trustee's service on the Committee or allocation issues.  The objections apply to the following four firms[21]:

- Law Debenture was the Trustee from the inception of these cases until December 2016.  Law Debenture's fees and expenses on this matter total $381,702.12.  The Fee Objectors have objected to $253,324.17 of those fees.

- Law Debenture retained Dewey & LeBoeuf LLP ("Dewey") as its lead bankruptcy counsel on or about the Petition Date.  Dewey's fees and expenses on this matter total $2,744,022.02.  The Fee Objectors have objected to $1,896,670 of those fees.

- Law Debenture retained Patterson Belknap to replace Dewey as its lead bankruptcy counsel in May 2012.[22]  Patterson Belknap's fees and expenses on this matter total  $4,187,143.82.  The Fee Objectors have objected to $2,023,479.50 of those

---

[20] *See Fifth Supplemental Verified Statement of Milbank, Tweed, Hadley & McCloy LLP and Pachulski Stang Ziehl & Jones LLP, Pursuant to Bankruptcy Rule 2019 Filed by Ad Hoc Group of Bondholders*, June 15, 2016 [D.I. 16919]; *Supplemental Verified Statement of Milbank, Tweed, Hadley & McCloy LLP and Pachulski Stang Ziehl & Jones LLP, Pursuant to Bankruptcy Rule 2019*, June 26, 2013 [D.I. 11035; *Second Supplemental Verified Statement of Milbank, Tweed, Hadley & McCloy LLP and Pachulski Stang Ziehl & Jones LLP, Pursuant to Bankruptcy Rule 2019*, March 11, 2014 [D.I. 13142]

[21] Morris James LLP has acted as the Trustee's Delaware counsel since May 2012.  Delaware Trust has been the Trustee since December 6, 2016.  The Fee Objectors do not object to any of the fees or expenses incurred by Morris James LLP or Delaware Trust.  Accordingly, the Trustee respectfully requests that the Court approve these firms' fees and expenses in full.

[22] Delaware Trust engaged Patterson Belknap to remain in this role when it succeeded Law Debenture as Trustee in December 2016.

fees.

- Borden Ladner Gervais LLP ("BLG") served as the Trustee's Canadian counsel from September 17, 2012 to August 19, 2016.  BLG's fees and expenses on this matter total CAD 692,371.86.  The Fee Objectors have objected to CAD 244,063.00 of those fees.

For the reasons described below, these objections are without merit and are insufficient as a matter of law to overcome the *prima facie* showing of reasonableness that the Trustee has made.

A party challenging attorneys' fees "cannot merely allege in general terms that the time spent was excessive."  *UAW Local 259*, 501 F.3d at 291.  "Once the plaintiff has made the *prima facie* showing with respect to the appropriate hourly rate, that rate may be contested, but only with appropriate record evidence.  In the absence of such evidence, the plaintiff must be awarded attorneys' fees at her requested rate."  *Evans*, 273 F.3d at 361.  For this reason, the Trustee requested and the Court ordered the Fee Objectors to identify the specific "time entries to which they object."[23]

As noted above, the Fee Objectors' Letter purported to identify specific time entries to which the Fee Objectors object.  But this exercise hardly reflects a thoughtful and detailed analysis of the invoices.  Instead, the Fee Objectors devised five broad and overlapping categories of time entries to which they object and then simply highlighted as many entries as they could possibly shoehorn in to one or more of these categories (with overwhelming focus on Committee service and allocation issues).  As detailed below, their objections do not withstand scrutiny.[24]

The Fee Objectors identified and objected to virtually all of the fees associated with the Trustee's participation in the Allocation Trial and the fees associated with the Trustee's service

---

[23] Scheduling Order, ¶ 1.  *See also* Monzo Aff., Ex. F (Transcript of January 25, 2017 Hearing at 10 ("THE COURT: I agree with that, Mr. Lowenthal.  I do think that the objectors have to identify by entry, what time records they think are unreasonable.")).

[24] A table summarizing the Fee Objectors' objections to the Trustee's fees and the Trustee's responses to those objections is attached as Exhibit 2 to this Supplemental Brief.

16

on the Committee (and many more that the Fee Objectors incorrectly assert relate to the Trustee's service on the Committee).  This general objection is legally insufficient to contest the *prima facie* showing of reasonableness that the Trustee has made.  The Fee Objectors have not offered specific objections to the fees; rather, they "merely allege in general terms that the time spent was excessive," *i.e.*, that every single time entry associated with those two categories is objectionable.

> **A.**  **The Trustee's Service on the Committee, Which the Fee Objectors Have Known About Since 2009, was Consistent with the Trustee's Duties and Benefitted All Holders of the 7.875% Notes.**

The Fee Objectors object to $2,625,288.41[25] of fees incurred by the Trustee in connection with "time incurred in connection with activities (a) undertaken by the Indenture Trustee and its professionals in connection with the Indenture Trustee's service as a member of the Creditors' Committee, which time does not appear directly related to the 7.875% Notes or matters peculiar to their holders' interests, and/or (b) where staffing or the time spent were excessive."

As an initial matter, the Trustee contends that the substantial majority of the fees that the Fee Objectors have placed in this category of objection were not incurred in connection with the Trustee's service on the Committee and therefore do not belong in this (or any other) category of objection.  By way of example only (and by no means exhaustive), the Fee Objectors object to the following:

| Date | Rate | Challenged Time Entry | Hours | Amount |
|------|------|-----------------------|-------|--------|
| 9/18/2009 | $850 | Review several e-mails regarding auction process and court hearing; Long telephone conference with R. Bice | 1.75 | $1,487.50 |
| 10/27/2009 | $850 | Review US Government Tax issue | 1.25 | $1,062.50 |
| 12/06/2011 | $875 | Review documents; Analyze issues; Confer with M. Khambati; Confer with J. Heaney; Consider international arbitra- | 4.25 | $3,718.75 |

---

[25] Of this amount, the Fee Objectors object to $221,301.61 of Law Debenture's fees, $1,648,928 of Dewey's fees, $748,406 of Patterson Belknap's fees, and CAD 8,640.00 of BLG's fees.

| Date | Rate | Challenged Time Entry | Hours | Amount |
|------|------|----------------------|-------|--------|
| | | tion issues | | |
| 12/29/2011 | $875 | Review email and 3rd Circuit opinion on Automatic Story enforcement against the UK Pension Trustee and Pension Protection Trust. | 1.75 | $1,531.25 |
| 1/25/2012 | $875 | Review international arbitration materials and several court filings and applications. | 2.50 | $2,817.50 |
| 4/17/2013 | $860 | Review Court Order re KPMG (.1); conf. B. Guiney re upcoming hearing (.2); initial review of EMEA appeal papers (.9). | 1.2 | 1032.0 |
| 4/30/2013 | $860 | Review draft Confidentiality Agreement (.5) | 0.5 | 430.0 |
| 8/30/2013 | $860 | Review appeal brief (.2). | 0.2 | 172.0 |
| 11/3/2015 | $630 | E-mails re UKP chart and mediation (.3). | 0.3 | 189.0 |
| 2/29/2016 | $740 | Review docket, follow-up re: SNMP schedule (.3). | 0.3 | 222.0 |
| 4/19/2016 | $740 | Prepare for and monitor Bankruptcy Court hearing, confer D. Lowenthal re: same and follow-up re: same (1.6). | 1.6 | 1184.0 |
| 9/8/2016 | $970 | Review and revise status report on Third Circuit conference (1.0) | 1.0 | 970.0 |

As discussed below, all of the fees incurred in connection with the Trustee's service on the Committee are reasonable and compensable. But, even if the Fee Objectors' allegations to the contrary had merit, the examples above and a review of the Fee Objectors' Letter demonstrate that the amount of fees incurred by the Trustee in connection with its service on the Committee are *far* lower than the more than $2.6 million alleged by the Fee Objectors. The vast majority of the time entries that the Fee Objectors have objected to in this category have <u>nothing</u> to do with and were not dependent upon the Trustee's service on the Committee. Instead, each one of them reflects tasks that any large creditor would perform in order to protect its investment and remain abreast of key developments in a complex bankruptcy case.

18

  i.  *It Was Prudent for the Trustee to Serve on the Committee and Doing So Benefitted All Holders of the 7.875% Notes.*

As explained in detail in the Trustee's Confirmation Response (¶¶ 30-33), it was prudent and reasonable for the Trustee to have sought appointment to and served on the Committee and it benefitted the Fee Objectors.  Significantly more work would have been required of the Trustee and its professionals had the Trustee <u>not</u> been a member of the Committee.  The Fee Objectors assume that the work of the Trustee's counsel duplicated the work of the Committee's legal professionals.[26]  In fact, the opposite is true:  the professionals hired by the Committee streamlined the work that was required of the Trustee's counsel, which helped control legal costs.  Similarly, the Trustee's ability to rely on the Committee's financial advisors in connection with issues on which the interests of the Fee Objectors were aligned with the interests of unsecured creditors also helped control costs.  The Trustee might have required its own financial advisor if it did not have the opportunity to work and consult with the Committee's financial advisor.  Heaney Aff., ¶ 40.

After the conclusion of the Rockstar sale, the overwhelming majority of the Trustee's service on the Committee was spent on allocation-related issues.  Heaney Aff., ¶ 42.  Even if the Trustee is not eligible for compensation for time it spent on the Committee for matters that do not directly relate to the recoveries of the holders of the 7.875% Notes (a position the Trustee vigorously disputes), the evidence shows that the Committee spent virtually all of its time over the last six years on issues that did directly impact those recoveries.

If indenture trustees are not eligible to be compensated for time serving on a creditors' committee, or are required to serve without the benefit of counsel, they might decline to serve.

---

[26] *See Affidavit of Stephen Blauner in Support of Objection of NNCC Noteholders to Asserted Fees and Expenses of Indenture Trustee*, February 22, 2017 [D.I. 17945] ("Blauner Aff."), ¶ 19.

This would be detrimental to investors in corporate bonds who would lose an otherwise willing and capable advocate on the creditors' committee.   Noteholders themselves often elect not to become restricted in order to preserve flexibility to trade in and out of securities of a debtor – as was the case here – so the indenture trustee is usually the only entity capable of acting as a representative of their interests on a committee.  Heaney Aff., ¶ 10.

     ii.   *The Trustee Is Entitled to Rely on the Advice of Counsel of its Choosing.*

   Despite objecting to $221,301.61 of fees incurred by Law Debenture "in connection with . . . the Indenture Trustee's service as a member of the Creditors' Committee," the Fee Objectors now appear to concede that it was reasonable and prudent for the Trustee to serve on the Committee.[27]   However, they still maintain that the Trustee is not eligible to benefit from the advice of counsel in connection with that service.  Blauner Aff., ¶ 19.  The Fee Objectors' position is controverted by the Indenture and at odds with the prudence required of the Trustee.  The Indenture authorizes the Trustee to seek the advice of, rely on, and act through counsel.[28]  If prudence requires or permits the Trustee to serve on the Committee, then the Trustee is entitled to be represented by counsel in connection with that service.  And, given the complex nature of these cases, and the fact that each other Committee member was represented by counsel at virtually every meeting or call of the Committee, it would not have been prudent for the Trustee to disadvantage itself or the holders of 7.875% Notes by participating in those meetings and calls without its counsel.

---

[27] Blauner Aff., ¶ 18 ("I was aware that the Indenture Trustee sat on the Creditor's Committee.  And, of course, we are not objecting to any and all of the Indenture Trustee's fees and expenses with respect to the Creditor's Committee.").

[28] *See, e.g.,* Indenture, § 602 ("The Trustee may act through agents or attorneys. [. . .] The Trustee may consult with counsel of its selection[.]").

  iii.  *It is Common Practice in Most Large Chapter 11 Cases for Indenture Trustees to Serve on the Creditors' Committee.*

As this Court and the Fee Objectors know, indenture trustees serve on creditors' committees in the vast majority of large chapter 11 cases with outstanding unsecured public debt: examples of such cases include Lehman Brothers, General Motors, MF Global, Energy Future Holdings, and Washington Mutual, to name just a few.[29]  In fact, given how customary it is for the U.S. Trustee to appoint indenture trustees to creditors' committees (because they are often among the debtor's largest creditors), a holder of 7.875% Notes might have challenged a decision by the Trustee *not* to do so in this case.  A decision by this Court that the fees incurred by the Trustee for service on the Committee are not compensable (or that the Trustee is not eligible to benefit from the advice of counsel in connection with that service) would upend years of standard practice in this District and others, and call into question the legitimacy of hundreds of plans, confirmation orders and other Court orders that approving the payment of the fees and expenses of indenture trustees and their counsel for, among other things, serving on a creditors' committee.

The Fee Objectors are familiar with this custom and practice in the restructuring industry. As discussed below, Mr. Blauner complained to Mr. Heaney in 2012 that the Trustee's refusal to

---

[29] *See* Monzo Aff., Exhs. G-J (*Amended Appointment of Official Committee of Unsecured Creditors*, dated September 6, 2012, *In re: MF Global Holdings Ltd., et al.*, Case No. 11-15059 (Bankr. S.D.N.Y.) [D.I. 819] (Wilmington Trust); *Second Amended Appointment of Official Committee of Unsecured Creditors*, dated March 5, 2010, *In re Motors Liquidation Company et al., f/k/a General Motors Corp. et al.*, Case No. 09-50026 (Bankr. S.D.N.Y.) [D.I. 5201] (Wilmington Trust, Law Debenture); *Third Amended Appointment of Committee of Unsecured Creditors*, dated February 9, 2010, *In re Lehman Brothers Holdings Inc., et al.*, Case No. 08-13555 (Bankr. S.D.N.Y.) [D.I. 7034] (Wilmington Trust, Bank of New York Mellon, U.S. Bank); *Notice of Appointment of Committee of Unsecured Creditors*, dated October 15, 2008, *In re: Washington Mutual, Inc., et al.*, Case No. 08-12229 (Bankr. D. Del.) [D.I. 78] (Bank of New York Mellon, Law Debenture, Wells Fargo, Wilmington Trust)).  In the Energy Future Holdings case, the largest bankruptcy case ever filed in Delaware, there were two official committees and indenture trustees served on both of them.  *See* Monzo Aff., Exhs. K-L (*Third Amended Notice of Appointment of Committee of Unsecured Creditors*, dated July 20, 2016, *In re: Energy Future Holdings Corp., et al.* Case No. 14-10979 (Bankr. D. Del.) [D.I. 8955] (American Stock Transfer) and *Notice of Appointment of Committee of Unsecured Creditors*, dated May 13, 2014, *In re: Energy Future Holdings Corp., et al.* Case No. 14-10979 (Bankr. D. Del.) [D.I. 420] (Bank of New York Mellon, Law Debenture and Wilmington Savings Fund Society)).

21

hire two law firms that were hand-picked by Solus to represent Law Debenture in the Nortel case was "out of synch with custom and practice."[30]   To prove it, Mr. Blauner offered two examples of cases in which indenture trustees hired multiple law firms to represent them in complex bankruptcy cases, Wilmington Trust Company in the American Airlines bankruptcy and U.S. Bank in the Eastman Kodak bankruptcy. *But both of those indenture trustees served on the creditors' committee in those cases.*[31]   This is the kind of double-talk that permeates the Fee Objectors' objection vis-a-vis their prior conduct in these cases:  one day they are chiding the Trustee for being out of synch with custom and practice, and the next day they are complaining about the fees it incurred for *adhering* to custom and practice.

iv.    <em>Worldwide Direct Does Not Support the Fee Objectors' Position.</em>

Notwithstanding the common practice and appropriate judgment that supported the Trustee's decision to serve on the Committee, the Fee Objectors rely on *In re Worldwide Direct, Inc.*, 334 B.R. 112 (Bankr. D. Del. 2005), to argue that the Trustee and its professionals are not eligible for compensation for time spent serving on the Committee.[32]   But the differences between the facts in that case and those in this case make *Worldwide Direct* inapposite.  Worldwide Direct, Inc. filed a voluntary petition for relief in January 1999.  Within two months, it had secured entry of an order approving the sale of substantially all of its assets.  Less than two years after that, the debtors had secured entry of an order confirming a plan of liquidation.  As this Court is aware, the Nortel bankruptcy cases are not comparable to a relatively brief and straightforward

---

[30] *See* Heaney Aff., Exh. E (IT00000002).

[31] *See* Monzo Aff., Exhs. M-N (*Appointment of Official Committee of Unsecured Creditors*, dated December 5, 2011, *In re: AMR Corporation, et al.*, Case No. 11-15463 (Bankr. S.D.N.Y.) [D.I. 128] and *Appointment of Official Creditors' Committee*, dated January 25, 2012, *In re: Eastman Kodak Company, et al.*, Case No. 12-10202 (Bankr. S.D.N.Y.) [D.I. 115]).

[32] *See* Confirmation Objection, ¶18 ("To the extent the Asserted Fees were incurred by the Indenture Trustee in its capacity as a member of the Creditors' Committee, then they should not be charged to holders of the 7.875% Notes.").

22

case filed nearly 20 years ago.

In any event, the holding in that case does not create the kind of *per se* rule that the Fee

Objectors are asking the Court to apply here.  Judge Walrath did not question the propriety of an

indenture trustee serving on a creditors' committee nor did she create a universal prohibition

against indenture trustees or their counsel receiving reasonable compensation for that service.

Instead, in her highly case-specific analysis, Judge Walrath simply found that:

> ***In this case***, [counsel for the trustee] attended almost every Committee meeting,
> performed such business-related tasks as interviewing prospective crisis manag-
> ers, interviewing counsel in litigation against third parties and claims against the
> estate, and serving (in lieu of his client or any other Committee member) as a
> member of the Plan working group. This he did regardless of whether the meeting
> or call impacted on the senior debt issue or other matters peculiar to the Note-
> holders' interests. Such services were not reasonably necessary or compensable.

*Id.* at 133 (emphasis added).  The Fee Objectors do not allege (nor could they) that the Trustee's

counsel took on the kind of outsized role in this case that the trustee's counsel appears to have

taken on in *Worldwide Direct*.[33]

Even if this Court were persuaded that Judge Walrath actually intended to preclude in-

denture trustees from serving on creditors' committees (or to preclude them or their counsel for

being compensated for that service), such a conclusion need not impact the Court's assessment

of the reasonableness of the Trustee's fees.  For one thing, the decisions of another Bankruptcy

Judge, while entitled to respect, are not binding on this Court.  And, perhaps more importantly,

Judge Walrath herself does not appear to follow *Worldwide Direct* in the manner urged by the

Fee Objectors.  Subsequent to issuing *Worldwide Direct*, Judge Walrath herself has approved the

payment of the fees and expenses of indenture trustees for, *inter alia*, time spent in connection

---

[33] *See id.* ("[The noteholder] argues that because of [the indenture trustee's] inexperience in chapter 11 matters, [its] counsel] effectively became a member of the Committee, without court approval, at his full hourly rate").  This was not the case here.  Mr. Heaney participated in virtually all Committee calls and meetings and was responsible for the decisions the Trustee made with respect to Committee business.  Heaney Aff., ¶ 42.

23

with their service on a creditors' committee.[34]

Finally, even if *Worldwide Direct* did control, and even if it required the Trustee to limit its charging lien fees to those that "singularly advance[d] the interests of the holders of the 7.875% Notes," Confirmation Objection, ¶ 19 (a notion predicated on the false assumption that the Trustee's service on the Committee time did *not* directly benefit the Fee Objectors) and to seek compensation for Committee service elsewhere, then this Court could still determine that the vast majority of the Asserted Fees are unopposed. The Fee Objectors object to $4.3 million of the approximately $8 million of fees incurred through the end of 2016. They therefore concede that $3.7 million of those fees are reasonable. By failing to object, the Fee Objectors acknowledge that those $3.7 million in fees "singularly advanced their interests" and are – by their own standard – payable out of the charging lien. Separately, the Debtors have agreed to pay up to $4.25 million of the Asserted Fees. Neither the Debtors, the U.S. Trustee, nor any other party in interest has objected to the payment of this amount.[35] In total, there are $7.95 million of fees that have not been objected to by the party with a financial interest at stake (*i.e.*, $4.25 million to be paid by the Debtors and $3.7 million that the Noteholders have conceded).

*Worldwide Direct* is not relevant to the dispute at bar, it is not binding on this Court, it does not support the Fee Objectors' argument, and it has not been cited in any other case as a basis to deny compensation to an indenture trustee for service on a creditors' committee in the more than 11 years since it was issued (not even by the Judge who issued it).

---

[34] *See* Monzo Aff., Exh. O (*Order Granting Motion of Law Debenture Trust Company of New York, in Its Capacity as Indenture Trustee, for Entry of an Order: (A) Partially Liquidating and Allowing Proof of Claim for Fees and Expenses; and (B) Establishing a Protocol for Review of Additional Fees and Expenses*, dated June 8, 2011, *In re: Washington Mutual, Inc., et al.*, Case No. 08-12229 (MFW)(Bankr. D. Del.) [D.I. 10461]).

[35] The Fee Objectors refuse to concede the reasonableness of even the $4.25 million that will have no economic impact on their recovery. *See* Confirmation Objection, ¶ 25.

24

**B.** **The Trustee's Designation as a Core Party to the Allocation Trial, Which the Fee Objectors Have Known About Since 2013, was Consistent with the Trustee's Duties and Benefitted All Holders of the 7.875% Notes.**

The central issue in this bankruptcy case was the allocation of the proceeds of the sales of the Debtors' intellectual property and lines of business.  After multiple attempts to resolve the allocation dispute consensually failed, this Court and the Canadian Court held a trial to determine the proper allocation.  The Trustee was appointed by this Court as a "Core Party" in the Allocation Protocol that it approved in an Order dated May 17, 2013 [D.I. 10565].  The other two indenture trustees were also Core Parties to the Allocation Trial.

An indenture trustee, acting prudently, could not have justified sitting on the sidelines during a trial that would dictate the recovery on its claim from two different bankruptcy estates.  And it is not hard to fathom how a disgruntled holder or group of holders might have responded if an adverse consequence had resulted from such inaction.   Nevertheless, the Fee Objectors object to $1,444,495.71[36] of fees incurred by the Trustee for "time spent in connection with activities related to 'allocation issues' that either (a) duplicated the efforts of the professionals retained by the Debtors, the Creditors' Committee, or the Bondholder Group, (b) did not advance the interest of NNCC or holders of 7.875% Notes, and/or (c) where staffing or the time spent were excessive."

The Fee Objectors have not identified discrete tasks that they believe were duplicative or unnecessary; they object to all of the fees that the Trustee incurred in connection with allocation.  This is an objection to the Court's designation of the Trustee as a Core Party in the first place – a

---

[36] Of this amount, the Fee Objectors object to $141,766 of Dewey's fees,  $1,121,454 of Patterson Belknap's fees, and CAD 235,423.00 of BLG's fees.  Given that the Fee Objectors did not retain their own counsel in Canada, relying instead on the Trustee's Canadian counsel in connection with allocation, reconsideration, appeal and other issues, their objection to BLG's fees in this category is particularly galling.

collateral attack on the May 17, 2013, Order that is more than three years late.[37] If the Fee Objectors believed the Trustee should not have been a Core Party, then the Fee Objectors should have raised that concern before the Allocation Protocol was approved, and certainly no later than the deadline to appeal.

As it turned out, and as the following examples demonstrate, the Court's designation of the Trustee as a Core Party, and the Trustee's acceptance and performance of that role, were valuable to the Fee Objectors and wholly consistent with their interests.

First, it was only in its capacity as a Core Party that the Trustee had standing to bring a motion for reconsideration of the allocation decisions in the U.S. and Canada. In Canada, Justice Newbould's decision limited the claims of bondholders against Canadian guarantors to any shortfall remaining *after* payment by the issuer in the U.S. The Trustee believed this ruling was inconsistent with Canadian law and sought reconsideration.[38] Justice Newbould agreed, reversing himself to permit the Trustee to assert the full amount of its claim against NNL *despite* any payment from a U.S. Debtor (subject only to the limitation that the Trustee cannot receive, in the aggregate, more than the total amount due on its claim). Because the 7.875% Notes were issued in the U.S. and guaranteed by a Canadian Debtor, the Trustee was the <u>only</u> creditor to raise this issue before Justice Newbould.[39] Had it failed to do so, the Fee Objectors' recoveries might have

---

[37] *See* Fed. R. Bankr. P. 8002(a)(1) ("notice of appeal must be filed with the bankruptcy clerk within 14 days after entry of the judgment, order, or decree being appealed."); *In re Sonnax Indus., Inc.*, 907 F.2d 1280, 1283 (2d Cir. 1990) ("[t]he standards for determining finality in bankruptcy differ from those applicable to ordinary civil litigation").

[38] The Fee Objectors do not object to the time spent by the Trustee and its professionals in connection with the reconsideration motions, but the Trustee only had standing to seek reconsideration because it was a Core Party.

[39] The other bondholders raised the issue in the U.S., before this Court, pursuant to *Ivanhoe Building & Loan Association of Newark v. Orr*, 295 U.S. 243 (1935). But the Trustee was the only creditor with an *Ivanhoe*-like argument in Canada.

been drastically reduced.[40]  Despite the critical impact that the allocation decisions would have had on the recoveries for the holders of the 7.875% Notes, and the improved prospects resulting from the successful reconsideration motions, Mr. Blauner nevertheless posits that "[n]ot one of the competing methodologies advanced at the Allocation Trial would have yielded any recovery to NNCC or its creditors."  Blauner Aff., ¶ 12.  On the contrary, the Allocation Trial was of considerable significance to the holders of the 7.875% Notes.  It was entirely prudent for the Trustee to participate.

Second, the Fee Objectors argue that the Trustee's attendance at the depositions conducted in connection with the Allocation Trial "duplicated the efforts of the professionals retained by the Debtors, the Creditors' Committee, or the Bondholder Group."[41]  The April 4, 2014, deposition of John McConnell proves otherwise.  At the McConnell deposition, counsel for the UK Pension Claimants (the "UKPC") asked the witness to confirm that, because the 7.875% Notes were issued by NNCC, not NNI, and were only guaranteed by NNL, not NNI, they "had access only to the NNL pool of assets and not the NNI pool of assets."[42]  Mr. McConnell's response to this question was wrong, implying limitations on the claims of the 7.875% Notes that do not exist.  The Trustee's counsel promptly examined Mr. McConnell regarding the Support Agreement and the other intercompany claims of NNCC against NNI (which give the 7.875% Notes access to the NNI "pool of assets" despite the lack of a U.S.-entity guarantee) in order to correct the record.  *Id.* at 208.  If the Trustee's counsel had not attended this deposition, this error might

---

[40] The Trustee also successfully prosecuted a motion for reconsideration before this Court.  *See Order on Motion of Law Debenture Trust Company of New York as Indenture Trustee for the NNCC Notes for Partial Reconsideration of the Courts Order and Allocation Trial Opinion*, July 6, 2015 [D.I. 15831].

[41] The Fee Objectors ignore the fact that the Trustee attended only selected depositions, *i.e.*, those that seemed most likely to cover topics of particular interest to the holders of the 7.875% Notes.  For the rest, the Trustee relied on summaries provided by the Committee's counsel or monitored them by video link.

[42] *See* Monzo Aff., Ex. P (Transcript of Deposition of John McConnell, April 4, 2014 at 93).

have remained uncontroverted.

Finally, the Fee Objectors also object to fees incurred by the Trustee's counsel for attend-

ing the conference on the allocation appeal before the Third Circuit on September 7, 2016.  This

objection is ***directly at odds*** with instructions that the Fee Objectors' counsel conveyed to the

Trustee more than a year earlier that it should not "sit on the sidelines" during the allocation ap-

peal.[43]  It is unfair and dishonest for the Fee Objectors, through counsel, to <u>actively</u> <u>encourage</u>

the Trustee to follow a particular course of action and then object that the very course of action

they advocated was duplicative of the efforts of other parties and, therefore, is not compensable.

This type of contradiction plagues much of the Fee Objectors' challenge to the Trustee's

fees.  Their position, if validated, would subject every indenture trustee to a Hobson's choice of

either being responsive to the demands and requests of noteholders, only to face criticism that

doing so generated unreasonable legal fees, or ignoring those requests, only to subject itself to

accusations that it failed to act prudently and in the best interests of those holders.  None of the

Indenture, the Trust Indenture Act, or applicable law can possibly be interpreted to place the

Trustee in such an untenable position.

### C.    The Fee Objectors' Remaining Objections Are Also Baseless.

The Fee Objectors' Letter also identifies certain other time entries that they allege should

be written off because the time entries relate to time spent in connection with billing, are duplica-

tive, or relate to the transition from Dewey to Patterson.

### i.    *Billing and Invoices*

The Fee Objectors object to and have asked for a write off of $84,471.50 incurred by Pat-

---

[43] *See* Heaney Aff., Exh. E (IT00000308) (e-mail from D. Lowenthal to J. Heaney, August 4, 2015 at 3:50 p.m., summarizing D. Lowenthal call with J. Tecce regarding allocation appeal and reporting that "Jamie [Tecce] also said ***Law Debenture shouldn't 'sit on the sidelines' and do nothing during the appeals***.  Instead, Law Debenture should be involved, particularly since Law Debenture will want to be included if settlement is discussed.  He wouldn't want anyone to say Law Debenture can't participate in settlement talks because it is no longer involved in the litigation.").

terson Belknap "for time spent in connection with the preparation of invoices and billing."  The

Fee Objectors do not offer any authority whatsoever for the proposition that time spent in con-

nection with invoices and billing is not reasonable under the Indenture.  Nevertheless, Patterson

Belknap has decided to write off the amount requested by the Fee Objectors in this category.

> ii.    *Duplication*

The Fee Objectors object to and have asked for a write off of $101,170.56 for "duplica-

tive time entries."  The Trustee disputes that the entries identified by the Fee Objectors are dupli-

cative.  The Fee Objectors do not provide any more detail in this category of objection beyond a

naked assertion of duplication.  This is not sufficient to overcome the *prima facie* showing of

reasonableness made by the invoices, the other record evidence and this Supplemental Brief.

Accordingly, the Trustee submits that this objection should be overruled.

> iii.    *Transition Time*

Finally, the Fee Objectors object to $105,976.00 of fees incurred by the Trustee "with re-

spect to memoranda or other attorney-work product prepared by Dewey & LeBoeuf LLP that

were not transferred to Patterson Belknap Webb & Tyler LLP or the [Fee Objectors]."  The Trus-

tee disputes the merits of this objection, but Dewey has agreed to reduce its fees, which totaled

$2,744,022.02 at the conclusion of its engagement, by $60,000.  This is more than sufficient to

offset any transition time associated with the retention of new counsel.

**D.    The Fee Objectors' Assertion that the Trustee Failed to Supervise its Profes-
sionals is Thoroughly Controverted by the Evidence.**

In addition to the five categories of fees to which the Fee Objectors object, they also al-

lege that the Trustee failed adequately to supervise its legal professionals.[44]  This is wrong.  The

---

[44] *See* Monzo Aff., Exh. Q (Transcript of January 24, 2017 Hearing at 111 ("There's also an issue as to whether the
Trustee managed its professionals properly over that period of time.")).  *See also* Blauner Aff., ¶ 6 ("[T]he Indenture

Trustee chose law firms carefully and supervised them throughout these cases.

James Heaney was the representative of Law Debenture with primary responsibility for this matter. Heaney Aff., ¶ 1. Recently retired, Mr. Heaney had 44 years of experience in the corporate trust industry. Over the years, he managed dozens of law firms. Heaney Aff., ¶¶ 3, 53. Mr. Heaney is well-known and well-respected in the restructuring community.

Throughout these cases, Mr. Heaney required his chosen professionals to keep him apprised of all key developments in the bankruptcy case, with e-mails and calls on an as-needed basis, and mandatory quarterly reports. Heaney Aff., ¶ 36. Mr. Heaney personally reviewed the invoices of the Trustee's professionals on a regular basis and concluded that they were reasonable. Heaney Aff., ¶¶ 52-55.

It is particularly ironic that the Fee Objectors question the Trustee's supervision of its professionals when they themselves tried to complicate that job. In the Spring of 2012, Law Debenture refused to comply with a deficient direction from Solus that Law Debenture retain two different law firms as counsel to replace Dewey; Mr. Heaney had already determined that hiring one law firm as lead counsel – Patterson Belknap – was appropriate under the circumstances. Heaney Aff., ¶¶ 24-29. Solus apparently believed in 2012 that the Debtors' cases and the 7.875% Notes were complicated enough to warrant the Trustee's retention of both Kirkland & Ellis LLP as lead bankruptcy counsel and Malek Schiffrin LLP as special counsel. But now it complains that the Trustee did not need to be so thorough and should have ceded some or all of its responsibilities to law firms retained by other stakeholders. *See*, *e.g.*, Blauner Aff., ¶14.

The Fee Objectors baseless insinuation that Mr. Heaney did not manage or supervise his professionals – that they took actions in this case without his knowledge and approval – is not

---

Trustee has not, in my view, fulfilled its duty to holders of the 7.875% Notes to properly manage its lawyers and their fees.").

supported by the record.  To the contrary, his active involvement in all key decisions and his supervision of his professionals throughout the process is uncontroverted.

## IV.     The Fee Objectors' Conduct Underscores the Reasonableness of the Asserted Fees.

The Trustee respectfully submits that all of the foregoing, taken together with the Trustee's Confirmation Response, the Heaney Affidavit (and the attached invoices), and the Horwitz Affidavit (and the attached invoices) conclusively establish the reasonableness of the Asserted Fees and demonstrate why the Court should overrule the Fee Objectors' objections.  Further, the Trustee did not incur its fees in a vacuum and they should not be analyzed in one.  The Fee Objectors' own conduct further underscores the reasonableness of the Asserted Fees.

### A.     *Worldwide Direct* Does not Require the Court to Blind Itself to the Fee Objectors' Conduct Throughout these Cases.

The Fee Objectors do not want their conduct to factor into this Court's assessment of the reasonableness of the Asserted Fees because, as the evidence shows, the Fee Objectors routinely requested, sought, demanded, and availed themselves of the expertise that the Trustee and its counsel developed in these cases.  The Fee Objectors argue that *Worldwide Direct* allows them to object to the fees of the Trustee without regard to their own conduct.[45]  It does not.

While the noteholders' conduct in *Worldwide Direct* did not preclude them "from reviewing the reasonableness of the fees sought under the Indenture," 334 B.R. at 128, neither is this Court precluded from taking notice of the Fee Objectors' conduct in this case.  The Fee Objectors would have this Court ignore their own action and inaction vis-à-vis the Trustee for the duration of these cases.  Judge Walrath rejected this position:

The Court agrees with [the indenture trustee] that [the noteholder] cannot now ar-

---

[45] *See* Confirmation Objection, ¶ 23; Fee Objectors' Confirmation Reply, ¶ 2, n.10.  *See also* Monzo Aff., Exh. R (Transcript of February 9, 2017 Hearing at 6 ("MR. TECCE: "Judge Walrath has addressed this issue [. . . ] and she specifically determined that knowledge of things like participation on a creditors committee is not a waiver of the right to challenge the reasonableness of fees in connection with their participation.")).

> gue that none of [the indenture trustee's] services benefitted the Noteholders
> when [the noteholder] itself relied on [the indenture trustee] and its counsel to
> keep it advised of the progress in the case.  The Court is also persuaded that [the
> noteholder's] *delay* in restricting the activities of [indenture trustee] is evidence
> that [the noteholder] believed that those activities did provide a benefit to the
> Noteholders.

*Id* (emphasis added).  The Court should take notice of the Fee Objectors' conduct, action and

inaction, in determining the reasonableness of the Asserted Fees under the circumstances of these

cases.

      **B.**      **The Fee Objectors are Highly Sophisticated and Experienced Investors with Highly Sophisticated and Experienced Counsel that Solicited and Demanded – then Benefitted from – the Trustee's Active Involvement in these Cases.**

The record shows that the Fee Objectors and their counsel were in regular contact with

the Trustee's counsel throughout these cases regarding a wide range of issues, including the

Support Agreement, the claims of the PBGC and other creditors, research regarding the no-call

feature of the 7.875% Notes, the Allocation Trial and the allocation decisions, the motions for

reconsideration, the appeals of the allocation decisions, issues and proceedings in both jurisdic-

tions pertaining to post-petition interest, and the consensus that emerged in the SPSA.  This was

not accidental:  it was the direct result of the demand from the Fee Objectors for a "general pro-

tocol" for regular and ongoing consultation and collaboration between the Fee Objectors and the

Trustee.[46]

The Fee Objectors are sophisticated and experienced investors whose reliance on and co-

operation with the Trustee throughout these cases contradicts their professed surprise over the

quantum of the Asserted Fees.  *See* Blauner Aff., ¶ 13 ("I did not reasonably expect or anticipate

---

[46] *See* Monzo Aff., Exh. S (IT00003102) (E-mail from S. Blauner to D. Lowenthal, December 26, 2012, describing "general protocol" for communication between Fee Objectors and Trustee) and response from D. Lowenthal dated December 28, 2012, explaining that Trustee would require evidence of holdings (which were subsequently provided) before agreeing to general protocol and also describing meeting between Trustee's counsel and Fee Objectors' counsel).

9588889v.2

that the Trustee would spend significantly in excess of a million dollars auditing [the Allocation Trial]").  Given the level of interaction between the Trustee's counsel and the Noteholders' counsel reflected in the record, Mr. Blauner's expectations are baffling.

The evidence described in this Supplemental Brief details many of the interactions between the Trustee and the Fee Objectors, but two of them are particularly illustrative.  First, at 7:25 a.m. on June 29, 2016, counsel for the Fee Objectors e-mailed counsel to the Trustee, asking, "Did you submit any papers arguing for the no call. I thought you might have. If so can you please send them to us this morning. Thanks."[47]  About an hour later, the Fee Objectors' counsel emailed a second request:  "Do you guys have any memos of law you submitted on the make-whole in Nortel?  If so, can you please send them to us this morning.  I though[t] you wrote about it [in] one of the briefs.  Thanks in advance."[48]  The Trustee's counsel immediately provided copies of pleadings that the Trustee submitted in July 2014 discussing the potential no-call claims and the related case law.[49]

A few months later – despite the onset of this dispute and despite having already accused the Trustee of "a pattern and practice of not documenting fees and incurring needless fees"[50] – counsel for the Fee Objectors did not hesitate to seek the Trustee's help with respect to voting on the Plan, asking "[i]s it correct that the Indenture Trustee will be voting the bond claims on behalf of the bondholders?"[51]  It was not correct, and so the Trustee's counsel responded that:

With respect to the U.S. plan, the indenture trustee does not vote on the plan.

---

[47] *See* Monzo Aff., Exh. T (IT0003634) (E-mail from J. Tecce to D. Lowenthal, June 29, 2016 at 7:25 a.m.).

[48] *See* Monzo Aff., Exh. U (IT0003635) (E-mail from J. Tecce to D. Lowenthal, June 29, 2016 at 8:35 a.m.).

[49] *See* Monzo Aff., Exh. V (IT0003642) (E-mail from C. Dent to J. Tecce, June 29, 2016 at 10:11 a.m.).

[50] *See* Monzo Aff., Exh. W (IT00014584) (E-mail from D. Holzman to B. Guiney, L. Schweitzer, D. Lowenthal and J. Tecce, November 17, 2016 at 3:19 p.m.).

[51] *See* Monzo Aff., Exh. X (IT00014601) (E-mail from D. Holzman to D. Lowenthal and B. Guiney, December 22, 2016 at 12:22 p.m.).

Each beneficial holder should receive a beneficial holder ballot from its bank or broker which it needs to complete and return to the bank or broker in advance of whatever deadline is established by the bank or broker (typically a few days before the voting deadline to give the bank or broker sufficient time to complete and return its master ballot). If your clients have not yet received beneficial ballots, I encourage you to reach out to the Debtors' balloting agent (with whom I'd be happy to put you in touch if needed).

I believe the voting process is similar with respect to the Canadian plan, but I'd be happy to put you in touch with Law Debenture's Canadian counsel if you would like to have any more detail in respect of that process.[52]

The only reason that the Trustee was able to be responsive to these inquiries (and many others) so quickly is because it was well-versed in and had researched all of the key issues pertaining to the 7.875% Notes and their treatment under the Plan. The Trustee did not have a crystal ball: it did not know and could not predict when the Fee Objectors would have questions nor what those questions might be. But, as these exchanges and others like them make clear, the Fee Objectors expected the Trustee to be informed and involved on all key matters – an expectation wholly consonant with the Trustee's duties – and the Trustee proceeded accordingly.

The correspondence between the Fee Objectors and the Trustee also shows that the Fee Objectors knew how to ask when they wanted something from the Trustee. Whether they wanted the Trustee's help developing their expertise on the no-call or assistance with the Plan voting process; whether they wanted a second pair of eyes on pleadings to be filed with the Court, or they wanted to confer about how the Trustee should approach the appeals of the allocation decision; whether they wanted to rely on the Trustee's attendance at mediation, or consult with the Trustee's Canadian counsel about strategy for pursuing their claims in Canada, the Fee Objectors and their counsel knew how to contact the Trustee and they knew how to make demands of the Trustee. They did it <u>countless</u> times. And yet, there was not a single instance when the Fee Ob-

---

[52] *See* Monzo Aff., Exh. Y (IT00014602) (E-mail from B. Guiney to D. Holzman, December 22, 2016 at 3:11 p.m.).

jectors questioned the Trustee's role in these cases or raised any concern whatsoever with the work that they <u>knew</u> the Trustee was performing.  They never asked the Trustee to consider re-signing from the Committee, and they never gave it a direction to do so; they never asked the Trustee to petition the Court to relieve it from its designation as a Core Party, and they never gave it a direction to do so; and they never asked the Trustee for a budget or any information <u>at all</u> about fees it had incurred.  Heaney Aff., ¶ 41.  Instead, they shut their eyes to the fees associ-ated with the work that the Trustee performed – often at their behest and always for their benefit – until they had leveraged that work into a highly-favorable settlement.

## V.     The Fees and Expenses Incurred by the Trustee in Connection with this Fee Dispute are Compensable Under the Indenture.

The Trustee's dispute with the Fee Objectors has resulted in additional fees that are due to the Trustee and certain of its professionals.[53]  These fees are also payable out of the charging lien.  The Indenture requires the Debtors to:

> indemnify the Trustee or any predecessor Trustee and their agents for, and to hold them harmless against, any and all loss, damage, claims, liability or expense arising out of or in connection with the acceptance or admin-istration of the trust or trusts hereunder, **including costs and expenses of defending itself against any claim or liability in connection with the exercise or performance of any of its powers or duties hereunder**, ex-cept to the extent that such loss, damage, claim, liability or expense is due to its own negligence or bad faith, or that of its agents or attorneys.

Indenture, § 606(b)(emphasis added).  The Trustee is entitled to exercise its charging lien against distributions in order to "secure the Issuers' respective payment obligations in this Section."  *Id.* at § 606(d).  Unless the Court determines that the Trustee acted in bad faith or was negligent, the plain language of the Indenture entitles the Trustee to satisfy the fees and expenses it incurs in

---

[53] The fees through January 31, 2017, that are identified on <u>Exhibit 1</u> hereto are inclusive of fees incurred in connec-tion with this dispute through that date.  The Trustee will know the fees for February 2017 in early March.

connection with this fee dispute out of the distribution it will receive from the Debtors on ac-

count of the 7.875% Notes before remitting the balance to the holders of those notes.[54]

Any other result would be inconsistent with the Indenture and inequitable.  Holders of

distressed debt are often sophisticated investors with considerable resources at their disposal.  If

the Trustee is not entitled to compensation out of the charging lien for the fees and expenses it

incurs defending the fees and expenses it has already incurred, then such holders can always

force the Trustee to choose between expensive and unfunded litigation on the one hand, or suc-

cumbing to unreasonable settlement demands on the other.

## CONCLUSION

The Indenture and the Trust Indenture Act require the Trustee to act as a prudent person

following an event of default and ensure payment of the reasonable fees the Trustee incurs in the

performance of those duties.  The evidence conclusively demonstrates that the Trustee acted pru-

dently by making the sensible choice to serve on the Committee and participate in the Allocation

Trial to protect and maximize the value of its claim.  The Fee Objectors' blanket objections to

the fees incurred by the Trustee in connection with the Allocation Trial and its service on the

Committee are insufficient to overcome the *prima facie* showing of reasonableness the Trustee

has made.

The Court could approve all of the Trustee's fees on these grounds alone.  However, the

Court should also take notice of the extent of the Fee Objectors' reliance on the Trustee in these

cases.  Having so frequently and regularly sought the Trustee's input and assistance, and without

ever indicating that they wanted the Trustee to stand down (or that they would even tolerate it), it

is simply unfair and unreasonable for the Fee Objectors to complain about the fees now.

---

[54] The Fee Objectors do not allege that the Trustee was negligent or acted in bad faith.  In fact, they allege the exact opposite – that the Trustee did too much.

9588889v.2

Dated: February 24, 2017

MORRIS JAMES LLP

/s/ Stephen M. Miller
Stephen M. Miller (DE Bar. No. 2610)
Eric J. Monzo (DE Bar No. 5214)
500 Delaware Avenue, Suite 1500
P.O. Box 2306
Wilmington, DE  19899-2306
Telephone:  (302) 888-6800
Facsimile:   (302) 571-1750
Email:      smiller@morrisjames.com
                 emonzo@morrisjames.com

- and -

Daniel A. Lowenthal
James V. Masella, III
Brian P. Guiney
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, NY  10036-6710
Telephone:  (212) 336-2000
Facsimile:   (212) 336-2222
Email:      dalowenthal@pbwt.com
                 jmasella@pbwt.com
                 bguiney@pbwt.com

*Attorneys for Delaware Trust Company, as
Indenture Trustee*

37

9588889v.2