# Exhibit D-1

Court File No. 09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS***
***ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF**
**COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL**
**NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL**
**CORPORATION, NORTEL NETWORKS TECHNOLOGY CORPORATION, NORTEL**
**COMMUNICATIONS INC., ARCHITEL SYSTEMS CORPORATION AND**
**NORTHERN TELECOM CANADA LIMITED**

**ONE HUNDRED AND THIRTY SECOND REPORT OF THE MONITOR**
**DATED NOVEMBER 16, 2016**

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................1

PURPOSE ......................................................................................................................3

TERMS OF REFERENCE ...............................................................................................3

OVERVIEW OF THE MONITOR'S ROLE AND KEY PERSONNEL.......................................3

OVERVIEW OF THE MONITOR'S COUNSEL AND THEIR ROLE.......................................5
Canadian Counsel .....................................................................................................5
U.S. Counsel ..............................................................................................................6

FEES AND DISBURSEMENTS OF THE MONITOR AND ITS COUNSEL .............................7
Fees and Disbursements - Overview.........................................................................7
Monitor's Fees and Disbursements............................................................................8
Monitor's Counsel Fees and Disbursements..............................................................9
Disbursements..........................................................................................................10
Fees and Disbursements – Monitor's Observations.................................................11

SUMMARY OF THE WORK PERFORMED BY THE MONITOR AND ITS COUNSEL.......14
I.    2009..............................................................................................................14
Overview.........................................................................................................14
The CCAA Filing and its Aftermath................................................................15
Cash Flow Forecasting....................................................................................18
Flextronics Disputes and Settlements ............................................................19
Early Employee Related Matters ....................................................................20
The IFSA and the Line of Business Sales.......................................................22
Employee Hardship Process ...........................................................................27
Asia Restructuring Agreement and Other Fourth Estate Matters ..................28
Final Canadian Funding and Settlement Agreement .....................................31

II.   2010..............................................................................................................32
Overview.........................................................................................................32
UK Pensions Regulator's Warning Notice and FSD Proceedings..................33
Employee Settlement Agreement ...................................................................34
Canadian Asset Sales .....................................................................................38
CCAA Claims Process.....................................................................................40
Allocation Protocol Negotiation Efforts and Phillips Mediation.....................43
HWT Allocation Methodology and Distributions ...........................................45
Estate Separation and Wind-down Activities and Transition Services .........50
UKPC Claims...................................................................................................51
French Employee Proceedings and Claims.....................................................54

III.  2011..............................................................................................................55
Overview.........................................................................................................55
EMEA Claims Process.....................................................................................56
Residual IP Sale .............................................................................................58
Allocation Protocol Motions ...........................................................................60
IP Address Sale Process .................................................................................61
Environmental Matters....................................................................................62

- 2 -

        Q1 2010 Transfer Pricing Settlement Agreement, Agreement on Transfer Pricing Amendments and Related Inter-Estate Settlements ........................................................ 65

        Employee Compensation Claims Process .................................................................... 66

        CTDI Litigation ............................................................................................................. 70

IV.  2012 .................................................................................................................................. 71

        Overview ........................................................................................................................ 71

        Allocation Settlement Agreement (APAC/CALA) ...................................................... 71

        French Proceedings Commenced by NNSA ................................................................ 73

        Chief Justice Winkler Mediation ................................................................................. 75

        Cessation of Public Reporting ...................................................................................... 76

        Tax Matters ................................................................................................................... 76

V.   2013 .................................................................................................................................. 77

        Overview ........................................................................................................................ 77

        Allocation and Claims Litigation - Overview .............................................................. 77

        Allocation and Claims Litigation – Phase 1: Case Exploration and Document Discovery ....................................................................................................................................... 79

        Allocation and Claims Litigation – Phase 2: Fact Witness Depositions ...................... 83

VI.  2014 .................................................................................................................................. 85

        Allocation and Claims Litigation – Phase 3: Expert Witness and Initial Trial Preparation ................................................................................................................... 85

        Allocation and Claims Litigation – Phase 4: Trial Preparation and Trial .................... 86

        Allocation and Claims Litigation – Phase 5: Closing Briefing and Argument ............. 89

        EMEA Claims Settlement ............................................................................................. 90

        Monitor's Observations Regarding the Allocation and Claims Litigation ................... 91

        Crossover Bondholder Claims Litigation ..................................................................... 96

        Settlement of Chubb Claims ......................................................................................... 99

VII.  2015 ................................................................................................................................ 100

        Overview ...................................................................................................................... 100

        UKPC Appeal .............................................................................................................. 100

        Allocation Reconsideration Motions and Appeals and Farnan Mediation ................. 101

        Records Disposal Process ............................................................................................ 104

VIII. 2016 ................................................................................................................................ 105

        Overview ...................................................................................................................... 105

        SNMPRI Claims .......................................................................................................... 105

        Dunn Claims ................................................................................................................ 107

        Calgary Former Employee Claims .............................................................................. 108

        Lucescu Claims ............................................................................................................ 109

CONCLUSION AND ORDER SOUGHT ................................................................................ 111

APPENDIX "A"  FIFTH AMENDED AND RESTATED INITIAL ORDER

APPENDIX "B"    BACKGROUND AND ROLES OF LEAD PROFESSIONALS OF THE MONITOR

APPENDIX "C"    EXCERPTS FROM MONITOR'S REPORTS RE: PROFESSIONAL FEE REPORTING

APPENDIX "D"  LISTING OF MONITOR'S ACCOUNTS

APPENDIX "E"    SUMMARY  OF  WORK  PERFORMED  BY  MONITOR'S PROFESSIONALS

APPENDIX "F"  NORTEL GROUP CORPORATE CHART

APPENDIX "G"  EXCERPTS FROM CERTAIN MONITOR'S REPORTS RE: INCREASING COSTS AND DELAYS OF ALLOCATION AND CLAIMS LITIGATION

APPENDIX "H"   LITIGATION  TIMETABLE  AND  DISCOVERY  PLAN  AND  RELATED ORDERS

## INTRODUCTION

1.      On January 14, 2009 (the "**Filing Date**"), Nortel Networks Corporation ("**NNC**" and collectively with all its subsidiaries "**Nortel**"), Nortel Networks Limited ("**NNL**"), Nortel Networks Technology Corporation, Nortel Networks International Corporation and Nortel Networks Global Corporation (collectively, with the New Applicants (as defined below), the "**Canadian Debtors**") filed for and obtained protection under the *Companies' Creditors Arrangement Act* ("**CCAA**"). Pursuant to the Order of this Court dated January 14, 2009, as amended and restated (the "**Initial Order**"), Ernst & Young Inc. was appointed as the Monitor of the Canadian Debtors in the CCAA proceedings (the "**Monitor**"). A copy of the Fifth Amended and Restated Initial Order is attached as Appendix "A" hereto. The stay of proceedings was extended to March 31, 2017, by this Court in its Order dated September 29, 2016.

2.      Nortel Networks Inc. ("**NNI**") and certain of its U.S. subsidiaries and affiliates concurrently filed voluntary petitions under Chapter 11 of the U.S. Bankruptcy Code (the "**Code**") in the United States Bankruptcy Court for the District of Delaware (the "**U.S. Court**") on January 14, 2009 (the "**Chapter 11 Proceedings**"). As required by U.S. law, an official committee of unsecured creditors (the "**UCC**") was established in January, 2009.

3.      An ad hoc group of holders of bonds issued by NNL, NNC and Nortel Networks Capital Corporation has been organized and is participating in these proceedings as well as the Chapter 11 Proceedings (the "**Bondholder Group**"). In addition, pursuant to certain Orders of this Court, representative counsel was appointed on behalf of the former employees of the Canadian Debtors and the LTD Beneficiaries (collectively, "**Representative Counsel**") as well as independent counsel to the continuing employees of the Canadian Debtors and each of these groups is participating in the CCAA proceedings.

4.      Nortel Networks (CALA) Inc. ("**NN CALA**" and together with NNI and certain of its subsidiaries and affiliates that filed on January 14, 2009, the "**U.S. Debtors**") filed a voluntary petition under Chapter 11 of the Code in the U.S. Court on July 14, 2009.

5.      Nortel Networks UK Limited ("**NNUK**") and certain of its affiliates located in EMEA (collectively, the "**EMEA Debtors**" and with the Canadian Debtors and the U.S. Debtors, the "**Estates**" and each an "**Estate**") were granted administration orders (the "**U.K. Administration Orders**") by the High Court of England and Wales on January 14, 2009 (the "**U.K. Administration Proceedings**"). The U.K. Administration Orders appointed Alan Bloom, Stephen Harris, Alan Hudson and Chris Hill of Ernst & Young LLP as administrators of the various EMEA Debtors, except for Nortel Networks (Ireland) Limited, to which David Hughes (Ernst & Young LLP Ireland) and Alan Bloom were appointed (collectively, the "**Joint Administrators**").

6.      Subsequent to the filing date, Nortel Networks S.A. ("**NNSA**") commenced secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings in the Republic of France pursuant to which a liquidator and an administrator were appointed by the Versailles Commercial Court (the "**French Court**").

7.      The CCAA proceedings and the U.K. Administration proceedings of NNUK and the other EMEA Debtors have been recognized by the U.S. Court as foreign main proceedings under Chapter 15 of the Code.

8.      Subsequent to the Filing Date, certain other Nortel subsidiaries have filed for creditor protection or bankruptcy proceedings in the local jurisdiction in which they are located.

9.      On March 18, 2016, Nortel Communications Inc., Architel Systems Corporation and Northern Telecom Canada Limited (collectively, the "**New Applicants**") sought and were granted an Order (New Applicants) of this Court pursuant to the CCAA (the "**New Applicants Order**"). Pursuant to the New Applicants Order, each of the New Applicants was deemed to be an "Applicant" (as defined in the Initial Order) in the CCAA proceedings, entitled to all of the rights, benefits and protections granted by, and otherwise subject to, among other Orders of this Court entered in the CCAA proceedings, the Initial Order as if it were an Applicant thereunder. The New Applicants Order also procedurally consolidated the CCAA proceedings of the New Applicants with the CCAA proceedings.

## PURPOSE

10.    The purpose of this One Hundred and Thirty Second Report (the "**Report**"), along with the related affidavits filed by Murray McDonald, the President of Ernst & Young Inc., and representatives of the Monitor's counsel, being Goodmans LLP ("**Goodmans**") as its Canadian legal counsel, Allen & Overy LLP ("**A&O**") as its U.S. legal counsel, and Buchanan Ingersoll & Rooney PC ("**BIR**") as its Delaware local legal counsel, is to provide this Court with information in respect of the Monitor's motion to pass the accounts of the Monitor and of its counsel for fees and disbursements incurred during the period January 14, 2009, through to and including May 31, 2016 (the "**Period**").

## TERMS OF REFERENCE

11.    The Monitor has made various materials relating to the CCAA proceedings available on its website at www.ey.com/ca/nortel. The Monitor's website also contains a dynamic link to Epiq Bankruptcy LLC's website where materials relating to the Chapter 11 Proceedings are posted.

12.    Unless otherwise stated, all monetary amounts contained herein are expressed in U.S. dollars.

## OVERVIEW OF THE MONITOR'S ROLE AND KEY PERSONNEL

13.    Ernst & Young Inc. was appointed as Monitor by this Court pursuant to the Initial Order on January 14, 2009.

14.    Pursuant to paragraph 31 of the Initial Order, the Court directed that the Monitor apply to the Court to pass its accounts.

15.    The Monitor's lead professional on this mandate is Murray McDonald, President of Ernst & Young Inc. Other lead professionals of the Monitor involved in the CCAA proceedings include: (i) Sharon Hamilton (Senior Vice-President); (ii) Brent Beekenkamp (Vice-President/Senior Vice-President); (iii) Tom C. Ayres (Senior Vice-President); (iv) Jodat Hussain (Manager/Vice-President); (v) Edmund Yau (Manager/Vice-President); (vi) David Saldanha (Manager/Vice-President); (vii) Lee Close (Vice-President); and (viii)

Carol McGran (Vice-President). Details regarding the background and roles of these professionals in the CCAA proceedings are provided in Appendix "B" hereto.

16.     During the period January 14, 2009, to August 14, 2009, the Monitor fulfilled the role of Monitor as such role is described in the Initial Order and prescribed by the CCAA. This role included, among other things: (i) assisting the Canadian Debtors in considering their restructuring options and consulting with key stakeholders; (ii) assisting in the preparation of cash-flow forecasts and otherwise assisting the Canadian Debtors in managing their financial affairs following the CCAA filing; (iii) providing requisite notices in connection with the commencement of the CCAA proceedings; (iv) assisting the Canadian Debtors in connection with considering and implementing certain restructuring actions, including the repudiation of various contracts; (v) assisting the Canadian Debtors in connection with negotiating with suppliers and other stakeholders; (vi) commencing a claims process; (vii) assisting the Canadian Debtors in the various sale processes conducted in this period; and (viii) reporting to the Court on the status of the CCAA proceedings.

17.     On June 19, 2009, Nortel issued a press release announcing that it had entered into a stalking horse agreement to sell its CDMA business and certain of its LTE assets and that it was advancing in discussions with external parties to sell its other lines of business ("**LOBs**"). On August 10, 2009, Nortel announced the departure of its then CEO, Mike Zafirovski. On the same date, five members of NNC's and NNL's boards of directors resigned.

18.     As a result of this change in circumstances, on August 14, 2009, this Court granted an Order that expanded the Monitor's role and powers to include, *inter alia*, the ability:

(a)     to conduct, supervise and direct the sales processes for the Canadian Debtors' property or business and any procedure regarding the allocation and/or distribution of proceeds of any sales;

(b)     to cause the Canadian Debtors to exercise the various restructuring powers authorized under paragraph 11 of the Initial Order and to cause the Canadian Debtors to perform such other functions or duties as the Monitor considers

necessary or desirable in order to facilitate or assist the Canadian Debtors in dealing with their property, operations, restructuring, wind-down, liquidation or other activities; and

(c)     to administer the claims process established pursuant to the Claims Procedure Order dated July 30, 2009 and any other claims bar and/or claims resolution process or protocol approved by the Court.

19.     The aforementioned sale processes would ultimately result in the sale of all of Nortel's LOBs and most of its residual assets over the years 2009 through 2011. With the closing of the LOB sales and winding down of the Canadian Debtors' business operations over this period and into 2012, most of the 6,000 employees of the Canadian Debtors either transferred to the LOB purchasers, resigned or had their employment terminated. By October 2012, the Canadian Debtors only had approximately 50 remaining employees.

20.     Following the resignation of the Canadian Debtors' remaining directors and officers in October 2012, the Monitor's role and powers were further expanded by Order (Monitor's Expansion of Power Order # 2) of this Court dated October 3, 2012, to authorize and empower the Monitor to, *inter alia*, exercise any powers which may be properly exercised by a board of directors of any of the Canadian Debtors.

21.     The changing circumstances of the CCAA proceedings and the resulting expansion of the Monitor's powers have resulted in the Monitor and its counsel undertaking a scope of work that is beyond the typical role of a monitor in a CCAA proceeding. Indeed, since October 2012 substantially all activities undertaken by or on behalf of the Canadian Estate have been undertaken by the Monitor's professionals, including with the assistance of Monitor's counsel. Further details regarding the specific activities of the Monitor and its counsel during the Period are described in paragraphs 46 to 248 of this Report.

## OVERVIEW OF THE MONITOR'S COUNSEL AND THEIR ROLE

### *Canadian Counsel*

22.     The Monitor engaged Goodmans as Canadian counsel to the Monitor prior to the commencement of the CCAA proceedings. Goodmans' lead lawyer on this mandate is

Jay A. Carfagnini, partner and head of Goodmans' restructuring practice. Other lead Goodmans' restructuring lawyers involved in the CCAA proceedings include: (i) Joseph Pasquariello; (ii) Gale Rubenstein; and (iii) Chris Armstrong. In addition, the significant litigation that has taken place in the CCAA proceedings (most notably, the Allocation and Claims Litigation, as defined and described below) necessitated the involvement of Goodmans' litigation group. Goodmans' litigation counsel involved in the CCAA proceedings include: (i) Benjamin Zarnett; (ii) Alan Mark; (iii) Jessica Kimmel; (iv) Graham Smith; and (v) Peter Ruby. Details describing the background and roles of these professionals are provided at Exhibit "C" to the Carfagnini Affidavit (as defined below).

23.     Goodmans has represented the Monitor in all aspects of the CCAA proceedings to date, including in connection with: (i) more than 200 motions and Court hearings in the case through the Period; (ii) 11 leave to appeal applications and five appeals to the Ontario Court of Appeal, and seven leave to appeal applications to the Supreme Court of Canada; (iii) 10 cross-border sales processes and transactions for the LOBs and residual intellectual property and a further 18 transactions through the Period in respect of other assets of the Canadian Debtors; (iv) the Allocation and Claims Litigation; (v) the resolution of disputed claims filed pursuant to the various claims procedures approved in the CCAA proceedings; and (vi) the negotiation of various inter-estate and other settlement agreements that have been central to these proceedings.

*U.S. Counsel*

24.     In addition to being appointed as Monitor in the CCAA proceedings, the Monitor was appointed as foreign representative of the Canadian Debtors. In such capacity, the Monitor commenced foreign recognition proceedings for the CCAA proceedings under Chapter 15 of the United States Bankruptcy Code in early 2009 (the "**Chapter 15 Proceedings**"). Further, the CCAA proceedings have been coordinated from the outset with the parallel Chapter 11 Proceedings commenced by the U.S. Debtors, including as reflected in the Cross-Border Protocol approved by this Court in the Initial Order.

25.     Given the commencement of the Chapter 15 Proceedings, the significant interests of the Canadian Debtors in the Chapter 11 Proceedings and the significant cross-border aspects of the CCAA proceedings (including numerous issues relating to matters of U.S. law), the

Monitor and Canadian Debtors engaged Allen & Overy LLP (A&O) as their U.S. counsel. A&O's lead attorney on this mandate is Ken Coleman, partner and head of A&O's U.S. restructuring group. Other lead A&O lawyers representing the Monitor and the Canadian Debtors in the Chapter 15 Proceedings and the Chapter 11 Proceedings include: (i) Jay Pultman; (ii) Paul Keller[1]; and (iii) Laura Hall. A&O has represented the Canadian Debtors and Monitor in all aspects of the Chapter 11 Proceedings and Chapter 15 Proceedings to date, including the Allocation and Claims Litigation before the U.S. Court and the CTDI (as defined below) litigation. In addition, A&O has also represented the Monitor in connection with various foreign proceedings and matters, particularly in France and with respect to certain APAC (as defined below) matters.

26.     As the Chapter 15 Proceedings and Chapter 11 Proceedings are pending before the United States Bankruptcy Court for the District of Delaware, the Canadian Debtors and Monitor also engaged Buchanan Ingersoll & Rooney PC (BIR) as Delaware local counsel. BIR's lead attorneys on this mandate are Mary F. Caloway, chair of BIR's bankruptcy and insolvency practice, and Kathleen Murphy. BIR's primary mandate has been dealing with and advising on Delaware local law matters in the context of the Chapter 15 Proceedings and Chapter 11 Proceedings, including attending to the filing of materials with the U.S. Court.

## FEES AND DISBURSEMENTS OF THE MONITOR AND ITS COUNSEL

*Fees and Disbursements - Overview*

27.     The fees and disbursements (excluding taxes) of the Monitor and its counsel for the Period are as follows:

---

[1] Mr. Keller is now a partner at Norton Rose Fulbright US LLP.

| (in millions) | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | Jan - May 2016 | Total |
|---|---|---|---|---|---|---|---|---|---|
| Ernst & Young Inc. | 20.3 | 22.1 | 17.8 | 15.1 | 13.5 | 10.4 | 6.2 | 2.6 | 108.0 |
| Goodmans LLP | 4.1 | 9.1 | 9.9 | 3.6 | 20.8 | 28.7 | 6.8 | 3.4 | 86.4 |
| Total Fees (CAD) | 24.4 | 31.2 | 27.7 | 18.7 | 34.3 | 39.1 | 13.0 | 6.0 | 194.4 |
| Disbursements (CAD) | 0.8 | 1.3 | 0.8 | 0.4 | 0.9 | 1.0 | 0.3 | 0.1 | 5.6 |
| **Fees & Disbursements (CAD)** | **25.2** | **32.5** | **28.5** | **19.1** | **35.2** | **40.1** | **13.3** | **6.1** | **200.0** |
| | | | | | | | | | |
| Allen & Overy LLP | 0.8 | 1.8 | 3.5 | 1.0 | 9.1 | 10.0 | 2.3 | 1.2 | 29.7 |
| Buchanan Ingersoll & Rooney PC | 0.1 | 0.1 | 0.2 | 0.1 | 0.1 | 0.3 | 0.1 | 0.1 | 1.1 |
| Total Fees (USD) | 0.9 | 1.9 | 3.7 | 1.1 | 9.2 | 10.3 | 2.4 | 1.3 | 30.8 |
| Disbursements (USD) | 0.1 | 0.1 | 0.2 | 0.1 | 0.6 | 0.8 | 0.2 | - | 2.1 |
| **Fees & Disbursements (USD)** | **1.0** | **2.0** | **3.9** | **1.2** | **9.8** | **11.1** | **2.6** | **1.3** | **32.9** |

28.  The professional fees and disbursements of the Monitor, its counsel and other professionals being funded by the Canadian Debtors have been provided (and continue to be provided) in the line item for "Restructuring Costs" contained in the cash flow forecasts and variances included in the Monitor's reports relating to the Canadian Debtors' stay extension motions. In addition, at the request of the Court, the Monitor began providing in each of its reports relating to stay extension motions a detailed breakdown of the Canadian Debtors' restructuring costs, including the fees and disbursements of the Monitor and its counsel. Each of the Monitor's stay extension reports filed subsequent to April 30, 2013, has provided such a breakdown. Copies of the relevant excerpts of the above noted reports are attached hereto as Appendix "C".

*Monitor's Fees and Disbursements*

29.  Attached as Appendix "D" hereto is a listing of the Monitor's accounts for the Period, including each account date and amount. Attached as Appendix "E" hereto is a summary table which identifies the individual professionals of the Monitor that have worked on the Nortel file along with their rank, average hourly billing rate, total number of hours worked, total associated professional fees and the work stream(s) in the CCAA proceedings in which the professional has been involved.[2] Copies of the detailed accounts of the Monitor are available for the Court's review, subject to further direction

---

[2] Individual professionals working less than 50 hours have been aggregated in a single line item at each given rank.

and Order of this Court that the Monitor may require relating to matters of privilege and confidentiality.

30.     The Monitor seeks approval of its accounts for the Period in the amount of CA$122,972,821.96, inclusive of applicable taxes. This amount includes billings for 200,065.4 professional hours at an average hourly rate of CA$540.

31.     The Monitor's professional rates, as well as its disbursements, are comparable to the rates charged by other professional firms in the Toronto market for the provision of similar services regarding significant complex commercial restructuring matters.

32.     As noted, the table at Appendix "E" includes the average hourly billing rate for each Monitor professional based on his or her total hours worked on the file and the time period during which those hours were worked. The hourly rates of the Monitor's professionals have changed from time to time throughout the course of the Nortel mandate as a result of the following:

(a)     on a yearly basis, Ernst & Young Inc. conducts a review of its fees relative to market. In some cases this review results in an increase to hourly fees consistent with market changes; and

(b)     as certain of the Monitor's professionals have been promoted in rank, the hourly fee charged for those professionals' services has increased.

33.     The Monitor's accounts for the Period have been paid by the Canadian Debtors in the normal course since the commencement of the CCAA proceedings as authorized by the Initial Order.

*Monitor's Counsel Fees and Disbursements*

34.     The Monitor also seeks to pass the accounts of Goodmans for the Period in the amount of CA$99,994,744.85, inclusive of applicable taxes. This amount includes billings for 134,562.4 professional hours at an average hourly rate of CA$643. Jay A. Carfagnini, partner and head of Goodmans' restructuring practice and the lead lawyer on the Nortel

mandate for the Monitor, will provide an affidavit (the "**Carfagnini Affidavit**") which provides further details in respect of Goodmans' accounts.

35.    The Monitor also seeks to pass the accounts of A&O for the Period in the amount of $31,352,136.73, inclusive of applicable taxes. This amount includes billings for 46,448.4 professional hours at an average hourly rate of $639. Ken Coleman, partner and head of A&O's restructuring practice and the Monitor's lead U.S. counsel, will provide an affidavit which provides further details in respect of A&O's accounts.

36.    The Monitor also seeks to pass the accounts of BIR for the Period in the amount of $1,476,489.87. This amount includes billings for 3,576.4 professional hours at an average hourly rate of $311. Mary F. Caloway, a shareholder and chair of BIR's restructuring practice, will provide an affidavit which provides further details in respect of BIR's accounts.

37.    The accounts submitted for the Period by each of Goodmans, A&O and BIR have been reviewed by the Monitor as and when received (generally on a bi-weekly or monthly basis), authorized for payment by the Monitor and paid by the Canadian Debtors in the normal course since the commencement of the CCAA proceedings as authorized by the Initial Order. Based upon the Monitor's review of counsel's accounts, the Monitor believes such accounts to be reasonable and that they reflect billings for services performed by the Monitor's counsel consistent with the instructions given by the Monitor to such counsel, all at such counsel's standard rates and charges for legal services at the relevant times, or at such lesser rates as were agreed between the Monitor and counsel for certain counsel performing document review and related case building work in the context of the Allocation and Claims Litigation.

38.    Copies of the detailed accounts of the Monitor's counsel are available for the Court's review, subject to further direction and Order of this Court that the Monitor may require relating to matters of privilege and confidentiality.

*Disbursements*

39.    The Monitor and its counsel have conducted a review of their disbursements for the Period, which total approximately $7.4 million. Based on this review, the Monitor

estimates approximately 37% of the Monitor and its counsel's disbursements are attributable to travel, approximately 21% to computer searches/technology and printing/photocopying, and approximately 15% to CCAA notices (i.e. newspaper publications and mailings), Court filing fees and mailing and courier costs.

40.    Given the international aspect of the Nortel insolvencies travel expenses have been significant, with many meetings, negotiations, mediations and other events (e.g. sale auctions) taking place outside of Toronto, particularly in New York, Raleigh (North Carolina), Richardson (Texas) and London (U.K.). In addition, Monitor representatives have made trips (in some cases several) to Hong Kong, China, India, South Korea, Singapore, Vietnam and Denmark in connection with efforts directed at monetizing assets of the Canadian Debtors and their foreign controlled subsidiaries or repatriating funds from foreign controlled subsidiaries.

41.    Expenses incurred in connection with the Allocation and Claims Litigation, and in particular the approximately 140 fact and expert witness depositions related thereto that took place at various locations throughout North America, Europe and Asia, were a significant portion of travel-related disbursements. Recognizing this, the Monitor made efforts to reduce associated travel expenses to the extent possible, including by organizing deposition teams that, to the extent possible, completed depositions in a particular geographic region to avoid additional return travel to and from North America.

*Fees and Disbursements – Monitor's Observations*

42.    As detailed herein, the Monitor estimates the assets administered or to be administered in the within CCAA proceedings to be in excess of $6 billion, including nearly $1 billion of operating receipts of the Canadian Debtors during the CCAA proceedings, the Canadian Debtors' allocation of the $7.3 billion of escrowed sale proceeds (being in excess of $4.1 billion based on the settlement reflected in the Settlement and Plans Support Agreement (as defined below)), more than CA$615 million of sale proceeds arising from other asset sales of the Canadian Debtors and the repatriation of more than $328 million to NNL through payment of intercompany balances, dividends or other equity distributions.

43.     These proceedings have been coordinated from the outset with the Chapter 11 Proceedings and the U.K. Administration Proceedings. Each of the Estates has had to address many of the same issues and undertake many of the same processes (for example, completing asset sales and undertaking claims resolution procedures). Indeed, as NNC (the parent holding company and public issuer) and NNL (the principal operating entity of which virtually all other Nortel entities are direct or indirect subsidiaries) were the parent companies of the Nortel group, the challenges facing the Canadian Debtors have, in some cases, been more significant than those facing the other Estates. By way of example, the claims filed against the Canadian Debtors in the CCAA Claims Process[3] alone exceed CA$39 billion, which is significantly more than the claims filed against the other Estates. Similarly, in the Allocation and Claims Litigation, the Canadian Debtors produced approximately 50% of the documents produced by all parties (which included not only the other Estates, but various other participants as well).

44.     In light of the foregoing, the Monitor is of the view it is noteworthy that the professional fees and disbursements of the Monitor and its counsel together with the fees and disbursements of the Canadian Debtors' main advisors are less, and in some cases significantly less, than the fees and disbursements of the main advisors to the other Estates. Set forth below is a table which compares the fees and disbursements of the Monitor and its counsel, together with the fees and disbursements of the Canadian Debtors' main advisors (Norton Rose Fulbright Canada LLP (previously Ogilvy Renault LLP), Gowling WLG (Canada) LLP (previously Gowling Lafleur Henderson LLP)), and Freshfields Bruckhaus Deringer LLP, against the fees and disbursements of the main legal and financial advisors to each of the other Estates as publically reported.[4] The fees and disbursements of the main advisors to the Canadian Estate for the period January 14, 2009, through December 31, 2015, are approximately 76% of the fees and disbursements

---

[3] As defined below and which excludes both the billions of dollars of intercompany claims filed against the Canadian Debtors and claims governed by the Compensation Claims (as defined below) process.

[4] The fees and disbursements of the Canadian Debtors' main advisors are not subject to Court approval, and therefore are not part of the accounts that the Monitor seeks to pass on this motion, but are included in the table below in order that an equivalent comparison of fees and disbursements among the Estates can be made.

of the main advisors to the U.S. Estate, and approximately 51% of the fees and disbursements of the EMEA Estate advisors.[5] [6]

| Nortel Estate Main Advisors Professional Fees For the period January 14, 2009 - December 31, 2015 (in USD millions) | Fees | Disbursements | Total Fees & Disbursements |
|---|---|---|---|
| Ernst & Young Inc.[1,2] | 100.1 | 2.9 | 103.0 |
| Goodmans LLP[1,2] | 77.8 | 2.4 | 80.2 |
| Norton Rose Fulbright Canada LLP[1,2] | 63.3 | 1.6 | 64.9 |
| Gowling Lafleur Henderson LLP[2] | 9.0 | 0.2 | 9.2 |
| Freshfields Bruckhaus Deringer LLP[3] | 7.3 | 1.7 | 9.0 |
| **Total** | **257.5** | **8.8** | **266.3** |
| Allen & Overy LLP | 28.5 | 1.6 | 30.1 |
| Buchanan Ingersoll & Rooney PC | 1.1 | 0.4 | 1.5 |
| **Total Professional Fees** | **287.1** | **10.8** | **297.9** |
| Fees and Expenses of Main Advisors of: | | | |
| US Debtors[4] | | | 389.9 |
| EMEA Debtors[5] | | | 581.9 |

1. Fees exclude undrawn retainer

2. Foreign exchange rates used based on Bank of Canada Monthly Average Noon-Exchange Rates

3. Foreign exchange rates used based on Federal Reserve Monthly Average Noon-Exchange Rates

4. US Debtors professionals included are Cleary Gottlieb Steen & Hamilton LLP, Ernst & Young LLP (US), Huron Consulting Group, John Ray, Torys LLP, Chillmark Partners, LLC and Morris, Nichols, Arsht & Tunnell LLP, based on monthly fee applications filed in the United States Bankruptcy Court for the District of Delaware

5. Based on Joint Administrators' Abstract of Receipts and Payments from January 14, 2009 to January 13, 2016

---

[5] The EMEA Estate's advisor fees include VAT taxes; the fees of the U.S. and Canadian Estates do not include any applicable taxes. The EMEA Estate's advisor fees do not include the fees and expenses of the advisors to the UKPC, which have not been disclosed.

[6] The fees and expenses of advisors to certain of the main stakeholders in the CCAA proceedings and the Chapter 11 Proceedings for the period January 14, 2009, through December 31, 2015 (to the extent known to the Monitor) are as follows:

(i) UCC - $145.5 million  (Akin Gump Strauss Hauer & Feld LLP, Ashurst LLP, Berkeley Research Group, LLC, Capstone Advisory Group, LLC, Dentons Canada LLP, Jefferies & Company, Inc., Richards, Layton & Finger, P.A., Whiteford, Taylor & Preston LLC and Cassels Brock & Blackwell LLP) (Source: monthly fee applications filed in the U.S. Court);

(ii) Bondholder Group - $95.6 million (Milbank, Tweed, Hadley & McCloy LLP, Bennett Jones LLP, and FTI Capital Advisors, LLC); and

(iii) Former Employees (Representative Counsel) - $38 million (DLA Piper LLP (US), Koskie Minsky LLP, Nelligan O'Brien Payne LLP, RSM Richter/6038441 Canada Inc., Segal Consulting, Shepell FGI, Shibley Righton LLP and Wardle Daley Bernstein LLP).

45.     The Monitor and its counsel have sought to ensure that the work required to be performed in the case has been undertaken in the most efficient manner possible, including by utilizing consistent core personnel throughout the mandate (thereby ensuring continuity and the more efficient completion of tasks) and by having work performed by junior/lower cost professionals to the extent appropriate. For instance, approximately 65% of the total hours worked by the Monitor and its counsel's professionals have been worked by non-partners.

**SUMMARY OF THE WORK PERFORMED BY THE MONITOR AND ITS COUNSEL**

46.     The paragraphs that follow provide a summary description of the significant work undertaken by the Monitor and its counsel on a year-by-year basis for the Period. Many work streams in the CCAA proceedings have occurred across one or more (and sometimes all) of these years. The Monitor has indicated the approximate timeframe of particular work streams and, for organization purposes, has included work streams in either the year of the case they commenced in, or alternatively in the year of the case when the majority of work was undertaken in connection with the particular work stream.

47.     In addition to the foregoing, the Monitor has filed 131 reports with the Court to date (including 128 reports through the Period) that detail the activities of the Canadian Debtors and the Monitor throughout these proceedings and the professional fees and disbursements of (among others) the Monitor and its counsel, certain of which are cited or reference herein. Copies of these reports are available on the Monitor's website at www.ey.com/ca/nortel, and are incorporated herein by reference to the extent necessary.

**I.      2009**

*Overview*

48.     The year 2009 included the commencement of the CCAA proceedings and dealing with their immediate aftermath, including efforts to stabilize Nortel's business, consider restructuring options and undertake various restructuring actions (e.g. the repudiation of contracts). Ultimately, it was determined that going-concern sales of the Nortel LOBs was the best means of maximizing value to creditors and Nortel proceeded to conduct sales processes and conclude transactions in respect of the LOBs, many of which were

conducted, negotiated and closed before the end of the year. 2009 also featured the negotiation of many of the key agreements that underpin these proceedings, including the IFSA and CFSA (each as defined below). For 2009, approximately 50% of the Monitor's and its counsel's fees are attributable to Nortel's operations, stabilization of the business and CCAA administration, and over 20% of their fees are attributable to asset realizations.

### The CCAA Filing and its Aftermath
(Timeframe: January 2009 – August 2009)

49.     As at the Filing Date, NNC and NNL were the parent holding company and chief operating entity, respectively, of the Nortel group of companies, a multi-national telecommunications company that had approximately 126 subsidiaries and operated in virtually every country in the world. Attached as Appendix "F" hereto is a corporate chart of the Nortel group as it existed just prior to the Filing Date. At the time of the insolvency filings, Nortel employed approximately 30,000 people worldwide (down from a high of nearly 93,000 in the early 2000s) and had gross consolidated revenues for 2008 of $10.421 billion. Its three core business segments were Carrier Networks, Enterprise Solutions ("**Enterprise**") and Metro Ethernet Networks ("**MEN**"). A fourth business segment, Global Services (essentially Nortel's support and services arm), was a separate reportable segment until December 31, 2008, before being integrated into the other LOBs.

50.     The Canadian Debtors filed for protection under the CCAA on January 14, 2009, and Ernst & Young Inc. was appointed Monitor on the same date. The activities of the Monitor and its counsel undertaken in connection with the CCAA filing and its immediate aftermath include the following:

(a)     preparing and publishing/mailing the statutory notice of the CCAA filing to creditors and otherwise assisting the Canadian Debtors in discussing the CCAA filing with their customers, suppliers, creditors and other stakeholders, including through establishing the Monitor's website, the Monitor's email address (which received more than 20,500 emails during the Period) and a toll-free telephone hotline (which received almost 19,000 calls through the Period);

(b)      assisting the Canadian Debtors in developing and preparing both a consolidated and unconsolidated global weekly cash flow forecasting and reporting process for Nortel's global operations as well as reporting on a weekly basis to stakeholders and their respective advisors and responding to their questions;

(c)      assisting the Canadian Debtors in reviewing their finances and operations to improve their cash position and liquidity and otherwise stabilizing the Canadian Debtors' business following the CCAA filing;

(d)      monitoring the overall business, operations and cash situation of the Nortel group as a whole, including its cash position by region;

(e)      assisting the Canadian Debtors in reviewing and considering their restructuring options and consulting with stakeholders and their respective advisors regarding same;

(f)      reviewing and considering the exercise of various restructuring powers by the Canadian Debtors pursuant to the Initial Order, including the repudiation of contracts and real property leases and workforce reduction;

(g)      assisting the Canadian Debtors in the review of non-core assets for potential divestiture;

(h)      assisting the Canadian Debtors in preparing employee communications and addressing operational related human resources and expatriate issues;

(i)      coordinating actions in the CCAA proceedings with the Chapter 11 Proceedings and the U.K. Administration Proceedings and assisting in addressing the impact of the insolvency filings on the business and operations of the Canadian Debtors' wholly owned subsidiaries in the Asia Pacific/Asia Central ("**APAC**") region and the Central America/Latin America ("**CALA**") region;

(j)      assisting in considering and addressing various issues arising from the CCAA filing, including:

    (i)      the continuation of Nortel's performance bonding facility with Export Development Canada;

    (ii)      the unwinding and termination of the Canadian Debtors' foreign exchange and interest rate derivative programs, resulting in net cash receipts to the Canadian Debtors of $34.5 million in January 2009 and a further $23 million in February 2009;

    (iii)      the implementation of the $120 million amending agreement (the "**Flextronics Amending Agreement**") entered into with Flextronics Telecom Systems Ltd. ("**Flextronics**") that ensured the continuing post-filing provision of goods and services by Flextronics, Nortel's largest contract manufacturer, to Nortel;

    (iv)      the $200 million secured post-filing inter-company loan facility between NNI and the Canadian Debtors, including subsequent amendments to this facility and related security in March 2009;

    (v)      the negotiation and implementation of the group supplier protocol agreement among the Canadian Debtors, U.S. Debtors and EMEA Debtors as well as negotiations regarding the continuation of Nortel's global intercompany settlement process (known as "Citi-netting") which facilitated the continued post-filing delivery of goods and services among the Estates and other Nortel entities; and

    (vi)      working closely with the Canadian Debtors to identify key employees who were considered essential to the restructuring, assisting in developing and considering a key employee incentive plan for certain senior executives, including officers of the U.S. Debtors, and a further key employee retention plan for certain other key employees, and consulting with stakeholders and their respective advisors thereon.

51.    In addition, in order to ensure compliance with the Initial Order, staff of the Monitor attended at Nortel's payment processing centre in Nashville, Tennessee for approximately three months to develop and implement processes for reviewing payments for compliance with the Initial Order and similar U.S. stay provisions. This process was also coordinated with joint Monitor and Nortel processes for monitoring purchasing and supplier relationships. The global nature of Nortel's supplier relationships, the volume of disbursements and the need to design processes that worked with Nortel's highly complex and integrated purchase order and delivery systems resulted in this work stream being difficult and time-consuming.

*Cash Flow Forecasting*
(Timeframe: January 2009 – Ongoing)

52.    Prior to the CCAA filing, Nortel had no cash flow forecasting model or cash flow reporting process that allowed for weekly cash flow forecasting and reporting on an entity level. As noted above, one of the earliest activities (and focuses) of the Monitor was assisting the Canadian Debtors in preparing both a consolidated and unconsolidated global weekly cash flow forecasting and reporting process for Nortel's global operations so Nortel could understand its entity-level cash position in "real time". These and subsequent cash flow forecasting efforts by the Monitor have included:

(a)    creating cash flow templates for approximately 60 Nortel entities (including joint venture entities) in North America, APAC, CALA and EMEA;

(b)    creating a global process to retrieve cash flow data on a weekly basis, reviewing and analyzing variances, discussion with management from all regions, preparing consolidated, regional and entity cash flows, and reporting on cash flows and related analysis to stakeholders on a weekly basis from January 14, 2009, until Estate separation in 2011;

(c)    after Estate separation until the end of 2012, preparing and reporting on the Canadian Debtors and APAC entities cash flows to stakeholders, initially on a weekly basis and subsequently on a bi-weekly basis;

(d)     continuing to prepare cash flow forecasts for the Canadian Debtors on a bi-weekly basis and reporting thereon to stakeholders; and

(e)     preparing and filing cash flow forecasts and reconciliations in connection with stay extension motions in the CCAA proceedings.

*Flextronics Disputes and Settlements*

(Timeframe: January 2009 – November 2009)

53.     As referenced above, Flextronics was Nortel's largest contract manufacturer, providing approximately 70% of Nortel's hardware products on a global basis and a significant portion of logistics and repair services required in connection with those products. Following execution of the Flextronics Amending Agreement entered into at the time of filing, certain disputes developed between Nortel and Flextronics in the period from early January 2009 through November 2009, including disputes regarding the interpretation of the Flextronics Amending Agreement and other ongoing supply matters, Flextronics involvement in the LOB divestitures, Flextronics ability to set-off amounts alleged owing by Nortel and the resolution of the approximately $7 billion of claims filed by Flextronics against the Canadian Debtors and other Nortel entities. Following negotiations between Nortel and Flextronics, various settlement agreements were entered into to resolve these disputes, including most significantly a settlement and release agreement dated November 20, 2009 (the "**November Settlement and Release Agreement**"), that settled substantially all outstanding and potential disputes between Nortel and Flextronics and provided a mechanism for Flextronics and Nortel to cooperate with respect to the LOB transactions.[7]

54.     While the negotiations leading to the various Flextronics settlements were led by Nortel supply chain personnel, the Monitor and its counsel assisted the Canadian Debtors in connection with these negotiations and settlements by:

(a)     reviewing and providing advice regarding the content and terms of the settlement agreements, preparing calculations relating to eligible and non-eligible set off

---

[7]  A final settlement was entered into between Nortel and Flextronics in December 2011.

amounts, discussing issues and strategy and participating in negotiations and discussions with Flextronics;

(b)     reporting to the Court on the terms of the settlements in connection with the Canadian Debtors' motions seeking approval of them; and

(c)     negotiating, reviewing and assisting in preparing a side agreement entered into among the Estates to facilitate payments to Flextronics pursuant to the November Settlement and Release Agreement and to determine and allocate the costs of the November Settlement and Release Agreement amongst the Estates.

*Early Employee Related Matters*
(Timeframe: January 2009 – November 2009)

55.     As at the Filing Date, the Canadian Debtors employed approximately 6,000 employees. They also administered two registered defined benefit pension plans, the Nortel Networks Limited Managerial and Non-Negotiated Pension Plan and the Nortel Networks Negotiated Pension Plan, that provided pension benefits to more than 11,000 former employees and their survivors at the time of filing. In addition, the Canadian Debtors administered a Capital Accumulation and Retirement Program, which consisted of a combination of separate pension and other retirements savings plans and various other pension and benefits programs for their current employees. Total participation in Nortel's Canadian pension plans at the time was approximately 21,000 members. Finally, the Canadian Debtors also funded various current and post-employment employee benefits through Nortel's Health & Welfare Trust ("**HWT**"), a trust that provided benefits to approximately 9,000 current and former employees at the time of filing.

56.     Given the number of employees and former employees and the expected impact of the CCAA proceedings on them, the Monitor agreed with the Canadian Debtors that the appointment of representative counsel was warranted to ensure proper and efficient representation of employee interests and to avoid the costs associated with multiple counsel representing parties with the same interests. There were four groups of former employees seeking appointment as representatives, each with associated law firms seeking appointment as representative counsel. The Monitor worked with the various

parties and supported the appointment of Koskie Minsky LLP ("**Koskie**") as Representative Counsel, which appointment was approved in May 2009. Four Court-appointed representatives were also appointed to represent former employees and provide instructions to Representative Counsel, namely Donald Sproule, David Archibald and Michael Campbell for the Former Employees, pensioners and beneficiaries, and Susan Kennedy for the LTD beneficiaries (the "**Court Appointed Employee Representatives**"). Nelligan O'Brien Payne LLP was subsequently appointed to represent continuing employees of the Canadian Debtors. The Canadian Autoworkers Union (now Unifor) ("**Unifor**") represented the unionized employees and retirees who were members of the Unifor locals when they were employees. The retiree and former employee groups formed a not-for-profit organization called the "Nortel Retirees and Former Employees Protection Canada" or "**NRPC**" to represent the interests of former employees and retirees of the Canadian Debtors in public policy matters as well as assisting each other in the CCAA proceedings. Three of the Court Appointed Employee Representatives are members of the NRPC. In addition, the Canadian Nortel Employees on Long Term Disability ("**CNELTD**") was formed to represent the interests of disabled employees and the fourth Court Appointed Employee Representative, Susan Kennedy, represents this group. The Monitor has worked with all counsel to the various employee groups, and, to the extent appropriate, the NRPC and CNELTD, in assisting with communications with employees and former employees, attending and speaking at webinars presented by Representative Counsel, meeting with the Court Appointed Employee Representatives as required, and maintaining its own dedicated email and communications resources for employees and other stakeholders.

57.    In April 2009, Unifor (then CAW) and Representative Counsel sought an order requiring the Canadian Debtors to pay certain post-employment benefits, including termination pay and severance pay. The motions were heard April 21, 2009, and dismissed by this Court, which dismissal was upheld on appeal. The Monitor assisted all parties in the matter to ensure the litigation process was as cost-effective as possible.

58.    On the Filing Date, the Canadian Debtors also ceased making payments pursuant to the Supplementary Pension and Retirement Allowance Plan for certain senior officers. Sun Life Assurance Company of Canada ("**Sun Life**") held annuities pursuant to the plan.

The Monitor assisted in discussions and the organization of a motion brought in November 2009 on agreed facts with respect to whether the annuities were assets of the Canadian Debtors or held in trust for the plan members. This Court ultimately found that the annuities were held in trust for plan members.

59.    Finally, based on updated actuarial estimates prepared in April 2009, the Canadian Debtors became concerned that the "transfer ratios", being the percentage amount at which commuted pension values are transferred, for the two registered defined benefit pension plans should no longer be based on the 2006 valuations, given the fall in global stock markets, the general economy and the insolvency of the Canadian Debtors. The Canadian Debtors, with the support of Representative Counsel, therefore sought and obtained an Order of this Court dated May 28, 2009, approving a reduction in the transfer ratio for each plan to 69% for the purpose of making interim commuted value payments. The Monitor assisted in consideration of this issue with the Canadian Debtors and their legal and actuarial advisors and consulting with stakeholders regarding the relief sought by the Canadian Debtors.

### _The IFSA and the Line of Business Sales_
(Timeframe: February 2009 – March 2011)

60.    Two issues were central to the CCAA proceedings in the first six months: (i) attempts to develop and implement a global restructuring plan; and (ii) a means of addressing the significant cash burn being experienced by NNL as a result of it continuing to incur significant corporate overhead and R&D costs to preserve the enterprise value of the LOBs and coordinate global restructuring efforts notwithstanding the post-filing cessation of ordinary course payments to NNL under Nortel's transfer pricing system. The Monitor recognized these issues, in particular NNL's funding crisis and the risk it posed to both stabilizing Nortel's business and achieving either a successful restructuring or a coordinated going-concern sale of the Nortel LOBs. Accordingly, the Monitor engaged with representatives of the other Estates and key stakeholders in an attempt to address these matters.

61.    On June 9, 2009, NNL, NNI, NNUK and the Joint Administrators (among other parties) entered into the Interim Funding and Settlement Agreement (the "**IFSA**") that assisted in

addressing these issues. First, pursuant to the IFSA, NNI agreed to pay $157 million to the Canadian Debtors which, together with a $30 million payment made in January 2009, was in satisfaction of any claims of NNL for corporate overhead and research and development costs incurred by NNL for the benefit of the U.S. Debtors for the period from the Filing Date to September 30, 2009. Second, NNL agreed to pay NNUK $20 million on a deferred basis (secured by a Court-ordered charge) and the EMEA Debtors, on the one hand, and the Canadian Debtors and U.S. Debtors, on the other, agreed to the settlement of any transfer pricing obligations between them for the period from the Filing Date to December 31, 2009. Third, pursuant to the IFSA, the Estates reached certain agreements that facilitated the LOB transactions that would be entered into in the coming months, including an agreement that the execution of sale documentation or closing of a transaction of material assets would not be conditioned upon reaching agreement on either allocation of the sale proceeds of such sale or a binding procedure for the allocation of such sale proceeds and that all sale proceeds would be deposited in escrow pending resolution of allocation.

62.    The Monitor led the negotiation of the IFSA on behalf of the Canadian Estate, including preparing and distributing various financial models that supported the Canadian Debtors' funding request.

63.    With the IFSA in place, the Estates, in consultation with their constituents, embarked on a process that resulted in a series of sales of the LOBs, which occurred from mid-2009 through late 2010 (with the last LOB transaction, MSS, closing in March 2011).[8] It was imperative that the negotiation, execution, carve-out and closing of the LOB transactions proceed as quickly as possible because Nortel was facing various significant issues with its business as a result of the insolvency filings and other factors, including:

(a)    revenues and new orders began to decline as customers lost faith in Nortel's long-term ability to perform. Of particular note, in February 2009 Verizon Communications, a major CDMA customer and prospective customer for Nortel's LTE technology, advised Nortel it had not been selected as an LTE provider to Verizon. It later advised Nortel that in light of the insolvency filings, Nortel's

---

[8] Prior to the IFSA being entered into, Nortel had already entered into and closed the sale of its Layer 4-7 business.

financial condition and the difficulties experienced by Nortel over the course of the 2000s, it preferred that the CDMA LOB move into "safe hands" (i.e., an experienced telecommunications business with a strong balance sheet), failing which Verizon would direct a disproportionate amount of its CDMA purchases to its other CDMA supplier on a go-forward basis;

(b)    key employees were being recruited by Nortel's competitors;

(c)    Nortel was unable to provide the necessary level of R&D funding for the Nortel technology underlying the LOBs, resulting in a potential decline of the value of those LOBs on a go-forward basis; and

(d)    notwithstanding the funding received under the IFSA (and subsequently the CFSA), the Canadian Debtors were continuing to incur a significant cash-burn as a result of continuing to fund R&D and corporate overhead expenses to facilitate the LOB transactions. For the period from the Filing Date through to the closing of the final LOB transactions in March 2011, the Canadian Debtors incurred an operational cash burn of approximately $128.2 million (net of funding received pursuant to the IFSA and CFSA).

64.    Over the period March 2009 through March 2011, Nortel entered into and closed nine LOB transactions as follows:

| LOB | Sale Process Approval Date | Initial (Stalking Horse) Sale Price | Final Sale Price | % Increase in Sale Price | Closing Date |
|------|------|------|------|------|------|
| Layer 4-7 | 2/27/2009 | $17,650,000 | $17,650,000 | - | 3/31/2009 |
| CDMA/LTE | 6/29/2009 | $650,000,000 | $1,130,000,000 | 74% | 11/13/2009 |
| NGPC | 9/29/2009 | n/a | $10,000,000 | n/a | 12/8/2009 |
| Enterprise | 8/4/2009 | $475,000,000 | $900,000,000 | 89% | 12/19/2009 |
| MEN | 10/15/2009 | $390,000,000 | $769,000,000 | 97% | 3/19/2010 |
| GSM/GSM-R | 10/15/2009 | n/a | $103,000,000 | n/a | 3/31/2010 |
| CVAS | 1/6/2010 | $282,000,000 | $282,000,000 | - | 5/28/2010 |
| GSM Retained Contracts | n/a | n/a | $2,000,000 | n/a | 6/4/2010 |
| MSS | 9/1/2010 | $39,000,000 | $65,000,000 | 67% | 3/11/2011 |
| TOTAL | | | $3,278,650,000 | | |

65.    The LOB sale processes generally utilized a stalking-horse auction process that ultimately generated sale proceeds in excess of $3.2 billion. The transactions were also going concern sales resulting in more than 10,600 of Nortel's global employees being transferred to the various purchasers and the preservation of most Nortel supplier and customer relationships.

66.    In consultation with Nortel's M&A group and representatives of the other Estates, the Monitor led the LOB sale negotiations on behalf of the Canadian Debtors, including focusing on advancing and protecting the interests of the Canadian Estate in the context of the transaction negotiations and ultimate sales. The Monitor's and its counsel's activities in connection with the LOB transactions included:

(a)    reviewing and negotiating the terms of various sale processes and bidding procedures with the Estates and their respective stakeholders;

(b)    assisting in negotiating potential stalking-horse bids with various bidders and reviewing and commenting on draft documentation;

(c)     assisting and reviewing Nortel's efforts to operationally and financially "carve-out" the individual LOBs from the wider Nortel enterprise;

(d)     assisting in negotiating, reviewing and commenting on definitive stalking-horse transaction documentation (including asset sale agreements, intellectual property license agreements, transitions services agreements, bidding procedures, approval and vesting orders and dozens of other transaction documents), particularly as related to the interests of the Canadian Estate;

(e)     reporting to the Court on the terms of stalking-horse LOB transactions in connection with the Canadian Debtors' motions seeking approval of such transactions;

(f)     assisting in negotiating with various potential bidders in the Court-approved auction processes, reviewing and considering submitted bids and attending at the auctions to represent the interests of the Canadian Estate;

(g)     updating stakeholders regarding the status of the various LOB sale processes;

(h)     assisting in negotiating, reviewing and commenting on definitive transaction documents, particularly as related to the interests of the Canadian Estate;

(i)     reporting to the Court on the results of the auctions and the terms of the ultimate LOB transactions in connection with the Canadian Debtors' motions seeking approval of such transactions;

(j)     assisting the Canadian Debtors in closing and implementing the LOB transactions;

(k)     negotiating various inter-Estate and other LOB transaction related side agreements that governed, for instance, the sharing of certain transaction related expenses among the Estates as well as the various distribution escrow agreements that govern the holding and distribution of the LOB sale proceeds; and

(l)     assisting in negotiating the resolution of various disputes between Nortel and the LOB purchasers, including significant purchase price disputes with Avaya and

Genband, reviewing and commenting on settlement documentation, and reporting to the Court on settlements.

*Employee Hardship Process*
(Timeframe: June 2009 – Ongoing)

67.     As described above, there were various employee related motions early on in the CCAA proceedings. The evidence filed in connection with those motions established that some former employees and LTD employees were suffering hardship as a result of the cessation or reduction of benefit payments or other amounts owing to them (e.g. termination and severance payments) by the Canadian Debtors. On June 18, 2009, this Court issued an Endorsement directing the Monitor to "…determine the feasibility of establishing a process by which certain creditors facing hardship might receive a partial distribution in advance of a general distribution to creditors."

68.     The Monitor considered and, in consultation with various stakeholders, developed such a process and on July 30, 2009, this Court issued an Order approving an employee hardship application process (the "**Hardship Process**"). The Hardship Process was established to provide a means whereby former employees with a claim against the Canadian Debtors could apply for interim distributions upon demonstrating financial hardship resulting from loss of income and/or medical benefit coverage. The Hardship Process has allowed eligible claimants to receive a timely interim distribution in advance of a general distribution to creditors. The initial funding approved for the Hardship Process was CA$750,000. From time to time the Monitor has sought funding increases based on its experience in administering the Hardship Process. As at the writing of this Report, total funding approved for the Hardship Process was CA$2.3 million.

69.     The activities of the Monitor and its counsel in connection with the Hardship Process have included:

(a)     working closely with the Canadian Debtors and Representative Counsel to develop criteria to evaluate applications for hardship payments asserted by Canadian resident former employees, LTD beneficiaries or survivors of

pensioners of the Canadian Debtors and establishing a process for the submission and review of applications and the payment of accepted claims;

(b)     preparing Court materials in respect of, and seeking Court approval of, the Hardship Process and amendments thereto;

(c)     working with the Canadian Debtors and Representative Counsel to propose certain amendments to the funding levels and eligibility criteria for the Hardship Process and extension of the expiry date of the Hardship Process from time to time; and

(d)     administering the Hardship Process, including reviewing and considering more than 410 applications received, record keeping, communicating with applicants (to, for instance, request missing information), arranging payments and dealing with tax-related issues, reporting to Representative Counsel on a weekly basis, convening and attending hardship committee meetings and conference calls and reporting to the Court on the status of the Hardship Process.

_Asia Restructuring Agreement and Other Fourth Estate Matters_
(Timeframe: November 2009 – Ongoing)

70.     As noted above, as at the Filing Date Nortel was a worldwide multi-national company that operated in almost every country in the world and had approximately 126 corporate subsidiaries. Many of these entities, including numerous legal entities in the APAC and CALA regions, are (or were) direct or indirect subsidiaries of NNL. As described in greater detail below, a significant focus of the Monitor's efforts has been on restructuring, liquidating and winding-up these controlled entities such that any remaining equity value can be repatriated to NNL for the benefit of creditors.

71.     In addition, the Monitor has dealt with issues arising from the insolvency and liquidation filings of various Nortel subsidiaries to the extent they impact the interests of the Canadian Estate (such as, for instance, preserving the value of Nortel's LOBs pending their sale), including dealing with issues arising from insolvency and liquidation filings in China, Singapore, Australia, Mexico, Ecuador, Uruguay, Argentina, Thailand, New

Zealand, Vietnam, Malaysia, Indonesia, Taiwan, Peru and Hungary, among other countries.

72.    Following the insolvency filings, many of the Nortel entities in the APAC region faced liquidity and/or balance sheet constraints that threatened their ability to continue in business and created the risk of local bankruptcy proceedings being commenced in respect of such entities. In addition to the continued operation of these entities being important for purposes of facilitating the LOB transactions, NNL had a direct economic interest in many of these APAC entities by virtue of being an equity holder and/or an intercompany creditor. There were significant intercompany balances owing between the various APAC entities, as well as between the APAC entities and various Canadian, U.S. and EMEA Debtor entities. The result was that each of the Estates had a significant (and sometimes conflicting) economic interest in the APAC entities.

73.    On November 5, 2009, the Estates and 11 Nortel entities in the APAC region entered into the Asia Restructuring Agreement (the "**ARA**"). The ARA implemented a restructuring plan for the APAC entities that addressed both pre-filing and post-filing intercompany balances owing by those entities. This in turn assisted in addressing the liquidity and/or balance sheet constraints faced by many of the APAC entities, allowing them to continue their business operations and participate in the LOB sales.

74.    The Monitor and its counsel led the negotiations relating to the ARA on behalf of the Canadian Estate. These efforts included:

(a)    reviewing and preparing materials with respect to transfer pricing related obligations between the Canadian Debtors and the APAC entities;

(b)    reviewing and reconciling intercompany payables and receivables owing between the APAC entities and between the APAC Entities and each of the Canadian Debtors, U.S. Debtors and EMEA Debtors;

(c)    assisting management in evaluating the liquidity and solvency of the APAC entities;

- 30 -

(d)    assisting in the development of a monthly reporting process for the APAC entities as well as reporting on a monthly basis to stakeholders and their respective advisors regarding same and responding to queries;

(e)    working with APAC entity representatives in developing and proposing the restructuring plan reflected in the ARA and negotiating the plan with the other Estates and representatives of the APAC Entities and consulting with stakeholders and their respective advisors;

(f)    negotiating the ARA and reviewing and commenting on its terms and that of related security documentation;

(g)    reporting to the Court on the terms of the ARA in connection with the Canadian Debtors' motions seeking approval of the ARA; and

(h)    monitoring the implementation of the ARA as it related to the liquidity of the APAC entities and the payment of intercompany balances.

75.    In light of the Canadian Debtors' direct and indirect economic interest in many of the APAC and CALA entities, the Monitor has also assisted in monitoring and facilitating the ongoing wind-up and liquidation of these non-filed entities, including by:

(a)    negotiating a Trust Indenture dated April 5, 2010, that established a $35 million trust in favour of certain individuals to assist in ensuring such individuals would continue to serve as directors, officers or agents of APAC and CALA entities;

(b)    assisting in running a sale process for and negotiating the December 2010 sale of the assets of Guangdong Nortel Telecommunications Equipment Co. Ltd. ("**GDNT**"), a Chinese joint venture owned by NNL, a wholly owned NNL subsidiary and various state-controlled Chinese entities, to Ericsson for approximately $50.4 million;

(c)    overseeing the liquidation and winding up of various non-filed Nortel entities in which the Canadian Debtors maintain an economic interest, such as GDNT, Nortel Networks (China) Limited and Nortel Networks (India) Private Limited,

including liaising with various local professional advisors (e.g. local law firms and accounting firms) to implement such liquidations, dealing with tax clearance issues and issues relating to the transfer of foreign currencies out of state pursuant to local law and negotiating with other stakeholders regarding the liquidation of such entities; and

(d)     overseeing and seeking the repatriation of funds to NNL through the payment of intercompany balances, dividends or other equity distributions, resulting in receipt of approximately $328 million to date.

*Final Canadian Funding and Settlement Agreement*
(Timeframe: November 2009 – February 2010)

76.     As described above, one of the significant challenges faced by the Canadian Debtors in the first year of these proceedings was addressing the significant cash burn they continued to incur pending closing of the LOB sales as a result of continuing to fund R&D and corporate overhead costs notwithstanding the cessation of transfer pricing payments. On December 23, 2009, the Canadian Debtors, the Monitor and the U.S. Debtors entered into the Final Canadian Funding and Settlement Agreement (the "**CFSA**") pursuant to which NNI agreed to make a payment of approximately $190 million to NNL in full satisfaction of its reimbursement obligations in respect of corporate overhead, R&D, and other costs incurred by any of the Canadian Debtors for the benefit of the U.S. Debtors for the period October 1, 2009, through the end of the CCAA proceedings. In addition, pursuant to the CFSA NNL agreed to admit a $2.0627 billion claim by NNI (the "**NNI Claim**") in settlement of (among other things) any transfer pricing overpayments made by NNI to NNL for the period 2001 through 2005 and an outstanding revolving loan.

77.     The Monitor led the negotiations with the U.S. Debtors and various stakeholders leading to the CFSA. The activities of the Monitor and its counsel in connection with the CFSA included:

(a)     preparing and distributing various financial models that supported the Canadian Debtors' funding request;

(b)  reviewing and considering NNL's and NNI's respective tax positions for the years 2001 through 2005 and alleged transfer pricing overpayments by NNI to NNL during that period;

(c)  negotiating, reviewing and commenting on the CFSA, including considering the NNI Claim;

(d)  updating stakeholders regarding the proposed terms of the CFSA; and

(e)  reporting to the Court on the terms of the CFSA in connection with the Canadian Debtors' contested motion seeking approval of the CFSA.

78.  In addition to establishing the NNI Claim, the CFSA provided that each of NNL and NNI enter into an advance pricing arrangement ("**APA**") with the Canada Revenue Agency ("**CRA**") and Internal Revenue Service, respectively, with respect to the tax years 2001 through 2005. The Monitor and its counsel led discussions and negotiations relating to the APA with the CRA and assisted the Canadian Debtors in responding to CRA information requests related thereto.

**II.    2010**

*Overview*

79.  In 2010, the Monitor's focus was on closing the remaining LOB transactions, conducting sale processes in respect of a number of significant assets of the Canadian Debtors, including NNL's interest in LG-Nortel Co. Ltd. (a Korean joint venture with LG Electronics) and the Carling Campus (as defined below), and implementing various processes to resolve claims against the Canadian Debtors. In addition, with the conclusion of many of the LOB transactions the Estates continued their efforts to negotiate a process to allocate the resulting sale proceeds and participated in the first mediation in an attempt to resolve allocation and other inter-Estate disputes. Approximately 30% of the Monitor's and its counsel's fees for 2010 were attributable to Nortel's operations, including performance under transition services agreements ("**TSAs**"), CCAA administration and asset realizations, approximately 30% were attributable to the various CCAA claims resolution processes, and approximately 30%

were attributable to negotiations, mediation and other Allocation and Claims Litigation related matters.

<u>UK Pensions Regulator's Warning Notice and FSD Proceedings</u>

(Timeframe: January 2010 – January 2011)

80.     On January 11, 2010, the UK Pensions Regulator (the "**UKPR**") issued a document to NNC and NNL styled: "Warning Notice". The Warning Notice purported to commence a proceeding enabling the UKPR to make financial support direction ("**FSD**") orders under U.K. pension law that would require target entities (such as NNC and NNL) to become liable to contribute funds towards the deficit in the pension plan maintained by NNUK. The Monitor was of the view that the service of the Warning Notice was a breach of the CCAA stay and the first step in an attempt establish a substantial monetary claim against the Canadian Debtors outside of the CCAA Claims Process (as defined below). In addition, many of the matters that would likely have been in dispute in any FSD litigation (e.g. Nortel's transfer pricing regime) were issues that went to the heart of the then nascent Allocation and Claims Litigation. Accordingly, the Monitor brought a motion seeking certain relief from this Court in response to the Warning Notice, including that it be declared a breach of the CCAA stay, null and void and not capable of creating any rights against the Canadian Debtors or their assets in Canada.

81.     As the result of a motion brought by the Monitor, the issuance of the Warning Notice was found by Order of this Court dated February 26, 2010, to constitute a breach of the CCAA stay and this Court granted substantially all of the relief sought by the Monitor. This decision was upheld on appeal to the Ontario Court of Appeal by decision dated June 16, 2010. The UKPR's subsequent application for leave to appeal to the Supreme Court of Canada was dismissed on January 27, 2011.

82.     The activities of the Monitor and its counsel in connection with the Warning Notice litigation included:

        (a)     reviewing the Warning Notice and consulting with U.K. counsel regarding the Warning Notice;

(b)     consulting with the U.S. Debtors and other stakeholders regarding the Warning Notice;

(c)     preparing and bringing a motion to this Court seeking to have the Warning Notice declared (among other things) null and void; and

(d)     responding to the leave to appeal motions and appeals filed by the UKPR.

*Employee Settlement Agreement*

(Timeframe: November 2009 – December 2010)

83.     With the LOB sales underway and a substantial portion of the Canadian Debtors' workforce planned to be transferred to the various purchasers, the Monitor assisted in identifying several employee related matters that needed to be addressed, including the following:

(a)     the transition of benefits for continuing employees from existing benefit plans and administrative processes to a structure more appropriate for the reduced workforce;

(b)     the termination of unfunded and non-pension benefits for pensioners, long-term disability ("**LTD**") beneficiaries and survivors in an orderly manner, without undue disruption;

(c)     the transition of the Canadian registered pension plans and the ongoing funding of such plans;

(d)     the status and wind-up of the HWT; and

(e)     the achievement of greater certainty regarding the ranking of employee claims.

84.     The Monitor had engaged in discussions with Representative Counsel and representatives of Unifor with respect to the claims of their respective constituents since the appointment of Representative Counsel in May 2009. Those discussions intensified with the completion of certain of the LOB transactions and the signing of the CFSA in December 2009. Throughout January 2010 the parties engaged in extensive negotiations and

exchanged numerous proposals. In addition, counsel for the Canadian Debtors' continuing employees were kept apprised of these discussions.

85.   The numerous meetings, negotiations and proposals exchanged among affected parties culminated in the execution of a Settlement Agreement dated February 8, 2010 (the "**Employee Settlement Agreement**") by the Canadian Debtors, Monitor, various former employee and LTD representatives, Representative Counsel and Unifor (collectively, the "**Settlement Parties**").

86.   The terms of the Employee Settlement Agreement provided certainty to the Canadian Debtors and their stakeholders by establishing the date on which the Canadian Debtors would terminate payment of benefits to pensioners, LTD beneficiaries and survivors, facilitating the distribution of the HWT, providing advance notice of such termination and preserving the corpus of the HWT to the extent possible pending a Court approved distribution. In total, the Employee Settlement Agreement provided for payments of approximately CA\$57 million in employee benefits, pension plan contributions and termination payments, while beneficiaries of the HWT, including pensioners, LTD beneficiaries and survivors, maintained their rights in respect of the HWT. The Employee Settlement Agreement also confirmed that all employee claims allowed against the Canadian Debtors would be admitted as ordinary unsecured claims.

87.   The Monitor led the negotiations with the Settlement Parties leading to the Employee Settlement Agreement. The activities of the Monitor and its counsel in connection with the Employee Settlement Agreement included:

(a)   reviewing and considering correspondence from Representative Counsel regarding payment of benefits and matters related to the pension plans, HWT and other employee matters;

(b)   negotiating and drafting the Employee Settlement Agreement, which involved numerous meetings, negotiations and exchange of proposals among affected parties;

(c)   updating stakeholders regarding the proposed terms of the Employee Settlement Agreement, including through the development and implementation of an

extensive notice and opposition process set out in the Notice of Procedure Order granted by this Court on February 9, 2010, which involved:

   (i)    the preparation and posting on the Monitor's website of a notice letter, notice of appearance (both in English and French), the Employee Settlement Agreement and other relevant documents;

   (ii)   the sending of the notice letter to each of the former employees, LTD beneficiaries, continuing employees (both unionized and non-unionized) and the provincial pension plan regulators; and

   (iii)  publishing the notice letter in several newspapers;

(d)    reporting to the Court on the terms of the Employee Settlement Agreement in connection with the Canadian Debtors' motion seeking approval of same, which was contested by the UCC, the Bondholder Group and a small group of dissenting LTD beneficiaries (the "**Dissenting LTD Beneficiaries**");

(e)    negotiating and preparing an amended and restated version of the Employee Settlement Agreement (the "**A&R Employee Settlement Agreement**") that was approved by the Court as representing a fair and reasonable compromise; and

(f)    preparing court materials in response to a leave to appeal application filed by the Dissenting LTD Beneficiaries of the Order approving the A&R Employee Settlement Agreement, which leave to appeal application was ultimately denied by the Ontario Court of Appeal.

88.    Following Court approval of the A&R Employee Settlement Agreement, the Monitor oversaw the payment of benefits through December 31, 2010, in accordance with the agreement and assisted with the administration of the CA$3,000 termination payments made to eligible former employees, including the extension of the eligibility criteria to a group of additional former employees and obtaining a Court order in March 2016 to address matters relating to termination payments owing to 54 former employees.

89.    In addition, the Monitor worked closely with the Canadian Debtors and Service Canada to ensure appropriate steps were taken with respect to the termination of employment of the LTD beneficiaries, whose situation with respect to records of employment, potential employment insurance benefits and other claims was complex.

90.    With respect to employee benefits, the Monitor worked closely with the Canadian Debtors, Sun Life and Representative Counsel to manage the termination of benefits. Sun Life provided benefits to the employees and former employees under "administrative services only" policies and took on no risk with respect to the provision of such benefits. Given the number of employees and the comprehensive nature of Nortel's benefit programs, the termination of these benefits and Sun Life's administration brought with it its own complexity. The final accounting required a review of all outstanding matters and negotiation of an amount to be held by Sun Life for incurred but not reported claims and amounts for claims in dispute. The final accounting and completion of the arrangements with Sun Life did not occur until August 31, 2011.

91.    Pursuant to the A&R Employee Settlement Agreement, NNL ceased to be the administrator of the Canadian registered pension plans on September 30, 2010, and Morneau Sobeco Limited Partnership (now Morneau Shepell Ltd.) ("**Morneau**") was appointed by the Ontario Superintendent of Financial Services to act as administrator of the plans. The original Nortel pension plans were adopted in 1920. There have been many tens of thousands of members and survivors of members over the decades. The records were in part in hard copy and also electronic. The transfer of administration from NNL to Morneau as plan administrator required the transfer of records so that member data was readily accessible and useable as soon as the wind-up began, to ensure there was no interruption in benefits and to reduce costs to the extent possible. The Monitor assisted in the transition by working with the Canadian Debtors, Mercer (Canada) Limited ("**Mercer**") (the Canadian Debtors' pension and benefits consultant) and Morneau and resolving issues as they arose, ensuring co-operation and as smooth and cost effective a transition as possible.

92.    From the time of their appointment, Representative Counsel and the former employees' financial advisors and actuarial advisors actively considered and advocated for alternative

arrangements for the Canadian registered pension plans beyond the traditional wind-up provided for in the *Pension Benefits Act* (Ontario). The Canadian Debtors and Monitor consulted with Representative Counsel as appropriate with respect to pension administration issues, and provided information and some assistance in the exploration of alternatives to a traditional wind-up whose goal was to reduce or ameliorate the impact of the pension deficits. There were numerous related meetings and presentations in which the Monitor and its counsel participated. Ultimately, the Province of Ontario enacted a regulation that enabled pensioners to transfer funds out from a pension plan in wind-up, on an individual basis, which was in part responsive to the requests of Representative Counsel and the NRPC.

*Canadian Asset Sales*

(Timeframe: May 2009 – March 2011)

93.    In addition to the various LOB sales, in the period from May 2009 through early 2011, the Monitor oversaw the Court-approved sales processes for various assets of the Canadian Debtors, including:

(a)    the May 2009 sale of the Westwinds Business Complex in Calgary, Alberta for approximately CA$97 million;

(b)    the November 2009 sale of certain vacant lands in Ottawa for approximately CA$8.85 million;

(c)    the April 2010 sale of shares in LG-Nortel Co. Ltd. (a Korean joint venture between NNL and LG Electronics) to Ericsson for approximately $242 million following an 11 month sale process;

(d)    the June 2010 sale of the assets related to the wireless backhaul and multi-hop digital repeater/relay research development program to 7522312 Canada Inc. for approximately $0.6 million;

(e)    the late 2010 sale of 3500 Carling Avenue (the Canadian Debtors' main research and development campus) (the "**Carling Campus**") to Her Majesty the Queen in

Right of Canada as represented by the Minister of Public Works and Government Services for approximately CA$208 million; and

(f)    the March 2011 sale of five million limited partnership units in Summerhill Ventures LLP to CS SP IV Investments Canada Corp. for approximately $0.5 million.

94.    The activities of the Monitor and its counsel in connection with these sale processes and transactions included:

(a)    marketing (in certain cases with the assistance of other professional advisors to the Canadian Debtors) the asset for sale;

(b)    conducting a sale process for the asset in question, including attending meetings and telephone conferences and exchanging correspondence with potential bidders;

(c)    updating stakeholders regarding the status of the various sales processes;

(d)    negotiating transaction documentation with potential bidders and negotiating, reviewing and commenting on definitive transaction documentation with the ultimate purchasers;

(e)    reporting to the Court on the results of the sale process and the terms of the proposed transaction in connection with the Canadian Debtors' motions seeking approval of such transactions;

(f)    assisting the Canadian Debtors in closing and implementing the transactions; and

(g)    in the case of the Carling Campus sale, negotiating a post-sale lease allowing the Canadian Debtors to continue to remain in a portion of the Carling Campus to facilitate the continued operation of the Canadian Debtors' IT infrastructure, negotiating and implementing the discharge of the Court-ordered charge on the Carling Campus and repaying the approximately $75 million loan from NNI secured thereby.

<u>CCAA Claims Process</u>

(Timeframe: July 2009 – Ongoing)

95.     On July 30, 2009, this Court granted a Claims Procedure Order establishing a claims bar date of September 30, 2009, for various classes of claims against the Canadian Debtors, and on September 16, 2010, this Court granted a Claims Resolution Order governing the review and resolution of such claims (the "**CCAA Claims Process**").[9] 1,146 claims have been filed in the CCAA Claims Process totalling approximately CA$39.9 billion. The Monitor has overseen and continues to oversee all aspects of the CCAA Claims Process, including by:

(a)     assisting the Canadian Debtors in preparing their list of known creditors;

(b)     preparing and sending the CCAA Claims Process proof of claim package to known creditors and preparing and publishing notice of the CCAA Claims Process;

(c)     discussing the CCAA Claims Process with creditors;

(d)     reviewing proofs of claim and supporting documentation filed and reconciling (or assisting the Canadian Debtors' personnel in reconciling) proofs of claim with Nortel's books and records;

(e)     consulting with counsel to the Monitor with respect to certain claims to the extent such claims required legal analysis;

(f)     administering the Monitor's CCAA Claims Process database which includes detailed claim information, documentation, correspondence and claim status by individual claim;

(g)     administering changes to claim details (e.g. contact and address changes and claim assignments) and administering the toll-free claims hotline;

---

[9] The most notable classes of claims excluded from the CCAA Claims Process are Compensation Claims (as defined below) and intercompany claims. The Monitor has also overseen claims processes for these classes of claims, which are discussed later in this Report.

(h)     preparing and issuing approximately 550 notices of disallowance;

(i)     negotiating and resolving proofs of claim (including the approximately 160 dispute notices filed to date) with creditors;

(j)     preparing updates in respect of the CCAA Claims Process, including preparing and delivering a summary of the status of the CCAA Claims Process to the representatives of certain stakeholders on a monthly basis as directed by the Claims Resolution Order;

(k)     negotiating the Cross-Border Protocol on the Resolution of Claims approved by this Court and the U.S. Court that governs the resolution of claims filed against both the Canadian Debtors and the U.S. Debtors and consulting with and negotiating the resolution of such claims with the U.S. Debtors; and

(l)     where necessary, referring disputed claims to a claims officer for resolution and instructing counsel with respect to such claim disputes.

96.     Of the 1,146 claims filed in the CCAA Claims Process, 1,012 claims with a claim value of approximately CA\$2.9 billion (original filed claim amount of approximately CA\$12.5 billion) were classified by the Monitor as "Accepted or Reviewed and unadjusted" as at May 31, 2016. Accordingly, with respect to claims resolved through the Period, the Monitor had reduced the value of those claims by approximately CA\$9.6 billion, or approximately 77%.[10]

97.     Significant claims resolved in the CCAA Claims Process through May 2016 include:

(a)     settling claims in excess of \$137 million relating to various master services agreements with a multi-national group of companies for approximately \$16.9 million;

(b)     settling disputed claims totalling in excess of CA\$40 million in respect of the repudiation of an outsourcing and revenue sharing program and unpaid invoices,

---

[10] Although certain claims have yet to be finally resolved, the Settlement and Plans Support Agreement resolves the significant majority in value of unresolved claims outstanding as at the end of the Period.

- 42 -

including amounts asserted to be post-Filing Date obligations, for total unsecured claims of approximately $4.3 million;

(c)     settling disputed claims totalling approximately $42.3 million in respect of the repudiation of a joint development and purchase agreement and unpaid invoices for approximately $11 million;

(d)     settling disputed claims totalling approximately CA$24 million in respect of the repudiation of contracts relating to the lease of certain equipment for CA$14.5 million;

(e)     settling claims totalling nearly $3 million, including alleged post-Filing Date obligations, for a cash payment of CA$107,185 by NNL and a license of certain intellectual property;

(f)     resolving claims in excess of CA$126 million relating to Nortel's performance bonding facility for approximately $20 million, including the return of approximately $470,000 to NNL on account of a deposit held by the creditor;

(g)     settling claims totalling approximately $3.6 million, including alleged post-Filing Date obligations, relating to the repudiation of a license agreement for an unsecured claim of $1.61 million;

(h)     settling disputed guarantee claims totalling approximately CA$722,000 filed by employees of a foreign Nortel affiliate for CA$212,500;

(i)     settling a claim for approximately $12.2 million relating to the repudiation of certain environmental monitoring and remediation obligations for $4.3 million;

(j)     settling a claim for approximately $18.4 million relating to excess and obsolete inventory obligations for $6 million;

(k)     settling and resolving claims totalling in excess of $40 million relating to certain environmental remediation obligations for claims of just over $3 million plus a cash payment of $300,000;

- 43 -

(l)     settling unliquidated indemnity claims of an insurance company and resolving a dispute over related amounts held in escrow resulting in the release of approximately US$7.7 million to NNC from escrow; and

(m)     disallowing in full a late claim for contribution and indemnity in the amount of approximately CA$264 million.

98.    The specific work undertaken in connection with the resolution of the above noted claims varies on a case by case basis, but has generally included all or some of the following activities by the Monitor and its counsel: (i) discussions and negotiations with the creditor and/or their counsel; (ii) exchanging correspondence regarding the claim, including exchanging settlement offers; (iii) the preparation of notices of disallowance and, to the extent a claim was referred to a claims officers for resolution, various other claim dispute filings such as pleadings and facta; (iv) participating in a mediation, including preparing mediation materials; and (v) drafting and negotiating settlement documentation and in certain cases seeking Court approval of the settlement in question.

99.    The Monitor continues to work to resolve outstanding claims, including by negotiating with claimants and/or disallowing such claims and referring them to a claims officer or this Court for resolution as required.

*Allocation Protocol Negotiation Efforts and Phillips Mediation*
(Timeframe: July 2009 – April 2011)

100.    Pursuant to the IFSA, the Estates were obligated to negotiate in good faith and attempt to reach agreement on a timely basis on a protocol for resolving disputes concerning the allocation of sale proceeds from sale transactions governed by the IFSA, which protocol was to provide binding procedures for the allocation of such sale proceeds where agreement had not been reached. From approximately mid-2009 into 2010, the Monitor, with the assistance of its counsel, engaged in negotiations with the U.S. Debtors, the Joint Administrators and certain stakeholders regarding the terms of such a protocol, including exchanging numerous drafts and convening numerous telephone conferences and meetings to discuss the draft protocol. During the course of these negotiations it became apparent the parties had differing views as to the proper scope of such a protocol and the

parties agreed to cease negotiations and instead focus on a process to facilitate comprehensive settlement discussions of all inter-Estate matters.

101.    This inter-Estate settlement negotiation process involved, among other things, the without prejudice exchange of documents outlining, in a summary form, putative heads of claims the Estates may have against each other and the establishment of an electronic data room in June 2010 populated with documents sought through information requests prepared by the Estates. Owing to the reduced headcount of the Canadian Debtors, the document review and production process undertaken by the Canadian Debtors was largely undertaken by the Monitor and its counsel, with assistance from counsel to the Canadian Debtors.

102.    The Estates and various of their stakeholders ultimately agreed this process would be aided by the appointment of a mediator and the parties selected Layn R. Phillips, a former U.S. federal district court judge and commercial arbitrator and mediator, to act as mediator. The first mediation sessions with Mr. Phillips took place in New York over four days in November 2010 and continued over the course of a further four days in April 2011 before concluding unsuccessfully. The efforts of the Monitor and its counsel in connection with the Phillips mediation included:

(a)    negotiating the terms of the mediation;

(b)    reviewing the approximately 43,000 documents posted in the mediation data room and other information exchanged by the Estates in advance of the mediation;

(c)    preparing a detailed opening mediation brief of the Canadian Debtors and the Monitor, including numerous detailed financial models in support thereof that modelled various recovery scenarios to creditors of the respective Estates;

(d)    consulting with stakeholders regarding the mediation (including the models described above);

(e)    reviewing opening mediation briefs of the other parties and preparing a reply mediation brief in November 2010 and a supplemental response in April 2011; and

(f)    preparing for and participating in the two mediation sessions.

*HWT Allocation Methodology and Distributions*
(Timeframe: March 2010 – Ongoing)

103.    The A&R Employee Settlement Agreement provided that the Settlement Parties would work towards a Court approved distribution of the HWT corpus in 2010 to the beneficiaries entitled thereto. This was in recognition of the importance and significance of achieving an allocation of the HWT corpus before the end of 2010 (when payment of benefits would cease) in order for distributions to be made to individuals based on such an allocation.

104.    The Monitor worked closely with the Canadian Debtors, the trustee of the HWT, Sun Life and Mercer on all major aspects of the Canadian Debtors' employee and former employee benefit plans and sought their assistance in assembling facts and documents relevant to the HWT.

105.    In order to analyze the options available for distribution of the funds held in the HWT, the Monitor and its counsel reviewed documentation relevant to the HWT that was available, which information the Monitor shared with Representative Counsel and Independent Counsel (as defined below).

106.    Following extensive compilation and review of documentation relevant to the HWT, including documents relating to the establishment of the HWT over 30 years ago, benefits information (i.e. policies with Sun Life and experience reports) and financial reports and valuations, the Monitor developed and sought Court approval of a proposed allocation methodology to enable a distribution of the HWT corpus.

107.    This Court approved the proposed allocation methodology (the "**Approved HWT Allocation Methodology**") by Order dated November 9, 2010 (the "**HWT Allocation Order**"). Counsel for the Dissenting LTD Beneficiaries filed an application for leave to appeal the HWT Allocation Order, which was denied by the Court of Appeal for Ontario. In addition, the Supreme Court of Canada dismissed a further application by the Dissenting LTD Beneficiaries for leave to appeal the HWT Allocation Order.

108. The Approved HWT Allocation Methodology enabled a distribution of the HWT corpus of approximately CA$80 million to its approximately 9,000 beneficiaries reasonably and equitably in an economical and practical manner to alleviate hardship felt by the beneficiaries of the HWT as a result of the insolvency of the Canadian Debtors.

109. The activities of the Monitor and its counsel in connection with the Approved HWT Allocation Methodology included:

   (a)    working with the applicable parties to compile information relevant to the HWT for review and inclusion in the Monitor's comprehensive report to the Court;

   (b)    extensive review of HWT documentation and preparation of a memorandum of law considering the potential interpretations of the HWT trust agreement;

   (c)    discussions and meetings with Mercer regarding its 2010 HWT preliminary valuation, which was prepared to assist with the analysis of the proposed allocation methodology and formed the basis for distribution of the HWT corpus;

   (d)    the development of the proposed allocation methodology, including the preparation of various illustrative allocation scenarios;

   (e)    providing assistance regarding the engagement by each of the Court Appointed Employee Representatives of independent legal counsel (collectively, "**Independent Counsel**") to represent the interests of their constituents in the HWT, including sharing information with Independent Counsel;

   (f)    the sharing of information with Representative Counsel and Independent Counsel and discussions with them regarding same;

   (g)    numerous in person meetings and telephone discussions concerning the HWT among various combinations of representatives of the Monitor and its counsel, the Canadian Debtors, Mercer, the trustee of the HWT and its counsel, Court Appointed Employees Representatives, Representative Counsel, Unifor counsel, Independent Counsel, counsel to the continuing employees, as well as their respective financial advisors as applicable;

(h)     working with Mercer on the preparation of beneficiary estimated allocation statements based on the proposed allocation methodology and delivery of same to LTD beneficiaries;

(i)     preparing a comprehensive report to the Court on the proposed allocation methodology, including a description of facts concerning the HWT with relevant HWT documents attached, in support of its request for Court approval of the proposed allocation methodology, and posting copies of same on the Monitor's website, together with French translations of the illustrative scenarios;

(j)     placing English and French versions of a notice of the proposed allocation methodology in various newspapers;

(k)     preparing responding materials relating to the leave to appeal motions filed by the Dissenting LTD Beneficiaries, each of which was dismissed by the Court of Appeal for Ontario and subsequently the Supreme Court of Canada;

(l)     working with Sun Life, the HWT trustee, Nortel HR staff and Nortel's payroll provider to establish new processes and payment mechanisms which did not previously exist;

(m)     completing over 21,000 individual payments over a total of eight interim and declared distributions from the HWT over a number of years;

(n)     addressing withholding tax issues arising from distributions from the HWT, including the issuance of approximately 30,000 tax slips, and issues arising from the fact that beneficiaries were located throughout Canada;

(o)     providing information to Representative Counsel with respect to an advance tax ruling request ("**ATR**") relating to the tax treatment of certain HWT distributions and the subsequent "test-case" appeal of the ATR to the Tax Court of Canada;

(p)     attending to approximately 2,700 calls and numerous emails regarding HWT and pension matters, distribution questions and other HWT related matters and

maintaining a database and distribution list of HWT beneficiaries, including updating the database for address and contact changes.

110.  After the Court granted the HWT Allocation Order (such that the proposed allocation methodology became the Approved HWT Allocation Methodology), the Monitor sought and obtained Court approval for the various distributions of the HWT corpus based on the Approved HWT Allocation Methodology. Interim distributions were made pending the final outcome of the leave to appeals, as well as the reconciliation of data and the determination of certain variables that could affect assets available for distribution.

111.  The Monitor also took a number of steps together with the Canadian Debtors to facilitate the allocation and distribution of the HWT corpus, including:

(a)  reducing the term of the investments held by the HWT;

(b)  establishing a new banking arrangement for payment of continuing employee health benefits;

(c)  requesting a tax ruling with respect to the taxability to recipients of funds to be distributed from the HWT;

(d)  terminating the LTD program for working employees;

(e)  investigating options with respect to life insurance;

(f)  addressing stale-dated cheques and unclaimed distribution cheques through a Court-approved process; and

(g)  working with the CRA in respect of tax matters, including alternative minimum tax ("**AMT**"), and seeking and obtaining a refund on account of AMT.

112.  On November 19, 2013, this Court granted an Order setting out the procedure for a final distribution from the HWT and termination of the HWT (the "**HWT Declared Distribution Order**"), which would bring total distributions on participating benefits to

38% .[11] The activities of the Monitor and its counsel in connection with the termination of the HWT included:

(a)     assisting in the accounting of the HWT from 2009 to present;

(b)     coordinating with KPMG with respect to conducting specified auditing procedures on the HWT financial reporting and to report thereon and working closely with the Court Appointed Employee Representatives and Representative Counsel on the development of these procedures and reporting;

(c)     considering KPMG's specified auditing procedures report and the sharing of such report with Representative Counsel and former employee and LTD representatives;

(d)     working with KPMG on additional procedures to address requests of the foregoing parties following their review of the report;

(e)     working, in conjunction with the Canadian Debtors and the HWT trustee, with CRA to obtain appropriate comfort to allow for a final distribution from the HWT and the conclusion of its tax affairs and obtaining a clearance certificate from the CRA;

(f)     working with Representative Counsel and the HWT trustee to develop a process and resolution allowing for a final distribution from the HWT and its termination, as reflected in the HWT Declared Distribution Order; and

(g)     implementation of the process set out in the HWT Declared Distribution Order.

113.    The Monitor continues to work with the HWT trustee, the Court Appointed Employee Representatives and Representative Counsel, Unifor and others to finalize matters to complete the wind-up of the HWT.

---

[11] With the total distribution on account of pension life benefits being 31.2% after application of the pensioner life premium reduction.

114.    The appeals of the ATR by the Court Appointed Employee Representatives and Representative Counsel are pending and the Monitor has been providing information to the parties in connection with these appeals.

*Estate Separation and Wind-down Activities and Transition Services*

(Timeframe: June 2010 – December 2011)

115.    At the Filing Date, many of Nortel's corporate functions spanned multiple legal entities across the three Estates. For example, the accounts payable function for Nortel's North American operations was conducted primarily out of Nashville, Tennessee, while the North American Treasury function operated primarily out of the Mississauga, Ontario corporate office. With most of the LOB transactions having closed by the spring of 2010, the interdependency of the Nortel entities began to diminish and the Estates took steps to prepare for the separation of various functions to allow for each of them to become a "standalone" entity able to independently administer and complete its wind-down. The activities of the Monitor (with the assistance of certain remaining employees of the Canadian Debtors) in connection with Estate separation included:

(a)    considering and directing the separation of various accounting and finance functions and related IT systems, and where necessary, the creation of a particular function/role or process for the Canadian Debtors, while maintaining the Canadian Debtors compliance requirements and ability to continue to fulfill Nortel's financial statement and other public reporting obligations;

(b)    considering and directing the separation of Nortel's IT infrastructure, including the cloning of various servers and applications and transfer of certain data between the Estates; and

(c)    negotiation of an inter-Estate agreement regarding the provisions of certain services between Estates to continue during a transition period including cost and payment settlement terms.

116.    The closing of the LOB transactions also resulted in the cessation of most ongoing business activities of the Canadian Debtors except for the provision of transition services

to the various LOB purchasers. The activities of the Monitor in connection with transition services included:

(a) coordination of personnel and functions to enable the Canadian Debtors to fulfil the various TSAs while also achieving reductions in headcount and costs;

(b) working closely with the Canadian Debtors and U.S. Debtors to identify key employees who were considered essential to fulfilling the TSAs, assisting in developing and considering a key employee incentive/retention plan for those employees and consulting with stakeholders and their respective advisors regarding same;

(c) assisting in the preparation of detailed TSA personnel and services budgets for the provision of services to the LOB purchasers; and

(d) ongoing monitoring and review of the overall provision of TSA services and operations as against budgets and TSA revenues earned from the LOB purchasers.

*UKPC Claims*
(Timeframe: September 2009 – Ongoing)

117. On or about September 30, 2009, the Board of Trustees of NNUK's U.K. Pension Plan (the "**Trustee**") and the Pension Protection Fund (the "**PPF**" and with the Trustee, the "**UKPC**")[12] filed proofs of claim against each of the Canadian Debtors in accordance with the Claims Procedure Order (the "**Original UKPC Proofs of Claim**"). Although a total liquidated claim amount was not specified, the Original UKPC Proofs of Claim filed by the Trustee against NNL claimed:

(a) £495.25 million in respect of amounts alleged owing pursuant to a guarantee made by NNL in favour of the Trustee dated November 21, 2006 (the "**Funding Guarantee**");

---

[12] At the commencement of the trial of the UKPC Claims, counsel to the UKPC represented that the claims of the UKPC represent 93% of the total claims against NNUK, and 76% of the total claims against the EMEA Debtors. Accordingly, throughout these CCAA proceedings the UKPC and the EMEA Debtors have been aligned in the goal of achieving significant distributions to the EMEA Debtors, be it in the context of the Allocation Dispute, or on account of their respective significant claims asserted against the Canadian Debtors.

(b)    $150 million in respect of amounts alleged owing pursuant to a guarantee made by NNL in favour of the Trustee dated December 21, 2007 (the "**Insolvency Guarantee**"); and

(c)    an unspecified placeholder claim in respect of liability owing pursuant to the FSD regime under the *U.K. Pensions Act 2004*, as amended.

118.    Although no liquidated claim amount was specified with respect to the alleged FSD liability, the Original UKPC Proofs of Claim note that the "section 75 debt of NNUK" (i.e. the amount that would be due from NNUK to the Trustee in connection with the funding deficiency of the U.K. Pension Plan) had been estimated to be £2.1 billion as at January 13, 2009, and that the Joint Administrators had stated that an informal estimate of the section 75 debt of NNUK was $3.055 billion. Accordingly, in addition to the guarantee claims, the Original UKPC Proofs of Claim raised the possibility of an FSD related claim in excess of $3 billion against NNL. The same unliquidated FSD liability was claimed against each of the other Canadian Debtors. Accordingly, the Original UKPC Claims contemplated aggregate claims against the Canadian Debtors of nearly CA$20 billion.

119.    Following the decision of the Court of Appeal dated June 16, 2010, relating to the Warning Notice litigation described above, the UKPC was given an opportunity to amend the Original UKPC Proofs of Claim and on November 29, 2010, filed amended proofs of claim against NNC and NNL (collectively, the "**Amended UKPC Proofs of Claim**" and with the Original UKPC Proofs of Claim, the "**UKPC Claims**"). Like the Original UKPC Proofs of Claim, the Amended UKPC Proofs of Claim failed to specify a total liquidated claim amount. They were also filed in addition to and did not replace the Original UKPC Claim against NNL in respect of the Funding Guarantee and the Insolvency Guarantee.

120.    The Amended UKPC Claims asserted an FSD related claim of up to £2.1 billion against each of NNC and NNL, including on the following basis:

(a)    "[NNC and NNL] controlled NNUK, ignoring its separate legal identity, and used it for their own direct and indirect benefit, with insufficient regard for NNUK's funding needs as employer of the Scheme."

(b)    "NNUK was seriously under-remunerated by [Nortel's] transfer pricing system, which operated to the advantage of [NNC and NNL]."

(c)    "NNUK was subject to other financially detrimental treatment by [NNC and NNL] and the [Nortel] Group, in particular the US$950m interest-free loan to NNL and the Project Swift transaction."

121.    As alternatives to the FSD claim, the Amended UKPC Claims also asserted:

(a)    an oppression claim under section 241 of the *Canada Business Corporations Act*; and

(b)    a claim for breach of the "implied obligation of good faith" under U.K. pension law for conduct on the part of NNC and NNL "…by virtue of their control over NNUK and in particular the discharge of its duties toward the [U.K. pension plan]."

122.    The Amended UKPC Claims contemplate joint and several liability of NNC and NNL for the FSD claim.

123.    The UKPC also sought documentary discovery from the Canadian Debtors in respect of a broad category of documents for the period 1991 to 2009. In addition to categories of documents relating to pension matters, the UKPC also sought discovery of various documents relating to Nortel's transfer pricing regime and the treatment of intangible property.

124.    As outlined in the Sixty Fifth Report of the Monitor dated April 28, 2011, there was significant overlap between the UKPC Claims and the EMEA Claims (as defined and described below). For instance, both asserted claims against the Canadian Debtors alleged to be arising out of:

(a)    the Nortel group's transfer pricing arrangements;

(b)    the Nortel group's intercompany loan arrangements;

(c)    Project Swift, an intercompany transaction completed in 2007; and

(d)     the alleged underfunding of NNUK's pension plans.

125.    At this stage of dealing with the UKPC Claims, the work of the Monitor and its counsel included:

(a)     reviewing and considering the Original UKPC Proofs of Claim and the Amended UKPC Proofs of Claim and the supporting documentation filed therewith, including consulting with U.K. counsel regarding such claims; and

(b)     preparing the Sixty Fifth Report of the Monitor dated April 28, 2011, which provided an overview of the UKPC Claims.

126.    As discussed in further detail later in this Report, the Monitor and its counsel performed significant additional work with respect to the UKPC Claims in connection with the Allocation and Claims Litigation.

*French Employee Proceedings and Claims*
(Timeframe: August 2010 – Ongoing)

127.    From 2010 through 2014, approximately 160 former employees of NNSA (the "**French Employees**") commenced proceedings (collectively, the "**French Employee Proceedings**") against, *inter alia*, NNC, NNL and the Monitor before the Versailles Employment Tribunal in France (the "**Tribunal**"). Although the specific relief claimed by the French Employees varies on a case by case basis, the central claim alleges that NNC and NNL are liable for various employment related claims of the French Employees on the grounds they were "co-employers" with NNSA. The Monitor estimates the aggregate amount claimed by the French Employees against NNC and NNL in the French Employee Proceedings is approximately €24.5 million.

128.    The Monitor is of the view that commencement of the French Employee Proceedings and service of process on each of NNC, NNL and the Monitor in Canada is a breach of the stay of proceedings provided for in the Initial Order. None of NNC, NNL or the Monitor has appeared in the French Employee Proceedings. NNC, NNL and the Monitor delivered letters to the Tribunal advising of the commencement of the CCAA proceedings, the stay of proceedings granted under the Initial Order and that the Tribunal does not have

jurisdiction over any of NNC, NNL or the Monitor. The Monitor also disallowed in full a CCAA proof of claim filed on behalf of 131 of the French Employees in an amount of up to €21 million, which disallowance was not disputed and is now final.

129.    The French Employee Proceedings are at various procedural stages, with one claim having yet to have been heard and others at various stages of appeal. In all but one case heard to date, the Tribunal has found itself not to have jurisdiction over any of NNC, NNL or the Monitor, which decisions have been appealed by the relevant French Employees.

130.    The activities of the Monitor and its counsel in connection with the French Employee Proceedings include:

(a)    reviewing and considering the claims of the French Employees, including consulting with French counsel regarding such claims;

(b)    drafting and sending letters to counsel to the French Employees advising of the CCAA stay;

(c)    assisting French counsel in preparing the letters to the Tribunal discussed above;

(d)    drafting, serving and filing a motion with this Court that, among other things, seeks to have the French Employee Proceedings declared null and void;

(e)    drafting and issuing a notice of disallowance disallowing the claim of the French Employees in the CCAA Claims Process; and

(f)    consulting with French counsel regarding the status of the French Employee Proceedings from time to time, including reviewing translations of decisions and certain other French Court filings.

## III.    <u>2011</u>

*<u>Overview</u>*

131.    In 2011, the Monitor continued its focus on claims resolution, including beginning to address the EMEA Claims, the UKPC Claims, employee compensation claims and

environmental claims. In addition, the sale process for the Residual IP (as defined below) culminated in a four day auction in New York and a sale of the Residual IP for $4.5 billion, a 400% increase in value relative to the stalking-horse bid. The Estates also began taking litigation steps with respect to establishing a protocol for the resolution of the Allocation Dispute. For 2011, approximately 40% of the Monitor's and its counsel's fees are attributable to the various claims resolution processes, and approximately 30% are attributable to negotiations, mediation and other Allocation and Claims Litigation related matters.

*EMEA Claims Process*

(Timeframe: December 2010 – June 2014)

132.   In the course of discussing and negotiating inter-Estate matters and an allocation protocol, it became apparent that the EMEA Debtors intended to pursue various significant claims against the Canadian Debtors. Accordingly, in December 2010, the Canadian Debtors, with the support of the Monitor, brought a motion seeking the establishment of a claims process for such claims (the "**EMEA Claims Process**") and this Court granted the EMEA Claims Procedure Order on January 14, 2011, which established a claims bar date of March 18, 2011 for the filing of claims by the EMEA Debtors.

133.   On March 18, 2011, more than 80 proofs of claim were filed against the Canadian Debtors and their former directors and officers (the "**Directors and Officers**") for and on behalf of the EMEA Debtors by the Joint Administrators and the French Liquidator (the "**EMEA Claims**").[13]

134.   The EMEA Claims were broad and far reaching in scope and included claims and allegations relating to: (i) inter-company trading debts; (ii) the implementation and operation of Nortel's transfer pricing regime; (iii) intercompany loans; (iv) an internal

---

[13] Similarly, on July 27, 2012, this Court granted the Intercompany Claims Procedure Order (the "**Intercompany Claims Procedure Order**"). The Intercompany Claims Procedure Order called for the filing of Intercompany Claims (as defined therein) by September 7, 2012. On September 7, 2012, six proofs of claim were filed by Nortel Networks AG ("**NNAG**") and Nortel Networks AS ("**NNAS**") against the Canadian Debtors and the Directors and Officers. Each of NNAG and NNAS is a wholly owned subsidiary of Nortel Networks International Finance & Holding BV, an EMEA Debtor. The proofs of claim filed by NNAG and NNAS are substantially similar to certain of the EMEA Claims and were subject to resolution in the Allocation and Claims Litigation.

corporate reorganization known as "Project Swift"; (v) mismanagement; (vi) breach of fiduciary duty; (vii) the funding of the NNUK pension fund; (viii) customer revenue recognition; and (ix) the allocation of pre-Filing Date asset sale proceeds. The EMEA Claims were advanced under both Canadian and foreign laws (i.e. English, French, Irish and 11 other European laws) and included allegations of, among other things, contractual breach, breach of duties, bankruptcy, insolvency and corporate law based claims and various tort based claims. They also included both unsecured claims and trust and/or proprietary claims to the Canadian Debtors' assets. Certain of these claims were also asserted against the Directors and Officers.

135.    Although not capable of precise quantification, the total amount of quantified claims in the EMEA Claims filed against NNL alone exceeded CA$9.8 billion.

136.    At this stage of the EMEA Claims Process, the work of the Monitor and its counsel included:

(a)    reviewing and considering the EMEA Claims, including consulting with U.K. and other European counsel regarding such claims;

(b)    preparing the Sixty Fifth Report of the Monitor dated April 28, 2011, which provided an overview of the EMEA Claims and the UKPC Claims;

(c)    preparing a request for particulars in respect of the EMEA Claims dated May 19, 2011; and

(d)    reviewing and considering the Joint Administrators December 2011 reply to the request for particulars.

137.    As discussed in further detail below, the Monitor and its counsel performed significant additional work with respect to the EMEA Claims in connection with the Allocation and Claims Litigation.

*Residual IP Sale*

(Timeframe: October 2010 – July 2011)

138.    In the period from mid-2009 until early 2011 the Monitor participated in the Estates' and their stakeholder's consideration of the potential ways to monetize NNL's portfolio of approximately 7,000 patents and patent applications that remained following the conclusion of the LOB sales (the "**Residual IP**"), including considering both a potential sale of the Residual IP and the possibility of establishing an "IP Co." (i.e. the potential retention of the Residual IP and the creation of a new licensing business which would seek to license the Residual IP to various technology companies believed to be infringing on the Residual IP). The activities of the Monitor and its counsel in connection with this initial consideration process included meetings and discussions with Nortel management, Nortel's financial advisor and IP consultant and various stakeholders regarding the best means of maximizing the value of the Residual IP as well as reviewing and considering related diligence materials and analysis.

139.    Ultimately, the Estates and their stakeholders opted to pursue a sale of the Residual IP and Nortel, assisted by its financial advisor, began marketing the Residual IP for sale in the fall of 2010. This preliminary marketing process led to the execution of a stalking-horse asset sale agreement with Ranger Inc., a wholly owned subsidiary of Google Inc., in April 2011 to sell the Residual IP for $900 million. Following a four day auction held at the end of June 2011, the Residual IP was ultimately sold to Rockstar Bidco, LP (a consortium comprised of Apple Inc., Research in Motion Limited, EMC Corporation, Ericsson, Sony Corporation and Microsoft Corporation) for $4.5 billion, a 400% increase over the stalking-horse price.

140.    In consultation with Nortel's M&A group and representatives of the other Estates, the Monitor led the Residual IP sale process on behalf of the Canadian Debtors, including focusing on advancing and protecting the interests of the Canadian Estate in the context of the sale process, transaction negotiations and ultimate sale. Of particular note, during the auction the Monitor and its counsel vigorously negotiated with representatives of the other Estates and their stakeholders to ensure the auction continued when certain Estate representatives indicated they were satisfied with the bid price achieved at that point and

wanted to terminate the auction. The continuation of the auction resulted in numerous additional rounds of bidding and a further $1.3 billion being paid for the Residual IP.

141.   The activities of the Monitor and its counsel in connection with the Residual IP transaction included:

(a)   assisting in compiling diligence materials for the Residual IP and reviewing and considering those materials;

(b)   assisting in preparing marketing materials for the Residual IP;

(c)   assisting in developing and drafting the form of stalking-horse sale agreement;

(d)   assisting in negotiating potential stalking-horse bids with various potential bidders and reviewing and commenting on draft transaction documentation;

(e)   negotiating, reviewing and commenting on definitive stalking-horse transaction documentation, including the asset sale agreement and a unique form of bidding procedures that made provision for joint and consortium bidding, particularly as related to the interests of the Canadian Estate;

(f)   reviewing, considering and negotiating unique license termination procedures approved by this Court in connection with approval of the stalking-horse agreement that terminated various types of licenses to the Residual IP which assisted in maximizing the value of the Residual IP;

(g)   reporting to the Court on the terms of the stalking-horse transaction, bidding procedures and the license termination procedures in connection with the Canadian Debtors' motion seeking approval of same;

(h)   providing notice of the license termination procedures to various parties, including preparing and distributing known license notices to licensees, and otherwise administering the license termination procedures, including conducting telephone conferences and exchanging correspondence with numerous licensees and other interested parties;

(i)      assisting in negotiating with various potential bidders in the Court-approved bid processes, reviewing and considering submitted bids and working with bidders to facilitate the formation of bidding partnerships;

(j)      attending and representing the interests of the Canadian Estate at the four day auction that included 19 rounds of bidding, including negotiating with bidders and representatives of the other Estates at the auction;

(k)      updating stakeholders regarding the status of the Residual IP sale process;

(l)      assisting in negotiating, reviewing and commenting on definitive transaction documents, particularly as related to the interests of the Canadian Estate;

(m)      reporting to the Court on the results of the auction and the terms of the ultimate Residual IP transaction in connection with the Canadian Debtors' motion seeking approval of such transaction;

(n)      assisting the Canadian Debtors in closing and implementing the Residual IP transaction; and

(o)      negotiating and drafting various Court-approved inter-Estate side agreements entered into in connection with the Residual IP transaction regarding, among other things, compensation for the use of certain tax attributes of the Canadian Debtors (resulting in a $18 million direct payment to the Canadian Debtors from the Purchaser), the sharing of transaction related expenses and potential liabilities among the Estates as well as the distribution escrow agreement that governs the holding and distribution of the Residual IP sale proceeds.

*Allocation Protocol Motions*
(Timeframe: May 2011 – June 2013)

142.    Following the failure of negotiations and the Phillips mediation, the U.S. Debtors and Canadian Debtors (supported by the Monitor) brought parallel motions to this Court and the U.S. Court in June 2011 seeking approval of an allocation protocol ("**Allocation Protocol**") pursuant to which this Court and the U.S. Court would determine the allocation of the approximately $7.3 billion of sale proceeds from the LOB and Residual

IP transactions amongst the Estates and certain other Nortel parties (the "**Allocation Dispute**") as well as the significant claims advanced against the Canadian Debtors and the U.S. Debtors, respectively, by the EMEA Debtors. The activities of the Monitor and its counsel in connection with the Allocation Protocol litigation included reviewing and negotiating the proposed form of Allocation Protocol with the U.S. Debtors and various stakeholders, reporting to the Court on the proposed Allocation Protocol, participating in the contested motion regarding the Allocation Protocol and (following the ultimate approval of the Allocation Protocol in April 2013) responding to the EMEA Debtors' motion to the Ontario Court of Appeal seeking leave to appeal this Court's Order approving the Allocation Protocol.

143.    Following the initial Allocation Protocol hearings on June 7, 2011, this Court and the U.S. Court ordered the parties to mediate the disputes raised in the Allocation Protocol hearings before former Chief Justice Winkler (the "**Winkler Mediation**"). The activities of the Monitor and its counsel in connection with the Winkler Mediation are discussed below in paragraphs 169 and 170.

*IP Address Sale Process*
(Timeframe: March 2011 – Ongoing)

144.    On March 25, 2011, this Court granted an Order authorizing the Monitor to conduct a sale process for the Canadian Debtors' remaining IT assets, most notably approximately 17 million legacy internet protocol (IPv4) addresses (the "**IP Addresses**"). Through the end of the Period, the Canadian Debtors had completed 12 transactions involving the IP Addresses with purchasers located in North America, Europe, China and Singapore.[14] The activities of the Monitor and its counsel in connection with the IP Address sale process include:

    (a)    marketing the IP Addresses for sale, including by initially contacting 107 prospective buyers or buyer groups, preparing and circulating "teaser" packages to potentially interested purchasers, conducting further marketing efforts in the

---

[14] The number of IP Addresses transferred as well as the sale proceeds generated in these transactions have been reported to the Court from time to time on a confidential basis given the sale process is ongoing.

Asia-Pacific region, meeting with potential purchasers and liaising with brokers in the IP address space;

(b)     preparing a form of non-disclosure agreement ("**NDA**") and negotiating NDAs with numerous potential purchasers;

(c)     assisting in preparing a template form of asset sale agreement and related transaction documentation;

(d)     discussions with the U.S. Debtors regarding the interest they asserted in the IP Addresses, negotiating a partial resolution of that issue to permit the sale process and sales to proceed on a consensual basis and reviewing and preparing related documentation;

(e)     consulting with the American Registry for Internet Numbers regarding the transfer process for IP Addresses;

(f)     dealing with brokers, including negotiating compensation arrangements in connection with broker facilitated transactions;

(g)     negotiating and preparing forms of transaction documentation with various potential purchasers, including negotiating, entering into and closing 12 transactions through the end of the Period;

(h)     providing updates to stakeholders from time to time as to the status of the sale process for the IP Addresses; and

(i)     reporting to the Court in connection with seeking approval of IP Address transactions.

_Environmental Matters_

(Timeframe: June 2010 – Ongoing)

145.    NNL or its subsidiaries are the former owners of properties located in Belleville, Brockville, Kingston, Brampton and London, Ontario that are subject to environmental impacts. NNL is also the current owner of certain lands in London, Ontario (the "**London**

**Retained Lands**") that are subject to environmental impacts. Most of these properties were sold by the Canadian Debtors in the period from 1995 to 2005. At the time of the CCAA filing, NNL (through its environmental consultant) was performing environmental remediation work at the various properties pursuant to various agreements in place with current property owners.

146.    In mid-2010, the Ontario Ministry of the Environment and Climate Change (the "**MOE**") issued an order requiring NNL to, among other things, prepare and complete a work plan for the remediation of the London property. The MOE subsequently issued similar orders against NNL for the balance of the properties in mid-2011 (collectively, the "**MOE Orders**"). Although the MOE Orders vary on a case by case basis, each requires NNL to prepare, seek MOE approval of, and implement a remediation work plan for the particular property. NNL previously estimated the cost of complying with the MOE Orders to be approximately CA$20 million.

147.    The Canadian Debtors and the Monitor took the position that the MOE Orders were subject to the stay of proceedings granted in the Initial Order (the "**CCAA Stay**") and sought relief from this Court with respect to the MOE Orders. In addition, the Canadian Debtors filed "placeholder" appeals of the MOE Orders before the Environmental Review Tribunal (Ontario) (the "**ERT**" and the "**ERT Proceedings**", respectively).

148.    On March 9, 2012, this Court issued an Order granting certain relief in respect of the Canadian Debtors' environmental obligations and confirming that the MOE Orders were subject to the CCAA Stay. The MOE sought and obtained leave to appeal this Order. Prior to the appeal being heard, the Supreme Court of Canada released its decision in *Newfoundland and Labrador v. AbitibiBowater Inc*., [2012] 3 SCR 443. On June 19, 2013, the Ontario Court of Appeal heard the MOE's appeal and on October 3, 2013, released its decision which granted the MOE's appeal with respect to all of the properties with the exception of the London Retained Lands. On December 2, 2013, the Canadian Debtors and Monitor sought leave to appeal the Ontario Court of Appeal's decision to the Supreme Court of Canada. On April 17, 2014, the Supreme Court of Canada denied the Canadian Debtors' and Monitor's leave to appeal application. The result is that the MOE

Orders, save as they relate to the London Retained Lands, are not subject to the CCAA Stay and the related relief granted by this Court.

149. Various proofs of claim (totalling in excess of CA$250 million) have also been filed against the Canadian Debtors asserting claims in respect of environmental impacts at the various properties and, in some cases, lands adjacent thereto. In addition, the MOE has also filed an omnibus proof of claim against NNL in respect of the cost of remediating environmental impacts at the properties for CA$100 million.

150. The activities of the Monitor and its counsel in connection with environmental matters have included:

(a)    reviewing and considering the MOE Orders and NNL's rights and obligations related thereto;

(b)    numerous telephone conferences and meetings with environmental counsel to NNL, NNL's environmental manager and NNL's environmental consultant regarding the MOE Orders, the ERT Proceedings, the status of the various properties and the remediation work being performed by NNL at the various properties;

(c)    reviewing, commenting on and preparing various Court materials relating to the environmental motion before this Court and the subsequent leave to appeal motions and appeals to the Ontario Court of Appeal and the Supreme Court of Canada;

(d)    reviewing and considering the proofs of claim filed against the Canadian Debtors relating to environmental impacts at the various properties, conducting without prejudice settlement meetings with certain claimants and the MOE, and preparing and considering settlement offers and other without prejudice settlement materials;

(e)    negotiating a transition agreement for NNL's obligations relating to the Brampton property and negotiating the settlement of the claim relating to the Brampton property, including drafting settlement documentation;

(f)      negotiating and preparing a settlement agreement for the Kingston property with the current property owner, liaising with various interested stakeholders (including the MOE) regarding such proposed settlement, and seeking Court approval of such settlement in March 2015; and

(g)      negotiating and preparing the Agreement re: Kingston Property Settlement and other Nortel ERT Proceedings entered into among NNL, the Monitor and the MOE in March 2015 and seeking Court approval of such agreement.

### *Q1 2010 Transfer Pricing Settlement Agreement, Agreement on Transfer Pricing Amendments and Related Inter-Estate Settlements*

(Timeframe: June 2010 – September 2011)

151.    In September 2011, the Estates entered into two agreements that resolved certain inter-estate matters. The first was the Q1 2010 Transfer Pricing Settlement Agreement (the "**Q1SA**") which settled transfer pricing obligations between, among others, the EMEA Debtors and various of their affiliates and the Canadian Debtors for the first quarter of 2010. Pursuant to the Q1SA it was agreed by NNL and NNUK that the EMEA parties owed NNL a net amount of $10.6 million, which amount was satisfied by setoff of certain amounts due to NNUK by NNL under the IFSA. The second was the Agreement on Transfer Pricing Amendments and Related Inter-Estate Settlements entered into among the three Estates. Pursuant to this agreement the Estates agreed there would be no further transfer pricing payments required or made in respect of the period from and after April 1, 2010, and also resolved various commercial matters among them, including: (i) the release of approximately $53 million to NNI from the Enterprise escrow account in respect of the cash on hand of certain wholly owned subsidiaries of NNI conveyed in that transaction; and (ii) the release of approximately $30 million to NNL as reimbursement for payments made by NNL to obtain carve-out financial statements for the LOBs in connection with the transactions.

152.    The activities of the Monitor and its counsel in connection with these agreements included:

(a)      reviewing the transfer pricing related obligations between the Canadian Debtors and the EMEA Debtors for Q1 2010, preparing materials supporting the Canadian

Debtors' position with respect to those transfer pricing obligations, reviewing the Joint Administrators' positions with respect to same and negotiating the transfer pricing obligations ultimately agreed and established;

(b)   preparing materials supporting the Canadian Debtors' request for reimbursement of approximately $30 million incurred in connection with the carve-out financial statements;

(c)   negotiating the agreements with the other Estates and their respective stakeholders and participating in drafting the agreements; and

(d)   preparing motion materials and seeking Court approval of the agreements.

*Employee Compensation Claims Process*
(Timeframe: May 2011– Ongoing)

153.   The Monitor led the development and implementation of a fair, reasonable, efficient and orderly process for the calculation and determination of the claims of approximately 15,000 of the Canadian Debtors' employees, former employees, pensioners and their survivors, including LTD beneficiaries (the "**Compensation Claims Process**"). But for the Compensation Claims Process and methodology put forward, most of the claims of approximately 15,000 people would have required individualized actuarial determinations and, with respect to former employees, individualized determinations of the applicable notice of termination and/or severance period, all at a significant cost to the Canadian Debtors.

154.   The Monitor, together with the Canadian Debtors, Court Appointed Employee Representatives, Representative Counsel and Unifor realized that it would be in the interests of all parties if they could develop and agree upon an acceptable methodology for the calculation of employment-related claims and a streamlined procedure to deal with them. The motion for Court approval of the Compensation Claims Process and related methodology proceeded on consent of each of the foregoing parties, and this Court granted the Compensation Claims Procedure Order and the Compensation Claims Methodology Order on October 6, 2011.

155.   The activities of the Monitor and its counsel in connection with the development of the Compensation Claims Process included:

(a)   working closely with the Canadian Debtors and Representative Counsel in identifying potential compensation claims, many of which had been previously identified through the A&R Employee Settlement Agreement and HWT distribution processes;

(b)   reviewing the records of the Canadian Debtors to identify those former employees with employment contracts, including employment termination contracts;

(c)   reviewing the Canadian Debtors' employment policies, including the CARP and the relevant collective bargaining agreements;

(d)   identifying potential compensation claims and consulting with Mercer with respect to those claims requiring actuarial assistance, including data exchanges, testing for reasonableness and confirmation of data consistency and, where necessary, making adjustments required to comply with benefit documents;

(e)   identifying and agreeing upon the basic principles of the Compensation Claims Process methodology, including the actuarial assumptions to be used, following extensive discussion and negotiations among interested parties and their financial and actuarial advisors;

(f)   working with Mercer in its preparation of its valuations forming the basis of the Compensation Claims Process methodology;

(g)   preparing draft information statement packages and proof of claim document packages and circulating draft materials to Representative Counsel;

(h)   attending in person meetings and a number of telephone meetings in which certain of the Court Appointed Employee Representatives and their committee members (along with Representative Counsel and other advisors) participated directly;

(i)   establishing a due diligence process for the design and content of the information statement packages and for the proof of claim document packages, which were

reviewed by the Court Appointed Employee Representatives and Representative Counsel, including French translations;

(j)    working with Mercer to perform "mock-ups" of the materials for individual employees identified by the Court Appointed Employee Representatives, leading to further drafts and refinement;

(k)    working with Mercer to perform "test runs" during which claims packages were run through the calculation process that would be used if the Compensation Claims Process was approved, leading to refinement of the forms and process;

(l)    engaging in various discussions with the U.S. Debtors, the UCC and the Bondholder Group with respect to the Compensation Claims Process; and

(m)    preparing a comprehensive report to the Court on the Compensation Claims Process and related methodology.

156.    The activities of the Monitor and its counsel in connection with the implementation of the Compensation Claims Process included:

(a)    publishing notices in newspapers;

(b)    completing, together with the Canadian Debtors and with actuarial assistance, an information statement using the approved methodology and data as at December 31, 2010, from the Canadian Debtors' books and records (as updated from time to time) for approximately 14,000 claimants who had been identified as having a compensation claim as at December 31, 2010;

(c)    seeking amendments to the Compensation Claims Procedure Order to revise the timing of mailing of information statements to parties with specified claims above $5 million or same-creditor claims or overlapping claims against the U.S. Debtors and consulting with counsel to the U.S. Debtors to resolve same-creditor claims and determine which are overlapping claims;

(d)    sending the information statement package and proof of claim package to approximately 14,000 identified claimants (which number did not include active employees);

(e)    attending webinars and "roadshows" held by Representative Counsel in a variety of locations across Canada to assist in explaining the Compensation Claims Process and to respond to inquiries;

(f)    sending the information statement package and proof of claim document package to active employees after their employment ceased;

(g)    reviewing and considering any requests for correction received with respect to the information statements and reviewing and considering any Form C proofs of claim received;

(h)    developing and maintaining a database of the more than 15,000 compensation claims which includes detailed claim information, correspondence and claim status by individual and processing approximately 4,500 address changes and other information update requests and working with claimants to receive proper documentation;

(i)    preparing and sending revised information statements or disallowances of requests for correction of Form C proofs of claim, as applicable;

(j)    working with Representative Counsel on the appointment of claims officers for the Compensation Claims Process and seeking Court approval of such appointments;

(k)    negotiating with individual claimants, Representative Counsel and other counsel where applicable to reach consensual resolutions or settlements in respect of claim disputes, including settlements relating to certain omnibus claims filed;

(l)    working with representatives of the U.S. Debtors to identify cross-border and overlapping compensation claims and consulting with the U.S. Debtors regarding the resolution of these claims;

(m)     where necessary, referring disputes to a claims officer, assisting in the preparation of materials for such dispute, directing counsel and participating in the dispute resolution process;

(n)     seeking approval of late-filed claims as applicable and appropriate; and

(o)     attending to approximately 13,800 calls and responding to thousands of email enquiries from claimants.

157.     Through May 2016, the Monitor had issued information statement packages to over 14,500 individuals and has received and processed over 1,550 request for correction forms and over 850 Form C proofs of claim from more than 2,200 claimants.

158.     The Monitor has concluded the majority of its review of both the requests for correction and Form C proofs of claim filed in the Compensation Claims Process. The Monitor has kept Representative Counsel and counsel to Unifor informed of its progress, including through providing them with copies of all notices sent to individuals and all dispute notices received from individual claimants, as appropriate.

*CTDI Litigation*

(Timeframe: August 2010 – October 2011)

159.     In September 2010, NNL and NNI commenced an adversary proceeding in the U.S. Court against Communications Test Design, Inc. ("**CTDI**") alleging claims of trade secret misappropriation, trademark infringement and breach of contract, among others. The litigation was settled in September 2011 for a settlement payment by CTDI of $19 million to NNL and NNI, which settlement amount was agreed to be split between NNL and NNI pursuant to a Court approved side agreement. The activities of the Monitor and its counsel in connection with the CTDI litigation and settlement included:

(a)     reviewing and considering the proofs of claim filed by CTDI against NNL;

(b)     discussing and considering NNL's rights and claims against CTDI with then in-house Nortel counsel, third party counsel who had originally been handling the claims and with counsel to NNI;

(c)     preparing NNL's complaint in the adversary proceeding, along with an amended complaint;

(d)     conducting a discovery and litigation process in respect of the CTDI litigation, including responding to a counter-claim by CTDI and successfully responding to CTDI's motion to dismiss the complaints of NNL and NNI; and

(e)     negotiating and documenting the settlement agreement with CTDI and related side agreement with NNI and seeking approval of the settlement and side agreement by the U.S. Court.

## IV.     2012

### *Overview*

160.    In 2012, the Monitor continued to focus on claims resolution (approximately 60% of the Monitor's and its counsel's fees), including implementing and conducting the Compensation Claims Process approved in late 2011 and the continuing review and resolution of claims filed in the CCAA Claims Process. The Monitor also participated in the first phase of the Court-ordered mediation process before former Chief Justice Winkler, including attending preliminary mediation sessions and preparing a mediation brief and related financial modelling. Finally, the Estates and the various Nortel "fourth estate" entities negotiated and entered into the Allocation Settlement Agreement (APAC/CALA) that resolved those entities' entitlement to the escrowed sale proceeds and resolved various significant pre-filing and post-filing inter-company claims.

### *Allocation Settlement Agreement (APAC/CALA)*
(Timeframe: March 2011 – August 2012)

161.    In addition to the three Estates, various non-debtor Nortel affiliates in the APAC and CALA regions (each a "**Fourth Estate Entity**") participated in the LOB transactions as sellers and were made party to certain of the distribution escrow agreements that govern the holding and distribution of the LOB sale proceeds. The consent of these parties was required to effect a consensual release of sale proceeds from a particular escrow account. As time passed without a resolution of the Allocation Dispute, this became an issue for two reasons. First, in some cases, receipt of an allocation entitlement was one of the final

matters that needed to be resolved in the winding up a Fourth Estate Entity and not having received that entitlement was preventing the entity from commencing liquidation or wind-up proceedings and distributing its equity to its parent (who, in many cases, was NNL). Second, the Fourth Estate Entities' potential entitlements to the global sale proceeds made the ongoing Allocation Dispute settlement discussions and mediation more complicated insofar as it involved a greater number of parties, and also made the mechanic of consensually distributing sale proceeds more complicated as the consent of various Fourth Estate Entities was required.

162.    To address these issues, the Estates and the Fourth Estate Entities (among others) entered into the Allocation Settlement Agreement (APAC/CALA) dated June 19, 2012 (the "**Fourth Estate Settlement Agreement**"). Pursuant to this agreement, the Fourth Estate Entities agreed to settle their allocation entitlement for payments totalling $44.9 million. In addition, under the Fourth Estate Settlement Agreement, the parties agreed to fix both the pre-filing and post-filing balances owing between the Fourth Estate Entities and between the Fourth Estate Entities and the other Nortel parties, including fixing significant claims against NNL by Nortel Networks (China) Limited (approximately $104 million) and Nortel Networks Singapore Pte Ltd. (approximately $91 million). Further, in some cases the Fourth Estate Entities agreed to direct some or all of their allocation entitlement to various inter-company creditors in accordance with the ARA. The Canadian Debtors were the recipients of approximately $11.6 million under the Fourth Estate Settlement Agreement as a result of such payments.

163.    The activities of the Monitor and its counsel in connection with the Fourth Estate Settlement Agreement included:

(a)    reviewing and considering an independent valuation of the value of the assets sold by the Fourth Estate Entities in the LOB sales that was obtained by the directors and officers of the Fourth Estate Entities;

(b)    reviewing and considering the inter-company balances owing between the various Nortel entities and the flow of funds in satisfaction of various inter-company balances upon consummation of the Fourth Estate Settlement Agreement,

including assisting in preparing the various schedules to the Fourth Estate Settlement Agreement which fixed these amounts;

(c)     negotiating the Fourth Estate Settlement Agreement with the Fourth Estate Entities, the other Estates and their respective constituents;

(d)     participating in drafting the Fourth Estate Settlement Agreement and related transaction documents; and

(e)     preparing motion materials and seeking Court approval of the Fourth Estate Settlement Agreement.

*French Proceedings Commenced by NNSA*
(Timeframe: June 2012– December 2014)

164.    On or about June 11, 2012, Maître Cosme Rogeau (the "**French Liquidator**") in his capacity as the liquidator of NNSA purported to commence proceedings against, among others, NNC, NNL and the Monitor pursuant to Articles L.651-1 et seq. of the Commercial Code (France) before the French Court seeking to hold NNC and NNL liable for any deficiency of NNSA's assets relative to its liabilities on the basis that NNC and NNL were the effective managers of NNSA and mismanaged its affairs (the "**French Proceedings**").

165.    The amount claimed by the French Liquidator against each of NNC and NNL was estimated in the summons received from the French Liquidator at approximately €250 million, but was subject to two significant contingencies: (i) the resolution of the Allocation Dispute, and in particular the quantum of the Nortel global sale proceeds to be allocated to NNSA; and (ii) whether or not the UKPR would have an enforceable claim against NNSA pursuant to an FSD issued by the Determinations Panel of the UKPR against NNSA. Based on these contingencies, the alleged liability of NNC and NNL could theoretically have been nil, or in excess of €2.4 billion.

166.    The Monitor took the position that, like the FSD proceedings commenced by the UKPR against NNC and NNL in early 2010, the French Proceedings – in which precisely the same mismanagement claims as were alleged in the EMEA Claims filed by and on behalf

of NNSA – were duplicative, an abuse of process and an improper attempt to circumvent the jurisdiction of this Court.

167.    Following a period during which a *de facto* stay of the French Proceedings was agreed to in the hope they would ultimately be rendered moot and need not be addressed, the Monitor served and filed motion materials with this Court in February 2014 seeking, among other things, to have the French Proceedings declared null and void. The Monitor and Canadian Debtors' motion was precipitated by the possibility that the French Proceedings were proceeding to trial. The French Proceedings were ultimately dismissed as part of the EMEA Claims settlement described below beginning at paragraph 210.

168.    The activities of the Monitor and its counsel in connection with the French Proceedings included:

(a)    reviewing and considering the summons received from the French Liquidator, including consulting with French counsel regarding same;

(b)    drafting letters to counsel to the French Liquidator advising of the CCAA Stay and the Monitor's views regarding the commencement of the French Proceedings;

(c)    exchanging correspondence with counsel to the French Liquidator regarding the *de facto* stay;

(d)    monitoring the status of the French Proceedings, including consulting with French counsel and reviewing translations of various filings in the French Proceedings;

(e)    drafting, serving and filing a motion with this Court seeking to have the French Proceedings declared null and void; and

(f)    negotiating the resolution of the French Proceedings in connection with the EMEA Claims Settlement, including consulting with French counsel regarding same and the process to dismiss the French Proceedings as against NNC, NNL and the Monitor.

*Chief Justice Winkler Mediation*

(Timeframe: July 2011– January 2013)

169.    At the conclusion of the June 2011 Allocation Protocol hearings, this Court and the U.S. Court ordered the parties to mediate the disputes raised in those hearings before former Chief Justice Winkler. On July 28, 2011, Chief Justice Winkler wrote to the parties requesting that mediation briefs be filed by no later than September 16, 2011, and indicating a procedural meeting would be held in early September. By request of the U.S. Court, those dates were subsequently extended in mid-August 2011 to allow the U.S. Court to hear and consider the U.S. Debtors' motion to dismiss the EMEA Debtors' claims against them. The U.S. Court's decision in respect of that motion was released on March 20, 2012, and the mediation process formally commenced, with mediation briefs being delivered on or about April 16, 2012, and an introductory mediation session being held in Toronto on April 24, 2012. Individual meetings were held with the mediation participants over the course of August through October 2012 and certain further information provided to the mediator and distributed to the parties. A full mediation session with all parties was held in Toronto from January 14 through 18, 2013. The mediation session was extended twice before Chief Justice Winkler declared that further efforts at mediation were no longer worthwhile on January 24, 2013.

170.    The activities of the Monitor and its counsel in connection with the Winkler Mediation included:

(a)    preparing an extensive mediation brief of the Monitor and Canadian Debtors, including significant financial modelling supporting the Canadian Estate's position, reviewing and considering the briefs filed by the other parties and consulting with stakeholders regarding the foregoing;

(b)    preparing supplementary mediation information requested by Chief Justice Winkler; and

(c)    preparing for and participating in the various mediation sessions.

_Cessation of Public Reporting_

(Timeframe: May 2012 – November 2012)

171.    NNC and NNL are reporting issuers in all provinces and territories of Canada and, as such, are subject to continuous disclosure requirements prescribed by Canadian securities laws. NNC's common shares are also registered under the U.S. _Securities Exchange Act of 1934_, as amended, and, as such, NNC is subject to the public reporting requirements prescribed by U.S. securities laws.

172.     NNC and NNL continued to comply with their reporting obligations from the Filing Date through late 2012. In light of, among other factors, the significant costs associated with fulfilling NNC's and NNL's ongoing reporting obligations (approximately $10 - $11 million per year) and the limited relevance of such reporting in the context of the CCAA proceedings, the Monitor concluded in September 2012 that the costs to be incurred in complying with the reporting obligations could no longer be justified and NNC and NNL discontinued preparing and filing interim and annual financial statements and all other periodic disclosure documents under applicable Canadian and U.S. securities laws in November 2012. Prior to the cessation of NNC's and NNL's public reporting, the Monitor and its counsel engaged with the Ontario Securities Commission ("**OSC**") regarding these matters, including submitting a Memorandum of Submissions to the OSC on September 21, 2012, recommending that certain permitted trading exceptions be included in any cease trade orders issued by the OSC and the other Canadian securities regulatory authorities. The OSC and various other Canadian securities regulatory authorities subsequently issued cease trade orders incorporating those permitted trading exceptions.

_Tax Matters_

(Timeframe: January 2009 – Ongoing)

173.    The Monitor and its counsel have had extensive involvement in connection with the Canadian Debtors' tax matters, including:

(a)      leading discussions and negotiations with the CRA in respect of the APA;

(b)    reviewing the Canadian Debtors' tax position and tax attributes, including their scientific research and experimental development tax credits ("**SRED**") and net operating losses, and discussing these matters with the CRA;

(c)    preparing commodity tax returns for the Canadian Debtors and related filings from and after September 2012;

(d)    preparing annual tax returns for the Canadian Debtors and non-filed Canadian entities for the years 2013 and forward;

(e)    working with CRA payroll auditors in respect of employee and HWT tax matters;

(f)    working with Revenu Québec auditors in pursuit of a research and development tax credit; and

(g)    negotiating and preparing an agreement entered into with the CRA in late 2014 regarding the payment of HST refunds, resulting in the payment of approximately CA$25 million of HST refunds to the Canadian Debtors.

## V.    <u>2013</u>

### *Overview*

174.    With the failure of the Winkler Mediation in late-January 2013, the Monitor's focus turned to preparing to litigate both the Allocation Dispute as well as the EMEA Claims and the UKPC Claims. Over 2013 and 2014, the significant majority of the Monitor and its counsel's fees (approximately 70%) are attributable to the Allocation and Claims Litigation and related settlement efforts.

### *Allocation and Claims Litigation - Overview*

(Timeframe: March 2013 – October 2014)

175.    On March 7, 2013, this Court and the U.S. Court heard further argument on the appropriate forum to resolve the Allocation Dispute. Ultimately, this Court determined that it and the U.S. Court were the appropriate forums to determine the Allocation Dispute (rejecting the positions of the EMEA Debtors and the UKPC that the Allocation

Dispute should be arbitrated) and ordered a trial start date of January 6, 2014, for the Allocation Dispute.

176. Given the overlap between the Allocation Dispute, on the one hand, and the EMEA Claims and the UKPC Claims, on the other, as well as the significance of each of these issues to the CCAA proceedings and the other Nortel insolvency proceedings, the Allocation Protocol proposed by the Canadian Debtors and the Monitor (and ultimately approved by the Courts) contemplated a joint discovery and litigation process to resolve the Allocation Dispute, the EMEA Claims and the UKPC Claims (the "**Allocation and Claims Litigation**").

177. The Monitor and its counsel led the efforts of the Canadian Estate in the Allocation and Claims Litigation, including directing and (in many cases) undertaking all of the specific steps and tasks outlined in the following paragraphs. For purposes of this Report, the Monitor has divided the Allocation and Claims Litigation into five phases based on the predominant activity or activities undertaken in a particular time period:

(a) **Phase 1: Case Exploration and Document Discovery** (May 1, 2013 – August 31, 2013) – During this phase, the Monitor and its counsel considered and developed the positions of the Canadian Debtors in the Allocation and Claims Litigation and drafted and exchanged pleadings with the other parties. The Monitor and its counsel also reviewed the Canadian Debtors' document sources for production, reviewed and produced documents to the other parties and began its review of the other parties' productions. Finally, the Monitor and its counsel also negotiated the procedures that governed the conduct of the discovery process and the Allocation and Claims Litigation.

(b) **Phase 2: Fact Witness Depositions** (September 1, 2013 – December 31, 2013) – During this phase the parties conducted more than 110 fact witness depositions;

(c) **Phase 3: Expert Witness and Initial Trial Preparation** (January 1, 2014 – April 10, 2014) – During this phase the parties prepared and exchanged expert reports and conducted expert depositions and began to prepare for the trials of the Allocation Dispute, the EMEA Claims and the UKPC Claims;

(d)     **Phase 4: Trial Preparation and Trial** (April 11, 2014 – July 22, 2014) – During this phase the Monitor and its counsel prepared for and completed the two trials that were held over the course of the late spring and early summer of 2014, including preparing affidavits, designating evidence for trial, drafting opening briefs and attending at and conducting the trial, including the examination and cross-examination of fact witnesses and expert witnesses on behalf of the Canadian Estate; and

(e)     **Phase 5: Closing Briefing and Argument** (July 23, 2014 – October 1, 2014) – During this phase the Monitor and its counsel reviewed the trial record, prepared closing briefs and proposed findings of fact and law and made closing arguments to the Courts.

Further details regarding each of these phases are provided in the paragraphs that follow.

*Allocation and Claims Litigation – Phase 1: Case Exploration and Document Discovery*
(Timeframe: May 2013 – August 2013)

178.    Following approval of the Allocation Protocol, this Court directed the Monitor to consult with the core parties regarding a litigation timetable and procedures for the Allocation and Claims Litigation. The parties had competing views with respect to this process, particularly as regards the appropriate breadth of documentary and oral discovery. The core parties could not reach agreement on a litigation timetable and competing timetables and discovery plans were ultimately presented to this Court and the U.S. Court for consideration.

179.    The form of litigation timetable and discovery plan proposed by the Monitor and Canadian Debtors proposed certain proportionate limitations on discovery, including that each core party be restricted to identifying 10 fact witnesses and that documentary discovery be restricted to electronic documents and indices of boxes of hard copy documents. Various core parties opposed the Monitor's proposal and advocated for a discovery plan that imposed no restrictions on the number of depositions or discovery generally. This Court and the U.S. Court ultimately approved the form of litigation timetable and discovery plan proposed by the U.S. Debtors and others (as amended from

time to time, the "**Litigation Timetable and Discovery Plan**") that imposed no restrictions on the number of depositions or on discovery generally.

180.   The resulting litigation and discovery process was extensive and involved a hybrid of Ontario and U.S. federal civil procedures. The Monitor maintained the view that proportionality was required in undertaking the Litigation Timetable and Discovery Plan, particularly in light of the insolvency context of these proceedings, and pointed out on a number of occasions when significant costs were being incurred in excess of forecasts and delays associated with carrying out the procedures mandated by the Litigation Timetable and Discovery Plan were anticipated. Some examples are contained in the excerpts of certain Monitor's reports attached as Appendix "G" hereto.[15] In contrast, the other parties, and particularly the EMEA Debtors and UKPC, consistently sought expanded discovery and procedure, arguing that (as expressed by the EMEA Debtors) the Allocation and Claims Litigation was "…without doubt, worthy of the 'Cadillac of procedure'."[16]

181.   Given the sheer volume and scope of the tasks required to be undertaken in the discovery phase of the Allocation and Claims Litigation, which the Monitor advised this Court was "massive and unprecedented" in the context of a CCAA proceeding, and the compressed timeframe in which such tasks were mandated to be completed, the associated professional time and effort was significant. Ultimately, more than 3 million documents were produced and approximately 140 fact and expert witness depositions were conducted in, among other cities, Toronto, Montreal, Ottawa, New York, Boston, Chicago, Washington, London, Paris, Brussels and Hong Kong. In addition, the start date for the hearings contemplated by the Allocation Protocol was extended from January 6, 2014, to March 31, 2014, and subsequently to May 12, 2014, to allow for further time for the litigation and discovery process to be completed.

---

[15] The excerpts attached as Appendix "G" hereto are: (i) Ninety Seventh Report of the Monitor dated August 26, 2013 at paras. 18 and 21 – 25; (ii) Ninety Eighth Report of the Monitor dated October 22, 2013 at paras. 26 and 112 – 114; (iii) One Hundredth Report of the Monitor dated November 14, 2013 at para. 31; and (iv) One Hundred First Report of the Monitor dated January 3, 2014 at para. 46.

[16] Factum of the EMEA Debtors (Motion to Amend the Litigation Timetable and Discovery Plan ret. August 27, 2013), para. 54.

182.    In the Case Exploration and Document Discovery phase, the activities of the Monitor and its counsel included:

(a)    considering the issues in the Allocation Dispute and preparing the allocation position of the Monitor and Canadian Debtors;

(b)    reviewing and considering the EMEA Claims, consulting with U.K. and other foreign counsel regarding the EMEA Claims and preparing and issuing 21 notices of disallowance for the EMEA Claims and subsequently preparing the joint response of the Monitor and the Canadian Debtors to the EMEA Claims;

(c)    reviewing and considering the UKPC Claims, consulting with U.K. counsel regarding the UKPC Claims and preparing and issuing a notice of disallowance for the UKPC Claims and subsequently preparing the joint response of the Monitor and the Canadian Debtors to the UKPC Claims;

(d)    considering the discovery and production obligations of the Canadian Debtors, reviewing the Canadian Debtors' document repositories and beginning the review and production of the Canadian Debtors' documents;

(e)    preparing interrogatories and document requests and responding to interrogatories received from other core parties;

(f)    retaining various experts and providing them with materials relevant to their particular subject matter;

(g)    reviewing the Canadian Debtors' and other parties' productions and preparing numerous memos summarizing the relevant documents in respect of a particular matter or fact at issue in the Allocation and Claims Litigation; and

(h)    researching and preparing numerous memorandums of law on matters at issue in the Allocation and Claims Litigation.

183.    Additional specific procedural tasks and activities undertaken by the Monitor and its counsel during the discovery phase of the Allocation and Claims Litigation are detailed in the Litigation Timetable and Discovery Plan itself as well as the numerous amendments,

supplemental orders and stipulations related thereto, copies of which are attached hereto as Appendix "H". In addition, the Monitor described the work undertaken on behalf of the Canadian Estate during the Case Exploration and Document Discovery phase in numerous contemporaneous reports filed with the Court and served on the service list.

184.    As the custodian of the largest number of documents, the Canadian Debtors (and, by extension, the Monitor and its counsel) bore a substantially higher burden than other parties in the document review and production process. The scope of the document requests and interrogatories received by the Canadian Debtors was wide ranging and related to documents going back to the 1980s, and in some cases earlier. Given the scope and overlap of the document requests and interrogatories served by the core parties, they worked together to develop an agreed set of consolidated document requests and interrogatories, itself a significant undertaking. The consolidated document requests contained 140 total document requests grouped in to 26 broad categories with more than 85 sub-categories of documents identified. Similarly, the consolidated interrogatories contained 54 individual requests spanning some 25 pages.

185.    With initial requests having been served on May 22, 2013, document production began in July 2013 and continued on a rolling basis through the balance of 2013 and into 2014, including up to the trial of the UKPC Claims. Of the more than 3 million total documents produced in connection with the Allocation and Claims Litigation, the Canadian Debtors produced approximately 1.5 million (50%) of those documents.

186.    In the course of document review and production, the Monitor and its counsel also identified hundreds of thousands of privileged documents. In many instances these documents were the subject of a joint privilege between the Canadian Estate and one or both of the other Estates. As a result, the Canadian Estate was also required to effect a further privilege review process to identify joint privileged documents such that those documents could be produced to the party or parties with whom the joint privilege was shared. These efforts also took place during the second half of 2013.

187.    As reported to the Court in the Ninety Eighth Report of the Monitor dated October 22, 2013, in seeking to minimize discovery related costs, the Canadian Debtors engaged a third party contractor (Mindcrest Inc.) who utilized personnel in India to assist in

document review and production as well as a third party document management and production service firm (Platinum Legal Group). This permitted the use of large scale document review teams comprised of relatively low cost contract reviewers as well as the deployment of sophisticated document review technology to assist in the document review and production process. Also, reduced rates were agreed between the Monitor and counsel for certain counsel performing document review and related case building activities.

188.    In addition, over the course of the Allocation and Claims Litigation specific teams of professionals assumed carriage of specific issues that were relevant to matters at issue in one or more of the Allocation Dispute, the EMEA Claims and the UKPC Claims such as, for instance, Nortel's transfer pricing system. This allowed for the more efficient and effective completion of tasks as the case progressed as individual professionals developed a significant amount of relevant background knowledge and subject matter expertise.

*Allocation and Claims Litigation – Phase 2: Fact Witness Depositions*
(Timeframe: September 2013 – December 2013)

189.    Fact witness depositions began on September 24, 2013, and by the end of 2013 more than 110 fact witnesses depositions had been undertaken, including the deposition of two Monitor representatives. The fact witnesses deposed were generally former employees or advisors of the Estates as well as current Estate representatives. As noted previously, depositions took place in a number of different cities in North America, Europe and Asia on a highly compressed timetable. The depositions required considerable professional time of both the Monitor and counsel to prepare for and complete. In most cases, counsel to the Monitor either led or defended the depositions on behalf of the interests of the Canadian Estate.

190.    In the Fact Witness Deposition phase the activities of the Monitor and its counsel included:

(a)    reviewing the productions for documents relevant to a particular fact witness and preparing and reviewing deposition binders of relevant documents;

(b)      meeting with the Canadian Estate's fact witnesses to review relevant documents and otherwise prepare them for depositions;

(c)      preparing for depositions, including reviewing relevant documents and preparing deposition plans;

(d)      conducting depositions; and

(e)      reviewing deposition transcripts and preparing internal deposition summaries for use in connection with building the Canadian Estate's case.

191.      Without the joint and concerted efforts of the Monitor and its counsel, the tasks required to be completed by the Canadian Estate in the discovery phase of the Allocation and Claims Litigation would not have been accomplished. In particular, as the Canadian Debtors had few remaining employees at the time (most of whom had no knowledge of matters relevant to the Allocation and Claims Litigation), aside from the identification and retrieval of categories of documents, virtually all document review was required to be performed by the Monitor's professionals, counsel or other third party vendors engaged by the Canadian Debtors.

192.      Further, given the cross-border nature of the Allocation and Claims Litigation (and in particular the fact that the EMEA Debtors and the UKPC asserted substantially similar claims against both the Canadian Debtors and the U.S. Debtors), the discovery phase required the involvement of both Canadian and U.S. counsel to the Monitor. While the EMEA Debtors and the UKPC ultimately settled their claims against the U.S. Debtors, this settlement did not occur until late December 2013. Accordingly, the entire discovery phase was conducted on a joint cross-border basis in anticipation of there being a joint trial between this Court and the U.S. Court in respect of the entire Allocation and Claims Litigation.

## VI.    <u>2014</u>

<u>*Allocation and Claims Litigation – Phase 3: Expert Witness and Initial Trial Preparation*</u>

(Timeframe: January 2014 – April 2014)

193.    With the substantial completion of the steps contemplated during the discovery phase, the focus of the Monitor's efforts turned to the completion and exchange of expert reports, the preparation for and conduct of expert depositions, and the preparation for attendance at trial, including preparation of trial records which required the parties to undertake a U.S. style process of document and transcript designations and counter-designations.

194.    With respect to expert reports, the core parties were required to deliver initial expert reports by January 24, 2014, and any rebuttal expert reports by February 28, 2014. Where sur-reply reports were agreed to or otherwise permitted, these were delivered in the mid-March to early April timeframe.

195.    In total, approximately 120 expert reports, reply expert reports and sur-reply expert reports were delivered in the Allocation and Claims Litigation. Sixty eight (68) of the expert reports were delivered by the EMEA Debtors and the Canadian Debtors with respect to foreign law matters relevant to the EMEA Claims.[17] A further 24 expert reports related to the EMEA Claims and UKPC Claims were filed, covering a wide array of topics including the solvency of the EMEA Debtors, U.K. law (on the issues of pension law, the FSD regime and contractual interpretation), valuations required under U.K. law in respect of the FSD claim, actuarial practice, analysis of actuarial calculations, transfer pricing, NNSA's claims against the Canadian Debtors and Project Swift. The balance of the expert reports related primarily to the valuation of the LOB assets and Residual IP.

196.    Expert depositions commenced March 17, 2014, and were largely concluded by April 10, 2014, with 34 expert depositions being conducted within that timeframe in Toronto and New York. The Canadian Debtors, Monitor and EMEA Debtors negotiated a stipulation

---

[17] As the EMEA Claims were asserted by the EMEA Debtors under both Canadian law and the local law of the relevant EMEA Debtor, the Monitor and Canadian Debtors were required to engage foreign legal experts in the U.K., Austria, Belgium, Czech Republic, France, Germany, Hungary, Ireland, Italy, Netherlands, Norway, Poland, Portugal, Slovakia, Spain, Sweden and Switzerland.

- 86 -

such that no depositions were taken of the foreign law experts, resulting in a significant reduction in the number of expert depositions required.

197.    Activities of the Monitor and its counsel in connection with expert witnesses included:

    (a)    meeting with the Canadian Estate's expert witnesses to brief them on the relevant facts of the case, providing relevant documents to the experts for review and consideration and reviewing draft expert reports;

    (b)    reviewing expert reports delivered by the other parties and meeting with the Canadian Estate's experts to discuss reply expert reports;

    (c)    meeting with the Canadian Estate's experts to prepare them for depositions;

    (d)    conducting expert depositions; and

    (e)    reviewing expert deposition transcripts and preparing internal expert deposition summaries for use in connection with building the Canadian Estate's case.

198.    During this phase, the Monitor and its counsel also began to prepare for the trials of each of the Allocation Dispute, the EMEA Claims and the UKPC Claims, including beginning many of the specific tasks outlined in the following section and otherwise taking steps to build the Canadian Debtors' cases to be presented at trial.

*Allocation and Claims Litigation – Phase 4: Trial Preparation and Trial*
(Timeframe: April 2014 – July 2014)

199.    Under the Joint Trial Protocol adopted by the parties and the Courts (the "**Joint Trial Protocol**"), the parties were required to complete a U.S. style process of designating documents they believed ought to form part of the trial record. This process involved the review, consideration and designation of thousands of documents. Ultimately, the document designation process resulted in over 21,000 documents being designated for potential use at trial.

200.    In accordance with the Joint Trial Protocol, parties were also required to designate portions of fact and expert witness testimony for use at trial. This transcript designation process involved:

(a)    the identification of portions of transcripts identified as being relevant to either the Allocation Dispute, on the one hand, or the EMEA Claims and UKPC Claims, on the other;

(b)    the review of transcript designations received from other parties, and the delivery of objections or counter-designations thereto, as appropriate, in order to ensure the appropriate context was provided and/or to preserve and protect the procedural rights of the Canadian Estate; and

(c)    the review of the objections and counter-designations filed by other parties, and the making of any further objections or supplemental designations in response.

201.    Ultimately, excerpts from over 100 fact witness deposition transcripts and 35 expert deposition transcripts were designated for use in the Allocation and Claims Litigation.

202.    In addition to the efforts described above, in the time leading up to the commencement of trial the core parties were also required to exchange fact witness affidavits, exhibit lists and pre-trial briefs, as well as address seven pre-trial motions filed by the core parties. The Canadian Estate prepared and filed 12 affidavits for use in the Allocation and Claims Litigation.

203.    The Allocation Dispute trial commenced on May 12, 2014, with opening statements being presented on May 12 and 13, 2014. Thereafter, the evidentiary phase of the Allocation Dispute trial took place, consisting primarily of cross-examination of fact and expert witnesses over the balance of May and into the month of June, concluding on June 24, 2014. In total, the opening and evidentiary phase of the Allocation Dispute trial took 21 days.

204.    As the Allocation Dispute trial was conducted by way of joint hearings between this Court and the U.S. Court, the Monitor as well as Canadian and U.S. counsel to the Monitor participated on a daily basis. Attendance was limited to only those counsel

required to deal with the issue being dealt with on a particular day and to necessary supporting personnel and counsel involved in the preparation and conduct of the Canadian Estate's case.

205.     Opening statements for the UKPC Claims trial took place on July 7 and 8, 2014.[18] The opening and evidentiary phase of the trial, consisting primarily of cross-examination of fact and expert witnesses, took place over 12 days, concluding on July 22, 2014. Eight fact witnesses were called to testify at the UKPC Claims trial, and several expert witnesses testified as well. As with the Allocation Dispute trial, attendance was limited to only those counsel required to deal with the issue being dealt with on a particular day and to necessary supporting personnel and counsel involved in the preparation and conduct of the Canadian Estate's defence of the UKPC Claims.

206.     As noted above, the Monitor and its counsel led the efforts of the Canadian Estate in the Allocation and Claims Litigation and were primarily responsible for directing and completing the tasks described in paragraphs 178 to 205, in some cases with the assistance of counsel to the Canadian Debtors. The specific activities of the Monitor and its counsel in the connection with the Trial Preparation and Trial phase included:

(a)     meeting with affiants and preparing 12 affidavits for use in the Allocation and Claims Litigation;

(b)     completing the document and testimony designation process described above and preparing the pre-trial record for this Court;

(c)     preparing opening briefs for each of the Allocation Dispute, EMEA Claims trial and UKPC Claims trial, and reviewing and considering the opening briefs prepared by the other core parties;

(d)     preparing for oral opening submissions and making same;

(e)     preparing witnesses for trial;

---

[18] As discussed later in this Report, the EMEA Claims were settled on the eve of trial.

(f)     preparing witness plans, reviewing relevant documents and otherwise preparing for examinations and cross-examinations;

(g)     attending at trial to hear testimony and examine and cross-examine fact and expert witnesses; and

(h)     reviewing trial testimony via video link and/or reviewing trial transcripts and preparing witness and evidence summaries for use at trial and in connection with closings.

207.    On June 6, 2014 (just prior to a short adjournment of the Allocation Dispute trial), this Court and the U.S. Court directed the core parties to exchange without prejudice settlement offers in respect of each of the Allocation Dispute, the EMEA Claims and the UKPC Claims, with such offers to be delivered to the other parties and the Courts (on a sealed basis) no later than June 15, 2014. The Monitor and its counsel prepared and circulated settlement offers consistent with this direction, reviewed the settlement offers received from the other core parties and engaged in certain without prejudice discussions with representatives of the other parties. Ultimately, no resolution was reached and the Allocation Dispute trial continued.

*Allocation and Claims Litigation – Phase 5: Closing Briefing and Argument*

(Timeframe: August 2014 – October 2014)

208.    With the completion of the evidentiary phase of the UKPC Claims trial in late July 2014 (and, indeed, prior to that with respect to the Allocation Dispute), the Monitor and its counsel began to prepare for closing briefing and argument. Initial and rebuttal briefs for the Allocation Dispute trial were exchanged on August 7, 2014 and September 10, 2014, respectively, and closing arguments were heard at joint hearings held on September 22, 23 and 24, 2014. Initial, responding and reply closing briefs for the UKPC Claims trial were exchanged on August 19, 2014, September 12, 2014 and September 22, 2014, respectively, and closing arguments were heard on September 29, 30 and October 1, 2014.

209.    The activities of the Monitor and its counsel in connection with the Closing Briefing and Argument phase included:

(a)    reviewing the trial record and preparing initial closing briefs and proposed findings of facts and law for each of the Allocation Dispute and UKPC Claims trial;

(b)    reviewing the closing briefs filed by the other core parties and preparing responding closing briefs and supplemental proposed findings of fact and law; and

(c)    preparing for oral closing arguments and attending at Court to make same submissions.

*EMEA Claims Settlement*
(Timeframe: February 2014 – November 2014)

210.    As described previously in this Report, although not capable of precise quantification, just the total amount of quantified claims in the EMEA Claims asserted against NNL exceeded CA$9.8 billion. In addition to unsecured claims, the EMEA Claims also asserted trust and/or proprietary claims against the Canadian Debtors' assets that could have resulted in effective priority treatment for such claims. Certain of the EMEA Claims were also asserted against the Directors and Officers.

211.    Following completion of the lengthy and costly discovery process and several months of negotiation between the Monitor and the Joint Administrators, the EMEA Claims were settled just prior to the commencement of the EMEA Claims and UKPC Claims trial for a maximum admitted general unsecured claim against NNL of $125 million (with $25 million of such unsecured claim being subject to the satisfaction of certain conditions relating to the French employee claims). The efforts of the Monitor and its counsel in connection with the settlement process included preparing, exchanging and reviewing numerous settlement term sheets over several months, negotiating the settlement, drafting the settlement agreement, seeking Court approval of the settlement and attending to various post-settlement matters, including ensuring the withdrawal and/or discontinuation of proceedings pending against the Canadian Debtors and former Nortel directors and officers in the U.K., France and Ireland.

212.    Nortel's books and records indicated that the consolidated intercompany book debt payable from the Canadian Debtors to the EMEA Debtors as at January 14, 2009, was approximately $203 million. When netted against pre-filing intercompany amounts shown in Nortel's books and records to be payable by the EMEA Debtors to the Canadian Debtors, there was a net $101 million payable to the EMEA Debtors. Accordingly, the EMEA Claims were settled for an amount only slightly in excess of the net consolidated pre-filing debt shown as being payable by the Canadian Debtors to the EMEA Debtors in Nortel's books and records.

213.    The settlement of the EMEA Claims confirmed the Monitor's position regarding the value and nature of the EMEA Claims.

*Monitor's Observations Regarding the Allocation and Claims Litigation*

214.    Set forth below is a table which details the fees of the Monitor and its Canadian and main U.S. counsel (Goodmans and A&O, respectively) during the time period of each of the phases of the Allocation and Claims Litigation referred to above:

| Ernst & Young Inc. and Goodmans LLP (in CAD millions) | 2013 | 2014 | Total |
|---|---|---|---|
| Allocation and Claims Litigation Phase 1 | 7.7 | - | 7.7 |
| Allocation and Claims Litigation Phase 2 | 12.2 | - | 12.2 |
| Allocation and Claims Litigation Phase 3 | - | 13.6 | 13.6 |
| Allocation and Claims Litigation Phase 4 | - | 10.3 | 10.3 |
| Allocation and Claims Litigation Phase 5 | - | 4.4 | 4.4 |
| | **19.9** | **28.4** | **48.3** |

| Allen & Overy LLP (in USD millions) | 2013 | 2014 | Total |
|---|---|---|---|
| Allocation and Claims Litigation Phase 1 | 2.8 | - | 2.8 |
| Allocation and Claims Litigation Phase 2 | 5.6 | - | 5.6 |
| Allocation and Claims Litigation Phase 3 | - | 2.9 | 2.9 |
| Allocation and Claims Litigation Phase 4 | - | 3.9 | 3.9 |
| Allocation and Claims Litigation Phase 5 | - | 1.7 | 1.7 |
| | **8.4** | **8.5** | **16.9** |

215.    Overall, the Monitor and its Canadian counsel estimate that approximately 40% of their total fees in these proceedings through the Period relate to work done in connection with the Allocation Dispute, the EMEA Claims and the UKPC Claims, including the Allocation and Claims Litigation and the various mediation and settlement efforts directed at resolving those disputes.

216.    The fees and disbursements of the Monitor and its counsel related to these matters are significant. However, the Monitor believes them to have been necessary and appropriate having regard to the imperative of advancing and protecting the interests of the Canadian Estate, including having regard to the following factors:

(a)    The total quantum at issue in the Allocation Dispute is approximately $7.3 billion. As the Canadian Debtors' allocation entitlements will make up a substantial portion of the amounts ultimately distributed to their creditors, in the absence of a fair and reasonable settlement it was (and is) imperative that the Monitor advance the interests of the Canadian Debtors in the Allocation Dispute to the best of its ability, including utilizing a significant amount of the Canadian Debtors' resources to do so.

(b)    The position of the U.S. interests at the trial of the Allocation Dispute was that the Canadian Debtors were only entitled to approximately $770 million of the $7.3 billion, or approximately 10.6% of the total sale proceeds. The position of the EMEA Debtors at trial was that the Canadian Debtors were entitled to receive either $836 million or $2.3 billion, depending on the theory the Courts adopted. Based on the settlement of the Allocation Dispute reflected in the Settlement and Plans Support Agreement entered into among the Estates and certain of their creditor constituents dated as of October 12, 2016 (the "**Settlement and Plans Support Agreement**"), the Canadian Estate will receive an allocation in excess of $4.1 billion, or approximately 57.1% of the total sale proceeds. As such, the Monitor believes pursuing the Allocation Dispute litigation has resulted in a significantly better outcome for the Canadian Debtors and their general body of creditors relative to available alternatives.

(c)    The EMEA Debtors asserted wide-ranging unsecured, trust and proprietary claims against the Canadian Debtors totalling in excess of CA$9.8 billion. Those claims were ultimately settled for a maximum general unsecured claim of $125 million against NNL, which amount is only slightly in excess of the net consolidated pre-filing intercompany amount shown to be payable by the Canadian Debtors to the EMEA Debtors in Nortel's books and records. Accordingly, the Monitor believes the significant costs incurred in defending the EMEA Claims were appropriate and in the best interests of the Canadian Debtors and their general body of creditors.

(d)    Similarly, in addition to asserting claims under specific agreements with NNL, the UKPC asserted billions of dollars of statutory, trust and tort based claims against the Canadian Debtors, many of which overlapped substantially with the EMEA Claims.[19] Notwithstanding the EMEA Debtors agreeing to settle their claims for a small fraction of what was claimed on the eve of trial, the UKPC continued to assert such claims through the conclusion of the trial. By decision dated December 9, 2014, this Court upheld the Monitor's disallowance of the billions of dollars of claims asserted by the UKPC against NNL and the other Canadian

---

[19] As noted above, the Original UKPC Claims contemplated aggregate claims against the Canadian Debtors of nearly CA$20 billion. The UKPC's affirmative claims pleading filed in the Allocation and Claims Litigation sought (a) £491,750,000 on account of the Funding Guarantee against NNL; (b) $150,000,000 on account of the Insolvency Guarantee against NNL; (c) against all of the Canadian Debtors, "…an amount to be accepted by the Court…" taking into account, among other factors: (i) the benefits of an approximate value of $1,866,500,000 that was alleged to have been conferred on NNC and NNL by NNUK; (ii) the amount of the NNUK pension plan shortfall, which was estimated to have increased to £2.6 billion by March 31, 2013; and (iii) "all the facts and matters set out in this Affirmative Claims Pleading"; (d) an amount to be determined by the Court for the FSD claim against NNC and NNL; (e) an amount to be determined by the Court for the oppression claim against NNC and NNL; and (f) an amount to be determined by the Court for the unjust enrichment claim against all of the Canadian Debtors. The UKPC also claimed against the Canadian Debtors for "…an amount equivalent to a constructive or resulting trust to be determined by this Court for conduct set out in respect of the Oppression Claim and/or the Unjust Enrichment Claim." Accordingly, not only did the UKPC assert unsecured claims, it also asserted an entitlement to trust remedies that would have resulted in some portion of its billions of dollars of claims receiving effective priority treatment over the claims of the Canadian Debtors general body of creditors. In summary, the UKPC asserted: (i) liquidated claims against NNL in excess of $1 billion under the Funding Guarantee and the Insolvency Guarantee; (ii) unliquidated claims against each of the Canadian Debtors to be calculated by reference to approximately CA$6.9 billion of alleged benefits conferred upon NNC and NNL or liabilities of NNUK; (iii) a further unliquidated claim against each of NNC and NNL for each of the FSD liability, oppression and unjust enrichment; plus (iv) a further unliquidated claim against all of the Canadian Debtors for unjust enrichment. Although not capable of precise quantification, the total liability asserted against the Canadian Debtors likely exceeds the nearly CA$20 billion of claims contemplated by the Original UKPC Claims. For instance, taking only items (a), (b) and (c) (i) and (ii), above, and valuing the liability asserted in (c) (i) and (ii) at half of the amount that the alleged liability is asserted to be calculated by reference to, the aggregate amount claimed against the Canadian Debtors in the Affirmative Claims Pleading results in claims of approximately CA$18.3 billion.

Debtors except for allowing a single claim against NNL pursuant to the Funding Guarantee in the amount of £339.75 million, which amount was approximately £152 million less than the amount sought by the UKPC on account of such claim. Accordingly, the Monitor believes the significant costs incurred in defending the UKPC Claims were appropriate and in the best interests of the Canadian Debtors and their general body of creditors.

(e)  As noted previously, the Monitor and its Canadian counsel estimate that approximately 40% of their total fees through the Period related to work done in connection with the Allocation Dispute, the EMEA Claims and the UKPC Claims. Such fees amount to less than a 1 cent on the dollar impact on estimated recoveries for unsecured creditors of the Canadian Estate.[20]  In contrast, the outcome of the Allocation Dispute and the resolution of the EMEA Claims and the UKPC Claims has a material impact on estimated recoveries for unsecured creditors of the Canadian Estate. By way of example, if the position of the U.S. interests in the Allocation Dispute that the Canadian Debtors were only entitled to approximately $770 million had been accepted by the Monitor, estimated recoveries for unsecured creditors of the Canadian Estate would be reduced by approximately 75%. Similarly, if the claims of the EMEA Debtors and UKPC had been allowed as asserted, the effect would have been to double (or more) the size of the Canadian Estate's unsecured creditor pool, thereby leading to a reduction in estimated recoveries for unsecured creditors of 50% or more.

(f)  Notwithstanding the Monitor asserting the full legal rights of the Canadian Debtors in the Allocation and Claims Litigation, the Monitor has continuously sought a fair and reasonable full and final settlement of the Allocation Dispute and related unresolved disputes and claim matters. In addition to the formal mediations described herein, the Monitor and its counsel have spent significant time meeting, negotiating and exchanging settlement proposals with

---

[20] In the Information Circular related to the proposed plan of arrangement in respect of the Canadian Debtors dated November 4, 2016 (the "**Plan**"), the Monitor estimated that for CAD Claims (as defined in the Plan) the range of recovery per CA dollar of proven affected unsecured claims against the Canadian Estate would be approximately CA 45 cents to CA 49 cents, and the range of recovery per U.S. dollar of all other proven affected unsecured claims would be approximately 41.5 cents to 45 cents.

representatives of the other Estates and their respective stakeholders in an attempt to reach such a settlement. Those efforts, combined with the litigation efforts, have now given rise to the settlement reflected in the Settlement and Plans Support Agreement.

(g)    Notwithstanding the fact that the Canadian Estate bore the greatest burden in the Allocation and Claims Litigation (including in that the EMEA Claims did not settle until immediately prior to the trial, and the UKPC Claims ultimately proceeded to trial), as set forth in the table below the total fees and disbursements of the Monitor and its counsel together with the fees and disbursements of the Canadian Debtors' main advisors for the years 2013 and 2014 (i.e. the years in which the Allocation and Claims Litigation took place) are less than the fees and expenses of the advisors to the other Estates for the same period [21] [22]:

---

[21] The fees and expenses of advisors to certain of the main stakeholders in the CCAA proceedings and the Chapter 11 Proceedings for 2013 and 2014 (to the extent known to the Monitor) are as follows:

(i) UCC - $51.8 million (Akin Gump Strauss Hauer & Feld LLP, Ashurst LLP, Berkeley Research Group, LLC, Capstone Advisory Group, LLC, Dentons Canada LLP, Jefferies & Company, Inc., Richards, Layton & Finger, P.A., Whiteford, Taylor & Preston LLC, and Cassels Brock & Blackwell LLP) (Source: monthly fee applications filed with U.S. Court);

(ii) Bondholder Group - $43.0 million (Milbank, Tweed, Hadley & McCloy LLP, Bennett Jones LLP, and FTI Capital Advisors, LLC); and

(iii) Former Employees (Representative Counsel) - $19.3 million (DLA Piper LLP (US), Koskie Minsky LLP, Nelligan O'Brien Payne LLP, RSM Richter/6038441 Canada Inc., Segal Consulting, Shepell FGI, Shibley Righton LLP and Wardle Daley Bernstein LLP).

[22] The EMEA Estate's advisor fees include VAT taxes; the fees of the U.S. and Canadian Estates do not include any applicable taxes. The EMEA Estate's advisor fees do not include the fees and expenses of the advisors to the UKPC, which have not been disclosed.

| Nortel Estate Main Advisors Professional Fees For the period January 1, 2013 - December 31, 2014 (in USD millions) | Fees | Disbursements | Total Fees & Disbursements |
|---|---|---|---|
| Ernst & Young Inc.[1] | 22.6 | 0.5 | 23.1 |
| Goodmans LLP[1] | 46.2 | 1.3 | 47.5 |
| Norton Rose Fulbright Canada LLP[1] | 3.8 | 0.2 | 4.0 |
| Gowling Lafleur Henderson LLP[1] | 8.7 | 0.2 | 8.9 |
| Freshfields Bruckhaus Deringer LLP[2] | 2.1 | 0.7 | 2.8 |
| **Total** | **83.4** | **2.9** | **86.3** |
| Allen & Overy LLP | 19.0 | 1.2 | 20.2 |
| Buchanan Ingersoll & Rooney PC | 0.5 | 0.1 | 0.6 |
| **Total Professional Fees** | **102.9** | **4.2** | **107.1** |

Fees and Expenses of Main Advisors of:

   US Debtors[3]       134.5

   EMEA Debtors[4]     219.7

1. Foreign exchange rates used based on Bank of Canada Monthly Average Noon-Exchange Rates

2. Foreign exchange rates used based on Federal Reserve Monthly Average Noon-Exchange Rates

3. US Debtors professionals included are Cleary Gottlieb Steen & Hamilton LLP, Ernst & Young LLP (US), Huron Consulting Group, John Ray, Torys LLP, Chillmark Partners, LLC and Morris, Nichols, Arsht & Tunnell LLP, based on monthly fee applications filed in the United States Bankruptcy Court for the District of Delaware

4. Based on Joint Administrators' Abstract of Receipts and Payments from January 14, 2013 to January 13, 2015

217.    In sum, the Monitor believes the significant professional fee and expense investment of the Canadian Estate in undertaking the Allocation and Claims Litigation, including the vigorous defence of the EMEA Claims and the UKPC Claims, will result in greater distributions being made to creditors of the Canadian Debtors relative to available alternatives.

### *Crossover Bondholder Claims Litigation*

(Timeframe: June 2014 – Ongoing)

218.    During the course of the Allocation Dispute, this Court and the U.S. Court directed a joint hearing to determine the following legal issues:

(a)    whether the holders (the "**Crossover Bondholders**") of bond claims asserted against both the Canadian Estate and the U.S. Estate are legally entitled in each

jurisdiction to claim or receive any amounts under the relevant indentures above and beyond the outstanding principal debt and pre-petition interest (namely, above and beyond $4.092 billion); and

(b)    if it is determined that the Crossover Bondholders are so entitled, what additional amounts are such holders entitled to so claim and receive.

219.    At the time, the Monitor estimated the post-Filing Date interest potentially claimable by the Crossover Bondholders to be approximately $1.6 billion (if claimed at the contractual rate). The Monitor opposed the ability of the Crossover Bondholders to claim amounts in excess of $4.092 billion, including interest accruing after the Filing Date.

220.    On July 25, 2014, this Court proceeded with the hearing in respect of the above noted matters and on August 19, 2014, issued an Endorsement holding and declaring that the Crossover Bondholders are not legally entitled to claim or receive any amounts under the relevant indentures above and beyond the outstanding principal debt and pre-petition interest (namely, above and beyond $4.092 billion). On September 9, 2014, the Bondholder Group filed a motion seeking leave to appeal this Court's Order in respect of the claims of the Crossover Bondholders. On November 27, 2014, the Ontario Court of Appeal denied leave to appeal on two of three issues the Bondholder Group sought leave to appeal and granted leave to appeal on one issue, namely whether the Crossover Bondholders were legally entitled to post-filing interest and other amounts owing under the relevant indentures for the post-filing period. The Bondholder Group's appeal was heard on April 29, 2015. On October 13, 2015, the Ontario Court of Appeal dismissed the Bondholder Group's appeal. The Bondholder Group subsequently sought leave to appeal the Ontario Court of Appeal's decision to the Supreme Court of Canada. On May 5, 2016, the Supreme Court of Canada dismissed the Bondholder Group's application for leave to appeal.

221.    The hearing in the U.S. Court with respect to these matters was scheduled to proceed at the same time as the hearing in this Court, but was adjourned on July 24, 2014, due to the U.S. Debtors announcing they had entered into a settlement agreement with certain bondholders resolving the post-petition interest claims of certain of the Crossover Bondholders. The Monitor and Canadian Debtors objected to approval of the settlement.

The litigation process leading to the settlement approval hearing involved a discovery process, the filing of expert reports and fact and expert witness depositions. The Monitor and its counsel led these efforts on behalf of the Canadian Estate.

222.    Prior to the settlement approval hearings, the U.S. Court directed a settlement conference in Delaware. The Monitor and its counsel prepared for and participated in this settlement conference. The settlement conference did not result in a settlement.

223.    Following a hearing held on November 4 and 5, 2014, the U.S. Court approved the settlement on December 18, 2014. On December 31, 2014, the Monitor and Canadian Debtors filed a notice of appeal of the U.S. Court's decision to the District Court. On February 18, 2015, the parties to the appeal submitted a joint-statement to the District Court proposing a briefing schedule for the appeal. On March 12, 2015, the District Court accepted the recommendation of the Magistrate Judge that the appeal be withdrawn from the mandatory referral for mediation and entered the briefing schedule proposed by the parties. On March 30, 2015, the Monitor and Canadian Debtors filed their opening brief and appendix. Subsequently, the parties have stipulated to, and the District Court has ordered, extensions of the briefing schedule in view of the developments in the Allocation Dispute.

224.    The activities of the Monitor and its counsel in connection with these issues have included:

(a)    considering the claims of the Crossover Bondholders and the legal issues related thereto in the circumstances of the CCAA proceedings and the Chapter 11 Proceedings; and

(b)    preparing numerous court filings in connection with the motions to this Court and the U.S. Court and the resulting appeals both in Canada and the U.S. and otherwise prosecuting such litigation.

_Settlement of Chubb Claims_

(Timeframe: March 2009 – December 2014)

225. Chubb Insurance Company of Canada (with certain of its affiliates, "**Chubb**") was Nortel's primary director and officer insurer in the early 2000s. In the early to mid-2000s, NNC and a number of its former directors and officers were sued in numerous class actions in the United States and Canada for, _inter alia_, allegedly making false statements which artificially increased the price of NNC's shares between October 24, 2000 and February 15, 2001, and for allegedly misrepresenting NNC's financial situation by creating improper cash reserves and issuing false reports and financial statements that artificially inflated NNC's earnings and the price of NNC securities between April 24, 2003 and April 27, 2004. In June 2006, NNC reached a global settlement agreement in respect of most of these class actions and on October 13, 2006, NNC, Chubb and various other insurers entered into a settlement agreement and release that resolved, as between NNC and the various insurers party thereto, the insurers' contributions towards the global settlement. Pursuant to the settlement, NNC agreed to certain indemnities in favour of Chubb in respect of further payments under the relevant insurance policies and Chubb's ongoing litigation with certain former employees of Nortel who had been terminated for cause, and also agreed to establish an escrow account in the amount of $10 million in connection with certain of the indemnities.

226. Chubb filed various proofs of claim in the CCAA proceedings relating to these indemnity obligations for amounts in excess of $37 million and also asserted trust and property claims in respect of the $10 million escrow fund and an approximately $0.5 million premium Chubb had purported to return to NNC (collectively, the "**Chubb Claims**").

227.  The activities of the Monitor and its counsel in connection with the Chubb Claims included:

(a) reviewing and considering Chubb's proofs of claim and their trust and proprietary claims;

(b) negotiating the resolution of certain of the Chubb Claims in connection with the resolution of the Nortel "ERISA" litigation in August 2010;

(c)     preparing a without prejudice settlement proposal in the summer of 2014 and engaging in negotiations and exchange of information and proposals with Chubb;

(d)     participating in a "back to back" mediation in October 2014 before former Justice George Adams (including preparing a mediation brief and reviewing and considering the mediation briefs filed by others parties) pursuant to which the Monitor and Canadian Estate mediated the Chubb Claims with Chubb and Chubb mediated claims by Frank Dunn against Chubb, which mediation resulted in the settlement of the Chubb Claims for significantly less than the filed amounts and the return of approximately $7.8 million of the escrow funds to NNC; and

(e)     preparing motion materials seeking Court approval of the settlement reached with Chubb, attending the hearing in respect of same and receiving Court approval.

## VII.    2015

### *Overview*

228.    Following the conclusion of the trial of the Allocation Dispute and the UKPC Claims in the fall of 2014, the Monitor and its counsel continued to progress CCAA claim related matters (approximately 35% of their fees in 2015) and otherwise advanced the wind-up and administration of the Canadian Estate such that when the Allocation Dispute is finally resolved and proceeds are received the Canadian Debtors will be in a position to promptly make distributions to their creditors. In addition to these efforts, approximately 40% of the Monitor's and its counsel's fees in 2015 are attributable to the Allocation Dispute reconsideration motion and appeals, the UKPC Claims appeal and related settlement efforts.

### *UKPC Appeal*

(Timeframe: December 2014 – Ongoing)

229.    The UKPC sought and was granted leave to appeal the UKPC Claims trial decision with respect to the Swift Guarantee. The Court of Appeal granted an order approving a timetable for the exchange of materials in the appeal of the Swift Guarantee, as well as a proposed cross-appeal and cross-cross appeal regarding the Funding Guarantee. The

activities of the Monitor and its counsel through the Period in connection with these appeals included:

(a)      considering and preparing materials in response to the UKPC's motion seeking leave to appeal;

(b)      considering and preparing materials with respect to the appeal, a cross-appeal by the Canadian Debtors and the Monitor and a cross-cross appeal by the UKPC;

(c)      attending to certain motions to address the conduct of the appeals; and

(d)      attending at the Ontario Court of Appeal on February 17 and 18, 2016, to argue the appeals and pending leave motions.

230.   As noted, the appeals and related leave motions were heard over two days in February 2016. The UKPC's motion seeking leave to cross-cross appeal on the quantum of the Funding Guarantee was denied from the bench. Decisions on the UKPC's appeal in respect of the Swift Guarantee and the Monitor and Canadian Debtors' motion for leave and cross-appeal in respect of the Funding Guarantee Claim are under reserve.

*Allocation Reconsideration Motions and Appeals and Farnan Mediation*
(Timeframe: May 2015 – Ongoing)

231.   On May 12, 2015, this Court issued its Reasons for Judgement and the U.S. Court issued its Allocation Trial Opinion (collectively, the "**Allocation Decisions**" and each an "**Allocation Decision**") in respect of the Allocation Dispute. The Allocation Decisions provide for a modified pro rata allocation of the LOB and Residual IP sale proceeds amongst the Canadian Debtors, the U.S. Debtors and the EMEA Debtors.

232.   At a June 25, 2015 joint hearing, this Court and the U.S. Court heard motions for clarification, reconsideration or amendment of the Allocation Decisions brought by the U.S. Debtors, the Bondholder Group and Law Debenture Trust Company of New York. On July 6, 2015, this Court issued a Ruling on Reconsideration/Clarification Motion and the U.S. Court issued a Memorandum Order on Motions for Reconsideration that granted certain of the relief sought on such motions, but denied most of the relief requested by the U.S. Debtors.

233.  On July 16, 2015, the U.S. Debtors, the UCC, the Bondholder Group, the Nortel Trade Claims Consortium, the Bank of New York Mellon and the Conflicts Administrator of NNSA (collectively, the "**Moving Parties**") filed motions to the Ontario Court of Appeal for leave to appeal this Court's Allocation Decision. On August 24, 2015, the Moving Parties filed facta in support of their motions. Responding materials for parties opposing the leave to appeal motions were filed September 21, 2015, including by the Monitor and Canadian Debtors. On May 3, 2016, the Ontario Court of Appeal denied the Moving Parties' motions seeking leave to appeal this Court's Allocation Decision. Although not occurring during the Period, it is worth noting that in July 2016, the Moving Parties brought applications seeking leave to appeal the Ontario Court of Appeal's decision to the Supreme Court of Canada. Subsequently, the parties have sought, and the Supreme Court has ordered, an extension of the schedule for responding materials to be filed in opposition to the applications for leave to appeal in view of the Settlement and Plans Support Agreement having been entered into.

234.  Appeals of the U.S. Court's Allocation Decision were also filed by the Moving Parties as well as by the U.S. Pension Benefit Guaranty Corporation. The Monitor and Canadian Debtors, the Joint Administrators and the Canadian Creditors Committee ("**CCC**") have also filed contingent cross-appeals of the U.S. Court's Allocation Decision solely to preserve arguments on appeal in the event the U.S. Court's Allocation Decision is altered on appeal.

235.  Contemporaneously with filing their notices of appeal, the Monitor and Canadian Debtors, joined by the CCC, filed a motion for certification of the U.S. Court's Allocation Decision for direct appeal to the United States Court of Appeals for the Third Circuit and a motion for leave to appeal on the basis that the U.S. Court's Allocation Decision is interlocutory but appeal should be permitted on the basis it will advance and expedite the final resolution of the Allocation Dispute and conclusion of these CCAA proceedings and the Chapter 11 Proceedings. On July 30, 2015, the U.S. Court entered an order denying certification of the U.S. Court's Allocation Decision for direct appeal to the United States Court of Appeals for the Third Circuit (the "**Third Circuit**"). In May 2016, the United States District Court for the District of Delaware (the "**District Court**"),

on its own motion, certified the U.S. allocation appeals, including the contingent cross-appeals, directly to the Third Circuit.

236.    On July 13, 2015, pursuant to its standing order directing all bankruptcy appeals to mediation, the District Court requested the parties to submit a joint statement regarding their positions on mediation and deferring briefing of the appeal until resolution of the mediation. Consistent with the U.S. Federal Rules of Bankruptcy Procedure, the parties to the appeal filed statements of issues on appeal and designated items for the record on appeal.

237.    On July 27, 2015, the Monitor and Canadian Debtors and the other parties to the appeal submitted a joint statement expressing their respective views on mediation. On August 25, 2015, the Magistrate Judge assigned to determine the appropriateness of mediation pursuant to the District Court's standing order scheduled a status conference for September 2, 2015, for the purpose of discussing details of the mediation, including selection of a mediator, length of mediation and adoption of protocols to govern the conduct of the mediation. The parties to the appeal ultimately submitted a joint mediation proposal to the Magistrate Judge and a mediation began in late October 2015 before retired Chief Judge Joseph J. Farnan.

238.    The activities of the Monitor and its counsel in connection with the foregoing during the Period included:

(a)    reviewing and considering the Allocation Decisions, including preparing and considering distribution and creditor recovery models;

(b)    considering and drafting responding materials in respect of the various reconsideration and clarification motions brought in respect of the Allocation Decisions and arguing such motions;

(c)    considering and drafting responding materials in respect of the various leave to appeal motions and appeals filed in respect of the Allocation Decisions and filing contingent cross-appeals as appropriate to preserve the Canadian Debtors' rights;

(d)    filing motions seeking to expedite the appeal of the U.S. Court's Allocation Decision;

(e)    preparing mediation briefs, reviewing and considering other party's mediation briefs and preparing for and attending at the initial mediation session before Chief Judge Farnan; and

(f)    engaging in numerous subsequent settlement negotiations (both via telephone conference and in person in London and New York) with other parties to the Allocation Dispute and further mediation sessions before Chief Judge Farnan, including preparing settlement proposals and related draft documentation, which efforts ultimately led to an agreement in principle being reached at the end of May 2016, which agreement in principle ultimately evolved into the Settlement and Plans Support Agreement.

_Records Disposal Process_
(Timeframe: May 2015 – October 2015)

239.    In an effort to reduce the Canadian Debtors' ongoing costs pertaining to records retention (approximately $1.8 million per annum), the Monitor brought a motion in July 2015 seeking to establish a records disposal process that would permit the Canadian Debtors to dispose of a portion of their remaining records, including electronic records stored on approximately 234 servers and more than 58,000 boxes of hard copy records and media tapes. On August 26, 2015, this Court granted an Order approving this process. The efforts of the Monitor and its counsel in connection with the records disposal process included:

(a)    reviewing the various types of the Canadian Debtors' records and available indices and considering the types of records the Canadian Debtors need to retain having regard to unresolved issues in the CCAA proceedings;

(b)    reviewing with the Canadian Debtors' remaining IT personnel the remaining applications, programs and databases on the Canadian Debtors' servers and the required IT infrastructure to support them;

(c)    liaising with the federal government regarding the status of the Canadian Debtors' lease at the Carling Campus and negotiating with a third party IT services provider to provide continuing support for the Canadian Debtors' remaining IT infrastructure;

(d)    preparing and bringing a motion seeking approval of the records disposal process;

(e)    negotiating the terms of the records disposal process with various stakeholders; and

(f)    reviewing and considering objections received in the records disposal process, preparing a supplemental report in respect of certain unresolved objections and ultimately resolving all filed objections.

## VIII.    2016

### *Overview*

240.    For the first five months of 2016, the Monitor and its counsel continued to progress the resolution of various significant claims asserted in the CCAA proceedings, including those of SNMP Research, Inc. and SNMP Research International, Inc. (collectively, "**SNMPRI**"), Frank Dunn and certain former employees based out of Calgary that asserted claims against certain of NNC and NNL's former directors (approximately 52% of their fees). The Monitor and its counsel also continued settlement negotiations in respect of the Allocation Dispute and related matters and progressed the appeals relating to the Allocation Dispute and the UKPC Claims (approximately 25% of their fees).

### *SNMPRI Claims*

(Timeframe: September 2009 – Ongoing)

241.    SNMPRI has asserted claims against the Canadian Debtors alleging unauthorized use and transfer of SNMPRI's software. SNMPRI alleges damages of $200 million in connection with the alleged wrongful transfer of its software in the LOB transactions and has filed proofs of claim in the CCAA proceedings against each of the Canadian Debtors claiming approximately $7.5 million on account of alleged unauthorized pre-filing use of SNMPRI's software.

242.    The activities of the Monitor and its counsel in connection with the claims of SNMPRI during the Period included:

(a)    considering and addressing SNMPRI's demand that Nortel conduct an audit of the computer source code used in the MSS business;

(b)    responding to SNMPRI's efforts to seek discovery from the U.S. Debtors, which discovery also sought discovery of documents from the Canadian Debtors;

(c)    negotiating a letter agreement pursuant to which the U.S. Debtors, the Canadian Debtors and SNMPRI agreed to (among other things) non-binding mediation of SNMPRI's claims and directing and participating in such mediation on behalf of the Canadian Estate;

(d)    reviewing and considering SNMPRI's claims;

(e)    proposing a joint protocol to resolve SNMPRI's claims against the Canadian Debtors and U.S. Debtors in a coordinated process pursuant to the Cross-Border Protocol;

(f)    responding to SNMPRI's motion to lift the CCAA stay to allow it to proceed with its claims against the Canadian Debtors in the United States, which motion was denied by the Court;

(g)    proposing and seeking Court approval of a modified protocol to resolve SNMPRI's claims against the Canadian Debtors, which protocol was approved by the Court;

(h)    participating in a Court-directed mediation before former Justice Colin Campbell to mediate the scope of documentary discovery and electronic searches of the Canadian Debtors;

(i)    directing and progressing the discovery and litigation process[23] contemplated by the protocol throughout 2015 and 2016, including the review and preparation of

---

[23] These efforts have primarily been led by litigation counsel to the Canadian Debtors given counsel's familiarity with SNMPRI's claims.

pleadings, the review and production of documents, electronic searching of the Canadian Debtors' ClearCase database, party examinations and the review and preparation of evidence (including fact witness and expert evidence) filed;

(j)     in connection with the records disposal process, negotiating an agreement with SNMPRI pursuant to which SNMPRI agree to pay the costs of the transfer and storage of certain records of the Canadian Debtors;

(k)     bringing a partial summary judgment motion in respect of SNMPRI's claims heard in April 2016, pursuant to which the Court dismissed SNMPRI's transfer and profits claims;

(l)     reviewing and considering SNMPRI's motion seeking leave to appeal this Court's dismissal of its transfer and profits claims; and

(m)     monitoring the status of SNMPRI's parallel claims against the U.S. Debtors.

*Dunn Claims*
(Timeframe: September 2009 – Ongoing)

243.    Mr. Dunn is the former President and Chief Executive Officer of NNC and NNL whose employment was terminated on April 27, 2004. At the time of the CCAA filing, there were various lawsuits pending between Mr. Dunn and Nortel, including an Ontario action commenced by Mr. Dunn against Nortel in 2006 claiming damages for wrongful dismissal, defamation and other alleged heads of damages. Mr. Dunn filed proofs of claim in the CCAA proceedings against each of NNC and NNL for CA$215 million.

244.    The activities of the Monitor and its counsel in connection with the resolution of Mr. Dunn's claims through the Period have included:

(a)     reviewing and considering Mr. Dunn's claims and the Canadian Debtors' records related thereto;

(b)     engaging in without prejudice settlement meetings with Mr. Dunn and his counsel, including the exchange of without prejudice settlement proposals;

(c)    preparing a request for further information from Mr. Dunn in respect of his claims and reviewing and considering the response;

(d)    bringing a motion permitting the Monitor to receive records from the Canadian Debtors' former counsel with respect to the Dunn claims and reviewing and considering those records as well as records received from NNC's former counsel in connection with the *R. v. Dunn, Beatty and Gollogly* criminal trial;

(e)    preparing and issuing a partial notice of disallowance in respect of Mr. Dunn's claims;

(f)    reviewing and considering the dispute notices filed by Mr. Dunn;

(g)    preparing and bringing a motion seeking approval of a procedure to resolve Mr. Dunn's claims;

(h)    responding to Mr. Dunn's motion seeking approval of a procedure he proposed to resolve his claims and a WAGG order; and

(i)    directing and progressing the resolution of Mr. Dunn's claims, including the preparation and negotiation of a litigation timetable and discovery plan, the review and production of thousands of the Canadian Debtors' documents, the review of the 137,356 documents produced by Mr. Dunn, party examinations, discussions and meetings with former employees and directors of NNC and NNL with knowledge of the matters relating to Mr. Dunn's claims and beginning the preparation of fact witness and expert evidence to be filed on behalf of the Canadian Debtors in the claim dispute (which was ultimately heard in mid-August 2016).

## *Calgary Former Employee Claims*

(Timeframe: September 2009 – Ongoing)

245.    Approximately 110 former employees of the Canadian Debtors (the "**Calgary Former Employees**") whose employment was terminated in the period from early to mid-2009 as a result of the closure of Nortel's Westwinds facility in Calgary, Alberta asserted claims against certain former directors of NNC and NNL alleging liability of those directors for

termination and severance payments owing to them. The Monitor calculated the maximum potential claim against the Directors to be approximately CA$5.37 million. The directors assert coverage for such claims under Nortel's director and officer insurance. The directors also hold certain indemnity rights against NNC and/or NNL and gave notice of the Calgary Former Employees' claims to the trustee of the approximately CA$12 million trust established by NNC (which NNC is the residuary beneficiary of) immediately prior to the Filing Date for the benefit of (then) current and future directors and officers.[24]

246.    The activities of the Monitor and its counsel in connection with the claims of the Calgary Former Employee Claims through the Period included:

(a)    negotiating various consent lift-stay orders permitting the Calgary Former Employees to file statements of claim with the Court of Queen's Bench of Alberta to preserve rights against the directors;

(b)    reviewing and considering the proof of claim filed by the Calgary Former Employees and the termination letters delivered in support thereof;

(c)    negotiating with Representative Counsel and counsel to the former directors regarding the claims of the Calgary Former Employees;

(d)    negotiating a procedure to resolve the claims of the Calgary Former Employees with Representative Counsel and counsel to the former directors and bringing a motion seeking Court approval of such procedure; and

(e)    negotiating and drafting an agreed statement of facts with Representative Counsel and counsel to the former directors.

*Lucescu Claims*

(Timeframe: May 2009 – Ongoing)

247.    On May 18, 2009, David Lucescu, individually and on behalf of all others similarly situated, filed a class action complaint against certain former directors and officers of

---

[24] The claims of the Calgary Former Employees were ultimately heard and dismissed by the Court in September 2016.

NNC purporting to commence a securities class action before the the United States District Court of the Southern District of New York. The complaint alleges certain press releases and statements made by NNC in the period May 2, 2008, though to and including September 17, 2008, were materially false and misleading, resulting in NNC's common stock trading at artificially inflated prices and seeks remedies and damages against the former directors and officers under the *Securities Exchange Act of 1934* (U.S.). Proofs of claim alleging the same claims against both NNC and the former directors and officers were filed in the CCAA proceedings (collectively, with the class action, the "**Lucescu Claims**").

248.    The activities of the Monitor and its counsel in connection with the Lucescu Claims has included:

(a)    writing to class counsel to advise the filing of the class action was subject to the CCAA stay;

(b)    negotiating a limited modification of stay with class counsel for the sole purpose of permitting a motion for selection of lead plaintiffs;

(c)    responding to lead plaintiffs' motion filed with the U.S. Court seeking to lift the CCAA stay (which motion was denied) and responding to lead plaintiffs' appeal of such decision (which appeal was denied);

(d)    responding to a second motion filed by lead plaintiffs with the U.S. Court seeking to lift the CCAA stay, which motion was denied;

(e)    responding to lead plaintiffs' motion to this Court seeking to lift the CCAA stay;

(f)    engaging in without prejudice settlement discussions regarding lead plaintiffs' motion with class counsel, counsel to the former directors and officers and counsel to AIG; and

(g)    participating in a mediation of the Lucescu Claims with class counsel, counsel to the former directors and officers and counsel to AIG before Judge Daniel

Weinstein and former Justice Colin Campbell, including preparation of a mediation brief and related materials.

## CONCLUSION AND ORDER SOUGHT

249.    These CCAA proceedings, ongoing for more than seven and a half years as at the writing of this Report, are unprecedented in terms of their size, complexity, international aspects and the vast number of competing interests, all of which have contributed to the litigious nature of the proceedings. Further, the fact that the Monitor has had expanded powers since mid-2009 and has been authorized to exercise any powers which may be properly exercised by a board of directors of any of the Canadian Debtors since October 2012, all in the context of a liquidating insolvency, has resulted in the Monitor and its counsel undertaking a significantly greater scope of work than in a typical CCAA case.

250.    The efforts of the Monitor and its counsel have resulted in significant achievements for the Canadian Estate such that the Monitor estimates the assets administered or to be administered in the within CCAA proceedings to be in excess of $6 billion. Some of those key achievements through the Period included:

(a)    negotiating and entering into agreements to ensure the Canadian Debtors had sufficient funding to continue operations, avoiding the possibility of a value-destroying "hard-stop" liquidation or bankruptcy;

(b)    the successful going-concern sale of the LOBs for more than $3.2 billion over nine individual transactions, resulting in more than 10,600 Nortel employees being transferred to the LOB purchasers;

(c)    the sale of the Residual IP for $4.5 billion;

(d)    the sale of other assets of the Canadian Debtors over 18 transactions for more than CA$615 million;

(e)    the repatriation of more than $328 million to NNL through payment of intercompany balances, dividends or other equity distributions from foreign subsidiaries;

(f)      administering the CA$39.9 billion CCAA Claims Process, resolving the vast majority of claims filed and significantly reducing the admitted amount of claims resolved through the Period from an as filed amount of approximately CA$12.5 billion to an admitted amount of CA$2.9 billion, a reduction of approximately 77%;

(g)      successfully negotiating, implementing and conducting a compensation claims process for the more than 15,000 former employee related creditors of the Canadian Debtors;

(h)      settling the billions of dollars of claims filed by the EMEA Debtors for a maximum unsecured claim of $125 million, an amount only slightly higher than the net pre-Filing Date book debt owing by the Canadian Debtors to the EMEA Debtors;

(i)      successfully defending against the billions of dollars of claims filed by the UKPC; and

(j)      obtaining a successful outcome for the Canadian Estate in the Allocation Dispute that, if the Settlement and Plans Support Agreement is implemented, will see the Canadian Estate receive in excess of $4.1 billion, an amount that is some $3.3 billion greater than the amount various parties proposed to be allocated to the Canadian Estate at trial.

251.    The fees and disbursements of the Monitor and its counsel resulting from these activities and the other work described herein are significant. However, at all times the work performed by the Monitor, including by the Monitor's counsel at the direction of the Monitor, has been undertaken in good faith with a view to advancing the interests of the Canadian Estate based on the circumstances that have confronted the Monitor, including to maximize the amounts available for distribution to creditors and seeking to ensure that those amounts are ultimately distributed amongst creditors fairly and equitably in accordance with their respective legal entitlements.

252.    Having regard to the unique circumstances of these CCAA proceedings, the Monitor believes that its fees and disbursements and those of its counsel are fair and reasonable

and respectfully requests that this Court approve the fees and disbursements of the Monitor and its counsel for the period from January 14, 2009, through to and including May 31, 2016.

All of which is respectfully submitted this 16th day of November, 2016.

**ERNST & YOUNG INC.**
**in its capacity as Monitor of Nortel Networks Corporation *et al.***
**and not its personal capacity**

Per:

Murray McDonald
President

**APPENDIX "A"**

**FIFTH AMENDED AND RESTATED INITIAL ORDER**

**[ATTACHED]**



Court File No. 09-CL-7950

### *ONTARIO*
### SUPERIOR COURT OF JUSTICE

THE HONOURABLE          )   WEDNESDAY, THE 14TH

)

MR. JUSTICE MORAWETZ      )   DAY OF JANUARY, 2009

### IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

### AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION (the "Applicants")

### APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

### FIFTH AMENDED AND RESTATED INITIAL ORDER

THIS APPLICATION, made by the Applicants, pursuant to the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended (the "CCAA") was heard this day at 330 University Avenue, Toronto, Ontario.

ON READING the affidavit of John Doolittle sworn January 14, 2009 (the "Doolittle Affidavit") and the Exhibits thereto, the affidavit of John Doolittle sworn June 22, 2009 (the "June Affidavit") and the Exhibits thereto, the report dated January 14, 2009 of Ernst & Young Inc. ("E&Y"), the proposed monitor, and on hearing the submissions of counsel for the Applicants, counsel for the boards of directors of Nortel Networks Corporation and Nortel Networks Limited, counsel for E&Y, counsel for Export Development Canada ("EDC"), Flextronics

Telecom Systems Ltd., no one else appearing on this Application and on reading the consent of E&Y to act as the Monitor,

## SERVICE

1.    THIS COURT ORDERS that the time for service of the Notice of Application and the Application Record is hereby abridged so that this Application is properly returnable today and hereby dispenses with further service thereof.

## APPLICATION

2.    THIS COURT ORDERS AND DECLARES that each of the Applicants is a "debtor company" to which the CCAA applies.

## PLAN OF ARRANGEMENT

3.    THIS COURT ORDERS that each of the Applicants shall have the authority to file and may, subject to further order of this Court, file with this Court a plan of compromise or arrangement (hereinafter referred to as the "Plan") between, *inter alia*, such Applicant and one or more classes of its secured and/or unsecured creditors as it deems appropriate.

## POSSESSION OF PROPERTY AND OPERATIONS

4.    THIS COURT ORDERS that each of the Applicants shall remain in possession and control of its current and future assets, undertakings and properties of every nature and kind whatsoever, and wherever situate including all proceeds thereof (the "Property").  Subject to further Order of this Court, each of the Applicants shall continue to carry on business in a manner consistent with the preservation of its business (the "Business") and Property.  Each of the Applicants shall be authorized and empowered to continue to retain and employ the employees, consultants, agents, experts, brokers, accountants, legal counsel, financial advisors and such other persons (collectively "Assistants") currently retained or employed by such Applicant, with liberty to retain such further Assistants as such Applicant deems reasonably necessary or desirable for the Business or to carry out the terms of this Order or for the purposes of the Plan.

5.      THIS COURT ORDERS that the Applicants shall be entitled to continue to utilize the central cash management system currently in place as described in the Doolittle Affidavit or replace it with another substantially similar central cash management system (the "Cash Management System") and that any present or future bank or banks providing the Cash Management System shall not be under any obligation whatsoever to inquire into the propriety, validity or legality of any transfer, payment, collection or other action taken under the Cash Management System, or as to the use or application by the Applicants of funds transferred, paid, collected or otherwise dealt with in the Cash Management System; shall be entitled to provide the Cash Management System without any liability in respect thereof to any Person (as hereinafter defined) other than the Applicants, pursuant to the terms of the documentation applicable to the Cash Management System; and shall be, in its capacity as provider of the Cash Management System, an unaffected creditor under the Plan with regard to any claims or expenses it may suffer or incur in connection with the provision of the Cash Management System.

6.      THIS COURT ORDERS that each of the Applicants, either on its own behalf or on behalf of another Applicant, shall be entitled but not required to pay the following expenses whether incurred prior to, on or after the date of this Order:

(a)      all outstanding and future wages, salaries and employee benefits (including, but not limited to, employee medical and similar benefit plans, relocation and tax equalization programs, the Incentive Plan (as defined in the Doolittle Affidavit) and employee assistance programs), current service, special and similar pension benefit payments, vacation pay, commissions and employee and director expenses, in each case incurred in the ordinary course of business and consistent with existing compensation policies and arrangements;

(b)      compensation to employees in respect of any payments made to employees prior to the date of this Order by way of the issuance of cheques or electronic transfers, which are subsequently dishonoured due to the commencement of proceedings under the CCAA;

(c) all outstanding and future amounts owing to or in respect of individuals working as independent contractors in connection with the Business;

(d) the fees and disbursements of any Assistants retained or employed in accordance with paragraph 4 hereof;

(e) subject to the consent of the Monitor, amounts owing by one of more of the Applicants in respect of its Customer Programs (as defined in the Doolittle Affidavit);

(f) subject to consent of the Monitor, amounts owing by one or more of the Applicants to any other Nortel Company (as defined in the Doolittle Affidavit) in order to settle their inter-company accounts and make inter-company loans in the ordinary course of business, including as a result of the Nortel Companies' Transfer Pricing Model (as defined in the Doolittle Affidavit); and

(g) subject to the consent of the Monitor, amounts owing to the Applicants' carriers and warehousemen.

7. THIS COURT ORDERS that, except as otherwise provided to the contrary herein, each of the Applicants shall be entitled but not required to pay all reasonable expenses incurred by it in carrying on the Business in the ordinary course on and after the date of this Order, and in carrying out the provisions of this Order, which expenses shall include, without limitation:

(a) all expenses and capital expenditures reasonably necessary for the preservation of the Property or the Business including, without limitation, payments on account of insurance (including directors and officers insurance) and maintenance and security services;

(b) payment for goods or services actually supplied to the Applicants on or after the date of this Order;

(c) with the written approval of the Monitor, the posting of additional cash collateral into existing cash collateral accounts (collectively, and together with the cash collateral posted as at February 10, 2009, the "LC Cash Collateral") held by either

or both of ABN AMRO Bank N.V., Canada Branch ("ABN") and Royal Bank of Canada ("RBC") as additional and continuing security for existing, renewed and new letters of credit, letters of guarantee, surety bonds, and similar instruments (collectively, "LCs") issued (whether before or after January 14, 2009) for the account of or requested by the Applicants or any of them to third parties pursuant to the existing letter of credit agreements between the Applicants and ABN and RBC and any amendments thereto made with the written approval of the Monitor, and for any foreign exchange losses incurred by ABN and its correspondent banks, if any, under LCs issued in currencies other than Canadian dollars, U.S. dollars, British pounds sterling and Euros, on the following basis:

(i)     the posting of such additional cash collateral is for the purposes of paragraph 10 hereof specifically permitted herein and authorized hereby and shall not and will not constitute a fraudulent preference, fraudulent conveyance, oppressive conduct, settlement or other challengeable, voidable or reviewable transaction under any applicable law;

(ii)    the aggregate of all cash collateral that may be posted (inclusive of the cash collateral posted as at February 10, 2009) in respect of LCs issued in Canadian dollars, U.S. dollars, British pounds sterling and Euros shall not exceed the amount of U.S.$40 million (converting Canadian dollars at the Bank of Canada's Noon spot exchange rate for any day), provided that the LC Banks shall have no liability in the event that cash collateral is posted in an amount that exceeds such maximum and the validity of their claims with respect to any or all of the LC Cash Collateral shall not be limited, lessened or otherwise impaired in any way as a result of such excess; and

(iii)   cash collateral may be posted in respect of LCs issued by ABN in any other currencies in such amounts as are required by the provisions of the applicable letter of credit agreement, including any amendments thereto made with the written approval of the Monitor as security for ABN's exposure to foreign exchange losses;

(d)     if the same is not guaranteed by EDC, payment of any indebtedness of the Applicants to the LC Banks (as defined in paragraph 10A hereof) when due under the LC Agreements (as defined in paragraph 10A hereof) by way of set-off and transfer of LC Cash Collateral posted as at January 14, 2009 or posted thereafter pursuant to the LC Agreements and subparagraph (c) above;

(e)     without limiting (d), payment of costs and expenses of the LC Banks in connection with the amendment and enforcement of rights under the LC Agreements and any related guarantee bonds issued by EDC if so provided for under an applicable LC Agreement, whether incurred before or after February 10, 2009, including by way of set-off and transfer of LC Cash Collateral;

(f)     the posting of cash collateral in favour of Export Development Canada ("EDC") (collectively, the "EDC Cash Collateral") pursuant to the second amended and restated short-term support agreement between Nortel Networks Limited ("NNL") and EDC dated April 24, 2009, as amended by the amending agreement between NNL and EDC dated June 18, 2009, and the cash collateral agreement between NNL and EDC dated June 18, 2009 and any further amendments to the foregoing made with the written approval of the Monitor (collectively, the "EDC Support Agreements"), on the basis that the EDC Support Agreements are hereby ratified and approved and the posting of such cash collateral is for the purposes of paragraph 10 hereof specifically permitted herein and authorized hereby and shall not and will not constitute a fraudulent preference, fraudulent conveyance, oppressive conduct, settlement or other challengeable, voidable or reviewable transaction under any applicable law;

(g)     payment of any indebtedness of NNL to EDC under the EDC Support Agreements by way of set-off or transfer of EDC Cash Collateral posted as at June 29, 2009 or posted thereafter pursuant to the EDC Support Agreements and subparagraph (f) above; and

(h)     without limiting (g), payment of costs and expenses of EDC provided for under the EDC Support Agreements by way of set-off or transfer of EDC Cash Collateral, to the extent provided for in the EDC Support Agreements.

7A.     THIS COURT ORDERS that no provision of this Order shall require EDC to provide its approval for any proposed amendments to any of the LC Agreements pursuant to any agreement between EDC and any of the LC Banks.

8.     THIS COURT ORDERS that the each of the Applicants shall remit, in accordance with legal requirements, or pay:

(a)     any statutory deemed trust amounts in favour of the Crown in right of Canada or of any Province thereof or any other taxation authority which are required to be deducted from employees' wages, including, without limitation, amounts in respect of (i) employment insurance, (ii) Canada Pension Plan, (iii) Quebec Pension Plan, and (iv) income taxes;

(b)     all goods and services or other applicable sales taxes (collectively, "Sales Taxes") required to be remitted by such Applicant in connection with the sale of goods and services by such Applicant, but only where such Sales Taxes are accrued or collected after the date of this Order, or where such Sales Taxes were accrued or collected prior to the date of this Order but not required to be remitted until on or after the date of this Order; and

(c)     any amount payable to the Crown in right of Canada or of any Province or Territory thereof or any political subdivision thereof or any other taxation authority in respect of municipal realty, municipal business or other taxes, assessments or levies of any nature or kind which are entitled at law to be paid in priority to claims of secured creditors and which are attributable to or in respect of the carrying on of the Business by such Applicant.

9.     THIS COURT ORDERS that until such time as an Applicant delivers a notice in writing to repudiate a real property lease in accordance with paragraph 11(c) of this Order (a "Notice of Repudiation"), each Applicant shall pay all amounts constituting rent or payable as rent under

real property leases (including, for greater certainty, common area maintenance charges, utilities and realty taxes and any other amounts payable to the landlord under the lease) or as otherwise may be negotiated by such Applicant and the landlord from time to time ("Rent"), for the period commencing from and including the date of this Order, monthly on the first day of each month, in advance (but not in arrears). On the date of the first of such payment, any arrears relating to the period commencing from and including the date of this Order shall also be paid. Upon delivery of a Notice of Repudiation, such Applicant shall pay all Rent due for the notice period stipulated in paragraph 11(c) of this Order, to the extent that Rent for such period has not already been paid.

10.    THIS COURT ORDERS that, except as specifically permitted herein, each of the Applicants is hereby directed, until further Order of this Court: (a) to make no payments of principal, interest thereon or otherwise on account of amounts owing by such Applicant to any of its creditors as of this date unless such payments have been approved by the Monitor; (b) to grant no security interests, trust, liens, charges or encumbrances upon or in respect of any of its Property; and (c) to not grant credit or incur liabilities except in the ordinary course of business unless such obligation has been approved by the Monitor.

10A.    THIS COURT ORDERS that, notwithstanding paragraph 10 hereof,

(a)    the existing letter of credit agreements between the Applicants and ABN, RBC and Citibank, N.A. acting through its Canadian branch ("Citibank") and any amendments thereto made after January 14, 2009 with the written approval of the Monitor, together with any agreements entered into by the Applicants or any of them with any other lenders with the written approval of the Monitor providing letter of credit facilities or similar facilities to the Applicants or any of them (including those which may be the subject of EDC guarantee bonds issued pursuant to the EDC Support Facility) (collectively, the "LC Agreements"), and the issuance or renewal of LC's pursuant thereto by ABN, RBC, Citibank and any other lenders (collectively, the "LC Banks"), together with any payments made by the Applicants or EDC with respect thereto; and

(b)     the EDC Support Agreements and any amendments thereto made after June 18, 2009 with the written consent of the Monitor, together with any payments made by NNL with respect thereto,

are specifically permitted herein and authorized hereby and shall not and will not constitute fraudulent preferences, oppressive conduct, settlements or other challengeable, voidable or reviewable transactions under any applicable law

10B.    THIS COURT ORDERS that, notwithstanding any other provision in this Order, no LC Bank shall be required to issue a letter of credit to the Applicants or any of them and EDC shall not be required to provide any Secured Support to the Applicants or any of them.

## RESTRUCTURING

11.     THIS COURT ORDERS that each of the Applicants shall, have the right to:

(a)     permanently or temporarily cease, downsize or shut down any of its business or operations and to dispose of redundant or non-material assets not exceeding CDN$10,000,000 in any one transaction or CDN$50,000,000 in the aggregate, subject to paragraph (c), if applicable;

(b)     terminate the employment of such of its employees or temporarily lay off such of its employees as it deems appropriate and to deal with the consequences thereof in the Plan or on further order of the Court;

(c)     in accordance with paragraphs 12 and 13, vacate, abandon or quit the whole but not part of any leased premises and/or repudiate any real property lease and any ancillary agreements relating to any leased premises, on not less than seven (7) days notice in writing to the relevant landlord on such terms as may be agreed upon between the Applicant and such landlord, or failing such agreement, to deal with the consequences thereof in the Plan;

(d)     repudiate such of its arrangements or agreements of any nature whatsoever, including, without limitation, any of its deferred compensation, or bonus plans, change of control plans, stock options or restructured stock unit plans and

shareholder rights plans whether oral or written, as such Applicant may deem appropriate on such terms as may be agreed upon between such Applicant or any one of them and such counter-parties, or failing such agreement, to deal with the consequences thereof in the Plan; and

(e)     pursue all avenues of refinancing and offers for material parts of its Business or Property, in whole or part, subject to prior approval of this Court being obtained before any material refinancing or any sale (except as permitted by subparagraph (a), above);

all of the foregoing to permit the Applicants to proceed with an orderly restructuring of the Business (the "Restructuring").

12.     THIS COURT ORDERS that each of the Applicants shall provide each of the relevant landlords with notice of such Applicant's intention to remove any fixtures from any leased premises at least seven (7) days prior to the date of the intended removal. The relevant landlord shall be entitled to have a representative present in the leased premises to observe such removal and, if the landlord disputes such Applicant's entitlement to remove any such fixture under the provisions of the lease, such fixture shall remain on the premises and shall be dealt with as agreed between any applicable secured creditors, such landlord and such Applicant, or by further Order of this Court upon application by such Applicant on at least two (2) days notice to such landlord and any such secured creditors. If such Applicant repudiates the lease governing such leased premises in accordance with paragraph 11(c) of this Order, it shall not be required to pay Rent under such lease pending resolution of any such dispute (other than Rent payable for the notice period provided for in paragraph 11(c) of this Order), and the repudiation of the lease shall be without prejudice to such Applicant's claim to the fixtures in dispute.

13.     THIS COURT ORDERS that if a Notice of Repudiation is delivered, then (a) during the notice period prior to the effective time of the repudiation, the landlord may show the affected leased premises to prospective tenants during normal business hours, on giving the Applicants and the Monitor 24 hours' prior written notice, and (b) at the effective time of the repudiation, the relevant landlord shall be entitled to take possession of any such leased premises without waiver of or prejudice to any claims or rights such landlord may have against the Applicants in

respect of such lease or leased premises and such landlord shall be entitled to notify the Applicants of the basis on which it is taking possession and to gain possession of and re-lease such leased premises to any third party or parties on such terms as such landlord considers advisable, provided that nothing herein shall relieve such landlord of its obligation to mitigate any damages claimed in connection therewith.

## NO PROCEEDINGS AGAINST THE APPLICANTS OR THE PROPERTY

14.     THIS COURT ORDERS that until and including February 13, 2009 or such later date as this Court may order (the "Stay Period"), no proceeding or enforcement process in any court or tribunal (each, a "Proceeding") shall be commenced, or continued against or in respect of any of the Applicants or the Monitor, or affecting the Business or the Property, except with the written consent of the affected Applicant and the Monitor, or with leave of this Court, and any and all Proceedings currently under way against or in respect of the affected Applicant or affecting the Business or the Property are hereby stayed and suspended pending further Order of this Court.

## NO EXERCISE OF RIGHTS OR REMEDIES

15.     THIS COURT ORDERS that during the Stay Period, all rights and remedies of any individual, firm, corporation, governmental body or agency, or any other entities (all of the foregoing, collectively being "Persons" and each being a "Person") against or in respect of the Applicants or the Monitor, or affecting the Business or the Property, are hereby stayed and suspended except with the written consent of the affected Applicant and the Monitor, or leave of this Court, provided that nothing in this Order shall (i) empower the Applicants to carry on any business which the Applicants are not lawfully entitled to carry on, (ii) exempt the Applicants from compliance with statutory or regulatory provisions relating to health, safety or the environment, (iii) prevent the filing of any registration to preserve or perfect a security interest, or (iv) prevent the registration of a claim for lien.

## NO INTERFERENCE WITH RIGHTS

16.     THIS COURT ORDERS that during the Stay Period, no Person shall discontinue, fail to honour, alter, interfere with, repudiate, terminate or cease to perform any right, renewal right,

contract, agreement, licence or permit in favour of or held by the Applicants, except with the written consent of the Applicants and the Monitor, or leave of this Court.

## CONTINUATION OF SERVICES

17.      THIS COURT ORDERS that during the Stay Period, all Persons having oral or written agreements with the Applicants or with third parties on behalf of the Applicants, or statutory or regulatory mandates for the supply of goods and/or services, including without limitation all computer software, communication and other data services, centralized banking services, payroll services, employment agency services, insurance, transportation services, utility, leasing or other services to the Business or to any of the Applicants, are hereby restrained until further Order of this Court from discontinuing, altering, interfering with or terminating the supply of such goods or services as may be required by the applicable Applicant and that such Applicant shall be entitled to the continued use of its current premises, telephone numbers, facsimile numbers, internet addresses and domain names, provided in each case that the normal prices or charges for all such goods or services received after the date of this Order are paid by such Applicant, in accordance with normal payment practices of such Applicant, as applicable, or such other practices as may be agreed upon by the supplier or service provider and the affected Applicant and the Monitor, or as may be ordered by this Court.

## NON-DEROGATION OF RIGHTS

18.      THIS COURT ORDERS that, notwithstanding anything else contained herein, no creditor of the Applicants shall be under any obligation after the making of this Order to advance or re-advance any monies or otherwise extend any credit to the Applicants. Nothing in this Order shall derogate from the rights conferred and obligations imposed by the CCAA.

## PROCEEDINGS AGAINST DIRECTORS AND OFFICERS

19.      THIS COURT ORDERS that during the Stay Period, and except as permitted by subsection 11.5(2) of the CCAA, no Proceeding may be commenced or continued against any of the former, current or future directors or officers of the Applicants with respect to any claim against the directors or officers that arose before the date hereof and that relates to any obligations of the Applicants whereby the directors or officers are alleged under any law to be

liable in their capacity as directors or officers for the payment or performance of such obligations, until a compromise or arrangement in respect of the Applicants, if one is filed, is sanctioned by this Court or is refused by the creditors of the Applicants or this Court.

## DIRECTORS AND OFFICERS

20.    THIS COURT ORDERS that each of the Applicants shall indemnify its directors and officers from all claims, costs, charges and expenses relating to the failure of such Applicant, after the date hereof, to make payments of the nature referred to in subparagraphs 6(a), 6(b), 8(a), 8(b) and 8(c) of this Order or for the Applicants' failure to make payments in respect of employer health tax or workers' compensation which they sustain or incur by reason of or in relation to their respective capacities as directors and/or officers except to the extent that, with respect to any officer or director, such officer or director has actively participated in the breach of any related fiduciary duties or has been grossly negligent or guilty of wilful misconduct.

21.    THIS COURT ORDERS that the directors and officers of the Applicants shall be entitled to the benefit of and are hereby granted a charge (the "Directors' Charge") on the Property, which charge shall not exceed an aggregate amount of CDN $45 million, as security for the indemnities provided in paragraph 20 of this Order as well as for fees and disbursements of their legal counsel. The Directors' Charge shall have the priority set out in paragraphs 42 and 44 herein.

21A.    THIS COURT ORDERS that, to the extent that any one or more of proven Claims (as defined below), together with the fees and disbursements of legal counsel to the directors and officers of the Applicants, individually or in the aggregate, exceed the amount of CDN $45 million, each such proven Claim against such directors and officers shall be reduced *pro rata* so that the aggregate of all such proven Claims, together with the fees and disbursements of legal counsel to such directors and officers, shall not exceed the amount of CDN $45 million and such excess amounts of all such proven Claims and any other Claims are hereby and shall be forever barred, disallowed, enjoined, released, discharged and extinguished as against the directors and officers of the Applicants. Provided, however, that nothing in this paragraph 21A shall operate to release any director or officer of an Applicant in respect of such excess amount of any such Claim where, in respect of such Claim, such director or officer has actively participated in the

breach of any related fiduciary duties or has been grossly negligent or guilty of wilful misconduct.

In this paragraph 21A, "Claim" shall mean any claim (contingent, liquidated or unliquidated, proven or unproven, known or unknown) or any legal proceeding or action of any nature or kind, in these proceedings or any subsequent receivership or bankruptcy proceedings or in any other proceedings or in any other forum whatsoever, against one or more of the directors or officers of any one or more of the Applicants relating to the failure of any of the Applicants, after the date of this Order, to make payments of the nature referred to in subparagraphs 6(a), 6(b), 8(a), 8(b) and 8(c) of this Order or the Applicants' failure to make payments in respect of employer health tax or workers' compensation, which are or may be directly or indirectly advanced, asserted, re-asserted, refiled or made by any person, governmental or regulatory authority or other entity against one or more of the directors or officers of any one or more of the Applicants, to the extent that such Claim is not covered under any directors' and officers' insurance policy, or to the extent that such coverage is insufficient to pay amounts indemnified in accordance with paragraph 20 of this Order

22.     THIS COURT ORDERS that, notwithstanding any language in any applicable insurance policy to the contrary, (a) no insurer shall be entitled to be subrogated to or claim the benefit of the Directors' Charge, and (b) each of the Applicants' directors and officers shall only be entitled to the benefit of the Directors' Charge to the extent that they do not have coverage under any directors' and officers' insurance policy, or to the extent that such coverage is insufficient to pay amounts indemnified in accordance with paragraph 20 of this Order.

23.     THIS COURT ORDERS that each of NNC's and NNL's directors shall be entitled to receive remuneration in cash on a current basis at current compensation levels (less an overall U.S.$25,000 reduction) notwithstanding the terms of, or elections made under, the Directors' Compensation Plan.

**APPOINTMENT OF MONITOR**

24.     THIS COURT ORDERS that E&Y is hereby appointed pursuant to the CCAA as the Monitor, an officer of this Court, to monitor the Property and the Applicants' conduct of the

Business with the powers and obligations set out in the CCAA or set forth herein and that each of the Applicants and its officers, directors, and Assistants shall advise the Monitor of all material steps taken by such Applicant pursuant to this Order, and shall co-operate fully with the Monitor in the exercise of its powers and discharge of its obligations.

25.    THIS COURT ORDERS that the Monitor, in addition to its prescribed rights and obligations under the CCAA, is hereby directed and empowered to:

(a)    monitor the Applicants' receipts and disbursements;

(b)    provide the consents contemplated herein;

(c)    report to this Court at such times and intervals as the Monitor may deem appropriate with respect to matters relating to the Property, the Business, and such other matters as may be relevant to the proceedings herein;

(d)    advise the Applicants in their preparation of the Applicants' cash flow statements and any other reporting to the Court or otherwise;

(e)    advise the Applicants in their development of the Plan or Plans and any amendments to such Plan or Plans;

(f)    assist the Applicants, to the extent required by the Applicants, with the Restructuring;

(g)    assist the Applicants, to the extent required by the Applicants, with the holding and administering of creditors' or shareholders' meetings for voting on the Plan or Plans;

(h)    have full and complete access to the books, records and management, employees and advisors of the Applicants and to the Business and the Property to the extent required to perform its duties arising under this Order;

(i)    be at liberty to engage independent legal counsel or such other persons as the Monitor deems necessary or advisable respecting the exercise of its powers and

performance of its obligations under this Order including, without limitation, one or more entities related to or affiliated with the Monitor;

(j)     consider, and if deemed advisable by the Monitor, prepare a report and assessment on the Plan or Plans;

(k)     assist the Applicants with respect to any insolvency proceedings commenced by or with respect to any other Nortel Company (as defined in the Doolittle Affidavit) in any foreign jurisdiction (collectively, "Foreign Proceedings") and report to this Court, as it deems appropriate, on the Foreign Proceedings with respect to matters relating to the Applicants;

(l)     apply as the foreign representative of the Applicants, for recognition of these proceedings as "Foreign Main Proceedings", pursuant to Chapter 15 of the United States Bankruptcy Code, 11 U.S.C. §101 (the "U.S. Bankruptcy Code") or similar legislation in any other jurisdiction; and

(m)    perform such other duties as are required by this Order or by this Court from time to time.

26.     THIS COURT ORDERS that the Monitor shall not take possession of the Property and shall take no part whatsoever in the management or supervision of the management of the Business and shall not, by fulfilling its obligations hereunder, be deemed to have taken or maintained possession or control of the Business or Property, or any part thereof.

27.     THIS COURT ORDERS that nothing herein contained shall require the Monitor to occupy or to take control, care, charge, possession or management (separately and/or collectively, "Possession") of any of the Property that might be environmentally contaminated, might be a pollutant or a contaminant, or might cause or contribute to a spill, discharge, release or deposit of a substance contrary to any federal, provincial or other law respecting the protection, conservation, enhancement, remediation or rehabilitation of the environment or relating to the disposal of waste or other contamination including, without limitation, the *Canadian Environmental Protection Act*, the *Ontario Environmental Protection Act*, the *Ontario Water Resources Act*, or the *Ontario Occupational Health and Safety Act* and regulations

thereunder (the "Environmental Legislation"), provided however that nothing herein shall exempt the Monitor from any duty to report or make disclosure imposed by applicable Environmental Legislation. The Monitor shall not, as a result of this Order or anything done in pursuance of the Monitor's duties and powers under this Order, be deemed to be in Possession of any of the Property within the meaning of any Environmental Legislation, unless it is actually in possession.

28.     THIS COURT ORDERS that that the Monitor shall provide any creditor of the Applicants with information provided by the Applicants in response to reasonable requests for information made in writing by such creditor addressed to the Monitor. The Monitor shall not have any responsibility or liability with respect to the information disseminated by it pursuant to this paragraph. In the case of information that the Monitor has been advised by the Applicants is confidential, the Monitor shall not provide such information to creditors unless otherwise directed by this Court or on such terms as the Monitor and the Applicants may agree.

29.     THIS COURT ORDERS that, in addition to the rights and protections afforded the Monitor under the CCAA or as an officer of this Court, the Monitor shall incur no liability or obligation as a result of its appointment and the fulfilment of its duties or the carrying out of the provisions of this Order, save and except for any gross negligence or wilful misconduct on its part. Nothing in this Order shall derogate from the protections afforded the Monitor by the CCAA or any applicable legislation.

30.     THIS COURT ORDERS that the Monitor, counsel to the Monitor, counsel to the Applicants and counsel to directors shall be paid their reasonable fees and disbursements incurred both before and after the making of the Order, in each case at their standard rates and charges, by the Applicants as part of the costs of these proceedings. Each of the Applicants is hereby authorized and directed to pay the accounts of the Monitor, counsel for the Monitor, counsel for the Applicants and counsel to directors on a weekly basis and, in addition, each of the Applicants is hereby authorized to pay to: (a) the Monitor and its Canadian and U.S. counsel a retainer in the aggregate amount of CDN$750,000; and (b) counsel to the Applicants a retainer in the amount of CDN$750,000 (collectively, the "Retainers") to be held by them as security for payment of their respective fees and disbursements outstanding from time to time.

31.     THIS COURT ORDERS that the Monitor and its legal counsel shall pass their accounts from time to time, and for this purpose the accounts of the Monitor and its legal counsel are hereby referred to a judge of the Commercial List of the Ontario Superior Court of Justice.

32.     THIS COURT ORDERS that the Monitor, counsel to the Monitor, if any, and the Applicants' counsel shall be entitled to the benefit of and are hereby granted a charge (the "Administration Charge") on the Property, which charge shall not exceed an aggregate amount of $5,000,000, as security for their professional fees and disbursements incurred at the standard rates and charges of the Monitor and such counsel, both before and after the making of this Order in respect of these proceedings. The Administration Charge shall have the priority set out in paragraphs 42 and 44 hereof.

**EDC**

33.     Intentionally Deleted.

**INTERCOMPANY LOANS**

34.     THIS COURT ORDERS to the extent that an Applicant receives a post-filing inter-company loan or other transfer (including goods and services) from a Chapter 11 Entity (as defined in the Doolittle Affidavit) (including as a result of the Applicants' cash management system or otherwise) (each such Applicant, a "Beneficiary Applicant"), and such post-filing inter-company loan or other transfer is made (each an "Advance") by a Chapter 11 Entity (together with NNL for the purposes of paragraph 34A below, a "Protected Entity"), then, subject to the limitations set forth in this paragraph:

(a)     the Protected Entity shall have a proven and valid claim against such Beneficiary Applicant for the amount of such Advance (each, an "Inter-company Reimbursement Claim"), which Inter-company Reimbursement Claim shall bear interest at a rate agreed between the applicable Beneficiary Applicant and Protected Entity from time to time for the period in accordance with past practice; and

(b)     all of the Property of the Beneficiary Applicant, is hereby charged by a mortgage, lien and security interest (such  mortgage, lien and security interest, "Inter-company Charge") in favour of each of the Protected Entities as security for payment of the Inter-company Reimbursement Claim (including principal, interest and expenses) by the applicable Beneficiary Applicant to the corresponding Protected Entity.

34A.   THIS COURT ORDERS that the Inter-Company Charge shall also secure any Advances made by NNL to Nortel Networks Technology Corporation ("NNTC") on or after January 14, 2009 and that NNL shall be a "Protected Entity" and NNTC shall be a "Beneficiary Applicant" in respect of such Advances.

35.    THIS COURT ORDERS that the Inter-company Charge shall also secure the Remaining Revolver Claim (as defined in the Final Canadian Funding and Settlement Agreement dated as of December 22, 2009 among, *inter alia*, the Applicants and NNI) as also evidenced by the Secured Promissory Note dated as of February 16, 2010 in the principal amount of U.S.$62,700,000 given by NNL to NNI.

36.    THIS COURT ORDERS the Inter-company Charge shall be junior, subject and subordinate only to the other Charges (defined below), and any other future charges against such Beneficiary Applicant that, by the Court order creating them, are expressly stated to be senior to the Inter-company Charges entered after notice and a hearing.

37.    THIS COURT ORDERS that pending further order of this Court, an Inter-company Charge shall be a "silent" charge and the Protected Entity shall forbear from exercising, and shall not be entitled to exercise, any right or remedy relating to any Inter-company Reimbursement Claim held by such party, including, without limitation, as to seeking relief from the stay granted hereunder, or seeking any sale, foreclosure, realization upon repossession or liquidation of any Property of a Beneficiary Applicant, or taking any position with respect to any disposition of the Property, the business operations, or the reorganization of a Beneficiary Applicant. An Inter-company Charge automatically, and without further action of any person or entity of any kind, shall be released or otherwise terminated to the extent that Property subject to such Inter-company Charge is sold or otherwise disposed of in accordance with the terms of this Order or

further order of this Court after notice and a hearing, with respect to the effect of an Inter-company Charge on any sale of Property by any Beneficiary Applicant.

38.    THIS COURT ORDERS that the Beneficiary Applicants may sell Property, in accordance with the terms of this Order or further order of this Court after notice and a hearing, in each case free and clear of any Inter-company Charge, with such Inter-company Charge attaching to the proceeds of sale in the same priority and subject to the same limitations and restrictions as existed in respect of the Property sold.

**INTERIM GROUP SUPPLIER PROTOCOL AGREEMENT**

39.    THIS COURT ORDERS that the Applicants be and are hereby authorized to enter into a group supplier protocol agreement (the "Interim GSPA") substantially in the form attached as Exhibit "C" to the Doolittle Affidavit which agreement shall be effective upon the appointment of the Administrators in the United Kingdom, and the Applicants are hereby authorized to perform each of their obligations, if any, under the Interim GSPA. The obligations of the Applicants under the Interim GSPA shall be secured by the Inter-Company Charge.

**NNI LOAN**

40.    THIS COURT ORDERS that the amended and restated loan agreement entered into between NNL, as borrower, NNTC and the other Applicants as guarantors, and Nortel Networks Inc. ("NNI") as lender (the "NNI Loan Agreement"), substantially in the form attached as Exhibit "B" to the Affidavit of John Doolittle sworn March 27, 2009 providing for a revolving loan facility of up to U.S.$200 million is hereby approved and each of the Applicants is hereby directed to execute and to comply with its obligations under the NNI Loan Agreement.

41.    Intentionally deleted.

41A.   Intentionally deleted.

41B.   Intentionally deleted.

41C.   Intentionally deleted.

**EXCESS FUNDING CHARGE**

41D.   THIS COURT ORDERS that as security for NNL's obligation to repay to NNI the Contingent Payment (as defined in the Interim Funding Agreement, as defined in the June Affidavit) along with interest, if any, NNI shall be entitled to the benefit of and is hereby granted a charge on the Property (the "Excess Funding Charge"). The Excess Funding Charge shall have the priority set out in paragraphs 42 and 44 hereof.

**SHORTFALL CHARGE**

41E.   THIS COURT ORDERS that as security for any obligation of NNL to make the Shortfall Payments (as defined in the Interim Funding Agreement, as defined in the June Affidavit), Nortel Networks UK Limited shall be entitled to the benefit of and is hereby granted a charge on the Property (the "Shortfall Charge"). The Shortfall Charge shall have the priority set out in paragraphs 42 and 44 hereof.

**VALIDITY AND PRIORITY OF CHARGES CREATED BY THIS ORDER**

42.   THIS COURT ORDERS that the priorities of the Administration Charge, the Excess Funding Charge, the Directors' Charge, the Inter-company Charge, the Shortfall Charge, the Payments Charge and the Nortel Special Incentive Plan Charge on all Property shall be as follows:

> First – the Administration Charge;

> Second – the Excess Funding Charge

> Third – the Directors' Charge; and

> Fourth -

> (a)    the Inter-Company Charge;

> (b)    the Shortfall Charge,

which Inter-company Charge and Shortfall Charge shall rank *pari passu* with one another.

Fifth -

(a)      the Payments Charge (as defined in the employee Settlement Approval Order of this Court made on March 31, 2010); and

(b)      the Nortel Special Incentive Plan Charge (as defined in the order approving the Nortel Special Incentive Plan of this Court made on March 8, 2010),

which Payments Charge and Nortel Special Incentive Plan Charge shall rank *pari passu* with one another.

43.      THIS COURT ORDERS that the filing, registration or perfection of the Administration Charge, Excess Funding Charge, the Directors' Charge, the Inter-company Charge, the Shortfall Charge, the Payments Charge and the Nortel Special Incentive Plan Charge (collectively, the "Charges") shall not be required, and that the Charges shall be valid and enforceable for all purposes, including as against any right, title or interest filed, registered, recorded or perfected subsequent to the Charges coming into existence, notwithstanding any such failure to file, register, record or perfect. Notwithstanding anything herein, the Charges shall not attach to the Retainers.

44.      THIS COURT ORDERS that each of the Charges (all as constituted and defined herein), shall subject to this paragraph 44 and to paragraph 46 herein constitute a charge on the Property secured thereunder, and such Charges shall rank in priority to all other security interests, trusts, liens, charges and encumbrances, statutory or otherwise (collectively, "Encumbrances") in favour of any Person. For greater certainty,

(a)      the Charges shall attach to the LC Cash Collateral junior in priority to any rights or Encumbrances in favour of LC Banks in respect of LC Cash Collateral and only to the extent of the rights of the Applicants to the return of any LC Cash Collateral from the LC Banks following the exercise of the rights of the LC Banks

as against any such LC Cash Collateral pursuant to the LC Agreements or section 18.1 of the CCAA, and

(b)     the Charges shall attach to the EDC Cash Collateral junior in priority to any rights or Encumbrances in favour of EDC in respect of EDC Cash Collateral and only to the extent of the rights of NNL to the return of any EDC Cash Collateral from EDC following the exercise of the rights of EDC as against any such EDC Cash Collateral pursuant to the EDC Support Agreements or section 18.1 of the CCAA

notwithstanding anything to the contrary contained in this Order.

45.     THIS COURT ORDERS that except as otherwise expressly provided for herein, or as may be approved by this Court, the Applicants shall not grant any Encumbrances over any Property that rank in priority to, or *pari passu* with, any of the Charges charging such Property, unless the Applicants also obtain the prior written consent of the Monitor and the beneficiaries of such Charges, or by further Order of this Court.

46.     THIS COURT ORDERS that none of the Charges, the LC Agreements and the EDC Support Agreements shall be rendered invalid or unenforceable and the rights and remedies of the chargees entitled to the benefit of the Charges (collectively, the "Chargees") thereunder, the rights of the LC Banks under LC Agreements and the rights of EDC under the EDC Support shall not otherwise be limited or impaired in any way by (a) the pendency of these proceedings and the declarations of insolvency made herein; (b) any application(s) for bankruptcy order(s) issued pursuant to BIA, or any bankruptcy order made pursuant to such applications; (c) the filing of any assignments for the general benefit of creditors made pursuant to the BIA; (d) the provisions of any federal or provincial statutes; or (e) any negative covenants, prohibitions or other similar provisions with respect to borrowings, incurring debt or the creation of Encumbrances, contained in any existing loan documents, lease, sublease, offer to lease or other agreement (collectively, an "Agreement") which binds the Applicants, and notwithstanding any provision to the contrary in any Agreement:

(a)     the creation of the Charges, the entering into of the LC Agreements and the issuance or renewal of LC's thereunder and the entering into of the EDC Support

Agreements and the provision of Secured Support, as defined and contemplated thereunder, shall not create or be deemed to constitute a breach by any of the Applicants of any Agreement to which it is a party;

(b)     none of the Chargees, the LC Banks and EDC shall have any liability to any Person whatsoever as a result of any breach of any Agreement caused by or resulting from, the creation of the Charges, the entering into of the LC Agreements or the issuance or renewal of LC's thereunder or the entering into of the EDC Support Agreements and the provision of Secured Support; and

(c)     the payments made by the Applicants pursuant to this Order and the granting of the Charges and the entering into of the LC Agreements and the EDC Support Agreements do not and will not constitute fraudulent preferences, fraudulent conveyances, oppressive conduct, settlements or other challengeable, voidable or reviewable transactions under any applicable law.

47.     THIS COURT ORDERS that any Charge created by this Order over leases of real property in Canada shall only be a Charge in the Applicants' interest in such real property leases.

**FLEXTRONICS AMENDING AGREEMENT**

48.     THIS COURT ORDERS that the Flextronics Amending Agreement in the form attached as Exhibit "B" to the Doolittle Affidavit be and is hereby approved and NNL is hereby authorized and directed to comply with its obligations thereunder.

**CROSS-BORDER PROTOCOL**

49.     THIS COURT ORDERS that the cross-border protocol, as amended, in the form attached as Schedule "A" hereto be and is hereby approved and shall become effective upon its approval by the United States Bankruptcy Court for the District of Delaware and the parties to these proceedings and any other Person shall be governed by it and shall comply with the same.

**FOREIGN PROCEEDINGS**

50.      THIS COURT ORDERS that the Monitor is hereby authorized and directed to apply for recognition of these proceedings as "Foreign Main Proceedings" in the United States pursuant to Chapter 15 of the U.S. Bankruptcy Code.

51.      THIS COURT HEREBY REQUESTS the aid and recognition of any court, tribunal, regulatory or administrative body having jurisdiction in Canada, the United States, the United Kingdom or elsewhere, to give effect to this Order and to assist the Applicants, the Monitor and their respective agents in carrying out the terms of this Order. All courts, tribunals, regulatory and administrative bodies are hereby respectfully requested to make such orders and to provide such assistance to the Applicants and to the Monitor, as an officer of this Court, as may be necessary or desirable to give effect to this Order, to grant representative status to the Monitor in any foreign proceeding, or to assist the Applicants and the Monitor and their respective agents in carrying out the terms of this Order.

52.      THIS COURT ORDERS that each of the Applicants and the Monitor be at liberty and is hereby authorized and empowered to apply to any court, tribunal, regulatory or administrative body, wherever located, for the recognition of this Order and for assistance in carrying out the terms of this Order.

**SERVICE AND NOTICE**

53.      THIS COURT ORDERS that the Monitor shall, within ten (10) business days of the date of entry of this Order, send notice of this Order and the commencement of the within proceedings to the Applicants' known creditors, other than employees and creditors to which the Applicants owe less than $5,000, at their addresses as they appear on the Applicants' records, and shall promptly send a copy of this Order (a) to all parties filing a Notice of Appearance in respect of this Application, and (b) to any other interested Person requesting a copy of this Order, and the Monitor is relieved of its obligation under Section 11(5) of the CCAA to provide similar notice, other than to supervise this process. The Monitor, on behalf of the Applicants, shall, in its discretion, be entitled to engage a third party mailing service in order to assist or complete the mailing. Any such service provider shall be considered an "Assistant" hereunder.

54.    THIS COURT ORDERS that the Applicants and the Monitor be at liberty to serve this Order, any other materials and orders in these proceedings, and any notices or other correspondence, by forwarding true copies thereof by prepaid ordinary mail, courier, personal delivery or electronic transmission to the Applicants' creditors or other interested parties at their respective addresses as last shown on the records of the Applicants and that any such service or notice by courier, personal delivery or electronic transmission shall be deemed to be received on the next business day following the date of forwarding thereof, or if sent by ordinary mail, on the third business day after mailing.

55.    THIS COURT ORDERS that the Applicants, the Monitor, and any party who has filed a Notice of Appearance may serve any court materials in these proceedings by e-mailing a PDF or other electronic copy of such materials to counsels' email addresses as recorded on the Service List from time to time, in accordance with the E-filing protocol of the Commercial List to the extent practicable, and the Monitor may post a copy of any or all such materials on its website at http://www.ey.com/ca/nortel.

**GENERAL**

56.    THIS COURT ORDERS that any of the Applicants or the Monitor may from time to time apply to this Court for advice and directions in the discharge of its powers and duties hereunder.

57.    THIS COURT ORDERS that nothing in this Order shall prevent the Monitor from acting as an interim receiver, a receiver, a receiver and manager, or a trustee in bankruptcy of the Applicants, the Business or the Property.

58.    THIS COURT ORDERS that any interested party (including the Applicants and the Monitor) may apply to this Court to vary or amend this Order on not less than seven (7) days notice to any other party or parties likely to be affected by the order sought or upon such other notice, if any, as this Court may order.

59.    THIS COURT ORDERS that this Order and all of its provisions are effective as of 12:01 a.m. Eastern Standard Time on the date of this Order.

ENTERED AT / INSCRIT À TORONTO
ON / BOOK NO:
LE / DANS LE REGISTRE NO.:

FEB 25 2011

PER / PAR:

## SCHEDULE "A" – CROSS-BORDER PROTOCOL

**Attached.**

## CROSS-BORDER INSOLVENCY PROTOCOL

This cross-border insolvency protocol (the "Protocol") shall govern the conduct of all parties in interest in the Insolvency Proceedings (as such term is defined herein).

The Guidelines Applicable to Court-to-Court Communications in Cross-Border Cases (the "Guidelines") attached as Schedule "A" hereto, shall be incorporated by reference and form part of this Protocol. Where there is any discrepancy between the Protocol and the Guidelines, this Protocol shall prevail.

### A.    Background

1.    Nortel Networks Inc. ("NNI") is the wholly owned U.S. subsidiary of Nortel Networks Limited ("NNL"), the principal Canadian operating subsidiary of Nortel Networks Corporation ("NNC"). NNC is a telecommunications company headquartered in Toronto, Ontario, Canada. NNI is incorporated under Delaware law and is headquartered in Richardson, Texas.

2.    NNI and certain of its affiliates (collectively, the "U.S. Debtors"),[1] have commenced reorganization proceedings (the "U.S. Proceedings") under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (the "U.S. Court"), and such cases have been consolidated (for procedural purposes only) under Case No. 09-10138 (KG). The U.S. Debtors are continuing in possession of their respective properties and are operating and managing their businesses, as debtors in possession, pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in the U.S. Proceedings. On January 22, 2009,

---

[1]    The Debtors in the U.S. Proceedings (as defined herein) are: NNI, Nortel Networks Capital Corporation, Nortel Altsystems Inc., Nortel Altsystems International Inc., XROS, Inc., Sonoma Systems, QTERA Corporation, CoreTek, Inc., Nortel Networks Applications Management Solutions Inc., Nortel Networks Optical Components Inc., Nortel Networks HPOCS Inc., Architel Systems (U.S.) Corporation, Nortel Networks International Inc., Northern Telecom International Inc. and Nortel Networks Cable Solutions Inc.

the Office of United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Creditors Committee") in the U.S. Proceeding.  An ad hoc committee of bondholders (the "Bondholders Committee") has also been organized.

   3. On January 14, 2009, the U.S. Debtors' ultimate corporate parent NNC, NNI's direct corporate parent NNL (together with NNC and their affiliates, including the U.S. Debtors, "Nortel"), and certain of their Canadian affiliates (collectively, the "Canadian Debtors")[2] filed an application with the Ontario Superior Court of Justice (the "Canadian Court") under the Companies' Creditors Arrangement Act (Canada) (the "CCAA"), seeking relief from their creditors (collectively, the "Canadian Proceedings").  The Canadian Debtors have obtained an initial order of the Canadian Court (as amended and restated, the "Canadian Order"), under which, inter alia:  (a) the Canadian Debtors have been determined to be entitled to relief under the CCAA; (b) Ernst & Young Inc. has been appointed as monitor (the "Monitor") of the Canadian Debtors, with the rights, powers, duties and limitations upon liabilities set forth in the CCAA and the Canadian Order; and (c) a stay of proceedings in respect of the Canadian Debtors has been granted.

   4. The Monitor filed petitions and obtained an order in the U.S. Court granting recognition of the Canadian Proceedings under chapter 15 of the Bankruptcy Code (the "Chapter 15 Proceedings").  NNI also filed an application and obtained an order in the Canadian Court pursuant to section 18.6 of the CCAA recognizing the U.S. Proceedings as "foreign proceedings" in Canada and giving effect to the automatic stay thereunder in Canada.  None of the U.S. Debtors or Canadian Debtors are applicants in both the U.S. Proceedings and Canadian Proceedings.

---

[2] The Canadian Debtors include the following entities:  NNC, NNL, Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation.

5. For convenience, (a) the U.S. Debtors and the Canadian Debtors shall be referred to herein collectively as the "Debtors," (b) the U.S. Proceedings and the Canadian Proceedings shall be referred to herein collectively as the "Insolvency Proceedings," and (c) the U.S. Court and the Canadian Court shall be referred to herein collectively as the "Courts", and each individually as a "Court."

## B.    Purpose and Goals

6. Though full and separate plenary proceedings are pending in the United States for the U.S. Debtors and in Canada for the Canadian Debtors, the implementation of administrative procedures and cross-border guidelines is both necessary and desirable to coordinate certain activities in the Insolvency Proceedings, protect the rights of parties thereto, ensure the maintenance of the Courts' respective independent jurisdiction and give effect to the doctrines of comity. Accordingly, this Protocol has been developed to promote the following mutually desirable goals and objectives in the Insolvency Proceedings:

    a. harmonize and coordinate activities in the Insolvency Proceedings before the Courts;

    b. promote the orderly and efficient administration of the Insolvency Proceedings to, among other things, maximize the efficiency of the Insolvency Proceedings, reduce the costs associated therewith and avoid duplication of effort;

    c. honor the independence and integrity of the Courts and other courts and tribunals of the United States and Canada, respectively;

    d. promote international cooperation and respect for comity among the Courts, the Debtors, the Creditors Committee, the Estate Representatives (which include the Chapter 11 Representatives and the Canadian Representatives as such terms are defined below) and other creditors and interested parties in the Insolvency Proceedings;

    e. facilitate the fair, open and efficient administration of the Insolvency Proceedings for the benefit of all of the Debtors' creditors and other interested parties, wherever located; and

4

  f. implement a framework of general principles to address basic administrative issues arising out of the cross-border nature of the Insolvency Proceedings.

As the Insolvency Proceedings progress, the Courts may also jointly determine that other cross-border matters that may arise in the Insolvency Proceedings should be dealt with under and in accordance with the principles of this Protocol. Subject to the provisions of this Protocol, including, without limitation, those included in paragraph 15 hereof, where an issue is to be addressed only to one Court, in rendering a determination in any cross-border matter, such Court may: (a) to the extent practical or advisable, consult with the other Court; and (b) in its sole discretion and bearing in mind the principles of comity, either (i) render a binding decision after such consultation; (ii) defer to the determination of the other Court by transferring the matter, in whole or in part to the other Court; or (iii) seek a joint hearing of both Courts.

**C.** **Comity and Independence of the Courts**

  7. The approval and implementation of this Protocol shall not divest nor diminish the U.S. Court's and the Canadian Court's respective independent jurisdiction over the subject matter of the U.S. Proceedings and the Canadian Proceedings, respectively. By approving and implementing this Protocol, neither the U.S. Court, the Canadian Court, the Debtors nor any creditors or interested parties shall be deemed to have approved or engaged in any infringement on the sovereignty of the United States of America or Canada.

  8. The U.S. Court shall have sole and exclusive jurisdiction and power over the conduct of the U.S. Proceedings and the hearing and determination of matters arising in the U.S. Proceedings. The Canadian Court shall have sole and exclusive jurisdiction and power over the conduct of the Canadian Proceedings and the hearing and determination of matters arising in the Canadian Proceedings.

9.     In accordance with the principles of comity and independence recognized herein, nothing contained herein shall be construed to:

a.     increase, decrease or otherwise modify the independence, sovereignty or jurisdiction of the U.S. Court, the Canadian Court or any other court or tribunal in the United States or Canada, including the ability of any such court or tribunal to provide appropriate relief on an ex parte or "limited notice" basis to the extent permitted under applicable law;

b.     require the U.S. Court to take any action that is inconsistent with its obligations under the laws of the United States;

c.     require the Canadian Court to take any action that is inconsistent with its obligations under the laws of Canada;

d.     require the Debtors, the Creditors Committee, the Estate Representatives or the U.S. Trustee to take any action or refrain from taking any action that would result in a breach of any duty imposed on them by any applicable law;

e.     authorize any action that requires the specific approval of one or both of the Courts under the Bankruptcy Code or the CCAA after appropriate notice and a hearing (except to the extent that such action is specifically described in this Protocol); or

f.     preclude the Debtors, the Creditors Committee, the Monitor, the U.S. Trustee, any creditor or other interested party from asserting such party's substantive rights under the applicable laws of the United States, Canada or any other relevant jurisdiction including, without limitation, the rights of parties in interest to appeal from the decisions taken by one or both of the Courts.

10.  The Debtors, the Creditors Committee, the Estate Representatives and their respective employees, members, agents and professionals shall respect and comply with the independent, non-delegable duties imposed upon them, if any, by the Bankruptcy Code, the CCAA, the Canadian Order and other applicable laws.

**D.     Cooperation**

11.     To assist in the efficient administration of the Insolvency Proceedings and in recognizing that the U.S. Debtors and Canadian Debtors may be creditors of the others'

estates, the Debtors and their respective Estate Representatives shall, where appropriate: (a) cooperate with each other in connection with actions taken in both the U.S. Court and the Canadian Court and (b) take any other appropriate steps to coordinate the administration of the Insolvency Proceedings for the benefit of the Debtors' respective estates.

12.    To harmonize and coordinate the administration of the Insolvency Proceedings, the U.S. Court and the Canadian Court each may coordinate activities and consider whether it is appropriate to defer to the judgment of the other Court. In furtherance of the foregoing:

a.    The U.S. Court and the Canadian Court may communicate with one another, with or without counsel present, with respect to any procedural matter relating to the Insolvency Proceedings.

b.    Where the issue of the proper jurisdiction of either Court to determine an issue is raised by an interested party in either of the Insolvency Proceedings with respect to a motion or application filed in either Court, the Court before which such motion or application was initially filed may contact the other Court to determine an appropriate process by which the issue of jurisdiction will be determined; which process shall be subject to submissions by the Debtors, the Creditors Committee, the Monitor, the Bondholders Committee (collectively the "Core Parties"), the U.S. Trustee and any interested party prior to a determination on the issue of jurisdiction being made by either Court.

c.    The Courts may, but are not obligated to, coordinate activities in the Insolvency Proceedings such that the subject matter of any particular action, suit, request, application, contested matter or other proceeding is determined in a single Court.

d.    The U.S. Court and the Canadian Court may conduct joint hearings (each a "Joint Hearing") with respect to any cross-border matter or the interpretation or implementation of this Protocol where both the U.S. Court and the Canadian Court consider such a Joint Hearing to be necessary or advisable, or as otherwise provided herein, to, among other things, facilitate or coordinate proper and efficient conduct of the Insolvency Proceedings or the resolution of any particular issue in the Insolvency Proceedings. With respect to any Joint Hearing, unless otherwise ordered, the following procedures will be followed:

7

(i) A telephone or video link shall be established so that both the U.S. Court and the Canadian Court shall be able to simultaneously hear and/or view the proceedings in the other Court.

(ii) Submissions or applications by any party that are or become the subject of a Joint Hearing (collectively, "Pleadings") shall be made or filed initially only to the Court in which such party is appearing and seeking relief. Promptly after the scheduling of any Joint Hearing, the party submitting such Pleadings to one Court shall file courtesy copies with the other Court. In any event, Pleadings seeking relief from both Courts shall be filed in advance of the Joint Hearing with both Courts.

(iii) Any party intending to rely on any written evidentiary materials in support of a submission to the U.S. Court or the Canadian Court in connection with any Joint Hearing (collectively, "Evidentiary Materials") shall file or otherwise submit such materials to both Courts in advance of the Joint Hearing. To the fullest extent possible, the Evidentiary Materials filed in each Court shall be identical and shall be consistent with the procedural and evidentiary rules and requirements of each Court.

(iv) If a party has not previously appeared in or attorned or does not wish to attorn to the jurisdiction of a Court, it shall be entitled to file Pleadings or Evidentiary Materials in connection with the Joint Hearing without, by the mere act of such filings, being deemed to have appeared in or attorned to the jurisdiction of such Court in which such material is filed, so long as such party does not request any affirmative relief from such Court.

(v) The Judge of the U.S. Court and the Justice of the Canadian Court who will preside over the Joint Hearing shall be entitled to communicate with each other in advance of any Joint Hearing, with or without counsel being present, (1) to establish guidelines for the orderly submission of Pleadings, Evidentiary Materials and other papers and for the rendering of decisions by the Courts; and (2) to address any related procedural, administrative or preliminary matters.

(vi) The Judge of the U.S. Court and the Justice of the Canadian Court, shall be entitled to communicate with each other during or after any joint hearing, with or without counsel present, for the purposes of (1) determining whether consistent rulings can be made by both Courts; (2) coordinating the terms upon of the Courts' respective rulings; and (3) addressing any other procedural or administrative matters.

13.     Notwithstanding the terms of the paragraph 12 above, this Protocol recognizes that the U.S. Court and the Canadian Court are independent courts. Accordingly, although the Courts will seek to cooperate and coordinate with each other in good faith, each of the Courts shall be entitled at all times to exercise its independent jurisdiction and authority with respect to: (a) the conduct of the parties appearing in matters presented to such Court; and (b) matters presented to such Court, including, without limitation, the right to determine if matters are properly before such Court.

14.     Where one Court has jurisdiction over a matter which requires the application of the law of the jurisdiction of the other Court, such Court may, without limitation, hear expert evidence of such law or, subject to paragraph 15 herein, seek the written advice and direction of the other Court which advice may in the discretion of the receiving Court, be made available to parties in interest.

15.     Notwithstanding anything to the contrary herein contained, to the extent any motion is filed or relief is sought (collectively, "Requested Relief") in either Court relating to: (i) the proposed sale of assets for gross proceeds in excess of U.S. $30 million and where at least one U.S. Debtor and one Canadian Debtor are parties to the related sale agreement or that involves assets owned by at least one U.S. Debtor and one Canadian Debtor; (ii) any motion to allocate sale proceeds which are in the aggregate more than U.S. $30 million and where at least one U.S. Debtor and one Canadian Debtor are parties to the related sale agreement or that involves assets owned by at least one U.S. Debtor and one Canadian Debtor; (iii) matters relating to the advanced pricing agreement involving both the United States and Canadian taxing authorities; (iv) matters regarding transfer pricing methodology relating to an obligation for the transfer of goods and services between one or more U.S. Debtors and one or more Canadian

Debtors; (v) any matter relating to alleged fraudulent conveyance or preference claims in excess of U.S. $30 million and which may have a material impact on both one or more U.S. Debtors and one or more Canadian Debtors; (vi) matters relating to any proposal or approval of a disclosure statement, information circular, plan of reorganization or plan of compromise and arrangements in either the U.S. Proceedings or the Canadian Proceedings; (vii) any motion to appoint a Trustee or Examiner in the U.S. Proceedings, any motion to convert the U.S. Proceedings to a Chapter 7 proceeding, any motion to appoint a Receiver in the Canadian Proceedings, or any motion to convert the Canadian Proceedings to a bankruptcy or proposal proceeding under the Bankruptcy and Insolvency Act (Canada); (viii) any motion to substantively consolidate the Debtors' estates; (ix) matters impacting the material tax attributes of the U.S. Debtors, including the net operating losses of the U.S. Debtors in any prior fiscal year; (x) any motion to amend the terms of any of the Debtors' registered pension plans the effect of which would increase the liability of any Debtor thereunder; (xi) any motion to assume, ratify, reject, repudiate, modify or assign executory contracts having a material impact on the assets, operations, obligations, rights, property or business of both the U.S. and Canadian estates and accounting for annual gross revenue in excess of U.S. $30 million ("Material Contracts"); (xii) any motion seeking relief from the automatic stay in the U.S. Proceedings and/or the stay of proceedings in the Canadian Proceedings (1) involving any Material Contract or (2) to pursue actions having a material impact on the assets, operations, obligations, rights, property or business of at least one U.S. Debtor and one Canadian Debtor and involving damages in excess of U.S. $30 million; (xiii) any motion seeking to create or extend any program, plan, proposal or scheme relating to or authorizing payments to employees where the consideration relates to non-ordinary course incentive performance, retention, severance, termination or such like payments; and (xiv) any

motion regarding any program, plan proposal, scheme or similar course of action related to the

wind-down of one or more of the Debtors' businesses;

Then the following procedures shall be followed:

a.  unless otherwise consented to by the Core Parties, any and all documents, other than any Monitor's report related to the Requested Relief, shall be filed (as applicable) and served on the Core Parties on not less than seven days notice prior to the proposed hearing date for such Requested Relief in the Court of the forum country where the party seeking the Requested Relief intends the Requested Relief to be heard; *provided, however,* that to the extent the Requested Relief is necessary to avoid irreparable harm to the Debtors and/or the Debtors' bankruptcy estates, as may be determined by the Court of the forum country where the Requested Relief is being sought or such Court otherwise determines, such documents related to the Requested Relief shall be served on the Core Parties on such reasonable notice as such Court may determine;

b.  upon notice of such Requested Relief being provided to the Core Parties, each of the Core Parties will have not less than two business days from receipt of such notice (or such shorter period as the Court of the forum country where the Requested Relief is being sought shall determine, as set forth in paragraph 15(a) herein) to request, in writing, that the filing party seek a Joint Hearing for the Requested Relief;

c.  if the filing party agrees to seek a Joint Hearing, the Requested Relief shall be heard at a Joint Hearing conducted by the Courts in accordance with the procedures set forth in paragraph 12 herein; and

d.  if the filing party does not agree to seek a Joint Hearing, the party seeking to have the Requested Relief heard at a Joint Hearing may file a notice of Joint Hearing dispute in both the Court of the forum country and the Court of the non-forum country and serve notice thereof on the remaining Core Parties, whereupon the respective Courts of the forum country and the non-forum country may consult with one another in accordance with paragraphs 6 and 12 hereof, in order to determine whether a Joint Hearing is necessary or may otherwise consult with the Core Parties prior to any party proceeding with the underlying Requested Relief in the original proposed forum country.

E.    **Recognition of Stays of Proceedings**

16.    The Canadian Court hereby recognizes the validity of the stay of

proceedings and actions against the U.S. Debtors and their property under section 362 of the

11

Bankruptcy Code (the "U.S. Stay"). In implementing the terms of this paragraph, the Canadian Court may consult with the U.S. Court regarding: (i) the interpretation, extent, scope and applicability of the U.S. Stay and any orders of the U.S. Court modifying or granting relief from the U.S. Stay; and (ii) the enforcement of the U.S. Stay in Canada.

17.      The U.S. Court hereby recognizes the validity of the stay of proceedings and actions against the Canadian Debtors and their property under the Canadian Order (the "Canadian Stay"). In implementing the terms of this paragraph, the U.S. Court may consult with the Canadian Court regarding:  (i) the interpretation, extent, scope and applicability of the Canadian Stay and any orders of the Canadian Court modifying or granting relief from the Canadian Stay; and (ii) the enforcement of the Canadian Stay in the United States.

18.      Nothing contained herein shall affect or limit the Debtors' or other parties' rights to assert the applicability or nonapplicability of the U.S. Stay or the Canadian Stay to any particular proceeding, property, asset, activity or other matter, wherever pending or located.  Subject to paragraph 15, herein, motions brought respecting the application of the stay of proceedings with respect to assets or operations of the Canadian Debtors shall be heard and determined by the Canadian Court.  Subject to paragraph 15 herein, motions brought respecting the application of the stay of proceedings with respect to assets or operations of the U.S. Debtors shall be heard and determined by the U.S. Court.

F.    **Rights to Appear and Be Heard**

19.      The Debtors, the Core Parties, and any other committee that may be appointed by the U.S. Trustee, and the professionals and advisors for each of the foregoing, shall have the right and standing:  (i) to appear and to be heard in either the U.S. Court or Canadian Court in the U.S. Proceedings or Canadian Proceedings, respectively, to the same extent as creditors and other interested parties domiciled in the forum country, subject to any local rules or

regulations generally applicable to all parties appearing in the forum; and (ii) to file notices of appearance or other papers with the clerk of the U.S. Court or the Canadian Court in respect of the U.S. Proceedings or Canadian Proceedings, respectively; provided, however, that any appearance or filing may subject a creditor or interested party to the jurisdiction of the Court in which the appearance or filing occurs; provided further, that an appearance by the Creditors Committee in the Canadian Proceedings shall not form a basis for personal jurisdiction in Canada over the members of the Creditors Committee. Notwithstanding the foregoing, and in accordance with the policies set forth above, including, inter alia, paragraph 12 above; (i) the Canadian Court shall have jurisdiction over the Chapter 11 Representatives (as defined below) solely with respect to the particular matters as to which the Chapter 11 Representatives appear before the Canadian Court; and (ii) the U.S. Court shall have jurisdiction over the Canadian Representatives (as defined below) solely with respect to the particular matters as to which the Canadian Representatives appear before the U.S. Court.

20.    In connection with any matter in the Canadian Proceedings in which the Creditors Committee seeks to become involved and which would otherwise require the Creditors Committee to execute a confidentiality agreement, the Creditors Committee, its individual members and professionals shall not be required to execute confidentiality agreements but instead the Creditors Committee and its members shall be bound by the confidentiality provisions contained in the Creditors Committee bylaws, and the Creditors Committee's professionals shall be bound by the terms of the confidentiality agreement with the Debtors dated February 2, 2009.

G.    **Claims Protocol**

21.    The Debtors anticipate that it will be necessary to implement a specific claims protocol to address, among other things and without limitation, the timing, process,

jurisdiction and applicable governing law to be applied to the resolution of intercompany claims filed by the Debtors' creditors in the Canadian Proceedings and the U.S. Proceedings. In such event, and in recognition of the inherent complexities of the inter-company claims that may be asserted in the Insolvency Proceedings, the Debtors shall use commercially reasonable efforts to negotiate a specific claims protocol, in form and substance satisfactory to the Debtors, the Monitor, and the Creditors Committee, which protocol shall be submitted to the Canadian Court and the U.S. Court for approval. In the event that the Debtors fail to reach agreement among such parties, the Debtors shall file a motion in both the Canadian Court and the U.S. Court seeking approval of such claims protocol as the Debtors shall determine to be in the best interest of the Debtors and their creditors.

## H.    Retention and Compensation of Estate Representative and Professionals

22.    The Monitor, its officers, directors, employees, counsel and agents, wherever located, (collectively the "Monitor Parties") and any other estate representatives appointed in the Canadian Proceedings (collectively, the "Canadian Representatives") shall (subject to paragraph 19) be subject to the sole and exclusive jurisdiction of the Canadian Court with respect to all matters, including: (a) the Canadian Representatives' tenure in office; (b) the retention and compensation of the Canadian Representatives; (c) the Canadian Representatives' liability, if any, to any person or entity, including the Canadian Debtors and any third parties, in connection with the Insolvency Proceedings; and (d) the hearing and determination of any other matters relating to the Canadian Representatives arising in the Canadian Proceedings under the CCAA or other applicable Canadian law. The Canadian Representatives shall not be required to seek approval of their retention in the U.S. Court for services rendered to the Debtors. Additionally, the Canadian Representatives: (a) shall be compensated for their services to the Canadian Debtors solely in accordance with the CCAA, the Canadian Order and other applicable

14

Canadian law or orders of the Canadian Court; and (b) shall not be required to seek approval of their compensation in the U.S Court.

23.    The Monitor Parties shall be entitled to the same protections and immunities in the United States as those granted to them under the CCAA and the Canadian Order. In particular, except as otherwise provided in any subsequent order entered in the Canadian Proceedings, the Monitor Parties shall incur no liability or obligations as a result of the Canadian Order, the appointment of the Monitor, the carrying out of its duties or the provisions of the CCAA and the Canadian Order by the Monitor Parties, except any such liability arising from actions of the Monitor Parties constituting gross negligence or willful misconduct.

24.    Any estate representative appointed in the U.S. Proceedings, including without limitation any examiners or trustees appointed in accordance with section 1104 of the Bankruptcy Code (collectively, the "Chapter 11 Representatives") shall (subject to paragraph 19) be subject to the sole and exclusive jurisdiction of the U.S. Court with respect to all matters, including: (a) the Chapter 11 Representatives' tenure in office; (b) the retention and compensation of the Chapter 11 Representatives; (c) the Chapter 11 Representatives' liability, if any, to any person or entity, including the U.S. Debtors and any third parties, in connection with the Insolvency Proceedings; and (d) the hearing and determination of any other matters relating to the Chapter 11 Representatives arising in the U.S. Proceedings under the Bankruptcy Code or other applicable laws of the United States. The Chapter 11 Representatives shall not be required to seek approval of their retention in the Canadian Court and (a) shall be compensated for their services to the U.S. Debtors solely in accordance with the Bankruptcy Code and other applicable laws of the United States or orders of the U.S. Court; and (b) shall not be required to seek

approval of their compensation for services performed for the U.S. Debtors in the Canadian Court.

25.    Any professionals (i) retained by and being compensated solely by, or (ii) being compensated solely by, the Canadian Debtors including in each case, without limitation, counsel and financial advisors (collectively, the "Canadian Professionals"), shall be subject to the sole and exclusive jurisdiction of the Canadian Court. Such Canadian Professionals: (a) shall be subject to the procedures and standards for retention and compensation applicable in the Canadian Court under the CCAA, the Canadian Order and any other applicable Canadian law or orders of the Canadian Court with respect to services performed on behalf of the Canadian Debtors; and (b) shall not be required to seek approval of their retention or compensation in the U.S. Court.

26.    Any professionals (i) retained by, or (ii) being compensated by, the U.S. Debtors including in each case, without limitation, counsel and financial advisors (collectively, the "U.S. Professionals") shall be subject to the sole and exclusive jurisdiction of the U.S. Court. Such U.S. Professionals: (a) shall be subject to the procedures and standards for retention and compensation applicable in the U.S. Court under the Bankruptcy Code and any other applicable laws of the United States or orders of the U.S. Court; and (b) shall not be required to seek approval of their retention or compensation in the Canadian Court.

27.    Subject to paragraph 19 herein, any professional retained by the Creditors Committee, including in each case, without limitation, counsel and financial advisors (collectively, the "Committee Professionals") shall be subject to the sole and exclusive jurisdiction of the U.S. Court. Such Committee Professionals: (a) shall be subject to the procedures and standards for retention and compensation applicable in the U.S. Court under the

16

Bankruptcy Code and any other applicable laws of the United States or orders of the U.S. Court; and (b) shall not be required to seek approval of their retention or compensation in the Canadian Court or any other court.

**I.    Notice**

28.    Notice of any motion, application or other Pleading or paper (collectively the "Court Documents") filed in one or both of the Insolvency Proceedings involving or relating to matters addressed by this Protocol and notice of any related hearings or other proceedings shall be given by appropriate means (including, where circumstances warrant, by courier, telecopier or other electronic forms of communication) to the following:  (a) all creditors and interested parties, in accordance with the practice of the jurisdiction where the papers are filed or the proceedings are to occur; and (b) to the extent not otherwise entitled to receive notice under clause (a) of this sentence, counsel to the Debtors; the U.S. Trustee; the Monitor; the Creditors Committee; the Bondholders Committee and any other statutory committees appointed in the Insolvency Proceedings and such other parties as may be designated by either of the Courts from time to time.  Notice in accordance with this paragraph shall be given by the party otherwise responsible for effecting notice in the jurisdiction where the underlying papers are filed or the proceedings are to occur.  In addition to the foregoing, upon request, the U.S. Debtors or the Canadian Debtors shall provide the U.S. Court or the Canadian Court, as the case may be, with copies of any orders, decisions, opinions or similar papers issued by the other Court in the Insolvency Proceedings.

29.    When any cross-border issues or matters addressed by this Protocol are to be addressed before a Court, notices shall be provided in the manner and to the parties referred to in paragraph 28 above.

17

**J.**    **Effectiveness; Modification**

30.    This Protocol shall become effective only upon its approval by both the U.S. Court and the Canadian Court.

31.    This Protocol may not be supplemented, modified, terminated, or replaced in any manner except upon the approval of both the U.S. Court and the Canadian Court after notice and a hearing.  Notice of any legal proceeding to supplement, modify, terminate or replace this Protocol shall be given in accordance with the notice provisions set forth above.

**K.**    **Procedure for Resolving Disputes Under this Protocol**

32.    Disputes relating to the terms, intent or application of this Protocol may be addressed by interested parties to the U.S. Court, the Canadian Court or both Courts upon notice in accordance with the notice provisions outlined in paragraph 28 above.  In rendering a determination in any such dispute, the Court to which the issue is addressed:  (a) shall consult with the other Court; and (b) may, in its sole and exclusive discretion, either:  (i) render a binding decision after such consultation; (ii) defer to the determination of the other Court by transferring the matter, in whole or in part, to such other Court; or (iii) seek a Joint Hearing of both Courts in accordance with paragraph 12 above.  Notwithstanding the foregoing, in making a determination under this paragraph, each Court shall give due consideration to the independence, comity and inherent jurisdiction of the other Court established under existing law.

33.    In implementing the terms of this Protocol, the U.S. Court and the Canadian Court may, in their sole, respective discretion, provide advice or guidance to each other with respect to legal issues in accordance with the following procedures:

  a.    the U.S. Court or the Canadian Court, as applicable, may determine that such advice or guidance is appropriate under the circumstances;

  b.    the Court issuing such advice or guidance shall provide it to the non-issuing Court in writing;

18

      c.     copies of such written advice or guidance shall be served by the applicable Court in accordance with paragraph 28 hereof;

      d.     the Courts may jointly decide to invite the Debtors, the Creditors Committee, the Estate Representatives, the U.S. Trustee and any other affected or interested party to make submissions to the appropriate Court in response to or in connection with any written advice or guidance received from the other Court; and

      e.     for clarity, the provisions of this paragraph shall not be construed to restrict the ability of either Court to confer as provided in paragraph 12 above whenever it deems it appropriate to do so.

## L.    Preservation of Rights

34.    Except as specifically provided herein, neither the terms of this Protocol nor any actions taken under the terms of this Protocol shall: (a) prejudice or affect the powers, rights, claims and defenses of the Debtors and their estates, the Creditors Committee, the Estate Representatives, the U.S. Trustee or any of the Debtors' creditors under applicable law, including, without limitation, the Bankruptcy Code the CCAA, and the orders of the Courts; or (b) preclude or prejudice the rights of any person to assert or pursue such person's substantive rights against any other person under the applicable laws of Canada or the United States.

178

Court File No: 09-CL-7950

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL
NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS
GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND
NORTEL NETWORKS TECHNOLOGY CORPORATION

*ONTARIO*
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

Proceeding commenced at Toronto

FIFTH AMENDED AND RESTATED INITIAL
ORDER

**OGILVY RENAULT LLP**
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
P.O. Box 84
Toronto, Ontario  M5J 2Z4, Canada

**Derrick Tay LSUC#: 21152A**
Tel: (416) 216-4832
Email: dtay@ogilvyrenault.com

**Mario Forte LSUC#: 27293F**
Tel: (416) 216-4870
Email: mforte@ogilvyrenault.com

**Jennifer Stam LSUC #46735J**
Tel: (416) 216-2327
Email: jstam@ogilvyrenault.com
Fax: (416) 216-3930

Lawyers for the Applicants

APPENDIX "B"

**BACKGROUND AND ROLES OF LEAD PROFESSIONALS OF THE MONITOR**

**Name**:             Murray A. McDonald

**Rank**:             President (Partner) [1]

**Avg. Hourly Rate**:   CA$800

Mr. McDonald is President of Ernst & Young Inc. and the Canadian managing partner of Transaction Advisory Services at Ernst & Young LLP. He is a Chartered Professional Accountant, Chartered Accountant, a Trustee in Bankruptcy and a Chartered Insolvency and Restructuring Professional. Mr. McDonald has more than 25 years of experience in complex and cross-border restructuring matters, including Quebecor World Inc., Air Canada, Eaton's and Algoma Steel. Mr. McDonald is the lead Monitor professional on the Nortel file and has overseen and directed most aspects of the file on behalf of the Monitor, including considering Nortel's restructuring options, negotiating the IFSA, CFSA and various other inter-estate agreements and representing the Canadian Estate in the mediations and settlement discussions concerning the Allocation Dispute and related claims. Mr. McDonald has also spent significant time reviewing reports to the Court and briefing and discussing issues in the case with representatives of the Canadian Debtors' stakeholders and the other Estates.

**Name**:             Sharon Hamilton

**Rank**:             Senior Vice-President (Partner)

**Avg. Hourly Rate**:   CA$804

Ms. Hamilton is a Senior Vice-President of Ernst & Young Inc. and a partner at Ernst & Young LLP. She is a Chartered Professional Accountant, Chartered Accountant, Trustee in Bankruptcy and a Chartered Insolvency and Restructuring Professional. Ms. Hamilton has nearly 20 years of experience in complex and cross-border restructuring matters, including asset-backed commercial paper, Hollinger, Collins & Aikman and Air Canada. Ms. Hamilton was the lead Monitor representative on the LOB and Residual IP transactions as well as on the various other sales of the Canadian Debtors' assets, including the sale of the Carling facility and the sale of NNL's interest in the LG-Nortel joint venture and its IP Addresses. She had significant involvement in negotiating those transactions on behalf of the Canadian Estate with purchasers and prospective purchasers as well as negotiating various transaction related matters with stakeholders and the other Estates. Ms. Hamilton has also been involved in efforts relating to the wind-up and repatriation of funds from NNL's subsidiaries and joint ventures in the APAC region, particularly in China and India.

---

[1] Rank in parentheses indicates rank at Ernst & Young LLP.

**Name**:                    Brent Beekenkamp

**Rank**:                     Vice-President (Senior Manager) (2009 - 2013) and Senior Vice-President (Associate Partner) (2013 - 2015)

**Avg. Hourly Rate**:    CA$642

Mr. Beekenkamp is a Senior Vice-President of Ernst & Young Inc., having been promoted to that rank in 2013. He is a Chartered Professional Accountant, Chartered Accountant, Trustee in Bankruptcy and a Chartered Insolvency and Restructuring Professional. Mr Beekenkamp has over 15 years of experience in complex and cross-border restructuring matters, including Progressive Molded Products, Hollinger Inc., Stelco Inc., Teleglobe and Laidlaw Inc. Mr. Beekenkamp has been involved in virtually all aspects of the file to date, in particular cash-flow forecasting, financial modelling, intercompany and Fourth Estate matters, Estate separation matters, negotiations relating to the IFSA, CFSA, ARA, the Fourth Estate Settlement Agreement, the EMEA Claims settlement and other inter-Estate agreements, the Allocation Dispute, including assisting in production matters, case development, the provision of information to experts, and the wind-down of the Canadian Debtors. Mr. Beekenkamp has also spent significant time on the preparation of reports to the Court, the preparation of weekly and ad hoc reporting to stakeholders and responding to information requests of the Canadian Debtors' stakeholders and briefing and discussing issues in the case with representatives of the Canadian Debtors' stakeholders and the other Estates.


**Name**:                    Tom C. Ayres

**Rank**:                     Senior Vice-President (Associate Partner)

**Avg. Hourly Rate**:    CA$674

Mr. Ayres is a Senior Vice-President of Ernst & Young Inc. He is a Chartered Professional Accountant and Chartered Accountant who has over 30 years of experience in complex and cross-border restructuring matters, including Stelco Inc. and Calpine Canada. Mr. Ayres principal focus on the Nortel mandate has been on supplier, customer and creditor issues, including dealing with suppliers and customers in period following the CCAA filing, participating in Nortel's contract review process and leading the Monitor's claims resolution team. His claims resolution work has included dealing with cross-border claims, environmental claims and matters, the UKPC Claims and reviewing, negotiating and directing the resolution of various other significant creditor claims against the Canadian Debtors.

**Name**:           Jodat Hussain
**Rank**:           Manager  (2009 – 2012)/Vice-President (Senior Manager) (2012 – 2014)

**Avg. Hourly Rate**:   CA$538

Mr. Hussain was a Vice-President of Ernst & Young Inc. having been promoted to that rank in 2012. He is a Chartered Professional Accountant, Chartered Accountant, Trustee in Bankruptcy and a Chartered Insolvency and Restructuring Professional. Mr. Hussain's principal focus was on cash-flow forecasting matters, including weekly global cash flow reporting to Nortel's stakeholders and financial modelling. Mr. Hussain also provided support in negotiations relating to the IFSA, CFSA, ARA, the Fourth Estate Settlement Agreement, other inter-Estate agreements and the Allocation Dispute. Mr. Hussain left Ernst & Young Inc. at the end of 2014.

**Name**:           Edmund Yau
**Rank**:           Manager (2009 – 2012)/Vice-President (Senior Manager) (2012 – Present)

**Avg. Hourly Rate**:   CA$568

Mr. Yau is a Vice-President of Ernst & Young Inc. having been promoted to that rank in 2013. He is a Chartered Professional Accountant, Chartered Accountant, Trustee in Bankruptcy and a Chartered Insolvency and Restructuring Professional. Mr. Yau's focus has been on cash-flow analysis and reporting, including weekly and bi-weekly reporting to stakeholders, financial modelling and negotiations relating to the Allocation Dispute. He has also had involvement in matters relating to the wind-down and administration of the Canadian Estate and claims resolution matters, including the EMEA Claims.

**Name**:           David Saldanha
**Rank**:           Manager (2009)/Vice-President (Senior Manager) (2010 – Present)

**Avg. Hourly Rate**:   CA$567

Mr. Saldanha is a Vice-President of Ernst & Young Inc. having been promoted to that rank in 2010. He is a Trustee in Bankruptcy and a Chartered Insolvency and Restructuring Professional who has significant experience in complex and cross-border restructuring matters, including Air Canada, Calpine and SemCanada. Mr. Saldanha's focus was on supplier and customer issues, intercompany settlements and related matters and claim review and reconciliation matters.

**Name**:           Lee Close
**Rank**:           Vice-President (Senior Manager)

**Avg. Hourly Rate**:   CA$607

Ms. Close is a Vice-President of Ernst & Young Inc. She is a Chartered Professional Accountant, Chartered Accountant, Trustee in Bankruptcy and a Chartered Insolvency and Restructuring

Professional. Ms. Close has 20 years of experience in complex restructuring matters, including Teleglobe and Canadian Red Cross Society. Ms. Close's primary focus has been on dealing with employee related matters in Nortel's CCAA proceedings, including the A&R Employee Settlement Agreement, the Compensation Claims Process, the Hardship Process, pension matters and the distribution and wind-down of the HWT.


**Name**:              Carol McGran
**Rank**:              Vice-President (Senior Manager)

**Avg. Hourly Rate**:   CA$613

Ms. McGran is a Vice-President of Ernst & Young Inc. She is a Chartered Professional Accountant, Chartered Accountant, Trustee in Bankruptcy and a Chartered Insolvency and Restructuring Professional. Ms McGran has over 20 years of experience in complex restructuring matters, including Phillip Services and Universal Settlements. Ms. McGran's focus has been on dealing with employee related matters in Nortel's CCAA proceedings, including the A&R Employee Settlement Agreement, the Compensation Claims Process, the Hardship Process, pension matters and the distribution and wind-down of the HWT. Ms. McGran also provided support relating to the Allocation Dispute litigation.

**APPENDIX "C"**

**EXCERPTS FROM MONITOR'S REPORTS RE: PROFESSIONAL FEE REPORTING**

**[ATTACHED]**

Court File No. 09-CL-7950

**ONTARIO
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS
ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF
COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS
TECHNOLOGY CORPORATION (the "Applicants")**

**FIRST REPORT OF THE MONITOR
DATED FEBRUARY 5, 2009**

**INTRODUCTION**

1. On January 14, 2009, Nortel Networks Corporation ("NNC" and collectively with all its subsidiaries, "Nortel" or "Company"), Nortel Networks Limited ("NNL"), Nortel Networks Technology Corporation ("NNTC"), Nortel Networks International Corporation ("NNIC") and Nortel Networks Global Corporation ("NNGC") filed for and obtained protection under the *Companies' Creditors Arrangement Act* ("CCAA"). Pursuant to the Order of this Honourable Court dated January 14, 2009 (the "Initial Order"), Ernst & Young Inc. ("EYI") was appointed as the Monitor of the Applicants (the "Monitor") in the CCAA proceeding. The Initial Order provided for a stay of proceedings through to February 12, 2009.

**PURPOSE**

2. The purpose of this first report of the Monitor (the "First Report") is to provide this Honourable Court with an update in respect of the following:

185

Appendix A

**Nortel Networks**
**CCAA Applicants**
**Variance Actual to Forecast**
USD (Millions)

| | Forecast | | | | Actual | | | | Variances | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Start of period | 11-Jan-09 | 18-Jan-09 | 25-Jan-09 | | 11-Jan-09 | 18-Jan-09 | 25-Jan-09 | | 11-Jan-09 | 18-Jan-09 | 25-Jan-09 | |
| End of period | 17-Jan-09 | 24-Jan-09 | 31-Jan-09 | Total | 17-Jan-09 | 24-Jan-09 | 31-Jan-09 | Total | 17-Jan-09 | 24-Jan-09 | 31-Jan-09 | Total |
| **1. Receipts & Disbursements** | | | | | | | | | | | | |
| **Receipts** | | | | | | | | | | | | |
| Collection of Accounts Receivable | 3.2 | 16.6 | 65.6 | 85.4 | 7.3 | 4.5 | 53.7 | 65.5 | 4.1 | (12.1) | (11.9) | (19.9) |
| Other Receipts | 2.6 | 2.3 | 0.4 | 5.3 | 0.0 | - | 34.5 | 34.5 | (2.6) | (2.3) | 34.0 | 29.2 |
| Intercompany Receipts | 15.0 | 67.2 | - | 82.2 | 18.6 | 30.4 | 45.8 | 94.7 | 3.6 | (36.9) | 45.8 | 12.5 |
| NNL/NNI Restructuring Loan Advances | - | - | - | - | - | - | 75.0 | 75.0 | - | - | 75.0 | 75.0 |
| **Total Receipts** | 20.8 | 86.1 | 66.0 | 172.9 | 26.0 | 34.8 | 208.9 | 269.7 | 5.2 | (51.3) | 142.9 | 96.8 |
| **Disbursements** | | | | | | | | | | | | |
| Payroll (Gross) | 24.2 | - | 23.6 | 47.8 | 23.3 | 0.5 | 20.4 | 44.2 | 0.8 | (0.5) | 3.2 | 3.5 |
| Benefits | 2.7 | - | 2.7 | 5.4 | 2.0 | - | 4.6 | 6.7 | 0.6 | - | (1.9) | (1.3) |
| Pension | - | 1.9 | - | 1.9 | - | 0.5 | - | 0.5 | - | 1.5 | - | 1.5 |
| Inventory Purchases | 34.7 | 51.3 | 4.4 | 90.4 | 25.0 | 50.0 | - | 75.0 | 9.7 | 1.3 | 4.4 | 15.4 |
| Non-Inventory Purchases | 14.2 | 13.1 | 13.8 | 41.1 | 17.2 | 0.9 | 9.3 | 27.4 | (3.0) | 12.2 | 4.6 | 13.7 |
| Intercompany Disbursements | - | 62.3 | - | 62.3 | 11.1 | - | - | 11.0 | (11.1) | 62.4 | - | 51.2 |
| Professional Fees | 1.4 | 1.2 | 1.2 | 3.8 | 0.5 | - | - | 0.5 | 0.9 | 1.2 | - | 3.3 |
| Restructuring Costs | - | - | - | - | - | - | - | - | - | - | - | - |
| NNL/NNI Restructuring Loan Repayments | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Disbursements** | 77.1 | 129.8 | 45.8 | 252.7 | 79.2 | 51.8 | 34.3 | 165.3 | (2.0) | 78.0 | 11.5 | 87.4 |
| **Net Cash Flow** | (56.4) | (43.7) | 20.2 | (79.8) | (53.2) | (17.0) | 174.6 | 104.4 | 3.1 | 26.7 | 154.4 | 184.2 |
| **Opening Cash Balance** | 210.3 | 154.0 | 110.3 | 210.3 | 210.3 | 157.1 | 140.2 | 210.3 | - | 3.1 | 28.8 | - |
| **Closing Cash Balance** | 154.0 | 110.3 | 130.5 | 130.5 | 157.1 | 140.2 | 314.7 | 314.7 | 3.1 | 28.8 | 184.2 | 184.2 |

APPENDIX B

## Nortel Networks – Feb 1, 2009
### CCAA Applicants
### Forecast Cash Flow
USD (millions)

**1. Receipts & Disbursements**

| | 1-Feb-09 / 7-Feb-09 | 8-Feb-09 / 14-Feb-09 | 15-Feb-09 / 21-Feb-09 | 22-Feb-09 / 28-Feb-09 | 1-Mar-09 / 7-Mar-09 | 8-Mar-09 / 14-Mar-09 | 15-Mar-09 / 21-Mar-09 | 22-Mar-09 / 28-Mar-09 | 29-Mar-09 / 4-Apr-09 | 5-Apr-09 / 11-Apr-09 | 12-Apr-09 / 18-Apr-09 | 19-Apr-09 / 25-Apr-09 | 26-Apr-09 / 2-May-09 | Forecast 1-Feb-09 / 2-May-09 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Receipts** | | | | | | | | | | | | | | |
| Collection of Accounts Receivable | 4.0 | 6.2 | 9.6 | 37.3 | 3.6 | 3.6 | 3.6 | 7.2 | 21.8 | 3.6 | 3.6 | 7.2 | 16.8 | 154.7 |
| Other Receipts | 0.4 | 27.4 | – | 0.4 | – | – | – | 0.2 | 0.2 | – | – | 7.2 | – | 28.7 |
| Intercompany Receipts | 4.1 | 15.0 | 39.9 | 1.7 | 1.3 | 1.3 | 41.3 | 41.3 | 18.3 | 1.3 | 1.3 | 24.2 | 17.3 | 164.3 |
| NNI/NNL Restructuring Loan Advances | | | | | | | | | | | | | | |
| **Total Receipts** | 8.5 | 48.6 | 49.5 | 39.4 | 4.8 | 4.8 | 46.5 | 48.5 | 40.3 | 4.8 | 4.8 | 31.4 | 34.0 | 347.7 |
| **Disbursements** | | | | | | | | | | | | | | |
| Payroll (Gross) | 6.8 | 14.8 | 6.8 | 14.4 | 6.8 | 14.0 | 6.8 | 13.7 | 6.8 | 13.3 | 13.3 | 6.8 | 13.2 | 124.2 |
| Benefits | 1.7 | 1.0 | 1.7 | 3.0 | 1.7 | 1.0 | 1.7 | 1.0 | 1.0 | 1.0 | 1.0 | 1.7 | 1.0 | 21.7 |
| Pension | – | – | – | 1.9 | – | – | – | 1.9 | 1.9 | – | – | 1.8 | 1.8 | 5.7 |
| Inventory Purchases | 7.0 | 7.0 | 7.0 | 7.0 | 7.0 | 7.0 | 7.0 | 7.0 | 7.0 | 7.2 | 7.0 | 7.0 | 7.0 | 95.8 |
| Non-Inventory Purchases | 11.4 | 11.4 | 11.4 | 11.5 | 11.3 | 11.6 | 11.4 | 11.4 | 11.5 | 8.6 | 8.6 | 8.6 | 8.7 | 143.0 |
| Intercompany Disbursements | – | – | – | – | – | – | 7.5 | 7.5 | 11.5 | 14.6 | – | – | – | 33.0 |
| Professional Fees | 1.2 | 1.0 | 1.0 | 1.0 | 1.2 | 1.0 | 1.2 | 1.2 | 1.0 | 1.0 | 1.0 | 1.2 | 1.0 | 14.2 |
| NNI/NNL Restructuring Loan Repayments | | | | | | | | | | | | | | |
| **Total Disbursements** | 28.1 | 35.3 | 39.1 | 38.9 | 28.1 | 34.7 | 35.5 | 35.6 | 36.1 | 31.1 | 31.1 | 38.9 | 32.7 | 437.5 |
| **Net Cash Flow** | (19.6) | 13.3 | 10.5 | 0.6 | (24.5) | (29.8) | 12.9 | 4.2 | 7.7 | (26.3) | (8.5) | 1.3 | 0.5 | (89.9) |
| Opening Available Cash Balance | 261.3 | 241.7 | 255.0 | 265.5 | 266.1 | 241.6 | 211.7 | 224.6 | 228.8 | 236.5 | 210.4 | 184.1 | 175.6 | 261.3 |
| Closing Available Cash Balance | 241.7 | 255.0 | 265.5 | 266.1 | 241.6 | 211.7 | 224.6 | 228.8 | 236.5 | 210.4 | 184.1 | 175.6 | 176.9 | 171.5 |
| **Restricted Cash and Other Cash Deposits** | | | | | | | | | | | | | | |
| Restricted Cash | 30.3 | 30.3 | 30.3 | 30.3 | 30.3 | 30.3 | 30.3 | 30.3 | 30.3 | 30.3 | 30.3 | 30.3 | 30.3 | 30.3 |
| Cash Deposits | 22.3 | 17.3 | 17.3 | 17.3 | 17.3 | 17.3 | 17.3 | 17.3 | 17.3 | 17.3 | 17.3 | 17.3 | 17.3 | 17.3 |
| Total Restricted Cash and Other Cash Deposits | 52.6 | 47.6 | 47.6 | 47.6 | 47.6 | 47.6 | 47.6 | 47.6 | 47.6 | 47.6 | 47.6 | 47.6 | 47.6 | 47.6 |
| **Total Cash** | 294.3 | 302.7 | 313.1 | 313.7 | 289.2 | 259.4 | 272.3 | 276.4 | 284.1 | 231.8 | 223.3 | 224.5 | 225.0 | 219.1 |
| Facility Size | 75.0 | 75.0 | 75.0 | 200.0 | 200.0 | 200.0 | 200.0 | 200.0 | 200.0 | 200.0 | 200.0 | 200.0 | 200.0 | 200.0 |
| Less Utilized Facility | (75.0) | (75.0) | (75.0) | (75.0) | (75.0) | (75.0) | (75.0) | (75.0) | (75.0) | (75.0) | (75.0) | (75.0) | (75.0) | (75.0) |
| Available Facility | – | – | – | 125.0 | 125.0 | 125.0 | 125.0 | 125.0 | 125.0 | 125.0 | 125.0 | 125.0 | 125.0 | 125.0 |
| **Closing Cash + Available Facility** | 294.3 | 302.7 | 313.1 | 438.7 | 414.2 | 384.4 | 397.3 | 401.4 | 409.4 | 356.8 | 348.3 | 349.5 | 350.0 | 344.1 |

**BLUE SHEET**

Court File No. 09-CL-7950

**ONTARIO
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS
ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF
COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS
TECHNOLOGY CORPORATION (the "Applicants")**

**EIGHTH REPORT OF THE MONITOR
DATED APRIL 24, 2009**

**INTRODUCTION**

1. On January 14, 2009, Nortel Networks Corporation ("NNC" and collectively with all its subsidiaries, "Nortel" or "Company"), Nortel Networks Limited ("NNL"), Nortel Networks Technology Corporation ("NNTC"), Nortel Networks International Corporation ("NNIC") and Nortel Networks Global Corporation ("NNGC") filed for and obtained protection under the *Companies' Creditors Arrangement Act* ("CCAA"). Pursuant to the Order of this Honourable Court dated January 14, 2009 and as amended and restated on April 7, 2009 (the "Second Amended and Restated Initial Order"), Ernst & Young Inc. ("EYI") was appointed as the Monitor of the Applicants (the "Monitor") in the CCAA proceeding. The stay of proceedings was extended to May 1, 2009 by this Honourable Court in its Order dated February 10, 2009.

APPENDIX A

Nortel Networks
CCAA Applicants
Variance Actual to February 2009 Forecast
(USD Millions)

## Receipts & Disbursements

**Receipts**

| | | | |
|---|---|---|---|
| Collection of Accounts Receivable | 111.2 | 116.7 | 5.5 |
| Other Receipts | 28.4 | 31.2 | 2.8 |
| Intercompany Receipts | 84.4 | 119.8 | 35.4 |
| Intercompany Receipts - Transfer Pricing | 38.5 | - | (38.5) |
| **Total Receipts** | **262.5** | **267.7** | **5.2** |

**Disbursements**

| | | | |
|---|---|---|---|
| Payroll (Gross) | 104.3 | 97.8 | 6.5 |
| Benefits | 18.9 | 19.1 | (0.2) |
| Pension | 3.8 | 3.5 | 0.3 |
| Inventory Purchases | 74.6 | 93.5 | (18.9) |
| Non-Inventory Purchases | 108.8 | 75.5 | 33.3 |
| Intercompany Disbursements | 18.5 | 32.4 | (13.9) |
| Restructuring Costs | 10.8 | 7.9 | 2.9 |
| **Total Disbursements** | **339.7** | **329.7** | **10.0** |

| | | | |
|---|---|---|---|
| **Net Cash Flow** | **(77.2)** | **(62.0)** | **15.2** |
| FX Impact | - | (1.8) | (1.8) |
| **Opening Available Cash Balance** | **261.3** | **261.3** | **-** |
| **Closing Available Cash Balance** | **184.1** | **197.5** | **13.4** |
| Unavailable Cash | 17.3 | 10.9 | (6.4) |
| **Total Cash** | **201.4** | **208.4** | **7.0** |
| Restricted Cash | 30.3 | 46.0 | 15.7 |
| **Total Cash + Restricted Cash** | **231.7** | **254.4** | **22.7** |

190

APPENDIX B

| | | | | | | | | | | | | | Total |
|---|--:|--:|--:|--:|--:|--:|--:|--:|--:|--:|--:|--:|--:|
| **Receipts** | | | | | | | | | | | | | |
| Collection of Accounts Receivable | 7.7 | 0.5 | 3.4 | 6.1 | 9.2 | 15.3 | 3.2 | 6.5 | 9.7 | 3.7 | 8.0 | 12.1 | 188.6 |
| Other Receipts | - | - | 10.5 | - | - | 0.2 | - | 75.8 | 6.0 | - | - | 25.4 | 85.6 |
| Intercompany Receipts | 0.1 | 28.7 | - | - | - | 27.1 | - | - | 21.9 | - | - | - | 128.5 |
| Intercompany Receipts - Transfer Pricing | - | - | - | - | - | 52.0 | - | - | - | - | - | - | 135.0 |
| NNL/NNI Restructuring Loan Advances | - | - | - | - | - | - | - | - | - | - | - | - | |
| **Total Receipts** | 7.8 | 29.2 | 13.9 | 6.1 | 9.2 | 94.6 | 3.2 | 82.2 | 31.6 | 3.7 | 8.0 | 37.4 | 478.3 |
| **Disbursements** | | | | | | | | | | | | | |
| Payroll (Gross) | 10.6 | 14.9 | 16.4 | - | 18.4 | 8.1 | 6.6 | 27.2 | 7.3 | 6.7 | 10.7 | 6.6 | 159.4 |
| Benefits | 2.1 | 1.0 | 2.7 | - | 2.7 | 2.7 | 1.7 | 1.0 | 1.8 | 1.7 | 1.0 | 1.7 | 32.4 |
| Pension | - | 1.5 | - | - | - | 1.8 | - | - | 1.8 | - | - | 1.8 | 7.1 |
| Inventory Purchases | 3.3 | 5.5 | 6.0 | 6.0 | 7.5 | 6.0 | 6.0 | 6.0 | 8.0 | 4.3 | 4.5 | 4.5 | 107.4 |
| Non-Inventory Purchases | 4.6 | 6.7 | 7.9 | 11.9 | 8.7 | 8.7 | 8.6 | 6.6 | 8.9 | 6.3 | 6.2 | 7.5 | 121.7 |
| Intercompany Disbursements | 0.2 | 22.2 | - | - | 2.2 | 17.6 | - | - | 21.4 | - | - | 22.2 | 88.4 |
| Restructuring Costs | 1.1 | 1.0 | 1.0 | 1.1 | 1.0 | 1.0 | 1.0 | 1.1 | 1.0 | 1.0 | 1.2 | 1.0 | 16.1 |
| **Total Disbursements** | 22.0 | 53.3 | 33.9 | 19.0 | 38.4 | 37.7 | 23.8 | 44.0 | 48.0 | 19.9 | 23.5 | 45.0 | 533.4 |
| **Net Cash Flow** | (14.2) | (24.1) | (20.0) | (12.9) | (29.2) | 56.9 | (20.7) | 38.3 | (16.5) | (16.2) | (16.5) | (7.5) | (55.0) |
| Opening Available Cash Balance | 197.5 | 183.4 | 176.7 | 155.7 | 142.8 | 113.6 | 187.5 | 146.8 | 185.0 | 189.2 | 173.0 | 167.5 | 197.5 |
| Closing Available Cash Balance | 183.4 | 159.3 | 155.7 | 142.8 | 113.6 | 170.5 | 146.8 | 185.0 | 168.6 | 173.0 | 167.5 | 148.9 | 141.0 |
| Unavailable Cash | 10.9 | 10.5 | 5.9 | 5.9 | 5.9 | 5.8 | 5.9 | 5.9 | 5.2 | 5.9 | 5.9 | 5.8 | 5.9 |
| **Total Cash** | 194.3 | 170.2 | 161.6 | 148.7 | 118.5 | 176.4 | 152.7 | 180.9 | 174.5 | 176.9 | 183.4 | 155.8 | 146.9 |
| Restricted Cash | 46.0 | 46.0 | 46.0 | 46.0 | 46.0 | 46.0 | 46.0 | 46.0 | 46.0 | 46.0 | 46.0 | 46.0 | 46.0 |
| **Total Cash + Restricted Cash** | 240.3 | 216.2 | 207.7 | 194.7 | 164.5 | 222.5 | 198.7 | 237.0 | 229.5 | 224.9 | 208.4 | 201.8 | 192.9 |
| Facility Size | 75.0 | 75.0 | 75.0 | 75.0 | 75.0 | 76.0 | 75.0 | 75.0 | 75.0 | 75.0 | 75.0 | 75.0 | 75.0 |
| Less Utilized Facility | (75.0) | (75.0) | (75.0) | (75.0) | (75.0) | (75.0) | (75.0) | (75.0) | (75.0) | (75.0) | (75.0) | (75.0) | (75.0) |
| Available Facility | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Closing Cash + Restricted Cash + Available Facility** | 240.3 | 216.2 | 207.7 | 194.7 | 164.5 | 222.5 | 198.7 | 237.0 | 229.5 | 224.9 | 208.4 | 201.8 | 192.9 |

**BLUE SHEET**

Court File No. 09-CL-7950

**ONTARIO
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)**

IN THE MATTER OF THE *COMPANIES' CREDITORS
ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF
COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS
TECHNOLOGY CORPORATION (the "Applicants")

**SIXTEENTH REPORT OF THE MONITOR
DATED JULY 24, 2009**

## INTRODUCTION

1.  On January 14, 2009 (the "Filing Date"), Nortel Networks Corporation ("NNC" and collectively with all its subsidiaries, "Nortel" or "Company"), Nortel Networks Limited ("NNL"), Nortel Networks Technology Corporation ("NNTC"), Nortel Networks International Corporation ("NNIC") and Nortel Networks Global Corporation ("NNGC") (collectively the "Applicants") filed for and obtained protection under the *Companies' Creditors Arrangement Act* ("CCAA"). Pursuant to the Order of this Honourable Court dated January 14, 2009, as amended and restated (the "Initial Order"), Ernst & Young Inc. ("EYI") was appointed as the Monitor of the Applicants (the "Monitor") in the CCAA proceeding. The stay of proceedings was extended to July 30, 2009, by this Honourable Court in its Order dated April 28, 2009.

Nortel Networks - July 12, 2008
CCAA Applicants
Forecast Cash Flow Variance
(USD Millions)

| | Forecast | Actuals | Variance |
|---|---|---|---|

### 3. Receipts & Disbursements

| | Forecast | Actuals | Variance |
|---|---|---|---|
| **Receipts** | | | |
| Collection of Accounts Receivable | 49.3 | 66.6 | 17.3 |
| Other Receipts | 86.2 | 86.2 | - |
| Intercompany Receipts | 117.4 | 110.4 | (7.0) |
| Intercompany Receipts - Interim Funding Arrangement | 62.8 | 62.8 | - |
| NNL/NNI Restructuring Loan Advances | - | - | - |
| **Total Receipts** | 315.7 | 326.0 | 10.3 |
| | | | |
| **Disbursements** | | | |
| Payroll (Gross) | 52.3 | 50.7 | 1.6 |
| Benefits | 9.6 | 6.0 | 3.6 |
| Pension | 2.0 | 2.0 | - |
| Inventory Purchases | 67.6 | 62.8 | 5.0 |
| Non-Inventory Purchases | 39.3 | 43.6 | (4.3) |
| Intercompany Disbursements | 93.7 | 76.8 | 16.9 |
| Intercompany Disbursements - Interim Funding Arrangement | - | - | - |
| Restructuring Costs | 6.3 | 5.1 | 1.2 |
| NNL/NNI Restructuring Loan Repayments | - | - | - |
| **Total Disbursements** | 270.8 | 246.8 | 24.0 |
| | | | |
| **Net Cash Flow** | 44.9 | 79.2 | 34.3 |
| FX Impact | - | (4.8) | (4.8) |
| | | | |
| **Opening Available Cash Balance** | 127.3 | 127.3 | (0.0) |
| | | | |
| **Closing Available Cash Balance** | 172.2 | 201.7 | 29.5 |
| | | | |
| Unavailable Cash | 5.0 | 6.0 | 1.0 |
| **Total Cash** | 177.2 | 207.7 | 30.5 |
| | | | |
| Restricted Cash | 65.1 | 59.1 | (6.0) |
| **Total Cash + Restricted Cash** | 242.3 | 266.8 | 24.5 |

**Nortel Networks - Unit 12, 2009**
**CCAA Applicants**
**Forecast Cash Flow**
**($ millions)**

| | | | | | | | | | | | | | | | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Receipts** | | | | | | | | | | | | | | | | |
| Collection of Accounts Receivable | 5.4 | 4.3 | | 10.0 | 5.8 | 9.0 | 22.3 | | 3.4 | 7.3 | 11.1 | | 8.3 | 7.1 | 11.3 | 19.0 | 180.7 |
| Other Receipts | 3.0 | 2.0 | | | | 2.0 | 21.6 | | | | 26.7 | | | | 10.8 | 0.4 | 16.8 |
| Intercompany Receipts | | 24.7 | | 8.0 | | | 31.4 | | | | | | | | 1.8 | | 53.9 |
| Intercompany Receipts - Interim Funding Arrangement | | | | | | | | | | | | | | | | | 94.2 |
| NNL/NNI Restructuring Loan Advances | | | | | | | | | | | | | | | | | |
| **Total Receipts** | 8.4 | 51.0 | | 18.0 | 5.8 | 11.0 | 75.2 | | 3.4 | 7.3 | 37.8 | | 8.3 | 7.1 | 23.9 | 19.4 | 334.5 |
| **Disbursements** | | | | | | | | | | | | | | | | | |
| Payroll (Gross) | 14.6 | 6.1 | | 5.8 | 25.3 | 5.8 | 11.0 | | 18.2 | 4.8 | 8.5 | | 13.8 | | 13.2 | 0.0 | 145.1 |
| Benefits | 2.1 | 0.5 | | 1.8 | 1.1 | 1.8 | 1.1 | | 0.9 | 1.5 | 0.5 | | 2.0 | 0.0 | 2.0 | 2.6 | 28.6 |
| Pension | | 1.9 | | | | 1.9 | 1.9 | | | | 1.9 | | 1.7 | 1.7 | 1.9 | 1.7 | 7.7 |
| Inventory Purchases | 2.1 | 1.6 | | 14.9 | 4.5 | 4.5 | 8.5 | | 3.6 | 3.6 | 1.9 | | 1.7 | 1.7 | 1.7 | 8.8 | 80.0 |
| Non-Inventory Purchases | 7.5 | 6.4 | | 8.3 | 8.3 | 8.3 | 8.3 | | 6.3 | 6.4 | 5.5 | | 8.8 | 8.7 | 8.7 | 15.7 | 120.2 |
| Intercompany Disbursements | | 22.2 | | | | | 13.8 | | | | 21.4 | | | 1.2 | 1.2 | | 83.9 |
| Intercompany Disbursements - Interim Funding Arrangement | | | | | | | | | | | | | | | | | |
| Restructuring Costs | 2.2 | 1.0 | | 1.1 | 1.2 | 1.0 | 1.0 | | 1.0 | 1.2 | 1.0 | | 1.0 | 1.2 | 1.0 | 1.0 | 18.5 |
| NNL/NNI Restructuring Loan Repayments | | | | | | | | | | | | | | | | | |
| **Total Disbursements** | 28.4 | 39.8 | | 31.9 | 40.3 | 21.8 | 51.7 | | 30.1 | 17.5 | 40.6 | | 27.2 | 11.5 | 29.7 | 29.9 | 484.9 |
| **Net Cash Flow** | (20.0) | 11.2 | | (13.9) | (34.5) | (10.8) | 23.5 | | (26.7) | (10.3) | (2.9) | | (18.9) | (4.5) | (5.8) | (10.5) | (80.3) |
| Opening Available Cash Balance | 201.6 | 181.6 | | 209.5 | 195.8 | 160.8 | 150.0 | | 157.0 | 130.3 | 120.1 | | 191.0 | 142.0 | 137.6 | 131.8 | 201.6 |
| Closing Available Cash Balance | 181.6 | 172.7 | | 195.8 | 163.5 | 150.0 | 173.5 | | 130.5 | 120.1 | 117.2 | | 142.0 | 137.6 | 131.8 | 121.3 | 121.3 |
| Unavailable Cash | 3.0 | 1.0 | | 1.0 | 1.0 | 1.0 | 1.0 | | 1.0 | 1.0 | 1.0 | | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 |
| **Total Cash** | 184.5 | 173.7 | | 196.8 | 181.8 | 151.0 | 174.5 | | 131.5 | 121.1 | 118.2 | | 143.0 | 138.6 | 132.8 | 122.3 | 122.3 |
| Restricted Cash | 59.1 | 57.1 | | 57.1 | 57.1 | 57.1 | 57.1 | | 57.1 | 57.1 | 57.1 | | 57.1 | 57.1 | 57.1 | 57.1 | 57.1 |
| **Total Cash + Restricted Cash** | 243.6 | 230.8 | | 253.9 | 218.8 | 208.1 | 231.6 | | 188.4 | 178.1 | 175.4 | | 200.1 | 195.7 | 189.8 | 179.4 | 179.4 |

**BLUE SHEET**

Court File No. 09-CL-7950

*ONTARIO*
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

IN THE MATTER OF THE *COMPANIES' CREDITORS*
*ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF
COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS
TECHNOLOGY CORPORATION (the "Applicants")

TWENTY-FIFTH REPORT OF THE MONITOR
DATED OCTOBER 22, 2009

## INTRODUCTION

1.  On January 14, 2009 (the "Filing Date"), Nortel Networks Corporation ("NNC" and
    collectively with all its subsidiaries, "Nortel" or "Company"), Nortel Networks
    Limited ("NNL"), Nortel Networks Technology Corporation ("NNTC"), Nortel
    Networks International Corporation ("NNIC") and Nortel Networks Global
    Corporation ("NNGC") (collectively the "Applicants") filed for and obtained
    protection under the *Companies' Creditors Arrangement Act* ("CCAA").  Pursuant
    to the Order of this Honourable Court dated January 14, 2009, as amended and
    restated (the "Initial Order"), Ernst & Young Inc. ("EYI") was appointed as the
    Monitor of the Applicants (the "Monitor") in the CCAA proceeding.  The stay of
    proceedings was extended to October 30, 2009, by this Honourable Court in its
    Order dated July 30, 2009.

2.  Nortel Networks Inc. ("NNI") and certain of its U.S. subsidiaries concurrently filed
    voluntary petitions under Chapter 11 of the U.S. Bankruptcy Code (the "Code") in

APPENDIX A

Nortel Networks - Oct 4, 2009
CCAA Applicants
Forecast Cash Flow - Variances
USD (Millions)

| | Forecast | Actuals | Variance |
|---|---|---|---|
| Start (Prior) | 09-28-09 | 09-28-09 | 09-28-09 |
| End (Date) | 10-04-09 | 10-04-09 | 10-04-09 |

## 1.0 Receipts & Disbursements

**Receipts**

| | Forecast | Actuals | Variance |
|---|---|---|---|
| Collection of Accounts Receivable | 134.9 | 152.1 | 17.2 |
| Other Receipts | 5.0 | 7.0 | 2.0 |
| Intercompany Receipts | 91.8 | 68.6 | (23.2) |
| Intercompany Receipts - Interim Funding Arrangement | 94.2 | 94.2 | - |
| NNL/NNI Restructuring Loan Advances | - | - | - |
| **Total Receipts** | 325.9 | 321.9 | (4.0) |
| | | | |
| **Disbursements** | | | |
| Payroll (Gross) | 118.1 | 118.2 | (0.1) |
| Benefits | 22.9 | 23.3 | (0.4) |
| Pension | 5.8 | 6.0 | (0.2) |
| Inventory Purchases | 53.3 | 30.9 | 22.4 |
| Non-Inventory Purchases | 85.2 | 101.0 | (15.8) |
| Intercompany Disbursements | 67.1 | 52.8 | 14.3 |
| Intercompany Disbursements - Interim Funding Arrangement | - | - | - |
| Restructuring Costs | 14.1 | 16.6 | (2.5) |
| NNL/NNI Restructuring Loan Repayments | - | - | - |
| **Total Disbursements** | 366.5 | 348.8 | 17.7 |
| | | | |
| **Net Cash Flow** | (40.6) | (26.9) | 13.7 |
| FX Impact | - | 7.5 | 7.5 |
| | | | |
| **Opening Available Cash Balance** | 201.6 | 201.6 | (0.0) |
| | | | |
| **Closing Available Cash Balance** | 161.0 | 182.2 | 21.2 |
| | | | |
| Unavailable Cash | 1.0 | 0.1 | (0.9) |
| **Total Cash** | 162.0 | 182.3 | 20.3 |
| | | | |
| Restricted Cash | 57.1 | 58.7 | 1.6 |
| **Total Cash + Restricted Cash** | 219.1 | 241.0 | 21.9 |

**Nortel Networks / OCTS 2009**
**Cash Flow Forecast**
**$US millions**

| | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Receipts** | | | | | | | | | | | | | | | | |
| Collection of Accounts Receivable | 4.0 | 6.8 | 4.1 | 23.1 | 5.7 | 5.2 | 5.6 | 16.0 | 3.3 | 5.1 | 4.3 | 4.7 | 5.1 | 22.6 | 117.2 | |
| Other Receipts | | | | | | | | 11.3 | | | | | | 7.3 | 19.1 | |
| Payroll / Accounts Payable reimbursement from Buyers | | | | | | | | | | 2.5 | 6.9 | 2.8 | 6.9 | | 23.9 | |
| Intercompany Receipts | | | | | | | | 4.1 | | 12.9 | 7.3 | 33.3 | | | 249.4 | |
| Intercompany Receipts - Interim Funding Arrangement | 54.8 | 7.9 | 13.6 | 21.2 | 13.0 | 22.3 | 16.3 | 22.4 | 2.4 | | | | | | | |
| **Total Receipts** | 58.8 | 14.7 | 17.7 | 44.2 | 19.7 | 27.5 | 22.2 | 42.5 | 16.5 | 17.5 | 13.7 | 18.9 | 48.2 | 39.5 | 480.3 | |
| **Disbursements** | | | | | | | | | | | | | | | | |
| Payroll (Gross) | 17.5 | 9.2 | 17.8 | 6.0 | 16.0 | 5.5 | 22.3 | 5.5 | 6.0 | 8.5 | 7.4 | 7.8 | 4.2 | 7.5 | 116.5 | |
| Benefits | 1.1 | 0.9 | 1.8 | 3.4 | 1.0 | 0.8 | 1.0 | 3.0 | 1.0 | 1.0 | 0.6 | 1.0 | 1.6 | 4.3 | 21.4 | |
| Pension | | | 0.1 | | | | | 2.1 | | | | | 2.1 | | 8.2 | |
| Involuntary Purchases | 2.2 | 2.2 | 2.2 | 7.2 | 2.2 | 2.2 | 2.2 | 1.2 | 8.4 | 6.2 | 0.1 | 0.1 | 0.1 | | 14.4 | |
| Non-inventory Purchases | 19.5 | 16.4 | 19.4 | 11.6 | 8.1 | 6.8 | 8.8 | 3.1 | 1.4 | 33.6 | 7.3 | 7.6 | 8.5 | 9.6 | 124.8 | |
| Payroll / Accounts Payable payments on behalf of Buyers | | | | | | | | | | 5.6 | 4.1 | 5.8 | 4.1 | 3.9 | 22.3 | |
| Intercompany Disbursements | 13.2 | 5.4 | 13.2 | 24.7 | 13.2 | 7.2 | 17.4 | 22.2 | 5.1 | 16.1 | 7.2 | 12.4 | 32.2 | | 186.6 | |
| Intercompany Disbursements - Interim Funding Arrangement | | | | | | | | | | | | | | | | |
| Restructuring Costs | 1.1 | 1.3 | 1.1 | 1.1 | 1.1 | 1.2 | 1.2 | 1.1 | 1.1 | 1.1 | 1.1 | 1.1 | 1.1 | | 14.2 | |
| **Total Disbursements** | 45.6 | 25.1 | 48.4 | 43.1 | 42.1 | 24.8 | 50.1 | 43.5 | 11.3 | 69.4 | 27.8 | 32.7 | 55.0 | 15.2 | 524.2 | |
| **Net Cash Flow** | 13.2 | (5.4) | (28.7) | 1.2 | (22.4) | 2.9 | (25.0) | (1.4) | 6.7 | (42.9) | (9.1) | (12.4) | (7.8) | 15.3 | (123.9) | |
| **Opening Available Cash Balance** | 182.2 | 195.4 | 185.0 | 159.4 | 161.5 | 138.1 | 142.0 | 114.1 | 112.7 | 119.3 | 76.2 | 67.8 | 56.8 | 43.1 | 182.2 | |
| **Closing Available Cash Balance** | 195.4 | 189.0 | 159.4 | 161.5 | 139.1 | 142.0 | 114.7 | 112.7 | 119.3 | 76.8 | 67.6 | 56.8 | 43.1 | 51.4 | 58.4 | |
| Unavailable Cash | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 51.4 | 0.1 | |
| **Total Cash** | 195.5 | 189.1 | 159.5 | 161.5 | 139.2 | 142.1 | 114.2 | 112.2 | 119.4 | 76.3 | 67.7 | 56.9 | 43.1 | 51.4 | 58.4 | |
| Restricted Cash | 58.7 | 58.7 | 58.7 | 58.7 | 58.7 | 58.7 | 58.7 | 58.7 | 58.7 | 58.7 | 58.7 | 58.7 | 58.7 | 58.7 | 58.7 | |
| **Total Cash + Restricted Cash** | 254.2 | 247.8 | 218.1 | 220.3 | 197.9 | 200.8 | 173.0 | 171.4 | 178.1 | 135.0 | 126.4 | 105.6 | 101.8 | 117.1 | 117.1 | |

# BLUE SHEET

Court File No. 09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS***
***ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF**
**COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,**
**NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS**
**INTERNATIONAL CORPORATION AND NORTEL NETWORKS**
**TECHNOLOGY CORPORATION**

**THIRTY-THIRD REPORT OF THE MONITOR**
**DATED DECEMBER 16th, 2009**

**INTRODUCTION**

1.  On January 14, 2009 (the "Filing Date") Nortel Networks Corporation ("NNC" and
    collectively with all its subsidiaries "Nortel" or the "Company"), Nortel Networks
    Limited ("NNL"), Nortel Networks Technology Corporation, Nortel Networks
    International Corporation and Nortel Networks Global Corporation (collectively the
    "Applicants") filed for and obtained protection under the *Companies' Creditors*
    *Arrangement Act* ("CCAA"). Pursuant to the Order of this Honourable Court dated
    January 14, 2009, as amended and restated (the "Initial Order"). Ernst & Young
    Inc. was appointed as the Monitor of the Applicants (the "Monitor") in the CCAA
    proceedings. The stay of proceedings was extended to December 18, 2009 by this
    Honourable Court in its Order dated October 28, 2009.

2.  Nortel Networks Inc. ("NNI") and certain of its U.S. subsidiaries concurrently filed
    voluntary petitions under Chapter 11 of Title 11 of the U.S. Bankruptcy Code (the
    "Code") in the United States Court on January 14, 2009 (the "Chapter 11

**Nortel Networks**
**CCAA Applicants**
**Forecast Cash Flow - Variances**
USD (Millions)

| | Forecast | Actual | Variance |
|---|---|---|---|
| Start of period | 02-Oct-09 | 02-Oct-09 | 02-Oct-09 |
| End of period | 28-Nov-09 | 28-Nov-09 | 28-Nov-09 |

## 1. Receipts & Disbursements

| | Forecast | Actual | Variance |
|---|---|---|---|
| **Receipts** | | | |
| Collection of Accounts Receivable | 71.7 | 80.1 | 8.4 |
| Other Receipts | - | 11.5 | 11.5 |
| Payroll / Accounts Payable reimbursement from Buyers | 4.1 | 2.3 | (1.8) |
| Intercompany Receipts | 173.4 | 138.5 | (34.9) |
| Intercompany Receipts - Interim Funding Arrangement | - | - | - |
| NNL/NNI Restructuring Loan Advances | - | - | - |
| **Total Receipts** | 249.2 | 232.4 | (16.9) |
| **Disbursements** | | | |
| Payroll (Gross) | 82.7 | 69.9 | 12.8 |
| Benefits | 10.7 | 9.8 | 0.9 |
| Pension | 4.1 | 4.1 | - |
| Inventory Purchases | 17.3 | 10.1 | 7.2 |
| Non-Inventory Purchases | 76.1 | 58.5 | 17.6 |
| Payroll / Accounts Payable payments on behalf of Buyers | - | 2.3 | (2.3) |
| Intercompany Disbursements | 118.5 | 85.9 | 32.6 |
| Intercompany Disbursements - Interim Funding Arrangement | - | - | - |
| Restructuring Costs | 9.4 | 12.8 | (3.4) |
| **Total Disbursements** | 318.8 | 253.5 | 65.3 |
| **Net Cash Flow** | (69.6) | (21.1) | 48.5 |
| FX Impact | - | 0.5 | 0.5 |
| **Opening Available Cash Balance** | 182.2 | 182.2 | - |
| **Closing Available Cash Balance** | 112.6 | 161.6 | 49.0 |
| Unavailable Cash | 0.1 | 0.1 | - |
| **Total Cash** | 112.7 | 161.7 | 49.0 |
| Restricted Cash | 58.7 | 82.1 | 23.4 |
| **Total Cash + Restricted Cash** | 171.4 | 243.8 | 72.4 |

202

APPENDIX 8

**Nortel Networks - Nov 29, 2009**
**CCAA Applicants**
**Forecast Cash Flow**



| | Total |
|---|---|
| **Receipts** | |
| Collection of Accounts Receivable | 85.2 |
| Other Receipts | 29.7 |
| Payroll / Accounts Payable reimbursement from Buyers | 43.9 |
| Intercompany Receipts | 96.5 |
| Intercompany Receipts - Interim Funding Arrangement | - |
| **Total Receipts** | 267.3 |
| **Disbursements** | |
| Payroll (Gross) | 93.7 |
| Benefits | 25.1 |
| Pension | 6.2 |
| Inventory Purchases | 2.2 |
| Non-Inventory Purchases | 124.3 |
| Payroll / Accounts Payable payments on behalf of Buyers | 45.9 |
| Intercompany Disbursements | 70.1 |
| Intercompany Disbursements - Interim Funding Arrangement | - |
| Restructuring Costs | 10.7 |
| **Total Disbursements** | 381.2 |
| Net Cash Flow | (123.9) |
| Opening Available Cash Balance | 151.6 |
| Closing Available Cash Balance | 37.7 |
| Unavailable Cash | 8.2 |
| Total Cash | 45.9 |
| Restricted Cash | 54.7 |
| Total Cash + Restricted Cash | 100.7 |

**BLUE SHEET**

Court File No. 09-CL-7950

### *ONTARIO*
### SUPERIOR COURT OF JUSTICE
### (COMMERCIAL LIST)

### IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

### AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

### THIRTY-FIFTH REPORT OF THE MONITOR
### DATED JANUARY 18, 2010

## INTRODUCTION

1.    On January 14, 2009 (the "Filing Date") Nortel Networks Corporation ("NNC" and collectively with all its subsidiaries "Nortel" or the "Company"), Nortel Networks Limited ("NNL"), Nortel Networks Technology Corporation, Nortel Networks International Corporation and Nortel Networks Global Corporation (collectively the "Applicants") filed for and obtained protection under the *Companies' Creditors Arrangement Act* ("CCAA"). Pursuant to the Order of this Honourable Court dated January 14, 2009, as amended and restated (the "Initial Order"), Ernst & Young Inc. was appointed as the Monitor of the Applicants (the "Monitor") in the CCAA proceedings. The stay of proceedings was extended to January 30, 2010 by this Honourable Court in its Order dated December 18, 2009.

2.    Nortel Networks Inc. ("NNI") and certain of its U.S. subsidiaries concurrently filed voluntary petitions under Chapter 11 of Title 11 of the U.S. Bankruptcy Code (the "Code") in the United States Bankruptcy Court for the District of Delaware (the "U.S. Court") on January 14, 2009 (the "Chapter 11 Proceedings") (collectively the

**Nortel Networks**
**CCAA Applicants**
**Forecast Cash Flow - Variances**
USD (Millions)

| | Forecast | Actuals | Variances |
|---|---|---|---|
| Start of period | 29-Nov-09 | 29-Nov-09 | 29-Nov-09 |
| End of period | 02-Jan-10 | 02-Jan-10 | 02-Jan-10 |

## 1. Receipts & Disbursements

| | Forecast | Actuals | Variances |
|---|---|---|---|
| **Receipts** | | | |
| Collection of Accounts Receivable | 31.8 | 34.6 | 2.8 |
| Other Receipts | 27.4 | 27.4 | - |
| Payroll / Accounts Payable reimbursement from Buyers | 23.5 | 12.6 | (10.8) |
| Intercompany Receipts | 79.9 | 56.6 | (23.3) |
| Intercompany Receipts - Interim Funding Arrangement | - | - | - |
| NNL/NNI Restructuring Loan Advances | - | - | - |
| **Total Receipts** | 162.6 | 131.3 | (31.4) |
| **Disbursements** | | | |
| Payroll (Gross) | 43.5 | 48.0 | (4.5) |
| Benefits | 11.2 | 13.0 | (1.7) |
| Pension | 2.1 | 2.1 | 0.0 |
| Inventory Purchases | 1.7 | 11.7 | (10.0) |
| Non-Inventory Purchases | 82.4 | 102.0 | (19.6) |
| Payroll / Accounts Payable payments on behalf of Buyers | 23.5 | 12.6 | 10.8 |
| Intercompany Disbursements | 31.2 | 13.7 | 17.5 |
| Intercompany Disbursements - Interim Funding Arrangement | - | | - |
| Restructuring Costs | 3.9 | 3.6 | 0.3 |
| NNL/NNI Restructuring Loan Repayments | - | | - |
| **Total Disbursements** | 199.6 | 206.8 | (7.3) |
| **Net Cash Flow** | (36.9) | (75.5) | (38.6) |
| FX Impact | - | 1.1 | 1.1 |
| **Opening Available Cash Balance** | 161.6 | 161.6 | - |
| **Closing Available Cash Balance** | 124.6 | 87.1 | (37.5) |
| Unavailable Cash | 8.2 | 8.0 | (0.2) |
| **Total Cash** | 132.8 | 95.2 | (37.7) |
| Restricted Cash | 56.3 | 56.6 | 0.3 |
| **Total Cash + Restricted Cash** | 189.1 | 151.8 | (37.4) |

**Nortel Networks - January 3, 2010**
**CCAA Applicants**
**Forecast Cash Flow**
USD ($ millions)

**1. Receipts & Disbursements**

| | Total |
|---|---|
| **Receipts** | |
| Collection of Accounts Receivable | 102.5 |
| Other Receipts | 18.8 |
| TSA Recoveries from Buyer | 44.6 |
| Payroll & A/P reimbursement from Buyers | 15.0 |
| Intercompany Receipts | 191.8 |
| Intercompany Receipts - CFSA | |
| **Total Receipts** | 371.0 |
| **Disbursements** | |
| Payroll (Gross) | 95.0 |
| Benefits | 20.7 |
| Pension | 6.3 |
| Inventory Purchases | 3.4 |
| Non-Inventory Purchases | 82.7 |
| Payroll & A/P payments on behalf of Buyers | 44.6 |
| Intercompany Disbursements | 40.1 |
| Restructuring Costs | 22.9 |
| **Total Disbursements** | 324.1 |
| **Net Cash Flow** | 46.9 |
| Opening Available Cash Balance | 87.1 |
| Closing Available Cash Balance | 134.0 |
| Unavailable Cash | 8.0 |
| **Total Cash** | 142.0 |
| Restricted Cash | 58.3 |
| **Total Cash + Restricted Cash** | 200.3 |

# BLUE SHEET

Court File No. 09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS***
***ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF**
**COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,**
**NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS**
**INTERNATIONAL CORPORATION AND NORTEL NETWORKS**
**TECHNOLOGY CORPORATION**

**FORTY-THIRD REPORT OF THE MONITOR**
**DATED APRIL 9, 2010**

**INTRODUCTION**

1.  On January 14, 2009 (the "Filing Date"), Nortel Networks Corporation ("NNC" and
    collectively with all its subsidiaries "Nortel" or the "Company"), Nortel Networks
    Limited ("NNL"), Nortel Networks Technology Corporation, Nortel Networks
    International Corporation and Nortel Networks Global Corporation (collectively the
    "Applicants") filed for and obtained protection under the *Companies' Creditors
    Arrangement Act* ("CCAA"). Pursuant to the Order of this Honourable Court dated
    January 14, 2009, as amended and restated (the "Initial Order"), Ernst & Young Inc.
    was appointed as the Monitor of the Applicants (the "Monitor") in the CCAA
    proceedings. The stay of proceedings was extended to April 23, 2010 by this
    Honourable Court in its Order dated January 21, 2010.

2.  Nortel Networks Inc. ("NNI") and certain of its U.S. subsidiaries concurrently filed
    voluntary petitions under Chapter 11 of Title 11 of the U.S. Bankruptcy Code (the
    "Code") in the United States Bankruptcy Court for the District of Delaware (the
    U.S. Court") on January 14, 2009 (the "Chapter 11 Proceedings"). As required by

1

## Nortel Networks - March 27, 2010
## CCAA Applicants
## Forecast Cash Flow - Variances
USD (Millions)

|  | Forecast | Actuals | Variances |
|---|---|---|---|
| Start of period | 03-Jan-10 | 03-Jan-10 | 03-Jan-10 |
| End of period | 27-Mar-10 | 27-Mar-10 | 27-Mar-10 |

### 1. Receipts & Disbursements

| | Forecast | Actuals | Variances |
|---|---|---|---|
| **Receipts** | | | |
| Collection of Accounts Receivable | 73.4 | 77.7 | 4.3 |
| Other Receipts | - | 2.1 | 2.1 |
| TSA Recoveries from Buyer | 14.3 | 8.7 | (5.6) |
| Payroll & AP reimbursement from Buyers | 33.6 | 21.5 | (12.1) |
| Intercompany Receipts | 16.0 | 55.0 | 39.0 |
| Intercompany Receipts - CFSA | 178.5 | 178.5 | - |
| **Total Receipts** | 315.8 | 343.5 | 27.7 |
| | | | |
| **Disbursements** | | | |
| Payroll (Gross) | 75.0 | 70.2 | 4.8 |
| Benefits | 16.1 | 16.2 | (0.0) |
| Pension | 6.3 | 7.2 | (0.8) |
| Inventory Purchases | 2.4 | 8.3 | (5.9) |
| Non-Inventory Purchases | 63.2 | 71.3 | (8.1) |
| Payroll & AP payments on behalf of Buyers | 33.6 | 21.5 | 12.1 |
| Intercompany Disbursements | 41.1 | 32.2 | 8.9 |
| Restructuring Costs | 17.4 | 17.0 | 0.4 |
| **Total Disbursements** | 255.2 | 243.9 | 11.3 |
| | | | |
| **Net Cash Flow** | 60.6 | 99.6 | 39.1 |
| FX Impact | - | (0.3) | (0.3) |
| | | | |
| **Opening Available Cash Balance** | 87.1 | 87.1 | - |
| | | | |
| **Closing Available Cash Balance** | 147.7 | 186.4 | 38.7 |
| | | | |
| Unavailable Cash | 8.0 | 8.0 | 0.0 |
| **Total Cash** | 155.7 | 194.4 | 38.8 |
| | | | |
| Restricted Cash | 58.3 | 56.8 | (1.5) |
| **Total Cash + Restricted Cash** | 214.0 | 251.2 | 37.3 |

APPENDIX B

**Nortel Networks™ March 28, 2010**
**CCAA Applicants**
**Forecast Cash Flow**
(US$ in Millions)

| | | | | | | | | | | | | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Receipts** | | | | | | | | | | | | | |
| Collection of Accounts Receivable | | | | | | | | | | | | | |
| Other Receipts | | | | | | | | | | | | | |
| TSA Reimbursements from Buyers | | | | | | | | | | | | | |
| Payroll & A/P reimbursement from Buyers | | | | | | | | | | | | | |
| Intercompany Receipts | | | | | | | | | | | | | |
| Intercompany Receipts - OFSA | | | | | | | | | | | | | |
| **Total Receipts** | | | | | | | | | | | | | |
| **Disbursements** | | | | | | | | | | | | | |
| Payroll (Gross) | | | | | | | | | | | | | |
| Benefits | | | | | | | | | | | | | |
| Pension | | | | | | | | | | | | | |
| Inventory Purchases | | | | | | | | | | | | | |
| Non-Inventory Purchases | | | | | | | | | | | | | |
| Payroll & A/P payments on behalf of Buyers | | | | | | | | | | | | | |
| Intercompany Disbursements | | | | | | | | | | | | | |
| Restructuring Costs | | | | | | | | | | | | | |
| **Total Disbursements** | | | | | | | | | | | | | |
| **Net Cash Flow** | | | | | | | | | | | | | |
| Opening Available Cash Balance | | | | | | | | | | | | | |
| **Closing Available Cash Balance** | | | | | | | | | | | | | |
| Restricted Cash | | | | | | | | | | | | | |
| **Total Cash** | | | | | | | | | | | | | |
| **Total Cash + Restricted Cash** | | | | | | | | | | | | | |

# BLUE SHEET

Court File No. 09-CL-7950

### *ONTARIO*
### SUPERIOR COURT OF JUSTICE
### (COMMERCIAL LIST)

### IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

### AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

### FIFTIETH REPORT OF THE MONITOR
### DATED JULY 13, 2010

## INTRODUCTION

1.   On January 14, 2009 (the "Filing Date"), Nortel Networks Corporation ("NNC" and collectively with all its subsidiaries "Nortel" or the "Company"), Nortel Networks Limited ("NNL"), Nortel Networks Technology Corporation, Nortel Networks International Corporation and Nortel Networks Global Corporation (collectively the "Applicants") filed for and obtained protection under the *Companies' Creditors Arrangement Act* ("CCAA"). Pursuant to the Order of this Honourable Court dated January 14, 2009, as amended and restated (the "Initial Order"), Ernst & Young Inc. was appointed as the Monitor of the Applicants (the "Monitor") in the CCAA proceedings. The stay of proceedings was extended to July 22, 2010 by this Honourable Court in its Order dated April 14, 2010.

2.   Nortel Networks Inc. ("NNI") and certain of its U.S. subsidiaries concurrently filed voluntary petitions under Chapter 11 of the U.S. Bankruptcy Code (the "Code") in the United States Bankruptcy Court for the District of Delaware (the U.S. Court") on January 14, 2009 (the "Chapter 11 Proceedings"). As required by U.S. law, an

**Nortel Networks - June 26, 2010**
**CCAA Applicants**
**Forecast Cash Flow - Variances**
USD (Million )

| | Forecast | Actuals | Variances |
|---|---|---|---|
| **Receipts & Disbursements** | | | |

**Receipts**

| | | | |
|---|---|---|---|
| Collection of Accounts Receivable | 27.5 | 36.9 | 9.5 |
| Other Receipts | - | 0.0 | 0.0 |
| TSA Recoveries from Buyer | 29.0 | 30.3 | 1.3 |
| Payroll & AP reimbursement from Buyers | 36.4 | 7.5 | (28.9) |
| Intercompany Receipts | 23.2 | 101.2 | 78.0 |
| Intercompany Receipts - CFSA | 13.3 | 13.3 | - |
| **Total Receipts** | 129.4 | 189.2 | 59.9 |

**Disbursements**

| | | | |
|---|---|---|---|
| Payroll (Gross) | 39.4 | 52.1 | (12.7) |
| Benefits | 19.8 | 13.2 | 6.6 |
| Pension | 1.1 | 1.1 | 0.0 |
| Inventory Purchases | 1.4 | (1.7) | 3.1 |
| Non-Inventory Purchases | 46.0 | 57.9 | (11.9) |
| Payroll & AP payments on behalf of Buyers | 36.4 | 7.5 | 28.9 |
| Intercompany Disbursements | 18.1 | 18.0 | 0.1 |
| Restructuring Costs | 12.1 | 17.0 | (4.9) |
| **Total Disbursements** | 174.4 | 165.2 | 9.2 |

| | | | |
|---|---|---|---|
| **Net Cash Flow** | (45.1) | 24.0 | 69.1 |
| FX Impact | - | 5.7 | 5.7 |
| **Opening Available Cash Balance** | 186.4 | 186.4 | - |
| **Closing Available Cash Balance** | 141.3 | 216.1 | 74.7 |
| Unavailable Cash | 8.0 | 8.0 | 0.0 |
| **Total Cash** | 149.3 | 224.1 | 74.8 |
| Restricted Cash | 56.8 | 51.5 | (5.3) |
| **Total Cash + Restricted Cash** | 206.1 | 275.6 | 69.5 |

APPENDIX B

**Nortel Networks — June 27, 2010**
**CCAA Applicants**
**Forecasted Cash Flow**

Receipts
- Collection of Accounts Receivable
- Other Receipts
- TSA Recoveries from Buyers
- Payroll & IAP reimbursement from Buyers
- Intercompany Receipts

Total Receipts

Disbursements:
- Payroll (Gross)
- Benefits
- Pension
- Inventory Purchases
- Non-Inventory Purchases
- Payroll & IAP payments on behalf of Buyers
- Intercompany Disbursements
- Restructuring Costs

Total Disbursements

Net Cash Flow

Opening Available Cash Balance
Closing Available Cash Balance

Unavailable Cash
Total Cash

Restricted Cash
Total Cash + Restricted Cash

# BLUE SHEET

Court File No. 09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

IN THE MATTER OF THE *COMPANIES' CREDITORS*
*ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF
COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS
TECHNOLOGY CORPORATION

**FIFTY-FIFTH REPORT OF THE MONITOR**
**DATED OCTOBER 21, 2010**

**INTRODUCTION**

1.  On January 14, 2009 (the "Filing Date"), Nortel Networks Corporation ("NNC" and collectively with all its subsidiaries "Nortel" or the "Company"), Nortel Networks Limited ("NNL"), Nortel Networks Technology Corporation, Nortel Networks International Corporation and Nortel Networks Global Corporation (collectively the "Applicants") filed for and obtained protection under the *Companies' Creditors Arrangement Act* ("CCAA"). Pursuant to the Order of this Honourable Court dated January 14, 2009, as amended and restated (the "Initial Order"), Ernst & Young Inc. was appointed as the Monitor of the Applicants (the "Monitor") in the CCAA proceedings. The stay of proceedings was extended to October 29, 2010 by this Honourable Court in its Order dated July 16, 2010.

2.  Nortel Networks Inc. ("NNI") and certain of its U.S. subsidiaries and affiliates concurrently filed voluntary petitions under Chapter 11 of the U.S. Bankruptcy Code (the "Code") in the United States Bankruptcy Court for the District of Delaware (the U.S. Court") on January 14, 2009 (the "Chapter 11 Proceedings").

Nortel Networks - October 2, 2010
CCAA Applicants
Forecast Cash Flow Variances
(USD Millions)

|  | Forecast | Actual | Variance |
|---|---|---|---|
|  | Start 04-Jul-10 & 27-Jul-10 | 04-Jul-10 | 27-Jul-10 |
|  | Version 30-Jun-10 | 04-Oct-10 | 04-Oct-10 |

## 1 - Receipts & Disbursements

**Receipts**

| | Forecast | Actual | Variance |
|---|---|---|---|
| Collection of Accounts Receivable | 9.7 | 13.5 | 3.8 |
| Other Receipts | 214.8 | 226.1 | 11.3 |
| TSA Recoveries from Buyer | 42.3 | 43.8 | 1.5 |
| Payroll & AP reimbursement from Buyers | 8.1 | 7.1 | (1.0) |
| Intercompany Receipts | 13.4 | 14.6 | 1.2 |
| **Total Receipts** | **288.2** | **305.0** | **16.8** |

**Disbursements**

| | Forecast | Actual | Variance |
|---|---|---|---|
| Payroll (Gross) | 20.1 | 20.6 | (0.5) |
| Benefits | 24.0 | 16.0 | 8.0 |
| Pension | 1.1 | 1.1 | (0.0) |
| Inventory Purchases | 1.3 | 0.9 | 0.4 |
| Non-Inventory Purchases | 249.7 | 257.5 | (7.9) |
| Payroll & AP payments on behalf of Buyers | 8.1 | 7.1 | 1.0 |
| Intercompany Disbursements | 8.6 | 12.2 | (3.6) |
| Restructuring Costs | 21.8 | 18.4 | 3.4 |
| **Total Disbursements** | **334.7** | **333.7** | **1.0** |

| | Forecast | Actual | Variance |
|---|---|---|---|
| **Net Cash Flow** | **(46.4)** | **(28.7)** | **17.7** |
| FX Impact | - | 2.2 | 2.2 |
| **Opening Available Cash Balance** | **216.1** | **216.1** | **-** |
| **Closing Available Cash Balance** | **169.7** | **189.6** | **20.0** |
| Unavailable Cash | 222.7 | 242.7 | 20.0 |
| **Total Cash** | **392.4** | **432.3** | **40.0** |
| Restricted Cash | 51.5 | 44.4 | (7.1) |
| **Total Cash + Restricted Cash** | **443.9** | **476.7** | **32.8** |

APPENDIX 3

**BLUE SHEET**

Court File No. 09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS***
***ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF**
**COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,**
**NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS**
**INTERNATIONAL CORPORATION AND NORTEL NETWORKS**
**TECHNOLOGY CORPORATION**

**FIFTY-NINTH REPORT OF THE MONITOR**
**DATED FEBRUARY 18, 2011**

**INTRODUCTION**

1.  On January 14, 2009 (the "Filing Date"), Nortel Networks Corporation ("NNC" and
    collectively with all its subsidiaries "Nortel" or the "Company"), Nortel Networks
    Limited ("NNL"), Nortel Networks Technology Corporation ("NNTC"), Nortel
    Networks International Corporation and Nortel Networks Global Corporation
    (collectively the "Applicants") filed for and obtained protection under the
    *Companies' Creditors Arrangement Act* ("CCAA"). Pursuant to the Order of this
    Honourable Court dated January 14, 2009, as amended and restated (the "Initial
    Order"), Ernst & Young Inc. was appointed as the Monitor of the Applicants (the
    "Monitor") in the CCAA proceedings. The stay of proceedings was extended to
    February 28, 2011 by this Honourable Court in its Order dated October 27, 2010.

2.  Nortel Networks Inc. ("NNI") and certain of its U.S. subsidiaries and affiliates
    concurrently filed voluntary petitions under Chapter 11 of the U.S. Bankruptcy Code
    (the "Code") in the United States Bankruptcy Court for the District of Delaware (the
    "U.S. Court") on January 14, 2009 (the "Chapter 11 Proceedings"). As required by

**Nortel Networks - October 3, 2010 to February 5, 2011**
**CCAA Applicants**
**Forecast Cash Flow - Variances**
USD (Millions)
(Unaudited)

| | Forecast | Actuals | Variances |
|---|---|---|---|
| Start of period | 03-Oct-10 | 03-Oct-10 | 03-Oct-10 |
| End of period | 05-Feb-11 | 05-Feb-11 | 05-Feb-11 |

**1 . Receipts & Disbursements**

| | Forecast | Actuals | Variances |
|---|---|---|---|
| **Receipts** | | | |
| Collection of Accounts Receivable | 2.7 | 5.1 | 2.4 |
| Other Receipts | 203.9 | 210.6 | 6.7 |
| TSA Recoveries from Buyer | 43.8 | 53.0 | 9.2 |
| Payroll & AP reimbursement from Buyers | 10.8 | 8.6 | (2.2) |
| Intercompany Receipts | 17.5 | 14.3 | (3.2) |
| **Total Receipts** | 278.6 | 291.6 | 13.0 |
| **Disbursements** | | | |
| Payroll (Gross) | 23.0 | 20.8 | 2.2 |
| Benefits | 12.4 | 11.3 | 1.1 |
| Pension | - | - | - |
| Inventory Purchases | - | 3.7 | (3.7) |
| Non-Inventory Purchases | 36.2 | 48.2 | (12.0) |
| Payroll & AP payments on behalf of Buyers | 10.8 | 8.6 | 2.2 |
| Intercompany Disbursements | 83.9 | 80.4 | 3.5 |
| Restructuring Costs | 29.6 | 32.8 | (3.2) |
| **Total Disbursements** | 195.9 | 205.9 | (10.0) |
| **Net Cash Flow** | 82.7 | 85.6 | 3.0 |
| FX Impact | - | 5.4 | 5.4 |
| **Opening Available Cash Balance** | 189.6 | 189.6 | - |
| **Closing Available Cash Balance** | 272.3 | 280.7 | 8.4 |
| Unavailable Cash | 237.7 | 237.7 | - |
| **Total Cash** | 510.0 | 518.4 | 8.4 |
| Restricted Cash | 44.4 | 40.9 | (3.5) |
| **Total Cash + Restricted Cash** | 554.4 | 559.3 | 4.9 |

222

APPENDIX B

**Nortel Networks - February 6, 2011**
**CCAA Applicants**
**Forecast Cash Flow**
USD (Millions)

## 1. Receipts & Disbursements

| | Total Forecast |
|---|---|
| **Receipts** | |
| Collections of Accounts Receivable | 0.4 |
| Other Receipts | 10.0 |
| TSA Recoveries from Buyout | 37.0 |
| Intercompany Receipts | |
| **Total Receipts** | 67.4 |
| **Disbursements** | |
| Payroll (Gross) | 31.6 |
| Benefits | 5.1 |
| Pension | |
| Inventory Purchases | 2.5 |
| Non-Inventory Purchases | 21.6 |
| Intercompany Disbursements | 12.8 |
| Restructuring Costs | 31.8 |
| **Total Disbursements** | 105.4 |
| **Net Cash Flow** | F |
| **Opening Available Cash Balance** | 280.7 |
| **Closing Available Cash Balance** | 247.7 |
| **Unavailable Cash** | 297.1 |
| **Total Cash** | 478.6 |
| **Restricted Cash** | 40.9 |
| **Total Cash + Restricted Cash** | 520.2 |

# BLUE SHEET

Court File No. 09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS***
***ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF**
**COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,**
**NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS**
**INTERNATIONAL CORPORATION AND NORTEL NETWORKS**
**TECHNOLOGY CORPORATION**

**SEVENTIETH REPORT OF THE MONITOR**
**DATED JUNE 24, 2011**

**INTRODUCTION**

1.  On January 14, 2009 (the "Filing Date"), Nortel Networks Corporation ("NNC"
    and collectively with all its subsidiaries "Nortel" or the "Company"), Nortel
    Networks Limited ("NNL"), Nortel Networks Technology Corporation ("NNTC"),
    Nortel Networks International Corporation and Nortel Networks Global
    Corporation (collectively the "Applicants") filed for and obtained protection under
    the Companies' Creditors Arrangement Act ("CCAA"). Pursuant to the Order of
    this Honourable Court dated January 14, 2009, as amended and restated (the "Initial
    Order"), Ernst & Young Inc. was appointed as the Monitor of the Applicants (the
    "Monitor") in the CCAA proceedings. The stay of proceedings was extended to
    June 30, 2011 by this Honourable Court in its Order dated February 25, 2011.

2.  Nortel Networks Inc. ("NNI") and certain of its U.S. subsidiaries and affiliates
    concurrently filed voluntary petitions under Chapter 11 of the U.S. Bankruptcy
    Code (the "Code") in the United States Bankruptcy Court for the District of
    Delaware (the "U.S. Court") on January 14, 2009 (the "Chapter 11 Proceedings").

225

APPENDIX A

## Nortel Networks - February 6 to June 4, 2011
## CCAA Applicants
### Forecast Cash Flow - Variances
USD (Millions)

### 1 - Receipts & Disbursements

| | Forecast | Actuals | Variances |
|---|---|---|---|
| Start of period / End of period | 06-Feb-11 / 04-Jun-11 | 06-Feb-11 / 04-Jun-11 | 06-Feb-11 / 04-Jun-11 |
| **Receipts** | | | |
| Collection of Accounts Receivable | 0.4 | 5.0 | 4.6 |
| Other Receipts | 30.0 | 3.4 | (26.6) |
| TSA Recoveries from Buyer | 32.9 | 34.7 | 1.8 |
| Payroll & AP reimbursement from Buyers | - | 0.1 | 0.1 |
| Intercompany Receipts | - | 8.4 | 8.4 |
| **Total Receipts** | 63.3 | 51.6 | (11.7) |
| **Disbursements** | | | |
| Payroll (Gross) | 30.4 | 32.6 | (2.2) |
| Benefits | 4.6 | 5.9 | (1.3) |
| Pension | - | - | - |
| Inventory Purchases | 2.0 | 0.7 | 1.3 |
| Non-Inventory Purchases | 17.9 | 20.2 | (2.3) |
| Payroll & AP Payments on behalf of Buyers | - | 0.1 | (0.1) |
| Intercompany Disbursements | 9.0 | 0.8 | 8.2 |
| Restructuring Costs | 26.6 | 26.1 | 0.5 |
| **Total Disbursements** | 90.5 | 86.4 | 4.1 |
| Net Cash Flow | (27.2) | (34.8) | (7.6) |
| FX Impact | - | 6.4 | 6.4 |
| Opening Available Cash Balance | 280.7 | 280.7 | - |
| Closing Available Cash Balance | 253.5 | 252.3 | (1.2) |
| Unavailable Cash | 237.7 | 239.1 | 1.4 |
| Total Cash | 491.2 | 491.4 | 0.2 |
| Restricted Cash | 40.9 | 38.0 | (2.9) |
| Total Cash + Restricted Cash | 532.1 | 529.4 | (2.7) |

226

**Nortel Networks – June 5, 2011**
**CCAA Applicants**
**Forecast Cash Flow**
USD ($Millions)

## 1. Receipts & Disbursements

| | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Jun 2011 | | | | Jul 2011 | | | | | Aug 2011 | | | | Sep 2011 | | |
| Start period | 05-Jun-11 | 12-Jun-11 | 19-Jun-11 | 26-Jun-11 | 03-Jul-11 | 10-Jul-11 | 17-Jul-11 | 24-Jul-11 | 31-Jul-11 | 07-Aug-11 | 14-Aug-11 | 21-Aug-11 | 28-Aug-11 | 04-Sep-11 | 11-Sep-11 | 18-Sep-11 |
| End period | 11-Jun-11 | 18-Jun-11 | 25-Jun-11 | 02-Jul-11 | 09-Jul-11 | 16-Jul-11 | 23-Jul-11 | 30-Jul-11 | 06-Aug-11 | 13-Aug-11 | 20-Aug-11 | 27-Aug-11 | 03-Sep-11 | 10-Sep-11 | 17-Sep-11 | 24-Sep-11 |
| **Receipts** | | | | | | | | | | | | | | | | |
| Collection of Accounts Receivable | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other Receipts | - | 0.1 | 0.1 | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Reimbursement from Buyers | 1.8 | 2.9 | 0.1 | - | - | - | - | - | - | - | 0.4 | - | - | 0.4 | - | 0.4 |
| Pension | - | - | - | - | - | - | - | - | - | - | 0.0 | - | - | 0.1 | - | 0.1 |
| Intercompany Receipts | - | - | - | - | - | 5.0 | 2.7 | 6.4 | 1.5 | - | - | - | - | - | - | - |
| **Total Receipts** | 1.3 | 3.0 | 0.1 | - | - | 5.0 | 2.7 | 7.9 | - | - | 2.6 | 3.1 | 1.0 | - | 2.5 | 8.4 |
| **Disbursements** | | | | | | | | | | | | | | | | |
| Payroll (Gross) | 0.7 | 7.0 | - | - | 1.0 | 0.4 | - | 0.4 | 3.9 | - | 0.4 | 0.4 | 0.4 | - | 0.4 | 0.4 |
| Benefits | 0.1 | 2.1 | 0.4 | - | - | 1.0 | - | - | - | - | 0.0 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 |
| Pension | - | - | 0.2 | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Inventory Purchases | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Non-Inventory Purchases | 0.5 | 0.5 | - | 0.4 | 0.4 | 1.5 | 0.4 | 0.4 | - | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 |
| Intercompany Disbursements | 0.1 | 1.6 | 0.5 | 0.1 | 0.1 | 0.1 | - | 0.1 | 2.9 | 0.1 | 0.1 | - | 4.7 | 0.1 | 0.1 | 0.0 |
| Restructuring Costs | 1.6 | 1.6 | 1.6 | 1.5 | 1.5 | 1.8 | 1.8 | 1.8 | 1.8 | 1.8 | 1.8 | 1.8 | 1.4 | 1.4 | 1.4 | 1.4 |
| **Total Disbursements** | 2.2 | 4.4 | 2.1 | 0.6 | 3.4 | 4.8 | 2.2 | 9.4 | - | 2.5 | 2.6 | 3.1 | 6.7 | - | 2.7 | 8.4 |
| **Net Cash Flow** | (0.9) | (1.4) | 0.9 | (0.6) | (3.4) | 0.2 | 0.5 | (1.5) | (2.5) | - | (0.0) | (0.5) | (0.0) | (3.9) | (0.2) | (0.0) |
| FX Impact | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Opening Available Cash Balance | 252.6 | 252.3 | 247.8 | 248.6 | 237.8 | 237.1 | 233.8 | 234.0 | 234.5 | 233.0 | 233.0 | 230.5 | 227.8 | 224.7 | 223.9 | 216.3 |
| Closing Available Cash Balance | 252.3 | 247.8 | 248.6 | 237.8 | 237.1 | 233.8 | 234.0 | 234.5 | 233.0 | 233.0 | 230.5 | 227.8 | 224.7 | 222.9 | 216.3 | 211.1 |
| LC & Shorefood Proceeds | 238.6 | 238.6 | 238.6 | 238.6 | 238.6 | 236.6 | 238.6 | 238.6 | 235.6 | 235.6 | 235.6 | 235.6 | 238.6 | 235.6 | 238.6 | 238.6 |
| **Total Cash** | 490.9 | 486.4 | 487.4 | 476.4 | 475.7 | 472.4 | 472.6 | 473.1 | 471.6 | 471.6 | 466.4 | 463.3 | 461.5 | 461.5 | 454.9 | 449.7 |
| Restricted Cash | 38.0 | 38.0 | 38.0 | 38.0 | 38.0 | 38.0 | 38.0 | 38.0 | 38.0 | 38.0 | 38.0 | 38.0 | 38.0 | 38.0 | 38.0 | 38.0 |
| **Total Cash + Restricted Cash** | 528.9 | 524.4 | 525.4 | 514.4 | 513.7 | 510.4 | 510.6 | 511.1 | 509.6 | 509.6 | 504.4 | 501.3 | 499.5 | 499.5 | 492.9 | 487.7 |

227

**Nortel Networks - June 5, 2011**
**CCAA Applicants**
**Forecast Cash Flow**
USD (Millions)

## 1. Receipts & Disbursements

| | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Oct 2011 | | | | | Nov 2011 | | | | | Dec 2011 | | | | |
| Start period | 25-Sep-11 | 02-Oct-11 | 09-Oct-11 | 16-Oct-11 | 23-Oct-11 | 30-Oct-11 | 06-Nov-11 | 13-Nov-11 | 20-Nov-11 | 27-Nov-11 | 04-Dec-11 | 11-Dec-11 | 18-Dec-11 | 25-Dec-11 | 05-Jun-11 |
| End period | 01-Oct-11 | 08-Oct-11 | 15-Oct-11 | 22-Oct-11 | 29-Oct-11 | 05-Nov-11 | 12-Nov-11 | 19-Nov-11 | 26-Nov-11 | 03-Dec-11 | 10-Dec-11 | 17-Dec-11 | 24-Dec-11 | 31-Dec-11 | 31-Dec-11 |
| **Receipts** | | | | | | | | | | | | | | | |
| Collection of Accounts Receivable | | | | | | | | | | | | | | | 0.1 |
| Other Receipts | 30.0 | | | | | | | | | | | | | | 39.9 |
| Reimbursement from Buyers | 0.4 | | | | | | | | | | | | | | 13.1 |
| Intercompany Receipts | | | | | 0.7 | | | | | 0.3 | | | | | 9.8 |
| **Total Receipts** | 30.4 | - | - | - | 0.7 | - | - | - | - | 0.3 | - | - | - | - | 53.0 |
| **Disbursements** | | | | | | | | | | | | | | | |
| Payroll (Gross) | 4.8 | 0.3 | 0.3 | 0.3 | | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 1.1 | 18.2 |
| Benefits | 0.3 | 0.0 | 0.0 | 0.0 | 0.1 | 0.0 | 0.0 | | 0.1 | | 0.1 | | 0.0 | 0.1 | 9.7 |
| Pension | | | | | | | | | | | | | | | - |
| Inventory Purchases | | | | | | | | | | | | | | | - |
| Non-Inventory Purchases | 0.4 | 0.3 | 1.5 | 0.3 | | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 19.7 |
| Intercompany Disbursements | | 0.1 | | | | 0.1 | 0.1 | | | | 0.1 | | | | 14.3 |
| Restructuring Costs | 1.4 | 1.8 | 1.8 | 1.8 | | 1.8 | 1.8 | 1.8 | 1.8 | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 | 52.4 |
| **Total Disbursements** | 6.9 | 2.5 | 3.3 | 2.4 | 2.1 | 2.8 | 3.5 | 2.1 | 0.3 | 0.3 | 2.4 | 2.4 | 4.6 | 3.5 | 114.3 |
| **Net Cash Flow** | 23.5 | (2.5) | (3.3) | (2.4) | (1.4) | (2.8) | (3.5) | (2.1) | 0.0 | 0.3 | (2.4) | (2.4) | (2.4) | (2.5) | (61.4) |
| FX Impact | | | | | | | | | | | | | | | |
| Opening Available Cash Balance | 202.7 | 226.2 | 223.6 | 220.4 | 218.0 | 216.6 | 214.0 | 212.0 | 209.5 | 209.4 | 206.4 | 204.0 | 201.5 | 197.0 | 252.6 |
| Closing Available Cash Balance | 226.2 | 223.6 | 220.4 | 218.0 | 216.6 | 214.0 | 212.0 | 209.5 | 206.4 | 206.4 | 204.0 | 201.5 | 197.0 | 194.7 | 191.2 |
| LG & Standby/ord Proceeds | 238.5 | 238.6 | 238.6 | 238.6 | 238.6 | 238.6 | 238.6 | 238.6 | 238.6 | 238.6 | 238.6 | 238.6 | 238.6 | 238.6 | 238.5 |
| **Total Cash** | 464.8 | 462.2 | 459.0 | 456.6 | 455.2 | 452.6 | 450.6 | 447.1 | 445.0 | 445.0 | 442.6 | 440.2 | 435.6 | 433.3 | 429.8 |
| Restricted Cash | 38.0 | 38.0 | 38.0 | 38.0 | 38.0 | 38.0 | 38.0 | 38.0 | 38.0 | 38.0 | 38.0 | 38.0 | 38.0 | 38.0 | 38.0 |
| **Total Cash + Restricted Cash** | 502.8 | 502.7 | 497.0 | 494.6 | 493.2 | 490.6 | 488.6 | 485.1 | 483.0 | 483.0 | 480.6 | 478.2 | 473.6 | 471.3 | 467.8 |

# BLUE SHEET

Court File No. 09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS***
***ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF**
**COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,**
**NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS**
**INTERNATIONAL CORPORATION AND NORTEL NETWORKS**
**TECHNOLOGY CORPORATION**

**SEVENTY-EIGHTH REPORT OF THE MONITOR**
**DATED DECEMBER 7, 2011**

**INTRODUCTION**

1.    On January 14, 2009 (the "Filing Date"), Nortel Networks Corporation ("NNC"
and collectively with all its subsidiaries "Nortel" or the "Company"), Nortel
Networks Limited ("NNL"), Nortel Networks Technology Corporation ("NNTC"),
Nortel Networks International Corporation and Nortel Networks Global
Corporation (collectively the "Applicants") filed for and obtained protection under
the *Companies' Creditors Arrangement Act* ("CCAA"). Pursuant to the Order of
this Honourable Court dated January 14, 2009, as amended and restated (the "Initial
Order"), Ernst & Young Inc. was appointed as the Monitor of the Applicants (the
"Monitor") in the CCAA proceedings. The stay of proceedings was extended to
December 14, 2011 by this Honourable Court in its Order dated June 30, 2011.

2.    Nortel Networks Inc. ("NNI") and certain of its U.S. subsidiaries and affiliates
concurrently filed voluntary petitions under Chapter 11 of the U.S. Bankruptcy
Code (the "Code") in the United States Bankruptcy Court for the District of
Delaware (the "U.S. Court") on January 14, 2009 (the "Chapter 11 Proceedings").

APPENDIX A

**Nortel Networks - June 5 to November 26, 2011**
**CCAA Applicants**
**Forecast Cash Flow - Variances**
USD (Millions)

| | Forecast | Actuals | Variances |
|---|---|---|---|
| Start of period | 05-Jun-11 | 05-Jun-11 | 05-Jun-11 |
| End of period | 26-Nov-11 | 26-Nov-11 | 26-Nov-11 |

### 1. Receipts & Disbursements

**Receipts**

| | Forecast | Actuals | Variances |
|---|---|---|---|
| Collection of Accounts Receivable | 0.1 | 4.1 | 4.0 |
| Other Receipts | 30.0 | 62.1 | 32.1 |
| TSA Recoveries from Buyer | 12.8 | 25.6 | 12.8 |
| Payroll & AP reimbursement from Buyers | - | 0.2 | 0.2 |
| Intercompany Receipts | 9.8 | 52.3 | 42.5 |
| **Total Receipts** | **52.7** | **144.3** | **91.6** |

**Disbursements**

| | Forecast | Actuals | Variances |
|---|---|---|---|
| Payroll (Gross) | 16.6 | 15.4 | 1.1 |
| Benefits | 9.5 | 4.0 | 5.5 |
| Pension | - | - | - |
| Inventory Purchases | - | 0.1 | (0.1) |
| Non-Inventory Purchases | 16.3 | 16.2 | 0.1 |
| Payroll & AP payments on behalf of Buyers | - | 0.2 | (0.2) |
| Intercompany Disbursements | 14.2 | 6.2 | 8.1 |
| Restructuring Costs | 42.3 | 39.9 | 2.4 |
| **Total Disbursements** | **98.9** | **82.1** | **16.8** |
| **Net Cash Flow** | **(46.2)** | **62.2** | **108.4** |
| FX Impact | - | (4.8) | (4.8) |
| **Opening Available Cash Balance** | **252.6** | **252.6** | **-** |
| **Closing Available Cash Balance** | **206.4** | **310.1** | **103.5** |
| Unavailable Cash | 238.6 | 238.4 | (0.2) |
| **Total Cash** | **445.0** | **548.5** | **103.4** |
| Restricted Cash | 38.0 | 23.5 | (14.5) |
| **Total Cash + Restricted Cash** | **483.0** | **572.0** | **89.0** |

**Nortel Networks – November 27, 2011**
**CCAA Applicants**
**Forecast Cash Flow**
USD (millions)

232

APPENDIX B

**Nortel Networks - November 27, 2011**
**CCAA Applicants**
**Forecast Cash Flow**
USD (Millions)

| | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Start period | 18-Mar-12 | 25-Mar-12 | 01-Apr-12 | 08-Apr-12 | 15-Apr-12 | 22-Apr-12 | 29-Apr-12 | 06-May-12 | 13-May-12 | 20-May-12 | 27-May-12 | 03-Jun-12 | 10-Jun-12 | 17-Jun-12 | 24-Jun-12 | 27-Nov-11 |
| End period | 24-Mar-12 | 31-Mar-12 | 07-Apr-12 | 14-Apr-12 | 21-Apr-12 | 28-Apr-12 | 05-May-12 | 12-May-12 | 19-May-12 | 26-May-12 | 02-Jun-12 | 09-Jun-12 | 16-Jun-12 | 23-Jun-12 | 30-Jun-12 | 30-Jun-12 |
| **Receipts** | | | | | | | | | | | | | | | | |
| Collection of Accounts Receivable | 0.5 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 0.4 |
| Other Receipts | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 0.1 |
| Reimbursement from Buyers | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 10.1 |
| Intercompany Proceeds | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Receipts** | | | | | | | | | 9.8 | | | | | | | 10.6 |
| **Disbursements** | | | | | | | | | | | | | | | | |
| Payroll (Gross) | 0.6 | - | 0.3 | - | 0.6 | - | 0.2 | - | 0.2 | - | 0.2 | - | 0.2 | - | 0.4 | 20.5 |
| Benefits | - | - | 0.1 | - | - | - | - | - | - | - | - | - | 0.1 | - | - | 6.0 |
| Pension | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 5.5 |
| Inventory Purchases | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 11.7 |
| Non-Inventory Purchases | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 6.2 |
| Intercompany Disbursements | 7.7 | - | - | - | - | - | - | - | - | - | - | - | - | 0.1 | - | 62.9 |
| Restructuring Costs | 2.1 | 2.1 | 2.5 | 2.5 | 2.5 | 2.5 | 2.0 | 2.0 | 2.0 | 2.0 | 2.0 | 2.5 | 2.5 | 2.5 | 2.5 | - |
| **Total Disbursements** | 10.6 | 2.5 | 3.3 | 2.8 | 3.4 | 2.8 | 2.6 | 2.5 | 2.3 | 2.3 | 2.3 | 2.6 | 2.8 | 2.9 | 3.2 | 114.7 |
| **Net Cash Flow** | (10.0) | (2.5) | (3.3) | (2.8) | (3.4) | (2.8) | (2.6) | (2.5) | 7.5 | (2.3) | (0.2) | (2.6) | (2.8) | (2.9) | 3.2 | (104.1) |
| FX Impact | - | - | - | - | - | - | - | - | - | - | (0.2) | - | - | - | (3.2) | - |
| **Opening Available Cash Balance** | 245.1 | 235.5 | 233.0 | 229.7 | 226.9 | 223.5 | 220.6 | 218.1 | 215.6 | 223.1 | 220.7 | 218.4 | 218.1 | 215.3 | 212.2 | 316.1 |
| **Closing Available Cash Balance** | 235.5 | 233.0 | 229.7 | 226.9 | 223.5 | 220.6 | 218.1 | 215.6 | 223.1 | 220.7 | 218.4 | 215.3 | 212.2 | 209.3 | 208.0 | 208.0 |
| LG & Standard Process | 238.4 | 238.4 | 238.4 | 238.4 | 238.4 | 238.4 | 238.4 | 238.4 | 238.4 | 238.4 | 238.4 | 238.4 | 238.4 | 238.4 | 238.4 | 238.4 |
| **Total Cash** | 473.9 | 471.4 | 468.1 | 465.3 | 461.9 | 459.0 | 456.5 | 454.0 | 451.6 | 459.1 | 456.8 | 453.7 | 450.6 | 447.6 | 444.4 | 444.4 |
| Restricted Cash | 23.5 | 23.5 | 23.5 | 23.5 | 23.5 | 23.5 | 23.5 | 23.5 | 23.5 | 23.5 | 23.5 | 23.5 | 23.5 | 23.5 | 23.5 | 23.5 |
| **Total Cash + Restricted Cash** | 497.4 | 494.9 | 491.6 | 488.8 | 485.4 | 482.5 | 480.0 | 477.5 | 475.1 | 482.6 | 480.3 | 477.2 | 474.1 | 471.1 | 467.9 | 467.9 |

# BLUE SHEET

Court File No. 09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

IN THE MATTER OF THE *COMPANIES' CREDITORS*
*ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF
COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL
NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL
CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

EIGHTY-FOURTH REPORT OF THE MONITOR
DATED APRIL 5, 2012

## INTRODUCTION

1.     On January 14, 2009 (the "Filing Date"), Nortel Networks Corporation ("NNC" and collectively with all its subsidiaries "Nortel" or the "Company"), Nortel Networks Limited ("NNL"), Nortel Networks Technology Corporation ("NNTC"), Nortel Networks International Corporation and Nortel Networks Global Corporation (collectively the "Applicants") filed for and obtained protection under the *Companies' Creditors Arrangement Act* ("CCAA"). Pursuant to the Order of this Court dated January 14, 2009, as amended and restated (the "Initial Order"), Ernst & Young Inc. was appointed as the Monitor of the Applicants (the "Monitor") in the CCAA proceedings.  The stay of proceedings was extended to April 13, 2012 by this Court in its Order dated December 14, 2011.

2.     Nortel Networks Inc. ("NNI") and certain of its U.S. subsidiaries and affiliates concurrently filed voluntary petitions under Chapter 11 of the U.S. Bankruptcy Code (the "Code") in the United States Bankruptcy Court for the District of Delaware (the "U.S. Court") on January 14, 2009 (the "Chapter 11 Proceedings"). As required by U.S. law, an official committee of unsecured creditors (the "Committee") was established in January, 2009.

**Nortel Networks - November 27, 2011 to March 24, 2012**
**CCAA Applicants**
**Forecast Cash Flow - Variances**
USD (Millions)

| | Forecast | Actuals | Variances |
|---|---|---|---|
| Start of period | 27-Nov-11 | 27-Nov-11 | 27-Nov-11 |
| End of period | 24-Mar-12 | 24-Mar-12 | 24-Mar-12 |

## 1 : Receipts & Disbursements

**Receipts**

| | Forecast | Actuals | Variances |
|---|---|---|---|
| Collection of Accounts Receivable | - | 0.7 | 0.7 |
| Other Receipts | 0.4 | 1.5 | 1.1 |
| TSA Recoveries from Buyer | 0.1 | 0.3 | 0.2 |
| Payroll & AP reimbursement from Buyers | - | 0.1 | 0.1 |
| Intercompany Receipts | 0.3 | 5.3 | 5.0 |
| **Total Receipts** | **0.8** | **7.9** | **7.1** |

**Disbursements**

| | Forecast | Actuals | Variances |
|---|---|---|---|
| Payroll (Gross) | 18.2 | 20.3 | (2.1) |
| Benefits | 5.8 | 1.0 | 4.8 |
| Pension | - | - | - |
| Inventory Purchases | 5.5 | - | 5.5 |
| Non-Inventory Purchases | 6.6 | 6.4 | 0.2 |
| Payroll & AP payments on behalf of Buyers | - | 0.1 | (0.1) |
| Intercompany Disbursements | 8.1 | 5.6 | 2.5 |
| Restructuring Costs | 31.2 | 17.5 | 13.7 |
| **Total Disbursements** | **75.4** | **50.9** | **24.5** |
| **Net Cash Flow** | **(74.6)** | **(43.0)** | **31.6** |
| FX Impact | - | 2.0 | 2.0 |
| **Opening Available Cash Balance** | **310.1** | **310.1** | **-** |
| **Closing Available Cash Balance** | **235.5** | **269.1** | **33.6** |
| Unavailable Cash | 238.4 | 238.5 | 0.1 |
| **Total Cash** | **473.9** | **507.6** | **33.7** |
| Restricted Cash | 23.5 | 23.3 | (0.2) |
| **Total Cash + Restricted Cash** | **497.4** | **530.9** | **33.5** |

## Nortel Networks - March 25, 2012
### CCAA Applicants
### Forecast Cash Flow
USD (Millions)

| | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Apr 2012 | | | | | May 2012 | | | | | |
| Start period | 25-Mar-12 | 01-Apr-12 | 08-Apr-12 | 15-Apr-12 | 22-Apr-12 | 29-Apr-12 | 01-May-12 | 06-May-12 | 13-May-12 | 20-May-12 | 27-May-12 | 01-Jun-12 | 03-Jun-12 |
| End period | 31-Mar-12 | 07-Apr-12 | 14-Apr-12 | 21-Apr-12 | 28-Apr-12 | 30-Apr-12 | 05-May-12 | 12-May-12 | 19-May-12 | 26-May-12 | 31-May-12 | 02-Jun-12 | 09-Jun-12 |
| **Receipts** | | | | | | | | | | | | | |
| Collection of Accounts Receivable | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other Receipts | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Reimbursement from Buyers | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Intercompany Receipts | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Receipts** | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Disbursements** | | | | | | | | | | | | | |
| Payroll (Gross) | - | 0.3 | - | 0.6 | - | - | 0.2 | - | 0.2 | - | - | 0.2 | - |
| Benefits | - | 0.1 | - | - | - | - | - | - | - | - | - | - | - |
| Pension | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Inventory Purchases | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Non-Inventory Purchases | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | - | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | - | 0.4 |
| Intercompany Disbursements | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Restructuring Costs | 2.1 | 2.1 | 2.1 | 2.1 | 2.1 | - | 1.7 | 1.7 | 1.7 | 1.7 | 1.7 | - | 2.1 |
| **Total Disbursements** | 2.5 | 2.9 | 2.5 | 3.1 | 2.5 | - | 2.3 | 2.1 | 2.3 | 2.1 | 2.1 | 0.2 | 2.5 |
| Net Cash Flow | (2.5) | (2.9) | (2.5) | (3.1) | (2.5) | - | (2.3) | (2.1) | (2.3) | (2.1) | (2.1) | (0.2) | (2.5) |
| FX Impact | | | | | | | | | | | | | |
| **Opening Available Cash Balance** | 258.1 | 255.6 | 263.7 | 261.2 | 258.1 | 255.6 | 255.6 | 253.3 | 251.2 | 248.9 | 246.8 | 244.7 | 244.5 |
| **Closing Available Cash Balance** | 255.6 | 253.7 | 261.2 | 258.1 | 255.6 | 255.6 | 253.3 | 251.2 | 248.9 | 246.8 | 244.7 | 244.5 | 242.0 |
| LG & Standberd Proceeds | 238.5 | 238.5 | 238.5 | 238.5 | 238.5 | 238.5 | 238.5 | 238.5 | 238.5 | 238.5 | 238.5 | 238.5 | 238.5 |
| **Total Cash** | 505.1 | 502.2 | 499.7 | 496.6 | 494.1 | 494.1 | 491.8 | 489.7 | 487.4 | 485.3 | 483.2 | 483.0 | 480.5 |
| Restricted Cash | 23.3 | 23.3 | 23.3 | 23.3 | 23.3 | 23.3 | 23.3 | 23.3 | 23.3 | 23.3 | 23.3 | 23.3 | 23.3 |
| **Total Cash + Restricted Cash** | 528.4 | 525.5 | 523.0 | 519.9 | 517.4 | 517.4 | 515.1 | 513.0 | 510.7 | 508.6 | 506.5 | 506.3 | 503.8 |

237

APPENDIX B

## Nortel Networks - March 25, 2012
### CCAA Applicants
### Forecast Cash Flow
USD (Millions)

| | Jun 2012 | | | Jul 2012 | | | | | Forecast |
|---|---|---|---|---|---|---|---|---|---|
| **Start of period** | 10-Jun-12 | 17-Jun-12 | 24-Jun-12 | 01-Jul-12 | 08-Jul-12 | 15-Jul-12 | 22-Jul-12 | 29-Jul-12 | 25-Mar-12 |
| **End of period** | 16-Jun-12 | 23-Jun-12 | 30-Jun-12 | 07-Jul-12 | 14-Jul-12 | 21-Jul-12 | 28-Jul-12 | 31-Jul-12 | 31-Jul-12 |
| **Receipts** | | | | | | | | | |
| Collection of Accounts Receivable | - | - | - | - | - | - | - | - | - |
| Other Receipts | - | - | - | - | - | - | - | - | - |
| Reimbursement from Buyers | - | - | - | - | - | - | - | - | - |
| Intercompany Receipts | - | - | 11.2 | - | - | - | - | - | 11.2 |
| **Total Receipts** | - | - | 11.2 | - | - | - | - | - | 11.2 |
| **Disbursements** | | | | | | | | | |
| Payroll (Gross) | 0.2 | - | 0.3 | 0.3 | 0.2 | - | 0.2 | 0.2 | 2.4 |
| Benefits | 0.1 | - | - | - | - | - | 0.3 | 0.3 | 0.5 |
| Pension | - | - | - | - | - | - | - | - | - |
| Inventory Purchases | - | - | - | - | - | - | - | - | - |
| Non-Inventory Purchases | 0.4 | 0.4 | 0.4 | 0.3 | 0.3 | 0.3 | 6.6 | 6.6 | 5.5 |
| Intercompany Disbursements | 0.1 | 0.1 | 0.1 | - | - | - | 0.3 | 0.3 | 0.1 |
| Restructuring Costs | 2.1 | 2.1 | 2.1 | 2.2 | 2.2 | 2.2 | 2.2 | 2.2 | 36.2 |
| **Total Disbursements** | 2.8 | 2.6 | 2.8 | 2.5 | 2.7 | 2.5 | 9.5 | - | 51.5 |
| **Net Cash Flow** | (2.8) | (2.6) | 8.4 | (2.5) | (2.7) | (2.5) | (8.5) | - | (40.3) |
| FX Impact | | | | | | | | | |
| **Opening Available Cash Balance** | 242.0 | 239.2 | 236.6 | 245.0 | 242.5 | 239.8 | 237.3 | 228.8 | 266.1 |
| **Closing Available Cash Balance** | 239.2 | 236.6 | 245.0 | 242.5 | 239.8 | 237.3 | 228.8 | 228.8 | 228.8 |
| LG & Shorthand Proceeds | 238.5 | 238.5 | 238.5 | 238.5 | 238.5 | 238.5 | 238.5 | 238.5 | 238.5 |
| **Total Cash** | 477.7 | 475.1 | 483.5 | 481.0 | 478.3 | 475.8 | 467.3 | 467.3 | 467.3 |
| Restricted Cash | 23.3 | 23.3 | 23.3 | 23.3 | 23.3 | 23.3 | 23.3 | 23.3 | 23.3 |
| **Total Cash + Restricted Cash** | 501.0 | 498.4 | 506.8 | 504.3 | 501.6 | 499.1 | 490.6 | 490.6 | 490.6 |

# BLUE SHEET

Court File No. 09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS***
***ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF**
**COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL**
**NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL**
**CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION**

**EIGHTY-SEVENTH REPORT OF THE MONITOR**
**DATED JULY 19, 2012**

**INTRODUCTION**

1.  On January 14, 2009 (the "Filing Date"), Nortel Networks Corporation ("NNC" and
    collectively with all its subsidiaries "Nortel" or the "Company"), Nortel Networks Limited
    ("NNL"), Nortel Networks Technology Corporation ("NNTC"), Nortel Networks
    International Corporation and Nortel Networks Global Corporation (collectively the
    "Applicants") filed for and obtained protection under the *Companies' Creditors
    Arrangement Act* ("CCAA"). Pursuant to the Order of this Court dated January 14, 2009,
    as amended and restated (the "Initial Order"), Ernst & Young Inc. was appointed as the
    Monitor of the Applicants (the "Monitor") in the CCAA proceedings.  The stay of
    proceedings was extended to July 31, 2012 by this Court in its Order dated April 13, 2012.

2.  Nortel Networks Inc. ("NNI") and certain of its U.S. subsidiaries and affiliates
    concurrently filed voluntary petitions under Chapter 11 of the U.S. Bankruptcy Code (the
    "Code") in the United States Bankruptcy Court for the District of Delaware (the "U.S.
    Court") on January 14, 2009 (the "Chapter 11 Proceedings").  As required by U.S. law, an
    official committee of unsecured creditors (the "Committee") was established in January,
    2009.

**Nortel Networks - March 25 to June 30, 2012**
**CCAA Applicants**
**Forecast Cash Flow - Variances**
USD (Millions)

| | Forecast | Actuals | Variances |
|---|---|---|---|
| Start of period | 25-Mar-12 | 25-Mar-12 | 25-Mar-12 |
| End of period | 30-Jun-12 | 30-Jun-12 | 30-Jun-12 |

## 1 . Receipts & Disbursements

| | Forecast | Actuals | Variances |
|---|---|---|---|
| **Receipts** | | | |
| Collection of Accounts Receivable | - | - | - |
| Other Receipts | - | 1.0 | 1.0 |
| TSA Recoveries from Buyer | - | 0.3 | 0.3 |
| Payroll & AP reimbursement from Buyers | - | - | - |
| Intercompany Receipts | 11.2 | 12.2 | 1.0 |
| **Total Receipts** | 11.2 | 13.5 | 2.3 |
| **Disbursements** | | | |
| Payroll (Gross) | 2.0 | 2.8 | (0.8) |
| Benefits | 0.2 | 0.5 | (0.3) |
| Pension | - | - | - |
| Inventory Purchases | - | - | - |
| Non-Inventory Purchases | 5.6 | 4.3 | 1.3 |
| Payroll & AP payments on behalf of Buyers | - | - | - |
| Intercompany Disbursements | 0.1 | 0.4 | (0.3) |
| Restructuring Costs | 27.4 | 12.1 | 15.3 |
| **Total Disbursements** | 35.3 | 20.1 | 15.2 |
| **Net Cash Flow** | (24.1) | (6.6) | 17.5 |
| FX Impact | - | (6.3) | (6.3) |
| **Opening Available Cash Balance** | 269.1 | 269.1 | - |
| **Closing Available Cash Balance** | 245.0 | 256.2 | 11.2 |
| Unavailable Cash | 238.5 | 238.2 | (0.3) |
| **Total Cash** | 483.5 | 494.4 | 10.9 |
| Restricted Cash | 23.3 | 21.9 | (1.4) |
| **Total Cash + Restricted Cash** | 505.8 | 516.3 | 9.5 |

241

APPENDIX B

# Nortel Networks – July 1, 2012
## CCAA Applicants
## Forecast Cash Flow
USD (Millions)

| | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Jul 2012 | | | | | Aug 2012 | | | |
| Start of period | 01-Jul-12 | 08-Jul-12 | 15-Jul-12 | 22-Jul-12 | 29-Jul-12 | 01-Aug-12 | 05-Aug-12 | 12-Aug-12 | 19-Aug-12 | 26-Aug-12 | 01-Sep-12 |
| End of period | 07-Jul-12 | 14-Jul-12 | 21-Jul-12 | 28-Jul-12 | 31-Jul-12 | 04-Aug-12 | 11-Aug-12 | 18-Aug-12 | 25-Aug-12 | 31-Aug-12 | 01-Sep-12 |
| **Receipts** | | | | | | | | | | | |
| Collection of Accounts Receivable | - | - | - | - | - | - | - | - | - | - | - |
| Other Receipts | - | - | - | - | - | - | - | - | - | - | - |
| Reimbursement from Buyers | - | - | - | - | - | - | - | - | - | - | - |
| Intercompany Receipts | - | - | - | - | - | - | 11.6 | - | - | - | - |
| **Total Receipts** | - | - | - | - | - | - | 11.6 | - | - | - | - |
| **Disbursements** | | | | | | | | | | | |
| Payroll (Gross) | - | 0.2 | - | 0.2 | - | - | 0.2 | - | 0.2 | - | - |
| Benefits | - | - | - | - | - | - | - | - | - | - | - |
| Pension | - | - | - | - | - | - | - | - | - | - | - |
| Inventory Purchases | - | - | - | - | - | - | - | - | - | - | - |
| Non-Inventory Purchases | 0.3 | 0.3 | 0.3 | 0.3 | - | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | - |
| Intercompany Disbursements | 1.0 | 1.0 | 1.0 | 1.0 | - | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | - |
| Restructuring Costs | - | - | - | - | - | - | - | - | - | - | - |
| **Total Disbursements** | 1.3 | 1.5 | 1.3 | 1.5 | - | 1.3 | 1.5 | 1.3 | 1.5 | 1.3 | - |
| **Net Cash Flow** | (1.3) | (1.5) | (1.3) | (1.5) | - | (1.3) | 10.1 | (1.3) | (1.5) | (1.3) | - |
| FX Impact | - | - | - | - | - | - | - | - | - | - | - |
| Opening Available Cash Balance | 256.2 | 254.9 | 253.4 | 252.1 | 250.6 | 250.6 | 249.3 | 259.4 | 258.1 | 256.6 | 255.3 |
| Closing Available Cash Balance | 254.9 | 253.4 | 252.1 | 250.6 | 250.6 | 249.3 | 259.4 | 258.1 | 256.6 | 255.3 | 255.3 |
| LG & Standfeed Proceeds | 238.2 | 238.2 | 238.2 | 238.2 | 238.2 | 238.2 | 238.2 | 238.2 | 238.2 | 238.2 | 238.2 |
| **Total Cash** | 493.1 | 491.6 | 490.3 | 488.8 | 488.8 | 487.5 | 497.6 | 496.3 | 494.8 | 493.5 | 493.5 |
| Restricted Cash | 21.9 | 21.9 | 21.9 | 21.9 | 21.9 | 21.9 | 21.9 | 21.9 | 21.9 | 21.9 | 21.9 |
| **Total Cash + Restricted Cash** | 515.0 | 513.5 | 512.2 | 510.7 | 510.7 | 509.4 | 519.5 | 518.2 | 516.7 | 515.4 | 515.4 |

48

242

APPENDIX B

## Nortel Networks - July 1, 2012
## CCAA Applicants
### Forecast Cash Flow
USD (Millions)

| | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Sept 2012 | | | | | Oct 2012 | | | | | |
| Start of period | 02-Sep-12 | 09-Sep-12 | 16-Sep-12 | 23-Sep-12 | 30-Sep-12 | 01-Oct-12 | 07-Oct-12 | 14-Oct-12 | 21-Oct-12 | 28-Oct-12 | 01-Jul-12 |
| End of period | 08-Sep-12 | 15-Sep-12 | 22-Sep-12 | 29-Sep-12 | 30-Sep-12 | 06-Oct-12 | 13-Oct-12 | 20-Oct-12 | 27-Oct-12 | 31-Oct-12 | 31-Oct-12 |
| **Receipts** | | | | | | | | | | | |
| Collection of Accounts Receivable | - | - | - | - | - | - | - | - | - | - | - |
| Other Receipts | - | - | - | - | - | - | - | - | - | - | - |
| Reimbursement from Buyers | - | - | - | - | - | - | - | - | - | - | - |
| Intercompany Receipts | - | - | - | - | - | - | - | - | - | 1.3 | 12.9 |
| **Total Receipts** | - | - | - | - | - | - | - | - | - | 1.3 | 12.9 |
| **Disbursements** | | | | | | | | | | | |
| Payroll (Gross) | 0.2 | | 0.8 | | | 0.2 | | 0.2 | 0.2 | 0.2 | 2.4 |
| Benefits | | | 0.1 | | | | | | | | 0.3 |
| Pension | | | | | | | | | | | |
| Inventory Purchases | | | | | | | | | | 5.5 | 5.5 |
| Non-Inventory Purchases | 0.3 | 0.3 | 0.3 | 0.3 | | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 5.4 |
| Intercompany Disbursements | | | | | | | | | | 1.5 | 1.5 |
| Restructuring Costs | 1.2 | 1.2 | 1.2 | 1.2 | | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 | 19.8 |
| **Total Disbursements** | 1.7 | 1.5 | 2.4 | 1.5 | | 1.7 | 1.5 | 1.7 | 1.7 | 8.7 | 34.9 |
| **Net Cash Flow** | (1.7) | (1.5) | (2.4) | (1.5) | - | (1.7) | (1.5) | (1.7) | (1.7) | (7.4) | (22.0) |
| FX Impact | | | | | | | | | | | |
| Opening Available Cash Balance | 255.3 | 253.6 | 252.1 | 249.7 | 248.2 | 248.2 | 246.5 | 245.0 | 243.3 | 241.6 | 256.2 |
| Closing Available Cash Balance | 253.6 | 252.1 | 249.7 | 248.2 | 248.2 | 246.5 | 245.0 | 243.3 | 241.6 | 234.2 | 234.2 |
| LG & Standfeed Proceeds | 238.2 | 238.2 | 238.2 | 238.2 | 238.2 | 238.2 | 238.2 | 238.2 | 238.2 | 238.2 | 238.2 |
| **Total Cash** | 491.8 | 490.3 | 487.9 | 486.4 | 486.4 | 484.7 | 483.2 | 481.5 | 479.8 | 472.4 | 472.4 |
| Restricted Cash | 21.9 | 21.9 | 21.9 | 21.9 | 21.9 | 21.9 | 21.9 | 21.9 | 21.9 | 21.9 | 21.9 |
| **Total Cash + Restricted Cash** | 513.7 | 512.2 | 509.8 | 508.3 | 508.3 | 506.6 | 505.1 | 503.4 | 501.7 | 494.3 | 494.3 |

# BLUE SHEET

Court File No. 09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS***
***ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF**
**COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL**
**NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL**
**CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION**

**EIGHTY-NINTH REPORT OF THE MONITOR**
**DATED OCTOBER 24, 2012**

**INTRODUCTION**

1.  On January 14, 2009 (the "Filing Date"), Nortel Networks Corporation ("NNC" and collectively with all its subsidiaries "Nortel" or the "Company"), Nortel Networks Limited ("NNL"), Nortel Networks Technology Corporation ("NNTC"), Nortel Networks International Corporation and Nortel Networks Global Corporation (collectively the "Applicants") filed for and obtained protection under the *Companies' Creditors Arrangement Act* ("CCAA"). Pursuant to the Order of this Court dated January 14, 2009, as amended and restated (the "Initial Order"), Ernst & Young Inc. was appointed as the Monitor of the Applicants (the "Monitor") in the CCAA proceedings. The stay of proceedings was extended to October 31, 2012 by this Court in its Order dated July 27, 2012.

2.  Nortel Networks Inc. ("NNI") and certain of its U.S. subsidiaries and affiliates concurrently filed voluntary petitions under Chapter 11 of the U.S. Bankruptcy Code (the "Code") in the United States Bankruptcy Court for the District of Delaware (the "U.S. Court") on January 14, 2009 (the "Chapter 11 Proceedings"). As required by U.S. law, an official committee of unsecured creditors (the "Committee") was established in January, 2009.

1

**Nortel Networks - July 1 to October 13, 2012**
**CCAA Applicants**
**Forecast Cash Flow - Variances**
USD (Millions)

| | Forecast | Actuals | Variances |
|---|---|---|---|
| Start of period | 01-Jul-12 | 01-Jul-12 | 01-Jul-12 |
| End of period | 13-Oct-12 | 13-Oct-12 | 13-Oct-12 |

**1 . Receipts & Disbursements**

| | Forecast | Actuals | Variances |
|---|---|---|---|
| **Receipts** | | | |
| Net Intercompany Receipts | 11.6 | 15.9 | 4.3 |
| **Total Receipts** | 11.6 | 15.9 | 4.3 |
| **Disbursements** | | | |
| Payroll (Gross) | 2.0 | 2.8 | (0.8) |
| Benefits | 0.1 | 0.3 | (0.2) |
| Non-Inventory Purchases | 4.5 | 2.0 | 2.5 |
| Net Intercompany Disbursements | - | - | - |
| Restructuring Costs | 16.2 | 11.1 | 5.1 |
| **Total Disbursements** | 22.8 | 16.2 | 6.6 |
| **Net Cash Flow** | (11.2) | (0.3) | 10.9 |
| FX Impact | - | 8.5 | 8.5 |
| **Opening Available Cash Balance** | 256.2 | 256.2 | - |
| **Closing Available Cash Balance** | 245.0 | 264.4 | 19.4 |
| Unavailable Cash | 238.2 | 238.7 | 0.5 |
| Total Cash | 483.2 | 503.1 | 19.9 |
| Restricted Cash | 21.9 | 22.4 | 0.5 |
| Total Cash + Restricted Cash | 505.1 | 525.5 | 20.4 |

246

APPENDIX B

**Nortel Networks - October 14, 2012**
**CCAA Applicants**
**Forecast Cash Flow**
USD ($Millions)

| | | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Oct 2012 | | | | Nov 2012 | | | | | Dec 2012 | |
| | Start of period | 14-Oct-12 | 21-Oct-12 | 28-Oct-12 | 01-Nov-12 | 04-Nov-12 | 11-Nov-12 | 18-Nov-12 | 25-Nov-12 | 01-Dec-12 | 02-Dec-12 | 09-Dec-12 |
| | End of period | 20-Oct-12 | 27-Oct-12 | 31-Oct-12 | 03-Nov-12 | 10-Nov-12 | 17-Nov-12 | 24-Nov-12 | 30-Nov-12 | 01-Dec-12 | 08-Dec-12 | 15-Dec-12 |
| **Receipts** | | | | | | | | | | | | |
| Other Receipts | | - | - | - | - | - | 2.5 | - | - | - | - | - |
| Net Intercompany Receipts | | - | - | - | - | - | 3.3 | - | - | - | - | - |
| **Total Receipts** | | - | - | - | - | - | 5.8 | - | - | - | - | - |
| **Disbursements** | | | | | | | | | | | | |
| Payroll (Gross) | | 0.3 | - | - | 0.3 | - | 0.2 | - | 0.7 | - | - | 0.2 |
| Benefits | | 0.1 | 0.2 | - | - | - | - | - | 0.1 | - | - | - |
| Inventory Purchases | | - | - | - | - | - | - | - | - | - | - | - |
| Non-Inventory Purchases | | 0.2 | - | 0.2 | - | 0.2 | 0.2 | 0.2 | 0.2 | - | 0.2 | 0.2 |
| Net Intercompany Disbursements | | - | - | - | - | - | - | - | - | - | - | - |
| Restructuring Costs | | 1.0 | 1.0 | 1.0 | - | 0.9 | 0.9 | 0.9 | 0.9 | - | 0.9 | 0.9 |
| **Total Disbursements** | | 1.6 | 1.2 | 1.2 | 0.3 | 1.1 | 1.3 | 1.1 | 1.9 | - | 1.1 | 1.3 |
| Net Cash Flow | | (1.6) | (1.2) | (1.2) | (0.3) | (1.1) | 4.5 | (1.1) | (1.9) | - | (1.1) | (1.3) |
| FX Impact | | - | - | - | - | - | - | - | - | - | - | - |
| Opening Available Cash Balance | | 264.4 | 262.8 | 261.6 | 260.4 | 260.1 | 259.0 | 263.5 | 262.4 | 260.5 | 260.5 | 259.4 |
| Closing Available Cash Balance | | 262.8 | 261.6 | 260.4 | 260.1 | 259.0 | 263.5 | 262.4 | 260.5 | 260.5 | 259.4 | 258.1 |
| LG & Standard Proceeds | | 238.7 | 238.7 | 238.7 | 238.7 | 238.7 | 238.7 | 238.7 | 238.7 | 238.7 | 238.7 | 238.7 |
| **Total Cash** | | 501.5 | 500.3 | 499.1 | 498.8 | 497.7 | 502.2 | 501.1 | 499.2 | 499.2 | 498.1 | 496.8 |
| Restricted Cash | | 22.4 | 22.4 | 22.4 | 22.4 | 22.4 | 22.4 | 22.4 | 22.4 | 22.4 | 22.4 | 22.4 |
| **Total Cash + Restricted Cash** | | 523.9 | 522.7 | 521.5 | 521.2 | 520.1 | 524.6 | 523.5 | 521.6 | 521.6 | 520.5 | 519.2 |

247

APPENDIX B

**Nortel Networks - October 14, 2012**
**CCAA Applicants**
Forecast Cash Flow
USD (Millions)

| | Forecast 16-Dec-12 / 22-Dec-12 | Forecast 23-Dec-12 / 29-Dec-12 | Forecast 30-Dec-12 / 31-Dec-12 | Forecast 01-Jan-13 / 05-Jan-13 | Forecast 06-Jan-13 / 12-Jan-13 | Forecast Jan 2013 13-Jan-13 / 19-Jan-13 | Forecast 20-Jan-13 / 26-Jan-13 | Forecast 27-Jan-13 / 31-Jan-13 | Forecast 01-Feb-13 / 02-Feb-13 | Forecast 14-Oct-12 / 02-Feb-13 |
|---|---|---|---|---|---|---|---|---|---|---|
| Start of period / End of period | | | | | | | | | | |
| **Receipts** | | | | | | | | | | |
| Other Receipts | - | - | - | - | - | - | - | - | - | 2.5 |
| Net Intercompany Receipts | - | - | - | - | - | - | - | - | - | 3.3 |
| **Total Receipts** | - | - | - | - | - | - | - | - | - | 5.8 |
| **Disbursements** | | | | | | | | | | |
| Payroll (Gross) | - | 0.4 | - | - | 0.9 | - | 3.1 | - | - | 6.1 |
| Benefits | - | 0.1 | - | - | 0.1 | - | 0.2 | - | - | 0.6 |
| Inventory Purchases | - | - | - | - | - | - | - | 5.5 | - | 5.5 |
| Non-Inventory Purchases | 0.1 | 0.1 | - | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | - | 2.5 |
| Net Intercompany Disbursements | - | - | - | - | - | - | - | - | - | 14.2 |
| Restructuring Costs | 0.9 | 0.9 | - | 0.8 | 0.8 | 0.8 | 0.8 | 0.8 | - | 14.2 |
| **Total Disbursements** | 1.0 | 1.5 | - | 0.9 | 1.9 | 0.9 | 4.2 | 6.4 | - | 28.9 |
| **Net Cash Flow** | (1.0) | (1.5) | - | (0.9) | (1.9) | (0.9) | (4.2) | (6.4) | - | (23.1) |
| FX Impact | | | | | | | | | | |
| Opening Available Cash Balance | 258.1 | 257.1 | 255.6 | 255.6 | 254.7 | 252.8 | 251.9 | 247.7 | 241.3 | 264.4 |
| Closing Available Cash Balance | 257.1 | 255.6 | 255.6 | 254.7 | 252.8 | 251.9 | 247.7 | 241.3 | 241.3 | 241.3 |
| L&G Stranded Proceeds | 238.7 | 238.7 | 238.7 | 238.7 | 238.7 | 238.7 | 238.7 | 238.7 | 238.7 | 238.7 |
| **Total Cash** | 495.8 | 494.3 | 494.3 | 493.4 | 491.5 | 490.6 | 486.4 | 480.0 | 480.0 | 480.0 |
| Restricted Cash | 22.4 | 22.4 | 22.4 | 22.4 | 22.4 | 22.4 | 22.4 | 22.4 | 22.4 | 22.4 |
| **Total Cash + Restricted Cash** | 518.2 | 516.7 | 516.7 | 515.8 | 513.9 | 513.0 | 508.8 | 502.4 | 502.4 | 502.4 |

# BLUE SHEET

Court File No. 09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

IN THE MATTER OF THE *COMPANIES' CREDITORS*
*ARRANGEMENT ACT,* R.S.C. 1985, c. C-36, AS AMENDED

**AND IN THE MATTER OF A PLAN OF**
**COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL**
**NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL**
**CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION**

**NINETY-FIRST REPORT OF THE MONITOR**
**DATED JANUARY 25, 2013**

**INTRODUCTION**

1.   On January 14, 2009 (the "Filing Date"), Nortel Networks Corporation ("NNC" and
collectively with all its subsidiaries "Nortel" or the "Company"), Nortel Networks Limited
("NNL"), Nortel Networks Technology Corporation ("NNTC"), Nortel Networks
International Corporation and Nortel Networks Global Corporation (collectively the
"Applicants") filed for and obtained protection under the *Companies' Creditors*
*Arrangement Act* ("CCAA"). Pursuant to the Order of this Court dated January 14, 2009,
as amended and restated (the "Initial Order"), Ernst & Young Inc. was appointed as the
Monitor of the Applicants (the "Monitor") in the CCAA proceedings. The stay of
proceedings was extended to February 2, 2013 by this Court in its Order dated October 30,
2012.

2.   Nortel Networks Inc. ("NNI") and certain of its U.S. subsidiaries and affiliates
concurrently filed voluntary petitions under Chapter 11 of the U.S. Bankruptcy Code (the
"Code") in the United States Bankruptcy Court for the District of Delaware (the "U.S.
Court") on January 14, 2009 (the "Chapter 11 Proceedings"). As required by U.S. law, an
official committee of unsecured creditors (the "Committee") was established in January,
2009.

**Nortel Networks - October 14, 2012 to January 12, 2013**
**CCAA Applicants**
Forecast Cash Flow - Variances
USD (Millions)

|  | Forecast | Actuals | Variances |
|---|---|---|---|
| Start of period | 14-Oct-12 | 14-Oct-12 | 14-Oct-12 |
| End of period | 12-Jan-13 | 12-Jan-13 | 12-Jan-13 |
| **1 . Receipts & Disbursements** | | | |
| **Receipts** | | | |
| Other Receipts | 2.5 | 2.7 | 0.2 |
| Net Intercompany Receipts | 3.3 | 11.1 | 7.8 |
| **Total Receipts** | 5.8 | 13.8 | 8.0 |
| **Disbursements** | | | |
| Payroll (Gross) | 3.0 | 2.7 | 0.3 |
| Benefits | 0.4 | 4.3 | (3.9) |
| Non-Inventory Purchases | 2.2 | 1.1 | 1.1 |
| Net Intercompany Disbursements | - | 0.1 | (0.1) |
| Restructuring Costs | 11.8 | 10.2 | 1.6 |
| **Total Disbursements** | 17.4 | 18.4 | (1.0) |
| **Net Cash Flow** | (11.6) | (4.6) | 7.0 |
| FX Impact | - | (2.3) | (2.3) |
| **Opening Available Cash Balance** | 264.4 | 264.4 | - |
| **Closing Available Cash Balance** | 252.8 | 257.5 | 4.7 |
| Unavailable Cash | 238.7 | 238.5 | (0.2) |
| Total Cash | 491.5 | 496.0 | 4.5 |
| Restricted Cash | 22.4 | 22.2 | (0.2) |
| Total Cash + Restricted Cash | 513.9 | 518.2 | 4.3 |

APPENDIX B

**Nortel Networks – January 13, 2013**
**CCAA Applicants**
**Forecast Cash Flow**
USD (Million)

| | Jan 2013 | | | | Feb 2013 | | | | | | Mar 2013 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast |
| Start of period | 13-Jan-13 | 20-Jan-13 | 27-Jan-13 | 01-Feb-13 | 03-Feb-13 | 10-Feb-13 | 17-Feb-13 | 24-Feb-13 | 01-Mar-13 | 03-Mar-13 | 10-Mar-13 |
| End of period | 19-Jan-13 | 26-Jan-13 | 31-Jan-13 | 02-Feb-13 | 09-Feb-13 | 15-Feb-13 | 23-Feb-13 | 28-Feb-13 | 02-Mar-13 | 09-Mar-13 | 16-Mar-13 |
| **Receipts** | | | | | | | | | | | |
| Other Receipts | - | - | - | - | - | - | - | - | - | - | - |
| Net Intercompany Receipts | - | 0.5 | - | - | - | - | - | - | - | - | - |
| **Total Receipts** | - | 0.5 | - | - | - | - | - | - | - | - | - |
| **Disbursements** | | | | | | | | | | | |
| Payroll (Gross) | - | 0.3 | - | - | 3.3 | - | 0.2 | - | - | 0.1 | - |
| Benefits | - | - | - | - | 0.3 | - | 0.1 | - | - | - | - |
| Inventory Purchases | - | - | - | - | - | - | - | - | - | - | - |
| Non-Inventory Purchases | 0.1 | 0.2 | 0.2 | - | 0.2 | 0.2 | 0.1 | 0.1 | - | 0.2 | 0.2 |
| Net Intercompany Disbursements | - | - | - | - | - | - | - | - | - | - | - |
| Restructuring Costs | 0.9 | 0.9 | 0.9 | - | 0.9 | 0.9 | 0.9 | 0.9 | - | 0.9 | 0.9 |
| **Total Disbursements** | 1.0 | 1.4 | 1.1 | - | 4.7 | 1.1 | 1.3 | 1.0 | - | 1.2 | 1.1 |
| **Net Cash Flow** | (1.0) | (0.9) | (1.1) | - | (4.7) | (1.1) | (1.3) | (1.0) | - | (1.2) | (1.1) |
| FX Impact | | | | | | | | | | | |
| Opening Available Cash Balance | 257.5 | 256.5 | 255.6 | 254.5 | 254.5 | 248.8 | 248.7 | 247.4 | 246.4 | 246.4 | 245.2 |
| Closing Available Cash Balance | 256.5 | 255.6 | 254.5 | 254.5 | 248.8 | 248.7 | 247.4 | 246.4 | 246.4 | 245.2 | 244.1 |
| LG & Short-hand Proceeds | 238.5 | 238.5 | 238.5 | 238.5 | 238.5 | 238.5 | 238.5 | 238.5 | 238.5 | 238.5 | 238.5 |
| Total Cash | 495.0 | 494.1 | 493.0 | 493.0 | 488.3 | 487.2 | 485.9 | 484.9 | 484.9 | 483.7 | 482.6 |
| Restricted Cash | 22.2 | 22.2 | 22.2 | 22.2 | 22.2 | 22.2 | 22.2 | 22.2 | 22.2 | 22.2 | 22.2 |
| Total Cash + Restricted Cash | 517.2 | 516.3 | 515.2 | 515.2 | 510.5 | 509.4 | 508.1 | 507.1 | 507.1 | 505.9 | 504.8 |

252

APPENDIX B

**Nortel Networks - January 13, 2013**
**CCAA Applicants**
Forecast Cash Flow
USD Millions

| | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast (Apr 2013) | Forecast | Forecast | Forecast | Forecast |
|---|---|---|---|---|---|---|---|---|---|---|
| Start of period | 17-Mar-13 | 24-Mar-13 | 31-Mar-13 | 01-Apr-13 | 07-Apr-13 | 14-Apr-13 | 21-Apr-13 | 28-Apr-13 | 01-May-13 | 13-Jan-13 |
| End of period | 23-Mar-13 | 30-Mar-13 | 31-Mar-13 | 06-Apr-13 | 13-Apr-13 | 20-Apr-13 | 27-Apr-13 | 30-Apr-13 | 04-May-13 | 04-May-13 |
| **Receipts** | | | | | | | | | | |
| Other Receipts | - | 1.4 | - | - | - | - | - | - | - | 1.4 |
| Net Intercompany Receipts | - | - | - | - | - | - | - | - | - | 0.5 |
| **Total Receipts** | - | 1.4 | - | - | - | - | - | - | - | 1.9 |
| **Disbursements** | | | | | | | | | | |
| Payroll (Gross) | 0.1 | - | - | 0.1 | - | 0.1 | - | - | 0.1 | 4.3 |
| Benefits | 0.1 | - | - | - | - | - | - | - | - | 0.5 |
| Inventory Purchases | - | - | - | - | - | - | - | - | 5.5 | 5.5 |
| Non-Inventory Purchases | 0.1 | 0.1 | - | 0.2 | 0.2 | 0.2 | 0.2 | - | 0.2 | 2.7 |
| Net Intercompany Disbursements | - | - | - | - | - | - | - | - | - | - |
| Restructuring Costs | 0.9 | 0.9 | - | 0.9 | 0.9 | 0.9 | 0.9 | - | 0.9 | 14.4 |
| **Total Disbursements** | 1.2 | 1.0 | - | 1.2 | 1.1 | 1.2 | 1.1 | - | 6.7 | 27.4 |
| **Net Cash Flow** | (1.2) | 0.4 | - | (1.2) | (1.1) | (1.2) | (1.1) | - | (6.7) | (25.5) |
| FX Impact | - | - | - | - | - | - | - | - | - | - |
| **Opening Available Cash Balance** | 244.1 | 242.9 | 243.3 | 243.3 | 242.1 | 241.0 | 239.8 | 238.7 | 238.7 | 257.5 |
| **Closing Available Cash Balance** | 242.9 | 243.3 | 243.3 | 242.1 | 241.0 | 239.8 | 238.7 | 238.7 | 232.0 | 232.0 |
| LG & Standstill Proceeds | 238.5 | 238.5 | 238.5 | 238.5 | 238.5 | 238.5 | 238.5 | 238.5 | 238.5 | 238.5 |
| **Total Cash** | 481.4 | 481.8 | 481.8 | 480.6 | 479.5 | 478.3 | 477.2 | 477.2 | 470.5 | 470.5 |
| Restricted Cash | 22.2 | 22.2 | 22.2 | 22.2 | 22.2 | 22.2 | 22.2 | 22.2 | 22.2 | 22.2 |
| **Total Cash + Restricted Cash** | 503.6 | 504.0 | 504.0 | 502.8 | 501.7 | 500.5 | 499.4 | 499.4 | 492.7 | 492.7 |

# BLUE SHEET

Court File No. 09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS***
***ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF**
**COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL**
**NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL**
**CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION**

**NINETY-FOURTH REPORT OF THE MONITOR**
**DATED APRIL 25, 2013**

**INTRODUCTION**

1.   On January 14, 2009 (the "Filing Date"), Nortel Networks Corporation ("NNC" and
collectively with all its subsidiaries "Nortel" or the "Company"), Nortel Networks Limited
("NNL"), Nortel Networks Technology Corporation ("NNTC"), Nortel Networks
International Corporation and Nortel Networks Global Corporation (collectively the
"Applicants") filed for and obtained protection under the *Companies' Creditors
Arrangement Act* ("CCAA"). Pursuant to the Order of this Court dated January 14, 2009,
as amended and restated (the "Initial Order"), Ernst & Young Inc. was appointed as the
Monitor of the Applicants (the "Monitor") in the CCAA proceedings.   The stay of
proceedings was extended to May 3, 2013 by this Court in its Order dated January 31,
2013.

2.   Nortel Networks Inc. ("NNI") and certain of its U.S. subsidiaries and affiliates
concurrently filed voluntary petitions under Chapter 11 of the U.S. Bankruptcy Code (the
"Code") in the United States Bankruptcy Court for the District of Delaware (the "U.S.
Court") on January 14, 2009 (the "Chapter 11 Proceedings"). As required by U.S. law, an
official committee of unsecured creditors (the "Committee") was established in January,
2009.

**Nortel Networks - January 13, 2013 to April 13, 2013**
**CCAA Applicants**
**Forecast Cash Flow - Variances**
USD (Millions)

| | Forecast | Actuals | Variances |
|---|---|---|---|
| Start of period | 13-Jan-13 | 13-Jan-13 | 13-Jan-13 |
| End of period | 13-Apr-13 | 13-Apr-13 | 13-Apr-13 |

**1. Receipts & Disbursements**

| | Forecast | Actuals | Variances |
|---|---|---|---|
| **Receipts** | | | |
| Other Receipts | 1.4 | 1.6 | 0.2 |
| Net Intercompany Receipts | 0.5 | 1.4 | 0.9 |
| **Total Receipts** | 1.9 | 3.0 | 1.1 |
| **Disbursements** | | | |
| Payroll (Gross) | 4.1 | 4.1 | |
| Benefits | 0.5 | 0.1 | 0.4 |
| Non-Inventory Purchases | 2.1 | 1.2 | 0.9 |
| Net Intercompany Disbursements | - | - | |
| Restructuring Costs | 11.7 | 13.9 | (2.2) |
| **Total Disbursements** | 18.4 | 19.3 | (0.9) |
| **Net Cash Flow** | (16.5) | (16.3) | 0.2 |
| FX Impact | - | (3.5) | (3.5) |
| **Opening Available Cash Balance** | 257.5 | 257.5 | - |
| **Closing Available Cash Balance** | 241.0 | 237.7 | (3.3) |
| Unavailable Cash | 238.5 | 238.3 | (0.2) |
| **Total Cash** | 479.5 | 476.0 | (3.5) |
| Restricted Cash | 22.2 | 22.0 | (0.2) |
| **Total Cash + Restricted Cash** | 501.7 | 498.0 | (3.7) |

256

APPENDIX B

**Nortel Networks - April 14, 2013**
**CCAA Applicants**
**Forecast Cash Flow**
USD (millions)

| | Forecast Apr-2013 | Forecast | Forecast | Forecast May-13 | Forecast | Forecast | Forecast | Forecast Jun-13 | Forecast | Forecast | Forecast | Forecast |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Start of period | 14-Apr-13 | 21-Apr-13 | 28-Apr-13 | 05-May-13 | 12-May-13 | 19-May-13 | 26-May-13 | 02-Jun-13 | 09-Jun-13 | 16-Jun-13 | 23-Jun-13 | 30-Jun-13 |
| End of period | 20-Apr-13 | 27-Apr-13 | 04-May-13 | 11-May-13 | 18-May-13 | 25-May-13 | 01-Jun-13 | 08-Jun-13 | 15-Jun-13 | 22-Jun-13 | 29-Jun-13 | 06-Jul-13 |
| **Receipts** | | | | | | | | | | | | |
| Other Receipts | - | - | - | - | - | - | - | - | - | - | - | - |
| Net Intercompany Receipts | 5.2 | - | - | - | - | - | - | - | - | - | 1.6 | - |
| **Total Receipts** | 5.2 | - | - | - | - | - | - | - | - | - | 1.6 | - |
| **Disbursements** | | | | | | | | | | | | |
| Payroll (Gross) | 0.1 | - | 0.1 | - | 0.1 | - | 0.1 | - | 0.1 | - | 0.1 | - |
| Benefits | - | - | - | - | - | - | 0.1 | - | - | - | - | - |
| Inventory Purchases | - | - | - | - | - | - | - | - | - | - | - | - |
| Non-Inventory Purchases | 0.2 | 0.1 | 0.2 | 0.2 | 0.2 | 0.2 | 0.1 | 0.2 | 0.2 | 0.2 | 0.1 | 0.2 |
| Net Intercompany Disbursements | - | - | - | - | - | - | - | - | - | - | - | - |
| Restructuring Costs | 1.7 | 1.7 | 1.7 | 1.7 | 1.7 | 1.7 | 1.7 | 1.7 | 1.7 | 1.7 | 1.7 | 1.7 |
| **Total Disbursements** | 2.0 | 1.8 | 2.0 | 1.9 | 2.0 | 1.9 | 2.0 | 1.9 | 2.0 | 2.0 | 1.9 | 1.9 |
| **Net Cash Flow** | (2.0) | 3.4 | (2.0) | (1.9) | (2.0) | (1.9) | (2.0) | (1.9) | (2.0) | (1.9) | (0.3) | (1.9) |
| FX Impact | - | - | - | - | - | - | - | - | - | - | - | - |
| Opening Available Cash Balance | 237.7 | 235.7 | 239.1 | 237.1 | 235.2 | 233.2 | 231.3 | 229.3 | 227.4 | 225.4 | 223.5 | 223.2 |
| Closing Available Cash Balance | 235.7 | 239.1 | 237.1 | 235.2 | 233.2 | 231.3 | 229.3 | 227.4 | 225.4 | 223.5 | 223.2 | 221.3 |
| LG & Standbied Proceeds | 238.3 | 238.3 | 238.3 | 238.3 | 238.3 | 238.3 | 238.3 | 238.3 | 238.3 | 238.3 | 238.3 | 238.3 |
| **Total Cash** | 474.0 | 477.4 | 475.4 | 473.5 | 471.5 | 469.6 | 467.6 | 465.7 | 463.7 | 461.8 | 461.5 | 459.6 |
| Restricted Cash | 22.0 | 22.0 | 22.0 | 22.0 | 22.0 | 22.0 | 22.0 | 22.0 | 22.0 | 22.0 | 22.0 | 22.0 |
| **Total Cash + Restricted Cash** | 496.0 | 499.4 | 497.4 | 495.5 | 493.5 | 491.6 | 489.6 | 487.7 | 485.7 | 483.8 | 483.5 | 481.6 |

**Nortel Networks - April 14, 2013**
**CCAA Applicants**
**Forecast Cash Flow**
USD (Millions)

| | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Start of period | 07-Jul-13 | 14-Jul-13 | 21-Jul-13 | 28-Jul-13 | 04-Aug-13 | 11-Aug-13 | 18-Aug-13 | 25-Aug-13 | 01-Sep-13 | 08-Sep-13 | 15-Sep-13 | 22-Sep-13 |
| End of period | 13-Jul-13 | 20-Jul-13 | 27-Jul-13 | 03-Aug-13 | 10-Aug-13 | 17-Aug-13 | 24-Aug-13 | 31-Aug-13 | 07-Sep-13 | 14-Sep-13 | 21-Sep-13 | 28-Sep-13 |
| **Receipts** | | | | | | | | | | | | |
| Other Receipts | - | - | - | - | - | - | - | - | - | - | - | - |
| Net Intercompany Receipts | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Receipts** | - | - | - | - | - | - | - | - | - | - | - | - |
| **Disbursements** | | | | | | | | | | | | |
| Payroll (Gross) | 0.6 | - | - | - | - | - | - | - | - | - | - | - |
| Benefits | 0.1 | - | 0.1 | - | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | - |
| Inventory Purchases | - | - | - | - | - | - | - | - | - | - | - | - |
| Non-Inventory Purchases | 0.2 | 0.2 | 0.2 | 0.1 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.1 |
| Net Intercompany Disbursements | - | - | - | - | - | - | - | - | - | - | - | - |
| Restructuring Costs | 1.7 | 1.7 | 1.7 | 1.7 | 1.7 | 1.7 | 1.7 | 1.7 | 1.7 | 1.7 | 1.7 | 1.7 |
| **Total Disbursements** | 2.6 | 1.9 | 2.0 | 1.8 | 2.0 | 2.0 | 1.9 | 2.0 | 2.0 | 2.0 | 2.0 | 1.8 |
| **Net Cash Flow** | (2.6) | (1.9) | (2.0) | (1.8) | (2.0) | (2.0) | (1.9) | (2.0) | (2.0) | (2.0) | (2.0) | (1.8) |
| FX Impact | - | - | - | - | - | - | - | - | - | - | - | - |
| **Opening Available Cash Balance** | 221.3 | 218.7 | 216.8 | 214.8 | 213.0 | 211.0 | 209.1 | 207.1 | 205.3 | 203.3 | 201.4 | 199.4 |
| **Closing Available Cash Balance** | 218.7 | 216.8 | 214.8 | 213.0 | 211.0 | 209.1 | 207.1 | 205.3 | 203.3 | 201.4 | 199.4 | 197.6 |
| LG & Standbond Proceeds | 238.3 | 238.3 | 238.3 | 238.3 | 238.3 | 238.3 | 238.3 | 238.3 | 238.3 | 238.3 | 238.3 | 238.3 |
| **Total Cash** | 457.0 | 455.1 | 453.1 | 451.3 | 449.3 | 447.4 | 445.4 | 443.6 | 441.6 | 439.7 | 437.7 | 435.9 |
| Restricted Cash | 22.0 | 22.0 | 22.0 | 22.0 | 22.0 | 22.0 | 22.0 | 22.0 | 22.0 | 22.0 | 22.0 | 22.0 |
| **Total Cash + Restricted Cash** | 479.0 | 477.1 | 475.1 | 473.3 | 471.3 | 469.4 | 467.4 | 465.6 | 463.6 | 461.7 | 459.7 | 457.9 |

258

APPENDIX 3

**Nortel Networks - April 14, 2013**
**CCAA Applicants**
**Forecast Cash Flow**
USD Millions

|  | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  |  |  |  | Oct-13 |  |  | Nov-13 |  |  |  | Dec-13 | Dec-13 |
| Start period | 29-Sep-13 | 06-Oct-13 | 13-Oct-13 | 20-Oct-13 | 27-Oct-13 | 03-Nov-13 | 10-Nov-13 | 17-Nov-13 | 24-Nov-13 | 01-Dec-13 | 08-Dec-13 | 15-Dec-13 |
| End period | 05-Oct-13 | 12-Oct-13 | 19-Oct-13 | 26-Oct-13 | 02-Nov-13 | 09-Nov-13 | 16-Nov-13 | 23-Nov-13 | 30-Nov-13 | 07-Dec-13 | 14-Dec-13 | 21-Dec-13 |
| **Receipts** |  |  |  |  |  |  |  |  |  |  |  |  |
| Other Receipts | - | - | - | - | - | - | - | - | - | - | - | - |
| Net Intercompany Receipts | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Receipts** | - | - | - | - | - | - | - | - | - | - | - | - |
| **Disbursements** |  |  |  |  |  |  |  |  |  |  |  |  |
| Payroll (Gross) | 0.1 | - | 0.1 | - | - | 0.1 | - | - | 0.1 | - | 0.1 | - |
| Benefits | - | - | - | - | - | - | - | - | - | - | 0.1 | - |
| Inventory Purchases | - | - | - | - | - | - | - | - | - | - | - | - |
| Non-Inventory Purchases | 0.2 | 0.2 | 0.2 | 0.2 | 0.1 | 0.2 | 0.2 | 0.2 | 0.1 | 0.2 | 0.2 | 0.1 |
| Net Intercompany Disbursements | - | - | - | - | - | - | - | - | - | - | - | - |
| Restructuring Costs | 1.7 | 1.7 | 1.7 | 1.7 | 1.7 | 1.7 | 1.7 | 1.7 | 1.7 | 1.7 | 1.7 | 1.7 |
| **Total Disbursements** | 2.0 | 1.9 | 2.0 | 1.9 | 1.8 | 2.0 | 1.9 | 1.9 | 1.9 | 1.9 | 2.1 | 1.8 |
| **Net Cash Flow** | (2.0) | (1.9) | (2.0) | (1.9) | (1.8) | (2.0) | (1.9) | (1.9) | (1.9) | (1.9) | (2.1) | (1.8) |
| FX Impact | - | - | - | - | - | - | - | - | - | - | - | - |
| **Opening Available Cash Balance** | 197.8 | 195.6 | 193.7 | 191.7 | 189.8 | 188.0 | 186.0 | 184.1 | 182.2 | 180.3 | 178.4 | 176.3 |
| **Closing Available Cash Balance** | 195.6 | 193.7 | 191.7 | 189.8 | 188.0 | 186.0 | 184.1 | 182.2 | 180.3 | 178.4 | 176.3 | 174.5 |
| LG & Standbrid Proceeds | 238.3 | 238.3 | 238.3 | 238.3 | 238.3 | 238.3 | 238.3 | 238.3 | 238.3 | 238.3 | 238.3 | 238.3 |
| **Total Cash** | 433.9 | 432.0 | 430.0 | 428.1 | 426.3 | 424.3 | 422.4 | 420.5 | 418.6 | 416.7 | 414.6 | 412.8 |
| Restricted Cash | 22.0 | 22.0 | 22.0 | 22.0 | 22.0 | 22.0 | 22.0 | 22.0 | 22.0 | 22.0 | 22.0 | 22.0 |
| **Total Cash + Restricted Cash** | 455.9 | 454.0 | 452.0 | 450.1 | 448.3 | 446.3 | 444.4 | 442.5 | 440.6 | 438.7 | 436.6 | 434.8 |

259

**Nortel Networks - April 14, 2013**
**CCAA Applicants**
**Forecast Cash Flow**
USD million

| | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Jan-14 | | | | Feb-14 | | |
| Start of period | 22-Dec-13 | 29-Dec-13 | 05-Jan-14 | 12-Jan-14 | 19-Jan-14 | 26-Jan-14 | 02-Feb-14 | 09-Feb-14 | 16-Feb-14 | 23-Feb-14 | 14-Apr-13 |
| End of period | 28-Dec-13 | 04-Jan-14 | 11-Jan-14 | 18-Jan-14 | 25-Jan-14 | 01-Feb-14 | 08-Feb-14 | 15-Feb-14 | 22-Feb-14 | 01-Mar-14 | 01-Mar-14 |
| **Receipts** | | | | | | | | | | | |
| Other Receipts | - | - | - | - | - | - | - | - | - | - | 6.8 |
| Net Intercompany Receipts | - | - | - | - | - | - | - | - | - | - | - |
| **Total Receipts** | - | - | - | - | - | - | - | - | - | - | 6.8 |
| **Disbursements** | | | | | | | | | | | |
| Payroll (Gross) | 0.1 | - | - | - | 1.9 | - | - | - | - | - | 4.2 |
| Benefits | - | - | - | - | 0.1 | - | - | - | - | - | 0.4 |
| Inventory Purchases | - | - | - | - | - | - | - | - | - | 5.5 | 5.5 |
| Non-Inventory Purchases | - | 0.2 | 0.2 | 0.2 | 0.2 | 0.1 | 0.2 | 0.2 | 0.1 | 0.1 | 7.6 |
| Net Intercompany Disbursements | - | - | - | - | - | - | - | - | - | - | - |
| Restructuring Costs | - | 1.7 | 1.7 | 1.7 | 1.7 | 1.7 | 1.7 | 1.7 | 1.7 | 1.7 | 74.6 |
| **Total Disbursements** | 0.1 | 1.9 | 1.9 | 1.9 | 3.9 | 1.8 | 1.9 | 1.9 | 1.8 | 7.3 | 92.5 |
| **Net Cash Flow** | (0.1) | (1.9) | (1.9) | (1.9) | (3.9) | (1.8) | (1.9) | (1.9) | (1.8) | (7.3) | (85.7) |
| FX Impact | - | - | - | - | - | - | - | - | - | - | - |
| Opening Available Cash Balance | 174.5 | 174.4 | 174.4 | 172.5 | 170.6 | 166.7 | 164.9 | 163.0 | 161.1 | 159.3 | 237.7 |
| Closing Available Cash Balance | 174.4 | 174.4 | 172.5 | 170.6 | 166.7 | 164.9 | 163.0 | 161.1 | 159.3 | 152.0 | 152.0 |
| L&G & Strandherd Proceeds | 238.3 | 238.3 | 238.3 | 238.3 | 238.3 | 238.3 | 238.3 | 238.3 | 238.3 | 238.3 | 238.3 |
| **Total Cash** | 412.7 | 412.7 | 410.8 | 408.9 | 405.0 | 403.2 | 401.3 | 399.4 | 397.6 | 390.3 | 390.3 |
| Restricted Cash | 22.0 | 22.0 | 22.0 | 22.0 | 22.0 | 22.0 | 22.0 | 22.0 | 22.0 | 22.0 | 22.0 |
| **Total Cash + Restricted Cash** | 434.7 | 434.7 | 432.8 | 430.9 | 427.0 | 425.2 | 423.3 | 421.4 | 419.6 | 412.3 | 412.3 |

# BLUE SHEET

Court File No. 09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS***
***ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF**
**COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL**
**NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL**
**CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION**

**SUPPLEMENT TO THE NINETY-FOURTH REPORT OF THE MONITOR**
**DATED APRIL 30, 2013**

1.    This is a supplement to the Ninety-Fourth Report of the Monitor dated April 25, 2013.

2.    Further to the cash flow forecast of the Applicants attached as Appendix B to the Ninety-Fourth Report of the Monitor, the following chart provides further detail regarding the forecast weekly Restructuring Costs for the stay extension period from April 14 to October 31, 2013.

| Restructuring Costs (Inclusive of sales taxes)<br>(All figures In USD) | Apr 14, 2013 - Oct 31, 2013<br>Weekly Forecast |
|---|---|
| **Canadian Debtors, Directors and Officers Advisors** | |
| Davies Ward Phillips & Vineberg LLP (Environmental) | |
| Gowling Lafleur Henderson LLP | |
| Mercer Human Resources Co | |
| Norton Rose | |
| Osler Hoskin & Harcourt LLP | |
| Other Litigation Fees | |
| | 290,000 |
| **Monitor and Advisors** | |
| Allen & Overy LLP | |
| Ernst & Young Inc. | |
| Goodmans LLP | |
| | 910,000 |
| **Employee Advisors** | |
| 6038441 Canada Inc. (Financial Advisor) | |
| Koskie Minsky LLP | |
| Nelligan O'Brien Payne | |
| Shepell FGI | |
| Shibley Righton LLP | |
| The Segal Company Ltd | |
| | 200,000 |
| **Ad Hoc Bondholder Group Advisors** | |
| Bennett Jones LLP | |
| FTI Capital Advisors LLC | |
| Milbank Tweed Hadley & McCloy | |
| | 300,000 |
| **Total** | **1,700,000** |

All of which is respectfully submitted this 30th day of April, 2013.

**ERNST & YOUNG INC.**
**In its capacity as Monitor of the Applicants**
**and not in its personal capacity**

Per:
Murray A. McDonald
President

2

# BLUE SHEET

Court File No. 09-CL-7950

### *ONTARIO*
### SUPERIOR COURT OF JUSTICE
### (COMMERCIAL LIST)

### IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

### AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

### NINETY-EIGHTH REPORT OF THE MONITOR
### DATED OCTOBER 22, 2013

## INTRODUCTION

1.  On January 14, 2009 (the "Filing Date"), Nortel Networks Corporation ("NNC" and collectively with all its subsidiaries "Nortel" or the "Company"), Nortel Networks Limited ("NNL"), Nortel Networks Technology Corporation ("NNTC"), Nortel Networks International Corporation and Nortel Networks Global Corporation (collectively the "Applicants") filed for and obtained protection under the *Companies' Creditors Arrangement Act* ("CCAA"). Pursuant to the Order of this Court dated January 14, 2009, as amended and restated (the "Initial Order"), Ernst & Young Inc. was appointed as the Monitor of the Applicants (the "Monitor") in the CCAA proceedings. The stay of proceedings was extended to October 31, 2013 by this Court in its Order dated May 1, 2013.

2.  Nortel Networks Inc. ("NNI") and certain of its U.S. subsidiaries and affiliates concurrently filed voluntary petitions under Chapter 11 of the U.S. Bankruptcy Code (the "Code") in the United States Bankruptcy Court for the District of Delaware (the "U.S. Court") on January 14, 2009 (the "Chapter 11 Proceedings"). As required by U.S. law, an official committee of unsecured creditors (the "Committee") was established in January, 2009.

## Nortel Networks - April 14, 2013 to October 12, 2013
## CCAA Applicants
### Forecast Cash Flow - Variances
USD (Millions)

| | Forecast | Actuals | Variances |
|---|---|---|---|
| Start of period | 14-Apr-13 | 14-Apr-13 | 14-Apr-13 |
| End of period | 12-Oct-13 | 12-Oct-13 | 12-Oct-13 |

### 1 . Receipts & Disbursements

| | Forecast | Actuals | Variances |
|---|---|---|---|
| **Receipts** | | | |
| Other Receipts | - | 15.1 | 15.1 |
| Net Intercompany Receipts | 6.8 | 9.8 | 3.0 |
| **Total Receipts** | 6.8 | 24.9 | 18.1 |
| **Disbursements** | | | |
| Payroll (Gross) | 1.8 | 1.4 | 0.4 |
| Benefits | 0.2 | 0.2 | - |
| Non-Inventory Purchases | 4.6 | 2.5 | 2.1 |
| Net Intercompany Disbursements | - | - | - |
| Restructuring Costs - Advisor Fees | 44.2 | 43.9 | 0.3 |
| Restructuring Costs - Allocation Dispute Support Services | - | 11.2 | (11.2) |
| **Total Disbursements** | 50.8 | 59.2 | (8.4) |
| **Net Cash Flow** | (44.0) | (34.3) | 9.7 |
| FX Impact | - | (2.0) | (2.0) |
| **Opening Available Cash Balance** | 237.7 | 237.7 | - |
| **Closing Available Cash Balance** | 193.7 | 201.4 | 7.7 |
| Unavailable Cash | 238.3 | 238.2 | (0.1) |
| **Total Cash** | 432.0 | 439.6 | 7.6 |
| Restricted Cash | 22.0 | 21.3 | (0.7) |
| **Total Cash + Restricted Cash** | 454.0 | 460.9 | 6.9 |

266

**Nortel Networks - October 13, 2013**
**CCAA Applicants**
**Forecast Cash Flow**
US$ millions

| | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Ended | | | | | | | | | | | | | | |

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Receipts** | | | | | | | | | | | | | | |
| Other Receipts | | | | | | | | | | | | | | |
| Net Intercompany Receipts | | | | | | | | | | | | | | |
| **Total Receipts** | | | | | | | | | | | | | | |
| **Disbursements** | | | | | | | | | | | | | | |
| Payroll (Gross) | 0.1 | | | | 0.1 | | | | | | | | | 2.7 |
| Benefits | | | | | | | | | | | | | | |
| Inventory Purchases | | | | | | | | | | | | | 5.5 | 5.5 |
| Non-Inventory Purchases | 0.2 | 0.2 | | | 0.2 | | 0.1 | | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 2.4 |
| Net Intercompany Disbursements | | | | | | | | | | | | | | |
| Restructuring Costs - Advisor Fees | 2.2 | 2.2 | 2.2 | 2.2 | 2.2 | 2.2 | 2.2 | 2.2 | 2.2 | 2.2 | 2.2 | 2.2 | 2.2 | 35.2 |
| Restructuring Costs - Allocation Dispute Support Services | 0.8 | 0.8 | 0.8 | 0.8 | 0.8 | 0.8 | 0.8 | 0.8 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 11.3 |
| **Total Disbursements** | 3.3 | 3.2 | 3.3 | 3.2 | 3.2 | 3.3 | 3.4 | 3.2 | 3.1 | 2.7 | 2.8 | 2.9 | 8.3 | 57.3 |
| **Net Cash Flow** | (3.3) | (3.2) | (3.3) | (3.2) | (3.2) | (3.3) | (3.4) | (3.2) | (3.1) | (2.7) | (2.8) | (2.9) | (8.3) | (57.3) |
| FX Impact | | | | | | | | | | | | | | |
| Opening Available Cash Balance | 201.4 | 198.1 | 194.9 | 191.7 | 188.4 | 185.2 | 182.0 | 178.7 | 175.5 | 172.1 | 169.5 | 165.8 | 163.1 | 201.4 |
| Closing Available Cash Balance | 198.1 | 194.9 | 191.7 | 188.4 | 185.2 | 182.0 | 178.7 | 175.5 | 172.1 | 169.5 | 165.8 | 163.1 | 158.1 | 144.1 |
| IG & Strandfund Proceeds | 238.2 | 238.2 | 238.2 | 238.2 | 238.2 | 238.2 | 238.2 | 238.2 | 238.2 | 238.2 | 238.2 | 238.2 | 238.2 | 238.2 |
| **Total Cash** | 436.3 | 433.1 | 429.9 | 426.6 | 423.4 | 420.2 | 416.9 | 413.7 | 410.3 | 407.3 | 404.0 | 401.3 | 396.3 | 382.3 |
| Restricted Cash | 21.3 | 21.3 | 21.3 | 21.3 | 21.3 | 21.3 | 21.3 | 21.3 | 21.3 | 21.3 | 21.3 | 21.3 | 21.3 | 21.3 |
| **Total Cash + Restricted Cash** | 457.5 | 454.4 | 451.2 | 447.9 | 444.7 | 441.5 | 438.2 | 435.0 | 431.6 | 428.6 | 425.3 | 422.6 | 417.5 | 403.5 |

267

Nortel Networks
CCAA Applicants
Restructuring Costs – Advisor Fees, Allocation Dispute Support Services (inclusive of sales taxes)
All Figures in USD

| Restructuring Costs – Advisory Fees [All figures in USD] | Apr 14, 2013 - Oct 31, 2013 Weekly Forecast | Apr 14 - Oct 12, 2013 Total Forecast | Apr 14 - Oct 12, 2013 Total Actual | Oct 13, 2013 - Feb 1, 2014 Weekly Forecast | Oct 13, 2013 - Feb 1, 2014 Total Forecast |
|---|---|---|---|---|---|
| **Canadian Debtors, Directors and Officers Advisors** | | | | | |
| Davies Ward Phillips & Vineberg LLP (Environmental) | | | | | |
| Gowling Lafleur Henderson LLP | | | | | |
| Mercer Human Resources Co | | | | | |
| Norton Rose | | | | | |
| Osler Hoskin & Harcourt LLP | | | | | |
| Other Litigation Fees | | | | | |
| | 290,000 | 7,540,000 | 5,580,304 | 300,000 | 4,800,000 |
| **Monitor and Advisors** | | | | | |
| Allen & Overy LLP | | | | | |
| Ernst & Young Inc. | | | | | |
| Goodmans LLP | | | | | |
| | 910,000 | 23,660,000 | 23,549,882 | 1,340,000 | 21,440,000 |
| **Employee Advisors** | | | | | |
| 6838441 Canada Inc. (Financial Advisor) | | | | | |
| Koskie Minsky LLP | | | | | |
| Nelligan O'Brien Payne | | | | | |
| Shops FGI | | | | | |
| Shibley Righton LLP | | | | | |
| The Segal Company Ltd | | | | | |
| | 200,000 | 5,200,000 | 2,951,937 | 140,000 | 2,240,000 |
| **Ad Hoc Bondholder Group Advisors** | | | | | |
| Bennett Jones LLP | | | | | |
| FTI Capital Advisors LLC | | | | | |
| Milbank Tweed Hadley & McCloy | | | | | |
| | 300,000 | 7,800,000 | 11,444,627 | 420,000 | 6,720,000 |
| **Total** | 1,700,000 | 44,200,000 | 43,935,910 | 2,200,000 | 35,200,000 |
| | | | | | |
| **Restructuring Costs – Allocation Dispute Support Services** | | | | | |
| **Total¹** | - | - | 11,234,497 | 706,250 | 11,300,000 |

(1) Represents average weekly run-rate for the Forecast Period. The weekly run-rates for the periods October 13, 2013 - December 28, 2013 and December 29, 2013 - February 4, 2014 are $0.8 million and $0.5 million, respectively.

# BLUE SHEET

Court File No. 09-CL-7950

**ONTARIO**
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS***
***ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF**
**COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL**
**NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL**
**CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION**

**ONE HUNDRED AND FOURTH REPORT OF THE MONITOR**
**DATED MARCH 14, 2014**

**INTRODUCTION**

1.  On January 14, 2009 (the "Filing Date"), Nortel Networks Corporation ("NNC" and collectively with all its subsidiaries "Nortel" or the "Company"), Nortel Networks Limited ("NNL"), Nortel Networks Technology Corporation ("NNTC"), Nortel Networks International Corporation and Nortel Networks Global Corporation (collectively the "Applicants") filed for and obtained protection under the *Companies' Creditors Arrangement Act* ("CCAA"). Pursuant to the Order of this Court dated January 14, 2009, as amended and restated (the "Initial Order"), Ernst & Young Inc. was appointed as the Monitor of the Applicants (the "Monitor") in the CCAA proceedings. The stay of proceedings was extended to April 1, 2014 by this Court in its Order dated October 29, 2013.

2.  Nortel Networks Inc. ("NNI") and certain of its U.S. subsidiaries and affiliates concurrently filed voluntary petitions under Chapter 11 of the U.S. Bankruptcy Code (the "Code") in the United States Bankruptcy Court for the District of Delaware (the "U.S. Court") on January 14, 2009 (the "Chapter 11 Proceedings"). As required by U.S. law, an official committee of unsecured creditors (the "Committee") was established in January, 2009.

## Nortel Networks - January 19, 2014 to March 1, 2014
## CCAA Applicants
## Forecast Cash Flow - Variances
USD (Millions)

| | Forecast | Actuals | Variances |
|---|---|---|---|
| Start of period | 19-Jan-14 | 19-Jan-14 | 19-Jan-14 |
| End of period | 01-Mar-14 | 01-Mar-14 | 01-Mar-14 |

### 1 . Receipts & Disbursements

| | Forecast | Actuals | Variances |
|---|---|---|---|
| **Receipts** | | | |
| Other Receipts | - | 0.1 | 0.1 |
| Net Intercompany Receipts | - | 5.0 | 5.0 |
| **Total Receipts** | - | 5.1 | 5.1 |
| | | | |
| **Disbursements** | | | |
| Payroll (Gross) | 1.9 | 1.7 | 0.2 |
| Benefits | 0.2 | 0.1 | 0.1 |
| Non-Inventory Purchases | 0.6 | 0.1 | 0.5 |
| Net Intercompany Disbursements | - | - | - |
| Restructuring Costs - Advisor Fees | 15.0 | 11.2 | 3.8 |
| Restructuring Costs - Allocation Dispute Support Services | 3.6 | 2.8 | 0.8 |
| **Total Disbursements** | 21.3 | 16.0 | 5.4 |
| | | | |
| **Net Cash Flow** | (21.3) | (10.8) | 10.5 |
| FX Impact | - | (5.7) | (5.7) |
| | | | |
| **Opening Available Cash Balance** | 225.7 | 225.7 | - |
| | | | |
| **Closing Available Cash Balance** | 204.4 | 209.2 | 4.8 |
| | | | |
| Unavailable Cash | 238.0 | 237.6 | (0.4) |
| **Total Cash** | 442.4 | 446.8 | 4.4 |
| | | | |
| Restricted Cash | 20.9 | 20.4 | (0.5) |
| **Total Cash + Restricted Cash** | 463.3 | 467.2 | 3.9 |

274
APPENDIX 6

**Nortel Networks - March 2, 2014**
**CCAA Applicants**
**Forecast Cash Flow**
(US$ millions)

|  | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast |
|---|---|---|---|---|---|---|---|---|---|---|---|
|  |  | Mar-14 |  |  |  | Apr-14 |  |  |  |  | May-14 |
| Start of period | 02-Mar-14 | 09-Mar-14 | 16-Mar-14 | 23-Mar-14 | 30-Mar-14 | 06-Apr-14 | 13-Apr-14 | 20-Apr-14 | 27-Apr-14 | 04-May-14 | 11-May-14 |
| End of period | 08-Mar-14 | 15-Mar-14 | 22-Mar-14 | 29-Mar-14 | 05-Apr-14 | 12-Apr-14 | 19-Apr-14 | 26-Apr-14 | 03-May-14 | 10-May-14 | 17-May-14 |
| **Receipts** | | | | | | | | | | | |
| Other Receipts | - | - | - | - | - | - | - | - | - | - | - |
| Net Intercompany Receipts | - | - | - | - | - | - | - | - | - | - | - |
| **Total Receipts** | - | - | - | - | - | - | - | - | - | - | - |
| **Disbursements** | | | | | | | | | | | |
| Payroll (Gross) | 0.1 | - | 0.1 | - | 0.1 | - | 0.1 | - | 0.1 | - | 0.1 |
| Benefits | - | - | - | - | - | - | - | - | - | - | - |
| Inventory Purchases | - | - | - | - | - | - | - | - | - | - | - |
| Non-Inventory Purchases | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 |
| Net Intercompany Disbursements | - | - | - | - | - | - | - | - | - | - | - |
| Restructuring Costs - Advisor Fees | 2.5 | 2.5 | 2.5 | 2.5 | 2.5 | 2.5 | 2.5 | 2.5 | 2.5 | 2.5 | 2.5 |
| Restructuring Costs - Allocation Dispute Support Services | 0.6 | 0.6 | 0.6 | 0.6 | 0.6 | 0.6 | 0.6 | 0.6 | 0.6 | 0.6 | 0.6 |
| **Total Disbursements** | 3.3 | 3.2 | 3.3 | 3.2 | 3.3 | 3.2 | 3.3 | 3.2 | 3.3 | 3.2 | 3.3 |
| **Net Cash Flow** | (3.3) | (3.2) | (3.3) | (3.2) | (3.3) | (3.2) | (3.3) | (3.2) | (3.3) | (3.2) | (3.3) |
| FX Impact | - | - | - | - | - | - | - | - | - | - | - |
| Opening Available Cash Balance | 209.2 | 205.9 | 202.7 | 199.4 | 196.2 | 192.9 | 189.7 | 186.4 | 183.2 | 179.9 | 176.7 |
| Closing Available Cash Balance | 205.9 | 202.7 | 199.4 | 196.2 | 192.9 | 189.7 | 186.4 | 183.2 | 179.9 | 176.7 | 173.4 |
| I,G & Standalone Proceeds | 237.6 | 237.6 | 237.6 | 237.6 | 237.6 | 237.6 | 237.6 | 237.6 | 237.6 | 237.6 | 237.6 |
| **Total Cash** | 443.5 | 440.3 | 437.0 | 433.8 | 430.5 | 427.3 | 424.0 | 420.8 | 417.5 | 414.3 | 411.0 |
| Restricted Cash | 20.4 | 20.4 | 20.4 | 20.4 | 20.4 | 20.4 | 20.4 | 20.4 | 20.4 | 20.4 | 20.4 |
| **Total Cash + Restricted Cash** | 463.9 | 460.7 | 457.4 | 454.2 | 450.9 | 447.7 | 444.4 | 441.2 | 437.9 | 434.7 | 431.4 |

2778
APPENDIX 3

**Nortel Networks – March 2, 2014**
**CCAA Applicants**
**Forecast Cash Flow**
(in millions)

| | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Start of period | 18-May-14 | 25-May-14 | 01-Jun-14 | 08-Jun-14 | 15-Jun-14 | 22-Jun-14 | 29-Jun-14 | 06-Jul-14 | 13-Jul-14 | 20-Jul-14 | 27-Jul-14 |
| End of period | 24-May-14 | 31-May-14 | 07-Jun-14 | 14-Jun-14 | 21-Jun-14 | 28-Jun-14 | 05-Jul-14 | 12-Jul-14 | 19-Jul-14 | 26-Jul-14 | 02-Aug-14 |
| **Receipts** | | | | | | | | | | | |
| Other Receipts | - | - | - | - | - | - | - | - | - | - | - |
| Net Intercompany Receipts | - | - | - | - | - | - | - | - | - | - | - |
| **Total Receipts** | - | - | - | - | - | - | - | - | - | - | - |
| **Disbursements** | | | | | | | | | | | |
| Payroll (Gross) | - | 0.1 | - | 0.1 | - | 0.1 | - | 0.1 | - | 0.1 | - |
| Benefits | - | - | - | - | - | 0.1 | - | - | - | - | - |
| Inventory Purchases | - | - | - | - | - | - | - | - | - | - | - |
| Non-Inventory Purchases | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 |
| Net Intercompany Disbursements | 2.5 | 2.5 | 2.5 | 2.5 | 2.5 | 2.5 | 2.5 | 2.5 | 2.5 | 2.5 | 2.5 |
| Restructuring Costs - Advisor Fees | 0.6 | 0.6 | 0.6 | 0.6 | 0.6 | 0.6 | 0.6 | 0.6 | 0.6 | 0.6 | 0.6 |
| Restructuring Costs - Allocation Dispute Support Services | | | | | | | | | | | |
| **Total Disbursements** | 3.2 | 3.3 | 3.2 | 3.3 | 3.3 | 3.4 | 3.2 | 3.3 | 3.2 | 3.3 | 3.2 |
| Net Cash Flow | (3.2) | (3.3) | (3.2) | (3.3) | (3.3) | (3.4) | (3.2) | (3.3) | (3.2) | (3.3) | (3.2) |
| FX Impact | | | | | | | | | | | |
| Opening Available Cash Balance | 173.4 | 170.2 | 166.9 | 163.7 | 160.4 | 157.2 | 153.8 | 150.6 | 147.3 | 144.1 | 140.8 |
| Closing Available Cash Balance | 170.2 | 166.9 | 163.7 | 160.4 | 157.2 | 153.8 | 150.6 | 147.3 | 144.1 | 140.8 | 137.6 |
| LG & Standherd Proceeds | 237.6 | 237.6 | 237.6 | 237.6 | 237.6 | 237.6 | 237.6 | 237.6 | 237.6 | 237.6 | 237.6 |
| Total Cash | 407.8 | 404.5 | 401.3 | 398.0 | 394.8 | 391.4 | 388.2 | 384.9 | 381.7 | 378.4 | 375.2 |
| Restricted Cash | 20.4 | 20.4 | 20.4 | 20.4 | 20.4 | 20.4 | 20.4 | 20.4 | 20.4 | 20.4 | 20.4 |
| Total Cash + Restricted Cash | 428.2 | 424.9 | 421.7 | 418.4 | 415.2 | 411.8 | 408.6 | 405.3 | 402.1 | 398.8 | 395.6 |

272
APPENDICES

**Nortel Networks - March 2, 2014**
**CCAA Applicants**
**Forecast Cash Flow**
USD millions

| | | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Aug-14 | | | | | Sep-14 | | | |
| | Start of period | 03-Aug-14 | 10-Aug-14 | 17-Aug-14 | 24-Aug-14 | 31-Aug-14 | 07-Sep-14 | 14-Sep-14 | 21-Sep-14 | 28-Sep-14 | 02-Mar-14 |
| | End of period | 09-Aug-14 | 16-Aug-14 | 23-Aug-14 | 30-Aug-14 | 06-Sep-14 | 13-Sep-14 | 20-Sep-14 | 27-Sep-14 | 04-Oct-14 | 04-Oct-14 |
| **Receipts** | | | | | | | | | | | |
| Other Receipts | | - | - | - | - | - | - | - | - | - | 1.6 |
| Net Intercompany Receipts | | - | - | - | - | - | - | - | - | - | 0.2 |
| **Total Receipts** | | - | - | - | - | - | - | - | - | - | - |
| **Disbursements** | | | | | | | | | | | |
| Payroll (Gross) | | 0.1 | - | 0.1 | - | 0.1 | - | 0.1 | - | 0.1 | 1.6 |
| Benefits | | - | - | - | - | - | - | 0.1 | - | - | 0.2 |
| Inventory Purchases | - | - | - | - | - | - | - | - | - | - | - |
| Non-Inventory Purchases | | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 8.6 | 11.6 |
| Net Intercompany Disbursements | | 2.5 | 2.5 | 2.5 | 2.5 | 2.5 | 2.5 | 2.5 | 2.5 | 2.5 | 77.5 |
| Restructuring Costs - Advisor Fees | | 0.6 | 0.6 | 0.6 | 0.6 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 17.1 |
| Restructuring Costs - Allocation Dispute Support Services | | | | | | | | | | | |
| **Total Disbursements** | | 3.3 | 3.2 | 3.3 | 3.2 | 3.0 | 2.9 | 3.1 | 2.9 | 11.5 | 168.0 |
| **Net Cash Flow** | | (3.3) | (3.2) | (3.3) | (3.2) | (3.0) | (2.9) | (3.1) | (2.9) | (11.5) | (108.0) |
| FX Impact | | | | | | | | | | | |
| Opening Available Cash Balance | | 137.6 | 134.3 | 131.1 | 127.8 | 124.6 | 121.6 | 118.7 | 115.6 | 112.7 | 209.2 |
| Closing Available Cash Balance | | 134.3 | 131.1 | 127.8 | 124.6 | 121.6 | 118.7 | 115.6 | 112.7 | 101.2 | 101.2 |
| LG & Standhond Proceeds | | 237.6 | 237.6 | 237.6 | 237.6 | 237.6 | 237.6 | 237.6 | 237.6 | 237.6 | 237.6 |
| **Total Cash** | | 371.9 | 368.7 | 365.4 | 362.2 | 359.2 | 356.3 | 353.2 | 350.3 | 338.8 | 338.8 |
| Restricted Cash | | 20.4 | 20.4 | 20.4 | 20.4 | 20.4 | 20.4 | 20.4 | 20.4 | 20.4 | 20.4 |
| **Total Cash + Restricted Cash** | | 392.3 | 389.1 | 385.8 | 382.6 | 379.6 | 376.7 | 373.6 | 370.7 | 359.2 | 359.2 |