# Exhibit P

*IN RE: NORTEL NETWORKS INC., et al.*

---

*JOHN MCCONNELL*
*April 4, 2014*
*HIGHLY CONFIDENTIAL*

---



126 East 56th Street, Fifth Floor New York, New York 10022
PHONE: (212) 750-6434   FAX: (212) 750-1097
www.ELLENGRAUER.com

*Original File 106654.TXT*
*Min-U-Script® with Word Index*

Case 09-10138-MFW   Doc 17958-27   Filed 02/24/17   Page 3 of 77

IN RE: NORTEL NETWORKS INC., et al.   HIGHLY CONFIDENTIAL

JOHN MCCONNELL
April 4, 2014

Page 1

```
 1  UNITED STATES BANKRUPTCY COURT
 2  FOR THE DISTRICT OF DELAWARE
    ---------------------------------------X
 3  In re
 4       NORTEL NETWORKS INC., et al.,
 5                    Debtors.
 6  Chapter 11 Case No.: 09-10138(KG)
    ---------------------------------------X
 7  (CAPTION CONT'D ON FOLLOWING page)
 8
 9       * * * HIGHLY CONFIDENTIAL * * *
10
11                One Liberty Plaza
                  New York, New York
12
                  April 4, 2014
13                9:25 a.m.
14
15       VIDEOTAPED DEPOSITION of Expert Witness,
16  JOHN MCCONNELL, before Fran Insley, a Notary
17  Public of the States of New York and New
18  Jersey.
19
20
21
22
23       ELLEN GRAUER COURT REPORTING CO. LLC
            126 East 56th Street, Fifth Floor
24            New York, New York 10022
                  212-750-6434
25                Ref: 106654
```

Page 2

```
 1  (CAPTION CONT'D FROM PREVIOUS PAGE)
    ---------------------------------------X
 2                 - and -
 3       Court File No. 09-CL-7950
 4              ONTARIO
 5       SUPERIOR COURT OF JUSTICE
 6          (COMMERCIAL LIST)
 7   IN THE MATTER OF THE COMPANIES' CREDITORS
 8  ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED
 9   AND IN THE MATTER OF A PLAN OF COMPROMISE OR
10   ARRANGEMENT OF NORTEL NETWORKS CORPORATION,
11   NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL
12    CORPORATION, NORTEL NETWORKS INTERNATIONAL
13    CORPORATION AND NORTEL NETWORKS TECHNOLOGY
14              CORPORATION
15   APPLICATION UNDER PART IV OF THE COMPANIES'
16  CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36,
17              AS AMENDED.
    ---------------------------------------X
18
19
20
21
22
23
24
25
```

Page 3

```
 1  A P P E A R A N C E S:
 2
 3  THORNTON GROUT FINNIGAN, LLP
 4  Attorneys for UK PENSION CLAIMANTS
 5       100 Wellington Street West
 6       Suite 3200
 7       P.O. Box 329, Toronto-Dominion Centre
 8       Toronto, Canada M5K 1K7
 9  BY:  MICHAEL BARRACK, ESQ.
10       D.J. MILLER, ESQ.
11       MICHAEL S. SHAKRA, ESQ.
12       Phone: (416) 304-1616
13       Fax:  (416) 304-1313
14       mbarrack@tgf.ca
15
16  DLA PIPER
17  Attorneys for CANADIAN CREDITORS COMMITTEE
18       1251 Avenue of the Americas
19       New York, New York 10020-1104
20  BY:  RICHARD F. HANS, ESQ.
21       CONSTANCE TSE, ESQ.
22       Phone: (212) 335-4829
23       Fax:  (212) 884-8529
24       richard.hans@dlapiper.com
25
```

Page 4

```
 1  A P P E A R A N C E S (Cont'd):
 2
 3  ALLEN & OVERY, LLP
 4  Attorneys for CANADIAN DEBTORS
 5  1221 Avenue of the Americas
 6  New York, New York 10020
 7    BY: PAUL B. KELLER, ESQ.
 8  Phone: (212) 610-6300
 9  Fax: (212) 610-6399
10  paul.keller@allenovery.com
11
12  AKIN GUMP STRAUSS HAUER & FELD, LLP.
13  Attorneys for US OFFICIAL COMMITTEE OF
14  UNSECURED CREDITORS
15  One Bryant Park
16  New York, New York 10036-6745
17    BY: JOSEPH L. SORKIN, ESQ.
18  ABID QURESHI, ESQ.
19  JACQUELINE G. YECIES, ESQ.
20  Phone: (212) 872-7479
21  Fax:  (212) 872-1002
22  jsorkin@akingump.com
23
24
25
```

Page 5

```
1   A P P E A R A N C E S (Cont'd):
2
3   HUGHES HUBBARD & REED, LLP.
4   Attorneys for UK JOINT ADMINISTRATORS and
5   CERTAIN EMEA ENTITIES
6        One Battery Park Plaza
7        New York, New York 10004-1482
8   BY:  FARA TABATABAI, ESQ.
9        Phone: (212) 837-6028
10        Fax:   (212) 299-6028
11        tabataba@hugheshubbard.com
12
13  MILBANK, TWEED, HADLEY & MCCLOY, LLP
14  Attorneys for US BONDHOLDER GROUP
15        One Chase Manhattan Plaza
16        New York, New York 10005
17  BY:  ATARA MILLER, ESQ.
18        NICHOLAS BASSETT, ESQ.
19        Phone: (212) 530-5421
20        Fax:   (212) 822-5421
21        amiller@milbank.com
22
23
24
25
```

Page 7

```
1   A P P E A R A N C E S (Cont'd):
2
3   PATTERSON BELKNAP WEBB & TYLER, LLP
4   Attorneys of LAW DEBENTURE TRUST
5        133 Avenue of the Americas
6        New York, New York 10036
7   BY:  BRIAN GUINEY, ESQ.
8        Phone: (212) 336-2000
9        FAX:   (212)336-2222
10        bguiney@pbwt.com
11
12  ALSO PRESENT:
13        RICHARD M. GRUDZINSKI, RBC Capital Markets
14        NATHANIEL ARMSTRONG, Videographer
15
16
17
18
19
20
21
22
23
24
25
```

Page 6

```
1      A P P E A R A N C E S (Cont'd):
2
3   PALIARE ROLAND ROSENBERG ROTHSTEIN, LLP
4   Attorneys for CANADIAN CREDITORS
5   155 Wellington Street West - 35th Floor
6   Toronto, ON M5V 3H1
7      BY: KEN ROSENBERG, ESQ.
8   Phone: (416) 646-4304
9   Fax:  (416) 646-4301
10   ken.rosenberg@paliareroland.com
11
12   CLEARY GOTTLIEB STEEN & HAMILTON, LLP
13   Attorneys for US DEBTORS
14   One Liberty Plaza
15   New York, New York 10006
16      BY: ANN NEE, ESQ.
17   Phone: (212) 225-2000
18   Fax:  (212) 225-2877
19   anee@cgsh.com
20
21
22
23
24
25
```

Page 8

```
1   ------------------ I N D E X -------------------
2   WITNESS           EXAMINATION BY          PAGE
3   JOHN MCCONNELL    MR. BARRACK              14
4                     MR. KELLER              165
5                     MR. HANS                179
6                     MR. GUINEY              205
7
8
9   ---------------- E X H I B I T S ----------------
10  MCCONNELL         DESCRIPTION          FOR I.D.
11  Exhibit 12033     Professor McConnell's     15
12                    report
13  Exhibit 12034     Nortel Bond and Related   42
14                    Documents Chart
15  Exhibit 12035     United States Court of    56
16                    Appeals Third Circuit
17                    decision
18  Exhibit 12036     Moody's Investor Services 87
19                    report dated June 16,
20                    2006
21  Exhibit 12037     DBRS report dated July    94
22                    2006
23  Exhibit 12038     Moody's Investor Services 95
24                    report dated March 22,
25                    2007
```

Case 09-10138-MFW    Doc 17958-27    Filed 02/24/17    Page 5 of 77

IN RE: NORTEL NETWORKS INC., et al.    HIGHLY CONFIDENTIAL

JOHN MCCONNELL
April 4, 2014

Page 9

```
 1   ------------ E X H I B I T S (Cont'd) -----------
 2   MCCONNELL      DESCRIPTION            FOR I.D.
 3   Exhibit 12039  DBRS report dated         100
 4                  November 9, 2008
 5   Exhibit 12040  Moody's Investor Services 102
 6                  report dated May 21, 2008
 7   Exhibit 12041  DBRS report dated July    103
 8                  14, 2008
 9   Exhibit 12042  Moody's Investor Services 105
10                  report dated December 15,
11                  2008
12   Exhibit 12043  Offering Memorandum for   111
13                  Nortel Networks Limited
14   Exhibit 12044  Series of tables          127
15                  reflecting pricing
16                  information with respect
17                  to subject bonds
18   Exhibit 12045  Moody's Investor Services 182
19                  Report dated December 16,
20                  2008
21   Exhibit 12046  Form 10-K for Nortel      198
22                  Networks Corporation
23
24
25                  (EXHIBITS TO BE PRODUCED)
```

Page 10

```
 1            S T I P U L A T I O N S
 2
 3   1.  Upon completion of the transcription of
 4   today's session, the original transcript shall
 5   be sent to counsel for the witness by the court
 6   reporter.  Counsel shall promptly forward it to
 7   the witness for review, correction and
 8   signature under penalty of perjury.  The
 9   witness shall have 30 days from the day of
10   receipt within which to review, make any
11   corrections, sign the deposition transcript
12   under penalty of perjury, and return it to
13   counsel.  The witness' counsel shall then
14   forward the original transcript plus
15   corrections to the court reporter, who will
16   promptly notify all counsel of its receipt and
17   any changes to testimony made by the witness.
18   2.  If the witness is not represented by
19   counsel, the original transcript will be sent
20   to the witness by the court reporter.  After
21   review, correction and signature within 30 days
22   from the date of receipt, the witness shall
23   return the original transcript to the court
24   reporter, who will notify all counsel of its
25   receipt and any changes to testimony by the
```

Page 11

```
 1   witness.
 2   3.  The court reporter will retain the original
 3   transcript, including exhibits.  If, for any
 4   reason, the original is lost, misplaced, not
 5   returned, not signed, or unavailable, a
 6   certified copy may be used in its place for all
 7   purposes.  The court reporter is otherwise
 8   relieved of any statutory duties.
 9                    -oOo-
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 12

```
 1   P R O C E E D I N G S
 2   *  *  *  *
 3   THE VIDEOGRAPHER: This is tape one.
 4   We are now on the record at
 5   9:25 a.m. on Friday, April 4th, 2014.
 6   This is the opening of the deposition of
 7   John McConnell in the matter of In Re:
 8   Nortel Networks Incorporated, et al.
 9   This deposition is being held at the
10   offices of Cleary, Gottlieb, Steen &
11   Hamilton, LLP, located at One Liberty
12   Plaza, New York, New York 10004.  The
13   court reporter is Fran Insley, with Ellen
14   Grauer Court Reporting.  I'm the legal
15   videographer, Nathaniel Armstrong, also
16   with Ellen Grauer Court Reporting.
17   Will counsel please introduce
18   themselves and state whom they represent.
19   MR. BARRACK: Michael Barrack, DJ
20   Miller, Mike Shakra for the UK Pension
21   claimants.
22   MR. HANS: Richard Hans and Connie
23   Tse from DLA Piper for the Canadian
24   Creditors Committee.
25   MS. TABATABAI: Fara Tabatabai from
```

Page 13

1  Hughes Hubbard & Reed on behalf of the
2  joint administrators and the EMEA debtors.
3    **MR. KELLER:** Paul Keller with the
4  law firm of Allen & Overy representing the
5  Canadian debtors and the monitor.
6    **MR. ROSENBERG:** Ken Rosenberg for
7  the CC, the Canadian Creditors.
8    **MR. GRUDZINSKI:** Richard Grudzinski
9  with RBC Capital Markets, same.
10   **MR. GUINEY:** Brian Guiney, Patterson
11  Belknap Webb & Tyler, for Law Debenture
12  Trust Company of New York.
13   **MS. MILLER:** Atara Miller and Nick
14  Bassett from Milbank Tweed Hadley & McCoy
15  on behalf of the ad hoc group of
16  bondholders.
17   **MS. NEE:** Ann Nee from Cleary
18  Gottlieb on behalf of the US debtors.
19   **MR. SORKIN:** Joseph Sorkin from Akin
20  Gump Strauss Hauer & Feld on behalf of the
21  Official Committee of Unsecured Creditors.
22  Along with me are my colleagues, Abid
23  Qureshi and Jacqueline Yecies, and I am
24  here representing the witness today, John
25  McConnell.

Page 14

1    **THE VIDEOGRAPHER:** Thank you.  Would
2  the court reporter swear the witness in,
3  please.
4  J O H N   M C C O N N E L L ,
5  having been first duly sworn before the
6  Notary Public, was examined and testified
7  as follows:
8
9  EXAMINATION BY
10   **MR. BARRACK:**
11  Q.  Professor McConnell, we met.  I'm
12  Mike Barrack.  I'm here for the UK pensioners.
13  I think we are both on the disabled list today,
14  so you can tell from my voice that I have a
15  cold.  And I understand you recently had knee
16  replacement surgery.  So in a spirit of
17  Canadian civility and cooperation, if either
18  one of us needs the break, we will do the time
19  out, let us know, and we can break at any
20  point.  Please don't hesitate, if you need a
21  break or you need anything else, just let me
22  know.
23  A.  Thank you very much.  That's very
24  kind and considerate.
25    Let's get some housekeeping out of

Page 15

1    **MCCONNELL - HIGHLY CONFIDENTIAL**
2  the way first.  I just want to mark your report
3  as a copy of it.
4    (Whereupon Exhibit 12033 was marked
5  for identification.)
6  Q.  We're not going to go there right
7  away, and I want you to have it there in front
8  of you in case you want to look at it at any
9  point.
10   Sir, I understand you're the Emanuel
11  T. Weiler Distinguished Professor of Management
12  Finance at Purdue University; is that correct?
13  A.  Actually, my title has changed
14  slightly.
15  Q.  Oh, no.
16  A.  I'm still at Purdue University.  I'm
17  still a professor of finance in the School of
18  Management.  I received a different title than
19  the Emanuel T. Weiler Professor.  I believe I'm
20  the Morgan -- the Burgundy Morgan Professor of
21  Enterprise at the present time, but that's a
22  tiny distinction.
23  Q.  So if I just call you Professor
24  McConnell, will that work for you?
25  A.  It certainly will.

Page 16

1    **MCCONNELL - HIGHLY CONFIDENTIAL**
2  Q.  So I understand your experience is
3  as an academic and an expert consultant.  Is
4  that --
5    **MR. SORKIN:** Objection.
6  A.  I am a scholar.  I do teach at
7  Purdue.  I have taught and conducted research
8  on various subjects I'm going to be testifying
9  about or expect to be testifying about.  I've
10  also been a consultant in various ways and I
11  served on boards of directors.
12  Q.  What is your relationship with
13  Navigant?
14  A.  Navigant is a consulting firm.  I
15  occasionally or episodically work with Navigant
16  on matters for which they provide various types
17  of support and analysis to assist me in
18  projects that I am working on.
19  Q.  This is one of those projects?
20  A.  It is.
21  Q.  What did you do, what did they do?
22    **MR. SORKIN:** Objection.
23  A.  I reviewed documents in this matter,
24  thought about the documents in this matter,
25  wrote a report in this matter.  Navigant

IN RE: NORTEL NETWORKS INC., et al.   HIGHLY CONFIDENTIAL

JOHN MCCONNELL
April 4, 2014

Page 17

MCCONNELL - HIGHLY CONFIDENTIAL
1
2 assisted me and personnel at Naviant assisted
3 me by doing primarily calculations and analysis
4 that I requested of them; also obtaining for me
5 documents that I requested; reviewed certain
6 other documents and summarized them for me; and
7 there may be other ways in which Naviant
8 assisted me in this undertaking.
9 Q.   You're not a lawyer?
10 A.   I am not a lawyer.
11 Q.   Do you have any legal training?
12 A.   Do I have any legal training?
13 Q.   Yes.
14 A.   I would say I'm not a lawyer and I
15 have not been to law school.  So I would say I
16 have no legal training except to the extent
17 that I have picked up various things by working
18 with lawyers.
19 Q.   You're a management finance
20 professor?
21 A.   I am a finance professor in the
22 School of Management.
23 Q.   You're offering in your report an
24 opinion on the effective certain choices the
25 court might make on capital markets?

Page 18

MCCONNELL - HIGHLY CONFIDENTIAL
1
2 A.   Can I have the question again,
3 please?
4 Q.   In your opinion, you're offering an
5 opinion on the effect of certain choices the
6 court might make on capital markets?
7 A.   That's correct.
8 Q.   What is the primary area of interest
9 of your research?
10 A.   I would say it's capital markets,
11 and within capital markets various instruments
12 that trade in capital markets.  Those could be
13 equity instruments or what are referred to as
14 fixed income instruments.  I have also
15 conducted research with respect to corporate
16 governance.  But I would say almost any aspect
17 of capital markets, participants in capital
18 markets, the institutions in capital markets,
19 the prices, the way in which prices are derived
20 in capital markets, financial transactions, so
21 the whole range of components of financial
22 markets, both in the US and outside of the US.
23 Q.   Do you study the impact of certain
24 policies on capital markets?
25 A.   I have.

Page 19

MCCONNELL - HIGHLY CONFIDENTIAL
1
2 Q.   Do you ever quantitate -- do you
3 ever do quantitative analysis of the impact of
4 policies on capital markets?
5 A.   I have.
6 Q.   When you're analyzing the capital
7 market effects of policies, I take it you try
8 to capture all of the effects, both positive
9 and negative?
10 A.   I believe that would be a fair
11 characterization that depending upon the
12 question, that the impact could be positive,
13 could be negative.
14 Q.   If a policy has both negative and
15 positive effects you try to identify those so
16 that conscious policy choices can be made?
17 A.   I believe that's a fair
18 characterization.
19 Q.   And the presence of a negative
20 effect will not in and of itself mandate that a
21 policy not be adopted if the net effect of the
22 policy is positive?
23      MR. SORKIN: Objection.
24 A.   I don't follow the question.
25 Q.   If you're doing research -- let me

Page 20

MCCONNELL - HIGHLY CONFIDENTIAL
1
2 restate it.  It probably wasn't well put.  If
3 you're doing research, you're trying to assess
4 whether a particular policy that affects the
5 capital markets is one that should be promoted
6 or adopted or is one that should be rejected
7 and not adopted, the presence of a negative
8 effect from that policy will not in and of
9 itself mandate that the policy not be promoted
10 or adopted if when weighed against the positive
11 effects the net effect is positive?
12      MR. SORKIN: Objection.  Go ahead
13 and answer if you can.
14 A.   I believe it depends very much on
15 the circumstances in the particular question at
16 issue.  So I'm not sure I can give a blanket
17 answer to that question.
18 Q.   I take it as a careful academic you
19 would want to consider all of the data
20 available when you're assessing a particular
21 issue?
22 A.   I believe that there are data that
23 relate to the question that I'm addressing I
24 would want to take that into consideration.  It
25 would depend very much on the facts and

Page 21

MCCONNELL - HIGHLY CONFIDENTIAL

1  circumstances at issue.
2  Q.  Have you done any academic work on
3  international insolvency principles?
4  A.  Not that I recall.  Now, I'm not
5  quite sure what the term principles is meant to
6  encompass here, but I don't recall doing a
7  paper where I specifically said I'm concerned
8  with some component of international -- what
9  was the term you used?
10 Q.  Insolvency.
11 A.  Insolvency principles.
12 Q.  This isn't a trap.  I use these
13 words broadly.  If you want to qualify them.
14 I'm trying to use as generic a term, when I use
15 principles, as possible.
16 A.  Well, to the extent that -- I have
17 done work on the question of insolvency and
18 bankruptcy and so forth and related issues.  To
19 the extent that those would have international
20 implications, my work might have touched upon
21 that, but I can't say that I recall
22 specifically writing a report or a paper or
23 conducting a study that's focus was on
24 international or principles of international

Page 22

MCCONNELL - HIGHLY CONFIDENTIAL

1  insolvency.
2  Q.  Are you a member of any insolvency
3  organizations?
4  A.  I'm a member of various
5  organizations that are, like Financial
6  Management Association, The Western Finance
7  Association, American Finance Association.
8  There are certainly members of those
9  associations who focus on or think about the
10 almost every issue that would occur in finance
11 or financial markets.  There are annual
12 conferences of those organizations at the
13 annual conferences.  There are sessions.  Those
14 sessions cover a broad range of topics.  The
15 topics probably include, I suspect do include,
16 questions with respect to international
17 insolvency.  So in that sense I believe the
18 answer would be -- as I understand your
19 question, the answer would be yes.
20 Q.  You know in our world of increasing
21 specialization and subspecialization there are
22 specific organizations that are dedicated to
23 insolvency questions, per se, as opposed to
24 general finance.  I take it you don't belong to

Page 23

MCCONNELL - HIGHLY CONFIDENTIAL

1  any of those organizations?
2  A.  If you're asking me is there a very
3  narrowly defined organization, its only role is
4  to think about international insolvency, no, I
5  do not belong to such a narrowly defined
6  undertaking.
7  Q.  Have you ever in any of your work --
8  has any of your work involved trading bonds?
9  A.  Yes.
10 Q.  What work has involved trading
11 bonds?
12 A.  Could I look at my CV?
13 Q.  Sure.
14 A.  It may be -- it's in the report.  So
15 if I may.
16 Q.  Let me be more precise.  Not
17 academic writing about trading bonds but the
18 actual activity of trading bonds.
19 A.  Oh, I'm sorry.  I misunderstood.
20 Are you asking me was I a bond trader that sat
21 on the trading desk of an institutional
22 investment?
23 Q.  Well, even beyond that.  If you
24 managed a bond desk or you've worked in the

Page 24

MCCONNELL - HIGHLY CONFIDENTIAL

1  bond industry at all in any way.
2  A.  The way you now characterized the
3  question, I would have to say yes.
4  Q.  So you tell me what your connection
5  with the bond industry has been.
6  A.  I have been a consultant to various
7  investment banks.  I have been particularly or
8  specifically a consultant to their research
9  groups that support the bond trading activities
10 of the banks, including Goldman Sachs and
11 Merrill Lynch and I believe others; developed
12 models for bond traders; understanding those
13 models have been used extensively by the bond
14 traders in their trading of the bonds.  I have
15 sat on boards of directors of institutions that
16 had bond portfolios.  I was a member, in fact
17 chairman of a -- of the investment committee of
18 an institution that bought and sold bonds.  So
19 if that is your question, I think you said very
20 generally, that's the best I could do for an
21 answer.
22 Q.  Who did you meet with, apart from
23 the people at Naviant who assisted you with
24 this, regarding the preparation of this report?

Page 25

MCCONNELL - HIGHLY CONFIDENTIAL

2 MR. SORKIN: Just objection to the

3 extent you're just asking which

4 individuals, that's fine, but I would just

5 caution the witness not to divulge any

6 communications, but go ahead and answer

7 the question with respect to individuals.

8 A. Can I have the question again,

9 please?

10 Q. Who did you meet with other than the

11 people at Navigant in order to prepare this

12 report?

13 A. I have met with counsel.

14 Q. Anyone other than counsel?

15 A. I don't recall meeting with anyone

16 other than counsel. If there were others

17 beyond counsel at meetings I was unaware of it.

18 Q. Did you meet with any bondholders?

19 A. Of? Any bondholders?

20 Q. Any bondholders at all for the

21 preparation of this report.

22 A. I assume that people with whom I

23 have met have held bonds.

24 Q. So in addition to counsel at the

25 meetings that you were at were there

Page 26

MCCONNELL - HIGHLY CONFIDENTIAL

2 bondholders at those meetings as well?

3 A. Are you asking me whether some of

4 the people at the meeting might have held bonds

5 or are you asking me whether a particular set

6 of bondholders? I really don't know what

7 you're asking me.

8 Q. What I'm asking you is you went to

9 these meetings?

10 A. Yes.

11 Q. At these meetings there were

12 lawyers?

13 A. Yes.

14 Q. Great. What firm were the lawyers

15 with?

16 A. I believe Akin Gump. There may have

17 been other law firms represented.

18 Q. In addition to the Akin Gump

19 lawyers, at these meetings were there other

20 people at the meetings?

21 A. Not that I'm aware, as I understand

22 your question.

23 Q. So there were no non-lawyer

24 bondholders at these meetings?

25 A. And again, excluding the Navigant

Page 27

MCCONNELL - HIGHLY CONFIDENTIAL

2 people, who could also be bondholders, there

3 were no individuals at these meetings who

4 identified themselves as bondholders for the

5 purpose of being bondholders at this meeting.

6 Q. So I take it you've specifically not

7 met with any Nortel bondholders?

8 A. To my knowledge that is correct.

9 Q. Now, when you say you reviewed

10 documents, can you tell me in broad terms what

11 type of documents you reviewed?

12 A. In broad terms I reviewed documents

13 that I thought would be related to this

14 litigation.

15 Q. Let's be a little bit more specific.

16 What types of documents did you review? I'm

17 trying to avoid being pedantic and getting you

18 to list every document. I want to know the

19 categories of documents you reviewed.

20 A. Depositions; financial statements;

21 summaries of reports that I asked Navigant to

22 compile for me; bond indenture agreements;

23 prospectuses; academic reports and academic

24 papers. There may be others. I'm trying to

25 give you the broad sweep.

Page 28

MCCONNELL - HIGHLY CONFIDENTIAL

2 Q. Did you review the bond indentures

3 yourself?

4 A. I reviewed some parts of bond

5 indentures.

6 Q. Were they summarized for you?

7 A. I also had summarizations of them

8 created for me.

9 Q. Did you review the rating agency

10 reports yourself or summaries prepared for you?

11 A. Both.

12 Q. So on your -- if you go to the

13 documents relied upon. I don't see any

14 summaries listed there prepared by Navigant.

15 You didn't include those in the documents you

16 reviewed?

17 A. I did not.

18 Q. Now, can we look at your report at

19 paragraph -- let's go to paragraph 67. The

20 first sentence, I take it, contains the essence

21 of your report, which is "If the principles of

22 'modified universalism' were to be accepted

23 globally as a general legal doctrine, the

24 immediate impact would be far-reaching."

25 That's the essence of your opinion?

Case 09-10138-MFW   Doc 17958-27   Filed 02/24/17   Page 10 of 77

IN RE: NORTEL NETWORKS INC., et al.   HIGHLY CONFIDENTIAL

JOHN MCCONNELL
April 4, 2014

Page 29

MCCONNELL - HIGHLY CONFIDENTIAL
1
2    MR. SORKIN: Objection.
3 A.  No.
4 Q.  No?  What is the essence of your
5 opinion?
6    MR. SORKIN: Objection.
7 A.  In my report I set forth several
8 opinions.  From my perspective, if you were to
9 ask me what is the primary opinion, my primary
10 opinion is in response to the report submitted
11 in this matter by Mr. Clark -- Messrs. Clark
12 and Westbrook.  My primary opinion is that
13 contrary to what I understand Mr. Clark and
14 Westbrook's opinion to be, which is that
15 investors (interrupted) --
16 Q.  You were going to tell me what the
17 essence of your opinion was, and then you
18 reframed it and said the primary aspects of
19 your opinion was, so go ahead.
20 A.  I think that would be -- the essence
21 would be equivalent to the primary, which is
22 that as I understand Mr. Clark and
23 Mr. Westbrook's opinion, with respect to the
24 bondholders, their opinion is that, and I'm
25 quoting from them, "It appears more likely that

Page 30

MCCONNELL - HIGHLY CONFIDENTIAL
1
2 the expectations of Nortel creditors were based
3 upon the credit of the corporate group rather
4 than any individual component of that group."
5 They say -- give that opinion in various forms
6 throughout their report.  My primary opinion as
7 I think of it is that the creditors'
8 expectations were in fact not based on the
9 entire group but were rather based upon the
10 likely recoveries of individual entities within
11 the group.  So I would say that's the essence
12 of my opinion.
13 Q.  And in that expectation is --
14 created by the presence of guarantees?
15 A.  Can I have that question again,
16 please?
17    MR. SORKIN: Objection.
18 Q.  That expectation -- is your opinion
19 that that expectation was created by the
20 presence of guarantees in the bonds?
21    MR. SORKIN: Objection.  Go ahead
22 and answer it.
23 A.  The guarantees in my opinion played
24 a role in the formation of bondholders'
25 expectations.

Page 31

MCCONNELL - HIGHLY CONFIDENTIAL
1
2 Q.  Significant role?
3 A.  Yes.
4 Q.  So despite you framing this as the
5 essence of your opinion, you give an awful lot
6 of air time in your opinion to a critique of
7 modified universalism; would you agree with
8 that?
9    MR. SORKIN: Objection.
10 A.  I'm not sure what you mean by air
11 time.
12 Q.  Ink, words.
13 A.  And your question is?
14 Q.  There is a lot of commentary in your
15 report about modified universalism?
16 A.  There is commentary in my report
17 about my understanding of modified
18 universalism.
19 Q.  Is your understanding of modified
20 universalism in any way associated with the
21 essence of your report that creditor
22 expectations are entity based?
23    MR. SORKIN: Objection.
24 A.  Well, I believe the answer is yes,
25 but I'm not quite sure what you're asking.

Page 32

MCCONNELL - HIGHLY CONFIDENTIAL
1
2 Q.  Well, let's break it down a little
3 bit.  Let's go back to paragraph 67, where you
4 say, "If the principles of 'modified
5 universalism' were to be accepted globally as a
6 general legal doctrine, the immediate impact
7 would be far-reaching."  And then you go on to
8 say, "Generally, senior credits (i.e., senior
9 loans and bonds) would fall in price and more
10 junior credits (i.e., junior loans and bonds)
11 would increase in price.  Such price changes
12 would represent wealth transfers from senior
13 credits to more junior credits.  These wealth
14 transfers would occur among the creditors of a
15 single corporation or among the creditors of an
16 integrated group of corporations.  Further, in
17 general, secured credits would fall in price
18 and unsecured credits would increase in price.
19 Again, the wealth transfers would occur among
20 creditors to a single corporation or among the
21 creditors of an integrated group of
22 corporations."
23    So, in this part of your report,
24 whether it's the essence or the primary part or
25 not, you seem to be drawing a cause and effect

Page 33

MCCONNELL - HIGHLY CONFIDENTIAL

1   relationship between modified universalism and
2   capital market impacts, correct?
3   A.   That's a fair representation, yes.
4   Q.   And the impact, the cause and effect
5   that you posit in your report, is that if
6   modified -- if the principles of modified
7   universalism were to be accepted globally as a
8   general legal doctrine, then there would be
9   negative -- what you -- would you characterize
10  these as negative capital market effects,
11  positive capital market effects or neutral
12  capital market effects?
13  A.   I would characterize them as
14  effects.  I don't label them as positive or
15  negative.
16  Q.   Fair enough.  So you're just drawing
17  to the court's attention that if this modified
18  universalism was adopted or accepted globally
19  as a general legal doctrine as you say, then
20  there would be market effects, and it is for
21  the court to assess whether those are positive,
22  negative or neutral?
23  A.   I'm not telling the court whether
24  they should make any judgment as to whether

Page 34

MCCONNELL - HIGHLY CONFIDENTIAL

1   they are positive, negative or neutral.  I'm
2   merely stating my opinion.
3   Q.   That's fair.  So I take it what
4   you're doing in this report is simply informing
5   the court of some consequences that you
6   anticipate from modified universalism so that
7   the court can make a decision with intended
8   consequences, not with unintended consequences;
9   is that fair?
10  MR. SORKIN: Objection.
11  A.   Can I have the question again,
12  please?
13  Q.   Yes.  One of the things courts are
14  always concerned about is that their decisions
15  are made with unintended consequences.  And as
16  an academic I take it is no different, that
17  much of academic work is trying to elucidate
18  what the consequences of certain behaviors are
19  so that policy decisions can be made against
20  that background; is that fair?
21  A.   Some research and writing is aimed
22  in that -- toward that goal, not all.
23  Q.   Right.  So in your report you're
24  simply trying to identify a possible effect so

Page 35

MCCONNELL - HIGHLY CONFIDENTIAL

1   that the court can be conscious about it and
2   take it into account?
3   MR. SORKIN: Objection.
4   A.   I believe that's a fair
5   characterization.
6   Q.   So I just want to break down some of
7   the statements here in 67 because I think
8   you've been quite fair earlier in your report.
9   Senior credits --
10  A.   Thank you.
11  Q.   Senior credits and more junior
12  credits -- I want to relate some of these
13  statements to the Nortel case and the capital
14  structure of Nortel.  When you talk about
15  senior credits and junior credits, you're not
16  talking about priority of security in the
17  Nortel case?
18  A.   Only to the extent -- or to the
19  extent, rather, not only to the extent as I
20  have written in my report, that at least one of
21  the rating agencies viewed the non-guaranteed
22  bonds as being structurally junior to the
23  guaranteed bonds.  In that respect, then, the
24  comments, as I understand what you're asking

Page 36

MCCONNELL - HIGHLY CONFIDENTIAL

1   me, would apply.
2   Q.   So I want to break that down.  When
3   you say one of the rating agencies considered
4   them to be structurally junior, is that because
5   they gave them a different rating?
6   A.   No.  That's because of their --
7   well, they did give a different rating but that
8   is also the language they used in describing
9   their conclusions.
10  Q.   So I'm trying to understand what the
11  rating agency has to do with it.  Is it
12  anything that the rating agency did that
13  creates seniority or makes one senior and one
14  junior?
15  A.   My understanding is no.
16  Q.   So let's put this idea of senior and
17  junior aside.  It really has nothing to do with
18  what the rating agencies do.  It depends on the
19  characteristics of the security, correct?
20  A.   That is correct.
21  Q.   And the only distinguishing
22  characteristic of the securities that we are
23  dealing with here -- sorry, let me back up.
24  The securities that we are focusing on here are

Page 37

MCCONNELL - HIGHLY CONFIDENTIAL
1
2 the debt securities of Nortel; is that fair?
3 A.  **Nortel as a global -- as an**
4 **enterprise using that term generically.**
5 Q.  Fair enough.  I will be more
6 precise.  We are dealing with the debt
7 securities issued by various Nortel entities
8 and guaranteed by Nortel entities; is that
9 fair?
10 A.  **That's fair in my opinion.**
11 Q.  So focusing on that subset of
12 securities, those securities were all
13 unsecured, as you point out?
14 A.  **Yes, that's correct.**
15 Q.  The only distinguishing feature
16 between them would -- between a plain vanilla
17 bond and these bonds was the presence of a
18 guarantee?
19 A.  **Can I have that again, please?**
20 Q.  The difference between these bonds
21 and a plain vanilla bond, a single entity bond
22 that was an unsecured bond, is the presence of
23 the guarantees?  That may be too broad.  The
24 feature that you focus upon in your report that
25 distinguishes these Nortel bonds from a general

Page 38

1        MCCONNELL - HIGHLY CONFIDENTIAL
2 unsecured bond is the presence of the
3 guarantee; is that fair?
4 A.  **I'm not quite sure where you're**
5 **going.**
6        MR. SORKIN: Objection.
7 A.  **I'm not sure if it is unfair or**
8 **fair.  I don't know what you're getting at.**
9 Q.  I'm getting at this, your statement
10 that generally senior credits would fall in
11 price and more junior credits, loans and bonds
12 would increase in price.
13 A.  **Okay.**
14 Q.  I'm getting at this concept of
15 senior and junior.
16 A.  **Okay.**
17 Q.  What you're saying, in this case
18 you're informing the court of an effect.  We
19 established that's what you're providing an
20 opinion for.  And the -- and I'm trying to get
21 at this concept of senior and junior credits,
22 and in this case would you classify some of the
23 Nortel bonds as senior credits and some of the
24 Nortel bonds as junior credits?
25 A.  **Yes.**

Page 39

1    MCCONNELL - HIGHLY CONFIDENTIAL
2 Q.  And the distinguishing feature
3 between the senior credits and junior credits
4 was the presence or absence of a guarantee?
5 A.  **Yes.**
6 Q.  Anything else that distinguished
7 them?
8 A.  **Yes.**
9 Q.  What else?
10 A.  **Different coupon rates.**
11 Q.  But that didn't affect whether they
12 were senior or junior?
13 A.  **That's correct.**
14 Q.  So the -- sorry.  Let me again be
15 more precise.  The distinguishing feature
16 between -- in addition to the guarantee was
17 there any other feature of these Nortel bonds
18 that indicated whether they were senior or
19 junior?
20 A.  **Can I have it again, please?**
21 Q.  Yes.  Sorry.  In addition to the
22 guarantee was there any feature of these Nortel
23 bonds which caused them to be either senior or
24 junior?
25 A.  **I do not believe so.**

Page 40

1    MCCONNELL - HIGHLY CONFIDENTIAL
2 Q.  Thank you.  So when you say if the
3 principles of modified universalism were to be
4 accepted globally as a general legal doctrine,
5 what do you mean by the principles of modified
6 universalism?
7 A.  **As I understand Clark and**
8 **Westbrook's position, and I'm here in response**
9 **to their report, their position is that the**
10 **distribution of the proceeds from the**
11 **liquidation of Nortel should be distributed on**
12 **a pro rata basis.  Now, my understanding of a**
13 **pro rata basis is that each claimant would**
14 **receive a -- the same payoff based on the same**
15 **fraction of whatever that claimant's claims is**
16 **without regard to any seniorities or**
17 **juniorities or guarantees that the claims may**
18 **have.  That's my understanding of what their**
19 **position is with respect to or from -- their**
20 **position flows from, as I understand it,**
21 **modified universalism.  So as I understand**
22 **their proposition, the implication would be**
23 **that guarantees, seniority and juniority would**
24 **be ignored.  That's my understanding and I**
25 **think I answered your question.  I think I**

IN RE: NORTEL NETWORKS INC., et al.   HIGHLY CONFIDENTIAL

JOHN MCCONNELL
April 4, 2014

Page 41

MCCONNELL - HIGHLY CONFIDENTIAL

1 tried to.

3 Q.   That's fair.  So when we talk about
4 modified universalism or alternatively we talk
5 about separate concept pro rata, it's your
6 understanding as you've just described?

7 A.   My understanding is that the pro
8 rata distribution, as I understand Mr. Clark
9 and Mr. Westbrook's report, flows from the
10 theory or a theory of which they label or has
11 been labeled modified universalism.

12 Q.   So that if the -- and again what
13 you're advising the court is that if the court
14 were to adopt that pro rata method of
15 allocation as you've described it, there would
16 be potential market impacts that you've
17 identified?

18 A.   Yes.

19 Q.   Now, have you analyzed any of the
20 positive effects or any of the other effects --
21 sorry.  Let me -- have you analyzed any of the
22 other effects of modified universalism on
23 capital markets other than as it relates to
24 these bonds and the treatment of these bonds as
25 you've described it?

Page 42

MCCONNELL - HIGHLY CONFIDENTIAL

2 A.   Now you've lost me.

3 Q.   Have you analyzed any of the
4 wider --

5 A.   I'm sorry.  You said these bonds.
6 I'm not sure --

7 Q.   When I say these bonds, I'm
8 referring to the Nortel bonds that have been
9 issued.  Let's get some nomenclature worked out
10 here.

11 A.   I apologize for that.  Initially you
12 were talking about this statement which is
13 general and then you --

14 Q.   We are going to start heading down
15 into a little more particulars.  I'm going to
16 show you a document.  This is a chart that I
17 have prepared.

18     MR. BARRACK: We will mark it as an
19 exhibit.

20     (Whereupon Exhibit 12034 was marked
21 for identification.)

22 A.   I apologize for talking over you.

23 Q.   So what I have prepared here,
24 Professor McConnell, is a Nortel bond and
25 related documents chart.  And this perhaps can

Page 43

MCCONNELL - HIGHLY CONFIDENTIAL

2 assist us because we are going to be talking
3 about some of these bonds.  And when I --
4 Nortel bonds.  And let's just make sure we are
5 together on this and we can get some
6 nomenclature with this.

7     So you can see we've got a number of
8 columns and a number of rows.  So in each of
9 the -- in the first column on the left-hand
10 side we identified the various bonds that
11 Nortel issued.  And then in the next column we
12 have the issuer, the primary issuer, and then
13 the guarantor if there was one, the issue date.
14 And then we have some related documents that we
15 may come to.  But let's just deal with those
16 first three columns.

17     If you want to run your eye down
18 that -- in November of '88, NNL -- do these
19 shorthand forms, NNL, NNC, NN Capital
20 Corporation, NNI, are those familiar to you?

21 A.   They are and I usually keep them
22 straight.

23 Q.   Okay.  Like many of us, in this case
24 we do mix them up from time to time.  So NNL is
25 a Canadian entity?

Page 44

MCCONNELL - HIGHLY CONFIDENTIAL

2 A.   That's my understanding, yes, sir.

3 Q.   NNI is the American entity?

4 A.   Yes.  Am I allowed to write on this
5 document?

6 Q.   Sure -- no.  Actually, we will give
7 you one that you can write on.

8     So NNL is the Canadian?

9 A.   That's my understanding, yes.

10 Q.   Do you understand that NN Capital
11 Corporation is a shell corporation that was
12 just -- had no assets in it but was issued the
13 bonds?

14 A.   I know it issued bonds.  I do not
15 know precisely what was in their asset
16 portfolio.

17 Q.   So NNL is the Canadian corporation.
18 We go down to the next one.  NNL, N/NNC are
19 both Canadian entities?

20 A.   That's my understanding, yes.

21 Q.   NNI, again the American corporation?

22 A.   Yes.

23 Q.   And then it just repeats itself
24 right there.

25     Is it your understanding that the

Case 09-10138-MFW    Doc 17958-27    Filed 02/24/17    Page 14 of 77

IN RE: NORTEL NETWORKS INC., et al.    HIGHLY CONFIDENTIAL

JOHN MCCONNELL
April 4, 2014

MCCONNELL - HIGHLY CONFIDENTIAL

1    bonds that were issued in the guarantee
2    situation in them is that in November of '88 --
3    and the way I refer to these -- going to refer
4    to these bonds is by their maturity date.  So I
5    call the first one the September 2023s.  2023s,
6    that there was a $200 million issued by NNL
7    without a guarantee in the principal amount of
8    US 200 million.  Similarly going down the
9    chart, in '96, 150 million, the June 2026s.
10       We will come to the specifics of
11   some of these.  And if any of your counsel who
12   are looking at this or anybody else has any
13   changes to this we can adjust as we go along.
14   But when I refer to the Nortel bonds, what I'm
15   referring to are these bonds that were issued
16   by Nortel.  And if you want to take a minute
17   and compare it to your report just to satisfy
18   yourself that these were the bonds that were
19   issued by Nortel, maybe you can do that so that
20   we know what we are talking about when we talk
21   about the Nortel bonds.
22 **A.   I believe I know what you are**
23 **talking about when you are talking about the**
24 **Nortel bonds.**

MCCONNELL - HIGHLY CONFIDENTIAL

1 Q.   Okay.  So if I say the Nortel bonds,
2    that's what I'm referring to?
3 **A.   Fair enough.**
4 Q.   So have you done any quantitative
5    analysis of the impact of adopting modified
6    universalism on the capital markets?
7 **A.   We are referring now to paragraph 67**
8 **again?**
9 Q.   Anywhere in your report.  I mean
10   I -- I went to 67 because it's the essence of
11   the capital market effects that you identify,
12   but feel free to refer to any other part of
13   your report.
14      I understand that you looked at some
15   pricing information, but you're positing an
16   effect in paragraph 67 of adopting modified
17   universalism, and so in advising the court of
18   that possible effect did you do any
19   quantitative analysis of that effect?
20 **A.   I did not attempt to quantify the**
21 **wealth transfers that in my opinion would**
22 **occur.**
23 Q.   Do you accept that in addition to
24   the wealth transfers that you've identified

MCCONNELL - HIGHLY CONFIDENTIAL

1    there may be other impacts from adopting
2    modified universalism?
3 **A.   Are you asking me with respect to**
4 **paragraph 68 and 69 of my report where I talk**
5 **about other effects or...?**
6 Q.   Any other effects.  68, 69, anywhere
7    else in your research, anywhere else in your
8    report did you consider any other impacts of
9    modified universalism other than the wealth
10   transfer effects that you identified in
11   paragraph 67?
12 **A.   Yes.**
13 Q.   What other effects did you consider?
14 **A.   As I discuss in my report, that as I**
15 **understand the pro rata distribution that**
16 **Misters Clark and Westbrook seem to claim would**
17 **flow from the adoption of modified**
18 **universalism, in my opinion that would mean**
19 **that credit agreements, the way in which they**
20 **are constructed, would be affected.  And in**
21 **particular, as I note, the contracts would very**
22 **likely no longer have the types of provisions**
23 **that establish juniority and seniority and**
24 **other types of provisions that we often**

MCCONNELL - HIGHLY CONFIDENTIAL

1 **observe -- are often observed in corporate**
2 **credit agreements.  I talk about that in**
3 **paragraph 68 of my report.**
4 Q.   And do you identify in paragraph 69
5    how you hypothesized that those credit
6    agreements might be changed?
7 **A.   That is a fair representation, yes.**
8 Q.   In addition to the wealth transfer
9    and the modification of credit agreements, did
10   you analyze any other impacts of modified
11   universalism or the adoption of a pro rata
12   allocation approach in this case?
13 **A.   As I talk about in paragraph 69**
14 **also, it's in my opinion quite likely that**
15 **provisions would be either necessitated**
16 **limiting additional borrowing by entities or**
17 **each time an additional debt was proposed to be**
18 **offered existing credit agreements would be**
19 **restated, and or -- excuse me -- or interest**
20 **rates or coupon rates would very likely be**
21 **higher on the initial debts offered as a way of**
22 **protecting against the subsequent dilution of**
23 **the initial debts due to subsequent debts that**
24 **could be issued.**

Page 49

**MCCONNELL - HIGHLY CONFIDENTIAL**

Q.   And are those, again, positive
effects, negative effects or neutral effects?

**A.   I would like to go back to -- now**
**that you've asked the question this particular**
**way, I would like to go back to my response to**
**a question you asked me on paragraph 67.**

Q.   About the wealth transfers?

**A.   Yes.  If I may?**

Q.   Yes.

**A.   The way you've now seemed to**
**characterize the question, whether positive**
**effects or negative effects, I was thinking in**
**terms of a policy implication.  I believe that**
**was the context of your question.**

Q.   Right.  And I'm asking this question
in a policy context too.

**A.   In that respect, then, my answer to**
**your question regarding paragraph 67 remains**
**there would -- and I believe it's implied by**
**the paragraph, there would be positive effects**
**for some creditors, negative effects for other**
**creditors, but I don't set forth a policy**
**implication.**

Q.   Right.  And similarly, with respect

Page 50

**MCCONNELL - HIGHLY CONFIDENTIAL**

to these other changes, do you set forth the
policy implication on potential changes to
credit agreements?

**A.   I would say that I don't in my**
**report.  If I were to speculate, given that we**
**observe in capital markets credit agreements**
**that are structured to provide for seniority**
**and juniority, as an economist my presumption**
**is that those are put in place as the most**
**efficient way to conduct financing**
**arrangements.  To the extent that that is**
**perturbed, my inclination -- I'm not offering**
**this as an opinion as part of my report but now**
**that you've asked the question, my inclination**
**would be that it's likely to make the**
**functioning of capital markets -- or corporate**
**borrowings in capital markets less efficient.**
**But again I'm not -- I don't propose to offer a**
**policy position for the courts.**

Q.   Let's just test that a little bit.
If as the result of this case there was greater
clarity and certainty about the meaning of
provisions of bonds in the capital markets, and
as a result of that the bonds at future bond

Page 51

**MCCONNELL - HIGHLY CONFIDENTIAL**

issuances became more precise in their terms so
as to provide greater clarity and certainty of
outcome to investors, would that be a positive
thing or a negative thing or a neutral thing?

MR. SORKIN: Objection.

**A.   In the context of my prior answer,**
**which is that financial arrangements are**
**structured as we observe them, presuming that**
**that is an efficient way to structure**
**contracts, to the extent that there is**
**pertubation away from an efficient solution to**
**a less efficient solution, my interpretation as**
**an economist would be that that is a less --**
**that that would in general be a negative**
**effect.**

Q.   That is tautologic, though.  If you
have a perturbation from a efficient to a less
efficient, it's going to be negative.  That is
tautologic.  If you -- the question becomes
whether the perturbation is one of efficiency
or inefficiency, correct?

MR. SORKIN: Objection.

**A.   I don't think so.**

Q.   Well, let me break it down.  If the

Page 52

**MCCONNELL - HIGHLY CONFIDENTIAL**

perturbation moves the market to a place of
greater efficiency --

**A.   Just to be clear, are you saying**
**perturbation?**

Q.   Perturbation.  It's your word.  It's
a big word.  I like learning new words.  You
got a cheaper word for me?

**A.   Yeah.  I apologize.  When you're**
**from the midwest --**

Q.   I apologize for my limited
vocabulary.

**A.   This is very serious and I don't**
**mean to make light of this undertaking**
**whatsoever.  What I was attempting to say is if**
**there is a disturbance that moves away --**

Q.   Can we go all the way down to
change?

**A.   Fair.**

Q.   Good.

**A.   If there is a change in the -- I've**
**forgotten the question.**

Q.   If there is a change in the capital
market as a result of this case and there is a
change in the capital market, the outcome in

Page 53

MCCONNELL - HIGHLY CONFIDENTIAL

1    MCCONNELL - HIGHLY CONFIDENTIAL
2  this case, you know, to cut to the chase, what
3  you are saying is that if the courts were to
4  adopt a pro rata allocation methodology in this
5  case, that might represent -- that might affect
6  a change in the market, right?
7  A.  It could.
8  Q.  It could.  It could not but could.
9  And if it did, situation you're positing, if it
10  did, there would be two broad effects.  One
11  would be a wealth transfer from more senior to
12  more junior as -- to use your terms, and we've
13  been through that, and the second change is
14  that there may be changes in bond covenant
15  terms that account for that?
16  A.  Fair.
17  Q.  So the change in the bond covenant
18  terms could either promote greater efficiency
19  in the market or not?
20  A.  My inclination is to think not but
21  it's conceivable that it could.
22  Q.  Right, and it's conceivable that it
23  could because what it could do is clarify a
24  situation that had previously been unclear and
25  allow parties to allocate their risk in those

Page 54

1    MCCONNELL - HIGHLY CONFIDENTIAL
2  agreements in a way that would create greater
3  efficiency in the market; that's a possibility?
4    MR. SORKIN: Objection.
5  A.  I want to make sure I understand the
6  predicate.  The predicate is that somehow bond
7  covenants are unclear.
8  Q.  Right.
9  A.  And you're saying that they would
10  now become clear.
11  Q.  Right.
12  A.  Is that your position?
13  Q.  Well, not --
14  A.  Is that your question?
15  Q.  My question is that there was a
16  certain level of clarity.  Clear and unclear
17  are at the margins.  There is a certain level
18  of clarity in bond terms now and there would be
19  a greater level of clarity in bond terms as a
20  result of this change?
21  A.  That's your assumption.
22  Q.  That's my assumption, right.  And
23  that could happen and that could be a positive
24  effect, correct?
25    MR. SORKIN: Objection.

Page 55

1    MCCONNELL - HIGHLY CONFIDENTIAL
2  A.  It's conceivable.  I can't quite
3  envision the circumstances under which that is
4  likely to be true.  I haven't thought about
5  that at great detail.  I'm not here to render
6  an opinion with respect to that.  You're asking
7  me to think that through on the fly.  So all I
8  can say is it is conceivable and possible.
9  Q.  So let's go back to the positive
10  effects of modified universalism.  Are you
11  aware of any positive effects of modified
12  universalism?
13  A.  I haven't thought through all of the
14  possibilities.  I'm only here responding to
15  Mr. Clark and Westbrook's report.
16  Q.  Did you do any investigation or
17  study about the possible positive effects of
18  modified universalism on capital markets?
19  A.  I have not done a study beyond what
20  I have in my report.
21  Q.  What I would like to show you, and
22  I'm going to -- I'm not asking you for a legal
23  opinion of any kind, but what I'm going to give
24  you a copy of a United States Court of Appeals
25  Third Circuit decision, and they discuss

Page 56

1    MCCONNELL - HIGHLY CONFIDENTIAL
2  universalism, and I want to use it to have you
3  assume certain positive effects of
4  universalism.
5    (Whereupon Exhibit 12035 was marked
6  for identification.)
7  Q.  I'm going to take you through -- I
8  highlighted some passages of this and I'm going
9  to take you through the highlighted passages,
10  and when I come to the end of the highlighted
11  passages I'm going to ask you to assume that
12  the positive effects that are identified in
13  this decision from universalism exist.  Just so
14  you know where we are going.
15  A.  Say it again, please.
16  Q.  I could say to you -- I could give
17  you an example --
18  A.  I'm just asking you to repeat what
19  you said.
20  Q.  I'm going to set it up just so you
21  know where we are going.  I am trying not to
22  confuse you with this so you know exactly where
23  I am going.  I could say to you that the
24  positive effects of universalism are, for
25  instance, fair and efficient administration of

IN RE: NORTEL NETWORKS INC., et al.    HIGHLY CONFIDENTIAL

JOHN MCCONNELL
April 4, 2014

Page 57

MCCONNELL - HIGHLY CONFIDENTIAL
1  cross-border insolvencies that protect the
2  interests of all creditors and other interested
3  entities including the debtor. I want you to
4  assume that, Professor McConnell. This is a
5  long-winded way of saying I want you to assume
6  that the positive effects of modified
7  universalism are as identified by the United
8  States Court of Appeals Third Circuit.
9        So against that background, let's
10 turn to this and I would like -- I'm going to
11 take you to some paragraphs of this decision to
12 have you assume that these are the benefits
13 that are identified here, okay?
14 A. Yes.
15 Q.  So if you could go to the second
16 page of what I've handed you.  Do you see the
17 highlighted portion that reads, "Congress
18 enacted Chapter 15 to provide effective
19 mechanisms for dealing with cases of cross-
20 border insolvency with the following
21 objectives:  (1) Cooperation between...courts
22 of the United States... and the courts and
23 other competent authorities of foreign
24 countries involved in cross-border insolvency

Page 58

MCCONNELL - HIGHLY CONFIDENTIAL
1  cases; (2) Greater legal certainty for trade
2  and investment; (3) Fair and efficient
3  administration of cross-border insolvencies
4  that protects the interests of all creditors,
5  and other interested entities, including the
6  debtor; (4) protection and maximization of the
7  value of the debtors' assets; and (5)
8  facilitation of the rescue of financially
9  troubled businesses, thereby protecting
10 investment and preserving employment." And
11 then jumping down on the same page, "The
12 UNCITRAL Legislative Guide explains the Model
13 Law was designed to address inadequate and
14 inharmonious legal approaches, which hamper the
15 rescue of financially troubled businesses, are
16 not conducive to a fair and efficient
17 administration of cross-border insolvencies,
18 impede the protection of assets of the
19 insolvent debtor against dissipation and hinder
20 maximization of the value of those assets.
21 Moreover, the absence of predictability in the
22 handling of cross-border insolvency cases
23 impedes capital flows and is a disincentive to
24 cross-border investment. Fraud by insolvent

Page 59

MCCONNELL - HIGHLY CONFIDENTIAL
1  debtors, in particular by concealing assets or
2  transferring them to foreign jurisdictions, is
3  an increasing problem, in terms of both its
4  frequency and its magnitude." And then jumping
5  down on the same page, "The Model Law reflects
6  a universalism approach to transnational
7  insolvency.  It treats the multinational
8  bankruptcy as a single process in the foreign
9  main proceeding, with other courts assisting in
10 that single proceeding.  Westbrook, above it
11 715.  In contrast, under a territorialism
12 approach a debtor must initiate insolvency
13 actions in each country where its property is
14 found.  This approach is the so-called 'grab
15 rule' where each country seizes assets and
16 distributes them according to each country's
17 insolvency proceedings."  The next paragraph,
18 "Chapter 15 embraces the universalism
19 approach."  And then finally, "Chapter 15
20 improved predictability by mandating
21 recognition when a foreign proceeding meets
22 Section 1517 recognition requirements.  Leif M.
23 Clark."  And then, "One of the reasons congress
24 changed so little of the wording in the Model

Page 60

MCCONNELL - HIGHLY CONFIDENTIAL
1  Law was to endorse it wholesale, and encourage
2  wide adoption by other nations.  Westbrook,
3  above it 719."  What I would like you to assume
4  with me is that the positive -- that when it
5  refers to universalism in this case.
6 A.  In this case being this case?
7 Q.  No, sorry.  In the quotes we've just
8 read.
9 A.  In the ABC Learning Centres case?
10 Q.  In the ABC Learning Centres case.
11 In the quotes we just read I would just like
12 you to assume that the positive effects that
13 are identified in that case are positive
14 effects of modified universalism.  I would like
15 you to accept that as an assumption.
16 A.  Okay.
17     MR. SORKIN:  I haven't heard a
18 question yet, and I have been waiting
19 until there is one, but I think we are
20 about to get to questions.  I just want to
21 on the record object to this entire line
22 of questioning and the hypothetical as
23 incomplete, as out of context.  I haven't
24 seen modified universalism anywhere in

IN RE: NORTEL NETWORKS INC., et al.   HIGHLY CONFIDENTIAL

JOHN MCCONNELL
April 4, 2014

Page 61

MCCONNELL - HIGHLY CONFIDENTIAL

1    what we've read.  I have no way of knowing
2    that there is any indication anywhere that
3    these are positive effects of modified
4    universalism or that this case has any
5    relationship to modified universalism as
6    articulated by Judge Clark and Professor
7    Westbrook.
8       So for the limited purpose that you
9    want to simply assume -- have him assume a
10   document that is multiple pages that
11   you've just read for the last several
12   minutes, if not ten or more, that is fine,
13   but I will object to the entire line of
14   questioning as already stated.
15      **MR. BARRACK:** Obviously upset.
16   Q.  So if you assume the positive
17   effects that are identified in these quotes as
18   positive effects of modified universalism, in
19   order to determine from a policy perspective
20   whether it was appropriate to adopt modified
21   universalism we would have to measure the net
22   effect of the effects that you identify and any
23   other positive effects that might exist,
24   correct?

Page 62

MCCONNELL - HIGHLY CONFIDENTIAL

1       **MR. SORKIN:** Objection.
2    **A.  Can I have the question again,**
3    **please, sir?**
4    Q.  I'll make it more precise.  As an
5    academic, if you were going to test whether the
6    acceptance of modified -- to use your words,
7    the acceptance of modified universalism as a
8    general legal doctrine, we would want to test
9    the effects that you identify in your report
10   and any other positive effects of modified
11   universalism as well, correct?
12      **MR. SORKIN:** Objection.
13   **A.  I want to make sure I understand**
14   **your question.  In my report I talk about and**
15   **discuss and describe and offer an opinion with**
16   **respect to the likely effect of the adoption of**
17   **modified universalism as I understand Mr. Clark**
18   **and Mr. Westbrook have set forth.**
19   Q.  Understood.
20   **A.  I'm not making a policy prescription**
21   **or policy recommendation.  I believe we've**
22   **already established that.**
23   Q.  And you're not making an outcome
24   recommendation to the court; you're not

Page 63

MCCONNELL - HIGHLY CONFIDENTIAL

1    advising the court it should make a decision
2    one way or the other with respect to
3    allocation, you're simply identifying certain
4    impacts?
5    **A.  With respect to paragraph 67, 68 and**
6    **69?**
7    Q.  Right.
8    **A.  You're not referring to other parts**
9    **of my report with that statement, I assume?**
10   Q.  No.  Let's take that up.  Are you
11   making a recommendation to the court as to an
12   allocation methodology that should be adopted
13   in the Nortel case?
14   **A.  To the extent Clark and Westbrook**
15   **are proposing an allocation methodology, and I**
16   **believe they are, I'm putting forth evidence**
17   **that contradicts their -- or actually is**
18   **consistent with their proposition that their**
19   **allocation method should be ignored if their**
20   **creditor expectations to the contrary.  To the**
21   **extent that I am therefore putting forth**
22   **evidence that contradicts their proposition in**
23   **which they have in essence established or set**
24   **the foundation for, then in that respect I am**

Page 64

MCCONNELL - HIGHLY CONFIDENTIAL

1    **making a recommendation to the court, if I**
2    **understand your question.**
3    Q.  Well, let's break it down.  In your
4    report you're telling me that you challenge the
5    assumption of creditor expectation in the
6    Westbrook and Clark report, correct?
7    **A.  I don't know if it's an assumption**
8    **or an assertion.**
9    Q.  An assertion.  Call it an assertion.
10   The assertion of creditor expectation, correct?
11   You challenge that assertion?
12   **A.  It could be an assumption but my**
13   **impression is it's an assertion.**
14   Q.  Fine, let's have it your way.  You
15   challenge the assertion of creditor expectation
16   of Clark and Westbrook?
17   **A.  That's correct.**
18   Q.  And you also identify the effects of
19   implementing what you call modified
20   universalism, correct?
21   **A.  I believe it's what they call**
22   **modified universalism.**
23   Q.  What you call it -- they call it --
24   you identify in your report cause and effect

IN RE: NORTEL NETWORKS INC., et al.   HIGHLY CONFIDENTIAL

JOHN MCCONNELL
April 4, 2014

Page 65

MCCONNELL - HIGHLY CONFIDENTIAL
1
2  with modified universalism and you identify
3  impacts or effects from, as you say the
4  acceptance of modified universalism, correct?
5  A.  Can I have it again, please?
6  Q.  Yes.  You identify in your report
7  effects from the adoption of modified
8  universalism, correct?
9  A.  As I understand Mr. Clark and
10  Mr. Westbrook's conclusions with respect to
11  that, yes.
12  Q.  And with respect to the effects that
13  you identify, you previously told me that those
14  effects are there to be considered by the court
15  but don't indicate or advocate a particular
16  outcome?
17  A.  That's fair.
18  Q.  With respect to the identification
19  of creditor expectations and your challenge of
20  their assertion with respect to creditor
21  expectations, do your comments in your report
22  advocate an outcome for the allocation process
23  in this case?
24  A.  I can only answer, I think the
25  answer is yes.

Page 66

MCCONNELL - HIGHLY CONFIDENTIAL
1
2  Q.  And it's only to -- it's -- you
3  don't advocate a positive outcome, you only say
4  that the Westbrook and Clark should be
5  rejected?
6  A.  I say that the evidence rejects
7  Mr. Clark and Mr. Westbrook's assertion.
8  Q.  Of creditor expectation?
9  A.  With respect to creditor
10  expectations.  And I set forth that evidence
11  and my opinion is therefore that their
12  proposition as I understand it should be
13  rejected by the courts.
14  MR. BARRACK:  Okay, let's change the
15  tape and let's go to that evidence.
16  THE VIDEOGRAPHER:  This marks the
17  end of tape one.  The time is 10:33 a.m.
18  on April 4, 2014.  We are now off the
19  record.
20  (Off the record.)
21  THE VIDEOGRAPHER:  This marks the
22  beginning of tape two in the deposition of
23  John McConnell.  The time is 10:54 a.m. on
24  April 4th, 2014.  We are now back on the
25  record.  You may proceed.

Page 67

MCCONNELL - HIGHLY CONFIDENTIAL
1
2  Q.  Can you go to paragraph 29 of your
3  report, Professor McConnell.  It's at page 7.
4  A.  Yes, sir.
5  Q.  You say there, "As set forth by
6  Messrs. Clark and Westbrook modified
7  universalism stands in contrast to the
8  application of absolute priority across
9  creditors in the event of a corporate
10  bankruptcy and reorganization or liquidation."
11  That is based on the definition of modified
12  universalism that you gave me earlier, correct?
13  A.  My interpretation of Mr. Clark and
14  Mr. Westbrook's usage of that term, yes.
15  Q.  In this case we've identified that
16  the only application of modified universalism
17  would be to the Nortel bonds and to the
18  guarantees applicable to those bonds, correct?
19  A.  I'm sorry.  I was reading this
20  paragraph.
21  Q.  In this case we've identified that
22  your concern with respect to -- in this Nortel
23  case your concern with the application of
24  modified universalism is to its application to
25  the treatment of the bonds and particularly the

Page 68

MCCONNELL - HIGHLY CONFIDENTIAL
1
2  guarantees of those bonds, correct?
3  A.  That is correct.
4  Q.  And so that there is nothing in this
5  case, as you rightly point out in paragraphs 21
6  and 22, if you look at the last sentences of
7  those two paragraphs, there is -- you say, "I
8  have been advised by counsel there is Nortel's
9  long-term debt does not feature any collateral
10  pledge and is entirely unsecured," in 21, and
11  then in 22, "I have been advised by counsel
12  that none of Nortel's long term debt contains
13  contractual subordination provisions."  The
14  implications in this case of the application of
15  modified universalism would have no impact on
16  bonds that had any collateral pledge, security
17  or contractual subordination, correct?
18  A.  I think we have talked about this to
19  the extent that the guarantees would fall into
20  that category.  The answer is yes.
21  Q.  But you'd say that the guarantees
22  don't fall into that category because none of
23  the Nortel bonds have those features, correct?
24  You've identified these features in 21 and 22
25  and you've said that the Nortel bonds don't

Page 69

MCCONNELL - HIGHLY CONFIDENTIAL

1
2 have them, correct?
3 **A.  That is correct.**
4 Q.  So that to the extent that the
5 result in this case would not affect any bonds
6 having those features, correct?
7 **A.  Again I want to emphasize that there**
8 **is -- S&P characterizes the bonds as being**
9 **structurally subordinated, so to that extent it**
10 **would apply.**
11 Q.  So -- but only -- and the only
12 reason they -- S&P characterizes them as
13 structurally subordinated is the presence of
14 the guarantee, correct?
15 **A.  That's my interpretation, yes.**
16 Q.  So if I could just pick up something
17 from this morning, with respect to the
18 documents reviewed, will you produce to us all
19 of the reports that Navigant prepared for you?
20      **MR. SORKIN:** Objection.  To the
21 extent that there is information
22 reflecting attorney-client privilege we
23 would object to it.  But we will take your
24 request under advisement.
25      **MR. BARRACK:** Thank you.

Page 70

MCCONNELL - HIGHLY CONFIDENTIAL

1
2      **MR. SORKIN:** And just to clarify,
3 when I am saying privileged, I am speaking
4 about the agreement that the parties have
5 in place with respect to experts in this
6 case.
7      **MR. BARRACK:** Understand.
8 Q.  So I would like to now go to the
9 rating agencies themselves.  So you -- there is
10 a number of statements in your reports about
11 what rating agencies did or did not do.  Did
12 you ask Navigant to review the rating agency
13 reports for you?
14 **A.  I did.**
15 Q.  Did they provide you with -- and you
16 refer to the S&P extensively and reports, end
17 quote, from those.  Did you look at all of the
18 rating agency reports?
19 **A.  I don't know if I looked at all of**
20 **the rating agency reports.**
21 Q.  Did you ask them to look at all the
22 rating agency reports?
23 **A.  I looked at all the rating agency**
24 **reports of which I'm aware.**
25 Q.  You became aware of them because

Page 71

MCCONNELL - HIGHLY CONFIDENTIAL

1
2 Navigant reviewed them for you?
3 **A.  Because I asked them to search for**
4 **them, yes.**
5 Q.  And then they searched them and gave
6 you the relevant -- what they considered to be
7 the relevant reports?
8      **MR. SORKIN:** Objection.
9 Q.  Did you review a greater number of
10 reports -- rating agency reports than are
11 referred to in your report?
12 **A.  Not that I recall.**
13 Q.  Do you know if Navigant reviewed a
14 greater number of rating agency reports than
15 are contained in your report?
16 **A.  I do not know.**
17      **MR. SORKIN:** Objection.
18 Q.  So let's go to paragraph 6 of your
19 report, at page 2.  6A, you say, "As a general
20 proposition, in evaluating debt issuances,
21 credit rating agencies take into account the
22 priority of repayment in the event of default."
23 And then let's go down to 6F.  You say, "Credit
24 rating agencies recognized NNI's contributions
25 to Nortel's revenues, cash flow, and assets by

Page 72

MCCONNELL - HIGHLY CONFIDENTIAL

1
2 assigning higher expected recovery rates for
3 debt guaranteed by NNI in classifying Nortel's
4 non-guaranteed debt as junior to the guaranteed
5 debt."  Was that true for all rating agencies?
6      **MR. SORKIN:** Objection.
7 **A.  I don't know.**
8 Q.  You don't know.  Was it true for all
9 of the rating agency reports that you reviewed?
10 **A.  Yes.  Prior to looking at this**
11 **report or writing my report, yes.**
12 Q.  Have you looked at some subsequent
13 to writing your report?
14 **A.  I have.**
15 Q.  Is it true based on the ones you've
16 reviewed subsequent to writing your report?
17 **A.  Is what true?**
18 Q.  That "credit rating agencies
19 recognized NNI contributions to revenues, cash
20 flow, and assets by assigning higher expected
21 recovery rates for debt guaranteed by NNI in
22 classifying Nortel's non-guaranteed debt as
23 junior to the guaranteed debt."
24 **A.  I would have to review those**
25 **reports, again as I sit mere.**

Page 73

MCCONNELL - HIGHLY CONFIDENTIAL

1     Q.  Well, we are going to do that.  But
2  do you recall subsequent to writing these
3  reports reviewing some credit agency reports
4  where that statement was not true?
5     A.  Where it's not true or not in the
6  report?
7     Q.  Not in the report.
8     A.  I do not know whether that statement
9  was in the reports that I have reviewed
10  subsequently.
11     Q.  Did you see reports -- when you say
12  "assigning higher expected recovery rates," if
13  I look up in a rating report, what metric do I
14  look at to determine the expected recovery
15  rate?
16     A.  The report to which I'm referring
17  here specifically is, I believe, cited in my
18  list of documents relied upon.
19     Q.  And I want to know what metric in
20  the rating report I look to to determine what
21  the expected recovery rate is?
22     A.  My recollection is that the recovery
23  in the Standard & Poor's report gives -- I
24  don't have the report in front of me.  My

Page 74

MCCONNELL - HIGHLY CONFIDENTIAL

1  recollection is that they give a higher
2  recovery rate.
3     Q.  But which metric in the report?  Do
4  I look at the rating or do I look at the
5  percentage recovery rate?
6     A.  Oh, I'm sorry.  My recollection is
7  it's the percentage recovery rate.
8     Q.  And then you go on to say -- so
9  assuming, "assigning higher expected recovery
10  rates," that's the percentage rate of recovery
11  rate that is included in that report, "in
12  classifying Nortel's non-guaranteed debt as
13  junior to the guaranteed debt."  Do you see
14  that in 6F?
15     A.  Yes.
16     Q.  When you say classifying non-
17  Nortel's guaranteed debt as junior to the
18  guaranteed debt, is that in the words of the
19  report or is there a metric that determines
20  what is senior and what is junior?
21     A.  That is in the words of the report.
22     Q.  And is it your recollection that
23  these bonds whether guaranteed or not
24  guaranteed were generally rated in the same

Page 75

MCCONNELL - HIGHLY CONFIDENTIAL

1  rating?
2     A.  My recollection is that they were
3  rated differently by Standard & Poor's.
4     Q.  And it's -- and so you take -- is
5  part of your opinion that credit rating
6  agencies differentiated between these bonds the
7  fact that they gave them different ratings?
8        MR. SORKIN:  Objection.
9     A.  I believe there are two parts to
10  that.
11     Q.  Is part of your assessment of
12  creditor expectations based upon the ratings
13  that rating agencies gave to the various series
14  of bonds?
15     A.  Can I have that question again,
16  please?
17     Q.  Is part of your assessment of
18  creditor expectations based upon the ratings
19  that rating agencies gave to the various series
20  of bonds?
21     A.  That's a factor that enters into my
22  consideration among other factors.
23     Q.  So if we go to paragraph 58 of your
24  report.  You -- actually, skim your eye over

Page 76

MCCONNELL - HIGHLY CONFIDENTIAL

1  58, your conclusion.  And so read 57 and 58 to
2  yourself.
3     A.  (Witness reading document).
4     Q.  And the point you're making in 57
5  and 58 is that if creditors expected to have --
6  that the bonds both guaranteed and
7  non-guaranteed were identical you would not
8  expect them to have the same rating, correct?
9        MR. SORKIN:  Objection.
10     A.  Say it again?
11     Q.  If creditors did not treat the
12  guaranteed and non-guaranteed bonds the same in
13  terms of their expectation of recovery you
14  would not expect them to be rated the same?
15     A.  Not necessarily.
16     Q.  So the fact that they are rated the
17  same is a neutral fact to you?
18     A.  The fact that a rating agency rated
19  them the same, if a rating agency rated them
20  the same, your question is what?  I'm missing
21  your question.
22     Q.  Does that impact at all on your
23  assessment of creditor expectations?
24     A.  I would say that I have looked at

Page 77

MCCONNELL - HIGHLY CONFIDENTIAL
various pieces of information.  The most
important piece of information to me are the
prices of the securities, which clearly from an
economic perspective in my view affirmatively
affect -- represent bondholders' expectations.
Other pieces of information are certainly
consistent, as I have tried to spell out here,
with the way in which those bonds were priced,
which in my view reflects bondholders'
expectations.  Even if -- to get to your
question if I may, even if the credit rating
agencies had rated them the same, to me the
telling piece of evidence is the prices that
investors were willing to pay to buy and sell
those bonds.
Q.  Fair enough.  So let's -- we will
come to prices in a minute but let's just stay
on prices for a second.
A.  Stay on prices for a second?
Q.  Stay on prices for a second.  Prices
of bonds are expressed in terms of absolute
dollars, yields and spreads, correct?
A.  No.
Q.  Okay.  You can express the price of

Page 78

MCCONNELL - HIGHLY CONFIDENTIAL
a bond in terms of the absolute dollar price
that someone pays for the bond, correct?
A.  Yes.
Q.  That price can be expressed as a
yield to maturity that that price creates,
correct?
MR. SORKIN:  Objection.
A.  I'm going to ask what you mean by
yield to maturity, because there are multiple
definitions of yield to maturity and I want to
be precise when I answer your question.  Which
particular yield to maturity do you have in
mind?
Q.  If I have a bond that has a
10 percent coupon rate, okay, and it pays
10 percent once a year every year, and I pay a
hundred dollars for that bond, and it's a
ten-year bond, it's going to yield me
10 percent, correct?
A.  Fair enough.
Q.  If I pay $200 for that bond it is
going to yield me 5 percent, correct?
A.  Fair enough.
Q.  That's what I mean by yield to

Page 79

MCCONNELL - HIGHLY CONFIDENTIAL
maturity.
A.  Okay.
Q.  Now, in the same way bonds can be
expressed as -- bond prices can be expressed
and are commonly expressed in terms of spreads
against government securities, correct?
A.  Could you be more precise?
Q.  Right.  So if I have a bond that
pays 10 percent per year for ten years once a
year, and there is an equivalent government
bond that pays 5 percent a year once a year for
ten years, there would be a 500 basis point
spread between that bond and the government
bond, correct?
A.  And they are both selling at par?
Q.  And they are both selling at par.
A.  That is a very important component
of your characterization.
Q.  Right.  That would be a 500 basis
point spread.  Are we together on that?
A.  We are -- I believe we are.
Q.  And are you aware that in Canada
bond prices are generally expressed by those
agencies that list bond prices as spreads

Page 80

MCCONNELL - HIGHLY CONFIDENTIAL
against government of Canada similarly termed
securities?
A.  I have not observed that, no.
Q.  You just don't know that one way or
the other?
A.  That is correct.
Q.  Would it surprise you if the fact
was that bond traders in Canada generally
express the prices of bonds as spreads against
government securities?
A.  Depending upon the way in which
they've calculated the spreads, and if some
trader were to tell me that that is the way
in which he or she thinks about pricing, I
would accept that.
Q.  Right.  Well, I want you to accept
that there are prices -- that the public
information that is disseminated about bond
prices in Canada identifies spreads against
similarly termed government securities, okay?
I want you to accept that.
A.  And by similarly termed you have
what in mind?
Q.  Maturity date.

Case 09-10138-MFW   Doc 17958-27   Filed 02/24/17   Page 23 of 77
IN RE: NORTEL NETWORKS INC., et al.   HIGHLY CONFIDENTIAL

JOHN MCCONNELL
April 4, 2014

Page 81

1      MCCONNELL - HIGHLY CONFIDENTIAL
2  A.  Okay.
3  Q.  So if you have a ten-year corporate
4    you can measure it against a ten-year
5    government, in simple terms.
6  A.  Okay.
7  Q.  I want you to accept that.
8      In terms of if that is the market
9    nomenclature for the pricing of bonds in
10   Canada, I want you to accept that as an
11   assumption.
12 A.  Okay.
13 Q.  Then you would expect on your theory
14   that the bonds with a guarantee would have a
15   lower spread against government of Canada's
16   than the bonds without the guarantee; they
17   would have a higher spread?
18     MR. SORKIN: Objection.
19 A.  It depends upon the way in which the
20   yields are calculated.
21 Q.  Understood.  But if we just had
22   exactly the same bond, exactly the same
23   maturity, exactly the same coupon rate, exactly
24   the same payment structure, then the bond that
25   had a guarantee, all other things being equal,

Page 82

1      MCCONNELL - HIGHLY CONFIDENTIAL
2    ceteris paribus, there would be a lower yield
3    on the guaranteed bond or a lower spread on the
4    guaranteed bond and a higher spread on the
5    non-guaranteed bond?
6      MR. SORKIN: Objection.
7  A.  Again it depends upon the way in
8    which the yields are -- or the yields to
9    maturities are calculated.
10 Q.  Professor, it doesn't -- with the
11   greatest respect, I want you to hold everything
12   else constant, including the way the yields are
13   calculated, okay?
14 A.  I think what you're asking me is
15   assume the prices are the same.
16 Q.  No, I'm not saying assume the prices
17   are the same.  I'm saying you have two bonds,
18   one with a guarantee and one without a
19   guarantee.  Your hypothesis is that the prices
20   in the marketplace should be different,
21   correct?
22 A.  That's correct.
23 Q.  Now I want to just do the simple
24   arithmetic so that when we come to spreads,
25   when we express that pricing hypothesis in

Page 83

1      MCCONNELL - HIGHLY CONFIDENTIAL
2    terms of spreads, what the difference should
3    be.  And if -- your hypothesis is that a bond
4    with a guarantee should be at a lower price and
5    a -- sorry, at a higher price, and the bond
6    without the guarantee should be at a lower
7    price, when we translate that thought into
8    spreads against governments, holding everything
9    else constant, other than the guarantee, you
10   would expect that the bond with the guarantee
11   would have a higher spread against government
12   securities and the bond with the guarantee
13   would have a lower spread, correct?
14     MR. SORKIN: Objection.
15 A.  I cannot answer that until you tell
16   me how you're calculating this yield to
17   maturity.
18 Q.  What variable do you need me to
19   advise you on?
20 A.  Well, is this an internal rate of
21   return?
22 Q.  What do you mean internal rate of
23   return?
24 A.  Yield to maturity as I think of it.
25 Q.  So assume it's yield to maturity.

Page 84

1      MCCONNELL - HIGHLY CONFIDENTIAL
2  A.  Okay.
3  Q.  What else do you need to know?
4  A.  That's it.
5  Q.  So have you satisfied yourself that
6    the yield to maturity -- so we're measuring
7    them on yield to maturity, okay?
8  A.  Yes.
9  Q.  Now let's go back to my question.
10   You have a yield to maturity.  You have two
11   bonds.  You have spreads against government of
12   Canadas.  On your thesis, the bond with the
13   guarantee would have a higher spread and the
14   bond without the guarantee -- sorry.  The
15   bond -- sorry.  The bond without the guarantee
16   would have the higher spread and the bond with
17   the guarantee would have the lower spread,
18   correct?
19     MR. SORKIN: Objection.
20 A.  To go back to your characterization
21   earlier, I think that's a tautology.  If I
22   understand your --
23 Q.  Well, it will be a tautology.
24   That's what I want you to agree with, because
25   your pricing assumption -- I just want to take

Case 09-10138-MFW   Doc 17958-27   Filed 02/24/17   Page 24 of 77

IN RE: NORTEL NETWORKS INC., et al.   HIGHLY CONFIDENTIAL

JOHN MCCONNELL
April 4, 2014

Page 85

MCCONNELL - HIGHLY CONFIDENTIAL
1
2  your pricing assumption and turn it into
3  spreads.
4  A.  And if the spread is measured as the
5  internal rate of return, which I do not know
6  whether that is what you have in mind, but if
7  that's the case, the answer is yes.
8  Q.  Okay.  So we are going to come back
9  to prices and we are going to look at prices
10  but we are going to go to rating agencies,
11  which you say is a minor factor compared to
12  prices, correct?
13      MR. SORKIN:  Objection.
14  A.  I don't know that I used the word
15  minor.
16  Q.  Less persuasive?
17  A.  I would say it's a factor to be
18  considered.
19  Q.  Let's talk about rating agencies.
20  You've identified two metrics in the rating
21  agencies.  You identified the recovery rates,
22  correct?
23  A.  Yes.
24  Q.  And you identified the rating that
25  the agencies give to bonds, correct?  Those are

Page 86

MCCONNELL - HIGHLY CONFIDENTIAL
1
2  the two metrics you've identified.
3  A.  May I read my report for a minute,
4  please?
5  Q.  Sure.
6  A.  (Witness reading report).  I would
7  say that's not the only factors.
8  Q.  No.  Metrics.  Metrics from rating
9  agencies.  I would like to know the metrics
10  that rating agencies identify.  In addition to
11  the rating of the bond and the recovery rates,
12  are there other metrics from rating agencies
13  that you've identified?
14  A.  (Witness reading report).
15  Q.  So did you read your report,
16  Professor?
17  A.  Yes, I'm reflecting upon that.
18  Q.  Okay.
19  A.  I do have other discussions of my --
20  in my report.
21  Q.  I know discussion -- sorry to cut
22  you off.
23  A.  With respect to credit rating
24  agencies' characterizations of the bonds, a
25  question in this matter and generally factors

Page 87

MCCONNELL - HIGHLY CONFIDENTIAL
1
2  that credit rating agencies take into account,
3  if you are precluding that information with
4  respect to your question, if you're precluding
5  that information, then yes, I do talk about
6  recovery rates and ratings.
7  Q.  Thank you.
8      (Whereupon Exhibit 12036 was marked
9  for identification.)
10  Q.  What I'm showing you purports to be
11  Moody's Investors Services rating agency credit
12  research June 16, 2006 with respect to Nortel.
13      Can you flip over to the second page
14  of that rating agency report.
15  A.  I have a feeling you don't mean the
16  second page but I don't want to tell you.
17  Q.  Well, they are two-sided, so the
18  back of the first page I call that the second
19  page.  Maybe because we use the metric system
20  in Canada.
21  A.  No comment.
22  Q.  So -- and you might want to pull out
23  your bond chart as well.
24  A.  My bond chart or your bond chart?
25  Q.  Either bond chart.  Use mine so that

Page 88

MCCONNELL - HIGHLY CONFIDENTIAL
1
2  we can work through these together.
3      MR. SORKIN:  You're referring to
4  Exhibit 12034, correct?
5      MR. BARRACK: Thank you.  Is that
6  what it is?
7  Q.  So if we look at the ratings on
8  these bonds, if we go down, "Proposed 2 billion
9  senior unsecured notes," and this credit report
10  is as of June 16, 2006, and if we look at 12034
11  we see they were priced on the 29th of June '06
12  and we see --
13  A.  I'm sorry, I'm not sure where you
14  are here.
15  Q.  Go to this document.
16  A.  I'm sorry.
17  Q.  Go to 12304, just so we understand
18  where we are.  Just to locate where we are,
19  this is a rating report of June 16, 2006.
20  A.  Yes.
21  Q.  We know that the issue date -- the
22  bonds of the July 2011s, the July 2013, and the
23  July 2016, do you see those in the left-hand
24  column?
25  A.  Yes, I do.

Page 89

MCCONNELL - HIGHLY CONFIDENTIAL

1
2  Q.  And 1 billion 550 and 450 adds up to
3  2 billion, correct?
4  A.  I believe so.
5  Q.  And these were bonds that had an NNI
6  guarantee, correct?
7  A.  Yes, sir.
8  Q.  And these bonds are in this rating
9  report given a B3 rating, correct?
10 A.  Yes, sir.
11 Q.  And if we go to -- if we go down to
12 the 6.875, what is referred to senior notes,
13 that's equal to the bond chart, 12034, that is
14 the first bond that is listed due
15 September 2023, and those are the
16 non-guaranteed bonds, correct?
17 A.  Yes, sir.
18 Q.  And those are similarly given a B3
19 rating, correct?
20 A.  They were changed from B2 to B3,
21 yes.
22 Q.  And if we go down to the bottom
23 where it says "Nortel Networks Capital
24 Corporation, 7.875 senior unsecured notes," do
25 you see those?  And if we go to 12034, we -- in

Page 90

MCCONNELL - HIGHLY CONFIDENTIAL

1
2  the second row we see "US 150 million 7.875
3  senior notes due June 2026," correct?
4  A.  Yes.
5  Q.  Those were issued by NN Capital
6  Corporation, and you told me before you know
7  nothing about NN Capital Corporation, whether
8  it had any assets?
9  MR. SORKIN: Objection.
10 A.  I do not know the structure of the
11 business, the undertakings of NNCC.
12 Q.  And NNL was the guarantor, not NNI?
13 A.  That is correct.
14 Q.  And if we go back to paragraph 6F of
15 your report at page 2, the expectation -- you
16 say, "Credit rating agencies recognized NNI's
17 contributions to Nortel's revenues, cash flows
18 and assets by assigning higher expected
19 recovery rates for debt guaranteed by NNI.  In
20 classifying Nortel's non-guaranteed debt as
21 junior to the guaranteed debt this would not be
22 debt that was guaranteed by NNI," correct?
23 MR. SORKIN: Objection.
24 A.  This being?
25 Q.  The June 2026s.

Page 91

MCCONNELL - HIGHLY CONFIDENTIAL

1
2  A.  That is correct.
3  Q.  Now, I don't see any reference to
4  that series of bonds in your reports.  Is there
5  any reference to that series of bonds in your
6  reports?
7  A.  There is not.
8  Q.  Why not?
9  A.  What I was attempting to do is to
10 have an experiment where I was comparing bonds
11 that differed only with respect to one factor.
12 In this instance, the NNCC bond, I did not have
13 a comparable to compare it to.
14 Q.  So I want you to assume for the
15 purpose of your testimony that NNCC is a
16 corporation that has no assets or no
17 substantial assets of any significance.
18 MR. GUINEY: Objection.
19 Q.  And that it does not -- that the
20 only guarantee of these bonds is by NNL and
21 there is no access in these bonds to the assets
22 of NNI.
23 MR. GUINEY: Objection.
24 Q.  Will you assume that with me?
25 A.  I believe I followed your

Page 92

MCCONNELL - HIGHLY CONFIDENTIAL

1
2  assumptions that there were some byplay in
3  here.
4  Q.  The most critical assumption is that
5  the bondholders of these bonds have looked to
6  the pool of assets for their recovery, the NNL
7  pool of assets, and do not have access for
8  their recovery on the terms of the bonds to
9  NNI.
10 MR. SORKIN: That's the assumption
11 you want him to make.
12 Q.  That's the assumption I want you to
13 make.  Okay?
14 A.  Yes.
15 Q.  Do you have any -- are you aware of
16 any facts that would contradict that
17 assumption?
18 MR. SORKIN: Objection.
19 A.  Well, I have not explored the NNCC
20 bonds.  They did not fit within the framework
21 of the analysis that I was attempting to
22 conduct.
23 Q.  Understand.
24 A.  So if you're asking me do I -- have
25 I done an exploration of those, no.

IN RE: NORTEL NETWORKS INC., et al.   HIGHLY CONFIDENTIAL

JOHN MCCONNELL
April 4, 2014

Page 93

MCCONNELL - HIGHLY CONFIDENTIAL

1
2  Q.   So if my assumption holds that those
3  2026 bonds had access only to the NNL pool of
4  assets and not the NNI pool of assets.
5  A.   Okay.
6  Q.   They would be economically
7  equivalent, all other things being equal, to
8  the non-guaranteed bonds, correct?
9      MR. SORKIN: Objection.
10 A.   I would have to take a look at the
11 structure of the bonds and know something more
12 about them before I can offer a definitive
13 answer on that question.
14 Q.   So if we look at this rating agency,
15 they rated those bonds as B3, the same as the
16 bonds, correct?  Down in the bottom, just above
17 "The outlook is stable."
18 A.   That is correct.
19     MR. BARRACK: Can we go off for a
20 couple of minutes and we'll organize
21 these.
22     THE VIDEOGRAPHER: The time is
23 11:29 a.m. on April 4th.  We are now off
24 the record.
25     (Off the record.)

Page 94

MCCONNELL - HIGHLY CONFIDENTIAL

1
2      THE VIDEOGRAPHER: The time is
3  11:41 a.m. on April 4th, 2014.  We are now
4  back on the record.  You may proceed.
5  Q.   So I'm going to show you next,
6  Professor McConnell, a rating agency report of
7  DBRS of July 6, 2006 for the Nortel Networks
8  Corporation and Nortel Networks Limited.
9      (Whereupon Exhibit 12037 was marked
10 for identification.)
11 Q.   You can either look at the first
12 page of this, which has the various ratings for
13 the various series of bonds, but it's easier to
14 flip over to the chart on the second -- on page
15 2, "Nortel Debt Issuing Entities Estimate as of
16 July 5, 2006," and you will see there that
17 there are listed the US $1.8 billion notes due
18 2008 under Nortel Networks Corporation Canada,
19 rated minus B (low), and then under Nortel
20 Networks Limited Canada, B (low).  So those
21 2008 bonds are B (low), and then all of the
22 Series B (low) the US 1 billion unsecured due
23 the 2011, the 2013s and the 2016s, which make
24 up the 2 billion notes that we talked about.
25 And the 2023s, which are the unsecured notes

Page 95

MCCONNELL - HIGHLY CONFIDENTIAL

1
2  that we talked about on Exhibit 12034.  All of
3  those are given a minus B (low) rating,
4  correct?
5  A.   That's my reading, yes.
6  Q.   Did you review this report?  Do you
7  recall reviewing this report?
8  A.   Not prior to resubmitting my report.
9  Q.   Okay.  Did you review it after you
10 submitted your report?
11 A.   I have.
12 Q.   You didn't do any amendment or any
13 errata to your report?
14 A.   I did not.
15     MR. BARRACK: Next.
16     Madam reporter, would you like to
17 give this an exhibit number.
18     (Whereupon Exhibit 12038 was marked
19 for identification.)
20 Q.   What we are looking at is a Moody's
21 Investor Service rating of March 22, 2007.
22     Did you look at this rating report
23 before you submitted your report?
24 A.   I don't recall doing so.
25 Q.   Do you recall looking at it after

Page 96

MCCONNELL - HIGHLY CONFIDENTIAL

1
2  you submitted your report?
3  A.   I reviewed some Moody's materials.
4  I do not recall if this was one of them.
5  Q.   So let's -- so the date of this is
6  March 2007, so if we go to our chart at Exhibit
7  12034, and we see proposed $1 billion
8  convertible senior unsecured notes guaranteed
9  by Nortel Networks Limited, these would be the
10 April 2012s and the April 2014 notes that we
11 are talking about.  And if we go on the first
12 page to those proposed 1 billion convertible
13 senior unsecured notes, the rating they are
14 giving is B3; is that correct?
15     MR. SORKIN: Objection.  I'm sorry.
16 Just to clarify, on Exhibit 12034 we are
17 talking about the fourth row?
18     MR. BARRACK: Yes, the fourth row.
19     MR. SHAKRA: There is additional
20 uptake later on and that's why you'll see
21 a variance in the number, in the amount.
22     MR. SORKIN: Additional uptake in
23 the 757 million.
24     MR. SHAKRA: There is uptake that
25 leads to the 575 million.

Page 97

1    MCCONNELL - HIGHLY CONFIDENTIAL
2    MR. SORKIN: So the chart on 12034
3    that counsel has prepared summarizing is
4    the complete issuance, not the issuance
5    proposed at the time that is in
6    Exhibit 12038?
7    MR. BARRACK: Yes.
8    Q. So that that series of bonds were
9    given a B3 rating, correct?
10   A. The colloquy left me a little --
11   Q. Let me locate you, Professor
12   McConnell. That's fair. If we go down to the
13   heading "The following" -- where it says --
14   half to a third of the way down the page, "The
15   following rating was assigned" --
16   A. Oh, 12034. Three quarters of the
17   way down?
18   Q. No, the Moody's rating.
19   A. The 38.
20   Q. You see where the heading is "Nortel
21   Networks Corporation"? Below that it says,
22   "Proposed 1 billion convertible senior
23   unsecured notes guaranteed by Nortel Networks
24   Limited."
25   A. Yes, I see that.

Page 98

1    MCCONNELL - HIGHLY CONFIDENTIAL
2    Q. Given the date of this and knowing
3    there was a greater uptake than proposed than
4    what we are dealing with is the third -- sorry,
5    the fourth row on Exhibit 12034.
6    A. Just to make sure -- I'm looking on
7    12034 I'm looking at the fourth box?
8    Q. Yes.
9    A. And in that fourth box we have
10   575 million of 1.3 -- one and three quarters
11   convertibles, and another 575, 8, right?
12   Q. Right.
13   A. And now in 038 we are looking at a
14   billion dollars.
15   Q. Right. And the reason is that there
16   was a greater -- the numbers in the chart are
17   what was actually issued. This is what was
18   proposed to be issued.
19   A. Okay, got it.
20   Q. And those are given a B3 rating?
21   A. That's correct.
22   Q. And this other metric that you refer
23   to, this LGD4 67 percent, what do you
24   understand that to be?
25   A. I don't know.

Page 99

1    MCCONNELL - HIGHLY CONFIDENTIAL
2    Q. That 67 percent, as I understand it,
3    is the loss given default rating. It's an
4    assessment of the loss given default. That's
5    the other metric that you refer to, recovery
6    ratios in your report?
7    A. It's one minus that.
8    Q. When you say one minus that, what do
9    you mean?
10   A. The recovery rate -- 67 percent is
11   the loss. The recovery would be one minus
12   67 percent.
13   Q. Understood. And that series of
14   bonds is given 67 percent. So that if we go
15   down then to the 1.8 billion, 4.2 -- oh, no,
16   leave the convertibles aside. But the
17   convertibles we do know are given a B3,
18   67 percent as well. If we go down under the
19   heading "Nortel Networks Limited," the
20   corporate family rating is B3. And again the
21   LGD4 is 67 percent. That doesn't relate to any
22   specific bond but just generally?
23   A. That's my understanding, yes.
24   Q. Then the next line, the 2 billion
25   unsecured notes, that would -- you refer to the

Page 100

1    MCCONNELL - HIGHLY CONFIDENTIAL
2    July 2011s, the July 2013s and the July 2016s
3    on Exhibit 12034; is that your understanding?
4    A. Yes, that is my understanding.
5    Q. And they are just similarly given a
6    B3 rating and an LGD4 of 67 percent?
7    A. That is correct.
8    Q. And the 200 million 6.875 senior
9    unsecured notes, those would be, on 12034 in
10   the first row, the September 2023s, the bonds
11   without the guarantee?
12   A. Yes.
13   Q. And those are given a B3 rating and
14   an LGD4 67 percent, correct?
15   A. That is correct.
16   Q. So this rating agency in this report
17   makes no differentiation on those two metrics,
18   between the guaranteed and non-guaranteed
19   bonds, correct?
20   A. That's fair.
21   MR. BARRACK: Madam reporter, can we
22   give this document an exhibit number.
23   (Whereupon Exhibit 12039 was marked
24   for identification.)
25   Q. If you look up in the top left

Page 101

1    MCCONNELL - HIGHLY CONFIDENTIAL
2  corner, this is a DBRS report of November 9,
3  2007.  Do you see that?
4  **A.  Up in the upper right-hand corner?**
5  Q.  Upper left-hand corner.  Do you see
6  previous report July 6?
7  **A.  Oh, I'm sorry.  Yes, I see that.**
8  Q.  And again, as DBRS does, they -- if
9  we go to the page 2 of this report, they have
10  an organizational chart where they set out the
11  various outstanding bond issues.  If you review
12  it, we don't have to go through them all, but
13  they are all given exactly the same reason of B
14  (low), correct.
15  **A.  That is correct.**
16  Q.  Did you review this report before
17  delivering your report?
18  **A.  I did not.**
19  Q.  Did you view it subsequent to
20  delivering your report?
21  **A.  I do not recall specifically this**
22  **report as opposed to other reports.  I may**
23  **have.**
24  Q.  Did you review some DBRS reports
25  after you delivered your report?

Page 102

1    MCCONNELL - HIGHLY CONFIDENTIAL
2  **A.  I did.**
3  Q.  And you did not issue any errata or
4  change to your report after reviewing those?
5  **A.  That is correct.**
6  Q.  Thank you.
7     (Whereupon Exhibit 12040 was marked
8  for identification.)
9  Q.  I'm showing you, sir, another
10  Moody's rating report.  This one, if we look at
11  the top right-hand corner, is dated May 21,
12  2008.  And again on the first page of this, if
13  you'll -- and rather going through line by
14  line, just take a minute and look at all of the
15  bond issues of Nortel that are referred to
16  there whether guaranteed or un-guaranteed are
17  given a B3 rating and an LGD4 of 66 percent.
18  **A.  I believe that is not correct.**
19  Q.  Which one --
20  **A.  Oh, I'm sorry.  I was looking at the**
21  **wrong statistic.  Yes, I agree with you.**
22  Q.  Did you review this rating report
23  before you delivered your report?
24  **A.  I did not.**
25  Q.  Did you review it after you

Page 103

1    MCCONNELL - HIGHLY CONFIDENTIAL
2  delivered your report?
3  **A.  I do not recall seeing this.  I**
4  **believe not.**
5  Q.  I would like to show you another
6  document, sir.
7     (Whereupon Exhibit 12041 was marked
8  for identification.)
9  Q.  This a DBRS report July 14, 2008,
10  and what I would like you to turn to is the
11  second page of this document.  The last -- or
12  sorry, the second to last paragraph on that
13  page, "Some of Nortel's debt."  Do you see
14  where I am?
15  **A.  I do.**
16  Q.  It reads, "Some of Nortel's debt
17  carries a guarantee from its US subsidiary
18  Nortel Networks Inc. (NNI), which DBRS believes
19  gives these notes superior recovery prospects
20  versus the notes that do not carry such a
21  guarantee.  However, the notes that mature in
22  2023 and 2026 that do not carry a guarantee
23  from the U.S. operating subsidiary NNI have
24  default recovery prospects that are not
25  sufficiently inferior to cause them to be rated

Page 104

1    MCCONNELL - HIGHLY CONFIDENTIAL
2  differently.  All of these notes have an
3  expected recovery in default that DBRS
4  considers average and consistent with a
5  recovery rating of RR4 and an instrument rating
6  of B (low)."  Did you review this report before
7  you delivered your report?
8  **A.  Again, I reviewed various or some**
9  **DBRS reports.  I don't recall specifically**
10  **reviewing this report.  May I read that**
11  **paragraph that you just read?**
12  Q.  Yes, sure.
13  **A.  (Witness reading document).  Okay.**
14  Q.  Do you recall if you reviewed it
15  after you delivered your report?
16  **A.  I don't recall specifically this**
17  **document, this specific document.  I may have.**
18  Q.  I understand what you told me
19  earlier about prices being the more precise
20  indicator of creditor expectations, but would
21  you agree that this rating agency did not
22  assign a significant economic difference
23  between the bonds with the guarantee and the
24  bond without the guarantee?
25     **MR. SORKIN:** Objection.

Case 09-10138-MFW   Doc 17958-27   Filed 02/24/17   Page 29 of 77

IN RE: NORTEL NETWORKS INC., et al.   HIGHLY CONFIDENTIAL

JOHN MCCONNELL
April 4, 2014

Page 105

1      MCCONNELL - HIGHLY CONFIDENTIAL
2  A.  No, I would not agree with that.
3  Q.  Okay.  We will let the words speak
4  for themselves.
5  A.  The way you phrased the question.
6  Q.  Okay.  The last one of these, sir.
7      (Whereupon Exhibit 12042 was marked
8  for identification.)
9  Q.  This is a Moody's report dated
10  December 15, 2008, one month prior to the
11  insolvency.  Did you review this report before
12  you delivered your report?
13  A.  I did not to my knowledge.
14  Q.  Did you review it after you
15  delivered your report?
16  A.  I do not recall reviewing this
17  specific report.
18  Q.  If you will look on the first page,
19  each of the series of bonds that is issued are
20  given a CAA2 rating and the LGD3 of 37 percent.
21  Do you see that?
22  A.  Yes.
23  Q.  And so that Moody's was making no
24  differentiation between a guarantee by NNL and
25  a guarantee by NNI, right?

Page 106

1      MCCONNELL - HIGHLY CONFIDENTIAL
2      MR. SORKIN: Objection.
3  A.  With respect to this report and the
4  information on this report that would be a fair
5  characterization.
6  Q.  All right.  Thank you.  I've got one
7  broad area to go over with you.  So what I
8  wouldn't mind if we break for lunch now.  Let
9  me organize and I can shorten it down and make
10  sure we got the paper.
11      MR. BARRACK: Okay, let's break now.
12  Thank you.
13      THE VIDEOGRAPHER: The time is
14  11:59 a.m. on April 4, 2014.  We are now
15  off the record.
16      (Lunch recess)
17
18      AFTERNOON SESSION
19      THE VIDEOGRAPHER: This marks the
20  beginning of tape three in the deposition
21  of John McConnell.  The time is 1:02 p.m.
22  on April 4th, 2014.
23      We are now back on the record and
24  you may proceed.
25  CONTINUED EXAMINATION

Page 107

1      MCCONNELL - HIGHLY CONFIDENTIAL
2      BY MR. BARRACK:
3  Q.  Professor McConnell, I would like to
4  turn now to talk a little bit about the nature
5  of the guarantees that were provided in the
6  Nortel bonds.  Did you review the bond
7  indentures to understand those guarantees?
8  A.  I reviewed the bond indentures in
9  part to understand their guarantees, yes.
10  Q.  We will come to pricing
11  specifically, but is it your understanding when
12  investors look at bond terms, when deciding
13  whether to purchase a bond, they look at
14  something that I refer to as structural risk in
15  being the features of the particular bond?
16      MR. SORKIN: Objection.
17  A.  If I understand your question, the
18  answer would be yes.
19  Q.  And, for instance, in paragraphs,
20  and we referred to it several times, paragraphs
21  20 and 21 of your report -- sorry, 21 and 22 of
22  your report.  You identify a number of features
23  that may exist in other bonds that would be
24  taken into account, you would expect investors
25  to take into account when purchasing bonds?

Page 108

1      MCCONNELL - HIGHLY CONFIDENTIAL
2  A.  Can I have the question again, sir.
3  Q.  There are a number of features that
4  you identified in paragraphs 21 and 22 which
5  are not present in the Nortel bonds.  But if
6  those features were present in a bond, you
7  would expect creditors -- your expectation is
8  creditors would take those into account in
9  deciding at what price whether to purchase a
10  bond or not purchase a bond, and if they did
11  decide to purchase a bond, the price at which
12  they would purchase the bond?
13  A.  Yes, sir.
14  Q.  And just so we have nomenclature
15  between us, and if you want to change it, give
16  me whatever, I call that an assessment of the
17  structural risk associated with the bond.  Do
18  you have a term that you like better than that?
19  A.  Now that you've defined what you
20  have in mind, I'm perfectly fine with that
21  definition.
22  Q.  And an assessment of the guarantees,
23  similarly would be on that definition an
24  assessment of the structural risk associated
25  with the bond?

Page 109

MCCONNELL - HIGHLY CONFIDENTIAL
1
2  A.  Fair enough, as I understand it,
3  yes.
4  Q.  To the extent that guarantees are
5  provided in the Nortel bonds, what that means
6  is that in the event of an insolvency the bond
7  debtor will have a claim to pools of assets in
8  more than one entity; is that fair?
9  A.  That's my understanding, yes.
10  Q.  In these Nortel bonds there were
11  very few additional protections provided with
12  the guarantees other than that right to claim
13  from the pools of assets in more than one
14  entity?
15      MR. SORKIN: Objection.
16  A.  I'm not sure I would go that far,
17  but I do not recall the particular
18  characteristics of the indentures by heart as I
19  sit here.  I would have to review them in
20  detail before I could agree with that.
21  Q.  Do you recall generally that the
22  Nortel bonds did not limit the number of other
23  creditors who could have access to either NNL
24  or NNI?
25  A.  Could I have the question again,

Page 110

MCCONNELL - HIGHLY CONFIDENTIAL
1
2  please?
3  Q.  Do you recall that bonds did not
4  limit the number of other creditors who could
5  make claims against either NNL or NNI?
6  A.  I would have to review the indenture
7  to be certain that that provision is in the
8  indenture.
9  Q.  You don't recall that sitting here
10  today?
11  A.  I do not recall it specifically as I
12  sit here today.
13  Q.  Do you recall whether --
14  A.  I'm not saying it's not in there.  I
15  just don't recall.
16  Q.  No, I understand, you just don't
17  recall.  Similarly, do you recall that the
18  Nortel bonds do not limit NNL or NNI from
19  providing guarantees of all other Nortel
20  entities' debts?
21  A.  Now I have lost the question.
22  Q.  Do you recall from your review of
23  the indentures that those indentures did not
24  limit either NNL or NNI's ability to provide
25  guarantees of all other Nortel entities' debts?

Page 111

MCCONNELL - HIGHLY CONFIDENTIAL
1
2  A.  Again, I would have to review the
3  indentures to know the specific language.
4  Q.  You just don't recall one way or the
5  other?
6  A.  That's fair.
7  Q.  Would you agree with the statement
8  that the covenants in these indentures
9  governing the notes and guarantees contain
10  significant exceptions and carve-outs?
11      MR. SORKIN: Objection.
12  A.  Can I have that again?
13  Q.  That the covenants in the indentures
14  governing the notes and guarantees contain
15  significant exceptions and carve-outs?
16      MR. SORKIN: Objection.
17  A.  Again, I would want to -- before
18  responding I would like to have the indenture
19  to review.
20  Q.  Did you review any of the offering
21  memoranda associated with the bonds?
22  A.  Yes, I did.  Well, prospectuses if
23  you're using that term synonymously.
24      (Whereupon Exhibit 12043 was marked
25  for identification.)

Page 112

MCCONNELL - HIGHLY CONFIDENTIAL
1
2  Q.  What I'm showing you, sir, is the --
3  if you take the clip off -- for abundance of
4  completeness we produced the whole document.
5  Just to identify it first, we are looking here
6  at an Offering Memorandum for Nortel Networks
7  Limited for the $2 billion offering of the
8  2016, 2013 and 2011 bonds.  That is -- I don't
9  know if this document is dated, whether
10  June 2006 is the time period that this would
11  have been issued.  And if we go to page 29 of
12  this document -- first of all, did you review
13  this document?
14  A.  I reviewed parts of it.
15      MS. A. MILLER: Could you refer to
16  the number by Bates number?
17      MR. BARRACK: Sure.
18      MS. A. MILLER: Thank you.
19  Q.  So this document is Bates number
20  CCC0004590.  We haven't been able to identify
21  it previously marked as an exhibit.  So if you
22  could go to page 29 of this document, which is
23  Bates number CCC0004630.  Are you there, sir?
24  A.  Yes, sir.
25  Q.  Sorry.  I was asking you if you have

IN RE: NORTEL NETWORKS INC., et al.    HIGHLY CONFIDENTIAL

JOHN MCCONNELL
April 4, 2014

Page 113

MCCONNELL - HIGHLY CONFIDENTIAL
1
2  reviewed this -- you said you had reviewed
3  parts of this document?
4  **A.  That's correct.**
5  Q.  Would that have been in a summary
6  that would have been prepared by Navigant by
7  you?
8  **A.  I would say both.  That I reviewed**
9  **some parts of these documents.  When I am**
10 **saying documents, I'm referring to the offering**
11 **memoranda myself, but I also had summarizations**
12 **provided to me.**
13 Q.   So you see at the bottom it reads,
14 "The covenants in the indenture will contain
15 significant exceptions and 'carve-outs' which
16 may provide less protection to holders of Notes
17 than indentures governing securities of
18 comparably rated companies, and many of these
19 covenants will cease to be in effect should the
20 ratings on the Notes increase to investment
21 grade."  As a professor of finance, would you
22 agree with the statement in the offering
23 memorandum that these covenants "contain
24 significant exceptions and 'carve-outs' which
25 may provide less protection to holders of Notes

Page 114

MCCONNELL - HIGHLY CONFIDENTIAL
1
2  than indentures governing securities of
3  comparably rated companies"?
4  **MR. SORKIN:** Objection.
5  **A.  And your question is have I read**
6  **that?**
7  Q.  No.  Do you agree with that
8  statement?
9  **A.  Do I agree with the following**
10 **statement, that the covenants in the indenture,**
11 **that is an indenture that will govern the**
12 **Nortel Networks Limited bonds that are cited on**
13 **the front page?**
14 Q.  Yes, sir.
15 **A.  Do I agree that "covenants in the**
16 **indenture will contain significant exceptions**
17 **and 'carve-outs' which may provide less**
18 **protections to holders of Notes than indentures**
19 **governing securities of comparably rated**
20 **companies, and many of these covenants will**
21 **cease to be in effect should the ratings on the**
22 **Notes increase to investment grade."  Are you**
23 **asking me --**
24 Q.  I'm asking you, that is a
25 prospective statement.  With respect to those

Page 115

MCCONNELL - HIGHLY CONFIDENTIAL
1
2  bonds once issued, if you take it from
3  prospective to an actual statement, do you
4  agree with that statement is correct as applied
5  to the covenants applicable to these bonds as
6  issued?
7  **MR. SORKIN:** Objection.
8  **A.  Well, it's hard to disagree with the**
9  **statement when it says it may provide.**
10 Q.  Do you agree that it does provide?
11 **MR. SORKIN:** Objection.
12 **A.  I would have to review the**
13 **indentures again.**
14 Q.  Will you run your eye down the
15 bullet points on page 30, Bates number
16 CC0004631, and tell us whether that description
17 of the carve-outs in the various covenant
18 patterns is consistent with your reading of the
19 indentures?
20 **MR. SORKIN:** Objection.  Are you
21 asking him if these bullet points are an
22 accurate reflection of what is actually
23 contained in the indenture?
24 **MR. BARRACK:** Yes.
25 **MR. SORKIN:** Same objection.

Page 116

MCCONNELL - HIGHLY CONFIDENTIAL
1
2  **A.  Could I have the question, please,**
3  **now?**
4  Q.  Yes.  Sure, go ahead.
5  **A.  Can I have the question?**
6  Q.  Oh, the question is are the
7  statements in the bullet points consistent with
8  your reading of the indentures?
9  **MR. SORKIN:** Objection.
10 **A.  I would have to take a look at the**
11 **indentures again to be certain.**
12 Q.  And if I ask you any questions about
13 what is in the indentures, about what
14 protections they provide or don't provide,
15 you're going to give me the same answer, that
16 you have to go back and look at the indentures?
17 **MR. SORKIN:** Objection.
18 **A.  I don't know.  It would depend on**
19 **the question.**
20 Q.  Do you have any reason to believe
21 that these bullet points are incorrect based on
22 your review of the indentures?
23 **MR. SORKIN:** Objection.
24 **A.  I have no reason to -- was your**
25 **question doubt or --**

Case 09-10138-MFW   Doc 17958-27   Filed 02/24/17   Page 32 of 77

IN RE: NORTEL NETWORKS INC., et al.   HIGHLY CONFIDENTIAL

JOHN MCCONNELL
April 4, 2014

MCCONNELL - HIGHLY CONFIDENTIAL

1
2 Q.  I'll take doubt.
3 **A.  Doubt that what is represented in**
4 **the prospectus is also representative of what**
5 **is in the indenture.**
6 Q.  The offering memorandum?
7 **A.  Excuse me, the offering memorandum.**
8 Q.  Thank you.  When you say you
9 reviewed -- if we can go to your report.  We
10 can go to -- if we look at Appendix 3 to your
11 report, "Documents Relied Upon."
12 **A.  Yes, sir.**
13 Q.  I don't see reference to any of the
14 offering memoranda.  Did you review them before
15 or after you delivered your report?
16 **A.  Before.**
17 Q.  So they should have been listed on
18 that list?
19 **A.  They should have been to the extent**
20 **that I relied upon them, yes.**
21 Q.  Can you give us an updated list of
22 the offering memoranda and any other documents
23 that you did review that are not on that list?
24 **MR. SORKIN:** We will take that under
25 consideration.

MCCONNELL - HIGHLY CONFIDENTIAL

1
2 Q.  I would like to go now to paragraphs
3 53 to 56 of your report.  And if you skim that
4 briefly, this is the part of your report, as I
5 understand it, where you examine pricing and
6 make some conclusions about pricing; is that
7 fair?
8 **A.  That's a fair representation, yes.**
9 Q.  And the conclusion that you come to
10 is contained at paragraph 56, after looking at
11 pricing data for the bonds.  Your conclusion is
12 that "These data contradict the implication of
13 Messrs. Clark's and Westbrook's assertion that
14 all Nortel's creditors expected recover on a
15 single pool basis in the event of default and
16 liquidation."  That is your conclusion?
17 **A.  Yes, sir.**
18 Q.  The data you refer to, if we go back
19 up, is -- if we go to paragraph 54, you refer
20 to your Exhibit 2 and you say "The prices of
21 the bonds guaranteed by NNI were all
22 substantially above, and in some cases almost
23 double, the price of the non-guaranteed bond."
24 In paragraph 55 you set out a chart and then
25 you set out a graph and in paragraph 55 you

MCCONNELL - HIGHLY CONFIDENTIAL

1
2 refer to the graph and you say that "Exhibit 3
3 below plots the prices for the six bonds for
4 the period January 14, 2009 through January 14,
5 2014.  This exhibit shows that the price
6 differences of January 14, 2009 were not an
7 aberration, and the bonds not guaranteed by NNI
8 continue to trade at prices substantially below
9 those of the guaranteed bonds."  So it is this
10 price differential during this period of the
11 bonds you have listed that causes you to come
12 to your conclusion?
13 **MR. SORKIN:** Objection.
14 **A.  Not exclusively.  But if you're**
15 **asking me my conclusion with respect to**
16 **specifically paragraph 56, yes.**
17 Q.  Yes.  Okay.  Now, sir, why did you
18 choose the time period January 14, 2009 to
19 January 15, 2009?
20 **A.  Two reasons.  One, as I described in**
21 **paragraph 53, I believe, that -- if I may quote**
22 **from that paragraph: "If Misters Clark and**
23 **Westbrook's assertion is correct that inventors**
24 **expected distribution on a single pool basis,**
25 **creditors would expect the recovery rate to be**

MCCONNELL - HIGHLY CONFIDENTIAL

1
2 **a constant fraction of the outstanding face**
3 **amount of every Nortel debt and, as such, all**
4 **of Nortel's bonds would have traded at similar**
5 **prices as of Nortel's bankruptcy date.  Nortel**
6 **filed bankruptcy on January 14, 2009."**
7 Q.  Do you think that the period before
8 the filing of bankruptcy informs at all
9 creditor's expectations as to the strength of
10 the guarantees?
11 **A.  Informs at all?**
12 Q.  Yes.
13 **A.  What was the question again, please.**
14 Q.  Do you think that the presence or
15 absence of the guarantees - let me make it more
16 precise - would be expected to affect the price
17 of the bonds prior to the announcement of the
18 insolvency?
19 **A.  I do.**
20 Q.  So did you go back and look at data
21 prior to the filing for bankruptcy of the bonds
22 to determine whether or not there was a
23 differential in the pricing based upon the
24 guarantees?
25 **A.  I did not study those prices.**

Page 121

MCCONNELL - HIGHLY CONFIDENTIAL

2  Q.  Why not?
3  A.  **From my perspective, as I understand**
4  **the bonds and I believe this is a fair**
5  **characterization, that there could be -- there**
6  **are differences in maturities.  On the**
7  **bankruptcy filing date all of the bonds come**
8  **due as of that date because of their cross --**
9  Q.  Cross-guarantees.
10  A.  **Cross-guarantees as of that date.**
11  **So to the extent that differences in maturities**
12  **could have affected the price prior to that**
13  **date, I'm isolating from that effect as of the**
14  **maturity date -- as of the petition date on**
15  **which they all become due and payable.**
16  Q.  So that if there was a method of
17  comparing bonds that eliminated the differences
18  in maturity date to be able to assess the
19  difference in pricing, that would be a relevant
20  consideration prior to the insolvency?
21  A.  **Could I have the question again,**
22  **please?**
23  Q.  If there was a method of eliminating
24  the difference in maturity dates between the
25  series of bonds so that prices could be put on

Page 122

MCCONNELL - HIGHLY CONFIDENTIAL

2  a comparable basis, despite the difference in
3  maturity, that would be a relevant comparison
4  in the period prior to insolvency?
5  MR. SORKIN: Objection.
6  A.  **It could be as I understand your**
7  **question.**
8  Q.  The pricing information that you
9  have relied upon in these prices is the
10  absolute dollar value of the bonds, correct?
11  A.  **I believe what you're asking me is**
12  **the price per hundred dollars of par.**
13  Q.  Right.
14  A.  **Yes.**
15  Q.  Right.  Which reflects the absolute
16  dollar pricing of the bonds, correct?
17  A.  **I'm not -- I really truly don't know**
18  **what you mean by reflects the absolute dollar**
19  **pricing.**
20  Q.  It reflects the number of dollars
21  paid for the bond.
22  A.  **Yes, per thousand -- per hundred.**
23  Q.  Now I want you to assume with me --
24  as we had this conversation earlier, I want you
25  to assume with me that when prices are quoted

Page 123

MCCONNELL - HIGHLY CONFIDENTIAL

2  in Canada for bonds they are quoted as spreads
3  over government of Canada securities of a
4  similar term?
5  A.  **Okay.**
6  Q.  I want you to assume with me that
7  that allows for the isolation of the risks
8  associated with the particular bonds separate
9  and apart from the risk free rate of return
10  that the government bond is a proxy for.
11  MR. SORKIN: Objection.
12  A.  **Can I have it again, please?**
13  Q.  You understand the concept, it's a
14  basic finance concept, often bonds are compared
15  to what is a proxy for the risk free rate of
16  return?
17  A.  **Yes.  That's a fair**
18  **characterization.**
19  Q.  And the proxy that is generally used
20  for the risk free rate of return is -- in
21  Canada and the United States is the federal
22  government bond?
23  A.  **I believe that's true in Canada.**
24  **It's certainly true in the US.**
25  Q.  So that the -- by making that

Page 124

MCCONNELL - HIGHLY CONFIDENTIAL

2  comparison and expressing prices in terms of
3  spreads it allows bond traders to isolate the
4  risks associated with the bonds separate from
5  the risk free rate of return?
6  A.  **It could.**
7  Q.  Similarly, if in -- if prices are
8  expressed in that manner, the lower the spread
9  the less risky a bond is, and the corollary is
10  the higher the spread the more risky the bond
11  is, correct?
12  A.  **This goes back to our earlier**
13  **discussion which is the general notion of a**
14  **spread.  Often spreads are calculated in terms**
15  **of so called option-adjusted spreads.  I do not**
16  **know here if you're talking an option-adjusted**
17  **spread.**
18  Q.  Assume it's not an option-adjusted
19  spread.
20  A.  **In that case I'm not sure how to**
21  **interpret it.**
22  Q.  You don't know as a professor of
23  finance, whatever name your professorship has,
24  you do not know, as a matter of your learning,
25  training and expertise, that if bonds are

IN RE: NORTEL NETWORKS INC., et al.   HIGHLY CONFIDENTIAL

JOHN MCCONNELL
April 4, 2014

Page 125

1     MCCONNELL - HIGHLY CONFIDENTIAL
2 expressed -- bond prices are expressed in terms
3 of a spread to government bonds, assume
4 government of Canada's or government of the
5 United States', you're telling me and the court
6 that you do not know that if bond prices are
7 expressed in those terms, that the lower the
8 spread means the bond is less riskier and the
9 higher the spread means the bond is more risky?
10     MR. SORKIN: Objection. That's not
11 what he said.
12 **A. Again, I have to know how the spread**
13 **is being calculated.**
14 Q. Give me one method of calculation.
15 **A. Option-adjusted spread is a way.**
16 Q. Give me -- I don't want an option --
17 I want the most plain vanilla way to calculate.
18 What is the most plain vanilla way to
19 calculate?
20 **A. One discussion and series of**
21 **questions that you asked me earlier today was**
22 **on two bonds that are identical in every**
23 **respect including they're selling at par and**
24 **they have I believe the same coupon interest**
25 **rate, and that interest -- in that instance one**

Page 126

1     **MCCONNELL - HIGHLY CONFIDENTIAL**
2 **could calculate a internal rate of return which**
3 **would be the same as the coupon rates on the**
4 **bonds. One could compare that again to a**
5 **similar maturity government bond, assuming a**
6 **flat yield curve, and from that make a**
7 **determination as to the relative risk as**
8 **relative to a federal security, federal**
9 **government guaranteed security, assuming they**
10 **have the same coupon rates. Excuse me, I take**
11 **that back. No, they have different coupon**
12 **rates, sorry. Same maturity.**
13 Q. With that set of assumptions, if the
14 spread was lower than -- we are comparing two
15 bonds and one has a lower spread and one has a
16 higher spread, the lower spread is considered
17 by the marketplace to be less risky and the
18 higher spread more risky?
19 **A. In that specific instance that we**
20 **discussed, or I discussed, yes.**
21 Q. Now, in that specific instance that
22 you discussed, if the guarantees reduce the
23 risk of a bond then we would expect it to
24 reduce the spread at the time of issue relative
25 to the bonds without a guarantee?

Page 127

1     MCCONNELL - HIGHLY CONFIDENTIAL
2     **MR. SORKIN: Objection.**
3 **A. Under certain conditions that is**
4 **true.**
5     **(Whereupon Exhibit 12044 was marked**
6 **for identification.)**
7 Q. Now, sir, what I have given you is a
8 series of tables at various points in times
9 that reflect various pricing information with
10 respect to these bonds. I presume that if I
11 were to take out screen shots from various bond
12 pricing agencies to corroborate the pricing on
13 these bonds that would not have been something
14 that you had previously reviewed?
15 A. That's correct.
16 Q. In terms of the sourcing of your
17 pricing information from the bonds, is that
18 something that Navigant gave you?
19 **A. It is -- well, back up. They did**
20 **not give me -- I believe I identified the**
21 **pricing of the bond sourcing as Bloomberg. Are**
22 **you asking me --**
23     **MR. SORKIN: I'm actually going to**
24 cut off the answer at this point. To the
25 extent the source is identified in the

Page 128

1     MCCONNELL - HIGHLY CONFIDENTIAL
2 report, under the protocol that is
3 required. Any further discussions about
4 back and forth I'm going to instruct the
5 witness not to answer.
6     **MR. BARRACK: I'm not asking about**
7 back and forth. I am asking about the
8 source. If he can refer me to the
9 report --
10 Q. What I want to know is how you came
11 to your pricing information in your report.
12 **A. From Bloomberg.**
13 Q. And did you derive it yourself from
14 the Bloomberg?
15 **A. That was procured for me by --**
16     **MR. SORKIN: Again, to the extent**
17 it's in the report, that's all the witness
18 needs to answer and we are going to end
19 the questioning right there.
20 Q. Okay. I'm going to ask the question
21 on the record whether you looked at the pricing
22 information or whether that pricing information
23 was prepared for you by Navigant?
24     **MR. SORKIN: And again I'm going to**
25 object and instruct the witness not to

Page 129

MCCONNELL - HIGHLY CONFIDENTIAL
1
2  answer.
3     MR. BARRACK: On the basis?
4     MR. SORKIN: It's the same basis.
5  Questions of what the communications were
6  as between and how the information was
7  provided is off limits based on the
8  protocol agreed to by the parties.
9     MR. BARRACK: You say it's
10  privileged?
11     MR. SORKIN: I say that it is
12  contained within the specific protocol set
13  forth by the parties that that information
14  is not -- does not need to be disclosed.
15  Q.  So, again, you did not look or no
16  one on -- you did not look specifically, sir,
17  at any Canadian pricing for the bonds that
18  would have been based on spreads?
19  **A.  I'm sorry, what was the question?**
20  Q.  You did not look at any Canadian
21  publicly available pricing for these bonds that
22  was expressed in terms of spreads?
23  **A.  I believe the answer is correct.**
24  **That is yes.**
25  Q.  Yes, you did not look at those?

Page 130

MCCONNELL - HIGHLY CONFIDENTIAL
1
2  **A.  Yes, I did not.**
3  Q.  So I want you to assume in these
4  tables, then, that the trading prices and the
5  spreads that are stated are taken from publicly
6  available pricing information, okay?
7  **A.  Yes.**
8  Q.  So let's look at the -- you might
9  want to get out your Exhibit 12034 as well.
10     MR. SORKIN: I'm sorry, counselor.
11  You just referred back to Exhibit 12034,
12  the summary of the bond chart?
13     MR. BARRACK: Yes.  I'm just asking
14  you to bring that up because that may help
15  him identify which bonds we are dealing
16  with.
17  **A.  Yes, I have that.  I have 12034 in**
18  **front of me.**
19     MR. SORKIN: Counselor, just so I'm
20  clear, as you represented earlier,
21  Exhibit 12034 is a summary of what is
22  actually contained in the indentures,
23  correct?
24     MR. BARRACK: Yes.
25     MR. SORKIN: The Exhibit 12044 is a

Page 131

MCCONNELL - HIGHLY CONFIDENTIAL
1
2  summary of pricing data that you have
3  prepared, correct?
4     MR. BARRACK: Yes.
5     MR. SORKIN: What is the source of
6  this information?
7     MR. BARRACK: The source of this
8  information is Price Advantage --
9  Advantage Data, and Bloomberg, and S&P
10  Capital IQ, which Mr. Kilimnik identified
11  for us as authoritative sources of pricing
12  on his examination.
13     MR. SORKIN: In terms of the source
14  of each price and each sell as -- in order
15  to determine which one was -- which source
16  was used for each sell; so whether, for
17  example, we take the trading price on the
18  first page at 92-5/8 on the first bond
19  from January 31, 2008, how do we know if
20  we want to source ourselves whether that
21  is Advantage, S&P, Capital IQ?
22     MR. BARRACK: We will provide that
23  for you if you want us to.
24     MR. SORKIN: Just as a running
25  objection, to the extent that we haven't

Page 132

MCCONNELL - HIGHLY CONFIDENTIAL
1
2  had the opportunity to verify these
3  sources, we ask that you provide them and
4  we will object subject to your undertaking
5  that it is what is included in those
6  reports.
7     MR. BARRACK: Understood, all right.
8  Q.  So if we look at January 31, 2008,
9  and we look at the various bonds that are -- so
10  what we have done here, sir, is we have taken
11  the prices at January 31, 2008 and March 31,
12  2008.  And the significance of those two
13  dates -- so do you recall from your review of
14  the documents that in 2008, between these two
15  dates there was a 10-K released by Nortel that
16  disaggregated the consolidated financial
17  information?
18  **A.  Yes.  I don't recall the specific**
19  **date.**
20  Q.  But in that time period?
21  **A.  Yes.**
22  Q.  With respect to --
23  **A.  I'm sorry.  Do I know whether it was**
24  **between January 31st, 2008 and March 31st,**
25  **2008; are you asking me that?**

Case 09-10138-MFW    Doc 17958-27    Filed 02/24/17    Page 36 of 77
IN RE: NORTEL NETWORKS INC., et al.    HIGHLY CONFIDENTIAL

JOHN MCCONNELL
April 4, 2014

Page 133

MCCONNELL - HIGHLY CONFIDENTIAL

1  Q.  Yes.
3  A.  I don't know if it was in that
4    specific interval.
5  Q.  You just remember it was in 2008
6    sometime?
7  A.  Yes, that's correct.
8  Q.  That we can otherwise establish.
9      I want you to assume that it was in
10   that time period for the purpose of looking at
11   this chart, and I want to identify that what we
12   have in the first three rows of this chart are
13   the July '11, the July '13 and the July '16
14   bonds which are the equivalent of the third row
15   in the Nortel Bond and Related chart.  And so
16   those indicate in the second column that NNI is
17   a guarantor of that series.  And, similarly,
18   let's leave the convertibles aside and go down
19   to the bottom two rows where we have the 6.875s
20   due in September '23.  Those we agree have no
21   guarantee; is that right, sir?
22  A.  Yes.
23  Q.  And the June '26, which you didn't
24   refer to in your chart, do not have NNI as a
25   guarantor, correct?

Page 134

MCCONNELL - HIGHLY CONFIDENTIAL

2  MR. SORKIN: Objection.
3  MR. BARRACK: I think he's already
4    given me that.  It has NNL.  They are the
5    Capital Corporation ones with NNL.
6  Q.  My question was they don't have NNI
7    as a guarantor?
8  A.  Based upon this chart that's
9    correct.
10  Q.  Do you have any information contrary
11   to that?
12  A.  I do not.
13  Q.  And so that if we go to -- we have
14   trading price listed, and in the same way that
15   you tell me that there are noise in the numbers
16   of spreads there are noise in the numbers of
17   trading prices, correct?
18  A.  That's not what I said.
19  Q.  Do you -- let me be more precise.
20   You have to know more about a bond than just
21   its trading price to compare one with the
22   other?
23  A.  You can compare the prices.  To
24   interpret the prices one would need to know
25   more I believe is the way I would characterize

Page 135

MCCONNELL - HIGHLY CONFIDENTIAL

2    that.
3  Q.  So if we look at the approximate
4    spread to the US government yield curve, and we
5    take the assumption, and I want you to take the
6    assumption -- we have been around it twice now
7    but I want you to assume that bonds with a
8    lower spread are less risky than bonds with a
9    higher spread.  If we look at the January 31,
10   '08 spreads.
11  A.  Hold on a second, please.  Could you
12    tell me which row?
13  Q.  I'm on one, two, three, four, fifth
14    row.
15  A.  Yes, okay.
16  Q.  January 31, '08.  Assuming that
17    those are the spreads?
18  A.  Oh, I'm sorry.  I was looking at
19    this chart incorrectly.  I'm sorry.  So we are
20    looking at the panel January 31.  Okay, I have
21    got it.
22  Q.  Got it?
23  A.  Yes.
24  Q.  I'm sorry.  The fifth of the second
25    row, the approximate spread to the yield

Page 136

MCCONNELL - HIGHLY CONFIDENTIAL

2    curves.  What we actually observe is that the
3    spreads --
4  A.  Now you've lost me again.  We are in
5    the panel January 30th of 2008, correct?
6  Q.  Right.
7  A.  And we want to go down how many
8    rows?
9  Q.  There are three beneath that?
10  A.  Yes.
11  Q.  There are three columns, trading
12   price, yields and approximate price to US
13   government yield curve?
14  A.  Yes.
15  Q.  I want to look at the approximate
16    spread to government yield curve column.
17  A.  Okay, yes.
18  Q.  What that demonstrates to us is that
19    in fact the spreads on the bonds that do not
20    have a guarantee have a lower spread than the
21    bonds that do have a guarantee, correct?
22  MR. SORKIN: Objection.
23  A.  I'm going to comment as I have
24    throughout or tried to explain, the
25    characterization that I gave to you and you

Case 09-10138-MFW    Doc 17958-27    Filed 02/24/17    Page 37 of 77

IN RE: NORTEL NETWORKS INC., et al.    HIGHLY CONFIDENTIAL

JOHN MCCONNELL
April 4, 2014

Page 137

MCCONNELL - HIGHLY CONFIDENTIAL

1 **MCCONNELL - HIGHLY CONFIDENTIAL**
2 **agreed to was that the bonds would be selling**
3 **at par.  These bonds are not selling at par.**
4 Q.  Right.
5 **A.  Therefore, unless I know the way in**
6 **which these spreads are calculated I cannot**
7 **unequivocally agree with your characterization.**
8 Q.  Similarly, if I go through any of
9 these yields and spreads, you will make the
10 same objection that you cannot draw any
11 conclusion about the way the market perceived
12 the riskiness of it based upon the spreads?
13     MR. SORKIN: Objection.
14 **A.  I would have to hear the question.**
15 Q.  My question is can you draw any
16 conclusion based on the information that I have
17 provided to you as to how the market perceived
18 the relative riskiness of those bonds based --
19 if you assume that the pricing information with
20 respect to the spreads before you is accurate?
21     MR. SORKIN: Objection.
22 **A.  I want to make sure you're asking**
23 **me -- that I understand the question.  You're**
24 **asking me to look only at the column of**
25 **spreads, nothing else on this exhibit?**

Page 138

1 **MCCONNELL - HIGHLY CONFIDENTIAL**
2 Q.  Yes.
3 **A.  And then based upon looking at those**
4 **spreads, nothing else, not knowing how they are**
5 **calculated, can I tell you something about the**
6 **riskiness?  No, I cannot do that.**
7 Q.  If you take into account the yield
8 and trading price columns and look at the
9 spreads, can you tell us anything about the
10 relative perception of risk in the marketplace
11 about those bonds?
12     MR. SORKIN: Objection.
13 **A.  No.  I believe the answer is no.**
14 Q.  And that includes looking at the
15 trading price?
16 **A.  That does in this instance, correct.**
17 Q.  And similarly, if you look just at
18 the trading price column, this is your evidence
19 that you can tell us something about the
20 market's perception of the riskiness of those
21 bonds?
22     MR. SORKIN: Objection.
23 **A.  I believe not.**
24 Q.  Can you tell me what the difference
25 is between the trading prices on this chart and

Page 139

1     MCCONNELL - HIGHLY CONFIDENTIAL
2 the trading prices in your report?  Can you
3 tell me what the differences are between the
4 trading prices, not specific numbers, but you
5 tell me you can't draw any conclusions about
6 the credits -- the market's perception of risk
7 based on these trading prices, yet you have
8 drawn conclusions about the market's perception
9 of risk in your report, correct, based on
10 trading prices?
11 **A.  I don't believe I said anything with**
12 **respect to risk.**
13 Q.  Well, what does the difference in
14 trading price indicate to you in your report?
15 **A.  That the difference in trading price**
16 **to me reflects, as I said, investors'**
17 **expectations of recoveries.**
18 Q.  And is an expectation of recovery a
19 form of risk assessment?
20 **A.  I suppose it could be determined or**
21 **thought of in that context.**
22 Q.  So if we can have the nomenclature
23 that you can tell something about the
24 expectation of recovery or risk from the prices
25 in this report, can you similarly tell

Page 140

1     MCCONNELL - HIGHLY CONFIDENTIAL
2 something about expectation of recovery or risk
3 from the prices --
4 **A.  Recovery.**
5 Q.  Expectation of recovery.
6 **A.  Yes.**
7 Q.  Or risk assessment?
8 **A.  Well, I would like to take them one**
9 **at a time.**
10 Q.  How do you differentiate them?  What
11 is the difference between an expectation of
12 recovery and a risk assessment?
13 **A.  I would say risk assessment could be**
14 **much broader.**
15 Q.  So you're only focusing in your
16 report not on a broad risk expectation but only
17 expectation of recovery?
18 **A.  I'm focusing on investors' vested**
19 **expectations.**
20 Q.  Of recovery?
21 **A.  Investors' expectations of their**
22 **payoffs in the future which would include,**
23 **importantly in a liquidation matter, I believe,**
24 **recovery.**
25 Q.  I want to understand the difference.

Page 141

MCCONNELL - HIGHLY CONFIDENTIAL
1
2  I understand expectation of recovery as one
3  element of a risk assessment; is that fair?
4  A.  That's a reasonable
5  characterization.
6  Q.  In your report were you using the
7  prices as a proxy for the broader risk
8  assessment or the narrower recovery?
9      MR. SORKIN: Objection.
10  A.  The point that I tried to make and
11  I'm trying to make is the following.  I was
12  asked to respond to Mr. Clark and Westbrook's
13  report.  My interpretation of their report is
14  that creditors would have, should have expected
15  to receive a pro rata distribution such that
16  all creditors, I understand the report, would
17  receive the same proportional distribution.
18  And what -- as I read the report is that the
19  only instance or an instance in which their --
20  as I read their report, position would be
21  controverted or ruled out or precluded would be
22  as if there were creditor expectations to the
23  contrary.  I view these, the prices here, as
24  being very strong evidence to the contrary of
25  what I understand they're proposing.  That was

Page 142

MCCONNELL - HIGHLY CONFIDENTIAL
1
2  the purpose --
3  Q.  I understand.
4  A.  -- of my presenting these prices.
5  Q.  Okay.  So we understand the purpose.
6  Now let's talk about the mechanic of how you
7  use that purpose, okay.  Let's get down to the
8  plumbing.  So you start with that broad thesis,
9  which is very easy to understand, and then you
10  say, well, I'm going to look at some bond
11  prices to see whether that thesis is supported
12  or contradicted, the Westbrook and Clark thesis
13  is supported or contradicted, correct?
14  A.  I believe that's a reasonable
15  characterization.
16  Q.  And what your hypothesis is is if
17  their -- the pricing of particular bonds will
18  either support or defeat that hypothesis --
19  support or contradict.  Defeat might be too
20  strong a word.  Support or contradict that
21  hypothesis, and you have posited that based on
22  your definition of modified universalism, you
23  would hypothesize that the bond prices should
24  be identical because the only difference
25  between the bonds is the guarantees; is that

Page 143

MCCONNELL - HIGHLY CONFIDENTIAL
1
2  fair?
3      MR. SORKIN: Objection.
4  Q.  If the hypothesis is supported in
5  the marketplace.
6      MR. SORKIN: Objection.
7  A.  I believe that is not correct.
8  Q.  Well, then help me out then.  Your
9  hypothesis in looking at the marketplace if --
10  if the Clark and Westbrook hypothesis is
11  supported by pricing information what would we
12  expect to see in the marketplace for the
13  pricing of the bonds?
14  A.  As of the petition date, as I've
15  described in my report and as I understand
16  their position, and I believe I do understand
17  their position, the bonds would be priced
18  proportionally to par in the same fraction.
19  Q.  And they would be identically
20  priced?
21      MR. SORKIN: Objection.
22  A.  That is correct.
23  Q.  And any other pricing -- and if --
24  so let's leave the Clark and Westbrook
25  assumption aside.  If creditors had an

Page 144

MCCONNELL - HIGHLY CONFIDENTIAL
1
2  expectation that the guarantees would be fully
3  honored, in an insolvency, and -- what would
4  you expect -- would you expect creditor
5  expectations to be reflected in the marketplace
6  in the pricing of the bonds?
7  A.  As I understand your question, yes.
8  Q.  How would you expect it to be
9  reflected in pricing of bonds in the market?
10  A.  That the bonds with the guarantee
11  would be priced higher as of the petition date.
12  Q.  Which would mean that the yields on
13  those bonds would be lower?  Sorry.  The prices
14  of the bonds -- the prices of the bonds with
15  the guarantees would be higher?
16  A.  That's correct.
17  Q.  So the yields would be lower?
18  A.  Well, I want to go back to this
19  point that I am asking you to define precisely
20  what you have in mind by the use of the term
21  yield, because there are multiple definitions
22  and ways of calculating yield and I do not to
23  which you are referring.
24  Q.  That's why I want to understand what
25  you mean by price.  What do you mean by price?

Page 145

MCCONNELL - HIGHLY CONFIDENTIAL
1
2  A.  I mean per dollar of par.
3  Q.  So if I have a bond that has a
4  10 percent coupon paid once a year for ten
5  years and it's priced at a hundred dollars.
6  A.  Okay.
7  Q.  It's a $10 coupon.
8  A.  Okay.
9  Q.  And I have another one that is
10  priced at $200 and has a 10 percent coupon paid
11  once a year, you would expect the one with the
12  guarantee -- so let's just finish that.  The
13  first bond, the 110, yields 10 percent and the
14  210 yields 5 percent, correct, on that example?
15  A.  It depends very much on the par.
16  Q.  And par is a hundred.
17  A.  Par is a hundred?
18  Q.  Par is a hundred.
19  A.  Oh.  Then I don't know what the
20  yield is on the bond that is trading at 200.
21  Q.  So you expect higher prices, so
22  if -- sorry.  If the -- take the one bond.  If
23  it trades at -- the one bond with the
24  10 percent coupon, that's the right example,
25  the one bond with the 10 percent coupon, okay?

Page 146

MCCONNELL - HIGHLY CONFIDENTIAL
1
2  There is one with a hundred, 10 percent coupon,
3  10 years, guarantee.  One with hundred dollar
4  par, 10 percent coupon, they both have hundred
5  dollar par, one has a guarantee, one doesn't
6  have a guarantee, one trades at a hundred and
7  one trades at 110, okay?
8  A.  Okay.
9  Q.  You would expect the one with the
10  guarantee to trade at 110 and the one without
11  the guarantee to trade at a hundred?
12     MR. SORKIN: Objection.
13  A.  Now you've lost me here.  I think
14  you crossed me up.  Can I have it again,
15  please?  Can I write this down on a pad of
16  paper?
17  Q.  Yes.  Two bonds.  Do two columns.
18  A.  Okay.
19  Q.  Guarantee, no guarantee.  Par, 100
20  for both of them.  Coupon, 10 percent once a
21  year, both of them.  Any other characteristics
22  you need to know about the bonds?
23  A.  I don't believe so.  I think you
24  said term to maturity is ten years.
25  Q.  Ten years.  Both bonds.  Okay?

Page 147

MCCONNELL - HIGHLY CONFIDENTIAL
1
2  A.  Yes.
3  Q.  They both trade at a hundred dollars
4  in the market -- because they trade -- they
5  both trade at 105 in the marketplace, then we
6  would expect creditor expectation with respect
7  to recovery would be no different, correct?
8     MR. SORKIN: Objection.
9  Q.  On your hypothesis -- you're testing
10  creditor expectation of recovery.  On your
11  hypothesis if they both trade at 105?
12     MR. SORKIN: Objection.
13  A.  I believe that's a fair
14  interpretation as I understand your question,
15  assuming there is risk of default.
16  Q.  And assuming there is risk of
17  default, if -- you would expect that the bond
18  on that -- with the guarantee would trade at a
19  higher price relative to the bond with the --
20  sorry -- with the no guarantee?
21  A.  That's correct.
22  Q.  And so that if you look at -- and
23  what you have done in your report is look at
24  the prices of the bonds at which they trade and
25  drawn assumptions about creditor expectations

Page 148

MCCONNELL - HIGHLY CONFIDENTIAL
1
2  of recovery?
3  A.  Drawn conclusions.
4  Q.  All right, conclusions.  Now, when
5  you go to 12044, can you look at the trading
6  prices on those charts and draw any conclusions
7  about creditor expectations of recovery?
8  A.  As I read this, they have different
9  maturity dates and different coupons, so I
10  believe the answer is no.
11  Q.  So what did you do to normalize for
12  the difference in coupon rates and maturity
13  dates in your report?
14  A.  I think I have testified to this
15  already but I'll testify to it again.  As of
16  the petition date, all of the bonds become due
17  and payable as of that date.  So I have
18  extracted from the maturity effect.
19  Q.  What about the coupon effect?
20  A.  There could be -- there could be a
21  coupon effect.
22  Q.  But you did not adjust for the
23  coupon effect?
24  A.  Given the price differences and the
25  differences in the coupon it didn't seem to me

Page 149

**MCCONNELL - HIGHLY CONFIDENTIAL**

1      **MCCONNELL - HIGHLY CONFIDENTIAL**
2  that that could have explained -- assuming
3  there is the possibility of coupon recovery and
4  I don't know that there is.
5  Q.  Right.
6  A.  Assuming that and I don't know that
7  there is, it seemed to me that that would not
8  have explained the disparity in prices that
9  were observed.
10  Q.  So the analysis that you do can only
11  be done once a default -- once a default
12  occurs?
13  A.  No.
14  Q.  Can be done prior to default?
15  A.  Could be.
16  Q.  Could be if they had -- if the two
17  bonds had similar maturities and similar coupon
18  rates?
19  A.  And other provisions.
20  Q.  And other provisions.  Absent --
21  A.  Not similar.
22  Q.  Identical.  So absent identical
23  coupon rates and identical maturities and
24  identical par, your analysis of the prices
25  would not tell you anything about creditor

Page 150

1      MCCONNELL - HIGHLY CONFIDENTIAL
2  expectations?
3      **MR. SORKIN:** Objection.
4  A.  Say it again, please.
5  Q.  Well, I may be too broad.
6      You cannot compare prices in the way
7  you have compared prices and draw any
8  meaningful conclusions prior to insolvency
9  about creditor expectation of recovery?
10  A.  What I think you had asked me
11  earlier --
12  Q.  No, answer the one I just asked you.
13  A.  Well, I'm going to answer the one
14  you just asked me but I need to put it -- I
15  believe I need to put that in context.  Earlier
16  you had asked me would it be possible to
17  construct an analysis in which all of those
18  characteristics were held constant, and I
19  believe the question was prior to the petition
20  date, and my answer I believe was it's
21  possible, and so I will give you the same
22  answer here.
23  Q.  Now what I want you to tell me is
24  that just looking at trading prices prior to
25  insolvency, you can't draw conclusions about

Page 151

1      MCCONNELL - HIGHLY CONFIDENTIAL
2  creditor expectation of recovery rate just
3  looking at the trading price type column
4  because of the differences between the bonds,
5  correct?
6  A.  Without adjusting for those, as I
7  have testified to, I don't believe so, that's
8  correct.
9  Q.  But if you -- as a professor of
10  finance, there are adjustments that could be
11  made that would allow someone to compare the
12  pricing of the bonds prior to insolvency to
13  determine whether or not creditor expectations
14  were that there would be higher recoveries to
15  the guarantees?
16      **MR. SORKIN:** Objection.
17  A.  There could be.  As I sit here at
18  this moment I'm not sure of all the factors
19  that would have to be taken into account, but I
20  would not rule that out as a possibility.
21  Q.  And did you not do that?
22  A.  I did not.
23      **MR. BARRACK:** Let's take a break.
24      **THE VIDEOGRAPHER:** The time is
25      1:59 p.m. on April 4, 2014.  We are now

Page 152

1      MCCONNELL - HIGHLY CONFIDENTIAL
2  off the record.
3      (Off the record.)
4      **THE VIDEOGRAPHER:** This is tape four
5  in the deposition of John McConnell.  The
6  time is 2:19 p.m. on April 4, 2014.
7      We are now back on the record.  You
8  may proceed.
9      **MR. BARRACK:** Mr. Sorkin, I would
10  like to speak with you now that we are
11  back on the record.  With respect to the
12  objection that you have to producing the
13  summaries that have been prepared by
14  Navigant or any information or documents
15  prepared by Navigant and your purported
16  objection was in reliance on the expert
17  deposition protocol?
18      **MR. SORKIN:** Correct.
19      **MR. BARRACK:** And I see you have it
20  in front of you there?
21      **MR. SORKIN:** I have a version --
22      **MR. BARRACK:** You probably got the
23  American version, I probably got the
24  Canadian version.
25      **MR. SORKIN:** I might actually have

Page 153

MCCONNELL - HIGHLY CONFIDENTIAL
1  MCCONNELL - HIGHLY CONFIDENTIAL
2  the Canadian version as well.
3      MR. BARRACK: So starting at
4  paragraph 1, the parties agree that as a
5  result of Section 7 of the discovery
6  plan -- are we together?
7      MR. SORKIN: Yes.
8      MR. BARRACK: "The question shall
9  not be asked in examinations, depositions
10  or at trial regarding the following
11  categories of information and no expert
12  trial witness, discovery deposition
13  witness or discovery participant shall be
14  required to produce any documents
15  regarding the following categories."
16      MR. SORKIN: Correct.
17      MR. BARRACK: And then there is
18  Category A and B, and then at B it says
19  "except to the extent that the
20  communications" and then down to 2,
21  "identify facts or data that the party's
22  attorney or representative provided that
23  the expert considered in forming the
24  opinions to be expressed."
25      So that I can be precise in my

Page 154

1  MCCONNELL - HIGHLY CONFIDENTIAL
2  request, I would like any documents
3  prepared by Navigant which were given to
4  Professor McConnell which identified facts
5  or data that Professor McConnell
6  considered in forming his opinions. And
7  we have heard thus far about summaries of
8  indentures provided by Navigant, summaries
9  of credit rating agency reports, summaries
10  of offering memoranda and summaries of
11  pricing data. So I want those and all
12  other similar documents that fall within
13  that exception. Can I have that
14  undertaking?
15      MR. SORKIN: We will consider it,
16  review the transcript and the documents.
17  And yes, to the extent that it is provided
18  for, we will consider that request,
19  subject to the other provisions,
20  specifically such provisions like E, which
21  say that internal notes and internal work
22  product prepared by the expert or the
23  expert's staff. Again I recognize what
24  you pointed out in B and we will consider
25  that.

Page 155

1  MCCONNELL - HIGHLY CONFIDENTIAL
2      MR. BARRACK: All right. Obviously,
3  anything that was prepared and given that
4  he considered, not just whether it was
5  referred to in his testimony?
6      MR. SORKIN: That's not exactly what
7  the document says.
8      MR. BARRACK: That's what I'm
9  requesting.
10      MR. SORKIN: We will consider it,
11  and consistent with what the document
12  says, consider it in forming -- take that
13  under advisement. We understand your
14  request.
15      MR. BARRACK: Okay. And delivered
16  both prior to or after the delivery of the
17  report?
18      MR. SORKIN: We will consider it and
19  review based on what information exists
20  consistent with the protocol.
21  Q.  Professor McConnell, back to you.
22      You've I think identified that prior
23  to sometime in 2008 Nortel's financial
24  disclosure was on a consolidated basis?
25  A.  Yes, I believe that's correct.

Page 156

1      MCCONNELL - HIGHLY CONFIDENTIAL
2  Q.  And without --
3  A.  What I'm not certain of is whether
4      that was -- yes, the answer is yes.
5  Q.  Without unconsolidated financial
6  information it would be more difficult to
7  assess the economic value of a guarantee
8  because it would be more difficult to know what
9  assets were in various entities?
10      MR. SORKIN: Objection.
11  A.  Would it be more difficult?
12  Q.  Yes.
13  A.  Yes.
14  Q.  Are you aware that in this
15  proceeding virtually all of the parties are in
16  agreement that much of the value of Nortel was
17  derived from its intellectual property?
18  A.  Yes, I am.
19      MR. SORKIN: Objection.
20  Q.  When you reviewed the financial
21  statements --
22  A.  But to the extent we are referring
23      to parties, we are talking about EMEA,
24      Canadian -- what I have been told to be the
25      Canadian entities and the US entities.

Page 157

MCCONNELL - HIGHLY CONFIDENTIAL

1
2 Q.  Sure.  I don't have to go as far as
3    all.  Some of the parties, the court will make
4    its own conclusion, assert that the value of
5    Nortel derived from its intellectual property?
6 A.  I have seen assertions in various
7    pleadings and documents to that effect, yes.
8 Q.  From your review of the Nortel
9    documents, was it possible to determine from
10    the publicly available documents prior to the
11    insolvency which entity owned the intellectual
12    property?
13    MR. SORKIN: Objection.
14 A.  Can I have the question again,
15    please?
16 Q.  From your review of the publicly
17    available Nortel documents prior to insolvency,
18    was it possible to identify which Nortel entity
19    owned the intellectual property?
20    MR. SORKIN: Objection.
21 A.  I don't know that I focused on that
22    question so I have no opinion.
23 Q.  Now, in terms of market effects --
24    I'm switching gears here.  I'm talking about
25    something completely different now.  In terms

Page 158

MCCONNELL - HIGHLY CONFIDENTIAL

1
2    of market effects, in your opinion as a finance
3    professor, if the court wanted to consider the
4    market effects of various allocation
5    methodologies, okay?  So it -- the court wants
6    to stand back and say I want to assess these
7    various allocation methodologies, and one of
8    the things I want to do is assess the market
9    effects, if there is any effect of one
10    methodology or another methodology on the
11    capital markets, okay?  That is something
12    that -- that is the type of analysis generally
13    you do as a finance professor?
14    MR. KELLER: Objection to the form
15    of the question.
16    MR. SORKIN: Objection.  We are
17    pretty far beyond the scope of the expert
18    report that was provided.
19 Q.  You have to answer that.
20 A.  The answer to the question which I
21    think you asked is that the type of analysis
22    that I do, the answer is yes.
23 Q.  And would the costs of realization,
24    the costs of creditors realizing on their
25    claims, that's what I mean by the cost of

Page 159

MCCONNELL - HIGHLY CONFIDENTIAL

1
2    realization, the transaction costs of realizing
3    a claim, so if there is one allocation method
4    that has taken out to the margin, you know,
5    zero realization costs and another has
6    substantial realization costs, would a
7    comparison of the realization costs be a
8    relevant factor in assessing the impact on the
9    capital markets?
10    MR. SORKIN: Objection.
11 A.  I haven't considered that question
12    and I need some time to reflect upon it.
13 Q.  You don't have an opinion one way or
14    the other?
15 A.  That's correct.
16 Q.  Could or couldn't be?
17    MR. SORKIN: Objection.
18 A.  I have no opinion one way or the
19    other.  I haven't had a chance to think about
20    it.
21 Q.  Are you aware from your study of
22    capital markets of any ways in which trading
23    activities of bonds might be different
24    pre-insolvency and post-insolvency?
25 A.  By insolvency are you referring in

Page 160

MCCONNELL - HIGHLY CONFIDENTIAL

1
2    this instance?
3 Q.  Not in this instance, generally.
4 A.  Are we referring to a petition date
5    or filing date?  I'm not sure what you mean by
6    insolvency.
7 Q.  The date on which the
8    cross-guarantees come into effect and the bonds
9    enter the place that you described of no longer
10    maturities having any relevance but being due
11    and payable.
12    MR. SORKIN: Objection.
13 A.  And the question is?
14 Q.  Are you aware of any -- in which
15    trading activities of bonds might be different
16    pre-insolvency and post-insolvency?
17 A.  By trading activities do you include
18    prices?
19 Q.  Yes.
20 A.  Prices could be affected by
21    insolvency.
22 Q.  Right.  Any other trading activities
23    that you are aware of that may be different
24    pre-insolvency and post-insolvency?
25 A.  If you're referring to facts or

Page 161

MCCONNELL - HIGHLY CONFIDENTIAL

1  considerations that creditors or bond --
2
3  investors would take into account, I don't
4  believe so, except to the extent that some
5  regulatory authorities, I suppose, I believe
6  prohibit some types of investors from buying
7  bonds that are in the state of insolvency.  I
8  don't know of any technical characteristics of
9  the trading activity that would make that
10  distinction.  It's not to say there aren't any,
11  I just don't know of any as I sit here.
12  Q.  So your concerns that you've
13  expressed with respect to modify universalism
14  or pro rata distribution as you interpret
15  Mr. Clark and Mr. Westbrook hypothesizing, that
16  arises from the treatment of creditors of
17  multiple entities the same way rather than
18  respecting differences in entities; is that
19  fair?
20       MR. SORKIN: Objection.
21  A.  When you say my concerns, to what
22  are you referring?
23  Q.  I'm sorry.  The effects that you --
24  your criticisms.
25  A.  My criticisms of Mr. Clark's and

Page 162

MCCONNELL - HIGHLY CONFIDENTIAL

1
2  Westbrook's opinion?  Sorry.  Start over,
3  please.
4  Q.  So you don't criticize Mr. Clark and
5  Westbrook's opinion; is that what you are going
6  to tell me?
7       MR. SORKIN: Objection.
8  A.  What I'm not certain of given your
9  preamble is whether you're referring to
10  paragraph 67 of my report, which refers to
11  the --
12  Q.  Market effects?
13  A.  The wealth transfer effects.  I'm
14  not sure -- I didn't know whether you're
15  referring to that or some other aspect of my
16  report.
17  Q.  Let's stay with the wealth transfer
18  in paragraph 67.
19  A.  Okay.
20  Q.  Would your -- let's use a neutral
21  term, your observations in paragraph 67.  Is
22  that fair?
23  A.  Fair.  Thank you.
24  Q.  Would your observations in paragraph
25  67 be the same if it was proposed within, say,

Page 163

MCCONNELL - HIGHLY CONFIDENTIAL

1
2  the Canadian estate to allow creditors of other
3  Canadian entities who did not have a guarantee
4  to share -- to assert their claims in a common
5  pro rata pool with NNL and NNC?
6       MR. SORKIN: Objection.
7  A.  I believe your hypothetical is
8  incomplete as I heard it.
9  Q.  I'm going to bring it right down to
10  cases.  There is a company called Nortel
11  Networks Technology Corporation, and it
12  employed a substantial number of the
13  researchers in Canada, and it accumulated in
14  respect of, I want you to assume -- it
15  assumed -- it accumulated in respect of those
16  researchers a substantial unfunded pension
17  debt.  I want you to assume that the
18  bondholders had -- that there were no bonds
19  issued by that corporation, and that the
20  employee creditors of that corporation would
21  otherwise have no call on Nortel Networks
22  Limited, who issued the bonds.  Okay?  Would
23  it -- would your observations be the same if
24  within Canada the courts affected a pro rata
25  distribution of the Canadian entities including

Page 164

MCCONNELL - HIGHLY CONFIDENTIAL

1
2  that Canadian entity and treated creditor
3  claims of multiple Canadian entities on a pro
4  rata basis?
5       MR. SORKIN: Objection.
6  A.  Just to make sure that all this in
7  the proper context, that there was no
8  expectation prior to the court's decision that
9  that would occur, so that it came as a
10  surprise.  In that case then there would be
11  wealth transfers.
12  Q.  Right.  And similarly, if that same
13  situation happened within the American estate,
14  there would -- and it came as a surprise,
15  that -- there would be wealth transfers?
16       MR. SORKIN: Objection.
17  A.  That is my opinion, yes.
18       MR. BARRACK: Can we just go off the
19  record for a second.
20       THE VIDEOGRAPHER: The time is
21  2:34 p.m. on April 4, 2014.  We are now
22  off the record.
23       (Off the record.)
24       THE VIDEOGRAPHER: The time is
25  2:42 p.m. on April 4, 2014.  We are now

Page 165

MCCONNELL - HIGHLY CONFIDENTIAL

1  back on the record and you may proceed.
2  EXAMINATION BY
3  **MR. KELLER:**
4  Q.  Good afternoon.  My name is Paul
5  Keller.  I represent the Canadian debtors and
6  the Monitor and I really just have a handful of
7  questions that I would like to go through with
8  you.
9  Focusing on paragraph 20 of your
10  expert report, if you could please pull that
11  out.  I think it's right there on top in front
12  of you.  It's on page 5.  And I'll read it into
13  the record just to make sure we all have it.
14  "In assessing risk," you write, "that is, in
15  assessing the likelihood that the borrower can
16  service the debt, creditors consider the assets
17  of the borrower, the borrower's potential
18  future earnings, and the covenants embedded in
19  the debt agreement.  It is the borrower's
20  assets that generate future earnings, and it is
21  from these earnings that interest and principal
22  payments are made.  It is also the borrower's
23  assets that serve as a source of payment in the
24  event of default, bankruptcy, and liquidation

Page 166

MCCONNELL - HIGHLY CONFIDENTIAL

1  of the borrower."  Did I read that correctly?
2  **A.  Yes, I believe so.**
3  Q.  You don't want to change anything in
4  that paragraph?
5  **A.  I don't believe so.**
6  Q.  Just to make sure I understand the
7  information you're conveying there, investors
8  before purchasing a bond should only review the
9  bond's prospectus, correct?
10  **A.  Fair enough.**
11  Q.  And they review any guarantees
12  related to that bond, correct?
13  **A.  That would be my expectation, yes.**
14  Q.  Do investors also evaluate the
15  particular companies' revenues?
16  **A.  That would be my expectations, yes.**
17  Q.  Profits and losses?
18  **A.  Yes.**
19  Q.  And based on this paragraph they are
20  doing that to try to determine whether the
21  borrower can pay off the bonds that get
22  purchased?
23  **A.  And service the interest, yes.**
24  Q.  So if we get a little bit more

Page 167

MCCONNELL - HIGHLY CONFIDENTIAL

1  specific and focus on a particular Nortel
2  subsidiary.  Let's pick one.  NNI, for example.
3  Investors in NNI's bonds review the revenue --
4  revenue of NNI before purchasing the bonds;
5  that's your expectation?
6  **MS. A. MILLER:** Objection.
7  **MR. SORKIN:** Objection.
8  **A.  To the extent that information is**
9  **available that would be my expectation.**
10  Q.  To the extent the information is
11  available investors would review future
12  earnings or the potential for future earnings
13  of NNI, correct?
14  **MS. A. MILLER:** Objection.
15  **A.  That would be my expectation to the**
16  **extent that such information is available.**
17  Q.  And to the extent that information
18  was available at the time the bonds were
19  purchased by investors you would expect that
20  those investors are reviewing NNI's financial
21  information to determine the ability to service
22  the bonds; is that right?
23  **A.  To the extent that information is**
24  **available or proxies for that information are**

Page 168

MCCONNELL - HIGHLY CONFIDENTIAL

1  available that would be my expectation, yes.
2  Q.  To the extent -- again I understand
3  the limitation to the extent the information is
4  available, but the investors also are trying to
5  understand -- strike that.
6  It is also your expectation that in
7  purchasing bonds of NNI investors are trying to
8  understand the ability of NNI to make revenue;
9  is that right?
10  **A.  Generate revenue, is that to what**
11  **you are referring?**
12  Q.  That's correct.
13  **A.  That's fair.**
14  Q.  That would include also NNI's
15  ability -- strike that.
16  That would include NNI's contractual
17  obligations and rights that it may have at the
18  time the bonds are purchased; is that right?
19  **A.  Could you be more specific?**
20  Q.  Sure.  I started broad but let's
21  just provide an example of what I think I might
22  be referring to.  To the extent information is
23  available on a license that NNI has, the
24  bondholders, the investors in the bonds would

Case 09-10138-MFW    Doc 17958-27    Filed 02/24/17    Page 45 of 77
IN RE: NORTEL NETWORKS INC., et al.    HIGHLY CONFIDENTIAL

JOHN MCCONNELL
April 4, 2014

Page 169

1    MCCONNELL - HIGHLY CONFIDENTIAL
2  be interested in understanding the terms of
3  that license?
4    MR. SORKIN: Objection.
5  Q.  Before investing in purchasing the
6  bonds?
7    MR. SORKIN: Objection.
8  Q.  If that license was going to in fact
9  result in revenue generation?
10   MR. SORKIN: Objection.
11 A.  As I understand your question, which
12 is to the extent information is available that
13 influences future revenues and the ability to
14 service any debt that would be issued, that
15 piece of information to the extent were
16 available my expectation would be of relevance
17 to investors.
18 Q.  And those investors would want to
19 know that information as to NNI's specifically,
20 not just some global corporate -- Nortel global
21 situation?
22   MR. SORKIN: Objection.
23 A.  To the extent, as I understand your
24 question, that NNI issued a bond or borrowed
25 and NNI is the sole issuer, no guarantees, then

Page 170

1    MCCONNELL - HIGHLY CONFIDENTIAL
2  my expectation would be that those investors
3  would want to know the ability of NNI to
4  service that debt.
5  Q.  And not only the ability to service
6  that debt but the rights and obligations it had
7  that impacted its ability to service that debt?
8    MR. SORKIN: Objection.
9  A.  I'm not sure there was a distinction
10 between those but to the -- so I don't see the
11 distinction.  I would say it's all encompassed
12 in the ability to service the debt.
13 Q.  Is it your understanding -- not
14 specific to NNI, is it your understanding
15 that -- strike that.
16     Specific to NNI, but is it your
17 expectations that creditors when purchasing the
18 bonds understood that NNI had certain
19 contractual obligations and rights?
20   MR. SORKIN: Objection.
21 A.  Say it again, please.
22 Q.  Sure.  Is it your expectation that
23 when the investor purchased NNI bonds that they
24 understood that NNI had certain contractual
25 obligations and rights in place at the time the

Page 171

1    MCCONNELL - HIGHLY CONFIDENTIAL
2  bonds were purchased?
3    MR. SORKIN: Objection.
4  A.  I do not know whether investors knew
5  every specific obligation and right that NNI
6  had.  To the extent that those were relevant
7  and available to potential bond investors I
8  would assume and expect that they would have
9  taken those into consideration.
10 Q.  And even for those that were not
11 readily available, certainly the investors
12 understood that there were likely contractual
13 obligations that NNI had where it had certain
14 rights and had certain obligations?
15   MR. SORKIN: Objection.
16 A.  I would assume any -- that's true of
17 any corporation.  To the extent that NNI is a
18 corporation I would expect that to be true.
19 Q.  And you understand NNI is a
20 corporation?
21 A.  I do.
22 Q.  Have you ever heard of a document
23 called the MRDA?
24 A.  I have.
25 Q.  What do you understand that document

Page 172

1    MCCONNELL - HIGHLY CONFIDENTIAL
2  to be?
3    MR. SORKIN: Objection.
4  A.  My vague appreciation of the
5  document is that it is an agreement between
6  various Nortel entities.  Beyond that I don't
7  have any particular understanding.
8  Q.  Well, let's drill down on that just
9  to exhaust whatever thoughts, any information
10 you do have on it.  It was an agreement that
11 various Nortel entities had entered into; you
12 understand that?
13 A.  That's my belief and understanding.
14 Q.  Is it your understanding that NNI
15 was a signatory to the MRDA?
16   MR. SORKIN: Objection.
17 A.  I don't know all of the signatories
18 or all of the parties involved.  My impression
19 is that it encompassed NNI.
20   MR. SORKIN: Could you help me
21 understand how this questioning is related
22 in any way to the report that Professor
23 McConnell issued.
24   MR. KELLER: Sure, be happy to.
25 Q.  We are talking about paragraph 20 in

Page 173

MCCONNELL - HIGHLY CONFIDENTIAL

1      MCCONNELL - HIGHLY CONFIDENTIAL
2  your report, sir, and how investors effectively
3  review companies to determine their ability to
4  service the bonds.  And so I'm trying to
5  understand how -- whether and to what extent
6  you understood the MRDA may have impacted NNI's
7  ability to do that.
8      MR. KELLER: Does that answer your
9  question?
10     MR. SORKIN: I don't think that
11  Professor McConnell has issued any opinion
12  specific to the questioning of NNI's
13  ability to service the debt.  That's
14  not -- the question is creditor
15  expectations, as he testified to, so I
16  think we've gone outside the scope of the
17  expert opinion that Professor McConnell
18  has issued.
19     MR. KELLER: That's exactly what I'm
20  trying to find out, sir.
21  Q.   And if you want to adopt any of his
22  testimony as you're own you're more than
23  welcome to do that.
24  A.  Okay.
25  Q.  So you understand that the MRDA --

Page 174

1      MCCONNELL - HIGHLY CONFIDENTIAL
2  how did you put it?  Extended to NNI?
3      MR. SORKIN: Objection.
4  A.  I'm sorry.
5  Q.  I just missed your testimony before.
6  Did you testify that -- is it your
7  understanding that the the MRDA covered NNI?
8      MR. SORKIN: Objection.
9  A.  What I testified to I believe is
10  that -- my understanding is that it encompassed
11  or embodied or included a variety of or several
12  Nortel entities.  I cannot tell you for certain
13  that it included NNI but my priors would be
14  that it did.
15  Q.  I'm sorry?
16  A.  My priors, my guess would be that it
17  did.
18  Q.  To the extent that the MRDA provided
19  NNI with certain rights and obligations and
20  those rights and obligations were readily
21  available as information available to
22  investors, is it your expectation that at the
23  time the bonds were purchased that the
24  investors would have reviewed that information?
25     MR. SORKIN: Objection.

Page 175

1      MCCONNELL - HIGHLY CONFIDENTIAL
2  A.  That would be my expectation, yes.
3  Q.  Are you aware of the transfer
4  pricing scheme at Nortel?
5  A.  I have heard reference --
6      MR. SORKIN: Objection.
7  A.  I have heard reference to it but
8  that exhausts my knowledge.
9  Q.  You don't know if the transfer
10  pricing scheme included NNI?
11     MR. SORKIN: Objection.
12  A.  I don't know anything about the
13  transfer pricing other than there was a
14  transfer pricing issue involved in this
15  litigation.
16  Q.  Is it your expectation that if the
17  transfer pricing scheme at Nortel included NNI
18  and that information was readily available to
19  investors at the time the bonds were purchased,
20  that the investors would have reviewed that
21  information in determining whether to purchase
22  the bonds?
23     MR. SORKIN: Objection.
24  A.  To the extent it affected the future
25  earnings, cashflows and assets it would be

Page 176

1      MCCONNELL - HIGHLY CONFIDENTIAL
2  relevant, as I perceive it, to bonds issued by
3  NNI, so yes.
4  Q.  Just the change of subject, sir, you
5  have provided a rebuttal report to
6  Messrs. Clark and Westbrook, correct?
7  A.  Yes, sir.
8  Q.  You're not rebutting any other
9  expert in this case?
10     MR. SORKIN: Objection.
11  Q.  Is that you're understanding?
12  A.  I'm not responding to any other
13  expert in this matter.
14  Q.  Have you reviewed any other expert
15  reports other than their expert report?
16  A.  Yes, I have.
17  Q.  Whose are those?
18  A.  I reviewed an expert report by
19  Mr. Kilimnik.  I reviewed an expert report by
20  Mr. Cox and Berenblut or Misters Cox and
21  Berenblut.  I know there are other expert
22  reports I reviewed.  Mr. Green, I reviewed an
23  expert report by Mr. Green.  I believe there
24  are other expert reports that if I heard the
25  names I would be able to tell you whether I

Page 177

MCCONNELL - HIGHLY CONFIDENTIAL

2 reviewed them.
3 Q.  Instead of rattling those off I'll
4 try to ask an all-encompassing question.  Do
5 you expect to offer any expert opinions in
6 rebuttal to any of the other expert reports
7 other than the Clark and Westbrook opinion at
8 trial?
9     MR. SORKIN: Objection.
10 A.  I do not.
11 Q.  Would you consider yourself a
12 valuation expert?
13 A.  I am.
14 Q.  In what field?
15 A.  The field of financial assets and
16 certain real property assets.
17 Q.  Would you consider yourself a
18 valuation expert in IP?
19 A.  I would not.  By IP we are referring
20 to intellectual property?
21 Q.  That's correct.
22 A.  Including patents or specifically
23 I'm going to say patents.
24 Q.  Fine.  You are not an expert in
25 evaluating patents?

Page 178

MCCONNELL - HIGHLY CONFIDENTIAL

2 A.  In this particular matter I'm
3 specifically not an expert in valuing patents.
4 There may be patents that would have
5 characteristics that would sometime in the
6 future allow them to be -- fall within my
7 purview of thinking about valuation from a
8 financial perspective or -- but I do not expect
9 to be valuing any patents in this matter.
10 Q.  Do you expect to value any patent
11 licenses in this matter?
12 A.  I do not.
13 Q.  Would you consider yourself a patent
14 licensing expert?
15 A.  Again, I consider myself an expert
16 with respect to valuation financial assets.  To
17 the extent that cashflow projections are
18 available and to the extent that those cashflow
19 projections embody a present value of a patent
20 right, then I feel quite comfortable in
21 assessing the value -- would feel, believe to
22 feel quite comfortable in assessing the value
23 of those patent rights.  I do not expect to
24 offer testimony in that regard in this matter.
25 Q.  To the extent any intellectual

Page 179

MCCONNELL - HIGHLY CONFIDENTIAL

2 property license has an associated cashflow or
3 expected cashflow related to it you feel that
4 you're an expert as related to the valuation of
5 those licenses?
6     MR. SORKIN: Objection.
7 A.  I believe that I could do so.
8 Q.  Do you consider yourself a transfer
9 pricing expert?
10 A.  I am not a transfer pricing expert,
11 certainly not in this matter.
12     MR. KELLER: I have got no further
13 questions at this time.  After counsel
14 evaluates the request of additional
15 documentation from the previous examiner
16 and those materials are produced, I'll
17 keep the deposition held open until we get
18 a chance to review those materials or
19 until that issue is resolved.
20 EXAMINATION BY
21     MR. HANS:
22 Q.  Professor, my name is Richard Hans.
23 I'm from the law firm of DLA Piper who
24 represents the Canadian Creditors Committee.
25 Shorthand for that is the CCC here in this

Page 180

MCCONNELL - HIGHLY CONFIDENTIAL

2 case.  I'm going to try and cut through and ask
3 some kind of follow-up questions just to make
4 sure I understood what your testimony is, clear
5 up a few other things, and I will try to make
6 this as short as possible here because it is
7 Friday afternoon.
8     So earlier in the day you mentioned
9 that one of the things that you have done in
10 the course of your career is create trading
11 models for bond trading firms; is that correct?
12 A.  Valuation models for pricing.
13 Q.  And have you ever done that for a
14 distressed debt trading firm?
15 A.  Yes.
16 Q.  And did you consider or review any
17 model that is currently employed by any of the
18 current holders of Nortel bonds?
19 A.  No.
20 Q.  You know, I would like to go back to
21 Exhibit 12042.  It's the Moody's report from
22 December 16, 2008, if I could.
23 A.  What is the document number, sir, if
24 I may ask?
25 Q.  It is presented to you as 12042.

Page 181

1    MCCONNELL - HIGHLY CONFIDENTIAL
2    It's the Moody's report dated 15 December,
3    2008.
4  A.  I have it, yes, sir.
5  Q.  I just want to be clear.  You did
6    not review this particular Moody's report prior
7    to the completion of your report; is that
8    correct?
9  A.  That is correct.
10  Q.  And if I understood earlier, to your
11    recollection you don't recall reviewing it
12    subsequent to the preparation of your report;
13    is that correct?
14  A.  I think what I testified to is that
15    I reviewed several or some Moody's report
16    subsequent to submitting my report.  I cannot
17    say for certain this is one of them or not one
18    of them.
19  Q.  In the preparation of your report is
20    there any reason why you would not have also
21    looked for or considered a contemporaneous
22    Moody's report to the S&P report that you
23    looked at?
24  A.  I felt that the data that I had
25    available to me clearly in my view rejected

Page 182

1    MCCONNELL - HIGHLY CONFIDENTIAL
2    Mr. Clark and Westbrook's proposition.  So I
3    really didn't feel that I needed additional
4    information to reject that proposition.  Now --
5    so that's the answer.
6    (Whereupon Exhibit 12045 was marked
7    for identification.)
8  Q.  I'm going to show you a document
9    marked 12045.  There is a Moody's report Global
10    Credit Research 16 December, 2008.  So at least
11    it has a date one day later than the report we
12    were looking at earlier.
13    If I can refer you to page 3, there
14    is at the top of the page a section called
15    "Structural Considerations."  Please feel
16    free -- I know it's the first time you're
17    seeing this document or may be the first time
18    and maybe I should ask you that, I apologize.
19    Have you ever seen this document before?
20  A.  I do not know for certain yes or no.
21  Q.  I would ask you just to review the
22    sections -- two paragraphs "Structural
23    Considerations," and I'm going to bring you,
24    once you read it, to a particular provision in
25    our sentence in the second paragraph.

Page 183

1    MCCONNELL - HIGHLY CONFIDENTIAL
2  A.  Okay.  Thank you.  (Witness reading
3    document.)  I have read that.
4  Q.  The second paragraph, or the second
5    paragraph reads, "In general, a system of
6    cross-guarantees causes all debt to be
7    interpreted as pari passu."  Do you have an
8    understanding of what pari passu means?
9  A.  I believe it means, in my words,
10    equal footing or something like that.
11  Q.  From sitting here as a professor of
12    finance and being offered as an expert in this
13    matter, this equal footing, what does that mean
14    for you with respect to the Nortel debt --
15    MR. SORKIN: Objection.
16  Q.  -- if it were to be considered pari
17    passu?
18  A.  If that is the proper interpretation
19    it means there are on an equal basis.
20  Q.  The paragraph goes on to say
21    "Technically, however, there are two note
22    issues that are not pari passu.  However, since
23    the financial consequences of this situation
24    are not determinable and are, in any a case,
25    thought to be minimal, Moody's rates all of the

Page 184

1    MCCONNELL - HIGHLY CONFIDENTIAL
2    Nortel group of companies' debts as if they
3    were pari passu," and then follows with a
4    parenthetical listing certain of the notes.  Do
5    you see that?
6  A.  Yes.
7  Q.  Is this information that would have
8    been relevant to and/or informative for a
9    bondholder considering to -- or a bond buyer
10    considering the purchase of these bonds?
11    MR. SORKIN: Objection.
12  A.  And you're referring particularly
13    that the two notes that are not pari passu?
14  Q.  In particular that they would
15    consider all of the Nortel group of company
16    debts as pari passu.
17  A.  Well, I'm not sure that I can read
18    that one passage without the entire context
19    which goes on to say that there are two notes
20    that are not pari passu.  And to the extent
21    that the prices are quite different, as I have
22    reported and commented on, apparently investors
23    took great consideration of the possibility or
24    the recognition that the notes are not pari
25    passu.

IN RE: NORTEL NETWORKS INC., et al.   HIGHLY CONFIDENTIAL

JOHN MCCONNELL
April 4, 2014

Page 185

MCCONNELL - HIGHLY CONFIDENTIAL

1
2 Q.  But this report and at least the
3 consideration of the debt is pari passu would
4 stand in contrast to the report you relied upon
5 from Standard & Poor's issued one month
6 earlier, correct?
7     MR. SORKIN: Objection.
8 A.  In part yes and in part no.
9 Q.  In what part yes?
10 A.  To the extent that they are viewed
11 by Moody's as pari passu that would stand in
12 contrast, and in fact would stand in contrast
13 to the pricing and to the next statement which
14 is that they are not pari passu.
15 Q.  And the next statement is the
16 parenthetical that you're referring to?
17 A.  No.  Technically they are not pari
18 passu.
19 Q.  And then the following statement
20 says Moody's considers them pari passu in any
21 event; isn't that correct?
22     MR. SORKIN: Objection.
23 A.  What it says specifically is that
24 the consequences are not determinable and in
25 any case thought to be minimal by Moody's and

Page 186

MCCONNELL - HIGHLY CONFIDENTIAL

1
2 therefore -- I believe that's a comma not a
3 period - the word "therefore" is not in the
4 sentence - Moody's rates all Nortel group of
5 company's debts as if they were pari passu, so
6 it is giving them the same rating even though
7 they are not pari passu.
8 Q.  I understand.  That's all I wanted
9 to know is that Moody's in fact considered them
10 as they stated here pari passu?
11     MR. SORKIN: Objection.
12 A.  Well, it says that we are rating the
13 debts as if -- as if they were pari passu.
14 Q.  And that's information, though, that
15 an investor would have considered, is it not?
16 A.  To the extent that was in the
17 marketplace, certainly.
18 Q.  Do you have any reason to believe
19 that a Moody's report would not have been in
20 the marketplace?
21 A.  No, I do not.
22 Q.  I just want to make sure I'm clear
23 on something.  Did you have any conversations
24 or discussions with any of the current
25 bondholders of the Nortel debt?

Page 187

MCCONNELL - HIGHLY CONFIDENTIAL

1
2 A.  Not to my knowledge.
3 Q.  And I just want to run through a
4 number of names.  I just want to make sure that
5 in fact that is the case.
6     Angela Gordon and Company, any
7 conversations with them regarding the Nortel
8 debt for the purposes of your report?
9 A.  No, sir.
10 Q.  ACP Master Limited?
11 A.  No, I have not spoken with anyone
12 from ACP Limited.
13 Q.  Aurelius Capital Master Limited?
14 A.  No, I did not speak with anyone from
15 Aurelius Capital Limited.
16 Q.  Aurelius Convergence Master Limited?
17 A.  No, I did not.
18 Q.  CarVal Investors, LLC?
19 A.  No, I have not.
20 Q.  Centerbridge Partners, LP?
21 A.  No, I have not.
22 Q.  DW Investment Management, LP?
23 A.  No, I have not.
24 Q.  Franklin Mutual Advisors, LLC?
25 A.  No, I have not.

Page 188

MCCONNELL - HIGHLY CONFIDENTIAL

1
2 Q.  Golden Tree Asset Management.
3 A.  No, I have not.
4 Q.  GS Investment Strategies, LLC?
5 A.  No, I have not.
6 Q.  King Street Capital Management, LP?
7 A.  No, I have not.
8 Q.  Monarch Alternative Capital, LP?
9 A.  No, I have not.
10 Q.  Quantum Partners, LP?
11 A.  No, I have not.
12 Q.  Solus Alternative Asset Management,
13 LP?
14 A.  No, I have not.
15 Q.  Tenor Capital Management?
16 A.  No, I have not.
17 Q.  Are you familiar with any of those
18 entities.
19 A.  I believe I've heard some of the
20 names.
21 Q.  Would any of those entities be
22 considered distressed debt firms?
23     MR. SORKIN: Objection.
24 A.  They may hold as part of their
25 portfolios debt that is in default, if that is

Page 189

MCCONNELL - HIGHLY CONFIDENTIAL

1    MCCONNELL - HIGHLY CONFIDENTIAL
2  what you mean by distressed debt.  I can't
3  speak to it.  I have not reviewed their
4  portfolios.  I don't know specifically what
5  they hold in their portfolios, but I'm not
6  ruling it out.
7  Q.  Are you aware or have you ever
8  reviewed the investment guidelines that any of
9  those entities may have?
10  A.  I have not.
11  Q.  Do you have any knowledge as to when
12  any of those entities may have purchased their
13  holdings?
14    MR. SORKIN: Objection.
15  A.  Their holdings of Nortel?
16  Q.  Their holdings of Nortel.
17  A.  Bonds?
18  Q.  Yes.
19  A.  No, I have no knowledge of the day
20  on which they purchased or if they hold them at
21  all for that matter.
22  Q.  I will represent to you that each of
23  those have been represented to the parties as
24  currently holding Nortel bonds, and I will also
25  note that several of the largest holders here

Page 190

1    MCCONNELL - HIGHLY CONFIDENTIAL
2  all purchased on or after July 2011.  Do you
3  have any understanding as to what information
4  or considerations those bondholders may have
5  had when they purchased in July -- on or
6  about -- on or after July of 2011?
7    MR. SORKIN: Objection.
8    MS. A. MILLER: Objection.
9  A.  You mean specifically or --
10  Q.  Specifically.
11  A.  I have not spoken with any
12  representative or employee or anyone associated
13  with those firms, to my knowledge, and I
14  certainly haven't spoken with them about the
15  Nortel bonds.
16  Q.  Have you otherwise considered,
17  whether you spoke to them or not, any
18  information that would have informed an
19  understanding of why they purchased at that
20  time?
21    MR. SORKIN: Objection.
22  A.  As a general proposition?
23  Q.  As a general proposition.
24  A.  Yes.
25  Q.  As a general proposition what is

Page 191

1    MCCONNELL - HIGHLY CONFIDENTIAL
2  your understanding as to why they would have
3  purchased on or after July of 2011?
4    MR. SORKIN: Objection.
5  A.  Well, investors in general form
6  expectations about the future cashflows that
7  investment opportunity can and will and might
8  provide to them, and I would have expected, as
9  I testified to earlier, that these particular
10  investors, whomever they may be, would have
11  undertaken such an analysis, just as investors
12  at any other point in time would have done.  I
13  would not have expected their analysis to be
14  any different from any other investors at any
15  other point in time, as I've described in my
16  report and I have been teaching and talking
17  about and thinking about for the past 35 or 40
18  years.
19  Q.  Is there anything in your report
20  that speaks to what the considerations would
21  have been at any point in time post-filing in
22  January of 2009?
23    MR. SORKIN: Objection.
24  A.  You will have to help me.  What is
25  your question?

Page 192

1    MCCONNELL - HIGHLY CONFIDENTIAL
2  Q.  Your report makes reference to the
3  November 2008 S&P report and some other things
4  but is there anything that you considered from
5  a factual perspective post-filing,
6  post-petition date that would have gone into
7  your opinion?
8    MR. SORKIN: Objection.
9  A.  You mean beyond prices?
10  Q.  Beyond prices.
11    MR. SORKIN: Same objection.
12  A.  What was the date again, sir?
13  Q.  January 14, 2009.
14  A.  And again we are extracting from or
15  abstracting from or extracting from the Clark
16  and Westbrook report which was clearly
17  submitted post-2009?
18  Q.  Yes.
19  A.  Any other reports I have read in
20  this and so forth?
21  Q.  That's correct.
22  A.  Yes.
23  Q.  And what is that?
24  A.  In footnote 15 I reference a
25  Standard & Poor's document dated 2010.

Page 193

MCCONNELL - HIGHLY CONFIDENTIAL

2 Q. And that Standard & Poor's document
3 to which you refer in footnote 15, 2010 is
4 entitled "Guide to Credit Rating Essentials,"
5 correct?
6 A. Yes, it is.
7 Q. And that is a general document, not
8 a document specific to Nortel, correct?
9 A. That's my recollection, yes. Am I
10 missing your question? Sorry.
11 Q. Is there anything else specific to
12 Nortel -- the Nortel group of companies
13 post-petition date that you considered or
14 relied upon in coming to your opinion?
15 MR. SORKIN: Objection.
16 A. And again beyond the prices?
17 Q. Beyond the price.
18 A. I believe not.
19 Q. To be clear, there were a series of
20 transactions that the Nortel entities engaged
21 in post-petition with respect to the sale of
22 various businesses and other assets. Are you
23 aware of that?
24 MR. SORKIN: Objection.
25 A. The sale of assets, yes.

Page 194

MCCONNELL - HIGHLY CONFIDENTIAL

2 Q. Assets and various businesses.
3 A. Assets in various businesses?
4 Q. Assets and various business lines.
5 A. Yes.
6 Q. Would the sale of any of those
7 entities have affected the expectations of
8 bondholders?
9 A. Yes.
10 Q. But you didn't consider those
11 necessarily in coming to the opinion in your
12 report; is that correct?
13 A. No, that's not correct.
14 MR. SORKIN: Objection.
15 Q. I'm sorry, I thought you just
16 testified that you had not considered anything
17 post-petition in coming to the opinion in your
18 report.
19 MR. SORKIN: Objection.
20 A. Except with respect to prices.
21 Q. In what respect did you consider
22 these various transactions in relation to the
23 prices?
24 A. If I could ask you to or not turn to
25 Exhibit 3 of my report, I would note that I

Page 195

MCCONNELL - HIGHLY CONFIDENTIAL

2 highlight on my report the sale of the business
3 lines, but in particular the sale of the --
4 what I refer to -- have been referring to and
5 had referred to heard referred to as the
6 residual patent portfolio, which occurred in
7 July of 2011 and the associated price increase
8 or the price increase that occurred
9 contemporaneously.
10 Q. I note you make reference only in
11 this chart to the last line of business sale;
12 is that correct?
13 A. That is correct.
14 Q. Did you consider any of the other
15 business sales and the effect on pricing?
16 A. I did not.
17 Q. Is there any reason why you selected
18 only the last line of business sale?
19 A. I thought at the time I was
20 preparing the report it was informative to
21 distinguish between when the line of business
22 sales occurred and the RPP sale occurred, but
23 it really was not informative to my opinions.
24 Q. Have you ever in the course of your
25 work as a professor and as a consultant, as

Page 196

MCCONNELL - HIGHLY CONFIDENTIAL

2 you've mentioned before, have you ever analyzed
3 any cases that engaged in substantive
4 consolidation?
5 A. I do not believe. In fact I am
6 confident that I was never involved in a case
7 where I was asked to think about substantive
8 consolidation and with respect to -- I think
9 you asked me with respect to my teaching?
10 Q. Yes.
11 A. I have not taught about that topic.
12 Q. Have you otherwise studied it
13 separate and apart from your teaching or
14 consultation?
15 A. I have been only vaguely aware of
16 the idea prior to this case. So the answer is
17 no.
18 Q. So you have not reviewed any cases
19 in which substantive consolidation may have
20 occurred for purposes of this case?
21 A. That is correct.
22 MR. SORKIN: Objection.
23 Q. In the context of what you learned
24 in this case, what is your understanding of
25 what substantive consolidation is?

Page 197

1     MCCONNELL - HIGHLY CONFIDENTIAL
2     MR. SORKIN: Objection.
3  A.  I'm going to try to give an example
4  which I think characterizes or characterizes my
5  understanding of substantive consolidation.
6  I'm going to try to do this very carefully, but
7  my belief is that something of the following
8  sort. Let's suppose that in Indiana there is a
9  parent company in Indianapolis and a subsidiary
10  in West Lafayette, Indiana, they have different
11  pools of assets that they each own separately.
12  My impression is or understanding is, again,
13  I'm not an expert on this so bear with me, is
14  that in a substantive consolidation those
15  assets would be placed into a single pool for
16  allocation that would -- as I understand it
17  would still respect any priority agreements
18  that were in place prior to the substantive
19  consolidation but it's a matter of putting the
20  assets together as if they were not two
21  separate entities.
22  Q.  Separate and apart, of course, from
23  any discussion you may have had with counsel,
24  is that understanding derived from any recent
25  study?

Page 198

1     MCCONNELL - HIGHLY CONFIDENTIAL
2  A.  It is not.
3     Are you ready for a break now?
4  Q.  Absolutely. We can take a break. I
5  don't have that much longer but we can take a
6  break and then I can clear it up.
7  A.  Let's go.
8  Q.  You want to go?
9  A.  Yes.
10  Q.  I'm going to show you another
11  document marked Exhibit 12046.
12     (Whereupon Exhibit 12046 was marked
13  for identification.)
14  Q.  As you can see, we killed more than
15  a few trees along the way here today,
16  unfortunately.
17     Professor, I handed you a document
18  that is a Form 10-K for Nortel Networks
19  Corporation, NNC. I'm not going to ask you to
20  review this entire report but I just want to
21  know if in the course of your preparation of
22  your report, did you consider or review this
23  10-K?
24  A.  I'm sure there is a date on here. I
25  found the date. Yes.

Page 199

1     MCCONNELL - HIGHLY CONFIDENTIAL
2  Q.  You did?
3  A.  Oh, well -- it's not listed on my
4  documents reviewed but I have -- or relied upon
5  but I have looked at this 10-K or at least
6  parts of it.
7  Q.  Would you have considered it, do you
8  think, after the preparation of your report?
9  A.  I don't know.
10     MR. HANS: And I will just note for
11  the record that the date on the very last
12  page in the certification is March 2,
13  2009.
14  Q.  So that I understand -- let me go
15  back to what we were just talking about,
16  substantive consolidation as you understand it.
17  Is that something that would have been a
18  consideration for an investor in the debt of
19  Nortel should that have been a risk?
20     MR. SORKIN: Objection.
21  A.  You're asking me should it have been
22  a risk?
23  Q.  No, no. If in fact it was a risk
24  would that have been something that would have
25  been of interest to you or considered by an

Page 200

1     MCCONNELL - HIGHLY CONFIDENTIAL
2  investor?
3  A.  I believe so.
4     MR. SORKIN: Objection.
5  Q.  I'm sorry, I just want to make sure.
6  You said I believe so?
7  A.  Yes.
8  Q.  I want to make sure. I just want to
9  direct you to one page and then we will be done
10  with this document. Page 25, which is
11  CCC0099058. The very last paragraph, which is
12  preceded by bold language, it says, "Some or
13  all of the US debtors could be substantively
14  consolidated." Do you see that?
15  A.  Oh, yes, I do.
16  Q.  In your view would a -- an investor
17  who purchased Nortel debt after March 2, 2009,
18  which is the date of this 10-K, in your expert
19  opinion would an investor have considered
20  information that is found in the Form 10-K?
21  A.  Yes, I believe so.
22     MR. SORKIN: Objection.
23  Q.  So this particular provision, and
24  back on page 25, 99058 Bates number. Now, I
25  will note that what it speaks to here, and you

Case 09-10138-MFW   Doc 17958-27   Filed 02/24/17   Page 53 of 77
IN RE: NORTEL NETWORKS INC., et al.   HIGHLY CONFIDENTIAL

JOHN MCCONNELL
April 4, 2014

Page 201

1    MCCONNELL - HIGHLY CONFIDENTIAL
2  can read through the paragraph, is simply that
3  there may be a substantive consolidation of US
4  debtors, and after you have taken a read
5  through the paragraph -- if you need to read
6  through the paragraph, please do so.  I only
7  have a couple of questions.
8  A.  (Witness reading document).  Yes, I
9    read it.
10 Q.  Do you know how many US debtors
11   there are?
12 A.  No, I do not.
13 Q.  Do you know if there are more than
14   one?
15 A.  My impression there is more than one
16   but I do not know.
17 Q.  I just note here it says "If
18 litigation over substantive consolidation
19 occurs or if substantive consolidation is
20 ordered the ability of a US debtor that has
21 been substantively consolidated with another US
22 debtor to make payments required with respect
23 to its debt could be adversely affected."  Do
24 you have any understanding as to what that
25 sentence means or would mean to an investor?

Page 202

1    MCCONNELL - HIGHLY CONFIDENTIAL
2    MR. SORKIN: Objection.
3  A.  I believe that is consistent with
4    what I had testified to earlier.  So I -- in
5    that respect, yes.
6  Q.  Do you have any reason to think that
7  that would not have been considered by an
8  investor?
9    MR. SORKIN: Objection.
10 A.  I have no reason to believe that
11   that would not be considered by an investor.
12 Q.  Are you aware of the various
13 pleadings that have been filed in this case
14 with respect to allocation?
15 A.  I have read pleadings that have been
16   filed in this case with respect to that
17   question.  I do not know if I've read every
18   single one of them or have access to every
19   single one of them but I certainly have read
20   pleadings submitted by various parties.
21 Q.  In your expert opinion, given the
22 various pleadings that have been filed by the
23 parties, would an investor have considered
24 those pleadings in determining whether to
25 purchase, sell or hold Nortel debt?

Page 203

1    MCCONNELL - HIGHLY CONFIDENTIAL
2    MR. SORKIN: Objection.
3  A.  Let me make sure I get it.  The
4    pleadings occur post-petition as I understand
5    it.
6  Q.  That's correct.
7  A.  I do not know whether those are
8    publicly available.  If they are publicly
9    available it would seem reasonable to me that
10   investors would have -- had access to them and
11   to the extent that they provided information
12   that was informative to investors in assessing
13   the future cashflows that would accrue or could
14   accrue to them by virtue by making an
15   investment in Nortel bonds, I would have
16   expected those to have been taken into account.
17   MR. HANS: Let me go off the record
18 for two minutes.  Let me see what if else
19 if anything I want to do.
20   THE VIDEOGRAPHER: The time is
21 3:30 p.m. on April 4, 2014.  We are now
22 off the record.
23   (Off the record.)
24   THE VIDEOGRAPHER: This is tape five
25 in the deposition of John McConnell.  The

Page 204

1    MCCONNELL - HIGHLY CONFIDENTIAL
2  time is 3:39 p.m. on April 4, 2014.
3    We are now back on the record.  You
4    may proceed.
5    MR. SORKIN: Mr. Hans, before you
6  go, I just wanted to put on the record
7  that during the break Mr. Barrack and I
8  spoke and he wanted to indicate on the
9  record that he made the same reservation
10 that Mr. Keller did with respect to any
11 subsequent production, and we understand
12 that has been made.
13   MR. HANS: Thank you.  I will share
14 in that reservation without having to
15 restate it here on the record.  Thank you.
16 Q.  Professor, I hope this will be the
17 last question.  I mentioned earlier a series of
18 questions that were investors in the Nortel
19 bonds.  Do you remember that discussion?
20 A.  I do.
21   MR. SORKIN: Objection.
22 Q.  I just want to ask if you reviewed
23 anything that any of those companies published
24 with respect to Nortel bonds in preparation of
25 your report?

Page 205

1       MCCONNELL - HIGHLY CONFIDENTIAL
2       MR. SORKIN: Objection.
3       MS. A. MILLER: Objection.
4   A.  No.
5   Q.  I have no further questions.  Thank
6   you very much, Professor.
7       MR. HANS: I think somebody else
8   does here.  So I'm done.  Thank you.
9   EXAMINATION BY
10      MR. GUINEY:
11  Q.  Good afternoon, Professor McConnell.
12  My name is Brian Guiney.  I am an attorney with
13  the law firm of Patterson, Belknap, Webb &
14  Tyler.  We represent Law Debenture Trust
15  Company of New York in this proceeding, which
16  is the indenture trustee for the 7.875 percent
17  notes.
18      Professor McConnell, do you have
19  Exhibit --
20  A.  I'm sorry.  You really went too
21  fast.  It's probably irrelevant.
22  Q.  I'm sorry.  Our client is law
23  Debenture Trust Company of New York, the
24  indenture trustee for the 7.875 percent notes.
25  I'm going to ask you just a few questions about

Page 206

1       MCCONNELL - HIGHLY CONFIDENTIAL
2   that.  Do you have Exhibit 12034 handy?
3   A.  I do.
4   Q.  Exhibit 12034 is the Nortel Bond and
5   Related Documents chart that Mr. Barrack gave
6   you this morning.
7   A.  Yes, sir.
8   Q.  And the second row of that chart, do
9   you see the reference to the 7.875 percent
10  senior notes?
11  A.  I do.
12  Q.  I'm going to call those the NNCC
13  notes.  And you see the reference to NN Cap
14  Corp. as the issuer?
15  A.  Yes, I do.
16  Q.  And if I refer to NN Cap Corp. as
17  NNCC, you'll know that I am referring to that
18  issuer?
19  A.  Yes, sir.
20  Q.  Do you recall, Professor McConnell,
21  shortly before lunch Mr. Barrack asked you a
22  couple of questions about the NNC notes and
23  about NNCC and specifically with reference to
24  whether or not there was an NNI guarantee of
25  the NNCC notes?

Page 207

1       MCCONNELL - HIGHLY CONFIDENTIAL
2   A.  I don't recall that specific
3   question but I do recall questions with respect
4   to the NNCC notes.
5   Q.  That's fine.  And you recall that in
6   that discussion Mr. Barrack asked you to assume
7   that the NNCC bonds have no access to the NNI
8   pool of assets?
9   A.  If he asked me to assume that I will
10  say that I made that assumption.
11  Q.  Do you recall, Professor McConnell,
12  that he asked you if you were aware of any
13  facts to contradict that assumption?
14  A.  I have no specific recollection at
15  this point.
16  Q.  That's fine.  Those really were just
17  questions to frame the two questions that I
18  have for you to refresh your recollection about
19  the topic that I want to ask you about.
20  A.  Thank you.
21  Q.  I have only two questions, I think.
22  Do you know sitting here today, Professor
23  McConnell, whether or not there exists a
24  support agreement between NNI and NNCC?
25  A.  I do not.

Page 208

1       MCCONNELL - HIGHLY CONFIDENTIAL
2   Q.  Do you know, separate and apart from
3   whether there is any support agreement, whether
4   or not NNCC has any other rights or claims
5   against what Mr. Barrack referred to as the NNI
6   pool of assets?
7   A.  I do not.
8   Q.  I don't have any other further
9   questions.  Thank you, Professor McConnell.
10      THE VIDEOGRAPHER: This concludes
11  today's deposition of John McConnell.  The
12  time is 3:44 p.m. on April 4, 2014.
13      This is the end of tape five.  We
14  are now off the record.
15      (Time noted:  3:44 p.m.)
16
17
18
19
20
21
22
23
24
25

Page 209

1      A C K N O W L E D G M E N T

2

3      **STATE OF**              :

4                          :ss

5      **COUNTY OF**            :

6

7          I, JOHN MCCONNELL, hereby certify that

8      I have read the transcript of my testimony

9      taken under oath in my deposition on the 4th

10     day of April, 2014; that the transcript is a

11     true, complete record of my testimony and that

12     the answers on the record as given by me are

13     true and correct.

14

15     _____

16     JOHN MCCONNELL

17

18     Signed and subscribed to before me

19     this _____ day of _____, 20___.

20

21     _____

22     Notary Public of the State of _____

23

24

25

---

Page 210

1          C E R T I F I C A T E

2

3          I, FRAN INSLEY, hereby certify that the

4      Deposition of JOHN MCCONNELL was held before me

5      on the 4th day of April, 2014; that said

6      witness was duly sworn before the commencement

7      of testimony; that the testimony was taken

8      stenographically by myself and then transcribed

9      by myself; that the party was represented by

10     counsel as appears herein;

11          That the within transcript is a true

12     record of the Deposition of said witness;

13          That I am not connected by blood or

14     marriage with any of the parties; that I am not

15     interested directly or indirectly in the

16     outcome of this matter; that I am not in the

17     employ of any of the counsel.

18          IN WITNESS WHEREOF, I have hereunto set

19     my hand this 8th day of April, 2014.

20

21

22

23

24     _____

25     FRAN INSLEY

---

Page 211

1              *** ERRATA SHEET ***

2         ELLEN GRAUER COURT REPORTING CO. LLC
          126 East 56th Street, Fifth Floor
3             New York, New York 10022
                  212-750-6434
4

5      NAME OF CASE: IN RE NORTEL NETWORKS, INC.
       DATE OF DEPOSITION: APRIL 4, 2014
6      NAME OF WITNESS: JOHN MCCONNELL

7      PAGE  LINE      FROM          TO          REASON

8      ___|____|_____|_____|_____|_____

9      ___|____|_____|_____|_____|_____

10     ___|____|_____|_____|_____|_____

11     ___|____|_____|_____|_____|_____

12     ___|____|_____|_____|_____|_____

13     ___|____|_____|_____|_____|_____

14     ___|____|_____|_____|_____|_____

15     ___|____|_____|_____|_____|_____

16     ___|____|_____|_____|_____|_____

17     ___|____|_____|_____|_____|_____

18     ___|____|_____|_____|_____|_____

19     ___|____|_____|_____|_____|_____

20

21                    _____

22     Subscribed and sworn before me
       this____day of_____,20__.
23

24     _____          _____

25     (Notary Public)              My Commission Expires:

---

**$**

**$1 (1)**
96:7
**$1.8 (1)**
94:17
**$10 (1)**
145:7
**$2 (1)**
112:7
**$200 (3)**
45:7;78:22;145:10

**A**

**ABC (2)**
60:10,11
**aberration (1)**
119:7
**ABID (2)**
4:18;13:22
**ability (13)**
110:24;167:22;
168:9,16;169:13;
170:3,5,7,12;173:3,7,
13;201:20
**able (3)**
112:20;121:18;
176:25
**above (4)**
59:11;60:4;93:16;
118:22
**absence (3)**
39:4;58:22;120:15
**Absent (2)**
149:20,22
**absolute (6)**
67:8;77:22;78:2;
122:10,15,18
**Absolutely (1)**
198:4
**abstracting (1)**
192:15
**abundance (1)**
112:3
**academic (9)**
16:3;20:18;21:3;
23:18;27:23,23;34:17,
18;62:6
**accept (7)**
46:24;60:16;80:16,
17,22;81:7,10
**acceptance (3)**
62:7,8;65:4
**accepted (5)**
28:22;32:5;33:8,19;
40:4
**access (7)**
91:21;92:7;93:3;
109:23;202:18;203:10;
207:7
**according (1)**

59:17
**account (11)**
35:3;53:15;71:21;
87:2;107:24,25;108:8;
138:7;151:19;161:3;
203:16
**accrue (2)**
203:13,14
**accumulated (2)**
163:13,15
**accurate (2)**
115:22;137:20
**ACP (2)**
187:10,12
**across (1)**
67:8
**actions (1)**
59:14
**activities (5)**
24:10;159:23;
160:15,17,22
**activity (2)**
23:19;161:9
**actual (2)**
23:19;115:3
**Actually (10)**
15:13;44:6;63:18;
75:25;98:17;115:22;
127:23;130:22;136:2;
152:25
**ad (1)**
13:15
**addition (7)**
25:24;26:18;39:16,
21;46:24;48:9;86:10
**additional (10)**
48:17,18;96:19,22;
109:11;179:14;182:3
**address (1)**
58:14
**addressing (1)**
20:23
**adds (1)**
89:2
**adjust (2)**
45:14;148:22
**adjusting (1)**
151:6
**adjustments (1)**
151:10
**administration (3)**
56:25;58:4,18
**administrators (1)**
13:2
**adopt (4)**
41:14;53:4;61:21;
173:21
**adopted (6)**
19:21;20:6,7,10;
33:19;63:13
**adopting (3)**
46:6,17;47:2
**adoption (5)**

47:18;48:12;60:3;
62:17;65:7
**Advantage (3)**
131:8,9,21
**adversely (1)**
201:23
**advise (1)**
83:19
**advised (2)**
68:8,11
**advisement (2)**
69:24;155:13
**advising (3)**
41:13;46:18;63:2
**Advisors (1)**
187:24
**advocate (3)**
65:15,22;66:3
**affect (5)**
39:11;53:5;69:5;
77:6;120:16
**affected (7)**
47:21;121:12;
160:20;163:24;175:24;
194:7;201:23
**affects (1)**
20:4
**affirmatively (1)**
77:5
**AFTERNOON (4)**
106:18;165:5;180:7;
205:11
**again (54)**
18:2;25:8;26:25;
30:15;32:19;34:12;
37:19;39:14,20;41:12;
44:21;46:9;49:2;50:19;
56:15;62:3;65:5;69:7;
72:25;75:16;76:11;
82:7;99:20;101:8;
102:12;104:8;108:2;
109:25;111:2,12,17;
115:13;116:11;120:13;
121:21;123:12;125:12;
126:4;128:16,24;
129:15;136:4;146:14;
148:15;150:4;154:23;
157:14;168:3;170:21;
178:15;192:12,14;
193:16;197:12
**against (16)**
20:10;34:20;48:23;
57:10;58:20;79:7;80:2,
10,20;81:4,15;83:8,11;
84:11;110:5;208:5
**agencies (24)**
35:22;36:4,19;70:9,
11;71:21,24;72:5,18;
75:7,14,20;77:13;
79:25;85:10,19,21,25;
86:9,10,12;87:2;90:16;
127:12
**agencies' (1)**

86:24
**agency (21)**
28:9;36:12,13;70:12,
18,20,22,23;71:10,14;
72:9;73:4;76:19,20;
87:11,14;93:14;94:6;
100:16;104:21;154:9
**agree (16)**
31:7;84:24;102:21;
104:21;105:2;109:20;
111:7;113:22;114:7,9,
15;115:4,10;133:20;
137:7;153:4
**agreed (2)**
129:8;137:2
**agreement (7)**
70:4;156:16;165:20;
172:5,10;207:24;208:3
**agreements (10)**
27:22;47:20;48:3,7,
10,19;50:4,7;54:2;
197:17
**ahead (5)**
20:12;25:6;29:19;
30:21;116:4
**aimed (1)**
34:22
**air (2)**
31:6,10
**AKIN (4)**
4:12;13:19;26:16,18
**al (1)**
12:8
**ALLEN (2)**
4:3;13:4
**all-encompassing (1)**
177:4
**allocate (1)**
53:25
**allocation (13)**
41:15;48:13;53:4;
63:4,13,16,20;65:22;
158:4,7;159:3;197:16;
202:14
**allow (4)**
53:25;151:11;163:2;
178:6
**allowed (1)**
44:4
**allows (2)**
123:7;124:3
**almost (3)**
18:16;22:11;118:22
**Along (3)**
13:22;45:14;198:15
**Alternative (2)**
188:8,12
**alternatively (1)**
41:4
**always (1)**
34:15
**amendment (1)**
95:12

**American (5)**
22:8;44:3,21;152:23;
164:13
**Americas (1)**
4:5
**among (5)**
32:14,15,19,20;
75:23
**amount (3)**
45:8;96:21;120:3
**analysis (13)**
16:17;17:3;19:3;
46:6,20;92:21;149:10,
24;150:17;158:12,21;
191:11,13
**analyze (1)**
48:11
**analyzed (4)**
41:19,21;42:3;196:2
**analyzing (1)**
19:6
**and/or (1)**
184:8
**anee@cgshcom (1)**
6:19
**Angela (1)**
187:6
**ANN (2)**
6:16;13:17
**announcement (1)**
120:17
**annual (2)**
22:12,14
**answered (1)**
40:25
**anticipate (1)**
34:7
**apart (5)**
24:23;123:9;196:13;
197:22;208:2
**apologize (5)**
42:11,22;52:9,11;
182:18
**apparently (1)**
184:22
**Appeals (2)**
55:24;57:9
**appears (1)**
29:25
**Appendix (1)**
117:10
**applicable (2)**
67:18;115:5
**application (5)**
67:8,16,23,24;68:14
**applied (1)**
115:4
**apply (2)**
36:2;69:10
**appreciation (1)**
172:4
**approach (5)**
48:13;59:7,13,15,20

**approaches (1)**
58:15
**appropriate (1)**
61:21
**approximate (4)**
135:3,25;136:12,15
**April (17)**
12:5;66:18,24;93:23;
94:3;96:10,10;106:14,
22;151:25;152:6;
164:21,25;203:21;
204:2;208:12;209:10
**area (2)**
18:8;106:7
**arises (1)**
161:16
**arithmetic (1)**
82:24
**Armstrong (1)**
12:15
**around (1)**
135:6
**arrangements (2)**
50:12;51:8
**articulated (1)**
61:7
**aside (4)**
36:18;99:16;133:18;
143:25
**aspect (2)**
18:16;162:15
**aspects (1)**
29:18
**assert (2)**
157:4;163:4
**assertion (11)**
64:9,10,10,11,12,14,
16;65:20;66:7;118:13;
119:23
**assertions (1)**
157:6
**assess (6)**
20:3;33:22;121:18;
156:7;158:6,8
**assessing (7)**
20:20;159:8;165:15,
16;178:21,22;203:12
**assessment (13)**
75:12,18;76:24;99:4;
108:16,22,24;139:19;
140:7,12,13;141:3,8
**asset (3)**
44:15;188:2,12
**assets (37)**
44:12;58:8,19,21;
59:2,16;71:25;72:20;
90:8,18;91:16,17,21;
92:6,7;93:4,4;109:7,
13;156:9;165:17,21,
24;175:25;177:15,16;
178:16;193:22,25;
194:2,3,4;197:11,15,
20;207:8;208:6

**assign (1)**
104:22
**assigned (1)**
97:15
**assigning (5)**
72:2,20;73:13;74:10;
90:18
**assist (2)**
16:17;43:2
**assisted (4)**
17:2,2,8;24:24
**assisting (1)**
59:10
**associated (9)**
31:20;108:17,24;
111:21;123:8;124:4;
179:2;190:12;195:7
**Association (3)**
22:7,8,8
**associations (1)**
22:10
**assume (32)**
25:22;56:3,11;57:5,
6,13;60:4,13;61:10,10,
17;63:10;82:15,16;
83:25;91:14,24;
122:23,25;123:6;
124:18;125:3;130:3;
133:9;135:7;137:19;
163:14,17;171:8,16;
207:6,9
**assumed (1)**
163:15
**assuming (8)**
74:10;126:5,9;
135:16;147:15,16;
149:2,6
**assumption (19)**
54:21,22;60:16;64:6,
8,13;81:11;84:25;85:2;
92:4,10,12,17;93:2;
135:5,6;143:25;
207:10,13
**assumptions (3)**
92:2;126:13;147:25
**Atara (1)**
13:13
**attempt (1)**
46:21
**attempting (3)**
52:15;91:9;92:21
**attention (1)**
33:18
**attorney (2)**
153:22;205:12
**attorney-client (1)**
69:22
**Attorneys (4)**
4:4,13;6:4,13
**Aurelius (3)**
187:13,15,16
**authoritative (1)**
131:11

**authorities (2)**
57:24;161:5
**available (24)**
20:20;129:21;130:6;
157:10,17;167:10,12,
17,19,25;168:2,5,24;
169:12,16;171:7,11;
174:21,21;175:18;
178:18;181:25;203:8,9
**Avenue (1)**
4:5
**average (1)**
104:4
**avoid (3)**
27:17
**aware (16)**
26:21;55:11;70:24,
25;79:23;92:15;
156:14;159:21;160:14,
23;175:3;189:7;
193:23;196:15;202:12;
207:12
**away (3)**
15:7;51:12;52:16
**awful (1)**
31:5

**B**

**B2 (1)**
89:20
**B3 (12)**
89:9,18,20;93:15;
96:14;97:9;98:20;
99:17,20;100:6,13;
102:17
**back (32)**
32:3;36:24;49:4,6;
55:9;66:24;84:9,20;
85:8;87:18;90:14;94:4;
106:23;116:16;118:18;
120:20;124:12;126:11;
127:19;128:4,7;
130:11;144:18;152:7,
11;155:21;158:6;
165:2;180:20;199:15;
200:24;204:3
**background (2)**
34:21;57:10
**bankruptcy (9)**
21:19;59:9;67:10;
120:5,6,8,21;121:7;
165:25
**banks (2)**
24:8,11
**Barrack (45)**
12:19,19;14:10,12;
42:18;61:16;66:14;
69:25;70:7;88:5;93:19;
95:15;96:18;97:7;
100:21;106:17;112:2;
112:17;115:24;128:6;
129:3,9;130:13,24;

131:4,7,22;132:7;
134:3;151:23;152:9,
19,22;153:3,8,17;
155:2,8,15;164:18;
204:7;206:5,21;207:6;
208:5
**based (23)**
30:2,8,9;31:22;
40:14;67:11;72:15;
75:13,19;116:21;
120:23;129:7,18;
134:8;137:12,16,18;
138:3;139:7,9;142:21;
155:19;166:20
**basic (1)**
123:14
**basis (12)**
40:12,13;79:13,20;
118:15;119:24;122:2;
129:3,4;155:24;164:4;
183:19
**Bassett (1)**
13:14
**Bates (5)**
112:16,19,23;
115:15;200:24
**bear (1)**
197:13
**became (2)**
51:2;70:25
**become (3)**
54:10;121:15;148:16
**becomes (1)**
51:20
**beginning (2)**
66:22;106:20
**behalf (4)**
13:1,15,18,20
**behaviors (1)**
34:19
**belief (2)**
172:13;197:7
**believes (1)**
103:18
**Belknap (2)**
13:11;205:13
**belong (2)**
22:25;23:6
**Below (3)**
97:21;119:3,8
**beneath (1)**
136:9
**benefits (1)**
57:13
**Berenblut (2)**
176:20,21
**best (1)**
24:21
**better (1)**
108:18
**betweencourts (1)**
57:22
**beyond (9)**

23:24;25:17;55:19;
158:17;172:6;192:9,
10;193:16,17
**big (1)**
52:7
**billion (13)**
88:8;89:2,3;94:17,
22,24;96:7,12;97:22;
98:14;99:15,24;112:7
**bit (5)**
27:15;32:3;50:21;
107:4;166:25
**blanket (1)**
20:16
**Bloomberg (4)**
127:21;128:12,14;
131:9
**boards (2)**
16:11;24:16
**bold (1)**
200:12
**bond (114)**
23:21,25;24:2,6,10,
13,14,17;27:22;28:2,4;
37:17,21,21,22;38:2;
42:24;50:25;53:14,17;
54:6,18,19;78:2,3,15,
18,19,22;79:5,9,12,14,
15,24,25;80:9,19;
81:22,24;82:3,4,5;83:3,
5,10,12;84:12,14,15,
15,16;86:11;87:23,24,
24,25;89:13,14;91:12;
99:22;101:11;102:15;
104:24;107:6,8,12,13,
15;108:6,10,10,11,12,
17,25;109:6;118:23;
122:21;123:10,22;
124:3,9,10;125:2,6,8,9;
126:5,23;127:11,21;
130:12;131:18;133:15;
134:20;142:10,23;
145:3,13,20,22,23,25;
147:17,19;161:2;
166:9,13;169:24;
171:7;180:11;184:9;
206:4
**bondholder (1)**
184:9
**bondholders (18)**
13:16;25:18,19,20;
26:2,6,24;27:2,4,5,7;
29:24;92:5;163:18;
168:25;186:25;190:4;
194:8
**bondholders' (3)**
30:24;77:6,10
**bonds (200)**
23:9,12,18,19;24:15,
19;25:23;26:4;30:20;
32:9,10;35:23,24;
37:17,20,25;38:11,23,
24;39:17,23;41:24,24;

42:5,7,8;43:3,4,10;
44:13,14;45:2,5,15,16,
19,22,25;46:2;50:24,
25;67:17,18,25;68:2,
16,23,25;69:5,8;74:24;
75:7,15,21;76:7,13;
77:9,16,22;79:4;80:10;
81:9,14,16;82:17;
84:11;85:25;86:24;
88:8,22;89:5,8,16;91:4,
5,10,20,21;92:5,8,20;
93:3,8,11,15,16;94:13,
21;97:8;99:14;100:10,
19;104:23;105:19;
107:6,23,25;108:5;
109:5,10,22;110:3,18;
111:21;112:8;114:12;
115:2,5;118:11,21;
119:3,7,9,11;120:4,17,
21;121:4,7,17,25;
122:10,16;123:2,8,14;
124:4,25;125:3,22;
126:4,15,25;127:10,13,
17;129:17,21;130:15;
132:9;133:14;135:7,8;
136:19,21;137:2,3,18;
138:11,21;142:17,25;
143:13,17;144:6,9,10,
13,14,14;146:17,22,25;
147:24;148:16;149:17;
151:4,12;159:23;
160:8,15;161:7;
163:18,22;166:22;
167:4,5,19,23;168:8,
19,25;169:6;170:18,
23;171:2;173:4;
174:23;175:19,22;
176:2;180:18;184:10;
189:17,24;190:15;
203:15;204:19,24;
207:7
**bond's (1)**
166:10
**border (1)**
57:21
**borrowed (1)**
169:24
**borrower (4)**
165:16,18;166:2,22
**borrower's (3)**
165:18,20,23
**borrowing (1)**
48:17
**borrowings (1)**
50:18
**both (19)**
14:13;18:22;19:8,14;
28:11;44:19;59:4;76:7;
79:16,17;113:8;146:4,
20,21,25;147:3,5,11;
155:16
**bottom (4)**
89:22;93:16;113:13;

133:19
**bought (1)**
24:19
**box (2)**
98:7,9
**break (15)**
14:18,19,21;32:2;
35:7;36:3;51:25;64:4;
106:8,11;151:23;
198:3,4,6;204:7
**Brian (2)**
13:10;205:12
**briefly (1)**
118:4
**bring (3)**
130:14;163:9;182:23
**broad (11)**
22:15;27:10,12,25;
37:23;53:10;106:7;
140:16;142:8;150:5;
168:21
**broader (2)**
140:14;141:7
**broadly (1)**
21:14
**Bryant (1)**
4:15
**bullet (4)**
115:15,21;116:7,21
**Burgundy (1)**
15:20
**business (7)**
90:11;194:4;195:2,
11,15,18,21
**businesses (5)**
58:10,16;193:22;
194:2,3
**buy (1)**
77:15
**buyer (1)**
184:9
**buying (1)**
161:6
**byplay (1)**
92:2

**C**

**CAA2 (1)**
105:20
**calculate (3)**
125:17,19;126:2
**calculated (8)**
80:13;81:20;82:9,13;
124:14;125:13;137:6;
138:5
**calculating (2)**
83:16;144:22
**calculation (1)**
125:14
**calculations (1)**
17:3
**call (11)**

15:23;45:6;64:10,20,
22,24,24;87:18;
108:16;163:21;206:12
**called (4)**
124:15;163:10;
171:23;182:14
**came (3)**
128:10;164:9,14
**can (79)**
14:14,19;18:2;19:16;
20:13,16,25:8;27:10;
28:18;30:15;34:8,12,
20;35:2;37:19;39:20;
42:25;43:5,7;44:7;
45:14,20;52:17;55:8;
62:3;65:5,24;67:2;
75:16;77:25;78:5;79:4,
5;81:4;87:13;88:2;
93:12,19;94:11;
100:21;106:9;108:2;
111:12;116:5;117:9,
10,21;123:12;128:8;
133:8;134:23;137:15;
138:5,9,19,24;139:2,
22,23,25;146:14,15;
148:5;149:10,14;
153:25;154:13;157:14;
164:18;165:16;166:22;
182:13;184:17;191:7;
198:4,5,6,14;201:2
**Canada (14)**
79:23;80:2,9,20;
81:10;87:20;94:18,20;
123:2,3,21,23;163:13,
24
**Canadas (1)**
84:12
**Canada's (1)**
81:15;125:4
**CANADIAN (23)**
4:4;6:4;12:23;13:5,
7;14:17;43:25;44:8,17,
19;129:17,20;152:24;
153:2;156:24,25;
163:2,3,25;164:2,3;
165:6;179:24
**Cap (2)**
206:13,16
**Capital (46)**
13:9;17:25;18:6,10,
11,12,17,17,18,20,24;
19:4,6;20:5;33:3,11,12,
13;35:14;41:23;43:19;
44:10;46:7,12;50:7,17,
18,24;52:23,25;55:18;
58:24;89:23;90:5,7;
131:10,21;134:5;
158:11;159:9,22;
187:13,15;188:6,8,15
**capture (1)**
19:8
**career (1)**
180:10

**careful (1)**
20:18
**carefully (1)**
197:6
**carries (1)**
103:17
**carry (2)**
103:20,22
**CarVal (1)**
187:18
**carve-outs (3)**
111:10,15;115:17
**carve-outs' (3)**
113:15,24;114:17
**case (41)**
15:8;35:14,18;38:17,
22;43:23;48:13;50:22;
52:24;53:2,5;60:6,7,7,
10,11,14;61:5;14:14;
65:23;67:15,21,23;
68:5,14;69:5;70:6;
85:7;124:20;164:10;
176:9;180:2;183:24;
185:25;187:5;196:6,
16,20,24;202:13,16
**cases (7)**
57:20;58:2,23;
118:22;163:10;196:3,
18
**cash (3)**
71:25;72:19;90:17
**cashflow (4)**
178:17,18;179:2,3
**cashflows (3)**
175:25;191:6;203:13
**categories (3)**
27:19;153:11,15
**category (3)**
68:20,22;153:18
**cause (4)**
32:25;33:5;64:25;
103:25
**caused (1)**
39:23
**causes (2)**
119:11;183:6
**caution (1)**
25:5
**CC (1)**
13:7
**CC0004631 (1)**
115:16
**CCC (1)**
179:25
**CCC0004590 (1)**
112:20
**CCC0004630 (1)**
112:23
**CCC0099058 (1)**
200:11
**cease (2)**
113:19;114:21
**Centerbridge (1)**

187:20
**Centres (2)**
60:10,11
**certain (24)**
17:5,24;18:5,23;
34:19;54:16,17;56:3;
63:4;110:7;116:11;
127:3;156:3;162:8;
170:18,24;171:13,14;
174:12,19;177:16;
181:17;182:20;184:4
**certainly (9)**
15:25;22:9;77:7;
123:24;171:11;179:11;
186:17;190:14;202:19
**certainty (3)**
50:23;51:3;58:2
**certification (1)**
199:12
**certify (1)**
209:7
**ceteris (1)**
82:2
**chairman (1)**
24:18
**challenge (4)**
64:5,12,16;65:19
**chance (2)**
159:19;179:18
**change (13)**
52:18,21,23,25;53:6,
13,17;54:20;66:14;
102:4;108:15;166:4;
176:4
**changed (4)**
15:13;48:7;59:25;
89:20
**changes (5)**
32:11;45:14;50:2,3;
53:14
**Chapter (3)**
57:19;59:19,20
**characteristic (1)**
36:23
**characteristics (6)**
36:20;109:18;
146:21;150:18;161:8;
178:5
**characterization (12)**
19:11,18;35:6;79:19;
84:20;106:5;121:5;
123:18;136:25;137:7;
141:5;142:15
**characterizations (1)**
86:24
**characterize (4)**
33:10,14;49:12;
134:25
**characterized (1)**
24:3
**characterizes (4)**
69:8;12;197:4,4
**chart (25)**

42:16,25;45:10;
87:23,24,24,25;89:13;
94:14;96:6;97:2;98:16;
101:10;118:24;130:12;
133:11,12,15,24;134:8;
135:19;138:25;195:11;
206:5,8
**charts (1)**
148:6
**chase (1)**
53:2
**cheaper (1)**
52:8
**choices (3)**
17:24;18:5;19:16
**choose (1)**
119:18
**Circuit (2)**
55:25;57:9
**circumstances (3)**
20:15;21:2;55:3
**cited (2)**
73:18;114:12
**civility (1)**
14:17
**claim (4)**
47:17;109:7,12;
159:3
**claimant (1)**
40:13
**claimants (1)**
12:21
**claimant's (1)**
40:15
**claims (7)**
40:15,17;110:5;
158:25;163:4;164:3;
208:4
**clarify (3)**
53:23;70:2;96:16
**clarity (5)**
50:23;51:3;54:16,18,
19
**Clark (30)**
29:11,11,13,22;40:7;
41:8;47:17;55:15;
59:24;61:7;62:18;
63:15;64:7,17;65:9;
66:4,7;67:6,13;119:22;
141:12;142:12;143:10,
24;161:15;162:4;
176:6;177:7;182:2;
192:15
**Clark's (2)**
118:13;161:25
**classify (1)**
38:22
**classifying (5)**
72:3,22;74:13,17;
90:20
**clear (9)**
52:4;54:10,16;
130:20;180:4;181:5;

186:22;193:19;198:6
**clearly (3)**
77:4;181:25;192:16
**CLEARY (3)**
6:12;12:10;13:17
**client (1)**
205:22
**clip (1)**
112:3
**cold (1)**
14:15
**collateral (2)**
68:9,16
**colleagues (1)**
13:22
**colloquy (1)**
97:10
**column (8)**
43:9,11;88:24;
133:16;136:16;137:24;
138:18;151:3
**columns (5)**
43:8,16;136:11;
138:8;146:17
**comfortable (2)**
178:20,22
**coming (3)**
193:14;194:11,17
**comma (1)**
186:2
**comment (2)**
87:21;136:23
**commentary (2)**
31:14,16
**commented (1)**
184:22
**comments (2)**
35:25;65:21
**COMMITTEE (5)**
4:13;12:24;13:21;
24:18;179:24
**common (1)**
163:4
**commonly (1)**
79:6
**communications (3)**
25:6;129:5;153:20
**companies (6)**
113:18;114:3,20;
173:3;193:12;204:23
**companies' (2)**
166:16;184:2
**Company (7)**
13:12;163:10;
184:15;187:6;197:9;
205:15,23
**company's (1)**
186:5
**comparable (2)**
91:13;122:2
**comparably (3)**
113:18;114:3,19
**compare (7)**

45:18;91:13;126:4;
134:21,23;150:6;
151:11
**compared (3)**
85:11;123:14;150:7
**comparing (3)**
91:10;121:17;126:14
**comparison (3)**
122:3;124:2;159:7
**competent (1)**
57:24
**compile (1)**
27:22
**complete (2)**
97:4;209:11
**completely (1)**
157:25
**completeness (1)**
112:4
**completion (1)**
181:7
**component (3)**
21:9;30:4;79:18
**components (1)**
18:21
**concealing (1)**
59:2
**conceivable (4)**
53:21,22;55:2,8
**concept (5)**
38:14,21;41:5;
123:13,14
**concern (2)**
67:22,23
**concerned (2)**
21:8;34:15
**concerns (2)**
161:12,21
**concludes (1)**
208:10
**conclusion (9)**
76:2;118:9,11,16;
119:12,15;137:11,16;
157:4
**conclusions (10)**
36:10;65:10;118:6;
139:5,8;148:3,4,6;
150:8,25
**conditions (1)**
127:3
**conducive (1)**
58:17
**conduct (2)**
50:11;92:22
**conducted (2)**
16:7;18:15
**conducting (1)**
21:24
**conferences (2)**
22:13,14
**confident (1)**
196:6
**CONFIDENTIAL (194)**

15:1;16:1;17:1;18:1;
19:1;20:1;21:1;22:1;
23:1;24:1;25:1;26:1;
27:1;28:1;29:1;30:1;
31:1;32:1;33:1;34:1;
35:1;36:1;37:1;38:1;
39:1;40:1;41:1;42:1;
43:1;44:1;45:1;46:1;
47:1;48:1;49:1;50:1;
51:1;52:1;53:1;54:1;
55:1;56:1;57:1;58:1;
59:1;60:1;61:1;62:1;
63:1;64:1;65:1;66:1;
67:1;68:1;69:1;70:1;
71:1;72:1;73:1;74:1;
75:1;76:1;77:1;78:1;
79:1;80:1;81:1;82:1;
83:1;84:1;85:1;86:1;
87:1;88:1;89:1;90:1;
91:1;92:1;93:1;94:1;
95:1;96:1;97:1;98:1;
99:1;100:1;101:1;
102:1;103:1;104:1;
105:1;106:1;107:1;
108:1;109:1;110:1;
111:1;112:1;113:1;
114:1;115:1;116:1;
117:1;118:1;119:1;
120:1;121:1;122:1;
123:1;124:1;125:1;
126:1;127:1;128:1;
129:1;130:1;131:1;
132:1;133:1;134:1;
135:1;136:1;137:1;
138:1;139:1;140:1;
141:1;142:1;143:1;
144:1;145:1;146:1;
147:1;148:1;149:1;
150:1;151:1;152:1;
153:1;154:1;155:1;
156:1;157:1;158:1;
159:1;160:1;161:1;
162:1;163:1;164:1;
165:1;166:1;167:1;
168:1;169:1;170:1;
171:1;172:1;173:1;
174:1;175:1;176:1;
177:1;178:1;179:1;
180:1;181:1;182:1;
183:1;184:1;185:1;
186:1;187:1;188:1;
189:1;190:1;191:1;
192:1;193:1;194:1;
195:1;196:1;197:1;
198:1;199:1;200:1;
201:1;202:1;203:1;
204:1;205:1;206:1;
207:1;208:1
**confuse (1)**
56:22
**Congress (2)**
57:18;59:24
**connection (1)**

24:5
**Connie (1)**
12:22
**conscious (2)**
19:16;35:2
**consequences (7)**
34:6,9,9,16,19;
183:23;185:24
**consider (22)**
20:19;47:9,14;
154:15,18,24;155:10,
12,18;158:3;165:17;
177:11,17;178:13,15;
179:8;180:16;184:15;
194:10,21;195:14;
198:22
**considerate (1)**
14:24
**consideration (8)**
20:24;75:23;117:25;
121:20;171:9;184:23;
185:3;199:18
**considerations (5)**
161:2;182:15,23;
190:4;191:20
**considered (24)**
36:4;65:14;71:6;
85:18;126:16;153:23;
154:6;155:4;159:11;
181:21;183:16;186:9,
15;188:22;190:16;
192:4;193:13;194:16;
199:7,25;200:19;
202:7,11,23
**considering (2)**
184:9,10
**considers (2)**
104:4;185:20
**consistent (5)**
63:19;77:8;104:4;
115:18;116:7;155:11,
20;202:3
**consolidated (4)**
132:16;155:24;
200:14;201:21
**consolidation (11)**
196:4,8,19,25;197:5,
14,19;199:16;201:3,18,
19
**constant (4)**
82:12;83:9;120:2;
150:18
**construct (1)**
150:17
**constructed (1)**
47:21
**consultant (5)**
16:3,10;24:7,9;
195:25
**consultation (1)**
196:14
**consulting (1)**
16:14

contain (5)
111:9,14;113:14,23;
114:16
contained (5)
71:15;115:23;
118:10;129:12;130:22
contains (2)
28:20;68:12
Cont'd (2)
4:1;6:1
contemporaneous (1)
181:21
contemporaneously (1)
195:9
context (9)
49:15,17;51:7;60:24;
139:21;150:15;164:7;
184:18;196:23
continue (1)
119:8
CONTINUED (1)
106:25
contracts (2)
47:22;51:11
contractual (6)
68:13,17;168:17;
170:19,24;171:12
contradict (5)
92:16;118:12;
142:19,20;207:13
contradicted (2)
142:12,13
contradicts (2)
63:18,23
contrary (5)
29:13;63:21;134:10;
141:23,24
contrast (5)
59:12;67:7;185:4,12,
12
contributions (3)
71:24;72:19;90:17
controverted (1)
141:21
Convergence (1)
187:16
conversation (1)
122:24
conversations (2)
186:23;187:7
convertible (3)
96:8,12;97:22
convertibles (4)
98:11;99:16,17;
133:18
conveying (1)
166:8
cooperation (2)
14:17;57:22
copy (2)
15:3;55:24
corner (1)
101:2,4,5;102:11

corollary (1)
124:9
Corp (2)
206:14,16
corporate (8)
18:15;30:3;48:2;
50:17;67:9;81:3;99:20;
169:20
corporation (22)
32:15,20;43:20;
44:11,11,17,21;89:24;
90:6,7;91:16;94:8,18;
97:21;134:5;163:11,
19,20;171:17,18,20;
198:19
corporations (2)
32:16,22
correctly (1)
166:2
corroborate (1)
127:12
cost (1)
158:25
costs (6)
158:23,24;159:2,5,6,
7
counsel (12)
12:17;25:13,14,16,
17,24;45:12;68:8,11;
97:3;179:13;197:23
counselor (2)
130:10,19
countries (1)
57:25
country (2)
59:14,16
country's (1)
59:17
COUNTY (1)
209:5
couple (3)
93:20;201:7;206:22
coupon (24)
39:10;48:21;78:16;
81:23;125:24;126:3,
10,11;145:4,7,10,24,
25;146:2,4,20;148:12,
19,21,23,25;149:3,17,
23
coupons (1)
148:9
course (4)
180:10;195:24;
197:22;198:21
court (26)
12:13,14,16;14:2;
17:25;18:6;33:22,24;
34:6,8;35:2;38:18;
41:13,13;46:18;55:24;
57:9;62:25;63:2,12;
64:2;65:14;125:5;
157:3;158:3,5
courts (7)

34:14;50:20;53:3;
57:23;59:10;66:13;
163:24
court's (2)
33:18;164:8
covenant (3)
53:14,17;115:17
covenants (11)
54:7;111:8,13;
113:14,19,23;114:10,
15,20;115:5;165:19
cover (1)
22:15
covered (1)
174:7
Cox (2)
176:20,20
create (2)
54:2;180:10
created (3)
28:8;30:14,19
creates (2)
36:14;78:6
credit (22)
30:3;47:20;48:3,6,
10,19;50:4,7;71:21,23;
72:18;73:4;75:6;77:12;
86:23;87:2,11;88:9;
90:16;154:9;182:10;
193:4
creditor (25)
31:21;63:21;64:6,11,
16;65:19,20;66:8,9;
75:13,19;76:24;
104:20;141:22;144:4;
147:6,10,25;148:7;
149:25;150:9;151:2,
13;164:2;173:14
creditors' (1)
30:7
creditor's (1)
120:9
credits (19)
32:8,10,13,13,17,18;
35:10,12,13,16,16;
38:10,11,21,23,24;
39:3,3;139:6
critical (1)
92:4
criticisms (2)
161:24,25
criticize (1)
162:4

critique (1)
31:6
cross (1)
121:8
cross- (1)
57:20
cross-border (6)
57:2,25;58:4,18,23,
25
crossed (1)
146:14
Cross-guarantees (4)
121:9,10;160:8;
183:6
current (2)
180:18;186:24
currently (2)
180:17;189:24
curve (4)
126:6;135:4;136:13,
16
curves (1)
136:2
cut (4)
53:2;86:21;127:24;
180:2
CV (1)
23:13

# D

data (12)
20:19,22;118:11,12,
18;120:20;131:2,9;
153:21;154:5,11;
181:24
date (31)
43:13;45:5;80:25;
88:21;96:5;98:2;120:5;
121:7,8,10,13,14,14,
18;132:19;143:14;
144:11;148:16,17;
150:20;160:4,5,7;
182:11;192:6,12;
193:13;198:24,25;
199:11;200:18
dated (5)
102:11;105:9;112:9;
181:2;192:25
dates (5)
121:24;132:13,15;
148:9,13
day (5)
180:8;182:11;
189:19;209:10,19
DBRS (8)
94:7;101:2,8,24;
103:9,18;104:3,9
deal (1)
43:15
dealing (5)
36:24;37:6;57:20;
98:4;130:15

Debenture (3)
13:11;205:14,23
debt (46)
37:2,6;48:18;68:9,
12;71:20;72:3,4,5,21,
22,23;74:13,14,18,19;
90:19,20,21,22;94:15;
103:13,16;120:3;
163:17;165:17,20;
169:14;170:4,6,7,12;
173:13;180:14;183:6,
14;185:3;186:25;
187:8;188:22,25;
189:2;199:18;200:17;
201:23;202:25
debtor (7)
57:4;58:7,20;59:13;
109:7;201:20,22
DEBTORS (10)
4:4;6:13;13:2,5,18;
59:2;165:6;200:13;
201:4,10
debtors' (1)
58:8
debts (9)
48:22,24,24;110:20,
25;184:2,16;186:5,13
December (4)
105:10;180:22;
181:2;182:10
decide (1)
108:11
deciding (2)
107:12;108:9
decision (6)
34:8;55:25;56:13;
57:12;63:2;164:8
decisions (2)
34:15,20
dedicated (1)
22:23
default (13)
71:22;99:3,4;103:24;
104:3;118:15;147:15,
17;149:11,11,14;
165:25;188:25
defeat (2)
142:18,19
define (1)
144:19
defined (3)
23:4,6;108:19
definition (4)
67:11;108:21,23;
142:22
definitions (2)
78:11;144:21
definitive (1)
93:12
delivered (9)
101:25;102:23;
103:2;104:7,15;
105:12,15;117:15;

155:15
**delivering (2)**
101:17,20
**delivery (1)**
155:16
**demonstrates (1)**
136:18
**depend (2)**
20:25;116:18
**depending (2)**
19:11;80:12
**depends (5)**
20:14;36:19;81:19;
82:7;145:15
**deposition (11)**
12:6,9;66:22;106:20;
152:5,17;153:12;
179:17;203:25;208:11;
209:9
**Depositions (2)**
27:20;153:9
**derive (1)**
128:13
**derived (4)**
18:19;156:17;157:5;
197:24
**describe (1)**
62:16
**described (7)**
41:6,15,25;119:20;
143:15;160:9;191:15
**describing (1)**
36:9
**description (1)**
115:16
**designed (1)**
58:14
**desk (2)**
23:22,25
**despite (2)**
31:4;122:2
**detail (2)**
55:5;109:20
**determinable (2)**
183:24;185:24
**determination (1)**
126:7
**determine (10)**
61:20;73:15,21;
120:22;131:15;151:13;
157:9;166:21;167:22;
173:3
**determined (1)**
139:20
**determines (1)**
74:20
**determining (2)**
175:21;202:24
**developed (1)**
24:12
**differed (1)**
91:11
**difference (13)**

37:20;83:2;104:22;
121:19,24;122:2;
138:24;139:13,15;
140:11,25;142:24;
148:12
**differences (9)**
119:6;121:6,11,17;
139:3;148:24,25;
151:4;161:18
**different (18)**
15:18;34:17;36:6,8;
39:10;75:8;82:20;
126:11;147:7;148:8,9;
157:25;159:23;160:15,
23;184:21;191:14;
197:10
**differential (2)**
119:10;120:23
**differentiate (1)**
140:10
**differentiated (1)**
75:7
**differentiation (2)**
100:17;105:24
**differently (2)**
75:4;104:2
**difficult (3)**
156:6,8,11
**dilution (1)**
48:23
**direct (1)**
200:9
**directors (2)**
16:11;24:16
**disabled (1)**
14:13
**disaggregated (1)**
132:16
**disagree (1)**
115:8
**disclosed (1)**
129:14
**disclosure (1)**
155:24
**discovery (3)**
153:5,12,13
**discuss (3)**
47:15;55:25;62:16
**discussed (3)**
126:20,20,22
**discussion (6)**
86:21;124:13;
125:20;197:23;204:19;
207:6
**discussions (3)**
86:19;128:3;186:24
**disincentive (1)**
58:24
**disparity (1)**
149:8
**disseminated (1)**
80:19
**dissipation (1)**

58:20
**distinction (4)**
15:22;161:10;170:9,
11
**distinguish (1)**
195:21
**Distinguished (2)**
15:11;39:6
**distinguishes (1)**
37:25
**distinguishing (4)**
36:22;37:15;39:2,15
**distressed (3)**
180:14;188:22;189:2
**distributed (1)**
40:11
**distributes (1)**
59:17
**distribution (8)**
40:10;41:8;47:16;
119:24;141:15,17;
161:14;163:25
**disturbance (1)**
52:16
**divulge (1)**
25:5
**DJ (1)**
12:19
**DLA (2)**
12:23;179:23
**doctrine (6)**
28:23;32:6;33:9,20;
40:4;62:9
**document (37)**
27:18;42:16;44:5;
61:11;76:4;88:15;
100:22;103:6,11;
104:13,17,17;112:4,9,
12,13,19,22;113:3;
155:7,11;171:22,25;
172:5;180:23;182:8,
17,19;183:3;192:25;
193:2,7,8;198:11,17;
200:10;201:8
**documentation (1)**
179:15
**documents (31)**
16:23,24;17:5,6;
27:10,11,12,16,19;
28:13,15;42:25;43:14;
69:18;73:19;113:9,10;
117:11,22;132:14;
152:14;153:14;154:2,
12,16;157:7,9,10,17;
199:4;206:5
**dollar (1)**
78:2;122:10,16,18;
145:2;146:3,5
**dollars (7)**
77:23;78:18;98:14;
122:12,20;145:5;147:3
**done (14)**
21:3,18;46:5;55:19;

92:25;132:10;147:23;
149:11,14;180:9,13;
191:12;200:9;205:8
**double (1)**
118:23
**doubt (3)**
116:25;117:2,3
**down (31)**
32:2;35:7;36:3;
42:14;43:17;44:18;
45:9;51:25;52:17;
58:12;59:6;64:4;71:23;
88:8;89:11,22;93:16;
97:12,14,17;99:15,18;
106:9;115:14;133:18;
136:7;142:7;146:15;
153:20;163:9;172:8
**draw (6)**
137:10,15;139:5;
148:6;150:7,25
**drawing (1)**
32:25;33:17
**drawn (3)**
139:8;147:25;148:3
**drill (1)**
172:8
**due (10)**
48:24;89:14;90:3;
94:17,22;121:8,15;
133:20;148:16;160:10
**duly (1)**
14:5
**during (2)**
119:10;204:7
**DW (1)**
187:22

**E**

**earlier (17)**
35:9;67:12;84:21;
104:19;122:24;124:12;
125:21;130:20;150:11,
15;180:8;181:10;
182:12;185:6;191:9;
202:4;204:17
**earnings (6)**
165:19,21,22;
167:13,13;175:25
**easier (1)**
94:13
**easy (1)**
142:9
**economic (3)**
77:5;104:22;156:7
**economically (1)**
93:6
**economist (2)**
50:9;51:14
**effect (28)**
18:5;19:20,21;20:8,
11;32:25;33:5;34:25;
38:18;46:17,19,20;

51:16;54:24;61:23;
62:17;64:25;113:19;
114:21;121:13;148:18,
19,21,23;157:7;158:9;
160:8;195:15
**effective (2)**
17:24;57:19
**effectively (1)**
173:2
**effects (53)**
19:7,8,15;20:11;
33:11,12,13,15,21;
41:20,20,22;46:12;
47:6,7,11,14;49:3,3,3,
13,13,21,22;53:10;
55:10,11,17;56:3,12,
24;57:7;60:13,15;61:4,
18,19,23,24;62:10,11;
64:19;65:3,7,12,14;
157:23;158:2,4,9;
161:23;162:12,13
**efficiency (4)**
51:21;52:3;53:18;
54:3
**efficient (10)**
50:11,18;51:10,12,
13,18,19;56:25;58:3,17
**either (10)**
14:17;39:23;48:16;
53:18;87:25;94:11;
109:23;110:5,24;
142:18
**element (1)**
141:3
**eliminated (1)**
121:17
**eliminating (1)**
121:23
**Ellen (2)**
12:13,16
**else (14)**
14:21;39:6,9;45:13;
47:8,8;82:12;83:9;
84:3;137:25;138:4;
193:11;203:18;205:7
**elucidate (1)**
34:18
**Emanuel (2)**
15:10,19
**embedded (1)**
165:19
**embodied (1)**
174:11
**embody (1)**
178:19
**embraces (1)**
59:19
**EMEA (2)**
13:2;156:23
**emphasize (1)**
69:7
**employed (2)**
163:12;180:17

employee (2)
163:20;190:12
employment (1)
58:11
enacted (1)
57:19
encompass (1)
21:7
encompassed (3)
170:11;172:19;
174:10
encourage (1)
60:2
end (5)
56:10;66:17;70:16;
128:18;208:13
endorse (1)
60:2
engaged (2)
193:20;196:3
enough (8)
33:17;37:5;46:4;
77:17;78:21,24;109:2;
166:11
enter (1)
160:9
entered (1)
172:11
Enterprise (2)
15:21;37:4
enters (1)
75:22
entire (5)
30:9;60:22;61:14;
184:18;198:20
entirely (1)
68:10
entities (26)
30:10;37:7,8;44:19;
48:17;57:4;58:6;94:15;
156:9,25,25;161:17,18;
163:3,25;164:3;172:6,
11;174:12;188:18,21;
189:9,12;193:20;
194:7;197:21
entities' (2)
110:20,25
entitled (1)
193:4
entity (9)
31:22;37:21;43:25;
44:3;109:8,14;157:11,
18;164:2
envision (1)
55:3
episodically (1)
16:15
equal (6)
81:25;89:13;93:7;
183:10,13,19
equity (1)
18:13
equivalent (4)

29:21;79:11;93:7;
133:14
errata (1)
95:13;102:3
ESQ (6)
4:7,17,18,19;6:7,16
essence (11)
28:20,25;29:4,17,20;
30:11;31:5,21;32:24;
46:11;63:24
Essentials (1)
193:4
establish (1)
47:24;133:8
established (3)
38:19;62:23;63:24
estate (2)
163:2;164:13
Estimate (1)
94:15
et (1)
12:8
evaluate (1)
166:15
evaluates (1)
179:14
evaluating (2)
71:20;177:25
even (5)
23:24;77:11,12;
171:10;186:6
event (6)
67:9;71:22;109:6;
118:15;165:25;185:21
evidence (8)
63:17,23;66:6,10,15;
77:14;138:18;141:24
exactly (8)
56:22;81:22,22,23,
23;101:13;155:6;
173:19
EXAMINATION (6)
14:9;106:25;131:12;
165:3;179:20;205:9
examinations (1)
153:9
examine (1)
118:5
examined (1)
14:6
examiner (1)
179:15
example (7)
56:17;131:17;
145:14,24;167:3;
168:22;197:3
except (4)
17:16;153:19;161:4;
194:20
exception (1)
154:13
exceptions (5)
111:10,15;113:15,

24;114:16
excluding (1)
26:25
exclusively (1)
119:14
excuse (3)
48:20;117:7;126:10
exhaust (1)
172:9
exhausts (1)
175:8
Exhibit (39)
15:4;42:19,20;56:5;
87:8;88:4;94:9;95:2,
17,18;96:6,16;97:6;
98:5;100:3,22,23;
102:7;103:7;105:7;
111:24;112:21;118:20;
119:2,5;127:5;130:9,
11,21,25;137:25;
180:21;182:6;194:25;
198:11,12;205:19;
206:2,4
exist (3)
56:13;61:24;107:23
existing (1)
48:19
exists (2)
155:19;207:23
expect (25)
16:9;76:9,15;81:13;
83:10;107:24;108:7;
119:25;126:23;143:12;
144:4,4,8;145:11,21;
146:9;147:6,17;
167:20;171:8,18;
177:5;178:8,10,23
expectation (36)
30:13,18,19;64:6,11,
16;66:8;76:14;90:15;
108:7;139:18,24;
140:2,5,11,16,17;
141:2;144:2;147:6,10;
150:9;151:2;164:8;
166:14;167:6,10,16;
168:2,7;169:16;170:2,
22;174:22;175:2,16
expectations (29)
30:2,8,25;31:22;
63:21;65:19,21;66:10;
75:13,19;76:24;77:6,
11;104:20;120:9;
139:17;140:19,21;
141:22;144:5;147:25;
148:7;150:2;151:13;
166:17;170:17;173:15;
191:6;194:7
expected (17)
72:2,20;73:13,15,22;
74:10;76:6;90:18;
104:3;118:14;119:24;
120:16;141:14;179:3;
191:8,13;203:16

experience (1)
16:2
experiment (1)
91:10
expert (32)
16:3;152:16;153:11,
23;154:22;158:17;
165:11;173:17;176:9,
13,14,15,18,19,21,23,
24;177:5,6,12,18,24;
178:3,14,15;179:4,9,
10;183:12;197:13;
200:18;202:21
expertise (1)
124:25
experts (1)
70:5
expert's (1)
154:23
explain (1)
136:24
explained (2)
149:2,8
explains (1)
58:13
exploration (1)
92:25
explored (1)
92:19
express (3)
77:25;80:10;82:25
expressed (13)
77:22;78:5;79:5,5,6,
24;124:8;125:2,2,7;
129:22;153:24;161:13
expressing (1)
124:2
Extended (1)
174:2
extensively (2)
24:14;70:16
extent (48)
17:16;21:17,20;25:3;
35:19,20,20;50:12;
51:11;63:15,22;68:19;
69:4,9,21;109:4;
117:19;121:11;127:25;
128:16;131:25;153:19;
154:17;156:22;161:4;
167:9,11,17,18,24;
168:3,4,23;169:12,15,
23;171:6,17;173:5;
174:18;175:24;178:17,
18,25;184:20;185:10;
186:16;203:11
extracted (1)
148:18
extracting (2)
192:14,15
eye (3)
43:17;75:25;115:14

F

face (1)
120:2
facilitation (1)
58:9
fact (14)
24:17;30:8;75:8;
76:17,18,19;80:8;
136:19;169:8;185:12;
186:9;187:5;196:5;
199:23
factor (5)
75:22;85:11,17;
91:11;159:8
factors (4)
75:23;86:7,25;
151:18
facts (6)
20:25;92:16;153:21;
154:4;160:25;207:13
factual (1)
192:5
fair (45)
19:10,17;33:4,17;
34:4,10,21;35:5,9;37:2,
5,9,10;38:3,8;41:3;
46:4;48:8;52:19;53:16;
56:25;58:3,17;65:17;
77:17;78:21,24;97:12;
100:20;106:4;109:2,8;
111:6;118:7,8;121:4;
123:17;141:3;143:2;
147:13;161:19;162:22,
23;166:11;168:14
fall (7)
32:9;17;38:10;68:19,
22;154:12;178:6
familiar (2)
43:20;188:17
family (1)
99:20
far (4)
109:16;154:7;157:2;
158:17
Fara (1)
12:25
far-reaching (2)
28:24;32:7
fast (1)
205:21
Fax (4)
4:9,21;6:9,18
feature (7)
37:15,24;39:2,15,17,
22;68:9
features (7)
68:23,24;69:6;
107:15,22;108:3,6
federal (3)
123:21;126:8,8
feel (7)

46:13;178:20,21,22;
  179:3;182:3,15
**feeling (1)**
  87:15
**FELD (2)**
  4:12;13:20
**felt (1)**
  181:24
**few (4)**
  109:11;180:5;
  198:15;205:25
**field (2)**
  177:14,15
**fifth (2)**
  135:13,24
**filed (4)**
  120:6;202:13,16,22
**filing (4)**
  120:8,21;121:7;
  160:5
**finally (1)**
  59:20
**Finance (15)**
  15:12,17;17:19,21;
  22:7,8,11,25;113:21;
  123:14;124:23;151:10;
  158:2,13;183:12
**financial (15)**
  18:20,21;22:6,12;
  27:20;51:8;132:16;
  155:23;156:5,20;
  167:21;177:15;178:8,
  16;183:23
**financially (2)**
  58:9,16
**financing (1)**
  50:11
**find (1)**
  173:20
**fine (7)**
  25:4;61:13;64:15;
  108:20;177:24;207:5,
  16
**finish (1)**
  145:12
**firm (6)**
  13:4;16:14;26:14;
  179:23;180:14;205:13
**firms (4)**
  26:17;180:11;
  188:22;190:13
**first (21)**
  14:5;15:2;28:20;
  43:9,16;45:6;87:18;
  89:14;94:11;96:11;
  100:10;102:12;105:18;
  112:5,12;131:18,18;
  133:12;145:13;182:16,
  17
**fit (1)**
  92:20
**five (2)**
  203:24;208:13

**fixed (1)**
  18:14
**flat (1)**
  126:6
**flip (2)**
  87:13;94:14
**Floor (1)**
  6:5
**flow (3)**
  47:18;71:25;72:20
**flows (4)**
  40:20;41:9;58:24;
  90:17
**fly (1)**
  55:7
**focus (4)**
  21:24;22:10;37:24;
  167:2
**focused (1)**
  157:21
**focusing (5)**
  36:25;37:11;140:15,
  18;165:10
**follow (1)**
  19:24
**followed (1)**
  91:25
**following (9)**
  57:21;97:13,15;
  114:9;141:11;153:10,
  15;185:19;197:7
**follows (2)**
  14:7;184:3
**follow-up (1)**
  180:3
**footing (2)**
  183:10,13
**footnote (2)**
  192:24;193:3
**foreign (4)**
  57:24;59:3,9,22
**forgotten (1)**
  52:22
**form (5)**
  139:19;158:14;
  191:5;198:18;200:20
**formation (1)**
  30:24
**forming (3)**
  153:23;154:6;155:12
**forms (2)**
  30:5;43:19
**forth (13)**
  21:19;29:7;49:23;
  50:2;62:19;63:17,22;
  66:10;67:5;128:4,7;
  129:13;192:20
**found (3)**
  59:15;198:25;200:20
**foundation (1)**
  63:25
**four (2)**
  135:13;152:4

**fourth (5)**
  96:17,18;98:5,7,9
**fraction (3)**
  40:15;120:2;143:18
**frame (1)**
  207:17
**framework (1)**
  92:20
**framing (1)**
  31:4
**Fran (1)**
  12:13
**Franklin (1)**
  187:24
**Fraud (1)**
  58:25
**free (6)**
  46:13;123:9,15,20;
  124:5;182:16
**frequency (1)**
  59:5
**Friday (2)**
  12:5;180:7
**front (6)**
  15:7;73:25;114:13;
  130:18;152:20;165:12
**fully (1)**
  144:2
**functioning (1)**
  50:17
**Further (5)**
  32:16;128:3;179:12;
  205:5;208:8
**future (11)**
  50:25;140:22;
  165:19,21;167:12,13;
  169:13;175:24;178:6;
  191:6;203:13

## G

**gave (9)**
  36:6;67:12;71:5;
  75:8,14,20;127:18;
  136:25;206:5
**gears (1)**
  157:24
**general (19)**
  22:25;28:23;32:6,17;
  33:9,20;37:25;40:4;
  42:13;51:15;62:9;
  71:19;124:13;183:5;
  190:22,23,25;191:5;
  193:7
**generally (12)**
  24:21;32:8;38:10;
  74:25;79:24;80:9;
  86:25;99:22;109:21;
  123:19;158:12;160:3
**generate (2)**
  165:21;168:11
**generation (1)**
  169:9

**generic (1)**
  21:15
**generically (1)**
  37:4
**given (24)**
  50:6;89:9,18;95:3;
  97:9;98:2,20;99:3,4,14,
  17;100:5,13;101:13;
  102:17;105:20;127:7;
  134:4;148:24;154:3;
  155:3;162:8;202:21;
  209:12
**gives (2)**
  73:24;103:19
**giving (2)**
  96:14;186:6
**global (4)**
  37:3;169:20,20;
  182:9
**globally (5)**
  28:23;32:5;33:8,19;
  40:4
**goal (1)**
  34:23
**goes (3)**
  124:12;183:20;
  184:19
**Golden (1)**
  188:2
**Goldman (1)**
  24:11
**Good (3)**
  52:20;165:5;205:11
**Gordon (1)**
  187:6
**GOTTLIEB (3)**
  6:12;12:10;13:18
**govern (1)**
  114:11
**governance (1)**
  18:16
**governing (5)**
  111:9,14;113:17;
  114:2,19
**government (21)**
  79:7,11,14;80:2,11,
  21;81:5,15;83:11;
  84:11;123:3,10,22;
  125:3,4,4;126:5,9;
  135:4;136:13,16
**governments (1)**
  83:8
**grab (1)**
  59:15
**grade (2)**
  113:21;114:22
**graph (2)**
  118:25;119:2
**Grauer (2)**
  12:14,16
**Great (3)**
  26:14;55:5;184:23
**greater (11)**

  50:22;51:3;52:3;
  53:18;54:2,19;58:2;
  71:9,14;98:3,16
**greatest (1)**
  82:11
**Green (2)**
  176:22,23
**group (11)**
  13:15;30:3,4,9,11;
  32:16,21;184:2,15;
  186:4;193:12
**groups (1)**
  24:10
**Grudzinski (2)**
  13:8,8
**GS (1)**
  188:4
**guarantee (50)**
  37:18;38:3;39:4,16,
  22;45:2,8;69:14;81:14,
  16,25;82:18,19;83:4,6,
  9,10,12;84:13,14,15,
  17;89:6;91:20;100:11;
  103:17,21,22;104:23,
  24;105:24,25;126:25;
  133:21;136:20,21;
  144:10;145:12;146:3,
  5,6,10,11,19,19;
  147:18,20;156:7;
  163:3;206:24
**guaranteed (26)**
  35:24;37:8;72:3,4,
  21,23;74:14,18,19,24,
  25;76:7,13;82:3,4;
  90:19,21,22;96:8;
  97:23;100:18;102:16;
  118:21;119:7,9;126:9
**guarantees (30)**
  30:14,20,23;37:23;
  40:17,23;67:18;68:2,
  19,21;107:5,7,9;
  108:22;109:4,12;
  110:19,25;111:9,14;
  120:10,15,24;126:22;
  142:25;144:2,15;
  151:15;166:12;169:25
**guarantor (5)**
  43:13;90:12;133:17,
  25;134:7
**guess (1)**
  174:16
**Guide (2)**
  58:13;193:4
**guidelines (1)**
  189:8
**Guiney (6)**
  13:10,10;91:18,23;
  205:10,12
**GUMP (2)**
  4:12;13:20;26:16,18

## H

**Hadley (1)**
13:14
**half (1)**
97:14
**HAMILTON (2)**
6:12;12:11
**hamper (1)**
58:15
**handed (2)**
57:17;198:17
**handful (1)**
165:7
**handling (1)**
58:23
**handy (1)**
206:2
**HANS (9)**
12:22;22;179:21,22;
199:10;203:17;204:5,
13;205:7
**happen (1)**
54:23
**happened (1)**
164:13
**happy (1)**
172:24
**hard (1)**
115:8
**HAUER (2)**
4:12;13:20
**heading (4)**
42:14;97:13,20;
99:19
**hear (1)**
137:14
**heard (9)**
60:18;154:7;163:8;
171:22;175:5,7;
176:24;188:19;195:5
**heart (1)**
109:18
**held (5)**
12:9;25:23;26:4;
150:18;179:17
**help (4)**
130:14;143:8;
172:20;191:24
**hereby (1)**
209:7
**hesitate (1)**
14:20
**higher (23)**
48:22;72:2,20;73:13;
74:2,10;81:17;82:4;
83:5,11;84:13,16;
90:18;124:10;125:9;
126:16,18;135:9;
144:11,15;145:21;
147:19;151:14
**highlight (1)**
195:2
**highlighted (4)**
56:8,9,10;57:18

**HIGHLY (194)**
15:1;16:1;17:1;18:1;
19:1;20:1;21:1;22:1;
23:1;24:1;25:1;26:1;
27:1;28:1;29:1;30:1;
31:1;32:1;33:1;34:1;
35:1;36:1;37:1;38:1;
39:1;40:1;41:1;42:1;
43:1;44:1;45:1;46:1;
47:1;48:1;49:1;50:1;
51:1;52:1;53:1;54:1;
55:1;56:1;57:1;58:1;
59:1;60:1;61:1;62:1;
63:1;64:1;65:1;66:1;
67:1;68:1;69:1;70:1;
71:1;72:1;73:1;74:1;
75:1;76:1;77:1;78:1;
79:1;80:1;81:1;82:1;
83:1;84:1;85:1;86:1;
87:1;88:1;89:1;90:1;
91:1;92:1;93:1;94:1;
95:1;96:1;97:1;98:1;
99:1;100:1;101:1;
102:1;103:1;104:1;
105:1;106:1;107:1;
108:1;109:1;110:1;
111:1;112:1;113:1;
114:1;115:1;116:1;
117:1;118:1;119:1;
120:1;121:1;122:1;
123:1;124:1;125:1;
126:1;127:1;128:1;
129:1;130:1;131:1;
132:1;133:1;134:1;
135:1;136:1;137:1;
138:1;139:1;140:1;
141:1;142:1;143:1;
144:1;145:1;146:1;
147:1;148:1;149:1;
150:1;151:1;152:1;
153:1;154:1;155:1;
156:1;157:1;158:1;
159:1;160:1;161:1;
162:1;163:1;164:1;
165:1;166:1;167:1;
168:1;169:1;170:1;
171:1;172:1;173:1;
174:1;175:1;176:1;
177:1;178:1;179:1;
180:1;181:1;182:1;
183:1;184:1;185:1;
186:1;187:1;188:1;
189:1;190:1;191:1;
192:1;193:1;194:1;
195:1;196:1;197:1;
198:1;199:1;200:1;
201:1;202:1;203:1;
204:1;205:1;206:1;
207:1;208:1
**hinder (1)**
58:20
**hoc (1)**
13:15

**hold (6)**
82:11;135:11;
188:24;189:5,20;
202:25
**holders (5)**
113:16,25;114:18;
180:18;189:25
**holding (2)**
83:8;189:24
**holdings (3)**
189:13,15,16
**holds (1)**
93:2
**honored (1)**
144:3
**hope (1)**
204:16
**housekeeping (1)**
14:25
**Hubbard (1)**
13:1
**Hughes (1)**
13:1
**hundred (13)**
78:18;122:12,22;
145:5,16,17,18;146:2,
3,4,6,11;147:3
**hypothesis (11)**
82:19,25;83:3;
142:16,18,21;143:4,9,
10;147:9,11
**hypothesize (1)**
142:23
**hypothesized (1)**
48:6
**hypothesizing (1)**
161:15
**hypothetical (2)**
60:23;163:7

# I

**idea (2)**
36:17;196:16
**identical (7)**
76:8;125:22;142:24;
149:22,22,23,24
**identically (1)**
143:19
**identification (15)**
15:5;42:21;56:6;
65:18;87:9;94:10;
95:19;100:24;102:8;
103:8;105:8;111:25;
127:6;182:7;198:13
**identified (24)**
27:4;41:17;43:10;
46:25;47:11;56:12;
57:8,14;60:14;61:18;
67:15,21;68:24;85:20,
21,24;86:2,13;108:4;
127:20,25;131:10;
154:4;155:22

**identifies (1)**
80:20
**identify (19)**
19:15;34:25;46:12;
48:5;61:23;62:10;
64:19,25;65:2,6,13;
86:10;107:22;112:5,
20;130:15;133:11;
153:21;157:18
**identifying (1)**
63:4
**ie (2)**
32:8,10
**ignored (2)**
40:24;63:20
**immediate (2)**
28:24;32:6
**impact (10)**
18:23;19:3,12;28:24;
32:6;33:5;46:6;68:15;
76:23;159:8
**impacted (2)**
170:7;173:6
**impacts (7)**
33:3;41:16;47:2,9;
48:11;63:5;65:3
**impede (1)**
58:19
**impedes (1)**
58:24
**implementing (1)**
64:20
**implication (5)**
40:22;49:14,24;50:3;
118:12
**implications (2)**
21:21;68:14
**implied (1)**
49:20
**important (2)**
77:3;79:18
**importantly (1)**
140:23
**impression (4)**
64:14;172:18;
197:12;201:15
**improved (1)**
59:21
**inadequate (1)**
58:14
**Inc (1)**
103:18
**inclination (3)**
50:13,15;53:20
**include (7)**
22:16,16;28:15;
140:22;160:17;168:15,
17
**included (6)**
74:12;132:5;174:11,
13;175:10,17
**includes (1)**
138:14

**including (2)**
24:11;57:4;58:6;
82:12;125:23;163:25;
177:22
**income (1)**
18:14
**incomplete (2)**
60:24;163:8
**Incorporated (1)**
12:8
**incorrect (1)**
116:21
**incorrectly (1)**
135:19
**increase (7)**
32:11,18;38:12;
113:20;114:22;195:7,8
**increasing (2)**
22:21;59:4
**indenture (12)**
27:22;110:6,8;
111:18;113:14;114:10,
11,16;115:23;117:5;
205:16,24
**indentures (22)**
28:2,5;107:7,8;
109:18;110:23,23;
111:3,8,13;113:17;
114:2,18;115:13,19;
116:8,11,13,16,22;
130:22;154:8
**Indiana (2)**
197:8,10
**Indianapolis (1)**
197:9
**indicate (4)**
65:15;133:16;
139:14;204:8
**indicated (1)**
39:18
**indication (1)**
61:3
**indicator (1)**
104:20
**individual (2)**
30:4,10
**individuals (3)**
25:4,7;27:3
**industry (2)**
24:2,6
**inefficiency (1)**
51:22
**inferior (1)**
103:25
**influences (1)**
169:13
**information (54)**
46:16;69:21;77:2,3,
7;80:19;87:3,5;106:4;
122:8;127:9,17;
128:11,22,22;129:6,13;
130:6;131:6,8;132:17;
134:10;137:16,19;

143:11;152:14;153:11;
155:19;156:6;166:8;
167:9,11,17,18,22,24,
25;168:4,23;169:12,15,
19;172:9;174:21,24;
175:18,21;182:4;
184:7;186:14;190:3,
18;200:20;203:11
**informative (4)**
184:8;195:20,23;
203:12
**informed (1)**
190:18
**informing (2)**
34:5;38:18
**informs (2)**
120:8,11
**inharmonious (1)**
58:15
**initial (2)**
48:22,24
**Initially (1)**
42:11
**initiate (1)**
59:13
**Ink (1)**
31:12
**Insley (1)**
12:13
**insolvencies (3)**
57:2;58:4,18
**insolvency (30)**
21:4,11,12,18;22:2,3,
18,24;23:5;57:21,25;
58:23;59:8,13,18;
105:11;109:6;120:18;
121:20;122:4;144:3;
150:8,25;151:12;
157:11,17;159:25;
160:6,21;161:7
**insolvent (2)**
58:20,25
**instance (11)**
56:25;91:12;107:19;
125:25;126:19,21;
138:16;141:19,19;
160:2,3
**Instead (1)**
177:3
**institution (1)**
24:19
**institutional (1)**
23:22
**institutions (2)**
18:18;24:16
**instruct (2)**
128:4,25
**instrument (1)**
104:5
**instruments (3)**
18:11,13,14
**integrated (2)**
32:16,21

**intellectual (6)**
156:17;157:5,11,19;
177:20;178:25
**intended (1)**
34:8
**interest (7)**
18:8;48:20;125:24,
25;165:22;166:24;
199:25
**interested (3)**
57:3;58:6;169:2
**interests (2)**
57:3;58:5
**internal (6)**
83:20,22;85:5;126:2;
154:21,21
**international (7)**
21:4,9,20,25,25;
22:17;23:5
**interpret (3)**
124:21;134:24;
161:14
**interpretation (6)**
51:13;67:13;69:15;
141:13;147:14;183:18
**interpreted (1)**
183:7
**interrupted (1)**
29:15
**interval (1)**
133:4
**into (23)**
20:24;35:3;42:15;
68:19,22;71:21;75:22;
83:7;85:2;87:2;107:24,
25;108:8;138:7;
151:19;160:8;161:3;
165:13;171:9;172:11;
192:6;197:15;203:16
**introduce (1)**
12:17
**inventors (1)**
119:23
**investigation (1)**
55:16
**investing (1)**
169:5
**investment (13)**
23:23;24:8,18;58:3,
11,25;113:20;114:22;
187:22;188:4;189:8;
191:7;203:15
**Investor (11)**
95:21;170:23;
186:15;199:18;200:2,
16,19;201:25;202:8,11,
23
**investors (37)**
29:15;51:4;77:15;
87:11;107:12,24;
161:3,6;166:8,15;
167:4,12,20,21;168:5,
8,25;169:17,18;170:2;

171:4,7,11;173:2;
174:22,24;175:19,20;
184:22;187:18;191:5,
10,11,14;203:10,12;
204:18
**investors' (3)**
139:16;140:18,21
**involved (6)**
23:9,11;57:25;
172:18;175:14;196:6
**IP (2)**
177:18,19
**IQ (2)**
131:10,21
**irrelevant (1)**
205:21
**isolate (1)**
124:3
**isolating (1)**
121:13
**isolation (1)**
123:7
**issuance (2)**
97:4,4
**issuances (2)**
51:2;71:20
**issue (10)**
20:16,21;21:2;22:11;
43:13;88:21;102:3;
126:24;175:14;179:19
**issued (26)**
37:7;42:9;43:11;
44:12,14;45:2,7,16,20;
48:25;90:5;98:17,18;
105:19;112:11;115:2,
6;163:19,22;169:14,
24;172:23;173:11,18;
176:2;185:5
**issuer (5)**
43:12,12;169:25;
206:14,18
**issues (4)**
21:19;101:11;
102:15;183:22
**Issuing (1)**
94:15

**J**

**JACQUELINE (2)**
4:19;13:23
**January (16)**
119:4,4,6,18,19;
120:6;131:19;132:8,
11,24;135:9,16,20;
136:5;191:22;192:13
**John (9)**
12:7;13:24;66:23;
106:21;152:5;203:25;
208:11;209:7,16
**joint (1)**
13:2
**JOSEPH (2)**

4:17;13:19
**jsorkin@akingumpcom (1)**
4:22
**Judge (1)**
61:7
**judgment (1)**
33:25
**July (18)**
88:22,22,23;94:7,16;
100:2,2,2;101:6;103:9;
133:13,13,13;190:2,5,
6;191:3;195:7
**jumping (2)**
58:12;59:5
**June (9)**
45:10;87:12;88:10,
11,19;90:3,25;112:10;
133:23
**junior (24)**
32:10,10,13;35:12,
16,23;36:5,15,18;
38:11,15,21,24;39:3,
12,19,24;53:12;72:4,
23;74:14,18,21;90:21
**juniorities (1)**
40:17
**juniority (3)**
40:23;47:24;50:9
**jurisdictions (1)**
59:3

**K**

**keep (2)**
43:21;179:17
**KELLER (11)**
4:7;13:3,3;158:14;
165:4,6;172:24;173:8,
19;179:12;204:10
**KEN (2)**
6:7;13:6
**kenrosenberg@paliarerolandcom (1)**
6:10
**Kilimnik (2)**
131:10;176:19
**killed (1)**
198:14
**kind (3)**
14:24;55:23;180:3
**King (1)**
188:6
**knee (1)**
14:15
**knew (1)**
171:4
**knowing (3)**
61:2;98:2;138:4
**knowledge (7)**
27:8;105:13;175:8;
187:2;189:11,19;
190:13

4:17;13:19

**L**

**label (2)**
33:15;41:10
**labeled (1)**
41:11
**Lafayette (1)**
197:10
**language (3)**
36:9;111:3;200:12
**largest (1)**
189:25
**last (10)**
61:12;68:6;103:11,
12;105:6;195:11,18;
199:11;200:11;204:17
**later (2)**
96:20;182:11
**law (11)**
13:4,11;17:15;26:17;
58:14;59:6;60:2;
179:23;205:13,14,22
**lawyer (3)**
17:9,10,14
**lawyers (4)**
17:18;26:12,14,19
**leads (1)**
96:25
**learned (1)**
196:23
**learning (4)**
52:7;60:10,11;
124:24
**least (4)**
35:21;182:10;185:2;
199:5
**leave (3)**
99:16;133:18;143:24
**left (2)**
97:10;100:25
**left-hand (2)**
43:9;88:23;101:5
**legal (13)**
12:14;17:11,12,16;
28:23;32:6;33:9,20;
40:4;55:22;58:2,15;
62:9
**Legislative (1)**
58:13
**Leif (1)**
59:23
**less (12)**
50:18;51:13,14,18;
85:16;113:16,25;
114:17;124:9;125:8;
126:17;135:8
**level (3)**
54:16,17,19
**LGD3 (1)**
105:20
**LGD4 (5)**
98:23;99:21;100:6,

14;102:17
**Liberty (2)**
6:14;12:11
**license (4)**
168:24;169:3,8;
179:2
**licenses (2)**
178:11;179:5
**licensing (1)**
178:14
**light (1)**
52:14
**likelihood (1)**
165:16
**likely (9)**
29:25;30:10;47:23;
48:15,21;50:16;55:4;
62:17;171:12
**limit (4)**
109:22;110:4,18,24
**limitation (1)**
168:4
**limited (8)**
52:11;61:9;94:8,20;
96:9;97:24;99:19;
112:7;114:12;163:22;
187:10,12,13,15,16
**limiting (1)**
48:17
**limits (1)**
129:7
**line (8)**
60:22;61:14;99:24;
102:13,14;195:11,18,
21
**lines (2)**
194:4;195:3
**liquidation (5)**
40:11;67:10;118:16;
140:23;165:25
**list (7)**
14:13;27:18;73:19;
79:25;117:18,21,23
**listed (7)**
28:14;89:14;94:17;
117:17;119:11;134:14;
199:3
**listing (1)**
184:4
**litigation (3)**
27:14;175:15;201:18
**little (8)**
27:15;32:2;42:15;
50:21;59:25;97:10;
107:4;166:25
**LLC (3)**
187:18,24;188:4
**LLP (5)**
4:3,12;6:3,12;12:11
**loans (3)**
32:9,10;38:11
**locate (2)**
88:18;97:11

**located (1)**
12:11
**long (1)**
68:12
**longer (3)**
47:23;160:9;198:5
**long-term (1)**
68:9
**long-winded (1)**
57:6
**look (45)**
15:8;23:13;28:18;
68:6;70:17,21;73:14,
15,21;74:5,5;85:9;
88:7,10;93:10,14;
94:11;95:22;100:25;
102:10,14;105:18;
107:12,13;116:10,16;
117:10;120:20;129:15,
16,20,25;130:8;132:8,
9;135:3,9;136:15;
137:24;138:8,17;
142:10;147:22,23;
148:5
**looked (10)**
46:15;70:19,23;
72:12;76:25;92:5;
128:21;181:21,23;
199:5
**looking (19)**
45:13;72:10;95:20,
25;98:6,7,13;102:20;
112:5;118:10;133:10;
135:18,20;138:3,14;
143:9;150:24;151:3;
182:12
**loss (3)**
99:3,4,11
**losses (1)**
166:18
**lost (4)**
42:2;110:21;136:4;
146:13
**lot (2)**
31:5,14
**low (7)**
94:19,20,21,22;95:3;
101:14;104:6
**lower (16)**
81:15;82:2,3;83:4,6,
13;84:17;124:8;125:7;
126:14,15,16;135:8;
136:20;144:13,17
**LP (6)**
187:20,22;188:6,8,
10,13
**lunch (3)**
106:8,16;206:21
**Lynch (1)**
24:12

## M

**M5V (1)**
6:6
**Madam (2)**
95:16;100:21
**magnitude (1)**
59:5
**main (1)**
59:10
**makes (3)**
36:14;100:17;192:2
**making (8)**
62:21,24;63:12;64:2;
76:5;105:23;123:25;
203:14
**managed (1)**
23:25
**Management (10)**
15:11,18;17:19,22;
22:7;187:22;188:2,6,
12,15
**mandate (2)**
19:20;20:9
**mandating (1)**
59:21
**manner (1)**
124:8
**many (5)**
43:23;113:18;
114:20;136:7;201:10
**March (6)**
95:21;96:6;132:11,
24;199:12;200:17
**margin (1)**
159:4
**margins (1)**
54:17
**mark (2)**
15:2;42:18
**marked (17)**
15:4;42:20;56:5;
87:8;94:9;95:18;
100:23;102:7;103:7;
105:7;111:24;112:21;
127:5;182:6,9;198:11,
12
**market (24)**
19:7;33:3,11,12,13,
21;41:16;46:12;52:2,
24,25;53:6,19;54:3;
81:8;137:11,17;144:9;
147:4;157:23;158:2,4,
8;162:12
**marketplace (10)**
82:20;126:17;
138:10;143:5,9,12;
144:5;147:5;186:17,20
**Markets (25)**
13:9;17:25;18:6,10,
11,12,17,18,18,20,22,
24;19:4;20:5;22:12;
41:23;46:7;50:7,17,18,
24;55:18;158:11;
159:9,22

**market's (3)**
138:20;139:6,8
**marks (3)**
66:16,21;106:19
**Master (3)**
187:10,13,16
**materials (3)**
96:3;179:16,18
**matter (17)**
12:7;16:23,24,25;
29:11;86:25;124:24;
140:23;176:13;178:2,
9,11,24;179:11;
183:13;189:21;197:19
**matters (1)**
16:16
**mature (1)**
103:21
**maturities (6)**
82:9;121:6,11;
149:17,23;160:10
**maturity (24)**
45:5;78:6,10,11,13;
79:2;80:25;81:23;
83:17,24,25;84:6,7,10;
121:14,18,24;122:3;
126:5,12;146:24;
148:9,12,18
**maximization (2)**
58:7,21
**may (45)**
17:7;23:15,16;26:16;
27:24;37:23;40:17;
43:15;47:2;49:9;53:14;
66:25;77:12;86:3;94:4;
101:22;102:11;104:10,
17;106:24;107:23;
113:16,25;114:17;
115:9;119:21;130:14;
150:5;152:8;160:23;
165:2;168:18;173:6;
178:4;180:24;182:17;
188:24;189:9,12;
190:4;191:10;196:19;
197:23;201:3;204:4
**maybe (3)**
45:20;87:19;182:18
**McConnell (223)**
12:7;13:25;14:11;
15:1,24;16:1;17:1;
18:1;19:1;20:1;21:1;
22:1;23:1;24:1;25:1;
26:1;27:1;28:1;29:1;
30:1;31:1;32:1;33:1;
34:1;35:1;36:1;37:1;
38:1;39:1;40:1;41:1;
42:1,24;43:1;44:1;
45:1;46:1;47:1;48:1;
49:1;50:1;51:1;52:1;
53:1;54:1;55:1;56:1;
57:1,5;58:1;59:1;60:1;
61:1;62:1;63:1;64:1;
65:1;66:1,23;67:1,3;

68:1;69:1;70:1;71:1;
72:1;73:1;74:1;75:1;
76:1;77:1;78:1;79:1;
80:1;81:1;82:1;83:1;
84:1;85:1;86:1;87:1;
88:1;89:1;90:1;91:1;
92:1;93:1;94:1,6;95:1;
96:1;97:1,12;98:1;
99:1;100:1;101:1;
102:1;103:1;104:1;
105:1;106:1,21;107:1,
3;108:1;109:1;110:1;
111:1;112:1;113:1;
114:1;115:1;116:1;
117:1;118:1;119:1;
120:1;121:1;122:1;
123:1;124:1;125:1;
126:1;127:1;128:1;
129:1;130:1;131:1;
132:1;133:1;134:1;
135:1;136:1;137:1;
138:1;139:1;140:1;
141:1;142:1;143:1;
144:1;145:1;146:1;
147:1;148:1;149:1;
150:1;151:1;152:1,5;
153:1;154:1,4,5;155:1,
21;156:1;157:1;158:1;
159:1;160:1;161:1;
162:1;163:1;164:1;
165:1;166:1;167:1;
168:1;169:1;170:1;
171:1;172:1,23;173:1,
11,17;174:1;175:1;
176:1;177:1;178:1;
179:1;180:1;181:1;
182:1;183:1;184:1;
185:1;186:1;187:1;
188:1;189:1;190:1;
191:1;192:1;193:1;
194:1;195:1;196:1;
197:1;198:1;199:1;
200:1;201:1;202:1;
203:1,25;204:1;205:1,
11,18;206:1,20;207:1,
11,23;208:1,9,11;
209:7,16
**McCoy (1)**
13:14
**mean (22)**
31:10;40:5;46:10;
47:19;52:14;78:9,25;
83:22;87:15;99:9;
122:18;144:12,25,25;
145:2;158:25;160:5;
183:13;189:2;190:9;
192:9;201:25
**meaning (1)**
50:23
**meaningful (1)**
150:8
**means (7)**
109:5;125:8,9;183:8,

9,19;201:25
**meant (1)**
  21:6
**measure (2)**
  61:22;81:4
**measured (1)**
  85:4
**measuring (1)**
  84:6
**mechanic (1)**
  142:6
**mechanisms (1)**
  57:20
**meet (3)**
  24:23;25:10,18
**meeting (3)**
  25:15;26:4;27:5
**meetings (9)**
  25:17,25;26:2,9,11,
  19,20,24;27:3
**meets (1)**
  59:22
**member (3)**
  22:3,5;24:17
**members (1)**
  22:9
**memoranda (5)**
  111:21;113:11;
  117:14,22;154:10
**Memorandum (4)**
  112:6;113:23;117:6,
  7
**mentioned (3)**
  180:8;196:2;204:17
**mere (1)**
  72:25
**merely (1)**
  34:3
**Merrill (1)**
  24:12
**Messrs (4)**
  29:11;67:6;118:13;
  176:6
**met (4)**
  14:11;25:13,23;27:7
**method (6)**
  41:14;63:20;121:16,
  23;125:14;159:3
**methodologies (2)**
  158:5,7
**methodology (5)**
  53:4;63:13,16;
  158:10,10
**metric (7)**
  73:14,20;74:4,20;
  87:19;98:22;99:5
**metrics (7)**
  85:20;86:2,8,8,9,12;
  100:17
**Michael (1)**
  12:19
**midwest (1)**
  52:10

**might (16)**
  17:25;18:6;21:21;
  26:4;48:7;53:5,5;
  61:24;87:22;130:8;
  142:19;152:25;159:23;
  160:15;168:22;191:7
**Mike (2)**
  12:20;14:12
**Milbank (1)**
  13:14
**Miller (9)**
  12:20;13:13,13;
  112:15,18;167:7,15;
  190:8;205:3
**million (8)**
  45:7,9,10;90:2;
  96:23,25;98:10;100:8
**mind (4)**
  78:14;80:24;85:6;
  106:8;108:20;144:20
**mine (1)**
  87:25
**minimal (2)**
  183:25;185:25
**minor (2)**
  85:11,15
**minus (5)**
  94:19;95:3;99:7,8,11
**minute (4)**
  45:17;77:18;86:3;
  102:14
**minutes (3)**
  61:13;93:20;203:18
**missed (1)**
  174:5
**missing (2)**
  76:21;193:10
**Misters (3)**
  47:17;119:22;176:20
**misunderstood (1)**
  23:20
**mix (1)**
  43:24
**Model (4)**
  58:13;59:6,25;
  180:17
**models (4)**
  24:13,14;180:11,12
**modification (1)**
  48:10
**modified (48)**
  28:22;31:7,15,17,19;
  32:4;33:2,7,7,18;34:7;
  40:3,5,21;41:4,11,22;
  46:6,17;47:3,10,18;
  48:11;55:10,11,18;
  57:7;60:15,25;61:4,6,
  19,21;62:7,8,11,18;
  64:20,23;65:2,4,7;67:6,
  11,16,24;68:15;142:22
**modify (1)**
  161:13
**moment (1)**

151:18
**Monarch (1)**
  188:8
**monitor (2)**
  13:5;165:7
**month (2)**
  105:10;185:5
**Moody's (20)**
  87:11;95:20;96:3;
  97:18;102:10;105:9,
  23;180:21;181:2,6,15,
  22;182:9;183:25;
  185:11,20,25;186:4,9,
  19
**more (36)**
  23:17;27:15;29:25;
  32:9,13;35:12;37:5;
  38:11;39:15;42:15;
  51:2;53:11,12;61:13;
  62:5;79:8;93:11;
  104:19;109:8,13;
  120:15;124:10;125:9;
  126:18;134:19,20,25;
  156:6,8,11;166:25;
  168:20;173:22;198:14;
  201:13,15
**Moreover (1)**
  58:22
**Morgan (2)**
  15:20,20
**morning (2)**
  69:17;206:6
**most (5)**
  50:10;77:2;92:4;
  125:17,18
**moves (2)**
  52:2,16
**MRDA (6)**
  171:23;172:15;
  173:6,25;174:7,18
**much (9)**
  14:23;20:14,25;
  34:18;140:14;145:15;
  156:16;198:5;205:6
**multinational (1)**
  59:8
**multiple (5)**
  61:11;78:10;144:21;
  161:17;164:3
**must (1)**
  59:13
**Mutual (1)**
  187:24
**myself (2)**
  113:11;178:15

**N**

**N/NNC (1)**
  44:18
**name (4)**
  124:23;165:5;
  179:22;205:12

**names (3)**
  176:25;187:4;188:20
**narrower (1)**
  141:8
**narrowly (2)**
  23:4,6
**Nathaniel (1)**
  12:15
**nations (1)**
  60:3
**nature (1)**
  107:4
**Navigant (22)**
  16:13,14,15,25;17:2,
  7;24:24;25:11;26:25;
  27:21;28:14;69:19;
  70:12;71:2,13;113:6;
  127:18;128:23;152:14,
  15;154:3,8
**necessarily (2)**
  76:16;194:11
**necessitated (1)**
  48:16
**NEE (3)**
  6:16;13:17,17
**need (11)**
  14:20,21;83:18;84:3;
  129:14;134:24;146:22;
  150:14,15;159:12;
  201:5
**needed (1)**
  182:3
**needs (2)**
  14:18;128:18
**negative (16)**
  19:9,13,14,19;20:7;
  33:10,11,16,23;34:2;
  49:3,13,22;51:5,15,19
**net (3)**
  19:21;20:11;61:22
**Networks (16)**
  12:8;89:23;94:7,8,
  18,20;96:9;97:21,23;
  99:19;103:18;112:6;
  114:12;163:11,21;
  198:18
**neutral (7)**
  33:12,23;34:2;49:3;
  51:5;76:18;162:20
**New (12)**
  4:6,6,16,16;6:15,15;
  12:12,12;13:12;52:7;
  205:15,23
**next (8)**
  43:11;44:18;59:18;
  94:5;95:15;99:24;
  185:13,15
**Nick (1)**
  13:13
**NN (6)**
  43:19;44:10;90:5,7;
  206:13,16
**NNC (4)**

43:19;163:5;198:19;
206:22
**NNCC (12)**
  90:11;91:12,15;
  92:19;206:12,17,23,25;
  207:4,7,24;208:4
**NNI (55)**
  43:20;44:3,21;72:3,
  19,21;89:5;90:12,19,
  22;91:22;92:9;93:4;
  103:18,23;105:25;
  109:24;110:5,18;
  118:21;119:7;133:16,
  24;134:6;167:3,5,14;
  168:8,9,24;169:24,25;
  170:3,14,16,18,23,24;
  171:5,13,17,19;172:14,
  19;174:2,7,13,19;
  175:10,17;176:3;
  206:24;207:7,24;208:5
**NNI's (10)**
  71:24;90:16;110:24;
  167:4,21;168:15,17;
  169:19;173:6,12
**NNL (19)**
  43:18,19,24;44:8,17,
  18;45:7;90:12;91:20;
  92:6;93:3;105:24;
  109:23;110:5,18,24;
  134:4,5;163:5
**noise (2)**
  134:15,16
**nomenclature (5)**
  42:9;43:6;81:9;
  108:14;139:22
**non- (1)**
  74:17
**none (2)**
  68:12,22
**non-guaranteed (12)**
  35:22;72:4,22;74:13;
  76:8,13;82:5;89:16;
  90:20;93:8;100:18;
  118:23
**non-lawyer (1)**
  26:23
**normalize (1)**
  148:11
**Nortel (95)**
  12:8;27:7;30:2;
  35:14,15,18;37:2,3,7,8,
  25;38:23,24;39:17,22;
  40:11;42:8,24;43:4,11;
  45:15,17,20,22,25;
  46:2;63:14;67:17,22;
  68:23,25;87:12;89:23;
  94:7,8,15,18,19;96:9;
  97:20,23;99:19;
  102:15;103:18;107:6;
  108:5;109:5,10,22;
  110:18,19,25;112:6;
  114:12;120:3,5;
  132:15;133:15;156:16;

157:5,8,17,18;163:10,
21;167:2;169:20;
172:6,11;174:12;
175:4,17;180:18;
183:14;184:2,15;
186:4,25;187:7;
189:15,16,24;190:15;
193:8,12,12,20;198:18;
199:19;200:17;202:25;
203:15;204:18,24;
206:4

**Nortel's (15)**
68:8,12;71:25;72:3,
22;74:13,18;90:17,20;
103:13,16;118:14;
120:4,5;155:23

**Notary (2)**
14:6;209:22

**note (8)**
47:22;183:21;
189:25;194:25;195:10;
199:10;200:25;201:17

**noted (1)**
208:15

**notes (36)**
88:9;89:12,24;90:3;
94:17,24,25;96:8,10,
13;97:23;99:25;100:9;
103:19,20,21;104:2;
111:9,14;113:16,20,25;
114:18,22;154:21;
184:4,13,19,24;205:17,
24;206:10,13,22,25;
207:4

**notion (1)**
124:13

**November (4)**
43:18;45:3;101:2;
192:3

**number (22)**
43:7,8;70:10;71:9,
14;95:17;96:21;
100:22;107:22;108:3;
109:22;110:4;112:16,
16,19,23;115:15;
122:20;163:12;180:23;
187:4;200:24

**numbers (4)**
98:16;134:15,16;
139:4

## O

**oath (1)**
209:9

**object (5)**
60:22;61:14;69:23;
128:25;132:4

**Objection (142)**
16:5,22;19:23;20:12;
25:2;29:2,6;30:17,21;
31:9,23;34:11;35:4;
38:6;51:6,23;54:4,25;

62:2,13;69:20;71:8,17;
72:6;75:9;76:10;78:8;
81:18;82:6;83:14;
84:19;85:13;90:9,23;
91:18,23;92:18;93:9;
96:15;104:25;106:2;
107:16;109:15;111:11,
16;114:4;115:7,11,20,
25;116:9,17,23;
119:13;122:5;123:11;
125:10;127:2;131:25;
134:2;136:22;137:10,
13,21;138:12,22;
141:9;143:3,6,21;
146:12;147:8,12;
150:3;151:16;152:12,
16;156:10,19;157:13,
20;158:14,16;159:10,
17;160:12;161:20;
162:7;163:6;164:5,16;
167:7,8,15;169:4,7,10,
22;170:8,20;171:3,15;
172:3,16;174:3,8,25;
175:6,11,23;176:10;
177:9;179:6;183:15;
184:11;185:7,22;
186:11;188:23;189:14;
190:7,8,21;191:4,23;
192:8,11;193:15,24;
194:14,19;196:22;
197:2;199:20;200:4,
22;202:2,9;203:2;
204:21;205:2,3

**objectives (1)**
57:22

**obligation (1)**
171:5

**obligations (8)**
168:18;170:6,19,25;
171:13,14;174:19,20

**observations (3)**
162:21,24;163:23

**observe (4)**
48:2;50:7;51:9;
136:2

**observed (3)**
48:2;80:4;149:9

**obtaining (1)**
17:4

**Obviously (2)**
61:16;155:2

**occasionally (1)**
16:15

**occur (6)**
22:11;32:14,19;
46:23;164:9;203:4

**occurred (5)**
195:6,8,22,22;
196:20

**occurs (2)**
149:12;201:19

**off (21)**
66:18,20;86:22;

93:19,23,25;106:15;
112:3;127:24;129:7;
152:2,3;164:18,22,23;
166:22;177:3;203:17,
22,23;208:14

**offer (5)**
50:19;62:16;93:12;
177:5;178:24

**offered (3)**
48:19,22;183:12

**offering (13)**
17:23;18:4;50:13;
111:20;112:6,7;
113:10,22;117:6,7,14,
22;154:10

**offices (1)**
12:10

**OFFICIAL (2)**
4:13;13:21

**often (4)**
47:25;48:2;123:14;
124:14

**once (10)**
78:17;79:10,12;
115:2;145:4,11;
146:20;149:11,11;
182:24

**One (86)**
4:15;6:14;12:3,11;
14:18;16:19;20:5,6;
34:14;35:21;36:4,14,
14;43:13;44:7,18;45:6;
51:21;53:10;59:24;
60:20;63:3;66:17;80:5;
82:18,18;91:11;96:4;
98:10;99:7,8,11;
102:10,19;105:6,10;
106:6;109:8,13;111:4;
119:20;125:14,20,25;
126:4,15,15;129:16;
131:15;134:21,24;
135:13;140:8;141:2;
145:9,11,22,23,25;
146:2,3,5,5,6,7,9,10;
150:12,13;158:7,9;
159:3,13,18;167:3;
180:9;181:17,17;
182:11;184:18;185:5;
200:9;201:14,15;
202:18,19

**ones (2)**
72:15;134:5

**only (29)**
23:4;35:19,20;36:22;
37:15;55:14;65:24;
66:2,3;67:16;69:11,11;
86:7;91:11,20;93:3;
137:24;140:15,16;
141:19;142:24;149:10;
166:9;170:5;195:10,
18;196:15;201:6;
207:21

**open (1)**

179:17

**opening (1)**
12:6

**operating (1)**
103:23

**opinion (48)**
17:24;18:4,5;28:25;
29:5,9,10,12,14,17,19,
23,24;30:5,6,12,18,23;
31:5,6;34:3;37:10;
38:20;46:22;47:19;
48:15;50:14;55:6,23;
62:16;66:11;75:6;
157:22;158:2;159:13,
18;162:2,5;164:17;
173:11,17;177:7;
192:7;193:14;194:11,
17;200:19;202:21

**opinions (5)**
29:8;153:24;154:6;
177:5;195:23

**opportunity (2)**
132:2;191:7

**opposed (2)**
22:24;101:22

**option (1)**
125:16

**option-adjusted (4)**
124:15,16,18;125:15

**order (3)**
25:11;61:20;131:14

**ordered (1)**
201:20

**organization (1)**
23:4

**organizational (1)**
101:10

**organizations (5)**
22:4,6,13,23;23:2

**organize (2)**
93:20;106:9

**others (3)**
24:12;25:16;27:24

**otherwise (4)**
133:8;163:21;
190:16;196:12

**ourselves (1)**
131:20

**out (21)**
14:19,25;37:13;42:9;
60:24;68:5;77:8;87:22;
101:10;118:24,25;
127:11;130:9;141:21;
143:8;151:20;154:24;
159:4;165:12;173:20;
189:6

**outcome (6)**
51:4;52:25;62:24;
65:16,22;66:3

**outlook (1)**
93:17

**outside (2)**
18:22;173:16

**outstanding (2)**
101:11;120:2

**over (6)**
42:22;75:25;87:13;
94:14;106:7;123:3;
162:2;201:18

**OVERY (2)**
4:3;13:4

**own (5)**
157:4;173:22;197:11

**owned (2)**
157:11,19

## P

**pad (1)**
146:15

**page (31)**
57:17;58:12;59:6;
67:3;71:19;87:13,16,
18,19;90:15;94:12,14;
96:12;97:14;101:9;
102:12;103:11,13;
105:18;112:11,22;
114:13;115:15;131:18;
165:13;182:13,14;
199:12;200:9,10,24

**pages (1)**
61:11

**paid (3)**
122:21;145:4,10

**PALIARE (1)**
6:3

**panel (2)**
135:20;136:5

**paper (4)**
21:8,23;106:10;
146:16

**papers (1)**
27:24

**par (16)**
79:16,17;122:12;
125:23;137:3,3;
143:18;145:2,15,16,17,
18;146:4,5,19;149:24

**paragraph (46)**
28:19,19;32:3;46:8,
17;47:5,12;48:4,5,14;
49:7,19,21;59:18;63:6;
67:2,20;71:18;75:24;
90:14;103:12;104:11;
118:10,19,24,25;
119:16,21,22;153:4;
162:10,18,21,24;
165:10;166:5,20;
172:25;182:25;183:4,
5,20;200:11;201:2,5,6

**paragraphs (8)**
57:12;68:5,7;107:19,
20;108:4;118:2;182:22

**parent (1)**
197:9

**parenthetical (2)**

184:4;185:16
**pari (18)**
    183:7,8,16,22;184:3,
    13,16,20,24;185:3,11,
    14,17,20;186:5,7,10,13
**paribus (1)**
    82:2
**Park (1)**
    4:15
**part (13)**
    32:23,24;46:13;
    50:14;75:6,12,18;
    107:9;118:4;185:8,8,9;
    188:24
**participant (1)**
    153:13
**participants (1)**
    18:17
**particular (23)**
    20:4,15,20;26:5;
    47:22;49:5;59:2;65:15;
    78:13;107:15;109:17;
    123:8;142:17;166:16;
    167:2;172:7;178:2;
    181:6;182:24;184:14;
    191:9;195:3;200:23
**particularly (3)**
    24:8;67:25;184:12
**particulars (1)**
    42:15
**parties (12)**
    53:25;70:4;129:8,13;
    153:4;156:15,23;
    157:3;172:18;189:23;
    202:20,23
**Partners (2)**
    187:20;188:10
**parts (7)**
    28:4;63:9;75:10;
    112:14;113:3,9;199:6
**party's (1)**
    153:21
**passage (1)**
    184:18
**passages (3)**
    56:8,9,11
**passu (18)**
    183:7,8,17,22;184:3,
    13,16,20,25;185:3,11,
    14,18,20;186:5,7,10,13
**past (1)**
    191:17
**patent (5)**
    178:10,13,19,23;
    195:6
**patents (6)**
    177:22,23,25;178:3,
    4,9
**patterns (1)**
    115:18
**Patterson (2)**
    13:10;205:13
**PAUL (3)**

4:7;13:3;165:5
**paulkeller@allenovery.com (1)**
    4:10
**pay (4)**
    77:15;78:17,22;
    166:22
**payable (3)**
    121:15;148:17;
    160:11
**payment (2)**
    81:24;165:24
**payments (2)**
    165:23;201:22
**payoff (1)**
    40:14
**payoffs (1)**
    140:22
**pays (4)**
    78:3,16;79:10,12
**pedantic (1)**
    27:17
**Pension (2)**
    12:20;163:16
**pensioners (1)**
    14:12
**people (6)**
    24:24;25:11,22;26:4,
    20;27:2
**per (6)**
    22:24;79:10;122:12,
    22,22;145:2
**perceive (1)**
    176:2
**perceived (2)**
    137:11,17
**percent (29)**
    78:16,17,20,23;
    79:10,12;98:23;99:2,
    10,12,14,18,21;100:6,
    14;102:17;105:20;
    145:4,10,13,14,24,25;
    146:2,4,20;205:16,24;
    206:9
**percentage (3)**
    74:6,8,11
**perception (4)**
    138:10,20;139:6,8
**perfectly (1)**
    108:20
**perhaps (1)**
    42:25
**period (9)**
    112:10;119:4,10,18;
    120:7;122:4;132:20;
    133:10;186:3
**personnel (1)**
    17:2
**perspective (6)**
    29:8;61:20;77:5;
    121:3;178:8;192:5
**persuasive (1)**
    85:16
**pertubation (1)**

51:12
**perturbation (5)**
    51:18,21;52:2,5,6
**perturbed (1)**
    50:13
**petition (6)**
    121:14;143:14;
    144:11;148:16;150:19;
    160:4
**Phone (4)**
    4:8,20;6:8,17
**phrased (1)**
    105:5
**pick (2)**
    69:16;167:3
**picked (1)**
    17:17
**piece (3)**
    77:3,14;169:15
**pieces (2)**
    77:2,7
**Piper (2)**
    12:23;179:23
**place (4)**
    50:10;52:2;70:5;
    160:9;170:25;197:18
**placed (1)**
    197:15
**plain (4)**
    37:16,21;125:17,18
**plan (1)**
    153:6
**played (1)**
    30:23
**Plaza (2)**
    6:14;12:12
**pleadings (7)**
    157:7;202:13,15,20,
    22,24;203:4
**please (28)**
    12:17;14:3,20;18:3;
    25:9;30:16;34:13;
    37:19;39:20;56:15;
    62:4;65:5;75:17;86:4;
    110:2;116:2;120:13;
    121:22;123:12;135:11;
    146:15;150:4;157:15;
    162:3;165:11;170:21;
    182:15;201:6
**pledge (2)**
    68:10,16
**plots (1)**
    119:3
**plumbing (1)**
    142:8
**pm (9)**
    106:21;151:25;
    152:6;164:21,25;
    203:21;204:2;208:12,
    15
**point (14)**
    14:20;15:9;37:13;
    68:5;76:5;79:13,21;

127:24;141:10;144:19;
    191:12,15,21;207:15
**pointed (1)**
    154:24
**points (5)**
    115:15,21;116:7,21;
    127:8
**policies (3)**
    18:24;19:4,7
**policy (16)**
    19:14,16,21,22;20:4,
    8,9;34:20;49:14,17,23;
    50:3,20;61:20;62:21,
    22
**pool (10)**
    92:6,7;93:3,4;
    118:15;119:24;163:5;
    197:15;207:8;208:6
**pools (3)**
    109:7,13;197:11
**Poor's (5)**
    73:24;75:4;185:5;
    192:25;193:2
**portfolio (2)**
    44:16;195:6
**portfolios (4)**
    24:17;188:25;189:4,
    5
**portion (1)**
    57:18
**posit (1)**
    33:6
**posited (1)**
    142:21
**positing (2)**
    46:16;53:9
**position (9)**
    40:8,9,19,20;50:20;
    54:12;141:20;143:16,
    17
**positive (32)**
    19:8,12,15,22;20:10,
    11;33:12,15,22;34:2;
    41:20;49:2,12,21;51:4;
    54:23;55:9,11,17;56:3,
    12,24;57:7;60:5,13,14;
    61:4,17,19,24;62:11;
    66:3
**possibilities (1)**
    55:14
**possibility (4)**
    54:3;149:3;151:20;
    184:23
**possible (10)**
    21:16;34:25;46:19;
    55:8,17;150:16,21;
    157:9,18;180:6
**post-2009 (1)**
    192:17
**post-filing (2)**
    191:21;192:5
**post-insolvency (3)**
    159:24;160:16,24

**post-petition (5)**
    192:6;193:13,21;
    194:17;203:4
**potential (5)**
    41:16;50:3;165:18;
    167:13;171:7
**preamble (1)**
    162:9
**preceded (1)**
    200:12
**precise (11)**
    23:17;37:6;39:15;
    51:2;62:5;78:12;79:8;
    104:19;120:16;134:19;
    153:25
**precisely (2)**
    44:15;144:19
**precluded (1)**
    141:21
**precluding (2)**
    87:3,4
**predicate (2)**
    54:6,6
**predictability (2)**
    58:22;59:21
**pre-insolvency (2)**
    159:24;160:16,24
**preparation (7)**
    24:25;25:21;181:12,
    19;198:21;199:8;
    204:24
**prepare (1)**
    25:11
**prepared (14)**
    28:10,14;42:17,23;
    69:19;97:3;113:6;
    128:23;131:3;152:13,
    15;154:3,22;155:3
**preparing (1)**
    195:20
**prescription (1)**
    62:21
**presence (10)**
    19:19;20:7;30:14,20;
    37:17,22;38:2;39:4;
    69:13;120:14
**present (4)**
    15:21;108:5,6;
    178:19
**presented (1)**
    180:25
**presenting (1)**
    142:4
**preserving (1)**
    58:11
**presume (1)**
    127:10
**presuming (1)**
    51:9
**presumption (1)**
    50:9
**pretty (1)**
    158:17

**previous (2)**
101:6;179:15
**previously (4)**
53:24;65:13;112:21;
127:14
**price (42)**
32:9,11,11,17,18;
38:11,12;77:25;78:2,5,
6;83:4,5,7;108:9,11;
118:23;119:5,10;
120:16;121:12;122:12;
131:8,14,17;134:14,21;
136:12,12;138:8,15,18;
139:14,15;144:25,25;
147:19;148:24;151:3;
193:17;195:7,8
**priced (7)**
77:9;88:11;143:17,
20;144:11;145:5,10
**prices (68)**
18:19,19;77:4,14,18,
19,20,21,21;79:5,24,
25;80:10,20;82:15,16,
19;85:9,9,12;104:19;
118:20;119:3,8;120:5,
25;121:25;122:9,25;
124:2,7;125:2,6;130:4;
132:11;134:17,23,24;
138:25;139:2,4,7,10,
24;140:3;141:7,23;
142:4,11,23;144:13,14;
145:21;147:24;148:6;
149:8,24;150:6,7,24;
160:18,20;184:21;
192:9,10;193:16;
194:20,23
**pricing (47)**
46:16;80:15;81:9;
82:25;84:25;85:2;
107:10;118:5,6,11;
120:23;121:19;122:8,
16,19;127:9,12,12,17,
21;128:11,21,22;
129:17,21;130:6;
131:2,11;137:19;
142:17;143:11,13,23;
144:6,9;151:12;
154:11;175:4,10,13,14,
17;179:9,10;180:12;
185:13;195:15
**primarily (1)**
17:3
**primary (9)**
18:8;29:9,9,12,18,
21;30:6;32:24;43:12
**principal (2)**
45:8;165:22
**principles (10)**
21:4,6,12,16,25;
28:21;32:4;33:7;40:3,5
**prior (22)**
51:7;72:10;95:8;
105:10;120:17,21;

121:12,20;122:4;
149:14;150:8,19,24;
151:12;155:16,22;
157:10,17;164:8;
181:6;196:16;197:18
**priority (4)**
35:17;67:8;71:22;
197:17
**priors (2)**
174:13,16
**privilege (1)**
69:22
**privileged (2)**
70:3;129:10
**pro (13)**
40:12,13;41:5,7,14;
47:16;48:12;53:4;
141:15;161:14;163:5,
24;164:3
**probably (5)**
20:2;22:16;152:22,
23;205:21
**problem (1)**
59:4
**proceed (6)**
66:25;94:4;106:24;
152:8;165:2;204:4
**proceeding (5)**
59:10,11,22;156:15;
205:15
**proceedings (1)**
59:18
**proceeds (1)**
40:10
**process (2)**
59:9;65:22
**procured (1)**
128:15
**produce (2)**
69:18;153:14
**produced (2)**
112:4;179:16
**producing (1)**
152:12
**product (1)**
154:22
**production (1)**
204:11
**Professor (40)**
14:11;15:11,17,19,
20,23;17:20,21;42:24;
57:5;61:7;67:3;82:10;
86:16;94:6;97:11;
107:3;113:21;124:22;
151:9;154:4,5;155:21;
158:3,13;172:22;
173:11,17;179:22;
183:11;195:25;198:17;
204:16;205:6,11,18;
206:20;207:11,22;
208:9
**professorship (1)**
124:23

**Profits (1)**
166:18
**prohibit (1)**
161:6
**projections (2)**
178:17,19
**projects (2)**
16:18,19
**promote (1)**
53:18
**promoted (2)**
20:5,9
**proper (2)**
164:7;183:18
**property (8)**
59:14;156:17;157:5,
12,19;177:16,20;179:2
**proportional (1)**
141:17
**proportionally (1)**
143:18
**propose (1)**
50:19
**proposed (9)**
48:18;88:8;96:7,12;
97:5,22;98:3,18;
162:25
**proposing (2)**
63:16;141:25
**proposition (10)**
40:22;63:19,23;
66:12;71:20;182:2,4;
190:22,23,25
**prospective (2)**
114:25;115:3
**prospects (2)**
103:19,24
**prospectus (2)**
117:4;166:10
**prospectuses (2)**
27:23;111:22
**protect (1)**
57:2
**protecting (2)**
48:23;58:10
**protection (4)**
58:7,19;113:16,25
**protections (3)**
109:11;114:18;
116:14
**protects (1)**
58:5
**protocol (5)**
128:2;129:8,12;
152:17;155:20
**provide (17)**
16:16;50:8;51:3;
57:19;70:15;110:24;
113:16,25;114:17;
115:9,10;116:14,14;
131:22;132:3;168:22;
191:8
**provided (13)**

107:5;109:5,11;
113:12;129:7;137:17;
153:22;154:8,17;
158:18;174:18;176:5;
203:11
**providing (2)**
38:19;110:19
**provision (3)**
110:7;182:24;200:23
**provisions (9)**
47:23,25;48:16;
50:24;68:13;149:19,
20;154:19,20
**proxies (1)**
167:25
**proxy (4)**
123:10,15,19;141:7
**Public (3)**
14:6;80:18;209:22
**publicly (7)**
80:18;129:21;130:5;
157:10,16;203:8,8
**published (1)**
204:23
**pull (2)**
87:22;165:11
**purchase (8)**
107:13;108:9,10,11,
12;175:21;184:10;
202:25
**purchased (14)**
166:23;167:20;
168:19;170:23;171:2;
174:23;175:19;189:12,
20;190:2,5,19;191:3;
200:17
**purchasing (6)**
107:25;166:9;167:5;
168:8;169:5;170:17
**Purdue (3)**
15:12,16;16:7
**purported (1)**
152:15
**purports (1)**
87:10
**purpose (7)**
27:5;61:9;91:15;
133:10;142:2,5,7
**purposes (2)**
187:8;196:20
**purview (1)**
178:7
**put (8)**
20:2;36:17;50:10;
121:25;150:14,15;
174:2;204:6
**putting (3)**
63:17,22;197:19

## Q

**qualify (1)**
21:14

**quantify (1)**
46:21
**quantitate (1)**
19:2
**quantitative (3)**
19:3;46:5,20
**Quantum (1)**
188:10
**quarters (2)**
97:16;98:10
**quite (9)**
21:6;31:25;35:9;
38:4;48:15;55:2;
178:20,22;184:21
**quote (2)**
70:17;119:21
**quoted (2)**
122:25;123:2
**quotes (3)**
60:8,12;61:18
**quoting (1)**
29:25
**QURESHI (2)**
4:18;13:23

## R

**range (2)**
18:21;22:15
**rata (13)**
40:12,13;41:5,8,14;
47:16;48:12;53:4;
141:15;161:14;163:5,
24;164:4
**rate (21)**
73:16,22;74:3,6,8,11,
12;78:16;81:23;83:20,
22;85:5;99:10;119:25;
123:9,15,20;124:5;
125:25;126:2;151:2
**rated (13)**
74:25;75:4;76:15,17,
19,20;77:13;93:15;
94:19;103:25;113:18;
114:3,19
**rates (19)**
39:10;48:21,21;72:2,
21;73:13;74:11;85:21;
86:11;87:6;90:19;
126:3,10,12;148:12;
149:18,23;183:25;
186:4
**rather (5)**
30:3,9;35:20;102:13;
161:17
**rating (76)**
28:9;35:22;36:4,6,8,
12,13,19;70:9,11,12,
18,20,22,23;71:10,14,
21,24;72:5,9,18;73:14,
21;74:5;75:2,6,14,20;
76:9,19,20;77:12;
85:10,19,20,24;86:8,

10,11,12,23;87:2,11,
14;88:19;89:8,9,19;
90:16;93:14;94:6;95:3,
21,22;96:13;97:9,15,
18;98:20;99:3,20;
100:6,13,16;102:10,17,
22;104:5,5,21;105:20;
154:9;186:6,12;193:4

**ratings (8)**
75:8,13,19;87:6;
88:7;94:12;113:20;
114:21

**ratios (1)**
99:6

**rattling (1)**
177:3

**RBC (1)**
13:9

**Re (1)**
12:7

**read (27)**
60:9,12;61:2,12;
76:2;86:3,15;104:10,
11;114:5;141:18,20;
148:8;165:13;166:2;
182:24;183:3;184:17;
192:19;201:2,4,5,9;
202:15,17,19;209:8

**readily (3)**
171:11;174:20;
175:18

**reading (10)**
67:19;76:4;86:6,14;
95:5;104:13;115:18;
116:8;183:2;201:8

**reads (4)**
57:18;103:16;
113:13;183:5

**ready (1)**
198:3

**real (1)**
177:16

**realization (5)**
158:23;159:2,5,6,7

**realizing (2)**
158:24;159:2

**really (8)**
26:6;36:18;122:17;
165:7;182:3;195:23;
205:20;207:16

**reason (10)**
69:12;98:15;101:13;
116:20,24;181:20;
186:18;195:17;202:6,
10

**reasonable (3)**
141:4;142:14;203:9

**reasons (2)**
59:24;119:20

**rebuttal (2)**
176:5;177:6

**rebutting (1)**
176:8

**recall (35)**
21:5,7,22;25:15;
71:12;73:3;95:7,24,25;
96:4;101:21;103:3;
104:9,14,16;105:16;
109:17,21;110:3,9,11,
13,15,17,17,22;111:4;
132:13,18;181:11;
206:20;207:2,3,5,11

**receive (3)**
40:14;141:15,17

**received (1)**
15:18

**recent (1)**
197:24

**recently (1)**
14:15

**recess (1)**
106:16

**recognition (3)**
59:22,23;184:24

**recognize (1)**
154:23

**recognized (3)**
71:24;72:19;90:16

**recollection (9)**
73:23;74:2,7,23;
75:3;181:11;193:9;
207:14,18

**recommendation (4)**
62:22,25;63:12;64:2

**record (31)**
12:4;60:22;66:19,20,
25;93:24,25;94:4;
106:15,23;128:21;
152:2,3,7,11;164:19,
22,23;165:2,14;
199:11;203:17,22,23;
204:3,6,9,15;208:14;
209:11,12

**recover (1)**
118:14

**recoveries (3)**
30:10;139:17;151:14

**recovery (44)**
72:2,21;73:13,15,22,
23;74:3,6,8,10,11;
76:14;85:21;86:11;
87:6;90:19;92:6,8;
99:5,10,11;103:19,24;
104:3,5;119:25;
139:18,24;140:2,4,5,
12,17,20,24;141:2,8;
147:7,10;148:2,7;
149:3;150:9;151:2

**reduce (2)**
126:22,24

**Reed (1)**
13:1

**refer (19)**
45:4,4,15;46:13;
70:16;98:22;99:5,25;
107:14;112:15;118:18,

19;119:2;128:8;
133:24;182:13;193:3;
195:4;206:16

**reference (11)**
91:3,5;117:13;175:5,
7;192:2,24;195:10;
206:9,13,23

**referred (10)**
18:13;71:11;89:12;
102:15;107:20;130:11;
155:5;195:5,5;208:5

**referring (23)**
42:8;45:16;46:3,8;
63:9;73:17;88:3;
113:10;144:23;156:22;
159:25;160:4,25;
161:22;162:9,15;
168:12,23;177:19;
184:12;185:16;195:4;
206:17

**refers (2)**
60:6;162:10

**reflect (2)**
127:9;159:12

**reflected (2)**
144:5,9

**reflecting (2)**
69:22;86:17

**reflection (1)**
115:22

**reflects (6)**
59:6;77:10;122:15,
18,20;139:16

**reframed (1)**
29:18

**refresh (1)**
207:18

**regard (2)**
40:16;178:24

**regarding (5)**
24:25;49:19;153:10,
15;187:7

**regulatory (1)**
161:5

**reject (1)**
182:4

**rejected (4)**
20:6;66:5,13;181:25

**rejects (1)**
66:6

**relate (3)**
20:23;35:13;99:21

**related (10)**
21:19;27:13;42:25;
43:14;133:15;166:13;
172:21;179:3,4;206:5

**relates (1)**
41:23

**relation (1)**
194:22

**relationship (3)**
16:12;33:2;61:6

**relative (6)**

126:7,8,24;137:18;
138:10;147:19

**released (1)**
132:15

**relevance (2)**
160:10;169:16

**relevant (8)**
71:6,7;121:19;122:3;
159:8;171:6;176:2;
184:8

**reliance (1)**
152:16

**relied (8)**
28:13;73:19;117:11,
20;122:9;185:4;
193:14;199:4

**remains (1)**
49:19

**remember (2)**
133:5;204:19

**render (1)**
55:5

**reorganization (1)**
67:10

**repayment (1)**
71:22

**repeat (1)**
56:18

**repeats (1)**
44:23

**replacement (1)**
14:16

**report (177)**
15:2;16:25;17:23;
21:23;23:15;24:25;
25:12,21;28:18,21;
29:7,10;30:6;31:15,16,
21;32:23;33:6;34:5,24;
35:9,21;37:24;40:9;
41:9;45:18;46:10,14;
47:5,9,15;48:4;50:6,
14;55:15,20;62:10,15;
63:10;64:5,7,25;65:6,
21;67:3;71:11,15,19;
72:11,11,13,16;73:7,8,
14,17,21,24,25;74:4,
12,20,22;75:25;86:3,6,
14,15,20;87:14;88:9,
19;89:9;90:15;94:6;
95:6,7,8,10,13,22,23;
96:2;99:6;100:16;
101:2,6,9,16,17,20,22,
25;102:4,10,22,23;
103:2,9;104:6,7,10,15;
105:9,11,12,15,17;
106:3,4;107:21,22;
117:9,11,15;118:3,4;
128:2,9,11,17;139:2,9,
14,25;140:16;141:6,13,
13,16,18,20;143:15;
147:23;148:13;155:17;
158:18;162:10,16;
165:11;172:22;173:2;

176:5,15,18,19,23;
180:21;181:2,6,7,12,
15,16,19,22,22;182:9,
11;185:2,4;186:19;
187:8;191:16,19;
192:2,3,16;194:12,18,
25;195:2,20;198:20,
22;199:8;204:25

**reported (1)**
184:22

**reporter (4)**
12:13;14:2;95:16;
100:21

**Reporting (2)**
12:14,16

**reports (33)**
27:21,23;28:10;
69:19;70:10,13,16,18,
20,22,24;71:7,10,10,
14;72:9,25;73:4,4,10,
12;91:4,6;101:22,24;
104:9;132:6;154:9;
176:15,22,24;177:6;
192:19

**represent (7)**
12:18;32:12;53:5;
77:6;165:6;189:22;
205:14

**representation (3)**
33:4;48:8;118:8

**representative (3)**
117:4;153:22;190:12

**represented (4)**
26:17;117:3;130:20;
189:23

**representing (2)**
13:4,24

**represents (1)**
179:24

**request (5)**
69:24;154:2,18;
155:14;179:14

**requested (2)**
17:4,5

**requesting (1)**
155:9

**required (3)**
128:3;153:14;201:22

**requirements (1)**
59:23

**rescue (2)**
58:9,16

**research (10)**
16:7;18:9,15;19:25;
20:3;24:9;34:22;47:8;
87:12;182:10

**researchers (2)**
163:13,16

**reservation (1)**
204:9,14

**residual (1)**
195:6

**resolved (1)**

179:19
**respect (55)**
18:15;22:17;25:7;
29:23;35:24;40:19;
47:4;49:18,25;55:6;
62:17;63:3,6,25;65:10,
12,18,20;66:9;67:22;
69:17;70:5;82:11;
86:23;87:4,12;91:11;
106:3;114:25;119:15;
125:23;127:10;132:22;
137:20;139:12;147:6;
152:11;161:13;163:14,
15;178:16;183:14;
193:21;194:20,21;
196:8,9;197:17;
201:22;202:5,14,16;
204:10,24;207:3
**respecting (1)**
161:18
**respond (1)**
141:12
**responding (3)**
55:14;111:18;176:12
**response (3)**
29:10;40:8;49:6
**restate (2)**
20:2;204:15
**restated (1)**
48:20
**resubmitting (1)**
95:8
**result (7)**
50:22,25;52:24;
54:20;69:5;153:5;
169:9
**return (8)**
83:21,23;85:5;123:9,
16,20;124:5;126:2
**revenue (5)**
167:4,5;168:9,11;
169:9
**revenues (5)**
71:25;72:19;90:17;
166:16;169:13
**review (44)**
27:16;28:2,9;70:12;
71:9;72:24;95:6,9;
101:11,16,24;102:22,
25;104:6;105:11,14;
107:6;109:19;110:6,
22;111:2,19,20;
112:12;115:12;116:22;
117:14,23;132:13;
154:16;155:19;157:8,
16;166:9,12;167:4,12;
173:3;179:18;180:16;
181:6;182:21;198:20,
22
**reviewed (39)**
16:23;17:5;27:9,11,
12,19;28:4,16;69:18;
71:2,13;72:9,16;73:10;

96:3;104:8,14;107:8;
112:14;113:2,2,8;
117:9;127:14;156:20;
174:24;175:20;176:14,
18,19,22,22;177:2;
181:15;189:3,8;
196:18;199:4;204:22
**reviewing (7)**
73:4;95:7;102:4;
104:10;105:16;167:21;
181:11
**Richard (3)**
12:22;13:8;179:22
**right (40)**
15:6;34:24;44:24;
49:16,25;53:6,22;54:8,
11,22;63:8;79:9,20;
80:17;98:11,12,15;
105:25;106:6;109:12;
122:13,15;128:19;
132:7;133:21;136:6;
137:4;145:24;148:4;
149:5;155:2;160:22;
163:9;164:12;165:12;
167:23;168:10,19;
171:5;178:20
**right-hand (2)**
101:4;102:11
**rightly (1)**
68:5
**rights (9)**
168:18;170:6,19,25;
171:14;174:19,20;
178:23;208:4
**risk (29)**
53:25;107:14;
108:17,24;123:9,15,20;
124:5;126:7,23;
138:10;139:6,9,12,19,
24;140:2,7,12,13,16;
141:3,7;147:15,16;
165:15;199:19,22,23
**riskier (1)**
125:8
**riskiness (4)**
137:12,18;138:6,20
**risks (2)**
123:7;124:4
**risky (6)**
124:9,10;125:9;
126:17,18;135:8
**ROLAND (1)**
6:3
**role (3)**
23:4;30:24;31:2
**ROSENBERG (4)**
6:3,7;13:6,6
**ROTHSTEIN (1)**
6:3
**row (10)**
90:2;96:17,18;98:5;
100:10;133:14;135:12,
14,25;206:8

**rows (4)**
43:8;133:12,19;
136:8
**RPP (1)**
195:22
**RR4 (1)**
104:5
**rule (1)**
151:20
**rule' (1)**
59:16
**ruled (1)**
141:21
**ruling (1)**
189:6
**run (3)**
43:17;115:14;187:3
**running (1)**
131:24

## S

**S&P (7)**
69:8,12;70:16;131:9,
21;181:22;192:3
**Sachs (1)**
24:11
**sale (8)**
193:21,25;194:6;
195:2,3,11,18,22
**sales (2)**
195:15,22
**same (41)**
13:9;40:14,14;58:12;
59:6;74:25;76:9,13,15,
18,20,21;77:13;79:4;
81:22,22,23,24;82:15,
17;93:15;101:13;
115:25;116:15;125:24;
126:3,10,12;129:4;
134:14;137:10;141:17;
143:18;150:21;161:17;
162:25;163:23;164:12;
186:6;192:11;204:9
**sat (2)**
23:21;24:16
**satisfied (1)**
84:5
**satisfy (1)**
45:18
**saying (10)**
38:17;52:4;53:3;
54:9;57:6;70:3;82:16,
17;110:14;113:10
**scheme (3)**
175:4,10,17
**scholar (1)**
16:6
**School (3)**
15:17;17:15,22
**scope (2)**
158:17;173:16
**screen (1)**

127:11
**se (1)**
22:24
**search (1)**
71:3
**searched (1)**
71:5
**second (20)**
53:13;57:16;77:19,
20,21;87:13,16,18;
90:2;94:14;103:11,12;
133:16;135:11,24;
164:19;182:25;183:4,
4;206:8
**Section (3)**
59:23;153:5;182:14
**sections (1)**
182:22
**secured (1)**
32:17
**securities (16)**
36:23,25;37:2,7,12,
12;77:4;79:7;80:3,11,
21;83:12;113:17;
114:2,19;123:3
**security (5)**
35:17;36:20;68:16;
126:8,9
**seeing (2)**
103:3;182:17
**seem (4)**
32:25;47:17;148:25;
203:9
**seemed (2)**
49:11;149:7
**seizes (1)**
59:16
**selected (1)**
195:17
**sell (4)**
77:15;131:14,16;
202:25
**selling (5)**
79:16,17;125:23;
137:2,3
**senior (27)**
32:8,8,12;35:10,12,
16;36:14,17;38:10,15,
21,23;39:3,12,18,23;
53:11;74:21;88:9;
89:12,24;90:3;96:8,13;
97:22;100:8;206:10
**seniorities (1)**
40:16
**seniority (4)**
36:14;40:23;47:24;
50:8
**sense (1)**
22:18
**sentence (4)**
28:20;182:25;186:4;
201:25
**sentences (1)**

68:6
**separate (7)**
41:5;123:8;124:4;
196:13;197:21,22;
208:2
**separately (1)**
197:11
**September (4)**
45:6;89:15;100:10;
133:20
**series (15)**
75:14,20;91:4,5;
94:13,22;97:8;99:13;
105:19;121:25;125:20;
127:8;133:17;193:19;
204:17
**serious (1)**
52:13
**serve (1)**
165:24
**served (1)**
16:11
**Service (11)**
95:21;165:17;
166:24;167:22;169:14;
170:4,5,7,12;173:4,13
**Services (1)**
87:11
**SESSION (1)**
106:18
**sessions (2)**
22:14,15
**set (14)**
26:5;29:7;49:23;
50:2;56:20;62:19;
63:24;66:10;67:5;
101:10;118:24,25;
126:13;129:12
**several (6)**
29:7;61:12;107:20;
174:11;181:15;189:25
**Shakra (3)**
12:20;96:19,24
**shall (2)**
153:8,13
**share (2)**
163:4;204:13
**shell (1)**
44:11
**short (1)**
180:6
**shorten (1)**
106:9
**shorthand (2)**
43:19;179:25
**shortly (1)**
206:21
**shots (1)**
127:11
**show (6)**
42:16;55:21;94:5;
103:5;182:8;198:10
**showing (3)**

Case 09-10138-MFW   Doc 17958-27   Filed 02/24/17   Page 73 of 77

IN RE: NORTEL NETWORKS INC., et al.          HIGHLY CONFIDENTIAL                    JOHN MCCONNELL
                                                                                       April 4, 2014

87:10;102:9;112:2
**shows (1)**
    119:5
**side (1)**
    43:10
**signatories (1)**
    172:17
**signatory (1)**
    172:15
**Signed (1)**
    209:18
**significance (2)**
    91:17;132:12
**Significant (7)**
    31:2;104:22;111:10,
    15;113:15,24;114:16
**similar (7)**
    120:4;123:4;126:5;
    149:17,17,21;154:12
**Similarly (15)**
    45:9;49:25;80:2,21,
    23;89:18;100:5;
    108:23;110:17;124:7;
    133:17;137:8;138:17;
    139:25;164:12
**simple (2)**
    81:5;82:23
**simply (5)**
    34:5,25;61:10;63:4;
    201:2
**single (10)**
    32:15,20;37:21;59:9,
    11;118:15;119:24;
    197:15;202:18,19
**sit (5)**
    72:25;109:19;
    110:12;151:17;161:11
**sitting (3)**
    110:9;183:11;207:22
**situation (6)**
    45:3;53:9,24;164:13;
    169:21;183:23
**six (1)**
    119:3
**skim (2)**
    75:25;118:3
**slightly (1)**
    15:14
**so-called (1)**
    59:15
**sold (1)**
    24:19
**sole (1)**
    169:25
**Solus (1)**
    188:12
**solution (2)**
    51:12,13
**somebody (1)**
    205:7
**somehow (1)**
    54:6
**someone (2)**

78:3;151:11
**sometime (3)**
    133:6;155:23;178:5
**SORKIN (165)**
    4:17;13:19,19;16:5,
    22;19:23;20:12;25:2;
    29:2,6;30:17,21;31:9,
    23;34:11;35:4;38:6;
    51:6,23;54:4,25;60:18;
    62:2,13;69:20;70:2;
    71:8,17;72:6;75:9;
    76:10;78:8;81:18;82:6;
    83:14;84:19;85:13;
    88:3;90:9,23;92:10,18;
    93:9;96:15,22;97:2;
    104:25;106:2;107:16;
    109:15;111:11,16;
    114:4;115:7,11,20,25;
    116:9,17,23;117:24;
    119:13;122:5;123:11;
    125:10;127:2,23;
    128:16,24;129:4,11;
    130:10,19,25;131:5,13,
    24;134:2;136:22;
    137:13,21;138:12,22;
    141:9;143:3,6,21;
    146:12;147:8,12;
    150:3;151:16;152:9,
    18,21,25;153:7,16;
    154:15;155:6,10,18;
    156:10,19;157:13,20;
    158:16;159:10,17;
    160:12;161:20;162:7;
    163:6;164:5,16;167:8;
    169:4,7,10,22;170:8,
    20;171:3,15;172:3,16,
    20;173:10;174:3,8,25;
    175:6,11,23;176:10;
    177:9;179:6;183:15;
    184:11;185:7,22;
    186:11;188:23;189:14;
    190:7,21;191:4,23;
    192:8,11;193:15,24;
    194:14,19;196:22;
    197:2;199:20;200:4,
    22;202:2,9;203:2;
    204:5,21;205:2
**sorry (41)**
    23:20;36:24;39:14,
    21;41:21;42:5;60:8;
    67:19;74:7;83:5;84:14,
    15;86:21;88:13,16;
    96:15;98:4;101:7;
    102:20;103:12;107:21;
    112:25;126:12;129:19;
    130:10;132:23;135:18,
    19,24;144:13;145:22;
    147:20;161:23;162:2;
    174:4,15;193:10;
    194:15;200:5;205:20,
    22
**sort (1)**
    197:8

**source (8)**
    127:25;128:8;131:5,
    7,13,15,20;165:24
**sources (2)**
    131:11;132:3
**sourcing (2)**
    127:16,21
**speak (4)**
    105:3;152:10;
    187:14;189:3
**speaking (1)**
    70:3
**speaks (2)**
    191:20;200:25
**specialization (1)**
    22:22
**specific (22)**
    22:23;27:15;99:22;
    104:17;105:17;111:3;
    126:19,21;129:12;
    132:18;133:4;139:4;
    167:2;168:20;170:14,
    16;171:5;173:12;
    193:8,11;207:2,14
**specifically (21)**
    21:8,23;24:9;27:6;
    73:18;101:21;104:9,
    16;107:11;110:11;
    119:16;129:16;154:20;
    169:19;177:22;178:3;
    185:23;189:4;190:9,
    10;206:23
**specifics (1)**
    45:11
**speculate (1)**
    50:6
**spell (1)**
    77:8
**spirit (1)**
    14:16
**spoke (2)**
    190:17;204:8
**spoken (3)**
    187:11;190:11,14
**spread (34)**
    79:14,21;81:15,17;
    82:3,4;83:11,13;84:13,
    16,17;85:4;124:8,10,
    14,17,19;125:3,8,9,12,
    15;126:14,15,16,16,18,
    24;135:4,8,9,25;
    136:16,20
**spreads (30)**
    77:23;79:6,25;80:10,
    13,20;82:24;83:2,8;
    84:11;85:3;123:2;
    124:3,14,15;129:18,22;
    130:5;134:16;135:10,
    17;136:3,19;137:6,9,
    12,20,25;138:4,9
**ss (1)**
    209:4
**stable (1)**

93:17
**staff (1)**
    154:23
**stand (4)**
    158:6;185:4,11,12
**Standard (5)**
    73:24;75:4;185:5;
    192:25;193:2
**stands (1)**
    67:7
**start (3)**
    42:14;142:8;162:2
**started (1)**
    168:21
**starting (1)**
    153:3
**state (4)**
    12:18;161:7;209:3,
    22
**stated (3)**
    61:15;130:5;186:10
**statement (16)**
    38:9;42:12;63:10;
    73:5,9;111:7;113:22;
    114:8,10,25;115:3,4,9;
    185:13,15,19
**statements (6)**
    27:20;35:8,14;70:10;
    116:7;156:21
**States (4)**
    55:24;57:9,23;
    123:21
**States' (1)**
    125:5
**stating (1)**
    34:3
**statistic (1)**
    102:21
**stay (4)**
    77:18,20,21;162:17
**STEEN (2)**
    6:12;12:10
**still (3)**
    15:16,17;197:17
**straight (1)**
    43:22
**Strategies (1)**
    188:4
**STRAUSS (2)**
    4:12;13:20
**Street (2)**
    6:5;188:6
**strength (1)**
    120:9
**strike (3)**
    168:6,16;170:15
**strong (2)**
    141:24;142:20
**structural (5)**
    107:14;108:17,24;
    182:15,22
**structurally (4)**
    35:23;36:5;69:9,13

**structure (5)**
    35:15;51:10;81:24;
    90:10;93:11
**structured (2)**
    50:8;51:9
**studied (1)**
    196:12
**study (7)**
    18:23;21:24;55:17,
    19;120:25;159:21;
    197:25
**subject (3)**
    132:4;154:19;176:4
**subjects (1)**
    16:8
**submitted (6)**
    29:10;95:10,23;96:2;
    192:17;202:20
**submitting (1)**
    181:16
**subordinated (2)**
    69:9,13
**subordination (2)**
    68:13,17
**subscribed (1)**
    209:18
**subsequent (9)**
    48:23,24;72:12,16;
    73:3;101:19;181:12,
    16;204:11
**subsequently (1)**
    73:11
**subset (1)**
    37:11
**subsidiary (4)**
    103:17,23;167:3;
    197:9
**subspecialization (1)**
    22:22
**substantial (4)**
    91:17;159:6;163:12,
    16
**substantially (2)**
    118:22;119:8
**substantive (11)**
    196:3,7,19,25;197:5,
    14,18;199:16;201:3,18,
    19
**substantively (2)**
    200:13;201:21
**sufficiently (1)**
    103:25
**summaries (8)**
    27:21;28:10,14;
    152:13;154:7,8,9,10
**summarizations (2)**
    28:7;113:11
**summarized (2)**
    17:6;28:6
**summarizing (1)**
    97:3
**summary (4)**
    113:5;130:12,21;

131:2
**superior (1)**
103:19
**support (7)**
16:17;24:10;142:18,
19,20;207:24;208:3
**supported (4)**
142:11,13;143:4,11
**suppose (1)**
139:20;161:5;197:8
**sure (41)**
20:16;21:6;23:14;
31:10,25;38:4,7;42:6;
43:4;44:6;54:5;62:14;
86:5;88:13;98:6;
104:12;106:10;109:16;
112:17;116:4;124:20;
137:22;151:18;157:2;
160:5;162:14;164:6;
165:14;166:7;168:21;
170:9,22;172:24;
180:4;184:17;186:22;
187:4;198:24;200:5,8;
203:3
**surgery (1)**
14:16
**surprise (3)**
80:8;164:10,14
**suspect (1)**
22:16
**swear (1)**
14:2
**sweep (1)**
27:25
**switching (1)**
157:24
**sworn (1)**
14:5
**synonymously (1)**
111:23
**system (2)**
87:19;183:5

**T**

**Tabatabai (2)**
12:25,25
**tables (2)**
127:8;130:4
**talk (12)**
35:15;41:3,4;45:21;
47:5;48:3,14;62:15;
85:19;87:5;107:4;
142:6
**talked (3)**
68:18;94:24;95:2
**talking (15)**
35:17;42:12,22;43:2;
45:21,24,24;96:11,17;
124:16;156:23;157:24;
172:25;191:16;199:15
**tape (8)**
12:3;66:15,17,22;

106:20;152:4;203:24;
208:13
**taught (2)**
16:7;196:11
**tautologic (2)**
51:17,20
**tautology (2)**
84:21,23
**teach (1)**
16:6
**teaching (3)**
191:16;196:9,13
**technical (1)**
161:8
**Technically (2)**
183:21;185:17
**Technology (1)**
163:11
**telling (4)**
33:24;64:5;77:14;
125:5
**ten (6)**
61:13;79:10,13;
145:4;146:24,25
**Tenor (1)**
188:15
**ten-year (3)**
78:19;81:3,4
**term (12)**
21:6,10,15;37:4;
67:14;68:12;108:18;
111:23;123:4;144:20;
146:24;162:21
**termed (3)**
80:2,21,23
**terms (29)**
27:10,12;49:14;51:2;
53:12,15,18;54:18,19;
59:4;76:14;77:22;78:2;
79:6;81:5,8;83:2;92:8;
107:12;124:2,14;
125:2,7;127:16;
129:22;131:13;157:23,
25;169:2
**territorialism (1)**
59:12
**test (3)**
50:21;62:6,9
**testified (9)**
14:6;148:14;151:7;
173:15;174:9;181:14;
191:9;194:16;202:4
**testify (2)**
148:15;174:6
**testifying (2)**
16:8,9
**testimony (8)**
91:15;155:5;173:22;
174:5;178:24;180:4;
209:8,11
**testing (1)**
147:9
**theory (3)**

41:10,10;81:13
**thereby (1)**
58:10
**therefore (5)**
63:22;66:11;137:5;
186:2,3
**thesis (4)**
84:12;142:8,11,12
**thinking (3)**
49:13;178:7;191:17
**Third (3)**
55:25;57:9;97:14;
98:4;133:14
**though (3)**
51:17;186:6,14
**thought (10)**
16:24;27:13;55:4,13;
83:7;139:21;183:25;
185:25;194:15;195:19
**thoughts (1)**
172:9
**thousand (1)**
122:22
**three (8)**
43:16;97:16;98:10;
106:20;133:12;135:13;
136:9,11
**throughout (2)**
30:6;136:24
**thus (1)**
154:7
**times (2)**
107:20;127:8
**tiny (1)**
15:22
**title (2)**
15:13,18
**today (7)**
13:24;14:13;110:10,
12;125:21;198:15;
207:22
**today's (1)**
208:11
**together (5)**
43:5;79:21;88:2;
153:6;197:20
**told (4)**
65:13;90:6;104:18;
156:24
**took (1)**
184:23
**top (4)**
100:25;102:11;
165:12;182:14
**topic (2)**
196:11;207:19
**topics (2)**
22:15,16
**Toronto (1)**
6:6
**touched (1)**
21:21
**toward (1)**

34:23
**trade (11)**
18:12;58:2;119:8;
146:10,11;147:3,4,5,
11,18,24
**traded (1)**
120:4
**trader (2)**
23:21;80:14
**traders (4)**
24:13,15;80:9;124:3
**trades (3)**
145:23;146:6,7
**trading (35)**
23:9,11,18,19,22;
24:10,15;130:4;
131:17;134:14,17,21;
136:11;138:8,15,18,25;
139:2,4,7,10,14,15;
145:20;148:5;150:24;
151:3;159:22;160:15,
17,22;161:9;180:10,11,
14
**training (4)**
17:11,12,16;124:25
**transaction (1)**
159:2
**transactions (3)**
18:20;193:20;194:22
**transcript (3)**
154:16;209:8,10
**transfer (12)**
47:11;48:9;53:11;
162:13,17;175:3,9,13,
14,17;179:8,10
**transferring (1)**
59:3
**transfers (8)**
32:12,14,19;46:22,
25;49:8;164:11,15
**translate (1)**
83:7
**transnational (1)**
59:7
**trap (1)**
21:13
**treat (1)**
76:12
**treated (1)**
164:2
**treatment (3)**
41:24;67:25;161:16
**treats (1)**
59:8
**Tree (1)**
188:2
**trees (1)**
198:15
**trial (3)**
153:10,12;177:8
**tried (4)**
41:2;77:8;136:24;
141:10

**troubled (2)**
58:10,16
**true (14)**
55:4;72:5,8,15,17;
73:5,6;123:23,24;
127:4;171:16,18;
209:11,13
**truly (1)**
122:17
**Trust (3)**
13:12;205:14,23
**trustee (2)**
205:16,24
**try (8)**
19:7;15;166:21;
177:4;180:2,5;197:3,6
**trying (14)**
20:3;21:15;27:17,24;
34:18,25;36:11;38:20;
56:21;141:11;168:5,8;
173:4,20
**Tse (1)**
12:23
**turn (5)**
57:11;85:2;103:10;
107:4;194:24
**Tweed (1)**
13:14
**twice (1)**
135:6
**two (27)**
53:10;66:22;68:7;
75:10;82:17;84:10;
85:20;86:2;100:17;
119:20;125:22;126:14;
132:12,14;133:19;
135:13;146:17,17;
149:16;182:22;183:21;
184:13,19;197:20;
203:18;207:17,21
**two-sided (1)**
87:17
**Tyler (2)**
13:11;205:14
**type (4)**
27:11;151:3;158:12,
21
**types (5)**
16:16;27:16;47:23,
25;161:6

**U**

**UK (2)**
12:20;14:12
**unaware (1)**
25:17
**UNCITRAL (1)**
58:13
**unclear (3)**
53:24;54:7,16
**unconsolidated (1)**
156:5

**under (11)**
55:3;59:12;69:24;
94:18,19;99:18;
117:24;127:3;128:2;
155:13;209:9

**Understood (10)**
62:20;81:21;99:13;
132:7;170:18,24;
171:12;173:6;180:4;
181:10

**undertaken (1)**
191:11

**undertaking (5)**
17:8;23:7;52:14;
132:4;154:14

**undertakings (1)**
90:11

**unequivocally (1)**
137:7

**unfair (1)**
38:7

**unfortunately (1)**
198:16

**unfunded (1)**
163:16

**un-guaranteed (1)**
102:16

**unintended (2)**
34:9,16

**United (5)**
55:24;57:8,23;
123:21;125:5

**universalism (52)**
31:7,15,18,20;33:2,8,
19;34:7;40:3,6,21;
41:4,11,22;46:7,18;
47:3,10,19;48:12;
55:10,12,18;56:2,4,13,
24;57:8;59:7,19;60:6,
15,25;61:5,6,19,22;
62:8,12,18;64:21,23;
65:2,4,8;67:7,12,16,24;
68:15;142:22;161:13

**universalism' (2)**
28:22;32:5

**University (2)**
15:12,16

**unless (1)**
137:5

**UNSECURED (16)**
4:14;13:21;32:18;
37:13,22;38:2;68:10;
88:9;89:24;94:22,25;
96:8,13;97:23;99:25;
100:9

**up (17)**
17:17;36:24;43:24;
56:20;63:11;69:16;
73:14;89:2;94:24;
100:25;101:4;118:19;
127:19;130:14;146:14;
180:5;198:6

**updated (1)**

117:21

**upon (24)**
19:11;21:21;28:13;
30:3,9;37:24;73:19;
75:13,19;80:12;81:19;
82:7;86:17;117:11,20;
120:23;122:9;134:8;
137:12;138:3;159:12;
185:4;193:14;199:4

**upper (2)**
101:4,5

**upset (1)**
61:16

**uptake (4)**
96:20,22,24;98:3

**usage (1)**
67:14

**use (11)**
21:13,15,15;53:12;
56:2;62:7;87:19,25;
142:7;144:20;162:20

**used (6)**
21:10;24:14;36:9;
85:14;123:19;131:16

**using (3)**
37:4;111:23;141:6

**usually (1)**
43:21

## V

**vague (1)**
172:4

**vaguely (1)**
196:15

**valuation (6)**
177:12,18;178:7,16;
179:4;180:12

**value (10)**
58:8,21;122:10;
156:7,16;157:4;
178:10,19,21,22

**valuing (2)**
178:3,9

**vanilla (4)**
37:16,21;125:17,18

**variable (1)**
83:18

**variance (1)**
96:21

**variety (1)**
174:11

**various (36)**
16:8,10,16;17:17;
18:11;22:5;24:7;30:5;
37:7;43:10;75:14,20;
77:2;94:12,13;101:11;
104:8;115:17;127:8,9,
11;132:9;156:9;157:6;
158:4,7;172:6,11;
193:22;194:2,3,4,22;
202:12,20,22

**verify (1)**

132:2

**version (4)**
152:21,23,24;153:2

**versus (1)**
103:20

**vested (1)**
140:18

**VIDEOGRAPHER (16)**
12:3,15;14:1;66:16,
21;93:22;94:2;106:13,
19;151:24;152:4;
164:20,24;203:20,24;
208:10

**view (6)**
77:5,10;101:19;
141:23;181:25;200:16

**viewed (2)**
35:22;185:10

**virtually (1)**
156:15

**virtue (1)**
203:14

**vocabulary (1)**
52:12

**voice (1)**
14:14

## W

**waiting (1)**
60:19

**wants (1)**
158:5

**way (43)**
15:2;18:19;24:2,3;
31:20;45:4;47:20;
48:22;49:6,11;50:11;
51:10;52:17;54:2;57:6;
61:2;63:3;64:15;77:9;
79:4;80:5,12,14;81:19;
82:7,12;97:14,17;
105:5;111:4;125:15,
17,18;134:14,25;137:5,
11;150:6;159:13,18;
161:17;172:22;198:15

**ways (4)**
16:10;17:7;144:22;
159:22

**wealth (13)**
32:12,13,19;46:22,
25;47:10;48:9;49:8;
53:11;162:13,17;
164:11,15

**Webb (2)**
13:11;205:13

**weighed (1)**
20:10

**Weiler (2)**
15:11,19

**welcome (1)**
173:23

**Wellington (1)**
6:5

**West (2)**
6:5;197:10

**Westbrook (18)**
29:12;47:17;59:11;
60:3;61:8;62:19;63:15;
64:7,17;66:4;67:6;
142:12;143:10,24;
161:15;176:6;177:7;
192:16

**Westbrook's (14)**
29:14,23;40:8;41:9;
55:15;65:10;66:7;
67:14;118:13;119:23;
141:12;162:2,5;182:2

**Western (1)**
22:7

**whatsoever (1)**
52:15

**Whereupon (14)**
15:4;42:20;56:5;
87:8;94:9;95:18;
100:23;102:7;103:7;
105:7;111:24;127:5;
182:6;198:12

**whole (2)**
18:21;112:4

**wholesale (1)**
60:2

**whomever (1)**
191:10

**Whose (1)**
176:17

**wide (1)**
60:3

**wider (1)**
42:4

**willing (1)**
77:15

**within (9)**
18:11;30:10;92:20;
129:12;154:12;162:25;
163:24;164:13;178:6

**without (16)**
40:16;45:8;81:16;
82:18;83:6;84:14,15;
100:11;104:24;126:25;
146:10;151:6;156:2,5;
184:18;204:14

**witness (14)**
13:24;14:2;25:5;
76:4;86:6,14;104:13;
128:5,17,25;153:12,13;
183:2;201:8

**word (6)**
52:6,7,8;85:14;
142:20;186:3

**wording (1)**
59:25

**words (8)**
21:14;31:12;52:7;
62:7;74:19,22;105:3;
183:9

**work (12)**

15:24;16:15;21:3,18,
21;23:8,9,11;34:18;
88:2;154:21;195:25

**worked (2)**
23:25;42:9

**working (2)**
16:18;17:17

**world (1)**
22:21

**write (4)**
44:4,7;146:15;
165:15

**writing (7)**
21:23;23:18;34:22;
72:11,13,16;73:3

**written (1)**
35:21

**wrong (1)**
102:21

**wrote (1)**
16:25

## Y

**year (9)**
78:17,17;79:10,11,
12,12;145:4,11;146:21

**years (7)**
79:10,13;145:5;
146:3,24,25;191:18

**YECIES (2)**
4:19;13:23

**yield (23)**
78:6,10,11,13,19,23,
25;82:2;83:16,24,25;
84:6,7,10;126:6;135:4,
25;136:13,16;138:7;
144:21,22;145:20

**yields (11)**
77:23;81:20;82:8,8,
12;136:12;137:9;
144:12,17;145:13,14

**York (11)**
4:6,6,16,16;6:15,15;
12:12,12;13:12;
205:15,23

## Z

**zero (1)**
159:5

## 0

**038 (1)**
98:13

**06 (1)**
88:11

**08 (2)**
135:10,16

## 1

IN RE: NORTEL NETWORKS INC., et al.  HIGHLY CONFIDENTIAL  JOHN MCCONNELL
April 4, 2014

**1 (6)**
57:22;89:2;94:22;
96:12;97:22;153:4
**1.3 (1)**
98:10
**1.8 (1)**
99:15
**1:02 (1)**
106:21
**1:59 (1)**
151:25
**10 (13)**
78:16,17,20;79:10;
145:4,10,13,24,25;
146:2,3,4,20
**10:33 (1)**
66:17
**10:54 (1)**
66:23
**100 (1)**
146:19
**10004 (1)**
12:12
**10006 (1)**
6:15
**10020 (1)**
4:6
**10036-6745 (1)**
4:16
**105 (2)**
147:5,11
**10-K (6)**
132:15;198:18,23;
199:5;200:18,20
**11 (1)**
133:13
**11:29 (1)**
93:23
**11:41 (1)**
94:3
**11:59 (1)**
106:14
**110 (3)**
145:13;146:7,10
**12033 (1)**
15:4
**12034 (20)**
42:20;88:4,10;89:13,
25;95:2;96:7,16;97:2,
16;98:5,7;100:3,9;
130:9,11,17,21;206:2,4
**12035 (1)**
56:5
**12036 (1)**
87:8
**12037 (1)**
94:9
**12038 (2)**
95:18;97:6
**12039 (1)**
100:23
**12040 (1)**
102:7

**12041 (1)**
103:7
**12042 (1)**
105:7;180:21,25
**12043 (1)**
111:24
**12044 (3)**
127:5;130:25;148:5
**12045 (2)**
182:6,9
**12046 (2)**
198:11,12
**1221 (1)**
4:5
**12304 (1)**
88:17
**13 (1)**
133:13
**14 (7)**
103:9;119:4,4,6,18;
120:6;192:13
**15 (8)**
57:19;59:19,20;
105:10;119:19;181:2;
192:24;193:3
**150 (2)**
45:10;90:2
**1517 (1)**
59:23
**155 (1)**
6:5
**16 (6)**
87:12;88:10,19;
133:13;180:22;182:10

**2**

**2 (13)**
58:2;71:19;88:8;
89:3;90:15;94:15,24;
99:24;101:9;118:20;
153:20;199:12;200:17
**2:19 (1)**
152:6
**2:34 (1)**
164:21
**2:42 (1)**
164:25
**20 (3)**
107:21;165:10;
172:25
**20_ (1)**
209:19
**200 (3)**
45:9;100:8;145:20
**2006 (6)**
87:12;88:10,19;94:7,
16;112:10
**2007 (3)**
95:21;96:6;101:3
**2008 (19)**
94:18,21;102:12;
103:9;105:10;131:19;

132:8,11,12,14,24,25;
133:5;136:5;155:23;
180:22;181:3;182:10;
192:3
**2009 (9)**
119:4,6,18,19;120:6;
191:22;192:13;199:13;
200:17
**2010 (2)**
192:25;193:3
**2011 (6)**
94:23;112:8;190:2,6;
191:3;195:7
**2011s (2)**
88:22;100:2
**2012s (1)**
96:10
**2013 (2)**
88:22;112:8
**2013s (2)**
94:23;100:2
**2014 (16)**
12:5;66:18,24;94:3;
96:10;106:14,22;
119:5;151:25;152:6;
164:21,25;203:21;
204:2;208:12;209:10
**2016 (2)**
88:23;112:8
**2016s (2)**
94:23;100:2
**2023 (2)**
89:15;103:22
**2023s (4)**
45:6,6;94:25;100:10
**2026 (3)**
90:3;93:3;103:22
**2026s (2)**
45:10;90:25
**21 (7)**
68:5,10,24;102:11;
107:21,21;108:4
**210 (1)**
145:14
**212 (6)**
4:8,9,20,21;6:17,18
**22 (6)**
68:6,11,24;95:21;
107:21;108:4
**225-2000 (1)**
6:17
**225-2877 (1)**
6:18
**23 (1)**
133:20
**25 (2)**
200:10,24
**26 (1)**
133:23
**29 (3)**
67:2;112:11,22
**29th (1)**
88:11

**3**

**3 (5)**
58:3;117:10;119:2;
182:13;194:25
**3:30 (1)**
203:21
**3:39 (1)**
204:2
**3:44 (2)**
208:12,15
**30 (1)**
115:15
**30th (1)**
136:5
**31 (7)**
131:19;132:8,11,11;
135:9,16,20
**31st (2)**
132:24,24
**35 (1)**
191:17
**35th (1)**
6:5
**37 (1)**
105:20
**38 (1)**
97:19
**3H1 (1)**
6:6

**4**

**4 (10)**
58:7;66:18;106:14;
151:25;152:6;164:21,
25;203:21;204:2;
208:12
**4.2 (1)**
99:15
**40 (1)**
191:17
**416 (2)**
6:8,9
**450 (1)**
89:2
**4th (6)**
12:5;66:24;93:23;
94:3;106:22;209:9

**5**

**5 (6)**
58:8;78:23;79:12;
94:16;145:14;165:13
**500 (2)**
79:13,20
**53 (2)**
118:3;119:21
**54 (1)**
118:19
**55 (2)**

118:24,25
**550 (1)**
89:2
**56 (3)**
118:3,10;119:16
**57 (2)**
76:2,5
**575 (3)**
96:25;98:10,11
**58 (4)**
75:24;76:2,2,6

**6**

**6 (3)**
71:18;94:7;101:6
**6.875 (2)**
89:12;100:8
**6.875s (1)**
133:19
**610-6300 (1)**
4:8
**610-6399 (1)**
4:9
**646-4301 (1)**
6:9
**646-4304 (1)**
6:8
**66 (1)**
102:17
**67 (23)**
28:19;32:3;35:8;
46:8,11,17;47:12;49:7,
19;63:6;98:23;99:2,10,
12,14,18,21;100:6,14;
162:10,18,21,25
**68 (4)**
47:5,7;48:4;63:6
**69 (5)**
47:5,7;48:5,14;63:7
**6A (1)**
71:19
**6F (3)**
71:23;74:15;90:14

**7**

**7 (2)**
67:3;153:5
**7.875 (5)**
89:24;90:2;205:16,
24;206:9
**715 (1)**
59:12
**719 (1)**
60:4
**757 (1)**
96:23

**8**

**8 (1)**
98:11

**872-1002 (1)**
4:21
**872-7479 (1)**
4:20
**88 (2)**
43:18;45:3

### 9

**9 (1)**
101:2
**9:25 (1)**
12:5
**92-5/8 (1)**
131:18
**96 (1)**
45:10
**99058 (1)**
200:24