**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| -------------------------------------------------------------x | | **Chapter 11** |
| *In re* | : | **Case No. 09-10138 (KG)** |
| | : | **(Jointly Administered)** |
| **NORTEL NETWORKS, INC., <u>et</u> <u>al</u>.,** | : | |
| | : | Hearing Date:  February 28, 2017 at 9:00 a.m. |
| **Debtors.**[1] | : | Related ECF Nos.:  17687, 17741, 17747, 17805, 17809 |
| -------------------------------------------------------------x | | |

**MEMORANDUM OF LAW IN SUPPORT OF OBJECTION OF SOLUS**
**ALTERNATIVE ASSET MANAGEMENT LP AND POINTSTATE CAPITAL LP**
<u>TO ASSERTED FEES AND EXPENSES OF INDENTURE TRUSTEE</u>

---

[1]    The Debtors, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).

# TABLE OF CONTENTS

**Page**

I.      PRELIMINARY STATEMENT ...........................................................................1

II.     FACTUAL BACKGROUND ............................................................................10

    A.      7.875% NOTES & CROSSOVER BONDS ..............................................10

    B.      2009 – 2012: DEWEY FILES PROOF OF CLAIM .....................................11

    C.      2012 – 2017: PATTERSON ...............................................................14

        1.      COMMITTEE MEETINGS.........................................................14

        2.      ALLOCATION TRIAL ...............................................................15

        3.      PPI DISPUTE ........................................................................17

        4.      COURT FILINGS ....................................................................17

    D.      2011 – 2017: NNCC NOTEHOLDERS ENGAGE THEIR OWN COUNSEL ...................18

        1.      CONFIDENTIALITY AGREEMENT.............................................18

        2.      ESTIMATION MOTION; AMENDMENT TO SCHEDULES .................19

    E.      NNCC NOTEHOLDERS INDEPENDENTLY NEGOTIATE PLAN SETTLEMENT ..............21

    F.      NNCC NOTEHOLDERS REQUEST BILLS .................................................21

III.    ARGUMENT .............................................................................................22

    A.      TRUSTEE OWES NOTEHOLDERS FIDUCIARY DUTY OF UNDIVIDED LOYALTY .........22

    B.      COURT'S WORLDWIDE DIRECT DECISION IS DIRECTLY ON POINT AND SUPPORTS SUBSTANTIAL REDUCTION OF ASSERTED FEES .....................................24

    C.      FEES INCURRED IN CONNECTION WITH MATTERS RELATING TO CREDITORS' COMMITTEE ARE NOT REASONABLE ....................................................27

    D.      FEES INCURRED IN CONNECTION WITH ALLOCATION TRIAL ARE UNREASONABLE .........................................................................30

    E.      OTHER OBJECTIONS TO INDENTURE TRUSTEE'S FEES .............................31

    F.      INDENTURE TRUSTEE HAS NOT CARRIED ITS BURDEN OF ESTABLISHING REASONABLENESS .......................................................................33

    G.      INDENTURE TRUSTEE CANNOT CHARGE NOTEHOLDERS FOR FEES INCURRED IN LITIGATING ITS FEES ..................................................38

CONCLUSION .................................................................................................39

# TABLE OF AUTHORITIES

**Page**

## Cases

BNP Paribas Mortg. Corp. v. Bank of Am., N.A.,
    778 F. Supp. 2d 375 (S.D.N.Y. 2011) ...................................................................17

Baker Botts LLP v. ASARCO LLC,
    135 S. Ct. 2158 (2015) ..............................................................................4, 6, 33

Becker v. Bank of New York Mellon Trust Co.,
    172 F. Supp. 3d 777 (E.D. Pa. 2016) ....................................................................30

In re Boomerang Tube, Inc.,
    548 B.R. 69 (Bankr. D. Del. 2016) .......................................................................38

In re E Toys, Inc.,
    331 B.R. 176 (D. Del. 2005) ................................................................................21

Davis v. Elliot Mgmt. Corp. (In re Lehman Bros. Holdings, Inc.),
    508 B.R. 283 (S.D.N.Y. 2014) ...............................................................................9

In re Gen. Homes Corp. FMGC, Inc.,
    143 B.R. 99 (Bankr. S.D. Tex. 1992) ....................................................................21

Interfaith Cmty. Org. v. Honeywell Int'l, Inc.,
    426 F.3d 694 (3d Cir. 2005) .................................................................................20

Meinhard v. Salmon,
    164 N.E. 545 (N.Y. 1928) .......................................................................................3

Royal Park Inv. SA/NV v. HSBC Bank USA,
    109 F. Supp. 3d 587 (S.D.N.Y. 2015) ..................................................................17

In re PWS Holding Corp.,
    228 F.3d 224 (3d Cir. 2000) .................................................................................20

In re Worldwide Direct, Inc.,
    334 B.R. 112 (Bankr. D. Del. 2005) ............................................................. passim

Zurich Am. Ins. Co. v. Team Tankers, A.S.,
    811 F.3d 584 (3d Cir. 2016) .................................................................................38

Solus Alternative Asset Management LP and PointState Capital LP (collectively, the "NNCC Noteholders"), in their capacities as holders of certain fixed rate senior notes due June 15, 2026 (the "7.875% Notes") issued by Nortel Networks Capital Corporation f/k/a Northern Telecom Corporation ("NNCC") and Nortel Networks Limited f/k/a Northern Telecom Limited ("NNL"), and guaranteed by NNL, pursuant to an Indenture, dated February 15, 1996 (the "Indenture"), submit this memorandum in support of their objection[2] to the fees and expenses asserted by the Indenture Trustee[3] totaling approximately $8 million for the period from January 14, 2009 through December 31, 2016 (hereinafter, with any additional amounts asserted by the Indenture Trustee for any period, the "Asserted Fees") and, in support thereof, respectfully state as follows.

## I.    PRELIMINARY STATEMENT[4]

1.    New York law provides that the Indenture Trustee owes the NNCC Noteholders a fiduciary duty of undivided loyalty.  The legal contours of the trustee-noteholder relationship have been well defined for nearly 100 years.  As Chief Judge Cardozo presciently observed:  "[a] trustee is held to something stricter than the morals of the market place.  Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior ... the level of conduct for fiduciaries [has] been kept at a level higher than that trodden by the

---

[2]    See ECF No. 17687 (Statement Of Solus Alternative Asset Management LP And PointState Capital LP With Respect To (I) First Amended Joint Chapter 11 Plan Of Nortel Networks Inc. And Certain Of Its Affiliated Debtors And (II) Debtors' Motion For Entry Of An Order Pursuant To 11 U.S.C. §§ 105(A) And 363(B) And Federal Rule Of Bankruptcy Procedure 9019 Approving Settlement Agreement And Plan Support Agreement And Objection To Asserted Fees And Expenses Of Indenture Trustee), and ECF No. 17747 (Reply Of Solus Alternative Asset Management LP And PointState Capital LP With Respect To (I) NNCC Noteholders Statement Concerning Plan And SPSA And Objection To Asserted Fees And Expenses Of Indenture Trustee And (II) Indenture Trustee's Response To Fee Objection) (collectively, the "Objection").

[3]    "Indenture Trustee" means the NNCC Bonds Indenture Trustee and any predecessor or successor thereto, including Law Debenture Trust Company of New York and the Delaware Trust Company.

[4]    Capitalized terms not defined herein have the meanings ascribed to them in the First Amended Joint Chapter 11 Plan Of Nortel Networks Inc. And Certain Of Its Affiliated Debtors [ECF No. 17763-2] (as amended, modified, or supplemented from time to time, the "Plan").

crowd." Meinhard v. Salmon, 164 N.E. 545, 546 (N.Y. 1928). That fiduciary duty includes the

obligation, as prudence dictates, to secure the basic purpose of the indenture—repayment of the

underlying obligation. This Court has observed more specifically that while an indenture trustee

can hire its own attorneys, prudence dictates that the indenture trustee at all times remains

obligated to assure those attorneys only do what is necessary to protect the noteholders' interests,

e.g., the indenture trustee is obligated to avoid duplication among its professionals. The

Indenture Trustee has failed to comply with these obligations and thereby forced the NNCC

Noteholders into the anathematic position of objecting to its fees.

2.      The Trustee did not properly manage its professionals in a way that

avoided duplication, minimized expense, or limited the scope of their work to activities directly

benefitting the holders of the 7.875% Notes. The Asserted Fees, which total approximately $8

million as of December 31, 2016[5] and relate to more than 10,000 hours of attorney time, are not

commensurate with the role the Indenture Trustee played in these cases or the discrete activities

it conducted for the benefit of holders of the 7.875% Notes. Indeed, the greatest impediment to

repayment of the principal amount of the 7.875% Notes—approximately $150 million—is the

Asserted Fees which total *five percent* (5%) of Plan recoveries.

3.      In addition, the Asserted Fees fail to satisfy the reasonableness standards

imposed under the Indenture and applicable law. Section 606 of the Indenture requires the

Indenture Trustee's expenses, including the "charges and expenses of its counsel," to be

"reasonable and documented." This Court has defined "reasonable" fees as those non-

duplicative fees incurred advancing the singular interests of holders of the 7.875% Notes

separate from their interests as general unsecured creditors. In these cases, those efforts are

easily identified because the discrete issues relating to the 7.875% Notes were raised repeatedly

by the NNCC Noteholders. Indeed, the NNCC Noteholders argued throughout the cases that

---

[5]      The Trustee has submitted fees totaling $252,818.00 for the month of January 2017, most of
which relates to this fee litigation. The NNCC Noteholders object to being charged for this time.

their claims are entitled to "bespoke" treatment given the ability of the 7.875% Notes to look to the Intercompany Loan and Support Agreement Claims, in addition to the NNL guaranty claim, to fund distributions.

4.      The burden of establishing the reasonableness of the objected portion of the Asserted Fees falls squarely on the Indenture Trustee.  And, the NNCC Noteholders agree that the Indenture Trustee has satisfied that burden with respect to approximately $3.9 million. The NNCC Noteholders have not objected to fees that appear to have been reasonably incurred advancing the peculiar interests of the holders of 7.875% Notes and were not duplicative of fees for services provided by other professionals.  Those include time spent communicating with holders of the 7.875% Notes, communicating with the Creditors' Committee about issues specific to the 7.875% Notes, drafting two motions and a handful of joinders, statements, and reservations of rights, and participating in the final mediation in the cases.

5.      The other portion of the Asserted Fees fail to satisfy the applicable reasonableness standards.  While it is true these cases spanned several years and involved complex litigation over the allocation of sale proceeds, the Indenture Trustee did not play a leading role with respect to that aspect of the cases.  Instead, those issues were prosecuted for the U.S. estates by the Debtors, the Bondholder Committee, and the Creditors' Committee.  The Indenture Trustee's significant level of participation was duplicative of their efforts.  On allocation issues, the interests of the Indenture Trustee and these parties were aligned, e.g., in arguing that a substantial portion of the sale proceeds should be allocated to NNI—the source of recoveries for NNCC.

6.      The NNCC Noteholders' objection to the reasonableness of the asserted fees falls into the following categories:

- ***Creditors' Committee Time:  $2.36 million.***  The Indenture Trustee incurred $2.36 million in fees for time spent participating in routine meetings of the Creditors' Committee.  To the extent the Asserted Fees were incurred by the Indenture Trustee in its capacity as a member of the Creditors' Committee, they should ***not*** be charged

to holders of the 7.875% Notes.  Instead, the Indenture Trustee should file an application for a substantial contribution claim, which is what the law requires.  The Creditors' Committee owes a fiduciary duty to all unsecured creditors—not just holders of the 7.875% Notes—and it had its own battery of lawyers to represent its interests and those of the Indenture Trustee in its capacity as a member of that committee.  It is unreasonable to charge holders of the 7.875% Notes for fees incurred in the performance of duties that, as a matter of law, had to benefit *all* unsecured creditors.

- o   Even if the Court finds the Creditors' Committee time is compensable, this Court has determined that the attendance of an indenture trustee's attorneys at committee meetings is only for the convenience of the trustee and not a reasonable charge against noteholder distributions.  Moreover, the Indenture Trustee's firms staffed the vast majority of Creditors' Committee meetings and calls (325 in all between 2009 and 2016) with multiple senior-level attorneys.

- o   Out of more than 10,000 hours of attorney time, 86% relates to work performed by of-counsel or partner-level attorneys.  As this Court indicated, bills where the majority of the time was incurred by partners and not associates are not reasonably charged to the noteholders.

- o   Senior attorney attendance at the Creditors' Committee's meetings was so prevalent that the distinction between "trustee as client" and "senior attorney as trustee" becomes blurred.  As this Court has observed, fees for attorneys that effectively become members of the creditors' committee are not reasonable.

- *Allocation Trial:  $1.34 million.*  The Indenture Trustee's counsel billed over $1.34 million for time spent in connection with the litigation over the proper allocation of the Lock-box proceeds from the sale of the Nortel businesses, including extensive discovery and trial efforts (collectively, the "Allocation Trial").  NNCC is a financing company with no assets or operations.  On an intra-estate basis, the Debtors proposed to allocate *zero dollars ($0)* to NNCC from the Lock-box.  The Allocation Trial did not involve issues peculiar to holders of the 7.875% Notes and instead involved inter-estate disputes about the allocation of Lock-box proceeds among the U.S. Debtors and debtors in foreign jurisdictions—but not to NNCC.

- o   The Indenture Trustee's internal documents confirm it clearly understood allocation issues were "common" to all U.S. creditors and were not related to the "parochial" interests of holders of the 7.875% Notes—a position it communicated to counsel to Solus.

- o   The U.S. effort was led capably by a group of U.S. and Canadian attorneys representing the Debtors, the Bondholder Group, and the Creditors' Committee.  While the Indenture Trustee was a "Core Party," it transformed

4

what should have been a monitoring role into one that duplicated the efforts of these groups in the most granular aspects of discovery and trial, e.g., reviewing witness and exhibit lists; document reviews; commenting on expert reports; attending depositions; reviewing briefs filed by other parties; and having senior-level attorneys attend every day of the trial even though they neither examined witnesses nor made presentations to the Court.

- **Fees Incurred Collecting And Defending Fees ($100k-600k)**.  The Indenture Trustee's attorneys incurred over $100,000 in fees preparing invoices that were sent to the Indenture Trustee and not filed with the Court.

    - It also appears the Indenture Trustee may spend at least an additional $400,000-$500,000 defending its unreasonable fees.  The Supreme Court of the United States has spoken specifically to the inappropriateness of compensating professionals in bankruptcy cases for time spent litigating their fees.[6]  Departure from the bedrock principle known as the "American Rule," i.e., that each litigant pays its own attorneys' fees, win or lose, is only appropriate when a statute or contract explicitly provides otherwise.  The Indenture's reference to the ability of the trustee to be compensated for "reasonable" fees is not sufficiently precise to exempt the Indenture Trustee from the American Rule—contract references to "litigation costs" or "prevailing party" are required.  The Indenture does not contain them or otherwise specifically provide that the prevailing party's fees will be paid in the event of a dispute.

- **Dewey-Specific Charges ($1.85 million)**.  The clear majority ($1.42 million, or 84%) of Dewey's fees relate to time duplicating the work performed by Creditor's Committee counsel.  Dewey also billed for work product that does not appear to have been transferred to Patterson after Dewey stopped representing the Indenture Trustee ($93,000).  Nor did Dewey provide any meaningful discount from its fees to compensate for the disruption caused by its abrupt resignation.  Dewey's fees should be reduced further by at least an additional 10% to account for the inefficiencies inherent in the forced transition instead of charging holders of the 7.875% Notes for them, e.g., the "learning curve" associated with new counsel.

- **Duplicative Entries**.  The Indenture Trustee's attorneys submitted invoices of duplicative time entries totaling $109,000 that are exact replicas of time entries that appeared in prior bills.  Moreover, 50% of the Indenture Trustee's fees, i.e., from Law Debenture, do not contain any description apart from "extraordinary" services.  That is not a sufficient time entry to establish that the time spent was reasonable.

---

[6]   Baker Botts LLP v. ASARCO LLC, 135 S. Ct. 2158, 2162-63 (2015) (finding section 330 does not permit "a bankruptcy court to award attorneys' fees for work performed in defending a fee application in court").

- ***Fees Of Comparable Parties.***  The Asserted Fees of $8 million are considerably larger than those incurred by similarly situated parties in the Chapter 11 Cases.  The Bank of New York, which is indenture trustee for the Crossover Bonds with a principal amount of nearly $4 billion, was also a member of the Creditors' Committee and a Core Party in the Allocation Trial.  It incurred fees of approximately ***$4 million***.  And, in the <u>Worldwide Direct</u> case, where the trustee served as chairperson of the creditors' committee and where the bond debt it represented ($153 million) was 50% of all unsecured debt, this Court reduced its requested fees of $1.6 million by 38%.

  o  The fees of Wilmington Trust Company, the other indenture trustee, are ***not*** comparable because the issuer of those notes was a Canadian debtor, giving rise to a host of issues unique to Canada and the Canadian proceedings.  Moreover, those fees were $7.15 million—more than $800,000 lower than the fees that the Indenture Trustee is seeking (excluding its fees in this litigation).

  o  Notwithstanding the size of the Asserted Fees in comparison to other professionals in the cases, there is no evidence the Indenture Trustee ***has ever reduced its bills***.  This Court has observed the importance of a trustee reviewing bills and cutting unnecessary time.  That did not happen here.

7.    Accordingly, the fees to which the NNCC Noteholders object by category and by firm appears in the chart below:[7]

| Entity | Total Fees Challenged | Committee | Allocation | Fees/Invoices | Work Product | Duplication |
|---|---|---|---|---|---|---|
| Law Debenture | $ 254,574.18 | $ 214,081.61 | $ - | $ - | $ - | $ 40,492.57 |
| Borden Ladner Gervais LLP | $ 174,235.20 | $ 8,640.00 | $ 165,595.20 | $ - | $ - | $ - |
| Dewey & LeBoeuf LLP | $ 1,678,900.00 | $ 1,418,358.69 | $ 166,879.69 | $ - | $ 93,661.62 | $ - |
| Patterson Belknap Webb & Tyler LLP | $ 1,902,297.10 | $ 719,189.60 | $ 1,011,594.40 | $ 310,076.10 | $ - | $ 69,148.00 |
| | | | | | | |
| Dewey & LeBoeuf LLP (10% Discount) | $ 167,890.00 | | | | | |
| | | | | | | |
| | $ 4,385,607.48 | $ 2,360,269.90 | $ 1,344,069.29 | $ 310,076.10 | $ 93,661.62 | $ 109,640.57 |

8.    The Indenture Trustee's primary defense is "you knew it all along."  The Indenture Trustee claims the NNCC Noteholders knew it was a member of the Creditors' Committee and a Core Party and cannot now complain about the millions of dollars in fees it incurred in those capacities.  But the law in this Court clearly provides otherwise.  Knowledge of

---

[7]    The fees of the Indenture Trustee's Delaware counsel, Morris James LLP, are not being objected to by the Noteholders, nor are the fees of Fasken Martineau DuMoulin LLP, or Weir Foulds LLP, two of the three firms that represented the Indenture Trustee in Canada.  The NNCC Noteholders have continued to review the invoices provided by the Indenture Trustee as this matter has progressed through discovery and have withdrawn their objections to approximately $100,000 of previously objected-to-fees.

those particular activities does not preclude the NNCC Noteholders from challenging the reasonableness of the fees incurred performing them.

9.      Moreover, the Indenture Trustee did not inform the NNCC Noteholders of its fees until the end of the case in 2016—after almost all of the Asserted Fees had been incurred. Its fees were ***not known*** to the NNCC Noteholders until mid-2016 when the noteholders negotiated the NNCC Settlement; even then, the Indenture Trustee did not formally communicate the actual amounts until October 2016, three months after they were requested.  At no point before then did the Indenture Trustee send bills, budgets, or fee updates to the NNCC Noteholders.  It would have been easy to do considering that for most of the case, nearly 90% of the 7.875% Notes were held by two funds.  Nor did the NNCC Noteholders know the extent to which the Indenture Trustee was staffing multiple attorneys to perform work that was unrelated to the 7.875% Notes and duplicative of that performed by other estate professionals.  And while the Indenture Trustee points to emails containing professional courtesies thanking the Indenture Trustee's counsel for their efforts, those emails were hardly an invitation to incur millions in legal fees or a waiver of the NNCC Noteholders' rights to challenge their reasonableness.  In any event, those emails relate to discrete pleadings, e.g., joinders in other briefs and a motion for reconsideration, that the Indenture Trustee filed and ***which are not the subject of the NNCC Noteholders' objection***.

10.      Similarly, the Indenture Trustee attempts to style this as a $3.75 million dispute by claiming the Debtors have "agreed to pay $4.25 million of the Asserted Fees" (Response ¶ 5 & n. 6, ¶ 20).  On the contrary, Debtors have confirmed the Plan's provision for up to $4.25 million in reasonable and documented fees does not constitute a finding of reasonableness.[8]  This dispute is about whether $8 million is an unreasonable amount for the fees

---

[8]      See Debtors' Reply at 36 (¶ 61 ("By agreeing to the fee reimbursement provision, the Debtors did not signal any judgment regarding the reasonableness of the fees incurred by the NNCC Bonds Indenture Trustee or its advisors.")).

and expenses of the Indenture Trustee and its professionals and is commensurate with the discrete role they played in the Chapter 11 Cases and Canadian Proceeding.

11.    The Indenture Trustee also mischaracterizes the NNCC Noteholders' argument.  Their objection is ***not*** to the Indenture Trustee's decision to sit on the Creditors' Committee.  Nor do the NNCC Noteholders challenge that longstanding practice as the Indenture Trustee maintains.[9]  Instead, the NNCC Noteholders' argument is that when a trustee sits on a creditors' committee, its distinct fiduciary duty to the noteholders remains; that duty requires it to manage its professionals as a prudent investor; the trustee should minimize duplication by relying on creditors' committee counsel with respect to matters relating to unsecured creditors generally; and the trustee is only entitled to charge the noteholders for work directly relating to advancing the noteholders' specific interests as opposed to generally advancing those of unsecured creditors.

12.    Indeed, the NNCC Noteholders are not alone in focusing on the need to scrupulously examine the fees of individual committee members.  Congress reached the same conclusion and modified the Bankruptcy Code to excise individual committee members' professional fees from the administrative claim provisions in section 503.  Judge Walrath's Worldwide Direct decision comports squarely with the spirit of that amendment.[10]  And, the

---

[9]    See Affidavit of James D. Heaney [ECF 17944] ("Heaney Aff.), at ¶ 39 ("I understand that the Fee Objectors have taken the position that the Trustee should not have served on the Committee and/or that even if it was appropriate for the Trustee to serve on the Committee, it should not have involved its counsel."); Affidavit of Sandra E. Horwitz [ECF 17942] ("Horwtiz Aff."), at ¶ 16 ("I understand that the Fee Objectors contend that the Trustee should not have accepted a seat on the Committee or, if it did, it should not have been advised by counsel.").

[10]    See, e.g., Davis v. Elliot Mgmt. Corp. (In re Lehman Bros. Holdings, Inc., et al.), 508 B.R. 283, 287-90 (S.D.N.Y. 2014) ("To be effective, an official committee must hire lawyers and accountants.  The expenses of paying those professionals are 'administrative expenses' …. Unlike an official committee's professional fee expenses, individual member' professional fee expenses are not administrative expenses …. [§ 503(b)(4)] does not cover expenses on the basis of committee membership.  Thus, individual members must usually pay their own attorneys and accountants;" noting 2005 amendment excluded professional fees for official committee members from section 503).

Indenture Trustee is not left without a remedy. It retains the right to apply for a substantial

contribution claim with respect to fees of its professionals incurred in connection with

committee-related work.

13.     The Indenture Trustee's affidavits fail to carry its burden of proving the

reasonableness of the Asserted Fees. Indeed, they do not address any specific tasks or attempt to

explain how the interests of the holders of 7.875% Notes were served by the Indenture Trustee's

granular participation in the Allocation Trial or by the participation of the Indenture Trustee and

several of its lawyers in every aspect of the Creditors' Committee's actions. The only

justification for the Asserted Fees contained in the affidavits is judgment "based on many years

of experience."[11]

14.     The affidavits also confirm the Indenture Trustee fails (or refuses) to

recognize the distinction Judge Walrath recognized in Worldwide Direct between the two

capacities in which a trustee acts when it sits on a committee—(1) trustee as a committee

member and fiduciary for all unsecured creditors and (2) trustee as fiduciary for the

noteholders—and its implications with respect to fees. Instead, the affidavits reveal the

unsupportable argument the Indenture Trustee maintains in this litigation, i.e., that fees incurred

by an indenture trustee as a member of a creditors' committee are per se reasonable. The law

provides otherwise and contains no blanket rule of per se reasonableness for the fees charged by

a committee member's counsel in connection with committee work. Either the Indenture Trustee

can establish it made a substantial contribution to the cases and claim estate assets or can

establish its efforts singularly benefitted the interests of holders of the 7.875% Notes and charge

their distribution.

15.     This dispute has implications beyond the Nortel cases. Implicit in the

Indenture Trustee's fiduciary duty of undivided loyalty to holders of the 7.875% Notes is an

---

[11]     Horowitz Aff. ¶ 14; Heaney Aff. ¶ 17.

obligation to manage its professionals and ensure the work they perform relates only to advancing the noteholders' interests if their distributions are going to be charged.  As a result of the Indenture Trustee's failure to take those steps in these cases, the Asserted Fees spiraled out of control; the attorneys performed millions of dollars of work regardless of whether the work impacted the 7.875% Notes or other matters peculiar to their interests; and the distinction between client and attorney became indistinguishably blurred.  Accordingly, the NNCC Noteholders respectfully request that the Asserted Fees be reduced in an amount no less than 53% (i.e., $4.38 million) or any further amounts the Court considers appropriate.  In no event should the Indenture Trustee's fees in this litigation be charged to the noteholders.

## II.    FACTUAL BACKGROUND

### A.    7.875% NOTES & CROSSOVER BONDS

16.    The NNCC Noteholders hold approximately 90% of the 7.875% Notes. For the majority of the Chapter 11 Cases, Solus has held approximately 60% of the 7.875% Notes.[12]

17.    The Bank of New York is trustee for the Crossover Bonds in the face amount of $3.5 billion issued by NNL and guaranteed by Nortel Networks Corporation ("NNC") and NNI.  The Bondholder Group retained Milbank, Tweed, Hadley & McCloy LLP ("Milbank") and Bennet Jones are counsel in the Chapter 11 Cases and the Canadian Proceedings.  The fees and expenses incurred by Bank of New York in the Chapter 11 Cases and the Canadian Proceedings total $4 million.[13]  The NNCC Noteholders are members of the Bondholder Group.[14]

---

[12]    See Affidavit of Stephen Blauner in Support of Objection of NNCC Noteholders to Asserted Fees and Expenses of Indenture Trustee [ECF 17945] ("Blauner Aff."), at ¶ 4.

[13]    See Blauner Aff. ¶ 15.

[14]    See Blauner Aff. ¶ 5.

18.     During the cases, Law Debenture Trust Company of New York ("Law Debenture"), as successor Trustee to The Bank of New York under the Indenture, was the Indenture Trustee for the 7.875% Notes.  Law Debenture recently has been succeeded by Delaware Trust Company as the Indenture Trustee following Delaware Trust Company's acquisition of Law Debenture in December 2016.[15]  Law Debenture's fees for the Chapter 11 Cases and Canadian Proceedings total $378,518.78.  Of those fees, $246,416.61 relate to time it described as "extraordinary services" with no other description.[16]

**B.     2009 – 2012: DEWEY FILES PROOF OF CLAIM**

19.     When the Chapter 11 Cases were filed, the Indenture Trustee submitted its application to serve as a member of the Creditors' Committee.  The NNCC Noteholders did not instruct the Indenture Trustee to serve on the Creditors' Committee.[17]  While the NNCC Noteholders were aware of the Indenture Trustee's position as a member of the Creditors' Committee throughout the cases, at no point did the Indenture Trustee advise the NNCC Noteholders of the amount of time it was spending, or fees it was incurring in connection with committee-related work.[18]  The Creditors' Committee is represented in the Chapter 11 Cases and the Canadian Proceedings by Akin Gump Strauss Hauer & Feld LLP ("Akin") and Cassels Brock & Blackwell LLP ("Cassel").

20.     The Debtors are represented in the Chapter 11 Cases and the Canadian Proceedings by Cleary Gottlieb Steen & Hamilton ("Cleary") and Torys LLP ("Torys").

---

[15]     See *Delaware Trust Company Finalizes Acquisition of Law Debenture Corporate Trust Business, Welcomes Thomas Musarra to Team*, BUSINESSWIRE (December 8, 2016), http://www.businesswire.com/news/home/20161208005782/en/Delaware-Trust-Company-Finalizes-Acquisition-Law-Debenture.

[16]     See Declaration Of James C. Tecce in Support Memorandum of Law in Support of Objection of Solus Alternative Asset Management LP and Pointstate Capital LP to Asserted Fees and Expenses of Indenture Trustee ("Tecce Decl.") Ex. 1 (Law Debenture Trust Company of NY Invoices for February 2009 through September 2016 (with markup)).

[17]     See Blauner Aff. ¶ 17.

[18]     See Blauner Aff. ¶ 19.

11

21.     Dewey & LeBoeuf LLP ("Dewey") represented the Indenture Trustee in connection with the Chapter 11 Cases from 2009 until its collapse in 2012.  During the course of the representation, Dewey incurred fees totaling more than $2.7 million.  Dewey billed 3,473.94 hours of attorney time.  Three primary attorneys performed the majority of the work on the matter:  of counsel Lawrence E. Miller billed 1,723.05 hours at a blended rate of $871.32; senior counsel Mohsin N. Khambati billed 1,331.40 hours at a blended rate of $681.50 per hour; and partner Maria A. Dantas billed 311.15 hours at a blended rate of $763.52.  Dewey prepared and filed a proof of claim relating to the 7.875% Notes (the "Initial Proof of Claim").[19]  The NNCC Noteholders do not object to fees relating to the Initial Proof of Claim.

22.     The majority of Dewey's fees and expenses were incurred in connection with work that duplicated that performed by the Creditors' Committee's counsel.  Dewey attorneys attended 162 meetings and calls of the Creditors' Committee and billed 1,861.08 hours in connection with that time for a total of $1.42 million.[20]  While there was some interaction between Dewey and the NNCC Noteholders, it was limited.  Frustrated because it considered Dewey unresponsive to its requests, Solus forwarded a formal direction letter to the Indenture Trustee instructing it to change counsel and hire a different law firm.[21]  The Indenture Trustee

---

[19]     See Motion of Law Debenture Trust Company of New York, in its Capacity as Indenture Trustee, for Leave to Amend Proof of Claim [ECF 9168] at 3 ("On September 28, 2009, pursuant to an August 4, 2009 order … Law Debenture timely filed a proof of claim ….").

[20]     See Tecce Decl. Ex. 2 (Dewey & LeBoeuf LLP Invoices for January 2009 through April 2012 (with markup)).

[21]     See Blauner Aff. ¶ 24; see also Tecce Decl. Ex. 3 (QE_0000589 at 590) (Direction Letter to Law Debenture dated May 4, 2012 ) (requesting it replace Dewey with Kirkland & Ellis LLP as trustee counsel and arguing Solus "in its own name and at the direction of other holders of the NNCC Notes, has attempted to consult with or otherwise cooperate with Dewey with respect to the formulation and implementation of a legal strategy to protect the interests of the Holders. Unfortunately, Dewey has repeatedly ignored such requests for consultation and has stubbornly refused to cooperate in any meaningful way with the Majority Holders.").

refused.[22]  In 2012, during Dewey's collapse, the Indenture Trustee replaced Dewey with

Patterson Belknap Webb & Tyler LLP ("Patterson") as its counsel.

23.    In May 2012, Solus advised both counsel to the Bondholder Group and the

Debtors that Solus did not consider Law Debenture to be its representative in the Chapter 11

Cases and directed those parties to correspond with Solus' retained counsel (Malek & Schiffrin

LLP).[23]  Also at or about this time, Dewey insisted that it would not turn over files to Patterson

unless it received payment for its work in the Chapter 11 Cases.  Patterson spent the first several

months of its engagement attempting to retrieve Dewey's files.[24]  The Indenture Trustee did not

request that Dewey discount its overall bill to account for the costs incurred in consummating the

transition.  Instead it simply requested an invoice, agreed to the amount, and reiterated its

requests for Dewey's files.[25]  Patterson incurred fees and expenses totaling $22,000 attempting to

obtain those materials from Dewey.[26]  The NNCC Noteholders do not object to these fees.

---

[22]    See Blauner Aff. ¶ 25; see also Tecce Decl. Ex. 4 (QE_0000594 at 597)  (Letter from Law
        Debenture to S. Blauner dated May 9, 2012) (disputing that counsel selection falls within scope
        of matters subject to direction under Indenture).

[23]    See Tecce Decl. Ex. 5 (QE_0015083 at 15083) (Email from S. Blauner to A. Pisa (Milbank)
        dated May 10, 2012) (advising Schiffrin "will be our representative (not Law Debenture).  Given
        the loss of Dewey and the trustee's selection of a law firm with no background, I expect Javier
        [Schiffrin] to play a much more active role in the matter"); id. Ex. 6 (QE_0015087 at 15087)
        (Email from S. Blauner to J. Ray (Nortel) dated May 15, 2012) (advising "I consider Law
        Debenture irrelevant").

[24]    See Tecce Decl. Ex. 6 (QE_0015087 at 15087) (Email from S. Blauner to J. Ray (Nortel) dated
        May 15, 2012) advising "the [Indenture Trustee's] new lawyers can't get up to speed because
        they can't seem to get whatever work product Dewey produced"); id. Ex. 7 (IT00007287 at 7287)
        (Email from D. Lowenthal to L. Sheikh dated Aug. 30, 2012) ("[W]e have sought to obtain Law
        Debenture's files located at Dewey.  We understand that Dewey has less than a box of documents
        and also electronic files on a thumb drive.  But Dewey is refusing to provide the documents and
        thumb drive unless Dewey's fees and expenses for its work on the Nortel case are paid.").

[25]    See Tecce Decl. Ex. 8 (IT0003890 at 3890) (Email from D. Lowenthal to L. Sheikh dated
        September 7, 2012) ("Law Debenture has informed me that it doesn't dispute the amount of
        Dewey's invoice.  But Law Debenture also asked me to convey to you that it expects the Dewey
        estate to send us the files.").

[26]    Tecce Decl. Ex. 9 (Patterson Belknap Webb & Tyler LLP Invoices for May 2012 through
        September 2016 (with markup)).

### C.    2012 – 2017:  PATTERSON

24.     Patterson initially assigned three attorneys to the engagement:  Craig Dent at between $435 per hour and $735 per hour; Brian Guiney at between $640 per hour and $780 per hour; and Daniel Lowenthal at between $810 and $1020 per hour.  Patterson prepared its own memoranda analyzing the 7.875% Notes and related agreements, e.g., the Support Agreement and Indenture.  The NNCC Noteholders do not object to these fees.

25.     Patterson and Solus attempted to negotiate a "protocol" for working together on a going forward basis without success.  The Indenture Trustee insisted on a direction letter Solus was not willing to provide; the Indenture Trustee refused to enter into a joint defense agreement with Solus.[27]  In 2013, the Indenture Trustee hired its own Canadian counsel, Borden Ladner LLP ("Borden").[28]

### 1.    COMMITTEE MEETINGS

26.     Patterson's fees through December 31, 2016 total approximately $3.9 million, of which $719,189.60 relates to time spent attending routine Creditors' Committee meetings.  Patterson attorneys attended a total of 163 Creditors' Committee meetings and calls.  Of those, 53 were attended by all three attorneys working on the matter.  The combined hourly rate of those attorneys totaled between $1,885 per hour and $2,385 per hour.[29]

---

[27]     See Tecce Decl. Ex. 10 (IT00000008 at 8) (Email from J. Schiffrin to D. Lowenthal dated May 10, 2012) ("[w]e also would appreciate it if you could prepare a joint defense agreement draft, to cover any documents, etc. we may decide to share going forward"); id. ("LawDeb won't sign a joint defense agreement")); id. Ex. 11 (IT00000321 at 321) (Email from D. Lowenthal to D. Lowenthal dated January 16, 2013) (recounting conversations about how Solus had not provided "information LawDeb wanted to receive demonstrating that Solus was a majority holder and about "'general protocol' with us and LawDeb concerning how we can 'coordinate' efforts in the case.  Javier made clear that Solus doesn't want to give us a direction letter …. [and] said he was working on a confidentiality agreement with the US Debtors.").

[28]     See Tecce Decl. Ex. 12 (IT00007564) (Borden Ladner Gervais LLP Engagement Letter).

[29]     See Tecce Decl. Ex. 9 (Patterson Belknap Webb & Tyler LLP Invoices for May 2012 through September 2016 (with markup)).

2.    ALLOCATION TRIAL

27.    Patterson's fees through December 31, 2016 total approximately $3.9 million.  Of those fees, $1,011,594.40 relates to time spent in connection with the Allocation Trial.  Patterson's work relating to allocation of Lock-box proceeds began in February 2013.  The effort picked up in May 2013 when the discovery process started.  The trial ultimately took place in June and September of 2014.[30]

28.    The Indenture Trustee applied to be a "Core Party" in connection with the Allocation Trial.  While the NNCC Noteholders were aware of its status as a Core Party, they did not direct the Indenture Trustee to serve in that capacity.[31]  In addition to reviewing witness lists, exhibit lists, and draft expert reports, Patterson attorneys attended multiple meetings and calls relating to discovery and the trial.[32]  Patterson attorneys attended no less than 31 depositions relating to the Allocation Trial.[33]  The Indenture Trustee's attorneys attended each day of the Allocation Trial.[34]  During the trial, the Indenture Trustee's attorneys did not cross examine witnesses or make presentations to the Court.  The total fees incurred in connection with the Allocation Trial to which the NNCC Noteholders object are $1.34 million.[35]

---

[30]    See Tecce Decl. Ex. 9 (Patterson Belknap Webb & Tyler LLP Invoices for May 2012 through September 2016 (with markup)).

[31]    Blauner Aff. ¶ 13.

[32]    See Tecce Decl. Ex. 9 (Patterson Belknap Webb & Tyler LLP Invoices for May 2012 through September 2016 (with markup)).

[33]    See Tecce Decl. Ex. 9 (Patterson Belknap Webb & Tyler LLP Invoices for May 2012 through September 2016 (with markup)).

[34]    See Tecce Decl. Ex. 9 (Patterson Belknap Webb & Tyler LLP Invoices for May 2012 through September 2016 (with markup)).

[35]    See Tecce Decl. Ex. 2 (Dewey & LeBoeuf LLP Invoices for January 2009 through April 2012 (with markup)); id. Ex. 9 (Patterson Belknap Webb & Tyler LLP Invoices for May 2012 through September 2016 (with markup)); id. Ex. 13 (Borden Ladner Gervais LLP Invoices for May 2012 through December 2016 (with markup)).

29.     Patterson did prepare and submit a pleading in connection with the
Allocation Trial—a joinder.[36]  The NNCC Noteholders do not object to the fees with respect to
that pleading; although, it is worth noting the pleading was prepared without instruction from the
NNCC Noteholders, that its distribution to NNCC Noteholders' counsel was unsolicited, that it
was shared after the Indenture Trustee had decided to draft it and only hours before it was filed.

30.     The Allocation Trial did not involve issues that were specific to the
7.875% Notes or to NNCC.  Nor did the NNCC Noteholders—or NNCC—request an allocation
of the lock-box proceeds to NNCC.  Instead, their focus was on ensuring that the lock-box
proceeds flowed to the Debtors in the United States, particularly to NNI.[37]  That entity is
obligated to maintain NNCC's solvency under the Support Agreement and owes NNCC $147
million with respect to the Intercompany Loan.  In point of fact, the Debtors' position with
respect to the appropriate allocation to NNCC from the lock-box proceeds was that its estate was
entitled to *zero dollars ($0)*.[38]

31.     The Court's Allocation Decision[39] determined that, among other things,
the "allocation each Debtor Estate will be entitled to receive from the Lockbox funds is the
percentage that all allowed claims against that Estate bear to the total allowed claims against all
Debtor Estates."[40]  Accordingly, the Court's Allocation Decision resulted in an allocation of

---

[36]     See Tecce Decl. Ex. 14 (QE_0014553 at 14553) (Email from D. Lowenthal to J. Tecce dated
September 10, 2014) ("Post-trial reply briefs for the allocation trial are due today at 4 pm.  We've
reviewed drafts of Milbank's and Cleary's/Akin's briefs.  Our draft Joinder to those briefs is
attached.").

[37]     Blauner Aff. ¶ 14.

[38]     See ECF No. 17249 (Notice Of Execution Of Settlement And Plan Support Agreement) Exhibit B
[17249-2] (Debtor Financial Information) at 4 & n. c ("Nortel Networks Inc. .… Estimated US
Debtor Assets … Sale Proceeds Settlement .… [NNCC $0] .… For purposes of this schedule
only, all Sale Proceeds are attributed to NNI.").

[39]     Allocation Trial Opinion and the related Order, each dated May 12, 2015 [ECF Nos. 15544 and
15545] (respectively, the "Allocation Decision" and the "Allocation Order").

[40]     Allocation Order at 1 (¶ 2.a.); Allocation Dec. at 3 & n.4 (including NNI and NNCC in definition
of "U.S. Debtors").

16

lock-box proceeds to NNCC.  The Court reached this conclusion of its own accord.  After the Allocation Decision, the Indenture Trustee requested reconsideration to clarify discrete points in the Allocation Decision and joined in the appeal filed by the Debtors.  The NNCC Noteholders do not object to the fees incurred in connection with that effort.

### 3.    PPI DISPUTE

32.    In the summer of 2014, disputes relating to the payment of post-petition interest emerged in the Chapter 11 Cases, i.e., the "Wilmington Trust" objection to the payment of interest (hereafter, the "PPI Dispute").  The PPI Dispute was litigated principally among the Debtors and the Bondholder Group, on the one hand, and the Canadian Debtors and the Monitor, on the other hand.  Ultimately, the Debtors in the U.S. reached a settlement with the Bondholder Group with respect to post-petition interest, and a Rule 9019 motion seeking approval of the settlement was filed.[41]  The NNCC Noteholders did not participate in the settlement or compromise their claim to post-petition interest.  The NNCC Noteholders do not object to Patterson's or Borden's time in connection with the PPI Dispute, even though the 7.875% Notes were not involved.

### 4.    COURT FILINGS

33.    Patterson filed the following pleadings in the Chapter 11 Cases:  (a) eight joinders in, supplements to, or reservations of rights with respect to other pleadings;[42] (b) two

---

[41]    See ECF No. 14076 (Debtors' Motion For Entry Of An Order Pursuant To Bankruptcy Rule 9019 Approving Settlement Agreement By And Among Nortel Networks Inc., The Supporting Bondholders, And The Bank of New York Mellon With Respect To NNI Post-Petition Interest Dispute And Related Issues) (the "NNI-PPI 9019 Motion") requesting approval of the Agreement Settling The NNI Post-Petition Interest Dispute And Related Matters (the "NNI-PPI Settlement").

[42]    See ECF No. 10548 (Joinder In Motion To Approve Allocation Position Of US Debtors And Official Committee Of Unsecured Creditors And Opening Allocation Position Of Ad Hoc Group Of Bondholders); ECF No. 10691 (Joinder In Response Of US Debtors And Official Committee Of Unsecured Creditors To Core Parties Allocation Positions); ECF No. 13496 (Joinder In (A) Pre-Trial Brief Of US Interests And (B) Pre-Trial Brief Of Ad Hoc Group Of Bondholders); ECF No. 14028 (Supplemental Brief [To ECF No. 14025] With Respect To Monitors' Request That Court Determine Bondholder Entitlement To Post-Petition Interest And Additional Bondholder Claims Issues Under U.S. Law); ECF No. 14057 (Supplemental Reply Brief [To ECF No. 14053] With Respect To Monitors' Request That Court Determine Bondholder Entitlement To Post-

motions;[43] and (c) one response.[44]  The total fees incurred with respect to those pleadings was $272,578.90.  The NNCC Noteholders have not objected to the fees relating to the preparation of those pleadings.

### D. 2011 – 2017: NNCC NOTEHOLDERS ENGAGE THEIR OWN COUNSEL

#### 1. CONFIDENTIALITY AGREEMENT

34.    In 2011, Solus retained Malek & Schiffrin LLP ("Schiffrin") to act as its counsel in the Chapter 11 Cases.  In late 2011, Solus determined that it was willing to get restricted in order to participate in a mediation then-scheduled for early January 2012.[45]

35.    In mid-2014, Solus and Macquarie Capital (USA) Inc. engaged Quinn Emanuel Urquhart & Sullivan, LLP ("Quinn Emanuel") to succeed Schiffrin as counsel.[46]  Quinn Emanuel requested that the U.S. Debtors enter into a confidentiality agreement to enable it to

---

Petition Interest And Additional Bondholder Claims Issues Under U.S. Law); ECF No. 14184 (Joinder In (1) Post-Trial Brief Of US Interests And (2) Post-Trial Brief Of Ad Hoc Group Of Bondholders); ECF No. 14389 (Joinder In (1) Post-Trial Reply Brief Of US Interests And (2) Post-Trial Reply Brief Of Ad Hoc Group Of Bondholders); and ECF No. 16806 (Statement And Reservation Of Rights With Respect To Supplement To Motion Of Liquidity Solutions, Inc. For Entry Of Order (A) Authorizing And Directing Debtor, Nortel Networks Inc., To Make Interim Distributions On Allowed Administrative, Priority And Unsecured Claims Or (B) Converting Cases To Chapter 7 Pursuant To Section 1112(b) Of Bankruptcy Code).

[43]    See ECF No. 15615 (Motion Pursuant To Fed. R. Civ. P. 52(b), 59(e), And 60 For Partial Reconsideration Of Courts Order And Allocation Trial Opinion) and ECF No. 9168 (Motion For Leave to Amend Proof Of Claim Filed by Law Debenture Trust Company of New York).

[44]    See ECF No. 15734 (Response To U.S. Debtors Motion For Clarification And/Or Reconsideration Of May 12, 2015 Allocation Trial Opinion And Order)).  The Indenture Trustee also was a party to briefing submitted by the Bondholder Committee and the indenture trustee for the Crossover Bonds with respect to post-petition interest.  See ECF No. 14025 (Opening Brief Of Ad Hoc Group Of Bondholders, Law Debenture Trust Company of New York, As Trustee, And The Bank of New York Mellon, As Trustee, With Respect To Monitors' Request That Court Determine Bondholder Entitlement To Post-Petition Interest And Additional Bondholder Claims Issues Under U.S. Law Filed by Ad Hoc Group of Bondholders); ECF No. 14053 (Response)).

[45]    See Tecce Decl. Ex. 15 (QE_0000038 at 38) (Email from R. Cunningham to S. Blauner dated December 8, 2011) ("I agree we will need to be involved with mediation …. My sense is that participation in mediation likely means we need to get restricted"); id. Ex. 16 (QE_0000040 at 40) (Email from S. Blauner to J. Ray dated January 13, 2012) ("[W]e (I) would be pleased to participation in mediation as a holder of 7 7/8% bonds").

[46]    Blauner Aff. ¶ 23.

receive confidential information.[47]  The U.S. Debtors were willing to enter into such an

agreement.  At the time, the Canadian Debtors were not willing to enter into a three-way

agreement between the NNCC Noteholders, the U.S. Debtors, and the Canadian Debtors.[48]

Finally, in June 2016, the U.S. Debtors entered into a bilateral agreement with Quinn Emanuel,

as counsel to the NNCC Noteholders, that enabled it to become restricted with the option of

restricting the NNCC Noteholders.

**2.  ESTIMATION MOTION; AMENDMENT TO SCHEDULES**

36.    The NNCC Noteholders have long argued their claims are entitled to

unique treatment given the ability of the 7.875% Notes to look to different sources to fund

distributions **in addition to** the NNL guaranty claim.  The NNCC Noteholders have always

maintained that NNCC's recovery on the Intercompany Loan and Support Agreement Claims

would have rendered NNCC solvent—unlike every other U.S. and Canadian debtor.  The NNCC

Noteholders began raising these various arguments in 2014.  In mid-2014, the NNCC

Noteholders filed a series of pleadings that, among other things, (a) highlighted the Support

Agreement and Intercompany Loan Claims that are specific to the 7.875% Notes and (b) argued

they entitled the 7.875% Notes to unique treatment under any chapter 11 plan.[49]

---

[47]    Tecce Decl. Ex. 17 (QE_0011736 at 11741) (Email from D. Holzman to L. Schweitzer dated
March 4, 2014).

[48]    See Tecce Decl. Ex. 18 (QE_0009484 at 9484) (Email from C. Armstrong to L. Schweitzer et al.
dated Oct. 15, 2014)

[49]    See Joinder of Solus Alternative Asset Management LP and Macquarie Capital (USA) Inc. In
Bondholder Pleading [ECF No. 14029]; Statement Of Solus Alternative Asset Management LP
And Macquarie Capital (USA) Inc. With Respect To Debtors' Motion For Entry Of An Order
Pursuant To Bankruptcy Rule 9019 Approving Settlement Agreement By And Among Nortel
Networks Inc., The Supporting Bondholders, And The Bank Of New York Mellon With Respect
To NNI Post-Petition Interest Dispute And Related Issues [ECF No. 14340]; Limited Objection
Of Solus Alternative Asset Management LP And PointState Capital LP To Motion Of Liquidity
Solutions Inc. For Entry Of Order (A) Authorizing And Directing Debtor, Nortel Networks Inc.,
To Make Interim Distributions On Allowed Administrative, Priority And Unsecured Claims Or
(B) Converting Cases To Chapter 7 Pursuant To Section 1112(b) Of Bankruptcy Code [ECF No.
16811].

37.    In 2014, the NNCC Noteholders filed the Estimation Motion[50] requesting that the Court estimate the Support Agreement Claim and direct NNI to allow the Intercompany Loan Claim, which was scheduled as "disputed" at the time.  In response to the Estimation Motion, NNI agreed to amend its schedules to allow the Intercompany Loan Claim.[51] Thereafter, the NNCC Noteholders agreed to adjourn the balance of the Estimation Motion, including the portion seeking an Order estimating the Support Agreement Claim, to a date to be determined.[52]  The Creditors' Committee did not support the Estimation Motion and instead reserved its rights to oppose the substantive relief.[53]  At that time, the NNCC Noteholders made clear they were prepared to enter into direct discussions with any party in interest in the cases with respect to their claims and the appropriate treatment of the 7.875% Notes.[54]

---

[50]    See Motion Of Solus Alternative Asset Management LP And Macquarie Capital (USA) Inc. For Entry Of An Order, Pursuant To 11 U.S.C. §§ 105(a), 502(c), 521, Fed. R. Bankr. P. 1009(a) And L.R. Bankr. P. 1009-2, Estimating Nortel Networks Capital Corporation's Support Agreement Claim And Directing NNI To Amend Its Schedules With Respect To Intercompany Loan Claim [ECF. No. 14639] (the "Estimation Motion").

[51]    See Amended Schedules of Nortel Networks, Inc., dated December 10, 2014 [ECF No. 14918].

[52]    See Second Amended Notice Of Motion Of Solus Alternative Asset Management LP And Macqaurie Capital (USA) Inc. For Entry Of An Order, Pursuant To 11 U.S.C. §§ 105(a), 502(c), 521(a), Fed. R. Bankr. P. 1009(a) And L.R. Bankr. P. 1009-2, Estimating Nortel Networks Capital Corporation's Support Agreement Claim And Directing NNI To Amend Its Schedules With Respect To Intercompany Loan Claim [ECF No. 14886].

[53]    While the NNCC Noteholders did not need to prosecute the Estimation Motion to conclusion in light of the settlement, the Creditors' Committee reserved its right to take issue with the substantive relief requested in the Estimation Motion.  See May 5, 2015 Hr'g Tr. at 21:16-24 ("[COMMITTEE COUNSEL]:  [A]t the time of the original adjournment of the [Estimation] motion, the Debtors and the Committee both reserved all their rights to respond to the substance of the motion itself, including … whether or not the estimation [is] the appropriate vehicle for resolution of these claims.  So we're in the same position, obviously, the progress the Debtors made was excellent with respect to the technical issues of the allowance of the specific numbers, but with respect to substance, we are in the reserved rights position.").

[54]    See May 5, 2015 Hr'g Tr. [ECF No. 15542] at 16:16-25 ("Solus and Macquarie are fully prepared to engage in any discussions with any party in interest in the cases …. with respect to their claim. And they're also fully prepared to sign any confidentiality agreement that is required or considered a precondition for their participation in those discussions.").

**E.      NNCC NOTEHOLDERS INDEPENDENTLY NEGOTIATE PLAN SETTLEMENT**

38.      In the summer of 2016, the NNCC Noteholders independently negotiated

the settlement reflected in the Plan with respect to the 7.875% Notes (the "NNCC Plan

Settlement").  The NNCC Plan Settlement provides (subject to the terms of the Plan and the

SPSA) for the following:

- the 7.875% Notes will be allowed against NNI (into which NNCC shall be substantively consolidated) and NNL in their face amount, with pre-petition interest ($150,951,562);

- NNI shall reserve $7.5 million to provide a supplemental distribution to holders of the 7.785% Notes beyond the distributions afforded to other unsecured creditors of NNI to the extent NNI does not pay the 7.875% Notes in full; and

- the reasonable and documented fees and expenses of (a) the Indenture Trustee and (b) counsel to the NNCC Noteholders shall be paid by NNI in an amount not to exceed $4.25 million and $750,000, respectively.[55]

**F.      NNCC NOTEHOLDERS REQUEST BILLS**

39.      During the negotiations with the U.S. Debtors in the summer of 2016

concerning the NNCC Plan Settlement, it became known to the NNCC Noteholders that the

Indenture Trustee intended to assert fees and expenses in excess of $7 million.[56]  The sum of

$4.25 million, however, was the most the U.S. Debtor were prepared to provide to cover the

Indenture Trustee's fees.[57]  In July 2016, upon learning of the possible size of the fees, the

NNCC Noteholders immediately requested in writing that the Indenture Trustee provide a formal

---

[55]      See Plan at 48 (§ 7.13 ("NNI (or the Disbursing Agent on its behalf) shall pay the reasonable and documented fees of (a) the NNCC Bonds Indenture Trustee, in an amount not to exceed $4.25 million and (b) counsel to Solus Alternative Asset Management LP and PointState Capital LP in an amount not to exceed $750,000 …. If any amount remains in the cash reserve … NNI shall pay or reimburse out of such funds reasonable and documented fees (up to an additional $2.0 million) incurred by professionals in connection with the assertion of rights related to the NNCC Bonds"); id. § 7.14(c); SPSA at 24 (¶ 4(g)(v); ¶ 4(g)(vi); ¶ 4(m)).

[56]      Blauner Aff. ¶ 28.

[57]      Blauner Aff. ¶ 32.

statement regarding the fees it had incurred[58] as well as contact information of a principal at Law

Debenture who would be able to discuss the fee issue directly with Solus.  Law Debenture

responded in October, providing the fee information requested but did not provide the contact

information of a principal at Law Debenture.[59]  The October 2016 email is the first time in the

Chapter 11 Cases that the Indenture Trustee provided information about the amount of fees that

its professionals had incurred.

      40.    In early January 2017, prior to the confirmation hearing, the parties and

their attorneys met in person in an attempt to resolve the dispute over the Asserted Fees.  No

agreement was reached, and the Indenture Trustee refused to agree to the procedures the NNCC

Noteholders proposed to submit the dispute to the Court for decision.  It similarly refused to

agree to mediation.  The Court ultimately ordered the procedures and the mediation over the

Indenture Trustee's objection.  The mediation, which started on February 6, 2016, did not result

in settlement.

## III.    ARGUMENT

### A.    TRUSTEE OWES NOTEHOLDERS FIDUCIARY DUTY OF UNDIVIDED LOYALTY

      41.    New York law governs and imposes on the Indenture Trustee a fiduciary

duty of undivided loyalty to the noteholders.[60]  Section 601(a) of the Indenture requires the

---

[58]    See Tecce Decl. Ex. 19 (QE_0005573 at 5573) (Email from D. Lowenthal to D. Holzman dated July 8, 2016) (asking for "total amount of the Trustee's fees" and "name and phone number of the Trustee" so Solus could call him directly).

[59]    Tecce Decl. Ex. 20 (QE0001071 at 1071) (Email from D. Lowenthal to D. Holzman dated October 13, 2016) ("Per your request, attached is a spreadsheet showing the fees and disbursements of Law Debenture and its professionals from January 2009 through September 2016."); id. Ex. 21 (QE_0000743 at 744) (Letter Requesting Invoices dated October 14, 2016); id. Ex. 22 (QE_0001186 at 1188) (Email from J. Tecce to D. Lowenthal dated November 4, 2016) (requesting business-level discussions without presence of attorneys); id. Ex. 23 (QE_0001178 at 1179) (Letter from D. Lowenthal to J. Tecce dated November 14, 2016); id. Ex. 24 (QE_0001089 at 1091) (Letter from J. Tecce to D. Lowenthal dated November 22, 2016).

[60]    See, e.g., Royal Park Inv. SA/NV v. HSBC Bank USA, 109 F. Supp. 3d 587, 597 (S.D.N.Y. 2015) ("Following a contractually defined 'Event of Default' …. [the trustee] now must, as prudence dictates, exercise those singularly conferred prerogatives in order to secure the basic purpose of any trust indenture, the repayment of the underlying obligation."); BNP Paribas

Trustee, following an Event of Default, to exercise "the same degree of care and skill … as a prudent person would exercise or use under the circumstances in the conduct of its own affairs." This Court has observed that the prudent person standard imposes an affirmative obligation to manage professionals to avoid duplication, to ensure they only perform work that is necessary to protect the noteholders' interests and to avoid incurring fees that reduce noteholder recoveries. See In re Worldwide Direct, Inc., 334 B.R. 112, 121 & 129 (Bankr. D. Del. 2005) ("[A]n indenture trustee owes its fiduciary duty to the debenture holders, not the bankruptcy estate; " it must act "in the best interest of its debenture holders" and "with the same care as if it owned the investment"); id. at 131-32 ("While it was prudent of WTC to hire its own attorneys, it had an obligation to assure that the firm only did what was necessary to protect the Noteholders' interests;" accepting argument that indenture trustee "did not exercise the care required under the prudent person standard because it allowed duplication resulting in a reduced recovery for the Noteholders").

42.    Indeed, Worldwide Direct reviewed an indenture with the very same provisions as the Indenture governing the 7.875% Notes.  See id. at 129 ("The Indenture in this case incorporates this standard by mandating that WTC's [the indenture trustee's] services be performed with 'the same degree of care and skill in their exercise as a prudent person would exercise or use under the circumstances in the conduct of his own affairs.'"); Indenture at § 601(a).

43.    The Indenture Trustee breached the applicable duties and obligations with respect to its professionals in these cases because it allowed them to incur millions of dollars in duplicative fees for work that did not advance the interests of the holders of the 7.875% Notes.

Mortg. Corp. v. Bank of Am., N.A., 778 F. Supp. 2d 375, 401 (S.D.N.Y. 2011) ("After an event of default, the indenture trustee's fiduciary duties expand by operation of New York common law …. [It owes a] fiduciary duty of undivided loyalty to trust beneficiaries … [and its] obligations come more closely to resemble those of an ordinary fiduciary, regardless of any limitations or exculpatory provisions contained in the indenture."); see also Indenture § 112 (Indenture is governed by New York law).

Nor was it the NNCC Noteholders' obligation to direct the Indenture Trustee to not incur

unreasonable fees—that obligation resides with the Indenture Trustee under law in the

fulfillment of its fiduciary duties to the noteholders.

44.    Moreover, compared to the fees of other professionals that performed

similar work in the Chapter 11 Cases, the Asserted Fees are unreasonable.  Bank of New York is

a trustee for nearly $4 billion in notes, a member of the Creditors' Committee, and a Core Party.

It described its activity in the cases as follows:

> We've been involved in the entire case ... since day one and including since the
> Committee was formed in early 2009 .... [T]he unprecedented cross border trial that
> lasted for weeks.  The Bank of New York, as Indenture Trustee, was a core party in that
> matter.  Initially, some parties did not want us to be a core party.  We actually had to
> come to the Court to ask to be included as a core party …. [The] cross-over bondholders
> ... had claims both in the U.S. and Canada.  So there was ... nobody that spoke for the
> entire universe of those cross-over bondholders, not even the UCC .... Obviously, very
> vigorous negotiations, at least four mediations with three different mediators.  We were
> involved in all of them as Indenture Trustee .... We worked very closely with the
> Unsecured Creditors Committee certainly and the Ad Hoc Bondholder Group, provided
> input as Indenture Trustee as needed, obviously tried to keep our own legal fees and
> expenses to a minimum .... We've certainly had an active role in the allocation litigation.
> We made submissions during the trial .... [W]e appealed both this Court's Decision and
> the Canadian Court's Decision and we have the pending appeals both before the
> Canadian Supreme Court and the Third Circuit here.  We also .... helped negotiate the
> Plan provisions dealing with voting and distributions.[61]

45.    The Bank of New York engaged in the very same activities as the

Indenture Trustee.  For its services, it charged 50% less—or *$4 million*.

## B.    COURT'S WORLDWIDE DIRECT DECISION IS DIRECTLY ON POINT AND SUPPORTS SUBSTANTIAL REDUCTION OF ASSERTED FEES

46.    This Court has examined the precise issue submitted for consideration in

the NNCC Noteholders' Objection in Worldwide Direct.  In that case, Wilmington Trust

Company ("WTC") served as chairperson of the unsecured creditors' committee.  WTC also was

the indenture trustee with respect to $153 million in unsecured notes that made up 50% of all

---

[61]    See Blauner Aff. ¶ 15; Tecce Decl. Ex. 25 (Select Portions Of Jan. 24, 2017 Hr'g Tr. at 148:22-150:1 (statement from counsel to Bank of New York)).

unsecured debt in the cases.  See 334 B.R. at 118-119.  The Court reduced WTC's requested fees of $1.6 million by 38% to approximately $990,000, awarding a portion of the fees relating to WTC's committee service as a substantial contribution claim ($255,000) and the balance ($735,000) as an unsecured claim for reasonable fees under the indenture.  The remainder ($610,000) was disallowed as unreasonable.

47.     Worldwide Direct establishes the standards governing whether the Asserted Fees are reasonable.  It also compels a reduction in the Asserted Fees by more than 50%, particularly with respect to fees relating to Creditors' Committee activities and the Allocation Trial.  In no event does it support the Indenture Trustee's suggestion that fees incurred by trustees that are members of creditors' committees are per se reasonable.

48.     *First,* the decision explains that the Indenture Trustee bears the burden of proof in establishing the reasonableness of the Asserted Fees.  See Worldwide Direct, 334 B.R. at 133 ("'Where an opposing party lodges a sufficiently specific objection to an aspect of a fee award, the burden is on the party requesting the fees to justify the size of its award'") (quoting Interfaith Cmty. Org. v. Honeywell Int'l, Inc., 426 F.3d 694, 713 (3d Cir. 2005)).

49.     *Second,* the decision confirms that in order for an indenture trustee's fees to be considered "reasonable," they must relate to work performed advancing the interests of the noteholders specifically and matters peculiar to their interests—separate and apart from their interests as general unsecured creditors.  Id. at 132 (trustee has obligation to assure attorneys "only did what was necessary to protect the Noteholders' interests"); id. at 133 (disallowing fees for time spent on creditors' committee because it was for work "he did regardless of whether the meeting or call impacted on the senior debt issue or other matters peculiar to the Noteholders' interests.  Such services were not reasonably necessary or compensable").

50.     *Third,* contrary to the Indenture Trustee's position that its fees incurred as a member of the Creditors' Committee are per se reasonable, Worldwide Direct determined it is

unreasonable to charge the NNCC Noteholders for fees incurred in the performance of duties that, as a matter of law, had to benefit *all* unsecured creditors.  Indeed, the Creditors' Committee owes a fiduciary duty to all unsecured creditors—not just holders of the 7.875% Notes.  See, e.g., In re PWS Holding Corp., 228 F.3d 224, 246 (3d Cir. 2000) (noting section 1103(c) has been interpreted to imply "a fiduciary duty to committee constituents"); In re E Toys, Inc., 331 B.R. 176, 199 (D. Del. 2005) ("TBF is acting as counsel for the Committee and has a fiduciary duty to all creditors.  This is significantly different from acting as counsel for one individual creditor or group of creditors.").

51.    To the extent the Asserted Fees were incurred for work performed as a member of the Creditors' Committee, they are duplicative of the work performed by the Creditors' Committee's counsel and do not satisfy the reasonableness standard imposed under the Indenture.  See In re Worldwide Direct, Inc., 334 B.R. at 132-134 (disallowing substantial portion of counsel fees incurred by indenture trustee that served as committee co-chair for failure to satisfy indenture's reasonableness standard:  "[Counsel] attended almost every Committee meeting, performed such business-related tasks as interviewing prospective crisis managers, interviewing counsel in litigation against third parties and claims against the estate, and serving (in lieu of his client or any other Committee member) as a member of the Plan working group. This he did regardless of whether the meeting or call impacted on the senior debt issue or matters peculiar to the Noteholders' interests."); id. at 132 (noting with respect to asset sale and plan treatment that "[t]he Noteholders were in the same class and had the same interests as all other unsecured creditors .... The time records reveal an excessive amount of work on matters that were unnecessary or duplicative .... With the exception of the senior debt issue, the Noteholders' interests could be adequately represented by Committee counsel"); In re Gen. Homes Corp. FMGC, Inc., 143 B.R. 99, 103 (Bankr. S.D. Tex. 1992) ("The services provided by [indenture trustee] and its various counsel to the noteholders … in attending Committee meetings and in

bringing in-house and outside counsel to meetings of the Committee, were not beneficial to the estate or its unsecured creditors, and arguably were not beneficial to the noteholders themselves.").

52.     The Court also found that normally there is no need for counsel—as opposed to the committee member—to attend committee meetings.  If counsel participates in committee activities as a convenience to the trustee, that cannot properly be charged to the noteholders.  That is a convenience for the trustee that exists solely for its benefit.  It also leads to the undesired outcome of the attorney assuming the client's role.  See Worldwide Direct, 334 B.R. at 133 (noting with respect to attorney's attendance at committee meetings that "[attorney] effectively became a member of the Committee, without court approval, at his full hourly rate …. The Court has already stated, in this very case, its belief that Committee members' attendance at Committee meetings through counsel was not advisable").

53.     *Fourth*, the Court observed that bills where partners' time constitutes the most significant portion are unreasonable.  It similarly noted that attorneys and trustees should voluntarily reduce their bills to the extent they contain duplicative time.  See id. at 132 (observing firm "spent a total of 3,061.1 hours on this case; over 1,400 hours were spent by the partner on the file … while only 1,000 hours were spent by all associates on the file"); id. at 133 (noting that while partner "testified that he reviewed the monthly bills to eliminate unnecessary or inappropriate fees, it is not surprising that he apparently did not cut his own hours").

C.     **FEES INCURRED IN CONNECTION WITH MATTERS RELATING TO CREDITORS' COMMITTEE ARE NOT REASONABLE**

54.     The fees of Dewey and Patterson for work related exclusively to the Indenture Trustee's role as a member of the Creditors' Committee are $1.42 million and $719,000, respectively, totaling **$2.1 million**.  The Creditors' Committee was well represented by both Akin and Cassels.  There was no need for Dewey attorneys to attend 162 meetings or Patterson attorneys to attend 163 meetings; or for the two firms to staff most of these with no

27

fewer than two attorneys.  These meetings occurred on a weekly basis, and at times more frequently, over the course of an eight-year period.  A prudent person in conducting her own affairs would not have incurred these excessive fees, especially as the Creditors' Committee was ably represented by its own counsel.

55.    For most of the Creditors' Committee meetings, it was unnecessary to have the Indenture Trustee's attorneys participate.  See, e.g., Worldwide Direct, 334 B.R. at 133 ("[M]any of the services rendered by WF&G [indenture trustee's counsel] merely duplicated services performed by counsel for the Committee.  It was unreasonable for WF&G to perform them and WTC cannot be reimbursed for them;" noting that there was no reason for indenture trustee's counsel to attend meetings—that was simply for client convenience).  Moreover, to the extent there should have been any attorney in attendance at a routine call or meetings, it should have been a single attorney with a lower billing rate, not the most senior attorney with the highest billing rate.  See Worldwide Direct, 334 B.R. at 131 (agreeing that with respect to routine committee meetings, it was unreasonable to charge partner hours for work that could have been performed by a lower-billing associate).

56.    The attorneys' daily time entries also reveal several examples of needless duplication.  For example, four of the Indenture Trustee's attorneys spent over 175 hours and billed approximately $135,000 with respect to the sales of various assets of the Debtors, none of which were assets of NNCC.[62]

57.    To the extent fees were incurred in connection with Creditors' Committee activity on matters that directly impacted the 7.875% Notes, that time was reasonable.  It appears such instances were infrequent.  As the Indenture Trustee concedes "when the Trustee's obligations to the holders of the 7.875% Notes came in conflict with the Committee's position on a particular issue (e.g., the Trustee's advocacy for an allowed claim on account of the no-call

---

[62]    See Tecce Decl. Ex. 2 (Dewey & LeBoeuf LLP Invoices for January 2009 through April 2012 (with markup)).

feature of the 7.875% Notes) ... the Trustee recused itself from Committee meetings, deliberations, and votes."  Indenture Trustee's Response [ECF No. 17741] ("Ind. Trustee Resp.") ¶ 33.[63]  With respect to the few instances in which the Indenture Trustee's counsel's time entries reflect attendance at Creditors' Committee meetings where matters directly pertinent to the 7.875% Notes were discussed, the NNCC Noteholder do not object to the fees.

      58.    The Indenture Trustee clearly understood when issues related specifically to the 7.875% Notes and when they related to unsecured creditors generally.  It also understood when it was acting in its capacity as a Creditors' Committee member—and not advancing the interests of the 7.875% Notes.  To provide just one example, in early January 2013, Patterson attended a mediation and submitted an "issues" statement in advance.  The process of preparing the statement reveals the Indenture Trustee's position that it was attending that mediation "as a Committee member" and for that reason it would "discuss [the statement] with other Committee members."  In response, counsel for Solus advised "the interests of your constituents … manifestly are not [represented by the Creditors' Committee]" and asked that references to the Creditors' Committee in the Indenture Trustee's statement be removed.  Solus also asked that Law Debenture not attend the mediation, to which counsel responded "I plan to go …. as a Committee member."[64]

---

[63]    See Tecce Decl. Ex. 26 (IT0000306 at 306) (Email from D. Lowenthal to J. Heaney dated November 21, 2014) (indicating Indenture Trustee recused itself from discussion on Estimation Motion).

[64]    See Tecce Decl. Ex. 27 (IT00000320 at 320) (Email from D. Lowenthal to B. Guiney and C. Dent dated December 24, 2012) (recounting conversation with Schiffrin:  "he asked if LawDeb was going to the mediation.  I said Jim and I plan to go.  I said we've been told the mediator expects us to be there and we're going as a Committee member.  He said he heard that mediation is to deal with cross-border issues and that inter-creditor issues might not be part of it, and thus perhaps we shouldn't go"); id. Ex. 28 (IT00000272 at 272) (Email from D. Lowenthal to J. Heaney dated February 1, 2013) (recounting conversation with Shiffrin:  "Law Debenture went to and participated in the mediation last month in its capacity as a Committee member …. I said those statements suggest that the mediation parties should list issues that are common to both the U.S. and Canadian cases, and not issues that would be resolved solely in the United States"); id. Ex. 29 (IT00009292 at 9292) (Email from D. Lowenthal to J. Heaney dated February 4, 2013) (recounting conversation with Schiffrin:  "I told Javier that Judge Gross and Justice Morawetz likely don't expect parties to list their individual, parochial issues.  Rather , they want a list of the

### D.    FEES INCURRED IN CONNECTION WITH ALLOCATION TRIAL ARE UNREASONABLE

59.    Each of the Debtors and the other U.S. creditors, e.g., those represented by the Bondholder Group and the Creditors' Committee, shared the common goal of obtaining the maximum allocation of sale proceeds *vis-à-vis* the debtors' estates in non-U.S. jurisdictions. Allocation was not an NNCC-specific issue, and it did not touch upon issues peculiar to holders of the 7.875% Notes, e.g., the Support Agreement or the Intercompany Loan.  To the contrary, neither NNCC nor the holders of the 7.875% Notes ever sought to obtain any of the Lock-box proceeds.[65]  Although this Court's Allocation Decision resulted in an allocation of a portion of the Lock-box proceeds to NNCC, that result was not advocated by any party at any time.  Simply put, "allocation" was not an NNCC issue.  And, it was not made an NNCC issue simply by virtue of the Indenture Trustee's decision to make itself a Core Party.  The Indenture Trustee understood this clearly.  Its own emails reveal a clear understanding that allocation did not relate to the "*parochial*" interests being advanced by the NNCC Noteholders with respect to the 7.875% Notes.  Instead, the Indenture Trustee understood allocation was a "*common issue*" that related to U.S. creditors generally.  The Indenture Trustee's fees incurred with respect to allocation should not be charged to holders of the 7.875% Notes when, by its own admission, those fees did not specifically advance their interests. [66]

---

big, common issues, such as allocation …. Solus believes that the 2026 holders should have their own voice in the case.  'The symbolism is real' Javier said, and added that the Committee 'doesn't speak for the [2026 holders]' and that optically, it would be extremely negative not do this"); id. Ex. 30 (IT00000053 at 53) (Email from J. Schiffrin to D. Lowenthal dated February 8, 2013) (Solus counsel providing comments to statement:  "[t]here should be no reference to the Official Committee in this submission, which your client is filing in its capacity as Indenture Trustee …. [T]here is a risk the Court will mistakenly infer that the interests of your constituents are represented by the Official Committee, which they manifestly are not.  Dewey did not make a reference to the Official Committee in the mediation statement, precisely for this reason, and you should not either").

[65]    Blauner Aff. ¶¶ 9, 12-14.

[66]    See Tecce Decl. Ex. 29 (IT00009292 at 9292) (Email from D. Lowenthal to J. Heaney dated February 4, 2013) ("I told Javier that Judge Gross and Judge Morawetz **likely don't expect parties to list their individual, parochial issues.  Rather, they likely want of the big, common issues,**

60.     Moreover, the U.S. interests with respect to allocation were led capably by a battery of attorneys, including Cleary, Milbank, Akin, Torys, Bennett Jones, and Cassels.  The Indenture Trustee nonetheless involved itself at the most granular levels, even though it did not present or cross exam witnesses or make presentations at the trial.[67]  While the NNCC Noteholders were aware of the Indenture Trustee's status as a Core Party, at no point did the Indenture Trustee advise the noteholders of the accruing cost associated with it, the amount of fees that were being incurred, or the specific level of participation undertaken by the Indenture Trustee.[68]  A prudent person would not have expended $1.34 million on work that other, highly capable firms were handling when those firms and their clients had the same common goal of maximizing the sale proceeds allocated to the U.S. Debtors to the exclusion of other jurisdictions.

### E.     OTHER OBJECTIONS TO INDENTURE TRUSTEE'S FEES

61.     Dewey prepared various memoranda which do not appear to have been transferred to Patterson when it took over as the Indenture Trustee's counsel.  This resulted in the same work having to be redone and the holders of the 7.875% Notes being charged a second time for the same work.  The fees Dewey charged for these memoranda were approximately

---

*such as allocation*.  I also said that it might make sense for the Committee to indicate in its submission that each Committee member joins in and supports the joint list submitted by the Committee, the US Debtors, and the Ad Hocs.") (emphasis added).

[67]   See Tr., Hearing, May 12, 2014 [ECF No. 13963]; Tr., Hearing, May 13, 2014 [ECF No. 13964]; Tr., Hearing, May 14, 2014 [ECF No. 13965]; Tr., Hearing, May 15, 2014 [ECF No. 13966]; Tr., Hearing, May 20, 2014 [ECF No. 13968]; Tr., Hearing, May 21, 2014 [ECF No. 13969]; Tr., Hearing, May 22, 2014 [ECF No. 13970]; Tr., Hearing, May 27, 2014 [ECF No. 13971]; Tr., Hearing, May 28, 2014 [ECF No. 13973]; Tr., Hearing, May 29, 2014 [ECF No. 13974]; Tr., Hearing, May 30, 2014 [ECF No. 13975]; Tr., Hearing, June 2, 2014 [ECF No. 13976]; Tr., Hearing, June 5, 2014 [ECF No. 13977]; Tr., Hearing, June 6, 2014 [ECF No. 13978]; Tr., Hearing, June 16, 2014 [ECF No. 13967]; Tr., Hearing, June 17, 2014 [ECF No. 13979]; Tr., Hearing, June 18, 2014 [ECF No. 13980]; Tr., Hearing, June 19, 2014 [ECF No. 13981]; Tr., Hearing, June 20, 2014 [ECF No. 13982]; Tr., Hearing, June 23, 2014 [ECF No. 13983]; Tr., Hearing, June 24, 2014 [ECF No. 13984]; Tr., Hearing, Sept. 22, 2014 [ECF No. 15937]; Tr., Hearing, Sept. 2, 2014 [ECF No. 15957]; Tr., Hearing, Sept. 24, 2014 [ECF No. 15938].

[68]   Blauner Aff. ¶¶ 7, 12.

$93,000.[69]  It is unreasonable to charge the holders of the 7.875% Notes twice for the same work. In addition, the invoices of the Indenture Trustee's counsel contain various duplicate entries, totaling approximately $109,000.  These erroneous double-charges should be written off.[70] Finally, it is inappropriate and unreasonable for the Indenture Trustee's counsel to charge for time spent on preparing invoices, totaling over $100,000.  Entries reveal the attorneys at the associate and partner level billed the Indenture Trustee for time spent reviewing monthly invoices and sending them to the Indenture Trustee.  And while attorneys that are retained pursuant to an Order of the Court may submit their time for preparing fee applications, the Indenture Trustee's counsel was not retained and did not file its bills with the Court.

62.    Moreover, the Indenture Trustee's attorneys over the course of eight years billed steadily almost every single weekday and almost never on weekends or holidays, suggesting there was never any exigency to the work being performed.  By way of illustration, Dewey billed a total of 2,338.43 hours, consisting of (i) 866.1 hours on Mondays, (ii) 464.59 hours on Tuesdays, (iii) 454.25 hours on Wednesdays, (iv) 595.15 hours on Thursdays, (v) 307.19 on Fridays, (vi) 36.1 hours on Saturdays, and (vii) 31.6 hours on Sundays.  Patterson Belknap billed a total of 5,221.3 hours, consisting of (i) 866.1 hours on Mondays, (ii) 1,149.9 hours on Tuesdays, (iii) 1,080.1 hours on Wednesdays, (iv) 1,263.6 hours on Thursdays, (v) 746.3 on Fridays, (vi) 18 hours on Saturdays, and (vii) 97.3 hours on Sundays.  If the work was so pressing that it required steady billing almost every weekday over an eight-year period, it is surprising that it did not require any significant weekend time.

---

[69]    See Tecce Decl. Ex. 2 (Dewey & LeBoeuf LLP Invoices for January 2009 through April 2012 (with markup)).

[70]    See Tecce Decl. Ex. 1 (Law Debenture Trust Company of NY Invoices for February 2009 through September 2016 (with markup)) at 45-64; id. Ex. 2 (Dewey & LeBoeuf LLP Invoices for January 2009 through April 2012 (with markup)).

F. **INDENTURE TRUSTEE HAS NOT CARRIED ITS BURDEN OF ESTABLISHING REASONABLENESS**

63.     The affidavits submitted by the Indenture Trustee do not satisfy its burden of proving the reasonableness of the Asserted Fees.  See Worldwide Direct, 334 B.R. at 133 (rejecting attorneys' testimony whether its fees were reasonable as "self serving" and concluding "many of the services rendered by [trustee counsel] merely duplicated services performed by counsel for the Committee."); id. at 123 (reviewing application for substantial contribution and noting "[b]ecause WTC is presumed to be acting in the interests of the Noteholders, it must introduce something more than self-serving statements regarding its involvement in the case in order to carry its burden of demonstrating that its services provided a substantial contribution to the estate").

64.     The NNCC Noteholders do not take issue with the caliber of the Indenture Trustee's attorneys and have no intention of casting aspersions on the professionals.  This dispute goes to whether the ***Indenture Trustee*** properly managed those professionals; it has nothing to do with their qualifications.  Two affidavits have been submitted by the Indenture Trustee.  The affidavit from Delaware Trust Company—which acquired Law Debenture in December 2016—is not based on direct knowledge of the Indenture Trustee's efforts during the Chapter 11 Cases.  Both affidavits mischaracterize the NNCC Noteholders' position with respect to committee membership and reveal the ruling the Indenture Trustee seeks in this litigation. The NNCC Noteholders are not arguing that trustees should not sit on creditors' committees or even that their fees as committee members are not compensable.  Fees incurred advancing the singular interests of holders of the 7.875% Notes are reasonable for purposes of the Indenture. Here, they total no more than $3.9 million.  The Indenture Trustee can apply for a substantial contribution claim for the balance.  In no event should the Court find, as the affiants suggest, that fees incurred by indenture trustees serving as individual committee members are per se reasonable.

65.     According to the Indenture Trustee, the NNCC Noteholders "relied on it"

extensively in the cases; negotiated an unsatisfactory agreement (e.g., the NNCC Plan

Settlement) they now are trying to restructure; were aware of its status as a member of the

Creditors' Committee and a Core Party; and cannot now challenge fees relating to those

activities.  These arguments are unavailing.

66.     To substantiate the reliance argument, the Indenture Trustee points to

emails where the NNCC Noteholders counsel and the Indenture Trustee's counsel worked

cooperatively in filing short pleadings on distinct issues, e.g., the PPI dispute where interest and

"no-call" provisions were addressed and in responding to the Court's Allocation Decision.[71]

Over the course of the cases, the Indenture Trustee filed (a) eight joinders in, supplements to, or

reservations of rights with respect to other pleadings; (b) two motions; (c) one response; and (d)

proofs of claim relating to the 7.875% Notes.  With respect to several of these pleadings that are

reflected in the emails annexed to the Heaney affidavit, the Indenture Trustee and its counsel

worked in concert with the NNCC Noteholders and their counsel.

67.     But the NNCC Noteholders are *not* objecting to the fees incurred in

connection with those efforts.  Any argument premised on the NNCC Noteholders' consent to or

knowledge of that work is a red herring.  Nor do the email exchanges concerning the joinders

and statements the Indenture Trustee filed in consultation with counsel to the NNCC Noteholders

establish "reliance."  The Indenture Trustee neglects to mention that in 2011, the NNCC

Noteholders (specifically Solus) retained its own counsel (Schiffrin and later Quinn Emanuel).

That counsel ultimately became restricted on the noteholders' behalf through a separate

confidentiality agreement they negotiated with the Debtors,[72] advanced arguments relating to

post-petition interest and the Support Agreement and Intercompany Loan Claims on their own

---

[71]     See, e.g., Heaney Aff. Ex. H.

[72]     See Tecce Decl. Ex. 31 (QE_0010376 at 10381) (Final Executed Confidentiality Agreement
dated June 10, 2016).

initiative through the Estimation Motion and other pleadings, and independently negotiated the NNCC Plan Settlement.[73]  Having retained their own counsel, the NNCC Noteholders were not relying on the Indenture Trustee's counsel to monitor and be involved in every aspect of the Debtors' bankruptcy cases and they certainly did not direct the Indenture Trustee and its attorneys to do so.  Finally, in no event was that cooperative effort, and the attendant professionals courtesies reflected in "thank you" emails tantamount to a waiver of the NNCC Noteholders' rights to object to millions of dollars in fees.

68.    Those efforts and the emails annexed to the Heaney affidavit reflect that the Indenture Trustee knew how to coordinate with the NNCC Noteholders and their counsel, but failed to do so until later in the cases (e.g., 2014), after it already had incurred millions of dollars in fees.  For example, counsel for the Indenture Trustee asked if counsel for the NNCC Noteholders was going to attend depositions conducted in connection with the PPI Dispute.[74]  In another example, counsel to the NNCC Noteholders confirmed in writing that it did not want the Indenture Trustee to file an appeal from the Canadian Court's allocation decision—a direction it followed.[75]  The NNCC Noteholders also asked the Indenture Trustee to attend the final mediation, a request with which it complied; the NNCC Noteholders have *not* objected to the fees incurred in connection with that mediation.[76]

---

[73]    See ECF No. 14029 (NNCC Noteholders' Joinder in Bondholder Pleading); ECF No. 14340 (NNCC Noteholders' Statement With Respect To 9019 Motion); ECF. No. 14639 (Estimation Motion); ECF No. 16811 (NNCC Noteholders' objection to Liquidity Solution's motion to compel interim distributions).

[74]    See Tecce Decl. Ex. 32 (QE_0012687 at 12687) (Email from D. Lowenthal to J. Tecce dated September 11, 2014) ("Do you or your clients have a view about whether it would be worthwhile to attend?  If so, I will take that into consideration with Law Debenture in recommending whether to staff this or not"); id. Ex. 33 (QE_0014910 at 14910) (Email from D. Lowenthal to J. Tecce dated October 21, 2014) ("Do you plan to go to Wertheim's deposition tomorrow in the case?  I don't plan to go because Law Debenture's not a party to the PPI settlement.").

[75]    See Tecce Decl. Ex. 34 (QE_0006653 at 6653) (Email from J. Tecce to D. Lowenthal dated July 15, 2015).

[76]    See Tecce Decl. Ex. 35 (IT0000309 at 309) (Email from D. Lowenthal to J. Heaney dated August 28, 2015) ("[Tecce] said it is important that I attend mediation sessions because NNCC must have its own voice there.").

69.     Moreover, the waiver and acquiescence defenses fail a matter of law.  This Court already rejected the argument that time spent in connection with committee-related efforts cannot be challenged as unreasonable if the noteholders were aware of the participation.  See, e.g., In re Worldwide Direct, Inc., 334 B.R. at 128 (rejecting argument that noteholders were "barred" from objecting to reasonableness of indenture trustee's counsel's fees when they "never objected to [indenture trustee] serving on the Committee or serving as Committee co-chair. . . . urged [indenture trustee] to be active in the AT&T sale process and in objections to certain claims. . . . contacted [indenture trustee's counsel] for updates on the status of the case. . . . [and never told indenture trustee] its services were unnecessary;" noting "none of these factors prevents [the noteholders] (or the Court) from reviewing the reasonableness of the fees sought under the Indenture;" observing noteholders "delay in restricting the activities of WTC [the indenture trustee] is [not] evidence that Resurgence believed that those activities did provide a benefit to the Noteholders"); cf., Becker v. Bank of New York Mellon Trust Co., 172 F. Supp. 3d 777, 799 (E.D. Pa. 2016) (indenture provisions compensating trustee for "reasonable services" and providing for payment of its "reasonable expenses and disbursements" did not mean that "the bondholders would compensate the Indenture Trustee for any services, expenses, or disbursements whatsoever").

70.     The Indenture Trustee's assertion that the NNCC Noteholders knew of the Indenture Trustee's fees and waited until after they negotiated an unsatisfactory agreement in the NNCC Plan Settlement to challenge them is false.  The Indenture Trustee never sent any bills to the noteholders or provided a fee update during the course of the case.[77]  The NNCC Noteholders were unaware of the amount of the Indenture Trustee's fees until the summer of 2016 when their counsel heard informally from other parties in the case that the Indenture Trustee's fees might

---

[77]     Tecce Decl. Ex. 20 (QE_0001071 at 1071) (Email from D. Lowenthal to D. Holzman dated Oct. 13, 2016).

total between $7 million and $7.5 million.[78]  The NNCC Noteholders promptly sent emails in

early July 2016 to the Indenture Trustee requesting the actual amount and contact information for

a principal that could speak directly to the noteholders.[79]   The Indenture Trustee did not honor

either request at the time and did not send the fee totals until October 2016.[80]  And, the $4.25

million under the NNCC Plan Settlement is the maximum amount to which the Debtors would

agree to pay the Indenture Trustee's fees.[81]

      71.      The Indenture Trustee also argues the NNCC Noteholders never told it to

stop incurring fees.  But it was not until the invoices were received in December 2016 that the

NNCC Noteholders had any knowledge of the deficiencies in the invoices and the extent to

which the Indenture Trustee failed to manage its professionals.[82]  Moreover, the Indenture

Trustee is charged with the fiduciary duty to manage its professionals on behalf of the holders of

7.875% Notes and to act as a prudent person would, as if the 7.875% Notes were the Indenture

Trustee's own investment.

      72.      Lastly, while the U.S. Debtors' plan provides for the Debtors to fund **_up to_**

$4.25 million of the Indenture Trustee's reasonable and documented fees, that provision does not

constitute a finding of reasonableness.  The portion of the Asserted Fees that is determined to be

allowable ultimately may be less than $4.25 million, and the Plan's provisions are not admissions

to the contrary.  Indeed, the Plan contemplates that any portion of the $4.25 million that is not

used to satisfy the Asserted Fees will be returned to NNI for distributions to other unsecured

creditors.  See Plan at 48 (§ 7.13(b)).

---

[78]    Blauner Aff. ¶ 28.

[79]    See Tecce Decl. Ex. 19 (QE_0005573 at 5573) (Email from D. Holzman to D. Lowenthal dated July 7, 2016).

[80]    See Tecce Decl. Ex. 20 (QE_0001071 at 1071) (Email from D. Lowenthal to D. Holzman dated Oct. 13, 2016).

[81]    Blauner Aff. ¶ 32.

[82]    Blauner Aff. ¶ 20.

### G. INDENTURE TRUSTEE CANNOT CHARGE NOTEHOLDERS FOR FEES INCURRED IN LITIGATING ITS FEES

73. In January 2017, the Indenture Trustee incurred more than $200,000 with respect to this litigation. At that rate, its total fees in connection with this litigation may total at least between $400,000-$500,000. The Indenture Trustee intends to charge the noteholders for those amounts in addition to the $8 million in Asserted Fees. Neither the Supreme Court nor the Indenture permit the Indenture Trustee to do so. Under "the bedrock principle known as the American Rule: Each litigant pays his or her attorneys' fees, win or lose, unless a statute or contract provides otherwise. The American Rule has roots in our common law reaching back to at least the 18th century." ASARCO, 135 S. Ct. at 2164.

74. Any exception to the American Rule agreed to by the parties must be explicit. Language that merely refers to "reasonable attorneys' fees" without an express reference awarding "litigation costs to the prevailing party" is not sufficiently precise. See id. ("[We] will not deviate from the American Rule absent explicit statutory authority …. [Such exceptions contain] specific and explicit provisions for the allowance of attorneys fees …. [that authorize] 'reasonable attorneys' fees,' 'fees,' or 'litigation costs' *and* usually refer to a 'prevailing party' in the context of an adversarial action'") (emphasis added).

75. The Indenture's language contains no such express provision and does not justify a deviation from the American Rule. Section 606 simply refers to "reasonable" fees and expenses without referencing a "prevailing party" or "adversarial action" or otherwise providing that holders of the 7.875% Notes are responsible for fees if they loses a dispute with the Indenture Trustee. See, e.g., id. (finding phrase 'reasonable compensation for actual, necessary services rendered' neither specifically nor explicitly authorizes" departure from American Rule); Zurich Am. Ins. Co. v. Team Tankers, A.S., 811 F.3d 584, 590 (3d Cir. 2016) (finding contract provision that "[d]amages for breach of this charter shall include all provable damages, and all costs of suit and attorney fees incurred in any action hereunder" was not sufficiently precise to

cover fees incurred in shipper's action for damages to goods in transit); In re Boomerang Tube, Inc., 548 B.R. 69, 74-75 (Bankr. D. Del. 2016) (finding contract exception to American Rule might apply to contract "providing that each will be responsible for the other's legal fees if it loses a dispute between them").

76.     Indeed, services rendered defending the Indenture Trustee's fees and those of its professionals are not rendered for the benefit of holders of the 7.875% Notes.  They are rendered solely for the trustee and its professionals.  See, e.g., ASARCO, 135 S.Ct. at 2166 (noting fees incurred in adversarial fee-defense litigation are not for "services rendered"); Boomerang, 548 B.R. at 75 (fees in fee-defense litigation "are for services performed by Committee counsel only for their own interests").  Accordingly, the time spent defending the Asserted Fees is not compensable.  See id. ("We decline to adopt a reading of § 330(a)(1) that would allow courts to pay professionals for arguing for fees they were found never to have been entitled to in the first place.").

## CONCLUSION

WHEREFORE, the NNCC Noteholders respectfully request that the Court  (A) sustain the Objection and (B) award such other, further relief as the Court deems appropriate.

**[[Remainder Of Page Intentionally Left Blank]]**

Respectfully submitted,

Dated:  Wilmington, Delaware
        February 24, 2017

/s/ *Joanne Pileggi Pinckney*
    Joanne Pileggi Pinckney (DE No. 3344)
    Seton C. Mangine (DE No. 5574)

**PINCKNEY, WEIDINGER, URBAN & JOYCE LLC**
(302) 504 1497 (Telephone)
3711 Kennett Pike, Suite 210
Greenville, Delaware 19807

-and-

James C. Tecce (admitted pro hac)
Corey Worcester (admitted pro hac)
Daniel S. Holzman (admitted pro hac)
**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
52 Madison Avenue, 22nd Floor
(212) 849-7000 (Telephone)
New York, New York  10010

*Counsel to Solus Alternative Asset*
*Management LP and PointState Capital LP*