**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| NORTEL NETWORKS INC., *et al.* | ) | Case No. 09-10138(KG) |
| | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | **Re Dkt. Nos: 17687, 17741** |

## <u>OPINION</u>

<u>*Counsel for Indenture Trustee*</u>

Stephen M. Miller, Esquire
Eric J. Monzo, Esquire
Morris James LLP
500 Delaware Avenue, Ste. 1500
Wilmington, DE 19899-2306

and

Daniel A. Lowenthal, Esquire
James V. Masella, III, Esquire
Brian P. Guiney, Esquire
Patterson Belknap Webb
& Tyler LLP
1133 Avenue of the Americas
New York, NY 10036-6710

*Counsel for Solus Alternative Asset
Management LP and Point State Capital LP*

Joanne Pileggi Pinckney, Esquire
Seton C. Mangine, Esquire
Pinckney, Wedinger, Urban & Joyce LLC
3711 Kennett Pike, Ste 210
Greenville, DE 19807

and

James C. Tecce, Esquire
Corey Worcester, Esquire
Daniel Holzman, Esquire
Quinn Emanuel Urquhart
& Sullivan, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010

Dated: March 8, 2017

Solus Alternative Asset Management LP ("Solus") and Point State Capital LP (collectively, the "Noteholders")[1] are two sophisticated investment funds which have objected to the fees which the Nortel Networks Capital Corporation ("NNCC") Bonds Indenture Trustee (the "Indenture Trustee") asserts. The Noteholders own 90% of the Notes. The issues presented to the Court are these: did the Indenture Trustee act prudently in assigning work to and supervising its lawyers, and were the fees charged reasonable? The amount of fees at issue for the period from January 14, 2009, through the present, is approximately $8.1 million (the "Asserted Fees") and the amount to which the Noteholders object is approximately $4.4 million[2]. The matter has been briefed, the contesting parties presented evidence at a hearing before the Court on February 28, 2017 (the "Hearing"), and the Court is now deciding the appropriateness of the Asserted Fees and the Noteholders' objection to the Asserted Fees.

---

[1]   The Noteholders hold certain 7.875% rate senior notes due June 15, 2006 (the "Notes"), which NNCC f/k/a Northern Telecom Corporation and Nortel Networks Limited f/k/a Northern Telecom Limited ("NNL") issued, and which were guaranteed by NNL, pursuant to an Indenture, dated February 15, 1996 (the "Indenture").

[2]   The totals which the parties submitted i.e., the fees and the objections, have changed and differ. Accordingly, the Court's Order on the Opinion will speak to the amounts to be deducted and the Court may later have to address the amount due.

## BACKGROUND

Nortel Networks, Inc. ("NNI"), NNCC and other Nortel Entities filed for bankruptcy relief on January 14, 2009 (the "Petition Date").  On January 22, 2009, the Office of the United States Trustee appointed an Official Committee of Unsecured Creditors (the "Committee") which included the Indenture Trustee as a member.

On the Petition Date, the Debtors' ultimate corporate parent NNC, NNI's direct corporate parent NNL, and certain of their Canadian affiliates commenced a proceeding in the Ontario Superior Court of Justice (the "Canadian Court") under the Companies' Creditors Arrangement Act (Canada), seeking relief from their creditors.  The Canadian Court approved a Monitor, Ernst & Young, Inc. Also on the Petition Date, the High Court of England and Wales placed nineteen of Nortel's European affiliates, including Nortel Networks UK Limited and certain of its affiliates located in Europe, the Middle East and Africa into administration under the control of court-appointed administrators and foreign representatives. Other Nortel affiliates have commenced and in the future may commence additional creditor protection, insolvency and dissolution proceedings around the world.

NNCC is a special purpose financing vehicle that issued the Notes, which are guaranteed by NNL.  NNI and NNCC entered into the Support Agreement, dated February 15, 1996, (the "Support Agreement") in connection with NNCC's issuance of the Notes.  The Support Agreement required NNI to ensure NNCC's solvency.

Following a successful mediation,[3] the parties to the dispute over the allocation of $7.3 billion raised through sales of Debtors' assets (the "Allocation Dispute") agreed to settle the Allocation Dispute.  The parties, including the Noteholders, entered into a global settlement, the Settlement Plan Support Agreement (the "SPSA").  Thereafter, on January 24, 2017, the Court approved the SPSA and confirmed the Plan based on the SPSA.

During most of the case, Law Debenture Trust Company of New York ("Law Debenture") served as Indenture Trustee.  Affidavit of James D. Heaney, dated February 22, 2017 ("Heaney Aff."), ¶ 1.  On December 6, 2016, Delaware Trust Company ("DTC") became Indenture Trustee when Law Debenture sold its

---

[3]  The "successful" mediation was the fourth mediation and the only successful one.

corporate trust business to DTC.[4]  Affidavit of Sandra E. Horwitz, dated February 21, 2017 ("Horwitz Aff."), ¶ 1.

NNCC's and NNI's bankruptcy filings created an event of default under the Indenture.  In turn, the Indenture provides upon an event of default that:

> [T]he Trustee shall exercise such of the rights and powers vested in it by this Indenture, and use the same degree of care and skill in their exercise, as a prudent person would exercise or use under the circumstances in the conduct of his own affairs.

Indenture, Section 601.  *See also*, the Trust Indenture Act, 15 U.S.C. § 77ooo(c).  The Indenture Trustee is then authorized in performing its duties to "act through agents or attorneys," and to "consult with counsel of its selection."  Indenture, Section 602.

In the course of the case, the Indenture Trustee retained law firms to represent it.  The law firms (the "Lawyers") which are the subject of the present dispute[5] are:

- Dewey & LeBoeuf LLP ("Dewey") which represented the Indenture Trustee from the Petition Date to May 2012.  Dewey's fees total $2,707,644.50.  The Noteholders have objected to $1,896,670 of the fees.

---

[4]  "Indenture Trustee" therefore refers to Law Debenture before December 6, 2016, and DTC thereafter.  It is, however, Law Debenture to which the Court principally refers.

[5]  The Noteholders have not objected to the fees of Morris James LLP; or to the fees of the Canadian law firms, Fasken Martineau DuMoulin LLP and WeirFoulds LLP. All represented the Indenture Trustee.

- Patterson Belknap Webb & Tyler LLP ("Patterson Belknap") which represented the Indenture Trustee beginning May 2012 through the present. Patterson Belknap's fees as of January 31, 2017 total $4,134,423.00. The Noteholders have objected to $2,023,479.50 of the fees.

- Borden Ladner Gervais LLP ("BLG") which represented the Indenture Trustee as its Canadian counsel from September 17, 2012, to August 19, 2016. BLG's fees total $553,247.12. The Noteholders have objected to $187,928.51 of the fees.

The breakdown of the Noteholders objections are as follows:

| | |
|---|---|
| Law Debenture Fee Request | $ 379,892.86 |
| Committee Work | $ 221,301.61 |
| Duplication | $ 32,022.56 |
| | |
| DTC Fee Request | $ 38,875.00 |
| | |
| BLG Fee Request | $ 553,247.12 |
| Committee Work | $ 6,652.80 |
| Allocation | $ 181,275.71 |
| | |
| Dewey Fee Request | $2,707,644.50[6] |
| Committee Work | $1,648,928.00 |
| Allocation | $ 141,766.00 |
| | |
| Patterson Belknap Fee Request | $4,134,423.00 |
| Committee Work | $ 748,406.00 |
| Allocation | $1,121,454.00 |
| Fees | $ 84,471.50[7] |
| Duplication | $ 69,148.00 |

---

[6] Dewey voluntarily reduced its fee by $60,000.00.

[7] Patterson Belknap voluntarily reduced its fee by the amount charged for bill preparation, or $84,471.50.

The Court has reviewed the daily entries of Dewey, Patterson Belknap and BLG, and the fee request by Law Debenture.  The Court received the Heaney and Horwitz affidavits in lieu of their direct testimony.  Mr. Heaney testified that he carefully reviewed the bills which the Lawyers submitted and found them to be reasonable.  Heaney Aff., ¶¶ 54-55.  Likewise, Ms. Horwitz reviewed the December 2016 and January 2017 bills of Patterson Belknap and in her judgment they were reasonable.  Horwitz Aff., ¶¶ 12-14.  The Noteholders cross-examined Mr. Heaney and Ms. Horwitz at the Hearing.  Stephen Blauner of Solus submitted an affidavit but was not cross-examined at the Hearing.

## **DISCUSSION**

The Court uses the lodestar method which establishes a presumptively reasonable fee.  The lodestar is the number of hours multiplied by a reasonable hourly rate.  The Noteholders are not objecting to the hourly rates or the qualifications, caliber or integrity of the Lawyers, complexity of the case or the like, factors which courts consider to determine the lodestar.

The Indenture Trustees' and Lawyers' submission of detailed time records satisfied their *prima facie* burden to establish their entitlement to the fees they requested and the burden then shifted to the Noteholders.  The Court required the Noteholders to provide it with record evidence of the inappropriateness of the fees

7

the Indenture Trustee requested. *Evans v. Port Auth. Of N.Y. & N.J.*, 273 F. 3d 346, 361 (3d Cir. 2001). The Noteholders provided their review of the time records and marked their objections by color coding.

The Indenture requires that disputes over its terms be decided in accordance with New York law. Indenture, Section 112. Under New York law, the fiduciary duties of an indenture trustee are governed by a "prudent person" standard. *Dresner Co. Profit Sharing Plan v. First Fid. Bank, N.A., New Jersey*, 1996 WL 694345, at *3 (S.D.N.Y. Dec. 4, 1996), *LNC Inv., Inc. v. First Fid. Bank, Nat. Ass'n*, 935 F. Supp. 1333, 1347–48 (S.D.N.Y. 1996) (citing *Beck v. Manufacturers Hanover Trust Co.*, 632 N.Y.S. 2d 520, 527–28 (N.Y. App. Div. 1995) (holding that under New York law, after an event of default the prudent person standard applies to the conduct of indenture trustees). The test is whether the trustee exercised "such diligence and such prudence . . . . as in general, prudent men of discretion and intelligence in such matters, employ in their own like affairs." *In re Bank of N.Y.*, 323 N.E. 2d 700 (1974) (cited by *Dresner*, 1996 WL 694345, at *3 (S.D.N.Y. Dec. 4, 1996)).

Whether the Indenture Trustee acted with prudence is not something the Court can readily review in hindsight. The Indenture Trustee is charged with acting with prudence at the time in question. In other words, the Trustee's judgment must be informed at the time the Trustee acted. *LNC Invs., Inc. v. First*

*Fid. Bank, N.A.*, 1997 WL 528283, at * 17 (S.D.N.Y. Aug. 27, 1997). *See also Katsaros v. Cody*, 744 F. 2d 270, 279 (2d Cir. 1984), *quoting Donovan v. Mazzola*, 716 F. 2d 1226, 1232 (9th Cir. 1983), *cert. denied*, 464 U.S. 1040 (1984) ("The court's task is to inquire 'whether the individual trustees, at the time they engaged in the challenged transactions, employed the appropriate methods to investigate the merits of the investment and to structure the investment.'")  The questions to be decided in this Opinion are whether the Indenture Trustee acted prudently in assigning the Lawyers to their tasks, and whether the Lawyers' work was reasonable.

It does appear to the Court that the genesis of the dispute may be the poor relationship between the Indenture Trustee and Solus.  The latter issued a "direction letter" to the Indenture Trustee, dated May 4, 2012, directing the Indenture Trustee to replace Dewey with Kirkland & Ellis LLP as its attorneys. Blauner Aff., ¶ 24; Declaration of James Tecce, dated February 24, 2017, Exhibit 3. The Indenture Trustee instead hired Patterson Belknap.  Additionally, there was a difficult telephone conversation between Mr. Heaney of Law Debenture and Mr. Blauner of Solus on May 9, 2012.  Heaney Aff., ¶¶ 26-28.  It is unclear what, if any, affect these matters had on the present dispute.  The fact in connection with the "direction letter" is that Solus failed to provide the Indenture Trustee with proof of its majority ownership of the Notes, and that the Indenture Trustee is at liberty

to hire the law firm of its choice.    Hearing Transcript, pages 86:2-86:7; Blauner Aff., Exhibit F.   The relationship does not inform the dispute but it was unfortunate.

Nonetheless, the Indenture Trustee's lawyers, Patterson Belknap, had regular discussions with Solus.    For instance, on June 29, 2016, Solus asked Patterson Belknap for memoranda of law on a subject, which Patterson Belknap promptly provided.  Affidavit of Eric J. Monzo, dated February 24, 2017, Exhibits T, U, V.   There are many other such communications in the record.   The Noteholders, however, failed to ask or express concern about billing until the end of the case.

The Noteholders point in particular to a communication with Patterson Belknap, in which the Noteholders directed Patterson Belknap not to attend a mediation.  Patterson Belknap responded that "I plan to go . . . as a Committee member." Tecce Decl., Exhibit 27.  The Noteholders argue that this is an example of Committee work which is not compensable.   However, as further discussed within, the Indenture Trustee was a "Core Party" and Patterson Belknap was obligated to attend the mediation and it was prudent and reasonable that it attend.

## The Indenture Trustee's Prudence

The Court is fully satisfied that for the most part the Indenture Trustee acted prudently through the progress of the complex and contentious bankruptcy case and thereby satisfied Sections 601 and 602 of the Indenture. The Indenture Trustee points to the following as evidence of prudence (Heaney Aff., generally):

1.    The Indenture Trustee's lawyers reviewed pleadings filed in the cases pending in Canada and the United States, remained current on the cases and developments, monitored key issues and provided the Indenture Trustee with regular reports.

2.    The UST appointed the Indenture Trustee to the Committee from near the beginning of the case and the Indenture Trustee, through the Lawyers, represented all holders of the Notes.

3.    The Lawyers researched the unique features of the Notes.

4.    The Indenture Trustee filed proofs of claim and amended proofs of claim.

5.    The Indenture Trustee defended against Wilmington Trust Company's objection to the payment of post-petition interest.

6.    The Indenture Trustee participated in four rounds of mediation.

7.    The Court designated the Indenture Trustee as a Core Party for the Allocation trial, and the Indenture Trustee participated in discovery, pre-trial briefing, the trial in Canada and the United States, and post-trial briefing.

8.    The Indenture Trustee moved for reconsideration of the
Allocation decisions in both the United States and Canada and both
monitored and participated in appellate briefing.

9.    The Indenture Trustee negotiated provisions of the Plan and
Disclosure Statement, especially the voting and distribution
mechanics for the benefit of holders of the Notes.

The Indenture Trustee also had to learn the intricacies of the unique Notes.

The Noteholders have the benefit of the Support Agreement; a no-call provision

prohibits repayment before maturity; and the Notes were issued by a U.S. Debtor

and guaranteed by a Canadian Debtor, the opposite of the "cross-over bonds" and

therefore not necessarily aligned with the "cross-over bonds."

There is no question that the Nortel bankruptcy cases were very long,

complex and contentious cases.  It is equally clear that the Indenture Trustee

performed its responsibilities prudently except as discussed below.  Such

performance included retaining and relying on the Lawyers who represented and

advised it.  The evidence presented, on balance, indicates that the Indenture

Trustee, and Law Debenture in particular, upheld their duties.

<u>Categories of Objections</u>

The Noteholders have objected to categories of fee requests which the

Court will address.  The objection to Law Debenture's fees is confusing.  On one

hand, the Noteholders object to the Indenture Trustee's Committee Work to the

12

tune of $221,301.61.  Yet, the Noteholders say they "are not objecting to any and all of the Indenture Trustee's fees and expenses with respect to the Creditors' Committee."  Blauner Aff., ¶ 18.  The Court has, therefore, removed the Noteholders' objection to the Law Debenture's Committee Work.  The only remaining objection to Law Debenture's fees is to "Duplication."  The Court discusses Duplication below but could not find any basis for the category of objection.

### 1.   Committee Work

The Noteholders have objected to the Lawyers time and fees which they request for their work on the Committee.  The objections are substantial:

| | |
|---|---|
| Dewey | $1,896,670.00 |
| Patterson Belknap | $2,023,479.50 |
| Law Debenture | $   253,324.17 |
| BLG | $   187,928.51 |
| | |
| Total | $4,361,402.18 |

The total of the objections is over 50% of the requested fees.[8]  Based on the Noteholders' representation discussed above, the Court will not make any adjustment to the Indenture Trustees' fees.

---

[8]  Patterson Belknap directs the Court's attention to a number of entries to which the Noteholders objected on the basis of Committee Work.  The Court has carefully reviewed the time records and does not agree with the objections.

The question here is whether it was prudent and reasonable for the Indenture Trustee to have charged for the Lawyers' time working on the Committee.  *See* Affidavit of Stephen Blauner in Support of Objection of NNCC Noteholders to Asserted Fees and Expenses of Indenture Trustee, dated February 22, 2017 (the "Blauner Aff."):[9]

> 19.    I was not aware, however, that the Indenture Trustee had its own lawyers attending all meetings and calls of the Creditors' Committee.  Nor was I aware that legal fees relating to its participation on the Creditors' Committee would amount to nearly $2.3 million dollars.  Indeed, given that the Creditor's Committee was represented by Akin Gump and played an active role in the Chapter 11 Cases, I did not anticipate that the Indenture Trustee would have or need separate legal representation with respect to the Creditors' Committee, or that it would not rely on counsel for the Creditors' Committee in connection with discharging its duties to the entire body of unsecured creditors.  Nor was I provided a budget, fee summary, estimate, or update with respect to those fees at any time while they were being incurred.

> 20.    Having now reviewed the time records of the Indenture Trustee's lawyers associated with the Indenture Trustee's membership on the Creditor's Committee, the services appear routine and duplicative of services rendered by attorneys for the Creditors' Committee. To the extent that the Indenture Trustee represented the interests of holders of the 7.875% Notes-apart from membership on the Creditor's Committee-we do not question its fees.   To the extent that the fees represent the cost of services rendered generally to the entire body of unsecured creditors, it would be unreasonable to charge holders of the 7.875% Notes.

---

[9]  The Noteholders' objections address only fees.  The Noteholders do not contend that the expenses of the Indenture Trustee and the Lawyers were inappropriate.

Blauner Aff., ¶¶ 19 and 20.

The Indenture Trustee was entitled to "act through agents or attorneys" and to "consult with counsel of it selection . . . . "  Indenture, Section 6.02.  Which is what the Indenture Trustee did.  Given the complexity of the case, the Court is unwilling to speculate that the Lawyers' attendance at Committee meetings in person or by telephone was imprudent.  What was imprudent and unreasonable was having more than one attorney attending the meetings.  One attorney attending meetings and reviewing Committee materials was sufficient to protect the Noteholders.

The Court is reminded that it is common for indenture trustees to serve on creditors' committees.  *See e.g.*, *In re Washington Mutual, Inc.*, Case No. 08-12229 (Bankr. D. Del. 2008), D.I. 78; and *In re Energy Future Holdings Corp.*, Case No. 14-10979 (Bankr. D. Del. 2016), D.I. 420 and 8955 (Bankr. D. Del. 2014), as well as many other cases in Delaware and elsewhere.

In support of their objection, the Noteholders rely heavily on *In re Worldwide Direct, Inc.*, 334 B.R. 112 (Bankr. D. Del. 2005),[10] and the decision merits the Court's

---

[10]   The Court is aware that *In re Gen. Homes Corp.*, 143 B.R. 99 (Bankr. S.D. Tex.) held the same.  Like *Worldwide Direct*, the decision is of very limited applicability to the facts here.

careful consideration.   In *Worldwide Direct*, the court had to address the applications of Wilmington Trust Company ("WTC"), as indenture trustee, for allowance of an administrative expense claim and a charging lien for its unsecured claim for services rendered by WTC and its attorneys, to which there was an objection.   The court first noted that the indenture, like the Indenture here, required that WTC, as indenture trustee, perform its services with the care and skill as would a prudent person.  *Id.* at 129.  The court in *Worldwide Direct* held that the indenture trustee was obligated "to assure that the [law] firm did only what was necessary to protect the Noteholders' interests," *id.* at 132, the services rendered by the law firms "merely duplicated services performed by counsel for the Committee," and therefore the indenture trustee would not be reimbursed for the work of the law firms.  *Id.* at 133.  The Noteholders cite *Worldwide Direct* for the proposition that in order for an indenture trustee's fees to be considered reasonable, "they must relate to work performed advancing the interests of the noteholders specifically and matters peculiar to their interests – separate and apart from their interests as general unsecured creditors."   Memorandum of Law in Support of Objection to Solus Alternative Asset Management LP and Point State Capital LP to Asserted Fees and Expenses of Indenture Trustee, page 25.

16

The Indenture Trustee has an answer to the Noteholders' position. First, the Indenture Trustee points to the fact that the *Worldwide Direct* case was very different from the *Nortel* cases. In *Worldwide Direct* it took debtors less than two years to obtain an order confirming a plan of liquidation, compared to eight years in *Nortel*. Furthermore, the *Nortel* cases were far more complex – and riskier to the Noteholders – than was *Worldwide Direct* to its noteholders. The *Worldwide Direct* court itself acknowledged that "[t]his was not an unusually complicated case . . . ." 334 B.R. 132. *Nortel* was an unusually complicated case. Finally, the Court is not convinced that *Worldwide Direct* is controlling law because it does not allow for an indenture trustee's forward thinking about the issues in the case.

The Noteholders went through all of the time records and marked for the Court's benefit the Committee Work, namely the matters which the Noteholders "believe" were matters pertaining to the work the Committee was already doing on behalf of all unsecured creditors. In the Court's view, that was a hindsight exercise. It simply was implausible for the Indenture Trustee or the Lawyers to know whether at the time they were performing the work that the Noteholders' interests did not need protection, or whether what they learned through the Committee would be of no benefit to the Noteholders. It is not apparent that the Committee Work did not benefit the Noteholders. Except as noted below, the

Noteholders presented no evidence that the Indenture Trustee or the Lawyers were doing duplicative work. The matters at hand were too important to leave to chance that the Committee Work would have no impact on or significance to the Notes.

It was not, however, prudent for the Indenture Trustee or reasonable for the Lawyers to have more than one lawyer preparing for Committee meetings or attending Committee meetings. The Court has therefore carefully reviewed the Lawyers' time records and the Noteholders' objections. As a result, the Court will limit the Committee meeting fees (preparation and the meeting itself) to one lawyer at both Dewey and Patterson Belknap. The one lawyer at Dewey eligible to bill for Committee Work was Lawrence E. Miller; and at Patterson Belknap the one lawyer was Daniel A. Lowenthal. Both were the lead counsel at their firms. At BLG, only Edmond Lamek spent time on Committee Work to which the Noteholders objected.

Based on the Court's careful review of the time records, and based on then current hourly rates corresponding to the time, the Court will reduce the fees for the Committee Work as follows:[11]

Dewey - a reduction of $393,553.70
Patterson Belknap - a reduction of $188,169.50

The Court has therefore addressed and rectified the unreasonableness of the Lawyers' work on behalf of the Indenture Trustee.

## 2.  Allocation

The Noteholders take issue with the Indenture Trustee's and the Lawyers' participation, or some of the participation, in the Allocation Dispute.  In particular, the Noteholders object to the Lawyers' work on depositions, attendance at trial and work done preparing for and at the mediations.  The Noteholders do not object to the motion for reconsideration and appellate work which the Lawyers prepared after the Court issued its decision on the Allocation Dispute.  The Noteholders also do not object to work Patterson Belknap did on the payment of interest, called the "PPI Dispute."  The Noteholders do object to $1,444,495.71 of

---

[11]    The reduction reflects the elimination of the fees of Mohsin N. Khambati ($353,641.20) and Maria A. Dantas ($39,912.50) at Dewey, and Brian P. Guiney ($123,676.00) and Craig W. Dent ($64,493.50) at Patterson Belknap.  The amounts of the reduction are indicated in the parentheticals.

fees charged by Patterson Belknap ($1,121,454.00), Dewey ($141,766.00) and BLG ($181,275.71).

The Court and the Canadian Court named the Indenture Trustee as a "Core Party" in the Allocation Dispute.  The Court (and likely the Canadian Court) expected the Indenture Trustee's full participation in the Allocation Dispute and the Indenture Trustee did fully engage in depositions and at trial.  The Court finds that the Noteholders' position on Allocation is strained.  Using an expression which the Court heard at the Hearing, the Noteholders appear to argue that the lawyers should have "parachuted in and parachuted out" of the Allocation Dispute at what the Noteholders deem – in hindsight – to have been the appropriate times.  The Noteholders argue that Patterson Belknap and BLG should not have attended depositions or trial but that the work they did on the PPI Dispute, the motion for reconsideration and the appeal are compensable.  The Noteholders also assert that the Indenture Trustee and the Lawyers had no business attending the mediation sessions.

The Noteholders are clearly wrong on their objection to the fees billed on the Allocation Dispute.  The Court and the Canadian Court named the Indenture Trustee as a "Core Party" because its interest varied from other parties.  The Allocation Dispute was massive, unique and very complicated and it is little

wonder that the fees incident to the Allocation Dispute were large in amount.  It is passing strange for the Noteholders to expect the Lawyers to "parachute in" at the time for reconsideration and appeal of the Allocation decision, but "parachute out" when depositions were taken, the trial was taking place and there was mediation.  The Indenture Trustee and the Lawyers had a fiduciary duty to protect and to advance the interests of the Noteholders and that is what they did.[12]  The Court again reviewed the Lawyers' time entries relating to the Allocation Dispute and finds that the work performed was necessary and appropriate.

The Court will, however, deduct the fees of Dewey to which the Noteholders object in the sum of $141,766.  There was testimony at the Hearing and evidence presented that Dewey was uncooperative at the conclusion of its representation of the Indenture Trustee in transferring its work papers to Patterson Belknap, to the disadvantage of the Indenture Trustee.  It took Patterson Belknap four weeks of considerable effort to obtain the Dewey work papers and then Dewey delivered only minimal material.  The wrongful conduct of Dewey requires the Court to sustain the Noteholders' objection as to Dewey and to deduct from its fees the sum of $141,766.00 for its work on the Allocation Dispute.

---

[12]  The Indenture Trustee points out as an example of its and the Lawyers being on the spot the deposition of John McConnell and the correction Patterson Belknap made to the deposition testimony.

### 3. Duplication

The Noteholders object to the Indenture Trustee's ($32,022.56), and Patterson Belknap's ($69,148.00) fees for "Duplication."  The Noteholders did not discuss the "Duplication" objection in either its Memorandum or at the Hearing. After reviewing the time records the Court can find no basis for the objection. Accordingly, the Court denies the Duplication objection.

### 4. Transition

The Noteholders object to what they call "Transition" fees which Dewey charged and from which the Indenture Trustee did not benefit.  The amount at issue is $105,976.00.  Dewey agreed to reduce its fees by $60,000.00.  However, Patterson Belknap was compelled to do and bill for additional work as a result of Dewey's nonfeasance.  Accordingly, the Court will further reduce Dewey's fees by the entire amount of the objection, or $45,976.00.

### 5. Billing

The Noteholders object to Patterson Belknap's fees in preparing its bills. Patterson Belknap has withdrawn these fees and, accordingly, the objection is moot.

6.  Fees for the Dispute

The final issue for the Court to decide is whether Patterson Belknap is entitled to fees for its work in defending its fees.  The Court finds that it is.

The "American Rule" on fees is the concept that "[e]ach litigant pays his own attorney's fees, win or lose, unless a statute or contract provides otherwise." *Baker Botts L.L.P. v. ASARCO LLC*, 135 S. Ct. 2158, 2161 (2015) (quoting *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 252-53 (2010)).  The Supreme Court in *ASARCO* held that lawyers could not recover fees for defending their fees in the bankruptcy case.  *Id.* at 2163.  The Supreme Court found that Section 330 of the Bankruptcy Code which authorizes payment of professionals is not a statutory exception to the American Rule.  Before a statute or contract provides an exception to the American Rule, it must mention "fees," a "prevailing party" and a "civil action."  *Id.*  Section 330 does not.

Following *ASARCO*, the court in *In re Boomerang Tube, Inc.*, 548 B.R. 69 (Bankr. D. Del. 2016) held that an attempt by a creditors' committee and its counsel to contract for fee defense costs to be paid by the estate did not trump the American Rule.  The *Boomerang* court denied the fees for defending fees under Section 328 and the retention agreements.  The court held that Section 328 is not a

23

"specific and explicit" statute that authorizes the prevailing party to recover fees in an adversarial action. *Id.* at 72.

The court found that the retention agreement was a contract, but that it was not a bilateral agreement, and that its terms were subject to the court's approval and modification. *Boomerang*, 548 B.R. at 74. Thus, the retention agreement was not "a contract between two parties providing that each will be responsible for the other's legal fees if it loses a dispute between them." *Id.* at 74-75. Instead, the retention agreement was a contract between the creditors' committee and its attorneys providing that the estate, a third party, would pay the defense costs even if the estate was not the objecting party.

The Court finds that here, the Indenture is a contract which qualifies for an exception to the American Rule. The Indenture provides at Section 606 as follows:

> (a)    The Issuers shall pay to the Trustee from time to time compensation for its services as agreed separately by the Issuers and the Trustee. The Trustee's compensation shall not be limited by any law on compensation of a trustee of an express trust.
>
> (b)    The issuers, severally and not jointly, shall indemnify the Trustee or any predecessor Trustee and their agents for, and to hold them harmless against, any and all loss, damage, claims, liability or expense arising out of or in connection with the acceptance or administration of the trust or trusts hereunder, including the costs and expenses of defending itself against any claim or liability in connection with the exercise or performance of any of its powers or duties hereunder . . . .

(c)     Except as otherwise expressly provided herein, the Issuers agree to reimburse the Trustee upon its request for all reasonable and documented expenses, disbursements and advances incurred or made by the Trustee in accordance with any provision of this Indenture (including the reasonable and documented compensation, expenses and disbursements of its agents and counsel) . . . .

(d)     To secure the Issuers' respective payment obligations in this Section, the Trustee shall have a lien prior to Debt Securities on all money or property held or collected by the Trustee, except that held in trust to pay principal and interest on Debt Securities.

The contract, i.e., the Indenture, provides for payment of the Indenture Trustees' and its attorneys' fees incurred in the fee dispute.  Section 606(b) requires the Debtors, i.e., the Issuers, to indemnify the Indenture Trustee for "costs and expenses of defending itself  . . . ." Section 606(d) entitles the Indenture Trustee to exercise a charging lien against distributions to secure payment.  The Indenture is clearly outside the circumstances of *ASARCO* and *Boomerang*.  The Indenture Trustee and its lawyers are therefore awarded their fees for the fee dispute.

## CONCLUSION

The Court had to decide on a forward basis whether the Indenture Trustee acted prudently in managing its lawyers, and whether the amounts charged were reasonable.  The Noteholders do not challenge the professionalism of the Lawyers, the results or the hourly rates.  Instead, the Noteholders complain that the Lawyers

charged for work that was unnecessary, that did not directly benefit the Notes. The Court notes, however, that the Noteholders until the near end of the case never questioned service on the Committee, the designation of the Indenture Trustee as a "Core Party," or asked about the billing.  Heaney Aff., ¶ 41.

Armed with the evidence, the Court has concluded that $913,936.70 in fees was unnecessary on a timely, not hindsight, basis.   The Court is sustaining $641,295.70 of the objection to Dewey's fees (inclusive of its $60,000.00 voluntary deduction) and $272,641.00 of the objection to Patterson Belknap's fees (inclusive of its voluntary deduction of $84,471.50).  The Court is not deducting any fees of the Indenture Trustee or BLG.

The Court commends the parties and their lawyers for their remarkable professionalism and restraint under difficult circumstances.   The Court will issue an Order consistent with this Opinion.

Dated:  March 8, 2017

KEVIN GROSS, U.S.B.J.