# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re<br>Nortel Networks Inc., *et al.*,<br><br>          Debtors.[1] | Chapter 11<br><br>Case No. 09-10138 (KG)<br>(Jointly Administered)<br><br>**Re: DI 17432, 17433, 17836, 17838 and 18020** |

## REPLY IN FURTHER SUPPORT OF MOTION OF SNMP RESEARCH, INC. AND SNMP RESEARCH INTERNATIONAL, INC. TO AMEND PROOFS OF CLAIM AND ADD SNMP RESEARCH, INC. AS CLAIMANT

**OF COUNSEL**
Richard S. Busch, Esq.
**King & Ballow Law Offices**
315 Union Street, Suite 1100
Nashville, TN 37201
(615) 259-3456 (Phone)
(615) 726-5417 (Fax)
rbusch@kingballow.com

-and-

John L. Wood, Esq.
**Egerton, McAfee, Armistead & Davis, P.C.**
900 S. Gay Street
Knoxville, TN 37902
(865) 546-0500 (Phone)
(865) 525-5293 (Fax)
jwood@emlaw.com

**COLE SCHOTZ P.C.**
Norman L. Pernick (No. 2290)
Nicholas J. Brannick (No. 5721)
500 Delaware Avenue, Suite 1410
Wilmington, DE 19801
(302) 651-2002 (Phone)
(302) 652-3117 (Fax)
npernick@coleschotz.com
nbrannick@coleschotz.com

-and-

G. David Dean, Esq.
300 E. Lombard Street, Suite 1450
Baltimore, MD 21202
(410) 230-0660 (Phone)
(410) 230-0667 (Fax)
ddean@coleschotz.com

*Counsel for SNMP Research, Inc. and SNMP Research International, Inc.*

Dated: April 5, 2017

---

[1] In addition to Nortel Networks Inc., the debtors in these Chapter 11 cases are: Nortel Networks Capital Corporation, Nortel Altsystems Inc., Nortel Altsystems International Inc., Xros, Inc., Sonoma Systems, Qtera Corporation, CoreTek, Inc., Nortel Networks Applications Management Solutions Inc., Nortel Networks Optical Components Inc., Nortel Networks HPOCS Inc., Architel Systems (U.S.) Corporation, Nortel Networks International Inc., Northern Telecom International Inc., Nortel Networks Cable Solutions Inc.; Nortel Networks (CALA) Inc.; and Nortel Networks India International Inc.

# TABLE OF CONTENTS

**Page(s)**

PRELIMINARY STATEMENT ...................................................................................................1

ARGUMENT ..............................................................................................................................7

    I.     SNMPRI Should be Permitted to Amend its Own Claims to Modify its Damages.........................................................................................................7

          A.     The Prior Claims and the Proposed Amended Claim Properly Assert SNMPRI's Own Direct Copyright, Trade Secret and Contract Damages. ......................................................................................7

                i.     The Previously Filed Claims Asserted SNMPRI's Direct Damages under Copyright Infringement, Trade Secret Misappropriation and Breach of Contract.......................................9

                ii.    The Proposed Claim Also Covers Damages Based on SNMPRI's Direct Claims for Copyright Infringement, Trade Secret Misappropriation and Breach of Contract. ..............13

          B.     SNMPRI Also Properly Asserted Derivative Claims on Behalf of SNMPR for Trade Secret Misappropriation in the Prior Claims. ..............15

          C.     Alternatively, SNMPRI is Allowed to Add New Legal Theories, if Needed, Based on the Same Conduct Alleged in the Prior Claims. .........16

          D.     An Increase or Adjustment to the Allocation of Damages Has No Bearing on the Conduct Test and Cannot Render a Previously-Filed Claim a "New Claim." .................................................................18

          E.     The U.S. Debtors Cannot Demonstrate any "Unfair" Prejudice for Permitting the Proposed Claim in an Increased Damages Amount. ..........19

                i.     The U.S. Debtors Cannot Show Detrimental Reliance.................20

                 ii.    There is No Basis to Infer Bad Faith from SNMPRI's Amended Damages. ....................................................................24

          F.     The U.S. Debtors' So-Called Timeliness and Equitable Arguments are Largely Mislabeled as Such and Entirely Misplaced..........................28

    II.    SNMPR's Direct Copyright and Trade Secret Claims Should be Added to SNMPRI's Proposed Claim upon its Filing...........................................................30

i

A.      The Court Should Allow SNMPR to be Added under the Same
        Relation-Back Principles Applicable to SNMPRI's Proposed
        Amendment...........................................................................................30

B.      Federal Rule 15(c)(1)(C) is Satisfied in Any Event....................................32

C.      The Nelson Test is Essentially the Same as that Applied in Other
        Relation-Back Cases Allowing Existing Creditors to Amend and
        New Parties to be Substituted or Added to Claims, and is Similarly
        Satisfied................................................................................................35

D.      The Court Has Ample Jurisdiction to Consider a Motion for a
        Creditor to be Added to a Proof of Claim..................................................38

E.      Timeliness is Not at Issue in SNMPR's Request to be Added to the
        Proposed Claims. ...................................................................................40

CONCLUSION........................................................................................................41

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Adams v. Oels*, 2010 WL 1688551 (D. N.J. Apr. 27, 2010) ..........................................................36

*Allen v. Nat'l R.R. Passenger Corp.*, 2004 WL 2830629 (E.D. Pa. Dec. 7, 2004).................35, 36

*In re Ben Franklin Hotel Associates,* 186 F.3d 301 (3d Cir. 1999)...............................................16

*In re Bender Shipbuilding & Repair Co., Inc.*,
   2012 WL 4086445 (Bankr. S.D. Ala. Sep. 17, 2012) .............................................................30

*In re Brown*, 159 B.R. 710 (Bankr. D.N.J. 1993) .................................................................19, 23

*Clamp-All Corp. v. Foresta (In re Clamp-All Corp.)*,
   235 B.R. 137 (B.A.P. 1st Cir. 1999) ......................................................................................30

*EMI Entertainment World, Inc. v. Karen Records, Inc.*,
   2013 WL 2480212 (S.D.N.Y. Jun. 10, 2013) .........................................................................39

*In re FLYi Inc.*, 2008 WL 170555 (Bankr. D. Del. Jan. 16, 2008) ........................................17, 18

*G-I Holdings, Inc. v. Reliance Ins. Co.*, 586 F.3d 247 (3d Cir. 2009)..............................................8

*Gardner v. State Farm Fire & Casualty Company*, 544 F.3d 553 (3d Cir. 2008)..................33, 34

*Gens v. Resolution Tr. Corp.*, 112 F.3d 569 (1st Cir. 1997)......................................19, 20, 24, 30

*Gutierrez v. Johnson & Johnson*, 227 F.R.D. 255 (D. N.J. 2005)..........................................35, 36

*Heady v. PNC Bank N.A. (In re Cmty. Bank of N. Va.)*,
   622 F.3d 275 (3d Cir. 2010)...................................................................................................34

*Henglein v. Colt Indus. Operating Corp.*, 91 F. Appx. 762 (3d. Cir. 2004)..................................35

*Holstein v. Brill*, 987 F.2d 1268 (7th Cir. 1993)..........................................................................20

*Kinnally v. Bell of Pa.*, 748 F.Supp. 1136 (E.D.Pa.1990)............................................................36

*Krupski v. Casta Crociere S.p.A*, 560 U.S. 538 (2010) .........................................................29, 40

*Midland Cogeneration Venture L.P. v. Enron Corp. (In re Enron Corp.)*,
   419 F.3d 115 (2d Cir. 2005)...................................................................................................22

*Monahan v. City of Wilmington*, 2004 WL 758342 (3d Cir. Jan. 30, 2004).................................35

*N.A.I.F. v. Snyder*, 2005 WL 735554 (D. Del. Mar. 30, 2005).....................................35

*Nelson v. County of Allegheny*, 60 F.3d 1010 (3d Cir. 1995) ........................................33

*Nelson-Salabes, Inc. v. Morningside Dev., LLC*, 284 F.3d 505 (4th Cir. 2002)............................27

*In re Outdoor Sports Headquarters, Inc.*, 161 B.R. 414 (Bankr. S.D. Ohio 1993)......................20

*Plan Marketing, L.P. v. Bank of Am. (In re SemCrude, L.P.)*,
    443 B.R. 472 (Bankr. D. Del. 2011) ...........................................................17

*Praedium II Broadstone, LLC v. Wall St. Strategies, Inc.*,
    2004 WL 2624678 (S.D.N.Y. Nov. 18, 2004)........................................22

*SNMP Research Int'l, Inc. v. Nortel Networks Inc. (In re Nortel Networks Inc.)*,
    2016 WL 491639 (Bankr. D. Del. Feb. 8, 2016) ......................................25

*Matter of Stavriotis*, 977 F.2d 1202 (7th Cir. 1992) ................................................22, 23

*Stewart v. Phil. Hous. Auth.*, 487 F.Supp.2d 584 (E.D. Pa. 2007) .................................37

*Matter of Stoecker*, 5 F.3d 1022 (7th Cir. 1993).........................................................24

*In re Stone & Webster, Inc.*, 547 B.R. 588 (Bankr. D. Del. 2016) ...........................18, 24

*In re Telephone Co. of Cent. Florida*, 308 B.R. 579 (Bankr. M.D. Fla. 2004) ............................19

*Tex. A. Oil Corp. v. U.S. Dep't of Energy*, 44 F.3d 1557 (Fed. Cir. 1995)....................23

*In re Titus*, 467 B.R. 592 (Bankr. W.D. Pa. 2012) ..................................................23, 30

*Unioil, Inc. v. Elledge (In re Unioil, Inc.)*, 962 F.2d 988 (10th Cir. 1992) ....................30

*United States v. Kolstad (In re Kolstad)*, 928 F.2d 171 (5th Cir. 1991) ........................18

*Vianix Delaware LLC v. Nuance Communications, Inc.*,
    2009 WL 1364346 (D. Del. May 19, 2009)...........................................38

*In re White Motor Corp.*, 59 B.R. 286 (Bankr. N.D. Ohio 1986)..................................19

*Woburn Assocs. v. Kahn (In re Hemingway Transp., Inc.)*,
    954 F.2d 1 (1st Cir. 1992).......................................................................18

**RULES**

Federal Rule 15(c)......................................................................30, 33, 36, 37

Federal Rule 15(c)(1)(B)...............................................................................16

iv

Federal Rule 15(c)(1)(C)...........................................................................30, 32-35, 37, 40

**STATUTES**

11 U.S.C. §§ 157(b)(2)(B), (c)...........................................................................................39

11 U.S.C. § 726(a)(4)...........................................................................................................23

**OTHER AUTHORITIES**

*EMI Etm't World, Inc. v. Karen Records, Inc.*,
    2005 WL 451557 (S.D.N.Y Jan. 14, 2005) (Complaint)..........................................39

*Vianix Del. LLC v. Nuance Comm'ns, Inc.*,
    2009 WL 958021 (D Del. Jan. 27, 2009) (Complaint)...........................................38

53651/0001-14340767v1

# FILED UNDER SEAL

SNMP Research International, Inc. ("SNMPRI") and SNMP Research, Inc. ("SNMPR," and together with SNMPRI, "SNMP Research"), by their undersigned counsel, submits this Reply in further support of the Motion of SNMP Research International, Inc. and SNMP Research, Inc. to Amend Proofs of Claim and add SNMP Research, Inc. as Claimant [DI 17432] (the "Motion to Amend"),[2] and in response to Debtors' Memorandum of Law in Opposition to the Motion to Amend [DI 17836] (the "Opposition").

## PRELIMINARY STATEMENT

1.      The Opposition severely distorts the relief requested to create the illusion that the Motion to Amend is part of a nefarious scheme to "convert" a pre-petition contract claim into a copyright claim and multiply damages ten-fold as a result.  The U.S. Debtors make this argument in the hope of convincing the Court that SNMPRI's Proposed Claim is a "new claim" that should not relate-back to the prior amended claims, and that the addition of SNMPR as a claimant would somehow result in a "massive windfall."  Neither of these positions can be sustained.

2.      The flaws in the U.S. Debtors' arguments are best understood by considering the two requests in the Motion to Amend separately.  The first request is to permit SNMPRI to amend its own timely-filed and properly amended proof of claim against NNI,[3] in the form of the Proposed Claim.  While the analysis is somewhat detailed, due to the various hurdles created by the Opposition, the Court should ultimately grant this request with ease.  SNMPRI's prior

---

[2] Capitalized terms not otherwise defined in this Reply have the meaning ascribed to them in the Motion to Amend. SNMPRI is referred to in the Opposition as "International" or "Int'l," and SNMPR is referred to in the Opposition as "Inc."  This Reply and certain exhibits are being filed under seal pursuant to section V.F of the *Stipulation and Agreement Governing Production, Exchange and Filing of Confidential Materials* [Adv. D.I. 237-1].

[3] After the Motion to Amend was filed, the U.S. Debtors and SNMP Research resolved SNMP Research's objections to confirmation of the plan through language in the confirmation order.  In exchange for agreeing to include appropriate reserves to ensure that funds would be available for SNMP Research at the conclusion of this litigation, SNMP Research agreed to withdraw its pre-petition claim against non-NNI Debtors which had nominal or no projected funds available for distribution to unsecured creditors.  As a result of that settlement, SNMPRI only seeks to amend its prior proofs of claim filed against NNI (the "Proposed Claim").  Accordingly, references to the Proposed Claim in this Reply refer only to the currently proposed amended claim against NNI, while the Proposed Claims in the Motion refer to all of SNMPRI's prior claims against the U.S. Debtors.

timely-filed and properly amended claims assert direct claims for copyright infringement, trade secret misappropriation and breach of contract, as well as a proper derivative trade secret claim on behalf of SNMPR.  While the U.S. Debtors initially argue that SNMPRI's claims are solely contract-based, they later contradict their own position by admitting that SNMPRI asserted copyright claims in the prior proofs of claim.  *See* Opposition at ¶ 72.  The U.S. Debtors also wrongfully characterize SNMP Research's contention that Schedule 1A expired on June 20, 2003 as a "new" argument (*See* Opposition at ¶ 35), when they have known about this argument since as early as May 2011 in the Second Amended NNI Claim.[4]  There is no reasonable debate here that the prior claims covered all applicable legal theories and raised the appropriate arguments relating to Schedule 1A's termination.  The U.S. Debtors' arguments to the contrary contradict their own statements in the same Opposition and the plain language of the prior proofs of claim themselves.

3.      The Proposed Claim (and Mr. Ratner's underlying expert report) likewise covers damages based on alternative possible legal theories.  As such, the claims in the Proposed Claim are identical to the ones raised in the prior claims and thus unquestionably relate back.  But even if the Court were convinced that SNMPRI is attempting to add new legal theories, doing so is entirely appropriate under the "conduct" test, which is one method of satisfying relation-back standards.

4.      The law is also clear that increasing the amount of damages in an amended proof of claim does not constitute the assertion of a "new claim."  SNMPRI's amendment, therefore, must be allowed unless the U.S. Debtors can demonstrate "unfair" prejudice, which requires a showing of detrimental reliance on the U.S. Debtors' or creditors' part or bad faith on the part of

---

[4] See Case Declaration, Ex. 4, pg. 6 of 65 ("Under Schedule 1A of the License Agreement dated December 23, 1999, between Debtors and SNMP … the Debtors' right to possess, use, or distribute the SNMP-Bay Software in Bay Products ceased on June 20, 2003.").

SNMPRI.  The U.S. Debtors have not, and cannot, show either.  The Motion to Amend was disclosed in the U.S. Debtors' approved disclosure statement, with a "high/low" analysis showing unsecured creditors that they might receive a 53.5% instead of a 55.1% recovery if the Motion to Amend is granted and SNMP Research is fully successful on its asserted pre-petition claim.  The mere possibility that unsecured creditors might receive a small fraction less is not "unfair" prejudice to deny an amendment under well-settled law.  Otherwise, the unfair prejudice exception would swallow the general rule that amendments to claims should be freely allowed.  There is certainly nothing dilatory about increasing damages, especially when the information needed to calculate such damages was not available when the prior claims were filed, and the damages were not finally calculated until damages reports were due on November 2, 2016 (as agreed by the parties and ordered by the Court), three weeks before the Motion to Amend was filed.

5.      There is no basis to claim that revising damages to account for previously unavailable financial information would constitute a "massive windfall."  The amounts in the Proposed Claim are simply a reflection of SNMPRI's calculation of its substantial damages based on this recently discovered financial information.  If there is anything massive here, it is the amount of Nortel's unlicensed use of the Software which was revealed when the financial information was finally produced in discovery, after a hard-fought discovery hearing and massive resistance from the U.S. Debtors.

6.      The second and completely independent request in the Motion to Amend is to add SNMPR to the Proposed Claim, once it is filed by SNMPRI.  The purpose of this amendment is to ensure preservation of SNMPR's direct pre-petition copyright claims against the U.S. Debtors.  While SNMPRI intended to pursue those claims derivatively, it turns out that Dr. Case was likely mistaken in his belief that could be done.  SNMPRI's direct claims relate to the *same* Nortel

3

products, the *same* Software, and the *same* alleged wrongful Nortel conduct alleged in the prior proofs of claim. In fact, these are the same claims that SNMPRI preserved in the prior proofs of claim and intended to bring on behalf of SNMPR. Accordingly, like the request to amend SNMPRI's timely-filed claims, the request to add SNMPR and its direct claims satisfies the conduct test.

7. There is also no unfair prejudice in adding SNMPR. The trial in the Adversary Proceeding will involve the SNMPR copyright claims regardless of the outcome of the Motion to Amend, as those copyright claims straddle the Petition Date. This means that the U.S. Debtors will not even have to defend any additional claims at trial if the Motion to Amend is granted; rather, adding SNMPR could only result in SNMPR obtaining a larger judgment, an outcome that courts have universally held cannot give rise to unfair prejudice. Moreover, the evidence at the hearing will show that the failure to file a separate proof of claim for SNMPR was an actual and honest mistake, without any bad faith. For these reasons, both requests in the Motion to Amend should be separately granted.

8. In opposing the Motion to Amend, the U.S. Debtors also separately, and improperly, inject an argument having no place in its motion: that Nortel allegedly continued to have the unrestricted right to distribute so called Bay, ES and ERS products indefinitely, and on a royalty free basis, under Schedule 1A of the Nortel License despite clear language in Schedule 1A stating unambiguously that all licensed rights "**terminate**" as of three years from June 20, 2000.[5] There is *no* ambiguity whatsoever in Schedule 1A. The license granting Nortel any right

---

[5] After the Opposition was filed, the parties agreed to conduct a joint hearing on the Motion to Amend and the merits issue of whether the Software was licensed for use or distribution under Schedule 1A with respect to any products after June 20, 2003 (such products include the ES and ERS products). Pursuant to the scheduling order approving the parties' agreement and scheduling the joint hearing for May 11-12, simultaneous briefs on the Schedule 1A merits issue are due on May 4, 2017. *See* D.I. 18020. Accordingly, this Reply focuses on the relief requested in the Motion to Amend, although SNMP Research feels compelled to address the Schedule 1 issue preliminary in this Preliminary Statement, given that the U.S. Debtors focused five pages of their Opposition on it. A separate pre-hearing brief will be filed providing a detailed basis for SNMP Research's position on the merits issue.

to internally develop products using the Software, or distribute any products containing the Software, terminates under Schedule 1A three years from the date of the last signature on Schedule 1A.[6]  SNMP Research will be filing a motion asking the Court to so rule as a matter of law, but the evidence at the May 11-12 joint hearing on the Motion to Amend and Schedule 1A merits issue will, if needed, demonstrate just that.[7]

9.     Specifically, in 1999, following Nortel's acquisition of Bay Networks Inc. ("Bay"), SNMPRI and Nortel, a then existing SNMPRI customer, negotiated a new master license agreement to govern their overall relationship.  One part of that negotiation involved Nortel's request for SNMPRI to permit the transfer of a partially paid up, broad and nearly unlimited license granted to Bay, an entity that Nortel acquired the prior year, even though the license SNMPRI granted Bay stated that it was "non-transferrable."  SNMPRI expressly rejected Nortel's request to transfer and expand the scope of the Bay license, but did agree to enter into an initial temporary assignment (under which Nortel specifically acknowledged that it would have no rights under the Bay license agreement once it expired), and ultimately entered into Schedule 1A, which terminated all licensed rights as of June 20, 2003 (three years from the date of the last signature on the document).  The parties agreed that the only way Nortel would be able to continue distributing products after June 20, 2003, was to enter into schedules with

---

[6] As emails between the parties reveal, SNMPRI insisted on a clear and unambiguous termination date because of a concern that the lines between Bay and Nortel products would blur over time, and to prevent against the very argument Nortel is now trying to make 17 years later.

[7] Nortel cherry picks supposed evidence to support its arguments, but disregards evidence, including the initial temporary license agreement and emails from the Nortel employee involved with negotiating Schedule 1A himself, David Hyslop, which show that Mr. Hyslop fully understood that Nortel had to license each product separately to have the right to use SNMPRI's Software, and in which he recognized the need to enter into separate schedules to have any right to develop or distribute products after the expiration of Schedule 1A.  Nortel also ignores correspondence from SNMPRI employee John Southwood to Nortel in 2003, right after Schedule 1A terminated, in which he was clear that Nortel was required to enter into product schedules with SNMPRI to have  the right  to continue developing and distributing products.

5

SNMPRI identifying specific products that had been distributed by Bay and paying a license fee and a maintenance fee to distribute those products.

10.     Indeed, SNMPRI agreed to license specific products that had been distributed by Bay *royalty-free* so long as Nortel declared that the product had been distributed by Bay, and so long as the parties entered into a specific schedule under which Nortel paid a license and maintenance fee.  Any product that had not been distributed by Bay was not covered and the parties would have to enter into a new license agreement, and negotiate the royalties to be paid, in order for Nortel to have any rights to develop the product or distribute it.  Nortel affirmatively declared Bay products on multiple schedules before Schedule 1A expired, and paid the required license and maintenance fees.  SNMPRI allowed Nortel to therefore distribute those products royalty-free.

11.     After the three-year period of Schedule 1A terminated, Nortel decided to use the Software in unscheduled new products that were not declared, and without obtaining a proper license and paying for use of the Software in those products.  The failure to acquire a license for new products when Schedule 1A terminated was no mere oversight.  Nortel was a troubled company at that time, which was strapped for cash and in the midst of major layoffs following the dot.com bubble burst and the economic impacts of September 11, 2001.  Because no royalties were ever reported on the ES and ERS products, SNMP Research did not uncover Nortel's wrongful conduct until the ES and ERS product lines were sold to Avaya during these bankruptcy cases and Avaya disclosed that the products contained the Software.  Now that Nortel has been caught improperly using the Software in the ES and ERS product families, the U.S. Debtors seek to re-write the parties' agreement on Schedule 1A to contradict its plain and unequivocal termination language and minimize the real economic harm suffered by SNMP Research due to Nortel's failure to pay for the Software for several years.  At the joint hearing, or

6

before on SNMP Research`s upcoming motion to find Schedule 1A unambiguous and exclude

extrinsic evidence, the Court should easily hold that no products were licensed beyond June 20,

2003 under the plain language of Schedule 1A.

## ARGUMENT

I.    **SNMPRI Should be Permitted to Amend its Own Claims to Modify its Damages.**

    A.    *The Prior Claims and the Proposed Amended Claim Properly Assert*
        *SNMPRI's Own Direct Copyright, Trade Secret and Contract Damages.*

    12.    The Opposition is grounded on the implausible assertion that SNMP Research is

attempting to "convert" a contract-based claim into a copyright-based claim based on a different

theory of damages.  <u>See</u> Opposition at ¶¶ 3, 20-22, 73.  In advancing this argument, the U.S.

Debtors incredibly represent to the Court they have been defending a contract-based claim for

years "relating to the pre-petition period," despite their own prior admissions, the record in this

case, and common sense.  *See* Motion to Amend at ¶ 81 (citing U.S. Debtors' opposition to

motion to withdraw the reference [Adv. D.I. 184] ("<u>Opposition to Motion to Withdraw</u>") at p. 8

("Judge Gross has overseen the U.S. Debtors' bankruptcy cases for more than six years, is

charged with adjudication of the proof of claim filed by [SNMP Research] that substantially

overlaps with several claims asserted against the U.S. Debtors in this action …."); *Id.* at 11

("[SNMP Research's] core claims against the U.S. Debtors for the alleged post-petition use of

[SNMP Research's] software are largely duplicative of its pre-petition proof of claim, which is

not part of this adversary proceeding and which remains unresolved."); U.S. Debtors' appellee

brief regarding EMEA Debtors' appeal, Case No. 1:15-cv-879-LPS [Adv. D.I. 25] ("The

[Adversary] Complaint asserted claims for two distinct alleged actions. *First*, similar to the

claims in the SNMP Research Proof of Claim, the Complaint alleges infringement based on the

U.S. Debtors' and Canadian Debtors' use of SNMP Research's software in Nortel products

without payment of royalties to SNMP Research.")); *see also* Opposition to Motion to Withdraw

at p. 3 ("On September 29, 2009, [SNMP Research] filed a proof of claim in the U.S. Debtors'

bankruptcy proceedings.")); *see also* Opposition to Motion to Withdraw at p. 3 ("On November

2, 2011, SNMPR filed its complaint in this adversary proceeding (D.I. 6707, Adv. D.I. 1, the

"Complaint"), asserting post-petition claims against the U.S. Debtors and Canadian Debtors

alleging (similar to the allegations in the proof of claim) that they continued to use SNMPR's

software after the Petition Date without authorization or payment and therefore were liable for

copyright infringement, state trade secrets law violations and breach of contract.").[8]

13.    The U.S. Debtors have no response to their own prior admissions confirming that

that they fully understood that the pre-petition claims included claims for copyright

infringement.  Yet, despite failing to address their own prior admissions, the U.S. Debtors still

press the baseless claim that the pre-petition claims are purely contract-based.  Not only do the

U.S. Debtors' own prior statements contradict their current position, the language of the prior

proofs of claim and the Proposed Claim each plainly asserts damages based on all potential legal

theories in this case: copyright infringement, trade secret misappropriation and breach of

contract.

---

[8] The U.S. Debtors' prior admissions not only show that the U.S. Debtors had adequate notice that SNMPR was an intended party to the prior proofs of claim, they also should judicially estop the U.S. Debtors from arguing that the pre-petition claims are limited to contract-based claims or that they somehow lacked notice of a pre-petition copyright infringement claim.  *See G-I Holdings, Inc. v. Reliance Ins. Co.*, 586 F.3d 247, 262 (3d Cir. 2009) (judicial estoppel is appropriate where: (1) a party takes irreconcilably inconsistent positions; (2) the party's position is adopted in bad faith; and (3) estoppel addresses the harm and no lesser sanction is sufficient) (citations omitted). The U.S. Debtors completely ignore these admissions in their Opposition, for good reason.

i.   *The Previously Filed Claims Asserted SNMPRI's Direct Damages under Copyright Infringement, Trade Secret Misappropriation and Breach of Contract.*

14.     Starting with the Second Amended NNI Claim through the Fifth Amended Claim (the most recent amendment to date), SNMPRI asserted **estimated** direct[9] damages against the U.S. Debtors for Nortel's unauthorized use of the Software in several specifically identified products.   *See,* Case Dec., Ex. 10 (Fifth Amended Claim, Summary), items (ii)-(iv), (vi) (claiming damages for Nortel's unauthorized use of the Software in the MG9000, Bay Products (i.e., ES and ERS product families), GEM Products, SMC 2450, PP8600, and VSS products) (collectively, the "Accused Products").

15.     Because SNMPRI lacked shipping or sales data for the products at issue at the time,[10] given the U.S. Debtors' failure to produce it in discovery until SNMP Research pressed the matter in a lengthy discovery hearing in June 2016, SNMPRI did its best to calculate actual damages for the Accused Products without such data.   To do so, SNMPRI assumed that Nortel would have been required to pay SNMPRI for a lifetime royalty buyout, otherwise known as an "RBO," plus pre-petition interest calculated at the contract rate of 18% per annum.   SNMPRI calculated its estimated actual damages in this way because it lacked data to calculate them otherwise and did not yet have an opinion from a financial expert on the appropriate way to calculate actual damages from an economic standpoint (i.e., based on a hypothetical RBO or

---

[9] "Direct damages" as used herein refer to SNMPRI's claims for breach of its own separate copyrights, misappropriation of its own separate trade secrets, and breach of the Nortel License to which it is a party.  The U.S. Debtors argue that SNMP Research concedes in the Motion to Amend that SNMPR is the owner and developer of the relevant copyrights in this case.  *See* Opposition at ¶ 28 (citing Motion to Amend at ¶¶ 10, 68).   This mischaracterizes SNMP Research's position.   SNMPRI and SNMPR each have eight (8) copyrights, which are included as exhibits to the Second Amended Complaint in the Adversary Proceeding.   SNMP Research merely recognized the possibility that SNMPR's copyright claims could succeed while SNMPRI's copyright claims could fail, which makes it important to add SNMPR as a claimant to the Proposed Claims, which is the second part of the request in the Motion to Amend, discussed in Section II below.

[10] As noted in the Motion to Amend, the one exception was that SNMP Research had e-mail exchanges relating to the MG9000 product shipping.

9

based on a per copy royalty payment stream).  SNMPRI, of course, had no information to calculate its profit damages at the time of any of the prior proofs of claim.

16.    SNMP Research requested financial information in the Adversary Proceeding pursuant to written discovery requests in August 2015 [Adv. D.I. 241] (notice of service of first set of interrogatories and document requests).  The U.S. Debtors failed to produce that information for almost a year, and SNMP Research was required to ask the Court to allow its own financial systems expert to search the U.S. Debtors' server at a discovery hearing in June 2016.  See Adv. D.I. 441, 444 (discovery letters to Court in late June 2016).  It was only after the Court indicated at the discovery hearing that it was inclined to grant SNMP Research's request did the U.S. Debtors start rolling production of product sales and "profit center" data necessary for Mr. Ratner to complete its analysis and damages report.  These rolling productions of financial data continued until mid-October 2016, *two weeks* before Mr. Ratner's report (the "Ratner Report") was due under the parties' agreed scheduling order in the Adversary Proceeding.

17.    The U.S. Debtors try to use SNMPRI's estimated RBO and interest calculations to argue that the prior claims were all limited to a contract-based theory, and that the Proposed Claim is an attempt to fundamentally change the nature of the claim to a copyright-based claim.  *See* Opposition at ¶¶ 27, 41.  These arguments must be rejected for multiple reasons.

18.    *First*, SNMPRI clearly intended to assert any and all claims relating to Nortel's improper use of the Software during the pre-petition period.  That clause reads:

> SNMP further claims amounts to be determined (a) under the Copyright Act of 1976 as amended, applicable trade secret law, and other intellectual property law for unauthorized use and distribution of SNMP software with the MG9000, Bay Products, GEM Products, and other products of the Debtors, including the SMC 2450, PP8600 and VSS products and (b) any and all additional amounts associated with licensing fees, royalties, and maintenance fees for the Bay

10

Products and any other products of the Debtors that have not been reported by the Debtors to date and are owed to SNMP.

Case Declaration, Ex. 10 (p. 19 of 92).

19.     Ironically, the U.S. Debtors admit that SNMPRI's prior claims asserted copyright claims in their own Opposition, while later attempting to argue against SNMPR's copyright claims being added.  See Opposition at ¶ 72 (noting that, "only [SNMPRI] previously raised copyright claims" in the prior proofs of claim).  Ignoring this admission, the U.S. Debtors surprisingly still argue that the prior claims are limited to contract claims.  They do this in a subtle way, stating incorrectly that the "damages claimed" in the prior claims were limited to contract damages.  See Opposition at ¶ 74.  In other words, the U.S. Debtors want to focus the Court only on the paragraphs in the prior claims, where the actual dollar amounts are claimed for the Accused Products, and would have the Court ignore the clause that follows, which expressly asserts claims based on all applicable legal theories.  The Court should see through this nuanced argument.  It is clear that this clause expressly asserted claims with respect to the Accused Products on all relevant legal theories.

20.     Second, even if the broad clause asserting all possible applicable claims were absent from prior proofs of claim, the paragraphs above that clause listing SNMPRI's damages figures for the Accused Products also were not limited to contract-based damages.  As noted above, SNMPRI estimated its actual damages based on a hypothetical RBO in its prior claims because it lacked the information to calculate damages in a more appropriate way, based on the number of units containing the Software.  SNMPRI also had no profit data at all at the time.  Once SNMPRI received this data, Mr. Ratner incorporated the data into his damages report which was served three weeks before the Motion to Amend was filed.

21.     The Ratner Report appropriately calculates SNMP Research's pre-petition damages for the ES and ERS product families (and others) based on a per copy royalty analysis.

11

The U.S. Debtors attempt to persuade the Court, in advance of trial, that damages should be calculated based on an RBO approach, because RBOs were "the norm" between the parties. *See* Opposition at ¶¶ 37-40. At trial, the facts will demonstrate otherwise. Specifically, SNMP Research will show, among other things, that (i) the Nortel License contained vastly more per copy royalty arrangements than RBOs and that RBOs were far from the norm, (ii) Schedule 71, which the U.S. Debtors rely on in their Opposition to support the argument that the parties would have agreed to a single RBO for all ES and ERS products, was limited to a single, sparsely-used platform (QNX) and had limited to no value, (iii) in cases where SNMPRI offered an RBO and per copy arrangements as alternative options, Nortel did not always choose the RBO option, (iv) in 1999, SNMPRI expressly rejected Nortel's request for an RBO when Nortel requested that the Bay license rights be transferred to Nortel, and (v) SNMPRI would not have offered Nortel an RBO option for the ES product families when Schedule 1A expired in June 2003 because, *inter alia*, unlike any other Nortel products, actual sales data would have been available to confirm the success of those products in advance of granting the license once the temporary license via Schedule 1A expired in June 2003.

22.     *Third*, SNMPRI applied the contract rate in its proofs of claim because, at the time, SNMPRI believed it was the appropriate rate to make SNMPRI whole, regardless of whether the claims were based on infringement, misappropriation or contract. SNMPRI's use of the contract rate in the prior claims, therefore, was in no way intended to limit damages to contract-based damages. For these reasons, the Court should easily hold that the prior proofs of claim were broad enough to include SNMPRI's direct damages based on all relevant legal theories.

ii. *The Proposed Claim Also Covers Damages Based on SNMPRI's Direct Claims for Copyright Infringement, Trade Secret Misappropriation and Breach of Contract.*

23.     Turning to the Ratner Report, which is the basis of the Proposed Claim's new damages amount, the U.S. Debtors also wrongfully claim that the Ratner Report is restricted to copyright infringement damages.  That claim is wrong for several reasons.

24.     *First*, the Ratner Report expressly discusses breach of contract and trade secrets. *See* Transmittal Affidavit of Nicholas Brannick, Ex. A (Ratner Report excerpts) at ¶¶ 22, 32, 33, 36-38, 45 (n.38), 59 (n.52), 79, 82.  With respect to Nortel's unauthorized use of the Software (which spanned the pre- and post-petition periods), Mr. Ratner stated that, "SNMP Research alleges that the U.S. Debtors committed copyright infringement, trade secret misappropriation and breach of contract by, among other things, using the SNMP Software in an unauthorized manner…." *Id*. at ¶ 22.  In discussing the Copyright Act's actual and profit damages constructs generally, Mr. Ratner states, "[w]e have been advised that SNMP Research has alleged trade secret misappropriation, and that the damages categories described below could equally apply to such violations.  As such, I am not attempting to suggest that these damages exclusively are limited to alleged violations under the U.S. Copyright Act." *Id*. at ¶ 47.  These statements make clear that the Ratner Report does not constrain itself to copyright-based damages, as the U.S. Debtors argue.

25.     It should be noted that, as for contract-based damages, there is a dispute between the parties about whether the unauthorized use of the Software in the Accused Products (pre- and post-petition) are recoverable on contract or copyright and trade secret laws.  SNMP Research submits that the claims are based on copyright and trade secret laws, which allow for the recovery of profits and, in the case of trade secret laws, fees.  The U.S. Debtors wish to limit the claims to contract-based damages.  Mr. Ratner, a non-lawyer, calculated actual damages and

13

profit damages under the assumption that SNMP Research would prevail on the legal issue of which cause of action applies at trial. If the U.S. Debtors were to prevail, however, and the claims were limited to contract-based damages, Mr. Ratner's actual damages calculations (with an interest adjustment to ***increase*** the rate from the Prime to contract rate) are equally applicable to such contract-based damages.

26.      *Second*, the fact that Mr. Ratner applies a more conservative and favorable rate (i.e., the Prime Rate instead of the 18% contract rate) to his hypothetical per-copy royalty analysis than SNMPRI did in its prior claims is not indicative that Mr. Ratner intended for his analysis to be restricted to copyright damages. Mr. Ratner used a different rate because legal research leading to the finalization of the report revealed that, if the claims are based on infringement or misappropriation, the more conservative rate is Prime. Because SNMP Research's theory is that the use of the Software in unlicensed products constitutes infringement and misappropriation, as opposed to or in addition to breach of contract, Mr. Ratner conservatively applied the Prime Rate to his calculation of pre-petition damages, ***which inured the benefit of the U.S. Debtors***. Rather than recognizing that Mr. Ratner's use of a more conservative rate was an attempt to reach the proper damages figure, the U.S. Debtors somehow find a way to turn that into a baseless criticism, once again questioning SNMP Research's subjective motivations.

27.      *Third*, the U.S. Debtors' arguments concerning the so-called limitations in the Ratner Report are undermined by the rebuttal report of their own damages expert, Justin McLean (the "McLean Report"). In the McLean Report, Mr. McLean calculates damages based on assumptions that SNMP Research's claims are premised on both breach of contract *and* copyright infringement. *See* Transmittal Affidavit of Nicholas Brannick, Ex. B (McLean Report excerpts), Schedules A.1, A.10, A.13, A.16, A.19, A.20, A.21, A.24, A.27, A.1.B, A.10.B,

14

A.13.B, A.16.B, A.19B, A.20.B, A.21.B, A.24.B, and A.27.B. If the U.S. Debtors' legitimately thought that the Ratner Report was limited to copyright infringement damages, there would have been no reason for Mr. McLean to respond to the Ratner Report by calculating damages on alternative legal theories. Moreover, if the Court were to accept the U.S. Debtors' incorrect argument that the Ratner Report is focused solely on copyright damages, the McLean Report's calculation of contract-based damages would be improper rebuttal. In sum, the U.S. Debtors' argument that the Ratner Report is limited to copyright damages is simply wrong, as confirmed by their own expert's report.

**B.** ***SNMPRI Also Properly Asserted Derivative Claims on Behalf of SNMPR for Trade Secret Misappropriation in the Prior Claims.***

28.     In addition to attempting to constrain SNMPRI's direct claims to contract-based damages, the U.S. Debtors seek to deny any amendment that would include SNMPRI's derivative claims[11] SNMPRI intended to bring on behalf of SNMPR. Opposition at ¶¶ 42-44. To support this argument, the U.S. Debtors contend that SNMPRI never asserted derivative claims in its prior proofs of claim in the first place. *See id.* This position is erroneous factually and legally.

29.     While SNMPRI may not have used the U.S. Debtors' preferred words in the prior proofs of claim, the broad clause language discussed above makes clear that SNMPRI intended to assert all of its rights to bring whatever claims it could bring in its own name relating to Nortel's unauthorized use of the Software. *See* Case Declaration, Ex. 10 (p. 19 of 92) ("SNMP[RI] further claims amounts to be determined (a) under the Copyright Act …, applicable trade secret law ... and (b) any and all additional amounts associated with licensing fees, royalties, and maintenance fees for the Bay Products and other products of the Debtors that have

---

[11] "Derivative claims" as used herein refer to claims by SNMPRI on behalf of SNMPR for misappropriation of SNMPR's own trade secrets and infringement of SNMPR's own separate eight (8) copyrights.

53651/0001-14340767v1

not been reported by the Debtors to date and are owed to SNMP[RI].").  This includes SNMPRI's derivative claims for trade secret misappropriation on behalf of SNMPR.

30.    The U.S. Debtors brush aside the derivative trade secret claim as if it does not even exist, failing to address the law cited in the Motion to Amend demonstrating that SNMPRI has derivative standing to prosecute those claims, notwithstanding whether SNMPR's direct copyright claims are added.  *See* Motion to Amend at ¶¶ 66-67.  There can be no serious dispute that SNMPRI has standing to pursue SNMPR's trade secret claims.  Because those claims are fully preserved and asserted in the prior claims, SNMPRI should be allowed to include its derivative trade secret claim in the Proposed Claim.[12]

### C.    *Alternatively, SNMPRI is Allowed to Add New Legal Theories, if Needed, Based on the Same Conduct Alleged in the Prior Claims.*

31.    Assuming, *arguendo*, that SNMPRI's prior proofs of claim did not properly assert all possible direct or derivative legal theories (which they did), SNMPRI should still be permitted to include them in the Proposed Claim under Federal Rule 15(c)(1)(B)'s "conduct" test governing relation-back of pleadings.  That rule provides that an amendment relates back when, "the amendment asserts a claim or defense that arose out of the ***conduct***, transaction or occurrence set out, or attempted to be set out, in the original pleading."  Federal Rule 15(c)(1)(B) (emphasis added).

32.    Applying this concept to proof of claim amendments, the Third Circuit has held that "amendments to proofs of claim should be freely allowed where the purpose is to cure defects in a claim as originally filed, to describe a claim with greater particularity, or to plead ***new theories of recovery*** on facts set forth in the original claim."  *In re Ben Franklin Hotel*

---

[12] Because SNMPRI potentially lacks standing to pursue SNMPR's copyright claims derivatively, the Court should allow SNMPR's copyright claims to be included in the Proposed Claims if the Court separately finds cause to add SNMPR as a claimant (as discussed in Section II below).

53651/0001-14340767v1

*Associates,* 186 F.3d 301, 309 (3d Cir. 1999) (emphasis added) (affirming decision of bankruptcy court to permit creditor to amend proof of claim to add claim for conversion and increase damages from $2 million to $5 million, because such claims were "based on exactly the same transactions alleged in the original [pre-petition] complaint [on which the claim was based]."); *see also Plan Marketing, L.P. v. Bank of Am. (In re SemCrude, L.P.*), 443 B.R. 472, 477 (Bankr. D. Del. 2011) (allowing creditor to amend proof of claim to assert claims for recoupment and indemnification, when creditor had made a reservation of rights in original proof of claim to assert additional claims and creditor's additional claims were based on the same documents and facts included with original proof of claim, relying on Third Circuit's rule in *Ben Franklin Hotel Associates*); *In re FLYi Inc.*, 2008 WL 170555, at *3 (Bankr. D. Del. Jan. 16, 2008) (allowing lease rejection creditor to amend timely-filed claim after the bar date to assert damages based on contract law, when the rejection damages were originally based on property law, holding that asserting a new theory of recover was not a "new claim").

33.    Here, there is no reasonable debate that the conduct test permits the addition of legal theories SNMPRI may be required to add.  The Accused Products identified in the prior claims and in the Proposed Claim are the same.[13]  In addition, the Software, Nortel's alleged improper use of the Software in the Accused Products, and the Nortel License is the same.  The U.S. Debtors do not, and cannot, challenge the relationship of any of these facts bearing on SNMPRI's ability to add any necessary new legal theories.  Accordingly, to the extent the Court were to find that the prior claims do not cover all possible relevant legal theories, SNMPRI has

---

[13] As noted in the Motion to Amend, the PP8600 product identified in the proofs of claim is referred to by Mr. Ratner as the PP8660. With respect to the GEM product identified in the proofs of claim, Mr. Ratner identifies the GEM and GM2 (a/k/a GEM2), which was a later version of the GEM.  The Bay Products, as defined by the proofs of claim, include ES and ERS products families.  Motion to Amend at ¶ 34, n.11.

the right to add all applicable legal theories concerning damages for improper use of the Accused Products in the Proposed Claim.

**D.    *An Increase or Adjustment to the Allocation of Damages Has No Bearing on the Conduct Test and Cannot Render a Previously-Filed Claim a "New Claim."***

34.    The U.S. Debtors' only attack on the conduct test appears to be relegated to a two sentence paragraph contending that the Proposed Claim involves "different Nortel conduct, as evidenced by the ***focus*** on different Nortel products." *Id.* at ¶ 74 (emphasis added). In other words, the U.S. Debtors posit that the Proposed Claims fail the conduct test and constitute "new claims" because the percentage of damages allocated to the Accused Products changed with the Ratner Report. *See id.*

35.    In making this argument, however, the U.S. Debtors fail to address the well-recognized rule that "a post-bar date proof of claim seeking to increase the amount of a timely-filed claim is not the assertion of a new claim." Motion to Amend at ¶ 51 (citing *In re Edison Bros.*, 2002 WL 9999260, at *4 (Bankr. D. Del. May 15, 2002); *see also United States v. Kolstad (In re Kolstad)*, 928 F.2d 171, 173 (5th Cir. 1991) ("The claims filing deadlines, however, by no means fix in stone the final allowed amount of claims…Once an objection is filed, the final amount of the claim is determined by litigation and adversary proceeding."); *In re Stone & Webster, Inc.*, 547 B.R. 588, 606 (Bankr. D. Del. 2016) (emphasis added) (allowing insurance company to amend claim to increase damages eleven years after timely-filed original claim, finding that "while the eleven year gap between the [timely-filed] 2001 and 2012 Claims may suggest delay, the history of this particular dispute instructs the Court otherwise."); *Woburn Assocs. v. Kahn (In re Hemingway Transp., Inc.)*, 954 F.2d 1, 10 (1st Cir. 1992) ("[A]s a general rule, amendments intended merely to *increase* the amount of a claim grounded in the same *right to payments* are not considered "new" claims under the Code.") (citing *In re Hanscom Retail*

18

*Foods, Inc.*, 96 B.R. 33, 35 (Bankr. E.D. Pa. 1988); *In re White Motor Corp.*, 59 B.R. 286, 288

(Bankr. N.D. Ohio 1986)); *see also In re Telephone Co. of Cent. Florida*, 308 B.R. 579, 582

(Bankr. M.D. Fla. 2004) ("A proof of claim for unpaid taxes that effectively increases the

amount sought does not bar the amendment, unless the claim asserts a different tax or a different

fiscal timeframe.  Even large increases in the amount of taxes claimed may be asserted by

amendment under appropriate circumstances.") (internal quotations and citations omitted).

36.     In light of this authority, the U.S. Debtors' argument that the "conduct" test fails

because of a different allocation of damages is incorrect as a matter of established law.  Also

significant is the fact that the only reason SNMPRI's allocation of damages is different in the

Proposed Claim is because it lacked the necessary data from Nortel to calculate damages

accurately when the prior claims were filed.  Nortel took almost a year to begin producing this

information in the Adversary Proceeding following a multi-hour discovery hearing on the issue.

For these reasons, the U.S. Debtors' so-called "conduct" argument relating to the allocation of

damages must fail.

> **E.     *The U.S. Debtors Cannot Demonstrate any "Unfair" Prejudice for
> Permitting the Proposed Claim in an Increased Damages Amount.***

37.     Because the Proposed Claim is not a "new claim," for the reasons discussed

above, the Court should allow the Proposed Claim to be filed, unless the U.S. Debtors can show

that the proposed amendment would cause "unfair" prejudice.  To show unfair prejudice, the

U.S. Debtors have the burden of proving either that (i) the U.S. Debtors or their creditors

detrimentally relied on the amount of the prior claims or (ii) SNMPRI is seeking to file the

Proposed Claim in bad faith or with some dilatory motive.  *See Gens v. Resolution Tr. Corp.*, 112

F.3d 569, 575 (1st Cir. 1997) (to show unfair prejudice regarding an amended claim requires

either detrimental reliance or bad faith or dilatory motive); *In re Brown*, 159 B.R. 710, 716

(Bankr. D.N.J. 1993) (in evaluating a proof of claim amendment, holding that "there is no

19

prejudice when all the parties can be placed in the same situation that they would have been in if the error had not occurred."); *In re Outdoor Sports Headquarters, Inc.*, 161 B.R. 414, 422 (Bankr. S.D. Ohio 1993) ("Generally, substantial or undue prejudice [in the context of a claim amendment] involves an irrevocable change in position or some other detrimental reliance on the status quo."). As discussed immediately below, the U.S. Debtors have not presented any viable evidence or arguments to establish either one of these requirements.

*i.    The U.S. Debtors Cannot Show Detrimental Reliance.*

38.    The U.S. Debtors make two separate but related attempts to show "prejudice," but both attempts similarly fail for the simple reason neither rises to the level of detrimental reliance necessary to render any purported prejudice "unfair." The U.S. Debtors first claim prejudice due to a lack of "notice" of the Proposed Claim's claims prior to the plan and disclosure statement being filed in early November 2016. *See* Opposition at ¶¶ 77-78. The U.S. Debtors' focus on the confirmation proceeding is no coincidence. Detrimental reliance is extraordinarily difficult to show in advance of confirmation. *See Gens*, 112 F.3d at 575 (finding no detrimental reliance in the proposed claim amendments because they occurred prior to confirmation); *Holstein v. Brill*, 987 F.2d 1268, 1270-71 (7th Cir. 1993) (noting the difficultly in amending a claim post-confirmation because the amendment may "throw monkey wrenches into the proceedings, making the plan infeasible or altering distributions to unsecured creditors"). The reason for this rule is straight-forward: if a creditor votes on a plan expecting a certain distribution or other treatment, and another creditor is permitted to amend its claim to dilute that distribution, the creditor could argue that it detrimentally relied on the amount of the other creditor's prior claim in voting on the plan.

39.    The situation in this case is very different. On November 2, 2016, the U.S. Debtors were served with the Ratner Report. Two days later, with the Ratner Report in hand, the

20

U.S. Debtors filed the initial plan and disclosure statement, making no mention of the Motion to Amend, SNMP Research's increased damages or what impact the allowance of SNMP Research's claims might have on creditors.  *See* D.I. 17347-48.

40.     On November 18, 2016, SNMP Research objected to approval of the initial disclosure statement, in part due to the U.S. Debtors' failure to discuss SNMP Research's damages and the Ratner Report.  *See* D.I. 17417 at p. 19 ("[T]he Disclosure Statement fails to provide adequate information about other aspects of SNMP Research's claims.  Now that the Debtors have SNMP Research's expert reports quantifying the amount of SNMP's Administrative and General Unsecured Claims, this information should be added to the portion of the Disclosure Statement describing SNMP Research's claims.").  Five days later, on November 23, 2016, SNMP Research filed the Motion to Amend.

41.     In resolution of SNMP Research's disclosure statement objection, which argued that the U.S. Debtors failed to provide adequate disclosures to creditors of SNMP Research's claims, the U.S. Debtors agreed to revise the disclosure statement.  Those revisions included a summary of the damages conclusion reached in the Ratner Report, the filing of the Motion to Amend, and a revised recovery analysis showing what creditors would be estimated to receive if the Motion to Amend were granted and SNMP Research's pre-petition claims were allowed in full.  *See* D.I. 17502, at p. 53 (discussing the SNMP Research claims); Appendix C, p. 11 (Recovery Analysis, showing an estimated unsecured creditor recovery ranging from 53.5% if SNMP Research's pre-petition claim were allowed in full, to a 55.1% recovery if SNMP Research's pre-petition claim were disallowed in full).  Accordingly, the U.S. Debtors cannot show unfair prejudice due to any purported lack of notice in connection with the confirmation proceedings or otherwise.  In fact, SNMP Research is the one that pressed the U.S. Debtors to

improve the disclosures in their own disclosure statement to ensure that creditors had adequate notice of SNMP Research's claims and positions.

42.    The cases on which the U.S. Debtors rely provide no support for their lack of notice argument.  Three of the four cases do not even address prejudice or lack of notice in the context of an appropriate amended claim; instead, these cases all found that the proposed claims were in fact "new claims," which triggered an excusable neglect analysis in which the courts discussed the amount of the claims as a factor under excusable neglect principles, which is completely inapplicable here. *See Opposition* at ¶¶ 77-78 (citing *In re AM International, Inc.*, 67 B.R. 79 (N.D. Ill. 1986) (holding that tax claim for unreported sales taxes was new claim, when the original claim asserted a claim for reported taxes during a different period and did not include a reservation clause notifying of an intention to additional claims in the future); *Praedium II Broadstone, LLC v. Wall St. Strategies, Inc.*, 2004 WL 2624678, at *5 (S.D.N.Y. Nov. 18, 2004) (holding that lease rejection claim was a new claim, because the original claim did not contain a reservation clause to account for lease rejection damages); *Midland Cogeneration Venture L.P. v. Enron Corp. (In re Enron Corp.)*, 419 F.3d 115, 130 (2d Cir. 2005) (attempt by creditor to file claim against guarantor debtor, when no prior claim had been filed against that particular debtor, constituted a new claim)).

43.    The only case cited for the U.S. Debtors' notice argument that denied an otherwise proper claim amendment where there was not a finding of a new claim is *Matter of Stavriotis*, 977 F.2d 1202, 1205 (7th Cir. 1992).  That case is easily distinguishable from the present facts.  In *Stavriotis*, the issue was whether the IRS could amend an original $11-12 thousand dollar claim to assert a $2 million claim, based on the results of a post-petition audit.  Significantly, in analyzing the issue, the court first noted that, "were the huge disparity in the amount of the claim [$11-$12 thousand to $2 million] the only concern, we might still be

persuaded that the IRS should prevail." The court then held, however, that "there are two additional factors which persuade us that the bankruptcy court was not required to permit amendment": (1) the bankruptcy court made a factual finding that other creditors would be prejudiced who had been given no notice of the IRS's ongoing audit and relied on the general amount listed in the prior claims; and (2) the IRS offered no reason for the delay in failing to give notice, instead blaming tardiness on official IRS policy. *See id.* at 1205-06.

44.     In other words, the court found detrimental reliance under the facts of that case, as well as the complete failure of the IRS to provide any legitimate reason for the delay. Here, the revised disclosure statement expressly discussed the Motion to Amend and the "high/low" range, so there can be no detrimental reliance. In addition, the sole reason for the delay was the need for SNMP Research to access the U.S. Debtors' financial records and to permit its expert to submit a damages report, which was done by the November 2, 2016 deadline agreed by the parties and ordered by the Court. The *Stavriotis* holding, therefore, has no bearing here. For the foregoing reasons, the U.S. Debtors have failed to demonstrate any unfair prejudice due to a lack of notice.

45.     The U.S. Debtors next argue that allowing the Proposed Claim to be filed will cause prejudice due to possible reduced recoveries to other unsecured creditors. *See id.* at ¶ 79. The U.S. Debtors cite no relevant authority in support of this position, and for good reason.[14] Numerous courts have rejected the U.S. Debtors' argument. *In re Brown*, 159 B.R. at 716; *In re*

---

[14] The U.S. Debtors' only citation in support of its reduced creditor distribution argument is the Federal Circuit's decision in *Tex. A. Oil Corp. v. U.S. Dep't of Energy*, 44 F.3d 1557, 1569 (Fed. Cir. 1995). The apparent purpose of this citation is to demonstrate that creditors receiving a fine, penalty forfeiture or damages unrelated to pecuniary loss, have a lower priority than creditors who suffer actual loss. This case has no relevance to the present case for multiple reasons. *First*, it had nothing to do with a motion to amend a claim. Instead, the issue was whether a statutory amount owed to the government for restitution should be considered a penalty or fine. *Second*, the quotation from the case is merely a recitation of the priority statute in Chapter 7 (under 11 U.S.C. § 726(a)(4)), which is wholly inapplicable here; instead, the confirmed plan governs distribution of NNI's assets. *Third*, as the U.S. Debtors acknowledge, only about half of the pre-petition damages here are profits, while the other half are actual damages based on Nortel's failure to pay royalties over many years.

23

*Titus*, 467 B.R. 592, 632 (Bankr. W.D. Pa. 2012), *aff'd in part, vacated on other grounds in part, remanded sub nom. Titus v. Shearer*, 498 B.R. 508 (W.D. Pa. 2013) (allowing amendment to proof of claim because "something more than mere creditor disappointment is required to preclude amendment"); *Gens*, 112 F.3d at 575 (noting that the standard proposed by the objecting party, "would preclude virtually any amendment, since it dispenses with the requirement that the debtor or trustee show 'unfair' prejudice."); *Matter of Stoecker*, 5 F.3d 1022, 1028 (7th Cir. 1993) (holding that "prejudice" does not mean a potential decrease in creditor distributions).[15]

46.     The Court should adopt the same approach here, which is consistent with this Court's flexible approach to allowing claim amendments to increase damages.  *See Stone & Webster, Inc.*, 547 B.R. at 606.  If the Court were to adopt the U.S. Debtors' view of prejudice, no claim could ever be amended to increase damages, and the exception would entirely engulf the general rule allowing proper amendments in the absence of unfair prejudice.[16]

ii.     *There is No Basis to Infer Bad Faith from SNMPRI's Amended Damages.*

47.     The U.S. Debtors' inference of bad faith to support "unfair prejudice" fairs no better.  *See* Opposition at ¶¶ 80-81.  Through their so-called bad faith argument, the U.S. Debtors ask the Court to draw unreasonable inferences of SNMPRI's subjective intent given the timing of

---

[15] Significantly, the court in *Stoecker* also took the opportunity to address its decision the prior year in *Stavriotis*, on which the U.S. Debtors rely to support its notice argument, discussed above.  In so doing, the court in *Stoeker* held that *Stavriotis* did not equate prejudice to a decreased distribution, but instead equated prejudice to creditor surprise (i.e., lack of notice).  5 F.2d at 1028.

[16] Assuming, *arguendo*, that a potential for decreased creditor recoveries could be considered in a claim amendment analysis, the U.S. Debtors' recovery analysis in their amended disclosure statement confirms that the difference to NNI's other unsecured creditors is nominal (from 55.1% to 53.5% estimated recoveries, based on the Proposed Claim being denied entirely and allowed in full).  *See* D.I. 17502, at Appendix C, p. 11 (Recovery Analysis). Accordingly, from a factual standpoint, the nominal potential decrease in distributions also would require the Court to reject the U.S. Debtors' reliance on potential decreased creditor recoveries.

24

the filing and increased amount of the claim.  The evidence at the hearing will easily dispel any notion of bad faith on multiple grounds.

48.     *First*, as discussed above, the timing of the Motion to Amend was dictated by the U.S. Debtors' delayed production of financial records and finalization of the Ratner Report.  As soon as the Ratner Report was finished and served, work on the Motion to Amend began, and it was filed less than three weeks later.  There is no basis to infer that the timing of the Motion to Amend was in any way nefarious.

49.     *Second*, the increased amount of the Proposed Claim is also completely legitimate.  Mr. Ratner's conclusions were based on independent views of the amounts owed.  This independence is particularly apparent in his conclusions as to the value of the Software in the Avaya business line sale to support SNMP Research's business line sale "transfer" profit claim, on which the Court previously denied the U.S. Debtors' motion for partial summary judgment.  *See SNMP Research Int'l, Inc. v. Nortel Networks Inc. (In re Nortel Networks Inc.)*, 2016 WL 491639 (Bankr. D. Del. Feb. 8, 2016).

50.     SNMP Research anticipated, based on the business line sale prices, that the "transfer" profit claims would be much higher.  It turns out that Mr. Ratner's independent analysis of the value of the Software in the Avaya business line sale led to a much lower dollar amount than SNMP Research had expected.  If Mr. Ratner's claims were based on anything but pure independence, his value of the Software in connection with the Avaya business line sale would have been multiples of the value he actually reached.  Rather than commending SNMP Research for relying on an honest assessment of damages, the U.S. Debtors again find a way to turn honesty and objectiveness regarding damages into a criticism.  By contrast, Mr. Ratner's per-copy royalty analysis supporting the pre-petition "usage" claims subject to the present

dispute demonstrates that SNMPRI would have been paid significantly more money over the years by Nortel had the Accused Products been properly licensed.[17]

51.     Rather than focusing on the true value of SNMPRI's pre-petition claims, which is measured by Nortel's unauthorized usage of the Software, the U.S. Debtors continue to beat the drum that the damages do not comport with SNMP Research's historical revenues. *See* Opposition at ¶ 41. Not only are SNMP Research's revenues vastly understated by the U.S. Debtors, comparing SNMP Research revenues to its actual damages is a non sequitur. Had Nortel – one of SNMP Research's larger customers – properly paid for use of the Software in the Accused Products, SNMP Research's historical revenues would have been much higher. Tying SNMP Research's revenues to damages is akin to saying that the more Nortel infringed by failing to pay, the less the Software must be worth. This is circular logic.[18]

52.     ███████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████

---

[17] Nortel also generated substantial profits from the Accused Products, partly because it was improperly using SNMP Research's software for free. Copyright and trade secret laws allow SNMP Research to recover those profits.

[18] SNMP Research's total revenues are vastly understated in any event. If the Court were to consider the SNMP Research entities' revenue to have any bearing at all, the Court would have to consider revenue that is not being disclosed by Nortel. Specifically, the U.S. Debtors attempt to make the Software seem less valuable by claiming that the $81 million pre-petition damages amount is "more than 25 times more than [SNMPRI's] total annual royalties from all of its many customers." *See* Opposition at ¶ 9. This is factually untrue. The total combined revenue for the SNMP Research entities and their predecessors relating to the Software is ███████████; approximately ██████ for the last ten years or approximately ██████; and approximately ██████ or about ██████ since 1999, the date of the Nortel agreement. Moreover, the revenue in most years would have been significantly higher had Nortel paid the appropriate amounts for what it was using.

██████████    In the present case, Nortel has forced SNMP Research to spend millions and millions in Nortel-related litigation fees, and expenses and appears to be set on going to trial. Dr. Case would have never spent this kind of money to obtain justice if he subjectively did not believe in the value of the claims. The U.S. Debtors' bald assertion that Dr. Case is pursuing these claims in bad faith is absurd.

53.     After the Opposition was filed, the U.S. Debtors made another attempt to cast doubt on the amount of SNMPRI's damages. Specifically, they filed a so-called notice of supplemental facts to advise the Court of the resolution of SNMP Research's claims against the Canadian Debtors, in exchange for a $3,500.00 claim (the "Notice of Supplemental Facts"). *See* D.I. 17978. The settlement in Canada has no bearing on the value of SNMP Research's claims. As the Court may recall, the Canadian Debtors were initially named as co-defendants in the Adversary Proceeding, but when the Canadian court declined to grant relief from stay, SNMP Research was forced to proceed against the Canadian Debtors separately in Canada, even though the Nortel License provided for venue in the United States.

54.     Thereafter, SNMP Research evaluated the record in the allocation dispute and concluded that, because of the way Nortel operated as "one Nortel," SNMP Research could recover against the U.S. Debtors in this proceeding for all of Nortel's wrongdoing, because the non-U.S. Nortel entities constitute "practical partners" of the U.S. Debtors, making them jointly and severally liable for profits. *See generally Nelson-Salabes, Inc. v. Morningside Dev., LLC*, 284 F.3d 505, 517 (4th Cir. 2002) ("Although defendants in copyright infringement proceedings are generally not jointly liable for profits, a long-standing exception to this rule exists when *such defendants* act as partners or as 'practical partners.'") (citing *Frank Music Corp. v. Metro-*

*Goldwyn-Mayer, Inc.*, 772 F.2d 505, 519 (9th Cir. 1985)).  At trial, SNMP Research will present ample evidence of Nortel's joint and several liability for all of SNMP Research's damages, including the Court's own findings in its memorandum decision that "Nortel operated prior to insolvency as a highly integrated multinational that derived significant benefits from operating as 'one Nortel.'"  *See* D.I. 15544 at p. 56.  As a result of Nortel's operations as "one Nortel," among other things, it made no sense for SNMP Research to continue funding two separate litigations, since all of Nortel's actual damages and profits are grounded in joint and several liability principles.  Accordingly, the Canadian resolution has nothing to do with the value of SNMP Research's claims in this case, nor does it in any way infer bad faith.

**F.      *The U.S. Debtors' So-Called Timeliness and Equitable Arguments are Largely Mislabeled as Such and Entirely Misplaced.***

55.      The U.S. Debtors spend several pages at the end of their Opposition urging denial of the Motion to Amend on so-called timeliness and equitable grounds.  *See* Opposition at ¶¶ 70-84 (Argument Section IV).  But a review of the body of the U.S. Debtors' final section reveals that these arguments are really restated substantive arguments on why a "new claim" is supposedly being asserted.  *See id.* at ¶¶ 70-81.  The "new claim" issues are appropriately addressed in other sections of this Reply.

56.      There is one point regarding the U.S. Debtors' so-called timeliness and equity arguments that warrants separate discussion, which is their contention that filing a claim seven years after the bar date is "far too late."  *See id.* at ¶¶ 82-83.  This argument is wrong as a matter of law, as it improperly attempts to frame the request to amend SNMPRI's prior timely-filed claims under principles of excusable neglect.  SNMPRI, of course, filed a timely proof of claim and several proper amendments, and for the reasons discussed above, the Proposed Claim is not

28

a "new claim."[20]  When amended claims properly relate-back, as SNMPRI's Proposed Claim does here, it would be erroneous to consider the timing of the motion to amend.  As set forth in the Motion to Amend, the Supreme Court has directly so held.  *See Krupski v. Casta Crociere S.p.A*, 560 U.S. 538, 552-54 (2010).  The U.S. Debtors conveniently ignore this Supreme Court precedent in arguing that the Motion to Amend was filed "far too late."[21]

57.    Moreover, the Motion to Amend could not have been filed any sooner than it was.  The U.S. Debtors began rolling production of financial sales and profit data to be used in the Ratner Report following the late-June 2016 discovery hearing.  Those rolling productions continued through mid-October 2016, two weeks before the submission of the Ratner Report on November 2, 2016.  The Motion to Amend was filed on November 23, 2016, less than three weeks later.  Accordingly, any challenge to the timing of the Motion to Amend to increase SNMPRI's own damages must be rejected legally and factually.

---

[20] In the Motion to Amend, SNMPRI made the alternative argument that, if the Previously Amended Claims or the Proposed Claims constitute new claims that do not relate back to the Original Claims, the Court should allow them as late-filed new claims under excusable neglect principles.  Motion to Amend at ¶ 65.  The U.S. Debtors, in their Opposition, do not challenge whether the Previously Amended Claims relate back to the Original Claims.  They instead only argue that the Proposed Claim does not relate-back to the prior claims.  Accordingly, the Court should compare the Fifth Amended Claim (the most recent amendment) to the Proposed Claim in determining whether the Proposed Claim is a new claim.  In doing so, the Court may only evaluate the timing of the claim under excusable neglect standards if the Proposed Claim is a new claim that does not relate back; otherwise, timeliness cannot be considered.  If timeliness is considered, the amendment should easily be allowed, as the Proposed Claim simply seeks to increase SNMPRI's damages for SNMPRI's own direct and derivative claims.  As discussed below when addressing the addition of SNMPR's direct claims, SNMP Research does not argue excusable neglect at all.

[21] The Court should only consider excusable neglect if it were to find that one or more of the claims the Proposed Claim do not "relate-back" to the Fifth Amended Claim against NNI.  The Motion to Amend argues excusable neglect in the alternative (Motion to Amend at ¶¶ 52-65), but this issue should be decided on relation-back grounds, without having to reach SNMPRI's alternative excusable neglect argument.

II.     **SNMPR's Direct Copyright and Trade Secret Claims Should be Added to SNMPRI's Proposed Claim upon its Filing.**

A.     *The Court Should Allow SNMPR to be Added under the Same Relation-Back Principles Applicable to SNMPRI's Proposed Amendment.*

58.     The U.S. Debtors go to great lengths to argue that Federal Rule 15(c)(1)(C) does not apply.  While SNMP Research strongly disagrees with these arguments, as discussed in Section II.B below, the Court need not be constrained by a strict application of these rules which are generally applicable in a District Court case or adversary proceeding.  Even if the Court were to agree with the U.S. Debtors' tortured interpretation of Federal Rule 15(c)(1)(C) (i.e., that it only applies to "defendants" in ordinary litigation), the Court still should allow SNMPRI to be added under the standards applicable to a creditor's amendment of its own claim.

59.     There is ample authority in the bankruptcy context allowing proofs of claim to be amended to add or substitute proper creditors.  In these cases, courts analyze the addition or substitution of additional creditors under the same relation-back principles applicable to a creditor seeking to amend its own proof of claim after the bar date; namely, as discussed in detail in Section I above, that an amendment is proper under Federal Rule 15(c) if it does not assert a "new claim" and there is no unfair prejudice or bad faith present.  *See Unioil, Inc. v. Elledge* (*In re Unioil, Inc.*), 962 F.2d 988, 991-93 (10th Cir. 1992) (substitution); *Gens*, 112 F.3d at 575-76 (substitution); *Clamp-All Corp. v. Foresta (In re Clamp-All Corp.)*, 235 B.R. 137, 140-42 (B.A.P. 1st Cir. 1999) (addition of claimant); *In re Bender Shipbuilding & Repair Co., Inc.*, 2012 WL 4086445, at *3-4 (Bankr. S.D. Ala. Sep. 17, 2012) (substitution); *Titus*, 467 B.R. at 631-33 (Bankr. W.D. Pa. 2012) (substitution); *Vignone*, 2014 WL 5812341, at *3-4 (substitution).  None of these cases required that a creditor show that Federal Rule 15(c)(1)(C) applies to "plaintiffs," or even discussed the issue at all.  Instead, they simply applied the standards for relation-back

applicable to a creditor amending its own claim to determine whether another creditor could be substituted or added to an existing claim.  The Court should do the same here.

60.    Application of the standards for "relation-back" of a proof of claim easily demonstrates that the addition of SNMPR would not constitute a new claim, and that there is no unfair prejudice or bad faith.  As a threshold matter, for the reasons set forth in Section I.C. above, addressing application of the conduct test to SNMPRI's direct and derivative claims, the conduct test is also satisfied with respect to SNMPR's copyright claims.  SNMPR's copyright claims involve the same Software, the same Nortel products, the same Nortel License and the same alleged wrongful conduct asserted in SNMPRI's prior claims and the Proposed Claim.

61.    The only difference in analyzing the conduct test here is that SNMPR is not named specifically as a separate creditor in the prior SNMPRI claims.  But the U.S. Debtors' fixation on SNMPR being a different legal entity is a red-herring.  Because SNMPRI licensed SNMPR's products to Nortel, the facts underlying SNMPR's copyright claims are exactly the same as the facts underlying SNMPRI's direct and derivative trade secret claims.  The fact that SNMPR is a different legal entity than SNMPRI has no bearing on whether the conduct test has been satisfied with respect to the addition of SNMPR.  Accordingly, the addition of SNMPR would not create a "new claim."  Instead, the addition of SNMPR could be found to constitute the addition of a new legal theory in the form of SNMPR's direct claim for copyright infringement, which is entirely permissible.  *See supra* at § I.C.

62.    The U.S. Debtors also cannot show any unfair prejudice by the addition of SNMPR's direct copyright infringement claims to the Proposed Claim.  *First*, the U.S. Debtors cannot reasonably argue that they relied on the absence of SNMPR in any way, let alone "detrimentally."  For the same reasons detailed in Section I.C. above, the U.S. Debtors and creditors had adequate notice of the Motion to Amend in advance of confirmation, and the

31

general argument that unsecured creditors might receive slightly less (55.1% versus 53.5%) if SNMP Research's pre-petition claim is allowed is not "unfair" prejudice. *See id.* at § I.C.

63.     Moreover, there is also no unfair prejudice as it pertains to the addition of SNMPR's claims because the addition cannot have any impact on the scope of the litigation or the types of claims that the U.S. Debtors must defend.  SNMPR's copyrights are front and center in the Adversary Proceeding, and will be litigated at trial regardless of whether the Court were to deny the Motion to Amend and cut off SNMPR's right to recover pre-petition copyright-based damages.  Moreover, as discussed above in Section I.A, the U.S. Debtors' position that they have been defending contract claims during the pre-petition period for years contradicts their own prior admissions, the record in this case, and common sense.  Accordingly, the U.S. Debtors cannot satisfy the detrimental reliance test necessary to deny the addition of SNMPR.

64.     The U.S. Debtors also fail to demonstrate that SNMPR acted in bad faith.  The failure to add SNMPR as a claimant in the proofs of claim was an actual and honest mistake.  *See* Case Declaration at ¶ 15 ("Based on the way SNMP Research functioned, I believed that SNMPRI, as the party to the Nortel License and based on SNMP Research's common licensing practices, was the proper party to enforce the Software rights of SNMP Research and to file the proofs of claim before the Adversary Proceeding … was filed.").  For these reasons, the Court should allow the addition of SNMPR to the Proposed Claim.

**B.      *Federal Rule 15(c)(1)(C) is Satisfied in Any Event.***

65.     If the Court were to decide to consider the U.S. Debtors' argument that Federal Rule 15(c)(1)(C) does not apply to the addition of plaintiffs in federal court lawsuits, despite abundant bankruptcy case law allowing new parties to be substituted or added to proofs of claim, the Court should easily find that Federal Rule 15(c)(1)(C) does apply to the addition of plaintiffs. In the Motion to Amend, SNMP Research offers Federal Rule 15(c)(1)(C), by analogy, as one

possible avenue to allow the addition of SNMPR, citing the Third Circuit's decision in *Nelson v. County of Allegheny*, 60 F.3d 1010 (3d Cir. 1995), a non-bankruptcy case. *See* Motion to Amend at ¶¶ 73-83. In the Opposition, the U.S. Debtors attempt to restrict the Court's ability to allow the addition of SNMPR by making the hyper-technical (and incorrect) argument that Federal Rule 15(c)(1)(C) does not apply to plaintiffs in the Third Circuit, citing *Gardner v. State Farm Fire & Casualty Company*, 544 F.3d 553 (3d Cir. 2008). The U.S. Debtors' argument is wrong for several reasons.

66.     As a threshold matter, the *Nelson* Court did not make a mere suggestion that Federal Rule 15(c)(1)(C) applies to plaintiffs, as the U.S. Debtors contend. In *Nelson*, a class action lawsuit was filed, and at the time of the filing, the movants knew about their ability to bring suit and affirmatively decided not to do so. They then moved to be added as plaintiffs under Federal Rule 15(c)(1)(C). The Third Circuit expressly applied Federal Rule 15(c)(1)(C) to the request, recognizing that the 1966 Advisory Committee Notes to the rule said that "the attitude taken in revised Rule 15(c) toward change of defendants extends by analogy to amendments changing plaintiffs." *Nelson*, 60 F.3d at 1014, n.7. The Court held that under the circumstances, the movants, knowing of their rights prior to the expiration of limitations, intentionally sat on their rights and that their failure to join the suit initially was not a mistake. *See id*. The fact that the Third Circuit rejected the Federal Rule 15(c)(1)(C) request does not make the court's application of Federal Rule 15(c)(1)(C) a mere suggestion or any less significant than a case in which the court granted the request. The Third Circuit, after adopting the test for adding plaintiffs, merely held that the test was not satisfied under the facts of that case. Of course, in the present case, the record is clear that Dr. Case had no knowledge that SNMPR even had copyright infringement claims before the deadline to file proofs of claim.

53651/0001-14340767v1

67.     In *Gardner*, on which the U.S. Debtors rely, the issue before the Court had nothing to do with Federal Rule 15(c)(1)(C).  In that case, the plaintiff filed a suit on behalf of someone else without obtaining a proper assignment until after the case was filed and the statute of limitations had expired.  The court found that Federal Rule 15(c)(1)(C) simply did not apply. While the court indicated that Federal Rule 15(c)(1)(C) only applied to defendants on its face, the court did so with no analysis, quickly moving on to an application of Federal Rule 17 under the facts of that case.  *Gardner*, 544 F.3d at 561-62.

68.     Two years after *Gardner*, the Third Circuit again addressed the applicability of Federal Rule 15(c)(1)(C) to plaintiffs, in *Heady v. PNC Bank N.A.* (*In re Cmty. Bank of N. Va.*), 622 F.3d 275 (3d Cir. 2010).  In that case, the court decided that it did not need to reach the ultimate issue under Federal Rule 15, due to other errors of the trial court, but found it appropriate to delve into a detailed discussion of the issue of amending to add plaintiffs.

69.     The U.S. Debtors attempt to minimize *Heady* by relegating the Third Circuit's discussion to *dicta* and declaring that "the Third Circuit acknowledged - in a case concerning class certification - that some courts have 'applied [Rule 15's] requirements to the addition of new plaintiffs,' but did not, itself, do so to any effect."  *See* Opposition at ¶ 57, n. 11 (quoting *Heady*, 622 F.3d at 297-98).  The U.S. Debtors intentionally omit the most important part of the court's words: "Rule 15(c)(1)(C) does not expressly refer to the addition of a new plaintiff… [h]owever, ***our Court*** (and other courts) have also applied its requirements to the addition of new plaintiffs."  *Heady*, 622 F.3d at 297 (emphasis added) (citing *Nelson* and the Advisory Committee Notes).  The Third Circuit did not even feel the need to cite its prior decision in *Gardner*; instead, the Court expressly acknowledged that the Third Circuit in *Nelson* had recognized the application of Rule 15(c)(1)(C) to plaintiffs.

34

70.     If that were not enough to confirm the *Nelson* rule, the Third Circuit, this District and other courts within the Third Circuit have repeatedly done so in other cases. *See Monahan v. City of Wilmington*, 2004 WL 758342, at *3 (3d Cir. Jan. 30, 2004) ("To ameliorate the statute of limitations, Rule 15[(c)(1)(C)] imposes three conditions, all of which must be met for a party to successfully relate back an amended complaint adding a new plaintiff.") (citing *Nelson*); *Henglein v. Colt Indus. Operating Corp.*, 91 F. Appx. 762, 765 (3d. Cir. 2004) (rejecting Second Circuit's rule that plaintiff only had to satisfy one element to be added under Federal Rule 15(c)(1)(C), indicating that *Nelson* is the law in the Third Circuit and requires a plaintiff to satisfy three elements when seeking to be added under Federal Rule 15(c)(1)(C)); *Allen v. Nat'l R.R. Passenger Corp.*, 2004 WL 2830629, at *8-9 (E.D. Pa. Dec. 7, 2004) (recognizing the applicability of *Nelson* to the addition of plaintiffs); *N.A.I.F. v. Snyder*, 2005 WL 735554, at *2-3 (D. Del. Mar. 30, 2005) (relying on *Nelson's* three conditions for a plaintiff to utilize Federal Rule 15(c)(1)(C)); *Gutierrez v. Johnson & Johnson*, 227 F.R.D. 255, 258 (D. N.J. 2005) (relying on *Nelson* in affirming decision of magistrate to expand putative class, thereby adding plaintiffs). The U.S. Debtors' position on the application of Federal Rule 15(c)(1)(C) is indisputably incorrect and should be rejected.

### C.     *The Nelson Test is Essentially the Same as that Applied in Other Relation-Back Cases Allowing Existing Creditors to Amend and New Parties to be Substituted or Added to Claims, and is Similarly Satisfied.*

71.     As interpreted by subsequent courts, the *Nelson* test requires a showing that: (1) the claim arose out of the same conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, (2) the defendant had notice of the filing of the action within the period provided by Rule 4(m) and will not be prejudiced in maintaining a defense, and (3) the newly named plaintiffs failed to add their names to the complaint because of a mistake. *N.A.I.F. Inc.*, 2005 WL 735554, at *2; *Monahan*, 2004 WL 758342, at *3. This is effectively the same

35

"relation-back" test courts apply to creditors seeking to amend their own claims or to be added or supplemented as creditors in an existing proof of claim filed by another creditor. The first two elements focus on the conduct test and notice to the opposing party, just like the general relation-back tests bankruptcy courts have used to analyze the substitution or addition of creditors to existing proofs of claim.

72.    The third element (mistake) is, in essence, an analysis of the subjective motivations of the movant; in other words, the mistake element is the same as the "bad faith" element of the general relation-back test, stated differently. Accordingly, the *Nelson* standard (to the extent the Court finds the need to rely it) is satisfied for the same reasons as they are under more general relation-back principles that have been recognized in bankruptcy cases dealing with substitution or amendment of creditors in existing proofs of claim.

73.    Because the third element is stated differently, requiring a "mistake" as opposed to an absence of bad faith, and the U.S. Debtors focus on the mistake element at length, a separate discussion of this element of the *Nelson* test is appropriate. The U.S. Debtors argue that a mistake of law is not a viable mistake. *See* Opposition at ¶¶ 62-64. But none of the cases cited by the U.S. Debtors in support of that proposition address the standard for a mistake under Federal Rule 15(c).

74.    It is well-settled that a "mistake" within the meaning of Federal Rule 15(c)(1)(C)(ii) includes erroneous judgments of law ***and*** fact. *Allen*, 2004 WL 2830629, at *9 (citing *Dalicandro v. Legalgard Inc.*, 2003 WL 182942, at *6 (E.D. Pa. Jan.23, 2003) and *Advanced Power Sys., Inc. v. Hi-Tech Sys., Inc.*, 801 F. Supp. 1450, 1457 (E.D. Pa. 1992); *Kinnally v. Bell of Pa.*, 748 F.Supp. 1136, 1142 (E.D.Pa.1990)); *see also Gutierrez*, 227 F.R.D. at 258 (finding that mistake of law permits addition of plaintiffs under Rule 15(c) and *Nelson*); *Adams v. Oels*, 2010 WL 1688551, at *3 (D. N.J. Apr. 27, 2010) ("The "mistake" requirement in

Rule 15(c) 'should clearly not be read to limit its usefulness to cases of misnomer' and may be either a mistake of law or fact." (citing 3 Moore's Fed'l Prac. (4.-2) at 15-231 n.4)); *Stewart v. Phil. Hous. Auth.*, 487 F.Supp.2d 584, 590 (E.D. Pa. 2007) (citing *Advanced Power Sys., Inc.*, 801 F.Supp. at 1457) (Federal Rule 15(c) "permits amendments that simply cure errors in legal judgment.").

75.    Moreover, Dr. Case's mistake was not limited exclusively to a mistake of law in any event.  It was also partially a mistake of fact based on SNMPRI's common practice of licensing SNMPR's Software on a near-exclusive basis.  Case Dec. at ¶ 15 ("Based on the way SNMP Research functioned practically, I believed that SNMPRI, as the party to the Nortel License and based on SNMP Research's common licensing practices, was the proper party to enforce the Software rights of SNMP Research and to file the proofs of claim before the Adversary Proceeding … was filed.").  The evidence is uncontroverted that Dr. Case's mistake as to the proper SNMP Research entity that could prosecute SNMPR's copyright claims was actual, honest and absent any bad faith.[22]  Accordingly, regardless of whether the Court evaluates this element under the guise of a "mistake" or absence of "bad faith," the analysis is the same, and it is easily met.

---

[22] While not required under Rule 15(c)(1)(C), the mistake was also justified under an objective analysis, which would be applicable in an analysis under Federal Rule 17.  The U.S. Debtors attempt to build a barrier between the SNMP Research entities that does not exist by quoting Dr. Case's deposition testimony about a "Chinese wall" regarding SNMP Research.  *See* Opposition at ¶ 2.  They do this in an effort to cast doubt on the reasonableness of the mistake, fully understanding that Dr. Case's testimony about a Chinese wall was intended simply to convey that the entities exercised good corporate separation practices.  But there is no real issue about the substantial identity of interest between the SNMP Research entities.  SNMPR and SNMPRI are respectively owned by Dr. Case and his wife, Mary, respectively.  The two entities have operated on the same farm in Knoxville, Tennessee since the 1990s, and SNMPRI has been licensing SNMPR's software since then.  SNMPRI acts as the "sales" arm of the organization, and SNMPR acts as the "technical" arm.

**D.**     ***The Court Has Ample Jurisdiction to Consider a Motion for a Creditor to be Added to a Proof of Claim.***

76.     The U.S. Debtors argue that, because SNMPRI lacked standing to file a derivative copyright proof of claim on behalf of SNMPR, this Court lacks jurisdiction to add SNMPR as a claimant.  *See* Opposition at ¶¶ 49-55.  The U.S. Debtors rely heavily on the District Court's decision in *Vianix Delaware LLC v. Nuance Communications, Inc.*, 2009 WL 1364346 (D. Del. May 19, 2009), insisting that it is "directly on point" and dispositive of the Court's lack of subject matter jurisdiction to hear the request to add SNMPR.  *See* Opposition at ¶ 49.  This is incorrect, however, because *Vianix* is materially and factually distinguishable and wholly inapplicable as a matter of law in any event to an analysis of bankruptcy court subject matter jurisdiction.

77.     In *Vianix*, the movant sought to ***substitute*** a plaintiff that lacked standing to bring ***all*** of the claims in a complaint with a ***new plaintiff*** that had standing to bring ***all*** of the claims in an amended complaint, and have the amendment relate back to the time the original complaint was filed.  *See Vianix*, 2009 WL 1364346, at *2 ("In an attempt to cure this jurisdictional defect, Vianix Delaware LLC, pursuant to Federal Civil Procedure Rule 15(a), filed an amended complaint where it simply renamed Vianix LLC, the owner of the copyrights as plaintiff. Plaintiff, however, cannot correct the problem in this manner."); *see also Vianix Del. LLC v. Nuance Comm'ns, Inc.*, 2009 WL 958021 (D Del. Jan. 27, 2009) (original complaint asserting one count of copyright infringement and no other claims).

78.     The facts in *Vianix* are far from "directly on point" as represented by the U.S. Debtors.  Here, the U.S. Debtors completely ignore that SNMPRI has ***always had*** constitutional standing to bring several claims set forth in its proofs of claim, including its own direct copyright, trade secret and breach of contract claims and its derivative trade secret claims. SNMPRI is not seeking to abandon any of its own claims, or to "convert" those potential claims

38

to SNMPR's direct copyright claims.   In other words, SNMPR is not requesting to be "substituted" for SNMPRI.[23]   Had the original plaintiff in *Vianix* filed independent claims for which federal subject matter jurisdiction otherwise existed, the Court could not have dismissed the lawsuit on jurisdictional grounds, because jurisdiction would have been proper upon the filing of the complaint on other grounds.  The *Vianix* case, therefore, is completely inapplicable.

79.     The case also is inapposite legally, because it deals with federal question jurisdiction, as opposed to bankruptcy jurisdiction.  In bankruptcy, the Court has broad subject matter jurisdiction over all claims against a debtor's estate, as well as all claims that relate to the bankruptcy case.   *See* 11 U.S.C. §§ 157(b)(2)(B), (c).   Indeed, the U.S. Debtors have acknowledged this Court's more robust core jurisdiction over SNMP Research's pre-petition claims.  *See* Opposition to Motion to Withdraw at p. 1 ("[SNMP Research's] claims, particularly those against the U.S. Debtors … are core claims…."); *id.* at p. 16 (discussing "core claims against the U.S. Debtors asserted in [SNMP Research's] Proof of Claim").   The U.S. Debtors also acknowledged that the post-petition infringement claims in the Adversary Proceeding are based on a continuation of the pre-petition conduct giving rise to the pre-petition claims at issue before this Court.   *See id.* at p. 11 ("SNMPR's core claims against the U.S. Debtor for the alleged post-petition use of SNMPR's software are largely duplicative of its pre-petition proof of claim….").

80.     Because, as the U.S. Debtors concede, this Court has always had core subject matter jurisdiction over SNMP Research's claims, there is no gap, much less a lack, of subject matter jurisdiction in this Court as there was in *Vianix*.  The District Court's federal question

---

[23] For much the same reason, the case of *EMI Entertainment World, Inc. v. Karen Records, Inc.*, 2013 WL 2480212 (S.D.N.Y. Jun. 10, 2013), also cited by the U.S. Debtors, is inapposite.  *See* Opposition at ¶ 49.  There, as in *Vianix*, the plaintiff brought a copyright claim but was not the holder of the copyright.  The original plaintiff asserted no other claims that it would have had standing to bring independent of the copyright claim.  *See EMI Etm't World, Inc. v. Karen Records, Inc.*, 2005 WL 451557 (S.D.N.Y Jan. 18, 2005) (Complaint).

53651/0001-14340767v1

jurisdiction over a complaint when one plaintiff is completely substituted for another simply has no applicability to these facts or to bankruptcy proofs of claim generally. To hold otherwise would contradict basic principles of bankruptcy jurisdiction, as well as authorities recognizing that new creditors can be substituted or added to proofs of claim upon satisfaction of relation-back standards. *See supra* at § 2.A. The *Vianix* holding also appears to contradict the Third Circuit's decision in *Nelson* which permits plaintiffs to utilize Federal Rule 15(c)(1)(C) to be substituted in a federal lawsuit after the statute of limitations deadline passes. For these reasons, the Court should conclude that it has ample subject matter jurisdiction over the request to add SNMPR to the Proposed Claims.

## E.     *Timeliness is Not at Issue in SNMPR's Request to be Added to the Proposed Claims.*

81.     As discussed above, the U.S. Debtors' argument that the Motion to Amend was filed "far too late" is wholly inapplicable to any relation-back analysis. *See supra* at § 1.F (citing *Krupski*, 560 U.S. at 552-54). For these same reasons, it would be erroneous for the Court to consider the timeliness of the Motion to Amend as it relates to the request to add SNMPR and its direct claims to SNMPRI's Proposed Claims.[24] In fact, SNMPR is not even asking the Court to consider excusable neglect in the alternative in its request to be added to the Proposed Claim. There is nothing unfair about the timing in any event, as notions of relation-back view fairness through the lens of "unfair prejudice" to a debtor and its creditors, including a lack of detrimental reliance and bad faith. Applying the correct legal principles to the addition of SNMPR should lead the Court to allow the addition of SNMPR to the Proposed Claim.

---

[24] As discussed *supra* at footnote 18, SNMPRI did make an excusable neglect argument in the alternative as it relates to SNMPRI's request to amend its own timely-filed and properly amended proofs of claim, to the extent the Court were to find that SNMPRI's Proposed Claim is a "new claim" and thus does not relate back to SNMPRI's prior filed claims.

**CONCLUSION**

82.     The requests to (i) amend SNMPRI's Fifth Amended Claim to update the amount of its own damages claim and to (ii) add SNMPR to that claim each satisfies relation-back principles under applicable law.   Inherent in that law is the notion of fairness from the perspective of the U.S. Debtors and their creditors.  The Court must find fairness when there is no detrimental reliance by the debtors or their creditors, and an absence of bad faith.   The evidence at the hearing will demonstrate clearly that no detrimental reliance can be shown based on the full disclosure of SNMP Research's potential amended claim in the approved disclosure statement, as well as the fact that SNMPR's copyright claims will be included in the litigation on a post-petition basis regardless of how the Court rules.

83.     The U.S. Debtors' argument against the proposed amendment and addition of SNMPR boils down to the generic argument that unsecured creditors might receive a slightly reduced distribution (55.1% versus 53.5%) if the Motion to Amend is granted and the claims are allowed in their full amount.  This is not the type of potential prejudice that can bar a proof of claim amendment as a matter of law or fact.  For these reasons, and those set forth in the Motion to Amend and this Reply, the Motion to Amend should be granted in its entirety, and the Court should both (i) allow SNMPRI to file the Proposed Claim and (ii) order that SNMPR is deemed to be added to that Proposed Claim once it is filed.

53651/0001-14340767v1

Dated: April 5, 2017

<table>
<tr><td>

**OF COUNSEL**

Richard S. Busch, Esq.
**King & Ballow Law Offices**
315 Union Street, Suite 1100
Nashville, TN 37201
(615) 259-3456 (Phone)
(615) 726-5417 (Fax)
rbusch@kingballow.com


-and-

John L. Wood, Esq.
**Egerton, McAfee, Armistead &
Davis, P.C.**
900 S. Gay Street
Knoxville, TN 37902
(865) 546-0500 (Phone)
(865) 525-5293 (Fax)
jwood@emlaw.com

</td><td>

**COLE SCHOTZ P.C.**

*/s/ Norman L. Pernick*
Norman L. Pernick (No. 2290)
Nicholas J. Brannick (No. 5721)
500 Delaware Avenue, Suite 1410
Wilmington, DE 19801
(302) 651-2002 (Phone)
(302) 652-3117 (Fax)
npernick@coleschotz.com
nbrannick@coleschotz.com

-and-

G. David Dean, Esq.
300 E. Lombard Street, Suite 1450
Baltimore, MD 21202
(410) 230-0660 (Phone)
(410) 230-0667 (Fax)
ddean@coleschotz.com

*Counsel for SNMP Research, Inc. and SNMP
Research International, Inc.*

</td></tr>
</table>

53651/0001-14340767v1