# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | ) Chapter 11 |
| | ) Case No. 09-10138 (KG) |
| Nortel Networks Inc., *et al.,* | ) (Jointly Administered) |
| | ) **Related to Docket No. 18020** |
| Debtors.[1] | ) |
| SNMP Research International, Inc. | ) **Obj. Deadline:  April 20, 2017 at 5:00 p.m.** |
| and SNMP Research, Inc., | ) **Hearing Date:  May 2, 2017 at 2:00 p.m.** |
| Plaintiffs, | ) |
| | ) Adv. Proc. No. 11-53454 (KG) |
| v. | ) **Related to Adv. Docket No. 540** |
| | ) |
| Nortel Networks Inc., *et al.*, | ) |
| Defendants. | ) |

## MOTION OF SNMP RESEARCH, INC. AND SNMP RESEARCH INTERNATIONAL, INC. TO EXCLUDE EXTRINSIC EVIDENCE REGARDING THE SCHEDULE 1 ISSUE AND TO EXCLUDE THE TESTIMONY OF DR. RICHARD RAZGAITIS

SNMP Research, Inc. ("SNMPR") and SNMP Research International, Inc. ("SNMPRI") (together, "SNMP Research"), by their undersigned counsel, hereby move to exclude extrinsic evidence on the issue of whether any SNMP Research software (the "Software") was licensed for internal "Development" use or "Run-Time" distribution under Schedule 1A of the Nortel License (defined below) with respect to any Nortel products after June 20, 2003 (the "Schedule 1 Issue"). SNMP Research also moves to exclude the testimony of Dr. Richard Razgaitis, a purported expert on industry custom and practice retained by the U.S. Debtors, in the event that any extrinsic testimony is allowed.[2]  In support of this Motion, SNMP Research states as follows:

---

[1]  In addition to Nortel Networks Inc., the debtors in these Chapter 11 cases are:  Nortel Networks Capital Corporation, Nortel Altsystems Inc., Nortel Altsystems International Inc., Xros, Inc., Sonoma Systems, Qtera Corporation, CoreTek, Inc., Nortel Networks Applications Management Solutions Inc., Nortel Networks Optical Components Inc., Nortel Networks HPOCS Inc., Architel Systems (U.S.) Corporation, Nortel Networks International Inc., Northern Telecom International Inc., Nortel Networks Cable Solutions Inc.; Nortel Networks (CALA) Inc.; and Nortel Networks India International Inc. (the "U.S. Debtors").  The term "Nortel" as used herein refers to the U.S. Debtors and their affiliates, including those in insolvency proceedings in Canada and Europe.

[2]  This Motion is being filed under seal pursuant to section V.F of the *Stipulation and Agreement Governing Production, Exchange and Filing of Confidential Materials* [Adv. D.I. 237-1].

## PRELIMINARY STATEMENT

1.      At the hearing on May 11-12, the Court will be asked to decide whether any "products originating from what was Bay Networks" (the "Schedule 1 Products") were licensed under Schedule 1A after June 20, 2003.  The Court is being asked to decide this issue because Nortel improperly used and distributed the Software in Nortel products from June 20, 2003 through the bankruptcy business line sales, without the necessary licenses and without paying any royalties, resulting in substantial economic harm to SNMP Research.  Now that Nortel has been caught improperly using the Software in high volume products for several years, and causing significant damages to SNMP Research while making significant profits on the products, the U.S. Debtors are launching a desperate attack to re-write the parties' agreement seventeen years later to avoid liability for their years of wrongdoing.

2.      Knowing that the language of Schedule 1A could not be clearer, the U.S. Debtors will seek to introduce two forms of extrinsic evidence.  The first is factual evidence, which has been mischaracterized by the U.S. Debtors to support their story that the parties really did not mean what they clearly said in Schedule 1A.  The second is the purported expert testimony of Dr. Richard Razgaitis, who seeks to offer opinion testimony regarding so-called "custom and practice"[3] to reach his ultimate conclusion that Nortel had a perpetual license to the Schedule 1 Products, despite the clear language of Schedule 1A.

3.      Notwithstanding the roadblocks put up by the U.S. Debtors, deciding the Schedule 1A issue will be very straightforward and does not require the Court to look beyond the four corners of the Nortel License.  Schedule 1A plainly says that Nortel's right to use and distribute the Schedule 1 Products shall terminate three years from its full execution date, which

---

[3] Custom and practice is also referred to as custom and usage interchangeably.

was June 20, 2000, i.e., June 20, 2003.  Indeed, the language this Court is being asked to review and consider is found in just two sentences that make up the entirety of the language on page 2 of Schedule 1A:

> This Schedule supersedes all of the prior agreements between SNMP and Bay Networks and its predecessor entities as referenced above, and all such agreements are hereby terminated by execution of this Schedule.

> This Schedule and the license in regard to the Development Software and Run-Time Software shall terminate and be of no further effect after a period of three years from the last date that this Schedule is executed below.

4.     Because Schedule 1A's language could not be more clear, the Court's analysis should end with a review of that document.  Accordingly, the Court should exclude any fact and so-called expert "custom and practice" testimony as a matter of law.

5.     If the Court were to consider the termination language in Schedule 1A to be ambiguous and thus consider factual extrinsic evidence to interpret its meaning, the Court would conclude that the record further buttresses SNMP Research's position that Schedule 1A terminated on July 20, 2003.  Under no circumstances, however, should the Court permit the so-called "custom and practice" testimony of Dr. Razgaitis.  Dr. Razgaitis does not offer an opinion to assist the Court in interpreting any particular word or phrase in Schedule 1A based on custom or practice.  Instead, Dr. Razgaitis merely seeks to opine that custom and practice contradict the plain meaning of the parties' agreement.  Such an opinion is nothing more than an impermissible legal opinion on a contract interpretation issue.  This analysis is exclusively the province of the Court. For these reasons, the Motion to Exclude should be granted.

## RELEVANT FACTS

**B.     *Schedule 1A is Clear and Unambiguous.***

6.     In 1994, SNMPR entered into a license with SynOptics Communications, Inc. ("SynOptics") for the licensing of the Software.  Thereafter, SynOptics and Wellfleet

Communications, Inc. ("Wellfleet"), merged to form Bay Networks, Inc. ("Bay"). SNMP Research thereafter consented to the transfer of the SynOptics agreement to Bay, and Bay licensed the Software under the license agreement with SynOptics dated June 27, 1994, as amended (collectively, the "Bay License").[4] Transmittal Affidavit of Nicholas Brannick ("Brannick Aff."), Ex. A (Bay License).

7.      Under the Bay License, SNMPR granted to Bay a non-exclusive, ***non-transferrable***, worldwide license to use the Software, subject to certain restrictions contained therein. *Id*. at ¶¶ 2-3.

8.      In September 1998, Bay was acquired by Northern Telecom for $9.1 billion. This transaction broadened Northern Telecom's carrier customer base into enterprise data networking. As a result of this product and customer expansion, Northern Telecom renamed itself Nortel Networks (or Nortel).

9.      After the Bay acquisition, Nortel and SNMP Research entered into negotiations for Nortel to use the Software in Bay products and projects. These negotiations resulted in two temporary agreements, the first was a short-term agreement entitled "Temporary License Agreement," while the second was a three-year agreement, Schedule 1A to the December 23, 1999 License Agreement between the parties.

10.     The Temporary License Agreement provided that it expired on November 1, 1999, and further provided that:

> SNMPRI hereby grants Nortel a temporary assignment of the License Agreement,[5] which temporary assignment shall terminate on November 1, 1999. Upon the termination of this temporary assignment, Nortel shall have no further rights under the License Agreement.

---

[4] Pursuant to Amendment 2 to the Bay License, the parties confirmed the transfer of rights and responsibilities as licensor from SNMPR to SNMPRI, and the transfer of rights and responsibilities as licensee from SynOptics to Bay.

[5] The "License Agreement" referenced therein is the Bay License.

<u>Brannick Aff.</u>, Ex. B (Temporary License Agreement).[6]    While the Temporary License Agreement has no bearing on the Court's interpretation of Schedule 1A, SNMP Research is referencing it because it gives context to Dr. Razgaitis' improper opinion that Nortel had the right to use the Software in Bay products without an assignment from SNMP Research and separate licenses.

11.    As noted, the parties then entered into a License Agreement on December 23, 1999 (the "<u>Nortel License</u>").  Paragraph 9.10 of the Nortel License specifically provides that:

> This Agreement constitutes the entire agreement between the parties and supersedes all other agreements between the Parties concerning the subject matter herein, including the prior agreements entered into between SNMP and Nortel Networks Companies, and SNMP and companies acquired by NNC prior to the Effective Date of this Agreement.

*Id.* at Ex. C (Nortel License).

12.    The body of the Nortel License, however, absent its schedules, actually licensed nothing.  The parties instead agreed that they would enter into separate schedules to the Nortel License governing the licensing of the specific portions of the Software to specified authorized Nortel entities, for specific projects or products, and specific operating systems.  In other words, the license grant provisions of the Nortel License in paragraph 2 thereof (discussed in detail below) expressly reference schedules to it as the vehicle by which Nortel would obtain the right to license the Software.  *See id.*

---

[6] While SNMP Research cannot locate an executed version of this Temporary License Agreement, Dr. Case has testified that it was signed by the parties, and certain subsequent emails reference that it terminated on November 1, 1999, which is the same date that it terminates by its terms. Extrinsic evidence is allowable to prove the execution of a contract where the signed version cannot be located.  *See, e.g., Circle Line Sightseeing Yachts, Inc. v. Circle Line-Statue of Liberty Ferry, Inc.*, 2003 WL 253094, at *2 (S.D.N.Y. Feb. 4, 2003) (citing *C.I.F. Productions Inc. v. Burlington Coat Factory Warehouse Corp.*, 881 F. Supp. 104, 106 (S.D.N.Y. 1995); *Nicosia v. Muller*, 645 N.Y.S.2d 385, 386 (N.Y. App. Div. 1996) (holding that a party may utilize parol evidence to prove the existence and terms of a written agreement in order to satisfy the requirements of the Statute of Frauds and noting that the parol evidence may "consist of the testimony of others who have first-hand knowledge of the existence of the writing and its terms."); *Lynch v. Savarese*, 629 N.Y.S.2d 805, 806 (N.Y. App. Div. 1995) ("The loss or destruction of a written instrument does not deprive it of effect under the Statute of Frauds.  Therefore, even if no signed copy of the [contract] can be found, the appellants could still prove its existence by extrinsic evidence."); F.R.E. 1004(a).

5

13.     On June 20, 2000, the parties executed Schedule 1A to the Nortel License ("Schedule 1A"). *See Id*. at Schedule 1A.   Schedule 1A provides that: "[t]his Schedule supersedes all of the prior agreements between SNMP and Bay Networks and its predecessor entities … and all such agreements are hereby terminated by execution of this Schedule." *Id*. at Schedule 1A, p. 2.

14.     Thus, based upon the language of the Nortel License, and Schedule 1A, all prior license agreements and rights of Nortel for "Development" purposes and "Run-Time" distribution (including the rights temporarily granted under the Temporary License Agreement and any rights under the prior Bay License) were specifically overtaken by Schedule 1A.

15.     Schedule 1A provides Nortel with two license rights: (1) the limited right to develop products using the Software (the Development Software rights); and (2) the limited right to distribute Nortel products containing the Software (the Run-Time Software rights). *Id.* at Schedule 1A, p. 1. By its terms, Schedule 1A governed Nortel's use and distribution of the Software in the Schedule 1 Products (i.e., "[a]ll products of units and projects originating from what was Bay Networks"). *Id.*

16.     The termination language of Schedule 1A governing such internal use and distribution of the Schedule 1 Products provides that:

> This Schedule and the license in regard to the Development Software and Run-Time Software shall terminate and be of no further effect after a period of three years from the last date that this Schedule is executed below.

*Id*. at Schedule 1A, p. 2.  Schedule 1A was fully executed on June 20, 2000.  *See id*.

17.     The capitalized terms "Development Software" and "Run-Time Software" are defined in the body of the Nortel License.  *Id*. at ¶¶ 1.6, 1.16.[7]  The license grants relating to

---

[7] "Development Software" is defined, in relevant part, as "all or any part of any Source Code or Binary Code software product of SNMP, identified in the one or more Schedules A attached hereto and all Updates of any such

Nortel's authorized use and distribution of Development Software and Run-Time Software are set forth in paragraphs 2.1(a) and (c) of the Nortel License, respectively.

18.     Specifically, SNMPRI granted to the applicable Nortel Specified Entity "a non-exclusive, non-transferrable, worldwide license for Development Software specified in the relevant Schedule A" for internal research and development.  *Id*. at ¶ 2.1(a).  SNMPRI further granted to the Nortel Specified Entity (listed on the relevant Schedule A) a non-exclusive, non-transferable, worldwide license to directly or indirectly license the Run-Time Software (in Binary Code form) to end users.  *Id*. at ¶ 2.1(c). As noted, Schedule 1A also references those same rights as being the license rights on the first page of Schedule 1A. *Seeid*., Ex. B, Schedule 1A.

19.     Thus, under the clear and unambiguous language of Schedule 1A, Nortel was only permitted to use and distribute the Software in the Schedule 1 Products through June 20, 2003, three years after Schedule 1A was fully executed.

20.     The parties also negotiated an integration clause designed to avoid the introduction of extrinsic evidence. That provision states, in part, that "[t]his Agreement constitutes the entire agreement between the Parties and supersedes all other agreements between the Parties concerning the subject matter herein…." *Id*. at ¶ 9.10.

21.     The Nortel License is governed by New York law. *Id*. at ¶ 9.11.

---

product, under any name whatsoever." *Id*. at ¶ 1.6.  "Run-Time Software" is defined as "Binary Code which is developed for a Specified Entity, and which is derived from Development Software and which is integrated with a Nortel Networks products." *Id*. at ¶ 1.16. "Source Code" is defined as "software and associated Documentation and materials in a form in which the program logic is readily understandable by a human being." *Id*. at ¶ 1.18. "Binary Code" is defined as "the code resulting from the translation or processing of Source Code by a computer into machine language or intermediate code and which is suitable for execution or interpretation by a computer." *Id*. at ¶ 1.1. "Specified Entity" means "one or all of the licensed entities specified in the relevant Schedules A attached hereto." *Id*. at ¶ 1.20.

7

C.    *Dr. Razgaitis's Testimony*

22.    Dr. Razgaitis has been offered by Nortel as a purported expert witness on industry custom and practice, but he actually offers no such admissible testimony, and is clearly only a paid advocate presented to offer the inadmissible opinion that the language of Schedule 1A does not mean what it says because Nortel would never have agreed to it.  That conclusion became obvious during his deposition.

23.    First, at his deposition, Dr. Razgaitis admitted that there was no language he could identify in Schedule 1A to support his opinion that Nortel continued to have rights to distribute the Schedule 1A Products after June 20, 2003.  (Razgaitis Dep. at 43:3-54:3).  Second, and crucially, Dr. Razgaitis admitted that there are no ambiguous terms of art in Schedule 1A that require custom and practice testimony to understand.  *See* Brannick Aff. at Ex. D (Razgaitis Dep. excerpts at 321:8-18; 322:18-323:2).  In fact, Dr. Razgaitis admits that he never once even attempted to define a particular term in the two sentences in question in Schedule 1A according to industry custom and practice.[8]  (*Id*. at 323:3-324:7).

24.    That is fatal to Dr. Razgaitis's opinion because custom and practice testimony in this context is limited to assisting with the understanding of vague or ambiguous terms of art within a contract.  Interpretation of a contract is otherwise solely the province of the Court. *Marathon Asset Mgmt., LP v. Angelo Gordon & Co, LP* (*In re Energy Future Holdings Corp.*), 2017 WL 1170830, at *5 (D. Del. Mar. 28, 2017); *Cury v. Colonial Life Ins. Co.*, 737 F. Supp. 847, 854 (E.D. Pa. 1990) (citing *TCP Industries, Inc. v. Uniroyal, Inc.,* 661 F.2d 542, 549-50

---

[6] Regarding Schedule 1A's integration clause, Dr. Razgaitis confirmed that the purpose of Section 9.10 of the Nortel License is to confirm that what is written down in the contract is the entire agreement between the parties. (*Id*. at 29:10-23.)  Dr. Razgaitis agreed that there is nothing ambiguous about the language in Schedule 1A. (*Id*. at Razgaitis Dep. at 59:21-60:9.)  Dr. Razgaitis unambiguously admitted that this language is common in the software industry. (*Id*.  at 27:9-12), all words in the provision are commonplace words *Id*. at 320:23-321:13), and that there are no specific software trade industry words used in that sentence.  (*Id*. at 321:14-18).

(6th Cir. 1981) (absent any need to clarify or define terms of art, science or trade, expert opinion testimony to interpret contract language is not admissible).[9]

25.    Instead of providing appropriate custom and practice testimony, Dr. Razgaitis's proposed testimony admittedly boils down to three things: (1) Nortel would not have agreed to a three-year period after which its rights terminated because, under his view, Nortel had the right to distribute the Schedule 1 Products indefinitely so such an agreement makes no sense; (2) if Nortel's rights all terminated after 3 years, he would have expected to see a provision in Schedule 1A dealing with the return or destruction of the Software; and (3) if SNMP Research is correct in its interpretation, he would have expected to see some provision dealing with what to do with the Schedule 1 Products already in distribution.  Brannick Aff., Ex. D (Razgaitis Dep. excerpts at 106:2-107:15; 195:2-196:6). None of these opinions represent admissible custom and practice testimony.  Dr. Razgaitis was given numerous opportunities at his deposition to add any other bases for his opinions, and he did not do so.  (*Id*. at 166:11-167:11; 184:24-185:5; 202:15-23; 209:23-210:12; 293:18-22; 300:24-301:8.

26.    Each of these points is also unsupported by the record.  For example, Dr. Razgaitis admits that, fundamentally, his entire opinion is predicated on the notion that Nortel had the right to continue to distribute the Schedule 1 Products without SNMP Research's approval. (*Id*. at 121:11-22; 153:12-154:25; 198:11-19; 200:2-10.) Nortel, however, recognized it needed the assignment and asked for it.  That is because: (1) the license grant in the Bay License states that it is "non-transferrable" (Brannick Aff., Ex. A (Bay License) at ¶¶ 2 and 3); and (2)

---

[9] *Direxion Shares ETF Tr. v. Leveraged Innovations L.L.C.*, 2014 WL 6469084, at *8 (S.D.N.Y. Nov. 18, 2014) ("The Second Circuit recently made clear that evidence of trade practice is only relevant when it pertains to a particular contractual term; otherwise, the contract's unambiguous terms govern.") (citing *Sompo Japan Ins. Co. of Am. v. Norfolk S. Ry.*, 762 F.3d 165, 180 (2d Cir. 2014)); *see also Delta Mining Corp. v. Big Rivers Elec. Corp.*, 18 F.3d 1398, 1402 (7th Cir. 1994) (quoting *TCP Industries, Inc. v. Uniroyal, Inc.*, 661 F.2d 542, 549-50 (6th Cir. 1981) ("Absent any need to clarify or define terms of art, science or trade, expert opinion testimony to interpret contract language is inadmissible.").

Nortel's acquisition of Bay was a "reverse triangular merger"[10] which constituted an unauthorized transfer of the Bay License under applicable law.[11] Dr. Razgaitis's other points are likewise belied by the record, and SNMP Research will be happy to address them if Nortel litters the record with argument about them. The bottom line, however, is that none of those opinions are admissible custom and practice testimony.

27.      Dr. Razgaitis testified that industry custom and practice is to negotiate licensing agreements carefully, especially the scope of license rights and the costs associated with the use of those rights, such that the language of the agreement expresses the intent of the parties. Brannick Aff., Ex. D (Razgaitis Dep. excerpts at 30:16-25).[12] Dr. Razgaitis also testified that the subject of termination is an important consideration and that parties to an agreement would, or should, spell out such termination rights clearly in their agreement. (*Id*. at 187:25-189:8). The parties adhered to those principles in this case.  Dr. Razgaitis's and the U.S. Debtors' desperate attempts to re-write history, and Schedule 1A, is not admissible, and Dr. Razgaitis's testimony should thus be excluded.

---

[10]   The Bay acquisition was structured as a "reverse triangular merger," in which Nortel created a shell subsidiary into which Bay's assets and other Nortel assets were placed, with Bay being the surviving subsidiary entity in the merger.  *Schedule 14A Definite Proxy Statement Filed By Bay Networks, Inc. with Securities and Exchange Commission*, p. 4 (Filed as of July 27, 1998), *available at* https://www.sec.gov/Archives/edgar/data/876516/0000950123-98-006919.txt ("Upon consummation of the Merger (the 'Effective Time'), Sub will merge with and into Bay Networks, which will be the surviving corporation (the 'Surviving Corporation'), and a wholly-owned subsidiary of Nortel.").

[11]  Under California law, which governed the Bay License, a "reverse triangular merger" constitutes an improper transfer which violated the non-transferability provision of the Bay License.  *See Netbula, LLC v. BindView Dev. Corp.*, 516 F. Supp. 2d 1137, 1150 (N.D. Cal. 2007) ("The crucial inquiry is whether the law governing the [] license agreement would consider the [] reverse triangular mergers to constitute a transfer or assignment of [the licensee's] assets or license rights."); *SQL Sols., Inc. v. Oracle Corp.*, 1991 WL 626458, at *3 (N.D. Cal. Dec. 18, 1991) ("California courts have consistently recognized that an assignment or transfer of rights *does* occur through a change in the legal form of ownership of a business" and therefore held that "a transfer of rights under the [a]greement *did* occur" in a reverse triangle merger).

[12]  When asked whether the termination provision of Schedule 1A terminates Nortel's right to use Development Software and Run-Time Software three years from the execution of Schedule 1A, Dr. Razgaitis responded: "Well, those are the words on the page. Again I have an understanding as to what that means." (Razgaitis Dep. at 207:6-14).

**ARGUMENT**

**II.    The Court Should Exclude Extrinsic Evidence in Considering the Schedule 1 Issue.**

28.    In deciding the Schedule 1 Issue, the Court will be asked to interpret Schedule 1A and its termination language.  Because the Nortel License is governed by New York law, the Court should apply New York's principles of contract interpretation, as Judge Andrews of the District Court recently held in a case decided just two weeks ago.

29.    "Under New York law, the initial interpretation of a contract is a matter of law for the court to decide.  Where the agreement is unambiguous, a court may not admit extrinsic evidence and interprets the plain language of the agreement as a matter of law." *Energy Future Holdings*, 2017 WL 1170830, at *3 (citing *Serdarevic v. Centex Homes, LLC*, 760 F.Supp.2d 322, 328 (S.D.N.Y. 2010)). "The mere fact that the [p]arties disagree on the proper interpretation of the contract does not render the contractual language ambiguous." *Id*. at *9 (citing *Serdarevic*, 385 F.Supp.2d at 329. "[A] term is ambiguous when it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Id*. (citing *Prior v. Innovative Commc'ns Corp*., 207 F. App'x 158, 163 (3d Cir. 2006) (interpreting New York law)).

30.    Under New York law, "[t]he rules governing the construction of ambiguous contracts are not triggered unless the court first finds an ambiguity." *Wallace v. 600 Partners Co*., 658 N.E.2d 715, 717 (N.Y. 1995) (citing *Breed v. Ins. Co. of N. Am*., 385 N.E.2d 1280, 1282 (N.Y. 1978)).  The first inquiry for the Court "is whether the agreement on its face is reasonably susceptible of more than one interpretation." *Chimart Assocs. v. Paul*, 489 N.E.2d 231, 233 (N.Y. 1986).  In considering whether a contract is ambiguous on its face, New York

law does not permit consideration of extrinsic evidence. *Reiss v. Fin. Performance Corp.*, 764 N.E.2d 958, 961 (N.Y. 2001) (quoting *W.W.W. Assocs. v. Giancontieri*, 566 N.E.2d 639, 642 (N.Y. 1990)); *see also S. Rd. Assocs., LLC v. IBM*, 826 N.E.2d 806, 809 (N.Y. 2005); *R/S Assocs. v. N.Y. Job Dev. Auth.*, 771 N.E.2d 240, 242 (N.Y. 2002). If the language of the contract does not present an ambiguity, courts may not look beyond the four corners of the document to interpret the parties' intent. *See In re Royster Co.*, 132 B.R. 684, 688 (Bankr. S.D.N.Y. 1991); *see also Brad H. v. City of N.Y.*, 951 N.E.2d 743, 746 (N.Y. 2011) (holding that extrinsic evidence may only be considered if the agreement is ambiguous and ambiguity cannot be created by extrinsic evidence).

31.     Interpreting a contract based solely on its four corners is particularly appropriate where, as here, the contract at issue has an integration or merger clause. *See Primex Intl. Corp. v. Wal-Mart Stores*, 89 N.Y.2d 594, 600 (N.Y. 1997) ("A completely integrated contract precludes extrinsic proof to add to or vary its terms.") (citing *Giancontieri*, 566 N.E.2d at 639). The New York Court of Appeals has held that "[t]he purpose of a merger clause is to require the full application of the parol evidence rule in order to bar the introduction of extrinsic evidence to alter, vary or contradict the terms of the writing." *Jarecki v. Shung Moo Louie*, 745 N.E.2d 1006, 1009 (N.Y. 2001); *see also Schron v. Troutman LLP*, 986 N.E. 2d 430, 436 (N.Y. 2013) ("[W]here a contract contains a merger clause, a court is obliged to require full application of the parol evidence rule in order to bar the introduction of extrinsic evidence to vary or contradict the terms of the writing.") (citing *Primex*, 89 N.Y.2d at 599); *Sec. Plans, Inc. v. CUNA Mut. Ins. Soc'y*, 769 F.3d 807, 816 (2d Cir. 2014) (same).

32.     In the present case, at the May 11-12 hearing, the Court will be asked to decide substantively that the license rights under Schedule 1A terminated as to all Schedule 1 Products on June 20, 2003. If the Court rules in favor of SNMP Research, the issue of what composes the

12

Schedule 1 Products would be moot and unnecessary to litigate at trial, as none of them would be licensed under Schedule 1A.

33.     In making this determination, the Court must decide the Schedule 1 Issue based on a review of the four corners of the Nortel License, especially given the parties' negotiated integration clause, and the clear language of it.   As discussed fully above, Schedule 1A's termination language could not be more clear that all license rights with respect to the Schedule 1 Products terminated on June 20, 2003.   Accordingly, the Court should grant this Motion to Exclude and limit its consideration of this question to a review of the Nortel License.

## III.    <u>The Court Should Exclude Dr. Razgaitis's Testimony in its Entirety.</u>

34.     In addition to slanting and improperly relying on extrinsic facts in an attempt to re-write Schedule 1A, as discussed above, the U.S. Debtors have presented Dr. Razgaitis as a purported expert to opine that "custom and practice" somehow alters the plain termination language of Schedule 1A.   For the reasons discussed below, however, the unambiguous nature of Schedule 1A prohibits the use of any custom and practice evidence. Moreover, even if the Court were to rule that Schedule 1A is ambiguous, Dr. Razgaitis's so-called "custom and practice" testimony must still be excluded because his report and deposition testimony confirm that he is not attempting to clarify or define any terms of art or trade.

### D.    *Custom and Practice Expert Testimony is Inadmissible Because Schedule 1A is Clear and Unambiguous.*

35.     Because Schedule 1A is clear and unambiguous, for the reasons discussed in Section I above, Dr. Razgaitis's testimony must be excluded as a matter of law.   Just two weeks ago, Judge Andrews issued a decision in an appeal in the *Energy Futures Holdings Corp.* case, which is directly on point.   2017 WL 1170830.   That case involved a dispute between two lender groups regarding the payment of priorities under the debtor's various loan agreements.   *Id.* at *1.

13

The bankruptcy court dismissed the case, finding that the contract was clear and unambiguous under New York law, and in so doing, declined to consider custom and usage evidence. *Id*. at *5. On appeal, the plaintiff argued that the bankruptcy court erred in failing to consider such custom and usage evidence. *Id*. at *5.

36.     Judge Andrews agreed with the bankruptcy court's analysis. In so ruling, Judge Andrews found that, when the contract at issue is clear and unambiguous under New York law, there is no need to resort to trade custom and usage evidence to interpret the agreement. *Id*. at *5. As such, Judge Andrews ruled that the bankruptcy court did not err in failing to consider custom and usage evidence. *Id*. at *5.

37.     The Court should apply the same reasoning here and exclude Dr. Razgaitis's testimony based on the clear and unambiguous language of Schedule 1A.

**E.      *Dr. Razgaitis's Testimony Should Also Be Excluded Because He Does Not Seek to Offer any Proper Custom and Practice Testimony.***

38.     Assuming, *arguendo*, that the Court were to find that Schedule 1A is ambiguous, Dr. Razgaitis's testimony should still be excluded, because he admits that he is offering no opinion to assist the Court in interpreting any term of art, science or trade. Instead, Dr. Razgaitis' opinion is nothing more than a legal view on a contract interpretation issue, which is improper.

39.     The law of contract interpretation "firmly prohibits expert testimony as to legal duties, standards or ramifications arising from a contract," which is the domain of the judge and jury. *Dow Chem. Canada Inc. v. HRD Corp.*, 656 F. Supp. 2d 427, 435 (D. Del. 2009), *aff'd*, 587 F. Appx. 741 (3d Cir. 2014). "Absent any need to clarify or define terms of art, science or trade, expert opinion testimony to interpret contract language is inadmissible." *Delta Mining Corp. v. Big Rivers Elec. Corp.*, 18 F.3d 1398, 1402 (7th Cir. 1994) (quoting *TCP Industries,*

14

*Inc. v. Uniroyal, Inc.,* 661 F.2d 542, 549-50 (6th Cir. 1981)).  Experts are not allowed to provide

a legal opinion.  *Berckeley Inv. Group, Ltd. V. Colkitt*, 455 F.3d 195, 217 (3rd Cir. 2006) ("[T]he

District Court must ensure that an expert does not testify as to the governing law of the case.").

40.     There is no debate here that Dr. Razgaitis is not offering an opinion as to the

meaning of any particular IT software trade industry words in Schedule 1A or anywhere else in

the Nortel License.  (Razgaitis Dep. at 321:8-18; 322:18-324:7).  During his deposition, counsel

for SNMP Research read both of the salient paragraphs of Schedule 1A, and Dr. Razgaitis

confirmed that he is not offering an opinion as to the meaning of any of those words.  *See*

Brannick Aff., Ex. D (Razgaitis Dep. at 320:23-324:7).   Instead, Dr. Razgaitis's opinion is

simply that the "custom and practice" of those in the software industry contradict the

uncontroverted words the parties' negotiated.  *Id*. at Ex. E (Expert Report of Dr. Richard

Razgaitis) at page 10, ¶ 30); *see also id*. at Ex. D (Razgaitis Dep. excerpts) at 46:13-23; 51:9-19;

55:6-56:5; 71:18-72:21; 77:11-86:17, among others.

41.     Such testimony is nothing more than an unreliable legal opinion and is

inadmissible.  *Sompo Japan Ins. Co. of Am. v. Norfolk S. Ry.*, 762 F.3d 165, 181 (2d Cir. 2014)

("In other words, [the proposed expert] is asking us to consider evidence of industry practice and

custom in order to persuade us to ignore the [contract at issue], not to help us interpret it.").  As

such, Dr. Razgaitis' testimony must be excluded.

## CONCLUSION

42.     It would be erroneous to consider extrinsic evidence—whether fact or expert—

purportedly being offered to shed light on the unambiguous phrase "shall terminate and be of no

further effect" in Schedule 1A.  For these reasons, the Motion to Exclude should be granted in its

entirety, and the Court should exclude all extrinsic evidence in considering the Schedule 1 Issue.

53651/0001-14354451v2

WHEREFORE, SNMP Research respectfully requests that the Court enter an Order: (i) granting the Motion to Exclude in its entirety; (ii) excluding all extrinsic evidence from the Court's consideration of the Schedule 1 Issue at the May 11-12 hearing; and (iii) granting SNMP Research any further relief as the Court deems appropriate under the circumstances.

Dated: April 10, 2017

**OF COUNSEL**

Richard S. Busch, Esq.
**King & Ballow Law Offices**
315 Union Street, Suite 1100
Nashville, TN 37201
(615) 259-3456 (Phone)
(615) 726-5417 (Fax)
rbusch@kingballow.com

-and-

John L. Wood, Esq.
**Egerton, McAfee, Armistead & Davis, P.C.**
900 S. Gay Street
Knoxville, TN 37902
(865) 546-0500 (Phone)
(865) 525-5293 (Fax)
jwood@emlaw.com

**COLE SCHOTZ P.C.**

*/s/ Nicholas J. Brannick*
Norman L. Pernick (No. 2290)
Nicholas J. Brannick (No. 5721)
500 Delaware Avenue, Suite 1410
Wilmington, DE 19801
(302) 651-2002 (Phone)
(302) 652-3117 (Fax)
npernick@coleschotz.com
nbrannick@coleschotz.com

-and-

G. David Dean, Esq.
300 E. Lombard Street, Suite 1450
Baltimore, MD 21202
(410) 230-0660 (Phone)
(410) 230-0667 (Fax)
ddean@coleschotz.com

*Counsel for SNMP Research, Inc. and SNMP Research International, Inc.*

16