## Exhibit 1

2243373v1

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

```
-----------------------------------------------------------X
                                          :
In re                                     :   Chapter 11
                                          :
Nortel Networks Inc., et al.,¹            :   Case No. 09-10138 (KG)
                                          :
                           Debtors.       :   (Jointly Administered)
                                          :
                                          :
-----------------------------------------------------------X
SNMP Research International, Inc.,         :
                                          :
and                                       :
                                          :   Adv. No. 11-53454 (KG)
                                          :
SNMP Research, Inc.,                      :
                           Plaintiffs,    :
                                          :
                                          :
v.                                        :
                                          :
Nortel Networks Inc., et al.,             :
                                          :   RE: D.I. 417
and                                       :
                                          :
                                          :
Avaya Inc.,                               :
                                          :
                          Defendants.     :
-----------------------------------------------------------X
```

**NOTICE OF FILING OF EXHIBIT A TO LETTER TO THE HONORABLE KEVIN
GROSS FROM ANDREW R. REMMING, DATED MAY 24, 2016**

**PLEASE TAKE NOTICE** that on May 24, 2016 the above-captioned debtors
and debtors in possession (collectively, the "Debtors") filed the *Letter to the Honorable Kevin
Gross from Andrew R. Remming* [D.I. 417] (the "May 24th Letter").

**PLEASE TAKE FURTHER NOTICE** that the May 24th Letter indicated that an
April 26, 2016 opinion from the Ontario Superior Court of Justice was attached to the May 24th
Letter as Exhibit A (the "Opinion").  The Debtors inadvertently omitted the Opinion from the
May 24th Letter and thus it is attached hereto as **Exhibit A**.

---

¹       The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are:
Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel
Altsystems International, Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek,
Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components
Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks
International Inc. (0358), Northern Telecom International Inc. (6286) and Nortel Networks Cable Solutions Inc. (0567).
Contact information for the Debtors and their petitions are available at http://dm.epiq11.com/nortel.

Dated: May 24, 2016
Wilmington, Delaware

CLEARY GOTTLIEB STEEN & HAMILTON LLP
James L. Bromley (admitted *pro hac vice*)
Lisa M. Schweitzer (admitted *pro hac vice*)
David H. Herrington (admitted *pro hac vice*)
One Liberty Plaza
New York, New York 10006
Telephone:  (212) 225-2000
Facsimile:  (212) 225-3999

- and –

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

_____/s/ Andrew R. Remming_____
Eric D. Schwartz (No. 3134)
Derek C. Abbott (No. 3376)
Andrew R. Remming (No. 5120)
Tamara K. Minott (No. 5643)
1201 North Market Street
Wilmington, DE  19899-1347
Telephone:  (302) 658-9200
Facsimile:  (302) 658-3989

*Counsel for the Debtors and Debtors in Possession*

10109317.1

2

**Exhibit A**

**CITATION:** Re Nortel Networks Corporation et al, 2016 ONSC 2732
**COURT FILE NO.:** 09-CL-7950
**DATE:** 20160426

**SUPERIOR COURT OF JUSTICE – ONTARIO**
**COMMERCIAL LIST**

**IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. c-36, AS AMENDED**

> **AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION and NORTEL NETWORKS TECHNOLOGY CORPORATION**
>
> **APPLICATION UNDER THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED**


**BEFORE:**     Newbould J.

**COUNSEL:**    *Alan Merskey, Andrew McCoomb and Saeed Teebi*, for the Nortel Canadian debtors

*Joseph Pasquariello*, for the Monitor

*Harvey Chaiton, George Benchetrit and Donald M. Cameron,* for SNMP Research International, Inc. and SNMP Research Inc.

**HEARD:**      April 12 and 13, 2016


**<u>ENDORSEMENT</u>**


[1]     SNMP Research International, Inc. and SNMP Research Inc. (together "SNMP"), have made post-filing claims against the Nortel Canadian debtors in this Court and against the Nortel U.S. Debtors in litigation in the U.S. for breach of contract, breach of confidence and breach of copyright. Included in the claims for relief in this proceeding are amounts for damages said to have been suffered by SNMP and amounts for profits said to have been earned by the Nortel

Canadian debtors. Nortel moves on a summary judgment motion to have these damage and profits claims dismissed.

**SNMP licence**

[2]     SNMP Research, Inc. and SNMP Research International, Inc. are corporations based in Knoxville, Tennessee in the business of producing and distributing software for a computer process known as the simple network management protocol, the basic purpose of which is to manage and monitor network-attached devices.

[3]     SNMP does not sell its software. It licences the software to its customers. The property in the software remains with SNMP.

[4]     Prior to the commencement of the CCAA proceedings, SNMP and its predecessors had licenced its software to Nortel for over 20 years for use in a number of Nortel products.  At the time of the filing under the CCAA, this relationship was governed by a licence agreement between Nortel Network Corporation[1] and SNMP Research International, Inc. dated December 23, 1999 together with schedules that identified (i) the specified Nortel entity licensed to use the Software, (ii) the portion(s) of the software that the specified Nortel entity was licensed to use, and (iii) the particular purpose or product for which the licensed software could be used.  No Nortel entities, other than the specified Nortel entity that executed the schedule, were authorized to use or have access to the software identified on the schedule.

[5]     Typically, and as was the case with Nortel, SNMP licensed the source code for its software to its customer. Source code is human readable. The customer adapts the software to work with its product and links it to a binary version of the code that is capable of being modified. The customer such as Nortel sells its product to an end user with a binary version of the SNMP software.

---

[1] Now NNL

[6]     The specified Nortel entity that executed a schedule to the licence agreement was allowed to distribute the binary version of the appropriate portion of the software with a specific Nortel product to Nortel's end users.  Neither Nortel nor any of the specified Nortel entities had any right to distribute the software in source code form without SNMP's consent.  Furthermore, the Nortel licence required Nortel to keep all the software source code, as well as other portions of the licensed modules, confidential within the specified Nortel entity and not provide it to third parties.

[7]     When Nortel licenced the SNMP software it typically (a) paid a licencing fee and (b) agreed either to pay royalties on every binary copy of the software distributed or pay a royalty buyout, which means all royalties are paid at the time the licence is signed.  Additionally, Nortel paid yearly maintenance fees for telephone and email support and the right to receive and use fixes and updates to the SNMP software.

[8]     The Nortel licence contained a confidentiality provision in section 2.3(a):

> Any Confidential Information received by a Party shall be retained in confidence and shall be used, disclosed, and copied solely for the purposes of, and in accordance with, this Agreement.  The receiving Party shall use the same degree of care as it uses to protect its own confidential information of a similar nature, but no less than reasonable care, to prevent the unauthorized use, disclosure or publication of the Confidential Information.  Use and dissemination of Confidential Information with the receiving Party shall only extend to those with a reasonable need to know the Confidential Information.

**Sale of Nortel businesses**

[9]     As at the filing date of the CCAA proceedings, Nortel's three core business segments or lines of business (LOB) were Carrier Networks, Enterprise Solutions and Metro Ethernet Networks  A fourth business segment, Global Services (essentially Nortel's support and services arm), was a separate reportable segment until December 31, 2008, before being integrated into the other segments.

[10]   In June 2009 it was determined to sell the LOB assets. The sales took place from 2009 to 2011. The total proceeds from the LOB sales were approximately $3.285 billion. The proceeds obtained and closing date for each of the LOB sales were:

| LOB | Purchaser | Net Sale Proceeds (as at 12/31/2013) | Closing Date |
|---|---|---|---|
| Layer 4-7 | Radware | $18.1 million | March 31, 2009 |
| CDMA/LTE | Ericsson | $1,087.7 million | November 13, 2009 |
| NGPC | Hitachi | $10.37 million | December 8, 2009 |
| Enterprise | Avaya | $842.84 million | December 19, 2009 |
| MEN | Ciena | $631.85 million | March 19, 2010 |
| GSM/GSM-R | Ericsson and Kapsch | $104.47 million | March 31, 2010 |
| CVAS | Genband | $140.07 million | May 28, 2010 |
| GSM Retained Contracts | Ericsson | $1.5 million | June 4, 2010 |
| MSS | Ericsson | $46.02 million | March 11, 2011 |

[11]   The asset purchase agreements provided for the sale of intellectual property owned by the Nortel entities selling the LOB that was used exclusively in connection with the business being sold. Any licence rights that the Nortel selling entity did not own but possessed, such as the licence rights from SNMP, were not assigned or transferred to the purchaser.

[12]   In order to effect the transfer of assets in the LOB sales, Nortel provided purchasers with access to certain aspects of its software management systems, including a database known as ClearCase.  ClearCase housed pieces of software source code, including SNMP code, used in software development.

[13]   ClearCase housed software code whether or not that code was eventually used as part of a product that Nortel released and sold.  Much of the code in ClearCase never formed a part of any Nortel products at all.  The ClearCase database is comprised of individual units called "versioned object bases" (VOBs).  The source code in each VOB is not necessarily all related to a particular product or group of products. VOBs often contained a mixed bag of code related to different

software projects, which may or may not have been related to any actual products. There were 3,100 VOBs. Approximately 122 VOBs may have contained some SNMP code.

[14]    In connection with the LOB Sales, the purchasers were given access to certain of these VOBs, including VOBs containing SNMP code. That access was necessary because the VOBs held the source code and configuration history of products the purchasers were acquiring from Nortel. The purchasers required that information if they wanted to develop, understand or otherwise maintain full records of those products. In light of the way the VOBs were organized as described above, individual VOBs were often transferred to more than one purchaser.

[15]    However, only one purchaser received the complete code set or set of VOBs related to any given unique Nortel product. To the extent a particular Nortel product relied on SNMP code for any aspect of its functionality, only one purchaser could have received a commercial benefit from receiving such SNMP code in a VOB.

[16]    Although not admitted at the outset, Nortel now concedes that for the purposes of this motion, Nortel software containing SNMP code or code derived from SNMP code was transferred to the LOB buyers and LOB buyers distributed in some fashion Nortel software containing SNMP code or code derived from SNMP code.

[17]    The evidence in the record indicates that products containing SNMP code were transferred to Ericsson (in the Ericsson CDMA Sale), Avaya, Ciena and Genband. There does not appear to be evidence indicating that Ericsson received SNMP code in products acquired through the Ericsson GSM Sale or the Ericsson MSS Sale. Hitachi has stated to SNMP that it has not found any SNMP code in searches of its own products, and the Canadian debtors were not sellers in the Kapsch GSM/GSM-R sale. SNMP has indicated that it is no longer pursuing any claims in respect of the Radware sale.

[18]    Nortel was not authorized by SNMP to provide SNMP source code to anyone. By providing access to the SNMP source code through ClearCase and the VOBs to the purchasers of the LOB sales, Nortel breached its licence agreement with SNMP, and its actions thus constituted copyright infringement and the tort of breach of confidence. The one exception is

Ciena which signed an accession agreement with SNMP before it obtained access to the VOBs in connection with its purchase from Nortel.

[19]    Nortel takes the position that it has no liability for these breaches because (i) the sales were authorized by court order and (ii) SNMP has not established that it has suffered any damages or that Nortel earned any profits.

**Analysis**

[20]    The test to be applied in considering a motion for summary judgment is well-known and need not be discussed at length. A court may grant summary judgment where it is satisfied that there is no genuine issue requiring a trial.  There will be no genuine issue requiring a trial when the judge is able to reach a fair and just determination on the merits on a motion for summary judgment.  In *Hryniak v Mauldin*, 2014 SCC 7, the Supreme Court held that this will be the case when the process (1) allows the judge to make the necessary findings of fact, (2) allows the judge to apply the law to the facts, and (3) is a proportionate, more expeditious and less expensive means to achieve a just result. The new rule 20, with its enhanced fact-finding powers, demonstrates that a trial is not the default procedure.

[21]    Under rule 20.02 (2) a responding party may not rest solely on the allegations or denials in the party's pleadings, but must set out, in affidavit material or other evidence, specific facts showing that there is a genuine issue requiring a trial. Each side must put its best foot forward with respect to the existence or non-existence of material issues to be tried. The court is entitled to assume that the record contains all the evidence which the parties will present if there is a trial. See *New Solutions Extrusion Corporation v. Gauthier*, 2010 ONSC 1037 per Karakatsanis J. (as she then was). There is a burden on a party who resists summary judgment to 'lead trump or risk losing'. See *Gold Leaf Garden Products Ltd. v. Pioneer Flower Farms Ltd.* 2015 ONCA 365. A self-serving affidavit is not sufficient in itself to create a triable issue in the absence of detailed facts and supporting evidence. See *Guarantee Company of North America v. Gordon Capital Corporation*, [1999] 3 S.C.R. 423 at para. 31.

- Page 7 -

### (a) Court approval

[22]    Section 142 of the *Courts of Justice Act* provides that a person is not liable for any act done in good faith in accordance with an order of a court in Ontario. Nortel contends that the LOB sales were approved and directed by the Court to be closed in accordance with their terms and that the terms included a direction to transfer the VOBs that included SNMP source code. I do not agree.

[23]    The intellectual property transferred under the APAs was intellectual property owned by the Nortel sellers. No Nortel seller owned the SNMP software. All Nortel owned was its licence rights with SNMP and these rights were not assigned or transferred to any LOB purchasers.

[24]    Nortel argues that included in the definition of intellectual property in the APAs was software listed in disclosure schedules to the APAs. The schedule to which I was referred was the schedule to the Avaya sale, which I understand is consistent with the other schedules to the APAs. It refers to VOBs. However, VOBs included software other than SNMP software and in light of the language in the APA that only software owned by Nortel was being sold to the purchasers, it cannot be read into the schedule that the reference to VOBs was to software not owned by Nortel but by SNMP.

[25]    In the circumstances, I do not agree that in ordering Nortel to complete the LOB sales, the Court was ordering Nortel to transfer VOBs containing SNMP software that was not owned by Nortel.

### (b) Monetary claims of SNMP

[26]    In actions for breach of confidence, an accounting of a defendant's profits is often available. The *Copyright Act* provides in cases of copyright infringement that a plaintiff may recover its damages and also any profits earned by the wrongdoer that were not taken into account in calculating the plaintiff's damages. Section 35 of the *Copyright Act* provides:

35 (1) Where a person infringes copyright, the person is liable to pay such damages to the owner of the copyright as the owner has suffered due to the infringement and, in addition to those damages, such part of the profits that the infringer has made from the infringement and that were not taken into account in calculating the damages as the court considers just.

(2) In proving profits,

(a) the plaintiff shall be required to prove only receipts or revenues derived from the infringement; and

(b) the defendant shall be required to prove every element of cost that the defendant claims.

[27]    In its statement of claim filed in these CCAA proceedings, SNMP claimed damages in an unstated amount. In the U.S. claim filed by SNMP, it was estimated that it had suffered damages of at least U.S. $86 million. Later it was claimed that the damages could be in excess of U.S. $200 million. Whatever the figure, it is accepted that the claim for Nortel's profits makes up by far the bulk of the claim and that the damage claim of SNMP is quite small relative to the Nortel profit claim.

### (i)    Claim for Nortel profits

[28]    As per section 35(2)(a) of the *Copyright Act*, SNMP has an onus to prove the receipts or revenues derived from the infringement. SNMP bears the same onus on an equitable claim for disgorgement of profits. See MacOdrum, Donald H., *Fox on the Canadian law of Patents*, Thomson Reuters Canada, 206 chapter 14:5 (c) "Account of Profits".

[29]    Nortel's position is that the purchasers of the LOBs did not acquire any right to use SNMP software and that it did not charge the purchasers anything for IP that Nortel did not own. Thus Nortel derived no revenues from the SNMP software embedded in the products sold to the LOB purchasers.

[30]    SNMP's position through its expert is that the purchasers received SNMP software in the products they purchased and that part of the purchase price Nortel received must have been for that software. It likens the case to the hypothetical scenario where a car is sold with an engine

computer, but the seller did not have the right to sell the computer included with the car. Irrespective of what the seller thinks a reasonable purchaser would do, the purchaser received the value of both the car and the computer. In fact, the purchaser has received the value and is able to use the car immediately because it has an engine computer, without which the car could not start or run. In other words, the purchaser received a functioning car, even though the purchaser did not receive proper title to the computer sold with the car. SNMP says that the question is how much the buyer would have paid for the car without the computer being included in the car at all.

[31]     Both sides have filed expert reports dealing with the damages and profit claims. It is said by SNMP that if there are competing expert reports, it is a rare case that can be a proper candidate for a summary judgment. SNMP relies on a statement by Brown J. (as he then was) in *George Weston Ltd. v. Domtar Inc.* (2012), 112 O.R. (3d) 190 that:

> 89.  The simple reality is that usually if a case is sufficiently complex that its adjudication requires resorting to expert evidence, then that case most likely is not a good candidate for a summary judgment motion. There may be exceptions, such as where the expert evidence is uncontested, but that is not this case.

[32]     That statement was made in a highly complex case involving a price adjustment clause. There were obvious reasons why a summary judgment motion was not appropriate in that case. Justice Brown was not purporting to lay down any hard and fast rule. Each case must depend on its own facts. I also note that the decision was before *Hryniak*.

[33]     In this case, the issue of whether Nortel received any revenues from the infringement is really a causation issue rather than a valuation issue. While both experts have laid out their theory of the issue, I do not see it simply as a valuation issue. It is a factual issue whether Nortel received revenue for the SNMP software that was embedded in the products sold to LOB purchasers. Put another way, the question is whether there was a causal nexus between the receipt of revenue by Nortel and the infringement. The onus is on SNMP to prove that as part of its case.

[34]     In considering an action for an accounting of profits, the court is trying to determine what damage has been caused in a legal sense by the defendant's wrongful acts. See MacOdrum,

Donald H., *Fox on the Canadian law of Patents*, Thomson Reuters Canada, 206 chapter 14:5 (c) "Account of Profits" and the case of *Celanese International Corp. v. BP Chemicals Limited*, [1999] R.P.C.203 cited by the author.

[35]    Based on the record, I do not see that there is a triable issue on this issue. It is clear that the purchasers in the LOB sales did not receive any rights to SNMP software. They were aware of that. On all but one of the sales, SNMP attended before Judge Gross on the joint hearing to approve the sales and opposed any order that would effect a transfer of the rights to its software. Included in the orders made were provisions that neither the SNMP licence agreement with Nortel nor any rights to SNMP's intellectual property were being transferred. This included the sales to Ericcson, Avaya, Hitachi, Kapsch, Ciena and Genband. On the one sale in which SNMP did not object, to Radware, SNMP makes no claim against the Nortel Canadian debtors.

[36]    All of the purchasers but one in the LOB sales that acquired product which contained SNMP software and that are selling it their business have signed licences with SNMP under which they paid for the use of SNMP software. The one exception is Aveya which has refused to agree to the terms demanded by SNMP for a licence. Aveya signed an accession agreement which permitted it to temporarily use the SNMP software on the terms contained in the SNMP licence to Nortel continues, but after seven extensions to the accession agreement which eventually expired, Avaya refused to agree to the terms of a licence with SNMP to use the SNMP software and SNMP has sued it for damages. It claims damages against the Nortel Canadian debtors as well on the theory that but for the copyright infringement Avaya could not have used the SNMP copyright.

[37]    This is not a case such as the hypothetical used by SNMP contained in its expert report. A more apt hypothetical or analogy might be the case in which a car is sold with an engine computer, the seller did not have the right to sell the computer included with the car and the buyer knew that the seller did not have the right to sell it and negotiated with the owner of the computer software to pay something to use it. Can it be said in that case that a portion of the payment the seller received from the buyer was for the computer software? I think not.

[38]    This is a case in which Nortel did not sell any SNMP software and the buyers knew that. They knew they had to negotiate with SNMP for the right to use the SNMP software.

[39]    SNMP's valuation expert Mr. Ratner states the following in his report:

> In any event, whether the LOB Sale purchasers would have been reasonably expected to obtain a licence and pay royalties to SNMP Research at a later date has no bearing on what the SNMP Research Software was worth to buyers, which would not have obtained functioning products that included SNMP Research Software without obtaining the SNMP Research Software as part of the LOB Sales.  As such, I believe that LOB buyers either may not have closed on the LOB Sales without the SNMP Research Software being included, or might have paid less for the assets without the SNMP Research Software.

[40]    In connection with his hypothetical about the car being sold with an engine computer that the seller had no right to sell, and his criticism of the report of Mr. Berenblut, the valuation expert for Nortel, Mr. Ratner stated:

> Applying this hypothetical to the present case, Mr. Berenblut would put forward that the proper question is what a buyer would pay for the car, reasonably knowing that the buyer would have to get permission to use the computer later. The proper question, however, is how much the buyer would have paid for the car without the computer being included in the car at all.

[41]    I do not agree with Mr. Ratner's theory on the facts of this case. The statement that the proper question is how much the buyer of the LOB business would have paid for the product without the SNMP software being included in the product lacks any sense of reality. SNMP has led no evidence at all that a buyer would have purchased the Nortel product without the software needed to operate it.  The buyers knew they had to negotiate with SNMP to acquire the right to use the SNMP software and they set about to do that. All there is on this motion is a statement of belief of Mr. Ratner that LOB buyers might have paid less for the assets without the SNMP software. That statement of believe is not evidence of causation at all. It is unsupported speculation that does not accord with the facts.

[42]    This is even more the case with respect to SNMP software contained in VOBs accessed by purchasers that did not relate to the product sold to the purchaser. The purchaser could not use

that software as made clear in the evidence of Ms. Seanna Watson. In that circumstance a purchaser would pay nothing for it.

[43]     The issue is as stated in section 35(2)(a) of the *Copyright Act*, i.e. what did Nortel receive that was derived from the infringement. Nortel did not transfer ownership of the SNMP software to the buyers and was not authorized by the court to do so. No buyer would pay for something it knew it was not acquiring. I can understand that if a buyer purchased a product that the buyer knew contained software needed for the product to be useful, and did not know that the seller had no right to sell the imbedded software, it could be presumed that part of the purchase price paid by the buyer and received by the seller was derived from the infringement. In that case, some method would be needed to determine how much of the purchase price received by the seller was for the imbedded software. But that is not the situation here.

[44]     In my view on the evidence before me, SNMP has put forward no evidence that Nortel received anything from the LOB sales resulting from the copyright infringement that occurred. There is no genuine issue requiring a trial to determine if Nortel received revenues derived from its copyright infringement. I am satisfied on the evidence that it did not.

[45]     If SNMP had proven that Nortel received some amount from the copyright infringement, or on this motion had established a requirement of a trial to determine that issue, the next question would arise under section 35(2)(b) as to what Nortel  costs should be deducted from the receipts to arrive at the profit figure. The onus would be on Nortel, as it would be in an equitable claim for disgorgement of profits. See MacOdrum, *supra*.

[46]     Again, the experts disagree on how costs would be calculated. Mr. Berenblut's opinion is that there is no reasonable valuation or accounting methodology that would lead to a conclusion that the proceeds received in the LOB sales exceed the cost of the assets to Nortel Canada. The circumstances in which the LOB sales were made suggest that these were not "profit-making" transactions for Nortel Canada as these LOB sales were distressed sales of Nortel Canada's assets made in the context of Nortel's global bankruptcy proceedings. The total claims on Nortel Canada's assets in the bankruptcy proceeding far exceed not just the proceeds received in the

LOB sales, but the combined proceeds of the LOB sales and the sale of Nortel's residual patent portfolio, being $7.383 billion.

[47]    Mr. Ratner's opinion is that Mr. Berenblut's opinion is flawed for a number of reasons. He first argues that Nortel did not own the rights to or incur costs to develop the SNMP software, and therefore the portion of the proceeds it received for the value of the SNMP software represents profit, regardless of any costs associated with other assets sold in the LOB sales. I have difficulty with this argument.

[48]    What Nortel sold in the LOB sales were tangible assets, consisting of accounts receivable and prepaid expenses, inventory and fixed assets, and intellectual property, principally patents, to be used by each purchaser to manufacture and sell the product acquired from Nortel. The sale transactions were not independent sales of SNMP software. They were sales of a bundle of things that included SNMP software to be used in producing the products acquired from Nortel. It is not legitimate to separate out that SNMP software and say there were no costs associated with it. It is likely the case in most copyright infringement that no costs were incurred by the infringer in the development of the copyright that was infringed and if Mr. Ratner were correct, it would render section 35(2)(b) of the *Copyright Act* virtually meaningless.

[49]    In any event, it is the transaction in question that costs must be accounted for to determine the profitability of the transaction to the defendant. This is made clear in two cases relied on by Nortel that held that a defendant who lost money on a project which incorporated infringing copyright earned no profits within the meaning of section 35 of the *Copyright Act*. In one, *Neptusky v. Dominion Bridge Co. Ltd.* (1969), 58 C.P.R. 7 (BCCA) it was held that a contractor who had made unauthorized changes to the architectural plans in breach of copyright was not held liable for profits as it had a total loss on the project. In the other, *Prise de Parole Inc v Guérin, Éditeur Ltée*, [1995] FCJ No 1583, (Que. SC) aff'd [1996] FCJ No 1427 (Que. CA), a school publisher that published a collection of stories for a textbook that included a substantial extract from a copyrighted work was held not liable for profits as the publisher incurred a substantial loss on the textbook.

[50]    One measure of cost used by Mr. Berenblut was book value of Nortel costs. Mr. Ratner says book value and book losses are accounting concepts and do not reflect the appropriate data points used for fair market valuations of deductible costs in a copyright infringement analysis and that Mr. Berenblut's reference to book value is too broad because book value reflects the historical cost of investments made in the company as a whole and does not address the specific costs that are specifically relevant to each LOB Sale or account for costs that are attributable to operations outside of the LOB Sales, such as the separate $4.5 billion patent sales. Whether this could be done taken the integrated nature in which Nortel operated is highly questionable. IP represented the single most important part of the LOB sales and its cost was not accounted for in Nortel in a way that that can easily be dissected for any particular LOB sale.

[51]    The costs that would be deducted from the revenues would be for Nortel to prove. If the expenses of Nortel in receiving revenue derived from the copyright infringement were to be calculated, it would be no easy matter taken the integrated way in which Nortel operated. There is authority that in calculating profits, a differential cost approach is to be used in which net revenues are calculated by deducting variable and fixed costs which contributed to the revenue. No part or portion of any expenditure which would have been incurred had the infringing activity not taken place is to be considered deductible. See *Teledyne Industries Inc. v. Lido Industrial Products Ltd.* (1982), 68 C.P.R. (2d) 204 at 213 and *Apotex Inc. v. H. Lundbeck A/S* (2013), 111 C.P.R. (4th) 171.

[52]    I cannot say what exactly would have to be done to determine what costs Nortel would be entitled to deduct to determine its profits, but I cannot at this stage say that Nortel has established that if that were to be done, there is no issue requiring a trial to determine the costs that would need to be deducted to arrive at a profit or loss figure.

[53]    In light of my finding however that no revenue was derived by Nortel from the copyright infringement, summary judgment is granted dismissing that claim.

**(ii)    Damage claim**

[54]    The SNMP damage claim is for unpaid licence fees and royalties for products acquired by the buyers in the LOB sales and sold by them that use SNMP software. There is also an unquantified claim for the expenses incurred by SNMP in trying to determine what happened to its software.

[55]    In argument Mr. Chaiton contended that licence fees would also be payable if SNMP software was transferred to a buyer who did not use the software in a product purchased from Nortel, i.e. a licence fee would be payable by the buyer simply by being given access to or possessing the SNMP software. This would occur in the case of a purchaser being given access to a VOB that contained SNMP software unrelated to the product purchased by the buyer. I do not accept that contention. Dr. Case, the founder of SNMP who swore affidavits on behalf of SNMP did not at all state that licence fees would be payable by someone such as a purchaser of products in the LOB sales who acquired access to SNMP software unrelated to the products purchased and sold by the purchaser in the marketplace. Mr. Ratner in explaining what he as a valuer would require to establish the damage claim of SNMP said that he required the unit sales of all Nortel products containing SNMP software to quantify the damages for lost royalties, licence fees or maintenance fees owed to SNMP. He said nothing about a licence fee payable by someone having access to SNMP software that was not contained in a product acquired by the purchaser and for which there were no unit sales.

**(1)    Aveya**

[56]    Regarding Avaya which is selling products that include SNMP software and not paying any licence fee or royalties to SNMP, there is an issue whether the Nortel Canadian debtors have any liability. Nortel says that Avaya signed an accession agreement with SNMP and Nortel had nothing to do with Avaya being unable to come to terms with SNMP regarding a licence. SNMP says that Nortel induced the infringement of Avaya by the unauthorized disclosure of SNMP software by Nortel to Avaya, and but for that unauthorized disclosure, Avaya would be unable to sell product containing SNMP software. SNMP says that Nortel is thus jointly liable with Avaya under the authority of *Dableh v. Ontario Hydro* (1996), 68 C.P.R. (3d) 129 (Fed.CA). I agree

with Mr. Cameron that the statement in *CCH Canadian Ltd. v. Law Society of Upper Canada*, [2004] 1 S.C.R. 339 at para. 37 that there is a presumption that a person who authorizes an activity does so only so far as it is in accordance with the law is not applicable to this case as Nortel had no authority in the first place to permit SNMP to have access to SNMP source code.

[57]    Nortel argues a *Hadley v. Baxendale* type defence as discussed by Estey J. in *Asamera Oil Corp. v. Sea Oil and General Corp.*, [1979] 1 S.C.R. 633 by asserting that at the time of the formation of the licence agreement the damage as occurred by SNMP using the authorized SNMP software was not reasonably foreseeable. I do not think it possible on the record in this case to properly deal with that argument.

[58]    The claim against Avaya is being pursued by SNMP in the U.S. The extent of the use of SNMP software by Avaya is unclear. If SNMP succeeds against Avaya and collects all of the licence fees and royalties it is entitled to, there could be no double recovery against Nortel. At this stage, however, I cannot find that Nortel has established a sufficient basis to dismiss this damage claim against the Canadian debtors involving Avaya at this time.

**(2)    Ericcson**

[59]    Ericcson was already a licensee of SNMP prior to the LOB sales to Ericcson. Ericcson has signed a licence agreement with SNMP covering all products known to have SNMP software that were acquired by Ericcson on SNMP's usual commercial terms. Under the licence agreement, Ericcson agreed to conduct a diligent search within 60 days of all software received from Nortel and to immediately report its findings.  On May 12, 2011, Ericcson reported that it had conducted the search and found no SNMP software that was not covered by its licence with SNMP.

[60]    There is now evidence that Ericcson may have obtained access to VOBs that contained SNMP source code other than covered by its licence with SNMP. There is no evidence that this source code is contained in products acquired by Ericcson from Nortel without which the source code would be unusable by Ericcson. It is supposition that this source code may be in a product acquired by Ericcson from Nortel and it would be contrary to the report from Ericcson to SNMP

of May 12, 2011. SNMP says there is an outstanding subpoena to Ericcson in the U.S. proceeding for documents and oral discovery.

### (3)    Ciena

[61]    Ciena was already a licensee of SNMP software prior to the Ciena sale. Before its closing, Ciena and SNMP signed an accession agreement and after the closing signed a licence agreement. The Ciena licence agreement contained a representation by Ciena that it had diligently searched all software received from Nortel and that such software did not contain any SNMP software other than as allowed by the licence. On his discovery Dr. Case acknowledged that the licence covered all SNMP software being used by Ciena and was no longer asserting a claim against the Nortel Canadian debtors.

[62]    In his affidavit of November 22, 2015 Dr. Case reversed his position. The reason is the discovery that during the sale process Ciena had access to a number of VOBs that contained SNMP source code not licensed by SNMP to Ciena. It is supposition that this source code may be in a product acquired by Ciena. Dr. Case said discovery is ongoing, that SNMP has a collegial relationship with Ciena, and that Ciena is helping SNMP "to investigate the presence of SNMP software in the assets it received from Nortel".

### (4)    Genband

[63]    Genband was already a licensee of SNMP software prior to the closing of the Genband sale. SNMP and Genband attempted to negotiate a licence agreement prior to the closing of that sale which took place on May 28, 2010.   Those initial attempts were unsuccessful, and SNMP commenced legal proceedings against Genband alleging that Genband had sold or transferred products containing unlicensed SNMP software.  SNMP engaged in extensive discussions with Genband to carry out searches to determine what SNMP software had been transferred to Genband and eventually SNMP settled its action against Genband by concluding a licence agreement with Genband in February 2012 that covered the Nortel products that were sold to Genband that contained SNMP software.

[64]     As with Ericsson and Ciena, there is now evidence that during the sale process Genband was given access to a number of VOBs that contained SNMP source code not licensed by SNMP to Genband. It is supposition that this source code may be in a product acquired by Ciena. Dr. Code said that the discovery process in the U.S. is ongoing.

### (5)    Hitachi

[65]     There is no evidence that the products sold to Hitachi in the LOB sale contained any SNMP software. After the sale took place SNMP asked Hitachi, which had been a licencee from SNMP before the sale, to search the intellectual property that they received from Nortel for any SNMP intellectual property and to contact SNMP to obtain a licence if any was discovered. One month later Hitachi advised SNMP that they had researched it and that they did not find any SNMP software present. SNMI has not commenced any legal proceeding against Hitachi, nor has it entered into a new licence agreement with Hitachi as a result of the Hitachi sale.

[66]     As with Ericsson, Ciena and Genband, there is now evidence that during the sale process Hitachi accessed two VOBs with SNMP code not licensed by SNMP to Hitachi. Those VOBs contained software related to Nortel products that went to Genband, Ericsson and Ciena. SNMP has no evidence to suggest that Hitachi received SNMP source code for use in a Nortel product and it is supposition that this source code may be in a product acquired by Hitachi. Dr. Code said that the discovery process in the U.S. is ongoing.

### (6)    Kapsch

[67]     The Canadian debtors were not sellers in the LOB sale to Kapsch which involved the sale of Nortel's GSM/GSM-R assets located outside of North America to Kapsch.  SNMP has undertaken to advise as to the basis on which it alleges that the Nortel Canadian debtors transferred any SNMP software to Kapsch, given that the Canadian debtors were not sellers in the Kapsch sale.  That undertaking has not yet been answered.

[68]     The only evidence to establish any connection at all between SNMP code and Kapsch is that Kapsch accessed five VOBs containing SNMP code. In each case those VOBs went to

Genband. SNMP has no evidence to suggest that Kapsch received SNMP code for use in a Nortel product acquired by it. Dr. Case says discovery is ongoing. During argument Mr. Cameron said that SNMP has taken no procedural steps to get information from Kapsch, which is not a customer of SNMP, as it is trying to do so on a co-operative basis.

### (7)   Ongoing discovery process

[69]   In the CCAA process, the Canadian debtors have produced all the documents that they have. It has been no easy matter. Over $400,000 has been incurred in production costs alone. There is no basis to believe the Canadian debtors have any further relevant documents.

[70]   I ordered the parties to attend before the Honourable Colin Campbell to mediate the discovery process. A process was agreed to SNMP using former employees of the Canadian debtors to assist SNMP in its searching as follows:

(a)   Phase 1, which took place from May 12, 2015 to June 1, 2015. SNMP searched all 3,100 VOBs to determine those most likely to contain SNMP code. The process required 200 machine hours and 250 person hours.

(b)   Phase 2, which took place from June 24, 2015 to July 18, 2015. SNMP searched a subset of VOBs to determine if they could be used to identify links between SNMP code and final products. This was achieved in a limited number of cases, primarily from searching for Nortel products that purchasers had already advised SNMP contained SNMP code. Phase 2 required 347 person hours.

(c)   Phase 3, which at the request of SNMP took place from late August to early December, 2015. A draft report on Phase 3 has been with SNMP's lawyers since January 10, 2016. It has not been provided to the Canadian debtors or the Monitor. SNMP has not disclosed its search times, but one SNMP searcher alone dedicated over 466 hours to this process.

[71]    There is a discovery process in the U.S. proceeding. An order has been made in that U.S. proceeding that permits information obtained to be used in this CCAA proceeding. Nortel is concerned that SNMP is not proceeding with dispatch and that the CCAA process is taking a back seat to the U.S. process. From what I have been told in argument, SNMP is reluctant to press the parties that received VOBs because in many cases they are good customers of SNMP.

[72]    It is apparent that there is a good explanation why LOB purchasers may have been given access during the sales process to VOBs that contained source code not usable by the purchaser, as already discussed. What SNMP is engaging in appears to be a fishing expedition on a relatively slow boat. SNMP has had an obligation to put their best foot forward on this summary judgment motion and I see it as no answer by them that they eventually may get information that will assist a damage claim.

[73]    On the other hand I understand what SNMP has been doing, albeit slowly, in the U.S. and I am reluctant to dismiss the damage claim if there is any real prospect that cogent evidence may be available.

[74]    SNMP has to understand two things however. This is a CCAA proceeding and the time has more than passed for the Nortel Canadian debtors to be able to conclude the proceedings for the sake of the pensioners and other creditors from having distributed to them what is available. SNMP is not entitled to rely in this proceeding on what it chooses to do or not do in the U.S. and at what speed. It will do so at its peril in this CCAA proceeding.

[75]    In the circumstances, I will hold in abeyance for six months this motion regarding the damage claim of SNMP. At that time, SNMP will have to provide whatever evidence it can muster that LOB purchasers are using and selling product obtained from Nortel that includes SNMP software. A decision will be then be made.

**Conclusion**

[76]    SNMP's claim for lost profits is dismissed. Its claim for damages is held in abeyance for six months.

[77]    Unless there is some reason I am unaware of, Nortel is entitled to its costs. If not agreed, written submissions may be made within two weeks, along with a cost outline, and responding submissions may be made within a further two weeks. If there any issues regarding costs, counsel can arrange a 9:30 appointment to discuss them.

_____

Newbould J.

**Date:** April 26, 2016