**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

-------------------------------------------------------X
                                    :

*In re*                                   :

Nortel Networks Inc., *et al.*,[1]     :

                   Debtors.     :

                                   :

-------------------------------------------------- X
                                      :

SNMP Research International, Inc.    :

and                                  :

SNMP Research, Inc.,          :

                    Plaintiffs,    :

v.                                     :

Nortel Networks Inc., *et al.*,     :

                   Defendants.    :

                                   :

                                 :

-------------------------------------------------- X

Chapter 11

Bankr. Case No. 09-10138 (KG)

(Jointly Administered)

**Related to Docket No. 18020**

**Reply Deadline: April 27, 2017 at 5:00 p.m.
Hearing Date: May 2, 2017 at 2:00 p m.**

Adv. Proc. No. 11-53454 (KG)

**Related to Adv. Docket No. 540**

**U.S. DEBTORS' MEMORANDUM OF LAW
<u>IN OPPOSITION TO MOTION TO EXCLUDE</u>**

---

[1]       In addition to Nortel Networks Inc., the debtors in these Chapter 11 cases are: Nortel Networks Capital Corporation, Nortel Altsystems Inc., Nortel Altsystems International Inc., Xros, Inc., Sonoma Systems, Qtera Corporation, CoreTek, Inc., Nortel Networks Applications Management Solutions Inc., Nortel Networks Optical Components Inc., Nortel Networks HPOCS Inc., Architel Systems (U.S.) Corporation, Nortel Networks International Inc., Northern Telecom International Inc., Nortel Networks Cable Solutions Inc. and Nortel Networks (CALA) Inc. Additional information regarding the Debtors can be found in their respective Chapter 11 petitions, which are available at http://chapter11.epiqsystems.com/nortel.

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................................ 1

ARGUMENT ................................................................................................................... 6

    I.   SCHEDULE 1 CONFERS A ROYALTY BUY OUT ON ALL PRODUCTS AND PROJECTS ORIGINATING FROM BAY NETWORKS THAT EXISTED DURING ITS THREE-YEAR TERM ..................................................................... 6

    II.  INTERNATIONAL'S PROPOSED NEW INTERPRETATION DISREGARDS WHAT SCHEDULE 1 PROVIDES AND WOULD CREATE UNTENABLE CONSEQUENCES .............................................................................................. 9

    III. INTERNATIONAL'S OWN ACTIONS AND FORMAL STATEMENTS CONFIRM SCHEDULE 1'S MEANING AND EFFECT ........................................ 16

      A. International Confirmed Schedule 1's Meaning And Effect Before It Was Signed .. 18

      B. International's Actions Further Confirm Schedule 1's Proper Meaning ................... 21

      C. International Confirmed Yet Again Schedule 1's Proper Meaning In a Formal Letter In 2006 ......................................................................................................... 23

    IV. THE RECORD OF THE PARTIES' CONDUCT AND STATEMENTS ALSO WOULD ESTABLISH AN IMPLIED-IN-FACT CONTRACT .............................. 24

    V.  DR. RAZGAITIS OFFERS PROPER CUSTOM AND PRACTICE EVIDENCE THAT IS HELPFUL TO THE COURT AND ADMISSIBLE ................................ 27

      A. Dr. Razgaitis Has Significant Custom And Practice Experience To Offer ............... 28

      B. International Incorrectly Characterizes The Proper Scope Of Custom And Practice Expert Testimony ..................................................................................................... 31

      C. Even If Dr. Razgaitis Were Limited To Opining On The Meaning Of A Single Word In Schedule 1, His Opinion Is Proper............................................................. 34

CONCLUSION ............................................................................................................... 35

# TABLE OF AUTHORITIES

**Cases**                                                                                                     **Page(s)**

*Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, London,*
    136 F.3d 82 (2d Cir. 1998) ......................................................................................*passim*

*Bank of N.Y. Tr. N.A. v. Franklin Advisers, Inc.,*
    674 F. Supp. 2d 458 (S.D.N.Y. 2009) ...................................................................32

*Berckeley Inv. Group, Ltd. v. Colkitt,*
    455 F.3d 195 (3d Cir. 2006) ...................................................................................33

*Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce,*
*Fenner & Smith Inc.,*
    232 F.3d 153 (2d Cir. 2000) ...................................................................................17

*Cury v. Colonial Life Ins. Co.,*
    737 F. Supp. 847 (E.D. Pa. 1990) ..........................................................................32

*Delta Mining Corp. v. Big Rivers Elec. Corp.,*
    18 F.3d 1398 (7th Cir. 1994) ..................................................................................32

*Direxion Shares ETF Tr. v. Leveraged Innovations L.L.C.,*
    2014 WL 6469084 (S.D.N.Y. 2014) .......................................................................32

*Evans v. Famous Music Corp.,*
    807 N.E.2d 869 (N.Y. 2004)...........................................................................31, 33

*Former Shareholders v. Browning-Ferris Indus.,*
    2005 WL 2820594 (Cal. Ct. App. 2005) ................................................................30

*Harco Nat'l Ins. Co. v. Arch Speciality Ins. Co.,*
    2008 WL 1699755 (S.D.N.Y. 2008) ................................................................25, 26

*Int'l Multifoods Corp. v. Commercial Union Ins. Co.,*
    309 F.3d 76 (2d Cir. 2002) .................................................................................7, 14

*Jobim v. Songs of Universal, Inc.,*
    732 F. Supp. 2d 407 (S.D.N.Y. 2010) ....................................................................17

*Last Time Beverage Corp. v. F & V Distr. Co., LLC,*
    2010 WL 898072 (N.Y. Sup. Ct. 2010) ..................................................................31

*Last Time Beverage Corp. v. F & V Distr. Co., LLC,*
    951 N.Y.S.2d 77 (2d Dep't 2012) ................................................................ 31, 33

*Marathon Asset Mgmt., LP v. Angelo Gordon & Co, LP (In re Energy Future Holdings Corp.),*
    2017 WL 1170830 (D. Del. 2017) .............................................................. 16, 32

*Martilet Mgmt. Servs., Inc. v. Bailey,*
    2013 WL 5420966 (S.D.N.Y. 2013) .................................................................. 14

*Merritt Assocs., Inc. v. Scollard,*
    555 N.Y.S. 2d 771 (1st Dep't 1990) ................................................................. 32

*Metro. Life Ins. Co. v. Noble Lowndes Int'l, Inc.,*
    643 N.E.2d 504 (N.Y. 1994) ............................................................................ 15

*New Windsor Volunteer Ambulance Corps, Inc. v. Meyers,*
    442 F.3d 101 (2d Cir. 2006) ............................................................................ 18

*N. Am. Hyperbaric Ctr. v. City of New York,*
    604 N.Y.S.2d 56 (1st Dep't 1993) ................................................................... 25

*Prior v. Innovative Commc'ns Corp.,*
    207 F. App'x 158 (3d Cir. 2006) ...................................................................... 17

*Richmor Aviation, Inc. v. Sportsflight Air, Inc.,*
    918 N.Y.S.2d 806 (3rd Dep't 2011) ............................................................ 25, 27

*Sompo Japan Ins. Co. of Am. v. Norfolk S. Ry.,*
    762 F.3d 165 (2d Cir. 2014) ............................................................................ 32

*SQL Sols., Inc. v. Oracle Corp.,*
    1991 WL 626458 (N.D. Cal. 1991) .................................................................. 30

*Sutton v. E. River Sav. Bank,*
    435 N.E.2d 1075 (N.Y. 1982) .......................................................................... 14

*TCP Indus., Inc. v. Uniroyal, Inc.,*
    661 F.2d 542 (6th Cir. 1981) ........................................................................... 32

**Other Authorities**

WILLISTON ON CONTRACTS § 32.11 (4th ed.) ......................................................... 14

The U.S. Debtors submit this memorandum of law in opposition to the Motion Of SNMP

Research, Inc. And SNMP Research International, Inc. To Exclude [Adv. D.I. 542] (the "Motion

to Exclude" or "Int'l Br."), filed by SNMP Research International, Inc. ("International") and

SNMP Research, Inc. ("Inc.") (collectively, "SNMP Research").[2]

## PRELIMINARY STATEMENT

1.      The matter before the Court is the meaning and effect of an agreement between

Nortel and International known as "Schedule 1."  Schedule 1 refers to and incorporates a

"royalty buy out" that was provided by a license between International and Bay Networks (the

"Bay Networks License"), a company that Nortel acquired in 1998.  A royalty buy out is a paid-

up right to use something for the entire life of a product line.  The Bay Networks License

conferred a royalty buy out on all Bay Networks products, permitting them to use the designated

SNMP Research software for the entire life of the products.  And Schedule 1 likewise conferred

that royalty buy out on "[a]ll products of units and projects originating from what was Bay

Networks."  Schedule 1 provided for a three-year term, so that any existing products and any

development projects originating from Bay Networks that emerged during those three years

would take advantage of the lifetime royalty buy out until the products aged out of the

marketplace.  New products/projects brought on line after the three-year termination date would

need to address royalties on their own merit.

2.      It is undisputed that the product at issue in this suit, the BayStack line of Ethernet

switches, was covered by Schedule 1.  The BayStack switches were developed by Bay Networks

in the 1990s, and, following Nortel's acquisition of Bay, they continued as the same core

Ethernet switch product, using the same SNMP Research software covered by the Bay Networks

<hr/>

[2]      Because International is party to Schedule 1, and Inc. is not, we refer to this motion concerning the meaning of Schedule 1 as International's motion.

License and Schedule 1.  (Because these switches originally were sold under the "BayStack" name and later were rebranded with the "ES" and "ERS" names, they will be referred to here as the "BayStack/ES/ERS" switches.)  The BayStack/ES/ERS switches thus were an existing Bay Networks product when Schedule 1 was signed and were covered by the lifetime royalty buy out that Schedule 1 conferred.

3.    The meaning and effect of Schedule 1 outlined above is plain from its content, without needing to consider anything else.  Again, the Bay Networks License conferred a lifetime royalty buy out on all Bay Networks products, and Schedule 1 conferred that lifetime royalty buy out on all products and projects originating from what was Bay Networks that were in existence during its three-year term.

4.    While no other evidence is needed to understand Schedule 1, it bears emphasis that the understanding outlined above is exactly what International's point person in the negotiations, John Southwood, expressly confirmed in writing before Schedule 1 was signed. Writing to Nortel's principal negotiator, and noting that he was aware that "everyone's expectations are [being] fixed for all time," Mr. Southwood stated the following about what he referred to as the "final Bay transfer to Nortel"—i.e., Schedule 1:

> I told [the lawyer preparing Schedule 1] that the royalty buy out would expire in three years. . . . By expire I mean that new products/projects brought on line after three years would address royalties on their own merit.  Current Bay products and development projects for the next three years will take advantage of the lifetime royalty buy out until their products have aged out of the marketplace.[3]

This is exactly what Schedule 1 provides and what is meant by Schedule 1's three-year term.

---

[3]    Decl. of Tamara K. Minott ("Minott Decl.") Ex. 1 (SNMP_NCA_00105106).

5.      When Schedule 1 was awaiting signature, Jeffrey Case of Inc. described it, in an email to James Reeves of Nortel, in a manner consistent with the meaning and effect outlined above.  Reeves had been responsible for originally incorporating SNMP Research's software into the BayStack switches at Bay Networks and he continued to be in charge of the BayStack group at Nortel when Schedule 1 was being executed.  Writing to Reeves, Case referred to Schedule 1 as "the document that grandfathers the Bay licenses over to the new Nortel master agreement" and assured him "I was correct when I told you the cost is $0."[4]

6.      These statements by Southwood and Case are fully consistent with the proper reading of Schedule 1.  And they are fundamentally contrary to the new argument International is advancing in this lawsuit:  that the royalty buy out conferred by Schedule 1 on the BayStack/ES/ERS switches would be stripped away after three years and that International could then demand millions of dollars in royalties for the continued use of the software covered by Schedule 1.  SNMP Research never said any such thing in Schedule 1, or when Schedule 1 was signed, or when the three-year term had elapsed—or at any other time before filing this lawsuit.

7.      To the contrary, after Schedule 1 was executed, International's own actions and formal statements consistently confirmed the plain meaning outlined above—and they contradict the new and baseless argument International is offering up now.  For years after Schedule 1's June 2003 termination date, International repeatedly renewed an annual Software Service Agreement ("SSA") with Nortel covering the software licensed under Schedule 1.  In doing so, International provided updated versions of the software licensed under Schedule 1 to the Nortel group responsible for the BayStack/ES/ERS switches (referred to as the "Bay" group at Nortel), and International collected thousands of dollars in payments from Nortel for that software.

---

[4]      Minott Decl. Ex. 2 at SNMP_NUS_00065616.

8.    As International's own representative, John Southwood, admitted in his deposition, this course of conduct that repeatedly confirmed Nortel's ongoing right to use the software licensed under Schedule 1 is squarely "inconsistent" with International's current claim that the royalty buy out conferred by Schedule 1 did not extend beyond 2003.[5]  International's proposed licensing expert, David Tollen, likewise admitted that International's renewal of the SSA, year after year, plainly "wasn't consistent" with the interpretation of Schedule 1 that International is proffering now.[6]

9.    Still further, in January 2006, John Southwood of International again confirmed in a formal letter to the BayStack group at Nortel that it had an ongoing right to use the software covered by Schedule 1.  He wrote:  "Nortel Networks has a license with SNMPRI International for [SNMP Research's software] as referenced under Nortel Schedule 1.  That schedule incorporates the paid-up royalties' license previously established by Bay Networks."[7]  This statement, made in 2006, unequivocally contradicts International's new argument that the benefit of the paid-up royalty buy out for products covered by Schedule 1 ended in June 2003.

10.    In the face of all this, International's motion now offers up a new and drastically different interpretation of Schedule 1:  that the BayStack/ES/ERS switches were stripped of their royalty buy out rights as of June 2003 and became infringing from that point onward.  This proposed new interpretation of Schedule 1 is flatly contrary to the agreement's plain meaning.  It also is squarely contradicted by what International expressly confirmed that Schedule 1 meant before the parties signed it; and it is further contradicted by International's own statements and conduct over a course of years.  Yet in its motion, International has the audacity not only to offer

---

[5]        Minott Decl. Ex. 3, Southwood Dep., Dec. 8, 2016 at 118:6-121:6.

[6]        Minott Decl. Ex. 4, Tollen Rep., Feb. 10, 2017 ¶¶ 68-69.

[7]        Minott Decl. Ex. 5, at SNMP_NUS_00092085 (SNMP_NUS_00092083).

up this new and fallacious interpretation, but to insist it is the only possible reading of Schedule 1. International's argument is not merely meritless; it is deeply disingenuous. The Court should deny International's motion and thereby reject International's demand to exclude the evidence of its own words and actions that defeat its arguments about Schedule 1's meaning.

11.     In addition, as discussed below, even if International's motion could succeed on its own terms (which it cannot do), International still could not achieve its goal. New York law is clear that when parties continue to operate on the basis that a contract is still operative after its nominal termination date, they create an implied-in-fact agreement that continues in effect. Such an implied-in-fact agreement would be present here: even if Schedule 1 could be read as International now proposes (which it cannot be), Nortel's ongoing right to use the software covered by Schedule 1 was confirmed by International's repeated renewal of the SSA under which it continued to provide to Nortel the software licensed under Schedule 1, and it was likewise confirmed by International's express and formal written confirmation in 2006 of Nortel's ongoing right to use the software covered by Schedule 1. Thus, International cannot possibly succeed in barring the Court from granting relief based on the record of consistent conduct and statements that confirmed Nortel's ongoing right to use the Schedule 1 software.

12.     Finally, International's arguments as to Dr. Richard Razgaitis are just as meritless as those it makes about Schedule 1. Dr. Razgaitis, a leader in the field of intellectual property licensing, offers straightforward evidence concerning custom and practice in the field, including as it specifically relates to the meaning of "termination" in the context here. International's attacks depend on blatantly mischaracterizing his opinions and the basis for them. Here, too, the Court should reject International's baseless arguments.

5

## ARGUMENT

### I.   SCHEDULE 1 CONFERS A ROYALTY BUY OUT ON ALL PRODUCTS AND PROJECTS ORIGINATING FROM BAY NETWORKS THAT EXISTED DURING ITS THREE-YEAR TERM

13.      International misleadingly frames Nortel's position concerning Schedule 1 as if it depended on "extrinsic evidence." That is wrong: the meaning and effect of Schedule 1 is clear from its content. It is International that fails to address or acknowledge what Schedule 1 actually does: Schedule 1 refers to and incorporates the royalty buy out of the Bay Networks License so as to confer that royalty buy out on "[a]ll products of units and projects originating from what was Bay Networks" that existed during its three-year term.[8]

14.      It is common ground that, in considering a contract's meaning, including whether there may be any ambiguities concerning its meaning, the Court must assess the contract as "viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, London*, 136 F.3d 82, 86 (2d Cir. 1998); Int'l Br. ¶ 29 (quoting same standard).

15.      While Schedule 1's meaning is clear on its face, this analytical framework—including the focus on "the context of the entire integrated agreement" and on "the customs, practices, usages and terminology as generally understood in the particular trade or business"—serves to highlight its proper meaning and effect. *See Alexander & Alexander Servs.*, 136 F.3d at 87-89 (emphasizing the importance of context, even when assessing ordinary words such as "client or account," and holding that the district court "erred in not inquiring into the meaning of

---

[8]      Minott Decl Ex. 6, Schedule 1A, June 20, 2000 (NNC0024690).

[the contract] viewed objectively by a reasonable person who has examined it in context, cognizant of the customs, practices, usage and terminology of the particular trade or business."); *see also Int'l Multifoods Corp. v. Commercial Union Ins. Co.*, 309 F.3d 76, 87 n.4 (2d Cir. 2002) (emphasizing that "[t]he text should always be read in its context.  Indeed, text and context necessarily merge to some extent." (citations omitted)).

16.     Schedule 1 specifically refers to and incorporates the Bay Networks License, and accordingly, to understand the meaning of Schedule 1 requires consideration of the Bay Networks License and the rights it conferred.  (The reference to "Bay Networks License" encompasses licenses executed by a predecessor of Bay Networks, SynOptics Communications, Inc., in 1994.)

17.     As noted, the Bay Networks License provided for a royalty buy out as to certain SNMP Research software for use in any and all Bay Networks products.  Specifically, it provided for a royalty buy out for SNMP Research's "EMANATE" software for $100,000[9] and (per Amendment 2) a royalty buy out for an SNMP Research product called "Asynchronous Request Libraries" (or "ARL") for $86,668.[10]  Bay Networks purchased the royalty buy out for EMANATE, which was used to assist in developing a software agent for the BayStack switches that provided remote monitoring functionality compliant with the SNMP protocol—a feature that is just one of hundreds of features in these products.[11]  Nortel completed the purchase of the royalty buy out for the ARL product in December 1999, more than a year after it had acquired

---

[9]      Minott Decl. Ex. 7, Bay Networks License, June 27, 1994 at SNMP_NUS_00139195 (SNMP_NUS_00139177).

[10]     *Id.* Amendment 2, Nov. 3, 1999 at SNMP_NUS_00139270 (SNMP_NUS_00139269).

[11]     Minott Decl. Ex. 8, SNMPRI Customer Ledger at SNMP_NUS_00085604 (SNMP_NUS_00085603).  To be precise, the BayStack products used software that is a subset of EMANATE, referred to as EMANATE/Lite.

Bay Networks.[12]  By exercising these options, Bay Networks and later Nortel obtained a royalty

buy out:  that is, the right to "distribute in perpetuity an unlimited number of binary copies" of

the designated SNMP Research software.[13]

18.     Notably, International's motion makes no mention of the fact that the Bay

Networks License provided for a royalty buy out on all Bay Networks products—a fact that is

plainly important to understanding the meaning and effect of Schedule 1.

19.     Schedule 1 ensured that the benefit of these royalty buy outs, which Bay

Networks and Nortel obtained at significant cost, would be preserved for all products and

projects originating from Bay Networks that existed when Schedule 1 was signed or that came

into existence during its three-year term.  The specific provisions of Schedule 1 that

implemented this result are as follows:

- The "Specified Product or Project" section identifies the products and projects
  that would receive this benefit as follows:  "[a]ll products of units and projects
  originating from what was Bay Networks."

- The "Development Software" and "Run-Time Software" sections refer to the
  Bay Networks License to identify the specific SNMP Research software that
  was covered by the royalty buy out under the Bay Networks License and
  would likewise be covered by Schedule 1, including EMANATE.

- The "Royalties" section likewise refers to the Bay Networks License, stating:
  "As described in the agreements and amendments thereto between SNMP and
  Bay Networks and its predecessor entities."  As noted, the Bay Networks

---

[12]     Minott Decl. Ex. 9, SNMPRI Invoice, Dec. 29, 1999 (SNMP_NUS_00089711); Minott Decl. Ex. 8,
SNMPRI Customer Ledger (SNMP_NUS_0085603).

[13]     Minott Decl. Ex. 7, Bay Networks License, June 27, 1994 at SNMP_NUS_00139195
(SNMP_NUS_00139177); *id.* Amendment 2, Nov. 3, 1999 at SNMP_NUS_00139270 (SNMP_NUS_00139269).

agreements provided for a royalty buy out as to the designated SNMP

Research software, including EMANATE.

- The "Additional Conditions" section states as follows:

    This Schedule supersedes all of the prior agreements between SNMP and Bay
    Networks and its predecessor entitles as referenced above, and all such
    agreements are hereby terminated by execution of this Schedule.

    This Schedule and the license in regard to the Development Software and
    Run-Time Software shall terminate and be of no further effect after a period
    of three years from the last date that this Schedule is executed below.[14]

20.     In sum, Schedule 1 identifies the products and projects to be covered; it refers to

and incorporates the Bay Networks License with respect to the SNMP Research software to be

covered and the royalty buy out that is to be conferred; and it provides that it will terminate after

three years.  Thus, the meaning and effect of Schedule 1 is clear:  that "[a]ll products of units and

projects originating from what was Bay Networks" in existence during the three-year term—

including the BayStack/ES/ERS switches—will receive a royalty buy out in accordance with the

Bay Networks License so that they can use the designated SNMP Research software during the

lifetime of the product line.

## II.   INTERNATIONAL'S PROPOSED NEW INTERPRETATION
## DISREGARDS WHAT SCHEDULE 1 PROVIDES AND WOULD CREATE
## UNTENABLE CONSEQUENCES

21.     In its motion, International offers up a new and fundamentally flawed

interpretation of Schedule 1:  that, after three years, Schedule 1 would operate to strip away from

the legacy Bay Networks products and projects any right to use the software covered by the Bay

Networks License and Schedule 1, such that these products' continued use of that software

would be infringing.  Int'l Br. ¶ 19.  This proposed interpretation of Schedule 1 is demonstrably

wrong, for at least two reasons.

---

[14]     Minott Decl Ex. 6, Schedule 1A, June 20, 2000 (NNC0024690).

22.     First, International ignores the fact that Schedule 1 references and incorporates the key elements of the Bay Networks License.  Importantly, as discussed, Schedule 1 incorporates the royalty buy out of the Bay Networks License.[15]  Again, the Bay Networks License confers a royalty buy out—that is, the right to "distribute in perpetuity an unlimited number of binary copies" of the designated SNMP Research software.[16]

23.     International's proposed new interpretation cannot be squared with the fact that Schedule 1 expressly incorporates the royalty provisions of the Bay Networks License, which in turn provide for a royalty buy out for all Bay Networks products.  Indeed, International's motion does not even mention that the Bay Networks License provided for such a royalty buy out.

24.     The need to consider and account for the royalty buy out under the Bay Networks License is clear from the face of Schedule 1, as it expressly refers to and incorporates the Bay Networks License's royalty provisions.  And the importance of doing so is further highlighted by the analytical framework for assessing a contract's meaning and effect:  the Court must consider the contract from the perspective of a "reasonably intelligent person who has examined the context of the *entire* integrated agreement." *Alexander & Alexander Servs.*, 136 F.3d at 86 (emphasis supplied); Int'l Br. ¶ 29 (quoting same standard).  International violates this fundamental tenet by seeking to disregard what Schedule 1 actually says and does in incorporating the royalty buy out of the Bay Networks License.

25.     Second, International's proposed new interpretation would lead to a drastic and untenable consequence:  it would cause existing products and projects covered by Schedule 1 to be stripped of their right to use the SNMP Research software at the three-year mark, such that

---

[15]     *See id.*

[16]     Minott Decl. Ex. 7, Bay Networks License, June 27, 1994 at SNMP_NUS_00139195 (SNMP_NUS_00139177); *id.* Amendment 2, Nov. 3, 1999 at SNMP_NUS_00139270 (SNMP_NUS_00139269).

they would be purportedly infringing from that point onward.  What Schedule 1 provided is the

right to incorporate the SNMP Research software into the core codebase of the covered products

such as the BayStack/ES/ERS switches, so that the units of these products made and sold by

Nortel would include that software.  To extricate this software from the core codebase would be

difficult and time-consuming.[17]

26.    If the parties had intended Schedule 1 to have this meaning and effect, they would

have included in Schedule 1 a mechanism for extending the right to use the SNMP Research

software in these products beyond the three-year mark.  For example, there would be a provision

for an additional payment to be made to give these products the right to use the software until

they aged out of the market, just as the Bay Networks License itself had provided.

27.    No party could reasonably be expected to put itself in a circumstance in which it

loses the right to continue selling existing products with software that has been integrated into

them, with no mechanism for extending that right going forward.  And no party in International's

position could reasonably expect anyone to agree to such a scenario.  The absurdity of such a

scenario is demonstrated by SNMP Research's damages claims in this case.  As noted, Bay

Networks obtained the right to use the EMANATE software in perpetuity in all of its products

that it ever developed at any time for a single payment of $100,000.  In Nortel's license with

International, it likewise entered into schedules for its own products (that is, products not

covered by Schedule 1 because they were not legacy Bay Networks products) that provide for a

lifetime royalty buy out for the entire product line for a single payment of $100,000 or less.

---

[17]    This difficulty of extricating the software is not a measure of its importance or value; it is merely a
reflection of the fact that the software is woven into the core codebase and so would be difficult to disentangle, in
the same way it would be difficult to extricate thread of a particular color from a multicolor tweed jacket.

28.    But in this lawsuit, in conjunction with International's argument that Schedule 1 operated to strip the BayStack/ES/ERS switches of their right to use the EMANATE software at the three-year mark, Dr. Case claims that International would have refused to agree to an additional royalty buy out payment to cover these products' continued use of this software. Instead, he claims International would have insisted on a different framework that would have required Nortel to pay over $35 million in royalties for the BayStack/ES/ERS switches.

29.    This stunningly overreaching damages claim is both factually and legally baseless.  As a factual matter, the record makes clear that a royalty buy out for at most $100,000 would have been available and exercised.  Indeed, in other contexts, International repeatedly reminded Nortel of the availability of the royalty buy out option and recommended choosing it. And as a legal matter, it is black-letter law that damages cannot be measured by what a plaintiff self-servingly alleges in a lawsuit that it would have demanded.

30.    But the important point here is that no party would ever put itself in a position in which the party in International's position could make such an overreaching demand.  If the parties had intended that existing legacy Bay Networks products and projects would be stripped of their right to use SNMP Research software at the three-year mark (which they did not), they would have included a provision addressing how that right could be extended beyond that date. The absence of any such provision from Schedule 1 further demonstrates why International's proposed new interpretation cannot be right.

31.    By contrast, the proper reading of Schedule 1 would not lead to this untenable scenario.  Again, what Schedule 1 actually provided is that Bay Networks products and projects that were in existence during its three-year term received the royalty buy out of the Bay Networks License, so that they would be able to use the software covered by Schedule 1 until

they aged out of the market.  By contrast, any new project that Nortel began to develop after the three-year mark would not be covered by Schedule 1.  In that circumstance, at the beginning of such a new development project, Nortel could decide whether it was interested in using SNMP Research software in the new development.  If so, it could discuss that possibility with International and seek to agree on mutually acceptable terms.  If not, it could develop its own implementation of the SNMP protocol or choose from among the offerings of other vendors.  Thus, under the proper reading of Schedule 1, neither party would be at the other's mercy after the termination of Schedule 1.

32.    An analogy may be helpful in illustrating the critical difference between what Schedule 1 actually provides and what International now argues.  If a product line can be envisioned as a tree, the Bay Networks License conferred on each tree planted by Bay Networks a lifetime royalty buy out to use the designated SNMP Research software, such that it could continue using that software throughout its life span.  Schedule 1 likewise conferred that same lifetime royalty buy out on any tree that existed when Schedule 1 was signed or that was planted over the course of its three-year term, so that each such tree would likewise receive the benefit of the royalty buy out throughout its lifespan.  After Schedule 1's three-year termination date, newly planted trees would not be covered and so would not receive the benefit of the lifetime royalty buy out.  By contrast, International now proposes a radically different interpretation.  Not only would new trees planted after Schedule 1's three-year term not be covered, but existing trees that are already using the SNMP Research software would be stripped of that right and would become infringing.  This drastic and unworkable result is simply not what Schedule 1 actually provides.

33.     Here, too, the reasons that support the proper reading of Schedule 1 and that call for rejecting Schedule 1's fallacious new interpretation flow from the content of Schedule 1 itself.  These reasons are further highlighted and bolstered by the canons of contract interpretation.  Again, the analytical framework for assessing a contract's meaning emphasizes "the context of the entire integrated agreement" and "the customs, practices, usages and terminology as generally understood in the particular trade or business."  *Alexander & Alexander Servs.,* 136 F.3d at 86.  As a matter of the context of the agreement and customs and practices in the field of licensing, no licensee could reasonably be expected to agree to a contract under which it will be stripped of the right to continue making and selling existing products in which the software at issue has been embedded.  And no licensor could reasonably expect to be able to impose such a one-sided and unworkable scenario on a licensee.[18]

34.     Moreover, the drastic and untenable consequences that would be created by accepting International's proposed new interpretation would be incompatible with the goal of contract interpretation under New York law, which "must be to accord the words of the contract their 'fair and reasonable meaning'" by taking into account "not merely literal language, but whatever may be reasonably implied therefrom."  *Sutton v. E. River Sav. Bank*, 435 N.E.2d 1075, 1078 (N.Y. 1982) (citations omitted).  "[P]arties to an agreement are presumed to act sensibly in regard to it and an interpretation that produces an absurdly harsh result is to be avoided."  *Martilet Mgmt. Servs., Inc. v. Bailey*, 2013 WL 5420966, at *3 (S.D.N.Y. 2013) (citations omitted, modification in original); *see also* WILLISTON ON CONTRACTS § 32.11 (4th ed.)

---

[18]     This conclusion flows directly from the content of Schedule 1 itself, including the nature of the rights that it provides, and accordingly it is not necessary to consider anything beyond Schedule 1.  However, if the court were to find it necessary to do so, it could consider the custom and practice evidence provided by Dr. Razgaitis and discussed in Section V below, as part of its initial assessment of whether an ambiguity exists in Schedule 1.  *Int'l Multifoods Corp. v. Commercial Union Ins. Co.*, 309 F.3d 76, 87 n.4 (2d Cir. 2002) ("[T]he District Court erred in declining to consider the custom and usage evidence that was offered by the parties as part of its assessment of whether an ambiguity existed.").

("[I]nterpretations which render the contract fair and reasonable are preferred to those which render the contract harsh or unreasonable to one party."). Therefore, "[a] court will endeavor to give the [contract] construction most equitable to both parties instead of the construction which will give one of them an unfair and unreasonable advantage over the other." *Metro. Life Ins. Co. v. Noble Lowndes Int'l, Inc.*, 643 N.E.2d 504, 508 (N.Y. 1994) (citation omitted, modification in original).

35.     Moreover, the most International's argument about the intended effect of Schedule 1 could achieve would be to raise an ambiguity about the inferences to be drawn from its language:  did the parties intend that products and projects in existence during Schedule 1's three-year term would continue to enjoy the benefit of the lifetime royalty buyout (as Nortel understands) or did they intend that these existing products would be stripped of the right to use the Schedule 1 software at the three-year mark (as International now contends)?  Thus, entertaining International's proposed interpretation would at most give rise to an ambiguity as to Schedule 1's meaning and effect. *See Alexander & Alexander Servs.*, 136 F.3d at 86 ("Ambiguity with respect to the meaning of contract terms can arise either from the language itself or from inferences that can be drawn from this language.  Hence, 'only where the language **and** the inferences to be drawn from it are unambiguous' may a district court 'construe a contract as a matter of law.'" (citations omitted, emphasis in original)).

36.     In addition, International's argument is further contradicted by the absence of another feature that would be expected if its proposed interpretation of Schedule 1 were correct: a provision calling for the return or destruction of the covered software at the end of three years. If Schedule 1 was intended to deprive Nortel of the right to use the SNMP Research software in existing products after three years, one would expect International to include language

15

mandating that Nortel return or destroy that software to ensure it was no longer being used or distributed with Nortel's products.  The absence of such language is yet another factor pointing against International's proposed interpretation.

37.     In sum, International's proposed reading of Schedule 1 is simply wrong.  But the Court need not definitively reject International's interpretation in order to deny its motion.  To prevail, International would have to establish that its proposed new interpretation is the *only* reasonable reading.  In other words, International would have to make a showing in favor of its interpretation so overwhelming that the Court would be forced to conclude that the agreement has "a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which *there is no reasonable basis for a difference of opinion*." *Marathon Asset Mgmt., LP v. Angelo Gordon & Co, LP (In re Energy Future Holdings Corp.)*, 2017 WL 1170830, at *4 (D. Del. 2017) (citations omitted, emphasis supplied, modification in original).

38.     As set forth above, Nortel's reading of Schedule 1 is right.  At the very least, it is a reasonable reading.  Conversely, International's proposed interpretation is wrong, and it most definitely is not the only reasonable reading of the agreement.  Accordingly, International's motion must be denied.

## III.     INTERNATIONAL'S OWN ACTIONS AND FORMAL STATEMENTS CONFIRM SCHEDULE 1'S MEANING AND EFFECT

39.     It is no mystery why International is hoping so desperately to block any consideration of its own actions and statements concerning Schedule 1:  they emphatically confirm the proper meaning of Schedule 1 and they squarely defeat the new interpretation International is proffering now.  Again, the issue raised by International's motion can be resolved based on the content of Schedule 1 alone:  Schedule 1 plainly does not unambiguously mean

what International now contends it means.  To the contrary, International's proposed new interpretation is flatly wrong.  But beyond that threshold issue, it is useful to review the record of International's own statements and actions, because they both confirm Schedule 1's actual meaning and they highlight just how baseless—and indeed disingenuous—International's arguments are.

40.    At most, International's arguments about Schedule 1 would raise an ambiguity as to the agreement's meaning and effect.  And "[i]f the court finds that the terms [of Schedule 1], or the inferences readily drawn from the terms, are ambiguous, then the court may accept *any available extrinsic evidence* to ascertain the meaning intended by the parties during the formation of the contract." *Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, London*, 136 F.3d 82, 86 (2d Cir. 1998) (emphasis supplied).  This includes evidence of (i) the parties' negotiations, *Prior v. Innovative Commc'ns Corp.*, 207 F. App'x 158, 162 (3d Cir. 2006) ("An integration clause . . . does not preclude the use of extrinsic evidence, including the course of negotiations, to interpret ambiguous terms in order to determine parties' intent . . . no matter how well-crafted, [it] cannot change whether words in a contract are ambiguous and thus subject to varied interpretations." (applying New York law)); (ii) correspondence between the parties, *Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 232 F.3d 153, 160 (2d Cir. 2000) (finding letters sent by the parties prior to the execution of an agreement to be probative extrinsic evidence); and (iii) the parties' course of performance under the contract, *Jobim v. Songs of Universal, Inc.,* 732 F. Supp. 2d 407, 416 (S.D.N.Y. 2010) (noting that proper "extrinsic evidence includes the contracting parties' course of performance"); *New Windsor Volunteer Ambulance Corps, Inc. v. Meyers*, 442 F.3d 101, 113

(2d Cir. 2006) (affirming the district court's reliance on "the parties' course of conduct over the years in order to determine their intent").

41.    The record of International's own conduct and statements emphatically demonstrates that the interpretation of Schedule 1 it is proposing now is wrong.

## A.    International Confirmed Schedule 1's Meaning And Effect Before It Was Signed

42.    Shortly before Schedule 1 was signed, International's point person in the negotiations, John Southwood, expressly explained and confirmed its meaning—including, specifically, the meaning and effect of providing that Schedule 1 would terminate in three years. Southwood did so in an email to Nortel's lead negotiator, David Hyslop.  This was no casual comment:  Hyslop asked Southwood to review and approve a memo that would be sent to various constituents at Nortel, and Southwood made clear that in providing his comments, he understood that "everyone's expectations are [being] fixed for all time."[19]  Referring to Schedule 1—which he describes as the "final Bay transfer to Nortel"—Southwood stated the following:

> I told [the lawyer preparing Schedule 1] that the royalty buy out would expire in three years. . . . By expire I mean that new products/projects brought on line after three years would address royalties on their own merit.  Current Bay products and development projects for the next three years will take advantage of the lifetime royalty buy out until their products have aged out of the marketplace.[20]

43.    Thus, Southwood explained and confirmed exactly what is meant by providing that Schedule 1 would expire—i.e., terminate—after three years:  1) "new products/projects

---

[19]    Minott Decl. Ex. 1, Email from J. Southwood to D. Hyslop, Nov. 16, 1999 (SNMP_NCA_00105106).

[20]    *Id.*  A project or "development project," as confirmed by Southwood during his deposition, is something in development stages, relatively far away from being launched in the marketplace.  Minott Decl. Ex. 3, Southwood Dep., Dec. 8, 2016 at 160:25-161:7, 164:5-10.  According to a former Nortel engineer, a development project would begin approximately eighteen to twenty-four months before the "product" was then launched in the marketplace. Minott Decl. Ex. 10, Mead Dep., Sept. 28, 2016 at 262:11-23.  The Nortel License defines "Nortel Network Product" expansively to include "any enhancement, replacement, modification or evolution."  Minott Decl. Ex. 11, Nortel–SNMPRI License Agreement, Dec. 23, 1999, at SNMP_NCA_00003623 (SNMP_NCA_00003622).

brought on line after three years would address royalties on their own merit"[21]—that is, they would not receive the benefit of Schedule 1's lifetime royalty buy out; and 2) "[c]urrent Bay products and development projects for the next three years *will take advantage of the lifetime royalty buy out until their products have aged out of the marketplace*."[22]

44.     Southwood's email is entirely consistent with the language of Schedule 1, which, as noted in Section I, confers the royalty buy out of the Bay Networks License on "[a]ll products of units and projects originating from what was Bay Networks"[23] that existed during Schedule 1's three-year term.  Indeed, Southwood noted in his email that he had communicated the same understanding of Schedule 1 to International's counsel, Rick Barnes, who was "crafting" the schedule's text based on the same confirmatory explanation he was providing to Nortel.[24]  Nortel certainly would have no reason to think, when it saw the language in Schedule 1 providing that it would terminate after three years, that this would somehow have a radically different meaning and effect than what Southwood specifically explained.

45.     Yet now, International has the audacity to argue that this is *not* what Schedule 1 means—and indeed it tells the Court that this cannot possibly be what Schedule 1 means.  In other words, after its principal negotiator assured Nortel that this is exactly what was meant by providing that Schedule 1 would expire in three years, International now is insisting that no reasonable person could possibly understand Schedule 1 to have that meaning.  This is not merely a matter of aggressive and meritless argument.  It is deeply duplicitous.

---

[21]     Minott Decl. Ex. 1, Email from J. Southwood to D. Hyslop, Nov. 16, 1999 (SNMP_NCA_00105106).

[22]     *Id.* (emphasis supplied).

[23]     Minott Decl. Ex. 6, Schedule 1A, June 20, 1999 (NNC0024690).

[24]     Minott Decl. Ex. 1, Email from J. Southwood to D. Hyslop, Nov. 16, 1999 (SNMP_NCA_00105106).

46.     Still further, Dr. Case of Inc. described Schedule 1 in writing to James Reeves, who was in charge of the BayStack group at Nortel, in a manner that belies the arguments International is making now.  Reeves had been responsible for originally incorporating SNMP Research's software into the BayStack switches at Bay Networks and he continued to be in charge of the BayStack group at Nortel when Schedule 1 was being executed.[25]  Case and Reeves had worked together extensively over the years, and Dr. Case confirmed in his deposition that they had become friends.[26]  Writing to Reeves, Case refers to Schedule 1 as "the document that grandfathers the [B]ay licenses over to the new [N]ortel master agreement" and assures him "I was correct when I told you the cost is $0."[27]

47.     Dr. Case's description is fully consistent with the proper reading of Schedule 1: that it "grandfathers the [B]ay licenses over to the new [N]ortel master agreement," so that the BayStack/ES/ERS switches can continue using the SNMP Research software, and that there would be no additional cost.  But according to the new and baseless arguments International is making in this lawsuit, the reality was radically different:  the BayStack/ES/ERS switches would be stripped of the right to use the SNMP Research software after three years, and the cost would not be zero but instead allegedly would be tens of millions of dollars in royalties.

48.     Of course, Dr. Case's email did not say any such thing.  Nor did he or anyone else acting on behalf of either International or Inc. ever say any such thing—either then, or at the end of Schedule 1's three-year term, or at any other time before International asserted this baseless claim for the first time in a proof of claim in 2011.

---

[25]     *See* Minott Decl. Ex. 12, Case Dep., Jan. 11, 2017 at 51:13-52:2; 56:8-58:22; 59:23-60:20;  Mar. 30, 2017 at 433:3-14.

[26]     *See id.* at 433:3-14; 456:20-21.

[27]     *See* Minott Decl. Ex. 2, Email from J. Reeves to J. Case, May 15, 2000 (SNMP_NUS_00065616).  Their email exchange reflects their friendly relationship, as Dr. Case congratulates Reeves on his recent promotion and Reeves asks about Case's planned move to a new house.

49.     Moreover, if International actually had held the understanding of Schedule 1 that it now claims, Dr. Case surely would have said something to his friend James Reeves at the end of Schedule 1's three-year term.  After all, according to what International is now arguing, the BayStack/ES/ERS switches that Reeves was responsible for became infringing at that point.  But Case said nothing to Reeves; nor did he or anyone else from International or Inc. say to anyone at  Nortel—either then or at any other time—that the BayStack/ES/ERS switches were stripped of their right to use the software covered by Schedule 1 in June 2003 and became infringing thereafter.  The fact that nobody ever said any such thing is consistent with the proper understanding of Schedule 1—that the right to use the software continued on through the life of these products; and it is flatly contrary to the new interpretation International is proffering now.

**B.     International's Actions Further Confirm Schedule 1's Proper Meaning**

50.     Still further, International's own actions after Schedule 1 was executed emphatically confirm Schedule 1's actual meaning and effect—and they contradict International's new argument that products covered by Schedule 1 lost the right to use the designated SNMP Research software at the end of Schedule 1's three-year term in June 2003.  As noted, for years after Schedule 1's June 2003 termination date, International repeatedly renewed an annual Software Service Agreement ("SSA") with Nortel for the software covered by Schedule 1.[28]  In doing so, International provided updated versions of the software covered by Schedule 1 to the Nortel group responsible for the BayStack/ES/ERS switches (referred to as the "Bay" group).[29]

---

[28]     *See* Minott Decl. Ex. 13, SSA Renewal Invoices (NNC0511483; NNC0511480; NNC0510289; NNC0510305; NNC0510391; SNMP_NUS_00074512; SNMP_NUS_00077236; NNC0510569; NNC0510627).

[29]     *Id.*

51.     This was no casual conduct on International's part.  The SSA is a binding contract, and year after year—long beyond June 2003—International renewed with Nortel the SSA that covered the Schedule 1 software.  International charged and collected from Nortel thousands of dollars each year for the renewed SSA.  And in exchange for those payments, International provided to Nortel for its use the updated versions of the software covered by Schedule 1—which is the software incorporated into the BayStack/ES/ERS switches.  Nor were these repeated renewals of the SSA any accident on International's part.  To the contrary, International actively pursued and solicited Nortel to renew the SSA year after year.[30]

52.     International's repeated renewal of the SSA squarely contradicts the argument it now presents to the Court:  that Schedule 1 "went poof" in June 2003 (to use Dr. Case's words) and Nortel no longer had any rights to use the software covered by Schedule 1.  In addition, even apart from Schedule 1, International's repeated yearly renewals of the SSA—in which it collected payment from Nortel and in exchange provided to Nortel for its use updated versions of the software covered by Schedule 1—provides an independent contractual basis for Nortel's continued use of the software.

53.     As noted, even International's own representative, John Southwood, had to admit in his deposition that this course of conduct by International is squarely "inconsistent" with International's current claims about Schedule 1's meaning and effect.[31]  And International's proposed licensing expert, David Tollen, likewise admitted that International's renewal of the

---

[30]     *See, e.g.*, Minott Decl. Ex. 14, Email from K. White to L. Branch, Dec. 1, 2003 (SNMP_NUS_00073733); Minott Decl. Ex. 15, Email from L. Branch to J. Mead, Apr. 27, 2005 (SNMP_NUS_00077235).

[31]     Minott Decl. Ex. 3, Southwood Dep., Dec. 8, 2016 at 118:6-121:6.

SSA, year after year, plainly "wasn't consistent" with the new interpretation of Schedule 1 that International is proffering now.[32]

### C. International Confirmed Yet Again Schedule 1's Proper Meaning In a Formal Letter In 2006

54.    If there could be any remaining doubt about Schedule 1's actual meaning and effect, it would be eliminated by a formal letter that International issued to Nortel in January 2006—long after Schedule 1's three-year term ended—that expressly confirmed Nortel's ongoing right to use the software covered by Schedule 1 pursuant to the "paid-up royalties' license previously established by Bay Networks" and incorporated into Schedule 1.[33]

55.    The background of the January 2006 letter is that a member of the group at Nortel responsible for the BayStack/ES/ERS switches wrote to John Southwood at International, noting that his group was using SNMP Research software and requesting confirmation of their license to this software so that they could work together with a company called ███████████ ████████████, which was also an International licensee.[34]  In response, Mr. Southwood did not react with surprise that a group working on former Bay Networks products was still using SNMP Research software after June 2003.  Just the opposite:  he wrote that he *was pleased to learn that it was the 'old Bay license' incorporated into the Nortel license*" that this group was working under.[35]

56.    Mr. Southwood then issued a formal letter on behalf of International confirming Nortel's ongoing right to use the software covered by Schedule 1:

---

[32]    Minott Decl. Ex. 4, Tollen Rep., Feb. 10, 2017 ¶¶ 68-69.

[33]    Minott Decl. Ex. 6, Schedule 1A, June 20, 2000 (NNC0024690).

[34]    Minott Decl. Ex. 16, Email from N. La-Anyane to J. Southwood, Jan. 16, 2006 (SNMP_NUS_00078544).

[35]    Minott Decl. Ex. 17, Email from J. Southwood to G. Foster, Jan. 27, 2006 (SNMP_NUS_00113554) (emphasis supplied).

> Nortel Networks has a license with SNMP Research International
> for EMANATE® sources running on Windows, Solaris, and
> VxWorks as referenced under Nortel Schedule 1.  That schedule
> incorporates the paid-up royalties' license previously established
> by Bay Networks.[36]

57.    International's formal letter could not be clearer in confirming that Nortel

continued to have the ongoing right to use the software covered by Schedule 1—which is exactly

what the BayStack/ES/ERS group at Nortel was doing.  For International now to insist that

Schedule 1 means something radically different—that Nortel's ongoing use of this software in

the BayStack/ES/ERS switches actually constituted infringement after June 2003—is not merely

meritless.  It goes beyond the bounds of fair argument.[37]

## IV.    THE RECORD OF THE PARTIES' CONDUCT AND STATEMENTS ALSO WOULD ESTABLISH AN IMPLIED-IN-FACT CONTRACT

58.    Even if the Court were to read Schedule 1 as International urges and conclude that

the benefit of the royalty buy out under Schedule 1 ended in June 2003, it should not grant

International's motion because Nortel would present the evidence of the parties' conduct and

---

[36]    Minott Decl. Ex. 5, Fax from N. Knowles to. N. La-Anyane, Jan. 31, 2006 at SNMP_NUS_00092085 (SNMP_NUS_00092083).

[37]    Notably, International's own proposed licensing expert, David Tollen, does not adopt the simplistic and fallacious argument International advances in this motion.  Instead, he conjures a "two-part bargain" in which the Bay Networks royalty buy out would continue in perpetuity, but only if Nortel executed another schedule in which it would pay a modest license fee and obtain the royalty buy out benefit.  But Tollen's argument suffers from all the same problems as International's.  First, Schedule 1 says nothing about any need (or ability) to enter into new schedules to obtain the Bay Networks royalty buy out benefit.  Second, while Nortel and International executed four other schedules that received a royalty buy out benefit, they all involved something new:  an SNMP Research software product that was not covered by Schedule 1; and/or a Nortel product or project that was not entirely a legacy Bay Networks product; and/or a group at Nortel that was not a legacy Bay Networks group.  None of these other schedules addressed the circumstances of the BayStack/ES/ERS switches:  a legacy Bay Networks product belonging to a legacy Bay Networks group using only SNMP Research software covered by the Bay Networks License and therefore fully covered by Schedule 1.  Third, the record of International's conduct and formal statements squarely contradicts Tollen's arguments: as he is forced to admit, his proposed interpretation cannot be reconciled with a) International's repeated renewals of the SSA for the software covered by Schedule 1 long after June 2003 or b) International's formal statement in its January 2006 letter (again, long after June 2003) that Nortel continues to have an ongoing right to use the software covered by Schedule 1 pursuant to the "paid-up royalties' license previously established by Bay Networks" and incorporated into Schedule 1.  Minott Decl. Ex. 4, Tollen Rep., Feb. 10, 2017 ¶¶ 68-72.  Thus, while International's own expert departs from the meritless position that International advances in its motion, his alternative argument is just as fruitless.

communications at the May 11-12 trial hearing to establish an implied-in-fact contract. Specifically, the parties' conduct establishes that they continued to operate on the basis that Nortel's rights to use the software covered by Schedule 1 continued beyond June 2003.[38]

59.    "[I]t is well settled in New York that '[w]hen an agreement expires by its terms, if, without more, the parties continue to perform as theretofore, an implication arises that they have mutually assented to a new contract containing the same provisions as the old.'" *N. Am. Hyperbaric Ctr. v. City of New York*, 604 N.Y.S.2d 56, 57 (1st Dep't 1993) (quoting *Martin v. Campanaro*, 156 F.2d 127, 129 (2d Cir. 1946)) (second alteration in original); *Richmor Aviation, Inc. v. Sportsflight Air, Inc.*, 918 N.Y.S.2d 806, 808-09 (3rd Dep't 2011) ("[E]vidence that the parties continued to perform after [the contract's] expiration in substantially the same manner as they had performed during the initial term of the contract supports . . . [the] conclusion that the terms of the original contract continued to apply to the parties' subsequent agreement"); *Harco Nat'l Ins. Co. v. Arch Speciality Ins. Co.*, 2008 WL 1699755, at *6 (S.D.N.Y. 2008), *aff'd*, 328 F. App'x 678 (2d Cir. 2009) ("Where the parties continue to do business after the expiration of a contract as though the same contract terms apply, New York Courts will construe their actions as extending the terms of the original contract.").

60.    Here, the parties continued to perform on the basis that Nortel had an ongoing right to use the software covered by Schedule 1, beyond its three-year termination date, under its royalty buy out.  First, as noted, the parties repeatedly renewed the SSA relating to the SNMP Research software and the former Bay products covered by Schedule 1 for years after 2003. International continued to send invoices to the same address for the same amount covering the same software that is covered by Schedule 1.  Nortel paid those invoices and, in return, it

---

[38]     In the alternative, the same communications and conduct described in this section would bar any infringement claim, under the doctrines of equitable and/or promissory estoppel, with respect to the products covered by Schedule 1.  Nortel reserves the right to assert the estoppel issue at an appropriate stage of this case.

received updated versions of the software covered by Schedule 1.  The parties' conduct in connection with the yearly renewal of the SSA unequivocally demonstrates that the parties intended and understood that Nortel's right to use the software covered by Schedule 1 continued beyond June 2003.

61.    A similar pattern of conduct led the court in *Harco* to find an implied-in-fact contract.  *Harco*, 2008 WL 1699755, at *5-6.  There, the court concluded that a vehicle lease agreement remained in effect past its expiration date because the parties continued to perform as though the lease had not expired.  As the court explained, "[the lessee] continued to issue [the lessor] the same invoices as though the contract was still in effect, and [the lessor] paid them and operated as though the contract had been extended."  *Id.* at *6.  On that basis, the court "infer[red] from the parties' actions that the lease was extended according to the terms of the original agreement."  *Id.* at *6.

62.    Beyond the clear inference to be drawn from the parties' conduct in repeatedly renewing the annual SSA, International also expressly confirmed in writing that Schedule 1 remained in effect after June 2003.  As discussed above, in January 2006, a group at Nortel working on former Bay Networks products reached out to John Southwood, the International representative who negotiated Schedule 1, for confirmation that they had a license to SNMP Research software so that they could partner with another company also using that software.  In response, Mr. Southwood confirmed in a formal letter that "Nortel Networks **has a license** with SNMP Research International for [SNMP Research's product] ***as referenced under Nortel Schedule 1***.  That schedule incorporates the paid-up royalties' license previously established by Bay Networks."[39]

---

[39]    Minott Decl. Ex. 5, Fax from N. Knowles to. N. La-Anyane, Jan. 31, 2006 at SNMP_NUS_00092085 (SNMP_NUS_00092083) (emphasis supplied).

63.     Thus, Nortel made clear to International that it was continuing to use the software covered by the Schedule 1 royalty buy out in connection with former Bay Networks products, and International confirmed that it had a license to do so.  Also relevant is what International did not say:  International never communicated to Nortel that it believed the royalty buy out rights conferred by Schedule 1 had ended or that Nortel lacked the ongoing right to use the software covered by Schedule 1.  *See Richmor Aviation*, 918 N.Y.S.2d at 808 (affirming a finding of an implied-in-fact contract in part where "neither party said or did anything that would repudiate an essential term of the written contract").

64.     In sum, even if International could succeed in its argument that the benefits of the royalty buy out under Schedule 1 did not extend beyond June 2003 (which it cannot do, as discussed above), International and Nortel continued to operate on the basis that the buy out remained in effect, establishing an implied-in-fact agreement to that effect.  Accordingly, International's Motion to Exclude should be denied because, regardless of the outcome of the argument about the meaning of Schedule 1, the evidence outlined above would be presented at the May 11-12 trial hearing to establish an implied-in-fact contract.

## V.     DR. RAZGAITIS OFFERS PROPER CUSTOM AND PRACTICE EVIDENCE THAT IS HELPFUL TO THE COURT AND ADMISSIBLE

65.     Finally, International's argument that, even if the Court admits other extrinsic evidence concerning Schedule 1, it should exclude the testimony of Nortel's expert Dr. Razgaitis is just as meritless as its other arguments.  Int'l Br. ¶ 38.  First, Dr. Razgaitis has deep experience in the field of technology licensing, which he has brought to bear in elucidating custom and practice in this field that is relevant to the interpretation of Schedule 1.  Second, International's assertion that a custom and practice expert such as Dr. Razgaitis is limited to opining on terms of art that have specialized and exotic meanings is an artificially narrow definition of his role and is

unsupported by the case law it cites.  Int'l Br. ¶¶ 39-40.  Third, even if International were correct

about the applicable legal standard, Dr. Razgaitis's opinion meets it because he provides relevant

custom and practice context for interpreting Schedule 1's language, including the word

"terminate" as used in the context of Schedule 1.

66.     International's misplaced attacks rely on mischaracterizing Dr. Razgaitis's

deposition testimony.  Tellingly, International's brief includes only a single quotation from the

transcript of Dr. Razgaitis's deposition—in a footnote, no less—and elsewhere presents his

testimony through misleading paraphrases.  Dr. Razgaitis's actual testimony, at his deposition

and as disclosed in his expert report, wholly contradicts the false narrative put forth by

International.

**A.     Dr. Razgaitis Has Significant Custom And Practice Experience To Offer**

67.     Dr. Razgaitis has more than thirty years of experience in the licensing of

intellectual property, spanning a wide range of technologies and products, including various

types of software licensing.[40]  He has published numerous books on licensing and valuation.  He

also has held leadership positions with the Licensing Executives Society, the nation's leading

organization in the field of licensing, and in 2010 he received its annual Barnes Award

recognizing his mentorship in the field of licensing through his books, lectures, presentations and

workshops.[41]  After beginning his career as an engineer with the Apollo program, Dr. Razgaitis

spent more than 14 years in an executive licensing role where he was directly involved in, and

responsible for, the negotiation, valuation and execution of many technology-based intellectual

property licensing agreements.  For the last 19 years, Dr. Razgaitis has been a consultant,

---

[40]     Minott Decl. Ex. 18, Razgaitis Rep., Dec. 15, 2016 ¶¶ 3-4, 7.

[41]     *Id.* ¶¶ 12-13.

focusing on opportunity licensing involving custom licensing frameworks.[42]  Dr. Razgaitis thus

has a deep and broad understanding of custom and practice in the technology licensing industry.

68.     In this case, Dr. Razgaitis will explain relevant custom and practice to aid the

Court in interpreting Schedule 1, with a particular focus on its three-year term.  As Dr. Razgaitis

observes in his report, custom and practice does not support International's proposed

interpretation of Schedule 1, because "[i]t would be a very unusual and dramatic circumstance

whereby a licensee would place itself in a position in which it would be required at some date in

the future to strip out certain functionality or capability nested within many thousands, perhaps a

million or more, lines of code."[43]  Nor, in Dr. Razgaitis's view, is it likely that a company such

as Nortel, "with a commercial product-planning horizon of 10 years (or even longer)," would

continue developing and maintaining a software platform for the BayStack/ES/ERS switches that

incorporated SNMP Research software when its "rights to practice would expire in the midst of

such product horizon."[44]

69.     As Dr. Razgaitis further explains based on custom and practice in the licensing

field, had the parties "agreed to a trigger date extinguishment of the [royalty buy out]," they

would have included a mechanism for extending Nortel's right to use the software beyond that

date:

> [T]here would have been present as part of Schedule 1A the clear
> economic terms of the cost of post-trigger use of SNMP Research
> software either expressed as a second [royalty buy out] payment or
> as running royalties with another [royalty buy out] option available
> to Nortel as an election or, most-likely based on the parties' course

---

[42]     *Id.* ¶¶ 3-4, 8.

[43]     *Id.* ¶ 55.

[44]     *Id.* ¶ 57.

of dealing, a continuation of the existing [royalty buy out] condition.[45]

70.     The absence of language in Schedule 1 addressing Nortel's ability to extend its right to use SNMP Research's software is, in Dr. Razgaitis's view, "strong custom and practice guidance that the parties considered Nortel's [royalty buy out] right to be the same as Bay [Network]'s had been, perpetual as to its relevant products."[46]  Accordingly, custom and practice support the conclusion that the "termination" of Schedule 1 "meant only that those products or projects that did not exist until after June 2003 would no longer receive the benefit of the license."[47]  Importantly, this conclusion is consistent with and supported by the plain language of Schedule 1, as discussed above.  And it likewise is consistent with International's own words and actions concerning Schedule 1, as also discussed above.[48]

---

[45]     *Id.* ¶ 62.

[46]     *Id.* ¶ 63.

[47]     *Id.* ¶ 69; *see also id.* ¶ 95.

[48]     International wrongly asserts that Dr. Razgaitis's opinions are contingent on the notion that, following Nortel's acquisition of Bay Networks, Bay Networks and/or Nortel retained rights under Bay Networks License. Int'l Br. ¶ 26.  In fact, Dr. Razgaitis made clear during his deposition that his opinions do *not* rely on Bay Networks and/or Nortel having rights under the Bay Networks License after the acquisition. *See, e.g.*, Minott Decl. Ex. 19, Razgaitis Dep., Mar. 2, 2017 at 65:10-22; 121:23-122:3; 181:2-17; 197:12-198:10; 220:16-221:10; 223:9-21; 224:15-25.  Further, International is also wrong in claiming that Nortel "recognized" that no rights existed under the Bay Networks License after Nortel's acquisition of Bay Networks.  Int'l Br. ¶ 26.  International points to an unsigned agreement that purports to assign the Bay Networks License to Nortel temporarily as purported support for its argument.  But there is no documentary evidence that the parties ever signed this agreement.  To the contrary, shortly after receiving a draft of it, Nortel expressly reiterated to International "its belief that it[] ha[d] paid up rights" under the Bay Networks License.  Minott Decl. Ex. 20, Email from D. Hyslop to J. Southwood, Aug. 16, 1999 (SNMP_NCA_00104764); Minott Decl. Ex. 21, Fax from J. Southwood to D. Hyslop, Aug. 9, 1999 (SNMP_NUS_00090235).  Thus, the unsigned temporary license—which International concedes "has no bearing on the Court's interpretation of Schedule 1A"—does not support International's position.  Int'l Br. ¶ 10.  International also relies on an unreported federal court decision (*SQL Sols., Inc. v. Oracle Corp.*, 1991 WL 626458, at *3 (N.D. Cal. 1991)) for the proposition that a reverse triangular merger constitutes a transfer of rights under California law, but the California court of appeal has emphasized that this decision "[o]bviously . . . has no precedential value." *Former Shareholders v. Browning-Ferris Indus.*, 2005 WL 2820594, at *5 (Cal. Ct. App. 2005).  In any event, the parties never discussed the *SQL Solutions* opinion, and Nortel made clear to International that it believed the paid-up royalty buyout rights under the Bay Networks license were still in effect.  Given that International was courting Nortel as a major new customer, it had a strong incentive to accommodate Nortel's position.

**B.    International Incorrectly Characterizes The Proper Scope Of Custom And Practice Expert Testimony**

71.    International argues that Dr. Razgaitis's testimony must be limited to offering an opinion on the meaning of a specialized term of art, science or trade and that, because it purportedly is not so limited, it should be excluded.  Int'l Br. ¶¶ 26, 38-41.  International is wrong.  Permissible custom and practice testimony is not limited in the way that International contends, nor do any of the decisions it cites support such a limitation.

72.    Instead, New York courts regularly rely on custom and practice testimony to provide the context necessary to interpret an agreement.  *See, e.g.*, *Evans v. Famous Music Corp.*, 807 N.E.2d 869, 871, 873 (N.Y. 2004) (relying on expert custom and practice testimony concerning the music industry that calculating foreign tax credits on a song-by-song basis would be impractical or impossible to aid in interpreting a royalty agreement); *Last Time Beverage Corp. v. F & V Distr. Co., LLC*, 951 N.Y.S.2d 77, 81-82 (2d Dep't 2012) (relying on expert custom and practice testimony concerning the soft drink industry, that franchisors ordinarily give exclusive rights to distributors to distribute new soft drinks in their territory, to aid in interpreting a distribution agreement).

73.    In addition, New York courts also routinely allow experts to provide custom and practice testimony regarding both (i) entire contractual phrases, *see Evans*, 807 N.E.2d at 870 (interpreting the phrase "all net sums actually received . . . from any other source or right now known or which may hereafter come into existence . . . less all deductions for taxes"); *Last Time Beverage Corp. v. F & V Distr. Co., LLC*, 2010 WL 898072 (N.Y. Sup. Ct. 2010), *aff'd after reargument*, 951 N.Y.S. 2d 77 (2d Dep't 2012) (interpreting the phrase "the Franchisor shall afford Distributor the opportunity of offering and selling any new Beverage(s) which Franchisor becomes authorized to distribute in Distributor's Territory"); *Merritt Assocs., Inc. v. Scollard*,

555 N.Y.S. 2d 771, 772-73 (1st Dep't 1990) (interpreting the phrase "selling price"); and (ii)

commonplace words, *see Bank of N.Y. Tr. N.A. v. Franklin Advisers, Inc.*, 674 F. Supp. 2d 458,

467 (S.D.N.Y. 2009) (admitting custom and practice evidence relating to the word "through").

Thus, custom and practice testimony is admissible, even if it does not apply narrowly to the

definition of a single specialized technical term.

74.     The decisions on which International relies do not support its effort to exclude Dr.

Razgaitis's testimony.  Most are irrelevant because the court excluded expert testimony not on

the basis that it was improper in scope but because it found the contract at issue to be

unambiguous and therefore did not admit any extrinsic evidence at all.  *Marathon Asset Mgmt.,*

*LP v. Angelo Gordon & Co, LP (In re Energy Future Holdings Corp.)*, 2017 WL 1170830, at *5

(D. Del. 2017); *Cury v. Colonial Life Ins. Co.*, 737 F. Supp. 847, 854 (E.D. Pa. 1990); *Direxion*

*Shares ETF Tr. v. Leveraged Innovations L.L.C.*, 2014 WL 6469084, at *6 (S.D.N.Y. 2014);

*Delta Mining Corp. v. Big Rivers Elec. Corp.*, 18 F.3d 1398, 1402 (7th Cir. 1994).[49]  The

remaining two decisions were not decided under New York law and deal with testimony that is

easily distinguishable from what Dr. Razgaitis will offer in this case.  *Sompo Japan Ins. Co. of*

*Am. v. Norfolk S. Ry.*, 762 F.3d 165, 181 (2d Cir. 2014) (applying federal maritime law to

exclude expert testimony interpreting an "exoneration clause" because expert had claimed that,

"regardless of what the exoneration clauses mean, they simply are not enforced"); *TCP Indus.,*

*Inc. v. Uniroyal, Inc.*, 661 F.2d 542, 549-50 (6th Cir. 1981) (applying Michigan law in

concluding that expert was not qualified to "testify to the meaning given . . . a contract by the

trade" because he had never seen a contract like the one at issue).

---

[49]     In addition, *Delta Mining* applied Kentucky law, not New York law, *Delta Mining*, 18 F.3d at 1400, and
there is nothing in the *Cury* decision to suggest that the court in that case applied New York law.

75.    International also cites caselaw for the proposition that an expert witness cannot

offer a legal opinion, *see, e.g.*, *Berckeley Inv. Group, Ltd. v. Colkitt*, 455 F.3d 195, 217 (3d Cir.

2006), but that plainly is not what Dr. Razgaitis offers here, as he made clear in his deposition.[50]

Dr. Razgaitis's expert opinion instead provides his views on custom and practice in the

technology licensing industry.  Such testimony about custom and practice in an expert's field is

well within the boundaries of what courts have deemed admissible.  *See Evans*, 807 N.E.2d at

871, 873; *Last Time Beverage Corp.*, 951 N.Y.S.2d at 81-82.

76.    Finally, International argues that Dr. Razgaitis's opinion is improper because he is

seeking to use custom and practice to "contradict the uncontroverted words the parties' [sic]

negotiated," Int'l Br. ¶ 40, but again International is wrong.  In support of its argument,

International cites a single paragraph from Dr. Razgaitis's expert report, which states that

International's interpretation of Schedule 1 "would be contrary to industry custom and practice

for the termination of IP right[s] as are granted in a schedule to a technology license and also

contrary to the parties' course of dealings in this case, as demonstrated by their communications

and conduct."[51]  This passage does not contradict the words in Schedule 1 at all.  To the contrary,

it provides custom and practice evidence concerning the context of Schedule 1, which both

confirms what Schedule 1 already means by its own terms and helps demonstrate why

International's proposed interpretation is contrary to relevant custom and practice.

77.    International also purports to rely on testimony from Dr. Razgaitis's deposition in

support of its argument, but in the passages that International cites, Dr. Razgaitis simply

---

[50]    Minott Decl. Ex. 19, Razgaitis Dep., Mar. 2, 2017 at 29:10-23; 34:7-15; 46:13-23; 74:23-75:9; 77:11-22; 85:22-86:17; 87-16-88:17; 89:9-23.

[51]    Minott Decl. Ex. 18, Razgaitis Rep., Dec. 15, 2016 ¶¶ 30, 69; *see also id.* ¶ 95 ("[T]he implication and effect of the term 'terminated' in Schedule 1A was to prevent any extension of Nortel's [royalty buy out] right to projects and products developed after June 20, 2003."); Minott Decl. Ex. 19, Razgaitis Dep., Mar. 2, 2017 at 89:9-21 ("In my opinion, from reading [Schedule 1], it has a context that requires one to understand that the termination has to do with Nortel's royalty buy-out, royalties, free use for any and all products.").

confirms that his opinions are based on custom and practice in the industry.[52]   In short,

International's attempt to create a conflict between Dr. Razgaitis's opinion and Schedule 1's

language is baseless.

**C.      Even If Dr. Razgaitis Were Limited To Opining On The Meaning Of A Single Word In Schedule 1, His Opinion Is Proper**

78.      Even if International's narrow interpretation of what constitutes proper expert

testimony were correct, Dr. Razgaitis's opinion would satisfy it because he provides custom and

practice evidence that is helpful in giving context to the meaning and effect of the word

"terminate" as used in Schedule 1.   As Dr. Razgaitis explained at his deposition, "the issue is . . .

what terminates?  Does Nortel's right to use the products it already has in the marketplace

terminate, or does Nortel's broad right to have [a] royalty buy-out for anything that it creates into

the future, however far into the future, terminate[]?"[53]   Dr. Razgaitis's report and deposition

testimony answer this question based on Schedule 1 as placed in the context of custom and

practice:  "[t]he termination of the license and [royalty buy out] meant only that those products

or projects that did not exist until after June 2003 would no longer receive the benefit of the

license."[54]

79.      Dr. Razgaitis also explained in his deposition why International's proposed

interpretation of the meaning and effect of "terminate" would be inconsistent with custom and

practice:  "if the interpretation given to this language was that Nortel could not continue with its

products . . . then I would have expected, as an essential element, some language that would have

---

[52]      Minott Decl. Ex. 19, Razgaitis Dep., Mar. 2, 2017 at 46:13-23; 51:9-19; 55:6-56:5; 71:18-72:21; 77:11-86:17.

[53]      Minott Decl. Ex. 19, Razgaitis Dep., Mar. 2, 2017 at 65:25-66:21; *see also id.* at 323:3-9 (explaining that though the language in Schedule 1 did not contain "words of special art in the software industry," it did have "special importance" when read in context).

[54]      Minott Decl. Ex. 18, Razgaitis Rep., Dec. 15, 2016 ¶ 69.

provided what they could do to continue being in commercial operations . . . .”[55]  Thus, this evidence of the context provided by relevant custom and practice is helpful in assessing what “terminated” at the end of Schedule 1’s three-year term.[56]  As discussed, what “terminated” in June 2003 was the capture period for the royalty buyout benefit of Schedule 1, so that new projects begun after that date would not be covered.

80.    Because the custom and practice evidence provided by Dr. Razgaitis is in fact relevant to the contextual meaning of specific language from Schedule 1, his testimony would be admissible even if the scope of expert custom and practice testimony were as limited as International claims.

## CONCLUSION

81.    To sum up, International’s motion should be denied for the simple reason that its proposed interpretation of Schedule 1 most definitely is not the only reasonable reading.  In fact, it is flatly wrong.  Further, while the fact that International’s proposed interpretation is wrong is clear from the content of Schedule 1 alone, the Court should hear the evidence of International’s own conduct and statements because it eliminates any possible doubt about the meaning of Schedule 1.

82.    Still further, even if International’s proposed interpretation of Schedule 1 could somehow be accepted as the sole and unambiguous meaning of Schedule 1 (which it plainly is not), the evidence of its actions and statements should be admitted at the May 11-12 trial hearing to establish an implied-in-fact agreement:  the evidence demonstrates that the parties continued

---

[55]     Minott Decl. Ex. 19, Razgaitis Dep., Mar. 2, 2017 at 64:14-65:9; *see also id.* at 69:20-70:24; Minott Decl. Ex. 18, Razgaitis Rep., Dec. 15, 2016 ¶ 36.

[56]     Minott Decl. Ex. 18, Razgaitis Rep., Dec. 15, 2016 ¶¶ 32 n.10, 95.

to operate on the basis that Nortel's rights to use the software covered by Schedule 1 continued

beyond June 2003.

83.     Finally, International's fallacious arguments for excluding Dr. Razgaitis's

testimony likewise should be rejected; while the meaning of Schedule 1 is clear even without it,

his testimony provides appropriate and helpful evidence of the custom and practice context in

which this agreement should be assessed.

84.     For the reasons set forth above, the Debtors respectfully request that the Court

deny the Motion to Exclude and grant such other relief as the Court deems just and proper.

Dated: April 20, 2017
       Wilmington, Delaware

Respectfully submitted,

CLEARY GOTTLIEB STEEN & HAMILTON LLP

Lisa M. Schweitzer (admitted *pro hac vice*)
David H. Herrington (admitted *pro hac vice*)
One Liberty Plaza
New York, New York  10006
Telephone: (212) 225-2000
Fax: (212) 225-3999

-and-

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

_____ */s/ Andrew J. Roth-Moore*
Eric D. Schwartz (No. 3134)
Derek C. Abbott (No. 3376)
Andrew R. Remming (No. 5120)
Tamara K. Minott (No. 5643)
Andrew J. Roth-Moore (No. 5988)
1201 North Market Street, 16th Floor
Wilmington, DE  19899-1347
Telephone:  (302) 658-9200
Facsimile:  (302) 658-3989

*Counsel for the Debtors and Debtors in Possession*