**From: IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

---------------------------------------------------------X
                                                      :
*In re*                                               :    Chapter 11
                                                      :
Nortel Networks Inc., *et al.,*[1]                    :    Case No. 09-10138 (KG)
                                                      :
                                 Debtors.             :    Jointly Administered
                                                      :
                                                      :    **Hearing date: June 13, 2017 9:00 AM (ET)**
                                                      :    **Objections due: May 30, 2017 4:00 PM (ET)**
                                                      :
--------------------------------------------------------- X


**DEBTORS' MOTION FOR ENTRY OF AN ORDER PURSUANT
TO 11 U.S.C. §§ 105 AND FED. R. BANKR. P. 9019
APPROVING THE STIPULATION RESOLVING CLAIMS
BY THE AFFILIATES OF VERIZON COMMUNICATIONS, INC.**


Nortel Networks Inc. ("NNI") and certain of its affiliates, as debtors and debtors in

possession (collectively, the "Debtors"), hereby move this Court (the "Motion") for the entry of

an order substantially in the form attached hereto as Exhibit A, pursuant to sections 105(a) and

502 of title 11 of the United States Code (the "Bankruptcy Code") and Rule 9019 of the Federal

Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), (a) authorizing NNI's entry into and

approving a stipulation (the "Stipulation") with the affiliates of Verizon Communications, Inc.

("Verizon" or the "Claimants," and together with NNI, the "Parties")[2], attached hereto as Exhibit

---

[1]      The debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567), Nortel Networks (CALA) Inc. (4226) and Nortel Networks India International Inc. (8667). Contact information for the Debtors and their petitions are available at http://dm.epiq11.com/nortel.

[2]      The definition of "Verizon" or "Claimants" includes, without limitation, Verizon Communications Inc. and all wholly-owned subsidiaries of Verizon Communications Inc. (including, without limitation, Verizon Corporate Services Group Inc., Verizon Services Corp., Verizon Network Integration Corp., Verizon Business Network

<u>B</u>, which resolves the Claimants' claims against NNI (collectively, the "<u>Claim</u>"); and (b)

granting them such other and further relief as this Court deems just and proper.  In support of this

Motion, the Debtors respectfully represent as follows:

### Jurisdiction

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and

1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue is

proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory bases for the relief requested herein are sections sections 105(a) and

502 of the Bankruptcy Code and Bankruptcy Rule 9019.

### Background

**A.      Procedural Background**

3.      On January 14, 2009 (the "<u>Petition Date</u>"), the Debtors, other than Nortel

Networks (CALA) Inc.[3] and Nortel Networks India International Inc.[4], filed voluntary petitions

for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the

District of Delaware (the "<u>Court</u>"), which cases are consolidated for procedural purposes only

(the "<u>Chapter 11 Cases</u>").  The Debtors continue to operate as debtors in possession pursuant to

sections 1107(a) and 1108 of the Bankruptcy Code.

4.      The Office of the United States Trustee for the District of Delaware (the "<u>U.S.</u>

<u>Trustee</u>") has appointed an Official Committee of Unsecured Creditors (the "<u>Committee</u>") in

---

Services Inc., Verizon Select Services Inc., MCI Communications Services, Inc. d/b/a Verizon Business Services
and the local operating telephone company subsidiaries of Verizon Communications Inc.) and Cellco Partnership
and its affiliates, collectively d/b/a Verizon Wireless.

[3]      Nortel Networks (CALA) Inc. filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code
on July 14, 2009, which was consolidated and is being jointly administered with the other Debtors' chapter 11 cases
for procedural purposes [D.I. 1098].

[4]      Nortel Networks India International Inc. filed a voluntary petition for relief under Chapter 11 of the
Bankruptcy Code on July 26, 2016, which was consolidated and is being jointly administered with the other
Debtors' chapter 11 cases for procedural purposes [D.I. 17090].

respect of the Debtors [D.I.s 141, 142], and an ad hoc group of bondholders has been organized (the "Bondholder Group").  An ad hoc consortium of creditors holding trade claims against the Debtors (the "Nortel Trade Claims Consortium") was organized in 2015.

5.        On the Petition Date, the Debtors' ultimate corporate parent NNC, NNI's direct corporate parent NNL, and certain of their Canadian affiliates (collectively, the "Canadian Debtors"[5] and together with the EMEA Debtors (as defined below) and the Debtors, "Nortel") commenced a proceeding with the Ontario Superior Court of Justice (the "Canadian Court") under the Companies' Creditors Arrangement Act (Canada) (the "CCAA"), seeking relief from their creditors (collectively, the "Canadian Proceedings") and a Monitor, Ernst & Young Inc. (the "Monitor"), was appointed by the Canadian Court.  The CCC is an ad hoc committee of major creditors having claims only against the Canadian Debtors.  Also on the Petition Date, the High Court of England and Wales placed nineteen of Nortel's European affiliates, including Nortel Networks UK Limited ("NNUK") and certain of its affiliates located in Europe, the Middle East and Africa (collectively, the "EMEA Debtors")[6] into administration under the control court-appointed administrators and foreign representatives (collectively, the "Joint Administrators").  Additionally, certain of the EMEA Debtors' affiliates have not commenced administration proceedings, but are under the control of their respective directors.

---

[5]        The Canadian Debtors include the following entities:  NNC, NNL, Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation, as well as Nortel Communications Inc., Architel Systems Corporation and Northern Telecom Canada Limited, which subsequently commenced their own Canadian Proceedings.

[6]        The EMEA Debtors include the following entities: NNUK, Nortel Networks (Ireland) Limited, Nortel GmbH, Nortel Networks France S.A.S., Nortel Networks Oy, Nortel Networks Romania SRL, Nortel Networks AB, Nortel Networks N.V., Nortel Networks S.p.A., Nortel Networks B.V., Nortel Networks Polska Sp. z.o.o., Nortel Networks Hispania, S.A., Nortel Networks (Austria) GmbH, Nortel Networks, s.r.o., Nortel Networks Engineering Service Kft, Nortel Networks Portugal S.A., Nortel Networks Slovensko, s.r.o. and Nortel Networks International Finance & Holding B.V.

6.      Other Nortel affiliates have commenced and in the future may commence additional creditor protection, insolvency and dissolution proceedings around the world.

7.      After the commencement of these insolvency proceedings, the Debtors and their various affiliates entered into a series of transactions in which they sold various business units and other assets to various purchasers (the "Sales Transactions").  In furtherance of the Sales Transactions, the Debtors, the Canadian Debtors and certain of the EMEA Debtors entered into that certain Interim Funding and Settlement Agreement, dated as of June 9, 2009 (the "IFSA").[7] Following a joint hearing on June 29, 2009, the IFSA was approved by this Court [D.I. 993] and the Canadian Court.  Among other things, the parties to the IFSA agreed not to condition the sale of Nortel's businesses and assets on a prior agreement among the selling parties regarding the allocation of the ultimate sale proceeds (plus accrued interest, the "Sale Proceeds") from the relevant sale transaction.  See IFSA, ¶¶ 12(a), (b).  With this framework in place, from 2009-2011, Nortel conducted an extensive series of court-approved sale transactions generating in excess of $7.3 billion in net Sale Proceeds.

8.      As more fully set forth in the IFSA, the Selling Debtors,[8] the Joint Administrators, the Committee and the Monitor entered into various court-approved escrow agreements with JP Morgan Chase Bank, N.A. and Citibank, N.A., as escrow agents (the "Escrow Agreements") to hold all Sale Proceeds in escrow accounts (the "Distribution Escrow Accounts"), pending either the agreement of the relevant parties or filed decisions of this Court and the Canadian Court regarding the allocation of the Sale Proceeds. See id.  As of the date of this Motion, the Distribution Escrow Accounts hold approximately $7.3 billion in Sale Proceeds.

---

[7]     See Exhibit B to the Motion Pursuant to 11 U.S.C. § 105(a), § 363, § 503 and Fed. R. Bankr. P. 9019 for an Order (A) Approving the Interim Funding and Settlement Agreement, and (B) Granting Related Relief [D.I. 874].

[8]     The term "Selling Debtors" refers to any Nortel debtor that signed or acceded to the IFSA or that signed one or more of the Escrow Agreements (as defined below).

4

9.      For further information regarding these Chapter 11 Cases, references may be made to the Monthly Operating Reports filed by the Debtors at http://dm.epiq11.com/nortel and the Plan (as defined below).

B.      **The Debtors' Chapter 11 Plan**

10.      Despite early and repeated efforts at mediation (including before all of the asset sales were consummated), the key parties were unable to reach an agreement as to the distribution of the Sale Proceeds, and proceeded to engage in litigation before this Court and the Canadian Court (the "Allocation Dispute").  On May 12, 2015, this Court and the Canadian Court simultaneously issued opinions deciding the Allocation Dispute (the "Allocation Decisions").  Numerous parties appealed this Court's Allocation Decision to the United States District Court for the District of Delaware.  During the pendency of the appellate process, the parties engaged in court-supervised mediation.  The Debtors, their foreign affiliates and other key parties agreed upon a proposed settlement of the Allocation Dispute as well as various other inter-estate matters and claims, through the terms of a fully integrated settlement, as memorialized in the Settlement and Plans Support Agreement executed on October 12, 2016 [D.I. 17249] (the "SPSA").

11.      On December 1, 2016, the Debtors filed their amended *First Amended Joint Chapter 11 Plan of Nortel Networks Inc. and Certain of its Affiliated Debtors* [D.I. 17501] (the "Plan") on behalf of all Debtors (other than NNIII), along with an amended *Proposed Disclosure Statement for the First Amended Joint Chapter 11 Plan of Nortel Networks Inc. and Certain of its Affiliated Debtors* [D.I. 17502] (the "Disclosure Statement").  The Plan effectuates the terms of the SPSA, which is fully incorporated therein.

12.      On January 24, 2017, following a hearing, the Court entered an order confirming the Plan [D.I.17795], as well as a separate order approving the SPSA pursuant to Bankruptcy

Rule 9019 [D.I. 17794].  On January 30, 2017, the Canadian Court entered a Sanction Order

approving the Canadian Plan and an order authorizing the release of the Sale Proceeds from the

Distribution Escrow Accounts.

> **C.**    **The Verizon Claim**

13.    Shortly after the Petition Date, a number of customers of the Debtors, including

the Claimants, requested that they be permitted to apply existing customer credits to amounts

owed to NNI.  In furtherance of such request, on or about January 20, 2009, the Claimants

withheld payments totaling approximately $137,000,000 that were otherwise due and owing to

NNI.  In response to the request by their customers, the Debtors asked the Bankruptcy Court to

enter an order clarifying the rights of their customers with respect to certain customer credits.

On February 5, 2009, the Court entered an Order Clarifying Relief Granted Pursuant to Sections

105(a) and 363(b) of the Bankruptcy Code Authorizing Debtors to Honor Prepetition Obligations

to their Customers [D.I. 237] (the "Customer Order").  The Customer Order included the

following paragraph: "All rights of Debtors' customers to assert rights of setoff or recoupment

are expressly reserved notwithstanding any payments by such customers to the Debtors." Id. ¶ 5.

14.    During the first week of February 2009, the Verizon affiliates that had been

withholding payments resumed making payments to NNI on outstanding invoices, and following

the entry of the Customer Order continued making payments to NNI until early 2010.

15.    On September 30, 2009, Claimants filed a proof of claim against NNI that is listed

on the Debtors' claim register as claim number 5521 (the "Proof of Claim").  The total amount of

the Claim "at Time Case Filed" recorded on the Proof of Claim was $11,207,760.90.  The form

noted that the Claim was secured by "[r]ights of setoff."

16.      The attachment to the Proof of Claim (the "Proof of Claim Attachment") included, inter alia, three distinct sections describing purported claims asserted by various Verizon affiliates against NNI.

17.      The first of these sections set forth a claim for an aggregate amount of $516,674.97 in Telecom Charges, described as "liquidated amounts owed by Nortel Networks Inc. to Verizon" (the "Trade Claims").  Proof of Claim Attachment ¶ 2.  Claimants claimed $251,798.05 of this sum as a setoff.

18.      The second section of the Proof of Claim Attachment described a sum of $10,691,085.93 allegedly owed by NNI to Verizon Select Services Inc. ("VSSI"), under the "warranty and/or indemnification provisions" of a Global Business Partner Agreement between Verizon Network Integration Corporation and NNI, pursuant to which NNI supplied an allegedly faulty telecommunications switch to VSSI that was "incorporated into a project that VSSI performed for one of its customers" and ultimately gave rise to a lawsuit against VSSI.  Proof of Claim Attachment ¶ 5.

19.      The third section of the Proof of Claim Attachment related to a purported indemnity claim arising out of a pending patent infringement action entitled Voxpath Networks, Inc. v. Verizon Commc'ns, Inc. et al., No. 08- cv-127 (E.D. Tex), in which several Verizon entities were named as defendants (the "Voxpath Claim").  Proof of Claim Attachment ¶ 6.  The Proof of Claim Attachment stated that "Verizon has procured certain products and services from Nortel, including, but not limited to, PBX devices and CS2K softswitches, that may be implicated in the Voxpath litigation."  Id.  Claimants sought to recover "(i) costs and expenses associated with the defense of the Voxpath Litigation that relate to the Nortel products and

services, and (ii) any awards, judgments and/or settlements of the Voxpath Litigation that relate to the Nortel products and services." Id.

20.    Subsequent to the filing of the Claim, Verizon informed the Debtors that it had resolved its dispute with the customer that had purchased the allegedly faulty switch implicated in the Switch Claim for a settlement amount of $3,461,301 (the "Revised Switch Claim Amount"), and communicated to the Debtors that it would thereafter only seek to recover the Revised Switch Claim Amount, rather than the $10,691,085.93 initially claimed, on account of the Switch Claim.

21.    On or about April 1, 2010, certain Verizon affiliates placed an "administrative hold" on payments due and owing to NNI.  As of May 20, 2010, the outstanding amount withheld by these Verizon entities was approximately $10,379,084.61, of which approximately $7,129,132.84 was past due.  On May 21, 2010, the Debtors filed a Motion for Entry of an Order Enforcing the Automatic Stay Against Certain Affiliates of Verizon Communications Inc. [D.I. 3036] (the "Stay Motion").  In the Stay Motion, the Debtors requested an order enforcing the automatic stay against the Verizon affiliates with respect to any and all acts to collect, assess, or recover on any or all parts of the prepetition claims asserted by those entities against the Debtors in the Proof of Claim, including, without limitation, the withholding of payments on postpetition, liquidated trade amounts that were due and owing.  Together with the Stay Motion, the Debtors filed a Motion for Entry of an Order Directing an Examination of and Production of Certain Documents by Verizon Communications Inc. and Its Affiliates Pursuant to Fed. R. Bankr. P. 2004 [D.I. 3034] (the "2004 Motion").

22.    On June 10, 2010, the Bankruptcy Court entered an Agreed Protective Order between the Debtors and the Affiliates of Verizon Communications Inc. [D.I. 3168] (the

"Protective Order"), to, inter alia, facilitate the disclosure of information and production of documents by Verizon to NNI as requested in the 2004 Motion. Thereafter, VSSI began to produce a substantial number of documents relating to the Switch Claim. The parties later resolved the Stay Motion and the 2004 Motion by entering into a Stipulation and Order Resolving Debtors' Motions Against Verizon, which was approved by the Court on August 25, 2010 [D.I. 3827] (the "Stay Motion Order"). Pursuant to the Stay Motion Order, the Verizon affiliates were required, inter alia, to halt the administrative hold, and to release all funds they had withheld with respect to invoices issued by NNI. Verizon subsequently complied with the terms of the Stay Motion Order by releasing all withheld funds to NNI.

23.     In addition, the Stay Motion Order required all Verizon affiliates claiming a right of setoff and/or recoupment against any of the Debtors to file a motion requesting that the Court determine, with respect to each moving Verizon affiliate: (a) whether such entity had a prepetition right of setoff and/or right of recoupment against a particular Debtor as of the date of the Customer Order, and if so, in what amount; (b) the extent to which, if at all, such entity preserved such right; and (c) whether such entity is currently entitled to exercise, enforce, implement and/or effectuate such right through the withholding of payment of invoices by it or by another Verizon affiliate from the Debtor, by recovering such amount from the Debtor's estate, or by some other means. Stay Motion Order ¶ 3. Pursuant to the Stay Motion Order, the Debtors withdrew the Stay Motion and the 2004 Motion.

24.     On September 25, 2010, in accordance with the Stay Motion Order, the Claimants filed a Motion for (a) Modification of the Automatic Stay, (B) Determination of Verizon's Prepetition Rights of Setoff, and (c) An Order Requiring Verizon's Setoff Rights to be Effectuated and Satisfied by Nortel Networks Inc. [D.I. 3901] (the "Setoff Motion"). The

9

Debtors filed a response to the Setoff Motion on November 8, 2010 [D.I. 4259] in which they disputed Verizon's right to setoff for all but $162,464.79 of Verizon's claims, and Verizon filed a reply to the Debtors' response on November 18, 2010 [D.I. 4350]. The Setoff Motion was heard by the Bankruptcy Court in a hearing on November 23, 2010, but a ruling on the Setoff Motion has not been rendered to date.

25. Subsequent to the filing of the Proof of Claim and the litigation of the Setoff Motion, Verizon resolved its dispute giving rise to the Voxpath Claim through a confidential settlement, and communicated to the Debtors that it now sought $450,000 on account of the Voxpath Claim.

**D.** **Liabilities Verizon Owes to NNI**

26. On March 4, 2009, the Bankruptcy Court issued an Order Approving the Stipulation Establishing Adequate Assurance of Payment to the Affiliates of Verizon Communications Inc. [D.I. 415] (the "Adequate Assurance Order"). Pursuant to the Adequate Assurance Order, the Debtors agreed to pay all invoices issued by Verizon to the Debtors for post-petition services provided to the Debtors in the ordinary course of business in accordance with the applicable agreements between Verizon and the Debtors, and such sums would constitute administrative expense claims against the Debtors (the "Verizon Administrative Expense Claim"). In addition, the Debtors agreed to immediately pay a non-interest bearing deposit equivalent to one-half of the estimated average monthly billing for Verizon's services, which Verizon would return to NNI on the later of the Effective Date of the Plan or the payment in full of the Verizon Administrative Expense Claim. The Debtors promptly paid Verizon this deposit in the amount of $192,751.04 (the "Adequate Assurance Deposit"), and subsequently paid all invoices issued by Verizon in accordance with the Adequate Assurance Order.

Therefore, as of the Effective Date, Verizon is obligated to return the Adequate Assurance Deposit to NNI.

### E.    **The Stipulation**

27.    In an effort to negotiate an expeditious resolution of the disputes between the Debtors and the Claimants, the Parties entered into arm's-length settlement discussions.  As a result of these negotiations, subject to this Court's approval, NNI has reached a compromise with the Claimants that the Claim will be allowed as a single Class A2 Secured Claim against NNI in an amount totaling $1,957,248.96 (and paid in cash by NNI to Verizon upon the later of the effective date of the Plan or within ten (10) days of the entry of an Order approving this Motion), representing a settlement amount of $2,150,000 for resolution of Verizon's Claim less $192,751.04 for amounts owed by Verizon to NNI, and Verizon shall have no further claims against NNI or any other Debtor under the Claim or the Adequate Assurances Order.  This compromise will serve as a global resolution of all claims asserted in the Proof of Claim, including Verizon's claimed right to setoff.

28.    In consideration for the allowance of the Claim in the foregoing amount against NNI, the Claimants and the Debtors have agreed, subject to this Court's approval and the terms of the Stipulation, to release and forever discharge each other from any and all liability they now have or hereafter may have arising from or related to the Claim or the Adequate Assurances Order or the Debtors' bankruptcy cases, other than for the allowed amount and payment of such Claim.  The Claimants have further agreed that they will not amend or refile the Claim.

29.    The Debtors believe, in the exercise of their reasonable business judgment, that the resolution of the Claim through the Stipulation is appropriate and in the best interest of both their estates and their creditors, as it will avoid the potentially substantial and burdensome costs

11

and risks associated with litigating the Claim, reduce the potential size of claims asserted against the estate and preserve value of the Debtors' estates for the benefit of all of their stakeholders and meaningfully advance the Debtors' claims reconciliation and resolution process.

### Relief Requested

By this Motion, the Debtors seek entry of an order, pursuant to sections 105(a) and 502 of the Bankruptcy Code and Bankruptcy Rule 9019, (i) authorizing NNI to enter into and approving the Stipulation and (ii) granting such other and further relief as the Court deems just and proper.

### Basis For Relief

30.     The approval of the Stipulation as an integrated resolution of all of the claims asserted by Verizon against the Debtors and is squarely authorized by section 105(a) of the Bankruptcy Code and easily meets the applicable standards of Bankruptcy Rule 9019.[9]

31.     Bankruptcy Rule 9019 provides, in pertinent part, that, "on motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019. Citing this authority, the Third Circuit has emphasized that "[c]ompromises are favored in bankruptcy." Myers v. Martin (In re Martin), 91 F.3d 389, 393 (3d Cir. 1996) (quoting Collier on Bankruptcy ¶ 9019.03[1] (15th ed. 1993)); see also In re World Health Alts., Inc., 344 B.R. 291, 296 (Bankr. D. Del. 2006) (finding settlements "generally favored in bankruptcy"). Additionally, the Third Circuit has recognized that "'[i]n administering reorganization proceedings in an economical and practical manner it will often be wise to arrange the settlement of claims as to which there are substantial and reasonable doubts.'" In re

---

[9]     Section 105(a) of the Bankruptcy Code provides that "[t]he court may issue any order . . . that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Approval of the Settlement is consistent with the broad equitable authority of the bankruptcy courts, in furtherance of the above provisions of the Bankruptcy Code and Bankruptcy Rules. See, e.g., United States v. Energy Res. Co., 495 U.S. 545, 549 (1990); In re Kaiser Aluminum Corp., 456 F.3d 328, 340 (3d Cir. 2006) ("[B]ankruptcy courts have broad authority to act in a manner that will prevent injustice or unfairness in the administration of bankruptcy estates.").

Pa. Cent. Transp. Co., 596 F.2d 1102, 1113 (3d Cir. 1979) (quoting Protective Comm. for Indep.

Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424 (1968)).  Courts in this

District have recognized that the approval of a proposed compromise and settlement is

committed to the sound discretion of the bankruptcy court.  See, e.g., In re Coram Healthcare

Corp., 315 B.R. 321, 329 (Bankr. D. Del. 2004).

32.     Before approving a settlement under Bankruptcy Rule 9019, a court must

determine whether "the compromise is fair, reasonable, and in the interest of the estate."  In re

Marvel Entm't Grp., Inc., 222 B.R. 243, 249 (D. Del. 1998) (quoting In re Louise's, Inc., 211

B.R. 798, 801 (D. Del. 1997)).  Basic to the process of evaluating proposed settlements is "the

need to compare the terms of the compromise with the likely rewards of litigation."  TMT Trailer

Ferry, 390 U.S. at 424-25.  The court need not be convinced that the settlement is the best

possible compromise in order to approve it.  In re Coram Healthcare Corp., 315 B.R. at 330.

33.     The Third Circuit has set out four criteria for a bankruptcy court to consider when

evaluating a settlement proposal:  "(1) the probability of success in litigation; (2) the likely

difficulties in collection; (3) the complexity of the litigation involved, and the expense,

inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors."

In re Martin, 91 F.3d at 393 (citing In re Neshaminy Office Bldg. Assocs., 62 B.R. 798, 803

(E.D. Pa. 1986)); see also Fry's Metals, Inc. v. Gibbons (In re RFE Indus., Inc.), 283 F.3d 159,

165 (3d Cir. 2002); In re eToys, Inc., 331 B.R. 176, 198 (Bankr. D. Del. 2005).

34.     In keeping with the stated public policy in favor of settlement, courts in this

Circuit have repeatedly found that "[i]n analyzing the compromise or settlement agreement under

the Martin factors, courts should not have a 'mini-trial' on the merits, but rather should canvass

the issues and see whether the settlement falls below the lowest point in the range of

reasonableness." <u>W.R. Grace & Co.</u>, 475 B.R. at 77-78 (internal citations omitted); <u>Pulver Com,</u>

<u>Inc. v. Medialive Int'l Inc. (In re Key3Media Grp., Inc.)</u>, 336 B.R. 87, 93 (Bankr. D. Del. 2005),

aff'd, 2006 WL 2842462.  Moreover, courts generally defer to a debtor's judgment so long as

there is a legitimate business justification for its action.  <u>In re Coram Healthcare Corp.</u>, 315 B.R.

321, 330 (Bankr. D. Del. 2004); <u>Key3Media Grp., Inc.</u>, 336 B.R. at 93.

35.     The Debtors respectfully submit that the <u>Martin</u> Factors weigh in favor of

approving the Stipulation, and request that NNI's entry into the Stipulation be authorized under

Bankruptcy Rule 9019.  The Stipulation provides the Debtors with necessary certainty with

respect to the Claim and results in a decrease in claims against the Debtors' estates of

$9,250,511.94, compared to the filed amount of the Claim.  The Stipulation also resolves the

aforementioned liability Verizon owes to NNI on account of the Adequate Assurances Order,

thereby avoiding the expense and delay of pursuing collection of that amount.  Settlement of the

Claim permits the Debtors to allocate their resources efficiently and direct their attention toward

other matters relating to their Chapter 11 cases.  Such a resolution brings valuable and significant

reductions in cost, time and uncertainty on account of this Claim and represents the valid, fair

and reasonable business judgment of the Debtors.

36.     While the Debtors are prepared to litigate the true value of these outstanding

amounts and believe that they would prevail in such litigation, litigation carries with it inherent

uncertainties and costs, and there is no assurance that such litigation would achieve a better result

than the one set forth in the Settlement when accounting for the costs of litigation. In the absence

of a settlement between the Parties, the Debtors' estates would be burdened with the time and

costs of continuing litigation, which would be disruptive of the estates' efforts to bring finality to

these cases and which, given the total amount in dispute, would likely not yield a materially

better result for the Debtors' creditors even if successful.

37.     Allowance of the Claim as a Secured Claim also brings the contested dispute over

the setoff issue to a fair and reasonable conclusion.  Absent the Stipulation, resolution of the

setoff issue would require the Parties to expend further estate resources litigating the correct

allowed amount of Verizon's disputed claims and the extent to which these claims are entitled to

setoff.  If Verizon were to prevail on its setoff claim, it would receive a Secured Claim to the

extent of the amount the Court determines is subject to setoff.  11 U.S.C. § 506(a)(1).  This raises

the possibility that, if this issue were litigated, Verizon could receive a Secured Claim in an

amount significantly higher than the Stipulation amount of $1,957,248.96.  While the Debtors

are prepared to litigate the setoff issue and believe that they would prevail in such litigation, the

Debtors believe that a prompt resolution of the issue that avoids the expense and delay of further

litigation is in the best interest of the estate and their creditors.

38.     The interests of the creditors militate in favor of approval of the Stipulation.  The

Debtors believe that the interests of their creditors are served by the prompt and efficient

resolution of the Claim and the avoidance of legal expenses that would be incurred if the Claim

were to be litigated or if other causes of action related to or arising from the Claim were asserted.

39.     In light of the foregoing, the Debtors respectfully submit that the Stipulation fairly

balances the Debtors' likelihood of success on the merits against their interest in avoiding the

uncertainty, delay and additional costs associated with litigation, and falls well above the lowest

point in the range of reasonableness in satisfaction of the requirements of Bankruptcy Rule 9019.

Accordingly, the Debtors request that the Court approve the Stipulation and authorize the

Debtors to enter into the Stipulation.

15

**Notice**

40.     Notice of the Motion has been given via electronic transmission, first class mail,

hand delivery or overnight mail to (i) counsel to the affiliates of Verizon Communications, Inc.,

(ii) the U.S. Trustee; (iii) counsel to the Committee; (iv) counsel to the Bondholder Group; (v)

counsel to the Canadian Debtors; and (vi) the general service list established in these Chapter 11

cases.  The Debtors submit that under the circumstances no other or further notice is necessary.

**No Prior Request**

41.     No prior request for the relief sought herein has been made to this or any other

court.

WHEREFORE, the Debtors respectfully request that this Court (i) grant this Motion and the relief requested herein; (ii) enter the proposed order attached hereto; and (iii) grant such other and further relief as it deems just and proper.

Dated:  May 15, 2017
        Wilmington, Delaware

CLEARY GOTTLIEB STEEN & HAMILTON LLP

James L. Bromley (admitted *pro hac vice*)
Lisa M. Schweitzer (admitted *pro hac vice*)
One Liberty Plaza
New York, New York 10006
Telephone:  (212) 225-2000
Facsimile:  (212) 225-3999

- and -

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Tamara K. Minott*
Derek C. Abbott (No. 3376)
Andrew R. Remming (No. 5120)
Tamara K. Minott (No. 5643)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19801
Telephone:  (302) 658-9200
Facsimile: (302) 658-3989

*Counsel for the Debtors*
*and Debtors in Possession*