IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE


| | |
|---|---|
| In re: | ) OFFICIAL |
| | ) TRANSCRIPT |
| NORTEL NETWORKS, INC., | ) |
| et al., | ) Case No. 09-10138 |
| | ) (KG) |
| Debtors. | ) |
| _____ | ) |
| SNMP RESEARCH INTERNATIONAL, | ) |
| INC. and SNMP RESEARCH, INC. | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | ) Adv. Proc. No. |
| | ) 11-53454(KG) |
| NORTEL NETWORKS, INC., | ) |
| et al., | ) |
| | ) |
| Defendants. | ) |

U. S. Bankruptcy Court
Courtroom No. 3
824 Market Street
Wilmington, Delaware
Thursday, May 11, 2017
11:02 a.m.

BEFORE: THE HONORABLE KEVIN GROSS,
United States Bankruptcy Judge


HEARING ON
SCHEDULE 1 ISSUE AND MOTION TO AMEND

HEARING TRANSCRIPT - VOLUME I

_____
WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
(302) 655-0477
www.wilfet.com



1          THE COURT:  Good morning,

2    everyone.  Thank you.  You may be seated.  And,

3    of course, we are here on a very important

4    matter this morning.

5               Mr. Abbott, good morning.

6               MR. ABBOTT:  Good morning, Your

7    Honor.  Derek Abbott from Morris, Nichols, here

8    for the US Debtors.  Your Honor, we do have a

9    busy couple of days.

10          THE COURT:  Yes.

11          MR. ABBOTT:  I have just a couple

12    of things that I wanted, administrative things

13    maybe --

14          THE COURT:  And I have some, too,

15    of course, but I will hear from you.

16          MR. ABBOTT:  First, as Your Honor

17    will recall, I am sure, with some degree of

18    happiness, the plan has now become effective.

19          THE COURT:  Yes.

20          MR. ABBOTT:  You heard Mr. Johnson

21    for the unsecured creditors' committee at the

22    status conference.  Technically, the committee

23    has been dissolved because of the

24    effectiveness, but they did file papers.  He is

1    on the phone, Your Honor, and I think wished at

2    the very beginning to just say a couple of

3    words about the committee's views and then get

4    off the phone and not participate in the rest

5    of the trial.  And he asked us to try to tee

6    that up for him, and we are happy to do that.

7                    THE COURT:  All right.

8                    MR. ABBOTT:  Second, Your Honor, I

9    know Mr. Herrington has just a couple of

10   housekeeping things, so I will cede the podium

11   to him, if I may.

12                   THE COURT:  You certainly may.

13                   MR. ABBOTT:  Thank you, Your

14   Honor.

15                   THE COURT:  Mr. Herrington, good

16   morning.

17                   MR. HERRINGTON:  Good morning,

18   Your Honor.  Good to see you again.

19                   THE COURT:  Yes, good to see you.

20                   MR. HERRINGTON:  So a couple of

21   things.  One is Rule 615 as it applies to fact

22   witnesses.  There are two fact witnesses on the

23   side of Inc. and International.  One is

24   Dr. Case.  I assume Dr. Case will be a party



1    representative and stay here.

2                    THE COURT:  Yes.

3                    MR. HERRINGTON:  But the other is

4    a gentleman named John Southwood, who is a

5    former employee, will be offered as a fact

6    witness.  We will be calling him in our case as

7    a fact witness.  I believe International will

8    be calling him in their case as a fact witness.

9    So they will go first.  They will call him.  We

10   will be calling him as a witness.  They have

11   agreed to make him available to us, and on that

12   basis we withdrew our deposition designations,

13   so we will be calling him.

14                   And, of course, as a fact witness,

15   we believe he should be not in the courtroom --

16                   THE COURT:  Sequestered.

17                   MR. HERRINGTON:  -- including for

18   opening statements today.  We will be

19   previewing the testimony of other fact

20   witnesses.

21                   THE COURT:  Any objection to

22   having Mr. Southwood outside the courtroom?

23                   Mr. Busch, good morning.

24                   MR. BUSCH:  Good morning, Your



1    Honor.  And I am feeling better today.

2                    THE COURT:  Good.

3                    MR. BUSCH:  I can actually speak

4    today --

5                    THE COURT:  Good.

6                    MR. BUSCH:  -- so that's a

7    positive, I think.

8                    THE COURT:  Yes.

9                    MR. BUSCH:  And no, no objection

10   to that.

11                   THE COURT:  So Mr. Southwood,

12   there you are.  Good morning.

13                   MR. SOUTHWOOD:  Good morning.

14                   THE COURT:  If you will wait

15   outside the courtroom for us.  Someone will be

16   calling you shortly, I am sure.

17                   MR. HERRINGTON:  Thank you, Your

18   Honor.  And another housekeeping point, Your

19   Honor, is the local rule, it is 43.1,

20   concerning consulting with witnesses once they

21   start testifying.

22                   THE COURT:  Yes.

23                   MR. HERRINGTON:  And we would ask

24   guidance of Your Honor of when that applies.



1    Does that apply when the witness begins

2    testifying?

3                    THE COURT:  Yes, exactly.

4                    MR. HERRINGTON:  Okay.

5                    THE COURT:  In other words, if you

6    have a witness who has not testified, you are

7    free to talk to that witness.  But once he or

8    she begins to testify, that rule then takes

9    effect.

10                    MR. HERRINGTON:  Okay.

11    Understood.  And, of course, in terms of

12    talking to witnesses, I would expect that there

13    will be no talking to Mr. Southwood about the

14    testimony of other witnesses --

15                    THE COURT:  Right.

16                    MR. HERRINGTON:  -- since the

17    whole point of the rule is to prevent that from

18    happening.

19                    THE COURT:  Exactly.

20                    MR. HERRINGTON:  Okay.

21                    THE COURT:  Mr. Busch.

22                    MR. BUSCH:  Yes, we don't have to

23    be advised by Mr. Herrington to abide by those

24    court rules.  We will act ethically and



1    appropriately at all times.

2                  THE COURT:  Very fine.

3                  MR. HERRINGTON:  Thank you, Your

4    Honor.

5                  MR. BUSCH:  We do have one thing

6    ourselves.  May I?

7                  THE COURT:  Yes, Mr. Busch.

8                  MR. BUSCH:  So, Your Honor,

9    yesterday we had a conversation with

10   Mr. Herrington about post-hearing briefs, and

11   we think that there is going to be a lot of

12   testimony over the next two days, a lot of

13   exhibits, a lot of documents, a lot of legal

14   arguments, and we believe that post-hearing

15   briefs on this matter would be very helpful for

16   the Court.  And so we had an agreement, I

17   think, with Mr. Herrington that we will submit

18   post-hearing briefs.

19                  One point of --

20                  THE COURT:  You know what I would

21   prefer, Mr. Busch, to briefs?  And we can talk

22   about this.  Proposed findings of fact and

23   conclusions of law.  I think that would be,

24   frankly, more helpful to me than the briefs.



```
 1                    MR. BUSCH:  Okay.

 2                    THE COURT:  Is that something

 3       that, Mr. Herrington, would be acceptable to

 4       you as well?

 5                    MR. HERRINGTON:  Yes, Your Honor,

 6       absolutely.

 7                    THE COURT:  All right.

 8                    MR. BUSCH:  And just on the

 9       Schedule 1 issue; correct, Your Honor?

10                    THE COURT:  That's right.

11                    MR. BUSCH:  And so we have been

12       mindful of trying to get everything in over the

13       course of the next two days, and we were

14       prepared to start at 10:00 a.m. this morning.

15       I know Nortel said no, but we were prepared to

16       take Your Honor up on your offer and start at

17       10:00 a.m.  We have been very diligent in

18       trying to cut down our examination and really

19       work to get it in.

20                    But along those lines, I proposed

21       to Mr. Herrington that in light of findings of

22       fact and conclusions of law, that we not do

23       closings, because I think that it will all be

24       in our papers.  It will all be in what we
```



1    submit, and it is duplicative.  And given time

2    constraints, we were concerned about time

3    issues with respect to that.  Mr. Herrington

4    has said that he would like to do some short

5    closing, and we would like some guidance on

6    that, Your Honor.

7                   THE COURT:  Mr. Herrington, let me

8    hear from you first.

9                   MR. HERRINGTON:  Yes.  Thank you,

10   Your Honor.  Again, we will be hearing a lot of

11   new exhibits, new testimony from witnesses, a

12   whole bunch of new stuff.  We think it would be

13   helpful to the Court, certainly it would be

14   helpful to our explanation of what we think is

15   the significance of this evidence, kind of

16   putting together the jigsaw puzzle, to be able

17   to make some closing remarks.

18                   Obviously, it is in our incentive

19   to keep it very short.  We have a certain

20   amount of time to work with.  It is charged

21   against us.  If I give a long closing, I have

22   got to make it up somewhere else.  I don't plan

23   to give a long closing.  But I do think, Your

24   Honor, it would be helpful to just highlight

1    some of the key things that Your Honor will be

2    hearing for the first time, you know, again in

3    sort of different pieces, different sources of

4    evidence; just put it all together while we are

5    all here, while it is fresh, and create that

6    picture.

7              MR. BUSCH:  Your Honor, again, I

8    know we have a tight timeframe.

9              THE COURT:  We have six hours

10   apiece.

11             MR. BUSCH:  Right.  And I am not

12   sure how strict Your Honor is going to be on

13   that.

14             THE COURT:  Fairly strict, but my

15   timekeeping is not perfect.  So I will admit

16   that right upfront.

17             MR. BUSCH:  I appreciate that.

18   And we do plan to do closing on the motion to

19   amend issue.

20             THE COURT:  All right.

21             MR. BUSCH:  But on the Schedule 1

22   issue, we have more witnesses than they do, and

23   it is a very important issue, obviously.

24             THE COURT:  It is very important.



1           MR. BUSCH:  This is very

2    important.

3           THE COURT:  Yes.

4           MR. BUSCH:  And we don't want to

5    be crunched because we feel the need that we

6    are going to have to do an hour closing in

7    light of Mr. Herrington wanting to close.  We

8    are happy to do it if time was not an issue.

9    But that's my concern, is that as we get late

10   in the day on Friday and we are up against time

11   issues, where that is going to leave us on our

12   case, and I am going to be panicking and

13   thinking of what I have to do, that kind of

14   thing.  And this is so important that I just

15   want to make sure that we have enough time to

16   put our case on.  That's really my concern.

17          THE COURT:  Well, why don't we do

18   this.  I do agree with Mr. Herrington that

19   closing arguments would be helpful, and let's

20   see where we are at the end of the day

21   tomorrow, and I will make that decision at that

22   point.  Maybe we will go a little bit longer or

23   maybe I will say I have heard enough and I will

24   see it in the findings of fact and conclusions



```
1    of law.

2                    MR. BUSCH:  Fair enough.

3                    MR. HERRINGTON:  Thank you, Your

4    Honor.

5                    THE COURT:  Just a couple quick

6    things.  First of all, the schedule.  Let me

7    just give you the schedule, because I think

8    that would be important.  Today we will go

9    until 1:00, and then we will break for lunch

10   for an hour, and we will run roughly from

11   2:00 -- and this is rough -- to about 5:45.

12   And we will take a 15-minute break at an

13   appropriate time.

14                   And no one should ever hesitate to

15   ask for a break.  If you need one, please, ask

16   for a break, including the court reporters.

17                   Second, tomorrow we will go -- is

18   9:00 acceptable, if we start at 9:00 instead of

19   9:30?

20                   MR. BUSCH:  It works for us, Your

21   Honor.  Yes, Your Honor.

22                   THE COURT:  We will go 9:00 to

23   1:00 again with a 15 minute break, lunch for an

24   hour,  and then we will go roughly 2:00 to 5:00
```



1   or so, again with a 15-minute break in the

2   afternoon.

3               I have alloted the six hours per

4   side.  If there is an objection, the party that

5   loses the objection will lose roughly two

6   minutes.  That's an approximation, but between

7   argument and the like, I figure that probably

8   works.  And again, as I say, I keep the time,

9   but it is rough time.

10              And in addition, we have our ECRO,

11  Ms. Mace, and we have a court reporter here,

12  Ms. Marino.  And I propose to make Ms. Marino's

13  transcript the official transcript of the

14  hearing, unless someone would object to that.

15              MR. BUSCH:  No, no objection, Your

16  Honor.

17              MR. HERRINGTON:  No, no objection,

18  Your Honor.

19              THE COURT:  All right.  So

20  Ms. Marino's transcript will be our official

21  transcript.  And with that, I need to hear from

22  Mr. Johnson.

23              MR. ABBOTT:  Your Honor, I

24  apologize.  There is one more small



1    housekeeping matter.

2              THE COURT:  Yes, yes, sir.

3              MR. ABBOTT:  Your Honor, we had

4    moved to file our prehearing brief under seal.

5              THE COURT:  Under seal, yes.

6              MR. ABBOTT:  I have an order on

7    the sealing motion, if I may approach, Your

8    Honor.

9              THE COURT:  Yes, you may.

10   Certainly, Mr. Abbott.  Thank you.  Thank you,

11   sir.  All right.

12             Mr. Johnson.

13             MR. JOHNSON:  Good morning, Your

14   Honor.

15             THE COURT:  Good morning.

16             MR. JOHNSON:  Good morning.  It is

17   Robert Johnson, from Akin Gump, for the

18   Official Committee of Unsecured Creditors.

19   Your Honor, we are very happy that the debtors

20   had their effective date three days ago, on

21   Monday, May 8.  And in accordance with the

22   terms of the plan, the creditors' committee was

23   automatically dissolved on that date for most

24   purposes, with certain limited exceptions that



1    do not apply with respect to the SNMP

2    litigation, and that is why we are not

3    attending the hearing today.

4              But before we go, I would just

5    like to call to the Court's attention that the

6    creditors' committee did make a filing here

7    regarding the motion of SNMP Research to amend

8    its proof of claim.  The filing was made on

9    April 26, when the committee was very much in

10   existence.  We joined in the debtors'

11   opposition to that motion, and we stated our

12   additional reasons why we opposed the motion to

13   amend.  We explained why the motion to amend is

14   prejudicial to unsecured creditors.

15             At the close of this hearing, the

16   creditors' committee ask that Your Honor

17   consider the committee's views on the motion to

18   amend and our filings on the record at

19   DI-18132, and that is noted on the agenda.

20             And with that, Your Honor, we ask

21   that we be excused for the remainder of the

22   hearing.

23             THE COURT:  All right,

24   Mr. Johnson.  Yes, you are excused.  And thank



1    you.

2                    MR. JOHNSON:  Thank you.

3                    THE COURT:  All right.

4                    MR. DEAN:  Your Honor, I have

5    another housekeeping matter.  I have a similar

6    order.  It is good to see you.

7                    THE COURT:  Mr. Dean, good

8    morning.

9                    MR. DEAN:  I have another similar

10   sealing order, the same one as Mr. Abbott gave

11   you, except with regard to our prehearing

12   briefs.  I would like to hand that up.

13                    THE COURT:  That's great,

14   Mr. Dean.  Thank you.  We are getting all of

15   this out of the way.  Thank you.

16                    Now, tell me this.  When I hear

17   testimony, will I be hearing it -- for example,

18   from Dr. Case, will I be hearing it on both

19   matters, both the motion to amend and the

20   Schedule 1?

21                    MR. BUSCH:  Ultimately, yes, but

22   not initially.

23                    THE COURT:  Okay.

24                    MR. BUSCH:  So the way we have it



1    divided up is that the Schedule 1 issue will

2    have an opening, it will have testimony, and

3    then maybe a closing.  And then you will hear

4    the motion to amend issue.  And I believe

5    Dr. Case will be called in both cases.

6              THE COURT:  All right.  Thank you,

7    Mr. Busch.  All right.  I am ready to hear from

8    you.

9              MR. BUSCH:  Thank you, Your Honor.

10   Good morning, Judge.

11             THE COURT:  Good morning, sir.

12             MR. BUSCH:  For the record, my

13   name is Richard Busch, and I am representing

14   SNMP Research in this matter.  And I have with

15   me my co-counsel John Wood and, of course,

16   David Dean as well as Norm Pernick.

17             THE COURT:  Yes.

18             MR. BUSCH:  You will finally be

19   meeting, Your Honor, and hearing from the

20   founder of SNMP Research, who is one of the

21   creators of the SNMP standard, Dr. Jeff Case,

22   who is here.

23             THE COURT:  Yes, good morning.

24             MR. BUSCH:  And what you will hear



1    from Dr. Case is, unlike what you have been

2    told repeatedly by Nortel's counsel, the SNMP

3    Research implementation of SNMP is, I believe,

4    incredibly valuable software that in many ways

5    helped to revolutionize networks and is

6    invaluable to network administrators, who must

7    ensure that their networks do not fail.

8              You will also meet a former

9    employee of SNMP Research, John Southwood.

10   Mr. Southwood has been retired for nearly two

11   years but has come here to also set the record

12   straight about various statements Nortel has

13   made about him and comments that have been

14   attributed to him.

15             Finally, you will meet an expert

16   for SNMP Research, David Tollen.  Mr. Tollen

17   has been designated by SNMP Research to rebut

18   the opinions of the Nortel expert witness in

19   this case, Dr. Richard Razgaitis.  In short,

20   Mr. Tollen will explain to Your Honor that

21   there simply is no, quote unquote, custom and

22   practice that would allow for the rewriting of

23   the parties' agreement, Schedule 1A to the

24   Nortel-SNMP master license agreement, in the

1    way that Nortel would ask this Court to do.

2                    As you will hear, Dr. Razgaitis

3    has not supported any of his opinions with any

4    treatises, textbooks or authorities of any

5    kind, just his bald opinion.  It is completely

6    unsupported, Your Honor.

7                    And what is most striking and what

8    you will see over the next two days is that

9    Nortel does not have one witness, not one, to

10   support their story.  Their entire case is

11   based upon argument of counsel, pure

12   speculation, taking emails out of context, and

13   a single letter sent six years after the

14   execution of Schedule 1A.

15                    They could have found David

16   Hyslop.  They could have attempted to call him.

17   He was Nortel's negotiator of Schedule 1A.  But

18   they did not.  They didn't even try to find him

19   or locate him or call him.  And you will not

20   see him here this week.

21                    They could have attempted to

22   depose and use the testimony of James Reeves,

23   another Nortel employee that you will hear

24   mentioned.  They know where he was.  They made

1    sure SNMP Research could not speak with him by

2    making him fearful if he disclosed anything

3    deemed confidential by Nortel, he might be

4    sued.  So they will not have a single witness.

5              The only former Nortel employee

6    you will hear from is Pierre Tremblay.  He

7    replaced David Hyslop.  And he will be called

8    by deposition, Pierre Tremblay.  And what you

9    will hear Pierre Tremblay say is that he told

10   SNMP Research right after Schedule 1A

11   terminated that there were no products that

12   originated with Bay Networks being distributed

13   under Schedule 1A by Nortel that contained SNMP

14   Research software, not one such product.  And

15   both Pierre and other Nortel employees, Michel

16   Cote, for example, continued telling SNMP

17   Research that same fact up through and beyond

18   the Avaya asset sale, when Nortel sold the

19   products to Avaya.

20              Now, up until now you have only

21   heard arguments from Nortel's counsel of the

22   so-called extrinsic evidence, and that's

23   because, as Your Honor knows, it has been

24   SNMP's position that Schedule 1A to the master

1    license agreement is as clear as day and there

2    is no need for extrinsic evidence.  But now

3    that Your Honor has ruled that you will hear

4    extrinsic evidence, you will hear the complete

5    story from the people who were actually there

6    at the time and negotiated the deal.  And when

7    you hear the actual evidence, Your Honor, what

8    you will hear is that the complete extrinsic

9    evidence shows that while opposing counsel may

10   disagree with SNMP Research's position, David

11   Hyslop, Nortel's person at the time who

12   negotiated the relevant agreements, clearly

13   understood and agrees with what SNMP is saying

14   in this case, and that is shown by his own

15   contemporaneous internal Nortel emails as well

16   as his emails to SNMP Research.

17            So as we will show, Your Honor,

18   the relationship between SNMP Research and the

19   company that ultimately became Bay Networks,

20   SynOptics, began in 1994.  And that is

21   Plaintiff's Exhibit No. 20.  And that is under

22   a license agreement in which SNMP Research

23   licensed its software to SynOptics.  Under that

24   agreement, SNMP Research granted in paragraph 2

1    and 3 two license rights:  A license in

2    paragraph 2 for internal use to develop

3    products, and a license in paragraph 3 to

4    redistribute to customers the products that

5    were developed.  Importantly, the agreement

6    stated that those licenses were

7    nontransferable.  The agreement in paragraph 26

8    also stated that it was governed by California

9    law.

10            Finally -- and this will become

11    important later -- the agreement was a broad

12    location-based license and not a per-product

13    license.  The SNMP Research licensing model

14    evolved in the late 1990's to a per-product

15    licensing model, but at the time of the

16    SynOptics-Bay agreement, the license allowed

17    broad rights for development at particular

18    locations.

19            Now, ultimately, a few things

20    happened with the SynOptics agreement that will

21    also be known as the Bay agreement, Your Honor,

22    this 1994 agreement.  SynOptics merged with

23    another of SNMP Research's customers,

24    Wellfleet, and around 1996 those two customers



1    became Bay Networks.   SNMP Research and Bay

2    Networks then entered into two amendments to

3    the SynOptics agreement, Amendments 1 and

4    Amendment 2.   And that's Plaintiff's Exhibits

5    No. 21 and 22.

6                    Now, Amendment 1 and 2 did a few

7    things.   One, they consented to the assignment

8    of the SynOptics agreement to Bay and

9    transferred the agreement from SNMP Research,

10   Inc. to International, which had begun

11   operations in 1995.   And once International

12   began operations, Inc. stopped licensing

13   customers directly but did virtually all of its

14   licenses through Int'l.

15                   Now, the SynOptics-Bay agreement

16   had a per-copy royalty arrangement that gave

17   SynOptics and Bay the option to convert that to

18   a royalty buy-out.   The SynOptics-Bay agreement

19   licensed two different components of SNMP

20   Research's software, an agent component -- and

21   you will be hearing this word throughout the

22   trial and as we go forward in this case --

23   EMANATE.   That is the software that is known as

24   the agent component of SNMP Research software,

1    EMANATE that is found in the Bay agreement, and

2    a manager component, ARL, which is identified

3    in Amendment 2.  Those are the two things,

4    products, that the SNMP Research licensed.

5              There were separate options to buy

6    out each of them; i.e., a buy-out for use of

7    EMANATE found in the main agreement and a

8    buy-out amount for the manager component, which

9    is known as ARL.  So you have EMANATE, the

10   agent; ARL, the management component found in

11   Amendment 2.  Bay exercised the buy-out for

12   EMANATE only.

13             At the time Schedule 1A was

14   drafted, Bay-Nortel was on a royalty lease for

15   the ARL software licensed via Amendment 2 and

16   had not yet purchased the royalty buy-out, and

17   that's very important, and I will get to that

18   in a moment when I speak about Schedule 1.  But

19   at the time of the Bay merger with Nortel later

20   and at the time Schedule 1 was ultimately

21   drafted, Nortel and Bay had not paid for the

22   buy-out for the manager component of the

23   buy-out.  They had not paid for the manager

24   component, the ARL component.

1                    Now, in September 1998 Nortel's

2      acquisition of Bay closed.  The structure of

3      the agreement was a reverse triangular merger,

4      and this is shown by the SEC documents we have

5      as exhibits in this case, Exhibit No. 71.  And

6      under California law, which governed the

7      SynOptics-Bay agreement, this means that Nortel

8      had to get an assignment of the SynOptics-Bay

9      agreement in order to have any rights under it.

10     We cited in our trial brief the California

11     cases which govern this matter that make clear

12     that transactions of this type under California

13     law absolutely require an assignment from the

14     licensor, in this case SNMP Research.

15                   Now, Your Honor may recall at the

16     hearing last week that Nortel's counsel, US

17     Debtors' counsel, in order to avoid this clear

18     conclusion, stood up and stated that the cases

19     that we cited for this proposition were, quote

20     unquote, nonprecedential.  Not true.  There is

21     nothing nonprecedential about the cases we

22     cited.  That one case we cited that has a

23     Westlaw citation does not make it

24     nonprecedential.



1            And Nortel's violation of the

2    nontransferability provision of the Bay license

3    agreement to the merger is a very important

4    point for the Court to understand, and the

5    reason is the main issue, one of the main

6    issues and the premise of Dr. Razgaitis'

7    opinion later is that Nortel had these Bay

8    rights indefinitely without the need for an

9    assignment, so there would be no reason for

10   them to agree to a three-year limitation in

11   Schedule 1A.  That premise is incorrect.

12           And importantly, Nortel knew at

13   the time, in 1998, that it had no rights from

14   the Bay license and needed an assignment.

15   Indeed, following the merger, SNMP Research

16   advised Nortel they needed an assignment by

17   SNMP Research to have the right to distribute

18   the Bay products.  Mr. Hyslop responded by

19   asking for the relevant agreements.  And on

20   June 21, 1999, recognizing that he needed an

21   assignment, Dave Hyslop wrote to SNMP

22   Research -- this is Plaintiffs' Exhibit

23   No. 26 -- and stated, ". . .it occurred to me

24   that the SNMP RI - Bay agreement should be

1    formally assigned to Nortel as Nortel has been

2    operating as though it were the licensee since

3    the Nortel acquisition of Bay last September."

4              Mr. Hyslop went on to state in the

5    email that he was attaching, quote, in order

6    "To formalize that arrangement. . .a copy of an

7    assignment agreement for SNMP RI's approval and

8    signature."  Mr. Hyslop was being honest here

9    and recognizing the need for an assignment.  So

10   Mr. Hyslop attached to that email a proposed

11   assignment that simply assigned to Nortel the

12   Bay agreement as amended by Amendments 1 and 2,

13   and thus, the royalty buy-out terms with no

14   limitations whatsoever, and thereby

15   dramatically expanding the scope of it.  Now,

16   that's Plaintiffs' Exhibit No. 27.

17              SNMP Research did not agree to

18   this assignment.  And Dr. Case will be here to

19   tell you why and also why he includes these

20   provisions, the nontransferability provisions,

21   in his license agreements.

22              At the same time, the parties

23   agreed to try to move forward -- and that's

24   Nortel and SNMP Research -- on a new master



1    licensing agreement, because SNMP Research had

2    other deals with Nortel, and they were looking

3    to combine it into a single master agreement so

4    everyone had clarity and everything would be

5    governed under one single agreement.  SNMP, as

6    I said, wanted that in order to take clarity,

7    and Nortel wanted that in order to start fresh

8    with an agreement that would be a

9    self-contained agreement.

10                   Now, the first step in this

11   process was to enter into a temporary

12   assignment of the Bay agreement as amended to

13   give the parties time to negotiate and enter

14   into a new deal.  Thus, in August of 1999 the

15   parties agreed to a temporary assignment that

16   would terminate on November 1, 1999 and

17   specifically stated that, quote, "Upon the

18   termination of this temporary assignment" that

19   is going to terminate on November 1, 1999,

20   "Nortel shall have. . .no rights under the

21   License Agreement."  And the "License

22   Agreement" was defined to be the Bay-SynOptics

23   agreement as amended by Amendments 1 and 2.

24                   While the executed document cannot

1    now be located because it was not

2    electronically sent or received but sent and

3    received by fax -- that's the way I guess

4    people did it back in 1999 -- Dr. Case and

5    Mr. Southwood will both testify that they know

6    it was fully executed.  Furthermore, Your

7    Honor, we have two emails that were sent by

8    John Southwood to Dave Hyslop after November 1

9    of 1999 specifically saying to Mr. Hyslop that

10    the temporary license agreement term has now

11    expired, specifically saying that.  And

12    Mr. Hyslop never wrote back and said, "What are

13    you talking about?  We never signed that deal."

14    He never responded in any way, shape or form

15    like that.  It is clear that the deal was

16    signed.

17              Dr. Case will be here to tell you

18    all of the hoops that he jumped through to try

19    to find the signed agreement.  It wasn't -- we

20    cannot locate it, but there is no bad faith

21    here.  And we have evidence that shows -- not

22    only the testimony of Dr. Case and

23    Mr. Southwood but emails that will show Your

24    Honor and give Your Honor comfort that this

1  was, in fact, signed and was a deal that was in

2  place between the parties.

3              Now, on October 5 and 6, 1999,

4  Nortel representative David Hyslop met at SNMP

5  Research with Dr. Case and John Southwood and

6  SNMP Research attorney Rick Barnes.  At this

7  point the parties had a draft of the master

8  agreement they had been negotiating but had not

9  yet drafted Schedule 1A.  At this meeting and

10 before as well as after, the parties discussed

11 what their agreement would be with respect to

12 future Nortel products as well as products that

13 originated at Bay.  The arrangement they

14 discussed and struck was as follows:  They

15 would enter into a master license agreement

16 that gave Nortel development rights and

17 run-time distribution rights, but the parties

18 would need to enter into schedules to the

19 agreement in order to license specific

20 products.  That was in keeping with SNMP

21 Research's goal of moving to a product-based

22 license agreement.  This framework was

23 ultimately captured in the master license

24 agreement and its schedules.  Thus, with



1    respect to Nortel products, not products that

2    were either in development at Bay or had been

3    released as products by Bay, Nortel would have

4    to enter into a schedule to license the

5    software, pay license and maintenance fees and

6    pay royalties for each such product sold.

7                    And if Your Honor looks at the

8    master license agreement, this requirement to

9    enter into schedules is found throughout the

10   master license agreement.  It is found in

11   Section 1.17, the definition of Schedule A;

12   2.1, which talks about the licensing; 2.1(a)

13   and (c), 6.2, 6.2(b), 6.5, 7.2, 8 and 9.4.  The

14   requirement to enter into schedules was clearly

15   discussed and understood and became a part and

16   framework of the master license agreement.

17                    Now, with respect to the projects

18   that had begun at Bay prior to the merger,

19   which had not yet become products -- and you

20   will hear this.  You will hear the word

21   "projects" and "products" throughout this

22   trial/hearing.  A project, as you will hear, is

23   something that was in the lab at Bay but had

24   not yet become a product that was distributed

1    by Bay.  So a project becomes a product once it

2    becomes distributed.  So what the parties

3    discussed was that projects that were actually

4    in the lab at Bay being developed to be a

5    product that Bay was intending to release or a

6    product that actually had been distributed by

7    Bay would be covered under the agreement that

8    would be reached as a, quote, "product

9    originating at Bay."  And that's a defined

10   term.  That's a term in Schedule 1A, "products

11   and projects originating at Bay."  And that was

12   the discussion.  And the parties agreed that

13   SNMP Research would honor the prior royalty

14   buy-out terms so long as those products were

15   identified by Nortel as Bay products licensed

16   by being placed on product-specific schedules,

17   per the master license agreement, and license

18   and maintenance fees paid.

19            So the deal the parties discussed

20   and agreed to was that Nortel would have three

21   years to identify the Bay products that

22   originated at Bay on per-product schedules and

23   could distribute the products royalty-free

24   during that time, but would have to have those

1    Bay products on product-specific schedules in

2    order to have them properly licensed and to

3    enjoy the royalty buy-out terms after the

4    expiration of that three-year term.  So they

5    had three years to do it.  SNMP Research gave

6    them three years to identify these Bay

7    products, put them on schedules, license them,

8    pay the licensing fee and maintenance fee.  And

9    if they did that, then as long as they were a

10   product that originated at Bay, that it was a

11   product distributed by Bay or was actually in

12   the lab at Bay as a project, they could then

13   distribute that royalty-free forever, until the

14   product aged out of the system.  But they had

15   to be on a schedule and it had to be a product

16   that originated at Bay.

17            Now, this was all discussed

18   between the parties and understood, and Jeff

19   Case, Dr. Case will be here to tell you so.

20            Rick Barnes -- remember, Rick

21   Barnes was outside counsel to SNMP Research,

22   who was present at that meeting -- was tasked

23   with then drafting Schedule 1A based upon the

24   discussion of the parties at the October 5 and

1    6 meeting.

2                Now, Nortel has speculated in

3    papers submitted to Your Honor and at last

4    week's hearing that the deal struck was not

5    what SNMP Research says it was but that the

6    deal was actually that those Bay products and

7    products that derived from Bay products would

8    enjoy the royalty buy-out forever and that

9    Nortel was free to develop and distribute those

10   products forever without having to identify

11   them on schedules and license them.  Basically,

12   what they are saying is the deal was not what

13   we say it was but the deal was actually that

14   any product that came from Bay or any

15   derivative product that was made from an atom

16   that started at Bay could be distributed

17   royalty-free forever without having to be

18   placed on schedules and that the deal that we

19   say was struck was not struck.

20                Now, mind you, Your Honor, they

21   have absolutely no internal email at Nortel

22   that says so.  And they have not one Nortel

23   witness that says so.  But they base that

24   solely on the fact that Schedule 1A as drafted

1    has in the royalty section -- Your Honor will

2    recall this from the hearing last week -- a

3    reference to the prior Bay agreements in the

4    royalty section.  The undisputed evidence at

5    this hearing -- you will hear this from

6    Dr. Case -- will show that the reason there is

7    the reference to prior agreements in the

8    royalty section is because, as I stated

9    earlier -- and I mentioned this is very

10   important and now I am tying it back in, Your

11   Honor -- there was still money owed under the

12   royalty buy-out for the manager component, the

13   ARL component of the royalty buy-out.  So

14   therefore, there had to be a reference, because

15   it was not that nothing was owed during this

16   term.  Nortel still had to pay for that amount

17   that was owed under the ARL royalty lease in

18   order to be able to enjoy this product for this

19   time period.  That was what was agreed, and

20   that's why there is that reference.

21              And by the way, internal emails

22   from Nortel, David Hyslop, shows that.  So one

23   such email is August 25, 1999, which is Exhibit

24   P-32.  It is between Dave Hyslop and John

1    Southwood.  And in it Dave Hyslop acknowledged,

2    and Mr. Southwood agrees, that Bay-Nortel still

3    owed SNMPRI $40,000 on the royalty buy-out.

4              Finally, as we will show You, the

5    language of Schedule 1A is clear that all

6    rights to develop and distribute Bay products

7    with the software terminated in three years.

8    So a royalty buy-out meant nothing without the

9    right to develop and distribute the software.

10   Nortel's argument, Your Honor, is like saying

11   that if you lease a car from an automobile

12   dealership and you have a three-year lease and

13   it says you have unlimited miles, that the

14   reference to unlimited miles means the three

15   years doesn't apply and you could just keep the

16   car forever.  That's the analogy to what they

17   are saying.

18             There was a specific three-year

19   termination of rights to develop and distribute

20   products.  They want to ignore that language,

21   and you can't.

22             Indeed, we will show Your Honor

23   that this is just not SNMP Research saying

24   these things, but Dave Hyslop, Nortel's own



 1      corporate representative, the one who signed

 2      Schedule 1A, says it, too.  So in several

 3      emails after this October meeting at SNMP

 4      Research Dave Hyslop specifically says that for

 5      the Bay products, the royalty buy-out is

 6      relevant to royalties only and that Nortel has

 7      to license on a product-by-product basis the

 8      right to use EMANATE.  He also sent

 9      spreadsheets identifying products as either Bay

10      or Nortel.  And Nortel entered into schedules

11      for both types of products, including products

12      he represented to be Bay products.  That is

13      completely ignored by the US Debtors.

14                  Specifically, in a November 3,

15      1999 email, which is Exhibit P-36, between

16      Mr. Hyslop and Mr. Southwood, Mr. Hyslop -- and

17      P-37 -- Mr. Hyslop attaches a spreadsheet and

18      identifies products either as Bay or NT for

19      Nortel.  Then on November 15, Mr. Hyslop in

20      Exhibit P-38 and again on November 25, 1999,

21      P-42, in an internal email reiterates that the

22      Bay buy-out is a buy-out for royalties only and

23      Bay must still on a product-by-product basis

24      get the right to use the EMANATE software.

1              And Your Honor might recall that

2    one of the key pieces of so-called extrinsic

3    evidence relied upon by the US Debtors was

4    Mr. Southwood's November 16 response to

5    Mr. Hyslop's email, P-39.  Mr. Southwood will

6    be here to tell you there is absolutely nothing

7    in this email that supports Nortel's position.

8    He will tell you that he said that Mr. Hyslop

9    had the deal pretty well described based upon

10   Mr. Hyslop's reference to the need to identify,

11   schedule and license Bay and Nortel products

12   and pay additional run-time royalties on the

13   Nortel products.  And he was making clear to

14   Mr. Hyslop that Nortel had three years to

15   identify the Bay products.

16              He will also tell you that he

17   intended to make clear that the projects that

18   had begun at Bay or products distributed by Bay

19   would qualify for the royalty buy-out so long

20   as those products were placed on schedules.  He

21   will tell you that he did not reiterate the

22   need to put those products on schedules because

23   Mr. Hyslop and he had been working on the

24   schedules and he felt that it was contained in

1    Mr. Hyslop's email, so there was no need to

2    repeat it.

3                    And Mr. Hyslop notes in that same

4    email that it is the master license agreement

5    that will govern all transactions, and it is

6    the November 15 email to which Mr. Southwood

7    was responding.  And in that email Mr. Hyslop

8    specifically references the master license

9    agreement that governs the transaction, and the

10   master license agreement is where the

11   requirement to enter into schedules is

12   referenced.  And that is P-30.

13                   And how do we all know that

14   Mr. Hyslop knew about the need to enter into

15   schedules?  Well, he signed the master license

16   agreement that says schedules have to be

17   entered into, and he not only entered into

18   schedules on products for Nortel products; he

19   also identified and entered into schedules for

20   Bay products, and those schedules include

21   Schedules 14 and 20.  And, indeed, on Schedule

22   20 he entered into a schedule, paid a license

23   fee, and complained when John Southwood made a

24   mistake and was going to charge him royalties,

1    pointing out it was a Bay product.  Yet he

2    still licensed it and he paid the licensing fee

3    on a schedule, recognizing the need to do so.

4              Indeed, Your Honor, there are two

5    other schedules, Schedule 60 and 64.  And

6    shortly after Schedule 1A terminated, Nortel

7    came to SNMP Research and said, "We neglected

8    to put one of the products on a schedule.  It

9    is a Bay-originating product.  Will you agree

10   to allow us to put it on a schedule?"  And SNMP

11   Research out of the goodness of their heart

12   agreed to do so.  But that shows that Nortel

13   fully understood the need to do so.

14              Also, Your Honor, it is important,

15   I want to point out, that Nortel has been

16   arguing that certain actions by SNMP Research

17   somehow might waive or create an implied-in-

18   fact contract or something along those lines.

19   But the parties specifically contracted to

20   avoid against that exact argument and

21   eventuality.  In the Nortel master license

22   agreement, paragraph 9.4, the contract states

23   that the attached schedules as may be modified

24   -- "The attached Schedules A, as may be

1    modified in accordance with terms herein, form

2    part of this Agreement.  This Agreement may

3    only be modified by an instrument in writing

4    mutually agreed upon and executed by each

5    Party's duly authorized representatives"; and

6    furthermore, in paragraph 9.8 that "Failure to

7    enforce any provision of this Agreement is not

8    a waiver of such provision."

9              Now, just a few last points that I

10   want to make, Your Honor.  Nortel has come up

11   with a few different arguments and points, and

12   I will show you what the evidence will show

13   with respect to those.

14             First, Nortel has been saying that

15   the Bay products that Mr. Hyslop identified on

16   schedules were not really Bay products or that

17   it was something else being licensed.  But

18   that's not what the representation to SNMP

19   Research was at the time.  And SNMP Research

20   took Mr. Hyslop's representations at face value

21   and if he said it was a Bay product, SNMP

22   Research treated it as a Bay product.  If

23   Nortel and Mr. Hyslop defrauded SNMP Research

24   back then and got the benefit of a royalty

1  buy-out when they shouldn't have, then that was

2  on them, but they can't now point to that and

3  try to use that to say that somehow it wasn't a

4  Bay product.

5           So that brings us to the language

6  of both agreements, Your Honor.  Not to belabor

7  the point, but the master license agreement

8  clearly identifies the need to enter into

9  schedules, and Schedule 1A tracks everything

10  you will hear at this trial was the deal.  It

11  covers products and projects that originated

12  with Bay.  It terminates the Bay agreement as

13  amended, and it says that the license will

14  terminate and will be of no further effect

15  three years after execution.

16           Thus, as of the execution of

17  Schedule 1A, the prior Bay agreement was

18  terminated.  The temporary assignment had ended

19  on November 1, which had, in fact, terminated

20  all Bay rights as well, and therefore, the only

21  rights to develop or distribute the Bay

22  products lasted for three years, until the

23  termination of the schedule.  As I have stated

24  numerous times, a royalty buy-out does not do

1    anyone any good if there is no right at all to

2    develop or distribute products, and there was

3    no right after three years from June 20 of

4    2000.  Jeff Case will be here to tell you what

5    was discussed about the terms and that the

6    reference to the Bay agreement in the royalty

7    section was done because Bay-Nortel still owed

8    money to SNMP Research under that royalty

9    buy-out.

10              Now, the master license agreement

11   agreement, Your Honor, was signed on December

12   23, 1999, and Schedule 1 was circulated to be

13   re-signed.  Mr. Hyslop signed and faxed back

14   Schedule 1A without any changes to it, not one

15   change.  It was crafted by Rick Barnes, sent to

16   Dave Hyslop with this clear language in it, and

17   boom, he signed it.  Not a question about the

18   three-year term, not a question about the

19   termination of the schedule itself, not a

20   question about the termination of development

21   and run-time license rights after three years,

22   not a question about anything.  Because it was

23   faxed in -- apparently we had a problem with

24   faxes.  Because Mr. Hyslop's signature was

1    actually faxed in back in February of 2000 and

2    it was not electronically sent, apparently SNMP

3    Research, Dr. Case, may not have known that he

4    had received the signature.  So on May 15 of

5    2000 Dr. Case wrote to James Reeves in the

6    email that was referenced at the May 2 hearing

7    to ask him to get Dave Hyslop to send in the

8    executed Schedule 1A.  In that email Dr. Case

9    said specifically without the signed

10   Schedule 1A, Nortel was distributing the Bay

11   software without a license.  That's crucial.

12   He told them unless and until you sign

13   Schedule 1A, you don't have a license to

14   distribute the Bay products without Schedule 1A

15   being signed.

16            Neither James Reeves nor David

17   Hyslop wrote back to say, "What are you talking

18   about?  We have a royalty buy-out.  We can

19   distribute these products forever.  We don't

20   need anything from you."  No.  Dave Hyslop

21   responded by sending in another -- a signed

22   version of Schedule 1A.

23            And at the hearing Nortel's

24   counsel made a big deal about Dr. Case's

1    statement in that email that it did not cost

2    Nortel anything to sign Schedule 1A and made a

3    big deal, if Your Honor recalls, about the

4    failure to note in the email the three-year

5    term.  But why would Dr. Case note that in an

6    email to James Reeves simply asking Dave Hyslop

7    to sign the document?  Dave Hyslop was the one

8    that negotiated the deal.  He knew what the

9    terms were.  He knew about the three-year deal.

10   He knew what the terms of the deal were.  There

11   was no need for Dr. Case to reiterate all the

12   terms in the email.  Now, how do we know?

13   Because Dr. Case will be here to tell you that.

14               Now, so what is left to discuss?

15   Just of couple of things.  The US Debtors argue

16   that a 2004 software service renewal and a 2006

17   letter from John Southwood is evidence that the

18   parties agreed somehow to extend Schedule 1A

19   beyond the three-year term.  Not so.  The

20   undisputed evidence will show that the software

21   service agreement renewal was of a ten-year-old

22   software service agreement.  The person sending

23   out the renewals at SNMP would not have any

24   idea of the terms of Schedule 1A, and there is

1    nothing on the SSA that in any way references

2    Schedule 1A.

3              It is also undisputed that the

4    software was not even used by Nortel.  And

5    furthermore, Your Honor, in the agreements that

6    SNMP Research and Nortel have entered into, it

7    is very clear that the software service

8    agreement is a separate contract and the terms

9    of the license between the parties control.

10             As far as Mr. Southwood's 2006

11   letter is concerned, Mr. Southwood was writing

12   to tell Nortel why they did not have a license

13   for the product at issue and made a comment

14   about Schedule 1A without looking at it,

15   without recalling six years after it was

16   entered into that it had a three-year

17   termination date.  Mr. Southwood will tell you

18   that in 2006 Nortel was not a customer he was

19   dealing with much, and he was involved with 500

20   or so or more transactions.  The purpose of his

21   letter was to tell them why they didn't have a

22   license, and he simply made a mistake with

23   respect to his reference to Schedule 1A.

24             Now, with respect to whether

1    Mr. Southwood understood and knew that

2    Schedule 1A did, in fact, terminate in 2003,

3    what do the US Debtors not tell you?  They

4    pointed to this 2006 email from Mr. Southwood,

5    but what they did not point to -- and I raised

6    at the hearing on May 2 -- was that shortly

7    after Schedule 1A terminated -- it terminated

8    in June of 2003 -- in July-August of 2003, SNMP

9    Research and Dave Hyslop's replacement, Pierre

10   Tremblay, were going through the different

11   schedules, and a couple of very important

12   emails were sent at that time that will be put

13   into evidence.

14             One, Pierre Tremblay specifically

15   at P-57 and P-58 told Mr. Southwood that at the

16   time that there was no products that had

17   originated with Bay that were being distributed

18   by Nortel; very important.  Furthermore, Your

19   Honor, you will hear that this statement by

20   Pierre Tremblay and others at Nortel were

21   repeated up through the asset sale, as I

22   mentioned earlier.

23             Furthermore, Your Honor, you will

24   see an email from John Southwood where he

1   specifically describes the need in August of

2   2003 to enter into these schedules during this

3   three-year period and that the parties agreed

4   that schedules would be entered into and that

5   the concern was that without the schedules,

6   that the lines would blur between Bay and

7   Nortel products and Nortel would try to claim

8   that all the products were Bay products and try

9   to get the benefit of this royalty buy-out.  He

10  was prescient because that's exactly what has

11  happened.  And that email will be placed before

12  Your Honor as well.

13              What is apparent, Your Honor, what

14  we will show you is the arguments you will hear

15  from Nortel in the next two days are

16  litigation-inspired.  Nortel after 2003 created

17  new families of products, ES products and ERS

18  products that are at issue in this case, made a

19  fortune off of them without paying SNMP

20  Research a dime.  They engaged in wholesale and

21  willful copyright infringement and act as if

22  SNMP Research software is worthless.  It is

23  not.

24              At the same time Nortel was



1    involved in this behavior, SNMP Research was in

2    the middle of negotiations to license its

3    software to Cisco Systems, and that is

4    Plaintiffs' Exhibit No. 66.  And I don't want

5    to say in open court what the amount of the

6    license was, but Your Honor has that in front

7    of you, and it is substantial, and it shows the

8    value of SNMP Research's software.  It is

9    incredibly valuable.  And SNMP Research would

10   never agree to allow a company like Nortel to

11   use it forever without licensing and without

12   paying royalties.

13              Finally, Your Honor, you will hear

14   from a purported expert testifying for Nortel

15   that Schedule 1A does not mean what it says

16   because he would have expected certain other

17   provisions to be in it, such as what to do with

18   products in distribution and what to do with

19   software after rights were terminated, even

20   though the parties did deal with the former in

21   the master license agreement.  They dealt with

22   how to deal with products in distribution:  Put

23   them on schedules, and also dealt with the

24   latter as well by saying what to do with the

1    software after the license terminates.

2                You will also hear from him that

3    his primary issue, that his main issue in his

4    opinion, what underlies his opinion is the idea

5    that Nortel had a right to use the software in

6    the Bay products forever, so it would not have

7    agreed to limit that right.  As I pointed out,

8    he is just factually and legally wrong.

9                You will hear from David Tollen,

10   who I will tell you, Your Honor, has much more

11   experience in this industry than Dr. Razgaitis,

12   with all due respect to him, and he will tell

13   you that nothing Dr. Razgaitis has to say is

14   actually custom and practice of anything in

15   licensing software.

16                Thank you, Your Honor.

17                THE COURT:  All right, Mr. Busch.

18   Thank you.

19                Yes, Mr. Herrington.

20                MR. HERRINGTON:  Your Honor, we

21   have some exhibits that have been admitted, and

22   I would like to hand up a binder to Your

23   Honor --

24                THE COURT:  All right.



```
1                    MR. HERRINGTON:   -- to facilitate
2        following along.
3                    THE COURT:  Sure.  Thank you.
4                    MR. HERRINGTON:  Your Honor, may
5        it please the Court.
6                    THE COURT:  Yes, sir.
7                    MR. HERRINGTON:  David Herrington,
8        of Cleary Gottlieb, on behalf of the US
9        Debtors, and along with my colleagues here
10       today, we look forward to presenting the
11       evidence to Your Honor.  And we thank Your
12       Honor for taking the time to hear it.
13                    As we preview the evidence, let's
14       start with one important fact.  Schedule 1 and
15       the master Nortel license agreement were
16       negotiated and signed 17 years ago.  That's
17       important when we think about the two kinds of
18       evidence that are available to us and will be
19       presented to Your Honor.
20                    Number one is contemporaneous
21       written records, what the parties said to each
22       other and what they did back 17 years ago.
23       That was realtime.  That was before litigation.
24       And, Your Honor, you can see it for yourself.
```



1    You don't have to take somebody's spin.  You

2    can look at these documents for yourself.  And

3    of course, the most important one is Schedule 1

4    itself.

5              Now, the second type of evidence

6    is people coming into court 17 years later and

7    talking, telling Your Honor how to interpret

8    the written documents -- which, number one, I

9    don't think is actually admissible or

10   probative, but it certainly isn't very

11   meaningful -- and trying to tell us what they

12   think they remember, what they think they can

13   reconstruct from 17 years ago.

14             Now, Your Honor, even with the

15   best intentions, that kind of looking back 17

16   years is not very reliable.  But, Your Honor,

17   it is important and it is obvious this

18   testimony that people are going to come in and

19   give today is in the framework of litigation.

20   You know, SNMP actually said in their papers

21   Dr. Case has spent millions and millions of

22   dollars on this lawsuit.  And the claim they

23   are pursuing is a claim for $96 million.  And

24   that claim for $96 million depends on their

1    theory, their argument that, in Dr. Case's

2    words, Schedule 1 went poof -- those are the

3    words he used, "went poof" -- in June of 2003.

4    Well, Your Honor, fortunately, we have a

5    contemporaneous documentary record.  And one of

6    the things I would like to do this morning is

7    just to go over some of the key points of that

8    record.

9              Another thing I would like to do

10   is introduce Your Honor to the cast of

11   characters, the names that you will be hearing

12   over the course of the day; and then three is

13   to highlight some questions that we would

14   suggest Your Honor should keep in mind as this

15   evidence is being presented.

16             So number one, the documents.  And

17   again, let's start with Schedule 1.  That's the

18   most important document in the case.  What does

19   Schedule 1 do?  And let me just make a note,

20   there is some remark by counsel for SNMP that,

21   well, you always needed a schedule.  You needed

22   a schedule to get a license.  Well, Schedule 1

23   is a schedule, and it does something.  And

24   let's talk about what it does.

1               It refers to and incorporates the

2       royalty buy-out of the Bay Networks license.

3       And by the way, that was a buy-out that Bay

4       paid $100,000 for with respect to the software

5       at issue here, and that gave Bay the right to

6       use that software forever for any products it

7       developed whenever.  It was limited to Bay's

8       locations in Santa Clara, California, and in

9       Massachusetts, but it covered anything forever,

10      not just what they developed this year or that

11      year; what they developed into the future.  And

12      that was all for $100,000.  And if we ever get

13      to damages, we will ask Your Honor to compare

14      that to the claim for $96 million that SNMP is

15      making in this case.

16               So, Your Honor, Schedule 1 is one

17      of the things that we handed up.  It is in Tab

18      2.

19               THE COURT:  Yes.

20               MR. HERRINGTON:  In this hearing

21      it has been marked as Exhibit D-7.  By the way,

22      you will see D-7C.  We do 7A, 7B, 7C.  They are

23      multiple copies of the same document.  7C is

24      simply the clearest copy, so that's why we are

1    using that.

2                So what does Schedule 1 do?  It

3    defines specified product or project, what are

4    the products that are going to get the benefit

5    and the projects that will get the benefit of

6    Schedule 1.  And that is defined as "all

7    products of units and projects originating from

8    what was Bay Networks."  And there is no

9    dispute that the BayStack switches we are

10   talking about here were products that

11   originated from what was Bay Networks.

12               Number two, it refers to in

13   development software, again refers back to the

14   Bay Networks license.  Number three, very

15   importantly, in royalties, what is going to be

16   paid for the rights to use this software, it

17   refers back to the Bay Networks license, which

18   provided for these royalty buy-outs, the right

19   in perpetuity to use this software.

20               Now, it could have said zero.  It

21   could have said this is a temporary license.

22   SNMP is very intent on this temporary license

23   idea.  It could have said this is a three-year

24   temporary license.  That's not what it said.

1    It defined products and projects coming from

2    Bay and it referred back to the royalty buy-out

3    provisions or the Bay license, which had these

4    royalty buy-out provisions.  And what does that

5    give to these products and projects?  The right

6    in perpetuity to use the software.

7              And again, Schedule 1 has the

8    language of additional conditions.  "This

9    Schedule supersedes all of the prior agreements

10   between SNMP and Bay," and "This Schedule and

11   the license in regard to the Development

12   Software and Run-Time Software shall terminate

13   and be of no further effect after a period of

14   three years. . . ."  So if something comes

15   along after three years, it doesn't get the

16   benefit of Schedule 1.  For those products and

17   projects that existed during that three-year

18   term, yes, they get the benefit of Schedule 1.

19             THE COURT:  How about the fact

20   that the license fee is zero dollars?

21             MR. HERRINGTON:  Well, Your Honor,

22   that's a very good point.  Let's talk about

23   license fees.  Bay had already paid the license

24   fee for the EMANATE software.  I think it was

1   $68,000.  And so there was no need to pay an

2   additional license fee.  And let's contrast

3   that -- I am getting a little bit ahead of

4   myself.  But SNMP, Inc. and International like

5   to talk about the new schedules.  Every

6   reference to those new schedules reflects that

7   this was a new project being undertaken by a

8   group, and they needed to pay a license fee

9   because they didn't already have the

10   development software, the source code.  You see

11   that in the emails.  You see it in Schedule 1.

12   Schedule 1 -- and all those groups started out

13   with an evaluation license, again, showing this

14   was a group that wasn't already using the

15   source code that had been paid for and obtained

16   already.  They were doing something new.  And

17   that's what a license fee is for.  It is paying

18   for that source code you are going to use in

19   development.

20          Well, let's contrast that with

21   Schedule 1.  The BayStack group had already

22   paid for that software.  They already got it

23   years ago.  They incorporated it into their

24   product years ago.  There was nothing more they

1   needed to buy and nothing more they needed to

2   pay for.

3                   So, Your Honor, again, once one

4   understands -- in SNMP's pretrial brief they

5   said, well, we don't think Schedule 1 actually

6   incorporates the Bay Networks license.  Well,

7   of course it does.  It says for royalties, look

8   back at the Bay Networks license.  How much

9   more definitively can you incorporate the Bay

10  Networks license?  You have to go back to it to

11  see what it provided.

12                  Now, let's talk about

13  International's new interpretation, the idea

14  that what Schedule 1 really did is took

15  existing products and stripped them of their

16  right to use the software that was already

17  incorporated into them.  Now, what is wrong

18  with that?  Number one, it ignores the royalty

19  buy-out that was provided by the Bay Networks

20  license and incorporated into Schedule 1, and

21  it creates a problem, which is what is done

22  with this software and what was done with the

23  BayStack products is you take it when you are

24  developing your product -- in this case it is

1    an ethernet switch.  There is a common core

2    code base, the software, that does all the

3    things that a switch needs to do.  The SNMP

4    protocol is just one of hundreds of features

5    that will be included in that switch.  So you

6    integrate that software into the core code

7    base.

8              And if you were faced with a

9    prospect with your existing products, these

10   BayStack products, that you are going to hit a

11   three-year mark and actually be told, guys, you

12   have two choices.  You can strip your software,

13   the SNMP software out of this product -- and

14   actually, Avaya had a separate litigation with

15   SNMP, and that's going to be discussed in

16   testimony from one of the engineers who was at

17   Bay, then Nortel, then to Avaya.  They finally

18   just did that, and it took over a year and a

19   huge amount of effort to strip this SNMP

20   software out of the product.  And the reason is

21   not because the software is so particularly

22   valuable.  It is woven into the rest of the

23   software, and so to try to pull it out, to try

24   to extricate it is expensive and it is



1   difficult.  The engineer actually agreed with
2   the analogy that I gave at the hearing last
3   week.  It is like pulling one thread of fabric
4   from a tweed jacket.  Not that that one thread
5   of fabric is so important to the jacket, but if
6   you are told you have to find it and pull it
7   out, yes, that's difficult.
8           So if that's what Schedule 1 was
9   meant to do, what SNMP says, is at the
10  three-year mark they make you lose your rights,
11  then you would include right there in
12  Schedule 1 some mechanism for moving beyond the
13  three-year mark.  Otherwise, where you are left
14  is where SNMP is arguing that Nortel is now
15  facing:  A claim for $96 million.  I will let
16  you keep using my software.  Just write that
17  check for $96 million.  Of course, nobody is
18  going to put itself in that position.
19          Now, let's talk about SNMP's new
20  schedule argument.  There is a few problems
21  with it.  Number one is that Dr. Case says,
22  actually, Nortel didn't have a right to execute
23  a new schedule.  It would just depend if I felt
24  like it.  And he told us, "I wouldn't have felt

1    like it for the BayStack products."  That's the

2    whole premise, that's the linchpin of their

3    $96 million damage claim is, like, "No, you

4    couldn't just sign a new schedule and pay a

5    license fee of $30,000.  I would have refused

6    that.  You would have to come to me with a big

7    checkbook if you wanted to keep using this

8    software."  If that's not true, then their

9    damage claim for $96 million, which has a huge

10   defect in it already, just doesn't work at all.

11   So in trying to defend that claim, he tells us,

12   "No, Nortel didn't have a right to execute new

13   schedules.  It was just if I felt like it.  And

14   I wouldn't have felt like it for the BayStack

15   products."

16           But let's talk about the four

17   schedules that were executed.  Each one, again,

18   was for something new.  It was a group that was

19   developing a new project.  Two of them were

20   this group called Micom, which actually was a

21   separate company, so maybe they were merging

22   their technology with some technology from Bay,

23   and I think that's probably the case.  But they

24   certainly weren't just a legacy Bay project and

1    group.

2                 The other two were from

3    Richardson, Texas.  Again, that wasn't a Bay

4    location or a Bay group either.  So they may

5    have incorporated some Bay technology, but it

6    certainly wasn't a legacy Bay product.  But the

7    important thing is that they were new.  And

8    because they were new, they needed to purchase

9    the source code.  That's what Schedule 1

10   provides.  And the price for that source code

11   is set out as the license fee.

12                 Again, the BayStack group, they

13   didn't need to buy or obtain any source code.

14   They already had it, and they got it years

15   before, and they used it to develop their

16   product years before.

17                 The other thing that the new

18   schedules would do is set up an SSA for the

19   software that was being used by whatever group

20   was covered by the new schedule.  Again, the

21   SSA is a software support agreement that

22   provides for updates and support.  So every

23   year, if you keep paying for it, you get the

24   new, updated version of the software.  You can

1    call up International and ask questions and

2    they will support the software.

3                    Well, the BayStack group already

4    had an SSA, and, in fact -- and this is one of

5    the problems with International's arguments --

6    they kept paying for that SSA year after year,

7    long after the June 2003 end of the

8    Schedule 1's three-year term.  So that's

9    another thing that a new schedule would be

10   needed for, and there is no need for that with

11   the BayStack group.

12                   What none of those new schedules

13   did do is address a circumstance like here:  A

14   legacy Bay product that already got the source

15   code, already used it, already exists, already

16   has an SSA, and it was absolutely covered by

17   Schedule 1.  There is no dispute about that.

18   So there was no need for a new schedule, and

19   there was no suggestion that there should be a

20   new schedule for these existing BayStack

21   products.

22                   And Dr. Case knew all about the

23   BayStack products, and he knew about the

24   engineers who were responsible for them.  And

1    that's one of the things we will talk about as

2    we introduce the characters.

3                So, Your Honor, with that

4    background, let's just go quickly through some

5    of the key documents.  First one is Tab 5, and

6    that's Exhibit D-76C.  This is where John

7    Southwood, who was the point person, the

8    principal negotiator for International, is

9    writing about what became Schedule 1.  So in

10   the second paragraph he says, "Rick Barnes, our

11   counsel, is crafting the final Bay transfer to

12   Nortel based on the previous term which expired

13   November 1.  I told him that the royalty buy

14   out would expire in three years.  I thought we

15   agreed to that in our conference room."

16               And that goes to the key question

17   here that what International points to is that

18   the basis for their argument is, oh, Schedule 1

19   says it will terminate in three years.  Well,

20   Mr. Southwood explains what that means.  He

21   states, "By expire I mean that new

22   products/projects brought on line after three

23   years would address royalties on their own

24   merit."  So if you come along after three

1    years, you are not covered by Schedule 1.

2              But the next sentence explains

3    what happens if you are in existence during

4    those three years.  "Current Bay products and

5    development projects for the next three years

6    will take advantage of the lifetime royalty buy

7    out until their products have aged out of the

8    marketplace."  That's exactly what Schedule 1

9    says and what it does.

10             Now, International has now taken

11   to say, well, maybe what I just read doesn't

12   apply to Schedule 1.  Maybe it is describing

13   something else.  Well, remember, Mr. Southwood

14   was referring to the Bay-to-Nortel transfer.

15             THE COURT:  Yes.

16             MR. HERRINGTON:  Less than 48

17   hours later -- and this is Tab 6 -- he sends

18   Schedule 1 to Mr. Hyslop, and he has it in the

19   subject line, "Here is the permanent Bay to

20   Nortel transfer."  So when he said in this

21   email 48 hours earlier the Bay to Nortel

22   transfer, he is clearly talking about

23   Schedule 1.

24             Now, let's turn to Tab 7.  That is



1    D-77B.  This is an email from Jeff Case to

2    James Reeves.  And James Reeves is one of the

3    important names that we want to introduce to

4    Your Honor in the hearing today.

5                    THE COURT:  From James Reeves to

6    Dr. Case.

7                    MR. HERRINGTON:  The second one is

8    from James Reeves to Dr. Case, but it is

9    replying --

10                    THE COURT:  Oh, yes --

11                    MR. HERRINGTON:  -- to an email

12    from Dr. Case to James Reeves.

13                    THE COURT:  Yes.  I see, yes, yes.

14                    MR. HERRINGTON:  And there are a

15    few things that this reflects.  Number one is

16    Mr. Reeves and Mr. Case are friends.  They go

17    way back.  James Reeves is the lead engineer at

18    Bay Networks who brought in Dr. Case in the

19    first place, who brought in the use of SNMP

20    Research software and put it in the BayStack

21    products.  Okay?

22                    Dr. Case talks about spending

23    all-nighters in the office at Great America

24    Parkway with James Reeves and his BayStack



1    team.  They go way back, and they are friends,

2    and that's reflected in this email.  They

3    congratulate each other on their promotions, on

4    their move and so forth.

5              But Dr. Case refers to Schedule 1,

6    and he says, "Schedule 1, the document that

7    grandfathers the Bay licenses over to the new

8    Nortel master agreement. . . ."  Now, he is

9    talking about the fact that it hasn't been

10   signed yet, but he is saying Schedule 1 is the

11   document that grandfathers over the Bay

12   Networks license, which, of course, it does.

13   That's the whole premise of our understanding

14   of Schedule 1.  And evidently, he had spoken

15   about Schedule 1 to James Reeves earlier, when

16   they met at a trade show convention in Las

17   Vegas.  And he goes on two lines down to say,

18   "I was correct when I told you that the cost is

19   $0."

20             So what does he not say?  He

21   doesn't say, "James Reeves, my friend,

22   Schedule 1 will only get you so far.  You

23   better sign a new schedule."  He also doesn't

24   say, "When I say the cost is zero dollars, I

1    actually didn't mean that.  I meant at the very

2    least you had to execute another schedule and

3    pay a license fee."  Hmm, he doesn't say that.

4    And he sure as heck doesn't say what SNMP

5    Research is now saying in this court, which is

6    "Actually, my friend James Reeves, in three

7    years, when you are stuck, when Schedule 1

8    expires, according to our interpretation, you

9    are going to owe me tens of millions of

10   dollars."  What did he say?  He said, "The cost

11   to you is zero dollars."

12              Now, Your Honor, those are

13   statements made realtime when Schedule 1 was

14   being negotiated, when it was being signed.

15              Let's also look at SNMP Research's

16   own actions under Schedule 1.  Number one is

17   that going back to the SSAs -- these are Tabs 9

18   and 10.  These are the software support

19   agreements for the exact software that is

20   covered by Schedule 1.  So if International

21   really held the belief that they are presenting

22   today that there is no right to use that

23   software under Schedule 1, then those SSAs

24   should have come to a screeching halt in June

1    of 2003.  They did not.  They went on year

2    after year with International pursuing Nortel

3    and saying remember to get your SSA.  It is

4    important.  You will get the updates to this

5    software.  And in exchange, International

6    charged Nortel $7,800 a year and received that

7    money and in exchange provided the software

8    that is covered under Schedule 1.  Now, there

9    are other SSAs under other schedules, but this

10   is the SSA that can only exist under

11   Schedule 1.

12            Now let's look at when the

13   BayStack group actually came to John Southwood,

14   who negotiated Schedule 1, in 2006.  It was

15   January of 2006.  And this is Tab 13, Your

16   Honor.  It is Exhibit D-84.  This is Nana

17   La-Anyane, a member of the BayStack group, and

18   he writes to sales@SNMP and he writes to

19   johns@SNMP, and he states, "Hi.  The EDN group

20   in Nortel recently struck a partnership with

21   Trapeze Networks.  They are using the SNMP

22   engine in their source code, and so are we."

23   So if there was ever any doubt, he is saying we

24   are using your SNMP Research software in our

1    source code.  And he goes on to say for us to

2    collaborate with Trapeze, they just want a

3    letter confirming our right to use that source

4    code.

5                Now, let's turn to Tab 14.  It is

6    an email in this chain, because there is some

7    back and forth between Mr. Southwood and the

8    members of the BayStack team.  And if you look

9    at the first page, down toward the bottom,

10   there is a reference to the Nortel wireless

11   LAN/BayStack group, so it is clear this is the

12   BayStack team.  This is an email from Greg

13   Foster at Nortel, and he is saying do we need a

14   new schedule.  And Mr. Southwood writes -- and

15   this is going back to the top of D-85 -- "It's

16   fair that you raise the questions below, and so

17   I'm pleased that they are on the table.  You

18   may recall that our conversation started out

19   with my questions about which schedule/license

20   that you were working on.  And, I was pleased

21   to learn that it was the 'old Bay license'

22   incorporated into the Nortel license."  That is

23   Schedule 1.  He says I was pleased to learn it

24   in January of 2006, years after this idea that

1      in June of 2003 Schedule 1 went poof.  He

2      doesn't say, "My God, what are you doing?  You

3      are infringing."  He says I was pleased to

4      learn you are operating under the old Bay

5      Networks license that was incorporated into the

6      Nortel license.

7                  And then Mr. Southwood composes a

8      formal letter.  This is Exhibit 15, Tab 15, and

9      Exhibit 78A.  If we could go two pages in.

10     This is a letter to Nana La-Anyane, a member of

11     the BayStack team, at that same Great America

12     Parkway location that Dr. Case described

13     spending all-nighters in.  This is the Bay

14     group.  There is really a remarkable continuity

15     here.  There are engineers, John Mead, Nana

16     La-Anyane, there is another one named John

17     Seligson, who started at Bay, moved over to

18     Nortel and stayed on with this BayStack group.

19     And Nana La-Anyane is one of them.

20                 And what does Mr. Southwood write

21     in his letter?  It sounds like we are going to

22     hear, "Oh, sorry.  I wasn't paying much

23     attention."  He wrote a formal letter.  And

24     what did he state?  Nortel Networks -- let me

1    start again.  "Nortel Networks has a license

2    with SNMP Research International for EMANATE

3    sources running on Windows, Solaris, and

4    VxWorks as referenced under Nortel Schedule 1.

5    That schedule incorporates the paid-up

6    royalties' license previously established by

7    Bay Networks."

8                    There is no way that International

9    can reconcile this formal statement in a formal

10    letter with the argument that they are

11    presenting to Your Honor today, because again,

12    the argument that they are presenting is

13    Schedule 1 went poof in June 2003.

14    Mr. Southwood could not possibly have written

15    this letter.  But the fact is he did.  And that

16    speaks both to what was the parties' operating

17    understanding of Schedule 1 and it also speaks

18    to the implied-in-fact proposition; the fact

19    that even if someone were to say, you know, I

20    think the better reading of Schedule 1 is it

21    went poof in June 2003, when parties operate on

22    the basis that a license, a contract is still

23    in effect, as they did under the SSAs and as

24    Mr. Southwood formally confirmed in January



1    2006, then that creates an implied-in-fact

2    agreement that would take the place and

3    continue to be operative, regardless of what

4    happens with the underlying contract.

5                    Now, Your Honor, I would like to

6    talk about one of the things that counsel for

7    SNMP Research highlighted.  This is D-158.02.

8    Your Honor will probably recall hearing several

9    times counsel for SNMP Research saying that

10   Pierre Tremblay, who came in new to the

11   relationship in 2003, told John Southwood there

12   were no products operating under Schedule 1,

13   made this representation.  Well, let's look at

14   the email.  And we are on page 1 of 9.  And

15   this is a document that goes through the

16   various schedules that are in existence.  And

17   what Pierre says, being new to the

18   relationship, is -- if you see under "Bay -

19   Schedule 1," first there is a line by Martha,

20   who is somebody from SNMP Research, and then

21   there is a line from Pierre, which is Pierre

22   Tremblay.  And he says, "Schedule 1A covers

23   'All products of units and projects originating

24   from what was Bay Networks.'  I still haven't

1   found anything that fits this description but

2   to be honest, I have not yet looked very hard."

3   This is the statement that SNMP Research's

4   counsel says there was a representation by

5   Pierre Tremblay that Nortel is not using

6   software under Schedule 1.  That is not what he

7   said.

8           Now, Your Honor, I am going to

9   come back to that, but, Your Honor, what does

10  SNMP Research say about Schedule 1?  And again,

11  this is after June 2003.  They don't say,

12  "Pierre, stop your search.  It is irrelevant.

13  Schedule 1 went poof in June 2003.  There

14  better not be any products under Schedule 1."

15  They wrote, according to John, John Southwood,

16  as I understand him, Bay has a royalty buy-out

17  on EMANATE sources on WinNT, Solaris, and

18  VxWorks, as well as asynchronous request

19  libraries.  That EMANATE software is exactly

20  what the BayStack group is using.  So they

21  don't say Schedule 1 went poof.  They say there

22  is a license under Schedule 1.

23          But let's go back to this idea

24  that there was some representation that Nortel



1     wasn't using the software.  And again, this is

2     it.  This is the Pierre Tremblay statement that

3     that contention is based on.

4                 But let's go back to what we just

5     looked at, the email exchange where Nana

6     La-Anyane from the BayStack group wrote to

7     Mr. Southwood -- this is Tab 13 -- and said,

8     "The EDN group in Nortel recently struck a

9     partnership. . .They are using the SNMP

10    Research engine in their code, and so are we."

11    So what was the representation?  That this

12    group is using the SNMP Research code.

13                And again, as we looked at in Tab

14    14, D-85, what did Mr. Southwood say?  "I'm

15    pleased that you are operating under the old

16    Bay Networks license that was incorporated into

17    the Nortel license."  And what does he say in

18    Tab 15, the formal letter he writes?  Nortel

19    has a license under Nortel Schedule 1.

20                So this idea that, oh, there was

21    some representation that we are not making

22    products, we are not doing anything under

23    Schedule 1 anymore, Pierre Tremblay's email

24    certainly doesn't say that.  And when Nortel

1    expressly confirmed that they are operating

2    under Schedule 1, Mr. Southwood said he was

3    pleased and confirmed their right to do so.

4                Your Honor, this is the

5    documentary record.  This is realtime.  This is

6    before litigation.  Contrast that with the, oh,

7    I am sorries.  I made a mistake.  That couldn't

8    have been what I meant that I can predict we

9    will be hearing later today.  And again, oh, I

10   made a mistake, that doesn't work with the

11   implied-in-fact agreement.  This Nortel group

12   that makes these BayStack products was

13   repeatedly reassured of their rights to use the

14   software under Schedule 1, both through the

15   renewal of the SSAs and through this formal

16   letter in January 2006.

17               So, Your Honor, with that

18   background, let me briefly preview some of the

19   individuals that we will be hearing about.

20               (Discussion off the record.)

21               MR. HERRINGTON:  Your Honor, if I

22   may approach.

23               THE COURT:  Yes.

24               MR. HERRINGTON:  I am going to



1    give a physical copy, because I am afraid it is

2    a little hard to read.

3                    THE COURT:  It is a little small,

4    yes.  I could probably make it out, but it

5    would be a struggle.

6                    MR. HERRINGTON:  That's not a

7    whole lot better but a little bit better.

8    Okay.  And, Your Honor, actually on the screen

9    now we have got it highlighted.

10                   THE COURT:  Oh, good.

11                   MR. HERRINGTON:  Can we just go

12   through Nortel Schedule 1 Bay with Emerson

13   Monte showing.

14                   Your Honor, this is a document

15   produced from the files of SNMP Research, of

16   International, and what it does is it goes

17   through various schedules under the Nortel

18   license and it identifies people associated

19   with that schedule.  Okay?  And let's look at

20   what it says about Nortel Schedule 1.

21                   If you look three lines down, one

22   of the names that is associated with Schedule 1

23   is James Reeves.  Among the cast of characters,

24   I want to take a minute to talk about James



1    Reeves.  Again, he is the one who traced back

2    to the BayStack days at Bay Networks, brought

3    SNMP Research in in the first place, certainly

4    became friendly with Dr. Case, and was with

5    Nortel well beyond the expiration of

6    Schedule 1.  He stayed through the end of 2004.

7              Next is John Mead.  He was a

8    member of the BayStack team, and Dr. Case knew

9    him as well and worked with him.  This says

10   right in SNMP's own document, BayStack, John

11   Mead, and it also says SSA.

12             So one of the things that I

13   believe International has argued in this case

14   is, oh, those SSAs that we kept renewing,

15   nobody knew that they were under Schedule 1.

16   This is SNMP Research's own document that says

17   Nortel SCH 1, Schedule 1, identifies John Mead,

18   who is on invoices and emails from SNMP

19   Research about the SSAs, and it connects him

20   with the SSAs and with Schedule 1.

21             So this argument that, again,

22   these SSAs, forget about them, they didn't have

23   to do with Schedule 1, doesn't make any sense

24   in the first place, and it is contradicted by

1    SNMP Research's own documents.

2              Next is Nana La-Anyane, again

3    listed -- he is just below John Mead.  And

4    Mr. La-Anyane, I think goes by Michael, which

5    is probably a little easier to pronounce, but

6    Mr. La-Anyane again is a member of the BayStack

7    team, a member of James Reeves and John Mead's

8    team, goes back to the Bay Networks days,

9    stayed with Nortel.  He is the one in those

10   emails and that formal letter in January of

11   2006 who reached out to John Southwood and

12   said, "We are using your software in our

13   products.  Please give us a letter confirming

14   our license," and that led to that January 2006

15   letter.

16              So all of these members of the

17   BayStack team are identified in SNMP Research's

18   own documents as being connected to Schedule 1.

19   So the idea that SNMP was dealing with these

20   people but they had no idea that they were

21   really connected with Schedule 1, again, that's

22   contradicted by their own records.

23              Now, let's talk about some of the

24   other names we will be hearing today.  One is



1   Dave Hyslop.  And we can take this down.  Dave

2   Hyslop, SNMP Research made a representation of

3   we could have brought him in.  That's false.

4   We actually tried to find him.  He was an

5   employee of Nortel Canada.  We asked Nortel

6   Canada if they had contact information for him.

7   They had an old phone number.  They called and

8   it was not working.  So he is not our employee

9   of Nortel US, and even they couldn't find him.

10                  But again, fortunately, Your

11   Honor, we have the documentary record of what

12   was said and done under Schedule 1.

13                  Next is John Southwood.  John

14   Southwood was the point person for the

15   negotiations of Schedule 1 and the underlying

16   master license agreement.  He is an employee of

17   International.  International is a party to

18   those agreements.  You see him in emails.  And

19   we just went through emails and letters from

20   Mr. Southwood as the negotiator of Schedule 1

21   confirming what it meant and how it worked,

22   confirming in January 2006 that it is still in

23   effect with respect to those Bay products,

24   products that trace back to Bay Networks as

 1    defined in Schedule 1.

 2              Now, let's just talk about

 3    Dr. Jeffrey Case.  He is an employee of Inc.,

 4    not the entity that is party to Schedule 1 and

 5    party to the master license agreement.  He is

 6    not on the emails concerning the negotiation of

 7    Schedule 1.  We have that email where he talked

 8    to his friend James Reeves about Schedule 1 and

 9    said it grandfathers in the Bay license and the

10    cost to you is zero, but he is not on any of

11    the negotiation emails.  And yet it sounds as

12    if he will be presented as if he was front and

13    center in these negotiations.

14              And on that, let's call up Exhibit

15    249.  Your Honor, this is an email from John

16    Southwood.  It is called the Southwood activity

17    report.  It is dated October 7 of 1999.  And

18    this is describing a meeting when Dave Hyslop

19    came to the offices of International in

20    Knoxville and they talked through the various

21    issues with the agreement, including

22    Schedule 1.  Remember -- why don't we just go

23    back to it -- that email from Mr. Southwood on

24    November 16 of 1999.  This is D-76C.  I will

1    just read it.  We don't have to go back to it.

2              THE COURT:  All right.

3              MR. HERRINGTON:  But this is the

4    one where he is describing the final Bay

5    transfer, which is Schedule 1.  And he says, "I

6    told him" -- I told your counsel -- "that the

7    royalty buy out would expire in three years.  I

8    thought we agreed to that in our conference

9    room."  And, of course, he goes on to say what

10   it means to expire in three years.  Things that

11   exist in that three years are covered, things

12   that come along later are not covered.  But

13   when he refers to what we agreed to in our

14   conference room, I think this is the only

15   in-person visit by Mr. Hyslop to SNMP Research

16   International.

17              So what does Mr. Southwood write

18   in his report realtime?  He said, "Spent most

19   of the two days" -- he is talking about report

20   for Tuesday and Wednesday.  "Spent most of the

21   two days talking with Dave Hyslop, Nortel.

22   generally a good negotiating session.  Rick was

23   with us for parts of that time."  That seems to

24   be Rick Barnes, the counsel who is referenced.



1    And then he says, "Jeff stopped in yesterday

2    afternoon after Jeff started feeling a little

3    better."  So this idea that Dr. Case was front

4    and center leading the negotiations, we have a

5    realtime document, Mr. Southwood saying, "I

6    spent two days negotiating with Dave Hyslop.

7    Jeff stopped in."

8                    Now, despite that, despite the

9    fact that he wasn't the one sending these

10    emails back and forth, Dr. Case is presented as

11    if he is front and center in this whole story.

12    And in this lawsuit he has really been

13    something of a one-man band.  He has been

14    offered as a fact witness.  He has been offered

15    as a 30(b)(6) witness on every single one of

16    the topics, including those relating to

17    International that he is not even an employee

18    of, and he is offering himself as an expert

19    witness on a number of topics.  None of those

20    topics come into play today, but there are

21    about a half dozen topics that he is actually

22    serving as an expert witness on.  All of the

23    experts on the other issues talked about how

24    Dr. Case would mark up their draft reports, how

1     where did they get the information?  From

2     Dr. Case.  He is the motivating force behind

3     this lawsuit.  And he is obviously heavily

4     invested in it.  Again, SNMP Research's own

5     papers said he spent millions and millions of

6     dollars on this litigation.  And what he is

7     trying to get as the jackpot at the end is this

8     claim for $96 million.  So when we consider

9     Dr. Case's testimony, we have to consider what

10    was his actual role with respect to Schedule 1,

11    with respect to these negotiations, and what is

12    his role in this lawsuit that brings us here

13    today.

14              Now, there will be two expert

15    witnesses.  One is Dr. Richard Razgaitis.  I

16    have confirmed with the good doctor that that

17    is the Americanized pronunciation of his last

18    name, Razgaitis.

19              THE COURT:  Razgaitis.  Thank you.

20              MR. HERRINGTON:  Don't know what

21    it was back in the old country.  But

22    Dr. Razgaitis has had a successful and

23    impressive career.  He started out as a

24    scientist in the Apollo program, following his

1    dream there, and after spending years in that

2    program moved on into the world of -- and the

3    business of agreements like the one that brings

4    us here today, where parties are negotiating

5    rights to technology, to software, to something

6    that may be covered under intellectual property

7    frameworks.  Dr. Razgaitis is a leader in that

8    field.

9              There is a leading organization

10   called the Licensing Executive Society.  There

11   are members all across the country.  They have

12   a national organization.  They have chapters in

13   every state.  I am sure there is one here in

14   Wilmington.  Dr. Razgaitis was one of the

15   executives of that organization.  He also

16   received one of their annual awards for his

17   mentoring, the fact that he is cultivating

18   others who work in this field through his

19   books, through his lectures, through his

20   seminars.

21             And Dr. Razgaitis is here to make

22   a pretty simple point, and that is this:  If

23   you are talking about a situation like we have

24   here, if you are talking about software that is

 1    coming from a third-party vendor that someone

 2    like Nortel -- and actually it was Bay Networks

 3    originally -- is going to take that -- and by

 4    the way, the SNMP protocol, it is an open

 5    standard.  Anybody can write the software that

 6    implements it.  That doesn't belong to SNMP

 7    Research by any means.  There are other vendors

 8    out there who supply it.  There are actually

 9    open source implementations.  You can just

10    start with that.  You have to do a little bit

11    more work, but you can start with this free

12    open source.  But the point is you take this

13    software and you weave it into your code base,

14    as I was saying before.

15              So why is that significant for the

16    debate we are having here today?  Well, again,

17    our understanding of Schedule 1 and the

18    understanding that was confirmed by

19    International, by John Southwood both at the

20    time and years later, is, yes, once you do

21    that, you are fine.  As long as you do it

22    within that three-year window, then your rights

23    continue.  What comes along later when you

24    start from scratch, yes, you are not covered.

1    So at that point you have a decision to make.

2    Do you want to use SNMP Research or not?

3              So what is the problem with the

4    argument that International is making?  Well,

5    Bay already wove this software into the

6    BayStack product code base, and yet

7    International is saying, "Guess what.  At the

8    end of three years you are stuck."  Now, if

9    that were the agreement, that this schedule

10   will only get you three years, then you would

11   have to have something to say what about three

12   years and a day.  I can't be hostage to you at

13   that three-year mark, and it would be right

14   there in Schedule 1.

15             Now, SNMP tries to solve that

16   problem by saying, well, there is these other

17   new schedules.  Again, Schedule 1 doesn't say

18   anything about new schedules.  Nobody ever told

19   the BayStack group they needed a new schedule.

20   Dr. Case didn't tell his friend James Reeves

21   ever that you need a new schedule, so that's

22   just counter-historical.  But again, if there

23   was this escape valve, something to get you

24   beyond the three years, it would need to be

1 | right there in Schedule 1, because

2 | International is saying what Schedule 1 does to

3 | you is it strips your rights after three years.

4 | Dr. Razgaitis is one who has lived

5 | in this field, handled zillions of

6 | negotiations, would say nobody is going to

7 | accept that.  You would have to have the next

8 | paragraph tell me how am I going to get beyond

9 | that three years.  I have woven this into my

10 | product.  How do I get beyond the three years?

11 | It is a pretty simple point.  But having

12 | someone who has lived in this field, who is a

13 | leader in this field, confirm it, that, we

14 | think, is worthwhile.

15 | Now, Your Honor, the last part, as

16 | I said, is some questions that should be kept

17 | in mind as the evidence is coming in.  And I

18 | have got three.

19 | Number one is what did the parties

20 | actually say about Schedule 1.  There is a lot

21 | of talk from the other side about other things,

22 | other schedules, Schedule 12, Schedule 14, what

23 | about this temporary license agreement that no

24 | one can find, did that get signed or not

1    signed.  What is important is what did they say

2    about Schedule 1.  And we have reviewed some of

3    the key parts of that record, and they said it

4    realtime.

5                Now, the second is what did they

6    actually do under Schedule 1.  This yearly

7    renewal of the SSAs that could only be

8    associated with Schedule 1, that provided the

9    exact same software, updates of the exact same

10   software as Schedule 1, that at this point SNMP

11   Research can only say, "Sorry, that was a

12   mistake.  We shouldn't have renewed those year

13   after year.  We shouldn't have charged you.  We

14   shouldn't have collected your money.  We

15   shouldn't have sent you updated copies of the

16   software.  Sorry.  Forget about it."  That is

17   not how it works.

18                Again, this is what they did

19   realtime.  That January 2006 letter when the

20   group is saying, "We are using your software.

21   Please just write us a letter confirming our

22   rights to do that."  If SNMP Research had said

23   back then, "Wait a minute.  Schedule 1 went

24   poof.  You are infringing," I don't think we

1    would be here today.  They would have had a

2    business decision, a business discussion; they

3    would have worked it out.  That's not what SNMP

4    Research did.  They did the exact opposite.

5    They wrote a letter saying yes, Schedule 1

6    gives you the right under the old Bay Networks

7    license.

8              And the third question, Your

9    Honor, is what did International and Inc., SNMP

10   Research, not say or do.  They never told the

11   people operating under Schedule 1, the BayStack

12   team, that they needed to sign a new schedule,

13   never said.  They never told the BayStack team

14   that their product became unlicensed and

15   infringing in June of 2003.  Again, we just

16   talked about the January 2006 letter where they

17   said the exact opposite.

18              Now, Your Honor, this question of

19   what they didn't do, what they didn't say, is

20   especially important with respect to Dr. Case,

21   because after all, Dr. Case goes way back with

22   this BayStack team.  James Reeves brought him

23   in.  James Reeves continued to be a cheerleader

24   for SNMP Research within Nortel.  Dr. Case

1    worked with the rest of the BayStack team, John

2    Mead, Nana La-Anyane.  And yet Dr. Case is

3    telling us this team made up of my friends,

4    they became infringers in June of 2003.

5              Now, why didn't he say anything?

6    Well, he admits, as he has to, he would have

7    said something under his current contention

8    that Schedule 1 is no good after June 2003.

9    Surely he would have said something.  But he

10   says, "I concluded that this BayStack group

11   wasn't using my software anymore.  That's why I

12   didn't say anything."  We are going to address

13   that, Your Honor.  But even before addressing

14   what the actual record is, these are his people

15   he has worked with for years who brought his

16   product into the company, who put it into these

17   BayStack products.  If he thought they had

18   actually decided to pull his software out of

19   their products, to not use it anymore, to go a

20   different direction, wouldn't he ask a

21   question:  "James, my good friend, my

22   cheerleader, you have taken my software out of

23   your products?  What went wrong?"  That never

24   happened.  That absolutely never happened.

1              So this claim that he -- and he

2      admits, "Oh, I just never asked them."  And we

3      know if he had asked them, that he would have

4      been told, yes, of course, it is still in our

5      products.  It is in all our BayStack products.

6      They actually put that in their proof of claim.

7      They got an affirmation from James Reeves and

8      put it in their proof of claim.  It was in all

9      of our BayStack products all the way through

10     2004.  So we know what the answer would have

11     been if Dr. Case had asked.

12              But what he is telling us is,

13     because he has to, because otherwise, their

14     argument falls apart, is I concluded -- the

15     reason I didn't say anything in June 2003, even

16     though now I am saying this BayStack group

17     became infringers, is I concluded that the

18     BayStack group wasn't using my software

19     anymore.  Okay?  Didn't ask them.  Didn't ask

20     any of my old friends, my contacts there, my

21     cheerleaders.  I just formed that conclusion.

22     So, Your Honor, the credibility of that

23     assertion will be one of the key questions that

24     will be addressed in this hearing.

1           Just to finish off, Your Honor, so

2    this idea that International didn't know, that

3    Nortel was just hiding from them, was an

4    infringer, again, you only need to look back at

5    that January 2006 episode to defeat that.  The

6    BayStack group came to John Southwood, said,

7    "We are using your software.  Please just

8    confirm our right to do it."  He said, "I'm

9    pleased that you are operating under the old

10   Bay Networks license that was incorporated into

11   the Nortel license, which is under Schedule 1,"

12   and then he writes that letter saying yes,

13   indeed, that Bay license was incorporated under

14   Schedule 1.  That gives you the paid-up rights

15   from the old Bay Networks license.

16           So this idea that International

17   didn't know, that they thought something else,

18   that they thought Nortel just stopped using the

19   software in these BayStack products, it is

20   expressly negated, contradicted, defeated, by

21   their own letters and words.

22           That's all for now, Your Honor.

23   Look forward to presenting the evidence --

24           THE COURT:  All right.



```
 1              MR. HERRINGTON:  -- and as we go
 2    forward.  Thank you.
 3              THE COURT:  Thank you,
 4    Mr. Herrington.
 5              MR. BUSCH:  So, Your Honor, it is
 6    a quarter to 1:00.  Do you want to get started
 7    or what would you like to do?
 8              THE COURT:  We are going to start
 9    with Dr. Case or --
10              MR. BUSCH:  No.  Mr. Southwood.
11              THE COURT:  How long will his
12    testimony take?  Do you think it will take a
13    little while, won't it?
14              MR. BUSCH:  It will.  About an
15    hour and a half or so.
16              THE COURT:  Well, I hate to get
17    started then.  It is quarter to 1:00.  And why
18    don't we come back at quarter to 2:00.  Will
19    that be enough time for people?
20              MR. BUSCH:  Yes, Your Honor.
21              THE COURT:  All right.  We will be
22    back at quarter to 2:00.  Thank you, everyone.
23         (Luncheon recess taken at 12:42 p.m.)
24
```

```
 1                    AFTERNOON SESSION

 2               (Reconvened at 1:43 p.m.)

 3               THE COURT:  Good afternoon,

 4    everyone.  You may be seated.  We are ready for

 5    the afternoon session.

 6                    Mr. Busch.

 7               MR. BUSCH:  Thank you, Your Honor.

 8    We call John Southwood as our first witness.

 9               THE COURT:  Mr. Southwood, you are

10    back in the courtroom.

11               MR. SOUTHWOOD:  Thank you very

12    much.

13               THE COURT:  If you will just

14    remain standing in the witness stand while you

15    are sworn.

16               JOHN E. SOUTHWOOD, having been duly

17    sworn as a witness, was examined and testified as

18    follows:

19               THE COURT:  When you are ready,

20    Mr. Busch.

21               MR. BUSCH:  Thank you, Your Honor.

22                  DIRECT EXAMINATION

23    BY MR. BUSCH:

24       Q.  Good afternoon, Mr. Southwood.
```



1      A.   Good afternoon.

2      Q.   You have already stated your name for

3   the record.  I would like you to just tell the

4   judge some background about yourself.  Where

5   did you go to college?

6      A.   I went to Purdue University.

7      Q.   And what did you study?

8      A.   I studied industrial management, with

9   minors in economics and marketing.

10     Q.   And when did you graduate?

11     A.   1971.

12     Q.   And do you have any other degrees?

13     A.   Yes.

14     Q.   And what other degrees do you have?

15     A.   I have a master's of divinity degree

16   from Fuller Theological Seminary.

17     Q.   And what is your current occupation?

18     A.   I am retired.

19     Q.   And when did you retire?

20     A.   September 2015.

21     Q.   And before you retired what did you do?

22     A.   I was a VP of sales for SNMP Research

23   International, Incorporated.

24     Q.   But you have been gone now for about two



1  years or close to two years?

2      A.   Yes.

3      Q.   And how long did you work at SNMP

4  Research International?

5      A.   I started at SNMP Research in 1991 and,

6  when SNMP Research International was founded, I

7  went over immediately to that company.

8      Q.   And what was your official title at the

9  time you retired?

10     A.   VP, sales.

11     Q.   And before you became vice president of

12 sales, what was your role within the company?

13     A.   It was essentially the same functions

14 the whole time.

15     Q.   And what were those functions?

16     A.   For marketing, I would attend trade

17 shows.  I would attempt to find prospective

18 customers, work some on marketing literature.

19          From sales, I would talk to

20 prospective customers to find out what their

21 projects were, recommend SNMP products that

22 would help them, make proposals, create

23 licenses, negotiate licenses.

24     Q.   And do you have any formal training in



1    the negotiation of license agreements?

2        A.   No.

3        Q.   And do you have any knowledge whether

4    there is any custom and practice in the

5    software industry with respect to licensing?

6        A.   No.

7        Q.   You mentioned negotiations.  What did

8    negotiations entail?

9        A.   The customer, in order to get our

10   product, would need to sign a license, and the

11   license would name the product, the price and

12   the terms of use.  And we would discuss those.

13       Q.   And what did you use to try to craft

14   license agreements?

15       A.   We would always start with a standard

16   template license, and I would fill in the

17   details of that particular transaction.

18       Q.   If the negotiation involved matters that

19   were out of the ordinary, how was that handled?

20       A.   I would always go to Dr. Case to explain

21   the issues and sometimes to our outside

22   counsel.

23       Q.   Now, last week at the hearing that we

24   had before Judge Gross, Mr. Herrington called



1   you SNMP Research's, quote unquote, licensing

2   expert.  Were you SNMP Research's licensing

3   expert?

4      A.  No.

5               MR. HERRINGTON:  I don't think I

6   said that.  But maybe the transcript will speak

7   for itself, but I don't think I called him a

8   licensing expert.

9               MR. BUSCH:  You did.

10              THE COURT:  Well, we will --

11              MR. HERRINGTON:  That was a

12  misspeak.  He was the point person for SNMP

13  Research in negotiations.  I didn't say he was

14  a licensing expert.

15              MR. BUSCH:  I am not sure what the

16  objection is.

17              THE COURT:  I am not either.

18              MR. HERRINGTON:  Correcting the

19  record, Your Honor.

20              THE COURT:  If it was a

21  misstatement, then it was a misstatement.

22              MR. BUSCH:  I don't think it was,

23  but I am not sure what the objection is.

24              THE COURT:  All right.



1           MR. BUSCH:  So maybe that is two

2    minutes against Mr. Herrington.

3    BY MR. BUSCH:

4       Q.  So, Mr. Southwood, were you allowed to

5    draft or negotiate any licenses that were not

6    standard cookie-cutter-type deals?

7       A.  No.  I always started from the template.

8       Q.  Did you have signature authority on

9    contracts?

10      A.  No.

11      Q.  Can you describe Dr. Case's role at SNMP

12   Research?

13      A.  He was involved with both companies on a

14   day-to-day basis, and he or Mary would make all

15   major decisions.

16      Q.  And who is Mary?

17      A.  Mary is Mary Case, his wife.  And

18   typically, she would consult with Jeff even

19   before she made a decision.

20      Q.  Who had signature authority at SNMP

21   Research, Inc. and Int'l?

22      A.  At Inc. Jeff Case had signature

23   authority; at Int'l, Mary Case.

24      Q.  And with respect to your negotiations,



1    were they all subject to approval from the

2    Cases?

3         A.  Yes.

4         Q.  All right.  Now, let's talk about Bay

5    Networks, if we could.

6         A.  Okay.

7         Q.  Do you recall a company named Bay

8    Networks?

9         A.  Yes.

10        Q.  And what was Bay Networks' relationship

11   with SNMP Research?

12        A.  They were a customer.

13        Q.  And what type of business was Bay in?

14        A.  They manufactured switches and routers.

15        Q.  If you would please turn to in your

16   binder -- you should have binders behind you, I

17   think.  Those are the exhibits.

18        A.  Yes.

19        Q.  And I will be referencing those

20   exhibits.

21        A.  Okay.

22        Q.  And if you would please turn to Exhibit

23   P-20, 21 and 22.

24                  MR. BUSCH:  And, Your Honor, you



1    have a set of the exhibits?

2                    THE COURT:   Yes.

3                    MR. BUSCH:   Thank you.

4    BY MR. BUSCH:

5        Q.   Are you there?

6        A.   In Volume 1 of 2 it starts at P -- I am

7    sorry.   I have got it.   Thank you.

8        Q.   Okay.

9        A.   P-20.

10       Q.   Yes, P-20, P-21 and P-22.

11       A.   I have them.

12       Q.   And do you recognize Exhibit P-20?

13       A.   Yes.

14       Q.   And what do you recognize Exhibit P-20

15   to be?

16       A.   This is an SNMP Research license with

17   SynOptics Communications dated June 27, 1994.

18   It was eventually transferred to Bay.

19       Q.   And then look at Exhibit No. P-21, if

20   you would.

21       A.   P-21.   I have it.

22       Q.   And what is P-21?

23       A.   It is Amendment 1 to the same license

24   agreement.



1      Q.  And Exhibit P-22.

2      A.  I have it.  It is Amendment 2 to the

3   same license agreement.

4              MR. BUSCH:  Your Honor, we would

5   move into evidence Exhibits P-20, P-21 and

6   P-22.

7              THE COURT:  Any objection?

8              MR. HERRINGTON:  No objection,

9   Your Honor.

10             THE COURT:  They are admitted.

11             MR. BUSCH:  Thank you.

12             (Plaintiffs' Exhibit Nos. 20 through

13   22 were received in evidence.)

14   BY MR. BUSCH:

15     Q.  So this is the original contract about

16   which we are here today between SynOptics and

17   later Bay Networks; is that right?

18     A.  That's right.

19     Q.  Did you negotiate these agreements?

20     A.  Yes, with Dr. Case's approval, of

21   course.

22     Q.  And can you summarize the Bay license

23   agreement with SNMP Research?

24     A.  Yes.  It agrees to license certain



1    products, and there was payment terms and there

2    were terms of use in these licenses.

3        Q.   And was the original agreement between

4    SynOptics and SNMP Research what would be known

5    as a specific-location license?

6        A.   Yes.  They were location-based.  They

7    granted the development rights at a particular

8    location.

9        Q.   And what was the royalties that

10   originally SynOptics had to pay?

11       A.   There was a per-copy royalty schedule

12   that was named in Attachment C.

13       Q.   And was there a right to exercise a

14   royalty buy-out?

15       A.   Yes.

16       Q.   Now, if you will look at Amendment

17   No. 2, P-22, please.

18       A.   Yes.

19       Q.   P-22, Amendment 2.  What product does

20   Amendment 2 address?

21       A.   Under "Definitions," "'Licensed

22   Modules'" refers to that portion of the program

23   consisting of asynchronous request libraries

24   for Solaris, HPUX, AIX and Windows NT.



1      Q.  So in shorthand, would that be for the

2   manager product at SNMP, the ARL products?

3      A.  Yes, ARL is the manager product.

4      Q.  And can you explain to Judge Gross what

5   a per-location license it as SNMP?

6      A.  Yes.  A per-location license grants

7   development rights to be used at one particular

8   location of our licensee.  When it was there,

9   they were able to use it on any projects that

10   emanated from that location.

11      Q.  And just so Judge Gross also

12   understands, what is the difference between the

13   development license, the internal use license,

14   and the redistribution license?

15      A.  Okay.  The development license, we

16   granted rights to use our software to make

17   their own products and develop that in their

18   labs.  The redistribution rights were

19   associated with our per-copy royalties, and

20   they granted the rights to incorporate our

21   software into their software to make a product

22   and sell it to their customers.

23      Q.  Now, in addition to being a

24   location-restricted license and being



1    restricted to a specific operating system and

2    development location, what other restriction

3    was in the original SynOptics agreement with

4    respect to the license?

5       A.   They were nontransferable.

6       Q.   Now, would you characterize Bay's

7    license with SNMPR as typical licenses that

8    SNMP granted at that time?

9       A.   Yes.

10      Q.   You also mentioned that there was the

11   right to exercise a royalty buy-out for

12   products mentioned in this Bay license

13   agreement.

14      A.   Yes.

15      Q.   Can you explain the difference between a

16   license fee that a licensee might need to pay

17   versus the royalties that the licensee may need

18   to pay?

19      A.   Okay.  The royalty is not the royalty

20   buy-out; is that correct?

21      Q.   Right.  Royalties, yes.

22      A.   Okay.  The license fee was paid at the

23   time of the original transaction and the

24   execution of the license and was associated



1    with the delivery of our development tools to

2    our customer.

3              The redistribution rights had to

4    do with the delivery of their products.  And a

5    small per-copy royalty was attached to the

6    exercise of those distribution rights.

7              Did I answer your question?

8        Q.  That's fine.

9        A.  Yes.

10       Q.  Now, did the licensing model at SNMP

11   Research change at some point from this

12   per-location license to a --

13       A.  Yes.

14       Q.  -- per-product licensing model?

15       A.  Product-based.

16       Q.  And when did that occur?

17       A.  Late 1997 or early '98.

18       Q.  And what was the reason for the change?

19       A.  There were several reasons.  We found

20   that our customers were developing a number of

21   products on a single license grant, and so we

22   were not able to participate revenue-wise at

23   the same level that our customers were.  It was

24   difficult to keep track.  The technology was



1    allowing copies to move around, and so it was

2    difficult to keep track of where all of our

3    copies were.

4              Some large multinational

5    corporations were asking for a product-based

6    license because their engineering groups were

7    dispersed, and we wanted to reset our royalty

8    discount schedule for each product rather than

9    having a number of products.

10   Q.  And what do you mean when you say that

11   you wanted the royalties to reset?  What do you

12   mean by that?

13   A.  Our royalty schedule was based on an

14   accumulation of a number of products, and when

15   a certain number were accumulated by shipment,

16   they got a discount on the royalties.  And so

17   if our customers had a number of products going

18   onto the same count, they achieved the

19   discounts faster.  We wanted those discounts to

20   go per product.

21   Q.  Okay.  So now let's talk about the

22   relationship between Bay Networks and Nortel

23   and your knowledge about that.

24   A.  Okay.



1      Q.  Are you aware whether at some point in

2    time Nortel Networks acquired Bay Networks?

3      A.  Yes, they did.

4      Q.  And do you recall approximately when

5    that occurred?

6      A.  September 1998.

7      Q.  And are you aware whether Nortel and

8    Dr. Case had any discussions at that time about

9    the need to transfer the Bay license to Nortel?

10     A.  I think that they did.  I was not aware

11   of it at that moment.

12     Q.  Were you part of those conversations?

13     A.  No.

14     Q.  And what was your first involvement with

15   anything related to assigning or potentially

16   assigning the SNMP-Bay Networks agreement to

17   Nortel?

18     A.  Dave Hyslop sent me an email and said

19   "I'm thinking that this needs to be assigned"

20   and made a proposal on how to do that.

21     Q.  All right.  Will you please look at P-26

22   and P-27 in your binder, Mr. Southwood.

23     A.  Okay.  I have them.

24     Q.  And can you tell me whether P-26 is, in



1    fact, an email that you received from Dave

2    Hyslop?

3        A.  Yes, it is.  Dave Hyslop sent it on June

4    21, 1999.

5        Q.  And would you please just read that

6    email into the record?

7        A.  Yes.  "In going through the reams of

8    documentation in the SNMP RI file, it occurred

9    to me that the SNMP RI - Bay agreement should

10   be formally assigned to Nortel as Nortel has

11   been operating as though it were the licensee

12   since the Nortel acquisition of Bay last

13   September.  To formalize the arrangement, I've

14   prepared and attach a copy of an assignment

15   agreement for SNMP RI's approval and signature.

16   Any queries, please call."

17       Q.  Okay.  And did you receive that email

18   from Mr. Hyslop?

19       A.  Yes.

20              MR. BUSCH:  Your Honor, we move

21   for admission of P-26.

22              MR. HERRINGTON:  No objection,

23   Your Honor.

24              THE COURT:  It is admitted.



1              (Plaintiffs' Exhibit No. 26 was

2    received in evidence.)

3  BY MR. BUSCH:

4      Q.  And would you please now look at Exhibit

5    P-27, Mr. Southwood?

6      A.  Yes.

7      Q.  And is P-27 the attachment to

8    Mr. Hyslop's email with the proposed assignment

9    that Mr. Hyslop was requesting?

10     A.  Yes.  It was titled "Memorandum of

11   Agreement."

12              MR. BUSCH:  And, Your Honor, we

13   would move for introduction of P-27 into

14   evidence.

15              MR. HERRINGTON:  No objection.

16              THE COURT:  It is admitted.

17              (Plaintiffs' Exhibit No. 27 was

18   received in evidence.)

19              MR. BUSCH:  Thank you.

20  BY MR. BUSCH:

21     Q.  Now, upon review of the proposed

22   assignment that Mr. Hyslop was suggesting, did

23   you get back to Mr. Hyslop?

24     A.  Yes.



1    Q.   And what did you say?

2    A.   We did not accept his proposed

3    memorandum of agreement.

4    Q.   And why not?

5    A.   We were very concerned that a royalty

6    buy-out written to a smaller company would be

7    taken and acquired by a larger company and they

8    would apply that royalty buy-out to the breadth

9    of their product line, far exceeding what we

10   had originally anticipated.  So we would not

11   accept the transfer.

12   Q.   And at this time -- I am speaking now

13   about this 1999 time period -- were there also

14   going on at that time separate discussions

15   between SNMP Research and Nortel about entering

16   into a master license agreement?

17   A.   Yes.  There were a number of entities

18   within Nortel that were interested in our

19   product, using ours within their own emerging

20   products, and so they wanted a consistent set

21   of terms for acquisition and use, so a

22   corporate license made sense.

23   Q.   And by the way, with respect to these

24   conversations that you were having with



1    Mr. Hyslop and SNMP was having with Mr. Hyslop

2    in the spring-summer of 1999, was Dr. Case

3    involved in those discussions as well?

4        A.  Yes.

5        Q.  Now, was there also at this time

6    discussions between Nortel and SNMP Research

7    about moving from this location-based license

8    to a product-based license?

9        A.  Yes.  SNMP Research was very interested

10   in doing that.

11       Q.  And so in order to allow the parties

12   time to negotiate the requested transfer or

13   requested assignment of the Bay Networks deal

14   to Nortel and to do the master license

15   agreement, did the parties discuss entering

16   into a short-term temporary license agreement?

17       A.  Yes, they did.

18       Q.  And was Dr. Case involved in those

19   discussions with Nortel?

20       A.  Yes, very much.

21       Q.  Were you involved in those discussions

22   as well?

23       A.  Yes.  Not as much.  I made a few

24   modifications.



1    Q.   So let's turn, if we could, to P-28 in

2    your binder, please.

3    A.   I have it.

4    Q.   And what do you recognize P-28 to be?

5    A.   It is the original copy of the temporary

6    license agreement.

7    Q.   And did you prepare this document?

8    A.   No.  It was mostly Dr. Case and

9    Mr. Hyslop who prepared the document.

10   Q.   And were you responsible for sending it

11   to Mr. Hyslop?

12   A.   Yes.

13   Q.   And did you send it to Mr. Hyslop?

14   A.   Yes.

15             MR. BUSCH:  Your Honor, we would

16   move into evidence P-28.

17             MR. HERRINGTON:  Your Honor, we

18   don't have an objection, assuming it is not

19   being offered for the truth of the matter

20   asserted.  I don't think that's the purpose

21   that it is being offered for.

22             MR. BUSCH:  It has independent,

23   potential independent legal significance, Your

24   Honor.  It is not hearsay as a result.



1          MR. HERRINGTON:  Exactly.  It is

2    not offered for hearsay purposes.  On that

3    basis, we have no objection.

4          THE COURT:  All right.  It is

5    admitted.

6          (Plaintiffs' Exhibit No. 28 was

7    received in evidence.)

8  BY MR. BUSCH:

9    Q.  And I want to direct your attention in

10   P-28 to the bottom paragraph -- well, first of

11   all, let's just go through it, if we could,

12   very briefly.

13   A.  Okay.

14   Q.  Do you see, Mr. Southwood, where the

15   temporary license agreement references the

16   original SNMP-SynOptics agreement in the first

17   paragraph?

18   A.  Yes, I do.

19   Q.  And do you see where in the next two

20   paragraphs it references the first and second

21   amendment?

22   A.  Yes, I do.

23   Q.  And do you see where in the final

24   paragraph it says, "SNMP hereby grants Nortel a



1    temporary assignment of the License Agreement,

2    which temporary assignment shall terminate on

3    November 1, 1999.  Upon the termination of this

4    temporary assignment, Nortel shall have no

5    further rights under the License Agreement.

6    During the term of this temporary assignment,

7    the rights granted under the License Agreement

8    shall extend to all entities wholly owned by

9    Nortel but not to any entities that are not

10   wholly owned by Nortel"?

11        A.  Yes, I see that.

12        Q.  And you say that was jointly crafted

13   language --

14        A.  Yes.

15        Q.  -- between Nortel and SNMP Research?

16        A.  Yes.

17        Q.  Would you please turn now to Exhibit

18   No. P-29.

19        A.  I have it.

20        Q.  And do you recognize P-29?

21        A.  The first page is a fax cover letter

22   from me to Dave Hyslop.

23        Q.  And is there a difference between P-28

24   and P-29?



1      A.  There is only one difference.

2      Q.  And what is the difference?

3      A.  Mr. Hyslop requested a second signature

4  block for Nortel.

5      Q.  Okay.  So let me get this straight.

6  After you sent P-28 --

7      A.  Yes.

8      Q.  -- the temporary license agreement, and

9  Dave Hyslop reviewed it, and the only change he

10  requested was the addition of a second

11  signature line for Nortel Networks; is that

12  correct?

13      A.  That's correct.

14      Q.  And did you make that change?

15      A.  Yes.

16      Q.  And did you send this fax to Mr. Hyslop,

17  this agreement to Mr. Hyslop?

18      A.  Yes.

19      Q.  And I note that the first page is the

20  fax cover sheet; is that right?

21      A.  That's correct.

22      Q.  And the third page is the fax

23  confirmation?

24      A.  That's also correct.



1          MR. BUSCH:  Your Honor, we would

2    move for introduction of Exhibit P-29.

3          MR. HERRINGTON:  Again, as long as

4    it is not being offered for hearsay purposes,

5    for the truth of the matter asserted, we have

6    no objection.

7          MR. BUSCH:  Your Honor, once

8    again, it is being offered for the fact that

9    the parties entered into an agreement, which

10   has independent legal significance, and

11   therefore, it is excepted from the hearsay

12   rule.

13         MR. HERRINGTON:  It doesn't

14   demonstrate the fact that the parties entered

15   into an agreement.  There is no signed version.

16   But I think we are on the same page here.  He

17   is just saying this was an agreement.  They are

18   going to say it was signed.  As long as none of

19   the recitations within it are being offered as

20   if that was a true fact, then we don't have an

21   objection.

22         MR. BUSCH:  Well, I have another

23   issue, which is on their exhibit list this

24   document is already deemed admitted, because



1   they placed no objections next to P-29.

2                    MR. HERRINGTON:  Again, Your

3   Honor, I assume it is not being offered for the

4   truth of the matter asserted.  On that basis --

5                    MR. BUSCH:  I think their

6   objection should be overruled.  I don't think I

7   need to, with all due respect to

8   Mr. Herrington, debate this, because under the

9   Court's order, any exhibit that does not

10  contain an objection on the exhibit list is

11  deemed admitted.

12                    THE COURT:  Well, I don't think

13  Mr. Herrington is objecting to its admission

14  but just the purpose of its admission.

15                    MR. HERRINGTON:  Exactly, Your

16  Honor.

17                    MR. BUSCH:  Right.  But if he

18  wanted to object to the purpose, he should have

19  put it on his objections is my point.

20                    THE COURT:  Well, I will admit

21  PX-29, and we can, I suppose, argue about it

22  later.  All right?

23                    MR. BUSCH:  Yes.  Thank you, Your

24  Honor.



```
 1              MR. HERRINGTON:   Thank you, Your
 2   Honor.
 3              (Plaintiffs' Exhibit No. 29 was
 4   received in evidence.)
 5   BY MR. BUSCH:
 6      Q.   Now, did Mr. Hyslop execute and return
 7   Plaintiffs' Exhibit No. 29?
 8      A.   I believe so.
 9      Q.   And how do you know that?
10      A.   I have memory that it happened, and then
11   later I made a reference to the expiration date
12   that would only have been true if it had been
13   signed.
14      Q.   And just for the record, Mr. Southwood,
15   if you would please turn in your exhibit binder
16   to Exhibit No. 39.
17      A.   I think that's in the second binder.
18      Q.   Okay.  Plaintiffs' Exhibit 39.
19      A.   I have P-39.
20      Q.   And I just want to direct your attention
21   to the second paragraph of P-39, if we could.
22      A.   Yes.
23      Q.   And do you see where you write in
24   "crafting the final Bay transfer to Nortel
```



1   based on the previous term which expired

2   November 1"?

3        A.   Yes.

4        Q.   Do you see that?

5        A.   Yes.

6        Q.   And what was the date that the original

7   temporary license agreement expired?

8        A.   November 1.

9        Q.   If you would please now also look at

10  Plaintiffs' Exhibit No. 81.

11       A.   P-81?

12       Q.   Yes.

13            MR. HERRINGTON:  Your Honor, while

14  they are getting P-81, we have this issue they

15  just made a point about:  Deadlines.

16            THE COURT:  Yes.

17            MR. HERRINGTON:  The deadline for

18  designating exhibits was last week, May 4.  We

19  got this from them yesterday.  So we shouldn't

20  be getting surprised with new things less than

21  24 hours before the hearing, so we would

22  object, Your Honor.

23            MR. BUSCH:  And my response to

24  that, Your Honor, is that Nortel following the



1    deadline produced documents late, beyond the

2    deadline, at least three documents beyond the

3    deadline.  And we just noticed in this

4    yesterday in preparing for trial that there is

5    another reference in the email to the November

6    1 expiration.

7              So there is no prejudice.  This

8    document has been produced.  It is in the

9    record.  They have had it.  And the only reason

10   that I am using it is to simply note another

11   reference to Mr. Southwood noting that the

12   temporary license agreement expired on November

13   1.  There is zero prejudice.

14             MR. HERRINGTON:  Your Honor, let

15   me just say something.  SNMP added three

16   exhibits.  We then added some exhibits.  That

17   was over the weekend.  We got this yesterday.

18             But, Your Honor, we are going to

19   let it come in.  We are not going to object on

20   the timeliness grounds.  It is not a big deal.

21   It is not a very important document.  But I do

22   note it is ironic when they tell us we

23   dismissed a deadline, and yet over the weekend,

24   they added some things.  We added three things.

1     And 24 hours later we see this email for the

2     first time.

3                    Again, we won't object to it, Your

4     Honor.

5                    MR. BUSCH:  I don't understand.

6     He stood up and objected and then he withdrew

7     his objection, so it seems like that was a

8     waste of time.

9                    THE COURT:  Well, I understand the

10    point.  I only got this this morning, of

11    course.

12                   MR. BUSCH:  Yes.

13                   THE COURT:  And it did seem to be

14    a little bit late.  But they are not objecting,

15    so I will admit it.

16                   MR. BUSCH:  Thank you very much,

17    Your Honor.

18                   (Plaintiffs' Exhibit No. 81 was

19    received in evidence.)

20    BY MR. BUSCH:

21       Q.  Mr. Southwood, if you will take a look

22    in this exhibit, do you see where you reference

23    the temporary license agreement expired,

24    terminated on November 1?



1      A.   Can you guide me to the paragraph?

2      Q.   Sure.  If you go to the fourth paragraph

3   above your signature, the one that says, begins

4   with "So, you can see."

5      A.   Yes.  Shall I read that or -- I see the

6   reference to November 1.

7      Q.   Do you see where you say, "Since the

8   evaluation extensions and the temporary

9   transfer of the Bay license" agreement "expired

10   on November 1" --

11      A.   Yes, I see that.

12      Q.   -- "it is important that we complete

13   this license as soon as possible"?

14      A.   Yes.

15      Q.   So is there any doubt in your mind that

16   the temporary license agreement, P-29, was, in

17   fact, signed by Nortel and returned to SNMP

18   Research?

19      A.   There is no doubt in my mind.

20      Q.   And did Mr. Hyslop ever request that the

21   termination date in the temporary license

22   agreement be changed, the language be changed

23   or that the date be changed?

24      A.   I have no memory of him requesting that



1    at all.

2        Q.   All right.  So now let's talk about the

3    December 23, 1999 license between Nortel and

4    SNMP Research.  What was Nortel's relationship

5    to SNMP Research prior to the execution of this

6    license?

7        A.   They were already a customer.

8        Q.   And were you directly involved in the

9    negotiations of the Nortel license that was

10   executed on December 23, 1999?

11       A.   Yes.

12       Q.   And who else was involved in those

13   negotiations for SNMP Research?

14       A.   Dr. Case would sometimes participate in

15   the direct discussions.  I always kept him

16   informed of the status.  And our attorney,

17   outside counsel, Rick Barnes was involved.

18       Q.   And did Dr. Case have to approve

19   language that was agreed to?

20       A.   Yes.

21       Q.   And you said Rick Barnes was outside

22   counsel?

23       A.   Yes.

24       Q.   And what was Mr. Barnes' involvement in



1    the negotiations?

2        A.   He would review the language on each

3    version of the license, would comment to me

4    about some of the meanings, but then he often

5    crafted language that went into the license.

6        Q.   And who negotiated the license agreement

7    on behalf of Nortel?

8        A.   Dave Hyslop.

9        Q.   And who is Dave Hyslop?

10       A.   He was an employee in their software

11   acquisition department.

12       Q.   And was it your understanding that

13   Mr. Hyslop was authorized to negotiate and

14   execute licenses for Nortel?

15       A.   Yes.

16       Q.   And how were the negotiations conducted?

17       A.    In several ways.  We spoke regularly on

18   the telephone.  We would exchange email

19   messages; when documents were prepared, would

20   send them via fax.  And one time he traveled to

21   the farm to have face-to-face meetings.

22       Q.   And when you say we would speak on the

23   phone, would that be you and Dr. Case speaking

24   to Mr. Hyslop?



1    A.   Sometimes Dr. Case was on the phone;

2    sometimes it was only me.

3    Q.   So let's talk about the in-person visit

4    on the farm.  And I understand that occurred on

5    October 5 and 6 of 1999; is that correct?

6    A.   I believe so, yes.

7    Q.   And who was present for SNMP Research?

8    A.   Dr. Case was present.  I was present,

9    and Rick Barnes was present.

10    Q.   And would you please turn to Exhibit

11    P-35 in your binder.

12    A.   I have it.

13    Q.   Is this an email that you sent on

14    October 7 of 1999?

15    A.   Yes.  It was an email sent to our

16    internal activities report.

17    Q.   In his opening statement Mr. Herrington

18    pointed out that the language in your email in

19    the first paragraph where you say, "Spent most

20    of the two days talking with Dave Hyslop,

21    Nortel.  Generally a good negotiating session.

22    Rick was with us for parts of that time.  Jeff

23    stopped in yesterday afternoon after Jeff

24    started feeling a little better."  Do you see



1    that language?

2        A.  Yes.

3                 MR. HERRINGTON:  Your Honor, this

4    exhibit isn't admitted, and we would like to

5    know on what basis it is being admitted or

6    being proposed by the plaintiffs.

7                 MR. BUSCH:  I am not sure, Your

8    Honor, once again, because in his opening

9    statement Mr. Herrington stood up and said, "I

10   am going to show Your Honor exhibits that have

11   already been admitted," if Your Honor remembers

12   that.  And this was one of the exhibits that

13   Mr. Herrington mentioned, put on the screen,

14   focused on, said was going to be part of this

15   case, all of that.  So I am not sure what the

16   basis of this objection is now when he

17   represented to the Court that this document was

18   already admitted and actually used it in his

19   opening statement.

20                MR. HERRINGTON:  Your Honor, we

21   explained this basis to SNMP Research

22   yesterday.  This is a document written by

23   Mr. Southwood, so it is a party admission as to

24   him.  There is no hearsay problem for us to



1    introduce it.  But obviously, if they want to

2    introduce a document, it doesn't work that way.

3    It is not a party admission.  They don't get an

4    exception to the hearsay rule; we do.  So as to

5    us, yes, it is admissible, and there is a

6    hearsay exception.  That's the issue.

7              THE COURT:  Are you going to move

8    for the admission of this document at some

9    point?

10             MR. HERRINGTON:  Yes, but again --

11   and again, this document, we are perfectly

12   happy with the content.  But it is an important

13   rule of evidence that they apparently don't yet

14   understand.  If it was an email by my client,

15   then it is a party -- it qualifies as a party

16   admission.

17             THE COURT:  Right.

18             MR. HERRINGTON:  I can't make a

19   hearsay objection.  If I try to offer it and I

20   use it as hearsay for the truth of the matter

21   asserted, they could object; right?  That's

22   what we are saying here.

23             So the fact that we introduce it

24   and we can use it under the hearsay exception



1    doesn't mean it is the same thing for them.

2                    MR. BUSCH:  Well, I have a couple

3    of responses to that.  If they are going to

4    move it into evidence anyways and they are

5    going to question the witness about it, what is

6    the issue?  I am still not understanding that.

7                    Number two, this document is part

8    of -- and I can establish the foundation with

9    this witness that he does daily reports and

10   this is something that is done in his ordinary

11   course of business, it is maintained in the

12   ordinary course of business, and it is an

13   internal document that they do.  And I can get

14   it in as a business record.

15                   And it also just recites facts.

16   It recites facts that we want to discuss.

17                   So for purposes of this particular

18   email, I can just ask him whether Dr. Case was

19   present or not present or how present Dr. Case

20   was and whether he was doing that.  I am just

21   referencing it because Mr. Herrington chose to

22   say it was already admitted during -- if it is

23   already admitted, it can be used for any

24   purpose.  He represented to the Court it is



 1    already admitted.  I don't see the issue.

 2                  MR. HERRINGTON:  Well, I don't

 3    think that's right, it can be used for any

 4    purpose.  But if Mr. Busch establishes a

 5    business record exception, we are fine.  So

 6    let's see it.

 7                  MR. BUSCH:  It seems like --

 8                  THE COURT:  Mr. Busch, would you

 9    like to go forward and establish that it is a

10    business record?

11    BY MR. BUSCH:

12      Q.   Okay.  Mr. Southwood, was it your

13    practice to do daily reports?

14      A.   Yes, it was.

15      Q.   Daily activity reports?

16      A.   Yes.

17      Q.   And did you do that on a regular basis?

18      A.   I tried to make it every day when I came

19    into work.

20      Q.   And was it part of the practice of SNMP

21    Research to maintain those documents in the

22    ordinary course of business?

23      A.   Yes.

24      Q.   And was this document maintained in the



1    ordinary course of business?

2        A.  Yes.

3            MR. BUSCH:  Your Honor, we move

4    for introduction of this.

5            MR. HERRINGTON:  No objection,

6    Your Honor.

7            THE COURT:  It is admitted.

8            (Plaintiffs' Exhibit No. 35 was

9    received in evidence.)

10   BY MR. BUSCH:

11       Q.  All right.  So in this email you say

12   that "Rick was with us for parts of that time.

13   Jeff stopped in yesterday afternoon after Jeff

14   started feeling a little better."  And

15   Mr. Herrington in his opening statement made it

16   seem like this shows that Dr. Case wasn't

17   involved in the discussions.  So let's back up

18   for one second.

19            Was Dr. Case involved in these

20   discussions at the farm?

21       A.  Yes, he was.

22       Q.  And was there a period of time during

23   the two-day meeting that Dr. Case was not

24   feeling well?



1      A.   I don't recall all of the details, but I

2   know that Dr. Case established a framework for

3   where SNMP Research wanted to go, and I was

4   operating within that framework.  So when he

5   was in the room, he clearly was leading.  When

6   he was not in the room, he was still very much

7   influencing the direction of those

8   conversations.

9      Q.   Thank you.  Thank you, Mr. Southwood.

10  So this occurred on October 5 and 6 --

11  correct? -- this meeting?

12     A.   Yes.

13     Q.   Now, at this meeting did the subject of

14  schedules arise?

15     A.   Yes.

16     Q.   Tell Judge Gross -- this is very

17  important -- what was discussed at this meeting

18  about schedules and entering into of schedules

19  by Nortel?

20     A.   I am not sure I can tell you exactly

21  what was discussed at the meeting, but I can

22  discuss in the timeframe around the meeting

23  what happened, and that is, we were looking for

24  a corporate license that would define general

1   terms of use and acquisition, but we wanted to

2   make the license flexible for a number of

3   transactions that would take place.  We knew

4   many immediately, but over time everybody

5   expected more to be answered.  So we found --

6   we came to schedules.

7                   And schedules had defined items on

8   them that we needed to know in order to grant a

9   particular license.  And a license under the

10  Nortel agreement was granted when a particular

11  schedule was signed that named the information

12  and then the amounts were paid.

13      Q.  Okay.  Let's back up for one second, if

14  we could.

15      A.  Okay.

16      Q.  Was there a discussion around this time

17  period about the Bay royalty buy-out that Bay

18  had enjoyed and what to do with Bay products as

19  it relates to schedules?

20      A.  Yes.  Shall I go ahead and talk about

21  that?

22      Q.  Yes, sure.

23      A.  Dave Hyslop was quite concerned that Bay

24  just shortly before the acquisition and even in



1    1999 was still in the process of paying for

2    royalty buy-outs.  And our position was that

3    the Bay license was nontransferable.  And Dave

4    Hyslop said, "Wait.  We want some benefit

5    flowing from those royalty buy-outs that we

6    have paid just recently."  And so that was a

7    major negotiating point, as to how they would

8    receive benefit but we would be able to move to

9    a product-based license.

10       Q.  And so what was the deal struck between

11   SNMP Research and Nortel regarding Bay, the Bay

12   products?

13       A.  If Bay had a product in the field before

14   the acquisition, or if they had a development

15   project moving toward creating a product before

16   the acquisition, we would, if they signed a

17   schedule and paid the license fees, we would

18   incorporate the royalty buy-out on the schedule

19   for those Bay products.  But they moved to a

20   product-based license so that we were able to

21   define exactly where those royalty buy-outs

22   went.

23       Q.  And was there a discussion about how

24   long Bay would have -- Nortel would have to



1    identify those products on schedules?

2        A.   Yes.  We granted three years for them to

3    find all of them and name them.

4        Q.   And with respect to Nortel, with respect

5    to Nortel products, not products that

6    originated at Bay, but Nortel products

7    themselves, what did Nortel have to do in order

8    to license those products?

9        A.   Okay.  They needed to sign a schedule,

10   and the schedule would include license fees,

11   royalty buy-outs, with an option for a lifetime

12   royalty buy-out.  I am sorry.  Per-copy

13   royalties with an option for royalty buy-outs;

14   if they were interested, annual maintenance had

15   to be signed, declared.

16       Q.   Now, following, was there a lawyer from

17   Nortel also involved in these meetings at least

18   remotely?

19       A.   There was a lawyer from Nortel involved.

20       Q.   Do you remember her name?

21       A.   Catherine Grant.

22       Q.   So after this October 5 and 6 meeting,

23   after these terms were understood and agreed

24   to, what did you and Mr. Hyslop begin doing



1    after the October 5 and 6 meeting?

2        A.   We continued to work towards a full set

3    of terms that both companies could agree to.

4    And part of the effort was to define which

5    products Nortel wished to buy, and so Dave

6    Hyslop began to work on a list of new licenses

7    that needed to be granted.

8        Q.   And did he begin to provide you with

9    spreadsheets?

10       A.   Yes.  He provided a spreadsheet with his

11   first take on those.

12       Q.   And did he differentiate between Bay and

13   Nortel --

14       A.   Yes.

15       Q.   -- on them?

16       A.   Yes.  The first column on the

17   spreadsheet did that.

18       Q.   What did you understand was the purpose

19   of differentiating between Bay and Nortel on

20   the spreadsheet?

21       A.   By our agreement, the Bay products were

22   eligible to enjoy the royalty buy-out that Bay

23   had previously exercised.  Nortel was not

24   eligible for those royalty buy-out options.



1    They had to license, pay per-copy royalties on

2    their products.

3       Q.  And Mr. Southwood, going back for one

4    second, do you know whether, in fact, in the

5    fall of 1999, at the time this was going on,

6    whether Nortel/Bay had actually paid for the

7    royalty buy-out on the ARL product, on the

8    manager product?

9       A.  That was not what I tracked on a daily

10   basis, but it is my understanding they had not

11   completed the payment yet.

12      Q.  Let's look at P-36 and P-37, please.

13      A.  I have P-36.

14      Q.  Can you tell Judge Gross --

15            MR. HERRINGTON:  Your Honor, can

16   we wait for a moment.  As I think counsel

17   knows, we have an objection.  So let me just

18   assess these exhibits.

19            THE COURT:  All right.

20            MR. HERRINGTON:  May I ask for

21   what purpose this is being offered?

22            MR. BUSCH:  Your Honor, this is

23   being offered to show that Mr. Hyslop

24   understood the need to provide a schedule, a



1    spreadsheet identifying products as either Bay

2    or Nortel for the purpose of preparing

3    schedules.

4              MR. HERRINGTON:  That really isn't

5    an answer to the question.  That is an argument

6    that they will make about the evidence.  Is it

7    being offered for the truth of some matter

8    asserted or simply that it was sent?

9              MR. BUSCH:  Well, there is no

10   authentication issue because we have agreement

11   that documents produced by each side are

12   authentic.  And so since it was a document that

13   was sent by Nortel to SNMP Research, we will

14   introduce it for purposes of showing that it

15   was sent.  And I will be asking the question of

16   the witness about what discussions Mr. Hyslop

17   had with him about the document.

18             MR. HERRINGTON:  It doesn't sound

19   like they are offering it for the truth of the

20   matter asserted, and on that basis we don't

21   object.

22             THE COURT:  All right.  It is

23   admitted.

24             (Plaintiffs' Exhibit Nos. 36 and 37



1     were received in evidence.)

2   BY MR. BUSCH:

3       Q.   So did you receive from Mr. Hyslop P-36

4   and P-37?

5       A.   Yes.

6       Q.   And did you discuss with Mr. Hyslop

7   specifically what the columns on this chart

8   showed?

9       A.   Yes.

10      Q.   Tell Judge Gross about your

11  conversations with Mr. Hyslop about this

12  document.

13      A.   Okay.  And I am going over the columns

14  in P-37.

15      Q.   Okay.

16      A.   First, the rows, each row on the

17  spreadsheet represented a different potential

18  Nortel schedule.  And so then going across the

19  columns, the first column was the definition

20  was the product emanating from Bay or was it

21  emanating from Nortel.  And you can see the

22  letters that designate that.

23                The second column, who gave

24  Mr. Hyslop the information with regard to that



1    product.

2                    Third column, other members of the

3    team.

4                    Fourth column, the group or

5    division or line of business within Nortel who

6    intended to attain the license.

7                    Fifth column, the actual product

8    that was intended to receive the license.

9                    Next column, timeframe, when does

10   first customer ship.  So that's our target for

11   completing the schedule.

12                   The next several columns are lists

13   of SNMP Research products, and you would look

14   for an X in one of those, perhaps two of them,

15   the products that were intended to be licensed

16   on that row.

17                   Then SNMP Research products are

18   made to work on specific operating systems, but

19   each product could work on a number of

20   different ones.  It was just slightly modified

21   code per operating system.  So we needed to

22   know the operating system and hardware.

23                   Then notes about quotes, was a

24   hard copy sent, other potential contacts beyond



1    that.

2        Q.   And Mr. Southwood, did you request this

3    information from Mr. Hyslop?

4        A.   Yes.

5        Q.   And did you have a conversation with

6    Mr. Hyslop whether the indication of Bay or

7    Nortel was meant to indicate whether the

8    product originated at Bay?

9        A.   Yes.

10       Q.   And what did Mr. Hyslop represent to

11   you?

12       A.   He represented that when he said Bay,

13   that that was a product or a project that was

14   within the old Bay before the acquisition.

15       Q.   And did you take him at face value on

16   that?

17       A.   Yes.

18       Q.   And did you discuss with Mr. Hyslop

19   whether you would be creating schedules based

20   upon this information?

21       A.   Yes.  He knew that.

22       Q.   I would like to now have you turn your

23   attention to P-38.

24       A.   Okay.  I am there.



1       Q.  And do you recognize P-38 as an email

2    that Mr. Hyslop sent to you?

3       A.  It is an email from Dave Hyslop to me

4    November 15, 1999.

5               MR. BUSCH:  Your Honor, we would

6    move for introduction of P-38.

7               MR. HERRINGTON:  No objection,

8    Your Honor.

9               THE COURT:  It is admitted then.

10              MR. BUSCH:  Thank you.

11              (Plaintiffs' Exhibit No. 38 was

12   received in evidence.)

13   BY MR. BUSCH:

14      Q.  Did you have an understanding about the

15   purpose of this email, Mr. Southwood?

16      A.  Mr. Hyslop wished to inform those

17   individuals within Nortel who were responsible

18   for the potential -- the products that would

19   potentially license our code, he wanted to

20   inform them of the nature of the license that

21   was emerging.

22      Q.  And did Mr. Hyslop mention Bay products

23   in this email?

24      A.  Yes, he did.  I want to mention that he



1    sent me in this particular correspondence, he

2    sent me a copy of the text before he sent it to

3    his own individuals to make sure that it was

4    accurate and acceptable to me.

5        Q.   Okay.

6        A.   I am sorry for that interruption.

7        Q.   That's okay.  And I am drawing your

8    attention now to the first sentence, where he

9    says, "Column 1 divides the requirements into

10   'Bay' and 'NT' requirements."  Do you see that?

11       A.   Yes, I do.

12       Q.   And he says, "Those identified as 'Bay'

13   products are subject to the in place Bay-SNMP

14   RI agreement (which has been assigned by Bay to

15   Nortel); i.e. had the Bay-Nortel merger never

16   occurred, Bay would have been entitled to

17   deploy these products royalty free."

18              I am going to stop right there.

19   Okay?

20       A.   Yes.

21       Q.   Was there anything in this sentence that

22   you did not agree with?

23       A.   Yes, there were.

24       Q.   And what was that?



1       A.   The Bay license had not been assigned to

2   Nortel as of yet.   The temporary had expired.

3       Q.   But he does differentiate between Bay

4   and Nortel.

5       A.   Yes.

6       Q.   And did you agree that if it was a prior

7   Bay product that existed at Bay prior to the

8   merger, it would qualify, as long as it was on

9   the schedule with this royalty buy-out?

10      A.   Yes, I did agree with that.

11      Q.   Now, I want to direct your attention to

12  the next sentence.   And in this sentence he

13  says, "However, if any of these product

14  development groups require source code

15  development licenses (e.g. source code for

16  Emanate or license fees for other SNMP RI

17  software which will not be embedded into the

18  Bay product) they must be paid for on a 'Bay'

19  product by 'Bay' product basis as per the terms

20  of the existing. . .SNMP RI agreement.

21  Products identified as 'NT' products in Column

22  1 will have to pay for both the development

23  source code (and, if any, other non-embedded

24  SNMP RI tools) and also pay runtime royalties."



1              Do you see that?

2        A.  Yes, I do.

3        Q.  Did you agree with that sentence, those

4   sentences by Mr. Hyslop?

5        A.  Yes.  Like the -- he named it to Nortel

6   products, and then it was license fees per

7   product royalties from both those.

8        Q.  And so am I correct that your

9   understanding was from this that he had stated

10  that for Bay, they had to license and pay the

11  license fee, but for Nortel they had to do the

12  same but in addition pay run-time royalties?

13       A.  Yes.  That's what I understood.

14              MR. HERRINGTON:  Objection;

15  leading.  And the agreement speaks for itself,

16  but he is putting words into the witness'

17  mouth.

18              THE COURT:  There has been a lot

19  of leading questions.

20              MR. HERRINGTON:  Yes.  I let a lot

21  of them go, Your Honor, but --

22              THE COURT:  And it does move

23  things along, but where there is an objection,

24  I have to sustain it.



```
 1                    MR. BUSCH:  Okay.
 2     BY MR. BUSCH:
 3         Q.  Why did you agree with that sentence,
 4      those statements by Mr. Hyslop?
 5         A.  Because it reflected our previous
 6      conversations and the agreement we had come to
 7      verbally.
 8         Q.  That you described earlier for Judge
 9      Gross?
10         A.  That I had described previously.
11                    MR. BUSCH:  Okay.  And I am just
12      trying to move it along, Your Honor.
13                    THE COURT:  I understand.
14                    MR. BUSCH:  I am conscious of the
15      time.
16                    THE COURT:  Yes.
17     BY MR. BUSCH:
18         Q.  So now let's turn -- was there something
19      in this email that Mr. Hyslop left out that you
20      felt was important to point out?
21         A.  Yes.  He failed to mention the
22      three-year window that Bay had to declare their
23      products.
24         Q.  So now let's turn to what has become a
```



**W&F**

**WILCOX & FETZER LTD**
Registered Professional Reporters
(302) 655-0477
www.wilfet.com

1    famous document in this case.  Mr. Herrington,

2    Nortel's counsel, uses it quite frequently, and

3    I want to discuss it with you.

4              MR. HERRINGTON:  Your Honor, let

5    me also note, there have been several

6    references to the opening statement, to what I

7    have said.  The whole point of the rule is

8    Mr. Southwood wasn't supposed to be hearing all

9    that.

10             THE COURT:  That's true.  He was

11   sequestered and --

12             MR. BUSCH:  We have not spoken to

13   Mr. Southwood at all.  We have honored the

14   rule.  I think now that he is here, I want to

15   ask him whether statements that have been made

16   by Mr. Herrington are true or not.

17             MR. HERRINGTON:  There is

18   recitations of statements that were supposedly

19   made in the opening.  The whole point of

20   excluding Mr. Southwood is so he wouldn't hear

21   the opening, so I object, Your Honor.

22             MR. BUSCH:  I will move on.

23             THE COURT:  All right.  And try

24   and get around the questions.



```
 1                   MR. BUSCH:  I will.  I will, Your
 2     Honor.  I will do my best.
 3                   THE COURT:  Okay.
 4     BY MR. BUSCH:
 5        Q.  Let's look take a look at P-39,
 6     Mr. Southwood.
 7        A.  P-39.
 8        Q.  Yes.  Do you recognize this document?
 9        A.  It is an email from me to Dave Hyslop
10     dated November 16, 1999.
11        Q.  And did you send this email to
12     Mr. Hyslop?
13        A.  Yes.
14                   MR. BUSCH:  We move for
15     introduction of P-39, Your Honor.
16                   MR. HERRINGTON:  No objection,
17     Your Honor.
18                   THE COURT:  It is admitted.
19                   (Plaintiffs' Exhibit No. 39 was
20     received in evidence.)
21     BY MR. BUSCH:
22        Q.  So let's just walk through it very
23     carefully.  You wrote, "Hi, David:  Thanks for
24     giving me a chance to review your comments
```



1    before everyone's expectations are fixed for

2    all time.

3                    "I think that you have the

4    agreement pretty well described."

5                    Let's stop right there.

6        A.   Yes.

7        Q.   What were you referencing there when you

8    said that you think that he had the agreement

9    pretty well described?

10       A.   That Bay would license on a

11   product-by-product basis license, pay license

12   fees, have the royalty buy-out available to

13   them and sign the schedule.

14                   Nortel would have schedules with

15   license fees, per-product royalty obligations,

16   and then sign that.  So it was that general

17   framework that he had.

18       Q.   Okay.  Thank you.  And then you say,

19   "Rick Barnes, our counsel, is crafting the

20   final Bay transfer to Nortel based on the

21   previous term which expired November 1."  Do

22   you see that?

23       A.   Yes, I do.

24       Q.   And why did you use the word "final"



1    there?

2        A.   I was thinking of the framework for the

3    transfer, and it was associated with the Nortel

4    corporate license that we were going to be

5    using for a long time.

6        Q.   And you say, "Crafting the final Bay

7    transfer to Nortel based on the previous term

8    which expired November 1."  And what was your

9    reference there to the previous term that

10   expired November 1?

11       A.   It was a reference to the temporary

12   license, assignment.

13       Q.   And then you say, "I told him that the

14   royalty buy out would expire in three years.  I

15   thought we agreed to that in our conference

16   room."

17            What is that a reference to?

18       A.   It was first a reference to his omission

19   in his November 15 email and then bringing it

20   to his awareness here and with reference to

21   what Rick Barnes was working on.

22       Q.   And then you say, "By expire I mean that

23   the products/projects brought on line after

24   three years would address royalties on their



1    own merit.  Current Bay products and

2    development projects for the next three years

3    will take advantage of the lifetime royalty buy

4    out until their products have aged out of the

5    marketplace."

6                    Do you see that?

7        A.   Yes.

8        Q.   What did you mean there?

9        A.   That they had a three-year window to

10   declare the products that were in the

11   marketplace or in development prior to the

12   acquisition and that those products would have

13   a royalty buy-out for their lifetime in the

14   marketplace, but after that, they would -- Bay,

15   whether it was Bay or Nortel, they would have

16   to do licenses, royalties and software service

17   agreement.

18       Q.   And very briefly, Mr. Southwood, there

19   has been argument in this case that there is no

20   reference to schedules in this email.

21                    MR. HERRINGTON:  Objection, Your

22   Honor.  In fact, this question is now polluted.

23   I mean, he is now telling, like, oh, there is

24   an argument, and I want you to rebut an



```
 1    argument.  I move to strike any question that

 2    follows up on this.

 3                 MR. BUSCH:  This has been --

 4                 THE COURT:  I will sustain that

 5    objection.  And you will have to be more

 6    careful in your questioning.

 7                 MR. BUSCH:  Okay.  All right.

 8    BY MR. BUSCH:

 9        Q.  So Mr. Southwood --

10                 THE COURT:  This is your witness.

11                 MR. BUSCH:  I understand.

12                 THE COURT:  And you are not

13    supposed to make suggestions.

14                 MR. BUSCH:  I am trying not to,

15    Your Honor.

16                 THE COURT:  Okay.

17                 MR. BUSCH:  Okay.

18    BY MR. BUSCH:

19        Q.  Why didn't you put in this email any

20    reference to schedules?

21                 MR. HERRINGTON:  Your Honor, the

22    same -- continuing objection.  After sort of

23    suggesting an argument, he now follows up, you

24    know, hitting the same points.
```



1              MR. BUSCH:  Your Honor, this is

2    not something that is new.  This is not

3    something that has been polluting

4    Mr. Southwood.  This is something that they

5    have raised from the very beginning in this

6    case.  It is something that Mr. Southwood has

7    testified about in his deposition.  It is

8    something that has been involved in this case

9    from the very beginning.

10             THE COURT:  I will allow the

11   question.

12             MR. BUSCH:  Thank you very much,

13   Your Honor.

14   BY MR. BUSCH:

15   Q.  Why did you not make reference in your

16   email to the need to enter into schedules?

17   A.  It was not a topic of discussion.  It

18   was well-agreed between Dave Hyslop and I and

19   between Nortel and SNMP Research that the

20   licensing mechanism to tie to the new Nortel

21   license would be schedules.  That was why he

22   gave me the spreadsheet with each line to

23   become a new schedule.

24   Q.  Thank you.  Now, I want to direct your



1    attention to the next paragraph in your email,

2    where you write, "After three years the

3    distinctions between Bay and Nortel will have

4    blurred so much that it will be impossible to

5    tell which is which."

6              Why did you write that?

7    A.   This was a significant concern on the

8    part of SNMP Research, that a royalty buy-out

9    provided to one company would be -- the company

10   would be acquired and suddenly a much larger

11   company, without making any payments, would be

12   claiming something very wide and broad.  So we

13   were quite concerned about this.

14   Q.   And I am pretty sure that you have

15   already said this, but just for Judge Gross'

16   benefit, when you said in your email "By expire

17   I mean that new products/projects," what was

18   the distinction you were drawing between

19   products and projects?

20   A.   Okay.  A product was a product in the

21   marketplace.  Nortel had a specific name for

22   it, product numbers, prices.

23              A project was I want to say a

24   group of engineers who had been chartered to



1    make a product, but it wasn't done yet.  And we

2    were willing to extend the royalty buy-out to

3    projects that were in place at the time of the

4    acquisition.

5        Q.  In place at Bay?

6        A.  Bay, yes.  And, of course, the

7    requirements about scheduling and signatures

8    and all those things still apply.

9        Q.  Did you have conversations with

10   Mr. Hyslop about the subject in this email?

11       A.  I believe so.

12       Q.  And did you have conversations with

13   Mr. Hyslop concerning the concern that you

14   described that is found in the paragraph that

15   says, "After three years the distinction

16   between Bay and Nortel will have blurred so

17   much that it will be impossible to tell which

18   is which"?

19       A.  Yes, we had conversations about that.

20       Q.  Is there any doubt in your mind based

21   upon your conversations with Mr. Hyslop whether

22   he understood what the agreement was that was

23   reached?

24       A.  He understood our concern, and he agreed



1    with our proposal.

2                    MR. HERRINGTON:  Again, Your

3    Honor, it calls for speculation, to speculate

4    what was in Mr. Hyslop's mind.

5    BY MR. BUSCH:

6        Q.  Well, did Mr. Hyslop express to you

7    whether he understood the deal?

8        A.  It is hard for me to recall specific

9    words, but I know that he heard me express this

10   concern and was very agreeable, never raised

11   another option or objection to it.

12       Q.  Thank you.  All right, now, let me show

13   you as the next exhibit P-42.  If you would

14   please move to P-42.

15       A.  Okay, I have it.

16                   MR. HERRINGTON:  If you could just

17   wait a minute.  Well, Your Honor, if P-42 is an

18   internal Nortel email.

19                   THE COURT:  Yes.

20                   MR. HERRINGTON:  So I don't know

21   what this witness is going to do or how it

22   could be possibly something that is a basis for

23   this witness to provide testimony.

24                   MR. BUSCH:  So a couple of things,



**WILCOX & FETZER LTD**
Registered Professional Reporters
(302) 655-0477
www.wilfet.com

1    Your Honor.  Number one, I am moving for

2    introduction of it.  I believe we have an

3    agreement with Nortel that they don't have an

4    objection to it so long as we provide the Court

5    with a couple of other emails that were

6    produced at the same time.  And we are prepared

7    to do that.

8                    MR. HERRINGTON:  That's not

9    correct.  There are two issues.  One is this

10   was -- actually, he is talking about a

11   different issue.  Sometimes have marked an

12   exhibit where it was an email and an

13   attachment.  We said, well, it has to stay the

14   same.  That is not what we are talking about.

15                    This email is an internal Nortel

16   email, so not anything that was expressed to

17   SNMP.

18                    THE COURT:  Right.

19                    MR. HERRINGTON:  For it to be

20   extrinsic evidence of parties' intentions, it

21   has to be what is objectively manifested to

22   each other --

23                    THE COURT:  Right.

24                    MR. HERRINGTON:  -- not what is



1    said behind your own walls.  So this document

2    wouldn't be admissible or probative anyway, but

3    it is certainly not something for this witness

4    to comment on.

5              MR. BUSCH:  So my answer to that

6    is a couple things.

7              THE COURT:  Yes.

8              MR. BUSCH:  Number one, the

9    document was produced by Nortel, so it is

10   deemed authentic.  Number two, it is an

11   admission by Nortel of their state of mind and

12   understanding about the agreement.  So it is

13   not hearsay.  It is either an admission or

14   comes in as state of mind.

15             THE COURT:  But not through this

16   witness.

17             MR. BUSCH:  No, no.  I am asking

18   just for it to be admitted, and then I will

19   have a question for this witness, which is I

20   want him to direct his attention to a portion

21   of the document and I want to ask him whether

22   that is something that he communicated to

23   Mr. Hyslop to go to -- and why Mr. Hyslop is

24   repeating that as the understanding of the



1    parties.

2              Nortel has wanted this extrinsic

3    evidence in.  They have argued for it.  Now

4    this is crucial extrinsic evidence, and they

5    are trying to argue that we can't get in an

6    admission by Nortel.  So that's how I intend to

7    ask the witness a question about it.  It is an

8    admission, it goes to state of mind, and it is

9    deemed authentic.

10             MR. HERRINGTON:  Your Honor, here

11   is what I propose.  This is a bench trial.

12   Let's let things be put on the record, but it

13   is subject to our argument that an internal

14   Nortel email, it doesn't fit the bill of

15   relevance for extrinsic evidence because,

16   again, extrinsic evidence is what Party A says

17   to Party B, not what Party A says behind its

18   walls.

19             Number two, I also have a

20   reservation about this witness commenting on

21   some email.  That's not what fact witnesses are

22   to do.

23             But again, it is a bench trial.

24   We have no problem with this email on the



1    merits, frankly.  But rules of evidence do

2    apply.  So let's let it in evidence, subject to

3    our arguments as to the lack of any probative

4    value or any competence as evidence on the

5    issue that Your Honor is addressing.

6                    MR. BUSCH:  Well, he just agreed

7    that the document can come in.  I don't want my

8    silence to his statements about what is and

9    what is not relevant extrinsic evidence to be

10   deemed to be consent because it clearly -- if

11   there was a conversation between Mr. Hyslop and

12   Mr. Southwood about what the parties intended

13   and then Mr. Hyslop repeated that internally at

14   Nortel, that certainly goes to their state of

15   mind, their understanding of the agreement,

16   their intent.  So I completely disagree with

17   that premise that Mr. Herrington just said.

18                    But nonetheless, he just said the

19   document can come in, so the document should

20   come in.

21                    MR. HERRINGTON:  Subject to these

22   reservations, Your Honor.

23                    THE COURT:  That's right.  Subject

24   to the reservations, it is admitted.



1           MR. BUSCH:  Thank you, Judge

2   Gross.  I appreciate that.

3           But again, with all due respect to

4   US Debtors, on my time here --

5           THE COURT:  Yes.

6           MR. BUSCH:  -- and he raised an

7   objection; then in the midst of raising an

8   objection, he withdrew it, and we had to spend

9   a few minutes arguing about it.

10          MR. HERRINGTON:  No.  I propose --

11  this document actually is objectionable in the

12  way you are trying to use it with a fact

13  witness.  If you want, I will just object and

14  it will stay out of the record.

15          MR. BUSCH:  Whatever you say is

16  going to happen?  What are you --

17          MR. HERRINGTON:  No.  I think it

18  is clear that Judge -- anyway, Your Honor --

19          THE COURT:  Are you objecting or

20  not?  I understand your reservations.

21          MR. HERRINGTON:  Yes.  I do object

22  to this witness commenting on an internal

23  email, so I object to using it with this

24  witness.



1            THE COURT:  All right.  I will

2   sustain the objection.  It is an internal

3   Nortel document.  I don't know that the witness

4   has any basis to testify about it.

5            MR. BUSCH:  May I try and build

6   that foundation, Your Honor?

7            THE COURT:  Mr. Herrington?

8            MR. HERRINGTON:  Your Honor,

9   again, yes, please.  That's fine.

10            MR. BUSCH:  All right.  So the

11   document, just for the record, is deemed

12   admitted; correct, Your Honor?  The document is

13   admitted?

14            THE COURT:  I didn't think so.

15   Did you ultimately object to it?

16            MR. HERRINGTON:  Your Honor --

17            THE COURT:  It is authentic.

18            MR. HERRINGTON:  Yes, it is

19   authentic.  There is never going to be an

20   authenticity objection in this hearing.

21            THE COURT:  Okay.

22            MR. HERRINGTON:  It is not

23   probative evidence of extrinsic evidence.  It

24   is actually irrelevant.  But again, I don't



1    want to take -- you know, we will let it in

2    subject to that reservation.  But it has no

3    probative value as to the issue the Court is

4    addressing.

5                    THE COURT:  All right.  Okay.

6                    MR. BUSCH:  So that means --

7                    THE COURT:  I understand the

8    objection.  I agree with the objection about

9    not being probative.

10                    MR. BUSCH:  Okay.  Well, may I try

11    to build that foundation, Your Honor?

12                    THE COURT:  You may.

13                    MR. BUSCH:  All right.  Thank you.

14    BY MR. BUSCH:

15        Q.    Mr. Southwood, I want to direct your

16    attention in Plaintiffs' Exhibit No. 42 to Dave

17    Hyslop's email and the last line of the email,

18    the "PS Brian" line.  Do you see where

19    Mr. Hyslop says, "Note that" ---

20        A.  I have not found "PS Brian" yet.

21        Q.  It is right above Dave Hyslop's

22    signature line on Plaintiffs' Exhibit 42.  It

23    is the second page.

24        A.  Second page.



1          Q.   Do you have it?  It is a November --

2          A.   This is how I can tell I was on the

3     wrong page.  I am sorry.

4          Q.   November 25, 1999 email.

5          A.   Yes, I see "PS Brian."

6          Q.   And do you see where Mr. Hyslop writes,

7     "Note that the Bay buy out is a buy out for

8     royalties only, and Bay must still, on a

9     product by product basis, get the right to use

10    the Emanate source code"?  Do you see that?

11         A.   Yes, I do.

12         Q.   And this is dated November 25, 1999.  Do

13    you see that?

14         A.   I see that.

15         Q.   That would have been after your October

16    meeting at the farm; correct?

17         A.   Yes.

18         Q.   And would that have been after your

19    conversations with Mr. Hyslop about what the

20    deal was going to be?

21         A.   Yes.

22         Q.   And did you in connection with your

23    conversations with Mr. Hyslop communicate this

24    point to Mr. Hyslop?



1    A.   Yes.

2    Q.   And did Mr. Hyslop express to you

3    agreement about this being the deal?

4    A.   Yes.

5    Q.   Now, let me show you Plaintiffs' Exhibit

6    No. 43, if I could.

7    A.   Yes.

8              THE COURT:  This is another

9    internal email from Dave Hyslop at Nortel.

10   And, Your Honor, we may have the same

11   discussion with Mr. Herrington about this.  We

12   would move for introduction of this as

13   admissions by Nortel, and I would like the

14   leeway to try to have a foundation for this

15   witness to testify about it.

16             MR. HERRINGTON:  Your Honor,

17   again, it is subject to the reservation that

18   this is an internal Nortel email, not something

19   that was expressed to SNMP.  You know, we have

20   that reservation.  But we will allow some

21   questioning about it on that basis.

22             THE COURT:  All right.  You may

23   proceed with your questioning.

24             MR. BUSCH:  Thank you very much,



1    Judge Gross.

2  BY MR. BUSCH:

3      Q.   All right.   Mr. Southwood, if you will

4   look at this December 2, 1999 email between

5   Mr. Hyslop and various people at Nortel, I want

6   to direct your attention to the first two

7   paragraphs, where Mr. Hyslop writes, "Preside

8   is really a 'Nortel' project where 'Nortel'

9   means that part of present day Nortel which

10   existed prior to the September 1998 merger with

11   Bay, and to the extent the Preside work, even

12   if it borrows or uses software from 'Bay's'

13   Optivity projects, is a new licensee project

14   not covered by the previous Bay-SNMP RI license

15   agreement."   Do you see that?

16      A.   Yes.

17      Q.   Did you have conversations with

18   Mr. Hyslop along the lines of the subject

19   matter of this email that I just read?

20      A.   Yes.

21      Q.   And what did you discuss with Mr. Hyslop

22   along those lines?

23      A.   It is very similar to what he expresses

24   in this paragraph.



1      Q.   And what was that?

2      A.   That the royalty buy-out granted to Bay

3   was for Bay products and our concern about that

4   royalty buy-out bleeding out and/or being

5   confused with Nortel products.  The line was

6   drawn on what was there on the date of

7   acquisition, and if software or other parts of

8   Bay were merged in later, those were new

9   products.

10     Q.   And does paragraph 2 -- without

11   belaboring the record, can you read paragraph 2

12   to yourself, please?

13     A.   To myself or verbally?

14     Q.   To yourself.

15     A.   To myself.  Just a moment, please.

16   (Pause) Yes.

17     Q.   And was this concept also discussed with

18   Mr. Hyslop and agreed to?

19     A.   Yes.  I would comment that at the very

20   end of the paragraph, where he says, "The buy

21   out does not cover SNMP RI products required to

22   develop the Optivity products," that's a

23   reference to our license fees, not to our

24   royalty obligations.



1    Q.   All right.  You can put that document

2    away, Mr. Southwood.  Do you know when the

3    Nortel license was finally executed?

4    A.   December 23, 1999.

5    Q.   All right.  And would you please turn to

6    P-30 in your binder, please?

7    A.   That's in the other book.  Just a

8    moment.  Okay.  I have P-30.

9    Q.   And what do you recognize P-30 to be?

10   A.   It appears to be the signed copy of the

11   Nortel master license agreement.

12              MR. BUSCH:  And, Your Honor, we

13   would move for introduction of P-30.

14              THE WITNESS:  It is a signed copy.

15              MR. BUSCH:  We would move for

16   introduction of Plaintiffs' Exhibit No. 30.

17              MR. HERRINGTON:  I don't think we

18   have an objection, but let me just make sure.

19   What is now Exhibit 30 is just the signed

20   master license agreement, not all the

21   schedules?

22              MR. BUSCH:  Correct.  I believe

23   so.

24              MR. HERRINGTON:  Okay, yes.  No



1    objection, Your Honor.

2                    THE COURT:  All right.  It is

3    admitted.

4                    (Plaintiffs' Exhibit No. 30 was

5    received in evidence.)

6                    THE COURT:  Well, P-30 does have

7    the schedules attached.

8                    THE WITNESS:  No, sir.

9                    MR. BUSCH:  We have P-30 and then

10    we have P-30A and B.  Hold on one second.  May

11    I have a second, Your Honor?

12                    THE COURT:  Yes, yes.  At least

13    mine does.

14                    MR. BUSCH:  I am advised by

15    Mr. Dean that yesterday afternoon we brought

16    over in the exhibit set that we sent something

17    to replace what was there, and it is supposed

18    to just be the first 21 pages of the license

19    agreement without the schedules attached.

20                    THE COURT:  All right.  All right.

21    So okay.

22                    MR. BUSCH:  So with that --

23                    MR. HERRINGTON:  Yes.  No

24    objection, Your Honor.



1                    THE COURT:  All right.

2    BY MR. BUSCH:

3        Q.  Now, Mr. Southwood, based upon your

4    discussions with Mr. Hyslop as part of this

5    deal, can you tell us about how the Nortel

6    license differed from the original SynOptics

7    agreement?

8        A.  Yes.  First, it is a --

9                    MR. HERRINGTON:  Your Honor,

10   again, if he is just giving -- the witnesses

11   shouldn't be telling us what licenses mean and

12   so forth.  If he is just giving us some kind of

13   practical understanding, maybe.  But it is not

14   probative of the legal question that Your Honor

15   will be deciding.

16                   MR. BUSCH:  He is giving an

17   overview of the deal without giving any type of

18   legal opinion.  That's all, Your Honor.

19                   THE COURT:  Is that all right,

20   Mr. Herrington?

21                   MR. HERRINGTON:  Yes, Your Honor.

22                   THE COURT:  Okay.

23                   THE WITNESS:  Okay.

24



1    BY MR. BUSCH:

2        Q.   Go ahead.

3        A.   Okay.   The Nortel license was

4    product-specific in its license grants versus

5    location-specific.

6        Q.   And how did Nortel have to enter into

7    license-specific products in this agreement?

8        A.   A schedule was created for each new

9    license, and they signed and paid the fees.

10       Q.   And what needed to be included on a

11   schedule?

12       A.   The name of the specified entity, the

13   product, the Nortel product that was being

14   licensed, the price, the royalty obligation,

15   the SNMP Research product, operating system,

16   hardware platform, names of certain contacts

17   within Nortel that we needed for

18   administration.

19       Q.   And did you discuss with Mr. Hyslop as

20   part of the negotiations for this agreement how

21   you would distinguish between products that

22   would need to be separately licensed?

23       A.   Yes.

24       Q.   And so did you discuss with him whether,



1    if there were two products such as, for

2    example, a BayStack 450 or a BayStack 325

3    shipping at the same time, whether Nortel would

4    have to license both?

5        A.   They would have to license both.

6               MR. HERRINGTON:  Excuse me.

7               THE COURT:  Yes, yes.

8               MR. HERRINGTON:  This is not an

9    issue for this proceeding, the question of what

10   products are covered by Schedule 1 and what is

11   considered a new product, because if it was, we

12   would have a whole bunch of exhibits, including

13   emails from Mr. Southwood that we would have

14   introduced to show the broad scope of product

15   under this license.

16              MR. BUSCH:  Okay.  We will

17   withdraw the question, Your Honor.

18              THE COURT:  All right.

19              MR. BUSCH:  Your Honor, I hate to

20   do this, but I need a small, short break, if we

21   can.

22              THE COURT:  That's fine.

23              MR. BUSCH:  A post-lunch break.

24              THE COURT:  Yes.  Let's take --



1   shall we take 15 minutes now or 10 minutes?

2                  MR. BUSCH:  Let's take 15.

3                  THE COURT:  Let's take 15 minutes.

4   So I will be back out at 25 after.

5                  MR. BUSCH:  Thank you, Your Honor.

6                  THE COURT:  Thank you, everyone.

7                     (Recess taken.)

8                  THE COURT:  Thank you, everyone.

9   You may be seated.  All right, Mr. Busch.

10                  MR. BUSCH:  Feel better.  Ready to

11  go.

12                  THE COURT:  Yes, yes.  Everybody

13  feels better.  You know, I am not being a

14  caretaker when I say this, but according to my

15  clock, you have got about three hours and 45

16  minutes, which isn't a lot of time.  I don't

17  know what your colleagues think.

18                  MR. DEAN:  I have an hour and 57

19  minutes on our clock.  That's what we have --

20                  THE COURT:  That you have used?

21                  MR. DEAN:  Yes.

22                  THE COURT:  All right.

23                  MR. DEAN:  We are keeping time.

24  That's what we have so far.



```
1                  THE COURT:  All right.  That's
2      fine.
3                  MR. BUSCH:  Gives me a little more
4      time.
5                  THE COURT:  All right.  I will
6      make that adjustment.
7                  MR. BUSCH:  So I will try and get
8      through it, Your Honor.  I am doing my best.
9      This is all very important testimony, and I
10     am --
11                 THE COURT:  Understood.
12                 MR. BUSCH:  If Your Honor thinks
13     any of it is --
14                 THE COURT:  No.  It is your case.
15     It is your case, and you --
16                 MR. BUSCH:  I am just conscious of
17     it, but I have to put my case on, and I need --
18     this is important testimony.
19                 THE COURT:  Okay.
20                 MR. BUSCH:  All right.
21     BY MR. BUSCH:
22        Q.  Mr. Southwood, if you can please turn
23     to -- we have admitted P-40.  I am sorry.  If
24     you would move to Exhibit P-40, if you would,
```



1    and P-41.

2              MR. HERRINGTON:  No objection,

3    Your Honor.

4              THE COURT:  All right.  P-41, did

5    you say?

6              MR. BUSCH:  P-40 and P-41, both.

7              THE COURT:  I am sorry.  Yes.

8              (Plaintiffs' Exhibit Nos. 40 and

9    41 were received in evidence.)

10   BY MR. BUSCH:

11      Q.  And is this the Schedule 1A of the

12   Nortel license agreement, sir?

13      A.  This is Schedule 1A of the Nortel

14   license agreement.

15      Q.  And did you send this document, Exhibit

16   P-40 and 41, to Dave Hyslop?

17      A.  Yes.  This is the one that I sent to

18   him.

19      Q.  So P-40 is what?

20      A.  P-40 is the email cover to the delivery.

21      Q.  And P-41?

22      A.  P-41 is Schedule 1A, the original draft.

23      Q.  And after sending Exhibit P-40 and 41 to

24   Mr. Hyslop -- and that was on November 18 of



1    1999?

2        A.  Correct.

3        Q.  Did Mr. Hyslop request any changes at

4    all?

5        A.  No.

6        Q.  Would you please look at P-31, Exhibit

7    P-31?

8        A.  This is Schedule 1A, and it has been

9    signed.

10       Q.  And signed by Mr. Hyslop?

11       A.  Yes, Mr. Hyslop and Mary Case.

12       Q.  And are there any differences between

13   P-41 and P-31?

14       A.  No.

15       Q.  And when did Schedule 1A expire?

16       A.  Schedule 1A expired three years after

17   the date of signature.  That would be June 20,

18   2003.

19       Q.  And how do you know that?

20       A.  It is what we agreed to verbally during

21   negotiations, and it is stated the last

22   sentence above the signature block on

23   Schedule 1A.

24       Q.  And did you discuss with Mr. Hyslop



```
 1   whether Nortel would have any rights under

 2   Schedule 1A after the three-year termination

 3   period for products that were not placed on

 4   schedules?

 5       A.  They would have no rights on

 6   Schedule 1A.

 7       Q.  Was that discussed with Mr. Hyslop?

 8       A.  Yes.

 9       Q.  Now, in P-40, Plaintiffs' Exhibit

10   No. 40, if you go back to that --

11       A.  Yes.

12       Q.  -- in your email you call Schedule 1A

13   the permanent license agreement.  Why do you

14   use the word "permanent" there?

15       A.  I was making --

16               MR. HERRINGTON:  Excuse me.

17               THE WITNESS:  -- comparison to the

18   temporary license agreement.

19               THE COURT:  Hold on,

20   Mr. Southwood.

21               THE WITNESS:  Oh, I am sorry.

22               THE COURT:  That's okay.

23               MR. HERRINGTON:  If you are

24   purporting to read Schedule 40, you didn't read
```



**W&F**

**WILCOX & FETZER LTD**
Registered Professional Reporters
(302) 655-0477
www.wilfet.com

 1    it correctly.  It says, "The permanent Bay to

 2    Nortel transfer."

 3                    MR. BUSCH:  I am just asking why

 4    he used the word "permanent."

 5                    MR. HERRINGTON:  You said, "The

 6    permanent license."

 7                    MR. BUSCH:  I am sorry.

 8    BY MR. BUSCH:

 9       Q.  Why did you use the word "permanent" in

10    the sentence "Here is the permanent Bay to

11    Nortel transfer"?

12       A.  I was making comparison to the temporary

13    that had occurred and expired on November 1,

14    and this was intended to be the framework

15    associated with the corporate agreement.

16       Q.  Would you please look at P-46 and P-47.

17       A.  I have P-46.  It is an email from me to

18    Dave Hyslop, subject:  Revised Schedule 15A.

19       Q.  And is --

20                    MR. HERRINGTON:  Your Honor -- go

21    ahead.

22    BY MR. BUSCH:

23       Q.  And is Exhibit No. P-47 executed?

24       A.  It is Schedule 15A.  It is not executed.



1         MR. BUSCH:  We will move for

2    introduction of this P-46 and P-47, Your Honor.

3              THE COURT:  Any objection?

4              MR. HERRINGTON:  Is it being

5    offered for any truth of the matter asserted?

6    If so, it would be hearsay.

7              MR. BUSCH:  We are offering it

8    because it is a purported contract that has

9    independent legal significance, Your Honor.

10             MR. HERRINGTON:  As long as it is

11   not being offered for the truth of the matter

12   asserted, we won't object.

13             THE COURT:  All right.  It is

14   admitted under those circumstances, yes.

15             (Plaintiffs' Exhibit Nos. 46 and 47

16   were received in evidence.)

17   BY MR. BUSCH:

18     Q.  So you sent this document, this proposed

19   license to Nortel; is that right?

20     A.  Correct.

21     Q.  And can you tell us how this

22   schedule was created?

23             First of all, what project is this

24   for?



1      A.   This is for the Nortel product or

2    Project Falcon and BayStack 450.

3      Q.   And can you tell us how this schedule

4    was created?

5      A.   I went to the appropriate row on the

6    spreadsheet that Mr. Hyslop provided to me for

7    the information.

8      Q.   And was this product identified as a Bay

9    product on that spreadsheet?

10     A.   Do you a mind if I go look?

11     Q.   Sure.

12     A.   And I have forgotten the reference to

13   the spreadsheet, for the spreadsheet.  Oh, I

14   think I found a copy.  P-45?

15     Q.   P-37.

16     A.   P-37?

17     Q.   Yes, sir.

18     A.   I have the Falcon BayStack row.  And

19   what was your question again?  Was it a Bay or

20   a Nortel product?

21     Q.   Yes.  Was it identified by Mr. Hyslop as

22   a Bay product?

23     A.   It was identified as Bay on that.

24     Q.   And why does Schedule 15 not include



1    per-copy royalties for EMANATE?

2        A.  That was consistent with the agreement

3    we had struck with Mr. Hyslop that the Bay

4    original products would receive the royalty

5    buy-out.

6        Q.  Okay.  You can put that away.  By the

7    way, is the product description in Schedule 15

8    a standard product description?

9        A.  Yes.

10       Q.  Would you please go to Plaintiffs'

11   Exhibit 30.18, please.

12       A.  That would be in the other book?  Just a

13   moment.

14       Q.  Okay.

15       A.  Okay, I am there.

16       Q.  And can you identify this document?

17       A.  It is Schedule 12A.

18       Q.  To the Nortel license agreement?

19       A.  To the Nortel license agreement.

20       Q.  Can you tell us how this schedule was

21   created?

22       A.  Once again, I went to the spreadsheet

23   and with the named product on the spreadsheet

24   and then looked for the rest of the information



1    to create this schedule.

2        Q.  And how was this product on this

3    schedule identified by Mr. Hyslop; Bay or

4    Nortel?

5        A.  Bay.

6        Q.  And can you please read the royalties

7    section of this Schedule 12, 30.18?

8        A.  Yes.  "As portions of the former Bay

9    Networks, the royalty buy-out previously

10   exercised by Bay Networks applies to this

11   transaction."

12       Q.  Okay.  And why did you include the

13   royalty buy-out?

14       A.  Because that was what we agreed with

15   Dave Hyslop.

16       Q.  And this product was based on the

17   schedule?

18       A.  And the product was on a schedule, as we

19   had agreed, with the particular product name,

20   yes.

21               MR. BUSCH:  And, Your Honor, we

22   would move for introduction of Exhibit 30.18.

23               MR. HERRINGTON:  No objection.

24               THE COURT:  It is admitted.



1              (Plaintiffs' Exhibit No. 30.18 was

2     received in evidence.)

3    BY MR. BUSCH:

4        Q.   Let's go to 30.20, please.  Do you

5     recognize this document?

6        A.   Yes.  This is Schedule 14A.

7        Q.   And was this product identified on the

8     spreadsheet from Mr. Hyslop?

9        A.   Yes.

10       Q.   And what is the product identification

11    in the first column?

12       A.   It was Bay.

13       Q.   Was all of the SNMP Research software

14    identified on Schedule 14 previously licensed

15    under the Bay agreements?  And please look at

16    Schedule 1 of P-31.

17       A.   I am sorry.  My mind went elsewhere.

18    Can you ask again, please?

19       Q.   Was all the SNMP Research software

20    identified on Schedule 14 previously licensed

21    under the Bay agreement?  And I directed you to

22    Schedule 1 of Plaintiffs' Exhibit 31 for

23    reference.

24       A.   Yes, yes, it was previously identified.



1          MR. BUSCH:  Your Honor, we would

2     move for introduction of 30.20.

3          MR. HERRINGTON:  No objection.

4          THE COURT:  Admitted.

5          (Plaintiffs' Exhibit No. 30.20

6     document was received in evidence.)

7     BY MR. BUSCH:

8     Q.  Okay.  Were the cross-development tools

9     for Solaris licensed under the Bay agreements?

10    A.  Yes, it was, in that every distribution

11    of EMANATE included development tools.  They

12    are called out specifically on this one as a

13    note to our shipping department which operating

14    system.  Because this license is for a realtime

15    operating system, the development tools needed

16    to run on another operating system, and I was

17    telling our shipping department which operating

18    system to send.

19    Q.  Did Mr. Hyslop identify other Bay

20    products?

21    A.  Yes.

22    Q.  On the spreadsheet?

23    A.  On the spreadsheet, yes.

24    Q.  And did the products identified by



1    Mr. Hyslop on the spreadsheet as Bay all get a

2    royalty buy-out if Nortel signed a schedule?

3        A.   They were all eligible.   When they got

4    the schedule and signed it, they would have

5    gotten the royalty buy-out.   I don't believe

6    all of them did get the royalty buy-out.

7        Q.   Okay.   Because they weren't --

8        A.   Because they didn't execute a schedule.

9        Q.   Did you and Mr. Hyslop continue to work

10   together after the SNMPRI-Nortel license?

11       A.   Yes.

12       Q.   In what capacity?

13       A.   I remained VP, sales, and he remained in

14   software acquisition, and there were a number

15   of particular transactions that were under

16   demand from Nortel, and we had to deal with

17   those.

18       Q.   And how many sales did you make to

19   Nortel after the Nortel license, the one we

20   have been talking about, the December 23, 1999

21   license was signed?

22       A.   I don't have a specific count, but it

23   was well over 50 schedules.

24       Q.   So there were additional transactions



1    beyond those listed on the spreadsheet we

2    looked at?

3       A.   Yes.

4       Q.   How did you keep up with requests

5    subsequent to the initial round of schedules

6    specified in the spreadsheet?

7       A.   Mr. Hyslop and I would talk to each

8    other, but we would also enter information as

9    new rows on the spreadsheet, and then we would

10   send revised versions to each other.

11      Q.   Would you please now turn to Plaintiffs'

12   Exhibit No. 51, Mr. Southwood.

13      A.   Okay, I am there.

14      Q.   Do you recognize Plaintiffs' Exhibit

15   No. 51?

16      A.   It is an email from Dave Hyslop to me

17   dated September 21, 2000.

18              MR. BUSCH:  And, Your Honor, we

19   would move for introduction of Plaintiffs'

20   Exhibit No. 51.

21              MR. HERRINGTON:  No objection,

22   Your Honor.

23              THE COURT:  It is admitted.

24              (Plaintiffs' Exhibit No. 51 was



1    received in evidence.)

2    BY MR. BUSCH:

3        Q.   And do you have an understanding why

4    Mr. Hyslop sent you this email?

5        A.   Yes.   The subject is regarding Schedule

6    20A, and I had created a Schedule 20A and

7    mistakenly included per-copy royalty

8    obligations, so he was sending this back.

9                MR. BUSCH:   All right.   So let's

10   look at this, and I am going to read this for

11   the record because this is an important email,

12   Your Honor.

13   BY MR. BUSCH:

14       Q.   In this email, September 21 of 2000,

15   Mr. Hyslop writes, "John, I believe you are

16   mistaken in including royalty charges on the

17   attached Schedule 20.   You will recall that

18   back in December 1999 the old 'Bay' operations

19   products were 'grandfathered' as far as royalty

20   payments were concerned in recognition of a

21   previous 'Bay buy-out' for those products.

22   That was documented in Schedule 12 signed back

23   in December 1999.   Therefore, please modify

24   Schedule 20 to duplicate the wording in



**W&F**

**WILCOX & FETZER LTD**
Registered Professional Reporters
(302) 655-0477
www.wilfet.com

1    Schedule 12 under the royalty section.  Once so

2    changed, Nortel will sign and pay the Source

3    Code license fee for Brass."

4              Do you see that?

5        A.  Yes, I do.

6        Q.  Is this statement by Mr. Hyslop about

7    the royalty buy-out being made in the context

8    of him actually licensing the product?

9        A.  Yes, it is.

10       Q.  In your mind, is that significant?

11       A.  Yes.  He references the source code

12   license fee, and so he is living up to his half

13   of the deal.  We are going to live up to our

14   half of the deal.

15       Q.  And when you say "his half of the deal,"

16   what do you mean by that?

17       A.  Execute a schedule, name a product, pay

18   the source license fees.  Our half is to grant

19   the royalty buy-out.

20       Q.  When did Mr. Hyslop leave Nortel?

21       A.  I think late 2002 or early 2003.

22       Q.  And who did you work with at Nortel

23   after his departure?

24       A.  Primarily Pierre Tremblay.



1     Q.   And did you and Mr. Tremblay discuss the

2   licensing agreement and schedules?

3     A.   Yes.

4     Q.   And did you spend time trying to

5   understand and reconcile those things?

6     A.   Yes.  We took quite some time to try to

7   educate Mr. Tremblay on the negotiations and

8   the intent of the license and to go through the

9   schedules.

10    Q.   So turn to Plaintiffs' Exhibit No. 57

11   and 58, please.

12    A.   I have 57.  It is an email from Pierre

13   Tremblay to Martha Hopper and myself.

14    Q.   And what is Exhibit No. 58?

15    A.   58 is a Word document that was attached

16   to that email.

17              MR. BUSCH:  Your Honor, we would

18   move for introduction of Exhibits 57 and 58.

19              MR. HERRINGTON:  It just depends

20   on how they are being used.  If there are

21   statements in here by SNMP people, that would

22   be hearsay, and so if any of that is being

23   offered for the truth of the matter asserted,

24   then we would object.



1          MR. BUSCH:  As far as 58 is

2    concerned, Your Honor, there is one reference

3    to Mr. Southwood explaining the deal to

4    Mr. Tremblay under Schedule 12, and that would

5    come in under state of mind.  We are talking

6    about an explanation of the contract, and so it

7    would be state of mind.

8               Furthermore, this is the type of

9    document that is maintained by SNMP Research in

10   the ordinary course of business, so therefore,

11   it would be an exception to hearsay in any

12   event.

13          MR. HERRINGTON:  Well, Your Honor,

14   he can ask the witness.  This is an exchange

15   started by Pierre Tremblay.  It is an email

16   exchange.  Counsel just said this was some

17   document maintained in the course of SNMP's

18   business.  This was a one-off, unique exchange.

19               You said something about state of

20   mind?

21          THE COURT:  Yes.

22          MR. HERRINGTON:  This says 2004,

23   so it wouldn't be the state of mind when they

24   some kind Schedule 1 three and a half years



1    earlier.

2                    MR. BUSCH:  It is 2003, not 2004,

3    the document.  And it was right at the time of

4    the termination of 2003 and is explaining the

5    then-existing state of mind of the parties

6    concerning the contract at issue.  It is key

7    extrinsic evidence.  It was communicated and --

8                    THE COURT:  I will overrule the

9    objection.

10                    MR. BUSCH:  Thank you, Your Honor.

11                    (Plaintiffs' Exhibit Nos. 57 and 58

12    were received in evidence.)

13                    MR. BUSCH:  So P-58 and P-59 are

14    admitted, Your Honor?

15                    THE COURT:  Yes.

16                    MR. BUSCH:  Thank you.

17    BY MR. BUSCH:

18      Q.  So let's turn to some of the -- so

19    explain for the judge how this document, if you

20    have an understanding, was compiled; that is,

21    P-58.

22      A.  Okay.  P-58 is --

23                    MR. BUSCH:  I am sorry, Your

24    Honor.  I made a mistake that I need to correct



 1     for the record.  And a moment ago I said so

 2     P-58 and P-59 are admitted into evidence.  In

 3     fact, it is P-57 and 58.

 4                    THE COURT:  I thought that, and

 5     yes, good.

 6                    MR. BUSCH:  I just wanted to catch

 7     that.

 8                    THE COURT:  Thank you.

 9   BY MR. BUSCH:

10     Q.  So let's talk about P-58.

11     A.  Okay.

12     Q.  What is your understanding about how

13     P-58 was created?

14     A.  P-58, first there was an issue in that

15     the email program that Pierre used was

16     different from the email program that SNMP

17     Research used, so that he was tracking who said

18     what by color, and the SNMP Research program

19     did not show color.  So he went to a Word

20     document and crafted these previous emails and

21     marked who said what in the left-hand column

22     and so we could use it.

23                    MR. BUSCH:  Okay.  Thank you, Your

24     Honor.  I think that is helpful perhaps for the



1    Court.

2                    THE COURT:   Yes.

3                    MR. BUSCH:   Thank you.

4    BY MR. BUSCH:

5        Q.  So let's go to a couple of different

6    statements in this email.  So I would like to

7    start with "BAY - Schedule 1."

8        A.  Yes.

9        Q.  And by the way, you may have mentioned

10   this a moment ago, but Martha Hopper was an

11   SNMP employee; correct?

12       A.  That's correct.  She was in accounting.

13       Q.  All right.  So let's look at Schedule 1

14   where there is a reference to "(Pierre - 12

15   August 03)."  Do you see that?

16       A.  Yes.

17       Q.  And do you see where -- does that mean

18   that Mr. Tremblay said those words that would

19   follow that designation?

20       A.  Yes, yes, on the 12th of August 2003.

21       Q.  And so Mr. Tremblay said Schedule 1A

22   covers "all products of units and projects

23   originating from what was Bay Networks.  I

24   still haven't found anything that fits this



1    description but to be honest, I have not yet

2    looked very hard."  Do you see that?

3        A.   I see that.

4        Q.   Why did this arise?

5        A.   The three-year window had just expired,

6    and we were concerned that they had gotten all

7    of the products that should apply.

8        Q.   And that was a representation that

9    Mr. Tremblay made to you in that context?

10       A.   Yes.

11       Q.   Now, next you will see an entry for

12   Martha 14 August '03 right under Pierre

13   Tremblay, and you will see where she writes,

14   "According to John, as I understood him, Bay

15   has a Royalty-BuyOut on EMANATE Sources on

16   WinNT, Solaris, and VxWorks as well as

17   Asynchronous Request Libraries on Solaris."  Do

18   you see that?

19       A.   Yes.

20       Q.   Did she understand you correctly?

21       A.   No, she did not.

22       Q.   And did you in this document later

23   explain what your understanding of Schedule 1A

24   was?



1        A.   Yes, I did.

2        Q.   So let's go to that and let's go to

3    Schedule 12.

4        A.   I have it.

5        Q.   And to save your voice, I will read into

6    the record what you wrote.  And just for the

7    record, let me just ask if this is correct.

8    Under Schedule 12, where it says, "(John - 14

9    August 03)," that is you?

10       A.   That's me.

11       Q.   And so this is your email to Pierre

12    Tremblay on that date?

13       A.   Correct.

14       Q.   And I am just going to read this for the

15    record.  Then I will have a couple of questions

16    for you.

17            "My records indicate that Schedule

18    12 was associated with the former Bay, and so

19    the royalties were included in a royalty buy

20    out exercised by Bay before Bay was purchased

21    by Nortel.

22            "By the way, Pierre, this is a

23    good time to mention an informal agreement

24    reached by Dave Hyslop and me during license



1    negotiations.  In the years before Nortel

2    purchased Bay, Bay was one of SNMPRI's better

3    customers including the exercise of several

4    royalty buy outs.  Since we were negotiating

5    with Nortel at about the same time that Nortel

6    purchased Bay, Dave indicated that Nortel

7    wanted some benefit from those previous royalty

8    buy outs.  Since those royalty buy outs were

9    not product specific, SNMPRI responded by

10   saying that the lines between the former Bay

11   and the former Nortel were going to blur over

12   time, and the result would be that all of

13   Nortel would get a royalty free license if we

14   extended the benefits into the Nortel license.

15   The compromise was that the benefits of the Bay

16   royalty arrangement would extend to portions of

17   the former Bay who established schedules over

18   the following three years (2000, 2001, 2002).

19   SNMPRI agreed as long as all schedules would be

20   product specific.  Dave was certain to declare

21   whether a particular transaction was associated

22   with Bay or Nortel, and I have a column on the

23   spreadsheet that I use that indicates Dave's

24   comments.  You may find that you also have a



1    copy of that spreadsheet.

2              "So, Schedule 12 has a lifetime

3    royalty buy out based upon the Bay buy outs and

4    that it was completed during the open window."

5              Did you communicate that to Pierre

6    Tremblay in August of 2003?

7    A.   Yes.

8    Q.   Does this accurately reflect your

9    conversations with David Hyslop as you have

10   been describing them to Judge Gross in this

11   court today?

12   A.   Yes.

13   Q.   Was this matter fresh in your mind at

14   that time?

15   A.   Yes.

16   Q.   And you reference here the requirement

17   to enter into schedules.  Do you see that?

18   A.   Yes.

19   Q.   And where in the parties' agreement is

20   the requirement to enter into schedules

21   reflected?

22   A.   It is in the body of the corporate

23   agreement.

24   Q.   To which Schedule 1A is a part?



1      A.  To which 1A is attached, yes.

2      Q.  And did Nortel establish a schedule for

3   Schedule 12 during the window?

4      A.  Yes.

5      Q.  Did Mr. Tremblay ever express a contrary

6   understanding of the agreement?

7      A.  No.

8      Q.  Now, did Nortel in 2004 -- and this is

9   in 30.51, please.

10     A.  Just a moment okay.  I have 30.51.

11     Q.  Now, in 2004 did Nortel contact you to

12  advise that they had discovered a Bay product

13  that was using SNMP Research software and asked

14  to enter into a schedule?

15     A.  Yes, they did.

16              MR. HERRINGTON:  Just one second,

17  please.  Okay.

18  BY MR. BUSCH:

19     Q.  And do you recognize 30.51?

20     A.  Yes.  It is Schedule 60.

21              MR. BUSCH:  Your Honor, we move

22  for introduction of 30.51.

23              MR. HERRINGTON:  No objection,

24  Your Honor.



1                    THE COURT:  Admitted.

2                    (Plaintiffs' Exhibit No. 30.51 was

3      received in evidence.)

4    BY MR. BUSCH:

5        Q.   And did you confirm at that time whether

6      the product that they were requesting had, in

7      fact, been distributed by Bay when it was Bay

8      before the acquisition of Nortel?

9        A.   Yes, I did.

10       Q.   Before the acquisition by Nortel, I

11     should say.

12       A.   Yes.

13       Q.   And what were the products?

14       A.   Their specified product was Optivity

15     network management project.

16       Q.   And did you agree to allow Nortel to

17     enter into a schedule?

18       A.   Yes, I did.

19       Q.   Why?

20       A.   Number one, Optivity was a good customer

21     of ours all the way back into the Bay days, but

22     we wanted to be nice to a good customer.  We

23     were doing a lot of business with Nortel.

24       Q.   And was there any discussion at that



1    time about extending the Schedule 1A date

2    generally or otherwise sticking to the

3    three-year termination date?

4        A.   There was no conversation about that.

5        Q.   And are you aware at any time, at any

6    time, of Nortel providing any consideration

7    whatsoever to SNMP Research, any money of any

8    kind, to waive the three-year termination found

9    in Schedule 1A?

10       A.   No, no.

11       Q.   Now, let's now turn to Exhibit P-60.

12       A.   Not 30.60.

13       Q.   No.  P-60.

14       A.   P-60 okay.  I have it.

15              MR. HERRINGTON:  This is an email

16   where there are some emails from SNMP Research

17   employees.  Those can't be offered for the

18   truth of the matter asserted.  But as long as

19   they are not being offered for that purpose,

20   then we wouldn't object.

21              MR. BUSCH:  That's fine.

22              THE COURT:  All right.

23              MR. BUSCH:  I move for

24   introduction of P-60.



```
 1                    THE COURT:  Admitted.

 2                    (Plaintiffs' Exhibit No. 60 was

 3     received in evidence.)

 4   BY MR. BUSCH:

 5       Q.  So I want to first look at P-60, being a

 6   January 31, 2006 email.  Do you see that?

 7       A.  Yes, I do.

 8       Q.  Can you identify this document to the

 9   Court?

10       A.  It was from Nancy Knowles, who was

11   another SNMP Research employee, to me, with the

12   title "SNMP Research license question."

13       Q.  And when was this email sent?

14       A.  January 31, 2006.

15       Q.  Can you explain what prompted this email

16   exchange?

17       A.  It will be a bit complex, but I was

18   asking Nancy to craft a letter and send it to

19   Nortel.  I guess that is short enough.

20       Q.  And had Nana La-Anyane contacted SNMP

21   Research?

22       A.  Yes, he had.

23       Q.  And did this involve products known as

24   EDN and Trapeze?
```



1      A.   Those were -- EDN was a specified entity

2    within Nortel who was working on a project.  It

3    was a joint development project with an outside

4    company, Trapeze.

5      Q.   And did you try to locate a license

6    based on the request that was made to you that

7    licensed software for Trapeze?

8      A.   Yes.  Trapeze asked for a letter from

9    SNMP Research that two entities wanted to share

10   code, development code, that included ours, and

11   our license typically would not allow that.  So

12   they wanted a letter from us that would allow

13   these two companies to share our code.  And so

14   I went back to do research to verify that

15   Nortel and Trapeze had licensed the same code,

16   and they had not.

17     Q.   And so at the time did Nortel have a

18   license under the old Bay license?

19     A.   No.

20     Q.   Did you explain this to Nortel?

21     A.   Yes.

22     Q.   What did you explain?

23     A.   I explained that the products that had

24   been under Schedule 1 were not the same as the

1    ones that Trapeze had licensed.

2        Q.   And let's now look at Exhibit P-59.

3                MR. HERRINGTON:  Your Honor, the

4    same issue.  This is a letter from

5    Mr. Southwood.  It would be a party admission

6    for our use of it.  But if it were to be used

7    for the truth of the matter asserted by SNMP,

8    it would be hearsay.

9                THE COURT:  That's correct.

10               MR. BUSCH:  We are not offering it

11   for the truth of the matter asserted.

12               THE COURT:  All right.

13               MR. BUSCH:  We will move for

14   introduction of P-59, Your Honor.

15               THE COURT:  It is admitted.

16               (Plaintiffs' Exhibit No. 59 was

17   received in evidence.)

18   BY MR. BUSCH:

19       Q.   Okay.  So can you identify this

20   document?

21       A.   The fax cover letter is from Nancy

22   Knowles for me to Nana La-Anyane.  And I don't

23   know how to pronounce it.  I am sorry.

24       Q.   That's okay.



1     A.   And then the letter follows.

2     Q.   And what was the purpose of this letter?

3     A.   This was the letter that granted them

4  the rights to share SNMP Research code between

5  the two on the condition that Nortel sign

6  Schedule 71.

7     Q.   And can you please read the first

8  sentence of this letter?

9     A.   "Nortel Networks has a license with SNMP

10 Research International for EMANATE sources

11 running on Windows, Solaris, and VxWorks as

12 referenced under Nortel Schedule" 71.

13    Q.   Why did you make this statement about

14 Schedule 1?

15    A.   Well, I was intending to say that the

16 products under Schedule 71 were not the same as

17 the ones that Trapeze had licensed.

18    Q.   And did you go back and actually read

19 Schedule 1A in 2006 again at the time that you

20 did this?

21    A.   No.  I found one good reason to drive

22 forward and stopped there.

23    Q.   And what was that reason?

24    A.   They didn't license -- there was no way



1    that Nortel had the license that Trapeze had.

2        Q.   Do you know whether there is a mistake

3    in this letter?

4        A.   Yes, there is.

5        Q.   And what is the mistake?

6        A.   Nortel Networks did not have a license

7    in 2006 with SNMP Research International for

8    EMANATE sources under Schedule 71.  Or

9    Schedule 1.  I am sorry.  Under Schedule 1.

10       Q.   And in 2006, approximately how many

11   different transactions did you deal with?

12       A.   I am certain more than a thousand

13   potential transactions.

14       Q.   And how often were you working with

15   Nortel at this point?

16       A.   Not very often.  They had pretty much

17   dried up as a source of new licenses.

18       Q.   And did you simply forget about the

19   terms?

20       A.   Yes, I had forgotten.

21       Q.   And did Nortel, by the way, provide at

22   any time that you are aware of any money or

23   consideration or anything in order for SNMP

24   Research to waive the three-year termination



1    date in Schedule 1?

2        A.   No.

3        Q.   Did you ever even have any conversations

4    with Nortel at any time about extending or

5    eliminating that three-year termination?

6        A.   No.

7        Q.   Okay.  I have one last subject to cover

8    with you, Mr. Southwood.

9        A.   Yes.

10       Q.   Software service agreement.  Can you

11   explain what a software service agreement is?

12       A.   Yes.  It is an agreement between SNMP

13   Research and our customer in which we grant

14   maintenance services associated with our

15   license.  So upgrades, technical questions and

16   support.

17       Q.   Are software service agreements separate

18   from the license agreement?

19       A.   Yes, they are.

20       Q.   Did Bay Networks have an SSA with SNMP

21   Research?

22       A.   Yes.

23       Q.   Did Nortel also purchase SSAs?

24       A.   Yes.



1    Q.  Do you know whether the Bay Networks SSA

2  was tied to a schedule in the Nortel agreement?

3    A.  It was not tied to a schedule.

4    Q.  And what was your involvement with SSAs?

5    A.  I would attempt to sell the SSA at the

6  time of the original license, and then after

7  that I left it to others to renew the

8  schedules, or to renew the SSAs.

9    Q.  So do I understand then that you were

10  not responsible for renewing SSAs?

11    A.  That's correct.  I was not.

12    Q.  And did you ever pursue renewing any

13  particular SSA with Nortel?

14    A.  No.

15    Q.  And who was responsible at SNMP Research

16  for SSA administration?

17    A.  Lori Branch.

18    Q.  And was Lori in sales?

19    A.  No.

20    Q.  Can you name anyone in sales at SNMP

21  Research that had any responsibilities

22  regarding SSAs?

23    A.  No.

24    Q.  Turn to P-23, if you would.



1      A.   P-23?

2      Q.   Yes.

3      A.   I am on my way.  Okay, I have it.

4      Q.   Do you recognize this document?

5      A.   This is the software service agreement

6   with SynOptics that was later transferred to

7   Bay.

8      Q.   Does this SSA reference a particular

9   product?

10      A.   It does not reference a particular

11   SynOptics or Bay product.  It references SNMP

12   Research products.

13              MR. BUSCH:  Your Honor, we move

14   for introduction of P-23.

15              MR. HERRINGTON:  No objection,

16   Your Honor.

17              THE COURT:  Admitted.

18              (Plaintiffs' Exhibit No. 23 was

19   received in evidence.)

20   BY MR. BUSCH:

21      Q.   And at your deposition you said that the

22   SSA that was renewed in 2004 was inconsistent,

23   could be considered inconsistent with the

24   termination of the Schedule 1.



1     A.   Yes.

2     Q.   Why did you say that?

3     A.   The line of questioning made me think

4  that it was tied to Schedule 1, and so renewing

5  it in subsequent years would have been

6  inconsistent.  But Lori did not know about

7  Schedule 1.  She was just following her job.

8  And I was not aware of our renewal thing, so it

9  was not a conscious or willful decision at all.

10          MR. BUSCH:  Your Honor, that's all

11  that we have at this time for Mr. Southwood.

12          THE COURT:  All right.  Thank you,

13  Mr. Busch.

14          MR. HERRINGTON:  Your Honor, as we

15  explained to SNMP's counsel, since we are

16  calling Mr. Southwood in our case, we will let

17  him go, and we will call him back in our case.

18          THE COURT:  All right.

19  Mr. Southwood, you will be called back to

20  testify.

21          THE WITNESS:  Okay.  I can leave

22  this.  Okay.

23          THE COURT:  Yes.  And I guess you

24  ought to remain outside the courtroom; right?



1          MR. BUSCH:  Yes.  He will have to

2   be sequestered, I guess.

3          THE COURT:  Yes.

4          MR. HERRINGTON:  Right.

5          MR. BUSCH:  But he can go back to

6   the hotel, if you would like.

7          THE COURT:  I don't think you will

8   be called this afternoon.  Right?

9          MR. HERRINGTON:  I don't think so,

10  Your Honor.

11          THE COURT:  All right.  You may go

12  back to the hotel then, Mr. Southwood.

13          MR. BUSCH:  Or anywhere else he

14  chooses.

15          THE COURT:  Just don't get in

16  trouble.

17          (Witness excused.)

18          MR. BUSCH:  So we will call

19  Dr. Case at this time.

20          THE COURT:  All right.

21          MR. BUSCH:  Judge, Dr. Case would

22  like just three minutes before he gets called.

23          THE COURT:  Let's take five

24  minutes.  All right, five minutes.



```
1                    MR. BUSCH:  Thank you.

2                         (Recess taken.)

3                    THE COURT:  Thank you, all.  You

4       may be seated.  All right, Mr. Busch.

5                    MR. BUSCH:  Okay.  Dr. Case.

6                    THE COURT:  All right, Dr. Case.

7       If you will come to the stand, please.

8                    MR. BUSCH:  Your Honor, can I ask

9       you a question.  So I was a bit chastised

10      earlier about saying Mr. Herrington said this

11      or Mr. Herrington said that in his opening

12      statement.  Dr. Case was actually here.  He is

13      a party witness.

14                   THE COURT:  Right.

15                   MR. BUSCH:  He heard it.  If he

16      wants to respond to something Mr. Herrington

17      said, I am assuming that that objection that

18      Mr. Southwood was sequestered and so it is not

19      fair for me to mention that doesn't apply to

20      Dr. Case.

21                   THE COURT:  Mr. Herrington, is

22      that correct?  I think that's correct.

23                   MR. HERRINGTON:  Well, it is fine.

24      I think the party representative exception is
```



1    actually not to really get over the fact that

2    fact witnesses aren't supposed to see other

3    proceedings.  It is just that they need to be

4    there to consult with counsel.

5                  THE COURT:  Yes.

6                  MR. HERRINGTON:  So it is more a

7    question of their not leaving the courtroom for

8    that purpose rather than just ignoring the idea

9    that they are here to give their testimony, not

10   to comment on things beyond their testimony.

11                 MR. BUSCH:  If he has things he

12   wants to respond to that he heard, whether Mr.

13   Herrington thinks it is fair or not, he was

14   here and heard it.  I never heard of that,

15   what Mr. Herrington just said.  But if we can

16   take it question by question, perhaps we can

17   deal with it that way.

18                 THE COURT:  All right.

19                 JEFFREY DEAN CASE, having been

20   first duly sworn, was examined and testified as

21   follows:

22                 DIRECT EXAMINATION

23   BY MR. BUSCH:

24      Q.  Good afternoon, Dr. Case.



1        A.   Good afternoon.

2        Q.   Where do you work and what is your

3    title?

4        A.   I work at SNMP Research, Incorporated,

5    and my title is founder and chief technical

6    officer.

7        Q.   And are you the owner of SNMP Research,

8    Inc.?

9        A.   Yes.   I own 100 percent and always have.

10       Q.   And do you also own SNMP Research

11   International?

12       A.   No, I do not.   SNMP Research

13   International is owned by my wife, who also

14   serves as its CEO.

15       Q.   And has SNMP Research International

16   always existed alongside SNMP Research, Inc.?

17       A.   No, that's not correct.

18       Q.   When did International begin operations?

19       A.   January 1, 1995.

20       Q.   And please explain to Judge Gross how

21   International came into being.

22       A.   I had a former student who was moving to

23   Europe, and that presented us an opportunity to

24   open a European presence in that time zone, and



1    we thought that we might be able to do some

2    better business internationally with a physical

3    presence in that time zone.  I was advised that

4    having that under the auspices of a new company

5    was wise, and SNMP Research International was

6    born.

7        Q.  And what does Inc. do and what -- let me

8    back up one second.  For the Court and for ease

9    of reference, I will refer to SNMP Research as

10   Inc. and SNMP Research International as Int'l,

11   if that's okay.

12       A.  That's what we do internally.

13       Q.  Okay.  So what does Inc. do and what

14   does Int'l do?

15       A.  Inc. is in the business of creating and

16   producing software for Internet management

17   based upon the Internet standard management

18   framework and the simple network management

19   protocol.

20              SNMP Research International is

21   involved in the licensing of that software to

22   its customers.  So Inc. does engineering

23   research and development.  Int'l does sales,

24   marketing and distribution.



1      Q.   And what is your relationship to Int'l?

2      A.   I am an employee of Inc.  There is a

3   contract between Inc. and Int'l where Inc.

4   provides Int'l certain services and support and

5   resources in return for revenue.  And by virtue

6   of that contract, I am a contractor consultant

7   to Int'l, even though I am an employee of Inc.

8   I am also married to the CEO of Int'l for more

9   than four decades.  So I report to her.

10      Q.   And where are the SNMP Research

11   companies located?

12      A.   They are located on the farm where we

13   live outside of Knoxville, Tennessee.

14      Q.   And how many employees do the SNMP

15   Research companies have?

16      A.   Today there are 17 employees for the two

17   companies combined total.

18      Q.   And let's step back now, Dr. Case, if we

19   can for a moment and talk about your

20   background, the SNMP protocol and SNMP

21   Research's implementation of it.  What is your

22   educational background?

23      A.   I have six earned academic degrees,

24   three in engineering and technology and three



1    in education, culminating in a doctor of

2    philosophy, the Ph.D. degree, from the

3    University of Illinois in 1983.

4        Q.   And where did you work after you

5    received your Ph.D.?

6        A.   First, Purdue University in Indiana, and

7    then I moved to the University of Tennessee in

8    January 1 of '86, and then the SNMP Research

9    companies, first the predecessor entities and

10   then SNMP Research, Inc.  And I have worked for

11   SNMP Research, Inc. since 1991 to present.

12       Q.   Now, we have heard in this case and

13   Judge Gross has heard that there is the SNMP

14   protocol and then there is the SNMP Research

15   implementation of the protocol.  Are you a

16   creator of the SNMP protocol?

17       A.   I am a co-creator.  Yes, I am a

18   co-creator of the SNMP protocol.

19       Q.   And how did that happen?

20       A.   I was a member of a team, a small team.

21   There were four different teams at various

22   points in time.  First, when we did the

23   architecture of the Internet-standard

24   management framework based upon the simple

1    network management protocol, SNMP, and there

2    were six of us that did that architecture.  And

3    then four of us did SNMP Version 1, and then a

4    different four of us did SNMP Version 2, and

5    then about a dozen of us did SNMP Version 3.  I

6    was the only person who was common to all four

7    of those teams.

8                    I was a co-architect and a

9    coauthor.  I was the lead author for the SNMP

10   specification itself and the editor of the

11   document.

12      Q.  And has SNMP become a standard?

13      A.  Yes.  It is a full Internet standard as

14   promulgated by the relevant standard-setting

15   organization, the Engineering -- excuse me --

16   the Internet Engineering Task Force, IETF.

17      Q.  And does one need implementations of the

18   protocol in order for the protocol to be

19   useful?

20      A.  Yes, yes.  The standard doesn't do

21   management.  You have to have an implementation

22   of the standard to actually do the management.

23      Q.  And can you describe why you decided to

24   make a business out of implementing SNMP?



1       A.   Okay.   When we were developing the

2   standards, I was a faculty member and a

3   university administrator at the University of

4   Tennessee.   And while we were writing the

5   standards, I and a graduate student were also

6   implementing them at the same time to make sure

7   that the standard that we were writing was

8   viable, that it was implementable.

9             And then after we had done that,

10   the IBM Corporation came to us and said, "Have

11   you done this?"   And we said yes.   And they

12   said, "Well, we want it."   And we said, "Well,

13   we can't do that.

14             "Well, why not?

15             "We are just a couple of

16   university people."

17             They said, "Let us explain to you

18   how this works.   You need to get a lawyer and a

19   post office box."

20             And for the next several years the

21   SNMP Research was born.   The predecessor

22   entity, first it was a partnership with my

23   graduate student, then a sole proprietorship,

24   and then became a corporation, and then two



1    corporations.

2              And so they came to us, and IBM

3    was our first customer, and SNMP Research was

4    born.

5       Q.   And did IBM discuss with you why they

6    would not just implement the SNMP themselves?

7       A.   Yes.   I spoke with Barry Appleman about

8    that, yes.

9       Q.   And what were you advised?

10      A.   Well, there were really three reasons:

11   Faster, cheaper, better.   They were in a hurry.

12   They had deadlines to meet and time-to-market

13   issues.

14             Second, it was lower risk for them

15   because we had already done implementation.   It

16   was new technology, and there was some risk for

17   them.   And so we were able to do it better

18   because we knew what the standard said because

19   we had written the standard.

20             And cheaper was just lower overall

21   costs for their total cost of ownership.   It

22   was better.

23             So it is not often you get faster,

24   cheaper, better, all three of them, but in this



1    case it was.

2        Q.  All right.  Would you please tell Judge

3    Gross about what SNMP Research licenses and

4    examples of your customers.

5        A.  All right.  So we, SNMP Research

6    licenses software, software that is a source

7    code that would go to a developer or binary

8    code that would go to an end-user customer and

9    some hybrid that is partial source and partial

10   binary code that's a combination.

11              And we have two basic types of

12   customers:  OEM, original equipment

13   manufacturers like Nortel and their

14   competitors, former competitors, Cisco,

15   Hewlett-Packard, IBM, kind of a who's who of

16   the computer and networking business; and large

17   end users on the other side, large end users,

18   people like Verizon and Big Pharma and the

19   Fortune 500 companies.  And our largest end

20   user customer would be the various agencies,

21   bureaus and departments and offices of the

22   United States Government and allied countries.

23       Q.  And in total, how many customers do you

24   have?



1        A.   I don't know exactly, but it would be

2    more than 700.

3        Q.   And what is your responsibility

4    regarding the development of software at SNMP

5    Research.

6        Q.   I am responsible for the oversight of

7    all software development at SNMP Research, and

8    I have written a great deal of it personally.

9        Q.   And how long have the SNMP Research

10   companies spent creating your implementation of

11   SNMP Research?

12       A.   It is over 250-person years for the

13   research and development and over 500-person

14   years total.

15       Q.   So I would like to have you look at

16   Exhibit P-66, if you would.  And, Dr. Case, do

17   you recognize what Plaintiffs' Exhibit 66 is?

18       A.   Yes.

19       Q.   And what do you recognize it to be?

20       A.   It is a license agreement between Cisco

21   Systems, one of our customers, on one hand, and

22   SNMP Research, Inc., SNMP Research

23   International, Inc., Jeff Case personally and

24   Mary Case personally on the other hand.



1            MR. HERRINGTON:  Your Honor, two

2      things.  I would ask counsel just pause a

3      minute when referring to an exhibit so I can

4      raise an objection.  This is a license that has

5      nothing to do with this case.  It is with a

6      whole 'nother party.

7            THE COURT:  Right.

8            MR. HERRINGTON:  We have heard a

9      lot of urgency about how little time there is

10     to present what they need to present on this

11     case, this license, this Schedule 1.  This is

12     irrelevant.  We object to it because it is

13     irrelevant.  It is also a waste of our time.

14     It is a waste of the Court's time and

15     everybody's time.  But it is wholly irrelevant

16     to have this witness addressing questions about

17     a license with some other party.  So we object

18     to the exhibit and we object to testimony about

19     it.

20            MR. BUSCH:  Two points, Your

21     Honor.  Number one, we have already spent more

22     time with the objection than I was going to

23     spend on the document, so it is not a question

24     of waste of time because I had, like, three

1    questions on the document.

2                  But secondly, the real reason that

3    it is relevant in this case, one of Nortel's

4    primary arguments in this case, we have heard

5    over and over and over again, is about how not

6    valuable the SNMP Research software is and that

7    SNMP Research would have agreed -- one of their

8    fundamental arguments here is that SNMP

9    Research would have agreed to basically allow

10   Nortel to distribute not only the Bay products

11   but then all derivative products of the Bay

12   products that Nortel then created in the future

13   royalty-free forever without receiving any

14   money whatsoever.  That is a fundamental

15   principle of their position in this case.

16                  This Cisco agreement licenses SNMP

17   Research's software for a lot of money in the

18   license.  Dr. Case, do you mind if I say in

19   open court the amount?

20                  MR. HERRINGTON:  Again, Your

21   Honor, where are we going with this?

22                  MR. BUSCH:  My point is this.

23                  THE COURT:  I don't know why it is

24   relevant to the issues before me.  But look,



1    you have three hours and eight minutes.  How

2    you use that time -- but I am going to stop you

3    when your time is up.  I am not going to give

4    you extra time.

5                    MR. BUSCH:  Okay.

6                    THE COURT:  There is a limit to

7    time.  You know it was six hours.  You could

8    have planned your case accordingly.  You may

9    use your time however you please, but this is

10   not relevant.

11                   MR. BUSCH:  Then I will move on.

12                   THE COURT:  Okay.

13   BY MR. BUSCH:

14      Q.   How do most OEM companies license your

15   software?

16      A.   Through a license agreement that has our

17   standard terms and conditions, which are

18   typically today on a per-product basis.

19      Q.   And was that always the case?

20      A.   No.  Earlier licenses were more broad.

21   Our licenses have become more narrow with time

22   as we have learned more about licensing

23   software.

24      Q.   And when did you switch to a per-product



1    licensing model?

2        A.   Sometime in the 1997-'98 timeframe.

3        Q.   And is it your usual practice to license

4    on a per-copy royalty basis?

5        A.   That is our usual practice, yes.

6        Q.   And what are the kinds of products SNMP

7    Research licenses to its customers?

8        A.   In the SNMP-based Internet standard

9    management framework, we have two types, main

10   types of products.  At the risk of

11   oversimplifying, you have manager products and

12   you have agent products in the managed devices.

13   You have a pitcher and you have a catcher;

14   okay?  And so we license software for both ends

15   of the pipe.

16             And so we have manager station

17   products that would include the asynchronous

18   request library, which Your Honor has already

19   heard a little bit about, and with our other

20   products that are in that same category on the

21   manager end, on the pitcher end, if you will,

22   including a thing called BRASS, which is built

23   on top of and is a superset of ARL.

24             On the other hand, on the agent

1    side -- and again, at the risk of

2    oversimplifying, on the catcher end, or you

3    could call them the invoker and the responder.

4    On the catcher end, we have products like --

5    and the three products in that category that

6    are most germane to this case are EMANATE/Lite,

7    EMANATE and CIAgent.  And each one has a

8    successive increasing levels of features, with

9    EMANATE/Lite on the bottom and CIAgent on the

10   top with the most features.  And as you get

11   more features, it costs more.

12       Q.  And is EMANATE the same for every

13   customer that purchases it?

14       A.  No.  EMANATE -- all of these products

15   are actually families of products, so you might

16   have EMANATE for VxWorks on a power PC platform

17   or you might have EMANATE -- CIAgent for

18   Solaris or -- so it is a combination of which

19   product of SNMP Research as well as the target

20   environment that you are working with that the

21   customer needs it for as well as other

22   dimensions like is it domestic or is it export,

23   because we have issues about the exportability

24   of cryptography, for example, and other



1    refinements and bells and whistles that may or

2    may not be included that are all a part of the

3    customization process.

4        Q.  And do you charge the EMANATE price even

5    if a customer uses only a small portion of the

6    EMANATE but more than EMANATE/Lite?

7        A.  Right.  If they are using more than

8    EMANATE/Lite, then they would have to pay the

9    EMANATE pricing.

10               MR. HERRINGTON:  Your Honor, that

11   was like 15 -- never mind.

12   BY MR. BUSCH:

13       Q.  So we talked about the 1994

14   SynOptics-Bay agreement with Mr. Southwood.

15   You were present for that; correct?

16       A.  I was.

17               MR. BUSCH:  And I am going to skip

18   over and not be redundant with Mr. Southwood's

19   testimony, taking Your Honor's clue, I will

20   move this forward.  And I will try not be

21   duplicative at all.

22   BY MR. BUSCH:

23       Q.  There is something about the 1994

24   agreement that I want to talk to you about,



1    though.  In 1994, after entering into the

2    SynOptics agreement, did SynOptics and Inc.

3    enter into a software service agreement?

4        A.  Yes, they did.

5        Q.  And would you turn to Exhibit No. 23 in

6    your binder.

7        A.  Okay.

8        Q.  Is that it?

9        A.  Yes.

10               MR. BUSCH:  We would move into

11    evidence Exhibit No. 23.

12               MR. HERRINGTON:  No objection,

13    Your Honor.

14               THE COURT:  Admitted.

15    BY MR. BUSCH:

16        Q.  And in 1997 did Bay enter into a

17    software service agreement?

18        A.  Yes.

19        Q.  And would you look at Exhibit No. 24?

20        A.  Yes.

21        Q.  And is Exhibit No. 24 that software

22    service agreement?

23        A.  Yes.

24               MR. BUSCH:  Okay.  We would move



```
 1    Exhibit No. 24 into evidence, Your Honor.

 2                  MR. HERRINGTON:  No objection.

 3                  THE COURT:  Admitted.

 4                  (Plaintiffs' Exhibit No. 24 was

 5    received in evidence.)

 6  BY MR. BUSCH:

 7     Q.  And do you have language in your

 8    agreements that address whether those software

 9    service agreements grant any license rights?

10     A.  Yes.

11     Q.  And where are those found and what do

12    they say?

13     A.  All right.  In the 1994 agreement, I can

14    help you find that.  It would be in Exhibit

15    P-20 on page 3, under paragraph 4, "Service,"

16    second sentence, "Any and all accompanying

17    service from SNMP Research shall be covered by

18    separate agreement," and where the S has

19    parentheses around it, so I would read it by

20    separate agreement or agreements.

21                  And then in the software service

22    agreements themselves, I think that was -- the

23    first one was at Exhibit P-23.  The pages are

24    not numbered, but it is the second page.
```



1    Paragraph No. 5 says, "Application of Original

2    License Terms and Conditions.  Updates,

3    improvements, and enhancements will be treated

4    as components of the licensed Program and their

5    use will be governed by the terms and

6    conditions of the License Agreement with the

7    Customer."

8              And if you go to P-24, to the same

9    paragraph, you find amazingly similar text,

10   because it was from a template.

11       Q.   Okay.  Thank you, Dr. Case.  And we

12   covered with Mr. Southwood the events leading

13   to the short-term temporary license agreement,

14   the one that expired on November 1, 1999.  You

15   were present for that; correct?

16       A.   Yes.

17       Q.   And there is one thing I do want to

18   cover with you.  Would you please explain to

19   Judge Gross the lengths that you went to in

20   order to try to find the executed copy of that

21   document for purposes of this litigation?

22       A.   All right.  So it was an exhaustive

23   search.  We first looked in the file cabinets

24   where it should have been.  We had two



1    associates from Mr. Wood's firm had gone

2    through those documents.  I went through them

3    again personally.

4            And then we went to deep archive

5    storage, and I had members of my team look for

6    those documents.  Then we remembered that it

7    probably had a possibility of being on a fax

8    archive.  We have two fax lines, one for Inc.

9    and one for Int'l.  And one of those goes to a

10   computer and one of those goes to a real, true

11   fax machine.  And the computer receives that

12   fax and turns it into a file.  And so I had my

13   team dig out a backup tape from 1999 to try to

14   find, to see if that fax, if it had come in,

15   but apparently it came in on the one that went

16   to the true fax machine.

17           And then after our hearing last

18   week and I heard some things that -- I believe

19   the word was "knack," that we have a knack for

20   things -- that was troubling to me.  I

21   personally went to Building 7, which is a

22   building behind the barn that is actually a

23   single-wide mobile home, and I personally went

24   through somewhere on the order of 75 bankers



1    boxes looking for this document.  But I didn't

2    find it anyplace it should have been.

3              But I also found documents that

4    were misfiled that -- I found documents in

5    Nortel files that shouldn't have been in the

6    Nortel file, but I did not -- it would have

7    been an impossible task to look in every other

8    file to see if it had been misfiled under some

9    other company name.

10             There were -- as I testified in my

11   deposition, I had multiple members of my team

12   looking for this over a long period of time.  I

13   don't know where it is.

14   Q.  And, Dr. Case, do you have a

15   recollection of this temporary license

16   agreement, however, being faxed in by Dave

17   Hyslop that Nortel signed and executed?

18   A.  I do.

19   Q.  And do you have any explanation for why

20   it may not have been kept?

21   A.  Well, our contracts database effort,

22   where we did an effort to convert every

23   contract -- we have over 5,000 contract

24   documents on our contracts database.  That



1    effort was begun in the 2004 timeframe.  This

2    document is considerably older than that, and

3    it had already been obsoleted and expired in

4    accordance with its own terms and been

5    overtaken by events, by other documents, and so

6    it is not captured in what we currently use to

7    track and maintain every current contract

8    document that we have.

9              Nearly 20 years ago, it was a fax.

10   We normally are really pretty good about being

11   able to find documents, but this one and

12   another one we just have not been able to find,

13   in spite of -- I believe that we put in -- we

14   put in the effort, but we didn't get the

15   result.

16      Q.   And when you say that this may not have

17   been kept because it was overtaken by events,

18   what event are you talking about?

19      A.   Well, because it was a temporary license

20   agreement that was good for a few months and it

21   was replaced later by other licenses that it --

22   I didn't think it would ever matter again.  But

23   we normally would have kept it anyway.  I don't

24   know where it is.

1    Q.  All right.  Now, at some point -- and we

2   talked about this some before in

3   Mr. Southwood's testimony as well -- were you

4   involved in discussions with Mr. Hyslop

5   concerning the temporary license agreement, the

6   master license agreement that was executed on

7   December 23, 1999, and what became Schedule 1A?

8    A.  I missed the first part of your

9   question.  I apologize.

10   Q.  Were you involved with conversations

11   with Mr. Hyslop about the initial temporary

12   license agreement?

13   A.  Yes.

14   Q.  And about the terms of the master

15   license agreement?

16   A.  Yes, with both Mr. Hyslop and his

17   predecessor.

18   Q.  And in conversations about what would

19   ultimately become Schedule 1A?

20   A.  Yes.

21   Q.  So let's now talk about this visit that

22   Mr. Hyslop made to the farm on October 5 and 6,

23   1999.

24   A.  Okay.



1     Q.   Where did that meeting take place?

2     A.   Small conference room, Building 2, SNMP

3  Research offices on our farm outside Knoxville,

4  Tennessee.

5     Q.   And who was present?

6     A.   Well, various people were in the room at

7  various times, pulled in and pulled out as

8  necessary to take care of the topic of the

9  moment.  But the main, principal players were

10  Mr. Hyslop representing Nortel, John Southwood

11  and myself from SNMP Research, Rick Barnes, who

12  was one of our outside counsel, and Catherine

13  Grant was not present but involved remotely.

14     Q.   And just so Judge Gross would recall,

15  who is Catherine Grant?

16     A.   Catherine Grant was a Nortel in-house

17  counsel.

18     Q.   And why was Mr. Barnes present?

19     A.   Well, he had been drafting documents up

20  until that time.  There had been several drafts

21  of the agreement.  I am not sure what rev level

22  we were on.  I think we were on Rev. No. 4, 5

23  or 6.  And he had been involved in drafting

24  other drafts and other documents, related



1    documents.  And he was kind of holding the pen

2    to do the next draft, and so it made sense.  It

3    was a working, editing, hack-up-the-document

4    kind of a roll-up-your-sleeves kind of a

5    meeting, actively editing the document, so it

6    made sense to have him hear the dialogue,

7    because he was going to be responsible for

8    reducing it to writing and for the next

9    iteration of the draft.

10        Q.  And on these dates of the meeting,

11   October 5 and 6, was there part of the meeting

12   involving Mr. Southwood, Barnes and Mr. Hyslop

13   that you were not present at?

14        A.  Yes.

15        Q.  And what part of that was that and why

16   were you not present for part of it?

17        A.  There were three parts, three main parts

18   to the meeting, as I remember it.  And one was

19   to talk about the draft of the -- the mark-up

20   session of the main body of the license

21   agreement that became the December 23, 1999

22   license agreement.  And I was there for part of

23   that, but mainly I let those folks do what they

24   needed to do, and I only dealt with the parts

1   that were the sticking points at the end of the

2   second day with that part of the meeting.  They

3   just saved the hard stuff for me.

4               Second was they went through the

5   projects on a project-by-project basis, well,

6   how is -- you know, how is Brian's project, how

7   is that progressing, what platform do they

8   need, what products do they need, when are they

9   going to ship, that kind of stuff.  I wasn't

10  involved in that much either.

11              I was heavily involved in the

12  discussion of what to do about the predecessor

13  agreements and Bay and what was I willing to

14  agree to.  That part, I actually led that

15  portion of the face-to-face meeting.

16      Q.  And were you not feeling well at some

17  point during the part of the two-day meeting?

18      A.  Apparently.  I saw that, you know, some

19  time ago in the contemporaneous written

20  records.  And if you were to ask me what was

21  ailing me, I don't know.

22      Q.  All right.  And what was discussed at

23  this meeting that you can recall in general?

24      A.  Well, it was those three things that I



1    just told you.  The main terms of the main body

2    of the agreement and trying to advance to the

3    next draft, what schedules would be necessary

4    and kicking that can down the road to get it to

5    the next level of closer to done, and then what

6    to do about the predecessor agreements,

7    because, you see, Nortel's goal and our goal at

8    the end of this process was to take all that --

9    we had multiple documents; that this license

10   for this group, this license for that group and

11   another license for yet another group, and

12   there were many of these.  And the goal was to

13   sweep all of those up into a single unified,

14   grand unified license agreement.

15           But in order to do that, not only

16   did we have to prepare to take care of the

17   licenses for the future and future needs and

18   those needs that were on the table right then,

19   but we also had to accommodate the prior

20   licenses that we had with Nortel, because we

21   did have those, and we had to deal with the

22   prior licenses with companies that Nortel had

23   acquired over the years.  And there were at

24   least four of those that I can remember off the

1   top of my head.  So that was the challenge,

2   because they wanted to have -- we had these

3   multiple agreements with different terms and

4   different licensing models, and then trying to

5   move that to a single unified with a single

6   unified set of terms.

7       Q.  So let's take each three of the things

8   you just said a moment ago and break them down

9   a little bit.

10      A.  Okay.

11      Q.  What was discussed about the main

12  license agreement with Nortel?

13      A.  Well, they worked through the draft

14  paragraph by paragraph, and then they saved, as

15  I said, the hard parts for me.  And as I

16  recall, there were three hard parts that I had

17  to deal with:  Limitation of liability,

18  indemnification, and ironically, they were

19  concerned about what would happen if SNMP

20  Research went bankrupt.

21      Q.  And you mentioned that a second part of

22  the discussion was what was schedules.  What

23  was discussed concerning schedules?

24      A.  Well, again, it was what are the



1    schedules that will be needed.  They had

2    already the framework of having schedules and

3    that everybody that needed a license, the

4    licenses would come through the schedules and

5    what would be a template schedule, that had

6    already pretty well been discussed as a part of

7    the main license agreement part.

8              But then this was about, okay,

9    what about this team's project or what about

10   that team's project and what needs to be on

11   their particular schedule.  So there were two

12   separate schedules, discussions of schedule in

13   general.  One was as a part of the master

14   license agreement, what needs to be captured in

15   a schedule, and then there was each of the --

16   eventually, there were over 50 schedules, and

17   initially there were on the order of a dozen in

18   those almost instantly days around Christmas of

19   1999.

20   Q.  And was this concept of entering into

21   schedules documented anywhere?

22   A.  Yes, in the schedules themselves as well

23   as in multiple places in the main body of the

24   license agreement.



1      Q.   And did you have an understanding of

2    whether the December 23, 1999 license agreement

3    actually licenses anything if no schedules were

4    ever executed and entered into?

5      A.   Yes, I do.   The December 23, 1999

6    license agreement really only provides a

7    framework for entering into licenses through

8    schedules.   So absent schedules, that agreement

9    did not license anything.

10     Q.   Would you please turn to P-30, if you

11   would.

12     A.   I am there.

13     Q.   This has already been entered into

14   evidence.   And would you look at Section 1.17

15   and 2.1(a) and (b) and just give Judge Gross,

16   if you would, examples of where the need to

17   enter into schedules is referenced within this

18   agreement.

19     A.   Well, paragraph 1 is defined terms, and

20   1.17 is 17th paragraph in paragraph 1.   And it

21   gives the definition of "Schedule," and it says

22   Schedule A is one or more Schedules A that are

23   entered into -- attached hereto and so forth.

24   And that it specifies the license fee and

1    applicable royalties and that it is with a

2    specified entity and so forth.

3                    And then in the grant of rights,

4    grant of rights is found in paragraph 2 on page

5    3, and that's in paragraph 2.1.  And for our

6    purposes today, there are two important grants

7    of rights.  The first one is 2.1(a).  And this

8    would be where SNMP Research would provide

9    source code to a developer at Nortel, and they

10   would use that source code and the rights

11   granted in 2.1(a) to use and prepare derivative

12   works.  They can take our software and they can

13   modify it in a project in order to begin to

14   build a product, and they can use copy, modify.

15   They can edit our software, customize it,

16   tailor it, extend it, and integrate it with the

17   Nortel product.  And in 2.1(a) they can build

18   derivative works to create and support run-time

19   software.  So that would be the -- that's our

20   software in their product.

21                   And then in paragraph 2.1(c), that

22   gives Nortel the right to take the run-time

23   software -- this is their redistribution rights

24   with respect to run-time software.  And the



1    most important one, I think, is on the next

2    page:  Distribute the run-time software to end

3    users.

4              So in 2.1(a) they build the

5    product and in 2.1(c) they distribute the

6    products, and there are other rights in 2.1(c)

7    to sublicense to those end users the right to

8    use the product.  So they not only get the

9    product; they also have a right to use the

10   product.  And so each of these get their rights

11   through the relevant Schedule A.  So if you

12   look in 2.1(a), so they get a worldwide license

13   for development software specified in the

14   relevant Schedule A.  So this is all driven

15   through the schedules.

16              And then there are other

17   references to schedules in other places.  Do

18   you want me to find them or are you going to --

19   Q.  No.  We need to move along.

20   A.  Yes, sir.

21   Q.  And I am conscious of that.

22   A.  Well, I am hoping I have given you some

23   idea of how to navigate the document.

24   Q.  I will just point out one other example



1    for the judge.  There is a reference to

2    Schedule A in the run-time license, 2.1(c).  Do

3    you see where there is a reference to -- well,

4    just turn your attention to 2.1(c)(i),

5    Dr. Case.

6        A.  Yes, "(to the extent permitted in the

7    relevant Schedule A)."

8        Q.  All right.  We can put that away, and we

9    can point out other things when we are off the

10   clock.

11               Now let's talk about the third

12   issue that you said was discussed between

13   yourself and Mr. Hyslop, which was the handling

14   of prior products that had been distributed by

15   Bay and what to do with those.  What did you

16   and Mr. Hyslop discuss about that?

17       A.  Our discussion was that Nortel appealed

18   to me that Bay and Nortel had made investments

19   in prior royalty buy-out terms under the Bay

20   agreement, the SynOptics agreement as amended,

21   and they felt that it wasn't fair for them to

22   get nothing for that.

23               I had told them that the

24   SynOptics-Bay agreement was nontransferable and



1    that they had no rights under the SynOptics-Bay

2    agreement.  They thought that was unduly harsh,

3    and so we tried to find a compromise position

4    that would be fair to both companies.  And so I

5    agreed that Bay, which had already enjoyed the

6    benefit of the royalty buy-out by that time

7    from 1994 until 1999 -- I said I will let you

8    have -- I don't have to let Nortel have

9    anything, but I will let you have three more

10   years.  But at the end of that three years --

11   you see, our challenge was to try to map the

12   broad corporate-wide site-based licenses of the

13   terms of the SynOptics-Bay agreement into the

14   product-specific terms of the new Nortel

15   agreement.  And I wanted to avoid exactly what

16   we are experiencing today, where while this

17   thing from the past just lives on forever, I

18   wanted to have a bright line at the end so that

19   we could say the products of old, those are

20   gone.  It is time -- and after this point in

21   time, it has got to be on a product-specific

22   schedule.

23              And by a product-specific

24   schedule, I mean where it has the name of a



1    product, not something like all products coming

2    from Bay but something like either the code

3    name for a project, like INCA M10, or something

4    that actually names a product, either an

5    internal code word development or the actual

6    product name, so that we know what is licensed.

7                    We wanted clarity.  We wanted

8    clarity as to what was licensed and what

9    wasn't.  And I wanted a bright line.  And we

10   did that based upon time, and the time that was

11   picked was a three-year window, because if you

12   look at three years of a royalty lease, that's

13   about the same price as a royalty buy-out for a

14   given product, and it seemed to be rough

15   justice.

16                    And I proposed that to Mr. Hyslop,

17   and he thought that that would work, and he

18   took it back to his people to try to sell it.

19   And he did sell it, and we came to that

20   agreement.  He spent some time on the phone.

21   That was the deal we struck.

22       Q.  So what was the deal that you struck

23   with respect to the Bay products and how they

24   would become licensed and enjoy the royalty



1    buy-out?

2        A.    Well, first off, every product under the

3    Nortel agreement has to be on a schedule.    And

4    each schedule has to name the specified entity,

5    the Nortel software -- the Nortel product, the

6    SNMP software and so forth, the license fees,

7    the maintenance fees and the royalty

8    arrangement.    Every product has that.

9              The only thing that is special

10   about Bay products, these products that we were

11   grandfathering, is two-fold.    One is that they

12   are grandfathered for this temporary three-year

13   period on this broad license that expires in

14   three years, and second is that when they end

15   up on a product-specific schedule -- and we

16   gave them three years to do so -- they get a

17   break on the royalty part of it.    But they

18   still have to buy -- on every schedule, it is

19   license fees, maintenance fees and royalties.

20   But for the Bay products that came over that

21   were in -- that had been shipped by or in

22   development, failing that, in development in

23   the lab at Bay prior to September of '98, they

24   got a break on the royalties.



1    Q.   And you honored the royalty buy-out for

2   those products as long as they were placed on a

3   schedule?

4    A.   I would say it slightly differently than

5   that, but yes, when they were placed on a

6   schedule, they would not have to pay royalties.

7    Q.   And did you clearly discuss that with

8   Mr. Hyslop?

9    A.   Yes.  We discussed it extensively.

10    Q.   And did you discuss the three-year

11   period that he had to identify and place these

12   products on schedules?

13    A.   Yes, and we talked about the rationale

14   that I just shared with Your Honor.

15    Q.   Now, if you would -- and did Mr. Hyslop

16   ultimately agree to the deal you just discussed

17   with Judge Gross?

18    A.   Yes, he did.

19    Q.   And was Mr. Barnes present during this

20   meeting to be able to hear this dialogue?

21    A.   Yes, yes, as I have already testified.

22    Q.   And following the meeting, what was

23   Mr. Barnes, outside counsel, tasked to do?

24    A.   I asked him to draft Schedule 1.  I also



1    had him draft the next iteration of the license

2    agreement.

3                    Now, I actually had -- John

4    Southwood sent the email to Mr. Barnes asking

5    him to do that, but that was because I asked

6    him to.

7        Q.  And was the draft that Mr. Barnes

8    prepared that ultimately became Schedule 1A

9    sent to Mr. Hyslop?

10       A.  Yes, it was.

11       Q.  And did Mr. Hyslop have any changes at

12   all?

13       A.  No.

14       Q.  So how many drafts of Schedule 1A were

15   there?

16       A.  Just one, the one that was executed.

17       Q.  So now let's just take a brief look at

18   Schedule 1A.  Would you get it in front of you.

19   It is Exhibit 31, and I believe it has already

20   been admitted into evidence.

21                    THE COURT:  It has.

22                    THE WITNESS:  Okay.

23   BY MR. BUSCH:

24       Q.  So let's go to the section of



1    Schedule 1A, and this is Exhibit P-31.  And do

2    you see under "Royalties" on page 1 where it

3    says, "As described in the agreements and

4    amendments thereto between SNMP and Bay

5    Networks and its predecessor entities"?  Do you

6    see that?

7        A.  I do.

8        Q.  And you were present last week during

9    the May 2 hearing we had via telephone, were

10   you not?

11       A.  Yes.  I wasn't physically present, but I

12   was on Court Call.

13       Q.  Yes.  And you heard that the US Debtors'

14   counsel mentioned that section and said that if

15   the royalties were meant to be zero, it would

16   say zero and not reference the prior Bay

17   agreements.  Did you hear that?

18       A.  I did.

19       Q.  Can you tell both US Debtors' counsel

20   and Judge Gross why it doesn't say zero there?

21       A.  Because they still owed me money, and

22   they were still making -- at the time they had

23   not exercised the royalty buy-out option on

24   Amendment 2.  At the time they were still



1   making annual royalty lease payments.  In

2   Amendment 2 you could pay per-copy royalties on

3   onesy-twosies or you could pay a single fee for

4   an unlimited number for a fixed amount of time,

5   one year, or you could -- for another sum you

6   could get an unlimited number for a longer

7   period.

8              Well, so they were doing the

9   annual lease option, and they had accrued

10  credits that could be used to apply to convert

11  to the full royalty buy-out.  And so instead of

12  describing all of that here, one of Mr. Barnes'

13  principles for drafting contracts -- I have

14  worked with him for a long time now -- is while

15  I might believe in belt and suspenders, he

16  tends to say things exactly once because he is

17  fearful that things will conflict, so he

18  instead said look over there and as described

19  over there.

20             And so the reason it is not zero

21  is because they still owed money that we wanted

22  to get paid.  That's why it doesn't say zero.

23     Q.  Okay.  And how much money do they owe

24  you?



1        A.   Well, they either owed us $27,000 and

2    change -- I don't really want to take the time

3    to look up the exact number.

4        Q.   That's fine.

5        A.   -- per year, or for, like, I think it

6    was on the order of $40,000, they could convert

7    their past credits to a fully paid-up.

8        Q.   And so would you just take a look very

9    briefly at Plaintiffs' Exhibit No. 38.

10       A.   Yes.   I am not exactly confident of

11   those numbers without looking them up, but they

12   are close, if not exact.

13              MR. BUSCH:   Okay.   38.   And this

14   is an email that is in evidence, I believe,

15   Your Honor, Exhibit 38?

16              THE COURT:   Yes, yes.

17   BY MR. BUSCH:

18       Q.   And it is an email from Dave Hyslop to

19   John Southwood at SNMP, November 15, 1999.   And

20   if you look in the second paragraph, do you see

21   reference to Mr. Hyslop acknowledging owing

22   SNMP Research money?

23       A.   Yes.   The one -- he has kind of got --

24   it is kind of like a poor-man's footnote, where



1  in the first paragraph it says Column 1 divides

2  da, da, da, and then ends in free asterisk,

3  that they would be able to deploy these

4  products royalty-free asterisk.  And then

5  asterisk is kind of like a poor-man's footnote,

6  an anagram.  It says, "To be precise, the

7  Bay-Nortel license requires a final installment

8  payment before the rights set out therein are

9  fully paid up. . . ."

10           So yes, he is saying the same

11  thing that I just said.

12     Q.   Okay.  And did you discuss with

13  Mr. Hyslop why under what would become the

14  royalty section of Schedule 1A there would be a

15  reference to the prior royalty terms in the

16  SynOptics-Bay agreement as amended?

17     A.   I can't say yes to that exact question.

18  We did discuss with Mr. Hyslop -- remember, my

19  conversation with Mr. Hyslop was before

20  Schedule 1A was drafted, but we did talk about

21  what would go into that section in Schedule 1A.

22  So except for a timing, a tense of a verb in

23  your question, the answer is yes.  But the way

24  you phrased it, I have to say no.



1       Q.   Was it ever discussed with Mr. Hyslop or

2   agreed at all, at any time, that references to

3   the prior agreements in what became Schedule 1A

4   was meant to mean that Nortel could continue

5   distributing unscheduled products after the

6   expiration of Schedule 1A?

7       A.   No, absolutely not.  That would be the

8   antithesis of what we were trying to

9   accomplish.

10      Q.   Now, turn to Schedule 1A, P-31, page 2.

11      A.   Okay.

12      Q.   And I will read it for the record.

13   There is two sentences and only two sentences

14   on page 2; correct?

15      A.   Yes.

16      Q.   Okay.  And correct me if I am wrong, but

17   I am going to read it for the record.  "This

18   Schedule supersedes all of the prior agreements

19   between SNMP and Bay Networks and its

20   predecessor entities as referenced above, and

21   all such agreements are hereby terminated by

22   execution of this Schedule."  That's one

23   sentence; correct?

24      A.   Yes.



1      Q.   The second sentence says, "This Schedule

2    and the license in regard to the Development

3    Software and Run-Time Software shall terminate

4    and be of no further effect after a period of

5    three years from the. . .date that this

6    Schedule is executed below."  Is that what it

7    says?

8      A.   "The last date that this Schedule is

9    executed below," yes.

10     Q.   And were these concepts which ultimately

11   found their way into Schedule 1A discussed and

12   agreed to between yourself and Mr. Hyslop?

13     A.   Yes.

14     Q.   So what was discussed between you and

15   Mr. Hyslop about what would happen to the old

16   Bay agreement as amended?

17     A.   Well, we basically put a stake through

18   its heart multiple times.  They didn't have any

19   rights under it to start with.  They, Nortel,

20   did not have any rights under the Bay agreement

21   to start with.

22              Second, the main license agreement

23   killed all predecessor agreements in some

24   paragraph at the end just before the signature

1   block, I think paragraph 9. something, 9.10,

2   maybe.

3                   And then we had killed it in

4   the -- when the temporary license agreement

5   said that when the temporary license expires --

6   and it had expired -- that they had no rights.

7                   And once again, here we said it

8   had no rights.  So we just keep stabbing this

9   thing, and it keeps coming -- and, you know,

10  here we are today, people saying that they

11  still have rights under it.  It has been

12  terminated several times.

13      Q.  Now, as of the execution of Schedule 1A,

14  were Nortel's rights to distribute Bay products

15  confined to the rights granted by Schedule 1A?

16      A.  Yes.  Well, when Schedule 1A terminated,

17  they had no rights under Schedule 1A.  They

18  only had rights that would have been under

19  other schedules that were executed

20  contemporaneously.

21      Q.  And so when you said that at the

22  expiration of Schedule 1A, it goes poof -- I

23  have heard that today -- what did you mean?

24      A.  Well, I think it is actually a fairly



1    good description.  When at the end of the three

2    years Schedule 1A terminated and all of the

3    rights that were conveyed by Schedule 1A

4    terminated, it is not as if it terminated ab

5    initio, as I have come to learn that term over

6    the last 20-some years, because the end-user

7    rights that have been granted by the customers

8    that had received -- my customers' customers,

9    Nortel's customers, those rights were still in

10   effect as if -- because they had properly

11   received it during that three years.  But there

12   were no rights after that to do any more.  You

13   couldn't possess the source code.  You didn't

14   have the right to modify the source code.  They

15   did not have the right to prepare derivative

16   works.  They did not have the right to prepare

17   binary products.  They did not have the right

18   to sublicense run-time software.  They did not

19   have the right to distribute run-time software.

20            So that's what I meant by -- I

21   think saying "it went poof" is much more

22   economical.

23      Q.  And based on your conversations with

24   Mr. Hyslop, was this clearly understood?



1      A.   Yes.

2      Q.   Schedule 1A says that "This Schedule and

3    the license in regard to the Development

4    Software and Run-Time Software" terminates and

5    is "of no further effect after a period of

6    three years from the last date" on which "this

7    Schedule is executed below."

8                    Were the only rights to

9    distribute, to develop and distribute software

10   terminated at the end of the expiration of

11   Schedule 1A?

12     A.   Yes, all of the rights under 1A

13   terminated with the termination of Schedule 1A.

14     Q.   And was this discussed and agreed to

15   between yourself and Mr. Hyslop?

16     A.   Yes.   He understood that.

17     Q.   Do you agree with the notion, Dr. Case,

18   that Schedule 1A -- let me rephrase the

19   question.

20                    Do you agree with the notion,

21   Dr. Case, that somehow this is unfair to Nortel

22   because they lose rights for products that

23   embed your software after the expiration of

24   Schedule 1A?



1        A.   I don't think it is unfair, and I would

2    like to tell you why.

3        Q.   Okay.

4        A.   I think I was incredibly generous.  When

5    Bay was acquired by Nortel, they had no right

6    to be shipping products containing our software

7    that had come over from Bay at all, but they

8    did so without the right to do so.  When we

9    found that they were shipping software without

10   a license, we entered into a temporary license

11   agreement to make them legal again so that we

12   could have some breathing room to negotiate a

13   more long-lasting arrangement.  I didn't charge

14   them anything for that.  I didn't do a hold-up

15   fee.  I didn't do anything like that.  I

16   charged them zero dollars.  While I was

17   incurring legal expenses, I didn't even pass

18   those expenses on to them.

19             Then when it came time for this

20   agreement, I let them have Schedule 1A for zero

21   dollars.  There was no consideration for and

22   there is no financial consideration under

23   Schedule 1A for a license fee.  And I let them

24   have -- I wasn't obligated to.  I let them have



1    three more years royalty-free, for a total of

2    nearly five years royalty-free on an agreement

3    I didn't have to do that for.

4              And furthermore, I gave them the

5    opportunity that if they would just buy

6    product-specific licenses and name those

7    products by name on product-specific licenses

8    and pay a license fee and pay the maintenance

9    fee, I would allow them to convert those

10   licenses and preserve that investment in the

11   royalty buy-out.  And that's all they had to

12   do.

13             I don't think it was unfair at

14   all.  I thought it was incredibly generous of

15   me.  Mr. Hyslop wanted more.  I wanted less.

16   We came to a meeting of the minds.  That's the

17   definition of a deal.  And that's the deal that

18   we made.  That's the bargain that we struck.  I

19   am willing to live with my part of it.  And so

20   I don't think it is unfair at all.  I think it

21   was actually quite generous.

22   Q.  Counsel for the US Debtors has said that

23   you made a reference in your deposition about

24   supposedly maybe not agreeing to license



1    schedules or place the Bay products on

2    schedules.  Is that what you said?

3      A.  I am a businessman.  I will sell

4    licenses to my software.  I think that there

5    was some confusion about whether we were

6    talking about old Bay products or new products

7    that were somehow related to Bay.

8                There are products that are at

9    issue in this case that came into existence

10   after this 2003 time period, but it is my

11   understanding that that's not what is on the

12   agenda for today, which products are in and

13   which products are out.  So I am not really --

14   I don't want to take clock time to talk about

15   that.

16               So I think that he was asking me

17   about would I enter into new licenses for new

18   products.  I would.  The question is would I

19   allow a new product that established -- that

20   was created after it clearly had not been at

21   Bay, would I give a royalty-free license for

22   something that had not been at Bay.  I would

23   not do that.  Would I give them a license?  No.

24   Would I sell them a license?  Yes, I would.

1      Q.   All right.

2      A.   I might not give them a royalty buy-out.

3      Q.   All right.  Now, also at last week's

4  hearing US Debtors' counsel speculated that the

5  actual deal that had been struck in Schedule 1A

6  was that what Nortel had to license for use

7  after three years were brand new products only

8  and not products that were Bay products or

9  derived from Bay products which qualified for a

10  royalty buy-out and did not need schedules or

11  licenses to do so.  Was that the agreement

12  between yourself and Mr. Hyslop?

13      A.   No, it was not.  Our standard

14  template -- we have a stock agreement that we

15  normally use.  Now, the Nortel agreement does

16  not follow the stock agreement.  But when a

17  company is normally acquired, we have a

18  transfer amendment template that we normally

19  use.  And basically, when we grandfather

20  something in like this, we take a snapshot of

21  what was happening on the day of the merger or

22  the day of the acquisition, whatever the

23  business deal structure was, and we allow that

24  license with conditions to carry forward.  But

1    one of those conditions is it is just what it

2    was at that time, at that snapshot, not the

3    entirety of the new corporation, to protect us.

4                And that would have been the

5    mindset that we had, that we brought to this

6    negotiation, because that was our default

7    setting, and that's what -- we didn't use our

8    template, but that's what the thinking was

9    behind this.  So it is not what was a Bay

10   product at the end of the three years.  It is

11   what the Bay product was early on, what had

12   been in use at Bay.

13       Q.  Okay.  And is there any doubt in your

14   mind based on your conversations with

15   Mr. Hyslop that he understood that?

16       A.  There is no doubt in my mind that

17   Mr. Hyslop understood that, because he

18   communicated that to me in our dialogue.  He

19   communicated that to Mr. Southwood, and he

20   correctly was able to express it in his

21   communications with his colleagues at Nortel.

22                MR. BUSCH:  Your Honor, may I have

23   a bit of indulgence?  My intention is to finish

24   Dr. Case today with an idea of time, and that



1    will give us time to present the rest of our

2    case.  May I have five minutes to just look

3    through what I have left in my examination and

4    decide what I can cut and what I feel like I

5    need to cover?

6               THE COURT:  You may.  But we have

7    to stop at quarter of.

8               MR. BUSCH:  I need no more than

9    five minutes.

10              THE COURT:  Okay.  Fine.  We will

11   take a five-minute break.

12              MR. BUSCH:  Thank you.

13              THE COURT:  Thank you.

14                  (Recess taken.)

15              THE COURT:  Thank you, everyone.

16   You may be seated.

17              Mr. Busch.

18              MR. BUSCH:  Although there is a

19   lot more that I would love to do, we are on our

20   time, and Your Honor was indulgent, I will

21   spend no more --

22              THE COURT:  Well, I am indulgent,

23   and I am not going to hold you to the minute,

24   but there has to be some limit.



1              MR. BUSCH:  I understand that.

2    And so I can name that Jeff Case direct

3    examination in ten minutes.

4              THE COURT:  All right.

5              MR. BUSCH:  Thank you, Your Honor.

6              THE COURT:  Good.

7              MR. BUSCH:  Okay.

8    BY MR. BUSCH:

9       Q.  Dr. Case, just a few final questions.  I

10   have ten minutes, and I am going to try to wrap

11   it up with you on my direct after that.

12              First, you know that Nortel is

13   raising this post-2003 termination, quote

14   unquote, implied-in-fact argument; there was

15   some agreement implied in fact.  You are aware

16   of that?

17      A.  Yes.

18      Q.  At any time that you are aware of, from

19   the time that Schedule 1A terminated in 2003

20   until the present, did Nortel ever ask you or

21   discuss with you or raise with you extending

22   the Schedule 1A term?

23      A.  No.

24      Q.  At any time did Nortel provide any



1    consideration, money, anything of value in

2    exchange for you agreeing to extend the

3    Schedule 1A term?

4       A.   No.   We received revenue for other

5    things but never for that.

6       Q.   And who are the only people that have

7    the authority to enter into contracts at SNMP

8    Research?

9       A.   Mary Case, and apparently John Southwood

10   doesn't know that I have backup signature

11   authority, but I never exercise it.

12      Q.   That's at Int'l; correct?

13      A.   Correct.   And Mrs. Case has backup

14   signature authority for me, and she exercises

15   it.

16      Q.   And just a few other questions on a

17   different topic.   There has been some

18   discussion about the BayStack products.   And

19   how are you familiar with the BayStack products

20   that were distributed by Bay in the mid to late

21   '90's?

22      A.   Because I had extensive discussions with

23   SynOptics and Wellfleet and Bay from the

24   mid-1990's through the late 1990's, and I also



1    have some personal experience with some

2    BayStack hardware equipment, hands-on.

3        Q.   And in the 2003 timeframe, were you

4    aware whether Nortel was shipping BayStack

5    products with SNMP Research software?

6        A.   I am sorry.  Could you ask the question

7    again, please?

8        Q.   Yes.  In the 2003 timeframe, after the

9    expiration of Schedule 1A, did you know whether

10   Nortel was shipping BayStack products with SNMP

11   Research software in them?

12       A.   I not only didn't know that they were; I

13   was told that they weren't.

14       Q.   And why did you believe that they

15   weren't?

16       A.   Because I thought that they had been

17   phased out of the marketplace, that all of the

18   Bay products that had come over from Bay --

19   that by this time it was nearly five years

20   after Bay, and the half-life for products in my

21   market is relatively short, in my niche of the

22   marketplace, and I thought that they were all

23   aged out by five years and that they were no

24   longer using my software in any shipping

1    products --

2       Q.   And, Dr. Case --

3       A.   -- under Schedule 1A.  I believe that

4    our software was being used in products under

5    other schedules.  I want it to be clear.  But I

6    didn't know -- and, in fact, I believed that

7    they were not using our software in products

8    under Schedule 1A.

9       Q.   One other issue that has been raised by

10   Nortel is this SSA that was signed in renewal

11   that was done in 2004 or so.  Did SNMP Research

12   know at the time that it involved at all

13   Schedule 1A?  And describe for Judge Gross the

14   process at SNMP Research for SSAs so the judge

15   could understand.

16      A.   All right.  So the SSA is a contract

17   with what I think is called an evergreen

18   provision, so that it renews annually on its

19   anniversary date unless the parties say they

20   don't want to.  And the SSA that is in question

21   here was an SSA between SNMP Research, Inc., my

22   company, and SynOptics.  And the accused

23   products came from SNMP Research International,

24   my wife's company, Nortel Schedule 1A.  And we



1    shouldn't have done it.  That was a mistake.

2                    But we don't have the plumbing in

3    our company to correlate an Inc.-SynOptics

4    agreement with an Int'l-Nortel agreement and to

5    have all of the trips and levers work that,

6    well, this one expired so we should stop

7    renewing.  And the renewal clerk didn't know we

8    shouldn't have sold them a renewal and they

9    shouldn't have bought it.

10                   But this is like having an

11   extended warranty on a car with a lease.  Just

12   because you buy an extended warranty on the car

13   with a lease doesn't mean you get the car back.

14   You don't get your title back after the

15   three-year lease expires.

16                   So it shouldn't have happened.  We

17   shouldn't have sold it.  They shouldn't have

18   bought it.  Both parties are culpable.

19     Q.  And by the way, you mentioned this a

20   moment ago, but did the woman in the SSA

21   department know anything about Schedule 1A?

22     A.  No, she doesn't know licenses.  That's

23   not what she does.

24     Q.  Now, let's talk about just one last



1    thing I want to get in before the end of the

2    day, and that's this.  Even up to and through

3    the asset sale by Nortel to Avaya, was Nortel

4    continuing to represent to you that the ES and

5    ERS products did not contain your software?

6        A.  Yes.

7        Q.  Tell us about that.

8        A.  Well, when we were -- Nortel approached

9    us after the Avaya-Enterprise Systems sale had

10   been announced but not yet closed during the

11   due diligence period and said, "We are going to

12   be transferring your software to Avaya."  And I

13   said that's very odd, because they had a

14   carve-out in the sale agreement that said my

15   software licenses are not affected, so I was

16   very puzzled by that, and that caused a delay.

17              But then they told me -- I said,

18   "Well, what software is being transferred?"

19   And the ES and ERS never came up.  I was

20   speaking with Mr. Michel Cote at that time.  He

21   was at that time the director of OEM software

22   relationships.  And so I was reassured that the

23   list of schedules showed that all of the

24   products that were using our software was being

1    transferred to Avaya, but that list was

2    woefully incomplete, and the ES and the ERS

3    products were not present.  And I later asked

4    Michel Cote about that and said, "Is my

5    software in ERS?"  And he assured me no, it is

6    not.

7              I said, "Well, whose is?"

8              And he said, "It is third-party

9    software."

10             And I said, "Whose third-party

11   software?"

12             And he said, "I can't tell you

13   because of confidentiality reasons."

14             But then later I was told by Avaya

15   after they did a diligent search they found

16   that my software was present and there was no

17   other third-party software.

18             So somebody was telling the wrong

19   story and they were telling the wrong story for

20   a considerable long time, from 2003 through

21   2011.

22     Q.  And would you turn to Exhibit P-65 in

23   your binder, sir, in the exhibit binder.

24     A.  I am there.



1        Q.   And is P-65 the email that you referred

2    to where Michel Cote tells you that the SNMP

3    software in the ES and ERS products are

4    third-party software and he can't tell you what

5    software is being used for confidentiality

6    reasons?

7                    MR. HERRINGTON:   Your Honor, this

8    email is sent after Nortel no longer even owned

9    the business.

10                   MR. BUSCH:   It is from Nortel's

11   former chief head of OEM.   He went over to

12   Avaya.   He was the party that was representing

13   to SNMP Research both before and after whether

14   the products contained SNMP Research software.

15   And, Your Honor, it is deemed authentic, and it

16   is a statement that was made.   We are not

17   offering it for the truth of the matter

18   asserted because obviously, it wasn't true.   We

19   are offering it to show that Michel Cote, who

20   was the head of Nortel's OEM department and

21   then went over to Avaya, made that

22   representation to SNMP Research.

23                   MR. HERRINGTON:   Your Honor, not

24   by a Nortel person.   And by the way -- we will



1    get into this -- they were clearly looking at

2    schedules for which the active royalty payments

3    were being made.  No royalty payments were

4    being made under Schedule 1.  There were other

5    schedules for which no royalty payments were

6    being made, which also were not identified.

7    And they acknowledge that those schedules were

8    in effect, were valid and all that.

9              This group was looking at royalty

10   payments, and these schedules were not tied to

11   royalty payments.  So that whole story takes a

12   lot of explanation, but it is the Avaya story.

13   It is not something that is part of the Nortel

14   record that we have access to.

15              MR. BUSCH:  Your Honor, again,

16   Mr. Coe, who was in charge of the department at

17   Nortel, made this representation.

18   Mr. Herrington, US Debtors' counsel, has an

19   explanation that he would like to make or an

20   argument that he would like to make about why

21   it wasn't bad faith, but the fact is that

22   representation was made to Dr. Case that his

23   software was not contained in the ES and ERS

24   products.



1              THE COURT:  But it wasn't made by

2     Nortel.  In fact, it was made by Avaya.  That's

3     my concern.

4              MR. BUSCH:  But it was made --

5     true, it was made -- at the moment it was made,

6     Mr. Cote had gone over to Avaya.  However,

7     Mr. Cote was at Nortel and was in charge of

8     identifying these products before the sale.

9              THE COURT:  Well, I am going to

10    sustain that objection.

11             MR. BUSCH:  Okay.

12             THE COURT:  Yes.

13             MR. BUSCH:  Okay.  All right.

14             MR. BUSCH:  I was going to mark

15    another exhibit, but my co-counsel said it is

16    not necessary.  So I think we will close now

17    with our direct of Dr. Case.

18             THE COURT:  All right.

19             (Witness excused.)

20             MR. BUSCH:  I do know that

21    Mr. Dean has something he would like to mention

22    to Your Honor.

23             THE COURT:  All right, fine.

24             MR. DEAN:  Yes, just 30 seconds,



1    Your Honor.  I spoke with Mr. Herrington about

2    this on a break and it relates to tonight.

3    That's why I am bringing it up at 5:45.

4                   THE COURT:  Yes.

5                   MR. DEAN:  We have another hearing

6    tomorrow that I am handling on the motion to

7    amend, and I need to meet with Dr. Case tonight

8    to go over his direct testimony for that

9    hearing.  It is a totally different subject

10   matter.  I would obviously not talk to him

11   about anything he testified about today or

12   anticipated Schedule 1 testimony.  But I do

13   need to prep him for his direct testimony for

14   tomorrow's motion to amend hearing, and

15   Mr. Herrington has agreed to that.

16                   MR. HERRINGTON:  Yes, Your Honor,

17   we can accommodate that.  We don't object.

18                   THE COURT:  All right.  That's

19   fine.  That's fine.

20                   MR. DEAN:  Thank you, Your Honor.

21                   THE COURT:  Thank you for pointing

22   that out to me.  Obviously, there should be no

23   discussion by Dr. Case of his testimony.

24                   MR. DEAN:  Of course.



1          THE COURT:  But on the motion to

2   amend, of course, you may discuss that.

3          MR. DEAN:  Of course.  Thank you,

4   Your Honor.  See you tomorrow.

5          THE COURT:  All right, everyone.

6   Good evening.  Have a good evening, and we will

7   resume tomorrow at 9:00.

8          MR. BUSCH:  Thank you so much,

9   Your Honor.

10          THE COURT:  Thank you.

11                    -  -  -

12          (Court adjourned at 5:46 p.m.)

13                    -  -  -

14

15

16

17

18

19

20

21

22

23

24



```
1                    INDEX

2     PLAINTIFFS' WITNESSES      Direct   Cross   Redr.

3     John E. Southwood            95      --      --
      Jeffrey D. Case             213      --      --
4

5     PLAINTIFFS' EXHIBITS                        Rec'd.

6     Exhibit 20    --------------------------   103

7     Exhibit 21    --------------------------   103

8     Exhibit 22    --------------------------   103

9     Exhibit 23    --------------------------   209

10    Exhibit 24    --------------------------   230

11    Exhibit 26    --------------------------   111

12    Exhibit 27    --------------------------   111

13    Exhibit 29    --------------------------   120

14    Exhibit 30    --------------------------   170

15    Exhibit 30.18 --------------------------   184

16    Exhibit 30.20 --------------------------   185

17    Exhibit 30.51 --------------------------   200

18    Exhibit 35    --------------------------   132

19    Exhibit 36    --------------------------   139

20    Exhibit 37    --------------------------   139

21    Exhibit 38    --------------------------   143

22    Exhibit 39    --------------------------   149

23    Exhibit 40    --------------------------   176

24    Exhibit 41    --------------------------   176
```



```
 1    PLAINTIFFS' EXHIBITS, Cont'd.                 Rec'd.

 2    Exhibit 46      --------------------------   180

 3    Exhibit 47      --------------------------   180

 4    Exhibit 51      --------------------------   187

 5    Exhibit 57      --------------------------   192

 6    Exhibit 58      --------------------------   192

 7    Exhibit 59      --------------------------   204

 8    Exhibit 60      --------------------------   202

 9    Exhibit 81      --------------------------   123

10                          - - -

11                (Exhibits not attached.)

12

13

14

15

16

17

18

19

20

21

22

23

24
```



CERTIFICATE

1

2          I, LORRAINE B. MARINO, Registered

3    Diplomate Reporter, Certified Realtime Reporter and

4    Delaware Notary Public, do hereby certify that the

5    foregoing pages numbered 2 through 277 contain a

6    true and correct transcription of the proceedings

7    as stenographically reported by me at the hearing

8    in the above cause before the United States

9    Bankruptcy Court for the District of Delaware, on

10    the date therein indicated.

11          IN WITNESS WHEREOF I have hereunto set

12    my hand at Wilmington, this 15th day of May, 2017.

13

14

15

16

17    _____
                    Registered Diplomate Reporter,
                    Certified Realtime Reporter
18               and Delaware Notary Public

19

20

21

22

23

24

## $

**$0 (1)**
67:19

**$100,000 (2)**
54:4,12

**$27,000 (1)**
253:1

**$30,000 (1)**
61:5

**$40,000 (2)**
36:3 253:6

**$68,000 (1)**
57:1

**$7,800 (1)**
69:6

**$96 (8)**
52:23,24 54:14
60:15,17 61:3,9 84:8

## A

**ab (1)**
258:4

**Abbott (13)**
2:5,6,7,11,16,20
3:8,13 13:23 14:3,6,
10 16:10

**abide (1)**
6:23

**able (13)**
9:16 35:18 105:9
107:22 135:8,20
215:1 220:17 234:11,
12 249:20 254:3
264:20

**above (4)**
124:3 164:21
177:22 255:20

**absent (1)**
242:8

**absolutely (7)**
8:6 25:13 34:21
38:6 63:16 91:24
255:7

**academic (1)**
216:23

**accept (3)**
88:7 112:2,11

**acceptable (3)**
8:3 12:18 144:4

**access (1)**
274:14

**accommodate (2)**
239:19 276:17

**accompanying (1)**
230:16

**accomplish (1)**
255:9

**accordance (3)**
14:21 41:1 234:4

**according (4)**
68:8 74:15 174:14
195:14

**accordingly (1)**
225:8

**accounting (1)**
194:12

**accrued (1)**
252:9

**accumulated (1)**
108:15

**accumulation (1)**
108:14

**accurate (1)**
144:4

**accurately (1)**
198:8

**accused (1)**

**269:22**

**achieved (1)**
108:18

**acknowledge (1)**
274:7

**acknowledged (1)**
36:1

**acknowledging (1)**
253:21

**acquired (6)**
109:2 112:7 155:10
239:23 260:5 263:17

**acquisition (17)**
25:2 27:3 110:12
112:21 126:11 134:1,
24 135:14,16 142:14
152:12 156:4 168:7
186:14 200:8,10
263:22

**across (2)**
85:11 140:18

**act (2)**
6:24 48:21

**actions (2)**
40:16 68:16

**active (1)**
274:2

**actively (1)**
237:5

**activities (1)**
127:16

**activity (2)**
81:16 131:15

**actual (6)**
21:7 84:10 91:14
141:7 247:5 263:5

**actually (47)**
5:3 21:5 32:3,6
33:11 34:6,13 44:1
50:14 52:9,20 58:5

**59:11,14 60:1,22**
61:20 68:1,6 69:13
77:8 80:4 83:21 86:2,
8 88:20 89:6 91:18
92:6 128:18 138:6
158:10 162:11 163:24
189:8 205:18 212:12
213:1 218:22 227:15
232:22 238:14 242:3
247:4 250:3 257:24
261:21

**added (4)**
122:15,16,24,24

**addition (4)**
13:10 105:23
117:10 146:12

**additional (5)**
15:12 38:12 56:8
57:2 186:24

**address (6)**
63:13 64:23 91:12
104:20 151:24 230:8

**addressed (1)**
92:24

**addressing (4)**
91:13 161:5 164:4
223:16

**adjourned (1)**
277:12

**adjustment (1)**
175:6

**administration (2)**
172:18 208:16

**administrative (1)**
2:12

**administrator (1)**
219:3

**administrators (1)**
18:6

**admissible (3)**

52:9 129:5 159:2

**admission (12)**
110:21 119:13,14
128:23 129:3,8,16
159:11,13 160:6,8
204:5

**admissions (1)**
166:13

**admit (3)**
10:15 119:20
123:15

**admits (2)**
91:6 92:2

**admitted (37)**
50:21 103:10
110:24 111:16 115:5
118:24 119:11 128:4,
5,11,18 130:22,23
131:1 132:7 139:23
143:9 149:18 159:18
161:24 163:12,13
170:3 175:23 180:14
183:24 185:4 187:23
192:14 193:2 200:1
202:1 204:15 209:17
229:14 230:3 250:20

**advance (1)**
239:2

**advantage (2)**
65:6 152:3

**advise (1)**
199:12

**advised (5)**
6:23 26:16 170:14
215:3 220:9

**affected (1)**
271:15

**affirmation (1)**
92:7

**afraid (1)**

77:1

**after (72)**
19:13 20:10 29:8
30:10 33:3 37:3 40:6
42:15 43:3,21 46:15
47:7 48:16 49:19 50:1
56:13,15 63:6,7 64:22,
24 69:2 70:24 74:11
83:2 85:1 88:3 89:13
90:21 91:8 117:6
127:23 132:13 136:22,
23 137:1 151:23
152:14 153:22 155:2
156:15 165:15,18
174:4 176:23 177:16
178:2 186:10,19
189:23 208:6 217:4
219:9 229:1 232:17
246:20 255:5 256:4
258:12 259:5,23
262:10,20 263:7
266:11 268:8,20
270:14 271:9 272:15
273:8,13

**afternoon (13)**
13:2 83:2 95:1,3,5,
24 96:1 127:23
132:13 170:15 211:8
213:24 214:1

**again (65)**
3:18 9:10 10:2,7
12:23 13:1,8 37:20
53:17 55:13 56:7
57:13 58:3 61:17 62:3,
12,20 72:1,11 74:10
75:1,13 76:9 78:1,21
79:2,6,21 80:10 84:4
86:16 87:17,22 89:18
90:15 93:4 118:3,8
119:2 123:3 128:8

129:10,11 157:2
160:16,23 162:3
163:9,24 166:17
171:10 181:19 182:22
184:18 205:19 224:5,
20 227:1 232:3
234:22 240:24 257:7
260:11 268:7 274:15

**against (4)**
9:21 11:10 40:20
100:2

**aged (4)**
33:14 65:7 152:4
268:23

**agencies (1)**
221:20

**agenda (2)**
15:19 262:12

**agent (5)**
23:20,24 24:10
226:12,24

**ago (12)**
14:20 51:16,22
52:13 57:23,24 193:1
194:10 234:9 238:19
240:8 270:20

**agree (17)**
11:18 26:10 27:17
40:9 49:10 137:3
144:22 145:6,10
146:3 147:3 164:8
200:16 238:14 249:16
259:17,20

**agreeable (1)**
157:10

**agreed (32)**
4:11 27:23 28:15
32:12,20 35:19 40:12
41:4 45:18 48:3 50:7
60:1 64:15 82:8,13

125:19 136:23 151:15
156:24 161:6 168:18
177:20 183:14,19
197:19 224:7,9 246:5
255:2 256:12 259:14
276:15

**agreeing (2)**
261:24 267:2

**agreement (209)**
7:16 18:23,24 21:1,
22,24 22:5,7,11,16,20,
21,22 23:3,8,9,15,18
24:1,7 25:3,7,9 26:3,
24 27:7,12 28:1,3,5,8,
9,12,21,22,23 29:10,
19 30:8,11,15,19,22,
24 31:8,10,16 32:7,17
39:4,9,10,16 40:22
41:2,2,7 42:7,12,17
43:6,10,11 45:21,22
46:8 49:21 51:15
62:21 67:8 73:2 76:11
80:16 81:5,21 87:9
88:23 102:24 103:3,
23 104:3 106:3,13
109:16 110:9,15
111:11 112:3,16
113:15,16 114:6
115:15,16 116:1,5,7
117:8,17 118:9,15,17
121:7 122:12 123:23
124:9,16,22 126:6
134:10 137:21 139:10
144:14 145:20 146:15
147:6 150:4,8 152:17
156:22 158:3 159:12
161:15 166:3 167:15
169:11,20 170:19
171:7 172:7,20
176:12,14 178:13,18

179:15 182:2,18,19
184:21 190:2 196:23
198:19,23 199:6
207:10,11,12,18
208:2 209:5 222:20
224:16 225:16 228:14,
24 229:2,3,17,22
230:13,18,20 231:6,
13 233:16 234:20
235:5,6,12,15 236:21
237:21,22 239:2,14
240:12 241:7,14,24
242:2,6,8,18 245:20,
20,24 246:2,13,15
247:20 248:3 250:2
254:16 256:16,20,22
257:4 260:11,20
261:2 263:11,14,15,
16 266:15 270:4,4
271:14

**agreements (30)**
21:12 26:19 27:21
35:3,7 42:6 46:5 56:9
68:19 80:18 85:3 98:1,
14 103:19 184:15
185:9 207:17 230:8,9,
20,22 238:13 239:6
240:3 251:3,17 255:3,
18,21 256:23

**agrees (3)**
21:13 36:2 103:24

**ahead (4)**
57:3 134:20 172:2
179:21

**ailing (1)**
238:21

**AIX (1)**
104:24

**Akin (1)**
14:17

**allied (1)**
221:22

**all-nighters (2)**
66:23 71:13

**alloted (1)**
13:3

**allow (13)**
18:22 40:10 49:10
113:11 154:10 166:20
200:16 203:11,12
224:9 261:9 262:19
263:23

**allowed (2)**
22:16 100:4

**allowing (1)**
108:1

**almost (1)**
241:18

**along (13)**
8:20 40:18 51:2,9
56:15 64:24 82:12
86:23 146:23 147:12
167:18,22 244:19

**alongside (1)**
214:16

**already (34)**
56:23 57:9,14,16,
21,22 58:16 61:10
62:14 63:3,14,15,15,
15 87:5 96:2 118:24
125:7 128:11,18
130:22,23 131:1
155:15 220:15 223:21
226:18 234:3 241:2,6
242:13 246:5 249:21
250:19

**also (44)**
18:8,11 22:8,21
27:19 37:8 38:16
39:19 40:14 46:3

49:23 50:2 67:23
68:15 72:17 78:11
85:15 105:11 106:10
112:13 113:5 117:24
121:9 130:15 136:17
145:24 148:5 160:19
168:17 187:8 197:24
207:23 214:10,13
216:8 219:5 223:13
233:3 239:19 244:9
249:24 263:3 267:24
274:6

**Although (1)**
265:18

**always (8)**
53:21 98:15,20
100:7 125:15 214:9,
16 225:19

**amazingly (1)**
231:9

**amend (10)**
10:19 15:7,13,13,
18 16:19 17:4 276:7,
14 277:2

**amended (7)**
27:12 28:12,23
42:13 245:20 254:16
256:16

**Amendment (14)**
23:4,6 24:3,11,15
102:23 103:2 104:16,
19,20 115:21 251:24
252:2 263:18

**amendments (5)**
23:2,3 27:12 28:23
251:4

**America (2)**
66:23 71:11

**Americanized (1)**
84:17

**Among (1)**
77:23

**amount (7)**
9:20 24:8 35:16
49:5 59:19 224:19
252:4

**amounts (1)**
134:12

**anagram (1)**
254:6

**analogy (2)**
36:16 60:2

**and/or (1)**
168:4

**anniversary (1)**
269:19

**announced (1)**
271:10

**annual (4)**
85:16 136:14 252:1,
9

**annually (1)**
269:18

**another (23)**
5:18 16:5,9 19:23
22:23 44:21 53:9 63:9
68:2 71:16 118:22
122:5,10 157:11
166:8 185:16 202:11
234:12 239:11,11
252:5 275:15 276:5

**answer (5)**
92:10 107:7 139:5
159:5 254:23

**answered (1)**
134:5

**anticipated (2)**
112:10 276:12

**antithesis (1)**
255:8

**Anybody (1)**
86:5

**anymore (4)**
75:23 91:11,19
92:19

**anyone (2)**
43:1 208:20

**anyplace (1)**
233:2

**anything (25)**
20:2 43:22 44:20
45:2 50:14 54:9 74:1
75:22 87:18 91:5,12
92:15 109:15 144:21
158:16 194:24 206:23
242:3,9 246:9 260:14,
15 267:1 270:21
276:11

**anyway (3)**
159:2 162:18
234:23

**anyways (1)**
130:4

**anywhere (2)**
211:13 241:21

**apart (1)**
92:14

**apiece (1)**
10:10

**Apollo (1)**
84:24

**apologize (2)**
13:24 235:9

**apparent (1)**
48:13

**apparently (6)**
43:23 44:2 129:13
232:15 238:18 267:9

**appealed (1)**
245:17

**appears (1)**
169:10

**Appleman (1)**
220:7

**applicable (1)**
243:1

**Application (1)**
231:1

**applies (3)**
3:21 5:24 183:10

**apply (10)**
6:1 15:1 36:15
65:12 112:8 156:8
161:2 195:7 212:19
252:10

**appreciate (2)**
10:17 162:2

**approach (2)**
14:7 76:22

**approached (1)**
271:8

**appropriate (2)**
12:13 181:5

**appropriately (1)**
7:1

**approval (4)**
27:7 101:1 103:20
110:15

**approve (1)**
125:18

**approximately (2)**
109:4 206:10

**approximation (1)**
13:6

**April (1)**
15:9

**architecture (2)**
217:23 218:2

**archive (2)**
232:4,8

**argue (3)**
45:15 119:21 160:5

**argued (2)**
78:13 160:3

**arguing (3)**
40:16 60:14 162:9

**argument (20)**
13:7 19:11 36:10
40:20 53:1 60:20
64:18 72:10,12 78:21
87:4 92:14 139:5
152:19,24 153:1,23
160:13 266:14 274:20

**arguments (9)**
7:14 11:19 20:21
41:11 48:14 63:5
161:3 224:4,8

**arise (2)**
133:14 195:4

**ARL (11)**
24:2,9,10,15,24
35:13,17 105:2,3
138:7 226:23

**around (7)**
22:24 108:1 133:22
134:16 148:24 230:19
241:18

**arrangement (7)**
23:16 27:6 30:13
110:13 197:16 248:8
260:13

**asked (10)**
3:5 80:5 92:2,3,11
199:13 203:8 249:24
250:5 272:3

**asking (9)**
26:19 45:6 108:5
139:15 159:17 179:3
202:18 250:4 262:16

**asserted (13)**

**114:20 118:5 119:4**
129:21 139:8,20
180:5,12 190:23
201:18 204:7,11
273:18

**assertion (1)**
92:23

**assess (1)**
138:18

**asset (3)**
20:18 47:21 271:3

**assigned (6)**
27:1,11 109:19
110:10 144:14 145:1

**assigning (2)**
109:15,16

**assignment (24)**
23:7 25:8,13 26:9,
14,16,21 27:7,9,11,18
28:12,15,18 42:18
110:14 111:8,22
113:13 116:1,2,4,6
151:12

**associated (10)**
77:18,22 89:8
105:19 106:24 151:3
179:15 196:18 197:21
207:14

**associates (1)**
232:1

**assume (2)**
3:24 119:3

**assuming (2)**
114:18 212:17

**assured (1)**
272:5

**asterisk (3)**
254:2,4,5

**asynchronous (4)**
74:18 104:23

195:17 226:17

**atom (1)**
34:15

**attach (1)**
110:14

**attached (10)**
27:10 40:23,24
107:5 170:7,19
188:17 190:15 199:1
242:23

**attaches (1)**
37:17

**attaching (1)**
27:5

**Attachment (3)**
104:12 111:7
158:13

**attain (1)**
141:6

**attempt (2)**
97:17 208:5

**attempted (2)**
19:16,21

**attend (1)**
97:16

**attending (1)**
15:3

**attention (12)**
15:5 71:23 115:9
120:20 142:23 144:8
145:11 155:1 159:20
164:16 167:6 245:4

**attorney (2)**
30:6 125:16

**attributed (1)**
18:14

**August (8)**
28:14 35:23 48:1
194:15,20 195:12
196:9 198:6

**auspices (1)**
215:4

**authentic (6)**
139:12 159:10
160:9 163:17,19
273:15

**authentication (1)**
139:10

**authenticity (1)**
163:20

**author (1)**
218:9

**authorities (1)**
19:4

**authority (6)**
100:8,20,23 267:7,
11,14

**authorized (2)**
41:5 126:13

**automatically (1)**
14:23

**automobile (1)**
36:11

**available (3)**
4:11 51:18 150:12

**Avaya (13)**
20:18,19 59:14,17
271:3,12 272:1,14
273:12,21 274:12
275:2,6

**Avaya-Enterprise (1)**
271:9

**avoid (3)**
25:17 40:20 246:15

**awards (1)**
85:16

**aware (9)**
109:1,7,10 201:5
206:22 210:8 266:15,
18 268:4

**awareness (1)**
151:20

**away (3)**
169:2 182:6 245:8

**B**

**back (56)**
29:4,12 35:10
41:24 43:13 44:1,17
51:22 52:15 55:13,17
56:2 58:8,10 66:17
67:1 68:17 70:7,15
74:9,23 75:4 78:1
79:8 80:24 81:23 82:1
83:10 84:21 89:23
90:21 93:4 94:18,22
95:10 111:23 132:17
134:13 138:3 174:4
178:10 188:8,18,22
200:21 203:14 205:18
210:17,19 211:5,12
215:8 216:18 247:18
270:13,14

**background (5)**
64:4 76:18 96:4
216:20,22

**backup (3)**
232:13 267:10,13

**bad (2)**
29:20 274:21

**bald (1)**
19:5

**band (1)**
83:13

**bankers (1)**
232:24

**bankrupt (1)**
240:20

**bargain (1)**

261:18

**barn (1)**
232:22

**Barnes (18)**
30:6 33:20,21
43:15 64:10 82:24
125:17,21 127:9
150:19 151:21 236:11,
18 237:12 249:19,23
250:4,7

**Barnes' (2)**
125:24 252:12

**Barry (1)**
220:7

**base (5)**
34:23 59:2,7 86:13
87:6

**based (20)**
19:11 33:23 38:9
64:12 75:3 108:13
121:1 142:19 150:20
151:7 156:20 171:3
183:16 198:3 203:6
215:17 217:24 247:10
258:23 264:14

**basic (1)**
221:11

**Basically (4)**
34:11 224:9 256:17
263:19

**basis (23)**
4:12 37:7,23 64:18
72:22 100:14 115:3
119:4 128:5,16,21
131:17 138:10 139:20
145:19 150:11 157:22
163:4 165:9 166:21
225:18 226:4 238:5

**Bay (267)**
20:12 21:19 22:21

23:1,1,8,17 24:1,11,
19,21 25:2 26:2,7,14,
18,24 27:3,12 28:12
30:13 31:2,3,18,23
32:1,4,5,7,9,11,15,21,
22 33:1,6,10,11,12,16
34:6,7,14,16 35:3
36:6 37:5,9,12,18,22,
23 38:11,15,18,18
39:20 40:1 41:15,16,
21,22 42:4,12,12,17,
20,21 43:6 44:10,14
47:17 48:6,8 50:6
54:2,3,5 55:8,11,14,
17 56:2,3,10,23 58:6,
8,9,19 59:17 61:22,24
62:3,4,5,6 63:14
64:11 65:4,19,21
66:18 67:7,11 70:21
71:4,13,17 72:7 73:18,
24 74:16 75:16 77:12
78:2 79:8 80:23,24
81:9 82:4 86:2 87:5
90:6 93:10,13,15
101:4,7,10,13 102:18
103:17,22 106:12
108:22 109:2,9 110:9,
12 113:13 120:24
124:9 134:17,17,18,
23 135:3,11,11,13,19,
24 136:6 137:12,19,
21,22 139:1 140:20
142:6,8,12,14 143:22
144:14,16 145:1,3,7,7,
18 146:10 147:22
150:10,20 151:6
152:1,14,15 155:3
156:5,6,16 165:7,8
167:11 168:2,3,8
179:1,10 181:8,19,22,

23 182:3 183:3,5,8,10
184:12,15,21 185:9,
19 186:1 188:21
194:7,23 195:14
196:18,20,20 197:2,2,
6,10,15,17,22 198:3
199:12 200:7,7,21
203:18 207:20 208:1
209:7,11 224:10,11
229:16 238:13 245:15,
18,19 246:5 247:2,23
248:10,20,23 251:4,
16 255:19 256:16,20
257:14 260:5,7 262:1,
6,7,21,22 263:8,9
264:9,11,12 267:20,
23 268:18,18,20

**Bay' (5)**
144:10,12 145:18,
19 188:18

**Bay-Nortel (5)**
24:14 36:2 43:7
144:15 254:7

**Bay-originating (1)**
40:9

**Bay's (2)**
54:7 106:6

**Bay's' (1)**
167:12

**Bay-SNMP (2)**
144:13 167:14

**BayStack (50)**
55:9 57:21 58:23
59:10 61:1,14 62:12
63:3,11,20,23 66:20,
24 69:13,17 70:8,12
71:11,18 74:20 75:6
76:12 78:2,8,10 79:6,
17 87:6,19 90:11,13,
22 91:1,10,17 92:5,9,

16,18 93:6,19 173:2,2
181:2,18 267:18,19
268:2,4,10

**Bay-SynOptics (1)**
28:22

**Bay-to-Nortel (1)**
65:14

**became (14)**
21:19 23:1 31:15
64:9 78:4 90:14 91:4
92:17 97:11 219:24
235:7 237:21 250:8
255:3

**become (11)**
2:18 22:10 31:19,
24 147:24 154:23
218:12 225:21 235:19
247:24 254:13

**becomes (2)**
32:1,2

**before (33)**
15:4 30:10 48:11
51:23 62:15,16 76:6
86:14 91:13 96:21
97:11 98:24 100:19
121:21 134:24 135:13,
15 142:14 144:2
150:1 196:20 197:1
200:8,10 211:22
224:24 235:2 254:8,
19 256:24 271:1
273:13 275:8

**began (3)**
21:20 23:12 137:6

**begin (4)**
136:24 137:8
214:18 243:13

**beginning (3)**
3:2 154:5,9

**begins (3)**

6:1,8 124:3

**begun (4)**
23:10 31:18 38:18
234:1

**behalf (2)**
51:8 126:7

**behavior (1)**
49:1

**behind (6)**
84:2 101:16 159:1
160:17 232:22 264:9

**being (50)**
20:12 27:8 32:4,16
41:17 44:15 47:17
53:15 57:7 62:19
68:14,14 73:17 79:18
105:23,24 114:19,21
118:4,8,19 119:3
128:5,6 138:21,23
139:7 164:9 166:3
168:4 172:13 174:13
180:4,11 189:7
190:20,22 201:19
202:5 214:21 232:7
233:16 234:10 269:4
271:18,24 273:5
274:3,4,6

**belabor (1)**
42:6

**belaboring (1)**
168:11

**belief (1)**
68:21

**believe (20)**
4:7,15 7:14 17:4
18:3 78:13 120:8
127:6 156:11 158:2
169:22 186:5 188:15
232:18 234:13 250:19
252:15 253:14 268:14

269:3

**believed (1)**

269:6

**bells (1)**

228:1

**belong (1)**

86:6

**below (5)**

70:16 79:3 256:6,9

259:7

**belt (1)**

252:15

**bench (2)**

160:11,23

**benefit (11)**

41:24 48:9 55:4,5

56:16,18 135:4,8

155:16 197:7 246:6

**benefits (2)**

197:14,15

**best (3)**

52:15 149:2 175:8

**better (17)**

5:1 67:23 72:20

74:14 77:7,7 83:3

127:24 132:14 174:10,

13 197:2 215:2

220:11,17,22,24

**between (46)**

13:6 21:18 30:2

33:18 35:24 37:15

46:9 48:6 56:10 70:7

103:16 104:3 105:12

106:15 108:22 112:15

113:6 116:15,23

125:3 135:10 137:12,

19 145:3 154:18,19

155:3,18 156:16

161:11 167:4 172:21

177:12 197:10 205:4

207:12 216:3 222:20

245:12 251:4 255:19

256:12,14 259:15

263:12 269:21

**beyond (12)**

20:17 45:19 60:12

78:5 87:24 88:8,10

122:1,2 141:24 187:1

213:10

**big (5)**

44:24 45:3 61:6

122:20 221:18

**bill (1)**

160:14

**binary (3)**

221:7,10 258:17

**binder (11)**

50:22 101:16

109:22 114:2 120:15,

17 127:11 169:6

229:6 272:23,23

**binders (1)**

101:16

**bit (10)**

11:22 57:3 77:7

86:10 123:14 202:17

212:9 226:19 240:9

264:23

**bleeding (1)**

168:4

**block (3)**

117:4 177:22 257:1

**blur (2)**

48:6 197:11

**blurred (2)**

155:4 156:16

**body (4)**

198:22 237:20

239:1 241:23

**book (2)**

169:7 182:12

**books (1)**

85:19

**boom (1)**

43:17

**born (3)**

215:6 219:21 220:4

**borrows (1)**

167:12

**both (23)**

16:18,19 17:5

20:15 29:5 37:11 42:6

72:16 76:14 86:19

100:13 137:3 145:22

146:7 173:4,5 176:6

226:14 235:16 246:4

251:19 270:18 273:13

**bottom (3)**

70:9 115:10 227:9

**bought (2)**

270:9,18

**box (1)**

219:19

**boxes (1)**

233:1

**Branch (1)**

208:17

**brand (1)**

263:7

**Brass (2)**

189:3 226:22

**breadth (1)**

112:8

**break (13)**

12:9,12,15,16,23

13:1 173:20,23 240:8

248:17,24 265:11

276:2

**breathing (1)**

260:12

**Brian (3)**

164:18,20 165:5

**Brian's (1)**

238:6

**brief (4)**

14:4 25:10 58:4

250:17

**briefly (4)**

76:18 115:12

152:18 253:9

**briefs (6)**

7:10,15,18,21,24

16:12

**bright (2)**

246:18 247:9

**bringing (2)**

151:19 276:3

**brings (3)**

42:5 84:12 85:3

**broad (7)**

22:11,17 155:12

173:14 225:20 246:12

248:13

**brought (10)**

64:22 66:18,19

78:2 80:3 90:22 91:15

151:23 170:15 264:5

**build (5)**

163:5 164:11

243:14,17 244:4

**Building (3)**

232:21,22 236:2

**built (1)**

226:22

**bunch (2)**

9:12 173:12

**bureaus (1)**

221:21

**Busch (233)**

4:23,24 5:3,6,9

6:21,22 7:5,7,8,21 8:1,
8,11 10:7,11,17,21
11:1,4 12:2,20 13:15
16:21,24 17:7,9,12,13,
18,24 50:17 94:5,10,
14,20 95:6,7,20,21,23
99:9,15,22 100:1,3
101:24 102:3,4 103:4,
11,14 110:20 111:3,
12,19,20 114:15,22
115:8 118:1,7,22
119:5,17,23 120:5
121:23 123:5,12,16,
20 128:7 130:2 131:4,
7,8,11 132:3,10
138:22 139:9 140:2
143:5,10,13 147:1,2,
11,14,17 148:12,22
149:1,4,14,21 153:3,7,
8,11,14,17,18 154:1,
12,14 157:5,24 159:5,
8,17 161:6 162:1,6,15
163:5,10 164:6,10,13,
14 166:24 167:2
169:12,15,22 170:9,
14,22 171:2,16 172:1
173:16,19,23 174:2,5,
9,10 175:3,7,12,16,20,
21 176:6,10 179:3,7,8,
22 180:1,7,17 183:21
184:3 185:1,7 187:18
188:2,9,13 190:17
191:1 192:2,10,13,16,
17,23 193:6,9,23
194:3,4 199:18,21
200:4 201:21,23
202:4 204:10,13,18
209:13,20 210:10,13
211:1,5,13,18,21
212:1,4,5,8,15 213:11,

23 223:20 224:22
225:5,11,13 228:12,
17,22 229:10,15,24
230:6 250:23 253:13,
17 264:22 265:8,12,
17,18 266:1,5,7,8
273:10 274:15 275:4,
11,13,14,20 277:8
**business (21)**
85:3 90:2,2 101:13
130:11,12,14 131:5,
10,22 132:1 141:5
191:10,18 200:23
215:2,15 218:24
221:16 263:23 273:9
**businessman (1)**
262:3
**busy (1)**
2:9
**buy (21)**
24:5 58:1 62:13
64:13 65:6 82:7 137:5
151:14 152:3 165:7,7
168:20 196:19 197:4,
8,8 198:3,3 248:18
261:5 270:12
**buy-out (66)**
23:18 24:6,8,11,16,
22,23 27:13 32:14
33:3 34:8 35:12,13
36:3,8 37:5,22,22
38:19 42:1,24 43:9
44:18 48:9 54:2,3
56:2,4 58:19 74:16
104:14 106:11,20
112:6,8 134:17
135:18 136:12 137:22,
24 138:7 145:9
150:12 152:13 155:8
156:2 168:2,4 182:5

183:9,13 186:2,5,6
189:7,19 245:19
246:6 247:13 248:1
249:1 251:23 252:11
261:11 263:2,10
**buy-out' (1)**
188:21
**buy-outs (6)**
55:18 135:2,5,21
136:11,13

## C

**cabinets (1)**
231:23
**California (5)**
22:8 25:6,10,12
54:8
**call (13)**
4:9 15:5 19:16,19
63:1 81:14 95:8
110:16 178:12 210:17
211:18 227:3 251:12
**called (14)**
17:5 20:7 61:20
80:7 81:16 85:10
98:24 99:7 185:12
210:19 211:8,22
226:22 269:17
**calling (6)**
4:6,8,10,13 5:16
210:16
**calls (1)**
157:3
**came (19)**
34:14 40:7 69:13
73:10 81:19 93:6
131:18 134:6 214:21
219:10 220:2 232:15
247:19 248:20 260:19

261:16 262:9 269:23
271:19
**Canada (2)**
80:5,6
**cannot (2)**
28:24 29:20
**capacity (1)**
186:12
**captured (3)**
30:23 234:6 241:14
**car (5)**
36:11,16 270:11,12,
13
**care (2)**
236:8 239:16
**career (1)**
84:23
**careful (1)**
153:6
**carefully (1)**
149:23
**caretaker (1)**
174:14
**carry (1)**
263:24
**carve-out (1)**
271:14
**Case (134)**
3:24,24 4:6,8 11:12,
16 16:18 17:5,21 18:1,
19 19:10 21:14 23:22
25:5,14,22 27:18 29:4,
17,22 30:5 33:19,19
35:6 43:4 44:3,5,8
45:5,11,13 48:18
52:21 53:18 54:15
58:24 60:21 61:23
63:22 66:1,6,8,12,16,
18,22 67:5 71:12 78:4,
8,13 81:3 83:3,10,24

84:2 87:20 90:20,21,
24 91:2 92:11 94:9
98:20 100:17,22,23
109:8 113:2,18 114:8
125:14,18 126:23
127:1,8 128:15
130:18,19 132:16,19,
23 133:2 148:1
152:19 154:6,8
175:14,15,17 177:11
210:16,17 211:19,21
212:5,6,12,20 213:19,
24 216:18 217:12
221:1 222:16,23,24
223:5,11 224:3,4,15,
18 225:8,19 227:6
231:11 233:14 245:5
259:17,21 262:9
264:24 265:2 266:2,9
267:9,13 269:2
274:22 275:17 276:7,
23

cases (5)
17:5 25:11,18,21
101:2

Case's (5)
44:24 53:1 84:9
100:11 103:20

cast (2)
53:10 77:23

catch (1)
193:6

catcher (3)
226:13 227:2,4

category (2)
226:20 227:5

Catherine (4)
136:21 236:12,15,
16

caused (1)

271:16

cede (1)
3:10

center (3)
81:13 83:4,11

CEO (2)
214:14 216:8

certain (10)
9:19 14:24 40:16
49:16 103:24 108:15
172:16 197:20 206:12
216:4

certainly (10)
3:12 9:13 14:10
52:10 61:24 62:6
75:24 78:3 159:3
161:14

chain (1)
70:6

challenge (2)
240:1 246:11

chance (1)
149:24

change (6)
43:15 107:11,18
117:9,14 253:2

changed (4)
124:22,22,23 189:2

changes (3)
43:14 177:3 250:11

chapters (1)
85:12

characterize (1)
106:6

characters (3)
53:11 64:2 77:23

charge (5)
39:24 228:4 260:13
274:16 275:7

charged (4)

9:20 69:6 89:13
260:16

charges (1)
188:16

chart (1)
140:7

chartered (1)
155:24

chastised (1)
212:9

cheaper (3)
220:11,20,24

check (1)
60:17

checkbook (1)
61:7

cheerleader (2)
90:23 91:22

cheerleaders (1)
92:21

chief (2)
214:5 273:11

choices (1)
59:12

chooses (1)
211:14

chose (1)
130:21

Christmas (1)
241:18

CIAgent (3)
227:7,9,17

circulated (1)
43:12

circumstance (1)
63:13

circumstances (1)
180:14

Cisco (4)
49:3 221:14 222:20

224:16

citation (1)
25:23

cited (4)
25:10,19,22,22

claim (14)
15:8 48:7 52:22,23,
24 54:14 60:15 61:3,9,
11 84:8 92:1,6,8

claiming (1)
155:12

Clara (1)
54:8

clarity (4)
28:4,6 247:7,8

clear (12)
21:1 25:11,17
29:15 36:5 38:13,17
43:16 46:7 70:11
162:18 269:5

clearest (1)
54:24

clearly (10)
21:12 31:14 42:8
65:22 133:5 161:10
249:7 258:24 262:20
274:1

Cleary (1)
51:8

clerk (1)
270:7

client (1)
129:14

clock (4)
174:15,19 245:10
262:14

close (5)
11:7 15:15 97:1
253:12 275:16

closed (2)

25:2 271:10

**closer (1)**
239:5

**closing (8)**
9:5,17,21,23 10:18
11:6,19 17:3

**closings (1)**
8:23

**clue (1)**
228:19

**co-architect (1)**
218:8

**coauthor (1)**
218:9

**co-counsel (2)**
17:15 275:15

**co-creator (2)**
217:17,18

**code (38)**
57:10,15,18 59:2,6
62:9,10,13 63:15
69:22 70:1,4 75:10,12
86:13 87:6 141:21
143:19 145:14,15,23
165:10 189:3,11
203:10,10,13,15
205:4 221:7,8,10
243:9,10 247:2,5
258:13,14

**Coe (1)**
274:16

**collaborate (1)**
70:2

**colleagues (3)**
51:9 174:17 264:21

**collected (1)**
89:14

**college (1)**
96:5

**color (2)**

193:18,19

**column (13)**
137:16 140:19,23
141:2,4,7,9 144:9
145:21 184:11 193:21
197:22 254:1

**columns (4)**
140:7,13,19 141:12

**combination (2)**
221:10 227:18

**combine (1)**
28:3

**combined (1)**
216:17

**come (22)**
18:11 41:10 52:18
61:6 64:24 68:24 74:9
82:12 83:20 94:18
122:19 147:6 161:7,
19,20 191:5 212:7
232:14 241:4 258:5
260:7 268:18

**comes (3)**
56:14 86:23 159:14

**comfort (1)**
29:24

**coming (6)**
52:6 56:1 86:1
88:17 247:1 257:9

**comment (5)**
46:13 126:3 159:4
168:19 213:10

**commenting (2)**
160:20 162:22

**comments (3)**
18:13 149:24
197:24

**committee (7)**
2:21,22 14:18,22
15:6,9,16

**committee's (2)**
3:3 15:17

**common (2)**
59:1 218:6

**communicate (2)**
165:23 198:5

**communicated (4)**
159:22 192:7
264:18,19

**Communications (2)**
102:17 264:21

**companies (12)**
100:13 137:3
203:13 216:11,15,17
217:9 221:19 222:10
225:14 239:22 246:4

**company (19)**
21:19 49:10 61:21
91:16 97:7,12 101:7
112:6,7 155:9,9,11
203:4 215:4 233:9
263:17 269:22,24
270:3

**compare (1)**
54:13

**comparison (2)**
178:17 179:12

**competence (1)**
161:4

**competitors (2)**
221:14,14

**compiled (1)**
192:20

**complained (1)**
39:23

**complete (3)**
21:4,8 124:12

**completed (2)**
138:11 198:4

**completely (3)**

19:5 37:13 161:16

**completing (1)**
141:11

**complex (1)**
202:17

**component (10)**
23:20,24 24:2,8,10,
22,24,24 35:12,13

**components (2)**
23:19 231:4

**composes (1)**
71:7

**compromise (2)**
197:15 246:3

**computer (3)**
221:16 232:10,11

**concept (2)**
168:17 241:20

**concepts (1)**
256:10

**concern (9)**
11:9,16 48:5 155:7
156:13,24 157:10
168:3 275:3

**concerned (9)**
9:2 46:11 112:5
134:23 155:13 188:20
191:2 195:6 240:19

**concerning (6)**
5:20 81:6 156:13
192:6 235:5 240:23

**concluded (3)**
91:10 92:14,17

**conclusion (2)**
25:18 92:21

**conclusions (3)**
7:23 8:22 11:24

**condition (1)**
205:5

**conditions (6)**

56:8 225:17 231:2,
6 263:24 264:1

**conducted (1)**
126:16

**conference (6)**
2:22 64:15 82:8,14
151:15 236:2

**confident (1)**
253:10

**confidential (1)**
20:3

**confidentiality (2)**
272:13 273:5

**confined (1)**
257:15

**confirm (3)**
88:13 93:8 200:5

**confirmation (1)**
117:23

**confirmed (5)**
72:24 76:1,3 84:16
86:18

**confirming (5)**
70:3 79:13 80:21,
22 89:21

**conflict (1)**
252:17

**confused (1)**
168:5

**confusion (1)**
262:5

**congratulate (1)**
67:3

**connected (2)**
79:18,21

**connection (1)**
165:22

**connects (1)**
78:19

**conscious (4)**

147:14 175:16
210:9 244:21

**consent (1)**
161:10

**consented (1)**
23:7

**consider (3)**
15:17 84:8,9

**considerable (1)**
272:20

**considerably (1)**
234:2

**consideration (5)**
201:6 206:23
260:21,22 267:1

**considered (2)**
173:11 209:23

**consistent (2)**
112:20 182:2

**consisting (1)**
104:23

**constraints (1)**
9:2

**consult (2)**
100:18 213:4

**consultant (1)**
216:6

**consulting (1)**
5:20

**contact (2)**
80:6 199:11

**contacted (1)**
202:20

**contacts (3)**
92:20 141:24
172:16

**contain (2)**
119:10 271:5

**contained (4)**
20:13 38:24 273:14

274:23

**containing (1)**
260:6

**contemporaneous (4)**
21:15 51:20 53:5
238:19

**contemporaneously (1)**
257:20

**content (1)**
129:12

**contention (2)**
75:3 91:7

**context (3)**
19:12 189:7 195:9

**continue (4)**
73:3 86:23 186:9
255:4

**continued (3)**
20:16 90:23 137:2

**continuing (2)**
153:22 271:4

**continuity (1)**
71:14

**contract (15)**
40:18,22 46:8
72:22 73:4 103:15
180:8 191:6 192:6
216:3,6 233:23,23
234:7 269:16

**contracted (1)**
40:19

**contractor (1)**
216:6

**contracts (5)**
100:9 233:21,24
252:13 267:7

**contradicted (3)**
78:24 79:22 93:20

**contrary (1)**
199:5

**contrast (3)**
57:2,20 76:6

**control (1)**
46:9

**convention (1)**
67:16

**conversation (6)**
7:9 70:18 142:5
161:11 201:4 254:19

**conversations (18)**
109:12 112:24
133:8 140:11 147:6
156:9,12,19,21
165:19,23 167:17
198:9 207:3 235:10,
18 258:23 264:14

**convert (5)**
23:17 233:22
252:10 253:6 261:9

**conveyed (1)**
258:3

**cookie-cutter-type (1)**
100:6

**copies (4)**
54:23 89:15 108:1,3

**copy (13)**
27:6 54:24 77:1
110:14 114:5 141:24
144:2 169:10,14
181:14 198:1 231:20
243:14

**copyright (1)**
48:21

**core (2)**
59:1,6

**corporate (6)**
37:1 112:22 133:24
151:4 179:15 198:22

**corporate-wide (1)**
246:12

**Corporation (3)**

219:10,24 264:3

**corporations (2)**

108:5 220:1

**correct (33)**

8:9 67:18 106:20
117:12,13,21,24
127:5 133:11 146:8
158:9 163:12 165:16
169:22 177:2 180:20
192:24 194:11,12
196:7,13 204:9
208:11 212:22,22
214:17 228:15 231:15
255:14,16,23 267:12,
13

**Correcting (1)**

99:18

**correctly (3)**

179:1 195:20
264:20

**correlate (1)**

270:3

**correspondence (1)**

144:1

**cost (6)**

45:1 67:18,24
68:10 81:10 220:21

**costs (2)**

220:21 227:11

**Cote (7)**

20:16 271:20 272:4
273:2,19 275:6,7

**could (42)**

19:15,16,21 20:1
32:23 33:12 34:16
36:15 55:20,21,23
71:9 72:14 77:4 80:3
89:7 101:5 114:1
115:11 120:21 129:21

134:14 137:3 141:19
157:16,22 166:6
193:22 209:23 225:7
227:3 246:19 252:2,3,
5,6,10 253:6 255:4
260:12 268:6 269:15

**couldn't (4)**

61:4 76:7 80:9
258:13

**counsel (33)**

18:2 19:11 20:21
21:9 25:16,17 33:21
44:24 53:20 64:11
73:6,9 74:4 82:6,24
98:22 125:17,22
138:16 148:2 150:19
191:16 210:15 213:4
223:2 236:12,17
249:23 251:14,19
261:22 263:4 274:18

**count (2)**

108:18 186:22

**counter-historical (1)**

87:22

**countries (1)**

221:22

**country (2)**

84:21 85:11

**couple (15)**

2:9,11 3:2,9,20
12:5 45:15 47:11
130:2 157:24 158:5
159:6 194:5 196:15
219:15

**course (25)**

2:3,15 4:14 6:11
8:13 17:15 52:3 53:12
58:7 60:17 67:12 82:9
92:4 103:21 123:11
130:11,12 131:22

132:1 156:6 191:10,
17 276:24 277:2,3

**COURT (236)**

2:1,10,14,19 3:7,12,
15,19 4:2,16,21 5:2,5,
8,11,14,22 6:3,5,15,
19,21,24 7:2,7,16,20
8:2,7,10 9:7,13 10:9,
14,20,24 11:3,17 12:5,
16,22 13:11,19 14:2,5,
9,15 15:23 16:3,7,13,
23 17:6,11,17,23 19:1
26:4 49:5 50:17,24
51:3,5,6 52:6 54:19
56:19 65:15 66:5,10,
13 68:5 76:23 77:3,10
82:2 84:19 93:24 94:3,
8,11,16,21 95:3,9,13,
19 99:10,17,20,24
102:2 103:7,10
110:24 111:16 115:4
119:12,20 121:16
123:9,13 128:17
129:7,17 130:24
131:8 132:7 138:19
139:22 143:9 146:18,
22 147:13,16 148:10,
23 149:3,18 153:4,10,
12,16 154:10 157:19
158:4,18,23 159:7,15
161:23 162:5,19
163:1,7,14,17,21
164:3,5,7,12 166:8,22
170:2,6,12,20 171:1,
19,22 173:7,18,22,24
174:3,6,8,12,20,22
175:1,5,11,14,19
176:4,7 178:19,22
180:3,13 183:24
185:4 187:23 191:21

192:8,15 193:4,8
194:1,2 198:11 200:1
201:22 202:1,9 204:9,
12,15 209:17 210:12,
18,23 211:3,7,11,15,
20,23 212:3,6,14,21
213:5,18 215:8 223:7
224:19,23 225:6,12
229:14 230:3 250:21
251:12 253:16 265:6,
10,13,15,22 266:4,6
275:1,9,12,18,23
276:4,18,21 277:1,5,
10,12

**courtroom (6)**

4:15,22 5:15 95:10
210:24 213:7

**Court's (3)**

15:5 119:9 223:14

**cover (8)**

116:21 117:20
168:21 176:20 204:21
207:7 231:18 265:5

**covered (15)**

32:7 54:9 62:20
63:16 65:1 68:20 69:8
82:11,12 85:6 86:24
167:14 173:10 230:17
231:12

**covers (3)**

42:11 73:22 194:22

**craft (2)**

98:13 202:18

**crafted (4)**

43:15 116:12 126:5
193:20

**crafting (4)**

64:11 120:24
150:19 151:6

**create (5)**

10:5 40:17 97:22
183:1 243:18

**created (9)**
48:16 172:8 180:22
181:4 182:21 188:6
193:13 224:12 262:20

**creates (2)**
58:21 73:1

**creating (4)**
135:15 142:19
215:15 222:10

**creator (1)**
217:16

**creators (1)**
17:21

**credibility (1)**
92:22

**Creditors (2)**
14:18 15:14

**creditors' (4)**
2:21 14:22 15:6,16

**credits (2)**
252:10 253:7

**cross-development (1)**
185:8

**crucial (2)**
44:11 160:4

**crunched (1)**
11:5

**cryptography (1)**
227:24

**culminating (1)**
217:1

**culpable (1)**
270:18

**cultivating (1)**
85:17

**Current (5)**
65:4 91:7 96:17
152:1 234:7

**currently (1)**
234:6

**custom (3)**
18:21 50:14 98:4

**customer (16)**
46:18 98:9 101:12
107:2 125:7 141:10
200:20,22 207:13
220:3 221:8,20
227:13,21 228:5 231:7

**customers (20)**
22:4,23,24 23:13
97:18,20 105:22
107:20,23 108:17
197:3 215:22 221:4,
12,23 222:21 226:7
258:7,8,9

**customers' (1)**
258:8

**customization (1)**
228:3

**customize (1)**
243:15

**cut (2)**
8:18 265:4

# D

**D-158.02 (1)**
73:7

**D-7 (1)**
54:21

**D-76C (2)**
64:6 81:24

**D-77B (1)**
66:1

**D-7C (1)**
54:22

**D-84 (1)**
69:16

**D-85 (2)**
70:15 75:14

**da (3)**
254:2,2,2

**daily (4)**
130:9 131:13,15
138:9

**damage (2)**
61:3,9

**damages (1)**
54:13

**database (2)**
233:21,24

**date (17)**
14:20,23 46:17
120:11 121:6 124:21,
23 168:6 177:17
196:12 201:1,3 207:1
256:5,8 259:6 269:19

**dated (5)**
81:17 102:17
149:10 165:12 187:17

**dates (1)**
237:10

**Dave (43)**
26:21 29:8 35:24
36:1,24 37:4 43:16
44:7,20 45:6,7 47:9
80:1,1 81:18 82:21
83:6 109:18 110:1,3
116:22 117:9 126:8,9
127:20 134:23 135:3
137:5 143:3 149:9
154:18 164:16,21
166:9 176:16 179:18
183:15 187:16 196:24
197:6,20 233:16
253:18

**Dave's (1)**
197:23

**David (12)**
17:16 18:16 19:15
20:7 21:10 30:4 35:22
44:16 50:9 51:7
149:23 198:9

**day (11)**
11:10,20 21:1
53:12 87:12 131:18
167:9 238:2 263:21,
22 271:2

**days (14)**
2:9 7:12 8:13 14:20
19:8 48:15 78:2 79:8
82:19,21 83:6 127:20
200:21 241:18

**day-to-day (1)**
100:14

**deadline (5)**
121:17 122:1,2,3,23

**Deadlines (2)**
121:15 220:12

**deal (45)**
21:6 28:14 29:13,
15 30:1 32:19 34:4,6,
12,13,18 38:9 42:10
44:24 45:3,8,9,10
49:20,22 113:13
122:20 135:10 157:7
165:20 166:3 171:5,
17 186:16 189:13,14,
15 191:3 206:11
213:17 222:8 239:21
240:17 247:21,22
249:16 261:17,17
263:5,23

**dealership (1)**
36:12

**dealing (2)**
46:19 79:19

**deals (2)**

28:2 100:6

**dealt (3)**
49:21,23 237:24

**DEAN (16)**
16:4,7,9,14 17:16
170:15 174:18,21,23
213:19 275:21,24
276:5,20,24 277:3

**debate (2)**
86:16 119:8

**Debtors (9)**
2:8 14:19 37:13
38:3 45:15 47:3 51:9
162:4 261:22

**debtors' (6)**
15:10 25:17 251:13,
19 263:4 274:18

**decades (1)**
216:9

**December (12)**
43:11 125:3,10
167:4 169:4 186:20
188:18,23 235:7
237:21 242:2,5

**decide (1)**
265:4

**decided (2)**
91:18 218:23

**deciding (1)**
171:15

**decision (5)**
11:21 87:1 90:2
100:19 210:9

**decisions (1)**
100:15

**declare (3)**
147:22 152:10
197:20

**declared (1)**
136:15

**deemed (8)**
20:3 118:24 119:11
159:10 160:9 161:10
163:11 273:15

**deep (1)**
232:4

**default (1)**
264:6

**defeat (1)**
93:5

**defeated (1)**
93:20

**defect (1)**
61:10

**defend (1)**
61:11

**define (3)**
133:24 135:21
137:4

**defined (7)**
28:22 32:9 55:6
56:1 81:1 134:7
242:19

**defines (1)**
55:3

**definition (4)**
31:11 140:19
242:21 261:17

**Definitions (1)**
104:21

**definitively (1)**
58:9

**defrauded (1)**
41:23

**degree (3)**
2:17 96:15 217:2

**degrees (3)**
96:12,14 216:23

**delay (1)**
271:16

**delivery (3)**
107:1,4 176:20

**demand (1)**
186:16

**demonstrate (1)**
118:14

**department (6)**
126:11 185:13,17
270:21 273:20 274:16

**departments (1)**
221:21

**departure (1)**
189:23

**depend (1)**
60:23

**depends (2)**
52:24 190:19

**deploy (2)**
144:17 254:3

**depose (1)**
19:22

**deposition (6)**
4:12 20:8 154:7
209:21 233:11 261:23

**Derek (1)**
2:7

**derivative (5)**
34:15 224:11
243:11,18 258:15

**derived (2)**
34:7 263:9

**describe (3)**
100:11 218:23
269:13

**described (9)**
38:9 71:12 147:8,
10 150:4,9 156:14
251:3 252:18

**describes (1)**
48:1

**describing (5)**
65:12 81:18 82:4
198:10 252:12

**description (5)**
74:1 182:7,8 195:1
258:1

**designate (1)**
140:22

**designated (1)**
18:17

**designating (1)**
121:18

**designation (1)**
194:19

**designations (1)**
4:12

**despite (2)**
83:8,8

**details (2)**
98:17 133:1

**develop (11)**
22:2 34:9 36:6,9,19
42:21 43:2 62:15
105:17 168:22 259:9

**developed (5)**
22:5 32:4 54:7,10,
11

**developer (2)**
221:7 243:9

**developing (4)**
58:24 61:19 107:20
219:1

**development (35)**
22:17 30:16 31:2
43:20 55:13 56:11
57:10,19 65:5 104:7
105:7,13,15 106:2
107:1 135:14 145:14,
15,22 152:2,11
185:11,15 203:3,10

215:23 222:4,7,13
244:13 247:5 248:22,
22 256:2 259:3

**devices (1)**
226:12

**DI-18132 (1)**
15:19

**dialogue (3)**
237:6 249:20
264:18

**differed (1)**
171:6

**difference (5)**
105:12 106:15
116:23 117:1,2

**differences (1)**
177:12

**different (18)**
10:3,3 23:19 41:11
47:10 91:20 140:17
141:20 158:11 193:16
194:5 206:11 217:21
218:4 240:3,4 267:17
276:9

**differentiate (2)**
137:12 145:3

**differentiating (1)**
137:19

**differently (1)**
249:4

**difficult (4)**
60:1,7 107:24 108:2

**dig (1)**
232:13

**diligence (1)**
271:11

**diligent (2)**
8:17 272:15

**dime (1)**
48:20

**dimensions (1)**
227:22

**DIRECT (15)**
95:22 115:9 120:20
125:15 145:11 154:24
159:20 164:15 167:6
213:22 266:2,11
275:17 276:8,13

**directed (1)**
184:21

**direction (2)**
91:20 133:7

**directly (2)**
23:13 125:8

**director (1)**
271:21

**disagree (2)**
21:10 161:16

**disclosed (1)**
20:2

**discount (2)**
108:8,16

**discounts (2)**
108:19,19

**discovered (1)**
199:12

**discuss (21)**
45:14 98:12 113:15
130:16 133:22 140:6
142:18 148:3 167:21
172:19,24 177:24
190:1 220:5 245:16
249:7,10 254:12,18
266:21 277:2

**discussed (23)**
30:10,14 31:15
32:3,19 33:17 43:5
59:15 133:17,21
168:17 178:7 238:22
240:11,23 241:6

245:12 249:9,16
255:1 256:11,14
259:14

**discussion (14)**
32:12 33:24 76:20
90:2 134:16 135:23
154:17 166:11 200:24
238:12 240:22 245:17
267:18 276:23

**discussions (14)**
109:8 112:14 113:3,
6,19,21 125:15
132:17,20 139:16
171:4 235:4 241:12
267:22

**dismissed (1)**
122:23

**dispersed (1)**
108:7

**dispute (2)**
55:9 63:17

**dissolved (2)**
2:23 14:23

**distinction (2)**
155:18 156:15

**distinctions (1)**
155:3

**distinguish (1)**
172:21

**distribute (18)**
26:17 32:23 33:13
34:9 36:6,9,19 42:21
43:2 44:14,19 224:10
244:2,5 257:14
258:19 259:9,9

**distributed (11)**
20:12 31:24 32:2,6
33:11 34:16 38:18
47:17 200:7 245:14
267:20

**distributing (2)**
44:10 255:5

**distribution (6)**
30:17 49:18,22
107:6 185:10 215:24

**divided (1)**
17:1

**divides (2)**
144:9 254:1

**divinity (1)**
96:15

**division (1)**
141:5

**doctor (2)**
84:16 217:1

**document (64)**
28:24 45:7 53:18
54:23 67:6,11 73:15
77:14 78:10,16 83:5
114:7,9 118:24 122:8,
21 128:17,22 129:2,8,
11 130:7,13 131:24
139:12,17 140:12
148:1 149:8 159:1,9,
21 161:7,19,19
162:11 163:3,11,12
169:1 176:15 180:18
182:16 184:5 185:6
190:15 191:9,17
192:3,19 193:20
195:22 202:8 204:20
209:4 218:11 223:23
224:1 231:21 233:1
234:2,8 237:5 244:23

**documentary (3)**
53:5 76:5 80:11

**documentation (1)**
110:8

**documented (2)**
188:22 241:21

**documents (24)**

7:13 25:4 52:2,8

53:16 64:5 79:1,18

122:1,2 126:19

131:21 139:11 232:2,

6 233:3,4,24 234:5,11

236:19,24 237:1 239:9

**dollars (8)**

52:22 56:20 67:24

68:10,11 84:6 260:16,

21

**domestic (1)**

227:22

**done (12)**

43:7 58:21,22

80:12 130:10 156:1

219:9,11 220:15

239:5 269:11 270:1

**doubt (6)**

69:23 124:15,19

156:20 264:13,16

**down (7)**

8:18 67:17 70:9

77:21 80:1 239:4

240:8

**dozen (3)**

83:21 218:5 241:17

**Dr (97)**

3:24,24 16:18 17:5,

21 18:1,19 19:2 26:6

27:18 29:4,17,22 30:5

33:19 35:6 44:3,5,8,

24 45:5,11,13 50:11,

13 52:21 53:1 60:21

63:22 66:6,8,12,18,22

67:5 71:12 78:4,8

81:3 83:3,10,24 84:2,

9,15,22 85:7,14,21

87:20 88:4 90:20,21,

24 91:2 92:11 94:9

98:20 100:11 103:20

109:8 113:2,18 114:8

125:14,18 126:23

127:1,8 130:18,19

132:16,19,23 133:2

211:19,21 212:5,6,12,

20 213:24 216:18

222:16 224:18 231:11

233:14 245:5 259:17,

21 264:24 266:9

269:2 274:22 275:17

276:7,23

**draft (12)**

30:7 83:24 100:5

176:22 237:2,9,19

239:3 240:13 249:24

250:1,7

**drafted (5)**

24:14,21 30:9

34:24 254:20

**drafting (4)**

33:23 236:19,23

252:13

**drafts (3)**

236:20,24 250:14

**dramatically (1)**

27:15

**drawing (2)**

144:7 155:18

**drawn (1)**

168:6

**dream (1)**

85:1

**dried (1)**

206:17

**drive (1)**

205:21

**driven (1)**

244:14

**due (4)**

50:12 119:7 162:3

271:11

**duly (3)**

41:5 95:16 213:20

**duplicate (1)**

188:24

**duplicative (2)**

9:1 228:21

**during (17)**

32:24 35:15 48:2

56:17 65:3 116:6

130:22 132:22 177:20

196:24 198:4 199:3

238:17 249:19 251:8

258:11 271:10

# E

**each (21)**

24:6 31:6 41:4

51:21 61:17 67:3

108:8 126:2 139:11

140:16 141:19 154:22

158:22 172:8 187:7,

10 227:7 240:7

241:15 244:10 248:4

**earlier (8)**

35:9 47:22 65:21

67:15 147:8 192:1

212:10 225:20

**early (3)**

107:17 189:21

264:11

**earned (1)**

216:23

**ease (1)**

215:8

**easier (1)**

79:5

**economical (1)**

258:22

**economics (1)**

96:9

**ECRO (1)**

13:10

**edit (1)**

243:15

**editing (2)**

237:3,5

**editor (1)**

218:10

**EDN (4)**

69:19 75:8 202:24

203:1

**educate (1)**

190:7

**education (1)**

217:1

**educational (1)**

216:22

**effect (9)**

6:9 42:14 56:13

72:23 80:23 256:4

258:10 259:5 274:8

**effective (2)**

2:18 14:20

**effectiveness (1)**

2:24

**effort (6)**

59:19 137:4 233:21,

22 234:1,14

**eg (1)**

145:15

**eight (1)**

225:1

**either (11)**

31:2 37:9,18 62:4

99:17 139:1 159:13

238:10 247:2,4 253:1

**electronically (2)**

29:2 44:2

**eligible (3)**
137:22,24 186:3

**eliminating (1)**
207:5

**else (6)**
9:22 41:17 65:13
93:17 125:12 211:13

**elsewhere (1)**
184:17

**email (99)**
27:5,10 34:21
35:23 37:15,21 38:5,7
39:1,4,6,7 44:6,8 45:1,
4,6,12 47:4,24 48:11
65:21 66:1,11 67:2
70:6,12 73:14 75:5,23
81:7,15,23 109:18
110:1,6,17 111:8
122:5 123:1 126:18
127:13,15,18 129:14
130:18 132:11 143:1,
3,15,23 147:19 149:9,
11 151:19 152:20
153:19 154:16 155:1,
16 156:10 157:18
158:12,15,16 160:14,
21,24 162:23 164:17,
17 165:4 166:9,18
167:4,19 176:20
178:12 179:17 187:16
188:4,11,14 190:12,
16 191:15 193:15,16
194:6 196:11 201:15
202:6,13,15 250:4
253:14,18 273:1,8

**emails (20)**
19:12 21:15,16
29:7,23 35:21 37:3
47:12 57:11 78:18

79:10 80:18,19 81:6,
11 83:10 158:5
173:13 193:20 201:16

**EMANATE (26)**
23:23 24:1,7,9,12
37:8,24 56:24 72:2
74:17,19 145:16
165:10 182:1 185:11
195:15 205:10 206:8
227:7,12,14,16,17
228:4,6,9

**EMANATE/Lite (4)**
227:6,9 228:6,8

**emanated (1)**
105:10

**emanating (2)**
140:20,21

**embed (1)**
259:23

**embedded (1)**
145:17

**emerging (2)**
112:19 143:21

**Emerson (1)**
77:12

**employee (14)**
4:5 18:9 19:23 20:5
80:5,8,16 81:3 83:17
126:10 194:11 202:11
216:2,7

**employees (4)**
20:15 201:17
216:14,16

**end (25)**
11:20 63:7 78:6
84:7 87:8 168:20
221:17,17,19 226:21,
21 227:2,4 238:1
239:8 244:2,7 246:10,
18 248:14 256:24

258:1 259:10 264:10
271:1

**ended (1)**
42:18

**ends (2)**
226:14 254:2

**end-user (2)**
221:8 258:6

**enforce (1)**
41:7

**engaged (1)**
48:20

**engine (2)**
69:22 75:10

**engineer (2)**
60:1 66:17

**engineering (5)**
108:6 215:22
216:24 218:15,16

**engineers (4)**
59:16 63:24 71:15
155:24

**enhancements (1)**
231:3

**enjoy (5)**
33:3 34:8 35:18
137:22 247:24

**enjoyed (2)**
134:18 246:5

**enough (5)**
11:15,23 12:2
94:19 202:19

**ensure (1)**
18:7

**entail (1)**
98:8

**enter (23)**
28:11,13 30:15,18
31:4,9,14 39:11,14
42:8 48:2 154:16

172:6 187:8 198:17,
20 199:14 200:17
229:3,16 242:17
262:17 267:7

**entered (15)**
23:2 37:10 39:17,
17,19,22 46:6,16 48:4
118:9,14 242:4,13,23
260:10

**entering (6)**
112:15 113:15
133:18 229:1 241:20
242:7

**entire (1)**
19:10

**entirety (1)**
264:3

**entities (7)**
112:17 116:8,9
203:9 217:9 251:5
255:20

**entitled (1)**
144:16

**entity (6)**
81:4 172:12 203:1
219:22 243:2 248:4

**entry (1)**
195:11

**environment (1)**
227:20

**episode (1)**
93:5

**equipment (2)**
221:12 268:2

**ERS (7)**
48:17 271:5,19
272:2,5 273:3 274:23

**ES (6)**
48:17 271:4,19
272:2 273:3 274:23

**escape (1)**
87:23

**especially (1)**
90:20

**essentially (1)**
97:13

**establish (3)**
130:8 131:9 199:2

**established (4)**
72:6 133:2 197:17
262:19

**establishes (1)**
131:4

**ethernet (1)**
59:1

**ethically (1)**
6:24

**Europe (1)**
214:23

**European (1)**
214:24

**evaluation (2)**
57:13 124:8

**even (18)**
19:18 46:4 49:19
52:14 72:19 80:9
83:17 91:13 92:15
100:18 134:24 167:11
207:3 216:7 228:4
260:17 271:2 273:8

**evening (2)**
277:6,6

**event (2)**
191:12 234:18

**events (3)**
231:12 234:5,17

**eventuality (1)**
40:21

**eventually (2)**
102:18 241:16

**ever (13)**
12:14 54:12 69:23
87:18,21 124:20
199:5 207:3 208:12
234:22 242:4 255:1
266:20

**evergreen (1)**
269:17

**Every (13)**
57:5 62:22 83:15
85:13 131:18 185:10
227:12 233:7,22
234:7 248:2,8,18

**everybody (3)**
134:4 174:12 241:3

**everybody's (1)**
223:15

**everyone (8)**
2:2 28:4 94:22 95:4
174:6,8 265:15 277:5

**everyone's (1)**
150:1

**everything (3)**
8:12 28:4 42:9

**evidence (67)**
9:15 10:4 20:22
21:2,4,7,9 29:21 35:4
38:3 41:12 45:17,20
47:13 51:11,13,18
52:5 53:15 88:17
93:23 103:5,13 111:2,
14,18 114:16 115:7
120:4 123:19 129:13
130:4 132:9 139:6
140:1 143:12 149:20
158:20 160:3,4,15,16
161:1,2,4,9 163:23,23
170:5 176:9 180:16
184:2 185:6 188:1
192:7,12 193:2 200:3

202:3 204:17 209:19
229:11 230:1,5
242:14 250:20 253:14

**evidently (1)**
67:14

**evolved (1)**
22:14

**exact (9)**
40:20 68:19 89:9,9
90:4,17 253:3,12
254:17

**exactly (13)**
6:3,19 48:10 65:8
74:19 115:1 119:15
133:20 135:21 222:1
246:15 252:16 253:10

**examination (5)**
8:18 95:22 213:22
265:3 266:3

**examined (2)**
95:17 213:20

**example (5)**
16:17 20:16 173:2
227:24 244:24

**examples (2)**
221:4 242:16

**exceeding (1)**
112:9

**except (2)**
16:11 254:22

**excepted (1)**
118:11

**exception (6)**
129:4,6,24 131:5
191:11 212:24

**exceptions (1)**
14:24

**exchange (9)**
69:5,7 75:5 126:18
191:14,16,18 202:16

267:2

**excluding (1)**
148:20

**Excuse (3)**
173:6 178:16
218:15

**excused (4)**
15:21,24 211:17
275:19

**execute (7)**
60:22 61:12 68:2
120:6 126:14 186:8
189:17

**executed (18)**
28:24 29:6 41:4
44:8 61:17 125:10
169:3 179:23,24
231:20 233:17 235:6
242:4 250:16 256:6,9
257:19 259:7

**execution (7)**
19:14 42:15,16
106:24 125:5 255:22
257:13

**Executive (1)**
85:10

**executives (1)**
85:15

**exercise (5)**
104:13 106:11
107:6 197:3 267:11

**exercised (5)**
24:11 137:23
183:10 196:20 251:23

**exercises (1)**
267:14

**exhaustive (1)**
231:22

**Exhibit (97)**
21:21 25:5 26:22

27:16 35:23 37:15,20
49:4 54:21 64:6 69:16
71:8,9 81:14 101:22
102:12,14,19 103:1,
12 111:1,4,17 115:6
116:17 118:2,23
119:9,10 120:3,7,15,
16,18 121:10 123:18,
22 127:10 128:4
132:8 139:24 143:11
149:19 157:13 158:12
164:16,22 166:5
169:16,19 170:4,16
175:24 176:8,15,23
177:6 178:9 179:23
180:15 182:11 183:22
184:1,22 185:5
187:12,14,20,24
190:10,14 192:11
200:2 201:11 202:2
204:2,16 209:18
222:16,17 223:3,18
229:5,11,19,21 230:1,
4,14,23 250:19 251:1
253:9,15 272:22,23
275:15

**exhibits (17)**
7:13 9:11 23:4 25:5
50:21 101:17,20
102:1 103:5 121:18
122:16,16 128:10,12
138:18 173:12 190:18

**exist (2)**
69:10 82:11

**existed (4)**
56:17 145:7 167:10
214:16

**existence (4)**
15:10 65:3 73:16
262:9

**existing (4)**
58:15 59:9 63:20
145:20

**exists (1)**
63:15

**expanding (1)**
27:15

**expect (1)**
6:12

**expectations (1)**
150:1

**expected (2)**
49:16 134:5

**expenses (2)**
260:17,18

**expensive (1)**
59:24

**experience (2)**
50:11 268:1

**experiencing (1)**
246:16

**expert (10)**
18:15,18 49:14
83:18,22 84:14 99:2,3,
8,14

**experts (1)**
83:23

**expiration (9)**
33:4 78:5 120:11
122:6 255:6 257:22
259:10,23 268:9

**expire (8)**
64:14,21 82:7,10
151:14,22 155:16
177:15

**expired (18)**
29:11 64:12 121:1,
7 122:12 123:23
124:9 145:2 150:21
151:8,10 177:16

179:13 195:5 231:14
234:3 257:6 270:6

**expires (4)**
68:8 248:13 257:5
270:15

**explain (13)**
18:20 98:20 105:4
106:15 192:19 195:23
202:15 203:20,22
207:11 214:20 219:17
231:18

**explained (4)**
15:13 128:21
203:23 210:15

**explaining (2)**
191:3 192:4

**explains (2)**
64:20 65:2

**explanation (5)**
9:14 191:6 233:19
274:12,19

**export (1)**
227:22

**exportability (1)**
227:23

**express (5)**
157:6,9 166:2
199:5 264:20

**expressed (2)**
158:16 166:19

**expresses (1)**
167:23

**expressly (2)**
76:1 93:20

**extend (6)**
45:18 116:8 156:2
197:16 243:16 267:2

**extended (3)**
197:14 270:11,12

**extending (3)**

201:1 207:4 266:21

**extensions (1)**
124:8

**extensive (1)**
267:22

**extensively (1)**
249:9

**extent (2)**
167:11 245:6

**extra (1)**
225:4

**extricate (1)**
59:24

**extrinsic (13)**
20:22 21:2,4,8 38:2
158:20 160:2,4,15,16
161:9 163:23 192:7

## F

**fabric (2)**
60:3,5

**face (2)**
41:20 142:15

**faced (1)**
59:8

**face-to-face (2)**
126:21 238:15

**facilitate (1)**
51:1

**facing (1)**
60:15

**fact (43)**
3:21,22 4:5,7,8,14,
19 7:22 8:22 11:24
20:17 30:1 34:24
40:18 42:19 47:2
51:14 56:19 63:4 67:9
72:15,18 83:9,14
85:17 110:1 118:8,14,

20 124:17 129:23
138:4 152:22 160:21
162:12 193:3 200:7
213:1,2 266:15 269:6
274:21 275:2

**facts (2)**
130:15,16

**factually (1)**
50:8

**faculty (1)**
219:2

**fail (1)**
18:7

**failed (1)**
147:21

**failing (1)**
248:22

**Failure (2)**
41:6 45:4

**Fair (6)**
12:2 70:16 212:19
213:13 245:21 246:4

**Fairly (2)**
10:14 257:24

**faith (2)**
29:20 274:21

**Falcon (2)**
181:2,18

**fall (1)**
138:5

**falls (1)**
92:14

**false (1)**
80:3

**familiar (1)**
267:19

**families (2)**
48:17 227:15

**famous (1)**
148:1

**far (6)**
46:10 67:22 112:9
174:24 188:19 191:1

**farm (7)**
126:21 127:4
132:20 165:16 216:12
235:22 236:3

**faster (3)**
108:19 220:11,23

**fax (14)**
29:3 116:21 117:16,
20,22 126:20 204:21
232:7,8,11,12,14,16
234:9

**faxed (4)**
43:13,23 44:1
233:16

**faxes (1)**
43:24

**fearful (2)**
20:2 252:17

**features (4)**
59:4 227:8,10,11

**February (1)**
44:1

**fee (23)**
33:8,8 39:23 40:2
56:20,24 57:2,8,17
61:5 62:11 68:3
106:16,22 146:11
189:3,12 242:24
252:3 260:15,23
261:8,9

**feel (3)**
11:5 174:10 265:4

**feeling (6)**
5:1 83:2 127:24
132:14,24 238:16

**feels (1)**
174:13

**fees (16)**
31:5 32:18 56:23
135:17 136:10 145:16
146:6 150:12,15
168:23 172:9 189:18
248:6,7,19,19

**felt (7)**
38:24 60:23,24
61:13,14 147:20
245:21

**few (11)**
22:19 23:6 41:9,11
60:20 66:15 113:23
162:9 234:20 266:9
267:16

**field (6)**
85:8,18 88:5,12,13
135:13

**Fifth (1)**
141:7

**figure (1)**
13:7

**file (7)**
2:24 14:4 110:8
231:23 232:12 233:6,8

**files (2)**
77:15 233:5

**filing (2)**
15:6,8

**filings (1)**
15:18

**fill (1)**
98:16

**final (9)**
64:11 82:4 115:23
120:24 150:20,24
151:6 254:7 266:9

**finally (7)**
17:18 18:15 22:10
36:4 49:13 59:17

169:3

**financial (1)**
260:22

**find (19)**
19:18 29:19 60:6
80:4,9 88:24 97:17,20
136:3 197:24 230:14
231:9,20 232:14
233:2 234:11,12
244:18 246:3

**findings (3)**
7:22 8:21 11:24

**fine (14)**
7:2 86:21 107:8
131:5 163:9 173:22
175:2 201:21 212:23
253:4 265:10 275:23
276:19,19

**finish (2)**
93:1 264:23

**firm (1)**
232:1

**First (50)**
2:16 4:9 9:8 10:2
12:6 28:10 41:14 64:5
66:19 70:9 73:19 78:3,
24 95:8 109:14
115:10,16,20 116:21
117:19 123:2 127:19
137:11,16 140:16,19
141:10 144:8 151:18
167:6 170:18 171:8
180:23 184:11 193:14
202:5 205:7 213:20
217:6,9,22 219:22
220:3 230:23 231:23
235:8 243:7 248:2
254:1 266:12

**fit (1)**
160:14

**fits (2)**
74:1 194:24

**five (7)**
211:23,24 261:2
265:2,9 268:19,23

**five-minute (1)**
265:11

**fixed (2)**
150:1 252:4

**flexible (1)**
134:2

**flowing (1)**
135:5

**focused (1)**
128:14

**folks (1)**
237:23

**follow (2)**
194:19 263:16

**following (8)**
26:15 51:2 84:24
121:24 136:16 197:18
210:7 249:22

**follows (6)**
30:14 95:18 153:2,
23 205:1 213:21

**footnote (2)**
253:24 254:5

**force (2)**
84:2 218:16

**forever (12)**
33:13 34:8,10,17
36:16 44:19 49:11
50:6 54:6,9 224:13
246:17

**forget (3)**
78:22 89:16 206:18

**forgotten (2)**
181:12 206:20

**form (2)**

**formal (8)**
71:8,23 72:9,9
75:18 76:15 79:10
97:24

**formalize (2)**
27:6 110:13

**formally (3)**
27:1 72:24 110:10

**formed (1)**
92:21

**former (12)**
4:5 18:8 20:5 49:20
183:8 196:18 197:10,
11,17 214:22 221:14
273:11

**forth (7)**
67:4 70:7 83:10
171:12 242:23 243:2
248:6

**fortunately (2)**
53:4 80:10

**fortune (2)**
48:19 221:19

**forward (9)**
23:22 27:23 51:10
93:23 94:2 131:9
205:22 228:20 263:24

**Foster (1)**
70:13

**found (22)**
19:15 24:1,7,10
31:9,10 74:1 107:19
134:5 156:14 164:20
181:14 194:24 201:8
205:21 230:11 233:3,
4 243:4 256:11 260:9
272:15

**foundation (4)**
130:8 163:6 164:11

**29:14 41:1**

166:14

**founded (1)**
97:6

**founder (2)**
17:20 214:5

**four (7)**
61:16 216:9 217:21
218:3,4,6 239:24

**fourth (2)**
124:2 141:4

**framework (13)**
30:22 31:16 52:19
133:2,4 150:17 151:2
179:14 215:18 217:24
226:9 241:2 242:7

**frameworks (1)**
85:7

**frankly (2)**
7:24 161:1

**free (6)**
6:7 34:9 86:11
144:17 197:13 254:2

**frequently (1)**
148:2

**fresh (3)**
10:5 28:7 198:13

**Friday (1)**
11:10

**friend (5)**
67:21 68:6 81:8
87:20 91:21

**friendly (1)**
78:4

**friends (4)**
66:16 67:1 91:3
92:20

**front (5)**
49:6 81:12 83:3,11
250:18

**full (3)**

137:2 218:13
252:11

**Fuller (1)**
96:16

**fully (4)**
29:6 40:13 253:7
254:9

**functions (2)**
97:13,15

**fundamental (2)**
224:8,14

**further (5)**
42:14 56:13 116:5
256:4 259:5

**Furthermore (7)**
29:6 41:6 46:5
47:18,23 191:8 261:4

**future (5)**
30:12 54:11 224:12
239:17,17

**G**

**gave (10)**
16:10 23:16 30:16
33:5 54:5 60:2 140:23
154:22 248:16 261:4

**general (4)**
133:24 150:16
238:23 241:13

**generally (3)**
82:22 127:21 201:2

**generous (3)**
260:4 261:14,21

**gentleman (1)**
4:4

**germane (1)**
227:6

**gets (1)**
211:22

**getting (4)**

16:14 57:3 121:14,
20

**give (16)**

9:21,23 12:7 28:13
29:24 52:19 56:5 77:1
79:13 213:9 225:3
242:15 262:21,23
263:2 265:1

**given (3)**

9:1 244:22 247:14

**gives (5)**

90:6 93:14 175:3
242:21 243:22

**giving (5)**

149:24 171:10,12,
16,17

**goal (4)**

30:21 239:7,7,12

**God (1)**

71:2

**goes (14)**

64:16 67:17 70:1
73:15 77:16 79:4,8
82:9 90:21 160:8
161:14 232:9,10
257:22

**going (65)**

7:11 10:12 11:6,11,
12 28:19 39:24 47:10
52:18 55:4,15 57:18
59:10,15 60:18 68:9,
17 70:15 71:21 74:8
76:24 86:3 88:6,8
91:12 94:8 108:17
110:7 112:14 118:18
122:18,19 128:10,14
129:7 130:3,5 138:3,5
140:13,18 144:18
151:4 157:21 162:16

163:19 165:20 188:10
189:13 196:14 197:11
223:22 224:21 225:2,
3 228:17 237:7 238:9
244:18 255:17 265:23
266:10 271:11 275:9,
14

**gone (4)**

96:24 232:1 246:20
275:6

**Good (45)**

2:1,5,6 3:15,17,18,
19 4:23,24 5:2,5,12,
13 14:13,15,16 16:6,7
17:10,11,23 43:1
56:22 77:10 82:22
84:16 91:8,21 95:3,24
96:1 127:21 193:5
196:23 200:20,22
205:21 213:24 214:1
234:10,20 258:1
266:6 277:6,6

**goodness (1)**

40:11

**gotten (2)**

186:5 195:6

**Gottlieb (1)**

51:8

**govern (2)**

25:11 39:5

**governed (4)**

22:8 25:6 28:5
231:5

**Government (1)**

221:22

**governs (1)**

39:9

**graduate (3)**

96:10 219:5,23

**grand (1)**

239:14

**grandfather (1)**

263:19

**grandfathered (1)**

248:12

**grandfathered' (1)**

188:19

**grandfathering (1)**

248:11

**grandfathers (3)**

67:7,11 81:9

**grant (11)**

107:21 134:8
136:21 189:18 207:13
230:9 236:13,15,16
243:3,4

**granted (14)**

21:24 104:7 105:16,
20 106:8 116:7
134:10 136:2 137:7
168:2 205:3 243:11
257:15 258:7

**grants (4)**

105:6 115:24 172:4
243:6

**great (4)**

16:13 66:23 71:11
222:8

**Greg (1)**

70:12

**Gross (19)**

98:24 105:4,11
133:16 138:14 140:10
147:9 162:2 167:1
198:10 214:20 217:13
221:3 231:19 236:14
242:15 249:17 251:20
269:13

**Gross' (1)**

155:15

**grounds (1)**

122:20

**group (34)**

57:8,14,21 61:18,
20 62:1,4,12,19 63:3,
11 69:13,17,19 70:11
71:14,18 74:20 75:6,8,
12 76:11 87:19 89:20
91:10 92:16,18 93:6
141:4 155:24 239:10,
10,11 274:9

**groups (3)**

57:12 108:6 145:14

**guess (5)**

29:3 87:7 202:19
210:23 211:2

**guidance (2)**

5:24 9:5

**guide (1)**

124:1

**Gump (1)**

14:17

**guys (1)**

59:11

# H

**hack-up-the-document (1)**

237:3

**half (7)**

83:21 94:15 189:12,
14,15,18 191:24

**half-life (1)**

268:20

**halt (1)**

68:24

**hand (5)**

16:12 50:22 222:21,
24 226:24

**handed (1)**

54:17

**handled (2)**

88:5 98:19

**handling (2)**

245:13 276:6

**hands-on (1)**

268:2

**happen (4)**

162:16 217:19

240:19 256:15

**happened (7)**

22:20 48:11 91:24,

24 120:10 133:23

270:16

**happening (2)**

6:18 263:21

**happens (2)**

65:3 73:4

**happiness (1)**

2:18

**happy (4)**

3:6 11:8 14:19

129:12

**hard (8)**

74:2 77:2 141:24

157:8 195:2 238:3

240:15,16

**hardware (3)**

141:22 172:16

268:2

**harsh (1)**

246:2

**hate (2)**

94:16 173:19

**head (3)**

240:1 273:11,20

**hear (31)**

2:15 9:8 13:21

16:16 17:3,7,24 19:2,

23 20:6,9 21:3,4,7,8

31:20,20,22 35:5

42:10 47:19 48:14

49:13 50:2,9 51:12

71:22 148:20 237:6

249:20 251:17

**heard (16)**

2:20 11:23 20:21

157:9 212:15 213:12,

14,14 217:12,13

223:8 224:4 226:19

232:18 251:13 257:23

**hearing (36)**

9:10 10:2 13:14

15:3,15,22 16:17,18

17:19 23:21 25:16

34:4 35:2,5 44:6,23

47:6 53:11 54:20 60:2

66:4 73:8 76:9,19

79:24 92:24 98:23

121:21 148:8 163:20

232:17 251:9 263:4

276:5,9,14

**hearsay (15)**

114:24 115:2 118:4,

11 128:24 129:4,6,19,

20,24 159:13 180:6

190:22 191:11 204:8

**heart (2)**

40:11 256:18

**heavily (2)**

84:3 238:11

**heck (1)**

68:4

**held (1)**

68:21

**help (2)**

97:22 230:14

**helped (1)**

18:5

**helpful (7)**

7:15,24 9:13,14,24

11:19 193:24

**hereby (2)**

115:24 255:21

**herein (1)**

41:1

**hereto (1)**

242:23

**Herrington (159)**

3:9,15,17,20 4:3,17

5:17,23 6:4,10,16,20,

23 7:3,10,17 8:3,5,21

9:3,7,9 11:7,18 12:3

13:17 50:19,20 51:1,4,

7,7 54:20 56:21 65:16

66:7,11,14 76:21,24

77:6,11 82:3 84:20

94:1,4 98:24 99:5,11,

18 100:2 103:8

110:22 111:15 114:17

115:1 118:3,13 119:2,

8,13,15 120:1 121:13,

17 122:14 127:17

128:3,9,13,20 129:10,

18 130:21 131:2

132:5,15 138:15,20

139:4,18 143:7

146:14,20 148:1,4,16,

17 149:16 152:21

153:21 157:2,16,20

158:8,19,24 160:10

161:17,21 162:10,17,

21 163:7,8,16,18,22

166:11,16 169:17,24

170:23 171:9,20,21

173:6,8 176:2 178:16,

23 179:5,20 180:4,10

183:23 185:3 187:21

190:19 191:13,22

199:16,23 201:15

204:3 209:15 210:14

211:4,9 212:10,11,16,

21,23 213:6,13,15

223:1,8 224:20

228:10 229:12 230:2

273:7,23 274:18

276:1,15,16

**hesitate (1)**

12:14

**Hewlett-Packard (1)**

221:15

**Hi (2)**

69:19 149:23

**hiding (1)**

93:3

**highlight (2)**

9:24 53:13

**highlighted (2)**

73:7 77:9

**himself (1)**

83:18

**hit (1)**

59:10

**hitting (1)**

153:24

**Hmm (1)**

68:3

**Hold (3)**

170:10 178:19

265:23

**holding (1)**

237:1

**hold-up (1)**

260:14

**home (1)**

232:23

**honest (3)**

27:8 74:2 195:1

**Honor (237)**

2:7,8,16 3:1,8,14,

18 5:1,18,19,24 7:4,8
8:5,9,16 9:6,10,24
10:1,7,12 12:4,21,21
13:16,18,23 14:3,8,14,
19 15:16,20 16:4 17:9,
19 18:20 19:6 20:23
21:3,7,17 22:21 25:15
29:7,24,24 31:7 32:13
34:3,20 35:1,11 36:10,
22 38:1 40:4,14 41:10
42:6 43:11 45:3 46:5
47:19,23 48:12,13
49:6,13 50:10,16,20,
23 51:4,11,12,19,24
52:7,14,16 53:4,10,14
54:13,16 56:21 58:3
64:3 66:4 68:12 69:16
72:11 73:5,8 74:8,9
76:4,17,21 77:8,14
80:11 81:15 88:15
90:9,18 91:13 92:22
93:1,22 94:5,20 95:7,
21 99:19 101:24
103:4,9 110:20,23
111:12 114:15,17,24
118:1,7 119:3,16,24
120:2 121:13,22,24
122:14,18 123:4,17
128:3,8,10,11,20
132:3,6 138:15,22
143:5,8 146:21
147:12 148:4,21
149:2,15,17 152:22
153:15,21 154:1,13
157:3,17 158:1
160:10 161:5,22
162:18 163:6,8,12,16
164:11 166:10,16
169:12 170:1,11,24
171:9,14,18,21

173:17,19 174:5
175:8,12 176:3
179:20 180:2,9
183:21 185:1 187:18,
22 188:12 190:17
191:2,13 192:10,14,
24 193:24 199:21,24
204:3,14 209:13,16
210:10,14 211:10
212:8 223:1,21
224:21 226:18 228:10
229:13 230:1 249:14
253:15 264:22 265:20
266:5 273:7,15,23
274:15 275:22 276:1,
16,20 277:4,9

**honored (2)**
148:13 249:1

**Honor's (1)**
228:19

**hoops (1)**
29:18

**hoping (1)**
244:22

**Hopper (2)**
190:13 194:10

**hostage (1)**
87:12

**hotel (2)**
211:6,12

**hour (5)**
11:6 12:10,24
94:15 174:18

**hours (9)**
10:9 13:3 65:17,21
121:21 123:1 174:15
225:1,7

**housekeeping (4)**
3:10 5:18 14:1 16:5

**However (4)**

145:13 225:9
233:16 275:6

**HPUX (1)**
104:24

**huge (2)**
59:19 61:9

**hundreds (1)**
59:4

**hurry (1)**
220:11

**hybrid (1)**
221:9

**Hyslop (166)**
19:16 20:7 21:11
26:18,21 27:4,8,10
29:8,9,12 30:4 35:22,
24 36:1,24 37:4,16,16,
17,19 38:8,14,23 39:3,
7,14 41:15,23 43:13,
16 44:7,17,20 45:6,7
65:18 80:1,2 81:18
82:15,21 83:6 109:18
110:2,3,18 111:9,22,
23 113:1,1 114:9,11,
13 116:22 117:3,9,16,
17 120:6 124:20
126:8,9,13,24 127:20
134:23 135:4 136:24
137:6 138:23 139:16
140:3,6,11,24 142:3,6,
10,18 143:2,3,16,22
146:4 147:4,19 149:9,
12 154:18 156:10,13,
21 157:6 159:23,23
161:11,13 164:19
165:6,19,23,24 166:2,
9 167:5,7,18,21
168:18 171:4 172:19
176:16,24 177:3,10,
11,24 178:7 179:18

181:6,21 182:3 183:3,
15 184:8 185:19
186:1,9 187:7,16
188:4,15 189:6,20
196:24 198:9 233:17
235:4,11,16,22
236:10 237:12 245:13,
16 247:16 249:8,15
250:9,11 253:18,21
254:13,18,19 255:1
256:12,15 258:24
259:15 261:15 263:12
264:15,17

**Hyslop's (10)**
38:5,10 39:1 41:20
43:24 47:9 111:8
157:4 164:17,21

# I

**IBM (4)**
219:10 220:2,5
221:15

**idea (15)**
45:24 50:4 55:23
58:13 70:24 74:23
75:20 79:19,20 83:3
93:2,16 213:8 244:23
264:24

**identification (1)**
184:10

**identified (17)**
24:2 32:15 39:19
41:15 79:17 144:12
145:21 181:8,21,23
183:3 184:7,14,20,24
185:24 274:6

**identifies (4)**
37:18 42:8 77:18
78:17

Min-U-Script®                    Wilcox & Fetzer Ltd.                    (24) honored - identifies
www.wilfet.com
(302) 655-0477

**identify (11)**
32:21 33:6 34:10
38:10,15 136:1
182:16 185:19 202:8
204:19 249:11
**identifying (3)**
37:9 139:1 275:8
**ie (2)**
24:6 144:15
**IETF (1)**
218:16
**ignore (1)**
36:20
**ignored (1)**
37:13
**ignores (1)**
58:18
**ignoring (1)**
213:8
**Illinois (1)**
217:3
**immediately (2)**
97:7 134:4
**implement (1)**
220:6
**implementable (1)**
219:8
**implementation (6)**
18:3 216:21 217:15
218:21 220:15 222:10
**implementations (2)**
86:9 218:17
**implementing (2)**
218:24 219:6
**implements (1)**
86:6
**implied (1)**
266:15
**implied-in- (1)**
40:17

**implied-in-fact (4)**
72:18 73:1 76:11
266:14
**important (34)**
2:3 10:23,24 11:2,
14 12:8 22:11 24:17
26:3 35:10 40:14
47:11,18 51:14,17
52:3,17 53:18 60:5
62:7 66:3 69:4 89:1
90:20 122:21 124:12
129:12 133:17 147:20
175:9,18 188:11
243:6 244:1
**Importantly (3)**
22:5 26:12 55:15
**impossible (3)**
155:4 156:17 233:7
**impressive (1)**
84:23
**improvements (1)**
231:3
**Inc (26)**
3:23 23:10,12 57:4
81:3 90:9 100:21,22
214:8,16 215:7,10,13,
15,22 216:2,3,3,7
217:10,11 222:22,23
229:2 232:8 269:21
**INCA (1)**
247:3
**incentive (1)**
9:18
**include (6)**
39:20 60:11 136:10
181:24 183:12 226:17
**included (7)**
59:5 172:10 185:11
188:7 196:19 203:10
228:2

**includes (1)**
27:19
**including (9)**
4:17 12:16 37:11
81:21 83:16 173:12
188:16 197:3 226:22
**incomplete (1)**
272:2
**inconsistent (3)**
209:22,23 210:6
**incorporate (3)**
58:9 105:20 135:18
**incorporated (11)**
57:23 58:17,20
62:5 70:22 71:5 75:16
93:10,13 96:23 214:4
**incorporates (3)**
54:1 58:6 72:5
**incorrect (1)**
26:11
**increasing (1)**
227:8
**incredibly (4)**
18:4 49:9 260:4
261:14
**Inc-SynOptics (1)**
270:3
**incurring (1)**
260:17
**Indeed (5)**
26:15 36:22 39:21
40:4 93:13
**indefinitely (1)**
26:8
**indemnification (1)**
240:18
**independent (4)**
114:22,23 118:10
180:9
**Indiana (1)**

217:6
**indicate (2)**
142:7 196:17
**indicated (1)**
197:6
**indicates (1)**
197:23
**indication (1)**
142:6
**individuals (3)**
76:19 143:17 144:3
**indulgence (1)**
264:23
**indulgent (2)**
265:20,22
**industrial (1)**
96:8
**industry (2)**
50:11 98:5
**influencing (1)**
133:7
**inform (2)**
143:16,20
**informal (1)**
196:23
**information (9)**
80:6 84:1 134:11
140:24 142:3,20
181:7 182:24 187:8
**informed (1)**
125:16
**infringement (1)**
48:21
**infringer (1)**
93:4
**infringers (2)**
91:4 92:17
**infringing (3)**
71:3 89:24 90:15
**in-house (1)**

236:16

**initial (2)**

187:5 235:11

**initially (2)**

16:22 241:17

**initio (1)**

258:5

**in-person (2)**

82:15 127:3

**installment (1)**

254:7

**instantly (1)**

241:18

**instead (3)**

12:18 252:11,18

**instrument (1)**

41:3

**integrate (2)**

59:6 243:16

**intellectual (1)**

85:6

**intend (1)**

160:6

**intended (6)**

38:17 141:6,8,15

161:12 179:14

**intending (2)**

32:5 205:15

**intent (3)**

55:22 161:16 190:8

**intention (1)**

264:23

**intentions (2)**

52:15 158:20

**interested (3)**

112:18 113:9

136:14

**internal (16)**

21:15 22:2 34:21

35:21 37:21 105:13

127:16 130:13 157:18

158:15 160:13 162:22

163:2 166:9,18 247:5

**internally (2)**

161:13 215:12

**International (43)**

3:23 4:7 23:10,11

57:4 63:1 64:8,17

65:10 68:20 69:2,5

72:2,8 77:16 78:13

80:17,17 81:19 82:16

83:17 86:19 87:4,7

88:2 90:9 93:2,16

96:23 97:4,6 205:10

206:7 214:11,13,15,

18,21 215:5,10,20

222:23 269:23

**internationally (1)**

215:2

**International's (2)**

58:13 63:5

**Internet (5)**

215:16,17 218:13,

16 226:8

**Internet-standard (1)**

217:23

**interpret (1)**

52:7

**interpretation (2)**

58:13 68:8

**interruption (1)**

144:6

**Int'l (13)**

23:14 100:21,23

215:10,14,23 216:1,3,

4,7,8 232:9 267:12

**Int'l-Nortel (1)**

270:4

**introduce (7)**

53:10 64:2 66:3

129:1,2,23 139:14

**introduced (1)**

173:14

**introduction (18)**

111:13 118:2 132:4

143:6 149:15 158:2

166:12 169:13,16

180:2 183:22 185:2

187:19 190:18 199:22

201:24 204:14 209:14

**invaluable (1)**

18:6

**invested (1)**

84:4

**investment (1)**

261:10

**investments (1)**

245:18

**invoices (1)**

78:18

**invoker (1)**

227:3

**involve (1)**

202:23

**involved (23)**

46:19 49:1 98:18

100:13 113:3,18,21

125:8,12,17 132:17,

19 136:17,19 154:8

215:21 235:4,10

236:13,23 238:10,11

269:12

**involvement (3)**

109:14 125:24

208:4

**involving (1)**

237:12

**ironic (1)**

122:22

**ironically (1)**

240:18

**irrelevant (5)**

74:12 163:24

223:12,13,15

**issue (29)**

8:9 10:19,22,23

11:8 17:1,4 26:5

46:13 48:18 50:3,3

54:5 118:23 121:14

129:6 130:6 131:1

139:10 158:11 161:5

164:3 173:9 192:6

193:14 204:4 245:12

262:9 269:9

**issues (10)**

9:3 11:11 26:6

81:21 83:23 98:21

158:9 220:13 224:24

227:23

**items (1)**

134:7

**iteration (2)**

237:9 250:1

**itself (6)**

43:19 52:4 60:18

99:7 146:15 218:10

# J

**jacket (2)**

60:4,5

**jackpot (1)**

84:7

**James (23)**

19:22 44:5,16 45:6

66:2,2,5,8,12,17,24

67:15,21 68:6 77:23,

24 79:7 81:8 87:20

90:22,23 91:21 92:7

**January (14)**

69:15 70:24 72:24
76:16 79:10,14 80:22
89:19 90:16 93:5
202:6,14 214:19 217:8

**Jeff (15)**
17:21 33:18 43:4
66:1 83:1,2,7 100:18,
22 127:22,23 132:13,
13 222:23 266:2

**Jeffrey (2)**
81:3 213:19

**jigsaw (1)**
9:16

**job (1)**
210:7

**John (37)**
4:4 17:15 18:9 29:8
30:5 35:24 39:23
45:17 47:24 64:6
69:13 71:15,16 73:11
74:15,15 78:7,10,17
79:3,7,11 80:13,13
81:15 86:19 91:1 93:6
95:8,16 188:15
195:14 196:8 236:10
250:3 253:19 267:9

**johns@SNMP (1)**
69:19

**Johnson (8)**
2:20 13:22 14:12,
13,16,17 15:24 16:2

**joined (1)**
15:10

**joint (1)**
203:3

**jointly (1)**
116:12

**Judge (27)**
17:10 96:4 98:24
105:4,11 133:16

138:14 140:10 147:8
155:15 162:1,18
167:1 192:19 198:10
211:21 214:20 217:13
221:21 231:19 236:14
242:15 245:1 249:17
251:20 269:13,14

**July-August (1)**
47:8

**jumped (1)**
29:18

**June (18)**
26:20 43:3 47:8
53:3 63:7 68:24 71:1
72:13,21 74:11,13
90:15 91:4,8 92:15
102:17 110:3 177:17

**justice (1)**
247:15

## K

**keep (11)**
9:19 13:8 36:15
53:14 60:16 61:7
62:23 107:24 108:2
187:4 257:8

**keeping (2)**
30:20 174:23

**keeps (1)**
257:9

**kept (7)**
63:6 78:14 88:16
125:15 233:20 234:17,
23

**key (8)**
10:1 38:2 53:7 64:5,
16 89:3 92:23 192:6

**kicking (1)**
239:4

**killed (2)**
256:23 257:3

**kind (15)**
9:15 11:13 19:5
52:15 171:12 191:24
201:8 221:15 237:1,4,
4 238:9 253:23,24
254:5

**kinds (2)**
51:17 226:6

**knack (2)**
232:19,19

**knew (13)**
26:12 39:14 45:8,9,
10 47:1 63:22,23 78:8,
15 134:3 142:21
220:18

**knowledge (2)**
98:3 108:23

**Knowles (2)**
202:10 204:22

**known (6)**
22:21 23:23 24:9
44:3 104:4 202:23

**knows (2)**
20:23 138:17

**Knoxville (3)**
81:20 216:13 236:3

## L

**La-Anyane (11)**
69:17 71:10,16,19
75:6 79:2,4,6 91:2
202:20 204:22

**lab (4)**
31:23 32:4 33:12
248:23

**labs (1)**
105:18

**lack (1)**
161:3

**LAN/BayStack (1)**
70:11

**language (13)**
36:5,20 42:5 43:16
56:8 116:13 124:22
125:19 126:2,5
127:18 128:1 230:7

**large (3)**
108:4 221:16,17

**larger (2)**
112:7 155:10

**largest (1)**
221:19

**Las (1)**
67:16

**last (21)**
25:16 27:3 34:3
35:2 41:9 60:2 84:17
88:15 98:23 110:12
121:18 164:17 177:21
207:7 232:17 251:8
256:8 258:6 259:6
263:3 270:24

**lasted (1)**
42:22

**late (8)**
11:9 22:14 107:17
122:1 123:14 189:21
267:20,24

**later (19)**
22:11 24:19 26:7
52:6 65:17 76:9 82:12
86:20,23 103:17
119:22 120:11 123:1
168:8 195:22 209:6
234:21 272:3,14

**latter (1)**
49:24

**law (6)**
  7:23 8:22 12:1 22:9
  25:6,13
**lawsuit (4)**
  52:22 83:12 84:3,12
**lawyer (3)**
  136:16,19 219:18
**lead (2)**
  66:17 218:9
**leader (2)**
  85:7 88:13
**leading (6)**
  83:4 85:9 133:5
  146:15,19 231:12
**learn (4)**
  70:21,23 71:4 258:5
**learned (1)**
  225:22
**lease (10)**
  24:14 35:17 36:11,
  12 247:12 252:1,9
  270:11,13,15
**least (5)**
  68:2 122:2 136:17
  170:12 239:24
**leave (3)**
  11:11 189:20
  210:21
**leaving (1)**
  213:7
**lectures (1)**
  85:19
**led (2)**
  79:14 238:14
**leeway (1)**
  166:14
**left (5)**
  45:14 60:13 147:19
  208:7 265:3
**left-hand (1)**

  193:21
**legacy (3)**
  61:24 62:6 63:14
**legal (8)**
  7:13 114:23 118:10
  171:14,18 180:9
  260:11,17
**legally (1)**
  50:8
**lengths (1)**
  231:19
**Less (3)**
  65:16 121:20
  261:15
**letter (32)**
  19:13 45:17 46:11,
  21 70:3 71:8,10,21,23
  72:10,15 75:18 76:16
  79:10,13,15 89:19,21
  90:5,16 93:12 116:21
  202:18 203:8,12
  204:4,21 205:1,2,3,8
  206:3
**letters (3)**
  80:19 93:21 140:22
**level (3)**
  107:23 236:21
  239:5
**levels (1)**
  227:8
**levers (1)**
  270:5
**liability (1)**
  240:17
**libraries (3)**
  74:19 104:23
  195:17
**library (1)**
  226:18
**license (275)**

  18:24 21:1,22 22:1,
  1,3,12,13,16 26:2,14
  27:21 28:21,21 29:10
  30:15,19,22,23 31:4,5,
  8,10,16 32:17,17 33:7
  34:11 37:7 38:11 39:4,
  8,10,15,22 40:21 42:7,
  13 43:10,21 44:11,13
  46:9,12,22 49:2,6,21
  50:1 51:15 53:22 54:2
  55:14,17,21,22,24
  56:3,11,20,23,23 57:2,
  8,13,17 58:6,8,10,20
  61:5 62:11 67:12 68:3
  70:22 71:5,6 72:1,6,
  22 74:22 75:16,17,19
  77:18 79:14 80:16
  81:5,9 88:23 90:7
  93:10,11,13,15 98:1,
  10,11,14,16 102:16,
  23 103:3,22,24 104:5
  105:5,6,13,13,14,15,
  24 106:4,7,12,16,22,
  24 107:12,21 108:6
  109:9 112:16,22
  113:7,8,14,16 114:6
  115:15 116:1,5,7
  117:8 121:7 122:12
  123:23 124:9,13,16,
  21 125:3,6,9 126:3,5,
  6 133:24 134:2,9,9
  135:3,9,17,20 136:8,
  10 138:1 141:6,8
  143:19,20 145:1,16
  146:6,10,11 150:10,
  11,11,15 151:4,12
  154:21 167:14 168:23
  169:3,11,20 170:18
  171:6 172:3,4,9 173:4,
  5,15 176:12,14

  178:13,18 179:6
  180:19 182:18,19
  185:14 186:10,19,21
  189:3,12,18 190:8
  196:24 197:13,14
  202:12 203:5,11,18,
  18 205:9,24 206:1,6
  207:15,18 208:6
  222:20 223:4,11,17
  224:18 225:14,16
  226:3,14 230:9 231:2,
  6,13 233:15 234:19
  235:5,6,12,15 237:20,
  22 239:9,10,11,14
  240:12 241:3,7,14,24
  242:2,6,9,24 244:12
  245:2 248:6,13,19
  250:1 254:7 256:2,22
  257:4,5 259:3 260:10,
  10,23 261:8,24
  262:21,23,24 263:6,24
**license' (1)**
  70:21
**licensed (22)**
  21:23 23:19 24:4,
  15 32:15 33:2 40:2
  41:17 141:15 172:14,
  22 184:14,20 185:9
  203:7,15 204:1
  205:17 231:4 247:6,8,
  24

----

'

----

**'Licensed (1)**
  104:21

----

# L

----

**licensee (6)**

27:2 105:8 106:16,
17 110:11 167:13

**licenses (36)**
22:6 23:14 67:7
97:23,23 100:5 104:2
106:7 126:14 137:6
145:15 152:16 171:11
206:17 221:3,6
224:16 225:20,21
226:7 234:21 239:17,
20,22 241:4 242:3,7
246:12 261:6,7,10
262:4,17 263:11
270:22 271:15

**license-specific (1)**
172:7

**licensing (24)**
22:13,15 23:12
28:1 31:12 33:8 40:2
49:11 50:15 85:10
98:5 99:1,2,8,14
107:10,14 154:20
189:8 190:2 215:21
225:22 226:1 240:4

**licensor (1)**
25:14

**lifetime (5)**
65:6 136:11 152:3,
13 198:2

**light (2)**
8:21 11:7

**limit (3)**
50:7 225:6 265:24

**limitation (2)**
26:10 240:17

**limitations (1)**
27:14

**limited (2)**
14:24 54:7

**linchpin (1)**

61:2

**line (16)**
64:22 65:19 73:19,
21 112:9 117:11
141:5 151:23 154:22
164:17,18,22 168:5
210:3 246:18 247:9

**lines (9)**
8:20 40:18 48:6
67:17 77:21 167:18,
22 197:10 232:8

**list (5)**
118:23 119:10
137:6 271:23 272:1

**listed (2)**
79:3 187:1

**lists (1)**
141:12

**literature (1)**
97:18

**litigation (7)**
15:2 51:23 52:19
59:14 76:6 84:6
231:21

**litigation-inspired (1)**
48:16

**little (16)**
11:22 57:3 77:2,3,7
79:5 83:2 86:10 94:13
123:14 127:24 132:14
175:3 223:9 226:19
240:9

**live (3)**
189:13 216:13
261:19

**lived (2)**
88:4,12

**lives (1)**
246:17

**living (1)**

189:12

**local (1)**
5:19

**locate (3)**
19:19 29:20 203:5

**located (3)**
29:1 216:11,12

**location (6)**
62:4 71:12 104:8
105:8,10 106:2

**location-based (3)**
22:12 104:6 113:7

**location-restricted (1)**
105:24

**locations (2)**
22:18 54:8

**location-specific (1)**
172:5

**long (23)**
9:21,23 32:14 33:9
38:19 63:7 86:21
94:11 97:3 118:3,18
135:24 145:8 151:5
158:4 180:10 197:19
201:18 222:9 233:12
249:2 252:14 272:20

**longer (4)**
11:22 252:6 268:24
273:8

**long-lasting (1)**
260:13

**look (44)**
51:10 52:2 58:7
68:15 69:12 70:8
73:13 77:19,21 93:4,
23 102:19 104:16
109:21 111:4 121:9
123:21 138:12 141:13
149:5,5 167:4 177:6
179:16 181:10 184:15

188:10 194:13 202:5
204:2 222:15 224:24
229:19 232:5 233:7
242:14 244:12 247:12
250:17 252:18 253:3,
8,20 265:2

**looked (7)**
74:2 75:5,13
182:24 187:2 195:2
231:23

**looking (9)**
28:2 46:14 52:15
133:23 233:1,12
253:11 274:1,9

**looks (1)**
31:7

**Lori (3)**
208:17,18 210:6

**lose (3)**
13:5 60:10 259:22

**loses (1)**
13:5

**lot (15)**
7:11,12,13,13 9:10
77:7 88:20 146:18,20
174:16 200:23 223:9
224:17 265:19 274:12

**love (1)**
265:19

**lower (2)**
220:14,20

**lunch (2)**
12:9,23

**Luncheon (1)**
94:23

## M

**M10 (1)**
247:3

**Mace (1)**
13:11
**machine (2)**
232:11,16
**made (49)**
15:8 18:13 19:24
34:15 39:23 44:24
45:2 46:13,22 48:18
68:13 73:13 76:7,10
80:2 91:3 100:19
109:20 112:22 113:23
120:11 121:15 132:15
141:18 148:15,19
189:7 192:24 195:9
203:6 210:3 235:22
237:2,6 245:18
261:18,23 273:16,21
274:3,4,6,17,22 275:1,
2,4,5,5
**main (14)**
24:7 26:5,5 50:3
226:9 236:9 237:17,
20 239:1,1 240:11
241:7,23 256:22
**mainly (1)**
237:23
**maintain (2)**
131:21 234:7
**maintained (4)**
130:11 131:24
191:9,17
**maintenance (8)**
31:5 32:18 33:8
136:14 207:14 248:7,
19 261:8
**major (2)**
100:15 135:7
**make (39)**
4:11 9:17,22 11:15,
21 13:12 15:6 25:11,

23 38:17 41:10 53:19
60:10 77:4 78:23
85:21 87:1 97:22
100:14 105:16,21
117:14 129:18 131:18
134:2 139:6 144:3
153:13 154:15 156:1
169:18 175:6 186:18
205:13 218:24 219:6
260:11 274:19,20
**makes (1)**
76:12
**making (10)**
20:2 38:13 54:15
75:21 87:4 155:11
178:15 179:12 251:22
252:1
**managed (1)**
226:12
**management (11)**
24:10 96:8 200:15
215:16,17,18 217:24
218:1,21,22 226:9
**manager (11)**
24:2,8,22,23 35:12
105:2,3 138:8 226:11,
16,21
**manifested (1)**
158:21
**manufactured (1)**
101:14
**manufacturers (1)**
221:13
**many (8)**
18:4 134:4 186:18
206:10 216:14 221:23
239:12 250:14
**map (1)**
246:11
**Marino (1)**

13:12
**Marino's (2)**
13:12,20
**mark (6)**
59:11 60:10,13
83:24 87:13 275:14
**marked (3)**
54:21 158:11
193:21
**market (1)**
268:21
**marketing (4)**
96:9 97:16,18
215:24
**marketplace (7)**
65:8 152:5,11,14
155:21 268:17,22
**mark-up (1)**
237:19
**married (1)**
216:8
**Martha (4)**
73:19 190:13
194:10 195:12
**Mary (8)**
100:14,16,17,17,23
177:11 222:24 267:9
**Massachusetts (1)**
54:9
**master (30)**
18:24 20:24 27:24
28:3 30:7,15,23 31:8,
10,16 32:17 39:4,8,10,
15 40:21 42:7 43:10
49:21 51:15 67:8
80:16 81:5 112:16
113:14 169:11,20
235:6,14 241:13
**master's (1)**
96:15

**matter (23)**
2:4 7:15 14:1 16:5
17:14 25:11 114:19
118:5 119:4 129:20
139:7,20 167:19
180:5,11 190:23
198:13 201:18 204:7,
11 234:22 273:17
276:10
**matters (2)**
16:19 98:18
**may (47)**
2:2 3:11,12 7:6
14:7,9,21 21:9 25:15
40:23,24 41:2 44:3,4,
6 47:6 51:4 62:4
70:18 76:22 85:6 95:4
106:17 121:18 138:20
163:5 164:10,12
166:10,22 170:10
174:9 194:9 197:24
211:11 212:4 225:8
228:1,2 233:20
234:16 251:9 264:22
265:2,6,16 277:2
**maybe (12)**
2:13 11:22,23 17:3
61:21 65:11,12 99:6
100:1 171:13 257:2
261:24
**Mead (6)**
71:15 78:7,11,17
79:3 91:2
**Mead's (1)**
79:7
**mean (17)**
49:15 64:21 68:1
108:10,12 130:1
151:22 152:8,23
155:17 171:11 189:16

194:17 246:24 255:4
257:23 270:13

**meaningful (1)**
52:11

**meanings (1)**
126:4

**means (7)**
25:7 36:14 64:20
82:10 86:7 164:6
167:9

**meant (9)**
36:8 60:9 68:1 76:8
80:21 142:7 251:15
255:4 258:20

**mechanism (2)**
60:12 154:20

**meet (4)**
18:8,15 220:12
276:7

**meeting (27)**
17:19 30:9 33:22
34:1 37:3 81:18
132:23 133:11,13,17,
21,22 136:22 137:1
165:16 236:1 237:5,
10,11,18 238:2,15,17,
23 249:20,22 261:16

**meetings (2)**
126:21 136:17

**member (7)**
69:17 71:10 78:8
79:6,7 217:20 219:2

**members (6)**
70:8 79:16 85:11
141:2 232:5 233:11

**Memorandum (2)**
111:10 112:3

**memory (2)**
120:10 124:24

**mention (6)**

143:22,24 147:21
196:23 212:19 275:21

**mentioned (11)**
19:24 35:9 47:22
98:7 106:10,12
128:13 194:9 240:21
251:14 270:19

**mentoring (1)**
85:17

**merged (2)**
22:22 168:8

**merger (9)**
24:19 25:3 26:3,15
31:18 144:15 145:8
167:10 263:21

**merging (1)**
61:21

**merit (2)**
64:24 152:1

**merits (1)**
161:1

**messages (1)**
126:19

**met (2)**
30:4 67:16

**Michael (1)**
79:4

**Michel (5)**
20:15 271:20 272:4
273:2,19

**Micom (1)**
61:20

**mid (1)**
267:20

**mid-1990's (1)**
267:24

**middle (1)**
49:2

**midst (1)**
162:7

**might (9)**
20:3 38:1 40:17
106:16 215:1 227:15,
17 252:15 263:2

**miles (2)**
36:13,14

**million (8)**
52:23,24 54:14
60:15,17 61:3,9 84:8

**millions (5)**
52:21,21 68:9 84:5,
5

**mind (24)**
34:20 53:14 88:17
124:15,19 156:20
157:4 159:11,14
160:8 161:15 181:10
184:17 189:10 191:5,
7,20,23 192:5 198:13
224:18 228:11 264:14,
16

**mindful (1)**
8:12

**minds (1)**
261:16

**mindset (1)**
264:5

**mine (1)**
170:13

**minors (1)**
96:9

**minute (6)**
12:23 77:24 89:23
157:17 223:3 265:23

**minutes (16)**
13:6 100:2 162:9
174:1,1,3,16,19
211:22,24,24 225:1
265:2,9 266:3,10

**misfiled (2)**

233:4,8

**missed (1)**
235:8

**misspeak (1)**
99:12

**misstatement (2)**
99:21,21

**mistake (9)**
39:24 46:22 76:7,
10 89:12 192:24
206:2,5 270:1

**mistaken (1)**
188:16

**mistakenly (1)**
188:7

**mobile (1)**
232:23

**model (5)**
22:13,15 107:10,14
226:1

**models (1)**
240:4

**modifications (1)**
113:24

**modified (4)**
40:23 41:1,3 141:20

**modify (4)**
188:23 243:13,14
258:14

**Modules' (1)**
104:22

**moment (14)**
24:18 109:11
138:16 168:15 169:8
182:13 193:1 194:10
199:10 216:19 236:9
240:8 270:20 275:5

**Monday (1)**
14:21

**money (13)**

35:11 43:8 69:7
89:14 201:7 206:22
224:14,17 251:21
252:21,23 253:22
267:1

**Monte (1)**
77:13

**months (1)**
234:20

**more (34)**
7:24 10:22 13:24
46:20 50:10 57:24
58:1,9 86:11 134:5
153:5 175:3 206:12
213:6 216:8 222:2
223:21 225:20,21,22
227:11,11 228:6,7
242:22 246:9 258:12,
21 260:13 261:1,15
265:8,19,21

**morning (20)**
2:1,4,5,6 3:16,17
4:23,24 5:12,13 8:14
14:13,15,16 16:8
17:10,11,23 53:6
123:10

**Morris (1)**
2:7

**most (11)**
14:23 19:7 52:3
53:18 82:18,20
127:19 225:14 227:6,
10 244:1

**mostly (1)**
114:8

**motion (12)**
10:18 14:7 15:7,11,
12,13,17 16:19 17:4
276:6,14 277:1

**motivating (1)**

84:2

**mouth (1)**
146:17

**move (38)**
27:23 67:4 103:5
108:1 110:20 111:13
114:16 118:2 129:7
130:4 132:3 135:8
143:6 146:22 147:12
148:22 149:14 153:1
157:14 166:12 169:13,
15 175:24 180:1
183:22 185:2 187:19
190:18 199:21 201:23
204:13 209:13 225:11
228:20 229:10,24
240:5 244:19

**moved (5)**
14:4 71:17 85:2
135:19 217:7

**moving (6)**
30:21 60:12 113:7
135:15 158:1 214:22

**Mrs (1)**
267:13

**much (20)**
15:9 46:19 50:10
58:8 71:22 95:12
113:20,23 123:16
133:6 154:12 155:4,
10 156:17 166:24
206:16 238:10 252:23
258:21 277:8

**multinational (1)**
108:4

**multiple (6)**
54:23 233:11 239:9
240:3 241:23 256:18

**must (4)**
18:6 37:23 145:18

165:8

**mutually (1)**
41:4

**myself (5)**
57:4 168:13,15
190:13 236:11

## N

**name (19)**
17:13 84:18 96:2
98:11 136:3,20
155:21 172:12 183:19
189:17 208:20 233:9
246:24 247:3,6 248:4
261:6,7 266:2

**named (7)**
4:4 71:16 101:7
104:12 134:11 146:5
182:23

**names (6)**
53:11 66:3 77:22
79:24 172:16 247:4

**Nana (9)**
69:16 71:10,15,19
75:5 79:2 91:2 202:20
204:22

**Nancy (3)**
202:10,18 204:21

**narrow (1)**
225:21

**national (1)**
85:12

**nature (1)**
143:20

**navigate (1)**
244:23

**nearly (4)**
18:10 234:9 261:2
268:19

**necessary (3)**
236:8 239:3 275:16

**need (49)**
11:5 12:15 13:21
21:2 26:8 27:9 30:18
38:10,22 39:1,14 40:3,
13 42:8 44:20 45:11
48:1 57:1 62:13 63:10,
18 70:13 87:21,24
93:4 98:10 106:16,17
109:9 119:7 138:24
154:16 172:22 173:20
175:17 192:24 213:3
218:17 219:18 223:10
238:8,8 242:16
244:19 263:10 265:5,
8 276:7,13

**needed (22)**
26:14,16,20 53:21,
21 57:8 58:1,1 62:8
63:10 87:19 90:12
134:8 136:9 137:7
141:21 172:10,17
185:15 237:24 241:1,3

**needs (7)**
59:3 109:19 227:21
239:17,18 241:10,14

**negated (1)**
93:20

**neglected (1)**
40:7

**negotiate (7)**
28:13 97:23 100:5
103:19 113:12 126:13
260:12

**negotiated (7)**
21:6,12 45:8 51:16
68:14 69:14 126:6

**negotiating (7)**
30:8 82:22 83:6

85:4 127:21 135:7
197:4

**negotiation (5)**
81:6,11 98:1,18
264:6

**negotiations (18)**
49:2 80:15 81:13
83:4 84:11 88:6 98:7,
8 99:13 100:24 125:9,
13 126:1,16 172:20
177:21 190:7 197:1

**negotiator (3)**
19:17 64:8 80:20

**Neither (1)**
44:16

**network (4)**
18:6 200:15 215:18
218:1

**networking (1)**
221:16

**networks (48)**
18:5,7 20:12 21:19
23:1,2 54:2 55:8,11,
14,17 58:6,8,10,19
66:18 67:12 69:21
71:5,24 72:1,7 75:16
78:2 79:8 80:24 86:2
90:6 93:10,15 101:5,8
103:17 108:22 109:2,
2,16 113:13 117:11
183:9,10 194:23
205:9 206:6 207:20
208:1 251:25 255:19

**Networks' (2)**
73:24 101:10

**never (18)**
29:12,13,14 49:10
90:10,13,13 91:23,24
92:2 144:15 157:10
163:19 213:14 228:11

267:5,11 271:19

**new (58)**
9:11,11,12 27:24
28:14 48:17 57:5,6,7,
16 58:13 60:19,23
61:4,12,18,19 62:7,8,
17,20,24 63:9,12,18,
20 64:21 67:7,23
70:14 73:10,17 87:17,
18,19,21 90:12
121:20 137:6 154:2,
20,23 155:17 167:13
168:8 172:8 173:11
187:9 206:17 215:4
220:16 246:14 262:6,
17,17,19 263:7 264:3

**next (26)**
7:12 8:13 19:8
48:15 65:2,5 78:7
79:2 80:13 88:7
115:19 119:1 141:9,
12 145:12 152:2
155:1 157:13 195:11
219:20 237:2,8 239:3,
5 244:1 250:1

**nice (1)**
200:22

**niche (1)**
268:21

**Nichols (1)**
2:7

**nobody (4)**
60:17 78:15 87:18
88:6

**none (3)**
63:12 83:19 118:18

**non-embedded (1)**
145:23

**nonetheless (1)**
161:18

**nonprecedential (3)**
25:20,21,24

**nontransferability (2)**
26:2 27:20

**nontransferable (4)**
22:7 106:5 135:3
245:24

**nor (1)**
44:16

**Norm (1)**
17:16

**normally (5)**
234:10,23 263:15,
17,18

**Nortel (296)**
8:15 18:12,18 19:1,
9,23 20:3,5,13,15,18
21:15 24:19,21 25:7
26:7,12,16 27:1,1,3,
11,24 28:2,7,20 30:4,
12,16 31:1,3 32:15,20
34:2,9,21,22 35:16,22
37:6,10,10,19 38:11,
13,14 39:18 40:6,12,
15,21 41:10,14,23
44:10 45:2 46:4,6,12,
18 47:18,20 48:7,7,15,
16,24 49:10,14 50:5
51:15 59:17 60:14,22
61:12 64:12 65:20,21
67:8 69:2,6,20 70:10,
13,22 71:6,18,24 72:1,
4 74:5,24 75:8,17,18,
19,24 76:11 77:12,17,
20 78:5,17 79:9 80:5,
5,9 82:21 86:2 90:24
93:3,11,18 108:22
109:2,7,9,17 110:10,
10,12 112:15,18
113:6,14,19 115:24

116:4,9,10,15 117:4,
11 120:24 121:24
124:17 125:3,9 126:7,
14 127:21 133:19
134:10 135:11,24
136:4,5,6,7,17,19
137:5,13,19,23 139:2,
13 140:18,21 141:5
142:7 143:17 144:15
145:2,4 146:5,11
150:14,20 151:3,7
152:15 154:19,20
155:3,21 156:16
157:18 158:3,15
159:9,11 160:2,6,14
161:14 163:3 166:9,
13,18 167:5,9 168:5
169:3,11 171:5 172:3,
6,13,17 173:3 176:12,
13 178:1 179:2,11
180:19 181:1,20
182:18,19 183:4
186:2,16,19,19 189:2,
20,22 196:21 197:1,5,
5,6,11,13,14,22 199:2,
8,11 200:8,10,16,23
201:6 202:19 203:2,
15,17,20 205:5,9,12
206:1,6,15,21 207:4,
23 208:2,13 221:13
224:10,12 233:5,6,17
236:10,16 239:20,22
240:12 243:9,17,22
245:17,18 246:8,14
248:3,5,5 255:4
256:19 259:21 260:5
263:6,15 264:21
266:12,20,24 268:4,
10 269:10,24 271:3,3,
8 273:8,24 274:13,17

275:2,7

**Nortel' (2)**
167:8,8

**Nortel/Bay (1)**
138:6

**Nortel's (19)**
18:2 19:17 20:21
21:11 25:1,16 26:1
36:10,24 38:7 44:23
125:4 148:2 224:3
239:7 257:14 258:9
273:10,20

**Nortel-SNMP (1)**
18:24

**Nos (5)**
103:12 139:24
176:8 180:15 192:11

**note (10)**
45:4,5 53:19
117:19 122:10,22
148:5 164:19 165:7
185:13

**noted (1)**
15:19

**notes (2)**
39:3 141:23

**nother (1)**
223:6

**nothing (10)**
25:21 35:15 36:8
38:6 46:1 50:13 57:24
58:1 223:5 245:22

**noticed (1)**
122:3

**noting (1)**
122:11

**notion (2)**
259:17,20

**November (32)**
28:16,19 29:8

37:14,19,20 38:4 39:6
42:19 64:13 81:24
116:3 121:2,8 122:5,
12 123:24 124:6,10
143:4 149:10 150:21
151:8,10,19 165:1,4,
12 176:24 179:13
231:14 253:19

**NT (2)**
37:18 104:24

**NT' (2)**
144:10 145:21

**Number (31)**
51:20 52:8 53:16
55:12,14 58:18 60:21
66:15 68:16 80:7
83:19 88:19 107:20
108:9,14,15,17
112:17 130:7 134:2
141:19 158:1 159:8,
10 160:19 186:14
200:20 223:21 252:4,
6 253:3

**numbered (1)**
230:24

**numbers (2)**
155:22 253:11

**numerous (1)**
42:24

## O

**object (19)**
13:14 119:18
121:22 122:19 123:3
129:21 139:21 148:21
162:13,21,23 163:15
180:12 190:24 201:20
223:12,17,18 276:17

**objected (1)**

123:6

**objecting (3)**
119:13 123:14
162:19

**objection (55)**
4:21 5:9 13:4,5,15,
17 99:16,23 103:7,8
110:22 111:15 114:18
115:3 118:6,21 119:6,
10 123:7 128:16
129:19 132:5 138:17
143:7 146:14,23
149:16 152:21 153:5,
22 157:11 158:4
162:7,8 163:2,20
164:8,8 169:18 170:1,
24 176:2 180:3
183:23 185:3 187:21
192:9 199:23 209:15
212:17 223:4,22
229:12 230:2 275:10

**objectionable (1)**
162:11

**objections (2)**
119:1,19

**objectively (1)**
158:21

**obligated (1)**
260:24

**obligation (1)**
172:14

**obligations (3)**
150:15 168:24
188:8

**obsoleted (1)**
234:3

**obtain (1)**
62:13

**obtained (1)**
57:15

**obvious (1)**
52:17

**Obviously (7)**
9:18 10:23 84:3
129:1 273:18 276:10,
22

**occupation (1)**
96:17

**occur (1)**
107:16

**occurred (7)**
26:23 109:5 110:8
127:4 133:10 144:16
179:13

**October (12)**
30:3 33:24 37:3
81:17 127:5,14
133:10 136:22 137:1
165:15 235:22 237:11

**odd (1)**
271:13

**OEM (5)**
221:12 225:14
271:21 273:11,20

**off (7)**
3:4 48:19 76:20
93:1 239:24 245:9
248:2

**offer (2)**
8:16 129:19

**offered (18)**
4:5 83:14,14
114:19,21 115:2
118:4,8,19 119:3
138:21,23 139:7
180:5,11 190:23
201:17,19

**offering (6)**
83:18 139:19 180:7
204:10 273:17,19

**office (2)**
66:23 219:19

**officer (1)**
214:6

**offices (3)**
81:19 221:21 236:3

**official (4)**
13:13,20 14:18 97:8

**often (4)**
126:4 206:14,16
220:23

**old (15)**
70:21 71:4 75:15
80:7 84:21 90:6 92:20
93:9,15 142:14
188:18 203:18 246:19
256:15 262:6

**older (1)**
234:2

**omission (1)**
151:18

**once (12)**
5:20 6:7 23:11 32:1
58:3 86:20 118:7
128:8 182:22 189:1
252:16 257:7

**One (125)**
3:21,23 7:5,19
12:14,15 13:24 16:10
17:20 19:9,9 20:14
23:7 25:22 26:5 28:5
34:22 35:22 37:1 38:2
40:8 43:14 45:7 47:14
51:14,20 52:3,8 53:5,
16 54:16 58:3,18 59:4,
16 60:3,4,21 61:17
63:4 64:1,5 66:2,7,15
68:16 71:16,19 73:6
77:21 78:1,12 79:9,24
82:4 83:9,15 84:15

85:3,13,14,16 88:4,19,
24 92:23 105:7 117:1
124:3 126:20 128:12
132:18 134:13 138:3
141:14 155:9 158:1,9
159:8 170:10 176:17
185:12 186:19 191:2
197:2 199:16 200:20
205:21 207:7 215:8
218:17 222:21,21
223:21 224:3,7 227:7
230:23 231:14,17
232:8,9,9,10,15
234:11,12 236:12
237:18 241:13 242:22
243:7 244:1,24
248:11 250:16,16
252:5,12 253:23
255:22 264:1 269:9
270:6,24

**one-man (1)**
83:13

**one-off (1)**
191:18

**ones (3)**
141:20 204:1
205:17

**onesy-twosies (1)**
252:3

**only (37)**
20:5,20 24:12
29:22 37:6,22 39:17
41:3 42:20 67:22
69:10 82:14 87:10
89:7,11 93:4 117:1,9
120:12 122:9 123:10
127:2 165:8 218:6
224:10 228:5 237:24
239:15 242:6 244:8
248:9 255:13 257:18

259:8 263:7 267:6
268:12

**onto (1)**
108:18

**open (7)**
49:5 86:4,9,12
198:4 214:24 224:19

**opening (10)**
4:18 17:2 127:17
128:8,19 132:15
148:6,19,21 212:11

**operate (1)**
72:21

**operating (19)**
27:2 71:4 72:16
73:12 75:15 76:1
90:11 93:9 106:1
110:11 133:4 141:18,
21,22 172:15 185:13,
15,16,17

**operations (4)**
23:11,12 188:18
214:18

**operative (1)**
73:3

**opinion (5)**
19:5 26:7 50:4,4
171:18

**opinions (2)**
18:18 19:3

**opportunity (2)**
214:23 261:5

**opposed (1)**
15:12

**opposing (1)**
21:9

**opposite (2)**
90:4,17

**opposition (1)**
15:11

**option (6)**
23:17 136:11,13
157:11 251:23 252:9

**options (2)**
24:5 137:24

**Optivity (4)**
167:13 168:22
200:14,20

**order (24)**
14:6 16:6,10 25:9,
17 27:5 28:6,7 30:19
33:2 35:18 98:9
113:11 119:9 134:8
136:7 206:23 218:18
231:20 232:24 239:15
241:17 243:13 253:6

**ordinary (6)**
98:19 130:10,12
131:22 132:1 191:10

**organization (4)**
85:9,12,15 218:15

**original (13)**
103:15 104:3 106:3,
23 114:5 115:16
121:6 171:6 176:22
182:4 208:6 221:12
231:1

**originally (3)**
86:3 104:10 112:10

**originated (10)**
20:12 30:13 32:22
33:10,16 42:11 47:17
55:11 136:6 142:8

**originating (5)**
32:9,11 55:7 73:23
194:23

**other (62)**
4:3,19 6:5,14 20:15
28:2 40:5 49:16 51:22
62:2,17 67:3 69:9,9

79:24 83:23 86:7
87:16 88:21,21,22
96:12,14 106:2 141:2,
24 145:16,23 158:5,
22 168:7 169:7
182:12 185:19 187:8,
10 213:2 221:17
222:24 223:17 226:19,
24 227:21,24 233:7,9
234:5,21 236:24,24
244:6,16,17,24 245:9
257:19 267:4,16
269:5,9 272:17 274:4

**others (3)**
47:20 85:18 208:7

**Otherwise (3)**
60:13 92:13 201:2

**ought (1)**
210:24

**ours (3)**
112:19 200:21
203:10

**ourselves (1)**
7:6

**out (54)**
16:15 19:12 24:6
33:14 40:1,11,15
45:23 50:7 57:12
59:13,20,23 60:7
62:11 64:14 65:7,7
70:18 77:4 79:11 82:7
84:23 86:8 90:3 91:18,
22 97:20 98:19
127:18 147:19,20
151:14 152:4,4
162:14 165:7,7 168:4,
21 174:4 185:12
196:20 198:3 218:24
232:13 236:7 244:24
245:9 254:8 262:13

268:17,23 276:22

**outs (4)**
197:4,8,8 198:3

**outside (12)**
4:22 5:15 33:21
98:21 125:17,21
203:3 210:24 216:13
236:3,12 249:23

**over (39)**
7:12 8:12 19:8 53:7,
12 59:18 67:7,11
71:17 97:7 122:17,23
134:4 140:13 170:16
186:23 197:11,17
213:1 222:12,13
224:5,5,5 228:18
233:12,23 239:23
241:16 248:20 252:18,
19 258:5 260:7
268:18 273:11,21
275:6 276:8

**overall (1)**
220:20

**overrule (1)**
192:8

**overruled (1)**
119:6

**oversight (1)**
222:6

**oversimplifying (2)**
226:11 227:2

**overtaken (2)**
234:5,17

**overview (1)**
171:17

**owe (2)**
68:9 252:23

**owed (8)**
35:11,15,17 36:3
43:7 251:21 252:21

253:1

**owing (1)**
253:21

**own (19)**
21:14 36:24 64:23
68:16 78:10,16 79:1,
18,22 84:4 93:21
105:17 112:19 144:3
152:1 159:1 214:9,10
234:4

**owned (4)**
116:8,10 214:13
273:8

**owner (1)**
214:7

**ownership (1)**
220:21

## P

**P-20 (7)**
101:23 102:9,10,12,
14 103:5 230:15

**P-21 (5)**
102:10,19,21,22
103:5

**P-22 (5)**
102:10 103:1,6
104:17,19

**P-23 (4)**
208:24 209:1,14
230:23

**P-24 (1)**
231:8

**P-26 (3)**
109:21,24 110:21

**P-27 (4)**
109:22 111:5,7,13

**P-28 (6)**
114:1,4,16 115:10

116:23 117:6

**P-29 (6)**
116:18,20,24 118:2
119:1 124:16

**P-30 (8)**
39:12 169:6,8,9,13
170:6,9 242:10

**P-30A (1)**
170:10

**P-31 (6)**
177:6,7,13 184:16
251:1 255:10

**P-32 (1)**
35:24

**P-35 (1)**
127:11

**P-36 (4)**
37:15 138:12,13
140:3

**P-37 (6)**
37:17 138:12 140:4,
14 181:15,16

**P-38 (4)**
37:20 142:23 143:1,
6

**P-39 (6)**
38:5 120:19,21
149:5,7,15

**P-40 (8)**
175:23,24 176:6,16,
19,20,23 178:9

**P-41 (6)**
176:1,4,6,21,22
177:13

**P-42 (4)**
37:21 157:13,14,17

**P-45 (1)**
181:14

**P-46 (3)**
179:16,17 180:2

**P-47 (3)**

179:16,23 180:2

**P-57 (2)**

47:15 193:3

**P-58 (8)**

47:15 192:13,21,22
193:2,10,13,14

**P-59 (4)**

192:13 193:2 204:2,
14

**P-60 (5)**

201:11,13,14,24
202:5

**P-65 (2)**

272:22 273:1

**P-66 (1)**

222:16

**P-81 (2)**

121:11,14

**page (16)**

70:9 73:14 116:21
117:19,22 118:16
164:23,24 165:3
230:15,24 243:4
244:2 251:2 255:10,14

**pages (3)**

71:9 170:18 230:23

**paid (19)**

24:21,23 32:18
39:22 40:2 54:4 55:16
56:23 57:15,22
106:22 134:12 135:6,
17 138:6 145:18
172:9 252:22 254:9

**paid-up (3)**

72:5 93:14 253:7

**panicking (1)**

11:12

**papers (5)**

2:24 8:24 34:3

52:20 84:5

**paragraph (36)**

21:24 22:2,3,7
40:22 41:6 64:10 88:8
115:10,17,24 120:21
124:1,2 127:19 155:1
156:14 167:24 168:10,
11,20 230:15 231:1,9
240:14,14 242:19,20,
20 243:4,5,21 253:20
254:1 256:24 257:1

**paragraphs (2)**

115:20 167:7

**parentheses (1)**

230:19

**Parkway (2)**

66:24 71:12

**part (29)**

31:15 41:2 88:15
109:12 128:14 130:7
131:20 137:4 155:8
167:9 171:4 172:20
198:24 228:2 235:8
237:11,15,16,22
238:2,14,17 240:21
241:6,7,13 248:17
261:19 274:13

**partial (2)**

221:9,9

**participate (3)**

3:4 107:22 125:14

**particular (15)**

22:17 98:17 104:7
105:7 130:17 134:9,
10 144:1 183:19
186:15 197:21 208:13
209:8,10 241:11

**particularly (1)**

59:21

**parties (30)**

27:22 28:13,15
30:2,7,10,17 32:2,12,
19 33:18,24 40:19
45:18 46:9 48:3 49:20
51:21 72:21 85:4
88:19 113:11,15
118:9,14 160:1
161:12 192:5 269:19
270:18

**parties' (4)**

18:23 72:16 158:20
198:19

**partnership (3)**

69:20 75:9 219:22

**parts (10)**

82:23 89:3 127:22
132:12 168:7 237:17,
17,24 240:15,16

**party (18)**

3:24 13:4 80:17
81:4,5 128:23 129:3,
15,15 160:16,17,17
204:5 212:13,24
223:6,17 273:12

**Party's (1)**

41:5

**pass (1)**

260:17

**past (2)**

246:17 253:7

**Pause (2)**

168:16 223:2

**pay (27)**

31:5,6 33:8 35:16
38:12 57:1,8 58:2
61:4 68:3 104:10
106:16,18 138:1
145:22,24 146:10,12
150:11 189:2,17
228:8 249:6 252:2,3

261:8,8

**paying (7)**

48:19 49:12 57:17
62:23 63:6 71:22
135:1

**payment (3)**

104:1 138:11 254:8

**payments (8)**

155:11 188:20
252:1 274:2,3,5,10,11

**PC (1)**

227:16

**pen (1)**

237:1

**people (17)**

21:5 29:4 52:6,18
77:18 79:20 90:11
91:14 94:19 167:5
190:21 219:16 221:18
236:6 247:18 257:10
267:6

**per (7)**

13:3 32:17 108:20
141:21 145:19 146:6
253:5

**percent (1)**

214:9

**per-copy (10)**

23:16 104:11
105:19 107:5 136:12
138:1 182:1 188:7
226:4 252:2

**perfect (1)**

10:15

**perfectly (1)**

129:11

**perhaps (3)**

141:14 193:24
213:16

**period (15)**

35:19 48:3 56:13
112:13 132:22 134:17
178:3 233:12 248:13
249:11 252:7 256:4
259:5 262:10 271:11

**per-location (3)**
105:5,6 107:12

**permanent (8)**
65:19 178:13,14
179:1,4,6,9,10

**permitted (1)**
245:6

**Pernick (1)**
17:16

**perpetuity (2)**
55:19 56:6

**per-product (7)**
22:12,14 32:22
107:14 150:15 225:18,
24

**person (7)**
21:11 45:22 64:7
80:14 99:12 218:6
273:24

**personal (1)**
268:1

**personally (6)**
222:8,23,24 232:3,
21,23

**Pharma (1)**
221:18

**phased (1)**
268:17

**PhD (2)**
217:2,5

**philosophy (1)**
217:2

**phone (6)**
3:1,4 80:7 126:23
127:1 247:20

**phrased (1)**
254:24

**physical (2)**
77:1 215:2

**physically (1)**
251:11

**picked (1)**
247:11

**picture (1)**
10:6

**pieces (2)**
10:3 38:2

**Pierre (24)**
20:6,8,9,15 47:9,14,
20 73:10,17,21,21
74:5,12 75:2,23
189:24 190:12 191:15
193:15 194:14 195:12
196:11,22 198:5

**pipe (1)**
226:15

**pitcher (2)**
226:13,21

**place (12)**
30:2 66:19 73:2
78:3,24 134:3 144:13
156:3,5 236:1 249:11
262:1

**placed (8)**
32:16 34:18 38:20
48:11 119:1 178:3
249:2,5

**places (2)**
241:23 244:17

**plaintiffs (1)**
128:6

**Plaintiffs' (41)**
26:22 27:16 49:4
103:12 111:1,17
115:6 120:3,7,18

121:10 123:18 132:8
139:24 143:11 149:19
164:16,22 166:5
169:16 170:4 176:8
178:9 180:15 182:10
184:1,22 185:5
187:11,14,19,24
190:10 192:11 200:2
202:2 204:16 209:18
222:17 230:4 253:9

**Plaintiff's (2)**
21:21 23:4

**plan (4)**
2:18 9:22 10:18
14:22

**planned (1)**
225:8

**platform (3)**
172:16 227:16
238:7

**play (1)**
83:20

**players (1)**
236:9

**please (46)**
12:15 51:5 79:13
89:21 93:7 101:15,22
104:17 109:21 110:5,
16 111:4 114:2
116:17 120:15 121:9
127:10 138:12 157:14
163:9 168:12,15
169:5,6 175:22 177:6
179:16 182:10,11
183:6 184:4,15,18
187:11 188:23 190:11
199:9,17 205:7 212:7
214:20 221:2 225:9
231:18 242:10 268:7

**pleased (7)**

70:17,20,23 71:3
75:15 76:3 93:9

**plumbing (1)**
270:2

**pm (3)**
94:23 95:2 277:12

**podium (1)**
3:10

**point (37)**
5:18 6:17 7:19
11:22 26:4 30:7 40:15
42:2,7 47:5 56:22
64:7 80:14 85:22
86:12 87:1 88:11
89:10 99:12 107:11
109:1 119:19 121:15
123:10 129:9 135:7
147:20 148:7,19
165:24 206:15 224:22
235:1 238:17 244:24
245:9 246:20

**pointed (3)**
47:4 50:7 127:18

**pointing (2)**
40:1 276:21

**points (8)**
41:9,11 53:7 64:17
153:24 217:22 223:20
238:1

**polluted (1)**
152:22

**polluting (1)**
154:3

**poof (10)**
53:2,3 71:1 72:13,
21 74:13,21 89:24
257:22 258:21

**poor-man's (2)**
253:24 254:5

**portion (4)**

104:22 159:20
228:5 238:15

**portions (2)**
183:8 197:16

**position (7)**
20:24 21:10 38:7
60:18 135:2 224:15
246:3

**positive (1)**
5:7

**possess (1)**
258:13

**possibility (1)**
232:7

**possible (1)**
124:13

**possibly (2)**
72:14 157:22

**post (1)**
219:19

**post-2003 (1)**
266:13

**post-hearing (3)**
7:10,14,18

**post-lunch (1)**
173:23

**potential (5)**
114:23 140:17
141:24 143:18 206:13

**potentially (2)**
109:15 143:19

**power (1)**
227:16

**practical (1)**
171:13

**practice (7)**
18:22 50:14 98:4
131:13,20 226:3,5

**precise (1)**
254:6

**predecessor (8)**
217:9 219:21
235:17 238:12 239:6
251:5 255:20 256:23

**predict (1)**
76:8

**prefer (1)**
7:21

**prehearing (2)**
14:4 16:11

**prejudice (2)**
122:7,13

**prejudicial (1)**
15:14

**premise (5)**
26:6,11 61:2 67:13
161:17

**prep (1)**
276:13

**prepare (5)**
114:7 239:16
243:11 258:15,16

**prepared (7)**
8:14,15 110:14
114:9 126:19 158:6
250:8

**preparing (2)**
122:4 139:2

**prescient (1)**
48:10

**presence (2)**
214:24 215:3

**present (26)**
33:22 127:7,8,8,9
130:19,19,19 167:9
217:11 223:10,10
228:15 231:15 236:5,
13,18 237:13,16
249:19 251:8,11
265:1 266:20 272:3,16

**presented (5)**
51:19 53:15 81:12
83:10 214:23

**presenting (5)**
51:10 68:21 72:11,
12 93:23

**preserve (1)**
261:10

**Preside (2)**
167:7,11

**president (1)**
97:11

**pretrial (1)**
58:4

**pretty (9)**
38:9 85:22 88:11
150:4,9 155:14
206:16 234:10 241:6

**prevent (1)**
6:17

**preview (2)**
51:13 76:18

**previewing (1)**
4:19

**previous (10)**
64:12 121:1 147:5
150:21 151:7,9
167:14 188:21 193:20
197:7

**previously (7)**
72:6 137:23 147:10
183:9 184:14,20,24

**price (5)**
62:10 98:11 172:14
228:4 247:13

**prices (1)**
155:22

**pricing (1)**
228:9

**Primarily (1)**

**primary (2)**
50:3 224:4

**principal (2)**
64:8 236:9

**principle (1)**
224:15

**principles (1)**
252:13

**prior (20)**
31:18 32:13 35:3,7
42:17 56:9 125:5
145:6,7 152:11
167:10 239:19,22
245:14,19 248:23
251:16 254:15 255:3,
18

**probably (6)**
13:7 61:23 73:8
77:4 79:5 232:7

**probative (7)**
52:10 159:2 161:3
163:23 164:3,9 171:14

**problem (6)**
43:23 58:21 87:3,
16 128:24 160:24

**problems (2)**
60:20 63:5

**proceed (1)**
166:23

**proceeding (1)**
173:9

**proceedings (1)**
213:3

**process (5)**
28:11 135:1 228:3
239:8 269:14

**produced (6)**
77:15 122:1,8
139:11 158:6 159:9

**producing (1)**
  215:16
**product (110)**
  20:14 31:6,24 32:1,
  5,6,8 33:10,11,14,15
  34:14,15 35:18 40:1,9
  41:21,22 42:4 46:13
  55:3 57:24 58:24
  59:13,20 62:6,16
  63:14 87:6 88:10
  90:14 91:16 98:10,11
  104:19 105:2,3,21
  108:8,20 112:9,19
  135:13,15 138:7,8
  140:20 141:1,7,19
  142:8,13 145:7,13,18,
  19,19 146:7 155:20,
  20,22 156:1 165:9,9
  172:13,13,15 173:11,
  14 181:1,8,9,20,22
  182:7,8,23 183:2,16,
  18,19 184:7,10 189:8,
  17 197:9,20 199:12
  200:6,14 209:9,11
  227:19 243:14,17,20
  244:5,8,9,10 247:1,4,
  6,14 248:2,5,8 262:19
  264:10,11
**product-based (6)**
  30:21 107:15 108:5
  113:8 135:9,20
**product-by-product (3)**
  37:7,23 150:11
**products (213)**
  20:11,19 22:3,4
  24:4 26:18 30:12,12,
  20 31:1,1,3,19,21
  32:10,14,15,21,23
  33:1,7 34:6,7,7,10
  36:6,20 37:5,9,11,11,

  12,18 38:11,13,15,18,
  20,22 39:18,18,20
  40:8 41:15,16 42:11,
  22 43:2 44:14,19
  47:16 48:7,8,8,17,17,
  18 49:18,22 50:6 54:6
  55:4,7,10 56:1,5,16
  58:15,23 59:9,10 61:1,
  15 63:21,23 65:4,7
  66:21 73:12,23 74:14
  75:22 76:12 79:13
  80:23,24 91:17,19,23
  92:5,5,9 93:19 97:21
  104:1 105:2,17
  106:12 107:4,21
  108:9,14,17 112:20
  134:18 135:12,19
  136:1,5,5,6,8 137:5,
  21 138:2 139:1
  141:13,15,17 143:18,
  22 144:13,17 145:21,
  21 146:6 147:23
  152:1,4,10,12 155:19
  168:3,5,9,21,22 172:7,
  21 173:1,10 178:3
  182:4 185:20,24
  188:19,21 194:22
  195:7 200:13 202:23
  203:23 205:16 209:12
  224:10,11,12 226:6,
  10,11,12,17,20 227:4,
  5,14,15 238:8 244:6
  245:14 246:19 247:1,
  23 248:10,10,20
  249:2,12 254:4 255:5
  257:14 258:17 259:22
  260:6 261:7 262:1,6,6,
  8,12,13,18 263:7,8,8,
  9 267:18,19 268:5,10,
  18,20 269:1,4,7,23

  271:5,24 272:3 273:3,
  14 274:24 275:8
**products/projects (3)**
  64:22 151:23
  155:17
**product-specific (9)**
  32:16 33:1 172:4
  246:14,21,23 248:15
  261:6,7
**program (7)**
  84:24 85:2 104:22
  193:15,16,18 231:4
**progressing (1)**
  238:7
**project (22)**
  31:22 32:1 33:12
  55:3 57:7 61:19,24
  135:15 142:13 155:23
  167:8,13 180:23
  181:2 200:15 203:2,3
  238:6 241:9,10
  243:13 247:3
**project-by-project (1)**
  238:5
**projects (21)**
  31:17,21 32:3,11
  38:17 42:11 55:5,7
  56:1,5,17 65:5 73:23
  97:21 105:9 152:2
  155:19 156:3 167:13
  194:22 238:5
**promotions (1)**
  67:3
**prompted (1)**
  202:15
**promulgated (1)**
  218:14
**pronounce (2)**
  79:5 204:23
**pronunciation (1)**

  84:17
**proof (3)**
  15:8 92:6,8
**properly (2)**
  33:2 258:10
**property (1)**
  85:6
**proposal (2)**
  109:20 157:1
**proposals (1)**
  97:22
**propose (3)**
  13:12 160:11
  162:10
**Proposed (9)**
  7:22 8:20 27:10
  111:8,21 112:2 128:6
  180:18 247:16
**proposition (2)**
  25:19 72:18
**proprietorship (1)**
  219:23
**prospect (1)**
  59:9
**prospective (2)**
  97:17,20
**protect (1)**
  264:3
**protocol (11)**
  59:4 86:4 215:19
  216:20 217:14,15,16,
  18 218:1,18,18
**provide (7)**
  137:8 138:24
  157:23 158:4 206:21
  243:8 266:24
**provided (8)**
  55:18 58:11,19
  69:7 89:8 137:10
  155:9 181:6

**provides (4)**
62:10,22 216:4
242:6
**providing (1)**
201:6
**provision (4)**
26:2 41:7,8 269:18
**provisions (5)**
27:20,20 49:17
56:3,4
**PS (3)**
164:18,20 165:5
**pull (3)**
59:23 60:6 91:18
**pulled (2)**
236:7,7
**pulling (1)**
60:3
**purchase (2)**
62:8 207:23
**purchased (4)**
24:16 196:20 197:2,
6
**purchases (1)**
227:13
**Purdue (2)**
96:6 217:6
**pure (1)**
19:11
**purported (2)**
49:14 180:8
**purporting (1)**
178:24
**purpose (13)**
46:20 114:20
119:14,18 130:24
131:4 137:18 138:21
139:2 143:15 201:19
205:2 213:8
**purposes (7)**

14:24 115:2 118:4
130:17 139:14 231:21
243:6
**pursue (1)**
208:12
**pursuing (2)**
52:23 69:2
**put (24)**
10:4 11:16 33:7
38:22 40:8,10 47:12
49:22 60:18 66:20
91:16 92:6,8 119:19
128:13 153:19 160:12
169:1 175:17 182:6
234:13,14 245:8
256:17
**putting (2)**
9:16 146:16
**puzzle (1)**
9:16
**puzzled (1)**
271:16
**PX-29 (1)**
119:21

## Q

**qualified (1)**
263:9
**qualifies (1)**
129:15
**qualify (2)**
38:19 145:8
**quarter (5)**
94:6,17,18,22 265:7
**queries (1)**
110:16
**question (34)**
43:17,18,20,22
64:16 90:8,18 91:21

107:7 130:5 139:5,15
152:22 153:1 154:11
159:19 160:7 171:14
173:9,17 181:19
202:12 212:9 213:7,
16,16 223:23 235:9
254:17,23 259:19
262:18 268:6 269:20
**questioning (4)**
153:6 166:21,23
210:3
**questions (14)**
53:13 63:1 70:16,
19 88:16 92:23
146:19 148:24 196:15
207:15 223:16 224:1
266:9 267:16
**quick (1)**
12:5
**quickly (1)**
64:4
**quite (5)**
134:23 148:2
155:13 190:6 261:21
**quote (7)**
18:21 25:19 27:5
28:17 32:8 99:1
266:13
**quotes (1)**
141:23

## R

**raise (3)**
70:16 223:4 266:21
**raised (5)**
47:5 154:5 157:10
162:6 269:9
**raising (2)**
162:7 266:13

**rather (2)**
108:8 213:8
**rationale (1)**
249:13
**Razgaitis (12)**
18:19 19:2 50:11,
13 84:15,18,19,22
85:7,14,21 88:4
**Razgaitis' (1)**
26:6
**reached (4)**
32:8 79:11 156:23
196:24
**read (18)**
65:11 77:2 82:1
110:5 124:5 167:19
168:11 178:24,24
183:6 188:10 196:5,
14 205:7,18 230:19
255:12,17
**reading (1)**
72:20
**ready (4)**
17:7 95:4,19 174:10
**real (2)**
224:2 232:10
**really (16)**
8:18 11:16 41:16
58:14 68:21 71:14
79:21 83:12 139:4
167:8 213:1 220:10
234:10 242:6 253:2
262:13
**realtime (8)**
51:23 68:13 76:5
82:18 83:5 89:4,19
185:14
**reams (1)**
110:7
**reason (11)**

26:5,9 35:6 59:20
92:15 107:18 122:9
205:21,23 224:2
252:20

**reasons (5)**
15:12 107:19
220:10 272:13 273:6

**reassured (2)**
76:13 271:22

**rebut (2)**
18:17 152:24

**recall (14)**
2:17 25:15 35:2
38:1 70:18 73:8 101:7
109:4 133:1 157:8
188:17 236:14 238:23
240:16

**recalling (1)**
46:15

**recalls (1)**
45:3

**receive (5)**
110:17 135:8 140:3
141:8 182:4

**received (32)**
29:2,3 44:4 69:6
85:16 103:13 110:1
111:2,18 115:7 120:4
123:19 132:9 140:1
143:12 149:20 170:5
176:9 180:16 184:2
185:6 188:1 192:12
200:3 202:3 204:17
209:19 217:5 230:5
258:8,11 267:4

**receives (1)**
232:11

**receiving (1)**
224:13

**recently (3)**

69:20 75:8 135:6

**recess (4)**
94:23 174:7 212:2
265:14

**recitations (2)**
118:19 148:18

**recites (2)**
130:15,16

**recognition (1)**
188:20

**recognize (13)**
102:12,14 114:4
116:20 143:1 149:8
169:9 184:5 187:14
199:19 209:4 222:17,
19

**recognizing (3)**
26:20 27:9 40:3

**recollection (1)**
233:15

**recommend (1)**
97:21

**reconcile (2)**
72:9 190:5

**reconstruct (1)**
52:13

**Reconvened (1)**
95:2

**record (30)**
15:18 17:12 18:11
53:5,8 76:5,20 80:11
89:3 91:14 96:3 99:19
110:6 120:14 122:9
130:14 131:5,10
160:12 162:14 163:11
168:11 188:11 193:1
196:6,7,15 255:12,17
274:14

**records (4)**
51:21 79:22 196:17

238:20

**redistribute (1)**
22:4

**redistribution (4)**
105:14,18 107:3
243:23

**reducing (1)**
237:8

**redundant (1)**
228:18

**Reeves (23)**
19:22 44:5,16 45:6
66:2,2,5,8,12,16,17,
24 67:15,21 68:6
77:23 78:1 79:7 81:8
87:20 90:22,23 92:7

**refer (1)**
215:9

**reference (38)**
35:3,7,14,20 36:14
38:10 43:6 46:23 57:6
70:10 120:11 122:5,
11 123:22 124:6
151:9,11,17,18,20
152:20 153:20 154:15
168:23 181:12 184:23
191:2 194:14 198:16
209:8,10 215:9 245:1,
3 251:16 253:21
254:15 261:23

**referenced (7)**
39:12 44:6 72:4
82:24 205:12 242:17
255:20

**references (9)**
39:8 46:1 115:15,
20 148:6 189:11
209:11 244:17 255:2

**referencing (3)**
101:19 130:21

150:7

**referred (2)**
56:2 273:1

**referring (2)**
65:14 223:3

**refers (7)**
54:1 55:12,13,17
67:5 82:13 104:22

**refinements (1)**
228:1

**reflect (1)**
198:8

**reflected (3)**
67:2 147:5 198:21

**reflects (2)**
57:6 66:15

**refused (1)**
61:5

**regard (5)**
16:11 56:11 140:24
256:2 259:3

**regarding (5)**
15:7 135:11 188:5
208:22 222:4

**regardless (1)**
73:3

**regular (1)**
131:17

**regularly (1)**
126:17

**reiterate (2)**
38:21 45:11

**reiterates (1)**
37:21

**related (3)**
109:15 236:24
262:7

**relates (2)**
134:19 276:2

**relating (1)**

83:16

**relationship (7)**
21:18 73:11,18
101:10 108:22 125:4
216:1

**relationships (1)**
271:22

**relatively (1)**
268:21

**release (1)**
32:5

**released (1)**
31:3

**relevance (1)**
160:15

**relevant (11)**
21:12 26:19 37:6
161:9 218:14 224:3,
24 225:10 244:11,14
245:7

**reliable (1)**
52:16

**relied (1)**
38:3

**remain (2)**
95:14 210:24

**remainder (1)**
15:21

**remained (2)**
186:13,13

**remark (1)**
53:20

**remarkable (1)**
71:14

**remarks (1)**
9:17

**remember (9)**
33:20 52:12 65:13
69:3 81:22 136:20
237:18 239:24 254:18

**remembered (1)**
232:6

**remembers (1)**
128:11

**remotely (2)**
136:18 236:13

**renew (2)**
208:7,8

**renewal (8)**
45:16,21 76:15
89:7 210:8 269:10
270:7,8

**renewals (1)**
45:23

**renewed (2)**
89:12 209:22

**renewing (5)**
78:14 208:10,12
210:4 270:7

**renews (1)**
269:18

**repeat (1)**
39:2

**repeated (2)**
47:21 161:13

**repeatedly (2)**
18:2 76:13

**repeating (1)**
159:24

**rephrase (1)**
259:18

**replace (1)**
170:17

**replaced (2)**
20:7 234:21

**replacement (1)**
47:9

**replying (1)**
66:9

**report (5)**

81:17 82:18,19
127:16 216:9

**reporter (1)**
13:11

**reporters (1)**
12:16

**reports (4)**
83:24 130:9 131:13,
15

**represent (2)**
142:10 271:4

**representation (11)**
41:18 73:13 74:4,
24 75:11,21 80:2
195:8 273:22 274:17,
22

**representations (1)**
41:20

**representative (4)**
4:1 30:4 37:1
212:24

**representatives (1)**
41:5

**represented (5)**
37:12 128:17
130:24 140:17 142:12

**representing (3)**
17:13 236:10
273:12

**request (8)**
74:18 104:23
124:20 142:2 177:3
195:17 203:6 226:18

**requested (4)**
113:12,13 117:3,10

**requesting (3)**
111:9 124:24 200:6

**requests (1)**
187:4

**require (2)**

25:13 145:14

**required (1)**
168:21

**requirement (5)**
31:8,14 39:11
198:16,20

**requirements (3)**
144:9,10 156:7

**requires (1)**
254:7

**Research (174)**
15:7 17:14,20 18:3,
9,16,17 20:1,10,14,17
21:16,18,22,24 22:13
23:1,9,24 24:4 25:14
26:15,17,22 27:17,24
28:1 30:5,6 32:13
33:5,21 34:5 36:23
37:4 40:7,11,16 41:19,
19,22,23 43:8 44:3
46:6 47:9 48:20,22
49:1,9 66:20 68:5
69:24 72:2 73:7,9,20
74:10 75:10,12 77:15
78:3,19 80:2 82:15
86:7 87:2 89:11,22
90:4,10,24 96:22 97:4,
5,6 99:13 100:12,21
101:11 102:16 103:23
104:4 107:11 112:15
113:6,9 116:15
124:18 125:4,5,13
127:7 128:21 131:21
133:3 135:11 139:13
141:13,17 154:19
155:8 172:15 184:13,
19 191:9 193:17,18
199:13 201:7,16
202:11,12,21 203:9,
14 205:4,10 206:7,24

207:13,21 208:15,21
209:12 214:4,7,10,12,
15,16 215:5,9,10,20,
23 216:10,15 217:8,
10,11,14 219:21
220:3 221:3,5 222:5,7,
9,11,13,22,22 224:6,7,
9 226:7 227:19
230:17 236:3,11
240:20 243:8 253:22
267:8 268:5,11
269:11,14,21,23
273:13,14,22

**Research's (15)**
21:10 22:23 23:20
30:21 49:8 68:15 74:3
78:16 79:1,17 84:4
99:1,2 216:21 224:17

**reservation (4)**
160:20 164:2
166:17,20

**reservations (3)**
161:22,24 162:20

**reset (2)**
108:7,11

**re-signed (1)**
43:13

**resources (1)**
216:5

**respect (24)**
9:3 15:1 30:11 31:1,
17 41:13 46:23,24
50:12 54:4 80:23
84:10,11 90:20 98:5
100:24 106:4 112:23
119:7 136:4,4 162:3
243:24 247:23

**respond (2)**
212:16 213:12

**responded (4)**

26:18 29:14 44:21
197:9

**responder (1)**
227:3

**responding (1)**
39:7

**response (2)**
38:4 121:23

**responses (1)**
130:3

**responsibilities (1)**
208:21

**responsibility (1)**
222:3

**responsible (7)**
63:24 114:10
143:17 208:10,15
222:6 237:7

**rest (5)**
3:4 59:22 91:1
182:24 265:1

**restricted (1)**
106:1

**restriction (1)**
106:2

**result (3)**
114:24 197:12
234:15

**resume (1)**
277:7

**retire (1)**
96:19

**retired (4)**
18:10 96:18,21 97:9

**return (2)**
120:6 216:5

**returned (1)**
124:17

**rev (2)**
236:21,22

**revenue (2)**
216:5 267:4

**revenue-wise (1)**
107:22

**reverse (1)**
25:3

**review (3)**
111:21 126:2
149:24

**reviewed (2)**
89:2 117:9

**Revised (2)**
179:18 187:10

**revolutionize (1)**
18:5

**rewriting (1)**
18:22

**RI (9)**
26:24 110:8,9
144:14 145:16,20,24
167:14 168:21

**Richard (3)**
17:13 18:19 84:15

**Richardson (1)**
62:3

**Rick (15)**
30:6 33:20,20
43:15 64:10 82:22,24
125:17,21 127:9,22
132:12 150:19 151:21
236:11

**right (140)**
3:7 6:15 8:7,10
10:11,16,20 13:19
14:11 15:23 16:3 17:6,
7 20:10 26:17 36:9
37:8,24 43:1,3 50:5,7,
17,24 54:5 55:18 56:5
58:16 60:11,22 61:12
68:22 70:3 76:3 78:10

82:2 87:13 88:1 90:6
93:8,24 94:21 99:24
101:4 103:17,18
104:13 106:11,21
109:21 115:4 117:20
119:17,22 125:2
129:17,21 131:3
132:11 138:19 139:22
144:18 148:23 150:5
153:7 157:12 158:18,
23 161:23 163:1,10
164:5,13,21 165:9
166:22 167:3 169:1,5
170:2,20,20 171:1,19
173:18 174:9,22
175:1,5,20 176:4
180:13,19 188:9
192:3 194:13 195:12
201:22 204:12 210:12,
18,24 211:4,8,11,20,
24 212:4,6,14 213:18
221:2,5 223:7 228:7
230:13 231:22 235:1
238:22 239:18 243:22
244:7,9 245:8 258:14,
15,16,17,19 260:5,8
263:1,3 266:4 269:16
275:13,18,23 276:18
277:5

**rights (60)**
22:1,17 25:9 26:8,
13 28:20 30:16,17
36:6,19 42:20,21
43:21 49:19 55:16
60:10 76:13 85:5
86:22 88:3 89:22
93:14 104:7 105:7,16,
18,20 107:3,6 116:5,7
178:1,5 205:4 230:9
243:3,4,7,10,23 244:6,

10 246:1 254:8
256:19,20 257:6,8,11,
14,15,17,18 258:3,7,9,
12 259:8,12,22

**RI's (2)**
27:7 110:15

**risk (4)**
220:14,16 226:10
227:1

**road (1)**
239:4

**Robert (1)**
14:17

**role (4)**
84:10,12 97:12
100:11

**roll-up-your-sleeves (1)**
237:4

**room (9)**
64:15 82:9,14
133:5,6 151:16 236:2,
6 260:12

**rough (3)**
12:11 13:9 247:14

**roughly (3)**
12:10,24 13:5

**round (1)**
187:5

**routers (1)**
101:14

**row (4)**
140:16 141:16
181:5,18

**rows (2)**
140:16 187:9

**royalties (33)**
31:6 37:6,22 38:12
39:24 49:12 55:15
58:7 64:23 104:9
105:19 106:17,21

108:11,16 136:13
138:1 145:24 146:7,
12 151:24 152:16
165:8 182:1 183:6
196:19 243:1 248:19,
24 249:6 251:2,15
252:2

**royalties' (1)**
72:6

**royalty (108)**
23:16,18 24:14,16
27:13 32:13 33:3 34:8
35:1,4,8,12,13,17
36:3,8 37:5 38:19
41:24 42:24 43:6,8
44:18 48:9 54:2 55:18
56:2,4 58:18 64:13
65:6 74:16 82:7
104:11,14 106:11,19,
19 107:5 108:7,13
112:5,8 134:17 135:2,
5,18,21 136:11,12,13
137:22,24 138:7
144:17 145:9 150:12,
15 151:14 152:3,13
155:8 156:2 168:2,4,
24 172:14 182:4
183:9,13 186:2,5,6
188:7,16,19 189:1,7,
19 196:19 197:4,7,8,
13,16 198:3 226:4
245:19 246:6 247:12,
13,24 248:7,17 249:1
251:23 252:1,11
254:14,15 261:11
263:2,10 274:2,3,5,9,
11

**Royalty-BuyOut (1)**
195:15

**royalty-free (8)**

32:23 33:13 34:17
224:13 254:4 261:1,2
262:21

**Rule (9)**
3:21 5:19 6:8,17
118:12 129:4,13
148:7,14

**ruled (1)**
21:3

**rules (2)**
6:24 161:1

**run (2)**
12:10 185:16

**running (2)**
72:3 205:11

**runtime (1)**
145:24

**run-time (14)**
30:17 38:12 43:21
56:12 146:12 243:18,
22,24 244:2 245:2
256:3 258:18,19 259:4

# S

**said (90)**
8:15 9:4 28:6 29:12
38:8 40:7 41:21 44:9
51:21 52:20 55:20,21,
23,24 58:5 65:20
68:10 74:7 75:7 76:2
79:12 80:12 81:9
82:18 84:5 88:16 89:3,
22 90:13,17 91:7,9
93:6,8 99:6 109:18
125:21 128:9,14
135:4 142:12 148:7
150:8 155:15,16
158:13 159:1 161:17,
18 179:5 191:16,19

193:1,17,21 194:18,
21 209:21 212:10,11,
17 213:15 219:10,11,
12,12,17 220:18
240:8,15 245:12
246:7 251:14 252:18
254:11 257:5,7,21
261:22 262:2 271:11,
13,14,17 272:4,7,8,10,
12 275:15

**sale (6)**
20:18 47:21 271:3,
9,14 275:8

**sales (9)**
96:22 97:10,12,19
186:16,13,18 208:18,20
215:23

**sales@SNMP (1)**
69:18

**same (34)**
16:10 20:17 27:22
39:3 48:24 54:23
71:11 89:9,9 97:13
102:23 103:3 107:23
108:18 118:16 130:1
146:12 153:22,24
158:6,14 166:10
173:3 197:5 203:15,
24 204:4 205:16
219:6 226:20 227:12
231:8 247:13 254:10

**Santa (1)**
54:8

**save (1)**
196:5

**saved (2)**
238:3 240:14

**saw (1)**
238:18

**saying (31)**

21:13 29:9,11
34:12 36:10,17,23
41:14 49:24 67:10
68:5 69:3,23 70:13
73:9 83:5 86:14 87:7,
16 88:2 89:20 90:5
92:16 93:12 118:17
129:22 197:10 212:10
254:10 257:10 258:21

**SCH (1)**
78:17

**Schedule (330)**
8:9 10:21 12:6,7
16:20 17:1 18:23
19:14,17 20:10,13,24
24:13,18,20 26:11
30:9 31:4,11 32:10
33:15,23 34:24 36:5
37:2 38:11 39:21,22
40:3,5,6,8,10 42:9,17,
23 43:12,14,19 44:8,
10,13,14,22 45:2,18,
24 46:2,14,23 47:2,7
49:15 51:14 52:3 53:2,
17,19,21,22,22,23
54:16 55:2,6 56:7,9,
10,16,18 57:11,12,21
58:5,14,20 60:8,12,20,
23 61:4 62:9,20 63:8,
9,17,18,20 64:9,18
65:1,8,12,18,23 67:5,
6,10,14,15,22,23 68:2,
7,13,16,20,23 69:8,11,
14 70:14,23 71:1 72:4,
5,13,17,20 73:12,19,
22 74:6,10,13,14,21,
22 75:19,23 76:2,14
77:12,19,20,22 78:6,
15,17,20,23 79:18,21
80:12,15,20 81:1,4,7,

8,22 82:5 84:10 86:17
87:9,14,17,19,21 88:1,
2,20,22,22 89:2,6,8,
10,23 90:5,11,12 91:8
93:11,14 104:11
108:8,13 134:11
135:17,18 136:9,10
138:24 140:18 141:11
145:9 150:13 154:23
172:8,11 173:10
176:11,13,22 177:8,
15,16,23 178:2,6,12,
24 179:18,24 180:22
181:3,24 182:7,17,20
183:1,3,7,17,18 184:6,
14,16,20,22 186:2,4,8
188:5,6,17,22,24
189:1,17 191:4,24
194:7,13,21 195:23
196:3,8,17 198:2,24
199:2,3,14,20 200:17
201:1,9 203:24 205:6,
12,14,16,19 206:8,9,9
207:1 208:2,3 209:24
210:4,7 223:11 235:7,
19 241:5,11,12,15
242:21,22 244:11,14
245:2,7 246:22,24
248:3,4,15,18 249:3,6,
24 250:8,14,18 251:1
254:14,20,21 255:3,6,
10,18,22 256:1,6,8,11
257:13,15,16,17,22
258:2,3 259:2,2,7,11,
13,18,24 260:20,23
263:5 266:19,22
267:3 268:9 269:3,8,
13,24 270:21 274:4
276:12

**schedule/license (1)**

70:19

**schedules (98)**
30:18,24 31:9,14
32:16,22 33:1,7 34:11,
18 37:10 38:20,22,24
39:11,15,16,18,19,20,
21 40:5,23,24 41:16
42:9 47:11 48:2,4,5
49:23 57:5,6 61:13,17
62:18 63:12 69:9
73:16 77:17 87:17,18
88:22 133:14,18,18
134:6,7,19 136:1
139:3 142:19 150:14
152:20 153:20 154:16,
21 169:21 170:7,19
178:4 186:23 187:5
190:2,9 197:17,19
198:17,20 208:8
239:3 240:22,23
241:1,2,4,12,16,21,22
242:3,8,8,17,22
244:15,17 249:12
257:19 262:1,2
263:10 269:5 271:23
274:2,5,7,10

**scheduling (1)**
156:7

**scientist (1)**
84:24

**scope (2)**
27:15 173:14

**scratch (1)**
86:24

**screeching (1)**
68:24

**screen (2)**
77:8 128:13

**seal (2)**
14:4,5

**sealing (2)**
14:7 16:10

**search (3)**
74:12 231:23
272:15

**seated (5)**
2:2 95:4 174:9
212:4 265:16

**SEC (1)**
25:4

**Second (31)**
3:8 12:17 52:5
64:10 66:7 89:5
115:20 117:3,10
120:17,21 132:18
134:13 138:4 140:23
164:23,24 170:10,11
199:16 215:8 220:14
230:16,24 238:2,4
240:21 248:14 253:20
256:1,22

**secondly (1)**
224:2

**seconds (1)**
275:24

**Section (12)**
31:11 35:1,4,8 43:7
183:7 189:1 242:14
250:24 251:14 254:14,
21

**seem (2)**
123:13 132:16

**seemed (1)**
247:14

**seems (3)**
82:23 123:7 131:7

**self-contained (1)**
28:9

**Seligson (1)**
71:17

**sell (6)**
105:22 208:5
247:18,19 262:3,24

**seminars (1)**
85:20

**Seminary (1)**
96:16

**send (9)**
44:7 114:13 117:16
126:20 149:11 176:15
185:18 187:10 202:18

**sending (6)**
44:21 45:22 83:9
114:10 176:23 188:8

**sends (1)**
65:17

**sense (4)**
78:23 112:22 237:2,
6

**sent (30)**
19:13 29:2,2,7 37:8
43:15 44:2 47:12
89:15 109:18 110:3
117:6 127:13,15
139:8,13,15 141:24
143:2 144:1,2,2
170:16 176:17 180:18
188:4 202:13 250:4,9
273:8

**sentence (13)**
65:2 144:8,21
145:12,12 146:3
147:3 177:22 179:10
205:8 230:16 255:23
256:1

**sentences (3)**
146:4 255:13,13

**separate (9)**
24:5 46:8 59:14
61:21 112:14 207:17

230:18,20 241:12

**separately (1)**
172:22

**September (9)**
25:1 27:3 96:20
109:6 110:13 167:10
187:17 188:14 248:23

**Sequestered (4)**
4:16 148:11 211:2
212:18

**serves (1)**
214:14

**service (16)**
45:16,21,22 46:7
152:16 207:10,11,17
209:5 229:3,17,22
230:9,15,17,21

**services (2)**
207:14 216:4

**serving (1)**
83:22

**session (5)**
82:22 95:1,5
127:21 237:20

**set (9)**
18:11 62:11,18
102:1 112:20 137:2
170:16 240:6 254:8

**setting (1)**
264:7

**several (10)**
37:2 73:8 107:19
126:17 141:12 148:5
197:3 219:20 236:20
257:12

**shall (10)**
28:20 56:12 116:2,
4,8 124:5 134:20
174:1 230:17 256:3

**shape (1)**

29:14

**share (3)**
203:9,13 205:4

**shared (1)**
249:14

**sheet (1)**
117:20

**ship (2)**
141:10 238:9

**shipment (1)**
108:15

**shipped (1)**
248:21

**shipping (8)**
173:3 185:13,17
260:6,9 268:4,10,24

**short (6)**
9:4,19 18:19
173:20 202:19 268:21

**shorthand (1)**
105:1

**shortly (4)**
5:16 40:6 47:6
134:24

**short-term (2)**
113:16 231:13

**show (17)**
21:17 29:23 35:6
36:4,22 41:12,12
45:20 48:14 67:16
128:10 138:23 157:12
166:5 173:14 193:19
273:19

**showed (2)**
140:8 271:23

**showing (3)**
57:13 77:13 139:14

**shown (2)**
21:14 25:4

**shows (7)**

21:9 29:21 35:22
40:12 49:7 97:17
132:16

**side (6)**
3:23 13:4 88:21
139:11 221:17 227:1

**sign (12)**
44:12 45:2,7 61:4
67:23 90:12 98:10
136:9 150:13,16
189:2 205:5

**signature (16)**
27:8 43:24 44:4
100:8,20,22 110:15
117:3,11 124:3
164:22 177:17,22
256:24 267:10,14

**signatures (1)**
156:7

**signed (36)**
29:13,16,19 30:1
37:1 39:15 43:11,13,
17 44:9,15,21 51:16
67:10 68:14 88:24
89:1 118:15,18
120:13 124:17 134:11
135:16 136:15 169:10,
14,19 172:9 177:9,10
186:2,4,21 188:22
233:17 269:10

**significance (4)**
9:15 114:23 118:10
180:9

**significant (3)**
86:15 155:7 189:10

**silence (1)**
161:8

**similar (4)**
16:5,9 167:23 231:9

**simple (4)**

85:22 88:11 215:18
217:24

**simply (8)**
18:21 27:11 45:6
46:22 54:24 122:10
139:8 206:18

**single (10)**
19:13 20:4 28:3,5
83:15 107:21 239:13
240:5,5 252:3

**single-wide (1)**
232:23

**site-based (1)**
246:12

**situation (1)**
85:23

**six (7)**
10:9 13:3 19:13
46:15 216:23 218:2
225:7

**skip (1)**
228:17

**slightly (2)**
141:20 249:4

**small (7)**
13:24 77:3 107:5
173:20 217:20 228:5
236:2

**smaller (1)**
112:6

**snapshot (2)**
263:20 264:2

**SNMP (246)**
15:1,7 17:14,20,21
18:2,3,9,16,17 20:1,
10,13,16 21:10,13,16,
18,22,24 22:13,23
23:1,9,19,24 24:4
25:14 26:15,17,21,24
27:7,17,24 28:1,5

30:4,6,20 32:13 33:5,
21 34:5 36:23 37:3
40:7,10,16 41:18,19,
21,23 43:8 44:2 45:23
46:6 47:8 48:19,22
49:1,8,9 52:20 53:20
54:14 55:22 56:10
57:4 59:3,13,15,19
60:9,14 66:19 68:4,15
69:21,24 72:2 73:7,9,
20 74:3,10 75:9,12
77:15 78:3,16,18 79:1,
17,19 80:2 82:15 84:4
86:4,6 87:2,15 89:10,
22 90:3,9,24 96:22
97:3,5,6,21 99:1,2,12
100:11,20 101:11
102:16 103:23 104:4
105:2,5 106:8 107:10
110:8,9,15 112:15
113:1,6,9 115:24
116:15 122:15 124:17
125:4,5,13 127:7
128:21 131:20 133:3
135:11 139:13 141:13,
17 145:16,20,24
154:19 155:8 158:17
166:19 168:21 172:15
184:13,19 190:21
191:9 193:16,18
194:11 199:13 201:7,
16 202:11,12,20
203:9 204:7 205:4,9
206:7,23 207:12,20
208:15,20 209:11
214:4,7,10,12,15,16
215:5,9,10,20 216:10,
14,20,20 217:8,10,11,
13,14,16,18 218:1,3,4,
5,9,12,24 219:21

220:3,6 221:3,5 222:4,
7,9,11,22,22 224:6,7,
8,16 226:6 227:19
230:17 236:2,11
240:19 243:8 248:6
251:4 253:19,22
255:19 267:7 268:5,
10 269:11,14,21,23
273:2,13,14,22

**SNMP-based (1)**
226:8

**SNMP-Bay (1)**
109:16

**SNMPR (1)**
106:7

**SNMPRI (3)**
36:3 197:9,19

**SNMPRI-Nortel (1)**
186:10

**SNMPRI's (1)**
197:2

**SNMP's (6)**
20:24 58:4 60:19
78:10 191:17 210:15

**SNMP-SynOptics (1)**
115:16

**so-called (2)**
20:22 38:2

**Society (1)**
85:10

**software (153)**
18:4 20:14 21:23
23:20,23,24 24:15
31:5 36:7,9 37:24
44:11 45:16,20,22
46:4,7 48:22 49:3,8,
19 50:1,5,15 54:4,6
55:13,16,19 56:6,12,
12,24 57:10,22 58:16,
22 59:2,6,12,13,20,21,

23 60:16 61:8 62:19,
21,24 63:2 66:20
68:18,19,23 69:5,7,24
74:6,19 75:1 76:14
79:12 85:5,24 86:5,13
87:5 89:9,10,16,20
91:11,18,22 92:18
93:7,19 98:5 105:16,
21,21 126:10 145:17
152:16 167:12 168:7
184:13,19 186:14
199:13 203:7 207:10,
11,17 209:5 215:16,
21 221:6,6 222:4,7
224:6,17 225:15,23
226:14 229:3,17,21
230:8,21 243:12,15,
19,20,23,24 244:2,13
248:5,6 256:3,3
258:18,19 259:4,4,9,
23 260:6,9 262:4
268:5,11,24 269:4,7
271:5,12,15,18,21,24
272:5,9,11,16,17
273:3,4,5,14 274:23

**Solaris (8)**
72:3 74:17 104:24
185:9 195:16,17
205:11 227:18

**sold (4)**
20:18 31:6 270:8,17

**sole (1)**
219:23

**solely (1)**
34:24

**solve (1)**
87:15

**somebody (2)**
73:20 272:18

**somebody's (1)**

52:1

**somehow (5)**
40:17 42:3 45:18
259:21 262:7

**Someone (5)**
5:15 13:14 72:19
86:1 88:12

**something (41)**
8:2 31:23 40:18
41:17 53:23 56:14
57:16 61:18 65:13
83:13 85:5 87:11,23
91:7,9 93:17 122:15
130:10 147:18 154:2,
3,4,6,8 155:12 157:22
159:3,22 166:18
170:16 191:19 212:16
228:23 247:1,2,3
257:1 262:22 263:20
274:13 275:21

**Sometime (1)**
226:2

**sometimes (5)**
98:21 125:14 127:1,
2 158:11

**somewhere (2)**
9:22 232:24

**soon (1)**
124:13

**sorries (1)**
76:7

**sorry (16)**
71:22 89:11,16
102:7 136:12 144:6
165:3 175:23 176:7
178:21 179:7 184:17
192:23 204:23 206:9
268:6

**sort (2)**
10:3 153:22

**sound (1)**
139:18

**sounds (2)**
71:21 81:11

**source (26)**
57:10,15,18 62:9,
10,13 63:14 69:22
70:1,3 86:9,12 145:14,
15,23 165:10 189:2,
11,18 206:17 221:6,9
243:9,10 258:13,14

**sources (6)**
10:3 72:3 74:17
195:15 205:10 206:8

**Southwood (102)**
4:4,22 5:11,13 6:13
18:9,10 29:5,8,23
30:5 36:1,2 37:16
38:5 39:6,23 45:17
46:11,17 47:1,4,15,24
64:7,20 65:13 69:13
70:7,14 71:7,20 72:14,
24 73:11 74:15 75:7,
14 76:2 79:11 80:13,
14,20 81:16,16,23
82:17 83:5 86:19 93:6
94:10 95:8,9,11,16,24
100:4 109:22 111:5
115:14 120:14 122:11
123:21 128:23 131:12
133:9 138:3 142:2
143:15 148:8,13,20
149:6 152:18 153:9
154:4,6 161:12
164:15 167:3 169:2
171:3 173:13 175:22
178:20 187:12 191:3
204:5 207:8 210:11,
16,19 211:12 212:18
228:14 231:12 236:10

**Southwood's (4)**
38:4 46:10 228:18
235:3

**speak (5)**
5:3 20:1 24:18 99:6
126:22

**speaking (3)**
112:12 126:23
271:20

**speaks (3)**
72:16,17 146:15

**special (1)**
248:9

**specific (9)**
30:19 36:18 106:1
141:18 155:21 157:8
186:22 197:9,20

**specifically (12)**
28:17 29:9,11 37:4,
14 39:8 40:19 44:9
47:14 48:1 140:7
185:12

**specification (1)**
218:10

**specific-location (1)**
104:5

**specified (8)**
55:3 172:12 187:6
200:14 203:1 243:2
244:13 248:4

**specifies (1)**
242:24

**speculate (1)**
157:3

**speculated (2)**
34:2 263:4

**speculation (2)**
19:12 157:3

**spend (4)**
162:8 190:4 223:23
265:21

**spending (3)**
66:22 71:13 85:1

**spent (9)**
52:21 82:18,20
83:6 84:5 127:19
222:10 223:21 247:20

**spin (1)**
52:1

**spite (1)**
234:13

**spoke (3)**
126:17 220:7 276:1

**spoken (2)**
67:14 148:12

**spreadsheet (22)**
37:17 137:10,17,20
139:1 140:17 154:22
181:6,9,13,13 182:22,
23 184:8 185:22,23
186:1 187:1,6,9
197:23 198:1

**spreadsheets (2)**
37:9 137:9

**spring-summer (1)**
113:2

**SSA (21)**
46:1 62:18,21 63:4,
6,16 69:3,10 78:11
207:20 208:1,5,13,16
209:8,22 269:10,16,
20,21 270:20

**SSAs (16)**
68:17,23 69:9
72:23 76:15 78:14,19,
20,22 89:7 207:23
208:4,8,10,22 269:14

**stabbing (1)**

257:8

**stake (1)**
256:17

**stand (2)**
95:14 212:7

**standard (16)**
17:21 86:5 98:15
100:6 182:8 215:17
218:12,13,20,22
219:7 220:18,19
225:17 226:8 263:13

**standards (2)**
219:2,5

**standard-setting (1)**
218:14

**standing (1)**
95:14

**start (16)**
5:21 8:14,16 12:18
28:7 51:14 53:17 72:1
86:10,11,24 94:8
98:15 194:7 256:19,21

**started (13)**
34:16 57:12 70:18
71:17 83:2 84:23 94:6,
17 97:5 100:7 127:24
132:14 191:15

**starts (1)**
102:6

**state (12)**
27:4 71:24 85:13
159:11,14 160:8
161:14 191:5,7,19,23
192:5

**stated (11)**
15:11 22:6,8 25:18
26:23 28:17 35:8
42:23 96:2 146:9
177:21

**statement (14)**

45:1 47:19 72:9
74:3 75:2 127:17
128:9,19 132:15
148:6 189:6 205:13
212:12 273:16

**statements (9)**
4:18 18:12 68:13
147:4 148:15,18
161:8 190:21 194:6

**states (4)**
40:22 64:21 69:19
221:22

**station (1)**
226:16

**status (2)**
2:22 125:16

**stay (3)**
4:1 158:13 162:14

**stayed (3)**
71:18 78:6 79:9

**step (2)**
28:10 216:18

**sticking (2)**
201:2 238:1

**still (23)**
35:11,16 36:2
37:23 40:2 43:7 72:22
73:24 80:22 92:4
130:6 133:6 135:1
156:8 165:8 194:24
248:18 251:21,22,24
252:21 257:11 258:9

**stock (2)**
263:14,16

**stood (3)**
25:18 123:6 128:9

**stop (6)**
74:12 144:18 150:5
225:2 265:7 270:6

**stopped (7)**

23:12 83:1,7 93:18
127:23 132:13 205:22

**storage (1)**
232:5

**story (7)**
19:10 21:5 83:11
272:19,19 274:11,12

**straight (2)**
18:12 117:5

**strict (2)**
10:12,14

**strike (1)**
153:1

**striking (1)**
19:7

**strip (2)**
59:12,19

**stripped (1)**
58:15

**strips (1)**
88:3

**struck (12)**
30:14 34:4,19,19
69:20 75:8 135:10
182:3 247:21,22
261:18 263:5

**structure (2)**
25:2 263:23

**struggle (1)**
77:5

**stuck (2)**
68:7 87:8

**student (3)**
214:22 219:5,23

**studied (1)**
96:8

**study (1)**
96:7

**stuff (3)**
9:12 238:3,9

**subject (16)**
65:19 101:1 133:13
144:13 156:10 160:13
161:2,21,23 164:2
166:17 167:18 179:18
188:5 207:7 276:9

**sublicense (2)**
244:7 258:18

**submit (2)**
7:17 9:1

**submitted (1)**
34:3

**subsequent (2)**
187:5 210:5

**substantial (1)**
49:7

**successful (1)**
84:22

**successive (1)**
227:8

**suddenly (1)**
155:10

**sued (1)**
20:4

**suggest (1)**
53:14

**suggesting (2)**
111:22 153:23

**suggestion (1)**
63:19

**suggestions (1)**
153:13

**sum (1)**
252:5

**summarize (1)**
103:22

**supersedes (2)**
56:9 255:18

**superset (1)**
226:23

**supply (1)**
86:8

**support (8)**
19:10 62:21,22
63:2 68:18 207:16
216:4 243:18

**supported (1)**
19:3

**supports (1)**
38:7

**suppose (1)**
119:21

**supposed (4)**
148:8 153:13
170:17 213:2

**supposedly (2)**
148:18 261:24

**sure (21)**
2:17 5:16 10:12
11:15 20:1 51:3 68:4
85:13 99:15,23 124:2
128:7,15 133:20
134:22 144:3 155:14
169:18 181:11 219:6
236:21

**Surely (1)**
91:9

**surprised (1)**
121:20

**suspenders (1)**
252:15

**sustain (4)**
146:24 153:4 163:2
275:10

**sweep (1)**
239:13

**switch (4)**
59:1,3,5 225:24

**switches (2)**
55:9 101:14

**sworn (3)**
95:15,17 213:20

**SynOptics (20)**
21:20,23 22:20,22
23:3,8,17 102:17
103:16 104:4,10
106:3 171:6 209:6,11
229:2,2 245:20
267:23 269:22

**SynOptics-Bay (10)**
22:16 23:15,18
25:7,8 228:14 245:24
246:1,13 254:16

**system (9)**
33:14 106:1 141:21,
22 172:15 185:14,15,
16,18

**Systems (4)**
49:3 141:18 222:21
271:9

**T**

**Tab (10)**
54:17 64:5 65:17,
24 69:15 70:5 71:8
75:7,13,18

**table (2)**
70:17 239:18

**Tabs (1)**
68:17

**tailor (1)**
243:16

**taking (3)**
19:12 51:12 228:19

**talk (31)**
6:7 7:21 53:24
56:22 57:5 58:12
60:19 61:16 64:1 73:6
77:24 79:23 81:2

88:21 97:19 101:4
108:21 125:2 127:3
134:20 187:7 193:10
216:19 228:24 235:21
237:19 245:11 254:20
262:14 270:24 276:10

**talked (7)**
81:7,20 83:23
90:16 228:13 235:2
249:13

**talking (19)**
6:12,13 29:13
44:17 52:7 55:10
65:22 67:9 82:19,21
85:23,24 127:20
158:10,14 186:20
191:5 234:18 262:6

**talks (2)**
31:12 66:22

**tape (1)**
232:13

**target (2)**
141:10 227:19

**Task (2)**
218:16 233:7

**tasked (2)**
33:22 249:23

**team (19)**
67:1 70:8,12 71:11
78:8 79:7,8,17 90:12,
13,22 91:1,3 141:3
217:20,20 232:5,13
233:11

**teams (2)**
217:21 218:7

**team's (2)**
241:9,10

**technical (2)**
207:15 214:5

**Technically (1)**

2:22

**technology (7)**
61:22,22 62:5 85:5
107:24 216:24 220:16

**tee (1)**
3:5

**telephone (2)**
126:18 251:9

**telling (9)**
20:16 52:7 91:3
92:12 152:23 171:11
185:17 272:18,19

**tells (2)**
61:11 273:2

**template (7)**
98:16 100:7 231:10
241:5 263:14,18 264:8

**temporary (36)**
28:11,15,18 29:10
42:18 55:21,22,24
88:23 113:16 114:5
115:15 116:1,2,4,6
117:8 121:7 122:12
123:23 124:8,16,21
145:2 151:11 178:18
179:12 231:13 233:15
234:19 235:5,11
248:12 257:4,5 260:10

**ten (2)**
266:3,10

**tends (1)**
252:16

**Tennessee (4)**
216:13 217:7 219:4
236:4

**tens (1)**
68:9

**tense (1)**
254:22

**ten-year-old (1)**

45:21

**term (19)**

29:10 32:10,10
33:4 35:16 43:18 45:5,
19 56:18 63:8 64:12
116:6 121:1 150:21
151:7,9 258:5 266:22
267:3

**terminate (8)**

28:16,19 42:14
47:2 56:12 64:19
116:2 256:3

**terminated (18)**

20:11 36:7 40:6
42:18,19 47:7,7 49:19
123:24 255:21 257:12,
16 258:2,4,4 259:10,
13 266:19

**terminates (3)**

42:12 50:1 259:4

**termination (17)**

28:18 36:19 42:23
43:19,20 46:17 116:3
124:21 178:2 192:4
201:3,8 206:24 207:5
209:24 259:13 266:13

**terms (34)**

6:11 14:22 27:13
32:14 33:3 41:1 43:5
45:9,10,12,24 46:8
98:12 104:1,2 112:21
134:1 136:23 137:3
145:19 206:19 225:17
231:2,5 234:4 235:14
239:1 240:3,6 242:19
245:19 246:13,14
254:15

**testified (7)**

6:6 95:17 154:7
213:20 233:10 249:21

276:11

**testify (5)**

6:8 29:5 163:4
166:15 210:20

**testifying (3)**

5:21 6:2 49:14

**testimony (24)**

4:19 6:14 7:12 9:11
16:17 17:2 19:22
29:22 52:18 59:16
84:9 94:12 157:23
175:9,18 213:9,10
223:18 228:19 235:3
276:8,12,13,23

**Texas (1)**

62:3

**text (2)**

144:2 231:9

**textbooks (1)**

19:4

**Thanks (1)**

149:23

**their (70)**

4:8 14:20 18:7
19:10,10 30:11 40:11
52:20,24 53:1 57:23
58:15 61:2,8,22 62:15
64:18,23 65:7 67:3,4
69:22 75:10 76:3,13
79:22 83:24 85:16
90:14 91:19 92:6,8,13
93:21 97:20 105:17,
17,21,22 107:4 108:6
112:9,19 118:23
119:5 126:10 138:2
147:22 151:24 152:4,
13 159:11 161:14,15,
16 200:14 213:7,9,10
220:21 221:13 224:7,
15 231:4 241:11

243:20,23 244:10
253:7 256:11

**themselves (4)**

136:7 220:6 230:22
241:22

**then-existing (1)**

192:5

**Theological (1)**

96:16

**theory (1)**

53:1

**There (193)**

3:22 5:12 6:12 7:11
13:4,24 18:21 20:11
21:1,5 24:5 25:20
26:9 29:20 35:6,11,14,
20 36:18 38:6 39:1
40:4 43:1,2 45:10,24
47:16 53:20 55:8 57:1,
24 59:1 60:11,20
63:10,17,18,19,19
66:14 68:22 69:8,23
70:6,10 71:14,15,16
72:8 73:11,19,21 74:4,
13,21,24 75:20 83:20
84:14 85:1,9,10,13
86:7,8,8 87:14,16,22
88:1,20 92:20 98:4
102:5 104:1,1,11,13
105:8 106:10 107:19
112:13,17 113:5
116:23 117:1 118:15
122:4,7,13 124:15,19
128:24 129:5 132:22
134:16 135:23 136:16,
19 139:9 142:24
144:18,21,23 146:18,
23 147:18 148:5,17
150:5,7 151:1,9 152:8,
18,19,23 156:20

158:9 161:11 163:19
168:6 170:17 173:1
177:12 178:14 182:15
186:14,24 187:13
190:20 191:2 193:14
194:14 200:24 201:4,
16 205:22,24 206:2,4
213:4 216:2,16
217:13,14,21 218:1
220:10,16 223:9
225:6 228:23 231:17
233:10 236:20 237:11,
17,22 239:12,23
240:16 241:11,15,16,
17 242:12 243:6
244:6,16 245:1,3
250:15 251:20 252:18,
19 254:14 255:13
258:11 260:21,22
262:4,8 264:13,16
265:18,24 266:14
267:17 272:16,24
274:4 276:22

**thereby (1)**

27:14

**therefore (5)**

35:14 42:20 118:11
188:23 191:10

**therein (1)**

254:8

**thereto (1)**

251:4

**they (293)**

2:24 4:9,9,10 5:20
10:22 19:15,16,18,18,
21,24,24 20:4 23:7
24:23 26:16 28:2 29:5
30:8,13,14 33:4,9,9,
12,14 34:12,20,22,23
36:16,20 42:1,2 46:12,

21 47:3,5 48:20 49:21
51:22 52:11,12,12,12,
22 54:10,11,22 56:18
57:8,9,16,22,23,24
58:1,4 59:17 60:10
61:21,23 62:4,7,8,8,
12,14,14,15 63:2,6
66:16 67:1,1,2,16
68:21 69:1,1,21 70:2,
17 72:10,12,23 74:11,
15,20,21 75:9 76:1
78:15,22 79:20,20
80:6,7,7,9 81:20 84:1
85:11,12 87:19 89:1,3,
5,18 90:1,2,4,5,10,12,
13,16,19,19 91:4,17
92:6,7 93:17,18 101:1,
12,14 103:10 104:6,6
105:9,20 106:5
108:16,18 109:3,10
112:7,20 113:17
118:17 119:1 121:14,
14 122:9,22,24
123:14 125:7 129:1,3,
13,21 130:3,4,13
135:7,14,16,19 136:9,
14 138:1,10 139:6,19
145:18 146:10,11
152:9,14,15 154:4
158:3 160:3,4 172:9
173:5 178:5 185:11
186:3,3,4,7,8 190:20
191:23 195:6 199:12,
15 200:6 201:19
203:12,16 205:24
206:16 207:19 213:3,
9 216:12 219:11,17
220:2,5,11,12 223:10
228:7,8 229:4 230:12
237:23 238:2,4,7,8,8

240:2,13,14,18 241:1
243:9,12,12,14,15,17
244:4,5,8,9,12 245:21
246:1,2 247:23
248:11,14,16,17,23
249:2,5,6 251:21,22,
22,24 252:8,9,21,23
253:1,6,11 254:3
256:18,19 257:6,10,
17,17 258:10,14,16,
17,18 259:22 260:5,7,
9 261:5,11 268:12,13,
14,16,22,23 269:7,19
270:8,17 271:13,17
272:15,15,19 274:1,7

**thing (15)**

7:5 11:14 53:9 62:7,
17 63:9 130:1 210:8
226:22 231:17 246:17
248:9 254:11 257:9
271:1

**things (41)**

2:12,12 3:10,21
10:1 12:6 22:19 23:7
24:3 36:24 45:15 53:6
54:17 59:3 64:1 66:15
73:6 78:12 82:10,11
88:21 121:20 122:24,
24 146:23 156:8
157:24 159:6 160:12
190:5 213:10,11
223:2 232:18,20
238:24 240:7 245:9
252:16,17 267:5

**think (68)**

3:1 5:7 7:11,17,23
8:23 9:12,14,23 12:7
51:17 52:9,12,12
56:24 58:5 61:23
72:20 79:4 82:14

88:14 89:24 94:12
99:5,7,22 101:17
109:10 114:20 118:16
119:5,6,12 120:17
131:3 138:16 148:14
150:3,8 162:17
163:14 169:17 174:17
181:14 189:21 193:24
210:3 211:7,9 212:22,
24 230:22 234:22
236:22 244:1 253:5
257:1,24 258:21
260:1,4 261:13,20,20
262:4,16 269:17
275:16

**thinking (4)**

11:13 109:19 151:2
264:8

**thinks (2)**

175:12 213:13

**third (4)**

90:8 117:22 141:2
245:11

**third-party (5)**

86:1 272:8,10,17
273:4

**though (6)**

27:2 49:20 92:16
110:11 216:7 229:1

**thought (13)**

64:14 82:8 91:17
93:17,18 151:15
193:4 215:1 246:2
247:17 261:14 268:16,
22

**thousand (1)**

206:12

**thread (2)**

60:3,4

**three (72)**

14:20 32:20 33:5,6
36:7,14 38:14 42:15,
22 43:3,21 53:12
55:14 56:14,15 64:14,
19,22,24 65:4,5 68:6
77:21 82:7,10,11 87:8,
10,11,24 88:3,9,10,18
122:2,15,24 136:2
151:14,24 152:2
155:2 156:15 174:15
177:16 191:24 197:18
211:22 216:24,24
220:10,24 223:24
225:1 227:5 237:17,
17 238:24 240:7,16
246:9,10 247:12
248:14,16 256:5
258:1,11 259:6 261:1
263:7 264:10

**three-year (30)**

26:10 33:4 36:12,
18 43:18 45:4,9,19
46:16 48:3 55:23
56:17 59:11 60:10,13
63:8 86:22 87:13
147:22 152:9 178:2
195:5 201:3,8 206:24
207:5 247:11 248:12
249:10 270:15

**throughout (3)**

23:21 31:9,21

**thus (4)**

27:13 28:14 30:24
42:16

**tie (1)**

154:20

**tied (4)**

208:2,3 210:4
274:10

**tight (1)**

10:8

**timeframe (7)**
10:8 133:22 141:9
226:2 234:1 268:3,8

**timekeeping (1)**
10:15

**timeliness (1)**
122:20

**times (6)**
7:1 42:24 73:9
236:7 256:18 257:12

**time-to-market (1)**
220:12

**timing (1)**
254:22

**title (5)**
97:8 202:12 214:3,
5 270:14

**titled (1)**
111:10

**today (28)**
4:18 5:1,4 12:8
15:3 51:10 52:19 66:4
68:22 72:11 76:9
79:24 83:20 84:13
85:4 86:16 90:1
103:16 198:11 216:16
225:18 243:6 246:16
257:10,23 262:12
264:24 276:11

**together (3)**
9:16 10:4 186:10

**told (22)**
18:2 20:9 44:12
47:15 59:11 60:6,24
64:13 67:18 73:11
82:6,6 87:18 90:10,13
92:4 151:13 239:1
245:23 268:13 271:17
272:14

**Tollen (4)**
18:16,16,20 50:9

**tomorrow (5)**
11:21 12:17 276:6
277:4,7

**tomorrow's (1)**
276:14

**tonight (2)**
276:2,7

**took (5)**
41:20 58:14 59:18
190:6 247:18

**tools (5)**
107:1 145:24 185:8,
11,15

**top (4)**
70:15 226:23
227:10 240:1

**topic (3)**
154:17 236:8
267:17

**topics (4)**
83:16,19,20,21

**total (5)**
216:17 220:21
221:23 222:14 261:1

**totally (1)**
276:9

**toward (2)**
70:9 135:15

**towards (1)**
137:2

**trace (1)**
80:24

**traced (1)**
78:1

**track (3)**
107:24 108:2 234:7

**tracked (1)**
138:9

**tracking (1)**
193:17

**tracks (1)**
42:9

**trade (2)**
67:16 97:16

**training (1)**
97:24

**transaction (5)**
39:9 98:17 106:23
183:11 197:21

**transactions (8)**
25:12 39:5 46:20
134:3 186:15,24
206:11,13

**transcript (5)**
13:13,13,20,21 99:6

**transfer (16)**
64:11 65:14,20,22
82:5 109:9 112:11
113:12 120:24 124:9
150:20 151:3,7 179:2,
11 263:18

**transferred (5)**
23:9 102:18 209:6
271:18 272:1

**transferring (1)**
271:12

**Trapeze (10)**
69:21 70:2 202:24
203:4,7,8,15 204:1
205:17 206:1

**traveled (1)**
126:20

**treated (2)**
41:22 231:3

**treatises (1)**
19:4

**Tremblay (23)**
20:6,8,9 47:10,14,

20 73:10,22 74:5 75:2
189:24 190:1,7,13
191:4,15 194:18,21
195:9,13 196:12
198:6 199:5

**Tremblay's (1)**
75:23

**trial (7)**
3:5 23:22 25:10
42:10 122:4 160:11,23

**trial/hearing (1)**
31:22

**triangular (1)**
25:3

**tried (3)**
80:4 131:18 246:3

**tries (1)**
87:15

**trips (1)**
270:5

**trouble (1)**
211:16

**troubling (1)**
232:20

**true (10)**
25:20 61:8 118:20
120:12 148:10,16
232:10,16 273:18
275:5

**truth (13)**
114:19 118:5 119:4
129:20 139:7,19
180:5,11 190:23
201:18 204:7,11
273:17

**try (24)**
3:5 19:18 27:23
29:18 42:3 48:7,8
59:23,23 98:13
129:19 148:23 163:5

164:10 166:14 175:7
190:6 203:5 228:20
231:20 232:13 246:11
247:18 266:10

**trying (13)**
8:12,18 52:11
61:11 84:7 147:12
153:14 160:5 162:12
190:4 239:2 240:4
255:8

**Tuesday (1)**
82:20

**turn (23)**
65:24 70:5 101:15,
22 114:1 116:17
120:15 127:10 142:22
147:18,24 169:5
175:22 187:11 190:10
192:18 201:11 208:24
229:5 242:10 245:4
255:10 272:22

**turns (1)**
232:12

**tweed (1)**
60:4

**two (52)**
3:22 7:12 8:13 13:5
18:10 19:8 22:1,24
23:2,19 24:3 29:7
40:4 48:15 51:17
55:12 59:12 61:19
62:2 67:17 71:9 82:19,
21 83:6 84:14 96:24
97:1 100:1 115:19
127:20 130:7 141:14
158:9 159:10 160:19
167:6 173:1 203:9,13
205:5 216:16 219:24
221:11 223:1,20
226:9 231:24 232:8

241:11 243:6 255:13,
13

**two-day (2)**
132:23 238:17

**two-fold (1)**
248:11

**tying (1)**
35:10

**type (5)**
25:12 52:5 101:13
171:17 191:8

**types (4)**
37:11 221:11 226:9,
10

**typical (1)**
106:7

**typically (3)**
100:18 203:11
225:18

## U

**Ultimately (10)**
16:21 21:19 22:19
24:20 30:23 163:15
235:19 249:16 250:8
256:10

**under (86)**
14:4,5 20:13 21:21,
23 25:6,9,12 28:5,20
32:7 35:11,17 43:8
68:16,23 69:8,9,10
71:4 72:4,23 73:12,18
74:6,14,22 75:15,19,
22 76:2,14 77:17
78:15 80:12 85:6 89:6
90:6,11 91:7 93:9,11,
13 104:21 116:5,7
119:8 129:24 134:9
173:15 178:1 180:14

184:15,21 185:9
186:15 189:1 191:4,5
195:12 196:8 203:18,
24 205:12,16 206:8,9
215:4 230:15 233:8
245:19 246:1 248:2
251:2 254:13 256:19,
20 257:11,17,18
259:12 260:22 269:3,
4,8 274:4

**underlies (1)**
50:4

**underlying (2)**
73:4 80:15

**understand (16)**
26:4 74:16 123:5,9
127:4 129:14 137:18
147:13 153:11 162:20
164:7 190:5 195:20
208:9 266:1 269:15

**understanding (20)**
67:13 72:17 86:17,
18 126:12 130:6
138:10 143:14 146:9
159:12,24 161:15
171:13 188:3 192:20
193:12 195:23 199:6
242:1 262:11

**understands (2)**
58:4 105:12

**Understood (18)**
6:11 21:13 31:15
33:18 40:13 47:1
136:23 138:24 146:13
156:22,24 157:7
175:11 195:14 258:24
259:16 264:15,17

**undertaken (1)**
57:7

**undisputed (3)**

35:4 45:20 46:3

**unduly (1)**
246:2

**unfair (4)**
259:21 260:1
261:13,20

**unified (4)**
239:13,14 240:5,6

**unique (1)**
191:18

**United (1)**
221:22

**units (3)**
55:7 73:23 194:22

**University (7)**
96:6 217:3,6,7
219:3,3,16

**unless (3)**
13:14 44:12 269:19

**unlicensed (1)**
90:14

**unlike (1)**
18:1

**unlimited (4)**
36:13,14 252:4,6

**unquote (4)**
18:21 25:20 99:1
266:14

**unscheduled (1)**
255:5

**unsecured (3)**
2:21 14:18 15:14

**unsupported (1)**
19:6

**until (10)**
12:9 20:20 33:13
42:22 44:12 65:7
152:4 236:20 246:7
266:20

**up (40)**

3:6 8:16 9:22 11:10
16:12 17:1 20:17,20
25:18 41:10 47:21
50:22 54:17 62:18
63:1 81:14 83:24 91:3
123:6 128:9 132:17
134:13 153:2,23
187:4 189:12,13
206:17 215:8 225:3
236:19 239:13 248:15
253:3,11 254:9
266:11 271:2,19 276:3

**updated (2)**
62:24 89:15

**updates (4)**
62:22 69:4 89:9
231:2

**upfront (1)**
10:16

**upgrades (1)**
207:15

**upon (15)**
19:11 28:17 33:23
38:3,9 41:4 111:21
116:3 142:20 156:21
171:3 198:3 215:17
217:24 247:10

**urgency (1)**
223:9

**use (52)**
19:22 22:2 24:6
37:8,24 42:3 49:11
50:5 54:6 55:16,19
56:6 57:18 58:16
66:19 68:22 70:3
76:13 87:2 91:19
98:12,13 104:2 105:9,
13,16 112:21 129:20,
24 134:1 150:24
162:12 165:9 178:14

179:9 193:22 197:23
204:6 225:2,9 231:5
234:6 243:10,11,14
244:8,9 263:6,15,19
264:7,12

**used (18)**
46:4 53:3 62:15,19
63:15 105:7 128:18
130:23 131:3 174:20
179:4 190:20 193:15,
17 204:6 252:10
269:4 273:5

**useful (1)**
218:19

**user (1)**
221:20

**users (4)**
221:17,17 244:3,7

**uses (3)**
148:2 167:12 228:5

**using (26)**
55:1 57:14 60:16
61:7 69:21,24 74:5,20
75:1,9,12 79:12 89:20
91:11 92:18 93:7,18
112:19 122:10 151:5
162:23 199:13 228:7
268:24 269:7 271:24

**usual (2)**
226:3,5

**V**

**valid (1)**
274:8

**valuable (4)**
18:4 49:9 59:22
224:6

**value (6)**
41:20 49:8 142:15

161:4 164:3 267:1

**valve (1)**
87:23

**various (9)**
18:12 73:16 77:17
81:20 167:5 217:21
221:20 236:6,7

**Vegas (1)**
67:17

**vendor (1)**
86:1

**vendors (1)**
86:7

**verb (1)**
254:22

**verbally (3)**
147:7 168:13
177:20

**verify (1)**
203:14

**Verizon (1)**
221:18

**version (7)**
44:22 62:24 118:15
126:3 218:3,4,5

**versions (1)**
187:10

**versus (2)**
106:17 172:4

**via (3)**
24:15 126:20 251:9

**viable (1)**
219:8

**vice (1)**
97:11

**views (2)**
3:3 15:17

**violation (1)**
26:1

**virtually (1)**

23:13

**virtue (1)**
216:5

**visit (3)**
82:15 127:3 235:21

**voice (1)**
196:5

**Volume (1)**
102:6

**VP (3)**
96:22 97:10 186:13

**VxWorks (5)**
72:4 74:18 195:16
205:11 227:16

**W**

**wait (5)**
5:14 89:23 135:4
138:16 157:17

**waive (3)**
40:17 201:8 206:24

**waiver (1)**
41:8

**walk (1)**
149:22

**walls (2)**
159:1 160:18

**wanted (27)**
2:12 28:6,7 61:7
108:7,11,19 112:20
119:18 133:3 134:1
143:19 160:2 193:6
197:7 200:22 203:9,
12 240:2 246:15,18
247:7,7,9 252:21
261:15,15

**wanting (1)**
11:7

**wants (2)**

212:16 213:12

**warranty (2)**
270:11,12

**waste (4)**
123:8 223:13,14,24

**way (30)**
16:15,24 19:1 29:3,
14 35:21 46:1 54:3,21
66:17 67:1 72:8 86:4
90:21 92:9 112:23
129:2 162:12 182:7
194:9 196:22 200:21
205:24 206:21 209:3
213:17 254:23 256:11
270:19 273:24

**ways (2)**
18:4 126:17

**weave (1)**
86:13

**Wednesday (1)**
82:20

**week (8)**
19:20 25:16 35:2
60:3 98:23 121:18
232:18 251:8

**weekend (2)**
122:17,23

**week's (2)**
34:4 263:3

**well-agreed (1)**
154:18

**Wellfleet (2)**
22:24 267:23

**weren't (4)**
61:24 186:7 268:13,
15

**Westlaw (1)**
25:23

**whatever (3)**
62:19 162:15

263:22

**whatsoever (3)**
27:14 201:7 224:14

**whenever (1)**
54:7

**whistles (1)**
228:1

**whole (12)**
6:17 9:12 61:2
67:13 77:7 83:11
97:14 148:7,19
173:12 223:6 274:11

**wholesale (1)**
48:20

**wholly (3)**
116:8,10 223:15

**who's (1)**
221:15

**whose (2)**
272:7,10

**wide (1)**
155:12

**wife (2)**
100:17 214:13

**wife's (1)**
269:24

**willful (2)**
48:21 210:9

**willing (3)**
156:2 238:13
261:19

**Wilmington (1)**
85:14

**window (7)**
86:22 147:22 152:9
195:5 198:4 199:3
247:11

**Windows (3)**
72:3 104:24 205:11

**WinNT (2)**

74:17 195:16

**wireless (1)**
70:10

**wise (1)**
215:5

**wished (3)**
3:1 137:5 143:16

**withdraw (1)**
173:17

**withdrew (3)**
4:12 123:6 162:8

**within (13)**
86:22 90:24 97:12
112:18,19 118:19
133:4 141:5 142:14
143:17 172:17 203:2
242:17

**without (22)**
26:8 34:10,17 36:8
43:14 44:9,11,14
46:14,15 48:5,19
49:11,11 155:11
168:10 170:19 171:17
224:13 253:11 260:8,9

**witness (47)**
4:6,7,8,10,14 6:1,6,
7 18:18 19:9 20:4
34:23 83:14,15,19,22
95:8,14,17 130:5,9
139:16 153:10 157:21,
23 159:3,16,19 160:7,
20 162:13,22,24
163:3 166:15 169:14
170:8 171:23 178:17,
21 191:14 210:21
211:17 212:13 223:16
250:22 275:19

**witness' (1)**
146:16

**witnesses (12)**

3:22,22 4:20 5:20

6:12,14 9:11 10:22
84:15 160:21 171:10
213:2

**woefully (1)**
272:2

**woman (1)**
270:20

**Wood (1)**
17:15

**Wood's (1)**
232:1

**word (10)**
23:21 31:20 150:24
178:14 179:4,9
190:15 193:19 232:19
247:5

**wording (1)**
188:24

**words (8)**
3:3 6:5 53:2,3
93:21 146:16 157:9
194:18

**work (22)**
8:19 9:20 61:10
76:10 85:18 86:11
97:3,18 129:2 131:19
137:2,6 141:18,19
167:11 186:9 189:22
214:2,4 217:4 247:17
270:5

**worked (8)**
78:9 80:21 90:3
91:1,15 217:10
240:13 252:14

**working (8)**
38:23 70:20 80:8
151:21 203:2 206:14
227:20 237:3

**works (7)**

12:20 13:8 89:17
219:18 243:12,18
258:16

**world (1)**
85:2

**worldwide (1)**
244:12

**worthless (1)**
48:22

**worthwhile (1)**
88:14

**wove (1)**
87:5

**woven (2)**
59:22 88:9

**wrap (1)**
266:10

**write (8)**
60:16 71:20 82:17
86:5 89:21 120:23
155:2,6

**writes (9)**
69:18,18 70:14
75:18 93:12 165:6
167:7 188:15 195:13

**writing (6)**
41:3 46:11 64:9
219:4,7 237:8

**written (8)**
51:21 52:8 72:14
112:6 128:22 220:19
222:8 238:19

**wrong (7)**
50:8 58:17 91:23
165:3 255:16 272:18,
19

**wrote (10)**
26:21 29:12 44:5,
17 71:23 74:15 75:6
90:5 149:23 196:6

## Y

**year (13)**
54:10,11 59:18
62:23 63:6,6 69:1,2,6
89:12,13 252:5 253:5

**yearly (1)**
89:6

**years (79)**
18:11 19:13 32:21
33:5,6 36:7,15 38:14
42:15,22 43:3,21
46:15 51:16,22 52:6,
13,16 56:14,15 57:23,
24 62:14,16 64:14,19,
23 65:1,4,5 68:7
70:24 82:7,10,11 85:1
86:20 87:8,10,12,24
88:3,9,10 91:15 97:1,
1 136:2 151:14,24
152:2 155:2 156:15
177:16 191:24 197:1,
18 210:5 219:20
222:12,14 234:9
239:23 246:10,10
247:12 248:14,16
256:5 258:2,6,11
259:6 261:1,2 263:7
264:10 268:19,23

**yesterday (9)**
7:9 83:1 121:19
122:4,17 127:23
128:22 132:13 170:15

**yourself (9)**
51:24 52:2 96:4
168:12,14 245:13
256:12 259:15 263:12

## Z

**zero (13)**
55:20 56:20 67:24
68:11 81:10 122:13
251:15,16,20 252:20,
22 260:16,20

**zillions (1)**
88:5

**zone (2)**
214:24 215:3

## 0

**03 (3)**
194:15 195:12
196:9

## 1

**1 (157)**
8:9 10:21 16:20
17:1 23:3,6 24:18,20
27:12 28:16,19,23
29:8 42:19 43:12
51:14 52:3 53:2,17,19,
22 54:16 55:2,6 56:7,
16,18 57:11,12,21
58:5,14,20 60:8,12
62:9 63:17 64:9,13,18
65:1,8,12,18,23 67:5,
6,10,14,15,22 68:7,13,
16,20,23 69:8,11,14
70:23 71:1 72:4,13,17,
20 73:12,14,19 74:6,
10,13,14,21,22 75:19,
23 76:2,14 77:12,20,
22 78:6,15,17,17,20,
23 79:18,21 80:12,15,

20 81:1,4,7,8,22 82:5
84:10 86:17 87:14,17
88:1,2,20 89:2,6,8,10,
23 90:5,11 91:8 93:11,
14 102:6,23 116:3
121:2,8 122:6,13
123:24 124:6,10
144:9 145:22 150:21
151:8,10 173:10
179:13 184:16,22
191:24 194:7,13
203:24 205:14 206:9,
9 207:1 209:24 210:4,
7 214:19 217:8 218:3
223:11 231:14 242:19,
20 249:24 251:2
254:1 274:4 276:12

**1.17 (3)**
31:11 242:14,20

**1:00 (4)**
12:9,23 94:6,17

**1:43 (1)**
95:2

**10 (2)**
68:18 174:1

**10:00 (2)**
8:14,17

**100 (1)**
214:9

**12 (11)**
88:22 183:7 188:22
189:1 191:4 194:14
196:3,8,18 198:2
199:3

**12:42 (1)**
94:23

**12A (1)**
182:17

**12th (1)**
194:20

**13 (2)**

69:15 75:7

**14 (8)**

39:21 70:5 75:14
88:22 184:14,20
195:12 196:8

**14A (1)**

184:6

**15 (16)**

12:23 37:19 39:6
44:4 71:8,8 75:18
143:4 151:19 174:1,2,
3 181:24 182:7
228:11 253:19

**15A (2)**

179:18,24

**15-minute (2)**

12:12 13:1

**16 (3)**

38:4 81:24 149:10

**17 (6)**

51:16,22 52:6,13,
15 216:16

**17th (1)**

242:20

**18 (1)**

176:24

**1971 (1)**

96:11

**1983 (1)**

217:3

**1990's (2)**

22:14 267:24

**1991 (2)**

97:5 217:11

**1994 (8)**

21:20 22:22 102:17
228:13,23 229:1
230:13 246:7

**1995 (2)**

23:11 214:19

**1996 (1)**

22:24

**1997 (2)**

107:17 229:16

**1997-'98 (1)**

226:2

**1998 (4)**

25:1 26:13 109:6
167:10

**1999 (43)**

26:20 28:14,16,19
29:4,9 30:3 35:23
37:15,20 43:12 81:17,
24 110:4 112:13
113:2 116:3 125:3,10
127:5,14 135:1 138:5
143:4 149:10 165:4,
12 167:4 169:4 177:1
186:20 188:18,23
231:14 232:13 235:7,
23 237:21 241:19
242:2,5 246:7 253:19

**1A (88)**

18:23 19:14,17
20:10,13,24 24:13
26:11 30:9 32:10
33:23 34:24 36:5 37:2
40:6 42:9,17 43:14
44:8,10,13,14,22 45:2,
18,24 46:2,14,23 47:2,
7 49:15 73:22 176:11,
13,22 177:8,15,16,23
178:2,6,12 194:21
195:23 198:24 199:1
201:1,9 205:19 235:7,
19 250:8,14,18 251:1
254:14,20,21 255:3,6,
10 256:11 257:13,15,
16,17,22 258:2,3

259:2,11,12,13,18,24
260:20,23 263:5
266:19,22 267:3
268:9 269:3,8,13,24
270:21

**1's (1)**

63:8

---

## 2

**2 (28)**

21:24 22:2 23:4,6
24:3,11,15 27:12
28:23 44:6 47:6 54:18
102:6 103:2 104:17,
19,20 167:4 168:10,
11 218:4 236:2 243:4
251:9,24 252:2
255:10,14

**2.1 (2)**

31:12 243:5

**2.1a (7)**

31:12 242:15 243:7,
11,17 244:4,12

**2.1c (4)**

243:21 244:5,6
245:2

**2.1ci (1)**

245:4

**2:00 (4)**

12:11,24 94:18,22

**20 (9)**

21:21 39:21,22
43:3 103:12 177:17
188:17,24 234:9

**2000 (6)**

43:4 44:1,5 187:17
188:14 197:18

**2001 (1)**

197:18

**2002 (2)**

189:21 197:18

**2003 (29)**

47:2,8,8 48:2,16
53:3 63:7 69:1 71:1
72:13,21 73:11 74:11,
13 90:15 91:4,8 92:15
177:18 189:21 192:2,
4 194:20 198:6
262:10 266:19 268:3,
8 272:20

**2004 (10)**

45:16 78:6 92:10
191:22 192:2 199:8,
11 209:22 234:1
269:11

**2006 (20)**

45:16 46:10,18
47:4 69:14,15 70:24
73:1 76:16 79:11,14
80:22 89:19 90:16
93:5 202:6,14 205:19
206:7,10

**2011 (1)**

272:21

**2015 (1)**

96:20

**20A (2)**

188:6,6

**20-some (1)**

258:6

**21 (7)**

23:5 26:20 101:23
110:4 170:18 187:17
188:14

**22 (3)**

23:5 101:23 103:13

**23 (12)**

43:12 125:3,10
169:4 186:20 209:18

229:5,11 235:7
237:21 242:2,5

**24 (6)**
121:21 123:1
229:19,21 230:1,4

**249 (1)**
81:15

**25 (5)**
35:23 37:20 165:4,
12 174:4

**250-person (1)**
222:12

**26 (4)**
15:9 22:7 26:23
111:1

**27 (3)**
27:16 102:17
111:17

**28 (1)**
115:6

**29 (2)**
120:3,7

---

**3**

---

**3 (6)**
22:1,3 37:14 218:5
230:15 243:5

**30 (4)**
169:16,19 170:4
275:24

**30.18 (4)**
182:11 183:7,22
184:1

**30.20 (3)**
184:4 185:2,5

**30.51 (5)**
199:9,10,19,22
200:2

**30.60 (1)**

201:12

**30b6 (1)**
83:15

**31 (4)**
184:22 202:6,14
250:19

**325 (1)**
173:2

**35 (1)**
132:8

**36 (1)**
139:24

**37 (1)**
139:24

**38 (4)**
143:11 253:9,13,15

**39 (3)**
120:16,18 149:19

---

**4**

---

**4 (3)**
121:18 230:15
236:22

**40 (3)**
176:8 178:10,24

**41 (3)**
176:9,16,23

**42 (2)**
164:16,22

**43 (1)**
166:6

**43.1 (1)**
5:19

**45 (1)**
174:15

**450 (2)**
173:2 181:2

**46 (1)**
180:15

**47 (1)**
180:15

**48 (2)**
65:16,21

---

**5**

---

**5 (11)**
30:3 33:24 64:5
127:5 133:10 136:22
137:1 231:1 235:22
236:22 237:11

**5,000 (1)**
233:23

**5:00 (1)**
12:24

**5:45 (2)**
12:11 276:3

**5:46 (1)**
277:12

**50 (2)**
186:23 241:16

**500 (2)**
46:19 221:19

**500-person (1)**
222:13

**51 (4)**
187:12,15,20,24

**57 (5)**
174:18 190:10,12,
18 192:11

**58 (7)**
190:11,14,15,18
191:1 192:11 193:3

**59 (1)**
204:16

---

**6**

---

**6 (10)**

30:3 34:1 65:17
127:5 133:10 136:22
137:1 235:22 236:23
237:11

**6.2 (1)**
31:13

**6.2b (1)**
31:13

**6.5 (1)**
31:13

**60 (3)**
40:5 199:20 202:2

**615 (1)**
3:21

**64 (1)**
40:5

**66 (2)**
49:4 222:17

---

**7**

---

**7 (4)**
65:24 81:17 127:14
232:21

**7.2 (1)**
31:13

**700 (1)**
222:2

**71 (5)**
25:5 205:6,12,16
206:8

**75 (1)**
232:24

**78A (1)**
71:9

**7A (1)**
54:22

**7B (1)**
54:22

**7C (2)**

54:22,23

**8**

**8 (2)**
14:21 31:13
**81 (2)**
121:10 123:18
**86 (1)**
217:8

**9**

**9 (3)**
68:17 73:14 257:1
**9.10 (1)**
257:1
**9.4 (2)**
31:13 40:22
**9.8 (1)**
41:6
**9:00 (4)**
12:18,18,22 277:7
**9:30 (1)**
12:19
**90's (1)**
267:21
**98 (2)**
107:17 248:23