IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) OFFICIAL |
| | ) TRANSCRIPT |
| NORTEL NETWORKS, INC., | ) |
| et al., | ) Case No. 09-10138 |
| | )          (KG) |
| Debtors. | ) |
| _____ | ) |
| SNMP RESEARCH INTERNATIONAL, | ) |
| INC. and SNMP RESEARCH, INC. | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | ) Adv. Proc. No. |
| | ) 11-53454(KG) |
| NORTEL NETWORKS, INC., | ) |
| et al., | ) |
| | ) |
| Defendants. | ) |

U. S. Bankruptcy Court
Courtroom No. 3
824 Market Street
Wilmington, Delaware
Friday, May 12, 2017
9:00 a.m.

BEFORE: THE HONORABLE KEVIN GROSS,
United States Bankruptcy Judge

HEARING ON
SCHEDULE 1 ISSUE AND MOTION TO AMEND

HEARING TRANSCRIPT - VOLUME II

_____

WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
(302) 655-0477
www.wilfet.com



WILCOX & FETZER LTD
Registered Professional Reporters
(302) 655-0477
www.wilfet.com

1          THE COURT:  Good morning,

2    everyone.  Thank you.  You may be seated.  Good

3    to see you, and I hope you all had a decent

4    evening.  And we are ready to proceed.

5          Mr. Busch.

6          MR. BUSCH:  Yes, Your Honor.  Good

7    morning.  We just have a couple of things to do

8    before we close our case.

9          THE COURT:  All right.

10          MR. BUSCH:  First, we would like

11    to move into evidence Plaintiffs' Exhibits 55,

12    56 and 71.

13          THE COURT:  Let's see if there is

14    any objection.

15          MR. BUSCH:  Thank you, Your Honor.

16          MR. HERRINGTON:  I am sorry.

17          THE COURT:  55, 56 --

18          MR. BUSCH:  And 71.

19          THE COURT:  Yes.

20          MR. HERRINGTON:  We will just take

21    a quick look.

22          THE COURT:  The time is not

23    counting against you, Mr. Busch.

24          MR. BUSCH:  Thank you, Your Honor.



```
1    I was worried about that.  It was just crossing

2    my mind.

3                   MR. HERRINGTON:  55, 56 --

4                   MR. BUSCH:  71.  And then while

5    they are doing that, Your Honor, the only other

6    thing we have to do --

7                   THE COURT:  Yes.

8                   MR. BUSCH:  -- is we have some

9    deposition testimony of Pierre Tremblay.  What

10   we would suggest, Your Honor, is rather than

11   spend the time reading it, we can submit our

12   designations and Nortel's counterdesignations.

13   This is a bench trial.  Your Honor can review

14   it and see what Your Honor thinks is

15   appropriate or not.  But that way we can

16   conserve the time of actually having to read it

17   on the open record.

18                   THE COURT:  Mr. Herrington, what

19   do you think of the suggestion?

20                   MR. HERRINGTON:  So it is to just

21   hand them up and not read them out loud?

22                   THE COURT:  Right.

23                   MR. BUSCH:  Yes.

24                   THE COURT:  I am willing to do
```



```
 1    that.
 2                   MR. HERRINGTON:  Okay.
 3                   THE COURT:  I would be willing.
 4    How about objections to questions?
 5                   MR. HERRINGTON:  Yes, I don't
 6    know --
 7                   MR. BUSCH:  Well, the way we
 8    figured is we have objections that are
 9    identified.  Your Honor, it is a bench trial.
10    Your Honor can review it and decide what to
11    allow, what to not allow.  It just seems to me
12    that that's a more economical way of doing
13    things, given the time constraints.
14                   MR. HERRINGTON:  Well, Your Honor,
15    obviously the only objections that are in there
16    are form objections.
17                   THE COURT:  Right.
18                   MR. HERRINGTON:  So things like
19    relevance or lack of foundation, you know,
20    hearsay and so forth are not made.
21                   THE COURT:  That's right.
22                   MR. BUSCH:  What I was thinking
23    is, Your Honor, if there is an issue, we can
24    certainly address it once we finish the bench
```



1  trial.  We are submitting proposed facts and

2  conclusions of law.  It can be addressed within

3  those papers.  I would think that would be an

4  economical way to do it.

5              MR. HERRINGTON:  I will defer to

6  Your Honor.

7              THE COURT:  I will accept the

8  designations.

9              MR. BUSCH:  Thank you.

10              THE COURT:  And if you do have

11  objections to the designations, you can

12  certainly discuss those in your findings of

13  fact and conclusions of law.

14              MR. HERRINGTON:  Thank you, Your

15  Honor.

16              MR. BUSCH:  Thank you, Your Honor,

17  very much.  I appreciate that.

18              THE COURT:  Okay.

19              MR. HERRINGTON:  So with Exhibit

20  55 and 56, may I ask what is the purpose and

21  basis for offering that?

22              MR. BUSCH:  Okay.  So 55 and 56,

23  Your Honor, is an internal audit that was done

24  at Nortel in the 2002-2003 time period to



1    identify third-party software in certain

2    products.  And it predates Mr. Tremblay's

3    representation to SNMP Research that there were

4    no -- it predates Mr. Tremblay's representation

5    to SNMP Research that there were no BayStack

6    products that were currently distributing SNMP

7    Research software.  So I think it is clearly

8    relevant given that has been an issue at the

9    trial.  We would ask for it to be accepted.

10               MR. HERRINGTON:  Well, Your Honor,

11   it is entitled "Updated:  Open source code,"

12   not "third-party source code."  It is something

13   that is in progress.  It is not a business

14   record.  It is not some completed document.

15   They didn't ask Mr. Tremblay about this.  They

16   could have at his deposition.  I am sure he

17   would have said, "I have no idea what this

18   document is."

19               And it is absolutely established

20   that the BayStack products had SNMP Research

21   software in them.  And Mr. Tremblay did not

22   make a representation that they didn't.  He

23   said he hadn't looked very hard.

24               So whether this comes in or not,



1    it is going to be totally irrelevant to the

2    issues in this case.

3              MR. BUSCH:  Well, I disagree with

4    Mr. Herrington's factual representations and

5    his finding that it is irrelevant, Your Honor.

6    I think that Mr. Tremblay, in fact, did not

7    just say he did not look very hard.  He said

8    that we have located no BayStack products under

9    Schedule 1A that are --

10             THE COURT:  Well, how does it

11   become part of our record today?

12             MR. BUSCH:  It becomes part of our

13   record because it is authentic.  It was

14   produced by Nortel in this litigation.  It, in

15   fact, is a document that was produced by them,

16   and it was an audit that was done internally at

17   Nortel prior to that representation.

18             So the argument of opposing

19   counsel has been what you just heard:  That

20   Mr. Tremblay had not, quote unquote, looked

21   very hard when he made that representation.  On

22   the other hand, there is this audit.  Your

23   Honor can review it and give it whatever weight

24   or credit Your Honor believes it is entitled to



1    or not.  But I think it certainly can be in the

2    record and Your Honor can review it and decide

3    what to do with it.

4                    MR. HERRINGTON:  Your Honor,

5    again, we object for all the reasons that I

6    stated.

7                    THE COURT:  Yes.  I sustain the

8    objection.  I don't think it is an appropriate

9    document for the Court to be reviewing.

10                   MR. BUSCH:  All right.  And the

11   other document is Plaintiffs' Exhibit No. 71.

12                   MR. HERRINGTON:  So on that, Your

13   Honor, this is a public filing by Nortel.  We

14   don't object, but they only submitted some

15   excerpts that they like, and the entire

16   document should come in.

17                   MR. BUSCH:  We are okay with that.

18                   THE COURT:  All right.  So you

19   will submit the entire document.

20                   MR. BUSCH:  Yes, sir.

21                   THE COURT:  Very well.  And 55 was

22   the internal audit or --

23                   MR. HERRINGTON:  55 and 56.

24                   MR. BUSCH:  55 was an email, and



 1    then 56 was the actual audit.

 2                   THE COURT:  Okay.  All right.  So

 3    I will sustain the objection to both.

 4                   MR. BUSCH:  And I have Plaintiffs'

 5    Exhibit No. 71, the full ---

 6                   THE COURT:  Okay.

 7                   MR. BUSCH:  May I hand it up?

 8                   THE COURT:  Yes, that would be

 9    fine.

10                   MR. BUSCH:  Thank you, Your Honor.

11                   THE COURT:  Thank you, Mr. Busch.

12    Thank you, sir.

13                   (Plaintiffs' Exhibit No. 71 was

14    received in evidence.)

15                   (Discussion off the record.)

16                   MR. BUSCH:  And we will submit the

17    deposition designations later with the actual

18    pages and lines and transcript pages that we

19    discussed on Mr. Tremblay.

20                   THE COURT:  That will be fine,

21    Mr. Busch.

22                   MR. BUSCH:  Thank you, Your Honor.

23    And with that, I think we rest the Schedule 1A

24    part of our case.



1                    THE COURT:  All right.  Well,

2      Mr. Herrington, it is your turn.

3                    MR. HERRINGTON:  Yes, my turn,

4      Your Honor, our turn.  We call Dr. Case back to

5      the stand.

6                    THE COURT:  All right.  Dr. Case.

7                    You were sworn yesterday,

8      Dr. Case, so you don't need to be resworn, or

9      reaffirmed.  I am sorry.

10                   JEFFREY D. CASE, having been

11     previously sworn, was examined and testified

12     further as follows:

13                      DIRECT EXAMINATION

14     BY MR. HERRINGTON:

15        Q.   Dr. Case, good morning.

16        A.   Good morning.

17        Q.   You testified yesterday with respect to

18     whether in the 2000 timeframe the BayStack

19     products had SNMP Research software in them.

20     And you testified that you knew that they did

21     not.  And, in fact, you testified you were told

22     that they did not have SNMP Research software

23     in them.  Who told you that?

24                    MR. BUSCH:  Objection, Your Honor.



1    Mischaracterizes the record.

2    BY MR. HERRINGTON:

3        Q.  I will read the question.  "In the 2003

4    timeframe, after the expiration of Schedule 1A,

5    did you know whether Nortel was shipping

6    BayStack products with SNMP Research software

7    in them?

8                "Answer:  I not only didn't know

9    that they were; I was told. . .they weren't."

10               My question to you, Dr. Case, is

11   who told you they weren't.

12               THE COURT:  Wait a minute.

13               MR. BUSCH:  Your Honor, just to

14   make the record straight, I am looking at the

15   realtime.  The reason for my objection was when

16   he first asked the question, he said in the

17   2000 timeframe you were told it did not contain

18   your software, and then he rephrased it when I

19   objected to clarify and correct his statement

20   that it was the 2003 timeframe.

21               MR. HERRINGTON:  I think that's

22   right, Your Honor, and I appreciate that

23   correction.

24               THE COURT:  Very well.  All right.



1    BY MR. HERRINGTON:

2        Q.   In the 2003 timeframe -- this is when

3    Schedule 1 was expiring; right?  June 2003.

4    And you said with respect to whether BayStack

5    products had SNMP Research software in them,

6    you testified, "I was told they weren't.  I was

7    told they did not have SNMP Research software

8    in them."  Who told you that?

9        A.   I was referring to the representation by

10   Mr. Tremblay with respect to Schedule 1A.  And

11   perhaps I misspoke.  And we had been talking

12   about BayStack products under Schedule 1A, and

13   what I perhaps should have said was that we had

14   the representation that no products were being

15   shipped under Schedule 1A.  And I generalized

16   that answer -- I took that general answer to be

17   a specific answer that no BayStack products

18   were shipping as of August 2003, based upon the

19   representation by Nortel's liaison,

20   Mr. Tremblay.

21              MR. HERRINGTON:  Okay.  Your

22   Honor, I just want to take a moment, now that

23   he has referred to an email, to get that email.

24              THE COURT:  All right.



1    BY MR. HERRINGTON:

2        Q.  So, Dr. Case, what you are talking about

3    is an email from Pierre Tremblay, who was just

4    coming onto the relationship, and said,

5    "Schedule 1A covers all products of units and

6    projects originating from what was Bay

7    Networks.  I still haven't found anything that

8    fits this description but to be honest, I have

9    not yet looked very hard."  That's what you are

10   talking about?

11       A.  Yes.

12       Q.  Okay.

13       A.  But you have to remember that --

14               MR. HERRINGTON:  Your Honor --

15               THE WITNESS:  -- Mr. Tremblay

16   had -- you characterized that he was new to the

17   relationship.  Mrs. Case and I had met with

18   Mr. Tremblay and other members of the team

19   associated with Mr. Hyslop when we had traveled

20   to Ottawa in 2001 or the 2002 timeframe.  So he

21   wasn't totally new to the relationship.

22               And we know now that he had looked

23   very hard because he was involved in the audit

24   that we just discussed.



1              MR. HERRINGTON:   And, Your Honor,

2     the audit that is not in the record because

3     they never asked Mr. Tremblay about it.   And I

4     am sure if they had, he would have said, "I

5     have no idea what this is."   This was a year

6     and a half earlier.   He was looking at open

7     source software.   So I move to strike the

8     testimony for referring to an exhibit that has

9     been excluded by Your Honor.

10             THE WITNESS:   The exhibit

11     specifically talked about third-party software

12     as well as open source software.

13             THE COURT:   I have to strike the

14     testimony.

15     BY MR. HERRINGTON:

16        Q.   So, Dr. Case, you are representing to

17     the Court that in April of 2003 you believed

18     that the BayStack products did not have SNMP

19     Research software in them?

20        A.   No, that's not what I said.   You said

21     April.   I said August.

22        Q.   Well, let's take April 2003, shortly

23     before Schedule 1 would expire.

24        A.   What is the question?



1      Q.   The question is:   Are you representing

2   to the Court that you believed that the

3   BayStack products did not have SNMP Research

4   software in them?

5               MR. BUSCH:   Objection, Your Honor.

6   Timeframe.   The question is now vague.   I don't

7   know if he is talking about August or April of

8   2003.   And we have gone back and forth now,

9   so --

10              THE COURT:   I think he clearly

11   said April.

12              MR. BUSCH:   No.   He just said in

13   2003.   I am looking at the realtime.

14   BY MR. HERRINGTON:

15      Q.   All right.   Well, I said April of 2003.

16   Are you representing to the Court that you

17   believed that BayStack products did not have

18   SNMP Research software in them?

19      A.   In April of 2003 I did not know of any

20   BayStack product that had SNMP Research

21   software in it.

22      Q.   And you believed that there were no

23   BayStack products that had SNMP Research

24   software in them at that time?



1      A.   I believed that there were products that

2   had SNMP software in it but not SNMP Research

3   software in it.

4      Q.   Correct.   So there were no BayStack

5   products -- I want to get a clean answer on

6   this, Dr. Case.   In April 2003 you believed

7   there were no BayStack products that had SNMP

8   Research software in them?

9      A.   I don't think so.

10      Q.   Again, so the answer is correct; you

11   believed in April 2003 that there were no

12   BayStack products that had SNMP Research

13   software in them?

14      A.   Correct.   I don't think I believed that.

15      Q.   You don't think you believed what?

16      A.   Correct.   I do not think I believed that

17   there were any products that contained SNMP

18   Research software in the BayStack family, that

19   contained SNMP Research software in April of

20   2003.

21            MR. HERRINGTON:   So let's explore

22   that.   We are going to first go into the

23   background.   Let's mark D-77A.   Your Honor,

24   this is an admitted exhibit.



**WILCOX & FETZER LTD**
Registered Professional Reporters
(302) 655-0477
www.wilfet.com

1    BY MR. HERRINGTON:

2        Q.   Dr. Case, Exhibit D-77A is an email

3    exchange between yourself and James Reeves.  Do

4    you see that?

5        A.   I see that.

6        Q.   Now, James Reeves had worked at Bay

7    Networks; correct?

8        A.   Yes.

9        Q.   He, in fact, was one of the people

10   responsible for the original decision to bring

11   in your software and use it in the Bay Networks

12   products; isn't that correct?

13       A.   I don't know.

14       Q.   You don't remember whether James Reeves

15   was responsible for part of the decision-making

16   for bringing in your software in the Bay

17   Networks products?

18       A.   I am not absolutely certain, no.  In

19   1994, no, I don't know.

20       Q.   Well, let me get your deposition

21   testimony and see if this refreshes your

22   recollection.

23            You were asked, "You refer to

24   James Reeves and his team.  Do you remember who



1    was involved in the decision at SynOptics or

2    Bay to use SNMP Research -- SNMP Research

3    products in these BayStack products?"

4              And you testified, "Well, it was a

5    team effort.  I remember when you were deposing

6    Mr. Southwood you were talking about particular

7    addresses on Great America Parkway.  And I

8    thought, yeah, I've slept in that building.  I

9    pulled an all-nighter in that building.  So I

10   remember meeting with Peter Cross, the signator

11   of this document.  I met with James Reeves.

12   Members of his team would include John Mead.

13   And under James Reeves was John Mead and under

14   John Mead is Nana unpronounceable."  That is

15   Nana La-Anyane; correct?

16       A.  I am not sure what you are reading from.

17       Q.  I am reading from your deposition.

18       A.  Okay.

19       Q.  So let me ask you.  Let me rephrase the

20   question.  James Reeves was involved in your

21   early work with Bay Networks --

22       A.  Yes, that's correct --

23       Q.  -- for incorporating the SNMP Research

24   software into their products?



1      A.   Yes, he was involved at Bay Networks.

2   Your prior question, was he involved in the

3   earliest decisions at SynOptics, and that's

4   what I can't answer with certainty.

5      Q.   Okay.   But you worked with him when he

6   was at Bay Networks --

7      A.   Absolutely.

8      Q.   -- on the incorporation of your software

9   into the BayStack products?

10      A.   At Bay Networks, yes.   But your prior

11   question was one about SynOptics.

12      Q.   I actually don't think I mentioned

13   SynOptics.   But fine.

14             So you worked with him.   In fact,

15   you pulled all-nighters in the Bay Networks

16   offices working with that team?

17      A.   I did.

18      Q.   And Mr. Reeves had responsibility for

19   the BayStack products at Bay?

20      A.   He did.

21      Q.   And he continued --

22      A.   He had -- yes.

23      Q.   And he continued to have responsibility

24   for the BayStack products at Nortel?



1      A.   Yes.

2      Q.   And through the course of your working

3  together over the years, you and he became

4  friends?

5      A.   Yes.   I wouldn't say we were close

6  friends, but you in my deposition characterized

7  us as close friends.   We were business

8  acquaintances.   We were friendly business

9  acquaintances, yes.

10     Q.   Well, here is what you testified to,

11  Dr. Case.   I asked, "And James Reeves was a

12  friend of yours?

13            "Answer:   I would say yes.   He

14  certainly -- yeah, I would go with friend,

15  yeah, sure."

16            Do you remember that?

17     A.   That's pretty consistent with the answer

18  I just gave you.

19            MR. BUSCH:   Objection.   Your

20  Honor, this is the second time I have heard

21  Mr. Herrington attempt to or purport to try to

22  impeach Dr. Case with testimony that is not

23  impeaching, and I am not sure -- I don't think

24  it is appropriate.



```
1                    THE COURT:  Dr. Case said he
2    wasn't friends.  Business acquaintances.
3                    MR. BUSCH:  He said friends,
4    friendly --
5                    THE COURT:  Friendly business
6    acquaintances.
7                    MR. BUSCH:  Yes, and that's
8    consistent --
9                    THE COURT:  Well, friends is
10   different from a friendly acquaintance.
11                   MR. BUSCH:  Okay.  I just don't
12   think it is impeachment, Your Honor, and I
13   would appreciate --
14                   THE COURT:  I will overrule that
15   objection.
16   BY MR. HERRINGTON:
17     Q.  So let's go back to D-77A, your email
18   exchange with James Reeves.  The subject is
19   follow-up on Vegas conversation.  So you had
20   seen him in Las Vegas; correct?
21     A.  Yes.
22     Q.  And you say, "First, please let me say
23   that it certainly was good to see you again
24   last week -- congratulations on your
```



1    promotion."

2              Do you see that?

3        A.  Yes.

4        Q.  And in his response he says, PS - Good

5    to see you again, too!  Let me know when the

6    Big Move happens."  Do you see that?

7        A.  Yes.

8        Q.  So he discussed your imminent move, I

9    take it?

10       A.  It says, yes.

11       Q.  And now let's look at what you say about

12   Schedule 1.  You refer to Schedule 1 and the

13   need to get it signed.  And you refer to

14   Schedule 1 as "the document that grandfathers

15   the Bay licenses over to the. . .Nortel master

16   agreement."  Do you see that?

17       A.  Yes.

18       Q.  And you also say, "I was correct when I

19   told you that the cost is $0."  Do you see

20   that?

21       A.  Yes.  I was referring to the part of the

22   license agreement where it says -- of the

23   schedule where it says the license fee is zero.

24       Q.  Dr. Case, you will have an opportunity



1    to answer and embellish in response to your

2    counsel's questions.  I was asking you what you

3    said in this email, not for some embellishment

4    on it.  So please, if I am asking you what is

5    in an email, please give the answer yes or no.

6              So again, you referred to

7    Schedule 1 as the document that grandfathers

8    the Bay license over to the new Nortel master

9    agreement.  So let's look back at the Bay

10   Networks license.

11             Now, the Bay Networks license

12   includes an agreement that was entered into in

13   1994 between SNMP Research, Inc. and a company

14   called SynOptics; correct?

15       A.   Yes.

16       Q.   Now, Bay Networks had two locations:

17   Santa Clara, California, and Massachusetts;

18   correct?

19       A.   Eventually, yes, not -- are you asking

20   about whether the Bay license or whether Bay,

21   the corporation?

22       Q.   When Wellfleet and SynOptics merged, it

23   became Bay Networks; correct?

24       A.   Yes, that's my understanding and my



1    recollection.

2       Q.   And ultimately, the Bay license included

3    both the California location of Bay Networks

4    and the Massachusetts location of Bay Networks?

5       A.   Yes, after Amendment 1 was executed.

6       Q.   And you personally were involved in the

7    Bay Networks license; correct?

8       A.   Yes.

9       Q.   And it covered any products that Bay

10   Networks developed in either of its locations?

11      A.   That's not correct.

12      Q.   It covered any products using the

13   designated SNMP Research software at those two

14   locations?

15      A.   As long as it was used consistently with

16   those designations, yes.

17      Q.   Correct.  And the two types of SNMP

18   Research software were EMANATE and something

19   called -- we will stop at EMANATE.  It included

20   EMANATE; correct?

21      A.   That was part of the product

22   description, yes.

23      Q.   EMANATE on certain platforms; correct?

24      A.   Yes.



1      Q.   And the other SNMP Research product was

2    asynchronous request libraries, also called

3    ARL; correct?

4      A.   Yes, on certain platforms.

5      Q.   On certain platforms.  Now, Bay Networks

6    paid a license fee for the right to use the

7    development source code; correct?

8      A.   SynOptics paid part of it and Bay

9    Networks paid part of it.

10     Q.   So ultimately there was a license fee

11    paid for the right to use the EMANATE source

12    code?

13     A.   Yes.

14     Q.   And with respect to the ARL product,

15    there was a license fee paid for the right to

16    use that source code?

17     A.   That's correct.

18     Q.   Now, as to royalties, the Bay Networks

19    license provided for a royalty buy-out option;

20    correct?

21               THE WITNESS:  Your Honor, how do I

22    answer a yes/no question that doesn't have a

23    yes/no answer?

24               THE COURT:  I think you answer no.



1                    THE WITNESS:  No.

2    BY MR. HERRINGTON:

3        Q.  So was there not a royalty buy-out

4    option under the Bay Networks license?

5        A.  Yes, there was a royalty buy-out option.

6        Q.  Okay.  That was my question.  And the

7    royalty buy-out would cover distribution in

8    perpetuity of an unlimited number of binary

9    copies of the licensed modules; correct?

10       A.  Could you point to the language that you

11   are speaking of?

12       Q.  I am just asking you, you understand the

13   Bay Networks license; correct?

14       A.  I am asking to have it in front of me --

15       Q.  That's fine.

16       A.  -- before I answer the question.

17       Q.  Sure.

18       A.  I think you are probably looking for

19   Exhibit 22.

20                    MR. HERRINGTON:  This is Exhibit

21   D-4.

22                    MR. BUSCH:  Thank you.

23   BY MR. HERRINGTON:

24       Q.  And if you look at page 2, Dr. Case.  Do



1    you see where it says, "Paid-Up Royalty Option.

2    If Licensee pays to SNMP a Paid-Up" -- sorry.

3        A.   I am sorry.   What is on my screen is not

4    in my handout.

5                    MR. HERRINGTON:   May I approach?

6                    THE COURT:   Yes.

7                    MR. HERRINGTON:   Here you go.

8    BY MR. HERRINGTON:

9        Q.   Okay.   Dr. Case what I just gave you is

10   Exhibit D-4.   And if you look at page 2 under

11   "Paid-Up Royalty Option," and it states, "If

12   Licensee pays to SNMP a Paid-Up Royalty of"

13   86,668,000, "then Licensee may distribute in

14   perpetuity an unlimited number of binary copies

15   of the Licensed Modules and Derivative Works

16   according to the provisions governing

17   distribution as found elsewhere in the

18   Agreement including section 3, Binary

19   Redistribution Rights."

20                   THE COURT:   I think you said

21   86 million, Mr. Herrington.

22                   MR. HERRINGTON:   Yes.   86,668.

23   Thank you, Your Honor.

24                   THE WITNESS:   Had they paid



1    86 million, I would have allowed them to do it

2    in perpetuity.

3    BY MR. HERRINGTON:

4        Q.   With that correction, is that a fair

5    description of what a paid-up royalty is?

6        A.   Yes.  This is the paid-up royalty for

7    the ARL product.

8        Q.   And there was a paid-up royalty for the

9    EMANATE product as well?

10       A.   Well, it is not here.

11       Q.   Correct.  I am asking you, Dr. Case, you

12   are familiar with this license agreement.  And

13   I am asking you what a paid-up royalty is.  Is

14   it not something that gives the right to

15   distribute in perpetuity an unlimited number of

16   binary copies of the licensed modules and

17   derivative works?

18       A.   Yes.  It gave that right to -- this gave

19   that right to Bay Networks.  The other one gave

20   the right to SynOptics.

21       Q.   Okay.  So the other one, you are saying

22   with respect to EMANATE, under the SynOptics

23   license and in the Bay Networks license

24   provided this same right; correct?



1      A.   Except the other one was the -- the

2   EMANATE did not have the in-perpetuity

3   language.

4      Q.   But that's what a royalty buy-out is.

5   It is the right to distribute copies of that

6   software in perpetuity.

7      A.   This in perpetuity is about the ARL.

8   There is different language with respect to the

9   EMANATE software.

10     Q.   Dr. Case, I am asking you what is the

11  royalty buy-out as to EMANATE under the Bay

12  Networks license.  Is it not in perpetuity?

13     A.   I don't believe that language is found.

14     Q.   I am not asking you whether the language

15  is found, Dr. Case.  I am asking you what a

16  royalty buy-out is, what "paid-up royalties"

17  means.  It means the right in perpetuity to

18  make copies without paying additional

19  royalties.

20     A.    It would mean that SynOptics had the

21  right in perpetuity, but that right was not

22  transferable to anyone else.

23     Q.   I am asking -- exactly.  I am asking you

24  under the SynOptics license, which became the

1    Bay Networks license.  So the answer you just

2    gave is applicable to the Bay Networks license;

3    correct?

4        A.  Bay Networks would have the right to

5    redistribute certain products containing part

6    of EMANATE in perpetuity under a

7    nontransferable license; that is correct.

8        Q.  And what was paid for that right under

9    the Bay Networks license is $100,000; correct?

10       A.  For the EMANATE component, the royalty

11   buy-out for that limited set was $100,000, yes.

12       Q.  Now, Dr. Case, let's focus on the groups

13   and products at Bay that came within the scope

14   of the Bay Networks license.  Let's start with

15   James Reeves.  James Reeves was the senior

16   thought leader for the agent side; correct?

17       A.  I am not sure what a senior thought

18   leader was.  He was a senior engineering

19   manager.

20       Q.  Well, those were your words in your

21   deposition.

22       A.  Okay, fair enough.

23       Q.  And agent side is the use of the EMANATE

24   software; correct?



1    A.    The agent uses EMANATE; that's correct.

2    Q.    And again, you worked closely with him

3    over the years?

4    A.    I have already testified that, yes.

5    Q.    And, in fact, James Reeves also visited

6    your offices at what you call the farm?

7    A.    Yes, he did on at least one occasion.

8    Q.    Now, James Reeves' group was responsible

9    for the engineering of the BayStack products;

10   correct?

11   A.    Yes, among others.

12   Q.    Well, and others in his group included

13   John Mead and Nana La-Anyane; correct?

14   A.    I am certain about John Mead.  I am not

15   certain about the one whose name I could not

16   pronounce.

17   Q.    Okay.  But you identified him when I

18   asked about James Reeves' team at your

19   deposition.

20   A.    Yes, I think that's correct, but I said

21   I am not certain.

22   Q.    With respect to John Mead, you testified

23   that you met with him on several of your trips

24   to the Santa Clara campus, the Great America



1   Parkway campus; correct?

2       A.  Yes, that's correct.

3       Q.  And he is an engineer with James Reeves'

4   team?

5       A.  He had various positions of

6   responsibility over the years, but yes, I would

7   say that for part of that time he was an

8   engineer, yes.

9       Q.  And he also transferred from Bay to

10  Nortel?

11      A.  I think that's correct.

12      Q.  And, in fact, when James Reeves

13  ultimately left Nortel at the end of 2004, John

14  Mead became head of what had been James Reeves'

15  group; correct?

16      A.  I am less certain about that.

17      Q.  Well, in your deposition you testified,

18  "Question:  And John Mead became head of that

19  group and" -- Question:  Right?

20              And answer:  "He was with Trapeze

21  by then," meaning James Reeves had moved to

22  Trapeze.

23              "Question:  Right.  And John Mead

24  was head of that group?



1              "Answer:  That's correct."

2      A.  Okay.  I think that's right, but I am

3   less certain about that.

4      Q.  Now, with respect to Mr. La-Anyane, when

5   you were describing James Reeves' team, you

6   testified under James Reeves was John Mead.

7   Under John Mead is Nana unpronounceable;

8   correct?

9      A.  I think that's right.  I am not certain,

10  but I still think that's correct.

11     Q.  And Nana unpronounceable is Nana

12  La-Anyane?

13     A.  I don't know how you know that.  I don't

14  know that.

15     Q.  Well, we have got some documents that we

16  can refer to.

17              Then another member of the team

18  was John Seligson; correct?

19     A.  Yes, I am more certain about that.

20     Q.  He was at Bay Networks, and then he also

21  transferred to Nortel?

22     A.  Yes, I believe that's correct.

23     Q.  When Nortel acquired Bay Networks?

24     A.  Yes, I believe that's correct.



1      Q.  Okay.  Let's go back, Dr. Case, to that

2   email exchange with James Reeves.  That's

3   Exhibit D-77.  So again, Dr. Case, in this

4   email you were talking about Schedule 1;

5   correct?

6      A.  Yes.

7      Q.  You referred to Schedule 1 in this

8   email?

9      A.  Yes, among other things.

10      Q.  And you did not say anything about any

11   need for James Reeves and his BayStack group to

12   execute a new schedule in order to be licensed

13   beyond three years; correct?

14      A.  That's correct.

15      Q.  Dr. Case, let me show you Exhibit D-242.

16   It has been admitted into evidence.  Dr. Case,

17   Exhibit 242 is an email between you and James

18   Reeves in May of 2002; correct?  Do you see

19   that?

20      A.  I am sorry.  What was the question

21   again?

22      Q.  The question is:  Is this an email

23   exchange between you and James Reeves in May of

24   2002?



1      A.  Yes.

2      Q.  And this reflects you and James Reeves

3  trying to arrange for a meeting; correct?

4      A.  He was trying to broker a meeting with

5  Atul, A-T-U-L.

6      Q.  So obviously, you were in touch with

7  James Reeves as of May of 2002; correct?

8      A.  Yes.

9      Q.  Now, let's go back to this idea of the

10  BayStack products needing a new schedule in

11  order to have the right to use the EMANATE

12  software beyond June of 2003.

13          So when Schedule 1 was signed,

14  there were two legacy Bay products that were

15  using software covered by the Bay Networks

16  license and also covered by Schedule 1;

17  correct?

18      A.  There were two sets of products.

19      Q.  Two sets of products.  The BayStack

20  products were operating under the license to

21  EMANATE?

22      A.  Yes.

23      Q.  And there was a product called Optivity

24  that was operating under the license to ARL?



1      A.   Actually, I think Optivity was a set of

2   products.

3      Q.   And that set of products was operating

4   under the license to ARL?

5      A.   That's correct.  I have lost track of

6   the question that this is all the framework --

7   was this a Bay question?

8      Q.   This is a question about the state of

9   affairs when Schedule 1 was signed.

10      A.   Actually, the state of affairs at the

11   time Schedule 1 was signed, they were not

12   operating under a license.  They were operating

13   without a license.

14      Q.   I should say after Schedule 1 was

15   signed.

16      A.   After Schedule 1 was signed they were

17   not operating under the Bay license.  They were

18   operating under Schedule 1.

19      Q.   That actually was my question, Dr. Case,

20   so thank you.  So Optivity was operating under

21   Schedule 1 with respect to ARL software;

22   correct?

23      A.   Parts of Optivity were under Schedule 1

24   and parts of Optivity were under other



1    schedules.

2        Q.  And your position is that Optivity would

3    need a new schedule in order to have the right

4    to use the ARL software covered by Schedule 1

5    after Schedule 1's three-year term?

6        A.  All products would need to have their

7    own schedule after Schedule 1 expired, so yes.

8        Q.  And you say -- and the same thing with

9    BayStack.  You say that BayStack would also

10   have needed a new schedule in order to have the

11   right to use the EMANATE software covered by

12   Schedule 1 after Schedule 1's three-year term?

13       A.  Yes, my same previous answer applies.

14       Q.  So let's look back at the state of

15   affairs when you sent your email to James

16   Reeves, Exhibit D-77.  That's that email about

17   Schedule 1.  And again, in that email, when you

18   talk about Schedule 1, you didn't say anything

19   about any need to execute a new schedule in

20   order to be covered after three years; correct?

21       A.  I repeat my previous answer.  Yes.

22       Q.  And, in fact, you never told him that he

23   would need a new schedule in order to have the

24   right to use your software in the BayStack



1    products after three years?

2        A.   I don't know.

3        Q.   You can't say that you ever did?

4        A.   No.   I believe I testified to that

5    during my deposition.

6        Q.   Now, let's talk about what happened,

7    according to your argument, as of June 2003 at

8    the end of Schedule 1's three-year term.

9    According to the arguments that Inc. and

10   International have made in this case, these

11   BayStack products that your friend James Reeves

12   was responsible for became infringing in June

13   of 2003; correct?

14       A.   That's what it appears now, yes.

15       Q.   And they were infringing throughout the

16   rest of James Reeves' tenure at Nortel, through

17   the rest of 2003 and all of 2004; correct?

18       A.   That's what it appears now, yes.

19       Q.   But you never said anything to James

20   Reeves about this; correct?

21       A.   I didn't know it to tell him.

22       Q.   Because you claim that you believed his

23   products weren't using SNMP Research software

24   anymore?



1     A.  Say that again, please.

2     Q.  Well, let's put it this way.  As of

3   April 2003, shortly before the end of

4   Schedule 1's three-year term, if you had

5   believed that James Reeves' group was still

6   using your software in their products, you

7   would have said something about the fact that

8   they are about to become unlicensed; is that

9   correct?

10     A.  If I had believed that, yes, I probably

11   would have been very vocal about that.

12     Q.  Because your friend's products are about

13   to become infringing?

14     A.  If I had believed that they were --

15   first I would have to believe they were using

16   it, and then I would have to conclude they were

17   infringing.  And yes, I very likely would have

18   said something.

19     Q.  Okay.  Now, again, you claim that the

20   reason you didn't say something is you did not

21   know that the BayStack products were using SNMP

22   Research software as of April 2003?

23     A.  I did not know of any BayStack

24   products -- I testified that I did not know of



1  any BayStack products that were using our

2  software under Schedule 1A as of April 2003.

3      Q.  And, in fact, in your deposition you

4  testified that in the 2003 timeframe James

5  Reeves left the company.  The BayStack brand

6  faded into disuse, that you weren't going to

7  trade shows anymore, and that your information

8  about what was happening at Great America

9  Parkway, the offices of Bay Networks, all went

10  dark; correct?

11      A.  I am not sure that that's exactly what

12  my testimony was.  I can't recall with perfect

13  clarity what I said.  I would have to look at

14  the transcript.

15      Q.  Well, I will read it to you.  You were

16  testifying under oath.  You remember that?

17  Correct?

18      A.  I remember testifying under oath, yes.

19      Q.  And you stated, "In that same timeframe

20  several things happened in the 2003 timeframe.

21  Jim Vogt left the company.  James Reeves left

22  the company.  The BayStack brand faded into

23  disuse."  You had talked to John Southwood

24  about attending trade shows.  This is your



1   testimony.  September 11 of 2001 you talked

2   about us attending Networld and Interop "and we

3   were present the day that the Twin Towers Fell.

4   We were at Networld Interop in Atlanta.  And we

5   did one more after that, and then we stopped

6   going to Interop trade shows.  Our information

7   about what was happening at Great America

8   Parkway, it all went dark."

9            Do you remember testifying to

10  that?

11     A.  Yes, but that's different from how you

12  characterized my testimony.

13     Q.  Well, you testified James Reeves left

14  the company.

15     A.  The distinction is that I said in the

16  2003 timeframe, meaning approximately, and you

17  transformed that into exactly April of 2003,

18  and that's not the same testimony.  It is a

19  mischaracterization of what I testified.

20     Q.  In the 2003 timeframe you testified

21  James Reeves left the company?

22     A.  Yes, and we now know that that was in

23  2004.

24     Q.  You testified that you weren't going to



1    trade shows anymore?

2        A.   And by that I meant that we were not

3    exhibiting.

4        Q.   And you testified -- well, you said, "We

5    did one more after that.  Then we stopped going

6    to Interop trade shows."

7        A.   Correct.

8        Q.   And then you testified "our information

9    about what was happening at Great America

10   Parkway," Bay Networks offices, "it all went

11   dark."

12       A.   That was my testimony, and I stand by

13   that.

14       Q.   Well, let's talk about what actually

15   happened in the spring of 2003.  You actually

16   paid a visit to Bay Networks in April 2003 to

17   the offices of the Bay group at Nortel that was

18   responsible for the BayStack product; correct?

19       A.   That is correct.

20       Q.   So that wasn't true, that it all went

21   dark in Great America Parkway?

22       A.   In the 2003 timeframe it did all go

23   dark.  I did have one meeting in 2003, but in

24   the -- that's not the same as saying that it



1    went dark in the 2003 timeframe.  That was the

2    distinction that I made earlier, and I stand by

3    that.

4        Q.   In April 2003, just two months before

5    Schedule 1 hits its three-year term and if

6    there are any BayStack products using your

7    software, they became infringing, you actually

8    visited the BayStack offices in Great America

9    Parkway; correct?

10       A.   That's correct.

11       Q.   Let me show you the email that reflects

12   that.

13       A.   Okay.

14                MR. HERRINGTON:  Your Honor, I

15   will pass this up as well to make it easy to

16   follow.

17                THE COURT:  All right.  Thank you,

18   Mr. Herrington.

19   BY MR. HERRINGTON:

20       Q.   So, Dr. Case, Exhibit D-243 includes an

21   email exchange that you had with this gentleman

22   we have been talking about, Nana La-Anyane;

23   correct?

24       A.   In the bottom, the bottom two-thirds,



1    yes.

2        Q.   Yes.  And the subject line of this email

3    exchange is "Presentation to Nortel - BayStack

4    team"; correct?

5        A.   Correct.

6        Q.   This is April 16 of 2003.  You are

7    writing back to Mr. La-Anyane.  And what you

8    are writing back to is his email to you saying,

9    "Hi, Jeff, I was asked by John Mead and James

10   Reeves to contact you and set up a presentation

11   for a few people within our division."

12            Now, we talked about James Reeves

13   being responsible for the BayStack products;

14   correct?

15       A.   Yes, by that time, among other things.

16       Q.   And again, the subject line is

17   "Presentation to Nortel - BayStack team";

18   correct?  Do you see that?

19       A.   Yes.

20       Q.   And so Nana La-Anyane is saying, "I was

21   asked by John Mead," a member of James Reeves'

22   team, "and James Reeves to contact you and set

23   up a presentation for a few people within our

24   division."



1            Now, you write back, and your

2    response is the portion of the text that has

3    one caret.  Mr. La-Anyane's is the portion that

4    has two carets; is that correct?

5        A.  I think so, yes.

6        Q.  And you write back in response to his

7    invitation to make a presentation to the

8    BayStack team and you say, "I believe that we

9    are all set for Thursday afternoon for me to a)

10   meet with Atul and James, and b) make a

11   presentation to the team."

12           And then here is what you give to

13   Mr. La-Anyane as the proposed invitation for

14   this presentation to the BayStack team.  You

15   write, "Dr. Case from SNMP Research will be

16   here on_ fill in date, place, time_.  SNMP

17   Research continues to be our supplier of source

18   code for SNMP-based network management."

19           Do you see that?

20       A.  Yes.

21       Q.  Dr. Case, I am going to show you Exhibit

22   138.  Exhibit 138 is a PowerPoint presentation

23   titled "Nortel/SNMP Research Companies Customer

24   Visit April 24, 2003, redux May 9, 2003," and

1   then it has Jeff Case under the title.  Do you

2   see that?

3       A.  Yes.

4       Q.  This is the PowerPoint presentation that

5   you used for your presentation to the BayStack

6   team?

7       A.  I don't know with certainty, but it is a

8   fair guess.

9       Q.  Given that you made a presentation to

10  the BayStack team on April 24, 2003, and that's

11  the date of this presentation?

12      A.  Right.  I am confused by this redux May

13  9, 2003.  This looks like -- I don't know what

14  this is, but --

15      Q.  Well, the email traffic suggests you

16  made yet another presentation at Nortel in May

17  of 2003.

18      A.  At a different part of Nortel?

19      Q.  That's not clear.  But we are talking

20  about the April presentation at the invitation

21  of Nana La-Anyane.

22      A.  I think it is a fair guess, but it is

23  speculation.

24      Q.  Well, it is not speculation.  This is



1    the date of the presentation that you made to

2    the BayStack team.

3        A.   Okay.

4                MR. HERRINGTON:   Your Honor, we

5    move this into evidence.

6                THE COURT:   Any objection?

7                MR. BUSCH:   No objection.

8                THE COURT:   It is admitted.

9                (Defendants' Exhibit No. 138 was

10    received in evidence.)

11   BY MR. HERRINGTON:

12       Q.   Dr. Case, let's turn to page 3 of your

13    presentation.  The title is "SNMP Research and

14    Nortel Networks."  The first bullet point has

15    "As SNMP Research celebrates our 15 year

16    anniversary, we wish to thank you for your

17    important role in our success."

18                Did I read that right?

19       A.   Yes.

20       Q.   The next bullet point:  "Nortel has been

21    a customer for over a decade - since the days

22    of Wellfleet, SynOptics, and Northern Telecom."

23                Is that what you stated in this

24    presentation?



1      A.   Yes.   That's what the PowerPoint slide

2    says.

3      Q.   That's what your PowerPoint states.

4                 And next your PowerPoint states

5    Nortel was one of our top customers in 1999.

6    Do you see that?

7      A.   I see that.

8      Q.   Next you state, "Our companies have

9    always had an excellent relationship."  Do you

10   see that?

11     A.   Yes.   The previous point, you didn't

12   read it perfectly, but it is close enough.

13     Q.   Well, the previous point when you said

14   "Nortel was our top customer in 1999 ($)";

15   correct?

16     A.   Right.

17     Q.   Meaning in terms of revenue?

18     A.   They were one of our top customers in

19   terms of revenue in 1999.

20     Q.   Well, it didn't say "one of our top

21   customers," Dr. Case.

22     A.   Well, when you read it, that's what you

23   said.

24     Q.   Your presentation says, "Nortel was our



1    top customer in 1999."

2        A.  I am pointing out the discrepancy

3    between what you said and what the presentation

4    said, and both are correct.

5        Q.  Okay.  But again, what the presentation

6    says is what is stated here; correct?

7        A.  Yes.  This is what the presentation

8    said.

9               MR. HERRINGTON:  Your Honor, we

10   are now turning to Exhibit D-221.

11   BY MR. HERRINGTON:

12       Q.  Dr. Case, what we have introduced as

13   Exhibit D-221 is entitled "Minutes - A-team

14   Meeting, Monday, May 5, 2003."  Do you see

15   that?

16       A.  Yes.

17       Q.  That's in the subject line.  So that's

18   shortly after the April 24, 2003 date that you

19   made a presentation to the BayStack team at

20   Nortel; correct?

21       A.  Yes.  This is after I got home from my

22   travel.

23       Q.  And you reported on your travels to your

24   team back at your company.  Let's turn to the



1    second page, Dr. Case.

2         A.  Yes.

3         Q.  The second bullet point on the second

4    page.

5         A.  Yes.

6         Q.  The team meeting minutes state, "Jeff

7    also met with Amphus, Juniper Networks, and

8    Nortel in California.  Nortel had just

9    celebrated" -- let me back up.

10                Again, you met with Nortel in

11   April 2003; correct?

12        A.  Yes.

13        Q.  "Nortel had just celebrated the first

14   profitable quarter in some time.  The Alteon

15   Business Unit had made the" looks like it

16   should be "second profitable quarter in a row."

17                Do you see that?

18        A.  Yes.  I don't know whether "send" is

19   "second," but that's a good speculation on your

20   part.

21        Q.  And the next sentence says, "Nortel was

22   also celebrating the 50 millionth ethernet port

23   sold during Interop."

24                Do you see that?



1      A.   I see that.

2      Q.   So you were at that Interop trade show?

3      A.   Yes, I did -- I traveled -- my

4    recollection is that I went to California and

5    met with people and also visited -- I had four

6    or five visits in California, and I traveled

7    from San Jose to Las Vegas and then home.

8      Q.   And so again, Dr. Case, my question to

9    you was you were at the Interop trade show.

10     A.   Yes.  That was the reference to Las

11   Vegas.

12     Q.   And Nortel, you saw that Nortel was

13   celebrating the 50 millionth ethernet port sold

14   at that trade show?

15     A.   That's what it says, and that's my

16   recollection.

17     Q.   And then it goes on to say, "They are

18   all managed by SNMP."

19     A.   Yes.

20     Q.   Correct?

21     A.   SNMP, not by SNMP Research.

22     Q.   So you are saying that this celebration,

23   this proud moment that's reported in these

24   minutes, had nothing to do with these ethernet



1   switches that Nortel was celebrating using your

2   software?

3      A.   I didn't say that.   It was 50 million

4   ports total.   It was some of those were managed

5   using our software.   Some of those were managed

6   using other software.   That was the total.

7      Q.   Well, in fact, the celebration was

8   marked by BayStack products; correct?

9      A.   Among others.

10      Q.   And the BayStack products were, in fact,

11   using your software?

12      A.   Some of them were.

13      Q.   Some of the BayStack products were using

14   your software?

15      A.   Had been, because this was 50 million,

16   not during 2003.   This was 50 million total

17   over all of history.   So yes, some of them had.

18      Q.   But you are saying, and you are

19   celebrating this 50 millionth port sold by

20   Nortel, that the BayStack products that were

21   being celebrated were not using your software?

22      A.   It was not my celebration.   It was

23   Nortel's celebration.

24      Q.   Correct.   And you are saying the



1   BayStack products were not using your software?

2      A.   Some of them had, but they weren't

3   anymore.

4      Q.   But what the minutes said is they were

5   all managed by SNMP.

6      A.   They were all managed by SNMP but not

7   all managed by SNMP Research, SNMP --

8      Q.   So you are telling the Court when it

9   says that they are all managed by SNMP, that

10  someone is saying they are all managed by the

11  SNMP protocol but they are not using our

12  software?

13     A.   There is a difference between managing

14  with the SNMP protocol and managing with SNMP

15  Research software implementation of the SNMP

16  protocol.

17     Q.   I fully understand that, Dr. Case.  I am

18  asking you about what was said in your team

19  minutes when you talk about your visit to

20  Nortel.  You talk about their being profitable.

21  You talk about their celebrating their 50-

22  millionth ethernet port, and it says they are

23  all managed by SNMP.  And you think the person

24  would wrote this is saying they are all managed

1   by the industry protocol known as SNMP?

2       A.   If we were crowing here, it would say

3   they were all managed by EMANATE.  It does not

4   say that.

5       Q.   It says SNMP.

6       A.   Correct.

7       Q.   Correct.

8       A.   And you yourself have been very careful

9   to say that there is a distinction between

10  SNMP, the protocol, and SNMP Research, the

11  implementation.

12      Q.   I am asking you.  Are you seriously

13  saying that in this report on Nortel and their

14  celebration of the 50-millionth ethernet port,

15  they are all managed by SNMP, that doesn't

16  indicate that it was SNMP Research software?

17      A.   I am saying that I am absolutely

18  certain, without a doubt -- and to hear that

19  from an engineer is rare -- that not all

20  50 million of those ethernet ports were managed

21  by the SNMP Research implementation.  I am

22  absolutely certain of that.

23      Q.   That wasn't my question, Dr. Case.  You

24  came back and reported to your team about this



1    successful meeting with Nortel; correct?

2        A.   I didn't say anything about a successful

3    meeting with Nortel.

4        Q.   You came back --

5        A.   You are putting words into this.  In

6    fact, that meeting was not a very successful

7    meeting.

8        Q.   I will take away "successful," Dr. Case.

9    You came back and reported to your team about

10   your meeting with Nortel; correct?

11       A.   I came back and I reported to my team

12   about my travels, including my visit with

13   Nortel; that is correct.

14       Q.   And one of the things you told them

15   about was that Nortel was also celebrating the

16   50-millionth ethernet port sold during Interop;

17   correct?

18       A.   That is correct.

19       Q.   And you didn't tell them that it had

20   anything to do with your software?

21       A.   I don't -- what you see is what there

22   is.

23       Q.   I am asking you what you told them.

24       A.   I don't remember telling them this.  My



1    recollection comes from reading the same

2    document you are reading.

3        Q.   And then you are telling the Court what

4    you think it means is not that they were all

5    managed by SNMP Research software; that they

6    were all just managed by the protocol?

7        A.   I remember being in the Nortel booth

8    during that celebration period, and I will also

9    further tell you that I was with James Reeves

10   at the time.  But your question to me -- and I

11   have recollection of that celebration.  You are

12   asking me what is my recollection of this A

13   team meeting, and I am telling you I don't have

14   recollection of the A team meeting.  I do have

15   recollection of the celebration.

16       Q.   Okay.  Well, let's talk about that

17   celebration.

18                 MR. HERRINGTON:  Your Honor, we

19   will introduce Exhibit D-11.

20   BY MR. HERRINGTON:

21       Q.   So Dr. Case, Exhibit D-11 --

22                 THE COURT:  D-11 or 111?

23                 MR. HERRINGTON:  D-111.  And, Your

24   Honor, we move its admission.



1                    THE COURT:  Any objection?

2                    MR. BUSCH:  I am sorry.

3                    THE COURT:  Any objection to

4    D-111?

5                    MR. BUSCH:  Your Honor, much like

6    what Mr. Herrington objected to, this is a

7    hearsay document.  Is he offering it for the

8    truth of the matter asserted?

9                    MR. HERRINGTON:  I am offering it

10   because it refers to the celebration that

11   Dr. Case just testified that he remembers.

12                   MR. BUSCH:  Except that --

13                   MR. HERRINGTON:  We are going to

14   discuss the celebration.  Let's see if we can

15   lay a foundation.

16                   MR. BUSCH:  What is good for the

17   goose is good for the gander.  These are the

18   kind of objections that I got from

19   Mr. Herrington.

20                   THE COURT:  But they weren't

21   sustained.

22                   MR. BUSCH:  Some were and some

23   weren't, I think.

24                   THE COURT:  All right.  Let's see



1    what Mr. Herrington can do in establishing a

2    foundation.

3  BY MR. HERRINGTON:

4       Q.   Okay.   Dr. Case, Exhibit D-111 is a

5    press release by Nortel dated May 6 of 2003,

6    and it refers to on the second page the

7    BayStack products and the celebration of the

8    50-millionth ethernet port that you described.

9               So let's look.  It is three

10   paragraphs down on page 2.  It states, "With

11   its optimum customer value in price per port,

12   BayStack positions enterprises, branch offices

13   and small- to medium-size businesses to

14   maximize their data infrastructure, while

15   providing mature, customer-proven quality of

16   service for organizations with high bandwidth

17   requirements and the need to prioritize

18   mission-critical traffic."

19               Then it talks about a statement by

20   one of Nortel's customers for the BayStack

21   product.  It says -- it goes on to describe the

22   attributes of BayStack, and then in the last

23   sentence of that paragraph from the

24   representative of MGM it says, "We have relied



1    on the BayStack product line for many years and

2    continue to be pleased with its performance."

3                And then it goes on to talk about

4    that celebration that you remember.  It says,

5    "Last week at Networld+Interop Las Vegas 2003,

6    Campbell accepted a gold-plated BayStack

7    470-48T Switch and an award to commemorate the

8    50 millionth Ethernet port shipment of the

9    BayStack line."

10               Do you see that?

11   A.  I see that.

12   Q.  So that's that same celebration that you

13   remember at the Interop trade show?

14               MR. BUSCH:  Your Honor, I am going

15   to again -- I think I would like to object to

16   this exhibit on the grounds that it is hearsay.

17   There are comments -- there is hearsay within

18   hearsay.  There is statements within this.  And

19   for the same reasons that Mr. Herrington

20   objected to the documents that we were

21   attempting to introduce, I think this document

22   is inadmissible.

23               MR. HERRINGTON:  Your Honor, it is

24   a public statement about the celebration that



1    Dr. Case remembers.  And the point is he

2    remembers the celebration.  And he is saying,

3    "Well, I don't know if it really involved

4    BayStack."  Well, what it involved is a

5    gold-plated BayStack product.

6                    MR. BUSCH:  Well, he, first of

7    all, is misrepresenting Dr. Case's testimony,

8    number one.  But number two, whatever counsel

9    has to say about it or whatever, the fact that

10    Dr. Case remembers that he was at an event

11    doesn't give him carte blanche to introduce any

12    document he wants or anything that Nortel has

13    produced in the case concerning that event.

14                    THE COURT:  Well, I take it you

15    are using it to perhaps refresh Dr. Case's

16    recollection.

17                    MR. HERRINGTON:  His recollection,

18    exactly.

19    BY MR. HERRINGTON:

20        Q.  Dr. Case, you testified you remember the

21    celebration of the 50-millionth ethernet port;

22    correct?

23        A.  Yes, I do.  I do not remember any

24    gold-plated BayStack switch.



1    Q.  So you are saying you remember the

2    celebration but you don't remember the BayStack

3    gold-plated product that was commemorating that

4    celebration?

5    A.  No.

6              THE WITNESS:  And am I limited to

7    only -- there is other things in this document.

8    Am I limited to just the questions that he is

9    asking me?

10             THE COURT:  Well, we still have to

11   decide whether we are admitting the document or

12   not.

13             MR. HERRINGTON:  Right.

14             THE COURT:  And it is a hearsay

15   document.  That is my concern.

16             MR. HERRINGTON:  Your Honor, the

17   point -- that's fine.  I have gotten the

18   testimony.  Clearly he is saying he doesn't

19   remember the gold-plated BayStack product, even

20   though he remembers the celebration.

21   BY MR. HERRINGTON:

22   Q.  You are saying you don't remember the

23   gold-plated ethernet switch; correct?

24   A.  No, I don't remember a gold-plated



1    ethernet switch.

2        Q.  But you do remember -- you said you were

3    at Nortel's booth.  You were with James Reeves,

4    and you remember the celebration?

5        A.  I do.

6                THE COURT:  I will sustain the

7    objection to the document.

8                MR. HERRINGTON:  That's fine, Your

9    Honor.  Thank you.

10               THE WITNESS:  May I observe

11   something else about the document or --

12               MR. HERRINGTON:  Your Honor, they

13   will have an opportunity --

14               THE COURT:  That would be with

15   your attorney.

16               THE WITNESS:  All right.  Thank

17   you.

18               THE COURT:  Yes.

19   BY MR. HERRINGTON:

20       Q.  And again, this is that same celebration

21   that you actually went back and reported to

22   your team on; correct?

23       A.  Yes.

24               MR. HERRINGTON:  Your Honor, this



```
 1    might be a good time for a break.  We are
 2    moving to a different topic.
 3                   THE COURT:  All right.  Ten
 4    minutes, 15 minutes, five minutes?  How much
 5    time would you like?
 6                   MR. HERRINGTON:  I would say at
 7    least 10 or 15.
 8                   THE COURT:  We will take 15 then.
 9    Back at 10:25.
10                   MR. BUSCH:  Thank you, Your Honor.
11                   THE COURT:  Thank you, all.
12                      (Recess taken.)
13                   THE COURT:  Thank you, everyone.
14    You may be seated.  All right.
15                   Mr. Herrington.
16                   MR. HERRINGTON:  Thank you, Your
17    Honor.
18    BY MR. HERRINGTON:
19       Q.  Dr. Case, I would like to show you
20    Exhibits D-19 and D-32.  We will start with
21    Exhibits D-19 and D-32.  These are two of the
22    new schedules that were referred to yesterday
23    as being new schedules that provided for the
24    royalty buy-out under the Bay license.  Do you
```



1    see that?

2        A.   Yes.

3        Q.   There is Schedule 14A.  That's D-19.

4    And that specified entity is Northern Telecom

5    Limited, Micom Group, at Simi Valley,

6    California.  Do you see that?

7        A.   I see that.

8        Q.   And Exhibit D-32 is Schedule 37A.  That

9    also is Northern Telecom Limited, Enterprise

10   Micom Group, in Simi Valley, California.  Do

11   you see that?

12       A.   Yes.

13       Q.   And Micom is a different company that

14   Nortel had acquired; correct?

15       A.   Yes.

16       Q.   And this Simi Valley, California

17   location was not a Bay Networks location?

18       A.   It was not a former Bay location, but

19   these people did report to James Reeves.

20       Q.   And that made them qualify under the Bay

21   royalty buy-out?

22       A.   That was Mr. Hyslop's representation,

23   and we accepted that at face value, that these

24   projects had originated at Bay.



1      Q.  And, again, Simi Valley was not one of

2   the locations covered by the old Bay Networks

3   license; correct?

4      A.  That's correct.  But Schedule 1A was no

5   longer location-specific.

6      Q.  Okay.  But, Dr. Case, that wasn't my

7   question.  My question was there were two

8   legacy Bay Networks locations; correct:

9   Santa Clara, California, and Massachusetts?

10     A.  Under the Bay license agreement, that's

11  correct.  Under Schedule 1A, that would not be

12  a correct answer.

13     Q.  That was not my question, Dr. Case.  I

14  asked you about the Bay Networks license and

15  the legacy Bay Networks locations; correct?

16     A.  Time is an important dimension to your

17  question.

18            MR. HERRINGTON:  Your Honor, I

19  would ask the witness to answer my questions

20  and not make speeches about something else that

21  I haven't asked about.

22            THE COURT:  All right.  And if you

23  would answer the questions, Dr. Case, and of

24  course, through your attorney --



1              THE WITNESS:  I am trying to be

2     very careful to listen to his questions.  He is

3     asking some very nuanced questions, and I am

4     trying to -- what I say matters.  And I am

5     trying to get it right.

6              THE COURT:  All right.

7     BY MR. HERRINGTON:

8       Q.  And, Dr. Case, I just asked you a pretty

9     simple question.  What were the locations under

10    the Bay Networks license?

11      A.  Billerica and Santa Clara.

12      Q.  Okay.  Not Simi Valley, California?

13      A.  Correct.

14      Q.  Now look at Exhibit 17, D-17, and

15    Exhibit D-20.  D-17 is Schedule 12A.  That is

16    for the specified entity of Northern Telecom

17    Limited Enterprise Voice over IP.  And let me

18    stop there.  Enterprise voice over IP is

19    different from the data networking products

20    that were made by Bay Networks; correct?

21      A.  VoIP products, voice over IP products,

22    are different from ethernet switches.

23      Q.  And from the Optivity products?

24      A.  And different from the Optivity



1   products.

2       Q.   And those were the two Bay Networks

3   products, legacy Bay Networks products that had

4   been made under the Bay Networks license?

5       A.   Those are the ones that should have been

6   made under the Bay Networks license, yes.

7       Q.   And Bay Networks, to your knowledge, did

8   not make enterprise voice over IP products?

9       A.   I don't know.  I am confused because

10  Nortel represented to us that this was a Bay

11  product; that is, that it had come from the

12  original work at Bay Networks.  And so that was

13  why they got the discount on Schedules 12 and

14  20 and the two that we just looked at and I

15  have already closed.  So we --

16      Q.   Dr. Case --

17      A.   -- we listened to the representation of

18  Nortel, and they said that these were former

19  Bay products.

20      Q.   Dr. Case, I asked you, to your

21  knowledge, did Bay Networks make voice over IP

22  products.

23      A.   I have no knowledge of that.

24      Q.   And again, Richardson, Texas is not one



1  of the two legacy Bay Networks locations

2  covered under the Bay Networks license?

3      A.   Right.  But again, Schedule 1A was not

4  location-specific.

5      Q.   Again, Dr. Case, that's not my question.

6  I was asking you about the legacy Bay

7  locations; correct?  There were --

8      A.   Richardson, Texas is not a legacy Bay

9  location.

10     Q.   So, Dr. Case, is it your position that

11  Nortel for the BayStack products could have --

12  let me back up.

13          Let's talk about James Reeves.

14  You talked to James Reeves about Schedule 1;

15  correct?  You had that email exchange with him?

16     A.   In 2000, yes.

17     Q.   When Schedule 1 needed to be signed.

18  And you had talked about it at the convention

19  where you saw him before you sent that email;

20  correct?

21     A.   In 2000, yes.

22     Q.   So let's say in April of 2003 you had

23  told him that he needs to execute a new

24  schedule in order for the BayStack products to



**W&F**

**WILCOX & FETZER LTD**
Registered Professional Reporters
(302) 655-0477
www.wilfet.com

1    have the right to use SNMP Research software as

2    they were doing.  What do you think he would

3    have done in response?

4        A.  I would have to speculate.

5        Q.  Well, you know James Reeves; correct?

6        A.  I am sorry?

7        Q.  You had come to know James Reeves?

8        A.  Yes.

9        Q.  You were a friend of James Reeves?

10       A.  Yes, same answer as before.  Yes.

11       Q.  Same answer as you gave in your

12   deposition --

13       A.  Sort of kind of.  Yes, we were sort of

14   kind of friends, yes.

15       Q.  You had worked with him for years?

16       A.  Yes.

17       Q.  You had exchanged emails with him?

18       A.  Yes.

19       Q.  You had met with him many times?

20       A.  Yes.

21       Q.  So my question for you is based on your

22   knowledge of James Reeves, if you had said to

23   him in April 2003, "James, you know, Schedule 1

24   is about to expire.  You will need a new



1    schedule or else you will become infringing

2    after June of 2003," what do you think

3    Mr. Reeves would have said in response.

4                    MR. BUSCH:  Object, Your Honor;

5    calls for pure speculation.

6                    MR. HERRINGTON:  Your Honor, the

7    foundation is he knows James Reeves.  He has

8    worked with him.  He told him about Schedule 1.

9    He has a relationship with James Reeves.  I

10   think there is a foundation for him to give us

11   his view of what Mr. Reeves would have done in

12   response to telling him he is about to become

13   an infringer.

14                    MR. BUSCH:  The fact is there is

15   no predicate laid about him having a

16   conversation with him about this subject

17   matter.  And it is pure speculation for him to

18   get into the mind of someone else, Your Honor.

19                    THE COURT:  I will sustain --

20                    MR. HERRINGTON:  Your Honor, can I

21   suggest a predicate?

22                    THE COURT:  Yes.

23                    MR. HERRINGTON:  He did discuss

24   Schedule 1 with Mr. Reeves, so there is a



1    predicate, so Schedule 1 is on the table.  And

2    so what he is saying is that --

3                THE COURT:  You can argue the

4    point, but I don't know that the witness can

5    answer that question.

6    BY MR. HERRINGTON:

7      Q.  Well, let me ask you this:  From

8    anything you know about James Reeves, do you

9    think he would willingly and knowingly become

10   an infringer?

11               MR. BUSCH:  Same thing, Your

12   Honor.  I object; calls for speculation.

13               THE COURT:  I have to sustain the

14   objection.

15   BY MR. HERRINGTON:

16     Q.  But your argument is that the BayStack

17   group products did become infringing after June

18   of 2003; correct?

19     A.  We now believe that the BayStack

20   products became infringing after June of 2003,

21   yes.

22     Q.  You say you now believe that.  Did you

23   believe that in April 2003?  Let me withdraw

24   the question.



1               So let's assume -- you talked

2    earlier in your testimony in response to your

3    counsel's questions about what you would have

4    agreed to with respect to a new schedule for

5    the BayStack products, and I want to make sure

6    we are clear on that, because your deposition

7    testimony was, I think, different.

8               So let's assume that you had told

9    James Reeves in April of 2003 that the BayStack

10   products needed a new schedule to go beyond

11   June of 2003, and he said, "Okay, how much will

12   that cost?"  What would your response be?

13       A.   I would have to say I would have to know

14   what "it" was.  How many products are we

15   talking about?  They would have to be listed as

16   BayStack 1, 2, 3, BayStack, 4, 5, 6, BayStack

17   7, 8, 9.  We would have to list what those

18   products were.  We would have to know what they

19   were.  They would have to go onto a

20   product-specific schedule.

21               I would have had to price that,

22   find out what the price-book price was, apply

23   whatever discounts I was willing to offer, and

24   then I would have -- then we would have started

1    a negotiation.

2                    What I would not have done, what

3    my deposition testimony -- I will let you ask

4    the question.

5         Q.   You were about to say what you would not

6    have done.

7         A.   Do you want me to continue?  You have

8    been putting me in a box where I have to just

9    stay within these very confined questions and

10   not get to the truth.  Do you want me to finish

11   the answer or do you want to ask the next

12   question?

13        Q.   I would like you to finish the answer.

14        A.   What I would not have been willing -- I

15   would have been willing to sell them licenses,

16   and for that they would have needed to have

17   a -- these would have been new products that

18   had not come over from the old Bay Networks,

19   because these would have been products that

20   were developed long after the Bay-Nortel

21   acquisition.  So these would have been new

22   products that would not have qualified for the

23   free royalty buy-out.  So I would have offered

24   them a license with license fees, maintenance



1   fees and per-copy royalties.

2      Q.  Well, Dr. Case, you knew that the

3   BayStack ethernet switches were covered by

4   Schedule 1; correct?

5      A.  The BayStack ethernet switches were

6   covered by Schedule 1 up through June 20 of

7   2003; that is correct.

8      Q.  Okay.  So that's what we are talking

9   about.  You testified that the BayStack

10  ethernet switches were covered by Schedule 1.

11  So that's what I am talking about.

12             With respect to those BayStack

13  ethernet switches, what would have been the

14  cost of a new schedule?

15     A.  I would not have entered into a new

16  product-specific schedule that was vague, that

17  said all BayStack switches, past, present and

18  future.  It would have -- as I said, it would

19  have had to have a list, like we did on other

20  schedules, identifying certain -- like the

21  BayStack 450 license that we discussed that was

22  never entered into and they ended up using

23  someone else's SNMP.

24             The whole point of a



1    project-specific schedule was that we would

2    want to name those products so we would know

3    which products were licensed and which weren't.

4    So there would have to be a list of products.

5    So it would have to say that F-150 pick-up

6    truck, the F-250 pick-up truck, the Ford Taurus

7    and the Mercury whatever, Sable.  It would have

8    been specific.  It wouldn't have said all cars

9    from Ford Motor Company.  The old license was

10   all cars from Ford Motor Company.  The new

11   product-specific licenses would have had lists,

12   something that we could tell what was in and

13   what was out to meet that clarity goal that I

14   testified about yesterday.

15            MR. HERRINGTON:  Your Honor, I

16   move to strike, because I am going to go back

17   to my actual question, which Dr. Case did not

18   answer.

19            MR. BUSCH:  Your Honor, I object

20   to that motion to strike.  He asked Dr. Case

21   specifically to discuss what he meant.  He

22   opened the door to him, and now he doesn't like

23   the answer, but he gave him the opportunity to

24   give that answer, and it was directly



1    responsive to the question, what he was asked

2    to do.

3    BY MR. HERRINGTON:

4       Q.   Let me read back my question and my

5    answer.   It goes back to two questions and

6    answers.   I say, "Well, Dr. Case, you knew that

7    the BayStack ethernet switches were covered by

8    Schedule 1; correct?"

9              Your answer:  "The BayStack

10   ethernet switches were covered by Schedule 1 up

11   through June 20 of 2003; that is correct.

12             "Question:  Okay.  So that's what

13   we are talking about.  You testified that the

14   BayStack ethernet switches were covered by

15   Schedule 1.  So that's what I am talking about.

16             "With respect to those BayStack

17   ethernet switches, what would have been the

18   cost of a new schedule?"

19             MR. BUSCH:  And he answered the

20   question directly by talking about what the

21   cost would have been, what he would have

22   required and what he would have --

23             THE COURT:  But Mr. Herrington

24   wasn't talking about other products.  He was



1    talking about the BayStack ethernet 1.

2                    MR. HERRINGTON:  Actually, let me

3    back up.

4    BY MR. HERRINGTON:

5        Q.  Maybe that is your answer, Dr. Case.  So

6    in April of 2003, with respect to the BayStack

7    products that are covered under Schedule 1, you

8    would not have agreed to a new schedule as you

9    agreed with respect to the other four new

10   schedules that were entered into in which there

11   would be a royalty buy-out at no cost for these

12   BayStack ethernet switches?

13       A.  If the BayStack ethernet switch had

14   existed at Bay, yes, it would have qualified in

15   April of 2003 for the royalty buy-out.

16   However -- and I am now confused as to when I

17   am supposed to give these narrow, short --

18       Q.  That's --

19       A.  -- and when I am supposed to finish --

20       Q.  That actually answers my question.

21                   MR. BUSCH:  He is not done with

22   his answer, Your Honor.  And I would ask for

23   him to be allowed to, because he is about to

24   draw a distinction between two different



1    things:   Between the Bay products that were in

2    existence at the time of Bay and the Bay

3    products that weren't.   And I think he should

4    be allowed to answer that question and finish

5    his that answer.

6                  MR. HERRINGTON:   He answered my

7    question.   He is now going to say something

8    different.   But if Your Honor wants to hear

9    it --

10                 THE COURT:   I will allow him to --

11                 MR. HERRINGTON:   -- we will go

12   ahead and we will go back to the answer he just

13   gave to my question.

14                 THE COURT:   Go ahead.

15                 THE WITNESS:   Products -- in April

16   of 2003, products that had come from Bay and

17   had existed at Bay back in September of 1998

18   would have been able to go onto a schedule, a

19   product-specific schedule, specifically

20   enumerating those model numbers or, by using

21   wild-carding, families of model numbers.

22                 But products that were new that

23   had been developed at Nortel after the merger

24   would have also gone onto schedules, but they



1    would have had to pay -- they would have a

2    royalty, a non-zero royalty burden, that could

3    have been addressed through either per-copy

4    royalties or some other arrangement.  But I

5    probably would not have offered a royalty

6    buy-out for them, and I would not have given

7    them a free royalty buy-out.

8    BY MR. HERRINGTON:

9        Q.   Okay.  Dr. Case, let's look at

10   Schedule 1; all right?  That's D-7A.  And

11   Schedule 1 defines the specified product or

12   project as "all products of units and projects

13   originating from what was Bay Networks."  Do

14   you see that?

15       A.   Yes.

16       Q.   So that is my question to you, Dr. Case.

17   With respect to this definition of specified

18   product or project, any BayStack product or

19   project that fell within this definition, "all

20   products of units and projects originating from

21   what was Bay Networks, with respect to anything

22   that fell within that definition, Nortel would

23   have been entitled to a free royalty buy-out by

24   executing a new schedule?



1      A.   On a -- if it was a new product-specific

2    schedule.  But as I recall the question that I

3    was answering, this is not a product-specific

4    schedule.  So if you are asking me would I have

5    entered into a new schedule for all products of

6    units and projects originating from what was

7    Bay Networks, would I have put that on a new

8    schedule in April of 2003, the answer is I

9    would not have.

10     Q.   And, Dr. Case, I asked a different

11   question, and I am going to go back to that

12   question.

13     A.   Then let me make sure I understand your

14   question.

15     Q.   So we are talking about as of let's say

16   April of 2003 whatever BayStack products, if

17   any, fall within the definition of specified

18   product or project under Schedule 1.  Do you

19   understand that's what we are asking about?

20   That's what I am asking about; okay?

21              So any product or project that

22   falls within the definition of specified

23   product or project under Schedule 1A, as to

24   those, Nortel would have been entitled to

1   execute a new schedule and have them covered in

2   perpetuity at no royalty cost?

3       A.   I need to ask a clarifying question.

4       Q.   Please.

5       A.   Was it a unit or project originating

6   from what was Bay Networks on September of '98

7   or was it in 1999-2000, or was it as of April

8   2003?  Which of those three questions are you

9   asking me?

10      Q.   Whatever is meant by Schedule 1A.  So

11  whatever that means.  Schedule 1A is a signed

12  document, and it applies to "Specified Product

13  or Project:  All products of units and projects

14  originating from what was Bay Networks."  So

15  whatever BayStack products fit within that

16  definition, that is the predicate for my

17  question.  Do you understand?

18              MR. BUSCH:  Your Honor, I object.

19  This is outside the scope of this hearing.  We

20  specifically said we were not going to discuss

21  what products were and what products were not

22  covered, and that was specifically something

23  that we agreed to before this hearing.

24              MR. HERRINGTON:  That's actually



1    not my question at all.  My question is -- we

2    need to get a straight answer, because it

3    affects their argument under Schedule 1 on the

4    one hand and their damages argument on the

5    other hand.

6              Their argument under Schedule 1,

7    they need to say, "Oh, Nortel, you could have

8    gotten a free royalty buy-out for these

9    BayStack products if they are covered by

10   Schedule 1.  You just had to write a new

11   schedule."  Okay?  Well, they have got a

12   problem on damages even if they win on their

13   definition of Schedule 1, because their damages

14   become, okay, no damages.  They would have just

15   executed a new schedule for whatever is covered

16   under Schedule 1.

17             So what we need is a straight

18   answer.  I am not asking for him to opine on

19   was this model covered, was that model covered.

20   The predicate is whatever is shown to be

21   covered by Schedule 1.  That is the predicate

22   of my question.  Okay?

23             MR. BUSCH:  Okay.  Well, I need to

24   respond to Mr. Herrington, what he just said,



1    because he is arguing about why the question is

2    not outside the scope of the hearing, and he

3    made a couple of statements that are just

4    incorrect, and I have to set the record

5    straight.

6              So what Mr. Herrington just said a

7    moment ago is that for damages, that we are in

8    some kind of box, because if what we are saying

9    is true, they could have just executed a

10   schedule.  What he is ignoring is that there is

11   a termination date of Schedule 1 three years

12   after the execution of it.  And he is also

13   ignoring that what Dr. Case is saying and what

14   SNMP Research is saying is that for products

15   that existed at Bay at the time of the merger

16   or before, they could have entered into a

17   schedule that would have paid a maintenance fee

18   and a licensing fee, and they would have got a

19   royalty-free license for those specific

20   products that were at Bay prior to the time of

21   the merger.

22              However, for all of the products

23   that came after the merger between Bay --

24                   THE COURT:  But he is not asking



1    that.

2                   MR. BUSCH:  No.  He is.  What he

3    is saying is -- what he just said is that with

4    respect to those products, they would fall

5    under Schedule 1, and they could have gotten a

6    license, and therefore, they could have just

7    had a zero-cost license as well forever.  And

8    that's the point he is missing, is that for

9    those products, they would have had to pay, as

10   Dr. Case just said, license fee, maintenance

11   fee and royalties.  And they would have had to

12   put them on a schedule.

13                  And then as of 2003, Schedule 1A

14   is no longer effective by its terms.  There is

15   a termination date.  So those products

16   continue, and the only products that have the

17   zero cost of license are those that are on the

18   schedule that existed at Bay at the time or

19   before the acquisition.  That's it.

20                  So this box is just a completely

21   false statement.  And he is trying to draw this

22   distinction, this false distinction, and he is

23   going beyond what we have agreed to at this

24   hearing specifically.



1            MR. HERRINGTON:  Your Honor, I can

2    only repeat what I said.  For one thing, this

3    new argument like, oh --

4            MR. BUSCH:  It is not new.

5            MR. HERRINGTON:  -- it had to

6    exist at Bay Networks, we are not going to

7    address that.  The predicate of my question is

8    for whatever BayStack products fell within this

9    definition of Schedule 1.  They have got their

10   argument about what that means.

11           THE COURT:  Right.

12           MR. HERRINGTON:  Fine.  We are not

13   arguing about what that means.

14   BY MR. HERRINGTON:

15   Q.  But posit BayStack products that fall

16   within this definition of specified product or

17   project under Schedule 1.  Okay?  All products

18   of units and projects originating from what was

19   Bay Networks.

20           So posit a BayStack product, posit

21   BayStack products that fall within that

22   definition of Schedule 1.  The question then is

23   could Nortel have executed a new schedule and

24   obtained a royalty buy-out in perpetuity for



1    those products at no royalty cost.

2        A.   If those products existed at Bay at the

3    time of the merger, yes.

4        Q.   I didn't ask you whether they existed at

5    Bay.  I am asking whatever is shown to exist,

6    to qualify under Schedule 1 as a specified

7    product or project under Schedule 1.

8        A.   That is my interpretation of what

9    Schedule 1 means, and so it is the same answer.

10       Q.   So the answer is yes.  So whatever could

11   be shown to qualify under specified product or

12   project, whatever BayStack products fit within

13   that definition, as long as Nortel executed a

14   new schedule before June of 2003, they would

15   have gotten a right in perpetuity to sell those

16   products at no royalty cost?

17       A.   You are asking me for a legal

18   conclusion, and I believe that's the purview of

19   the judge.

20            What I am telling you is that if

21   Nortel came to me in April of 2003 and showed

22   me a product that was rightfully used at Bay at

23   the moment of the merger in 1998, whenever that

24   was, I would have allowed it.  And if it



**WILCOX & FETZER LTD**
Registered Professional Reporters
(302) 655-0477
www.wilfet.com

1    wasn't, we would have had to have -- we would

2    have been having a sale -- I would have been

3    trying to make a sale at that point.  And we

4    would have been the start of a negotiation.

5        Q.  And again, Dr. Case, that wasn't my

6    question.  I just want a clean answer to the

7    question.

8        A.  I have given you a clean answer to the

9    question.  I can give it to you again if you

10   wish.

11       Q.  Let me just ask, and you can say yes or

12   no.

13               MR. BUSCH:  I object.  It is asked

14   and answered, Your Honor.

15               THE COURT:  Well, I don't think it

16   has been fully -- I am not sure it has been

17   answered, so I will overrule the objection.

18   BY MR. HERRINGTON:

19       Q.  In April of 2003 any BayStack products

20   that fell within the definition of Schedule 1

21   could have received a lifetime royalty buy-out

22   at no cost by executing a new schedule?

23       A.  I don't understand your question, so I

24   can't answer it.



1      Q.  The question is:  In April of 2003 any

2  BayStack products that fell within the

3  definition of Schedule 1 could have received a

4  lifetime royalty buy-out at no cost by

5  executing a new schedule?

6              THE COURT:  That's a little

7  different question, I think, than you

8  previously asked.

9  BY MR. HERRINGTON:

10     Q.  So whatever BayStack products qualify

11  within the definition of specified project or

12  product --

13              THE COURT:  Okay.  I see.

14              THE WITNESS:  If they met my

15  definition, the answer is yes.  If they met

16  someone else's definition, the answer might be

17  different.

18  BY MR. HERRINGTON:

19     Q.  Now, Dr. Case, let's talk about the

20  state of affairs in April of 2003 with respect

21  to the BayStack products.

22              Now, in fact, as of that time all

23  of the BayStack products used your software in

24  them; correct?



1      A.   I don't think that's correct.

2      Q.   Well, that's what -- let's look at what

3  James Reeves, who was responsible for the

4  BayStack products, stated in an affidavit which

5  you submitted in your proof of claim.  That's

6  Exhibit D-71.  If you turn to page 57 of 65, 57

7  of 65.  If you look at the bottom of the page

8  in the center, it says Defendants' Exhibit

9  D-71, and then it tells you page numbers.  And

10  this is the affidavit of James Reeves in

11  support of SNMP Research International, Inc.'s

12  amended proof of claim.  Do you see that?

13      A.   I see that.

14      Q.   And it states, "The Affiant, James

15  Reeves, being duly sworn in accordance with the

16  law deposes and says as follows:"

17           And if you look at paragraph 6,

18  "From 1998 through 2004 I was an employee of

19  Nortel Networks Inc."  Okay?  So he was there

20  in April, May, June of 2003; correct?

21      A.   Yes, that's what it says here.  And that

22  matches my recollection, and it matches my

23  prior testimony that he left in the 2003

24  timeframe.



1        Q.   And, in fact -- well, he left through

2    2004.

3        A.   2004 is in the 2003 timeframe.

4        Q.   And he stated in his affidavit in

5    paragraph 7, "During my tenure at Nortel I

6    managed the engineering organization

7    responsible for development of the BayStack

8    product line and other product lines within

9    Nortel."  Do you see that?

10       A.   I see that.

11       Q.   Paragraph 8, "The BayStack product line

12   consisted of approximately 20 separate products

13   in 2004."  Do you see that?

14       A.   Yes, I see that.

15       Q.   No. 9, "As of 2004, Nortel used and

16   distributed software from SNMP Research

17   International, Inc. with each product in the

18   BayStack product line to enable the management

19   of the product."  Do you see that?

20       A.   Yes, I see that.

21       Q.   So James Reeves is affirming that each

22   product in the BayStack product line used SNMP

23   Research software.

24       A.   I see that he said that.



1      Q.   Are you asserting that that's untrue?

2      A.   I believe that since we have had

3   discovery since 2011, we found that that is not

4   true.

5      Q.   Well, in fact, Dr. Case, your proof of

6   claim, if you turn to page 5 of 65 -- and by

7   the way, what discovery are you talking about?

8   If you are talking about the audit that has

9   been excluded, that has been excluded.  Are you

10  talking about anything else?  That wasn't an

11  audit of SNMP Research software.  What are you

12  talking about, if not that?

13     A.   I was not speaking about the audit, but

14  the audit was about SNMP Research software in

15  part.  You keep saying it wasn't, but it was.

16          The evidence that I was speaking

17  of was that there were some schedules that were

18  offered, and it was our understanding that our

19  software was not used in certain parts of the

20  BayStack product line.

21     Q.   Who told you that?  Did James Reeves

22  tell you that?

23     A.   We were told when we offered a schedule

24  for the I believe it was Falcon and BayStack



1    450 -- they did not enter into that schedule --

2    they weren't using our software.

3        Q.   Well, did you ask your friend James

4    Reeves why it was there was a BayStack product

5    that wasn't using your software?

6        A.   No, because we knew that they had

7    multiple vendors for SNMP software and we were

8    not the only vendor in the building.  We knew

9    that.

10       Q.   If you would have asked James Reeves, he

11   would have told you that all of his BayStack

12   products used SNMP Research software.

13       A.   He said that in 2011, but apparently he

14   was mistaken.

15       Q.   And, Dr. Case, in your own proof of

16   claim, you assert at page 5 of 65, "In 2004 the

17   Debtors used the SNMP-Bay Software in all of

18   the 20 different product lines then produced as

19   part of the BayStack product lines."  Correct?

20       A.   That was an early proof of claim.  We

21   are here in part to amend the proof of claim

22   and to revise it based upon new information

23   obtained in discovery.  And I do not believe

24   that we are claiming wrongdoing with respect to

1    20 different product lines in our current proof

2    of claim that we are going to be talking about

3    after lunch.

4        Q.   Dr. Case, there is no BayStack product

5    identified anywhere in this case that was ever

6    made or sold that used anything but SNMP

7    Research software, is there?

8        A.   I don't think that's correct.

9        Q.   What is it?

10       A.   Falcon BayStack 450.

11       Q.   The BayStack 450 you are asserting does

12   not use SNMP Research software?

13       A.   That was the impression that we were

14   given.  That was what we were told back in the

15   day.

16                I believe that we were told

17   incorrectly back in the day that we had bad

18   information in the 2003-2004 timeframe that, in

19   fact, it did in fact use our software.  So the

20   dimension of time is important.  So when you

21   ask a question, it is hard for me to know what

22   you are asking me, what we knew when.  What we

23   knew in 2003-2004 is different than what we

24   knew in 2011 and it is different than what we

1   know in 2017.

2       Q.  Again, Dr. Case, there is no BayStack

3   product that you know of that actually was made

4   and sold that does not use SNMP Research

5   software?

6       A.  I haven't thought about that, but I

7   suppose that's probably true.  But I would want

8   to study that a bit.  I don't know.  That's

9   probably true, but I don't know.

10      Q.  Okay.  So again, in April of 2003, when

11  you met with the BayStack team, if you had

12  asked them, they would have told you that the

13  BayStack products use SNMP Research software.

14              MR. BUSCH:  Object.  Your Honor, I

15  object.  Calls for speculation.

16  BY MR. HERRINGTON:

17      Q.  As long as they were telling the truth.

18              THE COURT:  Let me see --

19              THE WITNESS:  He is asking me what

20  I thought they would say back then if I had

21  asked them the question.

22  BY MR. HERRINGTON:

23      Q.  So again, you met with the BayStack

24  team.  Let's back up.  You say you just didn't



1    ask anybody at Nortel whether the BayStack

2    products were using SNMP Research software in

3    April of 2003?

4        A.   There is something I want to say but I

5    can't say it in the context of his question.

6    So I am not -- because I am supposed to -- so

7    could you repeat your question, please.

8        Q.   You didn't ask anyone at Nortel in the

9    spring of 2003 whether the BayStack products

10   were using SNMP Research software?

11       A.   I was under the impression they were

12   not.

13       Q.   You were under the impression they were

14   not.  You didn't ask anyone at Nortel that

15   question?

16       A.   I want to tell you what conversation we

17   had, but you have not asked me a question that

18   allows me to do that.  So no, I didn't ask that

19   question.

20       Q.   And you now know if you had asked that

21   question that the correct answer would have

22   been yes, all of the BayStack products use SNMP

23   Research software?

24                  MR. BUSCH:  Wait one second.  No



1   objection, Your Honor.

2                  THE WITNESS:  Would you repeat the

3   question?

4   BY MR. HERRINGTON:

5       Q.  You now know that if you had asked that

6   question, that the correct answer would have

7   been yes, all of the BayStack products use SNMP

8   Research software?

9       A.  The first time you asked me that, you

10  said if they told the truth.

11      Q.  Correct.

12      A.  Do you want to ask me the question all

13  together?

14      Q.  You know that if you had asked that

15  question, that the correct answer would have

16  been yes, all of the BayStack products use SNMP

17  Research software?

18      A.  I think that's true.  My previous answer

19  was I said I am not certain of that and I would

20  want to study it, but I think that's true.  And

21  so yes, I think that's true.

22      Q.  Now, Dr. Case, let's go back to this

23  affidavit that you got from James Reeves.

24  That's page 57 of 65.  So you came into contact



1    with James Reeves.  You obtained this affidavit

2    from him.  He stated that throughout his time

3    at Nortel, including through 2004, all of the

4    BayStack product line used SNMP Research

5    software; correct?

6        A.  We were in touch with him, and he said

7    this in his affidavit, yes.

8        Q.  So your argument, your position in this

9    case, is that those products for which James

10   Reeves had responsibility became infringing

11   after June of 2003; correct?

12       A.  Correct.

13       Q.  You never told James Reeves that, did

14   you?

15       A.  In what time period do you mean "never"?

16       Q.  Well, in fact, even when you got this

17   affidavit from him.

18       A.  I don't know if we discussed it then.

19       Q.  Let me ask my question.  In this same

20   document you got this affidavit from your

21   friend James Reeves and you attach it to a

22   document where you said these BayStack products

23   that James Reeves is describing, they are

24   unlicensed and infringing after June of 2003;



**W&F**

**WILCOX & FETZER LTD**
Registered Professional Reporters
(302) 655-0477
www.wilfet.com

1    correct?

2       A.   Could you repeat the question?  I was

3    distracted by the "your friend" part.

4       Q.   Well, you have testified that James

5    Reeves was your friend.

6       A.   I stand by my prior testimony about

7    that.  Could you repeat the question, please,

8    or have it read back to me?

9       Q.   So you got this affidavit from James

10   Reeves.  You submitted it to the Court as part

11   of your claim that these products described by

12   James Reeves were infringing; correct?

13      A.   Yes.  It was the best information we had

14   available at the time.

15      Q.   But you never talked to James Reeves

16   when he gave you this affidavit about your

17   claim that these products he was responsible

18   for were infringing?

19      A.   My recollection is that I spoke with

20   James Reeves and brokered a conversation with

21   counsel, and then I turned it over to counsel.

22   So when you say "you" and "your," you never did

23   this and you never did that, I don't know if

24   you are talking about me personally, SNMP



```
 1    Research, the companies, or SNMP Research,

 2    including its counsel.  I don't understand the

 3    question.

 4       Q.  I am asking you.  You and your friend

 5    James Reeves; okay?  So you got this affidavit

 6    from him where he describes that all the

 7    BayStack products had SNMP Research software in

 8    them in June 2003, when Schedule 1 hit the

 9    three-year mark, and onward into 2004.  And

10    your argument is, well, James, those products

11    were infringing.  But you never told him,

12    "James, by the way, those products you were

13    responsible for, they became infringing in June

14    of 2003"; correct?

15       A.  I do not think I had a conversation with

16    James Reeves at that time because we were very

17    careful not to have me have a conversation with

18    him.  And those conversations after the

19    brokering introduction, those conversations

20    were through counsel.

21       Q.  So again, you never talked to your

22    friend James Reeves and said these products

23    were infringing?

24       A.  I believe I was told I couldn't talk to
```



1    James Reeves.

2        Q.   And you never said anything to James

3    Reeves or anyone else at Nortel prior to this

4    lawsuit about these BayStack products becoming

5    infringing as of June 2003?

6        A.   I don't believe that I have had a

7    conversation with James Reeves in the last ten

8    years that was not in the presence of counsel.

9        Q.   Okay.  But you had a conversation with

10   him in April of 2003, and you met with the

11   BayStack team in April 2003; correct?

12       A.   And with Atul Bhatnagar.

13       Q.   And in that invitation that you created

14   for that meeting, you described yourself as

15   Jeff Case of SNMP Research, which supplies the

16   software for implementing the SNMP protocol;

17   correct?

18       A.   Correct; to all of Nortel, not just to

19   BayStack.

20       Q.   Well, we looked at the email, Dr. Case.

21   This was a presentation to the Nortel BayStack

22   team.  Do you recognize that?

23       A.   That was a presentation I was making to

24   multiple Nortel groups and on multiple dates to



1    multiple locations to multiple Nortel groups.

2    I was talking about all of Nortel, not just the

3    BayStack team.

4                    MR. HERRINGTON:  Okay.  Your

5    Honor, the document will speak for itself:

6    Presentation to the Nortel BayStack team.

7                    With that, Your Honor, we have no

8    further questions, subject to any redirect.

9                    THE COURT:  All right.

10                   MR. HERRINGTON:  Exhibit D-71,

11   Your Honor, we would like to move in.

12                   THE COURT:  Let's go over the

13   exhibits you have admitted so far.  Or we can

14   do that at a later time.

15                   MR. HERRINGTON:  Okay, we will do

16   that.

17                   THE WITNESS:  Your Honor, before

18   we continue, could I beg your indulgence for

19   just two minutes for a quick biological break?

20   Or maybe you want to do the exhibits while I am

21   out of the room.

22                   THE COURT:  I will tell you what.

23   I will give you --

24                   THE WITNESS:  I only need two



```
1   minutes.

2                   THE COURT:  I will give you till

3   quarter after.  That is seven minutes.

4                   THE WITNESS:  That's generous.

5   Thank you, sir.

6                   THE COURT:  All right.  We will

7   take a recess for seven minutes, and then you

8   will follow up, Mr. Busch.

9                       (Recess taken.)

10                  THE COURT:  Thank you, all.  You

11  may be seated.  It is a trial, Dr. Case, but it

12  is not that kind of trial.  So anytime you need

13  a break.

14                  THE WITNESS:  Thank you.  I

15  appreciate your consideration.

16                  THE COURT:  Of course.

17                  MR. DEAN:  Your Honor, we thought

18  Mr. Busch was in here.  Mr. Wood went out to

19  get him, so he will be right in.

20                  THE COURT:  That's fine.

21                  MR. DEAN:  Sorry about that.

22                  THE COURT:  That's quite all

23  right.  That's quite all right.

24                  Mr. Busch.
```



```
1               MR. BUSCH:  Just a couple

2     questions, Your Honor.

3               THE COURT:  All right.

4                    CROSS-EXAMINATION

5     BY MR. BUSCH:

6         Q.  Dr. Case, during the direct examination

7     by counsel for the US Debtors there was a

8     question about the April 2003 meeting, and you

9     said that there was something you wanted to say

10    about what was actually discussed at that

11    meeting and the purpose of it.  Would you

12    please tell Judge Gross.

13        A.  All right.  So this was a traveling -- a

14    multi-stop trip where I made about a half a

15    dozen visits on a single trip, and I was making

16    the same presentation to a number of customers

17    and potential customers, including Nortel.

18               The greeting slide was different

19    for each one, but the meat of the

20    presentation -- I didn't write a new

21    presentation over and over again.  I just --

22    the informal greeting part, the thank you for

23    welcoming me, the connecting to your audience

24    part was different for each site.
```



1              But I also met with Atul

2    Bhatnagar -- and I will get you the spelling

3    for that later -- who had at that point had

4    come from another Nortel acquisition and was

5    the new VP and general manager of that group,

6    if I remember his title correctly.  I also

7    remember that that meeting didn't go well.  I

8    was on that trip for that meeting to try to

9    drum up business and revive the relationship

10   and to build new opportunities and to try to

11   make more sales.  That's what I was doing on

12   this road show.  And I remember it didn't go

13   well, and I didn't have a lot of success.

14              I think, but I am not certain, at

15   that same timeframe there had been some price

16   pressure on us to drop our prices for Nortel

17   for the Passport series of products, and there

18   are emails about this.  And I had resisted

19   those price pressures, and James had appealed

20   to me that it was very important to have

21   BayStack to use the same thing as the Passport

22   used and you are losing the Passport.  So it

23   wasn't unreasonable for me to conclude that I

24   had lost that business.

1              But we don't normally compete

2    based upon price.  We are not the lowest-cost

3    vendor, and that's never a goal for us, because

4    one of our competitors is free.  So for me to

5    be the lowest-cost vendor, I would have to give

6    my software away, and that's not a sustainable

7    business model.  And so we are not the cheapest

8    software, and that's never been our goal.  Our

9    goal was to be the best value, not the lowest

10   price.  And that was what I was hoping to say.

11      Q.  And so in the April 2003 time period

12   there were, in fact, scheduled Nortel products

13   that Nortel had the right to distribute?

14      A.  Oh, many, yes.

15      Q.  So there were scheduled Bay products;

16   correct?

17      A.  Yes.

18      Q.  And there were scheduled Nortel

19   products?

20      A.  Yes.

21      Q.  And you had a relationship with Nortel

22   separate and apart from the products that are

23   at issue in this case, the so-called

24   Schedule 1A products?



1          A.   Of course.

2          Q.   And so in April of 2003, Dr. Case, as

3     clear as day, can you please tell Judge Gross

4     were you aware of any unscheduled Schedule 1A

5     products?

6          A.   Could you repeat the question again.

7          Q.   Were you aware of any unscheduled

8     products that would have fallen under

9     Schedule 1A that had not been scheduled by

10    Nortel properly in April of 2003?

11         A.   In April of 2003, no, absolutely not.

12         Q.   And here I want to ask you this

13    question, and I will conclude with this.   I

14    actually have two questions left, but I will

15    conclude with those two questions.

16              One is, when you received Pierre

17    Tremblay's note in August of 2003, just a few

18    months later, that we had talked about, the

19    note that says there are no Schedule 1A

20    products being distributed by Nortel with SNMP

21    Research software in it, that note that has

22    been fully discussed in this trial, if you had

23    received contrary information just two or three

24    months earlier, in April of 2003, that there

1    were Schedule 1A products that were

2    distributing SNMP Research, what would you have

3    done when Pierre Tremblay said there are none?

4        A.   I would have said, "What?"  I would have

5    been in cognitive dissonance.  I would have

6    said what's up with that.

7        Q.   And you didn't, did you?

8        A.   No, because that didn't happen.

9        Q.   And by the way --

10       A.   I concluded that I had priced myself out

11   of the market.

12       Q.   And last question.  Counsel for the US

13   Debtors -- I counted this -- called James

14   Reeves your friend James Reeves at least 12

15   times during his direct examination.  How many

16   times have you seen James Reeves personally in

17   the last decade?

18       A.   I am not certain, but I believe the

19   number is exactly zero.

20            MR. BUSCH:  Thank you.

21            MR. HERRINGTON:  Your Honor, that

22   questioning actually touched upon several

23   things that are actually addressed in emails,

24   so I would like to show those to the witness,



1   and let's talk it through.

2                   REDIRECT EXAMINATION

3   BY MR. HERRINGTON:

4       Q.  For one thing, just with the Tremblay

5   point, you are talking about -- look at Exhibit

6   P-57 and P-58.  This is an email exchange

7   between Pierre Tremblay and Martha Hopper and

8   John Southwood, not you; correct?

9       A.  Can you please help me?  If I have

10  copies of those, I am not aware of it.  Can you

11  have an associate help me find it in my pile?

12      Q.  Certainly.

13      A.  Oh, this is our Exhibit 57.

14      Q.  Correct.

15      A.  Okay.  I am sorry.  Now, could you

16  please repeat your question or have it read

17  back to me?

18      Q.  So counsel keeps describing this Pierre

19  Tremblay email, and let's look at what Pierre

20  Tremblay says.  "Schedule 1A covers 'All

21  products of units and projects originating from

22  what was Bay Networks.'  I still haven't found

23  anything that fits this description but to be

24  honest, I have not yet looked very hard."



1    That's the statement in this email; correct?

2        A.  That's what it says.

3        Q.  And then, Dr. Case, you talked about in

4    response to questioning from your counsel just

5    now a conversation with James Reeves relating

6    to whether your software might be added to a

7    different product line called the Passport

8    products; correct?

9        A.  Yes.

10       Q.  Okay.  So let's look at Exhibit 215.

11   This is an email from James Reeves to you dated

12   May 21, 2001; correct?

13       A.  Yes, that's what it says.

14       Q.  And he writes, "Jeff - I wanted to give

15   you a heads-up on a pending Emanate decision...

16   As you may or may not know, we (my data org)

17   are now reporting into Clive Foreman.

18   (remember him)."  And then it looks like a

19   smily face.

20             Clive Foreman dates back to the

21   Bay Networks days as well; correct?

22       A.  At one point he was the head of the

23   Optivity team when James was the head of the

24   BayStack team, and Clive Foreman is the person



1    who signed Amendment 2.

2        Q.  Exactly.  And Mr. Reeves goes on to say,

3    "We are attempting to" it looks like it means

4    "align."  He misspelled "align."  "-- on

5    development, and there has been a discussion

6    debate on Emanate vs Envoy for the 8600

7    migration to V3 (finally).  They are very aware

8    of the momentum the Business Policy Switch has

9    with V3 and Emanate.

10                "A person by the name of Yu-Ten

11   Lee of the 8600 team has been tasked to contact

12   SRI" -- SRI is SNMP Research International;

13   correct?

14       A.  That's good speculation.

15       Q.  "-- for pricing on Emanate for 8600.

16   They have been using a number of $60 per unit

17   royalty.  I am now involved and desperately

18   want them to go to Emanate in order to help

19   align the BayStack and 8600 developments.  The

20   price as quoted is a non-starter" --  Do you

21   see where he says that?

22       A.  Yes.

23       Q.  "-- as well as the perception that the

24   port will be around four months longer than



1    porting to Envoy 9.1."

2        A.    Right.    Again, he says "aling," and I

3    think it is good speculation that he really

4    meant "align."    But you read it differently

5    than what it says, but his aling/align appears

6    in two places, not just one.

7        Q.    And he goes on to say, "Anyway, I am

8    giving you this heads up to try to salvage this

9    plan before it dies.    My guess is that there

10   are other options that have not been pursued

11   with pricing.    I know that you are not the

12   right person on pricing but I did want to send

13   this message to John" --    That's John

14   Southwood; correct?

15       A.    That's a good speculation.

16       Q.    "-- as it might be viewed incorrectly.

17              "Any help you can provide is (as

18   usual) greatly appreciated.

19              "It might be best if this

20   conversation wasn't repeated or forwarded as I

21   want to be perceived as unbiased.    James"

22              So James Reeves is trying to

23   advocate for adopting your software product for

24   another product line, the 8600; correct?



1       A.   Correct.

2       Q.   And, of course, at this time, in May of

3   2001, BayStack products are still using SNMP

4   Research software; correct?

5       A.   We believe -- I believed that then and I

6   believe that now.

7       Q.   Now, but you are saying at some point

8   James Reeves, even though he was an advocate

9   for you, even though he was trying to bring in

10   your software, at some point you formed the

11   conclusion that he actually pulled your

12   software out of the BayStack products; correct?

13       A.   All BayStack products transitioned to

14   this other product called Envoy.  Do you see in

15   paragraph 1 where it talks about EMANATE versus

16   Envoy?  Envoy was a competitor, a competitive

17   product to EMANATE.  And we lost the 8600 deal,

18   and it was -- what I thought at the time was

19   that we had lost the 8600 deal.  There was a

20   strong desire to have them be aligned, and as

21   old products faded out and new products came

22   in, that the new products weren't using our

23   stack anymore; that they had switched to envoy

24   in order to aling or align with the Passport

1    family, the -- when he refers to 8600, that's a

2    reference to what I am calling Passport.

3        Q.   And, Dr. Case, you now know that that is

4    not correct, that the BayStack products

5    continued right on using your software;

6    correct?

7        A.   I know that now.

8        Q.   And it would have been a matter of some

9    concern if James Reeves, your advocate within

10   Nortel, actually had decided to pull your

11   software out of his BayStack products; correct?

12       A.   Yes.

13       Q.   And yet you didn't ask him, "James, what

14   happened?  You pulled my software out of your

15   products?"

16       A.   Because I thought that we had been

17   phased out.

18       Q.   And you never asked him?

19       A.   I don't recall ever having a

20   conversation like that.  That doesn't mean it

21   didn't happen.

22       Q.   Well, if you had asked him, he would

23   have said, "No, Dr. Case.  No, Jeffrey, we

24   didn't pull your software out of our products.



1    Of course, they are still in our BayStack

2    products."

3        A.   I don't find any emails about that.  We

4    may have had an oral conversation.  I do

5    remember coming out of the meeting with Atul

6    Bhatnagar, that I felt like I had taken a

7    beating.  I do remember that.  But I don't have

8    a lot more to --

9        Q.   Again, you never asked James Reeves and

10   he never told you, "No.  We pulled your SNMP

11   Research software out of our BayStack

12   products"?

13       A.   I have answered that question.  I don't

14   remember having such a conversation.  I haven't

15   seen such an email, but that doesn't mean it

16   didn't happen.

17               MR. HERRINGTON:  Thank you, Your

18   Honor.

19               THE COURT:  All right.  All right.

20               MR. BUSCH:  Nothing further, Your

21   Honor.

22               THE COURT:  Thank you, Dr. Case.

23   You may step down, sir.

24               THE WITNESS:  Now, may I again



1    speak with my counsel at this point?

2                    THE COURT:  Yes, you may.

3                    THE WITNESS:  Thank you.

4                    THE COURT:  Yes.

5                    THE WITNESS:  So if we were to

6    chat over lunch, that would be all right.

7                    THE COURT:  That would be fine.

8                    MR. HERRINGTON:  Yes.  I assume he

9    is not going to be recalled.

10                   THE COURT:  No.  I am assuming

11   that as well.

12                   MR. BUSCH:  Correct.

13                   (Discussion off the record.)

14                   (Witness excused.)

15                   MR. JEDREY:  Good morning, Your

16   Honor.  We would like to call Dr. Richard

17   Razgaitis to the stand.

18                   THE COURT:  All right.

19   Dr. Razgaitis, you may enter the stand and

20   remain standing while you affirm your

21   testimony.

22                   RICHARD ANTHONY RAZGAITIS, SR.,

23   having been first duly sworn, was examined and

24   testified as follows:



1              THE COURT:  All right,

2    Dr. Razgaitis.  You may be seated.

3              MR. JEDREY:  Thank you, Your

4    Honor.

5              DIRECT EXAMINATION

6    BY MR. JEDREY:

7       Q.  Good morning, Dr. Razgaitis.

8       A.  Good morning.

9       Q.  Can you please describe for us your

10   educational background?

11      A.  Yes.  I went to the University of

12   Illinois 1961 to '65, getting a bachelor's

13   degree in aeronautical and astronautical

14   engineering.  Then later I got a master's

15   degree in aerospace engineering from the

16   University of Florida, and then later I got a

17   Ph.D. in mechanical engineering, thermal fluid

18   sciences, from SMU, and still later I got an

19   MBA from Ohio State University.

20      Q.  I want to talk about your professional

21   background.  Let's start with your career as an

22   engineer.  Can you tell me a little bit about

23   that?

24      A.  So my first job out of college, June of



**WILCOX & FETZER LTD**
Registered Professional Reporters
(302) 655-0477
www.wilfet.com

1    1965, was sending three men to the moon and

2    returning them safely to earth, the Saturn

3    Apollo program.  So I went to California first

4    and did design on the propulsion system and

5    wrote computer programs, was a certified

6    FORTRAN programmer on the then leading IBM

7    mainframe.  And then I was selected to go to

8    Cape Kennedy as part of the launch team, where

9    I was from the very first Apollo flight to the

10   lunar landing.

11       Q.  And after your work on the Apollo

12   program?

13       A.  Then I was a college professor,

14   mechanical engineering, for ten years full-time

15   and three years as an adjunct.  And during that

16   period of the adjunct, I also led R&D programs

17   for the Battelle Memorial Institute, a

18   6,000-person R&D organization.

19       Q.  And did there come a time where you

20   moved to Battelle full-time?

21       A.  Yes.  That would have been in 1981,

22   January of '81.

23       Q.  And can you tell me what you did at

24   Battelle?



1      A.   So first I was a principal research

2  scientist leading these R&D programs, which

3  increasingly involved intellectual property,

4  getting patents, licensing.  And in that course

5  of time I migrated over to the licensing group.

6      Q.   And can you tell me about your work on

7  licensing at Battelle?

8      A.   So it began as an inventor, and it began

9  in I would say '82, '83, '84, and then I

10  officially transferred to the licensing program

11  in '85.  So that would have been a little over

12  30 years ago.

13      Q.   And what were your responsibilities once

14  you transitioned to the licensing group?

15      A.   So the title was director of technology.

16  I think that was the correct title of the

17  Battelle Development Corporation, which again,

18  there were 6,000 people in Battelle.  The

19  development corporation was the

20  commercialization arm, which commercialized

21  xerography, which is the reason why you have so

22  many copies here today, and funded Battelle in

23  large part.

24                  And then I was a second-chair



1   negotiator basically for licenses during the

2   first early years and then later became manager

3   of licensing for the Battelle Development

4   Corporation, and then became later vice

5   president of commercial development for

6   Battelle.

7      Q.   And what was your involvement in

8   licensing negotiations once you transitioned

9   from second-chair negotiator to the manager of

10  these negotiations?

11     A.   So I had a broad range of

12  responsibilities that included finding

13  opportunities, finding licensees, developing

14  term sheets, negotiating agreements, and often

15  in the Battelle days I would actually write the

16  agreements.  We had legal counsel who was part

17  of our team, but I often would write large

18  parts of it; kind of satisfied a longing.  And

19  then I managed other people and oversaw their

20  work who did licensing under my direction.

21     Q.   And what kinds of things were you

22  licensing at Battelle?

23     A.   Battelle had a very wide portfolio of

24  technology, so I will start with software,



1    which is obviously the most relevant to this

2    discussion.  So they had something like 50

3    software packages that was not -- with a couple

4    of exceptions, it was not within the commercial

5    development of software such as the case of

6    Dr. Case.  We were selling small numbers of

7    copies to very discrete users, customized in

8    those agreements.  There were two examples that

9    I could think of offhand that were very large

10   programs.  One was a major database program

11   that we licensed widely, as Dr. Case has, and

12   another one was Toolchest, a computer-aided

13   design and manufacturing; Toolchest, all one

14   word.

15      Q.  And approximately how long were you

16   doing licensing at Battelle?

17      A.  So I continued at Battelle until the

18   spring of 1995.  So I was licensing on a

19   full-time basis for ten years and then prior to

20   that I had been involved as well.

21      Q.  And where did you move after Battelle?

22      A.  Then I went to Belcor, which is another

23   unusual company.  When Judge Greene demanded

24   the break-up of AT&T, the famous Bell Labs that



1    had been part of AT&T had to get broken into

2    two as well.  So half of Bell Labs went with

3    the long-distance AT&T and the former Western

4    Electric, which became ultimately Lucent.  The

5    other half of the R&D became Belcor and went

6    with the Baby Bells.

7        Q.  And what was the work of Belcor?

8        A.  Belcor was in the software business.  So

9    every phone call that -- probably with maybe no

10   exceptions, but a few exceptions, any phone

11   call you made in that time period went through

12   Belcor software.  They had the largest fielded

13   software code, I think, ever.  And all of the

14   Baby Bells used that software code to create

15   the dial tone and connect the call.  And in

16   addition, they had a major R&D program that

17   developed software for other purposes.

18       Q.  And what did you do at Belcor?

19       A.  I was a similar thing.  I was vice

20   president, technology licensing.  So I had a

21   team that worked with me, and we tried to

22   identify opportunities for licensing, buying

23   potential licensees, write license term sheets

24   that would be agreed to.  And in that case the



1    legal department, because they were so

2    concerned about the Judge Greene order and

3    staying out of gray-barred hotels, that they

4    took over the legal language to make sure --

5    particularly there was a worry about royalties

6    as far as participating in telecommunication.

7         Q.   And what were you licensing during your

8    time at Belcor?

9         A.   So Belcor had about 25 software

10   packages.  Again, just a couple of them might

11   have been large-scale ones similar to what

12   Dr. Case was describing.  Most of them, again,

13   were small, discrete software packages.  We had

14   quite a number of them related to media,

15   multimedia enablers, for instance, different

16   software products that would help narrow-band

17   transmission, at that time was a big issue;

18   graphical user interfaces, things that would

19   lay on top of browsers, like advertiser and

20   purchasing functions.

21                Then we had all kinds of software

22   that managed devices like EDFA, erbium-doped

23   fiber amplifiers, optical switches,

24   cross-connects, wavelength generators, lasers,



1    multi-wavelength generators.

2        Q.   And when did you leave Belcor?

3        A.   I left them on a full-time basis in '98,

4    and then one of the jobs I had there was

5    helping sell Belcor.  The Baby Bells wanted to

6    divest itself, so I worked quite a bit on the

7    sale of Belcor.  And the purchaser was SAIC,

8    which was another large R&D organization.  And

9    I consulted for three years approximately after

10   I left Belcor in '98 for the CEO of SAIC.

11       Q.   And what have you been doing since you

12   left Belcor?

13       A.   Then I joined an intellectual property

14   consulting firm which was then called IPC Group

15   in 1998.  We merged and formed other companies

16   called -- we merged and called the agglomerated

17   one Intacap.  And then in 2004 we were

18   purchased by Charles River Associates.  So I

19   work with the same group, but the name on the

20   door has changed, and I have been doing that

21   since '98.

22       Q.   And what have you been doing as a

23   consultant?  What does your work involve?

24       A.   So I help companies do what I call



1    licensing DVD.  It doesn't relate to DVDs.  But

2    the first D stands for opportunity discovery:

3    What can they license, how can they package it

4    best.  Then the V stands for valuation.  And

5    then the last D stands for deal-making.

6    Obviously, the point of all my work is, with

7    very few exceptions, is to help get a deal done

8    between a buyer and a seller.

9        Q.  So is it fair to say that you have been

10   involved in licensing intellectual property for

11   more than 30 years?

12       A.  Yes.

13       Q.  I think that my colleague Mr. Herrington

14   may have slightly exaggerated yesterday when he

15   said that you had done zillions of

16   negotiations.  Could you give us a sense of the

17   number of intellectual property licensing

18   negotiations you have been involved in?

19       A.  Well, I did look up zillions on the

20   Internet last night, and I was comforted to

21   hear it was an undefined number less than

22   gazillion, so I am happy about that.

23            In the Battelle era, there are two

24   answers to that.  It was around 100.  But in



1    addition, there were people that worked with

2    me, especially with the turnkey software

3    licensing projects, which were hundreds more,

4    for which I knew the deal transaction but I was

5    not the signator and I was not in the day-to-

6    day.  So there were a hundred hands-on and then

7    hundreds more that weren't hands-on.

8                    And then in the Belcor days there

9    was somewhere -- as I think about it more, I

10   remember more.  And I said before that it was

11   in the range of 20 to 50.  It could have been

12   even more than that.  And again, there was a

13   difference in the Belcor days, because you had

14   to do a little more careful handoff to the

15   legal department because of their concerns.

16       Q.   And since the Belcor days?

17       A.   I have worked on over 100 projects.

18   Most of them have been in this opportunity

19   discovery, where we are trying to find

20   something in the licensor shop or other cases

21   where I have helped a licensee acquire, look

22   and try to find things that they can buy to fit

23   a product hole, similar to the transactions we

24   have been hearing about where Nortel was buying

1    various companies.

2        Q.   And are you a member of any societies

3    for licensing professionals?

4        A.   Yes.  I have been a member of the

5    Licensing Executive Society since 1985.  I

6    think I misspoke in my deposition and said '95.

7    And I was on the board for at least six years

8    of the Licensing Executive Society.  It is

9    3,000 people that are licensing professionals

10   US and 3,000 more in the world.

11               And then I was for six years on

12   the board of the Licensing Foundation, three of

13   those years as its treasurer, three of those

14   years as its president.  And I was also the

15   treasurer for three years for the Licensing

16   Executive Society.

17       Q.   And have you received any awards from

18   the Licensing Executive Society?

19       A.   Yes.  They very kindly recognized me in

20   2011 by an annual award that they give for

21   recognizing licensing -- they call it mentor,

22   people that have helped the licensing industry

23   by mentoring, teaching people that are learning

24   the profession.



1         Q.   Have you published on licensing?

2         A.   Yes.  I have written quite a bit.  I

3    have written four books published by John

4    Wiley & Sons.  The 2009 book is "Technology,

5    Licensing and Dealmaking," "Technology,

6    Intellectual Property, Licensing and

7    Dealmaking."  "Valuation and Dealmaking."  I

8    have got to get the title straight.

9              And then I have written the

10   handbook chapter for valuation for the

11   University Association, which is AUTM, A-U-T-M.

12   I have also written a chapter in a book that

13   was published by the Rockefeller Foundation for

14   Third-World contexts of how to value

15   intellectual property that may arise there.

16              MR. JEDREY:  Your Honor, I would

17   like to tender Dr. Razgaitis as an expert in

18   the field of intellectual property licensing.

19              THE COURT:  Any objection?

20              MR. BUSCH:  We have objected to

21   his testimony, but we --

22              THE COURT:  I know, yes.

23              MR. BUSCH:  But we don't have an

24   objection to that specific request to qualify



1    him as that specific expert.

2                    THE COURT:  All right.  You are

3    now qualified to testify as an expert,

4    Dr. Razgaitis.

5                    THE WITNESS:  Thank you.

6    BY MR. JEDREY:

7        Q.  Dr. Razgaitis, do you have an

8    understanding of how SNMP Research's software

9    is used in Nortel's BayStack switches?

10       A.  In general, a general level.

11       Q.  Can you explain your understanding?

12       A.  So Nortel produces for its customers,

13   and the subject of this dispute, a product

14   called a BayStack, various numbers, and that's

15   an ethernet switch that has an operating system

16   which enables its customers to control, manage

17   and use that switch.  Without that, there isn't

18   any functionality to it.

19                    And that BayStack operating

20   system, called BoSS by Bay, has, according to

21   Mr. Mead's testimony that I read, some hundreds

22   of features that they have to have in order to

23   make it customer-acceptable.  And one of them

24   is the SNMP protocol.  And one way to do that,



1    which has been described here, is the use of

2    SNMPRI's software.

3        Q.   And is the BayStack operating system, to

4    your knowledge, used in multiple iterations of

5    the BayStack product?

6        A.   I understand that because of the

7    testimony of Mr. Mead.

8        Q.   Why might a company want to reuse a

9    software package, an operating system, across

10   multiple iterations of a product?

11       A.   Well, from especially my days at Belcor,

12   one of the essential mantras of running a

13   software business is called code reuse.  It is

14   very expensive, very time-consuming to create

15   high-quality code, so you want to reuse code

16   that you can whenever you can to the extent you

17   can.

18               MR. BUSCH:  Your Honor, this is

19   outside the scope of his expert report and as

20   well as the scope of his expert qualifications.

21   He is talking about now different things that

22   aren't either in his report or are outside the

23   scope of his qualifications.

24               MR. JEDREY:  This is the factual



1    basis that he is giving and looking at in the

2    context of understanding how Nortel was using

3    the licensed software.  And this is a predicate

4    for his opinion in this case.  And we are going

5    through as background so that he can explain

6    his opinion in light of the facts of this case.

7                    MR. BUSCH:  It is outside the

8    scope.  This is not from his report --

9                    MR. JEDREY:  It is not outside the

10   scope of his report.  These things are

11   mentioned in his report.  They were disclosed.

12   They are part of the record in this case.  This

13   is built, as he said, on the testimony of John

14   Mead, which is well-known to the parties.  I

15   don't think there is anything controversial

16   here.

17                    MR. BUSCH:  I just feel like his

18   discussion of what is done with the software

19   and those types of things is not part of

20   intellectual property licensing.  That's

21   outside the scope of what he is qualified as an

22   expert in this case.

23                    THE COURT:  Well, I will allow the

24   testimony.  I understand your concern,



1    Mr. Busch, and I don't have the report right in

2    front of me to review, frankly, but let's see

3    where the testimony takes us.

4              MR. BUSCH:  Thank you.

5    BY MR. JEDREY:

6        Q.  If Nortel was faced with the need to

7    remove and replace a third-party piece of

8    software that was integrated into the BayStack

9    operating system, how would it have dealt with

10   that situation?

11             MR. BUSCH:  Once again, it is

12   outside the scope.

13             MR. JEDREY:  I think this

14   objection has already been dealt with.  I would

15   appreciate if Mr. Busch would not interrupt my

16   examination further.

17             MR. BUSCH:  I have an obligation

18   to object when I think it is a proper

19   objection, whether he appreciates it or not.

20             MR. JEDREY:  You have made your

21   objection.

22             MR. BUSCH:  I am sorry.  This is

23   another objection.  It is a different question.

24   And I believe this is again outside the scope



1    of both his report as well as his opinions and

2    what he is qualified to testify about as an

3    expert.

4                    THE COURT:   Was there information

5    in the report dealing with removal and

6    replacement of software?

7                    MR. JEDREY:   Yes.   As

8    Dr. Razgaitis will explain, there is

9    information on the record about removal and

10   replacement and the time and costliness of

11   doing so, which is, again, information that

12   Dr. Razgaitis took into account in reaching his

13   opinions in this case.

14                   MR. BUSCH:   But I don't understand

15   how he can opine on that as an expert on

16   intellectual property licensing and he is going

17   to talk about how long it takes to remove

18   software from a product and those types of

19   things.   It has nothing to do with the license

20   that is at issue in this specific case and the

21   negotiations of the parties.   It is irrelevant.

22                   MR. JEDREY:   He is talking about

23   the understanding of the facts in this case

24   based on testimony in this case, and he is



1    providing an opinion in light of those facts.

2                    MR. BUSCH:  But what he is saying

3    is -- what I hear him saying is that it takes

4    time to remove software from products and

5    things.  That's not his -- he is not qualified

6    as an expert on that subject.

7                    THE COURT:  Well, isn't part of

8    his expert opinion that these matters would

9    have been addressed --

10                   MR. BUSCH:  Well --

11                   THE COURT:  -- had they been

12   raised?

13                   MR. JEDREY:  Your Honor, can I

14   read from the report, from Dr. Razgaitis'

15   report?

16                   MR. BUSCH:  My objection is that

17   regardless of whether that specific part is in

18   the report or not, my objection is that for him

19   to sit here and testify about -- and this is

20   part of an overall objection to his testimony.

21                   THE COURT:  I understand.

22                   MR. BUSCH:  But part of my

23   objection to this is he is talking about

24   something that is completely outside his



1    expertise with respect to how long it would

2    take to remove software and what discussions

3    there might have been about that.  And I don't

4    think that there is a proper -- this is proper

5    expert testimony on the custom and practice to

6    interpret the license agreement that is in

7    place in this case that is at issue.  I just

8    don't.

9              MR. JEDREY:  Your Honor, all he is

10   doing is providing, again, explaining the facts

11   that he uses, the background, in reaching his

12   opinions in this case.  As I said, he has

13   discussed it in his report.  This is part of

14   the factual background so that he can explain

15   this is the situation as I understood it at

16   Nortel at the relevant time.  These are the

17   considerations as a result of that background

18   that would have been taken into account in

19   their licensing discussions and negotiations.

20   It is an essential part of the background.  I

21   am just having him explain it.  He is obviously

22   not the source of this information.  He has

23   identified the source of the information as the

24   testimony of Mr. Mead.



1              THE COURT:  Right.

2              MR. JEDREY:  And all he is doing

3    is explaining his understanding of that so he

4    can give the Court the necessary background to

5    explain his opinion.

6              MR. BUSCH:  Let me read the exact

7    question that I objected to, because it is

8    getting lost a little bit.  The exact question

9    was, quote, "If Nortel was faced with the need

10   to remove and replace a third-party piece of

11   software that was integrated into the BayStack

12   operating system, how would it have dealt with

13   that situation?"

14             It calls for speculation.  He

15   wasn't at Nortel.  It is not relevant to any of

16   the issues in this case.  And it is an improper

17   question.  And there is nothing relevant about

18   that.

19             MR. JEDREY:  Let me rephrase the

20   question.

21             THE COURT:  Yes.

22             MR. JEDREY:  And maybe we can move

23   past this.

24             THE COURT:  Right.  Because I will



1    sustain the objection.

2   BY MR. JEDREY:

3      Q.   Do you have an understanding of if there

4    came a time when following the sale of the

5    BayStack business line to Avaya, Avaya made an

6    effort to remove SNMP Research software from

7    the BayStack operating system?

8      A.   Yes.

9      Q.   And do you have an understanding of the

10   time and the cost involved in doing so?

11     A.   Yes.

12     Q.   And could you describe that for us,

13   please?

14     A.   So again, I am referring to Mr. Mead --

15   I believe it was Mr. Mead's testimony, that it

16   took a period end to end of about two and a

17   half years, nine months of which was sort of

18   the intense period.  And I think he mentioned a

19   head count of 20 to 30 people.

20     Q.   And would the time and cost of removing

21   SNMP Research software from the BayStack

22   operating system have affected the way in which

23   Nortel approached licensing that software?

24             MR. BUSCH:  Again, Your Honor,



1    what Dr. Razgaitis just testified to was the

2    amount of time that it took Avaya in 2015,

3    after the asset sale and after SNMP Research

4    brought a claim against them, to remove

5    software.

6              Now he is asking a question -- the

7    question he is asking now is "And would the

8    time and cost of removing SNMP Research

9    software from the BayStack operating system

10   have affected the way in which Nortel

11   approached licensing that software?"  It calls

12   for complete speculation.  He is tying it into

13   something that happened 16 or 20 years later,

14   and he is asking for pure speculation about

15   whether that would have affected how Nortel,

16   who he was not there with, unless I don't know

17   something that I should know, would have dealt

18   with the situation.

19              It is complete speculation and it

20   is improper, and the predicate is improper

21   because he is tying it into something that

22   happened 20 years later.

23              MR. JEDREY:  Your Honor, Mr. Mead

24   is from BayStack.  He went to Nortel.  He went



1    to Avaya.  We are talking about the BayStack

2    operating system.  We are talking about the

3    SNMP Research software that was integrated into

4    the BayStack operating system.  Yes, the

5    removal of that software didn't happen until

6    2015.  There is no indication that the time or

7    cost would have been any different at an

8    earlier period.

9              The predicate of the question is

10   let's assume that that was the case, that there

11   was an understanding there.  Would that have

12   affected by custom and practice the way in

13   which Nortel approached licensing the SNMP

14   Research software.

15             MR. BUSCH:  Again, he keeps asking

16   this witness to completely speculate about

17   whether if something took the same time when

18   Avaya did it 20 years later back in 1995 or

19   1998 or 1999 whatever period we are at now,

20   would that have affected how Dave Hyslop at

21   Nortel was addressing his communications and

22   negotiations with Dr. Case.  It is pure

23   speculation.  It is completely prejudicial, and

24   there is no factual basis or predicate for this

1    opinion.

2                    He is here to testify about custom

3    and practice of licensing terms.  He is not

4    here to speculate about these types of things.

5    It makes no sense.

6                    MR. JEDREY:  Your Honor, what we

7    are talking about here is a piece of software,

8    the SNMP Research software that was tightly

9    integrated into the BayStack operating system.

10   The sole question that I would like

11   Dr. Razgaitis to answer is whether the fact

12   that the SNMP Research software was tightly

13   integrated into the BayStack operating system

14   would have by custom and practice affected how

15   they approached licensing that SNMP Research

16   software.

17                    MR. BUSCH:  I don't know how he

18   can testify about how David Hyslop, when he had

19   a nontransferable license -- how that fact

20   would have affected, because there is no

21   factual predicate that that was, in fact, a

22   fact that was being discussed between Dr. Case

23   and SNMP and Nortel on the other hand.  So just

24   to come in and say, oh, there might have been



1    an issue that had the parties discussed it and

2    had it been raised and had it been addressed,

3    they might have dealt with it, because 20 years

4    later it took a year to take the software out

5    of the product --

6                    THE COURT:  Well, I understand the

7    reason for the question.  And I understand your

8    objection.  But I am going to overrule your

9    objection.

10                   MR. BUSCH:  Thank you, Your Honor.

11                   THE COURT:  And I am going to

12   allow the witness to answer.

13   BY MR. JEDREY:

14      Q.  So to ask my question again, would the

15   fact that SNMP Research software was tightly

16   integrated into the BayStack operating system

17   have affected the way in which Nortel

18   approached licensing that SNMP Research

19   software?

20      A.  Yes.

21      Q.  And can you explain how that would

22   affect it?

23      A.  Well, if you are a licensee and you are

24   facing the event of losing your rights,



1    especially with a product line that you are

2    continuing, you need to carefully consider what

3    all your options are, because if you come to a

4    drop-dead date -- characterize it that way --

5    then you are stuck with terrible options.  You

6    either have to stop selling the product or you

7    have to have some kind of an emergency program

8    of reconfiguring in a way that won't violate

9    some other third-party agreement.  So knowing

10   the significance or grasping the full

11   significance of what it takes when you are

12   facing a cliff is an important issue.

13            And in some cases, in my

14   experience in software, you have something like

15   a subroutine or a separate module that is

16   called infrequently, called only by some

17   customers, called only for a certain function.

18   That's one kind of removal that you can

19   disconnect.  And I have written software

20   programs that actually do that.

21            There is other cases, which I

22   think are more akin here, where something is

23   threaded through the software, interacts in

24   many different ways, and that is a much more



1   complicated case.  I am not opining how much

2   effort it takes or cost.  Just in my own

3   experience, that's a much more significant

4   issue.

5              In both cases the licensee is

6   mortally worried about their ability to do

7   business when they are faced with a cliff of

8   losing rights.

9   Q.  And so, Dr. Razgaitis, how would a

10  licensee deal with a situation to avoid facing

11  a cliff like you described?

12  A.  Well, the term of art is commercial

13  certainty or commercial freedom.  I need

14  commercial freedom.  I need to be able to sell

15  my products.  And if for some reason I cannot,

16  I need to have lead time and a plan so that I

17  don't end up in being a case without commercial

18  freedom.

19  Q.  And how does a licensee obtain certainty

20  as to their commercial freedom?

21  A.  Well, the standard tool of art would be

22  a license agreement for intellectual property.

23  There is other forms of agreements for other

24  issues.  But they would enter into a license

1    agreement which would provide them a term of

2    rights and costs that can be sustainable in

3    their business model.

4        Q.   And how would the licensee get certainty

5    as to the cost of continuing to use the

6    licensed software?

7        A.   Well, every license agreement has a

8    grant language, which gives you the rights, and

9    it has a cost language that gives you the cost

10   of those rights.  So the specificity of the

11   grant, and that includes the term of the grant,

12   has to also be tied to the specificity of the

13   cost which is associated with the licensee's

14   enjoyment of the grant.

15       Q.   And how can a licensee ensure a

16   certainty as to the cost of the rights?

17       A.   Well, there are a variety of approaches.

18   Obviously, a running royalty or a per-copy

19   royalty, per-copy distributed royalty is one

20   way.  That has some serious negative

21   consequences potentially for a long-term

22   contract because it tends to be denominated in

23   fixed dollars, and as a product matures in the

24   marketplace, those fixed dollars may become



1    more consequential and economically untenable

2    because the price of the box is going down in

3    which that software is embedded.

4                    Another way, which is, I think,

5    the primary subject here and is the preferred

6    way if you could work everything out is called

7    a royalty buy-out.  It is also called a paid-up

8    royalty.  It is also called a one-time royalty.

9    And it basically means I buy a lifetime right,

10   a right in perpetuity at a fixed price.  I can

11   then thereafter sell as many copies as I want

12   at no incremental cost in terms of royalties.

13       Q.   And how long would a royalty buy-out

14   typically last?

15       A.   It would last forever.

16       Q.   And might it be shorter than a perpetual

17   right?

18       A.   It would be extraordinary, because it

19   kind of defeats the whole point of a royalty

20   buy-out.  If you are going to have a term in

21   which you are going to pay no royalties for

22   that year or several years, that's referenced

23   by other terms.  You would either sell a fixed

24   number of units; you could sell 5,000 units at

1    no additional royalty, or you might do it by

2    calendar.  You can do it for three years or two

3    years or something.  But that's not a royalty

4    buy-out.

5              A royalty buy-out is the deal

6    where the licensee pays a lot and may lose

7    because they don't use it very much, and the

8    licensor gets a big lump sum and they may lose

9    because it may turn out the product has a very

10   long life.  So both parties take a risk, and

11   they reduce that risk to one single number.

12   Q.  I want to talk about Schedule 1.  You

13   are familiar with Schedule 1 to the Nortel-SNMP

14   Research license agreement?

15   A.  Yes.

16   Q.  You have an understanding that

17   Schedule 1 covers all products of units and

18   projects originating from what was Bay

19   Networks?

20   A.  Yes, that's the language I recall.

21   Q.  And you understand that SNMP Research in

22   this case is claiming that Nortel lost all the

23   rights granted to these products under

24   Schedule 1 in June of 2003?



1      A.   That's what I understand.

2      Q.   If that were true, what kind of language

3   would you expect to see in Schedule 1?

4      A.   Well, I would expect to see at least two

5   categories of language.  And one of them is,

6   let's say, administrative but very important,

7   and that would be a way of cleaning it up,

8   where you would have provisions that

9   specifically say that the software under the

10  schedule has now been removed by the licensee

11  and it has either been destroyed or it has been

12  returned to SNMP, and that SNMP would then

13  likewise assert that they have affirmed that

14  fact.  They have received the software or they

15  have received that representation.

16              So that just sort of closes a

17  loop, makes sure that software isn't floating

18  around for which the company has no further

19  rights.

20              The more important thing

21  commercially is that a licensee, especially a

22  licensee with a royalty buy-out, especially a

23  licensee with incumbent products facing a cliff

24  of rights under an existing schedule, would



1    need to have absolute clarity and absolute

2    certainty about what it could do to extend its

3    rights beyond any trigger date, because

4    otherwise, it would be faced with the situation

5    I just described.

6        Q.   You mentioned the term "incumbent

7    products."  What did you mean by that?

8        A.   Well, as I understand -- and there is

9    this long history, some of it contentious, but

10   there are these BayStack products that go back

11   to a company called Bay, which was acquired by

12   Nortel, and that these BayStack products

13   continued during Nortel's ownership after the

14   BayStack acquisition up to 2003, after 2003,

15   and onto the Avaya acquisition.  So those

16   products I am talking about as incumbent are

17   the ones described in Schedule 1.

18       Q.   So an incumbent product is a product

19   that is already on the market, already being

20   sold?

21       A.   And I would add a project as well,

22   because that was an important distinction in

23   Schedule 1.

24       Q.   Does Schedule 1 have either of the two



1    categories of language that you just described?

2         A.   No.

3         Q.   And does the absence of those two

4    categories of language from Schedule 1 tell you

5    anything?

6         A.   It tells me that --

7                    MR. BUSCH:   I am just going to

8    pose an objection.   There hasn't been the

9    predicate of under custom and practice, and I

10   just want to make it clear that this witness is

11   not offering his legal opinion about what legal

12   impact there is to provisions being in or not

13   in, and that all of this testimony, even though

14   we object to it generally, is limited to his

15   understanding about, quote unquote, custom and

16   practice.   I just want to make that very clear

17   for the record.

18                   Otherwise, we object to all of

19   this on the grounds that it all calls for a

20   legal interpretation and conclusion that is the

21   province of the Court.

22                   MR. JEDREY:   Obviously, I disagree

23   with the suggestion that Dr. Razgaitis is in

24   any way offering a legal opinion here.   As we



1    have gone through extensively, he is an expert

2    in the field of technology licensing.  He is

3    talking about his experience in that field and

4    what licensees and licensors take into account

5    and into consideration in negotiations like

6    this.  And he is offering his views on that,

7    and --

8                    THE COURT:  I think his opinion

9    has to do with custom and usage.

10                    MR. JEDREY:  That is correct.

11   Yes.

12                    THE COURT:  And I think that's

13   what the question ought to include.

14                    MR. JEDREY:  Okay.  I can rephrase

15   the question.

16                    THE COURT:  All right.

17   BY MR. JEDREY:

18      Q.  So in light of custom and practice and

19   your expertise in the field, does the absence

20   of the two categories of language that you

21   mentioned earlier from Schedule 1 tell you

22   anything about that document?

23      A.  Well, it would tell me that I don't

24   think it is consistent with the idea that June



1    20 of '03 meant the termination of the

2    licensing rights, because again, I would have

3    expected as a licensee, custom and practice,

4    would have wanted the certainty that they could

5    get subsequent rights as it is stated in that

6    very schedule and the terms of those rights.

7        Q.   You are aware that SNMP Research is also

8    arguing in this case that there was an informal

9    arrangement between the parties whereby Nortel

10   could have extended a lifetime royalty buy-out

11   to legacy Bay products by executing new

12   schedules under Schedule 1?

13       A.   I saw that reference in one email.

14       Q.   Based on your knowledge of custom and

15   practice, would an informal arrangement of this

16   type have given a licensee in Nortel's position

17   the type of certainty that you had described

18   earlier?

19       A.   No.

20       Q.   And why not?

21       A.   Well, it is a big-deal issue.  Again,

22   there could be cases where the product is

23   exiting the marketplace and it doesn't really

24   matter.  But whenever you have a royalty



1    buy-out condition, that is a business asset.

2    And you don't ever want to be in a position

3    where you are just giving it away or losing it,

4    and because it is by definition a perpetual

5    benefit in the sense of cost.  So to have an

6    informal arrangement would make no sense.  You

7    would want to have business certainty, because

8    you would be faced otherwise with the

9    possibility that the informal arrangement

10   changed, that the parties change, the licensor

11   changed, they changed their strategy.  People

12   change, people leave, people get acquired.

13            And the thing I always tell

14   companies, always consider your potential

15   licensor being acquired by your worst

16   competitor.  So you wouldn't want to be in a

17   situation where you would be counting on the

18   goodwill of someone, even if it looked like you

19   would get it.

20   Q.  Did you review documents in this case

21   relating to a software service agreement for

22   software covered by Schedule 1?

23   A.  Yes.

24   Q.  Are you familiar with software service



 1      agreements from your experience in the field?

 2          A.   Yes.   That was a standard component of

 3      all the Belcor software.   That was a big part

 4      of our business.

 5          Q.   Can you tell me what a software service

 6      agreement is?

 7          A.   When you sell software, you also try to

 8      sell, because it is profitable and it helps the

 9      whole business relationship, a service

10      agreement.   So typically you bury that price in

11      the first-year's license fee, but after that

12      you charge them a fixed amount year by year by

13      year, and then you basically try to sell them

14      all the benefits of it, which includes fixing

15      bugs in the software you just sold them but

16      also enhancing, improving the software, and

17      then also providing hotline support.   So you

18      get a telephone number where you get a person,

19      sometimes 24-hour-a-day commitments.

20                      And then that goes year by year,

21      but it is at the option of the licensee.   So

22      they only pay if they want to continue.   If

23      they don't pay, they take the risk that they

24      are going to be on their own and they get no

1    improvements unless they come back hat in hand

2    and negotiate a new deal.

3        Q.  So it is typical to have a software

4    service agreement be renewable on an annual

5    basis?

6        A.  Yes.

7        Q.  And do you have an understanding whether

8    the software service agreement in this case was

9    renewable on an annual basis?

10       A.  Yes.

11       Q.  And do you have an understanding of

12   whether that software service agreement was

13   renewed after June of 2003?

14       A.  Yes.

15       Q.  And would it be consistent with custom

16   and practice for SNMP Research to have granted

17   that renewal and for Nortel to have paid for

18   that renewal if the software covered by the

19   software service agreement was not licensed?

20       A.  That would not be custom and practice.

21   It is so contrary to custom and practice,

22   especially with source code, but especially

23   with a licensee writing checks for something

24   they have no right to use.



1          MR. JEDREY:  That's all we have.

2          THE COURT:  All right.  Thank you.

3          Mr. Busch.

4          MR. BUSCH:  Yes.

5          THE COURT:  Your turn.

6          MR. BUSCH:  There is so much I

7    want to do but so little time.

8          THE COURT:  Yes.

9          MR. BUSCH:  So many questions, so

10   little time.

11         THE COURT:  My calculation is you

12   have about two hours left.

13         MR. BUSCH:  That's correct, Your

14   Honor.  That's about what we have as well.

15         THE COURT:  Okay, good.

16         MR. BUSCH:  And so I am not going

17   to spend as much time as I would like to, but I

18   will spend a few minutes with Dr. Razgaitis.

19         THE COURT:  All right.

20             CROSS-EXAMINATION

21   BY MR. BUSCH:

22     Q.  Okay. Dr. Razgaitis, we have met a

23   couple of times.

24     A.  We have.



1      Q.   Nice to see you again.

2      A.   Yes, thank you.

3      Q.   And I want to just address this right

4  off the bat.  You first were identified as an

5  expert witness in the Avaya case that SNMP had

6  against Avaya; correct?

7      A.   That's correct.

8      Q.   And in the expert report that you

9  submitted in the Avaya case, you stated that

10  you had, quote, read, negotiated or executed

11  approximately 100 licenses during your career,

12  did you not?

13      A.   That's not a correct characterization.

14      Q.   It is not?  Okay.  Let me see here.

15  What did you say then?

16      A.   Well, I think that question was in the

17  context of Battelle.  I think that was in the

18  context of my report.

19      Q.   Did you not say in your report that you

20  had --

21      A.   Right.  I did say it in my report, but

22  it was in the context of the Battelle period.

23      Q.   And then in your deposition in this case

24  you said that you have now read, executed or



1    licensed approximately 200; is that correct?

2        A.  No.

3        Q.  Okay.

4        A.  Again, you did some math with me on the

5    deposition, and what I answered for you, as I

6    did -- again, I am making estimates here.  I

7    don't have an accurate record of it.  I did 80

8    to 120 deals in the Battelle days.  Nominally,

9    I would say it was about a hundred.  And then

10   in my Belcor days, I think I told you it was 20

11   to 50.  I can't remember.  And then in my

12   consulting days, I was involved in that kind of

13   an activity about 30 times.  So you said it

14   could be as much as 200.  I said yes, if you do

15   that math.

16       Q.  In any event, it is far, far less than a

17   zillion?

18       A.  It is less than a zillion, sir.  You and

19   I agree on that.

20       Q.  So either you have been very busy since

21   my deposition or counsel for the US Debtors

22   stretched the truth a little bit.

23       A.  Well, again, it is an undefined number

24   less than a gazillion.  And I am sure, Your



1    Honor, that's the first time this testimony has

2    ever occurred in your court.

3        Q.   Well, when I heard zillions but I knew I

4    had known it was 100 to 200 before, obviously,

5    we had a question about that.

6                    THE COURT:   Yes.

7    BY MR. BUSCH:

8        Q.   Okay.  Let's move on from that.

9                    You testified at the deposition,

10   you testified, did you not, Dr. Razgaitis, that

11   you could point to no language in Schedule 1A

12   that supports your position in this case, did

13   you not?

14       A.   I pointed to the absence of language

15   that supports my case, yes.

16       Q.   Okay, thank you.  And you would agree

17   that industry custom and practice is to

18   negotiate licensing agreements carefully,

19   especially the scope of license rights and the

20   cost associated with use of those rights, such

21   that the language of the agreement expresses

22   the intent of the parties; correct?

23       A.   I do agree with that.  And then I

24   commented several times in the deposition that



1    that doesn't always happen.  That is certainly

2    the aspiration.

3        Q.  And you said that your experience is

4    that license agreements are heavily negotiated

5    and carefully crafted; isn't that right?

6        A.  Again, that's the aspiration.  It

7    doesn't always result in a good outcome.

8        Q.  And isn't it true that you testified

9    that the subject of termination is an important

10   consideration and that parties would or should

11   spell out such termination rights clearly in

12   their agreement?

13       A.  They should.  And again, it doesn't

14   always happen.

15       Q.  And despite saying that you could point

16   to no language in the agreement that supports

17   your position, you said that your position is

18   based on a few things at your deposition.  And

19   the three things that you said it was based on

20   was that Nortel inherited the royalty buy-out

21   from Bay as a matter of law, and therefore,

22   there would be no need for them to limit it to

23   three years; isn't that right?

24       A.  I am sure I didn't say Nortel inherited



1    something as a matter of law.

2        Q.   Well, that they inherited it.

3        A.   I don't know if I used the word

4    "inherited."  My understanding is, which we

5    went round and round at my deposition, is when

6    an acquiror purchases a company which it

7    operates as that company, it has the right to

8    operate that company as a going concern.

9    That's a general business principle.  I am not

10   expressing a legal opinion.

11            I also think that that's what

12   Nortel believed they could do.

13       Q.   Okay.  Let me just refresh your memory

14   about your deposition testimony.

15            "Question:  All right.  So once

16   again, I think you've just said this a moment

17   ago, but correct me if I'm wrong, that one of

18   the major reasons that you believe under custom

19   and practice the language of Schedule 1A

20   doesn't make sense is because Nortel would be

21   giving up a right after three years for a

22   royalty buy-out that they could have enjoyed

23   forever.  Correct?"

24            And there was an objection.



 1                "Question:  Right?"

 2                And the answer:  "Yes, I believe

 3     that's one of the major issues."

 4     A.    Okay.  So there is two parts to that.

 5     And again, I did not assume in my report -- my

 6     report does not depend upon whether this change

 7     of control right is correct, legal or not.

 8     That's one key point.

 9                The other point is that they had a

10     royalty-free right in accordance with

11     Schedule 1.  That's not debated.

12     Q.    Dr. Razgaitis, you testified in response

13     to my question that a major issue that

14     underpins your testimony is that under custom

15     and practice, that you believe that Nortel had

16     a royalty buy-out forever, so it would not make

17     sense for them to give up a right after three

18     years for a royalty buy-out that they could

19     have enjoyed forever; isn't that right?

20     A.    I did.  But the context was the

21     Schedule 1, not Nortel's change of control.

22     Q.    So if, in fact, Nortel did not have that

23     right forever at the time that Nortel acquired

24     Bay, then you would, in fact, have to



1    reconsider your opinion, wouldn't you?

2         A.   No.

3         Q.   Well, do you remember me asking you this

4    question:  "All right.  So if, in fact, that

5    wasn't true, if, in fact, Nortel did not have

6    the right to a royalty buy-out forever" -- and

7    I struck the question.

8                   "If it wasn't true that Nortel had

9    a right to inherit Bay's royalty buy-out" -- so

10   I premised this based on inheriting Bay's

11   royalty buy-out.  Remember a second ago you

12   said it wasn't based on the Bay royalty

13   buy-out?  Let's look at the question I asked

14   you.

15                  "If it wasn't true that Nortel had

16   the right to inherit Bay's royalty buy-out,

17   then would that affect your opinion that custom

18   and practice and the language of Schedule 1A?

19                  "Answer:  It would be something I

20   would consider.  But that's also -- there's

21   also a 1999 license and the schedule as it

22   stands."

23                  So, in fact, the context of my

24   original question was about the Bay royalty



1   buy-out and your belief that Nortel had

2   acquired the rights from Bay to have the

3   royalty buy-out forever; isn't that true?

4              MR. JEDREY:  Your Honor, I think

5   before we proceed with this question, he has

6   omitted an important part of Dr. Razgaitis'

7   response that I think should be read as well as

8   what he has read.

9   BY MR. BUSCH:

10     Q.  I am happy to read that.  At the end of

11  the next page, at the end of your answer you

12  say, "So it isn't contingent upon my

13  understanding about what happened between '98

14  and '99."  But you did say that it would be

15  something you would have to consider if, in

16  fact, Nortel had not acquired the Bay royalty

17  buy-out, didn't you?

18     A.  Whatever I said, I said.  It wasn't -- I

19  didn't cite that in my report.  I didn't use

20  that in the analysis in my report.  And my

21  report conclusions doesn't depend on it.  But

22  it does give color to the negotiations that

23  occurred.

24



1      Q.  And you have not studied California law

2   on whether, in fact, Nortel did, in fact,

3   acquire rights as a matter of law when it

4   acquired Bay; right?

5      A.  I can most assuredly affirm you that I

6   did not.

7      Q.  And so you do not know whether -- you

8   are not telling this Court whether as a matter

9   of law Nortel did or did not acquire the Bay

10  royalty -- the royalty buy-out when it acquired

11  Nortel; correct?

12              MR. JEDREY:  Your Honor, we have

13  already made clear we are not offering

14  Dr. Razgaitis to provide a legal opinion, so I

15  am not sure what the basis for these questions

16  is.

17              THE WITNESS:  But I can answer.

18              THE COURT:  I will allow the

19  answer.

20              THE WITNESS:  So I am not going to

21  be instructing a federal judge on the matter of

22  any law, but a business that is acquiring

23  another firm is acquiring what is in business

24  terms a very standard term of art, a going



1    concern.  They are not buying buildings,

2    chairs, desks, people and so forth.  They want

3    to buy a going concern.  So one of the due

4    diligence which I have been involved in many

5    examples is making sure that what we are buying

6    we can use and sell.  And if we can't, we need

7    to know where we can't, because that affects

8    everything.

9              So I believe, without knowing

10   anything specific about Nortel, but just custom

11   and practice, that Nortel would have made those

12   kinds of due diligence considerations and had

13   some basis of belief by which they could

14   operate Bay as Bay.  That's different than

15   permeating Nortel, that they could operate Bay.

16   BY MR. BUSCH:

17     Q.  And have you reviewed emails in this

18   case where, in fact, Nortel's counsel -- I am

19   sorry.  Nortel's representative, Dave Hyslop,

20   reached out to SNMP Research to ask for an

21   assignment?

22     A.  I saw that email, yes.

23     Q.  So you also say that the language in

24   Schedule 1A cannot mean what we say it does



1    because, quote, the business relationship

2    between the parties would require that they

3    deal with what Nortel can do after June 2003

4    and what they can do with SNMP Research's

5    software; correct?

6        A.   I think I said that, yes.

7        Q.   And you have only mentioned Schedule 1A,

8    but Schedule 1A is part of a master license

9    agreement between Nortel and SNMP Research;

10   correct?

11       A.   That's correct.

12       Q.   And do you know whether there are

13   references in the master license agreement to

14   entering into specific product schedules that

15   are identified with an A, Schedule As, that

16   would identify the products that Nortel could

17   license for use of SNMP Research software?

18       A.   Yes, I recall that.

19       Q.   And the other opinion is that, as you

20   have expressed a moment ago, that the parties

21   would have dealt with what to do with SNMP

22   Research software after termination, whether it

23   had to be returned or destroyed; correct?

24       A.   Yes.



1      Q.   Do you know whether there is a provision

2    in the master license agreement about returning

3    or destroying software?

4      A.   Yes, but not specific to Schedule 1.

5      Q.   But Schedule 1 is not a standalone

6    document.   Schedule 1A is part of the master

7    license agreement which contemplates Schedule

8    As being entered into; correct?

9      A.   But Schedule 1 has some very unusual

10   circumstances which would require it to be

11   handled differently.

12     Q.   Please answer any question.   Schedule 1A

13   is part of -- is a Schedule A that was

14   contemplated to be entered into pursuant to the

15   master license agreement; correct?

16     A.   That's correct.

17     Q.   Okay.   Dr. Razgaitis, in your report you

18   talked about the different opinions that you

19   have and you have told Judge Gross about custom

20   and practice.   You don't cite any treatise,

21   textbook or scholarly journal in your report at

22   all, do you, other than is it Buckvold on

23   patent licensing?

24     A.   It is Mr. Brunsvold.



1    Q.  Brunsvold.

2    A.  On patent and IP licensing.  That book

3    is not about patent licensing only, despite its

4    title.

5    Q.  But other than that textbook, you don't

6    cite any other treatise, textbook or anything

7    else to support any of your opinions, do you?

8    A.  No.

9    Q.  And that's despite the fact that you

10   have told the judge all the books you have

11   read, you have written?  And if any of the

12   positions that you have articulated here would

13   have been found in your textbooks, I would

14   assume you would have cited those to the Court?

15   A.  I could have.

16   Q.  Okay.  But you didn't?

17   A.  I did not.

18            MR. BUSCH:  Your Honor, that's all

19   we have.

20            THE COURT:  All right.  Thank you,

21   Mr. Busch.

22            MR. JEDREY:  Your Honor, if we

23   could just ask a couple questions.

24            THE COURT:  Yes, of course.



1              You will excuse me.  I didn't get

2      your name.

3              MR. JEDREY:  Sorry.  I should have

4      introduced myself.  I am Nat Jedrey.

5              THE COURT:  Thank you.

6              MR. JEDREY:  Counsel for the US

7      Debtors, along with Mr. Herrington.

8              THE COURT:  Thank you, Mr. Jedrey.

9                  REDIRECT EXAMINATION

10     BY MR. JEDREY:

11         Q.  Dr. Razgaitis, you testified in response

12     to a question from Mr. Busch that there was an

13     absence of language from the license that

14     supported your opinion; right?

15         A.  Yes.

16         Q.  Can you explain what you meant by that?

17         A.  Well, had the parties agreed to loss of

18     intellectual property rights by what became

19     June 20 of 2003, there should have been and

20     would have been two categories of additional

21     provisions in the schedule, one of which you

22     could say is administrative but I think is

23     still very important.  But the other one is

24     critically important from a business point of



1    view, and that is what do I as the licensee of

2    Schedule 1 upon this cliff date or anytime

3    obviously before -- what are my rights and what

4    are SNMP, the licensor's obligations, so that I

5    can continue to be in business after a

6    drop-dead date in terms of IP rights.

7                    MR. JEDREY:  That's all we have.

8                    THE COURT:  Thank you.  Thank you,

9    Mr. Jedrey.

10                    MR. BUSCH:  No, nothing else.

11                    THE COURT:  All right.

12    Dr. Razgaitis, thank you.

13                    THE WITNESS:  I have been doing

14    this so long, it is the first time I have ever

15    testified in court, and it was an honor to do

16    it here.

17                    THE COURT:  It was a pleasure to

18    have you here.  Thank you, sir.

19                    (Witness excused.)

20                    THE COURT:  Who next?

21                    MR. HERRINGTON:  Your Honor, we

22    will call John Southwood.  Would this be a good

23    time for the lunch break before that?

24                    MR. BUSCH:  How long do you think



**WILCOX & FETZER LTD**
Registered Professional Reporters
(302) 655-0477
www.wilfet.com

1    you have with him?

2              MR. HERRINGTON:  It is hard to

3    say.  I can give you a better estimate once I

4    finish going through my notes.

5              MR. BUSCH:  All right.  We are

6    fine with that, Your Honor.

7              THE COURT:  You are fine with

8    lunch?

9              MR. BUSCH:  Yes, sir.

10             THE COURT:  All right.  We will

11   take a break until 1:30, and that will give

12   us -- I think that will give us sufficient time

13   to finish.  All right.  So we will stand in

14   recess.  Thank you, everyone.

15             MR. BUSCH:  And just to remind

16   Your Honor, we do have one witness in rebuttal

17   to Dr. Razgaitis.

18             THE COURT:  Dr. Tollen.

19             MR. BUSCH:  Correct.

20             THE COURT:  Yes.  All right, thank

21   you.

22        (Luncheon recess taken at 12:25 p.m.)

23

24



1               AFTERNOON SESSION

2               (Reconvened at 1:30 p.m.)

3               THE COURT:  Thank you, everyone.

4    You may be seated.  All right.  We are down the

5    home stretch.

6               MR. HERRINGTON:  Yes, indeed, Your

7    Honor.  Your Honor, we would like to call John

8    Southwood to the stand.

9               THE COURT:  All right.

10   Mr. Southwood, there you are.  Good afternoon,

11   Mr. Southwood.

12               THE WITNESS:  Good afternoon.

13               THE COURT:  You have already

14   affirmed your testimony, so that won't be

15   necessary to do again.

16               THE WITNESS:  Thank you.

17               JOHN E. SOUTHWOOD, having been

18   previously sworn, was examined and testified

19   further as follows:

20                  DIRECT EXAMINATION

21   BY MR. HERRINGTON:

22        Q.  Good afternoon, Mr. Southwood.

23        A.  I am sorry.  I forgot to turn my

24   cellphone off.  May I?



1        Q.   Oh, please.

2        A.   Okay.   Good afternoon, Mr. Herrington.

3        Q.   Mr. Southwood, you were the point person

4    for SNMP Research International concerning the

5    negotiations that led up to the signing of

6    Schedule 1; correct?

7        A.   Correct.

8        Q.   And that Schedule 1 is an agreement and

9    part of an agreement between International and

10   Nortel; correct?

11       A.   Correct.

12       Q.   Now, you testified yesterday that any

13   product covered by Schedule 1 would need to

14   sign a new schedule in order to get the benefit

15   of the Bay Networks royalty buy-out; correct?

16       A.   Correct.

17       Q.   And let's talk about that.   And

18   specifically, let's talk about a product called

19   Optivity; okay?   Now, let me show you a

20   spreadsheet that I believe you looked at with

21   your counsel yesterday.   We have it marked as

22   our own exhibit, and that is Exhibit D-159.01

23   and .02.

24               MR. HERRINGTON:  And, Your Honor,

1    I believe this is already in evidence.

2   BY MR. HERRINGTON:

3       Q.   And, Mr. Southwood, what we have marked

4    as Exhibit D-159 is that spreadsheet that I

5    believe you talked about yesterday.  Do you

6    remember that?

7       A.   Yes.  I am not certain this is the same

8    version that we talked about yesterday.

9       Q.   It is actually the same November 3

10   version that you looked at yesterday.

11      A.   Okay.

12      Q.   And as you talked about, some of the

13   items on this spreadsheet were identified as

14   being associated with Bay.

15      A.   Yes, in Column 1.

16      Q.   And you testified that they would need a

17   new schedule; correct?

18      A.   Correct.

19      Q.   Well, let's look at Bay.  If you look

20   about halfway down the page, there is an entry

21   for Bay with Todd Kimble.  That's the name next

22   to it?

23      A.   Yes.

24      Q.   And you go one over and you see it is



 1    for the Optivity suite of products.

 2        A.   Yes.

 3        Q.   Okay?   So this is one of those items on

 4    Mr. Hyslop's spreadsheet that was identified as

 5    needing a new schedule; correct?

 6        A.   Correct.

 7        Q.   At that time it was identified.

 8              Now, if you look at the software

 9    that is identified as being used with Optivity

10    and you look under ARL --

11        A.   Yes.

12        Q.   -- do you see how it includes ARL?

13        A.   Yes.

14        Q.   Now let's turn to a draft of a schedule

15    that would have related to Optivity's use of

16    ARL, D-256.06.   Okay, Mr. Southwood.   D-256.06

17    is an email from you to Dave Hyslop dated

18    November 29 of '99, and it is titled "Schedule

19    16a for NIMD, Todd Kimball's group.   This

20    includes the Bay royalty buy-out."   Do you see

21    that?

22        A.   Yes.

23        Q.   And if you turn to the draft schedule

24    and you look under development software, do you



1    see that list of --

2        A.  I am sorry.  On the spreadsheet?

3        Q.  I am sorry.  Now look at the schedule,

4    schedule 256.07.

5        A.  Yes.

6        Q.  And you see a list of development

7    software?

8        A.  Yes.

9        Q.  And we have also given you Schedule 1 so

10   that you can look at the ARL development

11   software that is listed on that as well.  And

12   do you see it is the same as what is on

13   Schedule 16?

14       A.  Yes, yes.

15       Q.  Okay.  So this is a draft of a schedule

16   that is associated with that Todd Kimble item

17   on the Dave Hyslop spreadsheet for Optivity's

18   use of ARL; correct?

19       A.  Yes.

20       Q.  And Schedule 16, in fact, never became

21   signed; isn't that right?

22       A.  This copy is not signed.  I don't have a

23   memory of --

24       Q.  You don't remember what happened with



1    Optivity and ARL?

2        A.   Not with -- if you ask me a particular

3    schedule number, was it signed or not, if I

4    didn't have the paper in front of me, I

5    wouldn't know.

6        Q.   We do have some emails that will show

7    you what happened with Optivity and ARL.

8        A.   Okay.

9        Q.   This is a product that was originally

10   identified as a Bay product that needed a new

11   schedule.

12       A.   Okay.  And I will trust you that if you

13   say 16 wasn't signed, I --

14       Q.   Okay.  And the emails will reflect that.

15   You will be able to see that for yourself.

16       A.   All right.

17       Q.   Okay.  Let's look at Exhibit D-58.

18   Sorry.  This is Exhibit D-258.  And,

19   Mr. Southwood, this is an email chain.  I would

20   like to go back to the very beginning of the

21   chain, so that's on the last page of the

22   document, page 4 of 4.

23       A.   Okay.

24       Q.   And you see that you wrote to Vicki



1    Allen at Nortel on March 8 of 2000?

2        A.  Yes.

3        Q.  And you wrote, "Vicki; It was good to

4    speak to you today.  We determined that the

5    current Schedule 16 issued for ARL duplicates

6    the transaction completed in 1997 between Bay

7    and SNMPRI.  And so, we concluded that this

8    Schedule 16 should be retired."  Do you see

9    that?

10       A.  I see that.

11       Q.  Nobody showed you this email recently, I

12   take it?

13       A.  Correct.

14       Q.  And so you said it turns out we don't

15   need Schedule 16; correct?  Schedule 16 should

16   be --

17       A.  Should be retired.

18       Q.  Exactly.  So we don't need it; correct?

19       A.  It should be retired.  That's what I

20   said.

21       Q.  Meaning not used?

22       A.  I would want to know more context than

23   what I am looking at right now.  But that looks

24   like what I said.



1     Q.  Okay.  Let's look at another -- and, of

2  course, if this schedule is being retired --

3  Schedule 16 had provided for a license fee to

4  be paid; correct?

5     A.  Yes.

6     Q.  And if Schedule 16 is being retired and

7  there is no schedule, then there would not be a

8  license fee; correct?

9     A.  Correct.

10          MR. HERRINGTON:  Let's see another

11  email chain that refers to this same

12  conversation.  And, Your Honor, we move Exhibit

13  258 into evidence.

14          MR. BUSCH:  No objection.

15          THE COURT:  It is admitted.

16          (Defendants' Exhibit No. 258 was

17  received in evidence.)

18  BY MR. HERRINGTON:

19     Q.  And, Mr. Southwood, what we are showing

20  you now is Exhibit D-257.  And this was an

21  email that was forwarded to you by Dave Hyslop

22  on March 9 of 2000; okay?

23     A.  Yes.

24     Q.  And in this email -- and you see Todd



1    Kimble was also copied.  He was one of the ones

2    who was originally associated with Schedule 16.

3    Do you see that?

4         A.  I see that.

5         Q.  And in this email below Vicki Allen is

6    describing her conversation with you, with John

7    Southwood.  And she writes to Dave, and, of

8    course, Dave then forwards it to you.  "Dave,

9    Per my conversation with John Southwood at SNMP

10   Research, we discussed the following:

11                "Number one, per the new

12   agreement" --

13                MR. BUSCH:  Your Honor, I object

14   to this for the same reason that Nortel had

15   objected to.  This is an internal email from

16   Nortel and within Nortel that was not

17   distributed outside Nortel.  And therefore, for

18   Nortel to introduce it, it becomes hearsay.

19                MR. HERRINGTON:  Your Honor,

20   number one, all those exhibits he is referring

21   to came in.  But number two, it was sent to

22   Mr. Southwood.

23                MR. BUSCH:  I don't see it.

24                THE COURT:  There is a copy



1    showing to Mr. Southwood, yes.

2              MR. HERRINGTON:  Dave Hyslop sent

3    it to john@snmp.com.  That's you.

4              MR. BUSCH:  It wasn't on the

5    screen.  I did not see that so I withdraw the

6    objection.

7              THE COURT:  All right.

8    BY MR. HERRINGTON:

9        Q.  So again, Vicki Allen is reporting on

10   her conversation with you, Mr. Southwood, and

11   then this email is forwarded to you by Dave

12   Hyslop.  And Dave Hyslop has added his comments

13   to what Vicki Allen is reporting.  And again,

14   this is referring to Schedule 16A.  That's the

15   subject line, "16a for NIMD, Todd Kimble's

16   group.  This includes the Bay royalty buy-out."

17   Do you see that?

18       A.  Yes.

19       Q.  And she writes, "Dave, Per my

20   conversation with John Southwood at SNMP

21   Research, we discussed the following:

22              "Number one, per the new agreement

23   between Nortel and SNMP, which was signed at

24   the end of 1999, there is a Schedule 1 which



**WILCOX & FETZER LTD**
Registered Professional Reporters
(302) 655-0477
www.wilfet.com

1    covers all previous Bay agreements.  With this,

2    our separate Bay agreement with SNMP Research

3    for Optivity products is covered here."

4                    Do you see that?

5        A.   I do see that.

6        Q.   And Dave Hyslop writes, "Yes, that is

7    true."  Do you see that?

8        A.   I do.

9        Q.   And that's reflecting the email that we

10   saw from you where you said we don't need

11   Schedule 16 because it is already covered by

12   the prior Bay Networks license?

13       A.   I would note that this is in the

14   three-year time window.

15       Q.   We are going to get to that jump,

16   Mr. Southwood.  We are going to get to that.

17                    So, number two, -- well, actually,

18   let's go back to your email where you told

19   Vicki Allen we don't need Schedule 16; it can

20   be retired.  You didn't say in that email, "By

21   the way, Ms. Allen, you are okay for now, but

22   you better get yourself a new schedule within

23   three years"?

24       A.   I did not say that.



1    Q.  So looking back at this email that was

2    forwarded to you, let's look at Item 2.  It

3    says, "Per the Schedule 16A and B, these are

4    not needed per above, as we have already paid

5    the dev/run-time fees for the SNMP ARL product

6    back in 1997."

7              And Mr. Hyslop says, "Okay, John.

8    Let's therefore have Schedule 16 marked as

9    'available for re-use,'" meaning we don't need

10   it for Optivity using ARL; correct?

11   A.  Correct.

12   Q.  Now, let's look at what Ms. Allen is

13   saying.  She is saying we have already paid the

14   development run-time fees.  Now, dev means

15   development fees.  Do you have an understanding

16   of that?

17   A.  Mm-hmm.

18   Q.  And those are the fees that you pay for

19   getting the source code that is used for

20   development purposes; correct?

21   A.  Yes, the license fees.  We would call it

22   license fees.

23   Q.  License fee.  Exactly.  License fee.

24   And what a license fee is paid for is getting



1    the source code that you use for development

2    purposes; correct?

3        A.   Yes.

4        Q.   And again, for the ARL product that was

5    covered by the Bay Networks license and covered

6    by Schedule 1 and used by Optivity group, they

7    have already paid the development fees, so they

8    don't need to pay -- they don't need to execute

9    another schedule and pay development fees

10   again?

11       A.   I don't remember the conversations with

12   Vicki Allen.

13       Q.   But this is an email that was forwarded

14   to you; correct?

15       A.   Yes, yes.  I am just saying that clearly

16   there was some discussion going on between me

17   and Vicki Allen, and I don't remember that at

18   all.

19       Q.   Exactly.  And you weren't shown these

20   emails to refresh your memory when you

21   testified yesterday?

22       A.   Correct.

23       Q.   So again, Mr. Hyslop agrees, okay, let's

24   therefore have Schedule 16 marked as available



1   for reuse.

2              Now, in Item No. 3 Ms. Allen goes

3   on to say, "For the ARL product, we have

4   completed the royalty buy out, and I'm having

5   legal send SNMP a letter stating this."  Okay.

6   And we will come back to that in a moment.

7              Now, on Item 4, do you see Item 4,

8   it says, "As we will continue to use the SNMP

9   ARL product, we will continue to pay

10  maintenance, per the 9,600 per year stated in

11  the Bay agreement"?  Do you see that?

12     A.  I do.

13     Q.  So they are just going to continue

14  operating under the same SSA that was already

15  in place under Bay?

16     A.  And I don't recall the SNMP Research

17  price list and whether that was the same price

18  as Nortel would have paid for the same.

19     Q.  Well, that's --

20     A.  It is likely it would have been the same

21  price, but I don't know for sure.

22     Q.  Well, they will continue to pay

23  maintenance per the 9,600 per year stated in

24  the Bay agreement.  And that was, in fact,



1    what -- there was an SSA in the Bay agreement

2    for $9,600; correct?  If you don't remember,

3    that's okay.

4        A.  I don't remember.

5        Q.  The record will show that.

6        A.  Okay.

7        Q.  And you do remember that under the Bay

8    agreement there was an SSA for EMANATE, and

9    that was $7,800?

10       A.  Yes.

11       Q.  And that, too, continued on.  Nortel

12   kept renewing -- SNMP Research International

13   kept renewing that SSA with Nortel.  Remember

14   that?

15       A.  Yes, I do.

16       Q.  And here she is saying with respect to

17   Optivity's use of ARL, they, too, were going to

18   continue renewing that SSA that was put in

19   place under the Bay Networks license.

20       A.  Okay.

21       Q.  Do you see that?

22       A.  I understand.

23       Q.  So at this point the Optivity group is

24   taken care of.  They don't need a new schedule;



1    correct?

2        A.   That appears to be what we concluded,

3    yes.

4        Q.   And they can just continue on with the

5    SSA that had been set up under the Bay license;

6    correct?

7        A.   Correct.

8        Q.   Now, I mentioned Item 3.  There is a

9    letter that would be sent confirming the

10   payment of the final installment for the

11   royalty buy-out under ARL.  Let's just look at

12   that for a moment.  That's Exhibit D-161.

13            And D-161 is a letter from Nortel

14   Networks to Mary Gibson at SNMP Research

15   International, and it states, "Dear Ms. Gibson:

16   On February 17, 2000, Nortel Networks submitted

17   a check in the amount of $22,624 made payable

18   to SNMP Research International, Inc.," known as

19   SNMP.  "This amount constituted the full and

20   complete satisfaction on any amounts owed by

21   Nortel Networks to SNMP, including any and all

22   royalties, past, present or future, in

23   connection with the SNMP software licensed by

24   Nortel Networks, as set forth in the software

1    license agreement entered into between the

2    parties on June 20, 1994, including the

3    amendments thereto.

4              "If you have any questions

5    concerning this matter, please do not hesitate

6    to contact me."  And then you see it is cc'ing

7    Vicki Allen.

8      A.  Yes.

9      Q.  Does that appear to be the letter that

10   Ms. Allen is describing in Item 3 of her email?

11     A.  Well, just a minute.  Item 3 of her --

12     Q.  D-257.

13     A.  Yes, that appears to be what --

14              MR. HERRINGTON:  And, Your Honor

15   we would move D-161 into evidence.

16              MR. BUSCH:  No objection.

17              THE COURT:  All right.  It is

18   admitted.

19              (Defendants' Exhibit No. 161 was

20   received in evidence.)

21   BY MR. HERRINGTON:

22     Q.  Going back to D-257, as the last item,

23   Ms. Allen relates that she had asked you for a

24   proposal to consider changing from this ARL to



1    SNMP BRASS.  Do you see that?

2       A.  Just a moment, please.  Yes, I see that.

3       Q.  And we are going to talk about that

4    proposal.  But first let's look at Exhibit 015.

5    I am going to hand this up to you.  I am sorry.

6    It is D-195.  And Exhibit D-195 is documented

7    sales and marketing phone call notes.

8       A.  Yes.

9       Q.  Do these appear to be your notes,

10   Mr. Southwood?

11      A.  This appears to be my handwriting.

12      Q.  And this relates to your conversation

13   with Vicki Allen?

14      A.  Yes.

15      Q.  And, for example, in the middle you say,

16   "Kill Schedule 16.  Already finished in

17   transaction in 1997."

18      A.  I see that.

19      Q.  Okay.  And that's consistent with the

20   emails that we have been looking at?

21      A.  Yes.

22      Q.  Okay.  Let's look at D-56.02.  Let me

23   try that again.  D-256.02 and .03.

24      A.  I have D-256.02 in front of me.



1        Q.   Do you see that?

2        A.   I do.

3        Q.   .02 and .03.  So this D-256.02 is an

4    email from you to Dave Hyslop, and it says,

5    "Revised Schedule 16.  Vicki Allen modified

6    Schedule 16 for BRASS sources rather than ARL

7    sources.  The prices reflect a proposal in

8    which I gave 100 percent credit for the ARL

9    licenses fees already paid."  Do you see that?

10       A.   Yes.

11       Q.   So again, that reflects that the license

12   fees for ARL, they were already paid; correct?

13       A.   I want to comment on that a little

14   further.

15       Q.   Okay, sure.

16       A.   As I -- particularly as I read this and

17   I am also remembering a transaction with this

18   group in 2004.

19       Q.   And we are going to get to that.

20       A.   Yes, I assume.  And this group in

21   Optivity in Bay was one of our really good

22   customers that was driving the whole -- these

23   transactions forward.  So I am not sure -- this

24   is a general memory.  I can't remember if it



1    was these conversations with Vicki Allen or

2    elsewhere, where it became apparent to me that

3    these, our good friends, were the group that

4    had gotten hurt with the Nortel license, and so

5    I was trying to address the extra licensing

6    fees that they were going to have to pay even

7    though they had paid them, they had paid

8    license fees, so --

9        Q.   Well, exactly.  And you had already

10   determined that because the Optivity group had

11   already gotten ARL under the old Bay Networks

12   license, already gotten the source code --

13       A.   Yes.

14       Q.   -- they didn't need to execute a new

15   schedule; correct?

16       A.   No, that's --

17       Q.   That's what your email stated?

18       A.   Once again, I don't remember the entire

19   context, but I do remember it in terms of

20   feeling badly that they needed to pay for a

21   license that they had already paid for.

22       Q.   Well, they didn't even sign a license at

23   all.  We can go back to your March email,

24   Mr. Southwood --



1      A.   Well, I am referring to that they paid

2   for it as Bay.

3      Q.   Correct.  And remember, we just looked

4   over the emails.  You said we don't need to put

5   Optivity's use of ARL on a new schedule.

6      A.   Yes.  And I can't explain to you why I

7   said that, but I can say that I was trying to

8   address the fact that they had already paid.

9      Q.   Correct.

10      A.   They were good friends, and they were

11   the group in Bay that had particularly taken

12   the blow of the second of our requirement in

13   Nortel to pay a new license fee.

14      Q.   Right.  And again, Optivity didn't need

15   a new schedule at all.  We just looked at that.

16   We looked at your call notes saying kill

17   Schedule 16.

18      A.   I saw that, and I can't tell you my

19   thinking there.  I can just only tell you my

20   thinking with regard to the payment.

21      Q.   So again, we have got this record.  This

22   is 17 years ago, and fortunately, we have a

23   documentary record that you created right there

24   at the time; correct?



1            MR. BUSCH:  Objection.  I don't

2    know if that was a speech or a question or

3    what.

4  BY MR. HERRINGTON:

5      Q.  Well, these call notes, for example, you

6    prepared them soon after your conversation with

7    Vicki Allen; correct?

8      A.  My call notes are typically written

9    free-form during the conversation, so --

10     Q.  Great.

11     A.  So it is sometimes hard to tell what I

12   am quoting, what I am writing.  But they are

13   free-form during the conversation.

14     Q.  So it is actually realtime?

15     A.  Realtime.

16     Q.  And again, then you followed up with the

17   email to Vicki Allen that was in Exhibit 258,

18   and you wrote, "We determined that the current

19   Schedule 16 issued for ARL duplicates the

20   transaction completed in 1997 between Bay and

21   SNMPRI.  And so, we concluded that this

22   Schedule 16 should be retired."

23     A.  I remember seeing that.

24     Q.  So again, they ask for a proposal for



1  the possible use of BRASS, and you put that

2  together.  That's the email and draft schedule

3  that we looked at.  Do you see?

4      A.  I am sorry.  Which display are we

5  looking at?

6      Q.  D-256.02 and .03.

7      A.  I have 256.02 and 256.03.  But I don't

8  see a proposal.  256.03 is Schedule 16A.

9      Q.  Correct.

10     A.  With BRASS.  Okay.

11     Q.  Yes, exactly.  Do you see that?

12     A.  Yes.

13     Q.  So they were interested in a proposal

14  for BRASS.  You put it together and emailed it

15  over to Dave Hyslop.  Okay.  So let's look at

16  what ultimately happened.  Let's introduce

17  D-259.

18          And, Mr. Southwood, actually, let

19  me go back while we are still talking about

20  BRASS.  BRASS, there is a difference between

21  BRASS and ARL; correct?

22     A.  That's correct.

23     Q.  So D-259 is a follow-up email from Vicki

24  Allen to you.  Do you see that?



1     A.   Mm-hmm.

2     Q.   And copying Todd Kimble and Dave Hyslop.

3  And it says, "John, I just received word from

4  our Optivity engineering group that we have

5  changed our minds wrt," with respect to, "our

6  interest in licensing the BRASS libraries.

7  Therefore, there is no need to add this info to

8  a new schedule within the current Nortel/SNMP

9  contract.  We will be staying with the ARL

10  product.  Thanks for all your efforts."

11            Do you see that?

12     A.   I see that.

13     Q.   So they didn't sign any new Schedule 16;

14  correct?

15     A.   Correct.

16     Q.   Now, again, so you knew that the

17  Optivity group was using ARL in their products,

18  didn't sign a new schedule.  When you got to

19  the end of Schedule 1's three-year term, did

20  you ask them to confirm that they were no

21  longer using the ARL?

22     A.   I would have looked at Pierre Tremblay's

23  note that said there was none being shipped,

24  there were no products being shipped, and taken



1    that to include Optivity.

2        Q.   So you are telling us that you were told

3    that ARL wasn't being shipped, Optivity wasn't

4    using ARL anymore?

5        A.   Had I been asked that question, I would

6    have looked at Pierre's note and said it is not

7    being shipped anymore.

8        Q.   So if Pierre's note is accurate --

9    remember he said he didn't look very hard for

10   anything covered by Schedule 1 -- then there

11   should be no Optivity products using ARL at

12   that time?

13       A.   Right.

14       Q.   But Pierre's note was written long after

15   June of 2003?

16       A.   It was in August of 2003.

17       Q.   In August.  But again, so you knew the

18   Optivity group was using ARL.  Did you say,

19   "Vicki Allen, Todd Kimble, you know, I didn't

20   ask you to sign a new schedule.  You didn't

21   sign a new schedule.  But here it is June of

22   2003.  You got to stop using the software"?

23       A.   No, I did not send an email like that.

24       Q.   Or ask in any way?



1      A.   Or ask in any way.

2      Q.   Okay.  And, in fact, Mr. Southwood, the

3   Optivity group was still using ARL after June

4   of 2003.  I suppose you weren't shown any

5   emails that reflect that?

6      A.   Not until the 2004 exchange.

7      Q.   Well, let's look at some emails, and we

8   will see if you have seen those recently.  Tab

9   021, Exhibit D-271.

10             Okay, Mr. Southwood.  You see that

11   D-271 is an email exchange between you and

12   Pierre Tremblay and Kim Curran.  Do you see

13   that?

14      A.   Yes.

15      Q.   And let's start with below the middle of

16   the page, the email from Kim Curran to Pierre

17   Tremblay that ultimately gets forwarded to you;

18   okay?

19      A.   Just a moment.  Okay.  I found Kim

20   Curran's.

21      Q.   And in this email that is forwarded to

22   you, Kim Curran of Nortel states, "As per our

23   conversation, the Enterprise Optivity group

24   (Optivity Network Management System and



1    Optivity Policy Services) requires an update to

2    their SNMP Research software for support of

3    IPv6."

4              Let me just pause.  IPv6, are you

5    familiar with what that is?

6       A.   Generally, yes.  It was the next version

7    of the IP part of the TCP/IP network.

8       Q.   So IP Internet protocol addresses;

9    correct?

10      A.   Mm-hmm.

11      Q.   And there had been IPv4; correct?

12      A.   Had been and was still operating, but --

13      Q.   And that's what the Nortel team had

14   software for was something that was compatible

15   with IPv4; correct?

16      A.   Correct.

17      Q.   And all they were asking is saying we

18   are going to use this software but we just want

19   to upgrade, add the feature of compatibility

20   with IPv6?

21      A.   Yes.

22      Q.   So again, the email from Nortel states

23   that they are seeking an update to their SNMP

24   Research software for support of IPv6.  "Please



1    verify that the current license agreements

2    don't already include this upgrade.  If they do

3    not, please acquire SNMP Research's pricing for

4    Nortel."

5              And then she states, "The SNMP

6    Research products that are used within Optivity

7    are:  Optivity Network Management System

8    requires SNMP Research's ARL Stack."  Do you

9    see that?

10   A.   Yes.

11   Q.   That's that same Optivity use of ARL

12   that we have been talking about up till now?

13   A.   Yes.  And this is the beginning of the

14   2004 --

15   Q.   Exactly.  So this is after June 2003,

16   after the three-year term of Schedule 1?

17   A.   Yes.

18   Q.   Now, Pierre Tremblay forwards

19   Ms. Curran's email to you, and then in the top

20   of page 1 of Exhibit D-271 you explain, "My

21   copy of my April 15 response is inserted below

22   Kim Curran's message to you."  Okay?

23              So this email chain reflects your

24   response to her email and also to Pierre



1    Tremblay's email.

2        A.   And I wish I could find my response.

3        Q.   Well, I am going to show it to you.  If

4    you look at page 2 of 3, on the second page --

5        A.   Yes.

6        Q.   -- and about a third down the page there

7    is a remark it looks like from Pierre Tremblay.

8    "This request relates to schedules 52 and 55 (I

9    think)."  He is wondering, you know, what does

10   this relate to.

11                And do you see below that, that's

12   your response?  Do you see that?

13       A.   It starts, "The source IPv6

14   integration"?

15       Q.   No.  It is where you state, "This puzzle

16   has occupied most of my afternoon, but I think

17   that I have it solved."  Do you see what I am

18   talking about on page 2?

19       A.   I found it, yes.

20       Q.   So you say -- let's read this -- "This

21   puzzle has occupied most of my afternoon, but I

22   think that I have it solved."  And a smily

23   face.

24       A.   Yes.



1      Q.   "When the afternoon is finished I intend

2   to send you a new spreadsheet with more

3   information on it as a result of this search.

4   I may wait a day or two until Schedule 59

5   closes.

6                  "Schedule 52 licenses EMANATE

7   binary tools," et cetera.

8                  And then you say, "For Optivity."

9   "For Optivity, so everything seems fine with

10  Kim Curran's note below."  And then here is the

11  sentence I would like to focus on.  "But, where

12  is the ARL?  We found it under the old Bay

13  license completed before Nortel purchased Bay,

14  but the old license is incorporated into the

15  current license under Schedule 1."

16                  Do you see that?

17     A.   I see that.

18     Q.   So you are addressing the question where

19  is the license to Optivity's use of ARL;

20  correct?

21     A.   Yes.

22     Q.   And you are addressing that question in

23  April of 2004?

24     A.   Yes.



1    Q.  And your answer was "Where is the ARL?

2    We found it under the old Bay license completed

3    before Nortel purchased Bay, but the old

4    license is incorporated into the current

5    license under Schedule 1."

6              Is that what you stated in your

7    email?

8    A.  Yes.

9    Q.  You did not state Schedule 1 went poof

10   in June of 2003; correct?

11   A.  I did not say that.

12   Q.  You didn't say it is no longer in

13   effect, nothing should be licensed under it

14   anymore, nothing should be covered under

15   Schedule 1 as of April of 2004; correct?

16   A.  Correct.

17   Q.  And again, this relates back to that

18   same Optivity use of ARL which you discussed

19   with Vicki Allen back when all these new

20   schedules were being put together, and you told

21   her she doesn't need a new schedule for

22   Optivity's use of ARL.  You remember we looked

23   at those emails?

24   A.  Yes.  I don't remember saying she didn't



1   need a new schedule, but the schedule was

2   killed.

3       Q.  Well, you said we are going to retire

4   Schedule 16.

5       A.  Yes.

6       Q.  So here it is, it is April 2004, almost

7   a year after the end of Schedule 1's three-year

8   term, and you say, "Where is the ARL?  We found

9   it under the old Bay license completed before

10  Nortel purchased Bay, but the old license is

11  incorporated into the current license under

12  Schedule 1."

13              Now, again, there is a request for

14  a new feature by this group, IPv6, this

15  addition going from IPv4 compatibility to IPv6

16  compatibility; correct?  And you address that

17  new feature and you actually talk about what it

18  is going to cost.  Okay?

19      A.  Yes.

20      Q.  And that discussion first begins on page

21  2 just above the section we looked at, and it

22  says -- excuse me one second.  And it says,

23  "There is a separate licensing fee since IPv6

24  is considered optional and it is not required



1    by the core SNMP protocols.  See more below."

2              And then on the next page, page 3

3    of 3, the second full paragraph, you talk about

4    your pricing policy for the upgrade.  Okay?

5        A.  Yes.

6        Q.  And you state 10,000 on the first

7    platform, 9,000 on the second, 8,000 on the

8    third.  "In addition, the porting work to AIX

9    and HP-UX is estimated at $5,000."  And I think

10   you added up -- if it says one porting charge,

11   that comes to 32,000.  Do you see that?  Ten

12   plus nine is 19 plus 8 is 27 plus 5 is 32.

13       A.  I am really sorry.  My mind is -- I had

14   the 27 and on the fourth platform, that would

15   have been what?  35.  And there is porting work

16   on two operating systems, so that would be a

17   total of 10,000, 5,000 per platform.

18       Q.  Okay.  Let's look at an email where you

19   actually forwarded this entire exchange to

20   Dr. Case.  This is D-272.  And, Mr. Southwood,

21   if you look at the second page of D-272, that

22   has that same statement "Where is the ARL?  We

23   found it under the old Bay license completed

24   before Nortel purchased Bay, but the old

1    license is incorporated into the current

2    license under Schedule 1."  Do you see that?

3        A.  My eye hasn't gone on to it -- yes, I

4    found it again.

5        Q.  And let's turn to the first page.  And

6    what is happening here is if you look two-

7    thirds of the way down the page, there is an

8    email from Kim Curran to Pierre Tremblay saying

9    basically, can we get this IPv6 version under a

10   temporary license so we can start our

11   development effort.  Do you see that?

12       A.  Yes.

13       Q.  Pierre conveys that to you.  And then

14   you forward this entire email exchange to

15   Dr. Case.  And you say, "Nortel wants a source

16   eval of IPv6/ARL/Solaris.  They already have

17   licensed ARL/Solaris."  Do you see that?

18       A.  Yes.

19       Q.  And you ask his permission to send them

20   a source evaluation for the IPv6 feature;

21   correct?

22       A.  Correct.  That was really the topic of

23   the email.

24       Q.  And you get that permission?



1      A.   I don't recall, but apparently, we did.

2   I think if we sent it, then I did get the

3   permission.

4      Q.   Okay.  Let's look at Exhibit P-30.51.

5   And this is Schedule 60; correct?

6      A.   Yes.

7      Q.   This is what -- you testified about this

8   yesterday?

9      A.   Yes.

10      Q.   And this covers the upgrade to the IPv6

11   feature; correct?

12      A.   It covers asynchronous request libraries

13   on three different platforms with the IPv6 in

14   it.  But the license is for ARL.

15      Q.   And the license fee is for the addition

16   of the IPv6 feature; correct?

17      A.   Yes, but it is a license fee.  It names

18   ARL.  They have signed it.  This is a valid

19   schedule for --

20      Q.   There is no debate about that,

21   Mr. Southwood.  I wasn't questioning that.

22      A.   Okay.

23      Q.   I am asking you what the license fee is

24   for.  It is for the addition of going from



1    Version 4 to Version 6 compatibility?

2        A.   It is a license fee, and it states for

3    asynchronous request libraries.

4        Q.   Well --

5        A.   It doesn't call -- it names the IPv6,

6    but it is for the entire product.

7        Q.   Well, Mr. Southwood, let's just look

8    back at the email that we were just looking at.

9        A.   Yes.  I recall the correspondence.  I

10   know where the 27,000 came from.  But the

11   document says ARL.

12       Q.   Right.  And you explained in that

13   contemporaneous email why is there a charge;

14   correct?  There is a charge for the addition of

15   the IPv6 feature; correct?

16       A.   The charge was for the entire statement

17   of the product.  There was a discussion that

18   that was the charge for the IPv6 additional

19   feature.  But the way Schedule 60 is written,

20   it is for the entire product.

21       Q.   Well, back in -- actually, so two

22   things.  Let's look at your email again.  And

23   you said, "There is a separate licensing fee

24   since IPv6 is considered optional."  Correct?



1    That's what the licensing fee is.  That's the

2    basis for the licensing fee.

3        A.   That's the basis for the licensing fee.

4        Q.   And, in fact, let's look at an email

5    that you then sent to Dr. Case.  This is D-283.

6    And you wrote to Dr. Case, "Jeff, last week we

7    sold a license to Nortel to add IPv6 to

8    previously licensed ARL (old Bay license) on

9    three operating systems.  Schedule 60."

10   Correct?  So that's referring back to the

11   Schedule 60 that we just looked at.

12       A.   Yes.

13       Q.   Mr. Southwood, I would like to turn to

14   those four new schedules that were signed back

15   around the time of the signing of Schedule 1.

16   We are going to hand up those four new

17   schedules.

18                 MR. BUSCH:  What exhibit is this?

19                 MR. HERRINGTON:  Exhibits D-17,

20   D-19, D-20 and D-32.

21   BY MR. HERRINGTON:

22       Q.   Mr. Southwood, let's first look at D-17

23   and D-20.  And those are schedules for the

24   voice over IP group located in Richardson,



1   Texas.

2       A.   And I am sorry.   I have the schedules.

3   I don't have a reference to it.   So if you tell

4   me which schedule number, please.

5       Q.   D-17 and D-20.   That's Schedule 12 and

6   Schedule 20.

7       A.   I have Schedule 12 and Schedule 20.

8       Q.   Okay, great.

9       A.   Okay.   There is the markings on the

10  bottom.   I was looking at the top.

11      Q.   Yes.

12      A.   Okay, thank you.

13      Q.   And the location of those two specified

14  entities on those two is Richardson, Texas, and

15  one is for Enterprise Voice over IP, and the

16  other is Succession for Enterprise Network

17  Services, "Specified product or project:  Voice

18  over IP Network Services Software."  Do you see

19  that?

20      A.   Yes.

21      Q.   And then if you look at Exhibits 14 and

22  37, the specified entity there is Northern

23  Telecom Limited, the Micom group in one, the

24  Enterprise Micom Group in another, in Simi



1    Valley, California.  Do you see that?

2        A.  Yes.

3        Q.  The software covered by these schedules

4    includes, for example, Schedule 12, software

5    that is not covered by Schedule 1.  If you have

6    Schedule 1 with you.

7        A.  I do have Schedule 1.

8        Q.  Okay.  And Schedule 12 covers BRASS

9    server binary for Windows NT and BRASS

10   management applications development kit binary

11   for Windows NT.

12       A.  Yes.

13       Q.  Do you see that?

14       A.  Yes.

15       Q.  And that's not covered under Schedule 1?

16       A.  The EMANATE portion is.

17       Q.  Right.  I am asking you about the BRASS

18   portion.

19       A.  Yes, BRASS is not covered.

20       Q.  BRASS is not covered by Schedule 1?

21       A.  Yes.

22       Q.  And it was not covered by the Bay

23   Networks license either?

24       A.  Correct.  Just a moment.  Under



1    Schedule 1, "Development Software licensed in

2    these agreements and amendments are:"  No. 3

3    says, "BRASS binary tools on Solaris."

4       Q.   Right.  And my question was Schedule 12

5    covers BRASS server binary for Windows, not

6    Solaris.

7       A.   And it is not for Windows.

8       Q.   So again, what is included in Schedule

9    12 is not covered under Schedule 1?

10      A.   Yes.

11      Q.   Let me step back for a moment,

12   Mr. Southwood.  All of these new schedules

13   began with an evaluation license.  Do you

14   remember that?

15      A.   I know we were sending evaluations to

16   Nortel.  I can't agree with "all."  I don't

17   know if it was all of them.  But we did send

18   out a number of evaluations.

19      Q.   Okay.  Well, then we will just go

20   through the record to show you that, in fact,

21   all four of these schedules -- or at least we

22   will go through one or two to give you an

23   example, and then maybe we will just rely on

24   the documentary record to show it with respect



1    to the others.

2              Let's look at Exhibit D-306.  And,

3    Mr. Southwood, what I am going to be asking you

4    about is Schedule 12, so if you could take

5    these exhibits and look at them in relation to

6    Schedule 12.

7        A.   Okay.  I am looking at 306 with regard

8    to Schedule 12?

9        Q.   Correct.  And you see the top part of

10   the first page there is a contact name and

11   address, and then below the addresses it says,

12   "Evaluation needed:  EMANATE (Agent) and BRASS

13   (Manager) on CD, Platform:  Windows NT."  Do

14   you see that?

15       A.   Yes.

16       Q.   And those software products are included

17   on Schedule 12.  Do you see that?

18       A.   Yes, I do.

19       Q.   On Exhibit D-184, that's a fax from you

20   to Dave Hyslop.

21       A.   Just a moment.  Here is 184.  I have it.

22       Q.   And if you look at the third paragraph,

23   it says, "In addition, Schedule 12 is

24   attached."  And let's look at the last sentence



**WILCOX & FETZER LTD**
Registered Professional Reporters
(302) 655-0477
www.wilfet.com

1    in that paragraph.  "Since we sent this group

2    sources under an Evaluation License, then they

3    receive a license for the sources."  Do you see

4    that?

5       A.  Yes.

6       Q.  So that does refer to sending them an

7    evaluation license?

8       A.  Yes.

9       Q.  And then finally, let's just look at the

10   evaluation license.  That is Exhibit 300.

11      A.  I see it electronically.  Is that

12   No. 300?

13      Q.  It is.  If you look at the next page,

14   you will see the text.  So please look first

15   down toward the bottom of what is page 1.  It

16   is page 2 of 7 in this document, where it says

17   "Licensee."

18      A.  Yes.  Northern Telecom Inc.?

19      Q.  Exactly.  And you see Voice over IP

20   Division, same just like Schedule 12 is the

21   voice over IP, and you see it is an address in

22   Richardson, Texas?

23      A.  Yes.

24      Q.  And under "Licensed Module," you see



1  EMANATE for Windows and BRASS for Windows, and

2  those are both covered by Schedule 12.

3       A.  Yes.

4       Q.  Okay.  Does this appear to be the

5  evaluation license that you referred to in your

6  email to Dave Hyslop?

7       A.  It must have been.

8              I am going to cough.  I am sorry.

9       Q.  And please.  Mr. Southwood, Judge Gross

10  is indulgent.  Would you need a break or are

11  you okay?

12       A.  I think I am okay.

13       Q.  Please let us know if you do need a

14  break.

15              Okay.  So let's talk about the

16  scenario where a group needs an evaluation

17  license.  That's when a group doesn't have your

18  software already; correct?

19       A.  Yes.

20       Q.  And they are considering using your

21  software for a new development project?

22       A.  Yes.

23       Q.  And the evaluation license permits them

24  to have a copy of your software for purposes of



1    evaluating it?

2        A.   Yes.

3        Q.   And all of these evaluation licenses,

4    the record will speak for itself, the

5    documentary record, were sent in the 1999 and

6    2000 timeframe; okay?

7        A.   I would accept that because I know we

8    were sending a number of evaluations to Nortel

9    in that timeframe.

10       Q.   Okay.  And, again, that means that these

11   groups were just at the beginning of their

12   development process at that time when they were

13   asking for the evaluation license?

14       A.   I don't know if they were in the

15   beginning of their development process.

16   Generally, they were beginning to look at our

17   code.

18       Q.   Right.  So they haven't yet gotten your

19   code?  They haven't yet evaluated it?  They

20   haven't yet put it into their products?

21       A.   Yes.

22       Q.   And all of that process is beginning

23   with the evaluation license?

24       A.   I assume so, yes.



1    Q.   Now, another thing that happened with

2   these new schedules is that International

3   actually shipped the source code, the

4   development source code, to these groups

5   pursuant to the new schedules; correct?

6    A.   I want you to say with regard to an

7   evaluation license, but I think you are asking

8   with regard to schedules.

9    Q.   Well, I am talking about after the

10  schedule was signed, and so they are, indeed,

11  going forward; correct?

12   A.   If the schedule says source code, that's

13  what we sent to them.

14   Q.   And again, that is -- why don't we just

15  look at Exhibit D-166.  Mr. Southwood, this is

16  an interrogatory answer provided by SNMP

17  Research International and Inc.  And starting

18  on page 4, there is a schedule, a list of

19  shipments of source code from International to

20  Nortel.

21           And if you look at page 8, by page

22  8, 8 of 24, and you look at the very bottom,

23  you see Schedule 12, and that reflects a

24  shipment of source code January 27, 2000.  Do

1   you see that?

2      A.   The very last line on page 8?

3      Q.   Correct.

4      A.   Yes, I see that.

5      Q.   Okay.  And that shipment was January 27,

6   2000, which is after Schedule 12 was signed?

7      A.   Yes.

8      Q.   So --

9      A.   May I comment --

10     Q.   Sure.

11     A.   -- on a few things?  One is that our

12  internal language, Mab.SADK.w32 is for

13  binaries, not for sources.

14     Q.   Okay.  Then let's look at page 9.  And

15  you see another shipment for Schedule 12.  Do

16  you see that?

17     A.   I am on page 9, yes.

18     Q.   And what is that for?

19     A.   Typically, we use that Bb.MADK for

20  binaries.

21     Q.   And so was the source code already sent

22  to them under the evaluation license?

23     A.   We send out evals under binary and

24  source.  As I sit here, I can't tell you.



1      Q.  Well, we looked at the email that you

2  sent to Dave Hyslop about Schedule 12, and you

3  said because we sent this as an evaluation

4  license, they will be paying for the source

5  code.

6      A.  You did point that out to me, but that

7  sentence is inconsistent with the schedule, and

8  we would typically follow --

9      Q.  So these are shipments.  You are saying

10  if that's binary, then these happen to reflect

11  binary.  But again, under the evaluation

12  license, you would be giving them source code

13  to work with.

14      A.  Typically -- well, and I am talking

15  policy.  I am not talking this particular

16  transaction.

17      Q.  Yes.

18      A.  Almost always when we send out

19  evaluations, we send out binary evaluations.

20  And we did send out source evaluations to

21  Nortel, but we also sent out binary.  And so I

22  would hate to lead you either way on the

23  choice, on my choice of a single word.  I may

24  have misled in that email.

1     Q.   In that email you wrote, at the time you

2   were saying that under Schedule 12 they got an

3   evaluation license and they would be paying for

4   source code.

5     A.   Yes.  Schedule 12 actually licenses --

6   the prices in it are binary prices.

7     Q.   Okay.  Let's look at Schedule 14, for

8   example.  That covers EMANATE sources --

9     A.   I am kind of overwhelmed with papers

10   here.  Which ones should I be keeping open

11   and --

12     Q.   We will finish with the schedules in a

13   bit and you can then put them aside.  I will

14   read Schedule 14.

15     A.   I have Schedule 14 in front of me.

16     Q.   And Schedule 14 covers EMANATE sources

17   for VxWorks and cross-development tools for

18   Solaris.  Do you see that does include sources?

19     A.   Yes, and it would include sources.

20     Q.   Schedule 20 includes BRASS sources for

21   Windows NT, and Schedule 37 includes EPIC

22   adaption sources for EMANATE sources on

23   VxWorks.

24     A.   Yes, all those three were sources.



1      Q.   And you testified yesterday that what

2   the license fee is paid for under the new

3   schedules is -- you said the license fee was

4   paid at the time of the original transaction

5   and the execution of the license and was

6   associated with the delivery of our development

7   tools to our customer.

8      A.   Yes.

9      Q.   And that's accurate?  Okay.

10              And so what the new Nortel group

11  covered by these new schedules is paying for is

12  the delivery of your development tools to them;

13  correct?

14     A.   Correct.

15     Q.   And that's different from a situation

16  that we looked at with Optivity, for example,

17  in which that group had already purchased and

18  received the source code for developing their

19  products?

20     A.   I suspect that is true.  I can't again

21  as I sit here try to remember each of these

22  four transactions.

23     Q.   Well, again, the Optivity was the one

24  for which there was no schedule.



1      A.   Sure.  I remember that, but --

2      Q.   Because they had already paid for and

3   received a source code earlier.

4      A.   I remember that.

5      Q.   Okay.  Thank you.

6      A.   Whether or not any of these four had

7   received it previously or licensed it

8   previously, I don't know.

9      Q.   Well, again, if they received evaluation

10   licenses, that means they were just beginning

11   to take a look at your software; correct?

12      A.   I can see how you would connect those

13   dots.

14      Q.   Okay.  And again, another thing that

15   these new schedules did is set up an SSA for

16   the software that is being provided?

17      A.   Yes.

18      Q.   And as we looked back under that email

19   exchange you had with Vicki Allen back in the

20   2000 time period, there was no new schedule for

21   Optivity's use of ARL; correct?

22      A.   They were already -- they had already

23   received.  That was already in place, yes.

24      Q.   Exactly.  They had already received the



1  source code, and they didn't need a new

2  schedule to set up an SSA either; correct?

3      A.  Had they done -- again, I am mystified

4  with that one why I agreed not to have a

5  schedule.  But had they done a schedule, we

6  would have readdressed the software service

7  agreement on a schedule.

8      Q.  But I am addressing what actually

9  happened, which is they didn't sign a new

10  schedule.  They just kept that same SSA that

11  they had under the Bay Networks license;

12  correct?

13      A.  Okay.

14      Q.  Well, we can look back --

15      A.  I mean, I can see how you would connect

16  those dots, but --

17      Q.  Well, that's what Ms. Allen said in an

18  email that was forwarded to you.

19      A.  Yes.

20      Q.  Remember we looked at that?

21      A.  Yes.

22      Q.  Mr. Southwood, I would like to look at

23  an email that you were shown yesterday.  This

24  is Exhibit P-38.  This is the email that



1    Mr. Hyslop wrote to you on November 15 and that

2    you responded to on November 16; correct?

3        A.   Correct.

4        Q.   And again, as you testified, we just

5    reviewed, a license fee is paid at the time of

6    the original transaction and the execution of

7    the license and was associated with the

8    delivery of our development tools to our

9    customer.  So with that in mind, let's look at

10    what Mr. Hyslop says.

11              This is the beginning of his

12    email.  Do you have it in front of you?

13        A.   Yes, I do.

14        Q.   Okay.  "Column 1 divides the

15    requirements into 'Bay' and 'NT' requirements.

16    Those identified as 'Bay' products are subject

17    to the in place Bay-SNMP RI agreement (which

18    has been assigned by Bay to Nortel); i.e. had

19    the Bay-Nortel merger never occurred, Bay would

20    have been entitled to deploy these production

21    royalty free."

22              Okay?  Let's focus on the next

23    sentence.  "However, if any of these product

24    development groups require source code



1    development licenses (e.g. source code for

2    Emanate or license fees for other SNMP RI

3    software which will not be embedded into the

4    Bay product), they must be paid for on a 'Bay'

5    product by 'Bay' product basis as per the terms

6    of the existing Bay-SNMP RI agreement."  Do you

7    see that?

8        A.  I see it.

9        Q.  So he is saying if a group on this

10   spreadsheet needs the source code development

11   license, then they need to pay for it; correct?

12       A.  As I read his note, I read

13   development -- he didn't have the distinction

14   between binary and source in terms of

15   development tools.  And we offered code

16   development tools in both source and binary.

17   And so I didn't react to his use of the word

18   source.

19       Q.  And I am not focusing on whether it is

20   source or binary.  I am actually focusing on

21   development.

22       A.  Okay.

23       Q.  Correct?

24       A.  Yes.



```
1        Q.  So you are saying to be more precise, he

2   could have said require source code or binary

3   code development licenses; okay?

4        A.  Yes.

5        Q.  So he is saying if any of these product

6   development groups require source code

7   development licenses, then that needs to be

8   paid for; okay?  Do you see that?

9        A.  I see that.  I know that what they

10  needed was the rights that we were --

11       Q.  Right.  The rights to the development

12  software?

13            MR. BUSCH:  Your Honor, I would

14  like the witness to be able to answer the

15  question.  He is in the middle of answering and

16  Mr. Herrington interrupted him to add in the

17  middle of his answer.  I would like the

18  courtesy to have him finish his answer.

19            MR. HERRINGTON:  That's perfectly

20  fine.  I am sorry if I interrupted him.

21            THE WITNESS:  While the delivery

22  of the code, the development tools was a part

23  of a typical transaction, we were actually with

24  the schedule granting the rights under the
```



**WILCOX & FETZER LTD**

Registered Professional Reporters
(302) 655-0477
www.wilfet.com

1    Nortel license to those Bay parts who already

2    had the code.  So it was the rights that they

3    needed.

4  BY MR. HERRINGTON:

5      Q.  Well, we just looked at those four new

6    schedules, Mr. Southwood.  And remember we

7    looked at Schedule 12, for example.  They

8    started with an evaluation license; correct?

9      A.  Yes.

10     Q.  They didn't have the code; correct?

11     A.  Most often in a transaction it was as I

12   mentioned yesterday.  The license is signed, we

13   deliver the code, and they pay all in --

14     Q.  Correct.  Sorry to interrupt.

15     A.  So with Nortel or with Bay, that was

16   unusual because as you have been pointing out,

17   Bay already had the code, but that doesn't

18   undermine the fact that they needed the rights

19   and there was a payment --

20     Q.  Well, we looked at -- and you said the

21   license fee was paid at the time of the

22   original transaction and was associated with

23   the delivery of our development tools.  The

24   Optivity group already had ARL; correct?



1    A.   Yes.

2    Q.   And so they didn't need to execute a new

3  schedule at the time, as you stated to Vicki

4  Allen?

5    A.   I am still mystified about that.  I know

6  you are saying that's what happened and that's

7  what was in the emails, but I cannot come up

8  with our thinking on that.

9    Q.   That's what you said and that's what you

10  did; correct?

11    A.   That's what I wrote, yes, and that's

12  what we did.  But I am not sure what our

13  thinking was, and so I couldn't generalize at

14  all from that behavior.

15    Q.   But again, that group already had the

16  source code, already had it under the Bay

17  Networks license, and they didn't execute a new

18  schedule; correct?

19    A.   And I know I was very pleased for them

20  to sign Schedule 60 and to close that door.

21    Q.   Actually, what you said to them when you

22  first were addressing it was where is the

23  licensed ARL?  It is under Schedule 1.  Do you

24  remember that?

1      A.   I do.

2      Q.   Mr. Southwood, I will show you D-76C.

3    This is your email in response to Mr. Hyslop.

4    And you testified about this yesterday.

5      A.   And I am puzzled again.  We are on

6    the --

7      Q.   Oh, you don't have it yet.

8      A.   Okay.

9              MR. BUSCH:  Your Honor, we have

10   been going for about an hour and a half, and I

11   hate to do this, but if we are going to take a

12   mid-afternoon break, I would appreciate doing

13   that at this time.

14             THE COURT:  Is that all right with

15   everyone?

16             MR. HERRINGTON:  No objection,

17   Your Honor.

18             THE COURT:  Let's do 15 minutes.

19   So I will be back here at five after.

20                (Recess taken.)

21             THE COURT:  Thank you, everyone.

22   You may be seated.

23   BY MR. HERRINGTON:

24     Q.   All right.  Mr. Southwood, if you could



1    please turn, it is D-76B.

2                    MR. HERRINGTON:  And by the way,

3    Your Honor --

4                    THE COURT:  Yes.

5                    MR. HERRINGTON:  -- so we

6    oftentimes have exhibits A, B, C.  What that

7    means is they are all the same exhibit, but if

8    it was marked in say Dr. Case's deposition,

9    that is 76A.  If we want to do the one from

10   Mr. Southwood's deposition, that's 76B.  And

11   then because the quality of the reproduction

12   wasn't very good, we introduced 76C.

13                   THE COURT:  Okay.

14                   MR. HERRINGTON:  But they are all

15   76.

16                   THE COURT:  All right.  Good.

17   BY MR. HERRINGTON:

18       Q.  So, Mr. Southwood, actually, I have just

19   one or two questions about this document.  This

20   is your email in response to Mr. Hyslop's email

21   that we just looked at; correct?

22       A.  Correct.

23       Q.  And I want to focus on the part where

24   you say, "Rick Barnes, our counsel, is crafting



1    the final Bay transfer to Nortel based on the

2    previous term which expired November 1.  I told

3    him that the royalty buy out would expire in

4    three years.  I thought we agreed to that in

5    our conference room.

6                    "By expire I mean that new

7    products/projects brought on line after three

8    years would address royalties on their own

9    merit.  Current Bay products and development

10   projects for the next three years will take

11   advantage of the lifetime royalty buy-out until

12   their products have aged out of the

13   marketplace.

14                   "After three years the

15   distinctions between Bay and Nortel will have

16   blurred so much that it will be impossible to

17   tell which is which.

18                   "With the possible exception of

19   the time out, I think that your message is fine

20   to send.  I'm not even certain if the time out

21   is relevant to send to everyone at this time

22   since it won't affect current or short term

23   projects."

24                   Do you see that?



1       A.   Yes.

2       Q.   Okay.  And my question for you is in

3    that last paragraph, when you are referring to

4    the time out, you are referring to the

5    three-year period under Schedule 1?

6       A.   Yes.

7       Q.   Okay.  Thank you.

8       A.   Can I move these exhibits together?

9       Q.   You may.  We are moving on to some more

10   exhibits, so that's a good idea.

11      A.   Should I keep Schedule 1A?

12      Q.   You actually should keep that, because

13   we are going to refer back to that.

14      A.   But the rest of them I can pile up.

15      Q.   Yes, exactly.

16           Mr. Southwood, what we are marking

17   next are SSAs that were renewed year after year

18   for the same EMANATE software that is covered

19   by Schedule 1.  And the first one is D-96.

20   Mr. Southwood, we are going to give you some of

21   the earlier ones as well, but I want to start

22   with D-96.  That is an invoice for a software

23   service agreement on intellectual property for

24   a one-year period on SNMP software.  It is

1    EMANATE source on Solaris, VxWorks and Win32.

2    That EMANATE software is the same EMANATE

3    software that is specified in Schedule 1;

4    correct?

5        A.   Yes.

6        Q.   And at this time Nortel would have had

7    the right to use the software under Schedule 1;

8    correct?

9        A.   And this was in 2001?

10       Q.   Yes.

11       A.   Yes.

12       Q.   D-97 is a renewal of the same SSA.

13   That's May of 2002.   Correct?

14       A.   Yes.

15       Q.   And this as well would be covered under

16   Schedule 1; correct?

17       A.   I don't see any reference to Schedule 1

18   in this, and I note yesterday when we discussed

19   this Lori was not particularly aware of our

20   schedules.

21       Q.   Well, we actually have a document that

22   we have shown the Court that shows that SSAs --

23   well, we can -- we will get to that as the

24   documentary evidence.



1          MR. BUSCH:  I just object to the

2    representations that Mr. Herrington continues

3    to make about the evidence or whatever is when

4    there is no such need -- I don't think it is

5    proper for him to comment on what things say or

6    documents say.  That's my point.

7          THE COURT:  All right.

8    BY MR. HERRINGTON:

9        Q.  I actually was asking a different

10   question, Mr. Southwood.  Just as you said

11   before, the software covered by this SSA is the

12   same software covered under Schedule 1;

13   correct?

14       A.  It was actually the same software

15   covered under the Bay license.

16       Q.  Exactly.

17       A.  But at this point it was under

18   Schedule 1.

19       Q.  Exactly.  It was incorporated into the

20   Nortel agreement under Schedule 1.

21       A.  Yes.

22       Q.  Okay.  And so as of May 2002 this SSA

23   for the use of this software would have been

24   permitted under Schedule 1?



1      A.   Correct.

2      Q.   As you look at the other exhibits, other

3   invoices, they go on.   There is May of 2003,

4   May of 2004, May of 2005, May of 2006.

5      A.   You are going much too fast for me.

6      Q.   You can look at them quickly, but you

7   will see the point is they go on well after

8   June of 2003.

9      A.   Yes.

10      Q.   And so the same software that had been

11   licensed under Schedule 1, the updates are

12   being provided year after year beyond the

13   three-year period of Schedule 1; correct?

14      A.   They were being provided.   I am thinking

15   there wasn't very good communication.   It

16   wasn't willful.

17      Q.   I am not asking whether it is a willful

18   mistake or whether it was a mistake at all.   I

19   know that, you know -- I am asking you was the

20   same software that was covered under Schedule 1

21   continued to be provided year after year beyond

22   the three-year period after Schedule 1?

23      A.   We continued to provide their software

24   service renewals, yes.

1    Q.  And including copies of the software;

2    correct?

3    A.  Yes, I am assuming upgrades.  We didn't

4    make an exception for them.

5    Q.  And you would expect that if a customer

6    has paid and is paying for upgrades year a

7    after year, that they are actually using the

8    software; correct?

9    A.  I really don't know that.

10   Q.  Well, Mr. Southwood, I actually asked

11   you the same question in your deposition.

12   A.  Yes.

13   Q.  So let's go back to that.  And I said,

14   "Question:  I am not really asking whether you

15   pressed to know it.  But would it be the

16   norm -- would you expect that if a customer is

17   paying for upgrades year after year for a

18   period of eight years that they are actually

19   doing something with the software in their

20   products?  Correct?"

21               And your answer --

22               MR. BUSCH:  Different question,

23   Your Honor.  I just want to note for the record

24   that is not the same question.



**WILCOX & FETZER LTD**
Registered Professional Reporters
(302) 655-0477
www.wilfet.com

1          MR. HERRINGTON:  It is exactly the

2    same question.

3    BY MR. HERRINGTON:

4       Q.  "Answer:  One would expect they're using

5    it."  That's the testimony you gave --

6       A.  That was a general answer, not in

7    association -- what I recall of that

8    interchange is that you kept asking me if

9    Nortel was using it and I said I don't know.

10   That's not a question that we would ask our

11   customers.

12      Q.  And again, Mr. Southwood --

13      A.  And that's still true.

14      Q.  And again, I am not quarreling with

15   that.  I am quarreling with what one would

16   expect.  And what I asked you is -- I said, "I

17   am not really asking whether you pressed to

18   know it," whether you asked Nortel.  "But would

19   it be the norm -- would you expect that if a

20   customer is paying for upgrades year after year

21   for a period of eight years that they are

22   actually doing something with the software in

23   their products?"

24          And your answer was:  "One would



1    expect that they're using it."

2              Was that the testimony you gave

3    under oath in your deposition?

4        A.   It is.  I would not dispute that at all.

5    But may I make a few other comments?

6        Q.   Sure.

7        A.   At the time, as we were doing this,

8    there would be other companies, and again, no

9    reflection on Nortel, but who would get

10   upgrades and set it aside, and the value that

11   they were receiving, you know, was, number one,

12   access to support, but number two, having

13   that -- those development tools available to

14   them if they wished to use it.  But they had

15   taken a particular version, integrated it

16   within their product, and they had no interest

17   in upgrading their own product because the

18   software that they had from us many years ago

19   was working perfectly fine and according to the

20   standards.  So there were a number of times

21   that the value they got from the upgrade was

22   just to know they had it available if they

23   wanted it.

24       Q.   Correct.



1       A.   And if that's use, then that's use.   But

2    I can't say that it was rolled into a product.

3       Q.   But, Mr. Southwood, if they pulled it

4    out of their product -- you are saying maybe

5    they already put your software in their product

6    and they are not upgrading it anymore.   But if

7    they pulled it out of their product -- right?

8    -- they are not using your software at all

9    anymore, why in the world would they pay $7,800

10   a year to get updates and get support?

11      A.   Fair question.

12      Q.   Now, there wasn't any other schedule

13   after June of 2003 under which these SSAs could

14   be justified; correct?

15      A.   Correct.

16      Q.   We are going to go to January of 2006 --

17      A.   Wait a minute.

18      Q.   Excuse me.   I don't have a question

19   pending.   I am going to a new exhibit.

20      A.   I want to -- I am having a thought.

21   Your last question about there weren't any

22   other schedules under which it could be

23   justified.   Were these going to the Optivity

24   group and didn't -- I would have to go back and



1    look at the schedules for certain -- there were

2    some EMANATE products licensed to --

3        Q.  Well, let me show you an internal

4    document that reflects what these SSAs were

5    classified under.  This is D-79B.

6        A.  This looks like an accounting.  I am

7    sorry.  Please ask your question.

8        Q.  Yes.  This is a customer ledger, and you

9    see the $7,800 charges.  Let's look at page 8

10   of 36 in the document.  And you see "Bay Nortel

11   (Was Bay)"?

12       A.  I see that.

13       Q.  And you see the $7,800 charges that

14   appear periodically?

15       A.  No, I don't right at the moment.

16       Q.  Okay.  Look under debit amount.

17       A.  Okay.  6/1/99, I see $7800.

18       Q.  And it continues?

19       A.  As I glance down the column, I see it,

20   yes, four or five times.

21       Q.  Okay.  And, in fact, the last one looks

22   to be --

23       A.  Oh, I am sorry.  Yes, that was debit

24   amount.



1    Q.  It goes on to the next page up

2    through -- there are entries for 2007 and 2008

3    and 2009.  Do you see that?

4        A.  I see that.  I want to observe that this

5    is accounting, and I was not involved in this

6    with SNMP Research, so this is my first

7    exposure, unless you showed these to me at the

8    deposition.

9        Q.  Well, I did.

10       A.  I didn't spend time --

11       Q.  We did.  So this lists other schedules,

12   other Nortel items, Nortel 4, 5, 6, 7, 9.  So

13   these SSA payments are not put under any other

14   schedule or account connected with Nortel.  Do

15   you see that?

16       A.  No, I don't.  As a matter of fact, I

17   lost your references and not put under another

18   account.  That's so beyond my experience to be

19   able to comment on that.

20       Q.  That's fine, Mr. Southwood.  Okay, let's

21   look at something that actually did come from

22   you.  Let's start with Exhibit D-84.

23       A.  Is that coming?

24       Q.  Okay, Mr. Southwood.  D-84 is an email



1  from Nana La-Anyane to John S.  That's you;

2  correct?  Copying --

3     A.  John S was actually not my email

4  address, and there was another one that said I

5  had his wrong email address.  Mine was John@.

6  But I eventually received this.

7     Q.  You got this email?

8     A.  Yes.

9     Q.  And Mr. La-Anyane says, "Hi, The EDN

10  group in Nortel recently struck a partnership

11  with Trapeze Networks.  They are using the SNMP

12  Research engine in their code, and so are we."

13  Do you see that?

14     A.  I see that.

15     Q.  And then let's look at D-85.  This is an

16  email that you wrote, do you see at the top?

17     A.  Yes.

18     Q.  And then let's look at the letter that

19  you sent as part of this, D-78.  And,

20  Mr. Southwood, in your letter to Nana

21  La-Anyane, you wrote, "Nortel Networks has a

22  license with SNMP Research International for

23  EMANATE sources running on Windows, Solaris,

24  and VxWorks as referenced" under "Schedule 1.



1    That schedule incorporates the paid-up

2    royalties' license previously established by

3    Bay Networks."

4                Now, I want to ask you about

5    something you said yesterday.  And you seem to

6    be saying when you wrote this letter, you

7    actually hadn't looked at Schedule 1.

8        A.  I only went back to see that the

9    EMANATE -- his assertion was that it was the

10   same product as Trapeze that was licensed under

11   Schedule 1, and I went back.  When I saw that

12   the products didn't match up, I just thought

13   that's what I need to know and moved forward.

14   So I didn't look closely at Schedule 1.

15       Q.  But you are not saying you didn't look

16   at Schedule 1?

17       A.  No.  I don't remember where I looked.

18   We had internal documents that summarized, and

19   I may have very easily gone to that and not

20   gone to Schedule 1.

21       Q.  And, in fact, but you negotiated

22   Schedule 1?

23       A.  Six years previously.

24       Q.  Correct.  Well, now we are 17 years away



**WILCOX & FETZER LTD**
Registered Professional Reporters
(302) 655-0477
www.wilfet.com

1    from Schedule 1.

2        A.  Yes.

3        Q.  Right?

4        A.  Time moves on.

5        Q.  But you had negotiated Schedule 1?

6        A.  I had negotiated Schedule 1.

7        Q.  So that was ten years earlier, closer to

8    Schedule 1 than we are today; correct?

9        A.  Correct.

10       Q.  So it is not like this is some foreign

11   document that you didn't have experience with.

12       A.  I had studied Schedule 1 in much more

13   detail in the last little while than I was in

14   2006.

15       Q.  And you had negotiated Schedule 1, in

16   fact?

17            MR. BUSCH:  Asked and answered,

18   Your Honor.  I object.  He is just asking the

19   same questions.  I object.  It is getting late

20   in the day and I would ask him to move on.

21   BY MR. HERRINGTON:

22       Q.  Again, just to confirm, you did

23   negotiate Schedule 1 with Mr. Hyslop at Nortel?

24       A.  Yes, of course.



1      Q.  Let me ask you about this temporary

2   license agreement.

3      A.  So I can set these exhibits aside?

4      Q.  Yes.  Exhibit 87.  And you talked about

5   this yesterday in your testimony.  This is a

6   fax of an unsigned draft of the temporary

7   license agreement that you sent to Mr. Hyslop?

8      A.  Yes.

9      Q.  And when you sent this fax, Mr. Hyslop

10  had agreed he would sign the temporary license

11  agreement?

12     A.  I am responding to your timing.  When I

13  sent it, had -- you are assuming he had already

14  agreed by the time I sent it.  I can't say

15  that.  He just asked for another signature

16  block on it, and we were waiting for him to

17  agree.

18     Q.  Okay.  But at that point had he accepted

19  that SNMP Research -- that Nortel had no rights

20  under the Bay license?

21     A.  He never raised an objection to those

22  sentences.  He never asked for a modification

23  to those sentences.

24     Q.  Well, let's actually look at an email



1    that he sent after this draft of the license

2    agreement, D-86.  So you faxed him a draft of

3    the temporary license agreement on August 9,

4    and this is an email he sends to you on August

5    16, a week later.  And he writes, "Based on the

6    premise that my reading of Nortel's rights to

7    use the SNMP products set out in the SNMP RI -

8    Bay agreement are paid up rights (acknowledging

9    that a payment of 40,000 is still due but will

10   be made, and further acknowledging that SNMP RI

11   has not yet had the opportunity to dispute or

12   question such Nortel interpretation). . . ."

13            So does that accurately describe

14   Nortel's position as of August 16 as expressed

15   by Mr. Hyslop?

16       A.  I see what he is expressing.  I know

17   that SNMP Research did dispute in the future.

18   That's why we went to a new Nortel corporate

19   license rather than trying to transfer the Bay

20   license.

21       Q.  All I am saying is at this time he was

22   stating Nortel's position with respect to

23   whether they already had paid-up rights and he

24   is saying to you that you hadn't yet disputed

1    that position?

2        A.   Under the temporary license he did not

3    request a change to the terms that were in

4    there, either at the time I sent this revision

5    or as -- I don't recall that he ever asked for

6    changes to those terms.

7        Q.   And that wasn't my question.  So this

8    was after a draft of the temporary license

9    agreement, and he was saying that actually,

10   Nortel believes they already have paid-up

11   rights; correct?

12       A.   Yes, that was what his sentence was here

13   in the first paragraph.

14       Q.   Okay.  And that SNMP Research

15   International at that point hadn't disputed

16   that position?

17       A.   We hadn't gotten an opportunity to

18   dispute it yet.

19              MR. HERRINGTON:  Okay.  That's all

20   I wanted to clarify.

21              Subject to any questions on

22   redirect, I have nothing further right now.

23              THE COURT:  All right.  Yes,

24   Mr. Busch.



```
 1                     MR. BUSCH:  I just have a few
 2      questions.
 3                     THE COURT:  All right.
 4                          CROSS-EXAMINATION
 5      BY MR. BUSCH:
 6         Q.  Mr. Southwood, for ease of my
 7      examination of you, I would like to get three
 8      documents in front of you, if you could, at the
 9      same time.  They were all handed to you by
10      Mr. Herrington's colleagues during your
11      examination.  They are D-259, D-256.03 and
12      D-256.07.
13         A.  I will look for them, but do you mind if
14      I stand up for just a moment?
15                     THE COURT:  Go ahead,
16      Mr. Southwood, please.
17                     THE WITNESS:  Okay.  Thank you.  I
18      should have asked earlier.
19                     THE COURT:  Do you need a break?
20                     THE WITNESS:  No, I don't need a
21      break.  I just need to get my blood moving.
22                     THE COURT:  All right.  And I am
23      sorry.  Those documents, Mr. Busch, were?
24                     MR. BUSCH:  They were in numerical
```



1    order, although I didn't say it this way the

2    first time.  They are D-256.03, D-256.07 and

3    D-259.

4                    THE COURT:  All right.  Got it.

5                    THE WITNESS:  I have D-256.07.

6    BY MR. BUSCH:

7        Q.  Yes, that's one.

8        A.  256.03.

9        Q.  Correct.  And 259.

10       A.  And 259.  And I am feeling much better

11    with a little stretch there.

12       Q.  All right, good.  I am glad.

13                   So, Mr. Southwood, let me ask you

14    to get your bearings straight here and confirm

15    for me a few things.  256.07 is the Schedule

16    16A involving ARL; correct?

17       A.  That's correct.

18       Q.  And 256.03 came after the schedule with

19    the ARL, and that's the proposed schedule for

20    BRASS; correct?

21       A.  That's correct.

22       Q.  And then 259 is an email exchange that

23    Mr. Herrington asked you about in his

24    examination of you.



1        A.   From Vicki Allen to me on April 24.

2        Q.   Yes.

3        A.   Yes.

4        Q.   So do you recall at the beginning of

5    Mr. Herrington's examination of you, when he

6    was asking you questions about the unsigned

7    license, and you made a remark something along

8    the lines of but this was in the three-year

9    period that they had, and Mr. Herrington said

10   that he would come back to that?  Do you recall

11   that?

12       A.   Sort of, yes.

13       Q.   And he never came back to the three-year

14   period, did he, in his examination?

15       A.   No, he didn't.

16       Q.   And it is your testimony that, and what

17   I have heard during the trial, there were three

18   years that Nortel would have to sign licenses;

19   correct?  Schedules?

20       A.   Yes, that's correct.

21       Q.   All right.  So you said in your

22   examination -- and this is important for the

23   Court, because we spent a lot of time on this

24   in Mr. Herrington's cross-examination of you,



1    and I want to make sure the Court understands

2    this, because this is very important based on

3    Mr. Herrington's examination and what he was

4    trying to show.

5                    But you said in your answer you

6    were mystified.  I think that was the word.

7    You can't really recall why you may have not

8    required a signing of the license at the time,

9    in the March 2000 time period.  And I want to

10   see if I can refresh your memory about what may

11   have happened.  Okay?

12      A.   Please.

13      Q.   Okay.  So let's start with 256.07, the

14   ARL license.

15      A.   I have 256.07.

16      Q.   Now, Mr. Southwood, is it or is it not

17   fair to say that you sent this in light of the

18   requirement that for the old Bay products,

19   Nortel was required to enter into schedules?

20      A.   Yes.

21      Q.   And then now take a look at the email

22   exchange that followed.  It was the email

23   exchange -- I want to point your attention to a

24   couple of things in 259.  And I want to direct



```
1    your attention to the page that is the second,

2    the back of the first page of the email.

3        A.  At the top there is a separated word

4    "yes" about three lines, four lines --

5        Q.  Right.  And what I want to direct your

6    attention to is the text that is right above

7    that that says, "We're receiving 100 percent

8    credit for the $100,000 buy-out of the ARL

9    product.  You are quoting $216,000 for a BRASS

10   royalty buy-out on all four OS's.  Our BRASS

11   royalty buy-out is $116,000."  Do you see that?

12       A.  I do see that.

13       Q.  And then you go down and there is quotes

14   that bring the number for BRASS to $154,000.

15   Do you see that?

16       A.  I see that number, yes.

17       Q.  So, Mr. Southwood, is it fair to say

18   that after you sent the 256.07 asking them to

19   sign the schedule for ARL, they came back and

20   said, "We are thinking about moving to BRASS"?

21   Would that be fair to say?

22       A.  Yes.

23       Q.  Okay.  And so could that be an

24   explanation for why you did not require them to
```



1   sign the schedule for ARL?

2              MR. HERRINGTON:  Objection;

3   leading.

4              THE WITNESS:  Yes.

5              MR. BUSCH:  I said could that be.

6              THE COURT:  It is a leading

7   question, and I will --

8              MR. BUSCH:  Okay.  I will rephrase

9   the question.

10             THE COURT:  All right.

11  BY MR. BUSCH:

12     Q.  Would it or would it not be an

13  explanation to you that there was a change in

14  the product that was being licensed?

15     A.  They were expressing -- yes.  And since

16  BRASS was a different product but it was built

17  on the ARL product, it would be a good and

18  logical upgrade for them to move to BRASS.  I

19  would have been glad to move up to BRASS with

20  them.

21     Q.  So would that, Mr. Southwood, when you

22  said you were mystified about why the ARL

23  product, the schedule that you prepared did not

24  get signed, would that or would that not be an



1    explanation for why you did not require that to

2    be signed?

3         A.  Yes, yes, it would.

4         Q.  And now, then you prepared an actual

5    schedule, so look at 256.03.

6         A.  Okay.  I have this.

7         Q.  And you prepared an actual schedule for

8    16A, another 16A for BRASS; right?

9         A.  Yes.

10        Q.  And this is in the 2000 time period;

11   correct?

12        A.  I believe so.

13        Q.  And then as we saw ultimately, is it

14   correct that Nortel advised you that they

15   weren't going to move to BRASS after this

16   occurred?

17        A.  That's correct.

18        Q.  So, Mr. Southwood, would it be -- and I

19   am just -- would it be or would it not be an

20   explanation for what occurred here that after

21   you had prepared the license for ARL, Schedule

22   16 or the schedule, and then retracted it

23   because of the move, the potential move to

24   BRASS, that because they had three years to



1    enter into a schedule, it fell off your radar?

2        A.    It did fall off the radar.    They said

3    they weren't going to sign for BRASS.    I

4    thought, well, that would have been an upgrade.

5    And I turned my attention to the next task.

6        Q.    Okay.    And then I believe you said this

7    in your examination both by Mr. Herrington and

8    by myself earlier.    There was a three-year

9    period that Nortel would have to distribute

10   products, the old Bay products, royalty-free

11   without having to enter into a schedule, but

12   only if they were going to distribute those

13   products after that three years expired would

14   they need to enter into a schedule; correct?

15       A.    Correct.

16       Q.    And then in August of 2003 was it or was

17   it not Mr. Pierre Tremblay's representation

18   that there were no products under Schedule 1A?

19       A.    He did represent that, yes.

20                MR. BUSCH:    Okay.    Nothing else.

21                MR. HERRINGTON:    Your Honor, I am

22   very glad that counsel for SNMP said I didn't

23   talk about the three-year period.

24



1                     REDIRECT EXAMINATION

2    BY MR. HERRINGTON:

3        Q.   But first, Mr. Hyslop, we are going to

4    come to that.  Let's look at D-259.  This is

5    one of the email exchanges that your counsel or

6    counsel for SNMP just showed to you.

7        A.   Yes.

8        Q.   Turn to page 5 of 19.

9        A.   I am sorry.  5 --

10       Q.   Of 19.

11       A.   5 of 19.  Yes.

12       Q.   This is where you write, "Vicki:  It was

13   good to speak to you today.  We determined that

14   the current Schedule 16 issued for ARL

15   duplicates the transaction completed in 19" --

16   duplicates.  Let me back up.

17                "We determined that the current

18   Schedule 16 issued for ARL duplicates the

19   transaction completed in 1997 between Bay and

20   SNMPRI.  And so, we concluded that this

21   Schedule 16 should be retired."

22                Do you see that?

23       A.   Yes.

24       Q.   So you didn't say it can be retired if



**WILCOX & FETZER LTD**
Registered Professional Reporters
(302) 655-0477
www.wilfet.com

1   you go on to write another schedule for BRASS;

2   correct?

3       A.  I do see the next sentence.  It says,

4   "In further conversation you mentioned interest

5   in BRASS."

6       Q.  Absolutely.  But you did not say you

7   don't need a new schedule if you go on to

8   execute another schedule for BRASS; correct?

9               MR. BUSCH:  Objection.  The

10  document speaks for itself, Your Honor.

11              THE COURT:  I will overrule the

12  objection.

13              THE WITNESS:  I lost what

14  happened.

15  BY MR. HERRINGTON:

16      Q.  You did not say that --

17      A.  Am I supposed to be responding to you

18  now?

19      Q.  Yes.

20              THE COURT:  Yes.

21              THE WITNESS:  Is that --

22              THE COURT:  Yes.

23              THE WITNESS:  So please ask your

24  question again.



1    BY MR. HERRINGTON:

2        Q.   So you said, "We determined that the

3    current Schedule 16 issued for ARL duplicates

4    the transaction completed in 1997 between Bay

5    and SNMPRI.  And so, we concluded that this

6    Schedule 16 should be retired."  Full stop.

7                   Do you see that?

8        A.   I see the full stop.

9        Q.   Correct.

10       A.   But I also see that the next thought

11   that came along, and so I did not write in the

12   sentence that you would like to have me write

13   in 17 years ago.

14       Q.   Well, let's look at the same email

15   exchange in the first page; okay?

16       A.   On page 1 of 19?

17       Q.   D-259.  Exactly.  And it said, "John, I

18   just received word from our Optivity

19   engineering group that we have changed our

20   minds with respect to our interest in licensing

21   the BRASS libraries."  See that?  So they are

22   not going to go to BRASS.  Do you see that?

23       A.   Yes, I see that.

24       Q.   "Therefore, there is no need to add this



1    info to a new schedule within the current

2    Nortel/SNMP contract.  We will be staying with

3    the ARL product."

4              Do you see that?

5        A.  Yes.

6        Q.  So you didn't say, "Well, wait a minute.

7    I only agreed that you didn't have to execute a

8    new schedule if you did execute a new schedule

9    for BRASS"; correct?

10       A.  If I had been David Herrington, I

11   probably would have written that, but --

12       Q.  Well, there was no new schedule for this

13   group.

14       A.  At this point, that's correct.

15       Q.  Right.  Correct.  So this idea that it

16   is tied to BRASS, like, I thought they were

17   going to go with BRASS and that that's where

18   the new schedule would have been, that's not

19   what happened.  They said we don't want BRASS,

20   so we don't need a new schedule.  And, in fact,

21   they did not get a new schedule; correct?

22       A.   In fact, they did not get a new

23   schedule.

24       Q.  Okay.  So now let's go beyond the



1    three-year term of Schedule 1; right?  I said I

2    would come back to it, and I did come back to

3    it in your examination.  Please turn to D-271.

4        A.  And which tab is that?

5        Q.  Sorry?

6        A.  D-271, which tab is that so I can find

7    it?

8        Q.  Do you have it in a tab?

9        A.  Everything that has come to me has had

10   like a 259 or 256.03, so if I knew which -- I

11   don't know which --

12       Q.  I understand.  We will find another copy

13   for you.

14       A.  Well, if you will tell me which tab, I

15   can find it.

16       Q.  It is going to be Tab 21.

17       A.  Okay.  With assistance I have it.  Thank

18   you.

19       Q.  Okay, Mr. Southwood.  D-271 is from

20   April 23 of 2004.  Do you see that?

21       A.  Yes.

22       Q.  That is almost a year after the end of

23   Schedule 1's three-year term.  Do you see that?

24       A.  Yes.  Yes, I see it is April, April



**WILCOX & FETZER LTD**
Registered Professional Reporters
(302) 655-0477
www.wilfet.com

1    2004.

2        Q.   Okay.   So certainly beyond the end of

3    Schedule 1's three-year term?

4        A.   Correct.

5        Q.   Okay.   So the Optivity group comes back

6    to you and they say, we are using SNMP

7    Research's ARL stack.   Do you see that?   That's

8    at the bottom of page 1.

9                "The SNMP Research products that

10   are used within Optivity are:

11                "Optivity Network Management

12   System requires SNMP Research's ARL Stack."

13       A.   Yes, I see that.

14       Q.   Same -- Optivity using the same ARL as

15   in those emails that we just looked at when you

16   said you don't need a new schedule; correct?

17       A.   For our three years previous or two

18   years previous, whatever it was.

19       Q.   Exactly.   That's the whole point.

20       A.   There were other emails in the middle.

21       Q.   Now we are after the end of Schedule 1,

22   the end of the three-year term.

23       A.   Correct.

24       Q.   Okay.   So, Mr. Southwood, let's look at



1   the next page.  This is something we looked at

2   earlier.  And this is where you are identifying

3   what schedule would be applicable to Optivity's

4   use of ARL.  Do you see where you start, "This

5   puzzle has occupied most of my afternoon"?

6       A.  Yes, I have that.

7       Q.  "This puzzle has occupied most of my

8   afternoon, but I think that I have it solved."

9               And then I want to skip down two

10  paragraphs, where it says, "For Optivity, so

11  everything seems fine with Kim Curran's note

12  below.  But, where is ARL?"  Do you see that?

13      A.  You know, I have lost -- I found the

14  puzzle, and then I don't see a sentence that

15  starts with Optivity.

16      Q.  Okay.  So go down --

17      A.  Oh, "For Optivity, so everything seems

18  fine"?

19      Q.  Yes.

20      A.  Okay.  That was in the middle of the

21  paragraph.  I was looking in the beginning.

22      Q.  So "For Optivity, everything seems fine

23  with Kim Curran's note below.  But, where is

24  the ARL?  We found it under the old Bay license

1    completed before Nortel purchased Bay, but the

2    old license is incorporated into the current

3    license under Schedule 1."  Do you see that?

4        A.  I see that.

5        Q.  That's what you wrote realtime 13 years

6    ago and after the period of three years under

7    Schedule 1; correct?

8        A.  Correct.

9                MR. HERRINGTON:  Thank you.

10               MR. BUSCH:  May I have one or two

11    more questions, Your Honor?

12               THE COURT:  Yes.

13                RECROSS-EXAMINATION

14   BY MR. BUSCH:

15       Q.  Thank you.  Mr. Southwood, just a

16    couple, a few questions to follow up on what

17    Mr. Herrington just did.

18               Just to get the record straight on

19    the chronology, after Nortel advised that they

20    were going to BRASS and you prepared the new

21    schedule, this was like in March or April of

22    2000; correct?

23       A.  Yes.  I don't -- I have forgotten the

24    date, but it was within the three years, well



**WILCOX & FETZER LTD**
Registered Professional Reporters
(302) 655-0477
www.wilfet.com

1    within -- there was plenty of time after that

2    time before the expiration of the three-year

3    window.

4        Q.  For Nortel to actually come to you and

5    enter into a license?

6        A.  Correct.

7        Q.  Okay.  And then when Nortel in 2004

8    brought up, hey, we are actually still

9    distributing this Bay product from Bay days,

10   there was a schedule entered into?

11       A.  There was.  It named the entirety of

12   ARL.

13             MR. BUSCH:  That's all we have,

14   Your Honor.  Thank you.

15   BY MR. HERRINGTON:

16       Q.  What you did not say in this email is

17   "What are you doing still using ARL under

18   Schedule 1?"  You said where is the license --

19   I am going to read.  You said, ". . . where is

20   ARL?  We found it under the old Bay license

21   completed before Nortel purchased Bay, but the

22   old license is incorporated into the current

23   license under Schedule 1."  Correct?

24       A.  Correct.  That's what I said.



```
1                    MR. HERRINGTON:  Thank you.

2                    THE COURT:  And that's enough,

3     Mr. Busch.  That's enough.

4                    MR. BUSCH:  One question?

5                    THE COURT:  No, no.

6                    MR. BUSCH:  Okay.

7                    THE COURT:  That's enough.  One

8     question will lead to another question and then

9     we will be here all day with Mr. Southwood, and

10    he wants to get off the witness stand.

11                   MR. BUSCH:  I know.  I just wanted

12    to ask him if he is in the business of

13    cross-examining his clients and going after

14    them and doing to them what Mr. Herrington did

15    to him.  That's what I was going to ask.

16                   THE COURT:  Mr. Southwood --

17                   THE WITNESS:  Now, I may be

18    pulling myself back in, but I do want to

19    observe again that we really did feel like

20    Optivity and James Reeves were friends and --

21                   THE COURT:  All right.  You may

22    step down, Mr. Southwood.  You are finished,

23    and thank you.

24                   THE WITNESS:  Thank you.  And
```



1    should I take all these papers with me?

2                    MR. HERRINGTON:  We will take care

3    of that.  Thank you.

4                    THE COURT:  Thank you,

5    Mr. Southwood.

6                    (Witness excused.)

7                    MR. BUSCH:  We have one witness in

8    rebuttal.

9                    THE COURT:  Yes.

10                   MR. BUSCH:  That is David Tollen.

11                   THE COURT:  All right.

12                   MR. HERRINGTON:  Your Honor, what

13   should we do in terms of housekeeping with

14   exhibits?  Do it at the end of the day?  We

15   have a list.  I think they are either entered

16   or unobjected to.

17                   THE COURT:  I don't know that

18   there are any objections to any of the

19   exhibits.

20                   MR. HERRINGTON:  I think the ones

21   to which there are objections we addressed, and

22   Your Honor admitted them.

23                   THE COURT:  Ruled.  That's right.

24   All right.  So if I get a list from you of the



1    exhibits, that would be fine.

2                    MR. HERRINGTON:  Okay.  We will do

3    that, Your Honor.

4                    THE COURT:  Good.  Yes.

5                    MR. BUSCH:  Mr. Tollen.

6                    THE COURT:  All right.

7    Mr. Tollen, good afternoon.

8                    MR. TOLLEN:  Good afternoon, Your

9    Honor.

10                    MR. HERRINGTON:  If I could just

11    have a moment.

12                    THE COURT:  Oh, let's take a

13    minute, yes.  You can certainly be affirmed at

14    this point.

15                    DAVID WILLIAM TOLLEN, having been

16    first duly sworn, was examined and testified as

17    follows:

18                    THE COURT:  Just wait one minute,

19    if you don't mind.

20                    Are you all set, Nortel?

21                    MR. JEDREY:  Yes, we are all set.

22    Thank you.

23                    THE COURT:  All right.  You may

24    proceed when you are ready, Mr. Busch.



```
 1              MR. BUSCH:  Thank you very much,
 2      Your Honor.
 3                     DIRECT EXAMINATION
 4      BY MR. BUSCH:
 5          Q.  Good afternoon, Mr. Tollen.
 6          A.  Good afternoon.
 7          Q.  You may have done this already, but
 8      please state your name for the record.
 9          A.  David William Tollen.
10          Q.  And, Mr. Tollen, what is your occupation
11      or occupations?
12          A.  I am an attorney specializing in
13      software licenses and related technology
14      contracts.  I am also a trainer.  I teach
15      business people and lawyers to draft software
16      licenses and technology contracts.
17                     And I am an author.  I write
18      fiction for young people that teaches history
19      and science.  And I also write about technology
20      contracts, including an ABA book.
21          Q.  And what is your educational experience?
22          A.  I have a JD from Harvard Law School, a
23      BA from UC Berkeley, and an LLM from Cambridge
24      University in England.
```



1      Q.  And can you tell us some of the

2    companies you have worked for?

3      A.  Yes.  So I worked out of law school

4    briefly at a law firm called Lillick & Charles

5    about six months, and then I was three and a

6    half years, something like that, at Morrison &

7    Foerster in San Francisco.

8              I went on and was general counsel

9    of a publicly traded software company called

10   Centura Software Corporation after that, doing

11   embedded software like the software at issue

12   here.  And then I was a VP of business

13   development at a tech start-up called

14   clicktime.com.

15             And then I went back into

16   practice, private practice.  I worked for a

17   couple of small firms before founding my own,

18   which eventually grew larger and is now

19   Sycamore Legal, P.C., where I currently work.

20     Q.  And what was your primary responsibility

21   at the firms you have worked at?

22     A.  So I started out at Morrison doing

23   intellectual property litigation, patent cases,

24   copyright cases, et cetera.  But after a little



1   while, I switched departments and I started

2   doing deals.  And I did software licenses and

3   other technology contracts, and that's what I

4   have done consistently since then.  I did spend

5   a year as a business development guy doing a

6   few other things, but otherwise, that's what I

7   have done.

8       Q.  And from the beginning of your career

9   through today, how many software licenses and

10  other tech contracts have you negotiated and

11  drafted?

12      A.  I estimated that number in 2015 for the

13  earlier part of this case with Avaya as in

14  excess of a thousand.  I had done some

15  calculations.  I have been very busy since

16  then, so it is substantially in excess of a

17  thousand.

18      Q.  And do you have experience in both

19  patent and software licensing?

20      A.  Yes, I do.  My writing and speaking is

21  mainly about software licensing, but I have for

22  most of my career also done patent licensing.

23      Q.  And you mentioned your training

24  practice.  Would you please describe that?



1      A.   Yes.   Related to my book, I do trainings

2   for both lawyers and business people, contract

3   managers, procurement officers, et cetera,

4   teaching them how to draft technology

5   contracts, software licenses, et cetera, and

6   also lawyers both in house and outside counsel.

7      Q.   And you mentioned a book you wrote.

8   Would you please describe it?

9      A.   Yes.   It is called "The Tech Contracts

10   Handbook, Cloud Computing Agreements, Software

11   Licenses and Other Technology Contracts for

12   Lawyers and Business People," and it is

13   published by the American Bar Association.

14      Q.   And what is the focus of the book?

15      A.   Software licenses and similar contracts.

16      Q.   And has the book been successful?

17      A.   Yes, it has been successful.   It is used

18   in several law schools that I know of.   It is

19   the number-one best seller for the IP section

20   of the American Bar Association, and I believe

21   it has been more or less consistently since the

22   first edition came out in I think 2010.

23                MR. BUSCH:   Your Honor, we would

24   tender Mr. Tollen as an expert in software



1  licensing.

2            THE COURT:  Any objection?

3            MR. JEDREY:  No objection.

4            THE COURT:  All right.  He is so

5  qualified.

6            MR. BUSCH:  Thank you, Your Honor.

7  BY MR. BUSCH:

8     Q.  Mr. Tollen, what were you asked to do in

9  this case?

10    A.  I was asked to review the opinions of

11 Dr. Razgaitis about Schedule 1A and related

12 issues and respond to them.

13    Q.  Is the Nortel license agreement and

14 schedules the type of license agreements you

15 draft and negotiate?

16    A.  Yes, it is.

17    Q.  Okay.  And do you do these master

18 license structured agreements often?

19    A.  Yes, it is a very common thing.

20    Q.  Are you aware that Dr. Razgaitis argued

21 in his direct examination today -- and you were

22 here for that; correct?

23    A.  Yes, I was.

24    Q.  Let me restart my question.  Are you



1   aware that Dr. Razgaitis argues that

2   Schedule 1A grants a lifetime paid-up license

3   for the Nortel products and projects

4   originating from Bay Networks?

5       A.   I am aware.

6       Q.   And do you agree with his opinion?

7       A.   I don't agree.

8       Q.   And would you explain why?

9       A.   There are a lot of reasons.  I think the

10  most important one is that Schedule 1A has a

11  simple termination clause saying that it is --

12  that it shall terminate and be of no further

13  effect after three years.  What Dr. Razgaitis

14  is essentially saying is that that is a partial

15  termination clause and some rights survived.

16  And in my work, that is how you write a full

17  and complete clause that terminates all license

18  rights.  In fact, it is unusually complete.  It

19  doesn't just say it terminates it.  It says it

20  redundantly.  It would be enough, I think, just

21  in my work to say a license terminates.  They

22  go on and say redundantly "and be of no further

23  effect."

24              If that doesn't do it, countless



1    contracts out there that are meant to terminate

2    everything have been done wrong.

3                    MR. JEDREY:  Your Honor,

4    Mr. Tollen appears to be reading the text of

5    the license and offering his interpretation,

6    which, in our view, is the province of the

7    Court and not the province of an expert in

8    custom and practice.

9                    MR. BUSCH:  He is not doing that

10   at all.  He is offering his custom and practice

11   testimony about how the language in the custom

12   and practice of the field would be understood,

13   which is exactly what they have argued in

14   suggesting that Dr. Razgaitis can testify about

15   custom and practice.

16                   THE COURT:  Well, I don't think he

17   testified about custom and practice.  I think

18   he opined on the legal issue, whether there was

19   a termination after three years.

20                   MR. BUSCH:  Well, I can rephrase.

21                   THE COURT:  I think that was his

22   testimony.

23                   MR. BUSCH:  I can rephrase the

24   question, if that would be helpful.



1              THE COURT:  All right.

2    BY MR. BUSCH:

3       Q.  How would under custom and practice,

4    Mr. Tollen, how would the termination clause

5    that was meant to terminate all rights of the

6    licensee be drafted in the software industry?

7       A.  It would normally be simple, and we

8    would simply say something like "all license

9    rights under this schedule are terminated as of

10   X date."  It would not be necessary, but some

11   people might do it, to be redundant, like it

12   did here, and say "and be of no further

13   effect."

14      Q.  And so under the custom and practice in

15   the software industry, how would the

16   termination clause in Schedule 1A be

17   understood?

18              MR. JEDREY:  Your Honor, again,

19   Mr. Busch appears to be asking the witness to

20   read the text of the Schedule 1 additional

21   conditions language and explain to you what it

22   means.  I think that's inappropriate for him to

23   do.

24              MR. BUSCH:  No.  They argued for



1    Dr. Razgaitis to be allowed to testify about

2    custom and practice and what Schedule 1A under

3    custom and practice would be understood to

4    grant.  And he came in and said that

5    Schedule 1A would not be understood to

6    terminate all rights.

7                I am asking this witness -- and my

8    question was very specific and clear -- under

9    custom and practice, how would that language be

10   understood.

11               THE COURT:  I don't think that was

12   the question.  But if that's your question,

13   then that's fine.

14               MR. BUSCH:  Thank you.

15               THE WITNESS:  I think most people

16   in the industry -- it would be hard to imagine

17   anyone, in my experience, from a junior

18   contract manager at a software start-up to the

19   general counsel of Apple concluding that that

20   does anything other than simply terminate

21   everything.  That's how we write a clause that

22   terminates a whole license.

23   BY MR. BUSCH:

24     Q.  Thank you.  All right.  Now, are there



1  other reasons that you disagree with

2  Dr. Razgaitis that Schedule 1A grants a

3  perpetual license?

4      A.  Yes.  I mean, there are a lot of

5  reasons.  One is that the contract also, you

6  know, as Dr. Razgaitis discussed, has

7  additional schedules to it.  To me those

8  schedules -- so there are additional schedules

9  that Nortel said covered software licensed

10  under Schedule 1A.  It doesn't make sense to

11  sign those additional schedules, which cost

12  Nortel money, unless there was some limit to

13  the rights in Schedule 1A, which, since there

14  is a three-year termination, fits together

15  pretty logically.  The other schedules don't

16  make a lot of sense to me if Schedule 1A went

17  on and on forever.  It would be a waste of

18  paper and money.

19      Q.  Dr. Razgaitis also said, I believe, in

20  his direct examination that his understanding

21  is that a royalty buy-out is perpetual.  It

22  goes on forever.  Is that your understanding of

23  the custom and practice?

24      A.   No, and that is not the custom and



1    practice in the industry.

2              Your Honor, a royalty buy-out

3    means that instead of paying royalties on each

4    unit, you pay royalties in advance.  You don't

5    have to just track all the units and pay a few

6    dollars each.  It is an advance in a couple of

7    installments.  It has nothing to do with the

8    duration of the license.

9              And, in fact, I have looked at

10   Oracle's definition of royalty buy-out, which

11   is on the Web, and they specifically define

12   buy-out for their embedded software as being

13   for a fixed term.  So Oracle in this industry

14   is specifically saying we only use this for a

15   nonpermanent license, a fixed term.

16             MR. JEDREY:  Your Honor, we move

17   to strike the testimony about the Oracle

18   license, which was not disclosed in Mr. Tollen

19   Rule 26(a) report.

20             MR. BUSCH:  That specific Oracle

21   license, I guess he did some investigation and

22   looked at it, but it is not in his report.

23   That's correct.

24             THE COURT:  Then I have to strike



1    the testimony.

2                    MR. BUSCH:  All right.  That's

3    fine.  Thank you, Your Honor.

4                    THE COURT:  Yes.

5    BY MR. BUSCH:

6        Q.   Is there anything in Dr. Razgaitis'

7    testimony from earlier today that you do agree

8    with?

9        A.   Yes, I do agree strongly with one point

10   he made, which is that there is no text in

11   Schedule 1A that supports his argument that it

12   is a perpetual license or a partial

13   termination.  That was true.

14       Q.   Let's talk about his two opinions

15   that -- well, a few of the opinions that he did

16   express today.  So he talked about things that

17   were omitted from Schedule 1A.  You recall

18   that, don't you?

19       A.   Yes, I do.

20       Q.   Okay.  So he said that "by custom and

21   practice license termination provisions are

22   normally part of the schedules attached to

23   licenses."  Do you have a view on that?

24       A.   You mean he said they are not normally a



**WILCOX & FETZER LTD**
Registered Professional Reporters
(302) 655-0477
www.wilfet.com

1    part?

2        Q.  Yes.

3        A.  Yes.  That is just not right in the

4    industry.  When you do one of these master

5    agreement structures, you put in the master the

6    terms that stay the same for every project, and

7    you put in the schedules or the other

8    attachments the terms that vary project to

9    project.  And so if the duration -- in many

10   cases you don't know what the duration of a

11   future project is going to be.  You have to put

12   it in the schedule or other attachment.  And I

13   do that all the time.  So that is not how we

14   draft these contracts in the industry.

15       Q.  And Dr. Razgaitis states that he would

16   have expected to have seen something about how

17   Nortel might retain license rights or get them

18   back after termination if this was meant to

19   terminate after three years, that he would

20   expect to see something like that in

21   Schedule 1A.  Do you agree with that opinion?

22       A.  I don't agree with that.

23       Q.  Why?

24       A.  That would actually be quite unusual, in



1    my experience.  You don't need to put an

2    explanation for how the parties might do

3    business in the future in a contract that is

4    going to terminate.  You could, and it is not

5    unheard of, but I would call it the exception

6    to the rule.

7                     And the idea that you have to for

8    people to understand that the clause

9    terminates, again, it would mean lots of us,

10   including me in my trainings and other people's

11   trainings I go to, are teaching this wrong,

12   because I am just aware of no such

13   interpretation or need.  That's not how we

14   write these contracts.

15      Q.  And in the master license agreement is

16   there a reference to the anticipated entering

17   into of schedules?

18      A.  Yes.  So you have to have a schedule to

19   have a license, so there are terms there that

20   execute that, yes.

21      Q.  Dr. Razgaitis also has stated that

22   Schedule 1A terminates the license only as to

23   future products that were created after

24   Schedule 1A but not as to products already



1    licensed as of the end of the three years.  Do

2    you agree with that?

3        A.  I don't.

4        Q.  Why not?

5        A.  So again, this is the idea that this is

6    a partial termination.  In this business, when

7    you terminate a license and write "shall

8    terminate," it is all terminated.  And when you

9    go the next mile and write "and shall be of no

10   further effect," it just couldn't be clearer.

11            If I had an associate in my firm

12   give me a contract that was supposed to be

13   partially terminated that said this, that said

14   what is in Schedule 1A, I would be very

15   concerned for his or her drafting skills.

16            MR. JEDREY:  Your Honor, again,

17   the witness is reading the text of the

18   additional conditions language in Schedule 1

19   and offering his opinion as to what that means.

20   We think that's inappropriate.

21            MR. BUSCH:  I am not sure if I

22   used the word custom and practice in my

23   question.  I can look back and see, Your Honor,

24   if that would --



 1                    MR. JEDREY:  I think the nature of

 2      the question is not really at issue here.  The

 3      problem is the testimony, which is Mr. Tollen's

 4      view, which appears to us to be a legal view as

 5      to the proper reading of the additional

 6      conditions language in Schedule 1.

 7                    MR. BUSCH:  Well, here is the

 8      thing.  My question was a direct question

 9      related to an opinion that Dr. Razgaitis made

10      that he is rebutting.  So the question was:

11      Dr. Razgaitis has testified that under his

12      interpretation of Schedule 1A, that it

13      terminates the license as to future products

14      after three years that were created after

15      Schedule 1A but not as to products already

16      licensed as of the end of the three years.  So

17      that's something that is from Dr. Razgaitis'

18      own report.  So he is rebutting that, Your

19      Honor.

20                    THE COURT:  All right.  Yes.

21                    MR. JEDREY:  Just one more thing

22      on this.  I mean, what he is basically saying

23      is that in his view, the language in the

24      additional conditions is unambiguous and can



1   only be read in one way and means that all

2   rights were terminated.  That's the ultimate

3   issue here.  That's what he is opining on, and

4   that's why it is inappropriate.

5             MR. BUSCH:  Dr. Razgaitis has

6   offered the opinion that he is rebutting, Your

7   Honor.

8             THE COURT:  All right.  I will

9   overrule the objection.

10            MR. BUSCH:  All right.  Thank you.

11  So the question stands; the answer stands.

12  Thank you.

13  BY MR. BUSCH:

14    Q.  Dr. Razgaitis has said that SNMP

15  Research's interpretation of Schedule 1A would

16  not make commercial sense for Nortel.  Do you

17  agree with that?

18    A.  No, I don't.

19    Q.  Why not?

20    A.  I actually think Nortel got a good deal.

21  In the aftermath of the Bay acquisition it had

22  a problem, which was that it had these products

23  that it got from Bay that it couldn't keep

24  distributing without a license from a supplier.



1    And a lot of suppliers -- this is something I

2    worry about when I draft contracts.  A lot of

3    suppliers would hold their distributor for

4    ransom.  They would say, yes, you can keep

5    distributing our stuff but you are going to pay

6    a lot of money.  And SNMP didn't.  They gave

7    this as a free license.  They gave them three

8    years for everything, and then they gave them

9    permanent licenses with nothing but relatively

10   limited license and support fees if they just

11   declared their products.

12            So to me, I think Nortel, you

13   know, they got a pretty good deal.  I think

14   SNMP, you know, really could have hit them at

15   that point, and they did not.

16   Q.   Just a couple of last questions here.

17   Dr. Razgaitis' experience.  Do you attribute

18   the disagreements that you have with

19   Dr. Razgaitis to his experience in patent

20   licensing?

21   A.   I think that part of -- a lot of what

22   Dr. Razgaitis says suggests to me that he is

23   confused between patent licensing and software

24   licensing, particularly the conversation you



1    had about the Brunsvold book, but several other

2    things.  And so it gives me the impression that

3    he is coming at this from the customs and

4    procedures of patent licensing, which are

5    different from software licensing.  They are

6    very different functions in a technology

7    company.

8        Q.  And you mentioned the Brunsvold book.

9    Would you tell Judge Gross why you were

10   referencing the Brunsvold book with respect to

11   Dr. Razgaitis?

12       A.  Yes.  So Dr. Razgaitis, the only source

13   he cites of authority that he would call on in

14   these software license agreements is this book

15   by Brunsvold, and he said on the stand here

16   that Brunsvold is about both patent licensing

17   and software licensing.  And, in fact, he even

18   misquoted the title.  I have that book, and it

19   is a great book.  It is called "Drafting Patent

20   License Agreements."

21               I am not aware of a word in it

22   about software licensing.  I checked the index.

23   It uses "software" one time.  It never uses

24   "software licensing."  I checked through the

1    table of contents.  I can't swear I have read

2    every word, but I don't think there is a thing

3    in there about software licensing, and

4    certainly the title would tell you there isn't.

5              So if he is relying on that book,

6    he is looking at the wrong set of customs and

7    practices.  And that's just one of many ways I

8    think that is evidence that he is doing that.

9    Q.  And so just lastly, Mr. Tollen, is any

10   absence of anything that Dr. Razgaitis

11   mentioned at all relevant, in your view, as to

12   custom and practice about Schedule 1A?

13   A.  You mean where he said the absence of a

14   termination?

15   Q.  Yes.

16   A.  Well, he said the absence of a

17   termination provision in his report, which is

18   baffling.  The fact that Schedule 1A has a

19   termination clause, I think most people in my

20   business would say it is terminated.

21              MR. BUSCH:  That's all we have,

22   Your Honor.  Thank you.

23              THE COURT:  All right.

24



```
 1                    CROSS-EXAMINATION

 2    BY MR. JEDREY:

 3         Q.   Good afternoon, Mr. Tollen.

 4         A.   Good afternoon.

 5         Q.   I would like to talk to you about

 6    Schedule 1.

 7         A.   Sure.

 8         Q.   Now, it is your opinion that Schedule 1

 9    was one part of a two-part bargain between SNMP

10    Research and Nortel; right?

11         A.   Yes, that's one way to describe it.

12         Q.   And that's the way you have described

13    it; right?

14         A.   That's right.  But the Schedule 1 was

15    drafted after the bargain was made.  As I said

16    to Mr. Herrington in my deposition, the bargain

17    was all jumbled together.  It was the lawyer

18    who afterwards said, "All right, we will do

19    this part in Schedule 1," or it looks like it

20    was the lawyer, "and that part in future

21    schedules."

22         Q.   My question was solely whether it is

23    your view that Schedule 1 is one part of a

24    two-part bargain between Nortel and SNMP
```



1    Research.

2        A.    And what I am trying to tell you is it

3    ended up that way.  That's how it was written

4    up.

5        Q.    And so one part is Schedule 1, and then

6    the second part of the bargain is that Nortel

7    could get a lifetime license for a specific

8    project or product with no obligation to pay

9    royalties but only if it identified the project

10    or product to SNMP Research and signed a new

11    schedule covering that product or project?

12        A.    It sounds like you are reading a

13    subparagraph B from my report.  That sounds

14    right.

15        Q.    Schedule 1 itself doesn't talk about the

16    execution of new schedules, does it?

17        A.    It doesn't.  And it wouldn't be

18    something I would expect it to do, as I said

19    earlier.

20        Q.    Schedule 1 doesn't say that Nortel needs

21    to enter into new schedules in order to extend

22    the Bay Networks royalty buy-out to other

23    projects or products?

24        A.    Well, if you say by saying all rights



1   terminate and shall be of no further effect

2   after three years, it is implied in the way

3   that we normally imply if the contract ends,

4   you got to get a new contract.

5       Q.   Mr. Tollen, my question is looking at

6   Schedule 1, you know it is two pages; right?

7       A.   Right.

8       Q.   And in those two pages does it say

9   anything about a need by Nortel to execute new

10  schedules?

11      A.   It does not.

12      Q.   And it doesn't say anything about an

13  ability for Nortel to execute new schedules to

14  extend that Bay Networks royalty buy-out after

15  the end of Schedule 1's three-year term?

16      A.   It doesn't.  And as I said, I would find

17  it unusual, maybe not unheard of, for a

18  contract to explain options for future business

19  at the end of the termination clause or

20  anywhere.

21      Q.   So it is your opinion -- right? -- that

22  the second part of the two-part bargain that we

23  have discussed is not memorialized in the text

24  of Schedule 1; right?



1      A.   Certainly not.

2      Q.   In fact, it wasn't memorialized in any

3   writing signed by the parties; correct?

4      A.   I haven't seen anything.   My

5   understanding from an email that Mr. Southwood

6   sent in 2003 was that it was a, quote, informal

7   agreement.   But from my review of the record,

8   it looks like SNMP did live up to it and gave

9   them the schedules when they asked.

10     Q.   Mr. Tollen, my question is:   The

11  informal arrangement that you have described,

12  it was not memorialized in any writing signed

13  by the parties; correct?

14     A.   Not that I have ever seen.

15     Q.   And this informal arrangement, it wasn't

16  a legally binding commitment, was it?

17     A.   Well, that really does sound like it is

18  asking for a legal opinion.

19     Q.   Do you know one way or the other?

20     A.   I would be concerned that if Nortel

21  relied on that, SNMP would have to honor it.

22     Q.   And based on the honor system?

23     A.   No.   I think that -- I mean, you are

24  really asking me to give a legal opinion.   When



```
 1   one party makes a promise that the other relies

 2   on, you have got reliance that can turn it into

 3   quasi-contract, you know, all that promissory

 4   estoppel stuff we learned in first-year

 5   contracts, that -- yes.

 6      Q.  So it is your understanding that SNMP

 7   Research was bound to give Nortel new schedules

 8   to extend that Bay Networks royalty buy-out

 9   to --

10              MR. BUSCH:  Your Honor, I am going

11   to --

12              MR. JEDREY:  I am sorry.  Can I

13   finish my question, please?

14              MR. BUSCH:  Sure.

15   BY MR. JEDREY:

16      Q.  I will start again.  So it is your

17   opinion that SNMP Research was bound to give

18   Nortel new schedules at request for products

19   and projects that were covered by Schedule 1 in

20   order to extend that Bay Networks royalty

21   buy-out beyond Schedule 1's three-year term?

22              MR. BUSCH:  Objection; calls for a

23   legal opinion.

24              MR. JEDREY:  I just want to know
```



1    his understanding.  It is my understanding that

2    this is his opinion.  This is his view of the

3    bargain between the parties.  It is what he

4    discusses in his report.  I am trying to

5    explore that and understand it.

6              MR. BUSCH:  Mr. Tollen responded

7    to questions by counsel, and he is asking him

8    about the honor system and whether something is

9    legally binding, and now he has followed that

10   up with another question about his opinion what

11   under the law one would be required to do.  And

12   those are clearly questions that call for legal

13   conclusions.

14             THE COURT:  I sustain that

15   objection.

16             MR. BUSCH:  Thank you.

17   BY MR. JEDREY:

18      Q.  So your understanding of the informal

19   arrangement between the parties doesn't derive

20   from reading Schedule 1; right?

21      A.  That's right.  It is not in Schedule 1.

22   It is in the other schedules, and you can see

23   evidence that they agreed to it in the email

24   track that I read.



1    Q.  So your understanding of this informal

2  arrangement comes from other documents in the

3  record, including, as you said, emails?

4    A.  Well, that's my understanding, that SNMP

5  made this promise that they would grant future

6  schedules.  But I don't need the emails either

7  to understand, at least as most industry people

8  would look at it, what Schedule 1 meant.  And

9  to be --

10    Q.  Mr. Tollen, I am not asking you about

11  Schedule 1.  I am talking about the informal

12  arrangement which you previously testified is

13  not a part of Schedule 1.

14    A.  All right.  I also don't need the email

15  track to see that there are other schedules

16  that license the same stuff, that therefore --

17    Q.  So it is your opinion that these other

18  schedules, these four new schedules that you

19  have identified in your report, they license

20  the same stuff that is licensed under

21  Schedule 1?

22    A.  Mr. Hyslop told SNMP that it was the

23  same stuff, and the parties wrote in the other

24  four schedules royalties bought out pursuant to



1    the Bay agreement, so --

2        Q.   Just --

3                THE COURT:   Let's let the witness

4    answer the question.

5                MR. JEDREY:   Apologies.

6                THE WITNESS:   So it is in the

7    contract.   You don't have to go beyond the

8    contract to see that Schedule 12A, for

9    instance, under royalties says something along

10   the lines of royalties bought out pursuant to

11   the Bay royalty buy-out.   You don't have to go

12   beyond the contract to see that.

13   BY MR. JEDREY:

14       Q.   But to be clear, when you are saying

15   that, in your view, these new schedules license

16   the same stuff as Schedule 1, you are talking

17   about the same software?

18       A.   Well, it is the same software licensed

19   to the same products and projects of

20   Nortel/Bay.

21       Q.   And again, your testimony is that you

22   could have understood this informal arrangement

23   being between the parties solely by looking at

24   these additional schedules without reference to



1    any of the emails in the record?

2        A.   No, I don't think that would have told

3    me the informal arrangement.  What looking at

4    the future schedules would have done is just

5    show me that there were additional schedules

6    that did have lifetime licenses for some of the

7    same software on the same projects as you got

8    under Schedule 1A.  And so I would see, well,

9    rights, quote, went poof for the whole family

10   of Bay products, but some of them survived.

11   And so I would see that Nortel didn't just

12   sacrifice all of their rights to the Bay family

13   at the end of three years.

14       Q.   Let's look at one of the emails that you

15   rely upon in your report concerning the nature

16   of this informal arrangement, which is Exhibit

17   D-76.

18       A.   Okay.  I am sorry.  Where do I get that?

19       Q.   We are going to give it to you right

20   now.

21       A.   Oh, thank you.

22            MR. BUSCH:  Your Honor, this is

23   outside the scope of my direct examination.  I

24   did not -- while that might be in his report,



1    we did not solicit that.  The report is not

2    evidence.  His testimony is what is evidence.

3    So I don't think this is relevant testimony

4    given the fact that it was not elicited on

5    direct examination.

6                    THE COURT:  This is appropriate

7    cross-examination.

8                    MR. BUSCH:  Okay.  Thank you, Your

9    Honor.

10                   MR. JEDREY:  Thank you, Your

11   Honor.

12   BY MR. JEDREY:

13       Q.  Mr. Tollen, you have in front of you

14   Exhibit D-76?

15       A.  Yes.  It is Tollen, by the way.

16       Q.  I apologize.

17                   MR. BUSCH:  We got Razgaitis

18   right.

19                   MR. HERRINGTON:  Razgaitis.

20   BY MR. JEDREY:

21       Q.  Let me restate that.  Mr. Tollen, you

22   have in front of you --

23       A.  Tollen.

24       Q.  Mr. Tollen, you have in front of you



1    Exhibit D-76?

2        A.   Yes.

3        Q.   And this is an email from John Southwood

4    to Dave Hyslop dated November 16, 1999;

5    correct?

6        A.   Yes.

7        Q.   Now, in your view, this email describes

8    both parts of the two-part bargain that we

9    discussed; correct?

10       A.   Yes.  As I said to Mr. Herrington in my

11   deposition, this email is all jumbled together.

12   It describes both parts of what the drafter,

13   the lawyer, put into two different pieces

14   later.

15       Q.   And, in fact, your opinion depends on

16   the premise that Mr. Southwood isn't only

17   describing what became Schedule 1 in this

18   email; right?

19       A.   Yes.  He can't only be describing

20   Schedule 1 because Schedule 1 hadn't been

21   drafted yet.

22       Q.   So if we skip down to the second

23   paragraph here, it says, "I think that you have

24   the agreement pretty well described.  Rick



1    Barnes, our counsel, is crafting the final Bay

2    transfer to Nortel based on the previous term

3    which expired November 1.  I told him that the

4    royalty buy out would expire in three years.  I

5    thought we agreed to that in our conference

6    room."  Do you see that?

7        A.  Yes.  And I have read this many times.

8        Q.  And the second to last sentence where it

9    says, "I told him that the royalty buy out

10   would expire in three years," in your view,

11   that's a reference to Schedule 1; correct?

12       A.  Well, Schedule 1 hadn't been drafted.

13   He makes that clear.  It is a reference to

14   terms that ended up in Schedule 1.

15       Q.  And if you look at the next paragraph,

16   it says, "By expire I mean that new

17   products/projects brought on line after three

18   years would address royalties on their own

19   merit.  Current Bay products and development

20   projects for the next three years will take

21   advantage of the lifetime royalty buy out until

22   their products have aged out of the

23   marketplace."  Do you see that?

24       A.  Yes.



1      Q.   And that paragraph, in your opinion, is

2    not describing the agreement that became

3    Schedule 1; correct?

4      A.   As I complained to Mr. Herrington in the

5    deposition, it is kind of dividing it up

6    artificially, so I need to look at it

7    carefully.

8              Well, I think that first sentence

9    is referring to the fact that Schedule 1 would

10   terminate after three years or that the

11   agreement for this temporary license would

12   terminate.  Schedule 1 hadn't been drafted.

13   And then after that is pretty normal.  You

14   would have to get a new contract is a way to

15   put it.

16     Q.   And so would you agree that the second

17   sentence of that paragraph is describing the

18   informal arrangement that you referred to?

19     A.   "Current Bay products and development

20   projects for the next three years will take

21   advantage of the lifetime royalty buy

22   out. . . ."  Yes.  So to me that's what -- that

23   is a part of the understanding between the

24   parties that Mr. Barnes didn't put into



1  Schedule 1A.

2      Q.  Mr. Southwood's email doesn't

3  differentiate between the parts that refer to

4  what became Schedule 1 and the parts that refer

5  to this informal arrangement; right?

6      A.  No.  And nor would it given that he is

7  not a contract drafter.  He is not doing this.

8  And this is a situation that I see very often.

9          So a salesman in a tech company

10  sends me a jumble of notes about an arrangement

11  two parties have struck, and I've got to turn

12  it into an actual contract.  And so I do what

13  Mr. Barnes did.  I take this jumbled type of

14  explanation and turn it into something clear, a

15  contract, or in this case more than one

16  agreement.

17      Q.  Right.  And so Mr. Barnes took part of

18  this email, in your view, and incorporated it

19  into Schedule 1, and there is part of it that

20  was not incorporated in Schedule 1; correct?

21      A.  That's right, yes.

22      Q.  Mr. Southwood didn't say in this email

23  part of the understanding expressed in this

24  email will be memorialized in Schedule 1 and



1    part of it will be an informal arrangement, did

2    he?

3        A.   No.   I doubt that Mr. Southwood had any

4    such knowledge or plans.   I mean, he is not the

5    contract drafter.   My guess is that was

6    Mr. Barnes' choice, and he did what was, you

7    know, best for his client.   The really

8    important part was to get that schedule written

9    with a three-year termination clause, leaving

10   the rest of the agreement informal.

11       Q.   Are you aware of any subsequent

12   communication by Mr. Southwood explaining to

13   Mr. Hyslop that part of the arrangement that I

14   have described here is going to be memorialized

15   in Schedule 1 and part of it is just going to

16   be an informal understanding?

17       A.   I know a subsequent communication to

18   Mr. Tremblay in 2003 explained it.

19       Q.   What I am asking about is whether you

20   are aware of Mr. Southwood explaining to

21   Mr. Hyslop that part of the understanding that

22   he expressed in this email would be

23   memorialized in Schedule 1 and part of it would

24   be an informal understanding between the



1    parties.  Are you aware of anything like that?

2         A.  I am not aware.

3         Q.  Are you aware of any communication from

4    Mr. Southwood to anyone at Nortel prior to the

5    execution of Schedule 1 that would match that

6    description?

7         A.  No.

8         Q.  When you were examined by your counsel,

9    you noted that, in your view, Nortel got a good

10   deal under Schedule 1; right?

11        A.  Yes.

12        Q.  And that opinion is contingent on the

13   notion that Nortel did not have any rights

14   through Bay to continue selling Bay products

15   under the license agreement between Bay

16   Networks and SNMP Research after Nortel

17   acquired Bay Networks; right?

18        A.  Well, I guess if it were established

19   that Nortel could inherit the Bay license,

20   which would really surprise me, I would have to

21   rethink that.  So my thinking was Bay didn't

22   have those rights, and, you know, there is two

23   contracts that confirm that they didn't have

24   those rights, so I don't think I am

1   speculating.  But if you told me, you know,

2   hypothetically Bay -- I am sorry.

3   Hypothetically, Nortel did inherit Bay's

4   rights, I would have to relook at whether it is

5   a good deal or not.  I am not telling you I

6   wouldn't conclude it, but I didn't analyze it

7   on that framework.

8              It seemed pretty obvious to me

9   that -- I mean, in our business, when you use

10  "nontransferable," you are saying you can't

11  give it to anyone else, including an acquiror.

12  And if you want to say you can give your

13  license to an acquiror, you write a specific

14  exception, "may be transferred in case of a

15  merger or acquisition of all or substantially

16  all assets."  I can almost rattle off the

17  language.  That's what you do.  It is not there

18  in the Bay license.

19    Q.  Mr. Tollen, you said that two agreements

20  confirmed your understanding that Nortel had no

21  rights to continue operating Bay and selling

22  Bay products under the Bay-SNMP Research

23  license agreement after Nortel acquired Bay.

24  What two agreements were they?



1    A.  Well, you could actually say three

2  agreements.  So first of all, like I said, the

3  Bay agreement itself says it is

4  nontransferable.  And if you look in my book,

5  it talks about language like "nontransferable"

6  and "nonassignable."

7    Q.  I apologize, Mr. Tollen.  We are really

8  pressed for time.  Could you please just

9  identify the agreements?

10   A.  Okay.  So the Bay agreement is one of

11  three.  Two is the temporary license agreement

12  which I reviewed, which specifically said that

13  all Bay rights were terminated.  I am sorry.

14  That's two.  And then three is Schedule 1A

15  itself, which right before the termination

16  clause has this language again.  They just --

17  they kind of drove a stake into it, like

18  Dr. Case said.

19   Q.  So you are saying the temporary license

20  and Schedule 1, which both terminated Bay's

21  rights under the Bay license agreement,

22  confirmed to you that when Nortel acquired Bay,

23  it had no rights to continue selling Bay

24  products under the Bay-SNMP Research license?



1      A.   I am sorry.   Can you repeat the

2   question?

3      Q.   So you are saying that the temporary

4   license and Schedule 1, which both terminated

5   Bay's rights under the Bay license, confirmed

6   to you that when Nortel acquired Bay, it had no

7   rights to continue selling Bay products under

8   the Bay-SNMP Research license?   Is that your

9   opinion?

10      A.   It was one of many confirmations.

11   Again, I am not supposed to give legal opinions

12   here.   It is how people in the industry would

13   look at it.   But you didn't need the temporary

14   license because the original Bay license said

15   it wasn't transferable.

16      Q.   So you have looked at the language in

17   the Bay license on transferability, and it is

18   your view that that language does not permit

19   Nortel to continue operating Bay as Bay and

20   selling Bay products under the Bay-SNMP

21   Research license?

22      A.   It is my view that that's what people in

23   the industry would believe it.   I am not a

24   corporate attorney, so the reverse triangular



1  merger stuff is not my field.

2     Q.  So you don't know?

3     A.  I know that people in the industry would

4  believe that the use of that term

5  "nontransferable" means you can't give it.  And

6  I know that people, contract managers,

7  et cetera, when they mean to say that if you

8  are acquired, you can give the acquiror your

9  license, they write, but they write an

10  exception:  It is transferable in the case of a

11  merger or acquisition of all or substantially

12  all of the licensee's assets.  That's the

13  language you put in when you want to give that.

14  And at least I did not see that there in the

15  Bay license.

16              MR. JEDREY:  That's all we have.

17              THE COURT:  All right.  Thank you.

18              Mr. Busch, anything from you?

19              MR. BUSCH:  No, sir.

20              THE COURT:  Mr. Tollen, thank you.

21              THE WITNESS:  Thank you, Your

22  Honor.

23              (Witness excused.)

24              THE COURT:  All right.



1          MR. BUSCH:  We will turn it over

2    to Mr. Dean.  I don't know if we are at the

3    motion to amend or what we are going to do.

4          THE COURT:  Is there evidence that

5    you are bringing out, Mr. Dean, or is this

6    argument?

7          MR. DEAN:  This is evidence, but I

8    have a plan to get all this in.  I don't know

9    if the parties -- are we waiving closing on the

10   Schedule 1?  I think they are almost out of

11   time.

12         THE COURT:  They have about 45

13   minutes.

14         MR. DEAN:  Yes.  I think we have

15   an hour-plus.  But I have a plan to get this

16   in, and I will explain it when I get to the

17   podium.

18         MR. BUSCH:  Our understanding is

19   that Nortel has about 20 minutes left.

20         THE COURT:  I have 45 minutes for

21   them.  I have 45.

22         MR. BUSCH:  Can we confirm that,

23   Your Honor?  Is that okay?  I have been told we

24   have a different number, but I would like to



1   just confirm that.

2               (Discussion off the record.)

3               MR. BUSCH:  So, Mr. Herrington,

4   are we waiving closings?

5               MR. HERRINGTON:  I think probably

6   it would make sense to do Schedule 1 and see

7   where we are on timing.

8               MR. BUSCH:  Do the motion to

9   amend, you mean?

10              MR. HERRINGTON:  Yes, do the

11  motion to amend.

12              MR. DEAN:  Okay.  Then I will

13  proceed, Your Honor.  Thank you.  Okay.  Given

14  the time that we have, Your Honor, let me just

15  tell you what the game plan is.  I am not going

16  to do an opening statement on the motion.

17              THE COURT:  All right.  I have

18  your briefs.

19              MR. DEAN:  Right.  You have the

20  briefs.  I am going to save it all for

21  argument.  I have about 35 minutes' argument.

22  I would like to save five or so minutes for

23  rebuttal.

24              I am going to call Dr. Case to the



**WILCOX & FETZER LTD**
Registered Professional Reporters
(302) 655-0477
www.wilfet.com

1    stand and I am going to move his declaration as

2    his direct testimony, which Nortel has already

3    agreed to.

4                    THE COURT:  All right.

5                    MR. DEAN:  I am going to ask him

6    about five minutes of questions to supplement

7    his declaration, and then we will be ready to

8    proceed to closing arguments.

9                    And I will just weave everything

10   that I was going to say in opening into closing

11   to make this as brief as possible and not keep

12   you here too late on a Friday night.

13                   THE COURT:  We are going to end at

14   quarter to 6:00 on the button, in the middle of

15   a sentence.

16                   MR. DEAN:  Okay.  We will get that

17   done.  So I don't know if Nortel wants to do an

18   opening statement or not, but I am ready to

19   call Dr. Case to the stand and then proceed to

20   argument, if that's agreeable.

21                   MR. HERRINGTON:  Fine with us,

22   Your Honor.

23                   THE COURT:  All right,

24   Mr. Herrington.  Let's do that.



1          MR. DEAN:  Okay.  I will call

2    Dr. Case to the stand.

3          THE COURT:  And you say his

4    declaration is part of the direct.

5          MR. DEAN:  Yes, I am going to move

6    it in through his testimony along with other

7    exhibits.

8          MR. BUSCH:  And, your Honor, since

9    I am not needed for this portion --

10          THE COURT:  Mr. Busch, yes.

11          MR. BUSCH:  Since I am not needed

12    for this portion, may I excuse myself for one

13    moment from the courtroom?

14          THE COURT:  Of course.

15          MR. BUSCH:  Thank you.

16          MR. DEAN:  Did you want to swear

17    the witness again, Your Honor?

18          THE COURT:  No.  He has already

19    been.

20          MR. DEAN:  Already been affirmed.

21          THE COURT:  Yes.

22          JEFFREY D. CASE, having been

23    previously sworn, was examined and testified

24    further as follows:



```
 1                THE WITNESS:  I didn't know if
 2      this was a new thing if it was more of the
 3      same.  I thought it was a transition.  My
 4      error.  I apologize.
 5                THE COURT:  That's all right.
 6                DIRECT EXAMINATION
 7   BY MR. DEAN:
 8      Q.  Good afternoon, Dr. Case.
 9      A.  Hello.
10      Q.  Would you please grab the pleadings
11      binder P-1 through P-19, the one for this
12      hearing.
13                Okay, Dr. Case.  Please turn to
14      Exhibit P-1, please.
15      A.  Turn to which one?
16      Q.  P-1, the first exhibit.  This is the
17      declaration that you signed on November 23, the
18      fourth motion to amend?
19      A.  Yes.
20      Q.  Let me ask you just to confirm that the
21      statements made in the declaration are true and
22      accurate.
23      A.  Yes.
24      Q.  And are they true and accurate today?
```



1       A.   Yes.

2                  MR. DEAN:   Your Honor, I would

3       like to move the declaration in as Dr. Case's

4       direct testimony.

5                  THE COURT:   Any objection?

6                  MR. HERRINGTON:   No, Your Honor,

7       not under the circumstances.

8                  THE COURT:   All right.

9                  MR. DEAN:   I would also like to,

10      in light of that, move a couple of other

11      exhibits in now, Your Honor.   I am going to

12      move in all of the proofs of claim in the case.

13      I am not moving them in for the truth of the

14      matter asserted in any of the attachments or

15      the statements of claim, to deal with the

16      hearsay objections that Nortel has made.   And

17      those exhibits, just for the record, Your

18      Honor, are P-1, P-2, P-4, P-7, and P-11.

19                  THE COURT:   Any objection?

20                  MR. CANTWELL:   No objection, Your

21      Honor.   Philip Cantwell, on behalf of the US

22      Debtors, Cleary Gottlieb.

23                  THE COURT:   Is Mr. Cantwell

24      handling --



1              MR. HERRINGTON:  We are going to

2    actually share what little time we have for

3    argument on the issue.

4              THE COURT:  All right.

5              MR. DEAN:  Your Honor, let me just

6    make sure that I said this correctly.  P-2,

7    P-3, P-4, P-7, P-9 --

8              THE COURT:  I had P-1, 2, 4, 7 and

9    11.

10             MR. DEAN:  I missed P-3.

11             THE COURT:  So it is 1, 2, 3, 4, 7

12   and 11.

13             MR. DEAN:  Correct.

14             THE COURT:  Okay.

15             MR. DEAN:  And I will move those

16   into evidence.

17             THE WITNESS:  I think it is not

18   actually 1.  Didn't you do 1 as my declaration?

19             MR. DEAN:  P-1 is Dr. Case's

20   declaration.  The proofs of claim were P-2,

21   P-3, P-4, P-7, P-9 and P-11.

22             THE COURT:  P-9 is in there now,

23   too?

24             MR. DEAN:  P-9 is in there.  P-9



```
1    is the fourth amended claim, and P-11 is the

2    fifth amended claim.

3                    THE COURT:  So we have 1 is the

4    declaration, 2, 3, 4, 7, 9 and 11.

5                    MR. DEAN:  Correct.  Are those

6    admitted, Your Honor?

7                    THE COURT:  And there is no

8    objection.  Oh, I am sorry.  Mr. Herrington,

9    yes.

10                   MR. HERRINGTON:  These are the

11   proofs of claim?

12                   MR. DEAN:  Yes.

13                   MR. HERRINGTON:  Okay.  No, no

14   objection, Your Honor, on the basis they are

15   not being admitted for the truth of the matter

16   asserted.

17                   MR. DEAN:  That is right.

18                   THE COURT:  Correct.  They are

19   admitted.

20                   (Plaintiffs' Exhibit Nos. 1, 2, 3,

21   4, 7, 9 and 11 were received in evidence.)

22   BY MR. DEAN:

23      Q.  As I mentioned I just want to ask you a

24   couple of additional questions in addition to
```



1   what is already in your declaration.  Could you

2   please turn to Exhibit P-2, please?

3      A.  I am there.

4      Q.  Which is the original proof of claim

5   that International filed.  The language in the

6   proof of claim says that International

7   "reserves the right to modify or amend this

8   proof of claim to assert additional claims as

9   they arise."  Do you see that language, sir

10     A.  Yes, I do.

11     Q.  And was this language intended to

12   preserve any particular type of claim?

13     A.  Nothing in particular.  It was my

14   intention that it would be as broad to preserve

15   all of our rights, whatever they might be, of

16   whatever nature.

17     Q.  And can you confirm that this same

18   reservation language appears in the first

19   amended proof of claim that SNMP Research

20   International filed?

21     A.  I am not finding it right now, but I

22   found it before.  Yes, yes.  I found it.  Page

23   3 of 46, end of the first paragraph.

24     Q.  Please turn to Exhibit P-4, Dr. Case.



1      A.   Yes.

2      Q.   And I would like to direct your

3   attention to the language on the statement of

4   claim on page 2, the first full paragraph.  It

5   starts with "SNMP further claims" and ends with

6   "trade secrets."  Do you see that?

7      A.   I do.

8      Q.   And what was the purpose of including

9   this language in the proof of claim, Dr. Case?

10      A.   In order to preserve our claims,

11   whatever they might be, of whatever source and

12   nature.

13      Q.   And is this same language in the third,

14   fourth and fifth amended proofs of claim?

15      A.   Yes.  I know that to be true, but if you

16   want me to find each one, in the interest of

17   time --

18      Q.   I do not.

19      A.   I will just say I know it to be true.

20      Q.   You remember it was in there?

21      A.   Yes.

22      Q.   Dr. Case, did you believe at the time

23   you filed these proofs of claim that

24   International could bring derivative claims on



1    behalf of Inc.?

2        A.  I did.

3        Q.  Did you intend to assert derivative or

4    did you intend to assert claims that

5    International could bring on behalf of Inc. in

6    these claim amendments?

7        A.  Yes, we did.

8        Q.  What interest rate did you use in the

9    prior proofs of claim, Dr. Case?

10       A.  I used 18 percent per annum based upon

11   the contract rate for late payments, for

12   delayed payments.

13       Q.  And using the contract rate, did you

14   intend for the damages asserted in the prior

15   claims to be limited to contract damages?

16       A.  No, I did not.

17       Q.  Then why did you use the contract rate?

18       A.  Because I thought it was the amount that

19   would make us whole and it was the only

20   contract rate -- the only interest rate number

21   that I had.  And if I didn't use that number, I

22   wouldn't know what number to use.

23       Q.  Did you in any way intend at all to

24   limit International's claims to contract-based



1    damages in the prior proofs of claim that

2    International filed?

3        A.  No, absolutely not.  I intended for them

4    to be as broad as possible from whatever source

5    and kind.

6        Q.  Just one last question, Dr. Case.  Did

7    you intend to limit the proposed claim that is

8    before the Court today to copyright

9    infringement damages?

10       A.  No.  Again, it was my intention to

11   preserve all of our rights, whatever they were,

12   whatever nature, whatever source.

13               MR. DEAN:  In respect of the

14   Court's time, I have no further questions, Your

15   Honor.

16               THE COURT:  All right.

17               MR. HERRINGTON:  Your Honor, we

18   have a few points that we actually made through

19   Dr. Case's deposition, and those are in the

20   designations that are coming in.  So I don't

21   think we need to do that again through

22   examination here.

23               MR. DEAN:  Okay.

24               THE COURT:  All right.  Are we



```
 1    finished with --
 2                    MR. DEAN:  Your Honor, I am
 3    finished with Dr. Case.  And then when he steps
 4    down, I have a couple more exhibits to move in,
 5    and then we can move to argument.
 6                    THE COURT:  All right.  Thank you,
 7    Dr. Case.
 8                    THE WITNESS:  Thank you.
 9                    (Witness excused.)
10                    MR. DEAN:  All right.
11                    THE COURT:  Now, remember this,
12    Mr. Dean.  I have 80 pages of briefing on your
13    part.
14                    MR. DEAN:  I know.
15                    THE COURT:  I can't imagine you
16    have anything to say that is not in those
17    briefs.  But if there is, I will listen.  But
18    there is --
19                    MR. DEAN:  I have a few important
20    things --
21                    THE COURT:  I don't mind you
22    emphasizing a few things, but I don't need the
23    briefs to be reargued.
24                    MR. DEAN:  Okay.  I got it.  Point
```



1  well taken.

2              I would like to move a couple of

3  other exhibits now.

4              THE COURT:  Yes.

5              MR. DEAN:  I would like to move in

6  Exhibits P-14 and P-15, which are the debtors'

7  opposition to the motion to withdraw the

8  reference that we filed, that we argued before

9  Judge Stark, and their appellee brief relating

10  to the EMEA Debtors' appeal of your denial of

11  their contribution claim.  I don't believe

12  there are any objections to these, but --

13              MR. HERRINGTON:  No objection,

14  Your Honor.

15              THE COURT:  All right.

16              (Plaintiffs' Exhibit Nos. 14 and

17  15 were received in evidence.)

18              MR. DEAN:  Okay.  And then two

19  more exhibits.  I am telling you these

20  separately because I am not introducing these

21  for the truth of the matter asserted, and I

22  wanted to confirm that.  And these are P-18 and

23  P-19, which is our objection to the Nortel

24  disclosure statement and the revised Nortel



1    disclosure statement following our objection.

2                    And then Nortel raised a

3    completeness objection with respect to the

4    disclosure statement, so I agreed to move the

5    entire docket entry in as opposed to just the

6    excerpts that I put in the exhibit binder.  And

7    the docket entry for the record is 17502, Your

8    Honor.

9                    THE COURT:  All right.  Any

10   objection?

11                   MR. CANTWELL:  No, Your Honor.

12                   THE COURT:  All right.

13                   (Plaintiffs' Exhibit Nos. 18 and

14   19 were received in evidence.)

15                   MR. DEAN:  But I do think I have

16   some important points that I want to raise

17   today.

18                   THE COURT:  Please, yes.

19                   MR. DEAN:  And I will try to be as

20   brief as possible, but obviously, this motion

21   is just as important as the prior hearing we

22   just heard because we have to win both of them,

23   so I do want to make some important points.

24                   THE COURT:  Yes.



1              MR. DEAN:  The motion to amend, it

2     is important to keep in mind that this requests

3     two separate kinds of relief here.  We have the

4     request of International, which is SNMP

5     Research International -- we refer to them as

6     SNMPRI in the papers, by the way, but you have

7     been hearing International, so I will refer to

8     them as International -- to amend its own

9     timely filed and properly amended proofs of

10    claim, the proofs of claim I just admitted into

11    evidence.

12             The second request is the request

13    to add Inc. as an additional creditor in the

14    timely filed International proof of claim for

15    the purpose of preserving the International

16    copyright claim which we acknowledge in the

17    papers that International would have a hard

18    time pursuing derivatively, unlike the trade

19    secret claim.

20             THE COURT:  Right.

21             MR. DEAN:  Now, Your Honor, I

22    think you didn't hear a lot of evidence, so it

23    would help to walk you through some of it,

24    including the declaration.  And it does confirm

1   that the request for relief should be approved

2   under the Third Circuit's well-recognized

3   standard in Ben Franklin.  And in that case --

4   and I think it is important to highlight this

5   language -- the Court said, "Amendments to

6   proofs of claim should be freely allowed when

7   the purpose is to cure a defect in a claim as

8   originally filed or to plead new theories of

9   recovery on the facts set forth in the

10  complaint."

11           So this is a very flexible

12  standard when a party files a timely proof of

13  claim and requests to amend that claim to add

14  new legal theories, increase your damages or

15  adjust facts based on the core operative facts

16  that are pled in the underlying claim.

17           THE COURT:  Are you talking about

18  the first point, the request of International

19  to amend, or the request to add a party to this

20  claim?

21           MR. DEAN:  This standard applies

22  to both.  And I was going to tell you how it is

23  satisfied with respect to both.  I am going to

24  go through these separately.

```
1              THE COURT:  Okay.
2              MS. PARTHUM:  One other thing I
3    want to mention before I apply the evidence to
4    the law, Your Honor, is that if the two
5    requests satisfy that standard, the only way
6    that the Court should deny the motion is if
7    Nortel, who has the burden, can prove not just
8    prejudice but unfair prejudice.  And I
9    highlight the word "unfair," because what they
10   argue in their papers appears to be just
11   ordinary prejudice.  And I will refer the Court
12   to the Gens case from the First Circuit, which
13   appears to be the lead case in this area.  It
14   specifically says that unfair prejudice either
15   has to be detrimental reliance on the part of
16   the creditors or the debtor or bad faith or
17   some dilatory motive on the part of the movant.
18              So let me turn to the request to
19   add International, amend International's own
20   proof of claim.
21              THE COURT:  Yes.
22              MR. DEAN:  There is no dispute
23   that the original claim was timely filed before
24   the bar date.  It was filed for $22,000 for
```



1   Nortel's failure to pay license fees for

2   licensed products.  And at the time there was

3   no indication that Nortel had done anything

4   wrong.  It was just an ordinary claim.  There

5   was a preservation of rights, as Dr. Case just

6   testified to, but at the time there was no hard

7   evidence that Nortel had done anything wrong.

8                  And then after the bar date Nortel

9   begins to sell its assets, and SNMP starts to

10  negotiate with buyers and asked the buyers to

11  check the Nortel products to confirm what

12  software is in what products and discovers, to

13  its surprise, that, for example, the main

14  products here, the ES and ERS products sold to

15  Avaya, had the software in it.  We didn't know

16  that until Avaya told us.

17                 So what we learned through the

18  post-petition sale process was that the more

19  diligence we did, the more wrongdoing by Nortel

20  we uncovered.  And as detailed in the

21  declaration, each time we learned of

22  wrongdoing, we amended the proof of claim.  And

23  that's detailed in Dr. Case's declaration, Your

24  Honor, so I won't go into all the details about

1     that, but it is in there.

2                    The evidence is clear that

3     International's proposed claim is substantially

4     the same claim as the prior claims.  It is the

5     same software.  It is the exact same products

6     that we identified.  It is the same alleged

7     pre-petition wrongful use by Nortel, and it

8     involves the same causes of action.

9                    The language in the prior claims

10    that I pointed out to Dr. Case on the stand

11    also is sufficient to cover International's

12    pursuit of a proper derivative trade secret

13    claim on behalf of International, regardless of

14    whether you grant the motion, the portion of

15    the motion requesting that Inc. be added.  As

16    Dr. Case just told you, the language was

17    intended to cover any claims that International

18    could bring.

19                    But even if you were to accept the

20    debtors' legal theory that the prior claims are

21    limited to contract damages or they didn't

22    include the specific reference to Inc. and so

23    therefore, there is no derivative trade secret

24    claim, it doesn't matter, because if you look

1    at the Ben Franklin standard that I just read

2    to you, it specifically allows the addition of

3    legal theories under the same core operative

4    set of facts.  And this Court many times -- and

5    I will give you a couple of examples.  And the

6    Semcrude case and the Flyi, Inc. case have

7    allowed creditors to increase the damages and

8    to add new legal theories under the same core

9    operative set of facts.  And that is no

10   different than what we are trying to do here.

11                  Now, the other side of the coin,

12   Your Honor, is the scope of the proposed proof

13   of claim.  They ironically challenge the scope

14   of the proposed claim.  We put the proposed

15   claim up as Attachment A to our motion to be as

16   broad as possible.  We wanted the claim to

17   cover everything that we are saying we think it

18   claims.  That's the whole point.  It has

19   similar, very broad reservation language in it

20   that says we are asserting all claims that

21   International can bring under any possible

22   legal theory relating to Nortel's wrongful use

23   of the software prior to the petition date.

24   Yet they still say that because of Mr. Ratner's

1    report, which has a discussion of copyright

2    damages but which is clearly not just focused

3    on copyright damages, it is limited to contract

4    claims.  And why are they doing this?  Because

5    they know the Ben Franklin standard is very

6    flexible and they want to be able to convince

7    Your Honor that we are doing something to try

8    to convert a contract claim into a copyright

9    claim.  And I am not even sure I fully

10   understand exactly --

11              THE COURT:  But International

12   doesn't have a copyright claim; is that right?

13              MR. DEAN:  Yes, it does.  There

14   are eight -- each entity has eight copyrights.

15   So International has three direct claims.  They

16   have its own copyright claims for its eight

17   copyrights.  It has its own trade secrets for

18   its own trade secrets, and it has the breach of

19   contract claim for the contract that you have

20   heard about for the last two days.  But it also

21   has the properly asserted derivative trade

22   secret claim on behalf of Inc., but it cannot

23   prosecute the copyright claim on behalf of Inc.

24              THE COURT:  Right.

1              MR. DEAN:  Okay.  So those are the

2     five claims at issue.  Three of them are held

3     by Inc. directly.  Two of them -- I am sorry.

4     Three of them are held by International

5     directly and two of them are held by Inc., but

6     Inc. does not have a contract.  It is not a

7     party to the Nortel contract.

8              THE COURT:  What copyright claims

9     does International have?

10             MR. DEAN:  So the second amended

11    complaint, which is the adversary portion of

12    this, attaches all of Inc.'s and Int'l's eight

13    copyrights.  They each have eight copyrights.

14             But the truth is, Your Honor, the

15    only difference between the prior claims and

16    the one we are seeking to file, and the reason

17    why Nortel is objecting, is the proposed dollar

18    amount.  But that's not our fault.  The reason

19    why the claim keeps going up is because the

20    wrongdoing keeps going up every time we get

21    information.

22             And the reason why we filed this

23    claim for $81 million when the last claim was

24    $8 million is because you may recall that we

1    had a marathon hearing a year or so ago and we

2    wanted to bring our expert, financial expert,

3    into Nortel to search their servers to get all

4    this financial information that we said they

5    weren't giving to us.  And you gave an

6    indication that you were going to agree to let

7    us do that and you gave us a week to try to

8    work it out, and Nortel, reading the tea

9    leaves, agreed to give us the financial

10   information and started to roll it out

11   thereafter.  They rolled that information out

12   after the hearing and continued rolling that

13   information out up until two weeks before the

14   agreed deadline to submit expert reports in

15   this case, which was November 2.

16              So we gather all this information.

17   We give it to our expert.  We have him prepare

18   the report.  The report is filed on November

19   3 -- or I am sorry.  November 2.  It is served

20   on November 2.  We immediately start working on

21   this motion, and we have it on file before

22   Thanksgiving.  It would have been virtually

23   impossible for us to do this any faster than we

24   did, impossible.

1          So we cite multiple cases in our

2     papers that show that an increase in damages is

3     not a new claim.  There are several cases that

4     say this, but I will direct Your Honor's

5     attention specifically, because I think it is

6     very helpful, to Judge Walrath's decision in

7     the Stone & Webster case last year.  And in

8     that case she allowed a creditor to increase

9     its damages and admit a timely filed proof of

10    claim 11 years after the bar date and she did

11    that.  She said, "It is apparent from the very

12    nature of the within claim that quantification

13    is not readily ascertainable.  Consequently, it

14    is imperative to allow the amendment to allow

15    the creditor the opportunity to prove its

16    actual claim."

17          The analysis is no different here,

18    Your Honor.  As Judge Walrath held, all the

19    amendment does is give us the opportunity to

20    get our day in court and go to trial.  It

21    doesn't mean that we are necessarily going to

22    have a claim.  It doesn't mean that we are not

23    going to have a claim.  The only thing it does

24    is put creditors on notice as to what we think

1    the claim is worth.  And we thought it was

2    important to do that not only after

3    Mr. Ratner's report was filed but before the

4    plan was confirmed so that the creditors had

5    full notice of it in the disclosure statement,

6    which they did.

7                    And that brings me to detrimental

8    reliance.  The case law, I am not going to go

9    into it, but in our reply brief we cite cases,

10   including Gens but others, that talk about the

11   point in time that's most critical for

12   detrimental reliance when someone is seeking to

13   amend the claim is the plan, because obviously,

14   if you had a plan that was confirmed and

15   creditors thought they were going to get a

16   certain amount of money and a creditor came

17   along, and say there was a million dollars in

18   the plan, there was going to be a million

19   dollars distributed, and Creditor A has a

20   $100,000 claim and then wants to increase its

21   claim to $10 million, and the creditors all

22   vote thinking they are getting 50 cents on the

23   dollar, it would be unfair to allow that

24   creditor to amend his claim after confirmation

```
 1    unless there is a really good reason for doing
 2    so.
 3              But here the analysis is entirely
 4    different.  We actually objected to Nortel's
 5    disclosure statement which I just moved into
 6    evidence.  And the reason why I moved it into
 7    evidence is to show you that they didn't even
 8    put the explanation of our motion and our
 9    request in their disclosure statement.  They
10    didn't put the damages in Mr. Ratner's report,
11    which were available to them when the original
12    plan and disclosure statement were filed.  We
13    made them do that.  We forced them to make the
14    proper disclosures with a high-low range
15    showing what SNMP would get if their claim was
16    allowed in full, because we thought it was
17    important to get that disclosure out there.  So
18    no one can complain that they detrimentally
19    relied on anything.
20              There is also no bad faith, Your
21    Honor.  The evidence shows just the opposite.
22    As I just mentioned, we got this financial
23    information.  It showed massive amounts of
24    volume for ERS and ES, undisputably products
```



1    that contain our software.  And we were shocked

2    to see the extent of the volume and the money

3    that Nortel was making on our backs at

4    substantial detriment to SNMP.  And so that's

5    why the damages are so high.

6              Mr. Ratner's report, as you will

7    hear at trial, is completely independent.  We

8    gave him the numbers.  He came up with the

9    conclusions.  And he didn't come up with all

10   his conclusions we like, by the way.  You may

11   recall we have had a lot of discussion in this

12   case about the transfer claim, the

13   post-petition claim that you ruled on on

14   summary judgment.  And the debtors in their

15   papers say, well, we are trying to shift the

16   ball now because they say you made some

17   favorable comments to them in those papers.

18   That's not true.

19              What happened was that when we got

20   the numbers from the valuations that were done

21   in the asset sales, we realized -- and

22   Mr. Ratner advised us, and it is in his

23   report -- that the numbers weren't as good as

24   we thought they were going to be.  We thought

```
 1    they were going to be much higher.  But he

 2    concluded that they weren't.  But with respect

 3    to this issue, he concluded that they were

 4    actually higher than we thought.

 5              So we gave Mr. Ratner the numbers.

 6    He put them in his report, and he rendered the

 7    conclusions that he gave.  And we should

 8    certainly be entitled to present those to Your

 9    Honor at trial.

10              So that's International.  Let me

11    move now to Inc.

12              THE COURT:  We have two separate

13    matters, though.  We have a proof of claim.

14              MR. DEAN:  Proof of claim,

15    amending the proof of claim.

16              THE COURT:  Pre-petition.

17              MR. DEAN:  Pre-petition.

18              THE COURT:  International amends

19    its own proof of claim.

20              MR. DEAN:  Right.

21              THE COURT:  Then we have the

22    adversary proceeding.

23              MR. DEAN:  And we have the

24    adversary proceeding.
```



```
1                    THE COURT:  Correct.
2                    MR. DEAN:  Now, the claims, the
3      ERS and ES claims for unlicensed use straddled
4      the petition date.  So there are some of the
5      claims based on the exact same copyrights and
6      the exact same software that also apply in the
7      adversary proceeding from the petition date
8      through the sale to Avaya; okay?
9                    So then we have the addition, the
10     request to add Inc. to the existing proof of
11     claim as an additional creditor.  And for all
12     the reasons I have already said and are in our
13     papers, the request to add Inc. fits all the
14     same standards as International.  It is not a
15     new claim.  It involves the exact same conduct,
16     the exact same software, the exact same Nortel
17     wrongful alleged conduct and the exact same
18     products that we identified.  This is not a new
19     claim.
20                   We are trying to add a new legal
21     theory to the claim in the form of Inc.'s
22     direct copyright claim because International,
23     attempting to assert it in the filed claims,
24     realized later that it had a standing problem
```

1    and couldn't do it.  And so that's why we are

2    trying to do it.

3              With the derivative claim -- it is

4    important to repeat this -- the derivative

5    trade secret claim, we are confident -- and

6    Nortel does not dispute this -- that

7    International has standing to pursue the

8    derivative trade secret claim.

9              So the sole reason why we are

10   seeking to add Inc. is because of Inc.'s

11   specific copyright claim, which International

12   we do not believe, as Nortel points out through

13   countless pages in its papers, has standing to

14   prosecute.

15             Now, there are two issues.  And by

16   the way, the same detrimental reliance

17   arguments with respect to the disclosures that

18   we made and the increase in damages and the

19   financial information that we obtained all

20   still apply to the Ben Franklin analysis as it

21   relates to the Inc. claim in the same manner as

22   it does the International claim.  But there are

23   two issues with respect to Inc. that are unique

24   to the request for Inc., and I am going to



1    focus the rest of my argument on those two

2    issues.

3              Those issues are, number one, the

4    debtors' argument that we lack standing to file

5    the claim.  International lacks standing to

6    file the claim, and therefore, the claim cannot

7    be filed after the bar date under a case called

8    Vianix.  Second is detrimental reliance issues

9    specific to the addition of Inc.'s copyright

10   claim, not generally applicable to the other

11   issues we have already discussed with respect

12   to the plan.

13             So let's talk about Vianix for a

14   couple of minutes, because the debtors say this

15   case is directly on point.  They say this is

16   the most important case to them and that this

17   should be dispositive of the request to add

18   Inc.  So in that case, in a two-page decision

19   by the District Court, the District Court

20   dismissed a complaint and required the

21   plaintiff to refile the case as opposed to

22   letting the plaintiff substitute for another

23   affiliated entity.  And the Court in that case

24   said that the first plaintiff lacked standing



1   and required the suit to be refiled.  But this

2   case doesn't have any applicability here for a

3   couple of reasons.  Number one, the case was

4   not a relation-back case at all.  So the debtor

5   says it was directly employed.  It wasn't a

6   relation-back case.  The Court recognized that

7   the plaintiff in that case, it was like a no-

8   harm, no-foul situation.  The Court even

9   acknowledged that it understood that the

10  plaintiff could just refile the case and there

11  was no harm or no foul.  But there are more

12  important reasons why Vianix doesn't apply from

13  a legal standpoint, and I am going to go

14  through those quickly now.

15               Even if you could get beyond the

16  factual difference in Vianix, it doesn't apply

17  here for three reasons.  The first one is

18  because if you were to apply Vianix the way

19  that Nortel wants you to, it would run

20  completely contrary to a Third Circuit decision

21  called Nelson, which is the subject of a lot of

22  back and forth in the papers.  Nelson, what

23  Nelson held is that a plaintiff can substitute

24  for another plaintiff who is the real party in



1    interest under relation-back principles under

2    Rule 15.

3              The debtors, wanting to run as far

4    away as they can from this case, say that it

5    was dicta, it really didn't say that, but it

6    did, and I will tell you why in a second, and

7    that there is some other Third Circuit case

8    called Gardner, which came in 2008, that is

9    actually the law.  It doesn't allow plaintiffs

10   to use Rule 15(c).  It only allows defendants

11   to use Rule 15(c).

12             So the reason I sent you a letter

13   the other day is because I wanted to be able to

14   point to you a couple of cases in response to a

15   statement they made in their surreply brief.

16   In that letter I identified a Third Circuit

17   case and multiple lower court decisions after

18   Gardner which specifically said that Nelson is

19   the law in the Third Circuit.  And there is

20   another Third Circuit case in our brief, in our

21   reply brief, that also confirms that.

22             But even if the debtors are right

23   that Nelson is not the law in the Third

24   Circuit, there is another reason why.  The



1    second reason why Vianix cannot be applied as

2    the debtors submit is because it contradicts

3    Rule 17(c).  If you look at Rule 17(c), Rule

4    17(c) specifically says, "The court may not

5    dismiss an action for failure to prosecute in

6    the name of a real party in interest until,

7    after an objection, a reasonable time has been

8    allowed for the real party in interest to

9    ratify, join, or be substituted in an action.

10   After ratification, joinder, or substitution,

11   the action proceeds as if it had been

12   originally commenced by the real party in

13   interest."  So think about what that means.

14   That means the standing relates back under the

15   rule if the correct party is substituted or

16   added or joined.

17              And so under their theory of

18   Vianix, they would ask you to adopt a rule in

19   this court -- and there would be no exceptions

20   to it if you adopt their view of Vianix, and I

21   really mean no exceptions -- that a creditor

22   could never, ever, ever be added to a proof of

23   claim late, after an originally filed proof of

24   claim by an affiliate who filed the wrong claim

```
1    but wants --
2                  THE COURT:  But isn't that the
3    point?  This comes after, well after the bar
4    date.
5                  MR. DEAN:  It does.  Yes, it does.
6    It does.  But when you look at the cases that
7    talk about the standards that --
8                  THE COURT:  They are not proof of
9    claim cases that you are citing.
10                 MR. DEAN:  No.  I am getting
11   there.  I have five of those.  I have five of
12   those, and they have none.  So I am going to
13   get there, too, because Vianix -- I will move
14   on from 17.  Vianix also contradicts five
15   bankruptcy decisions throughout the country.
16                 THE COURT:  All right.
17                 MR. DEAN:  And remember, Vianix
18   and Nelson and all these other cases, they are
19   cases under the Federal Rules of Civil
20   Procedure.  They don't even necessarily apply
21   here.  They are just by analogy.  So Vianix is
22   the same.
23                 But we have direct, exact cases
24   that deal with these exact situations that we
```



1    have here, and I will just run you through them

2    really quickly.  And two of them are Circuit

3    Court of Appeals cases; okay?  One is the Tenth

4    Circuit's case decision in Unioil, which

5    allowed substitution of a party after the bar

6    date to a proof of claim.  The First Circuit's

7    decision in Gens, which I dealt with earlier

8    with respect to the unfair prejudice standard,

9    also does the same.  As well as a case within

10   the Third Circuit, Titus, from the Western

11   District of Pennsylvania.  So each of these

12   cases allowed for substitution.

13              Now, Nortel distinguishes those

14   cases from our facts by saying, well, you are

15   not really trying to just substitute, swap in

16   and swap out.  You are trying to add, and that

17   doesn't apply here.  But then they say in the

18   same breath that Vianix is directly on point

19   and that's exactly what happened in Vianix.  So

20   they can't have it both ways.  They say these

21   cases don't apply because they dealt with

22   substitution, but Vianix is directly on point,

23   and that case dealt with exactly the same fact

24   pattern as here except for in a federal

1    litigation as opposed to a proof of claim.

2              So there are two other cases,

3    though, that directly deal with the addition of

4    a creditor to a proof of claim, which is

5    exactly what we have here, and those cases are

6    the Clamp-All and the Bender case.  And the

7    debtors, all they can do to deal with these

8    cases is say, well, they don't apply because

9    those cases dealt with claims that were

10   substantially similar and that doesn't apply

11   here.  Well, of course, it does, for all the

12   reasons I have already said.  We are dealing

13   with the same software, the same products, the

14   same Nortel wrongdoing, the same contract, the

15   same everything.  And so, of course, the claims

16   are substantially similar.

17              But one thing they didn't do in

18   response was identify a single

19   bankruptcy-related decision anywhere in the

20   country -- and I am not aware of one either --

21   that holds anywhere contrary to the five cases

22   that I just identified saying that a creditor,

23   once it files a proof of claim and the bar date

24   passes, cannot substitute for an affiliated



```
1    true party in interest --

2                THE COURT:  You are talking about

3    substituting.

4                MR. DEAN:  Substituting or adding.

5                THE COURT:  All right.

6                MR. DEAN:  Substituting or adding,

7    either one.  I am talking about either one.

8                THE COURT:  The cases talk about

9    adding.  The five cases that you have cited --

10               MR. DEAN:  No, no.

11               THE COURT:  -- talk about adding a

12   party to the proof of claim; is that right?

13               MR. DEAN:  No, no.  Three of them

14   deal with substitution, the first three.

15               THE COURT:  Yes.

16               MR. DEAN:  And as I explained,

17   Nortel said those don't apply because they deal

18   with straight substitution and Vianix does,

19   too.  And the two cases that deal specifically

20   with adding are the Clamp-All and Bender cases.

21               THE COURT:  All right.

22               MR. DEAN:  Okay?  And Nortel

23   hasn't given us any authority in any bankruptcy

24   decision that says, well, if the creditor
```



1    messes up and doesn't file the claim in the

2    true party in interest's name, then they can't

3    be added or substituted later.  Five cases say

4    you can either do one or the other.  They have

5    identified none.  All they rely on is this

6    inapplicable two-page decision, and for all the

7    reasons I discussed, it does not apply.

8                    All right.  So I have one more

9    thing I want to talk about, and that is unfair

10   prejudice in the context of the Inc. claim.

11   And this is very important, Your Honor.  I

12   saved the best for last.

13                    The debtors really surprisingly --

14   I am really surprised that they would make this

15   argument.  They made the argument that they

16   believe they have been defending contract-based

17   claims for years and that they shouldn't have

18   to defend Inc.'s copyright claim, quote

19   unquote, during the pre-petition period because

20   they know that the same claims are being

21   litigated during the post-petition period

22   anyway, so it is kind of ironic that they would

23   make that argument.

24                    But the main point I want to make



1    here and the reason why I moved their motion to

2    withdraw the reference opposition and their

3    appellate brief into evidence earlier is to

4    make this point.  If you read those papers,

5    Your Honor -- and we cite them in our reply

6    brief and we quote them extensively -- the US

7    Debtors came before Judge Stark in the motion

8    to withdraw the reference and said, Your Honor,

9    don't take this adversary proceeding up.  The

10   reason why we don't want you to take it up is

11   because SNMP Research, both entities they

12   represented -- they even thought that both

13   entities were already in the claim.  They

14   defined it --

15                THE COURT:  We are in the

16   adversary proceeding.

17                MR. DEAN:  No, not in the

18   pre-petition.  In the adversary --

19                THE COURT:  The withdrawal of the

20   reference was the adversary proceeding, not in

21   the proof of claim.

22                MR. DEAN:  Correct.  Correct.  But

23   what they said to Judge Stark to get the motion

24   to withdraw the reference denied was you



1    shouldn't take that up because the same exact

2    similar claims are pending before Judge Gross

3    on the proof of claim.  He is going to have to

4    litigate those anyway.

5               So here is what they say in the

6    EMEA appeal.  And this is why they are

7    judicially estopped from making the argument

8    that they are now.  "The adversary complaint

9    asserts claims for two distinct alleged

10   actions.  First, similar to the claims in the

11   SNMP Research proof of claim" -- which is

12   defined as both entities in their paper.  So

13   they even thought that both entities were in --

14   "the complaint alleges infringement based on

15   the US Debtors and the Canadian Debtors' use of

16   SNMP Research's software in the Nortel products

17   without payment of royalties to SNMP Research."

18               So they represented themselves

19   that SNMP Research, similar to the pre-petition

20   proof of claim, was alleging copyright

21   infringement in the adversary proceeding.  So

22   how can they possibly come to court now and

23   make the exact opposite argument they made

24   twice in front of Judge Stark, once to win the

1    motion to withdraw the reference, then get it

2    denied without prejudice?

3              So, Your Honor, there is no doubt

4    in my mind based on the law of judicial

5    estoppel that the US Debtors should be estopped

6    from arguing that they would in any way be

7    prejudiced by the addition of Inc. in light of

8    those prior admissions.

9              THE COURT:  All right.  Let me

10   hear from the US Debtors now.

11             MR. DEAN:  And I am finished.

12             THE COURT:  Good.

13             MR. DEAN:  Thank you, Your Honor.

14             THE COURT:  Thank you.  Thank you,

15   Mr. Dean.

16             MR. DEAN:  I appreciate it.  We

17   really appreciate your time.

18             THE COURT:  Absolutely.

19             MR. HERRINGTON:  Your Honor, I do

20   think it would be helpful to have about 15, 20

21   minutes of closing on the Schedule 1 issue, so

22   I am going to try to be really brief on the

23   motion to amend.

24             THE COURT:  Do you want to come



1   back on the Schedule 1?

2                 MR. HERRINGTON:   No.   I think we

3   can give you a few thoughts.   Maybe we will

4   come back later, but I do think it is helpful

5   to have a few thoughts today while it is all

6   fresh.

7                 THE COURT:   All right.   So what

8   are you going to argue first?

9                 MR. HERRINGTON:   It might make

10  sense to do the Schedule 1 issue and then turn

11  back -- well, you know, let me --

12                THE COURT:   We have half an hour.

13                MR. HERRINGTON:   Yes.   Let me talk

14  about the motion to amend --

15                THE COURT:   Okay.

16                MR. HERRINGTON:   -- and to give

17  you a little context.

18                THE COURT:   Because it has been

19  well-briefed.

20                MR. HERRINGTON:   It has been well-

21  briefed.   And that's actually what I was going

22  to say is our surreply focuses on this attempt

23  to add Inc. and why it just doesn't work for

24  many, many reasons.   And I think everything



1    that --

2              THE COURT:  Are you inconsistent

3    with what you argued before Judge Stark?

4              MR. HERRINGTON:  No, Your Honor.

5    They look at defining things in shorthand,

6    saying SNMP Research, as we all do, we tend to

7    say just SNMP.  And then just to save us words,

8    we will say SNMP Research International, SNMP

9    Research, Inc., hereinafter SNMP Research.

10   There was no focus on, oh, is Inc. or

11   International asserting a claim in the proof of

12   claim.  And there couldn't have been a

13   representation that Inc. was asserting a claim

14   in the proof of claim.  They undisputably were

15   not.

16              THE COURT:  Not at the time of the

17   EMEA appeal particularly.

18              MR. HERRINGTON:  Exactly.  And

19   never -- you know, that's the striking thing in

20   this case.  They filed these amended proofs of

21   claim over and over and over and over, over a

22   period of six years, and never added

23   International, added Inc. International as a

24   claimant.



1                      And it goes with what is really

2      going on here.  The focus of all those claims

3      was the contract claim.  That's what it laid

4      out, talked about license fees you heard about,

5      royalties under a royalty buy-out approach that

6      allegedly would be owed, and contractual

7      interest.  Contract, contract, contract.  They

8      had a passing sentence saying, by the way, you

9      know, copyright and trade secret.  But it made

10     sense presumably to them and certainly to us

11     that International would be the only claimant.

12     It is only now that they say, you know, we are

13     not so keen on our contract claim anymore.  We

14     see the big bucks with this infringement claim.

15                      THE COURT:  Right.

16                      MR. HERRINGTON:  That's why they

17     want to change to an infringement claim.  And

18     in order to do that, they do need to bring in

19     Inc.

20                      And Your Honor asked the question

21     does International have copyrights.

22     International does have copyrights.  Copyright

23     is a distinct legal thing.  International has

24     some and Inc. has some.  The reason why it is

1    so important is that Inc.'s are the ones that

2    are relevant here.  Their own expert in doing a

3    copyright analysis only looked at the Inc.

4    copyrights.  So that's all there is on the

5    table from their expert.  And by the way, this

6    trade secret idea, nobody has asserted or

7    identified any trade secrets whatsoever.  So,

8    you know, they can try to assert a trade secret

9    claim, International can conceivably if they

10   are allowed to amend, but there is no trade

11   secret claim on the table.

12                What it is is a copyright claim.

13                THE COURT:  Yes.

14                MR. HERRINGTON:  And it is a

15   copyright claim under Inc.'s copyrights.  Those

16   are distinct legal claims.  They are not the

17   same claim.  All these bankruptcy cases that

18   Mr. Dean cited, he said we are either letting

19   it in because it is literally a substitution,

20   one for the other, and then the two cases where

21   there was an addition, it was the exact same

22   claim.  Basically, it is a situation where the

23   Court found actually this claim that has been

24   asserted belongs to two people, so we need to

1    have both.  That's not what is going on here.

2                 They say in their own papers

3    Inc.'s copyrights are what was shipped

4    allegedly, and that's why International will

5    not succeed on their claim.  So yes,

6    International, if they are permitted to amend,

7    yes, they will assert a copyright claim and

8    they will lose.  It is the Inc. copyright

9    claims that matter.

10                 THE COURT:  Okay.

11                 MR. HERRINGTON:  And, Your Honor,

12   again, our surreply touches on it all, but I do

13   want to -- since so much time was spent on

14   Vianix, Vianix is relevant really only if you

15   thought International did assert a claim under

16   Inc.'s copyrights.  It clearly doesn't.  Inc.

17   is nowhere to be found in the prior proofs of

18   claim.  But Vianix tells you even if they had,

19   they would lack standing, and that's a

20   constitutional defect.  You can't use that as a

21   peg, as a predicate to say we tried to do

22   something that constitutionally has no

23   standing.  Let that be our placeholder to bring

24   in the right party.  And instead, the answer is



1     no, you just dismiss it.  If the right party

2     can file a new claim and they are still within

3     the time limit, fine.  But it is their claim, a

4     new claim.  They have to live or die on their

5     own.

6                   Live or die on their own?  They

7     don't even try to justify a new claim by Inc.

8     under excusable neglect.  That's what you have

9     to do when you say, gosh, late in the day, I

10    missed the bar date.  Please let me come in

11    anyway.  That's excusable neglect.  They

12    expressly disclaim any attempt or ability to

13    satisfy excusable neglect.

14                  But I do want to point out one

15    case on this issue.  And it is not in the

16    binders.  It is the Painter Family Investments

17    case.  And it said one plaintiff without

18    standing to assert another plaintiff's claims

19    cannot attempt to do so and thereby toll the

20    statute of limitations on the latter claims.

21    It just doesn't work that way.  If you have got

22    no standing, it is a nullity.

23                  And then finally, just briefly,

24    there is an issue of law whether 15(c) can be



1   used as plaintiffs.  In the Gardner case the

2   Third Circuit said no, it can't.  Nelson went

3   through the analysis and said no, you don't --

4   you wouldn't succeed anyway.  And we are not

5   asking -- you know, that's an issue.  It is a

6   point of law.  We preserve it.

7             But here is the thing.  Even under

8   Nelson they clearly fail.  And the bottom line

9   in Nelson is it is not enough to satisfy the

10  conduct test.  It is not enough to show there

11  is no prejudice.  You have to show you didn't

12  sleep on your rights.  I mean, here you are

13  years later saying, "Oops.  Sorry.  I need to

14  come in and do something that I know I didn't

15  do five, six years ago.  I didn't do before the

16  bar date."

17            And SNMP's, you know, Inc. and

18  International's own actions just kill that

19  argument, because Inc. appeared as a plaintiff

20  in the adversary complaint.  That was November

21  of 2011.

22            THE COURT:  Right.

23            MR. HERRINGTON:  So they knew they

24  could.  They knew they should.



1    Dr. Case said -- why did you add Inc. then?  I

2    thought it would be better to have both

3    parties.  So they knew they could and should.

4    They didn't do anything about it.  They had

5    numerous opportunities.  The courts talk about

6    numerous opportunities to fix the problem.

7    They didn't do anything.  They filed two more

8    proofs of claim after that.  So if they thought

9    there was a problem to be fixed and needed to

10   be fixed and they wanted to fix it, they

11   didn't.

12           And we do think, Your Honor, this

13   all is about motive.  You know, where are they

14   going to finally find their way to the pot of

15   gold.  It used to be this claim of, you know,

16   you sold a $900 million business.  We just want

17   a few percentage points, and that's going to

18   give us $200 million.  That's really not on the

19   table anymore.  So where else are they going to

20   try to get to their big pot of gold?  It is the

21   Schedule 1 issue actually.  It is the claim

22   that is addressed in Schedule 1.  If the

23   Schedule 1 issue doesn't go their way and Your

24   Honor has to address the issue of what products

1    are covered by Schedule 1, then this pot of

2    gold goes away anyway.  But it is that pot of

3    gold that they can only get to by bringing in

4    Inc.  So that's the motive.  It is done after

5    setbacks.

6              And Mr. Cantwell will address, if

7    I haven't stolen his thunder, even as to

8    International, when that's the context, when

9    you are really trying to change your claim and

10   make a much bigger a claim is after you suffer

11   a setback, that goes to the bad faith and

12   dilatory motive.  But in any event, there is no

13   way that Inc. can be brought in as a claimant

14   here, and that is terribly important.

15             Thank you, Your Honor.

16             THE COURT:  Thank you.

17             Mr. Cantwell.

18             MR. CANTWELL:  I was given a look

19   by Mr. Herrington to be brief, so I will be

20   brief.

21             Good afternoon, Your Honor.

22   Philip Cantwell, Cleary Gottlieb, on behalf of

23   the US Debtors.  Just a few very brief points

24   in response to SNMP's arguments.



1               Just briefly, Your Honor, Mr. Dean

2     pointed out the cases that he had referred to

3     in his letter filed, I believe, Wednesday,

4     suggesting that he may raise them today.  I

5     would just encourage Your Honor, to the extent

6     you don't have anything to do after going

7     through 80 or 150 pages on this issue, just to

8     read those carefully, because first of all, one

9     of them is not even cited and explained in our

10    briefing.

11              Second of all, while it is

12    Mr. Dean's point they do suggest to be prior

13    courts' interpretations that perhaps

14    15(c)(1)(C) applies to plaintiffs, none of them

15    come out that way.  One expressly rests on the

16    foundation that, quote, "it appearing that

17    plaintiff does not seek to add a different

18    cause or a new cause of action," and it goes on

19    to deny 15(c)(1)(C) relation back.  The

20    Feuerstack case does the same thing.  And a

21    careful review of those cases I think will

22    ultimately support our position.

23              Briefly, on the International

24    point.  Your Honor, there seemed to be a little



1  briefs passing in the night on this
2  International point when SNMP opened and we
3  responded.  When SNMP opened on International
4  amending its proof of claim to assert different
5  causes of action, it was clear to us, and we
6  think it is clear from their brief, they were
7  trying to wrap themselves in Inc.'s copyright
8  claim and assert it as its own.  As
9  Mr. Herrington explained, it is not something
10  that can be done.
11           In their reply they clarify it or
12  raise the argument, and they said, no, we are
13  just looking at conduct.  We think that we
14  relate back generally under the Ben Franklin
15  standard that Mr. Dean quoted to the court.
16           Your Honor, regardless of if you
17  find that the proposed claim relates back
18  either because it is similar to what they had
19  previously asserted or because it satisfies Ben
20  Franklin, or if you don't, you are going to be
21  getting to the same equitable issues.  If you
22  find that it relates back, you still get to
23  look at bad faith, dilatory conduct.  And the
24  factors we pointed to in our briefing weren't

1    intended to come down on the side of normal

2    prejudice or unfair prejudice.  We think they

3    support either prejudice analysis that you find

4    yourself in.

5                    And if, Your Honor, as

6    International points out, to the extent their

7    proposed claim does not relate back, we are in

8    excusable neglect analysis as to International.

9    Why they haven't gone that route with Inc. I

10   don't know, but they have acknowledged that it

11   is the right path for International as a late

12   claimant asserting a new claim, which is where

13   we think Inc. is standing before you today.

14                   Your Honor, with that, actually,

15   with that, I will cede the podium.

16                   MR. DEAN:  30 seconds, Your Honor?

17                   THE COURT:  Yes, of course.

18                   MR. DEAN:  Really quick, I want to

19   get to the Schedule 1.  A couple points.

20                   THE COURT:  Well, I don't know

21   that we are going to have time for Schedule 1.

22                   MR. DEAN:  Okay.

23                   MR. HERRINGTON:  Can we have at

24   least five minutes so I can make some closing



1    thoughts?

2              THE COURT:  You can each have five

3    minutes.

4              MR. HERRINGTON:  Thank you.

5              MR. DEAN:  Let me just take 30 to

6    60 seconds.  Number one, Nortel is arguing all

7    of these excusable neglect principles; why did

8    we delay this, that and the other.  We have

9    good reasons for that.  Obviously, Dr. Case

10   didn't think he needed to do this until right

11   before we filed the motion.  He made a mistake.

12   He said that in the papers.  That's not a

13   problem.  We are not trying to say, you know,

14   the undue delay was proper under Pioneer and

15   excusable neglect.  We are not moving under

16   excusable neglect as to Inc.

17             THE COURT:  Right.

18             MR. DEAN:  And if you look at the

19   United States Supreme Court decision in

20   Krupski, which we cite in our reply, the Court

21   said that it would be erroneous for a trial

22   court to consider the reason for the delay in

23   rendering an analysis under Rule 15 under a

24   relation back.  So because International, a

1    related entity, has filed a timely proof of

2    claim, we are entitled to proceed under

3    relation-back principles, and that's what we

4    are doing.

5                So all of this stuff about

6    excusable neglect is inapplicable to Inc.'s

7    request.  We don't have to make that type of

8    showing as a matter of law, and it would be

9    error to consider that under the Krupski test.

10               The one thing that Nortel fails to

11   recognize or even address anywhere is the

12   unfair prejudice.  They make these prejudice

13   arguments, but they don't address the unfair

14   prejudice standard.  They don't even argue

15   today that they were prejudiced at all.  The

16   only thing they do is say you should infer bad

17   faith because the number got larger.  That is

18   not enough, Your Honor, to deny somebody a

19   right to present its case in court and go to

20   trial.

21               And so with that, Your Honor, I

22   have nothing further.  I know it has been a

23   long day.

24               THE COURT:  It has been a long



```
 1    day, Mr. Dean, but thank you.
 2              MR. DEAN:  So thank you.
 3              THE COURT:  Thank you.  You can do
 4    this in five minutes?
 5              MR. HERRINGTON:  Yes, Your Honor.
 6              THE COURT:  All right.  You don't
 7    want to come back.
 8              MR. HERRINGTON:  Do you want to
 9    go?
10              MR. BUSCH:  Well, I do think, Your
11    Honor, that after the statements of fact/
12    conclusions of law are submitted, that it might
13    be worthwhile for Your Honor to have us back.
14    So I wouldn't want to say this is in lieu of
15    that.
16              THE COURT:  All right.  Well, we
17    will look into that at a later date.  But for
18    now, I think Mr. Herrington wants to make a few
19    points.
20              MR. HERRINGTON:  Well, you are --
21              MR. BUSCH:  I am going to reserve
22    some time.  I know Mr. Herrington loves getting
23    the last word, but --
24              THE COURT:  Everyone wants the
```



1  last word.

2          MR. BUSCH:  Well, I think as the

3  plaintiff, we have the right to have the last

4  word.

5          THE COURT:  Yes, yes.

6          MR. BUSCH:  And so I will do two

7  or three minutes and I will say -- and I would

8  ask Your Honor to actually confine it to five

9  minutes.

10          THE COURT:  I will.

11          MR. BUSCH:  Okay.  And so I will

12  do two or three minutes, and I will ask that

13  Mr. Herrington be confined to five minutes, and

14  I will come back and conclude after that.

15          THE COURT:  But you don't have to

16  talk real fast, because our court reporter will

17  have trouble.

18          MR. BUSCH:  Okay.  I will try and

19  balance both issues.  Your Honor, just a few

20  final words, I guess, in my closing.  There is

21  a lot to say.  There is a lot of law.  There is

22  a lot of facts.  There is a lot of everything

23  that has been presented.  Impossible to

24  summarize within two or three minutes, but I



1    will try my best.  Just a few things.

2              Dr. Razgaitis said it best.  There

3    are no words in Schedule 1 that support his

4    opinion, none.  And in light of that, there is

5    undisputed testimony that Schedule 1 and the

6    language -- and Your Honor can read it -- is

7    clear as day that the schedule and the license

8    rights are terminated within three years of its

9    execution.  So I would ask Your Honor that,

10   based upon what you have heard, to go back and

11   rule based upon that language, because we

12   strongly believe that's appropriate.

13             What else has Your Honor heard?

14   Your Honor has heard the undisputed testimony

15   from Dr. Case and Mr. Southwood about the

16   negotiations, and that has come in unrebutted.

17   And while Mr. Herrington has talked about facts

18   that are in the record, realtime -- I think he

19   has used that phrase several times -- realtime

20   documents, there are several realtime documents

21   that we think are very appropriate to look at,

22   which is Mr. Hyslop's own internal email to

23   Nortel based upon his conversations.  Your

24   Honor will remember there was a discussion



1    about whether that was extrinsic evidence or

2    not because it was an internal email.  But

3    Mr. Southwood said that that was consistent

4    with what he and Mr. Hyslop had discussed.  And

5    when Mr. Hyslop goes back and reports that

6    following that conversation, I think that is

7    quite probative.  And he says that the Bay

8    products must be licensed to use EMANATE on a

9    product-by-product basis.

10                    And, Your Honor, and then in

11   August of 2003, right after Schedule 1

12   terminates, Mr. Southwood sends a very clear

13   email to Pierre Tremblay, who has just taken

14   over from Mr. Hyslop, but he had been there at

15   Nortel for some time, and he says specifically

16   that you had to identify products on schedules

17   over the course of Schedule 1A.  Very clear,

18   and we would direct Your Honor to that.

19                    And the argument that Nortel has

20   made is basically what I said earlier, the

21   analogy that I made, which is that if you

22   have -- if you lease a car for three years and

23   you have unlimited mileage, that doesn't mean

24   you get to keep the car after the three-year

1   lease expires.  And that is essentially what

2   they are trying to do.  They are trying to

3   rewrite the Schedule 1.  It went poof on June

4   20 of 2003, and their rights terminated unless

5   they were placed on other schedules.

6                And the requirement to identify

7   the products on schedules is right in the

8   master license agreement.  And remember,

9   Schedule 1A is part -- it is Schedule 1A to the

10  master license agreement, which contemplates

11  Schedule As being entered into.  And the

12  extrinsic evidence that Mr. Herrington points

13  out simply doesn't overcome that.

14  Mr. Southwood explained exactly what happened

15  with that Schedule 16 that was discussed.  He

16  explained the software service.  It was a

17  mistake to enter into it.  There was no

18  discussion whatsoever following the expiration

19  of Schedule 1 between the parties at any time,

20  not once, about extending the term of

21  Schedule 1.  There was no consideration.  They

22  didn't say we will pay you some money to extend

23  it.  They didn't do any of that.  There was

24  absolutely nothing.



```
 1                    The fact that Mr. Southwood in a
 2      letter in 2006 made a mistake when he was
 3      looking at it in order to tell them why they
 4      didn't have a license certainly doesn't create
 5      any kind of implied-in-fact contract between
 6      the parties.  You can't just say, oh, one
 7      employee of yours said this or one employee of
 8      yours said that and then aha, you have an
 9      implied-in-fact contract.  There are actually
10      standards for the implied-in-fact contract.
11      There are elements that have to be shown.  And
12      there is zero evidence of any discussion or
13      agreement or anything about that.  There just
14      isn't.
15                    With respect to, I think -- Your
16      Honor, I think those are my two or three
17      minutes, and I think I would say a lot more if
18      I could, but I will leave it at that.
19                    THE COURT:  All right.
20                    MR. HERRINGTON:  Thank you, Your
21      Honor.
22                    THE COURT:  You have got five
23      minutes.
24                    MR. HERRINGTON:  Yes.
```



1          THE COURT:  And if we have to come

2    back, we will come back.

3          MR. HERRINGTON:  Okay.  Your

4    Honor, just going back to some of the same

5    important points that we started out with, the

6    contrast between the documentary evidence, the

7    contemporaneous record, and then what the

8    witnesses would come in and say going back

9    literally 17 years.  And, of course, all the

10   witnesses were SNMP witnesses, so you got to

11   hear their spin, their story.

12         And I invite Your Honor -- this

13   will be presented in our briefs -- to go

14   through that documentary record.  And I am

15   going to try to hit some of the high points in

16   the little time that I have left to me.

17         And actually, I want to start with

18   something that counsel for SNMP just referred

19   to, and it is this email from Dave Hyslop,

20   where he says there is the Bay products in the

21   Bay- Nortel license, and he says, "However, if

22   any of these product development groups require

23   source code development licenses (e.g. source

24   code for Emanate or license fees. . .which will

1   not be embedded into the Bay product)," then

2   they must pay for it.

3                Well, that's not true of the

4   BayStack group.  They got that development

5   source code back in the Bay Networks days and

6   they paid for it.  They paid $68,000 in a

7   license fee.  There is also testimony that is

8   confirmed by the contract.  That's what a

9   license fee is for.

10               Now, thank goodness we have a test

11  case.  We have this Optivity group and their

12  use of ARL.  It is exactly parallel to

13  BayStack.  Dr. Case talked about that.  There

14  were two legacy Bay products that were in

15  existence at Bay and came under Schedule 1.

16  And I wish we had the emails that say it on

17  BayStack, but it is exactly the same about ARL.

18  Thank goodness it came up, because otherwise,

19  we would be stuck with these people trying to

20  reconstruct what they think they agreed to and

21  what they think they said 17 years ago.

22               The ARL product was going to

23  use -- the Optivity product was going to use

24  this ARL software.  And then they pointed out,



1    well, actually, that's the exact same thing

2    that is already under Schedule 1 and is already

3    under the Bay Networks license.  And what did

4    Mr. Southwood say?  "Oh, you don't need a

5    schedule."  And he didn't say you don't need a

6    schedule now but you need one in three years.

7    He said, "You don't need a schedule."  And he

8    walked through all the elements of why that is

9    so.  Because they have already paid the

10   development fee, that license fee.  That's what

11   those new schedules were for.  They had to pay

12   for the license fee for getting the development

13   software.

14             That email that again recounts the

15   conversation says, "And we have got the SSA

16   already, so we don't need a new schedule to set

17   that up either."  That's exactly the same as

18   BayStack as well.  They had that SSA.  That's

19   one of the things that's a real embarrassment

20   for them is, well, this SSA just continued on

21   and on.

22             THE COURT:  Right.

23             MR. HERRINGTON:  Well, that is

24   completely consistent with Optivity and ARL and

1    what Mr. Southwood said would be the case.  You

2    already got the source code.  You already got

3    the development rights.  You already paid for

4    those.  No, you don't need a new schedule.

5              And remember, I was called to task

6    and say, well, but that doesn't tell us what

7    happens three years later, after Schedule 1,

8    after the three-year term.  Thank goodness

9    there, too, we have got a documentary record,

10   because that same Optivity group came back and

11   said, you know, we have got the software that

12   works with this Internet Protocol Version 4,

13   but the Internet protocol has moved on and now

14   it is Version 6, and we just need to add this

15   kind of translation feature, this new feature

16   on top of it that is compatible with Version 6.

17   And Mr. Southwood said, okay, well, let me look

18   and see where is your schedule.  You are

19   Optivity operating under ARL.  This is in 2004.

20   He said, "Well, where is your schedule?  What

21   are you operating under?"  And he said, "Oh,

22   you are operating under Schedule 1"; right?

23   That's exactly what he said back at the time.

24   You don't need a new schedule.  And then after



 1   June 2003 he said you are operating under

 2   Schedule 1.

 3              Now, they signed Schedule 60, and

 4   all the email traffic -- and we will go through

 5   this in our briefs -- say Schedule 60 and the

 6   payment for it was just to add the Version 6

 7   compatibility.  ARL was already licensed.  If

 8   they didn't want to upgrade to Version 6, they

 9   wouldn't have needed a new schedule.

10   Mr. Southwood wouldn't say, "What?  You need a

11   new schedule."

12              But what is that consistent with,

13   that fact that he said in 2004 ARL is licensed

14   under Schedule 1?  It is exactly consistent

15   with the same darn thing he told the BayStack

16   group in that January 2006 letter; right?  The

17   BayStack group came to him and they said we are

18   using your software in our product.  We are

19   thinking about for something new collaborating

20   with this Trapeze group.  He wrote back.  He

21   said, "Oh, I am glad to know you are operating

22   under the Bay license."  He then wrote that

23   letter that said you have the rights under

24   Schedule 1.  And now all he can say is that's a

1  mistake.  I was moving too fast.  You know,

2  sorry.  That's what we hear throughout this.

3  Sorry.  You remember about the Optivity ARL.

4  He said I don't know what I was thinking.

5  That's a mystery.

6            So again, you have got the

7  documentary record.  It is coherent.  It is

8  compelling.  And it tells you exactly what

9  Schedule 1 means.  That's got to govern over

10  the attempt by people with motivation today to

11  come in 17 years later and basically excuse it,

12  say, "I am sorry.  I shouldn't have sent you

13  those SSAs.  I am sorry.  I shouldn't have sent

14  you that January 2006 letter."

15            And just one last word.  The

16  excuse me; I am sorry, that doesn't work on the

17  meaning of Schedule 1.  It doesn't show what

18  Schedule 1 meant.  It sure doesn't work on the

19  implied-in fact-agreement.  When you keep

20  sending software to Nortel saying you have got

21  the right to use it, and when you write them a

22  letter saying you have got the rights under

23  Schedule 1, you cannot turn around and say we

24  didn't have an agreement.  That wasn't our

```
 1    agreement.  That's exactly what that framework
 2    of law is meant to address.
 3                    So thank you, Your Honor.
 4                    THE COURT:  Thank you,
 5    Mr. Herrington.
 6                    MR. BUSCH:  A few minutes?
 7                    THE COURT:  Yes, Mr. Busch.
 8                    MR. BUSCH:  Okay.  So just a
 9    couple of things on the --
10                    THE COURT:  Two minutes.  You have
11    got two minutes.
12                    MR. BUSCH:  I will do my best.  A
13    couple of things on the last point.  On the
14    last point, what Mr. Herrington just said is
15    that him reconstructing this Schedule 12 cannot
16    overcome something, testimony.  Here is the
17    real point.  None of it overcomes what is the
18    clear language of the contract.  What is the
19    absolute, positive, most clear statement of the
20    parties' intent and agreement?  It is the
21    actual agreement.  There can be nothing more
22    clear of the parties' intent.
23                    And they would read out of the
24    language and the parties' intent and the
```



1    agreement the requirement that Schedule 1A ends

2    in three years.  They would read that

3    completely out.  And it is very clear what

4    happened.  Mr. Herrington is making a big deal

5    about the Schedule 16 issue.  It is very clear

6    what happened.  What happened was that

7    Mr. Southwood correctly sent them a schedule,

8    Your Honor, sent them a schedule for the ARL

9    product because it was an old Bay product.

10   They then said we are going to be going to

11   BRASS.  And he said they were friends.  I felt

12   it was unfair to charge them for the ARL

13   product again if shortly thereafter they are

14   going to be moving to BRASS.  And you saw that

15   he quoted them a license fee for BRASS of

16   $200,000.  And so he said forget about the ARL,

17   and then he sent them the BRASS schedule to

18   replace it.  And then they said we are not

19   going to BRASS.

20              And what Mr. Herrington ignores,

21   the point he ignores is not what happens after

22   three years.  What he ignores is that during

23   that three-year period, as Mr. Southwood said,

24   they had three full years to enter into a

1    schedule if they were going to be using that

2    product after it expired.  So there was no need

3    for him to push them at that moment in March of

4    2000, which was before Schedule 1A even started

5    and was fully executed in June 2000, saying,

6    well, now you have got to enter a schedule now.

7    They had three years.  And so three years goes

8    by; it falls off his radar.  And when does it

9    come back?  It comes back in after Pierre

10   Tremblay tells him we are not using any more of

11   the BayStack products with SNMP Research

12   software in August of 2003.

13            And then in 2004 they contact

14   Mr. Southwood and he says, "Fine, let's sign a

15   license."  And they sign a schedule for that

16   product.  That's the first time it comes to his

17   attention they are still using it.

18            There is nothing in that sequence

19   of events whatsoever that supports walking away

20   from the clear language of Schedule 1A.  And

21   there is nothing that Nortel -- there is no

22   evidence that Nortel used any of the software

23   with the SSA.  There is nothing that they ever

24   did to discuss the SSA or any of the post-2003

1    conduct where they agreed, discussed, acted,

2    had any conversations or otherwise discussed

3    the matter.

4              So, Your Honor, I would ask Your

5    Honor -- the question before Your Honor today

6    is this:  Was anything licensed in a

7    Schedule 1A after June 20 of 2003.  And I think

8    the answer to that question completely is shown

9    by the evidence in this case, the undisputed

10   evidence in this case, and the answer is no,

11   and by the language of Schedule 1, which the US

12   Debtors would read out and pretend like it was

13   never agreed to and was not part of the

14   agreement, but it was.

15             Thank you.

16             THE COURT:  Thank you.  Thank you,

17   Mr. Busch.

18             Well, we have gone through a tough

19   two days, I will tell you.  There was a lot

20   crammed into two days.  And I have listened,

21   and I will look forward to seeing your papers.

22             Now, on the motion to amend, there

23   I am not going to get any more papers.  Is that

24   right, Mr. Dean?



1          MR. DEAN:  It is fully briefed.

2     It is ready for you to decide.

3          THE COURT:  All right.  And as far

4     as the Schedule 1 is concerned, there, of

5     course, I will be getting your statements.

6          MR. BUSCH:  Do we have a timeframe

7     for that, Your Honor?

8          THE COURT:  Well, let's talk about

9     that for two minutes.  How much time do you

10     think you want?

11          MR. BUSCH:  Well, we want to get

12     the transcript.

13          THE COURT:  That's right.

14          MR. BUSCH:  And we want a chance

15     to review the transcript and that type of

16     thing.

17          THE COURT:  Yes.

18          MR. BUSCH:  So I would be willing

19     to speak to Mr. Herrington and come up with

20     something that is mutually acceptable.  I am

21     not sure when we will get to, but if we can do

22     that and make a proposal to Your Honor, that

23     would be great.

24          THE COURT:  That would be fine.  I



1   am not going to press you.  I know there is a

2   lot here.  And talk about a date, and if you

3   can't come up with a date, then I will fix one.

4             MR. HERRINGTON:  Your Honor, with

5   regard to the exhibits, we will send you a list

6   with all the exhibits, things that were either

7   introduced or were unobjected to and so were

8   admissible.  And same thing with deposition

9   designations.  We will be sending those in.

10  And perhaps we will just send it in with our

11  post-trial submissions.

12            THE COURT:  Maybe so.  I think

13  that would be best.  I agree with that.

14            MR. HERRINGTON:  Okay.

15            MR. DEAN:  We will send you our

16  exhibit list as well with our designations.

17            MR. HERRINGTON:  That's what I

18  meant --

19            THE COURT:  Thank you.

20            MR. HERRINGTON:  -- both parties.

21            THE COURT:  All right, everyone.

22  Well, enjoy the weekend.  Safe travel, and we

23  will stand in recess.  And I will look for your

24  papers.



1          MR. BUSCH:  Thank you, Your Honor.

2          THE COURT:  Thank you very much.

3                    - - -

4          (Court adjourned at 5:40 p.m.)

5                    - - -

6                  INDEX

7  DEFENDANTS' WITNESSES   Direct   Cross   Redr.   Recr.

8  Jeffrey D. Case          290     383     388     --
   Richard A. Razgaitis     396     434     448     --
9  John E. Southwood        451     526     534    541

10  PLAINTIFFS' WITNESSES

11  David W. Tollen          545     566     --      --
    Jeffrey D. Case          589     --      --      --
12

13  PLAINTIFFS' EXHIBITS                         Rec'd.

14  Exhibit  1  ----------------------------   593

15  Exhibit  2  ----------------------------   593

16  Exhibit  3  ----------------------------   593

17  Exhibit  4  ----------------------------   593

18  Exhibit  7  ----------------------------   593

19  Exhibit  9  ----------------------------   593

20  Exhibit 11  ----------------------------   593

21  Exhibit 14  ----------------------------   599

22  Exhibit 15  ----------------------------   599

23  Exhibit 18  ----------------------------   600

24  Exhibit 19  ----------------------------   600



```
1    PLAINTIFFS' EXHIBITS, Cont'd.                  Rec'd.

2    Exhibit 71  ------------------------------    289

3    DEFENDANTS' EXHIBITS

4    Exhibit 138  -----------------------------    327

5    Exhibit 258  -----------------------------    458

6    Exhibit 161  -----------------------------    467

7                        - - -

8              (Exhibits not attached.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```



1                        CERTIFICATE

2                I, LORRAINE B. MARINO, Registered

3    Diplomate Reporter, Certified Realtime Reporter and

4    Delaware Notary Public, do hereby certify that the

5    foregoing pages numbered 282 through 661 contain a

6    true and correct transcription of the proceedings

7    as stenographically reported by me at the hearing

8    in the above cause before the United States

9    Bankruptcy Court for the District of Delaware, on

10   the date therein indicated.

11               IN WITNESS WHEREOF I have hereunto set

12   my hand at Wilmington, this 16th day of May, 2017.

13

14

15
                    
16

17   _____
                  Registered Diplomate Reporter,
                  Certified Realtime Reporter
18                  and Delaware Notary Public

19

20

21

22

23

24

**$**

**$0 (1)**
302:19

**$10 (1)**
611:21

**$100,000 (4)**
310:9,11 530:8
611:20

**$116,000 (1)**
530:11

**$154,000 (1)**
530:14

**$200 (1)**
636:18

**$200,000 (1)**
656:16

**$216,000 (1)**
530:9

**$22,000 (1)**
603:24

**$22,624 (1)**
466:17

**$5,000 (1)**
483:9

**$60 (1)**
390:16

**$68,000 (1)**
650:6

**$7,800 (4)**
465:9 517:9 518:9,
13

**$7800 (1)**
518:17

**$8 (1)**
608:24

**$81 (1)**
608:23

**$9,600 (1)**

465:2

**$900 (1)**
636:16

**A**

**ABA (1)**
546:20

**ability (3)**
422:6 568:13
634:12

**able (7)**
358:18 422:14
456:15 504:14
519:19 607:6 619:13

**above (3)**
462:4 482:21
530:6

**absence (7)**
428:3 429:19
437:14 448:13
565:10,13,16

**absolute (3)**
427:1,1 655:19

**absolutely (10)**
286:19 297:18
299:7 334:17,22
386:11 535:6 597:3
628:18 647:24

**accept (3)**
285:7 494:7
605:19

**acceptable (1)**
659:20

**accepted (4)**
286:9 339:6
344:23 523:18

**access (1)**
516:12

**accordance (2)**

369:15 440:10

**according (5)**
307:16 318:7,9
408:20 516:19

**account (5)**
412:12 414:18
429:4 519:14,18

**accounting (2)**
518:6 519:5

**accurate (5)**
436:7 475:8 499:9
590:22,24

**accurately (1)**
524:13

**acknowledge (1)**
601:16

**acknowledged (2)**
618:9 640:10

**acknowledging (2)**
524:8,10

**acquaintance (1)**
301:10

**acquaintances (4)**
300:8,9 301:2,6

**acquire (4)**
405:21 443:3,9
478:3

**acquired (15)**
313:23 344:14
427:11 431:12,15
440:23 442:2,16
443:4,10 581:17
582:23 583:22 584:6
585:8

**acquiring (2)**
443:22,23

**acquiror (4)**
439:6 582:11,13
585:8

**acquisition (8)**

353:21 364:19
384:4 427:14,15
562:21 582:15
585:11

**across (1)**
409:9

**acted (1)**
658:1

**action (6)**
605:8 620:5,9,11
638:18 639:5

**actions (2)**
627:10 635:18

**activity (1)**
436:13

**actual (8)**
289:1,17 355:17
532:4,7 579:12
610:16 655:21

**actually (67)**
283:16 299:12
316:1,10,19 322:14,
15 323:7 342:21
357:2,20 361:24
374:3 383:10 386:14
387:22,23 392:11
393:10 399:15
421:20 453:9 461:17
472:14 473:18
482:17 483:19
486:21 495:3 498:5
501:8 503:20 504:23
506:21 508:18
510:12 511:21 512:9,
14 514:7,10,18
515:22 519:21 520:3
521:7 523:24 525:9
542:4,8 558:24
562:20 583:1 592:2,
18 597:18 612:4

614:4 619:9 629:21
632:23 636:21
640:14 644:8 648:9
649:17 651:1

**adaption (1)**
498:22

**add (22)**
427:21 474:7
477:19 487:7 504:16
536:24 601:13
602:13,19 603:19
606:8 615:10,13,20
616:10 617:17
622:16 629:23 636:1
638:17 652:14 653:6

**added (9)**
389:6 460:12
483:10 605:15
620:16,22 625:3
630:22,23

**adding (5)**
624:4,6,9,11,20

**addition (15)**
401:16 405:1
482:15 483:8 485:15,
24 486:14 491:23
593:24 606:2 615:9
617:9 623:3 628:7
632:21

**additional (17)**
309:18 425:1
448:20 486:18
553:20 555:7,8,11
560:18 561:5,24
573:24 574:5 593:24
594:8 601:13 615:11

**address (17)**
284:24 365:7
435:3 470:5 471:8
482:16 491:11

492:21 509:8 520:4,
5 577:18 636:24
637:6 642:11,13
655:2

**addressed (7)**
285:2 359:3
387:23 413:9 420:2
544:21 636:22

**addresses (3)**
298:7 477:8
491:11

**addressing (5)**
418:21 480:18,22
501:8 506:22

**adjunct (2)**
397:15,16

**adjust (1)**
602:15

**administrative (2)**
426:6 448:22

**admissible (1)**
660:8

**admission (1)**
336:24

**admissions (1)**
628:8

**admit (1)**
610:9

**admitted (11)**
296:24 314:16
327:8 381:13 458:15
467:18 544:22 593:6,
15,19 601:10

**admitting (1)**
341:11

**adopt (2)**
620:18,20

**adopting (1)**
391:23

**advance (2)**

556:4,6

**advantage (3)**
509:11 577:21
578:21

**adversary (11)**
608:11 614:22,24
615:7 626:9,16,18,
20 627:8,21 635:20

**advertiser (1)**
402:19

**advised (3)**
532:14 541:19
613:22

**advocate (3)**
391:23 392:8
393:9

**aeronautical (1)**
396:13

**aerospace (1)**
396:15

**affairs (4)**
316:9,10 317:15
368:20

**affect (3)**
420:22 441:17
509:22

**affected (8)**
416:22 417:10,15
418:12,20 419:14,20
420:17

**affects (2)**
362:3 444:7

**Affiant (1)**
369:14

**affidavit (11)**
369:4,10 370:4
376:23 377:1,7,17,
20 378:9,16 379:5

**affiliate (1)**
620:24

**affiliated (2)**
617:23 623:24

**affirm (2)**
395:20 443:5

**affirmed (4)**
426:13 451:14
545:13 589:20

**affirming (1)**
370:21

**after (117)**
291:4 304:5
316:14,16 317:5,7,
12,20 318:1 321:5
322:5 329:18,21
350:2 351:17,20
353:20 358:23
363:12,23 373:3
377:11,24 379:18
382:3 397:11 400:21
403:9 417:3,3
427:13,14 432:11
433:13 439:21
440:17 445:3,22
449:5 472:6 475:14
476:3 478:15,16
482:7 495:9 496:6
507:19 509:7,14
510:17 513:7,12,21,
22 514:7,17 515:20
517:13 524:1 525:8
527:18 530:18
532:15,20 533:13
538:22 539:21 541:6,
19 542:1 543:13
547:10,24 551:13
552:19 558:18,19
559:23 561:14,14
566:15 568:2,14
577:17 578:10,13
581:16 582:23 604:8

609:12 610:10 611:2,
24 617:7 619:17
620:7,10,23 621:3,3
622:5 636:8 637:4,
10 638:6 643:11
644:14 646:11,24
652:7,8,24 656:21
657:2,9 658:7

**aftermath (1)**
562:21

**afternoon (19)**
325:9 451:1,10,12,
22 452:2 479:16,21
480:1 540:5,8 545:7,
8 546:5,6 566:3,4
590:8 637:21

**afterwards (1)**
566:18

**again (107)**
288:5 296:10
301:23 302:5 303:6
311:2 314:3,21
317:17 319:1,19
324:16 329:5 330:10
331:8 339:15 342:20
345:1 347:24 348:3,
5 367:5,9 374:2,10,
23 379:21 383:21
386:6 391:2 394:9,
24 398:17 402:10,12
405:12 411:11,24
412:11 414:10
416:14,24 418:15
420:14 430:2,21
435:1 436:4,6,23
438:6,13 439:16
440:5 451:15 460:9,
13 463:4,10,23
468:23 469:11
470:18 471:14,21

472:16,24 474:16
475:17 477:22
481:17 482:13 484:4
486:22 490:8 494:10
495:14 497:11
499:20,23 500:9,14
501:3 502:4 506:15
507:5 515:12,14
516:8 522:22 535:24
543:19 553:18 559:9
560:5,16 570:16
573:21 583:16
584:11 589:17
597:10,21 633:12
651:14 654:6 656:13

**against (3)**
282:23 417:4
435:6

**aged (2)**
509:12 577:22

**agent (4)**
310:16,23 311:1
491:12

**agglomerated (1)**
403:16

**ago (12)**
363:7 398:12
439:17 441:11
445:20 471:22
516:18 536:13 541:6
609:1 635:15 650:21

**agree (16)**
436:19 437:16,23
490:16 523:17 551:6,
7 557:7,9 558:21,22
560:2 562:17 578:16
609:6 660:13

**agreeable (1)**
588:20

**agreed (21)**

352:4 357:8,9
361:23 364:23
401:24 448:17 501:4
509:4 523:10,14
537:7 571:23 577:5
588:3 600:4 609:9,
14 650:20 658:1,13

**agreement (75)**
302:16,22 303:9,
12 307:18 308:12
345:10 414:6 421:9
422:22 423:1,7
425:14 431:21 432:6,
10 433:4,8,12,19
437:21 438:12,16
445:9,13 446:2,7,15
452:8,9 459:12
460:22 461:2 464:11,
24 465:1,8 467:1
501:7 502:17 503:6
510:23 512:20 523:2,
7,11 524:2,3,8 525:9
550:13 558:5 559:15
569:7 573:1 576:24
578:2,11 579:16
580:10 581:15
582:23 583:3,10,11,
21 647:8,10 648:13
654:24 655:1,20,21
656:1 658:14

**agreements (19)**
399:14,16 400:8
422:23 432:1 437:18
438:4 461:1 478:1
490:2 549:10 550:14,
18 564:14,20 582:19,
24 583:2,9

**agrees (1)**
463:23

**aha (1)**

648:8

**ahead (3)**
358:12,14 526:15

**AIX (1)**
483:8

**akin (1)**
421:22

**align (5)**
390:4,4,19 391:4
392:24

**aligned (1)**
392:20

**aling (2)**
391:2 392:24

**aling/align (1)**
391:5

**alleged (3)**
605:6 615:17
627:9

**allegedly (2)**
631:6 633:4

**alleges (1)**
627:14

**alleging (1)**
627:20

**Allen (25)**
457:1 459:5 460:9,
13 461:19,21 462:12
463:12,17 464:2
467:7,10,23 468:13
469:5 470:1 472:7,
17 473:24 475:19
481:19 500:19
501:17 506:4 528:1

**all-nighter (1)**
298:9

**all-nighters (1)**
299:15

**allow (10)**
284:11,11 358:10

410:23 420:12
443:18 610:14,14
611:23 619:9

**allowed (13)**
308:1 357:23
358:4 366:24 554:1
602:6 606:7 610:8
612:16 620:8 622:5,
12 632:10

**allows (3)**
375:18 606:2
619:10

**almost (5)**
482:6 497:18
538:22 582:16
586:10

**along (6)**
448:7 528:7
536:11 573:9 589:6
611:17

**already (59)**
311:4 347:15
411:14 427:19,19
443:13 451:13 453:1
461:11 462:4,13
463:7 464:14 468:16
469:9,12 470:9,11,
12,21 471:8 478:2
484:16 493:18
496:21 499:17 500:2,
22,22,23,24 505:1,
17,24 506:15,16
517:5 523:13 524:23
525:10 546:7 559:24
561:15 588:2 589:18,
20 594:1 615:12
617:11 623:12
626:13 651:2,2,9,16
652:2,2,3 653:7

**also (54)**

302:18 305:2
311:5 312:9 313:20
315:16 317:9 330:7,
22 331:5 335:15
336:8 344:9 358:24
363:12 384:1,6
397:16 406:14
407:12 423:12 424:7,
8 430:7 432:7,16,17
439:11 441:20,21
444:23 455:9 459:1
469:17 478:24
497:21 536:10
546:14,19 548:22
549:6 555:5,19
559:21 572:14 591:9
605:11 607:20
612:20 615:6 619:21
621:14 622:9 650:7

**Alteon (1)**
330:14

**although (1)**
527:1

**always (7)**
328:9 431:13,14
438:1,7,14 497:18

**amend (18)**
372:21 586:3
587:9,11 590:18
594:7 601:1,8
602:13,19 603:19
611:13,24 628:23
629:14 632:10 633:6
658:22

**amended (9)**
369:12 593:1,2
594:19 595:14 601:9
604:22 608:10
630:20

**amending (2)**

614:15 639:4

**Amendment (4)**
304:5 390:1
610:14,19

**amendments (4)**
467:3 490:2 596:6
602:5

**amends (1)**
614:18

**America (7)**
298:7 311:24
320:8 321:7 322:9,
21 323:8

**American (2)**
549:13,20

**among (4)**
311:11 314:9
324:15 332:9

**amount (9)**
417:2 432:12
466:17,19 518:16,24
596:18 608:18
611:16

**amounts (2)**
466:20 612:23

**Amphus (1)**
330:7

**amplifiers (1)**
402:23

**analogy (2)**
621:21 646:21

**analysis (9)**
442:20 610:17
612:3 616:20 632:3
635:3 640:3,8 641:23

**analyze (1)**
582:6

**anniversary (1)**
327:16

**annual (3)**

406:20 433:4,9

**annum (1)**
596:10

**another (31)**
313:17 326:16
384:4 391:24 400:12,
22 403:8 411:23
424:4 443:23 458:1,
10 463:9 488:24
495:1 496:15 500:14
519:17 520:4 523:15
532:8 535:1,8
538:12 543:8 571:10
617:22 618:24
619:20,24 634:18

**Answer (75)**
291:8 292:16,16,
17 296:5,10 299:4
300:13,17 303:1,5
305:22,23,24 306:16
310:1 312:20 313:1
317:13,21 345:12,19,
23 349:10,11 351:5
353:11,13 355:18,23,
24 356:5,9 357:5,22
358:4,5,12 360:8
362:2,18 366:9,10
367:6,8,24 368:15,
16 375:21 376:6,15,
18 419:11 420:12
440:2 441:19 442:11
443:17,19 446:12
481:1 495:16 504:14,
17,18 514:21 515:4,
6,24 529:5 562:11
573:4 633:24 658:8,
10

**answered (7)**
356:19 358:6
367:14,17 394:13

436:5 522:17

**answering (2)**

360:3 504:15

**answers (3)**

356:6 357:20

404:24

**ANTHONY (1)**

395:22

**anticipated (1)**

559:16

**anybody (1)**

375:1

**anymore (12)**

318:24 320:7

322:1 333:3 392:23

475:4,7 481:14

517:6,9 631:13

636:19

**anyone (7)**

309:22 375:8,14

380:3 554:17 581:4

582:11

**anything (36)**

293:7 314:10

317:18 318:19 335:2,

20 340:12 351:8

359:21 371:10 373:6

380:2 388:23 410:15

428:5 429:22 444:10

447:6 475:10 554:20

557:6 565:10 568:9,

12 569:4 581:1

585:18 598:16 604:3,

7 612:19 636:4,7

638:6 648:13 658:6

**anytime (2)**

382:12 449:2

**Anyway (6)**

391:7 625:22

627:4 634:11 635:4

637:2

**anywhere (5)**

373:5 568:20

623:19,21 642:11

**apart (1)**

385:22

**Apollo (3)**

397:3,9,11

**Apologies (1)**

573:5

**apologize (3)**

575:16 583:7

590:4

**apparent (2)**

470:2 610:11

**apparently (2)**

372:13 485:1

**appeal (3)**

599:10 627:6

630:17

**appealed (1)**

384:19

**Appeals (1)**

622:3

**appear (4)**

467:9 468:9 493:4

518:14

**appeared (1)**

635:19

**appearing (1)**

638:16

**appears (12)**

318:14,18 391:5

466:2 467:13 468:11

552:4 553:19 561:4

594:18 603:10,13

**appellate (1)**

626:3

**appellee (1)**

599:9

**Apple (1)**

554:19

**applicability (1)**

618:2

**applicable (3)**

310:2 540:3

617:10

**applications (1)**

489:10

**applied (1)**

620:1

**applies (4)**

317:13 361:12

602:21 638:14

**apply (14)**

352:22 603:3

615:6 616:20 618:12,

16,18 621:20 622:17,

21 623:8,10 624:17

625:7

**appreciate (8)**

285:17 291:22

301:13 382:15

411:15 507:12

628:16,17

**appreciated (1)**

391:18

**appreciates (1)**

411:19

**approach (2)**

307:5 631:5

**approached (5)**

416:23 417:11

418:13 419:15

420:18

**approaches (1)**

423:17

**appropriate (6)**

283:15 288:8

300:24 575:6 645:12,

21

**approved (1)**

602:1

**approximately (6)**

321:16 370:12

400:15 403:9 435:11

436:1

**April (56)**

294:17,21,22

295:7,11,15,19

296:6,11,19 319:3,

22 320:2 321:17

322:16 323:4 324:6

325:24 326:10,20

329:18 330:11

348:22 349:23

351:23 352:9 357:6,

15 358:15 360:8,16

361:7 366:21 367:19

368:1,20 369:20

374:10 375:3 380:10,

11 383:8 385:11

386:2,10,11,24

478:21 480:23

481:15 482:6 528:1

538:20,24,24 541:21

**area (1)**

603:13

**argue (4)**

351:3 603:10

629:8 642:14

**argued (5)**

550:20 552:13

553:24 599:8 630:3

**argues (1)**

551:1

**arguing (5)**

363:1 365:13

430:8 628:6 641:6

**argument (27)**

287:18 318:7
351:16 362:3,4,6
365:3,10 377:8
379:10 557:11 586:6
587:21,21 588:20
592:3 598:5 617:1,4
625:15,15,23 627:7,
23 635:19 639:12
646:19

**arguments (5)**
318:9 588:8
616:17 637:24
642:13

**arise (2)**
407:15 594:9

**ARL (89)**
305:3,14 308:7
309:7 315:24 316:4,
21 317:4 454:10,12,
16 455:10,18 456:1,
7 457:5 462:5,10
463:4 464:3,9
465:17 466:11
467:24 469:6,8,12
470:11 471:5 472:19
473:21 474:9,17,21
475:3,4,11,18 476:3
478:8,11 480:12,19
481:1,18,22 482:8
483:22 485:14,18
486:11 487:8 500:21
505:24 506:23
527:16,19 529:14
530:8,19 531:1,17,
22 532:21 534:14,18
536:3 537:3 539:7,
12,14 540:4,12,24
542:12,17,20 650:12,
17,22,24 651:24
652:19 653:7,13

654:3 656:8,12,16

**ARL/Solaris (1)**
484:17

**arm (1)**
398:20

**around (5)**
390:24 404:24
426:18 487:15
654:23

**arrange (1)**
315:3

**arrangement (18)**
359:4 430:9,15
431:6,9 569:11,15
571:19 572:2,12
573:22 574:3,16
578:18 579:5,10
580:1,13

**art (3)**
422:12,21 443:24

**articulated (1)**
447:12

**artificially (1)**
578:6

**ascertainable (1)**
610:13

**aside (3)**
498:13 516:10
523:3

**asked (44)**
291:16 294:3
297:23 300:11
311:18 324:9,21
345:14,21 346:8
347:20 355:20 356:1
360:10 367:13 368:8
372:10 374:12,21
375:17,20 376:5,9,
14 393:18,22 394:9
441:13 467:23 475:5

514:10 515:16,18
522:17 523:15,22
525:5 526:18 527:23
550:8,10 569:9
604:10 631:20

**asking (58)**
303:2,4,19 306:12,
14 308:11,13 309:10,
14,15,23,23 333:18
334:12 335:23
336:12 341:9 346:3
348:6 360:4,19,20
361:9 362:18 363:24
366:5,17 373:22
374:19 379:4 417:6,
7,14 418:15 441:3
477:17 485:23
489:17 491:3 494:13
495:7 512:9 513:17,
19 514:14 515:8,17
522:18 528:6 530:18
553:19 554:7 569:18,
24 571:7 572:10
580:19 635:5

**aspiration (2)**
438:2,6

**assert (12)**
372:16 426:13
594:8 596:3,4
615:23 632:8 633:7,
15 634:18 639:4,8

**asserted (9)**
337:8 591:14
593:16 596:14
599:21 607:21 632:6,
24 639:19

**asserting (6)**
371:1 373:11
606:20 630:11,13
640:12

**assertion (1)**
521:9

**asserts (1)**
627:9

**asset (3)**
417:3 431:1
613:21

**assets (3)**
582:16 585:12
604:9

**assigned (1)**
502:18

**assignment (1)**
444:21

**assistance (1)**
538:17

**associate (2)**
388:11 560:11

**associated (9)**
293:19 423:13
437:20 453:14
455:16 459:2 499:6
502:7 505:22

**Associates (1)**
403:18

**Association (4)**
407:11 515:7
549:13,20

**assume (8)**
352:1,8 395:8
418:10 440:5 447:14
469:20 494:24

**assuming (3)**
395:10 514:3
523:13

**assuredly (1)**
443:5

**astronautical (1)**
396:13

**asynchronous (3)**

305:2 485:12
486:3

**AT&T (3)**
400:24 401:1,3

**A-team (1)**
329:13

**Atlanta (1)**
321:4

**attach (1)**
377:21

**attached (2)**
491:24 557:22

**attaches (1)**
608:12

**attachment (2)**
558:12 606:15

**attachments (2)**
558:8 591:14

**attempt (5)**
300:21 629:22
634:12,19 654:10

**attempting (3)**
339:21 390:3
615:23

**attending (2)**
320:24 321:2

**attention (7)**
529:23 530:1,6
533:5 595:3 610:5
657:17

**attorney (4)**
342:15 345:24
546:12 584:24

**attribute (1)**
563:17

**attributes (1)**
338:22

**Atul (5)**
315:5 325:10
380:12 384:1 394:5

**A-T-U-L (1)**
315:5

**audience (1)**
383:23

**audit (11)**
285:23 287:16,22
288:22 289:1 293:23
294:2 371:8,11,13,14

**August (12)**
292:18 294:21
295:7 386:17 475:16,
17 524:3,4,14
533:16 646:11
657:12

**authentic (1)**
287:13

**author (1)**
546:17

**authority (2)**
564:13 624:23

**AUTM (1)**
407:11

**A-U-T-M (1)**
407:11

**available (6)**
378:14 462:9
463:24 516:13,22
612:11

**Avaya (13)**
416:5,5 417:2
418:1,18 427:15
435:5,6,9 548:13
604:15,16 615:8

**avoid (1)**
422:10

**award (2)**
339:7 406:20

**awards (1)**
406:17

**aware (17)**
386:4,7 388:10
390:7 430:7 511:19
550:20 551:1,5
559:12 564:21
580:11,20 581:1,2,3
623:20

**away (7)**
335:8 385:6 431:3
521:24 619:4 637:2
657:19

---

**B**

---

**BA (1)**
546:23

**Baby (3)**
401:6,14 403:5

**bachelor's (1)**
396:12

**back (100)**
290:4 295:8
301:17 303:9 314:1
315:9 317:14 324:7,
8 325:1,6 329:24
330:9 334:24 335:4,
9,11 342:21 343:9
348:12 355:16 356:4,
5 357:3 358:12,17
360:11 373:14,17
374:20,24 376:22
378:8 388:17 389:20
418:18 427:10 433:1
456:20 461:18 462:1,
6 464:6 467:22
470:23 473:19
481:17,19 486:8,21
487:10,14 490:11
500:18,19 501:14
507:19 510:13
514:13 517:24 521:8,

11 528:10,13 530:2,
19 534:16 538:2,2
539:5 543:18 547:15
558:18 560:23
618:22 620:14 629:1,
4,11 638:19 639:14,
17,22 640:7 641:24
643:7,13 644:14
645:10 646:5 649:2,
2,4,8 650:5 652:10,
23 653:20 657:9,9

**background (9)**
296:23 396:10,21
410:5 414:11,14,17,
20 415:4

**backs (1)**
613:3

**bad (6)**
373:17 603:16
612:20 637:11
639:23 642:16

**badly (1)**
470:20

**baffling (1)**
565:18

**balance (1)**
644:19

**ball (1)**
613:16

**bandwidth (1)**
338:16

**bankruptcy (3)**
621:15 624:23
632:17

**bankruptcy-related (1)**
623:19

**Bar (11)**
549:13,20 603:24
604:8 610:10 617:7
621:3 622:5 623:23

634:10 635:16

**bargain (8)**
566:9,15,16,24
567:6 568:22 571:3
576:8

**Barnes (5)**
508:24 577:1
578:24 579:13,17

**Barnes' (1)**
580:6

**based (23)**
292:18 349:21
372:22 385:2 412:24
430:14 438:18,19
441:10,12 509:1
524:5 529:2 569:22
577:2 596:10 602:15
615:5 627:14 628:4
645:10,11,23

**basically (8)**
399:1 424:9
432:13 484:9 561:22
632:22 646:20
654:11

**basis (14)**
285:21 400:19
403:3 410:1 418:24
433:5,9 443:15
444:13 487:2,3
503:5 593:14 646:9

**bat (1)**
435:4

**Battelle (19)**
397:17,20,24
398:7,17,18,22
399:3,6,15,22,23
400:16,17,21 404:23
435:17,22 436:8

**Bay (224)**
293:6 297:6,11,16

298:2,21 299:1,6,10,
15,19 302:15 303:8,
9,11,16,20,20,23
304:2,3,4,7,9 305:5,
8,18 306:4,13
308:19,23 309:11
310:1,2,4,9,13,14
312:9 313:20,23
315:14,15 316:7,17
320:9 322:10,16,17
343:24 344:17,18,20,
24 345:2,8,10,14,15
346:10,20 347:2,3,4,
6,7,10,12,19,21
348:1,2,6,8 353:18
357:14 358:1,2,2,16,
17 359:13,21 360:7
361:6,14 363:15,20,
23 364:18 365:6,19
366:2,5,22 385:15
388:22 389:21
408:20 425:18
427:11 430:11
438:21 440:24
441:12,24 442:2,16
443:4,9 444:14,14,
15 452:15 453:14,19,
21 454:20 456:10
457:6 460:16 461:1,
2,12 463:5 464:11,
15,24 465:1,7,19
466:5 469:21 470:11
471:2,11 472:20
480:12,13 481:2,3
482:9,10 483:23,24
487:8 489:22 501:11
502:18,19 503:4
505:1,15,17 506:16
509:1,9,15 512:15
518:10,11 521:3

523:20 524:8,19
529:18 533:10
534:19 536:4 540:24
541:1 542:9,9,20,21
551:4 562:21,23
567:22 568:14 570:8,
20 573:1,11 574:10,
12 577:1,19 578:19
581:14,14,15,17,19,
21 582:2,18,21,22,
23 583:3,10,13,21,
22,23 584:5,6,7,14,
17,19,19,20 585:15
646:7 649:20 650:1,
5,14,15 651:3
653:22 656:9

**Bay' (4)**
502:15,16 503:4,5

**Bay- (1)**
649:21

**Bay-Nortel (2)**
353:20 502:19

**Bay's (6)**
441:9,10,16 582:3
583:20 584:5

**Bay-SNMP (6)**
502:17 503:6
582:22 583:24 584:8,
20

**BayStack (168)**
286:5,20 287:8
290:18 291:6 292:4,
12,17 294:18 295:3,
17,20,23 296:4,7,12,
18 298:3 299:9,19,
24 311:9 314:11
315:10,19 317:9,9,
24 318:11 319:21,23
320:1,5,22 322:18
323:6,8 324:3,13,17

325:8,14 326:5,10
327:2 329:19 332:8,
10,13,20 333:1
338:7,12,20,22
339:1,6,9 340:4,5,24
341:2,19 348:11,24
351:16,19 352:5,9,
16,16,16 354:3,5,9,
12,17,21 356:7,9,14,
16 357:1,6,12,13
359:18 360:16
361:15 362:9 365:8,
15,20,21 366:12
367:19 368:2,10,21,
23 369:4 370:7,11,
18,22 371:20,24
372:4,11,19 373:4,
10,11 374:2,11,13,
23 375:1,9,22 376:7,
16 377:4,22 379:7
380:4,11,19,21
381:3,6 384:21
389:24 390:19 392:3,
12,13 393:4,11
394:1,11 408:9,14,
19 409:3,5 411:8
415:11 416:5,7,21
417:9,24 418:1,4
419:9,13 420:16
427:10,12,14 650:4,
13,17 651:18 653:15,
17 657:11

**BbMADK (1)**
496:19

**bearings (1)**
527:14

**beating (1)**
394:7

**became (20)**
300:3 303:23

309:24 312:14,18
318:12 323:7 351:20
377:10 379:13 399:2,
4 401:4,5 448:18
455:20 470:2 576:17
578:2 579:4

**become (9)**
287:11 319:8,13
350:1,12 351:9,17
362:14 423:24

**becomes (2)**
287:12 459:18

**becoming (1)**
380:4

**before (44)**
282:8 294:23
306:16 319:3 323:4
348:19 349:10
361:23 363:16
364:19 366:14
381:17 391:9 405:10
437:4 442:5 449:3,
23 480:13 481:3
482:9 483:24 512:11
541:1 542:2,21
547:17 583:15
594:22 597:8 599:8
603:3,23 609:13,21
611:3 626:7 627:2
630:3 635:15 640:13
641:11 657:4 658:5

**beg (1)**
381:18

**began (3)**
398:8,8 490:13

**beginning (11)**
456:20 478:13
494:11,15,16,22
500:10 502:11 528:4
540:21 548:8

**begins (2)**
482:20 604:9

**behalf (7)**
591:21 596:1,5
605:13 607:22,23
637:22

**behavior (1)**
506:14

**being (32)**
292:14 324:13
332:21 333:20 336:7
343:23 369:15
386:20 419:22
422:17 427:19
428:12 431:15 446:8
453:14 454:9 458:2,
6 474:23,24 475:3,7
481:20 500:16
513:12,14 531:14
556:12 573:23
593:15 625:20
647:11

**Belcor (19)**
400:22 401:5,7,8,
12,18 402:8,9 403:2,
5,7,10,12 405:8,13,
16 409:11 432:3
436:10

**belief (2)**
442:1 444:13

**believe (40)**
309:13 313:22,24
318:4 319:15 325:8
351:19,22,23 366:18
371:2,24 372:23
373:16 379:24 380:6
387:18 392:5,6
411:24 416:15
439:18 440:2,15
444:9 452:20 453:1,

5 532:12 533:6
549:20 555:19
584:23 585:4 595:22
599:11 616:12
625:16 638:3 645:12

**believed (16)**
294:17 295:2,17,
22 296:1,6,11,14,15,
16 318:22 319:5,10,
14 392:5 439:12

**believes (2)**
287:24 525:10

**Bell (2)**
400:24 401:2

**Bells (3)**
401:6,14 403:5

**belongs (1)**
632:24

**below (9)**
459:5 476:15
478:21 479:11
480:10 483:1 491:11
540:12,23

**Ben (6)**
602:3 606:1 607:5
616:20 639:14,19

**bench (3)**
283:13 284:9,24

**Bender (2)**
623:6 624:20

**benefit (2)**
431:5 452:14

**benefits (1)**
432:14

**Berkeley (1)**
546:23

**best (11)**
378:13 385:9
391:19 404:4 549:19
580:7 625:12 645:1,

2 655:12 660:13

**better (4)**
450:3 461:22
527:10 636:2

**between (43)**
297:3 303:13
314:17,23 329:3
333:13 334:9 357:24
358:1 363:23 388:7
404:8 419:22 430:9
442:13 445:2,9
452:9 457:6 460:23
463:16 467:1 472:20
473:20 476:11
503:14 509:15
534:19 536:4 563:23
566:9,24 571:3,19
573:23 578:23 579:3
580:24 581:15
608:15 647:19 648:5
649:6

**beyond (14)**
314:13 315:12
352:10 364:23 427:3
513:12,21 519:18
537:24 539:2 570:21
573:7,12 618:15

**Bhatnagar (3)**
380:12 384:2
394:6

**Big (7)**
302:6 402:17
425:8 432:3 631:14
636:20 656:4

**big-deal (1)**
430:21

**bigger (1)**
637:10

**Billerica (1)**
346:11

**binaries (2)**
496:13,20
**binary (19)**
306:8 307:14,18
308:16 480:7 489:9,
10 490:3,5 496:23
497:10,11,19,21
498:6 503:14,16,20
504:2
**binder (2)**
590:11 600:6
**binders (1)**
634:16
**binding (2)**
569:16 571:9
**biological (1)**
381:19
**bit (7)**
374:8 396:22
403:6 407:2 415:8
436:22 498:13
**blanche (1)**
340:11
**block (1)**
523:16
**blood (1)**
526:21
**blow (1)**
471:12
**blurred (1)**
509:16
**board (2)**
406:7,12
**book (16)**
407:4,12 447:2
546:20 549:1,7,14,
16 564:1,8,10,14,18,
19 565:5 583:4
**books (2)**
407:3 447:10

**booth (2)**
336:7 342:3
**BoSS (1)**
408:20
**both (29)**
289:3 304:3 329:4
412:1 422:5 425:10
493:2 503:16 533:7
548:18 549:2,6
564:16 576:8,12
583:20 584:4 600:22
602:22,23 622:20
626:11,12 627:12,13
633:1 636:2 644:19
660:20
**bottom (8)**
323:24,24 369:7
488:10 492:15
495:22 539:8 635:8
**bought (2)**
572:24 573:10
**bound (2)**
570:7,17
**box (4)**
353:8 363:8
364:20 424:2
**branch (1)**
338:12
**brand (2)**
320:5,22
**BRASS (46)**
468:1 469:6 473:1,
10,14,20,20,21
474:6 489:8,9,17,19,
20 490:3,5 491:12
493:1 498:20 527:20
530:9,10,14,20
531:16,18,19 532:8,
15,24 533:3 535:1,5,
8 536:21,22 537:9,

16,17,19 541:20
656:11,14,15,17,19
**breach (1)**
607:18
**break (10)**
343:1 381:19
382:13 449:23
450:11 493:10,14
507:12 526:19,21
**break-up (1)**
400:24
**breath (1)**
622:18
**brief (14)**
588:11 599:9
600:20 611:9 619:15,
20,21 626:3,6
628:22 637:19,20,23
639:6
**briefed (2)**
629:21 659:1
**briefing (3)**
598:12 638:10
639:24
**briefly (4)**
547:4 634:23
638:1,23
**briefs (7)**
587:18,20 598:17,
23 639:1 649:13
653:5
**bring (10)**
297:10 392:9
530:14 595:24 596:5
605:18 606:21 609:2
631:18 633:23
**bringing (3)**
297:16 586:5
637:3
**brings (1)**

611:7
**broad (5)**
399:11 594:14
597:4 606:16,19
**broken (1)**
401:1
**broker (1)**
315:4
**brokered (1)**
378:20
**brokering (1)**
379:19
**brought (5)**
417:4 509:7 542:8
577:17 637:13
**browsers (1)**
402:19
**Brunsvold (7)**
446:24 447:1
564:1,8,10,15,16
**bucks (1)**
631:14
**Buckvold (1)**
446:22
**bugs (1)**
432:15
**build (1)**
384:10
**building (3)**
298:8,9 372:8
**buildings (1)**
444:1
**built (2)**
410:13 531:16
**bullet (3)**
327:14,20 330:3
**burden (2)**
359:2 603:7
**bury (1)**
432:10

**Busch (198)**

282:5,6,10,15,18,
23,24 283:4,8,23
284:7,22 285:9,16,
22 287:3,12 288:10,
17,20,24 289:4,7,10,
11,16,21,22 290:24
291:13 295:5,12
300:19 301:3,7,11
306:22 327:7 337:2,
5,12,16,22 339:14
340:6 343:10 350:4,
14 351:11 355:19
356:19 357:21
361:18 362:23 364:2
365:4 367:13 374:14
375:24 382:8,18,24
383:1,5 387:20
394:20 395:12
407:20,23 409:18
410:7,17 411:1,4,11,
15,17,22 412:14
413:2,10,16,22
415:6 416:24 418:15
419:17 420:10 428:7
434:3,4,6,9,13,16,21
437:7 442:9 444:16
447:18,21 448:12
449:10,24 450:5,9,
15,19 458:14 459:13,
23 460:4 467:16
472:1 487:18 504:13
507:9 512:1 514:22
522:17 525:24 526:1,
5,23,24 527:6 531:5,
8,11 533:20 535:9
541:10,14 542:13
543:3,4,6,11 544:7,
10 545:5,24 546:1,4
549:23 550:6,7

552:9,20,23 553:2,
19,24 554:14,23
556:20 557:2,5
560:21 561:7 562:5,
10,13 565:21 570:10,
14,22 571:6,16
574:22 575:8,17
585:18,19 586:1,18,
22 587:3,8 589:8,10,
11,15 643:10,21
644:2,6,11,18 655:6,
7,8,12 658:17 659:6,
11,14,18

**business (37)**

286:13 300:7,8
301:2,5 330:15
384:9,24 385:7
390:8 401:8 409:13
416:5 422:7 423:3
431:1,7 432:4,9
439:9 443:22,23
445:1 448:24 449:5
543:12 546:15
547:12 548:5 549:2,
12 559:3 560:6
565:20 568:18 582:9
636:16

**businesses (1)**

338:13

**busy (2)**

436:20 548:15

**button (1)**

588:14

**buy (9)**

405:22 424:9
444:3 464:4 509:3
577:4,9,21 578:21

**buyer (1)**

404:8

**buyers (2)**

604:10,10

**buying (4)**

401:22 405:24
444:1,5

**buy-out (59)**

305:19 306:3,5,7
309:4,11,16 310:11
343:24 344:21
353:23 357:11,15
359:6,7,23 362:8
365:24 367:21 368:4
424:7,13,20 425:4,5
426:22 430:10 431:1
438:20 439:22
440:16,18 441:6,9,
11,13,16 442:1,3,17
443:10 452:15
454:20 460:16
466:11 509:11 530:8,
10,11 555:21 556:2,
10,12 567:22 568:14
570:8,21 573:11
631:5

---

## C

**calculation (1)**

434:11

**calculations (1)**

548:15

**calendar (1)**

425:2

**California (13)**

303:17 304:3
330:8 331:4,6 344:6,
10,16 345:9 346:12
397:3 443:1 489:1

**call (22)**

290:4 311:6
395:16 401:9,11,15

403:24 406:21
449:22 451:7 462:21
468:7 471:16 472:5,
8 486:5 559:5
564:13 571:12
587:24 588:19 589:1

**called (30)**

303:14 304:19
305:2 315:23 387:13
389:7 392:14 403:14,
16,16 408:14,20
409:13 421:16,16,17
424:6,7,8 427:11
452:18 547:4,9,13
549:9 564:19 617:7
618:21 619:8 652:2

**calling (1)**

393:2

**calls (7)**

350:5 351:12
374:15 415:14
417:11 428:19
570:22

**Cambridge (1)**

546:23

**came (26)**

310:13 334:24
335:4,9,11 363:23
366:21 376:24
392:21 416:4 459:21
486:10 527:18
528:13 530:19
536:11 549:22 554:4
611:16 613:8 619:8
626:7 650:15,18
652:10 653:17

**Campbell (1)**

339:6

**campus (2)**

311:24 312:1

**Canadian (1)**
627:15
**cannot (10)**
422:15 444:24
506:7 607:22 617:6
620:1 623:24 634:19
654:23 655:15
**CANTWELL (8)**
591:20,21,23
600:11 637:6,17,18,
22
**Cape (1)**
397:8
**car (2)**
646:22,24
**care (2)**
465:24 544:2
**career (4)**
396:21 435:11
548:8,22
**careful (5)**
334:8 346:2
379:17 405:14
638:21
**carefully (5)**
421:2 437:18
438:5 578:7 638:8
**caret (1)**
325:3
**carets (1)**
325:4
**cars (2)**
355:8,10
**carte (1)**
340:11
**case (189)**
282:8 287:2
289:24 290:4,6,8,10,
15 291:10 293:2,17
294:16 296:6 297:2

300:11,22 301:1
302:24 306:24 307:9
308:11 309:10,15
310:12 314:1,3,15,
16 316:19 318:10
323:20 325:15,21
326:1 327:12 328:21
329:12 330:1 331:8
333:17 334:23 335:8
336:21 337:11 338:4
340:1,10,13,20
343:19 345:6,13,23
346:8 347:16,20
348:5,10 354:2
355:17,20 356:6
357:5 359:9,16
360:10 363:13
364:10 367:5 368:19
371:5 372:15 373:4,
5 374:2 376:22
377:9 380:15,20
382:11 383:6 385:23
386:2 389:3 393:3,
23 394:22 400:5,6,
11 401:24 402:12
410:4,6,12,22
412:13,20,23,24
414:7,12 415:16
418:10,22 419:22
422:1,17 425:22
430:8 431:20 433:8
435:5,9,23 437:12,
15 444:18 483:20
484:15 487:5,6
548:13 550:9 579:15
582:14 583:18
585:10 587:24
588:19 589:2,22
590:8,13 591:12
594:24 595:9,22

596:9 597:6 598:3,7
602:3 603:12,13
604:5 605:10,16
606:6,6 609:15
610:7,8 611:8
613:12 617:7,15,16,
18,21,23 618:2,3,4,6,
7,10 619:4,7,17,20
622:4,9,23 623:6
630:20 634:15,17
635:1 636:1 638:20
641:9 642:19 645:15
650:11,13 652:1
658:9,10
**cases (35)**
405:20 421:13,21
422:5 430:22 547:23,
24 558:10 610:1,3
611:9 619:14 621:6,
9,18,19,23 622:3,12,
14,21 623:2,5,8,9,21
624:8,9,19,20 625:3
632:17,20 638:2,21
**Case's (7)**
340:7,15 508:8
591:3 592:19 597:19
604:23
**categories (5)**
426:5 428:1,4
429:20 448:20
**cause (2)**
638:18,18
**causes (2)**
605:8 639:5
**cc'ing (1)**
467:6
**CD (1)**
491:13
**cede (1)**
640:15

**celebrated (3)**
330:9,13 332:21
**celebrates (1)**
327:15
**celebrating (6)**
330:22 331:13
332:1,19 333:21
335:15
**celebration (22)**
331:22 332:7,22,
23 334:14 336:8,11,
15,17 337:10,14
338:7 339:4,12,24
340:2,21 341:2,4,20
342:4,20
**cellphone (1)**
451:24
**center (1)**
369:8
**cents (1)**
611:22
**Centura (1)**
547:10
**CEO (1)**
403:10
**certain (25)**
286:1 297:18
304:23 305:4,5
310:5 311:14,15,21
312:16 313:3,9,19
334:18,22 354:20
371:19 376:19
384:14 387:18
421:17 453:7 509:20
518:1 611:16
**certainly (14)**
284:24 285:12
288:1 300:14 301:23
388:12 438:1 539:2
545:13 565:4 569:1

614:8 631:10 648:4

**certainty (10)**
299:4 326:7
422:13,19 423:4,16
427:2 430:4,17 431:7

**certified (1)**
397:5

**cetera (5)**
480:7 547:24
549:3,5 585:7

**chain (4)**
456:19,21 458:11
478:23

**chairs (1)**
444:2

**challenge (1)**
606:13

**chance (1)**
659:14

**change (8)**
431:10,12 440:6,
21 525:3 531:13
631:17 637:9

**changed (6)**
403:20 431:10,11,
11 474:5 536:19

**changes (1)**
525:6

**changing (1)**
467:24

**chapter (2)**
407:10,12

**characterization (1)**
435:13

**characterize (1)**
421:4

**characterized (3)**
293:16 300:6
321:12

**charge (7)**

432:12 483:10
486:13,14,16,18
656:12

**charges (2)**
518:9,13

**Charles (2)**
403:18 547:4

**chat (1)**
395:6

**cheapest (1)**
385:7

**check (2)**
466:17 604:11

**checked (2)**
564:22,24

**checks (1)**
433:23

**choice (3)**
497:23,23 580:6

**chronology (1)**
541:19

**Circuit (10)**
603:12 618:20
619:7,16,19,20,24
622:2,10 635:2

**Circuit's (3)**
602:2 622:4,6

**circumstances (2)**
446:10 591:7

**cite (7)**
442:19 446:20
447:6 610:1 611:9
626:5 641:20

**cited (4)**
447:14 624:9
632:18 638:9

**cites (1)**
564:13

**citing (1)**
621:9

**Civil (1)**
621:19

**claim (149)**
318:22 319:19
369:5,12 371:6
372:16,20,21 373:2
378:11,17 417:4
591:12,15 592:20
593:1,2,11 594:4,6,8,
12,19 595:4,9,14,23
596:6,9 597:1,7
599:11 601:10,10,14,
16,19 602:6,7,13,13,
16,20 603:20,23
604:4,22 605:3,4,13,
24 606:13,14,15,16
607:8,9,12,19,22,23
608:19,23,23 610:3,
10,12,16,22,23
611:1,13,20,21,24
612:15 613:12,13
614:13,14,15,19
615:11,15,19,21,22
616:3,5,8,11,21,22
617:5,6,6,10 620:23,
24,24 621:9 622:6
623:1,4,23 624:12
625:1,10,18 626:13,
21 627:3,11,20
630:11,12,13,14,21
631:3,13,14,17
632:9,11,12,15,17,
22,23 633:5,7,15,18
634:2,3,4,7 636:8,15,
21 637:9,10 639:4,8,
17 640:7,12 642:2

**claimant (4)**
630:24 631:11
637:13 640:12

**claiming (2)**

372:24 425:22

**claims (35)**
594:8 595:5,10,24
596:4,15,24 605:4,9,
17,20 606:18,20
607:4,15,16 608:2,8,
15 615:2,3,5,23
623:9,15 625:17,20
627:2,9,10 631:2
632:16 633:9 634:18,
20

**Clamp-All (2)**
623:6 624:20

**Clara (4)**
303:17 311:24
345:9 346:11

**clarify (3)**
291:19 525:20
639:11

**clarifying (1)**
361:3

**clarity (3)**
320:13 355:13
427:1

**classified (1)**
518:5

**clause (11)**
551:11,15,17
553:4,16 554:21
559:8 565:19 568:19
580:9 583:16

**clean (3)**
296:5 367:6,8

**cleaning (1)**
426:7

**clear (22)**
326:19 352:6
386:3 428:10,16
443:13 554:8 573:14
577:13 579:14 605:2

639:5,6 645:7
646:12,17 655:18,19,
22 656:3,5 657:20

**clearer (1)**
560:10

**clearly (9)**
286:7 295:10
341:18 438:11
463:15 571:12 607:2
633:16 635:8

**Cleary (2)**
591:22 637:22

**clicktimecom (1)**
547:14

**client (1)**
580:7

**clients (1)**
543:13

**cliff (5)**
421:12 422:7,11
426:23 449:2

**Clive (3)**
389:17,20,24

**close (5)**
282:8 300:5,7
328:12 506:20

**closed (1)**
347:15

**closely (2)**
311:2 521:14

**closer (1)**
522:7

**closes (2)**
426:16 480:5

**closing (6)**
586:9 588:8,10
628:21 640:24
644:20

**closings (1)**
587:4

**Cloud (1)**
549:10

**code (47)**
286:11,12 305:7,
12,16 325:18 401:13,
14 409:13,15,15
433:22 462:19 463:1
470:12 494:17,19
495:3,4,12,19,24
496:21 497:5,12
498:4 499:18 500:3
501:1 502:24 503:1,
10,15 504:2,3,6,22
505:2,10,13,17
506:16 520:12
649:23,24 650:5
652:2

**cognitive (1)**
387:5

**coherent (1)**
654:7

**coin (1)**
606:11

**collaborating (1)**
653:19

**colleague (1)**
404:13

**colleagues (1)**
526:10

**college (2)**
396:24 397:13

**color (1)**
442:22

**Column (3)**
453:15 502:14
518:19

**come (37)**
288:16 347:11
349:7 353:18 358:16
384:4 397:19 419:24

421:3 433:1 464:6
506:7 519:21 528:10
534:4 538:2,2,9
542:4 613:9 627:22
628:24 629:4 634:10
635:14 638:15 640:1
643:7 644:14 645:16
649:1,2,8 654:11
657:9 659:19 660:3

**comes (8)**
286:24 336:1
483:11 539:5 572:2
621:3 657:9,16

**comforted (1)**
404:20

**coming (5)**
293:4 394:5
519:23 564:3 597:20

**commemorate (1)**
339:7

**commemorating (1)**
341:3

**commenced (1)**
620:12

**comment (4)**
469:13 496:9
512:5 519:19

**commented (1)**
437:24

**comments (4)**
339:17 460:12
516:5 613:17

**commercial (8)**
399:5 400:4
422:12,13,14,17,20
562:16

**commercialization (1)**
398:20

**commercialized (1)**
398:20

**commercially (1)**
426:21

**commitment (1)**
569:16

**commitments (1)**
432:19

**common (1)**
550:19

**communication (4)**
513:15 580:12,17
581:3

**communications (1)**
418:21

**Companies (9)**
325:23 328:8
379:1 403:15,24
406:1 431:14 516:8
547:2

**company (20)**
303:13 320:5,21,
22 321:14,21 329:24
344:13 355:9,10
400:23 409:8 426:18
427:11 439:6,7,8
547:9 564:7 579:9

**compatibility (5)**
477:19 482:15,16
486:1 653:7

**compatible (2)**
477:14 652:16

**compelling (1)**
654:8

**compete (1)**
385:1

**competitive (1)**
392:16

**competitor (2)**
392:16 431:16

**competitors (1)**
385:4

**complain (1)**
612:18

**complained (1)**
578:4

**complaint (6)**
602:10 608:11
617:20 627:8,14
635:20

**complete (5)**
417:12,19 466:20
551:17,18

**completed (13)**
286:14 457:6
464:4 472:20 480:13
481:2 482:9 483:23
534:15,19 536:4
541:1 542:21

**completely (9)**
364:20 413:24
418:16,23 613:7
618:20 651:24 656:3
658:8

**completeness (1)**
600:3

**complicated (1)**
422:1

**component (2)**
310:10 432:2

**computer (1)**
397:5

**computer-aided (1)**
400:12

**Computing (1)**
549:10

**conceivably (1)**
632:9

**concern (6)**
341:15 393:9
410:24 439:8 444:1,3

**concerned (4)**

**concerning (4)**
340:13 452:4
467:5 574:15

**concerns (1)**
405:15

**conclude (6)**
319:16 384:23
386:13,15 582:6
644:14

**concluded (8)**
387:10 457:7
466:2 472:21 534:20
536:5 614:2,3

**concluding (1)**
554:19

**conclusion (3)**
366:18 392:11
428:20

**conclusions (8)**
285:2,13 442:21
571:13 613:9,10
614:7 643:12

**condition (1)**
431:1

**conditions (4)**
553:21 560:18
561:6,24

**conduct (6)**
615:15,17 635:10
639:13,23 658:1

**conference (2)**
509:5 577:5

**confident (1)**
616:5

**confine (1)**
644:8

**confined (2)**
353:9 644:13

**confirm (11)**
474:20 522:22
527:14 581:23
586:22 587:1 590:20
594:17 599:22
601:24 604:11

**confirmation (1)**
611:24

**confirmations (1)**
584:10

**confirmed (6)**
582:20 583:22
584:5 611:4,14 650:8

**confirming (1)**
466:9

**confirms (1)**
619:21

**confused (4)**
326:12 347:9
357:16 563:23

**congratulations (1)**
301:24

**connect (3)**
401:15 500:12
501:15

**connected (1)**
519:14

**connecting (1)**
383:23

**connection (1)**
466:23

**consequences (1)**
423:21

**consequential (1)**
424:1

**Consequently (1)**
610:13

**conserve (1)**
283:16

**consider (7)**

**confirm (11)**
421:2 431:14
441:20 442:15
467:24 641:22 642:9

**consideration (4)**
382:15 429:5
438:10 647:21

**considerations (2)**
414:17 444:12

**considered (2)**
482:24 486:24

**considering (1)**
493:20

**consisted (1)**
370:12

**consistent (9)**
300:17 301:8
429:24 433:15
468:19 646:3 651:24
653:12,14

**consistently (3)**
304:15 548:4
549:21

**constituted (1)**
466:19

**constitutional (1)**
633:20

**constitutionally (1)**
633:22

**constraints (1)**
284:13

**consultant (1)**
403:23

**consulted (1)**
403:9

**consulting (2)**
403:14 436:12

**contact (7)**
324:10,22 376:24
390:11 467:6 491:10
657:13

**contain (2)**
291:17 613:1

**contained (2)**
296:17,19

**containing (1)**
310:5

**contemplated (1)**
446:14

**contemplates (2)**
446:7 647:10

**contemporaneous (2)**
486:13 649:7

**contentious (1)**
427:9

**contents (1)**
565:1

**context (12)**
375:5 410:2
435:17,18,22 440:20
441:23 457:22
470:19 625:10
629:17 637:8

**contexts (1)**
407:14

**contingent (2)**
442:12 581:12

**continue (17)**
339:2 353:7
364:16 381:18
432:22 449:5 464:8,
9,13,22 465:18
466:4 581:14 582:21
583:23 584:7,19

**continued (10)**
299:21,23 393:5
400:17 427:13
465:11 513:21,23
609:12 651:20

**continues (3)**
325:17 512:2

518:18

**continuing (2)**
421:2 423:5

**contract (43)**
423:22 474:9
537:2 549:2 554:18
555:5 559:3 560:12
568:3,4,18 573:7,8,
12 578:14 579:7,12,
15 580:5 585:6
596:11,13,15,17,20
605:21 607:3,8,19,
19 608:6,7 623:14
631:3,7,7,7,13 648:5,
9,10 650:8 655:18

**contract-based (2)**
596:24 625:16

**contracts (15)**
546:14,16,20
548:3,10 549:5,9,11,
15 552:1 558:14
559:14 563:2 570:5
581:23

**contractual (1)**
631:6

**contradicts (2)**
620:2 621:14

**contrary (4)**
386:23 433:21
618:20 623:21

**contrast (1)**
649:6

**contribution (1)**
599:11

**control (3)**
408:16 440:7,21

**controversial (1)**
410:15

**convention (1)**
348:18

**conversation (27)**
301:19 350:16
375:16 378:20
379:15,17 380:7,9
389:5 391:20 393:20
394:4,14 458:12
459:6,9 460:10,20
468:12 472:6,9,13
476:23 535:4 563:24
646:6 651:15

**conversations (6)**
379:18,19 463:11
470:1 645:23 658:2

**convert (1)**
607:8

**conveys (1)**
484:13

**convince (1)**
607:6

**copied (1)**
459:1

**copies (10)**
306:9 307:14
308:16 309:5,18
388:10 398:22 400:7
424:11 514:1

**copy (5)**
455:22 459:24
478:21 493:24
538:12

**copying (2)**
474:2 520:2

**copyright (23)**
547:24 597:8
601:16 607:1,3,8,12,
16,23 608:8 615:22
616:11 617:9 625:18
627:20 631:9,22
632:3,12,15 633:7,8
639:7

**copyrights (11)**
607:14,17 608:13,
13 615:5 631:21,22
632:4,15 633:3,16

**core (4)**
483:1 602:15
606:3,8

**corporate (2)**
524:18 584:24

**corporation (5)**
303:21 398:17,19
399:4 547:10

**correct (306)**
291:19 296:4,10,
14,16 297:7,12
298:15,22 301:20
302:18 303:14,18,23
304:7,11,17,20,23
305:3,7,17,20 306:9,
13 308:11,24 310:3,
7,9,16,24 311:1,10,
13,20 312:1,2,11,15
313:1,8,10,18,22,24
314:5,13,14,18
315:3,7,17 316:5,22
317:20 318:13,17,20
319:9 320:10,17
322:7,18,19 323:9,
10,23 324:4,5,14,18
325:4 328:15 329:4,
6,20 330:11 331:20
332:8,24 334:6,7
335:1,10,13,17,18
340:22 341:23
342:22 344:14 345:3,
4,8,11,12,15 346:13,
20 348:7,15,20
349:5 351:18 354:4,
7 356:8,11 368:24
369:1,20 372:19

373:8 375:21 376:6,
11,15 377:5,11,12
378:1,12 379:14
380:11,17,18 385:16
388:8,14 389:1,8,12,
21 390:13 391:14,24
392:1,4,12 393:4,6,
11 395:12 398:16
429:10 434:13 435:6,
7,13 436:1 437:22
439:17,23 440:7
443:11 445:5,10,11,
23 446:8,15,16
450:19 452:6,7,10,
11,15,16 453:17,18
454:5,6 455:18
457:13,15,18 458:4,
8,9 462:10,11,20
463:2,14,22 465:2
466:1,6,7 469:12
470:15 471:3,9,24
472:7 473:9,21,22
474:14,15 477:9,11,
15,16 480:20 481:10,
15,16 482:16 484:21,
22 485:5,11,16
486:14,15,24 487:10
489:24 491:9 493:18
495:5,11 496:3
499:13,14 500:11,21
501:2,12 502:2,3
503:11,23 505:8,10,
14,24 506:10,18
508:21,22 511:4,8,
13,16 512:13 513:1,
13 514:2,8,20
516:24 517:14,15
520:2 521:24 522:8,
9 525:11 527:9,16,
17,20,21 528:19,20

532:11,14,17 533:14,
15 535:2,8 536:9
537:9,14,15,21
539:4,16,23 541:7,8,
22 542:6,23,24
550:22 556:23 569:3,
13 576:5,9 577:11
578:3 579:20 592:13
593:5,18 615:1
620:15 626:22,22

**correction (2)**
291:23 308:4

**correctly (3)**
384:6 592:6 656:7

**correspondence (1)**
486:9

**cost (27)**
302:19 352:12
354:14 356:18,21
357:11 361:2 364:17
366:1,16 367:22
368:4 416:10,20
417:8 418:7 422:2
423:5,9,9,13,16
424:12 431:5 437:20
482:18 555:11

**costliness (1)**
412:10

**costs (1)**
423:2

**cough (1)**
493:8

**could (70)**
286:16 306:10
311:15 348:11
355:12 359:2 362:7
363:9,16 364:5,6
365:23 366:10
367:21 368:3 375:7
378:2,7 381:18

386:6 388:15 400:9
404:16 405:11
416:12 424:6,24
427:2 430:4,10,22
436:14 437:11
438:15 439:12,22
440:18 444:13,15
445:16 447:15,23
448:22 479:2 491:4
504:2 507:24 517:13,
22 526:8 530:23
531:5 545:10 559:4
563:14 567:7 573:22
581:19 583:1,8
594:1 595:24 596:5
605:18 618:10,15
620:22 635:24 636:3
648:18

**couldn't (6)**
379:24 506:13
560:10 562:23 616:1
630:12

**counsel (28)**
287:19 340:8
378:21,21 379:2,20
380:8 383:7 387:12
388:18 389:4 395:1
399:16 436:21
444:18 448:6 452:21
508:24 533:22 534:5,
6 547:8 549:6
554:19 571:7 577:1
581:8 649:18

**counsel's (2)**
303:2 352:3

**count (1)**
416:19

**counted (1)**
387:13

**counterdesignations (1)**

283:12

**counting (2)**
282:23 431:17

**countless (2)**
551:24 616:13

**country (2)**
621:15 623:20

**couple (23)**
282:7 363:3 383:1
400:3 402:10 434:23
447:23 529:24
541:16 547:17 556:6
563:16 591:10
593:24 598:4 599:2
606:5 617:14 618:3
619:14 640:19 655:9,
13

**course (18)**
300:2 345:24
382:16 386:1 392:2
394:1 398:4 447:24
458:2 459:8 522:24
589:14 623:11,15
640:17 646:17 649:9
659:5

**COURT (328)**
282:1,9,13,17,19,
22 283:7,18,22,24
284:3,17,21 285:7,
10,18 287:10 288:7,
9,18,21 289:2,6,8,11,
20 290:1,6 291:12,
24 292:24 294:13,17
295:2,10,16 301:1,5,
9,14 305:24 307:6,
20 323:17 327:6,8
333:8 336:3,22
337:1,3,20,24
340:14 341:10,14
342:6,14,18 343:3,8,

11,13 345:22 346:6
350:19,22 351:3,13
356:23 358:10,14
363:24 365:11
367:15 368:6,13
374:18 378:10 381:9,
12,22 382:2,6,10,16,
20,22 383:3 394:19,
22 395:2,4,7,10,18
396:1 407:19,22
408:2 410:23 412:4
413:7,11,21 415:1,4,
21,24 420:6,11
428:21 429:8,12,16
434:2,5,8,11,15,19
437:2,6 443:8,18
447:14,20,24 448:5,
8 449:8,11,15,17,20
450:7,10,18,20
451:3,9,13 458:15
459:24 460:7 467:17
507:14,18,21 508:4,
13,16 511:22 512:7
525:23 526:3,15,19,
22 527:4 528:23
529:1 531:6,10
535:11,20,22 541:12
543:2,5,7,16,21
544:4,9,11,17,23
545:4,6,12,18,23
550:2,4 552:7,16,21
553:1 554:11 556:24
557:4 561:20 562:8
565:23 571:14 573:3
575:6 585:17,20,24
586:4,12,20 587:17
588:4,13,23 589:3,
10,14,18,21 590:5
591:5,8,19,23 592:4,
8,11,14,22 593:3,7,

18 597:8,16,24
598:6,11,15,21
599:4,15 600:9,12,
18,24 601:20 602:5,
17 603:1,6,11,21
606:4 607:11,24
608:8 610:20 614:12,
16,18,21 615:1
617:19,19,23 618:6,
8 619:17 620:4,19
621:2,8,16 622:3
624:2,5,8,11,15,21
626:15,19 627:22
628:9,12,14,18,24
629:7,12,15,18
630:2,16 631:15
632:13,23 633:10
635:22 637:16
639:15 640:17,20
641:2,17,19,20,22
642:19,24 643:3,6,
16,24 644:5,10,15,
16 648:19,22 649:1
651:22 655:4,7,10
658:16 659:3,8,13,
17,24 660:12,19,21

**courtesy (1)**
504:18
**courtroom (1)**
589:13
**courts (1)**
636:5
**courts' (1)**
638:13
**Court's (1)**
597:14
**cover (4)**
306:7 605:11,17
606:17
**covered (50)**

304:9,12 315:15,
16 317:4,11,20
345:2 348:2 354:3,6,
10 356:7,10,14
357:7 361:1,22
362:9,15,19,19,21
431:22 433:18
452:13 461:3,11
463:5,5 475:10
481:14 489:3,5,15,
19,20,22 490:9
493:2 499:11 510:18
511:15 512:11,12,15
513:20 555:9 570:19
637:1
**covering (1)**
567:11
**covers (10)**
293:5 388:20
425:17 461:1 485:10,
12 489:8 490:5
498:8,16
**crafted (1)**
438:5
**crafting (2)**
508:24 577:1
**crammed (1)**
658:20
**create (3)**
401:14 409:14
648:4
**created (4)**
380:13 471:23
559:23 561:14
**credit (3)**
287:24 469:8
530:8
**creditor (11)**
601:13 610:8,15
611:16,19,24 615:11

620:21 623:4,22
624:24
**creditors (6)**
603:16 606:7
610:24 611:4,15,21
**critical (1)**
611:11
**critically (1)**
448:24
**Cross (1)**
298:10
**cross-connects (1)**
402:24
**cross-development (1)**
498:17
**CROSS-EXAMINATION (6)**
383:4 434:20
526:4 528:24 566:1
575:7
**cross-examining (1)**
543:13
**crossing (1)**
283:1
**crowing (1)**
334:2
**cure (1)**
602:7
**Curran (4)**
476:12,16,22
484:8
**Curran's (6)**
476:20 478:19,22
480:10 540:11,23
**current (19)**
373:1 457:5
472:18 474:8 478:1
480:15 481:4 482:11
484:1 509:9,22
534:14,17 536:3
537:1 541:2 542:22

577:19 578:19

**currently (2)**
286:6 547:19

**custom (34)**
414:5 418:12
419:2,14 428:9,15
429:9,18 430:3,14
433:15,20,21 437:17
439:18 440:14
441:17 444:10
446:19 552:8,10,11,
15,17 553:3,14
554:2,3,9 555:23,24
557:20 560:22
565:12

**Customer (11)**
325:23 327:21
328:14 329:1 338:11
499:7 502:9 514:5,
16 515:20 518:8

**customer-acceptable (1)**
408:23

**customer-proven (1)**
338:15

**customers (11)**
328:5,18,21
338:20 383:16,17
408:12,16 421:17
469:22 515:11

**customized (1)**
400:7

**customs (2)**
564:3 565:6

**D**

**D-11 (3)**
336:19,21,22

**D-111 (3)**
336:23 337:4

338:4

**D-159 (1)**
453:4

**D-159.01 (1)**
452:22

**D-161 (3)**
466:12,13 467:15

**D-166 (1)**
495:15

**D-17 (5)**
346:14,15 487:19,
22 488:5

**D-184 (1)**
491:19

**D-19 (4)**
343:20,21 344:3
487:20

**D-195 (2)**
468:6,6

**D-20 (4)**
346:15 487:20,23
488:5

**D-221 (2)**
329:10,13

**D-242 (1)**
314:15

**D-243 (1)**
323:20

**D-256.02 (4)**
468:23,24 469:3
473:6

**D-256.03 (2)**
526:11 527:2

**D-256.06 (2)**
454:16,16

**D-256.07 (3)**
526:12 527:2,5

**D-257 (3)**
458:20 467:12,22

**D-258 (1)**

456:18

**D-259 (6)**
473:17,23 526:11
527:3 534:4 536:17

**D-271 (6)**
476:9,11 478:20
538:3,6,19

**D-272 (2)**
483:20,21

**D-283 (1)**
487:5

**D-306 (1)**
491:2

**D-32 (4)**
343:20,21 344:8
487:20

**D-4 (2)**
306:21 307:10

**D-56.02 (1)**
468:22

**D-58 (1)**
456:17

**D-71 (3)**
369:6,9 381:10

**D-76 (3)**
574:17 575:14
576:1

**D-76B (1)**
508:1

**D-76C (1)**
507:2

**D-77 (2)**
314:3 317:16

**D-77A (3)**
296:23 297:2
301:17

**D-78 (1)**
520:19

**D-79B (1)**
518:5

**D-7A (1)**
359:10

**D-84 (2)**
519:22,24

**D-85 (1)**
520:15

**D-86 (1)**
524:2

**D-96 (2)**
510:19,22

**D-97 (1)**
511:12

**damages (19)**
362:4,12,13,14
363:7 596:14,15
597:1,9 602:14
605:21 606:7 607:2,
3 610:2,9 612:10
613:5 616:18

**dark (6)**
320:10 321:8
322:11,21,23 323:1

**darn (1)**
653:15

**data (3)**
338:14 346:19
389:16

**database (1)**
400:10

**date (27)**
325:16 326:11
327:1 329:18 363:11
364:15 421:4 427:3
449:2,6 541:24
553:10 603:24 604:8
606:23 610:10 615:4,
7 617:7 621:4 622:6
623:23 634:10
635:16 643:17 660:2,
3

dated (4)
  338:5 389:11
  454:17 576:4
dates (2)
  380:24 389:20
Dave (21)
  418:20 444:19
  454:17 455:17
  458:21 459:7,8,8
  460:2,11,12,19
  461:6 469:4 473:15
  474:2 491:20 493:6
  497:2 576:4 649:19
David (5)
  419:18 537:10
  544:10 545:15 546:9
day (15)
  321:3 373:15,17
  386:3 405:6 480:4
  522:20 543:9 544:14
  610:20 619:13 634:9
  642:23 643:1 645:7
days (15)
  327:21 389:21
  399:15 405:8,13,16
  409:11 436:8,10,12
  542:9 607:20 650:5
  658:19,20
day-to- (1)
  405:5
deadline (1)
  609:14
deal (20)
  392:17,19 404:7
  405:4 422:10 425:5
  433:2 445:3 562:20
  563:13 581:10 582:5
  591:15 621:24 623:3,
  7 624:14,17,19 656:4
dealing (2)

412:5 623:12
Dealmaking (3)
  407:5,7,7
deal-making (1)
  404:5
deals (2)
  436:8 548:2
dealt (10)
  411:9,14 415:12
  417:17 420:3 445:21
  622:7,21,23 623:9
DEAN (79)
  382:17,21 586:2,5,
  7,14 587:12,19
  588:5,16 589:1,5,16,
  20 590:7 591:2,9
  592:5,10,13,15,19,
  24 593:5,12,17,22
  597:13,23 598:2,10,
  12,14,19,24 599:5,
  18 600:15,19 601:1,
  21 602:21 603:22
  607:13 608:1,10
  614:14,17,20,23
  615:2 621:5,10,17
  624:4,6,10,13,16,22
  626:17,22 628:11,13,
  15,16 632:18 638:1
  639:15 640:16,18,22
  641:5,18 643:1,2
  658:24 659:1 660:15
Dean's (1)
  638:12
Dear (1)
  466:15
debate (2)
  390:6 485:20
debated (1)
  440:11
debit (2)

518:16,23
debtor (2)
  603:16 618:4
Debtors (19)
  372:17 383:7
  387:13 436:21 448:7
  591:22 613:14
  617:14 619:3,22
  620:2 623:7 625:13
  626:7 627:15 628:5,
  10 637:23 658:12
debtors' (5)
  599:6,10 605:20
  617:4 627:15
decade (2)
  327:21 387:17
decent (1)
  282:3
decide (4)
  284:10 288:2
  341:11 659:2
decided (1)
  393:10
decision (12)
  297:10 298:1
  389:15 610:6 617:18
  618:20 622:4,7
  623:19 624:24 625:6
  641:19
decision-making (1)
  297:15
decisions (3)
  299:3 619:17
  621:15
declaration (13)
  588:1,7 589:4
  590:17,21 591:3
  592:18,20 593:4
  594:1 601:24 604:21,
  23

declared (1)
  563:11
defeats (1)
  424:19
defect (2)
  602:7 633:20
defend (1)
  625:18
defendants (1)
  619:10
Defendants' (4)
  327:9 369:8
  458:16 467:19
defending (1)
  625:16
defer (1)
  285:5
define (1)
  556:11
defined (2)
  626:14 627:12
defines (1)
  359:11
defining (1)
  630:5
definition (18)
  359:17,19,22
  360:17,22 361:16
  362:13 365:9,16,22
  366:13 367:20 368:3,
  11,15,16 431:4
  556:10
degree (2)
  396:13,15
delay (3)
  641:8,14,22
delayed (1)
  596:12
deliver (1)
  505:13

**delivery (5)**
  499:6,12 502:8
  504:21 505:23
**demanded (1)**
  400:23
**denial (1)**
  599:10
**denied (2)**
  626:24 628:2
**denominated (1)**
  423:22
**deny (3)**
  603:6 638:19
  642:18
**department (2)**
  402:1 405:15
**departments (1)**
  548:1
**depend (2)**
  440:6 442:21
**depends (1)**
  576:15
**deploy (1)**
  502:20
**deposes (1)**
  369:16
**deposing (1)**
  298:5
**deposition (33)**
  283:9 286:16
  289:17 297:20
  298:17 300:6 310:21
  311:19 312:17 318:5
  320:3 349:12 352:6
  353:3 406:6 435:23
  436:5,21 437:9,24
  438:18 439:5,14
  508:8,10 514:11
  516:3 519:8 566:16
  576:11 578:5 597:19

660:8
**Derivative (10)**
  307:15 308:17
  595:24 596:3 605:12,
  23 607:21 616:3,4,8
**derivatively (1)**
  601:18
**derive (1)**
  571:19
**describe (7)**
  338:21 396:9
  416:12 524:13
  548:24 549:8 566:11
**described (13)**
  338:8 378:11
  380:14 409:1 422:11
  427:5,17 428:1
  430:17 566:12
  569:11 576:24
  580:14
**describes (3)**
  379:6 576:7,12
**describing (10)**
  313:5 377:23
  388:18 402:12 459:6
  467:10 576:17,19
  578:2,17
**description (5)**
  293:8 304:22
  308:5 388:23 581:6
**design (2)**
  397:4 400:13
**designated (1)**
  304:13
**designations (8)**
  283:12 285:8,11
  289:17 304:16
  597:20 660:9,16
**desire (1)**
  392:20

**desks (1)**
  444:2
**desperately (1)**
  390:17
**despite (3)**
  438:15 447:3,9
**destroyed (2)**
  426:11 445:23
**destroying (1)**
  446:3
**detail (1)**
  522:13
**detailed (2)**
  604:20,23
**details (1)**
  604:24
**determined (6)**
  457:4 470:10
  472:18 534:13,17
  536:2
**detriment (1)**
  613:4
**detrimental (5)**
  603:15 611:7,12
  616:16 617:8
**detrimentally (1)**
  612:18
**dev (1)**
  462:14
**dev/run-time (1)**
  462:5
**developed (4)**
  304:10 353:20
  358:23 401:17
**developing (2)**
  399:13 499:18
**development (52)**
  305:7 370:7 390:5
  398:17,19 399:3,5
  400:5 454:24 455:6,

10 462:14,15,20
  463:1,7,9 484:11
  489:10 490:1 493:21
  494:12,15 495:4
  499:6,12 502:8,24
  503:1,10,13,15,16,
  21 504:3,6,7,11,22
  505:23 509:9 516:13
  547:13 548:5 577:19
  578:19 649:22,23
  650:4 651:10,12
  652:3
**developments (1)**
  390:19
**devices (1)**
  402:22
**dial (1)**
  401:15
**dicta (1)**
  619:5
**die (2)**
  634:4,6
**dies (1)**
  391:9
**difference (5)**
  333:13 405:13
  473:20 608:15
  618:16
**different (43)**
  301:10 309:8
  321:11 326:18 343:2
  344:13 346:19,22,24
  352:7 357:24 358:8
  360:10 368:7,17
  372:18 373:1,23,24
  383:18,24 389:7
  402:15 409:21
  411:23 418:7 421:24
  444:14 446:18
  485:13 499:15 512:9

514:22 531:16 564:5,
6 576:13 586:24
606:10 610:17 612:4
638:17 639:4

**differentiate (1)**
579:3

**differently (2)**
391:4 446:11

**dilatory (3)**
603:17 637:12
639:23

**diligence (3)**
444:4,12 604:19

**dimension (2)**
345:16 373:20

**DIRECT (23)**
290:13 383:6
387:15 396:5 451:20
529:24 530:5 546:3
550:21 555:20 561:8
574:23 575:5 588:2
589:4 590:6 591:4
595:2 607:15 610:4
615:22 621:23
646:18

**direction (1)**
399:20

**directly (9)**
355:24 356:20
608:3,5 617:15
618:5 622:18,22
623:3

**director (1)**
398:15

**disagree (3)**
287:3 428:22
555:1

**disagreements (1)**
563:18

**disclaim (1)**

634:12

**disclosed (2)**
410:11 556:18

**disclosure (8)**
599:24 600:1,4
611:5 612:5,9,12,17

**disclosures (2)**
612:14 616:17

**disconnect (1)**
421:19

**discount (1)**
347:13

**discounts (1)**
352:23

**discovers (1)**
604:12

**discovery (5)**
371:3,7 372:23
404:2 405:19

**discrepancy (1)**
329:2

**discrete (2)**
400:7 402:13

**discuss (6)**
285:12 337:14
350:23 355:21
361:20 657:24

**discussed (23)**
289:19 293:24
302:8 354:21 377:18
383:10 386:22
414:13 419:22 420:1
459:10 460:21
481:18 511:18 555:6
568:23 576:9 617:11
625:7 646:4 647:15
658:1,2

**discusses (1)**
571:4

**Discussion (14)**

289:15 390:5
395:13 400:2 410:18
463:16 482:20
486:17 587:2 607:1
613:11 645:24
647:18 648:12

**discussions (2)**
414:2,19

**dismiss (2)**
620:5 634:1

**dismissed (1)**
617:20

**display (1)**
473:4

**dispositive (1)**
617:17

**dispute (7)**
408:13 516:4
524:11,17 525:18
603:22 616:6

**disputed (2)**
524:24 525:15

**dissonance (1)**
387:5

**distinct (3)**
627:9 631:23
632:16

**distinction (8)**
321:15 323:2
334:9 357:24 364:22,
22 427:22 503:13

**distinctions (1)**
509:15

**distinguishes (1)**
622:13

**distracted (1)**
378:3

**distribute (6)**
307:13 308:15
309:5 385:13 533:9,

12

**distributed (5)**
370:16 386:20
423:19 459:17
611:19

**distributing (5)**
286:6 387:2 542:9
562:24 563:5

**distribution (2)**
306:7 307:17

**distributor (1)**
563:3

**District (3)**
617:19,19 622:11

**disuse (2)**
320:6,23

**divest (1)**
403:6

**divides (1)**
502:14

**dividing (1)**
578:5

**division (3)**
324:11,24 492:20

**docket (2)**
600:5,7

**document (34)**
286:14,18 287:15
288:9,11,16,19
298:11 302:14 303:7
336:2 337:7 339:21
340:12 341:7,11,15
342:7,11 361:12
377:20,22 381:5
429:22 446:6 456:22
486:11 492:16
508:19 511:21 518:4,
10 522:11 535:10

**documentary (8)**
471:23 490:24

494:5 511:24 649:6,
14 652:9 654:7

**documented (1)**
468:6

**documents (10)**
313:15 339:20
431:20 512:6 521:18
526:8,23 572:2
645:20,20

**dollar (2)**
608:17 611:23

**dollars (5)**
423:23,24 556:6
611:17,19

**done (26)**
285:23 287:16
349:3 350:11 353:2,
6 357:21 387:3
404:7,15 410:18
501:3,5 546:7 548:4,
7,14,22 552:2 574:4
588:17 604:3,7
613:20 637:4 639:10

**door (3)**
355:22 403:20
506:20

**dots (2)**
500:13 501:16

**doubt (3)**
334:18 580:3
628:3

**down (16)**
338:10 394:23
424:2 451:4 453:20
479:6 484:7 492:15
518:19 530:13 540:9,
16 543:22 576:22
598:4 640:1

**dozen (1)**
383:15

**Dr (160)**
290:4,6,8,15
291:10 293:2 294:16
296:6 297:2 300:11,
22 301:1 302:24
306:24 307:9 308:11
309:10,15 310:12
314:1,3,15,16
316:19 323:20
325:15,21 327:12
328:21 329:12 330:1
331:8 333:17 334:23
335:8 336:21 337:11
338:4 340:1,7,10,15,
20 343:19 345:6,13,
23 346:8 347:16,20
348:5,10 354:2
355:17,20 356:6
357:5 359:9,16
360:10 363:13
364:10 367:5 368:19
371:5 372:15 373:4
374:2 376:22 380:20
382:11 383:6 386:2
389:3 393:3,23
394:22 395:16,19
396:2,7 400:6,11
402:12 407:17 408:4,
7 412:8,12 413:14
417:1 418:22 419:11,
22 422:9 428:23
434:18,22 437:10
440:12 442:6 443:14
446:17 448:11
449:12 450:17,18
483:20 484:15 487:5,
6 508:8 550:11,20
551:1,13 552:14
554:1 555:2,6,19
557:6 558:15 559:21

561:9,11,17 562:5,
14 563:17,19,22
564:11,12 565:10
583:18 587:24
588:19 589:2 590:8,
13 591:3 592:19
594:24 595:9,22
596:9 597:6,19
598:3,7 604:5,23
605:10,16 636:1
641:9 645:2,15
650:13

**draft (13)**
454:14,23 455:15
473:2 523:6 524:1,2
525:8 546:15 549:4
550:15 558:14 563:2

**drafted (6)**
548:11 553:6
566:15 576:21
577:12 578:12

**drafter (3)**
576:12 579:7
580:5

**drafting (2)**
560:15 564:19

**draw (2)**
357:24 364:21

**driving (1)**
469:22

**drop (1)**
384:16

**drop-dead (2)**
421:4 449:6

**drove (1)**
583:17

**drum (1)**
384:9

**due (3)**
444:3,12 524:9

**duly (3)**
369:15 395:23
545:16

**duplicates (6)**
457:5 472:19
534:15,16,18 536:3

**duration (3)**
556:8 558:9,10

**during (20)**
318:5 330:23
332:16 335:16 336:8
370:5 383:6 387:15
397:15 399:1 402:7
427:13 435:11 472:9,
13 526:10 528:17
625:19,21 656:22

**DVD (1)**
404:1

**DVDs (1)**
404:1

# E

**each (13)**
370:17,21 383:19,
24 499:21 556:3,6
595:16 604:21
607:14 608:13
622:11 641:2

**earlier (19)**
294:6 323:2 352:2
386:24 418:8 429:21
430:18 500:3 510:21
522:7 526:18 533:8
540:2 548:13 557:7
567:19 622:7 626:3
646:20

**earliest (1)**
299:3

**early (3)**

298:21 372:20
399:2

**earth (1)**
397:2

**ease (1)**
526:6

**easily (1)**
521:19

**easy (1)**
323:15

**economical (2)**
284:12 285:4

**economically (1)**
424:1

**EDFA (1)**
402:22

**edition (1)**
549:22

**EDN (1)**
520:9

**educational (2)**
396:10 546:21

**effect (6)**
481:13 551:13,23
553:13 560:10 568:1

**effective (1)**
364:14

**effort (4)**
298:5 416:6 422:2
484:11

**efforts (1)**
474:10

**eg (2)**
503:1 649:23

**eight (7)**
514:18 515:21
607:14,14,16 608:12,
13

**either (24)**
304:10 359:3

409:22 421:6 424:23
426:11 427:24
436:20 489:23
497:22 501:2 525:4
544:15 572:6 603:14
623:20 624:7,7
625:4 632:18 639:18
640:3 651:17 660:6

**Electric (1)**
401:4

**electronically (1)**
492:11

**elements (2)**
648:11 651:8

**elicited (1)**
575:4

**else (13)**
309:22 342:11
345:20 350:1,18
371:10 380:3 447:7
449:10 533:20
582:11 636:19
645:13

**else's (2)**
354:23 368:16

**elsewhere (2)**
307:17 470:2

**email (114)**
288:24 292:23,23
293:3 297:2 301:17
303:3,5 314:2,4,8,17,
22 317:15,16,17
323:11,21 324:2,8
326:15 348:15,19
380:20 388:6,19
389:1,11 394:15
430:13 444:22
454:17 456:19
457:11 458:11,21,24
459:5,15 460:11

461:9,18,20 462:1
463:13 467:10 469:4
470:17,23 472:17
473:2,23 475:23
476:11,16,21 477:22
478:19,23,24 479:1
481:7 483:18 484:8,
14,23 486:8,13,22
487:4 493:6 497:1,
24 498:1 500:18
501:18,23,24 502:12
507:3 508:20,20
519:24 520:3,5,7,16
523:24 524:4 527:22
529:21,22 530:2
534:5 536:14 542:16
569:5 571:23 572:14
576:3,7,11,18 579:2,
18,22,24 580:22
645:22 646:2,13
649:19 651:14 653:4

**emailed (1)**
473:14

**emails (21)**
349:17 384:18
387:23 394:3 444:17
456:6,14 463:20
468:20 471:4 476:5,
7 481:23 506:7
539:15,20 572:3,6
574:1,14 650:16

**EMANATE (43)**
304:18,19,20,23
305:11 308:9,22
309:2,9,11 310:6,10,
23 311:1 315:11,21
317:11 334:3 389:15
390:6,9,15,18
392:15,17 465:8
480:6 489:16 491:12

493:1 498:8,16,22
503:2 510:18 511:1,
2,2 518:2 520:23
521:9 646:8 649:24

**embarrassment (1)**
651:19

**embedded (5)**
424:3 503:3
547:11 556:12 650:1

**embellish (1)**
303:1

**embellishment (1)**
303:3

**EMEA (3)**
599:10 627:6
630:17

**emergency (1)**
421:7

**emphasizing (1)**
598:22

**employed (1)**
618:5

**employee (3)**
369:18 648:7,7

**enable (1)**
370:18

**enablers (1)**
402:15

**enables (1)**
408:16

**encourage (1)**
638:5

**end (23)**
312:13 318:8
319:3 416:16,16
422:17 442:10,11
460:24 474:19 482:7
538:22 539:2,21,22
544:14 560:1 561:16
568:15,19 574:13

588:13 594:23

**ended (3)**
354:22 567:3
577:14

**ends (3)**
568:3 595:5 656:1

**engine (1)**
520:12

**engineer (4)**
312:3,8 334:19
396:22

**engineering (9)**
310:18 311:9
370:6 396:14,15,17
397:14 474:4 536:19

**England (1)**
546:24

**enhancing (1)**
432:16

**enjoy (1)**
660:22

**enjoyed (2)**
439:22 440:19

**enjoyment (1)**
423:14

**enough (9)**
310:22 328:12
543:2,3,7 551:20
635:9,10 642:18

**ensure (1)**
423:15

**enter (12)**
372:1 395:19
422:24 529:19 533:1,
11,14 542:5 567:21
647:17 656:24 657:6

**entered (12)**
303:12 354:15,22
357:10 360:5 363:16
446:8,14 467:1

542:10 544:15
647:11

**entering (2)**
445:14 559:16

**Enterprise (8)**
344:9 346:17,18
347:8 476:23 488:15,
16,24

**enterprises (1)**
338:12

**entire (9)**
288:15,19 470:18
483:19 484:14 486:6,
16,20 600:5

**entirely (1)**
612:3

**entirety (1)**
542:11

**entities (5)**
488:14 626:11,13
627:12,13

**entitled (8)**
286:11 287:24
329:13 359:23
360:24 502:20 614:8
642:2

**entity (6)**
344:4 346:16
488:22 607:14
617:23 642:1

**entries (1)**
519:2

**entry (3)**
453:20 600:5,7

**enumerating (1)**
358:20

**Envoy (6)**
390:6 391:1
392:14,16,16,23

**EPIC (1)**

498:21

**equitable (1)**
639:21

**era (1)**
404:23

**erbium-doped (1)**
402:22

**erroneous (1)**
641:21

**error (2)**
590:4 642:9

**ERS (3)**
604:14 612:24
615:3

**ES (3)**
604:14 612:24
615:3

**especially (8)**
405:2 409:11
421:1 426:21,22
433:22,22 437:19

**essential (2)**
409:12 414:20

**essentially (2)**
551:14 647:1

**established (3)**
286:19 521:2
581:18

**establishing (1)**
338:1

**estimate (1)**
450:3

**estimated (2)**
483:9 548:12

**estimates (1)**
436:6

**estopped (2)**
627:7 628:5

**estoppel (2)**
570:4 628:5

**et (5)**
480:7 547:24
549:3,5 585:7

**ethernet (25)**
330:22 331:13,24
333:22 334:14,20
335:16 338:8 339:8
340:21 341:23 342:1
346:22 354:3,5,10,
13 356:7,10,14,17
357:1,12,13 408:15

**eval (1)**
484:16

**evals (1)**
496:23

**evaluated (1)**
494:19

**evaluating (1)**
494:1

**evaluation (19)**
484:20 490:13
491:12 492:2,7,10
493:5,16,23 494:3,
13,23 495:7 496:22
497:3,11 498:3
500:9 505:8

**evaluations (6)**
490:15,18 494:8
497:19,19,20

**even (29)**
341:19 362:12
377:16 392:8,9
405:12 428:13
431:18 470:6,22
509:20 564:17
605:19 607:9 612:7
618:8,15 619:22
621:20 626:12
627:13 633:18 634:7
635:7 637:7 638:9

642:11,14 657:4

**evening (1)**
282:4

**event (5)**
340:10,13 420:24
436:16 637:12

**events (1)**
657:19

**Eventually (3)**
303:19 520:6
547:18

**ever (12)**
318:3 373:5
393:19 401:13 431:2
437:2 449:14 525:5
569:14 620:22,22
657:23

**every (5)**
401:9 423:7 558:6
565:2 608:20

**everyone (9)**
282:2 343:13
450:14 451:3 507:15,
21 509:21 643:24
660:21

**everything (15)**
424:6 444:8 480:9
538:9 540:11,17,22
552:2 554:21 563:8
588:9 606:17 623:15
629:24 644:22

**evidence (39)**
282:11 289:14
314:16 327:5,10
371:16 453:1 458:13,
17 467:15,20 511:24
512:3 565:8 571:23
575:2,2 586:4,7
592:16 593:21
599:17 600:14

601:11,22 603:3
604:7 605:2 612:6,7,
21 626:3 646:1
647:12 648:12 649:6
657:22 658:9,10

**exact (15)**
415:6,8 605:5
615:5,6,15,16,16,17
621:23,24 627:1,23
632:21 651:1

**exactly (34)**
309:23 320:11
321:17 340:18
387:19 390:2 457:18
462:23 463:19 470:9
473:11 478:15
492:19 500:24
510:15 512:16,19
515:1 536:17 539:19
552:13 607:10
622:19,23 623:5
630:18 647:14
650:12,17 651:17
652:23 653:14 654:8
655:1

**exaggerated (1)**
404:14

**EXAMINATION (25)**
290:13 383:6
387:15 388:2 396:5
411:16 448:9 451:20
526:7,11 527:24
528:5,14,22 529:3
533:7 534:1 538:3
546:3 550:21 555:20
574:23 575:5 590:6
597:22

**examined (6)**
290:11 395:23
451:18 545:16 581:8

589:23

**example (8)**
468:15 472:5
489:4 490:23 498:8
499:16 505:7 604:13

**examples (3)**
400:8 444:5 606:5

**excellent (1)**
328:9

**Except (3)**
309:1 337:12
622:24

**exception (5)**
509:18 514:4
559:5 582:14 585:10

**exceptions (6)**
400:4 401:10,10
404:7 620:19,21

**excerpts (2)**
288:15 600:6

**excess (2)**
548:14,16

**exchange (17)**
297:3 301:18
314:2,23 323:21
324:3 348:15 388:6
476:6,11 483:19
484:14 500:19
527:22 529:22,23
536:15

**exchanged (1)**
349:17

**exchanges (1)**
534:5

**excluded (3)**
294:9 371:9,9

**excusable (8)**
634:8,11,13 640:8
641:7,15,16 642:6

**excuse (6)**

448:1 482:22
517:18 589:12
654:11,16

**excused (5)**
395:14 449:19
544:6 585:23 598:9

**execute (14)**
314:12 317:19
348:23 361:1 463:8
470:14 506:2,17
535:8 537:7,8
559:20 568:9,13

**executed (8)**
304:5 362:15
363:9 365:23 366:13
435:10,24 657:5

**executing (4)**
359:24 367:22
368:5 430:11

**execution (6)**
363:12 499:5
502:6 567:16 581:5
645:9

**Executive (4)**
406:5,8,16,18

**Exhibit (72)**
285:19 288:11
289:5,13 294:8,10
296:24 297:2 306:19,
20 307:10 314:3,15,
17 317:16 323:20
325:21,22 327:9
329:10,13 336:19,21
338:4 339:16 344:8
346:14,15 369:6,8
381:10 388:5,13
389:10 452:22,22
453:4 456:17,18
458:12,16,20 466:12
467:19 468:4,6

472:17 476:9 478:20
485:4 487:18 491:2,
19 492:10 495:15
501:24 508:7 517:19
519:22 523:4 574:16
575:14 576:1 590:14,
16 593:20 594:2,24
599:16 600:6,13
660:16

**exhibiting (1)**
322:3

**Exhibits (26)**
282:11 343:20,21
381:13,20 459:20
487:19 488:21 491:5
508:6 510:8,10
513:2 523:3 544:14,
19 545:1 589:7
591:11,17 598:4
599:3,6,19 660:5,6

**exist (2)**
365:6 366:5

**existed (6)**
357:14 358:17
363:15 364:18 366:2,
4

**existence (2)**
358:2 650:15

**existing (3)**
426:24 503:6
615:10

**exiting (1)**
430:23

**expect (10)**
426:3,4 514:5,16
515:4,16,19 516:1
558:20 567:18

**expected (2)**
430:3 558:16

**expensive (1)**

409:14

**experience (13)**
421:14 422:3
429:3 432:1 438:3
519:18 522:11
546:21 548:18
554:17 559:1 563:17,
19

**expert (22)**
407:17 408:1,3
409:19,20 410:22
412:3,15 413:6,8
414:5 429:1 435:5,8
549:24 552:7 609:2,
2,14,17 632:2,5

**expertise (2)**
414:1 429:19

**expiration (3)**
291:4 542:2
647:18

**expire (7)**
294:23 349:24
509:3,6 577:4,10,16

**expired (5)**
317:7 509:2
533:13 577:3 657:2

**expires (1)**
647:1

**expiring (1)**
292:3

**explain (14)**
408:11 410:5
412:8 414:14,21
415:5 420:21 448:16
471:6 478:20 551:8
553:21 568:18
586:16

**explained (7)**
486:12 580:18
624:16 638:9 639:9

647:14,16

**explaining (4)**
414:10 415:3
580:12,20

**explanation (7)**
530:24 531:13
532:1,20 559:2
579:14 612:8

**explore (2)**
296:21 571:5

**exposure (1)**
519:7

**express (1)**
557:16

**expressed (4)**
445:20 524:14
579:23 580:22

**expresses (1)**
437:21

**expressing (3)**
439:10 524:16
531:15

**expressly (2)**
634:12 638:15

**extend (6)**
427:2 567:21
568:14 570:8,20
647:22

**extended (1)**
430:10

**extending (1)**
647:20

**extensively (2)**
429:1 626:6

**extent (4)**
409:16 613:2
638:5 640:6

**extra (1)**
470:5

**extraordinary (1)**

424:18

**extrinsic (2)**
646:1 647:12

**eye (1)**
484:3

## F

**F-150 (1)**
355:5

**F-250 (1)**
355:6

**face (3)**
344:23 389:19
479:23

**faced (5)**
411:6 415:9 422:7
427:4 431:8

**facing (4)**
420:24 421:12
422:10 426:23

**fact (63)**
285:13 287:6,15
290:21 297:9 299:14
311:5 312:12 317:22
319:7 320:3 332:7,
10 335:6 340:9
350:14 368:22 370:1
371:5 373:19,19
377:16 385:12
419:11,19,21,22
420:15 426:14
440:22,24 441:4,5,
23 442:16 443:2,2
444:18 447:9 455:20
464:24 471:8 476:2
487:4 490:20 505:18
518:21 519:16
521:21 522:16
537:20,22 551:18

556:9 564:17 565:18
569:2 575:4 576:15
578:9 622:23 648:1
653:13

**fact/ (1)**
643:11

**fact-agreement (1)**
654:19

**factors (1)**
639:24

**facts (13)**
285:1 410:6
412:23 413:1 414:10
602:9,15,15 606:4,9
622:14 644:22
645:17

**factual (6)**
287:4 409:24
414:14 418:24
419:21 618:16

**faded (3)**
320:6,22 392:21

**fail (1)**
635:8

**fails (1)**
642:10

**failure (2)**
604:1 620:5

**fair (9)**
308:4 310:22
326:8,22 404:9
517:11 529:17
530:17,21

**faith (5)**
603:16 612:20
637:11 639:23
642:17

**Falcon (2)**
371:24 373:10

**fall (5)**

360:17 364:4
365:15,21 533:2

**fallen (1)**
386:8

**falls (2)**
360:22 657:8

**false (2)**
364:21,22

**familiar (4)**
308:12 425:13
431:24 477:5

**families (1)**
358:21

**family (5)**
296:18 393:1
574:9,12 634:16

**famous (1)**
400:24

**far (6)**
381:13 402:6
436:16,16 619:3
659:3

**farm (1)**
311:6

**fast (3)**
513:5 644:16
654:1

**faster (1)**
609:23

**fault (1)**
608:18

**favorable (1)**
613:17

**fax (3)**
491:19 523:6,9

**faxed (1)**
524:2

**feature (10)**
477:19 482:14,17
484:20 485:11,16

486:15,19 652:15,15

**features (1)**
408:22

**February (1)**
466:16

**federal (3)**
443:21 621:19
622:24

**fee (34)**
302:23 305:6,10,
15 363:17,18 364:10,
11 432:11 458:3,8
462:23,23,24 471:13
482:23 485:15,17,23
486:2,23 487:1,2,3
499:2,3 502:5
505:21 650:7,9
651:10,10,12 656:15

**feel (2)**
410:17 543:19

**feeling (2)**
470:20 527:10

**fees (19)**
353:24 354:1
462:5,14,15,18,21,
22 463:7,9 469:9,12
470:6,8 503:2
563:10 604:1 631:4
649:24

**Fell (7)**
321:3 359:19,22
365:8 367:20 368:2
533:1

**felt (2)**
394:6 656:11

**Feuerstack (1)**
638:20

**few (26)**
324:11,23 386:17
401:10 404:7 434:18

438:18 496:11 516:5
526:1 527:15 541:16
548:6 556:5 557:15
597:18 598:19,22
629:3,5 636:17
637:23 643:18
644:19 645:1 655:6

**fiber (1)**
402:23

**fiction (1)**
546:18

**field (7)**
407:18 429:2,3,19
432:1 552:12 585:1

**fielded (1)**
401:12

**fifth (2)**
593:2 595:14

**figured (1)**
284:8

**file (6)**
608:16 609:21
617:4,6 625:1 634:2

**filed (24)**
594:5,20 595:23
597:2 599:8 601:9,
14 602:8 603:23,24
608:22 609:18 610:9
611:3 612:12 615:23
617:7 620:23,24
630:20 636:7 638:3
641:11 642:1

**files (2)**
602:12 623:23

**filing (1)**
288:13

**fill (1)**
325:16

**final (4)**
466:10 509:1

577:1 644:20

**finally (4)**
390:7 492:9
634:23 636:14

**financial (5)**
609:2,4,9 612:22
616:19

**find (15)**
352:22 388:11
394:3 405:19,22
479:2 538:6,12,15
568:16 595:16
636:14 639:17,22
640:3

**finding (4)**
287:5 399:12,13
594:21

**findings (1)**
285:12

**fine (26)**
289:9,20 299:13
306:15 341:17 342:8
365:12 382:20 395:7
450:6,7 480:9
504:20 509:19
516:19 519:20
540:11,18,22 545:1
554:13 557:3 588:21
634:3 657:14 659:24

**finish (10)**
284:24 353:10,13
357:19 358:4 450:4,
13 498:12 504:18
570:13

**finished (6)**
468:16 480:1
543:22 598:1,3
628:11

**firm (4)**
403:14 443:23

547:4 560:11

**firms (2)**
547:17,21

**First (52)**
282:10 291:16
296:22 301:22
319:15 327:14
330:13 340:6 376:9
395:23 396:24 397:3,
9 398:1 399:2 404:2
435:4 437:1 449:14
468:4 482:20 483:6
484:5 487:22 491:10
492:14 506:22
510:19 519:6 525:13
527:2 530:2 534:3
536:15 545:16
549:22 578:8 583:2
590:16 594:18,23
595:4 602:18 603:12
617:24 618:17 622:6
624:14 627:10 629:8
638:8 657:16

**first-year (1)**
570:4

**first-year's (1)**
432:11

**fit (3)**
361:15 366:12
405:22

**fits (4)**
293:8 388:23
555:14 615:13

**five (20)**
331:6 343:4
507:19 518:20
587:22 588:6 608:2
621:11,11,14 623:21
624:9 625:3 635:15
640:24 641:2 643:4

644:8,13 648:22

**fix (3)**
636:6,10 660:3

**fixed (9)**
423:23,24 424:10,
23 432:12 556:13,15
636:9,10

**fixing (1)**
432:14

**flexible (2)**
602:11 607:6

**flight (1)**
397:9

**floating (1)**
426:17

**Florida (1)**
396:16

**fluid (1)**
396:17

**Flyi (1)**
606:6

**focus (8)**
310:12 480:11
502:22 508:23
549:14 617:1 630:10
631:2

**focused (1)**
607:2

**focuses (1)**
629:22

**focusing (2)**
503:19,20

**Foerster (1)**
547:7

**follow (4)**
323:16 382:8
497:8 541:16

**followed (3)**
472:16 529:22
571:9

**following (6)**
416:4 459:10
460:21 600:1 646:6
647:18

**follows (6)**
290:12 369:16
395:24 451:19
545:17 589:24

**follow-up (2)**
301:19 473:23

**forced (1)**
612:13

**Ford (3)**
355:6,9,10

**foreign (1)**
522:10

**Foreman (3)**
389:17,20,24

**forever (10)**
364:7 424:15
439:23 440:16,19,23
441:6 442:3 555:17,
22

**forget (1)**
656:16

**forgot (1)**
451:23

**forgotten (1)**
541:23

**form (2)**
284:16 615:21

**formed (2)**
392:10 403:15

**former (3)**
344:18 347:18
401:3

**forms (1)**
422:23

**forth (6)**
284:20 295:8

444:2 466:24 602:9
618:22

**FORTRAN (1)**
397:6

**fortunately (1)**
471:22

**forward (5)**
469:23 484:14
495:11 521:13
658:21

**forwarded (9)**
391:20 458:21
460:11 462:2 463:13
476:17,21 483:19
501:18

**forwards (2)**
459:8 478:18

**foul (1)**
618:11

**found (21)**
293:7 307:17
309:13,15 371:3
388:22 447:13
476:19 479:19
480:12 481:2 482:8
483:23 484:4 540:13,
24 542:20 594:22,22
632:23 633:17

**foundation (8)**
284:19 337:15
338:2 350:7,10
406:12 407:13
638:16

**founding (1)**
547:17

**four (15)**
331:5 357:9
390:24 407:3 487:14,
16 490:21 499:22
500:6 505:5 518:20

530:4,10 572:18,24

**fourth (4)**
483:14 590:18
593:1 595:14

**framework (3)**
316:6 582:7 655:1

**Francisco (1)**
547:7

**Franklin (6)**
602:3 606:1 607:5
616:20 639:14,20

**frankly (1)**
411:2

**free (7)**
353:23 359:7,23
362:8 385:4 502:21
563:7

**freedom (4)**
422:13,14,18,20

**free-form (2)**
472:9,13

**freely (1)**
602:6

**fresh (1)**
629:6

**Friday (1)**
588:12

**friend (11)**
300:12,14 318:11
349:9 372:3 377:21
378:3,5 379:4,22
387:14

**friendly (4)**
300:8 301:4,5,10

**friends (11)**
300:4,6,7 301:2,3,
9 349:14 470:3
471:10 543:20
656:11

**friend's (1)**

319:12

**front (11)**
306:14 411:2
456:4 468:24 498:15
502:12 526:8 575:13,
22,24 627:24

**full (11)**
289:5 421:10
466:19 483:3 536:6,
8 551:16 595:4
611:5 612:16 656:24

**full-time (4)**
397:14,20 400:19
403:3

**fully (6)**
333:17 367:16
386:22 607:9 657:5
659:1

**function (1)**
421:17

**functionality (1)**
408:18

**functions (2)**
402:20 564:6

**funded (1)**
398:22

**further (20)**
290:12 336:9
381:8 394:20 411:16
426:18 451:19
469:14 524:10
525:22 535:4 551:12,
22 553:12 560:10
568:1 589:24 595:5
597:14 642:22

**future (11)**
354:18 466:22
524:17 558:11 559:3,
23 561:13 566:20
568:18 572:5 574:4

# G

**game (1)**
587:15

**gander (1)**
337:17

**Gardner (3)**
619:8,18 635:1

**gather (1)**
609:16

**gave (22)**
300:18 307:9
308:18,18,19 310:2
349:11 355:23
358:13 378:16 469:8
515:5 516:2 563:6,7,
8 569:8 609:5,7
613:8 614:5,7

**gazillion (2)**
404:22 436:24

**general (9)**
292:16 384:5
408:10,10 439:9
469:24 515:6 547:8
554:19

**generalize (1)**
506:13

**generalized (1)**
292:15

**generally (5)**
428:14 477:6
494:16 617:10
639:14

**generators (2)**
402:24 403:1

**generous (1)**
382:4

**Gens (3)**
603:12 611:10

622:7

**gentleman (1)**

323:21

**gets (2)**

425:8 476:17

**getting (12)**

396:12 398:4
415:8 462:19,24
522:19 611:22
621:10 639:21
643:22 651:12 659:5

**Gibson (2)**

466:14,15

**give (40)**

287:23 303:5
325:12 340:11
350:10 355:24
357:17 367:9 381:23
382:2 385:5 389:14
404:16 406:20 415:4
440:17 442:22 450:3,
11,12 490:22 510:20
560:12 569:24 570:7,
17 574:19 582:11,12
584:11 585:5,8,13
606:5 609:9,17
610:19 629:3,16
636:18

**given (13)**

284:13 286:8
326:9 359:6 367:8
373:14 430:16 455:9
575:4 579:6 587:13
624:23 637:18

**gives (4)**

308:14 423:8,9
564:2

**giving (6)**

391:8 410:1 431:3
439:21 497:12 609:5

**glad (4)**

527:12 531:19
533:22 653:21

**glance (1)**

518:19

**goal (4)**

355:13 385:3,8,9

**goes (16)**

331:17 338:21
339:3 356:5 390:2
391:7 432:20 464:2
519:1 555:22 631:1
637:2,11 638:18
646:5 657:7

**going (129)**

287:1 296:22
320:6 321:6,24
322:5 325:21 337:13
339:14 355:16 358:7
360:11 361:20
364:23 365:6 373:2
395:9 410:4 412:16
420:8,11 424:2,20,
21 428:7 432:24
434:16 439:8 443:20,
24 444:3 450:4
461:15,16 463:16
464:13 465:17
467:22 468:3,5
469:19 470:6 477:18
479:3 482:3,15,18
485:24 487:16 491:3
493:8 495:11 507:10,
11 510:13,20 513:5
517:16,19,23 532:15
533:3,12 534:3
536:22 537:17
538:16 541:20
542:19 543:13,15
558:11 559:4 563:5

570:10 574:19
580:14,15 586:3
587:15,20,24 588:1,
5,10,13 589:5
591:11 592:1 602:22,
23 608:19,20 609:6
610:21,23 611:8,15,
18 613:24 614:1
616:24 618:13
621:12 627:3 628:22
629:8,21 631:2
633:1 636:14,17,19
638:6 639:20 640:21
643:21 649:4,8,15
650:22,23 656:10,10,
14,19 657:1 658:23
660:1

**gold (4)**

636:15,20 637:2,3

**gold-plated (7)**

339:6 340:5,24
341:3,19,23,24

**gone (8)**

295:8 358:24
429:1 484:3 521:19,
20 640:9 658:18

**Good (52)**

282:1,2,6 290:15,
16 301:23 302:4
330:19 337:16,17
343:1 390:14 391:3,
15 395:15 396:7,8
434:15 438:7 449:22
451:10,12,22 452:2
457:3 469:21 470:3
471:10 508:12,16
510:10 513:15
527:12 531:17
534:13 545:4,7,8
546:5,6 562:20

563:13 566:3,4
581:9 582:5 590:8
612:1 613:23 628:12
637:21 641:9

**goodness (3)**

650:10,18 652:8

**goodwill (1)**

431:18

**goose (1)**

337:17

**gosh (1)**

634:9

**gotten (9)**

341:17 362:8
364:5 366:15 470:4,
11,12 494:18 525:17

**Gottlieb (2)**

591:22 637:22

**govern (1)**

654:9

**governing (1)**

307:16

**grab (1)**

590:10

**grandfathers (2)**

302:14 303:7

**grant (7)**

423:8,11,11,14
554:4 572:5 605:14

**granted (2)**

425:23 433:16

**granting (1)**

504:24

**grants (2)**

551:2 555:2

**graphical (1)**

402:18

**grasping (1)**

421:10

**gray-barred (1)**

402:3

**Great (11)**
298:7 311:24
320:8 321:7 322:9,
21 323:8 472:10
488:8 564:19 659:23

**greatly (1)**
391:18

**Greene (2)**
400:23 402:2

**greeting (2)**
383:18,22

**grew (1)**
547:18

**Gross (6)**
383:12 386:3
446:19 493:9 564:9
627:2

**grounds (2)**
339:16 428:19

**group (53)**
311:8,12 312:15,
19,24 314:11 319:5
322:17 344:5,10
351:17 384:5 398:5,
14 403:14,19 454:19
460:19 463:6 465:23
469:18,20 470:3,10
471:11 474:4,17
475:18 476:3,23
482:14 487:24
488:23,24 492:1
493:16,17 499:10,17
503:9 505:24 506:15
517:24 520:10
536:19 537:13 539:5
650:4,11 652:10
653:16,17,20

**groups (8)**
310:12 380:24

381:1 494:11 495:4
502:24 504:6 649:22

**guess (7)**
326:8,22 391:9
556:21 580:5 581:18
644:20

**guy (1)**
548:5

---

**H**

**half (8)**
294:6 383:14
401:2,5 416:17
507:10 547:6 629:12

**halfway (1)**
453:20

**hand (9)**
283:21 287:22
289:7 362:4,5
419:23 433:1 468:5
487:16

**handbook (2)**
407:10 549:10

**handed (1)**
526:9

**handled (1)**
446:11

**handling (1)**
591:24

**handoff (1)**
405:14

**handout (1)**
307:4

**hands-on (2)**
405:6,7

**handwriting (1)**
468:11

**happen (7)**
387:8 393:21

394:16 418:5 438:1,
14 497:10

**happened (22)**
318:6 320:20
322:15 393:14
417:13,22 442:13
455:24 456:7 473:16
495:1 501:9 506:6
529:11 535:14
537:19 613:19
622:19 647:14 656:4,
6,6

**happening (4)**
320:8 321:7 322:9
484:6

**happens (3)**
302:6 652:7
656:21

**happy (2)**
404:22 442:10

**hard (13)**
286:23 287:7,21
293:9,23 373:21
388:24 450:2 472:11
475:9 554:16 601:17
604:6

**harm (2)**
618:8,11

**Harvard (1)**
546:22

**hat (1)**
433:1

**hate (2)**
497:22 507:11

**head (6)**
312:14,18,24
389:22,23 416:19

**heads (1)**
391:8

**heads-up (1)**

389:15

**hear (9)**
334:18 358:8
404:21 413:3 601:22
613:7 628:10 649:11
654:2

**heard (10)**
287:19 300:20
437:3 528:17 600:22
607:20 631:4 645:10,
13,14

**hearing (10)**
361:19,23 363:2
364:24 405:24
590:12 600:21 601:7
609:1,12

**hearsay (8)**
284:20 337:7
339:16,17,18 341:14
459:18 591:16

**heavily (1)**
438:4

**held (5)**
608:2,4,5 610:18
618:23

**Hello (1)**
590:9

**help (8)**
388:9,11 390:18
391:17 402:16
403:24 404:7 601:23

**helped (2)**
405:21 406:22

**helpful (4)**
552:24 610:6
628:20 629:4

**helping (1)**
403:5

**helps (1)**
432:8

**hereinafter (1)**
630:9

**HERRINGTON (213)**
282:16,20 283:3,
18,20 284:2,5,14,18
285:5,14,19 286:10
288:4,12,23 290:2,3,
14 291:2,21 292:1,
21 293:1,14 294:1,
15 295:14 296:21
297:1 300:21 301:16
306:2,20,23 307:5,7,
8,21,22 308:3
323:14,18,19 327:4,
11 329:9,11 336:18,
20,23 337:6,9,13,19
338:1,3 339:19,23
340:17,19 341:13,16,
21 342:8,12,19,24
343:6,15,16,18
345:18 346:7 350:6,
20,23 351:6,15
355:15 356:3,23
357:2,4 358:6,11
359:8 361:24 362:24
363:6 365:1,5,12,14
367:18 368:9,18
374:16,22 376:4
381:4,10,15 387:21
388:3 394:17 395:8
404:13 448:7 449:21
450:2 451:6,21
452:2,24 453:2
458:10,18 459:19
460:2,8 467:14,21
472:4 487:19,21
504:16,19 505:4
507:16,23 508:2,5,
14,17 512:2,8 515:1,
3 522:21 525:19

527:23 528:9 531:2
533:7,21 534:2
535:15 536:1 537:10
541:9,17 542:15
543:1,14 544:2,12,
20 545:2,10 566:16
575:19 576:10 578:4
587:3,5,10 588:21,
24 591:6 592:1
593:8,10,13 597:17
599:13 628:19 629:2,
9,13,16,20 630:4,18
631:16 632:14
633:11 635:23
637:19 639:9 640:23
641:4 643:5,8,18,20,
22 644:13 645:17
647:12 648:20,24
649:3 651:23 655:5,
14 656:4,20 659:19
660:4,14,17,20

**Herrington's (5)**
287:4 526:10
528:5,24 529:3

**hesitate (1)**
467:5

**hey (1)**
542:8

**Hi (2)**
324:9 520:9

**high (3)**
338:16 613:5
649:15

**higher (2)**
614:1,4

**highlight (2)**
602:4 603:9

**high-low (1)**
612:14

**high-quality (1)**

409:15

**history (3)**
332:17 427:9
546:18

**hit (3)**
379:8 563:14
649:15

**hits (1)**
323:5

**hold (1)**
563:3

**holds (1)**
623:21

**hole (1)**
405:23

**home (3)**
329:21 331:7
451:5

**honest (2)**
293:8 388:24

**Honor (213)**
282:6,15,24 283:5,
10,13,14 284:9,10,
14,23 285:6,15,16,
23 286:10 287:5,23,
24 288:2,4,13
289:10,22 290:4,24
291:13,22 292:22
293:14 294:1,9
295:5 296:23 300:20
301:12 305:21
307:23 323:14 327:4
329:9 336:18,24
337:5 339:14,23
341:16 342:9,12,24
343:10,17 345:18
350:4,6,18,20
351:12 355:15,19
357:22 358:8 361:18
365:1 367:14 374:14

376:1 381:5,7,11,17
382:17 383:2 387:21
394:18,21 395:16
396:4 407:16 409:18
413:13 414:9 416:24
417:23 419:6 420:10
434:14 437:1 442:4
443:12 447:18,22
449:15,21 450:6,16
451:7,7 452:24
458:12 459:13,19
467:14 504:13 507:9,
17 508:3 514:23
522:18 533:21
535:10 541:11
542:14 544:12,22
545:3,9 546:2
549:23 550:6 552:3
553:18 556:2,16
557:3 560:16,23
561:19 562:7 565:22
569:21,22 570:10
571:8 574:22 575:9,
11 585:22 586:23
587:13,14 588:22
589:8,17 591:2,6,11,
18,21 592:5 593:6,
14 597:15,17 598:2
599:14 600:8,11
601:21 603:4 604:24
606:12 607:7 608:14
610:18 612:21 614:9
625:11 626:5,8
628:3,13,19 630:4
631:20 633:11
636:12,24 637:15,21
638:1,5,24 639:16
640:5,14,16 642:18,
21 643:5,11,13
644:8,19 645:6,9,13,

14,24 646:10,18
648:16,21 649:4,12
655:3 656:8 658:4,5,
5 659:7,22 660:4

**Honor's (1)**
610:4

**hope (1)**
282:3

**hoping (1)**
385:10

**Hopper (1)**
388:7

**hotels (1)**
402:3

**hotline (1)**
432:17

**hour (2)**
507:10 629:12

**hour-plus (1)**
586:15

**hours (1)**
434:12

**house (1)**
549:6

**housekeeping (1)**
544:13

**However (4)**
357:16 363:22
502:23 649:21

**HP-UX (1)**
483:9

**hundred (2)**
405:6 436:9

**hundreds (3)**
405:3,7 408:21

**hurt (1)**
470:4

**hypothetically (2)**
582:2,3

**Hyslop (35)**

293:19 418:20
419:18 444:19
454:17 455:17
458:21 460:2,12,12
461:6 462:7 463:23
469:4 473:15 474:2
491:20 493:6 497:2
502:1,10 507:3
522:23 523:7,9
524:15 534:3 572:22
576:4 580:13,21
646:4,5,14 649:19

**Hyslop's (4)**
344:22 454:4
508:20 645:22

# I

**IBM (1)**
397:6

**idea (9)**
286:17 294:5
315:9 429:24 510:10
537:15 559:7 560:5
632:6

**identified (20)**
284:9 311:17
373:5 414:23 435:4
445:15 453:13 454:4,
7,9 456:10 502:16
567:9 572:19 605:6
615:18 619:16
623:22 625:5 632:7

**identify (7)**
286:1 401:22
445:16 583:9 623:18
646:16 647:6

**identifying (2)**
354:20 540:2

**ie (1)**

502:18

**ignores (3)**
656:20,21,22

**ignoring (2)**
363:10,13

**Illinois (1)**
396:12

**imagine (2)**
554:16 598:15

**immediately (1)**
609:20

**imminent (1)**
302:8

**impact (1)**
428:12

**impeach (1)**
300:22

**impeaching (1)**
300:23

**impeachment (1)**
301:12

**imperative (1)**
610:14

**implementation (3)**
333:15 334:11,21

**implementing (1)**
380:16

**implied (1)**
568:2

**implied-in (1)**
654:19

**implied-in-fact (3)**
648:5,9,10

**imply (1)**
568:3

**important (31)**
327:17 345:16
373:20 384:20
421:12 426:6,20
427:22 438:9 442:6

448:23,24 528:22
529:2 551:10 580:8
598:19 600:16,21,23
601:2 602:4 611:2
612:17 616:4 617:16
618:12 625:11 632:1
637:14 649:5

**impossible (4)**
509:16 609:23,24
644:23

**impression (4)**
373:13 375:11,13
564:2

**improper (3)**
415:16 417:20,20

**improvements (1)**
433:1

**improving (1)**
432:16

**inadmissible (1)**
339:22

**inapplicable (2)**
625:6 642:6

**inappropriate (3)**
553:22 560:20
562:4

**Inc (47)**
303:13 318:9
369:19 370:17
466:18 492:18
495:17 596:1,5
601:13 605:15,22
606:6 607:22,23
608:3,5,6 614:11
615:10,13 616:10,21,
23,24 617:18 625:10
628:7 629:23 630:9,
10,13,23 631:19,24
632:3 633:8,16
634:7 635:17,19

636:1 637:4,13
640:9,13 641:16

**include (7)**
298:12 429:13
475:1 478:2 498:18,
19 605:22

**included (6)**
304:2,19 311:12
399:12 490:8 491:16

**includes (10)**
303:12 323:20
423:11 432:14
454:12,20 460:16
489:4 498:20,21

**including (15)**
307:18 335:12
377:3 379:2 383:17
466:21 467:2 514:1
546:20 559:10 572:3
582:11 595:8 601:24
611:10

**inconsistent (2)**
497:7 630:2

**incorporated (9)**
480:14 481:4
482:11 484:1 512:19
541:2 542:22 579:18,
20

**incorporates (1)**
521:1

**incorporating (1)**
298:23

**incorporation (1)**
299:8

**incorrect (1)**
363:4

**incorrectly (2)**
373:17 391:16

**increase (6)**
602:14 606:7

610:2,8 611:20
616:18

**increasingly (1)**
398:3

**incremental (1)**
424:12

**Inc's (12)**
369:11 608:12
615:21 616:10 617:9
625:18 632:1,15
633:3,16 639:7 642:6

**incumbent (4)**
426:23 427:6,16,
18

**indeed (2)**
451:6 495:10

**independent (1)**
613:7

**index (1)**
564:22

**indicate (1)**
334:16

**indication (3)**
418:6 604:3 609:6

**indulgence (1)**
381:18

**indulgent (1)**
493:10

**industry (14)**
334:1 406:22
437:17 553:6,15
554:16 556:1,13
558:4,14 572:7
584:12,23 585:3

**infer (1)**
642:16

**info (2)**
474:7 537:1

**informal (20)**
383:22 430:8,15

431:6,9 569:6,11,15
571:18 572:1,11
573:22 574:3,16
578:18 579:5 580:1,
10,16,24

**information (21)**
320:7 321:6 322:8
372:22 373:18
378:13 386:23 412:4,
9,11 414:22,23
480:3 608:21 609:4,
10,11,13,16 612:23
616:19

**infrastructure (1)**
338:14

**infrequently (1)**
421:16

**infringement (5)**
597:9 627:14,21
631:14,17

**infringer (2)**
350:13 351:10

**infringing (16)**
318:12,15 319:13,
17 323:7 350:1
351:17,20 377:10,24
378:12,18 379:11,13,
23 380:5

**inherit (4)**
441:9,16 581:19
582:3

**inherited (4)**
438:20,24 439:2,4

**inheriting (1)**
441:10

**in-perpetuity (1)**
309:2

**inserted (1)**
478:21

**installment (1)**

466:10

**installments (1)**
556:7

**instance (2)**
402:15 573:9

**instead (2)**
556:3 633:24

**Institute (1)**
397:17

**instructing (1)**
443:21

**Intacap (1)**
403:17

**integrated (7)**
411:8 415:11
418:3 419:9,13
420:16 516:15

**integration (1)**
479:14

**intellectual (13)**
398:3 403:13
404:10,17 407:6,15,
18 410:20 412:16
422:22 448:18
510:23 547:23

**intend (6)**
480:1 596:3,4,14,
23 597:7

**intended (4)**
594:11 597:3
605:17 640:1

**intense (1)**
416:18

**intent (4)**
437:22 655:20,22,
24

**intention (2)**
594:14 597:10

**interacts (1)**
421:23

**interchange (1)**
515:8

**interest (13)**
474:6 516:16
535:4 536:20 595:16
596:8,20 619:1
620:6,8,13 624:1
631:7

**interested (1)**
473:13

**interest's (1)**
625:2

**interfaces (1)**
402:18

**internal (8)**
285:23 288:22
459:15 496:12 518:3
521:18 645:22 646:2

**internally (1)**
287:16

**International (64)**
318:10 369:11
370:17 390:12 452:4,
9 465:12 466:15,18
495:2,17,19 520:22
525:15 594:5,6,20
595:24 596:5 597:2
601:4,5,7,8,14,15,17
602:18 603:19
605:13,17 606:21
607:11,15 608:4,9
614:10,18 615:14,22
616:7,11,22 617:5
630:8,11,23,23
631:11,21,22,23
632:9 633:4,6,15
637:8 638:23 639:2,
3 640:6,8,11 641:24

**International's (5)**
596:24 603:19

605:3,11 635:18

**Internet (4)**
404:20 477:8
652:12,13

**Interop (9)**
321:2,4,6 322:6
330:23 331:2,9
335:16 339:13

**interpret (1)**
414:6

**interpretation (7)**
366:8 428:20
524:12 552:5 559:13
561:12 562:15

**interpretations (1)**
638:13

**interrogatory (1)**
495:16

**interrupt (2)**
411:15 505:14

**interrupted (2)**
504:16,20

**Int'l's (1)**
608:12

**introduce (5)**
336:19 339:21
340:11 459:18
473:16

**introduced (4)**
329:12 448:4
508:12 660:7

**introducing (1)**
599:20

**introduction (1)**
379:19

**inventor (1)**
398:8

**investigation (1)**
556:21

**Investments (1)**

634:16

**invitation (4)**
325:7,13 326:20
380:13

**invite (1)**
649:12

**invoice (1)**
510:22

**invoices (1)**
513:3

**involve (1)**
403:23

**involved (17)**
293:23 298:1,20
299:1,2 304:6 340:3,
4 390:17 398:3
400:20 404:10,18
416:10 436:12 444:4
519:5

**involvement (1)**
399:7

**involves (2)**
605:8 615:15

**involving (1)**
527:16

**IP (15)**
346:17,18,21
347:8,21 447:2
449:6 477:7,8
487:24 488:15,18
492:19,21 549:19

**IPC (1)**
403:14

**IPv4 (3)**
477:11,15 482:15

**IPv6 (18)**
477:3,4,20,24
479:13 482:14,15,23
484:9,20 485:10,13,
16 486:5,15,18,24

487:7

**IPv6/ARL/Solaris (1)**
484:16

**ironic (1)**
625:22

**ironically (1)**
606:13

**irrelevant (3)**
287:1,5 412:21

**issue (28)**
284:23 286:8
385:23 402:17
412:20 414:7 420:1
421:12 422:4 430:21
440:13 547:11
552:18 561:2 562:3
592:3 608:2 614:3
628:21 629:10
634:15,24 635:5
636:21,23,24 638:7
656:5

**issued (5)**
457:5 472:19
534:14,18 536:3

**issues (13)**
287:2 415:16
422:24 440:3 550:12
616:15,23 617:2,3,8,
11 639:21 644:19

**item (9)**
455:16 462:2
464:2,7,7 466:8
467:10,11,22

**items (3)**
453:13 454:3
519:12

**iterations (2)**
409:4,10

**itself (7)**
381:5 403:6 494:4

535:10 567:15 583:3,
15

## J

**James (94)**
297:3,6,14,24
298:11,13,20 300:11
301:18 310:15,15
311:5,8,18 312:3,12,
14,21 313:5,6 314:2,
11,17,23 315:2,7
317:15 318:11,16,19
319:5 320:4,21
321:13,21 324:9,12,
21,22 325:10 336:9
342:3 344:19 348:13,
14 349:5,7,9,22,23
350:7,9 351:8 352:9
369:3,10,14 370:21
371:21 372:3,10
376:23 377:1,9,13,
21,23 378:4,9,12,15,
20 379:5,10,12,16,
22 380:1,2,7 384:19
387:13,14,16 389:5,
11,23 391:21,22
392:8 393:9,13
394:9 543:20

**January (6)**
397:22 495:24
496:5 517:16 653:16
654:14

**JD (1)**
546:22

**JEDREY (55)**
395:15 396:3,6
407:16 408:6 409:24
410:9 411:5,13,20
412:7,22 413:13

414:9 415:2,19,22
416:2 417:23 419:6
420:13 428:22
429:10,14,17 434:1
442:4 443:12 447:22
448:3,4,6,8,10 449:7,
9 545:21 550:3
552:3 553:18 556:16
560:16 561:1,21
566:2 570:12,15,24
571:17 573:5,13
575:10,12,20 585:16

**Jeff (6)**
324:9 326:1 330:6
380:15 389:14 487:6

**JEFFREY (3)**
290:10 393:23
589:22

**Jim (1)**
320:21

**job (1)**
396:24

**jobs (1)**
403:4

**John (32)**
298:12,13,14
311:13,14,22 312:13,
18,23 313:6,7,18
320:23 324:9,21
388:8 391:13,13
407:3 410:13 449:22
451:7,17 459:6,9
460:20 462:7 474:3
520:1,3 536:17 576:3

**John@ (1)**
520:5

**john@snmpcom (1)**
460:3

**join (1)**
620:9

**joinder (1)**
620:10

**joined (2)**
403:13 620:16

**Jose (1)**
331:7

**journal (1)**
446:21

**judge (18)**
366:19 383:12
386:3 400:23 402:2
443:21 446:19
447:10 493:9 564:9
599:9 610:6,18
626:7,23 627:2,24
630:3

**judgment (1)**
613:14

**judicial (1)**
628:4

**judicially (1)**
627:7

**jumble (1)**
579:10

**jumbled (3)**
566:17 576:11
579:13

**jump (1)**
461:15

**June (35)**
292:3 315:12
318:7,12 350:2
351:17,20 352:11
354:6 356:11 366:14
369:20 377:11,24
379:8,13 380:5
396:24 425:24
429:24 433:13 445:3
448:19 467:2 475:15,
21 476:3 478:15

481:10 513:8 517:13
647:3 653:1 657:5
658:7

**junior (1)**
554:17

**Juniper (1)**
330:7

**justified (2)**
517:14,23

**justify (1)**
634:7

## K

**keen (1)**
631:13

**keep (9)**
371:15 510:11,12
562:23 563:4 588:11
601:2 646:24 654:19

**keeping (1)**
498:10

**keeps (4)**
388:18 418:15
608:19,20

**Kennedy (1)**
397:8

**kept (4)**
465:12,13 501:10
515:8

**key (1)**
440:8

**Kill (3)**
468:16 471:16
635:18

**killed (1)**
482:2

**Kim (9)**
476:12,16,19,22
478:22 480:10 484:8

540:11,23

**Kimball's (1)**
454:19

**Kimble (5)**
453:21 455:16
459:1 474:2 475:19

**Kimble's (1)**
460:15

**kind (18)**
337:18 349:13,14
363:8 382:12 399:18
421:7,18 424:19
426:2 436:12 498:9
578:5 583:17 597:5
625:22 648:5 652:15

**kindly (1)**
406:19

**kinds (4)**
399:21 402:21
444:12 601:3

**kit (1)**
489:10

**knew (16)**
290:20 354:2
356:6 372:6,8
373:22,23,24 405:4
437:3 474:16 475:17
538:10 635:23,24
636:3

**knowing (2)**
421:9 444:9

**knowingly (1)**
351:9

**knowledge (7)**
347:7,21,23
349:22 409:4 430:14
580:4

**known (3)**
334:1 437:4
466:18

**knows (1)**
350:7

**Krupski (2)**
641:20 642:9

---

## L

**La-Anyane (12)**
298:15 311:13
313:4,12 323:22
324:7,20 325:13
326:21 520:1,9,21

**La-Anyane's (1)**
325:3

**Labs (2)**
400:24 401:2

**lack (3)**
284:19 617:4
633:19

**lacked (1)**
617:24

**lacks (1)**
617:5

**laid (2)**
350:15 631:3

**landing (1)**
397:10

**language (52)**
306:10 309:3,8,13,
14 402:4 423:8,9
425:20 426:2,5
428:1,4 429:20
437:11,14,21 438:16
439:19 441:18
444:23 448:13
496:12 552:11
553:21 554:9 560:18
561:6,23 582:17
583:5,16 584:16,18
585:13 594:5,9,11,

18 595:3,9,13 602:5
605:9,16 606:19
645:6,11 655:18,24
657:20 658:11

**large (4)**
398:23 399:17
400:9 403:8

**larger (2)**
547:18 642:17

**large-scale (1)**
402:11

**largest (1)**
401:12

**Las (4)**
301:20 331:7,10
339:5

**lasers (1)**
402:24

**last (32)**
301:24 338:22
339:5 380:7 387:12,
17 404:5,20 424:14,
15 456:21 467:22
487:6 491:24 496:2
510:3 517:21 518:21
522:13 563:16 577:8
597:6 607:20 608:23
610:7 625:12 643:23
644:1,3 654:15
655:13,14

**lastly (1)**
565:9

**late (6)**
522:19 588:12
596:11 620:23 634:9
640:11

**later (22)**
289:17 381:14
384:3 386:18 396:14,
16,18 399:2,4

417:13,22 418:18
420:4 524:5 576:14
615:24 625:3 629:4
635:13 643:17 652:7
654:11

**latter (1)**
634:20

**launch (1)**
397:8

**law (26)**
285:2,13 369:16
438:21 439:1 443:1,
3,9,22 546:22 547:3,
4 549:18 571:11
603:4 611:8 619:9,
19,23 628:4 634:24
635:6 642:8 643:12
644:21 655:2

**lawsuit (1)**
380:4

**lawyer (3)**
566:17,20 576:13

**lawyers (4)**
546:15 549:2,6,12

**lay (2)**
337:15 402:19

**lead (4)**
422:16 497:22
543:8 603:13

**leader (2)**
310:16,18

**leading (4)**
397:6 398:2 531:3,
6

**learned (3)**
570:4 604:17,21

**learning (1)**
406:23

**lease (2)**
646:22 647:1

**least (9)**
311:7 343:7
387:14 406:7 426:4
490:21 572:7 585:14
640:24

**leave (3)**
403:2 431:12
648:18

**leaves (1)**
609:9

**leaving (1)**
580:9

**led (2)**
397:16 452:5

**ledger (1)**
518:8

**Lee (1)**
390:11

**left (15)**
312:13 320:5,21,
21 321:13,21 369:23
370:1 386:14 403:3,
10,12 434:12 586:19
649:16

**legacy (9)**
315:14 345:8,15
347:3 348:1,6,8
430:11 650:14

**legal (30)**
366:17 399:16
402:1,4 405:15
428:11,11,20,24
439:10 440:7 443:14
464:5 547:19 552:18
561:4 569:18,24
570:23 571:12
584:11 602:14
605:20 606:3,8,22
615:20 618:13
631:23 632:16

**legally (2)**
569:16 571:9

**less (7)**
312:16 313:3
404:21 436:16,18,24
549:21

**letter (15)**
464:5 466:9,13
467:9 520:18,20
521:6 619:12,16
638:3 648:2 653:16,
23 654:14,22

**letting (2)**
617:22 632:18

**level (1)**
408:10

**liaison (1)**
292:19

**libraries (5)**
305:2 474:6
485:12 486:3 536:21

**license (229)**
302:22,23 303:8,
10,11,20 304:2,7
305:6,10,15,19
306:4,13 308:12,23,
23 309:12,24 310:1,
2,7,9,14 315:16,20,
24 316:4,12,13,17
343:24 345:3,10,14
346:10 347:4,6
348:2 353:24,24
354:21 355:9 363:19
364:6,7,10,17
401:23 404:3 412:19
414:6 419:19 422:22,
24 423:7 425:14
432:11 437:19 438:4
441:21 445:8,13,17
446:2,7,15 448:13

458:3,8 461:12
462:21,22,23,23,24
463:5 465:19 466:5
467:1 469:11 470:4,
8,12,21,22 471:13
478:1 480:13,14,15,
19 481:2,4,5 482:9,
10,11 483:23 484:1,
2,10 485:14,15,17,
23 486:2 487:7,8
489:23 490:13 492:2,
3,7,10 493:5,17,23
494:13,23 495:7
496:22 497:4,12
498:3 499:2,3,5
501:11 502:5,7
503:2,11 505:1,8,12,
21 506:17 512:15
520:22 521:2 523:2,
7,10,20 524:1,3,19,
20 525:2,8 528:7
529:8,14 532:21
540:24 541:2,3
542:5,18,20,22,23
550:13,14,18 551:2,
17,21 552:5 553:8
554:22 555:3 556:8,
15,18,21 557:12,21
558:17 559:15,19,22
560:7 561:13 562:24
563:7,10 564:14,20
567:7 572:16,19
573:15 578:11
581:15,19 582:13,18,
23 583:11,19,21,24
584:4,5,8,14,14,17,
21 585:9,15 604:1
631:4 645:7 647:8,
10 648:4 649:21,24
650:7,9 651:3,10,12

653:22 656:15
657:15

**licensed (32)**
306:9 307:15
308:16 314:12 355:3
400:11 410:3 423:6
433:19 436:1 466:23
481:13 484:17 487:8
490:1 492:24 500:7
506:23 513:11 518:2
521:10 531:14 555:9
560:1 561:16 572:20
573:18 604:2 646:8
653:7,13 658:6

**Licensee (22)**
307:2,12,13
405:21 420:23 422:5,
10,19 423:4,15
425:6 426:10,21,22,
23 430:3,16 432:21
433:23 449:1 492:17
553:6

**licensees (3)**
399:13 401:23
429:4

**licensee's (2)**
423:13 585:12

**licenses (25)**
302:15 353:15
355:11 399:1 435:11
469:9 480:6 494:3
498:5 500:10 503:1
504:3,7 528:18
546:13,16 548:2,9
549:5,11,15 557:23
563:9 574:6 649:23

**licensing (69)**
363:18 398:4,5,7,
10,14 399:3,8,20,22
400:16,18 401:20,22

402:7 404:1,10,17
405:3 406:3,5,8,9,12,
15,18,21,22 407:1,5,
6,18 410:20 412:16
414:19 416:23
417:11 418:13 419:3,
15 420:18 429:2
430:2 437:18 446:23
447:2,3 470:5 474:6
482:23 486:23 487:1,
2,3 536:20 548:19,
21,22 550:1 563:20,
23,24 564:4,5,16,17,
22,24 565:3

**licensor (4)**
405:20 425:8
431:10,15

**licensors (1)**
429:4

**licensor's (1)**
449:4

**lieu (1)**
643:14

**life (1)**
425:10

**lifetime (10)**
367:21 368:4
424:9 430:10 509:11
551:2 567:7 574:6
577:21 578:21

**light (7)**
410:6 413:1
429:18 529:17
591:10 628:7 645:4

**likely (2)**
319:17 464:20

**likewise (1)**
426:13

**Lillick (1)**
547:4

**limit (5)**
438:22 555:12
596:24 597:7 634:3

**limitations (1)**
634:20

**limited (12)**
310:11 341:6,8
344:5,9 346:17
428:14 488:23
563:10 596:15
605:21 607:3

**line (20)**
324:2,16 329:17
339:1,9 370:8,11,18,
22 371:20 377:4
389:7 391:24 416:5
421:1 460:15 496:2
509:7 577:17 635:8

**lines (9)**
289:18 370:8
372:18,19 373:1
528:8 530:4,4 573:10

**list (11)**
352:17 354:19
355:4 455:1,6
464:17 495:18
544:15,24 660:5,16

**listed (2)**
352:15 455:11

**listen (2)**
346:2 598:17

**listened (2)**
347:17 658:20

**lists (2)**
355:11 519:11

**literally (2)**
632:19 649:9

**litigate (1)**
627:4

**litigated (1)**

625:21

**litigation (3)**
287:14 547:23
623:1

**little (16)**
368:6 396:22
398:11 405:14 415:8
434:7,10 436:22
469:13 522:13
527:11 547:24 592:2
629:17 638:24
649:16

**live (3)**
569:8 634:4,6

**LLM (1)**
546:23

**located (2)**
287:8 487:24

**location (7)**
304:3,4 344:17,17,
18 348:9 488:13

**locations (10)**
303:16 304:10,14
345:2,8,15 346:9
348:1,7 381:1

**location-specific (2)**
345:5 348:4

**logical (1)**
531:18

**logically (1)**
555:15

**long (15)**
304:15 353:20
366:13 374:17
400:15 412:17 414:1
424:13 425:10 427:9
449:14,24 475:14
642:23,24

**long-distance (1)**
401:3

**longer (5)**
345:5 364:14
390:24 474:21
481:12

**longing (1)**
399:18

**long-term (1)**
423:21

**look (100)**
282:21 287:7
302:11 303:9 306:24
307:10 317:14
320:13 338:9 346:14
359:9 369:2,7,17
388:5,19 389:10
404:19 405:21
441:13 453:19,19
454:8,10,24 455:3,
10 456:17 458:1
462:2,12 466:11
468:4,22 473:15
475:9 476:7 479:4
483:18,21 484:6
485:4 486:7,22
487:4,22 488:21
491:2,5,22,24 492:9,
13,14 494:16 495:15,
21,22 496:14 498:7
500:11 501:14,22
502:9 513:2,6 518:1,
9,16 519:21 520:15,
18 521:14,15 523:24
526:13 529:21 532:5
534:4 536:14 539:24
560:23 572:8 574:14
577:15 578:6 583:4
584:13 605:24 620:3
621:6 630:5 637:18
639:23 641:18
643:17 645:21

652:17 658:21
660:23

**looked (35)**
286:23 287:20
293:9,22 347:14
380:20 388:24
431:18 452:20
453:10 471:3,15,16
473:3 474:22 475:6
481:22 482:21
487:11 497:1 499:16
500:18 501:20 505:5,
7,20 508:21 521:7,
17 539:15 540:1
556:9,22 584:16
632:3

**looking (19)**
291:14 294:6
295:13 306:18 410:1
457:23 462:1 468:20
473:5 486:8 488:10
491:7 540:21 565:6
568:5 573:23 574:3
639:13 648:3

**looks (10)**
326:13 330:15
389:18 390:3 457:23
479:7 518:6,21
566:19 569:8

**loop (1)**
426:17

**Lori (1)**
511:19

**lose (3)**
425:6,8 633:8

**losing (4)**
384:22 420:24
422:8 431:3

**loss (1)**
448:17

**lost (9)**
316:5 384:24
392:17,19 415:8
425:22 519:17
535:13 540:13

**lot (21)**
384:13 394:8
425:6 528:23 551:9
555:4,16 563:1,2,6,
21 601:22 613:11
618:21 644:21,21,22,
22 648:17 658:19
660:2

**lots (1)**
559:9

**loud (1)**
283:21

**loves (1)**
643:22

**lower (1)**
619:17

**lowest (1)**
385:9

**lowest-cost (2)**
385:2,5

**Lucent (1)**
401:4

**lump (1)**
425:8

**lunar (1)**
397:10

**lunch (4)**
373:3 395:6
449:23 450:8

**Luncheon (1)**
450:22

**M**

**MabSADKw32 (1)**

496:12

**made (43)**
284:20 287:21
318:10 323:2 326:9,
16 327:1 329:19
330:15 344:20
346:20 347:4,6
363:3 373:6 374:3
383:14 401:11
411:20 416:5 443:13
444:11 466:17
524:10 528:7 557:10
561:9 566:15 572:5
590:21 591:16
597:18 612:13
613:16 616:18
619:15 625:15
627:23 631:9 641:11
646:20,21 648:2

**main (2)**
604:13 625:24

**mainframe (1)**
397:7

**mainly (1)**
548:21

**maintenance (5)**
353:24 363:17
364:10 464:10,23

**major (5)**
400:10 401:16
439:18 440:3,13

**make (45)**
286:22 291:14
309:18 323:15 325:7,
10 345:20 347:8,21
352:5 360:13 367:3
384:11 402:4 408:23
428:10,16 431:6
439:20 440:16 512:3
514:4 516:5 529:1

555:10,16 562:16
587:6 588:11 592:6
596:19 600:23
612:13 625:14,23,24
626:4 627:23 629:9
637:10 640:24 642:7,
12 643:18 659:22

**makes (4)**
419:5 426:17
570:1 577:13

**making (7)**
380:23 383:15
436:6 444:5 613:3
627:7 656:4

**manage (1)**
408:16

**managed (18)**
331:18 332:4,5
333:5,6,7,9,10,23,24
334:3,15,20 336:5,6
370:6 399:19 402:22

**management (6)**
325:18 370:18
476:24 478:7 489:10
539:11

**manager (6)**
310:19 384:5
399:2,9 491:13
554:18

**managers (2)**
549:3 585:6

**managing (2)**
333:13,14

**manner (1)**
616:21

**mantras (1)**
409:12

**manufacturing (1)**
400:13

**many (19)**

339:1 349:19
352:14 385:14
387:15 398:22
421:24 424:11 434:9
444:4 516:18 548:9
558:9 565:7 577:7
584:10 606:4 629:24,
24

**marathon (1)**
609:1

**March (6)**
457:1 458:22
470:23 529:9 541:21
657:3

**mark (2)**
296:23 379:9

**marked (6)**
332:8 452:21
453:3 462:8 463:24
508:8

**market (2)**
387:11 427:19

**marketing (1)**
468:7

**marketplace (4)**
423:24 430:23
509:13 577:23

**marking (1)**
510:16

**markings (1)**
488:9

**Martha (1)**
388:7

**Mary (1)**
466:14

**Massachusetts (3)**
303:17 304:4
345:9

**massive (1)**
612:23

**master (13)**
302:15 303:8
445:8,13 446:2,6,15
550:17 558:4,5
559:15 647:8,10

**master's (1)**
396:14

**match (2)**
521:12 581:5

**matches (2)**
369:22,22

**math (2)**
436:4,15

**matter (18)**
337:8 350:17
393:8 430:24 438:21
439:1 443:3,8,21
467:5 519:16 591:14
593:15 599:21
605:24 633:9 642:8
658:3

**matters (3)**
346:4 413:8
614:13

**mature (1)**
338:15

**matures (1)**
423:23

**maximize (1)**
338:14

**may (61)**
282:2 285:20
289:7 307:5,13
314:18,23 315:7
325:24 326:12,16
329:14 338:5 342:10
343:14 369:20
382:11 389:12,16,16
392:2 394:4,23,24
395:2,19 396:2

404:14 407:15
423:24 425:6,8,9
451:4,24 480:4
496:9 497:23 507:22
510:9 511:13 512:22
513:3,4,4,4 516:5
521:19 529:7,10
541:10 543:17,21
545:23 546:7 582:14
589:12 608:24
613:10 620:4 638:4

**Maybe (9)**
357:5 381:20
401:9 415:22 490:23
517:4 568:17 629:3
660:12

**MBA (1)**
396:19

**Mead (18)**
298:12,13,14
311:13,14,22 312:14,
18,23 313:6,7 324:9,
21 409:7 410:14
414:24 416:14
417:23

**Mead's (2)**
408:21 416:15

**mean (24)**
309:20 377:15
393:20 394:15 427:7
444:24 501:15 509:6
555:4 557:24 559:9
561:22 565:13
569:23 577:16 580:4
582:9 585:7 587:9
610:21,22 620:21
635:12 646:23

**meaning (6)**
312:21 321:16
328:17 457:21 462:9

654:17

**means (21)**
309:17,17 336:4
361:11 365:10,13
366:9 390:3 424:9
462:14 494:10
500:10 508:7 553:22
556:3 560:19 562:1
585:5 620:13,14
654:9

**meant (13)**
322:2 355:21
361:10 391:4 430:1
448:16 552:1 553:5
558:18 572:8 654:18
655:2 660:18

**meat (1)**
383:19

**mechanical (2)**
396:17 397:14

**media (1)**
402:14

**medium-size (1)**
338:13

**meet (2)**
325:10 355:13

**meeting (19)**
298:10 315:3,4
322:23 329:14 330:6
335:1,3,6,7,10
336:13,14 380:14
383:8,11 384:7,8
394:5

**member (4)**
313:17 324:21
406:2,4

**members (2)**
293:18 298:12

**Memorial (1)**
397:17

**memorialized (6)**
568:23 569:2,12
579:24 580:14,23

**memory (5)**
439:13 455:23
463:20 469:24
529:10

**men (1)**
397:1

**mention (1)**
603:3

**mentioned (15)**
299:12 410:11
416:18 427:6 429:21
445:7 466:8 505:12
535:4 548:23 549:7
564:8 565:11 593:23
612:22

**mentor (1)**
406:21

**mentoring (1)**
406:23

**Mercury (1)**
355:7

**merged (3)**
303:22 403:15,16

**merger (10)**
358:23 363:15,21,
23 366:3,23 502:19
582:15 585:1,11

**merit (2)**
509:9 577:19

**message (3)**
391:13 478:22
509:19

**messes (1)**
625:1

**met (14)**
293:17 298:11
311:23 330:7,10

331:5 349:19 368:14,
15 374:11,23 380:10
384:1 434:22

**MGM (1)**
338:24

**Micom (5)**
344:5,10,13
488:23,24

**mid-afternoon (1)**
507:12

**middle (7)**
468:15 476:15
504:15,17 539:20
540:20 588:14

**might (20)**
343:1 368:16
389:6 391:16,19
402:10 409:8 414:3
419:24 420:3 424:16
425:1 553:11 558:17
559:2 574:24 594:15
595:11 629:9 643:12

**migrated (1)**
398:5

**migration (1)**
390:7

**mile (1)**
560:9

**mileage (1)**
646:23

**million (13)**
307:21 308:1
332:3,15,16 334:20
608:23,24 611:17,18,
21 636:16,18

**millionth (5)**
330:22 331:13
332:19 333:22 339:8

**mind (9)**
283:2 350:18

483:13 502:9 526:13
545:19 598:21 601:2
628:4

**minds (2)**
474:5 536:20

**Mine (1)**
520:5

**minute (6)**
291:12 467:11
517:17 537:6 545:13,
18

**Minutes (35)**
329:13 330:6
331:24 333:4,19
343:4,4,4 381:19
382:1,3,7 434:18
507:18 586:13,19,20
587:22 588:6 617:14
628:21 640:24 641:3
643:4 644:7,9,12,13,
24 648:17,23 655:6,
10,11 659:9

**minutes' (1)**
587:21

**mischaracterization (1)**
321:19

**Mischaracterizes (1)**
291:1

**misled (1)**
497:24

**misquoted (1)**
564:18

**misrepresenting (1)**
340:7

**missed (2)**
592:10 634:10

**missing (1)**
364:8

**mission-critical (1)**
338:18

**misspelled (1)**
390:4

**misspoke (2)**
292:11 406:6

**mistake (6)**
513:18,18 641:11
647:17 648:2 654:1

**mistaken (1)**
372:14

**Mm-hmm (3)**
462:17 474:1
477:10

**model (6)**
358:20,21 362:19,
19 385:7 423:3

**modification (1)**
523:22

**modified (1)**
469:5

**modify (1)**
594:7

**module (2)**
421:15 492:24

**modules (3)**
306:9 307:15
308:16

**moment (18)**
292:22 331:23
363:7 366:23 439:16
445:20 464:6 466:12
468:2 476:19 489:24
490:11 491:21
518:15 526:14
545:11 589:13 657:3

**momentum (1)**
390:8

**Monday (1)**
329:14

**money (6)**
555:12,18 563:6

611:16 613:2 647:22

**months (6)**

323:4 386:18,24

390:24 416:17 547:5

**moon (1)**

397:1

**more (41)**

284:12 313:19

321:5 322:5 384:11

394:8 404:11 405:3,

7,9,10,12,14 406:10

421:22,24 422:3

424:1 426:20 457:22

480:2 483:1 504:1

510:9 522:12 541:11

549:21 561:21

579:15 590:2 598:4

599:19 604:18,19

618:11 625:8 636:7

648:17 655:21

657:10 658:23

**morning (7)**

282:1,7 290:15,16

395:15 396:7,8

**Morrison (2)**

547:6,22

**mortally (1)**

422:6

**most (17)**

400:1 402:12

405:18 443:5 479:16,

21 505:11 540:5,7

548:22 551:10

554:15 565:19 572:7

611:11 617:16

655:19

**motion (23)**

355:20 586:3

587:8,11,16 590:18

599:7 600:20 601:1

603:6 605:14,15

606:15 609:21 612:8

626:1,7,23 628:1,23

629:14 641:11

658:22

**motivation (1)**

654:10

**motive (4)**

603:17 636:13

637:4,12

**Motor (2)**

355:9,10

**movant (1)**

603:17

**move (34)**

282:11 294:7

302:6,8 327:5

336:24 355:16

381:11 400:21

415:22 437:8 458:12

467:15 510:8 522:20

531:18,19 532:15,23,

23 556:16 588:1

589:5 591:3,10,12

592:15 598:4,5

599:2,5 600:4

614:11 621:13

**moved (7)**

312:21 397:20

521:13 612:5,6

626:1 652:13

**moves (1)**

522:4

**moving (8)**

343:2 510:9

526:21 530:20

591:13 641:15 654:1

656:14

**Mrs (1)**

293:17

**much (20)**

285:17 337:5

343:4 352:11 421:24

422:1,3 425:7 434:6,

17 436:14 509:16

513:5 522:12 527:10

546:1 614:1 633:13

637:10 659:9

**multimedia (1)**

402:15

**multiple (9)**

372:7 380:24,24

381:1,1 409:4,10

610:1 619:17

**multi-stop (1)**

383:14

**multi-wavelength (1)**

403:1

**must (4)**

493:7 503:4 646:8

650:2

**mutually (1)**

659:20

**myself (5)**

387:10 448:4

533:8 543:18 589:12

**mystery (1)**

654:5

**mystified (4)**

501:3 506:5 529:6

531:22

# N

**name (10)**

311:15 355:2

390:10 403:19 448:2

453:21 491:10 546:8

620:6 625:2

**named (1)**

542:11

**names (2)**

485:17 486:5

**Nana (11)**

298:14,15 311:13

313:7,11,11 323:22

324:20 326:21 520:1,

20

**narrow (1)**

357:17

**narrow-band (1)**

402:16

**Nat (1)**

448:4

**nature (6)**

561:1 574:15

594:16 595:12

597:12 610:12

**necessarily (2)**

610:21 621:20

**necessary (3)**

415:4 451:15

553:10

**need (78)**

290:8 302:13

314:11 317:3,6,19,

23 338:17 349:24

361:3 362:2,7,17,23

381:24 382:12 411:6

415:9 421:2 422:13,

14,16 427:1 438:22

444:6 452:13 453:16

457:15,18 461:10,19

462:9 463:8,8

465:24 470:14 471:4,

14 474:7 481:21

482:1 493:10,13

501:1 503:11 506:2

512:4 521:13 526:19,

20,21 533:14 535:7

536:24 537:20
539:16 559:1,13
568:9 572:6,14
578:6 584:13 597:21
598:22 631:18
632:24 635:13 651:4,
5,6,7,16 652:4,14,24
653:10 657:2

**needed (16)**
317:10 348:17
352:10 353:16
456:10 462:4 470:20
491:12 504:10 505:3,
18 589:9,11 636:9
641:10 653:9

**needing (2)**
315:10 454:5

**needs (5)**
348:23 493:16
503:10 504:7 567:20

**negative (1)**
423:20

**neglect (8)**
634:8,11,13 640:8
641:7,15,16 642:6

**negotiate (5)**
433:2 437:18
522:23 550:15
604:10

**negotiated (7)**
435:10 438:4
521:21 522:5,6,15
548:10

**negotiating (1)**
399:14

**negotiation (2)**
353:1 367:4

**negotiations (11)**
399:8,10 404:16,
18 412:21 414:19

418:22 429:5 442:22
452:5 645:16

**negotiator (2)**
399:1,9

**Nelson (9)**
618:21,22,23
619:18,23 621:18
635:2,8,9

**network (7)**
325:18 476:24
477:7 478:7 488:16,
18 539:11

**networking (1)**
346:19

**Networks (89)**
293:7 297:7,11,17
298:21 299:1,6,10,
15 303:10,11,16,23
304:3,4,7,10 305:5,9,
18 306:4,13 308:19,
23 309:12 310:1,2,4,
9,14 313:20,23
315:15 320:9 322:10,
16 327:14 330:7
344:17 345:2,8,14,
15 346:10,20 347:2,
3,4,6,7,12,21 348:1,
2 353:18 359:13,21
360:7 361:6,14
365:6,19 369:19
389:21 425:19
452:15 461:12 463:5
465:19 466:14,16,21,
24 470:11 489:23
501:11 506:17
520:11,21 521:3
551:4 567:22 568:14
570:8,20 581:16,17
650:5 651:3

**Networks' (1)**

388:22

**Networld (2)**
321:2,4

**Networld+Interop (1)**
339:5

**never (27)**
294:3 317:22
318:19 354:22
377:13,15 378:15,22,
23 379:11,21 380:2
385:3,8 393:18
394:9,10 455:20
502:19 523:21,22
528:13 564:23
620:22 630:19,22
658:13

**new (131)**
293:16,21 303:8
314:12 315:10 317:3,
10,19,23 343:22,23
348:23 349:24 352:4,
10 353:17,21 354:14,
15 355:10 356:18
357:8,9 358:22
359:24 360:1,5,7
361:1 362:10,15
365:3,4,23 366:14
367:22 368:5 372:22
383:20 384:5,10
392:21,22 430:11
433:2 452:14 453:17
454:5 456:10 459:11
460:22 461:22
465:24 470:14 471:5,
13,15 474:8,13,18
475:20,21 480:2
481:19,21 482:1,14,
17 487:14,16 490:12
493:21 495:2,5
499:2,10,11 500:15,

20 501:1,9 505:5
506:2,17 509:6
517:19 524:18 535:7
537:1,8,8,12,18,20,
21,22 539:16 541:20
567:10,16,21 568:4,
9,13 570:7,18
572:18 573:15
577:16 578:14 590:2
602:8,14 606:8
610:3 615:15,18,20
634:2,4,7 638:18
640:12 651:11,16
652:4,15,24 653:9,
11,19

**next (23)**
327:20 328:4,8
330:21 353:11
442:11 449:20
453:21 477:6 483:2
492:13 502:22
509:10 510:17 519:1
533:5 535:3 536:10
540:1 560:9 577:15,
20 578:20

**Nice (1)**
435:1

**night (3)**
404:20 588:12
639:1

**NIMD (2)**
454:19 460:15

**nine (2)**
416:17 483:12

**no- (1)**
618:7

**Nobody (2)**
457:11 632:6

**no-foul (1)**
618:8

**Nominally (1)**
436:8

**nonassignable (1)**
583:6

**none (7)**
387:3 474:23
621:12 625:5 638:14
645:4 655:17

**nonpermanent (1)**
556:15

**non-starter (1)**
390:20

**nontransferable (6)**
310:7 419:19
582:10 583:4,5 585:5

**non-zero (1)**
359:2

**nor (1)**
579:6

**norm (2)**
514:16 515:19

**normal (2)**
578:13 640:1

**normally (5)**
385:1 553:7
557:22,24 568:3

**Nortel (249)**
285:24 287:14,17
288:13 291:5 299:24
302:15 303:8 312:10,
13 313:21,23 318:16
322:17 324:3,17
326:16,18 327:14,20
328:5,14,24 329:20
330:8,8,10,13,21
331:12,12 332:1,20
333:20 334:13 335:1,
3,10,13,15 336:7
338:5 340:12 344:14
347:10,18 348:11

358:23 359:22
360:24 362:7 365:23
366:13,21 369:19
370:5,9,15 375:1,8,
14 377:3 380:3,18,
21,24 381:1,2,6
383:17 384:4,16
385:12,13,18,21
386:10,20 393:10
405:24 408:12 410:2
411:6 414:16 415:9,
15 416:23 417:10,15,
24 418:13,21 419:23
420:17 425:22
427:12 430:9 433:17
438:20,24 439:12,20
440:15,22,23 441:5,
8,15 442:1,16 443:2,
9,11 444:10,11,15
445:3,9,16 452:10
457:1 459:14,16,16,
17,18 460:23 464:18
465:11,13 466:13,16,
21,24 470:4 471:13
476:22 477:13,22
478:4 480:13 481:3
482:10 483:24
484:15 487:7 490:16
494:8 495:20 497:21
499:10 502:18 505:1,
15 509:1,15 511:6
512:20 515:9,18
516:9 518:10 519:12,
12,14 520:10,21
522:23 523:19
524:12,18 525:10
528:18 529:19
532:14 533:9 541:1,
19 542:4,7,21
545:20 550:13 551:3

555:9,12 558:17
562:16,20 563:12
566:10,24 567:6,20
568:9,13 569:20
570:7,18 574:11
577:2 581:4,9,13,16,
19 582:3,20,23
583:22 584:6,19
586:19 588:2,17
591:16 599:23,24
600:2 603:7 604:3,7,
8,11,19 605:7 608:7,
17 609:3,8 613:3
615:16 616:6,12
618:19 622:13
623:14 624:17,22
627:16 641:6 642:10
645:23 646:15,19
649:21 654:20
657:21,22

**Nortel/Bay (1)**
573:20

**Nortel/SNMP (3)**
325:23 474:8
537:2

**Nortel's (17)**
283:12 292:19
332:23 338:20 342:3
408:9 427:13 430:16
440:21 444:18,19
524:6,14,22 604:1
606:22 612:4

**Nortel-SNMP (1)**
425:13

**Northern (6)**
327:22 344:4,9
346:16 488:22
492:18

**Nos (3)**
593:20 599:16

600:13

**note (14)**
386:17,19,21
461:13 474:23 475:6,
8,14 480:10 503:12
511:18 514:23
540:11,23

**noted (1)**
581:9

**notes (7)**
450:4 468:7,9
471:16 472:5,8
579:10

**nothing (18)**
331:24 394:20
412:19 415:17
449:10 481:13,14
525:22 533:20 556:7
563:9 594:13 642:22
647:24 655:21
657:18,21,23

**notice (2)**
610:24 611:5

**notion (1)**
581:13

**November (13)**
453:9 454:18
502:1,2 509:2 576:4
577:3 590:17 609:15,
18,19,20 635:20

**nowhere (1)**
633:17

**NT (4)**
489:9,11 491:13
498:21

**NT' (1)**
502:15

**nuanced (1)**
346:3

**nullity (1)**

634:22

**number (38)**
306:8 307:14
308:15 340:8,8
383:16 387:19
390:16 402:14
404:17,21 424:24
425:11 432:18
436:23 456:3 459:11,
20,21 460:22 461:17
488:4 490:18 494:8
516:11,12,20 530:14,
16 548:12 586:24
596:20,21,22 617:3
618:3 641:6 642:17

**number-one (1)**
549:19

**numbers (9)**
358:20,21 369:9
400:6 408:14 613:8,
20,23 614:5

**numerical (1)**
526:24

**numerous (2)**
636:5,6

# O

**oath (3)**
320:16,18 516:3

**object (17)**
288:5,14 339:15
350:4 351:12 355:19
361:18 367:13
374:14,15 411:18
428:14,18 459:13
512:1 522:18,19

**objected (7)**
291:19 337:6
339:20 407:20 415:7

**objecting (1)**
608:17

**objection (56)**
282:14 288:8
289:3 290:24 291:15
295:5 300:19 301:15
327:6,7 337:1,3
342:7 351:14 367:17
376:1 407:19,24
411:14,19,21,23
413:16,18,20,23
416:1 420:8,9 428:8
439:24 458:14 460:6
467:16 472:1 507:16
523:21 531:2 535:9,
12 550:2,3 562:9
570:22 571:15 591:5,
19,20 593:8,14
599:13,23 600:1,3,
10 620:7

**objections (10)**
284:4,8,15,16
285:11 337:18
544:18,21 591:16
599:12

**obligation (2)**
411:17 567:8

**obligations (1)**
449:4

**observe (3)**
342:10 519:4
543:19

**obtain (1)**
422:19

**obtained (4)**
365:24 372:23
377:1 616:19

**obvious (1)**
582:8

**obviously (12)**
284:15 315:6
400:1 404:6 414:21
423:18 428:22 437:4
449:3 600:20 611:13
641:9

**occasion (1)**
311:7

**occupation (1)**
546:10

**occupations (1)**
546:11

**occupied (4)**
479:16,21 540:5,7

**occurred (5)**
437:2 442:23
502:19 532:16,20

**off (10)**
289:15 395:13
435:4 451:24 533:1,
2 543:10 582:16
587:2 657:8

**offer (1)**
352:23

**offered (6)**
353:23 359:5
371:18,23 503:15
562:6

**offering (10)**
285:21 337:7,9
428:11,24 429:6
443:13 552:5,10
560:19

**offhand (1)**
400:9

**officers (1)**
549:3

**offices (7)**
299:16 311:6
320:9 322:10,17

**officially (1)**
398:10

**often (5)**
399:14,17 505:11
550:18 579:8

**oftentimes (1)**
508:6

**Ohio (1)**
396:19

**old (21)**
345:2 353:18
355:9 392:21 470:11
480:12,14 481:2,3
482:9,10 483:23,24
487:8 529:18 533:10
540:24 541:2 542:20,
22 656:9

**omitted (2)**
442:6 557:17

**on_ (1)**
325:16

**once (10)**
284:24 398:13
399:8 411:11 439:15
450:3 470:18 623:23
627:24 647:20

**one (129)**
297:9 299:11
308:19,21 309:1
311:7,15 321:5
322:5,23 325:3
328:5,18,20 335:14
338:20 340:8 345:1
347:24 362:4 365:2
375:24 383:19 385:4
386:16 388:4 389:22
391:6 400:10,12,13
403:4,17 408:23,24
409:12 421:18

423:19 425:11 426:5
430:13 439:17 440:3,
8 444:3 448:21,23
450:16 453:24 454:3
459:1,11,20 460:22
469:21 482:22
483:10 488:15,23
490:22 496:11
499:23 501:4 508:9,
19 510:19 515:4,15,
24 516:11 518:21
520:4 527:7 534:5
541:10 543:4,7
544:7 545:18 551:10
555:5 557:9 558:4
561:21 562:1 564:23
565:7 566:9,11,23
567:5 569:19 570:1
571:11 574:14
579:15 583:10
584:10 589:12
590:11,15 595:16
597:6 603:2 608:16
612:18 617:3 618:3,
17 622:3 623:17,20
624:7,7 625:4,8
632:20 634:14,17
638:8,15 641:6
642:10 648:6,7
651:6,19 654:15
660:3

**ones (8)**
347:5 402:11
427:17 459:1 498:10
510:21 544:20 632:1

**one-time (1)**
424:8

**one-year (1)**
510:24

**only (38)**

283:5 284:15
288:14 291:8 341:7
364:16 365:2 372:8
381:24 421:16,17
432:22 445:7 447:3
471:19 521:8 533:12
537:7 556:14 559:22
562:1 564:12 567:9
576:16,19 596:19,20
603:5 608:15 610:23
611:2 619:10 631:11,
12 632:3 633:14
637:3 642:16

**onto (5)**
293:4 352:19
358:18,24 427:15

**onward (1)**
379:9

**Oops (1)**
635:13

**open (5)**
283:17 286:11
294:6,12 498:10

**opened (3)**
355:22 639:2,3

**opening (3)**
587:16 588:10,18

**operate (3)**
439:8 444:14,15

**operates (1)**
439:7

**operating (33)**
315:20,24 316:3,
12,12,17,18,20
408:15,19 409:3,9
411:9 415:12 416:7,
22 417:9 418:2,4
419:9,13 420:16
464:14 477:12
483:16 487:9 582:21

584:19 652:19,21,22
653:1,21

**operative (3)**
602:15 606:3,9

**opine (2)**
362:18 412:15

**opined (1)**
552:18

**opining (2)**
422:1 562:3

**opinion (34)**
410:4,6 413:1,8
415:5 419:1 428:11,
24 429:8 439:10
441:1,17 443:14
445:19 448:14 551:6
558:21 560:19 561:9
562:6 566:8 568:21
569:18,24 570:17,23
571:2,10 572:17
576:15 578:1 581:12
584:9 645:4

**opinions (9)**
412:1,13 414:12
446:18 447:7 550:10
557:14,15 584:11

**opportunities (5)**
384:10 399:13
401:22 636:5,6

**opportunity (9)**
302:24 342:13
355:23 404:2 405:18
524:11 525:17
610:15,19

**opposed (3)**
600:5 617:21
623:1

**opposing (1)**
287:18

**opposite (2)**

612:21 627:23

**opposition (2)**
599:7 626:2

**optical (1)**
402:23

**optimum (1)**
338:11

**option (6)**
305:19 306:4,5
307:1,11 432:21

**optional (2)**
482:24 486:24

**options (4)**
391:10 421:3,5
568:18

**Optivity (57)**
315:23 316:1,20,
23,24 317:2 346:23,
24 389:23 452:19
454:1,9 456:1,7
461:3 462:10 463:6
465:23 469:21
470:10 471:14 474:4,
17 475:1,3,11,18
476:3,23,24 477:1
478:6,7,11 480:8,9
481:18 499:16,23
505:24 517:23
536:18 539:5,10,11,
14 540:10,15,17,22
543:20 650:11,23
651:24 652:10,19
654:3

**Optivity's (8)**
454:15 455:17
465:17 471:5 480:19
481:22 500:21 540:3

**Oracle (3)**
556:13,17,20

**Oracle's (1)**

556:10

**oral (1)**
394:4

**order (18)**
314:12 315:11
317:3,10,20,23
348:24 390:18
392:24 402:2 408:22
452:14 527:1 567:21
570:20 595:10
631:18 648:3

**ordinary (2)**
603:11 604:4

**org (1)**
389:16

**organization (3)**
370:6 397:18
403:8

**organizations (1)**
338:16

**original (10)**
297:10 347:12
441:24 499:4 502:6
505:22 584:14 594:4
603:23 612:11

**originally (5)**
456:9 459:2 602:8
620:12,23

**originated (1)**
344:24

**originating (10)**
293:6 359:13,20
360:6 361:5,14
365:18 388:21
425:18 551:4

**OS's (1)**
530:10

**other (83)**
283:5 287:22
288:11 293:18 305:1

308:19,21 309:1
314:9 316:24 324:15
332:6 341:7 354:19
356:24 357:9 359:4
362:5 370:8 391:10
392:14 399:19 401:5,
17 403:15 405:20
419:23 421:9,21
422:23,23 424:23
440:9 445:19 446:22
447:5,6 448:23
488:16 503:2 513:2,
2 516:5,8 517:12,22
519:11,12,13 539:20
548:3,6,10 549:11
554:20 555:1,15
558:7,12 559:10
564:1 567:22 569:19
570:1 571:22 572:2,
15,17,23 589:6
591:10 599:3 603:2
606:11 617:10 619:7,
13 621:18 623:2
625:4 632:20 641:8
647:5

**others (5)**
311:11,12 332:9
491:1 611:10

**otherwise (6)**
427:4 428:18
431:8 548:6 650:18
658:2

**Ottawa (1)**
293:20

**ought (1)**
429:13

**out (72)**
283:21 329:2
352:22 355:13
381:21 382:18

387:10 392:12,21
393:11,14,17,24
394:5,11 396:24
402:3 420:4 424:6
425:9 438:11 444:20
457:14 464:4 490:18
496:23 497:6,18,19,
20,21 505:16 509:3,
12,19,20 510:4
517:4,7 524:7 547:3,
22 549:22 552:1
572:24 573:10 577:4,
9,21,22 578:22
586:5,10 605:10
609:8,10,11,13
612:17 616:12
622:16 631:4 634:14
638:2,15 640:6
647:13 649:5 650:24
655:23 656:3 658:12

**outcome (1)**
438:7

**outside (13)**
361:19 363:2
409:19,22 410:7,9,
21 411:12,24 413:24
459:17 549:6 574:23

**over (39)**
300:3 302:15
303:8 311:3 312:6
327:21 332:17
346:17,18,21 347:8,
21 353:18 378:21
381:12 383:21,21
395:6 398:5,11
402:4 405:17 453:24
471:4 473:15 487:24
488:15,18 492:19,21
586:1 630:21,21,21,
21,21 646:14,17

654:9

**overall (1)**
413:20

**overcome (2)**
647:13 655:16

**overcomes (1)**
655:17

**overrule (5)**
301:14 367:17
420:8 535:11 562:9

**oversaw (1)**
399:19

**overwhelmed (1)**
498:9

**owed (2)**
466:20 631:6

**own (23)**
317:7 372:15
422:2 432:24 452:22
509:8 516:17 547:17
561:18 577:18 601:8
603:19 607:16,17,18
614:19 632:2 633:2
634:5,6 635:18
639:8 645:22

**ownership (1)**
427:13

**P**

**P-1 (6)**
590:11,14,16
591:18 592:8,19

**P-11 (3)**
591:18 592:21
593:1

**P-14 (1)**
599:6

**P-15 (1)**
599:6

**P-18 (1)**

599:22

**P-19 (2)**

590:11 599:23

**P-2 (4)**

591:18 592:6,20
594:2

**P-3 (3)**

592:7,10,21

**P-30.51 (1)**

485:4

**P-38 (1)**

501:24

**P-4 (4)**

591:18 592:7,21
594:24

**P-57 (1)**

388:6

**P-58 (1)**

388:6

**P-7 (3)**

591:18 592:7,21

**P-9 (5)**

592:7,21,22,24,24

**package (2)**

404:3 409:9

**packages (3)**

400:3 402:10,13

**page (50)**

306:24 307:10
327:12 330:1,4
338:6,10 369:6,7,9
371:6 372:16 376:24
442:11 453:20
456:21,22 476:16
478:20 479:4,4,6,18
482:20 483:2,2,21
484:5,7 491:10
492:13,15,16 495:18,
21,21 496:2,14,17

518:9 519:1 530:1,2
534:8 536:15,16
539:8 540:1 594:22
595:4

**pages (7)**

289:18,18 568:6,8
598:12 616:13 638:7

**paid (36)**

305:6,8,9,11,15
307:24 310:8 322:16
363:17 433:17 458:4
462:4,13,24 463:7
464:18 469:9,12
470:7,7,21 471:1,8
499:2,4 500:2 502:5
503:4 504:8 505:21
514:6 524:8 650:6,6
651:9 652:3

**Paid-Up (14)**

307:1,2,11,12
308:5,6,8,13 309:16
424:7 521:1 524:23
525:10 551:2

**Painter (1)**

634:16

**paper (3)**

456:4 555:18
627:12

**papers (18)**

285:3 498:9 544:1
601:6,17 603:10
610:2 613:15,17
615:13 616:13
618:22 626:4 633:2
641:12 658:21,23
660:24

**paragraph (17)**

338:23 369:17
370:5,11 392:15
483:3 491:22 492:1

510:3 525:13 540:21
576:23 577:15 578:1,
17 594:23 595:4

**paragraphs (2)**

338:10 540:10

**parallel (1)**

650:12

**Parkway (7)**

298:7 312:1 320:9
321:8 322:10,21
323:9

**part (70)**

287:11,12 289:24
297:15 302:21
304:21 305:8,9
310:5 312:7 326:18
330:20 371:15
372:19,21 378:3,10
383:22,24 397:8
398:23 399:16 401:1
410:12,19 413:7,17,
20,22 414:13,20
432:3 442:6 445:8
446:6,13 452:9
477:7 491:9 504:22
508:23 520:19
548:13 557:22 558:1
563:21 566:9,19,20,
23 567:5,6 568:22
572:13 578:23
579:17,19,23 580:1,
8,13,15,21,23 589:4
598:13 603:15,17
647:9 658:13

**PARTHUM (1)**

603:2

**partial (3)**

551:14 557:12
560:6

**partially (1)**

560:13

**participating (1)**

402:6

**particular (6)**

298:6 456:2
497:15 516:15
594:12,13

**particularly (6)**

402:5 469:16
471:11 511:19
563:24 630:17

**parties (27)**

410:14 412:21
420:1 425:10 430:9
431:10 437:22
438:10 445:2,20
448:17 467:2 559:2
569:3,13 571:3,19
572:23 573:23
578:24 579:11 581:1
586:9 636:3 647:19
648:6 660:20

**parties' (3)**

655:20,22,24

**partnership (1)**

520:10

**Parts (10)**

316:23,24 371:19
399:18 440:4 505:1
576:8,12 579:3,4

**party (15)**

570:1 602:12,19
608:7 618:24 620:6,
8,12,15 622:5 624:1,
12 625:2 633:24
634:1

**pass (1)**

323:15

**passes (1)**

623:24

**passing (2)**
631:8 639:1
**Passport (6)**
384:17,21,22
389:7 392:24 393:2
**past (3)**
354:17 415:23
466:22
**patent (11)**
446:23 447:2,3
547:23 548:19,22
563:19,23 564:4,16,
19
**patents (1)**
398:4
**path (1)**
640:11
**pattern (1)**
622:24
**pause (1)**
477:4
**pay (24)**
359:1 364:9
424:21 432:22,23
462:18 463:8,9
464:9,22 470:6,20
471:13 503:11
505:13 517:9 556:4,
5 563:5 567:8 604:1
647:22 650:2 651:11
**payable (1)**
466:17
**paying (8)**
309:18 497:4
498:3 499:11 514:6,
17 515:20 556:3
**payment (6)**
466:10 471:20
505:19 524:9 627:17
653:6

**payments (3)**
519:13 596:11,12
**pays (3)**
307:2,12 425:6
**PC (1)**
547:19
**peg (1)**
633:21
**pending (3)**
389:15 517:19
627:2
**Pennsylvania (1)**
622:11
**people (32)**
297:9 324:11,23
331:5 344:19 398:18
399:19 405:1 406:9,
22,23 416:19 431:11,
12,12 444:2 546:15,
18 549:2,12 553:11
554:15 559:8 565:19
572:7 584:12,22
585:3,6 632:24
650:19 654:10
**people's (1)**
559:10
**per (16)**
338:11 390:16
459:9,11 460:19,22
462:3,4 464:10,10,
23,23 476:22 483:17
503:5 596:10
**perceived (1)**
391:21
**percent (3)**
469:8 530:7
596:10
**percentage (1)**
636:17
**perception (1)**

390:23
**per-copy (4)**
354:1 359:3
423:18,19
**perfect (1)**
320:12
**perfectly (3)**
328:12 504:19
516:19
**performance (1)**
339:2
**perhaps (5)**
292:11,13 340:15
638:13 660:10
**period (29)**
285:24 336:8
377:15 385:11
397:16 401:11
416:16,18 418:8,19
435:22 500:20 510:5,
24 513:13,22 514:18
515:21 528:9,14
529:9 532:10 533:9,
23 541:6 625:19,21
630:22 656:23
**periodically (1)**
518:14
**permanent (1)**
563:9
**permeating (1)**
444:15
**permission (3)**
484:19,24 485:3
**permit (1)**
584:18
**permits (1)**
493:23
**permitted (2)**
512:24 633:6
**perpetual (5)**

424:16 431:4
555:3,21 557:12
**perpetuity (14)**
306:8 307:14
308:2,15 309:6,7,12,
17,21 310:6 361:2
365:24 366:15
424:10
**person (6)**
333:23 389:24
390:10 391:12
432:18 452:3
**personally (3)**
304:6 378:24
387:16
**Peter (1)**
298:10
**petition (3)**
606:23 615:4,7
**phased (1)**
393:17
**PhD (1)**
396:17
**Philip (2)**
591:21 637:22
**phone (3)**
401:9,10 468:7
**phrase (1)**
645:19
**pick-up (2)**
355:5,6
**piece (3)**
411:7 415:10
419:7
**pieces (1)**
576:13
**Pierre (18)**
283:9 293:3
386:16 387:3 388:7,
18,19 474:22 476:12,

16 478:18,24 479:7
484:8,13 533:17
646:13 657:9

**Pierre's (3)**
475:6,8,14

**pile (2)**
388:11 510:14

**Pioneer (1)**
641:14

**place (6)**
325:16 414:7
464:15 465:19
500:23 502:17

**placed (1)**
647:5

**placeholder (1)**
633:23

**places (1)**
391:6

**plaintiff (11)**
617:21,22,24
618:7,10,23,24
634:17 635:19
638:17 644:3

**plaintiffs (3)**
619:9 635:1
638:14

**Plaintiffs' (7)**
282:11 288:11
289:4,13 593:20
599:16 600:13

**plaintiff's (1)**
634:18

**plan (11)**
391:9 422:16
586:8,15 587:15
611:4,13,14,18
612:12 617:12

**plans (1)**
580:4

**platform (4)**
483:7,14,17
491:13

**platforms (4)**
304:23 305:4,5
485:13

**plead (1)**
602:8

**pleadings (1)**
590:10

**please (42)**
301:22 303:4,5
319:1 361:4 375:7
378:7 383:12 386:3
388:9,16 396:9
416:13 446:12 452:1
467:5 468:2 477:24
478:3 488:4 492:14
493:9,13 508:1
518:7 526:16 529:12
535:23 538:3 546:8
548:24 549:8 570:13
583:8 590:10,13,14
594:2,2,24 600:18
634:10

**pleased (2)**
339:2 506:19

**pleasure (1)**
449:17

**pled (1)**
602:16

**plenty (1)**
542:1

**plus (3)**
483:12,12,12

**pm (2)**
450:22 451:2

**podium (2)**
586:17 640:15

**point (59)**

306:10 327:14,20
328:11,13 330:3
340:1 341:17 351:4
354:24 364:8 367:3
384:3 388:5 389:22
392:7,10 395:1
404:6 424:19 437:11
438:15 440:8,9
448:24 452:3 465:23
497:6 512:6,17
513:7 523:18 525:15
529:23 537:14
539:19 545:14 557:9
563:15 598:24
602:18 606:18
611:11 617:15
619:14 621:3 622:18,
22 625:24 626:4
634:14 635:6 638:12,
24 639:2 655:13,14,
17 656:21

**pointed (5)**
437:14 605:10
638:2 639:24 650:24

**pointing (2)**
329:2 505:16

**points (12)**
597:18 600:16,23
616:12 636:17
637:23 640:6,19
643:19 647:12 649:5,
15

**Policy (4)**
390:8 477:1 483:4
497:15

**poof (3)**
481:9 574:9 647:3

**port (11)**
330:22 331:13
332:19 333:22

334:14 335:16 338:8,
11 339:8 340:21
390:24

**portfolio (1)**
399:23

**porting (4)**
391:1 483:8,10,15

**portion (8)**
325:2,3 489:16,18
589:9,12 605:14
608:11

**ports (2)**
332:4 334:20

**pose (1)**
428:8

**posit (3)**
365:15,20,20

**position (13)**
317:2 348:10
377:8 430:16 431:2
437:12 438:17,17
524:14,22 525:1,16
638:22

**positions (3)**
312:5 338:12
447:12

**positive (1)**
655:19

**possibility (1)**
431:9

**possible (7)**
473:1 509:18
588:11 597:4 600:20
606:16,21

**possibly (1)**
627:22

**post-2003 (1)**
657:24

**post-petition (3)**
604:18 613:13

625:21

**post-trial (1)**
660:11

**pot (4)**
636:14,20 637:1,2

**potential (4)**
383:17 401:23
431:14 532:23

**potentially (1)**
423:21

**PowerPoint (5)**
325:22 326:4
328:1,3,4

**practice (36)**
414:5 418:12
419:3,14 428:9,16
429:18 430:3,15
433:16,20,21 437:17
439:19 440:15
441:18 444:11
446:20 547:16,16
548:24 552:8,10,12,
15,17 553:3,14
554:2,3,9 555:23
556:1 557:21 560:22
565:12

**practices (1)**
565:7

**precise (1)**
504:1

**predates (2)**
286:2,4

**predicate (14)**
350:15,21 351:1
361:16 362:20,21
365:7 410:3 417:20
418:9,24 419:21
428:9 633:21

**preferred (1)**
424:5

**prejudice (14)**
603:8,8,11,14
622:8 625:10 628:2
635:11 640:2,2,3
642:12,12,14

**prejudiced (2)**
628:7 642:15

**prejudicial (1)**
418:23

**premise (2)**
524:6 576:16

**premised (1)**
441:10

**prepare (1)**
609:17

**prepared (6)**
472:6 531:23
532:4,7,21 541:20

**pre-petition (6)**
605:7 614:16,17
625:19 626:18
627:19

**presence (1)**
380:8

**present (5)**
321:3 354:17
466:22 614:8 642:19

**Presentation (28)**
324:3,10,17,23
325:7,11,14,22
326:4,5,9,11,16,20
327:1,13,24 328:24
329:3,5,7,19 380:21,
23 381:6 383:16,20,
21

**presented (2)**
644:23 649:13

**preservation (1)**
604:5

**preserve (5)**

594:12,14 595:10
597:11 635:6

**preserving (1)**
601:15

**president (3)**
399:5 401:20
406:14

**press (2)**
338:5 660:1

**pressed (3)**
514:15 515:17
583:8

**pressure (1)**
384:16

**pressures (1)**
384:19

**presumably (1)**
631:10

**pretend (1)**
658:12

**pretty (7)**
300:17 346:8
555:15 563:13
576:24 578:13 582:8

**previous (10)**
317:13,21 328:11,
13 376:18 461:1
509:2 539:17,18
577:2

**previously (11)**
290:11 368:8
451:18 487:8 500:7,
8 521:2,23 572:12
589:23 639:19

**price (14)**
338:11 352:21,22
384:15,19 385:2,10
390:20 424:2,10
432:10 464:17,17,21

**price-book (1)**

352:22

**priced (1)**
387:10

**prices (4)**
384:16 469:7
498:6,6

**pricing (5)**
390:15 391:11,12
478:3 483:4

**primary (2)**
424:5 547:20

**principal (1)**
398:1

**principle (1)**
439:9

**principles (3)**
619:1 641:7 642:3

**prior (22)**
287:17 299:2,10
363:20 369:23 378:6
380:3 400:19 461:12
581:4 596:9,14
597:1 600:21 605:4,
9,20 606:23 608:15
628:8 633:17 638:12

**prioritize (1)**
338:17

**private (1)**
547:16

**probably (8)**
306:18 319:10
359:5 374:7,9 401:9
537:11 587:5

**probative (1)**
646:7

**problem (7)**
362:12 561:3
562:22 615:24 636:6,
9 641:13

**Procedure (1)**

621:20

**procedures (1)**

564:4

**proceed (7)**

282:4 442:5

545:24 587:13 588:8,

19 642:2

**proceeding (7)**

614:22,24 615:7

626:9,16,20 627:21

**proceeds (1)**

620:11

**process (4)**

494:12,15,22

604:18

**procurement (1)**

549:3

**produced (4)**

287:14,15 340:13

372:18

**produces (1)**

408:12

**product (107)**

295:20 304:21

305:1,14 308:7,9

315:23 322:18

338:21 339:1 340:5

341:3,19 347:11

359:11,18,18 360:18,

21,23 361:12 365:16,

20 366:7,11,22

368:12 370:8,8,11,

17,18,19,22,22

371:20 372:4,18,19

373:1,4 374:3 377:4

389:7 391:23,24

392:14,17 405:23

408:13 409:5,10

412:18 420:5 421:1,

6 423:23 425:9

427:18,18 430:22

445:14 452:13,18

456:9,10 462:5

463:4 464:3,9

474:10 486:6,17,20

488:17 502:23 503:4,

5,5 504:5 516:16,17

517:2,4,5,7 521:10

530:9 531:14,16,17,

23 537:3 542:9

567:8,10,11 649:22

650:1,22,23 653:18

656:9,9,13 657:2,16

**product-by-product (1)**

646:9

**production (1)**

502:20

**products (230)**

286:2,6,20 287:8

290:19 291:6 292:5,

12,14,17 293:5

294:18 295:3,17,23

296:1,5,7,12,17

297:12,17 298:3,3,

24 299:9,19,24

304:9,12 310:5,13

311:9 315:10,14,18,

19,20 316:2,3 317:6

318:1,11,23 319:6,

12,21,24 320:1

323:6 324:13 332:8,

10,13,20 333:1

338:7 346:19,21,21,

23 347:1,3,3,8,19,22

348:11,24 351:17,20

352:5,10,14,18

353:17,19,22 355:2,

3,4 356:24 357:7

358:1,3,15,16,22

359:12,20 360:5,16

361:13,15,21,21

362:9 363:14,20,22

364:4,9,15,16 365:8,

15,17,21 366:1,2,12,

16 367:19 368:2,10,

21,23 369:4 370:12

372:12 374:13 375:2,

9,22 376:7,16 377:9,

22 378:11,17 379:7,

10,12,22 380:4

384:17 385:12,15,19,

22,24 386:5,8,20

387:1 388:21 389:8

392:3,12,13,21,21,

22 393:4,11,15,24

394:2,12 402:16

413:4 422:15 425:17,

23 426:23 427:7,10,

12,16 430:11 445:16

454:1 461:3 474:17,

24 475:11 478:6

491:16 494:20

499:19 502:16 509:9,

12 514:20 515:23

518:2 521:12 524:7

529:18 533:10,10,13,

18 539:9 551:3

559:23,24 561:13,15

562:22 563:11

567:23 570:18

573:19 574:10

577:19,22 578:19

581:14 582:22

583:24 584:7,20

604:2,11,12,14,14

605:5 612:24 615:18

623:13 627:16

636:24 646:8,16

647:7 649:20 650:14

657:11

**products/projects (2)**

509:7 577:17

**product-specific (6)**

352:20 354:16

355:11 358:19 360:1,

3

**profession (1)**

406:24

**professional (1)**

396:20

**professionals (2)**

406:3,9

**professor (1)**

397:13

**profitable (4)**

330:14,16 333:20

432:8

**program (6)**

397:3,12 398:10

400:10 401:16 421:7

**programmer (1)**

397:6

**programs (5)**

397:5,16 398:2

400:10 421:20

**progress (1)**

286:13

**project (22)**

359:12,18,19

360:18,21,23 361:5,

13 365:17 366:7,12

368:11 427:21

488:17 493:21 558:6,

8,9,11 567:8,9,11

**projects (20)**

293:6 344:24

359:12,20 360:6

361:13 365:18

388:21 405:3,17

425:18 509:10,23

551:3 567:23 570:19
573:19 574:7 577:20
578:20

**project-specific (1)**
355:1

**promise (2)**
570:1 572:5

**promissory (1)**
570:3

**promotion (1)**
302:1

**pronounce (1)**
311:16

**proof (39)**
369:5,12 371:5
372:15,20,21 373:1
594:4,6,8,19 595:9
601:14 602:12
603:20 604:22
606:12 610:9 614:13,
14,15,19 615:10
620:22,23 621:8
622:6 623:1,4,23
624:12 626:21 627:3,
11,20 630:11,14
639:4 642:1

**proofs (13)**
591:12 592:20
593:11 595:14,23
596:9 597:1 601:9,
10 602:6 630:20
633:17 636:8

**proper (8)**
411:18 414:4,4
512:5 561:5 605:12
612:14 641:14

**properly (3)**
386:10 601:9
607:21

**property (13)**

398:3 403:13
404:10,17 407:6,15,
18 410:20 412:16
422:22 448:18
510:23 547:23

**proposal (7)**
467:24 468:4
469:7 472:24 473:8,
13 659:22

**proposed (11)**
285:1 325:13
527:19 597:7 605:3
606:12,14,14 608:17
639:17 640:7

**propulsion (1)**
397:4

**prosecute (3)**
607:23 616:14
620:5

**protocol (11)**
333:11,14,16
334:1,10 336:6
380:16 408:24 477:8
652:12,13

**protocols (1)**
483:1

**proud (1)**
331:23

**prove (2)**
603:7 610:15

**provide (4)**
391:17 423:1
443:14 513:23

**provided (9)**
305:19 308:24
343:23 458:3 495:16
500:16 513:12,14,21

**providing (4)**
338:15 413:1
414:10 432:17

**province (3)**
428:21 552:6,7

**provision (2)**
446:1 565:17

**provisions (5)**
307:16 426:8
428:12 448:21
557:21

**PS (1)**
302:4

**public (2)**
288:13 339:24

**publicly (1)**
547:9

**published (4)**
407:1,3,13 549:13

**pull (2)**
393:10,24

**pulled (7)**
298:9 299:15
392:11 393:14
394:10 517:3,7

**pulling (1)**
543:18

**purchased (8)**
403:18 480:13
481:3 482:10 483:24
499:17 541:1 542:21

**purchaser (1)**
403:7

**purchases (1)**
439:6

**purchasing (1)**
402:20

**pure (4)**
350:5,17 417:14
418:22

**purport (1)**
300:21

**purpose (5)**

285:20 383:11
595:8 601:15 602:7

**purposes (4)**
401:17 462:20
463:2 493:24

**pursuant (4)**
446:14 495:5
572:24 573:10

**pursue (1)**
616:7

**pursued (1)**
391:10

**pursuing (1)**
601:18

**pursuit (1)**
605:12

**purview (1)**
366:18

**push (1)**
657:3

**put (27)**
319:2 360:7
364:12 465:18 471:4
473:1,14 481:20
494:20 498:13 517:5
519:13,17 558:5,7,
11 559:1 576:13
578:15,24 585:13
600:6 606:14 610:24
612:8,10 614:6

**putting (2)**
335:5 353:8

**puzzle (5)**
479:15,21 540:5,7,
14

**puzzled (1)**
507:5

# Q

**qualifications (2)**
409:20,23
**qualified (7)**
353:22 357:14
408:3 410:21 412:2
413:5 550:5
**qualify (5)**
344:20 366:6,11
368:10 407:24
**quality (2)**
338:15 508:11
**quantification (1)**
610:12
**quarreling (2)**
515:14,15
**quarter (4)**
330:14,16 382:3
588:14
**quasi-contract (1)**
570:3
**question (158)**
291:3,10,16
294:24 295:1,6
298:20 299:2,11
305:22 306:6,16
312:18,19,23 314:20,
22 316:6,7,8,19
331:8 334:23 336:10
345:7,7,13,17 346:9
348:5 349:21 351:5,
24 353:4,12 355:17
356:1,4,12,20
357:20 358:4,7,13
359:16 360:2,11,12,
14 361:3,17 362:1,1,
22 363:1 365:7,22
367:6,7,9,23 368:1,7
373:21 374:21 375:5,
7,15,17,19,21 376:3,
6,12,15 377:19

378:2,7 379:3 383:8
386:6,13 387:12
388:16 394:13
411:23 415:7,8,17,
20 417:6,7 418:9
419:10 420:7,14
429:13,15 435:16
437:5 439:15 440:1,
13 441:4,7,13,24
442:5 446:12 448:12
472:2 475:5 480:18,
22 490:4 504:15
510:2 512:10 514:11,
14,22,24 515:2,10
517:11,18,21 518:7
524:12 525:7 531:7,
9 535:24 543:4,8,8
550:24 552:24 554:8,
12,12 560:23 561:2,
8,8,10 562:11
566:22 568:5 569:10
570:13 571:10 573:4
584:2 597:6 631:20
658:5,8
**questioning (3)**
387:22 389:4
485:21
**questions (32)**
284:4 303:2 341:8
345:19,23 346:2,3
352:3 353:9 356:5
361:8 381:8 383:2
386:14,15 434:9
443:15 447:23 467:4
508:19 522:19
525:21 526:2 528:6
541:11,16 563:16
571:7,12 588:6
593:24 597:14
**quick (3)**

282:21 381:19
640:18
**quickly (3)**
513:6 618:14
622:2
**quite (7)**
382:22,23 402:14
403:6 407:2 558:24
646:7
**quote (10)**
287:20 415:9
428:15 435:10 445:1
569:6 574:9 625:18
626:6 638:16
**quoted (3)**
390:20 639:15
656:15
**quotes (1)**
530:13
**quoting (2)**
472:12 530:9

## R

**R&D (6)**
397:16,18 398:2
401:5,16 403:8
**radar (3)**
533:1,2 657:8
**raise (3)**
600:16 638:4
639:12
**raised (4)**
413:12 420:2
523:21 600:2
**range (3)**
399:11 405:11
612:14
**ransom (1)**
563:4

**rare (1)**
334:19
**rate (6)**
596:8,11,13,17,20,
20
**rather (3)**
283:10 469:6
524:19
**ratification (1)**
620:10
**ratify (1)**
620:9
**Ratner (2)**
613:22 614:5
**Ratner's (4)**
606:24 611:3
612:10 613:6
**rattle (1)**
582:16
**Razgaitis (46)**
395:17,19,22
396:2,7 407:17
408:4,7 412:8,12
417:1 419:11 422:9
428:23 434:18,22
437:10 440:12
443:14 446:17
448:11 449:12
450:17 550:11,20
551:1,13 552:14
554:1 555:2,6,19
558:15 559:21 561:9,
11 562:5,14 563:19,
22 564:11,12 565:10
575:17,19 645:2
**Razgaitis' (5)**
413:14 442:6
557:6 561:17 563:17
**reached (1)**
444:20

**reaching (2)**

412:12 414:11

**react (1)**

503:17

**read (38)**

283:16,21 291:3
320:15 327:18
328:12,22 356:4
378:8 388:16 391:4
408:21 413:14 415:6
435:10,24 442:7,8,
10 447:11 469:16
479:20 498:14
503:12,12 542:19
553:20 562:1 565:1
571:24 577:7 606:1
626:4 638:8 645:6
655:23 656:2 658:12

**readdressed (1)**

501:6

**readily (1)**

610:13

**reading (12)**

283:11 298:16,17
336:1,2 524:6 552:4
560:17 561:5 567:12
571:20 609:8

**ready (5)**

282:4 545:24
588:7,18 659:2

**reaffirmed (1)**

290:9

**real (7)**

618:24 620:6,8,12
644:16 651:19
655:17

**realized (2)**

613:21 615:24

**really (32)**

340:3 391:3

430:23 469:21
483:13 484:22 514:9,
14 515:17 529:7
543:19 561:2 563:14
569:17,24 580:7
581:20 583:7 612:1
619:5 620:21 622:2,
15 625:13,14 628:17,
22 631:1 633:14
636:18 637:9 640:18

**realtime (8)**

291:15 295:13
472:14,15 541:5
645:18,19,20

**reargued (1)**

598:23

**reason (19)**

291:15 319:20
398:21 420:7 422:15
459:14 608:16,18,22
612:1,6 616:9
619:12,24 620:1
626:1,10 631:24
641:22

**reasonable (1)**

620:7

**reasons (14)**

288:5 339:19
439:18 551:9 555:1,
5 615:12 618:3,12,
17 623:12 625:7
629:24 641:9

**rebuttal (3)**

450:16 544:8
587:23

**rebutting (3)**

561:10,18 562:6

**recall (16)**

320:12 360:2
393:19 425:20

445:18 464:16 485:1
486:9 515:7 525:5
528:4,10 529:7
557:17 608:24
613:11

**recalled (1)**

395:9

**receive (1)**

492:3

**received (23)**

289:14 327:10
367:21 368:3 386:16,
23 406:17 426:14,15
458:17 467:20 474:3
499:18 500:3,7,9,23,
24 520:6 536:18
593:21 599:17
600:14

**receiving (2)**

516:11 530:7

**recently (3)**

457:11 476:8
520:10

**Recess (7)**

343:12 382:7,9
450:14,22 507:20
660:23

**recognize (2)**

380:22 642:11

**recognized (2)**

406:19 618:6

**recognizing (1)**

406:21

**recollection (13)**

297:22 304:1
331:4,16 336:1,11,
12,14,15 340:16,17
369:22 378:19

**reconfiguring (1)**

421:8

**reconsider (1)**

441:1

**reconstruct (1)**

650:20

**reconstructing (1)**

655:15

**Reconvened (1)**

451:2

**record (36)**

283:17 286:14
287:11,13 288:2
289:15 291:1,14
294:2 363:4 395:13
410:12 412:9 428:17
436:7 465:5 471:21,
23 490:20,24 494:4,
5 514:23 541:18
546:8 569:7 572:3
574:1 587:2 591:17
600:7 645:18 649:7,
14 652:9 654:7

**recounts (1)**

651:14

**recovery (1)**

602:9

**RECROSS-EXAMINATION (1)**

541:13

**redirect (5)**

381:8 388:2 448:9
525:22 534:1

**redistribute (1)**

310:5

**Redistribution (1)**

307:19

**reduce (1)**

425:11

**redundant (1)**

553:11

**redundantly (2)**

551:20,22

redux (2)
325:24 326:12

Reeves (83)
297:3,6,14,24
298:11,13,20 299:18
300:11 301:18
310:15,15 311:5
312:12,21 313:6
314:2,11,18,23
315:2,7 317:16
318:11,20 320:5,21
321:13,21 324:10,12,
22 336:9 342:3
344:19 348:13,14
349:5,7,9,22 350:3,7,
9,11,24 351:8 352:9
369:3,10,15 370:21
371:21 372:4,10
376:23 377:1,10,13,
21,23 378:5,10,12,
15,20 379:5,16,22
380:1,3,7 387:14,14,
16 389:5,11 390:2
391:22 392:8 393:9
394:9 543:20

Reeves' (8)
311:8,18 312:3,14
313:5 318:16 319:5
324:21

refer (11)
297:23 302:12,13
313:16 492:6 510:13
579:3,4 601:5,7
603:11

reference (16)
331:10 393:2
430:13 488:3 511:17
559:16 573:24
577:11,13 599:8
605:22 626:2,8,20,

24 628:1

referenced (2)
424:22 520:24

references (2)
445:13 519:17

referencing (1)
564:10

referred (8)
292:23 303:6
314:7 343:22 493:5
578:18 638:2 649:18

referring (11)
292:9 294:8
302:21 416:14
459:20 460:14 471:1
487:10 510:3,4 578:9

refers (4)
337:10 338:6
393:1 458:11

refile (2)
617:21 618:10

refiled (1)
618:1

reflect (4)
456:14 469:7
476:5 497:10

reflecting (1)
461:9

reflection (1)
516:9

reflects (6)
315:2 323:11
469:11 478:23
495:23 518:4

refresh (4)
340:15 439:13
463:20 529:10

refreshes (1)
297:21

regard (5)

471:20 491:7
495:6,8 660:5

regardless (3)
413:17 605:13
639:16

relate (4)
404:1 479:10
639:14 640:7

related (7)
402:14 454:15
546:13 549:1 550:11
561:9 642:1

relates (8)
467:23 468:12
479:8 481:17 616:21
620:14 639:17,22

relating (4)
389:5 431:21
599:9 606:22

relation (3)
491:5 638:19
641:24

relation-back (4)
618:4,6 619:1
642:3

relationship (9)
293:4,17,21 328:9
350:9 384:9 385:21
432:9 445:1

relatively (1)
563:9

release (1)
338:5

relevance (1)
284:19

relevant (10)
286:8 400:1
414:16 415:15,17
509:21 565:11 575:3
632:2 633:14

reliance (6)
570:2 603:15
611:8,12 616:16
617:8

relied (3)
338:24 569:21
612:19

relief (2)
601:3 602:1

relies (1)
570:1

relook (1)
582:4

rely (3)
490:23 574:15
625:5

relying (1)
565:5

remain (1)
395:20

remark (2)
479:7 528:7

remember (64)
293:13 297:14,24
298:5,10 300:16
320:16,18 321:9
335:24 336:7 339:4,
13 340:20,23 341:1,
2,19,22,24 342:2,4
384:6,7,12 389:18
394:5,7,14 405:10
436:11 441:3,11
453:6 455:24 463:11,
17 465:2,4,7,13
469:24 470:18,19
471:3 472:23 475:9
481:22,24 490:14
499:21 500:1,4
501:20 505:6 506:24
521:17 595:20

598:11 621:17
645:24 647:8 652:5
654:3

**remembering (1)**
469:17

**remembers (5)**
337:11 340:1,2,10
341:20

**remind (1)**
450:15

**removal (4)**
412:5,9 418:5
421:18

**remove (7)**
411:7 412:17
413:4 414:2 415:10
416:6 417:4

**removed (1)**
426:10

**removing (2)**
416:20 417:8

**rendered (1)**
614:6

**rendering (1)**
641:23

**renewable (2)**
433:4,9

**renewal (3)**
433:17,18 511:12

**renewals (1)**
513:24

**renewed (2)**
433:13 510:17

**renewing (3)**
465:12,13,18

**repeat (10)**
317:21 365:2
375:7 376:2 378:2,7
386:6 388:16 584:1
616:4

**repeated (1)**
391:20

**rephrase (6)**
298:19 415:19
429:14 531:8 552:20,
23

**rephrased (1)**
291:18

**replace (3)**
411:7 415:10
656:18

**replacement (2)**
412:6,10

**reply (5)**
611:9 619:21
626:5 639:11 641:20

**report (43)**
334:13 344:19
409:19,22 410:8,10,
11 411:1 412:1,5
413:14,15,18 414:13
435:8,18,19,21
440:5,6 442:19,20,
21 446:17,21 556:19,
22 561:18 565:17
567:13 571:4 572:19
574:15,24 575:1
607:1 609:18,18
611:3 612:10 613:6,
23 614:6

**reported (6)**
329:23 331:23
334:24 335:9,11
342:21

**reporter (1)**
644:16

**reporting (3)**
389:17 460:9,13

**reports (2)**
609:14 646:5

**represent (1)**
533:19

**representation (13)**
286:3,4,22 287:17,
21 292:9,14,19
344:22 347:17
426:15 533:17
630:13

**representations (2)**
287:4 512:2

**representative (2)**
338:24 444:19

**represented (3)**
347:10 626:12
627:18

**representing (3)**
294:16 295:1,16

**reproduction (1)**
508:11

**request (21)**
305:2 407:24
479:8 482:13 485:12
486:3 525:3 570:18
601:4,12,12 602:1,
18,19 603:18 612:9
615:10,13 616:24
617:17 642:7

**requesting (1)**
605:15

**requests (3)**
601:2 602:13
603:5

**require (8)**
445:2 446:10
502:24 504:2,6
530:24 532:1 649:22

**required (7)**
356:22 482:24
529:8,19 571:11
617:20 618:1

**requirement (4)**
471:12 529:18
647:6 656:1

**requirements (3)**
338:17 502:15,15

**requires (3)**
477:1 478:8
539:12

**Research (127)**
286:3,5,7,20
290:19,22 291:6
292:5,7 294:19
295:3,18,20,23
296:2,8,12,18,19
298:2,2,23 303:13
304:13,18 305:1
318:23 319:22
325:15,17,23 327:13,
15 331:21 333:7,15
334:10,16,21 336:5
349:1 363:14 369:11
370:16,23 371:11,14
372:12 373:7,12
374:4,13 375:2,10,
23 376:8,17 377:4
379:1,1,7 380:15
386:21 387:2 390:12
392:4 394:11 398:1
416:6,21 417:3,8
418:3,14 419:8,12,
15 420:15,18 425:14,
21 430:7 433:16
444:20 445:9,17,22
452:4 459:10 460:21
461:2 464:16 465:12
466:14,18 477:2,24
478:6 495:17 519:6
520:12,22 523:19
524:17 525:14 539:9
566:10 567:1,10

570:7,17 581:16
582:22 583:24 584:8,
21 594:19 601:5
626:11 627:11,17,19
630:6,8,9,9 657:11

**Research's (8)**
408:8 445:4 478:3,
8 539:7,12 562:15
627:16

**reservation (2)**
594:18 606:19

**reserve (1)**
643:21

**reserves (1)**
594:7

**resisted (1)**
384:18

**respect (35)**
290:17 292:4,10
305:14 308:22 309:8
311:22 313:4 316:21
352:4 354:12 356:16
357:6,9 359:17,21
364:4 368:20 372:24
414:1 465:16 474:5
490:24 524:22
536:20 564:10
597:13 600:3 602:23
614:2 616:17,23
617:11 622:8 648:15

**respond (2)**
362:24 550:12

**responded (3)**
502:2 571:6 639:3

**responding (2)**
523:12 535:17

**response (22)**
302:4 303:1 325:2,
6 349:3 350:3,12
352:2,12 389:4

440:12 442:7 448:11
478:21,24 479:2,12
507:3 508:20 619:14
623:18 637:24

**responsibilities (2)**
398:13 399:12

**responsibility (5)**
299:18,23 312:6
377:10 547:20

**responsible (10)**
297:10,15 311:8
318:12 322:18
324:13 369:3 370:7
378:17 379:13

**responsive (1)**
356:1

**rest (6)**
289:23 318:16,17
510:14 580:10 617:1

**restart (1)**
550:24

**restate (1)**
575:21

**rests (1)**
638:15

**result (3)**
414:17 438:7
480:3

**resworn (1)**
290:8

**retain (1)**
558:17

**rethink (1)**
581:21

**retire (1)**
482:3

**retired (10)**
457:8,17,19 458:2,
6 461:20 472:22
534:21,24 536:6

**retracted (1)**
532:22

**returned (2)**
426:12 445:23

**returning (2)**
397:2 446:2

**reuse (4)**
409:8,13,15 464:1

**re-use' (1)**
462:9

**revenue (2)**
328:17,19

**reverse (1)**
584:24

**review (10)**
283:13 284:10
287:23 288:2 411:2
431:20 550:10 569:7
638:21 659:15

**reviewed (3)**
444:17 502:5
583:12

**reviewing (1)**
288:9

**revise (1)**
372:22

**Revised (2)**
469:5 599:24

**revision (1)**
525:4

**revive (1)**
384:9

**rewrite (1)**
647:3

**RI (5)**
502:17 503:2,6
524:7,10

**Richard (2)**
395:16,22

**Richardson (5)**

347:24 348:8
487:24 488:14
492:22

**Rick (2)**
508:24 576:24

**right (230)**
282:9 283:22
284:17,21 288:10,18
289:2 290:1,6
291:22,24 292:3,24
295:15 305:6,11,15
308:14,18,19,20,24
309:5,17,21,21
310:4,8 312:19,23
313:2,9 315:11
317:3,11,24 323:17
326:12 327:18
328:16 337:24
341:13 342:16 343:3,
14 345:22 346:5,6
348:3 349:1 359:10
365:11 366:15 381:9
382:6,19,23,23
383:3,13 385:13
391:2,12 393:5
394:19,19 395:6,18
396:1 408:2 411:1
415:1,24 424:9,10,
17 429:16 433:24
434:2,19 435:3,21
438:5,23 439:7,15,
21 440:1,7,10,17,19,
23 441:4,6,9,16
443:4 447:20 448:14
449:11 450:5,10,13,
20 451:4,9 455:21
456:16 457:23 460:7
467:17 471:14,23
475:13 486:12
489:17 490:4 494:18

504:11 507:14,24
508:16 511:7 512:7
517:7 518:15 522:3
525:22,23 526:3,22
527:4,12 528:21
530:5,6 531:10
532:8 537:15 538:1
543:21 544:11,23,24
545:6,23 550:4
553:1 554:24 557:2
558:3 561:20 562:8,
10 565:23 566:10,13,
14,18 567:14 568:6,
7,21,24 571:20,21
572:14 574:19
575:18 576:18 579:5,
17,21 581:10,17
583:15 585:17,24
587:17,19 588:4,23
590:5 591:8 592:4
593:17 594:7,21
597:16,24 598:6,10
599:15 600:9,12
601:20 607:12,24
614:20 619:22
621:16 624:5,12,21
625:8 628:9 629:7
631:15 633:24 634:1
635:22 640:11
641:10,17 642:19
643:6,16 644:3
646:11 647:7 648:19
651:22 652:22
653:16 654:21
658:24 659:3,13
660:21

**rightfully (1)**
366:22

**Rights (62)**
307:19 420:24

422:8 423:2,8,10,16
425:23 426:19,24
427:3 430:2,5,6
437:19,20 438:11
442:2 443:3 448:18
449:3,6 504:10,11,
24 505:2,18 523:19
524:6,8,23 525:11
551:15,18 553:5,9
554:6 555:13 558:17
562:2 567:24 574:9,
12 581:13,22,24
582:4,21 583:13,21,
23 584:5,7 594:15
597:11 604:5 635:12
645:8 647:4 652:3
653:23 654:22

**risk (3)**
425:10,11 432:23

**River (1)**
403:18

**road (1)**
384:12

**Rockefeller (1)**
407:13

**role (1)**
327:17

**roll (1)**
609:10

**rolled (2)**
517:2 609:11

**rolling (1)**
609:12

**room (3)**
381:21 509:5
577:6

**round (2)**
439:5,5

**route (1)**
640:9

**row (1)**
330:16

**royalties (20)**
305:18 309:16,19
354:1 359:4 364:11
402:5 424:12,21
466:22 509:8 556:3,
4 567:9 572:24
573:9,10 577:18
627:17 631:5

**royalties' (1)**
521:2

**royalty (84)**
305:19 306:3,5,7
307:1,11,12 308:5,6,
8,13 309:4,11,16
310:10 343:24
344:21 353:23
357:11,15 359:2,2,5,
7,23 361:2 362:8
365:24 366:1,16
367:21 368:4 390:17
423:18,19,19 424:7,
8,8,13,19 425:1,3,5
426:22 430:10,24
438:20 439:22
440:16,18 441:6,9,
11,12,16,24 442:3,
16 443:10,10 452:15
454:20 460:16 464:4
466:11 502:21 509:3,
11 530:10,11 555:21
556:2,10 567:22
568:14 570:8,20
573:11 577:4,9,21
578:21 631:5

**royalty-free (3)**
363:19 440:10
533:10

**Rule (12)**

556:19 559:6
619:2,10,11 620:3,3,
3,15,18 641:23
645:11

**Ruled (2)**
544:23 613:13

**Rules (1)**
621:19

**run (3)**
618:19 619:3
622:1

**running (3)**
409:12 423:18
520:23

**run-time (1)**
462:14

**S**

**Sable (1)**
355:7

**sacrifice (1)**
574:12

**Safe (1)**
660:22

**safely (1)**
397:2

**SAIC (2)**
403:7,10

**said (182)**
286:17,23 287:7
291:16 292:4,13
293:4 294:4,20,20,
21 295:11,12,15
301:1,3 303:3
307:20 311:20
318:19 319:7,18
320:13 321:15 322:4
328:13,23 329:3,4,8
333:4,18 342:2

347:18 349:22 350:3
352:11 354:17,18
355:8 361:20 362:24
363:6 364:3,10
365:2 370:24 372:13
376:10,19 377:6,22
379:22 380:2 383:9
387:3,4,6 393:23
404:15 405:10 406:6
410:13 414:12
435:24 436:13,14
438:3,17,19 439:16
441:12 442:18,18
445:6 457:14,20,24
461:10 471:4,7
474:23 475:6,9
482:3 486:23 497:3
499:3 501:17 504:2
505:20 506:9,21
512:10 514:13 515:9,
16 520:4 521:5
528:9,21 529:5
530:20 531:5,22
533:2,6,22 536:2,17
537:19 538:1 539:16
542:18,19,24 554:4
555:9,19 557:20,24
560:13,13 562:14
564:15 565:13,16
566:15,18 567:18
568:16 572:3 576:10
582:19 583:2,12,18
584:14 592:6 602:5
609:4 610:11 615:12
617:24 619:18
623:12 624:17 626:8,
23 632:18 634:17
635:2,3 636:1
639:12 641:12,21
645:2 646:3,20

648:7,8 650:21
651:7 652:1,11,17,
20,21,23 653:1,13,
17,21,23 654:4
655:14 656:10,11,16,
18,23

**sale (7)**
367:2,3 403:7
416:4 417:3 604:18
615:8

**sales (3)**
384:11 468:7
613:21

**salesman (1)**
579:9

**salvage (1)**
391:8

**same (102)**
308:24 317:8,13
320:19 321:18
322:24 336:1 339:12,
19 342:20 349:10,11
351:11 366:9 377:19
383:16 384:15,21
403:19 418:17 453:7,
9 455:12 458:11
459:14 464:14,17,18,
20 478:11 481:18
483:22 492:20
501:10 508:7 510:18
511:2,12 512:12,14
513:10,20 514:11,24
515:2 521:10 522:19
526:9 536:14 539:14,
14 558:6 572:16,20,
23 573:16,17,18,19
574:7,7 590:3
594:17 595:13 605:4,
5,5,6,8 606:3,8
615:5,6,14,15,16,16,

17 616:16,21 621:22
622:9,18,23 623:13,
13,14,14,15 625:20
627:1 632:17,21
638:20 639:21 649:4
650:17 651:1,17
652:10 653:15 660:8

**San (2)**
331:7 547:7

**Santa (4)**
303:17 311:24
345:9 346:11

**satisfaction (1)**
466:20

**satisfied (2)**
399:18 602:23

**satisfies (1)**
639:19

**satisfy (3)**
603:5 634:13
635:9

**Saturn (1)**
397:2

**save (3)**
587:20,22 630:7

**saved (1)**
625:12

**saw (9)**
331:12 348:19
430:13 444:22
461:10 471:18
521:11 532:13
656:14

**saying (63)**
308:21 322:24
324:8,20 331:22
332:18,24 333:10,24
334:13,17 340:2
341:1,18,22 351:2
363:8,13,14 364:3

371:15 392:7 413:2,
3 438:15 462:13,13
463:15 465:16
471:16 477:17
481:24 484:8 497:9
498:2 503:9 504:1,5
506:6 517:4 521:6,
15 524:21,24 525:9
551:11,14 556:14
561:22 567:24
573:14 582:10
583:19 584:3 606:17
622:14 623:22 630:6
631:8 635:13 654:20,
22 657:5

**scenario (1)**
493:16

**Schedule (489)**
287:9 289:23
291:4 292:3,10,12,
15 293:5 294:23
302:12,12,14,23
303:7 314:4,7,12
315:10,13,16 316:9,
11,14,16,18,21,23
317:3,4,5,7,7,10,12,
12,17,18,19,23
318:8 319:4 320:2
323:5 344:3,8 345:4,
11 346:15 348:3,14,
17,24 349:23 350:1,
8,24 351:1 352:4,10,
20 354:4,6,10,14,16
355:1 356:8,10,15,
18 357:7,8 358:18,
19 359:10,11,24
360:2,4,5,8,18,23
361:1,10,11 362:3,6,
10,11,13,15,16,21
363:10,11,17 364:5,

12,13,18 365:9,17,
22,23 366:6,7,9,14
367:20,22 368:3,5
371:23 372:1 379:8
385:24 386:4,9,19
387:1 388:20 425:12,
13,17,24 426:3,10,
24 427:17,23,24
428:4 429:21 430:6,
12 431:22 437:11
439:19 440:11,21
441:18,21 444:24
445:7,8,15 446:4,5,6,
7,9,12,13 448:21
449:2 452:6,8,13,14
453:17 454:5,14,18,
23 455:3,4,9,13,15,
20 456:3,11 457:5,8,
15,15 458:2,3,6,7
459:2 460:14,24
461:11,19,22 462:3,
8 463:6,9,24 465:24
468:16 469:5,6
470:15 471:5,15,17
472:19,22 473:2,8
474:8,13,18,19
475:10,20,21 478:16
480:4,6,15 481:5,9,
15,21 482:1,1,4,7,12
484:2 485:5,19
486:19 487:9,11,15
488:4,5,6,7,7 489:4,
5,6,7,8,15,20 490:1,
4,8,9 491:4,6,8,17,
23 492:20 493:2
495:10,12,18,23
496:6,15 497:2,7
498:2,5,7,14,15,16,
20,21 499:24 500:20
501:2,5,5,7,10

504:24 505:7 506:3,
18,20,23 510:5,11,
19 511:3,7,16,17
512:12,18,20,24
513:11,13,20,22
517:12 519:14
520:24 521:1,7,11,
14,16,20,22 522:1,5,
6,8,12,15,23 527:15,
18,19 530:19 531:1,
23 532:5,7,21,22
533:1,11,14,18
534:14,18,21 535:1,
7,8 536:3,6 537:1,8,
8,12,18,20,21,23
538:1,23 539:3,16,
21 540:3 541:3,7,21
542:10,18,23 550:11
551:2,10 553:9,16,
20 554:2,5 555:2,10,
13,16 557:11,17
558:12,21 559:18,22,
24 560:14,18 561:6,
12,15 562:15 565:12,
18 566:6,8,14,19,23
567:5,11,15,20
568:6,15,24 570:19,
21 571:20,21 572:8,
11,13,21 573:8,16
574:8 576:17,20,20
577:11,12,14 578:3,
9,12 579:1,4,19,20,
24 580:8,15,23
581:5,10 583:14,20
584:4 586:10 587:6
628:21 629:1,10
636:21,22,23 637:1
640:19,21 645:3,5,7
646:11,17 647:3,9,9,
11,15,19,21 650:15

651:2,5,6,7,16 652:4,
7,18,20,22,24 653:2,
3,5,9,11,14,24 654:9,
17,18,23 655:15
656:1,5,7,8,17 657:1,
4,6,15,20 658:7,11
659:4

**scheduled (4)**
385:12,15,18
386:9

**schedules (64)**
317:1 343:22,23
347:13 354:20
357:10 358:24
371:17 430:12
445:14 479:8 481:20
487:14,17,23 488:2
489:3 490:12,21
495:2,5,8 498:12
499:3,11 500:15
505:6 511:20 517:22
518:1 519:11 528:19
529:19 550:14 555:7,
8,8,11,15 557:22
558:7 559:17 566:21
567:16,21 568:10,13
569:9 570:7,18
571:22 572:6,15,18,
18,24 573:15,24
574:4,5 646:16
647:5,7 651:11

**scholarly (1)**
446:21

**School (2)**
546:22 547:3

**schools (1)**
549:18

**science (1)**
546:19

**sciences (1)**

396:18

**scientist (1)**
398:2

**scope (15)**
310:13 361:19
363:2 409:19,20,23
410:8,10,21 411:12,
24 437:19 574:23
606:12,13

**screen (2)**
307:3 460:5

**search (2)**
480:3 609:3

**seated (6)**
282:2 343:14
382:11 396:2 451:4
507:22

**second (27)**
300:20 330:1,3,3,
16,19 338:6 375:24
441:11 471:12 479:4
482:22 483:3,7,21
530:1 567:6 568:22
576:22 577:8 578:16
601:12 608:10 617:8
619:6 620:1 638:11

**second-chair (2)**
398:24 399:9

**seconds (2)**
640:16 641:6

**secret (10)**
601:19 605:12,23
607:22 616:5,8
631:9 632:6,8,11

**secrets (4)**
595:6 607:17,18
632:7

**section (3)**
307:18 482:21
549:19

**seeing (2)**

472:23 658:21

**seek (1)**

638:17

**seeking (4)**

477:23 608:16

611:12 616:10

**seem (1)**

521:5

**seemed (2)**

582:8 638:24

**seems (5)**

284:11 480:9

540:11,17,22

**selected (1)**

397:7

**Seligson (1)**

313:18

**sell (12)**

353:15 366:15

403:5 422:14 424:11,

23,24 432:7,8,13

444:6 604:9

**seller (2)**

404:8 549:19

**selling (7)**

400:6 421:6

581:14 582:21

583:23 584:7,20

**Semcrude (1)**

606:6

**send (16)**

330:18 391:12

464:5 475:23 480:2

484:19 490:17

496:23 497:18,19,20

509:20,21 660:5,10,

15

**sending (6)**

397:1 490:15

**492:6 494:8 654:20**

660:9

**sends (3)**

524:4 579:10

646:12

**senior (3)**

310:15,17,18

**sense (12)**

404:16 419:5

431:5,6 439:20

440:17 555:10,16

562:16 587:6 629:10

631:10

**sent (30)**

317:15 348:19

459:21 460:2 466:9

485:2 487:5 492:1

494:5 495:13 496:21

497:2,3,21 520:19

523:7,9,13,14 524:1

525:4 529:17 530:18

569:6 619:12 654:12,

13 656:7,8,17

**sentence (15)**

330:21 338:23

480:11 491:24 497:7

502:23 525:12 535:3

536:12 540:14 577:8

578:8,17 588:15

631:8

**sentences (2)**

523:22,23

**separate (8)**

370:12 385:22

421:15 461:2 482:23

486:23 601:3 614:12

**separated (1)**

530:3

**separately (2)**

599:20 602:24

**September (3)**

321:1 358:17

361:6

**sequence (1)**

657:18

**series (1)**

384:17

**serious (1)**

423:20

**seriously (1)**

334:12

**served (1)**

609:19

**server (2)**

489:9 490:5

**servers (1)**

609:3

**service (13)**

338:16 431:21,24

432:5,9 433:4,8,12,

19 501:6 510:23

513:24 647:16

**Services (3)**

477:1 488:17,18

**SESSION (1)**

451:1

**set (21)**

310:11 316:1,3

324:10,22 325:9

363:4 466:5,24

500:15 501:2 516:10

523:3 524:7 545:20,

21 565:6 602:9

606:4,9 651:16

**setback (1)**

637:11

**setbacks (1)**

637:5

**sets (2)**

315:18,19

**seven (2)**

382:3,7

**several (10)**

311:23 320:20

387:22 424:22

437:24 549:18 564:1

610:3 645:19,20

**shall (4)**

551:12 560:7,9

568:1

**share (1)**

592:2

**sheets (2)**

399:14 401:23

**shift (1)**

613:15

**shipment (4)**

339:8 495:24

496:5,15

**shipments (2)**

495:19 497:9

**shipped (7)**

292:15 474:23,24

475:3,7 495:3 633:3

**shipping (2)**

291:5 292:18

**shocked (1)**

613:1

**shop (1)**

405:20

**short (2)**

357:17 509:22

**shorter (1)**

424:16

**shorthand (1)**

630:5

**shortly (4)**

294:22 319:3

329:18 656:13

**show (25)**

314:15 323:11
325:21 331:2,9,14
339:13 343:19
384:12 387:24
452:19 456:4 465:5
479:3 490:20,24
507:2 518:3 529:4
574:5 610:2 612:7
635:10,11 654:17

**showed (5)**
366:21 457:11
519:7 534:6 612:23

**showing (4)**
458:19 460:1
612:15 642:8

**shown (9)**
362:20 366:5,11
463:19 476:4 501:23
511:22 648:11 658:8

**shows (7)**
320:7,24 321:6
322:1,6 511:22
612:21

**side (4)**
310:16,23 606:11
640:1

**sign (16)**
452:14 470:22
474:13,18 475:20,21
501:9 506:20 523:10
528:18 530:19 531:1
533:3 555:11 657:14,
15

**signator (2)**
298:10 405:5

**signature (1)**
523:15

**signed (26)**
302:13 315:13
316:9,11,15,16

348:17 361:11 390:1
455:21,22 456:3,13
460:23 485:18
487:14 495:10 496:6
505:12 531:24 532:2
567:10 569:3,12
590:17 653:3

**significance (2)**
421:10,11

**significant (1)**
422:3

**signing (3)**
452:5 487:15
529:8

**Simi (6)**
344:5,10,16 345:1
346:12 488:24

**similar (11)**
401:19 402:11
405:23 549:15
606:19 623:10,16
627:2,10,19 639:18

**simple (3)**
346:9 551:11
553:7

**simply (3)**
553:8 554:20
647:13

**single (4)**
383:15 425:11
497:23 623:18

**sit (3)**
413:19 496:24
499:21

**site (1)**
383:24

**situation (11)**
411:10 414:15
415:13 417:18
422:10 427:4 431:17

499:15 579:8 618:8
632:22

**situations (1)**
621:24

**six (6)**
406:7,11 521:23
547:5 630:22 635:15

**skills (1)**
560:15

**skip (2)**
540:9 576:22

**sleep (1)**
635:12

**slept (1)**
298:8

**slide (2)**
328:1 383:18

**slightly (1)**
404:14

**small (3)**
400:6 402:13
547:17

**small- (1)**
338:13

**smily (2)**
389:19 479:22

**SMU (1)**
396:18

**SNMP (185)**
286:3,5,6,20
290:19,22 291:6
292:5,7 294:18
295:3,18,20,23
296:2,2,7,12,17,19
298:2,2,23 303:13
304:13,17 305:1
307:2,12 318:23
319:21 325:15,16
327:13,15 331:18,21,
21 333:5,6,7,7,9,11,

14,14,15,23 334:1,5,
10,10,15,16,21
336:5 349:1 354:23
363:14 369:11
370:16,22 371:11,14
372:7,12 373:6,12
374:4,13 375:2,10,
22 376:7,16 377:4
378:24 379:1,7
380:15,16 386:20
387:2 390:12 392:3
394:10 408:8,24
416:6,21 417:3,8
418:3,13 419:8,12,
15,23 420:15,18
425:21 426:12,12
430:7 433:16 435:5
444:20 445:4,9,17,
21 449:4 452:4
459:9 460:20,23
461:2 462:5 464:5,8,
16 465:12 466:14,18,
19,21,23 468:1
477:2,23 478:3,5,8
483:1 495:16 503:2
510:24 519:6 520:11,
22 523:19 524:7,7,
10,17 525:14 533:22
534:6 539:6,9,12
562:14 563:6,14
566:9,24 567:10
569:8,21 570:6,17
572:4,22 581:16
594:19 595:5 601:4
604:9 612:15 613:4
626:11 627:11,16,17,
19 630:6,7,8,8,9
639:2,3 649:10,18
657:11

**SNMP-based (1)**

325:18

**SNMP-Bay (1)**
372:17

**SNMPRI (5)**
457:7 472:21
534:20 536:5 601:6

**SNMPRI's (1)**
409:2

**SNMP's (2)**
635:17 637:24

**so-called (1)**
385:23

**societies (1)**
406:2

**Society (4)**
406:5,8,16,18

**software (250)**
286:1,7,21 290:19,
22 291:6,18 292:5,7
294:7,11,12,19
295:4,18,21,24
296:2,3,8,13,18,19
297:11,16 298:24
299:8 304:13,18
309:6,9 310:24
315:12,15 316:21
317:4,11,24 318:23
319:6,22 320:2
323:7 332:2,5,6,11,
14,21 333:1,12,15
334:16 335:20 336:5
349:1 368:23 370:16,
23 371:11,14,19
372:2,5,7,12,17
373:7,12,19 374:5,
13 375:2,10,23
376:8,17 377:5
379:7 380:16 385:6,
8 386:21 389:6
391:23 392:4,10,12

393:5,11,14,24
394:11 399:24 400:3,
5 401:8,12,13,14,17
402:9,13,16,21
405:2 408:8 409:2,9,
13 410:3,18 411:8
412:6,18 413:4
414:2 415:11 416:6,
21,23 417:5,9,11
418:3,5,14 419:7,8,
12,16 420:4,15,19
421:14,19,23 423:6
424:3 426:9,14,17
431:21,22,24 432:3,
5,7,15,16 433:3,8,12,
18,19 445:5,17,22
446:3 454:8,24
455:7,11 466:23,24
475:22 477:2,14,18,
24 488:18 489:3,4
490:1 491:16 493:18,
21,24 500:11,16
501:6 503:3 504:12
510:18,22,24 511:2,
3,7 512:11,12,14,23
513:10,20,23 514:1,
8,19 515:22 516:18
517:5,8 546:13,15
547:9,10,11,11
548:2,9,19,21 549:5,
10,15,24 553:6,15
554:18 555:9 556:12
563:23 564:5,14,17,
22,23,24 565:3
573:17,18 574:7
604:12,15 605:5
606:23 613:1 615:6,
16 623:13 627:16
647:16 650:24
651:13 652:11

653:18 654:20
657:12,22

**Solaris (5)**
490:3,6 498:18
511:1 520:23

**sold (11)**
330:23 331:13
332:19 335:16 373:6
374:4 427:20 432:15
487:7 604:14 636:16

**sole (2)**
419:10 616:9

**solely (2)**
566:22 573:23

**solicit (1)**
575:1

**solved (3)**
479:17,22 540:8

**somebody (1)**
642:18

**someone (6)**
333:10 350:18
354:23 368:16
431:18 611:12

**something (52)**
286:12 304:18
308:14 319:7,18,20
342:11 345:20
355:12 358:7 361:22
375:4 383:9 400:2
405:20 413:24
417:13,17,21 418:17
421:14,22 425:3
433:23 439:1 441:19
442:15 477:14
514:19 515:22
519:21 521:5 528:7
540:1 547:6 553:8
558:16,20 561:17
563:1 567:18 571:8

573:9 579:14 607:7
633:22 635:14 639:9
649:18 653:19
655:16 659:20

**sometimes (2)**
432:19 472:11

**somewhere (1)**
405:9

**Sons (1)**
407:4

**soon (1)**
472:6

**sorry (42)**
282:16 290:9
307:2,3 314:20
337:2 349:6 382:21
388:15 411:22
444:19 448:3 451:23
455:2,3 456:18
468:5 473:4 483:13
488:2 493:8 504:20
505:14 518:7,23
526:23 534:9 538:5
570:12 574:18 582:2
583:13 584:1 593:8
608:3 609:19 635:13
654:2,3,12,13,16

**sort (5)**
349:13,13 416:17
426:16 528:12

**sound (1)**
569:17

**sounds (2)**
567:12,13

**source (50)**
286:11,12 294:7,
12 305:7,11,16
325:17 414:22,23
433:22 462:19 463:1
470:12 479:13

484:15,20 495:3,4,
12,19,24 496:21,24
497:4,12,20 498:4
499:18 500:3 501:1
502:24 503:1,10,14,
16,18,20 504:2,6
506:16 511:1 564:12
595:11 597:4,12
649:23,23 650:5
652:2

**sources (14)**
469:6,7 492:2,3
496:13 498:8,16,18,
19,20,22,22,24
520:23

**Southwood (84)**
298:6 320:23
388:8 391:14 449:22
451:8,10,11,17,22
452:3 453:3 454:16
456:19 458:19 459:7,
9,22 460:1,10,20
461:16 468:10
470:24 473:18 476:2,
10 483:20 485:21
486:7 487:13,22
490:12 491:3 493:9
495:15 501:22 505:6
507:2,24 508:18
510:16,20 512:10
514:10 515:12 517:3
519:20,24 520:20
526:6,16 527:13
529:16 530:17
531:21 532:18
538:19 539:24
541:15 543:9,16,22
544:5 569:5 576:3,
16 579:22 580:3,12,
20 581:4 645:15

646:3,12 647:14
648:1 651:4 652:1,
17 653:10 656:7,23
657:14

**Southwood's (2)**
508:10 579:2

**speak (6)**
381:5 395:1 457:4
494:4 534:13 659:19

**speaking (4)**
306:11 371:13,16
548:20

**speaks (1)**
535:10

**specializing (1)**
546:12

**specific (17)**
292:17 355:8
363:19 407:24 408:1
412:20 413:17
444:10 445:14 446:4
554:8 556:20 567:7
582:13 605:22
616:11 617:9

**specifically (18)**
294:11 355:21
358:19 361:20,22
364:24 426:9 452:18
556:11,14 583:12
603:14 606:2 610:5
619:18 620:4 624:19
646:15

**specificity (2)**
423:10,12

**specified (15)**
344:4 346:16
359:11,17 360:17,22
361:12 365:16 366:6,
11 368:11 488:13,17,
22 511:3

**speculate (3)**
349:4 418:16
419:4

**speculating (1)**
582:1

**speculation (15)**
326:23,24 330:19
350:5,17 351:12
374:15 390:14 391:3,
15 415:14 417:12,14,
19 418:23

**speech (1)**
472:2

**speeches (1)**
345:20

**spell (1)**
438:11

**spelling (1)**
384:2

**spend (5)**
283:11 434:17,18
519:10 548:4

**spent (2)**
528:23 633:13

**spin (1)**
649:11

**spoke (1)**
378:19

**spreadsheet (8)**
452:20 453:4,13
454:4 455:2,17
480:2 503:10

**spring (3)**
322:15 375:9
400:18

**SR (1)**
395:22

**SRI (2)**
390:12,12

**SSA (18)**

464:14 465:1,8,13,
18 466:5 500:15
501:2,10 511:12
512:11,22 519:13
651:15,18,20 657:23,
24

**SSAs (5)**
510:17 511:22
517:13 518:4 654:13

**stack (4)**
392:23 478:8
539:7,12

**stake (1)**
583:17

**stand (16)**
290:5 322:12
323:2 378:6 395:17,
19 450:13 451:8
526:14 543:10
564:15 588:1,19
589:2 605:10 660:23

**standalone (1)**
446:5

**standard (12)**
422:21 432:2
443:24 602:3,12,21
603:5 606:1 607:5
622:8 639:15 642:14

**standards (4)**
516:20 615:14
621:7 648:10

**standing (13)**
395:20 615:24
616:7,13 617:4,5,24
620:14 633:19,23
634:18,22 640:13

**standpoint (1)**
618:13

**stands (6)**
404:2,4,5 441:22

562:11,11

**Stark (5)**

599:9 626:7,23

627:24 630:3

**start (14)**

310:14 343:20

367:4 396:21 399:24

476:15 484:10

510:21 519:22

529:13 540:4 570:16

609:20 649:17

**started (7)**

352:24 505:8

547:22 548:1 609:10

649:5 657:4

**starting (1)**

495:17

**starts (4)**

479:13 540:15

595:5 604:9

**start-up (2)**

547:13 554:18

**state (11)**

316:8,10 317:14

328:8 330:6 368:20

396:19 479:15 481:9

483:6 546:8

**stated (15)**

288:6 320:19

327:23 329:6 369:4

370:4 377:2 430:5

435:9 464:10,23

470:17 481:6 506:3

559:21

**statement (19)**

291:19 338:19

339:24 364:21 389:1

483:22 486:16

587:16 588:18 595:3

599:24 600:1,4

611:5 612:5,9,12

619:15 655:19

**statements (6)**

339:18 363:3

590:21 591:15

643:11 659:5

**states (12)**

307:11 328:3,4

338:10 369:14

466:15 476:22

477:22 478:5 486:2

558:15 641:19

**stating (2)**

464:5 524:22

**statute (1)**

634:20

**stay (2)**

353:9 558:6

**staying (3)**

402:3 474:9 537:2

**step (3)**

394:23 490:11

543:22

**steps (1)**

598:3

**still (22)**

293:7 313:10

319:5 341:10 388:22

392:3 394:1 396:18

448:23 473:19 476:3

477:12 506:5 515:13

524:9 542:8,17

606:24 616:20 634:2

639:22 657:17

**stolen (1)**

637:7

**Stone (1)**

610:7

**stop (6)**

304:19 346:18

421:6 475:22 536:6,8

**stopped (2)**

321:5 322:5

**story (1)**

649:11

**straddled (1)**

615:3

**straight (8)**

291:14 362:2,17

363:5 407:8 527:14

541:18 624:18

**strategy (1)**

431:11

**stretch (2)**

451:5 527:11

**stretched (1)**

436:22

**strike (6)**

294:7,13 355:16,

20 556:17,24

**striking (1)**

630:19

**strong (1)**

392:20

**strongly (2)**

557:9 645:12

**struck (3)**

441:7 520:10

579:11

**structured (1)**

550:18

**structures (1)**

558:5

**stuck (2)**

421:5 650:19

**studied (2)**

443:1 522:12

**study (2)**

374:8 376:20

**stuff (8)**

563:5 570:4

572:16,20,23 573:16

585:1 642:5

**subject (14)**

301:18 324:2,16

329:17 350:16 381:8

408:13 413:6 424:5

438:9 460:15 502:16

525:21 618:21

**submissions (1)**

660:11

**submit (5)**

283:11 288:19

289:16 609:14 620:2

**submitted (6)**

288:14 369:5

378:10 435:9 466:16

643:12

**submitting (1)**

285:1

**subparagraph (1)**

567:13

**subroutine (1)**

421:15

**subsequent (3)**

430:5 580:11,17

**substantial (1)**

613:4

**substantially (6)**

548:16 582:15

585:11 605:3 623:10,

16

**substitute (4)**

617:22 618:23

622:15 623:24

**substituted (3)**

620:9,15 625:3

**substituting (3)**

624:3,4,6

**substitution (7)**

620:10 622:5,12,
22 624:14,18 632:19

**succeed (2)**
633:5 635:4

**success (2)**
327:17 384:13

**successful (6)**
335:1,2,6,8
549:16,17

**Succession (1)**
488:16

**suffer (1)**
637:10

**sufficient (2)**
450:12 605:11

**suggest (3)**
283:10 350:21
638:12

**suggesting (2)**
552:14 638:4

**suggestion (2)**
283:19 428:23

**suggests (2)**
326:15 563:22

**suit (1)**
618:1

**suite (1)**
454:1

**sum (1)**
425:8

**summarize (1)**
644:24

**summarized (1)**
521:18

**summary (1)**
613:14

**supplement (1)**
588:6

**supplier (2)**
325:17 562:24

**suppliers (2)**
563:1,3

**supplies (1)**
380:15

**support (11)**
369:11 432:17
447:7 477:2,24
516:12 517:10
563:10 638:22 640:3
645:3

**supported (1)**
448:14

**supports (5)**
437:12,15 438:16
557:11 657:19

**suppose (2)**
374:7 476:4

**supposed (6)**
357:17,19 375:6
535:17 560:12
584:11

**Supreme (1)**
641:19

**sure (32)**
286:16 294:4
298:16 300:15,23
306:17 310:17
320:11 352:5 360:13
367:16 402:4 426:17
436:24 438:24
443:15 444:5 464:21
469:15,23 496:10
500:1 506:12 516:6
529:1 560:21 566:7
570:14 592:6 607:9
654:18 659:21

**surprise (2)**
581:20 604:13

**surprised (1)**
625:14

**surprisingly (1)**
625:13

**surreply (3)**
619:15 629:22
633:12

**survived (2)**
551:15 574:10

**suspect (1)**
499:20

**sustain (7)**
288:7 289:3 342:6
350:19 351:13 416:1
571:14

**sustainable (2)**
385:6 423:2

**sustained (1)**
337:21

**swap (2)**
622:15,16

**swear (2)**
565:1 589:16

**Switch (8)**
339:7 340:24
341:23 342:1 357:13
390:8 408:15,17

**switched (2)**
392:23 548:1

**switches (14)**
332:1 346:22
354:3,5,10,13,17
356:7,10,14,17
357:12 402:23 408:9

**sworn (7)**
290:7,11 369:15
395:23 451:18
545:16 589:23

**Sycamore (1)**
547:19

**SynOptics (12)**
298:1 299:3,11,13

303:14,22 305:8
308:20,22 309:20,24
327:22

**system (20)**
397:4 408:15,20
409:3,9 411:9
415:12 416:7,22
417:9 418:2,4 419:9,
13 420:16 476:24
478:7 539:12 569:22
571:8

**systems (2)**
483:16 487:9

---

**T**

**Tab (6)**
476:8 538:4,6,8,
14,16

**table (5)**
351:1 565:1 632:5,
11 636:19

**talk (36)**
317:18 318:6
322:14 333:19,20,21
336:16 339:3 348:13
368:19 379:24 388:1
396:20 412:17
425:12 452:17,18
468:3 482:17 483:3
493:15 533:23
557:14 566:5 567:15
611:10 617:13 621:7
624:8,11 625:9
629:13 636:5 644:16
659:8 660:2

**talked (20)**
294:11 320:23
321:1 324:12 348:14,
18 352:1 378:15

379:21 386:18 389:3
446:18 453:5,8,12
523:4 557:16 631:4
645:17 650:13

**talking (44)**
292:11 293:2,10
295:7 298:6 314:4
323:22 326:19
352:15 354:8,11
356:13,15,20,24
357:1 360:15 371:7,
8,10,12 373:2
378:24 381:2 388:5
409:21 412:22
413:23 418:1,2
419:7 427:16 429:3
473:19 478:12
479:18 495:9 497:14,
15 572:11 573:16
602:17 624:2,7

**talks (3)**
338:19 392:15
583:5

**task (2)**
533:5 652:5

**tasked (1)**
390:11

**Taurus (1)**
355:6

**TCP/IP (1)**
477:7

**tea (1)**
609:8

**teach (1)**
546:14

**teaches (1)**
546:18

**teaching (3)**
406:23 549:4
559:11

**team (41)**
293:18 297:24
298:5,12 299:16
311:18 312:4 313:5,
17 324:4,17,22
325:8,11,14 326:6,
10 327:2 329:19,24
330:6 333:18 334:24
335:9,11 336:13,14
342:22 374:11,24
380:11,22 381:3,6
389:23,24 390:11
397:8 399:17 401:21
477:13

**tech (4)**
547:13 548:10
549:9 579:9

**technology (13)**
398:15 399:24
401:20 407:4,5
429:2 546:13,16,19
548:3 549:4,11 564:6

**Telecom (6)**
327:22 344:4,9
346:16 488:23
492:18

**telecommunication (1)**
402:6

**telephone (1)**
432:18

**telling (11)**
333:8 335:24
336:3,13 350:12
366:20 374:17 443:8
475:2 582:5 599:19

**tells (5)**
369:9 428:6
633:18 654:8 657:10

**temporary (12)**
484:10 523:1,6,10

**termination (22)**
363:11 364:15
430:1 438:9,11
445:22 551:11,15
552:19 553:4,16
555:14 557:13,21
558:18 560:6 565:14,
17,19 568:19 580:9
583:15

**terms (19)**
328:17,19 364:14
419:3 424:12,23
430:6 443:24 449:6
470:19 503:5,14
525:3,6 544:13
558:6,8 559:19
577:14

**terrible (1)**
421:5

**terribly (1)**
637:14

**test (3)**
635:10 642:9
650:10

**testified (48)**
290:11,17,20,21
292:6 298:4 300:10
311:4,22 312:17
313:6 318:4 319:24
320:4 321:13,19,20,
24 322:4,8 337:11
340:20 354:9 355:14
356:13 378:4 395:24
417:1 437:9,10
438:8 440:12 448:11
449:15 451:18
452:12 453:16
463:21 485:7 499:1
502:4 507:4 545:16

**termination (22)**

**524:3 525:2,8**
524:3 525:2,8
578:11 583:11,19
584:3,13

**Ten (6)**
343:3 380:7
397:14 400:19
483:11 522:7

**tend (1)**
630:6

**tender (2)**
407:17 549:24

**tends (1)**
423:22

**Tenth (1)**
622:3

**tenure (2)**
318:16 370:5

**term (30)**
317:5,12 318:8
319:4 323:5 399:14
401:23 422:12 423:1,
11 424:20 427:6
443:24 474:19
478:16 482:8 509:2,
22 538:1,23 539:3,
22 556:13,15 568:15
570:21 577:2 585:4
647:20 652:8

**terminate (12)**
551:12 552:1
553:5 554:6,20
558:19 559:4 560:7,
8 568:1 578:10,12

**terminated (10)**
553:9 560:8,13
562:2 565:20 583:13,
20 584:4 645:8 647:4

**terminates (8)**
551:17,19,21
554:22 559:9,22

552:17 561:11
572:12 589:23 604:6

**testify (7)**
408:3 412:2
413:19 419:2,18
552:14 554:1

**testifying (3)**
320:16,18 321:9

**testimony (54)**
283:9 294:8,14
297:21 300:22
320:12 321:1,12,18
322:12 340:7 341:18
352:2,7 353:3
369:23 378:6 395:21
407:21 408:21 409:7
410:13,24 411:3
412:24 413:20 414:5,
24 416:15 428:13
437:1 439:14 440:14
451:14 515:5 516:2
523:5 528:16 552:11,
22 556:17 557:1,7
561:3 573:21 575:2,
3 588:2 589:6 591:4
645:5,14 650:7
655:16

**Texas (5)**
347:24 348:8
488:1,14 492:22

**text (8)**
325:2 492:14
530:6 552:4 553:20
557:10 560:17
568:23

**textbook (3)**
446:21 447:5,6

**textbooks (1)**
447:13

**Thanks (1)**

474:10

**Thanksgiving (1)**
609:22

**their (77)**
298:24 317:6
319:6 333:20,21,21
334:13 338:14 362:3,
4,6,12,13 365:9
399:19 405:15
414:19 422:6,20
423:3 431:11 432:24
438:12 474:17 477:2,
23 494:11,15,20
499:18 509:8,12
513:23 514:19
515:23 516:16,17
517:4,5,7 520:12
556:12 563:3,11
574:12 577:18,22
599:9,11 603:10
609:3 612:9,15
613:14 619:15
620:17,20 626:1,2
627:12 632:2,5
633:2,5 634:3,4,6
636:14,20,23 639:6,
11 640:6 647:4
649:11,11 650:11

**themselves (2)**
627:18 639:7

**theories (4)**
602:8,14 606:3,8

**theory (4)**
605:20 606:22
615:21 620:17

**there (261)**
282:13 284:15,23
286:3,5 287:22
295:22 296:1,4,7,11,
17 305:10,15 306:3,

5 308:8 309:8
315:14,18,23 323:6
333:13 334:9 335:21
339:17,17,18 341:7
344:3 345:7 346:18
348:7 350:10,14,24
355:4 357:10 363:10
364:14 369:19
371:17 372:4 373:4,
7 374:2 375:4 383:7,
9 384:15,17 385:12,
15,18 386:19,24
387:3 390:5 391:9
392:19 397:19
398:18 400:8 402:5
403:4 404:23 405:1,
6,8,12 407:15
408:17 410:15 412:4,
8 414:3,4 415:17
416:3 417:16 418:6,
10,11,24 419:20,24
421:21 422:23
423:17 427:8,10
428:8,12 430:8,22
434:6 438:22 439:24
440:4 445:12 446:1
448:12,19 451:10
453:20 458:7,7
459:24 460:24
463:16 465:1,8
466:8 471:19,23
473:20 474:7,23,24
475:10 477:11 479:6
482:13,23 483:15
484:7 485:20 486:13,
14,17,23 488:9,22
491:10 495:18
499:24 500:20
505:19 512:4 513:3,
15 516:8,20 517:12,

21 518:1 519:2
520:4 525:4 527:11
528:17 530:3,13
531:13 533:8,18
536:24 537:12
539:20 542:1,10,11
544:18,21 551:9
552:1,18 554:24
555:4,8,12,13 557:6,
10 559:16,19,19
565:2,3,4 572:15
574:5 579:19 581:22
582:17 585:14 586:4
592:22,24 593:7
594:3 595:20 598:17,
18 599:12 603:22
604:2,4,6 605:1,23
607:13 610:3 611:17,
18 612:1,17,20
615:4 616:15,22
618:10,11 619:7,19,
24 620:19 621:11,13
623:2 628:3 630:10,
12 632:4,10,21
634:24 635:10 636:9
637:12 638:24
644:20,21,21,22
645:2,4,20,24
646:14 647:17,21,23
648:9,11,12,13
649:20 650:7,13
652:9 655:21 657:2,
18,21,23 658:19,
22 659:4 660:1

**thereafter (3)**
424:11 609:11
656:13

**thereby (1)**
634:19

**therefore (10)**

364:6 438:21
459:17 462:8 463:24
474:7 536:24 572:16
605:23 617:6

**thereto (1)**
467:3

**thermal (1)**
396:17

**they (423)**
283:5 286:15,15,
22 288:14,15 290:20,
22 291:9,9,11 292:6,
7 294:3,4 307:24
316:11,12,16,17
318:15 319:8,14,15,
16 323:7 328:18
331:17 333:2,4,6,9,
10,11,22,24 334:3,
15 336:4,5 337:20
342:12 347:13,18
349:2 352:15,18,19
353:16 354:22
358:24 359:1 362:7,
9,11,12,14 363:9,16,
18 364:4,5,6,9,11
365:9 366:4,14
368:14,15 372:1,2,6
374:12,17,20 375:11,
13 376:10 377:23
379:13 390:7,16
392:23 394:1 400:2
401:12,16 402:1,3
404:3,3 405:22
406:19,20,21 408:22
410:11,12 413:11
419:15 420:3 422:7,
24 425:7,8,11
426:13,14,14 430:4
431:11 432:22,22,23,
23,23,24 433:1,24

438:13 439:2,12,22
440:9,18 444:1,2,13,
15 445:2,4 453:16
463:6,7,8 464:13,22
465:17,24 466:4
469:12 470:6,7,7,14,
20,21,22 471:1,8,10,
10 472:12,24 473:13
474:13,20 477:17,23
478:2 484:16 485:18
492:2 493:20 494:12,
14,16,18,19,19
495:10 497:4 498:2,
3 500:2,9,10,22,22,
24 501:1,3,5,9,10,11
503:4,11 504:9
505:2,7,10,13,18
506:2,17 508:7,14
513:3,7,14 514:7,18
515:21 516:11,14,14,
16,18,21,22,22
517:3,5,6,7,8,9
520:11 524:23
525:10 526:9,11,24
527:2 528:9 530:19
531:15 532:14,24
533:2,3,12,14
536:21 537:16,19,21,
22 539:6 541:19
544:15 551:21
552:13 553:24
556:11 557:24 563:4,
6,7,8,10,13,15 564:5
569:9 571:23 572:5,
19 581:23 582:24
583:16,17 585:7,9,9
586:10,12 590:24
593:14,18 594:9,15
595:11 597:11 603:9
605:21 606:13,24

607:4,5,6,15 608:13
609:4,11 611:6,15,
22 612:7,9,18
613:16,24 614:1,2,3
617:15 619:4,15
620:18 621:8,12,18,
20,21 622:17,20,20,
21 623:7,8,17
624:17 625:2,4,5,14,
15,15,16,17,20,22
626:11,12,13,23
627:5,6,8,13,18,22,
23 628:6 630:5,14,
20 631:7,12,16,18
632:8,9,16 633:2,6,7,
8,18,19 634:2,4,6,11
635:8,23,23,24,24
636:3,3,4,4,7,7,8,10,
10,13,19 637:3
638:12 639:6,11,12,
18 640:2,9,10
642:12,13,14,15,16
647:2,2,5,21,23
648:3 650:2,4,6,6,20,
20,21,21,24 651:9,
11,18 653:3,8,8,17
655:23 656:2,10,11,
13,18,24 657:1,7,13,
15,17,23 658:1

**thing (30)**
283:6 317:8
351:11 365:2 384:21
388:4 401:19 426:20
431:13 495:1 500:14
550:19 561:8,21
565:2 590:2 603:2
610:23 623:17 625:9
630:19 631:23 635:7
638:20 642:10,16
651:1 653:15 659:16

660:8

**things (37)**
282:7 284:13,18
314:9 320:20 324:15
335:14 341:7 358:1
387:23 399:21
402:18 405:22
409:21 410:10,19
412:19 413:5 419:4
438:18,19 486:22
496:11 512:5 527:15
529:24 548:6 557:16
564:2 598:20,22
630:5 645:1 651:19
655:9,13 660:6

**think (149)**
283:19 285:3
286:7 287:6 288:1,8
289:23 291:21
295:10 296:9,14,15,
16 299:12 300:23
301:12 305:24
306:18 307:20
311:20 312:11 313:2,
9,10 316:1 325:5
326:22 333:23 336:4
337:23 339:15,21
349:2 350:2,10
351:9 352:7 358:3
367:15 368:7 369:1
373:8 376:18,20,21
379:15 384:14 391:3
398:16 400:9 401:13
404:13 405:9 406:6
410:15 411:13,18
414:4 416:18 421:22
424:4 429:8,12,24
435:16,17 436:10
439:11,16 442:4,7
445:6 448:22 449:24

450:12 479:9,16,22
483:9 485:2 493:12
495:7 509:19 512:4
529:6 540:8 544:15,
20 549:22 551:9,20
552:16,17,21 553:22
554:11,15 560:20
561:1 562:20 563:12,
13,21 565:2,8,19
569:23 574:2 575:3
576:23 578:8 581:24
586:10,14 587:5
592:17 597:21
600:15 601:22 602:4
606:17 610:5,24
620:13 628:20 629:2,
4,24 636:12 638:21
639:6,13 640:2,13
641:10 643:10,18
644:2 645:18,21
646:6 648:15,16,17
650:20,21 658:7
659:10 660:12

**thinking (11)**
284:22 471:19,20
506:8,13 513:14
530:20 581:21
611:22 653:19 654:4

**thinks (1)**
283:14

**third (13)**
479:6 483:8
491:22 595:13 602:2
618:20 619:7,16,19,
20,23 622:10 635:2

**third-party (6)**
286:1,12 294:11
411:7 415:10 421:9

**thirds (1)**
484:7

**Third-World (1)**
407:14

**though (7)**
341:20 392:8,9
428:13 470:7 614:13
623:3

**thought (28)**
298:8 310:16,17
374:6,20 382:17
392:18 393:16 509:4
517:20 521:12 533:4
536:10 537:16 577:5
590:3 596:18 611:1,
15 612:16 613:24,24
614:4 626:12 627:13
633:15 636:2,8

**thoughts (3)**
629:3,5 641:1

**thousand (2)**
548:14,17

**threaded (1)**
421:23

**three (72)**
314:13 317:20
318:1 338:9 361:8
363:11 386:23 397:1,
15 403:9 406:12,13,
15 425:2 438:19,23
439:21 440:17
461:23 485:13 487:9
498:24 509:4,7,10,
14 526:7 528:17
530:4 532:24 533:13
539:17 541:6,24
547:5 551:13 552:19
558:19 560:1 561:14,
16 563:7 568:2
574:13 577:4,10,17,
20 578:10,20 583:1,
11,14 607:15 608:2,

4 618:17 624:13,14
644:7,12,24 645:8
646:22 648:16 651:6
652:7 656:2,22,24
657:7,7

**three-year (29)**
317:5,12 318:8
319:4 323:5 379:9
461:14 474:19
478:16 482:7 510:5
513:13,22 528:8,13
533:8,23 538:1,23
539:3,22 542:2
555:14 568:15
570:21 580:9 646:24
652:8 656:23

**throughout (4)**
318:15 377:2
621:15 654:2

**thunder (1)**
637:7

**Thursday (1)**
325:9

**tied (2)**
423:12 537:16

**tightly (3)**
419:8,12 420:15

**till (2)**
382:2 478:12

**time_ (1)**
325:16

**time-consuming (1)**
409:14

**timeframe (21)**
290:18 291:4,17,
20 292:2 293:20
295:6 320:4,19,20
321:16,20 322:22
323:1 369:24 370:3
373:18 384:15 494:6,

9 659:6

**timely (6)**
601:9,14 602:12
603:23 610:9 642:1

**times (11)**
349:19 387:15,16
434:23 436:13
437:24 516:20
518:20 577:7 606:4
645:19

**timing (2)**
523:12 587:7

**title (9)**
326:1 327:13
384:6 398:15,16
407:8 447:4 564:18
565:4

**titled (2)**
325:23 454:18

**Titus (1)**
622:10

**today (18)**
287:11 398:22
457:4 522:8 534:13
548:9 550:21 557:7,
16 590:24 597:8
600:17 629:5 638:4
640:13 642:15
654:10 658:5

**Todd (7)**
453:21 454:19
455:16 458:24
460:15 474:2 475:19

**together (9)**
300:3 376:13
473:2,14 481:20
510:8 555:14 566:17
576:11

**told (42)**
290:21,23 291:9,

11,17 292:6,7,8
302:19 317:22
335:14,23 348:23
350:8 352:8 371:21,
23 372:11 373:14,16
374:12 376:10
377:13 379:11,24
394:10 436:10
446:19 447:10
461:18 475:2 481:20
509:2 572:22 574:2
577:3,9 582:1
586:23 604:16
605:16 653:15

**toll (1)**
634:19

**Tollen (28)**
450:18 544:10
545:5,7,8,15 546:5,9,
10 549:24 550:8
552:4 553:4 556:18
565:9 566:3 568:5
569:10 571:6 572:10
575:13,15,21,23,24
582:19 583:7 585:20

**Tollen's (1)**
561:3

**tone (1)**
401:15

**too! (1)**
302:5

**took (8)**
292:16 402:4
412:12 416:16 417:2
418:17 420:4 579:17

**tool (1)**
422:21

**Toolchest (2)**
400:12,13

**tools (11)**

480:7 490:3
498:17 499:7,12
502:8 503:15,16
504:22 505:23
516:13

**top (12)**
328:5,14,18,20
329:1 402:19 478:19
488:10 491:9 520:16
530:3 652:16

**topic (2)**
343:2 484:22

**total (4)**
332:4,6,16 483:17

**totally (2)**
287:1 293:21

**touch (2)**
315:6 377:6

**touched (1)**
387:22

**touches (1)**
633:12

**tough (1)**
658:18

**toward (1)**
492:15

**Towers (1)**
321:3

**track (4)**
316:5 556:5
571:24 572:15

**trade (23)**
320:7,24 321:6
322:1,6 331:2,9,14
339:13 595:6 601:18
605:12,23 607:17,18,
21 616:5,8 631:9
632:6,7,8,10

**traded (1)**
547:9

**traffic (3)**
326:15 338:18
653:4

**trainer (1)**
546:14

**training (1)**
548:23

**trainings (3)**
549:1 559:10,11

**transaction (14)**
405:4 457:6
468:17 469:17
472:20 497:16 499:4
502:6 504:23 505:11,
22 534:15,19 536:4

**transactions (3)**
405:23 469:23
499:22

**transcript (4)**
289:18 320:14
659:12,15

**transfer (4)**
509:1 524:19
577:2 613:12

**transferability (1)**
584:17

**transferable (3)**
309:22 584:15
585:10

**transferred (4)**
312:9 313:21
398:10 582:14

**transformed (1)**
321:17

**transition (1)**
590:3

**transitioned (3)**
392:13 398:14
399:8

**translation (1)**

652:15

**transmission (1)**
402:17

**Trapeze (5)**
312:20,22 520:11
521:10 653:20

**travel (2)**
329:22 660:22

**traveled (3)**
293:19 331:3,6

**traveling (1)**
383:13

**travels (2)**
329:23 335:12

**treasurer (2)**
406:13,15

**treatise (2)**
446:20 447:6

**Tremblay (25)**
283:9 286:15,21
287:6,20 289:19
292:10,20 293:3,15,
18 294:3 387:3
388:4,7,19,20
476:12,17 478:18
479:7 484:8 580:18
646:13 657:10

**Tremblay's (6)**
286:2,4 386:17
474:22 479:1 533:17

**trial (13)**
283:13 284:9
285:1 286:9 382:11,
12 386:22 528:17
610:20 613:7 614:9
641:21 642:20

**triangular (1)**
584:24

**tried (2)**
401:21 633:21

**trigger (1)**
427:3

**trip (3)**
383:14,15 384:8

**trips (1)**
311:23

**trouble (1)**
644:17

**truck (2)**
355:6,6

**true (26)**
322:20 363:9
371:4 374:7,9
376:18,20,21 426:2
438:8 441:5,8,15
442:3 461:7 499:20
515:13 557:13
590:21,24 595:15,19
613:18 624:1 625:2
650:3

**trust (1)**
456:12

**truth (9)**
337:8 353:10
374:17 376:10
436:22 591:13
593:15 599:21
608:14

**try (19)**
300:21 384:8,10
391:8 405:22 432:7,
13 468:23 499:21
600:19 607:7 609:7
628:22 632:8 634:7
636:20 644:18 645:1
649:15

**trying (28)**
315:3,4 346:1,4,5
364:21 367:3 391:22
392:9 405:19 470:5

471:7 524:19 529:4
567:2 571:4 606:10
613:15 615:20 616:2
622:15,16 637:9
639:7 641:13 647:2,
2 650:19

**turn (28)**
290:2,3,4 327:12
329:24 369:6 371:6
425:9 434:5 451:23
454:14,23 484:5
487:13 508:1 534:8
538:3 570:2 579:11,
14 586:1 590:13,15
594:2,24 603:18
629:10 654:23

**turned (2)**
378:21 533:5

**turning (1)**
329:10

**turnkey (1)**
405:2

**turns (1)**
457:14

**twice (1)**
627:24

**Twin (1)**
321:3

**two (85)**
303:16 304:13,17
315:14,18,19 323:4
325:4 340:8 343:21
345:7 347:2,14
348:1 356:5 357:24
381:19,24 386:14,15,
23 391:6 400:8
401:2 404:23 416:16
425:2 426:4 427:24
428:3 429:20 434:12
440:4 448:20 459:21

461:17 480:4 483:16
486:21 488:13,14
490:22 508:19
516:12 539:17 540:9
541:10 557:14 568:6,
8 576:13 579:11
581:22 582:19,24
583:11,14 599:18
601:3 603:4 607:20
608:3,5 609:13
614:12 616:15,23
617:1 622:2 623:2
624:19 627:9 632:20,
24 636:7 644:6,12,
24 648:16 650:14
655:10,11 658:19,20
659:9

**two- (1)**
484:6

**two-page (2)**
617:18 625:6

**two-part (4)**
566:9,24 568:22
576:8

**two-thirds (1)**
323:24

**tying (2)**
417:12,21

**type (7)**
430:16,17 550:14
579:13 594:12 642:7
659:15

**types (4)**
304:17 410:19
412:18 419:4

**typical (2)**
433:3 504:23

**typically (6)**
424:14 432:10
472:8 496:19 497:8,

14

## U

**UC (1)**
546:23

**ultimate (1)**
562:2

**ultimately (8)**
304:2 305:10
312:13 401:4 473:16
476:17 532:13
638:22

**unambiguous (1)**
561:24

**unbiased (1)**
391:21

**uncovered (1)**
604:20

**undefined (2)**
404:21 436:23

**under (173)**
287:8 292:12,15
298:13,13 306:4
307:10 308:22
309:11,24 310:6,8
313:6,7 315:20,24
316:4,12,17,18,20,
23,24 320:2,16,18
326:1 343:24 344:20
345:10,11 346:9
347:4,6 348:2 357:7
360:18,23 362:3,6,
16 364:5 365:17
366:6,7,11 375:11,
13 386:8 399:20
425:23 426:9,24
428:9 430:12 439:18
440:14 454:10,24
464:14,15 465:7,19

466:5,11 470:11
480:12,15 481:2,5,
13,14 482:9,11
483:23 484:2,9
489:15,24 490:9
492:2,24 496:22,23
497:11 498:2 499:2
500:18 501:11
504:24 506:16,23
510:5 511:7,15
512:12,15,17,20,24
513:11,20 516:3
517:13,22 518:5,16
519:13,17 520:24
521:10 523:20 525:2
533:18 540:24 541:3,
6 542:17,20,23
553:3,9,14 554:2,8
555:10 561:11
571:11 572:20 573:9
574:8 581:10,15
582:22 583:21,24
584:5,7,20 591:7
602:2 606:3,8,21
617:7 619:1,1
620:14,17 621:19
631:5 632:15 633:15
634:8 635:7 639:14
641:14,15,23,23
642:2,9 650:15
651:2,3 652:19,21,
22 653:1,14,22,23
654:22

**underlying (1)**
602:16

**undermine (1)**
505:18

**underpins (1)**
440:14

**understand (22)**

306:12 333:17
360:13,19 361:17
367:23 379:2 409:6
410:24 412:14
413:21 420:6,7
425:21 426:1 427:8
465:22 538:12 559:8
571:5 572:7 607:10

**understanding (33)**
303:24 371:18
408:8,11 410:2
412:23 415:3 416:3,
9 418:11 425:16
428:15 433:7,11
439:4 442:13 462:15
555:20,22 569:5
570:6 571:1,1,18
572:1,4 578:23
579:23 580:16,21,24
582:20 586:18

**understands (1)**
529:1

**understood (8)**
414:15 552:12
553:17 554:3,5,10
573:22 618:9

**undisputably (2)**
612:24 630:14

**undisputed (3)**
645:5,14 658:9

**undue (1)**
641:14

**unfair (10)**
603:8,9,14 611:23
622:8 625:9 640:2
642:12,13 656:12

**unheard (2)**
559:5 568:17

**Unioil (1)**
622:4

**unique (1)**
616:23

**Unit (4)**
330:15 361:5
390:16 556:4

**United (1)**
641:19

**units (11)**
293:5 359:12,20
360:6 361:13 365:18
388:21 424:24,24
425:17 556:5

**University (5)**
396:11,16,19
407:11 546:24

**unless (6)**
417:16 433:1
519:7 555:12 612:1
647:4

**unlicensed (3)**
319:8 377:24
615:3

**unlike (1)**
601:18

**unlimited (4)**
306:8 307:14
308:15 646:23

**unobjected (2)**
544:16 660:7

**unpronounceable (3)**
298:14 313:7,11

**unquote (3)**
287:20 428:15
625:19

**unreasonable (1)**
384:23

**unrebutted (1)**
645:16

**unscheduled (2)**
386:4,7

**unsigned (2)**
523:6 528:6

**untenable (1)**
424:1

**until (11)**
400:17 418:5
450:11 476:6 480:4
509:11 577:21
604:16 609:13 620:6
641:10

**untrue (1)**
371:1

**unusual (5)**
400:23 446:9
505:16 558:24
568:17

**unusually (1)**
551:18

**up (61)**
283:21 289:7
323:15 324:10,23
330:9 348:12 354:6,
22 356:10 357:3
374:24 382:8 384:9
387:6 391:8 404:19
422:17 426:7 427:14
439:21 440:17 452:5
466:5 468:5 472:16
478:12 483:10
487:16 500:15 501:2
506:7 510:14 519:1
521:12 524:8 526:14
531:19 534:16
541:16 542:8 567:3,
4 569:8 571:10
577:14 578:5 606:15
608:19,20 609:13
613:8,9 625:1 626:9,
10 627:1 650:18
651:17 659:19 660:3

**update (2)**
477:1,23
**Updated (1)**
286:11
**updates (2)**
513:11 517:10
**upgrade (8)**
477:19 478:2
483:4 485:10 516:21
531:18 533:4 653:8
**upgrades (5)**
514:3,6,17 515:20
516:10
**upgrading (2)**
516:17 517:6
**upon (12)**
292:18 372:22
385:2 387:22 440:6
442:12 449:2 574:15
596:10 645:10,11,23
**usage (1)**
429:9
**use (69)**
297:11 298:2
305:6,11,16 310:23
315:11 317:4,11,24
349:1 373:12,19
374:4,13 375:22
376:7,16 384:21
408:17 409:1 423:5
425:7 433:24 437:20
442:19 444:6 445:17
454:15 455:18 463:1
464:8 465:17 471:5
473:1 477:18 478:11
480:19 481:18,22
496:19 500:21
503:17 511:7 512:23
516:14 517:1,1
524:7 540:4 556:14

582:9 585:4 596:8,
17,21,22 605:7
606:22 615:3 619:10,
11 627:15 633:20
646:8 650:12,23,23
654:21
**used (29)**
304:15 326:5
366:22 368:23
370:15,22 371:19
372:12,17 373:6
377:4 384:22 401:14
408:9 409:4 439:3
454:9 457:21 462:19
463:6 478:6 539:10
549:17 560:22
596:10 635:1 636:15
645:19 657:22
**user (1)**
402:18
**users (1)**
400:7
**uses (4)**
311:1 414:11
564:23,23
**using (51)**
304:12 315:15
318:23 319:6,15,21
320:1 323:6 332:1,5,
6,11,13,21 333:1,11
340:15 354:22
358:20 372:2,5
375:2,10 390:16
392:3,22 393:5
410:2 462:10 474:17,
21 475:4,11,18,22
476:3 493:20 514:7
515:4,9 516:1 517:8
520:11 539:6,14
542:17 596:13

653:18 657:1,10,17
**usual (1)**
391:18

**V**

**V3 (2)**
390:7,9
**vague (2)**
295:6 354:16
**valid (1)**
485:18
**Valley (6)**
344:5,10,16 345:1
346:12 489:1
**valuation (3)**
404:4 407:7,10
**valuations (1)**
613:20
**value (6)**
338:11 344:23
385:9 407:14 516:10,
21
**variety (1)**
423:17
**various (3)**
312:5 406:1
408:14
**vary (1)**
558:8
**Vegas (5)**
301:19,20 331:7,
11 339:5
**vendor (3)**
372:8 385:3,5
**vendors (1)**
372:7
**verify (1)**
478:1
**version (12)**

453:8,10 477:6
484:9 486:1,1
516:15 652:12,14,16
653:6,8
**versus (1)**
392:15
**Vianix (19)**
617:8,13 618:12,
16,18 620:1,18,20
621:13,14,17,21
622:18,19,22 624:18
633:14,14,18
**vice (2)**
399:4 401:19
**Vicki (21)**
456:24 457:3
459:5 460:9,13
461:19 463:12,17
467:7 468:13 469:5
470:1 472:7,17
473:23 475:19
481:19 500:19 506:3
528:1 534:12
**view (18)**
350:11 449:1
552:6 557:23 561:4,
4,23 565:11 566:23
571:2 573:15 576:7
577:10 579:18 581:9
584:18,22 620:20
**viewed (1)**
391:16
**views (1)**
429:6
**violate (1)**
421:8
**virtually (1)**
609:22
**visit (4)**
322:16 325:24

333:19 335:12

**visited (3)**
311:5 323:8 331:5

**visits (2)**
331:6 383:15

**vocal (1)**
319:11

**Vogt (1)**
320:21

**Voice (10)**
346:17,18,21
347:8,21 487:24
488:15,17 492:19,21

**VoIP (1)**
346:21

**volume (2)**
612:24 613:2

**vote (1)**
611:22

**VP (2)**
384:5 547:12

**vs (1)**
390:6

**VxWorks (4)**
498:17,23 511:1
520:24

**W**

**Wait (6)**
291:12 375:24
480:4 517:17 537:6
545:18

**waiting (1)**
523:16

**waiving (2)**
586:9 587:4

**walk (1)**
601:23

**walked (1)**

651:8

**walking (1)**
657:19

**Walrath (1)**
610:18

**Walrath's (1)**
610:6

**wanted (12)**
383:9 389:14
403:5 430:4 516:23
525:20 543:11
599:22 606:16 609:2
619:13 636:10

**wanting (1)**
619:3

**wants (10)**
340:12 358:8
484:15 543:10
588:17 611:20
618:19 621:1 643:18,
24

**waste (1)**
555:17

**wavelength (1)**
402:24

**way (50)**
283:15 284:7,12
285:4 319:2 371:7
379:12 387:9 408:24
416:22 417:10
418:12 420:17 421:4,
8 423:20 424:4,6
426:7 428:24 461:21
475:24 476:1 484:7
486:19 497:22 508:2
527:1 562:1 566:11,
12 567:3 568:2
569:19 575:15
578:14 596:23 601:6
603:5 613:10 616:16

618:18 628:6 631:8
632:5 634:21 636:14,
23 637:13 638:15

**ways (3)**
421:24 565:7
622:20

**weave (1)**
588:9

**Web (1)**
556:11

**Webster (1)**
610:7

**Wednesday (1)**
638:3

**week (5)**
301:24 339:5
487:6 524:5 609:7

**weekend (1)**
660:22

**weeks (1)**
609:13

**weight (1)**
287:23

**welcoming (1)**
383:23

**well- (1)**
629:20

**well-briefed (1)**
629:19

**Wellfleet (2)**
303:22 327:22

**well-known (1)**
410:14

**well-recognized (1)**
602:2

**weren't (23)**
291:9,11 292:6
318:23 320:6 321:24
333:2 337:20,23
355:3 358:3 372:2

392:22 405:7 463:19
476:4 517:21 532:15
533:3 609:5 613:23
614:2 639:24

**Western (2)**
401:3 622:10

**whatever (28)**
287:23 340:8,9
352:23 355:7 360:16
361:10,11,15 362:15,
20 365:8 366:5,10,
12 368:10 418:19
442:18 512:3 539:18
594:15,16 595:11,11
597:4,11,12,12

**what's (1)**
387:6

**whatsoever (3)**
632:7 647:18
657:19

**whenever (3)**
366:23 409:16
430:24

**whereby (1)**
430:9

**whole (9)**
354:24 424:19
432:9 469:22 539:19
554:22 574:9 596:19
606:18

**whose (1)**
311:15

**wide (1)**
399:23

**widely (1)**
400:11

**wild-carding (1)**
358:21

**Wiley (1)**
407:4

**willful (2)**
513:16,17
**WILLIAM (2)**
545:15 546:9
**willing (6)**
283:24 284:3
352:23 353:14,15
659:18
**willingly (1)**
351:9
**win (3)**
362:12 600:22
627:24
**Win32 (1)**
511:1
**window (2)**
461:14 542:3
**Windows (9)**
489:9,11 490:5,7
491:13 493:1,1
498:21 520:23
**wish (4)**
327:16 367:10
479:2 650:16
**wished (1)**
516:14
**withdraw (7)**
351:23 460:5
599:7 626:2,8,24
628:1
**withdrawal (1)**
626:19
**within (36)**
285:2 310:13
324:11,23 339:17,18
353:9 359:19,22
360:17,22 361:15
365:8,16,21 366:12
367:20 368:2,11
370:8 393:9 400:4

459:16 461:22 474:8
478:6 516:16 537:1
539:10 541:24 542:1
610:12 622:9 634:2
644:24 645:8
**without (12)**
309:18 316:13
334:18 408:17
422:17 444:9 533:11
562:24 573:24
627:17 628:2 634:17
**WITNESS (63)**
293:15 294:10
305:21 306:1 307:24
341:6 342:10,16
345:19 346:1 351:4
358:15 368:14
374:19 376:2 381:17,
24 382:4,14 387:24
394:24 395:3,5,14
408:5 418:16 420:12
428:10 435:5 443:17,
20 449:13,19 450:16
451:12,16 504:14,21
526:17,20 527:5
531:4 535:13,21,23
543:10,17,24 544:6,
7 553:19 554:7,15
560:17 573:3,6
585:21,23 589:17
590:1 592:17 598:8,9
**witnesses (3)**
649:8,10,10
**wondering (1)**
479:9
**Wood (1)**
382:18
**word (16)**
400:14 439:3
474:3 497:23 503:17

529:6 530:3 536:18
560:22 564:21 565:2
603:9 643:23 644:1,
4 654:15
**words (5)**
310:20 335:5
630:7 644:20 645:3
**work (21)**
298:21 347:12
397:11 398:6 399:20
401:7 403:19,23
404:6 424:6 483:8,
15 497:13 547:19
551:16,21 609:8
629:23 634:21
654:16,18
**worked (14)**
297:6 299:5,14
311:2 349:15 350:8
401:21 403:6 405:1,
17 547:2,3,16,21
**working (4)**
299:16 300:2
516:19 609:20
**Works (3)**
307:15 308:17
652:12
**world (2)**
406:10 517:9
**worried (2)**
283:1 422:6
**worry (2)**
402:5 563:2
**worst (1)**
431:15
**worth (1)**
611:1
**worthwhile (1)**
643:13
**wrap (1)**

639:7
**write (23)**
325:1,6,15 362:10
383:20 399:15,17
401:23 534:12 535:1
536:11,12 546:17,19
551:16 554:21
559:14 560:7,9
582:13 585:9,9
654:21
**writes (5)**
389:14 459:7
460:19 461:6 524:5
**writing (7)**
324:7,8 433:23
472:12 548:20 569:3,
12
**written (12)**
407:2,3,9,12
421:19 447:11 472:8
475:14 486:19
537:11 567:3 580:8
**wrong (8)**
439:17 520:5
552:2 559:11 565:6
604:4,7 620:24
**wrongdoing (5)**
372:24 604:19,22
608:20 623:14
**wrongful (3)**
605:7 606:22
615:17
**wrote (17)**
333:24 397:5
456:24 457:3 472:18
487:6 498:1 502:1
506:11 520:16,21
521:6 541:5 549:7
572:23 653:20,22
**wrt (1)**

474:5

## X

**xerography (1)**
398:21

## Y

**year (29)**
294:5 327:15
420:4 424:22 432:12,
12,13,20,20 464:10,
23 482:7 510:17,17
513:12,12,21,21
514:6,7,17,17
515:20,20 517:10
538:22 548:5 609:1
610:7

**years (87)**
300:3 311:3 312:6
314:13 317:20 318:1
339:1 349:15 363:11
380:8 397:14,15
398:12 399:2 400:19
403:9 404:11 406:7,
11,13,14,15 416:17
417:13,22 418:18
420:3 424:22 425:2,
3 438:23 439:21
440:18 461:23
471:22 509:4,8,10,
14 514:18 515:21
516:18 521:23,24
522:7 528:18 532:24
533:13 536:13
539:17,18 541:5,6,
24 547:6 551:13
552:19 558:19 560:1
561:14,16 563:8

568:2 574:13 577:4,
10,18,20 578:10,20
610:10 625:17
630:22 635:13,15
645:8 646:22 649:9
650:21 651:6 652:7
654:11 656:2,22,24
657:7,7

**yes/no (2)**
305:22,23

**yesterday (19)**
290:7,17 343:22
355:14 404:14
452:12,21 453:5,8,
10 463:21 485:8
499:1 501:23 505:12
507:4 511:18 521:5
523:5

**young (1)**
546:18

**yourself (6)**
297:3 334:8
380:14 456:15
461:22 640:4

**Yu-Ten (1)**
390:10

## Z

**zero (4)**
302:23 364:17
387:19 648:12

**zero-cost (1)**
364:7

**zillion (2)**
436:17,18

**zillions (3)**
404:15,19 437:3

## 0

**015 (1)**
468:4
**02 (2)**
452:23 469:3
**021 (1)**
476:9
**03 (4)**
430:1 468:23
469:3 473:6

## 1

**1 (218)**
292:3 294:23
302:12,12,14 303:7
304:5 314:4,7
315:13,16 316:9,11,
14,16,18,21,23
317:4,7,12,17,18
323:5 348:14,17
349:23 350:8,24
351:1 352:16 354:4,
6,10 356:8,10,15
357:1,7 359:10,11
360:18 362:3,6,10,
13,16,21 363:11
364:5 365:9,17,22
366:6,7,9 367:20
368:3 379:8 392:15
425:12,13,17,24
426:3 427:17,23,24
428:4 429:21 430:12
431:22 440:11,21
446:4,5,9 449:2
452:6,8,13 453:15
455:9 460:24 463:6
475:10 478:16,20

480:15 481:5,9,15
482:12 484:2 487:15
489:5,6,7,15,20
490:1,9 492:15
502:14 506:23 509:2
510:5,19 511:3,7,16,
17 512:12,18,20,24
513:11,13,20,22
520:24 521:7,11,14,
16,20,22 522:1,5,6,8,
12,15,23 536:16
538:1 539:8,21
541:3,7 542:18,23
553:20 560:18 561:6
566:6,8,14,19,23
567:5,15,20 568:6,
24 570:19 571:20,21
572:8,11,13,21
573:16 576:17,20,20
577:3,11,12,14
578:3,9,12 579:4,19,
20,24 580:15,23
581:5,10 583:20
584:4 586:10 587:6
592:11,18,18 593:3,
20 628:21 629:1,10
636:21,22,23 637:1
640:19,21 645:3,5
646:11 647:3,19,21
650:15 651:2 652:7,
22 653:2,14,24
654:9,17,18,23
658:11 659:4

**1:30 (2)**
450:11 451:2
**10 (1)**
343:7
**10,000 (2)**
483:6,17
**10:25 (1)**

343:9

**100 (6)**
404:24 405:17
435:11 437:4 469:8
530:7

**11 (6)**
321:1 592:9,12
593:4,21 610:10

**111 (1)**
336:22

**12 (23)**
347:13 387:14
488:5,7 489:4,8
490:4,9 491:4,6,8,17,
23 492:20 493:2
495:23 496:6,15
497:2 498:2,5 505:7
655:15

**12:25 (1)**
450:22

**120 (1)**
436:8

**12A (2)**
346:15 573:8

**13 (1)**
541:5

**138 (3)**
325:22,22 327:9

**14 (6)**
488:21 498:7,14,
15,16 599:16

**14A (1)**
344:3

**15 (11)**
327:15 343:4,7,8
478:21 502:1 507:18
599:17 619:2 628:20
641:23

**150 (1)**
638:7

**15c (3)**
619:10,11 634:24

**15c1C (2)**
638:14,19

**16 (36)**
324:6 417:13
455:13,20 456:13
457:5,8,15,15 458:3,
6 459:2 461:11,19
462:8 463:24 468:16
469:5,6 471:17
472:19,22 474:13
482:4 502:2 524:5,
14 532:22 534:14,18,
21 536:3,6 576:4
647:15 656:5

**161 (1)**
467:19

**16a (8)**
454:19 460:14,15
462:3 473:8 527:16
532:8,8

**17 (9)**
346:14 466:16
471:22 521:24
536:13 621:14 649:9
650:21 654:11

**17502 (1)**
600:7

**17c (3)**
620:3,3,4

**18 (2)**
596:10 600:13

**184 (1)**
491:21

**19 (7)**
483:12 534:8,10,
11,15 536:16 600:14

**1961 (1)**
396:12

**1965 (1)**
397:1

**1981 (1)**
397:21

**1985 (1)**
406:5

**1994 (3)**
297:19 303:13
467:2

**1995 (2)**
400:18 418:18

**1997 (6)**
457:6 462:6
468:17 472:20
534:19 536:4

**1998 (5)**
358:17 366:23
369:18 403:15
418:19

**1999 (9)**
328:5,14,19 329:1
418:19 441:21
460:24 494:5 576:4

**1999-2000 (1)**
361:7

**1A (62)**
287:9 289:23
291:4 292:10,12,15
293:5 320:2 345:4,
11 348:3 360:23
361:10,11 364:13
385:24 386:4,9,19
387:1 388:20 437:11
439:19 441:18
444:24 445:7,8
446:6,12 510:11
533:18 550:11 551:2,
10 553:16 554:2,5
555:2,10,13,16
557:11,17 558:21

559:22,24 560:14
561:12,15 562:15
565:12,18 574:8
579:1 583:14 646:17
647:9,9 656:1 657:4,
20 658:7

**1's (10)**
317:5,12 318:8
319:4 474:19 482:7
538:23 539:3 568:15
570:21

---

## 2

**2 (18)**
306:24 307:10
338:10 352:16 390:1
462:2 479:4,18
482:21 492:16 592:8,
11 593:4,20 595:4
609:15,19,20

**20 (23)**
347:14 354:6
356:11 370:12
372:18 373:1 405:11
416:19 417:13,22
418:18 420:3 430:1
436:10 448:19 467:2
488:6,7 498:20
586:19 628:20 647:4
658:7

**200 (3)**
436:1,14 437:4

**2000 (16)**
290:18 291:17
348:16,21 457:1
458:22 466:16 494:6
495:24 496:6 500:20
529:9 532:10 541:22
657:4,5

**2001 (5)**
293:20 321:1
389:12 392:3 511:9
**2002 (6)**
293:20 314:18,24
315:7 511:13 512:22
**2002-2003 (1)**
285:24
**2003 (109)**
291:3,20 292:2,3,
18 294:17,22 295:8,
13,15,19 296:6,11,
20 315:12 318:7,13,
17 319:3,22 320:2,4,
20 321:16,17,20
322:15,16,22,23
323:1,4 324:6
325:24,24 326:10,13,
17 329:14,18 330:11
332:16 338:5 339:5
348:22 349:23 350:2
351:18,20,23 352:9,
11 354:7 356:11
357:6,15 358:16
360:8,16 361:8
364:13 366:14,21
367:19 368:1,20
369:20,23 370:3
374:10 375:3,9
377:11,24 379:8,14
380:5,10,11 383:8
385:11 386:2,10,11,
17,24 425:24 427:14,
14 433:13 445:3
448:19 475:15,16,22
476:4 478:15 481:10
513:3,8 517:13
533:16 569:6 580:18
646:11 647:4 653:1
657:12 658:7

**2003-2004 (2)**
373:18,23
**2004 (25)**
312:13 318:17
321:23 369:18 370:2,
3,13,15 372:16
377:3 379:9 403:17
469:18 476:6 478:14
480:23 481:15 482:6
513:4 538:20 539:1
542:7 652:19 653:13
657:13
**2005 (1)**
513:4
**2006 (6)**
513:4 517:16
522:14 648:2 653:16
654:14
**2007 (1)**
519:2
**2008 (2)**
519:2 619:8
**2009 (2)**
407:4 519:3
**2010 (1)**
549:22
**2011 (5)**
371:3 372:13
373:24 406:20
635:21
**2015 (3)**
417:2 418:6
548:12
**2017 (1)**
374:1
**21 (2)**
389:12 538:16
**215 (1)**
389:10
**22 (1)**

306:19
**23 (2)**
538:20 590:17
**24 (5)**
325:24 326:10
329:18 495:22 528:1
**242 (1)**
314:17
**24-hour-a-day (1)**
432:19
**25 (1)**
402:9
**256.02 (1)**
473:7
**256.03 (6)**
473:7,8 527:8,18
532:5 538:10
**256.07 (5)**
455:4 527:15
529:13,15 530:18
**258 (3)**
458:13,16 472:17
**259 (5)**
527:9,10,22
529:24 538:10
**26a (1)**
556:19
**27 (4)**
483:12,14 495:24
496:5
**27,000 (1)**
486:10
**29 (1)**
454:18

**3**

**3 (17)**
307:18 327:12
352:16 453:9 464:2

466:8 467:10,11
479:4 483:2,3 490:2
592:11 593:4,20
594:23 609:19
**3,000 (2)**
406:9,10
**30 (6)**
398:12 404:11
416:19 436:13
640:16 641:5
**300 (2)**
492:10,12
**306 (1)**
491:7
**32 (1)**
483:12
**32,000 (1)**
483:11
**35 (2)**
483:15 587:21
**36 (1)**
518:10
**37 (2)**
488:22 498:21
**37A (1)**
344:8

**4**

**4 (13)**
352:16 456:22,22
464:7,7 486:1
495:18 519:12 592:8,
11 593:4,21 652:12
**40,000 (1)**
524:9
**45 (3)**
586:12,20,21
**450 (4)**
354:21 372:1

373:10,11

**46 (1)**

594:23

**470-48T (1)**

339:7

---

**5**

---

**5 (9)**

329:14 352:16

371:6 372:16 483:12

519:12 534:8,9,11

**5,000 (2)**

424:24 483:17

**50 (12)**

330:22 331:13

332:3,15,16,19

334:20 339:8 400:2

405:11 436:11

611:22

**50- (1)**

333:21

**50-millionth (4)**

334:14 335:16

338:8 340:21

**52 (2)**

479:8 480:6

**55 (9)**

282:11,17 283:3

285:20,22 288:21,23,

24 479:8

**56 (7)**

282:12,17 283:3

285:20,22 288:23

289:1

**57 (4)**

369:6,6 376:24

388:13

**59 (1)**

480:4

---

**6**

---

**6 (9)**

338:5 352:16

369:17 486:1 519:12

652:14,16 653:6,8

**6,000 (1)**

398:18

**6,000-person (1)**

397:18

**6/1/99 (1)**

518:17

**6:00 (1)**

588:14

**60 (8)**

485:5 486:19

487:9,11 506:20

641:6 653:3,5

**65 (6)**

369:6,7 371:6

372:16 376:24

396:12

---

**7**

---

**7 (8)**

352:17 370:5

492:16 519:12 592:8,

11 593:4,21

**71 (6)**

282:12,18 283:4

288:11 289:5,13

**76 (1)**

508:15

**76A (1)**

508:9

**76B (1)**

508:10

**76C (1)**

---

508:12

---

**8**

---

**8 (9)**

352:17 370:11

457:1 483:12 495:21,

22,22 496:2 518:9

**8,000 (1)**

483:7

**80 (3)**

436:7 598:12

638:7

**81 (1)**

397:22

**82 (1)**

398:9

**83 (1)**

398:9

**84 (1)**

398:9

**85 (1)**

398:11

**86 (2)**

307:21 308:1

**86,668 (1)**

307:22

**86,668,000 (1)**

307:13

**8600 (8)**

390:6,11,15,19

391:24 392:17,19

393:1

**87 (1)**

523:4

---

**9**

---

**9 (11)**

325:24 326:13

---

352:17 370:15

458:22 496:14,17

519:12 524:3 593:4,

21

**9,000 (1)**

483:7

**9,600 (2)**

464:10,23

**9.1 (1)**

391:1

**95 (1)**

406:6

**98 (5)**

361:6 403:3,10,21

442:13

**99 (2)**

442:14 454:18

---