## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | ) | |
| | ) | Chapter 11 |
| Nortel Networks Inc., *et al.,* | ) | Case No. 09-10138 (KG) |
| | ) | (Jointly Administered) |
| Debtors.[1] | ) | **Related to Docket No. 18020, 18086, 18118** |
| SNMP Research International, Inc. | ) | |
| and SNMP Research, Inc., | ) | |
| Plaintiffs, | ) | |
| | ) | Adv. Proc. No. 11-53454 (KG) |
| v. | ) | **Related to Adv. Docket No. 540, 542, 547** |
| | ) | |
| Nortel Networks Inc., *et al.*, | ) | **Hearing Date:  May 2, 2017 at 2:00 p.m.** |
| Defendants. | ) | |

### REPLY IN FURTHER SUPPORT OF MOTION OF SNMP RESEARCH, INC. AND SNMP RESEARCH INTERNATIONAL, INC. TO EXCLUDE EXTRINSIC EVIDENCE REGARDING THE SCHEDULE 1 ISSUE AND TO EXCLUDE THE TESTIMONY OF DR. RICHARD RAZGAITIS

**OF COUNSEL**
Richard S. Busch, Esq.
**King & Ballow Law Offices**
315 Union Street, Suite 1100
Nashville, TN 37201
(615) 259-3456 (Phone)
(615) 726-5417 (Fax)
rbusch@kingballow.com

-and-

John L. Wood, Esq.
**Egerton, McAfee, Armistead &
Davis, P.C.**
900 S. Gay Street
Knoxville, TN 37902
(865) 546-0500 (Phone)
(865) 525-5293 (Fax)
jwood@emlaw.com

**COLE SCHOTZ P.C.**
Norman L. Pernick (No. 2290)
Nicholas J. Brannick (No. 5721)
500 Delaware Avenue, Suite 1410
Wilmington, DE 19801
(302) 651-2002 (Phone)
(302) 652-3117 (Fax)
npernick@coleschotz.com
nbrannick@coleschotz.com

-and-

G. David Dean, Esq.
300 E. Lombard Street, Suite 1450
Baltimore, MD 21202
(410) 230-0660 (Phone)
(410) 230-0667 (Fax)
ddean@coleschotz.com

*Counsel for SNMP Research, Inc. and SNMP
Research International, Inc.*

Dated: April 27, 2017

---

[1] In addition to Nortel Networks Inc., the debtors in these Chapter 11 cases are:  Nortel Networks Capital Corporation, Nortel Altsystems Inc., Nortel Altsystems International Inc., Xros, Inc., Sonoma Systems, Qtera Corporation, CoreTek, Inc., Nortel Networks Applications Management Solutions Inc., Nortel Networks Optical Components Inc., Nortel Networks HPOCS Inc., Architel Systems (U.S.) Corporation, Nortel Networks International Inc., Northern Telecom International Inc., Nortel Networks Cable Solutions Inc.; Nortel Networks (CALA) Inc.; and Nortel Networks India International Inc.

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ..................................................................................................1

FACTS .........................................................................................................................................3

ARGUMENT ..............................................................................................................................11

    I.       The Parties Agree that Schedule 1A is Clear and Unambiguous...........................11

    II.      The Facts of Schedule 1's Negotiation Confirm its June 20, 2003 Termination Date. ................................................................................................13

    III.     Post-Termination Extrinsic Evidence May be Considered for a Limited Purpose.................................................................................................................15

    IV.     The Parties' Post-Termination Actions Do Not Imply that Schedule 1A Terminated After June 20, 2003 or Extended Beyond that Date...........................16

    V.      Nortel's Rights under Schedule 1A Terminated on June 20, 2003.......................17

    VI.     The U.S. Debtors Provide No Legitimate Basis for Dr. Razgaitis' testimony..............................................................................................................19

CONCLUSION...........................................................................................................................20

53651/0001-14419663v2

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Jarecki v. Shung Moo Louie*, 745 N.E.2d 1006 (N.Y. 2001)..........................................................13

*Marathon Asset Mgmt., LP v. Angelo Gordon & Co, LP* (*In re Energy Future
    Holdings Corp.*), 2017 WL 1170830 (D. Del. Mar. 28, 2017)..........................................11, 12

53651/0001-14419663v2

SNMP Research, Inc. and SNMP Research International, Inc., by their undersigned counsel, submit this Reply to the U.S. Debtors' Memorandum in Opposition [D.I. 18118; Adv. D.I. 547] (the "Opposition") to the Motion of SNMP Research, Inc. and SNMP Research International, Inc. to Exclude Extrinsic Evidence Regarding the Schedule 1 Issue and to Exclude the Testimony of Dr. Richard Razgaitis [D.I. 18086; Adv. D.I. 542] (the "Motion to Exclude").[2]

## PRELIMINARY STATEMENT

1.      In ruling on the Motion to Exclude, the Court must decide whether the following language of Schedule 1A leaves any reasonable doubt concerning *when* Nortel's right to use the Software terminated:

> This Schedule and ***the license*** in regard to the Development Software and Run-Time Software ***shall terminate*** and be of ***no further effect*** after a period of ***three years*** from the last date that this Schedule is executed below (emphasis added).

2.      Schedule 1A was fully executed on June 20, 2000, and therefore the rights granted thereunder terminated three years later, on June 20, 2003.  Schedule 1A could not be more straightforward, and neither could the issue before the Court.

3.      The U.S. Debtors have nonetheless continuously ignored this plain language. That theme continues with the Opposition to the Motion to Exclude.  Instead of addressing the actual text of Schedule 1A directly - a straightforward exercise and the issue before this Court - the U.S. Debtors resort to mischaracterizing and cherry-picking factual extrinsic evidence, and attempting to present a so-called "custom and practice" expert to contradict this clear language, with their transparent goal being to so prejudice the Court that the plain language of Schedule 1A is ignored. Indeed, while the parties agreed to present pre-hearing briefs on the merits of the

---

[2] All capitalized terms not otherwise defined in this Reply have the meaning ascribed to them in the Motion to Exclude.  This Reply is being filed under seal pursuant to section V.F of the *Stipulation and Agreement Governing Production, Exchange and Filing of Confidential Materials* [Adv. D.I. 237-1].

Schedule 1 Issue after the Court hears the Motion to Exclude, the U.S. Debtors chose to clutter the record here with what appears to be their entire merits argument.

4.      Notwithstanding their littering of extensive facts in the Opposition that have nothing to do with the underlying issue before the Court, the U.S. Debtors do not challenge that, under applicable New York law, this Court may *not* consider such facts if there is no reasonable ambiguity in the contract itself (i.e., the Nortel License, including Schedule 1A).[3]  And notably, on the issue of ambiguity, it actually appears the parties are in violent *agreement* that Schedule 1A is clear and unambiguous.  In fact, the U.S. Debtors make this point repeatedly in the Opposition.  Opposition at ¶¶ 3, 13, 15.  This agreement should end the analysis because extrinsic evidence is simply not admissible when there is no ambiguity.[4]

5.      Because the U.S. Debtors have improperly resorted to introducing extrinsic evidence in their Opposition, while purposefully omitting key pieces of it, SNMP Research is compelled to provide a full and accurate picture here. This full picture, discussed in detail below in the Facts section, shows that the extrinsic evidence fully supports SNMP Research.

6.      Finally, the U.S. Debtors repeatedly portray SNMP Research's interpretation of Schedule 1A as unfair.  Once again, the opposite is true.  The Bay License was non-transferable, meaning that SNMP Research was under absolutely no obligation to allow Nortel to receive any benefit from it after Nortel acquired Bay.  SNMP Research, nonetheless, agreed that Nortel could

---

[3] If the Court ultimately rules in favor of SNMP Research on the merits at the May 11-12 hearing, then the issue of what products are covered by Schedule 1A becomes moot, as none of them would be covered.  If the Court rules in favor of the U.S. Debtors on the merits at the May 11-12 hearing, extensive additional factual and expert evidence at trial (which is not yet scheduled) will be needed to determine what Nortel products were licensed under Schedule 1A and what Nortel products were not covered.

[4] While the U.S. Debtors claim that Schedule 1A is clear, they appear to be taking this position to preserve the right to argue at the May 11-12 hearing that the language supports them in the event the Motion to Exclude is granted. But their heavy reliance on extrinsic evidence to alter Schedule 1A's unequivocal text confirms that they understand the document does not favor their attempt to re-write the parties' agreement more than 17 years later.

2

inherit the royalty buy out that Bay purchased from SNMP Research, on Bay distributed products, so long as Nortel identified those products on schedules and paid license and maintenance fees. SNMP Research gave Nortel more than three years to do it. This was the point of Schedule 1A. What actually happened, however, as this Court will soon learn, is that Nortel abused and took advantage of SNMP Research's good faith, did not disclose products containing the Software, did not enter into the required Schedules to avoid paying license and maintenance fees, and represented to SNMP Research that there were no products covered by Schedule 1A, as of 2003, containing the Software. Nortel's representations were false, and it is liable for willful copyright infringement and misappropriation of trade secrets. Their attempt, more than 17 years later, to rewrite Schedule 1A to avoid this finding, must fail.

## FACTS

7.    In 1994, SNMPR licensed portions of the Software to a company by the name of SynOptics, which later merged with a company known as Wellfleet, to form Bay. SNMP Research thereafter consented to the transfer of the SynOptics agreement to Bay, and Bay licensed the Software under the license agreement with SynOptics dated June 27, 1994, as amended (collectively, the "<u>Bay License</u>").[5]  Brannick Aff., Ex. A (Bay License). Under the Bay License, SNMPR granted to Bay a non-exclusive, ***non-transferrable***, worldwide license to use the Software, subject to certain restrictions contained therein. *Id.* at ¶¶ 2-3.

8.    In September 1998, Bay was acquired by Northern Telecom for $9.1 billion. For more than a year following the Bay acquisition, Nortel improperly used the Software under the Bay License, without any such right. In an e-mail dated June 21, 1999 from Dave Hyslop of

---

[5] Pursuant to Amendment 2 to the Bay License, the parties confirmed the transfer of rights and responsibilities as licensor from SNMPR to SNMPRI, and the transfer of rights and responsibilities as licensee from SynOptics to Bay.

Nortel to John Southwood of SNMP Research, Mr. Hyslop acknowledged Nortel's use of the

Software without a license.  Mr. Hyslop said:

> In going through the reams of documentation in the SNMP RI file, it occurred to me that the SNMP RI – Bay agreement should be formally assigned to Nortel as Nortel has been operating as though it were the licensee since the Nortel acquisition of Bay last September.  To formalize that arrangement, I've prepared and attach a copy of an assignment agreement for SNMP RI's approval and signature.  Any queries, please call.

Transmittal Affidavit of Nicholas Brannick in Support of Reply (the "Brannick Reply Aff.") at

Ex. A.  Mr. Hyslop attached to that e-mail a proposed Memorandum of Agreement under which

the rights under the Bay License would transfer to all of Nortel without cost.  *Id.* at Ex. B.

SNMP Research did not agree to this proposal.

9.     The Bay License was broad, allowing use and distribution of certain Software in

certain Bay product developed at a given location, without time restrictions.  Bay did not have to

pay running royalties on some of the Software licensed under the Bay License because it had

exercised a royalty buyout or RBO, which Bay agreed to pay in installments.  *See* Brannick Aff.

at Ex. A (Bay License), Attachment C.  The Bay License also provided for a license fee.[6]  *See*

*id.*, Attachment A.

10.     SNMP Research and Nortel began their negotiations in steps.  The first step was

to enter into a Temporary License Agreement that gave Nortel the right to continue distributing

the Bay products until November 1, 1999.  *Id.* at Ex. B.  The Temporary License Agreement

provided that Nortel would have no right to distribute such products any further once the

Temporary License Agreement expired.  *See id.*

---

[6] As was typical with SNMP Research's agreements, software services were evidenced by separate Software Service Agreements ("SSAs") (here, there were two).  Bay also was required to pay fees under the SSAs.

11.     During the term of this Temporary License Agreement, the parties continued negotiations.  Nortel requested a quote from SNMP Research to use the Software in any Nortel product under a fully paid-up license.  By e-mail dated August 25, 1999, SNMP Research responded, and proposed to give Nortel an unlimited license to its Software and services ███ ███████████████████████████████.  Brannick Reply Aff. at Ex. C.  Nortel rejected this proposal as too expensive.  The discussions thus turned to licensing portions of the Software to specific Nortel entities in specified products (i.e., an "a la carte" arrangement).

12.     As a result of this new contemplated "a la carte" arrangement, SNMP Research was not willing to allow Nortel simply to obtain the benefit of the RBO in the Bay License without restrictions, as Mr. Hyslop originally requested.  SNMP Research was concerned that the lines between Bay and Nortel products would "blur over time," allowing Nortel to argue (as they do in this litigation, ironically) that Nortel products were Bay products for which no additional royalties needed to be paid when they were actually developed after Nortel's acquisition of Bay.

13.     As the parties continued to work on the proposed master license agreement, and during the term of the Temporary License Agreement, they met face-to-face at SNMP Research's facility in October of 1999 to negotiate what ultimately became the Nortel License, including Schedule 1A to that License.  *Id*. at Ex. D.  The meeting was attended by Nortel representative Mr. Hyslop, and Mr. Southwood and Dr. Case representing SNMP Research. Rick Barnes, SNMP Research's counsel, was also in attendance.  *Id*. at Ex. E.  Catherine Grant, Nortel's counsel, was also actively involved in reviewing the Nortel License, although not physically present.  *Id*. at Ex. F.  At that meeting, most of the major issues were resolved and the parties agreed to start preparing schedules to correspond to the Nortel products that would be licensed.  *Id*. at Ex. E.  Schedules were needed because the Nortel License required that, for any

5

Nortel product to be licensed, it must be evidenced on a schedule, which would identify the Nortel entity, product or project name, and operating system, as applicable, as part of this "a la carte" licensing arrangement.  *See* Brannick Aff. at Ex. C (Nortel License) at ¶¶ 1.17, 2(a), (c)).

14.     It was agreed at that meeting that Nortel would have a temporary 3 year right to continue distributing Bay products, but that its license right would terminate thereafter, and only those Bay products that had been separately placed on schedules during that 3-year period would be able to continue using SNMP Research Software.  The mechanism for declaring Bay products specifically on schedules allowed Nortel to receive the benefit of the Bay RBO for existing products, which benefited Nortel, while prohibiting Nortel from using the broad Bay License on new products which did not exist at Bay Networks.

15.     In follow up to the October 1999 meeting, Mr. Hyslop began preparing a list of Nortel products that needed to be scheduled in order to be licensed.  Mr. Hyslop sent Mr. Southwood a preliminary list of Nortel products on November 3, 1999.  *Id*. at Ex. G.  The spreadsheet attached to Mr. Hyslop's email identified 28 Nortel products, the SNMP Research software required by those Nortel products, and the individuals inside Nortel responsible for those products.  *Id*. at Ex. H.  Five of these products were identified as Bay products in column 1. On November 15, 1999, Mr. Hyslop sent Mr. Southwood an email containing correspondence that Mr. Hyslop intended to send to the individuals inside Nortel who were responsible for the Nortel products on the spreadsheet, and which explained the purpose of the new Nortel License. *Id*. at Ex. I.  In the correspondence Mr. Hyslop provided this explanation of "Bay" in Column 1:

> Column 1 divides the requirements into "Bay" and "NT" requirements. Those identified as "Bay" products are subject to the in place Bay-SNMP RI agreement (which has been assigned by Bay to Nortel); i.e. had the Bay-Nortel merger never occurred, Bay would have been entitled to deploy these products royalty free.

16.     Mr. Southwood acknowledged this e-mail on November 16, 1999 and responded with some corrections.  *See* Declaration of Tamara K. Minott in Support of Opposition [D.I. 18119; Adv. D.I. 548] (the "Minott Dec.") at Ex. 1.[7]  The only reason Mr. Hyslop would have identified the Bay products is because he fully understood that, for any Bay product to be licensed after the contemplated three-year period, and enjoy the RBO, the Bay products that existed at the time of the Nortel/Bay acquisition would have to be separately scheduled.  *See* Brannick Aff., Ex. C (Nortel License, ¶¶ 2(a), (c)).  The products identified as "NT" (i.e., the non-Bay Nortel products) also needed to be separately scheduled, but could not qualify for the Bay License RBO.  The parties would also have to negotiate a royalty rate for each such product.

17.     Two days later, by e-mail dated November 18, 1999, Mr. Southwood transmitted to Mr. Hyslop the first and only draft of Schedule 1A to the Nortel License.  *Id*. at Ex. J.  On November 25, 1999, Mr. Hyslop sent an internal email indicating that Bay products require a separate license: "PS Brian: note that the Bay buy out is a buy out for royalties only, and Bay must still, ***on a product by product basis***, get the right to use the Emanate source code." *Id*. at Ex. K (emphasis added).  This confirmed that Nortel understood that all Bay products using the Software had to be separately declared on schedules during the 3-year period of Schedule 1A.

18.     Mr. Southwood prepared schedules based on the spreadsheet Mr. Hyslop provided.  For each product labeled "Bay" in column 1, Mr. Southwood prepared a schedule which required license fees and maintenance fees but did not charge for royalties.  *See* Brannick Aff., Ex. C (Nortel License, Schedules 12, 14).  The Royalties section of Schedule 12 states: "[a]s portions of the former Bay Networks, the royalty buy out previously exercised by Bay Networks applies to this transaction."  This is consistent with Mr. Hyslop's understanding that

---

[7] This e-mail was quoted and discussed at length in the Opposition.  As such, SNMP Research is not quoting Mr. Southwood's extensive e-mail response here.

Bay distributed products needed a license but received credit for the RBO as specified in his

November 25, 1999 email, so long as the products were actually distributed by Bay and were in

fact declared on schedules during the three-year period of Schedule 1A.

19.     The Nortel License and certain schedules were fully executed on December 23,

1999.  Schedule 1A was not fully executed until June 20, 2000.  On May 15, 2000, Dr. Case

wrote to James Reeves of Nortel indicating to Mr. Reeves that Schedule 1A had not been signed.

Minott Dec. at Ex. 2.  Dr. Case referred to Schedule 1 as, "the document that grandfathers the

bay licenses over to the new Nortel master agreement…." *Id*.  Dr. Case also reminded Nortel

that it was distributing the products without a license until Schedule 1A was signed. *Id*.  It was

obviously important for SNMP Research to obtain a copy of the signed Schedule 1A, in part

because its termination was triggered from the date of full execution.

20.     Messrs. Hyslop and Southwood continued to work on licenses for products after

the Nortel License was signed.  In September of 2000, Mr. Hyslop asked Mr. Southwood for a

license for an old "Bay" product.   In response, Mr. Southwood prepared Schedule 20 but

mistakenly included a charge for royalties.  On September 21, 2000, Mr. Hyslop responded:

> John, I believe you are mistaken in including royalty charges on the attached
> Schedule 20.  Your [sic] will recall that back in December 1999 the old "Bay"
> operations/products were "grand fathered" as far as royalty payments were
> concerned in recognition of a previous "bay buy-out" for those products.  This
> was documented in Schedule 12 signed back in December 1999.  Therefore,
> please modify Schedul [sic] 20 to duplicate the wording in Schedul [sic] 12 under
> the royalties section….

Brannick Reply Aff. at Ex. L.  This e-mail confirms that Mr. Hyslop fully understood that all

Bay distributed products had to become covered by a separate schedule during the three year

period to be licensed at the end of that period,  even if the license was royalty-free.

21.     By 2003, Mr. Hyslop's responsibilities at Nortel shifted to Pierre Tremblay.  In

2003, Mr. Tremblay and Mr. Southwood along with Martha Hopper (an employee of SNMP

8

Research) began an exercise to understand the status of each schedule in the Nortel License.  In explaining why Schedule 12 had an RBO, more than five years before Nortel's bankruptcy filing or any thought of litigation, Mr. Southwood wrote the following:

> By the way Pierre, this is a good time to mention an informal agreement reached by Dave Hyslop and me during license negotiations.  In the years before Nortel purchased Bay, Bay was one of SNMPRI's better customers including the exercise of several royalty buy outs. Since we were negotiating with Nortel at about the same time that Nortel purchased Bay, Dave indicated that Nortel wanted some benefit from those previous royalty buy outs.  Since those royalty buy outs were not product specific, SNMPRI responded by saying that the lines between the former Bay and the former Nortel were going to blur over time, and the result would be that all of Nortel would get a royalty free license if we extended the benefits into the Nortel license.  **The compromise was that the benefits of the Bay royalty arrangement would extend to portions of the former Bay who established schedules over the following three years (2000, 2001, 2002). SNMPRI agreed as long as all schedules would be product specific.  Dave was certain to declare whether a particular transaction was associated with Bay or Nortel, and I have a column on the spreadsheet that I use that indicates Dave's comments.**  You may find that you also have a copy of that spreadsheet.

*Id*. at Ex. M (emphasis added).

22.     Mr. Southwood could not have been more clear that, even though Schedule 1A did not require SNMP Research to honor the Bay RBO for any products after the three-year period, SNMP Research informally agreed to do so on the express condition that the products be separately scheduled during the three-year window.  During this analysis, Mr. Tremblay stated, regarding Schedule 1A, "I still haven't found anything that fits this description but to be honest, I have not looked very hard."  *Id.*  In Mr. Tremblay's deposition, when asked about this statement, he stated: "[a]t that time when I made the comment, I couldn't find any product that somebody in R&D or product line management could confirm was from BayStack and included SNMP Research software."  *Id*. at Ex. N (Tremblay Deposition, October 18, 2016, 95:10-13).  These facts confirm the parties' understanding that Nortel only had the right to continue distributing the Schedule 1 products after June 20, 2003 if the product was placed on a separate schedule.

9

23.     Mr. Tremblay's statement that there were no Baystack products with the Software appears to be consistent with documentation regarding an internal audit at Nortel which SNMP Research uncovered in discovery in this case.  Specifically, in 2002, Mr. Tremblay was involved in an internal audit to determine what third-party software was used in Nortel products.  *Id*. at Ex. O.  As of June 4, 2002, the audit lists 38 products in the Baystack portfolio.  Of those 38 products, 26 were marked as "Legacy Products" or "Manufacturing Discontinued," 5 were new products, and 7 of the products were established.  Seven of the products have a vendor identified for its SNMP implementation.  Four of those products used Epilogue, a competitor to SNMP Research, and three of those products use SNMP Research's implementation.  *See id*.  This audit shows that Nortel discontinued the majority of these products before Mr. Tremblay's 2003 statement that he was unaware of any Software in Bay products.  Accordingly, it appears entirely reasonable that Mr. Tremblay would not have requested schedules for any Bay products, or thought that the Software was in any Bay products that existed in 1999, as the majority of them were being phased out and others had a competitor's SNMP software.

24.     In 2006, Nortel entered into a partnership with ▇▇▇▇▇▇▇▇ and wanted to use source code from ▇▇▇▇▇▇▇▇ containing the Software.  On January 16, 2006, Nana La-Anyane of Nortel asked Mr. Southwood for a letter verifying that Nortel had a license to the Software in the ▇▇▇▇▇▇ product.  *Id*. at Ex. P.  On January 24, 2016, Mr. Southwood wrote that he could not locate a license for the ▇▇▇▇ product.  *Id.*  ("I'm stuck at the moment because I'm wanting to locate the Nortel Schedule that you are using for your project.").

25.     On January 25, 2006, Mr. Southwood wrote that since there was no license he had prepared Schedule 71 and asked Nortel to sign it and send a PO to cover the license fees.  *Id.* In response, Greg Foster of Nortel wrote Mr. Southwood and asked why a new schedule was

10

needed because he was under the impression from a previous call that the ▮▮▮▮▮▮

product was licensed.  *Id.*  Mr. Southwood responded that on a previous call he had asked Nortel

what schedule/license covered the ▮▮▮▮ product and he was told the "old Bay license."  Mr.

Southwood looked at the old Bay License and found that it did not license the appropriate SNMP

Research products for the ▮▮▮▮▮▮ source code.  *Id.*  Then Mr. Southwood sent Nortel

a letter identifying the Software that Schedule 1A licenses and clearly stated that Nortel needed

to sign Schedule 71 to use the source code from ▮▮▮▮▮▮.  Minott Dec. at Ex. 5.

## ARGUMENT

## I.   The Parties Agree that Schedule 1A is Clear and Unambiguous.

26.    As discussed in the Motion to Exclude, under New York law, the analysis

regarding extrinsic evidence is straightforward:

> New York's contract law sets up essentially two stages of analysis.  In the first
> stage, the court asks, based on the intrinsic records, whether the language is
> ambiguous.  If it is unambiguous, that is the end of the matter.  Only if it is
> ambiguous, does the court move to the second stage, where the court could
> consider extrinsic evidence.

*Marathon Asset Mgmt., LP v. Angelo Gordon & Co, LP* (*In re Energy Future Holdings Corp.*),

2017 WL 1170830, at *4 (D. Del. Mar. 28, 2017) (interpreting New York contract law).

27.    The U.S. Debtors argue repeatedly in their Opposition that the termination

language in Schedule 1A is unambiguous. Opposition at ¶ 3 ("The meaning and effect of

Schedule 1 outlined above is plain from its content, without needing to consider anything else.");

*Id*. at ¶ 13 ("[T]he meaning and effect of Schedule 1 is clear from its content."); *Id*. at ¶ 15

("While Schedule 1's meaning is clear on its face.…").  The parties' agreement that the

termination language in Schedule 1A is unambiguous should end the inquiry as far as the Motion

to Exclude is concerned.  *See Marathon Asset Mgmt., LP,* 2017 WL 1170830, at *4 ("If it is

unambiguous, that is the end of the matter.").

28.     As Judge Andrews in *Marathon Asset Mgmt, LP* noted, "during the first stage, the question of whether language is ambiguous must be viewed through the lens of one knowledgeable of the customs and usages of the relevant field.  Under New York contact law, at this stage, evidence of who this person is and what this person knows must be derived from the intrinsic record."  *Id.*  After examining New York case law, Judge Andrews concluded that "under New York law, only at the second stage can extrinsic customs and usages evidence by considered."  *Id.* The Court's initial inquiry of whether the language is ambiguous therefore must be limited to the intrinsic record under New York law and that intrinsic record is the four corners of the agreement.  *Id.*  In discussing what constitutes extrinsic evidence, Judge Andrews held that, "[t]his appears to be classic extrinsic evidence because it does not appear that this information could be gleaned from the four corners of the Credit Documents."  *Id.*  The U.S. Debtors completely ignore the *Marathon Asset Mgmt, LP* case in its Opposition, and do not offer any argument that any of the so called custom and usage testimony is intrinsic, for good reason.

29.     While the parties agree that Schedule 1A is clear, they disagree about what Schedule 1A means.  This disagreement has no impact on the parol evidence rule.  As Judge Andrews explained:  "[t]he mere fact that the [p]arties disagree on the proper interpretation of the contract does not render the contractual language ambiguous."  *Id.* at *9 (quoting *Serdarevic v. Centex Homes, LLC,* 760 F. Supp. 2d 322, 329 (S.D.N.Y. 2010)).  At the May 11-12 hearing, therefore, the Court should decide between the parties' different interpretation of Schedule 1A without the use of extrinsic evidence.

30.     In addition, the Opposition completely ignores the integration clause in the Nortel License.  Brannick Aff. at Ex. C (Nortel License) at ¶ 9.10.  The New York Court of Appeals, which is New York's highest court, has held that, "[t]he purpose of a merger clause is to require

12

the full application of the parol evidence rule in order to bar the introduction of extrinsic evidence to alter, vary or contradict the terms of the writing." *Jarecki v. Shung Moo Louie*, 745 N.E.2d 1006, 1009 (N.Y. 2001).  Nortel does not even address the impact of the integration clause on the use of extrinsic evidence.  Even without the integration clause, extrinsic evidence would not be admissible, but the existence of such a clause should close the door to the analysis.

## II.    <u>The Facts of Schedule 1's Negotiation Confirm its June 20, 2003 Termination Date.</u>

31.    Because the U.S. Debtors have muddied the record with reams of inappropriate extrinsic evidence in its Opposition, SNMP Research is compelled to set the record straight and explain why the extrinsic evidence does nothing but reinforce Schedule 1A's clear termination date.  From the facts described above, it is clear that Nortel wanted SNMP Research to transfer the non-transferrable Bay License to Nortel without restrictions.  This request was indisputably denied by SNMP Research.  SNMP Research was concerned that the lines between products distributed by Bay and Nortel products would blur over time and would lead to an attempt by Nortel to argue that Nortel products are Bay products to avoid payment of future royalties to SNMP Research.  Although the U.S. Debtors failed in this attempt back in 1999, they are now trying to resuscitate that failure more than 17 years later without a single witness in support.

32.    SNMP Research was not obligated to give Nortel any benefit from the Bay RBO, but decided to do so as a good faith effort to compromise.  Namely, SNMP Research agreed to give Nortel the benefit of the Bay License RBO, for the products that were actually distributed by Bay, so long as they were separately scheduled during the three-year period of Schedule 1A.  As such, Nortel had three years to declare and license those products by signing schedules for those products and paying the appropriate license and maintenance fees.  This arrangement allowed Nortel to get the benefit of the Bay License RBO for certain existing products, while

13

protecting SNMP Research from future arguments that Nortel products were actually Bay products for which no royalty would be due if separately scheduled.

33.     Messrs. Hyslop and Southwood clearly understood this arrangement, which explains why Mr. Hyslop identified products as "Bay" and others as "NT" on the spreadsheet in 1999 that specified what products that needed licenses.  Brannick Reply Aff. at Ex. G.  When Mr. Southwood drafted schedules for the Bay products he used phrases such as "Paid under Bay Royalty Buy Out Agreement" to explain that royalties were not owed on this particular product. *See* Brannick Aff. at Ex. C (Nortel License), Schedule 14.  In the case of Schedule 20, where Mr. Southwood neglected to include the RBO in the initial draft schedule, Mr. Hyslop reminded him of this arrangement.  *Id*. at Ex. L.  The U.S. Debtors ignore all of this evidence as if Nortel never declared any Bay products under separate schedules, as the parties agreed.  None of these documents are a surprise to the U.S. Debtors, as they have all been mentioned in an expert report or deposition in this case.  The U.S. Debtors do not even attempt to explain why Mr. Hyslop identified Bay products as needing schedules if Schedule 1A licensed all Bay products forever. The reason is simple: Schedule 1A expired after 3 years, and Nortel only had license rights to a product distributed by Bay if a new schedule had been entered into covering that product.

34.     On the other hand, the U.S. Debtors' interpretation of Schedule 1A is primarily based on John Southwood's November 16, 1999 email, in which Mr. Southwood states: "[c]urrent Bay products and development projects for the next three years will take advantage of the lifetime royalty buy out until their products have aged out of the marketplace."  Minott Dec. at Ex. 1.  The U.S. Debtors' interpretation of this e-mail is wrong for multiple reasons.  *First,* Mr. Southwood never mentions Schedule 1A or says that the e-mail is the extent of Schedule 1A's agreement, which had yet to be drafted.  On the contrary, Mr. Southwood is replying to Mr.

14

Hyslop's November 15 email, in which Mr. Hyslop is clearly discussing the master license agreement and the attached schedules more generally.

35.     *Second*, there is no language in Schedule 1A providing for an RBO for longer than the term of Schedule 1A, and the U.S. Debtors have not been able to point to any.  Taken in context, therefore, it is obvious that Mr. Southwood was referring to the schedules that he and Mr. Hyslop had been preparing as reflected in the spreadsheet.  Indeed, the spreadsheet and the identification of Bay products is the focus of the email that Mr. Hyslop sent to Mr. Southwood, for the express purpose of preparing schedules for those products so that the license and RBO could continue.  The fact that the agreement regarding schedules for Bay distributed products is not documented in Schedule 1A does not somehow invalidate the meaning of Schedule 1A, or, as Nortel suggests, change its clear meaning.  The U.S. Debtors' attempt to twist this email demonstrates the inherent danger in allowing extrinsic evidence to circumvent the clear language of an actual and clear contract, and this is why New York law prohibits it.

## III.     <u>Post-Termination Extrinsic Evidence May be Considered for a Limited Purpose.</u>

36.     The U.S. Debtors rely on post-June 20, 2003 extrinsic evidence for two purposes: (1) to establish that Schedule 1A itself did not terminate on June 20, 2003 (which is factually inaccurate); and (2) to show that, if Schedule 1A actually terminated when it clearly says it did, post-termination conduct of the parties gives rise to an implied license after June 20, 2003, or an extension of Schedule 1A.  Opposition at §§ III(B), (C), IV.  If the Court were to consider any extrinsic evidence, such extrinsic evidence must be limited to the latter issue and conduct of the parties *after* June 20, 2003, the date Schedule 1A terminated.

15

**IV.**    **The Parties' Post-Termination Actions Do Not Imply that Schedule 1A Terminated After June 20, 2003 or Extended Beyond that Date.**

37.    In their next attempt to re-write the meaning of Schedule 1A, the U.S. Debtors rely heavily on the fact that SNMP Research shipped software under an SSA after 2003. The SSA in question, however, dated back nearly a decade, and this was simply a routine renewal by a department at SNMP Research that was neither familiar with Schedule 1A nor would have any reason to know anything about it. Also, there is no evidence that the Software shipped after 2003 was even used in the infringing products. In fact, the version of Software (15.3.1.15) used in the infringing products was shipped to Nortel in 2002. Indeed, the invoices associated with the SSA, and all the correspondence related to the SSAs, do not mention Schedule 1A or any particular Nortel product. *See* Minott Dec. at Ex. 13. The SNMP Research departments that handle SSAs and licenses operate independently. Brannick Reply Aff. at Ex. Q (Dr. Jeffrey Case depo. tr. (1/11/17) at 240:9-13). Nortel had approximately 56 Schedules under the Nortel License and many active SSAs.

38.    The crux of the U.S. Debtors' argument is that the shipment of unused software creates a license to use and distribute the products. That is not the law. SNMP Research did not know of the Nortel products that were related to this SSA, and specifically had no awareness that the Baystack, ES, or ERS products were using SNMP Research software as of June 20, 2003. Indeed, in August of 2003, Mr. Tremblay specifically told Mr. Southwood that he could not identify any products licensed under Schedule 1A that were using SNMP Research Software. *Id.* at Ex. M. If the Nortel person interfacing with SNMP Research, Mr. Tremblay, did not know

16

that the Baystack products were using SNMP Research Software in 2003, then how could SNMP Research know this?  There is zero evidence to suggest it did.[8]

39.    The U.S. Debtors next point out that Dr. Case referred to Schedule 1A as "the document that grandfathers the Bay licenses over to the new Nortel master agreement"  in an email to James Reeves.  Opposition at ¶ 5 (citing Minott Dec. at Ex. 2).  Dr. Case's position is accurate and the fact that he did not mention the three-year termination provision does not mean it no longer applies or that Nortel did not have the option to enter into other schedules.

40.    Nortel also relies on a 2006 letter from Mr. Southwood.  The purpose of Mr. Southwood's letter was to advise Nortel that it needed to sign a new schedule, Schedule 71, to have a license for the source code from ██████████.  Minott Dec. at Ex. 5.  Mr. Southwood mentioned Schedule 1A to explain that the source code from ██████████ was unlicensed.  The statement about Schedule 1 was a mistake on Mr. Southwood's part, but it certainly does not create a broad license that continued after June 20, 2003.  Also, Nortel was not asking in 2006 if it had a license to Baystack, ES, or ERS products, and nothing in Mr. Southwood's letter refers to Nortel having a license for these products.  In fact, as discussed above but ignored by Nortel, Mr. Southwood was crystal clear, three years earlier, that Nortel needed to enter into schedules to use or distribute any products containing the Software after the termination of Schedule 1A.  *See* Brannick Reply Aff. at Ex. M.

## V.    Nortel's Rights under Schedule 1A Terminated on June 20, 2003.

41.    The parties are scheduled to brief the merits of the Schedule 1A Issue by May 4, 2017.  In that brief, SNMP Research intends to submit in more detail why the Court should ultimately hold that Schedule 1A terminated on June 20, 2003 as to all products, and that no

---

[8] Also, the 2002 audit results show that many Baystack products were using an SNMP Research competitor, Epilogue.  *Id.* at Ex. O.

post-termination conduct gives rise to any implied new contract or extension.  As is typical with the U.S. Debtors, they chose to argue the ultimate merits issue here, so SNMP Research is compelled to address two of their arguments.

42.    The U.S. Debtors' first substantive argument is that Schedule 1A must have granted Nortel a perpetual RBO because the Bay License RBO provisions were incorporated into Schedule 1A.    *See* Opposition at ¶¶ 23-24.    The U.S. Debtors never explain why the incorporation of an RBO invalidates the clear termination provision in Schedule 1A.  Indeed, after referencing the Bay License RBO provisions, Schedule 1A clearly states that "this Schedule supersedes all of the prior agreements between SNMP and Bay … and all such agreements are hereby terminated by execution of this Schedule."  Brannick Aff. at Ex. C, p. 2.  Schedule 1A goes on to confirm that it "shall terminate and be of no further effect after a period of three years…."  *Id*.  If the parties intended to incorporate the Bay License RBO in full forever, there would have been no need to include the clear termination language of Schedule 1A that the U.S. Debtors completely ignore when making this first argument.

43.    The U.S. Debtors' second substantive argument is that the expiration of Schedule 1A on June 20, 2003 would lead to drastic and untenable consequences.  This is simply not the case.  Nortel could have received a perpetual, royalty free license for any product that Bay distributed before the acquisition by entering into a schedule for that product and paying the associated license fees and maintenance fees.  Nortel did exactly this for several products.  *See* Brannick Aff., Ex. C (Nortel License) Schedules 12, 14, 20.  The U.S. Debtors completely ignore these critical facts.  That SNMP Research honored its informal arrangement and allowed Nortel to schedule appropriate Bay products separately, for no royalty fee, completely undermines the U.S. Debtors' call for equity that, "under the proper reading of Schedule 1[A], neither party

18

would be at the other's mercy after the termination of Schedule 1[A]."   Opposition at ¶ 32.

Under the correct reading of Schedule 1, Nortel had a three-year license for all Bay products in

distribution in 1999.   Under the parties' informal arrangement, if Nortel wanted to extend those

licenses then it could do so by entering into new schedules and paying the license fees and

maintenance fees.   For any new Nortel products, Nortel had to decide if it wanted to use the

Software.   Alternatively, Nortel could choose to use another vendor's SNMP software or write

its own.   In sum, the U.S. Debtors' reading of Schedule 1A would actually create the inequitable

situation of allowing Nortel to create an entire forest of products when it only paid for one tree.

The U.S. Debtors are not seeing the forest for the trees.

## VI.    The U.S. Debtors Provide No Legitimate Basis for Dr. Razgaitis' testimony.

44.    The U.S. Debtors misstate Dr. Razgaitis's experience by noting that he has

published numerous books on licensing and valuation.   Opposition at ¶ 67.   In Dr. Razgaitis's

C.V., not a single publication on licensing is cited.   Each publication is on valuation and pricing.

45.    On the substance, the U.S. Debtors argue that Dr. Razgaitis's opinion is required

to understand the word "terminate."   Opposition at ¶ 78.   Dr. Razgaitis does not agree with the

U.S. Debtors, clearly stating in his deposition that there are no IT industry specific words in the

termination language of Schedule 1A:

> Q. Right. There's no specific word you're saying is a specialized word of art in
> this software industry that requires custom and practice interpretation to
> understand what that words means, correct?
>
> A. On an individual – word basis, I agree with you.

Brannick Aff. at Ex. D (Razgaitis depo. tr. at 323:23 - 324:6).

46.    Dr. Razgaitis's custom and practice opinion is not focused on understanding

words in the contract.   There can be no reasonable debate about what it means for a license right

to "terminate." Although completely ignored by the U.S. Debtors, Schedule 1A provides an

19

intrinsic explanation after the word "terminate in order to prevent any misunderstanding:  "and be of no further effect after a period of three years…."  Nothing could be clearer.

47.     Fully understanding that the contract language does not help them, and there is no custom and practice that can overcome it, Dr. Razgaitis instead focused on discrediting the clear language of Schedule 1A because of what is not in Schedule 1A.  The U.S. Debtors argue that "[t]he absence of language in Schedule 1 addressing Nortel's ability to extend its right to use SNMP Research's software is, in Dr. Razgaitis's view, 'strong custom and practice guidance that the parties considered Nortel's [royalty buy out] right to be the same as Bay [Network]'s had been, perpetual as to its relevant products.'"  Opposition at ¶ 70.  If Dr. Razgaitis is right that the absence of specific language in a termination provision changes the clear language of a termination provision then it would stand to reason that any reputable book written on drafting termination provisions in IT agreements would include such a requirement.  But, Dr. Razgaitis does not cite a single treatise, book, or article that supports his opinion in his report and Dr. Razgaitis could not cite a single source in his deposition either.  *Id*. at 209:23 - 210:11.  In fact, what is missing in Schedule 1A is the language to support the U.S. Debtors' new theory.  There is no language in Schedule 1A that provides a lifetime license.  If the parties intended to have a carve out to the three-year termination, then the parties would have added language to that effect.  Dr. Razgaitis does not mention any language in his report and when asked repeatedly in his deposition to point to the language that Nortel continued to have rights to distribute the products originally distributed by Bay after June 20, 2003, Dr. Razgaitis could not do so.  *Id*. at 43:3-54:3.

## CONCLUSION

48.     For the reasons set forth in the Motion to Exclude and this Reply, the Court should grant the Motion to Exclude and interpret Schedule 1A at the May 11-12 hearing based on its plain text.

53651/0001-14419663v2

Dated: April 27, 2017

<div style="display:flex">

**OF COUNSEL**

Richard S. Busch, Esq.
**King & Ballow Law Offices**
315 Union Street, Suite 1100
Nashville, TN 37201
(615) 259-3456 (Phone)
(615) 726-5417 (Fax)
rbusch@kingballow.com

-and-

John L. Wood, Esq.
**Egerton, McAfee, Armistead & Davis, P.C.**
900 S. Gay Street
Knoxville, TN 37902
(865) 546-0500 (Phone)
(865) 525-5293 (Fax)
jwood@emlaw.com

**COLE SCHOTZ P.C.**

*/s/ Nicholas J. Brannick*
Norman L. Pernick (No. 2290)
Nicholas J. Brannick (No. 5721)
500 Delaware Avenue, Suite 1410
Wilmington, DE 19801
(302) 651-2002 (Phone)
(302) 652-3117 (Fax)
npernick@coleschotz.com
nbrannick@coleschotz.com

-and-

G. David Dean, Esq.
300 E. Lombard Street, Suite 1450
Baltimore, MD 21202
(410) 230-0660 (Phone)
(410) 230-0667 (Fax)
ddean@coleschotz.com

*Counsel for SNMP Research, Inc. and SNMP Research International, Inc.*

</div>