# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | ) | |
| | ) | Chapter 11 |
| Nortel Networks Inc., *et al.*, | ) | Case No. 09-10138 (KG) |
| | ) | (Jointly Administered) |
| Debtors.[1] | ) | **Related to Docket Nos. 18020, 18086, 18118** |
| SNMP Research International, Inc. | ) | |
| and SNMP Research, Inc., | ) | |
| Plaintiffs, | ) | |
| | ) | Adv. Proc. No. 11-53454 (KG) |
| v. | ) | **Related to Adv. Docket Nos. 540, 542, 547** |
| | ) | |
| | ) | **Hearing Date: May 11, 2017 at 11:00 a.m. EST** |
| Nortel Networks Inc., *et al.*, | ) | |
| Defendants. | ) | |

## SNMP RESEARCH, INC.'S AND SNMP RESEARCH INTERNATIONAL, INC.'S PRE-HEARING BRIEF ON SCHEDULE 1 ISSUE

**OF COUNSEL**
Richard S. Busch, Esq.
**King & Ballow Law Offices**
315 Union Street, Suite 1100
Nashville, TN 37201
(615) 259-3456 (Phone)
(615) 726-5417 (Fax)
rbusch@kingballow.com

-and-

John L. Wood, Esq.
**Egerton, McAfee, Armistead & Davis, P.C.**
900 S. Gay Street
Knoxville, TN 37902
(865) 546-0500 (Phone)
(865) 525-5293 (Fax)
jwood@emlaw.com

**COLE SCHOTZ P.C.**
Norman L. Pernick (No. 2290)
Nicholas J. Brannick (No. 5721)
500 Delaware Avenue, Suite 1410
Wilmington, DE 19801
(302) 651-2002 (Phone)
(302) 652-3117 (Fax)
npernick@coleschotz.com
nbrannick@coleschotz.com

-and-

G. David Dean, Esq.
300 E. Lombard Street, Suite 1450
Baltimore, MD 21202
(410) 230-0660 (Phone)
(410) 230-0667 (Fax)
ddean@coleschotz.com

*Counsel for SNMP Research, Inc. and SNMP Research International, Inc.*

Dated: May 4, 2017

---

[1] In addition to Nortel Networks Inc., the debtors in these Chapter 11 cases are: Nortel Networks Capital Corporation, Nortel Altsystems Inc., Nortel Altsystems International Inc., Xros, Inc., Sonoma Systems, Qtera Corporation, CoreTek, Inc., Nortel Networks Applications Management Solutions Inc., Nortel Networks Optical Components Inc., Nortel Networks HPOCS Inc., Architel Systems (U.S.) Corporation, Nortel Networks International Inc., Northern Telecom International Inc., Nortel Networks Cable Solutions Inc.; Nortel Networks (CALA) Inc.; and Nortel Networks India International Inc.

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................................1

RELEVANT FACTS ........................................................................................................5

        A.    The Bay License, Temporary License Agreement and Parties'
             Negotiations Leading to the Nortel License and Schedule 1A ...................5

        B.    The Parties' entry into the Nortel License, Schedule 1A and Other
             Relevant Schedules, and their Respective Terms .....................................10

        C.    The Parties' Post-Schedule 1A Termination Communications ................13

ARGUMENT ...............................................................................................................17

     I.    Nortel's Rights under Schedule 1A Terminated on June 20, 2003 as to All
        Products................................................................................................18

     II.    Communications Leading to and Immediately Following Schedule 1A's
        Execution Confirm Schedule 1A's June 20, 2003 End Date. ...............................23

     III.    No Implied License Was Created Beyond Schedule 1A's Stated
        Termination Date. .................................................................................26

     IV.    The Schedule 1A Agreement Was More than Fair to Nortel................................29

CONCLUSION..............................................................................................................31

53651/0001-14445630v3

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Andrews v. Sotheby Int'l Realty, Inc.*, 2014 WL 626968 (S.D.N.Y. Feb. 18, 2014) ....................26

*Bajan Grp., Inc. v. Consumers Interstate Corp.*, 2010 WL 3341456 (N.Y. Sup. Ct.
  Aug. 12, 2010) ...................................................................................................................19, 20

*Barrow v. Lawrence United Corp.,* 538 N.Y.S.2d 363 (N.Y. App. Div. 1989) ...........................18

*Beal Sav. Bank v. Sommer,* 8 N.Y.3d 318, 324 (N.Y. 2007) ........................................................18

*Circle Line Sightseeing Yachts, Inc. v. Circle Line-Statue of Liberty Ferry, Inc.*,
  2003 WL 253094 (S.D.N.Y. Feb. 4, 2003).................................................................................7

*DDS Partners, LLC v. Celenza*, 6 A.D.3d 347 (N.Y. App. Div. 2004)........................................18

*Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*,
  375 F.3d 168 (2d Cir. 2004)......................................................................................................17

*Hamden v. Total Car Franchising Corp.*, 548 F. App'x 842 (4th Cir. 2013) ..............................18

*Intesa Sanpaolo, S.p.A. v. Credit Agricole Corp. and Inv. Bank,* 2013 WL
  4856199 (S.D.N.Y. Sep. 10, 2013) ..........................................................................................21

*Jefferson Chem. Co. v. Mobay Chem. Co.*, 267 A.2d 635 (Del. Ch. 1970) ..................................18

*Local Union 813, Int'l Bhd. of Teamsters v. Waste Mgmt. of N.Y., LLC*,
  469 F. Supp. 2d 80 (E.D.N.Y. 2007) ........................................................................................27

*Lynch v. Savarese*, 629 N.Y.S.2d 805 (N.Y. App. Div. 1995) ......................................................7

*M & G Polymers USA, LLC v. Tackett*, 135 S. Ct. 926 (2015) ....................................................19

*Maas v. Cornell Univ.,* 94 N.Y.2d 87, 721 N.E.2d 966, 699 N.Y.S.2d 716 (1999) .....................26

*Marathon Asset Mgmt., LP v. Angelo Gordon & Co, LP (In re Energy Future
  Holdings Corp.*), 2017 WL 1170830 (D. Del. Mar. 28, 2017) .................................................17

*Martin v. Campanaro*, 156 F.2d 127 (2d Cir. 1946).............................................................26, 27

*MBIA Insurance Corp. v. Patriarch Partners III, LLC*,
  842 F.Supp.2d 682 (S.D.N.Y. 2012).................................................................................21, 22

*Monahan v. Lewis*, 51 A.D.3d 1308, 858 N.Y.S.2d 812 (N.Y. App. Div. 2008) .........................27

*Nat'l Union Fire Ins. Co. of Pittsburgh v. Beelman Truck Co.*,
203 F.Supp.3d 312 (S.D.N.Y. 2016)......................................................22

*Netbula, LLC v. BindView Dev. Corp.*, 516 F. Supp. 2d 1137 (N.D. Cal. 2007) ........................24

*Nicosia v. Muller*, 645 N.Y.S.2d 385 (N.Y. App. Div. 1996) ........................................7

*Record Club of Am., Inc. v. United Artists Records, Inc.*,
890 F.2d 1264 (2d Cir. 1989)..............................................................17

*SQL Sols., Inc. v. Oracle Corp.*,
1991 WL 626458 (N.D. Cal. Dec. 18, 1991) .......................................24

*Tang v. Jinro Am., Inc.*, No. 2008 WL 4163183 (E.D.N.Y. Sept. 4, 2008)............................26, 27

*Torres v. Major Auto. Grp.*, 2014 WL 4802985 (E.D.N.Y. Sep. 25, 2014) ................................22

*Trubowitch v. Riverbank Canning Co.*, 30 Cal. 2d 335 (Cal. 1947)...........................................24

*Wall St. Sys. Swed. AB v. Hertz Glob. Holdings, Inc.*,
2015 WL 158887 (S.D.N.Y. Jan. 13, 2015) .................................17, 27

*Watts v. Columbia Artists Mgmt. Inc.*,
188 A.D.2d 799, 591 N.Y.S.2d 234 (N.Y. App. Div.) .........................26

*Zucker v. Waldmann*, 2015 WL 390192 (N.Y. Sup. Ct. Jan. 23, 2015) .......................................21

**RULES**

F.R.E. 1004(a)..............................................................................................7

**STATUTES**

Cal. Corp. Code § 1107..............................................................................24

**OTHER AUTHORITIES**

3 A. Corbin, Corbin on Contracts § 553 (1960) ........................................19

Black's Law Dictionary (10th ed. 2014)................................................1, 18

*Random House College Dictionary*, Revised Edition [1980].......................18

53651/0001-14445630v3

SNMP Research, Inc. ("SNMPR") and SNMP Research International, Inc. ("SNMPRI") (together, "SNMP Research"), by their undersigned counsel and pursuant to the Scheduling Order Concerning Motion to Amend Proofs of Claim and Schedule 1 Issue [D.I. 18020; Adv. D.I. 540] (the "Scheduling Order"), hereby submit this brief in connection with the portion of the joint hearing scheduled for May 11-12, 2017 (the "Hearing") concerning Schedule 1A of the License Agreement between Nortel and SNMPRI dated December 23, 1999 (the "Nortel License").[1]

## PRELIMINARY STATEMENT

1.      The narrow and agreed issue before the Court is "whether the SNMP Research Software was licensed for use or distribution under Schedule 1A of the Nortel License (the "Schedule 1 Issue") with respect to any products after June 20, 2003."[2]  The relevant provision of Schedule 1A provides that:

> This **_Schedule_** and **_the license_** in regard to the Development Software and Run-Time Software **_shall terminate_** and be of **_no further effect_** after a period of **_three years_** from the last date that this Schedule is executed below (emphasis added).

2.      The Schedule 1 Issue boils down to interpreting the meaning of the ordinary word "terminate," which is commonly defined to mean "to end" or "to conclude."[3]  If this straight-forward definition is applied here, Schedule 1A and all licenses granted to Nortel thereunder ended on June 20, 2003 as to *all* covered products, three years after it was fully executed, and the Court should rule in favor of SNMP Research.  The plain text of Schedule 1A leaves no reasonable doubt that "terminate" means what is says.  But if the word "terminate" is not clear enough, the phrase "and be of no further effect" following "terminate" ends any logical debate

---

[1] **Hearing Ex. P–31**.

[2] Scheduling Order at ¶ 1.  In confirming the narrow issue before the Court, the Scheduling Order provides that, "the Hearing shall not include consideration of what products might be covered by Schedule 1[A] if the Court were to determine that any license rights under Schedule 1[A] did not terminate on June 20, 2003."  *Id.*

[3] Black's Law Dictionary (10th ed. 2014).

1

on when Nortel's license rights under Schedule 1A concluded. The U.S. Debtors' argument that the plain text of Schedule 1A supports an interpretation that "terminate" does not apply to certain products directly contracts the plain meaning of the contract and must be rejected.

3.  On May 2, the Court denied SNMP Research's motion to exclude and ruled that, in addition to considering the contract language, the Court would also consider extrinsic evidence of the parties' interpretation of Schedule 1A. [D.I. 560] While SNMP Research disagrees that extrinsic evidence should be heard, when the Court hears this evidence, as opposed to the U.S. Debtors' commentary about it, the Court should easily rule that Schedule 1A terminated as to all products on June 20, 2003. Through the testimony of Dr. Jeffrey Case, John Southwood (a former SNMP Research employee) and David Tollen (SNMP Research's custom and practice rebuttal expert), and documentary evidence, SNMP Research will show that, at inception, Nortel fully understood that it had three years to obtain separate licenses for any product/projects that had been developed or distributed by Bay prior to Nortel's acquisition of Bay to receive the benefit of the royalty buyout for those products, and that nothing would be independently licensed under Schedule 1A after its termination date.

4.  As the Court will recall, Nortel argued at the hearing on the motion to exclude to the contrary - that the extrinsic evidence supposedly showed that it did not have to license products separately (i.e., place them on Schedules in order for a product to be licensed), and was just entitled to inherit the Bay royalty buy-out. Nortel relied upon, and stressed, that a November 16, 1999 email from John Southwood supports that argument, and stated that SNMP Research was basically acting in bad faith (has the "audacity") to argue otherwise in light of that email. In essence, Nortel asserted that the email showed that everyone understood, prior to the delivery of Schedule 1A, that Nortel did not have to license the Bay products from SNMP and just had a perpetual royalty-free license forever for any product that originated from Bay. Not only is this

2

statement not true, but Nortel knows it is not true, and purposefully did not show the Court

internal Nortel documents that prove that it is not true.  On November 25, 1999, nine days after

the allegedly damning email from John Southwood was sent, David Hyslop sent an internal

email within Nortel that stated:

> P.S. Brian: note that the Bay buy out is a buy out for royalties only, ***and Bay must still, on a product by product basis, get the right to use the Emanate Source Code.***

5.      Thus, David Hyslop, the very person negotiating Schedule 1A with SNMP

Research, and the recipient of the November 16 Southwood email, clearly knew and understood

on November 25, 1999 that, in order to take advantage of the Bay buy outs, Nortel needed

licenses to use the Software in each individual Bay product.  Without licenses, he knew that

Nortel had no right to distribute any such Bay product containing the Software.  It is, therefore,

Nortel, and not SNMP Research, that is being "deeply disingenuous" with this Court, and hoping

that it can convince this Court that a deal which is plain on its face instead means something

different than what the words say by twisting and taking "extrinsic" evidence not only out of

context, but also by disregarding the evidence it does not like.

6.      Indeed, if this were not enough, during this same time frame, David Hyslop was

sending spreadsheets to SNMP Research identifying products as "Bay" or "NT" products for the

very purpose of placing them on Schedules, and Nortel actually *did* obtain multiple separate

licenses before Schedule 1A terminated for products that it stated originated at Bay, which

SNMP Research licensed to Nortel royalty free - all critical facts the U.S. Debtors also continue

to ignore to date.  These are just examples of the "extrinsic evidence" Nortel has ignored, all of

which is discussed more fully below, and which full supports SNMP Research in this matter.

7.      Despite the U.S. Debtors' cries of unsupported unfairness, the Schedule 1A

arrangement was in fact the result of a fair compromise in response to Nortel's initial, overly

3

aggressive and completely unfair request for SNMP Research to give Nortel the full benefit of a *non-transferable* royalty buyout that SNMP Research granted to Bay before Nortel's acquisition of Bay in 1998. If SNMP Research had allowed Nortel to obtain the full benefit of the Bay royalty buyout, it would have resulted in Nortel claiming (as the U.S. Debtors do here, more than 17 years later) that products developed at Nortel were covered by the original Bay royalty buyouts simply because products that originated at Nortel used the same software as products that originated at Bay. SNMP Research then would not have had the right to be paid by Nortel for new Nortel products under the master Nortel License the parties were simultaneously negotiating. It was critical for SNMP Research to avoid that result, and, in a face-to-face meeting in October 1999, Dr. Case communicated SNMP Research's concern that Nortel and Bay products would blur over time if the Bay license was transferred without restriction. A few weeks later, Mr. Southwood reiterated this concern in an e-mail to Mr. Hyslop.

8.      While SNMP Research wanted to make sure it was paid fairly for new Nortel products, SNMP Research was willing to honor the Bay royalty buyouts for applicable existing Bay products, so long as Nortel obtained separate schedules for those covered products during the three-year period of Schedule 1A (which Nortel in fact did for several products). The extrinsic evidence simply leaves no doubt as to when Nortel's license rights as to all products under Schedule 1A ended, and the U.S. Debtors' purported custom and practice evidence more than 17 years later to override the plain language of Schedule 1A does nothing to change this result.

9.      Moreover, as discussed below, the parties' conduct after Schedule 1A does not even remotely support an argument that Nortel was granted an implied license or extension of Schedule 1A's stated termination date, and, in fact, the parties' post-June 2003 communications establish exactly the opposite. For these reasons, and as the evidence will make abundantly clear

4

at the Hearing, Schedule 1A's license rights ended on June 20, 2003, and all otherwise unscheduled products became unlicensed on that date.

## RELEVANT FACTS

### A. The Bay License, Temporary License Agreement and Parties' Negotiations Leading to the Nortel License and Schedule 1A

10.     In 1994, SNMPR licensed portions of its software (the "Software") to a company by the name of SynOptics, which later merged with a company known as Wellfleet, to form Bay. SNMP Research thereafter consented to the transfer of the SynOptics agreement to Bay, and Bay licensed the Software under the license agreement with SynOptics dated June 27, 1994, as amended (collectively, the "Bay License").[4]  **Hearing Ex. P–20**.  Under the Bay License, SNMP Research granted to Bay a non-exclusive, ***non-transferrable***, worldwide license to use the Software, subject to certain restrictions contained therein.  *Id.* at ¶¶ 2-3.

11.     The Bay License was broad, allowing use and distribution of certain Software in certain Bay products developed at a given location, without any time restrictions.  Bay did not have to pay running royalties on the Software licensed under the Bay License because it paid for a combination of a royalty buyout or "RBO" for certain Software and a royalty lease which later become an RBO for other Software.  *See id.*, Attachment C.  The Bay License also provided for a license fee.[5]  *See id.*, Attachment A.

12.     In September 1998, Bay was acquired by Northern Telecom for $9.1 billion.  For more than a year following the Bay acquisition, Nortel improperly used the Software under the Bay License without SNMP Research's consent.  In an e-mail dated June 21, 1999 from Dave

---

[4] Pursuant to Amendment 2 to the Bay License, the parties confirmed the transfer of rights and responsibilities as licensor from SNMPR to SNMPRI, and the transfer of rights and responsibilities as licensee from SynOptics to Bay.

[5] As was typical with SNMP Research's agreements, software services were evidenced by a separate Software Service Agreements ("SSA").  Here, there were two, one of which was originally with Synoptics and one of which was with Bay.  The SSAs required the payment of fees.

Hyslop of Nortel to John Southwood of SNMP Research, Mr. Hyslop acknowledged Nortel's use of the Software without a license.  Mr. Hyslop said:

> In going through the reams of documentation in the SNMP RI file, it occurred to me that the SNMP RI – Bay agreement should be formally assigned to Nortel as Nortel has been operating as though it were the licensee since the Nortel acquisition of Bay last September.  To formalize that arrangement, I've prepared and attach a copy of an assignment agreement for SNMP RI's approval and signature.  Any queries, please call.

**Hearing Ex. P–26**.  Mr. Hyslop attached to that e-mail a proposed Memorandum of Agreement under which the rights under the Bay License would transfer to all of Nortel without cost.  *See id.*

13.    In the months following Nortel's initial proposal relating to the Bay License, the parties began to discuss the possibility of a more global license agreement under which Nortel could license the Software for a single fee.  In furtherance of those preliminary discussions, Nortel requested a quote from SNMP Research to use the Software in any Nortel product under a fully paid-up license.  By e-mail dated August 25, 1999, SNMP Research responded and proposed to give Nortel an unlimited license to its Software and services for ███████████ ███████████████████████████.  *See* **Hearing Ex. P–32**.  Nortel rejected this proposal as too expensive.  The discussions thus turned to licensing portions of the Software to specific Nortel entities in specified products (i.e., an "a la carte" arrangement).

14.    As a result of this newly contemplated "a la carte" arrangement, SNMP Research was not willing to allow Nortel simply to obtain the benefit of the RBOs in the Bay License without restrictions, as Mr. Hyslop originally requested, and that initial proposal was rejected. SNMP Research was concerned that the lines between Bay and Nortel products would "blur over time," allowing Nortel to argue (as they do in this litigation, ironically) that Nortel products were Bay products for which no additional royalties would need to be paid when they were actually developed after Nortel's acquisition of Bay.

15.     While these preliminary discussions were ongoing, in approximately August 1999, the parties entered into a Temporary License Agreement that gave Nortel the right to continue distributing the Bay products until November 1, 1999, under the terms of the Bay License.  *See* **Hearing Ex. P–29**.  The Temporary License Agreement provided that "SNMPRI hereby grants Nortel a temporary assignment of the [Bay License] which temporary assignment shall terminate on November 1, 1999." *Id.*[6]

16.     As the parties continued to work on the proposed master license agreement, and during the term of the Temporary License Agreement, they met face-to-face at SNMP Research's facility in October of 1999 to negotiate what ultimately became the Nortel License, including Schedule 1A to that License.  **Hearing Ex. P–33**.  The meeting was attended by Nortel representative Mr. Hyslop, and Mr. Southwood and Dr. Case representing SNMP Research. Rick Barnes, SNMP Research's counsel, was also in attendance.  *See* **Hearing Ex. P–35**. Catherine Grant, Nortel's counsel, was also actively involved in reviewing the Nortel License, although not physically present.  *See* **Hearing Ex. P–36**.  At that meeting, most of the major issues were resolved and the parties agreed to start preparing schedules to correspond to the Nortel products that would be licensed.  *See* **Hearing Ex. P–35**.  Schedules were needed because the Nortel License required that, for any Nortel product to be licensed, it must be evidenced on a schedule, which would identify the Nortel entity, product or project name, and operating system,

---

[6] As noted in the motion to exclude, while SNMP Research cannot locate an executed version of this Temporary License Agreement, Dr. Case has testified that it was signed by the parties, and certain subsequent emails reference that it terminated on November 1, 1999, which is the same date that it terminates by its terms. Extrinsic evidence is allowable to prove the execution of a contract where the signed version cannot be located.  *See, e.g.*, *Circle Line Sightseeing Yachts, Inc. v. Circle Line-Statue of Liberty Ferry, Inc.*, 2003 WL 253094, at *2 (S.D.N.Y. Feb. 4, 2003) (citing *C.I.F. Productions Inc. v. Burlington Coat Factory Warehouse Corp.*, 881 F. Supp. 104, 106 (S.D.N.Y. 1995); *Nicosia v. Muller*, 645 N.Y.S.2d 385, 386 (N.Y. App. Div. 1996) (holding that a party may utilize parol evidence to prove the existence and terms of a written agreement in order to satisfy the requirements of the Statute of Frauds and noting that the parol evidence may "consist of the testimony of others who have first-hand knowledge of the existence of the writing and its terms."); *Lynch v. Savarese*, 629 N.Y.S.2d 805, 806 (N.Y. App. Div. 1995) ("The loss or destruction of a written instrument does not deprive it of effect under the Statute of Frauds.  Therefore, even if no signed copy of the [contract] can be found, the appellants could still prove its existence by extrinsic evidence."); F.R.E. 1004(a).

7

as applicable, as part of this "a la carte" licensing arrangement.  *See* **Hearing Ex. P–30** at ¶¶ 1.17, 2.1(a), (c)).  In fact, the Nortel License contained a template licensing schedule.  *See id.* at pp. 18-19.

17.     It was agreed at that meeting that Nortel would have a temporary three-year right to continue distributing Bay products, but that its license right would terminate thereafter, and only those Bay products that had been separately placed on schedules during that three-year period would be able to continue using SNMP Research Software.  The mechanism for declaring Bay products specifically on separate schedules allowed Nortel to receive the benefit of the Bay RBOs for certain existing products, which benefited Nortel, while prohibiting Nortel from using the broad Bay License on new products which did not exist at Bay Networks.

18.     Shortly after the October 1999 meeting, the Temporary License Agreement expired on November 1, 1999.  Following the expiration of the Temporary License Agreement, the parties continued to negotiate the terms of master agreement which included provisions for the Bay products for which Nortel no longer had any license rights.

19.     Specifically, in follow up to the October 1999 meeting, Mr. Hyslop began preparing a list of Nortel products that needed to be scheduled in order to be licensed.  Mr. Hyslop sent Mr. Southwood a preliminary list of Nortel products on November 3, 1999.  *See* **Hearing Ex. P–36**.  The spreadsheet attached to Mr. Hyslop's email identified 28 Nortel products, the SNMP Research software required by those Nortel products, and the individuals inside Nortel responsible for those products.  *See* **Hearing Ex. P–37**.  Five of these products were identified in column 1 as Bay products.  On November 15, 1999, Mr. Hyslop sent Mr. Southwood an email containing correspondence that Mr. Hyslop intended to send to the individuals inside Nortel who were responsible for the Nortel products on the spreadsheet, and

8

which explained the purpose of the new Nortel License.  *See* **Hearing Ex. P–38**.  In this

correspondence Mr. Hyslop provided this explanation of "Bay" in Column 1:

> Column 1 divides the requirements into "Bay" and "NT" requirements. Those
> identified as "Bay" products are subject to the in place Bay-SNMP RI agreement
> (which has been assigned by Bay to Nortel); i.e. had the Bay-Nortel merger never
> occurred, Bay would have been entitled to deploy these products royalty free.

*Id*.

20.    Mr. Southwood acknowledged this e-mail on November 16, 1999 and responded

with some corrections.  *See See* **Hearing Ex. P–39**.  The only reason Mr. Hyslop would have

identified the Bay products is because he fully understood that, for any Bay product to be

licensed after the contemplated three-year period, and enjoy the RBOs, they would have to be

separately scheduled.  *See* **Hearing Ex. P–30** at ¶¶ 2(a), (c).  The products identified as "NT"

(i.e., the non-Bay Nortel products) also needed to be separately scheduled, but could not qualify

for the Bay License RBOs.  The parties would also have to negotiate a royalty rate for each such

product.

21.    Two days later, by e-mail dated November 18, 1999, Mr. Southwood transmitted

to Mr. Hyslop the first and only draft of Schedule 1A to the Nortel License.  *See* **Hearing Ex. P–**

**40**.  As noted in the Preliminary Statement above, on November 25, 1999, Mr. Hyslop sent an

internal email indicating that Bay products require a separate license: "PS Brian: note that the

Bay buy out is a buy out for royalties only, and Bay must still, ***on a product by product basis***,

get the right to use the Emanate source code." **Hearing Ex. P–42** (emphasis added).  This

confirmed that Nortel understood all Bay products using the Software had to be separately

declared on schedules during the 3-year period of Schedule 1A.

22.    On December 2, 1999, Mr. Hyslop explained the difference between a Nortel

project and a Bay project to the Preside Policy Services group that had based its product on the

Optivity product which had originated at Bay.  Mr. Hyslop stated:

9

Preside is really a "Nortel" project, where "Nortel" means that part of present day Nortel which existed prior to the Sept. 98 merger with Bay, and to that extent the Preside work, even if it borrows or uses software from "Bay's" Optivity projects, is a new licensee project not covered by the previous Bay-SNMP RI license agreement.

23.     Mr. Hyslop went on to explain why the Optivity group would have to license the SNMP Research software also.  "It is true that Bay, under the Bay – SNMP RI agreement has a 'buy-out', but that 'buy-out' is restricted solely to royalties for deployed Optivity products; the buy-out does not cover the SNMP RI products required to develop the Optivity products."  Trial Ex. 43.

**B.     The Parties' entry into the Nortel License, Schedule 1A and Other Relevant Schedules, and their Respective Terms**

24.     Following the above-described negotiations, the parties executed the Nortel License on December 23, 1999.   Under the terms of the Nortel License, schedules such as Schedule 1A were required for rights to be granted under the Nortel License, as the body of the Nortel License itself, absent its schedules, licensed nothing.   In other words, the license grant provisions in paragraph 2.1 of the Nortel License expressly reference schedules as the vehicle by which Nortel would obtain the right to license the Software.  *See id*.   If schedules were in fact executed, a portion of Nortel would have the right to use "Development Software" for development purposes and "Run-Time Software" for distribution purposes as identified in the various Schedule A documents.  *See id*. at ¶¶ 2.1(a), (c).[7]

---

[7] "Development Software" is defined, in relevant part, as "all or any part of any Source Code or Binary Code software product of SNMP, identified in the one or more Schedules A attached hereto and all Updates of any such product, under any name whatsoever."  *Id*. at ¶ 1.6.  "Run-Time Software" is defined as "Binary Code which is developed for a Specified Entity, and which is derived from Development Software and which is integrated with a Nortel Networks product."  *Id*. at ¶ 1.16.  "Source Code" is defined as "software and associated Documentation and materials in a form in which the program logic is readily understandable by a human being."  *Id*. at ¶ 1.18.  "Binary Code" is defined as "the code resulting from the translation or processing of Source Code by a computer into machine language or intermediate code and which is suitable for execution or interpretation by a computer."  *Id*. at ¶ 1.1.  "Specified Entity" means "one or all of the licensed entities specified in the relevant Schedules A attached hereto."  *Id*. at ¶ 1.20.

25.     Specifically, SNMPRI granted internal use rights to the applicable Nortel Specified Entity (listed in the relevant Schedule A) "a non-exclusive, non-transferable, worldwide license for Development Software specified in the relevant Schedule A" for internal research and development.  *Id.* at ¶ 2.1(a).  SNMPRI further granted binary redistribution rights to the applicable Nortel Specified Entity (listed on the relevant Schedule A) a non-exclusive, non-transferable, worldwide license to directly or indirectly sub-license the Run-Time Software (in Binary Code form) to end users.  *Id.* at ¶ 2.1(c).  The Nortel License provides that it supersedes all other agreements between Nortel and SNMP Research.  *See* **Hearing Ex. P–30** at ¶ 9.10.

26.     Mr. Southwood prepared schedules based on the spreadsheet Mr. Hyslop provided.  For all of the products labeled "Bay" in column 1, Mr. Southwood, reasonably relying on Mr. Hyslop's representations, prepared schedules requiring license and maintenance fees but did not charge for royalties.  *See*, *e.g.* **Hearing Ex. P–30**, Schedules 12, 14.  Schedules 12 and 14 were signed on the same date as the Nortel License.  The Royalties section of Schedule 12 states: "[a]s portions of the former Bay Networks, the royalty buy out previously exercised by Bay Networks applies to this transaction."  This is consistent with Mr. Hyslop's understanding that products that originated at Bay needed licenses but received credit for the RBOs as specified in his November 25, 1999 email, so long as the products were eligible for the RBOs and in fact declared on schedules during the three-year period of Schedule 1A.

27.     Schedule 1A was also supposed to be signed contemporaneously with the Nortel License, but there was a delay in gathering the signature page.  On May 15, 2000, Dr. Case wrote to James Reeves of Nortel indicating to Mr. Reeves that Schedule 1A had not been signed.  **Hearing Ex. P–50**.  Dr. Case referred to Schedule 1 as, "the document that grandfathers the bay licenses over to the new Nortel master agreement…."  *Id.*  Dr. Case also reminded Nortel that it

11

was distributing the products without a license until Schedule 1A was signed. *Id.* It was obviously important for SNMP Research to obtain a copy of the signed Schedule 1A, in part because its termination was triggered from the date of full execution.

28. On June 20, 2000, Schedule 1A was fully executed. *See id.*, Schedule 1A. Schedule 1A provided a portion of Nortel with two license rights: (1) the limited right to develop products using the Software (the Development Software rights); and (2) the limited right to distribute Nortel products containing the Software (the Run-Time Software rights). *Id.* at Schedule 1A, p. 1.[8] By its terms, Schedule 1A governed Nortel's use and distribution of the Software in "[a]ll products of units and projects originating from what was Bay Networks." *Id.*[9] For the three-year term of Schedule 1A, Nortel owed whatever royalties it would have owed under the Bay License. *Id.*

29. Nortel's rights in the Bay License were terminated under the Temporary License Agreement and paragraph 9.10 of the Nortel License which were previously executed. That termination was further reiterated in Schedule 1A, which provides that, "[t]his Schedule supersedes all of the prior agreements between SNMP and Bay Networks and its predecessor entities … and all such agreements are hereby terminated by execution of this Schedule." *Id.* at Schedule 1A, p. 2. Thus, there is no reasonable debate that all prior license agreements and rights of Nortel for "Development" purposes and "Run-Time" distribution (including the rights temporarily granted under the Temporary License Agreement and any rights under the prior Bay License) were specifically ended and replaced by Schedule 1A.

---

[8] SNMP Research notes that similar Development Software rights were described in the Bay License as "Internal Use Rights," and that similar Run-Time Software rights were described in the Bay License as "Binary Redistribution Rights." *See* **Hearing Ex. P–20** at ¶¶ 2, 3.

[9] As noted above, what Bay products are covered by Schedule 1A under this language is not within the scope of the Hearing. Moreover, if the Court rules in favor of SNMP Research at the Hearing, then this issue becomes entirely moot for purposes of trial, because no products would be covered by Schedule 1A after June 20, 2003, and SNMP Research is not seeking any damages prior to then.

12

30.     Nortel's rights to develop and distribute the Software under Schedule 1A were also expressly limited to three years. The termination language of Schedule 1A specifically provides that:

> This ***Schedule*** and ***the license*** in regard to the Development Software and Run-Time Software ***shall terminate*** and be of ***no further effect*** after a period of ***three years*** from the last date that this Schedule is executed below.

*Id*. at Schedule 1A, p. 2.  As noted above, Schedule 1A was fully executed on June 20, 2000. *See id*. at Schedule 1A.

31.     Messrs. Hyslop and Southwood continued to work on licenses for products after the Nortel License and its Schedule 1A were signed.  In September of 2000, four months after Schedule 1A was signed, Mr. Hyslop asked Mr. Southwood for a license for an old "Bay" product.  In response, Mr. Southwood prepared Schedule 20 but mistakenly included a charge for royalties.  On September 21, 2000, Mr. Hyslop responded:

> John, I believe you are mistaken in including royalty charges on the attached Schedule 20.  Your [sic] will recall that back in December 1999 the old "Bay" operations/products were "grand fathered" as far as royalty payments were concerned in recognition of a previous "bay buy-out" for those products.  This was documented in Schedule 12 signed back in December 1999.  Therefore, please modify Schedul [sic] 20 to duplicate the wording in Schedul [sic] 12 under the royalties section….

**Hearing Ex. P–51**.  This e-mail confirms that Mr. Hyslop fully understood that all Bay products had to become covered by separate schedules during the three year period to be licensed at the end of that period, even if the license was royalty-free.

### C.     The Parties' Post-Schedule 1A Termination Communications

32.     After Schedule 1A was signed, SNMP Research honored its end of the bargain by allowing Nortel to use the Software on a royalty-free basis through June 20, 2003.  At the time Schedule 1A terminated in 2003, Nortel was a financially troubled company.  Nortel, a company that in 2000 represented the peak of the telecommunications market in Canada, was in an

economic freefall by 2001. In an attempt to weather the rapid decline in profits caused by the slowdown of the United States economy in 2001, Nortel began to lay off tens of thousands of its employees. According to the Nortel Networks Corporation 1999 Annual Report, Nortel had approximately 80,627 employees worldwide at that time.[10] By December 31, 2003 the Nortel Networks Corporation Annual Report stated that Nortel had reduced its workforce to just 35,160 employees worldwide.[11] As a result, Nortel employees were "shuffled into areas [where] they don't know the processes and responsibilities quite yet." **Hearing Ex. P–54**.

33.    By 2003, Mr. Hyslop's responsibilities at Nortel had shifted to Pierre Tremblay. In August 2003, after Schedule 1A had expired, Mr. Tremblay and Mr. Southwood along with Mrs. Martha Hopper (an employee of SNMP Research) began an exercise to understand the status of each schedule in the Nortel License. In explaining why Schedule 12 had an RBO, more than five years before Nortel's bankruptcy filing or any thought of litigation, Mr. Southwood wrote the following:

> By the way Pierre, this is a good time to mention an informal agreement reached by Dave Hyslop and me during license negotiations. In the years before Nortel purchased Bay, Bay was one of SNMPRI's better customers including the exercise of several royalty buy outs. Since we were negotiating with Nortel at about the same time that Nortel purchased Bay, Dave indicated that Nortel wanted some benefit from those previous royalty buy outs. Since those royalty buy outs were not product specific, SNMPRI responded by saying that the lines between the former Bay and the former Nortel were going to blur over time, and the result would be that all of Nortel would get a royalty free license if we extended the benefits into the Nortel license. **The compromise was that the benefits of the Bay royalty arrangement would extend to portions of the former Bay who established schedules over the following three years (2000, 2001, 2002). SNMPRI agreed as long as all schedules would be product specific. Dave was certain to declare whether a particular transaction was associated with Bay or Nortel, and I have a column on the spreadsheet that I use that indicates Dave's comments.** You may find that you also have a copy of that spreadsheet.

**Hearing Ex. P–57** (emphasis added) [Brannick Reply Ex. M].

---

[10] **Hearing Ex. P–72**.
[11] **Hearing Ex. P–73**.

34.     Mr. Southwood could not have been clearer that, even though Schedule 1A did not require SNMP Research to honor the Bay RBOs for any products after the three-year period, SNMP Research informally agreed to do so, on the express condition that the products be separately scheduled during the three-year window.  During this analysis, Mr. Tremblay stated, regarding Schedule 1A, "I still haven't found anything that fits this description but to be honest, I have not looked very hard."  *Id.*  In Mr. Tremblay's deposition, when asked about this statement, he stated: "[a]t that time when I made the comment, I couldn't find any product that somebody in R&D or product line management could confirm was from BayStack and included SNMP Research software."  Deposition Tr. of Pierre Tremblay at 95:10-13.[12]  These facts confirm the parties' understanding that Nortel only had the right to continue distributing the Schedule 1A products after June 20, 2003, if the product was placed on a separate schedule.

35.     While the foregoing post-Schedule 1A communications unequivocally confirmed the parties' initial intentions, and should end the story, the U.S. Debtors improperly misconstrue two post-Schedule 1A communications which require further elucidation.  The first deals with the renewal of the Synoptics SSA after Schedule 1A expired.  The SSA was renewed by the department at SNMP Research that deals with software services, which had no knowledge (nor reason to have knowledge) of Nortel's Schedule 1A or its contents.  The licensing and software service departments at SNMP Research operate independently, and the SSA invoices on which

---

[12] Mr. Tremblay's statement that there were no Baystack products with the Software appears to be consistent with documentation regarding an internal audit at Nortel which SNMP Research uncovered in discovery in this case.  Specifically, in 2002, Mr. Tremblay was involved in an internal audit to determine what third-party software was used in Nortel products.  *Id*. at Ex. O.  As of June 4, 2002, the audit lists 38 products in the Baystack portfolio.  Of those 38 products, 26 were marked as "Legacy Products" or "Manufacturing Discontinued," 5 were new products, and 7 of the products were established.  Seven of the products have a vendor identified for its SNMP implementation.  Four of those products used Epilogue, a competitor to SNMP Research, and three of those products use SNMP Research's implementation.  *See id*.  This audit shows that Nortel discontinued the majority of these products before Mr. Tremblay's 2003 statement that he was unaware of any Software in Bay products.  Accordingly, it appears entirely reasonable that Mr. Tremblay would not have requested schedules for any Bay products, or thought that the Software was in any Bay products that existed in 1999, as the majority of them were being phased out and others had a competitor's SNMP software.

15

the U.S. Debtors rely did not mention Schedule 1A or any Nortel products. SNMP Research routinely shipped software under other SSAs to Nortel, given their extensive licensing relationship on other products and projects.

36.     The second post-Schedule 1A communication the U.S. Debtors attempt to construe in their favor occurred in 2006, when Nortel entered into a partnership with ████ ██████ and wanted to use source code from ████████████ containing the Software. On January 16, 2006, Nana La-Anyane of Nortel asked Mr. Southwood for a letter verifying that Nortel had a license to the Software in the ████████████ product because ████████████ would not agree to allow Nortel to have access to the Software without the letter. **Hearing Ex. P–60**. On January 24, 2006, Mr. Southwood wrote that he could not locate a license corresponding to the █████ product. *Id.* ("I'm stuck at the moment because I'm wanting to locate the Nortel Schedule that you are using for your project.").

37.     On January 25, 2006, Mr. Southwood wrote that since there was no license he had prepared Schedule 71 and asked Nortel to sign it and send a PO to cover the license fees. *Id.* In response, Greg Foster of Nortel wrote Mr. Southwood and asked why a new schedule was needed because he was under the impression from a previous call that the ████████████ product was licensed. *Id.* Mr. Southwood responded that on a previous call he had asked Nortel what schedule/license covered the ██████ product and he was told the "old Bay license." Mr. Southwood looked at the old Bay License and found that it did not license the appropriate SNMP Research products for the ████████████ source code. *Id.* Then Mr. Southwood sent Nortel a letter identifying the Software that Schedule 1A licenses and clearly stated that Nortel needed to sign Schedule 71 to use the source code from ████████████. **Hearing Ex. P–59**.

38.     The purpose of Mr. Southwood's letter was to advise Nortel that it needed to sign a new schedule, Schedule 71, to have a license for the source code from ████████████. Mr.

16

Southwood correctly concluded that the ▮▮▮▮▮▮▮▮ software was unlicensed because it was not covered by Schedule 1A, but mistakenly indicated that Nortel had a license under Schedule 1A when he was explaining that the software was not covered by Schedule 1A. Because the software was not covered by Schedule 1A in the first place, however, whether Schedule 1A had expired was not relevant to the issue being addressed in the letter. In other words, Nortel was not asking in 2006 whether it had a license to Baystack, ES, or ERS, and nothing in the letter refers to Nortel having a license for these products.

## ARGUMENT

39.    The parties appear to agree on the general tenets of contract interpretation and that New York law, which governs the Nortel License and its Schedule 1A, applies. "Under New York law, '[t]he fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent.'" *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004) (citing *Greenfield v. Phillies Records, Inc.,* 98 N.Y.2d 562, 569, 750 N.Y.S.2d 565, 780 N.E.2d 166 (2002); *see also Record Club of Am., Inc. v. United Artists Records, Inc.,* 890 F.2d 1264, 1271 (2d Cir. 1989) (applying New York contract law and stating "[t]he objective of contract interpretation is to give effect to the expressed intentions of the parties.").

40.    Further, a court may not write into a contract conditions the parties did not insert by adding or excising terms under the guise of construction, nor may it construe the language in such a way as would distort the contract's apparent meaning." *Wall St. Sys. Swed. AB v. Hertz Glob. Holdings, Inc.*, No. 14-cv-7819 (KBF), 2015 WL 158887 (S.D.N.Y. Jan. 13, 2015) (citations omitted). Moreover, "[w]ords and phrases used in an agreement must be given their plain meaning.…" *Marathon Asset Mgmt., LP v. Angelo Gordon & Co, LP* (*In re Energy Future Holdings Corp.*), 2017 WL 1170830, at *4 (D. Del. Mar. 28, 2017). "A reading of the

17

contract should not render any portion meaningless." *Beal Sav. Bank v. Sommer,* 8 N.Y.3d 318, 324 (N.Y. 2007) (quotation marks and citations omitted); *see also Barrow v. Lawrence United Corp.,* 538 N.Y.S.2d 363, 365 (N.Y. App. Div. 1989) ("Contracts are also to be interpreted to avoid inconsistencies and to give meaning to all of its terms.").

I.      **Nortel's Rights under Schedule 1A Terminated on June 20, 2003 as to All Products.**

41.    The contract interpretation issue here is whether the termination clause in Schedule 1A terminated Nortel's right to ship Software in products licensed under Schedule 1A as of June 20, 2003.  As noted previously, Black's Law Dictionary defines terminate quite clearly—"1**.** To put an end to; to bring to an end. 2. To end; to conclude."  Black's Law Dictionary (10th ed. 2014).  Courts interpreting the word have found it to have similar meaning. For example, as the Delaware Court of Chancery has once explained, "[t]he word needs no construction. Terminate means terminate—to end." *Jefferson Chem. Co. v. Mobay Chem. Co.*, 267 A.2d 635, 637 (Del. Ch. 1970).  *See also DDS Partners, LLC v. Celenza*, 6 A.D.3d 347, 348 (N.Y. App. Div. 2004) ("The plain and ordinary meaning of the word terminate is 'to bring to an end; put an end to') (*citing The Random House College Dictionary*, Revised Edition [1980]); *Hamden v. Total Car Franchising Corp.*, 548 F. App'x 842, 846 (4th Cir. 2013) (termination means "both the act of ending something and the end of something in time or existence; conclusion or discontinuance.") (internal quotations omitted).  The Court should similarly interpret the word "terminate" here.  Schedule 1A unequivocally states that it terminates "and shall be of no further effect" three years from its execution.

42.    At the hearing on May 2, the U.S. Debtors acknowledged that they are not quibbling over the meaning of "terminate," and that the issue is now *what* terminated on June 20, 2003.  SNMP Research submits that the answer to this question is as simple as the meaning of the word "terminate."  **All** of Nortel's rights under Schedule 1A to use and distribute the

18

Software in **any** product ended when Schedule 1A says it did.  The U.S. Debtors contend that the language of Schedule 1A shows that Nortel's right to use and distribute some Bay products survived the June 20, 2003 termination date.  In support of this position, the U.S. Debtors make two primary arguments.

43.     The first is that, despite agreeing that "terminate" means to end, it only terminated rights to certain products, but not all of them.  The flaw with this argument is that the U.S. Debtors cannot point to any language that provides an exclusion from Schedule 1A's termination date.  The absence of such a carve-out or exclusion should end the inquiry as a matter of law.

44.     In construing a collective bargaining agreement that expired in 2003, the Supreme Court found that the Sixth Circuit erred in its reasoning that the benefits extended beyond expiration of the agreement, in part because the Sixth Circuit failed "to consider the traditional principle that courts should not construe ambiguous writings to create lifetime promises."  *M & G Polymers USA, LLC v. Tackett*, 135 S. Ct. 926, 936 (2015) (holding that Court of Appeals had erred in determining that an employer "had promised to provide lifetime contribution-free health care benefits for them, their surviving spouses, and their dependents" as part of a collective bargaining agreement that expired in 2000) (*citing* 3 A. Corbin, Corbin on Contracts § 553, p. 216 (1960) (explaining that contracts that are silent as to their duration will ordinarily be treated not as "operative in perpetuity" but as "operative for a reasonable time" (internal quotation marks omitted)).  In analyzing the contract at issue, the Supreme Court found that, "when a contract is silent as to the duration of retiree benefits, a court may not infer that the parties intended those benefits to vest for life."  *Id*. at 937.

45.     Similarly, the New York state court in *Bajan Grp., Inc. v. Consumers Interstate Corp.*, 2010 WL 3341456, at *7 (N.Y. Sup. Ct. Aug. 12, 2010), held that an anti-competition

clause did not survive termination because there was no express provision stating that the clause

survived.  Specifically, the court held that:

> There is nothing in the plain language of the parties' Agreement that obliges Bajan to refrain from competition following the termination of the Agreement or otherwise manifests a mutual intention to take this covenant **outside of the general rule that contractual obligations do not survive the termination of the agreement in which they are contained.**  Indeed, **in the one instance** where the parties intended to impose obligations that would survive the termination of the Agreement, **they said so expressly**.

*Id.* at *8 (emphasis added).

46.    In the present case, not only is there no survival clause in Schedule 1A excepting

any Bay products from the termination date, the Nortel License itself in fact contains a survival

clause.  **Hearing Ex. P–30** at ¶¶ 6.6.   That clause provides that "the following provisions shall

survive termination of this Agreement: Definitions, Title and Protection, Confidentiality, Fees

and Payments, and Limitation of Liability."  *Id.*  The clause does not mention the continuation of

any license rights for any Bay products under Schedule 1A after June 20, 2003.  Like the case

law described above, the absence of any provision expressly stating that the right to use or

distribution the Software in any specific Bay products requires the Court to hold that the right to

do so terminated as to all such products on June 20, 2003.

47.    The U.S. Debtors' second contract construction argument fairs no better.  That

argument is that the Bay License RBO is "incorporated" into Schedule 1A and that such

incorporation granted Nortel a perpetual license to use and distribute products after Schedule

1A's June 20, 2003 termination date.  This argument has several fatal flaws.

48.    *First*, Schedule 1A expressly says that it supersedes the Bay License and that the

Bay License is terminated upon its execution.  It is also just as clear that all rights under

Schedule 1A and "the license" to use and distribute the Development Software and Run-Time

Software granted in Schedule 1A terminated on June 20, 2003, three years after it was executed.

There is simply no right to use or distribute the Software under Schedule 1A after June 20, 2003 as to *any* products, whether originally covered by Schedule 1A, neither royalty free nor royalty bearing.

49.    *Second*, the Bay RBOs were not "incorporated" into Schedule 1A as Nortel says. Indeed, Schedule 1A does not even use the word "incorporate" as the U.S. Debtors suggest, but instead says that the royalties are "as described" in the Bay License.  This is not the same as incorporation by reference.  "'New York law prohibits the incorporation of extrinsic writings into an agreement unless those writings are specifically incorporated by reference.'"  *Zucker v. Waldmann*, 2015 WL 390192, at *5 (N.Y. Sup. Ct. Jan. 23, 2015) (quoting *ESPN, Inc. v. Office of the Comm'r of Baseball*, 76 F.Supp.2d 383, 404 (S.D.N.Y. 1999) (citing *PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1201 (2d Cir. 1996)).  "'***[T]he mere fact that a contract refers to another contract does not mean that it has 'incorporated' the other contract***.'"  *Id.* (emphasis supplied; quoting *MBIA Insurance Corp. v. Patriarch Partners III, LLC*, 842 F.Supp.2d 682, 706 (S.D.N.Y. 2012) (quoting *Rosen v. Mega Bloks Inc.*, 2007 WL 1958968, at *10 (S.D.N.Y. Jul. 6, 2007)).

50.    "Under New York law, two essential elements must be satisfied before a document will be deemed to have been incorporated by reference into another instrument or agreement. First, the agreement must specifically reference and sufficiently describe the documents to be incorporated such that they may be identified beyond all reasonable doubt. Second, 'it must be clear that the parties to the agreement had knowledge of and assented to the incorporated terms.'"  *Id.* (citing and quoting *Ryan, Beck & Co., LLC v. Fakih*, 268 F.Supp.2d 210, 223 (E.D.N.Y. 2003)); *see also Intesa Sanpaolo, S.p.A. v. Credit Agricole Corp. and Inv. Bank,* 2013 WL 4856199, at *3 (S.D.N.Y. Sep. 10, 2013) ("[W]hile express identification of a document is a necessary condition for incorporation of that document, it is not a sufficient one.

21

In addition to language explicitly identifying the referenced document, there must also be language that 'clearly communicate[s] that the purpose of the reference is to incorporate the referenced material into the contract[,] *rather than merely to acknowledge that the referenced material is relevant to the contract, e.g., as background law*....'" emphasis supplied; quoting *Northrop Grumman Info. Tech., Inc. v. United States*, 535 F.3d 1339, 1345 (Fed.Cir.2008)); *Nat'l Union Fire Ins. Co. of Pittsburgh v. Beelman Truck Co.*, 203 F.Supp.3d 312, 322 (S.D.N.Y. 2016) (quoting *Intesa*); *Torres v. Major Auto. Grp.*, 2014 WL 4802985, at *8 (E.D.N.Y. Sep. 25, 2014) (citing *Intesa* and quoting MBIA Ins. Corp., 842 F.Supp.2d at 706).

51.     *Third*, even if the Bay RBOs were somehow incorporated into the royalty payment section of Schedule 1A, the RBOs themselves did not confer any license rights to Nortel.  Rather, the Bay License described the RBO applicable to the products at issue here as a "fully paid up royalty fee of $100,000."  **Hearing Ex. P–20** at ¶ 24, Attachment C.  The use and distribution grants were found in completely different parts of the Bay License, separate from the Royalties section referenced in Schedule 1A.  *See id.* at ¶¶ 2-3 (Bay License grants).

52.     At oral argument on May 2, the U.S. Debtors referred to language in the "Paid Up Royalty Option" section of Amendment 2 to the Bay License which says that, if the royalty for a licensed module referred to as "Asynchronous Request Library for Solaris, HPUX, AIX, and Windows NT ("ARL"), then Bay "may distribute in perpetuity an unlimited number of binary copies…."  *Id.* at Am. 2, ¶ 3(b).  This language is also of no help to the U.S. Debtors, as the ARL module has nothing to do with the products at issue in this case.  In addition, Schedule 1A only references the Royalties portions of the Bay License, not any license grants.  A royalty-free rate, absent a right to use the Software itself, gives Nortel nothing.  Accordingly, to the extent the U.S. Debtors are attempting to argue that any license rights themselves were incorporated into Schedule 1A, as opposed to the amount of royalties themselves, they are wrong.

22

53.     Moreover, even if Nortel could construct a reasonable argument that right to use and distribute the Software in perpetuity from the Bay License amendment was "incorporated" into Schedule 1A, it does not matter, because any such rights were qualified by other language of Schedule 1A making it clear that such rights terminated in three years.   In other words, regardless of whether Nortel's right to use the Software in the covered Bay products originated from an "incorporation" of the Bay License rights or an independent right created by Schedule 1A, those rights to use the Software and redistribute products containing the Software terminated on June 20, 2003.

54.     Accordingly, the plain text of Schedule 1A supports SNMP Research's interpretation that all rights under Schedule 1A terminated.   The rights under the Bay License terminated when Schedule 1A was executed, and Nortel's license rights to all products covered by Schedule 1A terminated in June 20, 2003.   Nothing in the Bay License or Schedule 1A supports Nortel's view that Nortel's right to use and distribute the Software in some products, but not others, was carved-out of Schedule 1A's unequivocal termination date.

II.     **Communications Leading to and Immediately Following Schedule 1A's Execution Confirm Schedule 1A's June 20, 2003 End Date.**

55.     In addition to the plain text of Schedule 1A, after considering the communications leading to Schedule 1A and those that immediately followed, there is no doubt that the parties understood that Schedule 1A's license rights as to all products would end in three years and that Nortel would need to obtain separate licenses for all Bay products covered by Schedule 1A.   If qualifying products originated with Bay, Nortel could take advantage of the Bay royalty buyouts for those products, so long as it obtained separate schedules and paid the appropriate fees other than royalties.   For any new Nortel products not covered by Schedule 1A, Nortel would be required, at the time a license was needed, to request such a license from SNMP Research and pay appropriate fees including royalties for such products on their own accord.

23

56.     When negotiations started in 1999, Nortel had admittedly been infringing by using the Software as if it were the licensee for a year after Bay was acquired by Nortel as part of the Bay reverse triangular merger acquisition.  Mr. Hyslop was honest about Nortel's improper use at the time, because he apparently believed that SNMP Research would ratify Nortel's prior infringement by executing the initially proposed Memorandum of Understanding.[13]   Over the next several months, the parties engaged in discussions to give Nortel some benefit from the Bay royalty buyouts, while ensuring that SNMP Research would be able to make money from new Nortel products.  Mr. Southwood was clear that SNMP Research's goal was to ensure that Nortel and Bay products did not "blur" over time, which is the very reason why Schedule 1A limited the license rights to three years.

57.     During that three-year window, Nortel was permitted to and required to request from SNMP Research that qualifying Bay products be placed on separate schedules.  To determine what products could qualify for a stand-alone separate schedule and obtain the benefit of the buyout beyond the three years in Schedule 1A, Mr. Hyslop prepared a spreadsheet before

---

[13] As discussed at oral argument on May 2 and in the motion to exclude, the Bay License was non-transferable and the Bay acquisition was an improper transfer of the Bay License as a matter of law.  Nortel's acquisition of Bay was a reverse triangular merger.  *See* **Hearing Ex. P–71**.  *Schedule 14A Definite Proxy Statement Filed By Bay Networks, Inc. with Securities and Exchange Commission*, p. 4 (Filed as of July 27, 1998).  As such, the transaction constituted an improper transfer of the non-transferable Bay License as a matter of California law, which applies to the Bay License.  *See Netbula, LLC v. BindView Dev. Corp.*, 516 F. Supp. 2d 1137, 1150 (N.D. Cal. 2007) ("The crucial inquiry is whether the law governing the [] license agreement would consider the [] reverse triangular mergers to constitute a transfer or assignment of [the licensee's] assets or license rights."); *SQL Sols., Inc. v. Oracle Corp.*, 1991 WL 626458, at *3 (N.D. Cal. Dec. 18, 1991) ("California courts have consistently recognized that an assignment or transfer of rights *does* occur through a change in the legal form of ownership of a business" and therefore held that "a transfer of rights under the [a]greement *did* occur" in a reverse triangle merger); *Trubowitch v. Riverbank Canning Co.*, 30 Cal. 2d 335, 344–45 (Cal. 1947) ("[I]f an assignment results merely from a change in the legal form of ownership of a business, its validity depends upon whether it effects [sic] the interests of the parties protected by the nonassignability of the contract.").  At the May 2 hearing, the U.S. Debtors argued that the *Netbula* case, which is directly on point, should be disregarded, simply because it was not reported in a Federal Reporter, much like many District Court decisions cited by both sides in this long-standing dispute.  In addition to case law, however, California statutory law confirms that a reverse triangular merger is the type of transaction that results in a change in control and thus an improper transfer of the non-transferable Bay License.  *See* Cal. Corp. Code § 1107 ("Examples of mergers **that do not result in a change of ownership** are mergers between any of the following: (1) a corporation and its wholly owned subsidiary; (2) a corporation and the wholly owned subsidiary of that corporation's wholly owned subsidiary; or (3) two wholly owned subsidiaries of the same parent corporation.") (emphasis added).

24

the Nortel License was negotiated, detailing all of the products that existed at Bay and the other non-Bay Nortel products.  *See* **Hearing Ex. P–37 and P–45**.  The purpose of that spreadsheet was clear: to determine what Bay products existed at the time for the purpose of placing them on permanent schedules.

58.     If Nortel did not believe that separate schedules for qualifying Bay products were needed to be licensed after the three-year period under Schedule 1A, there would have been no need to prepare a spreadsheet before Schedule 1A was executed to identify those products and follow up with executed schedules for such products.  There is simply no other reasonable way to interpret the parties' communications.  At the May 2nd hearing the U.S. Debtors argued that products identified as "Bay" by Mr. Hyslop were not actually Bay products, but this is not how Mr. Hyslop describes products identified as Bay in the spreadsheet.  Mr. Hyslop describes "Bay" products as "subject to the in-place Bay-SNMP RI agreement (which has been assigned by Bay to Nortel); i.e. had the Bay-Nortel merger never occurred, Bay would have been entitled to deploy those products royalty free. **Hearing Ex. P–38**.  The U.S. Debtors' argument is clearly litigation inspired, because they cannot point to any statements by the parties that support their argument.

59.     In fact, Nortel ignores clear communications to the contrary such as Mr. Hyslop's explanation to the Preside group that even if the Preside project "borrows or uses software from 'Bay's' Optivity projects, is a new licensee project not covered by the previous Bay-SNMP RI license agreement."  Nortel understood that Schedule 1A had a limited shelf-life, and that existing covered Bay products needed to be separately scheduled in accordance with the license grant provisions of the Nortel License to be licensed beyond the three-year period.  It is also clear that Nortel understood at the time Schedule 1A was executed that any other products not covered by Schedule 1A would have to be separately scheduled and paid for after negotiation

25

with SNMP Research.  As Mr. Tollen will make clear at the Hearing, if necessary, nothing Dr. Razgaitis says about so-called "custom and practice" can negate the parties' clear intentions regarding their agreed licensing relationship.

### III.    No Implied License Was Created Beyond Schedule 1A's Stated Termination Date.

60.    In opposing the motion to exclude, the U.S. Debtors introduce a new argument that, even if Schedule 1A terminates when it says it did in June 20, 2003, post-termination conduct gives rise to an implied license to use the Software beyond Schedule 1A's stated term.

61.    Under New York law, "the parties' conduct after the expiration of [a] written contract, including [one party's] continued rendition of services, [the other's] acceptance of those services and . . . payment . . . in accordance with the terms of the written contract" can establish "a contract implied in fact with substantially the same terms and conditions as embodied in the expired written contract." *Watts v. Columbia Artists Mgmt. Inc.*, 188 A.D.2d 799, 591 N.Y.S.2d 234, 236 (N.Y. App. Div. 1992); *see also Martin v. Campanaro*, 156 F.2d 127, 129 (2d Cir. 1946).

62.    Nevertheless, "if the circumstances create an inference that the parties did not intend to continue their relationship on the same terms, then no new contract will be implied." *Andrews v. Sotheby Int'l Realty, Inc.*, 2014 WL 626968, at *8 (S.D.N.Y. Feb. 18, 2014), *aff'd,* 586 F. App'x 76 (2d Cir. 2014) (*quoting Millenium Expressions, Inc. v. Chauss Mktg., Ltd.*, 2007 WL 950070, at *6 (S.D.N.Y. Mar. 30, 2007)).

63.    An implied contract, though not in writing, "still requires such elements as consideration [and] mutual assent."[14]  *Maas v. Cornell Univ.,* 94 N.Y.2d 87, 93-94, 721 N.E.2d 966, 699 N.Y.S.2d 716 (N.Y. 1999) (*citing* 1 Williston, Contracts § 1:5, at 22).  "[T]he existence

---

[14] Mutual assent "must be inferred from the facts and circumstances of each case, including such factors as the specific conduct of the parties, industry custom, and course of dealing." *Tang v. Jinro Am., Inc.*, No. CV-03-6477CPS CLP, 2008 WL 4163183, at *4 (E.D.N.Y. Sept. 4, 2008) (*citing Nadel v. Play-By-Play Toys & Novelties, Inc.,* 208 F.3d 368, 376 n.5 (2d Cir. 2000)).

of such an implied contract will ordinarily be a question of fact, as it involves an assessment of the parties' conduct and the extent to which such conduct demonstrates a meeting of the minds." *Monahan v. Lewis*, 51 A.D.3d 1308, 1309-10, 858 N.Y.S.2d 812, 814 (N.Y. App. Div. 2008) (*citing Town of Webster v Village of Webster,* 280 A.D.2d 931, 934 (N.Y. App. Div. 2001)).  "In determining whether there is an implied contract, courts must follow an "'objective' test, i.e., whether a reasonable man would think the parties intended to make such a new binding agreement [and] whether they acted as if they so intended."  *Tang v. Jinro Am., Inc.*, 2008 WL 4163183, at *4 (E.D.N.Y. Sep. 4, 2008) (*citing Martin,* 156 F.2d at 129-30).

64.    Regardless, "[w]hen a contract is terminated . . . , the rights and obligations thereunder cease."  *Wall St. Sys. Sweden AB v. Hertz Glob. Holdings, Inc.*, No. 14-CV-7819 KBF, 2015 WL 158887, at *2 (S.D.N.Y. Jan. 13, 2015).  "The fact that the parties continue to deal under some sort of informal arrangement does not, without more, mean that all the terms of the expired formal contract continue to apply."  *Id.* (citation omitted).

65.    Even when parties continue to perform post-expiration, "unless an intent to make such a new contract is expressed or may be fairly inferred from the conduct of the parties, the obligations of the parties are as a matter of law not measured by the terms of the contract which has expired."  *Local Union 813, Int'l Bhd. of Teamsters v. Waste Mgmt. of N.Y., LLC*, 469 F. Supp. 2d 80, 85-86 (E.D.N.Y. 2007) (*citing N.Y. Tel. Co. v. Jamestown Tel. Corp.*, 282 N.Y. 365, 371 (N.Y. 1940)).

66.    In the present case, the facts are clear that no implied contract was created.  Less than two months after Schedule 1A terminated, Mr. Southwood detailed the purpose of Schedule 1A to Mr. Tremblay, explaining to him Schedule 1A's three-year time frame and the need for Nortel to acquire separate schedules thereafter for any products covered by Schedule 1A. **<u>Hearing Ex. P–57</u>**.  This August 2003 communication put Nortel on notice that Schedule 1A

27

had expired, and that Nortel was required to obtain schedules for any products that might then contain the Software.  In that same communication, Mr. Tremblay advised Mr. Southwood that he did not believe any such products existed.  *Id*.  Therefore, SNMP Research reasonably accepted Nortel's representation and could safely conclude that any products previously licensed under Schedule 1A were either using competitors' software, were no longer being distributed, or were licensed under a separate Schedule, and did not press the matter further.  SNMP Research did not discover otherwise until after Nortel sold its assets to Avaya Inc. in this bankruptcy case years later.  Nortel's failure to advise SNMP Research of the existence of its Software in products does not appear to have been a mistake.  As discussed above in the facts section in more detail, at the time Schedule 1A terminated, Nortel was a financially troubled company that was reducing in size, with significant cash flow problems.  Advising SNMP Research that the Software was contained in products and paying additional fees was apparently not at the top of Nortel's list of problems.

67.     The U.S. Debtors ignore the above critical evidence directly relating to the Schedule 1A license and attempt to twist two ancillary communications to favor their implied license position.  Nortel first contends that the SSA renewals after June 20, 2003 created an implied license.  While it is true that the SSA should not have been renewed, this mistake by SNMP Research's software services department, which operates separately from SNMP Research's licensing department, cannot create an implied license to use the Software.  This is especially true when it does not appear that Nortel even used the Software it received under the SSA after Schedule 1A terminated.  Indeed, as discussed above, in August 2003 (a year after Nortel conducted an audit for the existence of third-party software in its products), Nortel told SNMP Research it was not aware of any existing Baystack products that still used the Software.  The mistaken shipment of Software under an SSA that appears not to have even been used in the

28

subject products after 2003 does not create a new license.  The renewals did not even mention Schedule 1A or any particular product.

68.      Moreover, the mistake in Mr. Southwood's 2006 letter regarding the ████ issue, three years after he correctly put Nortel on notice that Schedule 1A had expired and that separate schedules were needed for any products, also similarly fails to give rise to an implied license.  In sum, SNMP Research's express notice to Nortel about the expiration of Schedule 1A in August 2003 makes clear that SNMP Research did not consent to use of its Software under the terms of Schedule 1A, and the two ancillary communications identified by Nortel to rebut that clear notice do not change the result.

## IV.    The Schedule 1A Agreement Was More than Fair to Nortel.

69.      The U.S. Debtors argue, primarily through Dr. Razgaitis, that SNMP Research's interpretation of Schedule 1A "would lead to a drastic and untenable consequence: it would cause existing products and projects covered by Schedule 1[A] to be stripped of their right to use the SNMP Research software at the three-year mark, such that they would be purportedly infringing from that point onward."  Opposition to Motion to Exclude [D.I. 18141; Adv. D.I. 547] at ¶ 25.  In other words, the U.S. Debtors want to have this Court believe that no reasonable company in Nortel's position would have agreed to a license that would terminate without a mechanism for renewal or future use after it terminated, because the products would have the Software embedded in them.

70.      The U.S. Debtors' call for equity, however, is belied by the facts.   Absent Schedule 1A, or another, different schedule, and for a brief period the Temporary License Agreement which had expired on November 1, 1999, Nortel had no right to use or distribute the Software.  Accordingly, at the time of Schedule 1A, there was no right to use or distribute the Software.  Nortel was already infringing at that time and had been since the Bay acquisition, with

the exception of the limited period of the Temporary License Agreement.  Schedule 1A gave an additional three years from execution (in reality, three and a half years, a total of nearly five years) for Nortel to make other arrangements.

71.    Moreover, there was a clear mechanism for Nortel to obtain a license for products **before** Schedule 1A terminated.  Indeed, Nortel exercised those rights four times when it asked for and received royalty-free schedules related to the Bay License for products that were covered by Schedule 1A.  For new Nortel products not covered by Schedule 1A, if Nortel had asked for licenses as they should have, SNMP Research would have granted them at SNMP Research's standard prices.

72.    What the U.S. Debtors are really suggesting, without directly saying, is that SNMP Research's interpretation would have resulted in a "hold up" by SNMP Research at the end of the three-year period of Schedule 1A, because the Software would have already been embedded in the products, which would have forced Nortel to pay whatever SNMP Research was asking or commit infringement.  Nortel's suggestion that Nortel's entry into Schedule 1A would have resulted in a "hold up" by SNMP Research at the end of three years is simply baseless.  There is nothing in the record indicating that SNMP Research ever tried to charge Nortel more than its standard pricing for anything.  Moreover, if SNMP Research was in the business of holding up companies, it would have done so in 1999 when it was already infringing by using the Software in Bay products as if Nortel were the licensee, as Mr. Hyslop admitted when requesting that the Bay License transfer without restriction.  SNMP Research did not "hold up" Nortel in 1999, would not have done so in 2003 even if it could have, and has never done so in its history with any customer.

73.    The truth is that, had Nortel done the right thing in 2003 and told SNMP Research that its Software was being used in unlicensed products—rather than denying that the Software

30

was in the products—SNMP Research likely would have offered a reasonable license based on its standard per copy royalty for unit sales. But because Nortel told SNMP Research in August 2003 that its Software was not being used in any Baystack products, the U.S. Debtors are left to engage in wild speculation about what might have happened or what would have happened had Nortel done the right thing at the time. The Court should reject these calls for equity. The deal as negotiated was more than fair to Nortel, and had Nortel properly disclosed the existence of the Software in its products as it should have when Schedule 1A expired, the parties would have negotiated a fair license. Nothing Dr. Razgaitis may attempt to say about "custom and practice" changes these undisputable facts.

## CONCLUSION

74.    After considering the evidence at trial on the Schedule 1 Issue, the Court should rule that Schedule 1A terminated as to all products on June 20, 2003. Nortel had no rights under the Bay License after November 1, 1999 when the Temporary License Agreement expired, and both the Nortel License and Schedule 1A reiterated that the Bay License was no longer effective to confer any rights to Nortel. As such, any rights Nortel had regarding Bay products were limited to Schedule 1A and the Nortel License itself. Schedule 1A is clear that all of Nortel's rights under Schedule 1A terminated on June 20, 2003, and there is nothing in the language of Schedule 1A or the underlying Nortel License that excludes any products from that termination date. If Nortel had intended to exclude any products from the termination date, it would have been required to carve-out such rights expressly in Schedule 1A. The Court cannot infer post-termination rights or obligations unless such rights are expressly identified through an effective survival provision. Not only is a carve-out absence in Schedule 1A, the carve-out in the Nortel License expressly preserves certain rights after termination, but fails to mention anything about

31

Schedule 1A or Bay products. Moreover, the Nortel License makes clear that schedules were required for Nortel to have a license to any products.

75.     When soliciting others at Nortel to use the Software in November 1999, Mr. Hyslop made clear that he understood that separate schedules were necessary to license any Bay products. Moreover, upon execution of the Nortel License, the parties entered into multiple schedules referring to the Bay license RBOs, leaving no doubt that Nortel understood the need to obtain a separate schedule for each Bay product to be licensed under the Nortel License. The evidence surrounding the parties' negotiations of Schedule 1A can lead to no other logical conclusion that the parties understood that Nortel rights under Schedule 1A would terminate in three years.

76.     There is also insufficient evidence to infer an implied license after Schedule 1A's termination date. Indeed, immediately following Schedule 1A's termination, Nortel advised SNMP Research (after conducting its own internal audit) that the Software was not in any Baystack products. As such, SNMP Research had no reason to believe that Nortel was using the Software in the Baystack products any longer. The renewal of the SSA by a separate SNMP Research department which had no knowledge of Schedule 1A (or reason to know anything about it), is simply not sufficient to infer an implied license, especially considering that the Software shipped after termination does not even appear to have been used in the products. Lastly, Mr. Southwood's 2006 letter was addressing the need for Nortel to obtain a license. It was not made in response to any inquiry by Nortel about Schedule 1A or its coverage. For these reasons, the U.S. Debtors' alternative implied license argument must likewise fail.

May 4, 2017

| | |
|---|---|
| **OF COUNSEL** | **COLE SCHOTZ P.C.** |
| | */s/ Nicholas J. Brannick* |
| Richard S. Busch, Esq. | Norman L. Pernick (No. 2290) |
| **King & Ballow Law Offices** | Nicholas J. Brannick (No. 5721) |
| 315 Union Street, Suite 1100 | 500 Delaware Avenue, Suite 1410 |
| Nashville, TN 37201 | Wilmington, DE 19801 |
| (615) 259-3456 (Phone) | (302) 651-2002 (Phone) |
| (615) 726-5417 (Fax) | (302) 652-3117 (Fax) |
| rbusch@kingballow.com | npernick@coleschotz.com |
| | nbrannick@coleschotz.com |
| -and- | |
| | -and- |
| John L. Wood, Esq. | |
| **Egerton, McAfee, Armistead &** | G. David Dean, Esq. |
| **Davis, P.C.** | 300 E. Lombard Street, Suite 1450 |
| 900 S. Gay Street | Baltimore, MD 21202 |
| Knoxville, TN 37902 | (410) 230-0660 (Phone) |
| (865) 546-0500 (Phone) | (410) 230-0667 (Fax) |
| (865) 525-5293 (Fax) | ddean@coleschotz.com |
| jwood@emlaw.com | |
| | *Counsel for SNMP Research, Inc. and SNMP* |
| | *Research International, Inc.* |